Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 3:20-CV-05640-EMC<br><br>**EPIC GAMES, INC.'S NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  August 17, 2020<br><br>Courtroom:  5, 17th Floor<br><br>Judge:  Hon. Edward M. Chen |

1

## NOTICE OF MOTION AND MOTION

2

### TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE THAT on August 17, 2020, as soon thereafter as the matter

4  may be heard, in the United States District Court for the Northern District of California, before

5  the Honorable Edward M. Chen, Plaintiff Epic Games, Inc. ("Epic") will and hereby does move

6  this Court pursuant to Federal Rule of Civil Procedure 65 for a Temporary Restraining Order and

7  an Order to Show Cause Why a Preliminary Injunction Should Not Issue (1) restraining

8  Defendant Apple Inc. ("Apple") from removing, de-listing, refusing to list or otherwise making

9  unavailable the app *Fortnite*, including any update thereof, from the App Store on the basis that

10  *Fortnite* offers in-app payment processing through means other than Apple's In-App Purchase

11  ("IAP") or on any pretextual basis; (2) restraining Apple from removing, disabling or modifying

12  *Fortnite* or any code, script, feature, setting, version or update thereof from any iOS user's

13  device; and (3) restraining Apple from taking any adverse action against Epic, including but not

14  limited to restricting, suspending, or terminating any Epic entity from Apple's

15  Developer Program, on the basis that Epic enabled in-app payment processing in *Fortnite*

16  through means other than IAP or on the basis of the steps Epic took to do so.

17      This motion is made on the grounds that (1) absent a temporary restraining order granted

18  without further notice, Epic is likely to suffer irreparable harm; (2) that Epic is likely to succeed

19  on the merits of its claims that Apple's conduct violates the Sherman Act; (3) that the balance of

20  equities tips sharply in Epic's favor; and (4) that the public interest supports an injunction.

21      This motion is based upon the Complaint in this action, this Notice of Motion, the

22  Memorandum of Points and Authorities filed herewith, the Proposed Temporary Restraining

23  Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, the Declaration

24  of Timothy Sweeney filed herewith along with its accompanying exhibits, the Declaration of

25  Paul Riehle filed herewith along with its accompanying exhibits, the Declaration of

26  Nicholas Penwarden filed herewith, the Declaration of Andrew Grant filed herewith along with

27

28

EPIC'S NOTICE OF MOTION AND              i              CASE NO. 3:20-cv-05640-EMC
MOTION FOR TRO AND ORDER TO
SHOW CAUSE

1   its accompanying exhibit, all matters with respect to which this Court may take judicial notice

2   and such oral and documentary evidence as may be presented to the Court.

3           The undersigned counsel for the plaintiff will notify Apple and its counsel of the

4   plaintiff's intention to bring this Motion before this Court shortly after filing.

5           Plaintiff hereby requests, pursuant to FRCP 65 and Civil Local Rules 7-10 and 65-1, that

6   the Court issue a temporary restraining order and an order to show cause why a preliminary

7   injunction should not issue.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ..................................................................................................4

    A.    Apple. ............................................................................................................6

    B.    The iOS App Distribution Market. ...............................................................6

    C.    The iOS In-App Payment Processing Market. ..............................................7

    D.    Epic's Challenge to Apple's Monopolistic Conduct. ...................................8

    E.    Apple's Retaliation .......................................................................................9

ARGUMENT .........................................................................................................................11

I.    EPIC WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION. .........................................................................................................12

II.    EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS ANTITRUST CLAIMS. ..........................................................................................14

    A.    Apple's Tying of the App Store and IAP Per Se Violates Section 1 of the Sherman Act. ............................................................................................14

    B.    Apple's Conduct Is an Unreasonable Restraint of Trade Under the Rule of Reason. ....................................................................................................19

    C.    Apple's Conduct Violates the Rule of Reason and Unlawfully Maintains its Monopoly in the Market for iOS In-App Payment Processing. ...........................21

    D.    Apple's Refusal to Let Epic Access iOS Is Denial of an Essential Facility. .........22

III.    THE BALANCE OF HARDSHIPS TIPS SHARPLY IN EPIC'S FAVOR. ....................23

IV.    THE PUBLIC INTEREST SUPPORTS A PRELIMINARY INJUNCTION. ..................24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ................................................. 18

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................. 12

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    No. 17CV205-MMA (MDD), 2018 WL 3032552 (S.D. Cal. June 19, 2018) .......................... 18

*Bernhardt v. Los Angeles Cty.*,
    339 F.3d 920 (9th Cir. 2003) ................................................. 24

*Boardman v. Pac. Seafood Grp.*,
    822 F.3d 1011 (9th Cir. 2016) ................................................. 25

*Brown Shoe v. United States*,
    370 U.S. 294 (1962) ................................................. 15

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ................................................. 14

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) ................................................. 22

*CollegeNet, Inc. v. Common Application, Inc.*,
    355 F. Supp. 3d 926 (D. Or. 2018) ................................................. 17, 20

*Datagate, Inc. v. Hewlett-Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995) ................................................. 19

*Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*,
    No. CV 14-2307 RSWL (FFMx), 2014 WL 4679001 (C.D. Cal. Sept. 18, 2014) ................................................. 24

*Go Daddy Operating Co. v. Ghaznavi*,
    No. 17-CV-06545-PJH, 2018 WL 1091257 (N.D. Cal. Feb. 28, 2018) ................................................. 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ................................................. 11, 12, 24

*Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*,
    No. 8:18-CV-00469-JLS-DFM, 2018 WL 3816745 (C.D. Cal. July 24, 2018) ................................................. 13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998) ................................................. 18, 21

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
    601 F. App'x 469 (9th Cir. 2015) ............................................................. 13

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ................................................................ 22

*Mitchell v. 3PL Sys., Inc.*,
    No. SACV11-0534 AG (ANX), 2013 WL 12129617 (C.D. Cal. Apr. 8, 2013) ..................... 14

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................ 14, 15

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ................................................................... 20, 21

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ............................................................... 20

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ............................................................... 22

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    No. SACV 12-2102-JLS, 2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) .......................... 19

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................ 18

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ............................................................ 16, 17

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*,
    732 F.2d 1403 (9th Cir. 1984) ............................................................... 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ................................................................ 12

*Tawfilis v. Allergan, Inc.*,
    157 F. Supp. 3d 853 (C.D. Cal. 2015) ........................................................ 22

*Teradata Corp. v. SAP SE*,
    No. 18-CV-03670-WHO, 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ......................... 16, 17

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 11

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ................................................................. 20

**Statutes & Rules**

Sherman Act Section 1.................................................................................................passim

Sherman Act Section 2................................................................................. 14, 20, 21, 22

**Other Authorities**

Big Tech Antitrust Hearing Full Transcript, Rev (July 29, 2020),
    https://www.rev.com/blog/transcripts/big-tech-antitrust-hearing-full-transcript-
    july-29 .................................................................................................................... 1

European Commission Decision at ¶¶ 284, 306, Case AT.40099, Google Android
    (Jul. 18, 2018),
    https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_
    3.pdf .................................................................................................................... 15

FCC (accessed Aug. 17, 2020),
    https://www.fcc.gov/general/lifeline-program-low-income-consumers................................. 22

Grubhub (accessed Aug. 16, 2020),
    https://bit.ly/30o5WJu.............................................................................................. 17

Nick Statt, *Apple Just Kicked Fortnite Off the App Store*, The Verge (Aug. 13,
    2020), https://bit.ly/3gW44NU ............................................................................... 9, 24

