THEODORE J. BOUTROUS JR., SBN 132099
    tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
    rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
    dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
    jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
    crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

VERONICA S. LEWIS (Texas Bar No.
24000092; *pro hac vice*)
    vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone:  214.698.3100
Facsimile:  214.571.2900

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>APPLE INC.<br><br>                    Defendant. | Case No. 3:20-cv-05640-YGR<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO EPIC GAMES, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................. 3

  A.   The App Store ......................................................................................... 3

  B.   App Store Guidelines and the Developer License Agreement ................. 5

  C.   Epic, *Fortnite*, and Agreements with Apple ......................................... 6

  D.   Epic's Decision to Breach Its Agreements ............................................ 7

  E.   Apple's Response ................................................................................... 9

  F.   Epic's Orchestrated "Challenge" to the App Store ............................... 10

III.   LEGAL STANDARD ....................................................................................... 11

IV.   ARGUMENT ................................................................................................... 13

  A.   Epic Has Not Suffered Irreparable Harm ............................................. 13

    1.   Epic's Claimed "Irreparable Harm" is Self-Inflicted and the Result of Its Choice to Breach Its Agreements ................................ 13

    2.   Epic's Alleged Injuries to Goodwill Do Not Constitute Irreparable Injury ...................................................................... 15

  B.   Epic Has Failed to Establish Any—Much Less a "High"—Likelihood of Success on the Merits ..................................................................... 17

    1.   Apple Manifestly Lacks Monopoly Power ................................. 17

    2.   IAP Is Not a Separate Market or Product ................................. 19

    3.   Apple Has Not Engaged in Anticompetitive Conduct ............... 21

    4.   Apple Has Not Denied Epic Access to an Essential Facility ...... 21

    5.   IAP Is Supported by a Legitimate Business Purpose ................. 22

  C.   The Balance of Equities Tips Sharply in Apple's Favor ....................... 23

  D.   An Injunction Would Harm the Public Interest .................................... 24

V.   CONCLUSION ................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.,*
   836 F.3d 1171 (9th Cir. 2016)..........................................................................................17, 22

5

*Al Otro Lado* v.*Wolf,*
   952 F.3d 999 (9th Cir. 2020)..................................................................................................13

6

*Allied Orthopedic Appliances, Inc.* v. *Tyco Health Care Group L.P.,*
   2008 U.S. Dist. LEXIS 112002 (C.D. Cal. 2008)..................................................................21

7

8

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
   750 F.2d 1470 (9th Cir. 1985)..........................................................................................15, 16

9

*Ohio* v. *American Express,*
   138 S. Ct 2274 (2018)............................................................................................................19

10

11

*Animal Legal Defense Fund* v. *United States Dep't of Agriculture,*
   2017 WL 2352009 (N.D. Cal. May 31, 2017) .......................................................................11

12

13

*Apple Inc.* v. *Psystar Corp.,*
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................................17, 19

14

*In re Apple iPod iTunes Antitrust Litig.,*
   2014 U.S. Dist. LEXIS 165276 (N.D. Cal. 2014)..................................................................21

15

16

*In re Apple iPod iTunes Antitrust Litig.,*
   796 F. Supp. 2d 1137 (N.D. Cal. 2011) .................................................................................21

17

18

*Benisek* v. *Lamone,*
   138 S. Ct. 1942 (2018)...........................................................................................................11

19

*Berkey Photo, Inc.* v. *Eastman Kodak Co.,*
   603 F.2d 263 (2d Cir. 1979)...................................................................................................21

20

21

*Biocad JSC* v. *F. Hoffmann-La Roche,*
   942 F.3d 88 (2d Cir. 2019).....................................................................................................25

22

23

*California Pawnbrokers Ass'n, Inc.* v. *Carter,*
   2016 WL 6599819 (E.D. Cal. Nov. 8, 2016) ........................................................................13

24

*Clapper* v. *Amnesty Int'l USA,*
   568 U.S. 398 (2013)...............................................................................................................13

25

26

*CSNK Working Capital Fin. Corp.* v. *Baxter, Bailey & Assoc., Inc.,*
   2016 WL 9176328 (N.D. Cal. Aug. 19, 2016).......................................................................15

27

28

ii

*Cyber Promotions, Inc.* v. *Am. Online, Inc.*,
    948 F. Supp. 456 (E.D. Pa. 1996) ...................................................................................21

*Dahl* v. *HEM Pharm. Corp.*,
    7 F.3d 1399 (9th Cir. 1993)...........................................................................................12

*Dish Network LLC* v. *Cox Media Grp., LLC*,
    2020 U.S. Dist. LEXIS 126850 (N.D. Ill. 2020)...........................................................13

*Disney Enterprises, Inc.* v. *VidAngel, Inc.*,
    224 F. Supp. 3d 957 (C.D. Cal. 2016), *aff'd,* 869 F.3d 848 (9th Cir. 2017) ...........................15

*Doe v. Texaco, Inc.*,
    2006 WL 2053504 (N.D. Cal. July 21, 2006) .........................................................15

*Dotster, Inc.* v. *Internet Corp.*,
    296 F. Supp. 2d 1159 (C.D. Cal. 2003).........................................................................14

*United States* v. *E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .......................................................................................................17

*Earth Island Inst.* v. *Carlton*,
    626 F.3d 462 (9th Cir. 2010).........................................................................................23

*Federal Trade Comm'n* v. *Qualcomm Inc.*,
    2020 WL 4591476, __ F.3d (9th Cir. Aug. 11, 2020).............................................2, 21

*Frank B. Hall & Co., Inc.* v. *Alexander & Alexander, Inc.*,
    974 F.2d 1020 (8th Cir. 1992)......................................................................................24

*G. Neil Corp.* v. *Cameron*,
    2003 U.S. Dist. LEXIS 19509 (E.D. Pa. 2003)..........................................................23

*Garcia* v. *Google*,
    786 F.3d 733 (9th Cir. 2015)....................................................................................11, 15

*Go Daddy Operating Co.* v. *Ghaznavi*,
    2018 WL 1091257 (N.D. Cal. Feb. 28, 2018).............................................................16

*Goldberg* v. *Barreca*,
    2017 WL 3671292 (D. Nev. Aug. 24, 2017), *aff'd*, 720 F. App'x 877 (9th Cir.
    2018) .......................................................................................................................24, 25

*Goldie's Bookstore, Inc.* v. *Superior Court of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984).........................................................................................16

*Hall's IV and Inst. Pharmacy, Inc.* v. *Prime Therapeutics LLC*,
    2016 WL 462054 (N.D. Tex. Jan. 29, 2016)..........................................................13, 14

*Heineke* v. *Santa Clara University*,
  2018 WL 3368455 (N.D. Cal. July 10, 2018) ..............................................................12

*Hicks* v. *PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ....................................................................................18

*hiQ Labs, Inc.* v. *LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ......................................................................................25

*Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*,
  2018 WL 3816745 (C.D. Cal. July 24, 2018) ..............................................................16

*Intergraph Corp.* v. *Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999) ..................................................................................21

*Interplay Entm't Corp.* v. *TopWare Interactive, Inc.*,
  751 F. Supp. 2d 1132 (C.D. Cal. 2010) ......................................................................25

*Johnston* v. *Citimortgage, Inc.*,
  2011 WL 941282 (N.D. Cal. Mar. 18, 2011) ..............................................................24

*K.D.* v. *Oakley Union Elementary Sch. Dist.*,
  2008 WL 360460 (N.D. Cal. Feb. 8, 2008) ................................................................13

*Kaufman* v. *Time Warner*,
  836 F.3d 137 (2d Cir. 2016) ......................................................................................20

*Life Alert Emergency Response, Inc.* v. *LifeWatch, Inc.*,
  601 F. App'x 469 (9th Cir. 2015) ..............................................................................16

*Los Angeles Memorial Coliseum Commission* v. *NFL*,
  634 F.2d 1197 (9th Cir. 1980) ....................................................................................15

*Marlyn Nutraceuticals, Inc.* v. *Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ......................................................................................11

*MetroNet Servs. Corp.* v. *Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ....................................................................................22

*United States* v. *Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................2, 17, 20

*Mitchell v. 3PL Sys., Inc.*,
  2013 WL 12129617 (C.D. Cal. Apr. 8, 2013) ............................................................16

*N. Cty. Commc'ns Corp.* v. *Sprint Commc'ns Co., L.P.*,
  2012 WL 12882889 (S.D. Cal. Sept. 27, 2012) ..........................................................15

*Oakland Tribune, Inc. v. Chronicle Publ'g. Co., Inc.*,
  762 F.2d 1374 (9th Cir. 1985) ....................................................................................15

APPLE'S OPPOSITION TO EPIC'S MOTION FOR A TRO/PI
Case No. 3:20-cv-05740-YGR

*Optronic Tech. Inc.* v. *Ningbo Sunny Elec. Co.*,
    414 F. Supp. 3d 1256 (N.D. Cal. 2019) ...............................................................22

*Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009) ................................................................................20, 21, 22, 23

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)...............................................................................18

*Rick-Mik Enters., Inc.* v. *Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008).............................................................................20

