| | |
|---|---|
| THEODORE J. BOUTROUS JR., SBN 132099<br>   tboutrous@gibsondunn.com<br>RICHARD J. DOREN, SBN 124666<br>   rdoren@gibsondunn.com<br>DANIEL G. SWANSON, SBN 116556<br>   dswanson@gibsondunn.com<br>JAY P. SRINIVASAN, SBN 181471<br>   jsrinivasan@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>Telephone: 213.229.7000<br>Facsimile: 213.229.7520<br><br>VERONICA S. LEWIS (Texas Bar No. 24000092; *pro hac vice*)<br>   vlewis@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>2100 McKinney Avenue, Suite 1100<br>Dallas, TX 75201<br>Telephone: 214.698.3100<br>Facsimile: 214.571.2900 | CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)<br>   crichman@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036-5306<br>Telephone: 202.955.8500<br>Facsimile: 202.467.0539<br><br>Attorneys for Defendant<br>APPLE INC. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>            Plaintiff,<br><br>   v.<br><br>APPLE INC.,<br><br>            Defendant. | CASE NO. 3:20-CV-05640-YGR<br><br>**DECLARATION OF PHILIP W. SCHILLER IN SUPPORT OF DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

I, Philip W. Schiller, declare as follows:

1. I make this declaration in support of Apple's Opposition to Plaintiff's Motion For Temporary Restraining Order And Order To Show Cause Why A Preliminary Injunction Should Not Issue. I have personal knowledge of the matters stated herein, and if called upon to do so, I could and would competently testify hereto.

2. I am currently an Apple Fellow, and before assuming this position, I served as Apple's Senior Vice President, Worldwide Marketing for approximately 20 years. I was involved in the development of the App Store before it went live and have remained involved with it ever since. As a result, I have personal experience and knowledge concerning Apple's App Store, including the App Store Review Guidelines, the App Store Developer Agreement, and the App Store Program License Agreement.

3. Apple's In-App Purchase mechanism ("IAP") is the App Store's centralized payment system. It lets users make in-app purchases; that is, purchase digital goods and services within apps without the inconvenience and security risks of registering their payment information with each developer. The business model for the App Store has remained unchanged since it launched in 2008: if you charge for software purchased through the App Store, Apple takes a percentage of the charge as commission. If a developer offers its software for free on the App Store or adopts a business model that depends entirely on advertising, then it pays no commission to Apple.

4. This monetization strategy for the App Store—*i.e.*, charging of a commission on in-app purchases of digital content, but not on free or ad-funded apps, sales of physical goods and services, or digital content purchased outside of iOS but accessed in the app—is the cornerstone of Apple's App Store business. It is based on Apple's role in connecting

developers with users that have a willingness to pay because they value the quality of Apple's devices or have an expectation that purchasing and using apps from the App Store will be a quality, secure experience. And it enables Apple to realize a revenue stream from the App Store, to earn a return on its substantial investments, and to fund future App Store innovation. It is up to each developer to choose their own business model on the App Store and decide for themselves whether their app will include in-app purchases of digital content for which Apple will receive a commission. Apple does not decide the business model for them. More than 80% of the apps on the App Store are free, and developers pay nothing to Apple in connection with them.

5. The App Store's monetization model is rooted in Apple's overall philosophy of putting the user and user experience first. This focus on user experience is reflected in Apple's overall business model and offerings to consumers, which prioritize quality (*e.g.*, distinctive design, innovative technology), security (*e.g.*, protection from malware), and privacy (*e.g.*, safeguarding of personal and payment data). This philosophy can also be seen in Apple's strategy of integrating its proprietary hardware, software, and services across the range of its products to ensure a high quality user experience, in contrast to many of its competitors.

