Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>  Plaintiff,<br><br>  vs.<br><br>APPLE INC.,<br><br>  Defendant. | No. 3:20-CV-05640-YGR<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF EPIC GAMES INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>Date: August 24, 2020, 3:00 p.m.<br>Courtroom: 1, 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

      Pursuant to the Court's Order Permitting Limited Reply Brief (ECF No. 38), Epic Games, Inc. ("Epic") submits this response to address certain issues and arguments in Apple's opposition brief that are "relate[d] to the *Unreal Engine*, and the revocation of Epic's developer tools". Epic also submits as attachments to the Declaration of M. Brent Byars, submitted herewith ("Byars Decl."), the agreements identified in the Court's Order.[1]

      Specifically, this response addresses the following points in Apple's Opposition.

      *First*, Apple argues that Epic's requested relief relating to the *Unreal Engine* and the revocation of developer tools is mandatory rather than prohibitory. (Opp'n 12.) That is incorrect. Epic asks only that the Court preserve the status quo so that Epic continues to have the same access to software, software development kits ("SDKs"), application programming interfaces ("APIs") and other developer tools that it has today.

      *Second*, Apple argues that its actions with respect to the *Unreal Engine* and its revocation of access to all developer tools and developer accounts are authorized by contract. (Opp'n 1.) They are not. That argument fails to acknowledge the multiple contracts between Apple and Epic affiliates and programmers. Apple has alleged a breach of only one such agreement, and that agreement does not govern Epic's access to developer tools for the *Unreal Engine*, the distribution of apps that are used for development purposes by *Unreal Engine* licensees or various other Epic Developer Program accounts. Even if those contracts did not violate the antitrust laws, an alleged breach of the specific Developer Program License Agreement[2] governing *Fortnite* would not justify Apple's actions with respect to other Developer Program accounts (including the account related to the *Unreal Engine*) or to the revocation of developer tools, all of which are governed by separate agreements. Instead, the breadth of Apple's retaliation is itself an unlawful effort to maintain its monopoly and chill any action by others who might dare oppose Apple.

---

[1] Epic's response is limited to addressing "the issues and arguments raised in Apple's opposition ***only*** as it relates to the Unreal Engine, and the revocation of Epic's developer tools." (ECF No. 38 at 1.) Epic does not, through its silence on other issues, concede the accuracy of any legal arguments or factual assertions in Apple's Opposition.

[2] Epic's Complaint and Motion refer to the Developer Program License Agreement as the "Developer Agreement".

1   *Third*, Apple argues that Epic has not "provided evidence showing that the Unreal Engine business will be significantly harmed". (Opp'n 16.) In fact, Epic's motion was accompanied by two declarations, including one from its CEO, that addressed this point in detail. Further, with the passage of time since the filing of Epic's motion, more evidence on this point has become available, as more developers become aware of Apple's actions and comprehend their significance to their businesses. Thus, Epic submits herewith a declaration regarding multiple inquiries it has received from concerned developers as well as a declaration from the General Manager of Gaming Developer Experiences at Microsoft Corp. addressing this issue.

*Fourth*, Apple argues that the balance of equities tips in its favor. (Opp'n 23-24.) But Apple does not argue why that is so—and in fact it is not so—with respect to the *Unreal Engine* or the revocation of developer tools.

*Fifth*, Apple argues that an injunction would harm the public interest. (Opp'n 24-25.) Again, however, Apple's arguments do not address the *Unreal Engine* or the revocation of developer tools. Epic's requested relief on those issues is very much in the public interest.

**POINT #1 (nature of injunction)**

The relief Epic seeks is prohibitory, not mandatory. "A prohibitory injunction prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the merits." *Faison v. Jones*, 440 F. Supp. 3d 1123, 1131 (E.D. Cal. 2020) (citation omitted). "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." *Id.* (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). Here, as a regular part of its business, Apple makes various software, SDKs, APIs and other developer tools widely available for use by software developers. The relevant status quo is that, like countless other developers, various Epic affiliates and their employees have access to those materials. Epic asks that this status quo be preserved. Contrary to Apple's contention (Opp'n Br. 12), Epic does not seek an affirmative order requiring Apple to work with Epic on the *Unreal Engine* or anything else. Rather, Epic seeks to *restrain* Apple from terminating Epic's access to Developer Program accounts that are currently active, including the account related to the *Unreal Engine*, and from

1  terminating Epic's access to widely available materials necessary for the development of
2  software intended to run on Apple operating systems. Apple's August 14, 2020 notice refers to
3  *future* action on those points, stating that Epic's "Apple Developer Program account *will be*
4  terminated" and that "*If* your membership is terminated . . . [y]ou *will* . . . lose access to the
5  following programs, technologies, and capabilities". (Sweeney Decl. Ex. B, ECF No. 17-10 at 2
6  (emphasis added).) Epic seeks an order prohibiting Apple from acting on that threat. That is a
7  prohibitory injunction.

