UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EPIC GAMES, INC.,**<br>Plaintiff,<br>vs.<br>**APPLE INC.,**<br>Defendant. | Case No. 4:20-cv-05640-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Re: Dkt. No. 17 |

Plaintiff Epic Games, Inc. ("Epic Games") brings this action against Apple Inc. ("Apple"), alleging violations of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law relating to Apple's App Store policies. Specifically, Epic Games contests Apple's in-app purchase ("IAP") system through which Apple takes 30% and further prevents its game, Fortnite, from offering its own IAP outside of Apple's system.

Now before the Court is Epic Games' motion for a temporary restraining order requesting broad relief with respect to all of its products, including those managed by affiliates. Apple opposes the motion. Based on a preliminary review of the briefing, the Court permitted a reply on the issues relating to the graphics engine, the Unreal Engine, and Apple's stated intention of revoking Epic's developer tools. The Court heard oral arguments on the motion via the Zoom platform on August 24, 2020.

Having carefully reviewed the parties' briefing, and the parties' oral arguments, and for the reasons set forth more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Epic's motion for a temporary restraining order.

**I. BACKGROUND**

Due to the expedited nature of Epic's motion, the Court only summarizes the facts relevant to the disposition of the motion. Thus:

Epic Games is a United States-based tech-company that specializes in video games, including, as relevant here, the popular multi-platform[1] game, Fortnite. Fortnite is structured around "seasons," whereby narratives, themes, and events are introduced for a limited time. Cross-platform play is enabled for all users so long as those users remain on the same version of the game. Fortnite's next season starts on Thursday, August 27, 2020, and will require an update of the game to play.

Epic Games International, S.a.r.l ("Epic International") is a related company based in Switzerland and hosts, among others, the Unreal Engine. The Unreal Engine is a graphics engine created by Epic International to assist in its development of video games that it later began licensing to other developers. The Unreal Engine 4, the current version of the engine on the market, is used by third-party developers for the development of video games for both console and mobile platforms, including for games currently offered in the iPhone App Store. These third parties range from smaller game developers to larger corporations, such as Microsoft Corporation. The Unreal Engine has also been used by third parties for architecture projects, film and television production, and medical training.

Apple is a ubiquitous tech-company that makes products ranging from hardware to software. Apple, as relevant here, maintains an App Store for the iOS platform that is geared for its mobile devices, the iPhones. The App Store allows third-party developers an opportunity to create and thereafter sell applications to iPhone users. Apple generally takes 30% of the sale of the application or of the IAP made within the third-party application itself. Apple's agreements with developers and the App Store guidelines do not generally permit third-party developers to circumvent the IAP system.

As relevant here, Apple maintains separate developer agreements and developer program licensing agreements between Epic Games, Epic International and four other affiliated entities. Apple also maintains a separate agreement, "Xcode and Apple SDKs Agreement," regarding its

---

[1] These platforms include Android, iOS, macOS, Windows, Sony Playstation, Microsoft Xbox, Nintendo Switch. Fortnite is also available for download through the Epic Games Store.

developer tools (software development kits, or "SDKs").

On Thursday, August 13, 2020, Epic Games made the calculated decision to breach its allegedly illegal agreements with Apple by activating allegedly hidden code in Fortnite allowing Epic Games to collect IAPs directly. In response, Apple removed Fortnite from the App Store, where it remains unavailable to the date of this Order. Later that same day, Epic Games filed this action and began a pre-planned, and blistering, marketing campaign against Apple.

The following day, Apple responded sternly. It informed Epic Games that, based on its breaches of the App Store guidelines, and the developer program license agreement, it would be revoking all developer tools, which would preclude updates for other programs, including the Unreal Engine. On Monday, August 17, 2020, Epic Games filed the instant motion. The next day, the parties filed a stipulation in the matter, *Donald Cameron, et. al. v. Apple Inc.*, 4:19-cv-03074-YGR ("*Cameron*"), requesting that this action be deemed a related case to *Cameron*. The Court agreed and the matter was reassigned.

## II.   LEGAL STANDARD

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, is an "extraordinary and drastic remedy," that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008) (internal citations omitted). "It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963). A temporary restraining order is "not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) (citation omitted).

Requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). In order to obtain such relief, plaintiffs must establish four factors: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in

3

the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council. Inc.,* 555 U.S. 7, 20 (2008). With respect to the success on the merits and balance of harms factors, courts permit a strong showing on one factor to offset a weaker showing on the other, so long as all four factors are established. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In other words, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citations and quotations omitted).

### III.  ANALYSIS

The Court evaluates most of the factors through the lens of Apple's actions with respect to (i) Epic Games specifically, including the delisting of Fortnite and other games authorized under Epic Games' contract with Apple, and (ii) the anticipated suspension/termination of developer rights authorized under other contracts, such as the one with Epic International.

Likelihood of Success on the Merits: Epic brings ten claims for violations of Sherman Act, the California Cartwright Act, and California Unfair Competition. Based on a review of the current limited record before the Court, the Court cannot conclude that Epic has met the high burden of demonstrating a likelihood of success on the merits, especially in the antitrust context. However, the Court also concludes that serious questions do exist. Indeed, the Court related this action to the *Cameron* action because there are overlapping questions of facts and law, including substantively similar claims based on the same Apple App Store policies: namely, the 30% fee that Apple takes from developers through each application sale and IAP in the application. *Compare Cameron*, Consolidated Complaint, Dkt. No. 53 *with Epic Games, Inc. v. Apple Inc.*, Complaint, Dkt. No. 1. The Court considers this context in weighing the other factors.

Irreparable Harm: The issue of irreparable harm focuses on the harm caused by *not maintaining the status quo*, as opposed to the separate and distinct element of a remedy under the

likelihood of success factor.[2]  Here, the Court's evaluation is guided by the general notion that "self-inflicted wounds are not irreparable injury." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003)).  Further courts generally decline to find irreparable harm that "results from the express terms of [the] contract."  *See Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (no irreparable harm where the alleged harm "results from the express terms of [the] contract").  At its core, irreparable harm is harm or injury that cannot be repaired.

The Court finds that with respect to Epic Games' motion as to its games, including Fortnite, Epic Games has not yet demonstrated irreparable harm.  The current predicament appears of its own making.  *See Second City Music*, 333 F.3d at 850 ("Only the injury inflicted by one's adversary counts for this purpose.").  Epic Games remains free to maintain its agreements with Apple in breach status as this litigation continues, but as the Seventh Circuit recognized in *Second City Music*, "[t]he sensible way to proceed is for [Epic to comply with the agreements and guidelines] and continue to operate while it builds a record."  *Id.*  "Any injury that [Epic Games] incurs by following a different course is of its own choosing."  *Id.*  Epic Games admits that the technology exists to "fix" the problem easily by deactivating the "hotfix."  That Epic Games would prefer *not* to litigate in that context does not mean that "irreparable harm" exists.

By contrast, Epic Games has made a preliminary showing of irreparable harm as to Apple's actions related to the revocation of the developer tools (SDKs).  The relevant agreement, the Apple Xcode and Apple SDKs Agreement, is a fully integrated document that explicitly walls off the developer program license agreement.  (*See* Dkt. No. 41-21 at 16.)  Apple's reliance on its "historical practice" of removing all "affiliated" developer accounts in similar situations or on

---

[2] Indeed, the cases mentioned in passing during the August 24, 2020 hearing and unbriefed by Epic do not appear to change the analysis.  These cases stand for the proposition that the doctrines of unclean hands and *in pari delicto* are not recognized as a defense to antitrust claims.  *See generally Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379,1381 (9th Cir. 1977); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968).  *See also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982) (enforcement of "private agreements" is subject to "the restrictions and limitations of the public policy of the United States").  The issue of affirmative defenses is not currently before the Court.

5

broad language in the operative contract at issue here can be better evaluated with full briefing. For now, Epic International appears to have separate developer program license agreements with Apple and those agreements have not been breached. Moreover, Apple is hard-pressed to dispute that even if Epic Games succeeded on the merits, it could be too late to save all the projects by third-party developers relying on the engine that were shelved while support was unavailable. Indeed, such a scenario would likely lead to nebulous, hard-to-quantify questions, such as, how successful these other projects might have been, and how much in royalties would have been generated, much less the collateral damage to the third-party developers themselves.

