Pages 1 - 57

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable Yvonne Gonzalez Rogers, Judge**

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. C-20-5640 YGR |
| | ) | |
| VS. | ) | MONDAY, AUGUST 24, 2020 |
| | ) | |
| APPLE, INC., | ) | OAKLAND, CALIFORNIA |
| | ) | |
| | ) | MOTION FOR TEMPORARY |
| | ) | RESTRAINING ORDER |
| Defendant. | ) | |
| _____ | ) | |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**For Plaintiff:**           CRAVATH, SWAINE & MOORE, LLP
                          825 Eighth Avenue
                          New York, New York 100019
                    BY:  Katherine B. Forrest, Esquire
                          Gary A. Bornstein, Esquire


**For Defendant:**          GIBSON, DUNN & CRUTCHER
                          333 South Grand Avenue
                          Los Angeles, California 90071
                    BY:  Richard J. Doren, Esquire

                          GIBSON, DUNN & CRUTCHER, LLP
                          2100 McKinney Avenue, Suite 1100
                          Dallas, Texas 75201
                    BY:  Veronica S. Lewis, Esquire


**Reported By:**            Diane E. Skillman, CSR 4909, RPR, FCRR
                          Official Court Reporter

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

| | |
|---|---|
| 1 | <u>MONDAY, AUGUST 24, 2020</u>                              <u>2:59 p.m.</u> |

2                     P R O C E E D I N G S

3                          o0o

4          **THE COURT:**  Okay.  Good afternoon, everyone.  Let's

5    go ahead and call the case.

6          **THE CLERK:**  Calling civil action 20-5640 Epic Games,

7    Inc. versus Apple, Inc.

8       Counsel, please state your appearances.

9          **MS. FORREST:**  Katherine Forrest with Cravath Swaine &

10   Moore for Epic, Your Honor.

11         **MR. BORNSTEIN:**  Gary Bornstein also with Cravath also

12   for Epic, Your Honor.

13         **THE COURT:**  Good afternoon.

14         **MR. DOREN:**  Richard Doren with Gibson, Dunn &

15   Crutcher on behalf of Apple, Your Honor.  Good afternoon.

16         **THE COURT:**  Good afternoon.

17         **MS. LEWIS:**  Veronica Lewis, Gibson, Dunn & Crutcher

18   also on behalf of Apple.  Good afternoon, Your Honor.

19         **THE COURT:**  Good afternoon.

20      Let's go ahead and read the admonishment.

21         **THE CLERK:**  Persons granted remote access to

22   proceedings are reminded of the general prohibition against

23   photographing, recording, and rebroadcasting of court

24   proceedings.  See General Order 58 at Paragraph 3.  Any

25   recording of a court proceedings, including screenshots or

1    other visual copying, is absolutely prohibited.  Persons

2    violating these prohibitions will face sanctions, including

3    removal of media credentials, or denial or restriction of

4    entry to future hearings.

5         **THE COURT:**  Okay.  Thank you.

6         Well, first of all, thank you for your filings over the

7    weekend, for the courtesy copies.  It is not easy to print the

8    hundreds of pages that you gave us, as is typically the case.

9         I have a number of questions and I'll obviously allow you

10   to make your arguments, but what I would like to know right

11   off the top are a couple of things.

12        One is, assuming we go to the preliminary injunction

13   stage, when will you be ready to brief?

14        I'll start with you, Ms. Forrest.

15        **MS. FORREST:**  Your Honor, we would be ready to brief

16   that as soon as Your Honor would like.  We can do it on as

17   expedited a schedule as Your Honor is able to impose.

18        We were thinking something in the vicinity of having the

19   hearing within 30 days would be something that we would like

20   to be able to do, but we stand ready to adhere to whatever

21   schedule Your Honor would like to impose.

22        **THE COURT:**  Mr. Doren.

23        **MR. DOREN:**  Your Honor, I am sorry, I actually froze

24   for a moment there while Ms. Forrest was talking, but I heard

25   her speak about a hearing in 30 days or so.  I think that time

1    frame sounds -- sounds appropriate, 30 to 45 days.

2        **THE COURT:** Okay. The second question I have is when

3    will you be ready for trial?

4     Ms. Forrest.

5        **MS. FORREST:** When would we be ready for trial?

6        **THE COURT:** Yes.

7        **MS. FORREST:** We would be ready for trial within a

8    short period of time thereafter, as soon as we can get some

9    discovery done. If Your Honor could give us an expedited

10    hearing in terms of a trial hearing, we would be ready to

11    proceed very, very expeditiously. As you know, this is a

12    bench trial only.

13        **THE COURT:** So you wouldn't be amending your

14    complaint to seek monetary damages?

15        **MS. FORREST:** No, Your Honor. We are seeking only

16    injunctive relief. We expect that this will be a bench

17    proceeding, and therefore whatever Your Honor's schedule would

18    allow, we would be prepared to proceed on that schedule.

19        **THE COURT:** Okay. Well, literally, give me a month.

20    When are you ready?

21        **MS. FORREST:** Your Honor, if we could have some

22    discovery in order to prove up market definition and things of

23    that nature, we could be ready within four to six months for a

24    full trial on the merits.

25        **THE COURT:** Okay. Mr. Doren?

1        **MR. DOREN:**  Your Honor, we haven't had a chance to

2   meet and confer with Epic about the scope of that discovery or

3   the scope of discovery we would need from Epic.

4        So, four to six months, frankly, sounds a little tight to

5   me.  I would think, Your Honor, probably more likely ten

6   months.  But, again, I say that without having had a chance to

7   talk with counsel.

8        **THE COURT:**  What do you think you need, Mr. Doren?

9        **MR. DOREN:**  Well, Your Honor, I -- as I've said, we

10  have not had a chance to discuss that or to understand what

11  they want from us.  So, that is my concern.

12       **THE COURT:**  Ms. Forrest, what do you think you want?

13       **MS. FORREST:**  What we are going to need, Your Honor,

14  is certain of the discovery that's already been produced,

15  frankly, in the *Cameron* case relating to the App Store.  Much

16  of that has been done.  We are not exactly sure what kind of

17  document production has been done, but we do know that there's

18  been substantial production.

19       We would plan to use that efficiently and not replicate

20  that.  However, we will need some additional discovery on the

21  in-app payment processing.  So that would be some limited

22  targeted additional discovery and some depositions, Your

23  Honor.  That's what we would need.

24       **THE COURT:**  Do you have an expert yet?

25       **MS. FORREST:**  Your Honor, we are in the process right

1    now of lining up experts.  We have two consulting experts who

2    we are right now using, but we are determining who is best

3    positioned to testify.

4            THE COURT:  All right.  Does that change your

5    assessment, Mr. Doren?

6            MR. DOREN:  Your Honor, as you know in *Cameron*, we

7    are in substantial compliance on document production, but very

8    few depositions have yet been taken.  And expert discovery,

9    both in that case and in this case, has yet to occur.

10      But -- so, again, counsel says four to six.  I guess, as I

11   try to be realistic about completing that discovery and

12   dealing with the experts, I would say six to eight.

13           THE COURT:  All right.  Let's get started then.

14      I just want to confirm, given that you must -- you know,

15   you know your case obviously better than I do, at least at

16   this point.  Exhibit H provided by the plaintiffs is also

17   Apple's Exhibit A, correct?  This is the developer agreement

18   for Epic Games, Inc., right?

19           MS. FORREST:  Yes.  That is correct.

20           THE COURT:  And similarly Exhibit I is Apple's

21   Exhibit B, correct?

22           MS. FORREST:  That is also correct, Your Honor.

23           MR. DOREN:  Correct, Your Honor.

24           THE COURT:  Now, Exhibit T, which gives me the

25   summary of all the contracts and the various entities,

1    identifies specific dates.  I see no dates on these documents.

2       Where are you getting the dates from?

3          **MS. FORREST:**  The dates, Your Honor -- and,

4    Mr. Bornstein, if you have more information on this please

5    sort of feel free to jump in, but as I understand it, Your

6    Honor, the dates is our best view of when these various

7    agreements were clicked through and actually entered into.

8    Some of those dates come from communications with our client.

9          **THE COURT:**  Is that correct, Mr. Bornstein?

10         **MR. BORNSTEIN:**  Yes, Your honor.  They are the

11   click-through dates.  And Your Honor may note that at least

12   some of them correspond to dates that appear in paragraph 16

13   of the Schiller declaration from Apple who also notes the

14   June 2020 dates, as I recall.

15      But it's the date on which people clicked through to

16   accept the document.

17         **THE COURT:**  And I gathered that although as I was

18   trying to review the documents myself, I didn't see any of

19   those dates.  So I am trying to understand where the dates

20   came from.

21         **MS. FORREST:**  As I understand it, Your Honor, if I

22   may, that there are developer accounts on the Apple website

23   which we were able to access, and that was able to assist us

24   with additional pinpointing of those dates.

