Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 4:20-CV-05640-YGR<br><br>**PLAINTIFF EPIC GAMES, INC.'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  September 28, 2020 at 9:30 a.m. (via Zoom Platform)<br><br>Courtroom:  1, 4th Floor<br><br>Judge:  Hon. Yvonne Gonzalez Rogers |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>NOTICE OF MOTION AND MOTION</u>

### TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on September 28, 2020, at 9:30 a.m., in the United States District Court for the Northern District of California, before the Honorable Yvonne Gonzalez Rogers, Plaintiff Epic Games, Inc. ("Epic") will move this Court pursuant to Federal Rule of Civil Procedure 65 for a Preliminary Injunction:  (1) restraining Defendant Apple Inc. ("Apple") from removing, de-listing, refusing to list or otherwise making unavailable the app *Fortnite* or any other app on Epic's Team ID '84 account in Apple's Developer Program, including any update of such an app, from the App Store on the basis that *Fortnite* offers in-app payment processing through means other than Apple's In-App Purchase ("IAP") or on any pretextual basis; (2) restraining Apple from taking any adverse action against Epic, including but not limited to restricting, suspending, or terminating any other Apple Developer Program account of Epic or its affiliates, on the basis that Epic enabled in-app payment processing in *Fortnite* through means other than IAP or on the basis of the steps Epic took to do so; (3) restraining Apple from removing, disabling, or modifying *Fortnite* or any code, script, feature, setting, certification, version or update thereof on any iOS user's device; and (4) requiring Apple to restore Epic's Team ID '84 account in Apple's Developer Program.

This motion is made on the grounds that:  (1) Epic is likely to succeed on the merits of its claims that Apple's conduct violates the Sherman Act; (2) absent a preliminary injunction, Epic is likely to suffer irreparable harm; (3) the balance of harms tips sharply in Epic's favor; and (4) the public interest supports an injunction.

This motion is based upon the Complaint in this action, this Notice of Motion, the Memorandum of Points and Authorities filed herewith, the Proposed Order Granting Plaintiff's Motion for a Preliminary Injunction, the Declaration of Timothy Sweeney ("Sweeney Decl.") along with its accompanying exhibits, the Declaration of Nicholas Penwarden ("Penwarden Decl."), the Declaration of Andrew Grant ("Grant Decl.") along with its accompanying exhibits, the Declaration of M. Brent Byars ("Byars Decl.") along with its accompanying exhibits, the

1   Declaration of David Evans ("Evans Decl."), all matters with respect to which this Court may
2   take judicial notice, and such oral and documentary evidence as may be presented to the Court.
3       Plaintiff hereby requests, pursuant to FRCP 65 and Civil Local Rules 7-2 and 65-2, that
4   the Court issue a preliminary injunction.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................................v

PRELIMINARY STATEMENT .......................................................................................1

FACTUAL BACKGROUND ............................................................................................5

    A.    *Fortnite* ..............................................................................................5

    B.    *Unreal Engine* ...................................................................................6

    C.    Apple and iOS ..................................................................................6

    D.    Epic's Challenge to Apple's Monopolistic Conduct ........................8

    E.    Apple's Retaliation ...........................................................................8

    F.    Procedural History ..........................................................................10

ARGUMENT .................................................................................................................11

I.     LEGAL STANDARD ...........................................................................................11

II.    EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS ANTITRUST CLAIMS. ......................................................................................12

    A.    Apple Has a Monopoly in the iOS App Distribution Market. ...............12

    B.    Apple Unlawfully Maintains a Monopoly in the iOS App Distribution Market. ...........................................................................15

    C.    Apple's Tying of the App Store and IAP *Per Se* Violates Section 1 ....................15

    D.    Apple's Tying Unreasonably Restrains Trade and Unlawfully Maintains Its Monopoly in the iOS In-App Payment Processing Market. ........................................19

III.   IRREPARABLE HARM & PUBLIC INTEREST: APPLE'S RETALIATION WILL IRREPARABLY HARM EPIC AND MILLIONS OF ITS CUSTOMERS. .........23

    A.    Epic's Decision To Defy Anti-Competitive Restrictions Does Not Require Discounting the Harm to Epic or Its Customers. ....................................23

    B.    Epic and Its Customers Will Suffer Irreparable Harm if Apple Is Permitted To Continue Its Retaliation. ...........................................25

IV.   THE BALANCE OF HARMS TIPS SHARPLY IN EPIC'S FAVOR. ...........................29

CONCLUSION ..............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acquaire v. Canada Dry Bottling Co. of New York, Inc.,*
  24 F.3d 401(2d Cir. 1994)...........................................................................................2, 24

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
  836 F.3d 1171 (9th Cir. 2016) .............................................................................................16

*Apple Inc. v. Psystar Corp.,*
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) .............................................................................13

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
  2018 WL 3032552 (S.D. Cal. June 19, 2018)...........................................................................14

*Cascade Health Sols. v. PeaceHealth,*
  515 F.3d 883 (9th Cir. 2008) ...............................................................................................16

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.,*
  611 F.3d 495 (9th Cir. 2010) ...............................................................................................20

*CollegeNet, Inc. v. Common Application, Inc.,*
  355 F. Supp. 3d 926 (D. Or. 2018) .......................................................................................18

*Collins Inkjet Corp. v. Eastman Kodak Co.,*
  781 F.3d 264 (6th Cir. 2015) ...............................................................................................25

*Continental Wall Paper Co. v. Louis Voight & Sons Co.,*
  212 U.S. 227 (1909)...............................................................................................................1, 24

*Datagate, Inc. v. Hewlett-Packard Co.,*
  60 F.3d 1421 (9th Cir. 1995) ...............................................................................................19

*Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.,*
  2014 WL 4679001 (C.D. Cal. Sept. 18, 2014) ......................................................................30

*Digidyne Corp. v. Data Gen. Corp.,*
  734 F.2d 1336 (9th Cir. 1984) ......................................................................................19, 22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992)...............................................................................................................13

*FTC v. Qualcomm Inc.,*
  2020 WL 4591476, __ F.3d __ (9th Cir. Aug. 11, 2020) ..................................................15, 16

*Germon v. Times Mirror Co.,*
  520 F.2d 786 (9th Cir. 1975) ...............................................................................................24

*Go Daddy Operating Co. v. Ghaznavi*,
  2018 WL 1091257 (N.D. Cal. Feb. 28, 2018) .......................................................................27

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*,
  99 F. Supp. 2d 1241 (D. Haw. 1999) ...................................................................................27

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) .......................................................................................11, 25

*Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*,
  2018 WL 3816745 (C.D. Cal. July 24, 2018) ......................................................................27

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) ..............................................................................................22

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ............................................................................................20

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1982) ..........................................................................................................2, 23

*McMullen v. Hoffman*,
  174 U.S. 639 (1899) ..........................................................................................................1, 23

*Memorex Corp. v. Int'l Bus. Mach. Corp.*,
  555 F.2d 1379 (9th Cir. 1977) ...................................................................................2, 23, 24

*Milsen Co. v. Southland Corp.*,
  454 F.2d 363 (7th Cir. 1971) ..............................................................................................24

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................................13

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ........................................................................................................22

*Perma Life Mufflers, Inc. v. Int'l Parts. Corp.*,
  392 U.S. 134 (1968) ............................................................................................................23

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ..............................................................................................14

*Regents of Univ. of California v. Am. Broad. Companies, Inc.*,
  747 F.2d 511 (9th Cir. 1984) ..............................................................................................25

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
  532 F.3d 963 (9th Cir. 2008) ..............................................................................................16

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*,
  732 F.2d 1403 (9th Cir. 1984) ............................................................................................18

*State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.*,
   730 F. Supp. 826 (C.D. Ill. 1990) ........................................................ 19

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ............................................................... 25

*Teradata Corp. v. SAP SE*,
   2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ...................................... 16

*trueEX, LLC v. MarkitSERV Ltd.*,
   266 F. Supp. 3d 705 (S.D.N.Y. 2017) .............................. 25, 26, 27, 29

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) ................................................................. 19

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................... 16

*W. Power Sports, Inc. v. Polaris Indus. Partners L.P.*,
   951 F.2d 365 (9th Cir. 1991) ............................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 11, 23

**Statutes & Rules**

Sherman Act Section 1 ............................................................. 12, 15, 19

Sherman Act Section 2 ......................................................... 12, 15, 19, 20

**Other Authorities**

David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of
   Multisided Platforms* (2016) ............................................................... 22

# PRELIMINARY STATEMENT[1]

Apple is a monopolist.  It controls all app distribution on iOS.  It controls all in-app payment processing for digital content on iOS.  It unlawfully maintains these two monopolies by explicitly prohibiting any competitive entry in either market.  It is highly likely to lose this case.

On this motion, however, all Epic seeks is for the Court to stop Apple from retaliating against Epic for daring to challenge Apple's misconduct.  As set out in more detail in the Complaint, on August 13, 2020, Epic ceased complying with one of Apple's anti-competitive rules:  it offered players of its popular game, *Fortnite*, the option of lower prices on in-app purchases using a competing payment processor.  This was a necessary first step on the long road to freeing consumers and developers from Apple's decade-long monopolistic grip over app distribution and in-app payment processing on iOS.

Apple retaliated with ferocity.  Not only did it remove *Fortnite* from the App Store, which Epic anticipated, but it also declared it would terminate every one of Epic's Apple Developer Program accounts and cut off Epic's access even to software tools that are widely available to the public.  This was a clear warning to any other developer that would dare challenge Apple's monopolies:  follow our rules or we will cut you off from a billion iOS consumers—challenge us and we will destroy your business.

