THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

VERONICA S. LEWIS (Texas Bar No.
24000092; *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone:  214.698.3100
Facsimile:  214.571.2900

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant and Counterclaimant*
*APPLE INC.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                        Plaintiff,<br><br>v.<br><br>APPLE INC.<br><br>                        Defendant. | CASE NO. 4:20-cv-05640-YGR<br><br>**DEFENDANT AND COUNTER-CLAIMANT APPLE INC.'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN REPLY TO EPIC GAMES, INC.'S COMPLAINT FOR INJUNCTIVE RELIEF** |

1  APPLE INC.,

2                              Counterclaimant,

3

4  v.

5

6  EPIC GAMES, INC.

                              Counter-defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **INTRODUCTORY STATEMENT TO APPLE'S ANSWER AND COUNTERCLAIMS**

2  Epic's lawsuit is nothing more than a basic disagreement over money. Although Epic portrays

3  itself as a modern corporate Robin Hood, in reality it is a multi-billion dollar enterprise that simply

4  wants to pay nothing for the tremendous value it derives from the App Store. Epic's demands for

5  special treatment and cries of "retaliation" cannot be reconciled with its flagrant breach of contract

6  and its own business practices, as it rakes in billions by taking commissions on game developers'

7  sales and charging consumers up to $99.99 for bundles of "V-Bucks."

8  For years, Epic took advantage of everything the App Store had to offer. It availed itself of the

9  tools, technology, software, marketing opportunities, and customer reach that Apple provided so that

10  it could bring games like *Infinity Blade* and *Fortnite* to Apple customers all over the world. It enjoyed

11  the tremendous resources that Apple pours into its App Store to constantly innovate and create new

12  opportunities for developers and experiences for customers, as well as to review and approve every

13  app, keeping the App Store safe and secure for customers and developers alike.

14  As a direct result of Apple's investments, the App Store has grown into a diverse marketplace

15  with a community of 27 million app developers worldwide, with about 1 billion customers across 175

16  countries. And, by all accounts, Epic has taken advantage of Apple's support and services more than

17  any other app developer for the past two years. *Fortnite* has only been in the App Store since 2018.

18  But in that short time, *Fortnite* (i) has used more than 400 of Apple's unique Application

19  Programming Interface (API) frameworks and classes (such as Metal), as well as five different

20  versions of Apple's Software Development Kit (SDK); (ii) has been reviewed more than 200 times

21  by Apple's app reviewers; and (iii) has pushed more than 140 unique updates to Apple's customers.

22  And each time Epic released a new season of *Fortnite*, Apple put it in the spotlight, providing free

23  promotion and favorable tweets, ultimately sending over 500 million marketing communications to

24  end users, and even paying for a billboard in Times Square to promote a particular *Fortnite* in-app

25  concert. With Apple's support, in the space of two short years, *Fortnite* grew into an incredibly

26  successful iOS app, enjoying nearly 130 million downloads in 174 countries—and earning Epic more

27  than half a billion dollars. As recently as April 2020, Epic executives recognized and thanked Apple

28  for its support and promotion of *Fortnite* events.

But sometime before June 2020, things changed. Epic decided that it would like to reap the benefits of the App Store without paying anything for them. Armed with the apparent view that Epic is too successful to play by the same rules as everyone else—and notwithstanding a public proclamation that Epic "w[ould] not accept special revenue sharing or payment terms just for ourselves"[1]—Epic CEO Tim Sweeney emailed Apple executives on June 30, 2020, requesting a "side letter" that would exempt Epic from its existing contractual obligations, including the App Store Review Guidelines (the "Guidelines") that apply equally to all Apple developers. Among other things, Mr. Sweeney demanded a complete end-run around "Apple's fees"—specifically, Epic wished to continue taking full advantage of the App Store while allowing consumers to pay Epic instead, leaving Apple to receive no payment whatsoever for the many services it provides developers and consumers. Mr. Sweeney also demanded the right to coopt the App Store to deliver "[a] competing Epic Games Store app," in another bid to line Epic's pockets at Apple's expense and fundamentally change the way Apple has run its App Store business for over a decade on the iOS operating system for iPhones and iPads. Mr. Sweeney expressly acknowledged that his proposed changes would be in direct breach of multiple terms of the agreements between Epic and Apple.

When Apple rejected Epic's request for a special deal, rather than abide by its long-running contractual agreements pursuant to which it has earned over $600 million, Epic resorted to self-help and subterfuge. On August 3, 2020, Epic sent a Trojan horse to the App Store—a new version of *Fortnite* that included what Epic has euphemistically described as a "hotfix" that allows Epic to bypass Apple's app review process and ability to collect commissions by directing app users to pay Epic instead, cutting Apple out entirely.

Unbeknownst to Apple, Epic had been busy enlisting a legion of lawyers, publicists, and technicians to orchestrate a sneak assault on the App Store. Shortly after 2:00 a.m. on August 13, 2020, the morning on which Epic would activate its hidden commission-theft functionality, Mr. Sweeney again emailed Apple executives, declaring that "Epic will no longer adhere to Apple's payment processing restrictions." According to Mr. Sweeney, Epic would continue to use Apple's

---

[1]  Tim Sweeney (@TimSweeneyEpic), Twitter (April 1, 2020), https://twitter.com/TimSweeneyEpic/status/1245522634114240512.

App Store but would "offer[] customers the choice" to pay Epic instead of Apple, effectively depriving Apple of any return on its innovation and investment in the App Store and placing Epic in open breach of years-long contractual obligations to which Epic and all other Apple developers have agreed.

Hours after Mr. Sweeney's 2:00 a.m. email, Epic triggered the "hotfix" it previously planted in *Fortnite* to push through a new external payment runaround—which Epic had deliberately concealed from Apple's app review process—that usurped Apple's commission and brazenly flouted its rules. This was little more than theft. Epic sought to enjoy all of the benefits of Apple's iOS platform and related services while its "hotfix" lined Epic's pockets at Apple's expense.

Following Epic's open, admitted, and deliberate breach of its contractual obligations and the cold-blooded launch of its "hotfix," Apple rightfully enforced its rights under the contractual agreements and the Guidelines by removing the non-compliant *Fortnite* app from the App Store. In keeping with its self-serving narrative, Epic attempts to recast Apple's conduct as "retaliation." But the exercise of a contractual right in response to an open and admitted breach is not "retaliation"; it is the very thing to which the parties agreed ex ante.

Epic proceeded to launch a calculated and pre-packaged campaign against Apple "on a multitude of fronts – creative, technical, business, and legal," as Mr. Sweeney had previously threatened. Epic filed its pre-drafted 56-page Complaint in this case mere hours after the removal of *Fortnite* from the App Store. Epic then publicized its willful contractual breaches through an animated *Fortnite* short film that mimicked Apple's seminal 1984 Macintosh campaign and villainized Apple for enforcing its contractual right to remove the non-compliant *Fortnite* from the App Store. Epic's wrongheaded Complaint is fatally flawed on the facts and law.

For starters, Apple is not a monopolist of any relevant market. Competition both inside and outside the App Store is fierce at every level: for devices, platforms, and individual apps. *Fortnite* users can dance their Floss, ride their sharks, and spend their V-Bucks in no fewer than six different mobile, PC, and game-console platforms. And the business practices that Epic decries as exclusionary and restrictive—including "technical restrictions" on the App Store that have existed since it debuted in 2008—have vastly increased output and made the App Store an engine of

3

innovation, with the number and diversity of apps, the volume of app downloads, and the dollars earned by app developers increasing exponentially over time. All the while, Apple's commission only decreased while software prices plummeted and barriers to entry evaporated.

Epic blasts as "pretext" the idea that Apple's curation of the App Store is "necessary to enforce privacy and security safeguards." Compl. ¶ 83. But Apple's requirement that every iOS app undergo rigorous, human-assisted review—with reviewers representing 81 languages vetting on average 100,000 submissions per week—is critical to its ability to maintain the App Store as a secure and trusted platform for consumers to discover and download software. Epic knows this. Indeed, when Epic itself "sell[s] a product to customers, [it too] feel[s] [it] ha[s] a responsibility"—in Mr. Sweeney's words—"to moderate for a reasonable level of quality, and also a reasonable level of decency."[2]  In the past, Epic has discharged that responsibility with mixed results.[3]  That Apple wishes to continue curating its own App Store—rather than outsource the safety and security of Apple's users to Epic (or other third parties)—should come as no surprise, and it ensures that iOS apps meet Apple's high standards for privacy, security, content, and quality.

Not content with attacking Apple's app review process, Epic, backed by the tech giant Tencent (which has its own competing app store, one of the largest in the world), also seeks to dismantle the App Store's entire business model to advance its own economic interests without regard to the effect on other developers and consumers. Under the current model, developers (like Epic) contractually agree to pay Apple a commission for its services. In this context, Apple's In-App Purchase (IAP) function is not a "payment processor[]" within some imagined "iOS In-App Payment Processing Market" (Compl. ¶¶ 10, 12); it is simply the practical, efficient, hardware-integrated, and consumer-friendly way by which Apple collects its contractually agreed-upon commission on paid

---

[2]  *Tim Sweeney on Why Players Should Embrace the Epic Games Store*, Eurogamer (Mar. 21, 2019), https://www.eurogamer.net/articles/2019-03-21-the-big-interview-tim-sweeney-on-why-players-should-embrace-epic-games-store.

[3]  *See, e.g.*, *Epic Games Has Already Exposed Android Users To Unacceptable Fortnite Malware Risks*, Forbes (Aug. 25, 2018), https://www.forbes.com/sites/ryanwhitwam/2018/08/25/epic-games-has-already-exposed-android-users-to-unacceptable-fortnite-malware-risks/#7a1bc9b8508c; *Fortnite players using Android phones at risk of malware infections*, The Guardian (Aug. 10, 2018), https://www.theguardian.com/games/2018/aug/10/fortnite-on-android-phones-risk-malware-infections.

*(Cont'd on next page)*

transactions. That commission reflects the immense value of the App Store, which is more than the sum of its parts and includes Apple's technology, tools, software for app development and testing, marketing efforts, platinum-level customer service, and distribution of developers' apps and digital content.

There is nothing anticompetitive about charging a commission for others to use one's service. Many platforms—including Epic's own app marketplace and *Unreal Engine*—do just that.[4] In Apple's case, that commission is not charged—and Apple earns nothing from its substantial investment in the App Store—unless and until developers bill and collect funds from users who engage in digital transactions. For the more than 80% of apps available to consumers for free on the App Store, this means Apple earns no commission whatsoever. Epic wants to change that in ways that would have dire consequences for the App Store ecosystem. In its Motion for a Preliminary Injunction, Epic boldly suggests that Apple monetize the App Store by charging a regressive "per download fee," leaving consumers and developers on the hook to pay for what otherwise would be billions of free app downloads.

Epic's intention is thus straightforward: It seeks free access to the Apple-provided tools that it uses and—worse yet—it wishes to then charge *others* for access to Apple's intellectual property and technologies. This is not something that Apple is willing to create a special "side letter" for Epic to do.

While Epic and its CEO take issue with the terms on which Apple has since 2008 provided the App Store to all developers, this does not provide cover for Epic to breach binding contracts, dupe a long-time business partner, pocket commissions that rightfully belong to Apple, and then ask this Court to take a judicial sledgehammer to one of the 21st Century's most innovative business platforms simply because it does not maximize Epic's revenues. By any measure, the App Store has revolutionized the marketplace and greatly benefitted consumers and app developers like Epic. Apple looks forward to defending against Epic's baseless claims.

---

[4]   *See* Welcome to Epic Games, https://www.epicgames.com/store/en-US/about (last visited Aug. 30, 2020) (12% revenue share on Epic Games store); Frequently Asked Questions, https://www.unrealengine.com/en-US/faq (standard 5% royalty on games build with Unreal Engine).

Epic fired the first shot in this dispute, and its willful, brazen, and unlawful conduct cannot be left unchecked. Neither Mr. Sweeney's self-righteous (and self-interested) demands nor the scale of Epic's business can justify Epic's deliberate contractual breaches, its tortious conduct, or its unfair business practices. This Court should hold Epic to its contractual promises, award Apple compensatory and punitive damages, and enjoin Epic from engaging in further unfair business practices.

### APPLE'S ANSWER TO PLAINTIFF'S COMPLAINT

Pursuant to Rules 7 and 8 of the Federal Rules of Civil Procedure, Defendant Apple Inc. ("Apple"), by and through its undersigned counsel, hereby answers and asserts defenses to the claims and allegations made by plaintiff Epic Games, Inc. ("Epic" or "Plaintiff") in the Complaint for Injunctive Relief ("Complaint").

