THEODORE J. BOUTROUS JR.,
  SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  333 South Grand Avenue
  Los Angeles, CA 90071-3197
  Telephone:   213.229.7000
  Facsimile:   213.229.7520

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar
  No. 492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  1050 Connecticut Avenue, N.W.
  Washington, DC 20036-5306
  Telephone:   202.955.8500
  Facsimile:   202.467.0539

VERONICA S. LEWIS (Texas Bar
  No. 24000092; *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  2100 McKinney Avenue, Suite 1100
  Dallas, TX 75201
  Telephone:   214.698.3100
  Facsimile:   214.571.2900

E. JOSHUA ROSENKRANZ
(N.Y. Bar No. 2224889; *pro hac vice pending*)
jrosenkranz@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:   212.506.5000
Facsimile:   212.506.5151

WILLIAM F. STUTE
(D.C. Bar No. 1032093; *pro hac vice pending*)
wstute@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005-1706
Telephone:   202.339.8400
Facsimile:   202.339.8500

**Attorneys for Defendant APPLE INC.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>APPLE INC.,<br><br>                    Defendant. | Case No. 4:20-cv-05640-YGR<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO EPIC GAMES, INC.'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: September 28, 2020 at 9:30 a.m. (via Zoom Platform)<br><br>Courtroom: 1, 4th Floor<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.   INTRODUCTION ................................................................................................... 1

II.  STATEMENT OF FACTS ...................................................................................... 3

    A.   Apple's Revolutionary iPhone Ecosystem. .............................................. 3

    B.   Apple's Developer License Agreement And App Store Guidelines Ensure Reliability, Safety, Security, And Privacy For Users Of iPhone Applications. ............................................................................................... 7

    C.   Epic Agrees To Apple's iPhone Developer License And App Store Guidelines. ................................................................................................ 9

    D.   Epic Intentionally Breaches Its Agreements With Apple, Is Expelled From The App Store, And Launches A Litigation And Public-Relations Campaign Against Apple. .......................................................................... 11

    E.   The Court Denies In Part And Grants In Part Epic's Request For A TRO, And Epic Continues To Breach Its Agreements. ..................................... 13

III. LEGAL STANDARD ........................................................................................... 14

IV.  ARGUMENT ........................................................................................................ 14

    A.   Epic Will Not Succeed On The Merits Of Its Antitrust Claims............... 15

        1.   Epic's monopoly maintenance claim will not succeed. ........... 15

            a.   Epic's proposed market definition is untenable. ........... 15

            b.   Epic identifies no unlawful monopoly maintenance. ................... 17

        2.   Epic's tying claims will fail because IAP is not a separate market or product. ..................................................................................... 18

        3.   Apple's iPhone business model is procompetitive................... 21

    B.   Epic Will Not Suffer Irreparable Harm Because Its Claimed Harm Is Entirely Self-Inflicted................................................................................ 23

    C.   The Balance Of Equities Tips Sharply In Apple's Favor. ...................... 27

    D.   An Injunction Would Harm The Public Interest. ................................... 29

V.   CONCLUSION ..................................................................................................... 30

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Acquaire v. Canada Dry Bottling Co.*,
5     24 F.3d 401 (2d Cir. 1994)..................................................................................... 25, 26

6

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
7     836 F.3d 1171 (9th Cir. 2016)........................................................................................ 19

8

*Al Otro Lado v. Wolf*,
      952 F.3d 999 (9th Cir. 2020)............................................................................... 2, 24, 26

9

*Apple Inc. v. Pepper*,
10     139 S. Ct. 1514 (2019) .................................................................................................. 15

11

*Apple Inc. v. Psystar Corp.*,
      586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................................................ 16

12

*Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*,
13     509 U.S. 209 (1993) ...................................................................................................... 22

14

*Chavez v. Whirlpool Corp.*,
15     93 Cal. App. 4th 363 (2001)........................................................................................... 23

16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
      504 U.S. 451 (1992) ...................................................................................................... 16

17

*Frank B. Hall & Co., Inc. v. Alexander & Alexander, Inc.*,
18     974 F.2d 1020 (8th Cir. 1992)........................................................................................ 29

19

*FTC v. Qualcomm Inc.*,
20     969 F.3d 974 (9th Cir. 2020)..................................................................................... 15, 23

21

*Garcia v. Google, Inc.*,
      786 F.3d 733 (9th Cir. 2015).................................................................................... 14, 15

22

*Germon v. Times Mirror Co.*,
23     520 F.2d 786 (9th Cir. 1975)......................................................................................... 26

24

*Goldberg v. Barreca*,
25     No. 2:17-CV-2106 JCM (VCF), 2017 WL 3671292 (D. Nev. Aug. 24, 2017).................... 29

26

*Hicks v. PGA Tour, Inc.*,
      897 F.3d 1109 (9th Cir. 2018)................................................................................... 16, 17

27

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
28     125 F.3d 1195 (9th Cir. 1997)........................................................................................ 21

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ............................................................................. 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) .................................................................................... 17, 20

*Memorex Corp. v. Int'l Bus. Mach. Corp.*,
    555 F.2d 1379 (9th Cir. 1977) ........................................................................... 25

*Milsen Co. v. Southland Corp.*,
    454 F.2d 363 (7th Cir. 1971) ............................................................................. 26

*Mozart Co. v. Mercedes-Benz of North America, Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ........................................................................... 21

*Newcal Indus., Ind. v. Ikon Office Sols.*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................................... 16

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ........................................................................ 15, 20, 22

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ........................................................................... 18

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ......................................................................................... 23

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ............................................................................. 18

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ........................................................................... 20

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ......................................................................................... 25

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) .............................................................................. 17

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ............................................................................. 20

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017) ............................................................................. 29

*Salt Lake Trib. Publ'g Co. v. AT&T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) ......................................................................... 24

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ............................................................................. 15

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................ 16

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ................................................................ 15

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .......................................... 18, 21

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
    914 F.2d 1256 (9th Cir. 1990) ............................................. 21

*Will v. Comprehensive Accounting Corp.*,
    776 F.2d 665 (7th Cir 1985) ................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................. 14

**Other Authorities**

10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1752b (3d ed. 2011) ................... 19

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
    § 2948.1 (3d ed. 2020) ......................................................... 24

ABA Section of Antitrust Law, Antitrust Law Developments (8th ed. 2017) ............................. 17

Apple, *App Store: Principles and Practices*, https://tinyurl.com/y4m7tdp5 (last
    visited Sept. 14, 2020) .................................................... 5, 6, 8

Apple, *Choosing a Business Model*, https://developer.apple.com/app-
    store/business-models/ (last visited Sept. 15, 2020) ..................... 19

AppleInsider, *Steve Jobs confirms native iPhone SDK by February*,
    https://tinyurl.com/y3m7a45l (last visited Sept. 14, 2020) ................. 4

Crystal Mills, 'Fortnite' Popularity Fades As 'Call of Duty' Closes Gap, Survey
    Says, Yahoo Finance (Apr. 8, 2020), https://tinyurl.com/y3k45f3u (last visited
    Sept. 14, 2020) ................................................................. 11

David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of
    Multisided Platforms* (2016) .................................................. 20

End User License Agreement for Unreal Engine: https://tinyurl.com/y5hbagot (last
    visited Sept. 14, 2020) ....................................................... 13

Epic Games, *FAQs: Where Can I Download Battle Royale?*,
    https://tinyurl.com/y2gzd8rk (last visited Sept. 14, 2020) ................... 13

Frequently Asked Questions, https://www.unrealengine.com/en-US/faq ..................................... 6

Google Trends, https://tinyurl.com/yxrkj4td (last visited Sept. 14, 2020) ................................. 11

Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 13.03 (3rd ed., 2016 Supp. 2019) ........................... 18

IDC, *Smartphone Market Share*, https://www.idc.com/promo/smartphone-market-share/vendor (last visited Sept. 15, 2020) .............................................................................. 4

Jonathan Borck, Juliette Caminade & Markus von Wartburg, *Apple's App Store and Other Digital Marketplaces: A Comparison of Commission Rates*, Analysis Group (July 22, 2020), https://tinyurl.com/yy27qoh3 (last visited Sept. 14, 2020) ...................................................................................................................... 6

Randall Williams, Fortnite's Slowdown Has Epic Games Battling to Spark New Growth, Bloomberg (Aug. 20, 2019), https://tinyurl.com/yxh4xgz2 (last visited Sept. 14, 2020) ...................................................................................................................... 11

Statement of Tim Cook, Apple Inc., before the U.S. House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law (July 29, 2020), https://tinyurl.com/y4cchmzr (last visited Sept. 14, 2020) ................................................................................................................ 3, 22

Unity Software, Inc., Registration Statement Under the Securities Act of 1933 (Form S-1) (Aug. 24, 2020), https://tinyurl.com/unitys1 (last visited Sept. 15, 2020) ...................................................................................................................... 10

Welcome to Epic Games, https://tinyurl.com/y8pkoovn (last visited Sept. 14, 2020) ........................................................................................................................ 6

I.    **INTRODUCTION**

Since *Fortnite* debuted on the iPhone in 2018, Apple has provided Epic with an exceptional array of benefits. Apple has licensed to Epic its full suite of developer tools, which Epic has used to create more than 200 Apple-reviewed modifications; at Epic's request, Apple has pushed more than 140 unique updates to end users, and has made systemic changes to enhance game play in *Fortnite*. Apple has provided a tremendous amount of marketing support by promoting *Fortnite* in the App Store, featuring *Fortnite* in keynote events, sending over 500 million marketing communications about *Fortnite* to end users, and even placing *Fortnite* billboards in Times Square at Apple's expense. Perhaps most significantly, Apple has given Epic access to its one billion iPhone customers, and facilitated transactions with them using the safe and secure App Store. More than 130 million people have downloaded *Fortnite* on the iPhone, earning Epic more than $550 million through iOS alone. For all of this, Epic has paid Apple just $99 each year for a developer license, plus a 30% commission on digital purchases by end users.

