THEODORE J. BOUTROUS JR.,
   SBN 132099
   tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
   rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
   dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
   Los Angeles, CA 90071-3197
   Telephone:   213.229.7000
   Facsimile:   213.229.7520

MARK A. PERRY, SBN 212532
mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar
   No. 492089; *pro hac vice*)
crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:   202.955.8500
Facsimile:   202.467.0539

VERONICA LEWIS (Texas Bar
No. 24000092; *pro hac vice*)
vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201
Telephone:   214.698.3100
Facsimile:   214.571.2900

E. JOSHUA ROSENKRANZ
(N.Y. Bar No. 2224889; *pro hac vice pending*)
jrosenkranz@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:   212.506.5000
Facsimile:   212.506.5151

WILLIAM F. STUTE
(D.C. Bar No. 1032093; *pro hac vice pending*)
wstute@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005-1706
Telephone:   202 339 8400580
Facsimile:   202 339 8500

**Attorneys for Defendant APPLE INC.**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>               Plaintiff,<br><br>   v.<br><br>APPLE INC.,<br><br>             Defendant. | CASE NO. 4:20-CV-05640-YGR<br><br>**DECLARATION OF PHILIP W. SCHILLER IN SUPPORT OF DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, Philip W. Schiller, declare as follows:

1.      I make this declaration in support of Apple's Opposition to Plaintiff's Motion for a Preliminary Injunction.  I have personal knowledge of the matters stated herein, and if called upon to do so, I could and would competently testify hereto.

2.      I am currently an Apple Fellow, and before assuming this position, I served as Apple's Senior Vice President, Worldwide Marketing for approximately 20 years.  I was involved in the development of the App Store before it went live and have remained involved with it ever since.  As a result, I have personal experience and knowledge concerning Apple's App Store, including the App Store Review Guidelines, the App Store Developer Agreement, and the App Store Program License Agreement.

**The App Store Business Model**

3.      Since the App Store's launch in 2008 with 500 apps, Apple has offered tremendous value to app developers while also providing a safe and secure place for users to bring desirable apps onto their mobile devices.   Before use of the App Store or other app marketplaces became common, software was sold on physical disks through brick-and-mortar electronics distributors, and those distributors charged commissions as high as 50% to 70%.  Later, some developers offered their software for download from the Internet but these transactions were fraught with security and privacy risks for the consumer; every such download risked that bad actors could expropriate user's financial or other personal information.   Through its App Store, Apple dramatically changed this experience for developers and consumers alike.   On the one hand, the App Store empowered developers, making it far less expensive and much easier for them to instantaneously reach Apple device users in 175 different countries.  As a result, iPhone and iPad users now have over 1.8 million apps at their fingertips through the App Store.  At the same time, Apple has built a lasting and essential trust with its iPhone and iPad users by vetting every one of these apps to ensure that they work as promised and that they do not compromise user safety, security, or privacy in any way.

4.      For a nominal $99 fee for membership in the Apple Developer Program, Apple provides developers with an assortment of software tools to build, test, and distribute their apps on Apple's iOS for iPhones and iPadOS for iPads (collectively "iOS").   Additionally, Apple personnel are available to advise developers on ways to improve their products and grow their businesses.   Developers also benefit from Apple's marketing, editorial, and promotional support to attract new users, and Apple's distribution services and systems make it easy for developers to close sales and deliver software in a safe and secure manner, no matter where in the world their customers live, what language they speak, or what currency they use.   Apple even helps developers navigate complicated foreign taxation systems by sorting through the requirements of different countries to assure that any required taxes are withheld.   The App Store is constantly evolving as Apple and its engineers continuously innovate to meet and exceed the needs and expectations of developers while ensuring that Apple customers always are treated to the best digital shopping experience.

5.      Apple has spent billions of dollars to develop and maintain the App Store.   The data centers alone that Apple has established to facilitate the App Store have cost Apple many billions of dollars, and Apple spends hundreds of millions of dollars per year to employ the engineers who contribute to the App Store's success.

6.      For over 80% of apps available on the App Store, all of these services are provided by Apple at no cost beyond the nominal annual fee.   If a developer chooses not to charge for its app, or if it monetizes its app through advertising or the sale of merchandise or services outside of the App Store, that developer pays Apple nothing other than the nominal annual fee.

7.      The App Store improves the experience of those who use Apple devices and makes it more likely that they will continue to purchase Apple devices and recommend them to others. Additionally, Apple realizes a return on its investment in the App Store by charging a

Gibson, Dunn &
Crutcher LLP

commission on two categories of commerce that take place within the App Store: the initial sale of apps for which developers elect to charge a purchase price; and, in-app purchases of digital content purchased and consumed within an app.   As part of their contractual agreements with Apple, developers agree to pay Apple a commission of 30% for each purchase.   Since the launch of the App Store in 2008, Apple has never increased this commission rate, and instead has found ways to decrease it in certain contexts.  For example, in 2016, Apple lowered the commission to 15% on subscription renewals after the first year.

8.     The App Store's monetization model is rooted in Apple's overall philosophy of putting the user and user experience first.   This focus on user experience is reflected in Apple's overall business model and offerings to consumers, which prioritize quality (*e.g.*, distinctive design, innovative technology), security (*e.g.*, protection from malware), and privacy (*e.g.*, safeguarding of personal and payment data). This philosophy can also be seen in Apple's strategy of integrating its proprietary hardware, software, and services across the range of its products to ensure a high quality user experience, in contrast to many of its competitors.

9.     Apple limits its commission to sales of *digital goods and services* (like game levels, premium app features, digital subscriptions, etc.) because Apple offers developers and consumers the most value in this arena—it does not charge commissions on the sale of physical goods and services through its app marketplace.  Apple has affirmatively chosen not to accept any payment for the latter category of transactions.   *See* App Store Review Guidelines 3.1.3(e).  Simply put, while Apple is unable to assure that an order from Amazon is delivered, a driver requested through Uber arrives on time, or a consumer product is as good as promised, Apple is uniquely well-suited to assure the quality of the user experience when it comes to how digital content is delivered and consumed on its devices.   And if something goes wrong in the transmission of an app or an in-app feature, Apple can fix the problem, and have any necessary refunds processed by its AppleCare support teams. Therefore, Apple limits its commissions to these specific categories of transactions.

