**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

EPIC GAMES, INC.,

                              Plaintiff,

vs.

APPLE INC.,

                              Defendant.

Case No. 4:20-CV-05640-YGR

Date: September 28, 2020

Courtroom: 5, 17th Floor

Judge: Hon. Yvonne Gonzalez Rogers

**EXPERT DECLARATION OF RICHARD SCHMALENSEE, PH.D.**

**September 15, 2020**

# Table of Contents

I.      Background and Qualifications .................................................................. 3

II.     Assignment and Conclusions ................................................................... 4

III.    Economics of Multi-sided Platforms ...................................................... 8

        A.      Multi-sided Platforms and Indirect Network Effects ............................... 8

        B.      Transaction Platforms ........................................................................ 12

IV.     Economic Analysis of Apple's App Store Business .................................. 17

        A.      Apple's Basic App Store Business Model is Reasonable and Pro-Competitive .. 17

                1.      The App Store Concept ............................................................ 17

                2.      The App Store Offers Developers a Wide Range of Monetization Strategies ..................................................................................... 19

                3.      Procompetitive Benefits of Apple's Monetization Strategy for the App Store ................................................................................... 20

        B.      The App Store is a Two-Sided Transaction Platform ............................ 27

        C.      No Anticompetitive Tie Can Exist Between App Distribution and IAP Payment Administration .................................................................................. 30

        D.      Plaintiff's and Dr. Evans' Criticisms of the App Store Monetization Strategy Have No Merit ..................................................................................... 34

        E.      Epic Benefits from the Pricing Flexibility Provided by the App Store ............... 38

## I.   Background and Qualifications

1.   I am the Howard W. Johnson Professor of Management Emeritus and Professor of Economics Emeritus at the Massachusetts Institute of Technology (MIT), where I have taught industrial organization and related subjects since 1977.  I served as the Dean of the MIT Sloan School of Management from 1998 through 2007.  I was a Member of the President's Council of Economic Advisers from 1989 through 1991.  I am a Fellow of the Econometric Society and the American Academy of Arts and Sciences and was the 2012 Distinguished Fellow of the Industrial Organization Society.  I have served as an elected member of the Executive Committee of the American Economic Association and am currently a member of the Executive Committee of the Board of Directors of the National Bureau of Economic Research.  I have S.B. and Ph.D. degrees in economics from MIT.  My Curriculum Vitae is attached as Appendix A.

2.   I am the author or co-author of 13 books, over 110 published articles, over 35 book chapters, and many shorter papers.  Since 1977 I have testified in a number of antitrust cases and related matters, including, as Microsoft's economic expert, in *U.S. v. Microsoft*.[1]  I have also testified before the U.S. Congress and state and federal regulatory agencies.  In the last two decades much of my work, including my three most recent books, has focused on platform-based businesses, which are defined below.  My work on multi-sided platforms with Dr. David S. Evans was cited extensively in the Supreme Court's recent *Amex* decision, discussed below.[2]

3.   Since my work on this matter is ongoing, I may review additional materials produced subsequently to the issuance of this declaration, or conduct further analysis.  I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to other experts' declarations and any additional information I may receive.

---

[1]   *United States v. Microsoft Corp.*, No. 98-1232, D.C. Cir., 2001.

[2]   Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf.  We were also cited by the District Court and the Court of Appeals, and in the dissent.

## II.  Assignment and Conclusions

4.  I have been asked by counsel for Apple to:

    i.  Assess the economic validity of the contentions that the distribution of iOS apps in the App Store and the processing of in-app payments via Apple's In-App Purchase ("IAP") system are separate products and that Apple's behavior serves to tie these two products with no efficiency justification; and

    ii.  Evaluate certain additional arguments put forward in the "Declaration of David S. Evans in Support of Motion for Preliminary Injunction filed by Epic Games, Inc." in this matter.[3]

5.  I understand that this declaration is being filed in connection with a response to a request by the Plaintiff Epic Games, Inc. ("Epic"), for a preliminary injunction, seeking, among other things, to restrain Defendant Apple Inc. ("Apple") from removing, de-listing, refusing to list or otherwise making unavailable the app Fortnite or any other app on Epic's account in Apple's Developer Program, including any update of such an app, from the App Store on the basis that Fortnite offers in-app payment processing through means other than IAP.[4]  The opinions expressed in this declaration are solely from the perspective of an economist addressing questions of antitrust economics.  I offer no legal opinions or interpretations of the law.

6.  The following is a summary of my key conclusions.

    i.  Two-sided platforms serve as intermediaries between distinct groups of customers who need each other in some way.  The core business of a two-sided platform is to provide a common (real or virtual) meeting place and to facilitate interactions between members of the two distinct customer groups.  Importantly, two-sided platforms generally exhibit so-called "indirect network

---

[3]  Declaration of David S. Evans in Support of Motion for Preliminary Injunction filed by Epic Games, Inc., *Epic Games, Inc., v. Apple, Inc.*, No. 4:20-CV-05640-YGR, United States District Court Northern District of California, Oakland Division, September 4, 2020 ("Evans Declaration").

[4]  Plaintiff Epic Games, Inc.'s Notice of Motion and Motion for a Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof, *Epic Games, Inc., v. Apple, Inc.*, No. 4:20-CV-05640-YGR, United States District Court Northern District of California, Oakland Division, September 4, 2020 ("Plaintiff's Motion for PI"), at p. ii.

effects" referring to a situation in which the value realized by members of one group of customers of a platform is higher when they have access to more members of the other group of customers with whom they can productively interact.  See **Section III.A**.

ii.    A transaction platform is a particular type of two-sided platform, a key feature of which is that it cannot make a sale to one side of the platform without simultaneously making a sale to the other.  If a platform is in the business of providing transactions, an exclusive focus on conduct with respect to only one of the groups involved is inappropriate and insufficient.  Any determination of the relevant market must account for both sides of a transaction platform and the fact that the platform sells a single product.  Dr. Evans opines that "the Apple App Store is a monopoly supplier of iOS app distribution."[5]  But he does not focus on the market that is relevant to Epic's allegations in this case, which is the market by which Epic and its competitors can enter into digital transactions with consumers.[6]  See **Section III.B**.

iii.    A little over a year after the release of the first iPhone, Apple launched the App Store as an additional feature of the iPhone that serves as an intermediary between developers and users, offering a frictionless marketing, distribution, and transaction system, facilitating interactions between developers and users. The App Store offers developers a wide range of monetization strategies to choose from, one of which is the "Freemium Model" that Fortnite also uses, which allows developers to offer the app to users free of charge, but comes with the option of in-app purchases.  Independent of the monetization strategy chosen by developers, Apple takes a fixed percentage commission on the purchase price of any app and any digital content purchase made through the App Store to support the suite of services provided by the App Store and Apple's investment in the mobile platform.  This business model offers a number of pro-competitive benefits to both developers and users.  Thus, the

---

[5]    Evans Declaration, at ¶ 55.

[6]    Dr. Hitt addresses the scope of that market in his declaration.

IAP system plays a critical role in offering a number of these pro-competitive benefits to App Store users as well as in collecting Apple's commission on in-app purchases of digital content, and the suggestion by Epic that charging a commission on in-app purchases is inherently problematic, as opposed to charging for the original download or only taking profits from the sale of the iPhone, has no basis in economics.  See **Section IV.A**.

iv.   It is my opinion that the App Store is a two-sided transaction platform.  I note that while the Evans Declaration concedes that software platforms are two-sided businesses, Dr. Evans does not opine as to whether the App Store is a two-sided transaction platform.[7]  In fact, Dr. Evans states that "[m]y preliminary conclusions are unlikely to depend on whether the app distribution market is treated as two-sided, single-sided, or a hybrid or on considering users and developers together or separately."[8]  I disagree.  In order to draw any meaningful conclusions regarding whether the distribution of iOS apps in the App Store is a relevant product separate from the processing of in-app payments via Apple's IAP system, one must account for both sides of the App Store platform and must take seriously the fact that the App Store platform provides a single product—transactions between developers and users.  See **Section IV.B**.

v.    Dr. Evans claims that there is material demand by developers of apps with in-app transactions for the provision of payment processing of in-app transactions.[9]  Whether or not this is true, it is irrelevant.  The IAP system, which Epic seeks to avoid, performs a variety of functions including but not limited to payment processing.  (Indeed, Apple typically outsources payment processing to independent systems.)  A core function of the IAP system is the

---

[7]   Evans Declaration, at ¶ 7 ("Software platforms are two-sided businesses that facilitate connections between consumers who want to use applications and developers who want to write applications for those consumers.").

[8]   Evans Declaration, at fn. 82.

[9]   Evans Declaration, at ¶ 61 ("[T]he provision of payment processing of in-app transactions is a separate product for which there is material demand by developers of apps with in-app transactions.").

collection of the commission that developers are obligated to pay Apple on in-app sales that go toward developing and maintaining the entirety of the iPhone ecosystem.  Dr. Evans does not make the implausible assertion that there is material demand by developers for the provision of *that* core IAP function.  I find that there is insufficient demand for in-app payment administration—as performed by the IAP system—separate from the demand for app distribution, such that one could identify a distinct product market in which it is efficient to offer in-app payment processing separately from app distribution.  The sale of digital content through the App Store is one of the many monetization strategies offered by Apple and is inextricably linked to the distribution of apps through the App Store as well as the iPhone itself.  Importantly, Dr. Evans does not assert that any aspect of Apple's conduct is anticompetitive. See **Section IV.C**.

vi.   Plaintiff's and Dr. Evans' description of the IAP system as simply providing transaction processing, akin to Mastercard or PayPal, completely mischaracterizes its economic role.[10]  The IAP system serves both as an efficient method to monetize the services that the App Store provides to the two groups it serves and to enhance those services.  The App Store's anti-circumvention rules are similar to rules in place in other digital marketplaces

---

[10]   Evans Declaration, at ¶ 71 ("For in-app purchases of digital content, Apple requires, other than for the just-mentioned exception, that developers use its IAP payment processor. Using the card (or other payment method) that the iOS user has registered with Apple, Apple processes the transaction and reimburses the developer minus applicable fees. In effect, Apple requires that the developer, for apps that offer in-app purchases of digital content, use Apple's payment processing method rather than the developer's own method which relies on third-party payment processors. This requirement has the further effect of making Apple the merchant, and the user Apple's customer, for that transaction for the purpose of anything related to payments."); Plaintiff Epic Games, Inc.'s Complaint for Injunctive Relief, *Epic Games, Inc., v. Apple, Inc.*, No. 4:20-CV-05640-YGR, United States District Court Northern District of California, Oakland Division, September 4, 2020 ("Plaintiff's Complaint for Injunctive Relief"), at ¶ 109 ("There is a relevant market for the processing of payments for the purchase of digital content, including in-game content, that is consumed within iOS apps, the iOS In-App Payment Processing Market. The iOS In-App Payment Processing Market comprises the payment processing solutions that (but for Apple's unlawful conduct) iOS developers could turn to and integrate into their iOS-compatible apps to process in-app purchases of in-app content.").

to prevent avoidance of fees.[11]  And they are similar to the anti-steering rules at issue in the recent *Amex* case. [12]  Like these other rules, the App Store's anti-circumvention rules serve to prevent free-riding and to ensure that the App Store receives the commission to which developers have agreed.  See **Section IV.D**.

vii.   The IAP system allows Epic to offer its gaming app Fortnite to users in the above described Freemium Model, and thus enables Epic to benefit from a convenient pricing strategy that allows it to attract both price-sensitive consumers who want to use the app in its basic version and more avid users who are willing to spend various amounts to enable additional special features.  See **Section IV.E**.

## III.  Economics of Multi-sided Platforms

### A.     Multi-sided Platforms and Indirect Network Effects

7.  In its *Ohio v. American Express* (*Amex*) decision, the Supreme Court noted that, according to economists, a "[t]wo-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them."[13]  It cited a more complete description, based on my work with Dr. Evans, that two-sided platforms serve distinct groups of customers who need each other in some way, and the core business of the two-sided platform is to provide a common (real or

---

11    Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_mark etplaces_a_comparison_of_commission_rates.pdf, at Appendix A1.

12    Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at pp.19-20 ("When merchants steer cardholders away from Amex at the point of sale, it undermines the cardholder's expectation of "welcome acceptance" […] A lack of welcome acceptance at one merchant makes a cardholder less likely to use Amex at all other merchants. This externality endangers the viability of the entire Amex network. And it undermines the investments that Amex has made to encourage increased cardholder spending, which discourages investments in rewards and ultimately harms both cardholders and merchants. […] [A]ntisteering provisions do not prevent Visa, MasterCard, or Discover from competing against Amex by offering lower merchant fees or promoting their broader merchant acceptance.").

13    Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at p. 2.

virtual) meeting place and to facilitate interactions between members of the two distinct customer groups."[14]  For a platform to be attractive to both groups it seeks to serve, it must serve to reduce frictions that impede their desired interaction, and it must structure the prices it charges to both sides so as to make the platform attractive to both.

8. Following the economic literature, the *Amex* Court highlighted that indirect network effects are a key feature of two-sided platforms: "Two-sided platforms differ from traditional markets in important ways.  Most relevant here, two-sided platforms often exhibit what economists call 'indirect network effects.'"[15]  Indirect network effects refer to the situation in which the value realized by members of one group of customers of a platform is higher when they have access to more members of the other group of customers with whom they could productively interact.[16]  Successful two-sided platforms must ensure that there are a large number of participants on both sides of the platform and that transactions on the platform are as easy, safe, and reliable as possible.[17]

---

[14]   Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy (ABA Section of Antitrust Law)*, 1, 2008, pp. 667-693, at p. 667.

[15]   Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at p. 3.

[16]   Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, May 3, 2016, at Chapter 2 ("A network effect is *indirect* when the value of a matchmaker to one group of customers depends on how many members of a *different* group participate."); Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?" *Antitrust,* 2018, pp. 72-79, at p. 72 ("Economists use 'network effects' to describe contexts in which a good or service offers increasing benefits the more users it has. Network effects can be direct—for example, a fax machine becomes more useful as other people also use fax machines. Network effects can also be indirect so that they flow across different sets of users. For example, Uber would not be a very useful app for a rider if there were no drivers using the platform. Similarly, drivers would not want to use the Uber app if no riders were using it.").

[17]   "The 'Sharing' Economy: Issues Facing Platforms, Participants, and Regulators," *Federal Trade Commission,* November 2016, available at https://www.ftc.gov/system/files/documents/reports/sharing-economy-issues-facing-platforms-participants-regulators-federal-trade-commission-staff/p151200_ftc_staff_report_on_the_sharing_economy.pdf, at pp. 3-4 ("[A successful platform] must attract a large number of participants to both sides of the market, so that each participant has a substantial number of potential matches on the other side of the market (resulting in a "thick" market). […] [And] platforms must make transacting between strangers safe and reliable enough that buyers and sellers feel confident that their transaction will proceed as agreed.").

9.  To ensure participation on both sides, so that each side finds participation on the platform attractive because of participation by the other side, platforms carefully choose their price structures on both sides.  Platforms may charge *access* fees for the right to participate on the platform (*e.g.*, the annual fee consumers pay to carry an American Express card) as well as *usage* fees for transactions (*e.g.*, the percentage of each purchase made with an American Express card that merchants pay to American Express).[18]  It is common for one side of a two-sided platform to be charged less than marginal cost to encourage participation on that side, making it attractive for the other side, which is charged above marginal cost, also to participate.[19]  Thus newspapers have traditionally been sold at a loss to boost circulation (some are even free) and make them more attractive to advertisers, who contribute almost all of their profits.[20]

10.  Multi-sided platform businesses have been around a long time, since at least matchmakers in traditional cultures brought together brides and grooms.[21]  Payment systems, like American Express, have facilitated interactions between merchants and consumers for decades.[22]  The internet and advances in information technology as well

---

[18]  Roche, Jean-Charles and Jean Tirole, "Two-Sided Markets: A Progress Report," *RAND Journal of Economics*, 37(3), 2006, pp. 645-667, at p. 647 ("We distinguish between membership charges and usage charges […] the platform charges a price or access charge $a^S$ to the seller and $a^B$ to the buyer for enabling the interaction. For example, American Express charges a merchant discount to the merchant, so $a^S > 0$, while the buyer pays nothing for using the American Express card, $a^B = 0$ […] the platform may charge interaction independent fixed fees $A^S$ and $A^B$. For example, American Express charges yearly fees to cardholders ($A^B > 0$).").

