1  Paul J. Riehle (SBN 115199)
   paul.riehle@faegredrinker.com
2  **FAEGRE DRINKER BIDDLE & REATH LLP**
   Four Embarcadero Center
3  San Francisco, California 94111
   Telephone: (415) 591-7500
4  Facsimile: (415) 591-7510

5  Christine A. Varney (*pro hac vice*)
   cvarney@cravath.com
6  Katherine B. Forrest (*pro hac vice*)
   kforrest@cravath.com
7  Gary A. Bornstein (*pro hac vice*)
   gbornstein@cravath.com
8  Yonatan Even (*pro hac vice*)
   yeven@cravath.com
9  Lauren A. Moskowitz (*pro hac vice*)
   lmoskowitz@cravath.com
10 M. Brent Byars (*pro hac vice*)
   mbyars@cravath.com
11 **CRAVATH, SWAINE & MOORE LLP**
   825 Eighth Avenue
12 New York, New York 10019
   Telephone: (212) 474-1000
13 Facsimile: (212) 474-3700

14 *Attorneys for Plaintiff Epic Games, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>APPLE INC.,<br><br>Defendant. | No. 4:20-CV-05640-YGR<br><br>**DECLARATION OF TIMOTHY SWEENEY IN FURTHER SUPPORT OF PLAINTIFF EPIC GAMES, INC.'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: September 28, 2020 at 9:30 a.m. (via Zoom Platform)<br><br>Courtroom: 1, 4th Floor<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

DECLARATION OF TIMOTHY SWEENEY                                CASE NO. 4:20-cv-05640-YGR

I, Timothy Sweeney, declare as follows:

1. I am the founder and Chief Executive Officer of Epic Games, Inc. ("Epic"), the plaintiff in this action. I submit this declaration in further support of Epic's Motion for a Preliminary Injunction. (ECF No. 61.) I also submitted a declaration in support of Epic's Motion for a Preliminary Injunction on September 4, 2020 (ECF No. 65), in which I described Epic's most popular and successful videogame, *Fortnite*, as well as a separate part of Epic's business, a software suite available to third-party developers called *Unreal Engine*.

2. I have reviewed the submission of Apple Inc. ("Apple") in opposition to Epic's Motion for a Preliminary Injunction and noted a number of statements that are factually incorrect. While I will not address all of those statements in responding to Apple's submission in this declaration, several are discussed below.

3. The contents of this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify thereto.

*Fortnite* **and Cross-Platform Play**

4. The Declaration of Mike Schmid, dated September 15, 2020 (ECF No. 79) asserts that in September 2018, Epic violated Sony's rules to force Sony to enable cross-platform play between Sony's PlayStation 4 and Microsoft's Xbox One (*id.* ¶ 19). That is false.

5. Cross-platform play allows users of different digital platforms to play together in the same online space, among personal computers, dedicated gaming consoles, and mobile devices like smartphones and tablets. Because circles of friends typically include users of different digital platforms, users on all platforms (as well as their videogame developers) benefit greatly from cross-platform features.

6. When *Fortnite* was officially released on PlayStation 4 and Xbox One in July 2017, users of each of those gaming consoles were unable to play with users of the other console due to restrictions on cross-platform capabilities that were imposed by the console makers.

7. In early 2018, Epic approached Sony to advocate for cross-platform play and engaged Sony in business negotiations that spanned several months. On September 18, 2018, Epic and Sony signed an agreement on the launch of a Sony cross-platform beta program that

would enable play on *Fortnite* across a variety of platforms, including PlayStation 4, Android, iOS, Nintendo Switch, Xbox One, Microsoft Windows, and macOS operating systems. On September 26, 2018, Sony announced this program publicly, and later that day Epic launched the feature. Contrary to Mr. Schmid's claim that Epic acted "explicitly against PlayStation's rules" (*id.*), Epic did not breach any Sony or PlayStation rules by enabling cross-platform play in September 2018.

8. Attached hereto as **Exhibit A** is a true and correct copy of Sony's September 26, 2018 announcement of cross-platform features on *Fortnite*.

9. Sony's beta program was a success and cross-platform functionality is now fully supported on PlayStation 4 and Xbox One. Many different game publishers now provide cross-platform play for popular multiplayer games, including Activision's *Call of Duty: Warzone*, Microsoft's *Minecraft*, and Electronic Arts' *Need for Speed Heat*.

