Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> APPLE INC., <br><br> Defendant. | Case No. 4:20-CV-05640-YGR <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF EPIC GAMES, INC.'S MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Date:  September 28, 2020 at 9:30 a.m. (via Zoom Platform) <br><br> Courtroom:  1, 4th Floor <br><br> Judge:  Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... iii

TABLE OF CITED DOCUMENTS ................................................................................................. iv

I.      LEGAL STANDARD ..................................................................................................3

II.     EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS. ......................................4

      A.     Apple's Conduct Violates Section 2 of the Sherman Act. ......................................4

            1.     Apple has a monopoly in the iOS App Distribution Market. .....................4

            2.     Apple unlawfully maintains its app distribution monopoly........................5

      B.     Apple's Conduct Violates Sections 1 and 2 of the Sherman Act. ..........................7

            1.     Apple ties app distribution to in-app payment processing..........................7

            2.     Under the rule of reason, Apple's conduct has anti-competitive effects. ...........................................................................................................9

            3.     Apple's procompetitive justifications are pretextual. .................................9

III.    EPIC WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION..............10

IV.    THE BALANCE OF HARMS STRONGLY FAVORS EPIC........................................12

V.     EPIC'S REQUESTED RELIEF WOULD FURTHER THE PUBLIC INTEREST. ........14

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Acquaire v. Canada Dry Bottling Co.*,
   24 F.3d 401 (2d Cir. 1994) ...................................................................... 11, 12

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .......................................................................... 14

*Germon v. Times Mirror Co.*,
   520 F.2d 786 (9th Cir. 1975) .......................................................................... 12

*Milsen Co. v. Southland Corp.*,
   454 F.2d 363 (7th Cir. 1971) .......................................................................... 12

*Newcal Indus., Inc. v. Ikon Office Sols.*,
   513 F.3d 1038 (9th Cir. 2008) .......................................................................... 5

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018) ...................................................................................... 8

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
   860 F.3d 844 (6th Cir. 2017) .......................................................................... 14

*Teradata Corp. v. SAP SE*,
   2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ................................................. 5

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ............................................................................ 4

*trueEX, LLC v. MarkitSERV Ltd.*,
   266 F. Supp. 3d 705 (S.D.N.Y. 2017) ........................................................... 14

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................................ 9

**TABLE OF CITED DOCUMENTS**

| Citation | Document |
|---|---|
| Opening | Plaintiff Epic Games, Inc.'s Notice of Motion and Motion for a Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof (ECF No. 61) |
| Opp'n | Defendant Apple Inc.'s Opposition to Epic Games, Inc.'s Motion for a Preliminary Injunction (ECF No. 73) |
| Byars | Declaration of M. Brent Byars in Support of Plaintiff Epic Games, Inc.'s Motion for a Preliminary Injunction (ECF No. 61-1) |
| Evans | Declaration of Dr. David S. Evans (ECF No. 62) |
| Grant | Declaration of Andrew Grant in Support of Plaintiff Epic Games, Inc.'s Motion for Preliminary Injunction (ECF No. 63) |
| Penwarden | Declaration of Nicholas Penwarden in Support of Plaintiff Epic Games, Inc.'s Motion for a Preliminary Injunction (ECF No. 64) |
| Sweeney | Declaration of Timothy Sweeney in Support of Plaintiff Epic Games, Inc.'s Motion for a Preliminary Injunction (ECF No. 65) |
| Schiller | Declaration of Philip W. Schiller in Support of Defendant Apple Inc.'s Opposition to Plaintiff's Motion for a Preliminary Injunction (ECF No. 74) |
| Schmalensee | Expert Declaration of Richard Schmalensee, Ph.D (ECF No. 78) |
| Schmid | Declaration of Mike Schmid in Support of Defendant Apple Inc.'s Opposition to Plaintiff's Motion for a Preliminary Injunction (ECF No. 79) |
| Byars Reply | Declaration of M. Brent Byars in Further Support of Plaintiff Epic Games, Inc.'s Motion for Preliminary Injunction (submitted herewith) |

Evans Reply                          Second Declaration of Dr. David S. Evans
                                     (submitted herewith)

Grant Reply                          Declaration of Andrew Grant in Further
                                     Support of Plaintiff Epic Games, Inc.'s Motion
                                     for Preliminary Injunction (submitted herewith)

Sweeney Reply                        Declaration of Timothy Sweeney in Further
                                     Support of Plaintiff Epic Games, Inc.'s Motion
                                     for a Preliminary Injunction (submitted
                                     herewith)

This preliminary injunction motion is crucial, yet narrow. Epic seeks one thing only: to offer consumers an alternative payment processing service that allows consumer choice and lower prices while this litigation proceeds without retaliation. The issue is less complicated than the voluminous legal arguments and technical jargon before the Court suggest. Epic is prepared to do everything possible to allow this Court to resolve this case in an expeditious manner. At that point, should Apple prevail, it can be made whole. But during the pendency of the case, consumers should not be harmed by Apple's overwhelming retaliation against Epic.

