*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Motion for Preliminary** |
| | ) | **Injunction** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1 - 103 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, September 28, 2020 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

APPEARANCES:

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                  BY:   GARY A. BORNSTEIN,
                        KATHERINE B. FORREST, ATTORNEYS AT LAW


For Defendant:          Gibson, Dunn & Crutcher LLP
                        333 South Grand Avenue
                        Los Angeles, California  90071
                  BY:   THEODORE J. BOUTROUS, JR.,
                        RICHARD J. DOREN, ATTORNEYS AT LAW


Reported By:       Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1   Monday, September 28, 2020                        9:24 a.m.
 2                    P R O C E E D I N G S
 3                      (Zoom webinar)
 4        THE CLERK:  I'm going to go ahead and read the
 5   admonition here.
 6        This is the courtroom clerk.  Persons granted remote
 7   access to proceedings are reminded of the general prohibition
 8   against photographing, recording, and rebroadcasting of court
 9   proceedings.  See General Order 58 at Paragraph 3.
10        Any recording of a court proceeding, including screen
11   shots or other visual copying is absolutely prohibited.
12   Persons violating these prohibitions will face sanctions
13   including removal of media credentials or denial or
14   restriction of entry to future hearings.
15        Thank you.
16        THE COURT:  Okay.  Good morning, everyone.
17        MS. FORREST:  Good morning, Your Honor.
18        THE COURT:  Let's go ahead and call the case.  I know
19   it's early.  It's 9:24.  But at this point, we've maxed out on
20   our license, and so no one else -- we can't wait.  Even if we
21   were waiting for anybody else, it wouldn't matter because
22   we've maxed out.
23        All right.  So let's go ahead and call the case, and we'll
24   get started.
25        Ms. Stone.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **THE CLERK:**  Calling civil action 20-5640, Epic Games,

2     Inc., versus Apple, Inc.

3        And, counsel, please state your appearances.

4          **MS. FORREST:**  Katherine Forrest for Epic.  Good

5     morning, Your Honor.

6          **THE COURT:**  Good morning.

7          **MR. BORNSTEIN:**  Gary Bornstein also for Epic Games.

8          **THE COURT:**  Morning.

9          **MR. BOUTROUS:**  Good morning, Your Honor.  Theodore

10    Boutrous for Apple.

11         **THE COURT:**  Okay.  Good morning.

12         **MR. DOREN:**  And good morning.  Richard Doren for

13    Apple.

14         **THE COURT:**  Okay.  Good morning.

15       So just a few things -- preliminaries, especially for

16    those folks who are watching.  We have a lot of people who

17    always want to raise their hands, and it doesn't matter.

18    We're not going to call on you.  So you should just know that

19    you can raise your hands -- think about where you are as if

20    you were in a courtroom sitting in the gallery.  We just don't

21    let you talk.  You're not admitted to the bar.  You're not

22    representing the parties.

23       This is a -- well, it's a court hearing.  And so at a

24    court hearing, we have people who are designated to speak.

25    There are actually lots of lawyers on each side, and I advised

1    all the lawyers that I was only interested in having on the

2    platform those who were going to argue.

3        I understand for the plaintiffs, Mr. Bornstein, you're

4    going to be arguing likelihood of success on the merits, and,

5    Ms. Forrest, you'll be arguing everything else.

6            **MS. FORREST:**  That's correct.

7            **THE COURT:**  And then with respect to defense,

8    Mr. Doren, you will be speaking to likelihood of success on

9    the merits, and Mr. Boutrous everything else.

10           **MR. BOUTROUS:**  Correct, Your Honor.

11           **MR. DOREN:**  And I'll also be handling the scheduling

12   issues when Your Honor reaches those.

13           **THE COURT:**  Oh, okay.  That's good to know.

14       Let me just say I have -- I've read all the papers.  I

15   have a number of questions.  Unlike the Court of Appeal, you

16   know, you aren't going to get 15 minutes a side and that's it.

17   This is going to be a long hearing.  We are going to talk

18   about many issues.

19       But I really am not interested in you regurgitating what

20   I've read in the papers because I've read the papers.  I'm

21   more interested in what you didn't respond to, what -- points

22   that the other side made that perhaps are not your strongest

23   points and so you avoided the issue.  I'd like to know, if

24   anything, what you have to say on those topics, and we'll go

25   through them all.

1      Hopefully, Mr. Doren has done a little practicing so he's

2   watching the screen and he gets my physical gestures to warn

3   you to stop, so stop so that I don't mute you because we're

4   going to be here for hours, I suspect.  And once in a while,

5   if I start hearing the same things over and over again, I --

6   and you don't listen or you don't look and you don't notice

7   that I'm trying to get to you stop, I'll mute you.

8      If we were in the courtroom, I could do that, and my court

9   reporter would pick up what I have to say as opposed to what

10   you have to say.  It's a little bit more difficult on Zoom

11   because someone actually has the platform.  But I do have a

12   control, so -- I hope not to do that, but please pay

13   attention.

14      And I suspect that you'll end up repeating some of what

15   you say, but really try to avoid it because I've already read

16   it and there are lots of big issues here and I'd like to hear

17   what you have to say on some of the things you didn't talk

18   about.

19      Let's first talk about, though, some of the issues that

20   were raised in your joint statement.  This is Docket 91.

21      Ms. Forrest, can you tell me why Epic hasn't responded to

22   the subpoenas in the related cases and hasn't produced

23   documents, especially given the fact that it's now trying to

24   push forward something that's the exact same topics yet it's

25   been -- it appears to be somewhat recalcitrant in the other

```
 1    case.

 2          MS. FORREST:  Yes, Your Honor.  Thank you.

 3       We -- at the time that we were on the verge of really

 4    beginning production for the subpoena, we were also on the

 5    verge of filing this case and we expected that, in fact, there

 6    would be some sort of efficiencies to be gained and some

 7    coordination with certain of the discovery.  So we did not

 8    produce then but are fully prepared to produce with alacrity

 9    right now quite fulsomely in those cases.  And so it was a

10    timing issue, Your Honor, having to do with the commencement

11    of this litigation.

12          THE COURT:  Well, Apple's already produced, so I find

13    it to be convenient for you, not convenient for anybody else.

14    So you will produce if -- are you ready to produce?

15          MS. FORREST:  Your Honor, we are ready to make a

16    significant production.  And one thing that would be of

17    assistance to us in terms of moving forward generally would be

18    to understand exactly what's been produced in those cases

19    generally.  We haven't yet been able to receive information on

20    that.

21          THE COURT:  Ms. Forrest, I don't see how that's

22    relevant to your own production.  How is that relevant?

23          MS. FORREST:  Your Honor, that's -- it's really a

24    separate point.  You're absolutely right.

25       We will make production with alacrity on the materials
```

1   that have been requested of us.

2        **THE COURT:**  Are the documents ready?  Can you produce

3   this week?

4        **MS. FORREST:**  We cannot produce this week, but we can

5   produce next week.  And the reason I say that, Your Honor, is

6   because we've got -- we have a holiday today, and there's also

7   some additional matters that are sort of coming up over the

8   next couple of days, and it's -- but we can produce as early

9   next week as possible.

10        **THE COURT:**  All right.  Who's talking about these

11   issues for Apple?  Mr. Doren?

12        **MR. DOREN:**  Yes, Your Honor.

13        **THE COURT:**  Have you had any discussions with them?

14   Is this news to you?  Is this expected?

15        **MR. DOREN:**  We've -- we've had discussions with them

16   about when their production could begin, and they have assured

17   us that documents would be coming soon.

18        **THE COURT:**  I want a date certain, Ms. Forrest.

19   Wednesday of next week?  Monday of next week?  Tuesday of next

20   week?

21        **MS. FORREST:**  Wednesday of next week, Your Honor.

22        **THE COURT:**  All right.  Production to occur by

23   Wednesday of next week.

24    By this Thursday, October 1, I want a protective order in

25   this case to be lodged with the court so that I can issue it.

1    That protective order should -- you're welcome to negotiate it

2    if you want, but the Northern District's protective order is

3    sufficient.  The only thing you have to change is the

4    provision with respect to discovery.  It should be consistent

5    with my standing order.  If you want to change anything,

6    that's fine as long as you agree.  If not, use the Northern

7    District form.  Okay?  By this Thursday.

8            **MS. FORREST:**  Understood.

9            **THE COURT:**  Because we are moving forward quickly,

10   there will be no amendments to pleadings without good cause

11   and only upon motion.

12       We have Apple's counterclaims -- I don't think anybody has

13   any need to -- to amend the pleadings, right?

14           **MS. FORREST:**  We don't intend to amend, Your Honor.

15           **MR. DOREN:**  Correct, Your Honor.

16           **THE COURT:**  All right.

17       All right.  I've got some other things, but we'll deal

18   with them later.

19       Let's start with likelihood of success on the merits.  In

20   your briefing, you both -- you both identify elements, and I

21   don't think that there is any material difference.  But just

22   to be -- just to confirm, I just want to make sure that we're

23   on the same page.

24       With respect -- let's start with Section 2 of the Sherman

25   Act.  So to establish liability under the Sherman Act, a

1    plaintiff must show the possession of a monopoly power in the

2    relevant market, the willful acquisition of that maintenance

3    of power, and under *Qualcomm*, which was cited by plaintiffs,

4    they indicate a -- antitrust injury.  Seems not controversial.

5        Right, Mr. Doren?

6            **MR. DOREN:**  Yes, Your Honor.

7            **THE COURT:**  So you agree that that's an element?

8            **MR. DOREN:**  Antitrust injury, yes.

9            **THE COURT:**  Yes.

10       Because in your recitation of the elements, you didn't

11   include that, but you did include the additional phrase from

12   *U.S. v. Grinnell*, quote, as distinguished from growth -- that

13   is, the acquisition or maintenance of monopoly power "as

14   distinguished from growth of development as a consequence of

15   superior product, business acumen, or historic accident."

16       Again, this is context.  I don't think it's necessarily an

17   element, but I don't think it's wrong in terms of the law.

18       Mr. Bornstein, you agree?

19           **MR. BORNSTEIN:**  I do agree.

20           **THE COURT:**  All right.  So even those were different,

21   there's really no material issue.

22       I think everybody can also probably agree it is a

23   threshold step in any antitrust case to accurately define the

24   relevant market.  And that is the area of effective

25   competition.  Correct?  We all agree on that fundamental

```
 1    proposition.

 2        Mr. Bornstein?

 3            MR. BORNSTEIN:  Yes, Your Honor.  Of course.

 4            THE COURT:  Mr. Doren?

 5            MR. DOREN:  Yes, Your Honor.

 6            THE COURT:  And that's really where they say the

 7    rubber meets the road, right?  The relevant market.

 8            MR. DOREN:  Indeed.

 9            THE COURT:  And it's clearly where I have the most

10    questions, is the relevant market.  So let's start there.

11        I am curious, Mr. Bornstein.  It seems to me that -- let's

12    start with the -- with one.  You've got two.  You've

13    identified two relevant markets, but the first that you've

14    identified is the market for the distribution of apps

15    compatible with IOS users of mobile -- of mobile devices.  And

16    you refer to that is the "IOS app distribution market," which

17    is, as we know, a single-product market.  Right?

18            MR. BORNSTEIN:  That is correct, Your Honor.

19    Single-product aftermarket, to be precise.

20            THE COURT:  A single -- right.  So that's my first

21    question, which is why is it that nowhere in your expert's

22    declarations, and he submitted two, does he ever describe this

23    as an "aftermarket," and why doesn't he ever go through the

24    factors that we as courts have to consider in determining

25    whether an aftermarket exists?
```

1          **MR. BORNSTEIN:**  Well, Your Honor, I -- Mr. -- excuse

2     me.  Dr. Evans doesn't use the word "aftermarket," but the

3     concept is there for sure.  And I would disagree as well that

4     he doesn't touch the factors, if I could explain.

5          When I say "the concept is there," he talks about how app

6     distribution is downstream from the software platform, from

7     the IOS smartphone software platform.

8          **THE COURT:**  Have you asked him -- I mean, the concept

9     of an aftermarket is a very -- is a very known, common,

10    description of what we're dealing with.

11         Why doesn't he use that term?

12         **MR. BORNSTEIN:**  Your Honor, I can't say why he

13    doesn't use the specific word "aftermarket," but I would

14    submit that it doesn't make a difference whether he used the

15    specific term given that the concept is there I believe in

16    spades.  And --

17         **THE COURT:**  All right.  So I've got his -- I've got

18    his declarations.  We're talking about Docket 62 and Docket

19    88.  Where does he describe the elements of an aftermarket?

20    I'd like paragraph numbers, please.

21         **MR. BORNSTEIN:**  Sure, Your Honor.

22         So I would start by just pointing the court in his initial

23    declaration, Docket number 62, to the description of stores

24    that begins on Paragraph 9, which he makes very clear are

25    downstream products from the software platform.  He then

1    turns, Your Honor, in the discussion of market power in the

2    platform to the switching costs and the information costs

3    which are important components of the *Newcal* test in assessing

4    a single-product market.

5        I would clarify that in *Newcal*, there is a difference

6    between whether something is an aftermarket and whether there

7    is a properly defined single-product market.

8        In order to a properly defined single-product market, you

9    need, to have the aftermarket and then also the switching cost

10   or information costs and other items that are defined and

11   described in *Newcal*.

12       To get to the aftermarket question, it's just the first of

13   the *Newcal* factors, which is whether the market at issue --

14   here, at distribution -- is wholly derivative of the primary

15   market -- here, the software platform.

16       And Dr. Evans makes clear in the declaration in the

17   sections that I referenced -- and I think, frankly, common

18   sense tells us the same thing -- that the distribution of

19   apps on the IOS is wholly derivative of the IOS platform

20   itself.

21       *Newcal*, for example, distinguished the Third Circuit

22   decision in *Queen City Pizza*, where there was no properly

23   defined single-brand market.  That was a case -- *Queen City*

24   *Pizza* was a case where they were Dominos Pizza franchisees who

25   were bringing suit.  And the court said, wait a minute.

1    The -- the purchase of ingredients for Dominos Pizza is not

2    wholly derivative of the Dominos franchise.  You can make a

3    pizza at home.  You can make a pizza in other stores.

4         You can't make an IOS app distribution, and you can't

5    distribute on IOS separately from the platform itself.  It is

6    wholly derivative under *Newcal*, and, therefore, constitutes an

7    aftermarket.

8         And Dr. Evans does --

9              **THE COURT:**  Well, it's --

10             **MR. BORNSTEIN:**  -- make clear that it's downstream.

11             **THE COURT:**  But, Mr. Bornstein, you've created -- in

12   many ways, you've created a fail-safe definition, right?

13   If -- because it is a single-product definition, then by

14   definition, they have a monopoly.

15             **MR. BORNSTEIN:**  Well, I disagree with that, Your

16   Honor.  They have a monopoly only because they've engaged in

17   conduct that prohibits competition in that market.

18        If, for example, there were other stores allowed on the

19   IOS platform, then there would be competition in that

20   single-brand market.

