**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **EPIC GAMES, INC.,**<br><br>    Plaintiff,<br><br>  vs.<br><br>**APPLE INC.,**<br><br>    Defendant. | Case No. 4:20-cv-05640-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 61 |

Preliminary injunctive relief is an extraordinary measure rarely granted. Plaintiff Epic Games, Inc.'s lawsuit against defendant Apple Inc. challenges the fundamental operation of digital platforms affecting millions of users. To resolve it, the Court must apply the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law—statutes enacted more than a century ago—to a technology context where lawyers and economists can merely hypothesize about the future of the digital frontier. While courts are charged with adjudicating cases of significant impact, they do so cautiously, and on full records, with the status quo intact.

In this motion for preliminary injunction, Epic Games asks the Court to force Apple to reinstate *Fortnite* to the Apple App Store, despite its acknowledged breach of its licensing agreements and operating guidelines, and to stop Apple from terminating its affiliates' access to developer tools for other applications, including Unreal Engine, while Epic Games litigates its claims. Having carefully considered the parties' arguments, and for the reasons set forth more fully below, the Court maintains its findings from the temporary restraining order and hereby **GRANTS IN PART** and **DENIES IN PART** Epic Games' motion for a preliminary injunction.

Epic Games bears the burden in asking for such extraordinary relief. Given the novelty and the magnitude of the issues, as well as the debate in both the academic community and society at large,[1] the Court is unwilling to tilt the playing field in favor of one party or the other with an

---

[1] *See e.g.*, "Investigation of Competition in Digital Marketplaces," STAFF OF SUBCOMM. ON ANTITRUST, COMMERCIAL, AND ADMIN. LAW OF THE COMM. ON THE JUDICIARY, UNITED

early ruling of likelihood of success on the merits.  Epic Games has strong arguments regarding Apple's exclusive distribution through the iOS App Store, and the in-app purchase ("IAP") system through which Apple takes 30% of certain IAP payments.  However, given the limited record, Epic Games has not sufficiently addressed Apple's counter arguments.  The equities, addressed in the temporary restraining order, remain the same.

## I.   BACKGROUND

The Court summarizes the limited record before it on this motion for preliminary injunction.  To expedite issuance of this Order, the Court cites to some of the basic background from its prior order[2] as the background is equally relevant here.  The Court notes disputes in the evidence where otherwise appropriate.

### A.   The Players

With respect to Epic Games:

> Epic Games is a United States-based tech-company that specializes in video games, including, as relevant here, the popular multi-platform[3] game, *Fortnite*.  *Fortnite* is structured around "seasons," whereby narratives, themes, and events are introduced for a limited time.  Cross-platform play is enabled for all users so long as those users remain on the same version of the game. . . .

> Epic Games International, S.a.r.l ("Epic International") is a related company based in Switzerland and hosts, among others, the Unreal Engine.  The Unreal Engine is a graphics engine created by Epic International to assist in its development of video games that it later began licensing to other developers.  The Unreal Engine 4, the current version of the engine on the market, is used by third-party developers for the development of video games for both console and mobile

---

STATES HOUSE OF REPRESENTATIVES, (Oct. 6, 2020).  The Court finds it appropriate to take judicial notice of public documents generated by Congress, although the Court does not consider the content therein for purposes of this motion.  *See Vasserman v. Henry Mayo Newhall Mem'l Hosp.*, 65 F. Supp. 3d 932, 942-43 (C.D. Cal. 2014) (noting that court can take notice of '[o]fficial acts of legislative, executive, and judicial departments of the United States'"); *Del Puerto Water Dist. v United States Bur. of Reclamation*, 271 F. Supp. 2d 1224, 1234 (E.D. Cal. 2003) (taking judicial notice of House Reports).

[2] *See Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR, 2020 WL 5073937 (N.D. Cal. Aug. 24, 2020) (Dkt. No. 48).

[3] These platforms include Android, iOS, macOS, Windows, Sony PlayStation 4, Microsoft Xbox One, Nintendo Switch.  *Fortnite* is also available for download through the Epic Games Store, as discussed herein.

platforms, including for games currently offered in the iPhone App Store. These third parties range from smaller game developers to larger corporations, such as Microsoft Corporation. The Unreal Engine has also been used by third parties for architecture projects, film and television production, and medical training.

*Epic Games*, 2020 WL 5073937 at *1 (Dkt. No. 48 at 2). Epic Games has released twenty-five (25) updates to Unreal Engine since 2014, and anticipates releasing future updates to ensure that Unreal Engine remains compatible with new versions of Apple's software, such as the now released iOS 14. Developers can use Unreal Engine commercially on a royalty model or negotiated license, but it is otherwise free for non-commercial use. Although more applications on the iOS platform are powered by a rival game engine, Unity, a significant number of iOS applications are constructed based on Unreal Engine, including *Fortnite* competitor *PlayerUnknown's Battlegrounds* ("*PUBG*").

Epic Games also maintains or controls other affiliates including: Epic International, Life on Air, Inc. (both in San Francisco, California and Austin, Texas), KA-RA S.a.r.l., Psyonix LLC, and Quixel AB (collectively, "Epic Affiliates"). The Epic Affiliates maintain control over certain applications and software within the Epic Games business. These identified applications include: Unreal Engine, Unreal Remote 2, Unreal Match 3, Action RPG Game Sample, Unreal Remote, Live Link Face, and House Party, among others. Meanwhile, Epic Games itself controls *Battle Breakers*, Infinity Blade Stickers, *Spyjinx*, and, as relevant here, *Fortnite*.

Beyond these games and applications, Epic Games also operates a digital marketplace to sell game software called the Epic Games Store. As pled in the operative complaint: the Epic Games Store was created to compete against the leading multi-publisher digital video game marketplace on computer platforms, Steam, which is operated by Valve Corporation. The Epic Games Store provides access to more than 250 games from more than 200 developers. Like other video game digital distribution platforms, the Epic Games Store offers personalized features, including friends list management and game matchmaking services. As alleged, absent Apple's alleged anti-competitive conduct, Epic Games would also create an analogous Epic Games Store for the iOS platform independent of Apple's digital marketplace.

United States District Court
Northern District of California

3

With respect to Apple:

> Apple is a ubiquitous tech-company that makes products ranging from hardware to software. Apple, as relevant here, maintains an App Store for the iOS platform that is geared for its mobile devices, the iPhones [and iPads]. The App Store allows third-party developers an opportunity to create and thereafter sell applications to iPhone [and iPad] users. Apple generally takes 30% of the sale of the application or of the IAP made within the third-party application itself. Apple's agreements with developers and the App Store guidelines do not generally permit third-party developers to circumvent the IAP system.

*Id.* at *2 (Dkt. No. 48 at 2). In addition to preventing developers from circumventing the IAP system, developers are also prohibited from distributing applications outside of the App Store on the iOS platform.[4] In short: Apple maintains the iOS platform as a walled garden or closed platform model, whereby Apple has strict and exclusive control over the hardware, the operating system, the digital distribution, and the IAP system.

In order to access the App Store and to obtain developer tools, developers are required to comply with Apple's rules and regulations through a web of agreements and guidelines:

> As relevant here, Apple maintains separate developer agreements and developer program licensing agreements between Epic Games, Epic International and four other affiliated entities. Apple also maintains a separate agreement, "Xcode and Apple SDKs Agreement," regarding its developer tools (software development kits, or "SDKs").

*Epic Games*, 2020 WL 5073937 at *1 (Dkt. No. 48 at 2-3). These agreements have broad language including terminable at-will clauses.[5]

The relationship between Epic Games and Apple dates to at least 2011, when Epic Games released its first *Infinity Blade* game on the iOS platform. Epic Games and Apple collaborated for several Apple events, showcasing Epic Games' iOS games and the earlier iterations of the Unreal Engine running on the iOS and macOS platforms. Following the success of *Fortnite* on other

---

[4] For purposes of this motion, the parties refer to the operating system for both iPhones and iPads as iOS. (*See* Opp'n at 4, n.2 (Dkt. No. 73 at 10).) Moreover, Epic Games pleads that there are no differences between iOS and iPadOS to the allegations in the complaint. (Compl. ¶ 39, n.1 (Dkt. No. 1).) Similarly, this Order refers to iOS to refer to both the iPhone and iPad platforms, and references to iPhones generally also apply to iPads.

[5] The record also contains two enterprise account agreements for Epic Games and YEVVO Entertainment, Inc. The parties do not otherwise discuss the significance of these agreements.

United States District Court
Northern District of California

video game platforms, Epic Games launched *Fortnite* on iOS in April 2018, where it remained on the platform until, as discussed below, August 13, 2020.  During this time period: (i) 116 million iOS device users accessed *Fortnite*, spending more than 2.86 billion hours in the game; (ii) the daily average users numbered approximately 2.5 million daily iOS players, representing nearly 10% of *Fortnite*'s total average daily players; and (iii) 63% of iOS players on *Fortnite* have only accessed *Fortnite* from an iOS device.  Finally, iOS users accounted for more IAPs within *Fortnite* than those on the Android platform, but iOS users spend less on IAPs than those on the console platforms, including the Sony PlayStation 4 and Microsoft Xbox One.

> **B.      Relevant Background**

On June 30, 2020, the developer program licensing agreements for the Epic Games account, the Epic International account, KA-RA S.a.r.l. account, and the Epic Games enterprise account were renewed by the payment of separate consideration.[6]  That same day, Epic Games founder and Chief Executive Officer ("CEO") Tim Sweeney sent an email to Apple executives, including Apple CEO Tim Cook, requesting the ability to offer iOS consumers: (1) competing payment processing options, "other than Apple payments, without Apple's fees, in *Fortnite* and other Epic Games software distributed through the iOS App Store"; and (2) a competing Epic Games Store app "available through the iOS App Store and through direct installation that has equal access to underlying operating system features for software installation and update as the iOS App Store itself has, including the ability to install and update software as seamlessly as the iOS App Store experience."  (Sweeney Decl. ¶ 14, Ex. A (Dkt. No. 65-1 at 2).)  Mr. Sweeney highlights that these two offerings would allow consumers to pay less for digital products, and allow developers to earn more money.  Mr. Sweeney also wrote that he "hope[d] that Apple w[ould] also make these options equally available to all iOS developers in order to make software sales and distribution on the iOS platform as open and competitive as it is on personal computers." (*Id.*)  In this email, Mr. Sweeney does not provide any offer to pay Apple any portion of the 30

---

[6]  The renewal price for the enterprise accounts were each $299; the other agreements were each renewed at a price of $99.

