THEODORE J. BOUTROUS JR.,
  SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  333 South Grand Avenue
  Los Angeles, CA 90071-3197
  Telephone: 213.229.7000
  Facsimile: 213.229.7520

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar
  No. 492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  1050 Connecticut Avenue, N.W.
  Washington, DC 20036-5306
  Telephone: 202.955.8500
  Facsimile: 202.467.0539

VERONICA S. LEWIS (Texas Bar
  No. 24000092; *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
  2001 Ross Avenue, Suite 2100
  Dallas, TX 75201
  Telephone: 214.698.3100
  Facsimile: 214.571.2900

E. JOSHUA ROSENKRANZ (N.Y. Bar
  No. 2224889; *pro hac vice*)
  jrosenkranz@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
  51 West 52nd Street
  New York, NY 10019-6142
  Telephone: 212.506.5000
  Facsimile: 212.506.5151

WILLIAM F. STUTE (D.C. Bar No.
  1032093; *pro hac vice*)
  wstute@orrick.com
ORRICK, HERRINGTON &
SUTCLIFFE LLP
  1152 15th Street, N.W.
  Washington, DC 20005-1706
  Telephone: 202.339.8400
  Facsimile: 202.339.8500

**Attorneys for Defendant APPLE INC.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>APPLE INC.,<br><br>    Defendant. | CASE NO. 4:20-CV-05640-YGR<br><br>**COUNTERCLAIMANT APPLE INC.'S RESPONSE TO MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: November 10, 2020 at 2:00 p.m.<br><br>Courtroom: 1, 4th Floor<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

APPLE INC.,

                      Counterclaimant,

       v.

EPIC GAMES, INC.,

                      Counter-Defendant.

APPLE INC.'S RESPONSE TO MOTION FOR JUDGMENT ON THE PLEADINGS
Case No. 4:20-cv-05640-YGR

## **INTRODUCTION**

The premise of Epic's motion for judgment on the pleadings (Dkt. 113) is that by conceding liability for breach of contract, Epic can somehow immunize itself from tort liability for smuggling code into *Fortnite* without Apple's knowledge or consent, intentionally interfering with the promises of security and privacy that Apple provides to end users of iOS devices, and stealing sales commissions that rightfully belong to Apple. The California Supreme Court has expressly rejected this premise, recognizing that "a contract is not a license allowing one party to cheat or defraud the other." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 992 (2004). As pleaded in Apple's counterclaims (Dkt. 66), Epic is liable in *both* contract *and* tort for its deceptive practices.

To be sure, Epic could have litigated its contract dispute without engaging in tortious behavior. It could have continued as a class member in the ongoing *Cameron* litigation, or it could have opted out of the class action and brought its own lawsuit, in either case "maintaining the contract in breach status." Dkt. 118 at 30. Instead, Epic chose the path of deception—implanting secret code in a *Fortnite* update it provided to Apple for distribution, intentionally concealing the purpose and effect of this code from Apple's review, and then activating a "hotfix" in the dead of night for the purpose of diverting to itself commissions that belong to Apple while jeopardizing the security and privacy of end users. It is beyond reasonable dispute that, by its intentional actions, Epic breached its contracts with Apple, rendering Epic liable in damages. And because "the means used to breach the contract are tortious, involving deceit" and constitute independently wrongful conduct, Apple is *also* entitled to pursue claims in tort. *Congdon v. Uber Tech.*, No. 16-cv-02499-YGR, 2018 WL 2971058, *3 (N.D. Cal. Jun. 13, 2018) (quoting *Erlich v. Menezes*, 21 Cal. 4th 543 (1999)).

First, California has long recognized a duty not to engage in wrongful acts that interfere with the prospective economic advantage of another. *Ixchel Pharma. v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142 (2020). Using deception to avoid paying a

commission is an example of this tort. *Buckaloo v. Johnson*, 14 Cal. 3d 815, 827 (1975), *overruled on other grounds by Della Penna v. Toyota Motor Sales, U.S.A*., 11 Cal. 4th 376, 393 n.5 (1995). Likewise, it is well established that, although mere breach of a contract cannot form the basis for tort liability, "a tortious breach of contract may be found when . . . the means used to breach the contract are tortious, *involving deceit* or undue coercion." *Robinson*, 34 Cal. 4th at 990 (emphasis added). As the Court recently recognized, Epic "admits that the technology exists to 'fix' the problem easily by deactivating the 'hotfix.'" Dkt. 118 at 31. Epic's refusal to do so now that the contracts have been repudiated (by Epic) and terminated (by Apple) is itself an independently tortious act. And Epic's attempt to avoid tort liability on the ground that it is "not a stranger" to the relationship between Apple and iOS end users is contrary to California law.

Second, Epic to this day is stealing definite, ascertainable sums of money from Apple, and the tort of conversion provides a civil remedy for such conduct. Apple has a possessory interest in the revenue from in-app purchases made by iOS end users, particularly the commissions therefrom. Epic's intentional conduct here—triggering its "hotfix" to introduce an unauthorized external payment mechanism—deprived Apple of those sums. The amount stolen by Epic from Apple can be fixed with certainty; the fact that this amount increases with every day that Epic continues its wrongdoing does not relieve Epic of tort liability. If the rule were as Epic argues, Apple would only have a claim for conversion if Epic ceased its illicit activity, but not when such activity continues. That is not and cannot be the law.

