Pages 1 - 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
                              )
IN RE APPLE IPHONE            )
ANTITRUST LITIGATION.         )    NO. CV 11-06714-YGR
                              )
_____ )
DONALD R. CAMERON, ET AL.,    )
                              )
          Plaintiffs,         )
                              )
  VS.                         )    NO. CV 19-03074-YGR
                              )
APPLE, INC.,                  )
                              )
          Defendant.          )
_____ )
EPIC GAMES, INC.,             )
                              )
          Plaintiff,          )
                              )
  VS.                         )    NO. CV 20-05640-YGR
                              )
APPLE, INC.,                  )
                              )
          Defendant.          )
_____ )
```

Oakland, California
Monday, October 19, 2020

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM**

(Appearances listed on the following page)

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                 Official Reporter

**APPEARANCES**:


For Plaintiffs in CV 11-06714-YGR:
                    WOLF HALDENSTEIN ADLER FREEMAN & HERZ
                    LLP
                    750 B Street, Suite 1820
                    San Diego, CA 92101
            BY:  **RACHELE R. BYRD, ESQUIRE**


For Plaintiffs in CV 19-03074-YGR:
                    HAGENS BERMAN SOBOL SHAPIRO LLP
                    1301 Second Avenue, Suite 2000
                    Seattle, WA 98101
            BY:  **ROBERT F. LOPEZ, ESQUIRE**


                    HAGENS BERMAN SOBOL SHAPIRO LLP
                    715 Hearst Avenue, Suite 202
                    Berkeley, CA 94710
            BY:  **BENJAMIN J. SIEGEL, ESQUIRE**


For Plaintiffs in CV 20-05640-YGR:
                    CRAVATH SWAINE MOORE
                    Worldwide Plaza
                    825 Eighth Avenue
                    New York, NY 10019
            BY:  **GARY A. BORNSTEIN, ESQUIRE**
                 **LAUREN MOSKOWITZ, ESQUIRE**


For Defendant Apple, Inc.:
                    GIBSON, DUNN & CRUTCHER LLP
                    1050 Connecticut Avenue, N.W.,
                    Suite 900
                    Washington, DC 20036
            BY:  **MARK A. PERRY, ESQUIRE**
                 **CYNTHIA RICHMAN, ESQUIRE**

<u>**Monday - October 19, 2020**</u>                              <u>**9:42 a.m.**</u>

**P R O C E E D I N G S**

---oOo---

            **THE CLERK:**  Calling Civil Action 11-6714, which is the

In Re Apple iPhone Antitrust Litigation.  The related case is

Civil 19-3074, which is the Cameron vs. Apple.  That's a

consolidated case.  And then Civil 20-5640, Epic Games vs.

Apple, Inc.

            **THE COURT:**  I will have everyone state their

appearances for the record.  Let's start with the Epic Games

vs. Apple.  For Epic Games, your appearances, please.

            **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

Bornstein for the plaintiff.

            **THE COURT:**  Good morning.

            **MS. MOSKOWITZ:**  Good morning, Your Honor.  Lauren

Moskowitz from Cravath, also for Epic.

            **THE COURT:**  Good morning.

     For Apple.

            **MR. PERRY:**  Good morning, Your Honor.  Mark Perry from

Gibson Dunn for Apple.

            **THE COURT:**  Good morning.

            **MS. RICHMAN:**  Good morning, Your Honor.  Cynthia

Richman also on behalf of Apple.

            **THE COURT:**  That's on behalf of Apple on all three

cases; correct?

1          **MR. PERRY:**  Correct, Your Honor.

2          **THE COURT:**  Now with respect to the Cameron case.

3          **MR. LOPEZ:**  Good morning, Your Honor.  Rob Lopez for

4      the developers.

5          **MR. SIEGEL:**  Good morning, Your Honor.  Ben Siegel of

6      Hagens Berman, also for the developer plaintiffs.

7          **THE COURT:**  Good morning.

8          And then the In Re Apple iPhone Antitrust Litigation case,

9      so the consumer case.

10          **MS. BYRD:**  Good morning, Your Honor.  Rachele Byrd

11      from Wolf Haldenstein on behalf of the plaintiffs.

12          **THE COURT:**  Okay.  Good morning, everyone.

13          We have a lot to do today.  And, again, apologies for the

14      technical issues we were having.  We'll investigate those after

15      we're done here.

16          So in terms of the schedule, as you now know, I've set the

17      trial on May 4th.  Just a little bit more color to that

18      decision.  I anticipate -- I'm not exactly sure -- I don't

19      think any of us are -- where this country is going to be next

20      spring and when we are going to have jury trials out, but I

21      certainly think that by the summer, we will be doing jury

22      trials.  I'm hoping to have some jury trials in the winter, but

23      I'm not exactly sure whether we are going to be able to manage

24      that, and certainly all criminal cases go out first.

25          When I spoke with you about a trial schedule, my

anticipation was that this was going to be a jury case, and so to be certain of when I could get you out, I talked about a July trial date because I was certain that I could get you out in July after a pretty big class action that I have to try in June.

Once you decided you wanted it to be a bench trial, then I gave you the last possible date that I'm going to be doing bench trials because once the summer hits, I'm not doing bench trials.  I'm doing jury trials, and we are going to be stacked up and backed up.

So given that you chose to do a bench trial, that was the timing that worked best for me.  And given our limited resources here at the court, that really drove the decision.  A couple of months, you know, doesn't change things one way or the other.  And fortunately or unfortunately, it just means a little -- some more resources to get it done in that time frame, and you all have the resources, so that's why I decided what I did.

That being said, it is an aggressive schedule, and so that means that everybody has to work not only cooperatively, but you have to work efficiently, and a number of the things that I saw when I read the joint CMC statements concerned me about the nature of efficiencies, so we'll talk about some of that.

The other thing that I'd like to do is to make sure that we are all on the same page so that we aren't dealing with

1    these things later about the legal framework, and that's the
2    first place we're going to talk or that's the first set of
3    issues that we're going to talk about.
4         I understand that you, on both sides, probably don't agree
5    with a number of things that were in my order with respect to
6    the preliminary injunction at Docket 118, but I think that we
7    should either be able to agree on the legal framework or where
8    there is disagreements, we should figure those things out.  The
9    application of the facts to the legal framework is, as they
10   say, where the rubber meets the road, but let's -- I want to
11   make sure that we don't waste time later when we're really into
12   the trial on the issues of what the legal framework is about.
13        So we'll begin with Epic and your counts.  You're got 10
14   different counts.  Counts 1, 2, 3, and 7 all relate to a
15   relevant market of iOS app distribution from your perspective.
16   Counts 4, 5, and 8 deal with your allegations regarding a
17   relevant market of the iOS in-app payment processing market.
18   Six and 9 relate to tying and then 10 relates to unfair
19   competition.  So that's the way that I'm thinking in grouping
20   those issues.
21        I outlined what I believed the legal framework was for the
22   maintenance claims under Section 2 of the Sherman Act in pages
23   11 to 15 of my order.  If you don't agree with the legal
24   framework, I want to know that you don't agree.  In pages 21 to
25   23, I discuss the legal framework for the tying claims.  If you

1   don't agree with the framework, I want to know.

2       We haven't really had any discussion about the UCL claim.

3   The Cartwright claims were all put to the side.  And nothing on

4   essential facilities and nothing on Section 1 other than the

5   tying claims.  And of course nothing on the 17200.

6       So what I'd like to see -- and I'm willing to hear your

7   perspectives on it -- is probably a trial brief maybe in

8   January, because I don't need it right this second -- a trial

9   brief in January that goes through the elements of these

10  claims.  Think about it kind of like joint jury instructions.

11  So outline of the elements.  If you agree, you tell me you

12  agree.  They're joint submissions.  If you don't agree, then

13  you give me your various perspectives and the legal authority

14  for the perspectives.  In jury instructions, you don't argue

15  the facts.  I don't really want you to argue the facts.  I just

16  want to make sure that we're on the same page.

