Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH
    LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (pro hac vice)
cvarney@cravath.com
Katherine B. Forrest (pro hac vice)
kforrest@cravath.com
Gary A. Bornstein (pro hac vice)
gbornstein@cravath.com
Yonatan Even (pro hac vice)
yeven@cravath.com
Lauren A. Moskowitz (pro hac vice)
lmoskowitz@cravath.com
M. Brent Byars (pro hac vice)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-Defendant
Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

EPIC GAMES, INC.,

Plaintiff,

vs.

APPLE INC.,

Defendant.

APPLE INC.,

Counterclaimant,

vs.

EPIC GAMES, INC.,

Counter-Defendant.

Case No. 4:20-CV-05640-YGR-TSH

**REPLY MEMORANDUM IN SUPPORT OF
COUNTER-DEFENDANT EPIC GAMES,
INC.'S MOTION FOR JUDGMENT ON
THE PLEADINGS**

Date:  November 10, 2020 at 2:00 p.m.

Courtroom:  1, 4th Floor

Judge:  Hon. Yvonne Gonzalez Rogers

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# TABLE OF CONTENTS

**Page**

I.    BECAUSE APPLE DOES NOT ALLEGE THE BREACH OF ANY DUTY OTHER THAN THOSE CREATED BY THE LICENSE AGREEMENT, THE ECONOMIC LOSS RULE BARS BOTH TORT CLAIMS. ...............................................1

II.   APPLE'S INTERFERENCE CLAIM FAILS AS A MATTER OF LAW.........................6

    A.    Apple Fails to Allege a Tortious Wrongful Act.......................................6

    B.    Epic Cannot Be Liable for Intentionally Interfering with Transactions in Which Epic Is the Principal Participant. ..................................................10

III.  APPLE'S HYPERBOLIC ACCUSATIONS OF THEFT DO NOT TRANSFORM A BREACH OF CONTRACT INTO CONVERSION. ..................................................10

IV.  PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR A MERE BREACH OF CONTRACT REGARDLESS OF THE MEANS OR MOTIVE. ...............................15

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andreoli v. Youngevity Int'l, Inc.*, 2018 WL 1470264 (S.D. Cal. Mar. 23, 2018) .......................... 13

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503 (1994) ......................................... 2

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App.4th 464
  (1996) ...................................................................................................................................... 6, 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................. 5

*Batts v. Bankers Life & Cas. Co.*, 2014 WL 296925 (N.D. Cal. Jan. 27, 2014) ............................. 9

*Buckaloo v. Johnson*, 14 Cal.3d 815 (1975) ................................................................................. 7, 8

*Congdon v. Uber Techs., Inc.*, 2018 WL 2971058 (N.D. Cal. June 13, 2018) .............................. 15

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376 (1995) .......................... 7, 8, 9, 11

*Expedited Packages, LLC v. Beavex Inc.*, 2015 WL 13357436 (C.D. Cal. Sept. 10,
  2015) ........................................................................................................................................... 4

*Fischer v. Machado*, 50 Cal. App.4th 1069 (1996) ...................................................................... 13

*Fresno Motors LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119 (9th Cir. 2014) ...................... 10

*Garcia v. M-F Athletic Co.*, 2012 WL 531008 (E.D. Cal. Feb. 17, 2012) ...................................... 5

*JRS Products, Inc. v. Matsushita Electr. Corp. of Am.*, 115 Cal. App.4th 168
  (2004) .................................................................................................................................. 6, 9, 15

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003) .................................. 5, 6, 8

*Lever Your Bus., Inc. v. Sacred Hoops & Hardwood, Inc.*, 2019 WL 7050226
  (C.D. Cal. Dec. 23, 2019) .......................................................................................................... 5

*Marin Tug & Barge v. Westport Petroleum*, 271 F.3d 825 (9th Cir. 2001) ........................... 10, 12

*McGehee v. Coe Newnes/McGehee ULC*, 2004 WL 2452855 (N.D. Cal. Feb. 10,
  2004) ...................................................................................................................................... 5, 15

*MJC Am., Ltd. v. Gree Elec. Appliances, Inc. of Zhuhai*, 2014 WL 12600963 (C.D.
  Cal. Jan. 21, 2014) ................................................................................................................... 11

*Najarian Holdings LLC v. Corevest Am. Fin. Lender LLC*, 2020 WL 3869195
  (N.D. Cal. July 9, 2020) ............................................................................................................. 2

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

*Oracle USA, Inc. v. XL Glob. Servs., Inc.*, 2009 WL 2084154 (N.D. Cal. July 13, 2009) ............................................................................................................... 2

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App.4th 384 (2007) .................................................................................. 14

*Popescu v. Apple Inc.*, 1 Cal. App.5th 39 (2016) .......................................................... 10

*Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979 (2004) ........................... 2, 3, 8, 9

*Sanowicz v. Bacal*, 234 Cal. App.4th 1027 (2015) ................................................. 12, 13

*Schulz v. Cisco Webez, LLC*, 2014 WL 2115168 (N.D. Cal. May 20, 2014) ................... 4

*Strome v. DBMK Enterprises, Inc.*, 2014 WL 4437777 (N.D. Cal. Sept. 9, 2014) ......... 9

*Textainer Equip. Mgmt. (U.S.) Ltd. v. TRS Inc.*, 2007 WL 1795695 (N.D. Cal. June 20, 2007) .............................................................................................................. 4

*United Nat'l. Maintenance, Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002 (9th Cir. 2014) ............................................................................................. 10

