Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS S. HIXSON, MAGISTRATE JUDGE

| | | |
|---|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION. | ) ) ) | **No. 11-cv-06714-YGR (TSH)** |
| DONALD R. CAMERON, et al., | ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | **No. 19-cv-03074-YGR (TSH)** |
| APPLE INC., | ) ) | |
| Defendant. | ) ) | |
| EPIC GAMES, INC., | ) ) | |
| Plaintiff/ Counter-defendant, | ) ) ) | |
| VS. | ) ) | **No. 20-cv-05640-YGR (TSH)** |
| APPLE INC., | ) ) | |
| Defendant/ Counterclaimant. | ) ) ) | |

San Francisco, California
Wednesday, December 9, 2020

**<u>TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR</u>**

(Appearances on next page)

Reported by:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

 1 | **APPEARANCES:** (via Zoom Webinar)

 2 | For Plaintiffs in In re Apple iPhone Antitrust Litigation,
   | 11-cv-06714-YGR:

 3 |                          WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
   |                          750 B Street, Suite 1820

 4 |                          San Diego, California 92101
   |                     BY:  **RACHELE R. BYRD, ESQ.**

 5 |
   | For Plaintiffs in Cameron, et. al v. Apple Inc.,

 6 | 19-cv-03074-YGR:
   |                          HAGENS BERMAN SOBOL SHAPIRO LLP

 7 |                          1301 Second Avenue, Suite 2000
   |                          Seattle, Washington 98101

 8 |                     BY:  **ROBERT F. LOPEZ, ESQ.**

 9 | For Plaintiff Epic Games, Inc.:
   |                          CRAVATH, SWAINE & MOORE LLP

10 |                          825 Eighth Avenue
   |                          New York, New York 10019

11 |                     BY:  **LAUREN A. MOSKOWITZ, ESQ.**

12 | For Defendant Apple Inc.:
   |                          GIBSON, DUNN & CRUTCHER LLP

13 |                          555 Mission Street
   |                          San Francisco, California 94105-0921

14 |                     BY:  **ETHAN D. DETTMER, ESQ.**

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

| | |
|---|---|
| 1 | **Wednesday - December 9, 2020**                          **1:01 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  All right, everyone.  Good afternoon. |
| 5 | Thank you for all joining us on the Zoom call. |
| 6 | We're here in Civil Action 11-6714, In re Apple iPhone |
| 7 | Antitrust Litigation, and in Case Number 19-3074, Cameron, et |
| 8 | al. versus Apple Inc.  And the last case is 20-5640, Epic |
| 9 | Games, Inc. versus Apple Inc. |
| 10 | Counsel, please state your appearances for the record. |
| 11 | The Honorable Thomas S. Hixson, presiding. |
| 12 | Let's start with the Apple Antitrust Litigation first. |
| 13 | **MS. BYRD:**  Good afternoon, Your Honor.  This is |
| 14 | Rachele Byrd, with Wolf Haldenstein Adler Freeman & Herz, on |
| 15 | behalf of the plaintiffs. |
| 16 | **THE COURT:**  Good afternoon. |
| 17 | **THE CLERK:**  Thank you. |
| 18 | And the Cameron v. Apple. |
| 19 | **MR. LOPEZ:**  Good afternoon, Your Honor.  This is Rob |
| 20 | Lopez, of Hagens Berman, for the developer plaintiffs in the |
| 21 | Cameron matter. |
| 22 | **THE COURT:**  Good afternoon. |
| 23 | **THE CLERK:**  And Epic Games, Inc., versus Apple Inc. |
| 24 | **MS. MOSKOWITZ:**  Good afternoon, Your Honor.  Lauren |
| 25 | Moskowitz, from Cravath, Swaine & Moore, on behalf of Epic |

1    Games.

2              **THE COURT:**  Good afternoon.

3              **MR. DETTMER:**  And, Your Honor, Ethan Dettmer, from

4    Gibson Dunn & Crutcher, on behalf of Apple in all three

5    matters.

6              **THE COURT:**  Good afternoon.

7              **MR. DETTMER:**  Good afternoon, Your Honor.

8              **THE COURT:**  So let me tell you what my agenda is for

9    the hearing.  I have some questions that I want to ask Epic

10   Games and Apple, and then I have some thoughts that I want to

11   discuss with those two parties.

12       And then what I'm likely to do is tell you to go meet and

13   confer a little bit more in light of my -- the ideas I discuss

14   with the two parties.

15       I know that you've met and conferred for several weeks

16   already in a good-faith attempt to get to an answer, and I'm

17   hoping that with some feedback from me we can get you over the

18   finish line.

19       So, anyway, there's not going to be an order coming out of

20   this hearing.  Or the order will be that you talk with each a

21   little bit more.

22       First, I want to ask Epic, Inc., just to make sure that I

23   understand how you searched for documents, I understand that

24   you had a set of search terms and that was shared with Apple.

25   Is that correct?

 1          **MS. MOSKOWITZ:**  Yes, Your Honor.  We had initially

 2   proposed a set of terms, and Apple responded with a lengthy set

 3   of proposed conditions that we met and conferred and reached

 4   agreement on.

 5          **THE COURT:**  Okay.  So there was -- at the start of the

 6   process, there was an agreement on a group of search terms so

 7   Apple would know if a document didn't have one of their search

 8   terms it wasn't going to come up.  And if it did, then the

 9   search term would pull it out.  Is that right?

10          **MS. MOSKOWITZ:**  Correct.  Correct.

11          **THE COURT:**  Okay.  Then after you ran the search

12   terms, did you have a team of document reviewers do manual

13   review to see which documents were, in fact, responsive?

14          **MS. MOSKOWITZ:**  That's correct, Your Honor.  We are

15   performing a linear review of all of the search term hit

16   results, which is in the order of over 3.5 million documents.

17          **THE COURT:**  Wow.  That sounds like a big task.

18          **MS. MOSKOWITZ:**  It is.

19          **THE COURT:**  Was there ever a time when you took a

20   sample of the documents that hit on the search terms and then

21   disclosed to Apple, here's how we're making responsiveness

22   calls with respect to this set, and let us know what you --

23   what you think?

24      In other words, I knew that they had input on your search

25   terms.  What I'm wondering is whether they also had any input

1    into your responsiveness calls or if -- and I know this a term

2    that no one -- it sounds pejorative, but whether what the

3    manual reviewers were doing is not just a black box to Apple?

4           MS. MOSKOWITZ:  Your Honor, we have not disclosed a

5    set of specific documents with the up or down determinations

6    that we are making.  We haven't discussed that with Apple.

7        We are -- we can describe that we are taking quite a broad

8    responsiveness on view, and we have disclosed that concept to

9    Apple, that we are not making very fine responsiveness calls,

10   but rather we are erring on the side of responsiveness.

11          THE COURT:  I see.  So, presumably, there's some

12   attorney-client privilege review memo, and your team are

13   working off of that.  Is that right?

