**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# Exhibit 6



Ted Wojcik
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2ND AVE #2000
SEATTLE, WA  98101
www.hbsslaw.com
Direct (206) 268-9329
tedw@hbsslaw.com



Rachele R. Byrd
byrd@whafh.com

Tel: 619-239-4599
Wolf Haldenstein Adler Freeman & Herz LLP
750 B Street, Suite 1820, San Diego, CA 92101
www.whafh.com

October 19, 2020

<u>*Via Email*</u>

Eli Lazarus
elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

Re:   *Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR
         *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR
         <u>Additional Document Custodians</u>

Dear Eli:

We write to further meet and confer about Apple's designated document custodians.

On February 25, 2020, Plaintiffs sent Apple a letter requesting that a number of additional parties be added as document custodians. By letter dated March 5, 2020, Apple refused Plaintiffs' demand, stating that, while it "remain[ed] open to discussing potential additional custodians," it would not add any unless plaintiffs "identif[ied] some unfilled information gap in the custodians that Apple has already proposed[.]" On July 31, 2020, Apple represented to Plaintiffs that it had "substantially completed" production of its custodial documents. Since that time, however, Apple has continued to make large document productions; most recently, on September 20, 2020 and October 9, 2020, Apple produced approximately 1.75 million and 167,000 pages of documents, respectively, in response to Plaintiffs' ongoing demand that it supplement its production of documents related to the costs and expenses of running the App Store.

Meanwhile, Plaintiffs have done additional research, and have worked diligently to review the adequacy of Apple's document production. Plaintiffs have also waited for Apple to substantially complete production before renewing their requests. Based on their research and

October 19, 2020
Eli Lazarus
Page 2

investigation, including substantial review of the documents so far produced (including Apple's productions since September 20), Plaintiffs believe that the following six people are likely to possess additional relevant, responsive documents: Tim Cook, Steve Jobs, Luca Maestri, Scott Forstall, Greg Joswiak, and Ann Thai.  Plaintiffs therefore request that they be designated as document custodians.  Please identify a time in the next week for the parties to meet and confer on this issue; we propose Thursday, October 22, at 10 a.m. PST. We ask that Apple specify its position on adding these proposed custodians on that call.

As discussed in detail below, searches of these custodians' files are likely to yield relevant, discoverable, and non-duplicative documents.  *See Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 269 F.R.D. 609, 620-21 (S.D.W.V. 2010) (production ordered from additional custodians where some documents could be duplicative, but "it is reasonable to believe they will have" other documents that are relevant and non-cumulative); *Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *12-16 (N.D. Ill. Sept. 28, 2012) (ordering production from 8 more custodians from each of two defendants in addition to the 75 and 28 already searched).  Furthermore, a search of these custodians' files would be neither "unduly expensive, time consuming, [nor] otherwise disproportionate to the needs of the case" under Rule 26(b)(1).  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."); *Strategic Partners, Inc. v. FIGS, Inc.*, No. CV 19-2286-GW (KSX), 2020 WL 2527056, at *7 (C.D. Cal. Feb. 6, 2020).

1. **Tim Cook**

Since 2011, Mr. Cook has been the CEO of Apple.

Recent events have made plain Mr. Cook's relevance to this case.  As Apple knows, Mr. Cook was recently called to testify before Congress regarding Apple's App Store policies—and whether those policies run afoul of U.S. antitrust law—in conjunction with an investigation into competition in digital markets by the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial and Administrative Law (the "Subcommittee").[1]  As part of the Subcommittee's investigation, Mr. Cook was identified as a "relevant executive," and his communications were the subject of a request for information.[2]  Among other things, the

---

[1] *Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2020), available at https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=3113.

