**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.**

# EXHIBIT 9

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Ethan Dettmer
Direct: +1 415.393.8292
Fax: +1 415.374.8444
EDettmer@gibsondunn.com

November 2, 2020

VIA ELECTRONIC MAIL

Rachele Byrd
Wolf Haldenstein Adler Freeman & Herz LLC
Symphony Towers
750 B. Street - Ste. 2770
San Diego, CA  92101

Ben Siegel
Hagens Berman Sobol Shapiro LLP
715 Hearst Ave., Ste. 202
Berkeley, CA 94710

Re:   *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR

Dear Counsel:

I write in response to Plaintiffs' October 27, 2020 letter regarding the production of transactional data—one of nine discovery-dispute letters that Plaintiffs have sent since the Court's October 19 case management conference.  It has become abundantly clear in that short time that Plaintiffs are trying to manufacture a record on which to base a motion to extend the class certification schedule.  But any delay in production is a result of Plaintiffs' own doing over the course of many months—specifically, Plaintiffs' ever-multiplying inquiries and demands, with new requests in virtually every letter that you send.  Indeed, Plaintiffs raise new demands for the first time in their most recent letter, *over one year* after serving the underlying request for production.

This letter first recounts the history of these lengthy negotiations: the many times Apple has adjusted its planned production of approximately 65 billion records in response to Plaintiffs' demands, by agreeing to Plaintiffs' further demands to produce more information or change the format of the planned production; the many times Plaintiffs have continued to move the goal posts by adding new demands; and the many times Plaintiffs have simply repeated a demand that Apple has already responded to.  This letter then responds to specific demands made in your most recent letter, a number of which—remarkably—are yet new demands made more than a year after you served the underlying requests for production.

At bottom, your latest letter is yet one more example of Plaintiffs crying "more!" out of one side of their mouth, while they are crying "delay!" out of the other side.  Apple has

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

001

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 2

been far more than cooperative in negotiating the production of this massive—and massively burdensome—data set. Apple continues to stand ready to make this single production of transactional data. It is up to Plaintiffs to agree to the production.

\*     \*     \*

To be clear about the history of the parties' negotiations over this issue, Developer Plaintiffs served their Request for Production No. 69 for transactional data on October 17, 2019. On February 10, 2020—before the effects of the COVID-19 pandemic were known—Apple communicated to Plaintiffs that it expected to substantially complete production of documents and data in July 2020. However, Apple made clear from the beginning that Plaintiffs were requesting an extraordinary amount of information in transactional data; it is now clear that the final production is likely to be in the range of approximately **65 billion** rows of data.

On July 9, 2020, nearly five months after the parties' initial discussion of a production timeline, and despite the fact that the ESI protocol that the parties had negotiated through February of 2020 provided for data production to be in "static" format, Plaintiffs requested for the first time that the transactional data be produced in "relational tables." Plaintiffs could, of course, have requested relational tables from the outset. Instead, Plaintiffs waited nearly eight months before modifying their request in this way, during which time Apple expended considerable effort to engineer an exceptionally large production in flat-table format (in addition to the tremendous amount of work necessary to identify and gather the data).

On July 23, 2020, at the Plaintiffs' request, and to facilitate further discussions and make the ultimate production of massive amounts of data as efficient and usable as possible, Apple produced to Plaintiffs a sample of 100,000 rows of transactional data, including 28 different data fields in each row. Apple pulled the data from multiple sources, and produced this sample in a flat table format, as consistent with the ESI protocol that had been negotiated, and also the most efficient and straightforward way for Apple to prepare that information for Plaintiffs. And when Plaintiffs presented Apple with a long list of questions regarding the July 23 sample, Apple investigated them and provided a long list of responses, including creating and providing a document for Plaintiffs explaining the meaning of values in certain data fields (rather than waiting for Plaintiffs to ask for that information of counsel, or at deposition).

