UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EPIC GAMES, INC.,

                Plaintiff and Counter-

defendant,

        v.

APPLE INC.,

                Defendant and

Counterclaimant.

Case No.  20-cv-05640-YGR   (TSH)

**DISCOVERY ORDER**

Re: Dkt. No. 213

We are here on a joint discovery letter brief concerning Apple's responses to Epic Games' requests for production ("RFPs").  ECF No. 213.  The Court held a hearing on December 30, 2020, and now issues this order.

**A.**      **Non-U.S. Documents**

The first dispute is over Apple's general refusal to produce documents concerning its activities outside the United States.  Apple has agreed to produce documents that reference its activities both within and outside of the U.S., as well as documents relating to Epic's own dealings with Apple outside of the U.S.  But it will not agree to produce documents that reference only extraterritorial conduct and that do not relate to Epic.  Epic says this geographic limitation is unjustified, and it moves to compel documents relating to foreign activities on all 70 RFPs in its first set of RFPs.[1]

---

[1] Epic has provided its first set of RFPs as Exhibit 1 to the joint discovery letter brief.  Apple reports in its section of the letter brief that Epic has served a total of 83 RFPs.  At the hearing Epic explained that its current motion relates only to the first 70 RFPs, but that the same dispute concerning geographic scope of Apple's production also applies to the other RFPs not currently

United States District Court
Northern District of California

United States District Court
Northern District of California

1      Notwithstanding its assertion that it has alleged global markets, Epic is suing under the

2   federal Sherman Act, the California Cartwright Act, and California Business and Professions Code

3   section 17200.  *See* ECF No. 1 (Complaint).  Therefore, wholly extraterritorial conduct not

4   directed at the U.S. cannot be a basis for liability in this case.  Having said that, foreign conduct

5   can sometimes be relevant evidence of domestic conduct.  The clearest example of this is an

6   international price-fixing conspiracy where you have to see the whole conspiracy to know how

7   broad it is, the role the various executives played, how the conspiracy was enforced and concealed,

8   and so on, before you can really understand what happened in the U.S.  *See, e.g., In re Aspartame*

9   *Antitrust Litig*., 2008 WL 2275531, *2 (E.D. Pa. May 13, 2008) (citing cases).  However, in other

10  cases, documents about purely foreign conduct may not be relevant.  Rule 26 limits discovery to

11  what is relevant and proportional, after all, and the Foreign Trade Antitrust Improvements Act

12  generally removes from antitrust liability commercial activities abroad, subject to a few

13  exceptions.  *See U.S. v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015).

14      So, the Court cannot endorse a simplistic holding that documents about foreign conduct are

15  always relevant or never relevant because neither proposition is true.  Instead, the analysis comes

16  down to having a good theory of relevance.  The moving party needs to explain why documents

17  concerning foreign activities are relevant to U.S. claims or defenses, and the Court must conduct a

18  careful analysis to determine if the foreign documents actually would be relevant.  *See, e.g., In re*

19  *eBay Seller Antitrust Litig.*, 2008 WL 3925350, *1-2 (N.D. Cal. Aug. 22, 2008) ("relevance does

20  not necessarily stop at the shores of the United States," so "at least some of the agreements with

21  the third parties, including those connected to activities overseas, may reflect upon plaintiffs'

22  claims," but "[t]hat said, to require production of all third party agreements and backup materials

23  at this junction would be premature in light of the significant probability that a number of these

24  contracts and agreements may have nothing whatsoever to do with the issues in this litigation").

25      Here, Epic has explained nothing.  Epic's assertions that it alleges worldwide markets and

26  that Apple also refers to its worldwide presence as part of its business justification defense do not

27

28  _____

before the Court.

2

even begin to explain how documents about purely foreign conduct that are responsive to any of these RFPs are relevant.[2]  The key legal principle that Epic misunderstands is that relevance is measured against "any party's claim or defense," Fed. R. Civ. Proc. 26(b)(1).  All of the claims and defenses in this case arise under U.S. or California law, not some non-existent worldwide antitrust law.  To show relevance, Epic must explain – as the plaintiffs did in *In re Aspartame Antitrust Litig.* and *In re eBay Seller Antitrust Litig.* – how the foreign documents it seeks would tend to prove or disprove claims under U.S. or California law, claims that by definition have a limited geographic reach.  But here, Epic abjures that task entirely, insisting that because its Complaint alleges global markets, it has no obligation to explain how the documents are relevant within the meaning of Rule 26 to claims or defenses under U.S. domestic law.  In Epic's view, the word "global" has magical power when used in a Complaint, wiping away the requirement of relevance in discovery.  The Court disagrees.

