```
1                                    Pages 1 - 46

2                      UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4         BEFORE THE HONORABLE THOMAS S. HIXSON, MAGISTRATE JUDGE

5

   IN RE APPLE IPHONE ANTITRUST   )
6  LITIGATION.                    )      No. 11-cv-06714-YGR (TSH)
   _____ )
7                                 )
   DONALD R. CAMERON, et al.,     )
8                                 )
            Plaintiffs,           )
9                                 )
     VS.                          )      No. 19-cv-03074-YGR (TSH)
10                                )
   APPLE INC.,                    )
11                                )
            Defendant.            )
12 _____ )
   EPIC GAMES, INC.,              )
13                                )
            Plaintiff/            )
14          Counter-defendant,    )
                                  )
15   VS.                          )      No. 20-cv-05640-YGR (TSH)
                                  )
16 APPLE INC.,                    )
                                  )
17          Defendant/            )
            Counterclaimant.      )
18 _____ )
                                         San Francisco, California
19                                       Wednesday, December 30, 2020

20

21        TRANSCRIPT OF REMOTE ZOOM WEBINAR PROCEEDINGS

22

23                      (Appearances on next page)

24

   Reported Remotely By:  Ana Dub, CSR 7445, RMR RDR CRR CCRR CRG
25                        Official Reporter - U.S. District Court
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   APPEARANCES: (via Zoom Webinar)

 2   Interim Class Counsel in In re Apple iPhone Antitrust
     Litigation, Case No. 4:11-06714-YGR:
 3                        WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
                          750 B Street, Suite 1820
 4                        San Diego, California 92101
              BY:  RACHELE R. BYRD, ATTORNEY AT LAW
 5
     Interim Lead Class Counsel in Cameron, et. al v. Apple Inc.,
 6   Case No. 4:19-cv-03074-YGR:
                          HAGENS BERMAN SOBOL SHAPIRO LLP
 7                        1301 Second Avenue, Suite 2000
                          Seattle, Washington 98101
 8            BY:  ROBERT F. LOPEZ, ATTORNEY AT LAW

 9                        HAGENS BERMAN SOBOL SHAPIRO LLP
                          715 Hearst Avenue, Suite 202C
10                        Berkeley, California 94710
              BY:  BENJAMIN J. SIEGEL, ATTORNEY AT LAW
11
     For Plaintiff Epic Games, Inc.:
12                        CRAVATH, SWAINE & MOORE LLP
                          825 Eighth Avenue
13                        New York, New York 10019
              BY:  LAUREN A. MOSKOWITZ, ATTORNEY AT LAW
14
     For Defendant Apple Inc.:
15                        GIBSON, DUNN & CRUTCHER LLP
                          333 South Grand Avenue
16                        Los Angeles, California 90071-3197
              BY:  JAY P. SRINIVASAN, ATTORNEY AT LAW
17
                          GIBSON, DUNN & CRUTCHER LLP
18                        555 Mission Street
                          San Francisco, California 94105-0921
19            BY:  ETHAN D. DETTMER, ATTORNEY AT LAW

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Wednesday - December 30, 2020**                              **10:01 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  So we're here in Civil Action 11-6714, In |
| 5 | Re Apple iPhone Antitrust Litigation; and in Civil |
| 6 | Action 19-3074, Cameron, et al. versus Apple Inc.; and Civil |
| 7 | Action 20-5640, Epic Games Inc. versus Apple Inc. |
| 8 | Counsel, please state your appearances.  The Honorable |
| 9 | Thomas S. Hixson presiding.  Let's start with the plaintiffs, |
| 10 | starting with the first case and go on down, and then the |
| 11 | defendants can chime in after. |
| 12 | **MS. BYRD:**  Good morning, Your Honor.  This is Rachele |
| 13 | Byrd with Wolf Haldenstein on behalf of the consumer |
| 14 | plaintiffs. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. LOPEZ:**  Good morning, Your Honor.  This is |
| 17 | Rob Lopez of Hagens Berman for the developer plaintiffs. |
| 18 | **THE COURT:**  Good morning. |
| 19 | **MS. MOSKOWITZ:**  Good morning, Your Honor.  Lauren |
| 20 | Moskowitz from Cravath Swaine & Moore on behalf of Epic Games. |
| 21 | **THE COURT:**  Good morning. |
| 22 | **MR. SRINIVASAN:**  Good morning, Your Honor.  Jay |
| 23 | Srinivasan from Gibson Dunn for Apple Inc. |
| 24 | **THE COURT:**  Good morning. |
| 25 | And I see two other individuals.  Are they just listening, |

 1   or do they plan to participate?

 2          **THE CLERK:**  They're listening, Judge.

 3          **THE COURT:**  Okay.  Great.  Then we can go ahead.  We

 4   can just take the issues in order.

 5       First, I have a question for Epic.  Turning to the

 6   non-U.S. documents, the letter brief attached as Exhibit 1,

 7   Epic's first set of RFPs which had 70 RFPs, so I interpreted

 8   you to be moving as to the non-U.S. documents for the first set

 9   of RFPs, I guess all 70, Apple, in its portion of the letter

10   brief, says that, in fact, there are 83 letter briefs, which

11   would mean that there are -- sorry -- 83 RFPs.  Not 83 letter

12   briefs, 83 RFPs -- which would mean that there are 13 others at

13   issue, but I don't have them in front of me.

14       So let me ask Epic to clarify which RFPs are at issue for

15   the non-U.S. documents.

16          **MS. MOSKOWITZ:**  Your Honor, we do have another set of

17   RFPs, a set second that were not the subject of this motion,

18   but I think Your Honor's ruling would likely impact those as

19   well.  But the general objection that Apple lodged to our first

20   set of RFPs was broadly applicable and would extend beyond just

21   those RFPs.

22          **THE COURT:**  I see.  Okay.

23       So let me just give you my tentative ruling, and then I'll

24   allow Epic to respond to it.

25       As a legal matter, I've read the cases that Epic cites,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    and you've persuaded me that foreign conduct can sometimes be

 2    relevant to a domestic antitrust lawsuit.  It just depends on

 3    the legal theories at issue and the types of documents that are

 4    being sought.

 5          You cited a case, the Aspartame case, that dealt with an

 6    international price-fixing conspiracy; and that's an example of

 7    where you would need to know what happened outside the

 8    United States to really understanding what is happening inside

 9    the United States.

10          So I get that general principle that sometimes foreign

11    conduct can be relevant.

12          At the same time, I don't think it's true that there's a

13    principle that foreign conduct is always or automatically

14    relevant.  I think it just depends on what the documents being

15    requested are about and the legal theories in the case.

16          So what I got from Epic was a four-paragraph argument that

17    established that, that foreign conduct can sometimes be

18    relevant; and then the argument ended and you said:  Look, over

19    there is a big pile of RFPs.

20          So I went through the RFPs and I started reading them.

21    And for some of them, I couldn't figure out why foreign conduct

22    would be relevant.  For example, RFP 59 asks about customer

23    awareness or familiarity or lack of awareness with the fact

24    that Apple does not permit a software store other than the iOS

25    App Store and certain other practices, and I'm not sure I
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1    understand why this is relevant even for domestic conduct.

2    Maybe this is the Kodak lock-in theory.  But then I wasn't able

3    to understand why we care about what people in Hungary or

4    Bolivia are aware of or not aware of and why that would be

5    relevant to the case.

6         And then, like, RFP 28 asks for a bunch of things, but one

7    thing that it asks for is the number of people or the

8    percentage of phone users who use the Find My feature within

9    certain periods of time.  And I was struggling to figure out

10   why we need to know how many people tried to find their

11   iPhone last month in Mongolia.  I just can't figure out why we

12   would need to know that.

13        And then, for some of your other RFPs, on my own -- I'm a

14   very imaginative person, and I was able to create theories of

15   relevance that seemed logical to me.  But then I was worried,

16   as I was doing that, because I don't know if Epic would even

17   agree with those theories of relevance.  And what I'm supposed

18   to be doing as a neutral is to be ruling on the litigants'

19   arguments.  I'm not supposed to think them up for myself.

20        So I felt like if I was coming up with relevance theories,

21   then I was writing the motion to compel that you should have

22   filed.  And also, I was worried about unfairness to Apple

23   because they only had the opportunity to respond to arguments

24   that Epic made.  They didn't have the opportunity to respond to

25   things that I think of on my own.
```

```
 1          So where I'm left with is that my tentative ruling is to
 2     deny Epic's motion as to the non-U.S. documents on the grounds
 3     that you really just haven't explained anything.  You made an
 4     abstract point, which is a good one, that foreign conduct can
 5     sometimes be relevant, and then you gestured at 70 RFPs.  And I
 6     was left thinking, well, I don't know that I really should
 7     compel anything here.
 8          But, Ms. Moskowitz, I've talked for a while now.  So why
 9     don't I get your thoughts on this issue.
10          MS. MOSKOWITZ:  Your Honor, thank you.
11          And apologies that we didn't do enough of a tethering to
12     the RFPs.  I think it is because we have alleged a worldwide
13     market, and we have alleged that Apple -- both markets are
14     worldwide, both the app distribution and the in-app payment
15     processing market are worldwide markets.  And we are asking for
16     information about consumer behavior, competitive behavior, the
17     competitive landscape across the entire world.
18          Now, that is not to say that we have ever -- we have not
19     asked Apple for an Algerian custodian or a Mongolian custodian
20     and searching specific Mongolian -- to use Your Honor's
21     example, Mongolian custodial documents or repositories.
22          What we've asked for is, in order for us to test our
23     worldwide market theory and in order to test that things that
24     are happening in the U.S. are extrapolated to the global market
25     that we believe -- and we believe we will prove -- exists, that
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   we're asking Apple not to withhold where they're already going,

 2   to not to withhold non-U.S. documents.

 3        For example, in Mr. Federighi's documents, for example, an

 4   existing custodian, as they're going through those documents,

 5   if he is told of a security breach involving an in-app purchase

 6   in Algeria, which is Apple's example, don't withhold that.

 7   Don't mark that non-responsive.  Give it to us, because we do

 8   think it's relevant to Apple's arguments that it provides a

 9   worldwide platform, a global, secure, the best out there,

10   according to Apple, in-app purchase processing method.

11        So we want to be able to test that.  Are there

12   differences?  Why are there differences?  Are those differences

13   having effects in the U.S.?

14        So our requests are cabined in the sense of we're only

15   asking them to go beyond the U.S. as to where they're already

16   going.  And we've asked for documents sufficient to show yearly

17   aggregate types of data, and we're asking for that on a global,

18   worldwide scale, not just for the U.S., which is how they've

19   already been reporting it as well.

20        So we're not asking for them to go find that Mongolian

21   example Your Honor gave.  Or I didn't write down the country

22   for the first one.  But I think -- what I'm trying to say is,

23   we are asking, within the confines of the search protocol

24   they've already agreed to, to just, instead of marking

25   non-responsive, mark responsive along the way.  We're not even
```

