Gary A. Bornstein (pro hac vice)
gbornstein@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-
  Defendant Epic Games, Inc.*

Mark A. Perry, SBN 212532
mperry@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant and Counter-
Plaintiff Apple Inc.*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

EPIC GAMES, INC.,

Plaintiff,

vs.

APPLE INC.,

Defendant.

APPLE INC.,

Counterclaimant,

vs.

EPIC GAMES, INC.,

Counter-Defendant.

Case No. 4:20-CV-05640-YGR

**JOINT SUBMISSION REGARDING TRIAL ELEMENTS, LEGAL FRAMEWORK AND REMEDIES**

Judge:  Hon. Yvonne Gonzalez Rogers

# TABLE OF CONTENTS

**Page**

1.   MUTUAL RESERVATION........................................................................1

2.   STANDING ........................................................................................3

**EPIC'S CLAIMS** .........................................................................................**6**

3.   SHERMAN ACT—EFFECT ON INTERSTATE COMMERCE.....................7

4.   MARKET DEFINITION—RELEVANT PRODUCT AND GEOGRAPHIC
     MARKET.........................................................................................8

    4.1   Relevant Market—Product Market Definition ....................................10

        4.1.1   Analytical Framework ...........................................10

        4.1.2   Single-Brand Markets ...........................................13

        4.1.3   Submarkets.........................................................16

        4.1.4   Two-Sided Platforms ............................................18

    4.2   Relevant Market—Geographic Market Definition ................................21

5.   SECTION 1 OF THE SHERMAN ACT—UNREASONABLE RESTRAINT OF
     TRADE—ELEMENTS .......................................................................22

    5.1   Section 1 of the Sherman Act—Unreasonable Restraint of Trade—
          Agreement......................................................................................23

    5.2   Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of
          Reason..........................................................................................24

        5.2.1   Section 1 of the Sherman Act—Unreasonable Restraint of Trade—
                    Rule of Reason—Market Power ................................26

        5.2.2   Section 1 of the Sherman Act—Unreasonable Restraint of Trade—
                    Rule of Reason—Anticompetitive Effects in the Relevant Market..........28

        5.2.3   Section 1 of the Sherman Act—Unreasonable Restraint of Trade—
                    Rule of Reason—Evidence of Procompetitive Effects............................30

        5.2.4   Section 1 of the Sherman Act—Unreasonable Restraint of Trade—
                    Rule of Reason—Less Restrictive Alternative ..........................................32

6.      SECTION 1 OF THE SHERMAN ACT—TYING...................................................34

        6.1     Section 1 of the Sherman Act—Tying—Per Se or Rule of Reason

                Analysis.................................................................................................34

        6.2     Section 1 of the Sherman Act—Tying—Per Se Analysis—Elements...................37

                6.2.1   Section 1 of the Sherman Act—Tying—Per Se Analysis—

                        Presence of Two Products.........................................................40

                6.2.2   Section 1 of the Sherman Act—Tying—Per Se Analysis—Proof of

                        a Tie ....................................................................................42

                6.2.3   Section 1 of the Sherman Act—Tying—Per Se Analysis—

                        Coercion and Market Power With Respect to the Tying Product..............43

                6.2.4   Section 1 of the Sherman Act—Tying—Per Se Analysis—

                        Foreclosure of a Substantial Volume of Commerce with Respect to

                        the Tied Product.....................................................................45

                6.2.5   Section 1 of the Sherman Act—Tying—Per Se Analysis—

                        Pernicious Effect and Lack of Any Redeeming Value .............................46

                6.2.6   Section 1 of the Sherman Act—Tying—Per Se Analysis—

                        Business Justification Defense................................................48

        6.3     Section 1 of the Sherman Act—Tying—Unlawful Tying under Rule of

                Reason..................................................................................................49

7.      SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—ELEMENTS ..........51

        7.1     Section 2 of the Sherman Act—Monopolization—Monopoly Power..................52

        7.2     Section 2 of the Sherman Act—Monopolization—Willful Maintenance of

                Monopoly Power....................................................................................55

                7.2.1   Section 2 of the Sherman Act—Monopolization—Willful

                        Maintenance of Monopoly Power—Analytical Framework....................56

                7.2.2   Section 2 of the Sherman Act—Monopolization—Willful

                        Maintenance of Monopoly Power—Anticompetitive Effects ..................59

7.2.3   Section 2 of the Sherman Act—Monopolization—Willful Maintenance of Monopoly Power—Business/Procompetitive Justification ............................................................. 62

7.2.4   Section 2 of the Sherman Act—Monopolization—Willful Maintenance of Monopoly Power—Less Restrictive Alternative ............ 65

7.2.5   Section 2 of the Sherman Act—Monopolization—Willful Maintenance of Monopoly Power—Balancing the Competitive Effects ......................................................................... 66

7.3   Section 2 of the Sherman Act—Monopolization—Causal Antitrust Injury .......... 67

8.   SECTION 2 OF THE SHERMAN ACT—ESSENTIAL FACILITY .............................. 68

8.1   Section 2 of the Sherman Act—Essential Facility—Competitor Standing .......... 70

8.2   Section 2 of the Sherman Act—Essential Facility—Essential Facility Defined ................................................................................ 73

8.3   Section 2 of the Sherman Act—Essential Facility—Monopolist in Control of an Essential Facility ................................................................. 75

8.4   Section 2 of the Sherman Act—Essential Facility—Reasonable Duplication Not Possible ................................................................ 76

8.5   Section 2 of the Sherman Act—Essential Facility—Denial of Access ................ 78

8.6   Section 2 of the Sherman Act—Essential Facility—Feasibility of Providing Facility ........................................................................ 80

9.   FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT (FTAIA) ............................ 82

10.   CARTWRIGHT ACT—RELATION TO SHERMAN ACT .......................................... 84

11.   CALIFORNIA UNFAIR COMPETITION LAW .......................................................... 88

11.1   California Unfair Competition Law—Statutory Standing ..................................... 89

11.2   California Unfair Competition Law—Unlawful Prong ......................................... 90

11.3   California Unfair—Competition Law—Unfairness Prong .................................... 91

11.3.1   California Unfair Competition Law—Unfairness Prong—Business Competitor Claims ............................................................ 94

11.3.2  California Unfair Competition Law—Unfairness Prong— Consumer Claims .................................................................96

**APPLE'S COUNTERCLAIMS** .................................................................**98**

12.   BREACH OF CONTRACT .................................................................99

   12.1   Breach of Contract—Existence of a Contract ...............................100

   12.2   Breach of Contract—Plaintiff's Substantial Performance ..................101

   12.3   Breach of Contract—Breach ...............................................102

   12.4   Breach of Contract—Causation and Damages ................................103

13.   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING .................................................................104

   13.1   Breach of Implied Covenant of Good Faith and Fair Dealing—The Parties Entered Into A Contract .................................................105

   13.2   Breach of Implied Covenant of Good Faith and Fair Dealing—Plaintiff's Substantial Performance .................................................106

   13.3   Breach of Implied Covenant of Good Faith and Fair Dealing—Conditions Precedent to the Defendant's Performance Occurred ......................107

   13.4   Breach of Implied Covenant of Good Faith and Fair Dealing— Interference With Plaintiff's Right to Receive the Benefits of the Contract .......108

   13.5   Breach of Implied Covenant of Good Faith and Fair Dealing—Causation and Damages .................................................................109

14.   QUASI-CONTRACT / UNJUST ENRICHMENT ......................................110

   14.1   Quasi-Contract / Unjust Enrichment—Receipt of a Benefit .................111

   14.2   Quasi-Contract / Unjust Enrichment—Unjust Retention of the Benefit at the Expense of Another .................................................112

15.   INDEMNIFICATION .................................................................113

**SELECTED AFFIRMATIVE DEFENSES** .................................................**114**

16.   EPIC'S AFFIRMATIVE DEFENSES .................................................115

   16.1   Epic's Affirmative Defenses—Antitrust Illegality ...........................115

16.1.1  Illegality Under Federal Law ....................................................115

16.1.2  Illegality Under State Law .......................................................117

16.2    Epic's Affirmative Defenses—Void as Against Public Policy..........................119

16.3    Epic's Affirmative Defenses—Unconscionability ...............................120

17.     APPLE'S AFFIRMATIVE DEFENSES ........................................................122

17.1    Apple's Affirmative Defenses—Failure to Join an Indispensable Party ............122

17.2    Apple's Affirmative Defenses—Waiver.......................................................123

17.3    Apple's Affirmative Defenses—Estoppel ......................................................124

17.4    Apple's Affirmative Defenses—Limitations on Actions ....................................125

**REMEDIES .........................................................................................................127**

18.     REMEDIES SOUGHT BY EPIC—LEGAL PRINCIPLES.............................................128

18.1    Remedies—Declaratory Judgment Act..........................................................128

18.1.1  Remedies—Declaratory Judgment Act—Declaration—Standing...........129

18.1.2  Remedies—Declaratory Judgment Act—Declaration—Equitable

        Factors ....................................................................................130

18.2    Remedies—Clayton Act .............................................................................131

18.2.1  Remedies—Clayton Act—Injunction—Antitrust Standing ...................132

18.2.2  Remedies—Clayton Act—Injunction—Antitrust Injury .......................133

18.2.3  Remedies—Clayton Act—Injunction—Equitable Factors.....................135

18.2.4  Remedies—Clayton Act—Injunction—Scope ........................................142

18.3    Remedies—Cartwright Act..........................................................................150

18.3.1  Remedies—Cartwright Act—Injunction—Scope ..................................151

18.4    Remedies—California Unfair Competition Law ................................................152

18.4.1  Remedies—California Unfair Competition Law—Injunction—

        Scope........................................................................................154

19.     REMEDIES SOUGHT BY APPLE—LEGAL PRINCIPLES .......................................155

19.1    Remedies—Compensatory Damages..............................................................155

19.2    Remedies—Restitution/Unjust Enrichment.....................................................156

19.3    Remedies—Declaratory Judgment ........................................................157

19.4    Remedies—Indemnification ..............................................................158

1   **1.      MUTUAL RESERVATION**

2         Pursuant to the Court's October 21, 2020 Order, Dkt. 132, the parties have set forth below

3   certain agreed-upon and disputed principles of law regarding the claims asserted by Epic and the

4   counterclaims asserted by Apple, as well as certain affirmative defenses asserted by the parties and

5   principles relating to remedies that will be sought by the parties.  However, this submission is

6   being made before the close of fact discovery, before the service of any merits expert reports, and

7   before the final pretrial submissions have been made.  The parties are also cognizant of the Court's

8   instruction "not to pre-argue the case" and that they will be afforded an opportunity to further brief

9   the legal issues in view of the evidence.  Dkt. 241 at 2.  Accordingly, the parties reserve their

10  respective rights to supplement and modify this submission in their pre-trial proposed conclusions

11  of law and any post-trial briefing, including but not limited to asserting additional legal principles

12  that they maintain are material to the resolution of the specific claims and counterclaims asserted

13  in this case.  Further, while the parties have addressed each of the claims and counterclaims that

14  remain pending, the parties have in the interest of efficiency addressed only certain of their

15  affirmative defenses, without waiving their respective rights to assert any affirmative defense not

16  addressed herein.  The parties also reserve their rights to amend or expand on the specific remedies

17  sought based on, among other things, the further development of the record.  In addition, while

18  certain principles may be "undisputed" in the sense that they are accepted legal doctrines in

19  particular circumstances, their applicability vel non to the facts of this case may be very much in

20  dispute.  Moreover, some principles (set forth herein or otherwise) may come into play only if the

21  Court were to make certain predicate determinations.  To facilitate the Court's request that this

22  submission "guide evidence at trial and an ultimate ruling," Dkt. 132 at 2, the parties have

23  generally drafted these principles in accordance with the law in the Ninth Circuit.  The parties

24  expressly reserve the right to argue in any appeal that the authorities discussed herein should be

25  modified, overruled, or interpreted in a different manner.

26         The parties have omitted a table of authorities to avoid adding length to this submission

27  but would be happy to provide one at the Court's request.

28

1   Appendix A hereto summarizes the specific relief that each party currently anticipates

2   seeking.  As stated therein, these potential remedies are being submitted, prior to the close of fact

3   or expert discovery, without prejudice to revision or supplementation at a later date, including on

4   the basis of further factual development and expert analysis.

5   **Epic's Statement:**  Epic states that in many of the sections below, Apple's approach to

6   this submission is inconsistent with the Court's January 8, 2021 Order, Dkt. 241.  Apple has gone

7   beyond the Court's request for a submission that "set[s] forth the unencumbered legal framework,"

8   *id.* at 2, and continued to adhere in many places to the approach the Court rejected, *id.* at 2, Dkt.

9   230-2.  Epic has refrained from responding in kind, but notes that this results in leaving certain

10  Apple arguments with which Epic disagrees without a response.  This should not be understood or

11  construed as Epic's agreement with any such arguments, but rather as Epic exercising restraint

12  consistent with the Court's Order given Epic's understanding that there will be "ample opportunity

13  to argue the relevance of any claim or the applicability of the facts to the elements identified,"

14  Dkt. 241 at 2.

15  **Apple's Statement:**  The parties have worked together in good faith to implement the

16  Court's orders regarding this submission, exchanging sample modules, meeting-and-conferring

17  regarding format and content, and submitting certain differences to the Court for clarification.  We

18  have reached agreement on a considerable number of undisputed principles, as the Court

19  instructed.  But we don't agree on everything, and the *implementation* of the principles set forth

20  below to the circumstances here presented will be informed by how courts have dealt with

21  analogous situations.  Epic's contention that Apple has gone beyond "the unencumbered legal

22  framework" really means that Apple has cited some cases in which courts have rejected doctrines

23  or claims for reasons that may be applicable here.  At the same time, Epic recites a number of

24  principles that, in Apple's estimation, have no applicability to this case as a matter of law or fact

25  (or both).  Apple's joinder in this submission should not be taken as acquiescence that any principle

26  herein (including those labeled "undisputed") is relevant or applicable to this case.  Like Epic,

27  Apple appreciates the Court's assurance that there will be "ample opportunity to argue the

28  relevance of any claim or the applicability of the facts to the elements identified."  Dkt. 241 at 2.

1   **2.    STANDING**

2          <u>Undisputed Principles</u>

3          Standing is "an essential and unchanging part of the case-or-controversy requirement of

4   Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "[S]tanding involves both

5   constitutional and prudential limitations."  *McMichael v. Cty. of Napa*, 709 F.2d 1268, 1269 (9th

6   Cir. 1983).  First, "the court must determine whether the plaintiff has met the requirements for

7   standing under Article III . . . . If the plaintiff meets the requirements for standing under Article III,

8   the court must then determine whether the plaintiff also meets the more demanding standard for

9   *antitrust standing*."  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232

10  (9th Cir. 1998) (internal quotation marks omitted) (emphasis in original); *In re Online DVD-Rental*

11  *Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) ("In addition to Article III standing, private

12  antitrust plaintiffs must also demonstrate antitrust injury.").

13         "The constitutional limitations of [A]rticle III involve three separate but interrelated

14  components."  *McMichael*, 709 F.2d at 1270.  Plaintiffs must demonstrate they (1) have suffered

15  an injury in fact that is "concrete and particularized . . . and actual or imminent, not conjectural or

16  hypothetical;" (2) "a causal connection between the injury and the conduct complained of;" and

17  (3) that it is "likely," rather than "speculative, that the injury will be redressed by a favorable

18  decision."  *Lujan*, 504 U.S. at 560-61 (citations and quotation marks omitted); *Juliana v. United*

19  *States*, 947 F.3d 1159, 1168 (9th Cir. 2020).  "The party invoking federal jurisdiction bears the

20  burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

21         <u>Disputed Principles</u>

22         **Epic's Position:**  "'Antitrust standing' is a threshold requirement that every plaintiff must

23  satisfy to bring a private suit under the federal antitrust laws."  *Lorenzo v. Qualcomm Inc.*, 603 F.

24  Supp. 2d 1291, 1300 (S.D. Cal. 2009); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104,

25  113 (1986).  Courts analyze antitrust standing with respect to the remedies sought by the plaintiff.

26  *E.g.*, *Cargill*, 479 U.S. at 109; *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1026-29 (N.D. Cal.

27  2015).  To establish standing to seek equitable relief under Section 16 of the Clayton Act, a plaintiff

28  must show "antitrust injury."  *Feitelson*, 80 F. Supp. 3d at 1026.  Standing requirements for

1  injunctive relief under Section 16 of the Clayton Act are lower than those for seeking damages
2  under Section 4 of the Clayton Act.  *Id.* at 1027-29 ("To be sure, the standing requirements for
3  injunctive relief are lower than those for damages.").   For further discussion, *see infra*
4  Section 18.2.1 Remedies—Clayton Act—Injunction—Antitrust Standing and Section 18.2.2
5  Remedies—Clayton Act—Injunction—Antitrust Injury.

6       In private antitrust actions, courts "possess[] broad power to fashion the equitable relief
7  necessary to halt conduct in violation of the Sherman Act. . . .  Antitrust relief should unfetter a
8  market from anticompetitive conduct and pry open to competition a market that has been closed
9  by illegal restraints." *Gen. Atomic Co. v. Exxon Nuclear Co.*, No. 78-223-E, 1979 WL 1708, at *3
10  (S.D. Cal. Sept. 6, 1979).  Such actions will often benefit not just the plaintiff but will also free
11  other market participants from the defendant's unlawful restraints and anticompetitive conduct.
12  "There is no general requirement that an injunction affect only the parties in the suit." *Bresgal v.*
13  *Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987).  *See infra* Section 18.2.4 Remedies—Clayton Act—
14  Injunction—Scope.  None of the cases cited by Apple below concern the scope of relief in an
15  antitrust action.

16       **Apple's Position:**  In addition to the irreducible minima of Article III, "at least three
17  prudential limitations on standing have been recognized." *McMichael*, 709 F.2d at 1270.  "[F]irst,
18  the plaintiff must assert his own rights and cannot rest his claim to relief on the legal rights or
19  interests of third parties; second, even when the plaintiff has alleged redressable injury sufficient
20  to meet the requirements of Article III, the plaintiff's injury must not be shared in substantially
21  equal measure by all or a large class of citizens—if so, it represents a generalized grievance not
22  normally appropriate for a judicial resolution; and third, the plaintiff's interest must be arguably
23  within the zone of interests to be protected or regulated by the statute or constitutional guarantee
24  in question." *Id.* (internal quotation marks and citations omitted).

25       Accordingly, a plaintiff "lacks standing to seek—and the district court therefore lacks
26  authority to grant—relief that benefits third parties." *McKenzie v. City of Chicago*, 118 F.3d 552,
27  555 (7th Cir. 1997).  This includes "injunctive relief . . . to protect [the plaintiff's] non-plaintiff
28  affiliates." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, No. 16-CV-00236-

WHO, 2020 WL 2065700, at *23 (N.D. Cal. Apr. 29, 2020).  Epic's statements regarding standing to seek injunctive relief are duplicative of the discussion below in connection with the requested injunction under Section 16 of the Clayton Act.  *See generally infra* Section 18.2 Remedies—Clayton Act (including subparts).  Apple adopts that discussion by reference rather than repeating it here.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EPIC'S CLAIMS**

1

### 3.    SHERMAN ACT—EFFECT ON INTERSTATE COMMERCE

2

Undisputed Principles

3

"[I]nvolvement of interstate commerce in a defendant's activities is a jurisdictional

4  requirement to actions filed under the Sherman Act."  *Musick v. Burke*, 913 F.2d 1390, 1394 (9th

5  Cir. 1990).

6

Disputed Principles

7

**Epic's Position:**  "As the power of Congress to regulate interstate commerce reaches

8  beyond activities actually in commerce to those local activities which substantially affect interstate

9  commerce, so the reach of the Sherman Act is correspondingly broad.  Congress intended the

10  Sherman Act to be as inclusive as the constitutional limits of Congress' power to regulate

11  commerce.  In determining jurisdiction under the Sherman Act, the focus of the inquiry is the

12  defendant's business activities.  [The plaintiff] must make a showing of a substantial effect on

13  interstate commerce generated either by [the defendant's] general business activities, or by the

14  alleged antitrust violations themselves, which provide a strong indicator that the defendant's

15  business has an interstate impact. . . .  Whether the defendant's activities sufficiently affect

16  interstate commerce to create Sherman Act jurisdiction is a highly fact-based question calling for

17  common sense judgment."  *Musick*, 913 F.2d at 1395 (quotation marks and citations omitted).

18

This jurisdictional requirement can also be satisfied by foreign commerce that is cognizable

19  under the FTAIA.  *See infra* Section 9 Foreign Trade Antitrust Improvements Act (FTAIA).

20

**Apple's Position:**    The plaintiff must prove that the defendant's alleged conduct

21  "substantially and adversely affect[ed] interstate commerce."  *Hosp. Bldg. Co. v. Trustees of Rex

22  Hosp.*, 425 U.S. 738, 743 (1976); *see also McLain v. Real Estate Bd. of New Orleans, Inc.*, 444

23  U.S. 232, 242, 246 (1980).

24

To the extent a plaintiff seeks to rely on foreign commerce, it must demonstrate that an

25  exception to the FTAIA applies and that the application of U.S. law to foreign commerce comports

26  with principles of international comity.  *See infra* Section 9 Foreign Trade Antitrust Improvements

27  Act (FTAIA).

28

1    **4.      MARKET DEFINITION—RELEVANT PRODUCT AND GEOGRAPHIC**

2    **MARKET**

3            <u>Undisputed Principles</u>

4            Market definition is a "threshold step in any antitrust case."  *FTC v. Qualcomm Inc.*, 969

5    F.3d 974, 992 (9th Cir. 2020) (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) and

6    *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)).  "[C]ourts

7    usually cannot properly apply the rule of reason without an accurate definition of the relevant

8    market.  Without a definition of the market there is no way to measure the defendant's ability to

9    lessen or destroy competition."  *Am. Express*, 138 S. Ct. at 2285 (quotation marks, alterations, and

10   footnote omitted).  "Vertical restraints often pose no risk to competition unless the entity imposing

11   them has market power, which cannot be evaluated unless the Court first defines the relevant

12   market."  *Id.* at 2285 n.7.

13           "The relevant market is the field in which meaningful competition is said to exist."  *Image*

14   *Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997); *see also Am.*

15   *Express*, 138 S. Ct. at 2285 (the relevant market is "the area of effective competition").  "The

16   relevant market must include both a geographic market and a product market."  *Hicks v. PGA Tour,*

17   *Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).

18           The plaintiff has the burden of establishing the relevant product and geographic markets.

19   *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989).

20           <u>Disputed Principles</u>

21           **Epic's Position:**   Epic believes the Undisputed Principles above lay out the

22   "unencumbered legal framework," Dkt. 241 at 2, and refrains from addressing the additional

23   arguments articulated by Apple below.

24           **Apple's Position:**  Market definition is a prerequisite for all of the claims asserted by Epic

25   in this case.  *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 457 (1993) (market definition is

26   required for Section 2 claims); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d

27   1291, 1300 (9th Cir. 1982) (market definition is required for section 1 claims).

28

1    The "relevance" of a proposed market definition is determined by reference to the
2    plaintiff's antitrust claim. *See Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,* 305 F. 3d 1124, 1130
3    (10th Cir. 2002) ("[T]he relevant market . . . is a market relevant to the legal issue before the
4    court."); *Kinderstart.com LLC v. Google, Inc.*, No. C-06-2057, 2006 WL 3246596 at *8 n.2 (N.D.
5    Cal. 2006) (The plaintiff in a Sherman Act claim must "sufficiently describe[] the markets relevant
6    to its claims."); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 64 (D.D.C. 2011) (citing
7    Areeda & Hovenkamp for the proposition that "a relevant market [] is a market relevant to the
8    particular legal issue being litigated"). The relevant market should also be defined in a way that
9    captures all relevant competitors. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,
10   1374 (9th Cir. 1989). "The goal in defining the relevant market is to identify the market
11   participants and competitive pressures that restrain an individual firm's ability to raise prices or
12   restrict output." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).
13   To meet its burden, a plaintiff must produce specific evidence supporting the proposed market
14   definition that is relevant to the legal issues it raises. *Moore v. James H. Matthews & Co.*, 550
15   F.2d 1207, 1218 (9th Cir. 1977).

1

### 4.1    Relevant Market—Product Market Definition

2

#### 4.1.1    Analytical Framework

3

Undisputed Principles

4

To define the product market, the Court must determine which products or services are in

5

"the area of effective competition."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018);

6

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) ("For antitrust

7

purposes, defining the product market involves identification of the field of competition: the group

8

or groups of sellers or producers who have actual or potential ability to deprive each other of

9

significant levels of business.").  The relevant product market "must encompass the product at

10

issue as well as all economic substitutes for the product."  *Newcal Indus., Inc. v. Ikon Office Sol.*,

11

513 F.3d 1038, 1045 (9th Cir. 2008).  "Economic substitutes have a 'reasonable interchangeability

12

of use' or sufficient 'cross-elasticity of demand' with the relevant product."  *Hicks v. PGA Tour,*

13

*Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal*, 513 F.3d at 1045); *see also Brown*

14

*Shoe v. United States*, 370 U.S. 294, 325 (1962); *United States v. E. I. du Pont de Nemours & Co.*,

15

351 U.S. 377, 404 (1956).

16

Disputed Principles

17

**Epic's Position:**  An antitrust product market may be defined as a product or group of

18

products such that "a hypothetical profit-maximizing firm, not subject to price regulation, that was

19

the only present and future seller of those products ('hypothetical monopolist') likely would

20

impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least

21

one product in the market."  U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger

22

Guidelines § 4.1.1 (2010); *see also Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health*

23

*Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015); *Theme Promotions, Inc. v. News America Marketing*

24

*FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) ("Determining the relevant market can involve a

25

complicated economic analysis, including . . . 'small but significant nontransitory increase in price'

26

('SSNIP') analysis.").  A SSNIP is typically considered to be five percent of the price paid by

27

consumers for the relevant product or service.  U.S. Dep't of Justice & Fed. Trade Comm'n,

28

Horizontal Merger Guidelines § 4.1.2 (2010).

1    "If a hypothetical monopolist could profitably target a subset of customers for price

2    increases," an antitrust market may be "defined around those targeted customers, to whom a

3    hypothetical monopolist would profitably and separately impose at least a SSNIP.  Markets to

4    serve targeted customers are also known as price discrimination markets."  U.S. Dep't of Justice

5    & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1.4 (2010); *see also FTC v. Staples,*

6    *Inc.*, 190 F. Supp. 3d 100, 117-18 (D.D.C. 2016) (analyzing price discrimination market as a type

7    of *Brown Shoe* submarket).

8        In conducting a hypothetical monopolist test, courts must take care to avoid the so-called

9    "cellophane fallacy", named after the decision in *United States v. E. I. du Pont de Nemours & Co.*,

10   351 U.S. 377 (1956).  Even "[a] monopolist faces product substitution and elastic demand at the

11   profit-maximizing output and price."  *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417,

12   1437 n.76 (S.D. Ohio 1990); William M. Landes & Richard A. Posner, *Market Power in Antitrust*

13   *Cases*, 94 HARV. L. REV. 937, 961 (1981) ("Because every monopolist faces an elastic demand . . .

14   at its profit-maximizing output and price, there is bound to be some substitution of other products

15   for its own when it is maximizing profits, even if it has great market power.") (footnote omitted).

16   As a result, if a monopolist has already exercised monopoly power and raised prices above the

17   competitive level, then consumers could be expected to switch to substitute products upon the

18   imposition of a SSNIP, even though they would not switch if a SSNIP were imposed on a

19   competitive price. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) ("The

20   existence of significant substitution in the event of *further* price increases or even at the *current*

21   price does not tell us whether the defendant *already* exercises significant market power.")

22   (emphasis in original) (quoting Phillip Areeda & Louis Kaplow, Antitrust Analysis ¶ 340(b)

23   (Aspen, 4th ed 1988)).  Applying the hypothetical monopoly test to actual market prices when

24   those prices reflect monopoly power would therefore make the market seem broader than it really

25   is.  *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) ("Courts

26   should be wary of defining markets so broadly that a seller's existing market power is missed.").

