Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

| | | |
|---|---|---|
| IN RE:  APPLE IPHONE ANTITRUST LITIGATION, | ) ) ) | NO. C 11-06714 YGR (TSH) |
| DONALD R. CAMERON, et al., | ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | NO. C 19-03074 YGR (TSH) |
| APPLE, INC., | ) ) | |
| Defendant. | ) ) | |
| EPIC GAMES, INC., | ) ) | |
| Plaintiff and Counter-Defendant, | ) ) ) | |
| VS. | ) ) | NO. C 20-05640 YGR (TSH) |
| APPLE, INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) ) | |

San Francisco, California
Monday, January 25, 2021

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**


**(APPEARANCES CONTINUED ON NEXT PAGE)**



Reported By:       Marla F. Knox, RPR, CRR, RMR
                   Official Reporter

**APPEARANCES**:   (via Zoom Webinar)

Interim Class Counsel for In Re: Apple iPhone Antitrust
Litigation - Case No. 4:11-06714 YGR:

                       WOLF, HALDENSTEIN, ADLER, FREEMAN
                       & HERZ LLP
                       750 B Street - Suite 1820
                       San Diego, California  92101
             BY:  **RACHELE R. BYRD, ATTORNEY AT LAW**

Interim Lead Class Counsel in Cameron, et al v. Apple, Inc. -
Case No. 4:19-cv-03074 YGR:

                       HAGENS BERMAN SOBOL SHAPIRO LLP
                       1918 Eighth Avenue - Suite 3300
                       Seattle, Washington  98101
             BY:  **STEVE W. BERMAN, ATTORNEY AT LAW**
                    **ROBERT F. LOPEZ, ATTORNEY AT LAW**

                       HAGENS BERMAN SOBOL SHAPIRO LLP
                       717 Hearst Avenue - Suite 202C
                       Berkeley, California  98101
             BY:  **BENJAMIN J. SIEGEL, ATTORNEY AT LAW**

For Plaintiff Epic Games, Inc.:

                       CRAVATH, SWAINE & MOORE, LLP
                       825 Eighth Avenue
                       New York, New York  10019
             BY:  **LAUREN A. MOSKOWITZ, ATTORNEY AT LAW**

For Defendant, Apple, Inc.:

                       GIBSON, DUNN & CRUTCHER LLP
                       333 South Grand Avenue
                       Los Angeles, California  90017
              BY:  **JAY P. SRINIVASAN, ATTORNEY AT LAW**


For Samsung Electronics America, Inc.:

                       QUINN EMANUEL URQUHART & SULLIVAN, LLP
                       555 Twin Dolphin Drive - Fifth Floor
                       Redwood Shores, California  94065
             BY:  **VICTORIA F. MAROULIS, ATTORNEY AT LAW**
                    **KYLE K. BATTER, ATTORNEY AT LAW**

1  <u>**Monday - January 25, 2021**</u>                                    <u>**10:08 a.m.**</u>

2                                    **P R O C E E D I N G S**

3                                         ---oOo---

4          **THE CLERK:**  Okay, everyone.  Sorry for the delay.

5      We are here in Civil Action 11-6714, In Re: Apple iPhone

6  Antitrust Litigation; and in 19-3074, Cameron, et al. versus

7  Apple, Inc. and Epic Games, Inc. versus Apple, Inc., 20-5640,

8  The Honorable Thomas S. Hixson presiding.

9          Counsel, please state your appearances.  Let's start with

10  Plaintiffs in the Apple Antitrust Litigation and then go down

11  the line and then Apple -- Counsel for Apple can speak up

12  after.  So let's start with Apple Antitrust.

13          **MS. BYRD:**  Good morning, Your Honor, Rachele Byrd,

14  Wolf Haldenstein, on behalf of the Consumers.

15          **THE COURT:**  Good morning.

16          **MR. LOPEZ:**  Good morning, Your Honor, Rob Lopez of

17  Hagens Berman for Developer Plaintiffs in the Cameron matter.

18          **THE COURT:**  Good morning.

19          **MR. SIEGEL:**  Good morning, Ben Siegel, also of Hagens

20  Berman, for the Plaintiffs in the Cameron action.

21          **THE COURT:**  Good morning.

22          **MS. MOSKOWITZ:**  Good morning, Your Honor, Lauren

23  Moskowitz from Cravath, Swaine & Moore on behalf of Epic Games.

24          **THE COURT:**  Good morning.

25          **MR. SRINIVASAN:**  Good morning, Your Honor, Jay

1   Srinivasan for Apple, Inc.

2           **THE COURT:**  Good morning.

3           **MS. MAROULIS:**  Good morning, Your Honor, Victoria

4   Maroulis for non-party Samsung Electronics America.

5       I'm here with my colleague Kyle Batter, and we are both

6   with Quinn Emanuel.

7           **THE COURT:**  Good morning.

8       So we have got three joint discovery letter briefs here

9   today.  Let's start with Apple's subpoena to Samsung so we

10  don't make Samsung sit through an Apex argument that it is not

11  going to care much about.

12      I will give you my tentative thoughts and then ask Apple

13  to respond.

14      I do think that this subpoena implicates confidential

15  commercial materials within the meaning of Rule 45(d).  So I

16  think -- at least my tentative thought is that Apple needs to

17  show a substantial need for these documents.

18      I understand that because you are only seeking documents

19  that are not in the possession of Epic Games that, I guess,

20  only Samsung is in possession of the documents that are the

21  subject of this motion.

22      Here is the issue I'm struggling with:  When I go back to

23  Judge Gonzales Rogers' ruling on the motion for preliminary

24  injunction, she emphasized a helpful point that these claims --

25  and antitrust law more generally -- are not concerned about an

1    individual consumer or an individual producer such as Epic

2    Games.  They are interested in market aggregates.

3        And so it seems to me that the entire subject of RFP 5 is

4    just one market participant.  It happens to be the Plaintiff in

5    action 20-5640, but Epic Games is just still one app producer.

6        And so I'm struggling with -- there could be some

7    relevance, of course, to what is Epic Games' individual

8    situation; but it seems like Apple is trying to use these

9    documents to show relevant markets or the existence of

10   competition.

11       And I'm just struggling with how information about one

12   participant in the market could -- there could be a substantial

13   need for that information.

14       So why don't you start with that.

15       **MR. SRINIVASAN:**  Sure.  And, Your Honor, we aren't

16   just seeking the material, first of all, from one participant.

17   We have, in fact, subpoenaed others.  But let me back up a

18   little bit.

19       We start with Judge Rogers' order where -- and I think we

20   quoted some of the language to Your Honor -- but her order out

21   of the preliminary injunction motion that said that this case

22   is really about Epic's -- and she talked about Epic, and at

23   times she talked about game developers more broadly; and at

24   times she talked about app developers -- but at a minimum

25   Epic's distribution options; that this case is the Epic case.

1        And as you know, Your Honor, we had an earlier subpoena

2   for Samsung related to the class.  This is an Epic focused

3   subpoena because Judge Gonzales Rogers did say for the Epic

4   case, the issues of the relevant market -- in particular the

5   distribution options for Epic -- is implied and is something

6   that the Court is interested in.

7        She had -- and I'm trying to find the order which I'm

8   getting to -- but particularly, Your Honor, on page 18 of the

9   order -- the order, this is page 18 of her preliminary

10  injunction order, she says:  "Epic Games' arguments

11  distinguishing these other platforms as potential economic

12  substitutes have not been sufficiently tested," which is why

13  she couldn't make a ruling in the PI context and wanted to do

14  it before trial.

15       Earlier on, on that same page, she writes, quote, The

16  multi-platform nature of Fortnite suggests that these other

17  platforms and their digital distributions may be economic

18  substitutes that should be considered in any relevant market

19  definition.

20       And we took that order and we have gone out -- the parties

21  have gone out and subpoenaed Microsoft because of their Xbox.

22  They have subpoenaed Sony because of the PlayStation 5.  They

23  have subpoenaed Nintendo and others so we can, in fact, see,

24  the degree to which there is -- to test the measures of the

25  relevant market, as Judge Gonzales asked us to do, to see how

1  broad it is.

2      We have a dispute.  Epic does not believe, for instance,

3  that Google Android should be part of the relevant market; that

4  Epic's distribution of its product on that platform is not

5  relevant to this case which -- with which we strongly disagree.

6      And so with that lone star in mind, we have issued these

7  subpoenas, not just on Samsung but on a number of the key

8  market participants.  And for a second reason too, Your Honor;

9  not just for the issue of relevant market and the breadth of

10  that market but also to show that our conduct is an

11  anticompetitive.

12      Miss -- Judge Gonzales Rogers was interested in that as

13  well.  And we are seeking information to show that these other

14  platforms on which Epic distributes -- including Microsoft,

15  Nintendo, Sony and others -- have essentially the same type of

16  conduct and restrictions that Apple does.

17      They have a set of rules.  They have a distribution

18  platform that charges a commission.  And they have rules that

19  require the developers to pay -- to be charged in a certain way

20  to use essentially the equivalent of Apple's function that

21  requires Apple to take its 30 percent and proceed that way.

22      So there are two fundamental reasons why we need all of

23  these platforms' information on these key issues.  And, in

24  fact, we think Judge Rogers' preliminary injunction order

25  directs us to do that.

