Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
Ben Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
benh@hbsslaw.com

*Interim Class Counsel in Cameron, et al. v.
Apple Inc., No. 4:19-cv-03074-YGR*

Joseph M. Vanek (*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com

*Class Counsel for Developer Plaintiffs in
Cameron, et al. v. Apple Inc., No. 4:19-cv-
03074-YGR*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>    Plaintiff, Counter-defendant,<br><br>  v.<br><br>APPLE INC.<br><br>    Defendant, Counterclaimant. | No. 4:20-cv-05640-YGR<br><br>BRIEF OF *AMICI CURIAE* DEVELOPER PLAINTIFFS REGARDING TRIAL ELEMENTS<br><br>Hon. Yvonne Gonzalez Rogers |

1

**TABLE OF CONTENTS**

2
<u>Page</u>

3

I.      RELEVANT MARKET ........................................................................................2

4

     A.      Relevant Market Analysis (Joint Submission § 4.1) .............................................2

5

           1.      Single Brand Markets (Joint Submission § 4.1.2)...........................................6

6

           2.      Two-Sided Markets (Joint Submission § 4.1.4) .............................................9

7

     B.      Section 2 of the Sherman Act Monopolization – Monopoly Power
          (Joint Submission § 7.1) ......................................................................................10

8

9

     C.      Section 2 of the Sherman Act – Willful Acquisition or
          Maintenance of Monopoly Power Defined (Joint Submission § 7.2) ......................12

10

           1.      Rule of Reason Analysis – No Less Restrictive Alternative
               and Balancing (Joint Submission §§ 7.2.1, 7.2.3, 7.2.4)..............................15

11

II.     FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT (JOINT
     SUBMISSION § 9)..................................................................................................16

12

13

III.    CALIFORNIA UNFAIR COMPETITION LAW (JOINT SUBMISSION
     § 18.4)....................................................................................................................17

14

IV.     PREVIEW OF DEVELOPER-FOCUSED ISSUES ...........................................17

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 3d 324 (E.D.N.Y. 2019) .................................................................8

5

*Apple Inc. v. Psystar Corp.*,
6
  586 F. Supp. 2d 119 (N.D. Cal. 2008) ...........................................................6, 7, 8

7

*In re Apple iPod iTunes Antitrust Litig.*,
  796 F. Supp. 2d 1137 (N.D. Cal. 2011) (Ware, J.) .............................................17
8

9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) .......................................................................................12, 13

10

*Associated Gen. Contractors, Inc. v. California State Council of Carpenters*,
11
  459 U.S. 519 (1983) ............................................................................................13

12

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3rd Cir. 2007)...............................................................................11
13

14

*Brown Shoe Co. v. U.S.*,
  370 U.S. 294 (1962) ..........................................................................................3, 9

15

*California Glazed Prods., Inc. v. The Burns and Russell Co.*,
16
  708 F.2d 1423 (9th Cir. 1983) .............................................................................15

17

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ...............................................................................13
18

19

*Clerkin v. MyLife.Com, Inc.*,
  2011 WL 3607496 (N.D. Cal. Aug. 16, 2011) ....................................................17

20

*CollegeNet, Inc. v. Common Application, Inc.*,
21
  355 F. Supp. 3d 926 (D. Or. 2018) ......................................................................15

22

*Digidyne Corp. v. Data Gen. Corp.*,
  734 F.2d 1336 (9th Cir. 1984) ...............................................................................8
23

24

*Digital Equip. Corp. v. Uniq Digital Techs.*,
  73 F.3d 756 (7th Cir. 1996) ...................................................................................7

25

*DSM Desotech Inc. v. 3D Sys. Corp.*,
26
  749 F.3d 1332 (Fed. Cir. 2014) ..............................................................................7

27

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ..................................................................................... *passim*

28

*Epic Games v. Apple Inc.*,
  2020 WL 5993222 (N.D. Cal. Oct. 9, 2020) ................................................................. *passim*

*Farmers Ins. Exch. v. Super. Ct.*,
  2 Cal. 4th 377 (Cal. 1992) ...............................................................................................17

*Federal Trade Comm'n v. Qualcomm*,
  969 F.3d 974 (9th Cir. 2020) ....................................................................................... *passim*

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1968) ............................................................................................11, 12, 13

*Headwaters Inc. v. United States Forest Serv.*,
  399 F.3d 1047 (9th Cir. 2005) .............................................................................................1

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) .............................................................................................3

*Illinois Union Ins. Co. v. Intuitive Surgical, Inc.*,
  179 F. Supp. 3d 958 (N.D. Cal. 2016)...................................................................................2

*Image Tech. Servs. v. Eastman Kodak Co.*,
  125 F. 3d 1195 (9th Cir. 1997) .........................................................................................16

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) (O'Connor, J., concurring)...............................................................14, 15, 16

*Kolon Indus. v. E.I. DuPont de Nemours & Co.*,
  748 F.3d 160 (4th Cir. 2014).......................................................................................10, 11

*Lee v. The Life Ins. Co. of N.A*
  23 F.3d 14, 20 (1st Cir. 1994) .............................................................................................7

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948) ............................................................................................................9

*Masimo Corp. v. Tyco Health Care Grp., LP*,
  2006 WL 1236666 (C.D. Cal. March 22, 2006)..................................................................14

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015)............................................................................................15

*MetroNet Servs. Corp. v. West Corp.*,
  383 F.3d 1124 (9th Cir. 2004)............................................................................................12

*Munoz v. Cnty. of Imperial*,
  667 F. 2d 811 (9th Cir. 1982)...............................................................................................2

*Nat'l Soc. of Prof'l Engineers v. United States*,
  435 U.S. 679 (1978) ..........................................................................................................14

*NCAA v. Bd. of Regents of the Univ. of Oklahoma*,
   468 U.S. 85 (1984) ........................................................................................13

*Newcal Indus. v. IKON Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ...................................................................6, 7, 9

*Ohio v. Am. Express Company*,
   138 S. Ct. 2274 (2018) ..................................................................................9

*Pacific Express, Inc. v. United Airlines, Inc.*,
   959 F.2d 814 (9th Cir. 1992) ........................................................................13

*Parklane Hosiery Co., Inc. v. v. Shore*,
   439 U.S. 322 (1979) ....................................................................................1, 2

*PSI Repair Servs. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) .........................................................................7

