Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

IN RE: APPLE IPHONE ANTITRUST    )    NO. 11-06714-YGR
LITIGATION,                      )        19-03074-YGR
                                 )        20-05640-YGR
_____ )

                            San Francisco, California
                            Wednesday, February 23, 2021

            <u>TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS</u>

<u>APPEARANCES</u>: (Appearances via Zoom videoconference.)

For Developer Plaintiffs:

                        HAGENS BERMAN SOBOL SHAPIRO LLP
                        1301 Second Avenue - Suite 2000
                        Seattle, Washington 98101
                 BY:    ROBERT F. LOPEZ
                        ATTORNEY AT LAW
For Apple, Inc.:

                        GIBSON, DUNN & CRUTCHER LLP
                        333 South Grand Avenue
                        Los Angeles, California 90071
                 BY:    JAGANNATHAN SRINIVASAN
                        ATTORNEY AT LAW

                        MCDERMOTT WILL & EMERY LLP
                        2049 Century Park East
                        Los Angeles, California 90067
                 BY:    MICHELLE S. LOWERY
                        ATTORNEY AT LAW


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**<u>APPEARANCES</u>:   (CONTINUED)**

For Non-party Valve Corporation:
                        FOX ROTHSCHILD LLP
                        1001 Fourth Avenue - Suite 4500
                        Seattle, Washington 98154
                   BY:  **GAVIN W. SKOK**
                        **ATTORNEY AT LAW**

                        FOX ROTHSCHILD LLP
                        345 California Street - Suite 2200
                        San Francisco, California 94104
                   BY:  **JAEMIN CHANG**
                        **ATTORNEY AT LAW**

```
 1   Wednesday - February 23, 2021                      9:05 a.m.

 2                      P R O C E E D I N G S

 3                          ---o0o---

 4        THE CLERK:  Hi.  Good morning, everyone.  We are here

 5   in Civil Action 11-6714, In Re: Apple iPhone Antitrust

 6   Litigation; and Case Number 19-3074, Cameron, et al., versus

 7   Apple, Inc.; and 20-5640, Epic Games, Inc. versus Apple, Inc.

 8        The Honorable Thomas S. Hixson presiding.

 9        Counsel, please state your appearances.  Let's start with

10   Mr. Skok.

11        MR. SKOK:  Good morning, Your Honor.  Gavin Skok on

12   behalf of Valve Corporation.

13        THE COURT:  Good morning.

14        THE CLERK:  Ms. Chang?

15        MR. CHANG:  Good morning.  This is Jaemin Chang for

16   non-party Valve Corporation.

17        THE COURT:  Good morning.

18        THE CLERK:  Mr. Lopez?

19        MR. LOPEZ:  Rob Lopez for the developer plaintiffs in

20   the Cameron matter.

21        THE COURT:  Good morning.

22        MR. LOPEZ:  Good morning.

23        THE CLERK:  And Apple?

24        MR. SRINIVASAN:  Good morning, Your Honor.  Jay

25   Srinivasan of Gibson Dunn for Apple.
```

**PROCEEDINGS**

1          **THE COURT:**  Good morning.

2          **MS. LOWERY:**  Good morning, Your Honor.  Michelle

3  Lowery for Apple as well.

4          **THE COURT:**  Good morning.

5      I have a procedural question for Apple, and that -- first

6  with respect to RFP Number 2, it asked for documents sufficient

7  to show, since 2008, a number of different items.

8      During meet and confer, did Apple offer to narrow this at

9  all, such as according to time frame or is the full scope of

10  RFP 2 at issue?

11          **MR. SRINIVASAN:**  Your Honor --

12          **MR. SKOK:**  Your Honor, Gavin Skok.

13      Apple did offer to narrow those from 2015 to the present.

14          **THE COURT:**  And, Apple, is that right?

15          **MR. SRINIVASAN:**  That's correct, Your Honor.

16          **THE COURT:**  Okay.  With respect to RFP 32, during meet

17  and confer, did Apple limit this request to 436 specific apps,

18  and limit the date range to 2015 to the present?  Let me ask

19  Apple.

20          **MR. SRINIVASAN:**  Yes, Your Honor.  And that was an

21  effort to address their concern about the 30,000-odd titles

22  that they indicated that they had on the store for the period

23  that we had asked for.

24          **THE COURT:**  Okay.  Thank you.

25      And then the 436 specific apps, were those apps that were

1    available on both Steam and the Epic Games Store; is that how

2    you came up with that list?

3            **MR. SRINIVASAN:**  That is correct, Your Honor.  And I'm

4    happy to speak to that as to, you know, why we made that

5    limitation if you're interested; but that's correct.

6            **THE COURT:**  Sure.  Why don't you go ahead.

7            **MR. SRINIVASAN:**  Yeah.  And so the relevance of

8    those 436 titles, I think, are a little bit different than what

9    we've typically been speaking about with this Court.

10       As you may recall, Your Honor, the issue -- one of the

11   issues we have in this case is whether there are

12   anticompetitive effects from Apple's administering of the App

13   Store in iOS.  Epic contends that if they enter the iOS

14   platform, that commissions will go down, and prices will go

15   down, and other pro-competitive effects that that currently

16   aren't present will happen.  Of course, we dispute that.

