UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Pretrial** Conference |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1 - 41 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, March 26, 2021 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES (VIA ZOOM):**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                   BY:  GARY A. BORNSTEIN,
                        KATHERINE B. FORREST, ATTORNEYS AT LAW

For Defendant:          Gibson, Dunn & Crutcher LLP
                        333 South Grand Avenue
                        Los Angeles, California  90071
                   BY:  RICHARD J. DOREN, ATTORNEY AT LAW

(Appearances continued next page)

Reported By:      Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1                 __A P P E A R A N C E S (CONT'D.)__

2

3   For Defendant:            Gibson Dunn & Crutcher LLP
                              2001 Ross Avenue, Suite 1100

4                               Dallas, Texas  75201
                    BY:  VERONICA S. MOYÉ, ATTORNEY AT LAW

5

6

7

8                       --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Friday, March 26, 2021                            9:21 a.m.
 2                      P R O C E E D I N G S
 3                        (Zoom Webinar)
 4          THE CLERK:  Calling civil action 20-5640, Epic Games,
 5    Inc. versus Apple Inc.
 6       And, counsel, please state your appearances.
 7          MS. FORREST:  Good morning, Your Honor.  This is
 8    Katherine Forrest for plaintiff Epic Games, Inc.
 9          MR. BORNSTEIN:  And good morning.  Gary Bornstein
10    also for Epic Games.
11          MR. DOREN:  Good morning, Your Honor.  Richard Doren
12    for Apple.
13          MS. MOYÉ:  Good morning, Your Honor.  Veronica Moyé
14    for Apple.
15          THE COURT:  Okay.  Good morning, everyone.
16       As you know, I sent you a note asking whether we needed
17    this conference.  It sounds like we did.  You sent me the
18    things that you want to talk about.  So we'll go through
19    those.  I've got something else I'd like to mention as well.
20       Just so that you know, none of you are actually in the
21    Bay Area, but the Bay Area is doing really well with COVID.
22    We track those numbers every week.
23       We are now having one criminal trial in each of our
24    courthouses.  And we hope if -- if the rates continue as we
25    expect, then a majority of all Bay Area counties will be in
```

 1  the minimal tier, which is our yellow.  I don't know what kind

 2  of classifications you use in your homes, but out here that is

 3  the -- that is the least restrictive tier.

 4      We should all -- we should have a majority of our counties

 5  in that tier by April 27th, and perhaps all of them by

 6  May 4th.  So we are really pleased with how people are doing

 7  in terms of health and safety.

 8      We just received notice yesterday that the vaccine is

 9  being opened for all people over 50 April 1st and for

10  everybody over 16 by April 15th.  So we are -- people are

11  getting vaccinated around here.  It's -- I think we're at a

12  point where things -- you know, we're trying to have as many

13  courtrooms open as possible.

14      So long and short, my -- I'm still prepared to proceed in

15  person.  That's the plan.  Our colleagues and I, we're -- we

16  have a method to our madness.  And I do have a courtroom for

17  this trial.  So assuming again that everything continues to

18  progress as we think it will.

19      Any questions on that front?

20          **MS. FORREST:**  No questions, Your Honor.

21      Actually just one perhaps related question to how I think

22  we're all preparing for the in-person trial and have been

23  assuming such.

24      There is a -- some ambiguity in terms of when -- what the

25  quarantine requirements are for people who are coming in from

1    out of state, if they have been vaccinated, and whether or not

2    they have to be in place and in state ten days in advance

3    or -- of their appearance or not.

4        If Your Honor receives any information in that regard,

5    that would assist us in determining whether there's a ten-day

6    advance quarantine period, from other experience you may have.

7    We would appreciate hearing about that.  Otherwise we will

8    monitor the CDC and State of California guidelines.

9        **THE COURT:**  Okay.  I will -- I'll ask our assistant

10   clerk of court who is doing all of this monitoring for us and

11   see if he has any better information.

12       **MS. FORREST:**  Thank you.

13       **MR. DOREN:**  And Your Honor, obviously that's great

14   news for many, many reasons.  And one of our agenda items was

15   the number of people who could be in the courtroom for trial.

16   And perhaps that's an issue that's better addressed as we get

17   closer to the day and can -- can, you know, size the

18   situation.

19       But in our meet and confer process, I think that both

20   sides would -- would prefer to have their own hot seat

21   operator in the room.  And the number that the parties had in

22   mind, if it would be acceptable to the Court by May 3, would

23   be for each side to be able to have up to eight people in the

24   courtroom.

25       **THE COURT:**  And who are the -- how are you

```
1   calculating that eight?

2           MR. DOREN:  That would be the hot seat operator, Your

3   Honor, the two lead counsel, and then in addition, some

4   support, for example, a paralegal who we would plan to have in

5   attendance, and then a corporate representative from each

6   party would be in the courtroom and then likely an associate

7   or two who would be helping with whichever witness is on the

8   stand.

9           THE COURT:  Let me see.  That's a little high because

10  I need to have in there individuals as well.

11      And you can plan on six.

12          MR. DOREN:  Thank you, Your Honor.

13          THE COURT:  If I can get you more than that, I will

14  try.  But you can plan on six.

15          MS. FORREST:  Thank you, Your Honor.

16      And can we assume that among the six would be the hot seat

17  operator?

18          THE COURT:  I don't care who you have as your six.

19  You get six --

20          MS. FORREST:  Perfect.

21          THE COURT:  -- people as far as I'm concerned.

22          MS. FORREST:  All right.  Thank you.

23          THE COURT:  And it doesn't -- you know, it doesn't

24  have to be the same for each side so you all can decide.

