Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS S. HIXSON, MAGISTRATE JUDGE

EPIC GAMES, INC.,                    )
                                     )
          Plaintiff/                 )
          Counter-defendant,         )
                                     )
  VS.                                )   No. 20-cv-05640-YGR (TSH)
                                     )
APPLE INC.,                          )
                                     )
          Defendant/                 )
          Counterclaimant.           )
_____)
                                         San Francisco, California
                                         Friday, April 9, 2021


**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**


**APPEARANCES**: (via Zoom)

Attorneys for Plaintiff Epic Games, Inc.:
                    CRAVATH, SWAINE & MOORE LLP
                    825 Eighth Avenue
                    New York, New York 10019
               **BY:  LAUREN A. MOSKOWITZ, ESQ.**

For Defendant Apple Inc.:
                    GIBSON, DUNN & CRUTCHER LLP
                    333 South Grand Avenue
                    Los Angeles, California 90071
               **BY:  JAY P. SRINIVASAN**



Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

<u>**Friday - April 9, 2021**</u>                                        **8:00 A.M.**

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Good morning, everyone.  We are here in Civil action 20-5640, Epic Games, Inc. versus Apple Inc.  The Honorable Thomas S. Hixson presiding.

Counsel, please state your appearances.  Let's start with the plaintiff.

**MS. MOSKOWITZ:**  Good morning, Your Honor.  Lauren Moskowitz, from Cravath, Swaine & Moore, on behalf of Epic Games.

**THE COURT:**  Good morning.

**MR. SRINIVASAN:**  Good morning, Your Honor.  Jay Srinivasan, of Gibson Dunn, for Apple.

**THE COURT:**  Good morning.  So a couple of issues for this hearing.  With respect to Cragg -- and is that how his name is pronounced, Ms. Moskowitz?

**MS. MOSKOWITZ:**  Yes, Your Honor.

**THE COURT:**  All right.  My tentative thought is that if he misspoke at his deposition, and it seems like Epic's position is that he did, then I think he needs to correct that.  His deposition testimony certainly conveys the impression that he performed a regression analysis on consumer expenditures.

And the ordinary way to handle misstatements during a deposition, obviously, is through a statement of changes under

1  Rule 30, where it's essentially an errata.  But because this

2  implicates whether he performed an analysis that would need to

3  be provided to Apple, I think that we need more than just some

4  after-the-fact edit by Epic's attorneys.

5       I think Cragg himself needs to clarify on the record what

6  analysis he did or did not do.  So my tentative thought is that

7  Apple should get to redepose him about this regression analysis

8  and about his prior testimony and about the change to paragraph

9  37 to his rebuttal report.

10      But this should be a pretty short deposition.  I'm

11 thinking I would cap it at 30 minutes.  And depending on what

12 he says, it might not need more than five minutes.

13      But let me ask, Epic, for your thoughts in response to

14 that tentative.

15      **MS. MOSKOWITZ:**  Your Honor, I certainly understand

16 that they don't need to take Epic's word for it.  I think that

17 Mr. Cragg was prepared to put in a signed errata -- well, he

18 already did put in a signed errata in removing the expenditures

19 language which was, I think, causing the confusion even with

20 him, frankly, at the deposition.

