# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>APPLE INC.,<br><br>　　　　　　Defendant. | Case No. 4:20-CV-05640-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

**REBUTTAL EXPERT REPORT OF DANIEL L. RUBINFELD, PH.D.**

**March 15, 2021**

## II. Summary

9. The challenged technical restrictions are procompetitive. The introduction of a new product with distinct features serves a procompetitive purpose because it expands the scope of consumer choice, which is almost always beneficial to consumers.

10. Apple's design choice to not facilitate sideloading, i.e., to create a "walled garden," was made before the first iPhone was sold and before Apple created the App Store, supporting my view that this design choice is procompetitive.

11. The vertical restraints that Epic challenges are crucially responsible for enabling the growth of the iOS ecosystem and the benefits that flow from it. They are procompetitive, prevent opportunistic behavior and free riding, and foster interbrand competition.

12. Epic's complaint argues that the App Store should not restrict third-party app stores that would not be subject to the App Store's policies and rules. The App Store's policies and rules, coupled with the hardware of the iPhone and the software of iOS, work together to keep users safe and secure, to give users the confidence to take advantage of the powers of the iPhone and its apps, and to ensure that the iOS platform itself stays healthy and thrives in the face of increasingly well-funded and sophisticated bad actors who would—whether by design or as collateral damage—cause harm to iPhone users. Apple's app-review policies are further necessary to prevent reputational damage to the iOS platform because customers that are harmed will not reliably discern that it was a malicious app picked up on a rogue app store, rather than instead some central feature of iOS, that was to blame. A loss of trust by users in the iOS platform could become a downward spiral.

13. Apple's App Store policies and rules, including the challenged restrictions, are integral to a licensing agreement—the Developer Program License Agreement ("DPLA")— that is procompetitive because it enables millions of developers to combine their complementary assets, skills, knowledge, and intellectual property with the revolutionary capabilities of Apple's iPhone on a platform that protects users and gives them confidence to freely and fully explore and take advantage of those developers' contributions. The challenged restraints serve procompetitive purposes because (a) they assure the safety, security, and quality of experience for users that is a defining

attribute of the iOS ecosystem and (b) they prevent free riding. The DPLA does not harm any horizontal competition that would have existed but for the DPLA.

14. Dr. Evans's claims that certain contractual restraints are anticompetitive are unconvincing. Dr. Evans is incorrect in his claim that, even absent Apple's App Store rules and policies, it is not possible that developers could free ride on Apple's innovations and investments.

15. Both Dr. Evans and Professor Athey fail to acknowledge the importance of Apple's intellectual property related to the iOS platform. Each fails to appropriately credit the procompetitive IP-driven benefits that flow from Apple's developer-related restrictions.

16. There are serious economic risks from wrongly condemning procompetitive behavior, particularly in technology markets. Given the high volume and rapid growth of the app economy, an erroneous condemnation of Apple's App Store policies could lead to significant foregone benefits.

17. The way third-party apps have been distributed on the Mac is not a benchmark for how Apple should allow third-party apps to be distributed on iOS. There are significant differences between the macOS and iOS platforms, including their history (Mac launched in 1984 vis-à-vis iPhone in 2007), how the devices are used, the range of sophistication of the users, the sensitivity of the information carried on them coupled with the relative vulnerability to theft and loss, and the number of apps users download.

18. The but-for worlds of both Dr. Evans and Professor Athey in essence argue for imposing a duty to deal upon Apple because each would impose a duty upon Apple to admit developers, third-party app stores, and third-party payment processes to the App Store on terms not chosen by Apple.

19. The duty upon Apple is more than the usual duty to deal; it would include a duty to redesign its hardware and software—both of which are covered by Apple's intellectual property—to make the iPhone interoperable with alternative app stores and with apps that would not qualify under Apple's app-review guidelines for distribution through the App Store.

