# EXHIBIT G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Epic Games, Inc.,<br><br>　　　　　*Plaintiff*<br>　　v.<br><br>Apple Inc.,<br><br>　　　　　*Defendant* | Civil Action No. 4:20-CV-05640-YGR |

# REBUTTAL EXPERT REPORT OF FRANCINE LAFONTAINE, PH.D.

March 15, 2021

## 2. SUMMARY OF OPINIONS

21. Based on my review of the evidence and my economic analysis, I reach the following conclusions.

- On market definition, the relevant antitrust product market is the market for game transactions on digital transaction platforms. The relevant antitrust geographic market is the United States. Combined, I conclude that the relevant antitrust product market is the market for game transactions on digital transaction platforms that operate in the US.
- On market power, I conclude that both market structure and market outcomes are inconsistent with Apple having monopoly power or the ability to impose supracompetitive quality-adjusted prices.
- My findings on market power and Apple's inability to impose supracompetitive quality-adjusted prices lead me to conclude that Apple's practices with respect to the App Store cannot have harmed competition or have inflicted competitive harm on Epic.
- The reports by Epic's experts do not change my conclusions and in many ways reinforce them. In particular, Dr. Evans' market definition, market power, and competitive effects conclusions are erroneous and without merit.

22. I reach these main conclusions based on the following more granular conclusions.

23. First, the general role of market definition in antitrust matters is to identify competitive constraints relevant to the conduct at issue and thus assist in evaluating specific theories of harm (§ 3.1, p. 18). The focus of market definition is therefore on the ability and willingness of customers to substitute to alternatives, and the appropriate "perspective" to adopt is therefore that of the customer (§ 3.2, p. 20). Economists and antitrust agencies define relevant antitrust markets as intuitive, natural groupings based on qualitative and quantitative evidence—they do not mechanically define markets as the narrowest set of products that satisfy the hypothetical monopolist test (§ 3.3, p. 22). Finally, in the context of two-sided transaction platforms, it is critical to consider customers on *both* sides of the transaction platform—in this matter, game developers and consumers who play games (§ 3.4, p. 24).

24. With these general principles in mind, I find that the relevant antitrust product market is the market for game transactions on digital transaction platforms, including downloads, updates, and in-app purchases.[45] This conclusion is supported by:

- The two-sided nature of the App Store—which Dr. Evans now agrees with (§ 4.1.1, p. 29);
- The need to consider both game developers and consumers who play games—addressing the Court's "perspective" question (§ 4.1.2, p. 30);
- The need to include the product that Apple sells and Epic buys, but also consider whether alternatives exist beyond the App Store for developers and consumers (§ 4.1.3, p. 31);
- The fact that multiple transaction platforms offer digital game transactions, which constitute competitive alternatives to customers on both sides of the platform (§ 4.1.4, p. 32)—this is supported by quantitative (§ 4.1.5, p. 34) and qualitative (§ 4.1.6, p. 37) evidence and addresses the Court's "reasonable interchangeability" question;
- The need to consider transactions on other devices where consumers might play games, which should be analyzed as substitutes, not complements, to transactions through the App Store (§ 4.1.7, p. 39); and
- This market definition being consistent with the forward-looking nature of the injunction inquiry at issue in this litigation (§ 4.1.8, p. 41).

25. I then turn to two of the Court's other market definition questions. First, I discuss "cluster markets" and "bundle markets" and explain why neither is applicable to this case. They also do not warrant expanding the relevant product market from game transactions to all app transactions. In particular, "cluster markets" and "bundle markets" refer to different market definition concepts (§ 4.2.1, p. 44); neither app transactions nor digital game transactions meet the criteria for bundle markets (§ 4.2.2, p. 45); cluster markets can only be defined for analytical convenience when underlying independent product markets face similar competitive conditions (§ 4.2.3, p. 46); game and non-game transactions face different competitive conditions and hence cannot appropriately be clustered together (§ 4.2.4, p. 48); and expanding the relevant market to all app transactions would undermine the ability of the relevant market to assist in evaluating the theory of harm in this case (§ 4.2.5, p. 50).

---

[45] In general, when I use the term downloads I refer to initial app downloads, subsequent downloads of already purchased apps that had been deleted or on a new device, and app updates, all of which are facilitated by the App Store.

26. Second, I find that Epic and Dr. Evans are wrong to claim that their alleged "iOS App Distribution" market is properly analyzed as an aftermarket. In particular:

- Dr. Evans now concedes that the App Store is a two-sided transaction platform, which means that the relevant market definition question is customer substitution of transactions, not devices (§ 4.3.1, p. 54);
- The foremarket/aftermarket framework is inapplicable to the present case because consumers who play games frequently multi-home and are not locked-in (§ 4.3.2, p. 55); the same is true of game developers (§ 4.3.3, p. 56);
- That Dr. Evans' logic is flawed can be seen from the fact that his approach would also overstate market power in other contexts (§ 4.3.4, p. 57);
- Because both sides of game transaction platforms multi-home, Epic and Dr. Evans are wrong to argue that game developers need the App Store to "access" these consumers (§ 4.3.5, p. 58); and
- Economists generally, and for good reasons, do not consider single brands to constitute relevant antitrust markets (§ 4.3.6, p. 59).

