# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., | Case No. 4:20-cv-05640-YGR-TSH |
| Plaintiff, Counter-defendant, | **REBUTTAL WRITTEN DIRECT TESTIMONY OF DR. NANCY A. MATHIOWETZ** |
| v. | |
| APPLE INC., | The Honorable Yvonne Gonzalez Rogers |
| Defendant, Counterclaimant. | Trial:  May 3, 2021 |
| | **Ex. Expert 14** |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## I.  INTRODUCTION

1.  My name is Nancy A. Mathiowetz and I am Professor Emerita, Department of Sociology at the University of Wisconsin-Milwaukee.  I have a Ph.D. in Sociology and an M.S. in Biostatistics from the University of Michigan, where the focus of my research was on survey methodology.  For the last 40 years, in a career that spans academic, commercial and federal statistical agency service, my research has focused on various aspects of survey methodology, including, but not limited to, measurement error associated with question wording and questionnaire design, the effects of mode and methods of data collection, and the means to assess and reduce sources of error in the survey process.

2.  I submitted a rebuttal report on March 15, 2021 and an errata on April 9, 2021 in which I reviewed and commented on the expert report of Dominique Hanssens (dated February 16, 2021) with respect to my areas of expertise, survey methodology and statistics.

3.  This is my direct testimony as if I were in Court providing testimony in person, and this testimony is given under penalty of perjury.

## II.  SUMMARY OF OPINIONS

4.  Dr. Hanssens' surveys failed to align with his goals for the research and cannot be used for Apple's economists' stated market definition exercise, which purports to assess consumers' ability and willingness to substitute if the terms at which the products or services at issue are offered worsen.  *See* pp. 3-4.

5.  Even if Dr. Hanssens' surveys had attempted to address his research questions and to inform Apple's market definition analysis, the surveys suffer from multiple serious flaws that render the results unreliable, including with respect to questionnaire design, pretesting and operationalization of his target populations and sample.  *See* pp. 4-5.

6.  Dr. Hanssens' survey questions are riddled with ambiguous words and vague concepts, including questions about devices that respondents have "regularly" used, have had "available to regularly use" and "could have regularly used" in the last 12 months.  This problem is exacerbated by Dr. Hanssens' inclusion of individuals ages 13-17.  *See* pp. 5-6.

7.  I cannot express strongly enough the extent to which I disagree with Dr. Hanssens' assertion that the ambiguities in his survey instruments provide respondents "flexibility" in interpretation and that this is advantageous.  The use of ambiguous terminology flies in the face of conventional wisdom and

recommendations with respect to question wording, and results in survey questions that are subject to an increase in random error, rendering the data unreliable. Further, overly broad terms likely biased Dr. Hanssens' results to overestimate access to other electronic devices. *See* pp. 5-6.

8.      Dr. Hanssens' use of a 12-month reference period for questions concerning device use, access, and availability serves to increase the number of respondents who report having used or having access to these devices. These questions provide no information concerning a respondents' current use of or access to devices. *See* p. 7.

9.      Dr. Hanssens' pretests failed to adequately assess respondent understanding. Dr. Hanssens violated survey pretesting best practices by using a strict script that posed yes/no questions about whether respondents thought the terms were clear and did not allow for the interviewers to ask follow-up questions off script. Moreover, Dr. Hanssens ignored confusion among his pretest participants that was revealed even from these inadequate pretest questions and did not revise his survey instruments to address their confusion. *See* pp. 7-9.

10.    In light of the inadequate pretest conducted by Dr. Hanssens, I directed and oversaw 15 qualitative interviews to evaluate respondent understanding of Dr. Hanssens' surveys. These in-depth interviews followed pretesting best practices and used a set of open question probes. The interviews confirmed a high level of variability in the way respondents interpreted several of the terms and concepts in Dr. Hanssens' questionnaires. *See* pp. 9-11.

11.    The same use of the ambiguous phrases "regularly use" and "available to use" in his screener questions combined with an irrelevant 12-month reference period may have resulted in Dr. Hanssens including respondents in his samples that were not in his target populations. Because of this, his estimates may be inapplicable to those target populations. *See* pp. 11-12.

