Steven L. Holley (*pro hac vice* pending)
(holleys@sullcrom.com)
Shane M. Palmer (SBN 308033)
(palmersh@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California  94303
Telephone:     (650) 461-5600
Facsimile:     (650) 461-5700

*Attorneys for Non-Party Spotify USA Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>APPLE INC.<br><br>　　　　　Defendant. | Case No. 4:20-cv-05640-YGR-TSH<br><br>**DECLARATION OF BENJAMIN KUNG PURSUANT TO CIVIL LOCAL RULE 79-5(e)(1) AND IN RESPONSE TO EPIC GAMES, INC.'S ADMINISTRATIVE MOTION TO SEAL PORTIONS OF ITS EXPERT WRITTEN DIRECT EXAMINATIONS (DKT NO. 509)** |

SULLIVAN & CROMWELL LLP

Decl. of Benjamin Kung in Response to Epic's Mot. to Seal Portions of Its Expert Written Direct Examinations
Case No. 4:20-cv-05640-YGR-TSH

I, Benjamin Kung, declare as follows:

1. I am a Director in the Financial Planning & Analysis ("FP&A") team at Spotify USA Inc. ("Spotify"), currently serving as our Head of Strategic Planning and Licensing Finance. I submit this declaration pursuant to Local Rule Civil 79-5(e) in support of sealing portions of Epic's Expert Written Direct Examinations that are the subject of an Administrative Motion to Seal filed by Epic Games, Inc. ("Epic") on April 28, 2021 (Dkt. No. 509).

2. I have worked at Spotify since March 2016 and have served in various roles within the FP&A team during that time. My current job responsibilities include overseeing teams that forecast and manage the economics of our music licensing deals, providing guidance and visibility to business teams and senior leadership on matters impacting Spotify's consolidated margins, and long-range strategic planning for the company. I have personal knowledge of the facts set forth in this declaration and can testify competently to those facts.

3. Spotify is an indirect, wholly-owned subsidiary of Spotify Technology S.A., a publicly-traded company incorporated in Luxembourg. Founded in Sweden, Spotify operates the most popular global audio streaming service. Spotify's streaming service first launched in Sweden in 2008 and launched in the United States in 2011. Spotify is available in 178 markets, and its platform is used by 356 million monthly active users.

4. The market for audio and music streaming apps and app distribution on various platforms is highly competitive and includes several of the largest tech companies in the world, including Apple. Because Spotify does not directly control a widely-used channel for distributing its audio streaming app to a large number of users, our business model not only depends on our ability to acquire content or negotiate licenses with content rights holders on favorable terms, but also requires us to simultaneously negotiate with distribution partners to keep distribution fees and commissions as low as possible. To optimize our distribution and user growth strategies against these variables, Spotify employs significant resources with respect to research and development, data collection, and analysis about user experience and behavior across various channels in order to successfully compete in the audio streaming market.

Sullivan & Cromwell LLP

1

Decl. of Benjamin Kung in Response to Epic's Mot. to Seal Portions of Its Expert Written Direct Examinations
Case No. 4:20-cv-05640-YGR-TSH

5. I have reviewed Epic's Motion to Seal; the attached Declaration of M. Brent Byars; and excerpts provided by Epic of the unredacted portions of the Rebuttal Written Direct Testimony of Michael I. Cragg, Ph.D., that are identified in Mr. Byars's Declaration as containing or describing Spotify's confidential information. The following portions of Epic's Expert Written Direct Examinations should remain under seal for the reasons stated in this declaration:

| Portion of Document Sought to be Sealed | Evidence Offered in Support of Sealing |
|---|---|
| Cragg Testimony ¶ 9, bullet 3 (everything after "Moreover, the data Prof. Hitt analyzes actually shows that" in the final sentence) | Declaration of Benjamin Kung ¶¶ 7–12 |
| Cragg Testimony ¶ 70 (everything after "This disaggregated presentation shows that" in the sixth sentence, through the end of the eighth sentence) | Declaration of Benjamin Kung ¶¶ 7–12 |
| Cragg Testimony ¶ 70 (everything after "which it estimates led to additional marketing costs" at the end of the final sentence) | Declaration of Benjamin Kung ¶¶ 13–14 |
| Cragg Testimony Figure 8 (except the caption and source) | Declaration of Benjamin Kung ¶¶ 7–12 |
| Cragg Testimony ¶ 71 (all content except "This finding is consistent with" in the first line, and "thus serves to show lack of substitutability away from iOS in-app purchases" in the last two lines) | Declaration of Benjamin Kung ¶¶ 15–16 |