Uber (accessed Aug. 16, 2020),
    https://ubr.to/3iNk45G ............................................................................................ 17

**PRELIMINARY STATEMENT**

Just over two weeks ago, Apple's CEO Tim Cook was asked during a Congressional hearing whether Apple has "ever retaliated against or disadvantaged a developer who went public about their frustrations with the App Store".  Mr. Cook testified, "We do not retaliate or bully people.  It's strongly against our company culture."[1]  But Apple has done just that.  When Epic gave users of its app *Fortnite* a choice of how they wanted to make purchases, Apple retaliated by removing *Fortnite* from its App Store.  Then when Epic sued Apple to break its monopoly on app stores and in-app payments, Apple retaliated ferociously.  It told Epic that by August 28, Apple will cut off Epic's access to all development tools necessary to create software for Apple's platforms—including for the *Unreal Engine* Epic offers to third-party developers, which Apple has never claimed violated *any* Apple policy.  Not content simply to remove *Fortnite* from the App Store, Apple is attacking Epic's entire business in unrelated areas.  Epic is likely to succeed on the merits of its claims, but without an injunction, Epic will be irreparably harmed long before final judgment comes.  Technology markets move swiftly.  Left unchecked, Apple's actions will irreparably damage Epic's reputation among *Fortnite* users and be catastrophic for the future of the separate *Unreal Engine* business.  If the *Unreal Engine* can no longer support Apple platforms, the software developers that use it will be forced to use alternatives.  The damage to Epic's ongoing business and to its reputation and trust with its customers will be unquantifiable and irreparable.  Preliminary injunctive relief is necessary to prevent Apple from crushing Epic before this case could ever get to judgment.

Apple has for years used its complete monopoly over the distribution of apps to the billion users of iOS, the Apple operating system ("OS") running on all iPhones and iPads, to coerce app developers into using Apple's payment platform, In-App Purchase ("IAP") for all in-app purchases of digital content used in their apps.  By tying IAP to app distribution, Apple eliminates all competition in the market for in-app payment processing, allowing it to impose an exorbitant 30% "app tax" on all in-app purchases of in-app content.  On August 13, 2020, Epic

[1] Big Tech Antitrust Hearing Full Transcript, Rev (July 29, 2020), https://www.rev.com/blog/transcripts/big-tech-antitrust-hearing-full-transcript-july-29.

offered *Fortnite* players on Apple devices competitive payment options and lower prices; users could make this simple choice:



(Sweeney Decl. ¶¶ 9-10.)  From the time Epic's direct payment option was launched until yesterday, August 16, 2020, more than half of iOS *Fortnite* players who made an in-app purchase chose to use Epic's direct payment over IAP.  (Sweeney Decl. ¶ 11.)

Apple's retaliation was swift and decisive.  The morning Epic made these options available, Apple removed *Fortnite* from the App Store, ensuring that millions of players would imminently lose the ability to use *Fortnite* to connect with their family and friends.  Soon after, Epic filed its suit against Apple challenging its monopoly on app stores and in-app purchases.  Less than twelve hours later, Apple notified Epic it was terminating Epic from the Apple Developer Program, blocking *all* Epic products from distribution through Apple's App Store.  Apple specifically stated it would terminate Epic's access to development tools, including those necessary for Epic to keep offering the world's most popular graphics engine, the *Unreal Engine*.  The *Unreal Engine* is used to develop a wide array of products including games, films, biomedical research and virtual reality.  Millions of developers rely on the *Unreal Engine* to develop software, and hundreds of millions of consumers use that software.

Epic now seeks a preliminary injunction, described with more specificity in the accompanying proposed order, restraining Apple from removing, de-listing, refusing to list or otherwise making unavailable the app *Fortnite*, including any *Fortnite* update, from the App Store because it provides *Fortnite* users choice and lower prices on in-app purchases.  Epic

1   further seeks an order prohibiting Apple from taking steps against Epic's *other* games and

2   against the *Unreal Engine* in retaliation for Epic steps to offer *Fortnite* users choice and lower

3   prices on in-app purchases.  Epic satisfies all the elements for preliminary injunctive relief.

4          *First*, Apple's actions harm millions of innocent consumers worldwide—the players who

5   enjoy *Fortnite* and other Epic games—which will sever their trust with Epic, a loss that is

6   impossible to quantify.  Because Apple has now removed *Fortnite* from the App Store, iOS users

7   cannot receive updates and will soon be stranded in an outdated version of the game, unable to

8   connect with family and friends who will play future versions on other platforms.  iOS users will

9   also lose access to new content that Epic regularly releases, such as the eagerly anticipated new

10  season of the game scheduled to launch at the end of this month.  The declarations in support of

11  this motion contain examples of what *Fortnite* consumers have said about the loss of access to

12  *Fortnite* in their own words; many are outraged.  This harm to Epic's iOS customers will

13  irreparably harm Epic's goodwill and reputation.

14         In addition, Apple's retaliation represents an existential threat to Epic's *Unreal Engine*.

15  OS providers like Apple routinely make certain software and developer tools available to

16  software developers, for free or a small fee, to enable the development of software that will run

17  on the OS.  Apple intends to deny Epic access to that widely available material.  Without that

18  access, Epic cannot develop future versions of the *Unreal Engine* for use on iOS or macOS.

19  Developers that intend to sell their apps for use on iOS or macOS devices will have to forgo the

20  *Unreal Engine* in favor of other engines.  The effects will reverberate well beyond video games;

21  it will affect developers who use the *Unreal Engine* on Apple products in many fields.  The

22  ensuing impact on the *Unreal Engine*'s viability, and the trust and confidence developers have in

23  that engine, cannot be repaired with a monetary award.  This is quintessential irreparable harm.

24         *Second*, Epic is likely to prevail on the merits of its antitrust claims.  Apple's conduct

25  constitutes per se illegal tying under Section 1 of the Sherman Act.  Apple has a complete

26  monopoly in the iOS App Distribution Market through its dominant App Store, which distributes

27  virtually all apps downloaded to iPhones and iPads.  Apple conditions access to the App Store on

28  a developer's promise to use IAP exclusively for all in-app purchases of in-app content (and pay

a 30% commission on those transactions), which coerces developers (who need access to the App Store for their apps to reach consumers on iOS devices) to accept IAP and Apple's concomitant higher commission, destroying competition in the iOS In-App Payment Processing Market. That is a classic per se tie.

Epic is also likely to succeed on the merits of its antitrust claims under the rule of reason. Epic will be able to show anti-competitive effects in the iOS In-App Payment Processing Market: but for Apple's tie, Epic, other app developers and dedicated third-party payment processors could enter and compete for market share, which would cause increased innovation and lower prices. There is no legitimate pro-competitive justification for Apple's restraint. Moreover, access to the iOS platform is an essential facility for app developers, and conditioning that access on acquiescence not to compete against Apple in the In-App Payment Processing Market maintains Apple's monopoly there.

The balance of equities also supports an injunction. Whereas Epic would suffer irreparable harm absent an injunction, any harm to Apple resulting from an injunction (should it later be found unwarranted) could be redressed monetarily. Finally, the public interest supports an injunction; without it, millions of players will lose their ability to stay connected on Epic games, and an entire ecosystem based on the *Unreal Engine* will collapse.