*Rovio Entertainment Ltd.* v. *Royal Plush Toys, Inc.*,
    907 F. Supp. 2d 1086 (N.D. Cal. 2012) ...........................................................11

*S. Glazer's Distributors of Ohio, LLC* v. *Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017)............................................................................24

*United States* v. *Sabre Corp.*,
    2020 WL 1855433 (D. Del. Apr. 7, 2020) .......................................................20

*Salt Lake Tribune Publishing Co. LLC* v. *AT&T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) .......................................................................14

*Silvas* v. *G.E. Money Bank*,
    2011 WL 3916073 (9th Cir. 2011)...................................................................23

*Smith v. Fredrico*,
    2013 WL 122954 (E.D.N.Y. Jan. 8, 2013) .....................................................15

*Stanley* v. *Univ. of S. California*,
    13 F.3d 1313 (9th Cir. 1994).......................................................................11, 12

*Stormans, Inc.* v. *Selecky*,
    586 F.3d 1109 (9th Cir. 2009)..........................................................................24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2008 WL 2219837 (N.D. Cal. May 27, 2008) .................................................25

*Trans Sport, Inc.* v. *Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992).............................................................................22

*U.S. Airways, Inc.* v. *Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)...............................................................................19

*Universal Analytics, Inc.* v. *MacNeal-Schwendler Corp.*,
    914 F.2d 1256 (9th Cir. 1990)..........................................................................22

*Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko LLP*,
    540 U.S. 398 (2004).........................................................................................22

APPLE'S OPPOSITION TO EPIC'S MOTION FOR A TRO/PI
Case No. 3:20-cv-05740-YGR

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................................11, 14

*Zango, Inc.* v. *PC Tools Pty Ltd.*,
    494 F. Supp. 2d 1189 (W.D. Wash. 2007) ...........................................................24, 25

*Zoslaw* v. *MCA Distrib. Corp.*,
    693 F.2d 870 (9th Cir. 1982)..................................................................................22

**STATUTES**

15 U.S.C. § 6a ...............................................................................................................25

**OTHER AUTHORITIES**

Analysis Group, *Apple's App Store and Other Digital Marketplaces: A
    Comparison of Commission Rates* (July 22, 2020)..........................................4, 5, 23

Apple, *App Store: Principles and Practices*, https://www.apple.com/ios/app-
    store/principles-practices/ ...................................................................................3, 4, 5

3A Areeda & Hovenkamp, Antitrust Law (4th ed. 2015)...............................................21

Brian Barrett, *Imposter Fortnite Android Apps Are Already Spreading Malware*,
    Wired (Aug. 16, 2018), https://www.wired.com/story/imposter-fortnite-
    android-apps-already-spreading-malware/.............................................................7

Chris Smith, *Epic Invented a Crisis so Fortnite Fans Would Support its Lawsuits
    Against Apple and Google* (Aug. 14, 2020),
    https://bgr.com/2020/08/14/fortnite-ban-iphone-android-apple-google-right-vs-
    epic/ .......................................................................................................................7

David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of
    Multisided Platforms* 117 (2016) ..........................................................................19

End User License Agreement for Unreal Engine,
    https://www.unrealengine.com/en-US/eula/publishing ...........................................9

Epic Games, *FAQs: Where Can I Download Battle Royale?* (last visited Aug. 20,
    2020), https://www.epicgames.com/fortnite/en-US/faq ........................................11

Epic Games, *Join the Battle and Play in the #FreeFortniteCup on August 23*,
    https://www.epicgames.com/fortnite/en-US/news/freefortnite-cup-on-august-
    23-2020 ................................................................................................................10

*'Fortnite'*, Engadget (Mar. 17, 2018), https://www.engadget.com/2018-03-17-
    fortnite-battle-royale-record-breaker.html .............................................................18

Tim Sweeney (@TimSweeneyEpic), Twitter (Aug. 14, 2020, 7:44PM),
    https://twitter.com/SamsungMobileUS/status/1294419706389045248 ...................11

vi

Jason Silverstein, *Fortnite Security Flaw Exposed Millions of Users to Being Hacked* (Jan. 16, 2019), https://www.cbsnews.com/news/fortnite-security-flaw-exposed-millions-of-users-to-being-hacked/ ....................................................................7

Shannon Liao, *Fortnite Made $1.8 Billion in 2019*, CNN (Jan. 3, 2020), https://www.cnn.com/2020/01/03/tech/fortnite-sales-2019/index.html...................................19

Statement of Tim Cook, Apple Inc., before the U.S. House of Representatives Judiciary Committee Subcommittee on Antitrust, Commercial and Administrative Law (July 29, 2020), https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-Wstate-CookT-20200729.pdf (last accessed August 20, 2020) ...............................3, 4, 6

Stijn Wernars, *Newzoo's Battle Royale Sentiment Study: Understanding the Phenomena and What Draws Players to Particular Franchises* (July 11, 2019), https://newzoo.com/insights/articles/newzoos-battle-royale-sentiment-study-understanding-the-phenomena-and-what-draws-players-to-particular-franchises........................................................................................................................18

Verge, *App Store 2.0* (June 8, 2016), https://www.theverge.com/2016/6/8/11880730/apple-app-store-subscription-update-phil-schiller-interview ..........................................................................................4

Verge, *Apple fires back at Epic: 'We won't make an exception'* (Aug. 15, 2020), https://www.theverge.com/2020/8/17/21373108/apple-response-epic-app-store-fortnite-lawsuit ...............................................................................................9

APPLE'S OPPOSITION TO EPIC'S MOTION FOR A TRO/PI
Case No. 3:20-cv-05740-YGR

## I.     INTRODUCTION

For years, Epic took advantage of everything Apple's App Store has to offer. It availed itself of the tools, technology, software, marketing opportunities, and worldwide customer reach that Apple provided so that it could bring its creativity to iOS and games like *Infinity Blade* and *Fortnite* to the App Store. It enjoyed the tremendous resources that Apple pours into the App Store to constantly innovate to create new opportunities for developers and experiences for customers, as well as to review and approve every app, keeping the App Store safe and secure for customers and developers alike. Over time, in part because of the opportunities Apple made available, Epic grew to a multi-billion dollar enterprise with large investors like the Chinese tech giant Tencent pouring hundreds of millions of dollars into the company. Now, having decided that it would rather enjoy the benefits of the App Store without paying for them, Epic has breached its contracts with Apple, using its own customers and Apple's users as leverage.

In the wake of its own voluntary actions, Epic now seeks emergency relief. But the "emergency" is entirely of Epic's own making. Epic's agreements with Apple expressly spell out that if an app developer violates the rules of the App Store or the license for development tools— both of which apply and are enforced equally to all developers large and small—Apple will stop working with that developer. Developers who work to deceive Apple, as Epic has done here, are terminated. So when Epic willfully and knowingly breached its agreements by secretly installing a "hotfix" into its app to bypass Apple's payment system and App Review Process, it knew full well what would happen and, in so doing, has knowingly and purposefully created the harm to game players and developers it now asks the Court to step in and remedy. Relief in these circumstances is not available under the law. And the injunction Epic seeks would threaten for everyone the benefits that Epic, developers and App Store customers have long enjoyed.

***First***, TROs exist to remedy irreparable harm, not easily reparable self-inflicted wounds, particularly under the Ninth Circuit's exacting standard for a mandatory injunction. Here, Epic executed a carefully orchestrated, multi-faceted campaign, complete with a parody video, merchandise, hashtag, belligerent tweets and now a pre-packaged TRO. All of the injury Epic claims to itself, game players, and developers could have been avoided if Epic filed its lawsuit

1

1  without breaching its agreements. All of that alleged injury for which Epic improperly seeks

2  emergency relief could disappear tomorrow if Epic cured its breach. Apple has offered Epic the

3  opportunity to cure, to go back to the status quo before Epic installed its "hotfix" that turned into

4  its hot mess, and to be welcomed back into the App Store. All of this can happen without any

5  intervention of the Court or expenditure of judicial resources. And Epic would be free to pursue its

6  primary lawsuit. But Epic does not want to remedy the harm that it contends requires immediate

7  relief because it has a different goal in mind: it wants the Court to allow it to free ride on Apple's

8  innovation, intellectual property and user trust.

9       ***Second***, Epic has not and cannot show that it is likely to succeed on the merits of its novel

10  antitrust claims. The App Store has exponentially increased output, reduced prices, and

11  dramatically improved consumer choice. As the Ninth Circuit declared just last week, novel

12  business practices—especially in technology markets—should not be "conclusively presumed to

13  be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have

14  caused or the business excuse for their use." *United States* v. *Microsoft Corp.*, 253 F.3d 34, 91

15  (D.C. Cir. 2001) (quoted in *Federal Trade Comm'n* v. *Qualcomm Inc.*, 2020 WL 4591476, at *9,

16  __ F.3d at __ (9th Cir. Aug. 11, 2020)). Epic, however, does not undertake any "elaborate inquiry"

17  in its motion. For example, it fails to enlist any economist to support its contrived market definitions

18  and "tying" theories. It conveniently ignores that *Fortnite* can be played on numerous platforms

19  with or without support from Apple, even as Epic touts that fact in its advertising and

20  communications to users. *See* https:// www.epicgames.com/fortnite/en-US/news/freefortnite-cup-

21  on-august-23-2020 ("Just because you can't play on iOS doesn't mean there aren't other awesome

22  places to play Fortnite."). And it fails to contend with the fact that its logic would make monopolies

23  of Microsoft, Sony and Nintendo, just to name a few. The lack of factual, economic, and legal

24  support is unsurprising because Epic's antitrust theories, like its orchestrated campaign, are a

25  transparent veneer for its effort to co-opt for itself the benefits of the App Store without paying or

26  complying with important requirements that are critical to protect user safety, security, and privacy.