6. Epic has had contracts with Apple to gain access to the App Store and Apple's various developer tools for many years. All developers, including Epic, are required to execute a Developer Agreement, and a Developer Program License Agreement in order to access Apple's developer tools and the App Store for each account they open. Epic, for example, has multiple accounts, including one under Epic Games and another under Epic Games International S.A.R.L. ("Epic SARL"). Epic administers these two accounts as if they are one. The accounts share a single tax ID number, a single individual as the registered account holder, and a single credit number that is used to pay the annual program fee. The two accounts share the same test devices, and their Developer Program License Agreements were renewed within a minute of each other on June 30, 2020. A true and correct copy of the

Developer Agreement that is currently in force is attached to this declaration as Exhibit A, and a true and correct copy of the Developer Program License Agreement that is currently in force is attached to this declaration as Exhibit B. In addition, all developers on the App Store have agreed to abide by the terms of the App Store Review Guidelines. A true and correct copy of the current App Store Review Guidelines is attached to this declaration as Exhibit C.

7. Over the last several months, Epic has demanded that Apple make various changes to Epic's rights and obligations under its contracts that would be destructive to Apple's basic business model. When Apple refused to fundamentally alter the way it does business to appease Epic, Epic resorted to sudden, unilateral action that blatantly breached its contracts with Apple, and simultaneously filed this lawsuit, which seeks to justify its deliberate breaches after the fact.

8. Specifically, on June 30, 2020, Epic's CEO Tim Sweeney wrote my colleagues and me an email asking for a "side letter" from Apple that would create a special deal for only Epic that would fundamentally change the way in which Epic offers apps on Apple's iOS platform, which is the operating system that runs Apple's iPhones and iPads, and enable Epic to make more money at Apple's expense. Moreover, what Mr. Sweeney asked for would have to apply not only to Epic but, based on the philosophy of our App Store, to all developers; this would have a catastrophic effect on the user experience and Apple's business model. In this email, Mr. Sweeney expressly acknowledged that his proposed changes would be in direct breach of multiple terms of the agreements between Epic and Apple. Mr. Sweeney acknowledged that Epic could not implement its proposal unless the agreements between Epic and Apple were modified. A true and correct copy of this email is attached as Exhibit D.

9. On July 10, 2020, Apple sent a 6-page letter responding to Mr. Sweeney's June 30 email. In it, Apple detailed why it could not give Epic preferential treatment over all other developers, and that it would not agree to change the terms of the contracts that governed the

relationship between Apple and Epic, which contain the same terms that Apple offers to all other developers. The letter also explained the various reasons why Apple has chosen to operate its App Store in the manner it does, and reminds Mr. Sweeney of several instances in which he had spoken out in favor of the principles espoused by Apple and the value of Epic's relationship with Apple. A true and correct copy of this letter is attached as Exhibit E.

10. One week later, on July 17, 2020, Mr. Sweeney sent another e-mail to my colleagues and me in which he stated that he disagreed with how Apple runs its App Store, and indicated that he was still pursuing a special deal for Epic. A true and correct copy of this letter is attached as Exhibit F.

11. Shortly after 2:00 a.m. on August 13, 2020, Mr. Sweeney sent another e-mail to several of my colleagues and me. In this early-morning communication, he stated that "Epic will no longer adhere to Apple's payment processing restrictions," and that Epic was changing the *Fortnite* app on the iOS platform to circumvent Apple's IAP. As Mr. Sweeney acknowledged, this was in plain breach of the contracts between Apple and Epic, which require that Apple's IAP be the exclusive means to pay for in-app purchases on Apple's iPhones and iPads. The agreement between Apple and Epic provides that Apple would receive a 30% commission from each of these payments and remit the remaining 70% to Epic. Apple's commission structures, administered through the IAP, apply equally to all developers who offer in-app purchases on the App Store.

12. The change that Mr. Sweeney had unilaterally decided Epic was going to make would allow consumers to bypass Apple's IAP when making in-app purchases, and instead pay Epic directly for those purchases. Through this arrangement, Epic would receive all of the money paid by the consumer, and Apple would receive no commission at all. Mr. Sweeney's pronouncement undid one of the most fundamental terms of the business relationship that had existed between the parties for many years, and was in blatant disregard for Epic's written

Gibson, Dunn & Crutcher LLP

4
DECLARATION OF PHILIP W. SCHILLER

contracts with Apple. Epic essentially granted itself preferential treatment vis-a-vis all other developers who offer in-app purchases on Apple's iOS platform, including Epic's direct competitors. In doing so, Mr. Sweeney did not identify anything Apple had recently done to provoke Epic's decision to breach its contracts with Apple; instead, he pointed to only longstanding Apple policies, which Epic had agreed to be bound by, and called upon Apple to make "historic changes." He also warned that Epic was prepared to litigate with Apple for years, if necessary. A true and correct copy of this email is attached hereto as Exhibit G.