8  **POINT #2 (contractual relationships)**

9  Apple has a variety of click-through, non-negotiable contracts that it uses to govern
10 membership in its Developer Program and access to software and other developer tools. Various
11 affiliates of Epic and their employees are parties to certain of these agreements. As set forth in
12 more detail below, Apple has alleged a breach of only one such agreement (under which *Fortnite*
13 was added to the App Store). That agreement does not govern access to the developer tools used
14 to create the *Unreal Engine*, nor does it govern the accounts used to distribute many of Epic's
15 other apps, including those related to the *Unreal Engine*.

16  A.   *Apple's Agreements.*

17  There are three types of agreements implicated by Apple's August 14 notice of
18 termination.

19  *First*, there is the Xcode and Apple SDKs Agreement ("SDKs Agreement"), an example
20 of which is attached as Exhibit U to the Byars Declaration. This agreement grants an individual
21 or company a license to use certain Apple software for specified purposes. (Byars Decl. ¶ 6, Ex.
22 U, § 2.2.) This agreement is entered into every time an individual downloads a copy of Xcode
23 and Apple SDKs to an Apple device, and by its terms binds the individual and the company that
24 employs her. (*Id.*, preamble ("YOU ARE AGREEING ON YOUR OWN BEHALF AND/OR
25 ON BEHALF OF YOUR COMPANY OR ORGANIZATION TO THE TERMS AND
26 CONDITIONS STATED BELOW").) Over the years, thousands of such agreements were
27 necessarily clicked through by employees of Epic and its affiliates.
28

Among other things, the SDKs Agreement grants a license to use "Xcode Developer Tools" to test and develop software, and a license to use SDKs for various Apple operating systems to test and develop software for use on those platforms. (Byars Decl. ¶ 6, Ex. U, § 2.2.) While this agreement permits testing and development of software, it generally does *not* allow the distribution of that software to third parties through Apple's App Store. As the SDKs Agreement states, "You may not distribute any Applications developed using the Apple SDKs (excluding the macOS SDK) absent entering into a separate written agreement with Apple". (*Id.* § 2.2(A)(iv).) Specifically, to distribute an application "for iOS, watchOS, iPadOS, or tvOS" or "for macOS through the App Store," the developer "must enter into a separate written agreement with Apple (the Apple Developer Program License Agreement)". (*Id.*, § 2.4.)

The SDKs Agreement is an integrated contract that "constitutes the entire agreement between the parties" with respect to the subject matter thereof. (*Id.* § 8.7.) The integration clause expressly addresses the circumstance in which developers are party to both the SDKs Agreement and a Developer Program License Agreement ("PLA"), providing, "to the extent that You have entered into the Apple Developer Program License Agreement (PLA) with Apple and are validly licensed by Apple to exercise additional rights, or to use additional features or functionality of the Apple Software or Apple Services under the PLA, You acknowledge and agree that *the PLA shall govern Your use of such additional rights* and *privileges*". (*Id.* (emphasis added).) Thus, the SDKs Agreement and the PLA cover different sets of rights; the additional rights provided by the PLA are governed solely by that agreement. Further, the SDKs Agreement states that it terminates if (and only if) a developer "fail[s] to comply with any term(s) of *this* Agreement" (*id.* § 5 (emphasis added))—and does not provide for termination upon breach of any other agreement.

*Second*, there is the PLA mentioned above. As noted, the PLA provides additional rights beyond the rights granted by the SDKs Agreement, including the right for a developer to test its apps on iOS devices (*see* Byars Decl. ¶ 4, Ex. I § 2.1 (granting a license to incorporate "Apple Certificates issued to You pursuant to this Agreement for purposes of digitally signing Your Applications"); *id.* § 5.1 (noting that "[a]ll applications must be signed with an Apple Certificate

in order to be installed on Authorized Test Units")), seek to "notarize" applications for macOS (*id.* § 5.3) and submit applications for distribution through the App Store (*id.* § 6.1). The PLA is the agreement that contains Apple's restrictions on how in-app payments may be processed. (*Id.* § 3.2.2.) The PLA also requires compliance with Apple's App Store Review Guidelines (*id.* Sch. 1, § 6.3(iv)), which in turn have further restrictions relating to in-app payments (*see* Riehle Decl. Ex. B, ECF No. 17-3, § 3.1.1).