<u>Balance of Equities</u>: The battle between Epic Games and Apple has apparently been brewing for some time. It is not clear why *now* became so urgent. The *Cameron* case which addresses the same issues has been pending for over a year, and yet, both Epic Games and Apple remain successful market players. If plaintiffs there, or here, prevail, monetary damages will be available and injunctive relief requiring a change in practice will likely be required. Epic Games moves this Court to allow it to access Apple's platform for free while it makes money on each purchase made on the same platform. While the Court anticipates experts will opine that Apple's 30 percent take is anti-competitive, the Court doubts that an expert would suggest a zero percent alternative. Not even Epic Games gives away its products for free.

Thus, in focusing on the status quo, the Court observes that Epic Games strategically chose to breach its agreements with Apple which changed the status quo. No equities have been identified suggesting that the Court should impose a *new* status quo in favor of Epic Games. By contrast, with respect to the Unreal Engine and the developer tools, the Court finds the opposite result. In this regard, the contracts related to those applications were not breached. Apple does not persuade that it will be harmed based on any restraint on removing the developer tools. The parties' dispute is easily cabined on the antitrust allegations with respect to the App Store. It need not go farther. Apple has chosen to act severely, and by doing so, has impacted non-parties, and a third-party developer ecosystem. In this regard, the equities do weigh against Apple.

<u>Public Interest</u>: "[T]he public interest inquiry primarily addresses the impact on non-parties." *HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1004 (9th Cir. 2019). "The plaintiffs

bear the initial burden of showing that the injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

With respect to the gaming requests, the Court recognizes based on the numerous internet postings and comments submitted in the record that Fortnite players are passionate supporters of the game, and eagerly anticipate its return to the iOS platform. The Court further recognizes that during these coronavirus pandemic (COVID-19) times, virtual escapes may assist in connecting people and providing a space that is otherwise unavailable. However, the showing is not sufficient to conclude that these considerations outweigh the general public interest in requiring private parties to adhere to their contractual agreements or in resolving business disputes through normal, albeit expedited, proceedings. *See S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853 (6th Cir. 2017) (declining to enjoin termination of contract according to its terms because the "public has a strong interest in holding private parties to their agreements").

With respect to the Unreal Engine and the developer tools, the calculus changes. The record shows potential significant damage to both the Unreal Engine platform itself, and to the gaming industry generally, including on both third-party developers and gamers. The public context in which this injury arises differs significantly: not only has the underlying agreement not been breached, but the economy is in dire need of increasing avenues for creativity and innovation, not eliminating them. Epic Games and Apple are at liberty to litigate against each other, but their dispute should not create havoc to bystanders. Certainly, during the period of a temporary restraining order, the status quo in this regard should be maintained.

<u>Weighing of Factors</u>: In sum, the Court finds that based upon the record before it, the *Winter* factors weigh ***against*** granting a temporary restraining order based on Epic Games' requests as to Fortnite and other games and ***in favor*** of granting a temporary restraining order based as to the Unreal Engine and other effected developer tools.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for a temporary restraining order.

**THEREFORE, APPLE AND ALL PERSONS IN ACTIVE CONCERT OR PARTICIPATION WITH APPLE, ARE TEMPORARILY RESTRAINED** from taking adverse action against Epic Games with respect to restricting, suspending or terminating any affiliate of Epic Games, such as Epic International, from Apple's Developer Program, including as to Unreal Engine, on the basis that Epic Games enabled in-app payment processing in Fortnite through means other than IAP or on the basis of the steps Epic took to do so.

For the reasons set forth above, and the parties' agreed-upon briefing schedule, this temporary restraining order is **EFFECTIVE IMMEDIATELY** and will remain in force until the Court issues an order on the motion for preliminary injunction. Neither party has requested a security bond and the Court finds that none is necessary as contemplated under Fed. R. Civ. P. 65(c). *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("The district court is afforded wide discretion in setting the amount of the bond, . . . and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction.").

Finally, as discussed at the August 24, 2020 hearing and reflected in the minutes therein, the Court **ORDERS** a briefing schedule on a motion for preliminary injunction as follows:

1. Motion for preliminary injunction filed **on or before September 4, 2020**;
2. Response to motion for preliminary injunction filed **on or before September 15, 2020**;
3. Reply in support of motion for preliminary injunction filed **on or before September 18, 2020**; and
4. Hearing on the motion for preliminary injunction is set for **Monday, September 28, 2020** at **9:30 a.m. PDT** via the Zoom platform. The link will be posted on the docket.

This Order terminates Docket Number 17.

**IT IS SO ORDERED.**

Dated: August 24, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**