25         **THE COURT:**  Okay.

1          Now, with respect to the developer agreements that were

2     provided to me by the Plaintiff, Exhibits H, J, L, N, P, and

3     R, and this is from your chart, I take it that they are all

4     identical?

5               **MS. FORREST:**  They are, Your Honor.

6               **THE COURT:**  Okay.

7               **MS. FORREST:**  They are separate agreements, but they

8     are identical in content.

9               **THE COURT:**  And then similarly, the Developer Program

10    License Agreement, so that is Exhibits I, K, M, O, Q, and S,

11    those, too, are identical?

12              **MS. FORREST:**  Yes, Your Honor.

13              **THE COURT:**  I just wanted to confirm that because I

14    didn't want to have to have any of us try to sit there and go

15    page by page and verify for ourselves.  This was a much more

16    efficient way of doing it.

17              **MR. BORNSTEIN:**  Your Honor, if I may supplement the

18    response to the Court's prior question about the dates of the

19    various agreements?

20         We noted in Paragraph 5 of Mr. Byars' declaration that the

21    dates on which the agreements were accepted come from the

22    Apple Developer Program website.  It's reflected there when a

23    party clicks through to accept a particular agreement, it's

24    noted in the membership account of the particular developer.

25         So those are taken, Mr. Byars' noted, from the website of

1    Apple.

2            **THE COURT:**  All right.

3        Let's start with -- and I'm not going to go through the

4    general standard for a TRO.  We do have a lot of people who

5    tapped in, so for their -- because you are all experienced

6    litigators, you all know, but they may not.

7        A TRO generally lasts only 14 days unless the parties

8    consent or the Court finds good cause to extend it.

9        The factors for determining whether to issue a TRO are

10   similar to those for Preliminary Injunction, but really my

11   goal with a TRO is to maintain the status quo so that a

12   Preliminary Injunction hearing on more of the merits can be

13   decided.

14       There are four factors under *Winter versus Natural*

15   *Resources Defense Counsel* 555 U.S. 7, Jump Cite 20, 2008

16   United States Supreme Court case.  One, likelihood of success

17   on the merits; two, irreparable harm in the absence of

18   preliminary relief; three, the balance of equities and in

19   whose favor they tip; and four, whether the injunction

20   ultimately or the relief is in the public interest.

21       I want to start with irreparable harm.  And having

22   reviewed and prepared for these proceedings, I can tell you

23   that I look at irreparable harm through two separate lenses,

24   really.  One is with respect to *Fortnite* and all of the gaming

25   apps that come to the platform, in effect, through the Epic

1    Games contract, and that's Exhibit H and I.

2        So, Shadow Complex Remastered, Battle Breakers, Infinity

3    Blade Stickers, Spyjinx, and *Fortnite* -- for ease of

4    reference, I'm going to call them the game apps.

5        And then the second lens is what comes to the platform

6    through the contract with Epic Games International.  And,

7    again, for ease of reference, I'm going to refer to that

8    entity as Epic International as opposed to Epic Games.

9        And with respect to that issue, we've got the *Unreal*

10   *Engine* and all of the other developer apps that access the

11   platform.

12       For me, the analysis is different with respect to each of

13   those two contracts and each of the effects with respect to

14   those issues.

15       So I can tell you right now that I am inclined not to

16   grant relief with respect to the games, but I am inclined to

17   grant relief with respect to the *Unreal Engine*.

18       We can start then, now that I have put that out there so

19   that you know where to focus your argument, we'll start with

20   you, Ms. Forrest.

21       And what I will say on the irreparable harm, on the ground

22   where you lose, tentatively, is that your client created the

23   situation.  Your client doesn't come to this Court with clean

24   hands.  But, you know, strategically and calculated, in a

25   calculated move, decided to breach, and decided to breach

1    right before a new season.  So, in my view, you cannot have

2    irreparable harm when you create the harm yourself.

3        You may proceed.

4            **MS. FORREST:**  Thank you, Your Honor.

5        And what I would like to do, Your Honor, is focus the

6    Court on a series of Supreme Court cases that actually hold

7    that we, in an antitrust case where the plaintiff has not

8    fulfilled its contractual obligations for some reason relating

9    to the anticompetitive conduct of the defendant, is entitled

10   nonetheless to judicial relief, even to injunctive relief;

11   that these Supreme Court cases say unclean hands is not a

12   defense in an antitrust case.  And it comes from the Supreme

13   Court, Your Honor.  And if I can lay those cases out.  We

14   would have --

15           **THE COURT:**  These are in your briefing, correct?

16           **MS. FORREST:**  They are not, Your Honor, because there

17   was no reply brief.  And -- there was no reply brief -- I'm

18   sorry.

19           **THE COURT:**  Well, you brought this affirmatively.

20   You knew -- you had to have known this was going to be an

21   issue.  It's not -- so the fact that you didn't raise this to

22   begin with is a little bit surprising.

23       Did you share those cases with Mr. Doren before coming on

24   the platform to argue so that he could, in fact, respond?

25           **MS. FORREST:**  Your Honor, I did not meet and confer

1    with Mr. Doren about these cases prior to this session with

2    the Court now.

3         They are well-known antitrust cases, including the *Memorex*

4    case, including the *Perma Life Muffler* case, including some

5    others.  These are cases -- the *Kaiser* case, which are

6    well-known in the antitrust area.

7         If I can lay them out, Your Honor, they are binding in

8    terms of the way in which unclean hands' defenses are able to

9    be utilized in an antitrust proceeding.  I do apologize, in

10   the nature of a TRO proceeding, because we didn't have the

11   sort of, you know, the kind of the speed reply papers, we

12   weren't able to lay them out.  But I would be very happy to go

13   through those right now, Your Honor.  It won't take me much

14   time.

15        **THE COURT:**  Mr. Doren, are you familiar with the

16   short names that Ms. Forrest has identified?

17        Typically, we are sitting in a court -- in my courtroom

18   and not on this virtual platform.  You would have come after

19   the case that preceded this one.  And lawyers would sometimes

20   frequently come to the podium and say, I have all these cases.

21   And I would say to them, did you give those cases to opposing

22   counsel while you were sitting there?  And if they say, no,

23   then my answer is no, you cannot argue them because you should

24   know better than to pull that out, especially when I am

25   talking about law firms like Cravath and Gibson.  I don't

1    expect surprises.

2        Mr. Doren, are you familiar with the short names?  Are you

3    prepared to respond, do you believe?

4        **MR. DOREN:**  Your Honor, I'm not prepared to address

5    those specific cases.

6        **THE COURT:**  Well, then, no, Ms. Forrest, you may not.

7        **MS. FORREST:**  Your Honor, I would -- I understand the

8    Court's position, and I will move on to an argument about

9    irreparable harm.

10       The one thing I would say is, that the precedent is

11   binding in the Ninth Circuit as well as in the Supreme Court.

12   And I've mentioned the cases -- the short names already.  I

13   won't delay any longer.  Let me go directly into irreparable

14   harm.

15       The irreparable harm for *Fortnite* relates to the fact that

16   the *Fortnite* game is a social environment, Your Honor.  It is

17   not just a game.  We call it a game, but, in fact, it is a

18   social environment.

19       What's going to happen at the end of this week with

20   *Fortnite* and with other games that are referenced in

21   Exhibit T, is that there's going to be shortly updates that

22   are going to, in fact, break the ability of users across a

23   number of different platforms to actually play these games.

24       We are already getting the kind of customer complaints,

25   the kind of customer reaction that goes directly to the

1    cognizable factors of harm to our goodwill, harm to our

2    reputation.

3         **THE COURT:**  All Epic has to do is take out -- or to

4    remove the hotfix, take it back to the status quo, and no one

5    suffers any harm.  That's all -- and you can have a trial date

6    in the Spring.

7       This has -- *Cameron* has been ongoing for the last -- well,

8    it returned from the Supreme Court over a year ago.

9         **MS. FORREST:**  Well, Your Honor --

10        **THE COURT:**  It's not as if these things had not been

11   in litigation, it's not as if money damages cannot provide a

12   remedy for Epic Games if it is correct in their view.  So

13   there's -- so far I haven't heard anything that suggests that

14   they can't flip the switch to the way it was August 3rd and

15   return everybody back to where they were.

16        **MS. FORREST:**  Your Honor, first, I would say that we

17   should not, as a matter of law, as a matter of public policy,

18   as a matter of what the Sherman Act actually stands for, be

19   required to comply with an anticompetitive provision that's

20   contained in the Apple contracts.

21        **THE COURT:**  But the Supreme Court count was on the

22   action, the *Cameron* action that went to the Supreme Court; do

23   you remember what the vote was?

24        **MS. FORREST:**  I don't remember the vote, Your Honor.