In short, accused of antitrust violations for misusing its power to create and maintain two monopolies, Apple used that same power to try to coerce Epic to abide by its unlawful restrictions.  The Court should not allow Apple to enforce these restrictions.  "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract."  *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899).  That result is mandated by strong public policy considerations:  "In such cases the aid of the court is denied, not for the benefit of the [non-complying party], but because public policy demands that it should be denied."  *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262 (1909).  More recently, the Supreme Court has explained, "our cases leave no

---

[1] Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted.

doubt that illegal promises will not be enforced in cases controlled by the federal law". *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982).  The Ninth Circuit has stated simply, "'Unclean hands' has not been recognized as a defense to an antitrust action for many years." *Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379, 1382 (9th Cir. 1977).  This principle has been applied in analogous preliminary injunction contexts. *See, e.g.*, *Acquaire v. Canada Dry Bottling Co.*, 24 F.3d 401, 411(2d Cir. 1994) (affirming preliminary injunction despite antitrust defendant's argument that "any irreparable harm to the [plaintiffs] was self-inflicted in that [defendant] withheld product only from those [plaintiffs] who elected to participate in the [challenged] program but refused to abide by its [allegedly unlawful] terms").

Epic is ideally situated to challenge Apple's restrictions.  Epic is a would-be direct competitor of Apple in the relevant markets, ready to offer competitive app distribution and competitive payment processing on iOS.  Epic demonstrated its readiness by offering a competitive alternative to Apple's payment processing, giving choice to consumers and delivering the benefit of lower prices to the users who chose it over Apple's offering.  To enable Epic to carry out this challenge without suffering irreparable harm from Apple's retaliation in the interim, Epic respectfully requests that the Court grant its motion for a preliminary injunction to stop Apple from retaliating further and to undo Apple's retaliation to date.

*First*, Epic is likely to succeed on the merits.  Apple controls a software platform—the iOS operating system—that gives it substantial market power over app developers and a billion consumers.  Using that power, it has designed a set of restrictions through which it acquired and maintains monopolies in two downstream markets where competition can and should thrive:  app distribution and in-app payment processing.  In the app distribution market, but for Apple's restrictions, developers would have a choice of how to distribute their iOS apps, consumers would have a choice of how to obtain them, and Apple's App Store would have to compete by offering better quality and/or lower prices.  Other successful operating systems, like Microsoft's Windows or Apple's own macOS, offer such a choice to consumers and developers.  Likewise, in the in-app payment processing market, but for Apple's restrictions, iOS app developers offering in-app purchases of digital content could choose which processor to use, just as they do

when their apps sell physical goods to iOS users.  Instead, Apple absolutely prohibits *any* competition in either market, leaving Apple free to impose distribution and processing terms unchecked by competitive forces.  To be clear, Epic does not seek to force Apple to provide distribution and processing services for free, nor does Epic seek to enjoy Apple's services without paying for them.  What Epic wants is the freedom *not* to use Apple's App Store or IAP, and instead to use and offer *competing* services.

*Second*, without injunctive relief, Apple's actions will cause irreparable harm to Epic, as well as harm to countless third parties and the public interest.  In this case, these two factors of the preliminary injunction standard are closely related.  Epic was willing to stand up to Apple because it was the right thing to do, and because Epic believed it was better positioned than many other companies to weather the storm.  But Epic is not immune from irreparable harm.  And Epic's willingness to challenge an unlawful monopoly is not a basis on which to discount its harm under the long line of Supreme Court precedent quoted above.  In fact, granting the injunction would promote the public policies favoring competitive markets and disfavoring enforcement of anti-competitive contract terms.

*Fortnite* is more than just a game.  It is an intensely social community whose value to its users depends in large part on the ability to connect with other users.  Epic has built a community that people rely on.  By removing *Fortnite* from the App Store, Apple has cleaved millions of users from their friends and family in the *Fortnite* community, which entirely depends on connectivity.  The user outcry has been deafening, showing real harm to the public interest.  Daily active users on iOS have declined by over 60% since *Fortnite*'s removal from the App Store.  And removal already has resulted in a loss of goodwill and irreparable damage to Epic's reputation.  The continued loss of *Fortnite* as a gathering place for users on all platforms will lead Epic's customers to defect.  Epic may never see these users again.  It will also be denied the opportunity to access even a single new user among the one-billion-plus iOS users for at least the next year.  The removal of *Fortnite* from iOS also substantially impedes a major Epic initiative—evolving *Fortnite* into a full-fledged "metaverse", a multi-purpose, persistent, interactive virtual space.  Harm like this to Epic's flagship app cannot be calculated in damages.

1      And then there is *Unreal Engine*.  Apple has attacked *Unreal Engine*, Epic's three-

2   dimensional environment engine on which millions of third-party developers rely in fields from

3   gaming to medicine, from movie production to space flight—as well as other parts of Epic's non-

4   *Fortnite* business.  If Apple can cut off Epic's ability to continue updating *Unreal Engine* for

5   iOS and macOS, both Epic and the millions of developers using *Unreal Engine* would be

6   harmed.  Developers who have invested in creating projects for iOS and macOS would have to

7   change course or simply end their work.  Going forward, developers are questioning whether

8   *Unreal Engine* would remain a viable platform on which to build their applications.  There is no

9   way to estimate the loss to Epic from an industry-wide shift away from *Unreal Engine*.  Only a

10   preliminary injunction can bring the level of certainty that developers need, and that Epic

11   therefore needs to protect its business.

12      *Third*, the balance of harms tips strongly in Epic's favor.  If the injunction is denied and

13   Epic ultimately prevails, Epic will suffer the irreparable harm described above.  If the injunction

14   is granted and Epic ultimately loses, Apple would at most lose some commissions from Epic,

15   which could easily be compensated in damages.  Apple's purported concern that every developer

16   would follow Epic's lead if *Fortnite* returned to iOS with Epic direct pay is speculative and

17   implausible; few developers can risk the wrath of Apple, and developers would have little

18   incentive to take the risk (and bear the expense of doing so) while this action is pending.

19   Further, should Apple prevail, it could still easily be made whole with damages.  In any event,

20   Apple's fear that developers will flee IAP if given the chance is further evidence that developers

21   use IAP only because Apple prevents competition and forces developers to do so.  And with

22   respect to *Unreal Engine*, Apple would lose nothing at all if Epic continues to use iOS and

23   macOS development tools to support it during the litigation.  Moreover, Apple does *not* assert

24   that the agreements governing the tools used to sustain *Unreal Engine* and many other Epic

25   businesses were breached—and the apps for *Unreal Engine* and the other businesses are

26   registered under different Apple Developer Program accounts than the account that registers

27   *Fortnite* for distribution on iOS.  Thus, Apple's attack on these other businesses is pure

28   retaliation to pressure Epic and deter others from challenging Apple's anti-competitive conduct.

1

2

**FACTUAL BACKGROUND**

     **A.**     ***Fortnite***

3

4

     *Fortnite* is a multifaceted online videogame that has attracted over 350 million registered

5

users, becoming a global cultural phenomenon.  (Sweeney Decl. ¶ 3.)  *Fortnite* has three main

6

game modes, including the wildly popular *Battle Royale*.  (*Id.* ¶ 4.)  *Battle Royale* is an

7

elimination and survival match involving up to 100 players marooned on an island in which

8

storylines, challenges, and other major changes to gameplay are periodically released in the form

9

of "chapters" and "seasons".  (*Id.* ¶¶ 4, 6, 9.)  Chapters and seasons introduce new gameplay

10

features and content, which requires users to have the same up to date version of *Fortnite* to play

11

together online.  (*Id.* ¶ 9.)  Players greatly value *Fortnite*'s regularly refreshed content.  (*Id.*)

12

Players with an outdated version of the game may play only with other players with the same

13

outdated version.  (*Id.*)  *Fortnite* is one of the first videogames to offer full "cross-platform"

14

play, meaning that *Fortnite* players on different platforms can play together in the same virtual

15

space, even though their underlying software and hardware is different.  (*Id.* ¶ 8.)  In fact, Epic

16

was instrumental in convincing the major gaming console manufacturers to support cross-

17

platform play, which also benefited other game developers.  (*Id.*)  Prior to August 13, *Fortnite*

18

was available on Sony's PlayStation 4, Microsoft's Xbox One, Nintendo's Switch, personal

19

computers ("PCs") and Macs, and Android and Apple mobile devices.  (*Id.* ¶ 3.)

20

     *Fortnite* is also a home for vibrant social community, creativity, and expression.  (*Id.*

21

¶¶ 4-5.)  Players can meet up with their friends to talk and socialize; build new worlds, structures

22

and environments; dance and play with one another; experience film releases together; attend

23

concerts with others; and spend time together engaging with exclusive content from providers

24

like ESPN and Discovery.  (*Id.*)  *Fortnite* has even hosted a series of discussions on racial

25

equality in America.  (*Id.* ¶ 5.)