### RESPONSES TO INDIVIDUAL PARAGRAPHS

Numbered paragraphs below correspond to the like-numbered paragraphs in the Complaint. Except as specifically admitted, Apple denies the allegations in the Complaint, including without limitation the Table of Contents, headings, subheadings, and illustrations contained within the Complaint. Plaintiff's Complaint contains 36 footnotes. Any allegations contained therein do not comply with Federal Rule of Civil Procedure 10(b), providing that allegations be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b); *see, e.g.*, *Bernath v. YouTube LLC*, 2017 WL 1050070, at *2 (M.D. Fla. Mar. 20, 2017) ("Plaintiff also alleges facts in various and lengthy footnotes that will not be considered as they are not properly stated in numbered paragraphs pursuant to Fed. R. Civ. P. 10(b)."); *Holmes v. Gates*, 2010 WL 956412, at *1 n.1 (M.D. Pa. Mar. 11, 2010) ("[T]he use of . . . footnotes run counter to the pleading requirements set forth by Federal Rule of Civil Procedure 10(b)."). No response is therefore required to the Complaint's footnotes. In any event, except as expressly admitted, Apple denies any and all allegations contained in footnotes 1 through 36.

### NATURE OF THE ACTION

1.     Apple admits that it released the Macintosh computer in 1984 and that the Macintosh was the first mass-market home computer. Apple admits that its advertisement for the

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

Macintosh was "breathtaking" and that its product was a "beneficial, revolutionary force" in the computing industry. Apple admits that its founder was Steve Jobs, and that Paragraph 1 selectively quotes statements attributed to Mr. Jobs. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 1.

2.      Apple denies the allegations in Paragraph 2.

3.      To the extent the allegations in Paragraph 3 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 3.

4.      Apple admits that users of its Mac or MacBook computers may obtain software from online storefronts and websites. Apple admits that people may use a variety of payment options online. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 regarding the "processing fees" of third parties, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 4, and specifically denies that Apple's commission is a "processing fee[]."

5.      Apple admits that apps provide news, entertainment, business, social networking, and other services. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 5, and specifically denies that its devices are "unfairly restricted" or "extortionately 'taxed.'"

6.      To the extent the allegations in Paragraph 6 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple admits that Paragraph 6 sets forth the relief that Plaintiff purports to seek, and that Plaintiff purports not to seek damages in this case. Apple denies that Plaintiff is entitled to any such relief. Apple denies any remaining allegations in Paragraph 6, and specifically denies that Epic is not "seeking favorable treatment for itself."

7.      To the extent the allegations in Paragraph 7 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple admits that, by launching the App Store in 2008, it opened up iOS and enabled third-party app developers to develop a diversity of apps for the iOS platform. Apple further admits that third-party

7

apps "contribute immense value" to the iOS ecosystem. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 7, and specifically denies that it "bans innovation in a central part of [its] ecosystem."

8.      Apple admits that it charges developers a 30% commission on paid applications, specific in-app purchases, and initial-year subscriptions sold through the App Store, and that the commission on subscriptions drops to 15% after one year. Apple further admits that Paragraph 8 selectively quotes alleged statements by Representative Hank Johnson, which speak for themselves. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 8, and specifically denies that "[t]here is no method app developers can use to avoid [Apple's alleged] tax"—Apple receives no revenue from 84% of apps distributed through the App Store, and billions of apps are downloaded every day without Apple receiving a penny.

9.      To the extent the allegations in Paragraph 9 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 9.

10.     To the extent the allegations in Paragraph 10 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 10.

11.     To the extent the allegations in Paragraph 11 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 11.

12.     To the extent the allegations in Paragraph 12 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 12.

13.     To the extent the allegations in Paragraph 13 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 13.

14.     Apple denies the allegations in Paragraph 14.

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

15.     Apple admits that Epic is a software developer and the developer of the game *Fortnite*. Apple admits that *Fortnite* has achieved widespread popularity and that only a portion of *Fortnite*'s hundreds of millions of users play the game through iOS. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 regarding *Fortnite*'s users and their perception of the game, and on that basis, denies them. Except as expressly admitted, Apple denies the allegations in Paragraph 15.

16.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 regarding Epic's hypothetical business plans and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 16.

17.     Apple admits that users of its Mac and MacBook computers may obtain software from the Mac App Store or sideloaded software, like Epic's *Fortnite*, from third-party stores and through direct download from a developer's website. Apple admits that websites may offer various different payment options. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 17.

18.     To the extent the allegations in Paragraph 18 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple admits that Epic demanded that Apple enter into a "side agreement" that would allow Epic to circumvent the App Store Review Guidelines that apply to every app in the App Store. Apple further admits that it rejected Epic's unreasonable demands. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 18.

19.     Apple admits that on August 13, 2020, Epic activated hidden software in its *Fortnite* app on iOS, thereby inviting Apple's iOS customers to use a direct payment option and circumvent Apple's In-App Purchase. Apple admits that, to motivate consumers to use this direct payment option and deny Apple any form of payment, Epic included a screen advising consumers that its offerings could be purchased at a lower price from Epic than through Apple's In-App Purchase. Apple avers that Epic's acts as just described were a deliberate breach of the contracts between Apple and Epic. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 19, and specifically denies that Epic passed along any cost savings to consumers.

9

20.     Apple admits that Apple informed Epic that it was in violation of its contractual obligations. Apple avers that it provided Epic an opportunity to cure this breach by bringing *Fortnite* back into compliance with the relevant agreements and guidelines, but that Epic refused. Apple admits that, given Epic's refusal to act lawfully, Apple removed the *Fortnite* app from its App Store. Apple admits that, because Epic's deceitful conduct breached Epic's contractual promises and put Apple's customers at risk, consumers will no longer receive updates to *Fortnite* on their iOS devices through the App Store. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 20.

21.     To the extent the allegations in Paragraph 21 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple admits that Paragraph 21 sets forth the relief that Plaintiff purports to seek, and that Plaintiff purports not to seek damages in this case. To the extent a response is required, Apple denies that Plaintiff is entitled to any such relief and denies any remaining allegations in Paragraph 21.

## PARTIES

22.     Apple admits that Epic is a Maryland corporation and purports to maintain its principal place of business in Cary, North Carolina. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 regarding the "mission" of Epic, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 22.

23.     Apple admits that Epic is a developer of gaming software and apps, and that it was founded by Mr. Sweeney. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 regarding the history of Epic, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 23.

24.     Apple admits that Epic is the developer of *Fortnite*. Apple admits that *Fortnite* has achieved great popularity and purports to have hundreds of millions of users. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 24.

25.     Apple admits that, prior to August 13, 2020, the App Store was one of many places users could download *Fortnite* for free and buy in-app purchases. Apple admits that Epic has

earned more than half a billion dollars in revenue through the App Store via the sale of in-app purchases in *Fortnite* and other content. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 regarding *Fortnite*'s gameplay and Epic's business model, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 25.

26.     Apple admits that *Fortnite* purports to have hundreds of millions of users, and had attracted more than 45 million players before it launched on iOS in 2018. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 26.

27.     Apple admits that Plaintiff operates the Epic Games Store, where it distributes Epic's and other developers' games to consumers for a fee. Apple admits the Epic Games Store is accessible by Mac personal computers, and that *Fortnite* is also available for Mac users to download outside of Apple's Mac App Store. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 regarding the contents, availability, and popularity of the Epic Games Store, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 27.

28.     Apple admits that Epic is the creator and distributor of the *Unreal Engine*. Apple further admits that an Epic subsidiary is the developer of the social-networking app *Houseparty*. Apple lacks knowledge or information sufficient to form a belief as to the truth of remaining allegations in Paragraph 28, and, on that basis, denies them.

29.     Apple admits the allegations in the first and third sentences of Paragraph 29. Apple admits that it is a publicly traded company. Apple further admits that it owns and operates the App Store and that app developers who wish to distribute their apps through the App Store can do so by entering into an Apple Developer Program License Agreement. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 29.

## **JURISDICTION AND VENUE**

30.     To the extent that the allegations in Paragraph 30 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any response is required, Apple admits that Plaintiff purports to plead jurisdiction pursuant to 15 U.S.C. § 26, and 28 U.S.C. §§ 1331,

11

1332, 1337, and 1367. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 30.

31.     Apple admits that it is headquartered in this District. To the extent the other allegations in Paragraph 31 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any response is required, except to the extent expressly admitted, Apple denies the allegations in Paragraph 31.

32.     Apple avers that its Apple Developer Program License Agreement ("License Agreement"), attached as Exhibit A to the Complaint, speaks for itself. Apple denies the remaining allegations in Paragraph 32.[5]

33.     Apple admits that, taking Plaintiff's venue-related allegations to be true, venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 33.

## INTRADISTRICT ASSIGNMENT

34.     To the extent that the allegations in Paragraph 34 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any response is required, Apple denies the allegations in Paragraph 34.

## RELEVANT FACTS

35.     To the extent the allegations in Paragraph 35 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 35.

36.     Apple admits the allegations in Paragraph 36.

37.     Apple admits that a mobile operating system ("OS") provides functionality to smartphone users, facilitates the basic operations of a smartphone, and may permit the installation and operation of apps. Except to the extent expressly admitted, Apple denies the allegations in

---

[5]   Epic refers to this agreement throughout its Complaint as the "Developer Agreement." As explained in Apple's Counterclaims, Epic is party to a Developer Agreement, which, *inter alia*, grants access to Apple's online Developer Portal and certain development software and resources, and a Developer Program License Agreement, which, *inter alia*, grants access to additional tools and software and governs distribution through the App Store for certain apps that use Apple's software. To avoid confusion, Apple refers to the former as the "Developer Agreement" and the latter as the "License Agreement" in its Answer and Counterclaims.

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

Paragraph 37, and specifically denies that mobile devices are "similar to" or "just like" laptop and desktop personal computers.

38.     Apple admits that smartphones and tablets are typically sold with a preinstalled OS. Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38 and, on that basis, denies them.

39.     Apple admits that it has spent decades developing unique operating systems that power customer experiences on Apple's devices. Apple admits that its iPhone runs on Apple's iOS operating system and its iPad runs on Apple's iPadOS operating system, and that these devices are sold to consumers with iOS or iPadOS preinstalled. Apple admits that it does not license iOS to other device manufacturers. Apple further admits that Google licenses a mobile OS called Android. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 39.

40.     Apple denies the allegations in Paragraph 40.

41.     Apple admits that its device customers use a number of apps on their devices, for functions that include shopping, social networking, food ordering, drafting and sending emails, newspaper subscriptions, video and music streaming, playing mobile games, and editing documents, to name a few. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 41.

42.     Apple admits that it launched the first iPhone in 2007. Apple admits that in March 2008 it released a software development kit to enable third-party software developers to design applications for use on the iPhone. Apple admits that it opened the App Store in July 2008 to distribute these "new and innovative applications" to iPhone users. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 42.

43.     Apple admits that the vast majority of apps available to iOS users are developed by third-party developers, not Apple. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 43, and specifically denies that developers need the iOS platform to distribute their products to consumers.

44.     Apple admits that app developers seek to update their apps from time to time for various reasons, including to add new functions, to ensure compatibility with an OS, and to fix technical issues. The App Store allows developers to provide unlimited, free, and automatic app

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

updates to consumers worldwide. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 44.

45.     Apple admits that apps are designed to function on the specific OS on which they will be downloaded and run. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 45.

46.     Apple admits that its active installed base of devices has surpassed 1.5 billion, more than 900 million of which are iPhones. Apple admits that the App Store connects developers with an "enormous" community of consumers in 175 countries. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 regarding Epic's experience with iOS and Android users, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 46.

47.     Apple denies the allegations in Paragraph 47.

48.     Apple admits that its iPhone and iPad devices come preinstalled with a small number of Apple apps and that users may choose to install additional third-party apps from the App Store, most of which are free. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 48.

49.     Apple admits that the App Store provides users a place to find and obtain apps seamlessly. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 49.

50.     Apple admits that the allegations in Paragraph 50 purport to summarize the contents of this Complaint, but otherwise denies the allegations in Paragraph 50.

51.     Apple denies the allegations in Paragraph 51, and specifically denies the existence of an "iOS App Distribution Market."

52.     Apple admits that app marketplaces, including the App Store, provide a convenient place for consumers to discover and obtain apps. Apple further admits that app marketplaces are just "one channel" for distributing products and services offered by developers. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 52.

53.     Apple denies the allegations in Paragraph 53. Apple specifically denies that "app developers cannot distribute their apps to iOS users on a non-iOS app store." Apple avers that

14

Epic can and does distribute *Fortnite* and other products to Apple's customers through numerous channels.

54.     Apple denies the allegations in Paragraph 54.

55.     Apple denies the allegations in Paragraph 55.

56.     Apple denies the allegations in Paragraph 56.

57.     Apple denies the allegations in Paragraph 57.

58.     To the extent the allegations in Paragraph 58 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 58. Apple specifically denies that it has a monopoly in any market, and that the App Store is the "sole means" through which consumers may access apps, including Epic's apps.

59.     Apple admits that the App Store comes preinstalled on iOS devices. Apple denies the remaining allegations in Paragraph 59.