Epic now wants to play by different rules—it wants to keep enjoying these extensive, and expensive, benefits of Apple's ecosystem, including continued access to Apple's iPhone customers—*for free*. To avoid paying Apple, Epic smuggled into *Fortnite* a "hotfix" that bypassed the App Store's payment functionality, in willful breach of its contractual promises that prohibit cheating the system. Simultaneously, Epic's CEO Tim Sweeney declared war against Apple "on a multitude of fronts—creative, technical, business, and legal." Decl. of Philip W. Schiller (Schiller Decl.), Ex. G at 2. Apple reasonably responded by exercising its absolute right to remove *Fortnite* from the App Store, and terminating the developer privileges of Epic and its affiliates, unless and until Epic comes back into compliance with Apple's policies. Epic refuses to do so, and instead asks this Court to issue an extraordinary order blue-penciling the parties' agreements so that Epic can use Apple's services without paying any commissions.

Epic's motion should be denied because it has not come close to meeting any of the four traditional equitable factors necessary to justify a preliminary injunction:

Apple is no monopolist, and Epic is not likely to succeed on the merits of its argument that the integrated iPhone business model violates the antitrust laws. Indeed, no court has ever accepted

a claim remotely like this one, and the sheer novelty of Epic's position precludes preliminary injunctive relief. The App Store connects app developers with iPhone users for commercial transactions. Apple charges developers, in addition to a nominal annual fee, a commission on paid apps and in-app digital purchases by end users. This approach and commission structure, which is common in the industry, provides Apple with a financial return on its significant investments in creating, safeguarding, and maintaining the iPhone ecosystem—which has fueled an exponential increase in output of mobile devices and apps, dramatically benefited users and developers, and significantly increased consumer choice. Simply put, the iPhone business model is decidedly procompetitive. Accordingly, Epic's theories of "monopoly maintenance" and "tying" will fail on the merits.

Epic also cannot demonstrate any irreparable injury, which is reason enough to deny its preliminary injunction motion. Epic started a fire, and poured gasoline on it, and now asks this Court for emergency assistance in putting it out, even though Epic can do so itself in an instant by simply adhering to the contractual terms that have profitably governed its relationship with Apple for years. This Court was right when it previously ruled that "'self-inflicted wounds are not irreparable injury.'" Dkt. 48 at 5 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020)). Epic created the current situation by triggering its "hotfix," knowing that Apple would invoke its contractual rights to protect iPhone customers. Apple is legally and equitably entitled to sever ties with a party that persists in breaking the rules, and that party's affiliates; accordingly, Apple removed *Fortnite* from the App Store and expelled Epic from the developer program. Apple has taken this approach thousands of times with other developers and their affiliates. There is no reason for this Court to issue extraordinary relief when Epic itself can avoid any further harm—to itself, *Fortnite* players, or third parties—with a keystroke, and "maintain its agreements with Apple … as this litigation continues." *Id.*

The balance of hardships favors Apple. Epic's "hotfix" was not just an open breach of contract but a fundamental breach of trust. Apple promises its customers that the App Store will be a safe and trustworthy place for customers to discover and download apps. By inserting secret and unreviewed functionality into an app, Epic threatens the relationship between Apple and iPhone

customers. Allowing Epic to continue offering *Fortnite* and Unreal Engine without complying with Apple's requirements would put at risk the privacy and security of iPhone customers, as well as the stability and integrity of the iPhone ecosystem.

Finally, the public interest warrants denial of injunctive relief because Epic is responsible for harming the very community it purports to be protecting. If Epic were really concerned about preserving iPhone users' access to *Fortnite*, or developers' access to Unreal Engine, it would deactivate the "hotfix" and comply with Apple's policies pending resolution of its claims. Instead, Epic is holding its own customers hostage to gain leverage in a business dispute. In contrast, Apple is protecting a billion iPhone users threatened by Epic's actions (and the requested injunction). This Court should not sanction such unauthorized and dangerous activity, or strip Apple of the ability to protect its users against such attacks, particularly given the very early stage of this litigation.

In sum, Epic's unprecedented and unsupported antitrust claims are doomed to fail on the merits, and thus Epic has not demonstrated likelihood of legal success; Epic's asserted harm is the self-inflicted and self-fixable result of its own cheating and breach and thus not irreparable; and the balance of hardships and public interest favor Apple because the relief requested by Epic risks harming the iPhone ecosystem and around a billion iPhone users around the world. The detailed fact and expert declarations submitted by Apple, in view of binding and persuasive decisional authority, overwhelm Epic's speculative and ultimately baseless submission. Accordingly, Epic's motion for a preliminary injunction should be denied.

## II.    STATEMENT OF FACTS

### A.    Apple's Revolutionary iPhone Ecosystem.

It is hard to remember what the digital marketplace looked like in 2006. Mobile phones and portable music devices were common, but they had very few features. Laptops could do more. But if you wanted to install a game or other software you had to either visit a physical retail store and pay high markups, or take your chances on the Internet where it was buyer beware.[1] *See* Schiller Decl. ¶ 3.

---

[1]    Statement of Tim Cook, Apple Inc., before the U.S. House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law (July 29, 2020), https://tinyurl.com/y4cchmzr (last visited Sept. 14, 2020) (Cook July 2020 Statement).

All that changed in 2007, when Apple introduced the iPhone and set off a revolution in mobile devices.[2] Apple thought differently. The iPhone combined cutting-edge design with an integrated system of hardware and software that offered unparalleled performance and ease of use. *See* Schiller Decl. ¶ 8. It included a powerful custom-made operating system that was designed from the ground up to exploit the unique features and functionality of the iPhone. The iPhone's operating system (iOS) is deeply integrated with Apple's hardware, and that engineering success enables a greater ability to innovate both for Apple and third-party developers. *See id.* Apple's approach created and nurtured an entire *ecosystem*, which now supports an enormous community of 27 million app developers and connects them with around a billion users around the world. *Id.* ¶¶ 12, 36, 45.

Thirteen years later, the iPhone represents just one of many smartphone choices available to consumers. Samsung, LG, Google, Motorola, and a number of others compete in a crowded marketplace. That fierce competition is reflected in Apple's share of the global market for smartphone sales, which IDC recently pegged at 13.3%.[3] And the choices are only growing.

The first iPhone offered a suite of Apple applications, *see* Expert Decl. of Richard Schmalensee (Schmalensee Decl.) ¶ 23, while the browser was initially the gateway for third-party developers. The immediate success of the iPhone, and the power of its computing platform, led to a clamoring in the developer community for the ability to create native applications. As Steve Jobs explained, Apple ultimately made the decision to open the platform, but it did so deliberately and carefully with the interests of users fully in mind. "[P]rovid[ing] an advanced and open platform to developers while at the same time protect[ing] iPhone users from viruses, malware, privacy attacks, etc. … is no easy task."[4]

---

[2]   Because Epic's Complaint "refers to the operating system on both [the iPhone and iPad] as 'iOS,'" and alleges that "[t]here are no differences between iOS and iPadOS that are relevant to the allegations herein," Dkt. 1 ¶ 39, n.1, references here to "iPhone" also apply to the iPad.

[3]   IDC, *Smartphone Market Share*, https://www.idc.com/promo/smartphone-market-share/vendor (last visited Sept. 14, 2020).

[4]   AppleInsider, *Steve Jobs confirms native iPhone SDK by February*, https://tinyurl.com/y3m7a45l (last visited Sept. 14, 2020); *see also id.* ("Some claim that viruses and malware are not a problem on mobile phones, this is simply not true. There have been serious viruses on other mobile phones already, including some that silently spread from phone to phone over the cell network. As our phones become more powerful, these malicious programs will become

There were three prongs from the beginning: Build, Test, Distribute. Apple first had to provide the fundamental building blocks for the developer community. It had to create the tools and the software that would allow developers to build native applications that could leverage the power and capability of the iPhone. *See* Schiller Decl. ¶¶ 16-18. Apple also wanted the ability to test the third-party applications before they went live on a user's device. *See id.* ¶ 19. It wanted to ensure that the tools, software, and access it provided to developers were not misused in a way that would harm users or their devices. *See id.* ¶ 20. And it wanted to ensure that the applications were appropriate for users and devices. *See id.* ¶¶ 23-26. Rather than recreating the Internet, Apple opted instead to create a safe and trusted place for its iPhone customers to discover and download apps, confident that they will work seamlessly and securely with the tap of a finger.[5] *See* Schiller Decl. ¶ 20. Starting with just 500 apps in 2008, the App Store now has 1.8 million of breathtaking variety and utility, every one of which has passed through Apple's quality control and safety checks. *Id.* ¶ 3.

For developers, the App Store is now a means to reach a customer base of a billion iPhone users. *Id.* ¶¶ 5, 36, 45. But it is way more than that. In the interest of stoking more creativity, and to bring more apps to its users, Apple supports developers in a variety of ways, investing billions in tools, software, and technology to make it as easy as possible for developers to bring their ideas to life on the iPhone. *Id.* ¶¶ 10-14; *see also* Expert Decl. of Lorin Hitt (Hitt Decl.) ¶ 66. For example, developers have access to 150,000 iOS Application Programming Interfaces (APIs), technical tools that simplify and accelerate the development process, across Apple's iOS. Schiller Decl. ¶ 17; Decl. of Mike Schmid (Schmid Decl.) ¶ 3. This is an exponential increase over the number of APIs available to developers in the beginning. Schiller Decl. ¶ 17. These tools, technology, and software are protected by copyrights, patents, and other intellectual property (IP) protections and subject to license agreements for their use. *Id.* ¶¶ 10-12, 16-18. Apple makes them available to developers who are willing to contribute to the healthy, functional ecosystem Apple

---

more dangerous. And since the iPhone is the most advanced phone ever, it will be a highly visible target.").

[5] Apple, *App Store: Principles and Practices*, https://tinyurl.com/y4m7tdp5 (last visited Sept. 14, 2020).

1   created. *See id*.

2          Apple has adopted a business model for the App Store that enables it to offer developers

3   access to its technology platform, tools, software and other resources (including marketing support)

4   at a very low cost. Apple has invested billions of dollars in making the ecosystem thrive. *Id.* ¶ 5.