DECLARATION OF PHILIP W. SCHILLER

Gibson, Dunn &
Crutcher LLP

**Apple's Agreements with Its Developers**

10.     To participate in the Developer Program, gain access to Apple's extensive library of app development software, and receive the distribution, marketing, and other services that Apple provides through the App Store, a developer must enter into certain contracts with Apple—most notably the Developer Agreement and the Developer Program License Agreement ("License Agreement").

11.     In order to log into and access Apple's online developer portal, through which all aspects of the relationship between Apple and its developers are managed, a developer must first execute the Developer Agreement.  This contract governs certain foundational elements of the relationship between Apple and a developer, such as confidentiality and protection of Apple's intellectual property rights.  It also provides a developer access to proprietary app development tools, including Apple's Xcode and Software Development Kits ("SDKs"), that Apple created to help developers "learn how to develop apps for Apple platforms for free."[1] A developer cannot enter into any other agreement with Apple, such as the Developer Program License Agreement, until it first executes the Developer Agreement and remains a party to the Developer Agreement.  These tools are provided for free to all developers who execute the Developer Agreement.  A true and correct copy of the Developer Agreement that was in force as of August 13, 2020 is attached to this declaration as Exhibit A.

12.     Of the more than 27 million registered iOS developers, only a fraction also join the Apple Developer Program by executing a Developer Program License Agreement ("License Agreement") and paying the $99 annual program fee.   The License Agreement governs distribution of apps through the App Store and provides access to the full suite of developer tools, software, and other intellectual property for app creation that Apple maintains for the Developer Program.  In addition to the Xcode and SDKs provided for free upon execution of the Developer Agreement, the License Agreement grants access to additional software such as

---

[1]  https://developer.apple.com/support/compare-memberships/

Gibson, Dunn &
Crutcher LLP

pre-release versions of the iOS operating system and additional Apple-proprietary software for advanced app development, such as Metal Developer Tools for Windows, Reality Composer 1.5 beta, Apple Configurator 2.13 beta, and Schoolwork 2.1 beta.  Distribution of free apps through the App Store is governed by Schedule 1 to the License Agreement. Distribution of paid apps or apps offering in-app purchases through the App Store requires execution of an additional Schedule 2 to the License Agreement.  A true and correct copy of the Developer Agreement that was in force as of August 13, 2020 is attached to this declaration as Exhibit B.

13.     Additionally, the App Store Review Guidelines (the "Guidelines") provide the rules and requirements relating to Apple's review of apps for possible publication on the App Store, and are incorporated by reference throughout in the License Agreement.  All developers on the App Store have agreed to abide by the terms of the Guidelines.  A true and correct copy of the current App Store Review Guidelines is attached to this declaration as Exhibit C.

14.     Together, these contractual agreements create a cohesive set of terms for participation in the Developer Program.  In order to publish to the App Store, a developer must have in place a valid Developer Agreement and License Agreement, and must submit an app that is compliant with the License Agreement and Guidelines.  Conversely, publishing an app or app update to the App Store that fails to comply with the Guidelines and/or the License Agreement —particularly through the use of fraud or deceit—can, and often does, result in termination of a developer's License Agreement and/or Developer Agreement, and removal from the Developer Program.

**Products and Services that Apple Provides to Developers Under the Agreements**

15.     By executing the Developer Agreement and License Agreement (among other contracts, like the license agreements that govern each Xcode or SDK download), developers are able to take advantage of both the significant investments Apple has made in the App

Gibson, Dunn &
Crutcher LLP

Store to help them design and build cutting-edge apps, and the services that Apple provides in the marketing and distribution of those apps to consumers.

**Software Licenses**

16.     During the app development phase, Apple provides developers who participate in the Developer Program (and execute both the Developer Agreement and License Agreement) with licenses to access a broad array of tools, software, and other intellectual property created and continuously refined by Apple, including the SDKs, operating systems, and other software described above, as well as the App Store Connect suite of web-based tools to distribute pre-release versions of apps via TestFlight and to publish approved apps on the App Store.

17.     Apple's SDKs currently feature more than 150,000 Application Programming Interfaces (APIs) on iOS for virtually every task a developer might wish to implement with software or hardware, an exponential increase from when the App Store was introduced. These APIs include, for example, HealthKit for secure access to health data, HomeKit to manage devices around the home, CloudKit for free data storage synced across devices, and In-App Purchase (IAP) to enable in-app sales of digital content.  App developers can bolster the capabilities of their apps by including Apple services like Apple Pay, PassKit, MusicKit, Push Notifications, Siri Shortcuts, Sign in with Apple, kernel extensions, and FairPlay Streaming.  Apple Developer Program members can obtain Apple-issued keys for connecting to services like MusicKit, DeviceCheck, APNs, CloudKit, and Wallet.

18.     Apple also maintains a dedicated team of engineers and other staff to support app development work.  Developers can engage with Apple throughout the development process by consulting with an Apple Engineer for code-level support to troubleshoot a bug, working with the App Review team to diagnose issues that might affect the user experience, or calling AppleCare to resolve payment issues.  With ever-improving tools, shorter service times, more transparent policies, and opportunities for one-on-one guidance, Apple supports developers in getting their apps in the App Store as soon as possible.

**App Review**

19.     Once app development is complete, Apple undertakes a rigorous, human-led review process for every app—with reviewers representing 81 languages vetting on average 100,000 submissions per week—to ensure that each app functions as intended and complies with Apple's stringent requirements on security and protection of customer privacy.

20.     The foundation of the App Store is that consumers can safely and easily download apps for their iPhones and iPads that perform as promised, do not jeopardize the security of their devices, and offer the privacy protections that consumers have come to expect from Apple.   The License Agreement and Guidelines therefore contain express provisions regulating the content that can be published.   For instance, by executing the License Agreement, developers agree:   that they "will not, directly or indirectly, commit any act intended to interfere with the Apple Software or Services," License Agreement ¶ 3.2(f); that any code downloaded to the app will not "change the primary purpose of the Application by providing features or functionality that are inconsistent with the intended and advertised purpose of the Application as submitted to the App Store, [and] (b) does not create a store or storefront for other code or applications…," *id.* ¶ 3.3.2; that an app will "not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store, Custom App Distribution or TestFlight," *id.* ¶ 3.3.3; that the developer "will not attempt to hide, misrepresent or obscure any features, content, services or functionality" in its apps, *id.* ¶ 6.1.