[19]  Rysman, Mark, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives,* 23(3), 2009, pp. 125-143, at p. 130 ("Such seeming anomalies as price below marginal cost or even negative prices can easily arise in a two-sided market. For example, a platform might charge a price below cost on one side if those agents have a large price elasticity and their participation attracts a large number of participants on the other side who are relatively price inelastic").

[20]  Chyi, Hsiang Iris and Ori Tenenboim, "Charging More and Wondering Why Readership Declined? A Longitudinal Study of U.S. Newspapers' Price Hikes, 2008-2016," *Journalism Studies*, 20(14), 2019, pp. 2113-2129, at p. 2116 ("[A]dvertising has been the primary revenue source for most U.S. newspapers, which accounted for as much as 70%–85% of a typical newspaper's total income").

[21]  Some of the earliest documented matchmakers were Orthodox Jewish matchmakers called Shadchans. *See* "What is a 'Shadchan'?" *Chabad.org*, available at https://www.chabad.org/library/article_cdo/aid/160984/jewish/What-Is-a-Shadchan.htm, accessed on September 8, 2020.

[22]  American Express launched its first travel charge card on October 1, 1958. *See* "The History of Amex," *Chosen Payments*, available at https://chosenpayments.com/the-history-of-amex, accessed on September 8, 2020.

as the development of smartphones, have enabled the creation and growth of many relatively young platforms, including Uber, OpenTable, and, of course the App Store.

11. The App Store and other online stores broadly modeled after it have made it much easier for potential customers to find and acquire attractive apps and for app developers to reach potential customers.  Before the App Store innovation, interactions between developers and customers involved large frictions related to search and asymmetric information.  In the 1990s, developers would contract with publishing houses to offer their personal computer software in brick-and-mortar stores, and consumers would travel to those stores to purchase software.[23]  Developers would agree to pay publishers a share of sales or up-front cash to finance the packaging, advertising, and marketing of software.[24]  Even after the rise of faster internet connections in the 2000s, developers incurred significant costs in managing their public websites, handling financial transactions, protecting their intellectual property,

---

[23]   "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *ACT | The App Association*, at p. 1 ("In the early 1990s, consumers were tasked with the challenge of locating and then traveling to a brick-and-mortar store that happened to sell software.").

[24]   *See, e.g.,* "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *ACT | The App Association*, at p. 2 ("Bungie—developer of popular games Halo, Myth, Oni, and Marathon—chronicled in 1996 the difficult and sometimes oppressive distributor requirements placed on software developers that predated the platform ecosystem. When dealing with retail distributors, Bungie was required to guarantee a competitive price, pay 3-6 percent of sales as a marketing fee in addition to $10,000 for product launch marketing, pay shipping to deliver their products to distributors, and agree to buy back unsold products. Once contracts were negotiated, software developers were often required to spend additional money so that in-store catalogs would feature their product or retail stores would place their product on an end cap display, all before consumers even saw the products.").

and promoting and securing consumer trust.[25]  Especially consumer trust typically requires a substantial online reputation.[26]

12. The App Store dramatically changed software distribution by (i) reducing overhead costs across the board, (ii) providing instantaneous consumer trust via Apple's reputation, and (iii) giving cost-effective access to a global market.[27]  This innovation dramatically reduced frictions that inhibited interactions between developers and consumers and thereby fueled enormous growth in app development.

**B.     Transaction Platforms**

13. Citing some of the relevant economic literature, the *Amex* Court distinguished a particular type of two-sided platform, the "transaction platform."  The Court said that: "Because they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected pricing and demand."[28]  The literature cited by the court noted that transaction platforms operate in a single market: the

---

[25]   "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *ACT / The App Association*, at p. 1 ("App companies were not only required to write code for their products, but they were also responsible for: (1) managing their public websites, (2) hiring third-parties to handle financial transactions, (3) employing legal teams to protect their intellectual property, and (4) contracting with distributors to promote and secure consumer trust in their product.").

[26]   "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *ACT / The App Association*, at p. 1 ("In the internet economy, immediate consumer trust is almost impossible without a substantial online reputation and not attaining it spells death for any app company. […] In this context, trust refers to an established relationship between the app company and consumer where the consumer demonstrates confidence to install the app and disclose otherwise personal information to an app company."); "Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship," Testimony of Morgan Reed Before the U.S. House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law, at p. 5 ("[T]rust refers to an established relationship between the app company and consumer where the consumer has the confidence to install the app and disclose otherwise personal information to an app company. Prior to platforms, software developers often handed over their products to companies with a significant reputation to break through the trust barrier.").

[27]   "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *ACT / The App Association*, at p. 8.

[28]   Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at p. 13.

market for transactions.[29]  Payment cards and auction houses are familiar examples of transaction platforms discussed in the academic literature.[30]

14. Like all two-sided platforms, two-sided transaction platforms need to set access and usage fees to the two sides in order to ensure balanced participation.  In addition, these platforms often need to establish and enforce rules of behavior to prevent platform participants from reducing the value of the platform to others.  For instance, OpenTable suspends a user's account if the user is a no-show for four reservations within a 12-month period.[31]  That may be a mild inconvenience for some consumers, but it makes the platform more valuable to restaurants, and if more restaurants participate, the platform is more valuable to all consumers.

15. Not all two-sided platforms are transaction platforms.[32]  Newspapers link advertisers and readers, but no transaction between them happens on the newspapers' platforms.  Shopping malls facilitate interaction between shoppers and merchants but are not involved in any transactions between those two groups.  It may make economic sense

---

[29]   Klein, Benjamin, Andres Lerner, Kevin Murphy, and Lacey Plache, "Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," *Antitrust Law Journal*, 73(3), 2006, pp. 571-626, at p. 580 ("a payment card system supplies only one product, payment card transactions that are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment"); Filistrucchi, Lapo, Damien Geradin, Eric van Damme, and Pauline Affeldt, "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, 10(2), 2014, pp. 293-339, at p. 298 ("Two-sided transaction markets, such as payment cards, are instead characterized by the presence and observability of a transaction between the two groups of platform users.").

[30]   *See, e.g.,* Filistrucchi, Lapo, Damien Geradin, Eric van Damme, and Pauline Affeldt, "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, 2014, 10(2), pp. 293-339, at p. 293 ("Drawing from the economics of two-sided markets, we provide suggestions for the definition of the relevant market in cases involving two-sided platforms, such as media outlets, online intermediaries, payment cards companies, and auction houses.").

[31]   "OpenTable Terms of Use," *OpenTable*, available at https://www.opentable.com/legal/terms-and-conditions, accessed on September 11, 2020.

[32]   Filistrucchi, Lapo, Damien Geradin, Eric van Damme, and Pauline Affeldt, "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, 10(2), 2014, pp. 293-339, at p. 298 ("Two-sided non-transaction markets, such as most media markets, are characterized by the absence of a transaction between the two sides of the market and, even though an interaction is present, it is usually not observable, so that a per-transaction fee or per-interaction fee or a two-part tariff is not possible.").

in some antitrust contexts to consider such platforms as competing in two separate but linked markets.

16. In contrast, in the *Amex* case, the Court correctly applied the relevant economic learning by observing that "[t]ransaction platforms are thus better understood as 'supply[ing] only one product'—transactions."[33]  In our *amicus* brief in that matter, Dr. Evans and I reached the same conclusion for platforms that provide services that are "jointly and unseverably consumed" by members of two distinct groups—a slightly different way of describing transaction platforms.[34]  If a platform is in the business of providing transactions, as American Express ("Amex") clearly is, it makes no economic sense to consider inputs into transactions production in isolation, as an exclusive focus on conduct with respect to only one of the groups involved (merchants in the *Amex* case) would do.  This conclusion has important implications for assessing the alleged conduct in this matter, as I discuss in detail in **Section IV** below.

17. An art gallery that displays and manages the sale of paintings owned by others is an instructive example of a transaction platform.  It is a platform because it exists to facilitate interactions between artists and art buyers by choice of venue, curation, and other means.  It is a transaction platform because its business is to sell paintings.  It is properly analyzed as producing a single product: sales of paintings.

18. As a two-sided platform, a gallery creates value through the indirect network effects that it offers to artists and art buyers.  Both artists and art buyers benefit from the platform that the gallery offers for members of the two groups to interact.  In addition to facilitating the sale of artwork, galleries—as a transaction platform—typically also

---

[33]  Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at p. 14 ("For all these reasons, '[i]n two-sided transaction markets, only one market should be defined.'").

[34]  Brief for *Amici Curiae* Prof. David S. Evans and Prof. Richard Schmalensee in Support of Respondents, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, January 23, 2018, at p. 5 ("The risk of error from ignoring customers on one side of a platform during the first stage of the rule of reason analysis is heightened for platforms that provide services that, by their very nature, are consumed jointly and unseverably by two different types of customers. In these cases, the platform can charge either or both types of customers for the service that both consume jointly in order to recover the platform's costs and make a profit.").

offer a variety of services to artists and collectors on an ongoing basis.  These services ultimately benefit all parties as they can lead to potential transactions in the future. Such services include, for example, "maintaining visual material for promotional purposes, […] cultivating collectors and corporate clients, […] monitoring the practitioner's interests and legal rights, […] collaborating with the practitioner on competition, grant and commission submissions."[35]

19. To capture some of this value, galleries typically choose to monetize by retaining between 30 percent and 60 percent of the artwork's sales price.[36]  This commission is much higher than the payment processing fees that the gallery pays, for instance, when a purchase is made via credit card, as it compensates the gallery for all its services to artists and art buyers.

20. There are many alternative monetization strategies a gallery could implement instead. For example, the gallery could choose to charge art buyers a fee to enter the gallery (*i.e.,* an access fee).  However, this monetization strategy could be counterproductive, as it might reduce the number of art buyers, which in turn would likely reduce the value of the gallery to artists.  Charging a percentage commission per transaction, on the other hand, is much more in line with economic principles, as monetization is proportional to the value of the transaction to the buyer, *i.e.*, the higher the sales price, the higher the commission the gallery receives.

21. Furthermore, galleries generally require that when a buyer makes a purchase using a payment card, that payment must be processed via the gallery's payment terminal. If

---

[35] "Code of Practice: Commercial Galleries and Retail Outlets," *National Association for the Visual Arts*, available at https://visualarts.net.au/code-of-practice/11-commercial-galleries/, accessed on September 7, 2020.

[36] "What Commission Rate Do Galleries Typically Retain When They Handle Artists' Work?" *Fine Art Trade Guild*, available at https://www.fineart.co.uk/faq/commission-rates-to-artists-32.aspx, accessed on September 5, 2020 (" Galleries typically retain between 30% and 60% of the selling price."); "Gallery-Artist Agreement," *Copyrights, Contracts, & Guidelines for Dinosaur Artists & Paleontologists*, available at http://www.dinoart.com/publications/prt2pg11.html, accessed on September 5, 2020 ("Standard commission percentages range from 32%, (where the artist takes care of many of the show expenses,) to 50%, (where the gallery absorbs all costs except framing.)"); Martin, Jenna, "Selling Art in Galleries: Everything You Need To Know," *PetaPixel*, November 14, 2014, available at https://petapixel.com/2014/11/14/selling-art-galleries-everything-need-know/ ("Every gallery is different, but most galleries take somewhere around a 50% commission from pieces you sell. Some take 40%, but rarely do any take more than 50%.").

instead the buyer were permitted to deal directly with the artist, the artist could avoid paying the gallery's commission.  This anti-circumvention rule is similar to the anti-steering provisions that Amex has in place to deter merchants from "steering" customers away from using their Amex cards.  Amex prohibits merchants who advertise that they accept the Amex card, and who thus attract business as a consequence, from trying to persuade consumers who seek to use their Amex cards to instead use a card that would charge the merchant a lower fee.  When successful, such steering enables the merchant to free-ride, to benefit from the image created by being able to advertise Amex card acceptance without paying for Amex's brand-building investments.  Similarly, an artist who takes payment directly from a buyer for a work that a gallery had displayed would avoid paying for the gallery's display and other services and would thus be free-riding.  In *Amex*, the Supreme Court said that "there is nothing inherently anticompetitive about Amex's anti-steering provisions" and that steering "undermines the investments that Amex has made […] and ultimately harms both cardholders and merchants."[37]  Likewise, free-riding artists would undermine the investments of galleries into their display services for artists, which would ultimately harm art buyers and artists alike.

22. In addition, the gallery's payment card terminal may generate data that is valuable to the gallery and to artists, but, strictly speaking, it does not process payments.  That is, it does not arrange the transfer of wealth from the buyer to the gallery.  If a work is purchased using a Visa card, for instance, that task is ultimately outsourced to the Visa network.  The gallery owner—and probably the artist—would be astonished to hear that the gallery's commission should be thought of as a markup on the use of its payment processing terminal.  The gallery's commission simply reflects what the gallery views as the optimal monetization strategy for the value that it offers to both sides of its transaction platform.

---

[37]   Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at p. 19.

**IV.     Economic Analysis of Apple's App Store Business**

**A.       Apple's Basic App Store Business Model is Reasonable and Pro-Competitive**

*1.   The App Store Concept*

23.   When the iPhone was launched in June 2007 with only pre-installed applications, or apps, Apple was operating an ordinary single-sided business.[38]  With its "remarkably elegant, easy to use, and even fun to play with [hardware and software],"[39] Apple could perhaps have successfully continued with this model for the iPhone, offering no opportunities to independent app developers.  Instead, about a year later, Apple opened up the iOS platform to developers with the introduction of its App Store.[40] The App Store officially launched on July 10, 2008 with around 500 apps.[41]  Only 30 days later, the App Store already offered more than 1,500 apps, and 60 million applications had been downloaded. [42]  When Apple launched the App Store, Apple's

---

[38]   Pierce, David and Lauren Goode, "The WIRED Guide to the iPhone," *WIRED*, December 7, 2018, available at https://www.wired.com/story/guide-iphone/.

[39]   Tweney, Dylan, "Review: Apple iPhone Rocks, Rolls, and Doesn't Disappoint," *WIRED*, July 1, 2007, available at https://www.wired.com/2007/07/review-apple-ip/.

[40]   "10 Years Ago, the App Store Still Didn't Understand What it Meant to be Mobile," *The Verge*, July 10, 2018, available at https://www.theverge.com/2018/7/10/17550430/apple-iphone-ios-app-store-10-years-look-back.

[41]   "10 Years Ago, the App Store Still Didn't Understand What it Meant to be Mobile," *The Verge*, July 10, 2018, available at https://www.theverge.com/2018/7/10/17550430/apple-iphone-ios-app-store-10-years-look-back.  Tech reviewers have considered the launch of the App Store one of the most significant events in the evolution of the iPhone.  *See, e.g.*, Pierce, David and Lauren Goode, "The WIRED Guide to the iPhone," *WIRED*, December 7, 2018, available at https://www.wired.com/story/guide-iphone/ ("The App Store will almost certainly stand as Apple's most important contribution to both the tech industry and society in general, even more than the phone itself. Developers immediately began building apps and games that changed the way we communicate, work, eat, and play. The App Store made way for Instagram, Uber, and Tinder, and it turned the iPhone into the pocket computer it was always meant to be.").