10. Apple's papers also claim that because *Fortnite* is available on multiple platforms, iOS is not an important platform for *Fortnite*. (ECF No. 77, ¶ 27.) That is false. The fact that *Fortnite* can be played on multiple platforms does not mean that Apple's iOS platform is not independently important to *Fortnite*. Each platform is important to *Fortnite* and iOS is particularly important for the reasons discussed herein. Cross-platform functionality is important specifically because it allows *Fortnite* to reach more users and allows users to play and share experiences with other users who have access only to different platforms.

11. Mr. Schmid also claims that unnamed "Epic personnel" threatened to "terminate" Epic's relationship with Apple if Apple failed to comply with Epic's routine requests for expedited review or propagation of its apps. (ECF No. 79, ¶ 18.) As discussed in more detail in the Declaration of Andrew Grant dated September 18, 2020, Epic did often make clear to Apple that if Apple's review process extended beyond the launch deadline for a new *Fortnite* build, Epic would launch the new build on other platforms without the iOS platform being updated. Because *Fortnite* at that time required all platforms to run the latest version of the game, this would result in *Fortnite* on iOS being unavailable to users until Apple completed its review of the new build and allowed iOS users to access an updated app. Epic has investigated Mr. Schmid's claim that

DocuSign Envelope ID: 3C86B126-445A-42BE-8F45-8D40AC077EB9

1  "Epic personnel have told [him] that if Apple did not comply with its demands, Epic would simply terminate its relationship with Apple and remove its games off of the iOS platform" (*id.*) and found no indication that such a thing was ever said. Epic never issued such a threat and never considered such termination.

12. Some of Apple's assertions related to multi-platform play are contained in the declaration of Lorin Hitt, dated September 15, 2020 (ECF No. 77). Professor Hitt states that because *Fortnite* can be played on multiple platforms, users can "freely" and "seamlessly" switch between the various platforms on which *Fortnite* is available. (*Id.* § 3.1.2.) I do not agree.

13. Non-mobile platforms like gaming consoles and PCs are simply not substitutes for mobile device access to *Fortnite*. It does not require an expert to establish that a home-based desktop computer is not a substitute for a personal smartphone in terms of quickly and easily accessing email or using banking software regardless of the user's location. Similarly, dedicated gaming consoles and PCs are not substitutes for mobile phones for gaming: PCs and gaming consoles are too large to be transported with ease and require a connection to a power supply. Simply put: You cannot carry a PlayStation in your pocket.

14. Gaming consoles and many PCs require electrical outlets and connection to dedicated screens. PCs and gaming consoles also require a Wi-Fi or wired Internet connection in order for consumers to play online with others. By contrast, mobile devices are easily portable, battery operated, cellularly connected, and have screens integrated into them. If a consumer is in transit, is away from home, or does not have access to a reliable wired or Wi-Fi Internet connection, playing *Fortnite* on a dedicated gaming console or a PC is not an option. If the consumer wants to play *Fortnite* in those circumstances, he or she will need to play on a mobile device. Moreover, there are typically many more mobile devices per household than computer or gaming consoles. For example, if one family member is playing on PlayStation 4 or watching a show on the television connected to the PlayStation 4, then the others would need to play on their mobile phone.

15. I attached to my prior declaration (dated September 4, 2020) examples of consumers who had contacted our customer service group after Apple delisted *Fortnite* from the

4

DECLARATION OF TIMOTHY SWEENEY                                    CASE NO. 4:20-cv-05640-YGR

App Store, and said that their iPhone or iPad was the only way they had to play the game. (ECF No. 65-5.) Some expressed an inability to afford a second platform. (*Id.*)

16. The fact that gaming consoles or PCs are not substitutable for mobile devices is borne out by the data. There are vastly more mobile devices currently in use than there are dedicated gaming consoles. According to publicly reported figures, while there are approximately 1 billion active iPhone users, the total combined number of PlayStation 4, Xbox One, and Nintendo Switch gaming consoles is under 300 million.

17. *Fortnite* gaming experiences are also differentiated on dedicated gaming consoles and mobile devices. What dedicated gaming consoles and PCs lack in mobility, they make up for in performance. PCs and consoles typically offer faster processing, larger screens, better graphics, and better controls than mobile devices do. Because of these differences, I would expect players to prefer playing on a console if one is available to them. Yet our data shows that 63% of *Fortnite* users on iOS play exclusively on iOS, which suggests that many iOS users do not have access to a gaming console or a PC offering a better experience.