Apple's papers try to make this dispute about Apple's innovative products, rather than Apple's practices. Many monopolists start with extraordinary products, yet courts have to step in if they use their power to stifle competition. Apple also tries to make this case about speculative security concerns. But Apple routinely allows third-party payment processing in other apps, including Amazon and Uber. And Apple identified no evidence that Epic's direct payment, or any Epic product, posed an actual security threat. Apple's strawman arguments should not distract from what is a simple situation supported by a long line of Supreme Court cases.

Turning to the merits, in its Opening Brief, Epic showed that Apple is a monopolist in two markets, for iOS app distribution and for iOS in-app payment processing, and that it illegally maintains its monopolies through unlawful contractual ties and technical restrictions that foreclose all competition. Apple does not dispute its complete control over app distribution to over a billion iOS users or over in-app payment processing, nor any of the restrictions that maintain that control. Yet Apple baldly asserts "it is no monopolist", asking this Court to believe that iPhones are "interchangeable" with personal computers and gaming consoles. That assertion is contrary to basic antitrust principles and common sense: a Sony PlayStation does not fit in your pocket but a smartphone does.

Apple also argues that its web of restrictions is not anti-competitive because they create an "integrated service" that is the basis of its "iPhone business model". (Opp'n 19.) But Apple cannot immunize these restrictions from antitrust scrutiny by labeling them a "business model". Nor can Apple credibly insist that IAP is an inseparable aspect of the App Store—that they are a "single" product—when (a) Apple already allows many apps to use alternative pay options, and

(b) many in-app transactions occur days, months, or years *after* the app is downloaded from the App Store.  Apple also cannot dispute direct evidence of separate demand for payment processing services, including (a) the robust demand for such services on eligible categories of iOS apps and open platforms, and (b) Apple's new disclosure that over the years Apple has terminated the accounts of no fewer than 2,000 developers who introduced alternative payment processors.  It is clear that developers are clamoring for competition.

Apple also does not dispute that its termination of Epic from its Developer Program would cause irreparable harm to Epic, *Fortnite* players, Epic's *Unreal Engine* customers, and customers of those customers—in essence, that it is dispensing collective punishment.  Instead of denying these harms to Epic and third parties, Apple argues that the Court should ignore them. *First*, it argues Epic "created the current situation" by offering alternative payment processing, "knowing that Apple would invoke its contractual right" to terminate Epic.  (*Id.* at 2.)  But Epic is doing precisely what the Supreme Court has instructed that Epic is entitled to do:  refuse to comply with anti-competitive contractual conditions.  Epic and the public should be protected from Apple's retaliation.  Apple has no valid response.

*Second*, Apple repeatedly invokes "security" and "privacy" as justifications for terminating Epic from its Developer Program, claiming that its retaliation somehow *benefits* consumers.  But Apple has not pointed to a single security issue relating to Epic's direct payment option, any of Epic's apps, or *Unreal Engine*.  Absent any evidence of harm to any user, Apple argues that the widely used hotfix update mechanism itself was malicious.  But as Epic showed in its Opening papers, using hotfixes to serve updated content is common industry practice, and Apple does not dispute that the *Fortnite* app has openly used them for years without objection.  Moreover, the hotfix update has come and gone, and Epic submitted several *Fortnite* builds expressly disclosing Epic's direct payment option.  Apple rejected them all, and still proceeded to terminate Epic's Developer Program account.  Apple's retaliation is not directed against the *method* by which Epic introduced competing payment processing functionality; Apple is objecting to the *fact* that Epic introduced competition offering consumers lower prices.  Apple is not protecting consumers; it is protecting its monopoly and its bottom line.

Finally, Apple's papers contain a number of half-truths and outright falsities intended to paint Epic as a bad actor. Epic cannot catalogue them all here but notes a few examples below:

(1) Apple asserts that Epic eliminated IAP from *Fortnite*. This is false. Epic's hotfix update offered IAP *and* Epic direct pay side-by-side. IAP remained available in *Fortnite* until Apple blocked IAP upon termination of Epic's Team ID '84 account. (Grant Reply ¶¶ 38-39.)

(2) Apple asserts that the August 13 release has security risks. That is false. Apple has not presented a shred of evidence that there is any security issue.

(3) An Apple declarant asserts that in 2018, Epic breached its agreement with Sony to launch cross-platform play without Sony's consent. (Schmid ¶ 19.) That is false. Sony announced the availability of cross-platform play in September 2018 with Epic as one of the first participants in the new program. (Sweeney Reply ¶ 7, Ex. A.)

(4) Apple claims Epic brought this case to revive supposedly waning interest in *Fortnite*, alleging a 70% decline in "interest" between October 2019 and July 2020. (Opp'n 11.) But Apple cherry-picked Google Trends data concerning Google *search* volumes, misleadingly starting from a one-week spike that took place in October 2019 when Epic ran an in-game event that captured global attention. *Fortnite users* increased over that period. (Sweeney Reply ¶ 18.)