21        *Newcal* was the same.  It was a situation where there was a

22   single-brand market, but the independent service operators who

23   were seeking to service the -- the copiers, the IKON copiers

24   in that case, were seeking to compete with respect to that

25   market.

```
 1         And, Your Honor, I'll interrupt myself just for a second

 2    to say I don't see the court on video.  That's fine if Your

 3    Honor has intentionally taken yourself off.  I just want to

 4    make sure we haven't lost the court.

 5         Okay.  I was worried we might have lost you.

 6              THE COURT:  No, my mistake.

 7              MR. BORNSTEIN:  Okay.  No -- no problem.

 8         And so you can have a single-brand market in which there

 9    is not a monopoly if the monopolist is not prohibiting

10    competition in that market.

11         And the -- the Kodak case in the Supreme Court is a good

12    example as is Newcal itself, where there was a proper --

13              THE COURT:  Okay.  So let's go back to the elements.

14    Let's go back to the elements.

15         So you have switching costs.  What else do you have?

16              MR. BORNSTEIN:  So in Newcal, there are four -- four

17    factors that the Ninth Circuit considered.  The first one is

18    that the market be wholly derivative of the primary market,

19    and I've talked about that at length and won't go through it

20    again unless the court has further questions.

21         The -- the second one is that the restraints at issue

22    occur only in the aftermarket and not in the primary market.

23    And that's satisfied here.  We are challenging restraints that

24    occur with respect to distribution and restraints that occur

25    with respect to payment processing.  And we are not
```

```
 1    challenging restraints that are applied at the software

 2    platform level, which is the primary market.

 3              THE COURT:  Can I --

 4         MR. BORNSTEIN:  The --

 5         THE COURT:  -- Mr. Bornstein, to interlace the

 6    paragraphs of the expert's report.

 7         MR. BORNSTEIN:  Well, the -- the second factor, Your

 8    Honor, I would say is not a matter that he discussed.  It's

 9    not an economic question.  The second factor is one that asks

10    what are the restraints that the plaintiff is challenging.

11    And I would submit we don't need economic evidence to describe

12    the nature of our claims and the nature of the -- the specific

13    markets in which the restraints occur, so I don't have a -- a

14    place --

15         THE COURT:  You can --

16         MR. BORNSTEIN:  -- to point for that one.

17         THE COURT:  Speaking of which, did he define the

18    market, or did you?  That is --

19                   (Simultaneous colloquy.)

20         THE COURT:  -- did the lawyers define the market, or

21    did you go to Dr. Evans and say, "We have this issue.  We'd

22    like to you take a look at it," and did he come up with this

23    economic argument himself?

24         MR. BORNSTEIN:  Yes, Your Honor.  We had a discussion

25    with Dr. Evans about the issues in the case.  We were speaking
```

1  to him before the complaint was filed.  And he has his

2  independent views on the market at issue, which he -- he's

3  very careful, in fact, Your Honor, in his declaration to say

4  that based on his analysis so far, he's reached a preliminary

5  conclusion as to the definition of the market, and he is

6  continuing --

7          **THE COURT:**  Well --

8          **MR. BORNSTEIN:**  -- to -- to do work as the case

9  proceeds and he gets more information.

10         **THE COURT:**  The reason I asked was because his

11 declaration raised the question.  That is, his declaration

12 indicated that the -- that counsel asked him to address these

13 issues as opposed to --

14     Well, you've answered the question.  It's fine.  I just --

15 the way he framed the analysis suggested to me that it --

16 there was this potential that the lawyers had framed the

17 market not the expert.

18         **MR. BORNSTEIN:**  No, and -- Dr. -- Dr. Evans

19 reputation would not permit him to just take a -- a market

20 that was thrust on him by -- by counsel, and we wouldn't do

21 that with him and ask him to put his name on the line if he

22 didn't believe -- in -- in the argument that he was developing

23 and presenting to the court.

24         **THE COURT:**  And does he have any reservations about

25 the ability of either Professor Hitt or Professor

1    Schmanslee's -- I don't know if I'm saying that right.

2               **MR. BORNSTEIN:**  It's Schmalensee, Your Honor.

3               **THE COURT:**  Schmalensee.

4        -- to opine on the topics in terms of their expertise?

5               **MR. BORNSTEIN:**  Dr. Evans certainly has no

6    reservations about Professor Schmalensee.  The two of them

7    have coauthored several books together, so I think there is a

8    great deal of mutual respect between the two of them, and I

9    expect that Mr. Doren would say the same about Professor

10   Schmalensee's view of Dr. Evans.

11       Mr. -- or Professor Hitt, I believe is the right way to

12   refer to him, is, as I understand it, not someone who has an

13   economics degree.  He's a professor of management and has a

14   Ph.D. in management.  But I do not know one way or the other

15   whether Dr. Evans has a view on the competency of

16   Professor Hitt.

17               **THE COURT:**  Okay.

18               **MR. BORNSTEIN:**  He has a view on the opinions that

19   he's expressed.

20               **THE COURT:**  And they disagree.

21               **MR. BORNSTEIN:**  They do, Your Honor.

22               **THE COURT:**  They do disagree, which just highlights

23   the fact that between the University of Chicago professor and

24   the MIT professor, we have a disagreement over what the

25   relevant market is, right?  So this is not something that is

```
 1    without debate within the community.

 2        You would agree with that.

 3        MR. BORNSTEIN:  Well, I agree that there are people

 4    on both sides, but I would say, Your Honor, that the test that

 5    Professor Hitt applied is just not the right test under the

 6    law.

 7        Under the law, we look to a hypothetical monopolist test

 8    to assess whether or not a monopolist in the market that is

 9    being assessed could impose a SSNIP, S-S-N-I-P, small but

10    significant nontransitory increase in price.  That is the

11    recognized test under the case law and under the guidelines

12    that are applied by the Department of Justice and the FTC.

13        And Professor Hitt didn't do that test.  He acknowledged

14    in Paragraph 17 of his declaration that it is the right test,

15    but then he failed to apply it.  What he did is he looked to

16    see whether there are other alternative distribution paths for

17    Epic to get Fortnite out to people who want to play the game.

18    That's not the test.

19        That would be like saying, that there's no -- there is not

20    a market for ridesharing and taxis if people can also walk or

21    bike or get a friend to drive them or take public transport.

22        What you need to do is not just assess whether or not

23    there are any alternatives.  You need to assess whether or not

24    the alternatives impose some kind of competitive discipline in

25    the market that's being proposed.  And that's what the
```

1   hypothetical monopolist test or the SSNIP test is intended to

2   do.

3       And Dr. Evans --

4           **THE COURT:**  -- go back to the -- let's go back to the

5   aftermarket.  You want to finish that up.

6           **MR. BORNSTEIN:**  Sure, Your Honor.  So I covered one

7   and two.  The third factor in *Newcal* is whether or not the

8   power that's at issue derives from express contractual

9   agreements that were reached in the primary market.

10      So here, there are no such contractual agreements in the

11  primary market between the users of the IOS platform and --

12  and Apple, that they will only download apps in certain ways.

13  The -- and Apple has not argued to the contrary in its papers

14  about any contracts between users and Apple.

15          **THE COURT:**  But there are contracts --

16                  (Simultaneous colloquy.)

17          **THE COURT:**  There are contracts.  There are licensing

18  agreements between the plaintiffs and Apple.

19          **MR. BORNSTEIN:**  That's correct, Your Honor.  There

20  are contracts between the developers and Apple, for sure.

21      But the relevant question in assessing the third factor of

22  *Newcal* is whether or not the users have signed on to a

23  contract or whether, instead, the power that Apple has over

24  the users derives from their access to -- to the consumers.

25  The -- the court in *Newcal* talked about special access to

1    consumers that derives from the relationship that in -- in

2    that case IKON had with the people who bought the copiers.

3        Here, the -- the information cost and switching cost and

4    so forth that I will talk about in the fourth factor in a

5    moment -- those all derive from the relationship that Apple

6    has with its users and not from any particular contractual

7    commitment on the part of the users to -- to limit their --

8    their -- their access to apps on the platform.

9        And so the -- the fourth factor, as we've talked about a

10   bit and I can probably go through it more briefly, is in some

11   sense, the most important, and it is whether competition in

12   the primary market for the software smartphone -- smartphone

13   software platform, whether competition in that primary market

14   imposes competitive discipline in the aftermarket.

15       So to put it in less antitrusty [phonetic] words and more

16   English words, does competition to sell iPhones or iPads

17   impose any discipline on Apple's conduct in the aftermarket.

18   And this is the subject that Dr. Evans talks about at length

19   where he talks about the switching costs and the information

20   costs that people face.

21       And, frankly, another -- very important factor is the

22   relative costs associated with the two things.  An iPhone

23   is --

24           THE COURT:  Where -- where does the video game market

25   come into play?  You seem to ignore that entirely.  And the

1    Sherman Act is concerned about competition, right?  It doesn't

2    care about Epic Games specifically.  It cares about

3    competition because through competition we get innovation,

4    consumers are -- certainly benefited from that.  And if we

5    look at the video game industry, of which your client is a

6    part, the 30 percent of which you complain seems to be the

7    industry rate, right?

8        Steam charges 30 percent.  Microsoft 30 percent.  GOG,

9    30 percent.  If you could go to console stores, Playstation,

10   XBox, Nintendo all charge 30 percent.  Physical stores, Game

11   Shop, Amazon, Best Buy, Wal-Mart all charge 30 percent.  Apple

12   and Google charge 30 percent.

13       Now, your client doesn't.  Okay.  Fine.  But where is

14   the -- where is the lack of competition where -- that which

15   you're complaining is -- seems to be what all the competitors

16   are charging?

17           **MR. BORNSTEIN:**  So the -- if I could try to tease out

18   two issues that Your Honor raised in the question, and if --

19   if you want me to respond to the other one, I'll switch, but I

20   am trying to be responsive to both.  The first is you asked

21   about the video game market, which I would submit is not the

22   market that's at issue here.  We have a market for

23   apps broadly on the -- on the iPhone.

24       With respect to the specific point about the 30 percent --

25           **THE COURT:**  But why -- why do you say that?

```
 1              MR. BORNSTEIN:   Sure.  I -- I say that, Your Honor,

 2      because --

 3                        (Simultaneous colloquy.)

 4              THE COURT:   And the reason in part I'm asking is

 5      because at least from what I've read, 84 percent of all

 6      apps on the iPhone are free.  Your client complains bitterly

 7      about the 30 percent in his market, which is video game apps.

 8          So I looked at percentages of licensing fees or whatever

 9      you want to call it -- he calls it a tax -- but for -- for

10      video games.  So you -- and it's all 30 percent, and you just

11      want to gloss over it.  You don't want to address it.  You

12      just say it's not it.

13          So why?

14              MR. BORNSTEIN:   Well, what I -- what I want to make

15      very clear, Your Honor, is we don't actually challenge

16      specifically the 30 percent.  The 30 percent is an outcome of

17      the anti-competitive structure that we do challenge.  We would

18      like to be able to distribute directly on the iPhone ourselves

19      without going through the app store.

20          We would like to be able to process payments ourselves on

21      the iPhone without going through the App Store.  We don't have

22      a number that we are advancing that the court, for example,

23      should conclude is the right number.  I -- I would agree with

24      my friends that is not really the role of an antitrust court

25      to pick a price and set a number.
```

1        The issue we're concerned about here is the structure in

2   which there is no competition, and 30 percent is selected

3   entirely by Apple without any competitive constraint from

4   other distribution --

5        **THE COURT:**  Mr. Bornstein, you say that, but the

6   evidence in that market doesn't support your blanket

7   assertion.  That's my point of referencing the rest of that --

8   the rest of the players in that market, is that there -- there

9   doesn't seem to be evidence to support what you're saying.

10       **MR. BORNSTEIN:**  Well, Your Honor, there are two

11  things here.  This is why I started earlier about referring to

12  the proper -- the proper market.  The -- the market that is at

13  issue here, in our view, is not all of the different ways that

14  somebody can reach a user to play a video game.  That's not

15  the right market.

16       As Your Honor said at the beginning, the -- the market

17  definition is obviously an important part of the dispute here.

18  And we're going to, I assume, continue talking about this

19  through the rest of -- of this litigation.  But in order to

20  assess what the right market is, the court needs to assess

21  whether these alternatives impose a competitive constraint on

22  what Apple can do in distributing apps.

23       And I think it's clear that they -- that those markets

24  cannot.  You can't, for example, play an XBox when you are,

25  you know, on a bus.  You can't --

1          **THE COURT:**  No, but you can play -- but you can play

2     a Switch, which you buy from Nintendo, right?

3          **MR. BORNSTEIN:**  You can play a Switch, but there are,

4     as Your Honor has seen in the papers, 63 percent of iPhone --

5     excuse me -- IOS users who play Fortnite play only on -- on

6     IOS.

7          Most people don't have multiple devices to go out and buy

8     a gaming console or -- or a separate gaming PC.  And certainly

9     they don't multi-palm in terms of using two different mobile

10    devices, an Android device and an iPhone device.

11         And what I think should weigh into Your Honor's

12    consideration of this 30 percent and whether there is evidence

13    that it is the product of an anti-competitive structure is the

14    staggering opposition in the marketplace to this 30 percent.

15    It's not just Epic who is complaining.  It is the industry at

16    large that is complaining about the 30 percent that Apple

17    charges.

18         And there -- there is no doubt I would -- I would say that

19    competition for the distribution of apps has been prevented

20    completely on IOS.

21         If it turns out, Your Honor, that after the opening of

22    iPhone and the opportunity for people like Epic to do direct

23    distribution -- if it turns out at that point that Apple is

24    providing a service that is worth 30 percent and people will

25    pay it in order to get what Apple is providing, God bless

 1  them.  That's fine.  They are entitled to charge 30 percent if

 2  they can get it in a competitive market.

 3      Our concern is there is no competitive market right now,

 4  and there is no constraint on what they can charge.

 5          **THE COURT:**  All right.  Anything else on *Newcal*?

 6          **MR. BORNSTEIN:**  No, Your Honor.  I'll just point out

 7  the other -- another important factor on whether there is a

 8  competitive constraint is just what Your Honor was talking

 9  about, specifically Google also charges 30 percent.

10      In -- in the primary market, this is a duopoly between

11  Android and IOS.  And there is no option for people who would

12  like to go a different place.  So that, to my mind, is another

13  reason why the primary market is -- is not a source of

14  competitive constraint for Apple's conduct in the aftermarket.

15          **THE COURT:**  Mr. Doren, a response.

16          **MR. DOREN:**  Thank you, Your Honor.

17      First of all, I guess I'll -- I'll begin where the court

18  did with Mr. Bornstein, which is the single market --

19  single-brand market.  Your Honor, of course, correctly notes

20  that this is something of a unicorn in antitrust law and --

21  and a very specific thing.

22      Judge Alsup in the *Psystar* litigation explained that it's

23  counterintuitive that any product is so unique that it suffers

24  no actual or potential competitors.

25      This case does not fit the -- you know, the narrow

1    exceptions created by *Kodak* and *Newcal*.   There are two

2    fundamental differences.   In both of those cases, the

3    plaintiffs were locked in to dealing only with Kodak and using

4    Kodak parts exclusively and using Kodak repair personnel

5    exclusively.   And in *Newcal*, there was an extension of service

6    contracts after there had been those -- those plaintiffs had

7    been locked in to dealing exclusively with *Newcal*.

8        So first of all, to fit the *Kodak* or *Newcal* exceptions to

9    the general rule that there's no such thing as a single-brand

10   market in the antitrust context, the -- the developer here, in

11   this case, must be locked in.   But, Your Honor, obviously has

12   the record well in hand and knows that there are many channels

13   of distribution available to Epic to distribute Fortnite.

14       And while Mr. Bornstein referenced a 63-million-person

15   figure, in that same Paragraph 3 of Mr. Sweeney's declaration,

16   he explains that only 10 percent of the average daily players

17   of Fortnite are using IOS devices, meaning that 90 percent on

18   any average day -- 90 percent of the people who are playing

19   Fortnite are using a device other than IOS.

20       We also know, Your Honor, that Fortnite is based on, and

21   Epic's business model is premised on, interchangeability of

22   platforms.   They urge people to use various platforms.   And

23   while Mr. Bornstein has asserted that not everyone has

24   separate -- excuse me -- that not everyone has separate -- or

25   -- or multiple devices, there's no evidence in the record on

 1    that.