United States District Court
Northern District of California

percent it charges on either app distribution or for IAP.

On July 10, 2020, Apple Vice President and Associate General Counsel Douglas G. Vetter responded to Mr. Sweeney's email with a formal letter.  In short, Apple's response to Epic Games' requests was no.  Both requests were unequivocally refused.  (Sweeney Decl. ¶ 15, Ex. B (Dkt. No. 65-2).)  As relevant here and with respect to the Epic Games Store request, Mr. Vetter wrote:

> Apple has never allowed this. Not when we launched the App Store in 2008. Not now. We understand this might be in Epic's financial interests, but Apple strongly believes these rules are vital to the health of the Apple platform and carry enormous benefits for both consumers and developers. The guiding principle of the App Store is to provide a safe, secure and reliable experience for users and a great opportunity for all developers to be successful but, to be clear, when it comes to striking the balance, Apple errs on the side of the consumer.

(*Id.*)  Mr. Vetter also reiterated that Epic Games' request to establish a separate payment processor would interfere with Apple's own IAP system, the business model of which has been used in the App Store since its inception.  (*Id.*)

On July 17, 2020 Mr. Sweeney responded to what he described as a "self-righteous and self-serving screed," writing that he hoped "Apple someday chooses to return to its roots building open platforms in which consumers have freedom to install software from sources of their choosing, and developers can reach consumers and do business directly without intermediation."  (Sweeney Decl. ¶ 16, Ex. C (Dkt. No. 65-3 at 2).)  He stated that Epic Games "is in a state of substantial disagreement with Apple's policy and practices," and promised that it would "continue to pursue this, as [it] ha[s] done in the past to address other injustices in [the] industry."  (*Id.*)

In fulfilling Mr. Sweeney's promise to "pursue this" perceived "injustice," Epic Games covertly introduced a "hotfix" into the *Fortnite* version 13.40 update on August 3, 2020.  Epic Games did not disclose the full extent of this hotfix to Apple, namely that this hotfix would enable a significant and substantive feature to *Fortnite* permitting a direct pay option to Epic Games that would be activated when signaled by Epic Games' servers.  Until this signal was sent out, this direct pay option would remain dormant.  When activated, however, this direct pay option would allow iOS *Fortnite* players to choose a direct pay option that would circumvent Apple's IAP system.  Relying on the representations, that intentionally omitted the full extent and disclosure of

United States District Court
Northern District of California

this hotfix, Apple approved of the *Fortnite* version 13.40 to the App Store.[7]

The hotfix remained inactive until the early morning of August 13, 2020, when Epic Games made the calculated decision to breach its allegedly illegal agreements with Apple by activating the undisclosed code in *Fortnite*, allowing Epic Games to collect IAPs directly. *Fortnite* remained on the App Store until later that morning, when Apple removed *Fortnite* from the App Store, where it remains unavailable.  Later that same day, Epic Games filed this action and began a pre-planned, and blistering, marketing campaign against Apple.  This marketing campaign included: a large-scale twitter campaign, a releasing of a parody video of the iconic Apple 1984 commercial, a *Fortnite* tournament in support of its lawsuit with in-game prizes, and a releasing of a limited time skin in *Fortnite* called the Tart Tycoon,[8] among other actions.

The following day, Apple responded sternly.  It informed Epic Games that, based on its breaches of the App Store guidelines, and the developer program license agreement, it would be revoking all developer tools, which would preclude updates for its programs and software.  Apple gave two weeks to comply with the App Store guidelines and the agreements. Apple also identified general consequences for any failure to comply, but specifically cited Unreal Engine as potentially being subject to harm should Epic Games fail to comply within the two-week period.

Thereafter on August 17, 2020, Epic Games filed the request for a temporary restraining order, requesting the reinstatement of Fortnite with its activated hotfix onto the App Store, and to enjoin Apple from revoking the developer tools belonging to the Epic Affiliates.  The Court declined to reinstate Fortnite onto the App Store, but temporarily restrained Apple from taking any action with respect to the Epic Affiliates' developer tools and accounts.

---

[7] Epic Games disputes that its use of the hotfix was deceptive where it is common practice in the gaming and software industry.  The deceptive conduct does not derive from Epic Games' use of the hotfix specifically, but from using a hotfix to clandestinely add features in violation of the guidelines and its agreements with Apple, and then failing to disclose such code.  Moreover, Epic Games did this despite receiving an unambiguous refusal from Apple only a few weeks prior to the introduction of its hotfix.  The record further reflects that while hotfixes are commonly used in the industry, their uses are generally to fix or patch critical bugs or defects—not to enact substantive and significant new features.  Epic Games' adamant refusal to understand this basic distinction is not only baffling, but undermines its credibility with this Court.

[8] Modeled presumably on Mr. Cook's likeness.

United States District Court
Northern District of California

On August 27, 2020, as planned by Epic Games, an updated version containing season four of *Fortnite* was released on all platforms except for the iOS platform, which Epic Games could no longer update due to its breaches of the Apple agreements and guidelines.  By design, *Fortnite* users can only play amongst other users currently operating the same version.  Because of this release, iOS *Fortnite* players no longer had the ability to play cross-platform with other players (unless these players chose not to update their version, forgoing playing the new season).

On August 28, 2020, on the expiration of the two-week deadline, Apple terminated Epic Games' developer program account, referenced as Team ID '84, stating "Apple is exercising its right in Apple's sole discretion to terminate your status as a registered Apple Developer pursuant to the Apple Developer Agreement and is terminating the Developer Agreement and the Program License Agreement pursuant to their terms. . . . [W]e will deny your reapplication to the Apple Developer Program for at least a year."  (Grant Decl. ¶ 35, Ex. H (Dkt. No. 63-8 at 2).)[9]

Following this, the parties engaged in briefing on the motion for preliminary injunction on a slightly expedited basis.  The Court heard oral argument on the motion on September 28, 2020.

## II.   LEGAL FRAMEWORK

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, is an "extraordinary and drastic remedy," that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted).  "It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).  A preliminary injunction is "not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) (citation omitted).

---

[9]  The record also reflects that Apple made moves in early September to cancel Epic Games' ability to use the Sign in with Apple ("SIWA") on the *Fortnite* game.  Apple eventually relented to allowing its continued use without waiving any right to revoke SIWA in the future.

United States District Court
Northern District of California

In order to obtain such relief, plaintiffs must establish four factors:  (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council. Inc.,* 555 U.S. 7, 20 (2008).  With respect to the success on the merits and balance of harms factors, courts permit a strong showing on one factor to offset a weaker showing on the other, so long as all four factors are established.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  In other words, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citations and quotations omitted).  Thus, under the Ninth Circuit's "'sliding scale' approach to these factors," "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'"  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1131). The Court addresses each.

III.   ANALYSIS

The Court finds it appropriate to evaluate, once again, Apple's actions with respect to (i) Epic Games specifically, including the delisting of *Fortnite* and other games authorized under Epic Games' contract with Apple, and (ii) the attempt to suspend and terminate developer rights authorized under other contracts, such as the one controlling Unreal Engine.

A.     Likelihood of Success on the Merits

Epic Games brings ten claims for violations of Sherman Act, the California Cartwright Act, and California Unfair Competition.  For purposes of the motion for preliminary injunction, Epic Games focuses on two:  the monopoly maintenance claim under section 2 of the Sherman Act, and the tying claim under section 1 of the Sherman Act.  Accordingly, the Court cabins its analysis with respect to these only.  Having reviewed the limited record, while Epic Games raises serious questions on the merits, the Court cannot conclude that Epic Games will likely succeed on the merits of those claims.  Too many unknowns remain.

9

1

### 1. *Preliminary Considerations*

The current legal landscape cautions against preliminarily finding antitrust violations based on less than a full record. As the parties acknowledge, this matter presents questions at the frontier edges of antitrust law in the United States. Simply put, no analogous authority exists. The questions and issues raised in this litigation concern novel and innovative business practices in the technology market that have not otherwise been the subject of antitrust litigation.[10]

As the Ninth Circuit recently recognized in *Federal Trade Commission v. Qualcomm Inc.*, "novel business practices—*especially* in technology markets—should not be 'conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have cause or the business excuse for their use.'" 969 F.3d 974, 990-91 (9th Cir. 2020) (emphasis in original) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 91 (D.C. Cir. 2001) (en banc)). This is "[b]ecause innovation involves new products and business practices, courts['] and economists['] initial understanding of these practices will skew initial likelihoods that innovation is anticompetitive and the proper subject of antitrust scrutiny." *Id.* at 991 (internal quotation marks omitted) (quoting Geoffrey A. Manne & Joshua D. Wright, *Innovation and the Limits of Antitrust*, 6 J. COMP. L. & ECON. 153, 167 (2010)); *see also* Rachel S. Tennis & Alexander Baier Schwab, *Business Model Innovation and Antitrust Law*, 29 YALE J. ON REG. 307, 319 (2012) (explaining how "antitrust economists, and in turn lawyers and judges, tend to treat novel products or business practices as anticompetitive" and "are likely to decide cases wrongly in rapidly changing dynamic markets," which can have long-lasting effects particularly in technological markets, where innovation "is essential to economic growth and social welfare" and "an erroneous decision will deny large consumer benefits"). The Court therefore has an even greater obligation to conduct an "elaborate inquiry" before determining that the alleged practices

---

[10] The exceptions involve the related *In re Apple Antitrust*, 4:11-cv-06714-YGR (N.D. Cal.) (*Pepper*), and *Donald Cameron v. Apple Inc.*, 4:19-cv-03074-YGR (N.D. Cal.), matters that are currently before this Court. Both *Pepper* and *Cameron* are in the middle of discovery, with motions for class certification anticipated in early 2021. No substantive rulings as to the merits of the claims have otherwise been made in those cases. Similar issues arise in *Epic Games, Inc. v. Google LLC*, 3:20-cv-05671-JD (N.D. Cal.), filed at the same time but which does not have similar motions for preliminary injunctive relief.