For essentially the same reasons, the economic loss rule does not preclude Apple's tort counterclaims. Apple has adequately pleaded that Epic engaged in tortious conduct over and above its open breaches of contract, thus entitling Apple to pursue alternative theories of liability. At the pleading stage, the Court should not countenance Epic's effort to escape the consequences—including punitive damages— that California law imposes on willful tortfeasors.

Gibson, Dunn & Crutcher LLP

## ARGUMENT

Epic's motion rests on the faulty premise that because its actions constitute a breach of its contracts with Apple, they cannot also be independently wrongful and actionable in tort. *See, e.g.*, Dkt. 113 at 5 ("Both of Apple's tort claims are premised entirely on the breach of duties created by the License Agreement"). That is false. It is well established in California law that "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts." *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 774 (1997) (citing 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 139, pp. 203-204)); *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999) (same). Were it otherwise, a party who contracted for protections from malfeasance would have *fewer* remedies than one who had not. The economic loss rule, and its application in the context of particular torts, does not preclude a claimant from proceeding in both contract and tort where, as here, the malefactor committed an independently wrongful act in addition to breaching its contract.

Apple's counterclaims plead two such wrongful acts, intentional interference with prospective economic advantage and conversion (Dkt. 66 at ¶¶ 66-73, ¶¶ 74-79), and therefore Epic is not entitled to judgment on the pleadings. Fed. R. Civ. P. 12(c).[1]

## I.   LEGAL STANDARD

A complaint (or counterclaim) must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In resolving a motion for judgment on the pleadings, a court must "accept as true all facts alleged in the complaint, and [] draw all reasonable inferences in favor of Plaintiff." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 (9th Cir. 2008); *see Summit Estate, Inc. v. United Healthcare Ins. Co.*, No. 4:19-CV-06724-YGR, 2020

---

[1] By proceeding in both contract and tort, Apple is not seeking "to recover twice for the same harm"; rather, it is pleading alternative theories of liability. *Sorayama v. Robert Bane Ltd. Inc.*, 380 F. App'x 707, 709 (9th Cir. 2010) (citing *Rogers v. Davis*, 28 Cal. App. 4th 1215, 1220 (1994) (plaintiff may request alternative remedies, "but may not be awarded both to the extent such an award would constitute a double recovery")). Any question regarding election of remedies is premature, as Epic appears to recognize by not raising any issue of duplicative recovery.

Gibson, Dunn & Crutcher LLP

WL 5436655, at *2 (N.D. Cal. Sept. 10, 2020) (holding that the standard for judgment on the pleadings is "'functionally identical' to the standard for determining a motion to dismiss under Rule 12(b)(6)").

Moreover, if "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion" under Rule 12. *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). Resolution of factual questions is inappropriate on the pleadings. *See Newcal*, 513 F.3d at 1052. Instead, "ambiguities should be resolved in favor of permitting [the] claim to proceed to discovery." *Harris v. Lappin*, No. EDCV 06-0664VBF(AJW), 2009 WL 789756, at *10 (C.D. Cal. Mar. 19, 2009).

Apple's tort counterclaims (Dkt. 66 at ¶¶ 66-73, ¶¶ 74-79) easily meet the liberal pleading requirements of Rule 12. Dismissal is therefore improper here.

## II. EPIC INTENTIONALLY INTERFERED WITH THE ECONOMIC RELATIONSHIP BETWEEN APPLE AND IOS END USERS.

Apple has stated a claim for intentional interference with prospective economic advantage by alleging that: (1) Apple has an economic relationship with iOS end users; (2) Epic is aware of Apple's relationship with these end users; (3) Epic engaged in intentional and wrongful conduct designed to interfere with or disrupt the relationship between Apple and iOS end users; (4) Epic's conduct actually interfered with Apple's relationships with end users; and (5) as a result of Epic's intentional interference, Apple has been injured. Dkt. 66 at ¶¶ 67-71; *see Buckaloo*, 14 Cal. 3d at 827.

The factual allegations pleaded in Apple's counterclaims amply support each element of its intentional interference claim, including wrongful conduct by Epic. And, as an outsider to the relationship between Apple and iOS end users, Epic can be held liable for its intentional interference with that relationship.

### A.    Epic engaged in independently wrongful acts.

Epic wrongfully interfered with Apple's relationship with iOS end users in at least two ways: (1) by failing to remit to Apple commissions from in-app purchases by

end users, *see, e.g.*, Dkt. 66 at ¶ 69, and (2) by deceptively introducing its "hotfix" to the App Store, thereby compromising Apple's ability to deliver on the security and privacy protections that Apple promises to end users, *see, e.g.*, *id.* at ¶ 73. Either one of these, standing alone, is sufficient to support an intentional interference claim.