17      The benefit of doing this really early is that it focuses

18  you on your elements of proof, and I can tell you whenever I

19  write an order, that's where I go.  I go first to the elements,

20  and this would be a document that I would use to guide that.

21  Now, if we have disagreements about the legal framework, we can

22  have a discussion about that in January and February,

23  irrespective of where discovery is, and that way we're ahead of

24  the game, and so once we get to trial, we're really talking

25  about how the facts get applied across those elements.

1    The other thing -- and in order to keep it, again,

2    efficient is it's important to just -- for me to know when

3    claims rise and fall with something else.  So, for instance --

4    and I'll look to you, either Mr. Bornstein or Ms. Moskowitz --

5    do your Cartwright claims rise and fall with the Sherman Act

6    claims, or is there something else you have to prove or is

7    there something less you have to prove?  Who is going to take

8    that question?

9         **MR. BORNSTEIN:**  So I could take that, Your Honor.

10   Mr. Bornstein.

11       The elements of the Cartwright Act claim, in our view, do

12   not completely overlap with the Sherman Act claim.  I will say

13   I anticipate the next question that you will ask would be for

14   me to explain how they are different, and I apologize in saying

15   I was not prepared and am not prepared to cover the precise

16   differences between the two right now, and I'm sorry about

17   that.

18       But in putting the claims together, we did assert both

19   because in preparing the Complaint, we were of the view that

20   although there is some meaningful overlap between the two, that

21   they are not precisely the same.

22       **THE COURT:**  Okay.  Hence my desire to have this

23   framework all tidied up in January, is what I'm looking for.

24       **MR. BORNSTEIN:**  Understood.

25       **THE COURT:**  Now, with respect to the unfair

1    competition claim under 17200, you alleged in your Complaint --

2    and this is Count 10 -- that the unlawful prong -- and as you

3    know, there are three prongs under 17200 -- that the unlawful

4    prong is tied to the Sherman Act and the Cartwright Act, which

5    is appropriate because you have to tie them to some statute,

6    but with respect to the unfair prong -- and Apple didn't bring

7    a motion on this, and I appreciate the -- not having yet

8    another motion, so I'm not asking Apple to do it, but I do want

9    clarity.

10        With respect to the unfair prong, as you may recall, under

11   California law, there are two standards.  The first standard is

12   for claims brought in the context of consumer claims or by

13   consumers.  You don't fall into that -- well, maybe you are

14   going to argue you are a consumer.  I don't know.  But the

15   second prong relates to harm to the consumers relative to the

16   defendant -- utility of the defendants' practices.

17        So, again, it seems to me with respect to the unfair

18   prong, I want to have a clear understanding of where you think

19   the overlap is with all of the other claims that you are

20   bringing.  Do you have a perspective now?

21        And it would be helpful, actually -- you know, when I was

22   preparing for today, I thought immediately that the first

23   standard didn't apply, but then as I was saying -- as I was

24   articulating it to you just a moment ago, if you're going to

25   claim that you're a consumer of these goods or of the platform,

1  then perhaps I'm -- I was not right in my first assumption that

2  the first standard doesn't apply.  If it does, then you do have

3  to tether it to a constitutional, statutory, or regulatory

4  provision, and I need to know in advance where the tether is.

5       **MR. BORNSTEIN:**  Understood, Your Honor.  And we will

6  in -- either in putting together the document that Your Honor

7  has asked the parties to put together or sooner, if it would be

8  helpful to the Court, we will make that clear.  That said, I

9  apologize.  I was not expecting to dive into the UCL claim on

10 this -- on this conference, and I don't want to step outside

11 the lines here.

12      **THE COURT:**  Okay.  That's fine.

13      The other component of that, right -- so I want to know

14 elements of proof for each.  I want to know where the overlap

15 is, whether something rises and falls with certain claims.

16      The last piece of it is remedy.  I want to understand what

17 remedy you are seeking for each one of these claims and if

18 they're different or if they're the same.

19      The remedy section of your Complaint is pretty broad and

20 pretty vague.  To the extent that you are seeking for me to in

21 effect dismantle the platform, then I want to know again in

22 advance where that authority comes from and to the extent that

23 there are other courts that have imposed such sanctions or such

24 remedies, I'd like to have copies of those orders.

25      So, again, you know, this is not an insignificant case.

1    I'd like to be able to think about it and mull about it, and

2    certainly, again, the framework doesn't relate to the facts so

3    I think I -- having it in January is probably sufficient.

4          **MR. BORNSTEIN:**  Yes, Your Honor.  On that point, I

5    think I can -- if it's helpful now, I can provide a little bit

6    more context.

7          I expect that there may be some disagreement about the

8    characterization between the parties, but it is not our

9    expectation that were we to prevail in the case, that we would

10   ask Your Honor to dismantle the entirety of the iOS platform.

11   We view this much more in the nature of a non-discrimination

12   order permitting other forms of payment processing, permitting

13   other forms of app distribution to happen on the platform.

14         I understand that there may be different perspectives from

15   the other side on whether or not that constitutes dismantling,

16   which is something we can have a spirited debate about in due

17   course, but we are not, in fact, looking for something that

18   goes as far as that, and we can provide the Court with examples

19   of similar non-discrimination orders to deal with antitrust

20   violations in other matters.

21         And I don't mean, to be clear, to cabin this to the kind

22   of non-discrimination-type cases, but I do think that's a

23   conceptual way of thinking about the kind of remedy that we

24   have in mind.  It would permit Epic to compete as another

25   distributor.  It would permit Epic to compete as another

1    payment provider.

2              **THE COURT:**   Okay.

3         Apple's claims.  You, too, have a number of claims.  You

4    have seven.  In this regard, I think they're much more

5    straightforward.  I still think it's useful to have it so that

6    we don't have to deal with it later.

7         Again, I prefer for these to be joint submissions, and it

8    is fine with me if you format it like you would do proposed

9    jury instructions, you know, one per claim with arguments on

10   both sides underneath the authorities that you have for each of

11   the claims.

12        I know that there is a motion for judgment on Claim 4 and

13   5.  I expect that I'll have some answer for you before the

14   submission deadline.  If I don't, just include them, and then

15   we can eliminate them later.

16        I do have a question with respect to the prayer for

17   relief, and so this goes to either Ms. Richman or Mr. Perry.

18        In the prayer for relief, you ask for a decree that Epic

19   is in violation of the California Unfair Competition law, but I

20   don't see a 17200 claim alleged, so where does that come from?

21   What's the basis for the allegation?

22        Who wants to take that?

23             **MR. PERRY:**   Your Honor, this is Mark Perry for Apple.

24        I hate to say this, but I believe that subparagraph H of

25   the prayer, the UCL references an artifact from a -- there

1    was -- we had drafted a UCL claim that we did not include in

2    the counterclaims, and I think the prayer did not get amended

3    in the final edit to pick that up.

4              **THE COURT:**  Okay.  Any objection to me striking that?

5              **MR. PERRY:**  No, Your Honor.

6              **THE COURT:**  All right.  That is stricken, and I'll put

7    it in the order that comes out so that everybody knows.

8         Okay.  With respect to the motion for judgment, as I

9    indicated to you, I don't anticipate having oral argument on

10   that.  It will be ripe on October 23rd.  A couple of points,

11   though, on that topic.

12        First is -- and this is a warning to the Apple lawyers.

13   You violated Rule 7-4(a) of the local rules.  I don't tend to

14   fine violations so I'm not going to sanction you, and I'll ask,

15   after I tell you what the violations were more specifically --

16   ask Epic if they want you to refile it.  But under that rule,

17   if you have a brief in excess of 10 pages, you need to give us

18   a table of contents and a table of authorities, a statement of

19   issues to be decided.  None of that was provided.  In addition,

20   your footnotes violated Rule 3-4(c)(2).