*Voris v. Lampert*, 7 Cal. 5th 1141 (2019) ............................................................. 12, 13

*WeBoost Media, S.R.L. v. LookSmart Ltd.*, 2014 WL 2621465 (N.D. Cal. June 12, 2014) ............................................................................................................... 3, 4

*Weiss v. Marcus*, 51 Cal. App.3d 590 (1975) ............................................................. 13

*Westport Ins. Corp. v. Vasquez, Estrada & Conway LLP*, 2016 WL 1394360 (N.D. Cal. Apr. 8, 2016) .............................................................................................. 2

**Statutes & Rules**

Cal. Civ. Code § 3294(a) ............................................................................................. 15

Federal Rule of Civil Procedure 9(b) ........................................................................... 15

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Apple has no right to the fruits of Epic's labor, other than the rights arising under a contract. Consumers who choose to make in-app purchases in *Fortnite* pay for Epic's creativity, innovation and effort—to enjoy an experience that Epic has designed. When Epic took steps to allow consumers on iOS devices to make those payments directly, it breached some of the contractual restrictions that Apple imposes on iOS developers. Epic did so because those contractual restrictions are unlawful. Epic chose to take a stand against Apple's monopoly to illustrate that competition could exist on iOS, and that consumers would welcome and benefit from it. Epic did so without advance notice to Apple because Apple would otherwise have used its monopoly control to prevent that competition from happening. Epic did so believing, as it still does, that Apple's contractual restrictions are anticompetitive, denying choice to developers and consumers alike. Epic did so to show that these restrictions are not a necessary part of the iOS ecosystem; they are just the tools Apple uses to maintain its monopoly. The parties will litigate these points in the coming months, and Epic has conceded that if it fails on its antitrust claims, Epic will be responsible for any sums owed to Apple under the License Agreement.

But whatever the outcome of Epic's antitrust claims, Epic's actions are a far cry from the tortious—even purportedly criminal—conduct that Apple's Opposition depicts. Simply put, Epic did not "steal" anything that belonged to Apple. Epic could not and did not "steal" the proceeds from the sales of its own creative efforts. Nor did Epic interfere with any prospective economic advantage Apple sought to gain from *Fortnite* users separate and apart from their interest in *Fortnite*. To the contrary, the only reason that Apple can assert a right to receive any funds from *Fortnite* users in the first place is that its License Agreement covers sales of *Fortnite* content. No matter how many times Apple labels Epic's conduct "deceptive" or "devious", the only duties at issue were contractual duties, and California law bars Apple's attempt to turn a breach of contract into something tortious. Apple's tort claims are deficient as a matter of law, and none of Apple's counterarguments shows otherwise.

## I.   BECAUSE APPLE DOES NOT ALLEGE THE BREACH OF ANY DUTY OTHER THAN THOSE CREATED BY THE LICENSE AGREEMENT, THE ECONOMIC LOSS RULE BARS BOTH TORT CLAIMS.

Under the economic loss rule, "[c]onduct amounting to a breach of contract becomes

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1    tortious only when it also violates an independent duty arising from principles of tort law".

2    *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994).  Epic's Motion

3    demonstrated that Apple's Counterclaims do not allege the breach of any duty other than those

4    created by the License Agreement.  (ECF No. 113, 4-5 ("Mot.").)  In its Opposition, Apple

5    responds that a contract "is not a license allowing one party to cheat or defraud the other".  (ECF

6    No. 129, 1 ("Opp.").)  But that is not Epic's argument.  It is well-established that a party to a

7    contract does not tortiously injure other contractual parties unless it violates a duty distinct from

8    the contract itself.  *Applied Equip.*, 7 Cal. 4th at 515.  Where the duty arises from the contract,

9    the appropriate claim under California law is for breach of contract, not tort.  Apple does not

10   identify a breach of a duty independent of the License Agreement; therefore, Apple's tort claims

11   are barred by the economic loss rule.

12        Apple nonetheless asserts that a breach of contract may be tortious when "the means used

13   to breach the contract are tortious, involving deceit or undue coercion".  (Opp. 2 (quoting

14   *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004)).)  But *Robinson* "is narrow

15   in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies

16   and which expose a plaintiff to liability for personal damages independent of the plaintiff's

17   economic loss".  34 Cal. 4th at 993; *see id.* at 991 (noting that defendant's fraud "exposed

18   [plaintiff] to liability for personal damages if a helicopter crashed and to disciplinary action by

19   the FAA"); *id.* at 992 n.7 ("Robinson's claims are based on [defendant's] intentional and

20   affirmative misrepresentations that risked physical harm to persons"); *see also Najarian*

21   *Holdings LLC v. Corevest Am. Fin. Lender LLC*, 2020 WL 3869195, at *6-7 (N.D. Cal. July 9,

22   2020) (the *Robinson* "exception" does not apply where (1) "the conduct alleged in plaintiffs'

23   [tort] claims directly relate[s] to the same conduct supporting the breach of contract claim" and

24   (2) "plaintiffs do not allege that they have been exposed to liability for personal damages

25   independent of the plaintiff's economic loss") (internal quotations omitted)).  Apple does not

26   allege that it faces "liability for personal damages" to third parties here.[1]

27

28        [1] A number of courts have suggested that *Robinson* does not apply at all beyond the products
     liability context.  *See, e.g.*, *Westport Ins. Corp. v. Vasquez, Estrada & Conway LLP*,  2016 WL

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1    Further, even if *Robinson* were not so limited, *Robinson* does not hold that *any* "deceit or

2    undue coercion" gives rise to tort liability, either alone or when it constitutes a breach of

3    contract.  Instead, *Robinson* dealt specifically with claims of "intentional misrepresentation or

4    fraud", 34 Cal. 4th at 984, finding that when a plaintiff pleads deceit or undue coercion that is

5    tortious "independent of [defendant's] breach of contract", the fact that the same acts also

6    constitute a breach of contract does not inoculate the defendant from tort liability.  *Id*. at 991.