14          MS. MOSKOWITZ:  A responsiveness protocol that

15   includes both privilege calls and the types of documents that

16   really shouldn't be marked "responsive," along the lines of

17   technical documents, coding documents, that really are not

18   relevant to the issues in the case.  But separate from that,

19   the instructions have been to mark "responsive."

20          THE COURT:  Okay.  And then in your validation

21   protocol, I think you had two aspects to it.  One is you would

22   validate that the search terms did, in fact, pull up a certain

23   recall level.  Is that the idea?

24          MS. MOSKOWITZ:  For step one, Your Honor, that's

25   correct.  What we had proposed to do upfront, so that we could

1   know with certainty the universe that we were going to be

2   performing the linear review on, would be to take a sample of

3   the overall population.

4        And that's, I think, on the order of 6-and-a-half million

5   documents after de-duplication, and to take a sample of 1500

6   documents from that full universe, some of which would be from

7   the hit results and some from the non-hit results, review those

8   by an expert for responsiveness, and calculate a recall

9   percentage based on the responsive hit in that sample

10  population.

11       And we had proposed to Apple that we would reach an

12  80 percent recall on that such that 80 percent of the

13  responsive documents were being returned by the search terms

14  and that we would be prepared to move forward on that basis.

15            THE COURT:  Okay.  So that's the first aspect.

16       Then there was another aspect, and that was the -- to take

17  a random sample of the ones coded "not responsive" to determine

18  which ones should have been responsive, and you would calculate

19  the elusion rate.

20       And for the benefit of the court reporter, I'm saying

21  e-l-u-s-i-o-n.  I'm not saying i-l-l-u-s-i-o-n.

22       So is that the other aspect of it?

23            MS. MOSKOWITZ:  That's correct, Your Honor.  That is

24  what our proposal was, as a compromise, given that we -- we

25  personally have never seen anyone go that far on a search terms

1    protocol.

2        I'm happy to give more background on how we ended up

3    there, but that is the end result of what we were proposing to

4    do.

5        **THE COURT:**  I see.

6        So I had two concerns that maybe you can speak to.  The

7    one is that the recall rate that you're estimating is not a

8    true recall rate because your doc review process had two steps.

9        First you had search terms, and then we had the manual

10   review.  And so this 80 percent, it doesn't capture the manual

11   review part, and that's kind of what I'm struggling with.

12       I understand that your elusion rate is designed to deal

13   with the manual review problem, but the concern there -- I

14   think Apple's right, that if the search terms got in a lot of

15   nonresponsive documents, then you could pass the elusion rate

16   test even if actual recall wasn't that great.

17       So I'm wondering if you could speak to those concerns.

18       **MS. MOSKOWITZ:**  Yes, Your Honor.  I think, just from

19   a -- backing up to first principles on what you're trying to

20   achieve in discovery, I think that we have a disagreement on

21   what that is.

22       And we don't view the exercise of discovery, especially in

23   cases with just millions and millions and millions and millions

24   of documents, that you are trying to find every responsive

25   document.

1       We've all served bilateral requests that, if read

2   literally, call for every document in our files.  And the real

3   idea is to get not just responsive documents but what's the

4   meat of the documents in this case.

5       An exhibit list in this trial is going to be a fraction of

6   a fraction of the documents produced.  And so search terms are

7   not just targeted at getting responsive documents but getting

8   what the critical documents are.

9       Apple got to say, we think that the documents that you

10  have, that we really care about, are going to say the following

11  types of words, and go look for those documents, and then

12  review those for responsiveness and produce them.

13      That is the whole idea behind search terms.  It's not a

14  blind responsiveness review but, rather, a targeted meet and

15  confer on targeted terms that Apple specifically can request us

16  to look at to get the documents that they think they need in

17  the case.

18      And so the -- the 80 percent offer that we did was

19  really -- it does look at responsiveness, but it's really just

20  a check on is there a huge number of responsive documents that

21  aren't hitting on the terms?

22      And that gives you the comfort that that's not happening,

23  that only 20 percent of technically responsive documents are

24  being left behind.

25      But Apple has already told us the specific documents they

1    want by virtue of the search terms.  So it's really the search

2    terms themselves are the validation of our protocol.  And the

3    80 percent is just a double check or a triple check because

4    they really do have so much involvement and had so much

5    involvement in search terms themselves.

6         So that's why we proposed that on the search terms piece.

7    And I can certainly speak to the second aspect of it, but I may

8    have lost your question if I haven't yet answered it.

9         **THE COURT:**  I think you have.  I think the concept

10   here, that you're getting at, is sometimes referred to as

11   precision.  The only way you can get every relevant document is

12   you produce all the documents.  But no one wants all the

13   documents, they want the good stuff.  And so okay.

14        All right.  Let me -- let me ask Apple some questions.

15        If I understand the way you did TAR, at the beginning you

16   would have to -- I mean, the machine learns.  So you start by

17   making some responsiveness calls so the machine can learn from

18   that and it can find documents that are similar to the ones

19   that are responsive and not so much of the nonresponsive ones.

20        Let me ask you a version of the same question I asked Epic

21   Games, which is:  Was there a time early on when you had a

22   sample set of documents, you made responsiveness calls, and you

23   shared those with Epic Games to get their input?

24        **MR. DETTMER:**  No, Your Honor.

25        First of all, we obviously started this review long before

```
 1   Epic filed its lawsuit.  You know, so there's two reviews,
 2   right?  There's the App Store antitrust class action reviews
 3   that have been going on, you know, for better part of a year
 4   now, and then the new Epic ones, which are separate but
 5   related.
 6       But in direct answer to your question, the way this
 7   particular TAR system works is it does not operate, you know,
 8   with any kind of seed set or anything like that.  It's a
 9   continuous active learning-type system where the review starts
10   and each and every call that a reviewer makes then looks at
11   each document, looks at the -- you know, the characteristics of
12   that document, and looks for other documents in the whole
13   collection that are either like or unlike it, and then re-sorts
14   the stack of documents to put the more likely to be a
15   responsive documents toward the top.
16       But that system keeps going throughout the whole review,
17   and you keep doing it until you get to a point where, you know,
18   the richness of the documents you're reviewing gets to a very
19   low point.  And then, you know, you do some validation and you
20   stop because there aren't enough documents left.
21       So this system is great in that it makes the review more
22   efficient by pushing the more likely to be responsive documents
23   toward the top, but also has the advantage of allowing you to
24   review, you know, each and every document as you go along until
25   you get to a point where, you know, there just aren't many
```

1   responsive documents left in what you're reviewing.

2       Now, I will just -- and sorry to drag this out a little

3   bit.  I'll give you a caveat in that, as Your Honor probably

4   knows, we have a much more aggressive timeline in place right

5   now than we had before the Epic case started.