[2] *See* Subcommittee on Antitrust, Commercial, and Administrative Law, *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations*, United States House of Representatives Committee on the Judiciary (Oct. 6, 2020) at 24 & n.47 (hereafter "Subcommittee Report"), available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

October 19, 2020
Eli Lazarus
Page 3

Subcommittee Report (1) notes that Mr. Cook "told the Subcommittee that Apple has no plans to open iOS to alternative app stores"[3]; (2) emphasizes Mr. Cook's goal of "doubl[ing] the size of the Services business by the end of 2020"[4]; and (3) demonstrates, more broadly—by way of repeated cites to Mr. Cook's testimony before Congress—that Mr. Cook is keenly aware of, and conversant in, many of the issues at the heart of Plaintiffs' cases, including: Apple's commission structure[5] (and practice of granting exceptions to certain businesses[6]), in-app payment system[7], app review process[8], competition against app developers (or "Sherlocking")[9], App Store guidelines[10], as well as the enforcement of those guidelines.[11] It is likely that Mr. Cook possesses a wide variety of unique, responsive documents related to these and other topics.

So far, Apple has produced only a small number of emails that include Mr. Cook as a sender or recipient. But consistent with the above, those few emails so far provided support Plaintiffs' belief that a search of Mr. Cook's custodial files would be likely to provide unique relevant information. For example, Mr. Cook:

- participates in discussions of the long-term feasibility of Apple's 30% commission and growth of its Services division[12], including discussions of potential changes to Apple's revenue share model[13];
- receives and closely reviews all App Store "scorecards," which track in detail various App Store-related profitability and user metrics[14], and closely monitors App Store revenue growth[15];

---

[3] *See id.* at 96, 337.

[4] *Id.* at 337.

[5] *Id.* at 344 & n.2156.

[6] *Id.* at 352 & n.2211.

[7] *Id.* at 357 & n.2247.

[8] *Id.* at 363 & n.2297.

[9] *Id.* at 365 & n.2311; 368 & n.2329.

[10] *Id.* at 369, 372-73 (noting, among other things, Mr. Cook's direct involvement in the receipt of preferential treatment by Chinese company Baidu).

[11] *Id.* at 374 & nn.2376-77.

[12] *See* APL-APPSTORE_07174822-APL-APPSTORE_07174832.

[13] *See* APL-APPSTORE_02024847-APL-APPSTORE_02024848 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[14] *See, e.g.*, APL-APPSTORE_02786198-APL-APPSTORE_02786199; APL-APPSTORE_02786194-APL-APPSTORE_02786195.

[15] *See, e.g.*, APL-APPSTORE_00315350.

3

October 19, 2020
Eli Lazarus
Page 4

- reads emails sent from both users and developers, indicating close attention to the App Store generally[16];
- receives yearly "business update" presentations that contain comprehensive and granular detail on all aspects of the App Store, including "focus areas" for each fiscal year, profit and loss figures, and headcount requests.[17]

Finally, as Epic Games notes in a recent filing, Apple has "repeatedly relied" on both Mr. Cook and former CEO Steve Jobs in its briefing of the temporary restraining order and preliminary injunctions sought by Epic.[18]  This further supports the inference that he is likely to possess unique documents relevant to this case.

### 2. Those maintaining the custodial files of Steve Jobs

Until his death in 2011, Mr. Jobs was the CEO of Apple.

As with Mr. Cook, the Subcommittee's recent report underscores Mr. Jobs' role in key decisions that shaped the App Store as it exists today.  Many of these decisions are at the heart of this case, and are likely memorialized in unique, responsive documents that have yet to be produced to Plaintiffs.  For example, the report notes Mr. Jobs' advocacy of an approach to the App Store's development deliberately focused on locking customers in to Apple's ecosystem[19], public discussion of the App Store's commission structure[20] and approach to competition.[21]  It also makes repeated, express reference to internal Apple documents that include Mr. Jobs and are relevant here:

> Internal Apple communications reviewed by Subcommittee staff indicate that Apple has leveraged its power over the App Store to require developers to implement IAP or risk being thrown out of the App Store.  Then-Apple CEO Steve

---

[16] APL-APPSTORE_03111828.