In a phone conversation on August 7 and a follow-up email on August 10, 2020, Plaintiffs asked for a second sample production, this time with 100 million records in a relational-table format, even though Apple clearly stated a self-evident reality: preparing this

002

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 3

second sample would meaningfully delay the final production. As we have reiterated numerous times, producing data in relational tables, including for that sample, is no simple task. It requires significant engineering work to assemble the tables, conduct quality control, and otherwise prepare the data for production.

Nonetheless, on August 14, after conferring with our client, we agreed to produce a second, extraordinarily large sample. Apple then worked diligently to prepare this relational-table sample, and produced it to Plaintiffs on Sunday, September 6. As we (and Plaintiffs[1]) have stated on numerous occasions, the purpose of the sample was (and remains) to resolve any issues with the data *before* the full production, which Apple will make only once, in light of the extraordinary effort and engineering resources required to do so.

Just over three weeks later, Plaintiffs sent Apple a 12-page letter with questions on the second sample, a number of which Apple had already answered in prior correspondence. Further, Plaintiffs' letter raised over a dozen brand-new requests for additional data not previously sought by Plaintiffs' Requests for Production, propounded nearly one year earlier. As Apple's October 12, 2020 and October 23, 2020 responses to Plaintiffs' letter made clear, Apple has already answered all of Plaintiffs' questions and is ready to produce the full data set of 65 billion records. Again, it is up to Plaintiffs to pull the trigger, recognizing that due to burden and efficiency concerns this production will be made only once.

Each time Plaintiffs make additional requests—like those made on July 9, 2020 for relational tables; or on August 10, 2020 for a new sample production; or on September 29, 2020 for over a dozen new data fields and elements; or, perhaps most problematically, on October 27, 2020 in Plaintiffs' most recent letter—this necessarily increases the time required to complete the full production. Changing the project's parameters on the fly ensures delay; changing the parameters on the fly while at the same time complaining about delay is wholly inappropriate. And yet, during these months of negotiation, Plaintiffs have continually invented more and more demands, and Apple has gone above and beyond its obligations to agree to produce significant amounts and attributes of data well outside the scope of Plaintiffs' original requests. A summary of many of Plaintiffs' demands and Apple's responses is provided in the following table:

---

[1] See B. Siegel Email of May 12, 2020 ("having a sample in hand would allow us to frame much simpler and more direct questions about ambiguities and problems in the data. Without a sample, we don't know where there are missing entries, unlabelled data codes, lookup codes that refer to un-produced data tables, etc.").

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 4

|  | Data elements and parameters that Plaintiffs have requested and Apple has agreed to provide (by date requested) | Data elements and parameters that Apple has not agreed to produce but Plaintiffs continue to demand (by date requested) | Data elements and parameters Plaintiffs have agreed to forgo |
|---|---|---|---|
| 1. | 7/9/2020—Change to relational tables | 2/24/2020—All fields in all databases with responsive information |  |
| 2. | 2/24/2020—Genre field | 3/18/2020—Code Apple uses to query its database |  |
| 3. | 7/31/2020—Method of payment field | 4/23/2020—Data from foreign storefronts |  |
| 4. | 7/31/2020—Production by hard drive | 7/31/2020—Field explaining non-30% commission (does not exist in database) |  |
| 5. | 8/10/2020—[redacted] field | 9/29/2020—"Client" field (does not exist in database) |  |
| 6. | 8/10/2020—[redacted] field | 9/29/2020—"Source Type" (does not exist in database) |  |
| 7. | 8/7/2020—Mapping of relational tables | 9/29/2020—Affiliate Commissions (does not exist in database) |  |
| 8. | 8/7/2020—Second sample production of 100 million rows | 9/29/2020—List of apps qualifying for treatment under Review Guidelines 3.1.3 (does not exist in database) |  |
| 9. | 9/29/2020—content_provider country code separate from postal code | 9/29/2020—Purchaser device specifications (RAM, screen size) (does not exist in database) |  |
| 10. | 9/29/2020—GAME_CENTER_ENABLED field |  |  |
| 11. | 9/29/2020—Purchaser device model name (in addition to model number) |  |  |
| 12. | 9/29/2020—Tax field |  |  |
| 13. | 9/29/2020—Transactions related to "Education" program in Apple School Manager |  |  |
| 14. | 9/29/2020—Transactions related to "Enterprise" sales or Apple Business Manager |  |  |
| 15. | 9/29/2020—Transactions related to iMessage, Apple Watch apps |  |  |

And now Plaintiffs' latest letter makes even more new demands and insists that Apple immediately make its full transactional data production, to be supplemented according

004

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 5

to any and all additional demands that Plaintiffs have made or may make in the future. This is neither fair nor appropriate.