Consider RFP 59, which seeks "All Documents Concerning Customers' awareness of, familiarity with, lack of awareness of, and/or lack of familiarity with (a) the fact that Apple does not permit any Software Store on iOS devices other than the iOS App Store; (b) the fact that Apple does not allow Developers to use any method other than Apple's IAP for accepting payments from Customers for certain types of transactions; or (c) Apple's fee or commission on the purchase of Apps and Apple's IAP transactions."  This RFP seems to be getting at a *Kodak*-style "lock in" argument, suggesting that maybe customers don't know what they're getting into when they buy an iPhone and then later it's too expensive to switch.  But why should we care what foreign customers are aware of when they buy an iPhone?  When the Court raised this example at the hearing, Epic just repeated that it is alleging worldwide markets, but it did not actually explain how the awareness or lack of awareness that people in foreign countries might have could be relevant to the Sherman Act and California law, which don't regulate Apple's transactions with foreign customers.

Or consider RFP 28.  It requests:  "Documents sufficient to show the number and

---

[2] The Court has also reviewed Epic's meet and confer correspondence that was attached to the joint discovery letter brief.  That correspondence added nothing of substance on this issue.

United States District Court
Northern District of California

percentage of iPhone, iPad or iPod touch Customers, respectively, who own at least one iPhone, iPad or iPod touch and used any of the following in the last 30, 90, 180 or 365 days, respectively: (a) Apple Music; (b) Apple TV+; (c) Apple News; (d) Apple Arcade; (e) Apple Pay; (f) Apple Card; (g) iMessage; (h) FaceTime; (i) Find My; (j) AirDrop; (k) iCloud Photos; (l) iCloud Drive; (m) iTunes; (n) Apple Books; (o) Family Sharing; (p) Apple One; and (p) none of the above."  The Court has a hard time understanding why we need to know how many people in Mongolia tried to find their iPhone in the last month, or what percentage of iPad users in Sri Lanka use Apple pay, or how popular FaceTime is in Brazil.  How would such evidence be relevant to claims and defenses under U.S. and California law?  Epic doesn't say.  At the hearing Epic did not dispute that RFP 28 asks for these things and did not present argument for why that information is relevant to the U.S. and California claims and defenses in this case.  Instead Epic argued that it did not demand document custodians who are in those foreign countries.  In other words, Epic argued that it did not go out of its way to seek out documents that relate exclusively to foreign conduct.  Well, that's good, but it still doesn't answer the Court's question about relevance.  Epic says that if a document is in the custodial collection of one of Apple's document custodians, Apple should not code it non-responsive merely because it relates to exclusively foreign conduct.  However, that appears to be an argument about burden and leaves unanswered the Court's skepticism about the relevance of such documents to claims and defenses under U.S. domestic law.

For a lot of the RFPs at issue, the Court can on its own dream up theories of how foreign conduct might indeed be relevant to claims and defenses under U.S. or California law.  But the Court is concerned that the Court is the one dreaming up those theories of relevance.  Epic's argument is that if an antitrust plaintiff says the words "global market" in the Complaint, then the Court should forget that the Sherman Act and California law do not apply to foreign conduct not directed at the U.S.  Epic has not advanced any arguments that the particular foreign conduct at issue in these RFPs actually is relevant to claims and defenses under U.S. law; Epic thinks it doesn't have to make that showing.  In the adversarial system, we normally leave it to the litigants to advocate for themselves rather than helping one side or the other.  Here, where Epic has done nothing more than gesture at a big pile of RFPs and say the word "global," for the Court to

4

determine that foreign documents responsive to any particular RFP are relevant to claims and defenses under U.S. domestic law would require the Court to write the motion to compel that Epic didn't write.  That doesn't seem like something the Court ought to do.  And it would be grossly unfair to Apple, which didn't have an opportunity to respond to the arguments Epic didn't make.