1  asking them to go back to what they've already done.  We're

2  just saying, going forward for the new custodians, include that

3  so that our experts, who are trying to establish a worldwide

4  market -- and that is what we intend to establish at trial --

5  that they have information about security, about consumer

6  preferences, about their behaviors and whether they're locked

7  in.  Are there competitors in Poland that are -- that are not

8  present in the U.S.?  Why?  How is Apple reacting to that?

9  Again, only to the extent they're coming up.

10      And the P&L data and the non-custodial type of data that

11  we're asking for really is important so that we understand the

12  global nature of the business, the App Store business, the IAP

13  business.  There's no burden associated with anything that

14  we're asking.  We're just asking for not an arbitrary line to

15  be drawn.

16      I hope that's helpful clarification.  Happy to answer

17  further questions.

18          **THE COURT:**  Since there's no such thing as a global

19  antitrust statute, why should accusations about global

20  market -- why should that matter and guide discovery rather

21  than the laws you've sued under, which are the federal Sherman

22  Act and the California state laws?

23          **MS. MOSKOWITZ:**  Your Honor, the Sherman Act is not

24  limited to conduct in the U.S. if that conduct has effects on

25  the U.S.  And Apple is operating on a global scale.  It is

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  operating across the world in what we believe to be the same

2  way, with the same policies.  They tout the global application

3  of IAP.  They try to compete on the basis that it is a global

4  solution.  And we need to understand how that conduct

5  throughout both the U.S. and abroad are impacting the

6  U.S. market.

7       They've never agreed to stipulate, for example, that the

8  exact same behaviors are across the global, but we are alleging

9  a global market.  There is a single agreement.  There's single

10  agreements across the world.  Apple operates at a global level

11  in the App Store and IAP.  And so that is the market that we

12  believe exists.  It's not an artifice.  It's what we believe

13  actually exists and has impacts on us.  We're trying to compete

14  on a global scale as well, as are others.  So that is why.

15            **THE COURT:**  Okay.  Let me hear from Apple.

16            **MR. SRINIVASAN:**  Sure, Your Honor.  There was a lot

17  there, but I'll try to unpack that.

18       I think we start with where Your Honor starts, which is

19  that ultimately, discovery has to be tied to a relevant claim

20  or defense.

21       They have alleged that this is a global market, and there

22  is one allegation in the complaint -- I think it's repeated a

23  second time -- that they're alleging a global market because

24  Apple sells iPhones everywhere.

25       Well, that's not what they're seeking discovery on.  I

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

mean, I think we would stipulate that we sell iPhones and iOSes

everywhere.  But that's not tethered -- that's not tethered to

any of the discovery they seek.

But more fundamentally, as you note, the allegations in

the complaint relate to conduct in the United States; they

relate to U.S. consumers.  To the extent that they relate --

conduct relates solely to foreign consumers -- so

Ms. Moskowitz's example of an Algerian and only Algerian

breach -- would not be relevant to this case in any way.

Now, that said, just to be clear so the Court

understands -- and I hope we made this clear -- to the extent

conduct is agnostic as to geography or it includes U.S. plus

areas that are affected outside the U.S., they're receiving

everything there.  Those documents are being produced.  And, in

fact, they have quite a bit of information regarding the global

market, to the extent that they're interested in testing their

theories, because we're producing it as part of what we've

already been searching for.

We're also producing any reference to Epic, even if it

relates exclusively to some foreign place.  We think that is

the test and the most expansive way of producing everything

that could possibly be relevant to their claims or our

defenses, and we've cabined it that way.