27       **Apple's Position:**  A plaintiff "cannot arbitrarily choose the product market relevant to its

28   claims; instead, the plaintiff must justify any proposed market by defining it with reference to the

1    rule of reasonable interchangeability and cross-elasticity of demand."  *Buccaneer Energy (USA)*
2    *v. Gunnison Energy Corp.*, 846 F. 3d 1297, 1313 (10th Cir. 2017).  A plaintiff must also rebut
3    evidence of substitutability to the extent it seeks to exclude products from its proposed market,
4    particularly where it proposes a "very narrow definition."  *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568
5    F.2d 1296, 1302 (9th Cir. 1978).

6        With respect to the econometric methods referred to by Epic, the viability of the SSNIP
7    test in the context of two-sided transaction platforms is unsettled.  *See, e.g.*, *United States v. Sabre
8    Corp.*, 452 F. Supp. 3d 97, 138 (D. Del. 2020) (rejecting the DOJ's proposed market definition
9    relying on the SSNIP test in a merger case involving two-sided transaction platforms).  Academic
10   literature that the Supreme Court cited in *Amex* states that "in a two-sided market the traditional
11   SSNIP test cannot be applied as it is usually conceived."  Filistrucchi, Geradin, Van Damme, &
12   Affeldt, *Market Definition in Two–Sided Markets: Theory and Practice*, 10 J. Competition L. &
13   Econ. 293, 330 (2014).  No court has applied the SSNIP test in a monopolization case under the
14   Sherman Act involving a two-sided transaction platform.

15       More generally, the Horizontal Merger Guidelines "are not binding on the courts."  *Olin
16   Corp. v. Fed. Trade Comm'n*., 986 F.2d 1295, 1300 (9th Cir. 1993); *see also Fed. Trade Comm'n
17   v. PPG Industries, Inc.*, 798 F.2d 1500, 1503 n.4 (D.C. Cir. 1986) (the guidelines "are by no means
18   to be considered binding on the court").

19       Accordingly, the SSNIP test is "not the only" method that courts can use to define the
20   relevant market.  *Sabre Corp.*, 452 F. Supp. 3d at 142.  "Another permissible analysis" in defining
21   the relevant market is to evaluate "economic 'practical indicia' to assess whether products are
22   'reasonably interchangeable.'"  *Id.* (citing *Brown Shoe*, 370 U.S. at 325).  "[T]he Ninth Circuit
23   allows a qualitative approach when determining the relevant market." *GSI Tech., Inc. v. Cypress
24   Semiconductor Corp.*, 2015 WL 364796 at *3 (N.D. Cal. 2015); *see also, e.g.*, *Malaney v. UAL
25   Corp.*, 434 F. App'x. 620, 621 (9th Cir. 2011) (assessing the relevant market solely on the basis of
26   qualitative factors); *Tanaka v. Univ. of S. Cal*., 252 F.3d 1059, 1063–64 (9th Cir. 2001) (same);
27   *Thurman Indus.*, 875 F.2d at 1374-77 (same).

28

"Defining a [price discrimination] market around a targeted customer . . . is not free from controversy." *Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 39 (D.D.C. 2015). "[T]here is no support in the law for that singular focus on [a subset of customers]." *Fed. Trade Comm'n v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1062 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (rejecting defining a market around targeted "core customers"). Similarly, the "cellophane fallacy" is an academic theory that is "not without its critics." *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, 1995 WL 853037 at *10 (N.D. Cal. 1995) (noting, for example, that Judge Posner of the U.S. Court of Appeals for the Seventh Circuit has rejected this theory).

### 4.1.2    Single-Brand Markets

Undisputed Principles

"[I]n some instances one brand of a product can constitute a separate market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) ("[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue."). Determining whether a single-brand market is proper requires "a factual inquiry into the 'commercial realities' faced by consumers." *Kodak*, 504 U.S. 482 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

Disputed Principles

**Epic's Position:** Courts in the Ninth Circuit typically consider four aspects of the alleged market to determine if it is a properly defined single brand aftermarket. *See Newcal*, 513 F.3d at 1049-50. The first indicator of an aftermarket is that the market is "wholly derivative from and dependent on the primary market." *Id.* at 1049. The second indicator is that the "illegal restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial market." *Id.* at 1050. The third indicator is that the defendant's market power "flows from its relationship with its consumers" and the defendant did "not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market." *Id.* The fourth indicator is that "[c]ompetition in the initial market . . . does not necessarily suffice to discipline anticompetitive practices in the aftermarket." *Id.*

1    The cases below on which Apple relies for an additional requirement that the defendant

2    have changed its policies after buyers began transacting with the defendant in the primary market

3    are primarily from out of Circuit.  The Ninth Circuit's decision in *Newcal* does not contain any

4    such requirement.  Nor do the two cases from this Court that Apple identifies—both of which

5    upheld allegations of a single-brand market.  In *Datel Holdings Ltd. v. Microsoft Corp.*, 712

6    F. Supp. 2d 974, 990 (N.D. Cal. 2010), the court applied *Newcal* and permitted a single-brand

7    market definition without any change in policy.  In *Teradata Corp. v. SAP SE*, No. 18-cv-03670-

8    WHO, 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018), the court recognized that a change in policy

9    was one possible way of satisfying *Newcal*'s fourth factor, but not the only way.  *See id.* at *17

10   (fourth factor takes into account whether "'market imperfections . . . prevent consumers from

11   realizing that their choice in the initial market will impact their freedom to shop in the

12   aftermarket'") (quoting *Newcal*, 513 F.3d at 1050).

13   **Apple's Position:**  "In general, a manufacturer's own products do not themselves comprise

14   a relevant product market. . . .  [A] company does not violate the Sherman Act by virtue of the

15   natural monopoly it holds over its own product."  *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d

16   1190, 1198 (N.D. Cal. 2008).  "It is an understatement to say that single-brand markets are

17   disfavored.  From nearly the inception of modern antitrust law, the Supreme Court has expressed

18   skepticism of single-brand markets."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361

19   F. Supp. 3d 324, 347 (E.D.N.Y. 2019); *see also* P. Areeda & H. Hovenkamp, *Antitrust Law: An

20   Analysis of Antitrust Principles and Their Application* ¶ 563d (4th ed. 2020 supp.) ("A single brand

21   or differentiated product within a product class is presumptively not a separate market, unless its

22   maker is the only producer in a relevant category … or unless a substantial group of customers can

23   be significantly exploited via price discrimination."); ABA Section of Antitrust Law, *Antitrust

24   Law Developments* 591 (8th ed. 2017) ("Relevant markets generally cannot be limited to a single

25   manufacturer's products.").  "Single-brand markets are, at a minimum, extremely rare."  *Epic

26   Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2020 WL 5993222, at *13 (N.D. Cal. Oct.

27   9, 2020) (citing *Psystar*, 586 F. Supp. 2d at 1198).  Courts routinely "reject the argument that a

28   single branded product constitutes a relevant market."  *Psystar*, 586 F. Supp. 2d at 1198; *see also,*

*e.g. Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–64 (9th Cir. 2001) (UCLA women's soccer program does not constitute its own market because other college programs compete to recruit student-athletes); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86-87 (2d Cir. 2000) (Yale University competes with other schools and thus is not its own product market); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (market cannot be limited to products approved by Domino's Pizza for Domino's stores).

As a matter of law, the assessment of a single-brand market involving two-sided transaction platforms must take into account interchangeability and the viability of switching on both sides of the platforms. *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d at 344-45 (assessing interchangeability from the perspective of both merchants and cardholders); *Amex*, 138 S. Ct at 2281 n.2, 2282, 2287 (defining the relevant market to include all credit card transactions despite observing, for example, that not all consumers own credit cards from all brands and "only a small number of Visa and MasterCard cardholders have Amex").

The Supreme Court has recognized that a single-brand market may be plausible in a derivative "aftermarket" in which customers were not informed about restrictive policies at the time they purchased the product from the primary market or were subject to post-purchase policy changes that limited their options in the aftermarket. *Kodak*, 504 U.S. at 464–78; *see also Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1049 (9th Cir. 2008).

"[A]n antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies."  *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *see also, e.g.*, *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016) (no *Kodak*-type aftermarket "when customers were put on clear notice that purchasing [defendant's product] precluded use of [third-party] maintenance"); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014) ("Crucial to the Kodak decision ... was the fact that customers had already purchased their equipment before learning about Kodak's policies on aftermarket parts and services."); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) ("The material dispute [in *Kodak*] was whether the

change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines."); *Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 20 (1st Cir. 1994) ("[T]he timing of the 'lock in' at issue in *Kodak* was central to the Supreme Court's decision."); *Teradata Corp. v. SAP SE*, 2018 WL 6528009 at *16 (N.D. Cal. 2018) (single-brand markets are possible only in situations in which customers face "restrictions that were undisclosed at the time of the purchase of the product from the primary market"); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 987 (N.D. Cal. 2010) (noting that what distinguished Kodak was that "the challenged restraint in Kodak was not authorized by the original contract terms and the change in policy was not foreseen at the time of sale, so buyers had no ability to calculate the risk").   While Epic notes that these cases are from other Circuits, neither the Supreme Court nor the Ninth Circuit has found single-brand markets (or aftermarkets) acceptable in other situations.

### 4.1.3   Submarkets

<u>Undisputed Principles</u>

"In limited settings . . . the relevant product market may be narrowed beyond the boundaries of physical interchangeability and cross-price elasticity to account for identifiable submarkets or product clusters." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).   A submarket is "a small part of the general market of substitutable products" and "is economically distinct from the general product market."  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).   "[T]he plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." *Id*.  Although there are "several 'practical indicia' of an economically distinct submarket," including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors," *id*. (quoting *Brown Shoe*, 370 U.S. at 325), they are "practical aids for identifying the areas of actual or potential competition" and "their presence or absence does not decide automatically the submarket issue." *Thurman Indus*., 875 F.2d at 1375.

"Ultimately, a 'submarket' definition turns on the same inquiry as a 'market' definition." *Pepsico, Inc. v. Coca-Cola Co.*, No. 98 CIV. 3282, 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998); *see also H.J., Inc. v. Intern. Tel. & Tel. Corp.*, 867 F.2d 1531, 1540 (8th Cir. 1989) ("[T]he same proof which establishes the existence of a relevant product market also shows (or . . . fails to show) the existence of a product submarket."); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1080 n.11 (D.D.C. 1997) ("Whatever term is used—market, submarket, relevant product market—the analysis is the same.").

Disputed Principles

**Epic's Position:** "[W]ell-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Newcal*, 513 F.3d at 1045 ("[I]t is legally permissible to premise antitrust allegations on a submarket."). A submarket may be found where the alleged submarket is meaningfully "insulated . . . from competition" with other products in the broader market. *Thurman Indus.*, 875 F.2d at 1375. A submarket may be evidenced by "an economically significant barrier to customer crossover similar to the pattern of gender and age-based purchasing at issue [in] *Brown Shoe*." *Thurman Indus.*, 875 F.2d at 1376.

**Apple's Position:** "The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ); *see also, e.g.*, *Allen-Myland, Inc. v. IBM*, 33 F.3d 194, 208 n.16 (3d Cir. 1994) ("The use of the term 'submarket' is somewhat confusing, and tends to obscure the true inquiry."); *Satellite Television & Associated Res. v. Cont'l Cablevision*, 714 F.2d 351, 355 n.5 (4th Cir. 1983) ("The use of the term 'submarket' is to be avoided; it adds only confusion to an already imprecise and complex endeavor"); P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 533c (4th ed. 2020 supp.) ("Speaking of submarkets is both superfluous and confusing in an antitrust case, where the courts correctly search for a 'relevant market'—that is, a market relevant to the particular legal issue being litigated.").

### 4.1.4    Two-Sided Platforms

Undisputed Principles

"[A] two-sided platform [is one that] offers different products or services to two different groups who both depend on the platform to intermediate between them."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018).

Disputed Principles

**Epic's Position:**  When defining the relevant product market, "it is not always necessary to consider both sides of a two-sided platform.  A market should be treated as one sided when the impacts of indirect network effects and relative pricing in that market are minor."  *Am. Express*, 138 S. Ct. at 2286.  However, where indirect network effects are "more pronounced,"  "courts must include both sides of the platform . . . when defining the . . . market."  *Id.*

**Apple's Position**:  A "two-sided platform offers different products or services to two different groups," *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018), but, from the standpoint of market definition, transactional platforms are not viewed as "supplying two separate products, one to each side of the platform."   *US Airways*, 938 F.3d at 57; *see also Amex*, 138 S. Ct. at 2286 n.8 (services offered to each platform side "are not complements").  If the interaction between the two sides of the platform is a transaction, the platform is "a special type of two-sided platform known as a 'transaction' platform." *Amex*, 138 S. Ct. at 2280.  The key feature of two-sided transaction platforms is that "they cannot make a sale to one side of the platform without simultaneously making a sale to the other."  *Id*.  Credit card networks are an example of a two-sided transaction platform because "no credit-card transaction can occur unless both the merchant and the cardholder simultaneously agree to use the same credit card network."  *Id*.  Two-sided transaction platforms "are best understood as supplying only one product—transactions—which is jointly consumed by [both sides of the platform]." *Id.* at 2286 n.8.  The service that the platform provides to each side of the platform "are both inputs to this single product."  *Id.*  The product market is defined to constitute a single transactional product even when the platform "allows [members on one platform side] to avoid the cost of processing transactions and offers them quick, guaranteed payment." *Id.* at 2280.

1    "Two-sided platforms differ from traditional markets in important ways." *Amex*, 138 S.

2    Ct. at 2280.  First, two-sided transaction platforms exhibit "pronounced" indirect network effects

3    (which "exist where the value of the platform to one group depends on how many members of

4    another group participate") and interconnected pricing and demand.  *Id.*  As a result of the presence

5    and degree of these economic relationships, two-sided transaction platforms cannot raise prices on

6    one side without risking a feedback loop of declining demand.  "To ensure sufficient participation,

7    two-sided platforms must be sensitive to the prices that they charge each side" of the platform to

8    avoid the phenomenon of "[r]aising the price on side A ... [and] losing participation on that side,

9    which decreases the value of the platform to side B," which in turn risks losing participation on

10   side B—and so on.  *Id.* at 2281.  Striking the "optimal balance" of the prices charged on each side

11   "is essential" for two-sided transaction platforms to "maximize the value of their services and to

12   compete with their rivals." *Id.*; *see also id.* at 2286.  Second, "competition cannot be accurately

13   assessed by looking at only one side of the platform in isolation." *Id.* at 2287.

14       For these reasons, "in a case brought under the Sherman Act that involves a 'two-sided

15   transaction platform,' the relevant market must *always* include both sides of the platform." *US*

16   *Airways, Inc. v. Sabre Holdings Corp.* 938 F.3d 43, 56 (2d Cir. 2019) (emphasis in original).

17   Courts should "combine different products or services into 'a single market' when 'that

18   combination reflects commercial realities.'" *Amex*, 138 S. Ct. at 2285 (internal citations omitted).

19   As a consequence, "in two-sided transaction markets, only one market should be defined," *id.* at

20   2287, even where the platform offers "different products or services to two different groups who

21   both depend on the platform to intermediate between them," *id.* at 2280; *see also id.* at 2286-87

22   (holding that "only one market should be defined" even though credit card networks provide

23   "separate but interrelated services to both cardholders and merchants"); *United States v. Sabre*

24   *Corp.*, 452 F. Supp. 3d 97, 140 (D. Del. 2020) (describing the plaintiff's attempt to analyze

25   booking services separately from the bundle "arbitrary" and "unpersuasive").[1]  Academic literature

26

27   _____
     [1] Although the court's opinion was later vacated as moot, the Third Circuit expressly noted
     that its order "should not be construed as detracting from the persuasive force of the District
     Court's decision, should courts and litigants find its reasoning persuasive." Order at 1-2, *United*

28   *States v. Sabre Corp.*, No. 20-1767 (3d Cir. July 20, 2020).

1    cited by the Supreme Court in *Amex* (138 S. Ct. at 2280-81) explained that "[a] year after its launch,

2    the iPhone was a two-sided platform connecting users and app developers."  David S. Evans &

3    Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* 117 (2016);

4    *see also* Evan Chesler and David Korn, *Lessons from* Amex *for Platform Antitrust Litigation*, 98

5    Neb. L. Rev. 345, 362 (2019) (describing the App Store as a two-sided platform).

6         This Court has previously observed that "[i]nterchangeability for purposes of the relevant

7    market may vary depending on perspective."  *Epic Games, Inc.*, 2020 WL 5993222, at *20 (citing

8    *Newcal*, 513 F.3d at 1045).  For a two-sided transaction platform, the relevant "perspective" is the

9    competing platforms on which such transactions may occur, including participants on both sides

10   of the platform.

1

**4.2      Relevant Market—Geographic Market Definition**

2

Undisputed Principles

3

"The criteria to be used in determining the appropriate geographic market are essentially

4

similar to those used to determine the relevant product market."  *Brown Shoe Co. v. United States*,

5

370 U.S. 294, 336 (1962).  "A geographic market is an area of effective competition where buyers

6

can turn for alternate sources of supply."  *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,

7

924 F.2d 1484, 1490 (9th Cir. 1991) (internal quotation marks and alterations omitted).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **5.     SECTION 1 OF THE SHERMAN ACT—UNREASONABLE RESTRAINT OF**

2  **TRADE—ELEMENTS**

3  <u>Undisputed Principles</u>

4  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

5  or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

6  foreign nations." 15 U.S.C. § 1.  Section 1 is understood "to outlaw only unreasonable restraints."

7  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (internal quotation marks and emphasis

8  omitted); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Standard Oil Co. of N.J. v. United States*,

9  221 U.S. 1, 59-60 (1911).  "To establish liability under § 1, a plaintiff must prove (1) the existence

10  of an agreement, and (2) that the agreement was in unreasonable restraint of trade."  *Aerotec Int'l,*

11  *Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).

12  <u>Disputed Principles</u>

13  **Epic's Position:**  "Restraints can be unreasonable in one of two ways.  A small group of

14  restraints are unreasonable *per se* because they always or almost always tend to restrict competition

15  and decrease output.   Typically only 'horizontal' restraints—restraints 'imposed by agreement

16  between competitors'—qualify as unreasonable *per se*.  Restraints that are not unreasonable *per*

17  *se* are judged under the 'rule of reason.'"  *Am. Express*, 138 S. Ct. at 2283-84 (internal quotation

18  marks and citations omitted).

19  **Apple's Position:**  "Vertical agreements . . . are analyzed under the rule of reason."  *In re*

20  *Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).  The *per se*

21  rule is generally limited to horizontal agreements among competitors to fix prices, divide markets,

22  or conduct a group boycott.  *Id.* at 1191; *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 8 (2006)

23  (observing that the categories of conduct condemned *per se* are "narrow").

24

25

26

27

28

1    **5.1    Section 1 of the Sherman Act—Unreasonable Restraint of Trade—**
2    **Agreement**

3    <u>Undisputed Principles</u>

4    "[E]xpress 'agreements'" are "direct evidence of 'concerted activity'" and satisfy the first
5    element of a Section 1 claim.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153
6    (9th Cir. 2003); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1192
7    (N.D. Cal. 2009) ("One way of proving concerted action is by express agreement.").  A plaintiff
8    "need not prove intent to control prices or destroy competition to demonstrate the element of an
9    agreement among two or more entities."  *Paladin*, 328 F.3d at 1153-54 (internal quotation marks
10   and alterations omitted).

11   "Unilateral conduct by a single firm, even if it appears to restrain trade unreasonably, is
12   not unlawful under section 1 of the Sherman Act."  *The Jeanery, Inc.* v. *James Jeans, Inc.*, 849
13   F.2d 1148, 1152 (9th Cir. 1988) (internal quotation marks omitted); *see also Monsanto Co. v.*
14   *Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed.").

15   <u>Disputed Principles</u>

16   **Epic's Position:**  The agreement need not advance the interests of all parties involved in
17   it; agreements that involve some form of coercion are still considered concerted action that may
18   give rise to Section 1 liability.  *See, e.g.*, *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421,
19   1427 (9th Cir. 1995) ("A showing that the buyer of the tied product was coerced by the tying
20   arrangement into making the purchase is sufficient to show that the buyer was not merely 'acting
21   independently.'"); *Cargill Inc. v. Budine*, No. CV-F-07-349-LJO-SMS, 2007 WL 4207908, at *3
22   (E.D. Cal. Nov. 27, 2007); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071,
23   1085 (C.D. Cal. 2017).

24   **Apple's Position:**  No agreement exists where "[t]here is no 'meeting of the minds'" but
25   rather only a unilateral "command[]" that others merely "comply with."  *Costco Wholesale Corp.*
26   *v. Maleng*, 522 F.3d 874, 898 (9th Cir. 2008).  The "tying" cases that Epic cites are not to the
27   contrary, as tying allegations are subject to special rules as discussed below.  *See infra* Section 6
28   Section 1 of the Sherman Act—Tying (and subparts).

**5.2     Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason**

Undisputed Principles

"Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'"  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).  "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure to assess the restraint's actual effect' on competition."  *Id.* at 2284 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)) (alterations omitted).  "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.  Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect.  Whether the businesses involved have market power is a further, significant consideration.  In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007) (citations omitted).

"To determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies.  Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint.  If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Am. Express*, 138 S. Ct. at 2284 (citations omitted); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020).

Disputed Principles

**Epic's Position:**  In the rule of reason analysis, "the factfinder must analyze the anti-competitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance."  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  This

1   is not, as Apple asserts, a "shorthand summary" of the rule of reason.  In *Bhan*, the Ninth Circuit

2   held that this balancing is one of the required steps in the analysis.  The court walked through the

3   three-step burden-shifting framework described above and then stated: "Finally, the court must

4   weigh the harms and benefits to determine if the behavior is reasonable on balance."  *Id.*

5        **Apple's Position:**  The sentence from *Bhan* quoted by Epic is a shorthand summary that

6   cannot replace the full rule-of-reason framework articulated by the Supreme Court in cases such

7   as *Leegin* and *Amex*, and reiterated most recently by the Ninth Circuit in *Qualcomm*.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**5.2.1      Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason—Market Power**

<u>Undisputed Principles</u>

Market power is "the ability to raise price profitably *by restricting output*. This Court will not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (emphasis in original) (citations and quotation marks omitted); *see also Rebel Oil Co. Inc. v. Atlantic Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995) (a defendant has sufficient market power "when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices" for a sustained period of time); ABA Model Jury Instrns.—Civil Instrn. 3B (2016) ("[M]arket power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market.").

Market power under Section 1 requires a lesser showing than monopoly power under Section 2. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

<u>Disputed Principles</u>

**Epic's Position:** "Market power is the ability to raise prices above those that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 n.46 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 27 (2006) ("As an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market."). "The existence of market power is a significant finding that casts an anticompetitive shadow over a party's practices in a rule-of-reason case." *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988).

**Apple's Position:** The possession of market power is not unreasonable or illegal. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999). The *Hahn* court remarked that market power can "cast[] an anticompetitive shadow over a party's practices in a rule-of-reason case" because "it is an essential ingredient in a rule-of-reason case." 868 F.2d at 1026. Without proof of market power, the challenged conduct is not be actionable under Section 1 and

the plaintiff's claim necessarily fails.  *See id.*; *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 951 (9th Cir. 1998); *see also Pac. Recovery Sols. v. United Behavioral Health*, No. 4:20-CV-02249 YGR, 2020 WL 5074315, at *5 (N.D. Cal. Aug. 25, 2020) (Gonzalez Rogers, J.); *Ajir v. Exxon Corp.*, No. C 93-20830 RMW (PVT), 1995 WL 429234, at *2 (N.D. Cal. July 7, 1995), *aff'd,* 185 F.3d 865 (9th Cir. 1999).

In the Ninth Circuit, "[c]ourts generally require a 65% market share to establish a prima facie case of market power," *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997), and "a market share of less than 50 percent is presumptively insufficient to establish market power," *Rebel Oil*, 51 F.3d at 1438.  That a business possesses intellectual property rights does not confer a presumption of market power.  *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 45 (2006).  Moreover, "[w]here . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).

1

2

### 5.2.2     Section 1 of the Sherman Act—Unreasonable Restraint of Trade— Rule of Reason—Anticompetitive Effects in the Relevant Market

3

Undisputed Principles

4

"[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial

5

anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*,

6

138 S. Ct. 2274, 2284 (2018).

7

"A plaintiff may prove that a restraint has anticompetitive effect either 'directly or

8

indirectly.'" *FTC v. Qualcomm*, 969 F.3d 974, 989 (9th Cir. 2020) (quoting *Am. Express*, 138 S.

9

Ct. at 2284). "Direct evidence includes 'proof of actual detrimental effects on competition, such

10

as reduced output, increased prices, or decreased quality in the relevant market.'" *Id.* (quoting *Am.*

11

*Express*, 138 S. Ct. at 2284). "Indirect evidence involves 'proof of market power plus some

12

evidence that the challenged restraint harms competition.'" *Id.* (quoting *Am. Express*, 138 S. Ct.

13

at 2284). *See supra* Section 4 Market Definition—Relevant Product and Geographic Market and

14

Section 5.2.1 Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason—

15

Market Power.

16

Disputed Principles

17

**Epic's Position:** When a two-sided platform has significant indirect network effects, both

18

sides of the platform should be taken into consideration in the anticompetitive effects analysis.

19

*Am. Express*, 138 S. Ct. at 2286-87.

20

**Apple's Position:** To demonstrate anticompetitive effects in the relevant market, the

21

plaintiff must prove "that the challenged action has had an *actual* adverse effect on competition as

22

a whole in the relevant market; to prove it has been harmed as an individual competitor will not

23

suffice." *Capital Imaging v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir. 1993)

24

(emphasis in original); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (a

25

challenged restraint must have an "*actual* [anticompetitive] effect on competition") (emphasis in

26

original; internal quotation marks omitted). Anticompetitive effects must be shown "market-

27

wide." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 244 (2d Cir.

28

1  1997); *see also Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 325 (2d

2  Cir. 2008) (Sotomayor, J.).

3          "[A]llegations that conduct 'has the effect of reducing consumers' choices or increasing

4  prices to consumers do[] not sufficiently allege an injury to competition" because "[b]oth effects

5  are fully consistent with a free, competitive market.'"   *Qualcomm*, 969 F.3d  at 990 (quoting

6  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)).

7          In cases involving two-sided transaction platforms, courts must analyze the effects of the

8  challenged restraint on both sides of the market.  *Amex*, 138 S. Ct. at 2285-86.  That is because

9  "two-sided transaction platforms . . . are different" because they "exhibit more pronounced indirect

10  network effects and interconnected pricing and demand."  *Id.* at 2286.  "Price increases on one

11  side of the platform do not suggest anticompetitive effects without some evidence that they have

12  increased the overall cost of the platform's services."  *Id.*  As a result, assessing anticompetitive

13  effects on only one side of the relevant two-sided market would "distort the competition that

14  actually exists among [two-sided platforms]" and "would lead to mistaken inferences of the kind

15  that could chill the very conduct the antitrust laws are designed to protect."  *Id.* at 2287 (internal

16  quotation marks and citations omitted); *see also United States v. Sabre Corp.*, 452 F. Supp. 3d 97,

17  138 (D. Del. 2020) ("[I]t is necessary to [consider both sides of the market] where, as here, both

18  sides of [the defendant's] platform 'facilitate a single, simultaneous transaction between

19  participants.'"), *vacated on other grounds*, 2020 WL 4915824 (3d Cir. July 20, 2020).

20          The plaintiff must identify the challenged conduct with "some specificity."  *E & L*

21  *Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 32 (2d Cir. 2006).

22

23

24

25

26

27

28

### 5.2.3    Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason—Evidence of Procompetitive Effects

Undisputed Principles

"If the plaintiff carries its [initial] burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256 (9th Cir. 2020), *cert. granted NCAA v. Alston*, No. 20-512, 2020 WL 7366281 (Dec. 16, 2020) (if a plaintiff carries its initial burden, "the [defendant] must come forward with evidence of the restraint's procompetitive effects.").   A procompetitive justification is "a nonpretextual claim that [the defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

Disputed Principles

**Epic's Position:**  Per the Court's instruction, Epic declines to "pre-argue" the merits of any alleged procompetitive justification.  Dkt. 241 at 2.

**Apple's Position:**  "Courts have recognized a wide range of justifications for restraints."  ABA Antitrust Section, *Antitrust Law Developments* 74 (8th ed. 2017).  The Supreme Court also has recognized that "using a different business model" can be procompetitive where it drives "competitive innovations in the [relevant industry], increasing the volume of transactions and improving the quality of the services."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2282 (2018).