1    She said to the parties:  Go and develop some facts on

2    these fundamental issues.  And, as I just quoted, she said that

3    we need to test that.  And that's what we are trying to do.  We

4    are trying to test it.

5    And I would also add that just on a -- I can be brief

6    here -- there are other references in her order particularly to

7    the Google Android system because another argument that Epic

8    makes -- that they made in the preliminary injunction order

9    context was that mobile systems are maybe different, and maybe

10   we are not allowed to talk about the consoles because they are

11   not mobile.

12   And that's a separate argument that they have raised, and

13   they have said that mobile devices are separate.

14   And so, therefore, Samsung becomes even more important if

15   the backup argument is going to be:  Well, there are other

16   distribution options for Epic but, you know, you can only look

17   at the mobile ones.

18   Well, there is no greater mobile option than the Android

19   system on which Samsung is based.  And so we think that not

20   only is this relevant, but we believe the Court has directed us

21   to do this very inquiry, which is what we are doing.  And, by

22   the way, the other parties have been cooperating and producing.

23   **THE COURT:**  Can you tell me a bit more about who all

24   you subpoenaed?  I think that would be helpful.

25   **MR. SRINIVASAN:**  Absolutely, Your Honor.  I don't know

1    that this would be an exhaustive list because I believe between

2    the parties there is something like 20 or 30 third parties that

3    have been subpoenaed.

4        We have subpoenaed Microsoft.  We have subpoenaed Amazon.

5    We have subpoenaed Sony; Nintendo; of course, Samsung; Google.

6    We have subpoenaed Nvidia.  They also distribute Fortnite

7    through something called GeForce Now, so Nvidia is in there.

8        And then in addition to that, Your Honor, we have

9    subpoenaed -- well, when I say "we," meaning either Apple or

10   Epic; in many cases both -- a number of developers, game

11   developers, base -- I shouldn't say developers -- game

12   developers -- app developers:  Basecamp, Spotify, Facebook, and

13   the list goes on.

14       And then there is probably a half a dozen payment

15   processors:  PayPal, Stripe, Square.  And, again, I'm giving

16   you a non-exhaustive list.  There is probably another 10 to 15

17   that I didn't mention on top of this.

18       **THE COURT:**  So I get the relevance of the platforms

19   like Nintendo or Sony, and I get the relevance of the payment

20   processors.

21       It is just for a particular app developer, that's where

22   I'm struggling with.  It seems like at most that is going to

23   be -- you are going to pick out a handful of participants in

24   the market and is this -- I'm worried that it might be kind of

25   almost quirky, the type of discovery into the particular

1    developers.

2          **MR. SRINIVASAN:**  Well, Your Honor, it's -- it is Epic

3    focused; and much of this is Epic focused on both sides in

4    terms of the subpoenas.

5          As you may remember, we did subpoena Samsung and Microsoft

6    and Amazon and some other -- well, I don't know if it all got

7    litigated before you; but there were a handful of folks that we

8    had subpoenaed for the class cases before Epic filed its

9    lawsuit and had asked broader questions.

10          And, in fact, we were here before you with Samsung and

11   were working those out.

12          This is now -- you know, both parties' inquiries now have

13   been very Epic focused.

14          **THE COURT:**  Sorry to interrupt.  But for these

15   subpoenas that go out to other platforms -- like Microsoft or

16   Nintendo or Sony -- are they about their platforms generally or

17   are these subpoenas narrowly focused on Epic?

18          **MR. SRINIVASAN:**  So again, with someone like Microsoft

19   or Amazon, we had a subpoena that we had broadly -- that we had

20   issued on broad issues before Epic was involved.

21          After Epic came in, we sent a separate subpoena to

22   Microsoft and Amazon that is Epic focused.  Sony and Nintendo

23   is Epic focused.  They were new.  We didn't need to bother them

24   before.

25          Our view is that this case the Plaintiff here in this

 1   initial lawsuit is Epic.  And ultimately the question here is:

 2   Was Epic foreclosed from distributing Fortnite by anything

 3   Apple did.  And the only way we can --

 4        **THE COURT:**  I'm still struggling with that -- I don't

 5   think that is the question.  I will have to go back and reread

 6   the order on the preliminary injunction.

 7        The question is not where Epic could distribute its

 8   products but just in general what does the market look like.

 9        **MR. SRINIVASAN:**  Sorry, Your Honor, I didn't mean to

10   interrupt.  I think there is a dispute with the parties on

11   that.

12        I think that Apple would say it is Epic, and we argued

13   that to Judge Gonzales Rogers.  There is an alternative that it

14   might be game developers is another option which these

15   subpoenas, by the way, would be equally applicable to in the

16   sense of they would stand as a proxy for game developers.

17        And, you know, there is also a suggestion that even in the

18   Epic case, it might be app developers.  But that is certainly a

19   hotly contested issue.

20        And what we -- our thought was we should be narrow in

21   asking about Epic.  We did not want to go back to these

22   platforms and say:  Give us everything you got about everybody

23   you deal with, aggregate data.

24        That would actually be more burdensome to most of these

25   platforms.  From what we understood, they have actually been

1    gratified that we have focused on Epic and not asked for a

2    broader inquiry, which arguably we could have asked for as

3    well.

4                THE COURT:  Okay.

5                MR. SRINIVASAN:  Your Honor, just so I may, just so I

6    can round this out, I mean, ultimately we are talking -- we

7    need to show platform competition.  And we can't do that

8    without going to the platforms to show the degree to which, you

9    know, games, apps, Epic -- however you want to slice it -- is

10   distributed very vigorously on these other platforms and in

11   many cases -- at least with respect to Fortnite -- much more so

12   than they did on IOS.

13       So our choice was to either do a kitchen sink approach or,

14   consistent with our view of the case, narrow it to Epic.  And,

15   again, I believe the third parties are happy that we have

16   narrowed it rather than broadened it.

17               THE COURT:  I'm sure that's true.  But with respect to

18   whether Epic can be used as a stand-in for app developers

19   generally, that raises another question because it looks

20   like -- at least according to the way RFP 5 is drafted in

21   Apple's argument, it looks like Samsung and Epic worked out a

22   deal between themselves.  It looks like it might be sui

23   generis.

24               MR. SRINIVASAN:  And, again, Your Honor, from our

25   perspective, this first lawsuit is Epic v. Apple.  And there is

1   no question that our position is the market is -- should be

2   narrowly drawn around Epic and Epic's ability to distribute on

3   other platforms.

4        It is a contested issue.  But that is certainly our

5   position; that we did deal with Samsung more broadly to deal

6   with the class cases, and we had a previous subpoena that we

7   had some litigation on that you ruled on.

8        This is a second question that relates to Epic.  And in

9   particular Epic is complaining.  Epic is an individual -- it is

10  essentially an opt-out; wanted to bring its own lawsuit and

11  it's complaining that it specifically was foreclosed.

12       And we do want to show that Epic specifically -- even to

13  the extent that other -- your run-of-the-mill app developers do

14  not have that option, Epic was able to make a specific

15  arrangement with Samsung because they are a major player.

16       And we are entitled to know that because we are entitled

17  to know how Epic is able to distribute elsewhere; that even

18  regardless of Apple's conduct, Epic is able to get its product

19  out; is able to cut deals with major market players.

20       And it is very Epic specific, Your Honor.  I would argue

21  you are absolutely right.  The average app developer does not

22  have that opportunity.

23       And if this was the class case -- I understand if

24  Your Honor's ruling was:  Wait a minute.  This is about a class

25  action of app developers.  Why do you care about this one

person?  They are an outlier, that may have some merit to it.

This is not a class case.  This is about Epic.  This is an individual plaintiff saying:  You, Apple, foreclosed us from getting our product out there.

We are showing that they have plenty of other options, and they actually have some preferable options.  I don't want to get into the details of that -- of their arrangement with Samsung.  I'm being mindful of that.

But we are absolutely entitled to know that, and we are absolutely entitled to show that to Judge Gonzales Rogers in explaining why what Apple did, did not foreclose any market and that Apple alone is not a market for Epic.

**THE COURT:**  But they are claiming -- this isn't a business tort claim.  Epic is not saying:  Apple, you torted us.  They are saying you monopolized a market.

To prove that, it's not -- I mean, just whatever happened to Epic would never be sufficient to prove an antitrust claim.

**MR. SRINIVASAN:**  Well, Your Honor, as you know, the definition of -- the market definition of what is a substitute is hotly litigated in virtually every antitrust case.

And they hold their Fortnite out as to be this unique, cross-platform, alternative universe that is not a substitute for any other game; that is a unique product of its own.

So at least we are entitled to make that argument; that the market is specific to Epic's ability to distribute its

1    Fortnite wherever.  And that is our version of the market,

2    which is their ability to distribute their product.  And we

3    believe that's a wide and expansive market.

4         And, again, maybe the fallback is we are talking just

5    about game developers.  We also would not agree at all that

6    Epic in bringing an antitrust claim against Apple somehow

7    represents all app developers.

8         And a way to illustrate that would be to say if you look

9    at an app that is a calculator app, for instance, on your

10   phone, that is not a substitute for Fortnite.