*Rebel Oil. Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .............................................................3, 4, 11, 12

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*,
   1995 WL 853037 (N.D. Cal. Sept. 7, 1995) ....................................................5

*St. Alphonsus Med. Ctr. – Nampa, Inc. v. St. Luke's Health Sys.*,
   778 F.3d 775 (9th Cir. 2015) .........................................................................4

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ..................................................................................14, 15

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ......................................................................................1

*Theme Promotions, Inc. v. News America Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ...................................................................2, 3, 5

*Times-Picayune Publishing Co. v. United States*,
   345 U.S. 594 (1953) ......................................................................................3

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) .......................................................................14, 15

*United States v. Grinnell*,
   384 U.S. 563 .................................................................................................12

*United States v. Hui Hsiung*,
   778 F.3d 738 (9th Cir. 2015) ........................................................................17

*United States v. Microsoft Corp.*,
   253 F.3d 34 (DC. Cir. 2001) ....................................................................3, 11, 14, 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ................................................8, 9, 12

**STATUTES**

15 U.S.C. § 1 ................................................................15, 16

15 U.S.C. § 2 ................................................................ *passim*

15 U.S.C. § 6a .....................................................................17

15 U.S.C. § 14 (1976).............................................................15

Cal. Bus. & Prof. Code §§ 17200 ...............................................17

**OTHER AUTHORITIES**

Filistrucchi, *Market Definition in Multi-Sided Markets* ...............................10

Richard A. Posner, *Antitrust Law: An Economic Perspective* 128-29 (1976) ....................5

Richard A. Posner, *Antitrust Law* 150-51 (2d ed. 2001) .................................5

1        Donald R. Cameron and Pure Sweat Basketball, Inc. ("PSB") are iOS developers and plaintiffs

2    in *Cameron v. Apple Inc.*, N.D. Cal. No. 4:19-cv-03074-YGR. They respectfully submit this *amici*

3    *curiae* brief as invited by the Court. (October 19, 2020 Tr. at 18-19; Order of October 21, 2020, *Epic*

4    *Games v. Apple* ECF ("Epic ECF") No. 132). The Developer Class ("Developers") in *Cameron* assert

5    that Apple has monopolized the multi-billion dollar market for distribution of iOS applications and in-

6    app purchases ("IAP") in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. They seek to

7    recover the damages they suffered as a result of the supracompetitive prices that Apple charges in

8    abuse of its monopoly power.

9        Developers have endeavored to avoid undue duplication of the parties' 167-page Joint

10    Submission and, in accordance with the Court's guidance, to avoid merits-based arguments where not

11    illustrative of a particular legal point. To this end, Developers address specific points raised by Apple

12    and Epic in their Joint Submission, citing to the referenced section (*e.g.*, "7.1"). Given that discovery

13    and expert analysis are ongoing in *Cameron*, Developers reserve all rights to vary, add to, or subtract

14    from the following statements in the briefing that will ensue in their own matter.

15        Developers also have endeavored to comply with the Court's desire for transparency and the

16    avoidance of surprise. (Oct. 20, 2020 Hearing Tr. at 16 ("I don't want to find out … there's something

17    wholly different or some different perspective a year later… .") To that end, Developers address the

18    preclusion issues raised by the *Epic Games v. Apple* trial, and the preservation of Developers' Seventh

19    Amendment jury trial right.

20        *First*, though nonparties, Developers may benefit from the Court's ruling in the *Epic Games v.*

21    *Apple* trial—*i.e.*, the Court's ruling may preclude Apple from relitigating any issue on which Epic

22    prevails. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 330-32 (1979). Developers would not be

23    subject to preclusion on any issue on which Apple prevails. *Taylor v. Sturgell*, 553 U.S. 880, 892

24    (2008). Developers are not parties to the case, are not adequately represented by Epic, and do not

25    "effectively control" the *Epic v. Apple* litigation. *Headwaters Inc. v. United States Forest Serv.*, 399

26    F.3d 1047, 1054 (9th Cir. 2005) ("[P]arallel legal interests alone, identical or otherwise, are not

27    sufficient to establish privity, or to bind a plaintiff to a decision reached in another case involving

28

another plaintiff."); *Munoz v. Cnty of. Imperial*, 667 F. 2d 811, 816 (9th Cir. 1982) ("[T]he filing of an amicus brief has never been enough to bind a non-party to the result of a proceeding").

*Second*, Developers (including the named plaintiffs) are entitled to a jury trial, and if there were any risk that they could be precluded from litigating an issue resolved in the *Epic Games v. Apple* bench trial, then their jury trial would need to proceed first. *Parklane*, 439 U.S. at 334 ("[W]hen legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial and 'that discretion … must, wherever possible, be exercised to preserve jury trial") (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959)); *Illinois Union Ins. Co. v. Intuitive Surgical, Inc.*, 179 F. Supp. 3d 958, 961 (N.D. Cal. 2016) ("As a result, where there are issues common to both the equitable and legal claims, the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims.") (internal citations omitted). To the extent desired by the Court, Developers stand ready to accelerate the date for a jury trial as much as reasonably practical.

Developers submit this brief solely in the role of *amici curiae*, pointing out areas of law that may help the Court's understanding and preparation for the bench trial in *Epic Games v. Apple*.

## I.   RELEVANT MARKET

### A.   Relevant Market Analysis (Joint Submission § 4.1)

Developers generally agree with the analytical framework that Epic provides for defining the relevant product market. (Joint Subm., Epic ECF No. 276, at 10-11.) Defining the relevant market is a question of fact rather than law. *Epic Games v. Apple Inc.*, No. 4:20-cv-05640-YGR, 2020 WL 5993222, at *7 (N.D. Cal. Oct. 9, 2020); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992); *Theme Promotions, Inc. v. News America Mktg. FSI*, 546 F.3d 991, 1001-02 (9th Cir. 2008). The purpose of the relevant market analysis is to draw boundaries around an area of competition within which the products or services are reasonably interchangeable in the eyes of the purchaser. *Eastman Kodak*, 504 U.S. at 481-82 (stating that relevant market for providing service to Kodak equipment "is determined by the choices available to Kodak equipment owners"). As this Court already observed, the relevant market is the "area of effective competition," *i.e.*, the "field in which meaningful competition is said to exist." *Epic Games*, 2020 WL 5993222, at *7 (quoting *Federal*

1    *Trade Comm'n v. Qualcomm*, 969 F.3d 974, 992 (9th Cir. 2020), and *Image Tech. Servs. v. Eastman*

2    *Kodak Co.*, 125 F. 3d 1195, 1202 (9th Cir. 1997)).