17       A very relevant analog here is what's happening on the PC

18   platform.  Of course, you know, for us and, as we clarified to

19   the Court in prior hearings or after prior hearings, you know,

20   for us game transactions is the relevant market.  And a major

21   hub of game transactions is the Steam Store.  And, in fact,

22   they're the dominant incumbent on the PC platform.

23       And our view is Epic Games Store came in as an entrant and

24   had a different commission model than the Steam Store did.  And

25   we think it would be instructive to show and it would be very

**PROCEEDINGS**

1    relevant for us to understand what happened to commissions and

2    prices when Epic, as a new entrant there, came in to compete

3    against the Steam Store on the PC platform.

4        And that's primarily why we are willing to say:  Look.

5    If -- we don't need all 30,000 titles, but it will be very

6    instructive for us in understanding this relevant market, what

7    we believe to be the relevant market, and how it operates.

8        And what effects new entrants would have on it, would be

9    illustrated by the episode between the Epic Games Store and the

10   Steam Store.  And so the titles where they share seem

11   particularly relevant and in an area where we could compromise.

12       **THE COURT:**  I see.  And so Steam, as I understand it,

13   has a similar pricing structure to the Apple App Store,

14   30 percent commission; is that right?

15       **MR. SRINIVASAN:**  That's correct, Your Honor.  And I

16   think it's also publicly known that Epic came in at a lower

17   commission rate.

18       **THE COURT:**  Got it.  Okay.

19       So the effect of new entrants, I see.  And is this also

20   discovery into market definition?

21       **MR. SRINIVASAN:**  It is, Your Honor.  In an ideal

22   world, we would get all 30,000 titles because it would inform

23   the broader market to show that, again, in our market of game

24   transactions, this is a significant player, meaning the Steam

25   Store.  And to understand what the availability there is and

**PROCEEDINGS**

1  what the pricing is, they do share titles with Apple, from time

2  to time.

3      So that would be -- our ideal scenario would be to get all

4  of the data, but in response to their, you know, complaints

5  about burden, we thought we would try to accommodate them and

6  at least achieve the focused purpose, the effect on

7  competition, but would also serve to give us some window on the

8  relevant market.

9      **THE COURT:**  Got it.

10     Okay.  So principally this is the effect on competition,

11 but there is also some information you would likely get about

12 the relevant market?

13     **MR. SRINIVASAN:**  That's correct, Your Honor.

14     **THE COURT:**  Got it.

15     Well, then let me hear from Valve, your thoughts on the

16 effect on competition, that theory of relevance.

17     **MR. SKOK:**  Your Honor, Gavin Skok on behalf of Valve.

18     So where we start is Valve doesn't compete in any way,

19 doesn't even participate in the mobile market.  And so what we

20 are is a PC games --

21             (Court reporter interruption.)

22     **MR. SKOK:**  So with respect to the competition piece --

23 I believe I may have lost audio.  Doesn't anyone -- can you

24 hear me?

25     **THE COURT:**  We can hear you now.

PROCEEDINGS

1           **MR. SKOK:** All right.  Hey.  Sorry about that, all.

2      So as I was saying, Valve doesn't participate in the

3  mobile market.  Valve doesn't make products for phones or iPads

4  or anything like that.  Valve operates Steam, which is a PC

5  gaming platform.  And you can play it on refresh your laptop,

6  you play it on you desktop.  This isn't kind of a one-to-one

7  cross --

8                    (Court reporter interruption.)

9           **MR. SKOK:** Let me give it one more shot.

10          **THE COURT:** Uh-oh.  His screen is frozen.

11                    (Pause in proceedings.)

12          **MR. SKOK:** I don't want to waste anyone's time.  If I

13  do happen to drop out again, Ms. Chang, please take over.

14      Your Honor, going back to where we started, Valve does not

15  participate in that mobile market, and doesn't make apps for

16  the mobile market.  You can't use them on Steam, which is a --

17                    (Court reporter interruption.)

18          **MR. SKOK:** If I have lost audio -- Jaemin, go ahead,

19  please.

20          **MR. CHANG:** Your Honor -- Gavin -- we apologize for

21  the tech aspects.

22      Gavin, you might want to just call in on the dial-in

23  number.

24      So the point we're trying to make is:  Valve is not

25  operating in the mobile apps world.  What we're selling on

**PROCEEDINGS**

1  Steam is essentially games that you play on your laptop or your

2  PC desktop.  So we believe we're not in the same market

3  definition that we have read so far in this case.  What Epic

4  does and what Apple does in connection with how they are

5  playing in this market, we're not in the mobile market, period.

6       **THE COURT:**  Well, let me push back on that a little

7  bit because one of issues that's in dispute is what is the

8  definition of the relevant market.  The plaintiffs in general

9  want a narrowly-defined market that's just the iOS, and Apple

10  wants it to be video games.