25          MR. DOREN:  Thank you, Your Honor.
```

1     **MS. FORREST:**  A related point had to do with the
2     masks in the courtroom and how Your Honor would like to handle
3     that in terms of both those present in the courtroom, the
4     examining attorney, and the witness.  And we stand ready to
5     comply with whatever Your Honor would like in that regard.  We
6     just wanted to understand.
7           **THE COURT:**  Yeah.
8        So we don't -- you know, we don't ask whether people have
9     the vaccine or not.  I'll let you know I do.  I don't mind
10    telling people.  So I'm fully vaccinated at this point.  I'm
11    in the courtroom now.
12       But I don't know whether people have opted to get the
13    vaccine or not.  So I think it still is useful for people to
14    wear masks in the courtroom, and you should plan on wearing
15    masks.  We expect it in the courthouse.  I don't think we're
16    going to change that rule.
17       I did -- we do have in -- and if you want to use a
18    different kind or found a different kind, that's fine.  I got
19    this from -- from our court staff.  So these are the masks
20    that we are using in trials.  They go over the nose and the
21    mouth so you can see the eyes.  I think there are a couple
22    ways to put them on.
23       But in any event, these are the masks that we'll have the
24    witnesses use so that we can actually see expressions, or at
25    least I can see expressions.  That would be my preference.  So

1    we'll provide these unless you have something similar that you

2    want to provide yourself.

3        If somebody wants on their own to wear a see-through

4    shield on top of this for their own safety, I don't have any

5    objection to them doing that.  But this would be the -- this

6    would be the plan for the witnesses.  And this is what we're

7    using in our other trials.

8            MR. DOREN:  I've used those masks in a trial last

9    December, Your Honor.  And they -- they work reasonably well.

10           THE COURT:  So can you then tell me, Mr. Doren, does

11   this go behind the neck?  Because --

12           MR. DOREN:  I --

13           THE COURT:  Because otherwise it seems to me when I

14   put it on, I tried it out, if it hangs here, then -- then the

15   sides don't fold in.

16           MR. DOREN:  Yeah.

17           THE COURT:  If you don't put it behind your neck --

18   or when you put it behind your neck, then it -- then it shapes

19   to the face and that gives more closure.

20           MR. DOREN:  Yep.

21           THE COURT:  That being said, this little thing pops

22   up.  So it seems to me that once it's fitted, someone should

23   tape it down or something so that it doesn't like scratch you

24   in the eye.

25           MR. DOREN:  It is quite a piece of engineering, there

 1    is no doubt about it.

 2         **MS. FORREST:**  A related point, Your Honor, which may

 3    be helpful is if people are wearing masks, would Your Honor

 4    allow us to have walk-around mics that would clip on to the

 5    lapel and actually boost the sound.  Because we can arrange

 6    for that, and it might be of help.

 7         **THE COURT:**  Absolutely.  So I will put in my next

 8    order, because we do have some -- although, you know, we

 9    really should test this.  I have in my order pre-COVID for

10    those attorneys during trial who cannot, for the life of them,

11    stay at the podium, I require them to have a lapel mic and --

12    and have the -- the language that -- or the -- technical

13    requirements that work for our courtrooms.

14       How that works with Zoom, I don't know.  I don't know that

15    we've tested that.  So we'll probably have to test it.  And I

16    don't know if your IT people can arrive earlier to test

17    whatever -- you know, whatever system you actually have, but I

18    think that that would be helpful.  And then it -- you know, to

19    the extent you have -- you each have them, it helps in terms

20    of folks moving around.

21         **MS. FORREST:**  Yeah, we can -- Your Honor, we're going

22    to actually be in the area before -- before the trial begins

23    in a sufficient time to, if we can, make arrangements with

24    your chambers to come over at a convenient time to test all of

25    the equipment, including those mics.  And so we'll arrange

1    that with your chambers.

2          MR. DOREN:   And the parties will coordinate on doing

3    that once together.

4          THE COURT:   Okay.

5          MR. DOREN:   And Your Honor, one other thing that I

6    think both parties were wondering is whether there may be a

7    viewing room for the public other than the courtroom, kind of

8    what would have an overflow room had it been a full courtroom.

9          THE COURT:   No.

10         MR. DOREN:   Okay.  Very good.

11         THE COURT:   There's not.  And here's the reason --

12   here's the reason why.  In the Oakland courthouse, we have six

13   courtrooms.  We have -- we are supposed to have trials going

14   on, that is, jury trials.  So we have six courtrooms, two

15   courtrooms on three floors.  So the two lower floors have --

16   will have jury trials happening.  I believe that, you know, we

17   are all backed up.  One courtroom is being used for

18   proceedings.  The second courtroom is being used for jury

19   deliberation to give the jurors sufficient distance and space.

20         That gives us a court, you know, an active courtroom on

21   the second floor, an active courtroom on the third floor, and

22   then on the fourth floor which is where I expect we will be,

23   we have our hybrid courtroom that all the judges share for

24   criminal proceedings that will continue to take place.

25         And then this -- and then the last courtroom, the last

1    courtroom to open would be the one that we're in that would be

2    for any other kind of proceedings, something like this.  So

3    there just is no other space.

4            **MR. DOREN:**  Sure.  Sure.  And would that go as well

5    for conference rooms where witnesses could wait and that sort

6    of thing, or would there be a space for that?

7            **THE COURT:**  So I asked about that, and this is

8    what -- what we can offer.  Because we are not using our jury

9    rooms, we can offer the jury room that is close to the

10   courtroom where we'll be.  So you can have the next witness

11   up, whoever that is, in that room with let's say one person,

12   maybe two, but we don't want a lot of people in there.

13       Down the hall -- so that -- that room we'll make available

14   to you.  But we don't want, you know -- it will be for the

15   next witness up is what we'll say, the next witness to

16   testify.

17       There is an attorney lounge down the hall.  We have one in

18   the building that is available to attorneys.  It is open.  It

19   will -- there will be signs about social distancing.  It is

20   not monitored.  And attorneys are asked to monitor it, you

21   know, to do self-monitoring with respect to these issues.

22       There are two conference rooms in that attorney lounge

23   which can be reserved on a first-come, first-served basis.  As

24   I said, there will be criminal trials that will have started

25   before you so I don't know if they're available or not

 1     available.  But those conference rooms will be -- you know,

 2     are available to attorneys in trial on a first-come,

 3     first-served basis.

 4         Now, I did have a trial a few years ago where the lawyers

 5     rented some office space literally across the street in an

 6     attorney's office.  So they had their war room set up across

 7     the street from the courthouse.  That may be an option that

 8     you want to think about.

 9             **MR. DOREN:**  Thank you.

10             **MS. FORREST:**  All right.

11         Your Honor, the next item on our agenda concerns a topic

12     that --

13             **THE COURT:**  You know what, let me --

14             **MS. FORREST:**  Pardon me.

15             **THE COURT:**  Let me interrupt, Ms. Forrest.

16         I haven't received any requests from news media on -- on

17     access.  I think all news media knows that we are restricted

18     under the Administrative Office of the Courts' requirements

19     that we cannot have live streaming of witness testimony, of

20     evidentiary hearings, and so access is only going to be, at

21     this point, by -- by the, you know, by conference line.  So

22     they'll get -- they'll get it orally.

23         But I've -- I'm not -- I don't know if you all have

24     received requests.  I haven't received any requests.

25             So, okay.  Go ahead.

1    **MS. FORREST:**  The next issue, Your Honor, has to do

2    with the handling of what has been marked during the discovery

3    process as confidential and highly confidential information.

4        The parties have met and conferred about this and are, I

5    believe, in agreement that we are aligned on our desire to

6    have an open proceeding that will not have a lot of sort of

7    choreography around handling such information.  And as a

8    result, both parties are motivated to dedesignate vast

9    quantities of information that has heretofore been considered

10   confidential or highly confidential.

11       For instance, it would be our expectation that the

12   findings of fact and the intended trial exhibits would be

13   largely -- maybe not completely because there's some

14   third-party issues that are with partners that might have to

15   be handled or some particular financial information -- but

16   that the vast bulk of information would be available to be

17   utilized in the open courtroom, talked about, and that would

18   then allow Your Honor to put together a decision which has as

19   few redactions or no redactions as possible for what we

20   believe is going to be a very important decision, and we want

21   the rationale of that decision to be as open as possible to

22   the readers.

23       **THE COURT:**  So you should know, Ms. Forrest, that --

24   or all of you, in the Northern District, we rarely redact.  So

25   the presumption is that it is open.  And I have a standard

1   footnote that I put in my orders that say to the extent it's

2   in this order, your request to seal is denied.

3      I have read plenty of orders where I can't tell what is

4   happening on topics that are important and are novel.  And I

5   don't like it and I don't do it.

6      So I write my orders -- in fact, I think the only thing

7   that I've ever sealed were national security issues.  I don't

8   think I've ever sealed anything else.

9      So the presumption in my courtroom is that it is open.

10  And you need to ask if I am sealing.  And if there is a

11  dispute about it, then I can resolve that.

12     But the fact that anybody designated something as

13  confidential or highly confidential before, there is no

14  presumption when we go to trial.  The presumption is that it

15  is not sealed.  Not the other way around.

16          **MS. FORREST:**  And, Your Honor, I think the parties

17  are going to attempt to actually facilitate that by having our

18  findings of fact and intended trial exhibits, as much as

19  possible, pre-dedesignated.  And so those will go into the --

20  and be available to the public early on so we won't have a lot

21  of choreography.

22     We just wanted to tell Your Honor that.  We understand

23  that we're just simply complying with the presumptions that

24  are already in place.

25          **THE COURT:**  No, I appreciate it, but you should also