21      But the notion that he needs to sit for a deposition just

22 to say what he's saying in writing and prepared to say in

23 writing, including any extra words to make it clear that there

24 was no analysis, under whatever name you want to call it that

25 was being asked about at that deposition, he's prepared to sign

```
 1    that errata.

 2        So it seems unnecessary but, of course, we'll follow Your

 3    Honor's instruction in that regard.

 4            THE COURT:  And let me ask, Apple, your thoughts.

 5            MR. SRINIVASAN:  Your Honor, first of all, thank you

 6    for squeezing us in.  Second of all, we agree with your

 7    proposal.

 8        The problem with just the errata itself, as we briefed in

 9    the letter, in fact, the striking of that language in his

10    report and similarly striking his testimony, doesn't really

11    solve the confusion here because there are prior statements

12    that suggest he did an analysis.  He doesn't back off the fact

13    that he did an analysis that included both revenues and play

14    time.

15        So we do think a very short deposition is appropriate.

16    It's a Zoom era.  We think we can minimally burden Dr. Cragg.

17    And, as you say, we certainly don't need more than half an

18    hour, and we hope to conclude it much sooner.

19            THE COURT:  All righty.  Okay.  And that's what I'm

20    going to do.

21        Now, with respect to the other issue about communications,

22    and I gather it's just two -- let me ask Epic.  You identified

23    there were only two of your expert witnesses, Evans and Athey,

24    who had anything even potentially responsive.  Is that still

25    the case?
```

 1          MS. MOSKOWITZ:  Yes, Your Honor.

 2          THE COURT:  Can you describe for me, to the extent you

 3  know, how many responsive materials are we talking about?

 4  That's what I couldn't get a sense of from your brief.

 5          MS. MOSKOWITZ:  Your Honor, frankly, I'm not sure I

 6  even know the answer because the language as written is

 7  extremely broad.  I mean, it could cover any communications.

 8  Some of these experts sit on boards.  Any communications, any

 9  discussions.  Of course, they're experts in this field.

10      So, you know, I frankly don't even know how broad it is.

11  I am aware that there is a nonzero set, but I don't know the

12  full range because the language is a bit broad and

13  all-encompassing.  So I do think that that may depend,

14  depending on how narrowly we read the request itself.

15          THE COURT:  I see.

16      Well, it's true that the request does contain the word

17  "communications."  And that could be anything.  It could be

18  emails or something.  But I think the gist of it is

19  something -- I'm looking because I've got it on my other

20  monitor over here.  Reports, lectures, speeches, talks.

21      What if I struck the word "communications," because of its

22  potentially all-encompassing range, and just left it at

23  presentations, reports, lectures, speeches or talks, would you

24  be able to ballpark that?  Those are more formalized documents.

25          MS. MOSKOWITZ:  Your Honor, I don't know -- I still

1  don't know the answer in terms of volume.  We, frankly, don't

2  have a right to know some of these things either.  Generally,

3  the practice you follow is you just don't cover confidential

4  issues.

5       We are producing the public -- things that were made

6  public, publicly or made public.  And the confidential

7  materials, these experts have a number of confidential

8  engagements.  And the general practice is that testifiers do do

9  that, but that you disclose the public stuff and not the

10 confidential, including even the identity of the clients and

11 the nature of the engagement.

12      And the request itself is really speaking about actions

13 taken by these individuals in their capacity as a confidential

14 consultant, presenting or speaking on behalf of a client not

15 involved in this case to potentially sensitive bodies in

16 confidential context.

17      So I don't know the scope of what these experts have done,

18 and I -- and they won't tell me either because of just the

19 confidentiality obligations that they have to their other

20 clients.  So we thought it was appropriate, given the balancing

21 here, to produce the public stuff.

22      This is, I guess, impeachment that they looking for.

23 These depositions have already happened.  These subpoenas were

24 served quite late.  And so just in the let's get to trial,

25 which is three weeks from Monday, we thought that we would give

1   them the public stuff.  They already have all the materials

2   relied upon, right, which is the baseline.

3       And so we just -- I -- I'm not being totally responsive to

4   Your Honor's question, which I realize now as I've been

5   continuing to talk.  So I think the short answer is I don't

6   know how much we're talking about other than I think that there

7   is concern that I can't even get that information from them

8   given that it would be a disclosure of their confidentiality

9   obligations.

10          **THE COURT:**  I see.

11      Well, when you draw the line at public versus

12  confidential, it makes me wonder.  In litigation, expert

13  reports are almost always designated confidential.  So if

14  you're excluding everything that's confidential, that would be

15  prior expert reports in litigation.  But that's precisely the

16  thing Apple would want to impeach them with, so that's kind of

17  hard.