20. It is well recognized by competition economists that imposing a duty to aid one's competitors as suggested by Epic would have adverse impacts on social welfare because it would erode ex ante incentives for investment and innovation. There is no economic basis to impose a duty upon Apple to redesign the iPhone and iOS to accommodate the preferred distribution model of Epic or any other developer. Seen from the perspective of competition economics, Epic's suggested application of the concept of an essential facility is at best suggestive of the imposition of a regulatory regime. It would be particularly inappropriate to apply such an "'essential facility' doctrine" to intellectual property.

21. Although Dr. Evans describes how other firms have made different business model choices in different circumstances than Apple, the choice of business model is an important dimension of competition and there should be no presumption that the old ways are the best ways or that a firm needs to justify choosing something new. The

fact that Apple's choice to create and adopt a new business model (the App Store) has been so successful illustrates the value of business model innovation.

22. The effort by Dr. Evans to draw inferences from the *U.S. v. Microsoft* case fails. In *Microsoft*, the DOJ proved that Microsoft had engaged in practices that attempted to exclude browser competition to maintain its operating system monopoly. Apple, however, has no operating system monopoly and has not attempted to exclude other operating systems or other gaming platforms. The competitive implications of Apple's design, policies, and rules of its platform are the opposite of the competitive implications of the actions Microsoft took in the 1990s. During that period, Microsoft monopolized a desktop operating system and aimed to protect its monopoly from competition from other operating systems. In contrast, Apple is engaged in intense inter-platform competition. Apple's competitive advantage is its iOS platform. The App Store and its rules are Apple's mechanism that allow it to freely design its product and ensure that consumers can trust that they will receive the full integrity of that design, including its safety, security, and usability. The App Store and its rules are central to Apple's offering of a competitive product.

23. Professor Athey sees the differentiations between iOS and Android not as a source of value to consumers but rather as creating switching costs that should be minimized. Professor Athey has described a but-for world in which she claims these switching costs would be reduced but she did not show that the reduction would be material, would increase competition between existing platforms, or would lead to the emergence of new ones. Her but-for world would homogenize the platforms to be uniform carriers of apps that users and developers would easily move between. This would be achieved at the cost of a reduction in the product differentiation between the iOS and Android platforms and would constitute a reduction in the competition between those platforms. Such a proposal would be extremely speculative. Professor Athey does not explain or specify, for example, the process or rationale by which this reduced differentiation would be achieved. Such an outcome—a loss of product differentiation—would be a severe loss to consumers, the economy, and innovation. The precedent it would set—one that sharply limited intellectual property rights and limited protection to innovators and investors in innovation—would be chilling to innovation going forward. Moreover, her focus on competition between operating systems is misguided, given that Epic has not claimed that Apple has monopolized or restrained competition among operating systems.

24. It is the differentiation between the iOS and the Android platforms that drives the competition between them. The choices thereby offered to consumers are extremely valuable. A key differentiator between the two platforms is Apple's approach, via the App Store and its policies and rules, to create a safe, secure, privacy-respecting, and highly usable experience for iOS users. Only Apple internalizes the health of the entire iOS platform, giving Apple uniquely strong incentives to manage the platform to maximize its value.

25. A Multiplatform App Store is not meaningfully conceived of as "middleware." In *Microsoft*, middleware was software that could enable entry by a new operating system by allowing applications written for one platform (or for no platform in particular) to

be run on a different platform. A Multiplatform App Store does not facilitate an iOS app running on Android or vice versa.

26. Consumers have the choice to select a mobile smartphone platform that takes a different approach than Apple. Many consumers exercise that option; many others choose Apple's platform. Apple's policies and rules for its App Store do nothing to dampen the viability of the alternative Android platform or deprive consumers of their option to choose that alternative platform. The but-for worlds of Dr. Evans and Professor Athey, on the other hand, would deprive all consumers of the option of choosing the platform where Apple takes responsibility for the safety, security, and privacy preservation of users.