27. Even if the foremarket/aftermarket framework were to be applied to this case, I explain that the particular circumstances under which it could give rise to anticompetitive concerns are not present here. I begin by explaining the historical applications of the framework (§ 4.4.1, p. 61). I then explain why the conditions necessary for harm are met for neither consumers (§ 4.4.2, p. 65) nor developers (§ 4.4.3, p. 70).

28. Dr. Evans also presents six purported hypothetical monopolist tests in support of his alleged "smartphone operating systems" and "iOS App Distribution" markets. While these "tests" may appear to bring a sense of scientific rigor to Dr. Evans' market definition exercise, they are each fundamentally flawed and wholly uninformative in establishing whether either of his markets are relevant antitrust product markets, for numerous reasons. This includes failing to even attempt to control for factors that the literature—including Dr. Evans' own writings—explains must be taken into account in order to appropriately carry out hypothetical monopolist tests in a two-sided context. Moreover, since the evidence shows that the App Store commission rate is not supracompetitive and thus must be lower than the monopoly price, even if it were possible to properly conduct a two-sided hypothetical monopolist test in the present case, it is unlikely that such a test would indicate that the App Store alone would constitute a relevant antitrust product market, as Dr. Evans claims. Given all of these flaws, these "tests" should be disregarded (§ 4.5).

29. I then turn to geographic market definition. I find that the relevant geographic market is the United States (§ 5.1, p. 86). I also explain why Dr. Evans is wrong to argue that the relevant geographic market is "global except for China" (§ 5.2, p. 88).

30. Finally, I turn to my analysis of market power and competitive effects. I first explain the economic principles relevant to evaluating market power, including the role of evidence that speaks to market structure and market outcomes, as well as constraints by factors outside of the relevant antitrust market, including potential entry and expansion (§ 6.1, p. 91). I then review the evidence and conclude that it is inconsistent with Apple possessing monopoly power or charging supracompetitive prices. In particular:

- The market structure demonstrates that Apple does not possess monopoly power in the relevant antitrust market (§ 6.2.1, p. 99); and
- Market outcomes are also inconsistent with Apple possessing monopoly power or charging supracompetitive prices (§ 6.2.2, p. 101).

31. I then explain that Dr. Evans has failed to establish that Apple has market power or is charging supracompetitive prices on the App Store even within his purported "iOS App Distribution" market. In particular:

- Dr. Evans' allegation that Apple has a market share of 100 percent rests entirely on his incorrect market definition (§ 6.3.1, p. 104);
- Even under Dr. Evans' purported "iOS App Distribution" market, Apple's market power is constrained by factors outside the market (§ 6.3.2, p. 105);
- Apple's profit margin on the App Store is consistent with market outcomes for innovative differentiated-product firms (§ 6.3.3, p. 106);
- Contrary to Dr. Evans' claims, Apple does not charge a supracompetitive commission rate on the App Store, and has increased the quality of its transaction product over time (§ 6.3.4, p. 108);
- The way Apple deals with developers has nothing to do with monopoly power (§ 6.3.5, p. 109);
- What Dr. Evans claims are barriers to entry to the App Store are, instead, part of Apple's business model, which is not anticompetitive (§ 6.3.6, p. 110); and
- Even if one were to analyze a foremarket/aftermarket framework, the market structure and market outcome evidence that Dr. Evans presents for his alleged foremarket are insufficient to support his claims (§ 6.3.7, p. 111).

32. Moreover, I explain that Dr. Evans' arguments about the but-for world fail to establish that market outcomes would be improved without the challenged conduct. China is not only a faulty benchmark but, if anything, it shows that Epic's but-for world would be worse for game developers and consumers who play games (§ 6.4.1, p. 113). Dr. Evans also offers a thought experiment on counterfactual entry, but it is ill-conceived and suffers from fatal methodological and conceptual flaws, leading to nonsensical predictions (§ 6.4.2, p. 115).

33. I also explain that Dr. Evans ignores critical procompetitive aspects of Apple's practices. He ignores and minimizes Apple's important innovations and investments (§ 6.5.1, p. 119). He also fails to recognize that Apple allows developers to freely choose among a wide variety of monetization strategies, which allow developers to pay nothing to Apple for App Store transactions (§ 6.5.2, p. 120).

34. Overall, the evidence is inconsistent with Apple's App Store practices leading to anticompetitive effects, whether harm to competition or threat of antitrust injury to Epic. The evidence is instead consistent with Apple's success with the App Store being the result of a superior product and business acumen (§ 6.6, p. 124).