12.    These flaws in Dr. Hanssens' surveys are evident in his results, which in some instances are patently inconsistent with independent data sources, including ████████████ For example, 46% of Dr. Hanssens' iOS Fortnite Survey respondents self-reported using or having access to Microsoft Windows smartphones. However, it is well known from publicly available information and ████████████ that hardly anyone uses these Microsoft smartphone devices and that Microsoft stopped making them years ago. Dr. Hanssens' Microsoft results indicate that respondents did not understand his questions and/or were not paying attention. The robustness check that Dr. Hanssens ran in response to my rebuttal report to remove all Microsoft Windows smartphone respondents—a large portion of his already small sample—does not solve this problem. *See* pp. 12-13.

2

13.    In light of the fatal design flaws in Dr. Hanssens' questionnaires coupled with his failure to properly operationalize his target population and pretest the surveys, it is my opinion that the resulting data is neither reliable nor valid.

III.   **HANSSENS' SURVEYS FAIL TO ALIGN WITH HIS SURVEY GOALS AND WITH APPLE'S ECONOMIST'S OPINION**

14.    Dr. Hanssens fielded two survey instruments:  the iOS App Survey and the iOS Fortnite Survey.  His stated research goals were to assess whether iOS App Store Users and iOS Fortnite players use or have access to Other Electronic Devices, and which Other Electronic devices iOS Fortnite Players use to play digital games.

15.    Apple's economic expert, Francine Lafontaine, opines on the relevant antitrust market by performing a market definition exercise which considered the following question:  "if the terms at which the products or services at issue are offered worsen (e.g., if their price increases or their quality decreases), what are the products to which customers are willing and able to substitute?"  (Lafontaine Opening Report, ¶ 28; Written Direct Testimony of Francine Lafontaine, Ph.D. ("Lafontaine Written Direct"), ¶ 20.)

16.    Dr. Hanssens' survey instruments do not align with either his own research goals or with Professor Lafontaine's characterization of the appropriate market definition exercise.

17.    In defining his survey goals, Dr. Hanssens used the terms "use" and "have access to" with respect to other electronic devices.  Importantly, both of these terms communicate *current* use or access by using the present tense.

18.    Likewise, implied in Professor Lafontaine's market definition exercise is that consumers have the *current* ability and willingness to switch devices in the event that the terms at which the products or services at issue are offered worsen.  No one can make a substitution with a device that they no longer use or can access.

19.    Despite this, all of Dr. Hanssens' survey questions are directed to use or access over the *past 12 months*, which includes but is not limited to current devices. Nowhere in Dr. Hanssens' surveys does he instruct respondents to only include devices that they currently use or have access to.  As a result, Dr. Hanssens' surveys fail to achieve his own stated survey goals as well as fail to support Professor Lafontaine's market definition exercise, all of which focus on the present.

3

20.     Moreover, Dr. Hanssens' surveys fail to support Professor Lafontaine's market definition exercise for other reasons. In particular:

- Dr. Hanssens' surveys do not address ability to switch devices because they fail to provide context about the specific use for which devices may be available—*i.e.*, for an emergency call versus an extended gaming session. Likewise, Dr. Hanssens' surveys do not assess, but rather "implicitly assume[]," whether a device is available to use to play games. (Written Direct Testimony of Dominique Hanssens, Ph.D. ("Hanssens Written Direct"), ¶ 15.)

- Dr. Hanssens' surveys do not assess whether consumers are willing to switch to these other devices, nor do they assess whether and under what circumstances respondents would switch to another device.

21.     Thus, Dr. Hanssens' surveys cannot be used to assess respondents' ability or willingness to make a substitution if the terms at which the products or services at issue are offered worsen, which is what Apple's expert says is the crux of her market definition exercise.

22.     Despite this, Professor Lafontaine misuses Dr. Hanssens' survey results in her relevant market analysis by implying that respondents have current use and access to non-iOS devices. She writes: "According to a survey Professor Hanssens conducted in this matter, 81 percent of iOS users (and 94 percent of iOS Fortnite users) regularly access non-iOS devices . . ." (Lafontaine Opening Report, ¶ 55; *see also* Lafontaine Written Direct, ¶ 54.). But Dr. Hanssens actually reported that "81 percent of iOS App Store Users [and 94 percent of iOS *Fortnite* Players] *had* regularly *used* at least one type of Other Electronic Devices not manufactured by Apple *in the last 12 months*." (Hanssens Written Direct, ¶¶ 16-17 (emphases added).)