6. In an effort to narrowly tailor its sealing requests, Spotify does not request sealing of paragraphs 65 or 69 of the Rebuttal Written Direct Testimony of Dr. Cragg; the first five sentences of paragraph 70 of the Rebuttal Written Direct Testimony of Dr. Cragg; the caption or the source of Figure 8 of the Rebuttal Written Direct Testimony of Dr. Cragg; or footnote 10 of the Rebuttal Written Direct Testimony of Dr. Cragg. Although the information reflected in some of these portions of Apple's Expert Written Direct Testimony is non-public, Spotify recognizes the Court's need to balance Spotify's interests against the public's interest in access to court records and has sought to narrow its sealing requests as much as possible.

SULLIVAN
&
CROMWELL LLP

2

DECL. OF BENJAMIN KUNG IN RESPONSE TO EPIC'S MOT. TO SEAL PORTIONS OF ITS EXPERT WRITTEN DIRECT EXAMINATIONS
CASE NO. 4:20-cv-05640-YGR-TSH

7. The final sentence of bullet 3 of paragraph 9 of Dr. Cragg's Rebuttal Written Direct Testimony describes the relative rate at which users of Spotify's Free audio streaming service converted to Spotify's Premium service on iOS devices compared with Android devices. Likewise, the sixth through eighth sentences of paragraph 70 of Dr. Cragg's Rebuttal Written Direct Testimony also describe the Free-to-Premium conversion rates for users on iOS devices relative to users on Android devices at different points in time. These descriptions appear to be based on data contained in a document that was produced by Spotify, bearing production number SPOT-EPIC-00001448, in response to subpoenas served on Spotify by Epic on December 2, 2020, and by Apple on December 8, 2020 (the "Subpoenas"). I understand that when Spotify produced this document to Apple and Epic, it designated that document as "SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY" pursuant to the Supplemental Protective Order Governing Discovery from Spotify that was filed jointly by Apple and Epic at Spotify's request and was entered by the Court in this litigation on February 11, 2021 ("Supplemental Protective Order") (Dkt. No. 407).

8. Similarly, Figure 8 of Dr. Cragg's Rebuttal Written Direct Testimony is a chart that reflects the relative growth in the proportion of Spotify app users on iOS and Android who subscribed to the Premium service from February 2015 through September 2019. This chart was also created using data contained in the document that was produced by Spotify bearing production number SPOT-EPIC-00001448.

9. Spotify would be competitively harmed in its business if the descriptions of the relative Free-to-Premium conversion rates for Spotify's app on iOS and Android devices contained in paragraphs 9 and 70 and Figure 8 were disclosed publicly. This information reflects Spotify's proprietary, internal data and analysis concerning the use of its app across different platforms and operating systems. This is highly sensitive information that Spotify keeps confidential and does not disclose to the public. Spotify was only willing to produce the data reflected in paragraphs 9 and 70 and Figure 8 of Dr. Cragg's Rebuttal Written Direct Testimony in this litigation subject to the protections of the Supplemental Protective Order, which restricts access to the documents containing the data to outside counsel, experts, and trial consultants for

SULLIVAN & CROMWELL LLP

3

DECL. OF BENJAMIN KUNG IN RESPONSE TO EPIC'S MOT. TO SEAL PORTIONS OF ITS EXPERT WRITTEN DIRECT EXAMINATIONS
CASE NO. 4:20-cv-05640-YGR-TSH

the parties and to the court and its personnel.  To maintain the confidentiality of the data reflected in these portions of Dr. Cragg's Rebuttal Written Direct Testimony, Spotify invests in data security measures to prevent unauthorized outside parties from accessing the information, and even restricts access to this data within the company.

10. Spotify uses the data reflected in paragraphs 9 and 70 and Figure 8 of Dr. Cragg's Rebuttal Written Direct Testimony for a variety of strategic business purposes, including but not limited to:

a. developing business strategies to compete with other audio and music streaming app providers, including Apple;

b. identifying and negotiating with potential distribution partners to broaden the availability of the Spotify app across multiple platforms and expand Spotify's subscription business; and

c. planning strategic corporate investment decisions to drive sustainable growth and remain competitive in the marketplace.

11. If the information in paragraphs 9 and 70 and Figure 8 of Dr. Cragg's Rebuttal Written Direct Testimony were disclosed publicly, it would give Spotify's competitors insight into Spotify's internal data and analysis concerning its business operations and relative market share on iOS and Android, including trends in those areas over time.  Such information can be used by Spotify's competitors to inform their own business and marketing strategies with respect to product strategy, distribution, and advertising.  For example, competing app developers could use the information to understand trends in Spotify usage on iOS and Android and then selectively devote their resources to optimize their apps differently.  And the competitive harm to Spotify resulting from any public disclosure of these portions of Dr. Cragg's Rebuttal Written Direct Testimony would be amplified because Spotify's competitors generally do not make the same level of platform-specific usage and subscription detail publicly available.