## FACTUAL BACKGROUND

*Fortnite* is a multifaceted online video game that has attracted over 350 million registered users and become a global cultural phenomenon. (Sweeney Decl. ¶ 3; Compl. ¶ 15.)[2] *Fortnite* includes three main game modes: (i) *Battle Royale*, an elimination and survival match involving up to 100 players marooned on an island; (ii) *Save the World*, a mode that involves up to four players teaming up against non-playable computer characters; and (iii) *Fortnite Creative*, where players can build custom structures on a private island for use in other game modes. (Sweeney Decl. ¶ 4.) In *Fortnite*, players can create new environments, watch a film, attend a concert or participate in a roundtable on racial equity in America. (*Id.*)

---

[2] Except as otherwise indicated, capitalized terms not defined herein have the same definition as in Epic's Complaint.

1    The most popular gameplay mode is *Battle Royale*, where storylines, challenges and

2    other major changes to gameplay are periodically released in the form of "chapters" and

3    "seasons", with each season typically lasting around 10 weeks.  (Sweeney Decl. ¶ 5.)  Chapters

4    and seasons introduce new gameplay features and content; for example, Version 13.40

5    introduced drivable cars for the first time.  (*Id.* ¶ 8.)  To play together online, users must have the

6    same version of *Fortnite*, so they can appear together in the same virtual environment with the

7    same updated content.  (*Id.*)  Players with an outdated version may play only with other players

8    with the same outdated version.  (*Id.*)  *Fortnite* is one of the first video games to offer full "cross-

9    platform" play.  (*Id.* ¶ 7.)  *Fortnite* players on all the major platforms can play together in the

10   same virtual space, even though their underlying software and hardware is different.  *Fortnite* is

11   available on Sony's PlayStation 4, Microsoft's Xbox One and the Nintendo Switch, personal

12   computers and Macs, certain Android mobile devices and (until Apple's retaliation) on Apple

13   mobile devices.  (*Id.* ¶¶ 3, 7.)

14   Consumers can play *Battle Royale* and receive its updates for free.  Epic then sells related

15   in-app content, such as digital avatars, costumes and dances.  (Sweeney Decl. ¶ 6; Compl. ¶ 25.)

16   These digital items, usable only in *Fortnite* gameplay, can be bought à la carte or through a

17   subscription model called a "Battle Pass", which unlocks an array of content as players complete

18   challenges throughout a season.  (Sweeney Decl. ¶ 6.)  This model has made *Fortnite* an

19   accessible sensation while allowing Epic to generate revenue and keep investing.

20   *Fortnite* is powered by Epic's *Unreal Engine*, a graphics engine that Epic launched in

21   1998 and offers to third-party developers to create three-dimensional digital content.  (Sweeney

22   Decl. ¶ 16; Penwarden Decl. ¶ 2.)  The *Unreal Engine* has been called the most successful video

23   game engine in history (Sweeney Decl. ¶ 20), and it powers popular video games like

24   *PlayerUnknown's Battlegrounds ("PUBG")*, which has hundreds of millions of mobile device

25   users (Sweeney Decl. ¶ 16; *see* Penwarden Decl. ¶ 4).  But *Unreal* has a broad range of

26   applications:  from training astronauts in virtual reality to generating visual effects in the

27   *Star Wars* series *The Mandalorian*, from helping brain surgeons prepare for challenging

28   operations to televising the Olympics.  (Sweeney Decl. ¶ 17; Penwarden Decl. ¶ 3.)  Making

*Unreal Engine* widely available is central to Epic's business philosophy.  (Sweeney Decl. ¶ 18.)

Developers can use it commercially on a royalty model or negotiated license, and it is free for

non-commercial use.  (Sweeney Decl. ¶ 18.)  And the *Unreal Engine* is by design a cross-

platform engine, powering games and other products on all major platforms.  (Sweeney Decl. ¶

19.)

### A.     Apple.

At a market cap of nearly $2 trillion, Apple is the most highly valued publicly traded

corporation ever.  Apple's empire extends to smartphones and tablets, music sales and streaming,

wearable devices, digital messaging, digital storage, web browsing, creativity and productivity

software, credit cards, television programming and more.

Apple controls iOS, one of the world's most widely used OSs, which powers its mobile

devices—iPhones and iPads.  (Compl. ¶¶ 39-40.)  An OS is software that supplies basic

functionality to users of computers, including personal computers (*e.g.*, laptops and desktops)

and mobile devices such as smartphones and tablets.  (Compl. ¶ 37.)  The OS displays, among

other things, the graphical user interface, which includes the "icons" and "windows" through

which users interact with software.  iOS is available only on Apple's own iPhones and iPads, and

no other OS is available for those devices.  (Compl. ¶ 39.)

### B.     The iOS App Distribution Market.

Applications, or apps, are additive software that users can install on a smart mobile

device to provide added functionality.  (Compl. ¶ 41.)  Mobile apps add enormous value to a

mobile OS; users will not buy a smartphone with few available apps.  With apps, a user can draft

a to-do list, edit photos, go shopping, spend time on social media—or play a game like *Fortnite*.

There is a relevant market for the distribution of apps compatible with iOS to users of

iOS mobile devices (the "iOS App Distribution Market").  This market consists of all the

channels through which, but for Apple's anti-competitive conduct, apps could be distributed to

iOS device users.  The geographic scope of the market is worldwide, as consumers and

developers can access iOS worldwide.  (Compl. ¶ 57.)

1    Apple has a complete monopoly in this market.  The only way that iOSusers may

2  download and install apps is through Apple's own App Store.  (Compl. ¶ 59.)  Likewise, Apple's

3  App Store is the only channel through which app developers can distribute their apps to iOS

4  users.  (Compl. ¶¶  59-60.)  This is no accident.  Apple has ensured that there are no alternatives.

5  (Compl. ¶¶ 59-60; 65-81.)  *First*, Apple has designed restrictions into iOS to prevent users from

6  downloading apps or app stores directly from websites (Compl. ¶ 66)—unlike Apple's Mac

7  personal computer, which does not restrict direct downloading (Compl. ¶¶ 4, 17, 83).  *Second*,

8  Apple pre-installs its App Store on the home screen of every iOS device (which users see when

9  they first turn it on), giving Apple a significant advantage over would-be competing app

10  distributors (if these alternatives were available).  (Compl. ¶ 67.)  *Third*, Apple disables iOS

11  users' ability to remove the App Store from their devices.  (*Id.*)

12    Apple also imposes contractual restrictions on developers that foreclose competition in

13  the iOS App Distribution Market.  *First*, Apple conditions all app developers' access to iOS on

14  the developers' agreement to distribute their apps to iOS users solely through the App Store.

15  (Compl. ¶ 69.)  Apple effects this unlawful condition by requiring all iOS developers to enter

16  into Apple's Developer Agreement, a contract of adhesion.  (Compl. ¶ 70.)  That agreement

17  prohibits apps from distribution to iOS users through channels other than the App Store.  (*See*

18  Compl. ¶ 71; Riehle Decl. ¶ 3, Ex. A, Developer Agmt. § 3.2(g) (providing that applications

19  "may be distributed only if selected by Apple (in its sole discretion) for distribution via the App

20  Store" or other means).)  *Second*, Apple conditions app developers' access to iOS on their

21  agreement not to distribute third-party iOS app stores.  (Riehle Decl. ¶ 3, Ex. A, Developer

22  Agmt., § 3.3.2 (prohibiting "Application[s]" that "create a store or storefront for other code or

23  applications"); *see also id.* ¶ 4, Ex. B, App Store Review Guidelines § 3.2.2(i) (it is

24  "unacceptable" to create "an interface for displaying third-party apps, extensions, or plug-ins

25  similar to the App Store or as a general-interest collection"); Compl. ¶¶ 78-80.)