27       ***Third***, the public interest and the balance of hardships do not and could not weigh in favor

28  of Epic's decision to breach its contract because it no longer wanted to play by Apple's long-

standing rules. Injunctions do not exist to give parties the contracts they wish they had. And an injunction would set off a flood of additional requests for "emergency" relief and threaten the entire App Store ecosystem as developers see they can breach their agreements, jeopardize the security of the App Store, and circumvent payments to Apple, all without consequence. The public would not benefit, and Apple's users would be the ultimate victims by losing the privacy, security, and quality experience of the curated App Store.

Apple wants Epic on iOS. Apple wants customers to have access to the games they love from Epic and every other developer. What's more, the success of Epic and so many other developers is exactly what Apple hoped for more than ten years ago when it opened the doors of the App Store. But Epic's success does not entitle it to have this Court step in and remedy the harm it knowingly created, nor is there any legal basis for that. If Epic is looking for immediate relief for its customers, it can remove its "hotfix," continue to comply with the contracts it signed and that apply to everyone else, and go on to pursue its legal challenge in this Court.

## II.     STATEMENT OF FACTS

### A.     The App Store

Apple created the App Store in 2008, shortly after it released the first iPhone, to provide a safe and trusted place for Apple's mobile consumers to discover and download apps. Declaration of Philip Schiller ("Schiller Decl.") ¶¶ 3, 18. The App Store allows users to find and download apps that work seamlessly and securely on Apple's iPhone and iPad devices.[1] Before the App Store, typical distribution options for developers were physical retail stores with high fees and limited reach.[2] The App Store—and the idea behind it—has succeeded beyond anyone's wildest expectations. It began with 500 apps in 2008. Since then, the App Store has unleashed innovation and economic activity for 1.7 million apps and their developers, created 1.9 million American jobs

---

[1]  Apple, *App Store: Principles and Practices*, https://www.apple.com/ios/app-store/principles-practices/ (last accessed Aug. 20, 2020).
[2]  Statement of Tim Cook, Apple Inc., before the U.S. House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law (July 29, 2020), https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-Wstate-CookT-20200729.pdf (last accessed Aug. 20, 2020) ("Cook July 2020 Statement").

1  in the app ecosystem, and created $138 billion in value to developers in the United States last year

2  alone. *Id*. at 3.

3        Apple launched the App Store to give consumers more choices. *Id.* Apple has worked hard

4  to convince developers to create great iOS apps. Apple has invested a massive amount in tools,

5  software, and technology to make it as easy as possible for developers to bring their ideas to life on

6  iOS. Schiller Decl. ¶¶ 20, 22-23, Ex. E at 5. Apple has long recognized that a secure and easy to

7  use App Store makes Apple devices more attractive to its millions of users.

8        The App Store is also a business. Apple charges a $99-a-year fee for the Developer Program

9  and then charges a commission on the sale of apps and in-app sales of digital goods and services.[3]

10  Apple has never increased its commission.[4] It has introduced programs and options that reduce the

11  effective commission for developers. For example, in 2016, Apple lowered its commission from

12  30% to 15% on subscriptions that renew after the first year.[5]

13        Apple does not earn any money through the App Store on its substantial investment in these

14  tools, software and technology until developers bill and collect funds from users who engage in

15  digital transactions with consumers on the store. More than 80% of the apps in the App Store pay

16  no commission to Apple. Schiller Decl. ¶ 4. If an app is available for free, then Apple makes

17  nothing. *Id.* Apple's commission reflects the value of Apple's technology, tools and software for

18  the development, testing and distribution of developers' apps and digital content. *Id.*

19        Apple's in-app purchase system ("IAP"), which Epic tried to bypass in violation of its

20  contractual commitments, provides a digital checkout for in-app sales and is the means by which

21  Apple collects its commission on eligible transactions. Schiller Decl. ¶ 3, Ex. E at 4. Without IAP,

22  Apple would be unable from a technical perspective to charge app developers a commission on in-

23  app sales. If developers can avoid the digital checkout, it is the same as if a customer leaves an

24  Apple retail store without paying for shoplifted products: Apple does not get paid.

25

26  [3] Apple, *App Store: Principles and Practices*, *available at* https://www.apple.com/ios/app-store/principles-practices/ (last accessed Aug. 20, 2020).

27  [4] Cook July 2020 Statement at 3.

28  [5] The Verge, *App Store 2.0* (June 8, 2016), https://www.theverge.com/2016/6/8/11880730/apple-app-store-subscription-update-phil-schiller-interview.

4

Apple's commission is hardly unique; Google's Play Store, the Amazon Appstore, and the Microsoft Store, and many video game digital marketplaces, such as Xbox, PlayStation, Nintendo, and Steam, all have similar fees and requirements to use the marketplace's official in-app purchase functionality.[6]

### B.   App Store Guidelines and the Developer License Agreement

Apple applies a set of contractual rules and guidelines for submitting apps to the App Store and use of the tools Apple provides. The App Store has always been a "highly curated" place where "every app is reviewed by experts and an editorial team helps users discover new apps every day." Schiller Decl., Ex. C at 1-2. Apple makes its app review standards available through public App Store Review Guidelines (the "Guidelines") and the Apple Developer Program License Agreement ("License Agreement"), and other standard documents, and requires that all participating developers follow these agreements. Schiller Decl., Ex. A, B, C.

These contractual standards protect Apple's customers. They ensure that the apps on the App Store are safe, secure and reliable, that they work as they should, that they adhere to Apple's rules on user privacy, that they protect consumers from malware and threats, that they use appropriate business models and that they do not offer content such as pornography or real-money gambling.[7] The App Store is the world's most trusted marketplace for apps precisely because of the standards and safeguards put in place. Schiller Decl. ¶ 18, Ex. E at 3.

To participate in the App Store and the Developer Program, app developers are bound by Guidelines, and agree that Apple may terminate their access to the App Store if they fail to live up to their promises. In the very first section of the Guidelines, Apple clearly informs developers wishing to sell their apps through the App Store that if "you attempt to cheat the system (for example, by trying to trick the review process, steal user data, copy another developer's work,

---

[6] Analysis Group, *Apple's App Store and Other Digital Marketplaces: A Comparison of Commission Rates* (July 22, 2020), at 5. Epic itself employs a royalty model on revenue generated by use of the Unreal Engine. Sweeney Decl. ¶ 18.
[7] Apple, *App Store: Principles and Practices*, https://www.apple.com/ios/app-store/principles-practices/.

manipulate ratings or App Store discovery) *your apps will be removed from the store and you will be expelled from the Developer Program*." Schiller Decl., Ex. C at 2 (emphasis added).

Apple has invested in an extensive array of tools, software, and Apple support services available to app developers. Schiller Decl. ¶¶ 20, 22-23. For example, Apple now makes 150,000 Application Programming Interfaces ("APIs") (which provide developers with immediate access to technical tools that simplify and accelerate the development process) available to all developers.[8] This is an exponential increase over the number of APIs available to developers in the beginning. As a condition of using these tools, Apple requires developers to sign the License Agreement. Schiller Decl., Ex. B.  This agreement prohibits developers, like Epic, from using Apple's software to "disable, hack, or otherwise interfere" with security or any other "Apple software or technology, or enable others to do so," *id.* ¶ 3.2(e), and prohibits developers from distributing applications to Apple's products that have circumvented its review process. *Id.* ¶ 3.2(g). It forbids developers like Epic from making changes to *Fortnite* without again submitting the revised app for review to ensure they have not made changes to the payment system, provided a "store or storefront for other code or applications," or bypassed security features of the iOS or privacy protections. *Id.* ¶¶ 3.3.2, 3.3.3. And it expressly says that violations will result in termination of "all rights and licenses granted by Apple hereunder." *Id.* ¶ 11.2.

### C.      Epic, *Fortnite*, and Agreements with Apple

Epic has been developing iOS games for many years. Schiller Decl. ¶ 6. It has used Apple's proprietary tools, software and services to bring its portfolio of games to iOS and it has taken advantage of the App Store to market and distribute those games to hundreds of millions of iOS customers. Schiller Decl. ¶ 14. For example, for years, Epic has used Apple's groundbreaking graphics technology, Metal, which Epic has explained "revolutionized graphic design" and "enable[d] developers like us to create richer 3D worlds." *Id.* ¶ 23. It launched *Fortnite* on the App Store in iOS in April 2018. Sweeney Decl. ¶ 3. *Fortnite* is a billion-dollar franchise that has become a global phenomenon.

---

[8] Cook July 2020 Statement at 2.