13. Later that same morning, Epic followed through on Mr. Sweeney's threat. Unbeknownst to Apple, Epic had planted a payment mechanism in its *Fortnite* app on the iOS platform. Epic's payment feature was not disclosed to Apple and it was not activated by Epic until a few hours after Mr. Sweeney sent his 2:00 a.m. e-mail to Apple describing his scheme. At that time, Epic "threw the switch," activating the hidden payment platform it had placed in *Fortnite* through what it has euphemistically called a "hot fix." By doing so, it circumvented Apple's IAP and invited consumers to do business directly with Epic, thereby denying Apple of agreed-upon commissions. To motivate consumers to use its direct payment option, and deny Apple any form of commission, Epic included a screen advising consumers that its offerings could be purchased at a lower price through direct purchase from Epic than through Apple's IAP.

14. Epic chose to hide unauthorized software in our App Store to deprive Apple of the commission the parties had agreed upon. Apple was therefore paid nothing on those purchases made by customers redirected to Epic, despite the substantial resources we have expended to promote and distribute *Fortnite* to hundreds of millions of iPhone and iPad users and to generate hundreds of millions of dollars in profits for Epic. Epic's conduct is akin to a manufacturer walking into a retail store and asking shoppers to pay the manufacturer directly for their products, leaving the store itself with nothing for its efforts.

Gibson, Dunn & Crutcher LLP

15. Upon learning what Epic had done, Apple immediately contacted Epic to inform it that the *Fortnite* app was now in violation of Epic's contractual obligations; Epic, of course, had already told me and others as much in its e-mail communications. To provide Epic an opportunity to come back into compliance with its contractual obligations, Epic's blatant disregard of them notwithstanding, we informed Epic that *Fortnite* could remain on the App Store if Epic simply removed the alternative payment option and brought the *Fortnite* app back into compliance. A true and correct copy of Apple's August 13, 2020 letter to Epic is attached to this declaration as Exhibit H. Epic refused. Given Epic's refusal to act lawfully, we had no choice but to remove the *Fortnite* app from our App Store, and a few hours later Epic filed this lawsuit against Apple.

16. On August 14, 2020, Apple sent Epic the same type of letter it has sent to other app developers who refuse to abide by its contractual obligations. Both this letter and the August 13 letter were sent to the individual who is the registered account holder both the Epic and Epic SARL accounts. Apple informed Epic that its change to *Fortnite* breached its agreements with Apple. Although not obligated to do so, Apple gave Epic fourteen days to cure these breaches. Apple also detailed the consequences if Epic refuses to remedy its violations, including that Epic's apps would be removed from the App Store and it could no longer submit apps to the App Store. As in the past, where Apple has terminated a developer account for bad faith or deceptive conduct like what Epic did here, we have also terminated accounts that we know to be affiliated with the offending account. A true and correct copy of this letter is attached to this declaration as Exhibit I.

17. The tens of millions of iOS users who already have downloaded *Fortnite* can continue to use the game on their iPhones and iPads. Unfortunately, this functionality includes the alternative payment option that Epic smuggled into the *Fortnite* app on August 13: improperly allowing Epic to circumvent Apple and receive payment directly from consumers. As a result, since August 13, and continuing through today, the millions of *Fortnite* users on the iOS

platform are able to make in-app purchases without Apple receiving a penny of the commission that Epic agreed to pay to Apple.

18. If tolerated, Epic's unilateral and ongoing breach of its contractual commitments will send giant ripples across the entire App Store business model and ecosystem to the detriment of not only Apple, but also the users and developers who depend on the integrity and security of the App Store. We designed the App Store to provide a safe, secure, reliable, and trusted place for consumers to discover and download apps, and a consumer-rich environment for developers to be successful. Central to these objectives is Apple's requirement that every app designed for iOS undergo rigorous, human-assisted review. Apple invests significant resources on a daily basis to ensure that apps meet high standards for privacy, security, content, and quality. Apple's rules prevent developers from making end-runs around this carefully designed platform.