The PLA is also an integrated contract that "constitutes the entire agreement between the parties" with respect to the subject matter thereof. (Byars Decl. ¶ 4, Ex. I § 14.11.) The PLA's integration clause expressly addresses the circumstance in which a developer is also a party to the SDKs Agreement, providing that the PLA "will govern in the event of any inconsistencies between the two with respect to the same subject matter; provided, however, that [the PLA] is not intended to prevent You from exercising any rights granted to You in the" SDKs Agreement. (*Id.*)

*Third*, there is the Apple Developer Enterprise Program License Agreement. (Byars Decl. ¶ 4, Ex. O.) This agreement authorizes companies or other organizations to develop applications for use on Apple products "and to deploy these Applications only for internal use by employees within Your company, organization or educational institution or for limited use as expressly set forth herein". (*Id.* at 1.)[3]

B.  *Epic Affiliated Developer Accounts.*

There are six Epic affiliates that are parties to a PLA, each of which has a separate account in the Apple Developer Program. (Byars Decl. ¶ 5, Ex. T.)[4] The account that submitted *Fortnite* and certain other apps to the App Store has a "Team ID" number ending in '84, and is governed by a PLA between Apple and Epic Games, Inc., a Maryland corporation. (*Id.*) The

---

[3] There is also an Apple Developer Agreement. (Schiller Decl. Ex. A, ECF No. 37-1.) This agreement is mentioned in, and attached to, the Schiller Declaration submitted with Apple's opposition, but Apple has not identified it as a basis to justify its actions with respect to the *Unreal Engine* or the revocation of developer tools, so Epic does not discuss it further in this limited reply brief. The references in Epic's Complaint and Motion to a "Developer Agreement" mean the PLA, *not* the agreement attached to the Schiller Declaration.

[4] In addition, one Epic entity is party to a Developer Enterprise Program License Agreement relating to applications for Epic's internal use, as opposed to uploading apps to the App Store. (Byars Decl. ¶ 4 & Ex. O.)

1. account that submitted certain apps related to *Unreal Engine* development has a "Team ID" number ending in '3Y, and is governed by a PLA between Apple and Epic Games International S.à r.l., a Swiss entity.  (*Id.*)  The remaining accounts are held by other entities and were used by Epic's affiliates to submit other apps to the App Store, such as the Houseparty app.  Separately from the PLAs, Epic and its programmers have entered into thousands of agreements for Apple software and SDKs made widely available under the SDKs Agreement.  (Byars Decl. ¶¶ 5-6 & Ex. T.)

Apple admits that Epic Games, Inc. and Epic Games International S.à r.l. have separate PLAs and separate accounts.  (Schiller Decl., ECF No. 37 ¶ 6.)  Although Apple claims that Epic "administers these two accounts as if they are one" (*id.*), it cannot and does not deny the existence of two separate agreements.  Indeed, Apple acknowledges that it charges a separate "annual program fee" for each account (*id.*), showing independent consideration for each agreement.  Further, Apple's assertion that the PLAs for each account were "renewed within a minute of each other" (*id.*) proves the point:  they were not renewed at the same time with the same mouse click, because they are separate agreements.  This is true not just for the PLAs to which Epic Games, Inc. and Epic Games International S.à r.l. are parties, but for all six of the PLAs between Apple and an Epic affiliate, as well as the Developer Enterprise Program License Agreement between Apple and Epic Games, Inc.  Each is an independent and integrated agreement, each was executed by a different legal entity, and each is subject to a separate "annual program fee".  (Byars Decl. ¶¶ 3-5 & Exs. H-T.)