25        **THE COURT:**  It was 5-4.  This is not something that

```
 1    is a slam dunk for Apple or for Epic Games.
 2              MS. FORREST:  Well, Your Honor, I would say that 5-4
 3    actually indicates some amount of likelihood of success on the
 4    merits of the underlying action perhaps.
 5         And so -- but let me go, if I could, to the fact that we
 6    can't just flip a switch and go back into an anticompetitive
 7    contract.  What the Court would be asking us to do is to
 8    actually then engage in a -- the scheme with Apple that
 9    provides for the anticompetitive kinds of lack of competition
10    and payment --
11              THE COURT:  Is there a technical reason why you
12    cannot do it?
13              MS. FORREST:  There's no technical reason why it
14    cannot be done, Your Honor, but it's something that the law
15    does not require and should not require here.
16         What we have here is a situation where users are actually
17    unable to -- very shortly are going to be unable to play this
18    game.  They are going to be unable to play with their other
19    partners in various kinds of groups who are utilizing any kind
20    of non-Apple device.  They are not going to be able to play
21    cross platform.  They're not going to be able to play
22    internationally.
23         We are getting consumer complaints every single day that
24    are saying that users are quitting.  We are not going to know
25    who's quitting.  We are not going to know who's not going to
```

1     come back to the game.  Those are the kinds of harms that are

2     cognizable.

3         In addition, Your Honor, there are loads of customer

4     service complaints that are coming in every single day.  We

5     don't control the customer service relationships for these

6     customers.  Your Honor, Apple, because of its Apple payment

7     system, actually has the only ability to give customers back

8     their money.  We don't have that ability when the payments

9     have been through the Apple pay system.  So we are being asked

10    by consumers to do things that we cannot do.

11        And that is going to and is, in fact, harming our

12    reputation on an immediate and irreparable basis.  It's

13    exactly the kinds of harm that are cognizable as irreparable

14    harm in this circuit.

15        And, Your Honor, asking Epic to turn back -- to put in a

16    build that takes out Epic pay is really asking us to require

17    that consumers pay more than they should in a competitive

18    environment.  There is no need for these consumers to pay more

19    than they need to pay in a competitive environment with Apple

20    pay.

21             THE COURT:  Do you have --

22             MS. FORREST:  And with Epic pay competing against

23    Apple pay.

24             THE COURT:  What's happening with Google?  Google

25    charges the exact same price.

1              **MS. FORREST:**  Your Honor, we have sued Google for

2      antitrust violations as well.  So we have sued Google.  They

3      have a different set of technologies.  Things are slightly

4      different in the Android environment for a variety of reasons,

5      but we have also sued Google for anticompetitive acts.

6              **THE COURT:**  Response, Mr. Doren.

7              **MR. DOREN:**  Your Honor --

8              **THE COURT:**  A response first before you move to the

9      *Unreal Engine.*

10             **MR. DOREN:**  Thank you, Your Honor.

11         First of all, we agree with Your Honor that this is solely

12     in the control of Epic.  It need only go back to the days

13     before it had breached by hiding code within a submission to

14     Apple without disclosing it, and then triggering that same

15     function to create this Epic Pay so that it is being paid

16     directly by in-app for in-app purchases by *Fortnite* users on

17     iOS platforms.

18         And when we hear about complaints from customers by Epic,

19     that is solely of their doing.  Whereas Apple is getting the

20     same calls, Your Honor, and there is nothing we can do about

21     them without conceding that Epic can breach the contract that

22     it has with Apple without permitting it to go forward with

23     these unauthorized functionalities, and to siphon money off of

24     the App Store to receive payment for in-app purchases without

25     paying the contractual commission to Apple.

1    Your Honor is completely right that this was a willful

2    breach by Epic.  It was strategic in nature.  It was intended

3    to position Epic so that it could profit from its breach while

4    this litigation proceeds, and this Court should not authorize

5    or bless a breach so that Epic can profit based on its own

6    wrongdoing and continue to siphon money off of the App Store

7    to fund this litigation against Apple.

8        They should go back to the status quo, we should litigate

9    this case on the merits, and we believe that Apple's business

10   model will be proven just and competitive when we go to trial

11   in the spring.

12              **MS. FORREST:**  Might I respond, Your Honor, briefly?

13              **THE COURT:**  Yes, you may.

14              **MS. FORREST:**  Thank you, Your Honor.

15       First, I would like to say that there was no hidden code

16   here and there was no code that needed to be executed.  All of

17   the code that was utilized for the quote "hotfix" which turned

18   on the competitive alternative Epic Pay System was included in

19   an app, which -- an app build, which was reviewed by Apple

20   several weeks prior to August 13th when it was turned on.

21       Second, Your Honor, hotfixes, which are being described as

22   something nefarious and something novel, are neither nefarious

23   nor novel.  They happen all the time.  Indeed, hundreds of

24   hotfixes have occurred with *Fortnite* and with Apple routinely.

25   They are the way in which concerts are actually played through

1    the *Fortnite* app.  They are also the way in which different

2    kinds of characters are put into play.  Hotfixes happen all

3    the time.

4        Your Honor --

5            **THE COURT:**  Epic Games didn't tell Apple that you had

6    code in there which would allow you to collect directly from

7    your consumers, right?  You --

8            **MS. FORREST:**  Your Honor, we didn't hide it.  We

9    never ever go through every single line of code and describe

10   exactly what's happening.  The words were there.  The words --

11           **THE COURT:**  I get to interrupt.  That's my privilege.

12   There was never -- this was not an insignificant breach,

13   hence, the reason we are here.

14       On June 30th, the CEO, right, of your client, Epic, sent

15   an email asking to -- Apple to allow Epic to directly sell to

16   iOS users.  Apple then responded and said no.  After that

17   happened, you turned on the code or you activated it.

18       It's not as if this -- you know, it's not as if they were

19   being forthright.  Call a spade a spade.  I don't see how you

20   can say they were being forthright in what they were

21   attempting to do.

22       You may respond.

23           **MS. FORREST:**  Your Honor, in the Ninth Circuit,

24   unclean hands is not a defense in an antitrust case.  Public

25   policy dictates that when you are the subject, the

1    counterparty to an anticompetitive contract, you need not

2    comply with that contract.  And there are a number of cases

3    which actually so find.

4        What we did here was we ceased complying with an

5    anticompetitive contract.  That was the sin that we committed,

6    was ceasing to comply with an anticompetitive provision.  And

7    it was with code that had been resident in the build for

8    several weeks beforehand.

9        Did we know what we were doing?  We did, Your Honor.  We

10   understood that to have this fight with Apple, it was going to

11   be a big fight.  It had to be done by a company that was

12   committed to go the distance, as Epic is.  Epic is a company

13   which understood it had to prepare for this fight, which it

14   did because it was the only way to try and break the chokehold

15   that Apple has on its payment system and its prohibition on

16   any kind of competition.

17            **THE COURT:**  So you are a billion-dollar company or

18   multiple billions, right?  So why aren't -- monetary damages

19   can suffice.

20            **MS. FORREST:**  Your Honor, monetary damages don't

21   suffice because of the number, the really thousands and

22   millions -- thousands of developers and millions of users who

23   are actually being irreparably harmed.

24            **THE COURT:**  The harm to Epic, not --

25            **MS. FORREST:**  The harm --

1            **THE COURT:**  There are multiple factors, and we will

2     go through each factor.

3         The harm to consumers, the harm to developers, those

4     actually, in some ways, are more under the public interest

5     rubric.  Where is the harm to Epic?

6            **MS. FORREST:**  Your Honor, with --

7            **THE COURT:**  That cannot be compensated?

8            **MS. FORREST:**  Your Honor --

9            **THE COURT:**  Unless what you are going to do with

10    respect to the *Cameron* case is you're going to opt out and

11    say, no, we don't -- we are not entitled to any monetary

12    damages because they can't -- monetary damages can't remedy

13    the situation.

14            **MS. FORREST:**  Your Honor, we are not seeking monetary

15    damages now.  We are not planning on seeking any monetary

16    damages in the *Cameron* case.  We are planning on opting out of

17    that case.

18        Your Honor, we do not believe that monetary damages make

19    us whole.  The kind of reputational harm, the kind of harm to

20    our goodwill that we are suffering now that is coming in in

21    waves from our users and from the developers, that's exactly

22    the kind of cognizable harm that constitutes irreparable harm

23    through the Supreme Court and in the Ninth Circuit.

24        We are squarely within the realm of cognizable irreparable

25    harm, Your Honor.  It cannot be the case that our business can

1    suffer as it is suffering right now with this retaliation and

2    not have it be cognizable harm with all that is happening.