26

     *Fortnite* is free to download and update, and the *Battle Royale* mode is free to play.  (*Id.*

27

¶ 7.)  Epic sells in-app content, such as digital avatars, costumes, and dances.  (*Id.*)  These items

28

can be bought individually or through a subscription model.  (*Id.*)

### B.   *Unreal Engine*

Aside from *Fortnite*, Epic has other lines of business, including the *Unreal Engine*. (Sweeney Decl. ¶ 2.)  *Unreal Engine* is a software tool for developing digital three-dimensional environments for multiple uses.  (*Id.*; Penwarden Decl. ¶¶ 2-3.)  *Unreal Engine* users enjoy free access to products and services developed by Epic affiliates, including Quixel Megascans, an online scan library of photorealistic three-dimensional content, and Twinmotion, architectural visualization tools.  (Sweeney Decl. ¶ 29.)  Epic also offers the *Unreal Engine* Marketplace, an e-commerce platform through which developers can create and sell art, animation, textures, and other assets to use with *Unreal Engine* projects.  (*Id.*)  With millions of developers relying on it, *Unreal Engine* has been called the most successful videogame engine in history.  (*Id.* ¶¶ 30, 34.) It powers popular videogames like *PlayerUnknown's Battlegrounds* ("*PUBG*"), which has hundreds of millions of mobile device users (*id.* ¶ 30; *see* Penwarden Decl. ¶ 4.)  It also has a broad range of other applications, including training astronauts, generating visual effects for television, helping brain surgeons prepare for operations, and televising the Olympics. (Sweeney Decl. ¶ 31.)  Developers can use *Unreal Engine* commercially on a royalty model or negotiated license, and it is free for non-commercial use.  (*Id.* ¶ 32.)  *Unreal Engine* powers games and other products on all major platforms.  (*Id.* ¶ 33.)

### C.   Apple and iOS

At a market cap of over $2 trillion, Apple is the most highly valued publicly traded corporation in history.  Apple's empire is vast, and extends to personal computers, smartphones and tablets, music sales and streaming, wearable devices, digital messaging, digital storage, web browsing, creativity and productivity software, credit cards, television programming, and more.

Apple controls iOS, one of the world's most widely used operating systems ("OS"), used solely in mobile devices that Apple sells.  (Evans Decl. ¶ 16.)  An OS is software that supplies basic functionality to users of computers, including personal computers and mobile devices such as smartphones and tablets.  (*Id.* ¶ 6.)  On mobile devices, consumers' OS options are effectively limited to a choice between devices that run on Google's Android OS and Apple devices running iOS.  (*Id.* ¶ 16.)

1        Applications, or apps, are software programs that users install on smart mobile devices to

2   provide added functionality.  Most apps are not developed by the creator of the OS; they are

3   developed by third parties for distribution on mobile devices.  (Byars Decl., Exs. V, AA.)  OS

4   developers make available software tools needed to create applications for their OS (mobile or

5   otherwise).  (Penwarden Decl. ¶ 5; Evans Decl. ¶¶ 6, 8.)  Mobile apps add enormous value to a

6   mobile OS; users generally do not buy smartphones with few available apps.  (*See* Evans Decl.

7   ¶ 7.)  And vice versa—most developers do not develop apps for OSs that have few users.  (*Id.*)

8        On many OSs, the platform provider does not control the distribution of apps or other

9   third-party software.  (Grant Decl. ¶ 14; Evans Decl. ¶ 9.)  For example, on personal computers

10  running Microsoft's Windows or Apple's macOS, users can download software from third-party

11  stores or directly from developers' websites.  (Grant Decl. ¶ 14; Evans Decl. ¶ 9.)

12       On iOS, however, the only approved way to make a consumer app available for

13  distribution is through Apple's App Store.  (Grant Decl. ¶ 14; Sweeney Decl. ¶ 12.)  Through a

14  variety of technical and contractual restrictions, Apple expressly prevents any alternative means

15  to distribute consumer apps.  (Sweeney Decl. ¶ 12; *see* Argument § II.B below.)

16       Another restriction that Apple imposes on iOS is to mandate use of IAP, Apple's

17  payment processor, for all in-app purchases of in-app digital content.  (Sweeney Decl. ¶ 13.)

18  Many mobile app developers, including Epic, generate revenue by offering users in-app digital

19  content.  To enable these transactions, developers need payment processing services.  (Evans

20  Decl. ¶ 60.)  A payment processor coordinates the various steps that take place between the time

21  a consumer pays a merchant, *e.g.*, with a credit card, through the time the merchant gets funds

22  deposited into its account.  (*Id.* ¶ 62.)  Payment processors typically charge less than 5% of a

23  purchase price.   (*Id.* ¶ 65 n.92; Byars Decl., Ex. CC.)  Apple's IAP takes 30%.  (Byars Decl.,

24  Ex. M § 3.4.)

25       Apple's Developer Program License Agreement (the "PLA") and App Store Review

26  Guidelines, an extension of the PLA, decree different rules for in-app purchases of digital

27  content and other in-app purchases.  Apps that offer in-app purchases of physical goods or

28  services consumed outside of the app are not required to use IAP; they may offer other payment

1   processors.  (*Id.* Ex. P § 3.1.5(a).)  By contrast, the App Store Review Guidelines explain that

2   "you must use" IAP for purchases of in-app content.  (*Id.* Ex. P § 3.1.1; *see also id.* Ex. K

3   § 3.3.3.)

### D.    Epic's Challenge to Apple's Monopolistic Conduct

5   *Fortnite* launched on iOS in April 2018 and remained available until it was removed by

6   Apple on August 13, 2020.  (Sweeney Decl. ¶¶ 3, 20.)  Throughout that period, due to Apple's

7   control of iOS, Epic was forced to comply with Apple's anti-competitive restrictions; thus,

8   *Fortnite* was distributed on iOS *only* through the App Store, and in-app purchases made within

9   *Fortnite* were processed *only* using IAP.  (*Id.* ¶¶ 12-13.)  On June 30, 2020, Epic's founder and

10  CEO, Timothy Sweeney, reached out to Apple, asking that Apple allow competing app stores

11  and competing payment processing on iOS.  (*Id.* ¶ 14.)  Mr. Sweeney explained his desire to

12  make "software sales and distribution on the iOS platform as open and competitive as it is on

13  personal computers."  (*Id.* Ex. A at 1.)  He asked that Apple "make these options equally

14  available to *all* iOS developers".  (*Id.* (emphasis added).)  On July 10, 2020, an Apple lawyer

15  responded with an unequivocal no.  (*Id.* ¶ 15, Ex. B at 2.)

16  On the morning of August 13, 2020, the *Fortnite* iOS app began offering users the choice

17  of making in-app purchases using either Epic direct payment or Apple's IAP.  (*Id.* ¶ 18.)

18  Because Epic's direct payment does not bear the 30% "app tax" imposed by IAP, Epic offered

19  reduced pricing to users that chose Epic direct payment.  (*Id.* ¶¶ 18-19.)

### E.    Apple's Retaliation

21  Within hours, Apple removed *Fortnite* from the App Store and posted a notice to Epic's

22  Developer Program account explaining Apple's purported reasons for removal.  (Grant Decl.

23  ¶¶ 25-26, Ex. B.)  Later that day, Epic filed its Complaint challenging Apple's anti-competitive

24  actions.  Apple then intensified its retaliation, through a second notice.  (*Id.* ¶ 27, Ex. C;

25  Penwarden Decl. ¶ 6.)  In this second notice, Apple stated it would terminate Epic's membership

26  in Apple's Developer Program and take certain other steps unless Epic complied with its

27  demands, including by providing a version of *Fortnite* that used only IAP.  (Grant Decl., ¶ 27,

28  Ex. C.)  Specifically, Apple stated that Epic would "no longer [be allowed to] submit apps to the

App Store" and its "apps still available for distribution will be removed". (*Id.*) Apple also stated it would cut off Epic's access to "[a]ll Apple software, SDKs [software development kits], APIs [application programming interfaces], and developer tools", as well as "[p]re-release versions" of iOS, macOS and other Apple OSs. (*Id.*) Finally, Apple stated that unless Epic capitulated, Apple would also end "[e]ngineering efforts to improve hardware and software performance of Unreal Engine on Mac and iOS hardware [and] optimize Unreal Engine on the Mac for creative workflows." (*Id.*)

As a result of Apple's removal of *Fortnite* from the App Store, no new users can download the app on iOS, and users who already downloaded it can no longer receive updates. (Sweeney Decl. ¶ 21.) Because *Fortnite* players must have the same software version to play online together, this has "broken" *Fortnite*. (*Id.*) As of August 27, 2020, when *Fortnite*'s version 14.0 was released on other platforms, *all* iOS *Fortnite* users became stranded, unable to play the game with their friends and family who updated the game on non-iOS platforms. (*Id.* ¶ 22.)

Apple's decision to block Epic from accessing the freely available suite of tools all developers use to make software for Apple products was a direct attack on all of Epic's businesses, including *Unreal Engine*. (*Id.* ¶¶ 36-37; Penwarden Decl. ¶¶ 6-7.) Epic cannot continue developing the engine for use on iOS and macOS devices without access to those tools. (Penwarden Decl. ¶ 8.) Many third-party developers who rely on *Unreal Engine* to power their software on Apple devices will not choose *Unreal Engine* if it is incompatible with Apple OSs. (Sweeney Decl. ¶¶ 39-40.) Epic has released 25 updates to *Unreal Engine 4* since 2014 (*id.* ¶ 33), but those development efforts would have to cease for Apple products (Penwarden Decl. ¶ 8.) Epic would also be unable to make *Unreal Engine* compatible with new versions of Apple's software as it is released, like iOS 14, which is set for release this fall. (*Id.*) Going forward, this will make *Unreal Engine* not viable for developers that have released or intend to release software on Apple platforms, which will decrease *Unreal Engine* use on *all* platforms because many projects are intended for use across multiple OSs. (Sweeney Decl. ¶¶ 39-40; Byars Decl., Ex. S.) This will drive developers away from *Unreal Engine* and toward its

1   competitors.  (Sweeney Decl. ¶ 40.)