60.     Apple denies the allegations in Paragraph 60.

61.     To the extent the allegations in Paragraph 61 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 61.

62.     Apple denies the allegations in Paragraph 62.

63.     Apple denies the allegations in Paragraph 63.

64.     To the extent the allegations in Paragraph 64 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 64.

65.     Apple denies the allegations in Paragraph 65.

66.     Apple denies the allegations in Paragraph 66.

67.     Apple admits that the App Store comes preinstalled on iOS devices. Apple denies the remaining allegations in Paragraph 67.

68.     Apple denies the allegations in Paragraph 68.

69.     Apple denies the allegations in Paragraph 69.

70. To the extent the allegations in Paragraph 70 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required Apple avers that the License Agreement speaks for itself, and denies the allegations in Paragraph 70.

71. Apple admits that Paragraph 71 selectively quotes from Apple's License Agreement, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 71, and specifically denies that its License Agreement "requires that developers distribute their apps only through the App Store."

72. Apple admits that Custom App Distribution, beta distribution through TestFlight, and Ad Hoc distribution are services Apple offers to app developers. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 72.

73. Apple admits that Custom App Distribution is a way for customers of its Apple Business Manager and Apple School Manager programs to distribute custom apps within their organizations or to select third parties. Apple admits that Paragraph 73 quotes selectively from Apple's License Agreement, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 73.

74. Apple admits that its TestFlight service allows developers to release non-final versions of iOS apps to select users in order to build and test code to ensure high quality customer experiences. Apple avers that Epic has taken advantage of TestFlight when developing multiple apps, including *Fortnite*. Apple admits that Paragraph 74 cites provisions of Apple's License Agreement, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 74.

75. Apple admits that its Ad Hoc distribution service allows members of its Developer Program to distribute iOS apps to a limited number of registered iOS devices. Apple avers that Epic has taken advantage of Ad Hoc distribution and that Apple has repeatedly granted Epic permission to exceed the number of Ad Hoc devices registered to Epic's account. Apple admits that Paragraph 75 cites provisions of Apple's License Agreement, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 75.

76. Apple denies the allegations in Paragraph 76.

77.     Apple denies the allegations in Paragraph 77.

78.     Apple admits that Paragraph 78 selectively quotes from Apple's License Agreement, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 78.

79.     Apple admits that Paragraph 79 selectively quotes from Apple's App Store Review Guidelines, which are attached as Exhibit B to the Complaint and speak for themselves. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 79.

80.     Apple denies the allegations in Paragraph 80.

81.     Apple admits that Epic has demanded to have an "Epic Games Store app available through the iOS App Store and through direct installation," even though this would violate Apple's longstanding App Store rules and jeopardize the security and privacy of its users. Apple further admits that it refused Epic's demand. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 81.

82.     Apple denies the allegations in Paragraph 82.

83.     To the extent the allegations in Paragraph 83 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required Apple denies the allegations in Paragraph 83, and specifically denies that its efforts to "enforce privacy and security safeguards" are "pretext." Apple takes responsibility for ensuring that apps meet industry-leading standards for privacy, security, and content.

84.     Apple admits that it has the unique capability to screen apps built using its technology for its devices. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 84.

85.     Apple admits that Paragraph 85 selectively quotes from an Apple web page about the App Store, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 85.

86.     To the extent the allegations in Paragraph 86 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 86.

1      87.     Apple denies the allegations in Paragraph 87.

2      88.     Apple denies the allegations in Paragraph 88.

3      89.     Apple denies the allegations in Paragraph 89.

4      90.     Apple admits that Mac users can download software from online storefronts.

5  Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in

6  Paragraph 90 regarding Steam and the Epic Games Store, and, on that basis, denies them. Except to

7  the extent expressly admitted, Apple denies the allegations in Paragraph 90.

8      91.     To the extent the allegations in Paragraph 91 are legal conclusions and

9  characterizations, no responsive pleading is required. Insofar as any responsive pleading is required,

10  Apple admits that Paragraph 91 cites and selectively quotes an August 6, 2020, article from *The*

11  *Verge*, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations

12  in Paragraph 91.

13      92.     Apple admits that Paragraph 92 cites and selectively quotes an August 7, 2020,

14  article from *The New York Times*, which speaks for itself. Except to the extent expressly admitted,

15  Apple denies the allegations in Paragraph 92.

16      93.     Apple denies the allegations in Paragraph 93.

17      94.     Apple denies the allegations in Paragraph 94.

18      95.     Apple denies the allegations in Paragraph 95, and specifically denies the

19  alleged absence of "competitive pressure for Apple to innovate and improve its own App Store."

20  Apple works constantly to make the App Store the best place to discover and obtain apps.

21      96.     Apple denies the allegations in Paragraph 96.

22      97.     Apple denies the allegations in Paragraph 97, and specifically denies that its

23  commission rate is "supra-competitive."

24      98.     Apple admits that Paragraph 98 selectively quotes from a document released

25  by the U.S. House of Representatives Committee on the Judiciary, which speaks for itself. Except to

26  the extent expressly admitted, Apple denies the allegations in Paragraph 98.

27      99.     Apple denies the allegations in Paragraph 99.

28      100.    Apple denies the allegations in Paragraph 100.

18

101.    Apple denies the allegations in Paragraph 101. The App Store encourages vigorous competition between apps and is an engine of innovation.

102.    Apple denies the allegations in Paragraph 102. Since the App Store opened in 2008, software prices have decreased sharply and output has increased exponentially.

103.    Apple admits that user downloads of paid apps and in-app purchases generate revenue (net of commissions) for developers. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 103.

104.    Apple admits that the iOS *Fortnite* app is currently an example of an app that, by breaching contractual obligations, has increased its revenue by circumventing Apple's platform and appropriating commissions for in-app digital transactions that rightfully belong to Apple. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 104.

105.    Apple admits that app developers and consumers benefit from being able to transact seamlessly and efficiently within apps. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 105.

106.    Apple admits that an application programming interface ("API") such as Apple's In-App Purchase API can be used to enable additional content, functionality or services to be delivered or made available for use within an app with or without an additional fee. Insofar as Paragraph 106 refers to a hypothetical in-app purchase on an unidentified platform, Apple lacks knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 106.

107.    Apple admits that third parties purport to offer services described as payment processing in some circumstances. Insofar as Paragraph 107 refers to Epic's alleged own "payment processing solutions," Apple lacks knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 107.

108.    To the extent the allegations in Paragraph 108 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required,

19

Apple denies the allegations in Paragraph 108, and specifically denies that it "coerces developers" into using In-App Purchase.

109.    Apple denies the allegations in Paragraph 109, and specifically denies the existence of an "iOS In-App Payment Processing Market."

110.    To the extent the allegations in Paragraph 110 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 110.

111.    Apple admits that the In-App Purchase API can be used, among other things, for the seamless purchase of digital content for use in an app. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 111.

112.    Apple denies the allegations in Paragraph 112.

113.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113 regarding the purchase of "skins" in *Fortnite* and other in-game products, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 113.

114.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 regarding use of online dating apps, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 114.

115.    Apple denies the allegations in Paragraph 115.

116.    Apple denies the allegations in Paragraph 116, and specifically denies the existence of an "iOS Games Payment Processing Market."

117.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117, and, on that basis, denies them.

118.    Apple denies the allegations in Paragraph 118.

119.    To the extent the allegations in Paragraph 119 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 119.

120.     To the extent the allegations in Paragraph 120 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 120.

121.     To the extent the allegations in Paragraph 121 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 121.

122.     Apple denies the allegations in Paragraph 122.

123.     Apple denies the allegations in Paragraph 123.

124.     Apple denies the allegations in Paragraph 124.

125.     Apple denies the allegations in Paragraph 125, and specifically denies that it "charges a 30% fee for In-App Purchase."

126.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 regarding third parties' payment processing fees, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 126.

127.     Apple denies the allegations in Paragraph 127.

128.     To the extent the allegations in Paragraph 128 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 128.

129.     To the extent the allegations in Paragraph 129 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 129.

130.     Apple admits that Paragraph 130 cites a provision of Apple's License Agreement, which speaks for itself. Apple admits that Paragraph 130 selectively quotes from Apple's App Review Guidelines, which also speak for themselves. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 130.

131.     Apple admits that Paragraph 131 selectively quotes from Apple's App Review Guidelines, which speak for themselves.

132.     To the extent the allegations in Paragraph 132 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 132.

133.     Apple admits that Paragraph 133 selectively quotes from a document released by the U.S. House of Representatives Committee on the Judiciary, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 133.

134.     Apple denies the allegations in Paragraph 134.

135.     Apple denies the allegations in Paragraph 135.

136.     Apple denies the allegations in Paragraph 136.

137.     Apple denies the allegations in Paragraph 137.

138.     Apple denies the allegations in Paragraph 138, and specifically denies that Apple has "no . . . entitlement" to a return on its investment in the App Store business.

139.     To the extent the allegations in Paragraph 139 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 139.

140.     Apple denies the allegations in Paragraph 140.

141.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 regarding supposed payment processing innovations, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 141.

142.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 142, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 142.

143.     Apple denies the allegations in Paragraph 143.

144.     Apple denies the allegations in Paragraph 144.

145.     Apple denies the allegations in Paragraph 145.

146.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 regarding Epic's supposed "payment processing services," and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 146.

147.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147 regarding the alleged complaints Epic receives from its customers, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 147, and specifically denies that Apple has "little incentive to compete through customer service." Apple provides peerless customer service through AppleCare, addressing more than 25 million customer support cases and handling almost $500 million in refunds per year.

148.     Apple denies the allegations in Paragraph 148.

149.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 149 regarding third parties' rates for purported payment processing services, and, on that basis, denies them. Apple avers that its App Store commission rate is similar or identical to commission rates charged by other app marketplaces and digital platforms, including Google Play, the Amazon Appstore, Steam, and Xbox. Apple denies the remaining allegations in Paragraph 149.

150.     Apple admits that Paragraph 150 cites and describes a July 28, 2020, article in *The New York Times*, which speaks for itself. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 150.

151.     Apple denies the allegations in Paragraph 151.

152.     Apple denies the allegations in Paragraph 152.

153.     Apple denies the allegations in Paragraph 153.

154.     Apple denies the allegations in Paragraph 154.

155.     Apple denies the allegations in Paragraph 155.

156.     Apple admits that there is vigorous "[c]ompetition in the sale of mobile devices." Except to the extent expressly admitted, Apple denies the allegations in Paragraph 156.

157.     Apple denies the allegations in Paragraph 157.

158.     Apple denies the allegations in Paragraph 158.

159.     Apple denies the allegations in Paragraph 159.

160.     Apple admits that its products are user-friendly and enable customers to operate seamlessly across different devices. Apple lacks knowledge or information sufficient to form

23

a belief as to the truth of the allegations in Paragraph 160 regarding the "key features" and "functions" of Android OS devices, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 160.

161.    Apple denies the allegations in Paragraph 161.

162.    Apple admits that its Family Sharing service lets customers share access to various Apple services, including App Store purchases and subscriptions, with up to five other family members. Apple admits that FaceTime, Find My, iMessage, and AirDrop are apps and features designed by Apple and available on Apple devices. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 162.

163.    Apple admits that its Continuity feature "make[s] it seamless to move between [Apple] devices," and that Handoff, Universal Clipboard, Instant Hotspot, and AirDrop are features of Continuity. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163 regarding consumers' "typical[]" ownership of Apple devices, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 163.

164.    Apple admits that it offers an "iPhone Upgrade Program" and advertises that members of this program may make recurring payments over the course of a year and "get a new iPhone every year." Apple admits that the third and fourth sentences of Paragraph 164 appear to selectively quote from a July 23, 2019, article on *BGR*[6] and an August 28, 2017, article on *ARN*[7] respectively, which speak for themselves. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 164.

165.    Apple admits that device users, app developers, hardware manufacturers, and cellular carriers participate in and derive significant value from the iOS ecosystem. Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

---

[6]  *Upgrading to iPhone 11 will be easier than ever with the new data migration feature in iOS 12.4*, BGR (July 23, 2019), https://bgr.com/2019/07/23/iphone-11-upgrade-transfer-data-from-old-iphone-via-wi-fi-or-cable/.

[7]  *iPhone to Android: The ultimate switching guide*, ARN (Aug. 28, 2017), https://www.arnnet.com.au/article/print/626556/iphone-android-ultimate-switching-guide/.

Paragraph 165, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 165.

166.    Apple denies the allegations in Paragraph 166.

167.    Apple denies the allegations in Paragraph 167, and specifically denies that it possesses "dominance" in any relevant market.

168.    Apple denies the allegations in Paragraph 168.

169.    Apple admits that it has earned billions of dollars of revenue from its distribution and sale of innovative products, including the iPhone. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 169, and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 169.

170.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170, and, on that basis, denies them.