5   Apple charges a $99-a-year fee to developers interested in distributing apps. *Id.* ¶ 4. And for

6   developers not interested in app distribution—be they job-seekers building a new skill or the

7   intellectually curious—Apple makes its developer tools and resources available for free. *Id.* ¶ 11.

8   Developers pay Apple nothing further for access to the App Store unless and until developers bill

9   and collect funds from users who engage in digital transactions. *Id.* ¶¶ 6-7.

10          The main mechanism by which developers pay Apple is through its in-app purchase (IAP)

11   technology. *Id.* ¶¶ 33, 39. Apple's IAP is hardly unique; Google's Play Store, the Amazon

12   Appstore, the Microsoft Store, and many video game digital marketplaces, such as Xbox,

13   PlayStation, Nintendo, and Steam, all have similar fees and requirements to use the marketplace's

14   official in-app purchase functionality.[6] In fact, even Epic's own app marketplace charges users and

15   developers a commission to use Epic's services.[7] Consistent with the practices of other mobile

16   platforms, Apple retains at most a 30% commission on sales made for digital products that are used

17   within the iPhone ecosystem (including apps and in-app purchases).[8] Schiller Decl. ¶ 7.

18          Apple has used this model from the beginning of the App Store, while adding features to

19   reduce the costs for developers. It also reduced the commission for some developers. Schiller Decl.

20   ¶ 7. More than 80% of the apps in the App Store pay no commission to Apple. Schiller Decl. ¶ 7.

21   And because of Apple's business model, consumers benefit by accessing an enormous amount of

22   content for free. *See* Schmalensee Decl. ¶¶ 25-27, 30.

23   _____

24   [6]   Jonathan Borck, Juliette Caminade & Markus von Wartburg, *Apple's App Store and Other Digital Marketplaces: A Comparison of Commission Rates*, Analysis Group, at 5 (July 22, 2020), https://tinyurl.com/yy27qoh3 (last visited Sept. 14, 2020).

25

26   [7]   *See* Welcome to Epic Games, https://tinyurl.com/y8pkoovn (last visited Sept. 14, 2020) (12% revenue share on Epic Games store); Frequently Asked Questions, https://www.unrealengine.com/en-US/faq (standard 5% royalty on games built with Unreal Engine).

27

28   [8]   Apple, *App Store: Principles and Practices*, https://tinyurl.com/y4m7tdp5 (last visited Sept. 14, 2020).

**B.      Apple's Developer License Agreement And App Store Guidelines Ensure Reliability, Safety, Security, And Privacy For Users Of iPhone Applications.**

No ecosystem thrives for long without rules. That is why Apple insists on securing from app developers contractual commitments to abide by clear requirements and policies in return for the benefits of participating in the App Store and the Developer Program. Any developer who wants permission to use certain Apple tools, technology, and software has to sign the Apple Developer Program License Agreement (License Agreement). Schiller Decl. ¶¶ 10-12; *id.* at Ex. B. But that is not all they agree to. They also agree in the App Store Review Guidelines (Guidelines) that certain breaches—like cheating—represent such a grave threat to the ecosystem that Apple must be able to respond with decisive action. The very first section of the Guidelines declares:

> **[*If*] *you attempt to cheat the system*** (for example, by trying to trick the review process, steal user data, copy another developer's work, manipulate ratings or App Store discovery) ***your apps will be removed from the store and you will be expelled from the Developer Program***.

*Id.* at Ex. C at 2 (emphasis added). This contractual right has teeth because Apple's developer contracts are at-will: Apple may terminate them at any time. *Id.* ¶¶ 46-48, 56.

Among other requirements, the License Agreement prohibits developers from using Apple's software to interfere with its security protocols and operation, and bars developers from distributing applications that have circumvented Apple's review process. *Id.* ¶¶ 10-14, 20-22; *id.* at Ex. B ¶ 3.2(e), (f), (g). It forbids developers from making changes to their apps without resubmitting the revised app for review, a safeguard that ensures developers have not made changes to the payment system or bypassed security features of the iPhone or privacy protections. *Id.* at Ex. B ¶¶ 3.3.2, 3.3.3. And it expressly says that violations will result in termination of "all rights and licenses granted by Apple hereunder." *Id.* at Ex. B ¶ 11.2. "Upon any termination or, … suspension, all rights and licenses granted to [a developer] by Apple will cease, including [the developer's] right to access the [Apple Developer web pages]." *Id.* at Ex. A § 10; *id.* ¶ 47. Apple has built its ecosystem to provide apps and thus only terminates a developer's account in the most egregious situations where (as here) a developer takes steps that put the security and operation of the ecosystem at risk. *Id.* ¶¶ 49-53.

Apple needs that power of expulsion to ensure safety, security, privacy, and reliability for

the consumers of this vast ecosystem. *Id.* ¶¶ 46, 52. If any developer could sneak in changes to its apps without "expressly call[ing] attention to the new functionality," the consequence could be catastrophic. Expert Decl. of Mark Graff (Graff Decl.) ¶ 22. "The extraordinary volume of app submissions, combined with the innate difficulty of finding security issues through mere examination of the software, would make iOS applications significantly less safe—to the detriment of Apple customers, the developers, and all those of us who live in a world with a billion or so active iPhones." *Id.* Just since 2017, Apple has terminated many, many developer accounts for violating the Guidelines: Apple has terminated over 75,000 unique accounts for introducing new features without going through App Review; over 2,000 accounts for introducing a non-IAP payment method; and over 60,000 accounts for introducing hidden features or obfuscating code (for example, by installing executable code). Schiller Decl. ¶ 53.

Apple also needs the ability to take decisive action not just against the particular account in which a developer breaks the rules, but also against other accounts controlled by that developer or its affiliates. When "a developer … engage[d] in deceptive acts on one account" is "terminated," it can easily "transfer its apps and redirect its activities to another account." *Id.* ¶ 56. Apple has to be able to protect itself—and its users—from that sort of shell game. That is why Apple's contracts permit it to terminate its agreements with developers. *Id.* at Ex. B ¶ 11.2, Ex. A ¶ 10. That is why "Apple maintains the express right under both the Developer Agreement and License Agreement to terminate with any developer at any time, with or without cause." *Id.* And that is why Apple has a longstanding practice of removing all affiliated developer accounts when a developer attempts to cheat or conceal, thereby terminating a breaching developer's Developer Program membership across all entities with similar ownership. *Id.* ¶¶ 53, 54-56. Apple does not wait to be fooled a second time before terminating an affiliate for the bad deeds of its principals. *Id.* ¶¶ 55-56.

iPhone users rightfully expect that Apple will ensure apps work as they should and are free from malware, that they protect user privacy, and that pornography apps and illegal real-money gambling apps are prohibited.[9] *See id.* ¶ 24. "The need for vigilance against malware and other

---

[9]   Apple, *App Store: Principles and Practices*, https://tinyurl.com/y4m7tdp5 (last visited Sept. 14, 2020).

security attacks is particularly acute on mobile devices like the iPhone," as customers "tend to carry large amounts of personal information on their iPhones." *Id.*; *see also id.* ¶ 25. The contractual standards also ensure compatibility and protect against malfunctions or crashes, not just of the app, but also of the device itself. *Id.* ¶¶ 20, 49, 52. The App Store is the world's most trusted marketplace for apps precisely because of the standards and safeguards put in place—and the mechanisms Apple has developed to enforce them. *Id.* ¶ 52; *id.* at Ex. E at 3; *see also* Graff Decl. ¶¶ 5, 20.

**C.    Epic Agrees To Apple's iPhone Developer License And App Store Guidelines.**

Epic is a game developer for a number of different platforms. *See, e.g.*, Hitt Decl. ¶ 20; Schiller Decl., Ex. E at 2 ("Epic has many ways to reach consumers, including through Android stores, PC-based platforms, consoles (Xbox, Nintendo, Play Station) and its very own app marketplace."). It has long developed games for the iPhone. Schiller Decl. ¶ 57. In the past, Epic not only abided by but succeeded under Apple's rules, using Apple's proprietary tools, software, and services to bring its games and other apps to life on the iPhone. *Id.* ¶¶ 57, 69, 77. The Epic application that prompted this controversy is *Fortnite*, an online video game. The game debuted in July 2017 on a number of platforms, but not on the iPhone. Hitt Decl. ¶¶ 21-22. When Epic finally brought the game to the iPhone in March 2018, *Fortnite* was already a runaway success, with more than 45 million active players. *Id.* Since then, the game has continued to grow in popularity, although the iPhone has never been essential to its success. Epic has disclosed that only 10% of *Fortnite* consumers play regularly on the iPhone. Sweeney Decl., Dkt. 65 ¶ 3. "Epic has repeatedly told [Apple] that … Apple is the 'smallest piece of the pie'" when it comes to revenue. Schmid Decl. ¶ 18; *see also* Hitt Decl. ¶ 51. With respect to revenues, all competing platforms besides Google's Android have a higher Average Revenue Per Daily Active User than does the iPhone, with some platforms—like Xbox and PlayStation—a full 70% or 40% higher than the iPhone, respectively. Schmid Decl. ¶ 18.