21.     Similarly, the Guidelines instruct developers:   "Don't include any hidden or undocumented features in your app; your app's functionality should be clear to end-users and App Review," Guidelines ¶ 2.3.1; "Apps should be self-contained in their bundles, and may not read or write data outside the designated container area, nor may they download, install, or execute code which introduces or changes features or functionality of the app, including other apps," *id.* ¶ 2.5.2; "If you want to unlock features or functionality within your app, (by

DECLARATION OF PHILIP W. SCHILLER

Gibson, Dunn &
Crutcher LLP

way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality," *id.* ¶ 3.1.1.

22. The License Agreement and Guidelines also require that any apps or app updates must be submitted to Apple for review and approval, so that Apple can assure itself of the quality, security, and privacy protection of the app in question. Developers agree in the License Agreement that they "will not attempt to hide, misrepresent or obscure any features, content, services or functionality in [their] submitted Applications from Apple's review or otherwise hinder Apple from being able to fully review such Applications." License Agreement ¶ 6.1. The License Agreement also provides: "If You make any changes to an Application (including any functionality made through use of the In-App Purchase API) after submission to Apple, you must resubmit the Application to Apple." *Id.* Likewise, the Guidelines provide that, if a developer tries to "trick the review process . . . your apps will be removed from the store and you will be expelled from the Developer Program." Guidelines, Introduction.

23. These provisions of the License Agreement and Guidelines are critical to the health of the iOS ecosystem. Apple takes responsibility for ensuring that apps published to the App Store are held to a high standard for privacy, security, and content, and that the customer experience is free of fraud and manipulation. Because Apple's developer community is comprised of many different types of developers—ranging from multi-billion dollar companies like Epic to students innovating in their basements—Apple cannot reliably outsource the protection of its customers to individual developers.

24. The need for vigilance against malware and other security attacks is particularly acute on mobile devices like the iPhone. As a result, from the outset, Apple developed a more secure, controlled ecosystem for iOS than what is needed for a personal computer, such as a Mac. When a personal computer crashes due to the introduction of malware, the results are

Gibson, Dunn &
Crutcher LLP

frequently inconvenient but rarely catastrophic.   But a mobile phone is something else entirely, and Apple decided from the outset that mobile phones must be treated differently.   In short, these are devices that need to work. iPhones must be available in any emergency, and their operation must not be compromised by malware.   Additionally, people tend to carry large amounts of personal information on their iPhones, such that a security breach could have especially unfavorable consequences for the user.   Because of these critical distinctions between mobile phones and computers, we appreciated at the time the iPhone was being developed that software downloads to an iPhone would have to be through more of a controlled environment than that used in an operating system designed for a personal computer, such as MacOS.  And the importance of maintaining and refining this "controlled environment" has only grown over time, as the iPhone has gained more and more functionalities upon which consumers depend in their day-to-day lives.   Nowadays, if an iPhone user somehow downloaded malware onto his or her iPhone that caused it to crash, he or she would be not only unable to make phone calls, but also unable to check email, take photos, get directions, hail a car, order food, listen to music, or make purchases at contactless retail terminals—all with the potential to cause far more disruption to a customer's life than if a desktop or laptop computer were to crash.

25.     Likewise, privacy protection is of far greater concern on a mobile device than a computer.  Virtually every individual's mobile phone houses all of the contact information for their friends and family, personal photographs, credit card and bank account information, and a record of the consumer's movements and current location.  Mobile phones thus tend to be a treasure trove of an individual's most private and confidential information localized in a single device, and their security is therefore paramount.  This is an important reason why Apple insists on its various strict and unyielding measures to protect the iOS platform.

26.     Apple's human-led review process includes multiple steps designed to uphold these security and privacy standards, including confirmation that the app is free from known

Gibson, Dunn &
Crutcher LLP

malware, use of signatures and encryption to ensure safe distribution via the App Store, verification of the digital signatures upon download to confirm that the app has not been tampered with or altered in any way, and revocation of signing certificates for developer accounts determined to be malicious.

27.     Since January 1, 2020, Apple has processed more than four million app submissions, approving approximately two thirds of them and rejecting approximately one third for non-compliance with the Guidelines and/or the agreements.  For example, more than 100,000 app submissions are rejected each year for data collection and storage practices that run afoul of Apple's strict requirements for consumer privacy protection.  Most of these developers whose apps are rejected make changes to their apps to address Apple's concerns, and ultimately have their apps published to the App Store.

**App Marketing and Distribution**

28.     Under the terms of the License Agreement, Apple serves as the developers' "agent for the marketing and delivery of the Licensed Applications to end-users" via the App Store. License Agreement, Schedule 2, ¶ 1.2.   In this capacity, Apple manages all aspects of the transaction with the consumer on behalf of the developer, including to:   "(a) market, solicit and obtain orders on Your behalf for Licensed Applications from end-users . . .; (b) provide hosting services to You subject to the terms of the Agreement, in order to allow for the storage of, and end-user access to, the Licensed Applications . . .; (c) make copies of, format, and otherwise prepare Licensed Applications for acquisition and download by end-users, including adding the Security Solution; (d) allow end-users to access and re-access copies of the Licensed Applications . . .; [and] (e) issue invoices for the purchase price payable by end-users for the Licensed Applications."  *Id.*

29.     Services that Apple provides under the License Agreement include handling more than 25 million customer support cases a year with a dedicated team of over 5,000 full-time AppleCare advisors;  verification of customer accounts to maintain the integrity of the

marketplace, including removal of hundreds of millions of fraudulent customer accounts each year; and implementing other measures to combat fraud and refund abuse.

30.     Apple's services also include ongoing monitoring of pirate app stores that compromise developer intellectual property through unauthorized modifications and illicit distribution; assistance for developers in protecting their trademarks, copyrights, and other intellectual property; management of the ratings and reviews function in the App Store; and administration of taxes in scores of countries worldwide.

31.     Apple also makes available to developers a dedicated publishing platform, App Store Connect, to help developers manage their products, track app performance, facilitate customer payments, handle tax obligations, and get paid.  Apple also offers promotional opportunities on the App Store and marketing capabilities to help developers grow their customer base. Members of Apple's Developer Advocates team are assigned to support and advocate for specific developers.