[42]   "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *The Wall Street Journal*, July 25, 2018 reprint of an interview from August 7, 2008, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201.

iOS devices became a multi-sided software platform linking developers and users.[43] However, even with its decision to open the iPhone to developers, Apple maintained what it describes as its "ongoing focus on the deep integration of hardware, software and services."[44]

24. The idea of the App Store was simple—to create "a safe and trusted place for customers to discover and download apps, and a great business opportunity for all developers."[45]  As Steve Jobs noted in an interview with *The Wall Street Journal* just shy of 30 days after the launch of the App Store: "What we've tried to do is to construct […] a frictionless marketing, distribution and transaction system for both the developer and the user so that the user can get what they want.  […]  Once your app is developed, to be able to submit it to Apple and have us take care of all of the marketing, wireless distribution, billing and all the transactional stuff for you, and deliver it right on the handset." [46]

25. As Apple had done with the design of the iPhone, the App Store further revolutionized the user experience for iPhone users, enabling them to directly download to their phones a wide range of third-party apps that had been approved by Apple as safe and high-quality.[47]  Similarly, the App Store granted developers of third-party apps direct

---

[43]   "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *The Wall Street Journal*, July 25, 2018 reprint of an interview from August 7, 2008, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201 ("What we've tried to do is to construct […] a frictionless marketing, distribution and transaction system for both the developer and the user so that the user can get what they want.").

[44]   "Apple Rings in New Era of Services Following Landmark Year," *Apple*, January 8, 2020, available at https://www.apple.com/newsroom/2020/01/apple-rings-in-new-era-of-services-following-landmark-year/.

[45]   "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020.

[46]   "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *The Wall Street Journal*, July 25, 2018 reprint of an interview from August 7, 2008, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201.

[47]   *See, e.g.,* "What do the App Store Updates Mean for Your App?" *Clearbridge Mobile*, available at https://clearbridgemobile.com/what-do-the-app-store-updates-mean-for-your-app/, accessed on September 12, 2020 ("When it was first introduced in 2008, Apple's App Store revolutionized the way in which software is bought and sold. The App Store essentially defined the app ecosystem, the process of developing and launching apps, and how users consume content, products, and services.").

access to a large and growing network of iPhone users.  Today, users can access over 1.8 million apps, around 84 percent of which are entirely free, and developers have direct access to 1.5 billion Apple devices and more than 900 million iPhone users.[48]

### 2. *The App Store Offers Developers a Wide Range of Monetization Strategies*

26. When offering their apps to users in the App Store, developers can choose between the *Free Model*, *Freemium Model*, *Paid Model*, *Paymium Model,* and the *Subscription Model*.[49]  In the *Free Model*, users get to download and use the app completely free of charge and with no optional in-app purchases, and developers obtain distribution services without paying download fees or using IAP.[50]  This model is especially attractive for developers planning to monetize their app by displaying ads within the app or by facilitating the purchase of certain physical goods, as in the case of Uber.  A completely free app is likely to attract more users, which in turn increases potential ad revenue.  About 84 percent of apps in the App Store follow the *Free Model*,[51] and in aggregate provide substantial consumer benefits.  Apple collects zero revenue for the download and usage of such apps, even if developers collect revenue by displaying ads.[52]

---

[48] Declaration of Philip W. Schiller in Support of Defendant Apple Inc.'s Opposition to Plaintiff's Motion for a Preliminary Injunction, *Epic Games, Inc., v. Apple, Inc.*, No. 4:20-CV-05640-YGR, United States District Court Northern District of California, Oakland Division, September 15, 2020 ("Schiller Declaration"), at ¶ 3; "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020; Defendant and Counterclaimant Apple Inc.'s Answer, Defenses, and Counterclaims in Reply to Epic Games, Inc.'s Complaint for Injunctive Relief, *Epic Games, Inc., v. Apple, Inc.*, No. 4:20-CV-05640-YGR, United States District Court Northern District of California, Oakland Division, September 8, 2020 ("Defendant's Answer, Defenses, and Counterclaims"), p. 8 at 10-11 and p. 14 at 6-8.

[49] "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020.

[50] "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020; Schiller Declaration, at ¶ 39.

[51] "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020.

[52] "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020.

27. The *Freemium Model* also offers the app to users free of charge and gives developers app distribution without paying download fees.[53]  However, this model comes with the option of in-app purchases, *i.e.*, users can enable certain features within the app by paying a premium.[54]  This model offers a convenient pricing strategy that allows developers to attract price-sensitive consumers that might want to use the app in its basic version while earning more from more avid users of the app who are willing to spend to enable additional special features.  Epic's *Fortnite* is an example of an app that employs this business model, as discussed in more detail in **Section IV.E**.

28. In the *Paid Model*, users pay once when they download the app, but are then able to use all features of the app at no additional charge.[55]  The *Paymium Model* on the other hand, is a combination of the Freemium Model and the Paid Model.  Users pay for the download of the app and can then choose to make additional in-app purchases to enable special features within the app.[56]  Developers can also choose a *Subscription Model*, in which users are charged a subscription fee on an ongoing basis.[57]

### 3. *Procompetitive Benefits of Apple's Monetization Strategy for the App Store*

29. To support the suite of services provided by the App Store and Apple's investment in the mobile platform, Apple charges a fixed percentage commission on downloads of paid apps and in-app purchases of digital goods and services via the IAP system.  IAP is Apple's secure and centralized payment system used to record sales and collect commissions on in-app purchases of digital content.[58]  Developers who wish to offer

---

[53]   "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020; Schiller Declaration, at ¶ 39.

[54]   "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020.

[55]   "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020.

[56]   "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020.

[57]   "Choosing a Business Model," App Store, *Apple*, available at https://developer.apple.com/app-store/business-models/, accessed on September 4, 2020.

[58]   Schiller Declaration, at ¶¶ 32-33.

digital content via in-app purchases are required to use IAP to do so.[59]  IAP offers many benefits to consumers (*e.g.*, single and easy point of sale) and developers (*e.g.*, aid with currency conversions and compliance with local tax laws).[60]  It is important to note, however, that IAP is not a payment settlement platform.  In fact, Apple outsources payment settlement to third-party providers.[61]  Thus, the commission that Apple charges developers on in-app purchases is not a fee for payment processing, but rather a fee to support the services offered by the App Store and Apple's investment in the mobile platform.

30. The services offered by the App Store and Apple's investments have been essential to the iPhone ecosystem, where consumers have access to over 1.8 million apps, 84 percent of which are completely free.[62]  Since the launch of the App Store, commissions for paid apps and in-app digital content purchases have consistently remained 30 percent of the corresponding purchase price.[63]  Commissions on subscriptions, which were 30 percent for several years, were reduced to 15 percent in June 2016 for subscriptions that extend beyond the first year.[64]  Apple does not charge

---

[59]  Schiller Declaration, at ¶ 40 ("To collect its contractually-agreed commission on sales of in-app digital content, Apple needs to know when such transactions take place. For this reason, Apple requires third-party developers to use IAP for eligible transactions, and prohibits them from circumventing IAP.").

[60]  Schiller Declaration, at ¶¶ 34-36.

[61]  Schiller Declaration, at ¶¶ 43-44 ("IAP is not a payment settlement platform. […] Apple contracts with third-party settlement providers to facilitate Apple's own ability to accept customer payments.").

[62]  Defendant's Answer, Defenses, and Counterclaims, p. 8 at 10-11; Schiller Declaration, at ¶ 3; "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020.

[63]  "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020; "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *The Wall Street Journal*, July 25, 2018 reprint of an interview from August 7, 2008, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201 ("The total revenue has been $30 million in the first 30 days. Developers get 70% of that.").

[64]  "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020 ("In that case, developers earn 70% of subscription sales for the first subscription year, and Apple collects a 30% commission. After the first year, the developer earns 85% for all successive years that the user remains a subscriber, and Apple collects a 15% commission"); Statt, Nick, "Google Matches Apple by Reducing Play Store Fee for Android App Subscriptions," *The Verge*, October 19, 2017, available at https://www.theverge.com/2017/10/19/16502152/google-play-store-android-apple-app-store-subscription-revenue-cut.

any commissions on free apps, advertising revenue, or revenue from purchases of physical goods.[65]  The Store's contractual provisions have not materially changed since its launch,[66] and the bulk of revenues on the iOS platform still come from devices.[67]

31. The App Store enables developers to sell in 175 countries with diverse tax and legal regimes and across 45 different local currencies.[68]  It records who owns what apps and other digital goods, enabling developers to provide frequent updates and to track sales and trends.  Apple also offers various additional services to developers without charging separately for them, such as: App Analytics which allows developers to find out "how customers discover and engage" with the app; Sales and Trends which provides "daily data" on "subscription activity" and "business performance"; and monthly payment and financial reports.[69]  Apple continues to invest in "new technologies to help its 23 million developers design and build the apps of tomorrow" — for example, Apple recently introduced "a new StoreKit tool in Xcode [that] lets developers simulate subscription setup, in-app purchases, and even refunds."[70]  Xcode, Apple's integrated development environment, consists of tools that enable developers to build, test, optimize, and submit apps to the App Store for the iOS, iPadOS, macOS, tvOS, and watchOS platforms.[71]  By further facilitating how developers offer and

---

[65]  "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020; Defendant's Answer, Defenses, and Counterclaims, p. 44 at 11-12; Schiller Declaration, at ¶ 39.

[66]  Schiller Declaration, at ¶ 7 ("Apple has never increased this commission rate, and instead has found ways to decrease it in certain contexts.").

[67]  Apple Inc., Form 10-K For the Fiscal Year Ended September 28, 2019, at p. 19; Evans Declaration, at ¶ 19.

[68]  Defendant's Answer, Defenses, and Counterclaims, p. 45 at 4-5.

[69]  "Gain Insights with Analytics," *Apple*, available at https://developer.apple.com/app-store-connect/analytics/, accessed on September 7, 2020.

[70]  "Apple Reveals New Developer Technologies to Foster the Next Generation of Apps," *Apple*, available at https://www.apple.com/newsroom/2020/06/apple-reveals-new-developer-technologies-to-foster-the-next-generation-of-apps/, accessed on September 8, 2020.

[71]  "Xcode," *Apple*, available at https://developer.apple.com/documentation/xcode/, accessed on September 11, 2020.

promote in-app purchases, the new StoreKit tool increases the value of the App Store as a two-sided transaction platform serving both developers and consumers.

32. Apple had the option to open up the iPhone and iPad completely, so that users could download apps from any source.  This may have created additional pathways for developers of all sorts to reach iPhone users, but it also would have eliminated Apple's ability to guarantee those users security, privacy, and a quality user experience, a distinguishing feature of Apple products since its inception.  Privacy protection is particularly important on smartphones, as they have access to user information, such as the user's image, voice, and location that is not as prevalent on other hardware platforms.[72]  Instead, Apple chose to establish a Developer Program which offers developers Apple's software for application creation and subsequently requires them to submit the app for review before it is published.[73]  This may be an inconvenience for some developers, but Apple's extensive efforts are meant to ensure the quality of the platform, which benefits both developers and customers, in a similar way that a selective gallery curator is likely to attract more potential buyers – and thus more artists.

33. In fact, Epic Games, citing a desire for the "Epic ecosystem to be welcoming for everyone," has also established content guidelines and rules which limit how Fortnite Creators can create and share content.  Most notably, Fortnite Creators are not allowed to "sell, trade, or give away in-game items or game codes outside of channels approved by Epic." [74,75]

---

[72]   Schiller Declaration, at ¶ 25.

[73]   "App Store Review Guidelines," App Store, *Apple*, available at https://developer.apple.com/app-store/review/guidelines/, accessed on September 14, 2020; "Choosing a Membership," Support, *Apple*, available at https://developer.apple.com/support/compare-memberships/, accessed on September 13, 2020.

[74]   "Content Guidelines," *Epic Games*, available at https://www.epicgames.com/site/en-US/content-guidelines, accessed on September 10, 2020.

[75]   "Support-A-Creator-FAQ," Fortnite, *Epic Games*, available at https://www.epicgames.com/fortnite/en-US/news/support-a-creator-faq, accessed on September 14, 2020 ("Creators earn money when supporters purchase on the Epic Games store or spend V-Bucks within Fortnite. […] Creators are video makers, streamers, storytellers, artists, cosplayers, musicians, and community builders.").

34. Apple's experts scrutinize each app to ensure that it runs smoothly, is free of bugs and performance issues, is compatible with Apple products and services, and is compliant with the safety and security and appropriate content guidelines of the App Store.[76] Apple reviews approximately 100,000 apps per week, and the review is rigorous. The rejection rate is around 40 percent, with user privacy being one of the top reasons for rejection.[77] Most reviews are completed in less than 24 hours, and almost all are completed within 48 hours. In addition, Apple's editorial team lowers consumer search costs by deciding which apps to feature on the store and how.[78]

35. Furthermore, the App Store safeguards critical financial and personal information of iOS users. First, it requires developers to disclose the type of information their apps collect: on each app's product page, users must be able to learn about some of the data types an app may collect, and whether the information is used to track them or is linked to their identity or device.[79] Second, developers do not receive access to the credit card information of users making purchases in the App Store.[80] The IAP system plays a critical role in extending this benefit to in-app purchases. These policies are all part of Apple's efforts to safeguard critical financial and personal information of iOS users.

---

[76] "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020; "App Store Review Guidelines," App Store, *Apple*, available at https://developer.apple.com/app-store/review/guidelines/, accessed on September 14, 2020; Leswing, Kif, "Inside Apple's Team That Greenlights iPhone Apps for the App Store," *CNBC*, available at https://www.cnbc.com/2019/06/21/how-apples-app-review-process-for-the-app-store-works.html, accessed on September 11, 2020.

[77] "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020.

[78] "App Review," *Apple*, available at https://developer.apple.com/app-store/review/, accessed on September 11, 2020; "Apple Introduces 'Editors' Choice' and Free 'App of the Week' on the Mac App Store and iTunes," *The Verge*, May 24, 2012, available at https://www.theverge.com/2012/5/24/3042074/apple-editors-picks-free-app-of-the-week-itunes.

[79] "User Privacy and Data Use," *Apple*, available at https://developer.apple.com/app-store/user-privacy-and-data-use/, accessed on September 7, 2020.

[80] Armerding, Taylor, "Google Play Shares Too Much Personal Info, App Developer Says," *CSO Online*, February 15, 2013, available at https://www.csoonline.com/article/2132939/google-play-shares-too-much-personal-info--app-developer-says.html.

36. Apple's iOS business model has enabled Apple to protect iOS users' security, privacy, and experience quality, while providing them access to the creativity of the vast membership of its Developer Program.  Protection from security threats is particularly important.[81]  According to a recent report by RiskIQ on mobile app threats, "Apple treats its App Store like Fort Knox and rarely hosts dangerous apps. Meanwhile, Google's security controls are improving despite allowing troublesome apps to enter the Play Store at a rate it finds acceptable […]."[82]  A Nokia Threat Intelligence Report from 2019 estimates that in 2017, less than one percent of malware threats came from iPhones.[83]  In contrast, one source estimates that more than 84 percent of malicious attacks that occur on mobile phones involve Android OS devices.[84]  Another source suggests that the introduction of an app review process for the Google Play platform was at least in part driven by security concerns.[85]  Similarly, in 2019, Facebook announced that it had suspended 69,000 apps "for improperly sucking up users'

---

[81]  "Apple Reveals New Developer Technologies to Foster the Next Generation of Apps," *Apple*, available at https://www.apple.com/newsroom/2020/06/apple-reveals-new-developer-technologies-to-foster-the-next-generation-of-apps/, accessed on September 8, 2020; "Principles and Practices," App Store, *Apple*, available at https://www.apple.com/ios/app-store/principles-practices/, accessed on September 7, 2020.

[82]  Herman, Jordan, "RiskIQ 2019 Mobile App Threat Landscape Report," *RiskIQ,* available at https://www.riskiq.com/resources/research/2019-mobile-threat-landscape-report/, accessed on September 11, 2020.

[83]  "Nokia Threat Intelligence Report - 2019," *Nokia*, available at https://pages.nokia.com/T003B6-Threat-Intelligence-Report-2019.html, accessed on September 11, 2020.