### *Fortnite*'s Continued Popularity

18. In its brief, Apple claims that "[b]y July 2020, interest in *Fortnite* had decreased by nearly 70% as compared to October 2019". (ECF No. 73 at 11.) This is misleading. To support this statistic, Apple cites to Google Trends data, which tracks *not* the number of users actually playing *Fortnite*, but instead the number of daily Google searches for *Fortnite*. In order to come up with a 70% decline, Apple cherry-picked an unusual single-week peak in October 2019 with the average number of searches in July 2020, as shown in the chart below:



Google Trends, https://trends.google.com/trends/explore?date=2019-08-01%202020-07-31&geo=US&q=Fortnite#TIMESERIES (last visited Sept. 18, 2020).  Apple is aware that the peak in this Google search data corresponds with a two-day in-game *Fortnite* event in October 2019 called "The End", which amassed record-breaking viewership on Twitter, Twitch, and YouTube as the world of *Fortnite* was swallowed by a black hole.



19. Epic's actual user engagement data reflecting the actual number of users playing *Fortnite* (not Google search results) shows Apple's claim of declining interest in *Fortnite* to be incorrect.  Over the period of time that Apple cherry-picked for its Google search volume comparison (between October 2019 and July 2020), the number of daily active users on *Fortnite* actually *increased* by more than 39%.

**Apple's Marketing of the DJ Marshmello Event**

20. Mr. Schmid's declaration states that Apple "placed billboards in New York's Times Square and LA Live to promote an in-app *Fortnite* concert with DJ Marshmello". (ECF No. 79 ¶ 11.) This statement is inaccurate.

21. The billboards actually promoted Apple's own Apple Music app and service, which offered a playlist containing music that DJ Marshmello had performed in a *Fortnite* concert.

22. An image of Apple's billboard in Times Square that DJ Marshmello posted on Twitter following the concert is attached as **Exhibit B**.

**Purchases Within *Fortnite* and Epic Games Stores**

23. Apple claims that its in-app purchase requirements are "hardly unique" and states that "Epic's own app marketplace charges users and developers a commission". (ECF No. 73 at 6 & n.7.) This is inaccurate because it mixes store sales and in-game purchases.

24. The Epic website cited by Apple describes *software sales*, not in-game purchases. As stated in my declaration of September 4, 2020 (ECF No. 65), Epic provides developers who distribute their software through the Epic Games Store (including free games distributed at no charge) the freedom to choose their in-game purchase payment processor without any payment to Epic. (*Id.* ¶ 10.)

**Unreal Engine**

25. The dispute between Epic and Apple concerns the distribution and payment options for and in *Fortnite*, an entirely different product from *Unreal Engine* or Epic's other non-game products.

26. Apple has asserted that Epic might use *Unreal Engine* as a vehicle for the insertion of malware or other code intended to breach contractual obligations with Apple. (ECF No. 73 at 28.) But as described in more detail in my prior declaration (ECF No. 65) and in the Declaration of Nicholas Penwarden, dated September 4, 2020 (ECF No. 64) (the "Penwarden Declaration"), *Unreal Engine* is not an iOS app. It is a development tool that has been used to create software and content on multiple platforms, including Apple iOS, for over ten years.

*Unreal Engine* is licensed and trusted as a software foundation by companies including Microsoft, Sony, Nintendo, Electronic Arts and Activision. Neither *Unreal Engine* nor any other Epic product was ever used by Epic as a vehicle to insert malware or other malicious code onto any platform. Epic never has and never will intentionally insert malware or other malicious code onto any platform.

27. Epic has taken issue with a particular set of payment processing rules that it believes are illegal and unenforceable. Epic will continue to comply with all contractual obligations with Apple relating to its non-game products and services, including *Unreal Engine*, during the pendency of this lawsuit.

**Competition to *Unreal Engine***

28. Apple also suggests that *Unreal Engine* is easily replaceable with *Unity*, another development platform. This argument is incorrect.

29. As described in more detail in the Penwarden Declaration, *Unreal Engine* developers have invested significant time and resources into projects reliant on *Unreal Engine*, and moving away from it would thus cause them significant harm. (ECF No. 64, ¶ 10.)

30. In addition, *Unity* is the only major competitive licensable alternative to *Unreal Engine*. As a result, eliminating *Unreal Engine* would mean that developers would have significantly less choice than before, and competition would be harmed. Therefore, if Apple is allowed to prevent iOS development on *Unreal Engine*, all developers would suffer.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on September 18, 2020, in Cary, North Carolina.

Timothy Sweeney