(5) Apple argues that "Epic's own app marketplace charges users and developers a commission" just like IAP. (Opp'n 6 & n.7.) But the Epic Games Store offers developers the choice that Apple does not: they can use Epic's payment processor for in-app purchases, or they can use another payment processor and pay Epic nothing. (Sweeney Reply ¶ 24.)

(6) Apple claims it placed *Fortnite* billboards in Times Square and LA Live, at its expense to the benefit of Epic. But the billboards actually promoted the availability of Marshmello's concert playlist on Apple Music. (Sweeney Reply ¶¶ 20-22, Ex. B.)

Epic looks forward to demonstrating at trial the unlawfulness of Apple's conduct. In the meantime, an injunction should issue.

## I.    LEGAL STANDARD

Apple does not dispute that Epic must satisfy the *Winter* test. (Opp'n 14.) Apple nonetheless suggests that this test is harder to meet here because the injunction sought is

"mandatory" instead of "prohibitory". (*E.g.*, Opp'n 14-15.)  Apple is wrong.  The requested injunction here is prohibitory; Epic seeks an order prohibiting Apple from retaliating against Epic in any way on account of Epic's introduction of a competitive alternative to Apple's IAP. (Opening ii (requesting an order prohibiting retaliation and undoing retaliatory actions taken).) In any event, Epic satisfies the four preliminary injunction factors as applied to the relief sought.

## II.   EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS.

### A.   Apple's Conduct Violates Section 2 of the Sherman Act.

#### 1.   Apple has a monopoly in the iOS App Distribution Market.

In its Opening brief, Epic established a relevant product market for distribution of apps compatible with iOS to users of mobile devices running iOS:  the iOS App Distribution Market. Apple does not and cannot dispute its complete control over this market.  Instead, Apple argues in its Opposition that Epic defined the market too narrowly.  Not so.

Apple argues that there are "alternative means to distribute *Fortnite*", and therefore, that the market here must include "at least" distribution on other platforms on which *Fortnite* can be played.  (Opp'n 16.)  That is inconsistent with basic antitrust principles.  Markets are commonly defined by applying the hypothetical monopoly test, which "asks whether a monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase" on the monopolized product to a specified set of customers.  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008); (Evans Reply ¶ 57).  The iOS App Distribution Market accordingly includes all the ways by which app developers generally (including, but not limited to, Epic) could (absent Apple's restrictions) distribute apps to the billion users of iOS devices.  (Evans ¶¶ 52-54.)  A hypothetical monopolist in iOS app distribution could profitably impose a price increase on iOS app developers (Apple does just that).  That is because distributing apps to users of other platforms is not an adequate substitute, from the developer's perspective, for accessing the one billion iOS users.  (*Id.* ¶¶ 41-42.)

For example, by distributing on Android, a developer does not reach the billion users of iOS devices because users typically do not have mobile devices on both OSs.  As for distribution on game consoles, many apps require mobility or are not games playable on a console.

Moreover, many millions of iOS users do not have those alternative devices. And even for those iOS users who do have alternatives at home, they are generally not portable and must be hooked up to a television or monitor and electrical outlet; even laptop computers are too large to fit in a pocket or a purse. The smartphone is unique: there is simply no other device that fits in your pocket and can be used anywhere and at any time. As the data show, of the *Fortnite* users on iOS, 63% access *Fortnite* only on iOS. (Sweeney Reply ¶ 17.) Those users, and iOS users more generally, are not accessible through distribution on other platforms.

Epic also explained in its Opening brief (at 13-14), and Epic's expert opined, how the iOS App Distribution Market reflects the characteristics of the single-brand market defined in *Newcal Indus., Inc. v. Ikon Office Sols.*, 513 F.3d 1038 (9th Cir. 2008): The primary market consists of OSs for smartphones or tablets; Apple has market power in the primary market; and competition for smartphone (or tablet) OSs cannot constrain Apple in the aftermarkets. (Evans ¶¶ 25-30; Compl. ¶¶ 156-83.) Apple contends that Epic has "no basis" to argue that "components of Apple's integrated offerings should be considered separately", and that "this is not an aftermarket case". (Opp'n 16-17.) But *Newcal* is that basis, and Apple cites no support that *Newcal* does not apply where a monopolist chooses to label its conduct in the downstream market as an "integrated offering". *See Teradata Corp. v. SAP SE*, 2018 WL 6528009 at *17 (N.D. Cal. Dec. 12, 2018) (aftermarket properly alleged despite defendant labeling its tied and tying products as "integrated"). Indeed, it is Apple's decision to contractually coerce developers to "integrate" its downstream offering that constitutes Apple's anti-competitive conduct.