 2         And -- and instead when we talk about those who have

 3    accessed -- accessed Fortnite by -- by one device, that does

 4    not tell us how many people are actually regular players on

 5    it.  And there we see it is simply 10 percent.

 6         So first of all, Your Honor, there's substantial

 7    interchangeability.  Epic uses that as one of its basic

 8    promotional properties, that people can -- can go on different

 9    devices and continue to play; that they can make purchases on

10    one device and then go to another device and continue to use

11    it; and 90 percent of the daily players are using other

12    devices.

13         Secondly and equally importantly, both *Kodak* and *Newcal*

14    involved a -- once the person was locked in, there was an

15    undisclosed change of terms that impacted the plaintiffs in a

16    negative way.  In *Kodak*, the exclusivity of dealing

17    exclusively with Kodak parts was interposed after the contract

18    had been entered.  In *Newcal*, the extension of the service

19    contracts occurred after they were already locked in with

20    Newcal.

21         And Epic has side cited to Judge Orrick's descript- --

22    decision in the *Teradata* case on tying generally.  But at

23    page 16, Judge Orrick also comments on *Kodak*.  And he says,

24    that the Supreme Court in *Kodak* adopted a limited exception

25    for a single aftermarket product in which customers do not

1  agree on restrictions that were undisclosed at the time of the

2  purchase of the product from the primary market.

3      There is no question here that any disagreement that Epic

4  has with -- with terms in Apple contracts with Epic, not with

5  consumers, but with the distributor of -- of these video games

6  has existed since 2011 when these in-app purchases and the

7  30 percent commission first went into effect.

8      Those terms have not changed, and those terms have

9  remained constant so there is no aftermarket or aftermarket

10  claim or derivative market under the standards set forth in

11  *Kodak* and *Newcal*.

12      One other comment, Your Honor, is Mr. Bornstein noted that

13  even in *Newcal*, the question is posed whether it is

14  competition in the primary market -- whether that imposes

15  competitive discipline on Apple.  And plainly, it does.

16      In fact, you can see that in Epic's own conduct in this

17  lawsuit where it breached the contract with Apple on the eve

18  of the -- of the issuance of the next season of Fortnite, a

19  significant season with Marvel characters and -- and much

20  publicity.

21      Apple gave Epic the -- the opportunity to cure, to come

22  back on to the App Store with that new release, and Epic

23  refused. It refused because what Apple -- what Epic has told

24  Apple throughout its relationship is that it is the smallest

25  piece of the pie for Epic and if Apple doesn't tow the line

1    with Epic, they will simply move on without Apple.

2         You also see that in the revenue figures, which are

3    estimated to be about 9.8 percent of -- of Epic's revenue

4    originates through Apple, through the Apple App Store.

5         So the -- the -- there is substantial discipline on Apple

6    in terms of its dealing with Epic.  And Epic itself uses the

7    options in the market place available to it.  The reasonable

8    substitutes, the reasonably interchangeable distribution

9    channels and the -- the rough equivalents available through

10   all the different platforms that Your Honor has already

11   defined and identified to -- to discipline Apple, if you will.

12        And finally, Your Honor --

13             **THE COURT:**  Let me ask you a question.  And I asked

14   you last time.  Perhaps you have an answer this time.

15             **MR. DOREN:**  Yes, Your Honor.

16             **THE COURT:**  And that is I believe that

17   Mr. Bornstein's right.  There is -- there is an uproar in the

18   marketplace about the lack of competition for -- for iPhone

19   apps.  It's -- you know, you read the papers.  I read the

20   papers.  It's -- it's there.

21        It's not clear to me whether or not this case is actually

22   going to get to that potential problem if -- I know you may

23   not think it's a problem, but there are clearly many people

24   who do.  And that's because of my questions about whether or

25   not this is the right plaintiff given the amount of

1    competition for mobile games where Apple is relative to Epic

2    or I think it's Tencent who owns a huge share of Epic.

3        But where is, in your view -- where is the competition?

4    Where does that 30 percent number come from?  What -- as I

5    asked before, you know, why isn't it 10 or 15 or 20 or 30?

6        It -- there doesn't seem to be competition.  And that's

7    what -- that's what the -- that's what we're concerned about,

8    is competition.  Not Epic.  Not any particular developer.

9    Competition.

10           **MR. DOREN:**  Your Honor, two responses.  First of all,

11   to your -- to your specific question, the test for monopoly

12   power is whether the alleged monopolist can increase prices by

13   decreasing output.  And as for a monopoly maintenance claim,

14   there needs to be some indication of anti-competitive conduct

15   that is used to maintain and sustain a monopoly.

16       Here, Apple established the business model back in 2008

17   when it first launched the App Store with 500 apps.  Since

18   that time.  And it -- and in 2011 when it began

19   in-app process- -- in-app payments for in-app purchases, it

20   set its commission at 30 percent.

21       Neither of those things have changed since 2008, except

22   the output has exploded.  It has gone from 500 apps in 2008 to

23   1.8 million today.  The commission has never been raised.  In

24   fact, it has actually decreased on subscriptions after one

25   year.  And that is something that doesn't involve Epic, Your

1    Honor, but it does involve, you know, other participants in

2    the App Store.  That has been decreased to 15 percent.

3        As Your Honor has already noted, 84 percent of apps are

4    absolutely free and Apple recognizes nothing from those.  And

5    as to the effective commission, if you will, people were

6    willing to pay and -- and Apple marketed when it obviously

7    had -- there was no width of market power, be it in video

8    games, which, as Your Honor's noted, there's profound

9    competition and still today or any other element of the

10   market.  Apple had no market power when it set 30 percent.  We

11   would suggest it still does not have market power in in-app

12   distribution because there's so much competition in it.

13       But what has occurred since that first app -- or first

14   iPhone is that the devices have become profoundly more

15   sophisticated.  Apple's -- they -- they have provided

16   profoundly more opportunities for distribution and also for --

17   for higher-tech apps, if you will, so as -- as our experts

18   testify, the effective commission has actually gone down over

19   these years.

20       And so, Your Honor, there is no -- "the test," if you

21   will, for whether or not there is competition would suggest

22   that there is competition.  The --

23       Epic has identified no anti-competitive conduct by Apple.

24   They -- they use the term, but they don't cite any facts.

25   Their expert doesn't even use the term.  And on the

1    pro-competitive side of the scale, the -- the evidence is

2    overwhelming.

3          **THE COURT:**  All right.  I interrupted you.  You can

4    go back to what you were arguing.

5          **MR. DOREN:**  Oh, thank you, Your Honor.

6       And by the way, on that, Your Honor, I -- I would suggest

7    that when -- when Epic suggested it doesn't challenge the

8    30 percent commission, that that's exactly what it challenges.

9    Epic -- and I realize we aren't to the tying claim yet, but

10   it -- it -- it's not credible that Epic has had a problem with

11   IAP as a technical element of the App Store.  What -- what

12   Epic does not like is that IAP and the App Store are taking

13   30 percent of the business model that Epic has chosen to

14   implement.

15      Your Honor, finally, in terms of -- of what market this

16   court should be looking at for purposes of today's motion, the

17   only evidence in front of this court relates to Fortnite and

18   relates to Epic.  Therefore, when we are talking about what is

19   the relevant market for this motion, the only evidence that's

20   been offered this court relates to Epic and Fortnite.  The

21   court has no other basis from which to evaluate the

22   competition in the marketplace.

23      In fact, the only other product identified is a reference

24   to Pokemon by Mr. Evans as he -- or Dr. Evans as he attempts

25   to distinguish Fortnite from some other devices.

 1          And regarding the question of the portability of Fortnite,

 2   Your Honor made the excellent point that -- that the Nintendo

 3   Switch is about 4 inches by 9 inches.  Microsoft offers

 4   tablets that are less than 10 inches by 7 inches.  We all now

 5   increasingly carry laptops around.  There are over -- there

 6   are a hundred million players streaming Fortnite on GeForce

 7   NOW only.  There's almost a quarter billion gaming consoles

 8   out there as well.

 9      And common sense tells us that a 12-year-old Fortnite

10   player would prefer a big screen and a large control pad

11   rather than playing with their thumbs on the bus.

12      So, Your Honor, the -- this notion that because a -- a

13   console is not portable -- first of all, that's wrong as a

14   factual matter.  There are many portable options.  And second

15   of all, Epic has actually not put any evidence in the record

16   that says that there is a portion of the population who is

17   completely committed to playing solely on mobile.  There's

18   only broad assertions in that regard.

19      So in terms of conducting the test required under the

20   Sherman Act in looking at reasonable substitutes, rough

21   equivalents, and reasonably interchangeable distribution

22   channels, which is what we're talking about here, not consumer

23   use, but distribution channels for Epic, they have not shown

24   that any of the different platforms this court has identified

25   are outside of the relevant market.  They all must be included

1    in the relevant market.

2            **THE COURT:**  All right.

3        So, Mr. Bornstein, Mr. Doren made the point that

4    plaintiffs were not locked in.  Ninety percent of their base

5    has access.

6        Do you agree that they're not locked in?

7        You're muted, Mr. Bornstein.

8            **MR. BORNSTEIN:**  I was being so respectful of

9    Mr. Doren, I kept myself on mute, Your Honor.

10       I do not agree with that point.  I'll make -- make two

11   observations about it.  First, it's not the law.  This idea

12   that you are required to have lock-in.  You'll notice it's not

13   in Apple's brief.  There's no discussion, in fact, of the

14   *Newcal* factors at all that we just heard from Mr. Doren in

15   Apple's brief.  This is a -- a new argument.  And it is wrong.

16       There are four factors in *Newcal*.  The -- the one that is

17   closest to this lock-in idea is whether there are switching

18   costs and information costs in the primary market that impose

19   competitive discipline in the aftermarket.  We've talked about

20   that at length.  I won't go through it again.  But to say that

21   there needs to be lock-in --

22                    (Simultaneous colloquy.)

23           **THE COURT:**  He was arguing a point that was made by

24   Judge Alsup, so I just -- let's get to -- you know, I can read

25   the cases as well as you all can.

1        **MR. BORNSTEIN:**  Better.

2        **THE COURT:**  So the question I have from [sic] you

3   just in terms of what's in front of the court relates to the

4   issue of lock-in.

5        **MR. BORNSTEIN:**  Sure.

6        **THE COURT:**  The --

7        **MR. BORNSTEIN:**  So the -- the evidence in the record,

8   Your Honor, is that 63 percent of people who play Fortnite on

9   IOS play it only on IOS.  That's in Mr. Sweeney's declaration.

10  There is evidence to that effect.

11       Secondly, there are approximately one billion people who

12  have IOS devices, and there is -- those individuals we have

13  shown are locked in, to use the term loosely, through the

14  information and switching costs that I described --

15       **THE COURT:**  You --

16       **MR. BORNSTEIN:**  -- to that device; and, therefore, we

17  can't reach those people through distribution unless those

18  people also have some other device.

19       **THE COURT:**  Yeah, so you're -- so you want access to

20  Apple's customer base.  That doesn't necessarily mean you're

21  locked in, given that it's, what, 10 percent of your user

22  base?

23       **MR. BORNSTEIN:**  It's not 10 percent of user base.

24  The -- the information that Mr. Doren was citing was daily

25  activity users, just to -- to make sure we've got the stat.

```
1    But -- but the issue, Your Honor, is if you step back and ask
2    the question that is relevant to the antitrust analysis, which
3    is, is there competitive discipline imposed on Apple by the
4    existence of these other distribution options for apps
5    generally, or if you want to get specific and talk about games
6    or even more specific and talk about Epic, although I would
7    submit you're not -- you shouldn't get that specific in
8    assessing the market.
9         THE COURT:  Well --
10        MR. BORNSTEIN:  But if --
11        THE COURT:  -- you do agree that that's what I have
12    in front of me now.  It may not be what I have in front of me
13    at a trial.  But in terms of what I have in front of me now,
14    it is this game market.
15        MR. BORNSTEIN:  I -- I don't agree with that, Your
16    Honor.  What the court has in front of -- of -- of it right
17    now in Dr. Evans' declaration is discussion of apps more
18    generally.  We don't have a gaming app market that's at issue
19    here.  We have an app distribution market on the iPhone.
20        And to -- to get to the point about whether the 90 percent
21    or the 10 percent plays in here, in order for Apple to face
22    competitive discipline from the availability of these other
23    distribution channels, it would mean that there need to be
24    a -- a -- a meaningful number of people or developers who'd be
25    willing to give up the platform if Apple raises its price.
```

1    And we know that that's not the case.  Developers are not

2  going to sacrifice a billion users for the opportunity to

3  reach a billion users if there's a slight increase in the

4  price or the other terms that Apple charges.

5    And a great example of --

6    I apologize, Your Honor.

7        **THE COURT:**  Finish your sentence.  Then I have --

8        **MR. BORNSTEIN:**  Sure.  I was just going to say, a

9  great example is the one that Mr. Doren gave with respect to

10  users.  Yes, it's true a 12-year-old who plays Fortnite would

11  probably rather be using a -- a big controller on a big

12  screen.  And yet, we see that 63 percent of those users play

13  only on IOS.  That, to me, is powerful evidence of the fact

14  that these people are actually -- I don't want to say "locked

15  in" 'cause it's not the right test but are actually committed

16  to this platform and don't have the opportunity and aren't

17  willing to spend the money to buy alternative platforms to

18  use.

19    I think that's powerful evidence in our favor, Your Honor.

20        **THE COURT:**  The -- the corollary on that, Mr. Doren

21  indicated that you have haven't identified any

22  anti-competitive act.  And by your statement, I suspect you

23  agree with that.  And that is because you're saying that

24  hypothetically, they could change the rate, but, in fact, they

25  haven't changed the rate.

1    So is the anti-competitive act, that they won't let

2    someone else on?  Is that what you're arguing?  Or what is the

3    act that he says that Epic's not identified.

4         **MR. BORNSTEIN:**  Yes.  In the app distribution market

5    the anti-competitive acts, plural, are the technical

6    restrictions that are imposed and the contractual restrictions

7    that are imposed that prevent alternative distribution from

8    being available on IOS.  It's that simple.

9    Epic right now today would like to have its own store to

10   distribute apps on IOS.  It can't because Apple has prohibited

11   it.  Flat forbid.  That is the anti-competitive act at

12   issue --

13        **THE COURT:**  The courts --

14        **MR. BORNSTEIN:**  -- in this market.

15        **THE COURT:**  -- have sometimes indicated that

16   licensing restrictions, which is what those are, are not -- do

17   not constitute antitrust actions.

18   And there seems to be great disagreement with the

19   licensing provisions at issue here.

20   What's your response?

21        **MR. BORNSTEIN:**  I would say, Your Honor, there is no

22   blanket exclusion to the antitrust laws for licensing.