United States District Court
Northern District of California

violate antitrust law.

Second, the record remains insufficient to conclude that Epic Games will likely succeed on the merits of its claims.  As discussed below, the record includes conflicting evidence in support of both Epic Games and Apple; a lack of crucial evidence without which the merits cannot be determined; and fundamental disagreement by expert witnesses that is not resolvable at this stage of the case. With respect to the last, the Court highlights that the parties' retained expert witnesses are all accomplished and distinguished individuals.  Epic Games submits declarations from Dr. David S. Evans, an economist with degrees from the University of Chicago, whose scholarly work has been widely read and cited, including by the Supreme Court in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) (*Amex*).  Apple submits declarations from Dr. Richard Schmalensee—an economist with degrees from the Massachusetts Institute of Technology ("MIT"), whose work is also widely read and cited, including in *Amex* and *Microsoft*—and Dr. Lorin Hitt—an academic with a business management background and degrees from MIT and Brown University, who has background in electrical engineering and technology.  These expert reports reflect fundamental disagreements from luminaries in the field as to the foundational questions of this matter.  While ultimately one view will likely prevail, at this juncture, the Court concludes that reasonable minds differ.

With these considerations in mind, the Court turns to the merits of the claims.

> 2.  *Monopoly Maintenance under Section 2 of the Sherman Act[11]*

> a.  Legal Framework

In order to prevail on its theory that Apple engaged in unlawful monopolization under section 2 of the Sherman Act, Epic Games must show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury."  *Qualcomm*, 969 F.3d at 990 (internal quotation marks omitted); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (stating that a section 2 claim requires "(1)

---

[11]  The Court's discussion of the section 2 claim before the section 1 claim mirrors the parties' briefing.

United States District Court
Northern District of California

the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Qualcomm*, 969 F.3d at 992 (quoting *Amex*, 138 S. Ct. at 2285); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("The relevant market is the field in which meaningful competition is said to exist."). Monopoly power under the first element can be defined as "the power to control prices or exclude competition"[12] and may be inferred from defendant's predominant market share in the relevant market. *Grinnell*, 384 U.S. at 571. In addition, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Amex*, 138 S. Ct. at 2285. Without a relevant market definition, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* (brackets and citation omitted).

"The relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). The latter "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also id.* ("The consumers do not define the boundaries of the market; the products or producers do [and] the market must encompass the product at issue as well as all economic substitutes for the product."). "Economic substitutes have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product." *Hicks*, 897 F.3d at 1120 (quoting *Newcal*, 513 F.3d at 1045); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). "Including economic substitutes ensures that the relevant product market encompasses 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Hicks*, 897 F.3d at 1120 (quoting *Newcal*, 513 F.3d at 1045); *see also Du Pont*, 351 U.S. at 393

---

[12] More precisely, "a firm is a monopolist if it can profitably raise prices substantially above the competitive level." *Microsoft*, 253 F.3d at 51.

United States District Court
Northern District of California

1   ("Illegal power must be appraised in terms of the competitive market for the product.").

2   "[I]n some instances one brand of a product can constitute a separate market."  *See*

3   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992); *see also Newcal*, 513

4   F.3d at 1048 ("[T]he law permits an antitrust claimant to restrict the relevant market to a single

5   brand of the product at issue . . . .").  However, such "[s]ingle-brand markets are, at a minimum,

6   extremely rare" and courts have rejected such market definitions "[e]ven where brand loyalty is

7   intense."  *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (internal

8   quotation marks omitted).  *But see id.* ("Antitrust markets consisting of just a single brand,

9   however, are not per se prohibited . . . . In theory, it may be possible that, in rare and unforeseen

10  circumstances, a relevant market may consist of only one brand of a product.")

11         Nevertheless, "it is legally permissible to premise antitrust allegations on a submarket" or

12  an aftermarket.  *Newcal*, 513 F.3d at 1045.  A submarket "is economically distinct from the

13  general product market."  *Id.* at 1045.  There are "several 'practical indicia' of an economically

14  distinct submarket," including:

15         industry or public recognition of the submarket as a separate
       economic entity, the product's peculiar characteristics and uses,
16         unique production facilities, distinct customers, distinct prices,
       sensitivity to price changes, and specialized vendors.
17

18  *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).[13]  An aftermarket is

19  "wholly derivative from and dependent on the primary market."  *Id*. at 1049.  An aftermarket may

20  constitute the relevant market where market imperfections, such as information and switching

21  costs, "prevent consumers from realizing that their choice in the initial market will impact their

22  freedom to shop in the aftermarket."  *Id.* at 1050.  Thus, "[d]etermining the relevant market can

23  involve a complicated economic analysis, including concepts like cross-elasticity of demand, and

24  'small but significant nontransitory increase in price' ('SSNIP') analysis."  *Theme Promotions,*

25  *Inc. v. News America Marketing FSI*, 546 F.3d 991, 1002 (9th Cir. 2008); *see also Psystar*, 586. F.

26

27         [13] Epic Games' economic expert does not address these factors; instead, he principally
28  relies on the those that follow.

Supp. 2d at 1198.

The determination of a "relevant market" is a highly factual question. *See Eastman Kodak*, 504 U.S. at 482 ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."); *see also Newcal*, 513 F.3d at 1051 ("The actual existence of an aftermarket . . . is a factual question.  The actual existence of a separate economic entity (i.e. a submarket) . . . is a factual question.  The actual existence of [a party's] market power within the alleged submarket is a factual question. . . .  The initial market's actual ability, through cross-elasticity of demand, to discipline anti-competitive conduct in the aftermarket is a factual question."); *Teradata Corp. v. SAP SE*, Case No. 18-cv-03670-WHO, 2018 WL 6528009, at *14 (N.D. Cal. Dec. 12, 2018) ("The definition of a 'relevant market' in which defendant has market power is typically a factual rather than legal question.").[14]

Even if a plaintiff establishes monopoly power in the relevant market under the first element, courts will not condemn it unless "it is accompanied by an element of anticompetitive *conduct*" under the second element.  *Qualcomm*, 969 F.3d at 990 (emphasis in original) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).  "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is . . . an important element of the free market system."  *Verizon Commc'ns*, 540 U.S. at 407.  Thus, courts distinguish between "the willful acquisition or maintenance of [monopoly] power" from "growth or development as a consequence of a superior product, business acumen, or historic accident." *See Grinnell*, 384 U.S. at 571.  To demonstrate the former, plaintiff must show "anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market."  *Qualcomm*, 969 F.3d at 990.  "To be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'—that is, it must harm the competitive process and thereby harm consumers[, i]n contrast [to] harm to one or more

---

[14]  The parties are reminded that *Newcal* was decided on a motion to dismiss and has limited reach.  The Ninth Circuit explicitly indicated that the case is not "guarantee[d]" to survive a motion for summary judgment because the "actual existence of a separate economic entity (i.e. a submarket) that includes only IKON's customers is a factual question."  513 F.3d at 1051.  The same is true of *Teradata* and *Psystar*.  The Court relies on each for those limited propositions.

United States District Court
Northern District of California

1  *competitors*[, which] will not suffice." *Id.* (emphasis in original) (internal quotation marks and

2  alternations omitted) (quoting *Microsoft*, 253 F.3d at 58).

3  Anticompetitive conduct is evaluated under the "rule of reason." *Id*. at 991.  First, plaintiff

4  must show "diminished consumer choices and increased prices" as "the result of a less competitive

5  market due to either artificial restrains or predatory or exclusionary conduct" by the defendant.  *Id.*

6  Then, "if a plaintiff successfully establishes a *prima facie* case . . . by demonstrating

7  anticompetitive effect, then the monopolist may offer a 'procompetitive justification' for its

8  conduct." *Id.* (internal quotation marks omitted) (quoting *Microsoft*, 253 F.3d at 59).  For

9  example, the monopolist may show "that its conduct is . . . a form of competition on the merits

10  because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* (internal

11  quotation marks omitted) (quoting *Microsoft*, 253 F.3d at 59).  Finally, if defendant offers a non-

12  pretextual procompetitive justification, the burden shifts back to the plaintiff to rebut defendant's

13  claim or "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive

14  benefit." *Id.* (internal quotation marks omitted) (quoting *Microsoft*, 253 F.3d at 59).

15  Last, if plaintiff satisfies the first and second elements of monopoly power and willful

16  maintenance or acquisition of that power in the relevant market, the last element of causation may

17  be inferred "when exclusionary conduct is aimed at producers of nascent competitive technologies

18  as well as when it is aimed at producers of established substitutes." *Microsoft*, 253 F.3d at 79

19  (cited with approval by *Qualcomm*, 969 F.3d at 992).

20  *b.   Relevant Market Analysis*

21  In summary, the record does not yet establish how the "relevant market" should be defined.

22  Without a definition of the relevant market, the existence of market power—the foundation of a

23  monopolization claim—cannot be assessed.  Accordingly, Epic Games has not yet shown that it

24  will likely succeed on the merits of the monopolization claim.

25  The relevant market must include both a geographic market and a product market.

26  Unsurprisingly, the parties disagree on the product market.[15]  Epic Games avers that the relevant

27  _____

28  [15] Both Epic Games and Apple agree, however, that the "geographic market" is likely
global.  (*But see* Evans Decl. at 10 n.37 (Dkt. No. 62 at 12) (reserving future opinion on whether

15

United States District Court
Northern District of California

product market is the market for distribution of apps on the iOS software platform, which it refers to as the "iOS App Distribution Market."  Thus, Epic Games narrows the relevant market to consider only how *iOS* apps are distributed on the *iOS* platform.  Apple meanwhile asserts that the relevant market *must* include competing platforms on which *Fortnite* is distributed and monetized.  In other words, Apple argues that the Court must consider the wider video game market and distribution on other platforms, including the Microsoft Xbox One, the Sony PlayStation 4, the Nintendo Switch, computer platforms (Microsoft Windows PCs, macOS computers), and tablets (Google Android and Microsoft Surface).  Thus, Apple seeks a broader market definition that includes the digital distribution of video games across all video game platforms.  Ultimately, the Court must discern where competition exists and whether such competition is sufficient to impact price and discipline market players.