### 1.    Epic deprived Apple of its commissions on in-app purchases.

Epic's use of deception to deprive Apple of its commissions on in-app purchases is wrongful independent of Epic's contractual obligation to pay those commissions. The California Supreme Court's decision in *Buckaloo*, which considered an intentional interference claim in the context of a real estate transaction, is particularly instructive. There, the defendant real estate purchaser, "after taking advantage of the broker's efforts and stock in trade, induce[d] the seller to accept the 'low net price' through the expedient of excluding the broker's commission." 14 Cal. 3d at 828. Even though the oral contract between the defendant and the broker was unenforceable under the statute of frauds, *id.* at 821, defendant's "subversion of [plaintiff's] prospective contractual relationship" was sufficient to state a claim for the tort of intentional interference "*irrespective of* the enforceability of the underlying agreement." *Id.* at 822 (emphasis added). Indeed, the California Supreme Court observed that "such devious dealings" are "*precisely* the conduct condemned by the traditional tort of interference." *Id.* at 827 (emphasis added). By depriving the broker of his commission, the buyer in *Buckaloo* committed both a tort and a breach of contract (if the contract was enforceable).[2]

---

[2]   In *Della Penna*, the California Supreme Court disapproved *Buckaloo*'s explication of the pleading and proof standard for the wrongful act element of intentional interference with prospective economic advantage. 11 Cal. 4th at 383, n. 5. That disapproval is not at issue here, where Apple's counterclaims plead a wrongful act by Epic, *see, e.g.*, Dkt. 66 at ¶ 69, and it does not affect *Buckaloo*'s recognition that deceptively taking commissions established by contract, even where that contract is unenforceable, is an independently wrongful act that will support a tort claim for interference. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003) ("Rather than *overrule* the established elements of" intentional interference with prospective economic advantage set forth in *Buckaloo*, "*Della Penna merely clarified the plaintiff's burden* as to the third element") (emphasis added); *see also Ixchel*, 9 Cal. 5th at 1146.

Gibson, Dunn &
Crutcher LLP

As in *Buckaloo*, Epic's "devious dealings" to subvert Apple's sales commissions are subject to tort liability independent of the existence or enforceability of any contracts between the parties. Like the defendant in *Buckaloo*, Epic, "after taking advantage of" the myriad benefits provided by Apple to facilitate the development and distribution of apps in the App Store, Dkt. 66 at ¶¶ 15-19, implemented its "hotfix" with the express purpose and effect of inducing consumers to make purchases through its unauthorized external payment mechanism at a "low net price" that excluded Apple's commission, *id.* at ¶¶ 34-37. *See Buckaloo*, 14 Cal. 3d at 828.

Indeed, Epic's tortious misconduct continues to this day. Although *Fortnite* has been removed from the App Store, iOS users continue to make in-app purchases using the "hotfix" payment bypass. Epic could deactivate the "hotfix," but has declined to do so—as the Court recognized in the Preliminary Injunction Order. Dkt. 118 at 31. Thus, even though the contracts have been repudiated (by Epic) and terminated (by Apple), Epic intentionally continues to deprive Apple of its commissions. Under clear California Supreme Court precedent, Apple is entitled to seek relief for this wrongful conduct through the tort of intentional interference with prospective economic advantage.

### 2. Epic used deception to interfere in Apple's relationships with iOS end users.

Epic also wrongfully interfered with Apple's customer relationships by using deception to sneak its "hotfix" onto the App Store and onto the devices of Apple's customers. Dkt. 66 at ¶ 72 ("Epic made the willful decision to interfere with [Apple's] relationships [with end users].")   Epic euphemistically refers to its misconduct as "offer[ing] iOS users the *choice* of dealing directly with Epic," Dkt. 113 at 2 (emphasis in original); but its benign description cannot mask the malignancy that Epic deliberately introduced into the iOS ecosystem. By smuggling its "hotfix" onto the App Store, Epic subverted not just Apple's IAP functionality but also the network of contractual, technological, logistical, and other security and privacy protections that

Apple has built into the iOS infrastructure for the benefit of end users. *See, e.g.*, Dkt. 66 at ¶ 46. And, in doing so, it launched a direct attack on the way Apple does business with those end users, including the promises of security and privacy that Apple provides to them. In fact, Epic has admitted that interfering with these relationships in order to force Apple to "rework the entire system" of the App Store is "exactly the point" of Epic's campaign. Dkt. 90 at 10.[3]

Importantly, Epic achieved its objective through trickery. As the Court observed in its Preliminary Injunction Order, Epic Games engaged in "deceptive conduct" when it "clandestinely add[ed] features in violation of the guidelines and its agreements with Apple, and then fail[ed] to disclose such code." Dkt. 118 at 7 n.7; *see* Dkt. 66 at ¶ 72 ("Epic carefully concealed from Apple its plan to introduce an unauthorized and unapproved external payment mechanism to Fortnite via hotfix, and it executed on this plan with a willful and knowing disregard of Apple's rights."). And it did so "despite receiving an unambiguous refusal from Apple only a few weeks prior to the introduction of its hotfix." Dkt. 118 at 7 n.7. Under these circumstances, the deceitful nature of Epic's conduct transcends an ordinary breach of contract and crosses into the realm of tort. *See Robinson*, 34 Cal. 4th at 990 ("a tortious breach of contract may be found when . . . the means used to breach the contract are tortious, *involving deceit* or undue coercion") (emphasis added). Put another way, if Epic had never executed the contracts with Apple and had instead found another way to smuggle *Fortnite* and its "hotfix" payment mechanism into the App Store, it would clearly be liable to Apple in tort. That this misconduct *also* breached Epic's contracts with Apple in no way negates its independently wrongful nature. *See id.*