21        Everybody take notice.  Footnotes need to be in 12-point

22   font.  That's the rule.  It's really easy for me to know you

23   violated this because it means when I see your briefs, I have

24   to get my glasses, so I can't read the 10-point without glasses

25   or without electronically increasing the size.

1    You seem to be well within your limits.  Sometimes we have

2    found and I have stricken pages and/or footnotes when it's

3    clear that they're being used to exceed the page limits in a

4    brief.  And I just strike it.  So you're on notice that you

5    need to follow the rules.  I'm not exactly sure why it is you

6    didn't follow the rules here, but it is a violation.

7    So does Epic want them to refile it with the appropriate

8    table of contents and authorities and the correct size font of

9    footnotes?

10    **MR. BORNSTEIN:**  No, Your Honor.  That's not necessary

11    to have done.

12    If I could make one request of the Apple lawyers, though,

13    it would be -- if you're able to electronically generate a

14    table of authorities, which you might be able to do since you

15    have a soft copy of the document, and just email that to us,

16    that would be very appreciated.

17    **MR. PERRY:**  Your Honor and Mr. Bornstein -- this is

18    Mark Perry.  That's my fault and I apologize.  I thought we had

19    it right, and we didn't, and so thank you for the admonition.

20    We will refile.  I think it's better to do it and to get

21    it right from the outset.  That way you'll have what the Epic

22    folks need, unless that's an inconvenience for the Court.  That

23    way everything in the file is correct, and we'll move forward,

24    and we will triple check on a going-forward basis.

25    **THE COURT:**  That's fine.  I like having a table of

1   authorities.  It helps us, and it might matter with respect to

2   the next issue.

3       In my standing order, I -- and this is Rule 2(d).  I will

4   consider having oral argument if the parties agree that a

5   lawyer with six years or fewer will do the argument.  Many of

6   us on this Court believe that it is important to give younger

7   lawyers an opportunity for argument.  We have fewer arguments.

8   We have fewer trials.  And you can't become great advocates

9   without practice.

10      So if each side is willing to identify someone who is --

11  or two who are six years or lower out of law school, then I

12  would consider allowing them to argue that motion; otherwise,

13  it will be submitted on the papers.

14      So you can discuss it between yourselves.  If that's

15  agreeable to you -- and it's obviously your call -- then send

16  us an email, and we'll put it back on the calendar when I can

17  get to it, but it's something that I try to do and I know some

18  of my colleagues try to do as well.

19      And otherwise, I just -- I think it's pretty

20  straightforward, so I was not planning on having argument.  But

21  I think it is helpful for people to know that we have those

22  rules, so it's an opportunity for you.

23      Okay.  As I read one of these statements, I saw that there

24  were issues with the Cameron case relating to the Foreign Trade

25  Antitrust Improvement Act, and this ties to what -- to my first

1   discussion with respect to getting a trial brief on the legal

2   framework.

3       One of the reasons why I related these cases is because I

4   want to make sure that I understand the whole playing field,

5   and that playing field involves what the Cameron plaintiffs are

6   doing and what the consumer plaintiffs are doing.

7       So what I think -- and I'll let those parties weigh in --

8   what I think would be helpful is that once the document that I

9   referenced earlier is filed, I would welcome or entertain what

10  I would call an amicus brief from the attorneys in those other

11  cases in case they believe that somehow that framework is not

12  accurate or right because I don't want to find out from them

13  that there's something wholly different or some different

14  perspective a year later when this case is resolved and it's up

15  at the Circuit and they're still litigating.  You are all

16  experts in this field.  Federal judges, by definition, are

17  generalists, but I have had my share of these cases, and I

18  understand that the impact is significant, and it would be

19  helpful to make sure that I'm not missing something.

20      So let's see.  Who do I have?  Ms. Byrd?  Mr. Lopez?  Who

21  would like to weigh in.

22          **MR. LOPEZ:**  So, Your Honor, since you've raised the

23  FTAIA issue, I believe that's unique between the class cases to

24  the developer case, but Ms. Byrd can weigh in if I'm incorrect

25  about that.

1    But, yes, that's correct.  There is an issue between us

2    and Apple with regard to that, and in brief, it stems from our

3    belief that the transactions at issue here for the developers

4    are between U.S. developers on the one hand and a U.S.

5    corporation on the other hand which is selling distribution

6    services to the developers, and so in our view, the FTAIA does

7    not apply at all, but in the unlikely event that the Court

8    should determine otherwise, we think that the exception applies

9    in terms of the impact on domestic commerce because, again, it

10   is U.S. developers that we represent and it's U.S. developers,

11   in our view, who have been overcharged, regardless of where the

12   corresponding retail sales have occurred.

13   Very briefly, what that means is that Apple operates the

14   App Store via -- I think it's about 175 or 176 storefronts

15   today, so the U.S. storefront is one on the retail side and

16   then you have storefronts in India and Mexico and various other

17   countries.  Regardless of all that, again, our claims are based

18   on the sale of distribution services.

19        **THE COURT:**  And then do you have a perspective about

20   weighing in on the --

21        **MR. LOPEZ:**  Yes.  Yes.  And we very much welcome the

22   opportunity, Your Honor, to file the brief along the lines that

23   you've suggested.  We anticipate doing that not only on this

24   issue but probably others.  We've been monitoring the

25   proceedings in Epic very carefully, and we contemplated asking

the Court for leave to file an amicus brief in the preliminary

proceedings there, but we decided that since merits were not at

issue there, that we would defer on that.  But we very much

welcome the opportunity to write.  And if other instances come

up where merits are brought before the Court for some reason

other than this, then we anticipate going to the parties,

asking for their okay to file, and then if not, in either

event, asking the Court for leave to file something.

**THE COURT:**  All right.

Do any of the parties have any concerns?  Sounds like "no"

from Mr. Perry.

**MR. PERRY:**  No, Your Honor.

**MR. BORNSTEIN:**  No, Your Honor.

**THE COURT:**  Okay.

Ms. Byrd, do you want to weigh in at all?

**MS. BYRD:**  Yes, Your Honor.

To the extent that there are merits issues that are

briefed for the Court, we would also like the opportunity to

seek leave to file an amicus brief to the extent that it

overlaps with the issues in the consumer case.

**THE COURT:**  Okay.

All right.  So I am thinking about filing by January 22nd.

Does that work for everybody?  And then the amicus would come

afterwards, maybe two weeks or a week.  I don't know what you

need.

1      But on the first instance, does January 22nd sound like a

2  doable deadline?

3         **MR. BORNSTEIN:**  It does, Your Honor.

4         **MR. PERRY:**  Yes, Your Honor.

5         **THE COURT:**  Okay.  Great.

6      And then do the plaintiffs in the other related cases want

7  one week or two?

8         **MR. LOPEZ:**  Your Honor, we'd appreciate two, but we

9  will do whatever the Court asks of us.

10         **THE COURT:**  Two weeks is fine.

11         **MS. BYRD:**  Thank you.

12         **THE COURT:**  Okay.  I'm going to move to discovery.  Is

13  there anything on anything we've talked about so far that you

14  want to discuss?

15         **MS. RICHMAN:**  Your Honor, would you like to hear from

16  Apple today on the FTAIA issue?

17         **THE COURT:**  Well, what I understood is that with

18  respect to the Cameron plaintiffs at least, you had all reached

19  an agreement that they weren't going to be an issue in that

20  case, and then with respect to the consumer case, you were

21  still meeting and conferring on that topic.

22         **MS. RICHMAN:**  That's correct, Your Honor.

23         **THE COURT:**  I'll let you keep meeting and conferring,

24  and I'll weigh in when I need to weigh in.

25         **MS. RICHMAN:**  Understood, Your Honor.

1        **MR. LOPEZ:**  Thank you, Your Honor.

2        **THE COURT:**  Okay.  Let's move to discovery.