7    The plaintiff alleged that defendant issued "false certificates of conformance", which constituted

8    "affirmative representations that [plaintiff] justifiably relied on to its detriment", thereby

9    satisfying the elements of a common law fraud claim irrespective of any agreement between the

10   parties. *Id*. at 990-91.  Apple does not plead such a fraud claim here, it does not plead any

11   "affirmative representations" by Epic, and it does not plead any reliance on affirmative

12   statements that Epic made.  Rather, it pleads that Epic violated the License Agreement by

13   "hid[ing] a new payment interface" in Version 13.40 of *Fortnite* and by "making changes [to

14   *Fortnite*] without resubmission to Apple" and "without Apple's permission".  (ECF No. 66, ¶¶

15   34, 36, 37 ("Counterclaims").)  None of these actions was independently tortious; all of the

16   duties that Apple alleges were breached derive from the License Agreement, so Apple's tort

17   claims must fail.

18   The other cases on which Apple relies do not support Apple's argument that Epic

19   breached a duty independent of the License Agreement.  Apple cites *WeBoost Media, S.R.L. v.*

20   *LookSmart Ltd.*, 2014 WL 2621465, at *7 (N.D. Cal. June 12, 2014), for the general proposition

21   that "the economic loss rule does not bar claims for intentional interference with prospective

22   economic advantage".  (Opp. 15-16.)  But the holding of *WeBoost* is not nearly as broad as

23   Apple states.  The court in *WeBoost* specifically recognized that the economic loss rule *does bar*

24   an intentional interference claim premised only on the breach of contractual duties:  "[S]ince

25   Plaintiff's tort claims as [originally] pled did not rest on any allegations or duties independent of

26   Plaintiff's contract claim [those claims were] barred by the economic loss doctrine."  *WeBoost*,

27

28   1394360, at *6 (N.D. Cal. Apr. 8, 2016); *Oracle USA, Inc. v. XL Glob. Servs., Inc.*, 2009 WL
     2084154, at *6 (N.D. Cal. July 13, 2009).

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1    2014 WL 2621465, at *3.

2        The *WeBoost* Court allowed a single tort claim—the interference claim—to proceed only

3    after the plaintiff's amended complaint clarified that the factual basis for its claim was that the

4    defendant used plaintiff's websites to direct fraudulent advertising traffic through the AdSense

5    program maintained by third party Google.  *Id.* at *2, *5.  This increased the plaintiff's costs of

6    doing business with Google and impaired plaintiff's contractual relationships with Google.  *Id*.

7    This conduct, therefore, was actionable in tort "independent of the parties' obligations under" the

8    agreement between them.  *See id*. at *8.  By contrast, Apple's tort claims rely exclusively on

9    breaches of duties imposed by contract.  (Counterclaims ¶¶ 68-69, 75-77.)  Take the contract

10   away, and Apple had no right to the sums allegedly converted and no right to economic

11   advantage from the sale of items in *Fortnite*.

12       Apple also cites two other decisions from this District—*Schulz v. Cisco Webez, LLC*,

13   2014 WL 2115168 (N.D. Cal. May 20, 2014), and *Textainer Equip. Mgmt. (U.S.) Ltd. v. TRS*

14   *Inc.*, 2007 WL 1795695 (N.D. Cal. June 20, 2007)—for the proposition that because Epic's

15   breach was "accompanied by . . . conversion and intentional interference . . . and was effectuated

16   through deceit", the economic loss rule "is inapplicable".  (Opp. 16.)  Neither case supports

17   Apple's tort claims.  The court in *Schulz* recognized that the existence of an agreement does not

18   immunize independently tortious conduct, but then dismissed the plaintiff's tort claim because

19   the plaintiff "must allege more than a breach of the contract that forms the basis of Defendants'

20   alleged obligations".  *See Schulz*, 2014 WL 2115168, at *6.  In *Textainer*, the defendant sold

21   shipping containers it had leased from the plaintiff.  The court found that the defendant "had an

22   independent duty not to misappropriate the containers" separate from the contract.  *See*

23   *Textainer*, 2007 WL 1795695, at *3.  The linchpin of *Textainer* was the fact that the duty

24   allegedly breached—the duty not to misappropriate the containers—*preexisted* the contractual

25   relationship between the parties.  *See Expedited Packages, LLC v. Beavex Inc.*, 2015 WL

26   13357436, at *4 (C.D. Cal. Sept. 10, 2015) (citing *Textainer* and explaining that "[w]here the

27   interest preexisted the contract, a conversion claim will lie").