6       So we have made a slight change to that now where we're

7   actually going to use kind of a hybrid system of what I just

8   described and a more traditional TAR 1 system where, you know,

9   the seed set, so to speak, is what we've done already, which is

10  obviously millions of documents reviewed, and hundreds of

11  thousands in the Epic case, which then has taught the system.

12      So it's complicated, but that's the -- that's the high

13  level.  And I will say we have described this in detail to the

14  plaintiffs, including, you know, allowing them to talk with our

15  consultant about it.

16          **THE COURT:**  Okay.  Thank you.  That's helpful.

17      And then, as I understand your validation proposal,

18  there's a symmetry with Epic Games in the sense that what you

19  want to validate is 75 percent recall of what you think is

20  responsive, but they don't really know what that is.

21      Like, just as the -- they haven't -- you don't have any

22  input into what their manual reviewers are saying, responsive

23  or not responsive.  The calls that Apple has been making, you

24  know, you've been making, but they don't get to see that and

25  they wouldn't as part of the validation.  Is that right?

 1          **MR. DETTMER:**  Well, yes and no, Your Honor.  I mean,

 2    we did produce to Epic, you know, as soon as -- well, shortly

 3    after they started the case, we produced to them the

 4    approximately 3.7 million documents that we produced in the

 5    class actions to date.

 6          So they have that production and, obviously, know that

 7    those documents were coded as responsive.  So to that extent,

 8    they do know what we are coding is responsive.  And as Your

 9    Honor knows, they take issue with at least part of that.  And,

10    obviously, I'm happy to talk about that further.

11          So I suppose, in a sense, they do know at least --

12          **THE COURT:**  Well, I mean, you both know that, what the

13    other side has produced.  I understand that.  But how the

14    sausage got made, you don't know.  You know the output of it

15    and they know the output of it.

16          There are some times with TAR where people do exchange

17    seed sets, and they do, as part of validation, exchange all

18    that.  I took from the letter brief that that didn't happen

19    here.  I'm just asking the question to confirm that that

20    understanding is correct.

21          **MR. DETTMER:**  That's correct, Your Honor.  And, as I

22    described, we don't really have a seed set in the first case.

23          **THE COURT:**  You started it before there was an Epic,

24    Inc. lawsuit, so I guess they -- they really couldn't have had

25    much input.

1          **MR. DETTMER:**  Right.

2          **THE COURT:**  Okay.  So here's a thought that I have.

3    At a high level, I -- I don't think search terms are any better

4    than TAR.  They both have pluses and minuses.  They have, you

5    know, pros and cons depending on the kind of case, but there's

6    no reason why one of them is inherently better than the other.

7    So I want to set a recall burden that's roughly similar for the

8    two sides because I do think that's appropriate.

9          Apple's proposal of -- I think it was 75 percent?  Is that

10   what you were looking at?

11         **MR. DETTMER:**  Yes, Your Honor.

12         **THE COURT:**  That seems right to me.

13         There is this tension between recall and precision that if

14   you go up too high then you start producing a lot of junk,

15   which, you know, no one wants.

16         But here's a thought that I have, is that maybe we need to

17   measure recall differently for the two sides.  And let me ask

18   Apple first.

19         So with the search terms it seems a little unfair to

20   measure recall against the population of documents that were

21   collected, because you know and Epic Games knows that

22   everything that didn't have a search term is just never going

23   to get reviewed.

24         And so what I'm thinking is that maybe the real issue is

25   making sure that their manual review was consistent and found

1    the stuff that it's supposed to find.

2         And so I'm thinking that maybe we -- for Epic Games, we

3    measure recall by the manual review as compared to the

4    documents that hit on the search terms, and we want 75 percent

5    of recall in that universe.

6         Another way of doing it is to compare what the manual

7    review says is responsive against not just what the search

8    terms found but what they were run against and didn't pull up.

9    But I'm wondering if that might be too big a burden on Epic

10   Games.

11        What are your thoughts?

12        **MS. MOSKOWITZ:**  Your Honor, I do --

13        **THE COURT:**  First I was asking Apple --

14        **MS. MOSKOWITZ:**  Oh.  Pardon me.

15        **THE COURT:**  -- because I'm proposing something more

16   favorable to you, and I want to hear their strenuous objections

17   to it before --

18        **MR. DETTMER:**  Well, I guess -- I guess a concern, Your

19   Honor, is twofold.  One, you know, the -- the idea of search

20   terms, as Your Honor pointed out, there are pluses and minuses.

21        One of the minuses, particularly in a case like this one,

22   where, you know, we obviously did have some input into what the

23   search terms were going to be, you know, at the outset we

24   obviously didn't have any idea what their documents were at the

25   time.

1     So, you know, while we can make a, you know, not

2  particularly well-educated guess about what the good search

3  terms might be, there's a lot of blind spots that we had in

4  giving our input into those search terms.

5     So I think, you know, I would have a lot of concern with

6  that, that there could be a lot of responsive documents that

7  were left out of the search term call.  I mean, in, you know, a

8  lot of these cases, as I'm sure Your Honor knows, there's an

9  iterative search process where you have search terms, you get

10  documents back, you look at the documents, you do another round

11  of that where you have sort of more knowledge about what the

12  documents are so that you can then, you know, say something

13  more intelligent about -- about the search terms.

14     And, frankly, we just don't have time for that here given

15  the really aggressive schedule in the case.

16         **THE COURT:**  Let me sort of short-circuit this a little

17  bit by saying, I understand and agree with all the things

18  you're saying.  It's always frustrating when one side says,

19  "What search terms do you want us to run?"  You know, I don't

20  know, I have your documents.  That's a logical thing to say.

21     I guess I'm more asking you about here we are getting

22  toward the end, and you knew that they were using search terms.

23  You had some limited ability to thoughtfully comment on them,

24  and you did what you could.  But the known risk is that if a

25  document didn't hit on a search term, they weren't going to

find it.  So that was -- you knew that at the beginning.  And

so I'm wondering if it's fair to hold you to that.

    The thing you had no ability to evaluate was their manual

review.  That really was a black box.  And I'm wondering if --

should we at least hold Epic Games to the burden to prove that

they found the things they were trying to find?

    That's really all your validation proposal is showing, as

well, that you found the things that you think were responsive.

    And so I'm wondering if just because you walked into this

known risk -- like, at the end of the document production we

can't have Epic Games redo all their search terms.  If they

weren't any good, that problem existed from the beginning.  But

we just don't have time to do that now.

    And so that's why I'm wondering if recall should be

measured against what hit on the search terms.  Can you respond

more to that, rather than addressing why search terms aren't

great, which I know already.

    **MR. DETTMER:**  Well, Your Honor, I didn't mean to

sidetrack.  I guess the reason I raise that is because that

creates, at the end of the day, a validation protocol that

really treats the two parties very differently.

    And I understand we're using different methodologies, but

at the end of the day our belief -- Apple's belief is that,

regardless of whether we're using search terms or TAR, each

party should -- and, frankly, the lawyers should be held to the

1   same ultimate recall standard.