[17] *See, e.g.*, APL-APPSTORE_09086182-APL-APPSTORE_09086412 (FY'20 budget deck).

[18] *See* Joint Case Management Statement at 10, ECF No. 120, *Epic Games v. Apple*, 4:20-cv-05640-YGR (Oct. 12, 2020).

[19] Subcommittee Report at 103-04 ("Apple's co-found and former CEO Steve Jobs advocated this approach, noting that Apple should '[t]ie all of our products together, so we further lock customers into our ecosystem.'") (quoting Don Reisinger, *Steve Jobs wanted to 'further lock customers' into Apple's 'ecosystem'*, CNET (Apr. 2, 2014), https://www.cnet.com/news/steve-jobs-wanted-to-further-lock-customers-into-apples-ecosystem/).

[20] *Id.* at 344 ("Prior to the App Store's debut in 2008, then-Apple CEO Steve Jobs explained 'We don't intend to make any money off the App Store . . . We're basically giving all the money to the developers and the 30 percent that pays for running the store, that'll be great.'") (Peter Cohen, *'App Store' will distribute iPhone software*, MACWORLD (Mar. 6, 2008), https://www.macworld.com/article/1132402/appstore html.

[21] *Id.* at 364.

October 19, 2020
Eli Lazarus
Page 5

> Jobs once explained, "there will be some roadkill because of it. I don't feel guilty" when confronted with developer complaints about Apple's commission and requirement to use IAP. The Netherlands Authority for Consumers and Markets (ACM) has noted that some app developers attribute Apple's inconsistent application of its rules to inattention to apps that are infrequently updated, and that Apple likely focuses on requiring IAP for high revenue-generating apps.[22]
>
> . . .
>
> In Apple's internal documents and communications, the company's senior executives previously acknowledged that IAP requirement would stifle competition and limit the apps available to Apple's customers. For example, in an email conversation with other senior leaders at Apple about whether to require IAP for e-Book purchases, then-CEO Steve Jobs concluded, "I think this is all pretty simple—iBooks is going to be the only bookstore on iOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from iOS without paying us, which we acknowledge is prohibitive for many things."[23]

The limited number of emails so far produced that include Mr. Jobs as a sender or recipient confirm Mr. Jobs' central role making key decisions that bear on this case. For example, Mr. Jobs:

- is referenced in early discussions among key executives as having "agreed to do in-app purchases for Kirkwood,"[24] discussions that also touch on the fundamental features of the App Store's IAP system[25] as it continues to exist today;
- actively monitored App Store competitors, including the Amazon Android App Store, and in at least one instance played a role in drafting a public statement distinguishing the two[26]; and

---

[22] *Id.* at 348 (emphasis added) (footnotes omitted).

[23] *Id.* at 350-51.

[24] On information and belief, Kirkwood was a name used by Apple employees to refer to a then-forthcoming version of the iOS operating system.

[25] *See, e.g.*, APL-APPSTORE 03178435-APL-APPSTORE_03178436 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[26] *See* APL-APPSTORE_07175717.

5

October 19, 2020
Eli Lazarus
Page 6

- played an active role in a variety of topics related to the App Store, including subscriptions[27] (and the distinction between various kinds of apps[28]).

### 3. Luca Maestri

Mr. Maestri is Apple's Chief Financial Officer.