As Apple has told Plaintiffs repeatedly, Plaintiffs have to make a choice: Apple will produce the data now, on the terms on which the parties have already agreed; or Plaintiffs can move the Court for whatever relief they seek, and Apple will produce the data following the Court's consideration of the issues presented. Apple will not elect to go through this process twice, given the extraordinary burden of such a production. The timing of Apple's ultimate production will be the product of Plaintiffs' decisions to continually modify and add to their transactional data production demands over the course of more than twelve months.

The other introductory points you make in your letter merit brief responses to correct the record.

*First*, you suggest that, because this production will be in relational tables, we could produce the bulk of the data to you and then easily "supplement[]" it with "revisions of particular existing tables" or "discrete" additional data in smaller productions. B. Siegel and R. Byrd Letter of October 27, 2020 at 3 n.1. You forget that we are producing **65 billion** records. Even producing one additional field will require significant effort and engineering work. This is why Apple has gone to such extraordinary lengths to give you large samples— indeed, samples that are themselves be massive data productions. If you do accept production on the terms on which the parties have agreed to date, then some processing time will be required before we can produce the data. As we have told you in the past, we anticipate this will take approximately two weeks after the parameters of the production are finalized. But Plaintiffs' continued insistence on moving the goal posts will make further delay inevitable.

*Second*, you suggest that Apple took too long to respond to the many questions in Plaintiffs' September 29 letter. But Plaintiffs themselves took 23 days after Apple produced its second sample (on September 6) before asking those questions related to that production. Presumably this is because Plaintiffs elected to use that time for their consultants to analyze the sample data and formulate their questions. We understand that doing so takes consideration and effort. But you seem to suggest it is reasonable for Plaintiffs to take over three weeks to formulate their questions and then expect Apple to answer them instantly. In reality, it takes significant time to investigate answers to your questions, which involve complicated technical and engineering issues. After receiving your questions on September 29, we responded to as many as we could in less than two weeks, and the remainder only 11 days after that. This is more than reasonable, as you should surely

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 6

recognize given the length of time it took you to analyze the sample and formulate the questions about it.

For example, your September 29 letter asked, for the first time, about purchases made through Apple Business Manager and Apple School Manager, and about purchases related to iMessage and Apple Watch apps, all of which existed well before you served your October 2019 requests for production. In other words, you waited over 11 months before you asked those questions. In contrast, we investigated your questions with our client and answered you on a rolling basis, within a few weeks. Given Plaintiffs' own delay in raising these issues, it is not reasonable to claim "Apple has not been timely" in responding to them. B. Siegel and R. Byrd Letter of October 27, 2020 at 2.

As for the many other additional items you discuss in your letter, which you—remarkably at this stage of the discussions—call "some, but not necessarily all, of the remaining disputes on which the parties are at an impasse," B. Siegel and R. Byrd Letter of October 27, 2020 at 3—I briefly respond below.

**Proceeds Reason:** Plaintiffs describe this field as "indicating why a different royalty rate [than 70%] was applied to [a] transaction." Plaintiffs first requested a field of this type in Ben Siegel's July 31, 2020 email. Plaintiffs could have asked for it when they served their requests for production over a year ago, in October 2019, but they waited nine and a half months. Nonetheless, Apple investigated this request and has already responded accordingly in its October 23 letter response. As explained in that correspondence, this data does not exist in the transactional data from which Apple is producing, and it would be unreasonably difficult to collect this data and produce it with the transactional dataset.