To be clear, the Court is not saying that each RFP had to be specifically discussed one by one.  It is common for litigants to group RFPs into related subjects and then discuss them in groups.  A common form of that argument is that RFPs 1-5 seek information about subjects A and B; documents that are responsive will likely show X, Y or Z; and they are relevant to the plaintiff's claims for reasons 1, 2 and 3.  And then the other side, having seen the moving party's arguments, can respond.  Another popular approach is to use illustrative examples.  In that approach, the moving party selects a few RFPs that are representative of a number of issues in the case, and the parties brief those examples.  This allows the parties to obtain a ruling that they can then apply to other RFPs without further judicial involvement.  The Court's experience is that a well-constructed five-page discovery letter brief can effectively cover a lot of ground.  But in any event, the problem here is not that Epic's discussion of why foreign documents responsive to any particular RFP are relevant to claims or defenses under U.S. law was insufficiently detailed.   The problem is that Epic did not even attempt that showing.

Epic's motion to compel Apple to produce documents concerning non-U.S. activities is denied because Epic has not explained how the foreign documents responsive to these 70 RFPs are relevant to the U.S. and California claims and defenses in this case.

**B.      RFP 3**

Epic's RFP 3 seeks:  "Documents sufficient to show actual and projected revenue, costs, expenses, and profits, by country, by year, incurred by, earned by and/or attributed to, sales of each of the following, respectively: (a) iPhone; (b) iPad; (c) iPod touch; (d) Apple Watch; and (e) Apple AirPods."

Epic argues that "Apple has market power in the market for mobile operating systems, and that this market power in turn supports Apple's market power in aftermarkets for app distribution and in-app payment processing on iOS."  Epic explains that "[s]ustained, high profit margins

evidence market power.  Apple's revenue from iOS comes primarily from selling devices that run iOS (iPhone, iPad and iPod touch) and accessories that depend on ownership of iOS devices (Apple Watch and Apple AirPods)."

The Court agrees, and Apple does not dispute, that this financial information is relevant for devices that access the App Store, since Epic alleges that Apple has market power in the aftermarkets for app distribution and in-app payment processing on iOS.  However, the Court is unable to discern the relevance of this information for Apple Watch or AirPods, which are just accessories to those devices.  It is true that "the consistent extraction of supracompetitive profits may be an indication of anticompetitive market power," *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (9th Cir. 2002), but the way Epic describes the alleged markets in the Complaint does not make it sound like Apple Watch or AirPods are in or access either market.  The app distribution market refers only to smartphones and tablets.  Complaint ¶¶ 35-50.  Paragraph 40 of the Complaint, which is part of the description of the app distribution market, alleges that "for mobile device users, there are effectively only two mobile operating systems to choose from: Google's Android OS or Apple's iOS.  As of July 2020, these two operating systems accounted for nearly 100% of the worldwide mobile OSs."  If the referenced "mobile devices" included wearables such as Apple Watch, then paragraph 40 would be false because Garmin's and Fitbit's products do not use Android OS or Apple's iOS.  Similarly, paragraph 183 alleges that "nearly 100% of all mobile devices run either Apple's iOS or Google's Android OS."  That allegation would also be false if "mobile devices" included wearables such as Apple Watch.  Paragraphs 40 and 183 therefore make clear that the "mobile devices" that access the app distribution market are limited to smartphones and tablets.  And the in-app payment processing market seems to refer to financial transactions that occur within the app distribution market.  *See id.* ¶ 109 ("There is a relevant market for the processing of payments for the purchase of digital content, including in-game content, that is consumed within iOS apps, the iOS In-App Payment Processing Market.").  Thus, as pleaded, the mobile devices that access the alleged relevant markets are Apple's smartphones and tablets, not Apple Watch – an interpretation that Epic confirmed at the hearing.  And, of course, AirPods don't access either market.

United States District Court
Northern District of California

1    The most that can be said is that Apple Watch and AirPods are part of an ecosystem of

2    products that are designed to be used with iPhones and iPads, along with cases, chargers, speakers,

3    and so on.  At this point we're not talking about the relevant markets anymore (app distribution

4    and in-app payment), or even products that allegedly access the relevant markets (smartphones and

5    tablets); we're talking about something that can be used with something that accesses a relevant

6    market.  The sole theory of relevance that Epic cites in the letter brief is that the consistent

7    extraction of supracompetitive profits may be an indication of anticompetitive market power.  But

8    if the Court ordered Apple to produce profit information for Apple Watch and AirPods, how

9    would Epic know if those profits were supracompetitive?  Epic would have to subpoena Garmin,

10   Fitbit and others in the market for wearables for their profit information, as well as the major

11   players in the market for headphones – a sprawling and unjustified expansion of discovery into

12   two entirely new markets that, at the hearing, Epic said it had no intention of undertaking.