Further, they have not given us, as you noted, any basis

for why any of the discovery they seek from these foreign

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   places -- exclusively foreign places are related to any of

 2   their claims.  And we would point back to the FTAIA, to say

 3   that if something relates to conduct that affects consumers

 4   outside the United States and only the United States, that

 5   would not be relevant to their claims here, and those are the

 6   only types of documents that we're not producing.

 7              THE COURT:  All right.  Thank you.

 8        Epic, any reply comments from you?

 9              MS. MOSKOWITZ:  Yes, just briefly, Your Honor.

10        Again, we are not asking them to go get those documents

11   from anywhere other than where they're already getting them.

12   But to the extent that they are showing -- when they go through

13   their custodial documents, to the extent they are seeing the

14   things like I just said, which is the Algerian security breach,

15   for example, that even if it doesn't mention the U.S., that's a

16   breach of the iOS or the IAP, the same systems that they're

17   saying are the most secure in the world and that that's why

18   they have to keep it closed to competition.

19        So all of those are relevant because they're keeping

20   competition constrained on a worldwide scale that is impacting.

21   If there was competition across the globe, but not in the

22   U.S., we might have a very different situation than what we

23   think we do.  And so that is why we are looking for that

24   information, and it's no heavier a lift than just going through

25   the documents they're already going through.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1        But on the separate side, the data, which I didn't hear

 2   Apple's counsel address, we are asking for data at a very high

 3   level, aggregate data.  We're not asking for the transactional

 4   data worldwide that Your Honor was dealing with at a separate

 5   hearing with the class plaintiffs.  We're asking for aggregate

 6   yearly, sort of worldwide but aggregate-level P&L and costs and

 7   expense data that is crucial to understand, not just for the

 8   U.S., but globally.

 9        THE COURT:  All right.  Okay.  Why don't we turn to

10   the next issue, which is RFP 3, and that's the one asking about

11   documents sufficient to show actual and projected revenue,

12   costs, expenses, profits, and so on, for five different

13   products,:  iPhone, iPad, iPod Touch, Apple Watch, and

14   Apple AirPods.

15        First let me ask Apple.  I didn't see in your letter brief

16   that you were opposing RFP 3 as to iPhone, iPad, and iPod

17   Touch.  I understood you to be opposing that only as to Apple

18   Watch and AirPods.  Is that correct?

19        MR. SRINIVASAN:  That is correct, Your Honor.

20        And, in fact, I think there is a line in Epic's portion of

21   the joint brief that says, quote, Apple refuses to search for

22   any data in response to RFP Number 3.  And that is not true.

23   We are, in fact, and have produced the responsive material

24   for -- as you said, for the devices:  the iPod, the iPhone,

25   and the iPad.  It is only about the Watch and AirPods.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **THE COURT:**  All right.  Then let me ask Epic Games.

2      I went through the complaint and read through it in

3  detail, and there are -- when I looked at how the markets were

4  defined, there are constant references to smartphones and

5  tablets, and then there's a term "mobile devices" that's used

6  in their complaint.

7      I'm pretty sure mobile devices was meant to mean only

8  smartphones and tablets.  I didn't think it referred to Apple

9  Watch and certainly not AirPods.

10      Do you think I was misreading the complaint?

11          **MS. MOSKOWITZ:**  No, Your Honor, I don't.

12      I think what we're trying to establish is market power

13  within those markets, as Your Honor correctly read our

14  complaint to be defining.  And one way to do that is to show

15  supracompetitive profits.

16      And one way to show supracompetitive profits in this

17  specific world of iOS is to show not only profits on the

18  specific devices that constitute that market, but also the

19  ancillary products that are so tethered and so dependent on

20  those devices, like an Apple Watch, that can help establish

21  that supracompetitive profits from iOS.  Because Apple Watch,

22  I think as most laypeople know, are better for you if you have

23  an iPhone.  And so if they're able to charge supracompetitive

24  profits on Apple Watches, it just shows more of the lock-in,

25  more of the fact of switching.  People are not going to be able

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   to switch out of the iOS Ecosystem because of all these other

2   products that really rely on you having an iOS device.

3        And so that is what our experts are seeking to try to

4   understand the full scope of how Apple can operate and

5   monopolize the markets that we have defined.  And that does

6   make reference to these ancillary products.  So they're not in

7   the market, as Your Honor said, but they're relevant for our

8   experts to understand the market.

9            **THE COURT:**  One concern I have about introducing Apple

10  Watch is that that also seems to introduce other competitors

11  such as Fitbit and Garmin.  And I don't know that you can just

12  look at the profits from Apple Watch and say:  Oh, it's all

13  because of iOS.  There are just new competitors that are now

14  introduced.

15       And I worry that that starts to make that whole inquiry

16  kind of sprawling.  For example, if we didn't have discovery

17  into those new competitors introduced by Apple Watch, then that

18  would present a misleading picture of trying to attribute all

19  the profit to the relevant markets as alleged here.  But then,

20  if we did get into that in discovery, then this case just sort

21  of broadens in ways that seem unjustified.

22       So can you speak to that concern.

23            **MS. MOSKOWITZ:**  Yes, Your Honor.

24       We're not trying to establish an Apple Watch market.  What

25  we're really just trying to establish is that, unlike the other

 1   devices Your Honor just mentioned, the Apple Watch really is

 2   tethered to the -- to being in the iOS Ecosystem already.  And

 3   so it is relevant to switching costs that people are -- that

 4   Apple is generating that much money through the Apple Watch.

 5       And, Your Honor, we're not looking for full-blown

 6   discovery on Apple Watch or its market share or any of that.

 7   We're really just trying to understand the costs, the revenue,

 8   and the expenses on a yearly basis by country.

 9       So it's not that we're trying to open a whole can of worms

10   and try to establish a whole other market with its competitors

11   and market sensitivities or anything along those lines.  We're

12   really just trying to get the aggregate data that we know Apple

13   tracks because our experts view it as relevant to try to

14   understand the full universe of the iOS Ecosystem, which does

15   include, in their view, iOS-dependent ancillary products.

16       We're actually not asking for every -- I'm sorry,

17   Your Honor.

18           THE COURT:  No.  My question, though, is:  How can

19   you -- say you get all this information about Apple Watch and

20   AirPods.  How can you know if Apple is charging

21   supracompetitive prices without knowing what Garmin and Fitbit

22   charge, what other headphone manufacturers charge?  You could

23   know they make a lot of profit, but you couldn't know it's

24   supracompetitive, could you?

25           MS. MOSKOWITZ:  No, Your Honor.  We're not

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    necessarily -- and I don't think we need to.  I think the point

2    is just to understand the full scope of how Apple is generating

3    profits as a whole.

4         And so understanding revenue and costs and expense data

5    for the Apple Watch, that won't say that Apple Watch is

6    supracompetitive vis-a-vis a Fitbit, which is not what we're

7    trying to establish.  But we're trying to establish that the

8    profits that Apple is generating as a whole from its suite that

9    are all dependent on this iOS that people can't switch away

10   from and all of the other aspects of what we're trying to

11   prove, that Apple Watch profit and the AirPod profit are part

12   of that whole analysis.

13        **THE COURT:**  So would this line of reasoning also

14   justify discovery into the profits from the wristbands on the

15   Watch?

16        **MS. MOSKOWITZ:**  Your Honor, we -- I think,

17   technically, yes; but we've narrowed our request to not do the

18   chargers and the cables and all of that stuff.