In cases involving two-sided transaction platforms, courts must consider procompetitive effects on both sides of the relevant market, *Amex*, 138 S. Ct. at 2285-86, because effects that may appear anticompetitive on one side of a market may present no "net harm," and may even be procompetitive, when both sides of the market are considered, *United States v. Am. Express Co.*, 838 F.3d 179, 206 (2d Cir. 2016), *aff'd*, 138 S. Ct. 2274.  In single-sided markets, the Ninth Circuit also has "permitted defendants to offer procompetitive effects in a collateral market as justification for anticompetitive effects in the defined market."  *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d at 1268 (Smith, J., concurring) (discussing *NCAA v. Bd. of Regents of Univ. of Oklahoma*,

1  468 U.S. 85 (1984), and *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir.

2  2015)).

3  "Licensing, cross-licensing, or otherwise transferring intellectual property can facilitate . . .

4  more efficient exploitation of the intellectual property, benefiting consumers through the reduction

5  of costs and the introduction of new products."  U.S. Dep't of Justice & Fed. Trade Comm'n,

6  *Antitrust Guidelines for the Licensing of Intellectual Property* 5 (1995) (internal parenthetical

7  omitted); *see also Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157-58 (9th Cir.

8  2003) (recognizing that a "business's offering new products [or services]" is procompetitive).

9  Indeed, such arrangements "may . . . encourage[] licensees to develop and market the licensed

10  technology (or specialized applications of that technology), increase[] licensors' incentives to

11  develop or refine the licensed technology, or otherwise increase[] competition and enhance[]

12  output in a relevant market"—all of which is procompetitive.  *Antitrust Guidelines for the*

13  *Licensing of Intellectual Property* at 27; *see also Kodak*, 125 F.3d at 1219.

14  *See also infra* Section 7.2.3 Section 2 of the Sherman Act—Monopolization—Willful

15  Maintenance of Monopoly Power—Business/Procompetitive Justifications.

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.2.4    Section 1 of the Sherman Act—Unreasonable Restraint of Trade— Rule of Reason—Less Restrictive Alternative

<u>Undisputed Principles</u>

"If the defendant makes this showing [of a procompetitive rationale], then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1074 (9th Cir. 2015) (if the defendant shows a procompetitive rationale for the restraint, the burden shifts back to the plaintiff to demonstrate "substantially less restrictive alternatives to the [challenged restraints]"); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001).  "[T]o be viable . . . an alternative must be 'virtually as effective' in serving the procompetitive purposes of the [challenged restraints], and 'without significantly increased cost.'"  *O'Bannon*, 802 F.3d at  1074 (quoting *Cty. of Tuolumne*, 236 F.3d at 1159).

<u>Disputed Principles</u>

**Epic's  Position:**   Epic believes the  Undisputed Principles above lay out the "unencumbered legal framework," Dkt. 241 at 2, and refrains from addressing the argumentative gloss Apple presents below.

**Apple's Position:**  "[C]ourts are not 'free to micromanage organizational rules or to strike down largely beneficial market restraints.'"  *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1156 (9th Cir. 2019) (quoting *O'Bannon*, 802 F.3d at 1075).  "[O]nly . . . where . . . a restraint is *patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives, an antitrust court can and should invalidate it and order it replaced with a less restrictive alternative."  *O'Bannon*, 802 F.3d at 1075 (emphasis in original). "[A] theoretically less restrictive alternative that is not realistic given business realities" does not suffice; "only alternatives that are practical in the business situation faced by" the defendant should be considered.  U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* § 3.36(b) (2000); *see also M & H Tire Co. v. Hoosier Racing*

1   *Tire Corp.*, 733 F.2d 973, 987 (1st Cir. 1984) (a plaintiff cannot rely on "possible less restrictive

2   alternatives" that are "more hypothetical than practical").

3          Apple notes that the Supreme Court has granted certiorari in a case that involves, among a

4   number of other things, the so-called "less restrictive alternative" prong of the rule-of-reason

5   framework.  *NCAA v. Alston*, No. 20-512.

1    **6.     SECTION 1 OF THE SHERMAN ACT—TYING**

2       **6.1     Section 1 of the Sherman Act—Tying—Per Se or Rule of Reason Analysis**

3       <u>Undisputed Principles</u>

4          Tying involves the linking of two separate products from two separate product markets.

5    *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984), *abrogated on other grounds by*

6    *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  "[T]he essential characteristic of an

7    invalid tying arrangement lies in the seller's exploitation of its control over the tying product to

8    force the buyer into the purchase of a tied product that the buyer either did not want at all, or might

9    have preferred to purchase elsewhere on different terms."  *Id.* at 12.

10         Tying arrangements may be evaluated under Section 1 of the Sherman Act under either *per*

11   *se* or rule of reason analysis.  *See Jefferson Parish*, 466 U.S. at 29.  The *per se* rule applies "only

12   after considerable experience with certain business relationships," *Broadcast Music, Inc. v.*

13   *Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 9 (1979), shows that a restraint "always or almost

14   always tend to restrict competition and decrease output," *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

15   2283 (2018).

16         <u>Disputed Principles</u>

17         **Epic's Position:** "It is far too late in the history of our antitrust jurisprudence to question

18   the proposition that certain tying arrangements pose an unacceptable risk of stifling competition

19   and therefore are unreasonable '*per se.*'"  *Jefferson Parish*, 466 U.S. at 9.  When "'forcing' is

20   present, competition on the merits in the market for the tied item is restrained and the Sherman

21   Act is violated."  *Id.* at 12.  "[A]s a threshold matter there must be a substantial potential for impact

22   on competition in order to justify *per se* condemnation. . . .  Once this threshold is surmounted,

23   *per se* prohibition is appropriate if anticompetitive forcing is likely[, *i.e.*,] situations in which the

24   existence of market power is probable."  *Id.* at 16-17.  "When, however, the seller does not have

25   either the degree or the kind of market power that enables him to force customers to purchase a

26   second, unwanted product in order to obtain the tying product, an antitrust violation can be

27   established only by evidence of an unreasonable restraint on competition in the relevant market."

28   *Id.* at 17-18.  Courts have experience with, and have applied *per se* analysis to, certain "contractual

1   ties."  *United States v. Microsoft Corp.*, 253 F.3d 34, 90 (D.C. Cir. 2001).  In contrast, rule of

2   reason analysis may be appropriate for practices the courts have not encountered before, *Broadcast*

3   *Music*, 441 U.S. at 10, or for "novel categories of dealings," *Microsoft*, 253 F.3d at 84.

4        Per the Court's instruction, Epic declines to "pre-argue" whether *per se* or rule of reason

5   analysis is appropriate in this case.  Dkt. 241 at 2.

6        **Apple's Position:**  "[T]he rule of reason, rather than per se analysis, should govern" in

7   tying cases "involv[ing] software that serves as a platform for third-party applications." *Microsoft*,

8   253 F.3d at 89; *see also Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2020 WL

9   5993222, at *1, 6 (N.D. Cal. Oct. 9, 2020) (recognizing this case "challenges the fundamental

10  operation of digital platforms affecting millions of users" and "presents questions at the frontier

11  edges of antitrust law.").  "In none of the[] cases" discussed in *Microsoft* "was the tied good

12  physically and technologically integrated with the tying good." *United States v. Microsoft Corp.*,

13  253 F.3d 34, 90 (D.C. Cir. 2001).  "Nor did the defendants ever argue that their tie improved the

14  value of the tying product to users *and* to makers of complementary goods." *Id.*  "[T]he rule of

15  reason, rather than per se analysis, should govern" in tying cases where "these and other novel,

16  purported efficiencies" may exist, including cases "involv[ing] software that serves as a platform

17  for third-party applications." *Id.* at 89-91; *see also Qualcomm*, 969 F.3d at 990-91 ("Novel

18  business practices—especially in technology markets—should not be 'conclusively presumed to

19  be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have

20  caused or the business excuse for their use.'").

21        More generally, the categories of conduct condemned *per se* are "narrow," *Texaco Inc. v.*

22  *Dagher*, 547 U.S. 1, 8 (2006), and the rule of reason applies where arrangements "can have either

23  procompetitive or anticompetitive effects." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,

24  551 U.S. 877, 894 (2007); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of*

25  *Oklahoma*, 468 U.S. 85, 104 n.24 (1984) ("[T]ying may have procompetitive justifications.");

26  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-200 (9th Cir. 2012) ("Like other vertical

27  restraints, tying arrangements may promote rather than injure competition."); P. Areeda & H.

28  Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1703g

TRIAL ELEMENTS, LEGAL FRAMEWORK AND
REMEDIES

Case No. 3:20-cv-05640-YGR

1    (4th ed. 2020 supp.) (recognizing "[m]ajor beneficial possibilities" of tying arrangements,

2    including "protecting quality, lowering costs or increasing value, increasing price competition,

3    aiding entry, or rewarding a valuable patent").  This includes cases in which "the economic impact

4    of certain practices is not immediately obvious." *Indiana Federation of Dentists*, 476 U.S. at 458-

5    459; *see also Qualcomm*, 969 F.3d at 990–91 (rule of reason applies to "[n]ovel business

6    practices—especially in technology markets"); *Microsoft*, 253 F.3d at 59 (rule of reason applies to

7    arrangements without "close parallel[s] in prior antitrust cases" and for which "simplistic

8    application of per se tying rules carries a serious risk of harm").  The rule of reason is also

9    applicable where "wooden application of per se rules" could "cast a cloud over platform

10   innovation." *Microsoft*, 253 F.3d at 94-95.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**6.2      Section 1 of the Sherman Act—Tying—Per Se Analysis—Elements**

2

Undisputed Principles

3      "For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the

4      defendant tied together the sale of two distinct products or services; (2) that the defendant

5      possesses enough economic power in the tying product market to coerce its customers into

6      purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume

7      of commerce in the tied product market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883,

8      913 (9th Cir. 2008); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-18 (1984),

9      *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Eastman*

10     *Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992).   The first element requires

11     the plaintiff to prove "the existence of a tie," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d

12     1171, 1178 (9th Cir. 2016), by showing that "two separate product markets have been linked,"

13     *Jefferson Parish Hosp.*, 466 U.S. at 21.   The second element requires the plaintiff to show that "the

14     defendant has market power in the tying product," *Ill. Tool Works*, 547 U.S. at 46, and that as a

15     result the plaintiff "was 'coerced' into buying the tied products from the defendant," *Cascade*

16     *Health Sols.*, 515 F.3d at 900; *see also Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1159

17     (9th Cir. 2003).

18         Disputed Principles

19     **Epic's Position:**  "[T]he *per se* rule relieves plaintiff of the burden of demonstrating an

20     anticompetitive effect, which is assumed."  *Newman v. Universal Pictures*, 813 F.2d 1519, 1522-

21     23 (9th Cir. 1987); *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1347 (9th Cir. 1982) ("Once

22     [the three *per se* tying] elements are established, a tying arrangement is presumptively illegal and

23     will be prohibited without a specific showing of anticompetitive purpose or effect."); *Betaseed,*

24     *Inc. v. U and I Inc.*, 681 F.2d 1203, 1215 (9th Cir. 1982) ("Once [the per se tying elements] are

25     demonstrated, no specific showing of unreasonable anticompetitive effect is needed.");  *see also*

26     *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 498 (1969) ("[A]t least when certain

27     prerequisites are met, arrangements of this kind are illegal in and of themselves, and no specific

28     showing of unreasonable anticompetitive effect is required.").  Epic therefore disputes that there

1   is a separate "pernicious effect" requirement in the context of a *per se* tying claim and notes that

2   Apple has not identified any Ninth Circuit case that so holds.  For further discussion, *see infra*

3   Section 6.2.5 Section 1 of the Sherman Act—Tying—Per Se Analysis—Pernicious Effect and

4   Lack of Any Redeeming Value.

5       The "*per se* rule does not broadly permit consideration of procompetitive justifications."

6   *United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001) (citing *Jefferson Parish*, 466

7   U.S. at 25 nn.41-42, 34-35 and *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).  For further

8   discussion, *see infra* Section 6.2.6 Section 1 of the Sherman Act—Tying—Per Se Analysis—

9   Business Justification Defense.

10      **Apple's Position:** Even where not subject to rule of reason analysis, tying claims are

11  subject to a unique "per se" rule that differs from the per se rule applicable to (for example)

12  horizontal price-fixing agreements because courts have "c[o]me to see that arguable tie-ins are to

13  be found everywhere, [and] that most of them serve legitimate objectives without threatening

14  competitive vitality in the second market or anywhere else and without even harming buyers."  P.

15  Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

16  ¶ 1701c (4th ed. 2020 supp.).  As more "modern antitrust principles" recognize "that 'the hallmark

17  of a tie-in is that it denies competitors free access to the tied product market,'" the "Ninth Circuit

18  has adopted the pernicious effect requirement" as a fourth element, requiring the plaintiff to prove

19  that the tying arrangement had a "pernicious effect on competition" in the tied product market.  *In*

20  *re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1034 (N.D. Cal. 2008) (quoting *Siegel v.*

21  *Chicken Delight,* 448 F.2d 43, 47 (9th Cir. 1971)); *see also In re Webkinz Antitrust Litig.*, No. C

22  08-1987 RS, 2010 WL 4168845, at *2 (N.D. Cal. Oct. 20, 2010) (plaintiff must "prove facts

23  showing a significant negative impact on competition in the tied product market"); *Sidibe v. Sutter*

24  *Health*, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (same); *Smith v. eBay Corp.*, No. C 10-03825

25  JSW, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012) (same).

26      In addition, a defendant "may defend itself by an affirmative showing of business

27  justification." *United States v. Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1378 (N.D. Cal.

28  1981); *see also Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1348 (9th Cir. 1987)

1   ("We have recognized that antitrust defendants may demonstrate a business justification for an

2   otherwise per se illegal tying arrangement.").  Courts have "substantial latitude" in "evaluating

3   business justifications."   ABA Model Civil Jury Instrns. Ch. 2.E.11, notes (2016).  While the

4   *Microsoft* court noted parenthetically that the "per se rule does not broadly permit consideration

5   of procompetitive justifications," 253 F.3d at 95, the Ninth Circuit has not imposed any such

6   limitation, *see Mozart Co.*, 833 F.2d at 1349 (recognizing any "legitimate purpose" as a valid

7   justification for a tie-in).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**6.2.1    Section 1 of the Sherman Act—Tying—Per Se Analysis—Presence of Two Products**

Undisputed Principles

The plaintiff must prove that the alleged tying product and the alleged tied product are "separate and distinct" products, *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008), that, if tied, would link "two separate product markets," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984); *see also United States v. Microsoft Corp*., 253 F.3d 34, 85 (D.C. Cir. 2001) ("[U]nless products are separate, one cannot be 'tied' to the other.").

"[T]he answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19; *see also Rick-Mik*, 532 F.3d at 975.  There must be "sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]." *Jefferson Parish*, 466 U.S. at 21-22; *see also Rick-Mik*, 532 F.3d at 975.

"[T]he 'purchaser demand' test of *Jefferson Parish* examines direct and indirect evidence of consumer demand for the tied product separate from the tying product.  Direct evidence addresses the question whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms.  Indirect evidence includes the behavior of firms without market power in the tying good market, presumably on the notion that (competitive) supply follows demand." *Rick-Mik*, 532 F.3d at 975 (citations omitted); *see also id.* ("If competitive firms always bundle the tying and tied goods, then they are a single product.").

Disputed Principles

**Epic's Position:**  Below, Apple cites a treatise stating that even when there exists separate demand for tied products, courts "should" also require "proof of [a] seller['s] ability to unbundle" those products, but Apple has not identified any court that has adopted such a rule, and Epic is not aware of any.

**Apple's Position:**  To show two items are "separate and distinct" products for purposes of a tying claim, *Rick-Mik Enters.*, 532 F.3d at 974, a plaintiff must prove that "there is a sufficient

demand for the purchase" of the allegedly tied product separate from the tying product given the manner the tied product would be offered in a competitive marketplace.  *Jefferson Par. Hosp.*, 466 U.S. at 21; *see also Kaufman*, 836 F.3d at 141 ("The 'separate product' element requires that the alleged tying product and tied product . . . exist in separate and distinct product markets.").  If the plaintiff establishes sufficient consumer demand for each product separately, "proof of [a] seller['s] ability to unbundle should also be required."  Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1743b (4th ed. 2020 supp.).  In other words, two items are "a single product" if they are (or are part of) "an 'integrated service.'"  *Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, 2020 WL 5993222, at *16 (N.D. Cal. Oct. 9, 2020); *see also Rick-Mik Enters.*, 532 F.3d at 974 (components of an overall "method of business" are not separate products).

### 6.2.2    Section 1 of the Sherman Act—Tying—Per Se Analysis—Proof of a Tie

<u>Undisputed Principles</u>

A tie exists where "sale of the desired ('tying') product is conditioned on purchase of another ('tied') product." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

"A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

### 6.2.3    Section 1 of the Sherman Act—Tying—Per Se Analysis—Coercion and Market Power With Respect to the Tying Product

<u>Undisputed Principles</u>

"[T]he Supreme Court has condemned tying arrangements when the seller has the market power to force a purchaser to do something that he would not do in a competitive market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 915 (9th Cir. 2008).  "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."  *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006); *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008).

The plaintiff must also show that it "was 'coerced' into buying the tied products from the defendant."  *Cascade Health Sols.*, 515 F.3d at 900; *see also Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).  "A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product."  *Paladin*, 328 F.3d at 1159.

<u>Disputed Principles</u>

**Epic's Position:** "[W]hat is required in a *per se* case is not power over the whole market for the tying product, but only . . . a 'type of market power [that] has sometimes been referred to as leverage defined here as a supplier's ability to induce his customers for one product to buy a second product from him that would not be purchased solely on the merit of that second product.'" *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1341 (9th Cir. 1984) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 n.20 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)) (internal alterations omitted); *see also Cty. of Toulumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001) (requiring for a *per se* violation "such power in the tying product or service market that the existence of forcing is probable").

*See supra* Section 5.2.1 Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason—Market Power.

1     **Apple's Position:**   The Supreme Court has held that in "all cases involving a tying

2  arrangement, the plaintiff must prove that the defendant has market power in the tying product."

3  *Illinois Tool Works*, 547 U.S. at 46; *accord Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532

4  F.3d 963, 972 (9th Cir. 2008).  Critically, a "defendant's economic power [must] be derived from

5  the market, not from a contractual relationship that the plaintiff has entered into voluntarily." *Rick-*

6  *Mik Enters.*, 532 F.3d at 973; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d

7  430, 443 (3d Cir. 1997) ("[W]here the defendant's 'power' to 'force' plaintiffs to purchase the

8  alleged tying product stems not from the market, but from plaintiffs' contractual agreement to

9  purchase the tying product, no claim will lie.").  The parties otherwise have set forth their positions

10  with respect to market power above.  *See* Section 5.2.1 Section 1 of the Sherman Act—

11  Unreasonable Restraint of Trade—Rule of Reason—Market Power.

### 6.2.4    Section 1 of the Sherman Act—Tying—Per Se Analysis— Foreclosure of a Substantial Volume of Commerce with Respect to the Tied Product

<u>Undisputed Principles</u>

There is foreclosure of a substantial volume of commerce with respect to the tied product where "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie." *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969); *see also Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) (foreclosure of a single purchaser sufficient so long as the dollar volume of sales is "not insubstantial").   There is no foreclosure where "the tied product is completely unwanted by the buyer." *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009).

**6.2.5    Section 1 of the Sherman Act—Tying—Per Se Analysis—Pernicious Effect and Lack of Any Redeeming Value**

<u>Disputed Principles</u>

**Epic's Position:**  Epic disputes that this is a separate element of *per se* tying.  "[T]he *per se* rule relieves plaintiff of the burden of demonstrating an anticompetitive effect, which is assumed."  *Newman v. Universal Pictures*, 813 F.2d 1519, 1522-23 (9th Cir. 1987); *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1347 (9th Cir. 1982) ("Once [the three *per se* tying] elements are established, a tying arrangement is presumptively illegal and will be prohibited without a specific showing of anticompetitive purpose or effect."); *Betaseed, Inc. v. U and I Inc.*, 681 F.2d 1203, 1215 (9th Cir. 1982) ("Once [the per se tying elements] are demonstrated, no specific showing of unreasonable anticompetitive effect is needed."); *see also Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 498 (1969) ("[A]t least when certain prerequisites are met, arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable anticompetitive effect is required.").

Apple states that the Ninth Circuit has adopted the pernicious effect requirement but does not identify any Ninth Circuit case that has done so.  Instead, it cites *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1034 (N.D. Cal. 2008), which drew this purported requirement from *Siegel v. Chicken Delight*, Inc., 448 F.2d 43, 47 (9th Cir. 1971), *abrogated by Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008).  *Siegel* predated *Newman*, *Hirsh*, and *Betaseed*, which "relieve[d] plaintiff of the burden of demonstrating an anticompetitive effect" when there is a *per se* tie.  *Newman*, 813 F.2d at 1522-23.  Further, *Siegel* did not announce a pernicious effect requirement but "only recited, without adopting, a slightly different potential fourth element that had been proposed by a party in that case."  *In re Webkinz Antitrust Litig.*, No. C 08–1987, 2010 WL 4168845, at *2 (N.D. Cal. 2010).

**Apple's Position:**  Because "[t]he Ninth Circuit has adopted the pernicious effect requirement," *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d at 1034, the plaintiff must "prove facts showing a significant negative impact on competition in the tied product market."  *In re Webkinz Antitrust Litig.*, 2010 WL 4168845, at *2.

1       Nothing in Epic's cited cases requires otherwise.  To start, *Newman v. Universal Pictures*,

2 813 F.2d 1519 (9th Cir. 1987), is a price-fixing, not a tying, case.  *See Cascade Health Sols. v.*

3 *PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (holding that a "unique per se rule" applies to

4 certain tying claims).  And while the Ninth Circuit stated in *Hirsh* (and *Betaseed*) that a plaintiff

5 "presumptively" need not make "a specific showing of anticompetitive purpose or effect," 674

6 F.2d at 1347, the court also recognized, as Judge Seeborg explained, that "'the rules governing

7 tying arrangements are designed to strike solely at practices employed to impede competition on

8 the merits,' and it declined to find illegality where the effect of an alleged tying arrangement was

9 'to promote rather than impede competition.'"  *In re Webkinz Antitrust Litig.*, No. C 08-1987 RS,

10 2010 WL 4168845, at *2 (N.D. Cal. Oct. 20, 2010) (quoting *Hirsh*, 674 F.2d at 1348-49).  Indeed,

11 where the alleged tie "tends to promote the welfare of consumers . . ., the tie-in doctrine can have

12 no application."  *Hirsh*, 674 F.2d at 1348.  It therefore "is of little consequence whether a

13 'pernicious effect' is characterized as a separate element to be pleaded and proved, or whether the

14 use of that term in some of the precedents merely makes explicit that the requisite effect on a 'not

15 insubstantial volume of commerce' cannot be a benign one.  In either event, a plaintiff must allege

16 and ultimately prove facts showing a significant negative impact on competition in the tied product

17 market."  *In re Webkinz Antitrust Litig.*, 2010 WL 4168845, at *2; *see also Sidibe v. Sutter Health*,

18 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (rejecting argument that the pernicious effects test

19 relied on outdated authority and dismissing complaint for failure to allege "any negative impact

20 on competition in the tied markets").

21

22

23

24

25

26

27

28

**6.2.6      Section 1 of the Sherman Act—Tying—Per Se Analysis—Business Justification Defense**

Undisputed Principles

The Ninth Circuit has "recognized that antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying arrangement." *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1348 (9th Cir. 1987).  "A tie-in does not violate the antitrust laws if implemented for a legitimate purpose and if no less restrictive alternative is available." *Id.* at 1349 (quotation marks omitted).

Disputed Principles

**Epic's Position:**    "It may seem somewhat anomalous to permit justifications for arrangements that are apparently subject to *per se* condemnation" but "allowing the defendant to assert a business justification defense is one way of inquiring into" whether *per se* analysis is appropriate.  *Mozart*, 833 F.2d at 1348 n.5; *accord United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001) (The "*per se* rule does not broadly permit consideration of procompetitive justifications.") (citing *Jefferson Parish*, 466 U.S. at 25 nn.41-42, 34-35 and *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).

"The defendant bears the burden of showing that the case falls within the contours of this affirmative defense." *Mozart*, 833 F.2d at 1349.

**Apple's Position:**  Legitimate business justification is an affirmative defense in a tying case governed by the per se rule, whereas procompetitive justifications are part of the burden-shifting applicable to the plaintiff's claim under the rule of reason.  *See* Section 5.2.3 Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason—Evidence of Procompetitive Effects.  Courts have "substantial latitude" in "evaluating business justifications." ABA Model Civil Jury Instrns. Ch. 2.E.11, notes (2016).  The burden rests on the plaintiff to "persuad[e] the tribunal that the factual premises of the defense are insubstantial."  *Id.*; *see also Mozart Co. v. Mercedes-Benz of North America*, 833 F.2d 1342, 1343, 1352 (9th Cir. 1987) (affirming judgment when plaintiff failed to "point[] to specific evidence" undermining the "plausible business justification . . . offered" by the defendant).

1    **6.3     Section 1 of the Sherman Act—Tying—Unlawful Tying under Rule of**

2    **Reason**

3    <u>Undisputed Principles</u>

4    If the rule of reason applies, the plaintiff "can prove, on the basis of a more thorough

5    examination of the purposes and effects of the practices involved, that the general standards of the

6    Sherman Act have been violated." *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 500

7    (1969).

8    The plaintiff needs to show "an actual adverse effect on competition caused by the tying

9    arrangement." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (quotation

10   marks omitted).  Courts conduct this analysis using a three-part burden-shifting framework.  *See*

11   *id.* at 1197.  The parties' discussion of the framework for assessing anticompetitive effects under

12   the rule of reason for Section 1 claims is above.  *See supra* Section 5.2.2 Section 1 of the Sherman

13   Act—Unreasonable Restraint of Trade—Rule of Reason—Anticompetitive Effects in the Relevant

14   Market.

15   <u>Disputed Principles</u>

16   **Epic's Position:**  If a plaintiff fails to establish *per se* liability, a plaintiff "can still prevail

17   on the merits", *Fortner*, 394 U.S. at 500, by demonstrating that a defendant "violated the Sherman

18   Act because it unreasonably restrained competition" under the rule of reason, *Jefferson Parish*

19   *Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984), *abrogated on other grounds by Ill. Tool Works*

20   *Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *United States v. Microsoft Corp.*, 253 F.3d 34, 95-97

21   (D.C. Cir. 2001).  The *per se* elements "are necessary only to bring into play the doctrine of *per se*

22   illegality." *Fortner Enters.*, 394 U.S. at 499-500.  *See supra* Section 5.2 Section 1 of the Sherman

23   Act—Unreasonable Restraint of Trade—Rule of Reason.

24   **Apple's Position:**  To prevail under the rule of reason, a plaintiff initially must prove the

25   first three requirements of a *per se* tying claim—that two separate product markets have been

26   linked through the alleged tying of two separate and distinct products, the existence of a tie, and

27   that the defendant possessed market power in the relevant tying product market and coerced the

28   plaintiff into buying the tied products from the defendant.  *See Illinois Tool Works Inc. v. Indep.*

*Ink, Inc.*, 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) ("[T]he first, most fundamental requirement" of any tying claim is "the existence of a tie" between separate products in separate markets). Apple adopts by reference the discussion above of these elements. In addition, the plaintiff must prove that the alleged tie "has a substantial and anticompetitive effect that harms consumers" in the relevant tied product market. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

Ties imposed on intermediaries, not end consumers, often pose fewer competitive concerns. Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1725b (4th ed. 2020 supp.). That is because "ties affecting 'mere' intermediaries" inhibit distributors in "only one of many channels" through which consumers can obtain separate products or services. *Id.*; *see also Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383 (5th Cir. 1994) (no liability for manufacturer of equipment that required dealers to carry its waxed paper but left consumers free to choose because "[t]ies that constrain only dealers . . . create relatively little danger to competition, provided consumers may purchase the two goods separately"); *Ransomes Am. Corp. v. Spartan Distribs.*, Inc., 914 F. Supp. 183, 185 (W.D. Mich. 1996) (similar); *Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.*, 917 F. Supp. 1208, 1229 (W.D. Tenn. 1995) (similar).