11        And so we know that at a minimum it is not going to be

12   that expansive of a market.  And the question is:  How narrowly

13   is it drawn?  Is it just game developers or is it just Epic?

14        It is a contested issue.  But, you know, as the Defendant

15   in this case, we should be allowed to defend the position of

16   the relevant market that we are advancing.  And this is the way

17   that we believe we need to do it.

18        And, again, in an ideal world, maybe we ask for all game

19   developers' information from these third parties; but we

20   thought that we would, you know, burden them less.

21        **THE COURT:**  So Apple is taking the view -- at least

22   with respect to the relevance of this discovery -- that the

23   relevant market is either Fortnite or Epic?

24        **MR. SRINIVASAN:**  Yeah.  I mean, that is our view in

25   the litigation.  That is what we argued in the PI.

1        And Judge Gonzales Rogers indicated she didn't know enough

2   yet.   The facts were still contested.   I believe -- the

3   language I just read -- she said -- look, I don't have in front

4   of me, so I can't quote it; but she -- actually, I have it.

5   She said that this theory hasn't been sufficiently tested.   So

6   she needs more information.

7        And that's why we are having discovery.   We need to be

8   able to test our view that the relevant market is limited to

9   Epic's distribution of the game Fortnite or, perhaps, a little

10  bit broader than that; but that's our view.   And we should be

11  entitled to get discovery into that.

12        **THE COURT:**   All right.

13        Let me hear from Samsung please.

14        **MS. MAROULIS:**   Good morning, Your Honor, Victoria

15  Maroulis for Samsung Electronics America.

16        In his answers to Your Honor, Counsel addressed the

17  relevance or what Apple argues is the relevance of Request

18  Number 5.

19        However, for a third party that is not the standard.   As

20  Your Honor both held in the October order of this Court and

21  opened up today, the standard is really substantial need.

22        And just like last time, the Court found that Apple did

23  not meet the substantial need standard to get highly

24  confidential internal -- purely internal -- competitive

25  documents of a third party.

The same is true here even though we only have one RFP
before us and it is focused on Epic.

So the inquiry about substantial need is:  Is Apple able
to get the information it thinks is relevant somewhere else?

And if Your Honor looks at RFP 5 and its seven subparts,
on the face of this RFP, it is pretty clear that everything
Apple says it needs regarding Epic's ability to distribute the
products and Epic's behavior in the marketplace and Epic's
interactions from -- with any Samsung entity is something that
they can get and have been getting from Epic.

It is our understanding that Epic has produced at least
20,000 documents addressing its discussions with Samsung, its
interactions with Samsung Korea and any governing agreements
that govern the relationship.  That can translate to anywhere
from 30,000 pages to hundreds of thousands of pages.

The point here is that Apple has what it says it needs
regarding what Epic does in the marketplace; how Epic interacts
with Samsung; what Epic thinks about it; what Epic and Samsung
Korea may be saying to each other.

The only thing Apple cannot get from Epic directly is
internal, highly-confidential, strategic, competitive documents
of Samsung Electronics America, to the extent they exist on
this point.

And that is the same set of information that Your Honor
already found not to be subject to production.  Your Honor

quashed several requests last time in Apple's subpoena that
sought purely internal, highly-confidential, competitive
information.

Now, normally this information does not meet the
substantial needs standard.  It has also been found irrelevant
in several cases.  For example, in *Ebay* case there was a
finding that a competitor's subjective thoughts about
marketplace are not relevant to the definition of the market.

But respectfully, Your Honor, we don't need to go deeply
into Apple's relevance arguments.  Whatever they say the market
is, whatever Epic says the market is, that fight is between the
parties.  That fight is not between Apple and non-party Samsung
Electronics America.

The only questions before us here is:  Is Apple entitled
to a handful of highly-confidential competitive documents from
a third party?  And they have not demonstrated the substantial
need, neither in their written papers that were submitted to
Your Honor nor in Counsel's arguments.

What may be relevant is not sufficient.  What Apple may
like to have is not sufficient.

The only thing that would allow Apple any access to these
documents is the solid proof demonstration of substantial need,
and they cannot meet this need.  And they have plenty of
information from Epic, and we understand more is forth coming
responsive to RFP 5.

1      Samsung Electronics America is a non-party.  It's not even

2  a non-party that has the agreement between Epic and another

3  Samsung entity.

4      So this discovery is burdensome and inappropriate because

5  it does not meet that very high standard, the substantial need.

6          **THE COURT:**  All right.  Thank you.

7      Let me then turn this back to Apple.  As I understand your

8  motion, you are asking for documents and information that Epic

9  doesn't have.  And if Epic is not even aware of something, if

10  they don't know about something, why do you need it?

11          **MR. SRINIVASAN:**  Yeah, and I will hit that right on,

12  Your Honor.

13      I just did want to note one thing that I couldn't find

14  before.  It is on page 18 also of Judge Gonzales Rogers' order

15  that -- there is a direct reference to Samsung Galaxy Store as

16  being a relevant market player.  I just wanted to mention that.

17      But as to your question about why we need it, we actually

18  studied your order last time very carefully; and we took your

19  position; that we are not interested and we are not allowed to

20  obtain evidence about a party's subjective views on the market

21  or its opinions.  And that was in your order in the prior

22  Samsung dispute, and we took that to heart.

23      We are not interested in Samsung's subjective views on

24  anything.  What we are interested in and we narrowly drew the

25  subpoena to understand the facts of Samsung's experience

1    distributing Epic and Fortnite and other Epic apps on its

2    Galaxy Store, which -- again, I don't want to get into

3    highly-confidential information -- but there are aspects of

4    that relationship and that distribution arrangement that are

5    unique and are very interesting in our view.  And, you know, we

6    can go into a closed session.  I'm happy to elaborate on that.

7    However --

8           THE COURT:  We don't need to.  I'm willing to take at

9    face value that there is probably something unique here.  And I

10   don't need to get all the details to know there is probably

11   something relevant here.

12       My question is more if Epic doesn't know about something,

13   then what is that all about?

14          MR. SRINIVASAN:  It is not so much what Epic knows and

15   what Apple knows, Your Honor.  It is Samsung's experience

16   distributing Epic on its platform -- on its Galaxy Store.  How

17   successful have they been?

18       What -- tweaking the relationship, how has that changed

19   their ability to distribute more or less of Epic?

20       How has the fact that Apple and Google Play have now

21   discontinued or you disabled Epic -- Fortnite in particular --

22   from their distribution, has that caused more people to go to

23   Epic -- excuse me -- Samsung on the Galaxy Store?

24          THE COURT:  Would Epic know that though?

25          MR. SRINIVASAN:  I don't know that they would,

1    Your Honor; and I don't know that Samsung would share all of

2    its own experience of the benefits of the positions they have

3    taken.   I don't know that they would tell their partner all of

4    that.

5         There is another very important piece of this, Your Honor,

6    which Epic would not know necessarily at all, which is

7    Samsung's own rules and regulations around how Epic is allowed

8    to distribute on their platform.

9         Epic has contended that what Apple is doing -- excuse me,

10   Your Honor -- that what Apple is doing with respect to

11   limiting -- limiting the ability that they can't have their own

12   app store within an app store -- sorry, Your Honor -- that they

13   can't have their own app store within an app store; that the

14   commission that Apple charges is improper; that they have to do

15   the payment processing through Apple is improper.

16        These are all things that, you know, we would like to

17   explore.   And, again, I'm trying to skirt as much as I can

18   here.   That Epic faces the exact same restrictions or very

19   similar restrictions on other platforms and to the extent that

20   they are contending that when Apple is doing it, it is

21   anticompetitive.   The fact that everybody else is doing it, you

22   know, is relevant to us defending that argument.

23        And Epic -- excuse me -- Samsung has those discussions

24   internally.   We -- you know, they may say:   We do this for X

25   reason.   We do this for Y reason.   We restrict our folks in the

1   same way.

2       They are not necessarily going to share that with Epic,

3   but they certainly may be talking about the virtues of what

4   they are doing which absolutely is internal.  We can't get it

5   anywhere else, and it is vital for us defending Apple's conduct

6   particularly when other platform vendors are doing the same

7   thing.

8       And that is not something they are going to share with

9   Epic necessarily and very unlikely that they would explain the

10  reasons for why they set up the rules the way they do.  And,

11  again, we contend it is very similar to what Apple does.

12      We can't get that from Epic.  We are seeking the same

13  information from other platforms.  And, again, we need it to

14  defend against our business justifications or pro-competitive

15  reasons for why we do what we do and ultimately to defend

16  Apple's conduct on this point.

17          **THE COURT:**  All right.

18          **MS. MAROULIS:**  Your Honor, may I address briefly?

19          **THE COURT:**  Sure, please.

20          **MS. MAROULIS:**  It appears what Apple seeks is not

21  facts about the relationship between Epic and Samsung

22  Electronics America but how Samsung Electronics America feels

23  about the relationship.

24      Respectfully, that is not relevant to either definition of

25  the market or any other part of the case.

1    Counsel tends to conflate Samsung Korea, that has the

2    relevant agreement, with Samsung Electronics America; and that

3    is an important distinction.

4        Regardless, Your Honor, has before you several documents

5    filed under seal in this case.  And Exhibit 5 to the joint

6    letter shows the agreement and shows the different duties and

7    responsibilities of the parties and shows the arrangement.