3         The Supreme Court has explained that "[t]he outer boundaries of a product market are

4    determined by the reasonable interchangeability of use or the cross-elasticity of demand between the

5    product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *see also Epic*

6    *Games*, 2020 WL 5993222, at *7 (quoting *Newcal Indus. v. IKON Office Sol.*, 513 F.3d 1038, 1045

7    (9th Cir. 2008) ("Including economic substitutes ensures that the relevant product market encompasses

8    the group or groups of sellers or producers who have actual or potential ability to deprive each other

9    of significant levels of business.") (internal quotation marks omitted)); *Hicks v. PGA Tour, Inc.*, 897

10   F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal*). However, not all substitute products belong in the

11   relevant market—rather, only those substitutes to which a significant number of purchasers will turn:

12           For every product, substitutes exist. But a relevant market cannot meaningfully
13           encompass that infinite range. The circle must be drawn narrowly to exclude
             any other products to which, within reasonable variations in price, only a
14           limited number of buyers will turn … .

15   *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612, n.31 (1953); FTC Horizontal Merger

16   Guidelines § 4 (2010) ("[P]roperly defined antitrust markets often exclude some substitutes to which

17   some customers might turn in the face of a price increase even if such substitutes provide alternatives

18   for those customers.").[1]

19        Interchangeability is the lynchpin to relevant market analysis because a purchaser's ability to

20   readily switch from one product to another is what constrains a seller from charging a supracompetitive

21   price. *Rebel Oil. Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (substitute products

22   belong in relevant market "[i]f the sales of other producers substantially constrain the price-increasing

23   ability of [defendant]"); *Theme Promotions*, 546 F.3d at 1002 (increase in price of product (coupon

24   inserts) did not result in decrease of insert usage); *United States v. Microsoft Corp.*, 253 F.3d 34, 53-

25   54 (D.C. Cir. 2001) (explaining that "reasonable interchangeability" requires inclusion in relevant

26   market "only [of] substitutes that constrain pricing" by seller). If the seller of product A raises the price

27

28           [1] Available at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

1  and purchasers can readily shift to product B, then product A will lose sales. But if the purchasers

2  cannot readily switch from product A to product B, then the products are not close substitutes, do not

3  meet the reasonable interchangeability test, and do not belong in the same relevant market. *Eastman*

4  *Kodak*, 504 U.S. at 481-82.

5      Thus, as discussed in the FTC Horizontal Merger Guidelines, "[t]he hypothetical monopolist

6  test may identify a group of products as a relevant market even if customers would substitute

7  significantly to products outside that group in response to a price increase." FTC Guidelines § 4.1.1

8  (providing example in which "two-thirds of the sales lost … are diverted to products outside the

9  relevant market" but nonetheless concluding that hypothetical monopolist test is satisfied). The

10  Guidelines explain:

11      Defining a market broadly to include relatively distant product or geographic substitutes
        can lead to misleading market shares. This is because the competitive significance of
12      distant substitutes is unlikely to be commensurate with their shares in a broad market.
        Although excluding more distant substitutes from the market inevitably understates
13      their competitive significance to some degree, doing so often provides a more accurate
        indicator of the competitive effects of the merger than would the alternative of including
14      them and overstating their competitive significance as proportional to their shares in an
        expanded market.
15

16  *Id.* § 4.

17      The test for interchangeability is hypothetical and asks whether purchasers would substitute

18  product B for product A if the price of B went down. The test does not require proof of an actual

19  change in price. *St. Alphonsus Med. Ctr. – Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 785

20  (9th Cir. 2015) (relevant market determination "involves prospective analysis—it predicts consumer

21  response to a hypothetical price increase"); *Rebel Oil*, 51 F.3d at 1434 (noting that relevant market is

22  determined by whether "hypothetical" set of sellers would be able to successfully raise price of their

23  products without consumers switching to products of other sellers).

24      The relevant market is frequently defined by applying economic analysis known as "'small but

25  significant nontransitory increase in price' ('SSNIP') analysis." *Epic Games*, 2020 WL 5993222 at *8.

26  Consistent with the FTC's Horizontal Merger Guidelines, this test looks to determine the relevant

27  market based on whether the rate of substitution across the entire market is enough to constrain a

28  hypothetical monopolist from raising prices by 5%. Contrary to Apple's description (Epic ECF No.

1   276 at 12), the economic SSNIP test is not just another "academic theory" but, rather, a well-settled

2   methodology that is routinely used by Courts to define the relevant market. *Theme Promotions*, 546

3   F.3d at 1002.

4          In applying a SSNIP analysis (as Epic correctly notes in its discussion of the *Cellophane* fallacy

5   and *Eastman Kodak* (Epic ECF No. 276, at 11)), courts must carefully consider whether the monopolist

6   already has raised prices above the competitive level. Apple disputes this point, but the Supreme Court

7   addressed and rejected Apple's argument in *Eastman Kodak*—holding that "[e]ven if Kodak could not

8   raise the price of service and parts one cent without losing equipment sales, that fact would not disprove

9   market power in the aftermarkets." 504 U.S. at 470-71 (quoting Areeda & Kaplow, *Antitrust Analysis*

10  ¶ 340(b) (4th ed. 1988) ("[T]he existence of significant substitution in the event of *further* price

11  increases or even at the *current* price does not tell us whether the defendant already exercises

12  significant market power.") (emphasis in original). The FTC Horizontal Merger Guidelines take the

13  same approach, recognizing that even if the rate of substitution at current prices is high enough to make

14  price increases unprofitable, that does not justify broadening the market definition in a monopolization

15  case, because a firm with monopoly power will have already raised prices above competitive levels.

16  *See* FTC Guidelines § 4.1.2 & n.5.