11       So that -- and Judge Gonzalez Rogers noted the difference

12  in the proposed market definitions and her order regarding the

13  preliminary injunction in the 20-5640 action.  And I'm just

14  managing discovery, so I don't know how she is going to end up

15  defining the relevant market.  She could go narrow like the

16  plaintiffs want or broad like Apple wants or somewhere in

17  between.  I don't think I can make strong assumptions about how

18  the merits are going to be adjudicated in the future.

19       Why shouldn't I allow Apple to take discovery into its

20  proposed market definition?  Maybe they'll win, maybe they'll

21  lose on that fight; I don't know.  But why should I cut them

22  off right at the discovery phase?

23       **MR. CHANG:**  Your Honor, I appreciate your concern

24  here.

25       What -- how we got here has to do with what we understand

1    Apple -- to be their position; Apple's position in terms of how

2    the discovery they seek from us is relevant.

3        So the way we see it is three different layers of

4    arguments here.  First is, we've also reviewed Your Honor's

5    various discovery orders wherein Apple has specifically stated

6    that their market definition has to do with Epic and Epic

7    alone.  So when we read that order, we saw the market

8    definition being more narrow than what's being presented here

9    today.  And especially --

10       **THE COURT:**  I can certainly appreciate how you got

11   that impression.  It is true that in a prior discovery hearing

12   Apple leaned so heavily on Epic that it created that impression

13   in me that it was focused on Epic alone; and in a later

14   discovery letter brief, Apple clarified that that's not really

15   their position.  And I appreciated that, but it may be that my

16   prior order failed to capture Apple's actual position.

17       **MR. CHANG:**  Thank you for that background, Your Honor.

18       So those discussions, unfortunately, you know, didn't

19   really get fleshed out during the meet and confer.  We saw what

20   the order said and the order specifically cites to Apple's

21   concession that the market definition is Epic alone.  So that's

22   just to give you a background of what our position is and how

23   we ended up here today, Your Honor.

24       So we see the relevance as being an issue because we're in

25   a different market altogether.  That's the relevance issue.

1    Then we run into the third-party confidentiality issue

2    where there -- the 436 games equals potentially other third

3    parties and their sales relevant information would be

4    protected, and we wouldn't be able to release that information

5    shy of the Court's order saying this is relevant and you should

6    release it.  So there is third-party confidentiality concerns,

7    Your Honor.  And third --

8        **THE COURT:**  Break that down.  With respect to

9    third-party confidentiality concerns, you identified two

10   concerns.  One is pricing and the other is sales volume.

11   Is the pricing actually confidential?  I would think that

12   anyone on the Steam Store could find the pricing.

13       **MR. CHANG:**  Your Honor, if you're talking about the

14   sales and financial data in general being confidential, as you

15   can see in the Request Number 2 and Number 3, that the kind of

16   information they want isn't just "What is the price?".  And if

17   that's the case, then that information is available from Steam.

18   We have allowed Steam to have various access to Steam's out --

19   public-facing component of our website so that they could get

20   that information without having to have us compile every single

21   component of the RFPD Number 2 and 32.

22       **MR. SKOK:**  Ms. Chang, may I just add one thing, if you

23   all can hear me now?

24       **THE COURT:**  Sure.

25       **MR. SKOK:**  My apologies.

**PROCEEDINGS**

1        Your Honor, with respect to the pricing, there is plenty

2   of public-facing pricing information, as Ms. Chang said.  Steam

3   is open to anyone.  It's free to create an account.  The

4   challenge that we have is, there are over 30,000 games on

5   there, and each game can be sold individually; it can be sold

6   as a package with different virtual items.  Each game can also

7   have additional content you can buy, or even virtual items you

8   can buy.  And so we talk about 30,000 games, but really the

9   universe is well over 100,000 different items that are for sale

10  on Steam.

11       And that just gives you a sense of the kind of burden we

12  would be looking at if we started digging into anything like

13  sales or individual pricing.

14       The challenge that we have with pricing in particular is

15  that not only is it public-facing and Apple can go get it

16  themselves, but we don't -- the prices are controlled by the

17  third-party developers who put their products on Steam.  This

18  is not something that Valve takes charge of or runs.  There is

19  no kind of central, organized database that has exactly what

20  they want.

21       I think we outlined in our brief, this is a lot of work to

22  identify -- they gave us a list of 436 games.  We would have to

23  identify what are each of the versions; each of the items

24  available in those games; who made those; and then we would

25  have to do a series of database queries to pull together the

1   information.  In fact, we would have to do eight separate

2   queries just to pull all of the information about historical

3   pricing, all of the information about sales, revenue split that

4   they want.  And we would have to do that for each of those

5   items.

6       And you take one process just for one item, and you're

7   already looking at a lot of work.  You multiply that out by the

8   well over 1,000 times we would have to do it, and suddenly you

9   have Valve -- which is a company that has 350 employees, almost

10  all of which are in a single location in Bellevue, and you're

11  having to take away employees from their jobs.  You're having a

12  significant impact on the company and the distraction.