```
 1    know what my perspective is.
 2              MS. FORREST:  Rich, would you like me to sort of
 3    launch into deposition designations?
 4                        (Simultaneous colloquy.)
 5              MR. DOREN:  Depositions, sure, that's great.
 6              MS. FORREST:  Okay.  And then for the exciting --
 7              THE COURT:  And then, again, Ms. Forrest, we use last
 8    names, not first names.
 9              MS. FORREST:  I'm sorry.  I'm sorry, Your Honor.
10              THE COURT:  Go ahead.
11              MS. FORREST:  Yeah.  Sometimes we slip into it having
12    spent so much time together recently.  But of course, Your
13    Honor, I understand.
14       The exciting topic of deposition designations, we wanted
15    to make sure that we are able to provide to you what you need
16    and want and comply with pretrial order number 2 in terms of
17    the designations.
18       And there really are just two issues.  We understand that
19    you would like to have the run time be the way in which the
20    clock is utilized for both the four hours and then counting
21    against the parties' clock.  I think everybody understands
22    that.
23       What we were wondering -- and this is coming from Epic, I
24    don't know actually if Apple takes a position on this or
25    not -- is whether we are able to utilize the company that
```

1   would normally cut the depositions for purposes of being

2   played at trial and to use that run time.  Because there are

3   things, for instance, where a witness may spend some

4   appropriate time looking at a document, but it can be a long

5   time on the transcript between the question and the answer.

6   That would often get cut out if the videographer is preparing

7   it for trial so that it would be a little bit more seamless.

8        So our request to Your Honor would be that we prepare the

9   excerpts in the same manner as we would if they were to be

10  played at trial and to use that run time.  The parties can

11  confer on that to make sure that we're aligned on that.  We

12  would use run time, but we would use run time that's done in

13  perhaps a more sophisticated manner than heretofore.

14            **THE COURT:**  That's fine.

15            **MS. FORREST:**  The second piece I think is just really

16  a logistics.  There'll be a number of documents that are going

17  to come in with a sponsoring witness through a deposition

18  designation.  And we just wanted to ask Your Honor if it would

19  be appropriate if at the beginning of trial, we could provide

20  Your Honor with a list of such documents and have those be

21  received if they do have appropriate sponsoring witnesses.

22       And of course, that assumes any objections will have been

23  dealt with by the judicial officer that the parties will hire

24  to resolve any such objections pursuant to Your Honor's order.

25            **MR. DOREN:**  And, Your Honor, I'm -- I'm -- I've never

1    been quite clear on how this would work.  We have discussed it

2    a time or two.  I know that Your Honor has said that you will

3    take some designations before trial begins.  And certainly to

4    the extent documents come in through those designations, it

5    would seem appropriate that they be included with the

6    designations and come into the record at that time.

7        I would think that other documents would come into

8    evidence at the time that other designations are used.

9        **THE COURT:**  So I'm not sure I'm following what your

10   question or your concern is.  Let me -- let me tell you what I

11   do.

12       Parties -- I always try to make things as efficient as

13   possible.  If you are all stipulating to the admission of

14   exhibits, that's fine.  You can give me a list, I can put a

15   stamp on it, and they're admitted.

16       What I do is I track all your exhibits, and I make a note

17   as to whether or not I've admitted them or not.  If there's a

18   stipulation and Exhibit 52 is being discussed, I look at my

19   list, it's admitted, we move on.

20       If it's not admitted because there's some dispute, then

21   I -- you have to lay the foundation, which takes time.  You

22   lay the foundation, I hear the objection, I rule on the

23   objection, I tell you whether or not it comes in.  So as an

24   accommodation to all of you, I'm agreeing to read some things

25   in advance.

1    If there is deposition testimony that references a

2    document and you don't give me the document, I don't know

3    how -- what you expect me to do with that testimony.  I need

4    to see the document.

5    If you've all agreed it's coming in, then it's -- it's

6    going to come in, and we'll do the mechanics of the order

7    later.

8    So I'm not sure I understand your question, Mr. Doren.

9         **MR. DOREN:**  Oh, no, I agree.  With the procedure Your

10   Honor just laid out, I'm in agreement with and completely

11   comfortable with.  And -- and to proceed in that way makes

12   perfect sense.

13   I guess my point was exactly I agree the parties should

14   meet and confer about which documents and exhibits they can

15   stipulate to the admission of, and -- and that will save us

16   all -- all a lot of time.  And -- and that of course is a meet

17   and confer once we have our exhibits in front of us.  And I --

18   and I agree that's how we should proceed.

19        **THE COURT:**  And the other thing is, again, just --

20   you know, if you stipulated -- lots of times lawyers want to

21   stipulate that lots of things come in, but they never talk

22   about it in trial.  I don't allow that.  Whether it's me or

23   the -- or a jury, what I'm not going to have you do is

24   stipulate to the admission of 50 documents which we never talk

25   about, I never discuss in an order because I don't understand

1    the context or what it is you're trying to do in terms of that

2    document, whether it's -- you know, if it's in deposition,

3    then I've read the deposition so that's -- that's part of the

4    trial.

5        But you actually have to explain its relevance.

6    Otherwise, you know, the Court of Appeal, you'll make some

7    argument at the Court of Appeal, which I'm assuming whoever

8    loses will go to under all circumstances, and then you can

9    argue that it was in the record.

10       Well, it might have been in the record, but if we didn't

11   talk about it, I don't know what I'm supposed to do with it.

12   So stipulate all you want.  I'll look at my list.  It comes in

13   when we talk about it.  No foundation is necessary.

14           **MS. FORREST:**  Thank you, Your Honor.  I think that

15   helps a lot with the logistics.

16           **MR. DOREN:**  And I guess the -- the next agenda topic

17   are questions regarding written directs.  And specifically,

18   Your Honor, for -- as a threshold matter, I just wanted to

19   confirm whether, in light of the Court's order about the

20   parties having 45 hours to do with what they will, whether the

21   Court would still receive written directs from expert

22   witnesses or whether you wanted that testimony live?

23           **THE COURT:**  I was expecting to get written directs.

24   What I'm trying to do is cabin some of what it is you all are

25   trying to do.  So some of -- so one side, for instance,

 1    suggested that I read much more than the other side.  That's

 2    why I gave you a time limit.  That's why I put limits on the

 3    deposition transcript pages that I need to read.

 4         And like I said in the order, if you want -- you know, if

 5    you want more than the presumptive, then it counts against

 6    your time.  I'm trying to keep the playing field even between

 7    both sides.

 8         I don't have your expert reports.  So I didn't have a

 9    sense of how to manage or cabin the written directs.  So I can

10    say 25 pages, ten pages, single-spaced.  I'm, you know -- if

11    you have a proposal, I'm willing to listen to it, but I didn't

12    exactly -- because I don't have your reports, I didn't exactly

13    know how to -- how to manage that piece.

14              **MR. BORNSTEIN:**  Your Honor, if I may, we, the

15    parties, have discussed the issue and tried to come up with a

16    proposal that we all can live with, obviously subject to the

17    Court's approval, that we thought would try to implement the

18    idea of giving each side the opportunity to have equivalent

19    time, so to speak, in terms of written time with the Court and

20    then to use whatever in-court time we have as -- as we see fit

21    pursuant to Your Honor's order.

22         So what we had discussed and agreed on in concept as

23    between the parties would be that there would be an aggregate

24    number of words.  You know, rather than dealing with

25    formatting and pages, we borrowed the Ninth Circuit word limit

 1    style that the parties could choose to use across their

 2    experts so it wouldn't be, you know, ten pages for Expert A,

 3    ten pages for Expert B, and so forth.  There would just be an

 4    aggregate number.  Because some experts cover much more ground

 5    than others do.  And a one-size-fits-all page limit we all

 6    thought would be constraining for some of our experts.

 7        So our thought was to come up with a word limit that was

 8    acceptable to the Court that the parties could then use their

 9    discretion to allocate across their -- their experts.

10            THE COURT:  And that includes, I take it, I'm not

11    going to get exhibits attached?  Or what am I -- you know,

12    that is, reports that you want me to read or written direct

13    that you want me to read without attachments.

14            MR. BORNSTEIN:  That was the concept, Your Honor.

15    Any attachments or -- or exhibits would -- would come in

16    through -- through a different process in the ordinary way.

17            THE COURT:  You know, that's fine.  I still think in

18    terms of pages.  I don't think in terms of words.  You have to

19    use 12 -- 12-point font because I -- if it's anything less, I

20    have to get my glasses, and I don't always want to get my

21    glasses.  So I have a very discriminate -- I can't read it so

22    I know that it's not 12-point.

23        And I don't -- you know, if we did pages, then it seems to

24    me I don't care how you allocate your pages just like I don't

25    care how you allocate your hours.  But I think what does --