18      I totally understand if the engagement, itself, is

19  confidential, then they can redact clients' names.  That's

20  fine.  Apple agreed to that as well.

21      But the expert work just normally isn't public.  So that's

22  the concern that I have with that.

23          **MS. MOSKOWITZ:**  And we didn't get that from them, Your

24  Honor, either.  I think the practice is that when you -- you

25  list your prior testimonies in the last four years, right.

1   That's the standard disclosure, and we did that, and we got

2   that from them.

3        And to the extent that that's all that they were asking

4   for, actual written expert reports, that's not what they're

5   asking for here.  They're actually talking about completely

6   separate things, where there wasn't an expert report submitted

7   in the litigation but, rather, a presentation or a discussion

8   with a regulator in a completely different context.

9        So this request doesn't even talk about documents created

10  or reports created in the context of a litigation.

11        **THE COURT:**  All right.  The protective order has a

12  provision in its Section 10 that where a party has to produce

13  documents that have a nonparty's confidential information, that

14  there's a procedure that they give notice to the nonparty, and

15  then the nonparty has 14 days to move for a protective order or

16  not.  And if they don't, then the party has to produce it.

17        A tentative thought I have is just to make the experts

18  follow that procedure, and then the burden is on the nonparties

19  to move, if they want to.

20        Why wouldn't that be an appropriate way to proceed?

21        **MS. MOSKOWITZ:**  Your Honor, even the identity of these

22  clients is confidential.  The fact that X company used this

23  expert in a consulting capacity to provide confidential

24  information to a regulator, all of the aspects of that is

25  confidential.

1          So to disclose the parties who have retained these experts

2     and force them to come speak to why their materials that they

3     thought were going to remain confidential are going to be

4     produced to Apple in this context, in and of itself would be a

5     disclosure beyond what I think they have an expectation of

6     privacy as to.

7          And the protective order certainly does contemplate that

8     Epic might have confidential information of third parties, and

9     we've been doing that very thing to give notice to third

10    parties.

11         But treating the expert as a third party and then their

12    clients as even yet another step removed of third parties, the

13    burden of giving the notice, the burden on the clients, the

14    chilling effect that this would have on all testifying experts,

15    that every confidential engagement that they have is going to

16    be subject to scrutiny, it really seems like a Hobson's choice

17    for all experts going forward to be able to be a testifier when

18    they're not going to be able to protect their clients'

19    confidentiality obligations and they're including the very name

20    of their clients and the context in which they've been engaged,

21    just to get some extra impeachment material where they do have

22    everything that's public, they have the writings, they have

23    prior trial testimony, they have a lot of that material.

24         The burden and the balancing here really seems to weigh

25    against forcing testifying experts to even give that notice and

force those clients to come forward and disclose themselves and
the regulators that they were involved in.  I mean, this is
very sensitive material for all of these individuals and their
clients.

So I don't think that would solve the issue, and I think
it would create part of the very issue that we're trying to
protect.

**THE COURT:**  One thing I'm struggling with is
proportionality.  And if it's just five presentations that they
have to disclose, because that's all that's responsive, then I
think that's easy and doable.  But if it's 200, then it's
ridiculous.  And I'm feeling frustrated because you're not
telling me which of those is the case.

**MS. MOSKOWITZ:**  Your Honor, I apologize that I don't
know.  But even for the five, even if it were just five, I
still think that it's -- the burden is not just on gathering
the materials, it's the disclosure.  It's the fact that the
identity of their clients -- redacting just the names isn't
going to be enough because the very substance and material in
there could very well provide the information about what this
consultant was hired for, who they were speaking to, and on
whose behalf and about what, all of which was expected to be
confidential and not to be disclosed to anyone, including
anyone who ever retains that expert ever again.  It's just not
to be disclosed.  It's not shared.  And that is the general

1    practice in this industry.