## IV.  EVEN IF DR. HANSSENS ADDRESSED THE CORRECT RESEARCH QUESTION, HIS SURVEYS SUFFER FROM SEVERAL SERIOUS FLAWS THAT RENDER HIS DATA UNRELIABLE

23.     Since Dr. Hanssens failed to address the research questions he was tasked to answer through his surveys and that could be used to inform Apple's market definition analysis, how well he designed and implemented his surveys is of secondary concern.

24.     Nonetheless, Dr. Hanssens' surveys suffer from several serious flaws that render his data unreliable, including (1) flaws in the design of his survey instruments, (2) flaws in the pretesting of his surveys, and (3) flaws in the operationalization of his target populations and samples.

4

A.      **Dr. Hanssens' Survey Questionnaires Suffer from Multiple Design Flaws**

25.     The reliability and validity of any survey are dependent upon the quality of the survey instrument, that is, the wording used in the questions and the structure of the overall instrument.

26.     A fundamental tenet of scientific measurement is that the measurement device is standardized over different objects being measured.  In particular, survey questions should be clear and should mean the same thing to all respondents, and the same thing to respondents as to the researcher.

27.     Words can be ambiguous by having more than one meaning or vague by having an imprecise range of interpretation.  Using ambiguous and vague words in survey questions allows respondents to interpret the meaning of the questions however they like; as such, they may answer the questions incorrectly or in a manner unintended by the researcher.  This can introduce variability and random error into survey results, rendering them unreliable.

i.      **Dr. Hanssens' Use of the Term "Regularly" Is Vague and Ambiguous**

28.     Throughout both of his surveys, Dr. Hanssens' questions use the undefined term "regularly."

29.     "Regularly" is a vague and ambiguous term that can be interpreted differently by different respondents or even by the same respondent when considering various devices.  The interpretation may vary based on whether a device is personal, a shared resource among family members, or a device related to one's employment, which Dr. Hanssens not only failed to take into account but now asserts is somehow acceptable.

30.     This concern was borne out by Dr. Hanssens' pretests, as discussed below.  In fact, one respondent thought "regular use" was "vague and could mean different things for different devices."[1]  Further, the qualitative interviews conducted under my supervision confirmed variability in respondent interpretation of the term "regular use" depending on the device and the context.[2]

31.     Dr. Hanssens insists that this variability was not only acceptable but advantageous because he intended for "regular use" to be "flexib[le]" and mean different things

---

[1] DX4866.

[2] PX2892.77-.79.

5

to different people.  (*See* Hanssens Written Direct, ¶ 13.)  I strongly disagree.  The use of ambiguous terminology violates conventional wisdom and recommendations with respect to question wording because we do not know how respondents interpreted the terms.  As a result, questions which incorporate ambiguous terminology are subject to an increase in random error rendering the data unreliable.

ii.    **Dr. Hanssens' Survey Questions Rely on the Vague Concept of Availability**

32.    Both of Dr. Hanssens' surveys employ undefined vague concepts, including "available to use" and "could have used."

33.    In particular, Dr. Hanssens asked respondents about devices available to them for regular use, and provided the following so-called "simple" example:  "the smartphone of a member of your household or of a friend that you *could have* regularly used but that you did <u>not</u> regularly use in the last 12 months."  (*See* Hanssens Written Direct, ¶ 14 and Exhibit 4 (emphasis added).)

34.    The questionnaires provide no guidance to respondents in deciding what is "available" and "could" be used.  If the respondent never used these other devices, he/she would have no basis to decide that a device was "available" and "could" have been used regularly.  Dr. Hanssens also provided no context to frame for what purpose the device might be available—*i.e.*, an emergency call versus an extended gaming period.

35.    Without such context, there is no way to know how respondents interpreted these concepts.  And even if all respondents came to the same interpretation, there is no way to know what metric they used to answer these questions.

36.    Once again, confusion and variability around these concepts are evident among Dr. Hanssens' pretest respondents and my qualitative interview participants, as discussed below.

37.    This problem is exacerbated by Dr. Hanssens' inclusion of individuals ages 13-17.  In the iOS Fortnite survey, over 30% of respondents were ages 13-17.