12. If paragraphs 9 and 70 and Figure 8 of Dr. Cragg's Rebuttal Written Direct Testimony were publicly disclosed, the information would also unfairly disadvantage Spotify in its negotiations with distribution partners (including original equipment manufacturers such as

SULLIVAN & CROMWELL LLP

4

DECL. OF BENJAMIN KUNG IN RESPONSE TO EPIC'S MOT. TO SEAL PORTIONS OF ITS EXPERT WRITTEN DIRECT EXAMINATIONS
CASE NO. 4:20-CV-05640-YGR-TSH

mobile, TV, gaming, and auto partners, as well as app providers and commercial partners), and advertisers. If this material were to fall into the hands of distribution platforms or partners, for example, it would undermine Spotify's position in negotiations, undercut deal terms, drive up the prices Spotify would pay (consequently impacting its margins), and generally harm Spotify's ability to compete and grow its business.

13. The final line of paragraph 70 of Dr. Cragg's Rebuttal Written Direct Testimony reflects Spotify's estimate of the additional marketing costs that Spotify incurred attributable to the marketing restrictions that Apple imposed on Spotify following Spotify's decision to discontinue the ability for users to make in-app purchases in Spotify's app for iOS devices. The number was taken from a document that was produced by Spotify, bearing production number SPOT-EPIC-00000925, in response to the Subpoenas. I understand that when Spotify produced this document to Apple and Epic, it designated that document as "SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY" pursuant to the Supplemental Protective Order.

14. Spotify would be competitively harmed in its business if the estimate of Spotify's increased marketing costs reflected in the last line of paragraph 70 were disclosed publicly, because Spotify's audio streaming app competitors could use this number to assess the extent of Spotify's marketing expenditures on iOS devices and use that to inform their own business and marketing strategies with respect to product strategy, distribution, and advertising.

15. Paragraph 71 of Dr. Cragg's Rebuttal Written Direct Testimony summarizes proprietary analysis that was undertaken by Spotify to understand the impact of Apple's marketing restrictions on Spotify's ability to get users to subscribe to Spotify's Premium audio streaming service. This summary was based on discussions of that analysis—including descriptions of the methods Spotify used to conduct the analysis—contained in documents that were produced by Spotify, bearing production numbers SPOT-EPIC-00000932 and SPOT-EPIC-00001023, in response to the Subpoenas. I understand that when Spotify produced these documents to Apple and Epic, it designated them as "SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY" pursuant to the Supplemental Protective Order.

Sullivan & Cromwell LLP

5

Decl. of Benjamin Kung in Response to Epic's Mot. to Seal Portions of Its Expert Written Direct Examinations
Case No. 4:20-cv-05640-YGR-TSH

16. If Paragraph 71 of Dr. Cragg's Rebuttal Written Direct Testimony were disclosed publicly, Spotify would be competitively harmed in its business because it would reveal the sophisticated types of analyses that Spotify performs to assess user behavior and the effectiveness of Spotify's marketing strategies. If Spotify's distribution partners knew the types of internal analyses that Spotify is capable of performing, they might demand that Spotify undertake such analyses as a condition of continued partnership. This could undermine the value of Spotify's existing distribution partnerships, undercut Spotify's ability to negotiate favorable deals with new distribution partners, drive up the prices Spotify would pay (consequently impacting its margins), and generally harm Spotify's ability to compete and grow its business.

I declare under penalty of perjury that the foregoing is true and correct. Executed this May 3, 2021 in Brooklyn, New York.

/s/ Benjamin Kung
Benjamin Kung

SULLIVAN & CROMWELL LLP

6

DECL. OF BENJAMIN KUNG IN RESPONSE TO EPIC'S MOT. TO SEAL PORTIONS OF ITS EXPERT WRITTEN DIRECT EXAMINATIONS
CASE NO. 4:20-CV-05640-YGR-TSH

**ATTESTATION**

I, Brendan P. Cullen, am the ECF User whose ID and password are being used to file this document with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories concur with this filing.

Dated: May 3, 2021 　　　　　　　　　　　　　　　/s/ Brendan P. Cullen
　　　　　　　　　　　　　　　　　　　　　　　　　Brendan P. Cullen