26    **C.    The iOS In-App Payment Processing Market.**

27    Many mobile device app developers, including Epic, generate revenues by offering users

28  in-app purchases.  There is a relevant antitrust market for the processing of payments for the

purchase of in-app content on devices running iOS (the "iOS In-App Payment Processing Market").  (Compl. ¶¶ 109-17.)  The geographic scope of the iOS In-App Payment Processing Market is worldwide.  (Compl. ¶ 118.)

The iOS In-App Payment Processing Market consists of the payment processing tools that can be integrated into iOS-compatible mobile apps and process payments for in-app purchases of in-app content.  (Compl. ¶ 109.)  Buying content for mobile apps outside the app, for example on a website or by phone, is not a reasonable substitute for seamless in-app purchases, which require integrated payment processing.  (Compl. ¶ 112.)  The essence of what makes in-app payment unique is that the entire transaction takes place in the app, without navigating to a website, making a phone call or moving to a different device.  (*Id.*)  That is particularly true for purchases of in-app content, where the payment is made in the app and the purchased content is then enjoyed in the app itself, typically instantaneously.  (Compl. ¶ 113.)  Apple's Developer Program License Agreement states that "an Application may not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store"—*i.e.*, in-app content may not be provided outside IAP.  (Riehle Decl. ¶ 3, Ex. A § 3.3.3.)  And Apple's App Store Review Guidelines, an extension of the Developer Agreement (Compl. ¶ 79), explain that "you must use" IAP for purchases of in-app content (Riehle Decl. ¶ 4, Ex. B § 3.1.1).  Apple imposes a 30% tax on all in-app purchases that meet these criteria.  (Compl. ¶¶ 3, 125.)

### D.  Epic's Challenge to Apple's Monopolistic Conduct.

Following a beta test, the mobile version of *Fortnite* launched on iOS in April 2018. *Fortnite* has been available on the App Store ever since.  (Sweeney Decl. ¶ 3.)

Epic submitted *Fortnite* Version 13.40 to Apple for a pre-launch review on August 3, 2020, and it was launched to iOS users shortly thereafter.  (Grant Decl. ¶ 12.)  Version 13.40 integrated functionality that allowed it to support multiple payment options alongside IAP.  (*Id.*) When users sought to make a purchase, the app queried Epic's servers as to which payment processors were available.  (*Id.*)  If the server indicated only one processor, then the user would see that one option and continue with the purchase using that option.  (*Id.*)  If the server indicated

that more than one option was available, the user would be presented with a screen asking the user to select the desired payment processor.  (*Id.*)  On the morning of August 13, 2020, Epic's servers began informing the *Fortnite* iOS app that an Epic direct payment option was available along with Apple's IAP.  (*Id.* ¶ 13.)  Because Epic's direct payment does not carry the 30% "app tax" that Apple imposes on transactions with IAP, Epic could offer reduced pricing to users that chose Epic direct payment.  (Sweeney Decl. ¶¶ 9-10.)

To make this payment choice available, the app did not download any executable code. Instead, the code performed the same server check that it had done previously but upon receiving notice of the two payment options, the code made both options accessible to users.  (Grant Decl. ¶¶ 12-13.)  The process of notifying an app to make existing functionality and updated content accessible to users through interaction with a developer's server is called a "hotfix", and the practice is common within the industry.  (*Id.* ¶¶ 4-9, 11.)  For example, new characters or items in a game can be made available to users upon notification from a developer's server.  (*Id.* ¶ 7.) This process is also used for testing different versions of a feature to assess which is more successful.  (*Id.* ¶ 9.)  Indeed, the practice is so common in the industry that there are companies that specialize in helping developers deliver hotfixes.  (*Id.* ¶ 11.)  Epic has made hotfixes to *Fortnite* for years without Apple objection.  (*Id.* ¶¶ 8, 10.)

## E.     Apple's Retaliation

After Epic's hotfix, Apple removed *Fortnite* from the App Store at around 11:19 a.m. Pacific time and posted a notice to an Epic Developer Program account explaining Apple's purported reasons for removal.  (Grant Decl. ¶ 14, Ex. A.)  Apple also issued a public statement, claiming that it "will make every effort to work with Epic . . . so they can return *Fortnite* to the App Store."  Nick Statt, *Apple Just Kicked Fortnite Off the App Store*, The Verge (Aug. 13, 2020), https://bit.ly/3gW44NU.  This litigation followed.

Apple then posted another notice at 12:04 a.m. Pacific Time on August 14.  (Sweeney Decl. ¶ 14, Ex. B; Grant Decl. ¶ 15; Penwarden Decl. ¶ 6.)  In the second notice, Apple said it found *Fortnite* "in direct violation of the Apple Developer Program License Agreement", and stated it will terminate Epic's membership in its Developer Program "within 14 days" if Epic did

not remove *Fortnite*'s alternative in-app payment system and comply with other demands. (Sweeney Decl. ¶ 21, Ex. B at 2.)  Apple stated that if it terminates Epic, then Epic "may no longer submit apps to the App Store" and its "apps still available for distribution will be removed."  (*Id*. at 3.)  Apple also stated it will cut off Epic's access to a list of tools, including "[*a*]*ll* Apple software, SDKs [software development kits], APIs [application programming interfaces], and developer tools", as well as "pre-release versions" of iOS, macOS and other Apple OSs.  (*Id.*)  Finally, Apple stated that unless Epic capitulates, Apple will also block "[e]ngineering efforts to improve hardware and software performance of Unreal Engine on Mac and iOS hardware [and] optimize Unreal Engine for the Mac for creative workflows".  (*Id.*)

The consequences from Apple's actions are immediate and grave.  As a result of Apple's removal of *Fortnite* from the App Store, no new users can download the game through the App Store, and users who already downloaded it from the App Store can no longer receive updates.  (Sweeney Decl. ¶¶ 12-13.)  Because *Fortnite* players must have the same software version to play online together, this will quickly "break" *Fortnite* for iOS players.  (*Id.* ¶¶ 8, 12.)  Those who did not yet update to Version 13.40 before Apple removed it from the App Store will be unable to play the game (except, potentially, with the few others who likewise did not update).  After the next *Fortnite* update, *all* iOS *Fortnite* users will be so stranded, unable to play the game with their friends and family who have updated the game on non-iOS platforms.  If Apple removes other Epic apps from the App Store, even those do not enable independent in-app payment, users of those apps will likewise be unable to update them.

Apple's actions to block Epic from accessing the suite of tools all developers use to make software compatible with Apple products is a direct attack on the ongoing viability of the *Unreal Engine*.  (Sweeney Decl. ¶¶ 24-27; *see* Penwarden Decl. ¶¶ 5, 7.)  It would make it impossible for Epic to continue developing the engine for use on iOS and macOS devices. (Penwarden Decl. ¶ 8.)  Third-party developers who rely on the *Unreal Engine* to power their software on Apple devices will not choose to use the *Unreal Engine* if it is incompatible with Apple OSs.  (Sweeney Decl. ¶¶ 25-26.)  Epic has released 25 updates to *Unreal Engine 4* since 2014 (*id.* ¶ 19), but on Apple products there would be no further updates (Penwarden Decl. ¶ 8).

1   Epic would also be unable to make the *Unreal Engine* compatible with new versions of Apple's

2   software as it is released, like iOS 14, which is set for release this fall.  (Penwarden Decl. ¶ 8.)