1  Epic admits that, in order to gain access to Apple's customers, it agreed to and was bound

2 by the contractual provisions in the Developer Agreement and the Guidelines. Compl. ¶ 210

3 ("Apple forces developers . . . to comply with Apple's App Store Review Guidelines," describing

4 the Guidelines and the License Agreement as "contractual provision" [sic]); ¶ 32 ("Apple is party

5 to an Apple Developer Program License Agreement . . . with Epic."); ¶ 81 ("Apple has enforced

6 these restrictions against Epic.").  It knew that the consequence of cheating the system and blatantly

7 violating Apple's contracts was that its "apps will be removed from the store" and that Epic would

8 be "expelled from the Developer Program," not only as to *Fortnite* but to other projects with Apple,

9 including Unreal Engine. Schiller Decl., Ex. C, at 2; Ex. B ¶ 11.2.

10  The experience of *Fortnite* outside of the iOS environment illustrates the importance of

11 Apple's approach to app review and security. In 2018, *Fortnite* announced that Android versions

12 of the game would be available on the web, and immediately sites appeared that not only advertised

13 Android *Fortnite* but also distributed malware in the game.[9] As one commentator noted,

14 "Unsurprisingly, malware versions of Fortnite targeted unsuspecting gamers in the months

15 following the Android launch, which is what malicious individuals would do with any popular app

16 that's available from outside the app store."[10] By 2019, Epic acknowledged security vulnerabilities

17 in non-iOS versions of *Fortnite* that exposed hundreds of millions of players to being hacked.[11]

18  **D.**  **Epic's Decision to Breach Its Agreements**

19  On June 30, 2020, Epic emailed Apple requesting to offer a competing Epic Games Store

20 app through the App Store that would allow iOS device users to install apps from Epic directly,

21 rather than through the App Store and to offer payment processing options within Epic's apps other

22 than IAP. Schiller Decl. ¶ 8, Ex. D. On July 10, Apple responded that "Apple has never allowed

23

24 [9] Brian Barrett, *Imposter Fortnite Android Apps Are Already Spreading Malware*, Wired (Aug.
  16, 2018), https://www.wired.com/story/imposter-fortnite-android-apps-already-spreading-
25  malware/.

26 [10] Chris Smith, *Epic Invented a Crisis So Fortnite Fans Would Support Its Lawsuits Against
  Apple and Google* (Aug. 14, 2020), https://bgr.com/2020/08/14/fortnite-ban-iphone-android-
  apple-google-right-vs-epic/.

27 [11] Jason Silverstein, *Fortnite Security Flaw Exposed Millions of Users to Being Hacked* (Jan. 16,
  2019), https://www.cbsnews.com/news/fortnite-security-flaw-exposed-millions-of-users-to-
28  being-hacked/.

APPLE'S OPPOSITION TO EPIC'S MOTION FOR A TRO/PI
Case No. 3:20-cv-05640-YGR

1    this . . . we strongly believe these rules are vital to the health of the Apple platform and carry

2    enormous benefits for both consumers and developers." Schiller Decl. ¶ 9, Ex. E at 4.

3         Despite this warning, on August 13, 2020, Epic made a deliberate choice to cheat Apple.

4    *See* Epic's Motion for a Temporary Restraining Order, Dkt. 17 ("TRO Br.") at 8-9. Around 2am

5    on August 13, Mr. Sweeney of Epic wrote to Apple stating its intent to breach Epic's agreements:

6    "Epic will no longer adhere to Apple's payment processing restrictions." Schiller Decl. ¶ 11. Hours

7    later, Epic activated a secretly planted payment mechanism in *Fortnite* to slide a non-approved

8    change into the app that blatantly evaded App Review. TRO Br. at 9; Schiller Decl. ¶¶ 11-12. In

9    order to deliberately conceal the change from Apple, Epic changed the option on its own servers to

10   enable the approved version of *Fortnite* to offer a non-compliant in-app purchase option. TRO Br.

11   at 9.

12        Epic's breach was flagrant. Epic willfully "direct[ed] customers to purchasing mechanisms

13   other than in-app purchase" and created a new "storefront" in contravention of the Guidelines.

14   Schiller Decl., Ex. C ¶¶ 3.1.1, 3.2.1.[12] This is "egregious behavior" prohibited under the agreements

15   that "can lead to removal from the Apple Developer Program."  Schiller Decl., Ex. H.  Epic

16   breached the License Agreement, Ex. F, by making changes without resubmission to Apple (¶ 6.1),

17   installing a store or storefront (¶ 3.3.2), enabling purchases without using the In-App Purchase API

18   (¶ 3.3.25), and more. Schiller Decl., Ex. I.

19        Epic knew full well that, in circumventing Apple's processes and breaching its contracts, it

20   was putting its entire relationship with Apple—including its Unreal Engine and other projects—at

21   serious risk. Epic made the calculated decision to breach anyway, and then run to this Court to

22   argue that its customers were being damaged. All of this was avoidable if Epic had brought its

23   antitrust case without breaching its agreements. It is hard to think of a case less worthy of the

24   extraordinary relief that Epic seeks.

---

[12] Without accepting Epic's self-serving statements about the regularity of "hotfixes" as true,
these arguments are a sideshow; Epic cannot seriously claim that the specific change it made
did not constitute a flagrant and intentional violation of Apple's policies and contracts by
directing in-app purchases to be made outside the App Store. TRO Br. at 8-9 (admitting that the
Developer Agreement and Guidelines prohibit in-app content from being sold or provided
outside of Apple's in-app purchasing mechanism).

E.     **Apple's Response**

On August 13, Apple notified Epic that "your app is in violation of the App Store Review Guidelines" and identified the specific guidelines that were violated, including the use of external purchase mechanisms, "egregious" hidden features designed to evade Apple's review, and other changes in features and functionalities. Schiller Decl., Ex. H. The email notified Epic that "your app has been removed from the App Store until we receive an update that is compliant with the App Store Review Guidelines," inviting Epic to submit an updated version of *Fortnite* for review "which addresses all these issues." *Id.* Epic does not dispute that this notice is correct and that it was blatantly violating the Guidelines.

On August 14, Apple gave Epic notice that it also was in violation of the License Agreement, specifying each breach. Schiller Decl., Ex. I. The breaches included the introduction of new payment functionality with submission for App Review, downloading code to an app to add an unauthorized payment system, and allowing users to purchase items without using IAP. *Id.*

Epic now argues that Apple has somehow stretched a dispute over *Fortnite* to include the Developer Program, but Epic does not dispute that Apple's notice was correct and that Epic is blatantly violating the License Agreement, which put its participation in the Developer Program at risk. Apple's notice is also consistent with how it treats other developers who violate this License Agreement in the same way. Schiller Decl. ¶ 16.[13]

Apple then allowed Epic an opportunity to cure its breaches, which Epic has thus far refused. Schiller Decl. ¶¶ 15-16, Ex. I. Apple notified Epic that, if Epic did not cease its violations of Apple's contractual terms and cure its breaches by August 28, Apple would exercise its right to terminate Epic's Developer Program membership. *Id.* Epic has the right to appeal the decision to the App Review Board. *Id.*

The offer to cure remains open. If Epic returns to compliance with Apple's contracts and policies, *Fortnite* would be available, within days, on the App Store, and Epic would remain in the

---

[13] Epic's End User License Agreement contains similar provisions. End User License Agreement for Unreal Engine: https://www.unrealengine.com/en-US/eula/publishing at § 17 (providing for termination by Epic if the licensee "materially breach[es] any provision of this Agreement").

Developer Program to continue its work with Unreal Engine.[14] As Apple explained to Epic: "We hope that you are able to cure your breaches of the Apple Program License Agreement and continue to participate in the program. We value our developers and we want to see them all achieve success on the App Store." Schiller Decl., Ex. I at 3.

### F.   Epic's Orchestrated "Challenge" to the App Store

Epic did not, and has not, contested that it is in breach of the App Store Guidelines and the License Agreement. Epic's plan was to violate the agreements intentionally in order to manufacture an emergency. The moment *Fortnite* was removed from the App Store, Epic launched an extensive PR smear campaign against Apple and a litigation plan was orchestrated to the minute; within hours, Epic had filed a 56-page complaint (Dkt. 1), and within a few days, filed nearly 200 pages with this Court in a pre-packaged "emergency" motion. And just yesterday, it even sought to leverage its request to this Court for a sales promotion, announcing a "#FreeFortniteCup" to take place on August 23, inviting players for one last "Battle Royale" across "*all platforms*" this Sunday, with prizes targeting Apple.[15] Epic has also launched a campaign against Google, which uses similar policies to Apple's, and claimed Google is also a monopoly.[16]

Some Epic customers, based on materials attached to Epic's motion, have seen through Epic's subterfuge to understand this is a problem of Epic's making. As one user asked Epic's customer support team after the takedown: "Did you guys just screw over all your mobile players?" Sweeney Decl. ¶ 14, Ex. A at 2. One user predicted Epic would "remove the illegal (according to Apple) update and be back to normal in no time." *Id*. at 13.