19. The significant investment in this business model has paid off not just for Apple, but also for app developers large and small, including Epic. Because of Apple's rules and efforts, iOS and the App Store are widely recognized as providing the most secure consumer technology available, to the benefit of consumers and developers alike. Due to measures that Apple has taken, consumers can download and pay for an app and in-app content without worrying that it might break their device, steal their information, or rip them off. The need for these measures is no less today than in years past. Developers benefit directly and significantly from the security safeguards in this marketplace for their apps.

20. That said, the App Store is not simply a marketplace—it is part of a larger offering of tools, technologies, and services that Apple makes available to millions of developers to use as they create great applications for iPhone, iPad, and other Apple products. Apple continually innovates and invests to maintain and improve the platform. Indeed, Apple has made massive investments to develop technologies and features that developers like Epic can

DECLARATION OF PHILIP W. SCHILLER

Gibson, Dunn & Crutcher LLP

use to make great apps (as well as a safe and secure place for users to download these apps). Apple designs its products and services to make developers successful through the use of custom chips, cameras, operating system features, APIs, libraries, compilers, development tools, testing, interface libraries, simulators, security features, developer services, cloud services, and payment systems.

21. This entire ecosystem would be in jeopardy if developers are allowed to breach their agreement without consequence as Epic has done. If every developer is free to breach its contracts with Apple and allowed to circumvent the App review process, which is intended to assure, among other things, that no app that presents a security risk, threatens the privacy of users, or permits any software to be downloaded from outside of the secure App Store ecosystem, then Apple's App Store cannot deliver the many benefits to consumers and developers that it currently does. And if developers can circumvent IAP and avoid paying Apple the commissions it is contractually due, Apple will be unable to continue its on-going investment in it. Epic's actions are putting the entire App Store model at risk. It will be disastrous for App Store users, for developers (other than Epic), and for Apple if Apple is not allowed to respond to Epic's breaches. In fact, if Epic is permitted to simply disregard contract terms that it does not like, the business model for all other developers, including other app stores (even Epic's own) is at risk.

22. Over the years, Apple has worked directly with Epic to provide it with many benefits unique to the App Store. Epic has made great use of Apple-provided tools, such as TestFlight, VOIP, Stickers, iCloud document storage, ARKit, Messages Extension, ReplayKit, and Push Notifications. These innovations are properly protected by intellectual property laws, and as a signatory to the Apple Developer Agreement and the Apple Developer Program License Agreement, Epic has acknowledged these IP rights (just as Epic's developers do the same with respect to Epic's intellectual property). *See* Apple Developer Program License Agreement § 2.5.

23. To take just one example, Epic has for years used Apple's groundbreaking graphics technology, Metal. When Apple launched Metal for Mac at WWDC in 2015, Billy Bramer, *Fortnite*'s then-lead gameplay programmer, took the stage and explained how Metal "revolutionized graphic design" and "enable[d] developers like us to create richer 3D worlds."[1] Epic, like countless developers, continues to use Metal to deliver cutting-edge games. Apple doesn't charge anything beyond its standard commission for the use of Metal or any of the other tools that Epic has used to develop great games on iOS.

24. Through its conduct, Epic is benefitting monetarily from this crisis of its own making. The *Fortnite* app remains functional for millions of iPhone and iPad users. Epic has been and is acting in violation of its agreements with Apple, selling to users in our App Store without paying Apple the commission it agreed to pay, and circumventing our app review process. And, critically, if Epic's misconduct is permitted, it would demonstrate to all developers that they can simply disregard the commitments they made in their contracts with Apple.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that I executed this Declaration on August 21, 2020 in Half Moon Bay, California.

_____
Philip W. Schiller

---

[1] *Apple – WWDC 2015*, Youtube (6/15/15), https://www.youtube.com/watch?v=_p8AsQhaVKI.