C. *Apple's Overbroad Retaliation.*

Apple stated its intent to revoke access to all developer tools and all accounts used by Epic affiliates, noting specifically the impact to the *Unreal Engine*, in a notice posted on August 14, 2020 to the Epic Games, Inc. Developer Program account with the Team ID ending in '84.  (Grant Decl., ECF No. 17-5 ¶ 15; Sweeney Decl. Ex. B, ECF No. 17-10.)  That notice purports to identify "several violations of the [PLA]" but did not claim a breach of any other agreement.  (Sweeney Decl. Ex. B, ECF No. 17-10 at 2.)  Each of the alleged PLA violations in that notice relates exclusively to *Fortnite*, and does not implicate the *Unreal Engine* or any other

part of Epic's business. For example, the August 14 notice states that "your app"—*i.e.*, *Fortnite*—"is in direct violation of" the PLA and refers to "introducing new payment functionality", an "unauthorized payment system" and "allowing users to purchase digital items within the app without using the In-App Purchase API". (*Id.*)

Even if the contractual provisions purportedly breached by *Fortnite* were lawful, Apple's revocation of all accounts affiliated with Epic and all access to developer tools (including for the *Unreal Engine*, which is not an App Store app), reaches far beyond the Team ID '84 account and the Epic Games, Inc. PLA. *First*, the August 14 notice states that Epic "will lose access to . . . . [a]ll Apple software, SDKs, APIs, and developer tools" and "[p]re-release versions of iOS, iPaD OS, macOS, tvOS [and] watchOS". (*Id.*) Revoking access to all of these materials would extend beyond the rights covered by the PLA and sweep in materials to which Epic (and all other developers and programmers) have access under the SDKs Agreement, which Apple has not claimed Epic breached. The PLA applies *only* to those "additional rights" not covered by the SDKs Agreement (Byars Decl. ¶ 6, Ex. U § 8.7) and "is not intended to prevent" the exercise of rights provided in the SDKs Agreement (Byars Decl. ¶ 4, Ex. I § 14.11).

*Second*, even if Epic Games, Inc. breached *its* PLA in connection with *Fortnite*, that would not establish a breach by Epic Games International S.à r.l. of its separate PLA. Nor would it establish that any of the four other Epic entities identified in Exhibit T to the Byars Declaration breached any of their PLAs, or that Epic Games, Inc. breached its Developer Enterprise Program License Agreement. Apple does not contend that any other Epic app or the *Unreal Engine* violated any of Apple's policies. Indeed, the *Unreal Engine* is far removed from the payment processing issue of which Apple complains; it is not a consumer-facing product and is not distributed through the App Store (though a few optional tools are distributed through the App Store for use by third-party developers). Instead, the *Unreal Engine* is a tool licensed for use by other software developers and is downloaded directly from its own website.

Apple does not dispute any of this. Instead, Apple asserts the right to revoke all Epic entities' access to developer tools and to terminate all PLAs with all Epic entities because in certain prior instances, when Apple has terminated a developer account, it has "also terminated

1  accounts that [it] know[s] to be affiliated with the offending account". (Schiller Decl., ECF
2  No. 37 ¶ 16.) The fact that Apple has overreached in the past is further evidence of Apple's
3  unlawful flexing of its monopoly power. But the fact that Apple has overreached in the past does
4  not justify doing it again here.

5  **POINT #3 (evidence of harm)**

6  Apple contends that Epic failed to present sufficient evidence of the harm that Apple's
7  actions would cause to the *Unreal Engine* business. (Opp'n Br. 16.) In fact, Epic presented
8  substantial evidence on this point and presents now even more evidence that has become
9  available since its opening brief.

10  In its opening brief, Epic explained, through the declaration of its founder and CEO,
11  Mr. Timothy Sweeney, that the revocation of development tools would mean that "Epic would
12  be unable to develop future updates to the *Unreal Engine* for use on iOS and macOS", which
13  would be "an existential threat to the *Unreal Engine*". (Sweeney Decl., ECF No. 17-8 ¶¶ 24-25.)
14  Mr. Sweeney further attested that without compatibility with iOS and macOS, the *Unreal Engine*
15  would become significantly less attractive to developers, while "third-party developers who rely
16  on Epic's engine and support" would be in jeopardy. (*Id.*) And Epic's Vice President of
17  Engineering, Mr. Nicholas Penwarden, declared that the *Unreal Engine* has been installed on
18  nearly half a million Macs. (Penwarden Decl., ECF No. 17-7 ¶ 4.)