3        Did we understand there would be retaliation?  We did

4    understand there would be retaliation.  What this

5    billion-dollar company, Epic, is able to do is to try to

6    withstand what Apple is doing, to try and survive it.  We

7    don't have to have a complete decimation of our business so

8    that there is no longer an Epic business.  What we have to

9    have --

10           **THE COURT:**  It is not a decimation.

11       All right.  Mr. Doren.

12           **MR. DOREN:**  Thank you, Your Honor.

13       Responding to the last point first, Epic attempted to and

14   so far has succeeded in putting Apple customers in the middle,

15   to essentially hold them hostage so they can come to this

16   Court and claim irreparable harm because people are

17   complaining to them about their inability to play their game

18   on the iOS platform.

19       Well, Your Honor, Apple is getting those same complaints.

20   And every iOS customer of Epic is a customer of Apple.  We

21   have offered Epic a path back that would eliminate any impact

22   on consumers and any impact on developers.  If they simply go

23   back to status quo ante, as Your Honor said, before August 3,

24   then they will be back in the App Store, everything will be

25   moving forward as it was before, both for *Unreal Engine* and

1    for *Fortnite* and other games --

2             **THE COURT:**  Well, Mr. Doren, Apple can act as Google.

3    They don't -- if you turn out to be right, then, you know,

4    Epic just owes you money.  I mean, you don't have to take the

5    step of removing access.

6             **MR. DOREN:**  Well, Your Honor, we do.  And that's the

7    difference.  We do because our contract requires that any new

8    code or new functionalities, first of all, be disclosed, and

9    they weren't.  So that's a breach.

10        Second of all, they can't be -- cannot be installed

11   without having been reviewed.  And they were because they

12   weren't disclosed.  So that's a breach.

13        Then they were triggered.  That's a breach.

14        Then they created a separate payment channel directly to

15   Epic, which is also a breach.

16        And, Your Honor, Apple's business model and its most

17   fundamental promise to its customers is that they will be --

18   their -- they will be safe, their privacy will be secured, and

19   there will not be malware.  There will not be unknown codes

20   migrating into the App Store.

21        And what Epic has done is to break that model, to break

22   that model, and profit by it, and place the customers in the

23   middle.

24        Now, we did not have to give Epic 14 days to cure, but we

25   did because of the importance to our customers of access to

1    Epic's games, and because Epic should cure, and all of this

2    should go away.  It's in Epic's hands and it's Epic's to

3    solve.

4        Instead, Your Honor, what Epic did was launch an

5    anti-Apple PR campaign and advertising campaign in a series of

6    *Fortnite* tournaments all focused against Apple.

7            **THE COURT:**  Mr. Doren, let's move on.  I know that.

8    That's been center in your papers.

9            **MR. DOREN:**  Thank you, Your Honor.

10           **THE COURT:**  With respect to --

11           **MS. FORREST:**  My --

12           **THE COURT:**  Hold on.  Make a note.  I will give you

13   some closing remarks at the end.

14       With respect, Mr. Doren, though, to the *Unreal Engine*,

15   here it seems to me that Apple has overreached.  That contract

16   is not in breach.  The contract with Epic International has

17   not been breached.

18       What Apple has done is reached beyond its one contract

19   with Epic Games and is doing -- you know, is using its hard

20   leverage and has slammed Epic Games with this additional

21   penalty.

22       It does, to me -- now, remember, I just got this case --

23   it does, to me, look retaliatory.  And certainly, again, I

24   don't see any harm to Apple to enjoin you or restrain you from

25   not impacting the *Unreal Engine* on that platform or the

1    developers' engines, anything that doesn't come within the

2    Epic Games' rubric until I can see this on a preliminary

3    injunction.  It looks like overreach to me.

4         You may respond.

5              **MR. DOREN:**  Thank you, Your Honor.

6         As Your Honor knows from the review of the record, the --

7    Epic is Unreal Games or Epic S.a.r.l., and Epic S.a.r.l. is

8    Epic Games.  You have, for example, two declarations submitted

9    by --

10             **THE COURT:**  Mr. Doren?

11             **MR. DOREN:**  Yes, Your Honor.

12             **THE COURT:**  Are they not -- I thought I read that

13   they were two separate companies.

14             **MR. DOREN:**  Your Honor, if I may?

15             **THE COURT:**  Are they two companies or not?

16             **MR. DOREN:**  There is an Epic S.a.r.l. entity, yes,

17   Your Honor.  And it has an account with Apple as does Epic

18   Games.

19        Nicholas Penwarden, who submitted two declarations to Your

20   Honor -- those were ECF 17-7 and 42 -- he explains in those

21   declarations that he's the Vice President of Engineering at

22   Epic Games, Inc., but he is the one responsible for *Unreal*

23   *Engine*, that software.

24        Mr. Sweeney, the CEO and founder of Epic Games, Inc., at

25   Document 17-8, he says in Paragraph 2 of that declaration that

1    Epic, Epic Games is how it's defined in his declaration, has

2    developed a number of popular video games as well as a

3    software suite called the *Unreal Engine*.  At Paragraph 18 he

4    says that open access to *Unreal Engine* is a core part of

5    Epic's business philosophy.

6        As we've already told Your Honor in the record, those two

7    accounts maintain the same Tax I.D. numbers, the same

8    individual serves as the account manager for both, the $99

9    fees on the two accounts were both paid with the same credit

10   card.

11       And when Apple identifies a breaching party, and here

12   that -- here, with Epic Games having violated its contract,

13   Epic S.a.r.l., while a -- while a legal entity, is a

14   wholly-owned subsidiary, every share of Epic S.a.r.l. is owed

15   by Epic Games, Inc.  And as I've said, it is people at Epic

16   Games, Inc. who are in charge of what goes on regarding *Unreal*

17   *Engine*.

18       Now, Apple, therefore, if it were to continue to do

19   business with the account that is relevant to --

20            **THE COURT:**  Mr. Doren, can you hear me?

21        **MR. DOREN:**  Now I can, Your Honor, yes.  Thank you.

22            **THE COURT:**  My focus was on the irreparable harm.

23   And I have yet to hear you talk about irreparable harm.

24        **MR. DOREN:**  Here it is, Your Honor.

25       When Apple is dealing with an entity that is breaching its

contracts, its practice is to terminate the accounts of all

affiliated companies --

          **THE COURT:**  Contractual obligations or contractual

language are two different things.

          **MR. DOREN:**  I'm sorry, Your Honor?

          **THE COURT:**  I said your practice is separate and

distinct from a contract.

          **MR. DOREN:**  But each -- Your Honor, two things.

    The reason Apple does that, and then I'll talk about the

contracts, is so it doesn't turn into a shell game; so that

Epic Games doesn't just slide the offending conduct over into

Epic S.a.r.l.  And each contract that's in place with each

entity, the Developer Agreement states at Paragraph 10, that

Apple may terminate or suspend you as a registered Apple

developer at any time in Apple's sole discretion.

    The Program License Agreement at 11.2, as Your Honor

knows, in F, talks about termination, which is what's been

briefed to the Court, and it also states that either party may

terminate this agreement for its convenience, for any reason

or no reason at all.

    The Xcode and SDK agreements, which we just saw for the

first time in the reply, says at Paragraph 5 that Apple

reserves the right to revoke, disable or suspend, and then it

lists the various accesses provided by that contract.

    The point is, Your Honor, Apple maintains the right, and

1    it is bilateral, but Apple maintains the right to cancel

2    contracts on any account because of situations exactly like

3    this where you have a shell corporation --

4            **THE COURT:**  Is it -- once again, this is a TRO.  It's

5    not a preliminary injunction.  I do not know if it is a shell

6    corporation.  I do not know whether there is going to be a

7    claim of piercing of the corporate veil.

8        What I know is that you have two separate contracts.  You

9    took two separate fees.  There are two separately distinctive

10   applications coming from these entities.  That's what I know

11   after a weekend of work.

12           **MR. DOREN:**  And, Your Honor, in sum, the concern is

13   that the misconduct will simply be transferred to another Epic

14   entity, one wholly-owned and controlled by Epic Games.

15           **THE COURT:**  All right.  A response, Ms. Forrest.

16           **MS. FORREST:**  Yes, Your Honor.

17       First of all, what I would like to do is sort of discuss

18   the fact that Apple's letter to us has a 14-day cure period

19   and says essentially for the *Fortnite* payment processing, if

20   you undo that, you can -- we will no longer threaten the

21   *Unreal Engine*, demonstrating it is not a lack of trust, Your

22   Honor, in Epic overall.  The utilization of the *Unreal Engine*

23   is for pressure and it's because they want to leverage their

24   other -- their other properties with Epic.

25       Now, as Your Honor knows, even if there was one

1    corporation, the contracts that are separate, are separate.

2    They are integrated contracts.  The -- and never the twain

3    shall meet.  If Apple had intended that these contracts would

4    actually read on one another, they could easily have done

5    that.  Instead, each and every one of those contracts, because

6    they are identical contracts of adhesion, those contracts all

7    have independent integration clauses.