2       Apple's threatened retaliation implicates many agreements that were not breached.

3   These agreements include (a) freely accessible tool agreements that are entered into by

4   individual programmers, as well as (b) PLAs that govern separate Developer Program accounts

5   held by separate entities.  Specifically, Epic and five of its affiliated entities had several separate,

6   integrated PLAs with Apple, each governing a separate Developer Program account with Apple.

7   Each such account had a distinct "Team ID" number, and each account paid a separate $99

8   annual fee.  (Byars Decl., Ex. N.)[2]  *Fortnite* was submitted to the App Store through an Epic

9   Games, Inc. account with Team ID ending '84 (Byars Decl., Ex. N), and the PLA governing that

10  account is the ***only*** agreement that Apple claims that Epic breached.

11      Most of Epic's non-*Fortnite* apps were released by other accounts, governed by separate

12  PLAs, which were not breached.  For example, apps associated with the *Unreal Engine* are

13  submitted through a separate account with Team ID ending '3Y, which is owned by Epic Games

14  International S.à r.l. ("Epic International").  (Grant Decl. ¶ 7.)  Apple admits that Epic and Epic

15  International have separate PLAs governing separate accounts.  (ECF No. 37, ¶ 6 ("Schiller

16  Decl.").)  Similarly, the *Houseparty* app was released under yet another account, governed by yet

17  another PLA and owned by another Epic affiliate, Life on Air, Inc.  (Grant Decl. ¶ 8.)

18  Nevertheless, Apple extended its termination to cover all accounts of Epic and its affiliates.

19  Moreover, Apple said it would terminate even those accounts that released apps, like those

20  related to *Unreal Engine*, that do not offer in-app purchases, precluding the possibility that a

21  feature like Epic direct payment could be introduced.  (*Id.* ¶ 7, Ex. C.)

22      **F.   Procedural History**

23      The breadth and illegality of Apple's retaliation led Epic to seek redress in this Court.

24  On August 17, 2020, Epic filed a Motion for Temporary Restraining Order and Order To Show

25  Cause Why a Preliminary Injunction Should Not Issue.  After a hearing on August 24, 2020, this

26  Court granted Epic's motion in part, temporarily restraining Apple "from taking adverse action

27

28      [2] In addition, two Epic affiliates are parties to a Developer Enterprise Program License
    Agreement with a $299 annual fee relating to applications for Epic's internal use, as opposed to
    apps for the App Store.  (Grant Decl. ¶¶ 3, 5-6, 9; Byars Decl., Ex. N.)

1    against Epic Games with respect to restricting, suspending or terminating any affiliate of Epic

2    Games from Apple's Developer Program, including as to *Unreal Engine*, on the basis that Epic

3    Games enabled in-app payment processing in *Fortnite* through means other than IAP or on the

4    basis of the steps Epic took to do so".  (ECF No. 48 at 8 ("TRO Op.").)

5            On August 28, 2020, Apple terminated Epic's Developer Program account (Team

6    ID '84), stating "Apple is exercising its right in Apple's sole discretion to terminate your status

7    as a registered Apple Developer pursuant to the Apple Developer Agreement and is terminating

8    the Developer Agreement and the [PLA] pursuant to their terms . . . .  [W]e will deny your

9    reapplication to the Apple Developer Program for at least a year".  (Grant Decl. ¶ 35, Ex. H.)

10           As a result, *Fortnite* and other apps associated with the Team ID '84 account—*Battle*

11   *Breakers*, *Spyjinx*, and *Infinity Blade Stickers*—have been removed from the App Store, and

12   *Shadow Complex Remastered* has been removed from the Mac App Store.  (*Id.* ¶ 36.)  These

13   apps can no longer be updated and will soon become obsolete.  (*Id.*)

14           Epic has been inundated with customer complaints expressing frustration and confusion

15   at not being able to download the latest version of Epic's apps from the App Store, as well as

16   disappointment and anger at Epic.  (Sweeney Decl. ¶¶ 25-26, Exs. E-F.)  Yet, Epic does not

17   control the customer service relationship on iOS, and cannot refund users because of Apple's

18   contractual restrictions.  (*Id.* ¶ 13; *id.* ¶¶ 25-26, Exs. E-F; Byars Decl., Ex. K attach. 2 § 3.4.)

19                                          **ARGUMENT**

20   **I.    LEGAL STANDARD**

21           "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

22   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

23   balance of equities tips in his favor, and that an injunction is in the public interest."  *hiQ Labs,*

24   *Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def.*

25   *Council, Inc.*, 555 U.S. 7, 20 (2008)).  Under the Ninth Circuit's "'sliding scale' approach to

26   these factors", "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff

27   need demonstrate only 'serious questions going to the merits'".  *Id.*  Epic meets each factor, and

28   a preliminary injunction should issue.

1

2

**II.    EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS ANTITRUST CLAIMS.**

3

As alleged in Epic's Complaint, Apple engages in wide-ranging anti-competitive conduct

4

in violation of both Section 1 and Section 2 of the Sherman Act.  Apple's anti-competitive

5

conduct begins with preventing all competitive alternatives to its App Store, leading to its

6

complete monopolization of the iOS App Distribution Market.  (Compl. ¶¶ 35-102.)  Apple then

7

exacerbates this harm by extending its monopoly over distribution, through a naked tie, into a

8

monopoly in the downstream iOS In-App Payment Processing Market.  (*Id.* ¶¶ 103-55.)

9

Because Apple's monopoly power in the iOS App Distribution Market is the foundation

10

of its misconduct in both markets, Epic begins there.  It briefly explains how Apple unlawfully

11

maintains its monopoly in that market and then focuses on the illegality of the restriction that

12

Epic defied, Apple's tying of in-app payment processing to its distribution monopoly, and the

13

resulting monopolization of the iOS In-App Payment Processing Market.

14

To grant a preliminary injunction, the Court does *not* need to find a likelihood of success

15

on Epic's claims in both markets.  A likelihood of success on Epic's tying claim alone would be

16

sufficient to support the relief Epic seeks.  But if Apple were correct that app distribution and in-

17

app payment processing are a single product, then a likelihood of success on Epic's broader

18

monopoly maintenance claim in the iOS App Distribution Market would support its requested

19

relief, as one important step in addressing Apple's overarching misconduct.

20

**A.    Apple Has a Monopoly in the iOS App Distribution Market.**

21

1. *Market Definition.*  iOS is an OS that Apple developed and that it installs on Apple-

22

branded hardware like iPhones and iPads.  Like other OSs, iOS allows third-party software

23

developers to write apps that run on the platform and make the platform more attractive to users.

24

(*See* ECF No. 36 at 4 ("TRO Opp'n"); Evans Decl. ¶ 17)  Once an app is developed, the

25

developer needs to distribute it to users.  Thus, there is a relevant product market for the

26

distribution of apps compatible with iOS to users of mobile devices:  the iOS App Distribution

27

Market.  (Evans Decl. ¶ 54.)  This market includes all the ways by which app developers could

28

(absent Apple's restrictions) distribute apps to users of an iOS device.  (*Id.* ¶¶ 52-45.)

The product market is properly limited to the distribution of iOS-compatible apps.  Apps,

including app stores, are programmed to run on a specific OS and will not run on a different OS. (Grant Decl. ¶ 14.)  Thus, app stores for different OSs lack the "actual or potential ability to deprive" participants in the iOS App Distribution Market of significant business.  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  The geographic market for the iOS App Distribution Market is likely global.  (Evans Decl. at 10 n.37.)

Contrary to Apple's position (TRO Opp'n 17-19), the iOS App Distribution Market is a proper single brand market.  "[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue".  *Newcal*, 513 F.3d at 1048; *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481-82 (1992).  Courts in the Ninth Circuit typically consider four aspects of the alleged market to determine if it is a single brand market. *See Newcal*, 513 F.3d at 1049-50.  Each aspect favors Epic.

*First*, app distribution on iOS is an "aftermarket" that is "wholly derivative from and dependent on the primary market", *id.* at 1049, which is smartphone (or tablet) OSs.  Without the OSs, there would be no market for app distribution on iOS.[3]

*Second*, the "illegal restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial market".  *Newcal*, 513 F.3d at 1050.  Epic does not challenge Apple's practices in the sale of smartphone (or tablet) OSs; the restraints at issue apply only to the aftermarket.

*Third*, Apple "does not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market" but instead "its market power . . . flows from its relationship with its consumers".  *Id.*  When purchasing iOS devices, consumers do not contractually agree to obtain apps only through the App Store.  (*See* Byars Decl., Exs. X-Y.) Rather, Apple's control over iOS gives it "special access to its consumers" that enables it to ensure that consumers have no other choice.  *See Newcal*, 513 F.3d at 1050.

*Fourth*, "[c]ompetition in the initial market . . . does not necessarily suffice to discipline anti-competitive practices in the aftermarket[s]".  *Id.*  Apple enjoys significant market power in

---

[3] For this reason, *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008), on which Apple has relied (TRO Opp'n 17-18), is off point.  The alleged market at issue there was the primary market for Mac OS, not a derivative aftermarket.  *Psystar*, 586 F. Supp. 2d at 1197.