171.    Apple admits that its iPhone business is profitable. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 171 regarding Apple's "share of smartphone operating profits among major smartphones [*sic*] companies," and, on that basis, denies them. Except to the extent expressly admitted, Apple denies the allegations in Paragraph 171.

172.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172 regarding the "global average selling price of smartphones," and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 172.

173.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173 regarding the percentage of iOS or iPhone users who upgraded or intended to upgrade to iOS devices, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph 173.

174.    Apple admits that the iPhone X cost $999 when it was released in 2017. Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third

1   sentence of Paragraph 174, and, on that basis, denies them. Except to the extent expressly admitted,

2   Apple denies the allegations in Paragraph 174.

3        175.    Apple denies the allegations in Paragraph 175.

4        176.    Apple admits that it has earned billions of dollars of revenue from its

5   distribution and sale of innovative products, including the iPad. Apple lacks knowledge or

6   information sufficient to form a belief as to the truth of the allegations in the second and third

7   sentences of Paragraph 176, and, on that basis, denies them. Except to the extent expressly admitted,

8   Apple denies the allegations in Paragraph 176.

9        177.    Apple lacks knowledge or information sufficient to form a belief as to the truth

10  of the allegations in Paragraph 177 regarding the "average global selling price of tablets," and, on

11  that basis, denies them. Apple denies the remaining allegations in Paragraph 177.

12       178.    Apple denies the allegations in Paragraph 178.

13       179.    Apple denies the allegations in Paragraph 179.

14       180.    Apple denies the allegations in Paragraph 180.

15       181.    To the extent the allegations in Paragraph 181 are legal conclusions and

16  characterizations, no responsive pleading is required. Insofar as any responsive pleading is required,

17  Apple admits that its iPhone 11, iPhone 11 Pro, and iPhone 11 Pro Max are presently listed for sale

18  on Apple's website starting at $699, $999, and $1099, respectively (not including trade-in). Except to

19  the extent expressly admitted, Apple denies the allegations in Paragraph 181, and specifically denies

20  that it imposes a "30% tax."

21       182.    Apple admits that the App Store is "the best place to discover new apps that let

22  [users] pursue [their] passions in ways [they] never thought possible." Except to the extent expressly

23  admitted, Apple denies the allegations in Paragraph 182.

24       183.    Apple lacks knowledge or information sufficient to form a belief as to the truth

25  of the allegations in Paragraph 183 regarding app downloads on Android OS devices and Google's

26  alleged conduct, and, on that basis, denies them. Apple denies the remaining allegations in Paragraph

27  183.

28

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

**COUNT 1: Sherman Act § 2**

**(Unlawful Monopoly Maintenance in the iOS App Distribution Market)**

184.   Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

185.   To the extent the allegations in Paragraph 185 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that 15 U.S.C. § 2 speaks for itself and denies the allegations in Paragraph 185.

186.   Apple denies the allegations in Paragraph 186.

187.   To the extent the allegations in Paragraph 187 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 187.

188.   To the extent the allegations in Paragraph 188 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 188.

189.   Apple denies the allegations in Paragraph 189.

190.   Apple denies the allegations in Paragraph 190.

191.   To the extent the allegations in Paragraph 191 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 191.

192.   Apple denies that Plaintiff is entitled to the relief described in Paragraph 192, and denies the remaining allegations in Paragraph 192.

**COUNT 2: Sherman Act § 2**

**(Denial of Essential Facility in the iOS App Distribution Market)**

193.   Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

194.   To the extent the allegations in Paragraph 194 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that 15 U.S.C. § 2 speaks for itself and denies the allegations in Paragraph 194.

195.    Apple denies the allegations in Paragraph 195.

196.    To the extent the allegations in Paragraph 196 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 196.

197.    To the extent the allegations in Paragraph 197 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 197, and specifically denies that "access to iOS" is an essential facility.

198.    Apple denies the allegations in Paragraph 198.

199.    Apple denies the allegations in Paragraph 199.

200.    Apple denies the allegations in Paragraph 200.

201.    To the extent the allegations in Paragraph 201 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 201.

202.    To the extent the allegations in Paragraph 202 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 202.

203.    Apple denies the allegations in Paragraph 203.

204.    Apple denies the allegations in Paragraph 204.

205.    To the extent the allegations in Paragraph 205 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 205.

206.    Apple denies that Plaintiff is entitled to the relief described in Paragraph 206, and denies the remaining allegations in Paragraph 206.

## COUNT 3: Sherman Act § 1

### (Unreasonable Restraints of Trade in the iOS App Distribution Market)

207.    Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

28

208.    To the extent the allegations in Paragraph 208 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that 15 U.S.C. § 1 speaks for itself and denies the allegations in Paragraph 208.

209.    Apple denies the allegations in Paragraph 209.

210.    To the extent the allegations in Paragraph 210 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 210.

211.    Apple denies the allegations in Paragraph 211.

212.    To the extent the allegations in Paragraph 212 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required Apple denies the allegations in Paragraph 212.

213.    Apple denies the allegations in Paragraph 213.

214.    To the extent the allegations in Paragraph 214 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 214.

215.    Apple denies that Plaintiff is entitled to the relief described in Paragraph 215, and denies the remaining allegations in Paragraph 215.

## COUNT 4: Sherman Act § 2

### (Unlawful Monopoly Maintenance in the iOS In-App Payment Processing Market)

216.    Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

217.    To the extent the allegations in Paragraph 217 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that 15 U.S.C. § 2 speaks for itself and denies the allegations in Paragraph 217.

218.    Apple denies the allegations in Paragraph 218.

219.    To the extent the allegations in Paragraph 219 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 219.

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

220.    To the extent the allegations in Paragraph 220 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 220.

221.    Apple denies the allegations in Paragraph 221.

222.    Apple denies the allegations in Paragraph 222.

223.    To the extent the allegations in Paragraph 223 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 223.

224.    Apple denies that Plaintiff is entitled to the relief described in Paragraph 224, and denies the remaining allegations in Paragraph 224.

**COUNT 5: Sherman Act § 1**

**(Unreasonable Restraints of Trade in the iOS In-App Payment Processing Market)**

225.    Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

226.    To the extent the allegations in Paragraph 226 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that 15 U.S.C. § 1 speaks for itself and denies the allegations in Paragraph 226.

227.    To the extent the allegations in Paragraph 227 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that its App Store Review Guidelines and PLA speak for themselves, and denies the remaining allegations in Paragraph 227.

228.    Apple denies the allegations in Paragraph 228.

229.    To the extent the allegations in Paragraph 229 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 229.

230.    Apple denies the allegations in Paragraph 230.

231.    To the extent the allegations in Paragraph 231 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 231.

232.    Apple denies that Plaintiff is entitled to the relief described in Paragraph 232, and denies the remaining allegations in Paragraph 232.

## COUNT 6: Sherman Act § 1

## (Tying the App Store in the iOS App Distribution Market to In-App Purchase in the iOS In-App Payment Processing Market)

233.    Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

234.    To the extent the allegations in Paragraph 234 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that 15 U.S.C. § 1 speaks for itself and denies the allegations in Paragraph 234.

235.    To the extent the allegations in Paragraph 235 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 235.

236.    Apple denies the allegations in Paragraph 236.

237.    To the extent the allegations in Paragraph 237 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 237.

238.    To the extent the allegations in Paragraph 238 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 238, and specifically denies that In-App Purchase and the App Store are "two separate products."

239.    Apple denies the allegations in Paragraph 239.

240.    Apple denies the allegations in Paragraph 240.

241.    Apple denies the allegations in Paragraph 241.

242.    Apple denies the allegations in Paragraph 242.

243.     To the extent the allegations in Paragraph 243 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 243.

244.     To the extent the allegations in Paragraph 244 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 244.

245.     Apple denies that Plaintiff is entitled to the relief described in Paragraph 245, and denies the remaining allegations in Paragraph 245.

<u>**COUNT 7: California Cartwright Act**</u>

<u>**(Unreasonable Restraints of Trade in the iOS App Distribution Market)**</u>

246.     Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

247.     To the extent the allegations in Paragraph 247 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that Cal. Bus. & Prof. Code § 16700 *et seq.* speaks for itself, and denies the allegations in Paragraph 247.

248.     To the extent the allegations in Paragraph 248 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that the Cartwright Act speaks for itself, and denies the allegations in Paragraph 248.

249.     Apple denies the allegations in Paragraph 249.

250.     To the extent the allegations in Paragraph 250 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required Apple denies the allegations in Paragraph 250.

251.     To the extent the allegations in Paragraph 251 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that its License Agreement speaks for itself, and denies the allegations in Paragraph 251.

252.     Apple denies the allegations in Paragraph 252.

253.     Apple denies the allegations in Paragraph 253.

254. Apple denies the allegations in Paragraph 254.

255. To the extent the allegations in Paragraph 255 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 255.

256. Apple admits that Paragraph 256 sets forth the relief that Plaintiff purports to seek. Apple denies that Plaintiff is entitled to any such relief and denies the remaining allegations in Paragraph 256.

### COUNT 8: California Cartwright Act

### (Unreasonable Restraints of Trade in the iOS In-App Payment Processing Market)

257. Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

258. To the extent the allegations in Paragraph 258 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that Cal. Bus. & Prof. Code § 16700 *et seq.* speaks for itself, and denies the allegations in Paragraph 258.

259. To the extent the allegations in Paragraph 259 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that the Cartwright Act speaks for itself, and denies the allegations in Paragraph 259.

260. Apple denies the allegations in Paragraph 260.

261. To the extent the allegations in Paragraph 261 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 261.

262. Apple denies the allegations in Paragraph 262.

263. Apple avers that its App Store Review Guidelines speak for themselves, and denies the allegations in Paragraph 263.

264. Apple denies the allegations in Paragraph 264.

265. Apple denies the allegations in Paragraph 265.

266. Apple denies the allegations in Paragraph 266.

267.     To the extent the allegations in Paragraph 267 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 267.

268.     Apple admits that Paragraph 268 sets forth the relief that Plaintiff purports to seek. Apple denies that Plaintiff is entitled to any such relief and denies the remaining allegations in Paragraph 268.

## COUNT 9: California Cartwright Act

## (Tying the App Store in the iOS App Distribution Market to In-App Purchase in the iOS In-App Payment Processing Market)

269.     Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

270.     To the extent the allegations in Paragraph 270 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that Cal. Bus. & Prof. Code § 16700 *et seq.* speaks for itself, and denies the allegations in Paragraph 270.

271.     To the extent the allegations in Paragraph 271 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that the Cartwright Act speaks for itself, and denies the allegations in Paragraph 271.

272.     To the extent the allegations in Paragraph 272 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that Cal. Bus. & Prof. Code § 16727 speaks for itself, and denies the allegations in Paragraph 272.

273.     To the extent the allegations in Paragraph 273 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 273.

274.     To the extent the allegations in Paragraph 274 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 274.

275.     Apple denies the allegations in Paragraph 275.

276.     To the extent the allegations in Paragraph 276 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 276.

277.     Apple denies the allegations in Paragraph 277.

278.     Apple denies the allegations in Paragraph 278.

279.     To the extent the allegations in Paragraph 279 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 279.

280.     Apple denies the allegations in Paragraph 280.

281.     Apple denies the allegations in Paragraph 281.

282.     Apple denies the allegations in Paragraph 282.

283.     To the extent the allegations in Paragraph 283 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 283.

284.     Apple admits that Paragraph 284 sets forth the relief that Plaintiff purports to seek. Apple denies that Plaintiff is entitled to any such relief and denies the remaining allegations in Paragraph 284.

### COUNT 10: California Unfair Competition Law

285.     Apple reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

286.     To the extent the allegations in Paragraph 286 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple avers that Cal. Bus. & Prof. Code § 17200, *et seq.* speaks for itself, and denies the allegations in Paragraph 286.

287.     To the extent the allegations in Paragraph 287 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 287.

288.     To the extent the allegations in Paragraph 288 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 288.

289.     To the extent the allegations in Paragraph 289 are legal conclusions and characterizations, no responsive pleading is required. Insofar as any responsive pleading is required, Apple denies the allegations in Paragraph 289.

290.     Apple denies the allegations in Paragraph 290.

291.     Apple admits that Paragraph 291 sets forth the relief that Plaintiff purports to seek. Apple denies that Plaintiff is entitled to any such relief and denies the remaining allegations in Paragraph 291.

The remainder of the Complaint consists of Plaintiff's prayer for relief to which no response is required. To the extent a response is required, Apple denies that Plaintiff is entitled to the relief sought in the Complaint or to any relief whatsoever.

## APPLE'S DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), Apple, without waiver, limitation, or prejudice, and without conceding that it bears the burden of proof or production, hereby asserts the following defenses:

### First Defense

### (Failure to State a Cause of Action)

The Complaint and the purported causes of action contained therein fail, in whole or in part, to state a claim for which relief can be granted.