Epic also offers Unreal Engine, a graphics engine available on many platforms, including PlayStation, Xbox, Nintendo Switch, PC, Mac, and the iPhone, that provides a suite of tools that developers can license to generate graphics for apps across a number of platforms, just one of which is the iPhone. Dkt. 1 ¶ 28; Dkt. 65 ¶ 33. Unreal Engine is one graphics engine that developers can

1 use. *See* Decl. of Mark Grimm (Grimm Decl.) ¶ 8. By comparison, one of Unreal Engine's key

2 competitors, Unity, characterizes itself as "the world's leading platform for creating and operating

3 interactive, real-time 3D content," and is available for "more than 20 platforms, including

4 Windows, Mac, iOS, Android, PlayStation, Xbox, Nintendo Switch, and the leading augmented

5 and virtual reality platforms, among others."[10] Unity is used by the overwhelming majority of

6 Apple developers that use a graphics engine. *Id.* ¶ 8.

7      Apple has gone to great lengths to help Epic market and distribute its games to hundreds of

8 millions of iPhone customers. Schiller Decl. ¶¶ 4, 65. Apple's graphic technology, Metal, is just

9 one example. Epic touted Metal as a technology that "revolutionized graphic design" and

10 "enable[d] developers like us to create richer 3D worlds." *Id.* ¶ 78. Apple also marketed Epic and

11 its software at major Apple events in 2011 and 2012, giving Epic—which was then a much smaller

12 developer—tremendously valuable publicity. *See* Grimm Decl. ¶ 7. Apple has facilitated

13 130 million *Fortnite* downloads—earning Epic more than $550 million. Schmid Decl. ¶ 5. *Fortnite*

14 has used more than 400 of Apple's unique API frameworks, five different versions of Apple's SDK,

15 and six unique Xcode builds. *See, e.g.*, Schiller Decl. ¶¶ 34, 77; Grimm Decl. ¶¶ 3, 5. Apple's app

16 reviewers have reviewed *Fortnite* more than 200 times, and Apple has completed more than 140

17 unique app store updates for *Fortnite*. Schmid Decl. ¶ 5. Moreover, Apple has sent over 500 million

18 marketing communications to *Fortnite* gamers and spent over a million dollars on social media

19 promotions. *Id.* ¶ 10. Apple has also revised its in-game gifting policy (Guideline 3.1.1) to

20 accommodate *Fortnite*'s holiday season marketing campaign. *Id.* ¶ 7.

21      Apple has devoted considerable resources to supporting Epic. From the launch of *Fortnite*

22 on iOS, "Apple's App Store team provided all-hands-on-deck treatment" to support Epic,

23 eventually including an Apple employee in Australia in order to provide 24-hour coverage. *Id.* ¶ 6.

24 In 2019 alone, Apple expedited app review in response to almost all of Epic's more than 80 rush

25 requests, even though developers are typically required to make such expedited requests only in

26 extenuating circumstances. *Id.* ¶ 8. Other unique benefits, too numerous to recite here, are

27

28 [10]  Unity Software, Inc., Registration Statement Under the Securities Act of 1933 (Form S-1) (Aug. 24, 2020), https://tinyurl.com/unitys1 (last visited Sept. 15, 2020).

1  documented more fully in the accompanying declarations. *See, e.g.*, *id.* ¶¶ 12-14.

2  　　　For reasons having nothing to do with Epic's claims against Apple, *Fortnite*'s popularity is

3  on the wane.[11] By July 2020, interest in *Fortnite* had decreased by nearly 70% as compared to

4  October 2019.[12] This lawsuit (and the front-page headlines it has generated) appears to be part of a

5  marketing campaign designed to reinvigorate interest in *Fortnite*.

6  **D.  Epic Intentionally Breaches Its Agreements With Apple, Is Expelled From

7  The App Store, And Launches A Litigation And Public-Relations Campaign
Against Apple.**

8  　　　To gain access to Apple's iPhone users, Epic and its affiliates signed on to Apple's License

9  Agreement and Guidelines. Dkt. 1 ¶¶ 32, 210; *see* Dkt. 61-1 ¶¶ 3-7, Ex. A-P. Epic Games, Inc.

10  signed the License Agreement for the account associated with *Fortnite*, and a wholly owned

11  subsidiary, Epic Games International S.à.r.l. (Epic International), signed the License Agreement

12  for the account associated with Unreal Engine. Epic administers the two accounts "as if they are

13  one." Schiller Decl. ¶ 57. "The accounts share a single tax ID number, a single individual as the

14  registered account holder, and a single credit [card] number that is used to pay the annual program

15  fee." *Id.* "The two accounts share the same test devices, and their [agreements] were renewed within

16  a minute of each other on June 30, 2020." *Id.* These agreements and the Guidelines put Epic and

17  its affiliates on notice of the consequences of cheating the system: All of Epic's "apps" will "be

18  removed from the store," and any other apps controlled by or affiliated with Epic, including Unreal

19  Engine, could likewise be "expelled from the Developer Program." *Id.* at Ex. C at 2; *id.* at Ex. B

20  ¶ 11.2.

21  　　　Apple invoked these provisions in response to one of the most egregious acts of sabotage

22  that Apple has experienced with any developer. Around 2:00 am on August 13, 2020, Epic's CEO,

23  Tim Sweeney, wrote to Apple stating the company's intent to breach its agreements: "Epic will no

24  longer adhere to Apple's payment processing restrictions." Schiller Decl. ¶ 62. Hours later, Epic

25

26  [11]  Crystal Mills, 'Fortnite' Popularity Fades As 'Call of Duty' Closes Gap, Survey Says, Yahoo

27  Finance (Apr. 8, 2020), https://tinyurl.com/y3k45f3u (last visited Sept. 14, 2020); Randall
Williams, Fortnite's Slowdown Has Epic Games Battling to Spark New Growth, Bloomberg

28  (Aug. 20, 2019), https://tinyurl.com/yxh4xgz2 (last visited Sept. 14, 2020).
[12]  Google Trends, https://tinyurl.com/yxrkj4td (last visited Sept. 14, 2020).

activated a hidden payment mechanism in *Fortnite* to slide a change into the app that blatantly evaded App Review. Dkt. 17 at 9; Schiller Decl. ¶¶ 62-65. Epic did not mention the direct pay "hotfix" in its August 3 submission of a *Fortnite* update to Apple, Dkt. 63 ¶ 23; rather, in order to conceal the change from Apple, Epic caused the change to come from its own servers so as to enable the approved version of *Fortnite* to offer a non-compliant in-app purchase option. Dkt. 17 at 9. "[T]he fact that the new functionality was delivered in two parts instead of one is not a significant difference." Graff Decl. ¶ 13. What matters is that "Epic's actions meant that the change was not properly subject to review by Apple." *Id.*

After Epic triggered the "hotfix" on August 13, Apple notified Epic that *Fortnite* violated the App Store Review Guidelines and that the app would be removed from the App Store until Epic provided an update that brought *Fortnite* back into compliance. Schiller Decl., Ex. H. The next day, Apple gave Epic notice that it also was in violation of the License Agreement. *Id.* at Ex. I. Apple has consistently provided Epic with opportunities to cure its breaches, which it continues to refuse. *Id.* ¶¶ 66-68. Instead, it engaged in a prepackaged marketing campaign and twice more submitted its app without removing the offending Epic direct payment feature. *Id.* ¶ 68.

Apple also recognized that Unreal Engine posed a potential threat. As noted, Unreal Engine is one of Epic's other lines of business that Epic controls and offers to developers. Dkt. 61 at 6; *see also* Schmid Decl. ¶ 20. Unreal Engine poses as a second potential "trojan horse" that would enable Epic to carry through on its threats to undermine the App Store and insert further unauthorized features. Schiller Decl. ¶ 72. Removing Epic's access to these developer tools reduces such a risk. *Id.* "[I]t is easy to see that a rogue application affecting the operation of a significant fraction of the world's iPhones could substantially disrupt local or even worldwide telephony systems, as well as broad segments of the Internet itself." Graff Decl. ¶ 9. "These risks mean that Apple, as steward of software running on about a billion devices worldwide, needs policies and practices that protect against such potential attacks while not needlessly impeding the flow of application software to its customers' phones." *Id.* Thus, in line with its Guidelines and practices, Schiller Decl. ¶¶ 46-56, Apple warned that it would terminate Epic's Developer Program membership, as it was entitled to do under the parties' at-will agreements, if Epic failed to comply with its agreement with Apple by

1    August 28.[13] Epic still has not done so.

2    Although Epic's willful violation of multiple contractual requirements has led to *Fortnite*'s

3    removal form the App Store, *Fortnite* remains widely available on Microsoft Windows, macOS,

4    PlayStation 4, Xbox One, Nintendo Switch, and Android. Dkt. 65 ¶ 3.[14] Tens of millions of iPhone

5    *Fortnite* players who have previously downloaded the video game "will continue to have access to

6    it on their devices and will have access to any available in-app purchase products." Schiller Decl.,

7    Ex. H. And despite Epic's intentional misconduct and campaign to smear Apple, Apple has

8    continued to provide Epic's users with services. For example, Apple has agreed to continue to allow

9    Epic's customers to use Sign In With Apple for the time being. Srinivasan Decl., Ex. A.

10   On August 13, 2020, Epic filed its Complaint against Apple. That same day, Epic's CEO

11   threatened that Epic would be "in conflict with Apple on a multitude of fronts—creative, technical,

12   business, and legal—for so long as it takes to bring about change …." Schiller Decl., Ex. G at 2;

13   *see also* Dkt. 36 at 18-19. A few days later, Epic presented the Court with an extensive "emergency"

14   motion premised on supposed harms that Epic could avoid simply by complying with its contractual

15   obligations.

16   **E.    The Court Denies In Part And Grants In Part Epic's Request For A TRO,**
     **And Epic Continues To Breach Its Agreements.**

17

18   On August 24, 2020, the Court issued its Order granting in part and denying in part Epic's

19   motion for a TRO. Dkt. 48. The Court held that it could not "conclude that Epic has met the high

20   burden of demonstrating a likelihood of success on the merits, especially in the antitrust context"

21   with regards to both *Fortnite* and Unreal Engine. *Id.* at 4.

22   As to *Fortnite*, the Court found that "Epic Games has not yet demonstrated irreparable

23   harm," "[t]he current predicament appears of [Epic's] own making," and "Epic Games strategically

24   chose to breach its agreements with Apple." *Id.* at 5-6. The Court held that Epic could "easily" fix

25   the problem and "remains free to maintain its agreements with Apple in breach status as this

26   ───────────────
     [13]  Epic's End User License Agreement contains similar provisions. End User License Agreement

27   for Unreal Engine: https://tinyurl.com/y5hbagot (last visited Sept. 14, 2020) at § 17 (providing for
     termination by Epic if the licensee "materially breach[es] any provision of this Agreement").