**In-App Purchase**

32.     When the App Store launched in 2008, iOS users could not make in-app purchases because the technology did not exist at that time to implement this feature.  At that time, if a developer wanted to maximize its user base by catering to both consumers who were interested in a free app as well as those who were willing to pay for a more enhanced app, the developer needed to offer two separate versions of the app on the App Store.  This was inefficient and prevented the developer from offering its consumers the seamless experience of a single app that could be augmented with premium features or paid content.  So in 2009, Apple introduced an in-app purchase functionality to the App Store, which is known as "IAP." IAP is the App Store's centralized payment system.  It lets users make in-app purchases; that is, purchase digital goods and services within apps without the inconvenience and security risks of registering their payment information with each developer.  In 2011, Apple developed a state-of-the-art technology so that IAP could support the purchase of subscriptions,

including for magazines, music streaming and online video content, an innovative offering that developers and users alike have embraced since it was introduced.

33.     IAP serves two core functions in maintaining the convenience and security of the iOS ecosystem.  First, it provides a safe, convenient mechanism by which consumers are able to make purchases on the App Store via a single, secure payment mechanism.  In addition, Apple is able to provide customer support for any issues with the transaction, which would not be possible without the use of IAP.  Second, and equally importantly, IAP is the mechanism by which Apple records sales and collects the commissions that fund Apple's investment in the maintenance of the App Store and the tools, intellectual property, and services that Apple provides to help developers create cutting-edge apps.

**Benefits of IAP to Consumers and Developers**

34.     IAP facilitates the sale of digital content by developers to iOS users via the App Store. For developers, Apple makes APIs available that they can use to enable their apps to accept transactions and release digital content within the app.   These APIs (which Apple calls StoreKit) permit developers to offer various types of in-app products, including products that deplete after one use (like Skype credit, or V-Bucks in *Fortnite*), products that never expire (like filters in a photo app), and different types of subscriptions.   Developers also can use these APIs to make additional free content available in-app.  In addition, IAP has a back-end component that links in-app purchases to the complex payment infrastructure Apple uses to accept payment when selling paid apps in the App Store, charge the customer's chosen payment method, and remit the balance minus Apple's commission to the developer.

35.     The App Store's IAP functionality provides consumers with a wealth of benefits—first and foremost by providing a centralized, convenient way for them to transact with any app developer on the App Store.  Consumers need only enter their preferred billing method once and they can instantly access the App Store's diverse catalogue of paid apps and in-app purchases with a couple of clicks.   If developers could forgo IAP and install their own payment portals, consumers would need to enter their billing information potentially scores of

Gibson, Dunn &
Crutcher LLP

times (depending on how many apps they download, and how often they change their payment information), making the customer experience much less convenient and putting the sensitive financial information of Apple's users at vastly greater risk.   Further, IAP ensures that transactions are secure and fraud-free by linking up with Apple's industry-leading security features, such as Face ID and two-factor authentication, and enabling Apple to verify that in-app purchases are actually delivered to iPhones and iPads.   If developers could offer in-app content without using IAP, Apple would no longer be able to provide refunds or offer other support for those purchases.   Relatedly, IAP provides parental control of payment options so that children cannot make unauthorized purchases, which is extremely important as many children may not realize purchasing credits in a game actually costs real money.   Plus, Apple's record of transactions through the App Store and IAP enable Apple to support features that optimize the user experience, such as the ability to access a comprehensive history of all purchases, to share apps and in-app content with family members, to restore purchases on new devices and avoid needing to pay for anything twice, and  to receive first-class customer service through AppleCare.

36.    The App Store's IAP feature also provides numerous benefits to developers.   While expanding developers' ability to monetize their apps, IAP also removes administrative burdens and allows developers to effortlessly sell their services to, and receive payments from, customers in the 175 countries where the App Store operates.   This support includes collecting and managing payment information from around one billion potential customers around the globe; handling conversions to 45 currencies; and ensuring compliance with local tax laws, and handling tax withholding in scores of countries.   Moreover, the records maintained through IAP help Apple provide both routine and customized business analytics to app developers.   For many developers, it would be prohibitively complex and costly to carry out these tasks on a similar scale.   Yet Apple's infrastructure makes it effortless for them. And, on top of all this, the benefits that iPhone and iPad users gain from transacting through

Gibson, Dunn & Crutcher LLP

the App Store and IAP benefit developers as well by giving consumers the confidence to spend freely knowing that they will not be defrauded or have their information stolen.

**Use of IAP to Record Sales and Collect Apple's Commission**

37.     In addition to facilitating payments, IAP records sales and collects Apple's commission on App Store transactions.  This is IAP's "digital checkout function."  It allows Apple to record transactions that take place on the App Store, calculate how much commission Apple is owed on those transactions, and collect its commission on each in-app sale.

38.     The License Agreement provides (i) that developers will use IAP as the exclusive means of collecting payments from consumers for sales of digital goods and services and will "not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store," and (ii) that Apple would be entitled to a "commission equal to thirty percent (30%) of all prices payable by each end-user" through IAP.  Schedule 2, ¶ 3.4(a).  For developers employing an auto-renewing subscription business model, Apple's commission drops to 15% for each subsequent renewal after the first year.  *Id.*

39.     This monetization strategy for the App Store—*i.e.*, charging of a commission on paid apps or in-app purchases of digital content, but not on free or ad-funded apps, sales of physical goods and services, or digital content purchased outside of iOS but accessed in the app—is the cornerstone of Apple's App Store business.   It is based on Apple's role in connecting developers with users who have a willingness to pay because they value the quality of Apple's devices or have an expectation that purchasing and using apps from the App Store will be a quality, secure experience.  It enables Apple to realize a revenue stream from the App Store, to earn a return on its substantial investments, and to fund future innovation across the Apple ecosystem.   It is up to each developer to choose their own business model on the App Store and decide for themselves whether their app will include in-app purchases of digital content for which Apple will receive a commission.  Apple does not decide the business model for them, and Apple does not require them to use IAP.  More than

Gibson, Dunn &
Crutcher LLP

80% of the apps on the App Store are distributed for free and without using IAP, and developers pay nothing to Apple in connection with them.

40.     To collect its contractually-agreed commission on sales of in-app digital content, Apple needs to know when such transactions take place.  For this reason, Apple requires third-party developers to use IAP for eligible transactions, and prohibits them from circumventing IAP.  *See* App Store Review Guidelines § 3.1.1 (In-App Purchase).  Apple has never allowed an app developer to use alternative payment technologies for in-app purchases of digital goods/services in violation of its App Store Review Guidelines.