[84]  Ahvanooey, Milad Taleby, Qianmu Li, Mahdi Rabbani, and Ahmed Raza Rajput, "A Survey on Smartphones Security: Software Vulnerabilities, Malware, and Attacks," *International Journal of Advanced Computer Science and Applications*, 8(10), 2017, at p. 36.

[85]  Raphael, JR, "Android Market Security: An Interview with Android's VP of Engineering," *Computerworld*, https://www.computerworld.com/article/2472262/android-market-security--an-interview-with-android-s-vp-of-engineering.html, accessed on September 11, 2020; "Creating Better User Experience on Google Play," *Android Developers Blog*, March 17, 2015, available at https://android-developers.googleblog.com/2015/03/creating-better-user-experiences-on.html.

personal information and other transgressions."[86]  Of these suspended apps, 10,000 were flagged "for potentially misappropriating personal data from Facebook users."[87]

37. The App Store adds further value by enhancing users' ability to maintain their apps across all of their iOS devices.  Apple collects data on transactions, including zero-revenue transactions, that enable it to provide a set of services to both developers and consumers that increase the value of the platform to both groups.  The IAP system extends these benefits by facilitating the restoration of inadvertently deleted in-app digital content purchases, and Apple has recently announced that developers will soon be able to allow consumers to share apps and subscriptions among family members.[88] The system ensures that items purchased are actually delivered and enables consumers to view all their past purchases, while protecting all their private information.[89]  With the growing popularity of subscription services, the App Store also allows users to unsubscribe from services purchased through IAP in a single place to avoid unauthorized recurrent charges.[90]

38. As noted above, this model has been enormously successful and beneficial for both consumers and developers.  Between 2008 and 2019, app developers received around $155 billion in payments from Apple for offering digital goods and services through the App Store or within their apps worldwide.[91]  Adding the sales of physical goods and services through apps and in-app advertising, it is estimated that the App Store

---

[86]  Conger, Kate, Gabriel J.X. Dance, and Mike Isaac, "Facebook's Suspension of 'Tens of Thousands' of Apps Reveals Wider Privacy Issues," *The New York Times*, September 20, 2019, available at https://www.nytimes.com/2019/09/20/technology/facebook-data-privacy-suspension.html.

[87]  Conger, Kate, Gabriel J.X. Dance, and Mike Isaac, "Facebook's Suspension of 'Tens of Thousands' of Apps Reveals Wider Privacy Issues," *The New York Times*, September 20, 2019, available at https://www.nytimes.com/2019/09/20/technology/facebook-data-privacy-suspension.html.

[88]  Chambers, Bradley, "Apple Adds Developer Option to Share In-App Purchases and Subscriptions via Family Sharing," *9to5Mac*, June 22, 2020, available at https://9to5mac.com/2020/06/22/apple-adds-developer-option-to-share-in-app-purchases-and-subscriptions-via-family-sharing.

[89]  Defendant's Answer, Defenses, and Counterclaims, p. 45 at 6-10; Schiller Declaration, at ¶ 35.

[90]  "See or Cancel Your Subscriptions," *Apple*, available at https://support.apple.com/en-us/HT202039, accessed on September 7, 2020.

[91]  "Apple Rings in New Era of Services Following Landmark Year," *Apple*, January 8, 2020, available at https://www.apple.com/newsroom/2020/01/apple-rings-in-new-era-of-services-following-landmark-year/.

facilitated more than $500 billion in billings and sales worldwide in 2019 alone.[92]  The curated app store model has been widely imitated, including by Epic, as discussed below.  And all have adopted monetization strategies quite consistent with that of the App Store.

### B.     The App Store is a Two-Sided Transaction Platform

39. While the Evans Declaration acknowledges that software platforms are two-sided businesses, Dr. Evans does not opine as to whether the App Store is a two-sided transaction platform.[93]  I find that the App Store is a two-sided transaction platform that "enables two distinct customer groups to transact."[94]  Like payment card systems that exist to facilitate transactions between merchants and consumers, the App Store exists to facilitate transactions between developers and iOS users, and, as discussed above, it has been remarkably successful at doing so.

40. The App Store exhibits all the hallmarks of a two-sided transaction platform.  First, to be viable, the App Store needs to attract both consumers and developers.  Apple notes that customers' decisions to purchase its hardware products depend in part on the availability of third-party software applications and services.[95]  In order to attract

---

[92]   Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "How Large is the Apple App Store Ecosystem?" *Analysis Group*, July 2020, available at https://www.apple.com/newsroom/pdfs/app-store-study-2019.pdf.

[93]   Evans Declaration, at ¶ 7 ("Software platforms […] are two-sided businesses that facilitate connections between consumers who want to use applications and developers who want to write applications for those consumers.").

[94]   Geradin, Damien and Dimitrios Katsifis, "The Antitrust Case against the Apple App Store," at p. 29. *See also, e.g.,* Völcker, Sven B., and Daniel Baker, "Why There Is No Antitrust Case against Apple's App Store: A Response to Geradin & Katsifis," July 26, 2020, at fn. 59; Chesler, Evan and David Korn, "Lessons from Amex for Platform Antitrust Litigation," *Nebraska Law Review*, 98, 2019, at pp. 362-363; Manne, Geoffrey and Kristian Stout, "The Evolution of Antitrust Doctrine After Ohio v. Amex and the Apple v. Pepper Decision that Should Have Been," *Nebraska Law Review*, 98, 2019, at p.454 ("Properly considered, the relevant market analysis for the provision of app services is an integrated one in which the overall effect of Apple's conduct on both app users and app developers must be evaluated.").

[95]   Apple Inc., Form 10-K For the Fiscal Year Ended September 29, 2018, at p. 1 ("As part of its strategy, the Company continues to expand its platform for the discovery and delivery of digital content and applications through its Digital Content and Services, which allows customers to discover and download or stream digital content, iOS, Mac, Apple Watch and Apple TV applications, and books through either a Mac or Windows personal computer or through iPhone, iPad and iPod touch® devices ("iOS devices"), Apple TV, Apple Watch and HomePod. The Company also supports a community for the development of third-party software and hardware products and digital content that complement the Company's offerings.").

developers, Apple has in place robust developer programs.[96]  Developing and marketing an operating system and handsets that enable developers to provide apps with high quality graphics and other attractive features and functionality helps attract both consumers and developers.

41. Second, there are clear indirect network effects here: consumers want access to good apps, developers want access to many potential customers.  The success of the App Store in turn depends on the strength of these indirect network effects and how they are managed.  Previous generations of mobile OS ecosystems such as Symbian and Microsoft "failed to take off because native programming languages for these OS were complex and hard to learn, their user interfaces and app stores were not user-friendly, and fragmentation within a single OS ecosystem (*e.g.*, incompatibility between different software layers and between the device and operating system) meant that developers had to create different app versions even for handset manufacturers using the same OS."[97]  By contrast, Apple provided powerful software tools to app developers and produced handsets that could run exciting apps they developed.  It capitalized on the indirect network effects, the hallmark of a two-sided platform, by launching the App Store and making it much easier for consumers and developers to interact.

42. Third, the App Store generates value for both groups of customers when there is a transaction between a consumer and a developer—a download or an in-app purchase

---

[96]   Apple Inc., Form 10-K For the Fiscal Year Ended September 29, 2018, at p. 3 ("The Company's developer programs support app developers with building, testing and distributing apps for iOS, macOS, watchOS and tvOS. Developer program membership provides access to beta software and advanced app capabilities (e.g., CloudKit®, HealthKit™ and Apple Pay), the ability to test apps using TestFlight®, distribution on the App Store, access to App Analytics and code-level technical support. Developer programs also exist for businesses creating apps for internal use (the Apple Developer Enterprise Program) and developers creating accessories for Apple devices (the MFi Program). All developers, even those who are not developer program members, can sign in with their Apple ID to post on the Apple Developer Forums and use Xcode®, the Company's integrated development environment for creating apps for Apple platforms. Xcode includes project management tools; analysis tools to collect, display and compare app performance data; simulation tools to locally run, test and debug apps; and tools to simplify the design and development of user interfaces. All developers also have access to extensive technical documentation and sample code.").

[97]   Völcker, Sven B. and Daniel Baker, "Why There Is No Antitrust Case against Apple's App Store: A Response to Geradin & Katsifis," July 26, 2020, at ¶ 31.

of digital content from a developer.  The Store is in the business of facilitating such transactions, not producing anything else.

43. Fourth, the App Store charges consumers neither access or transactions fees in order to encourage their participation.  As is common for two-sided platforms, the App Store earns all its revenue from one side: developers.  It charges them nominal access fees for the use of software development tools, again to encourage participation, and usage fees set as a fixed percentage of purchases of paid apps and of digital content purchased in apps.  This monetization strategy gives the App Store a share in the value created by the overall platform, leaving the bulk of that value in the hands of the developer.

44. Dr. Evans states that "[m]y preliminary conclusions are unlikely to depend on whether the app distribution market is treated as two-sided, single-sided, or a hybrid or on considering users and developers together or separately."[98]  I disagree.  In order to draw any meaningful conclusions regarding whether the distribution of iOS apps in the App Store is a relevant product separate from the processing of in-app payments via Apple's IAP system, one must account for both sides of the App Store platform and must take seriously the fact that the App Store platform provides a single product— transactions between developers and users.

45. As in *Amex*, it would make no economic sense to analyze the components of App Store transactions as if they were not bound together.  In *Amex*, the court said that it was improper to consider the merchant side of the platform and ignore the consumer side, because both sides were necessarily involved, essentially simultaneously, in each and every transaction.  Here, Epic seeks to separate the distribution of apps and in-app content from the management of those transactions by the App Store.  But this is the same economic error that the Supreme Court rejected in *Amex*: every App Store transaction at issue involves the simultaneous transfer of software and of money.  Both functions are necessarily involved, essentially simultaneously in each and every transaction.  It follows both from economic logic, as Dr. Evans and I argued in our

---

[98]   Evans Declaration, at fn. 82.

*Amex* amicus brief, that the App Store must be analyzed as competing in a single market, the market for transactions between developers and consumers.

### C. No Anticompetitive Tie Can Exist Between App Distribution and IAP Payment Administration

46. Plaintiff contends that Apple's condition of the use of app distribution through the App Store on the use of in-app payment processing for digital content through the IAP system is an anticompetitive tie.[99]  To begin with, it is important to note that Plaintiff's tying argument is vacuous, as Apple does not require that developers offer any in-app purchases of digital content.  Offering in-app purchases of digital content is only one of the many options offered to developers to monetize their apps in the App Store, as discussed in **Section IV.A.2**.  Furthermore, Dr. Evans does not reach any conclusion about Epic's tying allegation or even discuss whether any of Apple's conduct is anticompetitive.

47. At the most abstract level, economists consider a tie to be the requirement that a buyer purchase some product B, the tied product, in order to be permitted to purchase product A, the tying product.[100]  Thus shoe stores will generally require buyers who want only right shoes also to purchase left shoes.  Ties of this sort are clearly harmless. Consistent with this point, it is my understanding that in *Jefferson Parish* the Supreme Court observed that no potentially anticompetitive tie can exist unless there is "a sufficient demand for the purchase of [the alleged tied good] separate from [the tying good] to identify a distinct product market in which it is efficient to offer [the tied

---

[99]   Plaintiff's Motion for PI, p. 16 at 10-11 ("Apple conditions use of the tying product, app distribution through the App Store, on use of the tied product, in-app payment processing for digital content through IAP.").

[100]  Hovenkamp, Erik and Herbert J. Hovenkamp, "Tying Arrangements," In Roger D. Blair and D. Daniel Sokol (Eds.), *The Oxford Handbook of International Antitrust Economics*, Oxford, 2015, pp. 329-350, at pp. 329-330 ("Tying arrangements, sometimes known as 'ties,' 'tie-ins,' 'tied-in sales,' or 'bundles,' occur when a firm offers two separate products together, refusing to sell one of them without the other […]. In a one-way tie we can readily speak of a 'tying product' […] and a 'tied product' […]. In a two-way tie each product serves both functions.").

product] separately from the [tying good]."[101]  Since there is no material demand for left shoes alone, this rule correctly labels shoe-store ties as harmless.

48. As such, to evaluate this contention that a tie exists, one must assess whether there is sufficient demand for in-app payment processing for digital content, as facilitated by the IAP system that Epic wishes not to use, separate from the demand for app distribution to support a product market in which it is efficient to offer in-app payment processing for digital content as performed by the IAP system, separately from app distribution.

49. Both Plaintiff and Dr. Evans refer to the IAP system as in-app "payment processing."[102]  The Evans Declaration states that "in the absence of Apple's restrictions, there would likely be material demand by iOS developers for using third-party processors to provide payment processing services for in-app purchases of digital content."[103]  However, the Evans Declaration confuses the IAP system with general payment processing: Dr. Evans explains that "a payment processor is a business that coordinates" the steps that "take place between when a consumer pays a merchant with a card until the merchant gets funds deposited into its bank account."[104]  The Evans Declaration then goes on to compare the IAP system to in-app payment processing services like Stripe and PayPal.[105]  Despite Plaintiff's and Dr. Evans' description, the IAP system no more provides transaction processing than the payment card terminal in a grocery store.  Both hand off to a payment processing network, like Visa or

---

[101]  *Jefferson Parish Hospital District No. 2 et al. v. Hyde*, No. 82—1031, Supreme Court of the United States, March 27, 1984, Section III at 22 ("[I]n this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services.").

[102]  Plaintiff's Motion for PI, p. ii at 9-10; Evans Declaration, at ¶ 60.

[103]  Evans Declaration, at ¶ 73.

[104]  Evans Declaration, at ¶ 62.

[105]  Evans Declaration, at ¶ 74 ("I would expect that third-party payment processors would compete, along with Apple's IAP payment processing solution, to provide payment processing services for in-app purchases of digital content for iOS apps. At a minimum, these alternative sources of supply include Amazon Pay, Authorize.net, Braintree, Chase Merchant Services, PayPal, Square, Stripe, and Xsolla.").

MasterCard, depending on the card presented, that then executes the transfer of money from the customer to the merchant.

50. Instead, as noted above in **Section IV.A**, the IAP system does far more for consumers and developers than simply hand off payment requests to payment processors.  It enables a safe and secure marketplace and a seamless ecosystem that syncs across family members and devices.[106]  In addition, as discussed below in **Section IV.D** and **IV.E**, the IAP system collects a commission on paid apps and in-app sales that is the core of Apple's strategy for capturing some of the value that the App Store creates.  Neither Plaintiff nor Dr. Evans suggests that there is material demand from developers for this function of the IAP system.  Thus they do not discuss whether there is in fact independent demand for systems that perform all the functions of the IAP system.

51. The App Store's reliance on percentage commissions allows distributors like Epic to benefit from a pricing strategy that allows it to attract both price-sensitive consumers who want to use the app in its basic version and more avid users who are willing to spend various amounts to enable additional special features.  If the IAP system were simply to be replaced with third-party payment processing by Visa or PayPal or some similar system, as Plaintiff and the Evans Declaration suggests, Apple would need to alter its iPhone business model.  Epic might, of course, be better off under some alternative monetization strategies, but neither Plaintiff nor the Evans Declaration presented any support for efficiency gains or consumer benefits associated with forcing a change in the App Store's monetization strategy.

52. While there is a market for payment processing, as supplied by Amex, PayPal and other networks, neither Plaintiff nor Dr. Evans has argued persuasively that this is or could be an independent market for the bundle of transaction administration and other services provided by the IAP system.  That bundle is provided when transactions occur; it is simply the other side of the distribution coin.  Payment processing, as supplied by Amex and other such networks is an input to the bundle of services

---

[106]   Schiller Declaration, at ¶¶ 32-35 ("Plus, Apple's record of transactions through the App Store and IAP enable Apple to support features […] such as the ability […] to share apps and in-app content with family members, to restore purchases on new devices […].").

provided by the IAP system that Epic wishes to avoid.  The existence of a market for that input is not relevant.  Similarly, the *Jefferson Parish* case concerned the services of anesthesiologists; the existence of a market for anesthetics, a necessary input for the production of those services, was irrelevant.  And, to be clear, the commission charged by the IAP system is not a charge for that bundle of services; it is a core component of Apple's overall monetization strategy.