### 2.    Apple unlawfully maintains its app distribution monopoly.

Epic described in detail the web of technical and contractual restrictions Apple employs to ensure that consumer apps may be distributed on iOS solely through its own App Store, thereby unlawfully maintaining its monopoly over the iOS App Distribution Market. (Opening 12-15.) Apple does not dispute that it imposes the restrictions Epic identified. Instead, it claims these are legal for two reasons, neither of which is availing.

*First*, Apple contends its technical and contractual restrictions are legal because there are "alternative distribution options". (Opp'n 18.) As discussed above, that is factually and legally

incorrect—there are no alternative options to distribute consumer apps to iOS users, and through the restrictions, Apple maintains a complete monopoly in the iOS App Distribution Market.

*Second*, Apple says it need not provide "unfettered and uncompensated use of its own technology". (*Id.*)  That statement mischaracterizes Epic's argument.  Microsoft is compensated for its investment in Windows without forcing all transactions on Windows PCs through a single store that it controls.  Apple can be too.  Apple just cannot use its market power to force developers to use its own services to the exclusion of all others.  Epic is ready, willing, and able to compete by offering distribution services that would compete with Apple's; Epic (like other would-be distributors) has been blocked from doing so by Apple's anti-competitive conduct. (Sweeney ¶¶ 12-14.)  Apple's investment in iOS does not give it unfettered rights to maintain a monopoly in related, downstream markets, and Apple cites no case law suggesting otherwise.

Apple also tries to justify its total control of all iOS consumer app distribution by pointing to the need for security.  (Opp'n 5.)  This is a pretext.  There are many methods to secure a platform aside from controlling all consumer app distribution.  Indeed, Apple already has implemented many of those methods on iOS through the OS design, not through App Store control.  (Grant Reply ¶¶ 30-35.)  Apple does not control all app distribution on macOS. (Sweeney ¶ 10.)  Apple already allows certain entities on iOS to download directly from the Internet and bypass the App Store.  (Grant ¶¶ 5, 14.)  Apple is also aware that security could be a factor on which different app stores could compete; if Apple's App Store could in fact offer better security than all other stores, Apple could use this security advantage to prevail in a competitive market.  Epic does not claim that Apple cannot participate in the iOS app distribution marketplace.  Epic argues that Apple cannot use its market power to monopolize app distribution and that Apple should fairly compete in that market.

Finally, Apple asserts that "Epic's antitrust theories . . . have nothing to do with Unreal Engine, and thus cannot support that aspect of the requested injunction".  (Opp'n 18 n.17.)  But it was Apple that brought *Unreal Engine* into this dispute when it overreached in its retaliation against Epic by threatening to destroy the ability of *Unreal Engine* to provide third-party user tools for iOS and macOS development.  Now it is absolutely relevant to Epic's claims.  For

assessing likelihood of success on the merits, Apple's retaliation against *Unreal Engine* is further evidence of the absolute power Apple wields on iOS and the lengths to which Apple will go to maintain its monopolies.[1]  Apple's express purpose of attacking Epic's ability to develop *Unreal Engine* was to force Epic into submission and ensure compliance with Apple's anti-competitive scheme.  (Opp'n 28.)  An injunction protecting Epic's products including *Unreal Engine* would curtail the scope of Apple's anti-competitive conduct.[2]

### B.  Apple's Conduct Violates Sections 1 and 2 of the Sherman Act.

Apple does not dispute that it contractually conditions developers' ability to distribute iOS apps on their agreement to use solely Apple's own IAP to process all in-app payments for digital content and that it thereby forecloses all competition for the processing of such payments. That is unlawful *per se* and rule of reason tying and monopoly maintenance.  (Opening 15-23.)

### 1.  Apple ties app distribution to in-app payment processing.

Epic has shown the first element of tying:  two separate products.  Under the purchaser demand test, app distribution is a separate product from in-app payment processing for digital content because there is demand for in-app payment processing separate and apart from demand for distribution services.  In-app purchases occur days, months, or years after an app has been downloaded to a user's device.  But for Apple's IAP restrictions, these purchases would be between the developer and the consumer.  (Evans Reply ¶ 29.)  In its Opening brief (at 17), Epic provided examples where software developers use different in-app payment processors than that of the provider of the software distribution services.  Epic also pointed to its own experience that there is user demand for in-app payment processing from a provider other than Apple.  (*Id.*) Apple itself provides further examples.  On September 11, 2020, Apple amended its App Store Review Guidelines to liberate from its IAP requirement "app[s] . . . only sold directly by [developers] to organizations or groups for their employees or students" and "app[s that] enable[]

---

[1] In the same vein, to maximize its retaliatory threats to Epic, Apple recently threatened to shut down Sign in with Apple following its termination of the '84 account, potentially leaving hundreds of thousands of Epic users locked out of their accounts.  (Grant Reply ¶¶ 16-25.)