23   There are a variety of cases that analyze the use of

24   patents, for example, and whether or not they are misused,

25   or -- or when -- and in a way that is in violation of the

```
 1   antitrust laws.  There are situations in which --

 2            THE COURT:  When that happens, aren't they coupled

 3   with some other act?

 4            MR. BORNSTEIN:  And -- and here, Your Honor, I would

 5   say they are.  I"m -- I'm not sure, frankly, that that is a

 6   requirement, but here, I think it is the case.

 7            THE COURT:  Well, is --

 8            MR. BORNSTEIN:  Here, we have --

 9            THE COURT:  All right.  We -- do you have law to

10   support that notion?  Because there is law to support the

11   notion that disputes over licensing is insufficient.

12            MR. BORNSTEIN:  Your Honor, I think in -- in terms of

13   whether or not the court is suggesting that a dispute over

14   licensing is per se exempt from the antitrust law, I would

15   submit that is not correct.

16      There is -- if that were the case, for example, the Ninth

17   Circuit's decision in Qualcomm recently would have come out

18   in -- it would have been much easier to write for the court

19   since the issue there turned on patent licensing.  There was

20   instead a -- an in-depth analysis of -- of the nature of the

21   restraints and the effects.  And the court did not simply

22   excuse the conduct at issue from antitrust scrutiny because it

23   related to licensing.

24      There is also Federal Circuit case law on the subject, and

25   I am temporarily blanking on -- on the name of the case
```

```
 1      because I hadn't considered the issue since it wasn't raised

 2      in Apple's brief, that licensing was somehow excused

 3      completely from the antitrust laws.

 4           We can certainly submit supplemental authority if that

 5      would be useful for Your Honor.

 6                THE COURT:  No, it's just a question I had as I was

 7      reading the cases.

 8           Mr. Doren, any comment?

 9                MR. DOREN:  Yeah, just a couple, Your Honor.

10           First of all, in our opposition, we do, in fact, of course

11      speak to a party's right to safeguard its intellectual

12      property.  And -- and we agree with Your -- Your Honor's

13      observation that that is not an antitrust violation.

14           I would also note, Your Honor, that counsel for Epic

15      acknowledged that what Epic wants to do here is open its own

16      store within the App Store.  That's -- that's really what this

17      litigation is about.  That's really its objective here.  And

18      that takes us back to Apple's fundamental business model, and

19      frankly, the contention by Epic, which it -- which it repeats

20      but never proves, that Epic's [sic] commitment to safety,

21      security, and the privacy of its user information is a

22      pretext.

23           And, you know, that is a -- essentially an indictment of

24      Apple's entire business model, which has been committed to the

25      safety, security, and privacy of its users since day one.
```

1    And it's also -- ignores the record in this matter, such

2    as at Schmalensee Paragraph 36, he notes that less than

3    1 percent of malware attacks occur within the App Store.  And

4    that is because, Your Honor, Apple safeguards the App Store

5    and safeguards the IOS operating system to assure that its --

6    its users are safe and secure when they come into this

7    environment.

8         Now, Epic would like Apple to let it in to the App Store

9    and would like to let Epic set up a competing store within

10   Apple's own store.  That is the fundamental disagreement with

11   the way Apple has chosen to do business.

12        But Apple's business model has been consistent throughout

13   its existence.  This is the way it has chosen to set up its

14   model and its trademark, is to Safeguard its -- its users.

15   And it has concluded that through app review and through

16   maintaining a system where it closely controls what is on IOS,

17   that that is the best way to safeguard its users, and that's

18   what keeps it competitive in a very competitive marketplace.

19   And -- and the statistics bear out that Apple's efforts have

20   been effective.

21        Secondly, Your Honor, counsel commented that the court

22   should look at the 63 percent figure rather than the

23   10 percent figure.

24        Your Honor, I would suggest that Fortnite has the data,

25   and they could have put forward very precise information for

1    this court had they so chosen.

2        The 63 percent figure states that 68 percent of Fortnite

3    users on IOS access Fortnite only on IOS.  That does not tell

4    us how many actively play.  That just tells us that if we look

5    at everyone who has ever opened Fortnite on an IOS platform,

6    that they didn't use others.  Perhaps they looked and lost

7    interest.  We don't know.  There's no information offered.

8        The one relevant comparative statistic -- the one that

9    tells us how Apple compares to its competition in the

10   marketplace is in the line before that, which states that from

11   the time Fortnite -- Fortnite was launched on IOS through

12   August 13, 2020, nearly -- nearly -- so less than 10 percent

13   of Fortnite's average daily players used an IOS platform.

14       There is huge market competition.  The market is broad.

15   And -- and Apple does its best to compete.  But we know -- and

16   Mr. Schmid's depo- -- declaration is the one piece of evidence

17   in this -- in this case regarding the -- market discipline or

18   specific testimony.  And Mr. Schmid testified at Paragraphs 8

19   and 18 in his declaration that he was [sic] been repeatedly

20   told by Epic that Apple is a -- is the smallest piece of the

21   pie and that -- that Apple has to hit Epic's deadlines or

22   they'll proceed without them.

23       No one in -- in any of the Epic declarations has denied

24   that.  They too have said, we have told them they need to hit

25   the mark or we would leave them behind and only bring them in

```
 1   later.

 2       They --

 3           THE COURT:  I think -- I think that that's what the

 4   numbers bear out, right?  It -- Fortnite -- or Epic has

 5   advised the court, what, they've got 350 million users,

 6   116 million have registered their device, so somehow linked an

 7   IOS.  10 percent of their 25 million daily users --

 8           MR. DOREN:  2.5 million, Your Honor.  Oh, I'm -- I'm

 9   sorry.  I apologize, Your Honor.  10 percent of the 25.

10   Understood.

11           THE COURT:  Right.  10 percent of the 25, which gives

12   you about 2.5 million.  Of that 2.5 million, maybe -- I guess

13   63 percent only linked to the -- to the -- to their i device,

14   so 10 percent of 63 is about 6 percent.

15           MR. DOREN:  I -- I'd agree that that's a -- a

16   reasonable alternative reading of -- of this paragraph, yes,

17   Your Honor.  About 6 percent of -- of --

18           THE COURT:  Yeah, 6 percent is still about

19   1.575 million people, not an insignificant number --

20           MR. DOREN:  And, Your Honor --

21           THE COURT:  -- for devices, I would say.  Right?

22   Six percent is small for Epic --

23           MR. DOREN:  And --

24           THE COURT:  -- but it's still 1.575 million people.

25           MR. DOREN:  And yet, Your Honor, it's -- it's --
```

1    remember, we define the market looking at the product, not the

2    consumer.  And the product here are channels of distribution

3    for Fortnite.

4        And what this tells us is -- and what the court has

5    already noted is there are many channels of distribution for

6    Fortnite.  And even if Your Honor's interpretation that you

7    just offered is correct -- and as I said, I think it's a

8    reasonable interpretation of what's written here --

9    nonetheless, that does not mean that these -- that -- that

10   these users, should they want it, can't access Fortnite

11   through other channels.

12       But, again, for purposes of this antitrust analysis, the

13   question is whether or not Fortnite has alternative channels.

14   And additionally, under the antitrust laws, Fortnite is not

15   entitled to necessarily access to every single person on the

16   globe.  They only need to have reasonable distribution

17   alternatives available, and they have that in spades.

18           **THE COURT:**  Okay.

19       **MR. BORNSTEIN:**  Your Honor, if I might address the --

20   the numbers here?

21           **THE COURT:**  Sure.

22       **MR. BORNSTEIN:**  Thank you.

23       I -- I note that Mr. Doren did not endorse that particular

24   interpretation of the numbers and said, well, it's a

25   reasonable reading.  I submit that's because he probably

1    understands that's not actually the right number here.

2         The 63 percent is 63 percent of the 116 million people who

3    have downloaded Fortnite onto a device or have otherwise

4    logged into Fortnite.  So we're talking about 71 million

5    people or thereabouts based on my rough math, not -- not

6    1.75 million or whatever 63 percent of 2 and a half million

7    is.

8              **THE COURT:**  I wasn't saying -- the 63 percent were

9    those linked.  I was taking 10 percent of that because your

10   declarations indicated that only 10 percent of your users are

11   daily users.  I was looking at daily usage numbers.

12             **MR. BORNSTEIN:**  Yeah, it's 10 percent of the daily

13   active users recently have been IOS users.  That's the

14   right -- the right calculation.

15        But of the -- the total number of users who are reachable

16   and who have signed into Fortnite, we're talking about

17   71 million people who -- who sign in only through this way.

18   And, again, rather than quibble too much with -- with -- with

19   the numbers, the issue really is, is this the right framework

20   in which to look at whether there is competitive discipline

21   imposed here.

22        And for all the reasons that I've talked about in terms of

23   the non-substitutability of these alternative distribution

24   channels, it is very much our view that the possibility of

25   playing a game on an XBox or on a Playstation doesn't stop

1   Apple from imposing whatever rate it wants or at least a small

2   but significant nontransitory increase in price on the

3   distribution of apps on the iPhone.

4       Ultimately, I think it comes down to the -- to a

5   relatively pithy point that's made in one of the declarations.

6   You can't carry a Playstation in your pocket.  And you also --

7   you can't use --

8           **THE COURT:**  You keep forgetting other devices, right?

9           **MR. BORNSTEIN:**  Well, but --

10          **THE COURT:**  You're forgetting the Switch.  I went

11  online yesterday, and at least in the Bay Area, you can't get

12  a Switch anywhere.  You can't get it at Best Buy.  You can't

13  get it at Amazon for -- for at least a week.  You -- you can't

14  get these devices.  You can't get it at Target.  You can't get

15  them anywhere, so --

16          **MR. BORNSTEIN:**  But doesn't that make --

17          **THE COURT:**  -- it's not as if -- and perhaps it's

18  because everybody's stuck at home.

19          **MR. BORNSTEIN:**  Well, but --

20          **THE COURT:**  But if they're stuck at home, they're

21  probably downloading it on their TV's.

22          **MR. BORNSTEIN:**  Yeah, but doesn't it make the point,

23  Your Honor, that you can't get these devices?  There are a

24  billion IOS devices out there.  The possibility that some

25  people might have the money to buy themselves an alternative

1   gaming device if they can find it does not impose a

2   competitive discipline on Apple with its billion users.

3   That's really the point --

4       It's just not a substitute for being able to reach the IOS

5   users that there might be some other channels.  And I -- I

6   don't want to lose sight of the fact that we're not talking

7   about just about games here, right?  We're talking about an

8   app market more generally --

9           **THE COURT:**  And I --

10          **MR. BORNSTEIN:**  -- and you --

11          **THE COURT:**  I know that that's how you want to frame

12  the issue.  I'm not convinced that you have.

13          **MR. BORNSTEIN:**  I understand the -- that that's the

14  court's perspective.  I -- I would just urge the court to take

15  a look at what Dr. Evans has to say about the definition of

16  the market on that point.

17          **THE COURT:**  I do.  And I think this is going to be a

18  fascinating trial, frankly, because each of these experts

19  makes a compelling argument.  And like I said, there's great

20  debate in the industry.  You know, but -- but it's -- it's

21  complicated, because if we look at this plaintiff and this

22  industry, walled gardens have existed for -- for decades,

23  right?

24      Nintendo has had a walled garden.  Sony has had a walled

25  garden.  Microsoft has had a walled garden.  And so in this

```
 1    particular industry, what Apple's doing is not much different.

 2        Now, that -- that's not to say that what they're doing in

 3    the general developer market is not different.  They

 4    created -- they created a platform.  They have some

 5    competition, but -- but we're -- you know, as we frequently

 6    are in the Northern District of California, we're in a new

 7    world.  It's -- You know, they don't call this the "Wild West"

 8    for nothing.  I mean, we -- we frequently see these kinds of

 9    new issues, especially in -- in technology.

10        But this particular market has frequently had walled

11    gardens.  And -- and it's hard to ignore the economics of the

12    industry, which is what you're asking me to do.

13            MR. BORNSTEIN:  Well, I -- I -- I agree with the very

14    first thing Your Honor said, which is that this is

15    complicated, for sure.

16        I -- I would respectfully disagree with the last point

17    Your Honor made, that I'm asking the court to disregard the

18    economics of the market, in the following respect.  For

19    example --

20            THE COURT:  I'm being very specific, which is that

21    you're asking me to ignore the economics of the gaming

22    industry.

23            MR. BORNSTEIN:  Understood, Your Honor.  And I'll --

24    I'll try ask address that very specifically.

25        Mr. Doren made the point, and I agree with him, that just
```

1   looking at the 30 percent is not capturing the economics of

2   the transaction.  That is just the rate.  There are a number

3   of other economic factors and terms that play in.

4       So take a look, for example, at Microsoft and -- and the

5   Sony Playstation.  The -- the economics of the transactions

6   between those companies and the developers are entirely

7   different.  And the users are entirely different.

8       The consoles are sold, for example, at a loss so

9   30 percent there is very different from 30 percent here.  I

10  submit the court does need to look at the entirety of the

11  economic situation in each place.

12      And I -- I would be -- I would be remiss if I didn't make

13  the point just one more time that I think that restricting the

14  analysis here to games is looking at it from the perspective

15  of the plaintiff when the way that one defines a market is to

16  look at it from the perspective of the monopolist or the

17  hypothetical monopolist.  That's the test.

18      It's not is this particular plaintiff in a position to

19  find alternatives.  It's is the monopolist in a position, as

20  Mr. Doren said, to profitably raise prices above a competitive

21  level.  And I -- that needs to be the focus, I would submit.

22          **THE COURT:**  Well, plaintiffs always want me to define

23  that relevant markets as narrowly at possible.  That helps

24  their case.  And defendants always want me to define markets

25  as broad as possible because it helps their case.

1          I think we can all agree, right, that the definition of a

2     relevant market is a factual question; it's not a legal

3     question.

4          Right?

5               **MR. BORNSTEIN:**  Well, I --

6               **THE COURT:**  Ultimately, you've got the burden of

7     proof.  On those, we can agree, right?

8               **MR. BORNSTEIN:**  I agree we bear the burden of proof,

9     and it is a -- a factual question applying the right legal

10    test.  Yes.

11              **THE COURT:**  Let's move to Section 1.  I guess I can

12    tell you I'm not particularly persuaded with the Section 1

13    proffer, Mr. Bornstein.

14         You can proceed.

15              **MR. BORNSTEIN:**  Not an auspicious start for me, but

16    I'll do my best, Your Honor.

17         I -- I would say, first of all, if we're talking about --

18    and I think Your Honor's talking about the tying issue.  I

19    would say, first of all, that this is a case where per se

20    analysis is appropriate.  The -- the arguments made by Apple

21    that it needs to be a rule of reason test because, relying on

22    *Microsoft*, you're supposed to use rule of reason in software

23    cases as though there is a -- a software exception to the

24    per se test.  That's not correct.

25         Microsoft expressly distinguished technical ties from

1    contractual ties.  And here, the tie of which we complain is

2    entirely contractual.  It's the requirement in the relevant

3    agreements with Apple that developers have to use IAP for

4    in-app processing of digital content.  So per se is the right

5    way to look at the issue.

6        There is -- there is a threshold argument that gets made

7    by Apple that it's not a tie because there are people who get

8    to use the App Store and distribute their product on the App

9    Store without having to -- to use IAP at all if they don't

10   offer any in-app digital content.

11       Well, that's not, again, the way that one looks at a tie.

12   For these specific users who choose to have and who need to

13   use in-app processing, they have no choice.  They are tied,

14   and they are required to use the tied product, the IAP.

15       *Jefferson Parish*, which is the seminal Supreme Court tying

16   case, is a good example of this.  The tie there was medical

17   operations tied to anesthesia.  And the court found that --

18   that there was a tie in that case where people who had

19   operations at this hospital were required to use a particular

20   practice of anesthesiologists.

21       Well, there are medical operations that people under go

22   where they don't need anesthesia.  The fact that sometimes

23   people engage in the tying market without also needing what's

24   in the tied market, that doesn't make it any less of a tie.

25   For people who need both products, there is a contractual

 1   requirement.  That was true there.  That is true here.

 2      And --

 3         THE COURT:  Mr. Doren.

 4         MR. DOREN:  I'm sorry, Your Honor.  Did you -- did

 5   you call on me?