Epic Games' relevant market definition that iOS App Distribution is an "aftermarket" of the smartphone OS market is plausible.[16]  *See Newcal*, 513 F.3d at 1050.  However, in some ways, Epic Games offers a failsafe definition by restricting the market so narrowly.  By definition, Epic Games' proposed market definition excludes other smartphone systems, including the Google Android system, as well as video game platforms and their digital distribution markets.  Courts have expressly cautioned against such a narrowing of the relevant market definition.  *See Du Pont*, 351 U.S. at 392-93 ("A retail seller may have in one sense a monopoly on certain trade because of location . . . or because no one else makes a product of just the quality or attractiveness of his product . . . .  Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product.  [However, i]llegal power must be appraised in terms of the competitive market for the product."); *Psystar*, 586 F. Supp. 2d at 1198 ("[M]anufacturer's own products do

_____

the Chinese mobile market should be included in the geographic market).)

[16] Apple fails to respond adequately to the "aftermarket" theory, devoting a single paragraph to it and stating, in a conclusory fashion, that "this is not an aftermarket case."  Should Epic Games continue to assert this theory, Apple should explain why switching and information costs do not render the IOS app distribution market distinct.  Silence can be interpreted as an admission.

United States District Court
Northern District of California

not themselves comprise a relevant product market.").[17]

Moreover, Apple avers that an "aftermarket" requires user lock-in in the primary market. Given the lack of legal citation, the Court surmises that this theory has not been adopted by any court, even if embraced by economists. The term "lock-in" appears to derive from the Supreme Court mention that "[i]f the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands." *Eastman Kodak*, 504 U.S. at 476. In evaluating Epic Games' response, resolution of the issue is focused on timing: Apple argues that consumers are not locked-in to the purchase of iPhones, while Epic Games assumes the purchase and argues that after the purchases occurs, a consumer is locked-in and unlikely to switch to a different smartphone in response to slightly more expensive IAPs. Under the latter perspective, app developers who wish to reach iOS users have no choice but to tolerate Apple's 30% rate.[18]

Thus, at this stage of the litigation, and with the record before the Court, Apple's relevant market definition is also plausible. As Apple correctly points out, alternative means exist to distribute *Fortnite*.[19] Indeed, Epic Games expressly advertised the multiplatform nature of its product following its breach of the Apple terms and service. (*See* Hitt Decl. ¶ 39 (Dkt. No. 77)

---

[17] Apple further avers that as intellectual property owner, even if it is a monopolist, Apple is not required to allow unfettered and uncompensated use of its own technology. *See* Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 13.03 (3rd ed., 2016 & Supp. 2019) (citing *Microsoft Corp.*, 253 F.3d at 63-64). That said, "intellectual property rights do not confer a privilege to violate the antitrust laws." *Microsoft*, 253 F.3d at 64. Moreover, the parties fail to brief whether Apple possesses "essential facilities," which may require (compensated) access. The Court makes no express finding on these issues, but notes these as other potential hurdles.

[18] The Court also leaves for another day the proper classification of the 30% at issue, that is, whether it is a commission, a licensing fee, a "tax," or a "price." Each may have legal ramifications which have not been fully briefed, and therefore carry with them unintended consequences of choosing a term too quickly.

[19] However, the Court notes that Apple's argument assumes a user who owns multiple devices, pays attention to prices for in-app purchases, and switches devices in response to price increases. There is little evidence that the ordinary iOS consumer carries such characteristics. *Cf. U.S. v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997) (rejecting relevant market analysis based on customer interviews where proponent failed to show that the customers were representative).

United States District Court
Northern District of California

1    ("[The] party continues on PlayStation 4, Xbox One, Nintendo Switch, PC, Mac, GeForce Now,

2    and through both the Epic Games app at epicgames.com and the Samsung Galaxy Store.").)  The

3    multiplatform nature of *Fortnite* suggests that these other platforms and their digital distributions

4    may be economic substitutes that should be considered in any "relevant market" definition

5    because they are "reasonably interchangeable" when used "for the same purposes." *Du Pont*, 351

6    U.S. at 395; *see also Hicks*, 897 F.3d at 1120-21 (dismissing antitrust claim when alleged relevant

7    market ignored multiple ways of reaching consumers).  "If competitors can reach the ultimate

8    consumers of the product by employing existing or potential alternative channels of distribution, it

9    is unclear whether such restrictions foreclose from competition *any* part of the relevant market."

10   *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997).

11          Epic Games' arguments distinguishing these other platforms as potential economic

12   substitutes have not been sufficiently tested.  First, Epic Games avers that the iOS market is

13   distinct from other video game platforms because Sony, Nintendo, and Microsoft do not make

14   much profit, if any, on the sale of the hardware or console—unlike Apple, which allegedly makes

15   significant profits from the sale of each iPhone.  This distinction is without legal precedent under

16   section 2 of the Sherman Act.  Indeed, Sony, Nintendo and Microsoft all operate similar walled

17   gardens or closed platform models as Apple, whereby the hardware, operating system, digital

18   marketplace, and IAPs are all exclusive to the platform owner.  As such, a final decision should be

19   better informed regarding the impact of the walled garden model given the potential for significant

20   and serious ramifications for Sony, Nintendo and Microsoft and their video game platforms.

21          Second, Epic Games' avers that the iOS platform is unique from other gaming devices.

22   Specifically, Epic Games argues that gaming consoles and computers require electrical outlets and

23   separate screens and thus lack capacity for mobile play, which demands portable, battery operated,

24   and cellularly connected devices with built-in screens.  (*See* Sweeney Reply Decl. ¶ 14 (Dkt. No.

25   86).)  Yet, Epic Games repeatedly ignored discussion of gaming laptops, tablets, and the Nintendo

26   Switch, all of which can be played in a mobile fashion.  These devices could have significant

27   overlap with the iOS platform in terms of the ultimate consumer.  Again, however, at this stage,

28   the record does not contain sufficient information to determine whether such other devices are

economic substitutes or are merely complimentary to iOS devices.

Thus, and for other reasons, Apple's market definition also faces hurdles. Antitrust law is not concerned with individual consumers or producers, like Epic Games; it is concerned with market aggregates. Substitutes may not deprive a monopolist of market power if they fail to affect enough customers to make a price increase unprofitable. *See Theme Promotions*, 546 F.3d at 1002 (defining relevant market by whether a price increase would cause a "significant number" of customers to substitute to make the price increase unprofitable). Alternatively, constraints among some consumers may not render the market as a whole narrow. *See Telecor Commc'ns, Inc. v. Southwestern Bell Telephone Co.*, 305 F.3d 1124, 1131-32 (10th Cir. 2002) (rejecting relevant market definition based on a finding that "some" consumers could not substitute products because the record did not show they were "significant enough to render the market as a whole non-cross-elastic"). *But see Engelhard*, 126 F.3d at 1306 (noting that "it is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced in higher . . . prices.").

Here, both parties cite factors impacting the elasticity of their proposed markets. A final determination may depend on the magnitude of those effects. For instance, focusing on *Fortnite* alone, the record shows that (i) more than 116 million (out of 350 million) *Fortnite* players have accessed *Fortnite* through the iOS platform; (ii) iOS players constitute roughly 10% of the daily active *Fortnite* users since its iOS launch in April 2018; and (iii) 63% of *Fortnite* players on iOS *only* play on the iOS platform. (Sweeney Decl. ¶ 3 (Dkt. No. 65).) Notably, the record is silent on how often these 116 million individuals play *Fortnite* and devoid of information on the characteristics of 10% of daily active users or whether these users access *Fortnite* through other platforms. More broadly, there is no evidence regarding the size of the game app market compared to other apps and whether they constitute a separate submarket with unique characteristics that do not apply to other app developers.

Thus, the market definition rests on factual questions regarding the nature of the iOS market as a whole: how *many* iOS users own multiple devices; how *many* iOS users would switch to another device in response to a price increase; and how *many* producers can afford to forego

United States District Court
Northern District of California

1    iOS customers altogether.  Neither party adequately addresses these factual questions.  Epic

2    Games assumes all iOS customers are the same, and Apple assumes that only Epic Games

3    customers are relevant.

4         Moreover, underlying these questions is a significant and unresolved dispute over

5    clustering.  Apple focuses narrowly on game distribution channels because of the nature of Epic

6    Games' business.  But courts have often combined different services together when "the product

7    package is significantly different from, and appeals to buyers on a different basis from, the

8    individual products considered separately."  *Image Tech.*, 125 F.3d at 1204-05.  For example, in

9    *United States v. Phillipsburg National Bank and Trust Company*, the Supreme Court grouped

10   multiple financial services together into a relevant market of "commercial banking"—even though

11   they differed in their availability of substitutes—because customers generally obtain all banking

12   services from one place.  399 U.S. 350, 360-61 & n.4 (1970).  Here, Epic Games may establish

13   that app distribution generally should be considered separately from app distribution of individual

14   games, which could have a significant impact on how alternative distribution channels are

15   evaluated.

16        Finally, underlying each of these issues is the question of perspective.  Interchangeability

17   for purposes of the relevant market may vary depending on perspective.  *See, e.g.*, *Little Rock

18   Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) (reversing relevant

19   market definition based on improper perspective); *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854-

20   55 (1st Cir. 2016) (same); *Telecor*, 305 F.3d at 1132-33 (same).  Here, there are at least three

21   possible perspectives on the relevant market: (1) the customer who purchases the apps or games,

22   (2) the developer who makes the apps or games, and (3) the competing app store or digital

23   marketplace that distributes the apps or games.  The parties adopt different perspectives, but

24   neither justifies its choice.  And as the parties' briefing demonstrates, the resolution of this

25   question could lead to radically different analysis.

26        In short, without the record to define the relevant antitrust market, Epic Games has not

27   established likelihood of success as to monopoly maintenance, only serious questions.  Further,

28   without such definition, the Court need not evaluate the second or third elements of the section 2

20

1    claim.  Additionally, even under a section 2 claim, plaintiff must show anticompetitive conduct.