In contrast, the cases cited in Epic's motion all involve simple breach of contract—with no allegation of deceit or tortious breach. *See, e.g.*, *JRS Products, Inc.*

---

3   Notably, V-Bucks sold through Epic's "hotfix" are *not* priced 30% lower than those charged through Apple's IAP system. Dkt. 1 at ¶ 19. Epic is not passing the alleged savings from avoiding Apple's commission onto its customers. Rather, Epic's "hotfix" actually *increases* the revenue it receives per V-Buck from iOS users—further evidence that Epic's motive is to enrich itself.

Gibson, Dunn & Crutcher LLP

1   *v. Matsushita Electr. Corp. of Am.*, 115 Cal. App. 4th 168, 183 (2004) (alleging

2   intentional interference based on defendant's termination of the contract at issue);

3   *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 479

4   (1996) (same); *Batts v. Bankers Life & Cas. Co.*, No. C 13-04394-SI, 2014 WL

5   296925, at *4 (N.D. Cal. Jan. 27, 2014) (same). As such, each of these is

6   distinguishable from Epic's conduct here.

## B.      Epic's "Not a Stranger" Argument Misstates California Law.

8           Epic argues that "Apple's intentional interference counterclaim fails because

9   Epic is not a stranger to the relationship it allegedly interfered with."  Dkt. 113 at 8.

10  Epic goes so far as to represent to the Court that "it is *black-letter California law* that

11  intentional interference with prospective economic advantage claims may be asserted

12  only against 'third-party strangers' to the relationships allegedly interfered with."  *Id.*

13  at 2 (emphasis added). To support this claim, Epic's motion cites a single case—the

14  Ninth Circuit decision in *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271

15  F.3d 825, 832 (9th Cir. 2001). This entire line of argument is wrong as a matter of

16  California law.

17          The Ninth Circuit itself has acknowledged, years after *Marin Tug* issued, that

18  "California Courts of Appeal have rejected *Marin Tug*[]" and limited the "not-a-

19  stranger" doctrine to immunize "only *parties to a contract*" from intentional

20  interference claims. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119,

21  1126-27 (9th Cir. 2014) (emphasis added) (collecting cases); *see also Popescu v.*

22  *Apple*, 1 Cal. App. 5th 39 (2016) *overruled on other grounds by Ixchel*, 9 Cal. 5th at

23  1148 (rejecting the "not-a-stranger" argument); *Caliber Paving Co. v. Rexford Indus.*

24  *Realty & Mgmt., Inc.*, 54 Cal. App. 5th 175 (2020) (similar). The Ninth Circuit now

25  recognizes that parties with merely "an economic interest" in a relationship—as Epic

26  has here—can be held "liable for intentional interference" with that relationship.

27  *United Nat. Maintenance, Inc. v. Sandiego Convention Center, Inc.*, 766 F.3d 1002,

28  1008 (9th Cir. 2014). District courts in the Ninth Circuit have followed suit in

concluding that "the stranger test" articulated in *Marin Tug* "is no longer good law." *Rescap Liquidating Trust v. First California Mortgage Co.*, No. 18-cv-03283-WHO, 2018 WL 5310795, at \*6 (N.D. Cal. Oct. 25, 2018); *see Nuvasive, Inc. v. Madsen Medical, Inc.*, No. 13-cv-2077, 2016 WL 3166834, at \*7 (S.D. Cal. June 7, 2016 ) ("Recently, the Ninth Circuit held that *Marin Tug* does not impose an additional requirement—i.e., that the party be a 'stranger' to the contractual relationship with no direct interest or involvement in the relationship").

Epic does not acknowledge any of these developments in its motion. Yet they are fatal to Epic's "not-a-stranger" argument. Indeed, in walking back from *Marin Tug* the Ninth Circuit has acknowledged that "shield[ing] parties with an economic interest" in the relationship from potential liability for intentional interference would be "*particularly perverse* as it is those parties with some type of economic interest in a contract whom would have the *greatest incentive to interfere* with it." *United*, 766 F.3d at 1007 (emphasis added). Such is the case here. "[E]xactly the point" of Epic's misconduct in this case was to interfere with Apple's relationships with iOS end users to advance Epic's economic interest at the expense of Apple's. Dkt. 90 at 10. Shielding Epic from liability for its interference on the basis of its economic incentive to do so would create the exact "perverse" result contemplated by the Ninth Circuit in *United*. *See* 766 F.3d at 1007.