3        I'm referring discovery to Magistrate Judge Tom Hixson.

4   For those of you who do not regularly litigate in this

5   district, I believe our magistrate judges are what we call the

6   gold standard.  Most of them, if not all of them, could be

7   district judges themselves.  They have -- and the reason why we

8   have such high quality magistrate judges is because they are on

9   the wheel for all cases and they keep their own caseloads and

10  they help us with our substantial load.

11       Magistrate Judge Hixson was Harvard/Harvard, magna cum

12  laude at both, and he was chair of the California State Bar

13  Antitrust Section, so he is very well-versed in these issues.

14  He has been working with the Cameron and consumer class lawyers

15  and is well suited to work on the Epic/Apple case as well.

16  Okay.  So that reference is made.

17       I started off earlier saying that we need to be focused

18  and efficient.  You cannot re-litigate issues where you've

19  received the benefit of what has happened in the related

20  actions.  So I understand that Epic has received millions of

21  documents as a result of work that was already done in the

22  other cases.  To the extent that you are contemplating

23  re-litigating work product and attorney-client privilege, you

24  may not.  If you think you want to do that, then issue new

25  discovery, wait for them to respond, and go through that

1   process and waste all that time.  I have to tell you that if it

2   was good enough for the Cameron and consumer plaintiffs, it's

3   good enough for you, at least at this juncture.

4       Now, I'm not going to deny you your right to litigate

5   these things if that's where you want to waste resources, but

6   you're going to do it on your own nickel, so to speak, and on

7   your own time frame, and you're going to start from the

8   beginning.  So you do not get an advantage to re-litigate

9   things in this case.

10      Is there any questions about that framework?

11          **MS. MOSKOWITZ:**  Your Honor, this is Lauren Moskowitz.

12  If I may just make a request in conjunction with that.

13      We certainly don't intend to waste resources and

14  re-litigate agreements that have been reached.  We would like

15  to know what agreements have been reached or what narrowings or

16  limitations Apple has imposed, whether unilaterally or by

17  agreement.

18      The Cameron plaintiffs -- we did coordinate and discuss

19  with them, and they're not aware of agreements that have been

20  reached, so there may be a disconnect there.  It's really

21  transparency we're looking for so that we can understand where

22  the lines were drawn so that we can avoid serving duplicative

23  requests or trying to go down a path that we may very well

24  agree was reasonable.

25          **THE COURT:**  Okay.  What do you want me to say?  Who

1    wants to respond?

2         **MS. RICHMAN:**   Your Honor, I can respond for Apple.

3         We have made very fulsome productions pursuant to, you

4    know, extensive discovery requests from both the class -- the

5    developer class and the consumer class plaintiffs.   You know,

6    there is a coordination order that we believe governs the Epic

7    case, and it has already been entered by Your Honor, which

8    requires the exact sort of efficiency that you have described.

9         We think it makes sense to have a single ESI stipulation

10   binding all of the cases.   We think that the parties need to

11   avoid serving duplicative requests for documents.   And we will

12   be transparent with the Epic plaintiffs on, you know, what

13   we've done so far.

14        We have not, you know, unilaterally made decisions to

15   limit the scope of our production.   We've negotiated custodians

16   with the class plaintiffs, and Epic has that information.   And

17   we're, you know, standing by and happy to discuss with them the

18   process by which we've reviewed and produced those documents.

19        **THE COURT:**   Ms. Moskowitz.

20        **MS. MOSKOWITZ:**   I'm happy to hear that, Your Honor.

21   We never did hear what the custodians were.   We had to figure

22   it out for ourselves in the metadata, notwithstanding multiple

23   requests, so I'm happy to hear Ms. Richman say that we will be

24   getting transparency because I think that is the way forward

25   and that that is the way to coordinate, and we have every

1   intention of coordinating with the class plaintiffs on the

2   discovery that has taken place to date.  We understand the time

3   crunch.

4           **MR. SIEGEL:**  Judge Gonzalez Rogers, may I speak?

5           **THE COURT:**  You may.

6           **MR. SIEGEL:**  Okay.  Thank you.

7       I would say on behalf of the Cameron plaintiffs that there

8   is a lot of ongoing meeting and conferring and some discovery

9   disputes, and it would help us as well if Apple has identified

10  agreements that they believe limit the discovery of Epic into

11  our case to see those as well because we're not exactly sure

12  what Epic is referring to.  I mean, specifically with the

13  custodians, Ms. Richman says that custodians were decided, but

14  those are still subject to ongoing negotiations, and we have a

15  few more custodians we'd like to add.

16      So I think many issues are still open, so I do think it

17  would help if Apple identified the agreements they think limit

18  discovery.  It would help all the parties.

19          **THE COURT:**  Ms. Richman.

20          **MS. RICHMAN:**  Your Honor, I'm not sure what agreements

21  they are referring to.  We've produced documents pursuant to

22  the negotiated document -- requests for documents that have

23  been served in this case.  We've used technology-assisted

24  review.  We've discussed and negotiated that process with the

25  plaintiffs ad nauseam.  It's -- there is no secrets.

1    We served initial disclosures, and, you know, we --

2  there's -- we've provided Epic, as I said earlier, with copies

3  of all of the requests that have been made on Apple and our

4  objections and responses thereto.

5    To Mr. Siegel's concern about staying in the loop on the

6  Epic discussions, that's provided for in the coordination

7  order.  There is a specific provision of that that deals with,

8  you know, coordination of discovery among the related cases of

9  which Epic is now one.  I believe that's at ECF Docket No. 80

10  in the Pepper case -- I'm sorry -- it must be in the Cameron

11  case.

12    **THE COURT:**  I take it that when you have met and

13  conferred over discovery, you have reached certain agreements

14  when there is a dispute, and that tends to be memorialized by

15  email and/or letter; right, Mr. Siegel?

16    **MR. LOPEZ:**  Your Honor, this is Rob Lopez for the

17  developers.

18    Correct.  However, there are several ongoing, what I will

19  call, meta issues between the parties that persist, and those

20  go to certain categories of documents and data.  For example,

21  right now, we continue to meet and confer over final production

22  of a very large revenue side transaction database and the form

23  that that will take.  We've had back and forth on that.  We're

24  not resolved yet.  It's very important to all parties here, I

25  think.

1      Another meta issue is dealing with costs and revenue

2    documents, including many instances where we're not sure

3    exactly what has become of certain documents that seem to be

4    linked from other documents but we haven't seen in the

5    production.

6      And then, again just briefly, as far as custodians go --

7    Mr. Siegel raised this issue as well -- very early on Apple

8    provided us with a list of proposed custodians.  We asked for

9    supplementation.  Provided evidence at that time without having

10    seen the documents yet that we thought supported additional

11    custodians, including Epic custodians like Mr. Cook and the

12    archivist for Mr. Jobs, and Apple declined to add those at the

13    time.

14      So what we indicated to Apple is that all right, this is

15    an iterative process.  We will go through and look at the

16    documents, find additional support.

17      That's where we are now, so that matter remains in flux.

18    But as the Court observed, yes, of course, there are certain

19    instances where the consumers have said we'll stand down for

20    now, but really because we have been so embroiled, all the

21    parties, in discovery, there are very many open issues, I'd

22    say, and I think Epic is probably going to want to get involved

23    in the resolution of those.

24      As Ms. Richman has said, she believes that's indicated by

25    the coordination order, and, you know, I think that's probably

1   what will have to happen, is we try to resolve some of these

2   issues to the extent that they overlap with Epic's claims.

3        **MS. RICHMAN:**  Your Honor, may I respond?

4        **THE COURT:**  Go ahead.

5        **MS. RICHMAN:**  Just a couple of things.