28       It is clear under well-established California law that, "where the duty arises as a result of

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

the contract, the [tort] claim is not cognizable." *Id.*; *see also McGehee v. Coe Newnes/McGehee ULC*, 2004 WL 2452855 (N.D. Cal. Feb. 10, 2004) (holding that because the defendant's right to receive the title to patents arose solely from the contract, the defendant was barred from counterclaiming for conversion); *Lever Your Bus., Inc. v. Sacred Hoops & Hardwood, Inc.*, 2019 WL 7050226, at *7 (C.D. Cal. Dec. 23, 2019) ("Sacred Hoops' alleged failure to remit payment for shoes it purchased from LYB pursuant to the MAP agreement is not 'interference' with LYB's shoe inventory but an alleged failure to perform a contractual obligation."). Apple's alleged entitlement to collect a fee for sales to *Fortnite* users arises solely from the License Agreement. (Counterclaims ¶¶ 68-69, 75-77.) As further demonstrated below in Parts II and III, Apple's deficient tort claims do not allege a violation or wrongful act independent from Epic's contractual obligations.

Finally, Apple argues that "Epic's reliance on the economic loss rule is also misplaced because, as the Court recognized in the preliminary injunction hearing, Apple is entitled at this juncture of the case to plead in the alternative". (Opp. 16 (citing Sept. 28, 2020 Hr'g Tr. at 95).) Leaving aside that the Court's comments addressed only Apple's claim of a breach of the implied covenant of good faith and fair dealing (*see* Sept. 28, 2020 Hr'g Tr. at 95:2-13), a claim pled in the alternative must still be pled properly. Apple's tort claims are legally deficient under the economic loss rule; that is true whether they are pled as primary claims or in the alternative only. *See Garcia v. M-F Athletic Co.*, 2012 WL 531008, at *2 (E.D. Cal. Feb. 17, 2012) ("Although plaintiffs are allowed to plead in the alternative, on a motion to dismiss the plaintiff must allege facts that 'plausibly suggest an entitlement to relief.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009))). In this context, Apple's reliance on *Korea Supply Company v. Lockheed Martin* is misplaced. 29 Cal. 4th 1134, 1158-59 (2003). *Korea Supply* does not even address the economic loss rule because it involved pleading two different *torts* in the alternative. The plaintiff alleged both intentional interference with contractual relations (which requires proving the existence of a contract with a third party) and, in the alternative, intentional interference with prospective economic advantage (which can be maintained when the third-party relationship is not contractual). *Korea Supply*, 29 Cal. 4th at 1158. The plaintiff was simply covering its bases

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1  in case it could not prove the existence of an enforceable third-party contract with which the

2  defendant had interfered.  *Korea Supply* does not suggest that a party to an agreement may avoid

3  the economic loss rule by pleading a tort claim in the alternative to the underlying breach of

4  contract.

5       Because Apple does not allege breach of a duty distinct from breach of contract, the

6  economic loss rule bars its tort claims.

7  ## II.   APPLE'S INTERFERENCE CLAIM FAILS AS A MATTER OF LAW.

8  ### A.   <u>Apple Fails to Allege a Tortious Wrongful Act.</u>

9       Epic's Motion demonstrated that to make out an interference claim, Apple had to plead

10  interference through an act that is "independently wrongful" and "unlawful" because it is

11  "proscribed by some constitutional, statutory, regulatory, common law, or other determinable

12  legal standard".  (Mot. 6 (quoting *Korea Supply*, 29 Cal. 4th at 1158-59).)  An act that is

13  wrongful only because it is in breach of a contract cannot constitute the "independently

14  wrongful" conduct to support a tort of intentional interference.  (Mot. 6-7 (citing, *inter alia*, *JRS

15  Products, Inc. v. Matsushita Electr. Corp. of Am.*, 115 Cal. App. 4th 168, 183 (2004); *Arntz

16  Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 479 (1996)).)

17       Apple's Opposition asserts "two ways" in which "Epic wrongfully interfered with

18  Apple's relationship with iOS end users" (Opp. 4-5), but Apple's Counterclaims do not plead

19  that either violates an independent and "determinable legal standard".  Rather, Apple's

20  Counterclaims allege these two acts are wrongful because they violate provisions of Epic's

21  License Agreement with Apple.  That is legally insufficient to make out a tortious interference

22  claim.

23       *First*, Apple's Opposition argues that Epic interfered by "failing to remit to Apple

24  commissions from in-app purchases".  (Opp. 5.)  But Apple does not have a "constitutional,

25  statutory, regulatory, common law" or other right to these commissions.  As the Counterclaims

26  make clear, Epic's failure is a breach only of Epic's contractual duties:  Epic "breached the

27  License Agreement, Schedule 2, ¶ 3.4(a) by failing to pay Apple agreed-to commissions on its

28  in-app sales through *Fortnite*".  (Counterclaims ¶ 54.)

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1       *Second*, Apple's Opposition asserts that Epic interfered by "deceptively introducing its

2   'hotfix' to the App Store".  (Opp. 5.)  But again, Apple does not have a "constitutional, statutory,

3   regulatory, common law" or other right to demand any disclosure from Epic concerning app

4   updates; rather, any disclosure requirement is entirely a result of Apple's and Epic's contractual

5   relationship.  As Apple's Counterclaims allege, Epic "specifically agreed in the License

6   Agreement that it would 'not attempt to hide, misrepresent or obscure any features, content,

7   services or functionality in [its] submitted Applications from Apple's review or otherwise hinder

8   Apple from being able to fully review such Applications'" (Counterclaims ¶ 24 (quoting License

9   Agreement ¶ 6.1)), and Epic "breached . . . provisions of the License Agreement by publishing a

10  new external payment mechanism in *Fortnite* via hotfix and by failing to submit to Apple and

11  intentionally concealing from Apple these changes to the *Fortnite* app" (*id.* ¶ 51).  Apple's

12  interference claim, Count IV, simply re-alleges that Epic has violated rights to which Apple is

13  "contractually entitled".  (*Id.* ¶ 69.)