2       And I think if Apple is being held to a recall standard

3   against all the documents that are sort of in the search

4   universe and Epic is being held to one that's, you know, a much

5   narrower universe of documents that have already been searched

6   and winnowed, that's really not a -- you know, a real

7   comparison.  And Epic is being held to a much lower standard

8   under that different protocol than we are.

9       **THE COURT:**  Well, that's true in one sense.  They're

10  certainly being held to a different standard.  But I guess at

11  the beginning Apple said, we're running TAR against all of the

12  documents that we collect.

13      And Epic Games has said, we're not going to do a manual

14  review of all the documents, we're only going to do it with the

15  ones that come up with search terms.

16      So the way that these are symmetrical is that we're trying

17  to decide how good were you at finding the things you wanted to

18  find in the places you were looking?  And Apple and Epic were

19  looking at different places.

20      But, anyway, let me hear Epic Games' view on that.

21      **MS. MOSKOWITZ:**  Thank you, Your Honor.

22      We do think that what Your Honor is proposing is better

23  than what Apple is proposing, certainly.  Though the way the

24  math would work out, if we were including both the search terms

25  recall, meaning hits and non-hits, and the recall on the

1   review, we would have to hit -- almost 97 out of every hundred

2   needs to be in agreement.  And I couldn't even agree with

3   myself 97 out of a hundred times.

4        And so we do -- we do think search terms are different, as

5   Your Honor pointed out.  We do think that the very nature of

6   them allowed Apple to have input on what was going to be

7   reviewed.  And so we should move past that and then do the

8   recall on the review.

9        We had proposed elusion because, frankly, whether or not

10  they got extra documents as responsive that maybe they would

11  have thought were nonresponsive, so what.

12       And, really, what we should be looking at is, were there

13  really responsive documents in what we were not producing and

14  marking "nonresponsive."  That's what we thought, really, we

15  should be trying to get at, because is anyone really going to

16  complain from Epic producing a few documents that maybe could

17  have been marked "nonresponsive" when people were being really

18  careful and circumscribed in what we were calling responsive,

19  which we're not doing.

20       So that is why we proposed it.  We thought that would give

21  Apple the comfort that there weren't a whole batch of documents

22  sitting as a nonresponsive code, that they wouldn't get.  That

23  is the thought behind it.

24       But if Your Honor was focused on doing an overall recall

25  number, we would be prepared to meet and confer with Apple and

1   to do that on the percentage of documents that hit on search

2   terms and, thus, were actually linearly reviewed.

3        **THE COURT:**  All right.  Thank you.  That is what I'm

4   thinking.

5        Let me turn to the -- let me just look at my notes to make

6   sure that I -- so now I have a question for Apple.

7        Epic Games says that of the 3.8 million documents you

8   produced, 2.2 were these bulk emails.  If I were to say you

9   have to exclude those before you calculate the recall rate, how

10  would that affect -- how would that affect you?

11       **MR. DETTMER:**  It would be a dramatic problem in the

12  whole review, Your Honor, for a host of reasons.

13       One is, as Your Honor probably knows, Judge Gonzalez

14  Rogers talked about how we should not be relitigating the

15  earlier production and review, and this would be exactly that.

16       You know, Epic said twice in their letter to you that

17  these are responsive documents.  They're certainly responsive

18  documents.  It was admitted twice in the letter.  They claim

19  that they're not relevant.  That is just not true.

20       I mean, these documents are part of what Apple does to

21  review apps and app providers, developers in the App Store

22  ecosystem.  It does things -- these emails show things like

23  approval of selling apps in different areas.  It shows, you

24  know, changes to apps that may be needed to be followed up for

25  security or quality reasons.  It shows, you know, when there

1    have been changes to how the apps are actually operating that

2    Apple needs to follow up on.

3         So these are all part of showing how Apple takes these

4    dramatic steps and then puts all this investment into making

5    the App Store ecosystem safer, better for developers and

6    consumers.  So these are, you know, very relevant to the claims

7    and defenses in this case.  And the fact that Epic doesn't

8    think they are is just, A, not right.  They are part of our

9    defenses in the case and certainly relevant to those.

10        So, you know, in calculating recall, which, as Your Honor

11   knows, is just the percentage of documents that are responsive,

12   they're responsive.  I mean, it's admitted.  It's just true.

13        And if we had to go back and redo our production now

14   because of sort of a second-guessing of, you know, whether

15   these documents were relevant enough, which I don't even know

16   how you impose that kind of standard, would --

17        **THE COURT:**  You're getting a little bit away from my

18   question.  I'm certainly not proposing that you redo your

19   document production.  And I understand the philosophy behind

20   including those documents.

21        The concern I had is that there -- it looked like most of

22   your document production are these highly repetitive --

23   relevant, yes, but also low-value documents.  And I'm worried

24   that -- that the inclusion of those could mean that if your

25   recall rate was terrible on everything else, you would,

 1  nonetheless, pass the 75 percent threshold.

 2       And so I just mean operationally, from a TAR validation

 3  standpoint, what if I said, look, knock out the 2.2 million.

 4  Can you describe -- would this have any -- I don't want to do

 5  something that would make it too difficult for Apple to satisfy

 6  the validation.  That's the point I'm getting at.  I don't want

 7  to tell them to produce something that's impossible or very

 8  difficult.

 9       And so I'm asking, as an operational method, if you had to

10  block out the 2.2 million, those documents, what effect, if

11  any, would that have on your ability to get a recall rate of

12  75 percent?

13       MR. DETTMER:  It would -- I don't -- we haven't done

14  it at this point, but it would certainly affect, probably very

15  negatively, our ability to do that in a way that I think is

16  both, you know, unfair -- I mean, look, Your Honor, we reviewed

17  all these documents.  I mean, these weren't bulk-coded

18  documents.  They weren't, you know, machine coded.

19       People went through -- Apple spent a ton of time and money

20  reviewing and coding these documents as responsive because, as

21  Epic admits, they're responsive and they're also relevant.

22       And if they were now, you know, at this late stage in the

23  game to be found not relevant or not responsive, even though

24  they are, that would create an enormous problem for our

25  production, our validation, and, in our view, be a

re-litigation of the production because, you know, we -- like I

said, we've spent a lot of time and money on this.

      **THE COURT:**  Do you have any numbers or percentages you

can give to me in terms of how -- if you had to just exclude

these documents from your validation review, what -- the

plaintiffs say or Epic Games says that if you include these

2.2 million, then your recall rate would actually be 57 percent

for every other type of document, which is pretty low and far

below 75 percent.  So they say it gets you an unfair easy pass.

    And do you have a conflicting argument?  Like, if we took

out these 2.2 million, we'd have to hit 98 percent or

something?  Do you have a response?