As with Mr. Cook, Mr. Maestri was among the "relevant executives" identified by the House Subcommittee.[29] Consistent with this, the limited number of emails so far produced that include Mr. Maestri as a sender or recipient confirm that he is likely to possess unique, responsive documents containing App Store-related financial information, including profit and loss information. For example, Mr. Maestri:

- is keenly attentive to the App Store's finances and performance. Specifically, Mr. Maestri appears to receive all App Store "Scorecards" (which track the App Store's performance in granular detail), and often follows up with questions regarding the store's performance.[30]
- receives key documents that include business update and financial impact information about App Store and App Store-related developments[31]; and
- participates in discussions of the long-term feasibility of Apple's 30% commission and growth of its Services division.[32]

Other publicly available documents indicate that Mr. Maestri likely possesses detailed knowledge of relevant financial information, including the profitability of various subsets of Apple's "Services" division (which includes the App Store). For example, on a 2018 earnings call, Mr. Maestri stated: "At the same time, within the services portfolio that we have, we have services that have different levels of profitability, so we also need to take into account the mix of

---

[27] *See* APL-APPSTORE_06620268-APL-APPSTORE_06620273

[28] *See* APL-APPSTORE_07096874-APL-APPSTORE_07096878.

[29] Subcommittee Report at 24 & n.47

[30] *See, e.g.*, APL-APPSTORE_00227526-APL-APPSTORE_00227531; APL-APPSTORE_02842994-APL-APPSTORE_02842995.

[31] *See, e.g.*, APL-APPSTORE_07228182-APL-APPSTORE_07228184

[32] *See* APL-APPSTORE_07174822-APL-APPSTORE_07174832; *see also infra* note 12.

6

October 19, 2020
Eli Lazarus
Page 7

services we're going to be selling."[33]  Mr. Maestri's familiarity with these topics also makes it likely that his files contain unique documents relevant to an ongoing dispute between the parties regarding cost and expense documents—specifically, Apple's failure to provide (among other things) a complete set of App Store "budget decks" containing detailed financial information about the App Store.[34]  Given that Apple has represented that it does not have structured cost and expense data for the App Store, the deficiencies identified by Plaintiffs in the cost and expense data produced, and the high relevance of this type of financial information to Plaintiffs' antitrust claims, Mr. Maestri should be added as a custodian.

   **4. Scott Forstall**

Between 2007 and 2012, Mr. Forstall was the senior vice president of iOS software at Apple.

The limited number of emails so far produced here that include Mr. Forstall as a sender or recipient demonstrate that Mr. Forstall was, up until the time of his 2012 departure from Apple, centrally involved in discussions about competing marketplaces, including Android Marketplace[35], Google Play[36], the Amazon Appstore[37], and others (like PSP Go[38]), and about app store competition more broadly.[39]  Mr. Forstall was also involved in critically important early decisions regarding in-app purchases ("IAP")[40], as well as topics like discoverability and

---

[33] Stephen Nellis, *Apple services segment faces margin, competitive challenges*, REUTERS (May 2, 2018), https://fr.reuters.com/article/us-apple-services-idUSKBN1I32KX.

[34] *See* APL-APPSTORE_08882981-APL-APPSTORE_08883132 (sample deck).

[35] *See* APL-APPSTORE_00041334-APL-APPSTORE_00041337 ███████████████ ; APL-APPSTORE_05281180-APL-APPSTORE_05281213 (similar).

[36] *See, e.g.*, APL-APPSTORE_00066037-APL-APPSTORE_00066038 ██████████ APL-APPSTORE_06008961-APL-APPSTORE_06008963 ████████████.

[37] APL-APPSTORE_04726304-APL-APPSTORE_04726310 ████████████.

[38] *See* APL-APPSTORE_00320956-APL-APPSTORE_00320957 (████████████).

[39] *See, e.g.*, APL-APPSTORE_04692401-APL-APPSTORE_04692413 ████████████.

[40] *See, e.g.*, APL-APPSTORE_03178435-APL-APPSTORE_03178436 (████████████; APL-APPSTORE_07175756-APL-APPSTORE_07175757 ████████████

search.[41] He is likely to possess unique, responsive documents related to these topics—including Apple's understanding of the scope of the market, competition in the market, and Apple's business decisions in light of its views of the market and competition—which are critically important to this antitrust case.

   **5. Greg Joswiak**

Greg Joswiak is the former Vice President of iPhone Product Marketing, and is currently Senior Vice President of Worldwide Marketing.