**Affiliate Commissions:** Plaintiffs first requested this variable in their September 29, 2020 letter, stating their "understanding [] that Apple paid affiliate commissions to third parties linking to App Store pages until at least October 2018." In other words, while Plaintiffs claim this data existed a year before your October 17, 2019 requests for production, Plaintiffs waited nearly *another* year to ask for it. Apple responded on October 12, 2020 that affiliate commissions data does not exist in Apple's transactional database. On October 27, 2020, Plaintiffs replied that they "are not limited to obtaining relevant data from the transactional database, which [they] have made clear repeatedly." We are investigating whether this data exists and whether it can be produced without undue burden.

**Sales Tax:** Plaintiffs asked Apple for the first time on September 29, 2020 to add a tax field and the "formula for the tax variable" to the transactional data production. In our letter on October 12, 2020, we agreed to provide the field but not the formula for it. Your most recent letter asks for more information about this formula: whether the tax variable shows a value

for tax (a) per billing-quantity unit or (b) already multiplied by billing quantity. We have again investigated your question, and the answer is that the tax will already be multiplied out and reflect the total taxation for the transaction.

**"Client" Variable:** Plaintiffs first requested this variable in their September 29, 2020 letter, *nearly one year* after they could have done so in their original requests for production. In our October 23 letter, we responded that the "Client" field does not exist in the database from which Apple is producing transactional data, and it cannot be easily obtained. That remains Apple's position. Nevertheless, Plaintiffs continue insist on their right to any and all data they want, without explaining the significance of the data, and without regard to the burden on Apple.

**"Source Type" Variable:** Plaintiffs first requested this variable in their September 29, 2020 letter, again, nearly one year after they could have done so in their original requests for production. In our October 23 letter, we responded that this data is not accessible to Apple without significant expense. More important, this data is not responsive to Plaintiffs' discovery requests, and it is too late in the meet and confer process for Plaintiffs to insert such a disproportionate request. That remains Apple's position.

**App Store Cost Data:** As stated in our October 12, 2020 letter, other than fields that we have already agreed to produce to you, this requested information does not exist in the transactional database, but Apple is producing to you documents and data from other sources that are responsive to your RFPs relating to costs and financial information. And as you note, "Plaintiffs are separately meeting and conferring with Apple about cost and expense data." B. Siegel and R. Byrd Letter of October 27, 2020 Letter at 10. This topic has no place in this correspondence about transactional data, and will be addressed in a separate letter.

**Apps qualifying for treatment under Review Guidelines 3.1.3:** For the first time in their September 29, 2020 letter, Plaintiffs asked for a table that lists all apps (by adam_id) that Apple allows to "use purchase methods other than in-app purchase" under Section 3.1.3 of Apple's App Store Review Guidelines. We responded in our October 23, 2020 letter that this data is not accessible to Apple without significant expense. Further this data is not responsive to Plaintiffs' discovery requests, and it is too late in the meet and confer process for Plaintiffs to insert such a request. That remains Apple's position. Your October 27, 2020 states that you "find it implausible that Apple does not maintain" this data. We have not stated that the data is not maintained; we said that it is not accessible without significant burden and expense. Your October 27, 2020 letter further states that "this data is directly responsive to Plaintiffs' request . . . for data relating to the "*commissions or fees paid* to [Apple] by U.S. iOS developers" because it indicates the apps for which Apple *charges a*

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 8

*zero percent commission* for in-app purchases." (Emphasis added.) That is, you are claiming that information about commissions not paid is responsive to a request for data on commissions that are paid. To state that proposition is to refute it. We have met and conferred about this field, as we would have if you had not waited to raise it for over 11 months after service of your requests for production. But, again, producing it would require significant expense, and at this late date, Apple does not agree to incur the costs of collecting and producing this non-responsive data.