13   Epic's theory of relevance seems to be that Apple makes a lot of money off of iPhone

14   accessories.  That is surely true, but the distance between that fact and evidence of market power

15   in the app distribution and in-app purchase markets is too great for this discovery to be either

16   relevant or proportional.  Ask yourself this:  What if Apple's profit margins on Apple Watch or

17   AirPods are similar to the profit margins earned by competitors in the wearables or headphone

18   markets?  Then Apple's profit margins on those products would seem to mean nothing.

19   Alternatively, if Apple's profit margins on Apple Watch and AirPods are huge compared to its

20   competitors' profit margins in those markets, then maybe those profit margins do mean something,

21   although we would still have to figure out what.  This is one of those times where unless we burn

22   down the entire forest in discovery, we won't know what meaning to attach to the information the

23   moving party is seeking.  At the hearing Epic's counsel acknowledged that this theory of relevance

24   would technically extend to every single iPhone accessory in existence, including cases, chargers

25   and speakers – as well as accessories to the accessories, such as wristbands for Apple Watch – but

26   said Epic was not asking for all that.  However, the logical reach of this theory of relevance

27   underscores just how sweeping and disproportional it is.  Discovery into the profit margins of

28   products this attenuated from the relevant markets is not proportional to the needs of the case.

1    Accordingly, the Court grants Epic's motion in part and denies it in part and orders Apple

2    to produce documents responsive to RFP 3[3] for the iPhone, iPad and iPod touch.

3    **C.      RFP 5[4]**

4    Epic's RFP 5 seeks "Documents sufficient to show actual and projected revenue, costs,

5    expenses, investments (Including research and development) and profits, by year, incurred by,

6    earned by and/or attributed to, Apple's IAP."

7    This information seems relevant because it concerns Apple's profits in one of the relevant

8    markets.  Apple argues that "IAP is a functionality of the App Store, and not a separate product

9    that 'earns' or is 'attributed' any costs or revenue."  Apple also states that it "is working to

10    produce data underlying App Store P&L calculations.  This will include data on the expenses and

11    revenues associated with the App Store generally.  The documents Epic cites show only that

12    Apple tracks revenues from the App Store."

13    Apple is losing credibility by continuing to assert that it does not have data in the teeth of

14    documents proving that it does.  What's more remarkable is how this is playing out.  It's not the

15    case that Apple makes an incautious statement to the Court and then the Plaintiffs rummage

16    through Apple's document production to try to find a document that undermines Apple's

17    representation.  Rather, in both this and the prior filing, Apple denied the existence of information

18    in the very same joint discovery letter brief in which the opposing party cited by Bates number a

19    document proving that Apple does have the requested information.  Here, Epic cited and has now

20    provided to the Court APL-APPSTORE_00227526-27, which indicates that Apple tracks the

21    revenue associated specifically with in-app purchases, and is not limited to determining what

22    revenue is associated with the App Store generally.  At the hearing Apple stated that it has likely

23    produced hundreds of iterations of that email report.  While the Court appreciates the clarification

24    Apple provided at the hearing, in the letter brief Apple should not have said that revenue is not

25

26    ───────────────
[3] As to the worldwide reach of RFP 3, the Court's analysis in section A applies.  Epic has not

27    explained why Apple should have to produce this information for every country in the world.  The
parties did not discuss whether Apple actually has this information for each country in the world.

28    [4] Epic refers to RFP 30 in its portion of the letter brief.  However, neither side presents arguments
concerning that RFP.

8

*United States District Court*
*Northern District of California*

assigned or attributable to in-app purchases because Apple clearly does track that.  Accordingly, the Court orders Apple to produce this revenue information for in-app purchases for the relevant timeframe.

As for everything else requested by RFP 5 (costs, expenses, investments and profits associated with in-app purchases), the Court does not know if that exists or not.  Apple says it likely doesn't.  As to costs, Epic cites page 15 of the Fischer deposition, but in context that testimony does not say that Apple is able to identify credit card fees that are specific to in-app purchases as opposed to credit card fees more generally associated with the App Store. Accordingly, for these items, the Court orders Apple to produce whatever it has.

**IT IS SO ORDERED.**

Dated: December 31, 2020

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California