19        So we have narrowed it.  Because I do think, logically, we

20   probably could bring in every single thing that depends on

21   Apple products; but we did try to narrow it and be targeted,

22   both at the types of ancillary products as well as the type of

23   data we're requesting.

24        **THE COURT:**  All right.  Thank you.

25        Apple, let's hear from you.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. SRINIVASAN:**  Yeah.  Your Honor, I mean, we

2     generally agree with your comments.

3          Ms. Moskowitz just said:  We're not interested in

4     establishing supracompetitive products from the Apple Watch,

5     when that is exactly what they're saying they wanted it for in

6     their papers.

7          And as you note, they couldn't make that determination

8     without sweeping in a lot of other third-party discovery on

9     competing watches and also on competing headphone

10    manufacturers, and leave alone the fact that AirPods can be

11    used with other devices.  It gets incredibly complicated.  This

12    is a very attenuated issue, to begin with, not much different

13    than cases and chargers and wristbands.

14         They have Apple's overall profits.  If they want to show

15    it's a profitable company, they can.  To go to the Apple Watch

16    or the AirPod really has, again, almost no bearing on any issue

17    in this case.

18         The case -- Epic doesn't design games for the Watch.  As

19    we pointed out in our brief, Judge Gonzales Rogers noted that

20    she's looking at this as the relevant market as the game

21    market.  And, in fact, in that same page in the transcript,

22    Epic's counsel responded and said (reading):

23              "Well, I think it's not necessarily a games

24         market, but the app distribution market on the

25         iPhone."

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1        Well, they're getting everything about the App Store.

2    They're getting everything about the iPhone.  That's the

3    market in which we are, you know, involved in this case.

4        And for them to -- you know, on this idea that there's

5    sort of stickiness, this theory that I just heard from

6    Ms. Moskowitz, it's not in their papers, doesn't really apply

7    to the developer -- a developer like Epic in any event.

8        Lock-in is typically something that you see with respect

9    to a consumer case, but not -- and even that's a disfavored

10   theory, but that's a theory where you can potentially see it.

11       But Epic doesn't face any of those issues.  Epic

12   distributes for a variety of platforms.  And the question is:

13   Does Apple have power in the distribution of apps for games?

14   And the Watch and the AirPod really have nothing to do with

15   that.

16       **THE COURT:**  All right.  Any reply comments from Epic?

17       **MS. MOSKOWITZ:**  Your Honor, just briefly, because

18   Apple said a couple of times that they're giving us everything

19   that we've asked for, including in response to Your Honor's

20   question.

21       My understanding is Apple is standing on the U.S.-only

22   objection as to this request as well.  So there's that issue.

23   We do need -- we do still seek this on a global basis, as the

24   request calls for.

25       I don't know if Apple intended to indicate that they're

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  going to give that to us on a worldwide basis.  But I don't

2  have anything else to say on the specific question on Watch and

3  AirPods other than what I've already said.

4           **THE COURT:**  Okay.  All right.  Thanks.

5       And then RFP 5, Epic cited a specific Apple document by

6  Bates number that, on its face, indicates that Apple is at

7  least able to estimate revenue from in-app purchases

8  specifically, and not just revenue from the App Store as a

9  whole.  And yet Apple's portion of the letter brief kind of

10 flat-out states that that information doesn't exist.

11      And I was just -- Mr. Srinivasan, if you could speak to

12 that, because I'm looking at a document that seems to say that

13 at least this information can be estimated and that executives

14 at least sometimes do that and then your letter brief, which

15 sort of defiantly says that this document doesn't exist.

16      And so I'm having a little bit of the same reaction I had

17 last time when Apple told me some information didn't exist and

18 I said, well, there's this P&L sheet that seems to have it.

19      So can you talk to that.

20           **MR. SRINIVASAN:**  Sure, Your Honor.

21      There's two pieces to this issue, and I think I can clear

22 that up a little bit.

23      RFP Number 3 specifically asks for revenue, cost, and

24 expense, and things like that, related to what they -- a

25 defined phrase of theirs, "IAP."

1        If you look at their definition in the RFPs, they define

2   IAP based on the developer agreement, a section which

3   essentially is the IAP API.  In other words, it's the

4   functionality in the App Store that processes in-app payments.

5   It's software code.

6        And so what we've said to them throughout -- and this is

7   an issue in this case, as you know, wherein they are claiming

8   that this IAP API is a separate product -- we've said it's not

9   a separate product.  It's just a piece of the App Store.

10       And so when they asked us in this RFP Number 5, in terms

11  of revenue, expense, and profitability related to this IAP

12  code, this API, we said this is sort of a nonsensical RFP

13  because it's like saying the cash -- what is the revenue

14  associated with the cash register in a retail store?  Well,

15  there's revenue for the store.  There's no revenue associated

16  with the cash register.

17       And that was the primary basis for our objection to

18  Number 5 and Number 30.  There is no conceptual revenue, cost,

19  expense associated with the IAP code.

20       That said, there is another RFP Number 8 where they ask

21  for revenue, costs, same type of information for the iOS

22  App Store.  And, of course, for the iOS App Store, we are

23  producing every possible iteration of revenue either coming

24  from an app purchase or an in-app purchase, the commissions

25  associated with each in terms of percentage and absolute

```
 1    number, as part of the transactional data production.  So

 2    that's number one.

 3         We've said:  You are getting revenue that you can then

 4    take, slice and dice.

 5              THE COURT:  Let me interrupt you here.  Apologies,

 6    Counsel.  But you're not really speaking to the heart of the

 7    issue.

 8         I understand that for Apple's internal reporting

 9    structures, Apple may not deem revenue to be associated with

10    in-app purchases and it might deem it just to be at the store.

11    And it may be that that reporting structure is what ultimately

12    goes into documents that are filed with the SEC.  I understand

13    companies have certain ways that they account for things.

14         And yet, I'm staring at an e-mail that seems to say that

15    even though Apple reports things that way, at least on one

16    occasion, they were able to estimate what was due specifically

17    to in-app purchases.  So that is possible.

18         And so that's the problem I'm having.  I get that Apple

19    might say:  For a certain reporting purposes, we don't

20    associate revenue with IAP in particular.  But then somebody

21    was able to do that.  That's my concern.

22              MR. SRINIVASAN:  And, Your Honor, again, yes, we can,

23    in fact, say that the revenue came from a particular stream;

24    and, in fact, we do have that -- you have seen that document

25    that they have identified.  And I apologize for not getting to
```

1   this sooner.

2       But we -- that particular document that they identified,

3   which is a weekly -- I think it's a weekly dashboard or has a

4   name similar to that, weekly summary -- there are roughly 700

5   iterations of that document in the custodial production that we

6   have produced that provides that weekly summary.  It's not

7   always the same amount of detail in it.  It does vary from week

8   to week at times.  But much of that information, to the extent

9   we have it in the custodial production, there is no

10  non-custodial repository for that information, we've produced

11  it.

12      Not only that, there are other types of documents.  There

13  is a second document that they referenced in their section that

14  ended in 3313.  I think it was with respect to their argument.