1   **7.      SECTION 2 OF THE SHERMAN ACT—MONOPOLIZATION—ELEMENTS**

2         Undisputed Principles

3         In order to prevail on a claim of unlawful monopolization under Section 2 of the Sherman

4   Act, a plaintiff must show: "(a) the possession of monopoly power in the relevant market; (b) the

5   willful acquisition or maintenance of that power; and (c) causal antitrust injury."   *FTC v.*

6   *Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (internal quotation marks omitted); *see also*

7   *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (stating that a Section 2 claim

8   requires "(1) the possession of monopoly power in the relevant market and (2) the willful

9   acquisition or maintenance of that power as distinguished from growth or development as a

10  consequence of a superior product, business acumen, or historic accident.").

11        Disputed Principles

12        **Epic's Position:**  Epic believes the Undisputed Principles above lay out the

13  "unencumbered legal framework," Dkt. 241 at 2, and refrains from addressing the additional

14  argument presented by Apple below.

15        **Apple's Position:** To establish a claim under Section 2, the plaintiff must show the willful

16  acquisition or maintenance of monopoly power "through exclusionary conduct."  *MetroNet Servs.*

17  *Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).  In addition, Section 2 claims "must

18  be judged on a market-by-market basis." *United States v. Syufy Enterprises*, 903 F.2d 659, 672

19  (9th Cir. 1990); *see also Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,*

20  382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [the

21  defendant's] ability to lessen or destroy competition."); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

22  2285 (2018) (similar).

23

24

25

26

27

28

**7.1     Section 2 of the Sherman Act—Monopolization—Monopoly Power**

<u>Undisputed Principles</u>

Monopoly power is "the power to control prices or exclude competition." *United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level," *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), "without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable," *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (quotation marks omitted). "Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992).

A plaintiff can prove monopoly power directly and/or indirectly. *Microsoft*, 253 F.3d at 51. "[D]irect evidence" of monopoly power includes "evidence of restricted output and supracompetitive prices." *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995). "Because such direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power. Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51 (citations omitted); *see also Grinnell*, 384 U.S. at 571 ("The existence of such power ordinarily may be inferred from the predominant share of the market."); *Rebel Oil*, 51 F.3d at 1434 ("To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."). *See supra* Section 4 Market Definition—Relevant Product and Geographic Market.

Because "[a] mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme," a plaintiff also "must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Rebel Oil*, 51 F.3d at 1438-39 & n.10. "Entry barriers are additional long-run costs that were not incurred by incumbent firms

1   but must be incurred by new entrants, or factors in the market that deter entry while permitting

2   incumbent firms to earn monopoly returns.  The main sources of entry barriers are: (1) legal license

3   requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for

4   established brands; (4) capital market evaluations imposing higher capital costs on new entrants;

5   and, in some situations, (5) economies of scale."  *Id.* at 1439 (quotation marks, citations, and

6   footnote omitted).

7       <u>Disputed Principles</u>

8       **Epic's Position:**   "There is universal agreement that monopoly power is the power to

9   exclude competition or control prices."  *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir.

10  1990) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Syufy*

11  *Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990,  993 (9th Cir. 1986), *cert. denied*, 479 U.S. 1031

12  (1987)); *see also Microsoft*, 253 F.3d at 51 ("Where evidence indicates that a firm has in fact

13  profitably [raised prices substantially above the competitive level], the existence of monopoly

14  power is clear.").  "[T]he consistent extraction of supracompetitive profits may be an indication of

15  anticompetitive market power."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002).  "[A]

16  decline in prices does not necessarily imply an absence of monopoly power; a fair profit might

17  have been made at even lower cost to users."  *Greyhound Comput. Corp., Inc. v. Int'l Bus. Machs.*

18  *Corp.*, 559 F.2d 488, 497 (9th Cir. 1977).

19      **Apple's Position:**  The "Supreme Court has never found a party with less than 75% market

20  share to have monopoly power." *Kolon Indus. v. E.I. DuPont de Nemours & Co*., 748 F.3d 160,

21  174 (4th Cir. 2014.  Courts also consider "structural characteristics of markets in determining

22  whether or not a firm has monopoly power, including the relevant size and strength of competitors,

23  … probable development of the industry, [and] potential competition."  ABA Section of Antitrust

24  Law, *Antitrust Law Developments* 236 (8th ed. 2017).  For example, in two-sided platform markets

25  "[i]ndirect network effects [] limit [a] platform's ability to raise overall prices and impose a check

26  on its market power."  *Amex*, 138 S. Ct. at 2281.

27      Even if a plaintiff presents evidence that the defendant charged high prices and reaped high

28  profits, this does not directly show monopoly power if there is "no accompanying showing of

restricted output." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012); *see also Humana Inc. v. Mallinckrodt ARD LLC*, 2020 WL 3041309 at *6 (C.D. Cal. 2020) (dismissing Sherman Act claims for failure to show market power because the plaintiff alleged supracompetitive prices but not output restriction by the defendant). "Where . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993). Moreover, that "two-sided platforms charge one side a price that is below or above cost reflects differences in the two sides' demand elasticity, not market power or anticompetitive pricing." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018). What matters is "the overall cost of the platform's services," not "[p]rice increases on one side of the platform." *Id.*

In addition, "rates of return are more a reflection of various accounting conventions than true economic profit," and reveal "very little about [defendant's] market power." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002). Thus, the use of such measures to ascertain market power "has yet to be accepted by any circuit." *Id.* at 1253; *see also Qualcomm*, 969 F.3d at 994, 1003 & n.15 ("[P]rofit-seeking behavior alone is insufficient to establish antitrust liability," for "the goal of antitrust law is not to force businesses to forego profits or even '[t]he opportunity to charge monopoly prices.'"). Evidence that a defendant charged high prices and reaped high profits does not prove monopoly power if there is "no accompanying showing of restricted output." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

1    **7.2**     **Section 2 of the Sherman Act—Monopolization—Willful Maintenance of**

2             **Monopoly Power**

3    <u>Undisputed Principles</u>

4         "[T]he possession of monopoly power will not be found unlawful [under Section 2] unless

5    it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns v. Law Offices*

6    *of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990

7    (9th Cir. 2020); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (requiring

8    "the willful acquisition or maintenance of that power as distinguished from growth or development

9    as a consequence of a superior product, business acumen, or historic accident" for a Section 2

10   monopolization claim).  The plaintiff must show "anticompetitive abuse or leverage of monopoly

11   power, or a predatory or exclusionary means of attempting to monopolize the relevant market."

12   *Qualcomm*, 969 F.3d at 990.

13        <u>Disputed Principles</u>

14        **Epic's Position:**     Epic believes the Undisputed Principles above lay out the

15   "unencumbered legal framework," Dkt. 241 at 2, and refrains from addressing the additional

16   arguments presented by Apple below.

17        **Apple's Position:**  A monopoly maintenance claim is not abstract, but rather requires the

18   plaintiff to plead and prove unlawful exclusionary conduct; and it is the plaintiff's burden to

19   identify the challenged conduct with "some specificity." *E & L Consulting, Ltd. v. Doman Indus.*

20   *Ltd.*, 472 F.3d 23, 32 (2d Cir. 2006).  "Whether specific conduct is anticompetitive is a question

21   of law." *Smile Care Dental Group Delta Dental Plan Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).  "The

22   prohibited conduct must be directed toward competitors." *Qualcomm*, 969 F.3d at 992 (quoting

23   *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999)).

24

25

26

27

28

### 7.2.1   Section 2 of the Sherman Act—Monopolization—Willful Maintenance of Monopoly Power—Analytical Framework

<u>Disputed Principles</u>

**Epic's Position:** Typically, unilateral anticompetitive conduct is evaluated under the "rule of reason." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). "Regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same. . . . The similarity of the burden-shifting tests under §§ 1 and 2 means that courts often review claims under each section simultaneously." *Id.* at 991; *accord United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[I]t is clear . . . that the analysis under section 2 is similar to that under section 1 regardless whether the rule of reason label is applied.") (quoting *Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980)); *see also Standard Oil Co. v. United States*, 221 U.S. 1, 61-62 (1911) ("[W]hen the [second] section [of the Sherman Act] is thus harmonized with . . . the [first], it becomes obvious that the criteria to be resorted to in any given case for the purpose of ascertaining whether violations of the section have been committed is the rule of reason guided by the established law."). *See supra* Section 5.2 Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason.

*First*, "the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59 (citations omitted); *see also Qualcomm*, 969 F.3d at 991.

*Second*, "if a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct. 'If the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim.'" *Qualcomm*, 969 F.3d at 991 (quoting *Microsoft*, 253 F.3d at 59) (citations omitted).

1    *Third*, "[i]f the plaintiff cannot rebut the monopolist's procompetitive justification, 'then

2    the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the

3    procompetitive benefit.'"  *Id.* at 991 (quoting *Microsoft*, 253 F.3d at 59).  If "the monopolist's

4    conduct on balance harms competition," it is "condemned as exclusionary for purposes of § 2."

5    *Microsoft*, 253 F.3d at 59.

6        **Apple's Position:**  The "rule of reason" used to evaluate certain claims brought under

7    Section 1 does not map onto Section 2 claims.  While courts sometimes use a burden-shifting

8    approach for Section 2 claims, that "burden-shifting approach does not apply in all cases."  ABA

9    Section of Antitrust Law, *Antitrust Law Developments* at 320 (8th ed. 2017).  Instead, courts have

10   "develop[ed] considerably more specific rules for common forms of alleged misconduct."  *Novell,*

11   *Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.).  A court therefore

12   must use the specific framework applicable to the type of unilateral conduct challenged by the

13   plaintiff.  Where such a framework applies, it is legal error to apply the generic burden-shifting

14   approach.  *See, e.g., Trinko*, 540 U.S. at 407-09; *Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S.

15   438, 450-51 (2009); *Allied Orthopedic*, 592 F.3d at 998-1001; *Aerotec Int'l, Inc. v. Honeywell*

16   *Int'l, Inc.*, 836 F.3d 1171, 1181-84 (9th Cir. 2016).

17        While *Qualcomm* likened the burden-shifting approach sometimes used in Section 2 cases

18   to the framework used in Section 1 cases, it evaluated the actual conduct challenged under Section

19   2 using more specific rules.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th

20   Cir. 2020).  For example, it resolved "Qualcomm's refusal to provide exhaustive SEP licenses to

21   rival chip suppliers" under the established law holding "there is 'no duty to deal under the terms

22   and conditions preferred by [a competitors] rivals."  *Id.* at 993.  Nor did it shift burdens when

23   rejecting the FTC's argument that Qualcomm's conduct violated "traditional Section 2 standards."

24   *Id.* at 995-96.

25        There are sound reasons to treat concerted and independent action differently.  The

26   Sherman Act "contains a 'basic distinction between'" them, and "[c]oncerted activity subject to §

27   1 is judged more sternly than unilateral activity under § 2."  *Copperweld Corp. v. Indep. Tube*

28   *Corp.*, 467 U.S. 752, 767-68 (1984) (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S.

1   752, 761 (1984)).  That is because "[c]oncerted activity inherently is fraught with anticompetitive

2   risk" but unilateral conduct is not.  *Id.* at 768-69; *see also Verizon Comm. v. Law Offices of Curtis*

3   *V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (describing collusion as "the supreme evil of antitrust").

4   Thus, the Sherman Act may "prohibit unreasonable restraints of trade" among multiple firms but

5   "leave[] untouched" unilateral conduct "that may be indistinguishable in economic effect."

6   *Copperweld Corp.*, 467 U.S. at 775.

7        Examples of "more specific rules" for unilateral conduct are ubiquitous.  *Novell*, 731 F.3d

8   at 1072.  For example, "a monopolist generally has no duty to share (or continue to share) its

9   intellectual or physical property with a rival," *id.* at 1074, "including by making its products

10  interoperable, licensing to competitors, or sharing information with its competitors."  *In re Apple*

11  *iPod iTunes Antitrust Litig.*, No. 4:05-cv-00037-YGR, Dkt. 1005 at 19 (N.D. Cal. Dec. 15, 2014).

12  As another example, "[i]f a monopolist's design change is an improvement" when introduced—

13  that is, it provides any "benefit to consumers"—"it is necessarily tolerated by the antitrust laws,

14  unless the monopolist abuses or leverages its monopoly power in some other way when

15  introducing the product."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592

16  F.3d 991, 998, 1000 (9th Cir. 2010); *see also In re Apple iPod iTunes Antitrust Litig.*, No. 4:05-

17  cv-00037-YGR, Dkt. 1005 at 19 (N.D. Cal. Dec. 15, 2014) ("[O]ffering a genuine product

18  improvement cannot be considered an anticompetitive act, regardless of its effect on a

19  competitor."); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988)

20  (describing the "line of 'product innovation' cases" in which courts have "consistently rejected

21  antitrust liability for a monopolist's decision about when or whether to market new products").  As

22  just one more example, unilateral refusals to deal with (or assist) rivals are generally not actionable,

23  with no need for burden-shifting.  *See infra* Section 8 Section 2 of the Sherman Act—Essential

24  Facility.

25        Without "pre-arguing" the case, Apple states that the generic burden-shifting framework is

26  inapplicable to the conduct alleged in Epic's complaint.

27

28

**7.2.2**     **Section 2 of the Sherman Act—Monopolization—Willful**

**Maintenance of Monopoly Power—Anticompetitive Effects**

Undisputed Principles

"[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'"   *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)).   Anticompetitive effects are those that "harm the competitive *process* and thereby harm consumers.   In contrast, harm to one or more *competitors* will not suffice."   *Id.* (internal quotation marks and citation omitted) (emphasis in original).

The plaintiff bears the burden of proving "that the monopolist's conduct indeed has the requisite anticompetitive effect."   *Microsoft*, 253 F.3d at 58-59.   Anticompetitive effects can include increased prices and reduced output, but courts "will not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level."   *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (quotation marks omitted).   "[I]n order to prove a violation of the Sherman Act, the plaintiff must show that diminished consumer choices and increased prices are the result of a less competitive market due to either artificial restraints or predatory and exclusionary conduct."   *Qualcomm*, 969 F.3d at 990.

Evidence of anticompetitive effects includes "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market."   *Am. Express*, 138 S. Ct. at 2284 (quotation marks and citations omitted).   "[I]n assessing alleged antitrust injuries, courts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'"   *Qualcomm*, 969 F.3d at 992 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)).

In a two-sided market, courts must take into consideration the effects of the defendant's conduct on both sides of the market.   *Am. Express*, 138 S. Ct. at 2287.

Disputed Principles

**Epic's Position:**   A plaintiff can prove anticompetitive effects directly and/or indirectly. *Am. Express*, 138 S. Ct. at 2284.   "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased

quality in the relevant market." *Id.* (quotation marks and citations omitted).  "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted).[2]

Courts should consider the combined anticompetitive effects of a defendant's conduct. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1378 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").

**Apple's Position:** As a matter of law, "a plaintiff may not use *indirect* evidence to prove unlawful monopoly maintenance via anticompetitive conduct under § 2."  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (emphasis in original).  "Direct evidence of anticompetitive effects would be 'proof of actual detrimental effects [on competition].'"  *Amex*, 138 S. Ct. at 2284 (quoting *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986)). "[P]rofit-seeking behavior alone is insufficient to establish antitrust liability."  *Qualcomm*, 969 F.3d at 1003 (citing *Trinko*, 540 U.S. at 407).

To suffice, anticompetitive effects must be "significant and more-than-temporary."  *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Professional Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997).  "In addition, the practice must be reasonably susceptible to judicial control, which means that the court must be able to identify the conduct as anticompetitive and fashion either an appropriate deterrent or an equitable remedy likely to improve competition."  P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 651a (4th ed. 2020 supp.).

In markets that include two-sided transaction platforms, courts must consider "indirect network effects and interconnected pricing and demand" because "[e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power" as the defendant's "business model [may] spur[] robust interbrand competition and . . . increase[] the quality and quantity of [relevant] transactions" when both sides

---

[2] Apple's quote from *Qualcomm* limits the use of indirect evidence to prove the challenged conduct, not its effects.

1  of the market are considered. *Amex*, 138 S. Ct. at 2286-87, 2290 (internal quotation marks and

2  citations omitted).

### 7.2.3 Section 2 of the Sherman Act—Monopolization—Willful Maintenance of Monopoly Power—Business/Procompetitive Justification

Undisputed Principles

"[I]f a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (quoting *United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001)). "[T]he burden does not shift to [the defendant] to provide such justifications unless and until the [plaintiff] meets its initial burden of proving anticompetitive harm." *Id.* at 996.

A business or procompetitive justification is "a nonpretextual claim that [the defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* at 991; *Microsoft*, 253 F.3d at 59.

Disputed Principles

**Epic's Position:** Once the plaintiff has demonstrated anticompetitive effect, "the defendant generally has the burden of coming forward with a legitimate business justification." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1366 (9th Cir. 1992).

Per the Court's instruction, Epic declines to "pre-argue" the merits of any alleged business or procompetitive justification, Dkt. 241 at 2, but Epic specifically disputes Apple's assertion that the existence of any procompetitive justification, however weak, necessarily and automatically defeats Section 2 liability.

**Apple's Position:** An "antitrust defendant's conduct is redeemed by a legitimate business purpose." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990). Accordingly, there can be no "antitrust liability if there was a legitimate business justification" for the defendant's conduct. *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 369 (9th Cir. 1988); *see also*, *e.g.*, *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189 (2d Cir. 1992) ("[L]egitimate business justifications . . . prevent a rational trier of fact from finding § 2 liability.") (Marshall, J.). "In general, a business justification is valid if it relates

directly or indirectly to the enhancement of consumer welfare." *Data Gen. v. Grumman Sys. Support*, 36 F.3d 1147, 1183 (1st Cir. 1994).

The plaintiff bears the burden of proving that the defendant's "conduct [was not] redeemed by a legitimate business purpose." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258-59 & n.9 (9th Cir. 1990). The plaintiff "may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual." *Image Tech. Servs.*, 125 F.3d at 1212. To prove pretext, the plaintiff must adduce evidence that directly undermines the veracity of the defendant's proffered justification. *See Image Tech. Servs.*, 903 F.2d at 618-19.

A defendant's conduct is justified if undertaken to "enhance[] the quality or attractiveness of a product, increase[] efficiency by reducing costs or otherwise benefit[] consumers." *Image Tech. Servs.*, 125 F.3d at 1220 n.12. For example, a defendant "may assert that its desire to profit from its intellectual property rights justifies its conduct, and the [court] should presume that this justification is legitimately procompetitive." *Id.* at 1219. Also procompetitive is adopting "a different business model" that spurs "competitive innovations," increasing output and "improving the quality of the services." *Amex*, 138 S. Ct. at 2282. Additional justifications may include:

- Lowering costs of providing the product or service. *See Cal. Computer Products, Inc. v. Int'l Business Machines Corp.*, 613 F.2d 727, 744 (9th Cir. 1979); *Image Tech. Servs.*, 125 F.3d at 1220 n.12; *In the Matter of Mcwane, Inc., A Corp., & Star Pipe Prod., Ltd. A Ltd. P'ship.*, 2014 WL 556261, *30 (F.T.C. Jan. 30, 2014).

- Maintaining or improving the quality of the product or service. *See Cal. Comp.*, 613 F.2d at 744; *Data Gen. v. Grumman Sys. Support*, 36 F.3d 1147, 1183 (1st Cir. 1994); *Image Tech. Servs.*, 125 F.3d at 1220 n.12; *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007).

- Ensuring consumer safety or improving product security and privacy. *See GTE Sylvania Inc.*, 433 U.S. at 55 n.23; *Apple iPod iTunes Antitrust Litig.*, No. 05–CV–0037 YGR, 2014 WL 4809288 (N.D. Cal. Sep. 26, 2014).

- Improving the ease with which consumers can use the service. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 228 (E.D.N.Y. 2013), *rev'd on other grounds,* 827 F.3d 223 (2d Cir. 2016).

- Increasing output. *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1023 (10th Cir. 1998); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 841 (11th Cir. 2015).

- Broadening consumer choice. *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003); *United States v. Brown Univ.*, 5 F.3d 658, 675 (3d Cir. 1993).

- Generating network effects. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 435 (4th Cir. 2015); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010).

- Increasing interbrand competition. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 888-903 (2007); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 n.2 (9th Cir. 2016).

- Preventing free-riding. *See Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451, 461 (1992); *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013).

- Protecting trade secret or proprietary information. *See Technical Resource Ser. v. Dornier Med. Sys*, 134 F.3d 1458, 1467 (11th Cir. 1998).

- Reducing potential legal exposure. *See Technical Resource Ser.*, 134 F.3d at 1467.

- Avoiding dealing with a litigious (or otherwise difficult to deal with) counterparty. *See Technical Resource Ser.*, 134 F.3d at 1467.

**7.2.4    Section 2 of the Sherman Act—Monopolization—Willful**

**Maintenance of Monopoly Power—Less Restrictive Alternative**

<u>Disputed Principles</u>

**Epic's Position:** If the defendant successfully bears the burden of showing a procompetitive rationale for the restraint, "[t]he burden then shifts back to plaintiffs to demonstrate that there were less restrictive alternatives" to the challenged conduct.  *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001).  Contrary to Apple's assertion below, this principle is not limited to Section 1 claims.  Under Section 2, "[a]nticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

For further discussion, *see supra* Section 5.2.4 Section 1 of the Sherman Act—Unreasonable Restraint of Trade—Rule of Reason—Less Restrictive Alternative.

**Apple's Position:** "[T]here is no least restrictive alternative requirement in the context of a Section 2 claim."  *Image Tech. Serv. v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990); *accord Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037 YGR, 2014 WL 12719194, at *1 (N.D. Cal. Nov. 25, 2014); *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. L.P.*, No. CV, 2008 WL 7346921, at *16 (C.D. Cal. July 9, 2008), *aff'd*, 592 F.3d 991 (9th Cir. 2010).  That is because the Sherman Act "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."  *Verizon Comm. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 415-16 (2004).  The case Epic cites involves a Section 1 claim.  *See Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1151 (9th Cir. 2001).  Accordingly, Epic may prevail on a claim under Section 2 only if it demonstrates that each of Apple's proffered procompetitive justifications is invalid or pretextual.  *See Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258-59 & n.9 (9th Cir. 1990).

**7.2.5    Section 2 of the Sherman Act—Monopolization—Willful Maintenance of Monopoly Power—Balancing the Competitive Effects**

Disputed Principles

**Epic's Position:**   In a Section 2 claim, "[i]f the plaintiff cannot rebut the monopolist's procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.'"   *FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020) (quoting *Microsoft*, 253 F.3d at 59).   If "the monopolist's conduct on balance harms competition," it is "condemned as exclusionary for purposes of § 2."   *United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001).

**Apple's Position:**   Courts do not "balance" procompetitive and anticompetitive effects in Section 2 cases.   Under the burden-shifting framework sometimes used for Section 2 cases, a plaintiff only may "show that the proffered business justification is pretextual."   *Behrend v. Comcast Corp.*, No. CIV.A. 03-6604, 2012 WL 1231794, at *19 (E.D. Pa. Apr. 12, 2012); *see also Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (holding that once the defendant has met its burden to show its valid business justification, the plaintiff only may show that the proffered business justification is pretextual); *ACT, Inc. v. Sylvan Learning Sys., Inc.*, 296 F.3d 657, 670 (8th Cir. 2002) (similar).

While in *Microsoft* "the D.C. Circuit appeared to state a balancing requirement for close cases," the "court never attempted any real balancing."   P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 651e3 (4th ed. 2020 supp.).   Instead, the court "either condemned the conduct when the defendant had not offered an adequate justification or refused to condemn it once the justification had been accepted."   *Id.*   The same is true for *Qualcomm*, 969 F.3d at 994-1005.

**7.3     Section 2 of the Sherman Act—Monopolization—Causal Antitrust Injury**

<u>Undisputed Principles</u>

"Causal antitrust injury is a substantive element of an antitrust claim."  *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). "The four requirements for antitrust injury are '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027 (N.D. Cal. 2015) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F. 3d 1051, 1055 (9th Cir. 1999)).  *See infra* Section 18.2.1 Remedies—Clayton Act—Injunction—Antitrust Standing and Section 18.2.2 Remedies—Clayton Act—Injunction—Antitrust Injury.

1  **8.      SECTION 2 OF THE SHERMAN ACT—ESSENTIAL FACILITY**

2  <u>Undisputed Principles</u>

3  Under Ninth Circuit precedent, the plaintiff must show (1) that the defendant is "a

4  monopolist in control of an essential facility"; (2) that the plaintiff "is unable reasonably or

5  practically to duplicate the facility"; (3) that the defendant "has refused to provide [the plaintiff]

6  access to the facility"; and (4) that "it is feasible for [the defendant] to provide such access."

7  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016); *MetroNet Servs.*

8  *Corp. v. Qwest Corp.*, 383 F.3d 1124, 1128-29 (9th Cir. 2004); *Alaska Airlines, Inc. v. United*

9  *Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir. 1991).

10  <u>Disputed Principles</u>

11  **Epic's Position:**  An essential facilities claim may be brought under § 2 of the Sherman

12  Act.  While the Supreme Court has "f[ound] no need either to recognize . . . or to repudiate" the

13  essential facilities doctrine, *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

14  398, 411 (2004), the Ninth Circuit has recognized such a claim under Section 2.  *Aerotec*, 836 F.3d

15  at 1184-85; *Metronet*, 383 F.3d at 1129; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d

16  1195, 1209-10 (9th Cir. 1997) (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973));

17  *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1366 (9th Cir. 1992); *City of Anaheim v. S.*

18  *Cal. Edison Co.*, 955 F.2d 1373, 1379 (9th Cir. 1992); *Alaska Airlines*, 948 F.2d at 542-46.

19  **Apple's Position:**  The Supreme Court has "never recognized" an essential facilities

20  doctrine under Section 2.  *Verizon Comm. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398,

21  411 (2004); *accord MetroNet Servs.*, 383 F.3d at 1129.  That is because the "[e]ssential facility

22  doctrine generally is inconsistent with antitrust's purpose" when applied to unilateral action.  P.

23  Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

24  ¶ 771b (4th ed. 2020 supp.).  And "its application to intellectual property cases is particularly

25  problematic" because "an intellectual property owner has the right unilaterally to decide not to use

26  or license its intellectual property" and "[i]mposing a duty to deal in some cases threatens to

27  undermine this basic principle."  H. Hovenkamp, et al., *IP and Antitrust: An Analysis of Antitrust*

28  *Principles Applied to Intellectual Property* § 13.03 [C][2] (3rd ed. 2020 supp.).  Indeed, there is

1    "no case in which a United States court consciously held that an intellectual property right was

2    itself an essential facility that must be licensed on reasonable and nondiscriminatory terms." *Id.*

3    　　　　To the extent such a claim is cognizable under Section 2, an essential facilities claim is "a

4    variation on a refusal to deal claim." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171,

5    1184 (9th Cir. 2016).  The Sherman Act generally "does not restrict the long recognized right of a

6    trader or manufacturer engaged in an entirely private business, freely to exercise his own

7    independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250

8    U.S. 300, 307 (1919); *see also Trinko*, 540 U.S. at 407-09 (discussing the duty of a putative

9    monopolist to assist a rival); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448-51

10   (2009)  (same); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991-94 (9th Cir. 2020)

11   (same); *Fed. Trade Comm'n v. Qualcomm, Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (same); *Aerotec*,

12   836 F.3d at 1183-84 (same)*; MetroNet Servs.*, 383 F.3d at 1130-31 (same).  The Supreme Court

13   has recognized that "[f]irms may acquire monopoly power by establishing an infrastructure."

14   *Trinko*, 540 U.S. at 407.  "Compelling such firms to share the source of their advantage is in some

15   tension with the underlying purpose of antitrust law," *id.* at 407-08, and, absent a duty to cooperate,

16   any claim premised on a rival's refusal to deal with or assist the plaintiff fails.  *See Linkline*

17   *Commc'ns*, 555 U.S. at 451; *Aerotec*, 836 F.3d at 1184.  *A fortiori*, "a firm [that] has no antitrust

18   duty to deal with its competitors . . . certainly has no duty to deal under terms and conditions that

19   the rivals find commercially advantageous." *Linkline Commc'ns*, 555 U.S. at 450; *see also Novell*,

20   731 F.3d at 1066, 1078 (a plaintiff cannot evade "the hard road of refusal to deal doctrine" by

21   "trying to recast" a "withdrawal[] of assistance"—such as an alleged monopolist's "refus[al] to

22   share its intellectual property with rivals after first promising to do so"—"as an affirmative act of

23   interference with a rival rather than a unilateral" refusal to cooperate) (internal quotation marks

24   omitted).