8        That is what Apple appears to say they need.  They need to

9    understand how the arrangement is.  What are the

10   particularities of the arrangement, what responsibilities each

11   party has.

12       Plainly, it is in these documents and other Samsung to

13   Epic and Epic to Samsung documents that Epic is already

14   producing.

15       There is nothing that Apple can learn from unique, very

16   highly-confidential Samsung Electronics America documents

17   because they are not relevant to the actual facts of the

18   parties' behavior but subjective opinions about them.

19       And further, Your Honor -- I hesitate to walk the Court

20   through all seven subparts of RFP 5 -- but if the Court looks

21   at it at some later point, most of them don't address what

22   Counsel talked at length right now.

23       They talk about specific interactions between Epic and

24   Samsung Electronics America and these specific interactions,

25   whether it is technical support, co-marketing efforts,

1    campaigns and initiatives.

2         All of that would already be in the documents produced and

3    being produced to Epic because they involved, by definition,

4    both parties.  It is co-marketing, joint initiatives, support

5    given by Samsung to Epic and so forth.

6         **THE COURT:**  Okay.  Thank you.  Just taking a note

7    here.

8                         (Pause in proceedings.)

9         **THE COURT:**  I will give Epic an opportunity to speak

10   if you want to.  You don't need to.  This is a dispute between

11   Apple and Samsung, but everybody is talking about you.

12        So as long as you are here, if there is anything you want

13   to say, go ahead.

14        **MS. MOSKOWITZ:**  Thank you, Your Honor.

15        I think with respect to the dispute narrow, other than to

16   say, obviously we have a much different view of what the

17   relevant markets are here.  And so certainly to the extent the

18   Court has any questions, I am happy to address that.

19        Samsung's Counsel is clearly correct.  We ran search

20   terms.  We are producing a lot of documents about the

21   relationship, so that to the extent there is any question about

22   that, Apple is getting a number of documents from us about

23   Samsung.

24        **THE COURT:**  Okay.  All right.  Thank you.  Well, thank

25   you, Counsel.  I have what I need, and I will take it under

1  submission.

2         **MR. SRINIVASAN:**  Thank you, Your Honor.

3         **MS. MAROULIS:**  Thank you, Your Honor.  May we sign

4  off?

5         **THE COURT:**  Yep, we are all set.  We don't need

6  Samsung any further at this hearing.

7         **MS. MAROULIS:**  Thank you, Your Honor, and the court

8  staff.

9         **THE CLERK:**  Thank you, everyone.  We are off the

10 record.  Court is in recess.

11        **THE COURT:**  Well, we are continuing with the --

12        **THE CLERK:**  Okay.  Hold on, Judge.

13                    (Pause in the proceedings.)

14        **THE CLERK:**  I thought you were done completely.  Go

15 ahead.  It is still recording.

16        **THE COURT:**  No such luck.  We are still continuing.

17                    (Discussion held off the record.)

18        **THE COURT:**  So now we have the Apex issues.

19     And with respect to Mr. Cook's deposition, the dispute has

20 become narrowed by the parties' offers to compromise.  It is

21 somewhere between four hours and eight hours, and there isn't a

22 principle of law that is going to answer that question.  It is

23 more just a practical inquiry.

24     I guess my tentative ruling is that -- this isn't a

25 traditional Apex inquiry where the case is about some

historical decision, and we are trying to figure out who made it or how involved they were.

This is more detailed about -- in large part about the relationships between different types of markets and how much competition and some market's constraints competition in other markets, and it looks like it implicates an Apple business model or at least large parts of Apple's business model.  And I would think that we would want to hear from the CEO about these different issues.

So my thought is that 7 hours of record time, that would be an appropriate length for his deposition; but I guess I will have Apple respond to that.

**MR. SRINIVASAN:**   Thank you, Your Honor.

So on Mr. Cook, Your Honor, we think that this case, while it does implicate Apple's business model, many cases that are brought against Apple implicate the company broadly.

When, you know, the way we have these cases about Apple's battery or we have the case about some other aspect of Apple, Apple's iTunes music or some other important part of Apple's echo system, which are many.

So we think there is a dangerous precedent when on the theory that this implicates Apple's business model, its CEO is subject to a 7-hour deposition.

This is a massive company with lots of litigation; and it creates, we believe, a very bad precedent if that's all it

1  takes for somebody to say:  We get Tim Cook for 7 hours.

2      I note parenthetically there is a related case, *Pistachio*,

3  that is related to Apple Arcade, another part of the app store.

4  Those plaintiffs have put Mr. Cook now on their initial

5  disclosures list.  And undoubtedly they will say:  We need

6  Mr. Cook for 7 hours.

7      And so we think that the Court really should, particularly

8  with somebody like Mr. Cook, who is really about, you know, as

9  Apex as it gets, that we should rigorously apply that standard.

10      And the real standard there is unique knowledge.  Not does

11  Mr. Cook know about Apple's business model; not only that maybe

12  he has the largest voice in that business model, but whether on

13  the specific issue here of the app store, whether he has

14  anything unique to provide.

15      And what we are saying is Mr. Schiller, who is, you know,

16  among the closest inner circle of Apple's top executives -- we

17  are not talking about somebody at a low level.  This is

18  somebody who is mentioned in the same name often with Mr. Cook

19  and Mr. Jobs before that, who we are providing, who is the

20  person who leads the specific part of the Apple ecosystem that

21  is the focus of this lawsuit, and that is the app store.

22      They are going to get Mr. Schiller for a long time.  They

23  are getting a number of other high-level executives.  And

24  I guess this gets into Mr. -- you know, whether Mr. Federighi

25  and Mr. Cook are going to be ordered because if that's also the

case, then there are further people.

You have the CTO.  You have another high-level executive in Mr. Cue.  The real question starts to become:  What does Mr. Cook offer that is unique?

And if you look at their brief, Your Honor, really the only thing they say that is unique about him is that he gave some testimony to Congress as the CEO, which, of course, happens all the time with companies.

And that is not a basis to bring somebody in for an Apex deposition because, in fact, the fact that he gave testimony publicly actually gives you what you need from him on what he knows, which was a very high-level summary of what Apple does with the app store that is basically mostly public anyway.

He didn't provide any insights, the thinking behind policy.  Those are people like Mr. Schiller.

And so we are worried, Your Honor, that the thin thread on which they are bringing in Mr. Cook just because they have a very grandiose set of claims is a concern.

And we, by the way, thought a very appropriate balance is four hours.  Four hours is plenty of time to ask him about his Congressional testimony.

The other thing they cited is that he gets customer complaints and developer complaints.  And they gave you examples which I'm glad they did.  It illustrates what happens.

Like a lot of companies, he receives them.  He reads them

and he passes them on.  He doesn't get into resolving them.  He passes them on to people like Mr. Schiller, if you saw in those documents, who actually take the action to decide what to do and who are the original architects of this.

So we didn't want to take an unreasonable position and say:  We are not giving you Mr. Cook at all.  We do understand it is a significant case on some level.  So the compromise we reached is four hours, which, Your Honor -- as you know with depositions -- is essentially a day for him.  It is taking him out of commission for a day which is already a significant amount of time.

Seven hours on the record extends to ten hours of the day, potentially; much longer prep.  It is a much bigger imposition.  We thought we took a reasonable approach in giving them some time with him, which we think is ample.

By the way, they don't say in their brief that four hours is not enough time to cover the things that they note.  And I won't go through the other things they note.

They talk about switches costs, which, again, is a generic subject.  There is no reason to believe that Mr. Cook has any unique knowledge about switching costs.  There are any number of people at the company that deal with that that they could depose about that.

Lastly they say:  He must know about the competitive landscape.  He is the CEO of Apple.  Of course, that is true of

any CEO.  They know about their business.  It is not standard.
It is unique, first-hand relevance.

And I would note in the *Corellian* case we cited in the
context of the Cue and Federighi dispute, Mr. Federighi of
Apple was at a time ordered to sit for a deposition of four
hours; but it was only after he had been involved in meetings
that he was in that were part of the case and submitted a
declaration.

We don't have that here for Mr. Cook or, frankly, for
Mr. Federighi or Cue.  As a result, Your Honor, we are very
concerned about an order that puts Mr. Cook up for a deposition
in any case that alleges that Apple's business model is at
stake.

We think the app store is at stake, and we have the person
for the app store available for them to depose.

THE COURT:  All right.  Thank you.  Let me hear from
the Plaintiffs.

MS. MOSKOWITZ:  Thank you, Your Honor.

And I do note you said "Plaintiffs."  It is not just Epic.
I will take the lead.  There are three cases here, not just
Epic.  Of course, that means that those four generous hours
would be split three ways.

But one other thing I think is very interesting is:  I
just heard Apple's Counsel say how this entire case -- I guess,
Epic's case but maybe he referred to all three -- is only about

1   the app store.

2        We just got done hearing how it has nothing to do with

3   Apple.  It is all about competition across all platforms and

4   all markets.  It is about Android.  It is about what switching

5   costs there will be and how Epic, if it is just about Fortnite,

6   how Fortnite is distributed on all those other platforms.  It

7   is not just about the app store.