17         Apple also is wrong in asserting that Judge Posner somehow supports its view that there is no

18  such thing as the *Cellophane* fallacy. In *Santa Cruz Medical Clinic v. Dominican Santa Cruz Hospital*,

19  No. C93 20613 RMW, 1995 WL 853037 at *10 (N.D. Cal. Sept. 7, 1995), the court cited Judge

20  Posner's book *Antitrust Law: An Economic Perspective* and stated that Judge Posner "has rejected this

21  theory." But what the court meant was that Judge Posner rejected making the error of the fallacy, not

22  that he rejected the fallacy's existence. Indeed, in the passage of *Antitrust Law* cited by the court, Judge

23  Posner states the "elementary point" explicitly: "Reasonable interchangeability at the current price but

24  not at a competitive price level, far from demonstrating the absence of monopoly power, might well

25  be a symptom of that power; this elementary point was completely overlooked by the [*Cellophane*]

26  Court." Richard A. Posner, *Antitrust Law: An Economic Perspective* 128-29 (1976); *see also* Richard

27  A. Posner, *Antitrust Law* 150-51 (2d ed. 2001).

28

1

    **1.**      **Single Brand Markets (Joint Submission § 4.1.2)**

2

    As Epic states, the Ninth Circuit recognizes properly defined single-brand aftermarkets. (Epic

3

ECF No. 276, at 13-14.) In *Eastman Kodak*, the Supreme Court held that Kodak spare parts could be

4

a single-brand market—because the spare parts manufactured by other copier companies would not

5

work in a Kodak machine and the purchaser of the needed parts could turn only to Kodak. 504 U.S. at

6

457 ("Kodak parts are not compatible with other manufacturers' equipment, and vice versa").

7

    Kodak contended (as Apple does here) that none of that mattered if "competition exists in the

8

equipment market." *Id*. at 465 n.10. The Supreme Court rejected Kodak's argument.

9

    *First*, the Supreme Court held that Kodak's argument did not accurately reflect market behavior

10

because of the "existence of significant information and switching costs." *Id*. at 473. With regard to

11

information problems, the Court pointed out that aftermarket prices would affect initial equipment

12

sales only if the equipment purchaser knew, when the initial equipment was purchased, the extent of

13

future purchases and prices of aftermarket products. *Id*.; *see also Newcal*, 513 F.3d at 1050 (explaining

14

that "aftermarket" may constitute relevant market when switching costs "prevent consumers from

15

realizing that their choice in the initial market will impact their freedom to shop in the aftermarket").

16

    *Second*, the Supreme Court rejected Kodak's assertion that competition in the equipment

17

market would prevent the exercise of market power in a Kodak-only aftermarket, because of "the cost

18

to current owners of switching to a different product." *Eastman Kodak*, 504 U.S. at 476. To put the

19

issue in terms of this case, if the cost of switching from an iOS device to an Android device is high,

20

then Apple would be able to charge supracompetitive prices for app-distribution and IAP services

21

without causing much or any loss of equipment sales. *Id*. According to the Supreme Court, this would

22

be especially true "if the switching costs were high relative to the increase in [aftermarket] service

23

prices." *Id*. For these and other reasons, the Supreme Court held in *Eastman Kodak* that a plaintiff can

24

prove a single-brand relevant market.

25

    Nonetheless, Apple relies on *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 119 (N.D. Cal. 2008),

26

for the proposition that courts reject single-brand aftermarkets. But in *Psystar*, the plaintiff

27

manufactured computer hardware that was compatible with "a wide range of operating systems,"

28

including Apple's Mac OS, and the computer purchaser could choose from that range of alternatives.

BRIEF OF *AMICI CURIAE* DEVELOPER PLAINTIFFS
REGARDING TRIAL ELEMENTS - No. 4:20-cv-05640-YGR   -6-
010818-11/1434806 V1

1   586 F. Supp. 2d at 1193. The plaintiff in that case alleged that Apple prevented its operating system

2   from being installed on plaintiff's hardware and that Apple had restricted competition in two relevant

3   markets: (1) a market for Mac OS; and (2) a market for computer hardware hosting Mac OS. *Id*.

4   Rejecting those market allegations, the court found that: (1) Mac OS systems were reasonably

5   interchangeable with other operating systems and just one of the many operating systems a consumer

6   could choose; and (2) Apple computers with Mac OS operating systems competed with other

7   computers and operating systems and had "reasonable substitute[s]" in the eyes of the purchasers. *Id*.

8   at 1199-1200. And, the court distinguished Psystar's allegations from the ruling in *Eastman Kodak*—

9   on the ground that Psystar alleged a single-brand market in the *initial equipment market* where Apple

10  faced competitors that offered reasonably interchangeable equipment, as opposed to the aftermarket

11  single-brand market found in *Eastman Kodak*, in which the purchasers were "locked in" to only a

12  single brand. *Id*. at 1201.

13  Apple also contends that there cannot be a Kodak-like aftermarket for iOS app distribution

14  unless Apple "changed its policy after locking-in some of its customers." (Epic ECF No. 276, at 15

15  (citing *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997).) Yet, there is no such

16  lock-in timing requirement in *Eastman Kodak* or in the Ninth Circuit's precedent.[2] *Newcal*, 513 F.3d

17

18  ───────────

    [2] *PSI Repair* is also distinguishable on its facts. As Apple points out, PSI received information that

19  allowed it to take repair/life cycle information into account before buying the product. *Id*. at 820-21

    ("Honeywell and its customers engage in lengthy negotiations before the sale … This fact is hardly

20  surprising in light of the substantial price of the [$800,000] equipment."). Thus, the fully informed

    customers could comparison-shop and purchase a competing control system if the expected cost of

21  repair made a deciding difference in the overall price. *Id*. The same is true in *Lee v. The Life Ins. Co.*

    *of N.A.*, where students were *not* locked in to complete their education at URI after their first year (*i.e.*,

22  they had not paid four years of tuition in advance). 23 F.3d 14, 20 (1st Cir. 1994) (Students' effort "to

    extend *Kodak*, beyond the 'derivative aftermarket' context to the educational context, is problematic

23  at best.")