13      But the other challenge is of those 436 games, none of

14  those are Valve games.  Those are all games that are made by

15  third parties.  And just as these third parties control their

16  pricing on Steam, Valve thinks of the sale information -- and

17  the third parties do too, I'm sure -- thinks of that sales

18  information as belonging to the third party.  And so Valve

19  doesn't share that sales information with anyone else.

20      If Apple wants that sort of sales information, the place

21  to get it is not to go to Valve and try to short-circuit the

22  process.  It's to go to the third parties.

23          THE COURT:  Well, let me ask you about that.  With the

24  terms of the sales value, it's Valve's store.  I mean, Valve

25  tracks how much of each product is sold through its store.

**PROCEEDINGS**

1      Why is that confidential -- information confidential only

2    to the third party?  Isn't that also Valve's information?  Like

3    Safeway knows how many gallons of milk it sold.

4          **MR. SKOK:**  Yes.  I see what you're saying.

5      And if we look at the information on an aggregate level,

6    absolutely; that is, that's Valve's confidential information

7    and nobody knows that.  Valve is a private company; no outside

8    investors, no outside lenders.  It stayed private in part

9    because it doesn't want to deal with these regulatory issues.

10         **THE COURT:**  Well, staying private frees you from SEC

11   regulations, but it has no effect on your discovery

12   obligations.

13         **MR. SKOK:**  No, that's correct.  But I think the

14   challenge is, if you're a public company, like some of the

15   companies that have been ordered to produce information so far,

16   you've already done a lot of this work.

17      Valve, because it's small, because it's private, it

18   doesn't create these types of reports in the ordinary course of

19   business.  It's not preparing the types of monthly financial

20   reporting that you might expect to see at a public company.  It

21   doesn't have a staff of hundreds or thousands of accountants,

22   like some of these public companies.  And it doesn't prepare

23   these kind of reports on an individual, item-by-item, per-game,

24   for-the-last-six-years type of disclosure that Apple is

25   seeking.  We have to create that, and that is a lot of work.

**PROCEEDINGS**

1    That's where we start running into the different database

2    queries.  And even after we have done all of that work and

3    pulled the employees to do all that work, we still have the

4    issue that, if we're breaking this out by the 436 games that

5    they want, what we're really giving them is third-party

6    information about what is sold.  So that is third-party

7    confidential info.

8        The info that the Court asked about though, "What's

9    Valve's info?"  Apple wants to know "What does Valve make off

10   each of these transactions?"

11       **THE COURT:**  Well, let's back up.  The sales of each of

12   the 436 apps, why isn't that also Valve's information?  You

13   know how many of each of those have been sold through Steam.

14   Steam is Valve's store.

15       **MR. SKOK:**  No, that's correct.  I'm not saying that

16   Valve doesn't have this information.  I'm saying what Valve is

17   trying to do is be very respectful of the developers who sell

18   over Steam.  And that's why Valve has undertaken that challenge

19   of protecting their confidentiality.

20       That's why Valve is here today, because Valve doesn't look

21   at that as information that it's free to disclose.  That's at

22   third party's business.  That's their confidential sales

23   information.

24       And, you know, to use one particular example, there is a

25   game called "Grand Theft Auto V" on Steam.  That's also on the

**PROCEEDINGS**

1    list of 436 games that Apple gave us.  Now, that's made by a

2    third party, Rockstar Games.  And if we were to go through the

3    process Apple wants, what we have to do is we have to look at

4    Steam and we'd figure out very quickly -- and using public,

5    available information that Apple can have on its own -- that

6    there are multiple versions of Grand Theft Auto V on there.

7    Many of these are sold as packages, not just the game itself,

8    but different items with it or different downloadable content.

9    And then there are also just different individual items for use

10   in the game that you can buy.

11        So suddenly what looks like an easy query for one game

12   balloons into multiple queries for multiple items, multiple

13   versions, and then we have to figure out:  Gosh.  If Grand

14   Theft Auto is in a package with other games, how do we

15   allocate?

16        This is an awful lot of work.  And once we are done, we

17   have to go back and adjust it for things like returns; we have

18   to figure out what would Valve's revenue share have been.  And

19   then we've got to do that over and over for all 435 games on

20   the list.  And like I said --

21        **THE COURT:**  How long would this take?  Can you

22   quantify that?

23        **MR. SKOK:**  This would take well over two weeks.  And

24   that's assuming that we pulled employees to work full-time on

25   it.

1    And like I said, we don't have -- employees are not

2  fungible at Valve, and they're not plentiful either.  It is a

3  small company, particularly compared to the others who are

4  involved here.  And we would need to pull employees away to

5  focus on this entirely.  And at the end of the day --

6          **THE COURT:**  How many employees?

7          **MR. SKOK:**  So there is one person who would, in

8  particular, be used to write these queries, simply because this

9  person tends to be the -- I would say probably knows where the

10  data is more than anybody else.  That person would need to go

11  design the queries; would need to start doing some sample

12  pulls; would need to then test whether the queries are

13  accurate; refine them as needed; test along the way as results

14  were generated to look -- see if they are accurate.  And then

15  would need to design a similar process to combine all of that

16  data, compile it all together.