```
1    Apple has four experts and Epic has three?
2          MR. DOREN:  Your Honor, Apple has four economists.
3    And then there are also some security experts.  So Apple
4    actually has seven.  And I believe including rebuttal
5    experts -- and Mr. Bornstein can correct me if I'm
6    incorrect -- Epic has eight.
7          THE COURT:  Okay.  So knowing that, how many pages do
8    you think across all the experts that -- how many pages are
9    you looking at?
10          MR. BORNSTEIN:  Well, what we had discussed in terms
11    of words, Your Honor, which is how we had talked about it --
12    and obviously we can translate that to pages -- is we had
13    discussed a hundred thousand words.
14          THE COURT:  So I need -- so do your math.
15          MR. BORNSTEIN:  So to translate --
16          THE COURT:  How many words on a page, approximately?
17          MR. BORNSTEIN:  My -- my understanding is, I think
18    about it myself in terms of appellate briefs, and that would
19    be seven appellate briefs, which I think translates -- a
20    typical appellate brief is somewhere in the neighborhood of
21    30, 35 pages.  So I think that would translate, let's call it
22    50 words a page, to about 200 pages as across seven or eight
23    experts.  But someone should check me if I have that math
24    wrong because I was not thinking about it in pages myself.
25          MR. DOREN:  I actually think that's probably off by
```

1    about 50 percent.  I think it's close to 300 pages.

2    **MS. FORREST:**  I suppose that depends on whether you

3    single-space or double-space.

4    **THE COURT:**  Well, that's why I'm asking you.  Because

5    the Ninth Circuit uses 14 page -- 14-point font which I find

6    to be difficult to read too because it's too big.  You don't

7    get enough words on a page.

8    **MR. BORNSTEIN:**  So I'm -- I'm told, Your Honor, that

9    it's apparently approximately 250 words per page if you are

10    double-spaced.  So that would translate as actually to a

11    larger number even than Mr. Doren had spelled out, if my math

12    is correct.  It takes us to 400 if we were to use the -- the

13    number that the parties had -- had been talking about.

14    **THE COURT:**  So a hundred thousand words.

15    Okay.  That's fine.  Here's what I want you to do, though.

16    Using, you know, the standard Word format and standard Word

17    margins, single-spaced, 12-point font, spaces in between your

18    paragraphs, and a table of contents.

19    I also want up front a summary of the actual opinions, and

20    I want them numbered.  So executive summary up front, and then

21    the explanation as to each of those opinions in terms of a

22    written direct can follow.

23    But I should be able to tell -- actually if you do it that

24    way, I don't need a table of contents.  Just put in

25    parentheses if it's opinion one.  If there are ten opinions,