2        And Apple itself is specifically looking for information

3    that touches upon their business.  If these consultant experts

4    were speaking about Apple to regulators on behalf of other

5    clients, that is extremely sensitive information that has

6    nothing to do with their capacity to speak on the issues that

7    they are relying upon in this case.  And it seems inappropriate

8    for Apple to be using this mechanism to fish for that

9    information.  So we're very concerned about the substance as

10   well.

11       **THE COURT:**  Why would discussion with regulators be

12   confidential?  Shouldn't that be public?

13       **MS. MOSKOWITZ:**  Not -- they are -- they are treated as

14   confidential in many instances.  When companies are asked to

15   and do speak to regulators, it is often on an anonymous basis

16   and not disclosed publicly, let alone to other companies.

17       **THE COURT:**  Well, but I would think that if they're

18   telling antitrust regulators one thing and then saying a

19   different thing in this lawsuit, then that could be important

20   impeachment evidence.  Wouldn't it be?

21       **MS. MOSKOWITZ:**  Your Honor, in a confidential context

22   where this individual is speaking on issues that may be in some

23   ways overlapping, there is a proportionality issue.

24       To get the impeachment would require disclosing

25   confidential investigations and confidential information

1    provided in the context of those investigations when retained

2    by confidential parties being called to speak to regulators in

3    those context.  That is a very disproportionate outcome for

4    those materials.

5        The experts here have been retained in confidential

6    context like that.  And they have their own prior -- they have

7    other publicly available -- we're giving them everything that

8    they have publicly in response to this.  They have all the

9    materials relied upon.  They have laundry lists of prior

10   writings by these experts.  They have plenty of places to go

11   for true impeachment.

12       True impeachment does not need to be every single thing

13   this person has ever said on behalf of a client.  And that's

14   where the proportionality comes in, I think, Your Honor.

15          **THE COURT:**  All right.  Let me hear from Apple.

16          **MR. SRINIVASAN:**  Sure, Your Honor.  I don't understand

17   what Ms. Moskowitz means by "true impeachment."  What we have

18   asked for is materials on relevant issues in this lawsuit that

19   specific experts have opined on.

20       As you suggested, Your Honor, presentations made to a

21   regulator in particular are highly probative of what that

22   expert's views are on things or what they've expressed before,

23   to see if they're saying something different to regulators than

24   what they're saying on behalf of Epic currently.

25       You know, as far as this disclosing confidential

```
 1    information broadly, as we mentioned, we're not asking for the
 2    confidential information of regulators.  We're not asking about
 3    their investigations.  We're asking about what the expert
 4    presented and simply, in the case of Dr. Evans or Dr. Athey,
 5    what their opinions were on these issues.
 6         I'm a little surprised -- or I shouldn't say I'm
 7    surprised.  I mean, the issue of confidentiality, Epic throwing
 8    itself at the mercy of the Court on that basis, rings a little
 9    hollow for me.
10         We've had Valve come in here and say, "Hey, our material's
11    confidential," and you've said you have a protective order,
12    which is absolutely right.
13         We've had Samsung come in and say, "We shouldn't have to
14    give our confidentiality information up," and you said there's
15    a protective order.
16         Epic is a litigant.  And this is really an Epic issue;
17    right?  This is not the doctors coming in, filing their own
18    motion.  Epic filed this motion.  I mean, these are
19    Epic-related issues.  Epic should be subject to the same
20    protective order it's insisting third parties should be.
21         The confidentiality issue, I still don't fully understand
22    it.  We've said we can keep the nature of the party private,
23    and so there is no issue there.  But, fundamentally, this
24    information is absolutely important to us.
25         Dr. Athey, in particular, you can go on the website, on
```

1   the Internet, and she is very closely aligned with Microsoft.

2   She's on their website.  You can find her bio on their website.

3   It's important for us to know what she said in other industry

4   context because these other industry players aren't neutral in

5   this battle.  And we should know what she said.  And even if we

6   don't know who the identity of the client is, we understand

7   that she's opined and Dr. Evans has opined on related issues.

8          On the issue of burden, Your Honor, as Ms. Moskowitz said,

9   they have never made a burden argument in the sense of volume.