38.    This vague, overly broad concept of a device that was "available" and that the respondent "could" have regularly used, including those "of a friend," leads to data that are impossible to interpret, and likely biased Dr. Hanssens' results to overestimate access to other devices.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### iii. Dr. Hanssens' Use of a 12-Month Reference Period Inflates Measurement of Available Devices

39.     Both of Dr. Hanssens' surveys use a 12-month reference period, which raises two concerns.  First, for mundane behaviors, such as general use of or access to electronic devices, long reference periods lead to an increase in response error due to recall issues.  Second, and more importantly, it tells us nothing about respondents' *current* use of or access to devices.  It is irrelevant that a respondent used a device 10 months ago if he/she no longer has access to that device.

40.     Dr. Hanssens' proposed justifications for using a 12-month reference period— seasonality and idiosyncratic circumstances—are baseless.  He provides no explanation for the need to ask respondents about a *full year* of device usage in order to solve for these issues.

41.     Dr. Hanssens' use of a 12-month reference period serves only to increase the number of respondents who report having used or had access to other devices and therefore inflates Dr. Hanssens' estimates.

### B. Dr. Hanssens' Surveys Suffer from Inadequate Pretesting

42.     Pretesting refers to the activities undertaken in the development and testing of survey instruments.  These activities are usually designed to gain understanding about how the population of interest thinks about a topic, the language used concerning a topic, and to determine if the survey questions clearly and unambiguously communicate the intent to the members of the target population.  Among the goals of pretesting is understanding potential respondents comprehension of the survey questions as written.

43.     In violation of survey pretesting best practices, Dr. Hanssens' pretests were not designed to probe respondent understanding of his questions.  And even when respondents to his pretests expressed confusion or lack of clarity regarding his questions, Dr. Hanssens did not probe further or revise his survey instruments.  Because of this, I oversaw 15 qualitative interviews to assess respondent understanding of Dr. Hanssens' questions, which revealed wide variation in understanding and interpretation.

### i. Dr. Hanssens Failed to Adequately Pretest His Survey Instruments and Ignored Evidence of Confusion Among His Pretest Participants.

44.     In contrast to Dr. Hanssens' assertion that he conducted "rigorous pretests," (Hanssens Written Direct, ¶ 6), I find that his pretests were inadequate for the following reasons:  (1) he failed to conduct any qualitative research to understand

how individuals think about and discuss the topics in his surveys; (2) the pretest "interviews" that he did conduct were scripted in advance, consisted primarily of yes/no questions, and did not probe respondent understanding beyond the script even where respondents expressed confusion; and (3) he completely ignored issues raised in the pretests by failing to revise his survey instruments.

45.    Before developing a survey instrument, researchers often undertake some form of qualitative research to gather information about the topic.  By conducting qualitative interviews, Dr. Hanssens could have gained an understanding of the language respondents use to describe their devices (*e.g.*, by manufacturer, model, or operating system).  Similarly, qualitative research may have revealed how respondents organized their memory around device use and the language used to describe this usage.

46.    Dr. Hanssens failed to conduct any qualitative research to understand respondents' comprehension of the constructs of interest or the language they use with respect to use of iOS systems, downloading of apps, in-app purchases, and gaming across various devices.  He instead improperly relied on *his own* assumed understanding of the way respondents think about and discuss these topics.

47.    The pretesting that Dr. Hanssens did do—administering each of his surveys to six participants and asking a short series of scripted "de-briefing" questions—was entirely inadequate.

48.    Debriefing questions are most effective when they are open-ended and probe respondents' understanding.  For example, debriefing questions targeted at understanding the word "regularly" might ask the respondent to describe what the term "regularly" meant to him/her and how the respondent determined if a device qualified as used "regularly" or not.

49.    In contrast, most of Dr. Hanssens' pretest questions were yes/no questions,[3] which are ineffective at fully capturing respondents' understanding of the survey questions—the primary goal of pretesting.  A respondent can simply indicate no problem, which provides no information about how he or she interpreted a particular word or question, as most of Dr. Hanssens' pretest respondents did.[4]

50.    Further, Dr. Hanssens' pretest questions repeatedly asked respondents whether they thought certain things were "clear"—*i.e.*, "Was the definition of 'operating

---

[3] DX4865; DX4867.

[4] DX4866; DX4868.

system' clear?"[5]   Generally, these types of questions are to be avoided in pretests because respondents do not want to appear unintelligent and therefore often overstate their understanding, especially when speaking face to face with the interviewer, as was the case here.  Simply asking "why" or "why not," as Dr. Hanssens does in some of his pretest questions, does not solve this problem because "why" questions often put respondents on the defensive.