3   Going forward, this will make the *Unreal Engine* unviable for developers that intend to release

4   software on Apple platforms.  (Sweeney Decl. ¶ 26; Penwarden Decl. ¶ 8.)  This will drive

5   developers away from the *Unreal Engine* and toward its competitors, turning it from a widely

6   used tool to a niche product.  (Sweeney Decl. ¶¶ 26-27.)

7   **ARGUMENT**

8        Epic's motion for a preliminary injunction should be granted.  Epic seeks injunctive

9   relief: (1) restraining Apple from removing, de-listing, refusing to list or otherwise making

10   unavailable the app *Fortnite*, including any update thereof, from the App Store on the basis that

11   *Fortnite* offers in-app payment processing through means other than Apple's IAP or on any

12   pretextual basis; (2) restraining Apple from taking any adverse action against Epic, including but

13   not limited to terminating any Epic entity from Apple's Developer Program, on the basis of the

14   fact that Epic enabled in-app payment processing through means other than IAP on *Fortnite* or

15   on the basis of the steps Epic took to do so; and (3) restraining Apple from removing, disabling

16   or modifying *Fortnite* or any code, script, feature, setting, version or update thereof from any

17   iOS user's device.  Epic's requested relief would restore *Fortnite* to its status before Apple's

18   most recent anti-competitive actions, allow it to offer consumers the lower prices competition

19   enables and prevent Apple from crippling *Fortnite*, all other Epic apps and Epic's

20   *Unreal Engine*, while Apple's conduct is being adjudicated.

21        To obtain a preliminary injunction, a plaintiff must show:  (1) "that he is likely to suffer

22   irreparable harm in the absence of preliminary relief"; (2) "that he is likely to succeed on the

23   merits"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the

24   public interest."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019)

25   (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Under the

26   Ninth Circuit's "'sliding scale' approach to these factors . . . . when the balance of hardships tips

27   sharply in the plaintiff's favor, the plaintiff need only demonstrate 'serious questions going to the

28

merits.'" *Id.* (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Epic meets each factor.

## I.  EPIC WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

In the absence of a preliminary injunction, Apple's removal of *Fortnite* and other Epic apps from the App Store, blocking of further app updates from distribution through the App Store, and termination of Epic's Developer Program account, including as to the *Unreal Engine*, will irreparably harm Epic's reputation and cripple the *Unreal Engine* well before this case is adjudicated.  "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).  This is likely for two primary reasons.

*First*, without the latest *Fortnite* version, existing iOS users are doomed to obsolescence within weeks; they will be unable to play *Fortnite* with most other players (who *will* have access to future versions).  That is because for the multi-player gameplay to function, each player in a match must have the same software version.  (Sweeney Decl. ¶ 8.)  Over time, the virtual island on which *Fortnite* is played evolves, with different points of interest arising and disappearing.  Content and challenges also evolve; for example, the current *Battle Royale* season flooded the island map and introduced ridable sharks.  (*Id.*)  A player stranded on an old version of the island cannot play with those whose games have been updated; an island cannot simultaneously be submerged and dry.  The resulting damage to Epic's customer goodwill would extend beyond the players on Apple mobile devices to the millions of their friends and family who cannot join them.  And if Apple is not enjoined, soon other Epic apps will be removed from the App Store. (Sweeney Decl. ¶ 21, Ex. B.)  Epic's subscribers are particularly hurt.  As noted above, while *Fortnite* is free to download and play, Epic makes added content available in part through purchase.  (Sweeney Decl. ¶ 6.)  Apple's choice to block updates will prevent users who *have already paid* for that content to access it on iOS devices.  (*See id.* ¶¶ 6, 8.)

While all this results from Apple's retaliation, it is common in the video game industry for problems to reflect negatively on the developer, even if there are external causes.  (Sweeney

Decl. ¶ 13).  Indeed, in the time since Apple removed *Fortnite*, Epic received many customer support tickets expressing confusion or disappointment that players could not download the latest version from the App Store.  (Sweeney Decl. ¶ 14, Ex. A.)  Similar complaints abound on social media.  (Riehle Decl. ¶ 5, Ex. C.)  These are the words of regular people:  parents seeking to spend time with their children, players who invested time and money in the game but have no other options for play, and anyone seeking "a wonderful escape at a time we need to be home" due to COVID-19.  (Riehle Decl. ¶ 5, Ex. C at 1.)  Evidence of customer complaints like these shows irreparable harm.  *See, e.g.*, *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474-74 (9th Cir. 2015) (employee "declaration reporting numerous and persistent complaints from would-be customers" and "emails and social media posts from consumers"); *Go Daddy Operating Co. v. Ghaznavi*, No. 17-CV-06545-PJH, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018) (declaration that plaintiff "has received numerous customer complaints"); *Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*, No. 8:18-CV-00469-JLS-DFM, 2018 WL 3816745, at *9 (C.D. Cal. July 24, 2018) (declaration attaching "negative online reviews and customer complaints").

   *Second*, if Apple terminates Epic's Developer Program account, the *Unreal Engine* would wither.  (Sweeney Decl. ¶¶ 25-27.)  Without necessary development tools, Epic cannot develop future updates for the *Unreal Engine* for Apple's operating systems (both iOS and MacOS) and would be forced to discontinue the *Unreal Engine* for those platforms.  (Sweeney Decl. ¶¶ 25-27; Penwarden Decl. ¶¶ 7-8.)  That is a problem *right now*.  Developers making apps for multiple platforms or specifically for Apple devices will choose other engines instead of the *Unreal Engine* to ensure their programs can keep working on Apple products.  Developers create products over time and update them for many years.  They plan to use an engine over a long time scale including training, development, release and support of a product.  And they must formulate those plans long in advance, given the extended timeframe of developing these complex apps and other programs.  (Sweeney Decl. ¶ 25.)  Existing customers could likewise decide to switch away from the *Unreal Engine* for future releases.  (*Id. ¶* 26.)  This would affect developers across multiple areas:  games, film, healthcare and architecture.  (*Id.* ¶ 17.)

These harms to users, developers, Epic's reputation and the ongoing vitality of Epic's *Unreal Engine* business, are difficult if not impossible to quantify, and damages cannot adequately remedy them.  "The difficulty in putting a dollar value on such intangible harms supports the . . . conclusion that they are irreparable."  *Mitchell v. 3PL Sys., Inc.*, No. SACV11-0534 AG (ANX), 2013 WL 12129617, at *4 (C.D. Cal. Apr. 8, 2013).

## II.   EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS ANTITRUST CLAIMS.

Apple conditions app developers' access to app distribution through the App Store on their agreement to use Apple's IAP to process all their customers' in-app purchases of in-app content.  (Compl. ¶¶ 108, 129-131.)  That is tying, where "the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).  Epic is likely to prove that this conduct is:  (a) tying per se; (b) an unreasonable restraint of trade under Section 1 of the Sherman Act under the rule of reason; (c) unlawful maintenance of a monopoly under Section 2; and (d) a denial of access to an essential facility under Section 2.

### A.   Apple's Tying of the App Store and IAP Per Se Violates Section 1 of the Sherman Act.

Epic is likely to succeed on the merits of its Section 1 claim because Apple's tying of the App Store and IAP is per se unlawful.  "For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market."  *Cascade Health*, 515 F.3d at 913 (internal quotation and citation omitted).  Epic can readily show each element.