---

[14] Epic quotes Apple's willingness to let Epic back in on the terms that applied to it previously and that apply to everyone else. (TRO Br. at 9.) As Apple stated: "We very much want to keep the company as part of the Apple Developer Program and their apps on the Store. The problem Epic has created for itself is one that can easily be remedied if they submit an update of their app that reverts it to comply with the guidelines they agreed to and which apply to all developers." The Verge, *Apple fires back at Epic: 'We won't make an exception' (*Aug. 15, 2020), https://www.theverge.com/2020/8/17/21373108/apple-response-epic-app-store-fortnite-lawsuit.

[15] Epic Games, *Join the Battle and Play in the #FreeFortniteCup on August 23*, https://www.epicgames.com/fortnite/en-US/news/freefortnite-cup-on-august-23-2020 (emphasis added).

[16] *Epic Games* v. *Google LLC, et. Al.*, 5:20-cv-05671-NC (complaint filed Aug. 13, 2020).

Epic's action in forcing its own termination from the App Store has not deprived its customers of *Fortnite*. Tens of millions of iOS *Fortnite* players who have previously downloaded the video game "will continue to have access to it on their devices and will have access to any available in-app purchase products." Schiller Decl. ¶ 17, Ex. H. And *Fortnite* remains "available on Microsoft Windows, macOS, [Sony's] PlayStation4, [Microsoft's] Xbox One and Nintendo Switch." Sweeney Decl. ¶ 3.[17] Despite Epic's claims of an App Store monopoly, Mr. Sweeney is also tweeting about *Fortnite*'s availability on Samsung.[18]

## III.   LEGAL STANDARD

"The standard for a TRO is the same as for a preliminary injunction." *Rovio Entertainment Ltd.* v. *Royal Plush Toys, Inc*., 907 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012) (citation omitted). A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek* v. *Lamone*, 138 S. Ct. 1942, 1943 (2018). In general, a "plaintiff seeking a preliminary injunction must establish" (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter* v. *Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Epic bears the burden of meeting all of the *Winter* prongs and can meet none of them.

There are two types of preliminary injunctions: prohibitory injunctions, which preserve the status quo, and mandatory injunctions, which mandate a party to alter the status quo. *Marlyn Nutraceuticals, Inc.* v. *Mucos Pharma GmbH & Co*., 571 F.3d 873, 878-79 (9th Cir. 2009). The status quo is measured as the "last uncontested status" between the parties (*Garcia* v. *Google*, 786 F.3d 733, 740 & n.4 (9th Cir. 2015) (en banc)), which "is not measured from the time at which the first dispute at issue in a case arose, but from the time the complaint was filed." *Animal Legal Defense Fund* v. *United States Dep't of Agriculture*, 2017 WL 2352009, at *3 (N.D. Cal. May 31, 2017). "A mandatory injunction 'goes well beyond simply maintaining the *status quo pendente lite*

---

[17] Epic Games, *FAQs: Where Can I Download Battle Royale?* (last visited Aug. 20, 2020), https://www.epicgames.com/fortnite/en-US/faq.

[18] Tim Sweeney (@TimSweeneyEpic), Twitter (Aug. 14, 2020, 7:44PM), https://twitter.com/SamsungMobileUS/status/1294419706389045248 (retweeting @SamsungMobileUS statement that "You know what's epic? You can still download @FortniteGame Mobile").

1  [and] is particularly disfavored.'" *Stanley* v. *Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir.

2  1994) (quoting *Anderson* v. *United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). As a result, Epic's

3  burden is "doubly demanding." *Garcia*, 786 F.3d at 740. A court must deny a mandatory injunction

4  "unless the facts and law clearly favor the moving party." *Garcia*, 786 F.3d at 740 (quoting

5  *Anderson*, 612 F.2d at 1114).

6          Epic seeks a mandatory injunction by asking the Court to compel Apple to take affirmative

7  action to reinstate *Fortnite* to the App Store, to do so on unique terms, and also require Apple to

8  support Epic's compatibility with the App Store going forward and make available *Fortnite*

9  updates. *See Stanley*, 13 F.3d 1320 (preliminary injunction to reinstate head coach was "mandatory"

10  because on "the date th[e] action was filed in state court, Coach Stanley was no longer a USC

11  employee"); *Heineke* v. *Santa Clara University*, 2018 WL 3368455, at *24-25 (N.D. Cal. July 10,

12  2018) (rev'd in part on other grounds) (plaintiff seeks a prohibitory injunction when it moves to

13  prevent a termination and a mandatory injunction when it moves for reinstatement). Providing

14  ongoing support development tools and other technology and technical support is also mandatory

15  because it requires specific support and technology. *Dahl* v. *HEM Pharm. Corp.*, 7 F.3d 1399, 1403

16  (9th Cir. 1993) (requiring defendants to comply with contract constituted "mandatory preliminary

17  relief").

18          Epic's definition of the status quo underscores the point. It wants *Fortnite* back in the App

19  Store, but it wants that privilege under a set of new terms and conditions that were never a product

20  of the parties' negotiations and that have never been provided to other developers. It wants to be

21  reinstated and not removed on the "basis that *Fortnite* offers in-app payment processing through

22  means other than Apple's In-App Purchase ('IAP')." TRO Br. at i (identifying relief sought). This

23  was never the uncontested status quo; it was a breach that began on August 13, 2020. Compl. ¶¶

24  19-20; Grant Decl. ¶¶ 13-14; Schiller Decl., Ex. H. Apple has offered a return to the status quo that

25  existed before Epic smuggled in its unauthorized payment structure—it has offered that Epic submit

26  a version of *Fortnite* that conforms to the Guidelines. Epic has not taken Apple's offer.

27

28

## IV.    ARGUMENT

### A.    Epic Has Not Suffered Irreparable Harm

#### 1.    Epic's Claimed "Irreparable Harm" is Self-Inflicted and the Result of Its Choice to Breach Its Agreements

The harm raised by Epic here is completely avoidable—here and now. The asserted harm to Epic customers, whether of *Fortnite* or Unreal Engine, can be ended by Epic. All of the users and developers that Epic asserts are at risk are disadvantaged only because Epic's scheme included breaching its agreements and running into court for relief. Epic has put customers and developers in this position, not Apple.

As Apple has said to Epic and publicly, Epic can be reinstated immediately to the App Store if Epic complies with the rules to which it agreed. Apple has even given Epic notice of its right to cure its breaches. All Epic has to do is remove the "hotfix" that breached its agreements. The only losses that Epic would claim to suffer from reinstatement would be monetary and not irreparable harm. It would pay the commissions it agreed to pay, and abide by the Guidelines it agreed to accept for the last decade. The only real issue for Epic is the commission which it does not wish to pay and about which it is free to litigate. Epic does not need to breach its agreements or throw its own customers into this dispute to litigate an antitrust claim.

The Ninth Circuit said it best when it said "self-inflicted wounds are not irreparable injury." *Al Otro Lado* v. *Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Second City Music, Inc.* v. *City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *K.D.* v. *Oakley Union Elementary Sch. Dist.*, No. C 07-00920 MHP, 2008 WL 360460, at *11 (N.D. Cal. Feb. 8, 2008) ("harm is not irreparable if self-inflicted"); *California Pawnbrokers Ass'n, Inc.* v. *Carter*, No. 216CV02141, 2016 WL 6599819, at *10 (E.D. Cal. Nov. 8, 2016) (harm caused by the plaintiffs' voluntary choice did not support a showing of irreparable injury); *see also Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 416, 1 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").

Apple has had the policies that Epic now challenges in place for many years—from 2008 to the present—and for the entirety of Epic's relationship with Apple. Epic now cries "emergency," but the only change was Epic's choice to violate the previously followed policies, knowingly

1    triggering the contractually defined consequences. And all of the harms it claims to itself or its

2    customers are curable by once again following the contract Epic had previously agreed to. *See Dish*

3    *Network LLC* v. *Cox Media Grp., LLC*, 2020 U.S. Dist. LEXIS 126850, at *21-22 (N.D. Ill. 2020)

4    (losses from decision to black out stations rather than to pay higher rates is not irreparable harm:

5    "self-inflicted wounds are not irreparable injury").

6        Similarly, if "the parties have contemplated termination in their agreements," then

7    irreparable injury cannot result from termination. *E.g., Hall's IV and Inst. Pharmacy, Inc.* v. *Prime*

8    *Therapeutics LLC*, 2016 WL 462054, at *5 (N.D. Tex. Jan. 29, 2016). That is because any harm

9    "results from the express terms of [the] contract." *Salt Lake Tribune Publishing Co. LLC* v. *AT&T*

10   *Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003); *accord Dotster, Inc.* v. *Internet Corp.*, 296 F. Supp.

11   2d 1159, 1163-64 (C.D. Cal. 2003) (no irreparable injury from exercise of contract provision).

12       Epic does not contest that it made its promises. The contract language of the Developer's

13   License is crystal clear in prohibiting Epic from downloading and distributing, without Apple

14   approval, functionality such as an unauthorized payment system. Schiller Decl., Ex. B ¶¶ 6.1, 3.2,

15   3.3.2, 3.3.3. The App Store Review Guidelines likewise state: "Apps and their metadata may not

16   include buttons, external links, or other calls to action that direct customers to purchasing

17   mechanisms other than in-app purchase." Ex. G, ¶ 3.1.1.