19  Epic's opening brief was filed shortly after Apple notified Epic of its retaliatory actions.
20  Since then, further substantial evidence of harm to the *Unreal Engine* and the developers relying
21  on it has been accumulating. Specifically, over the past week, multiple *Unreal Engine* licensees
22  have contacted Epic expressing grave concern over Apple's actions and its impact on their iOS
23  and macOS-bound projects. (Penwarden Reply Decl. ¶¶ 2-3.) Microsoft, itself an
24  *Unreal Engine* licensee, confirms these concerns. In a declaration submitted herewith,
25  Kevin Gammill, Microsoft's General Manager of Gaming Developer Experiences, attests that
26  there are "very few other options available for creators" that offer "as many features and as much
27  functionality as *Unreal Engine* across multiple platforms, including iOS" (Gammill Decl.
28  ¶ 2(d)), and that Apple's revocation of developer tools "will place *Unreal Engine*" and games

1  that use it "at a substantial disadvantage" (*id.* ¶ 3).  Mr. Gammill also explains that
2  "*Unreal Engine*'s sudden loss of support for iOS and macOS would create significant costs and
3  difficult decisions" for game creators, who "would have significant sunk costs and lost time
4  using *Unreal Engine* for game creation, and would have to choose between (a) starting
5  development all over with a new game engine, (b) abandoning the iOS and macOS platforms, or
6  (c) ceasing development entirely".  (*Id.* ¶ 5(a).)  Publicly available statements in the press and on
7  social media share that sentiment, noting that Apple's actions would seriously impair the
8  *Unreal Engine* and jeopardize the work of thousands of developers.  (Byars Decl. ¶ 7, Ex. V.)
9  One developer interviewed by the *Washington Post* said that she "already invested thousands for
10 a new Mac to port an Unreal 3 iOS game over to a 64-bit program" and that "[n]ow that project
11 is dead in its tracks."  She suggested that "Apple seems to be pushing iOS developer to use
12 Xcode, Apple's own integrated software development program" that is "not anywhere near the
13 league of Unreal Engine."  Gene Park, *Apple cuts off Epic from its tools, endangering future*
14 *Unreal Engine projects on iOS and Mac*, Washington Post (Aug. 17, 2020), *available at*
15 https://wapo.st/2FH2Zfc.
16        None of this is "speculative", as Apple claims.  (Opp'n Br. 16.)  It is abundantly clear
17 that Apple's retaliatory steps are intended to harm Epic and its licensees, and harm them they
18 will.  Even if Apple, following a final judgment on the merits in this action, were required to
19 make these tools available to Epic once again, it will be too late to save all the projects that were
20 shelved while that support was unavailable.  How successful they might have been, and how
21 much in royalties Epic would have earned as a result (Sweeney Decl. ¶ 18), is impossible to
22 calculate.  That is why this harm to Epic (and others) is irreparable.  (*See* TRO Br. 12-14.)
23 **POINT #4 (balance of equities)**
24        Apple's argument that the balance of equities tips in its favor does not address the portion
25 of Epic's requested relief that relates to the *Unreal Engine* and the revocation of developer tools.
26 In particular, while Apple claims that "the harm to Apple and the App Store from an injunction
27 would be substantial", its harm argument relates entirely to a supposed "flood" of other app
28 developers seeking to offer alternative payment options to consumers.  (Opp'n Br. 23-24.)

1  Apple cannot and does not contend that it will be harmed if Epic continues developing and
2  supporting the *Unreal Engine* for use on Apple platforms. Similarly, Apple's claims that Epic
3  has unclean hands and that it "created the circumstances about which it now complains" (*id.*)
4  have nothing to do with the *Unreal Engine* or any other part of Epic's business.

5  In fact, with respect to the *Unreal Engine* and the revocation of developer tools, the
6  balance of equities tips strongly toward Epic, because Apple will not suffer any harm from the
7  *Unreal Engine*-related relief, Apple does not contend that Epic breached any contract in
8  connection with the *Unreal Engine*, and Apple's intention to cut off access to developer tools
9  and cripple the *Unreal Engine* is a naked effort to exert business leverage over Epic to try to get
10 Epic to back down from challenging Apple's unlawful contact.

11 **POINT #5 (public interest)**

12 None of Apple's public interest arguments speak to Epic's requested relief relating to the
13 *Unreal Engine* and the revocation of developer tools. For example, Apple argues that the public
14 interest would be disserved if its App Store model is put at risk (Opp'n 24-25), but it does not
15 even attempt to show that the App Store model would be jeopardized if Epic retains access to
16 developer tools and continues to be able to support the *Unreal Engine* on Apple platforms.

17 Apple also fails to address the substantial harm to the public interest that would occur if
18 Apple revoked Epic's access to developer tools and blocked further development and support of
19 the *Unreal Engine* on Apple platforms. As shown above, numerous third-party developers
20 would be harmed if Apple takes those steps.

Dated: August 23, 2020

Respectfully submitted,

By:   /s/ *Katherine B. Forrest*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff*
**EPIC GAMES, INC.**