8         Your Honor, in terms of the termination at will, that is

9    in the context of a retaliatory act by an alleged monopolist,

10   the termination at will is actually an act of monopoly

11   maintenance.  It's not just the exercise of a contractual

12   right in the context of the *Unreal Engine*.

13        I would recommend to Your Honor, the *Kaiser Steel* and

14   *Perma Life* cases as examples of exactly that, where there were

15   attempts to terminate at will allegedly in an antitrust

16   context.  When that was not allowed as a defense, it was seen

17   as an act of monopoly maintenance.

18             **MR. DOREN:**  And, Your Honor, that, of course, assumes

19   some sort of market power, which no evidence has been offered

20   on.

21        Apple is simply enforcing legitimate business provisions

22   in its contracts for legitimate business purposes.  Because if

23   what Epic Games has done in *Fortnite* were to make it into

24   *Unreal Engine* and to make it out into the marketplace, not to

25   say something too current, but it would spread like a virus,

1    Your Honor.

2        And that cannot be permitted to happen, that cannot be

3    risked, and that is why we are -- that is why we ask that

4    it -- that Apple not be required to continue to maintain

5    *Unreal Engine* until this matter is resolved.

6            **MS. LEWIS:**  Your Honor, if I could chime in very

7    quickly on the irreparable harm piece of it.  I don't know if

8    you can hear me, Your Honor.

9            **THE COURT:**  Ms. Lewis?

10           **MS. LEWIS:**  Yes.  If I could chime in very quickly on

11   the irreparable harm --

12           **THE COURT:**  Ms. Lewis, you may not.  That is, I do

13   not allow lawyers to double team on issues.

14       In advance of this hearing, I asked whether the argument

15   was going to be split so that I would know who was arguing.

16   It was not identified to me that you would be making that

17   argument, nor do I think Mr. Doren needs help.

18           **MR. DOREN:**  Your Honor --

19           **THE COURT:**  Now, I'm going to communicate -- and let

20   me know which issue, or if there is going to be an issue that

21   you would like to discuss solely on your own, I am happy to

22   let you do that, but I don't allow tag teaming.

23           **MR. DOREN:**  Your Honor, may I make one additional

24   point?

25           **THE COURT:**  You may.

1          **MR. DOREN:**  Thank you, Your Honor.

2      To the extent Your Honor is basing your tentative on the

3  notion that Epic S.a.r.l. is an independent corporation, then

4  there is no standing for a restraining order to be issued for

5  the benefit of Epic S.a.r.l.  It hasn't moved for that.

6  It's -- it isn't represented here, no filings have been made

7  on behalf of Epic S.a.r.l.  Either it is part of Epic Games or

8  it's not.  And if it's not, then it has not properly moved for

9  a TRO and relief cannot be granted to this absent third party.

10          **MS. FORREST:**  Your Honor, might I respond?

11          **THE COURT:**  You may.

12          **MS. FORREST:**  Your Honor, we are not saying S.a.r.l.

13  is not affiliated with Epic Games.  Just as any major

14  corporation may have a number of subsidiaries, S.a.r.l. is a

15  subsidiary of Epic.

16      What they have done is reached out beyond the contracts at

17  issue with *Fortnite* and the other accounts that are associated

18  with the 84 counts set forth on our Exhibit T, they have

19  reached beyond those where the in-app purchasing issue

20  occurred, and they're touching now a variety of other

21  contracts, including not just by the way, *Unreal Engine* but

22  also House Party and some of the other properties that are set

23  forth on Exhibit T.

24      These are independent contracts.  This is solely a

25  pressure tactic, Your Honor.  If Your Honor would like, I

1    don't want to repeat what's in our papers, but I could

2    describe some of the irreparable harm that is occurring right

3    now in a developer community and describe for Your Honor some

4    of that.

5            **MR. DOREN:**  Your Honor --

6            **THE COURT:**  Ms. Forrest, again, irreparable harm is

7    to the party.  It is with respect to the public interest, that

8    issue impacts the community.

9            **MS. FORREST:**  Well, and let me --

10           **THE COURT:**  Why don't we go ahead and move to that

11   issue.

12           **MS. FORREST:**  Let me --

13           **THE COURT:**  To the extent all of these kind of meld,

14   but go ahead and we'll address the public interest issue.

15           **MS. FORREST:**  Your Honor, the -- what will happen

16   with the *Unreal Engine* is that so far as Epic is concerned,

17   the *Unreal Engine* will be actually destroyed.  It will no

18   longer be a usable engine.

19       The reason for that is, because of cross-platform app

20   development, app developers need to have not only development

21   on one platform, such as iOS with Apple, but the ability to

22   actually have their app deployed on multiple platforms.  So

23   they're looking for an engine that can allow them -- for that

24   kind of cross-platform development.

25       If Epic cannot offer that with the *Unreal Engine*, *Unreal*

1   *Engine* will cease to exist.  And we are receiving information

2   from developers saying they are fleeing the *Unreal Engine* now.

3   It's happening now.  It's not speculative.  We've got some of

4   that referred to in Mr. Penwarden's declaration.  We've also

5   got some of that referred to in the materials we submitted

6   this weekend.

7        In terms of the public interest, Your Honor, that is,

8   again, where the flip side of what's happening with the *Unreal*

9   *Engine* is occurring.  That's where the investment that some of

10  these developers have made, and the *Unreal Engine* is going to

11  be absolutely destroyed.  To not going to be able to have Epic

12  be able to update and utilize the pools that it needs to have

13  to update the *Unreal Engine*, the *Unreal Engine* will just

14  absolutely stop being a platform on which they can rely.  They

15  won't be able to trust any development.

16       That puts these developers, many of whom don't have a lot

17  of resources into an untenable position.  It also affects all

18  of their users who are relying upon those app developers

19  who've utilized the *Unreal Engine* as their platform.  That's

20  the public harm that's occurring with regard to the *Unreal*

21  *Engine*.

22       I could, if Your Honor would like, talk also about the

23  public interest with respect to *Fortnite* and some of the other

24  properties.

25            **THE COURT:**  You may.

1              **MS. FORREST:**  All right.

2         In terms of *Fortnite*, Your Honor, what we have is, with

3    *Fortnite*, is a social environment.  Again, it's not just a

4    game.  There are ways in which people actually go into

5    *Fortnite* and listen to concerts and communicate with each

6    other across platforms and across the world.

7         What's happening is the -- those who are in the iOS world,

8    those who are using the Apple device for that, they are not

9    going to be able to do that after August 28th when the new

10   release is issued.  They are going to have a very short

11   window.  Then their social groups are actually going to be

12   unable to communicate with one another.

13        I would submit that in the context of a world in which we

14   live in, which is a strange world, indeed, with

15   socially-distant everything, these kinds of social connections

16   become incredibly important.  The public interest is

17   absolutely in our favor.

18        As Your Honor knows from the *hiQ* case and other Ninth

19   Circuit precedent, the standard for a TRO is a series of

20   sliding factors.  The Court can actually weigh the public

21   interest strongly in our favor.

22        Balance of the hardships, Your Honor, may I move to that

23   factor?

24        I'm sorry, I couldn't hear you.

25              **THE COURT:**  Response, Mr. Doren.

1          **MR. DOREN:**  Thank you, Your Honor.

2      First of all, Your Honor, the public interest in reference

3  to *Unreal Engine*, let me take it again back to first

4  principles.

5      All that Epic has to do to eliminate any issue on any

6  front is to put a compliant version of *Fortnite* back on the

7  App Store.  Unreal -- all of the issues with *Unreal Engine*,

8  all the threats to the ability of *Unreal Engine* to get iOS

9  updates are gone along with any impact -- on *Fortnite* are gone

10  if they simply back off of the intentional breach of the

11  contract that was intended to both put pressure on Apple

12  through developers and customers, the customers we care most

13  about, the ones that we want to see be able to ride their

14  sharks and buy their dances on *Fortnite*.  But it is Epic that

15  is refusing, or so far has.  Your Honor, we are still hopeful

16  that by Friday they will, in fact, cure their breach.

17      And any issues with *Unreal Engine* will be gone because

18  it's not a separate company, it's part of Epic Games.  And if

19  Epic Games solves its breach in the App Store, then *Unreal*

20  *Engine* will be back on track and *Fortnite* will be back on

21  track.