1    any appropriately defined antitrust market for smartphone (or tablet) OSs.  Apple is at least a

2    duopolist in such a market (along with Google).  Through the sale of iOS devices, Apple has

3    approximately 50-60% of global premium smartphone revenue, and for years, has captured over

4    60% of all operating profits flowing from global sales of smartphones.  (Evans Decl. ¶ 35; Byars

5    Decl., Ex. EE.)  In addition, once consumers opt into the iOS ecosystem by purchasing their first

6    iPhone or iPad, they face substantial switching costs.  Economist David Evans identifies eight

7    reasons why switching costs are high, including that users face the cost of learning a new OS;

8    they commit to iOS on a household basis and by purchasing multiple Apple devices; and Apple's

9    ecosystem is heavily integrated and networked.  (Evans Decl. ¶ 46.)  Consumers also face

10   significant information costs that make Apple's anti-competitive practices insufficiently salient

11   to affect primary market competition.  (*Id.* ¶ 44 n.65.)  Most consumers do not know of Apple's

12   anti-competitive practices; in fact, Apple *prevents* consumers from knowing about the anti-

13   competitive practices.  (*See* Byars Decl., Ex. BB; *id.* Ex. P § 3.1.1 ("Apps . . . may not . . . direct

14   customers to purchasing mechanisms other than in-app purchase"), § 3.1.3 (prohibiting

15   developers from discouraging use of IAP).)  In any event, Apple's anti-competitive practices

16   would not incentivize consumers to purchase a mobile device running a competing OS because

17   the other duopolist for mobile OSs—Google—maintains similar anti-competitive practices.

18   Therefore, competition for smartphone (or tablet) OSs cannot discipline Apple's conduct in the

19   aftermarket.  (Evans Decl. ¶ 50.)  Nor can developers discipline Apple by refusing to develop for

20   iOS; no developer can realistically afford to forgo one billion iOS users.  (Evans Decl. ¶¶ 41-42.)

21          2.  *Monopoly Power*.  "To demonstrate market power circumstantially, a plaintiff must",

22   along with defining the relevant market, (1) "show that the defendant owns a dominant share of

23   that market"; and (2) "show that there are significant barriers to entry and show that existing

24   competitors lack the capacity to increase their output" in the short run.  *Aya Healthcare Servs.,*

25   *Inc. v. AMN Healthcare, Inc.*, 2018 WL 3032552, at *20 (S.D. Cal. June 19, 2018) (quoting

26   *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).  Both prongs are easily

27   met here.  Apple's market share in iOS app distribution is 100%, as the App Store is the *only*

28   approved means by which developers may distribute consumer apps.  And the restrictions Apple

imposes in the distribution market, described below, completely foreclose any prospect of entry, thereby unlawfully maintaining Apple's monopoly.

**B.    Apple Unlawfully Maintains a Monopoly in the iOS App Distribution Market.**

To establish liability under Section 2, "a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury". *FTC v. Qualcomm Inc.*, 2020 WL 4591476, at *8, __ F.3d __ (9th Cir. Aug. 11, 2020).  Epic is highly likely to establish that liability here.  The first element, monopoly power, is above.  To maintain that power, Apple deploys a web of technical and contractual ties that ensures the App Store is the only approved way to distribute consumer apps:

Technical restrictions:  Apple has designed restrictions into iOS that prevent users from downloading apps or competing app stores directly from websites.  (Grant Decl. ¶ 14.)  The result is that the only viable distribution channel is the pre-installed App Store.  (*Id.*)

Contractual restrictions:  Apple conditions all app developers' access to iOS on the developers' agreement to distribute their apps to iOS users solely through the App Store.  Apple effects this condition by requiring all iOS developers to enter into the PLA, a contract of adhesion, which prohibits distribution of consumer apps through channels other than the App Store.  (*See* Byars Decl., Ex. K § 3.2(g) (providing that consumer applications "may be distributed only if selected by Apple (in its sole discretion) for distribution via the App Store").)  In addition, Apple conditions app developers' access to iOS on their agreement not to distribute third-party iOS app stores.  (*Id.* Ex. K § 3.3.2 (prohibiting "Application[s]" that "create a store or storefront for other code or applications"); *see also id.* Ex. P § 3.2.2(i) (it is "unacceptable" to create "an interface for displaying third-party apps, extensions, or plug-ins similar to the App Store or as a general-interest collection").)

Apple's conduct does not just harm competition in the iOS App Distribution Market—competition is completely eliminated.

**C.    Apple's Tying of the App Store and IAP *Per Se* Violates Section 1.**

Epic is highly likely to succeed on the merits of its claim that Apple's contractual tying of

the App Store and IAP is *per se* unlawful.  "For a tying claim to suffer per se condemnation, a plaintiff must prove:  (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).[4]  Epic can readily show each element even now, before discovery has commenced.

### 1.  Apple Ties Two Separate Products.

#### a.  Apple Ties IAP to the App Store.

Apple conditions use of the tying product, app distribution through the App Store, on use of the tied product, in-app payment processing for digital content through IAP.  A tie requires a "condition linked to a sale".  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  Apple's App Store Review Guidelines, an extension of the PLA, explain that "you must use" IAP for purchases of in-app content.  (Byars Decl., Ex. P § 3.1.1; *see also id.* Ex. K § 3.3.3).  That is, to avoid being banned from the App Store, Apple requires developers to use Apple's IAP for in-app purchases of digital content.  This is a naked tie.

#### b.  App Distribution and In-App Payment Processing for Digital Content Are Separate Products.

To assess whether a tie involves separate products, courts apply the purchaser demand test, which "examines direct and indirect evidence of consumer demand".  *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *12 (N.D. Cal. Dec. 12, 2018).  "Direct evidence of demand includes 'whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms.'"  *Id.* (quoting *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,

---

[4] Ignoring this binding precedent, Apple argued in its TRO Opposition that the rule of reason should govern its tie because it is a tech company with "novel business practices".  (TRO Opp'n 2, 17 (citing *Qualcomm Inc.*, 2020 WL 4591476, at *9; *United States v. Microsoft Corp.*, 253 F.3d 34, 91 (D.C. Cir. 2001)).)  But Apple's cited authorities are inapposite.  *Qualcomm* did not even involve tying.  The *Microsoft* court did not question the line of "Supreme Court tying cases" that apply the *per se* standard to "contractual ties".  *See Microsoft*, 253 F.3d at 89-95.  In *Microsoft*, the defendant technologically integrated its operating system with its web browser, and the court declined to condemn this technologically integrated product as *per se* unlawful for fear of chilling product innovation.  *Id.*  Apple, however, ties IAP to the App Store purely through contracts.  There is nothing innovative about such an arrangement.

1   532 F.3d 963, 975 (9th Cir. 2008)).

2   Contrary to Apple's argument in its TRO Opposition (at 19-20), direct evidence proves

3   that the App Store and IAP are separate.  Here, users generally have not been "given a choice"

4   about where to procure payment processing services for digital in-app content purchases.  But in

5   closely analogous situations, absent Apple's tie, developers incorporate, and consumers choose

6   to use, alternative in-app payment processors provided separately from app distribution services.

7   *First*, on iOS itself, Apple does *not* condition access to the App Store on use of IAP if the

8   in-app purchases are for physical products or for services consumed outside the app.  (Byars

9   Decl., Ex. P § 3.1.5(a).)  Thus, popular apps like Uber (for ride-hailing) or Grubhub (for

10  takeout)—which sell only physical products or services consumed in the physical world—may

11  offer an array of competing in-app payment systems.  Nearly all of these apps opt to procure

12  payment processing services from sources *other* than Apple, *i.e.*, separately from the distribution

13  services they are forced to obtain from the Apple App Store.  (Byars Decl., Ex. U).  If given the

14  choice, developers who sell in-app digital content would do the same.

15  *Second*, on other platforms besides iOS, there are separate markets for distribution

16  services and for payment processing services.  Developers can and do distribute apps through the

17  Epic Games Store for personal computers while using payment processing for in-app purchases

18  of digital content that is not provided by those stores.  (Sweeney Decl. ¶ 10.)  Similarly, app

19  developers often distribute their own apps for personal computers using third-party payment

20  processing for in-app purchases of digital content.  Thus, the demand for payment processing is

21  separate from the demand for distribution services.

22  *Third*, consumers' reaction to Epic direct pay on iOS proves that there is separate

23  consumer demand for distribution and payment processing.  From August 13, 2020 to August 27,

24  2020 (essentially the period during which users could choose between Epic direct pay and IAP),

25  53.4% of users who made an in-app purchase used Epic's direct payment, while 46.6%

26  continued to use only Apple's IAP.  (Sweeney Decl. ¶ 20.)

27  Functionally, in-app payment processing is also separate from the distribution services

28  offered by the App Store.  In-app purchases may occur months or even years after an app has

been downloaded onto a mobile device—long after distribution of the app has been completed.

### 2. Apple's Market Power in the iOS App Distribution Market Coerces Developers into Using IAP.

Apple wields its market power in the iOS App Distribution Market to coerce developers into using IAP. "[F]orcing (or coercion) is likely if the seller has power in the tying product market". *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 955 (D. Or. 2018) (quoting *Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984)). Here, Apple clearly has the requisite power in the upstream distribution market, as discussed in Section II.A above.

### 3. The Tying Affects a Not Insubstantial Amount of Commerce in the iOS In-App Payment Processing Market.

Finally, Apple's tie affects the requisite level of commerce in the market for the tied product. There is a relevant product market for the processing of payments for digital in-app content on devices running iOS: the iOS In-App Payment Processing Market. (Evans Decl. ¶ 74.) This market comprises all the processing solutions iOS developers could use (absent Apple restrictions) for in-app purchases of such content for their apps. (*Id.*)

The iOS In-App Payment Processing Market is a proper antitrust market. As an initial matter, purchases outside an app are not substitutes for in-app purchases because navigating to a website outside the app, or making a telephone call to a call center, is far less convenient than purchasing in-app. This is especially so for purchases of digital content, which are often inexpensive micro-transactions, time-sensitive or both—meaning that users who had to leave the app would be very unlikely to make the purchase. (Sweeney Decl. ¶ 7.) Therefore, developers who offer in-app purchases of digital content are especially reliant on in-app payment processing. This is also evidenced by the fact that Apple treats them differently from developers that offer real-world goods and services. In-app purchases of digital must be processed with IAP, which charges 30%. (Byars Decl., Ex. P § 3.1.1; *id.* Ex. M § 3.4.) By contrast, in-app purchases of real-world goods and services may be processed with other options, which typically charge less than 5%. (*Id.* Ex. P § 3.1.5(a); *id.* Ex. T; Evans Decl. ¶ 68.)