### Second Defense

### (Legitimate Business Justifications)

Apple alleges that, without admitting any liability whatsoever, at all times its conduct was reasonable and that its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition.

### Third Defense

### (No Injury or Threatened Injury)

Plaintiff's claims are barred, in whole or in part, because Plaintiff has neither sustained nor is threatened by any injury in fact or antitrust injury proximately caused by an act or omission by Apple.

**Fourth Defense**

**(No Entitlement to Injunctive Relief)**

Plaintiff is not entitled to injunctive relief because any alleged injury to Plaintiff is not immediate or irreparable, is entirely self-inflicted, and Plaintiff has an adequate remedy at law.

**Fifth Defense**

**(Causation)**

Plaintiff's claims are barred, in whole or in part, because of a lack of causation, including without limitation because any injuries that may have been suffered were caused solely or proximately by the intervening and superseding acts and omissions of others over whom Apple has no power, authority, or control, including Plaintiff itself.

**Sixth Defense**

**(Foreign Trade Antitrust Improvements Act)**

Plaintiff's claims are barred, in whole or in part, by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, insofar as Plaintiff makes claims concerning transactions or alleged conduct involving trade or commerce with foreign nations outside U.S. jurisdiction.

**Seventh Defense**

**(Doctrine of International Comity)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of international comity, insofar as Plaintiff seeks injunctive relief affecting transactions and conduct occurring outside U.S. jurisdiction.

**Eighth Defense**

**(Ratification/Agreement/Acquiescence/Consent)**

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's ratification, agreement, acquiescence, authorization, or consent to Apple's alleged conduct, including by renewing the term of the License Agreement on June 30, 2020—the same day that its CEO Tim Sweeney contacted

Apple to request a "side letter" exempting Plaintiff from certain obligations under the License Agreement. Apple denied the request, and Plaintiff continued to enjoy the benefits of the License Agreement, thereby ratifying, agreeing to, acquiescing, authorizing, and/or consenting to Apple's alleged conduct.

### Ninth Defense

### (Statute of Limitations)

Plaintiff's claims are barred in whole or in part by the statute of limitations applicable to its respective claims.

### Tenth Defense

### (Lack of Standing)

Plaintiff's claims are barred, in whole or in part, insofar as Plaintiff lacks standing to assert any or all of the claims alleged in the Complaint, including any and all claims belonging to parties not named as plaintiffs in the Complaint.

### Eleventh Defense

### (Failure to Join an Indispensable Party)

Plaintiff has failed to join all parties necessary for a just adjudication of their purported claims.

### Twelfth Defense

### (Due Process)

Plaintiff's California state law claims are barred, in whole or in part, by the Due Process Clause of the United States Constitution, insofar as Plaintiff makes claims based on alleged conduct occurring outside the state of California.

### Thirteenth Defense

### (Indemnity)

Plaintiff is a party to one or more agreements in which it has agreed to indemnify Apple for any and all claims, losses, liabilities, damages, taxes, expenses, and costs arising from or related to Plaintiff's claims in the Complaint.

### Fourteenth Defense

38

**(Protected Rights – Noerr-Pennington)**

Plaintiff's claims are barred, in whole or in part, insofar as they challenge the exercise of rights protected by the First Amendment of the United States Constitution, by Article I, Section 3 of the California Constitution, and by the *Noerr-Pennington* doctrine.

### Fifteenth Defense

**(Protected Rights – Intellectual Property & Other Statutes)**

Plaintiff's claims are barred, in whole or in part, insofar as it makes claims or seek remedies that conflict with Apple's rights under intellectual property law or other statutes.

### Sixteenth Defense

**(Protected Rights – Contract)**

Plaintiff's claims are barred, in whole or in part, insofar as Plaintiff makes claims or seek remedies that conflict with, are barred by, or are waived by the terms of Plaintiff's agreements with Apple.

### Seventeenth Defense

**(Laches)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### Eighteenth Defense

**(Waiver)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver, including because Plaintiff renewed the term of the License Agreement on June 30, 2020—the same day that its CEO Tim Sweeney contacted Apple to request a "side letter" exempting Plaintiff from certain obligations under the License Agreement. Apple denied the request, and Plaintiff continued to enjoy the benefits of the License Agreement. Thus, the doctrine of waiver bars Plaintiff's claims, in whole or in part.

### Nineteenth Defense

**(Estoppel)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel, including because Plaintiff renewed the term of the License Agreement on June 30, 2020—the same day that its CEO Tim Sweeney contacted Apple to request a "side letter" exempting Plaintiff from certain

obligations under the License Agreement. Apple denied the request, and Plaintiff continued to enjoy the benefits of the License Agreement. Thus, the doctrine of estoppel bars Plaintiff's claims, in whole or in part.

### Twentieth Defense

### (Unclean Hands)

Plaintiff's claims for injunctive relief are barred, in whole or in part, by the doctrine of unclean hands.

### Twenty-First Defense

### (Illegality)

Plaintiff's claims for injunctive relief are barred, in whole or in part, by the doctrine of illegality.

### Twenty-Second Defense

### (Non-Justiciability)

Plaintiff's claims are barred, in whole or in part, because they are non-justiciable.

### Twenty-Third Defense

### (Not Unlawful, Unfair, or Fraudulent)

Plaintiff's claims under California's Unfair Competition Law are barred in whole or in part because the alleged business practices are not unlawful, unfair, fraudulent, or likely to mislead consumers, within the meaning of Cal. Bus. & Prof. Code § 17200, or otherwise.

### Twenty-Fourth Defense

### (Waiver of Damages)

Plaintiff has waived any right to seek damages for its alleged injury by failing to assert a claim for such relief in the Complaint.

### Twenty-Fifth Defense

### (Election of Remedies)

Any attempt by Plaintiff to seek damages for the injury alleged in the Complaint is barred, in whole or in part, by the election of remedies doctrine.

### Twenty-Sixth Defense

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(Effective Opt-Out)**

By filing this action, Epic has forfeited any recovery or remedies it may be entitled to as a member of the putative class in *Cameron et al. v. Apple Inc.*, Civil Case No. 19-3074 (N.D. Cal.), including monetary damages.

**Twenty-Seventh Defense**

**(No Entitlement to Interest, Attorney's Fees or Costs)**

Plaintiff is not entitled to interest, attorney's fees, or costs in connection with this action.

**Additional Defenses**

Apple presently has insufficient knowledge or information to determine whether it may have additional, as yet unstated defenses. Apple has not knowingly and intentionally waived any applicable defenses and reserves the right to assert additional defenses as they become known to it through discovery in this matter. Apple reserves the right to amend this Answer to add, delete, or modify defenses based upon legal theories that may be or will be divulged through clarification of Plaintiff's Complaint, through discovery, or through further legal analysis of Plaintiff's position in this litigation.

**APPLE'S COUNTERCLAIMS IN REPLY**

Defendant and Counter-plaintiff Apple Inc. ("Apple"), on personal knowledge as to its own acts, and on information and belief as to all others based on its own and its attorneys' investigation, alleges the following Counterclaims against Plaintiff and Counter-defendant Epic, Inc. ("Epic").

**I.      JURISDICTIONAL STATEMENT**

**A.      Jurisdiction**

1.      The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship between Epic and Apple. The amount in controversy exceeds $75,000. This court also has jurisdiction over Apple's counterclaims pursuant to 28 U.S.C. § 1367, because each of Apple's counterclaims arises out of the same factual nucleus as Epic's claims brought under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.

2.      Epic has also subjected itself to personal jurisdiction by filing its Complaint against Apple in this District and consented to personal jurisdiction. Section 14.10 of the Apple Developer Program License Agreement ("License Agreement") between the parties further provides that "[a]ny litigation or other dispute resolution between [Epic] and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California, and [Epic] and Apple hereby consent to the personal jurisdiction of and exclusive venue in the state and federal courts within that District with respect to any such litigation or dispute resolution." In any event, Epic is subject to personal jurisdiction because it has engaged in sufficient minimum contacts with this District and has purposefully availed itself of the benefits and protections of both United States and California law such that the exercise of jurisdiction over Epic would comport with due process requirements.

**B.      Venue**

3.      Venue is proper in this District because Epic brought this action and thereby consented to venue. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Epic's claims occurred in this District. Epic has also consented to venue in this District. Section 14.10 of the License Agreement between the parties provides that "[a]ny litigation or other dispute resolution between [Epic] and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California, and [Epic] and Apple hereby consent to the personal jurisdiction of and exclusive venue in the state and federal courts within that District with respect to any such litigation or dispute resolution."

## II.      <u>THE PARTIES</u>

4.      Apple is a corporation organized under the laws of the State of California, and its principal place of business is in Cupertino, California.

5.      Epic is a Maryland corporation with its principal place of business in Cary, North Carolina.

## III.    BACKGROUND

### A.    The App Store

6.    In 2007, Apple released the iPhone. Although not contemplated at first, Apple quickly realized that consumers would enjoy this breakthrough device even more if it unlocked the power of third-party app developers. So, in 2008, Apple launched the first-of-its kind App Store, and invited third-party app developers to develop and distribute a wide array of apps for the iOS ecosystem.

7.    The App Store was designed to provide a safe and trusted platform for Apple's mobile consumers to discover and download apps. The App Store allows users to find and download apps that work seamlessly and securely on their iPhone and iPad devices. Before the App Store, typical distribution options for developers were physical retail stores with high distribution costs and limited reach.

8.    The App Store—and the idea behind it—has succeeded beyond anyone's wildest expectations. In a little over a decade, the iOS app economy has become one of the fastest-growing sectors of the economy. The App Store ecosystem now supports more than 2.1 million US jobs across all 50 states — an increase of 15 percent since last year — as part of the 2.7 million jobs Apple supports across the country.

9.    One reason for this success is Apple's investment in tools, services, and support to developers. Apple recognized very early on that third-party apps "add value to the iPhone"[8]; and still today, the success of the App Store platform depends on filling the store with fun, useful, high-quality, and innovative apps. To this end, there will be more than 250,000 Application Programming Interfaces (APIs) available to all developers in iOS 14; Apple provides developers with Test Flight, so they can test and refine their apps in a controlled environment; and creates programs like ARKit and Metal, which help developers to harness the power and innovation of Apple's hardware. And Apple's engineers and developer relations team work tirelessly and on a daily basis with developers to ensure that their apps are optimized to run seamlessly on Apple's devices, comply

---

[8]  *The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch*, Wall St. J. (July 25, 2018), https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-aninterview-with-steve-jobs-at-the-app-stores-launch-1532527201.

1  with Apple's security and privacy guidelines, and offer Apple's customers the experience they expect

2  from the iOS platform.

3       10.    The App Store is also a business. Through the App Store, Apple serves as the

4  platform that connects developers with the millions of iOS customers who rely on Apple to provide a

5  safe environment to download apps onto their Apple devices without compromising privacy, security,

6  or functionality. Apple manages all aspects of the transaction on behalf of the developer—from

7  offering an extensive library of tools for app development, to the promotion and marketing of apps

8  within the App Store, to providing customer support for app purchases, to collecting sales proceeds

9  from consumers for distribution to the developers. In order to publish their apps on the App Store,

10  developers pay a modest $99 annual fee. Apple also charges a commission on the sale of apps and in-

11  app sales of digital goods and services.[9]  For developers who offer only free apps, Apple receives

12  nothing but the nominal annual fee. Indeed, of the almost $140 billion in sales facilitated by the App

13  Store in 2019, more than $116 billion went entirely into app developers' back pockets.[10]

14       11.    Apple's in-app purchase mechanism ("IAP") provides a digital checkout for

15  app downloads and in-app sales and is the means by which Apple collects its commission on eligible

16  transactions. When a customer pays to download an app or makes an in-app purchase via IAP, the

17  sales proceeds are transmitted directly to Apple. Apple deducts its commission and applicable taxes,

18  then remits the remainder to the developer. In this way, Apple takes direct possession of all sales

19  proceeds from consumers and avoids the costs of collection from thousands of developers and the

20  risk (as in this case) of a developer failing to meet its contractual obligations to pay the agreed

21  commissions. On the other hand, if a developer circumvents this digital checkout process and

22  redirects sale proceeds from Apple to itself in violation of the applicable contracts and app

23  development guidelines, Apple gets paid nothing (or, as here, must initiate litigation to obtain its

24  rightful compensation), despite all of its investments in the App Store and the entire ecosystem in

25  which it operates.

26

27  [9]  Apple, App Store: Principles and Practices, available at https://www.apple.com/ios/app-store/principles-
practices/ (last accessed Aug. 20, 2020).

28  [10]  Borck et al, *supra* n._, at 3.