28   [14]  Epic Games, *FAQs: Where Can I Download Battle Royale?*, https://tinyurl.com/y2gzd8rk (last
     visited Sept. 14, 2020).

litigation continues, but … [t]he sensible way to proceed is for [Epic to comply with the agreements and guidelines] and continue to operate while it builds a record." *Id.* at 5 (citation and internal quotation marks omitted). "That Epic Games would prefer *not* to litigate in that context does not mean that 'irreparable harm' exists." *Id.* at 5.

In contrast, the Court temporarily restrained Apple from taking action involving Unreal Engine because "[f]or now, Epic International appears to have separate developer program license agreements with Apple and those agreements have not been breached." *Id.* at 5-8. At the same time, the court expressly noted that "Apple's reliance on its 'historical practice' of removing all 'affiliated' developer accounts in similar situations or on broad language in the operative contract at issue here can be better evaluated with full briefing." *Id.* at 5-6.

Since the TRO ruling, Apple's need to take action against both entities has been reinforced by information that Epic International (the Unreal Engine licensee) is collecting payment from iPhone users through the direct payment services that Epic Games (the *Fortnite* licensee) improperly inserted into *Fortnite*. *See* Schiller Decl. ¶ 68 (public reports indicate that circumvented payments from U.S. users go to Epic Games, and those from foreign users go to Epic International).

## III.   LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In general, a "plaintiff seeking a preliminary injunction must establish" (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. The party seeking the injunction "must satisfy *Winter's* four-factor test." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## IV.   ARGUMENT

In seeking a *mandatory* injunction requiring Apple to alter its contracts and give Epic privileges that no other developer enjoys, Epic's "burden here is doubly demanding." *Id.* In response to Epic's willful breaches and intentional misconduct, Apple has exercised its contractual rights to terminate Epic from the developer program to protect both Apple and end users. By asking

1    this Court to compel Apple to continue to allow both *Fortnite* and Unreal Engine to participate in

2    the iPhone ecosystem on terms other than those to which the parties contractually agreed, Epic is

3    seeking a mandatory (as distinguished from a prohibitory) injunction. *Stanley v. Univ. of S. Cal.*,

4    13 F.3d 1313, 1320 (9th Cir. 1994). Accordingly, Epic's motion must be denied "unless the facts

5    and law clearly favor the moving party." *Garcia*, 786 F.3d at 740. As explained below, Epic's

6    requests have no factual or legal support, and therefore no preliminary injunction should issue.

7         **A.    Epic Will Not Succeed On The Merits Of Its Antitrust Claims.**

8         At the TRO stage, the Court concluded that Epic had not "met the high burden of

9    demonstrating a likelihood of success on the merits, especially in the antitrust context." Dkt. 48 at

10   4. Since then, Epic has jettisoned its "essential facilities" theory, and it cannot succeed on its two

11   remaining theories of "monopoly maintenance" and "tying." The antitrust laws provide no support

12   for Epic's self-serving campaign to upend the operation of the App Store, an innovation that has

13   exponentially increased output, reduced prices, enriched developers like Epic, and dramatically

14   improved consumer choice and welfare.[15]

15        **1.    Epic's monopoly maintenance claim will not succeed.**

16        To prevail on its theory that Apple engaged in unlawful monopolization, Epic must prove

17   both "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition

18   or maintenance of that power as distinguished from growth or development as a consequence of a

19   superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S.

20   563, 570-71 (1966). Epic has not shown that it is *likely* to succeed in proving either element.

21        **a.    Epic's proposed market definition is untenable.**

22        "A threshold step in any antitrust case is to accurately define the relevant market, which

23   refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir.

24   2020) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (*Amex*)). *All* of Epic's

---

26   [15]   The 5-4 decision in *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019), addressed the "sole
27   question presented at th[at] early stage of the case," namely, whether iPhone users who purchased
     apps from the App Store were "direct" purchasers with standing to sue. The Court expressly did
28   "not assess the merits of the plaintiffs' antitrust claims against Apple" or "consider any other
     defenses Apple might have." *Id.* at 1519.

1    antitrust claims—and its insistence that Apple is a "monopolist"—turn on its assertion that the

2    relevant market is "the iOS App Distribution Market." Dkt. 61 at 8, 12. But the notion that the

3    market relevant for *Epic*'s apps is limited to distribution via iPhones—which Epic admits is the

4    "foundation" of its antitrust argument (*id.* at 12)—is meritless if not frivolous.

5        Epic distributes *Fortnite* not just on Apple devices, but through multiple computing

6    platforms—including PCs, Android devices, Xbox, PlayStation, and Nintendo's Switch. Hitt Decl.

7    ¶¶ 20-24. Epic itself built *Fortnite* to play the same on different platforms, and actively promotes

8    cross-platform play. *Id.* ¶ 26. Thus, the alternative means to distribute *Fortnite* present a textbook

9    example of services that are "reasonably interchangeable" when used "for the same purposes."

10   *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *see, e.g.*, *Hicks v. PGA*

11   *Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018) (dismissing antitrust claim when relevant market

12   ignored multiple ways of reaching consumers).

13       A "manufacturer's own products do not themselves comprise a relevant product market."

14   *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). In *Psystar*, for example,

15   Judge Alsup held that macOS was not a relevant product market because "MacOS performs the

16   same functions as other operating systems." *Id.* at 1199. Similarly, the relevant market here includes

17   at minimum the competing platforms available to Epic and other game developers. *See* Hitt Decl.

18   ¶ 14 ("[T]he relevant market cannot be limited to the distribution of iOS apps, and must at least

19   include competing platforms on which Epic already distributes and monetizes Fortnite."). That is

20   because the iPhone is only one of a number of "reasonably interchangeable" platforms for

21   distributing *Fortnite* and Epic's other games to consumers.

22       Epic attempts to distinguish *Psystar*, and limit the relevant market to a single brand, by

23   asserting that iOS is a "primary market" and app distribution is an "aftermarket." Dkt. 61 at 13 &

24   n.3 (citing *Newcal Indus., Ind. v. Ikon Office Sols.*, 513 F.3d 1038, 1048 (9th Cir. 2008), and

25   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)). But Epic has no basis for

26   arguing that components of Apple's integrated offerings should be considered separately. Epic's

27   own economic expert does not contend that the proposed "iOS App Distribution Market" is an

28   aftermarket—that word does not even appear in his declaration (or in Epic's complaint). *See* Hitt

1      Decl. ¶ 43. Rather, Epic's expert proposes an iOS-only market definition by erroneously

2      disregarding the other platforms that are manifestly available to distribute Epic's own products,

3      including *Fortnite*, to end users. *Id.* ¶¶ 20-24. Simply put, this is not an aftermarket case—and Epic

4      has no legal, expert, or factual support for its contrary assertion.

5            The relevant market here includes at least the other platforms on which Epic distributes

6      *Fortnite*. *Id.* ¶ 15. Within such a market, Apple has a market share of between 10 and 20 percent,

7      *id.* ¶ 15; *see also id.* at ¶¶ 49-50—well under the amount necessary to infer monopoly power. *See*

8      ABA Section of Antitrust Law, Antitrust Law Developments (8th ed. 2017), at 189 ("Since

9      *Jefferson Parish [Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)], no court has inferred the requisite

10     market power from a market share below 30 percent."). Indeed, only a fraction of Epic's customers

11     access *Fortnite* using an iPhone, and Epic's revenues from other platforms greatly exceed its

12     revenues from iPhone players.[16] *See* Schmid Decl. ¶ 18.

13           Epic's own conduct in developing and distributing *Fortnite* establishes that the iPhone is

14     "reasonably interchangeable" with other mobile devices running non-iOS operating systems, with

15     PCs and laptops, and with gaming consoles. Indeed, after *Fortnite* was removed from the App

16     Store, Epic urged users to switch platforms, explaining that the "party continues on PlayStation 4,

17     Xbox One, Nintendo Switch, PC, Mac, GeForce Now, and through both the Epic Games app at

18     epicgames.com and the Samsung Galaxy Store." Hitt Decl. ¶ 39. As a result, Epic's antitrust claims

19     falter at the outset because they rest on "a proposed relevant market that clearly does not encompass

20     all interchangeable substitute products." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d

21     430, 436-37 (3d Cir. 1997) (citing cases); *see also, e.g.*, *Hicks*, 897 F.3d at 1121.

22                    **b.**    **Epic identifies no unlawful monopoly maintenance.**

23           A "monopoly maintenance" claim requires a predicate monopoly in the relevant market,

24     which is lacking here as explained above. Regardless, Epic has not identified any unlawful conduct

25     undertaken by Apple to "maintain" a monopoly in its alleged distribution market. Epic observes

26     that Apple contractually requires distribution of iPhone apps through the App Store, and makes the

---

27
28    [16]   According to Epic's CEO, only 20% of *Fortnite* users have accessed the game exclusively on
Apple devices; and among *active* users, only 10% play through iOS. Dkt. 65 ¶ 3. Moreover, in 2018
and 2019, less than 15% of Epic's *Fortnite* revenue came from iOS. Hitt Decl. ¶ 50.

1    conclusory assertion that this requirement "completely eliminate[s]" competition in the proposed

2    "iOS App Distribution Market," Dkt. 61 at 15, but this argument simply repeats Epic's refusal to

3    acknowledge alternative distribution options. "If competitors can reach the ultimate consumers of

4    the product by employing existing or potential alternative channels of distribution, it is unclear

5    whether such restrictions foreclose from competition *any* part of the relevant market." *Omega*

6    *Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997).

7          Apple has spent billions of dollars creating developer tools and other IP that it licenses to

8    developers who wish to distribute games and other apps to iPhone users. *See* Schiller Decl. ¶¶ 5,

9    16. An IP owner, even if a monopolist (which Apple is not), is not required to allow unfettered and

10   uncompensated use of its own technology. *See* Herbert Hovenkamp et al., *IP and Antitrust: An*

11   *Analysis of Antitrust Principles Applied to Intellectual Property Law* § 13.03 (3rd ed., 2016 Supp.

12   2019) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 63-64 (D.C. Cir. 2001)). Accordingly,

13   Apple requires that apps developed using Apple software be distributed through the specified

14   channel (and only after approval by Apple), and that the developer pay a commission on certain

15   sales. There is nothing unlawful about that business decision.