41.     If a developer who earns money from in-app purchases—and owes a contractually-agreed commission to Apple for those purchases—were able to circumvent the IAP system by offering an external payment mechanism, Apple would have no ability, from a technical perspective, to collect any commissions on the sale.   The developer, meanwhile, would continue to enjoy the benefit of Apple's tools, software, and intellectual property—as well as Apple's ongoing services to market and distribute the developer's apps via the App Store—all for free, and all while reaping for itself the financial benefit of Apple's intellectual property and services.  Apple would be unable to continue its on-going investments, and the entire iOS ecosystem would be in jeopardy.

42.     The same rules apply in Apple's Mac App Store.   Developers who want to unlock features or functionality within apps distributed through the Mac App Store must use the Mac equivalent of In-App Purchase to do so.  As on the iPhone and iPad, this requirement ensures that Apple receives the commission that developers have contractually agreed to pay for distribution of their software through the Mac App Store.

**IAP vs. Payment Processing**

43.     IAP is not a payment settlement platform.  Companies like PayPal, Stripe, and Square provide services to online merchants that allow them to accept credit card payments, and then

help facilitate the transfer of funds from the payer to the merchant through other processors, credit card networks, and banks.  They typically take a small percentage of the transaction as payment.

44.     Apple contracts with third-party payment settlement providers to facilitate Apple's own ability to accept customer payments.  During this process, transactions are verified and payments authorized, but this function is just one part of the process and is outsourced to third parties to whom Apple itself pays a fee.

45.     Any comparison of Apple's 30% commission to the single-digit transaction fees charged by PayPal, Stripe, and others ignores that the services provided by the App Store are both different and far more comprehensive.   PayPal does not provide a platform for distributing apps and unlimited free app updates to consumers around the world.  Stripe does not provide tools for developers to harness the power and capabilities of cutting-edge devices. Square does not curate a store featuring stories, interviews, hand-picked lists, and stunning videos.  Apple does far more than process payments.  And Apple's App Store commission is not a payment processing fee that Apple charges to developers for "using" IAP.  Rather, it is a fee that Apple charges developers for helping them develop, test, and distribute their apps via Apple's App Store, which is patronized by approximately a billion iOS consumers worldwide.

**Terminations of Developer Accounts**

**Apple's Contractual Rights to Terminate**

46.     Apple retains broad rights to terminate its contracts with developers, including both the Developer Agreement and the License Agreement.   These broad termination rights are important both to ensure that Apple has sufficient latitude to protect the integrity of the App Store from developer malfeasance and to defend Apple's intellectual property from unauthorized use.

Gibson, Dunn & Crutcher LLP

47.     Section 10 of the Developer Agreement, for instance, provides that "Apple may terminate or suspend you as a registered Apple Developer at any time in Apple's sole discretion.  If Apple terminates you as a registered Apple Developer, Apple reserves the right to deny your reapplication at any time in Apple's sole discretion. . . .  Upon any termination or, at Apple's discretion, suspension, all rights and licenses granted to you by Apple will cease . . ., and you agree to destroy any and all Apple Confidential Information that is in your possession or control."

48.     Likewise, Apple has the right under Section 11.2 of the License Agreement to "terminate this Agreement for its convenience, for any reason or no reason, effective 30 days after providing the [developer] with written notice of its intent to terminate."   License Agreement, ¶ 11.2.  The License Agreement further provides that "[t]his Agreement and all rights and licenses granted by Apple hereunder and any services provided hereunder will terminate, effective immediately upon notice from Apple:   (a) if You or any of Your Authorized Developers fail to comply with any term of this Agreement . . . and fail to cure any such breach within 30 days after becoming aware of or receiving notice of such breach; . . . (f) if You engage, or encourage others to engage, in any misleading, fraudulent, improper, unlawful or dishonest act relating to this Agreement, including, but not limited to, misrepresenting the nature of Your submitted Application (e.g., hiding or trying to hide functionality from Apple's review, . . . engaging in payment fraud, etc.)."  *Id.*

49.     In deciding whether to terminate a developer account, the honesty and trustworthiness of the developer is of paramount importance to Apple.  Because developers who participate in the Developer Program have a direct link to iOS customers via their apps—and a security or privacy breach in one app can impact functionality of all Apple devices on which it is installed, as well as interfere with the operation of other apps on those devices or the device itself—Apple is careful to maintain relationships with, and expose its customers to, only trustworthy developers.

Gibson, Dunn &
Crutcher LLP

50.     For instance, although developers have 30 days to cure most incidents of non-compliance with the terms of the License Agreement, any "misleading, fraudulent, improper, unlawful or dishonest act" results in immediate termination.  *Id.*

51.     The Guidelines also reflect Apple's general philosophy:  "We work hard to make the App Store a trustworthy ecosystem and expect our app developers to follow suit; if you're dishonest, we don't want to do business with you."  Guidelines, ¶ 2.3.1.  The Guidelines confirm that "attempt[s] to cheat the system" and other "egregious" conduct will result in expulsion from the Developer Program.  *Id.*, Introduction, ¶ 2.3.1.

52.     The broad rights reserved to Apple under the foregoing provisions are important to protect the iOS ecosystem.  Consistent with Apple's overall philosophy of putting the user and user experience first, Apple designed the App Store to provide a safe, secure, reliable, and trusted place for consumers to discover and download apps, and a consumer-rich environment for developers to be successful.  Central to these objectives is Apple's requirement that every app designed for iOS undergo rigorous, human-assisted review to ensure that apps meet high standards for privacy, security, content, and quality.  Apple's rules prevent developers from making end-runs around this carefully designed platform.  As a result of the measures that Apple has taken, consumers can download and pay for an app and in-app content without worrying that it might break their device, steal their information, or defraud them.  The need for these measures is no less today than in years past.  Developers benefit directly and significantly from the security safeguards in this marketplace for their apps.  This entire ecosystem would be in jeopardy if developers are allowed to breach their agreement without consequence or engage in fraudulent or dishonest conduct with respect to the App Store.  The same is true if developers were able to shield themselves from termination by engaging in malfeasance in subsidiaries that could only be terminated if that individual subsidiary was the malefactor.  Of course, it would be impossible to anticipate every way that a developer could threaten the health of the iOS ecosystem.  Accordingly, Apple ensured that it had broad rights

Gibson, Dunn &
Crutcher LLP

to terminate relations with any particular developer or its affiliates in order to protect Apple and its users.