53. Dr. Evans asserts that "whether a transaction platform is one sided or two-sided, payment processing is an input that the business relies on to facilitate payment."[107] This is correct but irrelevant.  As I noted above, the App Store relies on third parties to execute transactions.  Epic does not seek to replace only the payment processing function of the App Store but to avoid its core function: collection of the agreed-upon commission on in-app sales.  There is also a tension between Plaintiff's claim and the correct teaching in the *Amex* ruling: in the case of a transaction platform such as the App Store that supplies one product – transactions, it makes no economic sense to consider inputs into transactions production that are simultaneously engaged in fixed proportions as actually or potentially separate markets.  The IAP system in the App Store is no different conceptually from, say, the merchant acceptance in the payment card situation: merchant acceptance was an input that American Express relied upon to produce transactions.

54. The above argument is conservative because it ignores the fact that, as I understand it, developers have a contractual obligation to pay a commission to Apple for in-app purchases even if they somehow circumvent Apple's in-app payment system.[108]  Thus, even if developers were allowed to contract directly with third-party payment processors, rather than using the payment processing service provided by the App Store at zero incremental cost, there would be no economic incentive for them to do so.  It would require them to pay the incremental payment processing fees charged by

---

107  Evans Declaration, at fn. 105.

108  Defendant's Answer, Defenses, and Counterclaims, p. 47 at 22-25 ("By prohibiting Epic from effectuating a transaction by means other than IAP, and providing that Apple would be entitled to a commission of 30% on all paid transactions made through IAP, the License Agreement guarantees Apple both the right and the means to collect the agreed commission.").

third party payment processors in addition to the commissions they are obligated to pay to Apple for in-app purchases.  There would be no rational demand for in-app payment processing for digital content separate from the demand for app distribution, and thus there would not be a distinct product market.

**D.     Plaintiff's and Dr. Evans' Criticisms of the App Store Monetization Strategy Have No Merit**

55. Plaintiff claims that developers have not been "'given a choice' about where to procure payment processing services for digital in-app content purchases" while in analogous situations such as the in-app purchases of for physical content, "developers incorporate, and consumers choose to use, alternative in-app payment processors provided separately from app distribution services."[109]  The Evans Declaration sums this up as follows: "[i]n effect, Apple requires that the developer, for apps that offer in-app purchases of digital content, use Apple's payment processing method rather than the developer's own method which relies on third-party payment processors."[110]

56. However, contrary to Plaintiff's and Dr. Evans' description of the IAP system as providing transaction processing, akin to Mastercard or PayPal, the IAP system serves both as an efficient method to monetize the services that the App Store provides to the two groups it serves and to enhance those services.  The App Store's anti-circumvention rules, which require that developers use the IAP system to process payments, have the same economic function as the anti-steering rules at issue in the *Amex* case.  As discussed above, both serve to prevent free-riding.  Here, the anti-circumvention rules serve to ensure that the App Store receives the commission to which developers have agreed.

57. The commissions that Apple charges for paid apps and in-app purchases of digital goods are not payment processing fees.  They are the price that developers pay to take advantage of the iPhone platform, and Apple uses these payments from developers as part of its overall  monetization strategy.  Hence, comparisons of Apple's commission rates with the rates charged by Visa and other third party firms that only process

---

[109]  Plaintiff's Motion for PI, p. 17 at 3-6.

[110]  Evans Declaration, at ¶ 71.

payments make no sense.  When a consumer uses a credit card, app stores necessarily use independent systems to process that payment, and they pay the charges of those firms.  Since app stores' commission rates include the cost of payment processing by a third party as well as serve as part of the monetization strategy of the store itself, the commission rates charged by app stores, including Epic's Game Store's 12 percent, are generally well above the rates charged by the payment processing firms.[111]  This reflects the fact that they do more than process payments.

58. Apple has had a large set of possible monetization strategies for the iOS platform.  As Plaintiff points out, it could, for instance, have chosen to charge consumers "a flat fee or a per-download fee."[112]  Alternatively, Plaintiff appears to suggest that Apple could monetize solely through the sale of its hardware.[113]  Finally, another alternative could have been for Apple to charge developers a monthly fee to make apps available in their store.  All these alternative monetization strategies would risk reducing participation on one side or both sides of the platform and thus reducing its overall value.  Monetization solely through the sale of hardware, for instance, would likely require a price increase, which would reduce sales to price-sensitive consumers.  Similarly, charging all developers a monthly fee would discourage production of niche apps.

59. Instead, Apple, like other app stores, chose a much more economically sensible monetization strategy in which the store's per-transaction revenue is roughly proportional to the value of the transaction to the buyer, *i.e.,* the more a user is willing to spend on in-app purchases, the more revenue will be generated.  Epic's suggestion,

---

[111]  Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf, at p. 6 ("An exception is the Epic Games Store, which charges a commission rate of 12%.); Prakash, Priyanka, "Credit Card Processing Fees: The Complete Guide," *Fundera*, August 24, 2020, available at https://www.fundera.com/blog/credit-card-processing-fees ("Generally, the average credit card processing fees range from 1.7% to 3.5% per transaction.).

[112]  Plaintiff's Motion for PI, p. 22 at 10-12.

[113]  Plaintiff's Motion for PI, p. 21 at 22-24 ("Apple would still be compensated handsomely for the development of the iOS platform. In 2019 alone, iPhone hardware sales generated more than $142 billion in revenue.").

on the other hand, that charging a commission on in-app purchases, as app stores generally do, is inherently problematic, whereas charging for the original download is not, has no basis in economics.[114]  Dr. Evans does not endorse this suggestion.

60. Plaintiff contends that Apple "does *not* condition access to the App Store on use of IAP if the in-app purchases are for physical products or for services consumed outside the app" and argues that this establishes that Apple could do the same for digital goods.[115,116]  Of course it could do so, but that would require it to sacrifice revenue or develop another monetization strategy.

61. Moreover, doing so would mean it likely could not provide the services to consumers and developers described above in **Section IV.A**, and it could alter developer incentives in ways that would reduce the value of the App Store platform to both sides. Finally, it is worth noting that Apple does not just permit the use of non-IAP payment processing for physical goods, as Dr. Evans and Epic imply,[117] it *requires* it.[118] Reasonably, Apple has explicitly chosen not to be involved in the purchase of physical goods for which it could not guarantee quality or even verify delivery.

62. Besides being economically sensible, as noted above, this strategy is also in line with industry practice. Apple's App Store monetization strategy closely resembles the monetization strategies of other digital marketplaces, and the App Store's rates are in line with those of other comparable marketplaces.  App stores such as the Google Play Store, Amazon Appstore, Samsung Galaxy Store, and Microsoft Store also charge

---

[114]  Plaintiff's Motion for PI, p. 22 at 7-12.

[115]  Plaintiff's Motion for PI, p. 17 at 7-8.

[116]  Since Apple does not require that developers offer any in-app purchases of digital content, Plaintiff's tying argument is vacuous, as noted above.  Offering in-app purchases of digital content is only one of the many options offered to developers to monetize their apps of the App Store, as discussed in **Section IV.A.2**.

[117]  Plaintiff's Motion for PI, at pp. 7-8 ("Apps that offer in-app purchases of physical goods or services consumed outside of the app are *not required* (emphasis added) to use IAP; they *may* (emphasis added) offer other payments processors.").

[118]  "App Store Review Guidelines," Section 3.1.3(e) Goods and Services Outside of the App, *Apple*, available at https://developer.apple.com/app-store/review/guidelines/, accessed on September 14, 2020 ("If your app enables people to purchase physical goods or services that will be consumed outside of the app, you must use purchase methods other than in-app purchase to collect those payments, such as Apple Pay or traditional credit card entry.").

commission rates of 30 percent.[119]   The Mac App Store also charges a 30 percent commission on in-app sales of digital products and does not charge separately for payment processing.[120]

63. To ensure that Apple receives the commission to which developers have agreed, Apple has barred developers from using mechanisms other than IAP to sell digital content.[121] This anti-circumvention rule generally applies to all developers of apps selling digital content.[122]   Even so-called "Reader" apps, which are handled somewhat more leniently, as they "may allow a user to access previously purchased content or content subscriptions," may only do so provided that they do not "encourage users to use a purchasing method other than in-app purchase."[123]   Moreover, Apple's anti-

---

[119]   Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf, at p. 5.

[120]   Spencer, Graham, "A Beginner's Guide to App Store Pricing Tiers," *MacStories*, September 1, 2015, available at https://www.macstories.net/stories/a-beginners-guide-to-app-store-pricing-tiers/; "Distributing Your Mac Apps", macOS, *Apple*, available at https://developer.apple.com/macos/distribution/, accessed on September 14, 2020.

[121]   "iOS Developer Program License Agreement," Section 3.3.3, *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/Archives/edgar/data/1366246/000119312513109950/d453444dex1027.htm, accessed on September 4, 2020 ("Without Apple's prior written approval or as permitted under Section 3.3.23 (In-App Purchase API), an Application may not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store or VPP/B2B Program Site.").

[122]   Anti-circumvention rules are commonly used in most major app stores. *See* Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf, at p. 12 ("The most prominent app stores and software distribution platforms (Google Play Store, Amazon Appstore, Samsung's Galaxy Store, Microsoft Store, App Store) all use policies that require developers to pay commission fees, and use the platform's in-app payment system to purchase in-app digital products, with certain carve-outs for multi-platform apps. Additionally, most of those stores explicitly require that developers do not direct app users to make purchases outside of the store.").

[123]   "App Store Review Guidelines," Section 3.1.3 Other Purchase Methods and Section 3.1.3(a) "Reader" Apps, *Apple*, available at https://developer.apple.com/app-store/review/guidelines/, accessed on September 14, 2020.

circumvention rule serves a role similar to Amex's anti-steering rules.[124]  Both prevent free-riding and ensure that the commissions are paid as agreed upon.

64. To sum up, the requirement that developers use the IAP system to execute transactions is, at base, no different from a gallery's requirement that a buyer use its credit card terminal to pay for a painting rather than deal directly with the artist on the sidewalk. Anti-circumvention rules serve to prevent free-riding and to ensure that the App Store—or the gallery in the example above—receives the agreed-upon commission for the services that they offer to both sides of the transaction platform.

## E.  Epic Benefits from the Pricing Flexibility Provided by the App Store

65. Epic's gaming app Fortnite is offered to users in the Freemium Model, discussed above.[125]  Users can download and play the app for free, but certain special features, like the enhancement of a player's appearance, can only be unlocked via in-app purchase.  This model has pro-competitive benefits from Epic's perspective.  By drawing in both more price-sensitive and less price-sensitive consumers, it allows a platform like Fortnite to maximize its user base, which is important.  A larger user base makes the app more compelling for additional new users.

66. This is particularly true for Fortnite because the essence of the game is to match "up to 100 players [to compete] individually or in teams to be the last one/ones standing"[126]: the more gamers are active on the platform, the faster Fortnite is able to match gamers

---

[124]   Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16-1454, Supreme Court of the United States, June 25, 2018, available at https://www.supremecourt.gov/opinions/17pdf/16-1454_5h26.pdf, at p. 2 ("To avoid higher fees, merchants sometimes attempt to dissuade cardholders from using Amex cards at the point of sale─a practice known as "steering." Amex places antisteering provisions in its contracts with merchants to combat this.").

[125]   Gilbert, Ben, "There's a Simple, Obvious Reason 'Fortnite' Is the Biggest Game in the World Right Now," *Business Insider*, May 3, 2018, available at https://www.businessinsider.com/fortnite-price-free-to-play-2018-5 ("In a brilliant move, you can play "Fortnite" for free in perpetuity ─ but if you want to unlock sweet, sweet loot, you have to pay for the game's Battle Pass.").

[126]   Iqbal, Mansoor, "Fortnite Usage and Revenue Statistics (2020)," *Business of Apps*, July 30, 2020, available at https://www.businessofapps.com/data/fortnite-statistics/.

and start a new game.[127]  In fact, a less well-known version of the Fortnite series, *Fortnite: Save the World*, was released as a paid-for version on PlayStation 4, Xbox One, Microsoft Windows, and macOS in July 2017 before the blockbuster, free-to-play version *Fortnite: Battle Royale* was introduced in September 2017 and quickly became viral.[128] The App Store has no doubt enhanced the popularity of *Fortnite: Battle Royale* as Fortnite was able to tap into the enormous pool of Apple device users and managed to reach 100 million iOS downloads within five months of its launch.[129]

67. On the other hand, this model still allows Epic to cash in on its most enthusiastic and hence potentially less price-sensitive users: since the launch of *Fortnite: Battle Royale* on iOS, players "have spent about $1.2 billion in total on passes and V-Bucks in the otherwise free-to-play game."[130]  The more avid a player, the more likely he or she will be to spend on additional features that can be enabled via in-app purchases, particularly as certain features in the game are engineered to be especially attractive to devoted players.  The "[s]easons system", for example, creates an artificial sense of scarcity as various rewards (such as skins, avatars, visual effects, and other cosmetics) from a Battle Pass would no longer be available after a season ends and will be replaced by new rewards.[131]  The Freemium Model hence provides a convenient method for Epic to earn more revenue from more avid players, thereby likely contributing to Fortnite's overall profitability.

---

[127]  Campbell, Colin, "Why Is Fortnite Battle Royale So Wildly Popular?" *Polygon*, March 30, 2018, available at https://www.polygon.com/fortnite-battle-royale/2018/3/30/17177068/why-is-fortnite-popular ("This broad popularity expands its audience considerably, leading to shorter wait times in queuing lobbies.").

[128]  Iqbal, Mansoor, "Fortnite Usage and Revenue Statistics (2020)," *Business of Apps*, July 30, 2020, available at https://www.businessofapps.com/data/fortnite-statistics/.

[129]  Iqbal, Mansoor, "Fortnite Usage and Revenue Statistics (2020)," *Business of Apps*, July 30, 2020, available at https://www.businessofapps.com/data/fortnite-statistics/.

[130]  Fingas, Jon, "Apple Earned $360 Million from Fortnite Before Pulling the Plug," *Android Authority*, August 14, 2020, available at https://www.androidauthority.com/apple-fortnite-ios-revenue-1148204/.

[131]  Madigan, Jamie, "The Psychology of Fortnite's Battle Pass," *Forbes*, July 6, 2019, available at https://www.forbes.com/sites/jamiemadigan/2019/07/06/the-psychology-of-fortnites-battle-pass.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that I executed this declaration on the 15th of September, 2020, in Boston, Massachusetts.

DocuSigned by:

RICHARD SCHMALENSEE

832159553478443...

Richard Schmalensee, Ph.D.