[2] Apple argues that "Epic's defective theory of monopoly maintenance does not provide any legal basis for a preliminary injunction that is independent from its flawed tying theory."  (Opp'n 18.)  If Epic is likely to prevail on monopoly maintenance, the requested injunction would be a partial remedy.  (Opening 12.)

the purchase of realtime person-to-person experiences between two individuals". (Byars Reply Ex. F §§ 3.1.3(c), (d).)  Apple also disclosed that it previously has terminated "over 2,000 [developer] accounts for introducing a non-IAP payment method". (Opp'n 8.)  Clearly, separate demand exists.  Schmalensee ¶¶ 46-54 and Schiller ¶ 45, on which Apple relies to argue that "no demand exists for IAP that is separate from distribution via the App Store" (Opp'n 20), do not rebut the evidence of separate demand.[3]

Apple also argues (Opp'n 20-21 n.19) that the two-sided nature of iOS gives Apple a license to foreclose all competition in the iOS aftermarkets.  But *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2286 (2018), held only that both sides of a two-sided market must be considered, not that all downstream aftermarkets must be considered part of the primary market if the primary market is two-sided.

Here, Epic has shown that Apple ties these two separate products.  Apple's argument that "[t]here is no . . . conditioning here" because "[d]evelopers are free to adopt other business models that do not include in-app digital purchases" (Opp'n 19) is misguided.  Under Apple's rules, the only way to distribute consumer apps on iOS is through the App Store.  The only way to sell in-app digital content on iOS is through IAP (subject to Apple's arbitrary unilaterally determined exceptions).  That is conditioning, and that is a tie.  The fact that some participants who are injured by a monopolist's unlawful acts may leave or decline to enter the market does not absolve the monopolist.  Indeed, that is anti-competitive harm, as Apple's former CEO himself recognized.  (Byars Reply Ex. I (a developer cannot "buy/rent/subscribe from iOS without paying us [Apple], which we acknowledge is prohibitive for many things").)[4]

---

[3] Schmalensee, for example, argues that IAP is not just a payment processing service, but a "system" providing "a safe and secure marketplace". (Schmalensee ¶ 50.)  Yet he ignores that developers choosing other payment processing services where allowed by Apple, such as for the Amazon or Uber iOS apps, demonstrates that separate demand exists.

[4] Apple does not address Epic's argument that Apple's tying affects a not insubstantial amount of commerce in the iOS In-App Payment Processing Market.  (Opening 18-19.)  Apple argues that there is no *per se* tying because it integrates "its StoreKit APIs into the App Store software platform".  (Opp'n 21.)  But Epic has always said that IAP can be one of the options available to iOS developers and users so long as the market is open to competition.  There is no technological reason that developers must integrate StoreKit APIs, rather than the APIs of alternative payment processors.  *Microsoft* did not undo the line of cases that apply the *per se* standard to "contractual ties".  *See United States v. Microsoft Corp.*, 253 F.3d 34, 89-95 (D.C. Cir. 2001).

### 2.      Under the rule of reason, Apple's conduct has anti-competitive effects.

In its Opening brief (at 20), Epic explained how Apple forecloses competition in the iOS In-App Payment Processing Market.  The facts are simple:  Epic offered a competing product with lower prices, and Apple ejected Epic from the market.  Apple now concedes that it has taken similar steps against over 2,000 other developers seeking to introduce competition into the iOS ecosystem.  (Opp'n 8.)  Foreclosure on this scale is clearly anti-competitive.

### 3.      Apple's procompetitive justifications are pretextual.

Apple argues that this undeniable competitive harm is justified by procompetitive benefits.  Apple is wrong.  Apple invokes the word "security" or some variation thereof at least 15 times in its Opposition brief.  (*E.g.*, Opp'n 1, 3, 7-9, 27-30.)  But security cannot justify the complete foreclosure of competition in a huge part of the digital economy.  And security is clearly not the reason for these restrictions.  Apple already allows alternative payment mechanisms for iOS apps that provide real-world goods or services (Byars Reply Ex. F § 3.1.3(e)), enterprise services (*id.* § 3.1.3(c)), or person-to-person experiences (*id.* § 3.1.3(d)).  Likewise Apple does not mandate IAP for digital content purchased on Mac computers.  (Sweeney ¶ 10; Byars Ex. K § 7.)  Thus, IAP plainly is not necessary to maintain the security of Apple devices.

Similarly, Apple's desire to be paid in a particular manner cannot justify its foreclosure of the iOS In-App Payment Processing Market.  (Opp'n 22-23.)  As explained in Epic's Opening brief (at 20-23), Apple is entitled to payment for services that it provides, but it is not entitled to force services onto users and developers when Apple's services are not wanted.  Apple repeatedly points to its investment in "the tools, education, and support services that Apple makes available to developers", including Epic.  (Opp'n 22.)  The fact that Apple makes these tools, education, and support available to developers is not related to the App Store or to public good; Apple undertakes these investments to make the iOS platform more appealing to app developers and users alike.  Apple's CEO has freely acknowledged this, as has one of Apple's experts.  (Opening 21-22 & n.6.)  Apple and Microsoft provide similar tools to developers of macOS and Windows OS applications, even though neither controls the distribution of such

1   applications on PCs.  (*See* Penwarden ¶ 5.)