 6         THE COURT:  I did.

 7         MR. DOREN:  Thank you.

 8      So Epic's -- Epic essentially declares IAB [sic] to be a

 9   separate product from the App Store but without any evidence

10   that it is, in fact, a -- a stand-alone product.

11      IAP is simply the function within the App Store that

12   administers the collection of a commission when Apple is due

13   that commission on paid apps and in-app purchases.  It's never

14   been marketed or sold separately.  Epic has offered no

15   evidence of there being a separate demand for IAP specifically

16   as a product.

17      And it's not at all like PayPal or Stripe in that it is an

18   integrated element of the App Store designed specifically

19   again to collect Apple's commissions and distribute payment in

20   as seamless a way as possible for the consumer, the developer,

21   and Apple.

22      In fact, Apple outsources the actual administrative step

23   of -- of the -- of the payment processing.

24      This -- Your Honor, the closest case we could find to this

25   specific fact pattern was the *Rick-Mik Enterprises* case out of

1    the Ninth Circuit, which is pretty darned close because there,

2    the Ninth Circuit addressed the question of whether a

3    payment-processing function, which was a required component of

4    a product, could form the basis for a tying claim.  And the

5    court there held it could not.

6        And specifically, the Ninth Circuit stated that where the

7    challenged aggregation is an essential ingredient of the

8    system's formula for success, there is but a single product

9    and no tie exists as a matter of law.

10        And here, Your Honor, IAP is, again, a function within the

11    App Store, within the iPhone, is an essential ingredient of

12    Apple's formula for success.  And it has -- it has been there,

13    again, since the beginning as an integrated part of -- of

14    Apple's offerings.

15              THE COURT:  Yeah, I don't -- Mr. Bornstein, I just

16    don't see this as a separate-and-distinct product.  I see it

17    as a -- a very creative way to get at the 30 percent.

18              MR. BORNSTEIN:  Look -- may I take a shot at

19    addressing that, Your Honor?

20              THE COURT:  You may.

21              MR. BORNSTEIN:  Okay.  I appreciate that.

22        Just to respond to -- to the observations that Mr. Doren

23    said about this being an integrated set of -- of functions and

24    an integrated set of transactions, that exact argument -- the

25    exact argument was presented by the defendants in

1    *Jefferson Parish* in the Supreme Court.  What they said -- and

2    I'm going to quote what the -- how the Supreme Court described

3    the argument there.  They argued, and I quote, that the

4    package does not involve a tying arrangement at all.  They are

5    merely providing a functionally integrated package of

6    services.

7        And what did the Supreme Court say?  They said, no, that

8    doesn't work because, quote, our cases indicate that the

9    answer to the question whether one or two products are

10   involved turns not on the functional relation between them

11   but, rather, on the character of the demand for the two items.

12       And Judge Orrick said -- it says the same thing in

13   *Teradata*, the same case that -- that Mr. Doren referred to us

14   earlier.  The defendant there, SAP, said, well, we have an

15   integrated software product.  And the court said, well, I'm

16   going to look and see if there is separate demand.  The fact

17   that you go ahead and you integrate these two things doesn't

18   insulate you from review under the antitrust laws as to

19   whether what you have done in integrating them is a tie.

20       And here, the supposed integration is not a technical

21   integration.  It is a contractual tie of the two separate

22   products.  And so the thing the court needs to do is to look

23   at whether there is separate demand.  That is the right test.

24       And it looked like Your Honor was going to say something,

25   so I don't want to --

| | |
|---|---|
| 1 | **THE COURT:**  So Apple Pay seems to be to me much more |
| 2 | like PayPal than some -- than when I'm in an app and I |
| 3 | purchase something and it's tied to my credit card and so it |
| 4 | just gets charged to my credit card, and Apple takes its cut |
| 5 | and gives the developer their cut. |
| 6 | I just -- I don't -- |
| 7 | **MR. BORNSTEIN:**  Well -- |
| 8 | **THE COURT:**  I don't see how that's an -- I don't see |
| 9 | how the transaction of being -- excuse me -- of divvying up |
| 10 | the payment is a separate-and-distinct product. |
| 11 | **MR. BORNSTEIN:**  So to address the -- the first point, |
| 12 | if I'm -- if I'm getting an Uber, right, my credit card is in |
| 13 | there already, and I get my Uber, and it seamlessly goes |
| 14 | through and I don't have to do anything else. |
| 15 | It's just like IAP in that respect, except Uber is not |
| 16 | required to use Apple services.  Why?  Because Apple doesn't |
| 17 | make it.  We can -- we can speculate about why they have |
| 18 | chosen or not chosen to extend the tie that far, but they have |
| 19 | chosen not to. |
| 20 | As to whether it's a separate product, this is something |
| 21 | Dr. Evans does address, Your Honor.  There is in the first |
| 22 | instance a transaction between a consumer who is looking to -- |
| 23 | to obtain an app and the developer in the App Store |
| 24 | facilitated by Apple to obtain the app and get it downloaded |
| 25 | onto -- onto the device.  That is a transaction that Apple |

1    facilitates through the store because Apple requires everyone

2    to go through the store.

3        Whether a year from now that person wants to upgrade their

4    fitness app from the free version to the premium version and

5    get more data about their daily run, or whether somebody wants

6    to, you know, up- -- upgrade their subscription to a

7    particular periodical or news source, that is a separate

8    decision made separate -- at a separate point in time, which

9    is a transaction that occurs between the user and the -- the

10   developer of the app.

11       So to take Fortnite as an example, if a Fortnite player a

12   year from now after downloading -- downloading the app on

13   to -- well, it can't right now on the iPhone, but after

14   downloading the app on to his or her device, wants to make a

15   purchase in the game, that is a relationship that the app has

16   built with the consumer.  It should be run by the app and the

17   consumer.  The customer service, the refunds, they should all

18   be managed between the developer and the consumer instead of

19   having Apple intermediate down the line in this entirely

20   separate transaction.

21            **THE COURT:**  All right.  A response.

22            **MR. DOREN:**  Your Honor, first of all, *Jefferson*

23   *Parish* and *Teradata* both did deal with separate products

24   and -- and products that were offered separately.

25       And here, IAP has never been offered separately.  It's

1    never stood alone as a product.  It's never been offered as a

2    product.  And there's no evidence of a separate demand in the

3    market for it.  So it's utterly distinct from the tying of

4    a -- of a second product to a first.

5        *Rick-Mik* is the case that really is on point here, Your

6    Honor.  That was a motion to dismiss case where the court held

7    that the inclusion of a payment process within a -- a -- a

8    product was not a separate product.  And that's exactly what

9    we have here.  And just as the court could find that on the

10   motion to dismiss stage there, so, too, this court can

11   conclude that this is not a separate product.

12       We talk about or -- or -- or Mr. Bornstein finished up by

13   talking about the -- the timing of -- of the transactions.

14   But Mr. Schmalensee addressed that directly in Paragraph 6 and

15   Paragraph 59 of his declaration why he said there's -- there's

16   no economic basis to distinguish between a -- in terms of

17   evaluating whether something is a product -- a separate

18   product or not from an initial transaction to a subsequent

19   one.

20       At the end of the day, Your Honor, I'll take no more time

21   on this because this is simply an element of the App Store,

22   which is an element of the iPhone.  It's a fully integrated

23   product.  It is not a separate product with a separate demand

24   in a separate market.

25            **THE COURT:**  Okay.

1            MR. BORNSTEIN:   Your Honor, may I be heard on the

2    subject of the separate demand, which has been raised a few

3    times now?

4            THE COURT:   All right.   Briefly.

5            MR. BORNSTEIN:   Sure.   I would just point out we have

6    in our papers -- I can refer the court to it -- extensive

7    evidence of separate demand for the payment processing

8    checkout function from the App Store.

9        There are, first of all, the apps that Apple doesn't

10   require it to be used for, like Uber and other physical apps.

11   There are the other app stores we've identified on Android

12   like Aptoide and SlideME and others.   And Epic Games itself

13   that doesn't require the use of an affiliated IAP.   Those are

14   in Footnote 45 of the reply declaration in Dr. Evans.

15       There is evidence that when Epic did the "hot fix," over

16   50 percent of people chose to use direct pay.   There was user

17   demand for that product, separate from -- from Apple IAP.

18       And Apple disclosed in its papers for the first time that

19   there have been thousands of instances in which developers

20   have attempted to introduce a separate payment processing

21   service in an app, and Apple has rejected it.

22       There's clearly demand from both developers and users for

23   something separate here.

24           THE COURT:   On that last point separate from the

25   antitrust specifically, just a -- you've mentioned, Mr. Doren,

1    multiple times that -- and it was my understanding that --

2    that Apple uses third parties to do -- to -- address the

3    payment function.  One, am I correct that?  And, two, do --

4    does Apple use -- or would they use other providers, let's

5    say, such as PayPal if PayPal gave you your 30 percent?

6         **MR. DOREN:**  No, Your Honor, 'cause IAP involves a --

7    a number of other elements.  For example, IAP deals with

8    foreign taxes.  It deals with foreign withholdings for the

9    developers.  And as to the users, when a transaction goes

10   through the App Store, then Apple's commitment to the safety,

11   security, and privacy of its members kicks in.

12        And, for example, the payment information provided to

13   Apple by users is never shared with the developer.  And the --

14   and there are parental controls in place so the parents have

15   an opportunity to make sure that their kids aren't buying too

16   many skins or V-Bucks on Fortnite or whatever another parallel

17   may be.

18        It also -- it facilitates family sharing of -- of

19   purchases.  It facilitates the generation of historic records

20   of purchases, so there are a lot of elements of it that are

21   part and parcel and really integrated into the operation of

22   the App Store.  And -- and so it's far more than just one, you

23   know, small administrative step.  It -- there's a lot of code

24   and a lot of functionality.  But it's all, again, fully

25   integrated into the App Store and has really been there since

1    the beginning.

2          **THE COURT:**  So your expert opines that there's no

3    separate demand for IAP.  But as Mr. Bornstein correctly

4    points out, once in that short period of time, between when

5    Fortnite was taken off the Apple platform and the dual

6    functionality that had been placed on there by Fortnite was

7    available, 50 percent of the people did, in fact, use the

8    alternative mechanism.

9        Doesn't that undercut, in fact, your argument that there

10    is no demand?

11          **MR. DOREN:**  No, Your Honor.

12        What it -- what it -- what it seems to -- to evidence is

13    that when people can purchase V-Bucks for 7.99 instead of

14    9.99, half of them will elect to pay 7.99.  And I think what's

15    probably most enlightening about that -- that statistic is

16    that half of the people are -- prefer to stay within the App

17    Store and within IAP because they trust Apple to protect their

18    safety, security, and privacy.

19          **THE COURT:**  The last topic that we haven't really

20    talked about in terms of the Section 1 and Section 2

21    arguments, Mr. Bornstein raised it.  I don't know if you want

22    to raise it or not, Mr. Doren, is the rule of reason analysis

23    that Apple identified in its brief.

24          **MR. DOREN:**  Your Honor, I -- I -- the distinctions

25    that -- that Mr. Bornstein draws in order to -- to avoid the

1  holdings in *Microsoft* and then the further discussion in

2  *Qualcomm* of the need to do a deep fact analysis in -- and

3  therefore that the per se standard really has no place when

4  dealing with the tech platforms, the fact that there are

5  contract provisions involved as well as integrated technical

6  elements, we don't think changes the analysis.

7      I think, frankly, the -- the fact that you need -- that

8  one would need to sort out between what is the nature of the

9  product, how integrated is it physically into the platform, is

10  it in fact only a contractual limitation, or is it also a

11  technological single product?  If one were dealing with what

12  is clearly two separate products, there may be a discussion to

13  have here.

14      But here, there's a threshold question of whether or not

15  there's just a single product.  We believe there -- that's not

16  even a question.  As Your Honor noted, it's a -- really a

17  clever argument to -- to dispute the 30 percent.

18      So this is -- this is clearly a rule-of-reason situation.

19  Having said that, we -- we also think that with *Rick-Mik*, it

20  shows that it's a -- it's a situation that is easily resolve

21  in finding that this is a single product that, therefore,

22  cannot form the legal basis of a tying claim.

23          **THE COURT:**  Okay.

24      All right.  Let's go ahead and shift to the other

25  elements.  This portion of the argument, Ms. Forrest and

 1   Mr. Boutrous, will be much shorter.

 2        Unlike junior people, I don't feel so bad given that you

 3   all get lots of time in front of courts and so you don't need

 4   additional argument time.  I always feel bad when I have a

 5   young person who is given the last motion to argue in front of

 6   the court and I'm out of the gas and just say, no I'm not

 7   going to hear argument and I feel bad about it.  But with you

 8   two, I don't feel that bad.

 9        I actually didn't read all that much new in the additional

10   papers with respect to the remaining elements.  So that --

11   that's why I said, I -- I don't know that this part of the

12   argument will be that long at all, given my admonition to you

13   in the beginning not to repeat.  But there were a couple of

14   new things but really not much.

15        Ms. Forrest.

16        **MS. FORREST:**  Thank you, Your Honor.

17        What I'd like to do is to focus on a few things that we

18   did not point out in our papers that are uncontested by Apple

19   in its papers as to the irreparable harm that is real, that is

20   actual, and that is happening today.

21        And these are things which were set out in the

22   declarations, the opening declarations of our witnesses.  And

23   they were not contested by the Apple witnesses, so I think

24   that it's important to point these things out.

25        One is that the IOS business for Epic has been shuttered.

1    And that there are all kinds of statistics in Mr. Sweeney's

2    declaration as to the declines that is real and that is

3    happening.

4        In addition to that, we have a shuttered series of

5    businesses that are event businesses.  These are the events

6    that Epic puts on through the Fortnite app for concerts that

7    we know IOS platform IOS users want.  There were 2 million of

8    them who attended the Travis Scott concert in April of 2020.

9    We know that there is IOS demand for the other concerts and

10   events in terms of ESPN-exclusive performances, for the

11   Discovery Channel exclusive performances, for the social

12   justice conversations.  Those businesses have been entirely

13   shuttered for Epic.

14       In addition -- and none of that is contested.  There is no

15   contest to the diminution of good will and to the reputational

16   harm.  No contest to that.

17       There's also no contest to the damage that is flowing to

18   the Unreal Engine.  In fact, Apple actually concedes that the

19   Unreal Engine is having an existential crisis, and it actually

20   puts forward a Unity as an alternative development platform

21   engine acknowledging that the Unreal Engine is going through

22   an existential moment.

23       Having competition go from two development platforms with

24   Unreal Engine and Unity down to one is not an answer.  There

25   is absolute irreparable harm to Epic's Unreal -- Unreal Engine

1    business.  It's got thousands -- hundreds of thousands of

2    developers who have millions of licensees who are dependent

3    upon these engines.  And this is going to shutter that

4    business for Epic.  That is not contested.

5        It is also not contested that the other ways in which

6    Apple is threatening now to extend its collective punishment

7    through the withdrawal of tools and the ability with the

8    developer programs to allow the other Epic properties to

9    function, that that is also going to potentially shutter those

10   IOS businesses for Epic.

11       So there is an across-the-board amount of collective

12   punishment against all of Epic's IOS businesses which have

13   been shuttered and where -- where Apple is not contesting

14   those facts.

15       Your Honor, I'd also like to talk about one argument in

16   this regard that Apple raises with respect to whether or not

17   the preliminary injunction context is a context in which the

18   case law which suggests that the breach by Epic of its

19   contractual relationship with Apple gives it the right not to

20   have to deal any longer and to terminate at will its contracts

21   and whether or not it withdraws and impacts the equitable

22   ability of this court to provide injunctive relief.