2    One way to do so includes a rule a reason analysis.  Given the overlap of this issue with a section

3    1 claim, the Court addresses it below.  *See, Qualcomm*, 969 F.3d at 991 ("The similarity of the

4    burden-shifting tests under [sections] 1 and 2 means that courts often review claims under each

5    section simultaneously.").

6                      *3.      Tying under Section 1 of the Sherman Act*

7                            *a.      Legal Framework*

8         Tying arrangements under section 1 of the Sherman Act[20] may be evaluated under either

9    per se or rule of reason analysis.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29

10   (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

11        Per se analysis allows "condemnation without inquiry into actual market conditions" based

12   on precedent that deems certain contractual arrangements "unreasonable as a matter of law."  *Id.* at

13   9, 15.  "For a tying claim to suffer per se condemnation, a plaintiff must prove:  (1) that the

14   defendant tied together the sale of two distinct products or services; (2) that the defendant

15   possesses enough economic power in the tying product market to coerce its customers into

16   purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume

17   of commerce in the tied product market."[21]  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883,

18   913 (9th Cir. 2008).

19        To assess the first element, courts apply the purchaser demand test, which "examines direct

20   and indirect evidence of consumer demand and whether [a] defendant[] foreclosed competition on

21   the merits in a product market distinct from the market for the tying item."  *Teradata*, 2018 WL

22   6528009, at *12 (internal quotation marks omitted).  "Direct evidence of demand includes

---

[20]  Section 1 of the Sherman Act broadly prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  The term "restraint of trade" has been limited to "undue" (unreasonable) restrains.  *Amex*, 138 S.Ct. at 2283.

[21]  As explained in *Jefferson Parish*, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  466 U.S. at 12.  Per se condemnation is only appropriate where such forcing is "probable."  *Id.* at 15.

United States District Court
Northern District of California

'whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms.'" *Id.* (quoting *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975 (9th Cir. 2008)). "Indirect evidence includes firm behaviors, for instance a single product is apparent if 'competitive firms always bundle the tying and tied goods' together." *Id.* (quoting *Rick-Mik*, 532 F.3d at 975). A tie requires a "condition linked to a sale." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).

The second element of "forcing (or coercion) is likely if the seller has power in the tying product market." *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 955 (D. Or. 2018) (quoting *Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984)). The third element asks "simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie . . . ." *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969); *see also Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) (foreclosure of a single purchaser sufficient so long as the dollar volume of sales is "not insubstantial").

If a plaintiff fails to establish per se liability, a plaintiff must demonstrate that a defendant "violated the Sherman Act because it unreasonably restrained competition" under the rule of reason. *Jefferson Parish*, 466 U.S. at 29. The rule of reason "requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the restraint's actual effect' on competition." *Amex*, 138 S.Ct. at 2284 (internal brackets omitted) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Recent cases suggest that the rule of reason applies to any tying claim that "involves software that serves as a platform for third-party applications." *Microsoft*, 253 F.3d 34 at 89; *see also id.* at 95 (no per se claim where "the tying product is software whose major purpose is to serve as a platform for third-party applications and the tied product is complementary software functionality").

"[T]he three-part burden-shifting test under the rule of reason is essentially the same" for section 1 as for section 2 claims. *Qualcomm*, 969 F.3d at 991. First, plaintiff has "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 138 S. Ct. at 2284. That said, the Court need not

United States District Court
Northern District of California

"consider whether competition was in fact unreasonably restrained."  *See Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338 (9th Cir. 1984).  Second, if "the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint."  *Amex*, 138 S. Ct. at 2284.  Finally, "[i]f the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.*

### b.   *Per Se Tying Analysis*

Epic Games avers that Apple ties the iOS app distribution "product," over which Apple has economic power, to a separate "product" of the IAP system.  Based upon the current record, the Court concludes that Epic Games has not yet shown that the IAP system is a separate and distinct service from iOS app distribution sufficient to constitute a "tie" under antitrust law.

Where the allegedly tied product is an essential ingredient of the overall "method of business" with customers, courts view them as one product not as two tied together.  *Rick-Mik*, 532 F.3d at 974 (quoting *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670 n.1 (7th Cir 1985)).  That is especially true where the allegedly separate products have always been integrated.  *See id.* at 975.  As the Ninth Circuit has recognized, payment processing can be part of a single integrated product.  *See id.* at 974 ("The franchise and the method of processing credit transactions are not separate products, but part of a single product (the franchise).").

Here, the IAP system appears to be integrated with the App Store and, historically, to have never been a separate product.  If so, the construct of the IAP appears to reinforce the notion that the App Store is a digital marketplace where developers on the App Store are able to structure their business models however they choose.[22]  Many of these developers, like Epic Games,

---

[22] Epic Games' Best Buy and QuickBooks analogy misses the mark.  Epic Games stated:

> [W]hat Apple wants to do is to have the consumer go in to Best Buy, buy the Quick[B]ooks . . . pay for it there, that's fine. That's the app distribution. But then take it home, and every time you do your taxes or every time you close your books using Quick[B]ooks, after you have the product, to keep paying Best Buy every single time another 30 percent. They are reaching into subsequent transactions."

(Dkt. No. 50 at 50-51.)  With respect to video games, however, at least two significant distinctions

United States District Court
Northern District of California

1    structure these models so that the game or app is free, presumably to entice customers to download

2    the game or app initially, and only monetize the subsequent IAPs.  The IAP system does not

3    appear to be a payment processor in the same way that Visa, Mastercard, or PayPal is a payment

4    processor; it is more akin to a link back to the App Store whereby the transaction must occur

5    *within* the digital confines of the App Store.[23]  The IAP system appears to have been created, in

6    part, to capture the value of a developer being on the digital shelf of the App Store which is owed

7    to Apple—either on the initial download, or in subsequent IAPs.[24]

8    Nevertheless, Epic Games raises serious questions about the existence of separate demand

9    for IAP-type services.  Payment processing markets are ubiquitous outside of IAPs.  Epic Games

10   offers indirect evidence of separate demand through analogy to these markets, including the

11   markets for the sale of physical goods sold through apps on the iOS platform.  *See Rick-Mik*, 532

12   F.3d at 975.  The experts disagree over whether the distinctions between IAP and these payment

13

14   _____

exist.  First, at a brick-and-mortar store, games were not distributed for free; that is, free-to-play
15   games like *Fortnite* did not exist.  In the digital context, consumers can obtain some games for
     free, and, under the license, no payment from Epic Games to Apple is due in that transaction.

16
     Second, an analogous pre-digital marketplace transaction exists: namely, the sale of
17   expansion packs, which could unlock additional content for base version of games, including new
     gameplay mechanics and functions.  Consumers would initially purchase the base game from a
18   brick-and-mortar store.  Assuming the expansion pack was not available at the time of purchase of
     the base game, consumers were thereafter required to return to a store to purchase in a separate
19   transaction the expansion pack—thereby unlocking this additional content in the base game.

20   IAP appears to operate analogously: the base version of a game is required to play, but IAP
     similarly unlocks additional content including new gameplay mechanics and functions.  These
21   analogous pre-digital transactions suggest that IAP is not merely a payment processor, as Epic
     Games contends, but rather an integrated part of the digital marketplace, permitting a prior
22   historical business model in the gaming industry.  The Court highlights that neither party discusses
     these analogous transactions, but the Court discloses that this conceptual similarity further colors
23   the Court's analysis, including the need for a more complete record.  *See also Amex*, 138 S. Ct. at
     2286-87 (discussing a transaction platform like the App Store, noting that it "facilitate[s] a single,
24   simultaneous transaction between" two parties).

25   [23]  Indeed, it is the Court's understanding that all video game digital distribution
     marketplaces require a consumer to similarly return to the marketplace to complete an IAP.

26
     [24]  The Court notes that the conceptualization of the IAP system as integrated within the
27   App Store may generally defeat a per se analysis.  *Microsoft* suggests that perhaps the
     appropriate lens to view a tying claim involving innovative technological business models is under the rule of
28   reason analysis, not under a per se tying analysis.  *See Microsoft*, 253 F.3d 34 at 89-95.

processing services actually impact consumer demand.[25]  (*Compare* Schmalensee Decl. ¶ 49 (Dkt. No. 78) *with* Evans Reply Decl. ¶ 36 (Dkt. No. 88).)  Moreover, Epic Games provides evidence that developers have demanded their own in-app purchase payment processing services.  (*See* Evans Reply Decl. ¶ 45 (Dkt. No. 88).)

Epic Games further points to evidence in the record demonstrating that some customers chose to use Epic Games' payment processing service when given the choice with IAP.  The trouble with this argument is that it conflates competition on the merits with Epic Games' goal of avoiding Apple's 30%.  It is not surprising that some customers would choose competing payment services if they provided lower prices offered only because of this non-payment.  This does not evidence separate demand for payment processing services, as much as a demand for alternatives to Apple's "integrated services" of iOS app distribution.  When framed in this way, Epic Games' argument is no more than a collateral attack on Apple's App Store model, not a demonstration of separate demand.  In this respect, Epic Games' strongest argument—left woefully underexplored in the record—lies with competition on *other* features provided by IAP, such as customer service, parental controls, and security.[26]  This evidence suggests that a more fully developed record could

---

[25]  The question of perspective underlies the tying claim as much as the monopolization claim.  In *Rick-Mik*, the court found that "[t]he relevant 'purchaser' is the franchisee (not the general consumer)" for purposes of separate demand for credit card processing services.  532 F.3d at 975.  Here, the equivalent of the franchisee is the developer, which may demonstrate stronger "separate demand" for payment processing services than the user who makes the purchases.

[26]  Epic Games shows that at least some developers have demanded separate payment processing services based on these features, independent of Apple's 30%.  For example, Epic Games claims the CEO of the company "Hey," which provides email service, made the following statement months before Epic Games' motion:

> [A]s the owner of a business, this isn't just about money.  Money grabs the headlines, but there's a far more elemental story here.  It's about the absence of choice, and how Apple forcibly inserts themselves between your company and your customer. . . .

> When Apple forces companies to offer In App Purchases in order to be on their platform, they also dictate the limits to which you can help your customer.  This has a detrimental impact on the customer experience, and your relationship with your customer.  It can flat out ruin an interaction, damage your reputation, and it can literally cost you customers.  It prevents us from providing exceptional customer service when someone who uses our product needs help.