## III. EPIC HAS TORTIOUSLY CONVERTED SPECIFIC, IDENTIFABLE SUMS OF MONEY FROM APPLE.

Apple has stated a claim for conversion by alleging that: (1) Apple has a possessory interest in specific, identifiable sums of money, including commissions on in-app purchases; (2) Epic misappropriated, took possession of, and interfered with Apple's possessory interest in such funds; (3) and, as a result of Epic's conversion, Apple has been injured. Dkt. 66 at ¶¶ 75–78.

Stated simply, Epic is stealing money from Apple. Theft is a crime, and "conversion" is its civil-law analogue. The victim of theft has always had the right to

sue for conversion to get its property back from the thief—irrespective of the technical means by which the conversion is accomplished. If, for example, Epic sent an agent into Apple Park and stole cash from a vault, a conversion claim could properly be pleaded. If Epic hacked an Apple bank account and stole cash electronically, a conversion claim could properly be pleaded. And if Epic bypassed IAP to funnel funds that include Apple's revenues and commissions into Epic's coffers, a conversion claim can be—and has been—properly pleaded.

The tort of conversion is not limited to non-fungible property. Money is subject to a conversion action so long as "there is a specific, identifiable sum involved," such as where "an agent" wrongfully absconds with "a sum of money to be paid to another." *Sanowicz v. Bacal*, 234 Cal. App. 4th 1027, 1041 (2015) (citation and emphasis omitted). Epic maintains that its wholesale theft from Apple does not constitute conversion "because Apple does not allege [A] that it *owned* or had a *possessory interest* . . . [B] in a *specific*, *traceable* sum of money alleged to have been converted." Dkt. 113 at 9 (emphasis altered). Epic is wrong in both respects.

### A. Apple has a possessory interest in its commissions.

Apple's allegations present far more than a "generalized claim for money lost or owed." *Ainsley Enterprises Inc. v. Merryman*, No. 19-CV-02101-YGR, 2020 WL 1677330, at *9 n.21 (N.D. Cal. Apr. 6, 2020). Rather, Apple's conversion claim is analogous to well-settled case law involving "failure to turn over commissions . . . which were earmarked for a specific person before being misappropriated and absorbed into another's coffers." *Voris v. Lampert*, 7 Cal. 5th 1141, 1156 (2019) (discussing authorities finding such conduct to constitute conversion). In *Voris*—which Epic itself cites (*see* Dkt. 113 at 10, 11, 12)—the California Supreme Court distinguished such *viable* conversion claims with, for example, "claim[s] for unpaid wages," which "simply seek[] the satisfaction of a monetary claim against the employer, without regard to the provenance of the monies at issue," and therefore "sound in contract, rather than as the tort of conversion." 7 Cal. 5th at 1156. In

contrast, a conversion claim was sufficiently pleaded where the plaintiff alleged that a real-estate-agent defendant "converted the commissions due [to the plaintiff] when [the defendant] allegedly received funds from [a] broker on [a sale] but refused to pay [the plaintiff's] share to him, and by implication exercised dominion and control over the funds to the exclusion of [the plaintiff]." *Sanowicz*, 234 Cal. App. 4th at 1042. Because, in that case, the conversion claim "allege[d] actual possession by [the defendant] of an amount of money part of which is due to [plaintiff,]" the complaint was "sufficient to overcome" defendant's effort to obtain a pleadings-based dismissal. *Id.* (reversing grant of demurrer); *see also Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072-74 (1996) (sales agent may be liable for conversion of proceeds from consignment sale where agent did not remit any portion of proceeds to principal seller); *Voris*, 7 Cal. 5th at 1152 (discussing *Sanowicz* and *Fischer*); *Andreoli v. Youngevity Int'l, Inc.*, No. 16-cv-02922-BTM-JLB, 2018 WL 1470264, at *11 (S.D. Cal. Mar. 23, 2018) (conversion sufficiently pleaded where defendant allegedly "withheld all commission payments" associated with distributorship agreements following alleged wrongful termination of the agreements).

The same reasoning applies here: through its larcenous "hotfix," Epic is continually converting sales proceeds that would otherwise be captured by Apple through IAP, including commissions that rightfully belong to Apple. *Sanowicz*, 234 Cal. App. 4th at 1042. In doing so, Epic is "wrongfully exercis[ing] dominion over a specifically identifiable pot of money that already belongs to [Apple]—in other words, the sort of wrong that conversion is designed to remedy." *Voris*, 7 Cal. 5th at 1152-53. Epic's arguments to the contrary are unpersuasive.[4]

---

[4] The unpublished decision in *California State Employees Association v. Bogart*, No. 2:14-cv-02494-JAM, 2015 WL 461646, at *1 (E.D. Cal. Feb. 3, 2015), upon which Epic relies (Dkt. 113 at 11-12), is easily distinguished. There, an insurance-broker plaintiff alleged that the defendant "converted" funds by writing a letter that led a separate (non-defendant) entity "to terminate[] its contract with [plaintiff] and stop[] paying him commissions." *Id.* The defendant's writing of the letter was "[t]he sole 'wrongful act'" giving rise to the conversion claim. *Id.* at *2. In contrast, Apple alleges here that Epic itself converted specific, identifiable sums by routing sales into its own accounts.