6        One, I think, you know, on the class discovery, the

7   heads-up here is we have been in discovery for about a year now

8   and have not brought a single dispute to Magistrate Judge

9   Hixson.  We've been able to compromise, you know.  Apple did

10  not get everything it wanted.  I don't think the class

11  plaintiffs have gotten everything that they've wanted, but

12  we've been able to meet in the middle thus far.

13       There are ongoing negotiations and disputes.  It will not

14  shock you to hear I disagree with Mr. Lopez's characterization

15  of them.

16       On custodians, we have not heard from March 5th about

17  additional custodians until September 14th, so that is, you

18  know, water under the bridge.  We've undertaken enormous effort

19  at reviewing documents for 15 custodians.  We've produced

20  millions and millions of documents, as Your Honor has noted,

21  and it wasn't a document dump on July 31st.  There were several

22  productions that preceded the final production for substantial

23  completion.

24       So we're happy to talk to the class plaintiffs about

25  custodians, but I don't know who they are sitting here right

1    now, other than the -- the ones that Mr. Lopez has just

2    identified.

3         On transactional data, Apple has invested enormous

4    resources in making sure that the production of tens of

5    billions of files is smooth and that we only have to do it once

6    because it is a very difficult process that's required

7    extensive engineering.  We've been responsive to the -- the

8    plaintiffs' requests.  These questions are highly technical in

9    nature.  They're not the sort of things that the lawyers have

10   answers to; that we've been working with the business very

11   closely to respond to, you know, the long list of questions we

12   got from plaintiffs.  We've produced a hundred million rows of

13   data in September at the plaintiffs' request in the format that

14   the plaintiff asked for.

15        So we are still underway with the discussions, but I

16   think, you know, that process will hopefully reach a conclusion

17   very soon.

18        On the links and the missing documents that Mr. Lopez

19   referred to, these are not links that link to, you know, some

20   sort of data repository.  They are links for file transfers,

21   and they are transitory in nature.  The documents are

22   transferred with the links and then, you know, edited or what

23   have you by the recipient.

24        We have been working with the plaintiffs where they've

25   identified links to documents that they think are responsive,

1    most -- you know, mostly related to the costs and expense

2    issues.  We've been working with the plaintiffs to identify

3    those documents, and we're still doing that, but we made a

4    significant production in September with many of those

5    documents.

6         So, again, another example of where we are in the

7    meet-and-confer process and the continued cooperation by Apple.

8         **MR. LOPEZ:**  Your Honor, may I respond briefly?

9         **THE COURT:**  Well, I'm not going to let you, Mr. Lopez,

10   because I don't think it matters right now.  It's not actually

11   ripe, unless you want me to do something today.

12        **MR. LOPEZ:**  Well, actually -- I'm sorry.

13        **THE COURT:**  Go ahead.

14        **MR. LOPEZ:**  Sorry, Your Honor.  Pardon me.  The

15   technology is getting in the way of us.

16        The only thing I was going to say, Your Honor, is yes, you

17   know, we've tried to catalog and give a list of what we think

18   are the ongoing disputes, but what's, I think, particularly

19   germane today is, as we noted in our papers, we have a

20   disagreement with Apple about whether or not it went past the

21   substantial completion deadline in terms of some important

22   categories of materials, including cost and expense documents

23   and in particular, with respect to how the transaction database

24   is going to be produced and some particulars there along with

25   other matters.

1     So we proposed to Apple recently -- and we noted this in

2     our last Joint Case Management Statement -- that the parties

3     agree to propose to the Court that we extend the deadline for

4     class cert motions by about two and a half months, something

5     like that.  We were thinking of April 16.  In part it's due to

6     what happened with the timeline from our standpoint because we

7     believe that the plaintiffs have been prejudiced as a result of

8     what's happened, you know, in discovery, but also obviously

9     Epic has now entered the scene, and we think there are

10    efficiencies to be achieved because Apple, you know, naturally

11    has insisted all along that it wants its representatives to be

12    deposed as infrequently as possible, preferably only once, and

13    Epic is going to need time to get up to speed.

14         So whereas we could begin depositions sooner, I think if

15    we're going to try to achieve the efficiencies that the Court

16    spoke to earlier and that I'm guessing Apple wants, I think it

17    makes sense to give Epic some time to catch up and see what we

18    can do to coordinate depositions, and an extension of the

19    deadline --

20         **THE COURT:**  I think that --

21         **MR. LOPEZ:**  -- would help with that.

22         **THE COURT:**  I think that there isn't much objection to

23    that; right?  That is --

24         **MR. LOPEZ:**  Well, we --

25         **THE COURT:**  -- if Apple wants -- I mean, if there are

1   going to be coordinated depositions, I don't remember reading

2   that Apple objected to a continuation of the class cert

3   briefing in the other cases.

4         **MR. LOPEZ:**  Well, we were surprised to hear late in

5   the afternoon on Friday that Apple was declining our request,

6   and part of the reason we were surprised is because there was a

7   call on Wednesday in which the only expressed concern -- my

8   understanding -- I was unable to attend the call -- was that

9   Apple was concerned about its experts being doubly tasked with

10  regard to class cert and what was going on in the Epic case,

11  but it wasn't indicated to the folks on the phone that Apple

12  would decline.  They were still going to think about it, and

13  they said no Friday afternoon.

14        **THE COURT:**  Mr. Perry, Ms. Richman, who is going to

15  speak on that?

16        **MR. PERRY:**  I will, Your Honor.  Mark Perry for Apple.

17     This came up after the Case Management Statement was

18  filed, Your Honor.  We had a meet-and-confer with the

19  plaintiffs in which the expressed concern was the integration,

20  if you will, with the Epic schedule.

21     We have studied the Epic schedule and the combined

22  schedule very carefully, as we think the Court did as well when

23  ordering it.  Apple can do the combined schedule as currently

24  ordered in all cases.  It works fine.  The pieces actually sync

25  up pretty well with respect to the various deadlines, and it

1    would get class certification briefing fully done about three

2    weeks before the trial starts so that the experts can turn

3    their attention to the trial.

4         We do oppose the extension because what the class

5    plaintiffs are proposing would put class certification motions

6    right before trial, essentially making the experts who would be

7    appearing at the Epic trial have to oppose a class

8    certification motion simultaneously and basically throwing

9    havoc into the schedule that is already there.

10        We didn't hear any of this when the Epic schedule was

11   being proposed -- you know, the various Epic schedules were

12   being proposed, and as I said, we can live with the schedule as

13   it is.  So that's the reason.

14        **THE COURT:**  So, Mr. Lopez, I can tell you that when I

15   put the schedule in place, I had your schedule in mind, and I

16   thought it would behoove the Court to have all of that briefing

17   in so that when I started this discussion, you know, I want to

18   understand the landscape.

19        That's not to say that an extension might not be

20   appropriate.  I don't know.  What you're claiming is that the

21   extension is appropriate for two reasons:  One, because of some

22   delay, and, two, because of coordination with depositions.  So

23   we can talk about those two aspects.

24        But I will tell you that I anticipated it being done so

25   that when I went into trial on this particular piece, I would

1   have the full scope of your class certifications in mind, and

2   as you know, for class certification, it's not the be all and

3   end all.  We do have -- we do look at merits to some extent,

4   but as your firm knows, in the *Batteries* antitrust case, I gave

5   you multiple opportunities to go and revise and refine your

6   class certification motions.  So it's not -- it's not the end

7   game for you.

8       With respect to whether or not there's prejudice, I'd have

9   to wait to see what Judge Hixson says on that topic.  I don't

10   know if there has been prejudice or not, and I haven't gotten

11   into the nitty-gritty to figure that out.  But I also haven't

12   heard whether -- how depositions impact either one of these

13   issues.

14       So where do we stand on depositions, and are they going to

15   be deposed twice, etc.?