14      In an attempt to avoid this straightforward application of California tort principles, Apple

15  engages in misdirection and cites now-disapproved law.  Apple first relies on an analogy to the

16  California Supreme Court's 1975 decision in *Buckaloo v. Johnson*, 14 Cal. 3d 815 (1975),

17  *disapproved of by Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 902 P.2d

18  740 (1995).  (Opp. 5-6.)  In *Buckaloo*, the court sustained a demurrer of contract claims based on

19  the statute of frauds, but denied the demurrer as to an intentional interference claim, which the

20  Court viewed as "not dependent on compliance with the statute of frauds".  14 Cal. 3d at 822.

21  But *Buckaloo* is inapposite because it significantly pre-dates the decision that established the

22  currently applicable elements of Apple's claim.  The rule requiring an independently wrongful

23  act to state a tortious interference claim was first articulated by the California Supreme Court 20

24  years after *Buckaloo* was decided.  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th

25  376, 393 (1995).

26      In *Della Penna*, "to achieve a closer alignment with the practice of the trial courts,

27  emerging views within the Court of Appeal, the rulings of many other state high courts, and the

28  critiques of leading commentators", the Court "reconstructed the formal elements" of a claim for

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

intentional interference, *id.* at 391, requiring for the first time that the plaintiff plead and prove as part of its case that the defendant engaged in "conduct that was wrongful by some legal measure other than the fact of interference itself", *id.* at 393.  The Court expressly held that "[t]o the extent that language in *Buckaloo* . . . addressing the pleading and proof requirements in the economic relations tort is inconsistent with the formulation we adopt in this case, it is disapproved."  *Id*. at 393 n.5.  Since *Della Penna*, California courts "have continued to apply the elements we articulated in *Buckaloo*, with the *added understanding* that a plaintiff must plead that the defendant engaged in an act that is wrongful apart from the interference itself".  *Korea Supply*, 29 Cal. 4th at 1153-54 (emphasis added).

Apple concedes that *Della Penna* "disapproved *Buckaloo*'s explication of the pleading and proof standard for the wrongful act element", but erroneously asserts that *Buckaloo* remains viable support for the proposition that "deceptively taking commissions established by contract, even where the contract is unenforceable, is an independently wrongful act".  (Opp. 5-6 n.2.) That assertion is plainly wrong:  the *Buckaloo* court did not address what constitutes an "independently wrongful act" because the element did not exist at the time.  The court therefore could not have concluded—and did not conclude—that the *Buckaloo* plaintiff had succeeded in pleading a yet-unnecessary element.  *Buckaloo* is thus completely irrelevant.

Separately, Apple relies on allegations of "devious dealings", "deception", or "trickery" by Epic, but these allegations do not meet the independently wrongful act requirement either. (Opp. 5-7.)  Apart from the "disapproved" *Buckaloo* holding, Apple again cites *Robinson*.  (Opp. 7.)  But, as noted above, *Robinson* did not hold that all deceptive acts give rise to a tort.  Instead, its "narrow" and "limited" holding was that where a plaintiff relied on the defendant's "affirmative misrepresentations" and was thereby exposed to "liability for personal damages" beyond the economic loss, then the plaintiff could pursue "claims of intentional misrepresentation or fraud", even if the fraudulent actions also happened to breach a contract. *Robinson*, 34 Cal. 4th at 985.  But Apple does not allege a fraud claim, it does not allege any affirmative misrepresentations, and it does not allege that when Epic "clandestinely added features in violation of the guidelines and its agreements with Apple" there was a breach of any

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1    duty *other than* those arising from the Guidelines and License Agreement.  (Opp. 7.)  Under

2    California law, a breach of contract does not become fraudulent—or even tortious—because it is

3    done clandestinely or even "deviously".

4        Epic's Motion cited a line of cases—all following *Della Penna*—dismissing interference

5    claims that were based merely on contractual breaches.  (Mot. 6-7.)  Apple attempts to

6    distinguish those cases by claiming they "all involve simple breach of contract—with no

7    allegation of deceit or tortious breach".  (Opp. 8.)  That is simply wrong.  *See JRS Products*, 115

8    Cal. App. 4th at 183 ("JRS argues that 'Panasonic had violated franchise laws by terminating

9    JRS without good cause, then attempted to fabricate "good cause" through misrepresentations

10   and concealments.'"); *Arntz*, 47 Cal. App. 4th at 480 (dismissing intentional interference claim

11   against surety premised on, among other things, Plaintiff's proffered evidence that the surety

12   "communicated false and misleading information to interested third parties"); *Batts v. Bankers*

13   *Life & Cas. Co.*, 2014 WL 296925, at *14 (N.D. Cal. Jan. 27, 2014) (employee alleging "that

14   defendant interfered with his economic relationships with his clients and made

15   misrepresentations to him regarding renewal commissions and other deferred compensation").