      **MR. DETTMER:**  I don't have a specific number, but I

guess I'm maybe not understanding Your Honor's point.  Because

the point I'm trying to make is that we would have to go back

and find, you know, a huge number of additional documents,

probably, that, you know, we shouldn't have -- in other words,

our recall rate would have to be significantly higher than it

already is, even though we've produced these, you know,

documents that are responsive and relevant to the case.

      **THE COURT:**  Can you explain that?

      **MR. DETTMER:**  Well, I mean, going back to first

principles again, our responsibility was to find documents that

are responsive and relevant and produce them.  And we, as I

said, spent a lot --

1          **THE COURT:**  I kind of don't want first principles.  I

2     want you to just spell out, operationally, if you had to ignore

3     those documents as part of the validation procedure, what would

4     that do?  How would that affect you?

5          **MR. DETTMER:**  Well, again, Your Honor, I don't have a

6     specific number of what the new validation -- what the

7     validation numbers -- how they would change if that happened.

8     They would certainly go down, and probably by a fair amount.

9          So we would have to go back and look at a bunch of

10    additional documents in order to then reraise -- and I would

11    say artificially reraise our -- our responsiveness rate, our

12    recall rate, so that we could match -- we could meet this.

13    And, honestly, that, one, is incredibly disproportionate to,

14    you know, our efforts in this case.

15         Second, given what we're doing right now -- and Your

16    Honor's seen some of this if you've read the briefing for next

17    week -- we're doing an enormous amount of work to just try to

18    meet the deadlines in this case, in the Epic case.

19         If we had to go back and re-review a whole bunch of

20    documents in order to, you know, make a new and different

21    validation number at this time, it would really dramatically --

22    it would dramatically change how we could try to meet these --

23    the deadlines in this case.

24         And I will say also, Your Honor, we -- we have produced

25    already something like 3.8 million documents in these combined

cases.  We will almost certainly have produced in excess of

4-and-a-half million documents, maybe as many as 5 million

documents by beginning of January when -- when we're supposed

to be largely completed.  Although, we've been talking with the

parties about continuing production after that.

Epic has talked about their production is likely going to

be under a million documents in total.  So, you know, the --

the proportional differences in productions here are just --

you know, just wildly different.

And Apple has really done significantly more than any of

the other parties to produce data, produce documents.  And for,

you know, Epic to demand more of us at this point is -- is just

unfair and, in our view, inappropriate.

**THE COURT:**  I see.  Okay.  Well, now I'm going to give

you your feedback that I want you to take and use in the meet

and confer.

I would like the parties to come up with a recall rate.

75 percent seems like a good one.  I'm not a fan of elusion

rates.  And I think it should be the same recall rate for the

two sides.

In terms of Epic Games, I do think the recall rate should

be measured against the documents that hit on the search terms,

because at the beginning everybody knew that's the only place

they were looking for relevant documents.  So I think in some

fashion the recall rate of 75 percent should be measured

against what hit on the search terms.

As for Apple, I hear what you're saying about including the 2.2 million documents.  The concern is that you're speaking in generalities and not specifics.  And you're saying the word "burdensome" but aren't able to put numbers or specifics on that, and so I just don't know what to do with any of that.

My strong inclination is that Apple should exclude the 2.2 million bulk of documents from the validation review because I think it makes it too easy for you to satisfy the 75 percent recall rate even if your identification of responsive documents is quite poor for other areas.

However, that comes with a big caveat, that if you can go crunch the numbers and come back to me and say, holy smokes, if we were to do that, here is the impact it would have on our validation procedures, and you describe with some detail an inappropriate burden that you shouldn't have to bear, then I'm certainly willing to listen to that.

But I would like to have some details and specifics about the impact that that would have, because it seems to me at a high level that these low-value documents that constitute the majority of your document production are not what we want to validate that you've produced a lot of.

However, this is without prejudice to Apple coming back with a more detailed and thorough explanation.  Because you do have deadlines coming up, I understand all of that, and I do

1   not want to impose a big burden on Apple just to do a

2   validation.  I really don't.  But if you can come up with

3   something more specific and detailed to me, I'm willing to

4   listen to that.

5        First of all, I think you should tell it to Epic Games.  I

6   think you should lay out, if we were -- during meet and confer,

7   if we excluded these 2.2 million documents, here,

8   operationally, is the effect it would have on our ability to

9   validate a 75 percent recall rate.

10       And then, Epic Games, you should listen to that and you

11  should take that seriously.  And if Apple describes a big

12  burden, I'm just going to tell you right now I'm not going to

13  make them do a big burden.  So you should listen to them

14  seriously.  And if they make a good case, with some details and

15  specifics, then I encourage you to agree.

16       And, Apple, if you don't make a good case, then they're

17  not going to agree and then, well, we'll be back in front of

18  me.

19       So I want you to take this guidance that I would like both

20  sides to do a 75 percent recall rate.  You see what I think the

21  denominator should be for Epic Games.

22       And for Apple, I think you have some work to do in

23  explaining why it would be a big problem to take out the

24  2.2 million documents and to explain that in more detail.  So I

25  think you should do that.

1      And then I want you to meet and confer.  And if you can

2   come up with an agreement on the validation procedure, then you

3   should do it.  And if you can't, then file another joint

4   discovery letter brief.

5      Let me ask Apple, do you want me to impose a deadline on

6   the parties, by date X, you either file a stipulation or you

7   file a joint discovery letter brief?  What do you think?

8      **MR. DETTMER:**  Well, Your Honor, I mean, given that,

9   effectively, you know, we need to have this resolved -- look,

10  Your Honor, we have not done a validation -- a final validation

11  yet because we don't have an agreement on what that should be.

12     So that's the reason why I don't have specific numbers for

13  you.  You know, we're going to need to get this resolved in the

14  next -- certainly, the next week because, otherwise, you know,

15  we're just not going to be able to produce these documents by

16  January 6th.

17     So, you know, we, I guess, are going to have to run, right

18  now, a validation based on what we have.  That will take a

19  couple of days.  And, you know, at that point we'll have to

20  meet and confer.

21     I mean, I -- I would be shocked, and I don't know, you

22  know, how we would be able to find enough additional documents

23  if these are just taken out.  So, you know, I'm -- I'm not

24  sure -- we're just going to have to get this resolved

25  immediately.  And I think the numbers are going to be dramatic

1   and show that we -- that this is going to create a real

2   problem.

3          **THE COURT:**  Well, if you can -- if the numbers are

4   dramatic and they show there's a real problem, then I won't

5   make you take out the 2.2 million.  But I want you to show me

6   that.

7      First show that to Epic Games.  And if they won't back

8   down, you can show it to me.  But the question is -- it sounds

9   like maybe I should impose a deadline for the parties to come

10  back.

11     And I see, Ms. Moskowitz, you think I should.

12         **MS. MOSKOWITZ:**  I do think that, Your Honor.  I think

13  that we have to resolve this quickly.  You have other disputes

14  coming to you, as you've already started to see.  We're

15  actually going to have more.