The limited number of emails so far produced here that include Mr. Joswiak as a sender or recipient demonstrate that he regularly discusses App Store financial information[42] and competition—including competition among marketplaces in particular—with a small number of senior executives[43]. Other emails indicate that Mr. Joswiak is regularly involved in high-level discussions about subjects like fast-tracking apps for approval[44], App Store marketing[45], and exceptions to Apple's standard 70/30 commission[46]. Mr. Joswiak also closely monitors various App Store metrics, like downloads and user base growth.[47] He is likely to possess unique, responsive documents related to these topics.

---

[41] *See* APL-APPSTORE_00241310 ▮▮▮.

[42] *See, e.g.*, APL-APPSTORE_00231027; APL-APPSTORE_00221052-APL-APPSTORE_00221054; APL-APPSTORE_00221411. ▮▮▮ *See* APL-APPSTORE_00042263-APL-APPSTORE_00042264

[43] *See, e.g.*, APL-APPSTORE_00208618 ▮▮▮ APL-APPSTORE_00066037-APL-APPSTORE_00066038 ▮▮▮ *see also* APL-APPSTORE_00315294; APL-APPSTORE_00315651; APL-APPSTORE_00320585; APL-APPSTORE_00321373; APL-APPSTORE_00340640-APL-APPSTORE_00340644.

[44] APL-APPSTORE_00220933-APL-APPSTORE_00220934 ▮▮▮.

[45] APL-APPSTORE_00223112-APL-APPSTORE_00223113 ▮▮▮.

[46] APL-APPSTORE_01993708-APL-APPSTORE_01993709 ▮▮▮.

[47] *See, e.g.*, APL-APPSTORE_00227604 ▮▮▮.

October 19, 2020
Eli Lazarus
Page 9

### 6. Ann Thai

Ann Thai is Director of Product, App Store. She also has a long history of being responsible for various important App Store business functions.

The limited number of emails so far produced here that include Ms. Thai as a sender or recipient demonstrate that she is likely to possess additional unique, responsive documents related to a variety of topics. For example, many of Ms. Thai's emails:

- discuss relevant topics like subscriptions[48] and games[49] in detail, and indicate that Ms. Thai plays a role in presenting this information directly to Mr. Cook. In particular, Ms. Thai also appeared to play a significant role in the launch of Apple's so-called "Subscriptions 2.0" model, as part of which Apple lowered its commission rate to 85/15 for subscriptions after one year[50];
- indicate close attention (both by Ms. Thai and her team) to other competing platforms[51], as well as global app store competition[52]; and
- demonstrate that Ms. Thai and her team play a central role in reviewing developers' requests for exemptions from Apple's IAP rules.[53]

**Conclusion**

Plaintiffs look forward to Apple's response to these time-sensitive matters, and request that Apple respond to this proposal no later than one week from today. Please do not hesitate to contact us if you have any questions.

---



[48] APL-APPSTORE_04763306-APL-APPSTORE_04763309 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; *see also* APL-APPSTORE_04477945-APL-APPSTORE_04477947 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[49] *See* APL-APPSTORE_06419097 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[50] *See, e.g.*, APL-APPSTORE_06180560-APL-APPSTORE_06180561 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[51] APL-APPSTORE_06092297-APL-APPSTORE_06092298 ▇▇▇▇▇▇▇▇▇▇▇▇.

[52] APL-APPSTORE_06150269-APL-APPSTORE_06150271 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[53] *See, e.g.*, APL-APPSTORE_00297087-APL-APPSTORE_00297090 ▇▇▇▇▇▇▇▇▇▇

Sincerely yours,

HAGENS BERMAN SOBOL SHAPIRO LLP

Ted Wojcik
Associate

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

*s/ Rachele R. Byrd*

Rachele R. Byrd
Partner

cc: Developer Counsel
    Consumer Counsel

TJW:bm