**SQL Code:** Plaintiffs have no need or entitlement to either the "the programming code . . . that Apple's engineers used to create the sample" or "the criteria Apple used to identify the transactions that are included in each particular production." B. Siegel and R. Byrd Letter of October 27, 2020 at 11. Nonetheless, as a courtesy and in the spirit of cooperation, Apple has already shared that it included in the September 6, 2020 sample a randomly selected collection of transactions from the App Store's U.S. storefront involving iOS, iPhone OS, and iPadOS content from a selection of dates that Apple specified.

As many courts have made clear, "'discovery on discovery' is disfavored." *Uschold v. Carriage Servs., Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019) (denying a discovery-upon-discovery request); *Ashcraft v. Experian Info. Sols., Inc.*, 2018 WL 6171772, at *2 n.2 (D. Nev. Nov. 26, 2018) (collecting cases). Here, Plaintiffs' request for the code that was used to structure the queries of Apple's databases so that Apple could fulfill Plaintiffs' informal request for a sample in advance of an actual production of discovery is even worse than "discovery on discovery"—it is discovery on discovery on discovery. Apple is neither obligated nor willing to provide this information to Plaintiffs as it unjustifiably presents a substantial "danger of extending the already costly and time[-]consuming discovery process *ad infinitum*." *Freedman v. Weatherford Int'l Ltd.*, 2014 WL 4547039, at *2 (S.D.N.Y. Sept. 12, 2014).



**Formula for** ▇▇▇▇▇▇▇: Your September 29, 2020 letter asked the formula for ▇▇▇▇▇▇▇, which your October 27 letter restated to ask ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ B. Siegel and R. Byrd Letter of October 27, 2020 at 12 (emphasis omitted). Apple reiterates that these questions are more appropriate for deposition but, as a matter of courtesy and in a spirit of cooperation, confirms that these values are ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

▇▇▇▇▇▇▇▇▇▇▇▇▇: Your September 29, 2020 letter asked questions about the meanings of 12 different variables, divided into four different collections, in the ▇▇▇▇▇▇▇ field. As with a number of other questions in that letter, we responded in our October 12 letter that

**GIBSON DUNN**

Rachele Byrd
Ben Siegel
November 2, 2020
Page 9

"[o]n August 2, 2020, [we] sent you a one-page PDF document that sets forth this information."  E. Lazarus Letter of October 12, 2020 at 3.  Your October 27 letter identifies two data values, ▇ and ▇, that have the same description in that August 2 listing.  We are investigating the difference between those two values and will let you know what we find.

**Additional First-Time Requests for New Data Fields: iMessage/Apple Watch Apps, Enterprise Sales, and Education Sales:**  For the first time in your September 29, 2020 letter, 11 months after serving requests for production of transactional data, Plaintiffs asked Apple to confirm that transactions/purchases related to iMessage and Apple Watch apps will be included in the final dataset, and Apple agreed to do so in its October 12, 2020 letter, 13 days after Plaintiffs asked the question.  Yet you accuse Apple of "substantial delay" on this point.  B. Siegel and R. Byrd Letter of October 27, 2020 at 13–14.  This is obviously wrong, deeply counterproductive, and illustrative of your efforts to manufacture a record of "delay" that just doesn't exist.

Plaintiffs similarly requested for the first time on September 29 that Apple confirm whether the transactional data would include "Enterprise" sales and/or sales made in Apple Business Manager and sales made under the "Education" program in Apple School Manager.  We did so in our letter of October 23.

But Plaintiffs did not stop adding to their transactional data request on September 29.  In your October 27 letter—376 days after serving your request for production, given that 2020 is a leap year—Plaintiffs ask for the first time that Apple include fields in its data production to identify enterprise sales, education sales, iMessage app transactions, and Apple Watch transactions.  It is much too late in the meet and confer process for Plaintiffs to insert these new requests.  It is particularly galling for you to be making new requests out of one side of your mouth, while shouting "delay" from the other side.

*       *       *

Please let us know if anyone would like to further discuss any of the above.

Sincerely,

*/s/ Ethan Dettmer*

Ethan Dettmer

cc: Lauren Moskowitz

009