15  In the non-U.S. piece, at the very end of their argument, they

16  site both the document that Your Honor identified and another

17  one.  There's 100-plus iterations of that document in the

18  custodial production that we had produced.

19      We had said to them early on that:  You are getting much

20  of this in the custodial production, and we don't keep it as a

21  segregated basis.

22      But the individuals who create that kept it as custodians,

23  and they were all produced, hundreds of them.

24          THE COURT:  Okay.  Well, then I am going to order you,

25  in response to RFP 5, to produce documents that show revenue

1   specifically associated with in-app purchases.  It might be

2   that your response is to say you already did that.  Since I

3   haven't seen those documents, I won't know.  But I am going to

4   tell you to do that.  And if that's where this information is

5   and you've produced it, then maybe you're all set.

6            MR. SRINIVASAN:  That would be fine with us,

7   Your Honor.

8            THE COURT:  What about the other things:  the costs,

9   expenses, investments?  Even if in Apple's formal reporting,

10  you don't -- Apple doesn't associate certain costs or

11  investments with in-app purchases, are there other ways that

12  can be estimated, or is that truly non-existent?

13           MR. SRINIVASAN:  Well, Your Honor, it truly is

14  non-existent.  This is sort of a replay, I think, of the

15  conversation you had with Mr. Dettmer a few weeks ago, wherein

16  occasionally folks have done this on an ad hoc basis.  And you

17  asked for us to go investigate, you know, that individual's --

18  whatever data they relied on in their methodology.

19       That's the issue again here.  We do not track the cost and

20  the other information that they're asking with respect to the

21  App Store.

22       To the extent we are already looking for it because

23  Your Honor ordered us to do that, we are doing that.  And if we

24  find something, we will certainly provide it.

25       Two specific issues, though, that should flow from this

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

and is mentioned in their brief.  One is -- you know, and

there's the excerpt from Mr. Fischer regarding fees paid to

credit card companies and other third-party payment providers

or processors.  That is a separate request, 18 and 19.

I believe there's two requests that they've asked for.  And we

are looking for that information, and we'll be providing that

information to them on a non-custodial basis.  That's a cost

that they identified, a discrete cost.  We don't necessarily

allocate that to the App Store, but we went and are looking for

it.

    And also, we have agreed when they asked us -- I think

it's RFP 10 -- for the compensation information, what we pay

our app reviewers, which they're characterizing as a cost,

that's fine.  We keep that separately, and we are producing

that as well.

    So where they have identified particular costs, we have

endeavored to look; and if we have it, we are producing it.

    **THE COURT:**  But I take it from your comments in the

letter brief that your view is those are going to be costs of

the App Store at large.  Those are not just IAP costs; right?

    **MR. SRINIVASAN:**  That's right, Your Honor.  As

mentioned, we don't really associate it -- we don't look at

that as a product.  And on top of it, even Apple doesn't

necessarily even do much in terms of allocating costs to the

App Store in any kind of organized way.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **THE COURT:**  I see.

2     Ms. Moskowitz, your response.

3          **MS. MOSKOWITZ:**  Your Honor, it's difficult for me to

4    know how Apple tracks things.  But we did get the sense that

5    credit card fees, for example, would be associated with in-app

6    purchase.

7          And it sounds like Apple is only responding to the extent

8    we've identified specific costs.  But we don't know what the

9    costs are or how they're tracked.  And we do have concerns that

10   IAP -- and if we've done it in the wrong technical definition

11   in our request, I worry that that's what Apple's resting on,

12   instead of actually stepping back and looking at the real

13   question here is:  Are there costs and expenses that are

14   attributable to the IAP as opposed to the App Store generally

15   so that we can understand how -- what Apple's profits are, what

16   their margin is, how things are tracked?  Are they making

17   investments in IAP, or are they not making investments in IAP?

18         And I don't know where to go for that.  And I -- and we're

19   asking Apple for that.  And sort of hearing that we made the

20   wrong technical definition of IAP in our request; thus they

21   don't have anything responsive, is concerning.

22         But we do have a sense that based on the fact that we get

23   these expenses being tracked, we are concerned that they might

24   exist.  And I don't know how better to ask for them other than

25   how we've done.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**THE COURT:**  Okay.  Well, for revenue, with that document that you provided, you did prove to me that they have a way of tracking in-app purchase revenue different from App Store revenue as a whole.  So I'm going to say that in the order and order Apple to produce those.

And as you've heard from Mr. Srinivasan, I think Apple's likely going to say they did because that's in their e-mails.

As to the cost stuff, I don't know what Apple has.  I read the excerpt of Mr. Fischer's deposition, and even though the question was phrased in terms of in-app purchases, his answer seemed broader.  And so that testimony didn't persuade me that they have a specific allocation of credit card fees to IAP as distinct from the App Store generally.  It looked to me like he was talking about the App Store in general.

And so, but my thought is to order Apple to produce whatever it has that's responsive to RFP 5, and they're going to have to go tell you what there is.  But I don't know how else to handle it better.

I mean, you know so much more about the facts than I do.  And if even you don't know what Apple has, then I really don't either.

So is there anything else that you think I can do on that, Ms. Moskowitz?

**MS. MOSKOWITZ:**  With respect to RFP 5, which is what we're talking about, I would like clarification that Apple's

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  going to make sure that they've given us this data globally and

2  not just for U.S., because that is what the request was.  And

3  it's really just looking by year.

4       And if the answer is:  You have every single weekly

5  scorecard between -- for the relevant time period and they want

6  to tell us that we do that and where they are, then, okay, we

7  can do the math on that.

8       But it's clearly that there's something generating these

9  reports on a weekly basis that is not sitting in someone's

10  e-mail files but, rather, is being pulled from something.

11  █████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████  ███████████████

15  ██████████████████████████

16       **THE COURT:**  They might file a motion to seal this part

17  of the transcript.

18       **MS. MOSKOWITZ:**  Okay.  I just stopped myself.

19       But it says a number, and then it says below that the

20  specific for in-apps and then a specific number for

21  subscriptions.

22       And so we're trying to -- that data came from somewhere,

23  and we're asking them just very much hit a button to give us

24  that on a yearly basis, by country, by year.  And that's what

25  we're asking for on the revenue.  It seems very simple, rather

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    than pointing us to a bunch of e-mails produced with

 2    attachments.

 3              THE COURT:  Well, let me ask Apple.

 4        What about that?

 5              MR. SRINIVASAN:  Your Honor, I -- by the way, just as

 6    a preface, we do -- we would want to be careful about what sort

 7    of highly confidential AEO information is disclosed in the

 8    transcript.  And we'll take a look at that and submit

 9    something, you know, to be sealed immediately if it's

10    warranted.  So we do take that seriously.

11        But on the question of revenues, you know, I didn't quite

12    follow what Ms. Moskowitz was saying.  But what we can tell you

13    is, unequivocally, again, IAP is just a function.  It's like a

14    cash register.  There's no cost when you go to a store and say:

15    Well, how much was your profit margin on your cash register?

16        What I think that's being conflated here and I think where

17    you were right about where Mr. Fisher's testimony was, he's

18    talking about the App Store.  This only makes sense in the

19    context of the App Store.  And the App Store has revenue.  One

20    stream is through in-app purchases.  Not the API, which is how

21    they it defined it, but the App Store itself has revenue, has

22    profit, you know, and that much we do track.  That's RFP 8.  We

23    are producing that for the U.S. storefront.