25

26

27

28

1

### 8.1     Section 2 of the Sherman Act—Essential Facility—Competitor Standing

2

<u>Disputed Principles</u>

3

**Epic's Position:**   The essential facilities doctrine affords standing to plaintiffs who are

4

presently unable to compete with a defendant by virtue of that defendant's denial of access to an

5

essential facility, as "[o]therwise, a monopolist would be able unreasonably to choke off all

6

competition, yet escape sanctions simply because it was the only one in a position to do so." *MCI*

7

*Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1147 n.100 (7th Cir. 1983).  Indeed, in

8

the *Ferguson* decision cited by Apple, the Ninth Circuit explicitly acknowledged that denial of

9

access to a "potential competitor" could constitute an actionable essential facilities claim.

10

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988)

11

("It is difficult to see how denying a facility to one who . . . is not an actual *or potential* competitor

12

[of a defendant] could enhance or reinforce [a defendant's] power.") (emphasis added) (alteration

13

omitted).

14

At least the Ninth, Seventh, and D.C. Circuits have noted that essential facilities claims are

15

often necessarily brought by plaintiffs who are would-be competitors but are unable to compete.

16

*Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992 (D.C. Cir. 1977) ("The essential facility doctrine,

17

also called the 'bottleneck principle,' states that where facilities cannot practicably be duplicated

18

by *would-be competitors*, those in possession of them must allow them to be shared on fair terms.")

19

(emphasis added) (internal quotation omitted); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948

20

F.2d 536, 542 (9th Cir. 1991) ("Stated most generally, the essential facilities doctrine imposes

21

liability when one firm, which controls an essential facility, denies a second firm reasonable access

22

to a product or service that the second firm must obtain *in order to compete* with the first.")

23

(emphasis added); *MCI Commc'ns*, 708 F.2d at 1147 n.100 ("Where a monopolist controls

24

essential services. . . its refusal to allow *potential competitors* to use those services gives rise to

25

antitrust liability where the purpose of the denial is to restrain competition, even if the monopolist

26

is the only one that controls the facility.") (emphasis added).

27

Contrary to Apple's contention, the cases cited above do not exclusively involve "claims

28

by actual or former competitors."  In *Hecht*, for example, "[p]laintiffs . . . [we]re a group of

1  promoters who . . . sought unsuccessfully to obtain an American Football League (AFL) franchise"

2  and who had "no football experience."  570 F.2d at 985-86.  The D.C. Circuit stated it plainly:

3  "[t]his case . . . concerns the *potential competition* between two teams."  *Id.* at 989 n.20 (emphasis

4  added).  The plaintiffs in *Hecht* are properly described as "would-be competitors," "potential

5  competitors" and "potential market entrants."  *Id.* at 992-93.

6      **Apple's Position:**  Only competitors of the defendant may assert essential facility claims.

7  *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988).

8  Accordingly, the plaintiff must prove that it is a competitor of the defendant "in the field of the

9  facility itself or in a vertically related market that is controlled by the facility."  *Intergraph Corp.*

10  *v. Intel Corp.*, 195 F.3d 1346, 1357 (Fed. Cir. 1999).

11      The cases discussed by Epic involved claims by actual competitors or former competitors

12  driven out of business due to their alleged inability to access an essential facility.  *See MCI*

13  *Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1104 (7th Cir. 1983) (claims brought by

14  actual competitors of defendant); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 538

15  (9th Cir. 1991) (same); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 985 (D.C. Cir. 1977) (claims

16  brought against owners of NFL team by a rival group of promoters who tried but failed to obtain

17  a competing football franchise because they could not gain access to the city's football stadium).

18  In *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 982-83 (9th Cir.

19  1988), the Ninth Circuit held that a university renting its stadium to one producer of trade shows

20  was not required to rent to other trade show producers precisely because the plaintiffs and

21  defendant were not in competition.

22      Moreover, courts have regularly rejected essential facility claims brought by plaintiffs who

23  were potential users that were not allowed to license patented or copyrighted technology.

24  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1356-57 (Fed. Cir. 1999); *see also*, *e.g.*, *Cyber*

25  *Promotions, Inc. v. Am. Online*, 948 F. Supp. 456, 461 (E.D. Pa. 1996) ("[A]n advertising agency

26  which provides advertising services for companies and individuals wishing to advertise their

27  products and services via e-mail," was "not a business competitor" of "a private commercial online

28  service").  The same is true for analogous arrangements outside technology sectors.  *See*, *e.g.*,

*Ferguson*, 848 F.2d at 982-83; *Interface Grp., Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 12 (1st Cir. 1987) (agency operating airport did not compete with charter airline that was denied access to a terminal and maintenance of its choice); *Garshman v. Universal Res. Holding, Inc.*, 824 F.2d 223 (3d Cir. 1987) (pipeline not obliged to sell space to gas explorers with whom it was not in competition); *Homefinders, Inc. v. Providence Journal Co.*, 621 F.2d 441 (1st Cir. 1980) (newspaper not required to print ads for specific entities that wished to advertise); *America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc.*, 347 F. Supp. 328 (N.D. Ind. 1972) (similar).

**8.2      Section 2 of the Sherman Act—Essential Facility—Essential Facility Defined**

<u>Undisputed Principles</u>

"A facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991); *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (an essential facility is one that is "critical[ ] to competition").

<u>Disputed Principles</u>

**Epic's Position:** "[W]hat makes a facility essential is not the nature of the facility itself, but the effect upon competition that withholding the facility might have." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983) (noting that "an essential facility" is "sometimes called a 'bottleneck'").

Per the Court's instruction, Epic declines to "pre-argue" whether any facility at issue in this matter may properly be considered an essential facility.  Dkt. 241 at 2.

**Apple's Position:**  As a prerequisite to proving that a facility has the power to eliminate competition in the downstream market, *Alaska Airlines*, 948 F.2d at 544, a plaintiff must define the relevant downstream market properly, *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003).  In addition, the plaintiff must prove that the defendant had the power to eliminate competition *permanently* in the downstream market, *Premiere Digital Access, Inc. v. Cent. Tel. Co.*, 360 F. Supp. 2d 1161, 1167 (D. Nev. 2005), and prove that the defendant in fact "exclude[ed] at least some of its competitors," *Alaska Airlines, Inc.*, 948 F.2d at 546; *accord* P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 773c (4th ed. 2020 supp.).

In addition, a facility is only "essential" if it is indispensable "to the plaintiff competitor's survival in the market."  Areeda & Hovenkamp ¶ 773b; *see also Twin Laboratories, Inc. v. Weider Health Fitness*, 900 F.2d 566, 569-70 (2d Cir. 1990) (to be essential, the denial of a facility's use must "inflict[] a *severe handicap* on potential [or current] market entrants") (second alteration and

emphasis in original). "Essential means essential," not "'best,' 'most profitable' or 'preferable.'" *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 839 (N.D. Ill. 2004).

Only preexisting "bottlenecks" (such as bridges and infrastructure networks) typically have been deemed essential facilities by the courts. *MCI Commn's Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1148 (7th Cir. 1983); *see also* H. Hovenkamp, et al., *Unilateral Refusals to License in the U.S.* at 23 (2005) ("[A]n intellectual property right itself cannot constitute an essential facility, and that the doctrine should not be applied to cases that seek access to an intellectual property right in any but the most unusual of circumstances."). Indeed, "no decision has condemned a mere refusal to license a copyright as an antitrust violation." Areeda & Hovenkamp ¶ 711b; *see also Antitrust Law Developments* at 277 ("Courts have held that patents and copyrights are not essential facilities because this would reduce the incentive to innovate and harm consumers.").

**8.3     Section 2 of the Sherman Act—Essential Facility—Monopolist in Control of an Essential Facility**

Monopoly control of the upstream market—that is, the market containing the allegedly essential facility—is a necessary element of an essential facility claim.  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 545 n.12 (9th Cir. 1991).

*See supra* Section 7.1 Section 2 of the Sherman Act—Monopolization—Monopoly Power.

1       **8.4**     **Section 2 of the Sherman Act—Essential Facility—Reasonable Duplication**

2                **Not Possible**

3       <u>Undisputed Principles</u>

4       "A facility is 'essential' if it is otherwise unavailable and cannot be 'reasonably or

5 practically duplicated.'" *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1210

6 (9th Cir. 1997) (*quoting City of Anaheim v. S. Cal. Edison Co*., 955 F.2d 1373, 1380 (9th Cir.

7 1992)); *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1129-30 (9th Cir. 2004)

8 ("[A] facility is only 'essential' where it is '*otherwise unavailable* and cannot be reasonably or

9 practically replicated.'") (emphasis in original) (quoting *City of Anaheim v. S. Cal. Edison Co.*,

10 955 F.2d 1373, 1380 (9th Cir. 1992)); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171,

11 1185 (9th Cir. 2016) (similar).

12       <u>Disputed Principles</u>

13       **Epic's Position:** "To be essential, a facility need not be indispensable; it is sufficient if

14 duplication of the facility would be economically infeasible." *Loren Data Corp. v. GXS, Inc.*, No.

15 DKC 10–3474, 2011 WL 3511003, at *10 (D. Md. Aug. 9, 2011), *aff'd in part*, 501 F. App'x 275

16 (4th Cir. 2012) (internal quotation marks omitted); *Directory Sales Mgmt. Corp. v. Ohio Bell Tel.*

17 *Co.*, 833 F.2d 606, 612 (6th Cir. 1987) ("[I]t is sufficient if duplication of the facility would be

18 economically infeasible."); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133

19 (7th Cir. 1983) ("The evidence presented did not demonstrate [] that the duplication of

20 [defendant's] intercity lines was economically infeasible."); *Wellnx Life Scis. Inc. v. Iovate Health*

21 *Scis. Research Inc.*, 516 F. Supp. 2d 270, 295 (S.D.N.Y. 2007) ("To prevail on a claim alleging an

22 essential facility, the plaintiff must demonstrate that duplication of the facility would be

23 economically infeasible.") (internal quotation marks omitted); *Sunshine Cellular v. Vanguard*

24 *Cellular Sys., Inc.*, 810 F. Supp. 486, 497-98 (S.D.N.Y. 1992) ("[T]he plaintiff must merely

25 demonstrate that duplication of the facility would be economically infeasible.") (quotation marks

26 omitted).

27       **Apple's Position:** "Essential means essential," not "'best,' 'most profitable' or

28 'preferable.'" *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 839 (N.D.

Ill. 2004).  "[A] facility is essential if it is vital to competitive viability because competitors cannot compete effectively in the relevant market without access to it."  ABA Section of Antitrust Law, *Antitrust Law Developments* 273 (8th ed. 2016); *see also Twin Laboratories, Inc. v. Weider Health Fitness*, 900 F.2d 566, 569-70 (2d Cir. 1990) (to be essential, the denial of a facility's use must "inflict[] a *severe handicap* on potential [or current] market entrants") (second alteration and emphasis in original).  That is, the facility "must be essential to the plaintiff competitor's survival in the market."  Areeda & Hovenkamp ¶ 773b.

Even if it is not economically feasible for the plaintiff to duplicate the alleged essential facility, that facility is not essential if alternatives are available to the plaintiff.  *See Blix Inc. v. Apple, Inc.*, No. CV 19-1869-LPS, 2020 WL 7027494, at *7 (D. Del. Nov. 30, 2020) ("Blix has not stated a claim for liability under the essential facilities doctrine because Blix's allegations, taken as true, demonstrate that the MacOS App Store is not an essential facility.  Blix alleged that BlueMail (1) 'achieved success on *multiple* platforms,' i.e., not just on Apple's platforms and (2) was sold in the market for five years before it became available in MacOS App Store.") (emphasis in original); P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 773b (4th ed. 2020 supp.) ("[T]he claimed input must not be available from another source or be capable of being duplicated by the plaintiff or others.").  The alternative need not be of equivalent quality or efficiency, for "even if [a plaintiff] was denied access to the most desirable facilities, that is not enough to make out an essential facilities claim" so "long as there is an alternative (albeit inferior)" facility that the plaintiff could access (or create).  *JamSports & Entm't, LLC*, 336 F. Supp. 2d at 839.

### 8.5    Section 2 of the Sherman Act—Essential Facility—Denial of Access

<u>Undisputed Principles</u>

A plaintiff must show that the defendant denied access to the alleged essential facility. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1129 (9th Cir. 2004); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1367 (9th Cir. 1992).

<u>Disputed Principles</u>

**Epic's Position:** A denial of access includes a refusal to provide access on reasonable terms and conditions.  *See City of Vernon*, 955 F.2d at 1367 (9th Cir. 1992) (noting that the defendant's insistence on a provision giving it the right to refuse access "until it felt like it" could constitute a denial of access to an essential facility); *City of College Station v. City of Bryan*, 932 F. Supp. 877, 888 (S.D. Tex. 1996) ("It is sufficient if . . . [the plaintiff] can demonstrate that Defendants do not offer reasonable terms."); *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 498 (S.D.N.Y. 1992) ("[T]here need not be such a complete refusal by [the defendant] in order to find that denial of an essential facility occurred; it is sufficient if the terms of [the defendant's] offer to deal are 'unreasonable.'"); *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, 2020 WL 127671, at *11 (N.D. Cal. Jan. 10, 2020) (holding that for purposes of determining whether a defendant denied access to an essential facility, "[a]n offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal") (citing *MetroNet*, 383 F.3d at 1132).

**Apple's Position:** "[W]here access exists, the [essential facilities] doctrine serves no purpose.'"  *Verizon Comm. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). The plaintiff must prove it was "frozen out of" access to the facility.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016).  To do so, it must identify what kind of access it sought, prove that it made a request for such access, and prove that the defendant refused to grant it such access.  *See City of Vernon*, 955 F.2d at 1367.  It is not enough that the defendant refused to deal in a manner "conducive to [the plaintiff's] existing business mode" or "in the most profitable manner" to the plaintiff.  *MetroNet Servs.*, 383 F.3d at 1130; *see also Aerotec*, 836 F.3d at 1185 (plaintiff had access to facility even where process for doing so was

78

1   "Kafkaesque" and inferior to "certain [other] customers").  Indeed, terms may be reasonable even

2   if they would not be profitable at all to the plaintiff.  *Laurel Sand & Gravel, Inc. v. CSX Transp.,*

3   *Inc.*, 924 F.2d 539, 545 (4th Cir. 1991).  Nor may a plaintiff insist on preferential terms and, when

4   the defendant refuses, claim that it was denied access.  *See Ferguson v. Greater Pocatello Chamber*

5   *of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988) (rejecting claim because plaintiff did not

6   outbid its competitors for access to facility); *see also Sun Dun, Inc. of Washington v. Coca-Cola*

7   *Co.*, 770 F. Supp. 285, 289 (D. Md. 1991) ("Failure to lower a price to meet what the customer

8   wants to pay for the product or service is not a refusal to deal.").  "[T]he access factor cannot be

9   read to mean that the courts will secure a better deal for an antitrust plaintiff."  *City of Coll. Station,*

10   *Tex. v. City of Bryan, Tex.*, 932 F. Supp. 877, 888 (S.D. Tex. 1996).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**8.6    Section 2 of the Sherman Act—Essential Facility—Feasibility of Providing Facility**

<u>Undisputed Principles</u>

For denial of access to give rise to liability, it must be technically and practicably feasible for the monopolist to give competitors access to its essential facility. *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983); *see also Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992-93 (D.C. Cir. 1977).

"[This] element basically raises the familiar question of whether there is a legitimate business justification for the refusal to provide the facility." *City of Anaheim v. S. Cal. Edison Co.* 955 F.2d 1373, 1380 (9th Cir. 1992). "Although the defendant generally has the burden of coming forward with a legitimate business justification after the plaintiff has shown evidence of monopolistic intent, the plaintiff . . . ultimately has the burden of proving that the defendant acted without a legitimate business justification." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1366-68 (9th Cir. 1992).

<u>Disputed Principles</u>

**Epic's Position:** There is no requirement that, to prove feasibility, a plaintiff must prove that the defendant provided access to others in the ordinary course of business. The Fourth Circuit opinion on which Apple relies for this proposition, *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539 (4th Cir. 1991), did not establish such a rule but instead looked to the defendant's prior practices as support for finding that the defendant "ha[d] articulated a number of legitimate business reasons for refusing" access. *Id*. at 545.

**Apple's Position:** In addition to technical and practical feasibility, the plaintiff bears the burden of proving that providing access would be economically feasible. *See City of Malden, Mo. v. Union Elec. Co.*, 887 F.2d 157, 160 (8th Cir. 1989) (use must be "economically and technically feasible"); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983) (similar); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1327 (M.D. Fla. 2000) (similar); P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 773e (4th ed. 2020 supp.) ("No matter how essential a monopolist's resources

may be, it is never obliged to sacrifice legitimate business objectives. Thus, one defendant did not act improperly when it refused to expand its plant at a time when it was uneconomical to do so.").

Moreover, the feasibility requirement is "analyzed not in terms of all the possibilities" but rather "in the context of [the defendant's] normal course of business." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 545 (4th Cir. 1991). To establish that access to the alleged essential facility was feasible in the ordinary course of business, the plaintiff must prove that the defendant provided such access, on similar terms, to similarly situated entities in the ordinary course of its business. *See id.* In addition, a defendant's refusal to license copyrighted software or other intellectual property is *presumed* valid. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997); *see also* Areeda & Hovenkamp ¶ 773a. Thus, the plaintiff must prove that the defendant refused access not based on an assertion of its intellectual property rights, *SolidFX, LLC*, 935 F. Supp. 2d at 1081, a good faith interpretation of contractual obligations, *Southern Pac. Comm'ns v. AT&T*, 740 F.2d 980 (D.C. Cir. 1984), a determination that permitting access could be detrimental to customers, *City of Vernon*, 955 F.2d at 1365 n.9, or any other "nonpretextual claim that [the defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal," *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).

An essential facilities claim fails unless the plaintiff proves that *all* of the defendant's business justifications were invalid and/or pretextual. *See, e.g.*, *City of Anaheim*, 955 F.2d at 1381 (affirming judgment in favor of defendant because plaintiff failed to disprove business justifications); *City of Vernon*, 955 F.2d at 1366 (same because plaintiff failed to prove that the defendant "acted on the asserted grounds").

1   **9.      FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT (FTAIA)**

2          Undisputed Principles

3          "The FTAIA provides that the Sherman Act 'shall not apply to conduct involving trade or

4   commerce (other than import trade or import commerce) with foreign nations unless—(1) such

5   conduct has a direct, substantial, and reasonably foreseeable effect—(A) on trade or commerce

6   which is not trade or commerce with foreign nations.'"   *United States v. Hui Hsiung*, 778 F.3d

7   738, 750-51 (9th Cir. 2015) (quoting 15 U.S.C. § 6a).  "[The FTAIA] initially lays down a general

8   rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach.

9   It then brings such conduct back within the Sherman Act's reach provided that the conduct both

10   (1) sufficiently affects American commerce, *i.e.*, it has a direct, substantial, and reasonably

11   foreseeable effect on American domestic, import, or (certain) export commerce, and (2) has an

12   effect of a kind that antitrust law considers harmful, *i.e.*, the effect must giv[e] rise to a [Sherman

13   Act] claim."  *Id.* (quoting *Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004)).

14          A direct effect "follows as an immediate consequence of the defendant's activity," "without

15   deviation or interruption."   *United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir.

16   2004).  An effect is substantial if it "involves a sufficient volume of U.S. commerce" and is not "a

17   mere 'spillover effect.'"   *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d

18   1101, 1110 (N.D. Cal. 2007).  An effect is reasonably foreseeable if it would "have been evident

19   to a reasonable person making practical business judgments."  *Animal Sci. Prod., Inc. v. China

20   Minmetals Corp.*, 654 F.3d 462, 471 (3d Cir. 2011).

21          To show an "effect gives rise to the plaintiff's injury," courts apply a "proximate causation

22   standard".  *Hui Hsiung*, 778 F.3d at 758 (quoting *In re Dynamic Random Access Memory (DRAM)*

23   *Antitrust Litig.*, 546 F.3d 981, 987 (9th Cir. 2008)).

24          Disputed Principles

25          **Epic's Position:**  "As the Supreme Court explained, '[t]he FTAIA seeks to make clear to

26   American exporters (and to firms doing business abroad) that the Sherman Act does not prevent

27   them from entering into business arrangements (say, joint-selling arrangements), however

28   anticompetitive, as long as those arrangements adversely affect only foreign markets.'"  *Hui*

*Hsiung*, 778 F.3d at 751 (quoting *Empagran*, 542 U.S. at 161 (2004)).  "The FTAIA does not limit the power of the federal courts; rather, it provides substantive elements under the Sherman Act in cases involving nonimport trade with foreign nations."  *Id.* at 753.

"No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs.  But our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused."  *Empagran,* 542 U.S. at 165 (discussing the exception to the application of the FTAIA).

**Apple's Position:** Even when permitted to exercise jurisdiction under the FTAIA, courts may decline to do so pursuant to principles of international comity.  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 797-98 & n.24 (1993); *see also Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1145 (D. Or. 2018) (even where "the FTAIA does not bar the application of the Sherman Act," a "[c]ourt may still apply the principles of international comity").  Courts consider "several elements" in deciding whether to abstain: (1) The degree of conflict with foreign law or policy; (2) the nationality or allegiance of the parties and the locations or principal places of business of corporations; (3) the extent to which enforcement by either state can be expected to achieve compliance; (4); the relative significance of effects on the United States as compared with those elsewhere; (5) the extent to which there is explicit purpose to harm or affect American commerce; (6) the foreseeability of such effect; (7) the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.  *Metro Indus. v. Sammi Corp.*, 82 F.3d 839 (9th Cir. 1996).

1    **10.      CARTWRIGHT ACT—RELATION TO SHERMAN ACT**

2         Undisputed Principles

3         The Cartwright Act makes "unlawful, against public policy and void" "every trust,"

4    defined as "a combination of capital, skill, or acts by two or more persons . . . [t]o create or carry

5    out restrictions in trade or commerce." Cal. Bus. & Prof. Code §§ 16720, 16726. "Interpretations

6    of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act,

7    given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes

8    enacted by California's sister states around the turn of the 20th century." *Aryeh v. Canon Business*

9    *Sols., Inc.*, 55 Cal. 4th 1185, 1195 (2013). "The Ninth Circuit has recognized after *Aryeh* it 'is no

10   longer the law in California' that the Cartwright Act is 'coextensive with the Sherman Act.'" *In*

11   *re Lithium Ion Batteries Antitrust Litig.*, No. 13–MD–2420, 2014 WL 4955377, at *10 (N.D. Cal.

12   Oct. 2, 2014) (quoting *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir.

13   2014)).

14        At the October 19, 2020 Case Management Conference, the Court instructed the parties to

15   address the relationship between the Sherman Act claims and the Cartwright Act claims. (*See*

16   Oct. 19, 2020 Hrg. Tr. at 8:5-7.) The parties set forth their respective positions below.

17        Disputed Principles

18        **Epic's Position:** "The Cartwright Act is broader in range and deeper in reach than the

19   Sherman Act." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 161 (2015) (quoting *Cianci v. Super.*

20   *Ct.*, 40 Cal. 3d 903, 920 (1985)) (internal quotation marks omitted). "[T]he [Cartwright] Act

21   reaches beyond the Sherman Act to threats to competition in their incipiency—much like section 7

22   of the Clayton Act, which prohibits mergers that '*may* . . . substantially . . . lessen competition,

23   or . . . *tend* to create a monopoly (15 U.S.C. § 18, italics added)—and thereby goes beyond clear-

24   cut menaces to competition in order to deal with merely ephemeral possibilities." *Cianci*, 40 Cal.

25   3d at 918 (quotation marks omitted). Following *Aryeh,* this Court has recognized that federal

26   decisions interpreting the Sherman Act do not bind courts in their interpretation of the Cartwright

27   Act. *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1072-3 (N.D. Cal. 2015) (citing *Aryeh*

28   and declining to apply the test for antitrust standing established by the Supreme Court in *AGC* to

plaintiffs' Cartwright Act claims, describing it as a "creature of federal law" that "has not been clearly applied by the California Supreme Court to claims brought under California's Cartwright Act").

If Apple's conduct violates Section 1 of the Sherman Act, it also necessarily violates the Cartwright Act.  Therefore, if Epic prevails on Counts 7, 8 and/or 9, it also prevails on Counts 3, 5 and/or 6, respectively.  However, given the scope of the Cartwright Act, Epic may prevail on its Cartwright Act claims even if it does not prevail on its Sherman Act Section 1 claims.  Per the Court's instruction, Epic does not "pre-argue" the application of the Cartwright Act to the facts. Dkt. 241 at 2.

Apple's arguments below about the scope of the Cartwright Act compared to the Sherman Act are inapposite.  *First*, while it is true that the Cartwright Act has no analogue to Section 2 of the Sherman Act, that is irrelevant to the reach of the Cartwright Act's prohibition on concerted action, which extends beyond Section 1 of the Sherman Act.  *Cianci*, 40 Cal. 3d at 917-18.  Further, the Cartwright Act may condemn conduct that is properly pled as a violation of Section 2 of the Sherman Act.  *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 977 (N.D. Cal. 2017) (noting that "an unlawful combination may exist under the Cartwright Act when 'a supplier or producer, by coercive conduct, imposes restraints to which distributors involuntarily adhere,'" and holding that "there [wa]s no perceived inconsistency" in pleading that the defendant's conduct constituted "both a Sherman Act § 2 claim and a Cartwright Act claim") (quoting *Kolling v. Kow Jones & Co.*, 137 Cal. App. 3d 709, 720 (1982)).

*Second*, Apple's discussion of the limited scope of Section 16727 of the Cartwright Act neglects to mention that "[a] tying arrangement may be condemned under either or both section 16720 and section 16727," *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541 (1998), and "tying arrangements challenged under Business and Professions Code section 16720 may involve services, real property, intangibles, leases, licenses, and the like," CACI No. 3420 (2020).

**Apple's Position:**  Epic contends that the Cartwright Act is "broader in range and deeper in reach than the Sherman Act," but does not make good on its promise to "explain how they are different."  Oct. 19, 2020 Hrg. Tr. at 8:14.  Where specific distinctions are not raised, courts

1   continue to analyze federal and state claims "together pursuant to federal antitrust law."  *In re*

2   *California Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *10 (N.D.

3   Cal. Apr. 13, 2020).  Apple observes that there are at least two ways in which the Cartwright Act

4   is narrower than the Sherman Act germane here.

5   　　　*First*, the Cartwright Act applies only to an unlawful "combination of capital, skill or acts

6   by two more persons."  Cal. Bus. & Prof. Code § 16720.  There is no analog in the statute to the

7   Sherman Act's prohibition on unilateral monopolistic conduct—it "does not have any parallel to

8   Sherman Act section 2's anti-monopoly provisions."  *Freeman v. San Diego Ass'n of Realtors*, 77

9   Cal. App. 4th 171, 200 n.32 (1999); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478

10  (9th Cir. 1986) ("This [monopoly] claim is not cognizable under the Cartwright Act, for it fails to

11  allege any combination."), *opinion modified on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987).

12  Indeed, the court in *In re Qualcomm Antitrust Litigation* similarly recognized that "the

13  [Cartwright] Act does not cover 'wrongful conduct on the part of a single entity.'"  292 F. Supp.

14  3d 948, 974 (N.D. Cal. 2017) (quoting *Bondi v. Jewels by Edwar, Ltd.*, 267 Cal. App. 2d 672

15  (1968)).  And the "coercive conduct" mentioned there refers to concerted action cognizable only

16  under Section 1 of the Sherman Act.  *See id.* (quoting *Kolling v. Dow Jones & Co.*, 137 Cal. App.

17  3d 709, 720 (1982), which, in relevant part, was describing the rule of three federal cases

18  evaluating Section 1 claims, *Reed Bros. v. Monsanto Co.*, 525 F.2d 486, 495 (8th Cir. 1975)

19  (agreement to divide territories challenged under Section 1); *Osborn v. Sinclair Ref. Co.*, 324 F.2d

20  566, 568 (4th Cir. 1963) (tying agreement challenged under Section 1); and *Jacobson & Co. v.*

21  *Armstrong Cork Co.*, 433 F. Supp. 1210, 1211 (S.D.N.Y. 1977) (agreement to divide territories

22  challenged under Section 1)).