8        In fact, that is why in particular we do need Mr. Cook and

9   we do need Mr. Federighi because they are not simply app store

10  people.  They are implicating the highest strategic level

11  decision making on how to structure Apple's business model,

12  what changes to make, what decisions to make.  It is not just

13  about Mr. Schiller.

14       I get that Apple -- that he is their favorite witness.  He

15  is going to be their 30(b)(6) witness.  He is going to be our

16  trial witness.  We get to depose people who we think have

17  relevant information, and that's not just unique.

18       We don't have to prove that Mr. Cook will not say anything

19  that overlaps with anyone else, but Mr. Cook has spoken

20  publicly about switching costs.  He has knowledge of switching

21  costs.  He has knowledge of why the model commission structure

22  was selected and why it is maintained.

23       I really don't want to dwell on this too much, Your Honor,

24  other than to say:  We actually -- Apple offered six tethered

25  to a whole bunch of other agreements.  We couldn't agree.  We

1  narrowed down to (inaudible).

2      Your Honor, 7 hours, we will make due with.  At least I'm

3  speaking on behalf of Epic.  If that's where we are ending up,

4  I don't think you need to hear anything else from me on this.

5  Four hours is just not enough.  We have to divide this up.  We

6  understand he is a busy man.

7      This is not a harassment case, like all the cases Apple

8  cites.  That is not what we are doing here.  We are trying to

9  depose the people with the relevant, critical knowledge at the

10  key areas of this company that are implicated in these three

11  cases; and we are going to do it together when we are

12  coordinating.  We will do so in 7 hours for Mr. Cook.

13      **THE COURT:**  Do the class Plaintiffs want to weigh in?

14  If you divided up oral argument among yourselves, then you

15  don't have to.  I just wanted to give you the opportunity.

16      **MR. LOPEZ:**  Just very little to say.  In addition,

17  Your Honor, I request Plaintiffs, also the developers, could

18  live with 7 hours; and we would do our best, obviously, to

19  split as efficiently as possible with Epic and with the

20  consumers.

21      Again, we just want to underscore what Ms. Moskowitz said.

22  These are three separate major cases.  In and of themselves,

23  each would be a major case.

24      And, again, you know, 4 hours is simply too little.  I

25  think the Court's landing on 7 hours is something that is fair

1    to all concerned.

2         So this isn't just a run-of-the-mill case.  I don't know

3    about this *Pistachio* case.  Again, that seems to be centered

4    just on one aspect of Apple's business.  So I don't know that

5    that is a very good concern for Mr. Srinivasan to be raising

6    here.

7         And, again, in addition to the cases that are pending, of

8    course, there has been a major Congressional investigation here

9    that Mr. Cook provided testimony to, including live testimony.

10   And those issues are obviously very important, not only to

11   these cases but to the country at large, which is grappling

12   with the power of these large platforms.

13        So, again, I think probably the 7 hours, as the Court has

14   indicated, is a good compromise.  We wish that we could have

15   more time.  And we think we are entitled to 10 hours under the

16   coordination order.  But we understand the concerns that the

17   Court has raised and that Apple has raised.

18        So I think with that, I will close.

19        **THE COURT:**  All right.  Ms. Byrd, anything the

20   consumer Plaintiffs want to add?

21        **MS. BYRD:**  On behalf of Consumers, we also believe

22   that 7 hours is a good compromise; that we should be able to

23   get what we need -- the questioning that we need to take within

24   that time period.

25        And Apple's concerns about precedent should be alleviated

 1   by noting that there are three very big and important cases

 2   that have been coordinated here.

 3          **THE COURT:**  All right.

 4          **MR. SRINIVASAN:**  Your Honor, if I may just briefly

 5   respond.  I don't want -- just a few points.

 6          One, you know, you heard Mr. Lopez say at the end that not

 7   only is Mr. Cook relevant to the cases here but that he could

 8   speak to important issues that are important to the country at

 9   large.

10          That is exactly our concern.  This is not an opportunity

11   for Plaintiffs to start asking him questions about issues that

12   are important to the country at large.  And that's exactly what

13   we worry about; that they don't need Mr. Cook for more than 4

14   hours.

15          In fact, you heard Ms. Moskowitz say that we were working

16   on a deal to negotiate 6 hours.  And we would just respectfully

17   say, Your Honor, that the Plaintiffs said:  If you give us more

18   time with other people, you can -- maybe we can live with 6

19   hours for Mr. Cook.

20          They know they don't need more than six hours with

21   Mr. Cook.  More than six hours with Mr. Cook will only lead to

22   the type of mischief that we are concerned about; that

23   Mr. Lopez sort of previewed.  And that is exactly why we are

24   very focused on this.

25          So at a minimum, Your Honor, if you are inclined to go

1    forward and give them more than four hours, we would

2    respectfully suggest that it at least be limited to six, a

3    number that the Plaintiffs were willing to at least negotiate

4    at one point.

5              **THE COURT:**  Well, that was the deal that didn't work

6    out.

7         So if the parties make deals, then you get the benefit of

8    those deals.  If the deal doesn't come together, then it's all

9    sort of left on the floor; and the Court is going to resolve

10   the dispute.  I think I have what I need for Cook's deposition.

11        Now, we come to Cue and Federighi, I guess, one question I

12   have for Apple is:  How many SVPs does Apple have?

13             **MR. SRINIVASAN:**  Your Honor, I don't know the answer

14   to that question.  But if you look at the Apple leadership

15   page, I think there is something like 16 people listed on the

16   entire page for the company.  That includes a bunch of people

17   from foreign -- you know, that have foreign responsibilities.

18        So you already have Mr. Schiller and Mr. Cue -- I'm

19   sorry -- Mr. Schiller and Mr. Cook now who are, of course, at

20   the very tip of that Himalayan range of Apex witnesses.  And

21   both Cue and Federighi -- Mr. Cue and Federighi are also on

22   that page.

23        So we are talking about folks who are the top 16 or so

24   people in what is the biggest company in the world.  And so

25   these are truly Apex people, and Plaintiffs are also now

getting a full day with Mr. Cook, what -- in a typical case a
7-hour deposition would be a full day with Mr. Cook and, of
course, Mr. Schiller as well.  So we think this is now getting
fairly excessive.

   **THE COURT:**  Okay.  All right.  And let me hear from
the Plaintiffs.

   **MS. MOSKOWITZ:**  Thank you, Your Honor.

  I think Your Honor's remarks in the beginning apply
equally to Mr. Cue and Mr. Federighi.  This is not a case where
we are just trying to get high-level executive depositions to
talk about policies and procedures or the same thing you can
get out of an interrogatory or a 30(b)(6).

  We don't want the company line from these guys.  We want
to understand what is going on in the -- in the space in
between the policies and procedures.

  There are discretional -- discretionary decisions that are
happening about app store issues, about the developers, about
exceptions, about policy changes and where the company is going
to go in the future with respect to the app store for Mr. Cue.

  Mr. Schiller is another one of those decision makers, but
he is not the only one.  Some decisions go to Mr. Cue.  Some go
to Mr. Schiller.  Sometimes they disagree.  Mr. Schiller is in
the room where it happens in some meetings, and Mr. Cue is in
the room when it happens in others.

  And Mr. Cue is a central person -- regarding even Apple's

view of how narrow this case is supposed to be when it was

making its argument just now about the app store -- Mr. Cue is

one of the two people that Apple's own witnesses has said has

veto power over decisions.  He is consulted in deciding on

critical issues of how to enforce or not enforce their stated

policies and procedures, their stated guidelines.

So it is really -- it's not about harassment.  This person

is very relevant.  He is -- Apple, themselves, put them on

their initial disclosures.  We are not pulling him out of thin

air.

There were a lot of other people that we contemplated

getting documents from and deposing.  We have narrowed it down.

Mr. Cue is highly relevant for all of the same reasons

Mr. Schiller is.  They don't get to pick which of the two they

want us to talk to.

And certainly we have issues with Mr. Schiller's

deposition and the timing of that, but I will want to raise --

if Your Honor will be willing to hear us out after this -- but

we are not -- we are not willing to just go with who Apple

wants us to talk to on these key issues.

With respect to Mr. Federighi, it is a completely separate

question.  Mr. Federighi isn't at the app store level, and that

is precisely why we want him.

Apple is making a lot of arguments.  Their entire

pro-competitive justification -- or at least a large part of

 1   it -- is about security and why they have to have security.

 2        Their position is that they want that at the app store

 3   level, and that's where it is happening.  We don't think that's

 4   right.  We don't buy the party line they are giving us in their

 5   interrogatory answers on that.

 6        We want to talk to the person who is developing the tools,

 7   developing the security features at the operating system level

 8   so that we can actually test and poke the holes that we think

 9   are there on Apple's -- what we believe -- pretextual argument

10   for why it is controlling the app store distribution.

11        So Mr. Federighi -- we have talked about this on the

12   custodian stage -- he is clearly relevant to these issues, and

13   we get to talk to him, in our view, about what his documents

14   are and what these issues are.

15        No one else -- not Mr. Schiller and not Mr. Cook -- can

16   talk about the technical and engineering aspects of security

17   and the tools that Apple is providing, why they are developing

18   them, how they invest in them, why they invest in them.  And

19   that is happening at Mr. Federighi's level, not just for IOS

20   but also for Mac OS.