24  Apple's other cited cases are inapt. In *Digital Equip. Corp. v. Uniq Digital Technologies*, 73 F.3d

    756, 762 (7th Cir. 1996), Uniq saw "in *Kodak* the message that there is a market in a firm's own

25  products, even if it sells in vigorous competition." The court rejected the argument, and it did so in a

    way that does not help Apple here (because users would have to change operating systems to switch

26  from the App Store to the Google Play Store); *id*. at 763 ("DEC is selling a fungible commodity (CPU

    cycles) to customers who can substitute brands without changing operating systems…. A monopoly

27  this is not."). And, in *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014) the

    Federal Circuit erroneously flipped the meaning of language in *Kodak*'s footnote 24, in which the

28

1   at 1048, 1050 ("Newcal offers factual allegations to rebut the economic presumption that IKON

2   consumers make a knowing choice to restrict their aftermarket options when they decided in the initial

3   (competitive) market to enter an IKON contract."); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336,

4   1342-43 (9th Cir. 1984) (rejecting defendant's "lock-in" argument because it did not accurately

5   characterize the market).[3]

6       As the case law shows, all that matters is whether the consumer is "locked-in." While a post-

7   acquisition lock-in would be helpful evidence to a plaintiff, it is not necessary—as is made clear by

8   one of Apple's authorities. In *Avaya Inc., RP v. Telecom Labs, Inc.*, the Third Circuit "cautioned that,

9   although one important consideration is whether a unilateral change in aftermarket policy exploits

10  locked-in customers, an 'aftermarket policy change' is not the *sine qua non* of a *Kodak* claim." 838

11  F.3d 354, 402 (3d Cir. 2016) (internal citations and brackets omitted). The Third Circuit continued that

12  "[o]ther factors to consider include evidence of (1) supracompetitive pricing, (2) the seller's dominant

13  share of the relevant aftermarket, (3) significant information costs that prevent lifecycle pricing, and

14  (4) high switching costs that serve to lock in the seller's aftermarket customers." *Id.*

15      Finally, "[i]t is important to make clear that single-brand market definitions are not formally

16  limited to the aftermarket context":

17          Single-brand market allegations are usually rejected because they are
            consistently pled in a manner that lacks plausibility or is otherwise untethered
18          to economic reality. Accordingly, an antitrust plaintiff may succeed in defining
            a single-brand relevant market if it can establish that a product's characteristics
19          make it unique or circumstances prevent consumers from substituting
            alternatives for the same purposes.
20

21  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 344 (E.D.N.Y. 2019)

22  (internal citations, quotation marks, and emphasis omitted); *see also US Airways, Inc. v. Sabre*

23  *Holdings Corp.*, 938 F.3d 43, 66 n.8 (2d Cir. 2019). The question is whether a plaintiff can show a

24  _____

25  majority pointed out that a fact "crucial" to the *dissent's hypothetical argument* supporting summary
    dismissal was in fact missing – and *not* that the fact was crucial to the *Kodak* Court's ruling.

26      [3] While stating that *Digidyne* had been "implicitly overruled" by *Illinois Tool Works* because
    *Digidyne* had relied on "the presumption of market power for copyrighted or patented products,"
27  *Psystar* distinguished the case on the grounds that the Ninth Circuit had "emphasized the presence of
    market imperfections such [as] switching costs and customer 'lock-in'" – which had not been alleged
28  in *Psystar*. 586 F. Supp. 2d at 1197 n.3.

1    relevant market using appropriate economic analysis or practical indicia. In this regard, even if the iOS

2    distribution and IAP services are not an *aftermarket* under *Eastman Kodak*, they could alternatively

3    constitute a *submarket* under the "practical indicia" test of *Brown Shoe*. *See Newcal*, 513 F.3d at 1045

4    (Submarket is "economically distinct from general product market" and can be determined based on

5    *Brown Shoe* indicia.). As addressed in the Joint Submission (Epic ECF No. 276, at 16), such a

6    submarket can be established by, among other things, "public recognition" of the iOS app distribution

7    market "as an economic entity." *Newcal*, 513 F.3d at 1045 (quoting *Brown Shoe*, 370 U.S. at 325).[4]

8           ## 2.    Two-Sided Markets (Joint Submission § 4.1.4)

9           Epic accurately describes the legal framework governing two-sided markets. But these

10   considerations do not come into play unless the App Store is a two-sided *transaction* platform. As

11   explained by the Supreme Court, a transaction platform must exhibit indirect network effects *and*

12   simultaneity. *US Airways*, 938 F.3d at 57 ("[Transaction] platforms inherently 'exhibit more

13   pronounced indirect network effects and interconnected pricing and demand' than other types of two-

14   sided platforms, because transaction platforms require that 'both sides of the platform simultaneously

15   agree to use their services.' As a result, '[e]valuating both sides of a two-sided transaction platform is

16   … necessary to accurately assess competition.'") (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

17   2286–87 (2018) (hereinafter, "*Amex*")).

18          Even when the relevant market is properly defined as a two-sided transaction market, the

19   defendant will be found to have engaged in anticompetitive conduct that causes "actual detrimental

20   effects on competition" if the plaintiff demonstrates that challenged conduct increased the net two-

21   sided price of the transaction above the competitive level, reduced the number of two-sided

22   transactions, or otherwise stifled competition in the two-sided market. *Amex*, 138 S. Ct. at 2284, 2287.

23          In defining two-sided markets, the SSNIP test can appropriately be applied. In *United States v.*

24   *Sabre Corp.*, the court rejected the DOJ market definition for not taking both sides into account; the

25

26   _____

27   [4] *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 243-44 (1948) (Court should not disregard the commercial realities of the market; rejecting argument that non-competitive beet industry should be viewed as part of the competitive agricultural market generally – "[t]o compare

28   an industry so completely interlocked in all its stages … is to ignore the facts of industrial life").

court did not say SSNIP tests could not be used in two-sided markets. 452 F. Supp. 3d 97, 137-38 (D. Del. 2020). Likewise, contrary to Apple's argument, (Epic ECF No. 276, at 12), the academic work it cites does not reject application of a SSNIP test to a two-sided transaction market, rather its author argues that the SSNIP test should simply be modified to instead assess "the profitability of an increase in the price level (*i.e.* the same of the prices paid for the transaction by the two sides)." *See* Filistrucchi, *Market Definition in Multi-Sided Markets*, OECD Paper (2018) at ¶ 83. It also bears note that courts assessing two-sided markets have analyzed interchangeability on only one side of the market. *See, e.g.*, *US Airways*, 839 F.3d at 64-67.