17    For example, if we look at pricing, you need to pull from

18  a couple of different databases after you've identified what

19  you're looking for.  One is what's the regular price.  You look

20  at the regular pricing over time and you pull from a second

21  database that shows you discounts that were done over time.

22    And even that, right there, you're writing separate

23  queries for separate databases and then you have to combine

24  everything together, and you still haven't even gotten close to

25  starting on the sale information.

**PROCEEDINGS**

1       That's an awful lot of work, particularly for a company

2   this size.  And the payoff is very small, because not only is

3   Valve not in the mobile market.  But really, at the end of the

4   day, all it shows you is, for a handful of games, what -- who

5   sold more, Valve or Epic.

6       And one of things that --

7           **THE COURT:**  I need a quantification of the burden,

8   though.  So you can do it in two weeks, and you have identified

9   one person.  Is there more involved?

10          **MR. SKOK:**  There are.  And I didn't mean to imply -- I

11  wasn't at all committing to being able to get it done in

12  two weeks.  I don't think we can.  I think it's well over

13  two weeks.

14      The person that I had in mind would write the queries and

15  would kind of design the process.  It would take his attention

16  as a process went along.  We would need at least one other

17  person to help identify some of the financial data and compile

18  it.  It is -- as it went along too.  And, of course, as we get

19  towards the end steps, with quality control, we're bringing in

20  other people as well.

21      It is a massive undertaking, particularly given the size

22  of the company.

23          **THE COURT:**  I see.

24      Let me ask what the burden on -- RFP 2 asks for -- there

25  is subparts A, B, C, D, and E, which, as written, look like

PROCEEDINGS

1    aggregate information.  But then, in the RFP, Apple also asked

2    for this information by app if that is available.

3         Maybe I should put this to Apple.  During meet and confer,

4    did you withdraw the request for that information by app?  Are

5    you only asking for aggregated data?

6         **MR. SRINIVASAN:**  I don't know that we expressly

7    withdrew that, Your Honor.  But that is certainly something

8    that we look at as independent things; in other words, the

9    aggregated data is separately useful to us and presumably it

10   would be less burdensome.

11        On the data broken up -- broken out, excuse me, we haven't

12   had the discussion with counsel as to the burden in their

13   processes; right?  In other words, we are willing to work with

14   them based on things that they may have, something that they

15   may have that's closer to what we want, to reduce the number of

16   queries they need to make, even on a per-app basis.

17        We just -- they haven't really engaged us in that

18   conversation.  We don't know what they maintain in the ordinary

19   course, versus what they could do with minimal burden versus

20   greater burden.

21        We would be happy to talk to them about it but, you know,

22   we haven't been able to engage with them at that level.  But

23   certainly we look at aggregated data, as relatively

24   burden-free.  It certainly doesn't implicate the third-party

25   issues raised by counsel.

**PROCEEDINGS**

1      And -- but on a per-app bases, we would be interested, not

2  just in the sales data, but in the pricing, the historical

3  pricing data.  And as Your Honor recognized, pricing is public;

4  when the apps were available is public.  We just can't get it

5  historically.  We can certainly pull the existing data, the

6  prices and what's on the website today, but we don't have that

7  information going back over time, which is why we've asked

8  Valve for it.

9      And, again, happy to work with them based on what they

10  have, but they've been fairly opaque.

11      **THE COURT:**  Well, then, Mr. Skok, let me ask you:  In

12  terms of the burden of responding to RFP 2, what is the

13  difference between just the aggregated data and providing it by

14  app?

15      **MR. SKOK:**  So if we look at it by app, we run straight

16  into that buzz saw that I outlined before of the different

17  queries of eight different databases and data processing,

18  employee distraction, et cetera.

19      One of the concerns we raised on the aggregated data --

20  really, two primary things to consider.  One of them is, as

21  Apple has said, Epic is a competitor in the space.  And Valve

22  is really -- Valve makes significant efforts to keep that

23  aggregated data to itself, and to keep it confidential.

24      One major concern is, to the extent it's released in this

25  litigation, it goes right to a competitor.  And that's going to

1   allow -- that's going to take away from Valve's competitive

2   edge, to the extent it has one, and it's going to allow Epic to

3   make some unfair inroads.  That's definitely one concern.

4        The other is just, thinking about here, where is this

5   ultimately going?  What is the substantial need for it?  And

6   the size of the market for PC games, that's certainly publicly

7   available.  There are public research reports.  Apple has

8   experts that I'm sure have already estimated that; the expert

9   reports have already been disclosed.  And there is no

10  discussion of the specific need for this information to somehow

11  show the size of the market.

12       And, in fact, it won't.  All it will show is one

13  participant's sales.  And the problem is, PC game market has so

14  many different participants.  Not just some bigger ones, like

15  Amazon or Microsoft; it has a company like Epic, that entered

16  the market in December of 2018.  It has other companies:  Good

17  Old Games; Origin; Uplay; many different companies that do the

18  same kind of online platforms.  And then any developer, of

19  course, can sell their game on their own website.  And you can

20  go into GameStop or other brick and mortar stores and buy PC

21  games.