```
1   opinion one, you know, see pages 2 to 7 after the opinion.

2   But I should be able to tell within the first two pages what

3   the opinions of all of these individuals are.

4         MR. BORNSTEIN:  And if we're -- if we're doing this

5   single-spaced, Your Honor, then I guess we cut that number

6   that I had given in half, the math would be about 500 words

7   per page --

8         THE COURT:  Right.

9         MR. BORNSTEIN:  -- single-spaced.  So that gets us

10  down to 200 pages, I believe, per side.

11        MR. DOREN:  A mere 200 single-spaced pages.

12        THE COURT:  Well, I'm reading Bork's book on

13  antitrust, and that's at 437.

14        MR. DOREN:  And, Your Honor, there have been some

15  discussion between the parties about the use of written

16  directs.

17        THE COURT:  Hold on.  I want that written direct by

18  April 27th.

19        MR. DOREN:  And, Your Honor, do you want those from

20  both parties on the same day, or may Apple, as the defendant,

21  have a few days in which to consider what is in the directs of

22  the Epic witnesses?

23        THE COURT:  Well, aren't you going to know that?

24  Haven't you taken their depositions?

25        MR. DOREN:  We will certainly have the discovery,
```

```
1    Your Honor.  Dr. Evans, for example, has a 500-page expert
2    report, and he will then be deposed for I think we're up to
3    14 hours.  So which of those opinions will actually be
4    expressed at trial, we will -- we will only learn when we see
5    his direct.
6              MR. BORNSTEIN:  Your Honor, if I can be heard on
7    that.  We -- we do think it would be very important to have
8    these go in simultaneously.  If Mr. Doren's concern is that he
9    will need an opportunity to respond, I think there are few --
10   few issues there.  Number 1, as you say, there's been
11   extensive discovery including a 14-hour deposition --
12             THE COURT:  Mr. Bornstein.  Mr. Bornstein.
13             MR. BORNSTEIN:  Yes.
14             THE COURT:  My response on all this is going to be
15   how would we do it at trial.  Right?  That's the point.  We're
16   trying to cut the number of hours in the courtroom down.
17        So if it is a rebuttal examination, that would always come
18   in after the fact.  I don't know how many rebuttal folks you
19   all have and how many affirmative opinions you have.  So let
20   me get my list, and you tell me.
21        All right.  So I'm looking at Epic's list.  Docket --
22   docket 376 at page 12.  Susan Athey, Ned Barnes, Michael
23   Cragg, David Evans, Wenke Lee, Nancy Mathiowetz, James
24   Mickens, Peter Rossi.
25        Are any -- are all of these affirmative experts or are any
```

1    of these rebuttals?

2         **MR. BORNSTEIN:**  So of those people, Your Honor, six

3    of them put in opening reports, two of them put in only a

4    rebuttal report.

5         **THE COURT:**  Okay.  Which --

6         **MR. BORNSTEIN:**  And two of them put in both.

7         **THE COURT:**  Which are those?

8         **MR. BORNSTEIN:**  Which are the ones who put in both?

9    That's Dr. Evans.

10        **THE COURT:**  Which are the ones who are your

11   rebuttals?

12        **MR. BORNSTEIN:**  The ones who are purely rebuttal were

13   Dr. Cragg and Professor Mathiowetz.

14        **THE COURT:**  And who put in both?

15        **MR. BORNSTEIN:**  That would be Dr. Evans and Professor

16   Lee.

17        **THE COURT:**  All right.  Apple.  I'm looking again at

18   docket 375, page 15 of 17.

19     Which of these are rebuttals as opposed to affirmative?

20        **MR. DOREN:**  Your Honor, each of the seven experts put

21   in both initial reports and rebuttal reports, which were

22   obviously submitted after seeing Epic's reports.  And each of

23   those experts will be replying, at least in part, to what Epic

24   puts in in their affirmative case.

25        **THE COURT:**  All right.  Go ahead, Mr. Bornstein.