10  They've said, we'll give you everything public.

11         Now, as you say, if the private materials are what's more

12  voluminous, we could have had that discussion with them if they

13  would have come to us and said, we have 200 of these.  We would

14  have -- we would have said five us -- we would have

15  prioritized.  We would have worked for them.

16         If there are only five, we want them all.  If there's only

17  ten, we want them all.  If there's 200, we'll work with them.

18  We understand what the practical constraints are.  We're

19  particularly interested in the regulator presentations.

20         And, finally, on communications, I appreciate Your Honor's

21  effort to broker something, you know, in the middle here.  I

22  will remind Your Honor that when it came to Analysis Group we

23  had another ruling by Your Honor early in this case where you

24  said, "You have to give the communications of Analysis Group

25  outside of their retention," and it was related to a prior

 1   retention that had nothing to do with this lawsuit.

 2        And so we do believe communications are relevant.  And,

 3   again, if it's a volume issue, we can have that discussion.

 4   But they have not indicated that that's the issue and have

 5   simply relied on this confidentiality concern which, frankly,

 6   isn't persuasive at all given all of the other third parties,

 7   given the nature of the protective order that we have here.

 8   The material will be protected.  It will be subject to the same

 9   protections that we've insisted that other parties be subject

10   to, including Epic.

11        **THE COURT:**  One issue, there are seven subjects in

12   Apple's third RFP.  And the sixth is mobile payment or payment

13   processing systems, and the seventh is middleware.

14        Those seem like -- although I understand their relevance

15   to this case, those seem like they could hit on a lot of things

16   that may have no -- like middleware, that's just a very vague

17   and broad topic.

18        And, you know, payment processing systems, if they did

19   anything regarding Square or, you know, credit card payments,

20   those seem like those could reach a lot of reports that might

21   not be particularly relevant in this case.

22        Does Apple have any strong objection if I strike those two

23   topics?

24        **MR. SRINIVASAN:**  Well, Your Honor, I know it doesn't

25   seem evident from the pleadings, but middleware is probably the

1   word you'd see the most in Dr. Athey's report.  It is basically

2   a focus of her analysis of middleware, and that's the reason

3   that's in there.  And she talks about how that's the way we

4   should be looking at things not the way that Apple has defined

5   the market.

6        And, of course, mobile payment and processing is what they

7   claim is a tying -- is the tied product market here.  And,

8   unfortunately, those are -- it's hard for me to sit here and

9   say you can strike those, because those are key issues.

10       We would much prefer to, you know, understand from Epic

11  what they have, you know, in terms of the volume here because,

12  again, if it's -- if it's not a lot we can -- we would want

13  them all.  And if it's a lot, then we would prefer to organize

14  it slightly differently in terms of is it a presentation to a

15  regulator?  Is it a presentation to a business group or

16  industry organization?

17       We would rather break it along those lines rather than

18  excise substantive issues, because these are all very relevant

19  issues to Dr. Athey's opinion in particular, for instance, in

20  the two that you mentioned.

21            **THE COURT:**  I see.  Okay.

22       Well, here's what I'm leaning toward -- and I'm interested

23  in Epic's thoughts -- is ordering the experts to give notice

24  under the protective order.  Then the nonparties have 14 days

25  to either propose redactions or move for protective order.

1        But I'm thinking I'm just going to say in my order that

2   you provided me with no information about how many responsive

3   materials there are.  And I'm not intending to order the

4   experts to produce 200 presentations.  I'm not intending that

5   at all.

6        And if you talk with the experts and the volume seems

7   high, then you should ask for leave to file a motion for

8   reconsideration, because I am concerned about the potential

9   proportionality problem here.  If it's just a handful of

10  things, then it doesn't seem like it's a problem.

11       But I'm really not intending people to do a large amount

12  of work on the eve of trial because I understand you have more

13  important things to do.  It's just, based on the information

14  given to me, I'm really not able to evaluate whether this is a

15  big ask or a small ask.  If it's a couple of hours of work,

16  then it seems worth doing.  But I don't mean to be burdening

17  the experts with a lot of work.