51.     Concerningly, Dr. Hanssens' pretest interviewers were unable to go "off script" to ask respondents any follow-up questions, even if they answered a question in only one word or if they expressed that a question or term was unclear.

52.     Despite his claims to the contrary, Dr. Hanssens' pretests indicated that respondents *did* have difficulty with the terms "regular," "available" and the 12-month reference period.  Specifically, despite the poorly worded debriefing questions, a quarter of respondents indicated some issues with the language and concepts in the surveys.[6]

53.     Dr. Hanssens did nothing to revise his questionnaire in response to signs of confusion and variability in interpretation.

54.     Dr. Hanssens asserts that the pretest results supported keeping his survey as drafted because the range of interpretations was consistent with the flexible definition of "regularly" that he intended.  I strongly disagree with this assertion and cannot imagine a scenario in which the knowledge that respondents interpreted terms differently from each other would be desirable or even *acceptable* in survey research.  Such variation results in data that are impossible to interpret because there is no way to know how respondents interpreted these concepts in considering their responses.

ii.     **Qualitative Interviews Confirm High Level of Variability in Respondents' Understanding of Dr. Hanssens' Survey Questions**

55.     Because of Dr. Hanssens' inadequate pretests, I directed and oversaw 15 qualitative interviews to evaluate respondent understanding of the questions in Dr. Hanssens' surveys.  I conclude that there was a high level of variance in respondents' understanding of various aspects of Dr. Hanssens' surveys,

---

[5] DX4865; DX4867.

[6] DX4866; DX4868.

REBUTTAL WRITTEN DIRECT                                    CASE NO. 4:20-cv-05640-YGR-TSH
TESTIMONY OF DR. NANCY A.
MATHIOWETZ

including the terms "regularly used in the last 12 months" and "available to use in the last 12 months," particularly with respect to gaming.[7]

56.     The interviews were conducted by a qualified interviewer and lasted approximately one hour each.  Another experienced survey professional sat in on each interview to observe and take notes.  Because the purpose of the interviews was to understand respondents' interpretation of certain terms, I determined that the interviewer should know the purpose of the interviews so that she could probe respondents accordingly.  A protocol was drafted that contained a series of probes to assist in conducting the interviews. Using the protocol as a guide, the interviewer engaged in a conversation with participants and asked follow-up questions as necessary.

57.     The interviews yielded many interpretations of "regularly use," ranging from frequency of use, duration of use and specific time of use.  When coupled with "in the last 12 months" as that phrase appears in Dr. Hanssens' survey, there was even more variation in interpretation.  While some thought this meant that you must have regularly used something all year, others thought this referred only to the past few months or the majority of the months.  One participant said that in order to qualify as "regular use in the last 12 months," "it has to happen in 4 of the 12 months, 30% of the time, that kind of comes out to once per season, once per quarter is regular to me, for any device."  In comparison, another participant said it meant "[e]very day for at least, maybe not every day, but then every other day continually for the past 12 months."

58.     Respondents' interpretation of "regularly use" also differed across devices.  One said "[a gaming console] is not something that is necessary, so the definition of regular here is different than for other devices."  Interpretation also differed based on whether the respondent owned the device or not.  For example, one respondent explained that regular use of another person's device "would only be doing a small task for like 5 minutes a month or playing a game on it at least once a month."

59.     In addition, participants' interpretation of "available to use" varied in terms of physical location, comfort level and/or permission to use another person's device and purpose of use.  Some participants interpreted a device as being "available" if it was in their house.  Others named devices in other places or owned by other people, even if they did not regularly use them or had to wait to use them.  One participant said "available might mean that you have a phone in another place as in your office desk or in storage, or that when [my] brother was staying . . . his

---

[7] A summary of the interviews is presented at PX-2892.77-.85.

REBUTTAL WRITTEN DIRECT                                    CASE NO. 4:20-cv-05640-YGR-TSH
TESTIMONY OF DR. NANCY A.
MATHIOWETZ

phone would be regularly available to [me] because it just sat on the desk and I knew I could use it."

60.   Another topic that was explored was availability of devices with respect to gaming.  While participants played games on multiple devices, the interviews revealed that the playing of different games is often compartmentalized to different devices for a variety of reasons.