#### 1.   Apple Ties Distinct Products in Separate Product Markets.

Apple conditions the use of the tying product, the App Store, on the use of the tied product, IAP.  Each product occupies a separate market.  "As the Supreme Court has instructed, 'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'"  *Newcal*

*Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (quoting *Brown Shoe v.*

*United States*, 370 U.S. 294, 325 (1962)).  A relevant market "must include 'the group or groups

of sellers or producers who have actual or potential ability to deprive each other of significant

levels of business.'"  *Id.* (citation omitted).

### a.     The Market for iOS Mobile App Distribution.

There is a relevant product market for the distribution of apps compatible with Apple's

iOS to users of mobile devices: the iOS App Distribution Market.  (Compl. ¶ 51.)  This market

includes all the ways app users can download and install apps on an iOS mobile device—and

there is only one way:  the App Store.  (*Id.*  ¶¶ 51, 58.)

The product market is properly limited to the distribution of iOS-compatible apps.  An

app store is OS-specific:  the App Store itself is an app that must be compatible with the

underlying OS, and the apps distributed through the app store likewise must be programmed for

functionality on that OS.  (Compl. ¶ 53.)  No other app store—like the Google Play Store, for

example—can run on Apple's iOS.  The European Commission, in finding that Google violated

European competition law through various practices in the mobile space, found that "app stores

for other licensable smart mobile OSs" and "for non-licensable smart mobile OSs such as

Apple's AppStore . . . do not belong to the same product market as Android app stores."

European Commission Decision at ¶¶ 284, 306, Case AT.40099, Google Android (Jul. 18, 2018),

https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf; *see id.*

¶¶ 284-322.  Thus, app stores for different OSs lack the "actual or potential ability to deprive"

participants in the iOS App Distribution Market of significant business.  *Newcal*, 513 F.3d at

1045 (internal quotation and citation omitted).  The geographic market for iOS Mobile App

Distribution is worldwide.  (Compl. ¶ 57.)

### b.     The Market for iOS In-App Payment Processing.

There is a relevant product market for the processing of payments for in-app products on

devices running iOS: the iOS In-App Payment Processing Market.  (Compl. ¶ 109.)  This market

comprises all the processing solutions iOS developers can use for in-app purchases of in-app

content for their apps.  (*Id.*)

1   Purchases outside an app are not substitutes for in-app purchases of in-app content.  The

2   essence of an in-app purchase is that the user need not leave the app itself to buy content for that

3   app.  (Compl. ¶ 112.)  Navigating to a website outside the app, or making a telephone call to a

4   call center, to buy content for use in app, are not viable substitutes for in-app purchasing

5   capability because they require more steps and break the user experience.  Remaining in the app

6   is far less cumbersome than toggling back and forth between the app and a browser to type in

7   credit card details on a website for every purchase.  And many in-app transactions are

8   inexpensive micro-transactions, situational or both—meaning that users who had to leave the app

9   would be very unlikely to make the purchase.  A user considering a $0.99 purchase is far less

10  likely to complete a purchase if she must leave the app, navigate to a website or place a call, and

11  wend through the purchasing process there before returning to the app.  Likewise, some in-app

12  purchases of in-app content have a time-sensitive aspect of demand.  Some content is available

13  only for a limited time; other content is part of an ongoing immersive experience, like purchasing

14  a particular item for immediate in-game use when it is needed or flagging a romantic prospect in

15  a dating app.  (Compl. ¶¶ 113-14.)  As a result, payment methods outside the app are not

16  reasonably interchangeable with in-app payment.[3]  The geographic market for iOS Mobile In-

17  App Payment Market is likewise worldwide.  (*Id.* ¶ 118.)

18   **c.      The App Store and IAP Are Separate Products.**

19   The App Store and IAP are separate products in separate markets under the purchaser

20  demand test, which "examines direct and indirect evidence of consumer demand".  *Teradata*

21  *Corp. v. SAP SE*, No. 18-CV-03670-WHO, 2018 WL 6528009, at *12 (N.D. Cal. Dec. 12, 2018).

22   *First*, direct evidence proves product separateness.  "Direct evidence of demand

23  includes 'whether, when given a choice, consumers purchase the tied good from the tying good

24  maker, or from other firms.'"  *Id.* (quoting *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532

25  F.3d 963, 975 (9th Cir. 2008)).  Here, users have not been "given a choice" about the in-app

26  processing of digital in-app content purchases.  But direct evidence shows that absent Apple's

27

28   [3] Even if there is a broader market for all in-app payment processing, there is a distinct, cognizable submarket for in-app payment processing for games, including for the reasons stated above.

tie, developers make available, and consumers choose to use, alternative in-app payment systems besides IAP for other types of purchases.  Apple does not condition access to the App Store on use of IAP if the in-app purchases available on the app are for physical products.  (Compl. ¶¶ 111, 117, 136.)  This contractual language permits popular apps like Uber (for ride-hailing and sharing) or Grubhub (for takeout)—which sell only physical products or services consumed in the physical world—to offer an array of in-app payment systems besides IAP.  *See* Uber (accessed Aug. 16, 2020), https://ubr.to/3iNk45G ("You can use almost any payment method, including credit cards, debit cards, Venmo, and PayPal, to add funds" to Uber Cash); Grubhub, (accessed Aug. 16, 2020), https://bit.ly/30o5WJu ("If you're signed into our app. . . . [4] Tap 'Add a new payment' and follow the prompts for adding a new Credit card or linking a PayPal or Venmo account.").  If given the choice in this market, app developers would do the same.

> *Second*, the indirect evidence also shows that the App Store and IAP are separate products.  "Indirect evidence includes firm behaviors, for instance a single product is apparent if 'competitive firms always bundle the tying and tied goods' together."  *Teradata Corp.*, 2018 WL 6528009, at *12 (quoting *Rick-Mik Enters.*, 532 F.3d at 975).  As explained above, in other contexts, Apple does not always bundle the App Store and IAP; Apple allows third-party processing for in-app purchases for physical products or digital content that can be consumed outside the app.  (Compl. ¶¶ 111, 117, 136.)  Google makes the same distinction.  (Compl. ¶ 149.)  Thus, firms do *not* always bundle app distribution and in-app payment processing together, and Epic will show that the App Store and IAP are separate products.

### 2. Apple's Market Power in the iOS Mobile App Distribution Market Coerces Developers into Using IAP.

> Apple wields its market power in the iOS App Distribution Market to coerce developers into using IAP.  "[F]orcing (or coercion) is likely if the seller has power in the tying product market."  *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 955 (D. Or. 2018) (quoting *Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984)) (alteration in original).  "To demonstrate market power circumstantially, a plaintiff must", along with defining the relevant market, (1) "show that the defendant owns a

1   dominant share of that market" and (2) "show that there are significant barriers to entry and show

2   that existing competitors lack the capacity to increase their output" in the short run.  *Aya*

3   *Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2018 WL

4   3032552, at *20 (S.D. Cal. June 19, 2018) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d

5   1421, 1434 (9th Cir. 1995)).  Epic shows both.

6      *First*, Apple has a dominant share of the iOS App Distribution Market.  (Compl. ¶ 59.)

7   "Courts generally require a 65% market share to establish a prima facie case of market power."

8   *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997), *cert.*

9   *denied*, 523 U.S. 1094 (1998).  Additionally, "market share of 44 percent is sufficient as a matter

10  of law to support a finding of market power, if entry barriers are high and competitors are unable

11  to expand their output."  *Aya Healthcare*, 2018 WL 3032552, at *20 (quoting *Rebel Oil*, 51 F.3d

12  at 1438).  Here, 100% of all iOS mobile app distribution takes place through the App Store.