18       Epic acknowledges that it violates these agreements. The screenshot at page 2 of its TRO

19   brief shows Epic offering users a button by which Epic would direct users to purchasing

20   mechanisms other than in-app purchase.  Epic acknowledges that it promised to "use IAP

21   exclusively for all in-app purchases of in-app content (and pay a 30% commission on those

22   transactions)." TRO Br. at 3-4. Epic admits that it offered an app with code that was a "hotfix"

23   which made "updated content accessible to users through interaction with a developer's server."

24   Epic's "hotfix" code was the mechanism by which it suddenly allowed users to make in-app

25   payments directly to Epic.  This is a clear breach of the contractual promise to "use IAP exclusively

26   for all in-app purchases." TRO Br. at 3.

27

28

**2.      Epic's Alleged Injuries to Goodwill Do Not Constitute Irreparable Injury**

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely"—not merely a "possibility"—"in the absence of an injunction." *Winter*, 555 U.S. at 22. Epic claims that all it needs to do is show that there is evidence that "supports a finding of the possibility of irreparable harm." TRO Br. 12 (quoting *Stuhlbarg Int'l Sales Co.* v. *John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). That is wrong. In *Winter*, seven years after *Stuhlbarg*, the Supreme Court held that the "'possibility' standard is too lenient" and plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. A "clear showing" of irreparable harm is required. *Garcia*, 786 F.3d at 746; *CSNK Working Cap. Fin. Corp.* v. *Baxter, Bailey & Assoc., Inc.*, 2016 WL 9176328, at *2-3 (N.D. Cal. Aug. 19, 2016). Epic's arguments about speculative prospective harm to its customer base and goodwill has failed to carry its burden. *Disney Enter., Inc.* v. *VidAngel, Inc.*, 224 F. Supp. 3d 957, 975 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) ("unsupported and conclusory statements regarding harm [the plaintiff] might suffer" are insufficient).

Allegations of loss of goodwill and reputation fail to establish irreparable injury without "credible and admissible evidence that such loss actually threatens plaintiff's business with termination." *N. Cty. Commc'ns Corp.* v. *Sprint Commc'ns Co., L.P.*, 2012 WL 12882889, *5 (S.D. Cal. Sept. 27, 2012).[19] Epic nowhere claims that its entire business is at risk. And Epic has provided absolutely no evidence that customer goodwill threatens the existence of Epic's business. To the contrary, the declarations that Epic submitted boast of *Fortnite's* success, noting that as of June 2020, *Fortnite* had 350 million registered users around the world. Sweeney Decl. ¶ 3.[20]

---

[19] *Accord Am. Passage Media Corp.* v. *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("Without a sufficient showing that these contracts threatened AP's existence, any loss in revenue due to an antitrust violation is compensable in damages"); *Oakland Tribune, Inc.* v. *Chronicle Publ'g. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("No evidence shows that the Tribune verges on bankruptcy"); *Los Angeles Memorial Coliseum Commission* v. *NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("Other than the threat of lost revenues, the plaintiff did not demonstrate any threat of harm that would have supported a finding of irreparable injury").

[20] The fact that Epic has not requested monetary damages yet and is only seeking equitable relief does not change the analysis of whether any harm is reparable by money damages. *Doe* v. *Texaco, Inc.*, No. C 06-02820 WHA, 2006 WL 2053504, at *3 (N.D. Cal. July 21, 2006); *Smith* v. *Fredrico*, No. 12-CV-04408 ADS ETB, 2013 WL 122954, at *4 (E.D.N.Y. Jan. 8, 2013).

15

Epic claims that it would lose customer goodwill, because of "players on Apple mobile devices . . . [whose] friends and family . . . cannot join them." TRO Br. at 12. But Epic provides no evidentiary support that these customers will actually lose the ability to play with friends and family. Instead, Mr. Sweeney's declaration makes clear, *Fortnite* is available on numerous platforms, including "Microsoft Windows, macOS, Playstation 4, Xbox One and Nintendo Switch." Sweeney Decl. ¶¶ 3, 7. It was only in April 2018 that an iOS version was released, enabling subscribers to extend play to the iOS platform. *Id*. ¶ 3.

The allegations of loss of customer goodwill also stem from Epic's own decisions about the compatibility of new versions of *Fortnite*. It is Epic that decides that a player "cannot play with those whose games have been updated." TRO Br. at 12. Absent this technological decision by Epic, all its users on iOS with older versions of *Fortnite* could play with players with updated games.

Nor has Epic provided evidence showing that the Unreal Engine business will be significantly harmed. Epic vaguely refers to "harms to . . . ongoing vitality of Epic's Unreal Engine business," Epic's assertions of harm are speculative, and "Speculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc.* v. *Superior Court of State of Cal*., 739 F.2d 466, 472 (9th Cir. 1984) (rejecting injury from loss of "untold" customers). Epic relies on mere possibilities which do not establish irreparable injury. *Am. Passage Media Corp.*, 750 F.2d at 1473 (discounting conclusory declarations submitted by movant's executives to support irreparable injury).

None of the cases Epic cites hold otherwise. TRO Br. at 13-14. All of its cases concern consumer confusion in trademark and copyright disputes to show irreparable harm from continued intellectual-property infringement. *E.g.*, *Life Alert Emergency Response, Inc.* v. *LifeWatch, Inc.*, 601 F. App'x 469, 473-74 (9th Cir. 2015) (evidence that customers were confused by a trademark infringer's robo-calls).[21]

---

[21] *See also Go Daddy Operating Co.* v. *Ghaznavi*, No. 17-CV-06545-PJH, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018) (infringer used GoDaddy's trademarks); *Home Comfort Heating & Air Conditioning, Inc.* v. *Ken Starr, Inc.*, No. 8:18-CV-00469-JLS-DFM, 2018 WL 3816745, at *9 (C.D. Cal. July 24, 2018) ( "evidence of actual confusion" with respect to trademark infringement); *Mitchell* v. *3PL Sys., Inc.*, No. SACV11-0534 AG (ANX), 2013 WL 12129617, at *4 (C.D. Cal. Apr. 8, 2013) (harm to a brand from a copyright infringer).

**B.** **Epic Has Failed to Establish Any—Much Less a "High"—Likelihood of Success on the Merits**

Epic's claim to have established a probability of success is an exercise in legal creativity. Its arguments stretch existing precedent to the outer limits and present a number of novel legal issues that would create new law on a scant record. The idea that Epic is likely to succeed on the merits of its antitrust claims, much less that they are "highly likely" to succeed on the merits, is not credible. The App Store has exponentially increased output (including hosts of free apps), has never raised prices, enhanced innovation, and dramatically improved developer and consumer welfare. Under these circumstances, the *per se* rule is off the table. *Microsoft*, 253 F.3d at 89-95 (rule of reason applies to cases that involve "software that serves as a platform for third-party applications").

**1.** **Apple Manifestly Lacks Monopoly Power**

Epic does not address (and asserts no likelihood of success on) its claims that Apple has a monopoly in a novel "iOS App Distribution Market" and has violated the Sherman Act by declining to facilitate the download of iOS apps other than through the App Review process. Compl. ¶¶ 184-92, 207-15. Epic must prove the existence of such a monopoly to sustain its tying claim, because Epic alleges that iOS app distribution is the "tying" product and that Apple "wields its market power in the iOS App Distribution Market to coerce developers into using IAP." TRO Br. at 17. Even if one was to assume that IAP is a separate "tied" product (which, as explained below, it is not), Epic's tying claim fails because a market limited to "iOS apps" has no basis in reality. *See Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (tying claim requires market power in tying market); *Apple Inc.* v. *Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (rejecting tying claim premised on Apple's monopoly power in supposed "Mac OS market").

A "manufacturer's own products do not themselves comprise a relevant product market" and a "company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." *Psystar*, 586 F. Supp. 2d at 1197-98 (quoting *Green Country Food Market, Inc.* v. *Bottling Group*, 371 F.3d 1275, 1282 (10th Cir. 2004)). Courts routinely "'reject the argument that a single branded product constitutes a relevant market.'" *Id.*; *see also id.* at 1198 ("Single-

17

brand markets are, at a minimum, extremely rare"). For this reason, the *Psystar* court held that a relevant market limited to the Mac OS was an improper, single-brand market, and dismissed tying claims based on Apple requiring only the Mac OS to be used on Apple computers. *Id.* at 1193, 1197-98. The only authority Epic offers in support of its single-brand iOS Mobile App Distribution and iOS In-App Payment Processing markets is an administrative decision of the European Commission—which interprets only "European competition law." TRO Br. at 15.

An antitrust market must include services "reasonably interchangeable by [developers] for the same purposes," *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)— here, getting their games in front of millions. *Fortnite* has achieved success by taking advantage of the multiple distribution channels available to gamers, including other mobile app marketplaces, video game consoles, and personal and laptop computers. *See Hicks* v. *PGA Tour, Inc.*, 897 F.3d 1109, 1111, 1120 (9th Cir. 2018) (dismissing antitrust claim when relevant market ignored multiple ways that advertisers reached consumers, including through television, radio, podcasts, and magazines); *Psystar*, 586 F. Supp. 2d at 1199 (rejecting tying claim because "Mac OS performs the same functions as other operating systems"). Epic claims to exclude these competitors because they "are not compatible with iOS and do not offer iOS-compatible apps." Compl. ¶ 54. But, while that may be factually true, it says nothing about whether the iOS platform is interchangeable for other outlets in the eyes of developers and consumers. *See Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) ("interchangeability" means that "one product is roughly equivalent to another for the use to which it is put").