22      And if Epic is truly concerned, as concerned about iOS

23  users as Apple is, then they should have it fixed by

24  August 28th before that new season begins.

25          **THE COURT:**  You must concede that the revocation of

```
1    the engine will negatively impact third parties; you concede

2    that, don't you?

3            MR. DOREN:  But it's self-inflicted, Your Honor.

4    It's self-inflicted -- not self-inflicted, it is manufactured

5    by Epic to put pressure --

6            THE COURT:  Mr. Doren, I get to mute you and I get to

7    interrupt you.  Okay?

8        I asked you a simple question.  "Yes" or "No."

9        Hold on.  Now you have to unmute yourself.

10           MR. DOREN:  Thank you, Your Honor.

11           THE COURT:  Right?  I just want you to answer very

12   cleanly, "yes" or "no," it doesn't hurt them.

13           MR. DOREN:  It does not need to, Your Honor.

14           THE COURT:  "Yes" or "no," Mr. Doren.

15           MR. DOREN:  Not until there is a new update of iOS or

16   something else that changes their ability to use what they

17   currently have.

18           THE COURT:  Does the revocation of the *Unreal Engine*

19   negatively impact third-party developers?

20           MR. DOREN:  May -- may it at some point in the

21   future?  Of course it may.  That is why Epic should cure its

22   breach.  Yes.

23           MS. FORREST:  Your Honor, might I mention one more

24   thing on this topic?

25           THE COURT:  Hold on.
```

```
 1                    (Pause in the proceedings.)

 2        Go ahead.

 3           MS. FORREST:  I would just refer Your Honor to the

 4     declaration of Mr. Gammill from Microsoft who put in a

 5     declaration supporting the actual harm that is being

 6     experienced by third-party developers.

 7           THE COURT:  I am quite aware of it, and I'm also

 8     aware of comments Brad Smith has made in the press on this

 9     topic as well.  Not with respect to the Unreal Engine, with

10     respect to the App Store.

11           MS. FORREST:  Your Honor, if you would like, I can

12     move on to the balance of the hardships.

13           THE COURT:  I don't know that there's -- you can,

14     I'll give you a couple of minutes.  I don't know there's much

15     more to be said.

16        The other way we reference that is balance of equities,

17     and you all disagree on this issue of Epic, Epic's own role in

18     what they've done, but you have a couple of minutes.

19           MS. FORREST:  Your Honor, one thing I would say is

20     that this, for Apple, appears to be about the ability to get

21     paid.  That is a monetary and compensable wrong.  If we end up

22     being wrong, then their hardship is going to be something that

23     can be measured in money damages, and we will pay them.

24        However, if -- the balance of the hardship for us is that

25     we are going to have our business strongly and very, very
```

1    decisively impacted by all of the integrated pattern of

2    retaliatory conduct that Apple is undertaking in terms of what

3    will happen with the *Unreal Engine*.

4            THE COURT:  Of course what I don't know, because I

5    don't have your financials, is what aspect of your -- well,

6    first of all, right, we are talking about a company worth

7    billions versus a company worth trillions.  At least as of

8    last week it was over two trillions, so I can use the plural.

9        What I don't know is, when you talk about devastation of

10   the company is how much does the game aspect account for

11   profits or market value versus all of these other things that

12   Epic Games has.

13       So, as you know, my tentative is to restrain with respect

14   to the engine but not with respect to the games.

15           MS. FORREST:  And what I would suggest, Your Honor,

16   is that all of it is an integrated package in terms of the

17   retaliation of what Apple has done.  What it did --

18           THE COURT:  Can you answer the question, Ms. Forrest,

19   about the economics of Epic Games?  Do you know?

20           MS. FORREST:  I don't know.  I do not know.

21           THE COURT:  All right.  Go ahead.

22           MS. FORREST:  That there is -- what happened when

23   Apple issued its letters to us on both August 13th and

24   August 14th was that it put together an integrated package of

25   retaliation that affects all of the Epic properties, not just

1    *Fortnite*, not just the In-App payment processing, but also a

2    variety of properties.

3         What we also know is there is no security issue that Apple

4    has been able to identify.  There is no hardship to Apple with

5    regard to security.  There is no security flaw that's been

6    identified.  And that on Page 7 of Apple's papers in

7    Footnotes 9 and 11, they identify some purported security

8    flaws that on their face are demonstrably web-based security

9    issues.  They are not *Fortnite*-based security issues.  So

10   there is no security issue which has been identified.

11        We also know that in terms of the balance of the hardships

12   that what Apple is already doing is allowing alternative

13   methods of payment with Mac.  This is solely an iOS issue,

14   Your Honor, in terms of how it is holding on to this.

15        In addition to that, we know that within the app itself,

16   within the app world itself, Apple makes a distinction between

17   In-App purchases of physical goods, In-App purchases of

18   digital goods.  It allows alternative payment processing

19   systems for In-App purchases of physical goods.  So there is

20   no security issue, Your Honor.  If there was, then those

21   things would not be able to happen.

22        What we know is Apple is not going to be paid as much as

23   it wants to be able to be paid.  We would submit, Your Honor,

24   that Apple -- if it needs to -- if one day Your Honor rules

25   against us, then Apple could get paid, it would be able to get

1    recommenced for whatever harm has occurred.

2        But we also know that the business model -- an

3    anticompetitive actor puts forward their business model if

4    they are acting in an anticompetitive way, should not be

5    protected by the Court.

6            **THE COURT:**  Response.

7            **MR. DOREN:**  Yes, your honor.

8        I think it's important to state the obvious, which is that

9    the nature of the breach here was to assure that Epic be paid.

10   It's not so that Apple could be paid.  So that Epic could take

11   money away from the App Store without paying any commission to

12   Apple.

13       In terms -- therefore, Your Honor, this is solely,

14   actually about money for Epic Games.  It is about getting

15   their -- the money without having to pay a 30 percent

16   commission to Apple.  And as Your Honor has noted on several

17   occasions, that can be addressed through a damage claim should

18   they elect to bring one and should they ever prevail on this

19   lawsuit, which we think unlikely.

20       Additionally, Your Honor, as the papers reflect, most of

21   Epic's business has nothing to do with iOS.  The iOS platform

22   involves -- we -- incurred -- finances about 12 percent of

23   their revenue, and Mr. Sweeney, in Paragraph 12 of his

24   declaration, tells us that most players play on other

25   platforms.  And of course they do, Your Honor, because Epic

1    only went mobile in 2018 and they did it on both Android and

2    iOS.  Before that time, of the 350 million players they have

3    managed to accumulate around the world and have today, the

4    vast majority of those people play on different platforms.

5        And in terms of any other transactions performed on the

6    App Store, that is with full disclosure, constant

7    communication, and making sure that payment mechanisms are

8    transparent and agreed upon by all parties, rather than having

9    somebody slip something through the back door and then trigger

10   it two weeks later under dark of night.

11       And, Your Honor, in terms of what Epic was biting off when

12   it launched this strategy to, first of all, set up the Epic

13   direct pay with hours before filing this lawsuit, Mr. Sweeney

14   sent Apple an email on August 13th where, before they threw

15   the switch on the code, and this is Document 37-7, which is

16   Exhibit G to the Schiller declaration, before they threw the

17   switch, he said, I'm writing to tell you that Epic will no

18   longer adhere to Apple's payment processing restrictions.

19   Today Epic is launching Epic direct payments in *Fortnite* on

20   iOS.

21       He went on to say, Epic will regrettably be in conflict

22   with Apple on a multitude of fronts for so long as it takes to

23   bring about change, if necessary, for many years.

24           **THE COURT:**  All right, Mr. Doren.  I'm going to move

25   on.  And I've read his email and the letters back and forth.

1          **MR. DOREN:**  Thank you, Your Honor.

2          **THE COURT:**  The last issue that the Court needs to

3    address is success on the merits.

4       And what I would say with respect to this issue is that

5    there appears to be an interesting battle here.  There appears

6    to be some measure of lack of competition, I see that, and

7    live barriers to market entry.

8          That said, there also appears to be evidence that everyone

9    who is using these platforms to sell these kinds of games is

10   charging 30 percent.  So whether or not Epic likes it, the

11   industry, and not just Apple, seems to be charging it, other

12   than Epic, and Epic itself doesn't pay -- you know, Epic --

13   right now Epic is paying Apple nothing.  Epic itself charges

14   third parties, I think --

15         **MR. DOREN:**  12 percent, Your Honor.

16         **THE COURT:**  -- 12 percent.

17      So, there is something here.  The definition of the

18   market, I think, will be an interesting and complicated issue.

19         And, frankly, I think that the battle here will not be won

20   or lost on a TRO and it probably won't be won or lost on a

21   preliminary injunction.

22      Apple has a reputation of going the distance.  It's not

23   surprising that they acted the way they did here, but as I

24   said, I think they overreached.

25         So, you can talk, and I believe it's you, Mr. Bornstein,

1   who is going to address this topic, but I don't know, again,

2   that a weekend of briefing on a TRO really does justice to the

3   antitrust issues that are at issue in this case.  And so for

4   me, this particular factor is really just the context, but it

5   doesn't drive the decision.