Apple's ability to exclude third-party payment processors and raise prices on developers

1   who offer in-app purchases of digital content shows that the iOS In-App Payment Processing

2   Market is properly defined.  *See* (Evans Decl. ¶ 74); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,

3   7 F.3d 986, 999 (11th Cir. 1993) (finding that "the ability to discriminate against a distinct group

4   of customers by charging higher prices for otherwise similar products demonstrates the existence

5   of market power with respect to that group"); *State of Ill. ex rel. Hartigan v. Panhandle E. Pipe*

6   *Line Co.*, 730 F. Supp. 826, 900 (C.D. Ill. 1990), *aff'd*, 935 F.2d 1469 (7th Cir. 1991) (defining

7   market "by reference to the capabilities of different types of end-users [of oil and gas]" to resist

8   the exercise of monopoly power, leading to price discrimination).  The geographic market for the

9   iOS In-App Payment Processing Market is likely global.  (Evans Decl. at 10 n.37.)

10          Just as the iOS App Distribution Market is a valid single-brand antitrust market, the iOS

11   In-App Payment Processing Market is as well, for similar reasons.  (*See* Section II.A. above.)

12          Apple's tie easily affects the requisite level of commerce in the iOS In-App Payment

13   Processing Market.  "[N]ormally the controlling consideration is simply whether a total amount

14   of business, substantial enough in terms of dollar-volume so as not to be *merely de minimis*, is

15   foreclosed to competitors by the tie".  *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421,

16   1425 (9th Cir. 1995).  Apple's conduct forecloses Epic and all similarly situated developers from

17   offering alternative in-app payment processing services on more than one billion iOS devices.

18   There can be no question that this element is satisfied.[5]

19          **D.      Apple's Tying Unreasonably Restrains Trade and Unlawfully Maintains Its**
20                 **Monopoly in the iOS In-App Payment Processing Market.**

21          Epic is also likely to show that Apple's tying of the App Store and IAP violates Section 1

22   and Section 2 of the Sherman Act under a rule of reason analysis.  Under Section 1, "[t]he rule of

23   reason analysis requires the fact-finder to 'analyze the anti-competitive effects along with any

24   pro-competitive effects to determine whether the [arrangement] is unreasonable on

25   balance'".  *W. Power Sports, Inc. v. Polaris Indus. Partners L.P.*, 951 F.2d 365 (9th Cir. 1991).

26   A Section 2 "claim for monopolization of trade has two elements:  'the possession of monopoly

27

28          [5] For *per se* tying, the Court need not "consider whether competition was in fact unreasonably
        restrained".  *See Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338 (9th Cir. 1984).

power in the relevant market and . . . the acquisition or perpetuation of this power by illegitimate 'predatory' practices'".  *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010).  "Section 2 plaintiffs must also establish antitrust injury."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

### 1. Apple's Conduct Has Substantial Anti-Competitive Effects in the iOS In-App Payment Processing Market and Injures Epic.

Apple's conduct exploiting its market power in the iOS App Distribution Market to tie the App Store to IAP has clear anti-competitive effects in the iOS In-App Payment Processing Market.  Just as Apple's conduct in the iOS App Distribution Market completely eliminates all competition in that market, the conduct here completely forecloses all competition in the iOS In-App Payment Processing Market.  Apple's actions here are illustrative.  Epic offered a competing payment platform that delivered savings to consumers.  (Sweeney Decl. ¶¶ 18-20.)  Apple immediately removed *Fortnite* from the App Store.  (*Id.* ¶ 20.)  Apple has since blocked each and every *Fortnite* build offered by Epic, on the ground that these versions offered the same competitive payment processor.  (Grant Decl. ¶¶ 25-34.)  When Epic did not capitulate by Apple's two-week deadline, Apple terminated Epic's Team ID '84 account and banned its games from the App Store for at least a year.  (*Id.* ¶ 35, Ex. H.)  Apple also threatened to destroy multiple other Epic businesses.  (*Id.* ¶ 27, Ex. C.)  That is clear anti-competitive harm to Epic, a putative competitor in payment processing; to all other competitors, who are likewise unable to enter; and to developers and users who are denied all competitive options and the innovation and lower prices they could deliver.  (*See* Sweeney Decl. ¶¶ 14, 20, 43.)

### 2. There Are No Procompetitive Justifications for Apple's Conduct.

Apple has put forth two purported justifications for its illegal tie:  user security and Apple's ability to get paid.  Both are unavailing.

Any security justification for requiring all in-app purchases to go through IAP is facially pretextual.  *Eastman Kodak*, 125 F.3d at 1223 ("A plaintiff may rebut an asserted business justification by demonstrating . . . that the justification is pretextual.").  Apple does *not* mandate use of IAP for in-app purchases of physical goods or services to be consumed outside of the app

1    (Byars Decl., Ex. P § 3.1.5(a)); nor does it mandate use of IAP for digital content purchased on

2    Mac computers (*see* Sweeney Decl. ¶ 10; Byars Decl., Ex. K § 7).  IAP is not necessary to

3    maintain the security of users of Apple devices.

4            As for Apple's ability to get compensated, in its TRO Opposition, Apple argued that

5    "IAP is the fundamental mechanism by which Apple, like many other transaction platforms,

6    implements its business model and recoups its substantial investment in the platform."  (TRO

7    Opp'n 23.)  But labeling a tie a "business model" does not remove it from the purview of the

8    antitrust laws.  Moreover, Apple's claim rings hollow:  Apple's tie is *not* necessary to ensure

9    payment (*see* Sweeney Decl. ¶ 10)—it is necessary only to ensure Apple's continued monopoly.

10           As relevant here, Apple does three separate things:  it develops and maintains the iOS

11   operating system; it distributes apps through the App Store; and it processes in-app payments for

12   digital content through IAP.  For the development and maintenance of iOS, like other platform

13   developers, Apple gets paid in a host of ways not at issue here, including primarily through its

14   sale of iOS devices.  But creating the iOS platform does not also entitle Apple to compensation

15   for app distribution and in-app payment processing services.  Apple can get paid for those

16   services if it competes successfully; if Apple offers competitive distribution or payment

17   processing services, developers would choose to use them and agree to pay Apple.  But Apple

18   may not use its market power in the primary market—stemming from its control of iOS—to

19   *compel* the use of its services in the aftermarkets for distribution and payment processing, and

20   then suggest it must be paid for the services it forces developers and consumers to use.

21           Granting the requested preliminary injunction would *not* cause Apple to "give[] away its

22   products for free".  (TRO Op. 6.)  Apple would still be compensated handsomely for the

23   development of the iOS platform.  In 2019 alone, iPhone hardware sales generated more than

24   $142 billion in revenue.  (Byars Decl., Ex. W at 37.)  That revenue reflects Apple's investment in

25   iOS, as well as the value provided to the iOS ecosystem by many thousands of developers who,

26   through their innovation, make the iOS ecosystem more attractive to users—and more lucrative

27   for Apple.  (*See* TRO Opp'n 4; Byars Decl., Ex. V at 3 (Apple CEO testifying that Apple

28   "giv[es] every developer access to the very latest technology" "not out of obvious financial

interest, but because we realize that we have a long-term stake in the health, dynamism and vitality of the whole system")).[6]  These benefits are not unique to iOS; operating system providers regularly facilitate platform access by providing development tools for free or for a nominal fee, recognizing that products created by third parties for the platform make the platform more valuable to users—and therefore to the platform provider.  (Byars Decl., Ex. O; Evans Decl. ¶ 8.)[7]

But Epic does not want or need Apple to provide it with distribution or payment processing services, for free or otherwise.  Epic wants to utilize its own competing services, for its own apps and for others.  If and when Epic prevails, Apple would no longer provide it with either service, and therefore would not be entitled to any payment from Epic.  And of course, there are many ways that Apple could get paid for distribution that do not foreclose the iOS In-App Payment Processing Market, such as charging a flat fee or a per-download fee.  *See also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("If the defendant [shows a procompetitive rationale], then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.").  But so long as it holds market power in the iOS App Distribution market, Apple cannot tie its distribution services and payment processing services, even if the tie simplifies Apple's collection efforts.  *See Digidyne*, 734 F.2d at 1344 (finding "restructured prices" were a "less restrictive alternative . . . to recoup [defendant's] investment costs and maintain its incentive for further innovation" than a tie); *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 619 (9th Cir. 1990), *aff'd sub nom. Eastman Kodak*, 504 U.S. 451 ("[I]t is a less restrictive alternative

---

[6] *See also* David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* 123 (2016) (detailing how Apple "invested great effort in stoking the supply of third-party apps, touting how many they had, and making it easy for users to get them", leading to "explosive growth").