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

12.     IAP is more than just necessary to implement Apple's business model. IAP provides immense benefit to consumers and developers by reducing contracting friction and enabling a host of Apple services. Because of IAP, consumers need not provide their payment information to each individual app developer, and developers are saved the hassle of setting up payment infrastructure to handle transactions in 175 different countries across 45 different local currencies. IAP also supports consumers' ability to restore in-app purchases for a variety of reasons, including setting up a new device and re-installing apps that were deleted, and helps them maintain a comprehensive and easily accessible purchase history of every app and in-app purchase they have acquired. And at the end of the year Apple will introduce the ability for customers to share IAP through Family Sharing. In short, IAP is one of several features that helps make the App Store a convenient, centralized, and trusted marketplace for apps and digital content.

**B.     Apple's Contracts with Epic**

13.     Epic has been developing iOS games for many years. It has used Apple's proprietary tools, software, and services to bring its portfolio of games to iOS and it has taken advantage of the App Store to market and distribute those games to hundreds of millions of iOS customers.

14.     Like all other Apple developers who publish apps to the App Store, Epic entered into a number of contracts with Apple. At least two contracts are relevant here. First, Epic is party to a Developer Agreement, which, *inter alia*, grants access to Apple's online Developer Portal and certain development software and resources, and is required to enter any other development relationship with Apple. Second, Epic is party to a Developer Program License Agreement ("License Agreement"), which, *inter alia*, grants access to additional tools and software and governs distribution through the App Store for certain apps that use Apple's software.

1.     Apple's Services under the Agreements

15.     Upon its execution of the License Agreement, Epic received a license to access and use the broad array of tools and services developed, maintained, and continuously refined by Apple—including Apple's Software Development Kits, the iOS platform, the iPadOS platform, and other Apple intellectual property—to facilitate development of iOS-compatible apps.

45

16.     Epic also received access to the extensive library of tools, software, and technology developed by Apple to make it as easy as possible for developers to bring their ideas to life on the iOS platform. For example, Apple now makes available over 150,000 APIs, which provide developers with immediate access to technical tools that simplify and accelerate the development process. Apple also employs a dedicated team of engineers to consult on app development and help developers to troubleshoot bugs.

17.     Upon app completion and approval, Apple also published Epic's apps, including *Fortnite*, to the App Store, connecting Epic to the millions of iOS consumers seeking to download additional functionality onto their Apple devices. Under the terms of the License Agreement, Apple served as Epic's "agent for the marketing and delivery of the Licensed Applications to end-users" in the App Store. License Agreement Schedule 2 ("Schedule 2"), ¶ 1.1 (Ex. A). Apple's responsibilities as Epic's agent included to:

> a.  market, solicit and obtain orders on Your behalf for Licensed Applications from end-users . . .
>
> b.  provide hosting services to You subject to the terms of the Agreement, in order to allow for the storage of, and end-user access to, the Licensed Applications . . .
>
> c.  make copies of, format, and otherwise prepare Licensed Applications for acquisition and download by end-users, including adding the Security Solution;
>
> d.  allow end-users to access and re-access copies of the Licensed Applications . . . [and]
>
> e.  issue invoices for the purchase price payable by end-users for the Licensed Applications.

*Id.*, ¶ 1.2.

18.     In other words, Apple managed all aspects of Epic's transactions with consumers—hosting *Fortnite* on the App Store and making it available for download by consumers, promoting and marketing Epic's apps in the App Store, collecting payment from consumers for in-app purchases and issuing invoices for those purchases, and distributing the proceeds of the sale to Epic. Post-sale, Apple also compiled and made available to Epic valuable "data concerning your

46

Licensed Applications' financial performance and user engagement" via its App Analytics, Sales and Trends, and Payments and Financial Reports tools. *Id.*, Ex. D, ¶ 2.

19.     Since it joined the developer program, Epic has taken full advantage of both Apple's transaction platform and the software and technology resources made available to Epic under the terms of the License Agreement. As just one example, for years, Epic has used Apple's groundbreaking graphics technology, Metal, which Epic has explained "revolutionized graphic design" and "enable[d] developers like us to create richer 3D worlds." And *Fortnite*, which launched on the App Store in iOS in April 2018, has become a billion-dollar franchise and global phenomenon.

### 2.  Epic's Obligations under the Agreements

20.     In exchange for the tremendous value brought by Apple to all of its developers, Epic agreed in the License Agreement that: (a) it would "not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store," License Agreement ¶ 3.3.3 (Dkt. 1, Ex. A), and (b) it would pay a "commission equal to thirty percent (30%) of all prices payable by each end-user" through the App Store, Schedule 2, ¶ 3.4(a).

21.     These provisions work together to serve a dual purpose. First, they ensure that Apple is paid for its services. Apple does not earn any money through the App Store on its substantial investment in the tools, software and technology that it has developed to facilitate app development on the App Store until a consumer makes a purchase. More than 80% of the apps in the App Store pay no commission to Apple. If an app is available for free, then Apple makes nothing. Likewise, if an app—like *Fortnite*—is free to download but allows for in-app purchases, Apple is paid nothing through the App Store for the services it provides until a consumer makes an in-game purchase through IAP. By prohibiting Epic from effectuating a transaction by means other than IAP, and providing that Apple would be entitled to a commission of 30% on all paid transactions made through IAP, the License Agreement guarantees Apple both the right and the means to collect the agreed commission.

22.     Second, the prohibition against unlocking features outside of the iOS ecosystem is one of many provisions of the License Agreement designed to protect Apple's customers. In order to submit apps to the App Store and use the tools Apple provides, all

47

developers—from individuals innovating in their garages to multi-billion dollar game companies like Epic—must agree with Apple to a set of contractual rules and guidelines (including the License Agreement and the contractually accepted Guidelines). A dedicated App Store team at Apple reviews every app for conformance with these contractual standards to ensure that the apps on the App Store are safe, secure and reliable, that they work as intended, that they adhere to Apple's rules on user privacy, that they protect consumers from malware and threats, that they use appropriate business models, and that they do not offer content such as pornography or real-money gambling.[11]

23.     Among other measures intended to preserve the system integrity of the iOS environment and user experience in that environment, the License Agreement specifically prohibits developers from (a) using Apple's software to "directly or indirectly, commit any act intended to interfere with . . . Apple's business practices including, but not limited to, taking actions that may hinder the performance or intended use of the App Store," License Agreement, ¶ 3.2(f); (b) downloading code that "change[s] the primary purpose of the Application by providing features or functionality that are inconsistent with the intended and advertised purpose of the Application as submitted to the App Store," *id.* ¶ 3.3.2, or (c) "creat[ing] a store or storefront of other code or applications" that could introduce security threats, *id.* ¶ 3.3.2.

24.     The License Agreement also requires that developers, including Epic, submit all apps and app updates to Apple's human-assisted app review process to ensure compliance with the Guidelines and fitness for distribution in the App Store. The License Agreement specifically states that, "[i]f You make any changes to an Application (including to any functionality made available through use of the In-App Purchase API) after submission to Apple, you must resubmit the Application to Apple. Similarly, all bug fixes, updates, upgrades, modifications, enhancements, supplements to, revisions, new releases and new versions of Your Application must be submitted to Apple for review in order for them to be considered for distribution via the App Store . . . ." *Id.* ¶ 6.1. Epic also specifically agreed in the License Agreement that it would "not attempt to hide, misrepresent or obscure any features, content, services or functionality in [its] submitted Applications

---

[11]  Apple, *App Store: Principles and Practices*, https://www.apple.com/ios/app-store/principles-practices/.

48

from Apple's review or otherwise hinder Apple from being able to fully review such Applications." *Id.*

25.     Likewise, the Guidelines prohibit apps that "include any hidden or undocumented features" (Guidelines, ¶¶ 2.3.1, 2.3.12) (Dkt. 1, Ex. B) and/or "download, install, or execute code which introduces or changes features or functionality of the app" (*id.* ¶¶ 2.5.2, 3.1.1, 3.2.2), and requires that developers do not "attempt to cheat the system" or "trick the review process" (*id.* Introduction).

26.     The App Store is the world's most trusted marketplace for apps precisely because of the standards and safeguards that apply equally to all developers, and the only way Apple can ensure that it remains that way is through enforcement of the obligations set forth in the License Agreement and the Guidelines. In the event that any developer violates the Guidelines and/or License Agreement by engaging in "any misleading, fraudulent, improper, unlawful or dishonest act," Apple reserves the express right under the License Agreement to immediately terminate "all rights and licenses granted by Apple hereunder and any services provided hereunder."  License Agreement, ¶ 11.2. The Developer Agreement similarly provides that "Apple may terminate or suspend you as a registered Apple Developer at any time in Apple's sole discretion," and "[u]pon any termination . . . all rights and licenses granted to you by Apple will cease."  Developer Agreement, ¶ 10 (Ex. B).

**C.     Epic's Demand for an Exemption to Its Contractual Obligations**

27.     Epic admits that, in order to gain access to Apple's customers, it agreed to and was bound by the contractual provisions in the License Agreement and the Guidelines. Dkt. 1, ¶ 210 (describing the Guidelines and the License Agreement as "contractual"); ¶ 32 ("Apple is party to an Apple Developer Program License Agreement . . . with Epic.").

28.     On June 30, 2020, Epic renewed the License Agreement with Apple for another one-year term—reaffirming Epic's obligations under that agreement and accepting the services and licenses provided by Apple under that agreement. That same day, just hours later, Epic's CEO emailed Apple, insisting that Apple: (a) allow Epic to introduce an external payment mechanism to its apps outside of IAP that would allow Epic to circumvent Apple commissions on in-app purchases and otherwise violate multiple provisions of the parties' agreements; and (b) publish in

the App Store an Epic Games Store app that would enable Epic to introduce apps without going through Apple's app review process. Epic's CEO expressly admitted that "Apple's contracts and standards documents . . . prohibit[ed] Epic" from the exact conduct it proposed to undertake. In spite of his public tweet only weeks earlier that Epic "w[ould] not accept special revenue sharing or payment terms just for ourselves," Epic's CEO did just that: he requested from Apple a "side letter"—a special arrangement for Epic and no other developer—that would excuse Epic from the contractual obligations and standards applicable to all developers who offer products in the App Store.

29.     Apple rightfully and unsurprisingly rejected this unreasonable demand in a letter sent July 10, 2020. Regarding Epic's request to introduce an external payment mechanism, Apple reminded Epic of the terms of the parties' contract: "IAP supports the seamless consumer experience and is the means by which Apple gets paid for the valuable services and consumer base that it provides. . . . To take advantage of Apple's App Store, the bargain is simple: if you charge for software purchased through the App Store, Apple takes a percentage of the charge as commission . . . Without IAP, however, Apple would have no practical or reliable way of collecting its commission on in-app digital sales." Jul. 10, 2010 Ltr. from Douglas Vetter (Ex. C). Apple's letter explained that these commissions are the primary way in which Apple is paid for the "billions of dollars [it has invested] to develop technologies and features that developers like Epic can use to make great apps as well as a safe and secure place for users to download these apps." *Id.* The letter also reaffirmed what should have been obvious:  "The App Store is not a public utility," and Epic has no right to reap "all the benefits Apple and the App Store provide without having to pay a penny." *Id.*

30.     Apple's response also pointed out the hypocrisy of Epic's request, observing: "Surely Epic must understand that Apple is entitled to a return on its investment and the use of its property.  After all, Epic takes great pains to protect its own investments and intellectual property." Epic "rightly demands royalties from games built using its development software," and "it tightly controls how its games, designs, and content may be used." *Id.* Apple's response letter also quoted Epic's own Fan Content Policy, stating: "we spend a lot of time, thought, and money creating our

intellectual property and need to protect it."[12] *Id.* This intellectual property constitutes nearly the entire value of Epic's own business. Yet Epic's request sought to take full advantage of Apple's extensive library of intellectual property for the App Store without paying Apple anything.

31.    Epic's request to publish its own Epic Games Store within the App Store was similarly untenable—both because Epic apparently wanted to operate "a rent-free store within the trusted App Store that Apple has built" and because doing so "would undermine Apple's carefully constructed privacy and security safeguards, and seriously degrade the consumer experience and put Apple's reputation and business at risk." *Id.* Despite Epic's assurances that it would provide a secure environment, Apple could not be "confident that Epic or any developer would uphold the same rigorous standards of privacy, security, and content as Apple." *Id.* Even more importantly, "since Apple treats all developers according to the same terms," granting Epic's request would mean that Apple would be "outsourc[ing] the safety and security of Apple's users to hundreds of thousands of iOS developers" with differing standards and capabilities. *Id.* And "when it comes to striking the balance" between developer desires and creating a "safe, secure and reliable experience for users," Apple's letter made clear that it always "errs on the side of the consumer." *Id.*

32.    Apple's concerns about Epic's request were hardly theoretical. The experience of *Fortnite* outside of the iOS environment illustrates the importance of Apple's approach to app review and security. In 2018, *Fortnite* announced that Android versions of the game would be available on the web, and immediately sites appeared that not only advertised Android *Fortnite* but also distributed malware in the game.[13]  As one commentator noted, "Unsurprisingly, malware versions of Fortnite targeted unsuspecting gamers in the months following the Android launch, which is what malicious individuals would do with any popular app that's available from outside the app store."[14] By 2019, Epic acknowledged security vulnerabilities in non-iOS versions of *Fortnite* that

---

[12]   Fan Content Policy, https://www.epicgames.com/site/en-US/fan-art-policy.