16         Epic's defective theory of monopoly maintenance does not provide any legal basis for a

17   preliminary injunction that is independent from its flawed tying theory. Epic seeks to enjoin "the

18   restriction that Epic defied," Dkt. 61 at 12, and to require Apple to return *Fortnite* to the App Store

19   with an alternative to IAP for facilitating in-app purchases. Epic identifies no other "maintenance"

20   activity that it seeks to enjoin. Yet evading the IAP functionality for Epic apps is the same remedy

21   that Epic seeks for its tying claim, and it fails for the same reasons (discussed below).[17]

22              **2.      Epic's tying claims will fail because IAP is not a separate market or**
                          **product.**
23

24         Epic devotes the bulk of its merits argument to contending that Apple "ties" "iOS App

25   Distribution" services (the "tying" product) to "iOS In-App Payment Processing" services (the

26   "tied" product). Dkt. 61 at 12; *see id.* at 15-23 (discussing tying claims). Epic's tying theory "falters

---

27   [17]  Epic's antitrust theories also have nothing to do with Unreal Engine, and thus cannot support
     that aspect of the requested injunction. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
28   810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not
     pled in the complaint, the court does not have the authority to issue an injunction").

1    on the first, most fundamental requirement—the existence of a tie." *Aerotec Int'l, Inc. v. Honeywell*
2    *Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). "A tie only exists where 'the defendant improperly
3    imposes conditions that explicitly or practically require buyers to take the second product if they
4    want the first one.'" *Id.* (quoting 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶
5    1752b (3d ed. 2011)); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir.
6    2016). There is no such conditioning here.

7         Apple does not force developers to use IAP in order to have an app distributed. However,
8    if developers do charge for in-app purchases, then they must pay Apple's commission. Epic's
9    suggestion that the commission is only for the use of IAP has no basis and, indeed, is contrary to
10   the record. *See* Schiller Decl. ¶¶ 5, 7, 33, 41. IAP is part of an integrated service delivered in the
11   form of a single transaction, not a separate product. Schmalensee Decl. ¶¶ 44-45. In the iPhone
12   business model, the commission is the return on Apple's investment in the App Store and the full
13   suite of IP, tools, and services Apple offers to developers. *See* Schiller Decl. ¶ 7; Hitt Decl. ¶ 75;
14   Schmalensee Decl. ¶ 29, 57. It is what allows Apple to offer access to its platform to any developer
15   for $99 and to offer free distribution for most apps on the App Store.

16        Developers are free to adopt other business models that do not include in-app digital
17   purchases on which they must pay Apple a commission. A developer can generate revenue through
18   advertising, through the sale of physical goods and services, and through any number of other ways
19   that will result in no commission to Apple.[18] *Id.* ¶ 26. None of these requires the use of IAP. *Id.*
20   ¶ 46. Over 80% of the apps on the App Store embrace those models. *See* Schiller Decl. ¶ 6;
21   Schmalensee Decl. ¶ 26. Indeed, Epic is among the 80% of developers that pay just $99 a year for
22   access, and takes advantage of this model to freely distribute other apps and to build its Unreal
23   Engine business. Epic's contention that IAP is a "tied" product that should be enjoined is nothing
24   other than a demand that this Court excuse Epic from its contractual obligation to pay commissions.
25   Epic is not likely to succeed in subverting tying doctrine to that end.

26        Although sales of in-app products in *Fortnite* (which is free to download and play) must be

27

28     [18]  *See, e.g.*, Apple, *Choosing a Business Model*, https://developer.apple.com/app-store/business-models/ (last visited Sept. 15, 2020).

1  made through IAP, Epic could have easily chosen a different business model to monetize *Fortnite*

2  without in-app products. Schmalensee Decl. ¶ 26; Schiller Decl. ¶ 39. Thus, Epic's conclusory

3  assertion that "Apple conditions use of the tying product, app distribution through the App Store,

4  on use of the tied product, in-app payment processing for digital content through IAP," Dkt. 61 at

5  16, is flat wrong. And even when a developer voluntarily decides to offer digital in-app purchases,

6  that does not mean that (as the law requires to prove tying) "there exist two distinct products or

7  services in different markets whose sales are tied together." *Paladin Assocs., Inc. v. Montana Power*

8  *Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

9          In addition, where, as here, the allegedly tied product is an essential ingredient of the overall

10  "method of business" with customers, courts view them as one product not as two tied together.

11  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008) (quoting *Will v.*

12  *Comprehensive Accounting Corp.*, 776 F.2d 665, 670 n.1 (7th Cir 1985)). That is especially true

13  where, as here, the allegedly separate products have always been integrated. *See id.* at 975. IAP and

14  the App Store have never been distinct or separated—from each other, or from the overall iPhone

15  platform. Schiller Decl. ¶ 32. Moreover, Epic's tying claim will fail because it cannot satisfy the

16  "purchaser demand" test for finding distinct products—*i.e.*, whether sufficient demand exists for

17  the tied product separate from the tying product. *Rick-Mik Enters., Inc.*, 532 F.3d at 975 (quoting

18  *Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 19). As Apple's economic expert attests, no demand

19  exists for IAP that is separate from distribution via the App Store. *See* Schmalensee Decl. ¶¶ 46-

20  54; *see also* Schiller Decl. ¶ 45. For these reasons, among others, Epic is not likely to succeed on

21  its tying claims.[19]

22

23  ────────────────

24  [19]   The cases in the text involve one-sided markets, but it is important to recognize that the iPhone
    is a classic example of a two-sided platform connecting developers with end users. Schmalensee
    Decl. ¶¶ 39-45; *see* David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics*
25  *of Multisided Platforms* 117 (2016) ("A year after its launch, the iPhone was a two-sided platform
    connecting users and app developers."). It is a *transaction* platform that provides "different
26  products or services to two different groups who both depend on the platform to intermediate
    between them." *Amex*, 138 S. Ct. at 2280. The function of such a platform is to "facilitate a single,
27  simultaneous transaction between" the two sides—in this case, app developers and iPhone users.
    *Amex*, 138 S. Ct. at 2286; *see* Schmalensee Decl. ¶¶ 44-45. As a matter of antitrust analysis,
28  transaction platforms supply "only one product—transactions" and accordingly "only one market

1

### 3.   Apple's iPhone business model is procompetitive.

2    Finally, Epic's assertion that Apple's conduct "has clear anti-competitive effects," Dkt. 61

3    at 20, is notably devoid of any economic support from Epic's expert, *see* Hitt Decl. ¶ 56, and its

4    assertion that there are "no procompetitive justifications for Apple's conduct," Dkt. 61 at 20

5    (capitalization altered), is contravened by the record and the everyday experience of smartphone

6    users over the last decade. The record now before the Court establishes that the challenged practices

7    have substantial procompetitive benefits, to both consumers and developers, providing another

8    independently sufficient reason that Epic is unlikely to succeed in proving *either* monopoly

9    maintenance *or* tying.

10    Despite Epic's suggestion to the contrary, *per se* analysis has no place in this case. The rule

11    of reason applies to any tying claim that "involves software that serves as a platform for third-party

12    applications." *Microsoft*, 253 F.3d 34 at 89 (en banc); *see also id.* at 95 (no per se claim where "the

13    tying product is software whose major purpose is to serve as a platform for third-party applications

14    and the tied product is complementary software functionality"). Just as the *Microsoft* decision

15    applied the rule of reason to Microsoft's integration of certain APIs into the Windows operating

16    system, here the rule of reason must apply to Apple's integration of its StoreKit APIs into the App

17    Store software platform (and indeed, the integration of the App Store with the iPhone), an

18    integration that offers numerous benefits to consumers and developers. Schiller Decl. ¶¶ 34-36;

19    Schmalensee Decl. ¶¶ 31, 34-37. These benefits offset and greatly outweigh any alleged harm

20    resulting from the challenged conduct. *Microsoft*, 253 F.3d at 59; *see also Mozart Co. v. Mercedes-*

21    *Benz of North America, Inc.*, 833 F.2d 1342, 1348-51 (9th Cir. 1987). They also constitute

22    legitimate business justifications for Apple's conduct. *See Image Tech. Servs., Inc. v. Eastman*

23    *Kodak Co.*, 125 F.3d 1195, 1220 n.12 (9th Cir. 1997); *Universal Analytics, Inc. v. MacNeal-*

24    *Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990).

25    The number of apps in the App Store grew from 500 at its start to 1.8 million today. End

26    users have downloaded billions of iPhone apps—the great majority for free—and developers, like

27

28    should be defined." *Amex*, 138 S. Ct. at 2286-87 (quotation marks and citations omitted). Epic's
refusal to recognize this reality is another reason that its antitrust claims will fail.

1   Epic, have used the App Store to create innovative businesses that generate or deliver hundreds of

2   millions of dollars in annual revenues. Schiller Decl. ¶¶ 8, 36, 39, 45, 65; Hitt Decl. ¶ 62. As a

3   matter of basic economics, such spectacular growth in output is wholly inconsistent with the claim

4   that Apple's conduct lacks competitive justification. Monopoly is synonymous with unjustified

5   output restriction, not vigorous output expansion. *See Brooke Grp., Ltd. v. Brown & Williamson*

6   *Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a restriction in

7   output."); *see also Amex*, 138 S. Ct. at 2288 ("'Market power is the ability to raise price profitably

8   *by restricting output*.'").