53.   Historically, Apple has terminated tens of thousands of agreements and relationships with developers who have engaged in dishonest behavior similar to Epic's conduct here. Since 2017, Apple has terminated:

a.   more than 75,000 accounts of developers for introducing new features to their apps without going through App Review, *i.e.*, bait-and-switch conduct, in which a developer makes changes post-review to circumvent the app review process, also referred to as Illicit Concept Changes (ICC);

b.   more than 2,000 developer accounts for introduction of a non-IAP payment method for in-app sales of digital content;

c.   more than 60,000 developer accounts for inclusion of hidden features or obfuscated code or for facilitating the download or installation of executable code; and

d.   more than 175,000 developer accounts for other fraudulent conduct.

**Termination of Affiliate Accounts**

54.   In terminating relations with developers for deceptive acts, Apple has treated developers and their corporate families comprehensively—irrespective of how many accounts they may have or how many separate Developer Agreements and/or License Agreements they have executed—as developers often maintain multiple accounts to support a single enterprise. For example, a developer may wish to conduct marketing through one account and app development through another, or a developer may wish to keep activities separated among multiple accounts for financial accounting purposes.   In these instances, the developer's

Gibson, Dunn &
Crutcher LLP

DECLARATION OF PHILIP W. SCHILLER

accounts frequently share bank accounts, app transfers, test devices, phone numbers, and email domains, and otherwise operate as a single business entity.

55.     When a developer breaches one or more of its agreements with Apple, or betrays Apple's trust and engages in dishonest behavior, Apple examines the connections between that developer and its affiliated accounts to determine which accounts to terminate.  Where an affiliated account shares key features with the breaching account—including shared contact information, shared test devices, and similar conduct from the developer across the accounts —Apple terminates accounts in the same family to prevent future misconduct.  Since 2016, Apple has terminated thousands of accounts based on affiliation with a terminated account or developer misconduct.

56.     This contractual right is fundamental to the integrity of the App Store.  If a developer is able to engage in deceptive acts on one account and then, when terminated, simply transfer its apps and redirect its activities to another account, Apple would be crippled in its efforts to protect the safety and security of the iOS ecosystem.  By terminating affiliate accounts, Apple can proactively prevent bait-and-switching and other deceptive acts, rather than responding reactively only after further misconduct occurs.  For this exact reason, Apple maintains the express right under both the Developer Agreement and License Agreement to terminate with any developer at any time, with or without cause.

**Apple's Dealings with Epic**

57.     Epic has had contracts with Apple to gain access to the App Store and Apple's various developer tools for many years.  Epic has used multiple accounts in contracting with Apple, including one under Epic Games, another under its wholly owned subsidiary Epic Games International S.A.R.L. ("Epic SARL") and still others under different subsidiaries and affiliates.   With respect to the Epic Games account and the Epic SARL account, Epic administers them as if they are one.  The accounts share a single tax ID number, a single individual as the registered account holder, and a single credit number that is used to pay the

annual program fee.   The two accounts share the same test devices, and their Developer Program License Agreements were renewed within a minute of each other on June 30, 2020. Epic has further commingled these two accounts by having its users share the same login credentials for access to apps formerly managed under the Epic Games account and Epic's Unreal Engine platform nominally managed under the Epic SARL account.  The intertwining of these two accounts by Epic is unsurprising given the tight corporate relationship between Epic and Epic SARL.  Corporate documentation shows that Epic SARL, a Luxembourg entity, was established and is wholly owned by Epic.  These documents further establish that two of Epic SARL's four current directors are Joseph Babcock and Julie LoBean, Epic's Chief Financial Officer and Director of Global Tax & Treasury respectively, both of whom work out of Epic's headquarters in North Carolina.

58.     Over the last several months, Epic has demanded that Apple make various changes to Epic's rights and obligations under its contracts that would be destructive to Apple's basic business model. When Apple refused to fundamentally alter the way it does business to appease Epic, Epic resorted to sudden, unilateral action that blatantly breached its contracts with Apple, and simultaneously filed this lawsuit, which seeks to justify its deliberate breaches after the fact.

59.     Specifically, on June 30, 2020, Epic's CEO Tim Sweeney wrote my colleagues and me an email asking for a "side letter" from Apple that would create a special deal for only Epic that would fundamentally change the way in which Epic offers apps on Apple's iOS platform, and enable Epic to make more money at Apple's expense. Moreover, what Mr. Sweeney asked for would have to apply not only to Epic but, based on the philosophy of our App Store, to all developers; this would have a catastrophic effect on the user experience and Apple's business model.  In this email, Mr. Sweeney expressly acknowledged that his proposed changes would be in direct breach of multiple terms of the agreements between Epic and Apple.   Mr. Sweeney acknowledged that Epic could not implement its proposal unless the agreements between Epic and Apple were modified.  A true and correct copy of this email is attached as Exhibit D.

60.     On July 10, 2020, Apple sent a 6-page letter responding to Mr. Sweeney's June 30 email.  In it, Apple detailed why it could not give Epic preferential treatment over all other developers, and that it would not agree to change the terms of the contracts that governed the relationship between Apple and Epic, which contain the same terms that Apple offers to all other developers.  The letter also explained the various reasons why Apple has chosen to operate its App Store in the manner it does, and reminded Mr. Sweeney of several instances in which he had spoken out in favor of the principles espoused by Apple and the value of Epic's relationship with Apple.  A true and correct copy of this letter is attached as Exhibit E.

61.     One week later, on July 17, 2020, Mr. Sweeney sent another e-mail to my colleagues and me in which he stated that he disagreed with how Apple runs its App Store, and indicated that he was still pursuing a special deal for Epic. A true and correct copy of this letter is attached as Exhibit F.

62.     Shortly after 2:00 a.m. on August 13, 2020, Mr. Sweeney sent another e-mail to several of my colleagues and me.  In this early-morning communication, he stated that "Epic will no longer adhere to Apple's payment processing restrictions," and that Epic was changing the *Fortnite* app on the iOS platform to circumvent Apple's IAP.   As Mr. Sweeney acknowledged, this was in plain breach of the contracts between Apple and Epic, which require that Apple's IAP be the exclusive means to pay for in-app purchases on Apple's iPhones and iPads.   The agreement between Apple and Epic provides that Apple would receive a 30% commission from each of these payments and remit the remaining 70% to Epic. Apple's commission structures, administered through the IAP, apply equally to all developers who offer in-app purchases on the App Store.