# Appendix A
# Richard Schmalensee

**Howard W. Johnson Professor of Management, Emeritus**
**Dean Emeritus, MIT Sloan School of Management**
**Professor of Economics, Emeritus**
**Massachusetts Institute of Technology**

MIT Room E62-525                         172 Beacon Street, Unit 4
100 Main Street                          Boston, Massachusetts 02116
Cambridge, MA 02142-1347                 (617) 247-0029
(617) 253-2957, fax: 258-6786
rschmal@mit.edu

**EDUCATION:**

MASSACHUSETTS INSTITUTE OF TECHNOLOGY
S.B., Economics, Politics and Science, 1965
Ph.D., Economics, 1970

**EMPLOYMENT:**

MASSACHUSETTS INSTITUTE OF TECHNOLOGY
2012-      Howard W. Johnson Professor of Management, Emeritus, and
           Professor of Economics, Emeritus
2007-12    Howard W. Johnson Professor of Management
2001-07    John C Head III Dean, MIT Sloan School of Management
1998-00    Dean, MIT Sloan School of Management (Interim, July-October 1998)
1996-98    Deputy Dean, MIT Sloan School of Management
1991-99,   Director, MIT Center for Energy and Environmental Policy Research
2008-12
1988-99    Gordon Y Billard Professor of Management
1986-12    Professor, Department of Economics
1979-12    Professor, MIT Sloan School of Management
1977-79    Associate Professor, MIT Sloan School of Management
1970       Assistant Professor, MIT Sloan School of Management (Spring)
1967-69    Instructor, MIT Sloan School of Management

PRESIDENT'S COUNCIL OF ECONOMIC ADVISERS
1989-91    Member
1967       Junior Staff Economist (Summer)

UNIVERSITY OF CALIFORNIA, SAN DIEGO
1974-77    Associate Professor, Department of Economics
1970-74    Assistant Professor, Department of Economics

**VISITING APPOINTMENTS:**

2008       Executive in Residence, Rady School of Management; U. of California, San Diego (Winter)
2007       Distinguished Visiting Scholar, Tuck School of Business, Dartmouth College (Fall)
1985-86    Visiting Professor, Harvard Business School
1985       Visiting Professor, CORE, University of Louvain, Belgium (Spring)
1980-81    Visiting Scholar, Department of Economics, Harvard University
1973-74    Visiting Associate Professor and Research Fellow, Department of Economics,
           University of Louvain, Belgium

**EDITORIAL SERVICE:**

Editor in Chief, 2005-08; Chairman, Editorial Advisory Board, 2008-: *Competition Policy International*
Editorial Board: *Journal of Economics and Management Strategy*, 1992-98
Associate Editor: *Journal of Economic Perspectives*, 1992-98
Associate Editor: *International Journal of Industrial Organization*, 1982-89
Board of Editors: *American Economic Review*, 1982-86
Founding Editor, 1978-89; Co-Editor, 1989-: MIT Press Series, *Regulation of Economic Activity*
Associate Editor, 1977-81; Board of Editors, 1981-89: *Journal of Industrial Economics*

**PROFESSIONAL ASSOCIATIONS:**

American Economic Association: Committee on Government Relations, 2009-12; Executive Committee, 1993-95; Budget Committee, 1993-95; Nominating Committee, 1987; Advisory Committee on Meetings Program, 1986, 1989, 1994
Econometric Society: Chair, Local Arrangements Committee, 1985 World Congress; Chair, Program Committee, 1980 North American Fall Meeting; Program Committee, 1980 World Congress
Second World Congress of Environmental Economists, Program Committee, 2002

**CONSULTATION AND GOVERNMENT SERVICE (SELECTED):**

Global Economics Group, Director, 2011-
National Climate Assessment Development & Advisory Committee, 2011-14
LECG, LLC: Director, 2004-2011
National Academies/National Research Council: Panel on Transportation and a Sustainable Environment, 1994-97; Committee on National Statistics, 1998-2001; Panel on Cost-of-Living Indexes, 1999-2001; Coordinating Committee on the Transition to Sustainability, 2000-2001; Committee on America's Climate Choices, 2008-2011; Committee for a Study of Freight Rail Transportation and Regulation (Chair), 2014-15; Committee on the Social Cost of Carbon, 2015-
U.S. Environmental Protection Agency: Environmental Economics Advisory Committee, 1992-96, 1998; Clean Air Act Compliance Analysis Council, 1992-98, Chairman 1992-96
Antitrust Division, U.S. Department of Justice, consultant, 1991-92 (1992 Merger Guidelines)
NERA Economic Consulting: Special Consultant 1981-89, 1991-2004
Bureau of Economics, U.S. Federal Trade Commission: consultant, 1972-81 (Antitrust Policy)

**AWARDS AND OTHER PROFESSIONAL ACTIVITIES (SELECTED):**

Asia School of Business, Board of Governors, 2015- (Co-Chair 2015-18)
Associate Scholar, Harvard Environmental Economics Program, 2013-
Director, National Bureau of Economic Research, 2013- (Executive Committee 2018-)
Chicago Booth IGM Economic Experts Panel, 2012-
Distinguished Fellow, Industrial Organization Society, 2012
John Kuszczek Memorial Lecture, Bank of Canada, 2011
Energy Board Member, Bipartisan Policy Center, 2011-13
Stackelberg Lecture, University of Milan, Bicocca, 2010
Keynote Speaker, World Congress of Environmental and Resource Economists, 2010
Director, Resources for the Future, 2009-18 (Chairman, 2014-18)
Master Class, Rafael del Pino Foundation, Madrid, 2009
Carpenter Lecture, Babson College, 2008
J.-J. Laffont Lecture, CRESSE Summer School, Greece, 2008
Member, National Commission on Energy Policy, 2006-2010
Director, International Data Group, 2004-2017

European Investment Bank Lecture, European University Institute, Florence, 2002
Director, MFS Investment Management, 2002-2004
Advisory Council, Tsinghua School of Economics and Management, 2001-07
Fathauer Lecture in Political Economy, University of Arizona, 2000
Director, International Securities Exchange, 2000-2009
Member: International Academy of Management, 1998-
Fellow: American Academy of Arts and Sciences, 1995-
Edward A. Hewett Prize, American Association for the Advancement of Slavic Studies (with P.L. Joskow
    and N. Tsukanova), 1995
*Revista de Análisis Económico* Lecture, Econometric Society Latin American Meeting, 1994
Director, MIT Press, 1994-2007
Research Associate: National Bureau of Economic Research, 1992-2013
Director: Long Island Lighting Company, 1992-98
Donald Gilbert Memorial Lecture, University of Rochester, 1992
American Council for Capital Formation Center for Policy Research: Board of Directors, 1991-2010;
    Environmental Policy Fellow, 1997-98
Fellow, Econometric Society, 1982-
Invited Speaker, Econometric Society World Congress, 1980

## BOOKS WRITTEN:

*The Economics of Advertising* (Vol. 80, Contributions to Economic Analysis), Amsterdam: North-
    Holland, 1972.

*Applied Microeconomics: Problems in Estimation, Forecasting and Decision-Making*, San Francisco:
    Holden-Day, 1973.

*An Introduction to Applied Macroeconomics* (with E. Kuh), Amsterdam:  North-Holland, 1973.  Japanese
    edition, 1975.

*The Control of Natural Monopolies*, Lexington: D.C. Heath (Lexington Books), 1979.

*Markets for Power: An Analysis of Electric Utility Deregulation* (with P. L. Joskow), Cambridge: MIT
    Press, 1983.

*Economics*, 2nd Ed. (with S. Fischer and R. Dornbusch), New York: McGraw-Hill, 1988.  Multiple
    foreign language editions.

*Paying with Plastic: The Digital Revolution in Buying and Borrowing* (with D.S. Evans), Cambridge:
    MIT Press, 1999.  Second edition, 2005; Chinese edition, 2006; Korean edition, 2011.

*Markets for Clean Air: The U.S. Acid Rain Program* (with A.D. Ellerman, P.L. Joskow, J.P. Montero, and
    E.M. Bailey), Cambridge: Cambridge University Press, 2000.

*Did Microsoft Harm Consumers? Two Opposing Views* (with D.S. Evans; F.M. Fisher and D.L.
    Rubinfeld), Washington: AEI Press, 2000.

*Invisible Engines: How Software Platforms Drive Innovation and Create Value* (with D.S. Evans and A.
    Hagiu), Cambridge: MIT Press, 2006.  Korean edition, 2008; Chinese edition, 2010.

*Catalyst Code* (with D.S. Evans), Boston: Harvard Business School Press, 2007.  Korean edition, 2008;
    Polish edition, 2010; Chinese edition, 2011.

*Matchmakers* (with D.S. Evans), Boston: Harvard Business School Press, 2016. French and Korean
    editions 2017, Chinese and Japanese editions 2018, Vietnamese edition 2019.

*Antitrust Analysis of Platform Markets: Why the Supreme Court Got It Right in* American Express (with D.S. Evans), Boston: Competition Policy International, 2019.

**REPORTS CHAIRED**

*The Future of the Electric Grid* (with J.G. Kassakian), Cambridge: MIT Energy Initiative, 2011.

*The Future of Solar Energy*, Cambridge: MIT Energy Initiative, 2015.

*Modernizing Freight Rail Regulation*, Washington: Transportation Research Board, 2015.

**BOOKS EDITED:**

*The Empirical Renaissance in Industrial Economics* (ed., with T. F. Bresnahan), Oxford: Basil Blackwell, 1987.

*Handbook of Industrial Organization, Vols. I & II*  (ed., with R. D. Willig), Amsterdam: North-Holland, 1989.

*Management: Inventing and Delivering Its Future* (ed., with T.A. Kochan), Cambridge: MIT Press, 2003. Chinese and Korean editions, 2004.

*Harnessing Renewable Energy in Electric Power Systems* (ed., with B. Moselle and J. Padilla), Washington/London: RFF Press, 2010.

*The Causes and Effects of Deregulation.* (2 Vols., ed., with P.W. MacAvoy), Cheltenham, UK: Edward Elgar, 2014.

**JOURNAL ARTICLES:**

"Regulation and the Durability of Goods." *Bell Journal of Economics and Management Science*, 1 (Spring 1970): 54-64.

"Consumer's Surplus and Producer's Goods." *American Economic Review*, 61 (September 1971): 682-687.

"A Note on Monopolistic Competition and Excess Capacity." *Journal of Political Economy*, 80 (May/June 1972): 586-591.

"Option Demand and Consumer's Surplus: Valuing Price Changes Under Uncertainty." *American Economic Review*, 62 (December 1972): 813-824.

"A Note on the Theory of Vertical Integration." *Journal of Political Economy*, 81 (March/April 1973): 442-449.

"Brand Loyalty and Barriers to Entry." *Southern Economic Journal*, 40 (April 1974): 579-588.

"Market Structure, Durability, and Maintenance Effort." *Review of Economic Studies*, 41 (April 1974): 277-287.

"Estimating the Costs and Benefits of Utility Regulation." *Quarterly Review of Economics and Business*, 14 (Summer 1974): 51-64.

"Consumer Behavior versus Economic Theory." *Recherches Economiques de Louvain*, 40 (September 1974): 261-276.

"Alternative Models of Bandit Selection." *Journal of Economic Theory*, 10 (June 1975): 333-342.

"An Experimental Study of Expectation Formation." *Econometrica*, 44 (January 1976): 17-41.

"Another Look at the Social Valuation of Input Price Changes." *American Economic Review*, 66 (March 1976): 239-243.

"Resource Exploitation Theory and the Behavior of the Oil Cartel." *European Economic Review*, 7 (April 1976): 257-279.

"Advertising and Profitability:  Further Implications of the Null Hypothesis." *Journal of Industrial Economics*, 25 (September 1976): 45-54.

"A Model of Promotional Competition in Oligopoly." *Review of Economic Studies*, 43 (October 1976): 493-507.

"Is More Competition Necessarily Good?" *Industrial Organization Review*, 4 (1976): 120-121.

"Public Investment Criteria, Insurance Markets, and Income Taxes." *Journal of Public Economics*, 6 (November 1976): 425-445.

"Valuing Changes in Regulated Firms' Input Prices." *Southern Economic Journal*, 43 (January 1977): 1346-1351.

"Using the H Index of Concentration with Published Data." *Review of Economics and Statistics*, 59 (May 1977): 186-193.

"Comparative Static Properties of Regulated Airline Oligopolies." *Bell Journal of Economics*, 8 (Autumn 1977): 565-576.

"Nonconvexity and Optimal Exhaustion of Renewable Resources" (with T. R. Lewis). *International Economic Review*, 18 (October 1977): 535-552.

"Common Stock Volatility Expectations Implied by Option Premia" (with R. R. Trippi). *Journal of Finance*, 33 (March 1978): 129-147.

"A Note on Economies of Scale and Natural Monopoly in the Distribution of Public Utility Services." *Bell Journal of Economics*, 9 (Spring 1978): 270-276.

"A Model of Advertising and Product Quality." *Journal of Political Economy*, 87 (June 1978): 485-504.

"Life-Cycle Costing for Consumers of Energy-Conserving Devices" (with S. S. Penner and M. R. Brambley). *Energy*, 3 (July/August 1978): 415-419.

"Entry Deterrence in the Ready-to-Eat Breakfast Cereal Industry." *Bell Journal of Economics*, 9 (Autumn 1978): 305-327.  Reprinted in *Market Strategy and Structure* (J.M.A. Gee and G. Norman, eds.), London: Harvester Wheatsheaf, 1992, pp. 84-111.

"Market Structure, Durability, and Quality: A Selective Survey." *Economic Inquiry*, 17 (April 1979): 177-198.

"On the Use of Economic Models in Antitrust:  The ReaLemon Case." *University of Pennsylvania Law Review*, 127 (April 1979): 994-1050.  Reprinted in *Antitrust Law and Economics* (O. E. Williamson, ed.), Houston: Dame, 1980, pp. 97-153.

"Nonconvexity and Optimal Harvesting Strategies for Renewable Resources" (with T. R. Lewis). *Canadian Journal of Economics*, 12 (November 1979): 677-691.

"Appropriate Government Policy Toward Commercialization of New Energy Supply Technologies." *Energy Journal*, 1 (April 1980): 1-40.

"Advertising and Aggregate Consumption:  An Analysis of Causality" (with R. Ashley and C. W. J. Granger). *Econometrica*, 48 (July 1980): 1149-1168.

"On Oligopolistic Markets for Nonrenewable Natural Resources" (with T. R. Lewis). *Quarterly Journal of Economics*, 95 (November 1980): 475-491.

"Qualitative Asymptotic Synthesis in Simple Optimal Control Problems." *Economic Letters*, 5 (1980): 349-352.

"Output and Welfare Implications of Monopolistic Third-Degree Price Discrimination." *American Economic Review*, 71 (March 1981): 242-247.

"Risk and Return on Long-Lived Tangible Assets." *Journal of Financial Economics*, 9 (June 1981): 185-205.

"Monopolistic Two-Part Pricing Arrangements." *Bell Journal of Economics*, 12 (Autumn 1981): 445-466.

"Economies of Scale and Barriers to Entry." *Journal of Political Economy*, 89 (December 1981): 1228-1238.

"Commodity Bundling by Single-Product Monopolies." *Journal of Law and Economics*, 25 (April 1982): 67-71.

"Antitrust and the New Industrial Economics." *American Economic Review*, 72 (May 1982): 24-28.

"Cartel Deception in Markets for Nonrenewable Resources" (with T. R. Lewis). *Bell Journal of Economics*, 13 (Spring 1982): 263-271.

"Another Look at Market Power." *Harvard Law Review*, 95 (June 1982): 1789-1816.

"Product Differentiation Advantages of Pioneering Brands." *American Economic Review*, 72 (June 1982): 349-365.  ("Errata," *AER*, 73 (March 1983): 250).

"George Stigler's Contributions to Economics." *Scandinavian Journal of Economics*, 85 (March 1983): 77-86.

"Advertising and Entry Deterrence: An Exploratory Model." *Journal of Political Economy*, 91 (August 1983): 636-653.

"The Impact of Scale and Media Mix on Advertising Agency Costs" (with A. J. Silk and R. Bojanek). *Journal of Business*, 56 (October 1983): 453-475.

"Gaussian Demand and Commodity Bundling." *Journal of Business*, 57 (January 1984): S211-S230.

"Estimating Effective Concentration in Deregulated Wholesale Electricity Markets" (with B. W. Golub). *RAND Journal of Economics*, 15 (Spring 1984): 12-26.

"Imperfect Information and the Equitability of Competitive Prices." *Quarterly Journal of Economics*, 99 (August 1984): 441-460.

"Adversary Hydro Relicensing Applications: Using Economic Efficiency Criteria" (with P. L. Joskow). *Public Utilities Fortnightly*, 114 (20 December 1984): 22-28.

"Econometric Diagnosis of Competitive Localization." *International Journal of Industrial Organization*, 3 (March 1985): 57-70.

"Do Markets Differ Much?" *American Economic Review*, 75 (June 1985): 341-351.