2        Apple complains that "if the Court were to enjoin one piece of the extant model . . .

3   Apple would have to rework the entire system" and switch to one of the many other potential

4   models that it acknowledges are possible.  (Opp'n 22-23.)  That is exactly the point; Apple

5   should have to change the unlawful portions of its business model.

6        Apple argues that the "spectacular growth" of iOS is proof of the procompetitive benefits

7   of its conduct.  (*Id.* at 22.)  But Apple has done nothing to show that growth is attributable to the

8   conduct at issue—that is, that this growth is the result of Apple's requirement that all consumer

9   app distribution occur through the App Store and that all in-app payment processing for digital

10  content occur through IAP.

11       Finally, Apple argues that the fact that "[o]ther app stores for computing platforms also

12  charge similar commissions, at a similar rate . . . is strong evidence" that Apple's conduct is

13  procompetitive.  (*Id.* at 23.)  Not so.  Google—the other duopolist for smartphone (or tablet)

14  OSs—is able to adopt the same anti-competitive policies Apple has adopted because it is a

15  monopolist in distribution of Android apps.  (*See* Byars Reply Ex. G § 4.5; *id.* Ex. H.)  As for

16  gaming consoles, the comparison is apples and oranges.  Apple does not address the many

17  distinctions Epic has raised between gaming consoles and mobile devices.  (Opening 22 n.7.)

18  And there is a wide diversity of practices among app stores on the open platforms of Windows

19  and macOS PCs (Evans Reply ¶ 12; Sweeney ¶ 10), demonstrating that competition benefits the

20  consumer.  Thus, little can be inferred from adoption of Apple's practices in other contexts.

21  **III.   EPIC WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.**

22       Apple does not dispute that removal of *Fortnite* from the App Store will cause many Epic

23  customers to give up on *Fortnite* and will undermine Epic's ability to create the *Fortnite*

24  metaverse.  Apple does not dispute that cutting off Epic's access to developer tools will cause

25  millions of developers who rely on *Unreal Engine* to question the viability of the engine.

26       Instead, Apple's argument is simply that since Epic changed its *Fortnite* app, Apple

27  should be able to do anything in retaliation.  Apple also complains that Epic publicized the fight

28  to "engender goodwill".  (Opp'n 26.)  Epic's public statements were made to expose to the

public Apple's anti-competitive conduct—which Apple takes pains to conceal.  (Byars Reply Ex. F § 3.1.3.)  In any event, users and developers are blaming Epic for the effects of this fight, with incalculable consequences to Epic's goodwill, reputation, and competitive standing. (Opening 25-29.)  Apple does not grapple with this quintessential evidence of irreparable harm.

This leaves Apple's main argument, that Epic's harm should be ignored because it is self-inflicted.  That argument fails as a matter of law.  In its Opening Brief, Epic discussed the long line of U.S. Supreme Court precedent holding that the law does not penalize, but rather protects, parties that challenge anti-competitive contract provisions, including when that challenge involves non-compliance with the terms of those contracts.  The Supreme Court has said courts should not aid monopolists by enforcing unlawful provisions in contracts, and should not penalize those who, in order to break out of the grip of a monopolist, breach such provisions. These cases are binding precedent that serves the congressional intent of finding ways to ensure that the competitive process maintains vibrancy.  If Epic is correct and Apple is maintaining a monopoly with anti-competitive contract restrictions, the Supreme Court instructs that what Apple characterizes as self-inflicted should be understood as protective of competition.

Apple's attempt to distinguish this line of binding precedents on the basis that they did not involve injunctive relief (Opp'n 25) finds no support in the cases themselves, and is flatly contradicted by Courts of Appeals precedent, cited in Epic's Opening brief (at 24-25), including *Acquaire v. Canada Dry Bottling Co.*, 24 F.3d 401 (2d Cir. 1994).  The *Acquaire* court recognized that if the plaintiffs there chose to "abide by [the] terms" of the defendant's illegal "promotional program", the defendant would not have "withheld product" from them.  *Acquaire*, 24 F.3d at 411.  The *Acquaire* court outright rejected the defendant's argument that the harm to the plaintiffs, caused by their choice to reject the illegal provisions, was "self-inflicted".  *Id.* at 411-12.  Epic was faced with a similar choice:  if it chose, "with a simple keystroke",[5] to capitulate and provide Apple with a compliant version of *Fortnite*, Apple would return *Fortnite*

---

[5] Apple argues that Epic cannot demonstrate irreparable harm because it "can solve its own problems" "with a simple keystroke".  (Opp'n 23-24; *see also id*. at 2.)  This is false, or at least inconsistent with Apple's statements to Epic.  Apple has decreed that it "will deny [Epic's] reapplication to the Apple Developer Program for at least a year".  (Grant Ex. H.)