23       A couple of points on that.  What I'd like to see first,

24   Your Honor, is the great irony that it would be if in fact

25   were the case that the same act that for the Supreme Court

1    cannot be held as a basis for denying recovery at the end of a

2    case could nonethe- -- nevertheless allow for the complete

3    destruction of a business during a case.

4            **THE COURT:**  But doesn't --

5            **MS. FORREST:**  It has got --

6            **THE COURT:**  The argument with respect to that

7    particular topic really does hinge on the fact that you

8    succeed, right?  And it goes back to the likelihood of success

9    on the merits, so -- so it's circular.  You're irreparably

10   harmed and cannot be damaged by being irreparably harmed

11   because you're going to succeed but you only succeed if -- I

12   mean, it's a circular argument, so -- so it hinges on the

13   first part of this debate.

14           **MS. FORREST:**  It does, Your Honor.  If Your Honor

15   does not find a likelihood of success on the merits, then a PI

16   will not issue here.  That is certainly true.

17       What I mean suggesting is that to the extent that the

18   balance of equity element has been argued by Apple to not

19   apply to us, that we have no equities based upon our conduct,

20   that that is not what the Supreme Court case -- the

21   Supreme Court case law holds.  It's not what the principles of

22   those cases hold.

23           **THE COURT:**  Well, I don't -- I certainly agree with

24   you.  I mean, I certainly agree.  I mean, balance is one of

25   the things that we -- that we look at.  But it is a

1    separate-and-distinct element from likelihood of success.

2        And other than the fact of you arguing -- and I

3    separate -- and I still separate Unreal Engine and Fortnite

4    and the other games.

5        The argument with respect to the -- to Fortnite -- your

6    argument is -- is really just we're going to win and so

7    therefore we get the balance of equities.  It's -- it's

8    nothing more than that.

9        **MS. FORREST:**  Your Honor, it's also that there is

10   extraordinary consumer harm that is happening right now

11   and that --

12       **THE COURT:**  That's public interest.  And, again, you

13   know, I don't conflate them.  That is, I am required to do a

14   separate analysis for each.  And what happens with the public

15   is separate and distinct than what happens with the parties.

16   And those need to be evaluated separately.

17       **MS. FORREST:**  I agree with you, Your Honor.  And my

18   point for the balance of the equities is that to the extent

19   that you have an entity, here Epic, that is actually ceasing

20   to comply with an anti-competitive provision, which we believe

21   the -- certain provisions of the Apple contracts constitute,

22   that those equities are in our favor, and that when consumers

23   are harmed by the fact that there's retaliation for that lack

24   of compliance with an anti-competitive provision, that those

25   equities are also in our favor.

1      I agree with you that the harm to the public actually hits

2  on multiple factors.  But it also hits on balance of the

3  equities.  I can, Your Honor, if you would like, in -- for a

4  moment talk about Apple's arguments that there are security

5  issues that somehow take away our arguments on the public

6  interest.

7      **THE COURT:**  I think that's a -- that's a good

8  argument to be had.  I would just say, you know, there is some

9  case law with respect to -- well, first of all, I should back

10  up and say in general, we don't have federal courts issue

11  injunctions just because parties get into a contractual

12  dispute.  And in many ways, part of this is all a contractual

13  dispute over the licensing fees that Apple is -- is engaging,

14  in addition to the -- to the antitrust issues.  But generally,

15  we don't have federal courts do that.

16      There are instances, though, where federal courts would

17  have -- might issue orders to keep the status quo in

18  situations where a company or business is going to go out of

19  business.  That's not the case for Epic.  No one's entitled to

20  make billions of dollars.

21      There was a calculated decision here, and as the

22  numbers -- went through these with Mr. Bornstein earlier --

23  the IOS share of the pie for Epic is pretty small, relative to

24  everything else.

25      So we aren't in a circumstance where some business is

1   going to go out of business.  Really, to the extent that there

2   is harm, it's -- it's the public interest, which is different.

3        So it was interesting to me the declaration of

4   Mr. Sweeney.  Mr. Sweeney's declaration did not, in fact,

5   indicate that there was nothing in the Unreal Engine that

6   violated effectively Paragraph 3 of the license agreement.

7   What he said is that Epic doesn't engage if malware.  Well,

8   great to hear.  Glad to hear it.  I don't think anybody -- any

9   reputable company should be engaging in malware.

10       But he didn't go further to say that there is nothing in

11  there that interferes with Apple's software or services, that

12  there's nothing in there that -- any hidden code that doesn't

13  provide or unlock or have additional features, that there's

14  nothing in there that is attempting to hide or misrepresent or

15  obscure features or content.

16       Why is that?  And is it?

17            MS. FORREST:  Well, Your Honor, there are a couple of

18  facts about the Unreal Engine that make that argument that it

19  could somehow act as a Trojan Horse really is a total

20  strawman.  Number one, the Unreal Engine is not consumer

21  facing.

22       This is a development platform or not which app developers

23  make their own apps.  That's what this is.  The app developers

24  are the one [sic] who are making the apps that then go into

25  the App Store.  It's a development platform.  It's not

1    consumer facing.  And that's set forth in the declaration of

2    Mr. Grant.

3        It also is what -- an app where there is no -- a

4    development platform where there's no IAP.  This is a

5    completely irrelevant argument to the Unreal Engine.  The

6    Unreal Engine is a development platform that is used by

7    developers all over the world for all kinds of different

8    industries, not just gaming.  But it's used for electronics.

9    It's used for medical devices.  It's used for space.  It's

10   used for airplanes.

11       And it's those developers who are determining what the

12   functionality is.  So the idea that it could act as some sort

13   of Trojan horse to Apple is misapprehending [sic] the Unreal

14   Engine from start to finish.

15           **THE COURT:**  I think -- and let's see.  Mr. Boutrous,

16   why don't you go -- you can respond on this one.  I'll come

17   back to you, Ms. Forrest.

18       But I -- I think that Apple's, you know, the sky is

19   falling down approach on this topic is a bit -- is a bit

20   overblown.

21       I did find the fact that -- that Mr. Sweeney was a little

22   bit obscure in his -- in his declaration to be interesting,

23   but I also don't think that Apple's really on solid ground in

24   some sense, that the I -- you know, that everything's going to

25   explode because the Unreal Engine's allowed to operate.

1      **MR. BOUTROUS:**  Let me start with that, Your Honor.

2   Thank you.

3      First, as, I think, the court was alluding to this.  Put

4   aside whether the -- Epic tries again to cheat and to sneak in

5   a Trojan Horse, which have really went to the core foundation

6   of its agreement with Apple, bypassing the app review process.

7      Let's -- let's -- let's assume it doesn't try it again.

8   But there's also the problem of inadvertent problems and --

9   and things that they might do.  And what they're trying to do

10  here is go after the entire business model.  If this court

11  were to uphold -- issue a preliminary injunction, Mr. Sweeney

12  is trying to be the Pied Piper of other developers.  He's

13  trying to bring everybody along.

14     And if this court were to say that others could do what

15  Epic did here, which is cheat, breach its agreement, sneak in

16  software to bypass app review and -- and IAP, others would do

17  it, too.  And that's really goes to the core of the system.

18     So it's just in fact Epic and Unreal Engine that we're

19  concerned about.  And that is a fundamental core of the

20  business model.  And Mr. Bornstein basically, again, admitted

21  that Epic wants to take down and have this court at the

22  beginning of the case issue an injunction that would go to the

23  core of Apple's business model and unravel it and -- and be a

24  green light to other companies.  And that would be very

25  dangerous.  We do take --

1       **THE COURT:**  But --

2       **MR. BOUTROUS:**  -- the secure --

3       **THE COURT:**  Let me ask, if I leave in place -- if I

4    make the injunction, the temporary injunction pending trial

5    the same as the TRO, then the public knows, right, that you've

6    breached the agreement.  It's fair game to kick you off the

7    platform.

8       And -- and, really, in my -- and my sole focus with

9    respect to the Unreal Engine has been that it was a separate

10   contract and the -- the harm to the public was incredibly high

11   especially when there wasn't a breach of that particular

12   contract.

13      So doesn't that shield Apple in the way that it needs to

14   be shield for purposes of this short period going to trial?

15      **MR. BOUTROUS:**  Let me go right to that, Your Honor.

16      First, as Mr. Schiller points out -- you know, he's one of

17   the founders of the App Store -- it's extremely important for

18   Apple to be able to terminate affiliates and -- and this is a

19   practice the court in its TRO order asked for invited

20   additional evidence on this point.  And he said that even

21   since 2016, Apple has terminated affiliates thousands of times

22   to protect consumers and privacy and data security.

23      And -- and on this point, Your Honor, let me just go right

24   to the new evidence on Unreal Engine, 'cause I know -- I

25   understood the court's concern there.

1          First, we now know that Epic International is not some

2     innocent party as they told the court at the TRO stage.

3     Paragraph 68 of Mr. Schiller's declaration states that without

4     dispute from Epic, that Epic International is siphoning off

5     illicit payments from the overseas Fortnite users through the

6     hot fix.  So they're participating in the scheme, the cheating

7     that happened.

8          Secondly, Epic has -- Epic International by doing that,

9     itself is breaching its agreements.  It's breaching its -- as

10    the court knows in the guidelines, which are incorporated into

11    the developer license agreement, it precludes cheating the

12    system and dishonest behavior.  That's what Epic

13    International's doing.  It's profiting from the wrong.

14         In addition, as Ms. Forrest alluded to and didn't dispute,

15    we've shown that Epic International is controlled by

16    Mr. Sweeney.  Mr. Penwarden, who submitted a declaration

17    saying he's basically in control of Unreal Engine, even though

18    he's the chief engineer for Epic Games.  Epic Games in -- in

19    responding on the sign-in with Apple dispute, which is all the

20    correspondence before the court, admitted that Epic Games and

21    Epic International and Unreal Engine are all tied together,

22    and Epic is managing that.

23         And so it's a -- it's a different record, Your Honor.  And

24    I think it goes to this retaliation point.  Apple wasn't

25    retaliating against Unreal Engine.  It was doing what it has

 1      done thousands of times, was protecting its ecosystem.

 2          Yes, Your Honor?

 3              **THE COURT:**  I understand that, Mr. Boutrous, but I

 4      can also say that every time Apple has a breach of contract

 5      with one of its developers, they don't call you into court to

 6      defend them, right?

 7          This is no small case.

 8              **MR. BOUTROUS:**  That's --

 9              **THE COURT:**  And -- and all the developers know that.

10      This is not a small case, so if someone would dare to do what

11      Epic has done, the likelihood that they are going to get shut

12      down and shut down hard as a developer -- yes, as you say,

13      your guidelines indicate.  They -- it's in there -- that the

14      developer -- not just the contract but the developer can be

15      shut out, is -- seems to be a contractual right.

16          But this is not an ordinary case.  And I think you would

17      probably agree with me, that this is not the ordinary case.

18          And so when we have extraordinary cases, we can try --

19      judges try as best we can, to keep the playing field as level

20      as possible with as little harm as possible so that we can in

21      a objective way move forward.

22          Now, one of the things that occurred to me having read

23      that paragraph -- and I would like a response on that topic,

24      Ms. Forrest -- is whether or not to order the payment of the

25      30 percent that is being collected by International or has

1    been collected by International to Apple during the pendency.

2       Thoughts.

3          **MS. FORREST:**  Your Honor, I can -- let me respond to

4    that question first, which is that if we are to -- if we lose

5    this preliminary injunction in terms of IAP and are not able

6    to have the Epic Pay be part of a Fortnite app that is

7    available on the App Store and Your Honor finds that, then

8    putting the 30 percent that is coming in from the small number

9    of Apple users who are still in existence, which is less than

10   25 percent of what they originally were, then that can go into

11   escrow.  It can go to wherever Your Honor directs.  Yes.  You

12   tell us where to put it, and it will be put there.

13      And let me just also respond to the fact that Epic has

14   been receiving those payments.  It's been receiving them

15   simply as an administrative matter only as to foreign.  It's

16   not been receiving them as to all transactions.

17      So the idea that it is somehow siphoning off illicit

18   payments, I think, is using hyperbolic language to

19   mischaracterize what is occurring here.

20      In terms of the Epic International and in terms of all of

21   the other affiliated companies with Epic, because it's not

22   just Epic International.  It's not just the Unreal Engine.  We

23   focus on those, but there are others, and those are set forth

24   in Mr. Grant's declaration.

25      And the fact as to those are not contested.  They are not

1   integrated agreements.  They are not agreements that can be

2   terminated at will.  Certainly they cannot be terminated at

3   will by a monopolist who has different kinds of law applicable

4   to his or her or its conduct.

5        They are entities which have got different start dates.

6   They're entities that have different products.  They're

7   entities have --

8            THE COURT:  Ms. Forrest, I don't think that you've

9   done, though, with respect to anything other than the Unreal

10  Engine is provide the same kind of compelling case with

11  respect to the damage in terms of public interest.

12           MS. FORREST:  Your Honor, you are correct that we did

13  focus on the Unreal Engine because there's only so much that

14  one can actually sort of evidence put into the record in a --

15  in this truncated proceeding.

16       However, we do have evidence in the record relating to

17  House Party, relating to a number of the other properties,

18  including Life on Air, Ka-Ra, Psyonix, and the Epic

19  International Sweden property.  And those are all set forth in

20  the Grant declaration, Paragraphs 5 through 12.  So there is

21  evidence that they will be impacted if the tools are taken

22  away, the same tools and their program developer agreements

23  are cut off, just as with Unreal Engine, they will be severely

24  impacted.

25       Those facts were in the opening declaration of Mr. Grant,

 1     and they were not contested by Apple.

 2         If I could, Your Honor, I could move on to a couple of

 3     other quick points that were raised by Mr. Boutrous.  One is

 4     the -- the choice of the business model by Apple, and I would

 5     just suggest that a monopolist cannot choose a business model

 6     and stick by it without consequence when there are unlawful

 7     contractual provisions --

 8              THE COURT:  Let me ask --

 9              MS. FORREST:  -- that are securing it.

10              THE COURT:  Do you have a perspective yet as to what

11     period in time -- at what point in time did Apple become a

12     monopolist?

13              MS. FORREST:  Your Honor, I do know that as of 2018

14     when Epic International -- when Epic itself went on to the IOS

15     platform, that's the data that we have, Apple was already in

16     the monopoly position.  It required --

17              THE COURT:  When?  You're claiming -- other

18     than the -- you want me not to think about the gaming

19     industry.  And I think it's obvious that in 2007, nothing

20     existed.  And in the 2007, 2008, early years, Apple created

21     something.  And now, it's a ubiquitous platform.  So they've

22     gone from being a non-player to an innovator, and at some

23     point, there is a claim that they are -- became a monopolist.

24              MS. FORREST:  Well, Your Honor --

25              THE COURT:  Even though -- even though, right, rates

1    haven't changed.

2        So do your experts have an opinion -- because we're

3    supposed to from your perspective only be thinking about all

4    the apps or the entire ecosystem -- at what time -- when did

5    the shift happen?  What happened?

6            **MS. FORREST:**  Your Honor, I --

7            **THE COURT:**  Maybe you can't answer that question yet.

8    I don't know, but it seems to me --

9            **MS. FORREST:**  I can answer part of it.

10                   (Simultaneous colloquy.)

11           **MS. FORREST:**  I can answer part of it, which is that

12   there are companies which actually have innovative products

13   and achieve a monopoly position as we started off today with

14   business acumen and with innovation --

15                   (Off-the-record discussion.)

16           **THE COURT:**  Ms. Forrest, you need to slow down.

17           **MS. FORREST:**  Oh, I'm sorry.