1  plausibly show demand for a separate product.

2      Should Epic Games satisfy the "purchaser demand" test for finding distinct products, it

3  may prevail on the remaining elements under the per se tying analysis.  While Apple claims that it

4  does not "tie" IAP to iOS app distribution because developers may choose other business models,

5  it does not dispute that its App Store Review Guidelines require the IAP system's use for IAPs as

6  a condition of app distribution.  (*See* Schiller Decl. ¶¶ 5, 7, 33, 41 (Dkt. No. 74).)  This

7  requirement manifests the coercion, that is, developers who offer IAP must do so on Apple's

8  terms.  Apple also does not dispute that it holds market power in the iOS app distribution market

9  and that the alleged tie affects a substantial volume of commerce in in-app payment processing.

10  Accordingly, Epic Games raises serious questions with regard to per se tying, but fails to

11  demonstrate the likelihood of success due to lack of evidence of "purchaser demand" for IAP

12  processing service separate from the "integrated service" of app distribution. [27]

13                *c.*    <u>Rule of Reason Analysis</u>

14      The rule of reason analysis is more fact specific than the per se analysis.  Here, the first

15  element focuses on the harm to competition and consumers.  Epic Games errs by focusing on harm

16  to competitors, and for that reason has not sustained its burden at this juncture.[28]

---

(Evans Reply Decl. ¶ 45 & n.40 (Dkt. No. 88).)  This statement suggests that the IAP dispute is not simply about Apple's fee, but also about whether "the world's largest company [gets] to decide how millions of other businesses can interact with their own customers."  *See* Jason Fried, "Our CEO's take on Apple's App Store payment policies, and their impact on our relationship with our customers," HEY (June 19, 2020), *available at* https://hey.com/apple/iap/.

[27]  Commentators have suggested that separate demand is a "threshold requirement" for separate products, following which defendant may show that the products are nevertheless a single product due to their being an "integrated service."  *See* Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1743 (4th Ed. 2020).  *United States v. Microsoft Corp.*, 147 F.3d 935, 948-49 (D.C. Cir. 1998), lays out the general requirements for an integrated service.

[28]  Nevertheless, for the same reasons as described for separate demand under the per se analysis, the Court can envision a plausible case for anticompetitive effect given the serious questions referenced above regarding Apple's IAP restrictions and whether they reduce consumer choice or increase price due to exclusionary conduct.  *See Qualcomm*, 969 F.3d at 990. Competitors could conceivably provide equal or superior services than IAP— better security, better customer service, and better parental controls.  Moreover, Epic Games may be able to prove anticompetitive effects even if it cannot show separate products:  *Microsoft* suggests that the separate-products test "is a rough proxy for whether a tying arrangement may [be] . . . unsuited to per se condemnation," not a determination of ultimate efficiency.  253 F.3d at 87.

United States District Court
Northern District of California

1    Even if it had, Apple, of course, offers a procompetitive justification consistent with step

2  two of the three-part burden shifting analysis.  Apple claims that the IAP provides the business

3  mechanism for it to be paid for the App Store given its support of 1.8 million apps, of which 84

4  percent are free, to 1.5 billion Apple devices and 900 million iPhone users.  Apple claims that IAP

5  also provides: (1) a "centralized, convenient way" to transact online, (2) security and fraud

6  protection, (3) refunds and customer support from Apple, (4) parental controls, and (5)

7  comprehensive list of purchases," all of which are facially reasonable.  (Schiller Decl. ¶ 36 (Dkt.

8  No. 74); *see also* Schmalensee Decl. ¶ 29 (Dkt. No. 78).)  That developers may not want to pay a

9  commission or licensing fee does not necessarily translate to antitrust behavior.

10    Under a rule of reason analysis, the burden shifts back to Epic Games to demonstrate that

11  the "procompetitive efficiencies could be reasonably achieved through less anticompetitive

12  means."  Here, the record is not fully developed, and mixed, at best.  Competitors could

13  conceivably provide equal or superior services.  Indeed, it is entirely plausible that app developers

14  could provide better refunds and customer support for goods purchased through their own apps

15  than can Apple, or not.  As noted, the sale of physical goods sold on the iOS already uses separate

16  payment processors or mechanisms outside of the Apple IAP system.  On the other hand, Apple

17  has produced evidence that its security features are more effective than its competitors, a basis on

18  which it competes.  Thus, the dispute likely comes down to whether these features and Apple's

19  monetization can be achieved through less anti-competitive means.  The record on these issues is

20  thin, as is any briefing on the method of proof given the frontier on which the questions sit.

21       *4.    Summary*

22    For the reasons set forth above, Epic Games has shown that serious questions exist with

23  respect to its section 1 and section 2 claims against Apple but has not proven a likelihood of

24  success on the merits on this record.

25    **B.    Irreparable Harm**

26    As the Court stated in the temporary restraining order: the issue of irreparable harm

27  focuses on the harm caused by *not maintaining the status quo*, as opposed to the separate and

28  distinct element of a remedy under the likelihood of success factor.  Here, once again, the Court's

evaluation is guided by the general notion that "self-inflicted wounds are not irreparable injury." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003)).  Further courts generally decline to find irreparable harm that "results from the express terms of [the] contract."  *See Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (no irreparable harm where the alleged harm "results from the express terms of [the] contract").  Quite simply, irreparable harm is harm or injury that cannot be repaired.

### 1.    *Fortnite*

Epic Games contests the Court's prior determination with respect to *Fortnite*, namely that no irreparable harm exists where Epic Games *chose* to breach its agreements with Apple in enacting its own direct IAP system.  Epic Games cites to precedent involving affirmative defenses to argue that the Court should not aid in the enforcement of contracts that are anti-competitive and violative of antitrust laws.  *See generally McMullen v. Hoffman*, 174 U.S. 639, 654 (1899) ("The authorities from the earliest times to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract."); *Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379,1383 (9th Cir. 1977) ("[Courts should] continue to side with the goal of vigorous enforcement of our antitrust laws."); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968) ("[T]he purposes of the antitrust laws are best served by insuring that private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws."); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982) (enforcement of "private agreements" is subject to "the restrictions and limitations of the public policy of the United States").  Epic Games concedes that these affirmative defenses are procedurally not at issue.  Instead, it claims it should "not be penalized for defying Apple's monopolistic edicts" (Mot. at 23 (Dkt. No. 61 at 30)), and that the Court should proactively extend the principle in support of Epic Games' proffer of irreparable injury.

Epic Games further avers that ongoing harm continues to its reputation, the *Fortnite* gaming community, and its ongoing ambitions in the creation of a metaverse.  In support, Epic Games introduces declarations attesting to a 60% decline in the number of iOS users in *Fortnite*,

United States District Court
Northern District of California

1   and that those who continue to play are doing so for significantly fewer hours per week, given that

2   these players are stuck on earlier version of the game and unable to play with other individuals.

3   (Sweeney Decl. ¶ 22 (Dkt. No. 65).) Next, Epic Games provides records reflecting customer

4   complaints and online comments about the unavailability of *Fortnite* on the iOS platform.  (*Id.* ¶¶

5   25-26, Exs. E-F (Dkt. Nos. 65-5, 65-6); Byars Decl., Ex. Q (Dkt. No. 61-18).)  Indeed, Epic

6   Games argues that "[m]any of these customers blame Epic [Games] for being cut off from access

7   to *Fortnite*."  (Mot. at 27 (Dkt. No. 61 at 34).)  Finally, Epic Games includes declarations attesting

8   to difficulty in creating and sustaining a metaverse in the *Fortnite* community given that it is no

9   longer on the iOS platform.

10       Epic Games does not persuade.  The cited cases are singularly premised on the fact that the

11  consequences from a breach of contract in which the parties are seeking to escape are *actually* in

12  violation of antitrust laws in the United States.[29]  As discussed, the Court has made no such

13  finding in this Order as to Epic Games' likelihood of success on the merits beyond only finding

14  serious questions as to the merits.  This is especially so where the alleged monopolistic practices

15  and conduct concern innovative technology platforms without analogous prior precedent.

16  Moreover, the Court considers countervailing interests in ensuring that antitrust laws are *not*

17  otherwise stretched into areas that are beyond what is required or contemplated.  *See Kelly v.*

18  *Kosuga*, 358 U.S. 516, 519 (1959) ("Obviously . . . federal courts should not be quick to create a

19  policy of nonenforcement of contracts beyond that which is clearly the requirement of the

20  Sherman Act."); *Germon v. Times Mirror Co.*, 520 F.2d 786, 788 (9th Cir. 1975) ("The purposes

21  of the antitrust laws deal with promoting competition, not with extending unsatisfactory

22  contractual relationships beyond their stipulated periods of effectiveness.").

23       In short, Epic Games cannot simply exclaim "monopoly" to rewrite agreements giving

24  _____

25  [29]  Epic Games' citation to *Acquaire v. Canada Dry Bottling Co.*, 24 F.3d 401 (2d Cir. 1994) is markedly distinguishable. As Apple correctly notes, *Acquaire* involved a defendant who

26  made after-the-fact changes to its policies, did not even comply with its own stated policy, and the plaintiffs made a showing that they would be driven out of business absent an injunction.  *Id.* at

27  412.  None of these facts are present, where Apple has maintained the same policies since the inception of the App Store, and there is no evidence in the record that Epic Games will be driven

28  out of business based on the unavailability of *Fortnite* on the iOS platform.

itself unilateral benefit.  Its other identified bases: damage to its reputation[30] and the *Fortnite*

gaming community cannot constitute irreparable harm where such harm flows from Epic Games'

own actions and its strategic decision to breach its agreements with Apple.[31]  While consumers are

feeling the impact of this litigation, the fact remains: these are business disputes.  A putative class

action on behalf of *all* developers on these *exact same issues* was already in progress when Epic

Games breached the agreements.  *See Cameron*, 4:19-cv-03074-YGR.  Yet, Epic Games has never

adequately explained its rush, other than its disdain for the situation.  The current predicament is

of its own making.  *See Second City Music*, 333 F.3d at 850 ("Only the injury inflicted by one's

adversary counts for this purpose.").[32]

Epic Games remains free to maintain its agreements with Apple in breach status as this

litigation continues and ignore what the Seventh Circuit recognized in *Second City Music*: "[t]he

sensible way to proceed is for [Epic Games to comply with the agreements and guidelines] and

continue to operate while it builds a record."  *Id.*  There is no loss of face *if* one's goal is to protect

its consumers, the *Fortnite* player base.  To assist, the Court even offered to require the 30% be

placed in escrow pending resolution of the trial which Epic Games flatly rejected.[33]  The refusal to

---

[30]  Even reviewing the record before the Court, the Court is not persuaded that Epic Games has suffered reputational harm.  Epic Games unleashed a pre-planned and scorching marketing campaign against Apple following its breach of the operating agreements and guidelines. As the Court noted at oral arguments, if anything, it appears Epic Games' actions have only increased its reputation in the wider community.