1    *First*, the fact that a contract (the License Agreement) both memorializes and

2    renders specific Apple's possessory interest in the identified sums does not mean that

3    its conversion claim is "fatally flawed."  Dkt. 113 at 3, 10. Quite the contrary, the

4    California Supreme Court explained in *Voris* that "[c]ontractual provisions may, of

5    course, determine whether the plaintiff has a possessory right to certain funds in the

6    defendant's hands."  7 Cal. 5th at 1152 (citing *Fischer*, 50 Cal. App. 4th at 1072-74

7    (agency agreement established principal sellers' legal entitlement to converted

8    commissions)). That is exactly what the License Agreement does here: it makes clear

9    that "a specific and identifiable sum" has been converted—including Apple's

10   commissions, a sum that can be "determined by multiplying the total amount of

11   consumer purchases in the *Fortnite* app by the contractually specified rate of 30%."

12   Dkt. 66 at ¶ 75. Courts frequently look to contracts both to establish that a possessory

13   interest in a converted sum *exists* and to determine the precise *amount* of that sum. *See,*

14   *e.g.*, *Sanowicz*, 234 Cal. App. 4th at 1031 (amount of converted commissions

15   delineated by "oral and written agreements"); *Fischer*, 50 Cal. App. 4th at 1072–74

16   (similar). The specificity of the contractual provisions here confirm the viability of

17   Apple's conversion counterclaim.

18   *Second*, Apple's possessory interest *did* in fact "exist[] at the time of the alleged

19   conversion."  Dkt. 113 at 11. In arguing otherwise, Epic mischaracterizes Apple's

20   claim as alleging that the conversion took place at the moment Epic incorporated its

21   hotfix into its *Fortnite* app. *See id.* at 9–11 (wrongly suggesting claim is about a "right

22   to collect money *in the future*"). In reality, the "time of [each] alleged conversion" (*id.*)

23   is the moment of "'collection of any amounts from any end-user.'"  Dkt. 66 at ¶ 76

24   (quoting License Agreement, Schedule 2, ¶ 3.5). Once any such transaction takes

25   place, Epic begins tortiously "exercis[ing] dominion and control over [those] funds to

26   the exclusion of [Apple]," and thus converts them. *Sanowicz*, 234 Cal. App. 4th at

27   1042. And Epic continues to do so for every in-app purchase made by an iOS end user

28   under the "hotfix" payment system.

This makes intuitive sense. One who converts funds by hacking into another's bank account does not commit the tort of conversion by virtue of the hacking itself, but rather by using wrongfully obtained access to *redirect the funds*. If the hack involved a periodic redirection continuing into the future, a separate act of conversion occurs upon every transfer. Likewise, Epic's "act of conversion" was not "the act of making the direct payment option available to *Fortnite* users via hotfix on the morning of August 13, 2020." Dkt. 113 at 11. It was and is, rather, Epic's discrete and ongoing diversions of specific, identifiable in-app sales to iOS end users and the commissions therefrom. *See* Dkt. 66 at ¶¶ 75–78. In stealing those specific, identifiable funds, Epic continues to wrongfully "assert[] dominion over [Apple's] property." *Voris*, 7 Cal. 5th at 1156 n.11.

Such blatant theft contrasts sharply with claims that do not constitute conversion because they arise from a "mere contractual right of payment" and a "simple failure to pay money owed." Dkt. 113 at 12, 10 (citation omitted). Apple does *not* allege, for example, that Epic "failed to reach into its own funds to satisfy [a] debt," *Voris*, 7 Cal. 5th at 1153, or otherwise "fail[ed] to pay [Apple] the money [Epic] owe[s]" pursuant to a contract, *id.* at 1156 n.11. To be clear, Epic does owe Apple contract damages. But that liability does not relieve Epic of its obligation to answer in tort for its wrongful acts of conversion—acts that continue to this day. Epic stole, and is still stealing, funds in which Apple has a possessory interest, as memorialized and delineated in its contracts; and this intentional conduct by Epic gives rise to liability in both contract and tort subject only to limitations on multiplicative recovery that are not now presented. *See* note 1, *supra*.

What's more, Epic's refusal to deactivate its hotfix makes this a continuing tort, as Epic's bank accounts continue to grow daily with additional stolen amounts. While Epic has repudiated its contractual obligations through its lawsuit, and its claims will be tested in time, Epic's continued siphoning of sales from IAP is just theft, plain and simple.

Gibson, Dunn &
Crutcher LLP

**B.     The stolen commissions are specific and capable of identification.**

Epic next attempts, impermissibly, to heighten the pleading standard for a conversion claim in suggesting that Apple must plead a definite sum. Dkt. 113 at 12. California law does not so require at the pleading stage. *See Natomas Gardens Inv. Grp., LLC v. Sinadinos*, 710 F. Supp. 2d 1008, 1019-20 (E.D. Cal. 2010) (denying motion to dismiss claim for conversion of money, finding that the "allegations sufficiently allege an amount that is capable of identification," rather than the requirement that plaintiffs "present evidence of a definite, identifiable sum of money" which is "only necessary" "at summary judgment") (citing *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 397 (2007)); *Brock v. Concord Auto. Dealership LLC*, No. 14-cv-01889-HSG, 2016 WL 829074, at *4 (N.D. Cal. Mar. 3, 2016) (explaining "a plaintiff is not required to plead the exact amount of money allegedly converted by the defendant . . . . Instead, the plaintiff need only allege conversion of a sum that is capable of identification . . . . to survive the pleading stage").