16       **MR. LOPEZ:**  Well, we're certainly willing to work with

17   the parties to try to avoid that where we can without

18   prejudicing our interests, but of course there are three cases

19   in play now that are quite different from one another, and so

20   we're going to need adequate time to do what we need to do, and

21   right now the coordination order calls for, I believe, ten

22   hours when there's a joint noting of a deposition, and that may

23   need to be revised, at least in our view, or at least ask the

24   Court to consider that given Epic's entry onto the scene.

25       But just specifically with regard to what Mr. Perry said,

1    my understanding is that we offered to accommodate its experts'

2    issues by agreeing to extra time for an opposition if that was

3    agreeable to the Court, but beyond that, we have been noting in

4    meet-and-confers with Apple in our Case Management Statement,

5    the one preceding this one and this one, that we believe that

6    prejudice had accrued to the plaintiffs, and, you know, some of

7    that is very substantial in terms of class certification; for

8    example, with regard to cost and expense documents because they

9    tell us there's no central database, and also due to this very

10   large revenue side database that still is not produced because

11   we still have not agreed to the form of production.  Apple

12   insists that it will only produce it once, and so we've been

13   working very hard with our consultants to get the parameters of

14   that right the first time, not because we agree that Apple can

15   unilaterally decree that when we haven't seen it yet, but

16   because we want to work efficiently and we're mindful of COVID

17   and all the difficulties that has imposed.

18        And, by the way, that's another reason why I think we are

19   where we are.  All the parties have worked hard on this, but

20   there have definitely been some inefficiencies that have come

21   in because of COVID.

22        Just to shorten this up, I do believe that an extension is

23   appropriate, you know, not only on the basis of depositions but

24   also on the basis of the prejudice that we think has accrued.

25            **THE COURT:**  I'm not going to give you an answer today

1    because I don't have enough information.  So I think -- it's,

2    you know, October 19th.  If there's an issue with respect to

3    production that you need to have compelled, you need to get to

4    Magistrate Judge Hixson, and then I need to have a conversation

5    with him about whether or not there's prejudice.

6         With respect to depositions, I don't know what you need.

7    I don't know if there -- if Apple's going to object to doing

8    things multiple times, then they have less of an argument with

9    respect to a continuance or at least with respect to opposing a

10   continuance.  So I need -- in order to be fair, I need more

11   specificity.

12        **MS. MOSKOWITZ:**  Your Honor, may I be heard briefly

13   just for Epic on the depositions question?

14        **THE COURT:**  You may.

15        **MS. MOSKOWITZ:**  Thank you, Your Honor.

16        The fact of the matter is that Apple just recently

17   produced the almost 3.7 million documents.  We just got those

18   last week.  We do understand that 2.3 million of those

19   documents are actually junk.  They're just auto-generated

20   emails that can just be moved to the Recycle Bin, but it's

21   still over a million documents, well over a million documents

22   that we will have to go through.

23        Apple has also identified additional custodians that it

24   recognizes are relevant to our case.  There are a whole host of

25   issues, for example, in-app purchases that are not squarely in

1   the developer class action but are obviously central to our

2   case, so there is a number of additional documents that Apple

3   recognizes they need to produce.  They haven't started that yet

4   either, but to the extent that there are overlapping

5   depositions, we just -- we understand developer plaintiffs are

6   going to need to get going, and we're not going to be able to

7   join those depositions if they're starting to happen imminently

8   just by virtue of the fact that we just started getting

9   documents from Apple.  So I think it does really --

10          **THE COURT:**  I understand that, and that's why I said

11   Apple can't have its cake and eat it, too.  You can't both say

12   that you want depositions coordinated and that you oppose a

13   continuance.  Well, actually you could, but you're not very

14   persuasive if that's what you do.

15      I also say -- hold on, Ms. Moskowitz, since you jumped in.

16   You know, Epic has to get on the ball itself with its

17   production.  It doesn't come into this looking very good given

18   its failure to produce in response to the third-party subpoenas

19   months ago.

20      And is it true -- is it true that you didn't give ESI with

21   respect to Mr. Sweeney?  Is that accurate?  That's astounding

22   to me.

23          **MS. MOSKOWITZ:**  Your Honor, that is not accurate,

24   Your Honor.  In response to the subpoena specifically, separate

25   and apart from productions that we have already started to make

1   in the Epic vs. Apple case but specifically in response to the

2   subpoena, it is correct that we did not do a custodial email

3   collection.  Apple was well aware of that.  They had themselves

4   memorialized that understanding back in July.  So we were doing

5   a document sufficient to show and policies and guidelines type

6   production in response to the subpoena.  We did that.

7        We also at the same time, Your Honor, on October 7th began

8   our rolling production of ESI, including those from

9   Mr. Sweeney.  So to date, including a production last week, we

10  are 30,000 documents and 125 pages into our production, and we

11  are going to continue to roll productions.  We have every

12  intention of facilitating the expeditious resolution of this

13  case, and we are getting documents out on a rolling basis.

14       **THE COURT:**  Is it also true that you're fighting

15  providing documents regarding malware on games distributed

16  through your marketplace?

17       **MS. MOSKOWITZ:**  In connection with the subpoena,

18  Your Honor, that was the state of play, but we are not going to

19  be restricting our searches or excluding documents returned by

20  our searches that touch upon those issues, and we did make

21  clear that we wouldn't be withholding such documents in

22  connection with our ESI collection and production.

23       So we have shared with Apple our custodian list, our

24  search terms, and how we are going to be producing documents.

25  We just on Friday received a lengthy document request from

1    Apple.  We are happy to meet and confer with them if they have

2    questions about our protocol, but we will not be withholding

3    documents that touch upon those issues, Your Honor.

4         **THE COURT:**  The other thing, Ms. Moskowitz -- and I

5    said this to your colleague in the other Epic case that I have

6    with respect to the minors' lawsuit against Epic -- that I

7    expect that Epic better not be dragging their feet on that

8    case.  That case charges Epic with not having sufficient

9    parental controls in place and as a consequence, harming

10   minors.  I don't know where that case will ultimately lead, but

11   it is one of the issues that Apple at least has commented on in

12   its defense of this case.

13        So I have told Magistrate Tse, you know, that just as

14   if -- just as if -- as Epic is pushing for productions in their

15   case as the plaintiff there where they're a defendant, you're

16   not going to be given any quarter if you're not pushing out

17   discovery for those plaintiffs in that case given some of the

18   overlap that happens.

19        Now, I'm not sure that I will ultimately see it, but

20   issues do arise and class certification happens and everything

21   else.  So you on your side, you can't have your cake and eat it

22   too either, so you're on notice.

23        **MS. MOSKOWITZ:**  Understood, Your Honor.  Thank you.

24        **MR. SIEGEL:**  Your Honor, can I apply some specifics

25   that I think will help with the deposition issue?  It is on

1  pages 1 and 2 of our Joint Case Management Conference

2  Statement.  We have quoted Apple counsel at the preliminary

3  injunction hearing at page 98 of the transcript.  This is

4  Apple's quote:  "Epic proposes that all depositions take place

5  between January 4th and February 5th, whereas we, Apple, would

6  extend that by about three weeks."  And our class certification

7  motion is due on February 3rd.  So if Apple is thinking that

8  depositions are going to start a couple weeks after

9  January 4th --

10         **THE COURT:**  Mr. Siegel --

11         **MR. SIEGEL:**  Yeah.  Sorry.

12         **THE COURT:**  -- unless you -- look, I just said a

13  moment ago that I instructed Apple -- I told Apple they can't

14  have it both ways.  It sounds to me the state of play right now

15  is as soon as this is done, you need to meet and confer again,

16  and then I'll hear back from you over this request for an

17  extension.

18         **MR. SIEGEL:**  Yes, Your Honor.

19         **THE COURT:**  You're not going to negotiate in front of

20  me, I guarantee you.  I don't have that much time.