16       As *Robinson* recognizes, California courts carefully scrutinize tort claims to "prevent[]

17   the law of contract and the law of tort from dissolving one into the other".  34 Cal. 4th at 988

18   (citation omitted).  One way the courts do that is by requiring claimants to plead an act that is

19   unlawful for reasons distinct from any breach of contract in order to sustain an interference

20   claim.  Apple does not do so, and its interference claim should be dismissed on this basis alone.[2]

21

22

23

---

24     [2] Apple's Opposition also argues that Epic "subverted . . . the network of contractual,
     technological, logistical, and other security and privacy protections that Apple has built into the
     iOS infrastructure".  (Opp. 7.)  This is a new theory of interference, contrary to Apple's

25   Counterclaims, which focus on Epic's alleged interference with Apple's ability to transact with
     iOS users via IAP.  (Counterclaims ¶ 70 ("Epic's conduct actually interfered with Apple's
     relationships with its consumers, in particular those who made purchases through Epic's

26   unauthorized external purchase mechanism, by depriving Apple of the economic benefit that it
     reasonably expected to receive from those relationships.").)  It is "axiomatic" that Apple may not

27   amend its pleading in an Opposition.  *See Strome v. DBMK Enterprises, Inc.*, 2014 WL 4437777,
     at *4 (N.D. Cal. Sept. 9, 2014).  In any event, Apple's allegations are entirely conclusory, and

28   Apple never alleges that Epic actually harmed users' security or privacy in any way.

EPIC'S REPLY MEMO ISO MOTION FOR          9          CASE NO. 4:20-CV-05640-YGR-TSH

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

**B.**   <u>Epic Cannot Be Liable for Intentionally Interfering with Transactions in</u>
<u>Which Epic Is the Principal Participant.</u>

Epic's Motion cited *Marin Tug & Barge v. Westport Petroleum*, 271 F.3d 825 (9th Cir. 2001), to show that "intentional interference with prospective economic advantage claims may be asserted only against 'third-party strangers' to the relationships allegedly interfered with". (Mot. 2.)  Apple's Opposition claims that "[t]his entire line of argument is wrong as a matter of California law" because "years after *Marin Tug* issued, . . . California Courts of Appeal have rejected *Marin Tug*".  (Opp. 8 (citing *Fresno Motors LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1126-27 (9th Cir. 2014)).)  Not so.

*First*, although Apple argues that courts have limited the "not-a-stranger" test to bar tort liability only against contracting parties, that limit has generally been applied in cases addressing alleged interference with *existing* contractual relations—as contrasted with the interference with *prospective* relations Apple alleges here.  Apple's own cases recognize that there is a distinction between the two torts for these purposes.  For example, *United National Maintenance v. San Diego Convention Center* involved only an interference with contract claim and distinguished *Marin Tug* on that basis.  766 F.3d 1002, 1007 (9th Cir. 2014) ("the plaintiff in *Marin Tug* sued under the tort of intentional interference with prospective economic advantage, and we specifically stated that the tort of intentional interference with contractual relations was not at issue in [the] appeal.  That tort is distinct, and California law draw[s] and enforce[s] a sharpened distinction between the two." (internal quotations omitted)).  Likewise, in *Popescu v. Apple*, where Apple itself raised the "not-a-stranger" defense to a claim for interference with contractual relations, the court found Apple's reliance on *Marin Tug* to be "misplaced" because "*Marin Tug* was concerned with a business interference claim, not a contract interference claim".  1 Cal. App. 5th 39, 54 (2016), *overruled on other grounds by Ixchel Pharma. v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020). [3]   As the California Supreme Court has made clear, "[e]conomic relationships

---

[3] *Popescu* also rejected the "not-a-stranger" defense to a "business interference" claim, but it did so "[f]or the reasons already stated in part II.B." of its opinion, *id.* at 64, including that "Apple was not mentioned—as a named agent or otherwise" in the agreement and that "Apple's relationship to the agreement was wholly tangential", *id.* at 55.  As shown below, Epic's

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1  short of contractual, however, should stand on a different legal footing as far as the potential for

2  tort liability is reckoned".  *Della Penna*, 11 Cal. 4th at 392.

3         *Second*, even courts that have limited the breadth of the "not-a-stranger" defense have not

4  eliminated it entirely—and Epic's role in the transactions at issue is so central that even the

5  narrowest version would still apply.  Apple's claim is based on Epic's alleged interference with

6  Apple's ability to serve "as Epic's agent in the marketing and delivery of *Fortnite* and all

7  associated in-app purchases to consumers." (Counterclaims ¶ 69.)  This is not a situation at the

8  outskirts of the "not-a-stranger" doctrine; Epic is the creator and supplier of the content being

9  provided in *Fortnite*, Epic is the principal in the transaction, and Apple's involvement is limited

10 to its role as *Epic's agent*.  (Counterclaims ¶¶ 17, 49, 68-69.)  Indeed, only by way of

11 confirmation of what Apple already pleads, this Court may take judicial notice that Apple's

12 agreement with consumers goes even further, stating that "Apple acts as an agent for App

13 Providers in providing the App Store and is not a party to the sales contract or user agreement

14 between you and the App Provider".  (Apple, *Apple Media Services Terms and Conditions*,

15 online at https://www.apple.com/legal/internet-services/itunes/us/terms.html (last accessed

16 October 23, 2020.)    Thus, whatever the outer bounds are of the "not-a-stranger" defense, it

17 applies here, as Epic is directly at the core of the doctrine; it is a party—indeed a principal—in a

18 relationship in which Apple is *at most* an agent, if not an outright non-party.  *MJC Am., Ltd. v.*

19 *Gree Elec. Appliances, Inc. of Zhuhai*, 2014 WL 12600963, at *4-5 (C.D. Cal. Jan. 21, 2014)

20 (discussing the differences in the stranger test in the context of the two interference torts and

21 concluding that "the parties to a contract *or a prospective economic relationship* have absolute

22 immunity from liability for interference with that contract or relationship under California law"