16     I was already going to ask Your Honor for another date on

17  the schedule before the holidays because by the time the

18  holidays are over, so is document production.  So I do think we

19  should resolve this and some other issues by -- by early next

20  week.

21         **THE COURT:**  Okay.  I think, Apple, you have the most

22  work to do in terms of going forward.  When do you want the

23  deadline that the parties either file their validation

24  procedure that they agree on or a joint discovery letter brief?

25         **MR. DETTMER:**  Well, I think we can probably get the

1   validation work done, I would say, probably in the next couple

2   of days.

3        So, you know, we can try to meet and confer and submit

4   something to you -- I guess we could try to do it by the end of

5   the day Tuesday.  I think that's going to be very -- I'm

6   sorry -- by the end of the day Monday.  I think that'll be

7   really challenging to do.

8        Maybe, since we're on calendar with you on Tuesday, we

9   could talk about it then.  I think it's going to be challenging

10  to get that work done between now and then, but we'll all work

11  together and try to do it.

12        **THE COURT:**  All right.  Then what if I order this?

13  What if I order the parties to meet and confer, and then by the

14  end of the day on December 14th either file a stipulation and

15  proposed order with an agreed validation procedure or file a

16  joint discovery letter brief with competing proposed orders.

17        Apple, do you think you could live with that?

18        **MR. DETTMER:**  I think so, Your Honor.  I think we can

19  get the validation done in a couple of days.  And then we'll

20  just have to meet and confer, you know, immediately after that,

21  probably over the weekend, and then try to submit something on

22  Monday.

23        And then perhaps we can add this to the agenda for

24  Tuesday, if that's all right with Your Honor.

25        **THE COURT:**  That sounds great.

1     And, Epic Games, do you think that time frame works for

2     you?

3          MS. MOSKOWITZ:  Absolutely.  We will make ourselves

4     available over the weekend to meet and confer.

5          THE COURT:  Okay.  So that's my order.  I order the

6     parties to meet and confer.

7          And then by the end of the day on December 14th, I order

8     you to either file a stipulation and proposed order with an

9     agreed validation procedure or you to file a joint discovery

10    letter brief attaching competing proposed orders for validation

11    proposal.  And then we will add this to the agenda for

12    December 15th.

13         MS. MOSKOWITZ:  Your Honor, may I ask a very silly

14    question?  "End of day" for you, does that mean 12:00 a.m. or

15    does that mean 5:00 p.m. West Coast time?  I know that there

16    has been some question on what that means.

17         THE COURT:  It means 11:59 p.m. California time.

18         MS. MOSKOWITZ:  Thank you.

19         THE COURT:  Sometimes lawyers don't want it to mean

20    that, but --

21         MS. MOSKOWITZ:  Especially the East Coast people.

22         THE COURT:  But you can file it earlier if you want

23    to.

24         And let me just tell my courtroom deputy, Rose, I'm not

25    planning to issue a written order coming out of this hearing,

so let's just state this in the minutes.

Okay.  All righty.  Well, this covers the agenda I had for today's hearing.

Let me ask Epic Games, do you have anything further that we should talk about at this hearing?

**MS. MOSKOWITZ:**  Your Honor, only the issue I mentioned very briefly.  Apple and class plaintiffs and Epic are continuing to meet and confer on a number of additional potential discovery disputes, including deposition limits and the like.

Is it possible to set some time and a deadline similar to what you just did for this -- this issue, for us to resolve or reach impasse on those issues and get something on the calendar before, say, the 21st or 22nd, before everyone goes away for the holiday?

Obviously, we hope that we can resolve, but if we can't, we'd like to get --

**THE COURT:**  That's fine.  Can you put more meat on the bones of what these issues are?  If I say you have a deadline of date X to meet and confer, you know, about these issues, maybe your opponents might not agree about what that applies to.

**MS. MOSKOWITZ:**  Sure, Your Honor.  Thank you.

The main issue is deposition limits.  The plaintiffs have coordinated and proposed a list of 18 specific Apple party

1  witnesses that we intend to depose.  We've already had a meet

2  and confer on that.

3       We do not believe that we are likely to agree on what the

4  limit should be for Apple witnesses, and so that's one very

5  specific issue that we, as a group of plaintiffs, think is

6  absolutely critical so we can start in earnest taking these

7  depositions and know how to prioritize.

8       So that is something we think really does need to be

9  addressed sooner rather than later, even before we close

10  discovery, because they're going to just start getting

11  scheduled.

12       THE COURT:  Remind me, what's the date of the close of

13  fact discovery?

14       MS. MOSKOWITZ:  Close of fact discovery for the Epic

15  versus Apple case is February 15th, and the close of documents

16  January 6th, Your Honor.

17       THE COURT:  I see.  Okay.  That's a lot of

18  depositions.  You'll be busy this winter.

19       MS. MOSKOWITZ:  We will.

20       THE COURT:  Okay.  So you want a date certain to

21  either agree or file the joint discovery letter brief regarding

22  the number of depositions in Epic Games v. Apple.  Is that

23  right?  Or do you mean all three cases?

24       MS. MOSKOWITZ:  All three cases were -- the list was

25  coordinated, and so we are prepared to coordinate with class

plaintiffs on that.  And so I think that would be across all
three actions for us to take the 18 depositions.  Or maybe we
agree on a lower number, but something more than ten,
certainly, for all three cases against -- for the Apple
witnesses.

        **THE COURT:**  All right.  And, Apple, let me have your
thoughts not on a substantive issue of how many depositions
there should be, but on whether I should set a deadline for
either an agreement or a disagreement and then schedule a
hearing.

        **MR. DETTMER:**  Sure, Your Honor.  The state of play is
that we've asked the plaintiffs to give us, sort of a witness
by witness, what is it about this witness that you think is
relevant and why should they be included or not included within
that.

    We've not said -- you know, the -- there's obviously a
ten-deposition assumption, but we're certainly willing to go
above that if, you know, the particular witnesses make sense,
and we can talk about it.

    We have not gotten that kind of specific, you know, this
witness should be deposed because blah, blah, blah, in order to
have that fulsome meet and confer about whether the list should
be 10 or 12 or 14 or 18.

    And so our position is that we should have that
discussion.  And in order to do that, we need that information

1    from the plaintiffs.

2         **THE COURT:**  Well, let me ask plaintiffs, is that

3    something that you feel that you need to or plan to provide to

4    Apple?  Or sometimes people say, well, until we have your

5    documents, we don't know.

6         **MS. MOSKOWITZ:**  Your Honor, we -- we have had a bit of

7    discussion on that, Your Honor.  And, obviously, I don't want

8    to steal all the other plaintiffs' thunder, but we have had a

9    discussion about that.

10        These are all document custodians.  We've talked

11   extensively about how we think Apple already knows why we want

12   these depositions.