24              THE COURT:  On the U.S., not for global?

25              MR. SRINIVASAN:  Not for global, except, as noted,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   they have roughly almost 700 instances of this weekly summary

2   that does often -- not in every instance, I don't believe, but

3   in many cases, depending on the week, include some global

4   information.

5        And again --

6        **THE COURT:**  This example was global.  It had the whole

7   world in it.

8        **MR. SRINIVASAN:**  Yes, yes.  And often it does.  And

9   we're not withholding that because it includes also

10  U.S. information.

11       If we had some repository of this information that was

12  simply non-U.S., we don't believe we're required to look for it

13  for the same reasons Your Honor mentioned at the top of this

14  hearing.

15       But to the extent they frequently will include both

16  U.S. and non-U.S., that's been produced.  They have it.  They

17  have plenty of information to look at and compare.  And I would

18  respectfully suggest they at least do that.  I don't think

19  they've even tried to look at what they already have to say:

20  We have X; we need some more.

21       **THE COURT:**  Well, one question that -- or one issue

22  that she pointed out to you is that there's a field that seems

23  to show in-app purchases.  And so the information isn't only in

24  that cover e-mail because that report is generated out of a

25  database.  And so it seems like there should be a non-custodial

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1    source of the in-app purchase revenue.  What about that?

 2            MR. SRINIVASAN:  Well, yes.  And, in fact, that's the

 3    source that we're producing.  That's the transactional data

 4    that we're producing to all plaintiffs in January.

 5            THE COURT:  Oh.  That's without the others.

 6            MR. SRINIVASAN:  Yes.  And that provides -- that will

 7    tell you whether the revenue to the App Store came through the

 8    IAP or it came from an up-front purchase of the app itself,

 9    which are really the two primary means in which revenue comes

10    into the App Store.  And that's all set out in detail, every

11    single transaction, since the very first transaction in the

12    App Store, Your Honor.

13            THE COURT:  Okay.  Thank you.

14        Ms. Moskowitz, does that help?

15            MS. MOSKOWITZ:  It doesn't because they're only doing

16    that for the U.S.

17        So I'm not asking for every single transaction for the

18    entire world.  I certainly don't want to have to add up all

19    those numbers.  And it sounds like there's a button you can

20    push to add those numbers up, to print out an example of what

21    we just attached to Your Honor.  And we're asking for them to

22    push that button and give that information to us, not just for

23    the U.S., but for year over year by country.

24        And so we just heard it does exist.  And we just -- it can

25    clearly be queried.  So we just don't see why it can't be

1   queried and given to us on a yearly basis, like we asked in a

2   very targeted way that we asked.

3           **THE COURT:**  All right.  Okay.  Well, I have what I

4   need to issue an order.  I'll hope to get it out within a day

5   or two.

6       I know we have upcoming briefing on at least the Apex

7   issue.  Are there any other -- now I'm including all the

8   different sets of plaintiffs.  Are there any other briefing

9   schedules we need to talk about, or are we good with the

10  existing ones that we have in place?

11          **MR. SRINIVASAN:**  Well, Your Honor, we do -- for Apple,

12  we have, I think, a hearing also set for the 8th regarding a

13  follow-up on one of the plaintiff's RFPs, with briefing,

14  I think, due on the 6th.  We have a few disputes that we would

15  also like to raise on that date, potentially, if we can't work

16  it out.

17      We are working with Epic on adding some custodians of

18  Epic's, just as Apple added custodians, and we may have a

19  dispute there, Your Honor.

20      And we also have data requests, just like Epic has of us,

21  that we're, again, trying to work out.  We may have a dispute

22  there.

23      And lastly, we may have another dispute with Samsung that

24  flows from their prior hearing we had with Your Honor and the

25  order and issues we're having with their compliance.  They're

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   not here, but I won't say more.

 2        But we do have those issues that we'd like to tee up for

 3   next week, for that 8th hearing.

 4        And before I turn it over to plaintiffs' counsel,

 5   Your Honor, we have one other issue, and it just sort of was

 6   implicated again, although differently.

 7        We do have that motion to seal based on what we believe to

 8   have been a disclosure of highly confidential AEO material.  I

 9   know Your Honor has the sealing motion under submission.

10   Plaintiffs -- developer plaintiffs are not, I don't believe,

11   opposing that.  But in their submission, nor did they really

12   get to the heart of the issue in terms of whether they made a

13   disclosure or not.  That is a motion that we may bring, a

14   motion for sanctions.

15        And the question that we have for Your Honor is:  Is that

16   a motion that we would bring before you?  I mean, the

17   disclosure did occur in a proceeding of yours.  Or would that

18   be -- would you suggest that we bring that before

19   Judge Gonzalez Rogers?

20            THE COURT:  So was this a disclosure during a hearing?

21        MR. SRINIVASAN:  Yes.  It was during the December 15th

22   hearing in front of Your Honor.

23            THE COURT:  Oh, I see.  Remind me.  Have you filed a

24   motion to seal that portion of the transcript?