23  　　　*Second*, where a plaintiff asserts a tying claim under Section 16727 of the Cartwright Act,

24  the tying product cannot be an intangible right or service instead of a tangible good.  That is

25  because Section 16727 provides that *tied* products may include "goods, merchandise, machinery,

26  supplies, commodities, or services," but "services" are omitted from the list of potential *tying*

27  products.  Cal. Bus. & Prof. Code § 16727.  Courts have rejected tying claims where the alleged

28  tying product is an intangible right or service instead of a tangible good.  *See*, *e.g.*, *Morrison v.*

*Viacom, Inc.*, 66 Cal. App. 4th 534, 548 (1998) (dismissing tying claim under Section 16727 because the statute "does not apply when the tying product is a service"); *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d 532, 550 (1980) (similar); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1032–34 (N.D. Cal. 2015) (similar); *Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005) (similar).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 11.     CALIFORNIA UNFAIR COMPETITION LAW

Undisputed Principles

California's Unfair Competition Law ("UCL") prohibits business practices that constitute "unfair competition," which is defined, in relevant part, as "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Claims under the UCL are available to both business competitor and consumer plaintiffs.  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186–87 & n.12 (Cal. 1999).

Disputed Principles

**Epic's Position:**  In response to the Court's inquiry at the Case Management Conference held on October 19, 2020 (*see* Oct. 19, 2020 Hr'g Tr. 9:10-10:4), Epic states that it brings its UCL claim both as a competitor of Apple and a consumer of Apple's distribution services.

A "consumer" may include a business consumer or client.  *See Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 992 (E.D. Cal. 2018) (in an action by Copart, a global used car auction company, against Sparta, which was hired to design and build a new business management system for Copart, the court evaluated Copart's UCL claim against Sparta in the consumer context, finding that "Copart was Sparta's consumer or client, not a competitor.").

**Apple's Position:**  Epic may bring its claim under the business competition standard, but Apple disputes that Epic can bring a claim under the consumer standard.  *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014) (the standards for liability applicable to competitor actions apply where "the crux of the business owners' complaint is that [the defendant's] conduct unfairly injures their economic interests"); *see also infra* § 9.3.1.

### 11.1    California Unfair Competition Law—Statutory Standing

Undisputed Principles

The UCL permits claims to be brought by any "person," which includes "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code §§ 17201, 17204.  To bring a claim under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to quantify as injury in fact, *i.e.*, *economic injury*, and (2) show that the economic injury was the result of, *i.e.*, *caused by*, the unfair business practice." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011) (emphasis in original); *see also* Cal. Bus. & Prof. Code § 17204.

**Injury in Fact.**  The injury-in-fact requirement "incorporate[s] the established federal meaning . . . for federal standing under article III." *Kwikset Corp.*, 51 Cal. 4th at 322; *see supra* Section 2 Standing.

**Lost Money or Property.**  The UCL requires the plaintiff to "demonstrate some form of economic injury." *Kwikset Corp.*, 51 Cal. 4th at 323.  For example "[a] plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.*  If the plaintiff proves "a personal, individualized loss of money or property in any nontrivial amount, he or she has also . . . proven injury in fact." *Id.* at 325.

**Causation.**  To satisfy the causation requirement, the plaintiff must show "a causal connection" between the defendant's conduct and alleged injury. *Id.* at 326.  This prong "imposes a requirement that a violation must cause or result in some sort of damage." *Id.* (internal quotation marks and alterations omitted).

1     **11.2     California Unfair Competition Law—Unlawful Prong**

2     <u>Undisputed Principles</u>

3         Under the unlawful prong, the UCL "permits violations of other laws to be treated as unfair

4     competition that is independently actionable." *AngioScore, Inc. v. TriReme Med., LLC*, 70 F.

5     Supp. 3d 951, 961 (N.D. Cal. 2014); *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,

6     20 Cal. 4th 163, 180 (Cal. 1999) ("By proscribing 'any unlawful' business practice, section 17200

7     borrows violations of other laws and treats them as unlawful practices.") (internal quotation marks

8     omitted).  The law covers any conduct that "can properly be called a business practice and that at

9     the same time is forbidden by law."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

10    1134, 1143 (Cal. 2003).  "Virtually any law—federal, state or local—can serve as a predicate for

11    an action under Business and Professions Code section 17200."  *Durell v. Sharp Healthcare*, 183

12    Cal. App. 4th 1350, 1361 (2010).

13        Here, under the unlawful prong, Epic's UCL claim rises and falls with its Sherman Act and

14    Cartwright Act claims.  *See, e.g.*, *Aleksick v. 7–Eleven, Inc.,* 205 Cal. App. 4th 1176, 1185 (Cal.

15    Ct. App. 2012); *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143 YGR, 2013

16    WL 316023, at *15 (N.D. Cal. 2013); *Datel Holdings Ltd. v. Microsoft Corp.,* 712 F. Supp. 2d

17    974, 999 (N.D. Cal. 2010).

18

19

20

21

22

23

24

25

26

27

28

### 11.3    California Unfair—Competition Law—Unfairness Prong

Undisputed Principles

California courts "do not hold that in all circumstances an 'unfair' business act or practice must violate an antitrust law to be actionable under the unfair competition law," but "conduct alleged to be 'unfair' because it unreasonably restrains competition and harms consumers . . . is not 'unfair' if the conduct is deemed reasonable and condoned under the antitrust laws." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).

Disputed Principles

**Epic's Position:**  In response to the Court's inquiry at the Case Management Conference held on October 19, 2020 (*see* Oct. 19, 2020 Hr'g Tr. 10:12-18), Epic states that its UCL claim under the unfairness prong survives even if its Sherman and Cartwright Act claims do not.

Under the unfairness prong, regardless of the test that is applied, a violation of the antitrust laws is also a violation of the UCL. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999) (for business competitor claim, *Cel-Tech* test is satisfied by a violation of the antitrust law); *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (for consumer claim under tethering test, analysis mirrors *Cel-Tech* test); *id.* (for consumer claim under balancing test, conduct is unlawful if it is "substantially injurious to consumers" and the conduct's harm outweighs its utility).

However, under the unfairness prong of the UCL, conduct may be actionable even if it does not violate an antitrust law. *Cel-Tech*, 20 Cal. 4th at 180 ("[A] practice may be deemed unfair even if not specifically proscribed by some other law."); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07–01057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (dismissing Sherman Act and Cartwright Act claims, but declining to dismiss UCL claim, finding that although the plaintiff had not pled an antitrust violation, defendant's alleged threats against plaintiff's customers and attempts to organize boycotts directed at its customers constituted an "unfair" practice that "significantly threatens or harms competition"); *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, No. 15-CV-1576, 2016 WL 4087302, at *12-13 (S.D. Cal. Aug. 1, 2016) (declining to dismiss UCL claim for

1    failure to allege an antitrust violation because under the unfairness prong, UCL claim "may also

2    be predicated on conduct that violates the policy or spirit of antitrust laws," which "includes

3    horizontal price fixing, exclusive dealing, or monopolization") (internal quotation marks omitted).

4    The UCL is "intentionally broad to give the court maximum discretion to control whatever new

5    schemes may be contrived, even though they are not yet forbidden by law." *People ex. rel. Renne*

6    *v. Servantes*, 86 Cal. App. 4th 1081, 1095 (2001).

7        Specifically, a business practice is not unfair if it is affirmatively permitted by law. *Lazar*

8    *v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999).  That said, "[t]o forestall an action under the

9    unfair competition law, another provision must actually 'bar' the action or clearly permit the

10   conduct.  There is a difference between (1) not making an activity unlawful, and (2) making that

11   activity lawful. . . .  Acts that the Legislature has determined to be lawful may not form the basis

12   for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged

13   under the unfair competition law even if the Legislature failed to proscribe them in some other

14   provision." *Cel-Tech*, 20 Cal. 4th at 182-83; *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d

15   1042, 1048 (9th Cir. 2000).

16       **Apple's Position:**  While it is true that "a practice may be deemed unfair even if not

17   specifically proscribed by some other law" in some cases, *Cel-Tech Commc'ns*, 120 Cal. 4th at

18   180, that is not the case where "the same conduct is alleged to support both a plaintiff's federal

19   antitrust claims and state-law unfair competition claim." *LiveUniverse, Inc. v. MySpace, Inc.*, 304

20   F. App'x 554, 557 (9th Cir. 2008).  In such cases, "a finding that the conduct is not an antitrust

21   violation precludes a finding of unfair competition." *Id.*; *see also Chavez*, 93 Cal. App. 4th at 375

22   ("To permit a separate inquiry into essentially the same question under the unfair competition law

23   would only invite conflict and uncertainty and could lead to the enjoining of procompetitive

24   conduct."); *Distance Learning Co. v. Maynard*, No. 19-CV-03801-KAW, 2020 WL 2995529, at

25   *10 (N.D. Cal. June 4, 2020) (collecting cases).

26       To the extent Epic's UCL claim does not rise and fall with its antitrust claims (a point

27   Apple disputes), the Court must analyze the claim under the applicable test.  Indeed, selecting the

28   applicable standard is crucial because "[c]ourts may not simply impose their own notions of the

1    day as to what is fair or unfair." *Cel-Tech Commc'ns*, 20 Cal. 4th at 185–87.  As described below,

2    the correct framework for cases involving competition claims between businesses requires the

3    plaintiff to show the challenged conduct is "tethered to some legislatively declared policy or proof

4    of some actual or threatened impact on competition" in the defendant's industry.  *Id.*; *see also*

5    *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014) (applying *Cel-Tech* to a non-competitor

6    business dispute because "the crux of the business owners' complaint" was a competitive injury).

### 11.3.1   California Unfair Competition Law—Unfairness Prong—Business Competitor Claims

<u>Undisputed Principles</u>

Under the unfair prong of the UCL, when the business competitor standard applies, a plaintiff must show that the alleged conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  The plaintiff must show that "any finding of unfairness to competitors under [the UCL] [is] tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."  *Id.* at 186-87.

<u>Disputed Principles</u>

**Epic's Position:**  Conduct that satisfies the *Cel-Tech* test can be considered "penumbral antitrust threats." *Cel-Tech*, 20 Cal. 4th at 196 (Kennard, J., concurring in part); *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 662 (2005) (conduct violates the policy or spirit of antitrust laws if the "effect of the conduct is comparable to or the same as a violation of the antitrust laws"); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07–01057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (defendant's alleged threats against plaintiff's customers and attempts to organize boycotts directed at its customers constituted an "unfair" practice that "significantly threatens or harms competition").

**Apple's Position:**  *Cel-Tech* requires the plaintiff's claim "to be tethered to the antitrust laws." *Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cty.*, 9 Cal. 5th 279, 304 n.10 (2020).  "To determine whether something is sufficiently 'tethered' to a legislative policy for the purposes of the unfair prong, California courts require a close nexus between the challenged act and the legislative policy."  *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018). Accordingly, a UCL claim that overlaps with deficient Sherman or Cartwright Act claims fails as a matter of law.  *See*, *e.g.*, *PNY Techs., Inc. v. SanDisk Corp.*, No. C-11-04689 YGR, 2012 WL 1380271, at *15 (N.D. Cal. Apr. 20, 2012) (Gonzalez Rogers, J.) (dismissing claim under "the

1   UCL's unfair-prong" because the plaintiff had "not adequately pled its federal antitrust claims"

2   and "its UCL claims [were] not materially different than its federal antitrust claims"); *Hicks v.*

3   *PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. Feb. 9, 2016) ("[W]here the same conduct

4   alleged to be unfair under the UCL is also alleged to be a violation of another law, the UCL claim

5   rises or falls with the other claims."); *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559

6   n.2 (9th Cir. 2018) (similar).

7           While *Cel-Tech* was decided in the context of claims brought between competitors, 20 Cal.

8   4th at 187, the Ninth Circuit has held that the same approach is properly applied to other claims

9   between businesses asserting competitive injuries—even if those businesses were not direct

10  competitors.   *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014); *see also Glob. Plastic*

11  *Sheeting v. Raven Indus.*, No. 17-CV-1670 DMS (KSC), 2018 WL 3078724, at *6 (S.D. Cal. Mar.

12  14, 2018) (applying *Cel-Tech* to dispute between manufacturer and distributor of plastic sheeting

13  products); *Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, No. 16-CV-02560-SI, 2017

14  WL 679496, at *5 & n.2 (N.D. Cal. Feb. 21, 2017) (applying *Cel-Tech* because it governs cases in

15  which "the crux of the business [plaintiffs'] complaint is that [the defendant's] conduct unfairly

16  injures their economic interests to the benefit of other businesses").

17

18

19

20

21

22

23

24

25

26

27

28

### 11.3.2   California Unfair Competition Law—Unfairness Prong—Consumer Claims

<u>Disputed Principles</u>

**Epic's Position**: California law is unsettled with regard to the correct standard to apply to consumer UCL claims under the unfairness prong. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007). California courts have applied three tests to evaluate claims by consumers: (1) the "tethering test," (2) the "balancing test," and (3) the FTC test. *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010); *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014); *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006). However, the Ninth Circuit has "decline[d] to apply the FTC standard in the absence of a clear holding from the California Supreme Court." *Lozano*, 504 F.3d at 736. Therefore, "[t]he remaining options . . . are to apply *Cel-Tech* to this case and require that the unfairness be tied to a legislatively declared policy or to adhere to the former balancing test." *Id.* (internal quotation marks and citation omitted); *In re Adobe*, 66 F. Supp. 3d at 1226 (for consumer claims under the unfairness prong of the UCL, "there are at least two possible tests: (1) the 'tethering test,' . . . and (2) the 'balancing test' . . . .").

The "tethering test" mirrors the *Cel-Tech* test that is applied in the context of business competitor claims. *See supra* Section [9.1.2.1] California Unfair Competition Law—Unfairness Prong—Business Competitor Claims; *In re Adobe Sys.*, 66 F. Supp. 3d at 1226-27 (citing *Cel-Tech* while analyzing the consumer plaintiff's UCL claim under the "tethering test").

The "balancing test" requires a consumer plaintiff to show that (1) a defendant's conduct "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and (2) "the utility of the defendant's conduct" is outweighed by "the gravity of the harm to the alleged victim." *Drum*, 182 Cal. App. 4th at 257. Contrary to Apple's position below, the balancing test remains good law after *Cel-Tech* for claims brought by consumers because "the [*Cel-Tech*] court expressly limited its new test to actions by competitors." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012).

1    Per the Court's instruction, Epic declines to "pre-argue" which test for consumer claims is

2    appropriate in this case.  Dkt. 241 at 2.

3    **Apple's Position**: Apple disputes that the standards for consumer claims are applicable in

4    this case; and submits that, in any event, a balancing test is inappropriate for consumer claims.  *See*

5    *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) ("Cel-Tech held that the

6    balancing test was 'too amorphous' and 'provide[d] too little guidance to courts and businesses.'");

7    *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) ("[W]e agree with the

8    Fourth District that *Cel-Tech* effectively rejects the balancing approach.").   Under the

9    circumstances of this case, only the tethering approach is appropriate as a matter of law.

1
2
3
4
5
6
7        **APPLE'S COUNTERCLAIMS**
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**12.   BREACH OF CONTRACT**

<u>Undisputed Principles</u>

The License Agreement "will be governed by and construed in accordance with the laws of the United States and the State of California."  License Agmt. ¶ 14.10.  Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011); *accord Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968); CACI No. 303 (2020).

1

**12.1    Breach of Contract—Existence of a Contract**

2    <u>Undisputed Principles</u>

3        "A contract is an agreement to do or not to do a certain thing."  Cal. Civ. Code § 1549.  To

4    prove the existence of a contract, a plaintiff must show (1) the parties were "capable of contracting"

5    (*i.e.*, they were not "minors, persons of unsound mind, and persons deprived of civil rights"),

6    (2) each party freely communicated its assent to the terms of the contract, (3) the objects to which

7    the parties agreed were lawful when the contract was made, and (4) the contract provided

8    "sufficient cause or consideration."  Cal. Civ. Code §§ 1550, 1556, 1565, 1595, 1596, 1605; *see*

9    *also Robinson v. Magee*, 9 Cal. 81, 83 (1858) ("A contract is a voluntary and lawful agreement,

10   by competent parties, for a good consideration, to do or not to do a specified thing.").

11       To establish that a contract is lawful, the plaintiff only must show that at least one objective

12   of the contract is lawful.  *Koenig v. Warner Unified Sch. Dist.*, 41 Cal. App. 5th 43, 55 (2019).

13   "Where a contract has several distinct objects, of which one at least is lawful, and one at least is

14   unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."  Cal. Civ.

15   Code § 1599; *see also Fair v. Bakhtiari*, 195 Cal. App. 4th 1135, 1157 (2011) ("Civil Code section

16   1599 codifies the common law doctrine of severability of contracts.").

17

18

19

20

21

22

23

24

25

26

27

28

1

**12.2    Breach of Contract—Plaintiff's Substantial Performance**

2

<u>Undisputed Principles</u>

3

To prove that it substantially performed its obligations under the contract, a plaintiff must

4

show that "there has been no willful departure from the terms of the contract [by the plaintiff], and

5

no omission of any of its essential parts, and that the [plaintiff] has in good faith performed all of

6

its substantive terms."   *Connell v. Higgins*, 170 Cal. 541, 556 (1915); CACI No. 312 (2020);

7

*accord Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d 169, 186-87 (1961); *Kossler v. Palm Springs*

8

*Devs., Ltd.*, 101 Cal. App. 3d 88, 101 (1980).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**12.3    Breach of Contract—Breach**

<u>Undisputed Principles</u>

Breach is an "unjustified or unexcused[] failure to perform a contract[ual]" obligation. CACI No. 303 (2020), Sources and Authority, (citing 1 Witkin, Summary 10th Contracts § 847 (2005)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**12.4    Breach of Contract—Causation and Damages**

<u>Undisputed Principles</u>

Last, a plaintiff must show "the breach was a substantial factor in causing the damages." *US Ecology, Inc. v. Cal.*, 129 Cal. App. 4th 887, 909 (2005); CACI No. 303 (2020).  *See infra* Section 19.1 Remedies—Compensatory Damages.

### 13.   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Undisputed Principles

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010) (emphasis and citation omitted).  While "[a] breach of the implied covenant of good faith is a breach of the contract," "'breach of a specific provision of the contract is not . . . necessary' to a claim for breach of the implied covenant of good faith and fair dealing." *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992)); CACI No. 325 (2020).

"In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citing CACI No. 325 (2020)).

**13.1    Breach of Implied Covenant of Good Faith and Fair Dealing—The Parties Entered Into A Contract**

<u>Undisputed Principles</u>

The first element of an implied-covenant claim—*i.e.*, the parties' entry into a contract—is addressed above.  *See supra* Section 12.1 Breach of Contract—Existence of a Contract.

**13.2    Breach of Implied Covenant of Good Faith and Fair Dealing—Plaintiff's**

**Substantial Performance**

<u>Undisputed Principles</u>

The second element of an implied-covenant claim—*i.e.*, the plaintiff's substantial performance of the contract—is addressed above. *See supra* Section 12.2 Breach of Contract—Plaintiff's Substantial Performance.

### 13.3 Breach of Implied Covenant of Good Faith and Fair Dealing—Conditions Precedent to the Defendant's Performance Occurred

Undisputed Principles

"[I]f the contract contains conditions precedent that must occur before the defendant is required to perform," the claimant must prove that those conditions occurred.  CACI No. 325 (2020), Directions for Use; *see also Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).  A "condition precedent" is "either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 231 Cal. App. 4th 1131, 1147 (2014).

**13.4    Breach of Implied Covenant of Good Faith and Fair Dealing—Interference With Plaintiff's Right to Receive the Benefits of the Contract**

<u>Undisputed Principles</u>

The implied covenant of good faith and fair dealing "requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *San Jose Prod. Credit Ass'n v. Old Republic Life Ins. Co.*, 723 F.2d 700, 703 (9th Cir. 1984) (citing *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979)). "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990) (emphasis in original). It exists to "prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.* The covenant thus cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Durell  v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010) (citations omitted; emphasis in original). "If there exists a contractual relationship between the parties, . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (1992). "This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (1960).

### 13.5   Breach of Implied Covenant of Good Faith and Fair Dealing—Causation and Damages

<u>Undisputed Principles</u>

Last, the plaintiff must show that "the breach was a substantial factor in causing the damages." *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 929 (E.D. Cal. 2010) (quoting *US Ecology, Inc. v. Cal.*, 129 Cal. App. 4th 887, 909 (2005)).

"The harm alleged in [a claim for breach of the implied covenant] may produce contract damages that are different from those claimed for breach of the express contract provisions." CACI No. 325 (2020), Directions For Use (citing *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873, 885 (2011) (noting that gravamen of the two claims rests on different facts and different harm)).  "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990), *as modified on denial of reh'g* (Oct. 31, 2001).

1   **14.   QUASI-CONTRACT / UNJUST ENRICHMENT**

2   Undisputed Principles

3   "[T]he elements for a claim of unjust enrichment" are "[1] receipt of a benefit and [2] unjust

4   retention of the benefit at the expense of another."  *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th

5   723, 726 (2000).

6   "Under California law, unjust enrichment is an action in quasi-contract, and is not

7   cognizable when there is a valid and enforceable contract between the parties."  *Cont'l Cas. Co. v.*

8   *Enodis Corp.*, 417 F. App'x 668, 670 (9th Cir. 2011) (citing *Paracor Fin., Inc. v. Gen. Elec.*

9   *Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996)).  Where the contract is invalid or unenforceable,

10  a "restitutionary obligation" may arise absent "a privity of relationship between the parties."

11  *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 998 (2015).  A quasi-contract/unjust-

12  enrichment claim may thus be "plead[ed] in the alternative" to a breach of contract claim.  *Verde*

13  *Media Corp. v. Levi*, No. 14-cv-00891-YGR, 2015 WL 374934, at *8 (N.D. Cal. Jan. 28, 2015)

14  ("[P]laintiff may plead in the alternative and assert claims based on both the existence and the

15  absence of a binding agreement between the parties.") (quotation marks omitted); *Hawthorne v.*

16  *Umpqua Bank*, No. C-11-6700 YGR, 2012 WL 1458194, at *3 (N.D. Cal. Apr. 26, 2012) (same).

17  "The doctrine applies where plaintiffs, while having no enforceable contract, nonetheless have

18  conferred a benefit on defendant which defendant has knowingly accepted under circumstances

19  that make it inequitable for the defendant to retain the benefit without paying for its value."

20  *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009).

21

22

23

24

25

26

27

28

### 14.1    Quasi-Contract / Unjust Enrichment—Receipt of a Benefit

Undisputed Principles

To prove the first element of a quasi-contract/unjust enrichment claim, a plaintiff must demonstrate the defendant's "receipt of a benefit." *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). "The term 'benefit' connotes *any* type of advantage." *Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 722 (2003) (emphasis in original). "Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss." *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996).

"For a benefit to be conferred, it is not essential that money be paid directly to the recipient by the party seeking restitution." *Cty. of Solano v. Vallejo Redevelopment Agency*, 75 Cal. App. 4th 1262, 1278 (1999) (internal quotation marks omitted).

### 14.2    Quasi-Contract / Unjust Enrichment—Unjust Retention of the Benefit at the Expense of Another

<u>Undisputed Principles</u>

A defendant "is required to make restitution 'only if the circumstances of its receipt or retention [of a benefit] are such that, as between the two persons, it is unjust for him to retain it.'" *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996) (citation omitted).  Stated differently, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution" for an unjust enrichment claim.  *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1663 (1992).

"Determining whether it is unjust for a person to retain a benefit may involve policy considerations." *Id.*  For example, "restitution is commonly denied against an innocent transferee or beneficiary, if he has changed his position after the transaction and it is impossible or impractical to restore him to his original position." *Id.*  "By contrast, a transferee with knowledge of the circumstances giving rise to an unjust enrichment claim may be obligated to make restitution." *Id.*  And "[w]hile the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." *Alkayali v. Hoed*, No. 3:18-cv-777-H-JMA, 2018 WL 3425980, at *6 (S.D. Cal. July 16, 2018) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**15.     INDEMNIFICATION**

<u>Undisputed Principles</u>

"An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract." *Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.*, 13 Cal. App. 4th 949, 968 (1993); *see also Herman Christensen & Sons, Inc. v. Paris Plastering Co.*, 61 Cal. App. 3d 237, 245 (1976) (where the parties "have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity"). Such agreements "are construed under the same rules that govern the interpretation of other contracts." *Alki Partners, LP v. DB Fund Servs., LLC*, 4 Cal. App. 5th 574, 600 (2016); *see also supra* Section 12 (describing the legal framework for Apple's breach of contract counterclaim).

1
2
3
4
5
6
7          **SELECTED AFFIRMATIVE DEFENSES**
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

16.   **EPIC'S AFFIRMATIVE DEFENSES**

16.1   **Epic's Affirmative Defenses—Antitrust Illegality**

16.1.1   **Illegality Under Federal Law**

Undisputed Principles

"[W]hile the effect of illegality under a federal statute is a matter of federal law, . . . the federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act." *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959). But "the illegality defense should be entertained in those circumstances where its rejection would be to enforce conduct that the antitrust laws forbid." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81-82 (1982). Courts decline to enforce a contract as in violation of the Sherman Act if "the judgment of the Court would itself be enforcing the precise conduct made unlawful by [the antitrust laws]." *Kelly*, 358 U.S. at 520; *see also El Salto, S. A. v. PSG Co.*, 444 F.2d 477, 482 (9th Cir. 1971) ("The Supreme Court has ruled that a Sherman Act violation is not an affirmative defense to a contract suit, even where the violation is inherent in the contract sued upon, so long as judicial enforcement of the contract would not be enforcing the precise conduct made unlawful by the Act."); *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 930 (N.D. Cal. 1970) ("Although the courts will not enforce a contract that is an illegal restraint on trade, it is the contract being sued upon which must give rise to the illegal or anticompetitive effect; it is not enough that the plaintiff's general activities are anticompetitive."); *Bassidji v. Goe*, 413 F.3d 928, 936 (9th Cir. 2005) ("Both federal law and California law begin from the core proposition that whatever flexibility may otherwise exist with regard to the enforcement of 'illegal' contracts, courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act.").

Disputed Principles

**Epic's Position:** The Supreme Court has made clear that the principles in *Kelly v. Kosuga* cited by Apple below "were subject to the limitation that the illegality defense should be entertained in those circumstances where its rejection would be to enforce conduct that the antitrust laws forbid." *Kaiser Steel*, 455 U.S. at 81.

1     **Apple's Position:**   A "plea of illegality based on violation of the Sherman Act" is

2  disfavored, and if "a lawful sale for a fair consideration constitutes an intelligible economic

3  transaction in itself," it is appropriate to enforce the contract "even though [the transaction]

4  furnished the occasion for a restrictive agreement."   *Kelly*, 358 U.S. at 518, 521; *see also*

5  *Electroglas, Inc. v. Dynatex Corp.*, 473 F. Supp. 1167, 1170 (N.D. Cal. 1979) ("Federal cases hold

6  that the purchaser cannot avoid paying for goods received under a contract by claiming an antitrust

7  defense.").

1

### 16.1.2   Illegality Under State Law

2

<u>Undisputed Principles</u>

3      Under California law, "[t]he object of a contract must be lawful when the contract is made."

4 Cal. Civ. Code § 1596.  Among other possibilities, a contract is unlawful if it is (1) "[c]ontrary to

5 an express provision of law," (2) "[c]ontrary to the policy of express law, though not expressly

6 prohibited," or (3) "[o]therwise contrary to good morals."  Cal. Civ. Code § 1667.  "A contract

7 must receive such an interpretation as will make it lawful, operative, definite, reasonable, and

8 capable of being carried into effect, if it can be done without violating the intention of the parties."