21        And Mac OS is another area that we are going to want to

22   test in this case because it is Apple's own operating system

23   that it has developed in a completely different way -- in an

24   open way -- and whether and to what extent the security

25   features can happen at an operating system level, we are going

1    to want to test that with Apple's own platform, Mac OS.   And

2    Mr. Federighi has absolute personal knowledge over that system,

3    choices that are made and distinctions between Mac OS and IOS.

4        So we think he is absolutely fundamentally relevant, not

5    substitutable, as is Mr. Cue.   So we have tailored our request

6    here.

7        We didn't ask for all 10 of those SVPs or however many --

8    17 people -- are on Apple's web page.   We went to the people we

9    think we need.   We asked for their documents.   We got them.

10       Mr. Cue's documents were always part of this case.   Apple

11   always had him as a custodian.   Without Mr. Federighi, we need

12   to talk to them about the key issues, about issues that are

13   fundamental to all three of our cases to implement the business

14   model.   Thank you.

15            **THE COURT:**   Thank you.   Do the class Plaintiffs want

16   to add anything?

17            **MR. LOPEZ:**   Yes, Your Honor, sorry about that.   I

18   couldn't get unmuted.

19       First of all, I'm not sure exactly what questions the

20   Court is going to have.   But to the extent the Court is

21   interested in Apple's exhaustion argument, Apple makes a broad

22   statement at page 8 of the letter brief that somehow all of us

23   agreed to an expedited schedule.   And, of course, that's not

24   true with respect to the class Plaintiffs.   So I wanted to

25   point out that distinction as well.

1          Again, to underscore what Ms. Moskowitz said in one

2     particular sense, the Plaintiffs, I think, had made a fulsome

3     record here with regard to the particular issues we want to get

4     into with these folks.

5          It is definitely not about any kind of stunt or anything

6     beyond these cases.  These are all grounded in the important

7     issues that these issues raise specifically.  And that's the

8     same for Mr. Cook.

9          Frankly, again, when I raise Mr. Cook's testimony to

10    Congress, I'm not talking about in some general sense.  I mean,

11    Mr. Cook specifically testified with regard to the commission

12    rates and with regard to what he thinks and, therefore, what

13    Apple thinks justifies those rates.

14         So these are all grounded in very specific issues that we

15    think all the Plaintiffs should go into and must go into in

16    their cases.

17              **THE COURT:**  All right.  Thank you.  Ms. Byrd, anything

18    further from the consumer Plaintiffs?

19              **MS. BYRD:**  No, Your Honor.  I don't have anything to

20    add.

21              **THE COURT:**  All right.  Mr. Srinivasan, some reply

22    from Apple.

23              **MR. SRINIVASAN:**  Sure.  Your Honor, in listening to

24    Ms. Moskowitz's justification for Mr. Cue and Federighi, really

25    strikes me as we are damned if we do and we are damned if we

1   don't.  I mean, she wants it both ways.

2       On the one hand Mr. Cue is relevant and absolutely

3   necessary and critical because he overlaps with so many other

4   people including Mr. Schiller.  He is central to the case,

5   which is the app store; and, therefore, he absolutely must be

6   deposed.

7       But when it comes to Mr. Federighi, it is suddenly:  We

8   need Mr. Federighi because he overlaps with nobody.  He

9   overlaps with not the central issue in this case; and,

10  therefore, he has to, of course, be deposed.

11      And the issue really, I think, is sharpened when you think

12  about it in the context of Mr. Federighi -- and I will come

13  back to Mr. Cue -- but as there is no dispute, Mr. Federighi

14  sits at the top of engineering -- software engineering for

15  Apple.  That is a large mountain that he sits at the top of.

16      There are many, many executives and, of course, other

17  employees below him.  We have offered one to them.  We said:

18  Mr. Neuenschwander is the person who can speak to these issues,

19  who is not an Apex executive, who doesn't need to be bothered.

20      Now in the context of documents, Your Honor, you said to

21  us -- and we agreed -- you ultimately said:  Look, I know you

22  would rather produce Neuenschwander's documents.  They want

23  Federighi.  What does it matter?  They are poking -- you know,

24  they are going down the wrong hole.

25      Let them get Federighi's documents even though you offered

1   to give them a better custodian.  That's on them.  It doesn't

2   matter.  This is not Apex.

3        Well, now we are at Apex.  And at Apex the rule is if we

4   say there is somebody less burdensome that you should take on

5   the very same issues that you want, they have to do that.

6        They haven't even tried.  And, in fact, as Ms. Moskowitz

7   says, there is a whole different operation that Mr. Federighi

8   is in charge of.  He is not the app store.  And he is the Apex

9   executive of that operation that is not the key piece of the --

10  of the company that is at issue in this case.

11       How in the world do you get to go to the top executive

12  first?  And particularly where we say there is another

13  executive?

14       Mr. Neuenschwander is a senior executive himself.  He is

15  not the top of the operation.  We said take his deposition.  If

16  you want to talk about these issues, he can talk about those

17  issues.  They have 16 -- 15 other depositions they can take.

18       They didn't take a single person.  They didn't ask for a

19  single person.  They insisted on the number one guy in the

20  organization who leads a thousand person division, and that's

21  the problem with Mr. Federighi.  We can go into more details

22  that we briefed.

23       Now with Mr. Cue, it is similar.  With Mr. Cue, he is also

24  at the top of a different organization now, Apple music and

25  iTunes -- it is right there on the website -- and, actually, a

1   bunch of other things, Apple search ads and a number of other

2   initiatives that Apple has.

3        What he is not in charge of is the app store.  They have

4   Mr. Schiller.  I know we are a broken record on that.  But they

5   will get Mr. Schiller.  They have asked and they have deposed

6   and will be deposing the VP of the app store, VP of developer

7   relations and a number of other people who are in the app store

8   organization who will give Epic and the Plaintiffs as many

9   different views on the app store as their hearts could desire.

10       It is not one person.  We are not putting forward one

11  Mr. Schiller who is going to be the spokesperson and give the

12  party line.  They have literally a dozen other people, almost

13  all of whom are executives -- many of whom are high-level

14  executives -- who they can ask these questions to.

15       Nothing they showed about Mr. Cue is unique to Mr. Cue.

16  There is no aspect of any document, Your Honor, that they

17  provided to you or any deposition testimony they provided to

18  you.  Nothing is unique to Mr. Cue.

19       At a minimum they should come back to you at some point

20  after they have taken -- they have taken five.  They still

21  haven't been able to identify anything where somebody said:

22  Mr. Cue is the only guy.  They identified a few documents that

23  said it would be Mr. Schiller or Mr. Cue or maybe Mr. Cook.

24  Nothing that said this is just Mr. Cue.

25       And they can take some more depositions, and they are

1    going to find the same thing.

2        The fact is this isn't just sort of open season on Apple.

3    There has to be some constraints.  We are already doing 16

4    depositions in this case of other high-level Apple executives.

5    There has to be a limit to it.

6        They haven't shown you any discipline in saying very

7    specifically why these two folks are needed.  And in the case

8    of Mr. Federighi, they have affirmatively spurned our offer to

9    give them a less intrusive deposition on the very issues that

10   they seek.

11            **THE COURT:**  All right.

12       Are you still bound by the prior deadline you had to

13   complete depositions in the Epic case?

14            **MR. SRINIVASAN:**  We are, Your Honor.  February 15th is

15   the day that is the cut-off date.

16       We believe -- you know, it is an interesting case where I

17   think in most antitrust cases, most complex cases, where you

18   have a typical discovery period of, you know, nine months to a

19   year.

20       Parties at the end say:  Let's -- we have to let a few

21   depositions go over.  Whether they formally get an extension or

22   not, it is something that is typically worked out.  That has

23   been our experience.

24            **THE COURT:**  Okay.

25            **MR. SRINIVASAN:**  In this case Epic is unwilling -- in

1    a compressed discovery schedule where we are trying to do all

2    of this in just a few weeks, we think it is absolutely

3    necessary to do that.  Frankly, you know, we can get into those

4    issues later, Your Honor.  We don't think it is physically

5    possible.

6        There are days we have ten depositions likely scheduled in

7    this case with third parties on one day.  So forget about

8    triple tracking.  It is ten.  I don't know.  Is it

9    deci-tracking?  I don't know if they ever counted that high.

10   That's where we are.

11       We do believe that part of the way that this can be

12   resolved is to extend that date a little bit through direct

13   court order or through the parties cooperating to do so.

14       At least Epic -- I don't know where the class Plaintiffs

15   are on this -- is absolutely unwilling to be flexible about

16   this.

17       **THE COURT:**  What I was leading up to is:  I would like

18   to take a couple of days to digest the oral argument before I

19   get out my order.  So probably on Wednesday or Thursday I would

20   get it out.  And I want to know would that cause a problem for

21   the parties?

22       **MR. SRINIVASAN:**  Your Honor, speaking for Apple, that

23   is the least of the problems Apple has, would be your order

24   coming out two or three days later.

25       We have, you know, dozens of unscheduled deposition or

1    depositions we are still trying to schedule; document

2    productions on both sides that are slower than they were

3    anticipated to be.

4        So we have a lot of problems, Your Honor, meeting that

5    date; but I don't think your order coming out a few days later

6    would be a problem for us.