**B.     Section 2 of the Sherman Act Monopolization – Monopoly Power (Joint Submission § 7.1)**

Developers also generally agree with the analytical framework Epic provides for determining monopoly power within the relevant market, a necessary element of a § 2 claim. (Epic ECF No. 276, at 10-11.) Apple's discussion of monopoly power improperly elevates an observation to a legal requirement. Quoting *Kolon Indus. v. E.I. DuPont de Nemours & Co*., 748 F.3d 160, 174 (4th Cir. 2014), Apple asserts that the "Supreme Court has never found a party with less than 75% market share to have monopoly power." (Epic ECF No. 276, at 53). But *Kolon* did not characterize 75% as a baseline. Rather, the Fourth Circuit stated that its own "bottom of the range" was a 70% share and that even that number was not an absolute requirement. 748 F.3d at 174 ("Kolon is correct that DuPont's market share of less than 60% during the relevant period does not necessarily foreclose a finding of monopoly power" although "it does weigh heavily against such a finding").

The *Cameron* plaintiffs allege supracompetitive prices for Apple's distribution services. While Apple argues that plaintiffs must show decreased output in addition to supracompetitive pricing in order to succeed with direct evidence of monopoly power (Epic ECF 276, at 52-54), supracompetitive pricing, *or* restricted output, is ample to demonstrate anticompetitive effects. And the word "or" is the appropriate conjunction. *See Epic Games*, 2020 WL 5993222, at *7 ("Monopoly power … can be defined as 'the power to control prices *or* exclude competition'") (quoting *United States v. Grinnell*, 384 U.S. 563, 571) (1966) (emphasis added). As a practical matter, however, a company with power to control price will generally also have the power to exclude competition and reduce output—

otherwise, competitors would enter and compete on price. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) ("If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power."); *Kolon*, 748 F.3d at 174 (noting that, if DuPont had market power, it could have prevented competitor from taking market share).

The power to control price or exclude competition "may be demonstrated through either of two types of proof." *Rebel Oil*, 51 F.3d at 1434. It may be proven by either "direct evidence of the injurious exercise of market power" or by "circumstantial evidence pertaining to the structure of the market" (*i.e.*, high market share). *Id.*; *Microsoft*, 253 F.3d at 51 (explaining that monopoly power may be proven by (1) direct evidence that defendant raised price or excluded competition or (2) circumstantial evidence of defendant's dominant market share, from which monopoly power is inferred).

Under the direct method of proof, the plaintiff demonstrates that defendant has actually injured competition by, for example, restricting output, raising price, or reducing quality, which "is direct proof of [an] injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil*, 51 F.3d at 1434; *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1968) ("proof of actual detrimental effects such as a reduction of output" obviates the need for further inquiry into market power "which is but a surrogate for detrimental effects"); *Microsoft*, 253 F.3d at 51 (defining power to control price as ability to "profitably raise prices substantially above the competitive level" and stating that "[w]here evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear") (citing *Rebel Oil*, 51 F.3d at 1434, and *Indiana Fed'n of Dentists*, 476 U.S. at 460-61).

Under the indirect or circumstantial method of proving market power, "a plaintiff must: (1) define the relevant market, [and] (2) show that the defendant owns a dominant share of that market." *Rebel Oil*, 51 F.3d at 1434. Monopoly or market power is then inferred from the dominant share of the market. *Id.*[5]

---

[5] When the direct method of proving market power is used, however, there is no need to prove that defendant has a high share of the market to prove market power. In *Indiana Federation of Dentists*, the FTC did not define a relevant market at trial, much less prove the defendant's share of that market. 476 U.S. at 453. Nonetheless, the Supreme Court held that the FTC's direct proof of "actual, sustained

1    Finally, Apple contends that a rate-of-return analysis reveals very little about a defendant's

2    market power, and that no circuit has used "such measures to ascertain market power." (Epic ECF No.

3    276, at 54.) Yet, Apple's contentions ignore the Second Circuit's decision in *US Airways*, 938 F.3d at

4    60-62, which is one of Apple's cited cases. In that case, the Second Circuit spoke favorably regarding

5    the rate-of-return analyses conducted by the plaintiffs in terms of demonstrating supracompetitive

6    pricing—which, as discussed above, is direct evidence of market power, obviating the need to both

7    define the relevant markets and show that the defendant owns a dominant share.

8    **C.    Section 2 of the Sherman Act – Willful Acquisition or Maintenance of Monopoly Power Defined (Joint Submission § 7.2)**

9    
10   As Epic correctly asserts, monopolization under § 2 of the Sherman Act has two elements:

11   "(1) the possession of monopoly power in the relevant market[;] and (2) the willful acquisition or

12   maintenance of that power." *Grinnell Corp.*, 384 U.S. at 570-71; *Qualcomm,* 969 F.3d at 990 (adding

13   third element of antitrust injury).[6] In order to constitute willful acquisition or maintenance of monopoly

14   power, the defendant's conduct must be "fairly characterized as 'exclusionary' or 'anticompetitive' …

15   or 'predatory'." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602, 605 (1985);

16   *MetroNet Servs. Corp. v. West Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004) (plaintiff must show that

17   defendant obtained or maintained monopoly power through "exclusionary conduct"); *Qualcomm*, 969

18   F.3d at 990 (possession of monopoly power is unlawful if "it is accompanied by an element of

     anticompetitive conduct").

19   
20   Conduct that is exclusionary, predatory, or anticompetitive means "behavior that not only (1)

21   tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits

22   or does so in an unnecessarily restrictive way." *Aspen Skiing Co.*, 472 U.S. at 605 n.32. And "[i]f a

23   firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize

24   adverse effects on competition" was sufficient to demonstrate that the defendant enjoyed market power

25   and that the FTC's "failure to engage in detailed market analysis is not fatal to its finding of a violation of the Rule of Reason." *Id*. at 460-61.

26   [6] If plaintiffs show monopoly or monopsony power, and willful acquisition or maintenance of that power (the first and second parts of the three-part test), the last part (causation) "may be inferred 'when

27   exclusionary conduct is aimed at producers of nascent competitive technologies as well as when it is aimed at producers of established substitutes.'" *Epic Games*, 2020 WL 5993222, at *9 (quoting

28   *Microsoft*, 253 F.3d at 79); *Qualcomm*, 969 F.3d at 992.

1    its behavior as predatory." *Id.* at 605; *see also Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883,

2    894 (9th Cir. 2008) (anticompetitive conduct is defined as "behavior that tends to impair the

3    opportunities of rivals and either does not further competition on the merits or does so in an

4    unnecessarily restrictive way"); *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 818 (9th

5    Cir. 1992) ("[a] defendant's behavior may fairly be characterized as predatory when the defendant is

6    attempting to exclude rivals on some basis other than efficiency") (citation and internal quotation

7    marks omitted).