22       And so, if we get evidence out there just about what Valve

23  is doing, that doesn't really tell you anything about the size

24  of the market.

25       It also doesn't really tell you a whole lot about the

1  market definition.  Apple obviously knows whose else is in the

2  PC game market.  And they've served requests on Valve for

3  Valve's information about who does Valve think of as

4  competitors.  We produced information.  That's not at issue.

5  There is no challenge there.

6      Where they want -- what they are really looking for is

7  sales information going back six years and they've told you

8  that's because somehow that goes to Epic Games Store and can it

9  compete.

10     But, gosh, the Epic Games Store really just went online

11  December of 2018.  And somehow we're getting asked to produce

12  all this information all the way back to 2015.  And there has

13  not been a specific description of the relevance:  How does it

14  show the market size?  How does it show the competition,

15  particularly when we're just talking about two companies out of

16  many, and one sales channel out of many.

17         **THE COURT:**  I see.  Well, my understanding is that

18  Apple has, for lack of better words, salted the Earth with

19  subpoenas to other participants in the market.  So they are not

20  just going after Valve.  So don't worry, it's not just you.

21     Let me round this to a conclusion.  The case schedule is

22  different in the *Epic Games* case versus the related class

23  actions.

24     And let me ask Apple:  It seems like maybe we need to put

25  a time frame -- in general, I have been ordering parties to

1   produce, but I haven't been specifying a deadline when they

2   have to do so; but I'm thinking we might need one here.

3        Is that the case from Apple's point of view?

4        **MR. SRINIVASAN:**  It is, Your Honor.  Rebuttal reports

5   are due on March 15th and so for us, ideally to have this

6   information sufficiently in advance of that, maybe a week so

7   our experts can look at this data, this is the type of data we

8   have, as Your Honor noted, sought and received from other

9   sources, and it would be important to us.

10       I'll just add, I think -- Your Honor, I don't want to take

11  too much more time, but Valve isn't just another entity selling

12  software on PCs.  They are mentioned in Epic's complaint.  They

13  were expressly mentioned in Judge Gonzalez Rogers's October 9th

14  preliminary junction order.  And they are expressly in Epic's

15  expert reports.

16       This is a prominent player for which we need information

17  to complete the picture on a relevant market that we're trying

18  to establish.  But, yes, we --

19       **THE COURT:**  If your reports are due on March 15th and

20  you want the data a week ahead of time, that would be

21  March 8th.  That's 12 days from now.  I mean, that's a tall

22  order.  I don't know that that's fair to Valve.

23       **MR. SRINIVASAN:**  Sure.  But, Your Honor, at least with

24  respect to the aggregated information, I mean, quite frankly,

25  for us the sales information in the aggregate form would be

1  most useful and most practical at this stage.  And from what I

2  understand from counsel's comments, the aggregated information

3  is not as burdensome to produce or to assemble.  So if we were

4  drawing a compromise there, that would be where I think that

5  would best make sense for us.

6      **THE COURT:**  Just to be sure for RFP 2 then, the

7  aggregated information is most useful to Apple and the

8  information broken down by app is not quite as useful?

9      **MR. SRINIVASAN:**  It's equally useful, Your Honor.

10  It's just in terms of the pragmatics.  I mean, just taking into

11  account what counsel said, he said two weeks.  If they could do

12  it -- if they could get us that in two weeks -- I think he

13  hedged on that later -- but, you know, if they could do that,

14  that would be wonderful.  We would still be able to work that

15  into our reports.

16      I just draw the distinction between the aggregated

17  information because it seems like it wasn't subject to the same

18  issues as the broken-out information was.

19      **THE COURT:**  Well, then, Mr. Skok, let me ask you:  If

20  I limit RFP 2 to aggregate data -- and that's just Valve's

21  information, it's not third-party -- and you don't have to do

22  it by app, could you do that by March 8th?

23      **MR. SKOK:**  Yes.  I mean, that is -- the burden piece

24  comes in with breaking it down by app.  And that is a

25  multi-week process.  So if we're just talking about aggregate

1  data, I think that is feasible to do by March 8.

2      We still have the challenge on the pricing.  I'm sorry.

3  Go ahead.

4          **THE COURT:**  I see.

5      And then, with respect to RFP 32, that's not asking for

6  aggregated data.  That is broken down.  What about 30 days?

7  That way you have more than two weeks.  Is that workable?

8          **MR. SKOK:**  If the Court orders it, we will do our

9  absolute best to make that work.

10     It is a subset of what they were looking for before.

11  There is some public available information about this.  Now,

12  that, hopefully, should get them a start.  But I think this

13  might be a good one -- particularly if the Court orders us to

14  produce aggregated data, this may be good for us to confer

15  further with on Apple.  During our meet and confers, they had

16  actually offered to withdraw this if we produce the information

17  sought on Request 2.

18     So my sense is, to the extent they do receive aggregated

19  information, they have what they need to address the issues of

20  market size, competition, et cetera.  But we certainly would

21  work with them on 32.

22          **THE COURT:**  So, well, I need to say something definite

23  in my order, though.