```
 1              MR. BORNSTEIN:   Thank you, Your Honor.
 2         The principle of having this match up with trial makes
 3    sense to me in the following respect.  We're going to have
 4    these witnesses come.  They will all testify live.  They will
 5    have the opportunity to review, for example, our economists'
 6    written directs much before they ordinarily would have the
 7    opportunity to review or hear the direct of a live trial
 8    witness before their responsive witness takes the stand.
 9         So take Dr. Evans, for example, who will be someone who
10    will supply an opening written -- written direct as well as
11    testify live.  Professor Schmalensee, one of their experts who
12    addresses Dr. Evans' testimony, not only will he have, you
13    know, the one day or so that he would ordinarily have at trial
14    given the pairing of experts, he will have at least a week to
15    review the written direct of Dr. Evans before Apple's
16    economist, Professor Schmalensee, takes the stand.
17         So we think that even if we have the written directs go in
18    simultaneously, there will be ample opportunity for rebuttal
19    witnesses, both ours and theirs, to consider the testimony to
20    which they are responding before they take the stand.
21         And if we do have these go in in a sequential way, as Your
22    Honor can see from the number of experts and the number that
23    do either rebuttal and/or an opening report, we're going to
24    have to have a series of staggered deadlines so that there can
25    be an exchange over time which I think will take us to a -- to
```

1    a time period that could very well be well before trial, which

2    would have the effect of compressing the time the parties have

3    to prepare these written directs and to make them as good as

4    they can be for the Court.

5              **MR. DOREN:**  Your Honor, if I may?

6              **THE COURT:**  You may.

7              **MR. DOREN:**  In our last hearing, counsel for Epic

8    proposed April 20th as a day to submit written directs.  And

9    so a reasonable schedule would be for the Epic written directs

10   to go in on April 20th and for the Apple written directs to go

11   in on April 27.  And the -- what that would accomplish is,

12   with the Court having given each side a hundred thousand words

13   to put in the opinions of each of these experts in their

14   direct, part of our experts' direct will be in responding to

15   the directs of their experts.

16       So to have a written direct in front of this Court

17   sufficiently in advance of trial where the Court can evaluate

18   how the experts engage on each other's opinions before they

19   take the stand and cross-examination begins, this is really

20   the only effective means to accomplish that.

21             **THE COURT:**  What's the prejudice, Mr. Bornstein?

22             **MR. BORNSTEIN:**  Well, the prejudice, Your Honor, is

23   twofold.  Number 1, it's compresses the time that we have to

24   prepare the written directs.  And second, we have opening

25   reports from both sides where if -- if we're going to do a

1    staggered approach like this, I would think we would need to

2    have both sides submit an opening and then a rebuttal, and

3    then we'll have a rebuttal to what their -- to what their

4    folks have had to say.  For example, Dr. Cragg and Professor

5    Mathiowetz, who are our rebuttal experts only in -- only in

6    rebuttal would need the opportunity to respond to what the --

7    the Apple witnesses to whom they respond have said.

8        So if, for example, we don't get any Apple reports until

9    April 27, well, Dr. Evans, Professor Lee, Professor Mathiowetz

10   and Dr. Cragg have nothing -- nothing to respond to until they

11   see those -- those reports, which would mean we have to have

12   yet another deadline sometime after that and presumably before

13   trial for us to put in our reports that respond to the reports

14   that Apple has generated.  And when I say reports, I mean the

15   written directs.

16       **MR. DOREN:**  Obviously, Your Honor, those are

17   qualitatively different situations, one being where the Apple

18   experts are coming in as defense experts to deal with what has

19   gone on in the affirmative case presented by Epic, and the

20   other being what Epic does or doesn't elect to do after Apple

21   has completed presenting its case in terms of presenting

22   expert rebuttal testimony.

23       And if there need be a date for expert rebuttal testimony

24   from Epic, that may, depending on how the Court wishes to

25   approach the issue, involve a second date.  But certainly

1  Apple needs, in preparing its case for trial, to be able to

2  respond in its written directs to the opinions that are put

3  forward by Epic in its affirmative case.

4          THE COURT:  All right.

5      This is what I'm going to do:  Epic, by April 20th, will

6  serve their written direct on Apple.  Apple will serve their

7  written direct by April 23rd.  Simultaneous filings with the

8  court by April 27th.

9          MR. BORNSTEIN:  And how would Your Honor propose that

10 we handle the -- the rebuttal experts that we have?

11         THE COURT:  You've got between the 23rd and the 27th

12 to get it done.

13         MR. BORNSTEIN:  Okay.

14         THE COURT:  So I don't need to see your first cuts.

15 They're really there so that you can -- you each can see what

16 the other side is doing.  All I want to see is the final

17 product on the 27th.

18     Okay.

19         MR. BORNSTEIN:  All right.  Thank you, Your Honor.

20 That's clear.

21         THE COURT:  The next topic on your list was expert --

22 expert testimony as to facts subject to connection.  I did not

23 understand.

24         MR. BORNSTEIN:  I can take a first shot at this, Your

25 Honor.

1          The -- the issue here is Your Honor had made some

2     observations the last time we were all together about the

3     importance of having the expert witnesses testify only based

4     on facts that are in the record or otherwise subject to

5     judicial notice for one reason or another, which the parties

6     all fully understand.

7          The question we had is whether Your Honor will allow the

8     witnesses, either in the written direct or live, to testify to

9     facts that have not yet come in the record because a

10     particular witness, for example, hasn't had the opportunity to

11     take the stand, but that the parties expect will come in the

12     record before the trial is concluded, recognizing that if some

13     particular fact does not come into the record, the -- the