18       So maybe you'll come back to me on Monday and say, yeah,

19  we talked with them over the weekend, and it's a huge pile of

20  stuff, and then I'll say, well, then, it's just not worth

21  doing.  But if it's only a few things, then I think they should

22  do it.

23       So I don't know.  Ms. Moskowitz, your reactions?

24            MS. MOSKOWITZ:  A couple of reactions, Your Honor.

25  Thank you.

1       One is, it sounded like Apple's counsel was unwilling to

2  limit the subject matter, but that there could be -- some of

3  the even categories of where the experts need to look, any

4  company that was presented to or communicated with, right, I

5  heard Your Honor, but Apple's trying to keep that in the mix.

6  Basically, any document where there's a communication with a

7  company about any of these topics does seem broad.

8       So to the extent the real concern here is communications

9  or presentations to regulators on behalf of these clients, we

10 do still think that there are confidentiality concerns.  But

11 that would limit the scope of even what the expert has to do to

12 try to figure out what's out there rather than any

13 communication with any business in any real capacity.

14      So that is one way that we can narrow it.  The other

15 issue, I think, Your Honor, especially on that category, is one

16 set of protections that we would really ask the Court to

17 provide, which is not contemplated by the protective order

18 currently, is that there be outside attorneys' eyes only.

19      We are very concerned about Apple having this information

20 more generally.  And so given the subject matters that are

21 being asked about here, that they be given only to outside

22 counsel on outside counsel's eyes only and not any of the Apple

23 employees or in-house counsel.

24      Again, this is potentially competitively sensitive

25 information, even the fact of these communications or

1   presentations in a confidential regulatory context.  So

2   that's -- that's one concern.

3        The -- well, I'll stop there.  So that would be one of the

4   requests we would make on top of potentially limiting this to

5   regulatory context.

6        THE COURT:  I feel like you're speaking hypothetically

7   about things that might or might not exist, and I'm not sure

8   that you even know if they exist.

9        MS. MOSKOWITZ:  I do believe that this category is not

10  a null set and that the concern is real about the

11  confidentiality with respect to Apple.

12       THE COURT:  Mr. Srinivasan, your thoughts.

13       MR. SRINIVASAN:  Yeah.  So this is part of the problem

14  is because we do feel there's a bit of the hide the ball here.

15       But what we would -- you know, a possible solution would

16  be for them to tell us what that list is.  If there's a burden

17  issue and they give us a list of 200, and they say, well, we

18  have these 200 things that would be covered by this, then we'd,

19  therefore, have all those implicated third parties that we have

20  to provide notice for, well, if they provided us that list

21  initially, we can say, well, look, okay, don't worry about, you

22  know, 80 percent of these, or focus just on these, and there's

23  only five or ten, or whatever it is.

24       We could have had that discussion.  We still can.  That

25  would limit the burden on them and what they need to do.  And

1    we're certainly willing to be reasonable.  We don't want to be

2    buried with 200 reports either.  And if they disclose to us

3    what the nature of this is, we can limit it for them.

4            **THE COURT:**  All right.  Anything further from Epic?

5            **MS. MOSKOWITZ:**  You know, Your Honor, I just -- the

6    very fact that these experts are going to have to look for

7    everything they ever said to any company in, really, any

8    context that touch upon any of these issues, including for the

9    very reason Mr. Srinivasan said he won't cut out middleware,

10   Professor Athey's expertise is in this topic, to the extent

11   she's having any communications with any company, including the

12   one she sits on the board of or otherwise, to even look for

13   that is burdensome.

14       And so that's -- that's part of the issue is to the extent

15   we can limit it to what they are really trying to get at.  And

16   I don't think it really is that -- it would be helpful to lower

17   the burden on the experts to even do this exercise more

18   broadly.