61.   For example, participants indicated that word and puzzle games often are played on smartphones and tablets that can be used in the car or in public places, whereas sporting and shooter games often are played on consoles because of the enhanced visual display and controllers.  As one participant explained:  "I see [smartphone and tablet] as very separate [from gaming consoles] because I don't play strategy games on my PlayStation or my Xbox.  Like my computer is where I'll play World of Warcraft.  I don't play those on my PlayStation, my Switch or my Xbox or my phone or my tablet.  I play that exclusively on my computer."

62.   In sum, these qualitative interviews indicate that the terms "regularly use" and "available to use," particularly when coupled with "over the last 12 months" mean different things to different people, for different devices, in different contexts and for different uses.  Contrary to Dr. Hanssens' views, this high level of variability is not a positive feature of his survey; it means that we simply do not know how respondents to Dr. Hanssens' surveys interpreted his questions.

C.    **Dr. Hanssens Failed to Properly Operationalize His Target Populations**

63.   The first requirement in developing a sample for a survey is to identify the target population of interest.  These are the individuals for whom a researcher will draw statistical inferences based on the survey data and the survey design.

64.   Dr. Hanssens defined the population of interest for the iOS App Survey as iOS App Store Users and the population of interest for the iOS Fortnite Survey as iOS Fortnite Players.  He then used a series of screener questions to operationalize his target populations.

65.   For the iOS App Survey, Dr. Hanssens operationalized the target population as those who have "regularly" used an iOS device in the past 12 months.  For the iOS Fortnite Survey, Dr. Hanssens operationalized the target population as those who have downloaded apps or played Fortnite on an iOS device they have "regularly" used during the past 12 months.

66.   By using a 12-month reference period in his screener questions, Dr. Hanssens included individuals in his sample who may no longer own or use iOS devices.

11

These respondents are of no interest to the matter at hand, since they no longer are iOS App Store Users or iOS Fortnite Players.

67.   All of the concerns identified as problematic for the survey instrument in general are applicable to the use of vague and ambiguous terminology in determining eligibility for the survey. Because there is no way to know how respondents interpreted "regularly," there is no way to assess whether respondents were appropriately included in Dr. Hanssens' sample or not.

68.   For both surveys, the use of a 12-month reference period and the ambiguous term "regularly" may have caused a mismatch between the stated target population and the operationalization of the target population. Therefore, the results of Dr. Hanssens' surveys may be inapplicable to the target populations of interest—iOS App Store Users and iOS Fortnite Players.

## V.   DR. HANSSENS' DATA ARE INCONSISTENT WITH EXTERNAL DATA

69.   One means by which to examine the quality of a survey is to compare the results to external benchmarks. To the extent there are inconsistencies, it can be evidence of underlying problems with the survey itself—*i.e.*, that respondents did not understand the questions, that the questions were poorly worded, or that respondents were not paying attention.

70.   The most glaring discrepancy in Dr. Hanssens' results involves the reported usage of Microsoft Windows smartphones. Dr. Hanssens' results indicate that 30% of iOS App Store Users regularly used or had available to regularly use a Microsoft Windows Smartphone in the last 12 months.[8] This is unreasonably high in light of the fact that it is publicly known that Microsoft stopped developing new hardware or features for Windows smartphones in 2017 and stopped supporting the devices altogether in 2019.



---

[8] Hanssens Written Direct, Exhibit 7; DX4714.



REBUTTAL WRITTEN DIRECT                     CASE NO. 4:20-CV-05640-YGR-TSH
TESTIMONY OF DR. NANCY A.
MATHIOWETZ

71.     This calls into question the rest of Dr. Hanssens' data.  It is quite possible that the reason for this error is that respondents did not understand or know what operating system their smartphones use.

72.     Removing these individuals from Dr. Hanssens' results, as he did in his so-called robustness check, does not guarantee that he has solved for all respondent confusion.  Due to Dr. Hanssens' use of ambiguous terms and his inadequate pretests, it is unlikely that confusion among respondents was limited to those who indicated that they used or had access to a Microsoft Windows smartphone in the last 12 months.  Simply removing these respondents—which throws out nearly half of Dr. Hanssens' sample—does not ensure that the remaining respondents all understood the survey questions in order to yield reliable data.

REBUTTAL WRITTEN DIRECT
TESTIMONY OF DR. NANCY A.
MATHIOWETZ

CASE NO. 4:20-CV-05640-YGR-TSH

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that I executed this written rebuttal testimony on April 27, 2021, in Oconomowoc, Wisconsin.

WORD COUNT: 4782

Nancy A. Mathiowetz, Ph.D.

14