13  (Compl. ¶ 59.)  This establishes a prima facie case of market power by any measure.

14     *Second*, barriers to entry in the iOS Mobile App Distribution Market prevent App Store

15  competitors from increasing output in the short run.  "Common entry barriers include: patents or

16  other legal licenses, control of essential or superior resources, entrenched buyer preferences, high

17  capital entry costs and economies of scale."  *Eastman Kodak*, 125 F.3d at 1208.  These barriers

18  are present here.  Competing app stores cannot be offered through Apple's App Store, and there

19  is no other way to install them on an iOS device.  (Compl. ¶¶ 59, 66)  Even without that

20  restriction, Apple would have a significant head start over competing app stores because its

21  App Store comes pre-installed (Compl. ¶ 67); and as the OEM for iPhones and iPads, Apple

22  could (and does) refuse to pre-install any others.  Epic has no way to overcome these barriers.

23     As a result of Apple's durable market power in the iOS Mobile App Distribution market,

24  it has been able to coerce exclusive use of IAP from developers for processing digital in-app

25  purchases.  A coercive tie requires a "condition linked to a sale".  *Aerotec Int'l, Inc. v. Honeywell*

26  *Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  Apple's App Store Review Guidelines, an

27  extension of the Developer Agreement (Compl. ¶ 79), explain that "you must use" IAP for

28  purchases of in-app content (Riehle Decl. ¶ 4, Ex. B § 3.1.1; *see also id.* ¶ 3, Ex. A § 3.3.3.).  In

other words, to avoid being banned from the App Store, which they need to distribute apps to iOS users, developers must agree to use Apple's in-app payment processor.  This is a classic tie. Apple's actions since this complaint were filed—ending Epic's ability to sell unrelated iOS apps and terminating Epic's Developer Program account to crush the *Unreal Engine*—are confirming evidence of Apple's coercion.

<strong>3.      The Tying Affects a Not Insubstantial Amount of Commerce for iOS In-App Payment Processing.</strong>

Finally, Apple's tie affects the requisite level of commerce in the market for iOS In-App Payment Processing.  When assessing "[t]he requirement that a 'not insubstantial' amount of commerce be involved . . . normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be *merely de minimis*, is foreclosed to competitors by the tie."  *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) (internal quotation and citation omitted) (emphasis in original).  Apple's conduct forecloses Epic and all similarly situated developers from offering alternative in-app payment processing services on around one billion iOS devices.  There can be no question that this element is satisfied.  Epic has a strong likelihood of success on the merits of its tying claim under Section 1.

**B.      Apple's Conduct Is an Unreasonable Restraint of Trade Under the Rule of Reason.**

Apple's practices in the iOS In-App Payment Processing Market also violate Section 1 more generally because they unreasonably restrain trade.  To prevail on a Section 1 claim, a plaintiff must show there is "(1) a contract, combination, or conspiracy between two or more entities; (2) in unreasonable restraint of trade; that (3) affects interstate commerce."  *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JLS (ANx), 2013 WL 6229141, at *5 (C.D. Cal. Dec. 2, 2013).  Epic has already shown there is an agreement—Apple's Developer Agreement and App Store Review Guidelines—and that these adhesion contracts affect interstate commerce in a worldwide market for iOS in-app payment processing.

Epic is likely to show that these adhesion terms are an unreasonable restraint of trade in the form of exclusive dealing.  "Restraints that are not unreasonable *per se* are judged under the

'rule of reason.'"  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).  "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its probable effect is to 'foreclose competition in a substantial share of the line of commerce affected.'"  *CollegeNet*, 355 F. Supp. 3d at 951 (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)).  "Generally, this requires 'a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects.'"  *Id.* (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012)).  Apple's conduct meets each step.

*First*, Apple's share in the market for iOS In-App Payment Processing shows its market power.  All iOS apps are downloaded from the App Store.  (Compl. ¶ 58.)  And all apps downloaded from the App Store must use IAP for in-app purchases of in-app content.  Thus, Apple's share of the market for iOS In-App Payment Processing for in-app content is likely 100%.  (Compl. ¶ 119.)

*Second*, Apple's conduct also forecloses a substantial share of the market for iOS In-App Payment Processing.  "For claims arising under § 1, '[s]ubstantial share' has been quantified as foreclosure of 40% to 50% of the relevant market."  *CollegeNet*, 355 F. Supp. 3d at 952 (citation omitted).  Here, Apple captures 100% of app downloads through the App Store, and given the contractual provisions described above, it likely captures a 100% share of in-app payment processing for in-app content.  Would-be competitors like Epic are shut out.

*Third*, the exclusive dealing here is perpetual.  The Developer Agreement is not terminable by the developer.  *See CollegeNet*, 355 F. Supp. 3d at 953 (finding termination unlikely given related tying provision).

*Finally*, Apple's exclusive dealing has anti-competitive effects.  Because the analysis under Section 1 is materially identical to the analysis under Section 2, *see United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001), effects are addressed in the following section.

### C.    Apple's Conduct Violates the Rule of Reason and Unlawfully Maintains its Monopoly in the Market for iOS In-App Payment Processing.

Epic is likely to succeed under the rule of reason and thereby establish Apple's liability under either Section 1 or Section 2 of the Sherman Act:

> "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint.  If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

*Am. Express*, 138 S. Ct. at 2284 (internal citations omitted).  This test favors Epic.

*First*, Apple's conduct exploiting its market power in the iOS App Distribution Market to tie the App Store to IAP has anti-competitive effects in the iOS In-App Payment Processing Market.  That conduct substantially forecloses competition in the market for iOS In-App Payment Processing.  Apple's actions here are illustrative.  Epic introduced a competing payment platform that delivers savings to consumers.  (Sweeney Decl. ¶¶ 9-10.)  But Apple blocked Epic's competing solution and removed *Fortnite* from the App Store, protecting its 30% tax at all costs.  Without competition in the iOS In-App Payment Processing Market, Apple has no incentive to compete on quality or price.  (Compl. ¶¶ 11-13, 148-49.)

*Second*, there are no procompetitive justifications for Apple's conduct.  Any security justification for requiring all in-app purchases to go through IAP is pretextual.  *Eastman Kodak*, 125 F.3d at 1223 ("A plaintiff may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual.").  Apple does *not* mandate use of IAP for app-based purchases of physical goods or portable digital content; nor does it mandate use of IAP for digital content purchased on Mac computers.  (Compl. ¶¶ 4, 17, 83, 111, 117, 136.)  And any claim that Apple must serve as the payment processor for purchases of in-app content to ensure it gets paid is both pretextual and circular, presupposing Apple's entitlement to a cut of every in-app purchase of in-app content for the services it compels developers to take.  Developers should be allowed to choose where to obtain these services—just like in-app purchases of physical goods do not entitle Apple to a cut

1  *unless* the developer (or the user) *chooses* to use Apple to process the transaction, and just as

2  Apple does not demand the same payment structure on its Mac computers.

3       Epic also suffered antitrust injury from Apple's violations of the antitrust laws.  "To

4  show antitrust injury, a plaintiff must prove that his loss flows from an *anticompetitive* aspect or

5  effect of the defendant's behavior."  *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 863 (C.D.

6  Cal. 2015) (quoting *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001)).

7  Apple's conduct has foreclosed Epic from offering its own in-app payment system to iOS users.

8  And it has injured Epic as an app developer, which must pay more to offer in-app transactions to

9  customers through Apple than it would in a competitive market.