There is substantial evidence of competition among platforms on which *Fortnite* is played. *Fortnite* achieved enormous popularity and attracted tens of millions of users before it launched on iOS.[22] *Fortnite* was among the first games to offer "cross-platform" play; and still today, consumers have ready access to *Fortnite* through "Sony's PlayStation 4, Microsoft's Xbox One and the Nintendo Switch, personal computers and Macs [and] certain Android mobile devices." TRO Br. at 5. Under Epic's theory, each of these platforms with millions of users based on their own

---

[22] *The Rise and Rise (and Rise) of 'Fortnite,'* Engadget (Mar. 17, 2018), https://www.engadget.com/2018-03-17-fortnite-battle-royale-record-breaker.html.

technology would be a monopoly. Epic's position on market definition is particularly startling given Epic's own admission that most people play *Fortnite* through platforms other than iOS, *see* Sweeney Decl. ¶ 12 (iOS "will be unable to play *Fortnite* **with most other players**" (emphasis added)), not to mention the fact that, of the more than $1.8 billion earned by *Fortnite* in 2019, less than 12% came from iOS.[23]

### 2.   IAP Is Not a Separate Market or Product

The antitrust claims Epic invokes in its motion—per se unlawful tying, unreasonable restraint of trade, and monopolization—rest on the false premise that there is a separate market for iOS in-app payment processing and that Apple's in-app purchase ("IAP") function is a separate product. Epic cannot support such a premise factually or legally. IAP functions as Apple's digital checkout for the App Store—a payment gateway through which all purchases of digital content made within iOS apps and on the App Store are channeled and logged. It is the means through which Apple tracks in-app sales and collects its commission.

The App Store is a transactional platform, *i.e.*, a platform that offers "different products or services to two different groups who both depend on the platform to intermediate between them." *Ohio* v. *American Express*, 138 S. Ct.  2274, 2280 (2018); David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* 117 (2016) ("A year after its launch, the iPhone was a two-sided platform connecting users and app developers."), *cited in Amex*, 138 S. Ct. at 2280-81. The App Store exhibits the defining feature of so-called two-sided platforms because it "cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Amex*, 138 S.Ct at 2280. It "facilitate[s] a single, simultaneous transaction between" app developers and iOS users. *Id.* at 2286. Epic seeks to transform that **single** transaction into **two** alleged products—distribution and payment processing—sold in **two** supposed relevant markets. But this effort must fail as a matter of law because "[t]ransaction platforms are . . . better understood as 'suppl[ying] only one product'—transactions" and, accordingly, "'[i]n two-sided transaction markets, only one market should be defined.'" *Id.* at 2286-87 (citations omitted); *see also U.S.*

---

[23] Shannon Liao, *Fortnite Made $1.8 Billion in 2019*, CNN (Jan. 3, 2020).

*Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided transaction platforms, the relevant market must, as a matter of law, include both sides of the platform"); *United States* v. *Sabre Corp.*, No. 19-1548, 2020 WL 1855433, at *36 n.17 (D. Del. Apr. 7, 2020) ("booking services" not a separate product from two-sided travel booking platform).[24]

Even setting aside the dispositive law on two-sided platforms, Epic's factual allegations provide no support for defining IAP as a separate single-sided product market. Where the alleged tied product is an essential ingredient of the overall "method of business" that is sold to customers, courts view them as one product. *Rick-Mik Enters., Inc.* v. *Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008). Epic's allegations make it clear that payment processing is an integral part of the broader business method that Apple offers to app developers. Compl. ¶¶ 112-13 (seamless and nearly instantaneous processing of payments provides "immense benefits for app users and developers"). Furthermore, where the alleged tied and tying products have always been integrated, "they are a single product." *Rick-Mik Enters., Inc.*, 532 F.3d at 975 (quoting *Microsoft*, 253 F.3d at 86); *see also Kaufman* v. *Time Warner*, 836 F.3d 137, 144-45 (2d Cir. 2016) (two services were not separate products for purposes of tying when they had never been sold separately in the U.S.).

IAP also fails the Ninth Circuit's "purchaser demand" test for finding distinct products— *i.e.*, whether sufficient demand exists for the tied product separate from the tying product. *Rick-Mik Enters., Inc.*, 532 F.3d at 975. Epic does not allege that there exists demand for IAP that is separate from the App Store. In fact, Apple does not charge developers any money for using IAP itself. Schiller Decl., Ex. B ¶¶ 1.2, 7.1.

While Epic points to the availability of third-party payment methods for the sale of physical goods as evidence that the App Store and IAP do not always have to be provided together, there are material differences between the two types of transactions. *See Kaufman*, 836 F.3d at 145 (evidence that the products at issue were sold separately in a different market was not probative where there were "obvious differences" between the markets).

---

[24] Although the court's opinion in *United States* v. *Sabre Corp.* was later vacated as moot, the Third Circuit expressly noted that its order "should not be construed as detracting from the persuasive force of the District Court's decision, should courts and litigants find its reasoning persuasive." Order at 1-2, *United States* v. *Sabre Corp.*, No. 20-1767 (3d Cir. July 20, 2020).

20

### 3.     Apple Has Not Engaged in Anticompetitive Conduct

Removing Epic from the App Store and, absent a cure of its breach, the Developer Program due to the breach of its agreements with Apple is legal conduct: "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citation omitted); *see also Qualcomm*, 2020 WL 4591476, at *11 (same). If the App Store were a brick-and-mortar store, it would be obvious that Apple could choose which products to distribute, which customers to sell to, and on what terms. The antitrust laws cannot condemn Apple for following the terms and conditions in place since 2008 upon which it made its App Store available to Epic and other developers. *Cyber Promotions, Inc.* v. *Am. Online, Inc.*, 948 F. Supp. 456, 461-62 (E.D. Pa. 1996) (denying TRO; "the federal antitrust laws simply do not forbid AOL from excluding from its system advertisers like Cyber who refuse to pay AOL any fee").

Epic's claim also depends on holding that Apple's App Store requirements—which ensure security, privacy and a quality user experience—are a "tie," monopoly maintenance and a violation of the rule of reason. Product and technology choices such as how Apple structures the App Store and its Guidelines do not constitute anticompetitive conduct. *In re Apple iPod iTunes Antitrust Litig.*, 2014 U.S. Dist. LEXIS 165276, at *7 (N.D. Cal. 2014); *Allied Orthopedic Appliances, Inc.* v. *Tyco Health Care Group L.P.*, 2008 U.S. Dist. LEXIS 112002, at *55-56 (C.D. Cal. 2008); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979) ("any firm, even a monopolist, may generally bring its products to market whenever and however it chooses."). The evidence that the App Store and its requirements are genuine innovations cannot seriously be disputed.

### 4.     Apple Has Not Denied Epic Access to an Essential Facility

Epic's claims that iOS is a "paradigmatic essential facility" are factually and legally untenable. TRO Mot. at 22. As a threshold matter, the Supreme Court has never adopted the essential facilities doctrine and the theory has been heavily criticized. 3A Areeda & Hovenkamp, ANTITRUST LAW ¶ 771c, at 173 (4th ed. 2015) ("[t]he essential facility doctrine is both harmful and unnecessary and should be abandoned."); *Intergraph Corp.* v. *Intel Corp.*, 195 F.3d

1346, 1356-59 (Fed. Cir. 1999); *see also id.* at 1357 ("The courts have well understood that the essential facility theory is not an invitation to demand access to the property or privileges of another, on pain of antitrust penalties"). Epic claims that Apple has denied it access to "iOS," but that is simply false.  Apple offers Epic and every other app developer access to iOS through the License Agreement.  Schiller Decl., Ex. B.  And as Mr. Sweeney explains, even after Apple removed *Fortnite* from the App Store, Epic is still making *Fortnite* sales via the iOS app and through IAP. Sweeney Decl. ¶ 11. That alone is fatal to Epic's essential facility claim, regardless of whether iOS can be deemed an essential facility. *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 411 (2004) ("where access exists, the [essential facilities] doctrine serves no purpose."); *MetroNet Servs. Corp.* v. *Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004) (rejecting essential facilities claim because "reasonable access to the essential facility exists").

Epic's essential facility claim is nothing more than a refashioned refusal to deal claim. And here, Epic's claim is dead on arrival because it cannot sidestep the reality that there was no actual refusal to deal, as discussed above. *Aerotec*, 836 F.3d at 1183. Moreover, "the doctrine does not guarantee competitors access to the essential facility in the most profitable manner." *MetroNet Servs. Corp.*, 383 F.3d at 1130. There is no antitrust obligation for Apple "to deal under terms and conditions favorable to its competitors." *Linkline*, 555 U.S. at 450-51. The Supreme Court has twice ordered dismissal of such claims ***as a matter of law***. *See id.*; *Trinko*, 540 U.S. at 410-11.