6       You may proceed.

7       **MR. BORNSTEIN:**  Right.  I couldn't agree more, Your

8   Honor, that this is a much more complex issue than can be

9   addressed over the course of a weekend or even the nine or so

10  or ten days since we filed our complaint.  So I fully

11  understand where the Court is coming from.

12      I want to make very quickly one technological observation

13  just to make sure I don't tread on Your Honor's comments or

14  questions.  There have been a few times during the course of

15  the hearing where the sound has been delayed when Your Honor

16  has started to speak.  I'm sure no counsel has intended to

17  interrupt the Court, and I certainly don't, so I apologize in

18  advance if it seemed that way because of the lag, Your Honor.

19      In terms of the merits, I think it is helpful just to

20  start with one overarching theme that appears in Apple's brief

21  about the success of the App Store and of the operating

22  system, and the suggestion that somehow this is itself a

23  defense to antitrust scrutiny.  It is not.  It is a red

24  herring, Your Honor.

25      We don't challenge that iOS, the operating system, has

great value and we don't challenge the concept of an app

store.  What we challenge are the specific restrictive

policies that Apple has put in place in this App Store that

prevents other stores and other payment processors from

competing for users on the iOS platform.

Providing a desirable product or a desirable service is

not a shield against antitrust review.  Most monopolists, at

least for a time, have good products.  That is often how they

get to be monopolists in the first place.  The law prohibits

them from maintaining that monopoly through unlawful

restraints of trade.  You can't get to the top of the mountain

and then prevent others from trying to scale the mountain,

too.

If Apple believes that its store is as good as it says, as

secure, as trusted, as high quality, well then, they can

compete and they should compete on that basis, and people will

use it and people will pay them for it.

And I think it takes some nerve, Your Honor, to suggest

that they need to be paid for what they are doing when what

they have done is they have forced all app developers to go

into the Store.  They have given people no choice of store,

they've given people no choice of processor, and then they

insist on being paid for the services they have forced people

to accept.

That is not a proper justification for their conduct.

1   That's just some framing, I think, given the way they have

2   pitched this.

3       I think also, just on the standing front, Your Honor,

4   since we need to move to the various elements of an antitrust

5   claim, fortunately this case does not involve the close

6   *Illinois-Brick* question that was presented in *Pepper* and was

7   addressed by the Supreme Court.  This is not a consumer

8   action.  We don't have indirect purchaser issues here.  And I

9   don't think Apple is contesting Epic's standing as a developer

10  who transacts directly with Apple to be able to bring its

11  claims.

12      So we can at least dodge that particular thorny question.

13  As Your Honor said in the beginning of allowing me to speak,

14  there are a lot of other thorny questions that we do need to

15  address.

16      I do think it's probably useful for me to focus just on a

17  few things.  I can obviously cover any of the merits that are

18  of interest to the Court.

19      But Your Honor mentioned market definition.  It is

20  obviously quite an important issue here, so I will start there

21  if that will be helpful for Your Honor.

22      We have defined two relevant markets:  One in iOS App

23  Distribution and one in iOS In-App payment processing.  Apple

24  has raised a threshold challenge to both of these markets on

25  the ground that they are single-brand markets.  They are

1    monopolies in things that Apple has created, as they put it.

2        But single-brand markets are allowed.  The *Newcal*

3    *Industries versus Ikon* case, which is cited in our papers,

4    Your Honor, it says very clearly -- this is the Ninth

5    Circuit -- the law permits an antitrust claimant to restrict

6    the relevant market to a single brand of the product at issue.

7        This is a recognized and permissible antitrust market.

8    There are certain elements that need to be satisfied in order

9    for plaintiff to make it out.  We've pleaded them at great

10   length in our complaint in Part 3, and I can walk through some

11   of that here given how central the single-market issue is in

12   Apple's briefing.

13       The most common circumstance in which there is a

14   single-brand market is a circumstance we have here where you

15   have a primary market, here it's the phones, the iPhones, the

16   iPads, and then you have derivative aftermarkets.  Here, it is

17   the iOS App Distribution and the iOS In-App Payment

18   Processing.

19       The *Newcal* case citing the *Kodak* case from the Supreme

20   Court as well, walk through what you need to look at in order

21   to assess whether the derivative aftermarket is a proper

22   antitrust market.  Here, we believe those tests are satisfied.

23       First of all, the derivative aftermarket here, the iOS App

24   Distribution, the iOS In-App Processing, they are, in fact,

25   solely derivative of the primary market.  That is the first

1    *Newcal* factor from the Ninth Circuit.  It's not a market that

2    exists separate and apart from iPhones and iPads.

3         Then Courts look at --

4              **THE COURT:**  I'm not going to let you go on forever.

5    Wrap it up at this point.

6              **MR. BORNSTEIN:**  That's fine, Your Honor.

7         I'll just make the point that we've pled, in Part 3 of our

8    complaint, each of the elements of *Newcal*.  Your Honor has the

9    case.  We have cited it in our papers.

10        And all I'll do on that point then to wrap it up is to

11   distinguish the key case that Apple points to, which is *Apple*

12   *versus Psystar* which was a decision from Judge Alsup where he

13   did a very careful examination of both *Kodak* and *Newcal*.  He

14   found that was a case where there was no single market because

15   it was not an aftermarket case.  It was a case in which the

16   plaintiff was alleging a single market in the primary market

17   that was at issue there.  It was the operating system itself.

18   And he drew that distinction very clearly.

19        The same thing goes for the *Queen City Pizza* case that

20   they cite which was distinguished expressly by the Ninth

21   Circuit in *Newcal*.

22        So I won't spend any more time on the single-market issue

23   or on market definition unless Your Honor has further

24   questions on that point.

25              **THE COURT:**  Not at this hearing.

1           **MR. BORNSTEIN:**  Okay.

2           **THE COURT:**  Mr. Doren, are you going to respond or

3     Ms. Lewis?

4           **MR. DOREN:**  I will respond, Your Honor.

5           **THE COURT:**  All right.  Response.

6           **MR. DOREN:**  Your Honor, first of all, of course the

7     only -- the only information in the record is in the form of

8     declaration -- in the form of allegations contained in the

9     complaint.  There is no discovery that's been taken in this

10    case.  There are no expert opinions around the market

11    definitions.

12          All we have is -- is -- is plaintiff's self-serving

13    definition that the iOS platform provides a market definition

14    for purposes of monopolization.  And we will prove as this

15    case proceeds that nothing could be further from the truth.

16    You are dealing with different factors, including other app

17    stores, other mobile platforms, other phones, and Apple, while

18    a serious and ardent competitor in that -- in that arena is

19    nothing -- nothing approaching a monopolist once you look at

20    the entirety of the situation.

21          In terms of this notion of the tying claims, which are

22    based on these two product markets of iOS Distribution and iOS

23    In-App Payment, this theory is essentially like saying, if you

24    go into Best Buy and buy a cellophane-wrapped version of

25    Quickbooks, and then you go to the cash register and you pay

1    before you leave the store, you have one product in your

2    Quickbooks and that your transaction of actually paying for it

3    is another product, and that those two are somehow tied.

4        That is illogical and silly, Your Honor.  Those are not

5    two separate product markets.  Those are not two things that

6    can be tied.

7        In terms of this notion that Apple -- how dare Apple ask

8    to be paid for the service that it provides.  Your Honor, I

9    think everyone on this screen, at least, remembers the day

10   when you had to drive somewhere to buy any software and then

11   sort out how to load it onto your laptop.  And Apple

12   completely revolutionized that and has only continued to

13   innovate and grow what it established.

14       And as I've already said, Your Honor, and we will prove as

15   this case proceeds Apple --

16           **THE COURT:**  The problem is, and as is alleged in the

17   complaint, if you have an iPhone you can't buy it from anyone

18   else.  You can't.  You are limited to buying it from Apple.  I

19   can't buy it from Google.  I can't buy it from Amazon.  There

20   is no competition.

21       So the question is, without competition, where does that

22   30 percent come from?  Why isn't it 10, 15, 20?  How is the

23   consumer at all benefiting from the fact that you get to say

24   what you want it to be?  And if it's not that, then you pull

25   the rug.

1      That's the harm.

2          MR. DOREN:  Your Honor, the competition is in the

3      foreign market.  There are choices to be made and people

4      choose the iOS market because of what it offers them --

5          THE COURT:  Economic theory, there is plenty of

6      economic theory about the cost of individuals to switch once

7      they are on a platform, whether it's Android or the iOS.

8          MR. DOREN:  And, Your Honor, none of that -- there is

9      no evidence of that in this record.  And when there is, we

10     will prove to Your Honor that there is significant competition

11     in this space.

12         THE COURT:  Well --

13         MR. DOREN:  People switch all the time.  If they --

14     people will switch all the time.