[7] Apple has argued that "many video game digital marketplaces" "have similar fees and requirements to use the marketplace's official in-app purchase functionality".  (TRO Opp'n 5.) But iOS is not a "video game digital marketplace".  It is a critical platform for developers of all sorts, and an essential tool for users in multiple aspects of their daily lives.  As Apple itself trumpets, vast swaths of economic and social activity are funneled through iOS.  And unlike the gaming consoles to which Apple points, which are typically sold at a loss in a competitive market (Byars Decl., Ex. GG), iOS is an inescapable member of an upstream duopoly with extraordinary power over developers and users alike.

for [defendant] to structure its prices for equipment, parts, and service so that the price for which [defendant] sells each of these reflects [its] investment costs in that area").

### III.   IRREPARABLE HARM & PUBLIC INTEREST: APPLE'S RETALIATION WILL IRREPARABLY HARM EPIC AND MILLIONS OF ITS CUSTOMERS.

The second and fourth inquiries under *Winter* involve, respectively, the harm to Epic and the harm to third parties.  555 U.S. at 20.  Here, the two are closely related, as the harm to Epic flows from the harm that Apple has inflicted, and has threatened to further inflict, on Epic's customers.  Epic therefore addresses these inquiries jointly below.

#### A.   Epic's Decision To Defy Anti-Competitive Restrictions Does Not Require Discounting the Harm to Epic or Its Customers.

On August 13, 2020, Epic took a stand against Apple's anti-competitive practices, which for over a decade have restricted competition and drained billions of dollars from consumers and developers.  (Sweeney Decl. ¶ 17.)  Epic did so for the purpose of opening up the iOS ecosystem—a major gateway into the digital economy—not just for itself, but for *all* app distributors, developers, and users.  (*Id.* ¶¶ 17, 43.)  Under the law, Epic should not be penalized for defying Apple's monopolistic edicts.  Nor should Epic's willingness to fight Apple's monopoly be used to undercut its showing of irreparable harm.

Apple has argued that Epic is not entitled to relief "because it has unclean hands".  (TRO Opp'n 23.)  But "'[u]nclean hands' has not been recognized as a defense to an antitrust action for many years." *Memorex*, 555 F.2d at 1381.  Indeed, a long line of Supreme Court cases going back over a century encourages private attorneys general to enforce the antitrust laws against monopolists, including by disregarding anti-competitive contractual provisions that monopolists impose.  In *McMullen*, 174 U.S. at 654, the defendant ceased to perform under an anti-competitive contract, and the Court refused to enforce the contract, writing: "The authorities from the earliest times to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract."  *See also Kaiser Steel*, 455 U.S. at 77 ("our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law"); *Perma Life Mufflers, Inc. v. Int'l Parts. Corp.*, 392 U.S. 134, 139 (1968) ("The purposes of the antitrust laws are best served by insuring that private action will be an ever-

1    present threat to deter anyone contemplating business behavior in violation of the antitrust

2    laws.”); *Continental Wall Paper*, 212 U.S. at 262 (noting that if an anti-competitive restriction is

3    breached, “the aid of the court [in enforcing the restriction] is denied, not for the benefit of the

4    [non-complying party], but because public policy demands that it should be denied”).

5         This Court correctly noted that *Kaiser Steel*, *Memorex*, and *Perma Life* involved

6    affirmative defenses.  (TRO Op. 5 n.2.)  But the same principle that prevents unclean hands from

7    being a defense to an antitrust claim *also* prevents it from being a basis to find lack of irreparable

8    harm—the law does not penalize parties that cease to comply with illegal contract provisions.

9    As the court observed in *Memorex*, this concept arises in various doctrinal contexts, but whatever

10   anti-competitive contract restrictions the plaintiff may have breached, the court “continue[s] to

11   side with the goal of vigorous enforcement of our antitrust laws”.  555 F.2d at 1383.

12        Moreover, the principle has been applied in analogous situations.  In *Acquaire v. Canada

13   *Dry Bottling Co.*, the defendant mandated resale prices for its distributors, and retaliated against

14   distributors who refused to comply by withholding product from them.  24 F.3d at 411.  The

15   distributors sought a preliminary injunction to prevent the defendant from withholding product,

16   *even as the distributors continued to defy the resale price requirements*.  *Id.*  The court granted

17   the preliminary injunction, rejecting the defendant’s argument that “any irreparable harm to the

18   distributors was self-inflicted in that [the defendant] withheld product only from those

19   distributors who elected to participate in the promotional program but refused to abide by its

20   terms”.  *Id.  Acquaire* is directly on point here.  Epic has demonstrated the viability of a

21   competitive alternative, the user demand for one, and the urgency in fighting Apple’s anti-

22   competitive practices.  Just as the distributors in *Acquaire* were entitled to protection from

23   retaliation (without adhering to the illegal scheme) while the case was pending, so too Epic

24   should be protected from retaliatory acts intended to make it succumb to Apple’s unlawful rules.

25   *See also, e.g.*, *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 368-69 (7th Cir. 1971) (reversing

26   denial of preliminary injunction because courts “have refused to permit a party to benefit from

27   contractual rights when the contract is an instrument of restraint of trade”); *Germon v. Times

28   *Mirror Co.*, 520 F.2d 786, 788 (9th Cir. 1975) (“A termination might be enjoinable even if done

pursuant to contract, if the contractual clause relied upon were being used to foster an unlawful

anticompetitive scheme.").

Finally, "[w]here the contractual right is alleged to violate the antitrust laws, the public

interest in antitrust enforcement and preservation of competition outweighs the interest in

freedom of contract."  *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 n.143

(S.D.N.Y. 2017); *see Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d

511, 521 (9th Cir. 1984) ("the public interest is served by preserving the competitive influence of

consumer preference").  Thus, by refusing to follow Apple's anti-competitive contractual

restrictions, Epic is furthering the public interest.[8]

### B.   Epic and Its Customers Will Suffer Irreparable Harm if Apple Is Permitted To Continue Its Retaliation.

In the absence of a preliminary injunction, Apple's termination of Epic's and its

affiliates' Developer Program accounts, including as to *Unreal Engine*, and removal of *Fortnite*

and other apps from the App Store, will splinter millions of *Fortnite* customers from their social

network, jeopardize the projects of millions of developers relying on *Unreal Engine*, harm Epic's

reputation and competitive standing and cripple *Unreal Engine.*  (Sweeney Decl. ¶¶ 38-41;

Penwarden Decl. ¶¶ 9-13.)  These harms have already begun to occur, and will materialize fully

well before this case is adjudicated.  "'[T]he public interest inquiry primarily addresses impact

on non-parties'".  *LinkedIn*, 938 F.3d at 1004.  Here, the ire of those harmed third parties—

*Fortnite* players and *Unreal Engine* developers—will be directed, at least in part, at Epic.

Moreover, the industry-wide concern about the continued viability of *Unreal Engine* will force

existing and potential customers to choose alternative tools.  "Evidence of threatened loss of

prospective customers or goodwill certainly supports a finding of the possibility of irreparable

harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *see*

*also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) ("It is

---

[8] To be clear, Epic does not argue on this motion that the entire PLA or all of the App Store Review Guidelines are unenforceable.  The unlawful provisions tying app distribution to in-app payment processing and requiring distribution of consumer apps through the App Store may easily be severed (*see* Byars Decl., Ex. K § 14.6) from the remainder of the contract, which would continue to be in force.

appropriate to use a preliminary injunction to avoid harms to goodwill and competitive position"); *trueEX*, 266 F. Supp. 3d at 726-28 ("a threatened loss of good will and customers, both present and potential" can "constitute irreparable harm").

### 1.   Apple's Retaliation Against *Fortnite* Has Harmed Millions of Consumers and Will Irreparably Harm Epic.

On August 13, 2020, Apple removed *Fortnite* from the App Store.  (Grant Decl. ¶¶ 25-26, Ex. B; Sweeney Decl. ¶ 20.)  Apple says it was concerned about the security of Epic's competitive payment processor (*see* TRO Opp'n 4, 6, 21), but if that were so, Apple could have blocked *Fortnite* from launching on the devices of existing users.  It did not.  Instead, Apple demanded that Epic publicly capitulate and provide it with a *Fortnite* build that complies with its illegal in-app payment restrictions—or else Apple would terminate *all* Epic Developer Program accounts and cut off Epic's access to all iOS and macOS development tools.  Epic declined to capitulate.

On August 27, 2020, the new season of *Fortnite* was released.  (Sweeney Decl. ¶ 22.) iOS users are unable to download the new season because *Fortnite* is no longer on the App Store. Moreover, since Apple has acted on its threats (as modified by this Court's TRO), macOS users also have lost access to the latest season of *Fortnite*.  Thus, millions of iOS and macOS users have been splintered off from the *Fortnite* community.  (*Id.*)  Apple has said this ban on *Fortnite* will last at least a year.  (Grant Decl. ¶ 35, Ex. H.)

Apple's actions will wreak havoc on the existing *Fortnite* community.  Daily active *Fortnite* users on iOS have already declined by more than 60% since Apple began its retaliatory campaign through September 2, 2020.  (Sweeney Decl. ¶ 22.)  Those that continue to play or socialize on *Fortnite* are doing so for significantly fewer hours per week.  (*Id.*)  Friends and family are disappearing.  People prefer *Fortnite* over other games in part because *Fortnite* facilitates a community.  When millions of players are forced to drop from the community overnight, *Fortnite* itself becomes less attractive, not only to the players who now cannot join but also to every other player.  (*Id.*)  *Fortnite* is also one of the world's largest event venues.  (*Id.* ¶ 5.)  Travis Scott's in-game concert in April 2020 drew over 2 million iOS users.  (*Id.*)  Since

1   then, three of Christopher Nolan's films were virtually screened in *Fortnite*; exclusive episodes

2   of ESPN's *The Ocho* and the Discovery Channel's *Tiger Shark King* aired in the game; and *We*

3   *the People*, a series of discussions on racial equality and voter suppression in America, was

4   likewise held within the *Fortnite* universe.  (*Id.*)  Particularly during the COVID-19 pandemic,

5   such events are critical to connecting friends and families worldwide.  Apple has driven a stake

6   in the *Fortnite* community.