[13]   Brian Barrett, *Imposter Fortnite Android Apps Are Already Spreading Malware*, Wired (Aug. 16, 2018), https://www.wired.com/story/imposter-fortnite-android-apps-already-spreading-malware/.

[14]   Chris Smith, *Epic Invented a Crisis So Fortnite Fans Would Support Its Lawsuits Against Apple and Google* (Aug. 14, 2020), https://bgr.com/2020/08/14/fortnite-ban-iphone-android-apple-google-right-vs-epic/.

*(Cont'd on next page)*

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

exposed hundreds of millions of players to being hacked.[15] Although Apple does not leave it to any developer to keep the iOS platform safe and secure, Epic in particular had demonstrated that it could not be entrusted with this type of responsibility.

33.     In spite of this prior experience, Epic's CEO emailed Apple on July 17, 2020, again demanding an App Store format in which "developers can reach consumers and do business directly without intermediation"—in other words, in the precise manner that already exposed millions of *Fortnite* players on Android to malware and security threats. Mr. Sweeney further stated that, until Apple adopted his suggestion of fundamentally abandoning the security measures it employed to keep the App Store safe for consumers, "Epic is in a state of substantial disagreement with Apple's policy and practices, and we will continue to pursue this." Although Apple did not know it at the time, Epic apparently intended to "pursue" its "disagreement" with Apple by simply disregarding its obligations under the License Agreement and Guidelines.

### D.     Epic's Breach of Its Contractual Agreements

34.     On August 3, 2020, despite knowing that Apple had no intention to change the terms of the parties' agreements, Epic submitted Version 13.40 of *Fortnite* for review by Apple and distribution through the App Store. Unlike prior versions of the game, Epic had hidden a new payment interface via what Epic calls a "hotfix"—coding that queries and imports data directly from Epic's servers to the app—into this new version. As of the date Version 13.40 was submitted to Apple for review and approval, Epic's servers—and therefore the in-app payment screen in the *Fortnite* app—reflected that IAP was the only available payment option for in-app purchases, as required by the parties' contractual agreements. And so Epic's Trojan Horse was approved and published to the App Store.

35.     On August 13, 2020, in the dark hours of the night, Epic launched its underhanded scheme to breach its agreements and free ride on Apple's investments. Around 2 a.m. on August 13, Mr. Sweeney wrote to Apple that Epic was planning to willfully breach its agreements with Apple, declaring that, "Epic will no longer adhere to Apple's payment processing restrictions."

---

[15]   Jason Silverstein, *Fortnite Security Flaw Exposed Millions of Users to Being Hacked* (Jan. 16, 2019), https://www.cbsnews.com/news/fortnite-security-flaw-exposed-millions-of-users-to-being-hacked/.

36.     Hours later, Epic changed the data on its own servers such that, when queried by the *Fortnite* app, Epic's server would direct the payment interface in the app to reflect two different payment options—IAP, and Epic's new direct payment system, which was not approved or reviewed by Apple and allowed Epic to bypass payment to Apple and divert payments from consumers to itself. *Id*. Epic thus was able to deliberately conceal its intentions from Apple and implement its unauthorized and non-compliant external payment mechanism without Apple's permission—which it already knew from previous communications would not be granted.

37.     Epic's breach was flagrant and larcenous. Epic willfully "direct[ed] customers to purchasing mechanisms other than in-app purchase" and created a new storefront in contravention of the Guidelines and over Apple's explicit objection. Guidelines, ¶¶ 3.1.1.  Epic breached the License Agreement by making changes without resubmission to Apple (License Agreement, ¶ 6.1), installing a store or storefront (*Id.*, ¶ 3.3.2), enabling purchases without using the In-App Purchase API (*Id.*, ¶ 3.3.25), and providing additional functionality through distribution mechanisms outside the App Store (*Id.*, ¶ 3.3.3). Its breach was a calculated effort—accomplished over multiple steps executed over the course of at least 10 days—designed to deprive Apple of its agreed-to commission (Schedule 2, ¶ 3.4(a)) and to interfere with Apple's business practices in maintaining the App Store as a curated environment for its customers (License Agreement, ¶ 3.2(f)). *Id.*

## E.     Apple's Response to Epic's Breach

38.     On August 13, 2020, Apple notified Epic that its app was "in violation of the App Store Review Guidelines" and identified the specific guidelines that were violated, including the use of external purchase mechanisms, "egregious" hidden features designed to evade Apple's review, and other changes in features and functionalities. The email informed Epic that Apple had suspended marketing and distribution of *Fortnite* on the App Store "until we receive an update that is compliant with the App Store Review Guidelines." *Id.* Apple invited Epic to submit an updated version of *Fortnite* for review "which addresses all these issues."

39.     Notwithstanding *Fortnite*'s removal from the App Store, the tens of millions of iOS *Fortnite* players who previously downloaded the app continued to have access to the app and to any available in-app purchase products on their devices. In fact, the customers who downloaded the

non-compliant version of *Fortnite* before its removal from the App Store are still today able to use Epic's concealed and unapproved external payment mechanism to make in-game purchases—subjecting these customers to potential security risks and allowing Epic to evade its contractually agreed commission to Apple for those purchases.

40.     On August 14, 2020, Apple gave Epic notice that Epic also was in violation of the License Agreement, specifying each breach. The breaches included the introduction of new payment functionality with submission for App Review, downloading code to an app to add an unauthorized payment system, and allowing users to purchase items without using IAP. Apple gave Epic 14 calendar days to cure its breaches, after which Epic's registration in the developer program would be permanently terminated, along with the Developer Agreement by its terms.

41.     Epic did not remedy its breach, and Apple terminated Epic's Developer Program account and terminated the License Agreement and Developer Agreement by their respective terms on August 28. On the same day that it was terminated as a registered developer and its Developer Agreement and License Agreement were terminated by their respective terms, Epic removed IAP altogether from *Fortnite*'s payment interface—leaving Epic's unauthorized external payment mechanism as the *sole* means of making in-app purchases through the app, and diverting to itself even more of the commissions to which Apple is contractually entitled. On information and belief, Epic has consummated millions of dollars of transactions and has paid Apple nothing.

### F.     Epic's Orchestrated "Challenge" to the App Store

42.     Epic has not contested that it breached the License Agreement and the Guidelines, or that the Apple had a contractual right to terminate the Developer Agreement, the License Agreement, and Epic's status as a registered developer. Instead, Epic's apparent plan was to violate the agreements intentionally as part of an orchestrated legal and public relations strategy to avoid the commissions to which Apple is contractually entitled.

43.     The moment *Fortnite* was removed from the App Store, Epic launched an extensive smear campaign and litigation plan against Apple. Within hours of *Fortnite*'s removal, Epic filed its 56-page complaint (Dkt. 1) with this Court, and released an animated video of a dystopian scene inspired by George Orwell's *1984*, featuring a rotten apple as its villain. Mere days later, Epic

filed nearly 200 pages of a pre-packaged "emergency" motion requesting that this Court reinstate *Fortnite* to the App Store on terms that contravene the parties' express contracts—a request that this Court denied. On August 23, Epic even hosted a sales promotion, a "#FreeFortniteCup," inviting players for one last "Battle Royale" across "*all platforms*" this Sunday, with prizes targeting Apple.[16]

44.     Some Epic customers, based on materials attached to Epic's TRO motion, have seen through Epic's subterfuge to understand that Epic is using its own customers as pawns in its orchestrated campaign against Apple. As one user asked Epic's customer support team after the takedown: "Did you guys just screw over all your mobile players?" Dkt. 17-9 at 2. One user predicted Epic would "remove the illegal (according to Apple) update and be back to normal in no time." *Id*. at 13.

45.     On the other hand, Epic's smear campaign has been successful in damaging Apple's reputation and goodwill with other customers, who blame Apple for the removal of the non-compliant *Fortnite* from the App Store.  As one user stated: "I paid moneyy [sic] and I got the battle pass I need to finish it why the hell did you remove it . . . ." Dkt. 17-4 at 10.

46.     Epic's flagrant disregard for its contractual commitments and other misconduct has caused significant harm to Apple. Upon information and belief, Epic has reaped millions of dollars in in-app purchases through its unauthorized external purchase mechanism,[17] thereby diverting to itself commissions that Apple was entitled to possess under the License Agreement. This is theft, period. In addition to the loss of Apple's contractual commissions, Epic's actions have caused Apple to suffer reputational harm and loss of goodwill with consumers who rely on Apple to offer the apps they want to download, like *Fortnite*, with all of the safety, security, and privacy protections that they expect from Apple. Left unchecked, Epic's conduct threatens the very existence of the iOS ecosystem and its tremendous value to consumers. Apple is entitled to relief for Epic's breaches of its contractual obligations and other unfair and tortious conduct.

[16]  Epic Games, *Join the Battle and Play in the #FreeFortniteCup on August 23*, https://www.epicgames.com/fortnite/en-US/news/freefortnite-cup-on-august-23-2020 (emphasis added).

[17]   Investopedia, *How Does Fortnite Make Money?*, https://www.investopedia.com/tech/how-does-fortnite-make-money/ (observing that *Fortnite* reportedly made $2 million a day from iOS users when it was released in 2018).

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

## IV.     CLAIMS AND PRAYER FOR RELIEF

### COUNT I

**Breach of Contract**

47.     Apple realleges and incorporates by reference each of the allegations set forth above.

48.     Epic entered into express and/or implied contractual commitments with Apple by executing the License Agreement.  The License Agreement is a valid and enforceable contract between Epic and Apple.

49.     Apple performed all of its obligations under the License Agreement, including by giving Epic access to Apple's iOS software and other intellectual property, as well as the significant library of resources it makes available to developers, and by acting as Epic's agent in the marketing and delivery of *Fortnite* to consumers via the App Store.  Epic has not disputed that Apple has performed its obligations under the License Agreement.

50.     Among other requirements, the License Agreement required that Epic not "hide, misrepresent or obscure any features, content, services or functionality" in its apps (License Agreement, ¶ 6.1), or "provide, unlock or enable additional features or functionality" through any mechanism outside of the App Store (*id.* ¶¶ 3.2, 3.3.2, 3.3.3, 3.3.25).

51.     Epic breached these provisions of the License Agreement by publishing a new external payment mechanism in *Fortnite* via hotfix and by failing to submit to Apple and intentionally concealing from Apple these changes to the *Fortnite* app, among other reasons.

52.     Additionally, the License Agreement obligated Epic to pay Apple "a commission equal to thirty percent (30%) of all prices payable by each end-user" for sales of Licensed Applications, including "any additional permitted functionality, content or services sold by [Epic] from within a Licensed Application using the In-App Purchase API." Schedule 2, ¶¶ 1.1(a), 3.4(a)).

53.     While the use of IAP to consummate the transaction is not a condition to Epic's obligation to pay Apple's commission, in the event that it is determined to be, that condition is excused because Epic, by its own conduct, hindered, prevented, or made impossible the performance

of the condition. Beginning on August 13, 2020, Epic utilized the hotfix it embedded into the *Fortnite* app to create a new external payment mechanism within the app, intentionally evading the use of Apple's IAP system.

54.    Epic therefore breached the License Agreement, Schedule 2, ¶ 3.4(a) by failing to pay Apple agreed-to commissions on its in-app sales through *Fortnite*.

55.    As a direct result of Epic's breach of contract, Apple has suffered injury, including at least the loss of its contractually agreed commission.

56.    Additionally, Epic's breaches of its contractual obligations are ongoing and have, in fact, become more egregious over time. Consumers who downloaded the version of *Fortnite* containing Epic's hotfix are currently only able to make in-app purchases using Epic's unauthorized external payment mechanism and do not even have the option of using Apple's trusted IAP system. Epic's breaches of its contractual obligations threaten Apple's reputation and goodwill with any such customers, who are accustomed to the ease and security of using IAP for apps downloaded through the App Store and who may now be exposed to additional security risks associated with Epic's hotfix payment system. Pecuniary compensation would not afford Apple adequate relief for these harms. As such, Apple requests that the Court permanently enjoin Epic, and all persons and entities in active concert or participation with Epic, from facilitating, assisting, or participating in: (a) the continued operation of Epic's unauthorized external payment mechanism in its apps, including *Fortnite*; (b) the introduction of any further unauthorized external payment mechanisms into any iOS apps, including *Fortnite*; and, (c) the removal of IAP as an available payment mechanism for in-app purchases through any iOS apps, including *Fortnite*.