9       Last year, the App Store facilitated $138 billion in commerce in the United States alone

10  with more than $116 billion going to developers.[20] This was made possible by the tools, education,

11  and support services that Apple makes available to developers. Epic itself has hugely benefited—

12  and earned hundreds of millions of dollars—from the tools that Apple has contractually agreed to

13  provide developers as well as a host of extra-contractual opportunities conferred on *Fortnite. See*

14  Schmid Decl. ¶¶ 4-17; Schmalensee Decl. ¶¶ 65-67. Commissions on app purchases or in-app

15  digital purchases through the App Store provide Apple with a return on its investment. Epic's

16  response that "creating the iOS platform does not also entitle Apple to compensation for app

17  distribution and in-app payment processing services," Dkt. 61 at 21, is absurd. It is not

18  anticompetitive for a provider of products and services to require payment, and nothing about the

19  way that Apple has structured its compensation system raises antitrust concerns.[21]

20      To be sure, as Epic notes, Dkt. 61 at 21-22, Apple might have structured its business

21  differently when it introduced the App Store more than a decade ago. Apple adopted a business

22  model of (i) charging iPhone users for device sales; and (ii) charging developers a modest annual

23  fee plus a commission from app purchases and in-app digital purchases. Apple could perhaps have

24  charged developers a higher, upfront price for its developer tools, marketing support, and other

25  valuable features of the iPhone ecosystem. Alternatively, it could perhaps have put the entire price

26

27  [20]   Cook July 2020 Statement at 3.

28  [21]   Epic complains that the commission is charged on digital purchases but not physical purchases, and that macOS and iOS do not work exactly the same with respect to app distribution. Dkt. 61 at 17. These are red herrings. *See* Schiller Decl. ¶¶ 9, 24-25, 39.

burden on device users. *See, e.g.*, Hitt Decl. ¶¶ 71-76 (critiquing Epic's proposed alternative monetization methods). But if the Court were to enjoin one piece of the extant model (the 30% commission on in-app purchases), Apple would have to rework the entire system—with disruptive, extensive, expensive, and likely adverse consequences for other developers and consumers. *Id.* ¶¶ 74-76; Schmalensee ¶ 58. Whether or not these alternatives would benefit Epic today, Apple (and the Court) must consider their impact on other developers and iPhone customers, and Epic has not even tried to show what the *net* effect of a different model would be.

It is clear that Epic doesn't want to pay commissions to Apple, even though it agreed to do so. But nothing in antitrust law requires Apple to provide the benefits it offers to developers "under terms and conditions favorable to" Epic. *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009). There is nothing anticompetitive about charging others to use one's service (as Epic itself does). *See* Hitt Decl. ¶ 56; Schmalensee Decl. ¶¶ 19-20, 43, 57-59, 62. Other app stores for computing platforms also charge similar commissions, at a similar rate; this is strong evidence that Apple's business judgment here is a rational, pro-competitive and sound one, even setting aside that having 70% of revenue going to developers represents a dramatic improvement over the revenues developers earned from software distribution before the App Store. *See* Schiller Decl. ¶¶ 3, 7; Hitt Decl. ¶ 58; Schmalensee Decl. ¶ 62. That Epic wishes to pay a lower price than what Apple charges, or nothing at all, does not make the iPhone's business model anticompetitive. *See Qualcomm*, 969 F.3d at 994 n.15. Particularly given the extensive benefits that Epic has derived from Apple, Epic has no prospect of succeeding on the merits of its claims.[22]

## B. Epic Will Not Suffer Irreparable Harm Because Its Claimed Harm Is Entirely Self-Inflicted.

Epic is a saboteur, not a martyr. It neither needs nor is equitably entitled to the extraordinary relief it seeks from this Court. Indeed, Epic does not even try to explain *why* it had to breach its contracts to bring this case—let alone why it had to so fundamentally breach Apple's trust by introducing its "hotfix." And Epic could have avoided any further harm involving both *Fortnite* and Unreal Engine—with a simple keystroke.

---

[22]  Epic's state law claims will fail for essentially the same reasons. *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).

Three points remain as true today as they did at the TRO stage: First, every bit of harm Epic asks this Court to address is entirely self-inflicted. This Court was right when it held in its TRO decision that Epic's "current predicament" is "of its own making," and that "self-inflicted wounds are not irreparable injury." Dkt. 48 at 5 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020)). That proposition is hornbook law. *See, e.g.*, 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2020). Second, a preliminary injunction is an extraordinary step that a court takes only when it is necessary to avoid harm. Since Epic itself can solve its own problems, it has no need for judicial intervention—as the Court has already recognized. Third, as this Court also held, harm that "results from the express terms of [the] contract" cannot be irreparable. Dkt. 48 at 5 (quoting *Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003)). Having executed contracts granting Apple the right to do exactly what it did, Epic cannot now complain of the harm it agreed to.

There is no dispute about the scope of Epic's contractual commitment. Epic does not dispute that its "hotfix" was a breach. And it does not dispute that the breach meant Apple had the right to "block[] consumer access to *Fortnite* or forthcoming updates." Schiller Decl., Ex. C at 3. Nor does it dispute that Apple *always* had the right to terminate the developer agreements at any time, for any reason, not just for Epic and not just for *Fortnite*, but for any Epic affiliate under any License Agreement. *Id.* at Ex. A ¶ 10 ("Apple may terminate or suspend you as a registered Apple Developer at any time in Apple's sole discretion."); *Id.* at Ex. B ¶ 11.2 ("Either party may terminate this Agreement for its convenience, or for any reason or no reason[.]").

Nor should there be any dispute about what Epic, and its affiliates, should reasonably have expected Apple to do. As documented above, the Guidelines advise in no uncertain terms that developers who attempt to "cheat the system," as Epic did here, "*will* be expelled from the Developer Program." *Id.* at Ex. C at 2 (emphasis added). While Epic labels Apple's response "retaliatory," it is not retaliation for one party to a contract to implement the consequence to which both parties agreed in the event of a breach. That is true not just of Epic Games, but also of its wholly owned subsidiary, Epic International, which is led by the same person who declared war on Apple and which is receiving illicit payments through the *Fortnite* "hotfix."

Based on a limited record, this Court temporarily restrained Apple from blocking access to Unreal Engine because "[t]he relevant agreement . . . is a fully integrated document that explicitly walls off the developer program license agreement." Dkt. 48 at 5. The Court agreed, however, that "Apple's reliance on its 'historical practice' of removing all 'affiliated' developer accounts in similar situations or on broad language in the operative contract at issue here can be better evaluated with full briefing." *Id.* at 5-6. As explained above, Apple's practice of removing affiliated developer accounts is well-established. Schiller Decl. ¶¶ 54-55. And as demonstrated below, an app developer can inflict incalculable harm on Apple's entire ecosystem. Epic's brazen insertion of the "hotfix" into *Fortnite* raises the very real possibility that it will attempt to use Unreal Engine to distribute other secret and unauthorized code. When an app developer proves to be untrustworthy, Apple has to have the power to protect itself and its customers from further harm.

Epic does not come to this Court with clean hands. Conceding as much, Epic argues that its unclean hands do not foreclose its antitrust claims. Dkt. 61 at 23. But as this Court recognized in its TRO decision—and as Epic now admits the Court "correctly" acknowledged, *id.* at 24—the cases Epic cites merely hold that "unclean hands" is not an affirmative defense to an antitrust claim, an issue "not currently before the Court." Dkt. 48 at 5 n.2; *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968); *Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379, 1381 (9th Cir. 1977). At this early stage, the issue is not whether "conduct by [Epic] defeats [its] right to sue," *Perma Life Mufflers*, 392 U.S. at 140, but whether it has suffered any irreparable harm.

Epic further asserts that "the same principle that prevents unclean hands from being a defense to an antitrust claim *also* prevents it from being a basis to find lack of irreparable harm." Dkt. 61 at 24. Epic cites no authority for that proposition, which conflicts with the venerable maxim that he who comes into equity must do so with clean hands. In any event, at the preliminary injunction stage, it suffices that Epic created the harm, that Epic agreed it would suffer these consequences based on its conduct, and that Epic can avoid any harm right now by changing course. All of these facts are undisputed, and they mean that the "extraordinary remedy" of a mandatory preliminary injunction is unavailable irrespective of the unclean hands doctrine.

Epic's only other rebuttal is to cite as "analogous" cases that are anything but. *Id.* Epic first

1   likens itself to the distributor plaintiffs in *Acquaire v. Canada Dry Bottling Co.*, 24 F.3d 401, 411

2   (2d Cir. 1994), who refused to comply with a bottler's resale price requirements. In enjoining the

3   bottler from withholding product to punish those distributors, the Second Circuit did not endorse a

4   rule allowing antitrust plaintiffs to disavow contractual provisions they do not like, while forcing

5   the defendant to provide them with contractual benefits during the pendency of litigation, as long

6   as the plaintiffs cry "retaliation." Instead, the court focused on several specific features of the

7   defendant's conduct in that case, including that the defendant made after-the-fact changes to its

8   policy of withholding product from distributors who failed to comply, that it did not even comply

9   with its own stated policy, and that the plaintiffs showed they could be "driven out of business"

10  absent an injunction. *Acquaire*, 24 F.3d at 412. The court therefore rejected the premise of the

11  defendant's claim that the plaintiffs' injuries were "self-inflicted." *Id.* at 411. None of the critical

12  facts of *Acquaire* are present here; indeed, it is indisputable that Epic's asserted injuries are self-

13  inflicted—as the Court has already recognized. Epic identifies no authority that would undermine

14  this Court's prior holding and allow antitrust plaintiffs to manufacture their own irreparable

15  injuries, when all other plaintiffs are held to the rule that self-created harm fails to support injunctive

16  relief. *Al Otro Lado*, 952 F.3d at 1008.[23]

17          Finally, a word about Epic's claimed reputational harm. Epic has engaged in a full-scale,

18  pre-planned media blitz surrounding its decision to breach its agreement with Apple, creating *ad

19  campaigns* around the effort that continue to this day. If Epic were truly concerned that it would

20  suffer reputational injury from this dispute, it would not be engaging in these elaborate efforts to

21  publicize it. From all appearances (including the #freefortnite campaign), Epic thinks its conduct

22  here will *engender* goodwill, boost its reputation, and drive users to *Fortnite*, not the opposite. That

23  is not harm.

---

24  [23]  Epic also cites cases suggesting that courts may refuse to enforce a "contractual right" or a

25  "contractual clause" that is itself illegal. *See* Dkt. 61 at 24-25 (citing *Milsen Co. v. Southland Corp.*,
    454 F.2d 363, 368-69 (7th Cir. 1971); *Germon v. Times Mirror Co.*, 520 F.2d 786, 788 (9th Cir.