63.     The change that Mr. Sweeney had unilaterally decided Epic was going to make would allow consumers to bypass Apple's IAP when making in-app purchases, and instead pay Epic directly for those purchases.  Through this arrangement, Epic would receive all of the money paid by the consumer, and Apple would receive no commission at all.   Mr. Sweeney's pronouncement undid one of the most fundamental terms of the business relationship that had existed between the parties for many years, and was in blatant disregard for Epic's written

Gibson, Dunn &
Crutcher LLP

contracts with Apple.  Epic essentially granted itself preferential treatment vis-a-vis all other developers who offer in-app purchases on Apple's iOS platform, including Epic's direct competitors.  In doing so, Mr. Sweeney did not identify anything Apple had recently done to provoke Epic's decision to breach its contracts with Apple; instead, he pointed to only longstanding Apple policies, which Epic had agreed to be bound by, and called upon Apple to make "historic changes."  He also warned that Epic was prepared to litigate with Apple for years, if necessary.  A true and correct copy of this email is attached hereto as Exhibit G.

64.     Later that same morning, Epic followed through on Mr. Sweeney's threat. Unbeknownst to Apple, Epic had planted a payment mechanism in its *Fortnite* app on the iOS platform. Epic's payment feature was not disclosed to Apple and it was not activated by Epic until a few hours after Mr. Sweeney sent his 2:00 a.m. e-mail to Apple describing his scheme. At that time, Epic "threw the switch," activating the hidden payment platform it had placed in *Fortnite* through what it has euphemistically called a "hot fix."  By doing so, it circumvented Apple's IAP and invited consumers to do business directly with Epic, thereby denying Apple of agreed-upon commissions.  To motivate consumers to use its direct payment option, and deny Apple any form of commission, Epic included a screen advising consumers that its offerings could be purchased at a lower price through direct purchase from Epic than through Apple's IAP.

65.     Epic chose to hide unauthorized software in our App Store to deprive Apple of the commission the parties had agreed upon.   Apple was therefore paid nothing on those purchases made by customers redirected to Epic, despite the substantial resources we have expended to promote and distribute *Fortnite* to hundreds of millions of iPhone and iPad users and to generate hundreds of millions of dollars in profits for Epic.  Epic's conduct is akin to a manufacturer walking into a retail store and asking shoppers to pay the manufacturer directly for their products, leaving the store itself with nothing for its efforts.

66.     Upon learning what Epic had done, Apple immediately contacted Epic to inform it that the *Fortnite* app was now in violation of Epic's contractual obligations; Epic, of course, had already told me and others as much in its e-mail communications.   To provide Epic an

Gibson, Dunn &
Crutcher LLP

opportunity to come back into compliance with its contractual obligations, Epic's blatant disregard of them notwithstanding, we informed Epic that *Fortnite* could remain on the App Store if Epic simply removed the alternative payment option and brought the *Fortnite* app back into compliance.  A true and correct copy of Apple's August 13, 2020 letter to Epic is attached to this declaration as Exhibit H.  Epic refused.  Given Epic's refusal to act lawfully, we had no choice but to remove the *Fortnite* app from our App Store, and a few hours later Epic filed this lawsuit against Apple.

67.     On August 14, 2020, Apple sent Epic the same type of letter it has sent to other app developers who refuse to abide by its contractual obligations.  Both this letter and the August 13 letter were sent to the individual who is the registered account holder for both the Epic and Epic SARL accounts.    Apple informed Epic that its change to *Fortnite* breached its agreements with Apple.  Although not obligated to do so, Apple gave Epic fourteen days to cure these breaches.   Apple also detailed the consequences if Epic refuses to remedy its violations, including that Epic's apps would be removed from the App Store and it could no longer submit apps to the App Store.  As in the past, where Apple has terminated a developer account for bad faith or deceptive conduct like what Epic did here, we have also terminated accounts that we know to be affiliated with the offending account.  A true and correct copy of this letter is attached to this declaration as Exhibit I.

68.     Epic did not cure its breaches or submit a compliant update of *Fortnite*.  Instead, it twice resubmitted—on August 20 and August 25—versions of *Fortnite* that again circumvented Apple's IAP and that Epic knew to be non-compliant.  Because Epic refused to cure its breach, Apple terminated Epic's Developer Program account, as well as its Developer Agreement and License Agreement with Apple, on August 28, 2020.  Apple's termination notwithstanding, the tens of millions of iOS users who already have downloaded *Fortnite* can continue to use the game on their iPhones and iPads.   Unfortunately, this functionality includes the alternative payment option that Epic smuggled into the *Fortnite* app on August 13, improperly allowing Epic to circumvent Apple and receive payment directly from consumers.   As a result, since August 13, and continuing through today, the millions of

*Fortnite* users on the iOS platform are able to make in-app purchases without Apple receiving a penny of the commission that Epic agreed to pay to Apple. Public reporting by Reuters has indicated that these circumvented payments from U.S. users go to Epic Games, Inc., and those from users outside the U.S. go to Epic SARL. To date, Epic has not stated that it plans to pay any portion of the commissions that it owes Apple from the payments it has been collecting from iOS users playing *Fortnite*.

69. Meanwhile, Apple's records reflect that Epic has continued to use Apple's proprietary software, including TestFlight, even after suspension and termination of Epic's developer account for circumventing the IAP system and otherwise violating the terms of the License Agreement and the Guidelines.

70. That Epic continues to maintain a developer account for Unreal Engine on the App Store and that third-party developers distribute a number of apps based on the Unreal Engine on the App Store poses a grave and immediate threat to Apple. Epic has already demonstrated, through its inclusion of a hidden direct payment feature in *Fortnite*, that it is both willing and able to circumvent and evade Apple's app review process in ways that directly violate its contractual obligations with Apple. It is unfortunate that Epic has created uncertainty for its developers using Unreal Engine by acting against one of its platform partners, but this was a calculated move that Epic was willing to take, regardless of the risk to its developer community. Epic's first foray into openly deceiving Apple and breaching its promises to Apple was financial with Epic circumventing the IAP mechanism and seizing Apple's agreed-upon commission for itself. Worse still, there is nothing stopping Epic from taking a similar or more damaging action again, this time focusing on a change that would compromise consumers' privacy or data security through its engine. As Epic's recent misconduct demonstrates, once a hidden feature is triggered, it is there to stay.