"Estimated Parameters as Independent Variables: An Application to the Costs of Electric Generating Units" (with P. L. Joskow). *Journal of Econometrics*, 31 (April 1986): 275-305.

"Incentive Regulation for Electric Utilities" (with P. L. Joskow). *Yale Journal on Regulation*, 4 (Fall 1986): 1-49.

"The Empirical Renaissance in Industrial Economics: An Overview" (with T. F. Bresnahan). *Journal of Industrial Economics*, 35 (June 1987): 371-378.

"Collusion versus Differential Efficiency: Testing Alternative Hypotheses." *Journal of Industrial Economics*, 35 (June 1987): 399-425.

"Ease of Entry: Has the Concept Been Too Readily Applied?" *Antitrust Law Journal*, 56 (1987): 41-51.

"The Performance of Coal-Burning Electric Generating Units in the United States: 1960-1980" (with P. L. Joskow). *Journal of Applied Econometrics*, 2 (April 1987): 85-109.

"Horizontal Merger Policy: Problems and Changes." *Journal of Economic Perspectives*, 1 (Fall 1987): 41-54.

"Competitive Advantage and Collusive Optima." *International Journal of Industrial Organization*, 5 (December 1987): 351-367.

"Industrial Economics: An Overview." *Economic Journal*, 98 (September 1988): 643-681.  Reprinted in *Surveys in Economics*, Vol. 2 (A.J. Oswald, Editor), Oxford: Basil Blackwell, 1991, pp. 51-89.

"Perceptual Maps and the Optimal Location of New Products: An Integrative Essay" (with J.-F. Thisse). *International Journal of Research in Marketing*, 5 (1988): 225-249.

"Intra-Industry Profitability Differences in U.S. Manufacturing: 1953-1983." *Journal of Industrial Economics*, 37 (June 1989): 337-357.

"An Expository Note on Depreciation and Profitability under Rate-of-Return Regulation." *Journal of Regulatory Economics*, 1 (September 1989): 293-298.

"Good Regulatory Regimes." *RAND Journal of Economics*, 20 (Autumn 1989): 417-436.

"Continuity and Change in the Economics Industry." *Economic Journal*, 101 (January 1991): 115-121. Reprinted in *The Future of Economics* (J.D. Hey, ed.), Oxford: Basil Blackwell, 1992, pp. 115-121.

"Sunk Cost and Market Structure: A Review Article." *Journal of Industrial Economics*, 40 (June 1992): 125-134.

"Comparing Greenhouse Gases for Policy Purposes." *Energy Journal*, 14 (1993): 245-255.

"Symposium on Global Climate Change." *Journal of Economic Perspectives*, 7 (Fall 1993): 3-10.

"Competition Policy in Russia During and After Privatization" (with P.L. Joskow and N. Tsukanova). *Brookings Papers on Economic Activity, Microeconomics*, 1994: 301-374. [Awarded the 1995 Edward A. Hewett Prize by the American Association for the Advancement of Slavic Studies.]

"Economic Aspects of Payment Card Systems and Antitrust Policy Toward Joint Ventures" (with D.S. Evans).  *Antitrust Law Journal*, 63 (Spring 1995): 861-901.

"The Benefits of Releasing the Bell Companies from the Interexchange Restrictions" (with P.S. Brandon). *Managerial and Decision Economics*, 16 (July-August 1995): 349-364.

"Privatization in Russia: What Should Be a Firm?" (with P.L. Joskow). *International Journal of the Economics of Business*, 2 (1995): 297-327.  Reprinted in *Transaction Cost Economics: Recent Developments* (C. Menard, ed.), Brookfield, VT: Edward Elgar, 1997, pp. 86-126.

"What Have We Learned About Privatization and Regulatory Reform?" *Revista de Análisis Económico*, 10 (November 1995): 21-39.  (Remarks in Roundtable Discussion, pp. 303-312.)

"Is There a Role for Benefit-Cost Analysis in Environmental Health and Safety Regulation?" (with K.J. Arrow, M.L. Cropper, G.C Eads, R.W. Hahn, L.B. Lave, R.G. Noll, P.R. Portney, M. Russell, V.K. Smith, and R.N. Stavins). *Science*, 272 (12 April 1996): 221-222. Reprinted in *Economics of the Environment: Selected Readings*, 4th Ed. (R.N. Stavins, ed.), New York: Norton, 1999. pp. 319-324.

"World Carbon Dioxide Emissions: 1950-2050" (with T.M. Stoker and R.A. Judson). *Review of Economics and Statistics*, 80 (February 1998): 15-27.

"The Political Economy of Market-Based Environmental Policy: The US Acid Rain Policy" (with P.L. Joskow). *Journal of Law and Economics*, 41 (April 1998): 37-83. Reprinted in *Economics of the Environment: Selected Readings*, 4th Ed. (R.N. Stavins, ed.), New York: Norton, 1999, pp. 603-645.

"Some Economic Principles for Guiding Antitrust Policy Towards Joint Ventures" (with H. Chang and D.S. Evans). *Columbia Business Law Review*, 1998 (1998): 223-329.

"An Analysis of the Welfare Effects of Long-Distance Market Entry by an Integrated Access and Long-Distance Provider" (with P.J. Hinton, J.D. Zona, and W.E. Taylor). *Journal of Regulatory Economics*, 13 (March 1998): 183-196.

"An Interim Evaluation of Sulfur Dioxide Emissions Trading" (with P.L. Joskow, A.D. Ellerman, J.-P. Montero, and E.M Bailey). *Journal of Economic Perspectives*, 12 (Summer 1998): 53-68. Reprinted in *Economics of the Environment: Selected Readings*, 4th Ed. (R.N. Stavins, ed.), New York: Norton, 1999, pp. 455-471.

"The Market for Sulfur Dioxide Emissions" (with P.L. Joskow and E.M Bailey). *American Economic Review*, 88 (September 1998): 669-685.

"Household Gasoline Demand in the United States" (with T.M. Stoker). *Econometrica*, 67 (May 1999): 645-662.

"Economic Development and the Structure of the Demand for Commercial Energy" (with R.A. Judson and T.M. Stoker). *Energy Journal*, 20 (1999): 29-57.

"Bill Baxter in the Antitrust Arena: An Economist's Appreciation." *Stanford Law Review*, 51 (May 1999): 1317-1332.

"Antitrust Issues in Schumpeterian Industries." *American Economic Review*, 90 (May 2000): 192-196.

"An Analysis of the Government's Economic Case in *U.S. v. Microsoft*" (with D.S. Evans and A.L. Nichols). *Antitrust Bulletin*, 46 (Summer 2001), pp. 163-251. Reprinted in *Microsoft, Antitrust and the New Economy: Selected Essays* (D.S. Evans, ed.), Boston: Kluwer: 2002.

"Payment Systems and Interchange Fees," *Journal of Industrial Economics*, 50 (June 2002): 103-122.

"Sunk Costs and Antitrust Barriers to Entry," *American Economic Review*, 94 (May 2004): 471-475.

"A Survey of the Economic Role of Software Platforms in Computer-Based Industries," *CESIfo Economic Studies*, 51 (2005): 189-224. (Reprinted, with minor changes, as "Software Platforms." In *Industrial Organization and the Digital Economy* (G. Illig and M. Peitz, eds.). Cambridge: MIT Press, 2006, pp. 31-70.)

"*United States v. Microsoft:* Did Consumers Win?" (with D.S. Evans and A.L. Nichols). *Journal of Competition Law and Economics*, 1 (September 2005): 497-539

"The Industrial Organization of Markets with Two-Sided Platforms" (with D.S. Evans), *Competition Policy International*, 3 (Spring 2007): 151-179. Also in W.D. Collins, ed., *Issues in Competition Law and Policy*, Chicago: American Bar Association, 2008, pp. 667-693.

"Pricing Patents for Licensing in Standard-Setting Organizations: Making Sense of *FRAND* Commitments" (with A. Layne-Farrar and A.J. Padilla), *Antitrust Law Journal*, 74 (2007): 671-706.

"Standard-Setting, Innovation Specialists, and Competition Policy," *Journal of Industrial Economics*, 57 (September 2009): 526-52.

"Failure to Launch: Critical Mass in Platform Businesses" (with D.S. Evans), *Review of Network Economics*, 9 (December 2010), Issue 4, Article 1 (26 pages).

"Jeffrey Rohlfs' 1974 Model of Facebook: An Introduction," *Competition Policy International*, 7 (Spring 2011): 301-12.

"Why is Platform Pricing Generally Highly Skewed?" *Review of Network Economics*, 10 (December 2011), Issue 4, Article 1, 11 pages.

"Evaluating Policies to Increase the Generation of Electricity from Renewable Energy," *Review of Environmental Economics and Policy*, 6 (Winter 2012): 45-64.

"'On a level with Dentists?' Reflections on the Evolution of Industrial Organization." *Review of Industrial Organization*, 41 (November 2012): 157-79.

"From 'Green Growth' to Sound Policies: An Overview," *Energy Economics*, 34 (Supplement 1, November 2012): S2-S6.

"The $SO_2$ Allowance Trading System: The Ironic History of a Grand Policy Experiment," (with R.N. Stavins), *Journal of Economic Perspectives*, 27 (Winter 2013): 103-22.

"An Instant Classic: Rochet & Tirole, Platform Competition in Two-Sided Markets," *CPI Journal,* 10:2 (Autumn 2014): 175-180.

"Pricing the Razor: A Note on Two-Part Tariffs," *International Journal of Industrial Organization*, 42 (September 2015): 19-22.

"The Future of Solar Energy: A Personal Assessment," *Energy Economics*, 52: Supplement 1(December 2015): S142-S148.

"The Performance of U.S. Wind and Solar Generators," *Energy Journal*, 37:1 (January 2016): 123-151.

"The Staggers Act at 35: Railroad Economics and Regulation" (with W.W. Wilson), *Review of Industrial Organization*, 49:2 (2016): 127-131.

"Modernizing U.S. Freight Rail Regulation" (with W.W. Wilson), *Review of Industrial Organization*, 49:2 (2016): 135-159.

"Socialism for Red States in the Electric Utility Industry," *Journal of Competition Law and Economics*, 12:3 (September 2016), 477-494.

"Reforming the U.S. Coal Leasing Program" (with K. Gillingham et al), *Science*, 354: 3616 (December 2, 2016), 1096-1098.

"Lessons Learned from Three Decades of Experience with Cap-and-Trade" (with R. Stavins), *Review of Environmental Economics and Policy*, 11: 1(Winter 2017): 59-79.

"The Design of Environmental Markets: What Have We Learned from Experience with Cap and Trade?" (with R. Stavins), *Oxford Review of Economic Policy*, 33:4 (Winter 2017): 572-588.

"Applying the Rule of Reason to Two-Sided Platform Businesses" (with D.S. Evans), *University of Miami Business Law Review*, 26: 1 (April 2018), 15 pp.  Available at https://repository.law.miami.edu/umblr/vol26/iss2/3.

 "Puzzles and Surprises in Employment and Productivity in U.S. Manufacturing After the Great Recession," *International Productivity Monitor*, No. 35 (Fall 2018): 1-23.

"Policy Evolution under the Clean Air Act" (with R.N. Stavins), *Journal of Economic Perspectives*, 33:4 (Fall 2019): 27-50.

## CHAPTERS IN BOOKS:

"Advertising and Economic Welfare."  In *Advertising and the Public Interest* (S. F. Divita, ed.),  Chicago: American Marketing Association, 1974, pp. 82-97.

"Promoting Competition in Tomorrow's Markets for Solar Energy Systems." In *The Solar Market: Proceedings of the Symposium on Competition in the Solar Energy Industry*, U.S. Federal Trade Commission, Washington, D.C.:  U.S. Government Printing Office, 1978, pp. 119-135.

"Cartel and Oligopoly Pricing of Nonreplenishable Natural Resources" (with T.R. Lewis). In *Dynamic Optimization and Mathematical Economics* (P. T. Liu, ed.), New York:  Plenum, 1980, pp. 133-156.

"The New Industrial Organization and the Economic Analysis of Modern Markets." In *Advances in Economic Theory* (W. Hildenbrand, ed.), Cambridge: Cambridge University Press, 1982, pp. 253-285.

"Optimal Use of Renewable Resources with Nonconvexities in Production" (with T.R. Lewis).  In *Essays in the Economics of Renewable Resources* (J. Mirman and D.F. Spulber, eds.), Amsterdam: North-Holland, 1982, pp. 95-111.

"Advertising and Market Structure."  In *New Developments in the Analysis of Market Structure* (J. E. Stiglitz and G. F. Mathewson, eds.), Cambridge: MIT Press, 1986, pp. 373-396.

"Standards for Dominant Firm Conduct: What Can Economics Contribute?" In *The Economics of Market Dominance* (D. Hay and J. Vickers, eds.), Oxford:  Basil Blackwell, 1987, pp. 61-88.

"Advertising." In *The New Palgrave*, Vol. 1 (J. Eatwell, M. Milgate, and P. Newman, eds.), New York: Macmillan, 1987, pp. 34-36.

"Industrial Organization."  In *The New Palgrave*, Vol. 2 (J. Eatwell, M. Milgate, and P. Newman, eds.), New York: Macmillan, 1987, pp. 803-808.

"George Stigler's Contributions to Microeconomics and Industrial Organization." In *The New Palgrave*, Vol. 4 (J. Eatwell, M. Milgate, and P. Newman, eds.), New York:  Macmillan, 1987, pp. 499-500.

"The Potential of Incentive Regulation." In *The Market for Energy* (D. Helm, J. Kay, and D. Thompson, eds.), Oxford: Clarendon Press, 1989, pp. 178-187.

"Inter-Industry Studies of Structure and Performance."  In *Handbook of Industrial Organization*, Vol. 2 (R. Schmalensee and R. D. Willig, eds.), Amsterdam:  North-Holland, 1989, pp. 951-1009.

"Empirical Models of Rivalrous Behavior."  In *Industrial Structure in the New Industrial Economics* (G. Bonanno and D. Brandolini, eds.), Oxford: Oxford University Press, 1990, pp. 138-167.

"Economías del Tamaño Empresarial y Poder de Mercado" and "Innovación y Posición Competitiva."  In *Concentración Empresarial y Competitividad: España en la C.E.E.* (Xavier Vives and Jordi Gual, eds.), Barcelona: Ariel Economía, 1990, pp. 55-67 and 119-131.

"Agreements Between Competitors." In *Antitrust, Innovation, and Competitiveness* (T. M. Jorde and D. J. Teece, eds.), Oxford: Oxford University Press, 1992, pp. 98-118.

"How Should We Address Economic Costs of Climate Change?"  In *Global Climate Change: The Economic Costs of Mitigation and Adaptation* (J.C. White, ed.), New York: Elsevier, 1991, pp. 73-76.

"The Costs of Environmental Protection."  In *Balancing Economic Growth and Environmental Goals*, Washington: American Council for Capital Formation Center for Policy Research, 1994, pp. 55-80. (Italian translation: "I costi della protezione abientale," *Energia*, 15 (December 1994): 30-48.)

"What Does Stabilizing Greenhouse Gas Concentrations Mean?" (with H.D. Jacoby and D.M. Reiner).  In *Critical Issues in the Economics of Climate Change* (B.P. Flannery and C.A.B. Grezo, eds.), London: IPIECA, 1997, pp. 225-244.

"Tradable Emissions Rights and Joint Implementation for Greenhouse Gas Abatement: A Look Under the Hood."  In *The Impact of Climate Change Policy on Consumers: Can Tradable Permits Reduce the Cost?* (C.E. Walker, M.A. Bloomfield, and M. Thorning, eds.), Washington: American Council for Capital Formation, 1998, pp. 39-55.

"Greenhouse Policy Architectures and Institutions." In *Economics and Policy Issues in Climate Change* (W.D. Nordhaus, ed.), Washington: Resources for the Future, 1998, pp. 137-158.