1    to the App Store and allow Epic to keep its Developer Program accounts.  If it refused, Apple

2    would punish Epic by terminating its accounts, cutting off its access to tools, and more.  Like the

3    *Acquaire* court, this Court should not discount irreparable harm based on the fact that Epic's

4    choice was to take a stand and not abide by Apple's anti-competitive policies.[6]

5    **IV.     THE BALANCE OF HARMS STRONGLY FAVORS EPIC.**

6            Absent relief, the harm to Epic will be significant.  (*See* Section III above.)  By contrast,

7    the parade of horribles Apple claims will occur if the injunction is granted is not credible.

8            Apple already allows many developers to offer direct payment as an alternative to IAP.

9    Apple did not reject Epic's direct payment to protect iOS users—Apple rejected it because it

10   posed a competitive threat.  Epic's refusal to abide by Apple's anti-competitive IAP tie does not

11   provide any support that *Fortnite*, *Unreal Engine*, or any other Epic app for that matter, would

12   become a source of malware.  Apple's entire security threat argument is destroyed by its own

13   practices that allow numerous other developers to offer direct payment.

14           Apple's argument is that there is a possibility Epic's payment service could

15   hypothetically create a future security issue—the "*prospect* that Epic's alternative payment

16   system may compromise [users'] privacy or data security".  (Opp'n 27 (emphasis added).)

17   Apple offers no evidence to support this speculation.  Numerous other developers already offer

18   direct pay safely.  Epic direct pay has been on iOS for over a month.  Apple has used this time to

19   dissect Epic direct pay to look for security threats.  Apple's failure to offer any evidence of such

20   a threat is conclusive.  Apple already allows many payment processors other than IAP for real-

21   world goods or services (Byars Reply Ex. F § 3.1.3(e)), enterprise services (*id.* § 3.1.3(c)), or

22   person-to-person experiences (*id.* § 3.1.3(d)).  Third-party payment processing is not a security

23

24           [6] *Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971), is also on point.  There, the
     defendant attempted to terminate agreements because the plaintiffs had refused to pay certain
25   allegedly anti-competitive franchise fees due under the agreements.  454 F.2d at 364-65.  The
     court reversed the denial of a preliminary injunction because "defendants who are or may be
26   guilty of anticompetitive practices should not be permitted to terminate . . . when such
     terminations would effectuate those practices".  *Id.* at 366; *see also Germon v. Times Mirror Co.*,
27   520 F.2d 786, 788 (9th Cir. 1975) (citing *Milsen*; "A termination might be enjoinable even if
     done pursuant to contract, if the contractual clause . . . foster[s] an unlawful anticompetitive
28   scheme.").  By contrast, none of Apple's cited cases (Opp'n 24) involved a party that refused to
     abide by a contract because the contract was unlawful under the antitrust laws.

1    threat.  Apple opposes Epic direct pay to protect its monopoly.

2           Similarly, restoring *Fortnite* to iOS would not increase the risk of Epic sneaking malware

3    into its apps or the *Unreal Engine* toolset.  (Opp'n 28.)  There is no such risk.  Epic had apps on

4    the App Store for a decade.  *Fortnite* has been on the store for two years.  *Unreal Engine* has

5    powered apps on the App Store for many years.  Epic is a respected, well-established company.

6    Epic's CEO has sworn under oath that Epic does not and will not deal in malware (Sweeney

7    Reply ¶ 26), and Epic would suffer incalculable reputational harm if it tried to sneak in malware.

8    Using the well-established hotfix mechanism to serve a second payment option is not malware.

9    (Grant ¶¶ 16-22.)  If Apple really believed this was a risk, it would not have requested that Epic

10   restore *Fortnite* to the App Store by providing a compliant build.  (*Id.* at Ex. B; Opp'n 12.)

11          Apple would not be harmed by the requested injunction.  Nothing about the requested

12   injunction would limit Apple's ability to terminate accounts (or even developers) that harm users

13   by introducing malware,  hurt security, or compromise privacy.  Instead, the requested injunction

14   would limit only Apple's ability to continue to use its absolute control over its digital platform to

15   instill existential fear in app developers and deter any challenge to its unlawful contractual terms.

16   That is hardly a "harm" that supports Apple's opposition.

17          Apple suggests there is no harm to Epic because of Apple's purported "right to terminate

18   the developer agreements at any time, for any reason . . . for any Epic affiliate".  (Opp'n 24.)

19   But the contracts do not permit Apple to terminate separate entities' *contracts* for their affiliate's

20   breach of a *separate* contract.  Apple's having done this thousands of times in the past is no

21   excuse.  That a contract is "at will" does not suggest Epic would not suffer harm from its

22   termination—or that termination as part of a retaliatory anti-competitive scheme is proper.