18           **THE COURT:**  Our court reporter -- you can't see her

19   on the platform -- at least I can't see her on the platform,

20   but I -- I generally -- we've been together for so many

21   years -- I know what -- when cadence -- when the caffeine

22   kicks in --

23           **MS. FORREST:**  That's the cry for help.  I get it.

24   Okay.

25       Let me just say that there are instances where there is a

1  company which has an innovative product where they have a

2  monopoly position in that product almost immediately.

3  However, they don't have an unlawful monopoly.  The unlawful

4  monopoly comes along when there's monopoly maintenance

5  conduct.

6      What we have here and what we know we have here from Apple

7  as of the time that we entered into our contractual

8  agreements, which were contracts of adhesion.  There was no --

9          **THE COURT:**  And that's okay with you, right?  You're

10  not opposed contracts of adhesion because you generate them.

11  Right?

12          **MS. FORREST:**  Well, the -- the Unreal Engine, for

13  instance, actually has negotiated --

14          **THE COURT:**  Ms. Forrest, I -- seriously, Epic Games

15  is not opposed to contracts of adhesion, are they?

16          **MS. FORREST:**  There are certain contracts of adhesion

17  that Epic Games has, correct.

18          **THE COURT:**  Okay.  Go ahead.

19          **MS. FORREST:**  What I'm -- what I'm suggesting is that

20  as of 2018, when we entered into our relationship with IOS,

21  there were no alternative app stores.  We were -- and there

22  was no alternative to IAP.  It was a monopolist at that time,

23  and it has sought to maintain its monopoly throughout that

24  time --

25      You look like you're about to say something, so I don't

1    want to interrupt.

2              **THE COURT:**  Go ahead.

3              **MS. FORREST:**  So that I think is our view as to

4    when it -- when it -- did it -- when did start?  It started at

5    the beginning.  When did it become unlawful?  That becomes a

6    more complicated question.  It became unlawful as to us as of

7    2018.

8         When did it become unlawful to the point where we could no

9    longer actually abide by the contractual provisions?  It was

10   after our ability to even try to negotiate with Apple, which

11   we did.  We did try.  Ran out.  And only after that in the

12   summer of 2020 did we sue.

13        And if I could, Your Honor, I'd go through just a couple

14   of the other points that were raised by Mr. Boutrous, which is

15   that he said that we had been a cheater and that this was an

16   act of sabotage.  And I want to address that because that goes

17   to both the public interest and the equitable arguments that

18   have been made as well as whether or not the court would feel

19   persuaded by the irreparable harm.  We are not cheaters.  We

20   are not saboteurs.

21        There is uncontradicted evidence in the record that was

22   put in in the opening declaration of Mr. Grant and Mr. Sweeney

23   relating to the turning on of the payment service.  We call

24   this the "hot fix."  And the hot -- the word "hot fix" seems

25   to have this negative connotation, but let me just say a

1     couple of words --

2            THE COURT:  I don't know that it has negative

3     connotation.  You were not forthright.  You weren't.  You were

4     told you couldn't do it.  And you did.

5        You know, there's that old saying, "a rose by any other

6     name is still a rose."  I mean, you can try all you want --

7     you can try -- but you're not going to convince anybody that

8     you had something in there you tried to have Apple approve of

9     it.  Good or bad, they said no, and you did it yourself.  It's

10    self help.

11           MS. FORREST:  What I want to say, though, is that we

12    have used hot fix hundreds of times --

13           THE COURT:  Lots of people use hot fixes.  That's not

14    the issue.  That's not the issue.  The issue is that you were

15    told and you knew explicitly because of your contractual

16    relations that you could not have that.  And you did.

17           MS. FORREST:  My point is --

18           THE COURT:  It's really pretty simple.

19           MS. FORREST:  I -- I understand, Your Honor.  My

20    point is I want to connect that to the alleged security issues

21    because Apple ties the hot fix to sabotage as if it's tied to

22    security.  Once it's understood that hot fixes are

23    commonplace, that they were used hundreds of times in the

24    past, that Apple never complained.  They're not a security

25    issue.  And indeed, no security --

1          **THE COURT:**  What the security issue is, is that you

2    did something, you lied about it.  By omission, by not being

3    forthcoming, that's the security issue.  That's the security

4    issue.

5          Now --

6          **MS. FORREST:**  Your Honor --

7          **THE COURT:**  -- it could have been -- you know, as you

8    say, it's not -- not malware.  But -- but let's -- let's not

9    debate a point that -- I mean, to -- you know, there are

10   plenty of people in the public who consider you guys heroes

11   for what you did, but it's still not honest.

12         **MS. FORREST:**  Your Honor, the -- what Apple tries to

13   do is it tries to tie the hot fix to the idea that we have

14   made the ecosystem insecure.  After a full month with this

15   code, they know that there is absolutely no security or

16   privacy issue that is real.  They also --

17         **THE COURT:**  Where do they start this discussion?  I

18   told Mr. Boutrous I thought that they were really overblowing

19   their claims, so no argument there.  But don't -- but don't

20   try to convince me that you were forthright when you weren't.

21         **MS. FORREST:**  I understand your position, Your Honor.

22   And I -- I do know that Your Honor has also read our papers

23   thoroughly on this point, so I'll leave it.

24         Can I talk just a little bit about the security point, or

25   have you heard enough on that as well?

1        **THE COURT:**  I don't -- I don't think there are

2    particular security issues.  I --

3       Mr. Boutrous.

4        **MR. BOUTROUS:**  Yes.  Thank you, Your Honor.

5       When -- if I could just back up for a second in terms of

6    the preliminary injunction standard.  I think the court was

7    just getting to a point I was going to get to.  Epic wasn't

8    honest.  This is a court -- this court's sitting as a court of

9    equity.  There's no dispute that Epic needs to meet all four

10   preliminary injunction standards to get an injunction, a

11   preliminary injunction.

12      Ms. Forrest just admitted they must show likelihood of

13   success on the merits.  The *Garcia v. Google* en banc decision

14   says that they must meet that standard.  They haven't met it.

15      As Mr. Doren demonstrated, this is the -- and the court

16   mentioned the "Wild West."  This is the frontier fringes of

17   antitrust law.  They can't possibly show likelihood of

18   success.

19      They also -- Epic needs to also show irreparable harm to

20   itself before we get to public interest or balance of the

21   equities.  It has failed to do so, both as to Fortnite for the

22   reasons the court held in the TRO, self-inflicted wound, a

23   problem of its own making.  They could have just kept

24   performing.  They just wanted to get more money and get the

25   platform for free.

1          **THE COURT:**  Now you're repeating yourself.

2      Anything new?

3          **MR. BOUTROUS:**  Yes.  Let me just think the -- the new

4   part, Your Honor.  That on the public interest focus, it's

5   Epic that's injuring the public interest with respect to

6   Unreal Engine and third parties.  Epic is by -- by not

7   complying with the contract, it's Epic that triggered the

8   contractual rights, and they could fix that with a key stroke.

9      So when you look at all of the factors --

10         **THE COURT:**  Well --

11         **MR. BOUTROUS:**  -- they must meet them all.

12         **THE COURT:**  -- doesn't matter at this point.

13     Are you telling me -- I understood that Apple had said --

14  and it really could be just hypothetical 'cause I don't think

15  that they would agree to go back on, but Apple said, look,

16  even if you -- even if you agreed, we're -- we are keeping you

17  off for a year, period.

18     And has --

19              (Simultaneous colloquy.)

20         **THE COURT:**  -- change -- changed?

21         **MR. BOUTROUS:**  Yes, Your Honor.  The standard

22  language from the usual letter in this context was included in

23  the Unreal Engine letter.  But Apple's willing to -- since

24  this court is involved and the court's supervision, if Epic

25  would just come into compliance, it can free Fortnite.  It can

1    free Unreal Engine by just complying, paying what it owes and

2    we have a trial and summary judgment and proceed.  And that

3    will protect the public.

4              **THE COURT:**  What about -- what about this?

5              **MR. BOUTROUS:**  Um.

6              **THE COURT:**  What if that 30 percent -- well, I was

7    going to go -- to say, well -- what if it went into some

8    escrow account?

9              **MR. BOUTROUS:**  That -- that would another least

10   address --

11             **THE COURT:**  It's kind of -- you know, we're talking

12   about billion-dollar companies.  I don't know why we would do

13   that but -- other than to give each side maybe a little bit to

14   hang their hat on.

15        So what if I said that?

16             **MR. BOUTROUS:**  Well, Your Honor --

17             **THE COURT:**  Since -- escrow account.

18             **MR. BOUTROUS:**  Yeah, it -- that at least addresses

19   part of it.  It's -- the fact that Epic International is, you

20   know, part of the -- the scheme to take these profits and take

21   it all.

22        But there's also the 30 percent that Epic -- is -- is

23   taking -- now it's Epic Games is taking as well for -- for

24   U.S. sales.  But it really goes to this point, Your Honor,

25   just as a legal matter.  It -- the same rationale with respect

1    to Fortnite applies to Unreal Engine.  Epic can cure it in a

2    second.  Just go into compliance.  If it's not about the

3    money, pay Apple the money they owe Apple.  It's -- and

4    then -- and then Unreal Engine, Apple's willing to let Unreal

5    Engine and Fortnite back on the system.

6        That's the proper approach here.  And we'll -- I would

7    suggest to Ms. Forrest --

8                    (Simultaneous colloquy.)

9            **MR. BOUTROUS:**  Yes, Your Honor.

10           **THE COURT:**  But respond to my question.

11       If -- if -- will Apple let Fortnite back on and would,

12   Ms. Forrest, Epic Games agree to go back on without -- without

13   their own payment option but all monies that flow from that

14   that go into a escrow account pending resolution of this

15   lawsuit?  Yes or no?  Or you don't know?

16       Mr. Boutrous?

17           **MR. BOUTROUS:**  So if I'm understanding --

18                   (Simultaneous colloquy.)

19           **MR. BOUTROUS:**  Yes.  Your Honor, if I'm understanding

20   the court's question, if Epic were to disable the hot fix,

21   their own payment system, go back to using IAP, the 30 percent

22   were to go into some sort of escrow account, and Unreal Engine

23   likewise would -- would come back on, I -- that would address

24   a lot of the issues.

25       I'd have to -- I would have to ask my client about it

1    since it is a significant thing, but it -- it does at least

2    start to address the issues.  There's just no way we can have

3    Fortnite stay on the App Store defying IAP, defying app review

4    for the reasons the court already resolved -- had -- had

5    ruled.  And with respect to Unreal Engine, seems like it's

6    easily fixable by -- by Epic.

7             THE COURT:  Ms. Forrest?

8             MS. FORREST:  Your Honor, we would not agree that the

9    scenario under which we are required not to have consumer

10   choice and competition on payment options --

11            THE COURT:  I don't need a long answer.  Yes -- so

12   it's sounds like no, you're not interested in that.

13            MS. FORREST:  We're not interested, and we would also

14   say, Your Honor, just briefly, that the cases that we've

15   cited, the Supreme Court cases say that this court should not

16   give its assistance to unlawful provisions by monopolists and

17   that, therefore, we would be agreeing and trying to comply

18   with unlawful provision.

19            THE COURT:  Yeah, I didn't buy that argument before.

20   I'm not particularly impressed with it now.

21            MS. FORREST:  Can I -- Your Honor, can I say --

22            THE COURT:  All right.

23            MS. FORREST:  -- one -- a couple of things just in

24   response to things Mr. Boutrous had said earlier?

25            THE COURT:  Quickly.  And I mean briefly.

 1          **MS. FORREST:**  Okay.

 2      I'll try not to be too quick.  One, that there is

 3  irreparable harm to Epic.  Epic's IOS business has been

 4  shuttered.

 5      And, two, monopolists -- when they say that --

 6          **THE COURT:**  There's no case that says that, you know,

 7  my billion dollar company is -- you know, is losing some

 8  millions and so, therefore, that's irreparable harm.  There's

 9  no case law to support that.

10          **MS. FORREST:**  No.  There's lots of case law that says

11  that when you've got a diminution in good will, which is

12  exactly the instruction of a business, that that is precisely

13  the time that there should be a preliminary injunction --

14                  (Simultaneous colloquy.)

15          **THE COURT:**  All right.

16          **MS. FORREST:**  It doesn't have all aspects of a

17  business.  It is this business.

18          **THE COURT:**  You can't -- you know, your good will is

19  probably in some ways increased.  So, again I -- maybe for

20  some people, less good will.  But for other people, lots of

21  good will.

22      And -- and it certainly -- you know, and you're

23  certainly -- your marketing campaign has been -- has been

24  lauded, given your conduct.

25      Okay.  What else?

```
1              MR. BOUTROUS:  Your Honor, if I could just address

2    one more point on the Unreal Engine.  I don't know if I

3    misheard Ms. Forrest suggest this, that somehow it's been

4    destroyed or it's going under.  The evidence -- this is --

5    they had the burden to bring the evidence.  Mr. Penwarden

6    talks about a few dozen complaints or concerns, gives three or

7    four examples.

8         And I just would suggest this is -- it's a -- extreme form

9    of relief they're asking having breached the agreements.  They

10   could cure the problem themselves.  They didn't bring forth

11   evidence of the -- the kind of harm they're suggesting to the

12   public and to -- to third parties.  And they could cure it

13   themselves.

14        And I -- Your Honor, I understand the court's

15   sensitivities about, you know, affecting other people.  But

16   it's -- I'll end with this.  It's the same analysis as to

17   Fortnite.  They could fix it in a second.  They're not

18   claiming damages.  They have publicized their campaign.  If

19   anyone's getting wind of what's happening it's, because

20   they've been on this blistering ad campaign, and they formed a

21   group last week of other developers to -- to expand it, so

22   they don't need this court's emergency help.  They have the

23   keys in their pocket to free Fortnite and Unreal Engine.

24        Thank you.

25             MS. FORREST:  Your Honor, on Unreal Engine, let me
```

1     just say because I think the evidence has been completely

2     mischaracterized.  There's is unrebutted evidence in the

3     record in both the declarations of Mr. Penwarden and Mr. Grant

4     that there are hundreds of thousands of developers whose

5     platforms are at risk.

6         We say that Apple, we believe, will stop accepting Unreal

7     Engine apps that are built on that platform as of 2021.  They

8     will be, then, destroyed.  We have numerous -- dozens and

9     dozens, and that's set forth in the Penwarden declaration of

10    instances where developers are saying that they are concerned,

11    and we have millions of users who are reliant upon those

12    applications.  All of that evidence is in the record.  This is

13    not a handful of -- of three or four examples.  We have got

14    millions of people who will be directly affected.

15        Can I say one more thing on --

16            THE COURT:  Let me just say on that last piece, that

17    if -- it is not uncommon, as you all well know, that if

18    circumstances significantly change, that motions and requests

19    can't be renewed.  All right.

20        Last issue.  You said you wanted to say something else,

21    Ms. Forrest.

22            MS. FORREST:  Last thing I would say, Your Honor, is

23    there's been discussion of a publicity campaign.  All I would

24    say with that is when you are taking on the biggest company in

25    the world, and you're taking it on where you know it's going

1   to retaliate, you don't lie down in the street and die.  You

2   plan very carefully on how you're going to respond, and you

3   try very hard to keep your head above water.  And that's what

4   we've done here.

5       Yes, there's been a publicity campaign.  We took on the

6   biggest company in the world that is fighting us hard, and we

7   knew that.

8           MR. BOUTROUS:  Your Honor, may I address that just

9   briefly?

10          THE COURT:  Here's the -- you know, there are other

11  people who are taking it on.  And one of the questions that

12  you never answered after the last hearing is what happened

13  that -- that made this so urgent.