[31]  It is further difficult to conceive how Epic Games' own ongoing ambitions in the creation of a metaverse would create a basis for a finding of irreparable injury.

[32]  Indeed, *Second City Music* is illustrative for *why* Epic Games' actions cannot constitute irreparable harm.  In *Second City Music*, the plaintiff-appellant challenged a city ordinance as unconstitutionally vague—not merely violative of a statutory regime.  333 F.3d at 847. The Seventh Circuit found that "some real injury may lurk beneath the surface . . . but evaluating this possibility requires evidence so far missing from the record."  *Id.* at 850.  Likewise, as discussed, the record here is inadequate for the Court to conclude that the agreements and guidelines are violative of antitrust laws such that Epic Games truly has irreparable harm as to *Fortnite*.

[33]  As made apparent at the oral argument, Apple's form letter purportedly banning Epic Games from the iOS platform for a one-year period is no barrier to Epic Games' return to the iOS platform during the pendency of this litigation.  (Dkt. No. 111 at 83-84.)  As Apple stated at the hearing, Epic Games is able to return to the App Store under the Court's supervision provided that Epic Games complies with the relevant agreements and guidelines and further pays Apple its

United States District Court
Northern District of California

1    do so suggests Epic Games is not principally concerned with iOS consumers, but rather, harbors

2    other tactical motives.  Certainly, no technical issue exists.  Epic Games admits that the

3    technology exists to "fix" the problem easily by deactivating the "hotfix."  Thus, given the totality

4    of these circumstances, the Court can easily find that the injury Epic Games "incurs by following a

5    different course is of its own choosing."  *Second City Music*, 333 F.3d at 850.  It is self-harm

6    caused by self-help.[34]  Accordingly, Epic Games has failed to demonstrate irreparable harm as to

7    *Fortnite* and the games under the Epic Games developer account.

8                        *2.    Epic Affiliates*

9            By contrast, with respect to Unreal Engine and the Epic Affiliates, the Court concludes that

10   Epic Games has made a sufficient showing as to the irreparable harm.  As the Court previously

11   found:

12               Apple is hard-pressed to dispute that even if Epic Games succeeded
                 on the merits, it could be too late to save all the projects by third-party
13               developers relying on the engine that were shelved while support was
                 unavailable.  Indeed, such a scenario would likely lead to nebulous,
14               hard-to-quantify questions, such as, how successful these other
                 projects might have been, and how much in royalties would have been
15               generated, much less the collateral damage to the third-party
                 developers themselves

16   *Epic Games*, 2020 WL 5073937, at 4 (Dkt. No. 48 at 6).  Apple does not challenge these prior

17   findings.  Indeed, there is ample evidence in the record demonstrating: (1) that the removal of

18   developer tools could have significant irreparable harm to Unreal Engine and to Epic Games and

19   its affiliates; and (2) that Apple's threat to revoke developer tools (SDKs) from Unreal Engine is

20   already having a negative impact on Unreal Engine.  (*See* Sweeney Decl. ¶¶ 38, 40 (Dkt. No. 65);

21   Penwarden Decl. ¶¶ 8-13 (Dkt. No. 64); Byars Decl., Exs. R (Dkt. No. 61-19), S ¶¶ 3-4 (Dkt. No.

22   61-20).)  In this regard, Epic Games could not otherwise be made whole even if victorious at trial.

23   _____

24   commission on the IAP that occurred after the breach on August 13, 2020.  (*Id.*)

25       [34]  Epic Games' argument that people are incorrectly blaming Epic Games for the
     unavailability of *Fortnite* on the iOS platform ignores the record in this matter.  The decision of
26   whether to return *Fortnite* to the iOS platform during the pendency of this litigation rests with
     Epic Games—not Apple.  Indeed, Epic Games has a choice, and it has exercised this choice by
27   weighing its own beliefs and principles as to the alleged illegality of the Apple agreements and
     guidelines above its interest in continuing to provide iOS users with access to *Fortnite*.  As noted,
28   Epic Games is free to make that choice; but it is Epic Games' choice nonetheless.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *See trueEX, LLC v. MarkitSERV Ltd.*, 266 F.Supp.3d 705, 728 (S.D.N.Y. 2017) ("trueEX is likely

2    also to suffer irreparable harm . . . [as] some [customers] have threatened to stop doing business

3    with trueEX . . . . Another client sought to accelerate a number of planned trades . . . suggesting

4    that the client did not believe it could do business with trueEX in the future").

5           Instead, Apple advances three arguments: (1) Apple has a well-established practice of

6    removing affiliated developer accounts and developer tools (SDKs) in similar circumstances based

7    on broad language in the agreements and guidelines (Schiller Decl. ¶¶ 54-55, Ex. C at 2); (2) the

8    harm to Unreal Engine is also self-inflicted harm and cannot be irreparable harm; and (3) Epic

9    Games and/or its affiliates could insert and distribute secret code in Unreal Engine and the other

10   applications remaining on the iOS and macOS platforms.

11          Apple does not persuade.  It is clear from the record that Apple's long-standing practice of

12   removing affiliated accounts based on broad language regarding termination in the relevant

13   agreements and guidelines would generally be permissible.  However, as applied to the specific

14   facts, the Court concludes that this matter presents an exception to the ordinary practices.  The

15   Court notes that the totality of facts is *not* overwhelming for either side, but leans towards Epic

16   Games on this topic.  On the one hand, facts weighing in favor of Apple include: the agreements

17   are at-will; the developer accounts for both Epic International and Epic Games list the same

18   taxpayer identification number; a single individual is listed as the registered account holder for

19   both accounts; a single credit card paid for both accounts; share the same test devices; the accounts

20   were renewed within a minute of each other; and Epic International receives customer payments

21   made by iOS *Fortnite* users who are playing outside the United States.   On the other hand, facts

22   weighing in favor of Epic Games, Epic International, and other Epic Affiliates include: each have

23   separate agreements with Apple; each of the Epic Affiliates pays separate consideration (*i.e.*

24   annual developer fees); all agreements were renewed at separate times; the Epic Affiliates'

25   agreements have not otherwise been breached; and Epic International has been represented by

26   Epic Games to be a different legal entity despite overlapping financial accounts (*e.g.* credit cards,

27   taxpayer identification number, etc.).  Additionally, despite the inclusion of broad termination

28   language in the agreements, the relevant agreement governing developer tools (SDKs), the Apple

1    Xcode and Apple SDKs Agreement, is a fully integrated document that explicitly excludes the

2    developer program license agreement.

3        Although it is a close question, the Court finds that, with respect to access to the developer

4    tools (SDKs), Apple's reaching into separate agreements with separate entities appears to be

5    retaliatory, especially where these agreements have not been otherwise breached.  Indeed, the form

6    letter first issued by Apple in response to Epic Games' breach does not mention Unreal Engine or

7    the possibility of Apple revoking the developer tools (SDKs).  However, after the commencement

8    of this lawsuit, Apple apparently sent a more personalized letter *specifically* identifying and

9    targeting Unreal Engine as a consequence of Epic Games' breach.  Significantly, the letter does

10   not otherwise identify or list *any* other specific application or software at risk from Epic Games or

11   any of the Epic Affiliates.  (*See* Grant Decl. ¶ 27, Ex. C (Dkt. No. 63-3 at 3-4) ("You will also lose

12   access to the following programs, technologies, and capabilities: . . . Engineering efforts to

13   improve hardware and software performance of Unreal Engine on Mac and iOS hardware;

14   optimize Unreal Engine on the Mac for creative workflows, virtual sets and their CI/Build

15   Systems; and adoption and support of ARKit features and future VR features into Unreal Engine

16   by their XR team.").)  The subtext of the letter where one, and only one, significant product is

17   mentioned evidences that Apple was impermissibly pressuring and retaliating against Epic Games

18   and the Epic Affiliates on Unreal Engine product.

19       Apple's remaining two arguments are also without merit.  Apple has not shown that Epic

20   Games' breach with respect to *Fortnite* results in a breach of agreements with Epic International

21   or the Epic Affiliates.  In the normal course of business, parties can terminate such at will

22   agreements pursuant to their express terms.  Here though, Apple reaches beyond these separate

23   agreements to inflict harm, or pressure, upon Epic Games and the Epic Affiliates. In this regard,

24   the injury cannot be said to be self-inflicted.

25       Finally, the Court is not persuaded by Apple's exaggerated claims that Epic Games would

26   insert hidden or malicious code into Unreal Engine or its products to damage the iOS platform.

27

28

United States District Court
Northern District of California

33

The record is devoid of any evidence to support such a finding or inference.[35]  To the extent any valid concern exists, however, it is easily remedied by narrowing the scope of the injunction to permit Epic Affiliates' continued access to the developer tools (SDKs) and to the App Store only so long as such applications and the Epic Affiliates remain in continued compliance with the terms of the relevant agreements and guidelines.

The Court notes that expanded briefing by Apple on the agreements and its historical practice has made this a closer question than was presented earlier.  On balance, however, and in light of the foregoing analysis, the Court concludes that ongoing irreparable harm and significant potential irreparable harm to Unreal Engine exist absent a preliminary injunction.