Moreover, the fact that Epic's acts of conversion continue to this day explains why Apple "seeks recovery of an ongoing and increasing sum." Dkt. 113 at 12. Each and every theft constitutes an independent, separately accruing wrong. *See Walker v. Blackground Records, LLC*, No. cv-16-4833-FMO-(FFMx), 2017 WL 8186040, at *6 (C.D. Cal. Aug. 7, 2017) (recognizing "the continuous accrual theory has been applied to conversion claims" and collecting cases). The converted amounts can easily be calculated as a specific and identifiable sum at the time of judgment.  Apple's commissions, for example, can be "determined by multiplying the total amount of consumer purchases in the *Fortnite* app by the contractually specified rate of 30%." Dkt. 66 at ¶ 75. That such a determination involves a figure that will increase over time is irrelevant so long as the final figure is readily ascertainable and specific, as it clearly is here. *See, e.g.*, *Gelow v. Central Pacific Mortg. Corp.*, 656 F. Supp. 2d 1217, 1230 (E.D. Cal. 2009) (noting that a "fluctuating" bank account was capable of being

converted because "the sum is always ascertainable"). At the time of judgment, the amount Epic has converted can easily be ascertained from information that is available from Epic's records.[5]

## IV.   EPIC'S REMAINING ARGUMENTS DO NOT REQUIRE DISMISSAL.

### A.   The economic loss rule is inapplicable here because Epic engaged in independently tortious conduct.

Epic's argument that the economic loss rule bars Apple's tort claims begs the question. California law is clear that the economic loss rule does not bar recovery in tort if "the breach [of contract] is accompanied by a traditional common law tort, such as fraud or conversion" or if "the means used to breach the contract are tortious, involving deceit." *Robinson*, 34 Cal. 4th at 990; *Congdon*, 2018 WL 2971058, at *3 (same). Likewise, the economic loss rule does not bar claims for intentional interference with prospective economic advantage. *See WeBoost Media, S.R.L. v. LookSmart Ltd.*, No. C 13-5304, 2014 WL 2621465, *7 (N.D. Cal. June 12, 2014). Because Apple has properly pleaded two tort claims in addition to claims for breach of contract, the economic loss rule is inapplicable.

As stated above, Epic's breach here was "accompanied by . . . traditional common law tort[s]" of conversion and intentional interference with prospective economic advantage, and was effectuated through deceit. The economic loss rule is thus inapplicable here. *See Schulz v. Cisco Webex, LLC*, No. 13-cv-04987-BLF, 2014 WL 2115168, *6 (N.D. Cal. May 20, 2014) (characterizing a "traditional common law

---

[5] Epic also argues that "Apple does not plead a 'specific identifiable sum'" because it seeks "at least" the commissions that would have been paid to Apple." Dkt. 113 at 12. To be clear, Apple's counterclaims allege that, but for Epic's conversion, "*all payments* from consumers would be delivered to Apple's possession via IAP." Dkt. 66 at ¶ 66 (emphasis added). Of these easily traceable payments, Apple is entitled to recover *at least* its commissions (which indisputably constitute a specific sum), establishing a floor for recovery on the conversion claim. Apple may also assert additional damages based on Epic's assertion of dominion and control over the *entire* revenue stream for in-app purchases from iOS users. Given that the commissions themselves are definite, such additional amounts go to damages rather than liability and are therefore improper for resolution on the pleadings. Epic's reliance on cases decided in the summary judgment context is likewise misguided. *See* Dkt. 113 at 12 (citing *Vu v. California Commerce Club, Inc.*, 58 Cal. App. 4th 229, 231-32, 235 (1997)).

tort" as one of the "exceptions to the general rule against tortious breach of contract claims"); *Textainer Equip. Mgmt. (U.S.) Ltd. v. TRS Inc.*, No. C 07–01519 WHA, 2007 WL 1795695, *3 (N.D. Cal. June 20, 2007) (conversion claim not barred by economic loss rule because "[c]onversion is an intentional tort that requires no proof of an independent duty. Moreover, parties to contracts are expected to understand the risks allocated by contract, but are not expected to anticipate fraud and dishonesty.").

Epic's reliance on the economic loss rule is also misplaced because, as the Court recognized in the preliminary injunction hearing, Apple is entitled at this juncture of the case to plead in the alternative. *See* Sept. 28, 2020 Hr'g Tr. at 95 ("The COURT: Under California law, you can plead in the alternative. We let people do it all the time."). In the words of the California Supreme Court, "a plaintiff who believes that he or she has a contract but who recognizes that the trier of fact might conclude otherwise might bring claims" in the alternative, "so that in the event of a finding of no contract, the plaintiff might prevail on a claim for interference with prospective economic advantage." *Korea Supply*, 29 Cal. 4th at 1158.