21         **MR. LOPEZ:**  Your Honor, just briefly with respect to

22  what the Court has just said then and a suggestion I made

23  earlier that we may need to bring this to Judge Hixson in some

24  regard and then he would be in a position to apprise the Court

25  of any prejudice -- one request that I would make is I don't

1   want to surprise the Court, but I believe that we can already

2   with the consumers make a good case for an extension.  We may

3   not need to go before Judge Hixson to do that.  So what I'm

4   wondering is would it be all right with the Court if we did

5   file an administrative motion pursuant to the Court's standing

6   order that contemplates --

7        **THE COURT:**  I don't want a motion until I have dueling

8   lists of depositions, so are they going to be together or not,

9   and if you even mention the failure to produce millions of

10  documents, then that has to go in front of Judge Hixson first.

11  So you cannot bring that motion without having certainty on

12  those two topics.  Okay.

13      As I saw, there are some agreements regarding discovery

14  that are in this Case Management Statement.  By Friday, I want

15  you to lift those out of the statement, make any revisions you

16  need to make, and send it in the form of a proposed form of

17  order so that I can sign it and we can -- it can be on the

18  docket.  Okay?

19      Mr. Perry, Apple just got served in Pistachio -- actually,

20  before I go there, anything else -- any more guidance that you

21  want on these discovery issues?

22      **MR. PERRY:**  Not from the Apple side, Your Honor.

23      **THE COURT:**  Mr. Lopez?

24      **MR. LOPEZ:**  Sorry.  I had trouble unmuting myself.

25  No.  I think I understand Your Honor.  I don't want to

1    show any disrespect to the Court.  That would not be my

2    intention at all.  I think I understand what the Court wants us

3    to do in terms of surfacing whatever issues there may remain

4    with regard to production still to come.

5         My only point would just be that again we think that given

6    what's already happened, prejudice has accrued, but I think we

7    understand the Court's instructions.

8              **THE COURT:**  All right.

9         Ms. Moskowitz?

10             **MS. MOSKOWITZ:**  No, Your Honor.  Thank you.

11             **THE COURT:**  Okay.  Other things that I had out there.

12        This new case, Pistachio vs. Apple, is there going to be a

13   request for me to relate that?  Have you had those discussions?

14        Mr. Perry, where do you stand on that front?

15             **MS. RICHMAN:**  I can field that one, Your Honor.

16        We have touched base with the consumer plaintiffs on the

17   question of relation because Apple does intend to file an

18   administrative motion to relate.  My understanding is that the

19   consumers will not be joining that motion, but they will not

20   oppose it.  We were --

21             **THE COURT:**  Let me go to Ms. Byrd.

22             **MS. BYRD:**  Yes, Your Honor.

23        We will not oppose a motion to relate.  We believe it

24   appears to be related and actually subsumed within the consumer

25   case.  In terms of the class definition and the market, it's a

1   subset of our case.

2          **THE COURT:**  That case was filed by the Saveri firm; is

3   that right?

4          **MS. BYRD:**  I think it was Berman Tabacco --

5          **THE COURT:**  Todd Seaver.  Have you had any discussions

6   with Todd Seaver?

7          **MS. RICHMAN:**  Not yet, Your Honor.

8          **MS. BYRD:**  No, Your Honor.

9          **THE COURT:**  So you're not joining, but you're not

10  objecting?

11         **MS. BYRD:**  That's right.  We didn't see any reason to

12  join in the motion, but we're not going to oppose it.  We agree

13  that it's related.

14         **THE COURT:**  The only reason to join is that that means

15  when I get it, I can approve it.  If you don't join, then I

16  have to wait five days to approve it.

17         **MS. BYRD:**  Okay.  Well, in that case, then we can join

18  in it.  That's fine.

19         **THE COURT:**  Okay.

20    So, Ms. Richman, when you make that motion, just put that

21  there is a joinder, unless no one objects, and -- well, I guess

22  the -- I guess the plaintiffs in that case have a right to

23  notice, so I'll make a note that there is no opposition from

24  this side.  And I don't see Mr. Seaver listening in; otherwise,

25  I would bring him in.  Okay.

1      It is important to me that -- one of the requirements of
2  the CMC statement, the very last one, is that everybody read
3  and agree to abide by the Guidelines for Professional Conduct
4  for the Northern District of California.  I know you said that
5  you did, but I am looking to all of you to make sure that
6  everyone on your team does in fact, so when I was a state court
7  judge, I used guidelines for professional conduct in my
8  courtroom.  When I became a federal judge, there were none
9  here.

10      My first MDL, which was the *Batteries* case -- in that MDL,
11  I had the lawyers, the antitrust lawyers from all the big
12  firms -- so, you know, we had -- well, there were lots of them,
13  and there are still lots of them -- write these rules
14  themselves.  I said, "I am told that you are some of the best
15  lawyers around.  I want you to write a set of rules that you
16  can live with."  And I gave them lots of examples of lots of
17  different guidelines.

18      The lawyers in that MDL wrote the rules, and I issued an
19  order enforcing -- having those be the guidelines for that MDL.
20  The Northern District then -- we requested that the entire
21  Northern District adopt them, which it did.  So this is from
22  the lawyers, so I know they are reasonable.

23      Make sure you read them and make sure you abide by them.
24  Okay?  You should know, because many of you have not practiced
25  in front of me, I will sanction.  I think it's fine to be a

zealous advocate, but that does not include ad hominem attacks,

that does not include not being professional.  I have seen too

many litigators leave the profession because of the nastiness.

I will read emails when you least expect it.  I will read

deposition transcripts when you least expect it.  And I have

sanctioned big-firm lawyers for instructing people not to

answer when it was not appropriate in a deposition.  And I have

sanctioned lawyers for being nasty in emails.  So I would

suggest -- and I'm not saying -- I have no reason to believe

that anybody on this platform acts like that, but I am warning

you because this is a very litigious case, and when you are

tired, things happen.  So you're on notice.  And make sure your

teams are on notice.  Okay?  Any questions?

Terrific.

On your list, you wanted to talk about Zoom accessibility

issues.

**MR. BORNSTEIN:**  Your Honor, if you were looking for

one of the parties to address it, this is an issue about which

we have met and conferred, so I think I am speaking for the

group here in saying that the platform has been working very

well so far for those of us who have been invited in to these

sessions so that we can be heard personally, but for other

members of the team and in particular for our clients who would

like to be able to observe the proceedings, in the TRO session

and in the PI session, there were a number of people who simply

1    were not able to get on given the public interest in the

2    matter.  I understand even that there have been some law school

3    classes that have been assigned to try to get in which has

4    taken up some of the bandwidth for the court.  I understand

5    there is a limit to the size of the license.

6        So we don't unfortunately have a solution to propose to

7    Your Honor because we don't have the familiarity with the

8    platform and the restrictions the Court might be operating

9    under in its relationship with Zoom, but if there is some way

10   that the Court is able to facilitate a small number of

11   representatives from each of the parties to be able to

12   participate, we would be grateful.  And if there is anything

13   that the parties can do to assist in that respect, we would of

14   course jointly be willing to facilitate that.

15        **THE COURT:**  We were taken a little bit by surprise

16   with respect to the interest, and as you all know, these Zoom

17   platforms are all new.  I think the Northern District has moved

18   pretty quickly as compared to others to do this as opposed to

19   phone access.  Our biggest license is 500, and so for the TRO,

20   we had the 500 license.  We, as you know, maxed out very

21   quickly, so for the second -- for the preliminary injunction,

22   we attempted to -- we attempted -- we have two 500 licenses, so

23   we attempted to join them to at least get -- to double our

24   capacity, and from a technology perspective, we were not able

25   to do that.

1    I can tell you that despite our warnings, they were

2    live-streamed by a number of people, and some of those

3    live-streams may still be out there on YouTube.  We found

4    ourselves five.  Some of them, it looked like lawyers.  Someone

5    clearly didn't want to get in trouble.  Immediately after it

6    was done, they closed the link, but there were others that at

7    least for a week or two were open, so I don't know -- I haven't

8    checked them so I don't know if they are.