23

24 ─────────────────────

25 involvement in the relationships here was much more than "tangential".  Apple's other
   prospective economic advantage cases are similarly distinguishable.  *Rescap Liquidating Trust v.*
   *First California Mortgage* rejected the argument that "third party beneficiaries" with a mere
26 "economic interest" in an agreement were immunized from interference liability, 2018 WL
   5310795, at *6 (N.D. Cal. 2018), but Epic is not a mere bystander with an abstract economic
27 interest—Epic is at the center of the allegedly interfered-with relationship.  And the discussion in
   *Fresno Motors v. Mercedes Benz* was admitted dicta, where the court concluded that it "need not
28 reach the issue".  771 F.3d at 1125-28.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1  (emphasis added)).[4]

2  ### III.   APPLE'S HYPERBOLIC ACCUSATIONS OF THEFT DO NOT TRANSFORM
   A BREACH OF CONTRACT INTO CONVERSION.

3

4      Epic's Motion showed that Apple's conversion claim is improper for multiple

5  independent reasons.  (Mot. 9-13.)  Apple's Opposition does not plug the legal holes in its claim,

6  but only doubles down on its rhetoric seeking to paint Epic as a thief.  Indeed, according to

7  Apple's Opposition, Epic may be liable in conversion not only for the 30% commissions on sales

8  of *Fortnite* content, but also for the remaining revenue Epic earns for the sales of its products.

9  (Opp. 15 n.5.)  Apple seeks to compare Epic's conduct to stealing cash from a vault in Apple

10  Park, or raiding Apple's bank account.  (Opp. 10.)  But what the Counterclaims allege is very

11  different.  The money in Apple's vault or bank account is the property of Apple, in which Apple

12  unquestionably has a possessory interest; the money paid by *Fortnite* users is not.  It is money

13  that *Fortnite* users choose to pay in return for *Epic's* creative endeavors.  Apple's repeated

14  assertions of theft boil down to the extraordinary assertion that Epic's collection of payments by

15  players of *Epic's* game to enjoy the work of *Epic's* artists, designers, and engineers is the taking

16  of something that belongs to Apple.  Apple's only basis for claiming an entitlement to be paid on

17  such sales is contractual, not possessory.  In the License Agreement, Epic was forced to agree to

18  make Apple its agent for those sales and let Apple take a 30% commission.  By offering *Fortnite*

19  users the choice of making purchases directly from Epic, Epic breached those contractual

20  provisions (assuming they are legal).  But Epic did not steal or convert Apple's property.

21  Apple's conversion claim is thus implausible and deficient as a matter of law.

22      *First*, Apple fails to plead that it had a possessory interest in any funds in Epic's

23  possession.  (Mot. 9-12.)  Apple's own precedent proves the point:  each of the cases cited by

24  Apple involved a defendant having accepted funds "*on behalf of*" another party, *Voris v.*

25  *Lampert*, 7 Cal. 5th 1141, 1152 (2019) (emphasis added), and then "misappropriat[ing]" or

26  "abscond[ing]" with it (Opp. 11 (citing *Sanowicz v. Bacal*, 234 Cal. App. 4th 1027, 1041 (2015);

27

28  ─────────
   [4] Apple itself concedes that courts limiting *Marin Tug* nevertheless have reaffirmed the
   availability of the "not-a-stranger" defense as between "parties to a contract".  (Opp. 8 (citing
   *Fresno Motors*, 771 F.3d at 1126-27).)

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

*Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072-74 (1996))).  Thus, in *Sanowicz*, a real estate

agent accepted money on behalf of himself and his business partner after the sale of a property,

and then simply kept it all to himself.  *Sanowicz*, 234 Cal. App. 4th at 1030-32, 1042.  In

*Fischer*, the plaintiff hired the defendants to serve as its agent to sell the plaintiff's farm

products.  50 Cal. App. 4th at 1071.  The defendants sold the products and accepted the sale

proceeds on their principal's behalf, and then filed bankruptcy without ever paying Plaintiffs.  *Id.*

The defendants in *Fischer* did "not dispute they were plaintiffs' agent nor d[id] they dispute they

received the proceeds from the sale of plaintiffs' consigned farm products".  *Id.* at 1034.[5]  In

each case then, the defendant first accepted money on behalf of another, then converted it.

These cases are irrelevant.  Here, as noted above, when Epic uses Apple's IAP system,

Apple then collects money on behalf of Epic, as Epic's agent.  But the opposite is not true.  Epic

never accepted money on behalf of Apple, and Apple does not and cannot plausibly plead

otherwise.

Citing *Voris*, Apple asserts that the License Agreement here "memorializes and renders

specific Apple's possessory interest in the identified sums".  (Opp. 12.)  That is not so—the

contract here *creates* Apple's interest in receiving a commission.  Apple's right arises from, and

only from, the contract.  The situations in which *Voris* addressed a conversion claim in the

context of a contract are very different.  For example, one situation is when a contract allows a

party to collect money that belongs to or was accepted on behalf of another, as discussed above.

*See Voris*, 7 Cal. 5th at 1152 (citing *Fischer*, 50 Cal. App. 4th at 1072-74).  Another is when a

contractual provision creates a *lien*, which is a specific possessory interest not alleged by Apple.