13        We are open to having further conversation, but the issue

14   is that Apple wants us to just start taking them and hit ten

15   and then see where we are.  And, obviously, as a group of three

16   sets of plaintiffs with our own counsel and our own interests,

17   we just can't do it.

18        So that's why we're prepared to talk about these

19   individuals, but we don't really think Apple is actually

20   unclear on why we want these folks.

21        **THE COURT:**  I see.  All right.  Well, let me let the

22   other plaintiffs speak.

23        **MR. LOPEZ:**  So, Your Honor, for the developers, first

24   of all, I understand that you don't want to get into too much

25   detail here, but Mr. Dettmer did indicate something about a

ten-deposition presumptive limit.  And there is no such limit.

That's not memorialized in any of the orders issued by the

Court in the class cases or, to my knowledge, in Epic as well.

     And, of course, there are three very separate cases with

different needs.  We are doing our best to coordinate, as

Ms. Moskowitz said, but this notion that we start at the basis

of ten is simply not true.

     So we do need, unfortunately, to scramble on these

depositions thanks to this accelerated schedule in the Epic

trial.  And, you know, we're forced into doing this out of

order, basically, in terms of our cases.

     So we're very sensitive to prejudice accruing simply

because of this accelerated schedule that Apple and Epic have

agreed to.  That's very problematic.  That's one of the reasons

we raised the issue of an extension with Apple and then with

your court as well as our district judge, as well, Judge

Gonzalez Rogers.

     So it's all of the piece.  It's extremely complicated at

this point.  You know, as Ms. Moskowitz has indicated, these

are not obscure witnesses.  They are very frontally relevant

witnesses.

     And, you know, this notion that somehow we have to provide

yet more and more and more justification for these witnesses,

given this accelerated schedule, is just really unfair to the

class plaintiffs.

1      And I don't know if you'd like to hear from me now, but I

2  also had a couple of comments, quickly, to make with regard to

3  the first part of the hearing, but I'll stop now if you want me

4  to defer on that.

5          **THE COURT:**  All right.  Thank you.

6      Ms. Byrd, did you want to add anything?

7          **MS. BYRD:**  I didn't have anything to add substantively

8  to what Mr. Lopez has already said.  I would just ask the Court

9  to put a short leash on this dispute.  We do need to start

10  taking depositions.

11      And we had a meet and confer for over an hour yesterday.

12  I don't -- I don't really have high hopes that we're going to

13  resolve it by continuing to meet and confer for another two

14  weeks.  And that will just put us in a really bad position.

15          **THE COURT:**  Okay.  I'm looking at my calendar.  And

16  let me ask plaintiffs to propose the deadline by which the

17  parties either reach an agreement or file a joint discovery

18  letter brief.

19          **MS. MOSKOWITZ:**  Your Honor, I think, given that

20  depositions are already starting next week -- I believe the

21  first one is on the 18th, if I'm not mistaken -- we would

22  appreciate if we could also brief this early next week and get

23  on the calendar either on the 15th -- I don't know if you're

24  already too jammed up with the disputes we already have, but

25  there is actually one on the 16th as well.  I apologize.

1    So the first one is that Wednesday.  So if we could get

2    before you on the 15th and combine it, that would be great,

3    because then we'll have the guidance we need going into our

4    first deposition, which, if we don't have that certainty,

5    that's a risk for us to take that deposition if it's going to

6    count against a limit we're not sure we're going to be

7    comfortable with.

8            **THE COURT:**  Okay.  That works for me.

9        But let me ask Apple, can you do that?

10           **MR. DETTMER:**  I suppose we can, Your Honor.  I guess

11   my concern is just what I said before, is that I don't know if

12   this is actually a dispute.

13       And if, you know, the plaintiffs would come to us and say,

14   you know, in these -- these discovery coordinated cases where,

15   you know, the federal rules provide a ten-deposition limit and

16   we have indicated we are open to more and are very happy to

17   talk about it, but we despite, you know, asking many times have

18   not gotten sort of specific, you know, we think this witness is

19   important because.

20       And, certainly, it's true that some of these witnesses we

21   know they're going to want to depose, but others we don't

22   really know why.  And that's something I think we could talk

23   about and take disputes off the table if plaintiffs would have

24   that sort of more full conversation with us.

25           **THE COURT:**  Just so you know, in case it aids your

1    meet and confer efforts, we do have three lawsuits.  Although

2    they have been coordinated, those are three lawsuits.  And the

3    Rule 30 limit at ten is per case.

4        So I do not start with the assumption that the plaintiffs

5    are limited to ten depositions for these cases that are related

6    to each other.  Just to help the discussion.

7        But let me see.  Okay.  I think that a joint discovery

8    letter brief by end of the day December 14th, concerning

9    deposition limits, that's a good idea.

10       But to make it persuasive, I think the plaintiffs are

11   going to want to say -- to explain to me who you want to depose

12   and why, the very thing that Apple is really asking you as

13   well.  If you just say 18 and Apple says 10, and I don't really

14   have information more than that, it's difficult for me to make

15   an informed decision.

16       So I think even if you don't feel obligated in meet and

17   confer to give Apple the kind of information that Apple is

18   asking for, I will want it.  So I think it's to your advantage

19   to first give it to Apple and see if it satisfies them.  And if

20   not, I'm going to want to see it in a letter brief.

21       So let's talk about page limits.  The default is five

22   pages, where each side gets two and a half pages.  If you're

23   going to need to talk a lot about witnesses -- let me ask

24   plaintiffs -- should we expand the page limits on this

25   discovery letter brief?

1           **MS. MOSKOWITZ:**  Yes, Your Honor.  I think we

2    understand that you would need to see some backup for why we

3    need these witnesses.  And we will have trouble doing that for

4    each of 18 people in the 2.5, so we welcome additional space.

5    Or, even, we could do an appendix that walks through the

6    witnesses one by one, sort of separate from the briefing.  Open

7    to however Your Honor would find it most helpful.

8           **THE COURT:**  I think just putting it in the joint

9    discovery letter brief is good.

10      Do you have a suggestion for page limits?

11          **MS. MOSKOWITZ:**  Five?  Is that too much?

12          **THE COURT:**  So ten pages total, five for each side?

13      Apple, what do you think?  Does that work for you?

14          **MR. DETTMER:**  Sure, Your Honor.  Again, I do think we

15   could resolve most of this, if not all of it, if we just had

16   this discussion in advance.  But -- but assuming we can't, then

17   I think that page limit probably makes sense.

18          **THE COURT:**  Okay.  Then -- okay.  Then I'm going to

19   order the parties to meet and confer about deposition limits.

20   And if you can't reach an agreement, then by end of the day

21   Monday, December 14th, I order you to file a joint discovery

22   letter brief, not to exceed ten pages, with five pages per side

23   concerning deposition limits.

24      And we will set this, as well, for the agenda on

25   December 15th.  It'll be a big day, but -- okay.

1              **MS. MOSKOWITZ:**  Thank you, Your Honor.