25        MR. SRINIVASAN:  We have, Your Honor, and that's
```

 1  submitted before you.

 2           **THE COURT:**  Okay.

 3           **MR. SRINIVASAN:**  And so we would need you to rule on

 4  that.  And then the question is, you know -- to the extent we

 5  will be bringing a sanctions motion, you know, the question is:

 6  Where would we bring that?

 7       On the one hand --

 8           **THE COURT:**  I see.

 9           **MR. SRINIVASAN:**  Right.

10           **THE COURT:**  I think you should bring it before me

11  because it's a hearing that happened before me.  And this is

12  all within the umbrella of the discovery reference.

13           **MR. SRINIVASAN:**  Okay.

14           **THE COURT:**  One issue to think about is, if your

15  opponent discusses confidential AEO material in a hearing --

16  I guess the hearing is public, is the issue.  So even sealing

17  the transcript isn't a good enough remedy.

18       Okay.  Well, you can discuss those things in your motion.

19           **MR. SRINIVASAN:**  Okay.  Thank you, Your Honor.

20           **THE COURT:**  And let me hear now from the plaintiffs on

21  any big plans you may have for additional discovery disputes.

22           **MR. LOPEZ:**  So, Your Honor, this is Rob Lopez for the

23  developers.

24       Just a few issues that I'm not sure will ripen into actual

25  motions, but one thing we wanted to raise is the fact that,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   unfortunately, Apple has gone dark with respect to our
 2   questions about the transactional database and whether it
 3   intends to produce by tomorrow.  We've asked for information
 4   about that to coordinate logistics if it's going to do that.
 5        Mr. Srinivasan, a moment ago, said that they're going to
 6   produce the transactional data in January.  I don't know if he
 7   meant cost and expense data at that point or if he was talking
 8   about the large transactional revenue database that we've also
 9   been speaking about and that implicates the request for
10   extension that we made.
11        So I'd like some clarity there, and it would be wonderful
12   if we could know if they're going to actually produce tomorrow.
13   We've corresponded with them and said that, in our view,
14   production means getting it to us tomorrow.  It's the COVID
15   era, unfortunately.  We've offered to have somebody on standby
16   to receive it if they're going to do that, but time is of the
17   essence if they're going to do that, you know, again, in
18   service of this February 3rd current deadline on class cert.
19        So we're hoping to get some clarity there today and hoping
20   to get instruction from the Court on that.
21           THE COURT:  I think Judge Gonzalez Rogers addressed
22   this by giving them -- saying that they either had to produce
23   this by December 31st or she would change the class cert
24   briefing schedule.  And then the mechanism for you learning,
25   I believe she said they had to file something on January 4th.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1          Is that correct?
 2              MR. LOPEZ:  That's correct.
 3              THE COURT:  Okay.
 4              MR. LOPEZ:  But, again, Your Honor, I mean, if nothing
 5      else, as a matter of professional courtesy, it is the holiday
 6      season as well, and getting staffing issues attendant to COVID
 7      as well, it'd be wonderful if we knew if they were actually
 8      going to produce this to us tomorrow.
 9          And for some reason they've declined to tell us whether
10      they're even trying to do that, despite our repeated requests.
11          So it's really, in my view, unfortunately, unprofessional
12      to not have substantive responses to our questions in that
13      regard.
14              THE COURT:  Well, I'm not going to add to the
15      reporting requirement that Judge Gonzalez Rogers has laid out.
16      She gave them a deadline and then told them that on
17      January 4th, they have to follow up and let her know whether
18      they did that or not.  And so I'm just going to let that sit
19      where it is.
20              MR. LOPEZ:  Okay.  Thank you, Your Honor.
21          The next issue is with regard to depositions, which,
22      again, has been an issue that we have brought before the Court.
23          The parties have asked for various dates from Apple.
24      Apple has given us dates later than we asked for for four
25      deponents.  We're particularly concerned about no dates yet for
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Mr. Schiller, Mr. Gray, who, in our view, have very much to do

2    with our class cert briefing.  And Mr. Srinivasan himself

3    referred to Mr. Schiller as somebody who obviously does have

4    information relevant to our motions.

5        We still don't have dates.  We asked for dates prior to

6    January 15.  We've gotten nothing from them with regard to

7    those two.  And so we'd like to get those dates going.  And I

8    hope we don't have to wait to bring a motion to the Court, but

9    we need those dates.

10       **THE COURT:**  Okay.  Well, then what I'm going to say

11   about that is, I encourage Apple to provide dates as soon as

12   you can.  If the parties are at an impasse, please reach out to

13   my courtroom deputy.  We can probably do that one -- we might

14   not need a discovery letter brief.  You can certainly file one

15   if you need to.  But, Apple, I do think you need to at least

16   get back to the plaintiffs with dates.

17       Are you prepared to do that?

18       **MR. SRINIVASAN:**  Your Honor, to be clear, we have --

19   they've asked for eight people.  We gave dates for four.  We

20   did provide dates.  We are working on the other four.

21       And, I mean, it's a little galling to hear that, you know,

22   it's the holidays, where my client has been working on a number

23   of fronts, on document issues and deposition issues, to do all

24   manner of things to accommodate what plaintiffs are asking for,

25   and we're doing it, we're working on all of these things over

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  the holidays ourselves and have provided them four of the eight

2  requested dates and are working on the other four.

3        **THE COURT:**  Okay.  Well, please keep working.  We've

4  all been very busy over this holiday season with these cases.

5  So we're all experiencing the same amount of Christmas joy with

6  respect to that.  But keep going.  It is important to got these

7  depositions on calendar.

8        **MR. LOPEZ:**  And then --

9        **THE COURT:**  Go ahead.

10        **MR. LOPEZ:**  And then just two more issues, Your Honor,

11  that hopefully won't ripen into a need for motions practice,

12  but they could.

13        Back to the transactional database.  Apple has told us

14  that there are X number of fields in its transactional

15  database, and it doesn't want to reveal what all those fields

16  are.  It wants to simply say that it's not going to tell us.

17  It's going to describe a few of those fields generally.

18        And we're disturbed by that, obviously, because Apple is

19  making this unilateral determination that these things don't

20  matter.

21        So we've asked Apple to give us more information with

22  regard to those.  I'm not sanguine that Apple is going to do

23  that, so that may be something we have to bring to the Court

24  very soon as well.

25        **THE COURT:**  Okay.  Let me ask Apple.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    I was under the impression that you were going to tell the

2    plaintiffs what the fields are in the data you're producing.

3        **MR. SRINIVASAN:**  Yes, Your Honor.  And I think the

4    order was -- I don't have it in front of me but -- was that if

5    there were lots of fields, that we didn't have to necessarily

6    detail all of them.

7        There's 520 fields, and my understanding is that we

8    described categories of those fields.

9        **THE COURT:**  Oh, sorry.  I think maybe we're talking

10   past each other.

11       There's the transactional data, the big data set that you

12   were going to produce.  And then, separately, I thought the

13   plaintiffs had other RFPs that asked for, like, every field

14   that Apple has related to the App Store.

15       **MR. SRINIVASAN:**  That is right, Your Honor.  And I do

16   think that's what I -- that was what I was attempting to

17   address.  And I believe Your Honor's direction was that, within

18   reason, we had to do that; but if there was an overwhelming

19   number of fields, we didn't have to go and catalog each one.

20   And we are in --

21       **THE COURT:**  I don't have my order in front of me, but

22   that sounds like something I said.

23       I was -- Mr. Lopez, maybe I misunderstood you.  I thought

24   you were talking about the big data set, the relational data

25   set that Apple was going to produce.  You were saying that they

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    weren't going to tell you what all those fields were.

2        Did I misunderstand you?

3        **MR. LOPEZ:**  No.  That's correct, Your Honor.  There

4    are -- again, Mr. Srinivasan is the one who's revealed the

5    number of fields.  I wasn't going to do that.

6        But there are a large number of fields available.

7    However, it's not that large relative to the size of the

8    database.  And Apple has provided us with a few categorizations

9    of what's supposedly in those fields, but we'd like to do the

10   examination ourselves.  And in our view, Apple has not made a

11   showing to us, at least, of undue burden in order to produce

12   those additional fields for us to examine.

13       **THE COURT:**  Okay.  Well, Mr. Srinivasan, let me ask

14   you.  And maybe I misunderstood.  But I thought that there were

15   lots and lots of fields potentially associated with the