9 Cal. Civ. Code § 1643.

10      "[T]he general rule [is] that the courts will deny relief to either party who has entered into

11 an illegal contract or bargain which is against public policy."  *Tri-Q, Inc. v. Sta-Hi Corp.*,

12 63 Cal. 2d 199, 216 (1965).  California courts will not "fashion an equitable remedy" where doing

13 so involves "enforcing the precise conduct made unlawful . . . in contravention of the legislative

14 purpose."  *Joe A. Freitas & Sons v. Food Packers, Processors & Warehousemen Local 865*, 164

15 Cal. App. 3d 1210, 1219 (1985).  "The rule that the courts will not lend their aid to the enforcement

16 of an illegal agreement or one against public policy is fundamentally sound".  *Tri-Q*, 63 Cal. 2d

17 at 218 (quotation marks omitted).  However, "[w]here, by applying the rule, the public cannot be

18 protected because the transaction has been completed, where no serious moral turpitude is

19 involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the

20 rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule

21 should not be applied."  *Id.* at 219 (quotation marks omitted).

22      "Where a contract has several distinct objects, of which one at least is lawful, and one at

23 least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."

24 Cal. Civ. Code § 1599.  Thus, if the alleged "illegality is collateral to the main purpose of the

25 contract, and the illegal provision can be extirpated from the contract by means of severance or

26 restriction, then such severance and restriction are appropriate."  *Marathon Entm't, Inc. v. Blasi*,

27 42 Cal. 4th 974, 996 (2008) (quotation marks omitted).  Moreover, "[i]f one of the alternative acts

28 required by an obligation is such as the law will not enforce, or becomes unlawful, or impossible

1   of performance, the obligation is to be interpreted as though the other stood alone."  Cal. Civ. Code
2   § 1451.

3     "The burden ordinarily rests upon the party asserting the invalidity of the contract to show
4   how and why it is unlawful."  *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d
5   343, 350 (9th Cir. 2014) (quoting *Morey v. Paladini*, 187 Cal. 727, 734 (1922)).

### 16.2   Epic's Affirmative Defenses—Void as Against Public Policy

<u>Undisputed Principles</u>

"That is not lawful which is . . . contrary to the policy of express law, though not expressly prohibited."  Cal. Civ. Code § 1667(2); *see also Kelton v. Stravinski*, 138 Cal. App. 4th 941, 949 (2006) ("In general, a contract contrary to public policy will not be enforced."); *Altschul v. Sayble*, 83 Cal. App. 3d 153, 162 (1978) ("There is no requirement that a contract violate an express mandate of a statute before it may be declared void as contrary to public policy.").

"The authorities all agree that a contract is not void as against public policy unless it is injurious to the interests of the public as a whole or contravenes some established interest of society."  *Rosenberg v. Raskin*, 80 Cal. App. 2d 335, 338 (1947).  "California has a settled public policy in favor of open competition."  *Kelton*, 138 Cal. App. 4th at 946; *see also Margolin v. Shemaria*, 85 Cal. App. 4th 891, 901 (2000) ("Both legislative enactments and administrative regulations can be utilized to further this state's public policy of protecting consumers in the marketplace of goods and services.").  A provision in a contract that obligates a party to the contract to violate the antitrust laws is void as against public policy.  *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 713 n.12 (1988) (citing *Tameny v. Atlantic Richfield Co.*, 27 Cal. 2d 167 (1980)).

"Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."  Cal. Civ. Code § 1599.

### 16.3    Epic's Affirmative Defenses—Unconscionability

Undisputed Principles

"[A] contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.'" *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 820 (1981). "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Phrased another way, unconscionability has both a 'procedural' and a 'substantive' element. . . . [B]oth the procedural and substantive elements must be met before a contract or term will be deemed unconscionable.  Both, however, need not be present to the same degree.  A sliding scale is applied so that 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Lhotka v. Geographic Expeditions*, 181 Cal. App. 4th 816, 821 (2010) (internal quotation marks and citations omitted).  "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civil Code § 1670.5(a); *Graham*, 28 Cal. 3d at 820 n.19 (citing Cal. Civil Code § 1670.5) ("The judicially developed concept of unconscionability has recently become a part of our statutory law.").

"The procedural element of the unconscionability analysis concerns the manner in which the contract was negotiated and the circumstances of the parties at that time.  The element focuses on oppression or surprise.  Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice.  Surprise is defined as the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms."  *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007) (internal quotation marks and citations omitted)). "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion.

1   The term contract of adhesion signifies a standardized contract, which, imposed and drafted by the

2   party of superior bargaining strength, relegates to the subscribing party only the opportunity to

3   adhere to the contract or reject it." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.

4   4th 83, 113 (2000) (quotation marks and alterations omitted).

5          "The substantive element of the unconscionability analysis focuses on overly harsh or one-

6   sided results," *Gatton*, 152 Cal. App. 4th at 586, or "whether a contractual provision reallocates

7   risks in an objectively unreasonable or unexpected manner," *Lhotka*, 181 Cal. App. 4th at 821.

8   Substantive unconscionability "traditionally involves contract terms that are so one-sided as to

9   'shock the conscience,' or that impose harsh or oppressive terms." *Wherry v. Award, Inc.*, 192

10  Cal. App. 4th 1242, 1248 (2011).

11          Disputed Principles

12          **Epic's Position:**  Contracts that would require indemnification of a party's own recovery

13  or the defendant's attorneys' fees have been found to be substantively unconscionable or have

14  been interpreted so as not to require that result.  *See Lennar Homes of Cal., Inc. v. Stephens*, 232

15  Cal. App. 4th 673, 691-93 (2014); *see also Layman v. Combs*, 994 F.2d 1344, 1352-53 (9th Cir.

16  1992).

17          **Apple's Position:**   Indemnification provisions are not inherently substantively

18  unconscionable.  *See, e.g.*, *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,

19  89 Cal. App. 4th 1042, 1056 (2001).  *Lennar* involved a clause that required indemnification by a

20  contracting party for all damages arising out of the performance of the contract, even those caused

21  by the counterparty and for which the contracting party was otherwise entitled to damages.

22  *Layman* did not involve the defense of unconscionability.

23

24

25

26

27

28

1    **17.    APPLE'S AFFIRMATIVE DEFENSES**

2    **17.1    Apple's Affirmative Defenses—Failure to Join an Indispensable Party**

3    Undisputed Principles

4    Federal Rule of Civil Procedure 19 "establishes two broad categories of required parties."

5    *Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015).  First, a party is "required" if, "in that

6    person's absence, the court cannot accord complete relief among existing parties."  *Id.* (quoting

7    Fed. R. Civ. P. 19(a)(1)(A)).  Second, a "party is required if: that person claims an interest relating

8    to the subject of the action and is so situated that disposing of the action in the person's absence

9    may: (i) as a practical matter impair or impede the person's ability to protect the interest; or

10   (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise

11   inconsistent obligations because of the interest."  *Id.* (quoting Fed. R. Civ. P. 19(a)(1)(B)).

12   The party asserting the absence of a necessary party bears the burden of persuasion.  *Makah*

13   *Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

14   Disputed Principles

15   **Apple's Position:**  "[T]he equitable relief sought in an action may make an absent party

16   required."  *Ward*, 791 F.3d at 1049.  In addition, "all parties who may be affected by a suit to set

17   aside a contract must be present."  *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030,

18   1044 (9th Cir. 1983); *see also Shields v. Barrow*, 58 U.S. 130, 132 (1854).

19   **Epic's Position:**  Per the Court's instruction, Epic declines to "pre-argue" whether any

20   party not joined is required.  Dkt. 241 at 2.

21

22

23

24

25

26

27

28

**17.2    Apple's Affirmative Defenses—Waiver**

<u>Undisputed Principles</u>

"'[W]aiver' means the intentional relinquishment or abandonment of a known right. Waiver requires an existing right, the waiving party's knowledge of that right, and the party's actual intention to relinquish the right.  Waiver always rests upon intent.  The intention may be express, based on the waiving party's words, or implied, based on conduct that is so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Lynch v. Cal. Coastal Comm'n*, 3 Cal. 5th 470, 475 (2017) (citations and quotation marks omitted).

### 17.3    Apple's Affirmative Defenses—Estoppel

Undisputed Principles

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quotation marks omitted); *accord Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013).  To establish an equitable estoppel defense, a plaintiff must prove that "(1) [the defendant] was aware of the true facts; (2) [the defendant] intended its representation to be acted on or acted such that the plaintiff[] had a right to believe it so intended; (3) [the plaintiff was] ignorant of the true facts; and (4) [the plaintiff] relied on the [the defendant's] representation to [its] detriment."  *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986); *accord Strong v. Cty. of Santa Cruz*, 15 Cal. 3d. 720, 725 (1975). Equitable estoppel applies "where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts."  *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678 (2000).

**17.4    Apple's Affirmative Defenses—Limitations on Actions**

Undisputed Principles

"Unlike damages claims under section 4 [of the Clayton Act], which are subject to section 4B's four-year statute of limitations, there is no statute of limitations for injunctive relief claims under section 16.  Claims for injunctive relief, however, are subject to the equitable defense of laches."  *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014).

"[I]n computing the laches period" for a Section 4 claim, "section 4B's four-year statute of limitation is used as a guideline."  *Id.* at 1086 (quotation marks omitted); *see also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014) ("We have held that the deadline for suits for equitable relief under the antitrust laws is governed by laches, and that the four-year statute of limitations in 15 U.S.C. § 15b 'furnishes a guideline for computation of the laches period.'") (quoting *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975)).  "Ordinarily, a cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act."  *Oliver*, 751 F.3d at 1086 (alteration and quotation marks omitted).  "[T]here are recognized exceptions to this general rule."  *Id.*  First, "each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."  *Id.*  In addition, "the limitations period may start to run after the defendant's initial violation of the antitrust law, if it is 'uncertain' or 'speculative' whether the defendants' antitrust violation has injured the plaintiff at the time of the violation."  *Id.*  "However, the mere fact that [a party] receive[s] a benefit today as a result of [previous alleged anticompetitive conduct] is not enough to restart the statute of limitations."  *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982).

"The statute of limitations under the Cartwright Act and UCL is four years."  *Bartlett v. BP W. Coast Prods. LLC*, No. 18-CV-01374, 2019 WL 2177655, at *2 (S.D. Cal. May 17, 2019) (citing Cal. Bus. & Prof. Code §§ 16750.1, 17208); *see also Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1062 (N.D. Cal. 2016) (same).  In California, the "common law last element accrual rule is the default," *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1196 (2013), which provides

1   that, "ordinarily, the statute of limitations runs from the occurrence of the last element essential to

2   the cause of action," *id.* at 1191 (internal quotation marks omitted).

3          Additional equitable considerations inform the analysis.  *See Danjaq LLC v. Sony Corp.*,

4   263 F.3d 942, 950-51 (9th Cir. 2001) ("Laches is an equitable defense that prevents a plaintiff,

5   who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.")

6   (internal quotation marks omitted).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>REMEDIES</u>**

1

## 18.    REMEDIES SOUGHT BY EPIC—LEGAL PRINCIPLES

2

### 18.1    Remedies—Declaratory Judgment Act

3

<u>Undisputed Principles</u>

4

"In a case of actual controversy within its jurisdiction . . . , any court of the United States,

5

upon the filing of an appropriate pleading, may declare the rights and other legal relations of any

6

interested party seeking such declaration, whether or not further relief is or could be sought.  Any

7

such declaration shall have the force and effect of a final judgment or decree and shall be

8

reviewable as such."  28 U.S.C. § 2201(a).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 18.1.1    Remedies—Declaratory Judgment Act—Declaration—Standing

<u>Undisputed Principles</u>

The test for declaratory relief is "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant' relief." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312 U. S. 270, 273). Moreover, "the dispute [must] be definite and concrete, touching the legal relations of parties having adverse legal interests; [and must] be real and substantial and admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts)." *Id.* at 127 (internal quotation marks omitted).

### 18.1.2    Remedies—Declaratory Judgment Act—Declaration—Equitable Factors

<u>Undisputed Principles</u>

Courts have "substantial discretion in deciding whether to declare the rights of litigants" under the Declaratory Judgment Act. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007). This "substantial" discretion permits the Court to consider "equitable, prudential, and policy arguments" for or against the declaratory relief sought. *Id.* A "district court should avoid needless determination of state law issues," "should discourage litigants from filing declaratory actions as a means of forum shopping," and "should avoid duplicative litigation." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005) (quotation marks omitted). Courts also consider "whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998. Essentially, the district court must "balance concerns of judicial administration, comity, and fairness to the litigants." *Principal Life Ins. Co*, 394 F.3d at 672 (quotation marks omitted).

**18.2    Remedies—Clayton Act**

<u>Undisputed Principles</u>

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings."  15 U.S.C. § 26.

1

### 18.2.1    Remedies—Clayton Act—Injunction—Antitrust Standing

2    Undisputed Principles

3    "'Antitrust standing' is a threshold requirement that every plaintiff must satisfy to bring a

4    private suit under the federal antitrust laws." *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291,

5    1300 (S.D. Cal. 2009).  "To have standing [to seek injunctive relief] under § 16 [of the Clayton

6    Act], a plaintiff must show (1) a threatened loss or injury cognizable in equity (2) proximately

7    resulting from the alleged antitrust violation." *City of Rohnert Park v. Harris*, 601 F.2d 1040,

8    1044 (9th Cir. 1979).

9    Disputed Principles

10    **Epic's Position:**  The plaintiff in *Associated Gen. Contractors* ("*AGC*"), on which Apple

11    relies below, was seeking treble damages under Section 4 of the Clayton Act and not an injunction

12    under Section 16.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

13    459 U.S. 519 (1983).  The language Apple quotes below from *Sacramento Valley* was likewise a

14    distillation of factors discussed in *AGC*.  *Sacramento Valley, Chapter of the Nat'l Elec.*

15    *Contractors Ass'n v. IBEW, Local 340*, 888 F.2d 605 & n.1 (9th Cir. 1989) ("For convenience, we

16    have enumerated four *AGC* 'factors' here.").

17    **Apple's Position:**  Because "the judicial remedy cannot encompass every conceivable

18    harm that can be traced to alleged wrongdoing," courts have imposed additional limits "to

19    determine whether a party injured by an antitrust violation" may seek relief.  *Associated Gen.*

20    *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983).  In

21    assessing antitrust standing, courts also consider "[1] the directness of the injury; [2] the

22    speculative measure of the harm; and [3] keeping the scope of complex antitrust trials within

23    judicially manageable limits." *Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n*

24    *v. IBEW, Local 340*, 888 F.2d 604, 605 & n.1 (9th Cir. 1989).

25

26

27

28

### 18.2.2   Remedies—Clayton Act—Injunction—Antitrust Injury

Undisputed Principles

To establish standing to seek equitable relief under Section 16 of the Clayton Act, a plaintiff must show antitrust injury.  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986).  There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F. 3d 1051, 1055 (9th Cir. 1999).

The Ninth Circuit impose[s] a fifth requirement, that "the 'injured party be a participant in the same market as the alleged malefactors.'"  *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (quoting *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)).  "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  *Id.* (quoting *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987)).   Under this requirement, a plaintiff is required to show that it has "suffered [an] injury in the market where competition is being restrained"—"[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *Am. Ad Mgmt.*, 190 F.3d at 1057.

Section 16 of the Clayton Act "requires a showing only of 'threatened' loss or damage," and does not require "a showing of injury to 'business or property.'"  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986).

Disputed Principles

**Epic's Position:** Standing requirements for injunctive relief under Section 16 of the Clayton Act are lower than those for damages under Section 4 of the Clayton Act.  *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027-29 (N.D. Cal. 2015) ("To be sure, the standing requirements for injunctive relief are lower than those for damages.").  "For example, § 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage;

1  similarly, § 4 requires a showing of injury to 'business or property,' while § 16 contains no such

2  limitation." *Cargill*, 479 U.S. at 111.

3  **Apple's Position:** The standard for injunctive relief under Section 16 "differ[s] in various

4  ways" from Section 4. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986). But

5  a plaintiff suing under Section 16, like a plaintiff suing under Section 4, must prove "an injury of

6  the type the antitrust laws were designed to prevent." *Id.*; *see Feitelson*, 80 F. Supp. 3d at 1028-

7  29 (quoting *Am. Ad Mgmt.*, 190 F.3d at 1055) (dismissing injunctive claim because the plaintiffs

8  allegedly suffered antitrust injury in a market other than that "in which the alleged anticompetitive

9  conduct occurred" and the "[p]laintiffs' alleged price injury [did not] 'flow[] from that which

10  makes [the defendant's] conduct unlawful.'").

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 18.2.3   Remedies—Clayton Act—Injunction—Equitable Factors

Undisputed Principles

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

"The party seeking an injunction 'has the general burden of establishing the elements necessary' to obtain relief."  *BladeRoom Grp. Ltd. v. Emerson Elec. Co*., No. 5:15-CV-01370, 2019 WL 1117537, at *2 (N.D. Cal. Mar. 11, 2019) (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009)).

Disputed Principles

**Epic's Position:**  Some courts, including in the Ninth Circuit, have applied the *eBay* factors to determine whether injunctive relief under the Clayton Act was warranted.  *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020 WL 1812257, at *2-5 (N.D. Cal. Apr. 9, 2020) (applying *eBay* factors to injunctive relief under Section 16 of the Clayton Act); *Avaya Inc. v. Telecom Labs, Inc.*, No. 06-2490, 2014 WL 2940455, at *3 (D.N.J. June 30, 2014) (holding that "the more restrictive four-factor [*eBay*] test is necessary" in antitrust cases); *ZF Meritor LLC v. Eaton Corp.*, 800 F. Supp. 2d 633, 637-38 (D. Del. 2011) *rev'd in part, vacated in part on other grounds*, 696 F.3d 254 (3d Cir. 2012) (without citing *eBay*, court applied similar four-factor equitable test to determine whether Sherman Act plaintiff was entitled to a permanent injunction).

However, at least one court in the Ninth Circuit has held that the Sherman Act does not impose any additional requirements on plaintiffs before a court may grant a permanent injunction. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 1007 (N.D. Cal. 2014), *aff'd in part, vacated in part on other grounds*, 802 F.3d 1049 (9th Cir. 2015) ("Although the NCAA

1    asserts that Plaintiffs must make a showing of irreparable harm in order to obtain permanent

2    injunctive relief here, it failed to cite any authority holding that such a showing is required in an

3    action brought under the Sherman Act.  The Sherman Act itself gives district courts the authority

4    to enjoin violations of its provisions and does not impose any additional requirements on plaintiffs

5    who successfully establish the existence of an unreasonable restraint of trade.  Accordingly, this

6    Court will enter an injunction to remove any unreasonable elements of the restraint found in this

7    case.").

8         **Apple's Position**:  Section 16 of the Clayton Act provides for equitable relief only "under

9    the same conditions and principles as injunctive relief against threatened conduct that will cause

10   loss or damages is granted by courts of equity."  15 U.S.C. § 26.  Section 16, "which was enacted

11   by the Congress to make available equitable remedies previously denied private parties, invokes

12   traditional principles of equity."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100,

13   131 (1969).  The Ninth Circuit has expressly held that an injunction may not issue under Section

14   16 absent a showing of "irreparable harm."  *Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir.

15   1986) ("Under any formulation of the test, plaintiff must demonstrate that there exists a significant

16   threat of irreparable injury." (quotation marks omitted)).

17        Numerous courts have applied the eBay factors when evaluating requests for permanent

18   injunctive relief under Section 16.  *See Optronic Techs.*, 2020 WL 1812257, at *2 (N.D. Cal. Apr.

19   9, 2020) ("These four elements [from eBay] apply when considering relief under Section 16 of the

20   Clayton Act."); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 651 (E.D. Va. 2018)

21   ("[T]he parties agree that 'well-established principles of equity' establish the framework governing

22   requests for injunctive relief . . . under the Clayton Act."), appeal filed, No. 19-1397 (4th Cir. Apr.

23   16, 2019); *Avaya Inc. v. Telecom Labs, Inc.*, 2014 WL 2940455, at *3 (D.N.J. June 30, 2014)

24   (holding that it is "clear that the more restrictive four-factor [eBay] test is necessary" in antitrust

25   cases).

26        The sole outlier—*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955—did not

27   cite or discuss the controlling language in Section 16, the Supreme Court or the Ninth Circuit cases

28   demanding application of the traditional equitable factors, or indeed, even acknowledge the

1    four-factor test under *eBay*.  See *id.* at 1007.  "[T]he basis of injunctive relief in the federal courts

2    has always been irreparable harm and inadequacy of legal remedies."  *Sampson v. Murray*, 415

3    U.S. 61, 88 (1974).

### 18.2.3.1    Irreparable Injury

5    Undisputed Principles

6    Irreparable harm is that "for which there is no adequate legal remedy."  *Ariz. Dream Act*

7    *Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  A plaintiff proves irreparable harm by

8    showing that "remedies available at law, such as monetary damages, are inadequate to compensate

9    for the injury," *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249-50 (9th

10   Cir. 2013), or that monetary damages are difficult to calculate, *see, e.g.*, *Optinrealbig.com, LLC v.*

11   *Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) ("Damage to a business' goodwill

12   is typically an irreparable injury because it is difficult to calculate.").

13   Disputed Principles

14   **Epic's Position**:  "A sufficient showing of injury to competition could support a finding

15   of irreparable harm."  *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473

16   (9th Cir. 1985).

17   **Apple's Position:**  An equitable remedy is "unavailable absent a showing of irreparable

18   injury."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  The named plaintiff must prove

19   that it—and not some other person or entity—will be irreparably harmed.  *See, e.g.*, *Doran v. Salem*

20   *Inn, Inc.*, 422 U.S. 922, 931 (1975) ("neither declaratory nor injunctive relief" can issue "except

21   with respect to the particular federal plaintiffs"); *ActiveVideo Networks, Inc. v. Verizon Commc'ns,*

22   *Inc.*, 694 F.3d 1312, 1337–40 (Fed. Cir. 2012); *Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed.

23   Cir. 2008).  Non-party affiliates of the plaintiff do not suffice.  *See, e.g.*, *Weeks Marine, Inc. v.*

24   *TDM Am., LLC*, No. CIV.A. 11-3850 ES, 2011 WL 6217799, at *7 (D.N.J. Dec. 14, 2011); *Balsam*

25   *Brands Inc. v. Cinmar, LLC*, Case No. 15-CV-04829-WHO, 2015 WL 7015417, at *5 (N.D. Cal.

26   Nov. 12, 2015).

27   "A long delay in seeking a[n] . . . injunction implies a lack of urgency and irreparable

28   harm."  *Miller ex rel. N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993).

**18.2.3.2    Remedies Available at Law Are Inadequate To Compensate Injury**

Undisputed Principles

"'The necessary prerequisite' for a court to award equitable remedies is 'the absence of an adequate remedy at law.'" *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1129 (9th Cir. 2020) (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (internal quotation marks omitted)).

Whether remedies available at law are inadequate to compensate for the injury "inevitably overlaps" with the first prong of the injunctive relief analysis. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020 WL 1812257, at *2-3 (N.D. Cal. Apr. 9, 2020) (analyzing the first two elements together).  However, "[i]n the permanent injunction analysis, whether the plaintiff has an 'inadequate remedy at law' is a separate factor." *Macnab v. Gahderi*, No. CV 09-4498, 2009 WL 10671026, at *5 n.4 (C.D. Cal. July 28, 2009).  Some courts have held that where "there is the possibility of future wrongful conduct, a legal remedy is inadequate." *Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1042 (E.D. Cal. 2014).

Disputed Principles

**Epic's Position**:  "Where a violation of law has already been established, injunctive relief should be granted if there exists some cognizable danger of recurrent violation."  *Optronic Techs.*, 2020 WL 1812257, at *1 (quotation marks omitted); *see also Microsoft Corp. v. Rivera*, No. 2:17-cv-07027-ODW(JPRx), 2019 WL 1641349, at *6 (C.D. Cal. April 16, 2019) ("Only an injunction will adequately prevent future violations of Microsoft's copyright.  Accordingly, monetary damages are inadequate.") (citation omitted).

The *Sonner* case on which Apple relies for the principle that a plaintiff has an adequate remedy at law if it could pursue redress through a damages award but waived such a request is one in which the plaintiff pursued a damages claim for four years and then dropped it on the brink of trial in favor of a request for "equitable restitution" in the same amount she had sought in damages. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837 (9th Cir. 2020).

**Apple's Position**:  One of the longstanding, "basic requisites [for] the issuance of equitable relief" from a federal court is "the inadequacy of remedies at law."  *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).  A plaintiff who could pursue redress through a damages award, but waived such a request, has an adequate remedy at law.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844-45 (9th Cir. 2020); *see also Huynh v. Quora, Inc.*, No. 5:18-CV-07597-BLF, 2020 WL 7495097, at *19 (N.D. Cal. Dec. 21, 2020) ("Cases in this Circuit have held that *Sonner* extends to claims for injunctive relief.").  Private plaintiffs may seek damages for violations of the antitrust laws, 15 U.S.C. § 15, but where a party "explicitly represent[s] that it [is] not seeking damages," that representation "preclude[s] the possibility of an award of damages at trial."  *Infor Global Solutions (Mich.), Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 08-CV-2621, 2010 WL 11583380, at *5 (N.D. Cal. Apr. 2, 2010); *see also GSI Tech., Inc. v. United Memories, Inc.*, No. 13-CV-1081, 2016 WL 3017544, at *11 (N.D. Cal. May 26, 2016), *aff'd*, 721 F. App'x 491 (9th Cir. 2017).

### 18.2.3.3    Balance of Hardships

<u>Undisputed Principles</u>

In considering the balance of hardships between the plaintiff and defendant, the Court "must consider the effect on each party of the granting or withholding of the requested relief."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1199-1200 (9th Cir. 2009) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

<u>Disputed Principles</u>

**Epic's Position:**  The balance of hardships favors the plaintiff where an injunction will "merely prohibit [d]efendants from engaging in future unlawful activity."  *Entrepreneur Media, Inc. v. Dye*, No. SA CV 18-0341-DOC, 2018 WL 6118443, at *8 (C.D. Cal. Sept. 11, 2018).  "There is no hardship to a defendant when a permanent injunction would merely require the defendant to comply with law."  *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, No. CV 14-2307, 2014 WL 4679001, at *13 (C.D. Cal. Sept. 18, 2014).

"'Unclean hands' has not been recognized as a defense to an antitrust action for many years."  *Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379, 1382 (9th Cir. 1977).  *Heldman*, cited by Apple below, concerned a preliminary and not a permanent injunction.  The court stated

that the unclean hands doctrine "provide[s] no defense to an antitrust violation when the merits are being decided," but found that the doctrine could be considered for purposes of determining whether a preliminary injunction should issue because "as of now, no violation of law by defendants has been tried, established or decided." *Heldman v. U.S. Lawn Tennis Ass'n*, 354 F. Supp. 1241, 1249 (S.D.N.Y. 1973).

**Apple's Position:** *All* injunctions are issued to prevent unlawful activity (or to compel conduct required by law). That does not automatically satisfy the balance-of-hardships factor. Rather, "[i]n each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).

In addition, "equity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue." *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985). The doctrine of unclean hands therefore precludes equitable relief where the defendant establishes "(1) the plaintiff engaged in inequitable conduct; and (2) the conduct 'relates to the subject matter of its claims.'" *Pipe Restoration Techs., LLC v. Coast Building & Plumbing, Inc.*, No. 13-CV-499, 2018 WL 6012219, at *9 (C.D. Cal. Nov. 16, 2018) (quoting *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997). Whether or not the doctrine of unclean hands provides a defense to liability, misconduct by the plaintiff may be taken into account when a court is asked to impose an equitable remedy. *See, e.g.*, *Heldman v. U.S. Lawn Tennis Ass'n*, 354 F. Supp. 1241, 1249 (S.D.N.Y. 1973) ("While the so-called clean hands doctrine may provide no defense to an antitrust violation when the merits are being decided, at this stage this equitable doctrine may well be applied . . . .").

### 18.2.3.4    Public Interest

Undisputed Principles

"[T]he public interest inquiry primarily addresses impact on non-parties rather than parties and takes into consideration" the "public consequences" of the injunction. *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1004 (9th Cir. 2019) (quotation marks omitted).

1        Disputed Principles

2        **Epic's Position:**  Courts have recognized the enforcement of the antitrust laws to be in the

3    public's interest.  *E.g.*, *Optronic Techs. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020

4    WL 1812257, at *4, *8 (N.D. Cal. Apr. 9, 2020) (granting permanent injunction for violations of

5    Sections 1 and 2 of the Sherman Act and Section 5 of the Clayton Act and finding that "it is in the

6    public interest to issue an injunction prohibiting Defendant from engaging in conduct previously

7    found to violate the law"); *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) ("We have

8    recognized when construing § 16 that it was enacted not merely to provide private relief, but . . .

9    to serve as well the high purpose of enforcing the antitrust laws.") (internal quotation marks

10   omitted).  Where unlawful conduct is ongoing, it is in the public interest to enjoin it.  *See FTC v.*

11   *Qualcomm Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019), *rev'd and vacated on other grounds*, 969

12   F.3d 974 (9th Cir. 2020) ("By its very nature, the determination that [a defendant] has violated the

13   Sherman Act and that 'the wrongs are ongoing or likely to recur' is a finding that an injunction is

14   in the public interest because it will restrain the defendant from further anticompetitive conduct.")

15   (citing *FTC v. Evans Prod. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)).

16       **Apple's Position:**  An injunction is not automatic even upon a finding of antitrust liability.

17   *See, e.g.*, *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 370 n.5 (7th Cir. 1990) ("The important point is

18   that equitable relief is discretionary, and not automatically available to an injured plaintiff.");

19   *Moore Drug Exch. v. Eli Lilly & Co.*, No. 76 CIV. 2817 (RWS), 1980 WL 1959, at *2 (S.D.N.Y.

20   Nov. 21, 1980) ("A finding of an antitrust violation in the past, and an award of treble damages

21   pursuant thereto, do not automatically  entitle the plaintiff to permanent injunctive relief."); P.

22   Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

23   ¶ 653 (4th ed. 2020 supp.) ("[I]t never follows automatically from the finding of a §2 violation

24   that . . . an injunction against future conduct is justified.").  If the equitable factors disfavor

25   injunctive relief, then a court may provide an alternative remedy such as a declaration.

26

27

28

### 18.2.4   Remedies—Clayton Act—Injunction—Scope

Undisputed Principles

"Once plaintiffs establish they are entitled to injunctive relief, the district court has broad discretion in fashioning a remedy." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990); *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1011 (C.D. Cal. 2012), *aff'd*, 644 F. App'x 709 (9th Cir. 2016) ("Courts enjoy broad discretion in fashioning suitable relief and defining the terms of a permanent injunction."). The relief ordered should be based "on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 653(b) (1996)).

An order granting an injunction must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required. Federal Rule of Civil Procedure 65(d)(1); *see also United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) (an injunction must be "reasonably clear so that ordinary persons will know precisely what action is proscribed"). "[Rule 65] was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047 (9th Cir. 2013) (internal quotation marks omitted); *see also Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) ("The benchmark for clarity and fair notice is not lawyers and judges, who are schooled in the nuances of [the] law," but instead the "lay person, who is the target of the injunction.").

Disputed Principles

**Epic's Position:** "In framing relief in antitrust cases, a range of discretion rests with the trial judge." *Besser Mfg. Co. v. United States*, 343 U.S. 444, 449 (1952); *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 322 (1961). In private antitrust actions, courts "possess[] broad power to fashion the equitable relief necessary to halt conduct in violation of the Sherman

1   Act. . . .   Antitrust relief should unfetter a market from anticompetitive conduct and pry open to

2   competition a market that has been closed by illegal restraints." *Gen. Atomic Co. v. Exxon Nuclear*

3   *Co.*, No. 78-223-E, 1979 WL 1708, at *3 (S.D. Cal. Sept. 6, 1979).

4           "[B]ecause the harm to be prevented here—as in all private antitrust cases—goes beyond

5   the harm occasioned on the individual plaintiff and extends to the harm to open, unfettered

6   competition as a whole, the injunctive relief granted in this [antitrust] case should effectively pry

7   open competition to a market that was previously closed by illegal restraints and should not

8   myopically focus solely on [plaintiff]'s harm." *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 136

9   F. Supp. 2d 542, 550 (E.D. Va. 2001), *vacated on other grounds*, 277 F.3d 499 (4th Cir. 2002)

10  (quotation marks omitted); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 371 (7th Cir. 1990)

11  (granting injunction that benefitted 30,000 chiropractors who were non-parties to the case and

12  further holding that the "[r]elief here is provided not only to the plaintiff chiropractors, but also in

13  a sense to all consumers of health care servicees"); *Image Tech. Serv., Inc. v. Eastman Kodak Co.*,

14  No. C 87-1686 AWT, 1996 WL 101173, at *3 (N.D. Cal. Feb. 28, 1996), *aff'd in part, rev'd in*

15  *part*, 125 F.3d 1195 (9th Cir. 1997) (granting injunction as to private party and non-party market

16  participants affected by illegal tying arrangement; on appeal, the injunction was narrowed but not

17  with respect to its coverage of non-party market participants).

18          "There is no general requirement that an injunction affect only the parties in the suit."

19  *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987).  "[A]n injunction is not necessarily made

20  over-broad by extending benefit or protection to persons other than prevailing parties in the

21  lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the*

22  *relief to which they are entitled.*"  *Id.* at 1170-71 (emphasis in original); *see also Image Tech.*

23  *Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1226 (9th Cir. 1997) ("Injunctive relief covering

24  nonparty [beneficiaries] is proper under these circumstances.").

25          The U.S. Supreme Court has interpreted Section 16 of the Clayton Act to permit global

26  injunctions.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132-33 (1969)

27  (upholding an injunction "barr[ing defendant] from conspiring with others to restrict or prevent

28  [plaintiff] from entering any . . . foreign market" where plaintiff was "interested in expanding its

1   foreign commerce and . . . suffered at the hands of [defendant]").  If it were to apply, the Foreign

2   Trade Antitrust Improvements Act ("FTAIA") does not limit the scope of injunctive relief the

3   Court has the power to order.  *See United States v. Hui Hsiung*, 778 F.3d 738, 753 (9th Cir. 2015)

4   ("The FTAIA does not limit the power of the federal courts; rather, it provides substantive elements

5   under the Sherman Act in cases involving nonimport trade with foreign nations.").  *See supra*

6   Section 9 Foreign Trade Antitrust Improvements Act (FTAIA).

7       An injunctive order should represent "a reasonable method of eliminating the consequences

8   of the illegal conduct." *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 698 (1978).

9   Pursuant to their broad discretionary powers, district courts are empowered to frame relief that is

10  both suitable and necessary to address the anticompetitive effects of a defendant's illegal conduct.

11  *See Besser Mfg.*, 343 U.S. at 449 (1952); *E. I. du Pont de Nemours & Co.*, 366 U.S. at 322.

12  Pursuant to the Court's request and Epic's statements at the October 19, 2020 Case Management

13  Conference (Oct. 19, 2020 Hr'g Tr. at 10:22-24, 11:7-20), Epic provides below examples of relief

14  entered in antitrust cases comparable to the remedies Epic has set forth in Appendix A, including

15  "examples of similar non-discrimination orders," (*id.* at 11:18-19):

16      1.  A court may enter an order that "den[ies] to the defendant the fruits of its

17          statutory violation, and ensure[s] that there remain no practices likely to

18          result in monopolization in the future."  *United States v. Microsoft Corp.*,

19          253 F.3d 34, 103 (D.C. Cir. 2001) (quoting *United States v. United Shoe*

20          *Mach. Corp.*, 391 U.S. 244, 250 (1968)); *see also United States v. Grinnell*

21          *Corp.*, 384 U.S. 563, 570-71 (1966) ("[A]dequate relief in a monopolization

22          case should put an end to the combination and deprive the defendants of any

23          of the benefits of the illegal conduct, and break up or render impotent the

24          monopoly power found to be in violation of the Act.").

25      2.  A court may enter an order that "eliminat[es] the consequences of the

26          [defendant's] illegal conduct."  *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at

27          698; *see also United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295,

28          350 (D. Mass. 1953), *aff'd*, 347 U.S. 521 (1954) ("[I]n the context of the

market situation created by [defendant] itself, the effect of the decree is to break down barriers erected by a monopolizer, so that, hereafter, there may be no wall between the class in which it is and the class in which its competitors are.").

3. A court may enter an order that enjoins defendant continuing to monopolize or attempt to monopolize by "us[ing] its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951) (enjoining defendant-newspaper from its practice of refusing to publish advertisements for local merchants who also advertised through local radio stations as an attempt to monopolize the advertising and news channels); *see also Associated Press v. United States*, 326 U.S. 1, 14 (1945) (enjoining a news-gathering agency from enforcing its by-laws which unlawfully restricted non-members' admission to the agency and prohibited members from furnishing news to non-members); *ZF Meritor LLC v. Eaton Corp.*, 800 F. Supp. 2d 633, 637-38 (D. Del. 2011) *rev'd in part, vacated in part on other grounds*, 696 F.3d 254 (3d Cir. 2012) (enjoining defendants from the use of "Long Term Agreements" that contained discounts linked to market penetration targets on the basis that they "constituted de-facto exclusive dealing contracts which had the effect of excluding others from the market, thus creating a situation where prices could be raised in the future and innovation could be stifled").

4. A court may enter an order that enjoins "acts [of the defendant] which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp.*, 395 U.S. at 132 (1969).

5. A court may enter an order that enjoins a defendant from retaliating or threatening to retaliate against market participants for "exercise[ing] new-

found freedoms offered by the remedy in the [respective antitrust] case." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 163 (D.D.C. 2002), *aff'd sub nom Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004); *see also id.* at 266-77 (Appendix B Final Judgment).

6.   A court may enter an order that enjoins a defendant from engaging in discriminatory practices that are "designed to operate as, and does operate as, a method of excluding" competitors from the defendant's market. *United Shoe Mach. Corp.*, 110 F. Supp. at 321, 352.

7.   A court may enter an order that requires a defendant to offer market participants "nondiscriminatory terms and prices." *Image Tech. Servs.*, 125 F.3d at 1201, 1225; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020 WL 1812257, at *6 (N.D. Cal. Apr. 9, 2020) ("requiring Defendant to supply Plaintiff . . . at non-discriminatory terms" in order to "remedy[] the harm to Plaintiff caused by Defendant's attempted monopolization and [to] ensur[e] that Defendant's violations of antitrust laws do not recur").

Below, Apple disclaims that it is "pre-arguing" the applicability or relevance of the decisions listed above, but that is precisely what Apple does by asserting that "the 'non-discrimination' orders on which Epic primarily relies do not support the relief that [Epic] is seeking here" and by grossly mischaracterizing Epic's remedial proposals. Consistent with the Court's direction, Epic will refrain from responding in kind, on the understanding that there will be a fair opportunity to explain and defend the remedies necessary to address Apple's anticompetitive conduct.

With respect to Apple's argument that "a suit instituted by the government for the benefit of society as a whole" is fundamentally different from "a claim brought by a private litigant," courts have held that in the context of a private Sherman Act action, a "plaintiff is suing not only in its own behalf, but as a 'private attorney general' representing the public interest," as "Congress established the private remedy to enlist the public as enforcers of the antitrust laws." *Javelin Corp.*

1   *v. Uniroyal, Inc.*, 546 F.2d 276, 279-80 (9th Cir. 1976) (internal citations omitted); *see also*

2   *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) (similar).

3   The *Zepeda* case on which Apple relies for the principle that where relief can be structured on an

4   individual basis, it must be narrowly tailored to remedy the specific harm, is one that involves

5   individual plaintiffs' requests for injunctions against the government, *Zepeda v. U.S. I.N.S.*, 753

6   F.2d 719, 722 (9th Cir. 1983), where complete relief to the plaintiffs did not require opening up a

7   market to free competition.

8       **Apple's Position:**   Ultimately, the goal of an equitable remedy is not the "punishment of

9   past transgression, nor is it merely to end specific illegal practices." *Int'l Salt Co. v. United States*,

10  332 U.S. 392, 401 (1947), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*,

11  547 U.S. 28 (2006).  Equitable relief in an antitrust case should not "embody harsh measures when

12  less severe ones will do," P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 325a (5d ed. 2020), nor

13  should it adopt over regulatory requirements which will "involve the judiciary in the administration

14  of intricate and detailed [business management]," *United States v. Paramount Pictures*, 334 U.S.

15  131, 163 (1948).

16      "Where relief can be structured on an individual basis, it must be narrowly tailored to

17  remedy the specific harm shown." *Bresgal*, 843 F.2d at 1170; *see also Zepeda v. U.S. I.N.S.*, 753

18  F.2d 719, 727 (9th Cir. 1983) ("[T]he injunction must be limited to apply only to the individual

19  plaintiffs unless the district judge certifies a class of plaintiffs.").  Injunctive relief may be "no

20  more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."

21  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted)

22  (emphasis added); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th

23  Cir. 1996) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where

24  there is no class certification").  Were it otherwise, "[w]henever any individual plaintiff suffered

25  injury as the result of official action, he could merely file an individual suit as a pseudo-private

26  attorney general and enjoin the government in all cases.  But such broad authority has never been

27  granted to individual plaintiffs absent certification of a class." *Zepeda*, 753 F.2d at 728 n.1.

28

Cases brought by the government do not support an expansive view of the appropriate scope of injunctive relief in a case brought by a private party. *See*, *e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961); *Besser Mfg. Co. v. United States*, 343 U.S. 444 (1952); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990); *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006 (C.D. Cal. 2012). "[A] suit instituted by the government for the benefit of society as a whole" is fundamentally different to "a claim brought by a private litigant." *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987); *see also United States v. Borden Co.*, 347 U.S. 514, 518-19 (1954) ("[T]he scheme of the statute is sharply to distinguish between Government suits, either criminal or civil, and private suits for injunctive relief or for treble damages."). "The Government seeks its injunctive remedies on behalf of the general public; the private plaintiff, though his remedy is made available pursuant to public policy as determined by Congress, may be expected to exercise it only when his personal interest will be served." *Borden Co.*, 347 U.S. at 518. The limits on injunctions sought by private parties and the government are therefore not coextensive. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 249 (3d Cir. 2010); *see also Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 927 (9th Cir. 1975) (observing in private-plaintiff cases that the public "enjoy[s] none of the safeguards of the public-interest standards and expertness which presumably guide the government when it is a plaintiff"), *disapproved on other grounds by Cal. v. Am. Stores Co.*, 495 U.S. 271(1990).

With respect to the cases involving private suits cited by Epic, the Ninth Circuit narrowed the injunction issued by the district court in *Image Technical Services, Inc. v. Eastman Kodak Co.*, for example, because it was too "onerous." 125 F.3d at 1225 & n.19. The injunction in *Continental Airlines* was vacated on appeal, 277 F.3d at 517, and never reinstated. And the injunction in *Wilk v. American Medical Association* was not "grant[ed] . . . to 30,000 chiropractors," as Epic asserts, but rather merely "benefit[ed]" them insofar as it required the defendant to disseminate the district court's order to the AMA's members and readers of its publications. 895 F.2d at 371. The Seventh Circuit recognized that "an injunction in a private antitrust suit should award a plaintiff injunctive relief *only* to the extent necessary to protect *it* from future damage likely to occur if the defendant

continues the unlawful antitrust conduct."  *Id.* at 370 (internal quotation marks and citation omitted; emphasis added).

"Although there is no bar against nationwide relief in federal district court or circuit court, such broad relief must be *necessary* to give prevailing parties the relief to which they are entitled." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quotation marks omitted) (emphasis in original).  "This rule applies with special force where there is no class certification."  *Id.*

This Court previously observed that if "there are other courts that have imposed [injunctions similar to those sought by Epic in this case], I'd like to have copies of those orders." Oct. 19, 2020 Hrg. Tr. at 10:22–24.  Epic's list of cases is nonresponsive to that direction.  Many of its citations refer only to general principles of law (e.g., "[a] court may enter an order that eliminates the consequences of the defendant's illegal conduct" (quotation marks omitted)), not to the specific types of injunctive relief sought by Epic.  *See infra* Appendix A.  In addition, the "non-discrimination" orders on which Epic primarily relies do not support the relief that it is seeking here; in none of those cases was the defendant enjoined to implement an entirely new business model on terms dictated by the plaintiff, including a compulsory license to intellectual property in which the defendant has exclusive rights under federal law.  While Apple will not "pre-argue" whether Epic's requested relief would require Apple to "dismantle the platform," Oct. 19, 2020 Hrg. Tr. at 10:20-21, Epic's injunctive wish-list is sufficiently complex and novel that, at minimum, it will require substantial additional proceedings.

The FTAIA on its face limits the geographic reach of any injunction because it limits the reach of any claim arising under Sections 1 or 2 of the Sherman Act.  *See* 15 U.S.C. § 6a.  And the Ninth Circuit has vacated international injunctions where the district court gave insufficient attention to their intrusion on foreign commerce.  *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 693 (9th Cir. 1976); *see also United States v. Gen. Elec. Co.*, 115 F. Supp. 835, 842 (D.N.J. 1953) (tailoring injunction to avoid subjecting defendant to conflicting obligations under foreign and domestic law).  *Hui Hsiung* did not even consider injunctive relief in that case (because there was no injunction).  *See id.* at 742-43.

**18.3     Remedies—Cartwright Act**

Undisputed Principles

"Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor" to obtain "preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by courts generally under the laws of this state and the rules governing these proceedings."  Cal. Bus. & Prof. Code § 16750(a).

1

### 18.3.1    Remedies—Cartwright Act—Injunction—Scope

2          Undisputed Principles

3          A prevailing plaintiff under the Cartwright Act may obtain "preliminary or permanent

4   injunctive relief when and under the same conditions and principles as injunctive relief is granted

5   by courts generally under the laws of this state and the rules governing these proceedings."  Cal.

6   Bus. & Prof. Code § 16750.

7          Disputed Principles

8          **Epic's Position**:  The California Supreme Court has held that the Cartwright Act applies

9   to any restraints that affect state interests, even if the activities at issue are interstate in nature.

10  *Younger v. Jensen*, 26 Cal. 3d 397, 405 (1980) ("Neither the Sherman Act nor the federal

11  prohibition of undue burdens on interstate commerce ([the dormant Commerce Clause]) prevents

12  [state antitrust laws] from reaching transactions that have interstate aspects but significantly affect

13  state interests.").

14         *Healy*, relied on by Apple below, addressed the application of state law to "commerce that

15  takes place wholly outside of the State's borders" *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336

16  (1989), and did not address the applicability of state law to the conduct of a business resident in

17  the state.

18         **Apple's Position**:  Injunctive relief obtained under the Cartwright Act may not extend

19  outside of California.  *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("[T]he Commerce

20  Clause precludes the application of a state statute to commerce that takes place wholly outside of

21  the State's borders, whether or not the commerce has effects within the State." (alteration and

22  quotation marks omitted)).

23

24

25

26

27

28

### 18.4 Remedies—California Unfair Competition Law

Undisputed Principles

"Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.  The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Cal. Bus. & Prof. Code § 17203.

"It has been a fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority."  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020) (applying federal equitable principles to the award of relief under the UCL). *Id.* at 841.  This includes requests for injunctive relief.  *See*, *e.g.*, *Roper v. Big Heart Pet Brands, Inc.*, No. 1:19-cv-00406-DAD-BAM, 2020 WL 7769819, at *9 (E.D. Cal. Dec. 30, 2020) (applying *Sonner* to claim for injunctive relief).

Disputed Principles

**Epic's Position:**  Both *Anderson* and *Bird*, cited by Apple below, concerned plaintiffs who sought money damages as well as equitable relief with respect to the same alleged injury.  *See Anderson v. Apple Inc.*, No. 20-CV-2328, 2020 WL 6710101, at *7 (N.D. Cal. Nov. 16, 2020) ("Because [plaintiffs] also request money damages, it is possible their legal remedy is sufficient; on this record, they have not yet disproven that."); *Bird v. First Alert, Inc.*, No. 14-CV-3585, 2014 WL 7248734, at *5 (N.D. Cal. Dec. 19, 2014) ("[P]laintiff cannot seek restitution under the UCL because she has an adequate remedy at law in her claim for damages under the CLRA.").

**Apple's Position:**  A plaintiff seeking equitable relief from a federal court under state law must meet two requirements.  First, the plaintiff must plead that no adequate remedy at law exists. *See Anderson v. Apple Inc.*, No. 20-CV-2328, 2020 WL 6710101, at *7 (N.D. Cal. Nov. 16, 2020). Second, the plaintiff must "disprove[]" the adequacy of an alternative remedy.  *Id.*  To do so, the

1   plaintiff must show that it has no adequate remedy through any other cause of action.  *See Bird v.*

2   *First Alert, Inc.*, No. 14-CV-3585, 2014 WL 7248734, at *5 (N.D. Cal. Dec. 19, 2014).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 18.4.1   Remedies—California Unfair Competition Law—Injunction— Scope

<u>Undisputed Principles</u>

The UCL provides for injunctive relief "as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition."  Cal. Bus. & Prof. Code § 17203.   "[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009).  A private party seeking injunctive relief under the UCL may request "public injunctive relief," *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 954 (2017), which is "relief that by and large benefits the general public and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public," *id.* at 955 (citations, quotation marks, and alterations omitted).

1   **19.      REMEDIES SOUGHT BY APPLE—LEGAL PRINCIPLES**

2          **19.1    Remedies—Compensatory Damages**

3          <u>Undisputed Principles</u>

4          "For the breach of an obligation arising from contract, the measure of damages . . . is the

5   amount which will compensate the party aggrieved for all the detriment proximately caused

6   thereby, or which, in the ordinary course of things, would be likely to result therefrom."  Cal. Civ.

7   Code § 3300.  Except where otherwise provided by law, "no person can recover a greater amount

8   in damages for the breach of an obligation, than he could have gained by the full performance

9   thereof on both sides."  Cal. Civ. Code § 3358.  Compensatory damages in a breach-of-contract

10  action therefore "seek to approximate the agreed-upon performance," and the "goal is to put the

11  plaintiff in as good a position as he or she would have occupied if the defendant had not breached

12  the contract."  *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967

13  (2004) (quotation marks omitted); *see also Brandon & Tibbs v. George Kevorkian Accountancy*

14  *Corp.*, 226 Cal. App. 3d 442, 455 (1990) ("The basic object of damages is compensation, and in

15  the law of contracts the theory is that the party injured by a breach should receive as nearly as

16  possible the equivalent of the benefits of performance.").  "[T]he nonbreaching party is entitled to

17  recover only those damages, including lost future profits, which are 'proximately caused' by the

18  specific breach."  *Postal Instant Press v. Sealy*, 43 Cal. App. 4th 1704, 1709 (1996).

19          "Contractual damages are of two types—general damages (sometimes called direct

20  damages) and special damages (sometimes called consequential damages)."  *Lewis Jorge Constr.*,

21  34 Cal. 4th at 968; *see also Mission Beverage Co. v. Pabst Brewing Co., LLC*, 15 Cal. App. 5th

22  686, 710–11 (2017) (categorizing damages).  "General damages" are those that "flow directly and

23  necessarily from a breach of contract, or that are a natural result of a breach."  *Lewis Jorge Constr.*,

24  34 Cal. 4th at 968.  "[S]pecial damages are those losses that do not arise directly and inevitably

25  from any similar breach of any similar agreement," but instead "are secondary or derivative losses

26  arising from circumstances that are particular to the contract or to the parties."  *Id.*

27

28

### 19.2    Remedies—Restitution/Unjust Enrichment

Undisputed Principles

"Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another." *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996); *see also First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662 (1992) (same). "[R]estitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004)); *see also Hartford Casualty Ins. Co. v. J.R. Mktg., LLC*, 61 Cal. 4th 988, 998 (2015).

The "amount by which defendants were unjustly enriched" typically is "the net profit attributable to the underlying wrong." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1491 (2014) (quotation marks omitted). "The amount of restitution to be made is sometimes described as the 'benefit' received by the defendant." *Id.* at 1487. Restitution may also be set at "the amount[] necessary to place the plaintiff in as good a position as he or she would have been had no contract been made. Consequently, an award limited to unjust enrichment is a relatively mechanical and undemanding calculation." *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938-39 (2009) (quotation marks, citation, and alterations omitted). The award may also include "compensation, reimbursement, indemnification, or reparation for benefits derived from, or for loss or injury caused to, another." *Dunkin v. Boskey*, 82 Cal. App. 4th 171, 198 (2000) (quotation marks omitted).

### 19.3   Remedies—Declaratory Judgment

The parties incorporate by reference their prior discussion regarding declaratory judgment. *See supra* Section 18.1 Remedies—Declaratory Judgment Act.

### 19.4    Remedies—Indemnification

Undisputed Principles

An express indemnity clause "is enforced in accordance with the terms of the contracting parties' agreement." *Prince v. Pac. Gas & Elec. Co.*, 45 Cal. 4th 1151, 1158 (2009).

Where an indemnification clause provides for attorneys' fees, courts imply a "reasonableness" limitation in the award of such fees. *See Yakima Co. v. Lincoln Gen Ins. Co.*, 583 F. App'x 744, 746 (9th Cir. 2014). It "is within the trial court's discretion to determine what constitutes reasonable attorneys' fees." *Niederer v. Ferreira*, 189 Cal. App. 3d 1485, 1507 (1987). Typically, courts begin by calculating the lodestar—"the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Grp. Inc. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000). That figure may then be adjusted in the trial court's discretion, taking into consideration: "the nature of the litigation and its difficulty;" "the amount of money involved in the litigation;" "the skill required and employed in handling the litigation;" "the attention given to the case;" "the attorney's success, learning, age and experience in the particular type of work demanded;" "the intricacy and importance of the litigation;" "the labor and necessity for skilled legal training and ability in trying the case;" and "the amount of time spent on the case." *Niederer*, 189 Cal. App. 3d at 1507.

Disputed Principles

**Epic's Position:** "A contractual indemnity provision may be drafted either to cover claims between the contracting parties themselves, or to cover claims asserted by third parties . . . . Courts look to several indicators to distinguish third party indemnification provisions from provisions for the award of attorney fees incurred in litigation between the parties to the contract. The key indicator is an express reference to indemnification. A clause that contains the words 'indemnify' and 'hold harmless' generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons—that is, it relates to third party claims, not attorney fees incurred in a breach of contract action between the parties to the indemnity agreement itself." *Alki Partners, LP v. DB Fund Servs., LLC*, 4 Cal. App. 5th 574, 600

1   (2016) (quotation marks omitted).  "Generally, if the surrounding provisions describe third party

2   liability, the clause will be construed as a standard third party indemnification provision."  *Id.*

3          **Apple's Position:**  A contract providing for indemnification for "expenses and attorney's

4   fees suffered or incurred *on account of any breach of the aforesaid obligations and covenants, and*

5   *any other provision or covenant of this [contract]*" contemplates indemnification for attorneys'

6   fees arising out of a breach of the contract.  *Cont'l Heller Corp. v. Amtech Mechanical Servs., Inc.*,

7   53 Cal. App. 4th 500, 509 (1997); *see also Alki Partners*, 4 Cal. App. 5th at 600–01 (A "court will

8   not infer that the parties intended an indemnification provision to cover attorney fees between the

9   parties if the provision does not specifically provide for attorney's fees *in an action on the*

10  *contract*" (quotation marks omitted)).

1   Dated: January 22, 2021          CRAVATH, SWAINE & MOORE LLP

2                                        Christine Varney
                                         Katherine B. Forrest
3                                        Gary A. Bornstein
                                         Yonatan Even
4                                        Lauren A. Moskowitz
                                         M. Brent Byars
5
                                     Respectfully submitted,
6
7                                    By:      */s/ Gary A. Bornstein*

8                                            Gary A. Bornstein
                                             *Attorneys for Plaintiff Epic Games, Inc.*
9
10  Dated: January 22, 2021          GIBSON, DUNN & CRUTCHER LLP

11                                       Theodore J. Boutrous Jr.
                                         Richard J. Doren
12                                       Daniel G. Swanson
                                         Mark A. Perry
13                                       Veronica S. Moyé
                                         Cynthia E. Richman
14                                       Jay P. Srinivasan
                                         Ethan D. Dettmer
15                                       Eli M. Lazarus
                                         Harry Phillips
16
17                                   Respectfully submitted,

18                                   By:      */s/ Mark A. Perry*
                                             Mark A. Perry
19                                           *Attorneys for Defendant Apple Inc.*

20
21                            **E-FILING ATTESTATION**

22          I, Gary A. Bornstein, am the ECF User whose ID and password are being used to

23  file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

24  signatories identified above has concurred in this filing.

25
26                                           */s/ Gary A Bornstein*
                                     _____
27                                            Gary A. Bornstein

28