7            THE COURT:  Go ahead.  Let me just ask the Plaintiffs

8    your view.  Would it be a problem if I took two or three days

9    to get this order out?

10           MS. MOSKOWITZ:  Your Honor, Lauren Moskowitz.

11       To address that specific question, no.  But I have a lot

12   of additional things to say if Your Honor would permit me.

13           THE COURT:  I will.  First, let me hear from the Class

14   Plaintiffs.  Is it okay if I wait two or three days to get this

15   order out?

16           MR. LOPEZ:  Yes, Your Honor.

17           MS. BYRD:  That's fine.

18           THE COURT:  Okay.  Thank you.  I wanted to think about

19   it.  I know you are under a tight deadline at least in the Epic

20   case.  I don't want to cause any problems.

21       Ms. Moskowitz, you have more on the agenda.

22           MS. MOSKOWITZ:  Thank you, Your Honor.

23       Just a couple of points just in response to some of the

24   things that Apple's Counsel just said.

25       We have been asking for depositions since before

1   Christmas, for the dates.  Everyone has known our list.  As

2   Your Honor knows, we briefed our list.

3        It is 14 additional people besides Mr. Cue and

4   Mr. Federighi.  We have been asking for dates.  Apple has been

5   not giving us dates including some of the people who they say

6   we should have deposed before pressing for Mr. Federighi.

7        We asked to depose them before we got here today.  They

8   refused to give us dates in that window.  They pushed them.  In

9   fact, one of them we don't even have.  And then they want us to

10  depose someone who Your Honor specifically said is not the

11  right custodian for us to have.

12       It is just -- it is an odd situation that Apple thinks it

13  is a benefit to them; that they haven't allowed us to take any

14  of these depositions as a way to stop us from taking

15  Mr. Federighi's deposition.  That is not the standard.

16       The other aspect of what Mr. Srinivasan said that is

17  troubling is that they repeatedly complain about the schedule.

18  They have complained to you multiple times.  They have even

19  complained to Judge Gonzales Rogers.

20       In a brief where they asked Judge Gonzales Rogers to move

21  the schedule, the Judge said no.  In fact, reaffirmed

22  everything about our schedule.

23       We are headed towards a May 3rd trial.  A lot of things

24  are tethered off of that including the fact discovery deadline,

25  which is not just February 15th for our fact discovery in Epic.

1  It is our deadline for opening expert reports.  Nothing can

2  slip.  Everything is -- you pull that thread and the thing

3  falls apart.  We need to keep it.

4      And Apple is engaging in self-help by just dragging their

5  feet and refusing to schedule depositions; give us answers to

6  interrogatories; give us documents that they have been

7  promising us and then saying we can't get it done.  That is not

8  one of their options.  We have to comply with the Court's

9  schedule.

10      So I do have a few issues that, Your Honor, we tried to

11  brief with Apple.  They refused to give us their portion of the

12  joint statement.  We gave ours over the weekend.

13      We need some relief from the Court as soon as Your Honor

14  can hear us out.  Some of which I actually don't think needs a

15  joint statement.  It is pretty simple.

16      For example, Apple has given us Mr. Schiller on

17  February 15th for a two-day deposition starting at the close of

18  fact discovery, the same day our expert reports are due.  We

19  immediately rejected that and said that can't happen.

20      They can't put their favorite witness -- who also, by the

21  way, Your Honor, is going to be their 30(b)(6) witness for up

22  to a dozen topics.  They haven't told us which topics, but they

23  have told us --

24          **THE COURT:**  Let me preview something for you.  I'm not

25  going to rule on any -- I had a fair amount of briefing coming

1  into this hearing, and that's what I have been able to

2  consider.  So I'm not going to rule on the merits of a new

3  dispute you raise.

4      What I'm willing to do is set a briefing schedule and a

5  further hearing if you would like me to do that.

6          MS. MOSKOWITZ:  Yes, Your Honor, thank you.  I was

7  just previewing the issues.

8      But, yes, I'm happy to do that.  And Apple has had our

9  joint statement portion for days.  So we would ask Your Honor

10 to order Apple to respond by this afternoon and for us to file

11 the joint statement as soon as possible.

12     And if Your Honor would like a hearing on that, to

13 schedule that as soon as you have availability.  And I can --

14         MR. SRINIVASAN:  Your Honor, can I be heard on that?

15         THE COURT:  Yes, please.

16         MR. SRINIVASAN:  This is actually a little bit

17 outrageous.  So you continued the hearing from Friday to today

18 because you wanted to see some more documents, which made

19 sense.

20     There was no briefing schedule.  On Saturday morning at

21 1:00 a.m., this past -- two days ago -- we received a brief

22 from them to say:  Brief this by tomorrow; okay.

23     Then we got another one on Sunday morning and said:  Brief

24 this by later today.  That is what she is talking about, about

25 the briefs that we have had for days.

1     So that's not the way we do things here.  We have them.

2    We haven't looked at them.  We have other things to do.  We are

3    trying to comply with all the things they are asking us to do.

4    We don't have time to needlessly brief.

5     We are happy to have a hearing on these issues, but we

6    have to have a chance to do it in an orderly way.

7     Let me just step back.  I do want to address the broader

8    point.  Ms. Moskowitz is right about one thing.  That is, we

9    have been a broken record about the schedule.  We said to the

10   Judge, Judge Gonzales Rogers, that we think we need more time

11   to do this.  She said no.

12   Epic said:  We don't need more time.  And I won't read you

13   the quotes, but they said something like:  We just want some

14   targeted limited discovery on IAP, which is just a small piece

15   of this case.  That's what they said to her.  And then she said

16   based on that okay.  Then we will give you Epic's abbreviated

17   schedule.

18    Well, their idea of limited targeted discovery has been 86

19   document requests, 9 more custodians; translates to 8 million

20   documents more that Apple is reviewing.  I don't believe that

21   is the discovery that Judge Gonzales Rogers had in mind when

22   she set the schedule.

23    Now, Epic then, for its part, has kept the pedal to the

24   medal on that.  They have doubled down.  They said:  We need

25   nine new custodians.  We said:  You know what, we can't do that

1    by January 6.  That's the deadline.

2         By the way, Ms. Moskowitz talks about the sacrosanct

3    February 15th deadline.  The deadline for document production

4    was January 6th.  We very openly said to them:  You are asking

5    us to review millions of documents.  We cannot produce those by

6    January 6th.  We can tell you right now we can't.

7         They made a deal.  They made a decision.  They said:  You

8    know what, we would rather have those documents.  Produce them

9    later.  We said:  You know what, it is going to be mid to late

10   January, maybe even bleeding into February.

11        That's what we told them from day one.  They said:  Fine,

12   we will take it.

13        And then they turned around and say:  We want 16

14   depositions.  And for every deponent, we want the documents 14

15   days before that deposition.

16        Well, let's think about that.  January 6th was the

17   original for the original deadline that we said we couldn't

18   meet.  Then at a minimum they said:  We don't want to take any

19   depositions before January 20th.

20        So now we are talking about taking 16 depositions of

21   theirs; 14 depositions of ours.  They want dozens of

22   third-party depositions, all between basically January 20th and

23   February 15th.

24        We have been trying to be adults about it.  We have said:

25   Look, one of two things has to happen.  Either your outsized

1    appetite for depositions and documents has to be renegotiated

2    or downsized or we need more time in the schedule.  We

3    physically can't do both.

4         In every other case I have been in, that is something the

5    parties do.  In this case -- where we need it more than any

6    other case given this compressed discovery -- it is not

7    happening.

8         Instead, they are going to come in and they are going to

9    insist that Apple produce millions of documents ahead of when

10   we said we would, so they can cram in dozens of depositions of

11   people they don't even need.

12        And that's the situation.  We can brief it.  I don't know

13   how the Court is going to resolve it.  Our own view is the

14   parties need to sit down and be adults and work this out.

15        But if they want to say:  We want all this to happen.  We

16   are not going to be flexible on what we want to happen, and we

17   are not going to be flexible on the date.  I don't even know

18   how Your Honor is going to resolve that.

19        But, you know, we should have a briefing schedule on it;

20   and we can come and deal with it then.  But I would urge

21   Counsel here -- you know, everybody on this Zoom -- we need to

22   work on this.  We need to figure out something because I don't

23   think, Your Honor, that you can order things to happen that

24   aren't physically possible.

25            **THE COURT:**  Well, we will see.

```
 1                    (Laughter)

 2        THE COURT:  So here is the deal.  Judge Gonzales

 3   Rogers sets the case schedule, and then I manage discovery

 4   within the boundaries that she sets.  So that's all I can

 5   really do.

 6        So I hear the two sides' points of view on whether the

 7   deadline should be extended.  I'm happy to listen to whatever

 8   you have to say.  There is simply nothing I can do about that.

 9   All I'm going to do is manage whatever is the appropriate

10   amount of discovery to take place by the deadline.

11        So I do think that with respect to party depositions, the

12   parties should work that out because I'm going to order those

13   depositions to happen by February 15th because that's the only

14   thing I really can do.

15        So I do think the parties should try to get those all

16   scheduled.  If you can't, then I'm happy to have a hearing.

17   And I don't think either of you is going to like that hearing

18   because I'm just going to pick dates on a calendar and order

19   depositions to happen on certain dates.  And it may not be what

20   either of you want.

21        But if I'm put in a bind where I have to schedule 16

22   depositions by mid-February -- and we are almost at the end of

23   January -- that's all I can really do is just say:  This depo

24   is on this date, and then order you to do that.  So I do think

25   it is to both sides' benefit if you can avoid doing that.
```

1    So what I would like to do now is setting a briefing

2    schedule, but I want to make sure I understand the issues

3    coming at me.

4       Ms. Moskowitz, is it the scheduling of the Apple party

5    depositions?  Is that the issue or are there more issues than

6    that?

7          **MS. MOSKOWITZ:**  There are a few issues, Your Honor.

8       So I will just briefly summarize so you have a sense of

9    the universe.

10      It is that Apple hasn't given us dates for several

11   witnesses; five plus Mr. Cue and Federighi, to the extent that

12   those are going to happen.

13      We also are in issue over the timing of Mr. Schiller's

14   deposition, which we do not want to start at the close of fact

15   discovery.  We want it earlier for several reasons.

16      It is the issue that -- which I haven't summarized yet --

17   but Apple is dumping documents on us on the eve or even after

18   some of these depositions and unilaterally trying to cancel

19   them.

20      We have a deposition scheduled for Wednesday,

21   Mr. Kosmynka, that Apple let us know over the weekend that they

22   were -- that they had just produced 65,000 and are producing

23   another 65,000 documents for him some time this week at some

24   point.

25      We are insisting that that deposition start on Wednesday.

1   We can't keep pushing things off.  We have to start, and we

2   want Apple to agree or be ordered by the Court to make him

3   available for his second day -- a longer second day -- at some

4   point after they have produced the documents and to commit to a

5   date certain on that.

6        That one is a little bit tough to wait just because his

7   deposition is starting on Wednesday.  Apple hasn't responded to

8   our notice of deposition to confirm that we will be getting him

9   for longer than the 10 hours and to start it as scheduled.  So

10  maybe that is something we can just put aside because it is a

11  little bit pressing.

12       We have the same issue about a deposition starting

13  tomorrow where they dumped 10,000 -- which, I guess, drop in

14  the bucket compared to 130,000 -- but still they are producing

15  documents at the last minute on these depositions.  And we

16  just -- they have to get their act together on these documents.

17  These are not new custodians.  These are old custodians.  So

18  the arguments that Apple's Counsel made don't apply to them.

19       So that's the other deposition-related issue that, again,

20  we may need to brief or to hear on an expedited basis.

21       There are a couple of other issues, Your Honor, not

22  directly tied to deposition.  Some interrogatory answers that

23  Apple keeps refusing to give us supplemental answers to, and we

24  just -- we are running out of time.  We need them.

25       We are 21 calendar days away from our expert reports going

1   in and for fact discovery to close.  We need, unfortunately,

2   the Court to compel them to do it because absent us coming to

3   you, we just don't get them to move.  So while I wish I didn't

4   have to bring disputes like this to Your Honor, we,

5   unfortunately, do.

6        And we have a similar issue about some document production

7   issues where they have committed to tell us basic things about

8   what we were getting and what standards they were applying,

9   which custodians they were doing; and they haven't done that

10  either.  They committed to and just haven't done.

11       So those are three separate letter briefs that Apple has

12  and about our -- about document issues, interrogatories and

13  depositions.  There is a little bit more meat on the bones on

14  that; but I'm cognizant that Your Honor is not looking for a

15  full presentation on them but just a summary.

16       **THE COURT:**  Okay.  So there are three letter briefs

17  that you have sent to Apple; is that right?

18       **MS. MOSKOWITZ:**  Correct, Your Honor.

19       **THE COURT:**  Mr. Srinivasan, when will Apple be able to

20  brief its portion of the letter briefs?

21       **MR. SRINIVASAN:**  Sure, Your Honor, we think maybe by

22  Thursday we can comfortably do that.  We have a lot going on.

23  I mean, we are triple -- quadruple tracking, and so we do need

24  some time.

25       I would just mention briefly that a number of these

1  issues -- particularly on the interrogatories and the document

2  production -- you know, parties have worked it out -- are

3  working it out.  And we will.  I mean, we will or we won't.

4      I mean, if Epic is going to insist on bringing these to

5  the Court, we will brief them.  But I think many of these will

6  be moot.

7      Just a few things.  On Mr. Kosmynka, he is not a new

8  custodian.  He is an Epic custodian for which he has an Epic

9  production, which is the ones that started anew.  That is the

10 issue for Mr. Kosmynka.  The notice for Mr. Kosmynka we

11 received four days ago, which did not give us enough time to

12 move to quash.

13     They can't now complain that we have to be compelled to go

14 forward on that day when they didn't give us enough time to

15 move to quash with just four days on that subpoena.

16     And so we think that, again, the parties are going to have

17 to work out these disputes until Your Honor weighs in on them

18 whenever Your Honor can.

19         **THE COURT:**  All right.  Let's turn to that.

20     Here is what I'm ordering:  I'm ordering the parties to

21 file these three joint discovery letter briefs by Noon on

22 January 29th, which is this Friday.  And then I'm going to

23 schedule a hearing for Monday, February 1st at 10:00 a.m. on

24 those letter briefs.

25     With respect to deposition scheduling issues, I strongly

1  encourage the parties to work out anything you can because I

2  guarantee you that a solution that the two sides find mutually

3  satisfactory is likely to be better than one I order especially

4  since the next hearing is going to be 14 days before all the

5  depositions have to come to an end in the Epic case.

6      So you have a strong incentive to work this out.  That's

7  what I'm going to do.  I'm scheduling a hearing for Monday,

8  February 1st at 10:00 a.m.  And I want the letter briefs in by

9  Noon on January 29th.

10      Is there anything else that Plaintiffs would like to raise

11  for today's purposes?

12      **MS. MOSKOWITZ:**  Your Honor --

13      **MR. LOPEZ:**  Just --

14      **MS. MOSKOWITZ:**  Pardon me.

15      **MR. LOPEZ:**  Go ahead.

16      **MS. MOSKOWITZ:**  To the extent -- just on the two

17  depositions that are happening tomorrow and Wednesday, is

18  Your Honor open to providing some guidance to us on that just

19  given that the briefing schedule obviously is moot -- that

20  issue will be mooted?

21      **THE COURT:**  I don't feel like I have an informed basis

22  that I can do that.  Sorry.  I think you should work it out.

23      **MR. LOPEZ:**  Your Honor, to that end, Ms. Moskowitz

24  mentioned the deposition tomorrow and the documents that we

25  received just last night.  I'm not sure exactly what the tone

1   is.  I mean, she referred to something around 10,000.  I'm not
2   sure if she means that count as 10,000 documents or pages.  It
3   is certainly a lot of pages, and we are still in the process of
4   literally putting those into the system; ingesting those and
5   figuring out exactly what is there.  Again, that deposition
6   begins tomorrow on a 30(b)(1) basis.

7        Also, where the class Plaintiffs are concerned -- where
8   the Developers are concerned, Apple had told us -- I believe it
9   was yesterday at 10:47 a.m. -- that they had also designated
10  the deponent that begins tomorrow as their 30(b)(6) spokesman
11  as to two of our topics.  And coupled with the fact that they
12  have just produced this large number of documents last night,
13  there is no way we can do a 30(b)(6) deposition of him as
14  well -- whether it is tomorrow or continued to the next day.
15  So I just wanted to put that on the Court's radar.

16       We understand the Court's instruction to try to work those
17  things out.  We will try to do that with Apple, but that may be
18  something we need to raise with the Court as well depending on
19  what Apple says when we raise it with them.

20            **THE COURT:**  I see.  Thank you.

21       **MR. SRINIVASAN:**  Your Honor, just lastly -- I don't
22  want to keep you -- to the extent we have that date, you know,
23  we do have some other brewing issues that we didn't yet raise
24  on 30(b)(6) negotiation, third-party depositions and getting an
25  agreement on that.

1       And if the parties can't reach an agreement on that, I

2   assume Your Honor would be okay for us to send a letter brief

3   to the other side and have that briefed as well?

4           **THE COURT:**  That's fine.  If there are additional

5   disputes -- whether Apple raises them or the Plaintiffs come up

6   with additional ones -- anything you want me to hear on Monday,

7   February 1st, you should have that letter brief filed by Noon

8   on January 29th.  That will be fine to raise additional issues.

9           **MR. SRINIVASAN:**  Thank you, Your Honor.

10          **THE COURT:**  All right.  Thank you, Counsel.  And it

11  looks like I will be seeing you a week from today.  I wish you

12  luck in working things out, and I will see what you are unable

13  to work out.  And we will talk about it then.

14          **MS. MOSKOWITZ:**  Thank you, Your Honor.

15          **MR. SRINIVASAN:**  Thank you, Your Honor.

16          **MR. LOPEZ:**  Thank you, Your Honor.

17          (Proceedings adjourned at 11:25 a.m.)

18                      ---oOo---

19

20

21

22

23

24

25

1

2

3                      <u>**CERTIFICATE OF REPORTER**</u>

4           We certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, January 25, 2021

8

9

10

11    _____

12                   Marla F. Knox, RPR, CRR
                       U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25