8         Thus, in this case, Apple's conduct may be found to be anticompetitive if it substantially

9    foreclosed the market. *Qualcomm*, 969 F.3d at 1003 (substantial foreclosure means that "the

10   opportunities for other traders to enter into or remain in that market [are] significantly limited")

11   (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)).

12        Likewise, Apple's conduct may be found to be anticompetive if it prevents consumer choice.

13   A primary goal of the Sherman Act is maximizing consumer choice, so exclusionary conduct that

14   reduces consumer choice is destructive of competition and constitutes an anticompetitive effect within

15   the meaning of the Act. *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*,

16   459 U.S. 519, 528 (1983) ("[A]ctivity that prevents its victims from making free choices between

17   market alternatives is inherently destructive of competitive conditions and may be condemned even

18   without proof of its actual market effect"). As the Supreme Court has stated, "[a]n agreement limiting

19   consumer choice by impeding the ordinary give and take of the market place … cannot be sustained

20   under the Rule of Reason." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. at 459; *see also NCAA v. Bd.*

21   *of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 107 (1984) ("[A] restraint that has the effect of

22   reducing the importance of consumer preference in setting price" is inconsistent "with this fundamental

23   goal of antitrust law"); *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692-93 (1978)

24   (conduct that "substantially deprives the consumer of the ability to utilize and compare prices"

25   adversely affects competition). An adverse effect on competition violative of the Sherman Act occurs

26   if "the plaintiff … show[s] that diminished consumer choices and increased prices are … due to either

27   artificial restraints or predatory and exclusionary conduct." *Qualcomm*, 969 F.3d at 990.

28

As a potentially relevant example here, a plaintiff may show that the defendant has obtained or maintained monopoly power through anticompetitive conduct by entering into exclusive dealing arrangements. *See, e.g.*, *Microsoft*, 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 197 (3d Cir. 2005) ("[E]vidence of … exclusive dealing [may] support the [Section 2 claim]"); *Masimo Corp. v. Tyco Health Care Grp., LP*, No. CV 02-4770 MRP, 2006 WL 1236666, at *11 (C.D. Cal. March 22, 2006) (exclusive dealing arrangement analyzed as § 2 violation). Exclusive dealing arrangements include agreements "between a vendor and a buyer that prevents the buyer from purchasing a given good [or service] from any other vendor." *Qualcomm*, 969 F.3d at 1003 (quoting *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 (9th Cir. 2010)). Exclusive dealing arrangements also include agreements that foreclose a vendor from selling to a competitor of the buyer. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) (exclusive dealing arrangements restrains "buyers or sellers").

The critical factor in determining whether "the competition foreclosed … constitute[s] a substantial share of the relevant market." *Tampa Elec.*, 365 U.S. at 328 (noting that the anticompetitive effect of prohibited exclusive dealing arrangements is that they "significantly limit[]" the "opportunities for other traders to enter into or remain in [the relevant market]"); *see also Qualcomm*, 969 F.3d at 1003 (same); *Microsoft*, 253 F.3d at 68-69 (whether an exclusive dealing agreement is anticompetitive depends on whether "its probable effect is to foreclose competition in a substantial share of the [market]"). In determining the degree of market foreclosure, the courts look not only at the share of the market that is foreclosed to actual competitors by the exclusive dealing arrangement, but also the share foreclosed to potential entrants into the market. *Tampa Elec.*, 365 U.S. at 328 (issue is whether exclusive dealing agreements "significantly limited" opportunities for competitors to "enter into or remain in that market"); *Qualcomm*, 969 F.3d at 1003 (same).

Total exclusion from the market is not required. The "test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply*, 399 F.3d at 191. In determining whether the exclusive agreements are anticompetitive, the courts also look to (1) whether the exclusive dealing agreements "create or extend market power of a

1  supplier or the purchaser party to the exclusive dealing arrangement." *Jefferson Parish*, 466 U.S. at 45

2  (O'Connor, J., concurring); (2) whether the exclusive dealing agreement has the effect of "preserving

3  [defendant's] monopoly" and preventing "any other rival [from] pos[ing] a real threat to [defendant's]

4  monopoly," *Microsoft*, 253 F.3d at 70-71; (3) the "relative strength of the parties" and "the probable

5  immediate and future effects which pre-emption of that share of the market might have on effective

6  competition therein," *Tampa Elec.*, 365 U.S. at 329; and (4) whether "the practical effect of [the]

7  program was to make it economically infeasible for [the restricted party] to … switch to [a rival]," thus

8  preventing rivals "from becoming an effective competitor," *McWane, Inc. v. FTC*, 783 F.3d 814, 834,

9  841 (11th Cir. 2015).

10          Alternatively, as Epic asserts, Apple's conduct can be found to be anticompetitive *per se* to the

11  extent it engages in an unlawful tie. In this regard, tying claims are not limited to § 1 of the Sherman

12  Act; they also may be prosecuted under § 2 as illegal *per se* or as unlawful under the Rule of Reason.

13  *See California Glazed Prods., Inc. v. The Burns and Russell Co.*, 708 F.2d 1423, 1427 (9th Cir. 1983)

14  ("Tying arrangements traditionally have been treated as per se illegal under Section 2 of the Sherman

15  Act and Section 3 of the Clayton Act, 15 U.S.C. § 14 (1976)."); *CollegeNet, Inc. v. Common

16  Application, Inc.*, 355 F. Supp. 3d 926, 953-56 (D. Or. 2018) (denying motion to dismiss tying claim

17  brought under §§ 1 and 2).[7] "[T]he essential characteristic of an invalid tying arrangement lies in the

18  seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied

19  product that the buyer either did not want at all, or might have preferred to purchase elsewhere on

20  different terms." *Jefferson Parish*, 466 U.S. at 12. "When such 'forcing' is present, competition on the

21  merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.*[8]

22          **1.      Rule of Reason Analysis – No Less Restrictive Alternative and Balancing (Joint
23                  Submission §§ 7.2.1, 7.2.3, 7.2.4)**

24          As this Court already held, "Anticompetitive conduct is evaluated under the 'rule of reason'."

25  *Epic Games*, 2020 WL 5993222, at *9 (quoting *Qualcomm*, 969 F.3d at 991). Apple nonetheless

26  ───────────────
          [7] As to tying, see the *Cameron* operative complaint (¶¶ 29, 43, 93, 116, 127, 134, 146, 159).

27          [8] Again, Developers note that here, as elsewhere, they do not seek to articulate all theories of
28  anticompetitve conduct alleged in their complaint but comment only on the legal framework as relevant
   to the trial in *Epic Games v. Apple*.

1     contends that, under the rule of reason in a § 2 case, the plaintiff cannot rebut defendant's

2     procompetitive justification by showing that the procompetitive benefits achieved by defendant's

3     conduct (1) could be achieved by a less restrictive alternative or (2) are outweighed by its

4     anticompetitive effects. (Epic ECF No. 276, at 62, 65, 66).

5          But contrary to Apple's contention, the Ninth Circuit held in *Qualcomm* that the "three-part

6     burden-shifting test under the rule of reason" applies "[r]egardless of whether the alleged antitrust

7     violation" is brought under § 1 or § 2 of the Sherman Act. 969 F.3d at 991. If the plaintiff "establishes

8     a *prima facie* case under § 2 by demonstrating anticompetitive effect," the defendant may "proffer a

9     procompetitive justification" by showing that "the conduct is indeed a form of competition on the

10    merits." *Id.* (internal citations and quotation marks omitted). Then the burden would "shift[] back to

11    the plaintiff to rebut that [procompetitive] claim." *Id.* And even if plaintiff "cannot rebut the

12    [defendant's] procompetitive justification," the plaintiff may still prevail by "demonstrat[ing] that the

13    anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.*

14         While Apple's cited authorities address the question of whether, to avoid § 2 liability,

15    companies must design and innovate with "less restrictive alternatives" in mind, *see Image Tech.*

16    *Servs.*, 125 F.3d at 1212-13, this Court previously has made plain that anticompetitive behavior by an

17    unlawful monopolist is always actionable under § 2. Thus, for example, Apple's conduct may violate

18    § 2 if its behavior associated with the introduction of the App Store (and IAP), or enforcement of

19    agreements, rules, and policies related to the use of the App Store (and IAP), "'constitutes an

20    anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of

21    attempting to monopolize the relevant market.'" *In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp.

22    2d 1137, 1143 (N.D. Cal. 2011) (Ware, J.) (citation and quotation marks omitted).

23    **II.     FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT (JOINT SUBMISSION § 9)**

24         As Epic indicates with respect to the Foreign Trade Antitrust Improvements Act ("FTAIA"),

25    the jurisdictional requirement of the Sherman Act that interstate commerce be involved "can also be

26    satisfied by foreign commerce that is cognizable under the FTAIA." Yet, the FTAIA does not purport

27    to cover commerce that is not foreign. 15 U.S.C. § 6a; *United States v. Hui Hsiung*, 778 F.3d 738, 754-

28    55 (9th Cir. 2015). Thus, for example, it does not apply simply because an end-user consumer in India

might be the ultimate purchaser of a U.S. developer's application. When a U.S. entity is aggrieved by Sherman Act violations pertaining to its business with another U.S. entity, the FTAIA does not apply; The interstate commerce requirement of the Sherman Act is met in such instances by way of the business between those two American entities. 15 U.S.C. § 6a; *Hui Hsiung*, 778 F.3d at 754-55.

## III.   CALIFORNIA UNFAIR COMPETITION LAW (JOINT SUBMISSION § 18.4)

The plaintiff class has filed suit not only under the federal antitrust laws but, also, under the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")). The UCL prohibits any "unlawful" business act or practice, and the violation of any federal or state statute governing business conduct may serve as the predicate unlawful act. *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (Cal. 1992); *Clerkin v. MyLife.Com, Inc.*, No. C 11-99527 CW, 2011 WL 3607496, at *6 (N.D. Cal. Aug. 16, 2011) (stating that "[v]iolation of almost any federal, state or local law may serve as a basis for a UCL claim").

## IV.   PREVIEW OF DEVELOPER-FOCUSED ISSUES

This submission addresses the legal framework that applies to claims asserted in the *Epic Games v. Apple* case. Unlike that case, *Cameron* will be tried to a jury and involves many different issues—including (among other things) direct-purchaser standing, claims for treble and overcharge damages, and a relaxed burden of proof regarding damages on antitrust claims. The legal framework that applies in *Cameron* will thus vary in significant respects from the framework addressed in this submission.

1    DATED: February 5, 2021                    HAGENS BERMAN SOBOL SHAPIRO LLP

2
                                               By    */s/ Steve W. Berman*
3                                                   STEVE W. BERMAN (*pro hac vice*)

4                                              Robert F. Lopez (*pro hac vice*)
                                               Theodore Wojcik (*pro hac vice*)
5                                              1301 Second Avenue, Suite 2000
                                               Seattle, WA 98101
6                                              Telephone: (206) 623-7292
                                               Facsimile:  (206) 623-0594
7                                              steve@hbsslaw.com
                                               robl@hbsslaw.com
8                                              tedw@hbsslaw.com

9
                                               Shana E. Scarlett (SBN 217895)
10                                             Benjamin J. Siegel (SBN 260260)
                                               Ben Harrington (SBN 313877)
11                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                               715 Hearst Avenue, Suite 202
12                                             Berkeley, CA 94710
                                               Telephone: (510) 725-3000
13                                             Facsimile:  (510) 725-3001
                                               shanas@hbsslaw.com
14                                             bens@hbsslaw.com
                                               benh@hbsslaw.com
15

16                                             *Interim Class Counsel in Cameron, et al.*
                                               *v. Apple Inc., No. 4:19-cv-03074-YGR*
17

18                                             Joseph M. Vanek (*pro hac vice*)
                                               Eamon P. Kelly (*pro hac vice*)
19                                             SPERLING & SLATER, P.C.
                                               55 W. Monroe Street, 32nd Floor
20                                             Chicago, IL 60603
                                               Telephone: (312) 676-5845
21                                             Facsimile:  (312) 641-6492
                                               jvanek@sperling-law.com
22                                             ekelly@sperling-law.com

23
                                               *Counsel for Developer Plaintiffs in Cameron, et al.*
24                                             *v. Apple Inc., No. 4:19-cv-03074-YGR*

25

26

27

28