24     I'm inclined to say that, you know, RFP 32, as narrowed to

25  the 436 and narrowed to 2015 to the present, that I order you

**PROCEEDINGS**

1   to produce that within 30 days.  I suppose you can meet and

2   confer with them, and if they don't need that, they could drop

3   it.  But why shouldn't I do that?

4        **MR. SKOK:**  Well, let me suggest one limitation then.

5        This RFP 32, the way the 436 games were -- list was

6   created were games that were for sale on Steam and on the Epic

7   Games Store.  The Epic Games Store has only existed since

8   December 6th of the 2018.  So that's a pretty narrow band of

9   information.  It's about two years worth of information.

10       To the extent the Court is ordering us to produce pricing

11  information on Request 32, we'd request the Court at least

12  narrow it just to the time that the Epic Games Stores actually

13  exists, because that's the basis, or the rationale for Apple's

14  request here.

15       **THE COURT:**  Well, then let me ask Apple:  What if I

16  limit RFP 32 to 2018 to the present?  So it's going to be eight

17  months before the Epic Games Store exists through the present.

18       **MR. SRINIVASAN:**  Well, Your Honor, we would suggest

19  maybe at least a year before that so our experts can see if

20  there was price fluctuation independent of the Epic Games Store

21  being established, so we have a runway before to see what it

22  looked like as a clean period, as it were.

23       **THE COURT:**  Okay.  So then I'm thinking, Mr. Skok,

24  that I limit it to 2017 to the present.  That shaves off

25  two years of what's present before me.  How about that?

1       **MR. SKOK:**  You know, we get -- we get almost to a year

2   if we just start January 2018, because the Epic Games Store

3   started on December 6th of 2018.  So you get a full 11 months

4   if you start back at January 1 of 2018.

5       **MR. SRINIVASAN:**  Yeah.  Well, Your Honor, I think

6   our -- my -- the experts would tell us they would want even

7   more time just to fully do their analysis before.  So I think

8   by saying 2017 we're trying to compromise here.  So I think

9   that would be a fair middle ground.

10      **THE COURT:**  All right.

11      And then I'm thinking that in order for Valve to get you

12  documents responsive to RFP 2 by March 8th, I would just strike

13  the request for that information by app, and just have them --

14  and order them to do the aggregated information by March 8th.

15      And then would that pose a significant problem for Apple?

16      **MR. SRINIVASAN:**  No.  That would be fine, Your Honor.

17      The suggestion I would have is, to the extent we're doing

18  the 436 and there is individualized queries for those 436 on

19  32, if we could have also the sales information for those on a

20  per-app basis, but on the 30-day schedule, that would be a

21  compromise, I think, since they are doing that work anyway.

22      **THE COURT:**  I think for RFP 32 that is on a per-app

23  basis.  That's what you're asking for.  And so I'm inclined to

24  say yes to those things for RFP 32 as the 436 on a per-app

25  basis from 2017 to the present, but in 30 days.

PROCEEDINGS

 1        **MR. SRINIVASAN:**  Got it.

 2     I just -- I'm sorry to belabor this point.  I think the

 3  issue is 32 doesn't specifically ask for sales information.  It

 4  asks for pricing and duration on the store.

 5     I'm just suggesting as part of the compromise, the sales

 6  info by app would be imported, as it were, into 32 just for the

 7  436, just because they're doing that work.

 8        **THE COURT:**  Oh, I see.

 9     Mr. Skok, your response to that?

10        **MR. SKOK:**  Yeah.  That undoes everything the Court

11  just talked about on Request 2.

12     Request 2 is the sales information and a big part of the

13  concern there is the huge burden that puts on Valve.  I

14  understand the Court is going to order production of aggregate

15  sales information.  When we do those pricing queries, pricing

16  queries are going to be a narrower subset.  And to do the

17  additional work then called for under Request 2 of getting

18  together all that sales data, all that revenue data by app is

19  when we really kick in a massive amount of work.  It's

20  already -- it's already work for sure, to pull in this pricing

21  info --

22        **THE COURT:**  I think the sales information would just

23  be for the 436, not for the 30,000.

24        **MR. SKOK:**  No, I understand.  But even doing that is a

25  significant burden that we outlined earlier.

**PROCEEDINGS**

1      And so I think what the Court had suggested is Request 2,

2   we produce the aggregated data for Valve's revenues.  And I

3   recognize that, and the Court was looking at having us produce

4   that by March 8.

5      The other piece, 32 was just focused on what are the

6   historical prices on these 436 games.  We can make those

7   queries.  We do it with couple of different databases.  We do

8   it focusing just on the pricing.  That's the scope of 32.

9      But what Apple is trying to do now is import the substance

10   of Request 2 under 32.  And that gets us right back in the soup

11   of the big burden of having to go find out for all 436 games

12   what the items are, do -- query eight different databases,

13   correlate the sales data, correlate the return data, et cetera.

14      I think the Court's compromise that it outlined of

15   producing the aggregate data and just the historical pricing

16   data on Request 32, is -- while it's burdensome, it's certainly

17   less burdensome than trying to produce sales information for

18   all these 436 games.

19      **THE COURT:**  Well, but these are the 436 games that are

20   sold on both Steam and the Epic Games Store.  And so I would

21   think that the trend line in the sales data, once the Epic

22   Games Store started, would be relevant to showing the effect on

23   competition of this additional store; wouldn't it?

24      **MR. SKOK:**  Well, what you're going to get with the

25   aggregated data would show the same thing.  And not so much

1    drill -- you've got a minimal return on putting a huge burden

2    on a third party to drill down to this individual 436-game

3    level on the sales piece.

4        Really what Apple started with was the goal was to show

5    the size of the market, aggregated data does that; to show

6    competition, you can see that from aggregated data; and to talk

7    about market definition, and, again, aggregated data does that.

8        The sales information, down on individual 436-app level,

9    aside from the burden of it, all it does is show you a little

10   bit about who sold more, Valve or Epic.  But if we're talking

11   about whether the Epic Games Store can get a foothold in the

12   market, the aggregated data absolutely shows you that.

13       And if we're talking -- so I think they get exactly what

14   they need on the aggregated data.  Keeping in mind that Valve

15   is a third party here, a small company and one that doesn't

16   have significant resources to devote to this, the burden that

17   would be imposed on a third party here is significant.

18       And then you kick in those third-party concerns, those

19   third-party confidentiality concerns.  If we're looking at

20   sales information on an app-specific level of games somebody

21   else made, that's their information.  But if we're just looking

22   at aggregated information, I agree with the Court's earlier

23   question, that is Valve's information.

24       So there is a significant number of problems.  And I think

25   Apple is doing a good job of trying to turn you back around and

1   get requests for 2 back in the mix.

2      **THE COURT:**  Yeah.  I think the aggregated information

3   certainly is relevant to market definition.  But I think when

4   we're looking at effect on competition, the 436 apps that are

5   on both Steam and the Epic Games Store seem like that's

6   relevant.

7     I certainly appreciate your point that that requires more

8   effort, and so I'm not going to order you to provide

9   information on an app basis by March 8th.  I don't think that

10  would be appropriate.  That I'm going to give you 30 days for.

11    But I think for both RFP 2 and RFP 32, we're going to

12  limit that to the 436 specific apps and give you 30 days on

13  that.

14    And then for the aggregated information required by RFP 2,

15  I'm going to order that produced by March 8th.

16    So thank you, counsel.  I think I have what I need in

17  terms of argument, and I will aspire to get out a written order

18  today or tomorrow.

19     **MR. SRINIVASAN:**  Your Honor, I'm sorry --

20     **MR. SKOK:**  Your Honor, just one question.

21     **THE COURT:**  Sure.

22     **MR. SKOK:**  Just one quick clarification on time frame.

23  We had talked about limiting that time frame given that the

24  Epic Games Store started in December 2018.  Are both of those

25  requests going to be limited by the Court?

1          THE COURT:  For RFP 2, I'm going to limit to 2015 to

2     the present for the aggregated data.  And then for the per-app

3     data for the 436 both the sales and pricing, I'm thinking 2017

4     to the present.

5          MR. SRINIVASAN:  And, Your Honor, sorry to extend this

6     hearing.  We had a third issue which is this idea that we

7     received this heavily redacted production that we can't make

8     heads nor tails of.  There are titles on some of the

9     documents -- I won't go into it.  They are marked "highly

10    confidential."  But that's really all we have.  We don't know

11    what there is here.  And so we would just ask that they be

12    unredacted subject to the protective order.

13         THE COURT:  Mr. Skok, that is my tentative inclination

14    is to order those to be unredacted.  I know you've made the

15    argument that this is confidential information, but we have a

16    protective order for that reason.

17         Any further concerns about that?

18         MR. SKOK:  Your Honor, same concerns as raised before.

19    These are some PowerPoints from internal Valve meetings that do

20    contain information specific to third parties and third party

21    games.  Those are not just limited to the 436 games we're

22    talking about here that are available on both Epic and Steam.

23    And as such, we're kind of expanding beyond the scope.

24         It's a third-party confidentiality concern for sure.

25         THE COURT:  I see.  Well, this is an antitrust case --

**PROCEEDINGS**

1   or these three cases are antitrust cases, so discovery into

2   what competitors are doing is just part of the mix.  There is a

3   protective order in the case, so you can designate these on the

4   protective order and that will limit what Epic can do or who

5   can see these documents within Epic Games.

6       All right?

7             **MR. SKOK:**  Understood.

8             **THE COURT:**  All right.  Anything further from Apple?

9             **MR. SRINIVASAN:**  No.  Thank you, Your Honor.

10            **THE COURT:**  Anything further from Valve?

11            **MR. SKOK:**  No.  Thank you, Your Honor.

12            **THE COURT:**  All right.  Thank you, Counsel.  The

13  matter stands submitted.

14            **THE CLERK:**  Thank you, Counsel.  We're off the record.

15  Court is in recess.

16            (Proceedings adjourned at 9:49 a.m.)

17                    ---o0o---

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

     I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Thursday, February 25, 2021


_____

     Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
        Official Reporter, U.S. District Court