14     opinion that is based on that fact would either be lacking one

15     of its supporting pillars or perhaps be stricken entirely if

16     none of those pillars are there.

17          So it's really just a question of sequencing as to whether

18     Your Honor wants the full factual basis to come in before the

19     witness actually takes the stand or whether the witness can

20     testify as to his or her opinions subject to the facts coming

21     in through a subsequent witness.

22          **THE COURT:**  Yeah, I think -- I don't see that there's

23     any way around it given that I've agreed to read in advance,

24     so....

25          **MR. BORNSTEIN:**  Very good.  Thank you --

1          **THE COURT:**  One thing with respect to that, though,

2     that I am going to modify from my pretrial order number 1, I

3     was talking to one of my colleagues here, Judge Jeff White,

4     who recommended to me that rather than have you all redline

5     those proposed findings of fact within a week, he said he

6     recently did a bench trial like -- not exactly like this, but

7     he required it daily.  And I think that that's a great idea.

8          So he said what you'll do is, you know, the attorneys will

9     designate one person, and they'll get those things done daily.

10    And that way we know what's come in and what hasn't come in.

11    And if there are any -- if there are any disputes, we deal

12    with them immediately rather than later.

13         So as you know, you're going to be filing proposed

14    findings of fact and conclusions of law and on a daily basis.

15    So the next day, the day after trial, you file a redlined

16    version which shows what's actually been proved as opposed to

17    what is proposed in terms of findings of fact.  Conclusions of

18    law are a little bit different.

19         **MR. BORNSTEIN:**  So I expect the way Your Honor is

20    envisioning this, in the first few days of trial would be an

21    awful lot of strikeout for things that haven't yet come in.

22    Is that the way that you are envisioning this would happen?

23    Because we clearly wouldn't have gotten to the full set of our

24    findings of fact after only the -- you know, the first few

25    days of trial.  So this would be an evolving document where in

1    the beginning there'd be a lot of things --

2          **THE COURT:**  It's not a strikeout as much as it is the

3    redline.  So it says, you know, in 2007 the iPhone was -- you

4    know, hit the market.  That's a proposed finding of fact.

5    After the day one or perhaps it's -- you know, after day one,

6    it would say at the end of that sentence, "day one of trial,

7    testimony Tim Cook."

8          So it's not that you're striking everything.  It's that

9    you're adding the record cites showing that you've proved it.

10          **MR. BORNSTEIN:**  I see.  That's very helpful.  Thank

11    you.

12          **THE COURT:**  And then what we can do at the end in

13    light of what you just said is that I am sure that if there is

14    an opinion by an expert that was based on a fact that was

15    never proved, the opposing side is going to let me know that.

16    Right?  I'm sure you won't let that slide.

17          Okay.

18          **MR. DOREN:**  Your Honor, one other comment or question

19    on the -- the order of expert witnesses.

20          Your Honor has expressed a preference for back-to-back

21    experts.  As Mr. Bornstein referenced, Professor Evans will be

22    providing a number of opinions to which we will be offering a

23    number of experts in response.  In other words, multiple

24    experts in response to the one.

25          And that puts us collectively in a position where after

1    Dr. Evans takes the stand, then several Apple witnesses would

2    take the stand.  And we wanted to ask the Court, in light of

3    that, since it may not have been clear that we had -- that

4    that would be the sequencing of experts, whether back to back

5    is still the Court's preference, or if Apple could present

6    those experts after its fact witnesses testify in its -- in

7    its case.  Obviously whatever the Court's preference.

8         **THE COURT:**  You know, the -- the one that I'm -- I

9    don't -- your brief statements of the summary of their

10   testimony is pretty brief, which is fine.  It's hard to give

11   you an informed opinion.  What my -- my main concern is the

12   economic experts.  Those are the ones that I would really

13   prefer to have back to back.

14        **MR. DOREN:**  And so --

15        **THE COURT:**  On issues like security and stuff like

16   that, I don't -- it's less of an issue.  But the economic

17   experts I'd like to have back to back.

18        **MR. DOREN:**  So where -- where that likely has us, and

19   I'm just stating it so we're all on the same page -- is the --

20   the Epic economist or economists will testify, and then Apple

21   currently has potentially four economists who would -- who

22   would testify then immediately thereafter so the Court

23   would -- would have them all as a unit basically.

24        **THE COURT:**  I just -- I think it will help me, you

25   know, grasp those concepts.  And frankly, look, I ask

1    questions in a bench trial.  And so I'll be able to ask

2    questions while everything is still fresh.  So --

3              **MR. DOREN:**  Thank you.

4              **THE COURT:**  -- I don't tend to do it in jury trials

5    but this isn't a jury trial.

6              **MR. DOREN:**  Thank you, Your Honor.

7              **MR. BORNSTEIN:**  And to that end, Your Honor, to round

8    it out, as we discussed, we do have our rebuttal experts.  I

9    presume -- I shouldn't presume.  Would Your Honor prefer to

10   have those come at the end so that those rebuttal experts can

11   take account not only of the expert testimony, but also the

12   facts that may be presented in Apple's case, rather than have

13   them come, you know, immediately after the Apple experts?  And

14   then we really -- we don't get kind of a full opportunity to

15   do rebuttal based on everything.

16        So I think it would be our preference to have them come at

17   the end, but I want to be sure we're responsive to what would

18   be most helpful to the Court.

19             **THE COURT:**  Look, I'm going to let you try your case

20   the way you're going to try your case.  I've told you what I

21   think will be helpful.  If you think it will be more helpful

22   for me to have all those facts before they come back in, then

23   that's fine.

24        In terms of the economic theory, I want them back to back.

25   If there's something else going on here, then, you know, then

```
1    you can -- then you can wait.  I'll leave it to you.

2            MR. BORNSTEIN:  Okay.  Thank you, Your Honor.  We'll

3    give that consideration.

4            THE COURT:  Okay.

5            MR. DOREN:  And then, Your Honor, the last item, at

6    least that -- that Apple has on its list, is simply the

7    question of liability and remedies and whether obviously Apple

8    does not expect there to be a remedy resulting from these

9    proceedings since that -- it believes there will be no

10   liability.  But having said that, we just want to know the

11   Court's expectations in this regard.

12      We --

13           THE COURT:  My expectation is that everything comes

14   in.  We are not bifurcating.  I want to understand the

15   totality of the liability and remedies issues.

16      I am -- I have pushed everything aside so that I can fully

17   engage in this case.  I've moved my criminal calendars until

18   after this trial.  And two weeks after this trial, I go into a

19   jury trial.  So my -- what I want is I want it all there now.

20           MR. DOREN:  Very well.  Thank you.

21           THE COURT:  Other questions?

22           MS. MOYÉ:  Your Honor, could I just circle back on

23   written expert directs for one moment.

24      You've been very generous in giving us a large word count.

25   I just want to be sure about the Court's expectation about the
```

1   scope of oral direct expert testimony in light of the written

2   direct.

3        Is it the Court's expectation that all of the direct --

4        **THE COURT:**  I have no expectation, Ms. Moyé.  I've

5   given you 45 hours.  You use it the way you want.

6        **MS. MOYÉ:**  Okay.

7        **MR. DOREN:**  Your Honor, let me reframe the question.

8   In terms of the written directs, do you expect them to be

9   comprehensive statements of the opinions to be offered by each

10  expert?

11       **MS. MOYÉ:**  That's the question.

12       **THE COURT:**  I will read what you give me within these

13  limits, and if you want to give me half, then I'll read half.

14  If you give my the whole thing, then I expect I'll get the

15  whole thing.  I -- you know, if for some reason you think you

16  don't want it in writing and it needs to be oral, okay, fine.

17  There -- there isn't -- I guess there isn't an expectation.  I

18  will take it orally, I will take it in writing.

19       **MR. DOREN:**  That's helpful.

20       **MS. MOYÉ:**  Understood, Your Honor.  We just wanted to

21  be clear.  Thank you.

22       **THE COURT:**  All right.  I think writing is easier.

23  It certainly helps for an order.  But --

24       **MS. MOYÉ:**  Yes, Your Honor, that's why --

25                 (Simultaneous colloquy.)

1          **MS. MOYÉ:**  Yeah, that's why we raised the issue

2    because the Court had previously explained how it intended to

3    use the written directs.  So --

4          **THE COURT:**  Ms. Moyé, you should invest in a $30 mic.

5          **MS. MOYÉ:**  I actually have a mic here.  I'm so sorry,

6    Your Honor, that it's creating difficulty.  I will get a

7    better one.

8          **THE COURT:**  We're going into trial next week on Zoom,

9    and one of the lawyers has this old-fashioned retro mic that

10   looks like a radio mic.  He said it cost him $35 on Amazon,

11   and we can hear him great.  So....

12         **MS. MOYÉ:**  I will check with that counsel, Your

13   Honor.

14         **THE COURT:**  Okay.

15      Other questions?

16         **MS. FORREST:**  I don't think we had anything further

17   on our list, Your Honor.

18         **MR. DOREN:**  That is our agenda, Your Honor.

19         **THE COURT:**  Do we have any -- any update in terms of

20   how many individuals we think are going to be testifying

21   remotely or asking to testify remotely?

22         **MS. FORREST:**  Your Honor, we have, we think

23   potentially and we're not yet sure, two.  And we are trying to

24   assess whether or not that's in fact going to occur or not.

25      But the bulk -- the vast majority of witnesses should be

1    testifying in person, Your Honor, for the Epic side.

2         **MR. DOREN:**  And, Your Honor, for Apple, I'm aware of

3    one witness currently who may seek leave to testify remotely.

4    But, again, the majority will be live.

5         **THE COURT:**  Okay.  That's helpful to know because

6    we'll still have to outfit the courtroom to -- to allow for

7    that remote appearance.

8         **MR. BORNSTEIN:**  Your Honor, it does occur to me there

9    is one other item that I thought would be helpful to raise

10   which is that we -- under the Court's rules, we have due to

11   the Court today our compliance statement.  And I --

12        **THE COURT:**  You're all complying?

13        **MR. BORNSTEIN:**  I can attest on behalf of Epic, we

14   are -- we are complying.  And I -- I would ask that you excuse

15   us of the opportunity to -- to file that piece of paper if we

16   can make an oral representation to the Court right now.

17        **MR. DOREN:**  I will join Mr. Bornstein's

18   representation and request.

19        **THE COURT:**  All right.  That's noted.

20      And, Ms. Stone, you can take them off the compliance

21   calendar.

22        **MR. BORNSTEIN:**  Thank you, Your Honor.

23        **THE COURT:**  Okay.  I think -- and you've made

24   arrangements -- if not, just don't forget to make arrangements

25   for the court reporter.  I'm assuming you're going to want

1    realtime and daily transcripts.

2        **MR. BORNSTEIN:**  Yes, Your Honor.

3        **THE COURT:**  And then do I have you on my calendar

4    again?  Or are we done?

5        **MR. BORNSTEIN:**  We do have a final pretrial

6    conference set in April.

7        **MS. FORREST:**  I think it's the 21st of April.

8        **MR. BORNSTEIN:**  That's right.

9        **THE COURT:**  Okay.  Do you want to leave it on

10   calendar, I take it?

11       **MS. FORREST:**  I think it would be helpful, Your

12   Honor, just in case there are additional issues.  But we can

13   confer in advance, and if there's nothing else for us to

14   raise, we can inform the Court and Your Honor can make a

15   determination as to whether we should proceed or not.

16       **MR. DOREN:**  Agreed.

17       **THE COURT:**  Okay.  If you do want to proceed, again

18   it's helpful for me when you send me your agenda in advance.

19   I was able to, on some of these things, because you sent it in

20   advance, talk to our court staff which is why I got that mask

21   and other things.  So it gives me a little bit of a head start

22   so I can actually be responsive as opposed to just taking down

23   your questions.

24      Okay?

25       **MR. BORNSTEIN:**  Thank you, Your Honor.

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **MR. DOREN:**  Thank you, Your Honor.

2          **MS. FORREST:**  All right.  Thank you.

3          **THE COURT:**  If there's nothing else, then we're

4   adjourned.  Stay safe, and we'll see you on the platform soon.

5   Thank you.

6          **MR. DOREN:**  Thank you, Your Honor.

7          **MS. FORREST:**  Thanks.

8          (Proceedings were concluded at 10:23 A.M.)

9                        --o0o--

10

11

12                **CERTIFICATE OF REPORTER**

13

14          I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16   I further certify that I am neither counsel for, related to,

17   nor employed by any of the parties to the action in which this

18   hearing was taken, and further that I am not financially nor

19   otherwise interested in the outcome of the action.

20

21   _____

22          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

23                Friday, March 26, 2021

24

25