19           **THE COURT:**  Well, I'm thinking I'm going to strike the

20   word "communications" and just leave it with the more

21   formalized presentations, reports, lectures, speeches, or talks

22   so that they're not looking for, you know, every email or every

23   voicemail they've sent to somebody but something more formal,

24   something that would look like an expert opinion rather than

25   just everything they've said on this subject.

1      But, again, I'm just going to put in my order that if this

2   is a huge burden, I'm not intending to do that.  And so you can

3   come back and ask for leave to file a motion for

4   reconsideration if after talking with the experts you've

5   concluded that this is a big burden.  Because if it's just a

6   little bit of stuff, then I think it's worth doing.  And if

7   it's hundreds of things, I don't think it's worth doing.

8      So anyway, I will -- that's where I'm headed.  I'll try to

9   get an order out later today, but as I keep -- I'm now just

10  repeating myself.  If it's just a few things, I don't think

11  it's a problem.  But you are --

12          **MR. SRINIVASAN:**  Your Honor --

13          **THE COURT:**  I don't want you to do a lot of work on

14  this.

15     Go ahead.

16          **MR. SRINIVASAN:**  Your Honor, and just quickly on that,

17  and this is the frustration we have, if there are a lot of

18  things, just like there typically would be when there's a --

19  somebody comes to you and says this is a very burdensome

20  request, I think there should be, still, a step where they come

21  to us and say, "This is burdensome, would you narrow it?"

22     I'm concerned that they're going to come back to you on

23  Monday and say, "There's hundreds of these things, what can we

24  do?" and then we're somehow out of luck because there's too

25  much impeachment material.

1    We should certainly at least then have the right to say,

2    okay, we don't want all hundreds of whatever you have, we'll

3    just take this.  And that could just be five to ten

4    presentations, for instance, to regulators.

5    We're in a box here because they won't tell us.  If they

6    told us that there's five to ten presentations to regulators

7    and a bunch of other stuff to industry, or whatever it is, we

8    would work with them.

9    We have a practical limit.  They have a practical limit.

10    We have trial.  It's still important for us to get at least the

11    cream of the crop.  It shouldn't be all or nothing, is, I

12    suppose, all I'm saying.  But, you know, it's not our fault

13    that we're in this position.  It's there's because they won't

14    tell us.  That's all.

15    I understand Your Honor's order.  I agree with it and

16    where you're heading.  I just wanted to say that I feel like we

17    should have that option to at least have some piece of it, if

18    it ends up being too much.

19    **THE COURT:**  Okay.  That's fair enough.  I think that

20    if they -- if there is a lot of stuff, then Epic should

21    describe for you what it is, and at least by categories, so

22    that you can have a meaningful meet and confer and then narrow

23    it and say, okay, these are the things we want and ignore all

24    the rest.  That's certainly fair.

25    So I think if Epic does come back to me on Monday with a

1  motion like that, I do think that simultaneously they should

2  tell Apple, you know, here's what the universe is, we've got

3  some few things to regulators, we've got the rest went to

4  private clients.  And then the parties should meet and confer

5  and then, hopefully, you can just resolve it.

6      So I do think that that's appropriate to have that kind of

7  communication.  Unfortunately, the way this has been presented

8  is a blank box, and that's not helpful toward resolving the

9  discovery dispute.

10      All righty.  I think I have what I need to get out an

11  order.  Thank you for at least -- well, you're on the East

12  Coast, Ms. Moskowitz, so this 8:00 a.m. start time wasn't a

13  problem for you.  Thank you, Mr. Srinivasan, for jumping on at

14  8:00 a.m. West Cost time.

15      So the matter will stand submitted.  Thank you, counsel.

16      **MS. MOSKOWITZ:**  Thank you.

17      **MR. SRINIVASAN:**  Thank you for accommodating us.

18      (At 8:31 a.m. the proceedings were adjourned.)

19                    - - - - -

20

21

22

23

24

25

1                    <u>**CERTIFICATE OF REPORTER**</u>

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4    DATE: Friday, April 9, 2021

5

6

7

8    _____

9        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                   U.S. Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25