10      **D.**     **Apple's Refusal to Let Epic Access iOS Is Denial of an Essential Facility.**

11       Epic is also likely to succeed in demonstrating that Apple denies it the use of an essential

12  facility—and thereby establish Apple's liability under Section 2.  Smartphones have become an

13  essential tool for daily life—used for work, entertainment, social communication, banking,

14  healthcare, and more.  In fact, for decades now, the U.S. Government has provided subsidies and

15  other benefits to ensure low-income individuals have access to essential cellular phone services

16  through the Lifeline program.  *See* FCC, https://www.fcc.gov/general/lifeline-program-low-

17  income-consumers (accessed Aug. 17, 2020).  And with a billion users and massive network

18  effects, iOS has become a paradigmatic essential facility for app distributors and developers

19  alike.  The essential facilities doctrine imposes on the owner of a facility that "cannot reasonably

20  be duplicated and which is essential to competition in a given market a duty to make that facility

21  available to its competitors on a nondiscriminatory basis."  *MetroNet Servs. Corp. v. Qwest*

22  *Corp.*, 383 F.3d 1124, 1128-29 (9th Cir. 2004) (internal quotation and citation omitted).  Epic is

23  likely to show that:  (1) Apple controls the iOS platform, an essential facility; (2) Epic, as

24  Apple's potential competitor in the iOS App Distribution Market, is unable to duplicate iOS; (3)

25  Apple has refused to provide Epic reasonable and nondiscriminatory access to iOS; even though

26  (4) it is feasible for Apple to provide such access.  *See id.; see also City of Anaheim v. S. Cal.*

27  *Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992).

28

*First*, for the reasons stated above, Epic is likely to show that iOS is an essential facility that Apple controls.  Over one billion people use iPhones or iPads.  (Compl. ¶¶ 47, 62, 124.)  Without access to iOS, Epic cannot offer its app store to all these users.  *Second*, for the same reasons, competing app distributors cannot reasonably or practically duplicate iOS as an alternate means to reach consumers in the iOS App Distribution Market.  Nor could app distributors reasonably create or use an alternative OS to reach those iOS consumers; there are enormous barriers to entry in developing a new mobile ecosystem, and existing iOS users face high switching costs.  (Compl. ¶¶ 62, 156-66.)  *Third*, Apple has barred Epic's access to iOS in its capacity as an app distributor.  Apple allows no other app stores on iOS and conditions app developers' access to iOS on their agreement not to distribute third-party app stores.  Consequently, Epic cannot place its competing app store on iOS, regardless of the price it is willing to pay for access, foreclosing it from competing in the iOS App Distribution Market.  *Fourth*, it would be feasible for Apple to give Epic access to launch an app store on iOS.  Indeed, Epic's competing app store is available on the OS for Apple's personal computer, the Mac, which shows there are no barriers to making third-party app stores available on iOS, too.  Apple's refusal to provide Epic and other app distributors with access to iOS to distribute apps on reasonable and nondiscriminatory terms is the anti-competitive denial of an essential facility.

## III.    THE BALANCE OF HARDSHIPS TIPS SHARPLY IN EPIC'S FAVOR.

The balance of equities strongly favors Epic.  On the one hand, Epic faces near-term irreparable harm from the imminent suspension of millions of *Fortnite* players from playing with their friends and family.  And Epic faces harm from Apple's retaliation in unrelated areas, most notably Apple's attack on the viability of the *Unreal Engine*, the most widely used graphics engine in the industry.  On the other hand, Apple will not be harmed by issuance of the injunction.  An injunction concerning *Fortnite* would at most cause Apple to lose some commissions, a loss that is fully compensable with damages.  An injunction as to the *Unreal Engine* would not harm Apple *at all*, except deny it the ability to retaliate against Epic while the dispute is being adjudicated.  Moreover, given that Epic is likely to succeed on the merits, "[t]here is no hardship to a defendant when [an] . . . injunction would merely require the

1  defendant to comply with law."  *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, No. CV

2  14-2307 RSWL (FFMx), 2014 WL 4679001, at *13 (C.D. Cal. Sept. 18, 2014).

3  **IV.    THE PUBLIC INTEREST SUPPORTS A PRELIMINARY INJUNCTION.**

4       Finally, a preliminary injunction that preserves status quo access to the latest *Fortnite*

5  content for millions of players, at lower prices, is strongly in the public interest.  "'[T]he public

6  interest inquiry primarily addresses impact on non-parties.'"  *LinkedIn*, 938 F.3d at 1004

7  (quoting *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931-32 (9th Cir. 2003)).  *LinkedIn* is

8  instructive.  There, the plaintiff sought to enjoin LinkedIn from restricting its access to publicly

9  available user data.  *Id.*  at 989.  LinkedIn argued that a preliminary injunction was against the

10  public interest because permitting such unilateral data collection from its website would invite

11  security threats.  *Id.* at 1005.  Affirming entry of the preliminary injunction, the Ninth Circuit

12  found that LinkedIn had options for "'technological self-help' against bad actors" besides

13  restricting plaintiff's access, and that LinkedIn's interest in security was outweighed by the

14  possibility that its conduct would create "information monopolies".  *Id.*

15       The same is true here.  Apple claimed it removed the latest version of *Fortnite* from the

16  App Store in part to keep users "safe".  Statt, *Apple Just Kicked Fortnite Off the App Store*, The

17  Verge (Aug. 13, 2020), https://bit.ly/3gW44NU.  And it points to language in its

18  Developer Agreement about the security around hidden features and updates.  (*See* Sweeney

19  Decl. ¶ 14, Ex. B.)  These claims are pretextual.  Apple allows Epic's own direct payment on

20  Mac computers, and routinely makes third-party in-app payment processing available on iOS for

21  other kinds of in-app purchases, like purchases through Uber and Amazon.  Like in *LinkedIn*, the

22  requested injunction does not stop Apple from taking other technological self-help against

23  malware besides retaliating against its competitor.  And of course, steps Apple takes against the

24  *Unreal Engine* or Epic apps without alternative in-app payment methods have nothing to do with

25  the security of in-app transactions.

26       Conversely, absent an injunction, millions of players of *Fortnite* on mobile Apple devices

27  will no longer be able to play online with other users on current versions, and potential new

28  players will be prevented from downloading those games in the first place.  The cascading effect

of losing ongoing *Unreal Engine* compatibility will threaten the viability of the engine and disrupt development of a constellation of apps and uses that rely on its graphics to render hundreds of video games, the human brain, Baby Yoda and space flight.  Apple's pretextual interest in security is thus outweighed by the public's interest in competition.  Preserving competition is "*vital to the public interest*."  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (citation omitted) (emphasis in original).

\* \* \*

The Court cannot, on today's motion, level the playing field against Apple.  But the Court can order that while its practices are being litigated, Apple cannot retaliate by blocking *Fortnite* and tools for the *Unreal Engine* and harm the hundreds of millions who—especially in this time of social distancing—use Epic's software to play, build and stay connected.

## **CONCLUSION**

For all these reasons, Epic respectfully requests that the Court enter the proposed preliminary injunction.

Dated: August 17, 2020

Respectfully submitted,

By:  /s/ *Paul J. Riehle*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff*
**EPIC GAMES, INC.**

**CERTIFICATE OF SERVICE**

Pursuant to L.R. 5-5, the undersigned certifies that on August 17, 2020, the foregoing motion is being filed electronically via the Court's CM/ECF system and served manually, with the complaint, on Defendant.

*/s/ Paul J. Riehle*