It is equally well settled in the Ninth Circuit that Apple owes Epic no duty to deal in light of Epic's breach of its contractual obligations and its threats to bring a lawsuit which culminated filing this case. *Zoslaw* v. *MCA Distrib. Corp.*, 693 F.2d 870, 889-90 (9th Cir. 1982); *Optronic Tech. Inc.* v. *Ningbo Sunny Elec. Co.*, 414 F. Supp. 3d 1256, 1269 (N.D. Cal. 2019) ("a company may refuse to deal with an entity that sues the company without contravening antitrust laws.").

### 5.      IAP Is Supported by a Legitimate Business Purpose

Lastly, Epic's claims will fail because it is black letter law that an "antitrust defendant's conduct is redeemed by a legitimate business purpose." *Universal Analytics, Inc.* v. *MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990); *see also, e.g.*, *Trans Sport, Inc.* v. *Starter Sportswear, Inc.*, 964 F.2d 186, 189 (2d Cir. 1992) ("legitimate business justifications . . . prevent

22

1   a rational trier of fact from finding ¶ 2 liability") (Marshall, J.). Apple needs a way of ensuring that

2   it actually gets paid. IAP is the fundamental mechanism by which Apple, like many other

3   transaction platforms, implements its business model and recoups its substantial investment in the

4   platform. *See* Analysis Group, *Apple's App Store and Digital Marketplaces*, Appendix A1, A4 (July

5   22, 2020) (all major app marketplaces, all major online retail platforms, all major digital booking

6   platforms, and both major ridesharing companies implement rules to prevent circumvention of

7   commissions).

8           **C.      The Balance of Equities Tips Sharply in Apple's Favor**

9           In balancing equities between the parties, the Court must weigh the effect of different harms

10  to both parties, at its own discretion. *Earth Island Inst.* v. *Carlton*, 626 F.3d 462, 475 (9th Cir.

11  2010). Here, the harm to Apple and the App Store from an injunction would be substantial. Epic,

12  by virtue of its media campaign, has made no secret that this is the entire point.

13          At the outset, equity does not favor Epic because it has unclean hands. Epic has undeniably

14  breached its agreement with Apple, and a party breaching a contract, as Epic here, has no standing

15  to seek equitable relief. *See, e.g.*, *Silvas* v. *G.E. Money Bank*, 2011 WL 3916073, at *2 (9th Cir.

16  2011) (affirming denial of preliminary injunction based on unclean hands); *see also G. Neil Corp.*

17  v. *Cameron*, 2003 U.S. Dist. LEXIS 19509, at *4 (E.D. Pa. 2003) (doctrine of unclean hands

18  "provides that a party breaching a contract has no standing in equity").

19          Epic also does not seek a return to the status quo. As its own correspondence with Apple

20  makes clear, it seeks an exception to Apple's policies, and a brand-new contractual relationship

21  that Apple did not negotiate for and that no developer has ever had. As the Supreme Court has

22  noted, "Courts are ill suited 'to act as central planners, identifying the proper price, quantity, and

23  other terms of dealing.'" *Linkline*, 555 U.S. at 452 (citation omitted).

24          While in public Epic is candid about its desire to harm Apple, in legal filings Epic claims

25  that the harm to Apple is minimal because Apple will only lose "some commissions," and suggests

26  that Apple could recover "damages" to replace those losses. TRO Br. at 23. The same can be said

27  of Epic: Epic can return to the App Store and only pay "some commissions."

28          If Epic's scheme succeeds, 1.7 million other developers will be eligible to make the same

1    argument and the user experience in the App Store will evaporate. A "Court-imposed injunction

2    would also encourage a flood of similar applications by other companies" who wish to evade the

3    policies of Apple and others and prevent them from recovering any revenue in exchange for its

4    significant investments. *Zango, Inc.* v. *PC Tools Pty Ltd.*, 494 F. Supp. 2d 1189, 1196 (W.D. Wash.

5    2007). If Epic's conduct is successful, it would demonstrate to all developers that they can simply

6    disregard their legal agreements with Apple. Schiller Decl. ¶ 25.

7         The Court should also again consider that Epic created the circumstances about which it

8    now complains. *See Johnston* v. *Citimortgage, Inc.*, No. 5:11-CV-00567-JF, 2011 WL 941282, at

9    *3 (N.D. Cal. Mar. 18, 2011) (Plaintiff did not prove that balance of equities tipped in its favor

10   when "any emergency caused by the pendency of the foreclosure sale is of the Johnstons' own

11   making."). The only harm Epic would suffer from adhering to Apple's uniform policies during this

12   litigation is to refrain from offering a direct-payment mechanism to its customers.

13        **D.      An Injunction Would Harm the Public Interest**

14        "The plaintiffs bear the initial burden of showing that the injunction is in the public

15   interest." *Stormans, Inc.* v. *Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Epic has not met that

16   burden here. The opposite is true: an injunction would harm the public interest.

17        ***First***, the public interest disfavors this Court endorsing Epic's breach of its agreements. *S.*

18   *Glazer's Distributors of Ohio, LLC* v. *Great Lakes Brewing Co*., 860 F.3d 844, 853 (6th Cir. 2017)

19   (declining to enjoin termination of contract according to its terms, because the "public has a strong

20   interest in holding private parties to their agreements."). And forcing Apple into a brand-new

21   agreement on Epic's terms would be contrary to the public interest, which "does not favor forcing

22   parties to [an] agreement to conduct themselves in a manner directly contrary to the express terms

23   of the agreement." *Frank B. Hall & Co., Inc*. v. *Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025-

24   26 (8th Cir. 1992); *see also Goldberg* v. *Barreca*, No. 2:17-CV-2106 JCM (VCF), 2017 WL

25   3671292, at *8 (D. Nev. Aug. 24, 2017), aff'd, 720 F. App'x 877 (9th Cir. 2018).

26        ***Second***, the public interest disfavors enjoining App Store rules that have created the most

27   trusted marketplace for apps. Epic's unilateral breach of its agreements threatens Apple's entire

28   App Store ecosystem as a safe, secure, reliable and trusted place for consumers. Schiller Decl. ¶

18. Apple's right to review each App is central to those objectives. *Id.* The entire ecosystem is at risk if developers breach their agreements as Epic has done. *Id.* ¶ 21. If developers can circumvent IAP to avoid paying Apple the commissions it is contractually due, Apple will be unable to continue its on-going investment in the App Store. *Id.* Epic's actions are putting the entire App Store model at risk. Other app stores whose agreements can be ignored will face this same risk of destruction.

**Third**, selling a video game is not the type of "public interest" that warrants emergency injunctive relief. *Interplay Entm't Corp.* v. *TopWare Interactive, Inc.*, 751 F. Supp. 2d 1132, 1138 (C.D. Cal. 2010) (there is "minimal public interest" in seeing a video game released). Moreover, Epic's games remain available on other popular gaming platforms. Sweeney Decl. ¶¶ 3, 7.

**Fourth**, Apple's business interest in enforcing its contracts has security and safety repercussions, and jeopardizes Apple's own reputation for providing access only to apps that meet its standards.[25] Epic has revealed that it is willing to and can circumvent Apple's procedures in *Fortnite* by smuggling a hidden feature into its last update. Depriving Apple of the ability to terminate its business relationship with those who circumvent its review process is not in the public interest. *Zango*, 494 F. Supp. 2d at 1196 ("it is in the public interest to allow companies similar to Defendant to be able to exercise their judgment and block potential malware applications").[26]

## V.    CONCLUSION

A "business relationship gone sour—even where plaintiffs risk losing money or risk loss of partnership rights in the short term—without more, does not constitute" an "emergency" that "justifies this court setting aside the court's hundreds of other important, earlier-filed matters to immediately address this matter." *Goldberg*, 2017 WL 3671292, at *5. For the reasons set forth above, Defendant Apple respectfully requests that the motion for a TRO be denied.

---

[25] Epic's reliance on *hiQ Labs, Inc.* v. *LinkedIn Corp.*, 938 F.3d 985, 1005 (9th Cir. 2019) is self-defeating. There, the conduct at issue was access to publicly available data that neither company owned. The "district court made clear that the injunction does not preclude LinkedIn from continuing to engage in 'technological self-help' against bad actors—for example, by employing 'anti-bot measures to prevent, *e.g.*, harmful intrusions or attacks on its server.'"

[26] Epic has not even attempted to satisfy its burden of showing that it has suffered actionable extraterritorial injury under the FTAIA, and its requested worldwide injunction that would seek to avoid non-actionable claims of foreign injuries must be denied. 15 U.S.C. § 6a; *Biocad JSC* v. *F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2008 WL 2219837, at *1 (N.D. Cal. May 27, 2008).

1    DATED:  August 21, 2020          GIBSON, DUNN & CRUTCHER LLP

2

3                                    By:   */s/ Daniel G. Swanson*

4                                    Theodore J. Boutrous, Jr.
                                     Richard J. Doren
5                                    Daniel G. Swanson
                                     Veronica S. Lewis
6                                    Cynthia E. Richman
                                     Jay P. Srinivasan

7                                    *Attorneys for Defendant Apple Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLE'S OPPOSITION TO EPIC'S MOTION FOR A TRO/PI
Case No. 3:20-cv-05640-YGR