15         THE COURT:  It will be interesting, like I said.

16     Anything else, Mr. Bornstein, in response?

17         MR. BORNSTEIN:  I'll just respond very quickly to the

18     analogy, Your Honor, about Best Buy.  Because I do think there

19     are two separate products here.

20     I think a better analogy with respect to Best Buy is what

21     Apple wants to do is to have the consumer go in to Best Buy,

22     buy the Quickbooks that Mr. Doren hypothesizes, pay for it

23     there, that's fine.  That's the app distribution.  But then

24     take it home, and every time you do your taxes or every time

25     you close your books using Quickbooks, after you have the

1    product, to keep paying Best Buy every single time another

2    30 percent.

3        They are reaching into subsequent transactions.  It's like

4    if you book a hotel room on Expedia, you pay Expedia for the

5    hotel room, but then you get room service at the hotel and you

6    still have to pay 30 percent to Expedia.  It's two separate

7    markets.

8            **THE COURT:**  The interesting thing, too, as I thought

9    about that particular analogy over the weekend, is that you

10   don't have to charge for the game.  You choose to charge for

11   the game, but many of the apps are free.

12           **MR. DOREN:**  84 percent, Your Honor.

13           **THE COURT:**  So for all those free Apps, no one is

14   paying anything.  And so one way -- you know, if they said,

15   okay, you don't charge us for in-play purchases, then you

16   could, you know, you could manipulate it in a way that they

17   never get paid depending on when it is you are charging.

18       And, you know, the other thing, Best Buy, it's

19   interesting -- just a footnote.  The whole model of Best Buy,

20   maybe people don't know because we all grew up with Best Buy

21   being the actual seller, their model has changed.  I don't

22   know if people know that their model has changed, but it's

23   probably not the best analogy that people should be using.

24   They provide a storefront, but all those departments are

25   owned.  Like Apple owns its department.  It pays Best Buy for

1    labor, I think.

2            **MR. DOREN:**  I guess I should have said Tower Records,

3    Your Honor.

4            **THE COURT:**  I'm just saying that people may want to

5    investigate how Best Buy actually works because I'm not sure

6    it's the appropriate analogy anymore.

7        And that was because of competition.  I mean, once again,

8    right, competition is good for the consumer.

9        Okay.  I will be issuing a written order and I will issue

10   it quickly.

11       Anything else?  Few wrap-up comments, Ms. Forrest?

12           **MS. FORREST:**  Yes.  Thank you, Your Honor.  Very,

13   very briefly.

14       I just wanted to respond to Mr. Doren's comment that this

15   is all about money for Epic.  I wanted to also indicate

16   something that's in our papers, which is that Epic, by virtue

17   of the In-App Payment Processing that Apple imposes, does not

18   have control over its customer service relationships.  This

19   has enormous implications.  So it's also about control of

20   customer service relationships.

21       The second point on that same topic is that -- is the

22   principles set forth in the *Memorex* case, the Ninth Circuit

23   case that the Plaintiff here, Epic, is acting as a private

24   Attorney General seeking to obtain relief for an entire

25   industry.  That's appropriate and something that the Courts in

1    this Circuit and the Supreme Court, actually, ask that courts

2    allow to occur.

3        The second point that I wanted to make is that there had

4    been comments by Mr. Doren that there had been hidden codes

5    that had been imposed with the hotfix.  I wanted to remind the

6    Court that in some of our briefing and from Mr. Sweeney in his

7    declaration, we talk about a build being submitted after

8    August 13th, a build that also had the In-App Payment

9    Processing from Epic that was not in any way, shape, or form

10   hidden, and Apple knew exactly where to look.

11       Lastly, Your Honor, let me just finish by saying, again,

12   apologizing for not having brought the unclean hands cases and

13   other sort of Supreme Court precedent relating to the lack of

14   unclean hands in an antitrust case as a defense to Apple prior

15   to this proceeding.  That really was only because of the time

16   allotted in terms of getting all of our arguments together.

17       If Your Honor would allow it, I don't know that you need

18   any additional paper, but we would be pleased to put that into

19   a short letter submission if Your Honor would like.

20           **THE COURT:**  No.  I'm going to pass.  I think that I

21   can review those arguments in the next round.

22       So, in terms of briefing for the next round --

23           **MR. DOREN:**  Your Honor, may I?

24           **THE COURT:**  Mr. Doren.

25           **MR. DOREN:**  Thank you, Your Honor.

1    Apologies for interrupting.  Just a few quick points.

2    First of all, on the issue of unclean hands, whatever

3    label is attached to it, this was an issue of Epic's making.

4    The equities weigh against Epic in its breach of its contract

5    with Apple.

6    Epic wants to be able to breach one contract with Apple

7    while forcing Apple to remain in other contracts with Epic

8    despite the actual nature of those contracts.  And we do not

9    think that that is appropriate.

10    Additionally, Your Honor, if Epic has not, and of course

11    it has not, proven a likelihood of success on the merits, then

12    there shouldn't be any relief in the form of a TRO.

13    And finally, Your Honor, in terms of the Court's comments

14    a few minutes ago about Apple overreaching, I just want to

15    raise again that it was Mr. Sweeney of Epic that announced to

16    Apple that he intended to fight Apple for years if that's what

17    it took for him to get his way.

18    Your Honor, this is not a fight that Apple has picked nor

19    that Apple wants.  It wants its App Store to be a robust place

20    for its customers, that they can enjoy, and that we can all

21    move forward together on.

22        **THE COURT:**  Okay.

23    Comprehensive briefings, Ms. Forrest, when can you have it

24    in?

25        **MS. FORREST:**  Your Honor, if Your Honor would tell us

1      when you would like to have the hearing, we can have it in two

2      weeks, if you would like, or in terms of the PI or for the

3      full trial.

4          For the PI, we can have it in in a couple of weeks.  That

5      would allow Apple to respond, and we could have a hearing as

6      soon as Your Honor is able to accommodate.

7              **THE COURT:**  All right.  Two weeks for full briefing

8      on a preliminary injunction due September 7th.

9          Mr. Doren, two weeks to respond?

10             **MR. DOREN:**  Yes, Your Honor.  Thank you.

11             **MS. FORREST:**  Your Honor, might we have the 8th only

12     because the 7th is Labor Day and just in terms of --

13             **THE COURT:**  Believe it or not, as you know, Court's

14     ECF is open 24/7, but September 8th is fine.  And you are

15     muted, Ms. Forrest.

16         So two weeks after that is September 22nd for a response

17     from Apple.

18             **MR. DOREN:**  Thank you, Your Honor.

19             **THE COURT:**  We will have a reply this time.

20     Ms. Forrest, one week?

21             **MS. FORREST:**  Yes.

22             **THE COURT:**  September 29th.

23         My trial, which was supposed to start next Monday, got

24     kicked.  Just a moment.

25                     (Pause in the Proceedings.)

1      All right.  You know what?  I am starting trial on the 5th

2  so I'm going to shorten this by a few days so that I can hear

3  it before I am in the midst of the trial.

4      I would like to have the hearing on September 28th.

5  Either that or I can have it at the end of October.

6          **MS. FORREST:**  Your Honor, the September 28th would be

7  certainly acceptable to us and our strong preference.  We

8  would be ready then.

9      The one question I would like to ask is whether Your Honor

10  would contemplate hearing from any witnesses live for say

11  20-minute presentations from two witnesses for a form of

12  evidentiary hearing?

13          **THE COURT:**  I typically do not.  That is, not at that

14  hearing.  If I deem after your papers that I need to have an

15  evidentiary hearing, then I will let you know, and we will set

16  it for an evidentiary hearing.

17          **MS. FORREST:**  Very good.

18          **THE COURT:**  So I'm going to change these dates.

19                  (Pause in the Proceedings.)

20      All right.  I'm going to give you 10 days.  Briefing by

21  Epic September 3rd.  I can give you September 4th.  And then

22  the response... 11 days after that would be September 15th,

23  and reply brief September 18th.  And that gives me a little

24  over a week.

25      Hearing September 28th at 9:30 a.m.  Once again it will be

1    on a Zoom platform.  And you will have a written order from me

2    shortly.

3         Anything else?

4              MR. DOREN:  No, Your Honor.

5              MS. FORREST:  No, Your Honor.  Thank you very much.

6              MR. DOREN:  Thank you.

7              MR. BORNSTEIN:  Thank you, Your Honor.

8              THE COURT:  We are adjourned.

9

10             (proceedings concluded at 4:24 p.m.)

11

12                     **CERTIFICATE OF REPORTER**

13         I, Diane E. Skillman, Official Reporter for the

14   United States Court, Northern District of California, hereby

15   certify that the foregoing is a correct transcript from the

16   record of proceedings in the above-entitled matter.

17

18                    _Diane E. Skillman_

19             DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

20                  Tuesday, August 25, 2020

21

22

23

24

25