7        Some iOS users can afford to gain access to *Fortnite* through other means, such as

8   gaming consoles or Windows PCs.  But for many users, an iPhone is the only way to access the

9   *Fortnite* universe; simply put, neither consoles nor PCs (let alone PCs strong enough for gaming)

10  are anywhere near as ubiquitous as iPhones.  63% of *Fortnite* users on iOS access *Fortnite only*

11  on iOS.  (*Id.* ¶ 3.)  The harm to these users is meaningful.  In the time since Apple removed

12  *Fortnite*, Epic has received countless customer complaints expressing customers' discontent.

13  Many of these customers blame Epic for being cut off from access to *Fortnite*.  (*Id.* ¶¶ 25-26,

14  Exs. E-F.)  These are the words of regular people:  parents seeking to spend time in *Fortnite* with

15  their children, players who invested time and money in the game, and people seeking a forum to

16  connect with others worldwide.  (*Id.*; Byars Decl., Ex. Q.)  These complaints have likely been

17  driven at least in part by Apple's notice to users who tried to update *Fortnite* that "[t]he

18  developer has removed this app from the App Store".  (Grant Decl. ¶ 25, Ex A.)  This is false—it

19  is Apple that removed *Fortnite*, not Epic.

20       Courts also routinely recognize complaints from customers as irreparable harm to the

21  company.  *See, e.g.*, *Go Daddy Operating Co. v. Ghaznavi*, 2018 WL 1091257, at *14 (N.D. Cal.

22  Feb. 28, 2018) (declaration that plaintiff "has received numerous customer complaints"); *Home*

23  *Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*, 2018 WL 3816745, at *9 (C.D. Cal.

24  July 24, 2018) (same); *see also trueEX*, 266 F. Supp. 3d at 728 (irreparable harm where

25  "customers will have no choice but to resort to using a substitute product to meet their needs");

26  *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1253-54 (D. Haw.), *aff'd sub*

27  *nom. State of Hawaii v. Gannett Pac. Corp.*, 203 F.3d 832 (9th Cir. 1999) (irreparable harm to

28  where antitrust defendants' actions threatened "the elimination of a significant forum for the

1    airing of ideas and thoughts").

2         Moreover, Apple's removal of *Fortnite* from the App Store will stunt Epic's efforts to

3    compete on a new technological frontier that is rapidly becoming a key focus of research and

4    development among digital innovators:  the creation of the metaverse.  A metaverse is a multi-

5    purpose, persistent, interactive virtual space.  (Sweeney Decl. ¶ 24.)  *Fortnite* already bears many

6    characteristics of the metaverse; it "fosters deep community; it's an immersive experience

7    centered around lasting social connection; it's a playground to be anybody, yet it's the most

8    authentic expression of our true authentic selves".  (Byars Decl., Ex. DD.)  The communal

9    experience of the *Fortnite* platform, the free flow of thoughts and ideas within the game's many

10   virtual spaces, and the game's utility as an outlet for social connection, have led *Fortnite* to be

11   considered a challenger and substitute for Facebook, Snapchat, and others.  (*Id.*; Sweeney Decl.

12   ¶ 24.)

13        Right now, major tech companies are focusing on the metaverse frontier and have made

14   significant investments, and *Fortnite* puts Epic ahead in this race.  (Byars Decl., Ex. HH.)  But

15   the success of *Fortnite*'s evolution into a metaverse depends on having a large userbase, which

16   will make interacting on the metaverse a better experience for potential new users.  (Sweeney

17   ¶ 24.)  Mobile users in particular are critical because mobile devices allow consumers to access

18   the metaverse wherever they are.  (*Id.*)  Over 116 million registered users have accessed *Fortnite*

19   through iOS—more than any other platform.  (*Id.* ¶ 3.)  They have spent more than 2.86 billion

20   hours in the app.  (*Id.*)  By eliminating many of these players from *Fortnite*, and blocking

21   *Fortnite*'s ability to access over a billion iOS users, Apple is irreparably harming Epic's chances.

22            **2.      Apple's Termination of Developer Accounts and Developer Tools**
                        **Would Irreparably Harm Epic and Its Customers.**
23

24        In its TRO Opinion, this Court held that "Epic Games made a preliminary showing of

25   irreparable harm as to Apple's actions related to the revocation of the developer tools" because

26   "if Epic Games succeeded on the merits, it could be too late to save all the projects by third-party

27   developers relying on the engine that were shelved while support was unavailable".  (TRO

28   Op. 6.)  "Indeed, such a scenario would likely lead to nebulous, hard-to-quantify questions, such

1    as, how successful these other projects might have been, and how much in royalties would have

2    been generated". (*Id.*)

3         These findings were amply supported. Without access to Apple's development tools,

4    "Epic would be unable to develop future updates to the *Unreal Engine* for . . . iOS and macOS",

5    all but ensuring that "third-party developers who rely on Epic's engine and support" would be in

6    jeopardy. (Sweeney Decl. ¶¶ 38, 40; Penwarden Decl. ¶¶ 8-13.) Apple leveled "an existential

7    threat to the *Unreal Engine*" that will be, in the words of one commenter, "catastrophic for far

8    more developers than just Epic". (Byars Decl., Ex. R at 10.) This is a problem *right now*.

9    Indeed, evidence of this has been bolstered since the TRO papers were filed. Developers making

10   apps for multiple platforms or specifically for Apple devices will choose alternatives to

11   *Unreal Engine* to ensure their programs work on Apple products. Epic already has received

12   dozens of complaints from developers raising concerns about the future of *Unreal Engine*, some

13   of whom are contemplating the need to move their business elsewhere. (Penwarden Decl. ¶ 11;

14   Byars Decl., Ex. S ¶¶ 3-4.) Anything short of a preliminary injunction would devastate these

15   developers, deny Epic future customers, and upend *Unreal Engine*. Epic could not be made

16   whole through a victory at trial. *See trueEX*, 266 F. Supp. 3d at 728 ("trueEX is likely also to

17   suffer irreparable harm . . . [as] some [customers] have threatened to stop doing business with

18   trueEX . . . . Another client sought to accelerate a number of planned trades . . . suggesting that

19   the client did not believe it could do business with trueEX in the future").

20   **IV.    THE BALANCE OF HARMS TIPS SHARPLY IN EPIC'S FAVOR.**

21        The balance of harms strongly favors Epic. If the Court does not grant the requested

22   preliminary injunction, the harm to Epic will be significant, and Epic's refusal to abide by

23   Apple's unlawful agreements should not be held against Epic. (*See* Section III above.)

24        By contrast, Apple would suffer little to no harm if the preliminary injunction is granted.

25   Requiring Apple to restore Epic's Team ID '84 account, which is governed by a PLA and

26   registered various game apps including *Fortnite*, would not "set off a flood" "threaten[ing] the

27   entire App Store ecosystem". (TRO Opp'n 2.) Apple's swift and far-reaching retaliation was

28   widely publicized, most developers cannot brook such retaliation (*see* Byars Decl., Ex. CC), and

1   few if any would have the appetite or incentive to test Apple when Epic is litigating their cause.

2   Further, Apple's fear that developers will drop IAP is additional evidence that developers use

3   IAP only because Apple forces them to do so.  A preliminary injunction would, at most, cause

4   Apple to lose commissions for a short time, which is harm easily compensable by damages.

5           The balance favors Epic even more with respect to Epic's other agreements with Apple,

6   which govern the developer tools downloaded by its individual programmers and the various

7   Developer Program accounts entered into by its affiliates.  These tools and accounts are

8   necessary to support many of Epic's products on iOS and macOS, including but not limited to

9   *Unreal Engine*, and are covered by *separate* integrated agreements that indisputably were not

10  breached.  (TRO Op. 5-6; *see also* TRO Reply Br. 3-8.)  Further, some of the apps on the other

11  Developer Program accounts do not even support in-app purchases (Grant Decl. ¶ 7), so Apple

12  cannot be concerned that Epic will offer its own payment processor in those apps.  Apple will not

13  be harmed *at all* by continuing to allow Epic access to developer tools or accounts that are

14  widely available; it would simply lose some leverage it was hoping to improperly gain.  Apple

15  should not be able to retaliate against a company with which it has multiple contractual

16  relationships by unilaterally terminating each and every one of them.  That Apple may have

17  previously retaliated more broadly against other developers (Schiller Decl. ¶ 16) does not justify

18  Apple doing so now.  To the contrary, Apple's practice of retaliating across the entirety of a

19  developer's business further explains why Epic is one of a handful of companies that have dared

20  challenge Apple's conduct—and is dramatic evidence of Apple's unlawful monopoly

21  maintenance.  This further undercuts any claim of hardship, as "[t]here is no hardship to a

22  defendant when [an] . . . injunction would merely require the defendant to comply with law".

23  *Deckers Outdoor Corp. v. Ozwear Connection Pty, Ltd.*, 2014 WL 4679001, at *13 (C.D. Cal.

24  Sept. 18, 2014).

25                                    **CONCLUSION**

26          For the reasons set forth above, the Court should grant Epic's motion for a preliminary

27  injunction.

28

Dated: September 4, 2020

Respectfully submitted,

By:   s/  *Katherine B. Forrest*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

***Attorneys for Plaintiff***
**EPIC GAMES, INC.**