## **COUNT II**

### **Breach of Implied Covenant of Good Faith and Fair Dealing**

57.    Apple realleges and incorporates by reference each of the allegations set forth above.

58.    Epic entered into valid contracts, including the License Agreement, with Apple.

59.     The License Agreement and other contracts between Epic and Apple presuppose, among other things, that Epic would not circumvent Apple's commission by making sales to consumers outside of the IAP system; that Epic would comply with the Guidelines in publishing any apps to the App Store; and that Epic would not otherwise interfere with Apple's operation and maintenance of the App Store.

60.     To the extent that any of Epic's bad faith actions did not breach the express terms of the License Agreement, Epic frustrated Apple's right to receive the benefits of the agreement actually made, including by publishing an update to *Fortnite* that circumvented payment of commissions to which Apple was contractually entitled, by violating the Guidelines, and by otherwise undermining Apple's operation and maintenance of the App Store.

61.     As a direct result of Epic's breach of its covenant of good faith and fair dealing, Apple has suffered damages, including at least the loss of its contractually agreed commission.

## COUNT III

### Quasi-Contract / Unjust Enrichment

62.     Apple realleges and incorporates by reference each of the allegations set forth above.

63.     In the alternative, Epic has been unjustly enriched at the expense of Apple through the conduct described in the preceding paragraphs, including by diverting to itself, through fraud or coercion, commissions that rightfully belonged to Apple as compensation for the app distribution and other services provided to Epic by Apple.

64.     Epic has continued to unjustly retain these benefits without compensating Apple for these benefits.

65.     Apple seeks restitution of any such amounts by which Epic has been unjustly enriched at Apple's expense.

## COUNT IV

### Intentional Interference with Prospective Economic Advantage

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR

66.     Apple realleges and incorporates by reference each of the allegations set forth above.

67.     Apple has an economic relationship with iOS users who make purchases through the App Store, in particular those who have downloaded the *Fortnite* app onto their iOS devices through the App Store.  Apple has a reasonable expectation that it will profit from this relationship.

68.     Epic is aware of Apple's relationship with consumers, in particular those who have downloaded the *Fortnite* app.  The License Agreement specifically designates Apple as Epic's agent for the marketing and delivery of *Fortnite* and all associated in-app purchases to these end-users, who are customers of Apple.

69.     Epic engaged in intentional and wrongful conduct designed to interfere with or disrupt the relationship between Apple and its consumers, including by refusing to pay Apple's contractually agreed commission for serving as Epic's agent in the marketing and delivery of *Fortnite* and all associated in-app purchases to consumers.

70.     Epic's conduct actually interfered with Apple's relationships with its consumers, in particular those who made purchases through Epic's unauthorized external purchase mechanism, by depriving Apple of the economic benefit that it reasonably expected to receive from those relationships.

71.     As a result of Epic's intentional interference, Apple has been injured in its business and has suffered damages, loss of goodwill and product image, and other harm.

72.     Additionally, Epic undertook its tortious conduct with malice and/or fraud. Epic carefully concealed from Apple its plan to introduce an unauthorized and unapproved external payment mechanism to *Fortnite* via hotfix, and it executed on this plan with a willful and knowing disregard of Apple's rights. Mr. Sweeney's August 13, 2020 email to Apple confirms that Epic was well aware of Apple's reasonable expectation that it would profit from its relationship with consumers who made purchases through *Fortnite*, and Epic made the willful decision to interfere with those relationships. Apple is therefore entitled to punitive damages to punish Epic for its malicious and/or fraudulent misconduct.

73.     Epic's tortious conduct also threatens Apple's reputation and goodwill with its customers, who are accustomed to the ease and security of using IAP for apps downloaded through the App Store and who may now be exposed to additional security risks associated with Epic's hotfix payment system. Pecuniary compensation would not afford Apple adequate relief for these harms. As such, Apple requests that the Court permanently enjoin Epic, and all persons and entities in active concert or participation with Epic, from facilitating, assisting, or participating in: (a) the continued operation of Epic's unauthorized external payment mechanism in its apps, including *Fortnite*; (b) the introduction of any further unauthorized external payment mechanisms into any iOS apps, including *Fortnite*; and, (c) the removal of IAP as an available payment mechanism for in-app purchases through any iOS apps, including *Fortnite.*

## COUNT V

### Conversion

74.     Apple realleges and incorporates by reference each of the allegations set forth above.

75.     Apple has a contractual right to the possession of property in the form of the commissions that it is entitled to under the License Agreement, including at Schedule 2, ¶ 3.4(a). These commissions are a specific and identifiable sum, determined by multiplying the total amount of consumer purchases in the *Fortnite* app by the contractually specified rate of 30%.

76.     The License Agreement provides that all payments from consumers would be delivered to Apple's possession via IAP. "Upon collection of any amounts from any end-user," Apple was then to "deduct the full amount of its commission" and remit the remainder to Epic.  Schedule 2, ¶ 3.5.

77.     By incorporating into its *Fortnite* app an external payment system that circumvented the IAP system, Epic misappropriated, took possession of, and interfered with Apple's possessory interest in Apple's property—namely, the 30% commission to which Apple was contractually entitled on all sales made through Epic's unauthorized external payment system. Epic has continued to wrongfully assert ownership over Apple's property. Upon taking discovery to

determine the total amount Epic received via its external purchase mechanism that is subject to Apple's commission, Apple will amend its pleadings.

78.     As a result of Epic's conversion, Apple has been injured, at least in the amount of the commission that was converted and reasonable compensation for the time and money spent by Apple in attempting to recover the property.

79.     Additionally, Epic undertook its tortious conduct with malice and/or fraud. Epic carefully concealed from Apple its plan to introduce an unauthorized and unapproved external payment mechanism to *Fortnite* via hotfix, and it executed on this plan with a willful and knowing disregard of Apple's right to the possession of its contractually agreed commissions. Mr. Sweeney's August 13, 2020 email to Apple confirms that Epic was well aware of Apple's right to possession of the commission and that Epic made the willful decision to convert Apple's commissions by diverting consumer payments through its unauthorized payment mechanism. Apple is therefore entitled to punitive damages to punish Epic for its malicious and/or fraudulent misconduct.

## **COUNT VI**

### **Declaratory Judgment**

80.     Apple realleges and incorporates by reference each of the allegations set forth above.

81.     There is an actual, substantial, continuing, and justiciable controversy between Apple and Epic regarding their respective rights under both the Developer Agreement and the License Agreement.

82.     Under the express terms of the Developer Agreement, Apple has the right to terminate Epic "as a registered Apple Developer at any time in Apple's sole discretion." Developer Agreement, ¶ 10. And, "[u]pon any termination . . . all rights and licenses granted to you by Apple will cease." *Id.* Likewise, Apple has the express right under the License Agreement to immediately terminate the agreement "and all rights and licenses granted by Apple hereunder and any services provided hereunder" if Epic engages "in any misleading, fraudulent, improper, unlawful or dishonest act relating to this Agreement, including, but not limited to, misrepresenting the nature of [any] submitted Application (e.g. hiding or trying to hide functionality from Apple's review . . . )." License

Agreement, ¶ 11.2. The License Agreement also provides that "[e]ither party may terminate this Agreement for its convenience, for any reason or no reason, effective 30 days after providing the other party with written notice of its intent to terminate." *Id.*

83.     In light of Epic's express statement on August 13, 2020 that it would "no longer adhere" to its obligations under the License Agreement, and Epic's use of a "hotfix" to release an unauthorized external payment mechanism to the Fortnite app in breach of the License Agreement, on August 14, 2020, Apple sent Epic a letter notifying Epic of Apple's intent to terminate Epic's License Agreement, Developer Agreement, and Program account within 14 days if Epic did not cure its breaches.

84.     On August 17, 2020, Epic filed a Motion for Temporary Restraining Order before this Court requesting, among other things, that the Court restrain Apple from exercising its contractual rights, including by "suspending or terminating any Epic entity from Apple's Developer Program."  The Court denied Epic's request as to Epic Games, Inc., but restrained Apple from "suspending or terminating any affiliate of Epic Games, such as Epic International, from Apple's Developer Program."

85.     On August 28, 2020, in accordance with the Court's order, Apple exercised its right to terminate Epic's status as a registered Apple developer and terminated the Developer Agreement and the License Agreement by their respective terms, including for Epic's breaches of the latter agreement. Apple continues to be restrained from exercising its contractual rights with respect to Epic's wholly owned subsidiaries, affiliates, and other entities under Epic's control, including Epic International.

86.     On September 4, 2020, Epic filed a Motion for Preliminary Injunction, characterizing Apple's termination of Epic's Developer Program account for cause as "unlawful" and "retaliatory," and renewing its request that the Court enjoin Apple from "restricting, suspending, or terminating" Epic's Apple Developer Program account based on its breaches of the License Agreement described above. Epic seeks this relief on behalf of itself and "its affiliates," including Epic International—a wholly owned subsidiary of Epic under its sole control that continues to take

advantage of Apple's intellectual property and services under the Developer Agreement and License Agreement notwithstanding Epic's breaches.

87.     Apple therefore has standing to seek declaratory judgment of its rights under the Developer Agreement and License Agreement with Epic and its affiliates.

88.     Apple seeks and is entitled to a declaratory judgment that: (a) the Developer Agreement and License Agreement are valid, lawful, and enforceable contracts; (b) Apple's termination of the Developer Agreement with Epic was valid, lawful, and enforceable; (c) Apple's termination of the License Agreement with Epic for cause was valid, lawful, and enforceable; (d) Apple has the contractual right to terminate its Developer Agreement with any or all of Epic's wholly owned subsidiaries, affiliates, and/or other entities under Epic's control, including Epic International (collectively, "Epic Affiliates"), at any time and at Apple's sole discretion; and (e) Apple has the contractual right to terminate the License Agreement with any or all of the Epic Affiliates for any reason or no reason upon 30 days written notice, or effective immediately for any "misleading fraudulent, improper, unlawful or dishonest act relating to" the License Agreement.

### **COUNT VII**

### **Indemnification**

89.     Apple realleges and incorporates by reference each of the allegations set forth above.

90.     The License Agreement between Apple and Epic provides, at paragraph 10: "To the extent permitted by applicable law, You agree to indemnify and hold harmless . . . from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs . . . incurred by [Apple] and arising from or related to any of the following . . . : (i) Your breach of any certification, covenant, obligation, representation or warranty in this Agreement, including Schedule 2; . . . or (vi) Your use (including Your Authorized Developers' use) of the Apple Software or services, Your Licensed Application Information, Pass Information, metadata, Your Authorized Test Units, Your Registered Devices, Your Covered Products, or Your development and distribution of any of the foregoing."

91.    Because Epic's lawsuit asserts claims arising from or related to, *inter alia*, Epic's breaches of its certifications, covenants, obligations, representations, and/or warranties under the License Agreement, and/or its use of the Apple Software or services, its licensed application information, its covered products, and/or its development and distribution of the foregoing, Apple is entitled to indemnification from Epic, including recovery of attorneys' fees and costs of defending this litigation and pursuing these Counterclaims.

## V.    JURY DEMAND

Apple demands a trial by jury on all issues so triable.

## VI.    PRAYER

Wherefore, Counterclaimant Apple respectfully requests that the Court:

A.  Decree that Epic is liable for breach of its contractual obligations under the License Agreement;

B.  Decree that Epic is liable for breach of its implied covenant of good faith and fair dealing;

C.  Decree that Epic is liable for intentional interference with Apple's prospective economic advantage;

D.  Decree that Epic is liable for negligent interference with Apple's prospective economic advantage;

E.  Decree that Epic is liable for conversion of Apple's property;

F.  Decree that Epic is in violation of the California Unfair Competition Law;

G.  Award Apple compensatory damages, punitive damages, attorney's fees, and interest;

H.  Award restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Epic as a result of its conduct in violation of the UCL;

I.  Enter a permanent injunction enjoining Epic, and all persons and entities in active concert or participation with Epic, from facilitating, assisting, or participating in: (a) the continued operation of Epic's unauthorized external payment mechanism in its apps, including *Fortnite*; (b) the introduction of any further unauthorized external payment mechanisms into any iOS apps, including *Fortnite*; and (c) the removal of IAP as an available payment mechanism for in-app purchases through any iOS apps, including *Fortnite*;

1

        J.   Award such other and further relief as the Court deems just and proper.

2

3      Dated: September 8, 2020          Respectfully submitted,

4                                  GIBSON, DUNN & CRUTCHER LLP

5

6                              By */s/ Theodore J. Boutrous Jr.*

7                                  Theodore J. Boutrous Jr.
                                    Richard J. Doren

8                                  Daniel G. Swanson
                                    Veronica S. Lewis

9                                  Cynthia E. Richman
                                  Jay P. Srinivasan

10

11                                Attorneys for Defendant and Counter-
                                  Claimant APPLE INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLE'S ANSWER AND COUNTERCLAIMS TO EPIC'S COMPLAINT FOR INJUNCTIVE RELIEF
Case No. 3:20-cv-05640-YGR