26  1975)). But that is not what Epic seeks. Rather, Epic asks this Court to rewrite the contracts so that
    Epic can reap all the benefits of the iPhone ecosystem while depriving Apple of its commissions.

27  *See* Dkt. 61 at 25 n.8 (acknowledging that Epic seeks to invalidate some provisions of the License
    Agreement while leaving others in force). As explained above, this would require Apple to rework

28  its entire business model.



**C.      The Balance Of Equities Tips Sharply In Apple's Favor.**

In contrast to Epic, Apple would face incalculable harm if this Court issues a preliminary injunction—and Apple has no power to avoid it. The reason goes back to the purpose of Apple's rule against sneaking undisclosed code past its review team and the need to apply that rule not just to a company that as a formal matter executed a contract, but also to all affiliated entities acting in concert: The rules are there to protect the entire ecosystem of iPhone customers and developers.

Stripping Apple of its power to enforce those rules would also pose an imminent threat to Apple's customers' data (including children's data), to the safety and security of the App Store, and—more broadly, to the integrity of the iPhone. *See* Schiller Decl. ¶¶ 46, 52. Because Epic's "hotfix" circumvents the customer safeguards of Apple's IAP, it threatens to put the customer's confidential information "at vastly greater risk." *Id.* ¶ 35. Indeed, users who previously downloaded the "hotfix" version of *Fortnite* are already facing the prospect that Epic's alternative payment system may compromise their privacy or data security. *Id.* ¶¶ 68, 70, 76. The alternate payment system Epic snuck into *Fortnite* also lacks the parental controls that Apple's IAP offers to restrict online purchases. *See id.* ¶¶ 35, 70. The preliminary injunction sought here would increase those risks exponentially: By compelling Apple to return the unauthorized version of the "hotfix" version of *Fortnite* to the App Store, additional users would be able to download the version of the app with Epic's potentially unsecure direct payment option. *See id.* ¶ 68. The injuries resulting from an injunction compelling Apple to restore *Fortnite* to the App Store would go well beyond the "los[s] of] commissions," Dkt. 61 at 30, and threaten the integrity of the iPhone ecosystem itself.

Those injuries would be compounded if Apple were compelled to continue to provide Epic

1  access to the Apple Developer Membership program, which Epic uses to offer the Unreal Engine
2  graphics engine to other developers. Schmid Decl. ¶ 20. By participating in the program, Epic gains
3  access to a full suite of developer tools, software, and other IP from Apple, as well as pre-release
4  versions of iOS updates. Schiller Decl. ¶¶ 10, 12. Unreal Engine, in turn, provides developers a
5  software development platform that allows developers to more quickly and easily build apps.
6  Schmid Decl. ¶ 20. Those shortcuts provide Epic with a possible trojan horse to further harm
7  Apple's customers, developers, and goodwill. *See, e.g.*, Schiller Decl. ¶¶ 71-73. Should this Court
8  require Apple to continue supporting Epic in its developer program, the Court's order would give
9  Epic access to the developer tools that it could use to insert malware, or other unauthorized features
10 such as alternative direct payment mechanisms, in the version of Unreal Engine for iOS devices,
11 and thus the non-Epic apps that are available on the App Store and rely on Unreal Engine. *Id.* ¶ 72.
12 By depriving Apple of the contractual remedy that it has to protect itself against Epic's announced
13 intent to subvert the App Store—the right to terminate its developer agreement—the injunction
14 Epic seeks would leave Apple defenseless against Epic's assault.

15     Each of the above harms is *immediate* given the fast-moving nature of app development. *Id.*
16 ¶ 70. And the harms are compounded by the fact that Epic is actively encouraging developers to
17 follow its lead. Epic insists that other developers will not follow its lead because they will fear
18 "retaliation." Dkt. 61 at 29-30. But no one will fear Apple's response if this Court grants the
19 injunction Epic seeks and declares that all developers can flout Apple's rules with no consequence
20 as long as they claim Apple's rules are anticompetitive.

21     As to the equities, the balance is not close. Epic, not Apple, willfully breached multiple
22 contractual promises. Epic, not Apple, breached the trust and security that is a hallmark of the
23 iPhone ecosystem. Epic, not Apple, continues to escalate this manufactured dispute with every
24 means within its power, even after the TRO. Epic, not Apple, brought this fight. Epic, not Apple,
25 can avoid all the harm now asserted. A preliminary injunction must comport with the principles
26 and traditions of equity, yet there would be nothing equitable about rewarding Epic—and punishing
27 Apple—for conduct by Epic that was not only flagrantly wrongful but entirely unnecessary.

28

1

### D.     An Injunction Would Harm The Public Interest.

2      The injunction Epic seeks would severely damage the public interest. By compelling Apple

3   to continue dealing with Epic, despite Epic's open breach of its agreement with Apple, an injunction

4   would contravene the public's "strong interest in holding private parties to their agreements." *S.*

5   *Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853 (6th Cir. 2017).

6   The public interest "does not favor forcing parties to [an] agreement to conduct themselves in a

7   manner directly contrary to the express terms of the agreement." *Frank B. Hall & Co., Inc. v.*

8   *Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025-26 (8th Cir. 1992); *see also Goldberg v.*

9   *Barreca*, No. 2:17-CV-2106 JCM (VCF), 2017 WL 3671292, at *8 (D. Nev. Aug. 24, 2017), *aff'd*,

10  720 F. App'x 877 (9th Cir. 2018). Here, the plain terms of the agreement permit Apple to terminate

11  its relationship for any reason at all. Yet the injunction Epic seeks would compel Apple to continue

12  to deal with a party that is violating the rules, thereby erasing that clear contractual right.

13      Such an injunction would harm other App Store developers—Epic's competitors—who

14  continue to pay the contractual commissions, and would thus essentially be forced to subsidize the

15  tools that allow Epic to succeed. Epic should not be allowed to continue to engage in rule-breaking

16  while pursuing its antitrust claims, and at the same time expect other developers to follow the rules.

17  And the consequences of the requested injunction holding Apple defenseless against further

18  intrusions of secret and unauthorized code would be hugely damaging to the public, including a

19  billion iPhone users whose data could be compromised—the very third parties Apple's rules are

20  designed to protect. As noted, Apple's IAP provides extensive benefits to iPhone users—including

21  protections for their privacy, for the security of personal data, and parental controls that allow

22  parents to prevent their children from racking up thousands of dollars of digital transactions. By

23  preventing Apple from removing *Fortnite* from the App Store, the contemplated injunction would

24  put customers' privacy and security at risk.

25      The same considerations apply with full force to Unreal Engine. If Apple is compelled to

26  continue supporting it despite Epic's overt breach and announced intent to harm Apple on any

27  "front" possible, Epic could use Unreal Engine as a "trojan horse" to enable developers to insert

28  other unauthorized features that compromise customers' security and privacy into apps. For

example, Unreal Engine could be used to steal from users, or misappropriate financial information, or link to an illegal currency site for payment. Schiller Decl. ¶¶ 72, 74. In short, barring Apple from enforcing the plain terms of its agreements with Epic will put Apple's entire ecosystem and its millions of users at risk for phishing scams, inappropriate content, and other security breaches. The public interest favors Apple.

Against this background, the only public interest considerations that Epic identifies are the generalized "public interest in antitrust enforcement" and "the ire of those harmed third parties—*Fortnite* players and Unreal Engine developers." Dkt. 61 at 25. The former point simply replicates Epic's merits argument—and fails for the same reasons. As to the latter consideration, in ruling on the TRO, this Court correctly recognized that as much as *Fortnite* players may want the game to return to the iPhone platform, their desires cannot "outweigh the general public interest in requiring private parties to adhere to their contractual agreements or in resolving disputes through normal, albeit expedited, proceedings." Dkt. 48 at 7. With respect to Unreal Engine, which is used by a minuscule fraction of iPhone apps, the court expressed concern about potential harm to "both third-party developers and gamers." *Id*. But with regard to all these groups, the power to avoid this adverse impact lies entirely in Epic's hands: The only reason third-party *Fortnite* players and Unreal Engine developers are threatened by this commercial dispute between Epic and Apple is because Epic is sacrificing them to advance its own commercial interests. And Epic's defiance of Apple's policies has put Apple to the choice of acceding to Epic's demands or safeguarding the data and privacy of a billion customers who rely on the iPhone ecosystem. Apple's decision to put its customers first should not be counted as a point favoring Epic in the equitable calculus. The public interest does not support rewarding Epic's strategy of intentionally harming third parties to gain a pecuniary advantage, to the detriment of others who follow the rules.

## V.    CONCLUSION

For the reasons set forth above, Apple respectfully requests that the motion for a preliminary injunction be denied.

1  Dated: September 15, 2020

2                                          GIBSON, DUNN & CRUTCHER LLP

3
                                           By:    /s/ Theodore J. Boutrous Jr.
4
5                                                 Theodore J. Boutrous Jr.
                                                  Richard J. Doren
6                                                 Daniel G. Swanson
                                                  Mark A. Perry (*pro hac vice*)
7                                                 Veronica S. Lewis (*pro hac vice*)
                                                  Cynthia E. Richman (*pro hac vice*)
8                                                 Jay P. Srinivasan

9                                          ORRICK, HERRINGTON & SUTCLIFFE LLP

10
                                           By:    /s/ William F. Stute
11
12                                                E. Joshua Rosenkranz (*pro hac vice pending*)
                                                  William F. Stute (*pro hac vice pending*)
13
14                                         *Attorneys for Defendant Apple Inc.*

15             **Attestation of Concurrence Under Local Rule 5-1(i)(3)**

16        I, Theodore J. Boutrous Jr., attest pursuant to Northern District Local Rule 5-1(i)(3) that

17  concurrence in the filing of the document has been obtained from William F. Stute.  I declare under

18  penalty of perjury under the laws of the United States of America that the foregoing is true and

19  correct.

20

21  Dated: September 15, 2020                By:    /s/ Theodore J. Boutrous Jr.
                                                   Theodore J. Boutrous Jr.
22

23

24

25

26

27

28