71. Apple's solution lies in its agreements with Epic. Apple has a legitimate and genuine concern that Epic's conduct will be repeated. And the easiest way Epic can repeat its conduct is through other accounts that continue to provide it access to the App Store. It is therefore critical for Apple to cut off such access so that Epic cannot continue to jeopardize the iOS

Gibson, Dunn &
Crutcher LLP

DECLARATION OF PHILIP W. SCHILLER

ecosystem.  With no realistic technological options to proactively cut off further misconduct, the only viable option is for Apple to cease doing business with Epic, including the termination of all contracts with it.

72.    If Apple is unable to enforce its right to terminate all of its contracts with Epic and its affiliates, including the account that encompasses Unreal Engine, then Epic can continue to include unauthorized functionality in the Unreal Engine, which in turn may be propagated by all developers who base their apps on this platform, spreading the unauthorized and improper functions to a large group of developers without any risk to Epic of losing its contracts with Apple.  There is no practical limit to the functions or code that Epic could impose on Apple without detection.   Further, if other developers understand that they can willfully breach Apple's contracts but be insulated from repercussions on their other accounts, then their incentive to undertake similar misconduct increases dramatically.  Other developers can try to do exactly what Epic did—use subterfuge and deception in connection with one of their apps by re-directing Apple's commissions to themselves (or, next time, by mining users' personal data for their benefit) while knowing that Apple will be forced to continue to give them access to the App Store, where they can continue to make mischief.

73.    If tolerated, Epic's unilateral and ongoing breach of its contractual commitments will send giant ripples across the entire App Store business model and ecosystem to the detriment of not only Apple, but also the users and developers who depend on the integrity and security of the App Store.  We designed the App Store to provide a safe, secure, reliable, and trusted place for consumers to discover and download apps, and a consumer-rich environment for developers to be successful.  Central to these objectives is Apple's requirement that every app designed for iOS undergo rigorous, human-assisted review.   Apple invests significant resources on a daily basis to ensure that apps meet high standards for privacy, security, content, and quality.   Apple's rules prevent developers from making end-runs around this carefully designed platform.

74.    The significant investment in this business model has paid off not just for Apple, but also for app developers large and small, including Epic.  Because of Apple's rules and efforts,

Gibson, Dunn &
Crutcher LLP

iOS and the App Store are widely recognized as providing the most secure consumer technology available, to the benefit of consumers and developers alike.  Due to measures that Apple has taken, consumers can download and pay for an app and in-app content without worrying that it might break their device, steal their information, or rip them off. The need for these measures is no less today than in years past. Developers benefit directly and significantly from the security safeguards in this marketplace for their apps.

75.     That said, the App Store is not simply a marketplace—it is part of a larger offering of tools, technologies, and services that Apple makes available to millions of developers to use as they create great applications for iPhone, iPad, and other Apple products.    Apple continually innovates and invests to maintain and improve the platform.  Apple has made massive investments to develop technologies and features that developers like Epic can use to make great apps (as well as a safe and secure place for users to download these apps).  Apple designs its products and services to make developers successful through the use of custom chips, cameras, operating system features, APIs, libraries, compilers, development tools, testing, interface libraries, simulators, security features, developer services, cloud services, and payment systems.

76.     This entire ecosystem would be in jeopardy if developers are allowed to breach their agreement without consequence as Epic has done.  If every developer is free to breach its contracts with Apple and allowed to circumvent the App review process, which is intended to assure, among other things, that no app that presents a security risk, threatens the privacy of users, or permits any software to be downloaded from outside of the secure App Store ecosystem, then Apple's App Store cannot deliver the many benefits to consumers and developers that it currently does.  And if developers can circumvent IAP and avoid paying Apple the commissions it is contractually due, Apple will be unable to continue its on-going investment in it.  Epic's actions are putting the entire App Store model at risk.  It will be disastrous for App Store users, for developers (other than Epic), and for Apple if Apple is not allowed to respond to Epic's breaches. In fact, if Epic is permitted to simply disregard

Gibson, Dunn &
Crutcher LLP

contract terms that it does not like, the business model for all other developers, including other app stores (even Epic's own) is at risk.

77.     Over the years, Apple has worked directly with Epic to provide it with many benefits unique to the App Store. Epic has made great use of Apple-provided tools, such as TestFlight, VOIP, Stickers, iCloud document storage, ARKit, Messages Extension, ReplayKit, and Push Notifications.  These innovations are properly protected by intellectual property laws, and as a signatory to the Apple Developer Agreement and the Apple Developer Program License Agreement, Epic has acknowledged these IP rights (just as Epic's developers do the same with respect to Epic's intellectual property).   *See* Apple Developer Program License Agreement § 2.5.

78.     To take just one example, Epic has for years used Apple's groundbreaking graphics technology, Metal.  When Apple launched Metal for Mac at WWDC in 2015, Billy Bramer, *Fortnite*'s then-lead gameplay programmer, took the stage and explained how Metal "revolutionized graphic design" and "enable[d] developers like us to create richer 3D worlds."[2]  Epic, like countless developers, continues to use Metal to deliver cutting-edge games.  Apple doesn't charge anything beyond its standard commission for the use of Metal or any of the other tools that Epic has used to develop great games on iOS.

79.     Through its conduct, Epic is benefitting monetarily from this crisis of its own making. The *Fortnite* app remains functional for millions of iPhone and iPad users.  Epic has been and is acting in violation of its agreements with Apple, selling to users in our App Store without paying Apple the commission it agreed to pay, and circumventing our app review process. And, critically, if Epic's misconduct is permitted, it would demonstrate to all developers that they can simply disregard the commitments they made in their contracts with Apple.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that I executed this declaration on the 15th of September, 2020 in _Cupertino_, California.

_____

[2]   *Apple – WWDC 2015*, YouTube (6/15/15), https://www.youtube.com/watch?v=_p8AsQhaVKI.

DECLARATION OF PHILIP W. SCHILLER

Gibson, Dunn & Crutcher LLP

1

Philip W. Schiller

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF PHILIP W. SCHILLER