"Joint Venture Membership: Visa and Discover Card (1993)" (with D.S. Evans). In *The Antitrust Revolution, 3rd Ed.* (J. Kwoka and L. White, eds.), Oxford: Oxford University Press, 1998, pp. 286-309.

"The Economics of the Microsoft Case: A Post-Trial Primer" (with D.S. Evans). In *Trial and Error: United States v. Microsoft* (P. Beckner and E.R. Gustafson, eds.), Washington: Citizens for a Sound Economy, 2001, pp. 70-86.

"Some Economic Aspects of Antitrust Analysis in Dynamically Competitive Industries" (with D.S. Evans). In *Innovation Policy and the Economy*, Vol. 2 (A. Jaffe, J. Lerner, and S. Stern, eds.), Cambridge: MIT Press, 2002, pp. 1-49.

"Introduction" (with T.A. Kochan).  In *Management: Inventing and Delivering Its Future* (T.A. Kochan and R. Schmalensee, eds.), Cambridge: MIT Press, 2003, pp. 1-13.

"Has the Consumer Harm Standard Lost its Teeth?" (with H.H. Chang and D.S. Evans). In *High-Stakes Antitrust: The Last Hurrah?* (R.W. Hahn, ed.), Washington: Brookings Institution Press, 2003, pp. 72-116.

"The Economics of Interchange Fees and Their Regulation: An Overview" (with D.S. Evans). In *Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?* Kansas City: Federal Reserve Bank of Kansas City, 2005, pp. 77-120.

 "Thoughts on the Chicago Legacy in Antitrust." In *Where the Chicago School Overshot the Mark: The Effect of Conservative Economic Analysis on U.S. Antitrust* (R. Pitofsky, ed.), New York: Oxford University Press, 2008, pp. 11-23.

"Innovation and Evolution of the Payments Industry" (with D.S. Evans).  In *Moving Money* (R.E. Litan and M.N. Baily, eds.), Washington: Brookings Institution, 2009, pp. 36-76.

"Epilogue." In *Post-Kyoto International Climate Policy: Implementing Architectures for Agreement* (J.E. Aldy and R.N. Stavins, eds.), Cambridge: Cambridge University Press, 2010, pp. 889-898.

"Toward a Low-Carbon Future in Electricity?" (with B. Moselle and J. Padilla). In *Harnessing Renewable Energy in Electric Power Systems* (B. Moselle, J. Padilla, and R. Schmalensee, eds.), Washington/London: RFF  Press, 2010, pp. 1-4.

 "Renewable Electricity Generation in the United States." In *Harnessing Renewable Energy in Electric Power Systems* (B. Moselle, J. Padilla, and R. Schmalensee, eds.), Washington/London: RFF Press, 2010, pp. 209-232.

"Epilogue – Whither Renewable Generation?" (with B. Moselle and J. Padilla). In *Harnessing Renewable Energy in Electric Power Systems* (B. Moselle, J. Padilla, and R. Schmalensee, eds.), Washington/London: RFF Press, 2010, pp. 328-333.

"The Future of the (U.S.) Electric Grid," (with H.D. Jacoby and J.G. Kassakian).  In *Handbook of  Energy and Climate Change* (R. Fouquet, ed.), Cheltenham, UK: Edward Elgar, 2013, pp. 125-139.

"Deregulation: Introduction and Overview."(with P.W. MacAvoy) In *The Causes and Effects of Deregulation.* (2 Vols., P.W. MacAvoy and R. Schmalensee, eds.), Cheltenham, UK: Edward Elgar, 2014, pp. ix-xv.

"The Antitrust Analysis of Multi-Sided Platform Businesses," (with D.S. Evans).  In *Oxford Handbook of International Antitrust Economic*s (R.D. Blair and D.D. Sokol, eds.), Oxford: Oxford University Press, 2015, pp. 404-447.

"The Future of the U.S. Electric Grid," in *Perspectives on Complex Global Challenges* (E. Paté-Cornell, W.B. Rouse, and C.M. Vest, eds.).  Hoboken, NJ: Wiley, 2016, pp. 73-79.

"Microsoft v. Motorola (2015)," (with H.H. Chang), in *The Antitrust Revolution, 7th Ed.* (John E. Kwoka, Jr. and Lawrence J White, eds.). Oxford: Oxford University Press, 2019, pp. 294-311.

"Strengths and Weaknesses of Traditional Arrangements for Electricity Supply," in *Handbook on the Economics of Electricit*y (Jean-Michel Galchant, Paul Joskow, and Michael Pollitt, eds.). Cheltenham: Edward Elgar, forthcoming, ch. 1.

**OTHER PUBLICATIONS:**

"The Computer Model of Energy Production without Fast Breeder Reactors" and "The Computer Model of Fast Breeder Demands and Prices" (with P. W. MacAvoy). Appendices E and F in P.W. MacAvoy, *Economic Strategy for Developing Nuclear Breeder Reactors*, Cambridge: MIT Press, 1969, pp. 186-199.

"Theory, Fact, and Policy: A Reply to Professor Barten." *Recherches Economiques de Louvain*, 41 (March 1975): 63-66.

*Measuring External Effects of Solid Waste Management* (with R. Ramanthan, W. Ramm, and D. Smallwood). Washington, D.C.: U.S. Environmental Protection Agency, Socioeconomic Environmental Studies Series, 1975.

"Option Demand and Consumer's Surplus: Reply." *American Economic Review*, 65 (September 1975): 737-739.

"Advertising, Concentration, and Profits: Comment." In *Issues in Advertising: The Economics of Persuasion* (D. C. Tuerck, ed.), Washington, D.C.: American Enterprise Institute, 1978, pp. 280-284.

"Remarks." In *The Conglomerate Corporation* (R. D. Blair and R. F. Lanzillotti, eds.), Cambridge: Oelgeschlager, Gunn & Hain, 1981, pp. 365-368.

"Income-Distributional Concerns in Regulatory Policymaking: Comment." In *Studies in Public Regulation* (G. Fromm, ed.), Cambridge: MIT Press, 1981, pp. 112-117.

"Comment on Beales, Craswell, and Salop." *Journal of Law and Economics*, 24 (December 1981): 541-544.

Review of C. C. von Weizsacker, *Barriers to Entry*. *Journal of Economic Literature*, 21 (June 1983): 562-564.

"Comments." In *Telecommunications Access and Public Policy* (A. Baughcum and G. R. Faulhaber, eds.), Norwood, N.J.: Ablex, 1984, pp. 76-80.

Review of D. J. Teece, ed., *The Competitive Challenge*. *Journal of Economic Literature*, 26 (December 1988): 1779-1780.

"Regulation and Antitrust in the Bush Administration." *Antitrust Law Journal*, 58 (1989): 475-480.

"Comment on Katz and Ordover." *Brookings Papers on Economic Activity: Microeconomics*, 1990: 194-197.

"Commentary." In *Environmental Policy and the Cost of Capital*, Washington: American Council for Capital Formation Center for Policy Research, 1990, pp. 104-7.

"Comment on Mannering and Winston." *Brookings Papers on Economic Activity: Microeconomics*, 1991: 107-110.

"A Comprehensive and Balanced Energy Policy." *Environmental Forum*, 8 (May/June 1991): 41-42.

"Commentary." In *U.S. Environmental Policy and Economic Growth: How Do We Fare?* Washington: American Council for Capital Formation Center for Policy Research, 1992, pp. 48-51.

*The Economics of the Payment Card Industry* (with D.S. Evans). Cambridge: National Economic Research Associates, Inc., 1993.

Review of J. Broome, *Counting the Cost of Global Warming*; William R. Cline, *The Economics of Global Warming*; and Alan S. Manne and Richard G. Richels, *Buying Greenhouse Insurance: The Economic Costs of $CO_2$ Limits*. *Journal of Economic Literature*, 32 (June 1994): 738-741.

"Green Costs and Benefits: The Buck Stops Where?" In *Environment Strategy America 1994/95* (W.K. Reilly, ed.), London: Campden, 1994, pp. 16-17.

Review of R. Wilson, *Nonlinear Pricing*. *Journal of Political Economy*, 102 (December 1994): 1288-1291.

"Commentary." In *Strategies for Improving Environmental Policy and Increasing Economic Growth*, Washington: American Council for Capital Formation, Center for Policy Research, 1995, 32-35.

"A Guide to the Antitrust Economics of Networks" (with D.S. Evans). *Antitrust Magazine*, 10 (Spring 1996): 36-40.

"Ways I Have Worked." *The American Economist*, 40 (Fall 1996): 37-43.  Reprinted in *Passion and Craft: How Economists Work* (M. Szenberg, ed.), Ann Arbor: University of Michigan Press, 1998, pp. 243-255.

"Commentary." In *Climate Change Policy, Risk Prioritization, and Economic Growth*, Washington: American Council for Capital Formation Center, for Policy Research, 1997, pp. 65-69.

"Kyoto's Unfinished Business" (with H.D. Jacoby and R.G. Prinn). *Foreign Affairs*, 77 (July/August 1998): 54-66.  Reprinted in *Economics of the Environment: Selected Readings*, 4th Ed. (R.N. Stavins, ed.), New York, Norton: 1999, pp. 517-526.

"Comment on 'Competition, Information, and Development,' by Jean-Jacques Laffont." In *Annual Bank Conference on Development Economics 1998* (B. Pleskovic and J.E. Stiglitz, eds.), Washington: The World Bank, 1999, pp. 262-266.

"Commentary." In *Climate Change Policy: Practical Strategies to Promote Economic Growth and Environmental Quality* (C.E. Walker, M.A. Bloomfield, and M. Thorning, eds.), Washington: American Council for Capital Formation, Center for Policy Research, 1999, pp. 33-38.

"A Monopolist would *Still* Charge More for Windows: A Comment on Werden" (with B. Reddy, D.S. Evans, and A. Nichols). *Review of Industrial Organization*, 18 (May 2001): 263-268.

"A Monopolist would *Still* Charge More for Windows: A Comment on Werden's Reply" (with B. Reddy, D.S. Evans, and A. Nichols). *Review of Industrial Organization*, 18 (May 2001): 273-274.

"Comments" (On Robert E. Litan and Carl Shapiro, "Antitrust Policy in the Clinton Administration"). In *American Economic Policy in the 1990s* (J.A. Frankel and P.R. Orzag, eds.), Cambridge: MIT Press, 2002, pp. 493-499.

"Lessons from the Microsoft Case." European Investment Bank Lecture Series, Florence: European University Institute, 2002.

"Interchange Fees: A Review of the Literature." In *The Payment Card Economics Review, Vol. 1*, Cambridge: payingwithplastic.org/National Economic Research Associates, 2003, pp. 25-44.

"The Retailer Class Action Antitrust Case Against the Card Associations" (with H.H. Chang and D.S. Evans). In *The Payment Card Economics Review, Vol. 2*, Cambridge: payingwithplastic.org/National Economic Research Associates, Winter 2004, pp. 123-141.

"El Debate Sobre las Tasas de Intercambio: Una Visión de Conjunto" (with D.S. Evans).  *Papeles de Economia Española*, Número Extraordinario, 2006, pp. 2-17.

"Where's the 'B' in B-Schools?" *Business Week*, November 27, 2006, p. 118.

"Pick your Pricing" (with D.S. Evans). *Chief Executive*, July/August 2007.

"New Risks, New Products, and New Regulations: Insurance for the 21st Century," *ICFAI Journal of Risk and Insurance*, 4 (July 2007): 7-18.

"Economic Analysis of Class Certification," *Global Competition Policy*, June 2008, Release 2.  Available at http://www.globalcompetitionpolicy.org/index.php?&id=1184&action=907.

"Should New Merger Guidelines Give UPP Market Definition?"  *GCP: The Antitrust Chronicle,* December 2009, Release 1.  Available at https://www.competitionpolicyinternational.com/dec-091/

"Comment on "Pharmaceutical Price Discrimination and Social Welfare" (by Frank R. Lichtenberg)," *Capitalism and Society*, 5 (2010), Issue 1, Article 5. DOI: 10.2202/1932-0213.1067. Available at: http://www.bepress.com/cas/vol5/iss1/art5

"The Net Effects of the Proposed Durbin Fee Reductions on Consumers and Small Business" (with D.S. Evans and R.E. Litan).  *The Lydian Journal*, Issue 5, March 2011, Available at http://www.pymnts.com/journal/

"AT&T/T-Mobile: Does Efficiency Really Count?" (with H. Chang and D.S. Evans), *CPI Antitrust Chronicle*, 10 (October 2011), Article 2, 5 pages. Available at https://www.competitionpolicyinternational.com/file/view/6564.

"Gridlock in 2030?" (with T.D. Heidel and J.G. Kassakian), *Public Utilities Fortnightly*, 150 (January 2012): 22-28.

"Policy Challenges and Technical Opportunities on the U.S. Grid" (with T.D. Heidel and J.G. Kassakian), *IEEE Power & Energy Magazine*, May/June 2012, 30-37.

"Summary for Policy Makers" (with M. Webster), in *Report from Growing Concerns, Possible Solutions: The Interdependency of Natural Gas and Electricity Systems*, Cambrdige: MIT Energy Initiative, June 2014, pp. 2-6. Available at http://mitei.mit.edu/system/files/2014-MITEI-Report-Growing-Concerns-Possible-Solutions.pdf.

"Comment on 'Market and Management Failures' (by Pankaj Ghemawat)," *Capitalism and Society*, Vol. 12, Issue. 1 (May 2017), Article 6.

"Brief of Dr. David S. Evans and Prof. Richard Schmalensee as Amici Curiae in Support of Appellants-Cross Appellees." In the matter of *U.S. Airways v. Sabre* before the Second Circuit Court of Appeals (Case 17-960), filed July 26, 2017.

"Multi-Sided Platforms" (with D.S. Evans), In *The New Palgrave Dictionary of Economics,* Palgrave Macmillan (eds.), Palgrave Macmillan, London, 2017.

"Network Effects: March to the Evidence, Not to the Slogans" (with D.S. Evans), *CPI Antitrust Chronicle*, August 2017. Available at https://www.competitionpolicyinternational.com/wp-content/uploads/2017/09/CPI-Evans-Schmalensee.pdf. Reprinted as "Debunking the 'Network Effects' Bogeyman," *Regulation* 40 (4, Winter 2017/18): 36-39.

"Lessons Learned from Cap-and-Trade Experience" (with R.N. Stavins), in R.N. Stavins and R.C. Stowe, eds., *Market Mechanisms and the Paris Agreement*, Harvard Project on Climate Agreements, October 2017, pp. 21-23. Available at https://www.belfercenter.org/sites/default/files/files/publication/2017-10_market-mechanisms-paris_v5.pdf

"Brief for *Amici Curiae* Prof. David S. Evans and Prof. Richard Schmalensee in Support of Respondents." In the matter of *State of Ohio, et al., v. American Express Company, et al.* before the U.S. Supreme Court (Case 16-1454), filed January 23, 2018.

"Ignoring Two-Sided Business Reality Can Also Hurt Plaintiffs" (with D.S. Evans). *CPI Antitrust Chronicle*, Spring 2018. Available at https://www.competitionpolicyinternational.com/ignoring-two-sided-business-reality-can-also-hurt-plaintiffs/.

"Two-Sided Red Herrings" (with D.S. Evans), *CPI Antitrust Chronicle*, Fall 2018. Available at https://www.competitionpolicyinternational.com/two-sided-red-herrings/

"Handicapping the High-Stakes Race to Net Zero," *Milken Institute Review*, v. 20, n. 3, (Third Quarter 2018), pp. 34-45.

"Learning from Thirty Years of Cap & Trade" (with R.N. Stavins), *Resources*, Issue 201 (May 2019), 13-20.

"The Role of Market Definition in Assessing Anticompetitive Harm in Ohio v. American Express" (with D.S. Evans), *CPI Antitrust Chronicle*, Spring 2019. Available at

https://www.competitionpolicyinternational.com/the-role-of-market-definition-in-assessing-anticompetitive-harm-in-ohio-v-american-express/