23          Importantly, the threatened termination is intended to further Apple's anti-competitive

24   scheme and deter resistance.  As such, it is itself illegal.  The law imposes a duty to deal on a

25   monopolist like Apple "when (1) it unilaterally terminates a voluntary and profitable course of

26   dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order

27   to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to

28   deal involves products that the defendant already sells in the existing market to other similarly

situated customers".  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 994-95 (9th Cir. 2020) (internal

quotations and alterations omitted).  Here, Apple is attempting unilaterally to terminate voluntary

and profitable contacts, with the express purpose of eliminating competition, denying Epic

accounts and developer tools that Apple "makes . . . available" to all developers.  (Opp'n 5-6.)

## V.     EPIC'S REQUESTED RELIEF WOULD FURTHER THE PUBLIC INTEREST.

Countless *Fortnite* users and developers who rely on *Unreal Engine* are collateral

damage to Apple's collective punishment.  (*See* Section III; Opening 25-29; Byars Ex. R-S.)

Apple does not dispute that harm to these users and developers is against the public interest.

Instead, Apple argues that "an injunction would contravene the public's 'strong interest

in holding private parties to their agreement[]'".  (Opp'n 29.)  But that principle applies only to

lawful agreements, as Apple's cited case recognizes.  *See S. Glazer's Distribs. of Ohio, LLC v.

Great Lakes Brewing Co.*, 860 F.3d 844, 853-54 (6th Cir. 2017) ("The public . . . has an *interest

in enforcing the [law]*," and that "*[b]ecause there is no conflict* [between the contract and the

law], the public's interest in enforcing private contracts weighs against the injunction"

(emphases added)).[7]  This case is not about enforcing lawful private contracts.  The contractual

provisions on which Apple relies and against which Epic has taken a stand are unlawful.  Apple

does not dispute that enforcement of the antitrust laws furthers the public interest.  (*See* Opening

at 23-25.)  "Where the contractual right is alleged to violate the antitrust laws, the public interest

in antitrust enforcement and preservation of competition outweighs the interest in freedom of

contract."  *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 n.143 (S.D.N.Y. 2017).

Apple's suggestion that an injunction would place other App Store developers at a

competitive disadvantage vis-à-vis Epic is likewise meritless.  (Opp'n 29.)  Apple's sudden

concern about equity and the concern that some app developers would "be forced to subsidize

the tools that allow Epic to succeed" rings hollow given Apple's repeated assertion that over

80% of app developers pay nothing for those tools; presumably, in Apple's view, they are

"subsidized" by those who do.  Nor is it true that an injunction somehow would lead developers

to feel free to "compromise" users' data.  The requested injunction would not prevent Apple

---

[7] Apple's other cited cases do not involve allegations of unlawful contracts.  (Opp'n 29.)

from enforcing rules that actually pertain to security or privacy.  All it would do is prevent Apple from retaliating against Epic for one thing only—the introduction of competition to IAP.

Apple's attempt to downplay the harm it inflicts on users of *Fortnite* and *Unreal Engine* is also unpersuasive.  (Opp'n 9-10, 30.)  *Fortnite* is a forum for shared experiences, including concerts, movies, roundtables, and gaming.  For the intensely social experience that *Fortnite* offers, the loss of even 10% of users impacts the entire *Fortnite* community.  Estranging all iOS users has resulted in manifold more disrupted connections that affect non-iOS friends and family who keenly feel the loss, and undermines Epic's ability to reach the crucial mass necessary to achieve the metaverse.  (Sweeney ¶¶ 3, 24.)  Contrary to Apple's statement that "Unreal Engine . . . is used by a minuscule fraction of iPhone apps" (Opp'n 30), Apple's own witness testified that "Unreal Engine is a popular development engine used by many developers on iOS and other platforms."  (Schmid ¶ 20.)  *Unreal Engine* has a community of 11 million developers worldwide (Penwarden ¶ 2), and is used to develop some of the most popular games on the App Store.  (Penwarden ¶ 4; Sweeney ¶ 30.)  Apple's claim that its retaliation against *Unreal Engine* would not harm developers because of the availability of *Unity*, an *Unreal Engine* competitor, is false.  *Unreal Engine* developers have put time and resources into projects reliant on *Unreal Engine*, and moving away would cause them significant harm.  (Sweeney Reply ¶ 29.)  And the removal from the market of one out of two primary engines currently available to developers would likewise harm developers for years to come.  (*Id.* ¶¶ 29-30; Penwarden ¶ 10.)

Finally, in this context as well, Apple argues that the public harm is of Epic's making. That is not the case, for all the reasons cited above.  Epic properly refused to abide by unlawful agreements.  It is Apple that removed *Fortnite* from the App Store. It is Apple that threatened to terminate access to tools used by other Epic businesses, including *Unreal Engine*.  It is Apple that threatened to terminate agreements that were not breached governing accounts and apps that have nothing to do with *Fortnite*.  Therefore, it is Apple that should be enjoined to prevent the harm to third parties relying on *Fortnite* and other Epic businesses, including *Unreal Engine*.

Dated: September 18, 2020

Respectfully submitted,

By:  _/s/_  _Katherine B. Forrest_

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff*
**EPIC GAMES, INC.**