14      The -- the topic related to the App Store is not a new

15  topic.  I tried a case over the alleged monopoly that Apple

16  had with respect to iPods.  This was so old by the time I got

17  it -- it was so old by the time we tried it that we had to

18  bring iPods into the courtroom because no one knew what they

19  were.

20      And, in fact, I tried -- I'd forgotten you have to put

21  headphones in.  I tapped the little button expecting to hear

22  the music and nothing came out until then I remembered, oh,

23  you need headphones for these things.

24      So we tried that case.  And Apple won on the security

25  issues in front of a jury, so this isn't just some judge.

1    This was a jury who made that -- who made that call.

2        And there is active litigation happening in the *Cameron*

3    case and in the *Pepper* case on this topic.

4        So you know, Epic can choose to go out on its own.  That's

5    fine.  But it's not as if others aren't taking Apple on.

6        **MS. FORREST:**  I understand.  Can I just address the

7    idea of why did we do it and -- just very, very briefly.

8        We have heard in this case and in the Apple's papers that

9    there is no separate market for the App Store and IAP.  If we

10   had brought a declaratory judgment argument that said that

11   there were separate products and they were tied together, what

12   you would hear from Apple is that they are integrated, that

13   there is no separate demand.

14       What we did when we released the hot fix is we showed that

15   there was separate demand.  We did proof of concept.  We

16   eliminated Apple's ability to say that there is no separate

17   product.  We showed that there is.  That gives us something

18   that we would otherwise have been unable to have.  We had it

19   for six hours.  But my -- by golly, those were an important

20   six hours.

21       We showed that consumers want the choice, that they want

22   lower prices.  We did the hot fix because we had to.

23       **THE COURT:**  It's good evidence, but it doesn't mean

24   that -- that you can't go back into compliance.  I mean, you

25   can.  And -- and, you know, which brings me to another point,

1    which is that I think personally this case should be tried to

2    a jury.  And I want everybody to think about that.

3        And the reason I say that is because individual judges

4    don't have and aren't the be-all and end-all.  I can tell you

5    that circuit court judges don't -- don't give district court

6    judges lots of discretion when it comes to factual matters,

7    despite what it is they're supposed to do.  Actually don't

8    care very much.  They're going to decide what they want to

9    decide that.

10       You know, I mean, I think we've seen time and time again,

11   district court judges can make -- we can write orders that are

12   hundreds of pages long with all sorts of factual findings, and

13   the appellate courts are going to do what they want to do.

14       But when it comes to juries, they are much less likely to

15   ignore the factual findings of jurors.  And you're going to go

16   through this whole process.  It's going to cost a lot of

17   money, time, and effort.  And as we've noted, these are

18   important cases, and they're on the frontier of antitrust law.

19       You might as well find out what people really think and

20   want and take that to the Court of Appeal, because I know that

21   I'm just a stepping stone for all of you.  Whoever loses is

22   going to take it up and say everything I did was wrong.

23   That's what litigators do.  I understand it.  There's no --

24   there's no hard feelings.  That's -- that's the job.

25       But I -- I think that it is important enough to understand

 1     what real people think.

 2         You know, do these security issues concern people or not?

 3         Is there -- is the concerns of the developers incredibly

 4     important?  I -- I think many people would think that it is.

 5     But I'll have you chew on that, because I do think that this

 6     is something for which jury import -- jury insights would be

 7     important.  Otherwise, it's just one more judge.

 8         Okay.  So with that, let's talk about trial schedule.

 9     Federal judges -- in case you didn't notice, are a little bit

10     busy.  I don't want to try two cases.  The difference between

11     six months, eight months, and ten months in our life is not a

12     big difference.  So I'm inclined to try both cases at once so

13     you should plan on that.

14         **MS. FORREST:**  Your Honor, in -- may I say one thing

15     just make sure that when we talked earlier about the no

16     amendments to the pleadings that we didn't lose sight of one

17     thing, which is our answer is due tomorrow.  We are answering

18     the counterclaims.  In order to make sure that every -- that

19     Apple understands exactly what our defenses are.

20         However, we are going to move to dismiss under 12 (c), two

21     of the counterclaims that actually try to -- three of them

22     that actually try to expand the evidence beyond really a

23     breach of contract.

24         We actually don't disagree that we have breached a

25     contract if you find against us on the antitrust claims.

 1    That's not going to be an issue that's going to require a lot

 2    of -- of complexity in this case.  If we are wrong, then we

 3    have breached the contract.

 4        And so we will try to get rid of -- we believe we've got

 5    very good legal reasons to get rid of the conversion claim,

 6    the prospective economic advantage, and the separate covenant

 7    of good faith and fair dealing.

 8        **THE COURT:**  So I think it's a good motion with

 9    respect to conversion.  And, frankly, what I'd like to do is I

10    would like for you all perhaps to meet and confer.  You can

11    file it tomorrow.  Your deadline's tomorrow.  It's probably

12    already written.  But perhaps after it's filed, you all can

13    meet and confer.

14        California law is pretty clear that in a conversion claim,

15    especially when you're talking about money damages, you have

16    to be able to trace the money.  So if -- if someone has -- you

17    know, in the old days, a set of gold coins, you could have a

18    conversion claim.  But you really have -- and I've actually

19    written on this.  You have to be able to trace.  You cannot

20    bring a conversion claim in your run-of-the-mill contract

21    dispute.

22        So you really should be able to address that without

23    motion practice.  And if you don't, it's fine.  I'll probably

24    cut and paste from a prior order and dismiss it.  I just -- I

25    mean, you'd have to have some very good arguments to claim

1      that somehow you've got conversion here.

2          I don't know what the arguments are for -- for trying to

3      dismiss the implied covenant of good faith and fair dealing.

4      There's always an implied covenant of good faith and fair

5      dealing, so what would be the basis for moving to dismiss that

6      claim?

7                **MS. FORREST:**  Because, Your Honor, it's not a

8      separate claim from a breach of contract claim.  If there is a

9      non- -- if there is a contractual obligation directly on

10     point, then one does not have a separate breach of covenant

11     and good faith and fair dealing --

12               **THE COURT:**  Under California law, you can plead in

13     the alternative.  We let people do it all the time.

14               **MS. FORREST:**  They're not asking for an alternative

15     reading, Your Honor.  They're saying there's a direct

16     contractual provision that has been breached.  And then

17     they're also asking for a breach of covenant of good faith and

18     fair dealing.  That's simply to bring an intent.  There's no

19     reason to bring an intent.  We're conceding that if there has

20     been -- if we're wrong about the antitrust claim, there's been

21     a breach of contract.  We're conceding that.  This is not a

22     situation --

23                         (Off-the-record discussion.)

24               **MS. FORREST:**  I'm sorry.

25               **THE COURT:**  Slow down.

1          **MS. FORREST:**  Let me repeat.  And I apologize,

2     Ms. Mercado.

3          That when there is a contractual obligation that is

4     directly on point, then there is no separate covenant of good

5     faith and fair dealing claim that lies.  And we believe that

6     that is exactly on point here.  And that is only being

7     asserted in order to bring in additional evidence of intent.

8          This is a simple contract issue.  It gets really --

9     it's the -- it's the opposite of the antitrust.  If we lose on

10    the antitrust, they win on the contract.  It's not really

11    going to be and shouldn't be a complex second trial.

12         In terms of prospective -- interference with prospective

13    business relations, again, when there are contractual

14    obligations directly on point, that doctrine is inapplicable.

15    And there's good California law on that as well.

16              **THE COURT:**  Mr. Doren.

17          **MR. DOREN:**  Your Honor, obviously, we disagree.  We

18    have -- we have pled the claims in the alternative, as is our

19    right.  And, obviously, we'll look to see what their motion

20    has to say, but we disagree with that characterization of the

21    law and with our rights as -- as the cross-complainant, we

22    believe that the claim should stand.

23              **THE COURT:**  Well, I suspect that you'll file your

24    motion.  Thirty-five days notice is a standard.  Don't expect

25    oral argument, and I'll probably just issue an order.  I mean,

1    it's --

2        And you certainly should not stop.  That is, you need to

3    get going here because time is going to be short and of the

4    essence.

5        All right.  So with respect to the schedules that have

6    been proffered, thoughts?

7            **MS. FORREST:**  Your Honor --

8            **THE COURT:**  Yeah.  If you want to say something other

9    than what's in your papers.

10           **MS. FORREST:**  Your Honor, what we would just urge the

11   court is for the shortest schedule possible, particularly if

12   there's not going to be any injunctive relief on one of our

13   bases or either of the bases, whatever Your Honor decides,

14   then it's going to be particularly important that we get to

15   trial as quickly as possible.

16           **THE COURT:**  I agree.  And just so that you all know,

17   I have frequently set trials where there is an injunction in

18   six months, so your stats are interesting, but they're not my

19   practice.

20           **MR. DOREN:**  And, Your Honor, I'm sorry.  I thought

21   Ms. Forrest had frozen, so I was remaining silent for a

22   moment.

23       Can I address the scheduling issue for just a few seconds?

24           **THE COURT:**  You may.

25           **MR. DOREN:**  Thank you, Your Honor.

1    As you can see from -- from Apple's schedule and -- and

2    Epic's schedule, both parties recognize that completion of

3    document or data production in early January is -- is, I

4    think, we hope a -- a reasonable goal.  Get that done at --

5    right by the time the holidays close out, and then turn to

6    depositions and expert work.

7    The -- the toggles, if you will, in the schedule, I think

8    Epic proposes that all depositions take place between

9    January 4th and February 5th, whereas we would extend that by

10   about three more weeks.

11   Epic has told us that they -- they intend to take at least

12   the ten depositions permitted under the rules.  Obviously, as

13   well, Your Honor, there will be third-party discovery.  And

14   that will involve, you know, scheduling with third parties as

15   well as getting their compliance with -- with discovery

16   obligations.

17   So having documents produced by early January followed by

18   what we have is about seven weeks of deposition discovery to

19   us seems like the practical and realistic approach and one

20   that can actually be achieved and that we will not be back to

21   the court asking for further relief on the schedule.  So that

22   was the thinking in the schedule that Apple's put forward.

23   And then the other -- the other, I think, flex points in

24   the schedule, if you will, are the -- the timing of the expert

25   reports vis-a-vis dispositive motions.  Apple's schedule has

1   dispositive motions after the expert report process is

2   completed, if you will.  And Epic's -- they call it their

3   compromised schedule.  Epic's schedule has dispositive motions

4   after the opening expert reports have been filed but before

5   the rebuttal expert.

6          **MS. FORREST:**  Your Honor, may I just respond to a

7   couple of things there?

8          **THE COURT:**  You may.

9          **MS. FORREST:**  All right.  Thank you.

10      I would just point out that in our six-month schedule,

11  which is a schedule that does -- that anticipates that there

12  would be a trial probably -- I don't know what Your Honor's

13  practices will be or the court's will be in terms of

14  impaneling a jury, but that it allows a trial in the absence

15  of a jury.  It also, because it would be a bench trial, does

16  not have dispositive motions, and so that is not built into

17  the schedule.

18      If we build dispositive motions into the schedule, what we

19  did on the eight-month schedule is allow the initial expert

20  reports to come in on February 19th prior to the initial

21  dispositive motion being filed.  And we followed, then,

22  exactly the same time frames that Apple had in its papers for

23  dispositive motions, so the difference is whether or not we're

24  going to have more than just the opening of the expert reports

25  for the dispositive motions.

1    Again, we don't think that we -- right now, we would like

2    to have it tried by the bench in particular also because not

3    only is it an equitable claim but because of COVID and the

4    uncertainty of when we're going to get a jury and the concern

5    that that might be some time.  But that --

6                    (Simultaneous colloquy.)

7         **THE COURT:**  Judge Freeman is picking a jury in a

8    Cisco case for next month.  We are trying hard to pick juries

9    here.  You're right.  We don't know what's going to happen.

10   But we are trying.

11       Okay.  At least there are some things that you all agree

12   on, so I'll order them.

13       Last day to meet and confer regarding initial disclosures,

14   October 5th.

15       Complete your initial disclosures or state your objections

16   by October 12th.

17       Complete document production and data, you couldn't agree,

18   so I'll give you January 6, 2021.

19       Do not intend to bifurcate so I do need to know from

20   Apple -- I'll give you until close of business tomorrow,

21   Mr. Doren, to let me know whether or not you're demanding a

22   jury or either one of you, frankly, given counterclaims.

23       Ms. Forrest?  In general -- and maybe I'll put it in the

24   order -- any deadlines I'll give, I'll always -- they're

25   always Pacific time, okay?  So to the extent it's not obvious,

1   I'll make it obvious, Pacific time.  Close of business, I know

2   for lawyers is midnight.  For the courts, we'll say it's

3   5:00 o'clock, even though we all know it's not, at least not

4   for the judges and the law clerks.

5       All right.  That's what I mean by "close of business."

6           **MR. DOREN:**  Thank you.

7           **THE COURT:**  Once I received those submissions, I will

8   give you your schedule.  Anything else you want me to

9   consider?

10          **MR. DOREN:**  No, Your Honor.

11          **MS. FORREST:**  No, Your Honor.  Thank you.

12          **THE COURT:**  You should know that I have a major class

13  action that is being tried in June so June is probably out.  I

14  think -- I think you're looking at a July trial date.  As soon

15  as I finish that case, I'll do this one.  But that case is

16  old.  It's gone up to the Court of Appeal and back down, and

17  I'm not bumping it for this case.

18      Okay.  Anything else you want to discuss?

19          **MR. DOREN:**  No, Your Honor.  Thank you.

20          **MS. FORREST:**  No, Your Honor.

21          **MR. BOUTROUS:**  Thank you, Your Honor.

22          **THE COURT:**  Case management conference?  Once you get

23  your schedule, you just -- you're good to go.

24          **MR. DOREN:**  Your Honor, if you're asking if it'd be

25  helpful to have a case management conference, that -- perhaps

1    it would.  And then after we see the schedule, if the parties

2    agree it's not necessary, we can -- we can let the court know.

3            **THE COURT:**  All right.  That's fine.

4        Does that work for you, Ms. Forrest?

5            **MS. FORREST:**  It works -- it works for me.  I mean,

6    we're -- we're fine getting it just with the court order, but

7    we're also fine to convene a conference.

8            **THE COURT:**  All right.  Why don't we say -- and you

9    can -- you can let me know that there's no need.  Should be

10   fine.

11       I'll put you on October 19th at 1:30 for case management

12   conference.

13           **MS. FORREST:**  And, Your Honor, just to be absolutely

14   clear so there's no debate about it, we assume that as of now,

15   we should be absolutely sort of full steam ahead to get

16   everything done for document production that we -- not waiting

17   for the case management conference for that purpose.

18           **THE COURT:**  I think if you don't want to fall behind,

19   you better start now --

20           **MS. FORREST:**  Thank you.

21           **THE COURT:**  -- so --

22       Okay.  Any other questions?

23           **MR. DOREN:**  No, Your Honor.

24           **THE COURT:**  All right, then.  Everybody stay safe.

25       I'll take it under submission.  You'll hear from me in

1     writing.

2          Thank you.

3               **MR. DOREN:**   Thank you.

4               **MS. FORREST:**   Thank you, Your Honor.

5               **MR. BOUTROUS:**   Thank you, Your Honor.

6                    (Proceedings were concluded at 11:56 A.M.)

7                              --o0o--

8

9

10                    <u>**CERTIFICATE OF REPORTER**</u>

11

12          I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14     I further certify that I am neither counsel for, related to,

15     nor employed by any of the parties to the action in which this

16     hearing was taken, and further that I am not financially nor

17     otherwise interested in the outcome of the action.

18

19     _____

20          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

21               Tuesday, September 29, 2020

22

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*