**C.     Balance of Equities**

*1.     Fortnite*

As the Court stated in its prior order:

> The battle between Epic Games and Apple has apparently been brewing for some time.  It is not clear why *now* became so urgent.  The *Cameron* case which addresses the same issues has been pending for over a year, and yet, both Epic Games and Apple remain successful market players.  If plaintiffs there, or here, prevail, monetary damages will be available and injunctive relief requiring a change in practice will likely be required.  Epic Games moves this Court to allow it to access Apple's platform for free while it makes money on each purchase made on the same platform.  While the Court anticipates experts will opine that Apple's 30 percent take is anti-competitive, the Court doubts that an expert would suggest a zero percent alternative.  Not even Epic Games gives away its products for free.

---

[35] Further, to do so would be tactically disastrous for Epic Games and its affiliates as it would prove Apple's point with respect to its need to maintain its walled garden or closed platform to protect iOS consumers against security attacks.

Moreover, Apple's arguments—that Mr. Sweeney's statements to Apple announcing the breach reflect a risk to the iOS platform—do not persuade.  Mr. Sweeney states that should Apple reject its demands for the ability to introduce a separate app market and use a different payment processor, then Epic Games will be in conflict with Apple on "a multitude of fronts - creative, technical, business, and legal - for so long as it takes to bring about change."  (Sweeney Decl., Ex. D (Dkt. No. 65-4).)  These statements appear hyperbolic, but even a generous reading in Apple's favor does not reflect any intent to harm the iOS platform with respect to the Unreal Engine or the other applications that are under other affiliates' developer accounts.  Indeed, Unreal Engine does not even utilize the App Store or itself offer IAP, as it is a graphics engine available to developers on computer platforms.  It is hard to determine how the Unreal Engine would or could be used to try to affect such changes as described in the above cited correspondence.

United States District Court
Northern District of California

United States District Court
Northern District of California

> Thus, in focusing on the status quo, the Court observes that Epic Games strategically chose to breach its agreements with Apple which changed the status quo.  No equities have been identified suggesting that the Court should impose a *new* status quo in favor of Epic Games.

*Epic Games*, 2020 WL 5073937, at 4 (Dkt. No. 48 at 6).

The Court's prior findings remain instructive in addressing the parties' arguments:  Epic Games advances two arguments for why the balance of equities tilt sharply in its favor with respect to *Fortnite*.  First, Epic Games dismisses Apple's concern that an injunction with respect to *Fortnite* would set off a rash of other developers breaching their agreements, and asserts that any harm to Apple would be limited to loss of commissions for a short time, "which is harm easily compensable by damages."  (Mot. at 30 (Dkt. No. 61 at 37).)  Second, the balance tilts towards Epic Games where the injunction seeks to ensure that Apple complies with antitrust laws.

Epic Games does not persuade on either of these two bases.  As discussed, Epic Games has not made a preliminary showing of the likelihood of success on its claim.  Therefore, it is not yet established that such an injunction reinstating *Fortnite* would issue in compliance with antitrust laws.  Moreover, Epic Games' argument with respect to damages only demonstrates that the harm to *Fortnite* is *not* irreparable.  As Epic Games states, the loss of commissions to Apple would be for a short duration and would be "easily compensable . . . ."  The converse is also true.

Finally, the Court finds that the balance of equities weighs toward Apple where Epic Games breached both its agreements and the guidelines, and an injunction would potentially incentivize similar breaches among developers.  Epic Games does not dispute that it breached its agreements.  Nor is a breach required to maintain or even commence this lawsuit as reflected by the fact that the named plaintiffs in *Cameron* did not breach their agreements.  As explained herein, Epic Games can similarly proceed.  The Court declines to incentivize breaches of contracts where the legality of those provisions has not yet been conclusively or presumptively determined to be illegal.

In sum, no equities have been identified suggesting that the Court should impose a *new* status quo in favor of Epic Games.  The balance of equities tilts sharply toward Apple on the issue of *Fortnite*.

2.      *Epic Affiliates*

By contrast, the Court finds that the balance of equities weighs in favor of Epic Games and the Epic Affiliates, including as to Unreal Engine, on the issue of continued access to developer tools and the App Store for the Epic Affiliates.  As the Court previously found:

> [W]ith respect to the Unreal Engine and the developer tools, the Court finds the opposite result.  In this regard, the contracts related to those applications were not breached.  Apple does not persuade that it will be harmed based on any restraint on removing the developer tools. The parties' dispute is easily cabined on the antitrust allegations with respect to the App Store.  It need not go farther.  Apple has chosen to act severely, and by doing so, has impacted non-parties, and a third-party developer ecosystem. In this regard, the equities do weigh against Apple.

*Epic Games*, 2020 WL 5073937, at 4 (Dkt. No. 48 at 6).  The Court finds that this analysis remains unchanged.  The only equity that Apple has identified concerns an alleged potential "trojan horse" or insertion of malicious code by Epic Games or the Epic Affiliates.  The Court rejects this argument for the same reasons discussed under the irreparable harm factor.  The modification in the preliminary injunction to ensure continued compliance with the operating agreements and guidelines addresses this issue.

Apple's aggressive targeting of separate contracts in an attempt to eradicate Epic Games and its affiliates fully from the iOS platform was unnecessary and imperiled a thriving third-party developer ecosystem.  Providing continued access for the Epic Affiliates to developer tools and the App Store preserves the status quo.  Accordingly, the balance of equities tilts sharply toward Epic Games on the issue of continued access to developer tools and the App Store for the Epic Affiliates.

**D.      Public Interest**

"[T]he public interest inquiry primarily addresses the impact on non-parties rather than parties."  *HiQ Labs,* 938 F.3d at 1004 (internal quotation marks omitted).  "The plaintiffs bear the initial burden of showing that the injunction is in the public interest."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).  The current briefing does not change significantly the parties' initial submissions or the Court's findings, which it reaffirms:

1
2
3
4
5
6
7
8

With respect to the gaming requests, the Court recognizes based on the numerous internet postings and comments submitted in the record that *Fortnite* players are passionate supporters of the game, and eagerly anticipate its return to the iOS platform.  The Court further recognizes that during these coronavirus pandemic (COVID-19) times, virtual escapes may assist in connecting people and providing a space that is otherwise unavailable.  However, the showing is not sufficient to conclude that these considerations outweigh the general public interest in requiring private parties to adhere to their contractual agreements or in resolving business disputes through normal, albeit expedited, proceedings.  *See S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853 (6th Cir. 2017) (declining to enjoin termination of contract according to its terms because the "public has a strong interest in holding private parties to their agreements").

9
10
11
12
13
14

With respect to the Unreal Engine and the developer tools, the calculus changes.  The record shows potential significant damage to both the Unreal Engine platform itself, and to the gaming industry generally, including on both third-party developers and gamers.  The public context in which this injury arises differs significantly: not only has the underlying agreement not been breached, but the economy is in dire need of increasing avenues for creativity and innovation, not eliminating them.  Epic Games and Apple are at liberty to litigate against each other, but their dispute should not create havoc to bystanders. . . .

15   *Epic Games*, 2020 WL 5073937, at 4 (Dkt. No. 48 at 7).

16      As to *Fortnite*, nothing has changed in the prior analysis.  The Court has empathy for

17   *Fortnite* players regarding the continued unavailability of the game on the iOS platform. This is

18   especially so during these continued difficult times that is the COVID-19 pandemic era, where

19   gaming and virtual worlds are both social and safe.  However, there is significant public interest in

20   requiring parties to adhere to their contractual agreements or in resolving business disputes

21   through the normal course.[36]  Thus, the public interest factor weighs in favor of Apple as to

22   *Fortnite*.

23      The record has also remained the same as to the Epic Affiliate accounts and Unreal Engine.

24   The record demonstrates potential significant damage to both developers and gamers absent the

25   issuance of a preliminary injunction.  Indeed, many games on iOS and on other platforms,

26

27
28

[36] Epic Games cites authority that it is not in the public interest to enforce illegal contracts. Of course, these cases presuppose a showing on the illegality of the contract, which Epic Games has not yet done, and are therefore inapposite.

37

including *Fortnite* competitor *PUBG*, are built using Unreal Engine and rely on the engine remaining compatible with future Apple software updates.  Without the ability to update the underlying engine for these and other games, the gaming industry built upon developers and fervent consumers, including iOS consumers, will be unnecessarily impacted.  Moreover, the need for increasing avenues for creativity and innovation has not abated since the prior order.  If anything, the continued ongoing pandemic has demonstrated the imperative for substantial digital and virtual innovation.  Epic Games and Apple are at liberty to litigate this action for the future of the digital frontier, but their dispute should not create havoc to bystanders.  Thus, the public interest weighs overwhelmingly in favor of Unreal Engine and the Epic Affiliates.

   **E.**  **Weighing of Factors**

   In sum, the Court finds that based upon the record before it, the *Winter* factors weigh ***against*** granting a preliminary injunction based on Epic Games' requests as to *Fortnite* and other games and ***in favor*** of granting a preliminary injunction order as the Epic Affiliates effected developer tools, including as to Unreal Engine.

**IV.** **CONCLUSION**

   Accordingly, for the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for preliminary injunction.

   **THEREFORE, APPLE AND ALL PERSONS IN ACTIVE CONCERT OR PARTICIPATION WITH APPLE, ARE PRELIMINARILY ENJOINED** from taking adverse action against the Epic Affiliates with respect to restricting, suspending or terminating the Epic Affiliates from the Apple's Developer Program, on the basis that Epic Games enabled IAP direct processing in *Fortnite* through means other than the Apple IAP system, or on the basis of the steps Epic Games took to do so.  This preliminary injunction shall remain in effect during the pendency of this litigation unless the Epic Affiliates breach: (1) any of their governing agreements with Apple, or (2) the operative App Store guidelines.  This preliminary injunction **SUPERSEDES** the prior temporary restraining order.

   For the reasons set forth above, this preliminary injunction is **EFFECTIVE IMMEDIATELY** and will remain in force until the disposition of this case.  Neither party has requested a security

United States District Court
Northern District of California

38

bond and the Court finds that none is necessary as contemplated under Fed. R. Civ. P. 65(c).  *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("The district court is afforded wide discretion in setting the amount of the bond, . . . and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction.").

This Order terminates Docket Number 61.

**IT IS SO ORDERED.**

Dated: October 9, 2020

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**