Although Epic has all but admitted breaching its contracts with Apple, it continues to assert various defenses, including illegality and unenforceability, and has yet to admit liability for damages. *See* Dkt. 106 at ¶¶ 17-18. In these circumstances, California law permits Apple to plead alternative tort theories while adjudication of its breach of contract claim is pending. Indeed, if the Court were to dismiss Apple's tort claims on the pleadings and then preclude Apple from recovering in contract on the merits, Apple would be left with no remedy despite the open and notorious wrong committed by Epic. The better course is to allow all of Apple's counterclaims to proceed through discovery to dispositive motions and/or trial.

## B. Punitive damages are available for Epic's tortious conduct.

Apple has properly pleaded that Epic committed two different torts, and that it did so with "fraud[] or malice"—hence, punitive damages are available. Cal. Civ. Code § 3294(a). Despite Epic's repeated and futile efforts to recast its deceptive

Gibson, Dunn &
Crutcher LLP

conduct as sounding only in contract, Apple's counterclaims allege facts establishing that Epic also acted maliciously, fraudulently, deceitfully, and intentionally to invade the trust between Apple and iOS end users (jeopardizing their security and privacy, and exposing Apple to potential liability) as well as to steal commissions from Apple—conduct that tort law is designed not only to compensate for, but to punish. *See, e.g.*, Dkt. 66 at ¶ 73.

Because Epic's misconduct here goes well beyond the bounds of ordinary breach of contract, it is distinguishable from the cases Epic cites in its motion. In one, the conduct in question was "fundamentally . . . that [defendant] terminated the contract without good cause." *JRS Products, Inc. v. Matsushita Eletr. Corp. of Am.*, 115 Cal. App. 4th 168, 183 (2004). Unlike here, the breach of contract was neither accompanied by independently wrongful conduct nor effectuated through deceit. *Id.*; *see Robinson*, 34 Cal. 4th at 990 ("a tortious breach of contract may be found when . . . the means used to breach the contract are tortious, *involving deceit* or undue coercion") (emphasis added). Likewise, in *Congdon*, this Court concluded that an award of punitive damages was inappropriate because the parties *stipulated* that the conversion claim was "*entirely dependent* upon their breach of contract claim." *Congdon*, 2018 WL 2971058, at *3 (emphasis added). Apple has made no stipulation here. To the contrary, and as further described in this response, the allegations in Apple's counterclaims make clear that Epic's misconduct violates independent duties actionable in tort—and has continued even after the contracts have been repudiated and terminated.

Epic's half-hearted argument that it lacks sufficient notice of its malicious and fraudulent conduct under Federal Rule of Civil Procedure 9(b) also strains credulity. California law defines "malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights . . . of others" and defines "fraud" as "deceit . . . with the intention on the part of the defendant of thereby depriving a

Gibson, Dunn & Crutcher LLP

1    person of property or legal rights or otherwise causing injury." *See* Cal. Civ. Code

2    § 3294(c)(1); (3). Apple's counterclaims plead, *inter alia*, that: "Epic had *hidden* a new

3    payment interface via what Epic calls a 'hotfix'" into Version 13.40 of *Fortnite*, Dkt.

4    66 at ¶ 34 (emphasis added); "Epic thus was able to *deliberately conceal* its intentions

5    from Apple and implement its unauthorized and non-compliant external payment

6    mechanism," *id.* at ¶ 36 (emphasis added); "Epic carefully *concealed* from Apple its

7    plan to introduce an unauthorized and unapproved external payment mechanism to

8    Fortnite via hotfix," *id.* at ¶¶ 72, 79 (emphasis added); and, "Epic was well aware of

9    Apple's reasonable expectation that it would profit from its relationship with

10   consumers who made purchases through Fortnite, and Epic made the *willful decision to*

11   *interfere* with those relationships," *id.* (emphasis added). All of this was orchestrated

12   by Tim Sweeney, Epic's CEO, and thus California's "managing agent" requirement is

13   easily satisfied. *See, e.g.*, Dkt. 66 at ¶¶ 72, 79 ("Mr. Sweeney's August 13, 2020 email

14   to Apple confirms that Epic . . . made the willful decision" to engage in tortious

15   conduct).

16        In the Court's words, Epic's conduct was "not forthright," *see* Sept. 28, 2020

17   Hr'g Tr. at 80:3, was "not honest," *see id.* at 81:11, and was in fact "deceptive," *see*

18   Dkt. 118 at 7 n.7. The allegations in Apple's counterclaims—and indeed the

19   undisputed record before the Court—are more than sufficient to put Epic on notice of

20   the misconduct at issue, as well as to establish the factual predicates of Apple's request

21   for punitive damages.

## **CONCLUSION**

22   Epic's motion for judgment on the pleadings should be denied.

23

24

25   Dated: October 12, 2020              GIBSON, DUNN & CRUTCHER LLP

26

27

28                                        By: *Mark A. Perry*

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Mark A. Perry
Veronica S. Lewis (*pro hac vice*)
Cynthia E. Richman (*pro hac vice*)
Jay P. Srinivasan

Attorneys for Defendant Apple Inc.