9        Here's the problem.  When I look at how many people access

10   those links for the PI hearing, there is 25,000 people.  25,000

11   people accessed those links.  There is no way that we will be

12   able to get a license to allow anybody on a platform to deal

13   with those kinds of numbers.

14       This morning because we weren't sure what was going to

15   happen -- clearly there's not as much interest for a Case

16   Management Conference, which is fine with me.  We have 80

17   people in addition who are watching.  The other people who were

18   upset were press who couldn't get in as well.

19       So one of the things that I think we can do -- and we

20   weren't able to achieve it this morning, but I noted -- I

21   hadn't prepared until this weekend for this morning.  That we

22   might be able to have at least a telephone link so that if

23   nothing else -- and we could give that just to the parties so

24   that if nothing else, people could at least hear because I know

25   your teams will probably be large any time we have a merit

1   hearing, so that might help.

2       But certainly, you know, we can offer some number of

3   people to be able to come on the platform.  I wouldn't want to

4   take -- you know, I don't want to overwhelm it, but just like

5   if you were in a courtroom, you know, you might have your

6   client with you at the table, and so I think that that's

7   entirely appropriate.

8       When the press complained that we weren't providing

9   access, I did have to laugh given that, you know -- given 500

10  people who accessed and potentially 25,000 who accessed is so

11  much more than you would ever get in a courthouse, even with an

12  overflow courtroom.  So I think that in many ways, we are

13  providing much more access than has ever been obtained.  But

14  we'll try to figure it out.  I understand it's an issue.

15      I don't quite understand how Zoom -- how their algorithm

16  works.  I don't know which people -- how -- at what point in

17  time they start accumulating the 500, whether it's just random,

18  whether it's how early you try to click on.  I have no idea,

19  and we don't have that information, so if you find that

20  information and that could inform our work, then we can do

21  that.  But certainly I think we can try to provide you with a

22  couple more seats on the platform so that your clients can be

23  on.

24          **MR. BORNSTEIN:**  That would be appreciated, Your Honor,

25  by all of the parties.

1    And I would say I recognize that the Court's technology

2    staff is probably extraordinarily stretched these days, as

3    we're all working in these circumstances, but we would be happy

4    to connect with someone if there is a point person at the court

5    who has responsibility for these matters.  If we can be of

6    assistance to him or her, we would be happy to do that, but

7    obviously we don't want to put more work on that person, so

8    that's just an offer, not a request.

9        **THE COURT:**  Well, if you have a proposal or an idea,

10   then let me know.

11       Yes, Mr. Perry?

12       **MR. PERRY:**  I don't know if your license, Your Honor,

13   is the same as the corporate license, but in our system, we can

14   set up rooms so that, you know, you could have a Cravath room,

15   a Gibson Dunn room, a consumer plaintiffs room, and that's one

16   line each on the license, and then there is the public license

17   that everybody could dial into.  Again, I don't know if the

18   court's license works the same way, but our IT people have

19   figured out how to do this when we have very large meetings.

20       Again, I have no idea personally, but if we could put the

21   IT people together, we might be able to figure out how to do it

22   on the Zoom -- and we use the Zoom platform daily.

23       **THE COURT:**  I think the problem, Mr. Perry, is that

24   the room technology is the Zoom meeting technology, not the

25   Zoom webinar technology.

1          **MR. PERRY:**  I see.

2          **THE COURT:**  And here's the issue with that.  All of

3     the press that you've seen about individuals who are watching,

4     kind of photobombing or doing chatbombing, those things happen

5     on the meeting platform, which is much more accessible than the

6     webinar platform, and so for security reasons, we have decided

7     that this is the safer platform because there are lots of

8     people out there -- and I can tell you every time we have one

9     of these hearings, my CRD, Ms. Stone, is, you know -- I've got

10    15 people who are raising their hands who want to be heard, and

11    she has to lower the hands, lower the hands, and, frankly, for

12    about a week or two after our hearings, they still come on the

13    platform and, you know, with a name like "Fortnite User" or

14    "Apple User" or whatever, raising their hand wanting to be

15    heard.

16         So this is a public forum, so to speak, but we do have --

17    but if you were in the courtroom and you were disruptive, the

18    court security officer would take you out of my courtroom.  And

19    not -- we wouldn't have thousands of people watching what it is

20    you wanted to post in some chat feature, and so that's what we

21    are -- that's what we are protecting against, is the

22    disruptiveness that many courts have found happen when you're

23    on the meeting platform as opposed to the webinar platform.

24    And that webinar platform, like I said, doesn't have rooms.

25    It's not an option.

1       And it's one of the things that when we've thought about

2  doing virtual trials, in some way the meeting platform is much

3  nicer because you can have your witnesses waiting in a meeting

4  room and then bring them in when it's time, but they have

5  these -- you know, the downside is that you've got this ability

6  for others who are not parties to disrupt.

7       So if they can merge the two, that would be great, but I

8  haven't seen that yet.

9       **MR. BORNSTEIN:**  Maybe I can suggest, Your Honor, that

10  the parties spend a little bit more time discussing with each

11  other having their IT people speak to each other, and if we

12  have any suggestions, we can communicate them to Ms. Stone.  Is

13  that an appropriate way to proceed?

14       **THE COURT:**  Yes.  As long as -- sending a note to

15  Ms. Stone is great, as long as everybody is copied, and it's

16  not an ex parte communication.

17       **MR. BORNSTEIN:**  Of course.

18       **THE COURT:**  We are pretty efficient with those.

19       **MR. BORNSTEIN:**  Thank you, Your Honor.

20       **THE COURT:**  Okay.  I am sure that I will hear from you

21  at some point, but it seems to me that at a minimum, we should

22  touch base at the end of February, beginning of March, with a

23  Joint Pretrial Statement due of April 9th.  That means that you

24  should be meeting and conferring on trial exhibits about four

25  weeks prior to that, so in early March.  And I think it would

1    be useful for us to meet just so we understand what that bench

2    trial is going to look like.

3        You know, I just don't know where we will be in terms of

4    COVID-19 and whether everything is going to be electronic,

5    whether we are going to have witness binders, whether we are

6    going to have you produce one set of exhibits, those kinds of

7    issues.  So before you get into the nitty-gritty, it might be

8    helpful to have a discussion.

9        So why don't I put you back on my calendar for March 1st

10   at 9:30 a.m., if that works for everybody.  I don't hear any

11   objection, so I'm assuming that's fine.

12           **MR. BORNSTEIN:**  Yes, Your Honor.  No objection.

13           **THE COURT:**  All right.  Anything else you want to talk

14   about today?

15       I will start with Epic.

16           **MS. MOSKOWITZ:**  No, Your Honor, thank you.

17           **THE COURT:**  How about Apple?

18           **MR. PERRY:**  No, Your Honor.  Thank you.

19           **THE COURT:**  Mr. Lopez or Siegel?

20           **MR. LOPEZ:**  No, Your Honor.  Thank you.

21           **THE COURT:**  Ms. Byrd or Ms. Moore?

22           **MS. MOORE:**  No, Your Honor.  Thank you.

23           **THE COURT:**  Ms. Byrd?

24           **MS. BYRD:**  That's a "no."  Thank you.

25           **MS. MOORE:**  No, Your Honor.  Ms. Moore.

1              **THE COURT:**  So I will get an order out.  I will expect

2    to see a proposed form of order on your discovery issues at

3    some point.  Perhaps I will see an administrative motion,

4    Mr. Lopez, and then an order relating.  I think that's -- I

5    think that's all.  Okay.

6                   (Proceedings adjourned at 11:06 a.m.)

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, October 19, 2020

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25