*Id.* at 1152 (citing *Weiss v. Marcus*, 51 Cal. App. 3d 590, 599 (1975)).  Apple thus has no answer

to the clear California law that mere contractual rights do not create a possessory interest; if they

did, "the tort of conversion would swallow the significant category of contract claims that are

based on the failure to satisfy mere contractual right[s] of payment".  *Voris*, 7 Cal. 5th at 1151-52

---

[5] The third case relied on by Apple, *Andreoli v. Youngevity Int'l, Inc.*, cannot support Apple's
argument because neither party's briefing in that case addressed whether the plaintiff had a
possessory interest in any funds, and the Court did not provide any rationale in support of its
holding.  2018 WL 1470264, at *11 (S.D. Cal. Mar. 23, 2018).

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

1   (quotations and citation omitted).

2        *Second*, Apple's claim also fails because Apple's alleged contractual rights did not

3   provide Apple with an interest that existed at the time of the alleged conversion.  (Mot. 11.)

4   Apple argues that Epic commits a separate conversion of Apple's funds each time it collects

5   commissions from any iOS end user.  (Opp. 13 ("In reality, the time of [each] alleged conversion

6   . . . is the moment of collection of any amounts from any end-user." (internal quotations

7   omitted)).)  This is again revisionist pleading.  Apple's Counterclaims allege instead that Epic

8   committed conversion "[b]y incorporating into its *Fortnite* app an external payment system that

9   circumvented the IAP system".  (Counterclaims ¶ 77.)  Thus, as shown in Epic's Motion,

10   Apple's claim fails because Apple's alleged contractual rights did not provide Apple with a

11   possessory interest that existed at the time of the alleged conversion. (Mot. 11-12.)

12        *Third*, Apple fails to rebut Epic's argument that Apple does not plead a "specific,

13   identifiable sum" that it seeks to recover.  (Mot. 12.)  Apple's Counterclaims seek recovery of an

14   ongoing and increasing sum of "at least" the commissions that would have been paid to Apple if

15   the transactions were completed through Apple's IAP, as well as an undefined quantum of

16   damages such as "reasonable compensation". (Counterclaims ¶ 78).  As explained in Epic's

17   Motion, such generalized damage claims do not allege the conversion of money as "specific

18   property" that is "identified as a specific thing".  (Mot. 12 (quoting *PCO, Inc. v. Christensen,*

19   *Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395 (2007)).)

20        Finally, Apple argues that while its commissions "establish[] a floor for recovery" on

21   Apple's conversion claim, "Apple may also assert additional damages based on Epic's assertion

22   of dominion and control over the *entire* revenue stream for in-app purchases from iOS users".

23   (Opp. 15 n.5 (emphasis in original)).  In other words, Apple accuses Epic of stealing not just

24   Apple's 30% commission, but *all* the money earned from the sale of Epic's content in *Fortnite*

25   through Epic Direct Pay.  Apple's suggestion that an agent should be able to sue the principal in

26   conversion for *all* of the proceeds the agent was contractually entitled to collect on behalf of its

27   principal is without precedent.  Apple cites no caselaw supporting such an absurd result.

28

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

## IV.  PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR A MERE BREACH OF CONTRACT REGARDLESS OF THE MEANS OR MOTIVE.

As explained in Epic's Motion, punitive damages are available only "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice".  Cal. Civ. Code § 3294(a).  Apple argues that the Counterclaims "allege facts establishing that Epic also acted maliciously, fraudulently, deceitfully, and intentionally" in violating the License Agreement. (Opp. 17-18.)  But as explained in Epic's Motion, "motive, regardless of how malevolent, remains irrelevant to a breach of contract claim and does not convert a contract action into a tort claim exposing the breaching party to liability for punitive damages".  (Mot. 13 (quoting *JRS Products*, 115 Cal. App. 4th at 182); *see also McGehee*, 2004 WL 2452855, at *4.)  In addition, as noted, Apple does not even attempt to allege a fraud claim, much less with the particularity required by Federal Rule of Civil Procedure 9(b).

In *Congdon v. Uber Techs., Inc.*, 2018 WL 2971058, at *3-4 (N.D. Cal. June 13, 2018), this Court recognized that punitive damages claims are inappropriate where allegations of fraud, oppression, or malice are premised on a tort claim "*entirely dependent upon* [a] breach of contract claim".  *Congdon*, 2018 WL 2971058, at *3.  Apple argues that *Congdon* does not apply here because the parties in that case stipulated that the conversion claim was dependent on the breach of contract claim (Opp. 17-18), but that is a distinction without a difference.  It does not matter whether the outcome of that specific case depended on a stipulation or instead the face of the complaint.  What matters is the underlying *principle* the Court articulated:  "[T]he general rule is that tort recovery is precluded for non-insurance breach of contract cases unless the breach also violates a duty independent of the contract arising from principles of tort law." *Congdon*, 2018 WL 2971058, at *3.  Here, the alleged tort is based only on the breach of a contractual duty, so the punitive damages request should be dismissed.

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.

Dated: October 23, 2020

**CRAVATH, SWAINE & MOORE LLP**
    Christine A. Varney
    Katherine B. Forrest
    Gary A. Bornstein
    Yonatan Even
    Lauren A. Moskowitz
    M. Brent Byars

Respectfully submitted,

By:  */s/ Gary Bornstein*
     Gary A. Bornstein

*Attorneys for Plaintiff and Counter-Defendant Epic Games, Inc.*

Dated: October 23, 2020

**FAEGRE DRINKER BIDDLE & REATH LLP**
  Paul J. Riehle

Respectfully submitted,

This document was created by an application that isn't licensed to use novaPDF.
Purchase a license to generate PDF files without this notice.