2              **THE COURT:**  Anything further that the plaintiffs would

3      like to discuss at this hearing?

4              **MR. LOPEZ:**  Your Honor, just for the record, I wanted

5      to indicate, as well, with regard to the TAR protocol, that

6      this issue with the 2.2 million form documents is one that also

7      is very important to the class plaintiffs.

8          It was developers who first discovered that there were

9      this many form emails out of the entire production.  And, of

10     course, you know, we didn't know exactly what Apple was doing

11     in the background with regard to validation or anything like

12     that, and so this issue surfaced for us as well, and it's near

13     and dear to us too.

14         And I'd just like to point out that while, again, Apple

15     and Epic are on this accelerated schedule, the class plaintiffs

16     had a substantial completion deadline of July 31st.  In our

17     view, Apple blew past that considerably.

18         But our discovery cutoff is not until -- I believe it's 60

19     days after the class cert date, or a decision is made,

20     actually.  And the class cert hearing, as of now, is scheduled

21     for June of next year.

22         So I understand that, you know, we have to try to push in

23     light of the Epic and Apple schedule, but, by the same token,

24     we don't want to be prejudiced by this rush to trial that's

25     going on between Epic and Apple.

1          So to the extent that there's a consideration here about

2     what should happen, and it's all driven by this

3     January 6th date, I simply wanted to register for the record

4     how very concerned we are about simply making the decision

5     largely based on that January 6th deadline.

6          **THE COURT:**  Okay.  Thank you.  That's a good point,

7     and thank you for pointing it out that you do have quite a

8     different fact discovery deadline in the developer class

9     action.

10          **MR. DETTMER:**  Your Honor, may I just respond briefly

11    to that --

12          **THE COURT:**  Sure.

13          **MR. DETTMER:**  -- because the class plaintiffs have

14    said this repeatedly, as has Epic, about this substantial

15    completion deadline in July.

16          You know, we -- we produced -- Apple produced about

17    3.7 million documents by that date and since then has produced

18    approximately another 100-, 150,000 documents.

19          So you know, substantial completion is obviously not

20    complete completion.  And, you know, the sort of very small

21    percentage of additional documents we've produced beyond that

22    is cleanup documents, many in response to, you know, questions

23    and further requests from the class plaintiffs.  So, you know,

24    I think that's not an issue.

25          And I do want to make one more pitch, Your Honor, if I may

1   on the 2.2 million documents, which is just this:  I mean, it

2   has been acknowledged that the documents are responsive.  And

3   it is clear to us that they're relevant.

4        And I think if, Your Honor, we can't count those documents

5   as responsive, it puts us -- and, frankly, any responding

6   party -- in a real bind, right, that we should be in a position

7   to say here we have documents that are responsive and relevant,

8   but we may be penalized in the validation process by producing

9   them.

10        And it creates this very difficult judgment issue of

11   should we produce these documents or not in light of that

12   tension.  And, in our view, there really isn't the choice but

13   to produce relevant and responsive documents.

14        **MS. MOSKOWITZ:**  Your Honor, may I offer one -- I'm

15   sorry, I know you're probably done with us, but if I could just

16   offer one, maybe, clarification.

17        We're actually -- we have the same situation.  We have

18   some bulk documents that we're proposing to just exclude those

19   from both the numerator and the denominator as if they didn't

20   exist.  Not to say that you have to count them on one side.

21   It's just pretend they don't exist, and just look at the rest

22   of the documents and calculate a pure recall on those

23   documents.  And that's exactly what we're willing to do for

24   this reason.

25        So I don't think it actually skews anything other than

1  making sure that the actual map is being done and the

2  responsiveness review is being done on actually unique

3  documents and not the bulk coded.  I don't know if that was

4  already obvious to everyone, but I wanted to at least make it

5  clear.

6          **THE COURT:**  Well, okay.

7          **MR. DETTMER:**  Your Honor --

8          **THE COURT:**  Hold on one second.

9      That is what I was assuming, that they would be excluded

10 from both enumerator and denominator.  And I should have spoken

11 more bilaterally rather than only focusing on Apple, but I was

12 assuming it would apply to Epic Games as well.

13     You can respond now, Mr. Dettmer.

14         **MR. DETTMER:**  Sure, Your Honor.  And I was an English

15 major in college and not a statistician, and I had the same

16 reaction, saying, if we exclude them from the numerator and the

17 denominator it shouldn't make any difference; right?

18     And the statisticians who we're working with say, no,

19 that's not the case.  It actually makes a substantial

20 difference in how the math is done and is, in fact -- you know,

21 really will change the validation calculation.

22         **THE COURT:**  Oh, and that's exactly why I want you to

23 talk to the statisticians more and get numbers like that, you

24 know, to make a real showing.  Because I felt like today you

25 were speaking in TAR generalities, which is fine, but it's just

1    that you could very well be right, that doing that has some

2    sort of bizarre statistical effect that would make it

3    inappropriate to exclude them.  I just need you to demonstrate

4    that.

5         First meet and confer.  And then if you can't agree, then

6    demonstrate that to me.  I think that would help to move the

7    ball forward.

8              **MR. DETTMER:**  Thank you, Your Honor.

9              **THE COURT:**  Is there anything further that Apple would

10   like to raise at this hearing?

11             **MR. DETTMER:**  No, Your Honor.  Just the point that I

12   raised of the workability of this solution with respect to how

13   responsive relevant documents are treated, and which relevant

14   responsive documents count and which ones don't.  To me, it

15   becomes a very difficult standard to employ and a difficult one

16   to use in cases going forward both for us and for others.

17             **THE COURT:**  Okay.  Well, again, if you can demonstrate

18   that.  I'm not going to make you do something crazy and

19   burdensome.  I just need you to show me that it would be crazy

20   and burdensome.  I mean, crazy is a high standard.  Just, you

21   know, that it would be inappropriately burdensome.  That's what

22   I need you to show.

23        And that just didn't come through in the letter brief or

24   in the discussion today.  But maybe after you talk to your

25   statisticians and to your TAR expert, you can flesh that out a

1   bit more.

2       All right.  Well, again, I'm not going to issue a written

3   order coming out of this hearing.  The transcript will reflect

4   what I've ordered in terms of the letter briefs that are due on

5   December 14th and what's been added to the agenda for

6   December 15th.

7       So thank you, all, Counsel, and have a good afternoon.

8           **MR. DETTMER:**  Thank you, Your Honor.

9           **MS. MOSKOWITZ:**  Thank you very much, Your Honor.

10          **MR. LOPEZ:**  Thank you, Your Honor.

11      (At 1:59 p.m. the proceedings were adjourned.)

12                      - - - - -

13

14                  **CERTIFICATE OF REPORTER**

15      I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17   DATE: Thursday, December 10, 2020

18

19

20   *Katherine Sullivan*

21   _____

22      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                 U.S. Court Reporter

23

24

25