16   App Store, and that the relational data set you were producing

17   is not all of those but is a relevant subset of those.

18       Have I misunderstood?

19       **MR. SRINIVASAN:**  I don't want to speak out of school,

20   Your Honor, because I don't know that I know the answer to your

21   question, as that was more one of my colleague's area.

22       That said, we have identified -- for the relational data

23   set, my understanding is there was an agreement on what fields

24   we would produce, and we identified every one of those fields.

25       On the delta of if there are additional fields or not, I

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    don't know what the negotiation was or what the history of that

 2    was.

 3         THE COURT:  Okay.  Because I think that for the

 4    relational data set that you've produced, when you say, "We've

 5    looked through all the possible fields and here are the fields

 6    that we think are relevant and we're producing these to you,"

 7    then I do think you have to tell them what those fields are

 8    because Apple is representing that it has -- these are the

 9    relevant ones.  And you're turning them over in the relational

10    data set.  And just to make sense of what the relational data

11    set is, you need to tell them what all those fields are.

12         And as for the delta and all the other fields that may be

13    in the App Store, I think my prior order addressed those.  And

14    I don't think I necessarily told -- I don't believe I told you

15    to identify a huge number of fields that was burdensome.

16         MR. SRINIVASAN:  My understanding is we are complying

17    with your order in this respect.  And we have sent the

18    plaintiffs a letter on that.  If they have an issue with it, we

19    would certainly meet and confer with them.  But we are, we

20    believe, complying with your order from two weeks ago.

21         THE COURT:  Then, Mr. Lopez, it seems like what

22    plaintiffs need to do is, once you get your hands on that

23    relational data set, you need to look at it and see are there

24    any fields in it that you don't understand.  And then you can

25    go to Apple and say:  Hey, what's this field?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. LOPEZ:**  True enough, Your Honor, and we intend to

2    do that.  However, there are these additional fields that are

3    out there.  And, again, our questions relate, as to these

4    additional fields, as to whether or not, in fact, these are

5    things that we should be getting as part of this production.

6          But, you know, harkening back to something Ms. Moskowitz

7    said, we just don't know what's out there.  And in our view,

8    this has been a continuing problem with Apple that's outside

9    the spirit of the guidelines in the Northern District of

10   cooperation on ESI.

11         So we'll continue to speak with them.  But the Court asked

12   if there may be additional things that we need to tee up soon,

13   and that may be something that we need to tee up soon.

14         **THE COURT:**  Okay.  Thank you for the preview.

15         **MR. LOPEZ:**  Thank you, Your Honor.

16         And the last thing, if I could, the Court will recall that

17   it ordered production of certain cost and expense material.

18   Don't have a handle yet on when Apple intends to produce that.

19   I believe the last communication was that it would intend to do

20   so promptly.  Obviously, again, our class cert deadline as of

21   today is February 3rd.  So we certainly hope that Apple means

22   promptly in the sense of within the next week or so.  So that

23   may be something that we need to bring to the Court if it drags

24   on past that.

25         But we've also, I think, almost ripened into an impasse,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    if not at an actual impasse, with regard to certain requests

2    that we have made pursuant to the Court's order for certain

3    linked materials, reference materials, that sort of thing.  As

4    I understand it, there are ten out there that we've identified.

5    Apple seems to think that we need to do more to identify what's

6    there or it's declining to produce.  I don't really know what's

7    going on there.  But that's a hot issue as well that we may

8    need to bring to the Court if we can't resolve that within the

9    next couple of days.

10          **THE COURT:**  Okay.  Thank you.

11       Any previewing that Epic or the consumer plaintiffs want

12   to raise?  You don't have to, but I just thought, as long as

13   we're thinking about what the next month is going to look like

14   in terms of upcoming discovery disputes, if I know what's

15   coming my way, then that's helpful to me.

16          **MS. BYRD:**  Your Honor, you set a hearing for the 8th

17   for the international transactional data that the consumers

18   were seeking.  And you also ordered us to further meet and

19   confer about the consumer demographic and usage information.

20   And we haven't made much progress on that.  So I anticipate

21   combining those issues into one letter brief to both be heard

22   on the 8th.  I just wanted to give you a heads-up on that.

23          **THE COURT:**  Okay.  Here's this, and this will also get

24   to Mr. Srinivasan's comments about additional issues that Apple

25   may want to raise.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    For any letter briefs that you want me to hear on

2  January 8th, please have those filed by noon on January 6th.  I

3  just need some time to read through them and prepare.  So a

4  noon deadline on January 6th for anything you want me to hear

5  on the 8th.

6    And I'm going to give you the same admonition that I gave

7  you at the December 15th hearing about letter briefs, which is,

8  you should make sure that for each letter brief, you discuss a

9  number of discrete issues that you can discuss with reasonable

10 detail in the page limit provided.  But there's no limit on the

11 number of letter briefs.

12   What I don't want you to do is to have really cursory,

13 brief arguments and try to cram in a lot of issues into a

14 five-page letter brief because that's just not helpful because

15 I don't have the explanation that I need.

16   So if you need more robust discussion of issues, then put

17 them into different letter briefs.  And the order that's going

18 to come out of today's hearing is going to remind you all of

19 that as well because I began with this thought, which is that

20 Epic made an argument about non-U.S. documents, it was very

21 brief, and then they just sort of gestured at 70 RFPs.  And

22 that's not the way that I want to hear a briefing.

23   So don't cram a lot of things into each particular letter

24 brief.  Just make sure that you identify a couple of subjects

25 that you can discuss in enough detail that it can be

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   persuasive.  And then, beyond that, do additional letter

2   briefs.  All right?

3        **MS. BYRD:**  Yes, Your Honor.  I just have a clarifying

4   question.

5        At the last hearing, we had mentioned we had offered to

6   submit a declaration from our expert in support of needing the

7   international transactional data.  I have that declaration.

8   Ordinarily, Your Honor's rules don't allow that sort of thing

9   to be attached.  But is it okay in this situation?

10       **THE COURT:**  Oh.  I thought -- oh.  I thought my prior

11  order contemplated that you would attach it.  Like, I need to

12  read the declaration.

13       **MS. BYRD:**  Okay.  Yeah.  I just wanted to make sure --

14       **THE COURT:**  Okay.

15       **MS. BYRD:**  -- because it's sort of contrary to your

16  standing orders.

17       **THE COURT:**  Okay.  Yes, please go ahead.

18       And I think I also invited Apple to submit their own

19  declaration if they wanted to.  And, of course, they can attach

20  that as well.

21       **MS. BYRD:**  Okay.  Thank you.

22       **MR. SRINIVASAN:**  Thank you, Your Honor.

23       **MS. MOSKOWITZ:**  Your Honor, nothing specific other

24  than to say -- or to ask, I suppose, is there any time limits

25  or issue limits that Your Honor has for next week?  Because I

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1  know Apple's contemplating potentially adding.  We may have a

 2  couple that we're trying to wrap up as well, hopefully we can

 3  wrap up without dispute.  But is Your Honor constrained in any

 4  way with what we put on your plate for next week?

 5           **THE COURT:**  Good question.  The answer is yes, because

 6  I have a settlement conference starting at 10:00 a.m.  So if

 7  there's too much to cover in an hour, I'm likely to start the

 8  hearing earlier at 8:00 a.m.  Ms. Moskowitz, you won't care

 9  because you're in New York; so that's convenient for you.  But

10  I'm probably going to be maxed out at two hours for that

11  hearing.

12           **MS. MOSKOWITZ:**  Okay.  Thank you, Your Honor.

13           **MR. SRINIVASAN:**  Thank you, Your Honor.

14           **THE COURT:**  All right.  Okay.  All right.  Thank you,

15  Counsel.  And as I said, I'll look to get an order out within

16  the next day or so.

17           **MS. MOSKOWITZ:**  Thank you very much, Your Honor.

18           **MR. LOPEZ:**  Thank you, Your Honor.

19           **MR. SRINIVASAN:**  Thanks very much.  Happy New Year,

20  everybody.

21           **MR. LOPEZ:**  Happy New Year.

22           **MS. MOSKOWITZ:**  Happy New Year.

23           **THE CLERK:**  Thank you, everyone.

24      We're off the record.  Court is in recess.

25                  (Proceedings adjourned at 10:59 a.m.)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Wednesday, December 30, 2020

7

8

9    _____

10     Ana M. Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
             Official Reporter, U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED