VOLUME 4

Pages 778 - 1052

UNDER SEAL PAGES - 824 - 828

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

```
EPIC GAMES, INC.,          )
                           )
        Plaintiff,         )   NO. C-20-5640 YGR
                           )
   vs.                     )   Thursday, May 6, 2021
                           )
APPLE, INC.,               )   Oakland, California
                           )
        Defendant.         )   BENCH TRIAL
_____)
APPLE, INC.,               )
                           )
        Counterclaimant,   )
   vs.                     )
                           )
EPIC GAMES, Inc.,          )
                           )
        Counter-Defendant. )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:              CRAVATH, SWAINE & MOORE, LLP
                           825 Eighth Avenue
                           New York, New York 10019
                       **BY:  KATHERINE B. FORREST, ESQUIRE**
                           **GARY A. BORNSTEIN, ESQUIRE**
                           **YONATAN EVEN, ESQUIRE**

                           (Appearances continued.)

Reported By:               Diane E. Skillman, CSR 4909, RPR, FCRR
                           Official Court Reporter

```
         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

For Plaintiff:              CRAVATH, SWAINE & MOORE, LLP
                            825 Eighth Avenue
                            New York, New York 10019
                     BY:    LAUREN A. MOSKOWITZ, ESQUIRE
                            JUSTIN C. CLARKE, ESQUIRE
                            W. WES EARNHARDT, ESQUIRE
                            BRENDAN BLAKE, ESQUIRE
                            JIN NIU, ESQUIRE


For Defendant:              GIBSON, DUNN & CRUTCHER
                            333 South Grand Avenue
                            Los Angeles, California 90071
                     BY:    RICHARD J. DOREN, ESQUIRE
                            DAN SWANSON, ESQUIRE
                            CYNTHIA RICHMAN, ESQUIRE
                            RACHEL BRASS, ESQUIRE

                            GIBSON, DUNN & CRUTCHER, LLP
                            2001 Ross Avenue, Suite 1100
                            Dallas, Texas 75201
                     BY:    VERONICA S. MOYE, ESQUIRE

                            PAUL WEISS RIFKIND
                            WHARTON & GARRISON LLP
                            2001 K STREET, NW
                            Washington, DC 20006
                     BY:    KAREN DUNN, ESQUIRE
                            JESSICA E. PHILLIPS, ESQUIRE


For Defendant:              PAUL WEISS RIFKIND
                            WHARTON & GARRISON LLP
                            943 Steiner Street
                            San Francisco, California 94117
                     BY:    MEREDITH DEARBORN, ESQUIRE
```

| **Plaintiff's Witnesses:** | **Page** | **VOL.** |
|---|---|---|
| **KO, THOMAS** | | |
| Direct Examination by Mr. Byars | 797 | 4 |
| Cross Examination by Mr. Srinivasan | 813 | 4 |
| Cross-Examination by Mr. Srinivasan (sealed) | 824 | 4 |
| **Fischer, Matthew** | | |
| Direct Examination by Ms. Forrest | 833 | 4 |
| Cross-examination by Mr. Srinivasan | 920 | 4 |
| Redirect Examination by Ms. Forrest | 960 | 4 |
| **Kosmynka, Trystan** | | |
| Direct Examination by Ms. Miskowitz | 981 | 4 |

| **Plaintiff's Exhibits:** | **EVD.** | **VOL.** |
|---|---|---|
| 6 | 1001 | 4 |
| 0052 | 832 | 4 |
| 0056 | 985/989 | 4 |
| 0057 | 836 | 4 |
| 0058 | 838 | 4 |
| 0059 | 862 | 4 |
| 0060 | 832 | 4 |
| 0061 | 832 | 4 |
| 0063 | 894 | 4 |
| 0064 | 900 | 4 |
| 0066 | 892 | 4 |

| Plaintiff's Exhibits: | EVD. | VOL. |
|---|---|---|
| 0072 | 832 | 4 |
| 0112 | 832 | 4 |
| 0146 | 844 | 4 |
| 0197 | 846 | 4 |
| 0198 | 846 | 4 |
| 0202 | 991 | 4 |
| 0257 | 1019 | 4 |
| 0300 | 1023 | 4 |
| 0301 | 1004 | 4 |
| 0305 | 1012 | 4 |
| 0314 | 988 | 4 |
| 0422 | 847 | 4 |
| 0827 | 832 | 4 |
| 0854 | 834 | 4 |
| 0858 | 1030 | 4 |
| 2052 | 995 | 4 |
| 2060 | 856 | 4 |
| 2062 | 886 | 4 |
| 2173 | 918 | 4 |
| 2185 | 858 | 4 |
| 2190 | 899 | 4 |
| 2197 | 895 | 4 |
| 2284 | 879 | 4 |
| 2451 (Provisionally admitted) | 810 | 4 |

| **Plaintiff's Exhibits:** | **EVD.** | **VOL.** |
|---|---|---|
| 2951 | 972/973 | 4 |
| 2953 | 974 | 4 |
| **Defendant's Exhibits:** | **EVD.** | **VOL.** |
| 3422 | 930 | 4 |
| 3427 (sealed) | 826 | 4 |
| 3647 | 934 | 4 |
| 3636 | 946 | 4 |
| 4178 | 860 | 4 |
| 4374 | 1038 | 4 |
| 5467 | 1047 | 4 |

1    THURSDAY, MAY 6, 2021                    8:01 a.m.

2                    P R O C E E D I N G S

3          **THE COURT:**  As is our practice, let's go ahead and

4    call the case and then we'll see what's on your list of things

5    to take care of.

6        Ms. Stone.

7          **THE CLERK:**   All right.  Calling CV 20-5640, Epic

8    Games, Inc., vs. Apple, Inc.

9        Counsel, please state your appearances.

10          **MS. FORREST:**   Good morning, Your Honor.  Katherine

11   Forrest for Epic, and we have some new people, new faces at

12   the table who will introduce themselves this morning.

13          **THE COURT:**   Great.  Thank you.

14          **MR. CLARKE:**   Good morning, Your Honor.  Justin Clarke

15   for Epic.

16          **MR. BYARS:**   Good morning, Your Honor.  Brent Byars

17   for Epic.

18          **THE COURT:**   Byars.  Brent Byars.

19          **MS. MOSKOWITZ:**    Good morning, Your Honor.  Lauren

20   Moskowitz, also for Epic.

21          **THE COURT:**   Mr. Sweeney, good morning.

22          **MR. SWEENEY:**   Good morning, Your Honor.

23          **MS. KLOSS:**   Good morning, Your Honor.  Lauren Kloss

24   for Epic games.

25          **THE COURT:**   Kloss.  Got it.  Thank you again for the

1    list.  It makes it so much more helpful.

2          And our hot seat operator is mister?

3                **MR. RUDD:**    Jason Rudd.

4                **THE COURT:**    Rudd.  Good morning.  Although you

5    weren't on this list.

6                **MR. RUDD:**    I don't often talk.

7                **THE COURT:**    I missed what you said.

8                **MR. RUDD:**    I don't often talk.

9                **THE COURT:**    You don't often talk.  Well, there are a

10   lot of people who aren't often talking in these groups.  Jason

11   Rudd.  I'm going to put you on my list, Mr. Rudd.  Okay.

12         And on the Apple team.

13               **MR. DOREN:**    Good morning, Your Honor.  Richard Doren.

14               **THE COURT:**    Mr. Doren, good morning.

15               **MS. DUNN:**    Good morning, Your Honor.  Karen Dunn.

16               **MR. SRINIVASAN:**    Good morning, Your Honor.  Jay

17   Srinivasan.

18               **MS. DANSEY:**    Good morning, Your Honor.  Lauren

19   Dansey.

20               **MR. DOREN:**    And, Your Honor, Heather Grenier from

21   Apple.

22               **THE COURT:**    Okay.  Good morning.

23         Now, Lauren, how do you spell your last name?  I'm not

24   seeing you on the Gibson list.  How do you spell your last

25   name?

1    **MS. DANSEY:**   Oh, I'm sorry.  D-A-N-S-E-Y.

2    **THE COURT:**   D-A-N-S-E-Y?

3    **MS. DANSEY:**   Yes.

4    **THE COURT:**   Okay.  And it's L-O-R-E-N?

5    **MS. DANSEY:**   L-A-U-R-E-N.

6    **THE COURT:**   L-A-U-R-E-N.  Okay.  Terrific.  Good

7    morning.

8         Okay.  And then from the press, it looks like we have

9    Ms. Akins from *Law 360*?

10    **MS. ADKINS:**   Adkins.

11    **THE COURT:**   Adkins.  Great.

12    And Leah Nylen from *Politico*.

13    **MS. NYLEN:**   Good morning, Your Honor.

14    **THE COURT:**   And then from the class, we have

15    Ms. Betsy Manifold for the class counsel.

16    **MS. MANIFOLD:**   Good morning, Your Honor.

17    **THE COURT:**   Good morning.  Okay.  I think that does

18    it.

19         Let's start with any issues you might have.

20         Ms. Forrest.

21    **MS. FORREST:**   Thank you, Your Honor.  We have, I

22    guess, two things to raise.  One is quite minor.

23         Yesterday afternoon when I was discussing with Your Honor

24    sort of the order of witnesses and related matters, we talked

25    about the evidence for the experts, and I failed to mention

1    that there will be some evidence for the experts that will

2    come in subject to connection because as we mentioned to

3    Your Honor in a prior pretrial conference, certain of the

4    evidence will come in through some Apple witnesses, for

5    instance, Mr. Federighi or Mr. Schiller.  So we will be

6    prepared with each and every fact that our expert talks to to

7    tell Your Honor what the origin and source for that fact is

8    and whether it's subject to connection.  If the connection is

9    not made, we will be able to provide Your Honor with exactly

10   where that failure occurred, but we don't expect it to occur.

11           **THE COURT:**   Okay.  Any other issues?

12           **MS. FORREST:**   Yes, Your Honor.

13       The second issue we have has to do with some documents,

14   and we've met and conferred with Apple now a number of times

15   on documents that were authenticated at deposition and

16   discussed at deposition through a variety of witnesses, and

17   under Rule 32(a), met the Rules of Civil Procedure, met all of

18   the basic parameters for being admitted.  And for 10 of them,

19   there are no evidentiary objections nor is there an objection

20   from Apple, nor is there an objection that the testimony

21   received at deposition was somehow ineffective to authenticate

22   these.

23       This is not a matter of document dumping, Your Honor.

24   This first group, there will be about a total that I will talk

25   about right now of 20, but this first group was fully capable

1   of being discussed and was discussed at deposition, and it was

2   simply our desire to move these into evidence.  And I would

3   note that as the parties had extensive meet-and-confers over

4   the four hours of testimony that we had provided Your Honor

5   pretrial, each side had been very reasonable and accommodating

6   with each other over doing precisely what I'm suggesting right

7   now with regard to the four-hour read, which was to allow the

8   admission of documents that had been duly authenticated and

9   sometimes about which there was not extensive testimony in the

10  deposition.

11      So --

12          **THE COURT:**    Ms. Forrest, can we get to the point

13  because I would like to be on the record here soon.

14          **MS. FORREST:**    Sure.  The point is, Your Honor, I

15  would seek the admission of 10 specific documents, the numbers

16  of which I'm prepared to provide you right now.  I can also

17  provide the Court with a binder with the authenticating

18  testimony.

19          **THE COURT:**    And there is an objection to this,

20  Mr. Doren?

21          **MR. DOREN:**    Yes, Your Honor.  We were provided with

22  29 documents yesterday morning that fit into the scope of this

23  dispute.  Sixteen of those are identified as documents for

24  which Mr. Matt Fischer, who will be testifying here today, is

25  a sponsor witness, and 13 of those have Mr. Kosmynka as

1    sponsor witness, and he, too, will be here testifying today.

2         The deposition designations for the most part and all the

3    ones I've looked at in their entirety are simply in the nature

4    of, "This is an email you received.  Is that your name?  Did

5    you receive it in the ordinary course?"  Sometimes that's in

6    the questioning, sometimes it's not.

7         And as Your Honor has noted, this Court's practice is to

8    have important documents discussed with witnesses and for

9    there to be a sponsoring witness and -- before those are put

10   into evidence, and here the sponsoring witness on Epic's

11   witness list will be here today and available to be questioned

12   on these documents and to lay the proper foundation document

13   by document.

14        **MS. FORREST:**   Your Honor, can I just correct one

15   thing?

16        **THE COURT:**   Okay.

17        **MS. FORREST:**   The -- first of all, the process

18   surrounding these documents has been going on for weeks.  It

19   is true that Mr. Doren and I at first -- he and I had our

20   first conversation about it which we sometimes do about issues

21   that had been unable to be resolved at lower levels.  We had

22   our first conversation about this yesterday, but it's been

23   going on in meet-and-confers between the parties for a number

24   of weeks.

25        Number two --

1    **THE COURT:**    Ms. Forrest, I'm going to interrupt you.

2    I keep a separate binder with anything that I admit during

3    trial so that I can separately go and review and consider the

4    documents in the context of what I've heard during a trial day

5    because you all, each side, points to very specific things,

6    but I don't have the luxury during a trial day when I'm trying

7    to listen to trial testimony to actually review and consider

8    the whole document, which I do in the evenings and I will do

9    over the weekend.

10    What I'm not interested in are document dumps for the sake

11    of document dumps, so we're either going to use them in trial

12    or they were going to be -- as I did, I reviewed a number of

13    exhibits when I read deposition transcripts in the context of

14    those transcripts.

15    We aren't just going to put stuff out there on the

16    internet, which is what you all are doing at the end of a

17    trial day.  So if it's important enough for it to be in

18    evidence, I'm going to hear about it, and I want to know why

19    you want it in evidence.  It sounds to me like you just want

20    to add documents to the box.  That's what it sounds like.

21    **MS. FORREST:**    Your Honor, if it sounds like that,

22    then I have somehow not provided the appropriate context.

23    Many of these documents have come in through witnesses

24    where -- for instance, Mr. Haun.  Mr. Haun is an Apple witness

25    who was deposed pretrial who provided authenticating

1   testimony --

2           **THE COURT:**    Is he testifying?

3           **MS. FORREST:**    He's not testifying, but he did

4   pretrial, and he, under Rule --

5           **THE COURT:**    Pretrial, as you know, is irrelevant to

6   the trial unless it comes in.  Have you given me his

7   deposition transcript because I read the deposition

8   transcripts in advance, and every time there was a document

9   referenced, it was provided to me, which I thought I reviewed.

10      So what am I missing here?

11          **MS. FORREST:**    Your Honor, the amount of deposition

12  transcript that we were to provide Your Honor pretrial was

13  four hours.  There is additional deposition testimony in

14  addition to those four hours which we did not provide because

15  you --

16          **THE COURT:**    You had 45 hours each to present this

17  case, and I can tell you, yesterday I was wondering whether I

18  gave you too much time.  So I am not going to allow you to

19  just dump things into this record without actually presenting

20  the evidence at trial.

21          **MS. FORREST:**    Your Honor, with all due respect, under

22  Rule 32 of the Civil -- Rules of Civil Procedure and Rule

23  32(a), if there has been appropriate designating testimony

24  from a deposition for a witness who is not at trial, it is

25  appropriately received in a trial proceeding.  And we would

1    submit that those deposition designations and things as to

2    which there have not been objections should be able to be

3    received into evidence.

4        **THE COURT:**   Response.

5        **MR. DOREN:**   Your Honor, we -- again, we received the

6    29 documents for which admission will be sought today

7    yesterday.  We have reserved all foundation objections as to

8    exhibits on the exhibit list.  The Court is now being asked to

9    confront a series of deposition designations that it has not

10   had a chance to review.  The ones that I have seen are

11   inadequate to lay an appropriate foundation other than the

12   document is, you know -- other than the name of the document

13   perhaps that a witness's name is on it, and it is, in our

14   view, Your Honor -- here today they have a chance to review

15   each of the documents with the sponsoring witness identified

16   on their witness list, and we think that the most efficient

17   and the fairest way to go forward is for them to do that.

18       **MS. FORREST:**   Our sponsoring witness list,

19   Your Honor, included the individuals whose depositions had

20   been the source for the actual sponsor.  It is true that

21   Mr. Fischer is on each of the documents that I happen to be --

22   that I have in my binder today, and I can go through those,

23   each and every one, with Mr. Fischer.

24       I suggest to the Court that that is an inefficient way to

25   proceed given the fact that the pretrial rules set forth in

1    the Federal Rules of Civil Procedure allow for precisely this

2    kind of admission of material.

3         **MR. DOREN:**   To be clear, Your Honor, half of the

4    documents of the 29 are purportedly authenticated only by the

5    two witnesses who will be testifying here today, and then some

6    of the others have other random citations, but, once again,

7    the only witness who will be -- the witnesses who will be

8    testifying here at trial -- Mr. Fischer, Mr. Kosmynka, and in

9    some cases, also Mr. Schiller, depending on the document --

10   are each taking the stand and can address with counsel why

11   these documents are relevant to their case.

12        **MS. FORREST:**   Your Honor, can I make one final point?

13        **THE COURT:**   No.

14        What's the evidentiary basis for the documents?  That

15   they're business records?

16        **MS. FORREST:**   Your Honor, that they are business

17   records received in the ordinary course of business, yes.

18        **THE COURT:**   And is there -- is there some dispute,

19   Mr. Doren, that they're not business records?

20        **MR. DOREN:**   Well, Your Honor, they certainly were

21   produced from -- or, well --

22        **THE COURT:**   "Yes" or "no," Mr. Doren?  Are they

23   business records or not?

24        **MR. DOREN:**   The foundation laid for some is simply to

25   identify the document as --

1          **THE COURT:**     Is there a dispute that they are business

2     records or not?

3          **MR. DOREN:**     If they are from Apple's records, then

4     there is no dispute on that, Your Honor.

5          **THE COURT:**     Okay.  And what is the exact rule you are

6     relying on, Ms. Forrest?  32(a) what?

7          **MS. FORREST:**     Three.

8          **THE COURT:**     32(a)(3).  So 32(a)(3) doesn't say that

9     you get to admit them without -- it says that you can use

10    them.  32(a)(3) doesn't get you there.

11         **MS. FORREST:**     Your Honor, with all due respect,

12    32(a)(3) gets us precisely there.  32(a)(3) would allow for

13    the admission at trial --

14         **THE COURT:**     So you can use it at trial.  It doesn't

15    say that you can have it admitted without using it.

16         **MS. FORREST:**     Your Honor, if we could, would

17    Your Honor allow us -- I will take care of the documents today

18    with Mr. Fischer and Mr. Kosmynka.  Would Your Honor allow us

19    to brief this issue for you overnight so that we can provide

20    the appropriate citations for you in a letter brief?  We will

21    limit it to two pages that will lay out precisely how this

22    gets traced into admissibility because it will affect other

23    witnesses.

24         Your Honor, my concern is that there is an attempt to try

25    to keep documents out of the record in this case and that this

1    is an attempt to do that by Apple.

2              **THE COURT:**    Well, I think I have been quite generous,

3    and I certainly am not interested in keeping records out.  I

4    have been -- I have not sealed very much, but what I'm not

5    going to do is not have things in evidence in a proper way so

6    that I can understand the context of it.

7         As I have indicated to you before, I need to understand

8    what the point and the basis is for why you're trying to admit

9    things in the record.

10              **MS. FORREST:**    Your Honor --

11              **THE COURT:**    I will take a look at it myself.

12              **MS. FORREST:**    Each and every one of these documents

13   was cited in our findings of fact.  The relevance, the

14   importance of each and every one of these documents is set

15   forth in our findings of fact.  There is not a single document

16   that I'm talking about that is not in our findings of fact.

17   There is no surprise.  We are not trying to hold something in

18   abeyance for some sort of appeal point.  These are core

19   documents of our case, and Apple is aware of that.

20              **THE COURT:**    All right.

21        Any other issues?

22              **MR. DOREN:**    I'm sorry.  Any other issues, Your Honor?

23   No.

24              **THE COURT:**    Well, let's use the -- let's go through

25   it with Mr. Fischer, and then maybe I will have a better sense

1    of what it is you are trying to achieve.

2          One last housekeeping issue, and we will issue a revision,

3    but I want it on the record.  Trial Order No. 1, there was an

4    error with respect to PX2413.  I think the -- there was a

5    typographical error, but I hope you all have caught it.  We

6    haven't admitted or I have not admitted 2413, but on that --

7    with respect to that exhibit, the page should be sealed but

8    for the specific note that I said would be unredacted, and

9    there was an error.  It said "unsealed" instead of "sealed,"

10   but the context, I hope, made it clear that it meant sealed,

11   but we'll fix that.

12          **MR. DOREN:**    Thank you, Your Honor.

13          **THE COURT:**    Okay.  8:19.  First witness.  Speaking of

14   which, did you all talk about the developer counsel or the

15   class action attorneys?  Can they be in the room or not?

16          **MS. FORREST:**    Your Honor, we did -- Epic has no issue

17   because they are fully under the protective order and they've

18   seen everything in this case to date, including highly

19   confidential information.

20          **MR. DOREN:**    Your Honor, I neglected to discuss that

21   issue with my client last night.  We will do it at the first

22   break.

23          **THE COURT:**    Okay.

24          **MR. DOREN:**    Thank you.

25          **THE COURT:**    At this point, do we know whether we are

1    having any remote witnesses?

2          **MS. FORREST:**   Your Honor, from Epic's side, there are

3    no remote witnesses.

4          **MR. DOREN:**   Nor for Apple.

5          **THE COURT:**   Okay.  Great.  Thank you.  Okay.

6       Who do we have?

7          **MR. BYARS:**   Your Honor, Epic calls Mr. Thomas Ko.  If

8    I may approach the witness to give him a binder of trial

9    exhibits.

10         **THE CLERK:**   Let me swear him in.

11                    <u>**THOMAS KO**</u>,

12   called as a witness for the Plaintiff, having been duly sworn,

13   testified as follows:

14         **THE WITNESS:**   I do.

15         **THE CLERK:**   All right.  Please be seated.  Please

16   state your full name and spell your last name.

17         **THE WITNESS:**   My name is Thomas Ko.

18         **THE CLERK:**   Wait a minute.  I have to turn on the

19   mic.  Sorry.  Okay.  The mic is on.

20         **THE WITNESS:**   My name is Thomas Ko.  Last name is

21   K-O.

22         **THE COURT:**   Good morning, sir.

23         **THE WITNESS:**   Good morning.

24         **THE COURT:**   You may proceed.

25         **MR. BYARS:**   Your Honor, may I hand the witness a

**KO - DIRECT - BYARS**

1    binder of exhibits?

2                    **THE COURT:**   You may.  And, counsel, again, if you

3    will state your name for the record.

4                    **MR. BYARS:**   Your Honor, I'm Brent Byars for Epic

5    Games.

6                    <u>**DIRECT EXAMINATION**</u>

7    **BY MR. BYARS:**

8    **Q.**    Mr. Ko, could you please introduce yourself to the Court?

9    **A.**    My name is Thomas Ko.  I am head of online business,

10   strategy and operations.

11   **Q.**    When did you join Epic Games?

12   **A.**    October 2019.

13   **Q.**    Could you briefly describe your career before you joined

14   Epic.

15   **A.**    Sure.  I was a banker at Citibank in New York from 2007 to

16   2014.  In that particular position, I created many mobile

17   payment product.  One product called CitiDirect BE Mobile

18   processed several trillion dollars in first few years and end

19   up winning Banking Innovation Technology Award in 2012.

20   **Q.**    What was your next position in your career?

21   **A.**    That made an interest for Samsung to hire me as a general

22   manager for Samsung Pay in 2015.

23   **Q.**    What is Samsung Pay?

24   **A.**    Samsung Pay is a consumer wallet solution available for

25   Galaxy users so that they can use their phone instead of

**KO - DIRECT - BYARS**

1    plastic credit cards.

2    **Q.**    Did you have another role at Samsung?

3    **A.**    Yes.  After Samsung Pay general manager, I became global

4    head of content services for Samsung.

5    **Q.**    And as head of content services, what kinds of products

6    did you work on?

7    **A.**    I manage many of Samsung applications, including Samsung

8    Galaxy stores and music and media services.

9    **Q.**    What is the Samsung Galaxy Store?

10   **A.**    Samsung Galaxy Store is a store to distribute Android

11   applications to Samsung Galaxy users.

12   **Q.**    In that role, did you have occasion to interact with Epic?

13   **A.**    Yes, I did.

14   **Q.**    What kind of interactions did you have with Epic?

15   **A.**    In that role, I helped Epic Games to launch *Fortnite*

16   Android version in August 2018.

17   **Q.**    Did you subsequently leave Samsung?

18   **A.**    Yes, I did.

19   **Q.**    Is that when you joined Epic?

20   **A.**    Yes.

21   **Q.**    Why did you choose to join Epic?

22   **A.**    During the collaborations, I learned Epic and their value,

23   and what they tried to do was very noble things, and I wanted

24   to help.

25   **Q.**    And what specifically, if anything, did you want to help

1   with at Epic?

2   **A.**   As a payment expert, I realized that Epic could improve

3   few things on the payment side.

4   **Q.**   And what other areas do you manage now at Epic?

5   **A.**   In Epic, I manage E-commerce services that includes

6   payment, store platform services, ecosystem securities, and

7   marketing technologies.

8   **Q.**   And just to take a step back, does Epic have a technology

9   that it uses to accept payments from its users?

10   **A.**   Yes.

11   **Q.**   And does that -- does Epic have a name for that

12   technology?

13   **A.**   We call it Epic Payment Solutions.

14   **Q.**   And where is that payment solution now used?

15   **A.**   Epic Payment Solution is used for in-app purchase for our

16   first party game such as *Fortnite*, *Rocket League*, and also

17   Unreal Marketplaces and Epic Games Store.

18   **Q.**   What is the Unreal Marketplace?

19   **A.**   Unreal Marketplace is a place where Unreal developers to

20   purchase any pre-created 2D or 3D assets for their

21   development.

22   **Q.**   And on what platforms is Epic's Payment Solution currently

23   available?

24   **A.**   Currently Epic Payment Solution is available on PC and

25   Android.

**KO - DIRECT - BYARS**

1  **Q.**    How long has the Epic Payment Solution been available on

2  Android?

3  **A.**    Since August 2018.

4  **Q.**    Does Epic ever make its payment solution available to

5  other developers?

6  **A.**    Yes, we do.

7  **Q.**    And to which other developers does Epic make that payment

8  solution available?

9  **A.**    For developers who want to bring their games into Epic

10 Games Stores, when they wish to use our payment solutions for

11 in-app purchases, we provide the solutions to them.

12 **Q.**    Does Epic require that these developers use its payment

13 solution?

14 **A.**    No, we do not.

15 **Q.**    What is the process for integrating the payment solution

16 into an app by a developer?

17 **A.**    We provide payment solutions in SDK and help game

18 developers to incorporate that into their games.

19 **Q.**    When you joined Epic in 2019, did you form an initial

20 assessment about the quality of Epic's Payment Solution?

21 **A.**    Yes, I did.

22 **Q.**    And what was your assessment at that time?

23 **A.**    Our solutions were good in the countries where -- U.S. and

24 Western Europe, but outside of those regions, we didn't have a

25 lot of solutions in currencies and payment methods.

**KO - DIRECT - BYARS**

1    **Q.**    Has that assessment changed since 2019 up until today?

2    **A.**    Yes.

3    **Q.**    And how has it changed?

4    **A.**    For example, in December 2019, we only supported 10

5    different currencies.  Now we are supporting 42 local

6    currencies.

7    **Q.**    And why did Epic choose to add additional currencies that

8    it would support through the solution?

9    **A.**    Epic serves everyone around the world, and we believe any

10   person in U.S. or Western Europe should be equally treated to

11   anybody who is from developing countries, and many players in

12   developing countries, they are not fortunate to get a bank or

13   credit cards so therefore it is important to serve them with

14   the local currencies and payment methods that they can use.

15   **Q.**    And in about how many countries can users access the Epic

16   Payment Solution to make a payment?

17   **A.**    Local currencies currently are available in 42 currencies,

18   but we serve hundred-plus countries around the world.

19   **Q.**    And are you currently satisfied with Epic's Payment

20   Solution today?

21   **A.**    I believe that we have made lots of improvement but still

22   there are more room to improve.

23   **Q.**    Is Epic currently making efforts to improve the payment

24   solution today?

25   **A.**    Yes, we do.

**KO - DIRECT - BYARS**

1   **Q.**   Could you describe some of those efforts that Epic is

2   doing?

3   **A.**   I could give a few examples.  First will be Epic Wallet.

4   That we are working to provide value storage for user to store

5   their money and then use it for different transactions within

6   Epic ecosystem.

7   **Q.**   So, for example, could a parent use the Epic Wallet when

8   it's available to add value to an account held by a child or

9   teenager?

10   **A.**   That's correct.

11   **Q.**   Are there any other efforts that Epic is making to improve

12   its payment solution?

13   **A.**   I could give an example of smart pricing solutions which

14   is to protect developers from any unpredictive volatility of

15   the foreign currencies.

16   **Q.**   How would it do that if and when it's implemented?

17   **A.**   When it's implemented, it will grab all those realtime

18   informations of foreign currency exchange rate and volatility

19   and warn the developers if anything is materially changing the

20   pricing so that it could be protected.

21   **Q.**   Does Epic itself process the transactions that occur using

22   the payment solution?

23   **A.**   No, we do not.

24   **Q.**   Who does that?

25   **A.**   We work with payment service providers to process the

**KO - DIRECT - BYARS**

1    payments for us.

2    **Q.**    Could you identify some of the payment service providers

3    that Epic uses?

4    **A.**    We use several.  Chase Paymentech is U.S. and global

5    credit card processor.  We use PayPal globally and also Xsolla

6    and Adyen for international transactions.

7    **Q.**    Why does Epic use separate payment providers for

8    international transactions?

9    **A.**    Payments is in such a way that it requires regional

10   players that has local banking networks to be able to process

11   much better.  We call it as higher conversion rate, and these

12   international processors tends to bring higher conversion rate

13   for us.

14   **Q.**    Could you please explain to the Court what you mean by

15   "conversion rate"?

16   **A.**    Conversion rate is when any good customer with good credit

17   card wants to make a purchases that credit card becomes

18   successful in transacting.

19   **Q.**    Does Epic ever receive the credit card numbers, for

20   example, that users may use to process transactions in its

21   solution?

22   **A.**    No, we do not.

23   **Q.**    Who receives that information?

24   **A.**    Payment service providers.

25   **Q.**    I'd like to take a step back and talk about something

**KO - DIRECT - BYARS**

1    earlier.

2         You discussed the platforms on which the Payment Solution

3    is currently available.  Has the Payment Solution ever been

4    available on iOS?

5    **A.**    Yes.

6    **Q.**    And when was it available on iOS?

7    **A.**    During Project Liberty.

8    **Q.**    And what was your role in Project Liberty?

9    **A.**    My role was to provide Epic Payment Solutions to Project

10   Liberty and also as -- I was executive at Samsung advising how

11   to communicate to the new managements of Samsung.

12   **Q.**    And from your perspective, what was the purpose of Project

13   Liberty?

14   **A.**    From my perspective, Project Liberty is an attempt to

15   provide developer choices for payment solutions and bring that

16   benefit to the customers in a platform where the choice is not

17   available.

18   **Q.**    Do you believe that Epic's Payment Solution is safe to

19   use?

20   **A.**    Yes.

21   **Q.**    And was that true also when that payment solution was

22   being used on iOS during Project Liberty?

23   **A.**    Yes.

24   **Q.**    And how do you know that the payment solution is secure?

25   **A.**    First of all, you should check the compliance requirements

**KO - DIRECT - BYARS**

1    such as PCI DSS to make sure that all the service providers

2    are equipped to have that certifications.  And also you look

3    at overall fraud and chargeback ratios in your ecosystems to

4    be able to measure.

5    **Q.**    Could you please explain what you mean by fraud and

6    chargeback ratios?

7    **A.**    It is when anybody making a transactions using false

8    credit cards, stolen credit cards, or when a kid is making a

9    transaction using mom's credit card and later tells the credit

10   card that they didn't make that purchase.

11   **Q.**    Have you compared Epic's chargeback ratio overall to what

12   you understand to be normal in the industry?

13   **A.**    Yes.

14   **Q.**    And how does it compare?

15   **A.**    Normally industry says about one percent is average of

16   fraud-back and chargeback ratio.  We are currently under 0.9

17   percent.

18   **Q.**    You mentioned, I believe, PCI certification.  Could you

19   explain what that is?

20   **A.**    PCI DSS stands for Payment Card Industry Data Security

21   Standards.  Basically it helps those payment processors to

22   make sure that they have implemented right technology and

23   operations to protect customers to credit card informations.

24   **Q.**    Does Epic itself have a PCI certification?

25   **A.**    Yes, we do.

**KO - DIRECT - BYARS**

1   **Q.**   Is it required to have a PCI certification?

2   **A.**   No, it's not.

3   **Q.**   Why is Epic not required to have a PCI certification?

4   **A.**   Because we don't hold customers' credit card information.

5   **Q.**   So why does Epic obtain a PCI certification if it's not

6   required to?

7   **A.**   Because we believe that as a company that provides a

8   payment solutions and working with payment solution provider,

9   that informations may in transit with our solutions.  So

10   therefore, we volunteer to get PCI DSS certification.

11   **Q.**   I'd like to speak again about Epic's payment service

12   providers.  Are you in charge of selecting those?

13   **A.**   Yes.

14   **Q.**   What do you look for when you're selecting these payment

15   service providers?

16   **A.**   Look at all aspect from technical sophistications, user

17   experiences, operational excellency, and their service level

18   commitment.

19   **Q.**   What is a service level commitment?

20   **A.**   It means that this company guaranteeing 24 by 7, 365 days

21   of operational working conditions.

22   **Q.**   Does Epic consider the costs of using a payment service

23   provider when it's choosing a provider?

24   **A.**   Yes.

25   **Q.**   And how do you determine on average what the worldwide

**KO - DIRECT - BYARS**

1    costs of using these payment service providers is?

2    **A.**    In 2020 in average was about 4.2 percent for Epic

3    payments.

4    **Q.**    And within the U.S., did Epic have an average cost of

5    using a payment service providers?

6    **A.**    In U.S., it was around 3.5 percent.

7    **Q.**    Does Epic have the opportunity to negotiate these costs

8    with its payment service providers?

9    **A.**    Yes.

10    **Q.**    How does Epic typically approach these negotiations?

11    **A.**    We look at overall volumes, their conversion ratios, and

12    then competitions to see how we can always bring additional

13    discounts in the fees that they assess on us.

14    **Q.**    Has the payment service providers Epic uses changed since

15    you began working at Epic?

16    **A.**    Yes.

17    **Q.**    And how did that change come about?

18    **A.**    After the initial assessment, we issued an RFP in February

19    2020 to five different global payment service providers and

20    four regional players to submit on 145 questions that we

21    issued.

22    **Q.**    How long did that process take?

23    **A.**    Two month.

24    **Q.**    And why did Epic engage in that process?

25    **A.**    We wanted to make sure that the current players that we

**KO - DIRECT - BYARS**

1   engage give us the best fee structures and operational

2   excellency and also wanted to make sure that there are healthy

3   competitions in the payment service provider spaces with the

4   continuity as well.

5   **Q.**   Mr. Ko, could I please ask you to open in your binder to

6   PX2451.  It's the first tab in the binder that you have.

7        And, Your Honor, PayPal has indicated that they would

8   request to seal specific portions.

9            **THE COURT:**   So do I have a motion on this?  Have I

10   already ruled on it?

11            **MR. BYARS:**   They did not include this in their

12   motion.  This was recently discussed with PayPal.

13            **THE COURT:**   Have you met and conferred with opposing

14   counsel?

15            **MR. BYARS:**   I have not specifically on this document,

16   Your Honor.  I was intending to use -- to ask very general

17   questions without publishing the specific contents --

18            **THE COURT:**   So you are not asking that 2415 be

19   admitted?

20            **MR. BYARS:**   I will be asking that 2451 be admitted,

21   and the parties have agreed that when a document is subject to

22   a motion to seal, it will be kept out of box until that's

23   resolved.

24            **THE COURT:**   And who I do have from Apple's side on

25   this witness, please?

1          **MR. SRINIVASAN:**   Mr. Srinivasan, Your Honor.

2          We don't have an objection to what they are -- how they

3    want to treat this document.

4          **THE COURT:**   Okay.  Proceed.

5          **MR. BYARS:**   Thank you, Your Honor.

6    **Q.**   Mr. Ko, do you recognize what is marked as PX2451?

7    **A.**   Yes, I do.

8    **Q.**   What is this document?

9    **A.**   The first is an email from PayPal responding to the

10   questions that came during the RFP presentation.

11   **Q.**   And are there documents attached to this email?

12   **A.**   Yes.

13   **Q.**   What are the documents attached to this email?

14   **A.**   It has the formal RFPs submission from Braintree, part of

15   the PayPal company, as well as a presentation that was used as

16   RFP response.

17   **Q.**   And did Epic use the materials attached to this email?

18   **A.**   Yes, we did.

19   **Q.**   How did Epic use those materials?

20   **A.**   We used this material to evaluate their submission of RFP

21   responses and give score.

22         **MR. BYARS:**   Your Honor, I offer into evidence PX2451.

23         **THE COURT:**   Any objection?

24         **MR. SRINIVASAN:**   No objection, Your Honor.

25         **THE COURT:**   It's admitted, but we'll defer -- I guess

**KO - DIRECT - BYARS**

1  I still don't understand what portions you want sealed and not

2  sealed.

3          **MR. BYARS:**    Your Honor, we will reach out to PayPal

4  and ensure that they get a request specific to the specific

5  portions on file promptly.

6          **THE COURT:**    All right.  So it's provisionally

7  admitted.  It's not admitted yet.

8          **MR. BYARS:**    Thank you, Your Honor.

9  (Plaintiff's Exhibit 2451 provisionally received in evidence)

10  **BY MR. BYARS:**

11  **Q.**    Mr. Ko, you can put this away, and if you can please turn

12  to what is in your binder as 2452.

13  **A.**    Yes.

14  **Q.**    Do you recognize this set of materials?

15  **A.**    Yes.

16  **Q.**    What is this set of materials?

17          **THE COURT:**    So, counsel, I take it -- did you not

18  identify these to us?  We pull exhibits first thing in the

19  morning, and I don't have any of these.  Were these not on a

20  list that you sent to us?

21          **MR. BYARS:**    Your Honor, I believe they were on the

22  list.  We anticipated that Mr. Ko might go on an earlier day

23  in which case they may have been pulled for an earlier day and

24  not identified today.  I can pass up a binder to Your Honor,

25  if it would be helpful.

**KO - DIRECT - BYARS**

1          **THE COURT:**   No.  Let me see if I have them.  Hold on.

2     This one is 24 --

3          **MR. BYARS:**   2452, Your Honor.

4          **THE COURT:**   I don't have that one either.

5     Okay.  Just keep going.

6          **MR. BYARS:**   Thank you, Your Honor.

7     **Q.**   Mr. Ko, do you recognize what's marked as PX2452?

8     **A.**   Yes, I do.

9     **Q.**   What is this material?

10    **A.**   This is the RFP summary presentation after conclusion of

11    the RFP process.

12         **MR. BYARS:**   Your Honor, I offer into evidence PX2452.

13         **THE COURT:**   Is there an objection?

14         **MR. SRINIVASAN:**   No objection.

15    **BY MR. BYARS:**

16    **Q.**   And is there a particular page in this document that

17    summarizes the results of the RFP process?

18         **THE COURT:**   The document is admitted.

19         **MR. BYARS:**   I'm so sorry, Your Honor.  Thank you.

20         (Plaintiff's Exhibit 2452 received in evidence)

21         **THE WITNESS:**   Page No. 2452.5 is a result page.

22    **BY MR. BYARS:**

23    **Q.**   And what information is summarized on this page?

24    **A.**   It summarizes the conclusion of RFPs selecting three

25    payment service providers with their scores and highlights of

**KO - DIRECT - BYARS**

1    the first company Adyen and what their strength and benefits

2    were.

3    **Q.**    And is there a significant strength that Adyen provided as

4    part of this process?

5    **A.**    I believe that Adyen had highest score of 4.33 among all

6    the global service providers with their technical superiority

7    and the users experiences and many more things.

8    **Q.**    Thank you.

9         Could you please turn to the next page, which would be

10    page 6.  Could you summarize the information that's presented

11    on this slide?

12    **A.**    First two summarizes the additional RFP winner, Braintree

13    and Checkout.com with their strength in providing services and

14    benefits.

15    **Q.**    And there is a section on the side that says "Big wins."

16    What information is presented there?

17    **A.**    During the RFP process, how companies were very

18    competitive in fee structure so showing what Adyen was

19    providing as a benefit in fees, and also what we learned as

20    RFP process, that there are many companies that are very

21    competitive and then capable so that we can always switch to

22    some other companies.

23    **Q.**    Thank you.

24         You can put this document away now, please, Mr. Ko.

25         I'd like to ask you, though, did Epic have occasion to

**KO - CROSS - SRINIVASAN**

1    discuss the RFP process with its existing payment service

2    providers?

3    **A.**    Yes, we did.

4    **Q.**    And for what purpose did you discuss the RFP process with

5    existing providers?

6    **A.**    The purpose of the RFP was to bring healthy competitions

7    in payment service providing in Epic ecosystems, so therefore

8    I wanted to let the users and players know that we are looking

9    into bringing additional providers into the ecosystem so that

10   they can -- they can see what they can do to improve their

11   services.

12   **Q.**    And how did those existing payment service providers

13   respond to knowing about the RFP process?

14   **A.**    Good example would be they reduced their fees.

15   **Q.**    Thank you.

16        Your Honor, I tender the witness.

17                       <u>**CROSS-EXAMINATION**</u>

18   **BY MR. SRINIVASAN:**

19   **Q.**    Good morning, Mr. Ko.  My name is Jay Srinivasan, and I'm

20   a lawyer for Apple, and I'm just going to follow up with a few

21   questions to you.

22        I think you mentioned you joined Epic from Samsung in

23   October 2019; is that right, sir?

24   **A.**    Yes.

25   **Q.**    Okay.  And then one of your responsibilities when you

1    joined Epic from Samsung was to work on the Project Liberty

2    payment processing issue; is that correct?

3    **A.**    When I first joined, I worked on payment.

4    **Q.**    Okay.  And at some point that became part of Project

5    Liberty, those efforts on payment processing, I think you just

6    testified; is that correct?

7    **A.**    I think Project Liberty was more than payment, and I

8    supplied payment solutions to Project Liberty.

9    **Q.**    And that was one of your responsibilities; correct?

10    **A.**    Yes.

11    **Q.**    Okay.  And did you know that as part of Project Liberty,

12    Epic would involve deceiving Apple in some way in implementing

13    the payment processing?

14    **A.**    I don't know the description of deceiving, what that

15    means, but Project Liberty we were supplying payment

16    solutions.

17    **Q.**    I understand.  I will say it differently.

18        Did you understand at some point that the payment

19    processing solution that you worked on would be put on the

20    Apple platform without Apple's permission?

21    **A.**    I knew that my payment solutions would be used through

22    Project Liberty and any -- or how the communication goes on

23    was beyond my responsibility.

24    **Q.**    Okay.  So you were not told that it was going to be done

25    without Apple's permission; is that right?

**KO - CROSS - SRINIVASAN**

1    **A.**    I wasn't aware of it.

2    **Q.**    Okay.

3          So this was October of 2019.  You joined Epic and then you

4    I think you mentioned you were revamping their payment

5    solution system; correct?

6    **A.**    Yes.

7    **Q.**    And then soon after you joined, in December of 2019, Epic

8    changed its policy and allowed its developers to use their own

9    payment processing systems; correct?

10   **A.**    Can you rephrase the question?

11   **Q.**    Sure.  Epic no longer today requires developers of games

12   on the Epic Games Store to use Epic's payment processing

13   system; correct?

14   **A.**    That's correct.

15   **Q.**    Okay.  And that's only, though, for the in-game services;

16   correct?

17   **A.**    That's correct.

18   **Q.**    Okay.

19          And that policy didn't come into play until December 2019;

20   correct?

21   **A.**    I don't recall.

22   **Q.**    You don't remember when that happened?

23   **A.**    No.

24   **Q.**    Okay.  You joined in October of 2019; correct?

25   **A.**    Yes.

1    **Q.**    And do you recall that it happened soon after you joined?

2    **A.**    I remember something like that has happened, but, yeah, I

3    don't specifically recall.

4    **Q.**    Okay.  And was it your idea to do that?

5    **A.**    No.

6    **Q.**    Okay.

7          And do you recall that in December of 2019, sir, it was

8    your view that outside of the App Store, Apple's App Store and

9    Google Play Store on the Android, that there was no

10   comprehensive payment processing solution that any game

11   company was capable of doing on its own?

12   **A.**    At that moment of assessment, I -- my assessment said for

13   the game -- in-game processing, payment processing solutions,

14   that Apple and Google has one of the best solutions.

15   **Q.**    And, in fact, at that time in December of 2019, you

16   believed they were the only ones that had that solution;

17   correct?

18   **A.**    I don't recall whether I said they are the only, but I

19   certainly remember saying that they had one of the best

20   solutions.

21   **Q.**    Okay.

22          I'm going to show you a document.

23          And, Your Honor, I'd like to introduce DX4496.

24          May I approach, Your Honor?

25               **THE COURT:**    You may.

**KO - CROSS - SRINIVASAN**

1    **BY MR. SRINIVASAN:**

2    **Q.**    Mr. Ko, have you had a chance to look at DX4496?  It's at

3    the very end of your binder.

4    **A.**    Yes.

5    **Q.**    Do you recognize Exhibit 4496 as an email chain in which

6    you participated on December 25th, 2019, involving Mr. Sweeney

7    and others at Epic?

8    **A.**    Yes.

9    **Q.**    And do you recall that you were discussing a different

10   payment processor called Xsolla in this email?

11   **A.**    Yes.

12           **MR. SRINIVASAN:**    Your Honor, I would like to move

13   4496 into evidence.

14           **THE COURT:**    Any objection?

15           **MR. BYARS:**    No objection, Your Honor.

16           **THE COURT:**    4496 is admitted.

17           (Defense Exhibit 4496 received in evidence)

18   **BY MR. SRINIVASAN:**

19   **Q.**    If I can draw your attention, Mr. Ko, to the second full

20   paragraph of your top email there that you wrote, do you

21   recall where you say, "Currently when you come to IAP within a

22   game outside of App Store and Google Play, there is really no

23   truly comprehensive payment solution that does everything

24   needed for a game company," end quote.  Did I read that right?

25   **A.**    Yes.

**KO - CROSS - SRINIVASAN**

1    **Q.**    And that's what you wrote?

2    **A.**    Yes.

3    **Q.**    And that was your belief at the time?

4    **A.**    Yes.

5    **Q.**    So at the time that Epic offered this option of allowing

6    the game developers on the Epic Game Store to use their own

7    in-app payment processing, your view was none of them could do

8    it as comprehensively as Apple or Google; correct?

9    **A.**    *None of the others can do it* is, I think, too much of a

10   statement.  I think there were other companies who were able

11   to process the game payments at the time.

12          My assessment at the moment was that because App Store and

13   Google Play had such dominance in processing the internet

14   purchases so that they had a much more comprehensive

15   solutions.

16   **Q.**    So when you said they were the only one with the

17   comprehensive solution, you were meaning to say that they were

18   dominant in some way?

19   **A.**    I -- I don't think I said they are the only.

20   **Q.**    Okay.  Well, I'm not going to argue with what you said,

21   but you did say there was really no truly comprehensive

22   payment solution other than Apple or Google at that time;

23   correct?

24   **A.**    Yes.

25   **Q.**    Okay.  Now, again, just to be clear, this option was just

1   for in-app purchases where you were giving developers the

2   freedom to use their own payment processing; right?

3   **A.**   That's correct.

4   **Q.**   And very few games on the Epic Games Store offer in-app

5   purchases; correct?

6   **A.**   I don't recall.

7   **Q.**   You don't know the answer to that?

8   **A.**   No.

9   **Q.**   And a very few companies actually took you up on that

10   option; correct?

11   **A.**   I don't recall.

12   **Q.**   You don't know.  Okay.

13        You -- I think you testified -- moving on to a different

14   subject.  You can put that document away.

15        You testified that you're in charge of the security

16   ecosystem of Epic?  Did I get that right?

17   **A.**   Yes.

18   **Q.**   Okay.  And -- and that includes fraud, things like that,

19   fraud prevention?

20   **A.**   Yes.

21   **Q.**   What about customer data privacy?  Does that fall within

22   your ambit as well?

23   **A.**   No.

24   **Q.**   Okay.  So with respect to the payment processing,

25   safeguarding customer -- the privacy of customer data, that is

**KO - CROSS - SRINIVASAN**

1    not your responsibility?

2    **A.**    No.

3    **Q.**    So is payment processing -- is that a function that Epic

4    performs?

5    **A.**    The actual customer data privacy implementation is handled

6    by Info Sec -- Info Systems -- Information Security Services,

7    and they are not part of my duty.

8    **Q.**    Okay.  So in managing the payment processing function at

9    Epic, part of your duty does not include the safeguarding of

10   customer privacy; is that right?

11   **A.**    That's correct.

12   **Q.**    Okay.

13              **THE COURT:**    I'm sorry.  Info Sec, is that an

14   internal --

15              **THE WITNESS:**    Information Systems Security.

16              **THE COURT:**    But is it internal to Epic or is it

17   external?

18              **THE WITNESS:**    It's internal, Your Honor.

19              **THE COURT:**    Thank you.

20   **BY MR. SRINIVASAN:**

21   **Q.**    And do you have an understanding of whether Epic's

22   customers would want their personal information disseminated

23   in any way?

24   **A.**    I believe every single customer wants their data to be

25   protected.

**KO - CROSS - SRINIVASAN**

1  **Q.**   True.  And that would be true of Apple's customers as

2  well?  You would agree with that, sir?

3  **A.**   Yes.

4  **Q.**   And to the extent Epic has had issues safeguarding

5  customer information, is that something that would come to

6  your attention?

7  **A.**   I believe that I am stakeholder.

8  **Q.**   So the answer is yes, that would come to your attention?

9  **A.**   Yes.

10  **Q.**   Okay.  And so, to your knowledge, has Epic ever had issues

11  with improperly collecting or using customer personal

12  information in the past, whether it preceded your time there

13  or since your time there?

14  **A.**   I don't believe so.

15  **Q.**   You're not aware of any of that?

16  **A.**   No.

17  **Q.**   Are you aware whether Epic has ever had issues with

18  improperly using or collecting personal information about

19  children under the age of 13, whether it happened before or

20  since you arrived at Epic?  Are you aware of any of those

21  issues, sir?

22  **A.**   I don't recall.

23  **Q.**   You don't recall if you've heard about that or not?

24  **A.**   I was part of the -- part of the attorney privileged team

25  that are handling requests from FTC, but that was it.

1          THE COURT:    That are handling what?  Requests from

2     the FTC you said?

3          THE WITNESS:    Yes.

4          MR. SRINIVASAN:    Your Honor, I would like to follow

5     up on that answer, but I think maybe we would want to seal the

6     courtroom before we do that.

7          THE COURT:    We can do it later.

8          MR. SRINIVASAN:    Then I'm done with my questioning --

9     I'm sorry.  I have another portion that needs to be also done

10    under seal.  I'm finished with everything else.

11         THE COURT:    Okay.  Let's get -- let's get cross -- I

12    mean redirect with respect to the scope of cross.

13         MR. BYARS:    Your Honor, I have no redirect with

14    respect to that portion.

15         THE COURT:    All right.  Who is the -- who is your

16    next witness?

17         MS. FORREST:    Your Honor, the next witness will be

18    Matt Fischer, who is an Apple witness we are calling in our

19    case.

20         THE COURT:    Well, I don't think this will take too

21    long.  Let's go ahead and seal the courtroom, so I would ask

22    that the lines -- the public lines be moved out and the press

23    be -- I wouldn't go too far.  I don't think it will probably

24    take too long.

25         MR. SRINIVASAN:    I do have another set of questions.

1      **THE COURT:**   I know.  So how long do you think?

2      **MR. SRINIVASAN:**   I think it will take maybe 10

3   minutes.

4      **THE COURT:**   Ten minutes?

5      And then that includes the attorneys because they

6   haven't -- you will have to leave as well.

7      **MS. MANIFOLD:**   Okay.  Thank you, Your Honor.

8      **THE COURT:**   I don't have the response back yet from

9   Apple, Ms. Manifold.  Sorry about that.

10      (Proceedings held under seal on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (The following proceedings were sealed:)

24     ///

25     ///

1        ///

2        ///

24        ///

25        ///

1        ///

2        ///

24       ///

25       ///

1        ///

2        ///

24       ///

25       ///

1        ///

2        ///

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              (Under seal proceedings concluded.)

1                      (Proceedings held in open court:)

2              **THE COURT:**    And while the press is getting back, let

3    me go back to this topic of documents.

4              So, again, Ms. Forrest, I'm not sure I understand what

5    you're attempting to do.  Under Rule 32, the deposition of an

6    adverse party can be used at trial, and it can be used whether

7    or not that person is available.  That's a basic principle

8    under Rule 32, and I'll cite to Wright & Miller, Section 2145.

9              So you can read the deposition testimony.  I've never

10   suggested you can't.  So I don't -- there's nothing in Rule 32

11   that says as a rule of evidence, the Court admits the

12   document.  You admit it as part of the deposition testimony

13   which can be read.

14             **MS. FORREST:**    Your Honor, the -- I would agree with

15   you on the base -- on how you are reading Rule 32, with one

16   exception, which is that when deposition designations are

17   submitted pretrial, which is part of Your Honor's --

18             **THE COURT:**    When they're submitted during trial -- I

19   allowed you to do it outside of trial.

20             **MS. FORREST:**    As well as during trial, Your Honor.

21   You've allowed us to take additional time out of our time --

22             **THE COURT:**    Correct.

23             **MS. FORREST:**     -- to submit additional deposition

24   designations.

25             **THE COURT:**    Correct.

**KO - CROSS - SRINIVASAN**

1          **MS. FORREST:**   We are asking for no more than simply

2     the ability to ensure that where we have deposition-designated

3     testimony that has not been objected to, that fits within

4     Rule 32, as Your Honor has noted, that the authenticated

5     documents, which were not objected to or they were resolved by

6     Ms.-- Judge Laporte -- that those, as they would always be, be

7     received by the Court as if it was part of, for instance, the

8     four-hour read.  That is all we are asking for, Your Honor.

9          **THE COURT:**   All right.  So rule -- so now that I

10    think I understand what you're attempting to do, counsel -- I

11    don't now understand what your objection is.

12         **MR. DOREN:**   The objection, Your Honor, is simply that

13    the witnesses are here --

14         **THE COURT:**   Right.  But under Rule 32, it doesn't

15    matter.

16         **MR. DOREN:**   And, Your Honor, my only point is that

17    there is no substantive testimony about these documents in any

18    of these designations, and the Court has previously observed

19    that it would like to hear testimony on all relevant documents

20    and have them explained here in court.  That's our point in

21    terms of --

22         **THE COURT:**   So is the objection relevance?

23         **MR. DOREN:**   The objection on some of these 30 is, I'm

24    going to say, foundation as to the designating witness when

25    all they have done is agreed that their name is on it and it's

1    a document that they may have received in the ordinary course.

2    Now, if Your Honor finds that sufficient to establish the

3    necessary foundation and they can come in, there is just no

4    information about the documents beyond that.

5             THE COURT:    That's why I asked you whether there was

6    some objection that these weren't business records.  You said

7    that there was no objection that they were business records.

8             MR. DOREN:    That's correct, Your Honor.

9             THE COURT:    Okay.  So they come in.

10            MR. DOREN:    Thank you, Your Honor.

11            THE COURT:    I will admit them, but I need document

12   numbers.

13            MS. FORREST:    Your Honor, I will hand up a binder to

14   the Court -- I have already provided one to counsel -- and

15   then recite them for the record.

16            MR. DOREN:    And, Your Honor, presumably there is also

17   a representation as to how much time the authenticating

18   testimony consumes.

19            MS. FORREST:    Your Honor, we have the ability to give

20   exact, precise times with respect to these documents.  We will

21   do so.  We will confer with counsel and make sure that that

22   time for the designations matches, and we'll subtract it from

23   our time.  We will inform the Court.

24            THE COURT:    All right.

25            MR. DOREN:    Thank you, Your Honor.

**KO - CROSS - SRINIVASAN**

1          **THE COURT:**   As you all know, I do pull -- look, we

2    have 50 binders apiece for you.  So it will be helpful if,

3    again, even if you have identified these in the past -- my

4    team gives me a binder for the day or actually multiple

5    binders for the day.  We don't take things that you said two,

6    three days ago and put them in a current binder.

7          So if you know you're going to use something on a trial

8    day, please let me know so that I can have it easily

9    accessible.  I was able to find 2415 and 2452 from a prior

10   day, but I would prefer not to have to scrounge around looking

11   for it.

12         **MS. FORREST:**   Your Honor, the documents which we have

13   provided in a binder that are the subject of our prior

14   discussion are PX0006, PX0052, PX0060, PX0061, PX0072, PX0112.

15   There is a confidentiality issue, and so I believe until

16   that's resolved, it should not go into the box as to PX201.

17   That is from, I believe, Apple's side so PXO201 would not go

18   into the box.  The same is true with respect to PX0202.

19         The two final documents are PX0827 and PX0854.

20         **THE COURT:**   All right.  All of those are admitted

21   pending resolution of 201 and 202.

22   (Plaintiff's Exhibits 0006, 0052, 0060, 0061, 0072, 0112, 0827,

23   0854 received in evidence)

24         **THE COURT:**   Next witness.

25         **MS. FORREST:**   Your Honor, Epic calls Mr. Fischer,

1    please, to the stand.

2            And, Your Honor, so we don't complicate things, there was

3    a second group of documents that we mentioned this morning

4    which had some evidentiary objections.  I'm just going to go

5    through those with Mr. Fischer one by one.

6                            **<u>MATTHEW FISCHER</u>**,

7    called as a witness for the Plaintiff, having been duly sworn,

8    testified as follows:

9            **THE CLERK:**    Please be seated, and then would you

10   please state your full name and spell your last name.

11           **THE WITNESS:**    My name is Matthew Fischer,

12   F-I-S-C-H-E-R.

13                        **<u>DIRECT EXAMINATION</u>**

14   **BY MS. FORREST:**

15   **Q.**    Good morning, Mr. Fischer.

16   **A.**    Good morning.

17   **Q.**    The last time I saw you was over Zoom.

18           **THE COURT:**    Good morning, sir.

19       You may proceed.

20           **THE WITNESS:**    Good morning.

21   **BY MS. FORREST:**

22   **Q.**    What is your current position, Mr. Fischer?

23   **A.**    I'm the vice-president of the App Store at Apple.

24   **Q.**    And in lay person's terms, does that mean that you are the

25   head of the App Store?

1   **A.**   I wouldn't describe it as that.  I'm responsible for the

2   App Store business at Apple.

3   **Q.**   All right.  And you joined the App Store team in January

4   of 2010; is that right?

5   **A.**   That's correct.

6   **Q.**   All right.  And you were promoted to your current position

7   in 2016; is that right?

8   **A.**   That's right.

9   **Q.**   All right.  And in your current job, you're one of the

10  people that's held responsible for the revenue growth of the

11  App Store; is that correct?

12  **A.**   That's correct.

13  **Q.**   And is it also true that you report to Mr. Phil Schiller

14  in your current position?

15  **A.**   Yes, I do.

16  **Q.**   Is it true that you reported to Mr. Eddy Cue until 2015?

17  **A.**   That's correct, yes.

18  **Q.**   And in connection with your job at Apple, you have been

19  involved in the preparation of various business plans; isn't

20  that true?

21  **A.**   Yes.

22  **Q.**   I'm going to hand you a binder, sir, of documents, and we

23  have one for counsel and the Court.  I will have my associate

24  give one -- do you have one for counsel?

25              **THE COURT:**   You need to speak into the mic,

1   Ms. Fischer -- sorry -- Ms. Forrest.

2         **MS. FORREST:**   I'm going to hand to the Court a binder

3   of documents.  I will hand one to the witness, if it so please

4   the Court, and I will hand one to counsel.

5         **THE COURT:**   You may approach.

6         **MS. FORREST:**   For Your Honor's information, this is

7   the second binder that I was referring to this morning.

8         **THE COURT:**   Thank you.

9   **BY MS. FORREST:**

10  **Q.**   Mr. Fischer, could you please turn to the first document

11  in this binder which is identified as PX57.

12  **A.**   Okay.

13  **Q.**   Do you see -- can you identify this document?

14  **A.**   Yes, I can.

15  **Q.**   Is this a document that you were copied on?

16  **A.**   Yes, I was.

17  **Q.**   Did you receive it as a copy on or about April 11, 2011?

18  **A.**   Yes.  That's the date.

19  **Q.**   And did you receive it in connection with your duties and

20  responsibilities at Apple?

21  **A.**   Yes, I did.

22  **Q.**   And do you see in the email that Mr. Shoemaker wrote to

23  you on April 11th that -- there is a sentence that says,

24  referring to -- well, actually let me sort of read before

25  that.

1          "11.2 apps utilizing a system other than the app purchase

2     API IAP to purchase content, functionality or services in an

3     app will be rejected."

4          Do you see that?

5     **A.**     Yes, I do.  I think it said "in-app purchase."

6     **Q.**     In-app purchase.  Pardon me.  You're correct.

7          And then below that in the next paragraph, there is a

8     sentence that begins, "And while we have some outliers in the

9     store right now, I cannot guarantee that we will allow them to

10    continue."  Do you see that?

11    **A.**     I do see that Phillip Shoemaker said that, yes.

12               **MS. FORREST:**    Your Honor, I would offer PX057.

13               **THE COURT:**    No objections?

14               **MR. SRINIVASAN:**    Your Honor, the only issue is

15    there --

16               **THE COURT:**    What is the evidentiary objection?

17               **MR. SRINIVASAN:**    Hearsay, Your Honor, but to the

18    extent it's not being used for the truth of the matter, we

19    have no objection.

20               **THE COURT:**    It's admitted.  The Court will -- well,

21    it's admitted.  That particular statement is an admission, in

22    any event.

23               (Plaintiff's Exhibit 057 received in evidence)

24    **BY MS. FORREST:**

25    **Q.**     Would you please turn, Mr. Fischer, to the next document

**FISCHER - DIRECT - FORREST**

1    in your binder, PX58.

2    **A.**    Okay.

3    **Q.**    Can you identify this document for the Court?

4    **A.**    Yes.

5    **Q.**    What is it?

6    **A.**    This is an email.  There is multiple emails in this email.

7    One was from Elizabeth Lee to someone named Andrea.  Her name

8    is not mentioned here, her full name.  And then a forward of

9    that email from Sarah Herrlinger to myself, and then I

10   forwarded the email to Tanya Washburn.

11   **Q.**    Who is Ms. Washburn?

12   **A.**    Tanya Washburn is a leader on my App Store team, and at

13   the time was the leader of my Editorial team.

14   **Q.**    And does Tanya report to you or did she report to you at

15   this time?  Did Ms. Washburn report to you at this time?

16   **A.**    Yes.  She reported to me at that time and still reports to

17   me in a different capacity.

18   **Q.**    Did you receive what has been marked for identification as

19   PX58 on or about June 7, 2016?

20   **A.**    Yes, I did.

21   **Q.**    And did you receive it in connection with your duties and

22   responsibilities at Apple?

23   **A.**    Yes.

24   **Q.**    And do you see on the bottom of the first page of this

25   document it says in the middle of that paragraph under the

**FISCHER - DIRECT - FORREST**

1    Elizabeth_Lee email, quote, "Matt feels extremely strong about

2    not featuring our competitors on the App Store."

3    **A.**    I do see that that is what Elizabeth communicated, and as

4    I shared with you in my deposition --

5    **Q.**    That's -- you -- that can be brought out on -- by your

6    counsel.  Thank you.

7         Your Honor, I would offer PX58.

8              **THE COURT:**    No objection?

9              **MR. SRINIVASAN:**    No objection, Your Honor.

10             **THE COURT:**    Fifty-eight is admitted.

11                 (Trial Exhibit 58 received in evidence)

12   **BY MS. FORREST:**

13   **Q.**    Let's move on to the next document in your binder,

14   Mr. Fischer, which is to be PX65.

15   **A.**    Okay.

16   **Q.**    And when you have had an opportunity to review it, can you

17   please identify this document for the Court?

18   **A.**    Yes.  Just give me a moment to look at this, please.

19             **THE COURT:**    While he is looking at that, stipulate as

20   to admissibility, Mr. Srinivasan?

21             **MR. SRINIVASAN:**    Well, Your Honor, this is -- we

22   don't because this is an email from a third party; therefore,

23   it's not an admission.  And we also have an issue as to

24   whether Mr. Fischer has personal knowledge of its contents.

25             **THE COURT:**    All right.

FISCHER - DIRECT - FORREST

1    **THE WITNESS:**   Okay.

2    **BY MS. FORREST:**

3    **Q.**    All right.  Mr. Fischer, is your email

4    matt.fischer@apple.com?

5    **A.**    Yes, it is.

6    **Q.**    Did you receive this email on or about July 27th, 2018?

7    **A.**    Yes, I did.

8    **Q.**    And did you receive it in connection with your duties and

9    responsibilities at Apple?

10   **A.**    Yes.

11   **Q.**    And do you see that there is -- in the second paragraph it

12   says, quote, "There is an epidemic of fraudulent apps in the

13   App Store that attempt to defraud users of large sums of

14   money"?  Do you see that?

15   **A.**    Yes, I do.

16              **MS. FORREST:**   Your Honor, we offer PX65.

17              **MR. DOREN:**   We have the same objections.

18              **MS. FORREST:**   We're not going to be using it for any

19   hearsay purpose, Your Honor.  It's for the fact that the

20   statement was said.

21              **THE COURT:**   I don't understand.

22              **MS. FORREST:**   The objection -- I believe that there

23   was a hearsay objection to the document.  We're not offering

24   it for the truth of the --

25              **THE COURT:**   So you're not admitting -- you don't want

**FISCHER - DIRECT - FORREST**

1    me to admit the truth of this statement.  So then for what

2    purpose is it being offered?

3              **MS. FORREST:**    For the fact that it was said,

4    Your Honor.  It's for the fact that there are people who

5    believed that there are fraudulent apps in the App Store and

6    are making statements to Apple in that regard.  It will

7    connect up to a variety of arguments that we are making about

8    knowledge of Apple at various times as to conditions in the

9    App Store.  So the state of mind of the third party becomes

10   very relevant to that fact.

11             **THE COURT:**    Well, that's in the record, so I don't

12   know that I need to admit the document at this point then.

13             **MS. FORREST:**    All right.  Is it --

14             **THE COURT:**    So I will reserve until I see what the

15   connection is, but it's not admitted at this point.

16             **MS. FORREST:**    All right.

17   **Q.**    Let's turn then to the next document, Mr. Fischer, PX67.

18        This document has a confidentiality issue with regard to

19   it, so I will be careful, Your Honor, in not reading out

20   things other than just the identifying information into the

21   record and pointing the witness to certain information.

22             **THE COURT:**    Go ahead.

23   **BY MS. FORREST:**

24   **Q.**    Mr. Fischer, is this a document that you are -- you are

25   the addressee of?

**FISCHER - DIRECT - FORREST**

1   **A.**   Yes, it is.

2   **Q.**   And is it a document that you received on or about

3   March 26, 2019?

4   **A.**   Yes.

5   **Q.**   And did you receive it in connection with your duties and

6   responsibilities at the App Store?

7   **A.**   Yes.

8        **MS. FORREST:**   Your Honor, we would move the

9   admission.  PX67 for the non-hearsay purpose of state of mind

10  and the fact that certain statements were made and Apple was

11  informed of certain views --

12       **THE COURT:**   I would say the same thing.  What is it

13  you would want?

14       **MS. FORREST:**   I would turn the attention of the Court

15  to the third paragraph of the email below the phrase that

16  begins "per conversations last week" and the word that begins

17  with the word "based."  And there is a sentence there that is

18  relevant, Your Honor, to what is occurring -- at least the

19  knowledge of statements from third parties to individuals at

20  the App Store of what is occurring or alleged to be occurring.

21       **THE COURT:**   So the issue is notice then?

22       **MS. FORREST:**   Correct.  And, Your Honor, we are able

23  to connect up through admissions from Apple's own documents

24  the facts that underlie the notice that is going on here.

25       **THE COURT:**   All right.  So I'll reserve on this one

1    as well until we get the whole picture in front of us.

2              **MR. SRINIVASAN:**   Your Honor, if I could just

3    interject on something unrelated.

4          The parties have an agreement that the witness's personal

5    identifying information will not be disclosed, and I would

6    just ask the Court to ask Ms. Forrest not to --

7              **THE COURT:**   I have not --

8              **MR. SRINIVASAN:**   When she is reading off these

9    emails, she has mentioned Mr. Fischer's email address, and I

10   would just ask counsel to not do that.

11             **MS. FORREST:**   All right.  There had been an issue as

12   to whether or not he had personal knowledge of that particular

13   email, Your Honor.  That was the only reason I had raised

14   that.  I will not do that if that objection is not raised.

15             **THE COURT:**   Reserve on 67 as well.  Next.

16   **BY MS. FORREST:**

17   **Q.**   Would you please turn to the next item in your binder,

18   Mr. Fischer, which would be PX146.

19   **A.**   Okay.

20   **Q.**   All right.  And do you see that you are a copyee on this

21   document?

22   **A.**   Yes.

23   **Q.**   And do you see that there is a date August 27, 2013?

24   **A.**   Yes.

25   **Q.**   Is it correct that you received as a copyee of this

**FISCHER - DIRECT - FORREST**

1   document, PX146, the document on or about the 27th of August,

2   2013?

3   **A.**    Yes.

4   **Q.**    And did you do -- would you have received this document in

5   connection with your duties and responsibilities at Apple?

6   **A.**    Yes.

7   **Q.**    And do you see the subject line says, quote, "Seemingly

8   benign," quote, "'Jekyll'," end quote, "app passes Apple

9   review and then becomes," quote, "'evil'," end quote, "Ars

10   Technica."  Do you see that?

11   **A.**    Yes.

12   **Q.**    Are you familiar with the concept of a Jekyll app?

13   **A.**    No, I'm not.

14   **Q.**    And you're not -- you have never heard the phrase "Jekyll

15   app"?

16   **A.**    Well, this email has refreshed my memory, but that's not

17   something that I'm -- that I was familiar with.

18   **Q.**    Okay.  If it -- did it refresh your memory or did it

19   create new knowledge?  If it refreshed your memory, I would

20   like to inquire about it.  If it created new knowledge, then

21   we will not go there.

22   **A.**    It more created new knowledge after that description.

23   Thank you.

24   **Q.**    All right.  So let's ignore, then, the subject line.

25         Do you see -- do you see that there is an email from

FISCHER - DIRECT - FORREST

1   Mr. Shoemaker to Mr. Cue which then gets passed on to

2   Mr. Shoemaker and then ultimately to you, if we read the first

3   page, PX146?

4   **A.**   I believe the original email -- email from Phillip

5   Shoemaker was addressed to a different person than Mr. Cue.

6   **Q.**   Was that to Mr. Schiller?

7   **A.**   Yes.  He indicated -- he said "Phil."

8   **Q.**   Is it your practice to read emails such as this in

9   connection with your duties and responsibilities?

10  **A.**   Yes.

11  **Q.**   All right.

12       Your Honor, we offer PX146.

13            **THE COURT:**   No objection?

14            **MR. SRINIVASAN:**   No objection, Your Honor.

15            **THE COURT:**   146 is admitted.

16       (Plaintiff's Exhibit 146 received in evidence)

17  **BY MS. FORREST:**

18  **Q.**   Let's move on to the next email in your binder,

19  Mr. Fischer, which is PX197.

20       Your Honor, this document also has -- is subject to some

21  form of confidentiality issue, so I will be again careful as

22  to what I say about it.

23            **THE COURT:**   Okay.  Thank you.

24  **BY MS. FORREST:**

25  **Q.**   Mr. Fischer, is this -- is the top email an email from you

**FISCHER - DIRECT - FORREST**

1    to a variety of people on or about April 18th, 2018?

2    **A.**    Yes, it is.

3    **Q.**    And I just would point the Court's attention and your

4    attention, Mr. Fischer, to the second full sentence in the

5    paragraph beginning with the word "on."

6    **A.**    So could you repeat that?

7    **Q.**    I don't want to say the words so I will just point you to

8    the paragraph --

9    **A.**    Yes -- can you describe it again?

10   **Q.**    Yes.

11   **A.**    Thank you.

12   **Q.**    It's under the email of another individual.  It says

13   another individual's name wrote it, right, passing it on?

14   **A.**    Yes.

15   **Q.**    And then it begins "on."  Do you see that paragraph?

16   **A.**    Okay.  Yes, I do.

17   **Q.**    Do you see the sentence that begins with the -- a person's

18   name?  A person's name "and I"?

19   **A.**    Yes.

20   **Q.**    All right.  And did you receive this email in connection

21   with your duties and responsibilities at Apple?

22   **A.**    Yes.

23              **MS. FORREST:**    Your Honor, I would move in PX197.

24              **THE COURT:**    No objection.

25              **MR. SRINIVASAN:**    No objection, Your Honor.

FISCHER - DIRECT - FORREST

1          **THE COURT:**   This one is admitted, 197.

2          (Plaintiff's Exhibit 197 received in evidence)

3     **BY MS. FORREST:**

4     **Q.**   Turn, if you would, please, Mr. Fischer, to PX198, which

5     would be the next exhibit in your binder.

6          Your Honor, there is also a confidentiality issue that has

7     been raised by Apple with regard to this document, and so I

8     will be again careful as to how I refer to it.

9          **THE COURT:**   Okay.

10         **THE WITNESS:**   Ms. Forrest, I don't have anything

11    here.  It's -- there is no page whatsoever.

12         **MS. FORREST:**   That should certainly not be the case.

13    **Q.**   Let's go on to the next document.  We will come back to

14    that one.

15         **THE COURT:**   Let me just -- were you going to ask him

16    substantive questions on this?

17         **MS. FORREST:**   No.  I simply was going to ask him,

18    because it is under confidentiality, to identify it.

19         **THE COURT:**   Any objection to 198, Mr. Srinivasan?

20         **MR. SRINIVASAN:**   No, Your Honor.  No objection.

21         **THE COURT:**   198 is admitted.

22         (Plaintiff's Exhibit 198 received in evidence)

23         **MS. FORREST:**   All right.  Thank you.

24    **Q.**   We can move on to the next Exhibit, PX422, Mr. Fischer.

25    This also is under a confidentiality request from Apple so I

**FISCHER - DIRECT - FORREST**

1   will again be careful.

2   **A.**   Okay.  I have it here.

3   **Q.**   Do you see that you, Mr. Fischer, are a copyee on this

4   document dated, in the top portion of it, July 20th, 2018?

5   **A.**   Yes, I do.

6   **Q.**   All right.  And did you receive this document in

7   connection with your duties and responsibilities at Apple?

8   **A.**   Yes.

9   **Q.**   Do you see there are a series of four -- of several

10  bullets down the left-hand side on the first page of this

11  document, PX422?

12  **A.**   Yes, I do.

13  **Q.**   And I would just point your attention to the -- and the

14  Court's attention to the fourth bullet that begins with the

15  word "as."  Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   All right.

18      Your Honor, I would seek to admit PX422.

19          **THE COURT:**   No objection?

20          **MR. SRINIVASAN:**   To the extent that hearsay is not

21  being used for the truth of the matter, we have no objection,

22  Your Honor.

23          **THE COURT:**   Admitted.

24      (Plaintiff's Exhibit 422 received in evidence)

25

1    **BY MS. FORREST:**

2    **Q.**    Your Honor and Mr. Fischer, would you please turn to the

3    next document, which is PX744, and tell me when you've got

4    that in front of you.

5    **A.**    I've got it.  Thank you.

6    **Q.**    All right.  Is this a document, Mr. Fischer, that you

7    received on or about January 4th, 2016?

8    **A.**    Yes, it is.

9    **Q.**    And did you receive this email in connection with your

10   duties and responsibilities at Apple?

11   **A.**    Yes.

12           **MS. FORREST:**    Your Honor, this document is also under

13   a confidentiality request from Apple, so I will again be

14   careful with how I talk about it.

15   **Q.**    I'd ask you, Mr. Fischer, to turn to the second page of

16   the document, and I would turn your attention to the very last

17   paragraph on that page beginning with the word "it's."  Do you

18   see where I am, sir?

19   **A.**    Yes, I do.

20   **Q.**    I would ask you to take a look at that, carrying over to

21   the top of the next page, which ends with a Bates number 767.

22   Do you see where I am?

23   **A.**    Yes, I do.

24   **Q.**    All right.

25           Your Honor, I would seek to admit PX744.

1      **THE COURT:**   Any objection?

2           **MR. SRINIVASAN:**    This is similar to the other ones I

3   believe Your Honor is deferring, and we would put it in that

4   bucket.

5      **THE COURT:**   Well, I have only deferred emails that

6   have been written by others.

7           **MR. SRINIVASAN:**    And that's the case with this one,

8   Your Honor.  It's from a third party that -- the only Apple

9   portion of this is an FYI tag at the very top.

10          **MS. FORREST:**   Your Honor, as to this --

11     **THE COURT:**   Hold on.  I'm looking -- oh, I see what

12  you're saying.  Okay.  I will reserve on this one as well,

13  then.

14          **MS. FORREST:**    Just so the record is clear, we are not

15  seeking to admit it for anything other than a non-hearsay

16  purpose, and the statements that I had pointed Your Honor to

17  are the statements that we are interested in with this

18  document which we believe are simply for the state of mind of

19  the sender.

20     **THE COURT:**   I'll make a note.

21  **BY MS. FORREST:**

22  **Q.**   All right, Mr. Fischer.  You can put that to the side.

23       Do we have the other binder?  Might I approach,

24  Your Honor, and take away these binders that have become

25  excessive over by the witness stand?

**FISCHER - DIRECT - FORREST**

1        **THE COURT:**   Thank you.

2              **MS. FORREST:**   Your Honor, I now have the binder that

3    I was originally going to start with for Mr. Fischer's

4    examination.  Might I hand one up to the Court and to the

5    witness?

6              **THE COURT:**   You can, although I hope I already have

7    your exhibits.

8              **MS. FORREST:**   Your Honor, this was -- is in the same

9    bucket as with Mr. Grant yesterday.  Because he is, under the

10   stipulation, not a controlled witness, the documents were not

11   previously disclosed.

12             **THE COURT:**   I thought that you were sending me your

13   exhibits -- I'm not sharing that information with the other

14   side.

15             **MS. KLOSS:**   It was provided yesterday, Your Honor.

16             **THE COURT:**   I probably already have them.  You can

17   hand them to my law clerk.

18             **MS. FORREST:**   All right.  Thank you.

19             **THE COURT:**   So what I might need is -- well, I'll

20   look at it myself, but I might need some briefing on this

21   topic of whether you can introduce a document from someone

22   else who is not here for that other third party's state of

23   mind.  I'm not -- I'm not sure about that one.

24             **MS. FORREST:**   Your Honor, I would be very happy to

25   provide Your Honor with the case law that would support that

**FISCHER - DIRECT - FORREST**

1    proposition.  We believe it's a clear proposition, but we will

2    provide a letter brief to Your Honor by tomorrow.

3              **THE COURT:**    That's fine.  And I'm looking for circuit

4    authority.

5              **MS. FORREST:**    Yes.  I understand, Your Honor.

6    **Q.**    All right, Mr. Fischer.  You've never sideloaded an app

7    onto an iPhone, have you?

8    **A.**    That's correct.  I have never done that before.

9    **Q.**    You're not aware of anyone in your household sideloading

10   an app onto an iPhone; is that right?

11   **A.**    That's correct.

12   **Q.**    And you're not aware of any studies that have been done

13   with an Apple that have looked at security issues relating to

14   apps that have been sideloaded onto the iPhone; isn't that

15   right?

16   **A.**    I have not seen any studies like that, no.

17   **Q.**    And you're not aware of anyone within Apple who has ever

18   sideloaded an app onto an iPhone and who has reported to you

19   that they have actually experienced a security issue with

20   their iPhone as a result of that sideload; isn't that right?

21   **A.**    That's correct.

22   **Q.**    Now, you consider the App Store an app; is that right?

23   **A.**    Yes, I do.

24   **Q.**    And you were involved in the creation of the App Store; is

25   that right?

1    **A.**    No, I was not.

2    **Q.**    Let me -- can I have the deposition?

3         **THE COURT:**    Well, I would need his deposition, too.

4         **MS. FORREST:**    Yes.  May I approach, Your Honor?

5         **THE COURT:**    You may.

6         **THE WITNESS:**    I was not on the team --

7         **THE COURT:**    Sir, there is no question pending.

8         **THE WITNESS:**    I'm sorry.

9         **THE COURT:**    Just wait.

10        **THE WITNESS:**    I'm sorry, Your Honor.

11   **BY MS. FORREST:**

12   **Q.**    All right.  And so I would ask you whether or not -- and,

13   Your Honor, let me just turn your attention and the witness's

14   attention to the discussion that begins on page 29, line 20 --

15        **THE COURT:**    So you can -- was he -- are you trying to

16   impeach, or are you trying to get something in as an

17   admission?  What are we doing here?

18        **MS. FORREST:**    No.  I believe this is impeachment.

19        **THE COURT:**    Okay.  So point me to the line.

20        **MS. FORREST:**    Thirty -- page 30, lines 2 and 3.

21        **THE COURT:**    Thirty, 2 and 3.  And Volume 1?

22        **MS. FORREST:**    In Volume 1, Your Honor.

23        **THE COURT:**    Okay.  Go ahead and read it.

24        **MS. FORREST:**    All right.

25   **Q.**    Mr. Fischer, do you recall that you and I discussed during

FISCHER - DIRECT - FORREST

1    your deposition that -- whether or not you had ever been

2    involved in the creation of an app?

3    **A.**    I recall -- I recall that, but I was interpreting creation

4    and ongoing development differently.  I'm involved in the

5    ongoing development of the App Store app in my

6    responsibilities leading the App Store business, but I was not

7    on the original team back in 2008 or prior to 2008 that was

8    involved in the creation of the App Store app.  So I think I

9    was just misinterpreting maybe the term "created" versus

10   "involvement ongoing."

11   **Q.**    So you weren't involved in the origination of the App

12   Store?

13   **A.**    That's correct.  And that's what I meant.  I apologize if

14   I misspoke.

15   **Q.**    No.  I understand.  Thank you.

16         Now, is the App Store an example of an app that contains

17   numerous other apps?

18   **A.**    Yes, it is.

19   **Q.**    And the App Store launched in July of 2008; is that right?

20   **A.**    That's correct.  July 10, 2008.

21   **Q.**    You know who Steve Jobs was, don't you?

22   **A.**    Yes.

23   **Q.**    Who was Mr. Jobs?

24         **THE COURT:**    Stay next to the mic, please.

25

**BY MS. FORREST:**

**Q.**   Who was Mr. Jobs?

**A.**   Steve Jobs was the co-founder and CEO of Apple.

**Q.**   And do you recall that in 2018 you sent your team a transcript of an interview, an audio interview, that had been sent to you of Mr. Jobs?

**A.**   I don't recall doing that, but that's certainly possible.

**Q.**   All right.  In your binder, I would turn your attention to the document that is labeled PX2060.

**A.**   Okay.  I have it here.

**Q.**   All right.  Is this a document that was from you to other -- to another individual within Apple on July 27th, 2018?

**A.**   I believe I sent this to my broader organization, yes.

**Q.**   All right.  And why don't you take a moment just to see on the first page whether or not this refreshes your recollection that you sent to your team a transcript of an audio interview of Mr. Jobs.

**A.**   Yes.

**Q.**   All right.  And you told your team in sort of the middle of the first page of PX2060 that you thought that this was super cool and yet another example of how visionary Steve was; is that right?

**A.**   Yes.

**Q.**   All right.

1        And you understood that the audio recording -- or you took

2    the audio recording to be an accurate reflection of Mr. Jobs's

3    words; is that right?

4    **A.**    Yes.

5    **Q.**    And no one ever told you that Mr. Jobs did not say the

6    words that had been transcribed; is that right?

7    **A.**    That's correct.

8    **Q.**    All right.

9        Turn, if you would, please, to the Bates numbered page

10   down at the bottom, which is -- ends in 254.  The Bates

11   numbers are the little numbers on the right-hand side.

12   **A.**    Okay.

13   **Q.**    And do you see, when you get there, that there is a

14   "Mr. Jobs," a colon, and some words, and then there will be a

15   "Mr. Wingfield," a colon, and some words, and I want to turn

16   your attention to the one in the middle of the page where it

17   says, "Mr. Jobs, I don't know off the top of my head, but the

18   majority clearly, which is great.  Our purpose in the App

19   Store is to add value to the iPhone.  Free apps do that just

20   as well as pay apps sometimes.  We love free apps."

21       Do you see that statement?

22   **A.**    Yes, I do.

23   **Q.**    And turn, if you would, please, to the next page to the

24   fourth bullet down where it says "Mr. Jobs," and his words --

25   his first word is the word "no."  Do you see that?

FISCHER - DIRECT - FORREST

1    **A.**    Yes, I do.

2    **Q.**    All right.  And it says, "No.  It costs money to run it.

3    Those free apps cost money to store and to deliver wirelessly.

4    The paid apps cost money, too.  They have to pay for some of

5    the free apps.  We don't expect this to be a big profit

6    generator.  We expect it to add value to the iPhone.  We'll

7    sell more iPhones because of it."  Do you see that?

8    **A.**    Yes, I do.

9    **Q.**    And turn, if you would, please, to page 256, and

10   underneath in the middle of the page, it says "Mr. Jobs," and

11   it says the word "yeah."  Tell me when you're there.

12   **A.**    I'm here.

13   **Q.**    All right.  And underneath that paragraph, there is

14   another one that says, "Who knows?  Maybe it will be a

15   billion-dollar marketplace at some point in time."

16        Do you see that?

17   **A.**    Yes, I do.

18   **Q.**    And you would attribute that statement to one that's

19   indicated as coming from Mr. Jobs, would you not?

20   **A.**    Yes.

21   **Q.**    All right.

22        Your Honor, I would offer PX2060.

23            **THE COURT:**    Any objection?

24        **MR. SRINIVASAN:**    No objection, Your Honor.

25            **THE COURT:**    Admitted.

**FISCHER - DIRECT - FORREST**

1          (Plaintiff's Exhibit 2060 received in evidence)

2    **BY MS. FORREST:**

3    **Q.**    You're aware, aren't you, Mr. Fischer, that when the App

4    Store was launched in 2008, it was launched without the IAP

5    functionality in it?

6    **A.**    Yes.

7    **Q.**    And you would agree with me, wouldn't you, sir, that the

8    IAP functionality was added in 2009?

9    **A.**    Yes.

10   **Q.**    And you're aware, aren't you, that the App Store is

11   pre-installed on all iPhones?

12   **A.**    Yes.

13   **Q.**    And, in fact, you're aware that the App Store is preloaded

14   onto the home screen of the iPhone?

15   **A.**    Yes.

16   **Q.**    You're not aware, are you, of anyone who has actually

17   downloaded another app store onto the iPhone; is that right?

18   **A.**    That's my understanding.

19   **Q.**    Now, you recall in 2010, don't you, that the App Store

20   billings were already $2.1 billion?

21   **A.**    I don't recall that, no.

22   **Q.**    All right.

23          Turn, if you would, to the document in your binder labeled

24   PX2185.

25   **A.**    Okay.  I've got it.

**FISCHER - DIRECT - FORREST**

1 **Q.** And do you see that this is a subject "updated deck" and

2 it's -- it was sent to you on or about 11 November 2010?

3 **A.** Yes.

4 **Q.** And it states, "Here is the updated deck with changes we

5 discussed yesterday along with slides from Tanya added."  Do

6 you see that?

7 **A.** Yes.

8 **Q.** And that would be Ms. Tanya Washburn, who we referred to

9 earlier in your testimony?

10 **A.** That's correct.

11   **MS. FORREST:** Your Honor, I would seek to admit

12 PX2185.

13   **THE COURT:** Any objection?

14   **MR. SRINIVASAN:** No objection.

15   **THE COURT:** Admitted.

16   (Plaintiff's Exhibit 2185 received in evidence)

17 **BY MS. FORREST:**

18 **Q.** I would turn your attention, Mr. Fischer, to the Bates

19 numbered page ending in 164.

20 **A.** Okay.

21 **Q.** And do you see there that it says "2.1 billion cumulative

22 app billings"?

23 **A.** Yes, I do.

24 **Q.** And this is an -- this was provided to you on October

25 2010; is that right?

**FISCHER - DIRECT - FORREST**

1    **A.**    That is correct.

2    **Q.**    Now, turn, if you would, to PX2281 in your binder and --

3    you don't have it?

4    **A.**    I do not have it.

5    **Q.**    Neither do I.

6          Do we have 2281?

7          Let's go on.  Let's turn to DX4178, which is in your

8    binder.

9          Now, Your Honor, this document is under some

10   confidentiality requests by Apple, so I'm again going to be

11   careful.  I want to try not to seal the courtroom and just to

12   refer to certain information.

13              **THE COURT:**    All right.  Proceed.

14   **BY MS. FORREST:**

15   **Q.**    Mr. Fischer, could you take a look at what has been marked

16   as Defense Exhibit 4178.

17   **A.**    Yes.  I've got it here.

18   **Q.**    All right.  What is it?

19   **A.**    If I could just have a moment to review this.

20   **Q.**    Sure.

21   **A.**    (Witness reviews document.)

22          Okay.

23   **Q.**    Do you recognize what has been marked as Defense Exhibit

24   4178?

25   **A.**    Yes, I do.

FISCHER - DIRECT - FORREST

1    **Q.**   What is it?

2    **A.**   This is a presentation that a colleague of mine and I

3    prepared and presented in May of 2018.

4    **Q.**   All right.  Thank you.

5          Your Honor, I would move DX4178.

6                **MR. SRINIVASAN:**    No objection, Your Honor.  Just --

7    it's just the confidentiality issues is all we have.

8    **BY MS. FORREST:**

9    **Q.**   And, Mr. Fischer, without saying any of the words, I want

10   to turn your attention so I can also direct the Court's

11   attention to certain information.

12               **THE COURT:**    Do you want me to admit it?

13               **MS. FORREST:**   I'm sorry.

14               **THE COURT:**    Admitted.

15               **MS. FORREST:**    Thank you.

16               **THE COURT:**    Subject do those limitations.

17               (Defense Exhibit 4178 received in evidence)

18   **BY MS. FORREST:**

19   **Q.**   Mr. Fischer, would you please turn to Bates numbered page

20   ending in 983.

21   **A.**   Okay.

22   **Q.**   Is the word "a few" -- does that appear on that page so we

23   are in the same place?

24   **A.**   Yes.  I see that.

25   **Q.**   Do you see a numerical -- a number underneath that that

1    refers to billings?  Don't say it out loud.

2    **A.**    Yes, I do.

3    **Q.**    All right.  And did you expect that that was an accurate

4    number at that time?

5    **A.**    Yes.

6    **Q.**    All right.  Turn, if you would, please, to the next page,

7    984.  And do you see a number there in a black area in the

8    middle?

9    **A.**    Yes, I do.

10   **Q.**    And did you expect that that was correct information?

11   **A.**    Yes.

12   **Q.**    We can put this to the side.

13          **THE COURT:**    Hold on just a moment.  I just don't have

14   enough pulled, so we will try to get our communication

15   working.

16          **MS. FORREST:**    You know, Your Honor, we can each day,

17   if we have not hit the witness we thought we would hit,

18   provide you again with the information for the witnesses that

19   we didn't hit as if it was the first time so that we can make

20   sure that they are --

21          **THE COURT:**    That's what I was mentioning earlier.

22   Some of these things I found in prior days' designations, but

23   my team is trying to get me a condensed binder, and it's just

24   not -- you know, it's just a day -- what day is it?  Day four?

25   Day three?

1    **MS. FORREST:**   Day four.

2    **THE COURT:**   What's today?  Thursday?  So day four.

3    **MS. FORREST:**   Three days and three hours.

4    **THE COURT:**   All right.  Let's --

5    **MS. FORREST:**   Not that we're counting.

6    **THE COURT:**   Keep going.

7    **BY MS. FORREST:**

8    **Q.**   Mr. Fischer, would you please turn to the first exhibit in

9    your binder, which is Exhibit 59.

10        And, Your Honor, this document is also under

11   confidentiality restrictions.  I don't think we need to seal

12   the courtroom because I can do the work without doing that.

13        **THE COURT:**   Okay.

14        **THE WITNESS:**   Okay.  I've got it here.

15   **BY MS. FORREST:**

16   **Q.**   Can you please identify this document for us, Mr. Fischer.

17   **A.**   This is a presentation that some colleagues of mine and I

18   gave to Apple executives in the summer of 2019.

19        **MS. FORREST:**   Your Honor, I would seek to admit PX59.

20        **MR. SRINIVASAN:**   No objection, Your Honor.

21        **THE COURT:**   All right.  It's admitted subject to

22   those confidentiality issues.

23        (Plaintiff's Exhibit 59 received in evidence)

24   **BY MS. FORREST:**

25   **Q.**   Mr. Fischer, I would turn your attention and the Court's

**FISCHER - DIRECT - FORREST**

1   attention to the Bates numbered page ending in 516.  Do you

2   see that?

3   **A.**   Yes, I do.

4   **Q.**   Do you expect that that information was correct on or

5   about the time that you presented this material?

6   **A.**   Yes, I do.

7   **Q.**   And turn your attention, please, to the next page, Bates

8   number ending in 517 of PX59, do you see that information?

9   **A.**   At 517?

10  **Q.**   Yes.

11  **A.**   Yes, I do.

12  **Q.**   Did you expect that information to be correct?

13  **A.**   Yes.

14  **Q.**   And turn your attention, please, to the next page, 518,

15  and there is a hashtag and a number there.  Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   Did you expect that that number was correct on or about

18  the time that you made this presentation?

19  **A.**   I believe so, yes.

20  **Q.**   Thank you.  You can put that to the side.

21          There is one number, Your Honor, that relates to 2020 that

22  is from the deposition.  If Your Honor would be amenable to it

23  without sealing the courtroom, I could simply turn Your Honor

24  to that portion of the deposition.  I believe Mr. Fischer

25  would not contest that.

1          **THE COURT:**   I think that's fine.

2          **MS. FORREST:**   All right.  Deposition, page 298, line

3     25.

4          **THE COURT:**   Volume 1?

5          **THE WITNESS:**   Should I get my deposition binder?

6          **MS. FORREST:**   Why don't you get that out, too.  And

7     we will continue -- this wouldn't be the normal way we would

8     do it.

9          **THE COURT:**   Volume 1 or Volume 2?

10         **MS. FORREST:**   Volume 1, Your Honor.

11         **THE COURT:**   And try to slow down, please.

12         **MS. FORREST:**   I'm sorry.  I apologize.

13         **THE WITNESS:**   And which page in Volume 2 should I be

14    looking for?

15    **BY MS. FORREST:**

16    **Q.**   It's page 298 and it's at line 23, and actually

17    starting -- the question is starting at line 20.

18    **A.**   Okay.

19    **Q.**   Is that accurate -- is that information true and accurate

20    today in terms of that year, 2020?

21    **A.**   Yes.

22    **Q.**   All right.  We can put that to the side.

23         Let's turn, if you could, to the tab in your binder,

24    PX414.

25    **A.**   The pages are stuck in my binder here.  Let me just try to

1    figure this out.  Okay.

2    **Q.**    All right.  Before we get to this document -- so I don't

3    want to go into any of the confidential information that may

4    be on this document.  Let me ask you some general questions.

5         Did there come a time when the App Store began to provide

6    the ability to buy search advertising?

7    **A.**    There was a time where Apple gave developers the ability

8    to purchase advertising within a search in the App Store, yes.

9    **Q.**    And is it the case that the way that that works

10   essentially is that there is an auction that occurs very, very

11   quickly through an algorithm that the developers can

12   participate in that will, if they prevail, elevate their app

13   to the number one or number two spot in the App Store search

14   area?

15   **A.**    I don't manage that program nor do I have any

16   responsibilities over that program so I can't speak to the

17   specifics of exactly how the algorithm works.

18   **Q.**    Let me then break the question down.

19        Have you had occasion recently, sir, to search for an app

20   on the App Store?

21   **A.**    Yes.

22   **Q.**    Is it the case that when you search for an app -- anybody

23   searches for an app on the App Store -- the first result that

24   comes up is a paid search result?

25   **A.**    Sometimes there is no -- there is no advertising there and

1    sometimes there is.

2    **Q.**    And is the reason why there would not be advertising there

3    be because perhaps nobody had bid on that particular search

4    ad?

5    **A.**    Again, I don't manage that program so I'm not exactly sure

6    how they determine that.

7    **Q.**    Are there times when -- and a large number of times when

8    someone enters in a search query into the App Store and the

9    first result will be a paid search result?

10   **A.**    In the form of a paid ad, that is accurate.

11   **Q.**    And Apple receives revenue for that paid search result; is

12   that correct?

13   **A.**    That's my understanding.

14   **Q.**    All right.  And you understand, don't you, that Apple

15   makes a fair amount of revenue off of that; is that right?

16   I'm not going to go into the numbers.

17   **A.**    I -- I'm not sure exactly how much money.  Again, I don't

18   manage that program.

19   **Q.**    All right.

20        Let's turn, if you could, then, to the document that is at

21   tab 414.

22   **A.**    Okay.  I've got it here.

23   **Q.**    All right.  And do you see that PX414 -- you are copied on

24   this document, and it's dated September 2nd, 2019?

25   **A.**    Yes, I do.

**FISCHER - DIRECT - FORREST**

1    **Q.**    And is this a periodic report that is provided on a basis

2    that is either quarterly and then sometimes even more

3    frequently?

4    **A.**    Yes.

5    **Q.**    All right.  And you received this document on or about the

6    2nd of September, 2019; is that right?

7    **A.**    Yes.

8    **Q.**    All right.  And I would point your attention to the

9    portion of the page that says -- referring to search ads, but

10   I'm not going to say the number.  Do you see where I am where

11   it says after the -- the two names above it with an ampersand

12   in between?

13   **A.**    Yes.  This is kind of halfway down the page.

14   **Q.**    Correct.  Do you see a number there?

15   **A.**    Yes, I do.

16   **Q.**    And would you expect the information on these periodic

17   class reports to be true and correct?

18   **A.**    Yes.

19            **MS. FORREST:**    Your Honor, we move the admission of

20   PX414.

21            **MR. SRINIVASAN:**    No objection, Your Honor.

22            **THE COURT:**    Admitted.

23   **BY MS. FORREST:**

24   **Q.**    And turn back, if you would, please, Mr. Fischer, to

25   PX413.

**FISCHER - DIRECT - FORREST**

1    **A.**    This is stuck again.

2          **THE COURT:**    There is no question pending.

3          **THE WITNESS:**    Okay.

4    **BY MS. FORREST:**

5    **Q.**    You can't get to PX413 because it's stuck?

6    **A.**    No.  I've got it now.  It was just stuck.

7          **THE COURT:**    Oh, I'm sorry.  I thought you were trying

8    to just talk.

9          **THE WITNESS:**    No.

10          **THE COURT:**    That's not the way it works.

11          **THE WITNESS:**    Sorry, Your Honor.  It was just -- the

12    page was stuck.  I just needed a second to unstick it.

13    **BY MS. FORREST:**

14    **Q.**    Mr. Fischer, is this another one of the reports of the

15    type that we saw with PX414?

16    **A.**    Yes, it is.

17          **MS. FORREST:**    This, Your Honor, is also under some

18    confidentiality restrictions and so I will be careful with it.

19    **Q.**    Does it also relate to search ads?

20    **A.**    Yes, it does.

21    **Q.**    And did you receive this on or about the 14th of November,

22    2020?

23    **A.**    Yes, I did.

24    **Q.**    And would you expect the information in this document to

25    be true and correct?

**FISCHER - DIRECT - FORREST**

1    **A.**    Yes.

2    **Q.**    And I would turn your attention and the Court's attention

3    to after the names separated by the ampersand to where there

4    is a reference to the amount of -- generated.  Do you see

5    that?

6    **A.**    Yes, I do.

7    **Q.**    All right.  Thank you.

8         Your Honor, I would move -- seek to admit PX413.

9              **THE COURT:**    Any objection?

10             **MR. SRINIVASAN:**    No objection.

11             **THE COURT:**    413 is admitted.

12        Actually, those two were already admitted, so I think that

13   must have been part of your earlier stipulation.

14             **MS. FORREST:**    I'm sorry, Your Honor.  And I apologize

15   for that.  I was -- in the rush of the things this morning, I

16   didn't catch that.

17   **Q.**    If you could, turn back, if you would, Mr. Fischer, to

18   the -- what I think is the last document in your binder,

19   DX4178.  And I want to turn your attention to the Bates

20   numbered page 034 on that document.

21   **A.**    You said 034?

22   **Q.**    Correct.

23   **A.**    Okay.  I'm here.

24   **Q.**    Do you see there's -- again, this is one of the documents

25   that's got some confidentiality restrictions, but do you see

1    again on the second paragraph down, it begins with the word

2    "more"?

3    **A.**    Yes.

4    **Q.**    All right.  And did -- would you expect the information on

5    this page to be true and correct?

6    **A.**    Yes.

7    **Q.**    All right.  You can close up that binder for the moment.

8    Thank you.  We will come back to it, but you can close it.

9         You're not aware, are you, Mr. Fischer, of any

10   instances --

11              **THE COURT:**    Are you seeking to have this admitted?

12              **MS. FORREST:**    I'm sorry.  That was already admitted,

13   Your Honor.  I just returned to it to be able to point out the

14   Bates numbered page 034 to the witness and the Court.

15              **THE COURT:**    Was it part of this morning's events?

16              **MS. FORREST:**    DX4178.

17              **THE COURT:**    Was it part of this morning's --

18              **MS. FORREST:**    It was actually admitted earlier in

19   Mr. Fischer's testimony.

20              **THE COURT:**    Okay.  Thank you.

21              **MS. FORREST:**    Is there any dispute about that?

22              **MR. SRINIVASAN:**    I -- we don't know.  We don't --

23              **THE COURT:**    Actually, you're right.  You're right.

24              **MS. FORREST:**    Okay.

25   **Q.**    Mr. Fischer, you're not aware, are you, of any instances

**FISCHER - DIRECT - FORREST**

1   in which the increased cost of an app has resulted in a user

2   leaving the iPhone ecosystem and going to Android, are you?

3   **A.**   I have not heard of that, no.

4   **Q.**   And you're not aware of any instance in which the

5   increased cost of an in-app purchase on iOS has resulted in a

6   user leaving the iOS world and instead switching to Android,

7   are you?

8   **A.**   No.

9   **Q.**   And if I change the word from "cost" to "price" in that

10  prior question, the answer doesn't change, does it?  You're

11  not aware of anyone at Apple who has studied switching from

12  the iOS ecosystem to the Android ecosystem because of the

13  increased price on iOS of an in-app purchase; is that right?

14  **A.**   I'm not aware of a study like that, no.

15  **Q.**   And you're not aware of any studies that Apple has done as

16  to whether the increase in price of an app on iOS could cause

17  a user to switch to Android, are you?

18  **A.**   I have not seen a study like that, either.

19  **Q.**   And you're not aware of any studies that Apple has done

20  that examine whether or not an increase in the price of an app

21  purchased on Android has caused a user to switch from Android

22  to iOS, are you?

23  **A.**   I haven't seen a study like that either.

24  **Q.**   And you're not aware of any studies that Apple has done

25  that examine whether or not an increase in price of an in-app

FISCHER - DIRECT - FORREST

1    purchase on Android has resulted in a user switching from

2    Android to iOS; isn't that right?

3    **A.**    That's correct.

4    **Q.**    And consumers who own iPhones typically acquire apps from

5    the Apple App Store; is that right?

6    **A.**    If I'm doing my job, that's correct.

7    **Q.**    And you're not aware, are you, of how much money the

8    average consumer spends on apps from the App Store over the

9    life cycle of his or her iPhone, are you?

10   **A.**    No, I'm not.

11   **Q.**    And you're not familiar with any work that has been done

12   at Apple to determine the amount that a consumer spends on

13   apps over the life cycle of their iPhone, are you?

14   **A.**    No.  And I wouldn't know how to go about that type of

15   analysis or study.

16   **Q.**    And you're not aware of any information made available to

17   a consumer about how much they are likely to spend on apps

18   over the life cycle of their iPhone, are you?

19   **A.**    No.

20   **Q.**    The main ways -- the two main ways that people get their

21   apps on their iPhone are through the App Store and

22   pre-installation; isn't that right?

23   **A.**    Yes.  I would say that's accurate.

24   **Q.**    And you would agree with me, wouldn't you, that the only

25   apps that can be pre-installed on an iPhone are those that

**FISCHER - DIRECT - FORREST**

1    Apple has authorized?

2    **A.**    Yes.

3    **Q.**    And the apps in the App Store have to be written for the

4    iOS platform; is that right?

5    **A.**    Yes.

6    **Q.**    And you would agree with me that Android apps don't work

7    on an iPhone; is that right?

8    **A.**    Yes.

9    **Q.**    And there is currently a technology that Apple has

10   developed that allows iOS apps to function well on macOS;

11   isn't that right?

12   **A.**    Yes.

13   **Q.**    And that technology is called Catalyst; correct?

14   **A.**    Yes.  I don't -- I don't manage that technology.  That's

15   in a different group, but that's my understanding, yes.

16   **Q.**    And you're not aware of any technology similar to Catalyst

17   that allows an iOS app to work well on Android; is that right?

18   **A.**    I'm not aware of a technology like that, no.

19   **Q.**    And you're familiar with an operating system called tvOS,

20   are you not?

21   **A.**    Yes, I am.

22   **Q.**    And you're familiar with an operating system called macOS,

23   are you not?

24   **A.**    Yes.

25   **Q.**    And you're familiar with an operating system called

**FISCHER - DIRECT - FORREST**

1    iPadOS, are you not?

2    **A.**    Yes.

3    **Q.**    You're familiar with an operating system called watchOS,

4    are you not?

5    **A.**    Yes.

6    **Q.**    These are OSs that are written for those devices or series

7    of devices; is that right?

8    **A.**    That's accurate, yes.

9    **Q.**    So the watchOS is written for the Apple Watch?

10   **A.**    Yes.

11   **Q.**    And the tvOS is written for the Apple TV?

12   **A.**    Yes.

13   **Q.**    And the macOS is written for the Macs, the group of Macs

14   that Apple sells; correct?

15   **A.**    Yes.

16   **Q.**    And the iPhone is the -- is iOS; is that right?

17   **A.**    That's right.

18   **Q.**    And iPadOS relates to the iPad; correct?

19   **A.**    Yes.

20   **Q.**    All right.  And you would agree with me, wouldn't you,

21   that a game that uses a remote may have different

22   functionality from a game app written for iOS; right?

23   **A.**    Yes.

24   **Q.**    And you think of Apple's products as a whole as part of an

25   ecosystem; correct?

**FISCHER - DIRECT - FORREST**

1   **A.**   Yes, I do.

2   **Q.**   And part of that ecosystem is the operating system that

3   powers the devices; correct?

4   **A.**   Yes.  That's definitely part of the ecosystem.

5   **Q.**   And, for instance, you would consider iOS to be part of

6   the Apple ecosystem; correct?

7   **A.**   One hundred percent.

8   **Q.**   Okay.  And similarly, you would consider the iPadOS,

9   macOS, watchOS, and tvOS also to be part of the ecosystem for

10  Apple; correct?

11  **A.**   Yes.

12  **Q.**   Okay.  And you would agree with me, wouldn't you, that

13  Apple does not offer downloads from the App Store for any

14  devices powered outside of the OSs in the Apple ecosystem;

15  correct?

16  **A.**   Yes.

17  **Q.**   Now, you're familiar with an entity called the Executive

18  Review Board, are you not?

19  **A.**   Yes, I am.

20  **Q.**   And, in fact, you've been a member of the Executive Review

21  Board from 2010 until at least the time of your deposition;

22  correct?

23  **A.**   Yes.

24  **Q.**   Are you still a member of the Executive Review Board?

25  **A.**   Yes, I am.

**FISCHER - DIRECT - FORREST**

1    **Q.**    And is the Executive Reviewed Board sometimes known by the

2    acronym ERB?

3    **A.**    Yes, it is.

4    **Q.**    And at the time of your deposition, the other members of

5    the ERB were Phil Schiller, Eddy Cue, Ron Okamoto, Trystan

6    Kosmynka, C.K. Haun, Greg Joswiak, Ann Thai, Josh Shaffer, and

7    Sean Cameron; is that correct?

8    **A.**    Yes.  And some -- one of those folks has since retired,

9    and there's -- there's a few other people that are now part of

10   it.

11   **Q.**    But at the time of your deposition, that was an accurate

12   list?

13   **A.**    Yes.

14   **Q.**    And both Mr. Schiller and Mr. Cue have been on the ERB the

15   entire time that you have been on the ERB; is that correct?

16   **A.**    Yes.

17   **Q.**    And you consider Mr. Schiller to be the head of the ERB,

18   do you not?

19   **A.**    Well, there is no formal chair or official head, but, yes,

20   Phil leads the conversations, and if I had to pick someone, I

21   would pick Phil since he leads the conversations.

22   **Q.**    And you would agree with me, wouldn't you, that the

23   purpose of the ERB is to come together and review applications

24   that have been submitted by the developers to the App Store

25   and to discuss issues of policy and review the App Review

**FISCHER - DIRECT - FORREST**

1    Guidelines?

2    **A.**    Yes.

3    **Q.**    And the ERB discusses potential changes to the App Review

4    Guidelines; is that right?

5    **A.**    Yes, we do.

6    **Q.**    And the ERB also determines whether a different business

7    model could be utilized within the App Store; is that right?

8    **A.**    Yes.

9    **Q.**    And you're aware, aren't you, that before an app can be

10   listed in the App Store, it has to go through a process called

11   the app review process?

12   **A.**    Yes.

13   **Q.**    And you're aware, are you not, that from time to time,

14   Apple conducts surveys of developers?

15   **A.**    Yes, we do.

16   **Q.**    And Apple conducts surveys of developers who have

17   submitted apps through the app review process; correct?

18   **A.**    Yes.

19   **Q.**    And you see the results of those surveys from time to

20   time, do you not?

21   **A.**    Yes, I do.

22   **Q.**    All right.

23          Turn in your binder -- back to the binder to PX2284,

24   please.

25              **THE COURT:**    We have about five minutes.

**FISCHER - DIRECT - FORREST**

1          **MS. FORREST:**   Let me just confirm if I might,

2     Your Honor, with counsel as to whether there is a

3     confidentiality restriction on this one.

4          **THE COURT:**   Okay.

5                    (Counsel confer off the record.)

6          **MS. FORREST:**   There is not, Your Honor.

7          **THE WITNESS:**   Okay.  I've got -- you said 2284?

8     **BY MS. FORREST:**

9     **Q.**   Yes?

10    **A.**   I've got it here.

11    **Q.**   Do you see there is a "Developer Survey Presentation for

12    Phil."  That's the subject line?

13    **A.**   Yes.

14    **Q.**   And do you believe that to be to Phil Schiller?

15    **A.**   Yes.

16    **Q.**   And it's from an individual to you; is that right?

17    **A.**   To me and to one other person, yes.

18    **Q.**   And it was provided to you on or about the 28th of July,

19    2016; correct?

20    **A.**   Yes.

21    **Q.**   And you received this document in connection with your

22    duties and responsibilities at Apple?

23    **A.**   Yes, I did.

24          **MS. FORREST:**   Your Honor, I would seek to admit

25    PX2284.

FISCHER - DIRECT - FORREST

1        **THE COURT:**   Any objection?

2        **MR. SRINIVASAN:**   No objection, Your Honor.

3        **THE COURT:**   Admitted.

4             (Plaintiff's Exhibit 2284 received in evidence)

5    **BY MS. FORREST:**

6    **Q.**   Now, the date of this survey was December of 2015, was it

7    not?

8    **A.**   If you could just give me a second just to quickly look

9    over this, I'd appreciate it.

10   **Q.**   Yes.  And I'll -- just to orient you to where you might

11   find something that may provide you with information about the

12   date, I would turn you to Bates number ending in 058.

13   **A.**   Okay.  I'm here, yes.

14   **Q.**   Do you see that on 058 it states that the survey was

15   conducted in December of 2015?

16   **A.**   Yes, I do.

17   **Q.**   All right.  And do you see -- if you would, please -- if

18   you could turn to Bates numbered page 060 of PX2284 and tell

19   me when you're there.

20   **A.**   Zero-sixty?

21   **Q.**   Correct.

22   **A.**   I am here.

23   **Q.**   Do you see that it says, "Developers don't believe that

24   the App Store enables profitability of their apps, enables app

25   discovery, or provides the tools to successfully market their

FISCHER - DIRECT - FORREST

1    apps"?

2    **A.**    Yes.  I see that in the speaker notes here.

3         **MS. FORREST:**    Your Honor, we would move the admission

4    of PX2284 if I haven't already.

5         **THE COURT:**    You already did.

6         **MS. FORREST:**    I'm sorry.

7    **Q.**    All right.  And there were developer studies that were

8    done from year to year; is that right?

9    **A.**    Yes.  We try to do developer surveys every year to get

10   feedback from our developer community.

11        **MS. FORREST:**    Your Honor, I'm going to be moving on

12   to another document.  Should I stop at this point?

13        **THE COURT:**    You can.  That's fine.

14   So you may step down, sir.  We are going to take a

15   20-minute break.

16   One of the things that was helpful during Mr. Ko's

17   testimony was understanding these -- some sense of the

18   exhibits that you were seeking to admit.

19   As I noted during the colloquy, there were two of them

20   that I provisionally didn't because they weren't business

21   records but were being offered for a different purpose.

22   I don't know if there's any similarity with respect to the

23   other set.  I asked whether any of the others were -- the

24   other binder that you gave me, whether they were all business

25   records.  I thought I heard that they were, so just double

1   check.

2       What I'm admitting is business records.  What I haven't

3   admitted are other documents from other people who are not yet

4   in the courtroom and who may never be in the courtroom until I

5   understand the legal basis for the admission.  And I say that

6   because, as you know, all of these things are being published.

7   They are all out there.  And non-lawyers don't understand the

8   difference between something that is being admitted for its

9   truth and admitted for some other evidentiary purpose like

10  notice.  So we need to nail that down.  All right?

11          **MS. FORREST:**    Your Honor, I just want to be sort of

12  clear on it.  If a document is received in the ordinary course

13  of business that reflects routine comments from third parties

14  commenting on certain aspects of Apple's business and that is

15  the routine way in which there are communications that occur,

16  the receipt -- the fact of receipt would be in the ordinary

17  course and then the information of course would be varied,

18  depending upon the type of issue or discussion that ensued

19  thereafter.  And so we are seeking to have those documents

20  received as business records in the sense that they are the

21  business records that Apple receives on a routine basis from a

22  variety of individuals that are raising with them the same

23  kinds of concerns that get raised on a regular basis and then

24  notice is provided on the particular topics within the

25  specific document that we are referencing.

1    **THE COURT:**    I don't know -- how do you want me to

2    respond?

3    **MS. FORREST:**    I just wanted to be clear of -- I

4    didn't understand if Your Honor was suggesting that these were

5    not business records by virtue of the fact that they contain

6    third-party information, and I wanted to just make the record

7    clear that we believe they nonetheless are business records

8    but happen to incorporate third-party statements.

9    **THE COURT:**    Okay.  Well, the rule requires that the

10   maker of the document testify that it was made in the ordinary

11   course, not received in the ordinary course.  Those are two

12   different things.

13       Business records typically are admitted for their truth.

14   You're not offering this document or two of the documents --

15   you're not offering it for its truth.  You are offering it for

16   notice, which are two very different things, which is why I

17   asked for briefing.

18   **MS. FORREST:**    We will give you briefing, Your Honor.

19   I think that's perhaps the best way to handle this particular

20   issue, and we will provide that to you tomorrow.

21   **THE COURT:**    And with respect to that, that's why I

22   asked you to go back and double check, and before you upload

23   any of these other documents, which I have not actually seen

24   because you just gave me a binder, as long as they were

25   prepared in the ordinary course of business as opposed to

1    received, that's fine.

2         The other ones are provision -- I need to make sure that I

3    am comfortable with the evidentiary ruling, and so the other

4    documents, to the extent that you have a document prepared by

5    someone who is not an Apple employee and you are offering it

6    for some purpose other than its truth, it is not admitted.  It

7    will be provisionally addressed the way I'm addressing the

8    other two this morning.

9         **MS. FORREST:**   Your Honor, then -- I understand.  We

10   will brief this.

11        I would suggest that there were a number of documents that

12   were received into evidence that were received under the

13   business records rule with regard to Epic over the last couple

14   of days that also had the similar issue and indeed almost

15   identical issues as to those that we're discussing here with

16   regard to Apple.  So whatever Your Honor's ruling is I would

17   assume it would apply both to Epic and to Apple.

18        **THE COURT:**   Yeah.  I didn't have an objection, so I

19   don't rule unless I have objections.  I had objections this

20   morning.

21        **MS. FORREST:**   Your Honor, I don't --

22        **THE COURT:**   Ms. Forrest, just brief it.  That's all

23   I'm asking.  I'm asking you not to release it until I make an

24   affirmative decision.  That's all I'm asking.

25        **MS. FORREST:**   I'm just asking for parity.

1        **THE COURT:**    I try to be fair to both sides.  If

2     you're suggesting that I'm not, then -- well, I haven't made

3     any rulings --

4        **MS. FORREST:**    Your Honor --

5        **THE COURT:**    -- that I think are not fair to both

6     sides.

7        **MS. FORREST:**    I'm not suggesting there are any

8     rulings that have not been fair to both sides, Your Honor.

9     That is not my intent.  My intent is simply to ensure that as

10    these documents which, with these kinds of businesses, are

11    often of a very similar type, that the same type of issue when

12    it comes up on one sides happens to be applicable to the

13    other.  There are a lot of documents here, and it's very easy

14    for all of us to have a lot of things flowing across our desk.

15       **THE COURT:**    That's why I'm trying to be careful.

16       **MS. FORREST:**    As are we.

17       **THE COURT:**  Stand in recess.

18                    (Recess taken at 10:19 p.m.)

19                    (Proceedings resumed at      .m.)

20       (Recess taken at 10:15 a.m.; resumed at 10:39 a.m.)

21       **THE CLERK:**  Remain seated.  Court is in session.

22    Come to order.

23       **THE COURT:**  Okay.  We are back on the record.  The

24    record will reflect that the parties are present.  We have our

25    witness on the stand.

1          Ms. Forrest, you may proceed.

2              **MS. FORREST:**  Thank you, Your Honor.

3     **BY MS. FORREST:**

4     **Q.**  Mr. Fischer, could you please turn to the document in your

5     binder PX2062, please.

6     **A.**  Okay.  I've got it here.

7     **Q.**  Mr. Fischer, is PX2062 a document you received on or about

8     September 16, 2018?

9     **A.**  Yes.

10    **Q.**  And you received it in connection with your duties and

11    responsibilities at Apple?

12    **A.**  Yes.

13    **Q.**  And the subject says Summary of Developer Write-In's from

14    FY18 survey.

15         Do you see that?

16    **A.**  Yes, I do.

17    **Q.**  Does the "FY" there refer to full year?

18    **A.**  FY in this case means fiscal year.

19    **Q.**  So the fiscal year 2018?

20    **A.**  Correct.  Yes.

21    **Q.**  All right.

22             **MS. FORREST:**  Your Honor, I would seek to submit

23    PX2062.

24             **THE COURT:**  Any objection?

25             **MR. SRINVASAN:**  We do have an objection that this

1   document contains hearsay.

2           **THE COURT:**  All right.  As always, it is admitted for

3   its evidentiary -- with its proper evidentiary consideration.

4           (Plaintiff's Exhibit 2062 received in evidence)

5   **BY MS. FORREST:**

6   **Q.**  And, Mr. Fischer, do you see on the first page of this

7   document in the second bullet down, there's a reference to

8   quote, "search in the App Store is still really rough around

9   the edges?"

10  **A.**  Yes, I see that.

11  **Q.**  Is that your understanding that that was something that

12  was being told to you by a developer?

13  **A.**  Yes.  I believe the team that conducted this survey within

14  Apple was taking feedback verbatim from developers.

15  **Q.**  Do you see below, two bullets below that there's an

16  indented one bullet and it states, the App Store a plagued

17  with outdated, low-quality apps which make it harder for

18  higher quality apps to get the exposure they need.  It's time

19  Apple raised the bar again and its standard of what gets into

20  the App Store.  It seems that nowadays some low-quality apps

21  make the cut when they shouldn't.

22      Do you see that?

23  **A.**  Yes, I do.

24  **Q.**  Turn, if you would, please, to the next page, which bears

25  the Bates number 842 at the bottom of PX2062.

1          And I would turn your attention to the portion of the page

2     entitled, featuring.  Do you see where I am, sir?

3     **A.**   Yes, I do.

4     **Q.**   Do you see in the fourth bullet down, there are -- there's

5     the phrase "stop playing favorites."

6          Do you see that?

7     **A.**   Yes, I do.

8     **Q.**   And do you see that there are a series of indented bullets

9     after that?

10    **A.**   Yes.

11    **Q.**   And do you see that one of the comments that's reflected

12    there is quote, "start applying the same rules to all apps and

13    start eliminating the junk apps from the App Store."

14         Do you see that, sir?

15    **A.**   Yes, I do.

16    **Q.**   Turn, if you would, please, to the next page, Bates

17    numbered 843.

18         And do you see on the top portion of that page there are

19    one, two, three, four, five bullets.

20    **A.**   Yes, I do.

21    **Q.**   And do you see that the fifth bullet -- I'm sorry, the

22    fourth bullet down states, you tend only to feature IndyApps

23    and apps that spend or earn the most money.

24         Do you see that?

25    **A.**   I do see that, yes.

1    **Q.**  It continues.  There are lots of great apps out there like

2    ours and don't get much attention because we focus our efforts

3    on paying a fair wage to our staff, and developing great games

4    not on sales and marketing.

5        Do you see that?

6    **A.**  Yes, I do.

7    **Q.**  And then do you see further down under consumers and

8    developers, it states in the first bullet, I'm satisfied with

9    it as a consumer.  Again, as a developer, it's a nightmare.

10       Do you see that?

11   **A.**  I do see that.

12   **Q.**  And under app review, do you see that section?

13   **A.**  Little bit further down, yes.

14   **Q.**  It states, in the first bullet:  We release every week

15   when our app is rejected by review for something entirely

16   unrelated to the changes we have made.  It's extremely

17   disruptive and throws us off our calendar (sic).

18       Do you so that?

19   **A.**  I believe they said cadence.

20   **Q.**  I'm sorry.  Cadence.  Thank you.  Thank you, sir.

21       And then do you see below that, there's a bullet that

22   states:  The app reviewers are sometimes arbitrary and

23   unpredictable.  The app reviewers are not consistent among

24   competing apps.

25       Do you see that?

1   **A.**   Yes, I do.

2   **Q.**   Do you see at the bottom of the page, last bullet states:

3   In part, the review process is arbitrary?

4   **A.**   Yes, I do.

5   **Q.**   Turn, if you would, please, sir, to the next page under

6   "AB testing?"

7   **A.**   Okay.

8   **Q.**   And it is now Bates numbered page ending in 844.

9        And do you see the fifth bullet down there, it says quote,

10   review times should be hours not days, end quote?

11   **A.**   I do see that.

12   **Q.**   And turn, if you would, please, to Bates numbered page,

13   845, which is the next the page.

14   **A.**   Okay.

15   **Q.**   Do you see under search ads, it states in the first

16   bullet, Apple has given in to Payola.  Search as.

17   **A.**   I see that, yes.

18   **Q.**   And turn, if you would, to the next page, Bates number

19   ending in 846 to the portion of the page that says overall

20   negative.

21        Do you see where I am?

22   **A.**   Yes.

23   **Q.**   And under that segment, there are a series of bullets.

24   And in the fourth bullet down, it states the testing process.

25   Do you see that?

1    **A.**  Yes, I to.

2    **Q.**  The it ask states the testing process for in app purchases

3    is a joke the API is a joke the UI in general were in-app

4    purchases is a joke.

5        Do you see that?

6    **A.**  Yes, I do.

7    **Q.**  And does UI there, would you read that in your

8    understanding to be user interface?

9    **A.**  Yes, I would.

10   **Q.**  And then turn, if you would, please, to the next page,

11   under other.  And look at the third bullet down, and there's

12   one statement in all caps.

13       Do you see that?

14   **A.**  Yes, I do.

15   **Q.**  And it states, allow developers to issue refunds.  This is

16   beyond frustrating to us.  Your awful policies make us look

17   bad and it's painful to have to direct users to you.

18       Do you see that?

19   **A.**  Yes, I do.

20   **Q.**  Let's change topics for a moment.

21       You recall, don't you, sir, that in the last couple of

22   years you asked someone who works for you to take leadership

23   with regard to what was going on with all forms of fraud in

24   the App Store?

25   **A.**  Yes, I do recall that.

1    **Q.**  And turn in your binder, if you would, please, to PX66.

2    **A.**  I don't have anything in my binder similar to before.

3    It's an empty page.

4          **MS. FORREST:**  Why don't I hand you -- Your Honor, are

5    you missing PX66 as well?

6          **THE COURT:**  I'm going to check right now.

7       No, I have it.

8          **MS. FORREST:**  May I approach the witness with my copy

9    of PX66?

10         **THE COURT:**  You may.

11         **THE WITNESS:**  Thank you.

12   **BY MS. FORREST:**

13   **Q.**  Mr. Fischer, do you recognize what's been marked for

14   identification as PX66?

15   **A.**  Yes, I do.

16   **Q.**  Do you recognize this as an email, the top portion of

17   which you sent to an individual who worked for you.  The

18   subject line of which was, forward colon, App Store risk

19   fraud.

20   **A.**  Yes.  App Store risk/fraud.  Yes.

21   **Q.**  And you sent that top portion of the email to that

22   individual who works for you on or about October 26, 2018?

23   **A.**  Yes.

24         **MS. FORREST:**  Your Honor, I would seek to admit PX66.

25         **THE COURT:**  Any objection?

1          **MR. SRINVASAN:**  No objection, Your Honor.

2          **THE COURT:**  Admitted.

3          (Plaintiff's Exhibit 66 received in evidence)

4     **BY MS. FORREST:**

5     **Q.**  Mr. Fischer, in connection with -- in this email that you

6     wrote to the individual who works for you, you stated to that

7     individual quote, I need you to take leadership regarding

8     what's going on with all forms of fraud on the App Store in

9     part.

10         Do you see that?

11    **A.**  Yes, I do.

12    **Q.**  That's a statement you made; is that right?

13    **A.**  Yes.  That's correct.

14    **Q.**  You can put that to the side.

15         Would you agree with me, Mr. Fischer, there are several

16    forms of fraud associated with some apps that had been listed

17    in the App Store from time to time?

18    **A.**  Yes.

19    **Q.**  And among the types of fraud that have been associated

20    with some apps that have been listed in the App Store, are

21    apps that have -- resulted in financial fraud; would you agree

22    with that?

23    **A.**  Yes.

24    **Q.**  And fraud relating to customer ratings; would you agree

25    with that?

1    **A.**  Yes.

2    **Q.**  And fraud relating to customer reviews; would you agree

3    with that?

4    **A.**  Yes.

5    **Q.**  And do you recall that in -- even in 2012 -- strike that.

6        The email that you wrote that we just looked at in PX66 is

7    dated in 2018, correct?

8    **A.**  Yes.

9    **Q.**  And you recall, don't you, that there were fraud issues in

10   the App Store that went back to the beginning of the App

11   Store, correct?

12   **A.**  I don't know about the very beginning, but we've been

13   combating and fighting fraud for a long time.  Yes.

14   **Q.**  All right.  Turn, if you would, please, sir, to PX63 in

15   your binder.

16   **A.**  Okay.  I've got it here.

17   **Q.**  Do you recognize what's been marked for identification as

18   PX63?

19        **MR. SRINVASAN:**  Counsel, we don't have 63 in our

20   binder.

21        **MS. FORREST:**  You can have my copy.

22        **MR. SRINVASAN:**  Thanks.

23   **BY MS. FORREST:**

24   **Q.**  Do you recognize PX63, Mr. Fischer?

25   **A.**  Yes, I do.

**Q.**  Do you recognize it as an email that in part, the top part

of it, you sent to Mr. Ron Okamoto copying Mr. Phillip

Shoemaker on or about February 10th, 2012?

**A.**  Yes.

**Q.**  Since this is the 2012 time frame, correct?

**A.**  That's correct.

**Q.**  And the subject line is re App Store fraud gets

unbearable.  Correct?

**A.**  Yes.

  **MS. FORREST:**  Your Honor, we would seek to admit

PX63.

  **THE COURT:**  Any objection?

  **MR. SRINVASAN:**  Our objection is just that the

originating email is from a third party, and so constitutes

hearsay.

  **THE COURT:**  All right.  It's admitted with the usual

qualification.

  (Plaintiff's Exhibit 63 received in evidence)

**BY MS. FORREST:**

**Q.**  Turn, if you would, in your binder, sir, to PX2197.

  **MS. FORREST:**  And, Your Honor, there are

confidentiality issues from Apple regarding this document so

I'll be careful on how I deal with it.

  **THE WITNESS:**  If I may have a few seconds to review

this email.

1          **MS. FORREST:**  Sure.

2          **THE COURT:**  What are the confidentiality issues with

3     this document?

4          **MR. SRINVASAN:**  Your Honor, we don't have an

5     objection with respect to confidential in this document at

6     this point.

7          **THE COURT:**  All right.

8          **MS. FORREST:**  All right.  Thank you.

9     **BY MS. FORREST:**

10    **Q.**  Okay?  All right.  You recognize this as marked for

11    identification as 2817?

12    **A.**  Yes, I do.

13    **Q.**  It's a document that at the top portion of which you wrote

14    on September 21st, 2115; is that correct?

15    **A.**  Yes.

16    **Q.**  If you turn the page to Bates numbered page 036, you also

17    wrote a portion on that page dated September 21st, 2015 but at

18    a different time; at 3:48 p.m. versus 11:00 p.m.  Correct?

19    **A.**  Yes, I see that here.

20         **MS. FORREST:**  Your Honor, I seek to admit the 2197?

21         **THE COURT:**  No objection?

22         **MR. SRINVASAN:**  No objection.

23         **THE COURT:**  Admitted.

24         (Plaintiff's Exhibit 2197 received in evidence)

25

1    **BY MS. FORREST:**

2    **Q.**   Mr. Fischer, is it correct there in 2015, there were

3    128 million customers of Apple that had downloaded 2500 or

4    more apps that were affected by the issue that's described in

5    this -- in this email relating to Xcode ghost apps?

6    **A.**   Yes.   There's an email from one of my colleagues and I'm

7    reporting an analytics team that shared those numbers there,

8    yes.

9    **Q.**   Turn PX2190?

10           **THE COURT:**   What's the number again?

11           **MS. FORREST:**   PX2190.

12           **THE COURT:**   Thank you.

13           **THE WITNESS:**   Okay.   I've got it here.

14    **BY MS. FORREST:**

15    **Q.**   Is this a document that you were copied on on or about

16    July 22nd, 2016?

17    **A.**   Yes.

18           **MS. FORREST:**   And let me just ask, there was a

19    confidentiality issue with regard to this document, your

20    honor, but that may or may not still be in place.

21           **THE COURT:**   All right.   What's the issue?

22           **MR. SRINVASAN:**   We don't have an issue any longer,

23    Your Honor.

24           **THE COURT:**   All right.   Proceed.

25

**BY MS. FORREST:**

**Q.** Mr. Fischer, do you see that the subject here is, App Store weekly score card week July 11, 2016?

**A.** Yes.

**Q.** And on the second page do you see that under Bates numbered page 046 of PX2190 there's an area called transacting accounts.

Do you see that?

**A.** Yes.

**Q.** And there is a first bullet that says, most regions sit in the 60 to 70 percent range for trusted accounts.

Do you see that?

**A.** Yes, I do.

**Q.** And under Billings, on the bottom of that page, it says most regions are in the 45 to 55 percent range for the billings share from trusted accounts.

Do you see that?

**A.** Yes, I do.

**Q.** What did you mean by -- how did you understand the phrase "trusted accounts"?

**A.** So, yes. This was a response from a colleague. I don't know the exact definition of a trusted account. That's not something that my team looks at, so I can't tell you.

**Q.** Okay. All right.

You're aware, aren't you, that apps have made it through

1    the app review process that were considered by Apple to be

2    ripoffs?

3    **A.**   We, I think, subsequently identified them to be, you know,

4    ripoffs but certainly we would never approve an app in app

5    review knowing that that app is a rip-off.

6    **Q.**   You are aware, aren't you, sir, of instances where an IAP

7    has been used in support of money lawer schemes?

8    **A.**   I have heard that, yes?

9    **Q.**   You're aware, aren't you, sir, of instances in which fake

10   apps have made it past app review and went into email App

11   Store?

12   **A.**   Yes.

13   **Q.**   And you're aware, sir, aren't you, that there have been

14   individuals that have actually sawed fraudulent refunds?

15   **A.**   Yes.

16   **Q.**   And individuals in fact have sawed fraudulent refunds

17   on -- from the App Store relating to app or in-app purchases

18   going up to 2019; isn't that correct?

19   **A.**   Yes.

20   **Q.**   And you're familiar -- or have heard the term "white

21   listed developer", haven't you?

22   **A.**   I do remember an email from a number of years ago where

23   that -- that wording was mentioned, yes.

24   **Q.**   Okay.

25        Tell me, if you would sir, turn, if you would, sir, in

1  your binder to tab -- to the PX64.

2          **THE COURT:**  Do you not want 2190 in evidence?

3          **MS. FORREST:**  I'm sorry, Your Honor.  Thank you.

4          **THE COURT:**  Any objection?

5          **MR. SRINVASAN:**  No objection, Your Honor.

6          **THE COURT:**  2190 is admitted.

7          (Plaintiff's Exhibit 2190 received in evidence)

8  **BY MS. FORREST:**

9  **Q.**  Tell me when you have reached PX64.

10  **A.**  I have it.  Thank you.

11  **Q.**  All right.  Is this a document on which you were copied at

12  the top part of the page on or about October 18th, 2018?

13  **A.**  Yes.

14  **Q.**  And you received another portion of that email in the

15  middle of the first page as an addressee on October 17th,

16  2018; is that correct?

17  **A.**  Yes.

18  **Q.**  And in that second portion you received an email from

19  somebody at Apple who was writing to you stating, quote, "Hulu

20  is part of the set of white-listed developers."

21          Do you see that?

22  **A.**  Yes, I did.

23  **Q.**  And it said -- continues: "with access to subscription

24  cancel/refund API."

25          Do you see that?

1    **A.**  Yes.

2           **MS. FORREST:**  Your honor, we would seek to admit

3    Exhibit PX64.

4           **THE COURT:**  Any objection?

5           **MR. SRINVASAN:**  No objection, Your Honor.

6           **THE COURT:**  Admitted.

7           (Plaintiff's Exhibit 64 received in evidence)

8    **BY MS. FORREST:**

9    **Q.**  And white-listed developers are developers who get to do

10   things that other developers don't get to do, correct?

11   **A.**  That's how I would term that word.  And I certainly would

12   not use that particular word.  I find the word offensive, but,

13   yes, that's how I would define something like that.

14   **Q.**  You would agree with me, sir, that app store review

15   guidelines prohibit stores within stores?

16   **A.**  Yes.

17   **Q.**  And it is because of that rule that Apple does not allow

18   Epic to have the Epic Games Store in the Apple App Store; Is

19   that right.

20   **A.**  Yes.

21   **Q.**  And you're familiar with something called the Apple

22   Arcade, are you not?

23   **A.**  Yes.

24   **Q.**  And the Apple Arcade is Apple's own gaming app; is that

25   right?

1    **A.**   No.   Apple Arcade is a feature of the App Store.   And it

2    is a game subscription service that's in the App Store.   It's

3    not a separate app.

4    **Q.**   And Apple Arcade, would you agree with me, allows a

5    subscriber to have access to numerous games; is that right?

6    **A.**   Yes.

7    **Q.**   To that extent, the Apple Arcade competes with other game

8    stores; would you agree with me?

9    **A.**   I wouldn't necessarily characterize it as that, no.

10   **Q.**   You don't think the Apple Arcade, which has games in it,

11   competes with other stores that have games in them?

12   **A.**   Well, now that you word it like that, I could see that

13   Apple Arcade could be viewed as a competitor for some of those

14   stores for services.

15   **Q.**   You would agree with me, sir, that a game streaming

16   service is one that allows a user to run and access games that

17   are on the cloud, correct?

18   **A.**   That's my understanding, yes.

19   **Q.**   You would agree that Google Stadia is a game streaming

20   service, correct?

21   **A.**   Yes.

22   **Q.**   You're aware, aren't you, that recently there has been

23   announced a shutdown of most development on Google Stadia?

24   **A.**   I had not read that.   I had heard they had some in-house

25   development that had shut down, but I didn't hear what you had

1    said.

2    Q.  And would you consider, sir, Google Stadia to be a failed

3    attempt at a streaming app?

4    A.  I don't know enough about the current status of Google

5    Stadia to make a definitive statement about that.  I know they

6    have had some struggles, but I don't know exactly what the

7    status is now.

8    Q.  Your understanding is that the streaming version of Google

9    Stadia would require -- or does require users to pay a

10   subscription fee, correct?

11   A.  That's my understanding.  I don't know if they have other

12   business models to support that business or not.

13   Q.  And you would agree with me that xCloud is also a

14   streaming service, correct?

15   A.  Yes.

16   Q.  And xCloud, as of the time of your deposition at least,

17   did not have an app in the App Store, correct?

18   A.  That's correct.

19   Q.  Does it have an app in the App Store since your

20   deposition?

21   A.  No.

22   Q.  You similarly understand that in order for a user to

23   access xCloud, they have to pay a subscription fee, correct?

24   A.  Similar to Google Stadia, that's my understanding, but I

25   don't know if they have other monetization models as part of

1    xCloud.

2    **Q.**  You're also aware that Nvidia has a game streaming

3    service, correct?

4    **A.**  Yes.

5    **Q.**  You're also aware that Nvidia does not have an app for its

6    streaming service in the App Store, correct?

7    **A.**  Yes.

8    **Q.**  And it's your understanding that at least a portion of

9    Nvidia's business model, that will charge users a subscription

10   fee, correct?

11   **A.**  Yes, that's my understanding.  And, again, I don't know if

12   they have other business models that support that business or

13   not.

14   **Q.**  And you would agree with me that as a general matter,

15   web-based games are not coming in through the App Store,

16   correct?

17   **A.**  Yes.

18   **Q.**  And you understood that Apple doesn't carry web apps in

19   the App Store -- strike that.

20       You understand that because Apple does not carry web apps

21   in the App Store, it doesn't make money off of web apps,

22   correct?

23   **A.**  Correct.  Yes.

24   **Q.**  And you would agree with me that Apple is not planning t

25   market the benefits of obtaining web apps in the App Store; is

1   that right?

2   **A.**   Could you repeat that?

3   **Q.**   You would agree with me, wouldn't you, that despite the

4   fact that web apps are not carried in the App Store, Apple is

5   not planning to market the benefits of obtaining such apps

6   from the App Store?

7   **A.**   I'm not aware of any plans along those lines, no.

8   **Q.**   And you've not communicated with anybody about -- at

9   Apple, about trying to find out what differences there might

10  be in terms of user experience between a web-based game versus

11  a native game that can be obtained through the App Store; is

12  that right?

13  **A.**   Well, in my world, leaving the global app store business,

14  I focus on the App Store and distributing native apps.  But,

15  no, I haven't seen any type of differences like that.

16  **Q.**   So the answer is no, you have not, correct?

17  **A.**   No, I have not.

18  **Q.**   You don't regularly receive reports, do you, relating to

19  price differentials between the cost of an app on Android

20  versus one on the iPhone?

21  **A.**   Correct.

22  **Q.**   Or iOS?

23  **A.**   Correct.

24  **Q.**   And you don't regularly receive reports on differentials

25  and the cost of an app of in-app purchases on Android versus

1    iOS, correct?

2    **A.**   Correct.  I don't receive those types of reports.

3    **Q.**   And you are not aware, sir, are you, of any reports on

4    price differentials or equivalencies for apps that are written

5    for iOS versus apps written for Android, correct?

6    **A.**   That's correct.

7    **Q.**   And turning to a different topic:  You would agree with me

8    the Switch, Nintendo Switch, requires a cellular connection,

9    correct?

10   **A.**   That's my understanding.

11   **Q.**   You know what IAP is, do you not?

12   **A.**   Yes.

13   **Q.**   And you would agree with me, wouldn't you, that the

14   digital goods consumed within the app on iOS they have to

15   use Apple's IAP except under some limited circumstances?

16   **A.**   Yes.

17   **Q.**   And, you're aware, sir, aren't you, that many apps are

18   rejected for violations of 3.111?

19   **A.**   I don't lead our app review team, and I haven't memorized

20   all of our App store review guidelines, but if you want to

21   point it out to me, I'm happy to look at it.

22   **Q.**   Let me put it this way.  You're aware, sir, that third

23   parties have, from to time, submitted apps with an alternative

24   payment processing system, correct?

25   **A.**   Yes.

1    **Q.**  And you're aware, sir, that Apple has rejected apps that

2    have submitted their own alternative payment processing

3    system, correct?

4    **A.**  Yes.

5    **Q.**  And you're aware, sir, there are third-party companies

6    which have alternative payment processing systems that they

7    believe to be safe and secure, correct?

8    **A.**  I haven't spoken to those types of companies.  I don't

9    know what they believe.

10   **Q.**  Do you remember me asking you a question in that regard at

11   your deposition?

12   **A.**  I vaguely do, yes.

13        **MS. FORREST:**  First volume, Your Honor, page 101,

14   lines 18 through 25.

15        **MR. SRINVASAN:**  Ms. Forrest, can you repeat that

16   please.

17        **MS. FORREST:**  Yes.  Page 101, lines 18 through 21

18   actually.

19        **THE COURT:**  Go ahead.

20        **MS. FORREST:**  Do you recall, Mr. Fischer, that I

21   asked you at your deposition:

22      Are you aware that there are third-party companies which

23   also have what they deem to be safe and secure ways to

24   purchase goods within apps, and you answered yes, okay.

25   Yes.

**BY MS. FORREST:**

**Q.**   And that was truthful testimony, correct?

**A.**   Yes.

**Q.**   And among the alternative payment processing systems that you're aware of, is PayPal, correct?

**A.**   Yes.

**Q.**   And Amazon pays another one, correct?

**A.**   Yes.

**Q.**   And Braintree is another one, correct?

**A.**   Yes.

**Q.**   And Square is another one, correct?

**A.**   Yes.

**Q.**   And Epic Direct Pay has a payment processing system, correct?

**A.**   That's my understanding.

**Q.**   And you're aware that credit cards provide yet another example of alternative payment processing systems, correct?

**A.**   Yes.

**Q.**   And for an app on iOS, an app developer may not offer PayPal as a payment processing system in addition to IAP or as an alternative to IAP, correct?

**A.**   Yes.

**Q.**   You are not aware of any studies, are you, that Apple has ever done that look at whether or not there are any security issues if any game company was to offer an alternative payment

1   processing method other than IAP for the purchase of digital

2   goods, correct?

3   **A.**   Correct.  I'm not familiar with any studies like that, no.

4   **Q.**   And you are not aware of any study that Apple has ever

5   done as to any security issues that Stripe has as an

6   alternative payment processing method, correct?

7   **A.**   Correct.

8   **Q.**   And you are not aware of any study that Apple has done

9   with regard to whether PayPal has any security issues as an

10  alternative payment processing method, correct?

11  **A.**   Correct.

12  **Q.**   And you're not aware of any study that Apple has done with

13  regard to whether Amazon's pay is a secure alternative payment

14  processing system to IAP, correct?

15  **A.**   That's correct.

16  **Q.**   And you are not aware of any security study that Apple has

17  done relating to whether Braintree provides a secure

18  alternative payment processing system, correct?

19  **A.**   Yes, that's correct.

20  **Q.**   And you're not aware of any security study done by Apple

21  which looks at whether or not any of the major credit card

22  companies have any security issues with regard to payment

23  processing systems, correct?

24  **A.**   I'm not aware of any studies like that.

25  **Q.**   Let's turn to privacy for a moment.

1          You are not aware, are you, sir, of any studies that Apple

2     has done relating to any privacy issues with regard to the

3     alternative payment processing system by Stripe, correct?

4     **A.**   That's correct.

5     **Q.**   And you're not aware of any privacy study that Apple has

6     done with regard to PayPal payment processing system, correct?

7     **A.**   That's correct.

8     **Q.**   And you're not aware of any privacy study that Apple has

9     done with regard to Amazon pay as an alternative payment

10    processing system, correct?

11    **A.**   That's correct.

12    **Q.**   And you're not aware of any privacy study that Apple has

13    done with regard to Braintree's alternative payment processing

14    system, correct?

15    **A.**   Correct.

16    **Q.**   Apple has done with regard to privacy issues relating to

17    Square's alternative payment processing system, correct?

18    **A.**   Correct.

19    **Q.**   And you're not aware of any studies that Apple has done to

20    determine whether Epic's alternative payment processing system

21    has any security issues, correct?

22    **A.**   I'm not aware of any studies like that.

23    **Q.**   You are not aware of any studies that Apple has done with

24    regard to whether Epic's alternative payment processing system

25    has any privacy issues, correct?

1    **A.**   That's correct.

2    **Q.**   And you're not aware of any studies that demonstrate that

3    Apple's payment processing methods are more secure than

4    Stripe, are you?

5    **A.**   I'm not familiar with studies like that.

6    **Q.**   You're not aware of any studies that indicate that Apple's

7    payment methods are more secure than PayPal, correct?

8    **A.**   That's correct.

9    **Q.**   And you're not, in fact, aware of any studies that have

10   compared Apple's payment services to any other third-party

11   payment service, correct?

12   **A.**   That's correct.  I haven't seen studies like that, no.

13   **Q.**   You've had communications with one or more developers

14   about their desire to remove IAP from their app, correct?

15   **A.**   The conversations I've had with developers have really

16   been more around our commission versus their desire

17   specifically to remove IAP, but, yes, that's correct.

18   **Q.**   Hold on.

19                    (Pause in the proceedings.)

20          **MS. FORREST:**   Page 84, 12 through 17?

21          **THE COURT:**   Why is that up?

22          **MS. FORREST:**   It should not be up yet.

23          **THE COURT:**   He's just admitted that that was a

24   correct summary.

25          **MS. FORREST:**   He qualified it, Your Honor, and this

1    is an unqualified answer.

2              **THE COURT:**  Denied.

3    **BY MS. FORREST:**

4    **Q.**  You're aware, sir, aren't you, developers indicated to

5    Apple their view that the 30 percent commission is too high,

6    aren't you?

7    **A.**  Yes.

8    **Q.**  In fact, a few developers have expressed directly to you

9    that they think the 30 percent commission is too high,

10   correct?

11   **A.**  Yes.

12   **Q.**  And you learned at one point in time that there was a

13   price differential between one company on iOS and on Google,

14   correct?

15   **A.**  Yes.

16   **Q.**  You're not aware of any study that has looked at whether

17   any alternative payment processing method that is utilized by

18   any enterprise service is less secure than IAP, correct?

19   **A.**  I haven't seen any studies like that.

20   **Q.**  And the enterprise -- you are aware that Apple has an

21   enterprise program?

22   **A.**  Yes, I am.  I am not involved in that whatsoever.

23   **Q.**  But you are aware, aren't you sir, that the enterprise

24   program allows certain entities to receive special permission

25   to provide their apps directly to individuals within their

1   enterprise?

2   **A.**   Within their company.   That's my understanding.   I don't

3   have a lot of knowledge of that program though.

4   **Q.**   You are aware that they can offer a payment processing

5   solution in connection with those apps that are offered

6   through the enterprise program, correct?

7   **A.**   I'm not aware of that.   Again, I don't have a lot of

8   visibility into that program.

9   **Q.**   You don't know one way or the other whether any enterprise

10  app offers an alternative, offers a payment processing system?

11  **A.**   I don't have direct knowledge of that to my recollection,

12  but that's certainly possible.

13  **Q.**   But you're not aware of any study that's ever come across

14  your desk that has indicated that any payment processing

15  method utilized by any enterprise app is less secure than IAP,

16  correct?

17  **A.**   I don't recall something like that crossing my desk.

18  **Q.**   And you're aware that there are some apps that sell

19  person-to-person experiences, correct?

20  **A.**   Yes.

21  **Q.**   And you understand that those apps may utilize payment

22  methods other than IAP, correct?

23  **A.**   Yes.

24  **Q.**   And you are not aware of any study that indicates that any

25  of the alternative payment processing methods used by any of

1  those person-to-person experience apps are less safe or secure

2  than IAP, correct?

3  **A.**  Again, I haven't seen any studies along those lines.

4  **Q.**  Just a couple of additional things.

5       You would agree with me, sir, that....

6            **THE COURT:**  We couldn't hear that.

7  **BY MS. FORREST:**

8  **Q.**  Turn, if you would, please, Mr. Fischer, to PX174, which

9  is in your binder.

10 **A.**  Okay.  I have it here.

11 **Q.**  All right.  Do you see that you are an addressee of this

12 document dated 27 March 2015?

13 **A.**  Yes, I do.

14           **MR. SRINVASAN:**  Counsel, we don't have that in our

15 binder, 174.

16           **MS. FORREST:**  I can give you mine.

17           **MR. SRINVASAN:**  Thank you.

18 **BY MS. FORREST:**

19 **Q.**  You received the document that's been marked for

20 identification as PX174 on or about the 27th of March, 2015?

21 **A.**  Yes.

22 **Q.**  And the subject of this was forward fraudulent app on App

23 Store?

24 **A.**  Yes.

25 **Q.**  And underneath in the first paragraph it says, Tim

1    received a complaint about this app being a scam.

2        Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   Is your understanding that that Tim there is Tim Cook?

5    **A.**   Yes.

6            **MS. FORREST:**   Your Honor, we would seek to admit

7    PX174.

8            **THE COURT:**   Any objections?

9            **MR. SRINVASAN:**   We have an objection that this

10   witness lacks personal knowledge and also there's the email

11   with the substance in it is from a third party, therefore

12   hearsay.

13           **THE COURT:**   Double-check, you received this,

14   Mr. Fischer?

15           **THE WITNESS:**   Yes.  It appears that I received this

16   on March 27th of 2015.

17           **THE COURT:**   You received it from Mr. Schiller?

18           **THE WITNESS:**   Yes.

19           **THE COURT:**   Overruled.  Admitted.  Again, same issues

20   with respect to hearsay of nonbusiness records.

21           **MS. FORREST:**   Correct, Your Honor.  Also one thing I

22   would add in that there're also party admissions for the

23   portion of the email that is written from the individuals at

24   Apple.

25

1    **BY MS. FORREST:**

2    **Q.**   Would you turn please to PX2017.

3    **A.**   Okay.  I've got it here.

4    **Q.**   Do you see that you are -- at the top of the email is from

5    you to a number of individuals -- well, to Mr. Cue -- I'm

6    sorry, Mr. Cue is a copyee and Mr. Schiller as an addressee,

7    among others?

8    **A.**   Yes.

9    **Q.**   And you wrote the top portion of the email on June 5th,

10   2012; is that correct?

11   **A.**   Yes.

12   **Q.**   All right.

13        And in the middle of the email there's an email that

14   Mr. Schiller wrote to you, correct?

15   **A.**   Yes.

16   **Q.**   And in that email he states to you, note that you have a

17   scam app quote Pam reading booth on the top charge that should

18   not in the store.

19        Do you see that?

20   **A.**   Yes, I do.

21   **Q.**   You received this in connection with your duties and

22   responsibilities at Apple, correct?

23   **A.**   Yes.

24        **MS. FORREST:**  Your Honor, we would seek to move in

25   PX2017.

```
 1              MR. SRINVASAN:  No objection.

 2              THE COURT:  2017 is admitted.

 3          (Plaintiff's Exhibit 2017 received in evidence)

 4     BY MS. FORREST:

 5     Q.  Turn, if you would, please to PX2076 -- I'm sorry, 2076.

 6     A.  Okay.  I've got it here.

 7     Q.  Do you see that you are an addressee of this document that

 8     is dated January 9th, 2016?

 9     A.  Yes.

10     Q.  And you received this document in connection with your

11     duties and responsibilities at Apple?

12     A.  Yes.

13     Q.  And it is from Mr. Schiller, is it not?

14     A.  Yes.

15     Q.  And in the first portion of it, it states, FYI year in

16     review by some Apple bloggers.  Do you see that?

17     A.  Yes, I did.

18     Q.  Okay.  And then it goes down and it says, developer

19     relations.  Do you see that?

20     A.  Yes.

21     Q.  And it says --

22              MR. SRINVASAN:  Your Honor, we just have an objection

23     to this document in terms of that top part is from an Apple

24     employee, but the rest of it is hearsay.

25              MS. FORREST:  Your Honor, the --
```

1          **THE COURT:**  Let me look at the document.

2       So this is a document from Phil Schiller to a bunch of

3    Apple employees.  I don't see where.

4       What are you talking about?

5          **MR. SRINVASAN:**  Your honor, the email from

6    Mr. Schiller says that your year in review is by some Apple

7    bloggers.  Then the remainder is just a repetition of what

8    some Apple blogger said.

9       And, again, we have the issue of -- in terms of it being

10   used for the truth of the matter, which is how I think it's

11   going to be used as opposed to notice or some other effect.

12          **MS. FORREST:**  Your Honor, it's not for -- I mean,

13   there's a variety of ways in which we could use it.  It could

14   be for state of mind.  Also be for the fact that these

15   individuals were interested, and so for their state of mind in

16   what people were saying about them but for the state of mind

17   also of the third parties.

18          **THE COURT:**  How do I -- I'll admit it for the state

19   of mind of Apple.  I don't know how you expect me to admit it

20   for the state of mind of a third party who is not here.

21       I'll admit it for that limited purpose.  Proceed.

22   BY MS. FORREST:

23   **Q.**  Turn, if you would, please, to PX2173.

24          **MR. SRINVASAN:**  Counsel, this is another one that's

25   not in our binder.

1          **MS. FORREST:**  Is there any confidentiality issue with

2     2173?

3          **MR. SRINVASAN:**  There is not.

4          **MS. FORREST:**  Can you bring up PX2173, please?

5     **BY MS. FORREST:**

6     **Q.**  Mr. Fischer, can you please pull up PX2173 in your binder.

7     **A.**  Okay.  I've got it here.

8     **Q.**  And do you see that you are a copyee on this document?

9     **A.**  Yes, I do.

10    **Q.**  And do you see that the subject says, alert, possible

11    Phishing CNCERT request on malicious code of nonofficial

12    Xcode.

13         Do you see that?

14    **A.**  Yes, I see that as the subject.

15         **MS. FORREST:**  Your Honor, we would seek to admit

16    PX2173.

17         **THE COURT:**  Any objections?

18         **MR. DOREN:**  No objections, Your Honor.

19         **THE COURT:**  Admitted.

20         (Plaintiff's Exhibit 2173 received in evidence)

21         **MS. FORREST:**  Your Honor, I have no further questions

22    at this time.

23         **THE COURT:**  Cross and/or I take it do you have an

24    agreement that this will also be direct?

25         **MS. FORREST:**  Yes, Your Honor.

1              **MR. DOREN:**  Your Honor, Mr. Srinivasan had to step

2    down the hall for just a moment.  We can take a couple of

3    minutes out of our time.  He will be right back.

4              **THE COURT:**  I am.

5              **MR. DOREN:**  I understand.  My apologies.

6              **THE COURT:**  While we are waiting, yesterday,

7    Mr. Doren, you indicated that there were some sealing issues.

8       I think at this point best thing for both sides to do is

9    if there are documents that you cannot agree on with respect

10   to sealing, then you have your competing proposals that you

11   provide me on the day of, and I will just have to make day of

12   calls.

13             **MR. DOREN:**  Yes, Your Honor.  I believe you did

14   address those issues yesterday in your order.

15             **THE CLERK:**  Sorry.

16             **MR. DOREN:**  I believe you did address those issues in

17   your orders yesterday that I was not aware of when I made that

18   statement.  Thank you.

19             **THE COURT:**  Okay.  Any questions, Ms. Forrest?

20             **MS. FORREST:**  No questions, Your Honor.

21                   (Pause in the proceedings.)

22             **MR. SRINVASAN:**  Apologize for the delay, Your Honor.

23             **THE COURT:**  That's all right.  Clock is ticking.

24

25

1          **DIRECT EXAMINATION**

2     **BY MR. SRINVASAN:**

3     **Q.**  Mr. Fischer, you know me, I'm your lawyer for Apple.  I

4     wanted to just follow up on some more questioning.

5          And I want to start back with what you had talked about

6     before when you said your role at the App Store is vice

7     president of the App Store; is that correct?

8     **A.**  Yes, it is.

9     **Q.**  How long have you been in that role, sir?

10    **A.**  I joined the App Store team in January of 2010, and became

11    a vice president in 2016.

12    **Q.**  Have your responsibilities changed at all from 2010 to the

13    present?

14    **A.**  Yes.  The scope of my responsibilities have expanded,

15    including becoming responsible for the product of the App

16    Store.

17    **Q.**  What do you mean by "the product of the App Store"?

18    **A.**  What I mean is the product experience of the App Store,

19    the user experience of the App Store from a product

20    perspective, for both customers as well as for developers.

21    **Q.**  Can you describe briefly your educational and employment

22    history?

23    **A.**  Sure.

24         I graduated from the university of Virginia in 1995, and

25    soon after I graduated, I started working in the media and

1  technology space, including for some companies that were

2  innovating and online music distribution, including M2K, CDNow

3  and MyPlay.

4      And then I joined Apple in 2003 as one of the first

5  marketing hires for iTunes, and was in that capacity until

6  late 2009 when I was asked to run the App Store business for

7  Apple, which I did, in January of 2010.

8  **Q.**  And when you say you run the App Store business, which I

9  think you just mentioned, what does that business include?

10 **A.**  That includes the -- so I'm responsible for the Global App

11 Store business that includes the App Store for iPhone, the App

12 Store for Ipad, the App Store for Apple watch, the App Store

13 for Apple TV, the App Store for iMessage as well as the Mac

14 App Store.

15 **Q.**  So if I understand that answer, the App Store for the

16 iPhone is different than the App Store for the iPad?

17 **A.**  Yes.  They do have some similarities.  We have many apps

18 that are available only on the iPhone.  We also have many apps

19 that are available on both iPhone and iPad.

20     And then we also have some apps that are available only on

21 iPad.  So the catalogs have some similarities but also some

22 differences.  And then also the user interface of the App

23 Store on iPad is optimized a bit differently to account for

24 the larger form fact of the larger screen.

25 **Q.**  And just for reference in this lawsuit, do you understand

1    that this lawsuit encompasses both the App Store for the iPad

2    and the App Store for the iPhone?  Do you understand that?

3    **A.**  Yes.

4    **Q.**  And for purposes of our questions today, I'm just going to

5    refer to the App Store for ease of reference to cover both of

6    those stores; is that okay with you?

7    **A.**  Yes, it is.

8    **Q.**  And how would you describe what the App Store is?

9    **A.**  The App Store is a curated store where Apple works with

10   developers to sell and distribute their apps to customers in

11   175 countries and regions around the world.  And each and

12   every one of those countries have their own storefront so

13   people in that market access their storefront for that

14   particular market.

15       And we work really hard to make the App Store a

16   marketplace that is attractive to both customers as well as to

17   developers.

18   **Q.**  And can you describe your responsibilities in running

19   whatever aspect of that store is?

20   **A.**  Sure.

21       I focus on creating a great app discovery experience for

22   our customers and helping developers succeed on the App Store.

23       And what I mean by that is, I love helping developers

24   reach more users, gain global visibility to our global

25   customer base, and help them monetize their apps and help them

1    grow their business on our platforms.

2    **Q.**  And are there areas of the App Store for which you are not

3    responsible?

4    **A.**  Yes.  The App Store is a very cross-functional business at

5    Apple with many teams across the company supporting it.

6         For example, app review, which has come up already today,

7    worldwide developer relations, design, human interface,

8    engineering, fraud and security, payments and commerce,

9    finance, legal, HR.  I don't have any -- I don't manage any of

10   those functions.

11   **Q.**  You were asked a series of questions from counsel about

12   studies regarding privacy.  Are you responsible for privacy on

13   the App Store?

14   **A.**  No, I am not.

15   **Q.**  You were asked a series of questions about security.

16        Are you responsibility for the security of the App Store?

17   **A.**  No, I am not.

18   **Q.**  And you were asked a series of questions about app review.

19   Are you responsible for app review?

20   **A.**  No, I am not.

21   **Q.**  You were asked a series of questions about fraud.  Are you

22   the person responsible for preventing fraud on the App Store?

23   **A.**  No, I am not.

24   **Q.**  And in terms of -- I'm sorry.

25        I don't -- in -- in counsel's opening statement of this

1   lawsuit, which I don't know that you saw, Epic's counsel said

2   Apple came up with a master plan in 2010 to change the way the

3   App Store would operate in order to lock in users and

4   developers into the Apple ecosystem system.

5       You testified you started running the App Store in 2010,

6   correct?

7   **A.**   Yes.

8   **Q.**   So from 2010 to the present, have you ever heard of such a

9   plan?

10          **MS. FORREST:**   Your Honor, this is -- object as to

11   form.

12          **THE COURT:**   Say more.  I don't understand.

13          **MS. FORREST:**   Your Honor, it's the nature of

14   argument.

15          **THE COURT:**   You can rephrase.

16          **MR. SRINVASAN:**   Was the objection -- in any event,

17   sir --

18          **THE COURT:**   The objection was that you tied it to the

19   opening statement.

20          **MR. SRINVASAN:**   Understood.

21   **BY MR. SRINVASAN:**

22   **Q.**   Mr. Fischer, when did you start running the App Store --

23   the App Store business, excuse me.

24   **A.**   In January of 2010.

25   **Q.**   And so from January 2010 to the present, have you ever

1    heard of a plan to change the way the App Store would operate

2    in order to lock users and developers into the Apple

3    ecosystem?

4    **A.**   No.

5    **Q.**   And as the person running the App Store business, would

6    you be aware of such a plan if one existed at Apple?

7    **A.**   Yes.

8    **Q.**   And is this a plan that you could execute on if there were

9    such a plan?

10   **A.**   I don't know how I could execute against that because the

11   App Store, as I mentioned earlier, is a marketplace that we

12   work hard to make attractive to both customers, end users, as

13   well as developers, neither of which we have any control over.

14   **Q.**   Let's turn to something you do have control over.

15        What does your team actually do?

16   **A.**   So my team has a variety of functions, including

17   editorial, business management, and product.

18   **Q.**   And let's take those one by one.  What is the editorial

19   team --

20             **THE COURT:**  Do you set rates?

21             **THE WITNESS:**  No.

22             **THE COURT:**  Go ahead.

23   **BY MR. SRINVASAN:**

24   **Q.**   What is the editorial team responsible for?

25   **A.**   So my editorial team is responsible for having a deep

1   knowledge of the App Store catalog, meaning the apps and games

2   that developers have made available for sale and distribution

3   in the store.

4       And they, from that catalog, try out and select and

5   ultimately feature and highlight apps and games and developers

6   to our global customer base on the App Store across it.

7   Today, games and apps tabs.

8   **Q.**   How does the editorial team go about finding apps and

9   developers to feature on the App Store?

10  **A.**   A variety of ways.  My editorial team really needs to be

11  on top of what developers are working on, whether it's new

12  apps or games that they plan to distribute on the App Store,

13  as well as updates to existing apps and games.  And so that's

14  one major way.

15      And then quite a number of years ago, we created a web

16  portal where developers of all shapes and sizes all around the

17  world can communicate directly with my editorial team to tell

18  us what they are working on for editorial feature and

19  consideration on the App Store that's available at

20  AppStore.com/promote.

21  **Q.**   Then moving on to the second group you mentioned, was the

22  business management team within your organization.

23      What do they do?

24  **A.**   My business management team manages the business

25  relationships with developers.  And provides developers with

1    expert guidance to help them make, you know, smart business

2    decisions for whatever their business goals may be.

3    **Q.**   Does that team discuss different business models that are

4    available on the App Store?

5    **A.**   Yes.  So my business management team -- first of all,

6    Apple provides a lot of flexibility to developers on what

7    types of business models they can take advantage of.

8        And my business management team has a lot of expertise and

9    knowledge of all of those different business models, and then

10   shares insights and guidance with developers.  Ultimately to

11   help developers make the best decision for their business and

12   ultimately help grow their business on the App Store.

13   **Q.**   Then the third team I believe you identified was the

14   product team.  What does that team do?

15   **A.**   So my product team is responsible for creating a great app

16   discovery experience for our customers and also to support our

17   developers with great tools and technologies.

18       So there's a consumer-facing part of that team that

19   focuses on discovery, you know, features like search, browse,

20   and personalization.  And then there's also a developer

21   focused part of the team that focuses on developer tools and

22   technologies, things like App Store connect, app analytics,

23   Game Center, and more.

24   **Q.**   And you mentioned that as part of that, the consumer

25   facing team, I think you mentioned, the product team itself

1    focuses on discovery features.  And why is that issue app

2    discoverability important?

3    **A.**   App discoverability is incredibly important for us and for

4    everyone that works at the App Store.  First and foremost, we

5    love helping our customers discover grade apps and games that

6    can help them get the most out of their Apple devices and we

7    also love helping developers reach more users and help grow

8    their business.

9         And so I think both sides of that coin are really

10   important and that's why I think discoverability is important.

11   **Q.**   Has the look and feel of the App Store itself changed

12   since the beginning of the App Store in 2008?

13   **A.**   Yes, quite a bit.

14        The App Store launched with 500 apps back in 2008, and we

15   have nearly 2 million.  So the user interface of the App Store

16   has evolved substantially.  We have redesigned the App Store

17   multiple times since 2008.  We've added lots of features to

18   help customers better find and download what apps and games

19   that might interest them.  We've added lots of new feelers to

20   help developers, reach users efficiently, and drive downloads

21   and reach more users and build their business.  And I think

22   it -- user interface and the look and feel kind of culminated

23   with a redesign that we did in 2017.

24            **MR. SRINVASAN:**   And I would like to introduce exhibit

25   DX3422, which hopefully Your Honor has.

1    We have binders.  I think counsel already has one.

2    May I approach, Your Honor?

3         **THE COURT:**  And I do have it.

4         **MR. SRINVASAN:**  Sorry, you will have to deal with

5    another big binder, Mr. Fischer.

6    Can you tab over to DX3422?

7         **THE WITNESS:**  Okay.  I've got it.

8    **BY MR. SRINVASAN:**

9    **Q.**  Okay.  And can you describe for us what DX3422 is?

10   **A.**  So it's multiple emails, but the first of which was an

11   email that I sent to our global App Store team in June of

12   2014.  This was, looks like a week, after where our annual

13   worldwide developer conference.

14   And I was highlighting a bunch of the new features that we

15   had just announced and would be launching later that year with

16   the upcoming version of our iOS operating system to help

17   customers discover apps more easily and to help developers

18   build apps and grow their business.

19   I just wanted to send a note out to the global team

20   thanking them for all their hard work to get us to that point.

21   **Q.**  Is this email here that you are conveying indicating

22   changes to the look and feel of the App Store?

23   **A.**  Yes.  Among other things, yes, there were some design and

24   user interface changes that we had done during that time

25   frame.

1          **MR. SRINVASAN:**  Your Honor, I would like to move

2    DX3422 into evidence.

3          **THE COURT:**  Any objection?

4          **MS. FORREST:**  No objection.

5          **THE COURT:**  3422 is admitted.

6          (Defendant's Exhibit 3422 received in evidence)

7    **BY MR. SRINVASAN:**

8    **Q.**  Mr. Fischer, if you could turn to DX3642.

9    **A.**  Okay.

10   **Q.**  Let me know when you have had a chance to familiarize

11   yourself with it.

12   **A.**  I remember this, yes.

13   **Q.**  First of all, did you receive 3642 at some point?

14   **A.**  3642 is a press release that Apple sent out announcing the

15   all new app store from 2017.  It was a major redesign that we

16   had done.

17   **Q.**  And this was a press release -- who issued this press

18   release?

19   **A.**  The Apple PR team.

20   **Q.**  And can you turn to the second page of this document?  It

21   ends in.002 at bottom middle there.

22   **A.**  Okay.

23   **Q.**  Can you explain what the today section is describing in

24   this press release?

25   **A.**  Yes.

1       So we -- we, with this major redesign that we did, we

2   created a new home page for the App Store called today.  The

3   vision was to create a daily destination that's all about

4   celebrating games and apps and developers and kind of app

5   culture; how apps have impacted people's lives.

6       And so this, this new home page is something that we were

7   really excited about and putting a lot of resources into.

8   **Q.**  And forgive me if this seems like an obvious question, how

9   often is the today page updated?

10  **A.**  Today is indeed updated every day.

11      As I mentioned earlier, the App Store is available in 175

12  countries and regions around the world.  We actually update

13  this every single day all around the world.

14          **MR. SRINVASAN:**  Your Honor, at this time we have a

15  little demonstrative on what the today page looks like.  We

16  have shown it to opposing counsel, and I understood there is

17  no objection to show it.

18          **THE COURT:**  All right.

19          **MS. FORREST:**  No objection, Your Honor.

20  BY MR. SRINVASAN:

21  **Q.**  Mr. Fischer, if you can take a look at your screen there.

22  Can you walk us through what we are seeing?

23  **A.**  Yeah.  This is the today tab.  This is, I think, looks

24  like it's probably from a few days ago on May 4th.

25      Some Star War fans might know that's kind of big day, May

1   the 4th, instead of may the force be with you.  We did a big

2   kind of fun editorial feature where we highlighted a bunch of

3   Star Wars-related apps and games.

4       Now, back on the today tab here, here's a collection of

5   apps that my editorial team were highlighting top apps right

6   now.

7       And then scrolling down a little bit this was something

8   that our editorial team was doing around celebrating Asian

9   Pacific american heritage month with some apps to support the

10  AAPI community.

11      And then going a little bit further down, this is

12  something we do quite often where we highlight developers and

13  where my editorial team sits down with developers and

14  oftentimes goes kind of behind the scenes interviews with

15  developers to kind of shine the light on the innovative stuff

16  that our developer community does.

17      And then scrolling down, every day we do an App of the

18  Day, we highlight an app of the day.  So this looks like a

19  Star Wars-related thing.  We also do a daily Game of the Day

20  so it is an easy way to kind of discover new apps or learn

21  about apps you may already be familiar with.

22      We also personalize the App Store today tab.  So here's

23  another developer's spotlight.  We sat down with the developer

24  of waterminder, and highlighted some stuff about them.  It

25  looks like they are a small company.  There's nine people at

1    the company and they launched the app in 2013.  And so this is

2    something that we enjoy doing, especially shining a light on

3    smaller companies that might not have the marketing budget or

4    the marketing teams to, you know, get visibilty and we are

5    doing this, you know, highlighting these developers all around

6    the world.

7  **Q.**   Thank you.

8        If you can move back to the exhibit 3642.  If I can have

9    you look at the third page.  There is a heading there that

10   says games and apps.

11       Can you explain what that is referring to?

12  **A.**   Yes.  So in the 2017 redesign, we decided to kind of

13   create a dedicated destination for games with its own tab.

14       And games is the most popular category on the App Store,

15   and something that we thought would really help people who are

16   interested in learning more about games, discovering new games

17   or learning about things that developers might be doing and

18   existing games they may already have.  We decided to do the

19   same thing for kind of nongames, and that's called the Apps

20   tab.

21  **Q.**   And one more page here.  If you turn all the way to the

22   fifth page.  It says app product pages.

23       What are app product pages, or what changes were made

24   there.

25  **A.**   Yes.  So when an app is available on the App Store, every

1    single app has its own product page.  This is something that I

2    think is real important for both customers as well as

3    developers.

4        What we had done in the redesign, we had completely

5    redesigned the product page which had been quite kind of

6    static for quite a number of years.  The goal was really

7    putting the most helpful information above the fold for

8    customers so they could, you know, make an educated purchase

9    decision if they were downloading a new app.

10       So we put the star ratings higher.  If the app happened to

11   chart, in our charts we put that front and center.  We were

12   highlighting what we call video app previews indicated by this

13   play button there and that would automatically play if this

14   were actually -- if you were looking at a device.

15       And so those were some of the changes we made to the app

16   product pages at that time.

17           **MR. SRINVASAN:**  At this point, Your Honor, we would

18   like to move DX3642 into evidence.

19           **MS. FORREST:**  No objection.

20           **THE COURT:**  Admitted.

21       (Defendant's Exhibit 3642 received in evidence)

22   BY MR. SRINVASAN:

23   **Q.**  How was your team being able to maintain the new features

24   and content on the App Store?

25   **A.**  So this was a sizeable investment on our part.  We grew

the global team significantly to support this, not only within

what I am responsible for on the business side, but in other

groups like design and to execute that today tab on a daily

basis all around the world, we hired, you know, what I feel

are some world-class journalists as well as designers from

leading publications all over the world to come and help us

with that effort.

**Q.**   Have you received any feedback from developers on the

re-design?

**A.**   Yes, I have.

**Q.**   And what kind of feedback have you received?

**A.**   The feedback that I have received and seen and surveys and

things have been overwhelmingly positive.  Especially from

smaller developers.

As I mentioned earlier, a lot of smaller developers don't

have the marketing teams or PR teams to really help them grow

their business they are focused on creating a great app.  So I

think what we have done with this redesign has really kind of

provided a huge boost of support, especially for smaller

developers.

**Q.**   And have you, as part of your job, looked at other App

Stores to see what type of editorial efforts that they are

maintaining on their stores?

**A.**   Yes, I have.

**Q.**   And to the extent you've done that, how does the Apple App

1  Store teams editorial efforts compare to what other App Stores

2  are doing?

3  **A.**   I might be biased, but I certainly think that what we do

4  is incredibly unique.  And I certainly have not seen any

5  marketplace that -- that distributes apps or games, you know,

6  do what we are doing in terms of providing marketing and

7  editorial support like this to developers.

8  **Q.**   Do developers pay for any of this support?

9  **A.**   No, they do not.

10  **Q.**   And does Apple do anything -- what other initiatives does

11  your team do to support developers, if anything?

12  **A.**   So there's a group that used to be in my organization

13  that's no longer in my organization, which is our marketing

14  team.  And we do a lot of what we talked about is kind of

15  things we do on the App Store itself.

16       We invest significantly in marketing outside of the App

17  Store through things like paid advertising, social media,

18  emails, and marketing partnerships.  And we, you know, provide

19  developers with lots of support off of the store as well.

20  **Q.**   When you just said "paid advertising" who was paying for

21  that advertising in the case that you are talking about here?

22  **A.**   So in that case Apple is paying 100 percent of that -- of

23  that advertising.  It comes out of our ad budget.

24  **Q.**   Why has Apple chosen to provide all of this support to

25  developers at no cost to the developers?

1  **A.**  Well, as I mentioned I think a couple of times, we work

2  really hard to make the App Store an attractive marketplace

3  for both customers as well as for developers.

4      Developers will only be interested in the App Store if we

5  got customers who are there and interested in learning about

6  the apps and games that they are creating.  So I think

7  continuing to invest in the App Store which we have done since

8  we launched the App Store in 2008 and I certainly plan to for

9  a long time into the future.

10     We want to make that a great experience for both customers

11  and developers.

12  **Q.**  Do you know if developers have specifically benefited from

13  any of the features of the 2017 redesign?

14  **A.**  Yes.

15  **Q.**  And how do you know that?

16  **A.**  I've heard directly from developers and we've seen --

17          **MS. FORREST:**  Objection, Your Honor.

18          **THE COURT:**  The question is how do you know that?

19  So, sustained.

20  **BY MR. SRINVASAN:**

21  **Q.**  Do you have an understanding of what the impact of the

22  redesign has had on developers, Mr. Fischer?

23  **A.**  Yes.  I have access to data around the impact of the

24  redesign on developers.

25  **Q.**  And what does that data show you?

1    **A.**   The data showed me that more people are visiting the App

2    Store, more people are downloading apps from the App Store.

3    More people are spending money on apps on the App Store.  We

4    paid more money out to developers from our editorial and

5    marketing efforts.

6        Remind me, when did that start?

7            **THE WITNESS:**  The redesign launched in the fall of

8    2017.

9            **THE COURT:**  Okay.  Thank you.

10   **BY MR. SRINVASAN:**

11   **Q.**   I want to switch subjects, Mr. Fischer, to Apple and your

12   relationship with Epic.

13       Was *Fortnite* the first Epic game that was available on the

14   App Store?

15   **A.**   No, it was not.

16   **Q.**   What did Epic offer on the App Store before *Fortnite*?

17   **A.**   In 2010, Epic launched a game -- I know they announced it

18   in 2010.  I don't remember the exact launch date called

19   Infinity Blade.  We actually worked very closely with them.

20   We invited them to join us on stage for the iPhone event in

21   the fall of 2010 to make that announcement.  And they launched

22   the sequel the following year.  Actually, the first one did so

23   well we invited them back to join us on stage for the

24   subsequent iPhone event in the fall of 2011 and they launched

25   another game in that series Infinity Blade III in 2013.

1   **Q.**  At what point did you become personally involved in the

2   Apple/Epic relationships?

3   **A.**  So our teams and many other teams at Apple worked with

4   Epic for many years.  I personally became more involved after

5   Epic launched *Fortnite* on the App Store in March of 2018.

6   **Q.**  And then did Apple and Epic continue to work together

7   after the *Fortnite* launch in 2018?

8   **A.**  Yes.  We worked much more closely together between our two

9   companies.  And I, a few months after *Fortnite* launched,

10  which, again, was in March of 2018, in June of 2018, I flew to

11  North Carolina and met with Mark Rein, who is one of the

12  cofounders of Epic at their headquarters outside of Raleigh.

13      And Mark and I spent several hours together talking about

14  ways that our companies could work more closely together

15  around *Fortnite* and potentially other projects.

16  **Q.**  And did that, in fact, happen after you met with Mr. Rein

17  in the summer of 2018?

18  **A.**  Yes.  We and our teams met more regularly throughout the

19  remainder of the year.  And Mark and I worked closely together

20  on a big promotion for *Fortnite* around the holiday season on

21  the App Store in December of 2018.

22  **Q.**  And what was the nature of that promotion, if you can talk

23  about that?

24  **A.**  Yeah.

25      So we had kind of looked at some different things they

1    were doing in the game, and identified that there was a --

2    Mark, rather, brought up to me that there was a skin that they

3    would be willing to make available in the game to App Store

4    customers around the Christmas time period of 2018.

5    So we worked together and we did -- I did a big promotion

6    on the App Store to support that offer, both on the store and

7    we did a bunch of marketing outside of the store.  It was very

8    successful.

9    **Q.**  By the way, did Epic -- does Epic pay Apple for any of

10   that support?

11   **A.**  No, they did not.

12   **Q.**  And did Apple and Epic work together in any other respect

13   during the 2018 holiday season?

14   **A.**  Yes.  Mark reached out to me.  I don't recall the exact

15   time period, but I believe it was sometime in the fall of

16   2018, maybe closer to the holidays.  And he let me know that

17   gifting was becoming more popular within *Fortnite* on some of

18   the other platforms that *Fortnite* was available on.

19   He pointed out to me that the App Store review guidelines

20   had a guideline that did not allow for gifting.  And I asked

21   Mark to kind of educate me about how gifting worked and

22   *Fortnite* on other platforms and things they were doing on

23   their side to make sure that was kind of a safe experience.

24   And we -- so after Mark shared that information with me, I

25   had a conversation with a handful of colleagues internally,

1    and we decided to revisit the existing App Store review

2    guidelines that did not allow for gifting at that time.

3    **Q.**   First of all, what is gifting if you can talk about that?

4    **A.**   So gifting is the concept -- and what Epic had reached out

5    to me about was the concept of in-app gifting.  Like the

6    gifting of V-Bucks, which is their virtual currency in

7    *Fortnite*.  So that's what gifting is, gifting from one user to

8    another.

9        And ultimately that proposal was brought to ERB, which was

10   referenced earlier today, and the ERB decided to update the

11   guidelines and ultimately make a change to the guidelines for

12   all developers, not just for Epic, but for all developers.

13   And when we make a change, we want to make a change that

14   applies equally to all developers.

15   **Q.**   Can you talk to what Apple -- how Apple continued to work

16   with Epic into 2019 and 2020 at a high level?

17   **A.**   Yes.

18       So in early 2019, Epic had reached out and let us know

19   they were going to be conducting and organizing an in-game

20   concert in *Fortnite* with an artist named Marshmello.  I was

21   familiar with Marshmello and his music, so I know what they

22   were talking about.

23       It sounded to me pretty cool.  And my team and I got

24   excited about it, and we worked closely with Epic to get

25   marketing assets and things, and we promoted this Marshmello

1   concert on the App Store as well as through marketing outside

2   of the App Store.  And that was, I believe, early February of

3   2019.

4   **Q.**   Okay.  Any other notable initiatives in 2019 or 2020?

5   **A.**   No.  The teams were working closely together throughout

6   the year on a wide variety of promotions.  *Fortnite* was

7   launching new seasons, so that would always be kind of a

8   marketing moment; that we would collaborate together and

9   highlight those new kind of in-app events that they were doing

10  in *Fortnite* both on the App Store as well as through marketing

11  outside of the App Store.

12  **Q.**   Okay.  If you can take a look at your binder, I would like

13  to move -- I'd like to turn to 3636.  DX3636.  Okay.

14      Mr. Fischer, is this an email chain that you were involved

15  in?

16  **A.**   Yes, it is.

17  **Q.**   And this is a -- can you describe briefly what this email

18  chain is?

19  **A.**   Yes.  This was from April of 2020.  And it's kind of

20  similar to the in-game concert that I was just talking about

21  from 2019 that Epic did in *Fortnite* with Marshmello.

22      They had reached out to us in April of 2020 to let us know

23  that they were doing something similar, but I think they

24  viewed it as bigger with an artist named Travis Scott for a

25  big in-game concert.

1     And they told us about this quite last minute.  I think it

2  was maybe a week or so before it ultimately took place.  And

3  typically they had told us about things a little bit earlier

4  in advance so we could plan for it.

5     I thought this was a really cool concept, and Travis Scott

6  is a prominent artist.  We said, hey, let's get behind this.

7  So we kind of dropped everything we were doing and scrambled

8  and did a big promotion for this *Fortnite* Travis Scott in-game

9  concert.  On the top of the today tab, the top of our home

10  page, as well as the top spot on our games tab, which gets a

11  lot of App Store visitors on a daily basis, and I wanted to

12  let the Epic team know about all the things we were doing to

13  support their *Fortnite* in-game concert.

14  **Q.**  In the middle of this email, there's an email responding

15  back to you from Mark Rein; is that right?

16  **A.**  Yes.  That's right.

17  **Q.**  And I think you mentioned him before, but do you know who

18  Mr. Rein is?

19  **A.**  Yes.  He's the -- my understanding is he's the cofounder

20  of Epic.

21  **Q.**  And Mr. Rein writes to you in part, at least, quote:

22  "Thank you so much for the support.  It's going to be a really

23  fun event and we've got more fun stuff planned for the next

24  few weeks and months."

25     Correct?  Did I read that right?

1    **A.**   Yes.

2    **Q.**   How did you take that comment from Mr. Rein?

3    **A.**   I took it that Mark was very appreciative for our support

4    and what we were doing to give them more visibility on the App

5    Store.

6    **Q.**   The top email from April 23rd, 2020, is from a Mr. Adam

7    Sussman.

8        Do you know who Mr. Sussman is?

9    **A.**   Yes.

10   **Q.**   Who is Mr. Sussman?

11   **A.**   Adam was the new President at Epic.  And I've known Adam

12   for, at this point, over a decade when he had worked at a

13   variety of companies.

14       When Adam started working at Epic, we connected and we

15   spoke several times leading up to this correspondence and

16   explored ways that we could, you know, our teams and the

17   companies could work more closely together.

18   **Q.**   Mr. Sussman says to you quote:  "Thanks Matt.  This is

19   great support and we are so excited to see this in the store.

20   We are looking forward to an amazing event and working

21   together on our future calendar."

22       Did I read that right?

23   **A.**   Yes.

24   **Q.**   What was your reaction in response to that comment from

25   Mr. Sussman?

1   **A.**   Similar to Mark's response.   I felt Adam was very

2   appreciative of everything we were doing to support this, this

3   in-game concert.   And what was more important to me is that he

4   was looking forward to working together on their future

5   calendar.   I was very excited about that and very receptive to

6   that.

7   **Q.**   Did you expect you would continue to work with Epic on

8   future projects?

9   **A.**   Yes.   Absolutely.

10   **Q.**   When was the last time you interacted with anybody at

11   Epic, Mr. Fischer?

12   **A.**   It was in June of last year, of 2020.   Adam and I, after

13   the success of the Travis Scott in-game concert, we talked

14   about bringing our teams together during our annual worldwide

15   developer conference, which is always a very busy week for us

16   at Apple that work in the App Store and work with developers.

17       We prioritized meeting with Epic that week, and it was for

18   a quarterly business review.   So we talked about kind of the

19   up-to-date performance of not only *Fortnite* but Epic also has

20   other apps in the store.

21       They had acquired a company called *Houseparty*.   We had a

22   close relationship prior to their acquisition.   And so we

23   talked about *Fortnite*, we talked about *Houseparty* and ways

24   that our teams could work more closely together to help them

25   reach more users and help them grow their business on the App

```
1    Store.
2    Q.  So when you -- did you -- were you one of the recipients
3    of the email from Mr. Sweeney to the Apple team on
4    August 13th, 2020 notifying that Epic was going to implement
5    some kind of a hotfix?
6    A.  Yes, I was.
7    Q.  And what was your reaction to that email?
8    A.  I was blindsided.
9    Q.  Okay.  I want to turn to --
10            THE COURT:  Are you offering 3636?
11            MR. SRINVASAN:  Thank you, Your Honor.  I am.
12            THE COURT:  Any objection?
13            MS. FORREST:  No objection, Your Honor.
14            THE COURT:  It's admitted.
15        (Defendant's Exhibit 3636 received in evidence)
16    BY MR. SRINVASAN:
17    Q.  Mr. Fischer, are the rules for the App Store, the App
18    review guidelines, are they the same or different depending on
19    who the developer is?
20    A.  The App Store review guidelines apply equally to all
21    developers.
22    Q.  And are the rules applied -- I'm sorry, it's a slightly
23    different question, which is, are the rules themselves the
24    same for all developers?
25    A.  Yes.
```

**Q.**   And are the rules applied the same way to all developers?

**A.**   Yes.

**Q.**   Do any of the developers receive a special break or dispensation from those rules?

**A.**   No.

**Q.**   Does Apple ever change those rules?

**A.**   We do change the guidelines.  As I mentioned that instance when Epic reached out about this particular guideline, we always appreciate getting feedback from developers.  And oftentimes if we think that an update to the guidelines makes sense for all developers, it makes sense for our customers, it makes sense for Apple, then we will update the guidelines, and we have done that continuously since we first created the guidelines many years ago.

**Q.**   Earlier in questioning by Epic's counsel, you were confronted with the term "white-listed developers?"

       Do you recall that?

**A.**   Yes, I do.

**Q.**   Is that a term you have ever used?

**A.**   I don't believe so.

**Q.**   And I believe you said white-listed developers get to do -- she asked you, do white-listed developers get to do what other developers don't get to do.  I don't know if you heard that question, but what is your -- if you want to clarify or respond to that question, do you have a reaction to that?

**A.**   Yes.

From time to time, developers come to Apple with ideas of new features or new capabilities.  And, of course, sometimes we, within the company, come up with new ideas of things that we want to do in the App Store, whether it's things that we think it will be helpful to improve the customer experience or things that we think it would be helpful to developers.

And oftentimes before we are ready to kind of role out a feature to the world, to all developers or to all customers, we want to test a feature.  And in this particular case, this is something that we were testing -- it was brought to my attention with a few companies to kind of see how this particular feature would perform with the intention that if it performed well, it would be something that we would roll out to all developers.

**Q.**   Moving to another subject.

**THE COURT:**  If I can interpose.

So then when someone has something in the beta version, is it -- is it live to a subset?  Who does that go to, the beta testing of apps?

**THE WITNESS:**  Thank you, Your Honor.

When a developer has a beta version of an app, we have a service called Test Flight that they can use to distribute that beta version of their app to end users.

**THE COURT:**  To all end users or subset?

1          **THE WITNESS:**  The maximum distribution on a test

2     flight app is 10,000 users.

3          **THE COURT:**  Okay.

4          **THE WITNESS:**  And the developer is responsible for

5     soliciting those users.  Apple doesn't necessarily connect

6     them with users.  Developers can post a tweet on Twitter, and

7     then the people can --

8          **THE COURT:**  Agree to.

9          **THE WITNESS:**  -- agree to using that beta version but

10    that's not the version that's available in the App Store.

11         **THE COURT:**  Great.  Thank you.

12    **BY MR. SRINVASAN:**

13    **Q.**  Mr. Fischer, does Apple take feedback from developers on

14    how to improve the App Store experience?

15    **A.**  Developers are not a shy bunch.  And, yes, they give us

16    feedback all the time.  And we take all their feedback really

17    seriously.  And it actually really helps me and my product

18    time prioritize the developer facing features that we should

19    be, you know, supporting as part of our ongoing product

20    roadmap.

21    **Q.**  And does Apple solicit only positive feedback from

22    developers or does it ask for feedback both -- whatever that

23    feedback may be?

24    **A.**  I believe, as Ms. Forrest pointed out, she showed me some

25    examples of our developer survey from a few years ago, and

1    sometimes the feedback is positive, sometimes the feedback is

2    negative or more constructive.  We love getting all feedback

3    from developers regardless of whether it's positive or

4    negative.

5    **Q.**  Since you mentioned that exhibit, let's turn to that

6    exhibit.  It's PX2026.

7        I apologize, Mr. Fischer, I think it's going to be in the

8    black binder at the foot of your area.  They are both giant

9    binders.  You'll get your exercise for the day.

10           **THE COURT:**  I hope he gets a little more exercise

11   than that.

12           **MR. SRINVASAN:**  That would be exercise for my day.

13           **THE WITNESS:**  Would you please repeat the exhibit

14   number?

15           **MR. SRINVASAN:**  2062.

16           **THE WITNESS:**  Okay.

17   **BY MR. SRINVASAN:**

18   **Q.**  And if you look in the first page of 2062.  It's 2062.1.

19       You recall that Ms. Forrest directed you to a bullet at

20   the bottom about a comment about the App Store?

21       It's the very first sub-bullet in the -- at the bottom of

22   the page.  I think it's label number 1.  Do you see it?

23       The App Store is plagued with?

24   **A.**  Yes, I see that.

25   **Q.**  And then she had you read some criticism that they had.

1      Can you read the line right above that criticism?

2  **A.**   Although I gave the App Store a high rating, there are a

3  few pitfalls which Apple can address.

4  **Q.**   Right.

5      Then Ms. Forrest had you read one of those issues, right?

6  **A.**   Yes.

7  **Q.**   If you could turn to the third page?

8  **A.**   Of the same document?

9  **Q.**   Of the same document.

10      And there's a heading at the bottom that says app review.

11  Do you see that heading?

12  **A.**   Yes, I do.

13  **Q.**   And Ms. Fischer (sic) had you read a bullet or two under

14  there; do you recall that?

15  **A.**   Ms. Forrest, yes.

16  **Q.**   Ms. Forrest.

17  **A.**   Yes.

18  **Q.**   Are you in charge of app review?

19  **A.**   No, I am not.

20  **Q.**   If you can turn to the fifth page, do you recall that you

21  were asked to read some headings under the search ads section?

22  **A.**   Yes.

23  **Q.**   Are you in charge of search ads, sir?

24  **A.**   No, I am not.

25  **Q.**   And then on the next page, in the middle of the series of

1    bullets in the middle of the page there was a bullet that you

2    read about the testing process.  Do you recall that?

3    **A.**  Yes.

4    **Q.**  Are you responsible for that, sir, the testing of apps?

5    **A.**  No, I am not.

6    **Q.**  You can put that document away.

7         I think you mentioned this, so I'll just ask it again

8    cleanly.  Do you have responsibility for app review?

9    **A.**  No, I do not.

10   **Q.**  And she, Ms. Fischer -- Ms. Forrest, I'll get that

11   eventually, Ms. Forrest asked you a series of questions about

12   certain apps that I think she called them rip-off apps, money

13   laundering apps, fake apps, fraudulent refunds, and asked if

14   you had heard those things being on the App Store.

15        Do you recall that?

16   **A.**  Yes, I do.

17   **Q.**  In what capacity did you learn about those things?

18   **A.**  Typically in my capacity as a participant at ERB, it's

19   something through email, I'm often added to emails that are

20   related to the App Store, or related to developers, or related

21   to customers.  People often add me as an FYI or give me a

22   head's up on something.  Even if I don't, I have a direct

23   responsibility.

24   **Q.**  Are you responsible for remedying those issues for Apple?

25   **A.**  I am certainly an advocate for anything that we can do to

1    make the entire App Store better, and the experience better

2    for customers and developers.  But oftentimes when it comes to

3    those specific things, I'm not the person who's directly

4    responsible for it.

5    **Q.**   What is your understanding of what Apple does when it

6    discovers one of these types of issues on the App Store?

7    **A.**   Whether it's me or anyone else, if I ever get an email

8    about any issue of alleged fraud, I immediately forward it to

9    our fraud and security team for immediate investigation.

10   **Q.**   And if we can turn to Exhibit PX58.  It's in probably the

11   very thin black binder you have.  This is one of the very

12   first documents you were asked about, Mr. Fischer.

13        It's in -- the other one, sir.  That one.

14   **A.**   Okay.

15   **Q.**   It's PX0058?

16   **A.**   This is my deposition, and I don't see another one with 58

17   in it.

18        **MR. SRINVASAN:**  May I approach, Your Honor?  I'll

19   just hand --

20        May I approach?  I am sorry, actually.  Can you check the

21   big binder you have to see if 58 is in there.  It was one of

22   the early emails you were asked about by -- with Ms. Forrest.

23        **THE WITNESS:**  PX59 is the first one I have in here.

24   Okay.

25        **THE WITNESS:**  Unless it's out of order.

1          **MR. SRINVASAN:**  I'm going to hand it to you.

2          **THE WITNESS:**  Hold on.

3          **MR. SRINVASAN:**  Your Honor, this was, I believe,

4    maybe in the binder of exhibits that were read in before

5    Mr. Fischer arrived, but can I bring 58 to him?

6          **THE COURT:**  You can.  58 is admitted.  And it is in

7    that list, but I believe he was questioned on it because I

8    have notes on it.

9          **MR. SRINVASAN:**  I'm surprised it's not up there.  You

10   were question.  Thank you.

11   **BY MR. SRINVASAN:**

12   **Q.**  Mr. Fischer, do you recall testifying about this email?

13   **A.**  Yes, I do.  Earlier this morning.

14   **Q.**  And I think counsel for Epic asked you to read in a line

15   but you didn't provide any actual testimony on this email,

16   correct?

17   **A.**  That's my recollection, yes.

18   **Q.**  And just so we can set this up here, this is an email

19   chain at the top of which it's you, and a Ms. Tanya Washburn

20   from June of 2016 with this title competitor apps invoice

21   collection?

22   **A.**  Is that correct?

23   **Q.**  At the bottom of the email, I believe the line that was

24   read had to do with a colleague of yours saying quote, "Matt

25   feels extremely strong about net featuring our competitors on

1    the App Store.  Do you recall reading that?

2    **A.**  Yes, I do.

3    **Q.**  Can you provide us a little more context around what this

4    email exchange has to deal with and that comment in

5    particular?

6    **A.**   Yes.  This is someone one who was and still is a person on

7    my team, who was communicating to someone named Andrea who I

8    don't know, saying that I feel extremely strong about not

9    featuring competitors on the App Store.  That is definitely

10   not accurate, and she is -- was very misinformed and followed

11   up with her manager who is Tanya Washburn, and that's why I

12   forwarded the email.

13   **Q.**  What is your view of featuring competitors on the App

14   Store?

15   **A.**  We have promoted apps that are competitive to Apple apps

16   since before I joined the App Store team in 2010.

17       And we continue to not only distribute, but to feature and

18   promote apps that are competitive to Apple apps in the store.

19   We do this all the time.  I can provide lots of examples if

20   there's any interest, but we do that regularly.

21   **BY MR. SRINVASAN:**

22   **Q.**  Can you describe just a few examples?

23   **A.**  Sure.

24       Apple has a video subscription service called Apple TV

25   plus.  And before Apple TV plus launched and subsequent to

1     Apple TV plus launching, we promoted apps that are competitive

2     to that, whether it's Disney Plus or Hulu or Paramount plus,

3     or peacock, or you know, many other examples of apps that

4     anyone would say are directly competitive.  And we not only

5     promote them, we work closely with these companies, we work

6     hard with them, we put them on the today tab, we give them

7     lots of marketing and editorial support.

8     **Q.**  Close to the end of your testimony with Ms. Forrest, you

9     had had a colloquy about the use of the term "commission"

10    versus the use of the term "IAP."

11        Did you want to clarify as to what you mean by those two

12    terms?

13    **A.**  Sure.  IAP is a set of features that are part of the App

14    Store commerce engine.  And, you know, IAP in its simplest

15    form, is a way to sell, you know, digital content within an

16    app.  But actually it's much more complicated than that.  It's

17    a lot more things than that.

18        And IAP, as part of the commerce engine, enables the chafe

19    and frictionless delivery of digital goods from a developer to

20    an end user.  IAP is part of the commerce engine.  It helps

21    unlock features to improve the user experience like apps to

22    buy, which is something that my wife and I use.  We've got two

23    young kids and we don't necessarily want them purchasing stuff

24    just yet. So when they want to get something, it's sent

25    immediately to us and we can say yes or no.  So that's all

```
 1    part of, you know, the functionality and technology was part
 2    of IAP is the commerce engine.
 3         But also that IAP and a commerce engine enables us to, as
 4    part of our process for recording sales, for managing payments
 5    to developers, and also to officially collect our commission.
 6         So that's IAP.  I'm guilty, and I think lots of other
 7    people, both within Apple and outside of Apple, are guilty of
 8    conflating IAP and what I just talked about with Apple's
 9    commission.  And I've done that from time to time and other
10    people internally have done that from time to time, but they
11    are two very different things.
12    Q.   Can you turn in your binder to PX202?
13         I'm sorry, it's the white one now.
14    A.   Okay.  Could you repeat the --
15    Q.   Yes.  It's Px202.
16    A.   Okay.
17    Q.   Is -- this is an email involving yourself, Mr. Fischer,
18    and there's other individuals, Lindsey Blumenthal, Carson
19    Oliver from December 2012, right?
20    A.   No, it was from December 2018.
21    Q.   December 12th, 2018; is that right?
22    A.   That's right.
23    Q.   Who are Ms. Blumenthal and Mr. Oliver?
24    A.   So Lindsey Blumenthal was a member of my business
25    management team, and Carson Oliver was and remains the leader
```

1   of my business management team.  And Carson reports directly

2   to me.

3   **Q.**  And it appears that Ms. Blumenthal has written a message

4   to you, a copy to Mr. Oliver regarding Lyft, the Lyft service.

5        Can you describe what that email is discussing there?

6   **A.**  Sure.

7        So I think for -- I would say the first 10 years or so of

8   the App Store, things were pretty easy to understand and kind

9   of black and white when it relates to what Apple felt we

10  deserved a commission for and what we didn't.

11       And so from the inception of the App Store, again,

12  predates my time.  I joined the team in 2010.  But the

13  decision was made that for an app that sells physical goods

14  and services, Apple didn't make sense for Apple to earn a

15  commission as part of that because we ultimately wouldn't know

16  whether the physical good or service would be delivered to the

17  end user, right?

18       Call for an Uber or a Lyft, go from point A to point B, we

19  have no visibility whether that happened or you order paper

20  towels from Amazon, we don't know if it shows up at your front

21  door.

22       With digital goods and services, we know when that

23  purchase takes place, because it happens through our commerce

24  engine.  We know when the goods have been delivered from the

25  developer to the end user in the case of in-app purchases or

1    in-app subscriptions, and we feel very justified we earned our

2    commission for those types of transactions.

3         But this was about something we have never seen before,

4    which is businesses that were primarily focused in the

5    physical goods and services space that were starting to create

6    what I called at the time, and how I still view it as hybrid

7    subscriptions where you've got, you know, part of the

8    subscription is for something physical, part of the

9    subscription is for something digital.

10        And at this time back in 2018, we were starting to see in

11   certain developers experiment with this and we were internally

12   trying to wrap our head around what this means and how can we

13   support these developers with what they want to do from a

14   business perspective while at the same time having kind of

15   clear guidance.

16        This was all about that time period.  In this particular

17   case, this was with the company Lyft, which clearly we would

18   all say they are in the physical goods and services space with

19   ride sharing, but they were testing some things that were kind

20   of, again, this hybrid of physical plus digital.

21        And so Lindsey is just relaying communication that she had

22   with Trystan Kosmynka who was and still runs app review.  And

23   what Lindsey wrote here, you know, Hi Matt.  Trystan confirmed

24   that IAP was optional for membership subscriptions so I

25   commuted this message to Lyft today.

1    And I was kind of using that some language in my response

2    and said, thanks.  Unfortunately IAP being optional means that

3    no one will ever use it.  What I meant was, you know, Apple's

4    commission.

5        And I think this is an example of what I acknowledged

6    earlier where sometimes I and others conflate the two.  What I

7    meant was, if a developer has the option of sharing the

8    commission with Apple or not, then, you know, as a reasonable

9    business person, why would they share a commission.

10           **MR. SRINVASAN:**  Thank you, Mr. Fischer.  I have no

11   further questions at this time.

12           **THE COURT:**  We have just three minutes.  Do you want

13   to get started or --

14           **MS. FORREST:**  Sure.  I am happy to get started.  I

15   won't finish, but I can get started.

16                      <u>**REDIRECT EXAMINATION**</u>

17   **BY MS. FORREST:**

18   **Q.**  You had some questions from counsel on things that you

19   have responsibility for and don't have responsibility for.

20       Do you recall that?

21   **A.**  Yes, I do.

22   **Q.**  All right.  And you mentioned earlier and then again with

23   counsel that you are a member of the executive review board,

24   correct?

25   **A.**  Yes, I am.

1   **Q.**   And the executive review board has the acronym, ERB,

2   correct?

3   **A.**   Yes.

4   **Q.**   And among the highest level executives are on the

5   executive review board, correct?

6   **A.**   We have some high level executives on the ERB, yes.

7   **Q.**   Among the highest, correct?

8   **A.**   I think that's fair to say, yes.

9   **Q.**   And the executive review board receives reports on all

10  major issues within the App Store, correct?

11  **A.**   I wouldn't characterize it as that.

12  **Q.**   Let me put it differently.

13       If there was anything that was truly major going on in the

14  App Store, you would expect that the executives on the ERB

15  would be made aware of that fact, correct?

16  **A.**   I think that is fair to say, yes.

17  **Q.**   Now, you also talked about plan and whether or not you

18  would have been aware of a plan relating to the App Store,

19  correct?  I'm sorry.

20       You, in connection with counsel -- questions from your

21  counsel talked about whether or not you would have been aware

22  of a plan with regard to the App Store, correct?

23  **A.**   Yes.

24  **Q.**   And you said you would not have been, correct?

25  **A.**   I said I would have been aware of a plan if one such

1    existed.

2    **Q.**  I am sorry, you are exactly right.

3        You told me on Direct that you were not, in fact, a

4    creator of the App Store in 2008, correct?

5    **A.**  That is correct.  I joined the team in 2010.

6    **Q.**  All right.  So if there had been an earlier plan, then in

7    the time that you joined it, you may not have known about it,

8    correct?

9    **A.**  I -- for the type of plan that my counsel described, I

10   would imagine that I would be aware of that plan as the person

11   who is responsible for the global App Store business at Apple.

12   **Q.**  When you say you imagine, you're speculating, right?  You

13   don't know what you don't know for the portion of the job when

14   you weren't even there, correct?

15   **A.**  This's possible.

16   **Q.**  You also said that there are updates to the App Store

17   around the world, correct?

18   **A.**  I don't know what you mean by updates to the App Store.

19   **Q.**  I think that you were talking about the today tab and

20   changes to the today tab they profligate around the world on a

21   very regular basis, correct?

22   **A.**  Yes, I recall talking about that.

23   **Q.**  Would you agree with me that the updates to the today tab

24   are, generally speaking, the same but for language differences

25   that might occur around the world?

1   **A.**   No, I would not say that.

2   **Q.**   Tell me what the differences would be in a general sense.

3                        (Simultaneous Colloquy.)

4   **A.**   For example, in a market like Japan, there's many

5   markets -- sorry, there's many apps that are available only in

6   the Japanese market or, for example, games that might be only

7   either available in the Japanese market or only what we might

8   feel is relevant to the Japanese market, or games that might

9   be only localized into congee or, you know, a particular

10  language.

11       And so that's what I mean.  The Japan editorial team will

12  highlight things that are, from their perspective, relevant to

13  their market and that might be different than things, lets

14  say, that we would feature in the United States, or in the UK,

15  or in Brazil, or in China, or in Australia.

16  **Q.**   If I went back to the today tab for the --

17       **THE COURT:**   Okay.  Finish up.

18  **BY MS. FORREST:**

19  **Q.**   If I went back to the today tab for the last week, would I

20  find the majority of the content on the today tab would be the

21  same across the world and there may be differences, the

22  majority of the content would be the same?

23  **A.**   I don't think so, but I haven't done the type of exercise

24  that you are referring to.

25       **THE COURT:**   All right.  Let's go ahead and take our

1    second break.  We will stand in recess until be 1:15.  Thank

2    you.

3        (Lunch recess taken at 12:37 p.m.; resumed at 1:15 p.m.)

4        **THE CLERK:**  Remain seated.  Court is in session.

5    Come to order.

6        **THE COURT:**  We are back on the record.  The record

7    will reflect all counsel are present.

8        You may proceed, Ms. Forrest.

9        **MS. FORREST:**  Thank you.

10   **BY MS. FORREST:**

11   **Q.**  Mr. Fischer, during your testimony with your counsel, we

12   saw that Apple features third-party apps within its App Store,

13   correct?

14   **A.**  Yes.

15   **Q.**  You would agree with me, wouldn't you, that Apple doesn't

16   allow other companies to feature collections of third party

17   apps in the App Store?

18   **A.**  That's my understanding, yes.

19   **Q.**  You were also asked some questions by your counsel

20   regarding a December promotion, 2018.  Do you recall that?

21   **A.**  Yes.

22   **Q.**  That had to do with a *Fortnite* holiday outfit.  Do you

23   recall that generally?

24   **A.**  Yes.

25   **Q.**  You're aware, aren't you, that prior to the promotion

1   actually going live, Apple inadvertently leaked the IP assets

2   for that promotion, aren't you?

3   **A.**   I don't recall that, no.

4   **Q.**   You don't recall a situation arising in which the artwork

5   for the holiday outfit was leaked in advance to that

6   promotion?

7   **A.**   I don't remember that.

8   **Q.**   You were also asked some questions by your counsel

9   relating to PX64, which is the document that says Hulu is part

10  of the set of white-listed developers.

11      Do you recall those questions?

12  **A.**   I do, yes.

13  **Q.**   All right.

14      And you might want to just take a look, if you could, at

15  PX64.  It's going to be in the binder -- in a small binder, I

16  think, that you had -- a big binder?

17          **THE WITNESS:**  I've got three binders, a small black

18  binder, a large black binder, and a large white binder.

19          **MS. FORREST:**  Your Honor, may I approach and help the

20  witness find the document?

21          **THE COURT:**  You may.

22          **THE WITNESS:**  Thank you.

23  **BY MS. FORREST:**

24  **Q.**   Mr. Fischer, do you now have PX64 in front of you?

25  **A.**   Yes, I do.  Thank you.

1    **Q.**  Do you see in that same sentence that I was just referring

2    to, Hulu is a part of the set of white-listed developers; that

3    it's referring to Hulu as part of a set?

4    **A.**  Yes.

5    **Q.**  Do you know which other developers were in that set?

6    **A.**  I don't recall, no.

7    **Q.**  Do you see how it refers to, in plural, white-listed

8    developers?

9        Do you know who the other developers were?

10   **A.**  No, I don't.

11   **Q.**  All right.  You also referred in your testimony with your

12   counsel to the Marshmello concert.  Do you recall that?

13   **A.**  Yes, I do.

14   **Q.**  And you said you were familiar with Marshmello's music,

15   correct?

16   **A.**  Yes.

17   **Q.**  And you were familiar with Marshmello's music just in the

18   world of listening to music?

19   **A.**  I've got a background, as I mentioned at the beginning of

20   the day, working in the music industry.  So I'm a big music

21   fan and grew up playing music.  Yes.

22   **Q.**  You didn't, for instance, hear of Marshmello's music in

23   connection with the *Fortnite* app; is that right?

24   **A.**  No, I did not. my kids are Marshmello fans.

25   **Q.**  And Marshmello is a DJ, would you agree?

1    **A.**   That's my understanding of what he does.   EDM kind of

2    electronic dance music.

3    **Q.**   Marshmello, you would agree, is a well-known DJ in the

4    music world, correct?

5    **A.**   Yes, I would say so.

6    **Q.**   There was a concert of Marshmello that was hosted within

7    *Fortnite*, correct?

8    **A.**   Yes.

9    **Q.**   And you recall, don't you, that there were over 10 million

10   attendees at that Marshmello concert?

11   **A.**   I don't -- I don't know if that's the correct number or

12   not.

13   **Q.**   Did you ever come to learn that there were millions at

14   least of attendees at the Marshmello concerts within *Fortnite*?

15   **A.**   I think that the people I worked with at Epic at the time

16   mentioned that to me.

17   **Q.**   Do you have any reason to disbelieve that information?

18   **A.**   No.

19   **Q.**   And you're aware, aren't you, that Apple created a

20   playlist of the Marshmello music played during that concert

21   hosted within *Fortnite*, correct?

22   **A.**   What I remember from that campaign is that I was so

23   excited about this, that I brought in the Apple music team,

24   which is in a different part of Apple, with Epic's permission,

25   and Epic was excited to bring Apple music in.   I believe that

1  the Apple music team did do something to amplify that in-game

2  concert with Marshmello.

3  **Q.**  You are aware, aren't you, that within Apple music, one

4  could -- a totally separate app, one could actually acquire

5  the Marshmello playlist that was played within *Fortnite*,

6  correct?

7  **A.**  I don't recall exactly what Apple music did to support

8  that promotion.

9  **Q.**  You just don't know one way or the other?

10  **A.**  I just don't remember it.  It was a couple of years ago.

11  **Q.**  Now you said that you also were aware of a Travis Scott

12  concert that was hosted within *Fortnite*, correct?

13  **A.**  Yes.

14  **Q.**  And Travis Scott is actually a -- he's a musician, not a

15  DJ, correct?

16  **A.**  He's a hiphop artist, yes.

17  **Q.**  And you were aware of Travis Scott's music prior to it

18  even being raised by Epic as a possibility within *Fortnite*,

19  correct?

20  **A.**  Yes.

21  **Q.**  So you learned about Travis Scott's music completely

22  separately from having heard about it in connection with

23  *Fortnite*, correct?

24  **A.**  I first heard about Travis Scott's music through something

25  besides *Fortnite*.

1   **Q.**  In fact, just in terms of listening to music, or talking

2   to people about music, something like that?

3   **A.**  Yes.  I don't remember exactly where I first learned about

4   Travis Scott.

5   **Q.**  You said that Epic didn't give Apple a lot of notice

6   before the Travis Scott event; do you recall that?

7   **A.**  That is what may team mentioned to me; that it was later

8   notice than previous promotions and campaigns that we had done

9   together.

10  **Q.**  You recall, don't you, that the Travis Scott concert

11  occurred chronologically after the Marshmello concert?

12  **A.**  I remember Travis Scott took place last year, yes.

13  **Q.**  And you recall, don't you, that Apple music actually

14  leaked the entire set list for the Marshmello concert weeks

15  before the Marshmello event was posted within Fortnite?

16          **THE COURT:**  Marshmello or Scott?

17          **MS. FORREST:**  Marshmello.

18          **THE WITNESS:**  I do not remember that at all.

19  BY MS. FORREST:

20  **Q.**  You never heard that before the Marshmello event occurred,

21  Apple music had actually leaked the play list.

22  **A.**  I don't recall ever hearing that, no.

23  **Q.**  And you never heard that that was the reason why Epic was

24  concerned about giving Apple too much notice of the Travis

25  Scott concert?

**A.**   I don't recall hearing anything about that.

**Q.**   And you would agree with me, wouldn't you, that the Travis Scott concert was a big success?

**A.**   I believe it was a big success in what the people at Epic told me was that they were really pleased with how it went for them.

**Q.**   In fact, it was a full contract for Travis Scott within the *Fortnite* app, correct?

**A.**   I'm not sure about that.

**Q.**   And you're aware, aren't you, that there were, again, millions of attendees at the Travis Scott concert that was hosted within *Fortnite*?

**A.**   That is my understanding, yes.

**Q.**   You are aware, aren't you, that as a result*, Fortnite* was discussed as the largest concert venue ever in the world.

**A.**   I don't remember hearing that, no.

**Q.**   You never remember hearing that?

**A.**   I don't, no.

**Q.**   You don't remember hearing that nobody else in the world had ever hosted a concert of over 10 million attendees at a single time?

**A.**   I don't remember that specific statistic.

**Q.**   You also talked about your knowledge of the inventory within the App Store.  Do you recall that?

**A.**   I don't recall my -- saying my knowledge.  I think I was

1   referring to my editorial team and discussing some of their

2   responsibilities.

3   **Q.**   And you recall that you talked about games being placed

4   within a game area, within the App Store, correct?

5   **A.**   Yes, as part of our 2017 redesign, we created a games

6   destination called the games tab.

7   **Q.**   There's also an apps tab, would you agree with me?

8   **A.**   Yes.

9   **Q.**   The app tab can be found at the bottom of the App Store

10   home page, correct?

11   **A.**   Not from the home page, but there's navigation in the App

12   Store app.  And on the bottom of that, there's the today tab,

13   the games tab, the apps tab, and other taps.

14   **Q.**   All right.  And I would like to show you what I have

15   marked for identification as PX2951.  May I hand up a copy to

16   Your Honor and bring a copy to the witness?

17         **THE COURT:**  Yes, please.

18   **BY MS. FORREST:**

19   **Q.**   Are you familiar, sir, with the app *Houseparty*?

20   **A.**   Yes, I am.

21   **Q.**   And do you see *Houseparty* here?  Do you recognize PX2951

22   as a screenshot of the *Houseparty* app on the App Store?

23   **A.**   Yes.  This was an editorial collection that my editorial

24   team created where we featured *Houseparty*.

25   **Q.**   And how *Houseparty* is, if you look at the bottom of

1    PX2951, it's listed to be found under the app section of the

2    App Store, would you agree?

3    **A.**   Yes.

4    **Q.**   Not under the game section of the App Store, correct?

5    **A.**   Yes.  I believe *Houseparty* is considered a social

6    networking app.

7             **MS. FORREST:**  Your honor, we would move for the

8    admission of 2951.

9             **THE COURT:**  Any objection?

10            **MR. SRINVASAN:**  No objection, Your Honor.

11            **THE COURT:**  Admitted.

12        (Plaintiff's Exhibit 2951 received in evidence)

13   **BY MS. FORREST:**

14   **Q.**   Are you familiar with the app Live Link Face?

15   **A.**   I do not recognize the name of that app, no.

16            **MS. FORREST:**  Your Honor, may I hand up to the Court

17   and also approach the witness with an exhibit?  PX2952?

18            **THE COURT:**  You may.

19   **BY MS. FORREST:**

20   **Q.**   Do you recognize --

21            **MR. SRINVASAN:**  Counsel, we didn't --

22   **BY MS. FORREST:**

23   **Q.**   Do you recognize PX2952 is a screenshot from the App

24   Store?

25   **A.**   It appears that it is, yes.

1    **Q.**  And do there you see that there is an app on it, Live Link

2    Face?

3    **A.**  Yes, I do.

4    **Q.**  All right.  And the developer on that page is listed as

5    *Unreal Engine*, do you see that?

6    **A.**  No.

7    **Q.**  Under developer, midway down the page, it says, developer

8    *Unreal Engines*.  Do you see that?

9    **A.**  Yes, I do.

10          **MS. FORREST:**  Your Honor, we would move the admission

11   of PX2952.

12          **THE COURT:**  Any objection?

13          **MR. SRINVASAN:**  No objection, Your Honor.

14          **THE COURT:**  Admitted.

15          (Plaintiff's Exhibit 2951 received in evidence)

16   **BY MS. FORREST:**

17   **Q.**  Are you familiar with an app called the unreal remote two?

18   **A.**  No, that doesn't ring a bell, no.

19          **MS. FORREST:**  Your Honor, I would like to hand up

20   what's been marked for identification as PX2953.

21          **THE COURT:**  You may.

22   **BY MS. FORREST:**

23   **Q.**  Mr. Fischer, do you recognize what's been marked for

24   identification as PX2953?  It's a screenshot from the App

25   Store?

1  **A.**  Yes, it appears that this is from the App Store.

2  **Q.**  And do you see that there is an app referenced on PX2953

3  as unreal remote two?

4  **A.**  Yes, I do.

5  **Q.**  And it's listed as a productivity app; is that right?

6  **A.**  Yes.

7  **Q.**  And underneath it is another app called unreal remote.  Do

8  you see that?

9  **A.**  Yes.

10  **Q.**  And that's listed as a utility app, correct?

11  **A.**  Yes, under the category utilities.

12       **MS. FORREST:**  Your honor, we would move for the

13  admission of PX2953.

14       **MR. SRINVASAN:**  No objection, Your Honor.

15       **THE COURT:**  Admitted.

16       (Plaintiff's Exhibit 2953 received in evidence)

17  **BY MS. FORREST:**

18  **Q.**  Now, you had spoken earlier about information that you

19  received relating to developer -- responses to developer

20  surveys?

21  **A.**  Yes.

22  **Q.**  In the binder that your counsel handed you, are a number

23  of developer surveys.  So we're going to the white binder now

24  that your counsel handed you.  Okay?

25  **A.**  Okay.  I've got it here.

1          **MR. SRINVASAN:**  Your Honor, we object as this is

2     being outside the scope.  There was one document involving

3     developer surveys that counsel showed Mr. Fischer.  We asked a

4     few clarifying questions about that, but that was all we did

5     on developer surveys.

6          **THE COURT:**  What's the exhibit again?

7          **MS. FORREST:**  Your honor, I was going to go through

8     several of the developer surveys.  The reason for that --

9          **THE COURT:**  Can you give me the exhibit number again?

10         **MS. FORREST:**  DX3781, Your Honor.  And there are

11    several others.

12         **THE COURT:**  3781.

13         **MS. FORREST:**  As well as DX3800, DX3922, and DX4044.

14         **THE COURT:**  Did I admit these?

15         **MS. FORREST:**  No.  Your Honor, these were not

16    offered.  The reason that I am trying to use them at this time

17    is because the witness testified as to a variety of what he

18    said was data that he said he had received relating to

19    information from various developer surveys.  And he spoke

20    about it in the aggregate.

21       These are the documents from which we believe that data

22    comes.  Therefore, since that was opened on the Direct, I

23    would like to be able to at least use these documents.

24         **THE COURT:**  Okay.  So lay some foundation.  I don't

25    have the documents right in front of me.

1          **MR. SRINVASAN:**  Your honor, if we can be heard.

2          **THE COURT:**  Hold on.  I want to see the documents.

3    So these were not provided, right?  I need to actually go and

4    find them?

5          **MS. FORREST:**  No.  They are in the white binder

6    proved by Apple's that it is out of their documents they

7    provided this morning in the white binder.

8          **THE COURT:**  Now, I have the Fischer binder.  It is

9    not white.  I have his binder and I don't see any of those

10   documents in this binder.

11      3781, 3922, 4044?

12         **MS. FORREST:**  Correct, Your Honor.

13         **THE COURT:**  Do you have them over there?

14      And your question is with respect to 3781?  Let's see.

15   **BY MS. FORREST:**

16   **Q.**  Mr. Fischer, in connection with your duties and

17   responsibilities at Apple, did you from time to time review

18   the developer surveys that were done?

19   **A.**  I think there's been a variety of developer surveys that

20   have been conducted over the years.  Some of which my team and

21   I have been involved with and others that I have not been

22   involved with.

23   **Q.**  All right.  If you turn to 3781, can you tell me whether

24   or not this is one of the developer surveys?

25      Take it off the screen for the moment until we've

1    established a foundation.

2        Tell me whether or not you recognize this developer

3    survey.

4    **A.**   I do not recognize this developer survey.

5            **MS. FORREST:**  Your honor, may I proceed to see if

6    there's a foundation for the others?

7            **THE COURT:**  Yes.  I now have them.

8            **MR. SRINVASAN:**  Your honor can we just be heard on

9    what the issue here is specifically?  Because we think this

10   whole line is objectionable.

11           **THE COURT:**  Overruled.

12   **BY MS. FORREST:**

13   **Q.**   Could you turn to DX3800, and tell me whether or not this

14   is one of the surveys with which you have any familiarity in

15   connection with your job at Apple?

16   **A.**   I'll need some time to look this over.  I do not recognize

17   this.

18   **Q.**   Why don't you turn, if you could, to page 742 where it

19   refers to the App Store to see whether or not you would have

20   been made aware or were made aware of this information from

21   this survey.

22           **THE COURT:**  Well, first, we need to see if it

23   refreshes his recollection.  He already testified he didn't

24   remember the document.

25           **MS. FORREST:**  Your Honor, I was just trying to refer

1    him to a particular portion of it to see whether that refers

2    to the App Store refreshes his recollection.  If it doesn't,

3    it doesn't and I will move on.

4              **THE WITNESS:**  I don't remember this document at all.

5              **MS. FORREST:**  All right.

6        Why don't we turn to 3922, and tell me whether this App

7    Store developer survey that was included in your binder for

8    your examination this morning, whether or not you have ever

9    seen it before.

10                   (Pause in the proceedings.)

11   **A.**  I don't recall seeing this document.

12   **Q.**  All right.  Let's turn to DX4044.  Again, a document

13   contained in your binder for your testimony from Apple this

14   morning and see whether you have any familiarity with this

15   document.

16   **A.**  No, I don't recall this document.

17   **Q.**  So the only developer survey that you recall seeing is the

18   one that I showed you, but you don't recall seeing any of the

19   developer surveys that were included in the Apple binder; is

20   that right?

21   **A.**  That's correct.

22   **Q.**  All right.

23       Now, you had said earlier in response to some questioning

24   from your counsel about PX58 which was that Matt -- it has a

25   sentence in it that was discussed:  Matt feels extremely

```
1    strong about not featuring our competitors on the App Store,

2    but you disagreed with that 3statement, correct?

3    A.   Yes.  I'm sorry we're bouncing around from binder to

4    binder.  Where are we right now?

5    Q.   Big black binder, PX58.

6    A.   Okay.  I've got it here.

7    Q.   It says at the bottom, there was discussion about the line

8    Matt feels extremely strong about not featuring our

9    competitors on the App Store.

10        Do you see that?

11   A.   Yes.

12   Q.   You were asked questions about that from your counsel; do

13   you recall that?

14   A.   Yes, I do.

15   Q.   You're aware, aren't you, that Apple is under a regulatory

16   investigation from the European Union -- the European

17   Commission about self-prefacing apps on the App Store.

18   A.   I have heard about some of that regulatory efforts, but

19   I'm not totally up to speed on all of the specifics.

20           MS. FORREST:  Thank you.  No further questions, Your

21   Honor.

22           THE COURT:  Okay.  Any examination on the scope of

23   this one?

24           MR. SRINVASAN:  No, Your Honor.  Thank you.

25           THE COURT:  Mr. Fischer, you are excused, sir.  Thank
```

1    you.

2        Next witness.

3            **THE WITNESS:**  Thank you, Your Honor.

4            **MS. MOSKOWITZ:**  Your honor, good afternoon.  Lauren

5    Moskowitz for Epic.  We call Trystan Kosmynka who is also an

6    Apple witness.

7            **THE COURT:**  Okay.  Thank you.

8            **MS. MOSKOWITZ:**  Your honor, while we are waiting for

9    Mr. Kosmynka to arrive, can I ask if Your Honor had a chance

10   to obtain the exhibits that we had given your clerks or if we

11   should hand up a binder?

12           **THE COURT:**  At this point you should hand up a binder

13   because we do that before you arrive every morning.  And if

14   there was miscommunication this morning, then it didn't get

15   resolved.

16               (Pause in the proceedings.)

17           **THE COURT:**  Do we have a witness?

18           **MS. MOSKOWITZ:**  I'm sorry.  Your Honor, Epic calls

19   Trystan Kosmynka.

20           **THE COURT:**  Okay.

21        **(TRYSTAN KOSMYNKA,** called as a witness for the Plaintiff,

22   having been duly sworn, testified as follows:)

23           **THE WITNESS:**  I do.

24           **THE CLERK:**  Please be seated.  And then would you

25   please state your full name and spell your first and your last

```
 1   name.
 2           THE WITNESS:  Trystan Kosmynka, T-R-Y-S-T-A-N,
 3   K-O-S-M-Y-N-K-A.
 4           THE COURT:  Good afternoon.
 5           THE WITNESS:  Good afternoon.
 6           THE COURT:  Before you get started, Ms. Moskowitz,
 7   202 was not offered.  Someone will let me know if that was
 8   supposed to be offered and if there's an objection,
 9   Ms. Forrest, to 202.
10           MS. FORREST:  Your Honor, there is no -- we would
11   seek to offer 202 and there's no objection to 202 from our
12   perspective.
13           THE COURT:  Okay.  202?
14           MR. DOREN:  No objection, Your Honor.
15           THE COURT:  202 is admitted.
16       (Plaintiff's Exhibit 202 received in evidence)
17           THE COURT:  You may proceed.
18           MS. MOSKOWITZ:  Thank you, Your Honor.
19                     DIRECT EXAMINATION
20   BY MS. MOSKOWITZ:
21   Q.  Good afternoon, Mr. Kosmynka.
22   A.  Good afternoon.
23           MS. MOSKOWITZ:  I have a couple of binders of
24   materials that we might be referencing during the examination.
25       Your Honor, may I approach the witness?
```

1          **THE COURT:**  You may.

2          **MS. MOSKOWITZ:**  Thank you.

3     **BY MS. MOSKOWITZ:**

4     **Q.**   Mr. Kosmynka, when did you start at Apple?

5     **A.**   I believe I started at Apple in 2013.

6     **Q.**   And at the time you started working at Apple, what was

7     your position?

8     **A.**   I was an engineering manager.

9     **Q.**   And you did not have any duties in connection with app

10    review at that time, correct?

11    **A.**   That's correct.

12    **Q.**   And you didn't acquire any duties or responsibilities in

13    connection with app review until approximately one year into

14    your tenure; is that right?

15    **A.**   Roughly, yes.

16    **Q.**   So roughly 2014?

17    **A.**   I believe so.

18    **Q.**   And at the time you did obtain some responsibilities for

19    app review, at that time you were only responsible for the

20    tools engineering team, correct?

21    **A.**   That's correct.

22    **Q.**   And in that capacity, your responsibilities at that point

23    were squarely limited to tools; isn't that right?

24    **A.**   Yes.

25    **Q.**   And then in 2016, you took on the role of director of app

1   review, correct?

2   **A.**   Correct.

3   **Q.**   And then in 2017, you were promoted to senior director of

4   app review; is that right?

5   **A.**   That's right.

6   **Q.**   And in that role, you run the team and the organization

7   that review apps for the App Store, correct?

8   **A.**   Correct.

9   **Q.**   App review is responsible for the app review process, the

10  application of policy, and actually conducting the review of

11  apps; is that correct?

12  **A.**   Yes.

13  **Q.**   So all of those processes I just mentioned are under your

14  purview in your current role?

15  **A.**   Yes.

16  **Q.**   App review itself falls within the developer relations

17  organization within Apple; is that correct?

18  **A.**   Yes.

19  **Q.**   And you yourself have been part of the executive review

20  board or ERB since you started as director of app review in

21  2016, correct?

22  **A.**   That's correct.

23  **Q.**   And the ERB sets the policy for the App Store, correct?

24  **A.**   That's correct.

25  **Q.**   Is it also fair to say that app review escalates apps to

1    ERB for a ruling, and ERB provides feedbacks and decisions on

2    apps from time to time?

3    **A.**   There are escalations of apps to ERB, yes.

4    **Q.**   And the ERB decisions, those escalations?

5    **A.**   Yes.

6    **Q.**   I imagine in your role you are familiar with the App Store

7    review guidelines?

8    **A.**   Yes.

9    **Q.**   And you utilize the App Store review guidelines in

10   connection with the performance of your duties and

11   responsibilities at Apple?

12   **A.**   Yeah, we review apps against the App Store review

13   guidelines.

14   **Q.**   And the App Store review guidelines have changed from time

15   to time, correct?

16   **A.**   Yes.

17   **Q.**   Please, if you would, turn your binder to the documents

18   marked PX56 for identification.  That will be in the big

19   binder.

20   **A.**   Okay.

21   **Q.**   Do you recognize PX56 as the App Store review guidelines

22   as of September 11th, 2020?

23   **A.**   I do recognize the guidelines.  I don't see a particular

24   date on the guidelines.

25   **Q.**   If you look on the upper right-hand corner there -- in

1    this version there's not.  Okay.

2        Do you have any reason to believe that they are not a

3    version of the guidelines that existed in 2020?

4    **A.**  I would have to go through all the guidelines to see what

5    changes may have been made, but this looks like the current

6    format of the guidelines and that would have been current as

7    of 2020.

8                **MS. MOSKOWITZ:**  Your honor, I move --

9                **THE COURT:**  It looks like you may have covered up the

10   date.

11               **MS. MOSKOWITZ:**  I think that may have happened.

12               **THE COURT:**  Do you have the original without the tag?

13               **MS. MOSKOWITZ:**  I think these are hard stamped.  We

14   can come back to it.  I think there is no objection to the

15   exhibit, and we can establish the date by stipulation, I

16   imagine, and I don't think that the date in particular will be

17   a subject of debate.

18               **THE COURT:**  Okay.

19               (Plaintiff's Exhibit 56 received in evidence)

20   **BY MS. MOSKOWITZ:**

21   **Q.**  An iOS app developer can choose to have their app

22   available on many of Apple's App Store storefronts throughout

23   the world, right?

24   **A.**  Yes.

25   **Q.**  And the App Store review guidelines themselves are used

1  globally to conduct reviews of apps, right?

2  **A.**  Yes.  The guidelines apply to all storefronts.

3  **Q.**  Across the world?

4  **A.**  All App Store storefronts across the world, yes.

5  **Q.**  And that's true for all apps that want to be on iOS

6  regardless of what the app itself does, right?

7  **A.**  That's true for apps submitted to the Apps Store on iOS,

8  yes.

9  **Q.**  That's the only way to get a native app onto an iPhone is

10  through the iOS App Store, correct?

11  **A.**  The only way to get a consumer app on the iPhone is

12  through the iOS App Store.

13  **Q.**  And the distinction you are drawing is the enterprise

14  program?

15  **A.**  There's enterprise and ad hoc distribution for purposes of

16  testing.

17  **Q.**  So other than the enterprise program and things like Test

18  Flight or testing, in order for a consumer to obtain a native

19  app on their iPhone, they need to have an app that has gone

20  through the app review process by the iOS app store,

21  correct?

22  **A.**  Yes.

23  **Q.**  And that's true whether they are game apps, or social

24  apps, or weather apps, for example, right?

25  **A.**  Yes.

1    **Q.**  And there's not a different set of guidelines that applies

2    depending on what type of app that will be submitted?

3    **A.**  Well, the guidelines apply to all apps that are submitted,

4    but there are certainly guidelines that are specific to

5    certain types of apps.

6         You can imagine something like a VPN app has particular

7    guidelines that a game app may not qualify for.

8    **Q.**  Please turn to PX314.  That actually -- I apologize, that

9    is not in your binder.

10             **MS. MOSKOWITZ:**  Your Honor, if I may approach and

11   hand that up?

12             **THE COURT:**  You may.

13             **MS. MOSKOWITZ:**  Thank you.

14             **THE COURT:**  Are you offering 56 or not?

15             **MS. MOSKOWITZ:**  I am, but if Your Honor wants to wait

16   until we can establish the date, I am also happy to do that

17   later on.

18             **THE COURT:**  Is there an objection to 56?

19             **MS. MOYE:**  Could we defer until we have a date so we

20   have a clear record?

21             **THE COURT:**  That's fine.

22        I just looked at your exhibit list, it didn't have it on

23   there either.

24   **BY MS. MOSKOWITZ:**

25   **Q.**  I'll just warn you, there is no clip.  So just be careful

1    not to drop it.

2    **A.**   Thank you.

3    **Q.**   Do you have PX314 that has been marked for identification

4    in front of you, Mr. Kosmynka?

5    **A.**   I do.

6    **Q.**   This is a slide deck titled, "App Store Principles

7    Presentation to the European Commission", correct?

8    **A.**   That's correct.

9    **Q.**   And you received a copy of this presentation during the

10   course of your duties and responsibilities at Apple, correct?

11   **A.**   That's correct.

12        **MS. MOSKOWITZ:**   Your Honor, I move that PX314 be

13   introduced into evidence.

14        **THE COURT:**   Any objection?

15        **MS. MOYE:**   No objection.

16        **THE COURT:**   Admitted.

17        (Plaintiff's Exhibit 314 received in evidence)

18   **BY MS. MOSKOWITZ:**

19   **Q.**   Please turn to PX314.5, which should be the fifth page of

20   the document you have in front of you, Mr. Kosmynka.   It is

21   also on the screen if that's easier.

22        If you can please take a look at the middle paragraph that

23   starts, an ecosystem.

24        Do you see that?

25   **A.**   I do.

1   **Q.**  It says, an ecosystem, including third-party apps, made

2   our products more attractive.

3        Do you see that?

4   **A.**  I do.

5   **Q.**  That's referring to the fact that third-party developer

6   apps add value to the iOS ecosystem?

7   **A.**  I think that's what that states, yes.

8   **Q.**  That is a true statement?

9   **A.**  I think we loved third-party apps says customers on the

10  App Store.

11        **MS. MOSKOWITZ:**  Your Honor, just to return and square

12  this away, if we can go back to PX56.  On the very lasts page

13  we will see the date then we can move on from there.

14        **THE COURT:**  Ms. Moye?

15        **MS. MOYE:**  No objection, Your Honor.

16        **THE COURT:**  Okay.  So that's 2020 App Store

17  guidelines.  56 is admitted.

18        **MS. MOSKOWITZ:**  Thank you, Your Honor.

19        (Plaintiff's Exhibit 56 received in evidence)

20  BY MS. MOSKOWITZ:

21  **Q.**  Switching gears for a moment, and while you don't have the

22  benefit of this, I am aware the Judge has heard some of this,

23  so I just want to lay a little bit of foundation even though I

24  think Your Honor has heard a bit about web apps and native

25  apps.  I just want to ask a few questions.

1      A native app is an app written for a particular platform

2  and downloaded on to a device, right?

3  **A.**   Yes.

4  **Q.**   And a web app, generally speaking, is an app available

5  from a website and utilized on a device through a browser; is

6  that fair?

7  **A.**   Web apps go beyond just use in an individual browser.   In

8  the case of an iOS, it can be saved to the home screen.

9  **Q.**   With access through Safari?

10  **A.**   It is through Safari, but it's headless Safari so you

11  would not see a search bar or have to navigate to be where

12  else.

13      So from a consumer perspective, if you launch say Twitter

14  on native and Twitter as a web app, those are going to be very

15  similar experiences dependent on what the developer does to

16  create that experience.

17  **Q.**   And right now I'm not talking about user experience.   All

18  I'm asking is that it operates through the Safari web browser,

19  correct?

20  **A.**   That's the surrendering engine, yes.

21  **Q.**   And the App Store review guidelines do not apply to web

22  apps, correct?

23  **A.**   Correct.

24  **Q.**   So native apps installed from the iOS App Store go

25  directly to the home screen, right?

1    **A.**   Yes.

2    **Q.**   And as you were just mentioning, by contrast, if the

3    customer wants to have a web app persist on the home screen,

4    the consumer goes in to the browser, accesses the app, hits

5    the share icon, and then says add to home screen, right?

6    **A.**   Yes.   There would be two taps there.

7    **Q.**   WebKit is Apple's web browser engine for iOS, correct?

8    **A.**   Yes.

9    **Q.**   And, in fact, the guidelines require that native apps that

10   browse the web must use the appropriate WebKit Brainwork and

11   Webkit JavaScript, right?

12   **A.**   Yes.

13   **Q.**   And Safari uses WebKit, right?

14   **A.**   That's right.

15   **Q.**   The API that are available for web apps are different than

16   the set of APIs that are available for native apps, correct?

17   **A.**   Yes.   One is for web, one is for native, and it's very

18   common to have different APIs for --

19   **Q.**   Sir, I'm just asking if they are different.

20        Yes?

21   **A.**   Yes.

22   **Q.**   And, for instance, the push notification API allows native

23   apps to send messages or other notifications to a user,

24   correct?

25   **A.**   Correct.

1   **Q.**   And a WebKit does not support the push notification API;

2   is that true?

3   **A.**   Yes.

4   **Q.**   Let's take another example.

5        ARKit is an augmented reality framework, correct?

6   **A.**   Yes.

7   **Q.**   An ARKit is a native API available to native apps, right?

8   **A.**   That's right.

9   **Q.**   So ARKit cannot be used by a web app, right?

10  **A.**   That's right.

11  **Q.**   So let's focus now for a moment on native apps that are

12  submitted to the App Store for review.

13       Apple's app review process involves both human-led review

14  and automated tools for review, correct?

15  **A.**   That's right.

16  **Q.**   So starting out with automated portions, Apple requires

17  apps to be developed with updated SDK versions, correct?

18  **A.**   We do require that apps have a minimum version of a

19  particular SDK.

20  **Q.**   And in order to comply with that requirement, developers

21  have to know what the applicable required SDK version is,

22  right?

23  **A.**   That's right.

24  **Q.**   And so to that end, Apple publishes on its website its

25  requirements for SDK versions, right?

1    **A.**   Yes.

2    **Q.**   The app review process screens apps that are using

3    out-of-date iOS SDKs, right?

4    **A.**   The human process does not.  When we tell a developer --

5    we tell a developer community that a particular min version of

6    an SDK is required, that's communicated to them months and

7    months in advance.  When that requirement hits, developers, if

8    they are not on a compatible SDK, would be denied upload at

9    the ingestion process, not a human rejection at that point.

10   **Q.**   We are focusing on automated tools for the moment.

11       So part of the process, the automated process screens for

12   out-of-date iOS SDKs?

13   **A.**   Yes.

14   **Q.**   A private API is an undocumented API that is not intended

15   for third-party developer reviews, is that fair?

16   **A.**   Yes.

17   **Q.**   It is, in fact, a violation of the app review guidelines

18   for an app to use private APIs, correct?

19   **A.**   That's right.

20   **Q.**   When apps get uploaded to the app review process, Apple

21   scans using automated tools for private APIs, correct?

22   **A.**   Yes.

23   **Q.**   And to scan for those private APIs, Apple does both the

24   combination of static and dynamic analysis; is that right?

25   **A.**   That's right.

1   **Q.**   So just breaking down those terms, static analysis at a

2   high level looks at the binary code of an app and searches for

3   patterns or instructions in order to determine what the app

4   may or may not do.

5       Is that a fair summary?

6   **A.**   We look for a variety of facts, but yes.  We do not

7   execute the app during static analysis.

8   **Q.**   And by contrast, dynamic analysis does, in fact, refer to

9   executing the code or running the app as if the operating

10  system would run that app to understand and observe how it

11  would act in real life?

12  **A.**   Yes.

13  **Q.**   During app review, Apple scans for malware using automated

14  tools, correct?

15  **A.**   Correct.

16  **Q.**   And one way that Apple scans for malware is through static

17  analysis, again, right?

18  **A.**   Yes.

19  **Q.**   And also scans for malware using dynamic analysis,

20  correct?

21  **A.**   Correct.

22  **Q.**   Apple uses a system to perform static and dynamic analysis

23  that was developed outside of Apple by a third party, right?

24  **A.**   No.

25  **Q.**   All right.  Let's look at your binder.  PX2052 for

1    identification.

2    **A.**   I see it.

3    **Q.**   This is a document that you sent on September 22, 2015; is

4    that right?

5    **A.**   That's correct.

6           **MS. MOSKOWITZ:**   Your Honor, I offer this document

7    into evidence.

8           **THE COURT:**   Any objection?

9           **MS. MOYE:**   No objection.

10          **THE COURT:**   It's admitted.

11          (Plaintiff's Exhibit 2052 received in evidence)

12   **BY MS. MOSKOWITZ:**

13   **Q.**   You wrote here to one of your colleagues in the first

14   line, the Xcode ghost issue has generated much more interest

15   in acquiring source DNA.

16          Do you see that?

17   **A.**   I do.

18   **Q.**   And just for context, back in 2015, malware called Xcode

19   ghost affected thousands of apps that were live in the App

20   Store; is that right?

21   **A.**   I am not sure of the number of apps, but we did have

22   malware that was introduced in this time frame, yes.

23   **Q.**   It was a serious event, correct?

24   **A.**   It was a serious event, but the consequences to customers

25   were -- was not serious.  In fact, the malware commanding

1    control of the servers, to my knowledge, didn't actually

2    activate and perform any malicious actions.

3    **Q.**  You said that in this email that Source DNA would have

4    flagged that issue, right?

5    **A.**  It's going to take a moment to review the email.

6         Yes.

7    **Q.**  And, in fact, this email discusses acquiring or

8    potentially acquiring Source DNA to use their software to

9    counteract threats in the future.

10   **A.**  Yes.

11   **Q.**  And Apple, in fact, did acquire Source DNA in 2016?

12   **A.**  We did.

13   **Q.**  And the Source DNA technology that's now used at Apple is

14   renamed App Transparency?

15   **A.**  The Source DNA, the team, joined Apple and built

16   technology at Apple, which is named App Transparency.

17   **Q.**  And App Transparency does a combination again of static

18   and dynamic analysis?

19   **A.**  That's right.

20   **Q.**  And Source DNA had built similar tools when it was still

21   Source DNA.

22   **A.**  Source DNA was focused on similar problems, yes, and had

23   similar tool --

24   **Q.**  Sir, I'm just going to ask you those questions, and then

25   your counsel can ask you for further context if they wish.

1      Okay?

2  **A.**   Okay.

3  **Q.**   Thank you.

4      So, for example, another company called Data Theorem does

5  both static and dynamic analyses in connection with app review

6  also, right?

7  **A.**   I'm aware of Data Theorem doing static and dynamic

8  analyses.  Did not say it was in connection with --

9  **Q.**   Sir -- sorry.  I apologize.  You can finish that.  It is

10  not in connection with app review?

11  **A.**   That is what I was about to say, yes.

12  **Q.**   Appthority, A-P-P-T-H-O-R-I-T-Y, also does a combination

13  of dynamic and static analyses?

14  **A.**   They do.

15  **Q.**   The iOS platform places each native app in a separate

16  sandbox, correct?

17  **A.**   That's correct.

18  **Q.**   And when an app on iOS sandbox, this limits what that app

19  is allowed to do, right?

20  **A.**   It limits its access to resources.

21  **Q.**   In other words, it restricts apps from accessing files

22  stored by other apps or making changes to the device, correct?

23  **A.**   Yes.

24  **Q.**   App review does not perform tests for sandbox compliance

25  in all cases, correct?

1   **A.**   That's correct.

2   **Q.**   Rather, app review performs such tests only when there is

3   a reason to suspect that an app has done something to

4   maliciously try to escape that sandbox, right?

5   **A.**   That's right.

6   **Q.**   So let's turn to the human aspect of app review.

7       App review employees are paid hourly; isn't that correct?

8   **A.**   We have a combination of hourly and salaried employees.

9   **Q.**   The people who are reviewing individual apps are hourly

10   employees?

11   **A.**   Not in all cases.

12   **Q.**   App reviewers typically review 50 to a hundred apps per

13   day; is that right?

14   **A.**   That's right.

15   **Q.**   And an app reviewer's standard day is 10 hours; is that

16   right?

17   **A.**   No.  We have many reviewers who have a standard day of 10

18   hours, but we also have reviewers who have a standard day of

19   eight hours.

20   **Q.**   The standard day is 10 hours, correct?

21   **A.**   No.  I have a hundred reviewers in Ireland whose standard

22   day would be eight hours.

23   **Q.**   Why don't you take a look at PX6 marked for identification

24   in your binder.

25       Let me know when you are there.

1    **A.**   I'm here.

2    **Q.**   This is an email from Phil Schiller to you and others on

3    Friday, June 21, 2019.  Do you see that?

4    **A.**   I do.

5    **Q.**   And it's a bit complicated because there's some inline

6    responses to some quotes.

7         So if you can try to follow with me, I'm going to point

8    your attention to the bottom of page 1 just to set us up.

9         Starts out with, Phil, following a meeting at CNBC.

10        Do you see that?

11   **A.**   I do.

12   **Q.**   And there is -- the email continues to the next page.  And

13   they talk about fact checking.  The Apple employee talks about

14   fact checking and refers to some -- the below.

15        Do you see that on the last line of the first paragraph on

16   the top of page .2?

17   **A.**   I do see this, yes.

18   **Q.**   And then under the six or so stars, there's fact check and

19   a bunch of bullets with some information?

20   **A.**   Yes.

21   **Q.**   So, for example, just, again, the first bullet, the second

22   bullet there says app review employees are paid hourly.

23        Do you see that?

24   **A.**   I do.

25   **Q.**   Okay.  And there's an answer.  True, and then it goes on.

 1      Do you see that?

 2  **A.**  I do see that.

 3  **Q.**  So that's just to orient us.

 4      The true part is Apple's response to what the CNBC article

 5  is going to be reporting.  Is that a fair characterization?

 6  **A.**  The whole sentence is a response to what they were

 7  reporting.

 8  **Q.**  Understood.

 9      That is an Apple response to what was going to be

10  reported?

11          **MS. MOYE:**  Objection, foundation.

12  **BY MS. MOSKOWITZ:**

13  **Q.**  Do you have an understanding --

14          **THE COURT:**  Overruled.  It's an admission.

15          **THE WITNESS:**  So the point here was half of the

16  employees are paid hourly --

17  **BY MS. MOSKOWITZ:**

18  **Q.**  Sir, I actually am not asking about the substance of this.

19  I was trying to establish that you understood there was Apple

20  responses in line in this email?

21  **A.**  Yes.

22  **Q.**  Thank you.

23      So if you turn to the second -- the third page.  There is

24  a bullet that starts in summer 2016.  Do you see that?

25  **A.**  Yes.

1    **Q.**  And then the hyphen, which is Apple's response; do you

2    agree, two lines down?

3    **A.**  I do see that.

4    **Q.**  It says, "our standard day is ten hours.  The team works

5    five days a week."

6         Do you see that?

7    **A.**  I do.

8    **Q.**  And then it talks about giving people some extra hours,

9    right?

10   **A.**  Yes.

11          **MS. MOSKOWITZ:**  I offer PX6 into evidence.

12          **THE COURT:**  Any objection?

13          **MS. MOYE:**  No objection.

14          **THE COURT:**  Admitted.

15          (Plaintiff's Exhibit 6 received in evidence)

16   **BY MS. MOSKOWITZ:**

17   **Q.**  So, is it fair to say that app reviewers spend on average

18   approximately 6 to 12 minutes reviewing an app?

19   **A.**  I think on acknowledge that sounds accurate, but there's a

20   lot of variables to a particular app.  Some will take much

21   less.

22   **Q.**  Sir, I'm just asking for an average.  Average is 6 to 12

23   minutes, correct?

24   **A.**  Sounds accurate.

25   **Q.**  You, yourself, have reviewed apps before, correct?

1    **A.**  Yes.

2    **Q.**  The last time you reviewed an app, you did not spend more

3    than five minutes, correct?

4    **A.**  That would be correct.

5    **Q.**  There is always a backlog in submissions of apps to

6    review; is that right?

7    **A.**  Yes.

8    **Q.**  And from time to time there are concerns about the size of

9    the backlog in terms of the app review process, right?

10   **A.**  Yes.

11   **Q.**  And developers have complained to Apple about the length

12   of time that it has taken for their apps to undergo app

13   review, right?

14   **A.**  Yes.

15   **Q.**  Is it fair to say that that is a frequent complaint that

16   you receive or Apple receives from developers?

17   **A.**  No.

18   **Q.**  You don't think that that's a frequent occurrence?

19   **A.**  No, I don't believe it is.

20   **Q.**  Do you receive developer complaints along those lines?

21   **A.**  Yes.

22   **Q.**  The app review guidelines provide that creating an

23   interface for displaying third-party app, extensions, or plug

24   ins similar to the App Store or as a general interest

25   collection is unacceptable, correct?

1    **A.**   That's correct.

2    **Q.**   That's within guideline 3.2.2?

3    **A.**   I believe so.

4    **Q.**   And in shorthand that's the provision that prohibits

5    stores within stores; is that right?

6    **A.**   Yes.

7    **Q.**   And Apple has rejected apps for violating guideline 3.2.2,

8    correct?

9    **A.**   Yes.

10   **Q.**   Do you recall an app called Tribe?

11   **A.**   Yes.

12   **Q.**   Please turn your binder to PX301, which has been marked

13   for identification.

14        Are you with me?

15   **A.**   Yes.

16   **Q.**   Thank you.

17        This is an email that you received on March 21, 2018,

18   correct?

19   **A.**   Correct.

20   **Q.**   And you received that in the connection with your duties

21   and responsibilities in -- at Apple?

22   **A.**   Yes.

23            **MS. MOSKOWITZ:**   Your Honor, I move PX301 into

24   evidence.

25            **MS. MOYE:**   No objection.

1          **THE COURT:**  It's admitted.

2          (Plaintiff's Exhibit 301 received in evidence)

3   **BY MS. MOSKOWITZ:**

4   **Q.**  This March 2018 email is about the Tribe App, right?

5   **A.**  Yes.

6   **Q.**  And Mr. Havlicek, is that how you pronounce that?

7   **A.**  Havlicek.

8   **Q.**  Havlicek.  H-A-V-L-I-C-E-K.

9        That is the author of this email?

10  **A.**  Yes.

11  **Q.**  He works for the worldwide developer relations team at

12  Apple?

13  **A.**  Yes.  We works for app review.

14  **Q.**  So he works within app review under the worldwide

15  developer relations umbrella?

16  **A.**  Yes.

17  **Q.**  Do you see here that Mr. Havlicek wrote that according to

18  an ERB ruling, quote, "The app will be hidden for being a

19  store within our store"?

20       Do you see that?

21  **A.**  Yes.

22  **Q.**  He also notes that the app has been live since 2015,

23  right?

24  **A.**  Yes.

25  **Q.**  So that's approximately three years that the Tribe app was

1    on the App Store before the ERB ruling, right?

2    **A.**   Correct.

3    **Q.**   And you're not aware of any specific security issues that

4    had occurred with Tribe during the time it was on the App

5    Store, right?

6    **A.**   I'm aware of a safety issue with 3.2.2., it had a

7    guideline violation.

8    **Q.**   The guideline violation was being a store within a store?

9    **A.**   Yes.

10   **Q.**   While it was on the App Store before it was removed for

11   being a violation of the store-within-a-store guideline, you

12   are not aware of any security issue arising with respect to

13   Tribe while it was available on the App Store, right?

14   **A.**   I'm not aware of any issues outside this particular

15   guideline issue.

16   **Q.**   And the distinction you are trying to draw is you believe

17   guideline 3.2.2 is a security guideline?

18   **A.**   I'm trying to draw the distinction that we look at all the

19   guidelines as critical to the safety and trust of the App

20   Store.

21   **Q.**   And you are not aware and do not recall any specific

22   security issues with Tribe, right?

23   **A.**   I am not aware of any issues outside of the 3.2.2. issue.

24   **Q.**   So the answer is, yes, you are not aware of any specific

25   security issues with Tribe?

1    **A.**   Yes.

2    **Q.**   In fact, you are not aware of any specific security issues

3    with any stores within a store that occurred during that --

4    that were available during that time?

5    **A.**   I do recall some, but I recall safety and security issues.

6           **MS. MOSKOWITZ:**   Your Honor -- pardon me.

7    BY MS. MOSKOWITZ:

8    **Q.**   Mr. Kosmynka, do you recall being deposed in this case?

9    **A.**   I do.

10   **Q.**   And you testified under oath during that deposition?

11   **A.**   I did.

12   **Q.**   And you did, in fact, tell the truth?

13   **A.**   I did.

14          **MS. MOSKOWITZ:**   Your Honor, I would point your

15   attention, Mr. Kosmynka your attention to volume 1 of your

16   deposition, which should be behind the first tab in your big

17   binder, page 84, line 18 through 24.

18       Mr. Kosmynka --

19          **THE COURT:**   Okay.  Just, again, on the plaintiff's

20   side, you do not put that stuff up until I tell you.

21   Deposition transcripts are not evidence.

22       So lines, again, 84 what?

23          **MS. MOSKOWITZ:**   84:18 through 24, Your Honor.

24   BY MS. MOSKOWITZ:

25   **Q.**   Mr. Kosmynka, you were asked at your deposition the

```
 1   following --
 2           THE COURT:  Could you wait until I provide you
 3   with --
 4           MS. MOSKOWITZ:  Yes.  Absolutely.
 5           THE COURT:  Thank you.
 6                   (Pause in the proceedings.)
 7           THE COURT:  Okay.  Go ahead.
 8   BY MS. MOSKOWITZ:
 9   Q.  Mr. Kosmynka, at your deposition, you were asked the
10   following question and gave the following answer.
11           "Question:  Are you aware between the periods of
12           time, 2015 to 2018, of any security issue being
13           raised with you with regard to a store within a store
14           being live on the App Store?
15           "Answer:  I'm aware of apps that were raised to me
16           with sideline issues.  I do not recall if there were
17           specific security issues with those apps."
18   BY MS. MOSKOWITZ:
19   Q.  Did I read that correctly?
20   A.  Yes.
21   Q.  You were not aware of any study that was done of any apps
22   that were downloaded through the Tribe store that related to
23   security; isn't that right?
24   A.  I'm not aware of any studies, no.
25   Q.  You received, from time to time, inbound emails notifying
```

1    Apple about issues with apps that are found by the public or

2    third parties on the iOS App Store; is that right?

3    **A.**   That's right.

4    **Q.**   And those inbound notifications are maintained by Apple in

5    the ordinary course of business; is that right?

6    **A.**   That's right.

7    **Q.**   You take those very serious, right?

8    **A.**   Absolutely.

9    **Q.**   You investigate them?

10   **A.**   Yes.

11   **Q.**   In fact, there's a whole group that exists to investigate

12   them, right?

13   **A.**   Yes.

14   **Q.**   Let's keep looking at the document that we were just

15   looking at, which is 301.

16       Same first paragraph there.  The last sentence refers

17   to -- starts, unfortunately, the app has been live since 2015

18   that we looked at.

19       Do you see that?

20   **A.**   I do.

21   **Q.**   It says, so this is shocking for them, meaning Tribe was

22   shocked to be removed from the App Store for this guideline

23   violation, right?

24   **A.**   I think that's what Bill meant.

25   **Q.**   Just as it was for Gamee, G-A-M-E-E, who recently UTB'd

1    them; do you see that?

2    **A.**   Yes.

3    **Q.**   Gamee is a third-party developer?

4    **A.**   Yes.

5    **Q.**   And Gamee is who informed Apple about the existence of

6    Tribe being a store within a store?

7    **A.**   It appears that way, yes.

8    **Q.**   And the reference to UTB'd, UTB stands for under the bus?

9    **A.**   Correct.

10   **Q.**   UTB is what Apple called it when an inbound inquiry came

11   in from outside of Apple about an app, right?

12   **A.**   We used to call it that.  It's now named ARC.

13   **Q.**   For a time you called it UTB?

14   **A.**   Yes.

15   **Q.**   That refers to under the bus?

16   **A.**   Yes.

17   **Q.**   So when customers or developers or the press told Apple

18   about something, you referred to that -- you, Apple, referred

19   to that as under the bus?

20          **MS. MOYE:**   Object to the form.

21          **THE COURT:**   What?

22          **MS. MOYE:**   Object to the form.  It has multiple

23   parties that she's asking about --

24          **THE COURT:**   I am sorry.  I do not understand what you

25   just said.

1          **MS. MOYE:**  She asked what if three different groups

2     of people made reports that were referred to as UTB.

3          **THE COURT:**  Your objection is compound?

4          **MS. MOYE:**  I'm sorry?

5          **THE COURT:**  What was your legal objection?

6          **MS. MOYE:**  On the form of the question.

7          **THE COURT:**  On the form.  Sustained.

8     It's compound.

9          **MS. MOSKOWITZ:**  I will break it down.

10    **BY MS. MOSKOWITZ:**

11    **Q.**  Mr. Kosmynka, when a customer informed Apple about an app

12    on the iOS App Store, Apple referred to that as under the

13    bus, throwing an app under the bus.

14    **A.**  I believe we referred to that as a customer complaint and

15    it would be submitted to the UTB process.

16    **Q.**  You agree, though, that the UTB process had its name

17    because that customer was throwing an app under the bus.

18          **MS. MOYE:**  Object to the form.

19          **THE COURT:**  Overruled.  You can answer if you can.

20          **THE WITNESS:**  The UTB process was there to re-review

21    apps --

22    **BY MS. MOSKOWITZ:**

23    **Q.**  That's not my question, sir.

24    My question was that you and Apple referred to when a

25    customer or consumer raised a third-party app to Apple, it was

1  throwing it under the bus; that was how you described it.

2  **A.**  Yes.

3  **Q.**  And likewise, when a developer informed Apple about a

4  third-party app on the App Store, you referred to that as

5  throwing that app under the bus.

6  **A.**  Yes.

7  **Q.**  And when the press, an article or something like that

8  indicated that a third-party app on the App Store to be looked

9  at by Apple, that was the press throwing that app under the

10 bus, right?

11 **A.**  Until that process was renamed, yes.

12 **Q.**  And as you mentioned a couple of times, Apple changed the

13 name from UTB to ARC, right?

14 **A.**  Yes.

15 **Q.**  And ARC is after-review compliance?

16 **A.**  That's correct.

17 **Q.**  As of this time, March 2018, it was still called under the

18 bus or UTB, right?

19 **A.**  No.  It was renamed to ARC prior to 2016.  It was referred

20 to here, but it's the incorrect name in this particular email.

21 **Q.**  So even though it was renamed before this, people were

22 still using the term "UTB"?

23 **A.**  In this case it was used, yes.

24 **Q.**  Are you familiar with an app called Roblox, R-O-B-L-O-X?

25 **A.**  Yes.

1012

1    **Q.**  Roblox has a catalog of free games created by other users,

2    correct?

3    **A.**  I don't see it that way.

4    **Q.**  Let's please turn in your binder to PX305 for

5    identification.

6    **A.**  I see the document.

7    **Q.**  This is an email chain in which you participated in

8    July 27, 2017 and earlier?

9    **A.**  Yes.

10         **MS. MOSKOWITZ:**  Your Honor, I offer PX305 into

11   evidence.

12         **THE COURT:**  Any objection?

13         **MS. MOYE:**  No objection.

14         **THE COURT:**  It's admitted.

15         (Plaintiff's Exhibit 305 received in evidence)

16         **MS. MOSKOWITZ:**  Thank you, Your Honor.

17   **BY MS. MOSKOWITZ:**

18   **Q.**  Mr. Kosmynka, on the second page of this document, which

19   is the earliest email in the chain, is from you on July 25.

20        Do you see that?

21   **A.**  I do.

22   **Q.**  And the first sentence is a question:  Does Roblox follow

23   our guidelines?  Right?

24   **A.**  That's correct.

25   **Q.**  And then there are some follow-up emails in the chain

1    including from Mr. Baeklund?

2    **A.**   That's right.

3    **Q.**   Is he under your supervision?

4    **A.**   Yes.

5    **Q.**   And he said he will investigate?

6    **A.**   That's correct.

7    **Q.**   And he comes back to you with the results, right?

8    **A.**   Yes.

9    **Q.**   And that starts on page 3 -- PX305.1.

10       He says that he looked into it, and that it actually had

11   gone to the ERB for a potential store-within-a-store

12   violation, right?

13   **A.**   Yes, it did get escalated to ERB for a

14   store-within-a-store concern.

15   **Q.**   And a couple lines down, there's a reference to PLA 3.2.2.

16       Do you see that?

17   **A.**   I do.

18   **Q.**   It goes on to say, this social network has a catalog of

19   free block-style games created by other users.

20       Do you see that?

21   **A.**   I do.

22   **Q.**   And ERB, as we discussed earlier, is the body that handles

23   certain escalations with respect to decisions to be made on

24   certain apps?

25   **A.**   ERB sets policy and handles escalations for

1    precedent-setting issues.

2    **Q.**   You say in response, I am surprised this was approved by

3    ERB.

4         Do you see that?

5    **A.**   I do.

6    **Q.**   And you were surprised because you thought it looked like

7    a store within a store?

8    **A.**   I was surprised because their red text that is also

9    highlighted here suggested that it may be a store within a

10   store.  So at this time I only had context of this email.

11   **Q.**   And the response was that it had been flagged for ERB for

12   that reason, but it got approved, right?

13   **A.**   Yes, this was approved.

14   **Q.**   And Roblox is still on the App Store today, right?

15   **A.**   That's right.

16   **Q.**   Just going back to where I just read below when we were

17   talking about the language, catalog of free block-style games

18   created by other users.

19        The next sentence says, games are added/changed server

20   side.  Right?

21   **A.**   That's right.

22   **Q.**   That means live updates or hotfixes and not an actual

23   new-build submission?

24   **A.**   It means that changes are made server side.

25   **Q.**   Like a hotfix?

```
 1   A.  No, I don't believe it would be a hotfix.

 2   Q.  It is not something that goes through app review?

 3   A.  Roblox itself does go through app review, but there is

 4   consent that is coming from the server side --

 5   Q.  Right --

 6   A.  -- and that content would not be.

 7   Q.  Games are added and changed server side for Roblox, right?

 8   A.  That's what this email states.  But as I said earlier, I

 9   don't see these as games.

10        THE COURT:  You don't see them or you don't

11   understand that's what it does?

12        THE WITNESS:  I -- my -- earlier the question was,

13   Roblox has a catalog of games.  I said I don't see it that

14   way.

15        THE COURT:  What does this app do?

16        THE WITNESS:  What does Roblox do?

17        THE COURT:  Yeah.

18        THE WITNESS:  So Roblox is an app in which users

19   create a profile, hang out with their friends -- sorry Your

20   Honor.

21     Users create a profile within Roblox.  And they go hang

22   out with their friends and they can join in these experiences

23   that I would look at as content.  And so if you think of game

24   or app, games are incredibly dynamic.  Games have a beginning,

25   an end.  There's challenges in place.
```

1    I look at the experiences that are in Roblox similar to

2  the experiences that are in Minecraft.  These are maps.  These

3  are worlds.  They have boundaries in terms of what they are

4  capable of.

5    So I think that while the email suggests that these are

6  games, that's not how we've looked at it.  And that's why it

7  is compliant with the rules today.

8        **THE COURT:**  All right.  Keep going.  Thank you.

9  **BY MS. MOSKOWITZ:**

10 **Q.**  Just a few follow-up questions on that.

11   So with respect to an app, we won't label it, an app that

12 allows individual users to come together and hang out with

13 friends, you don't call that a game, right?

14 **A.**  Correct.

15 **Q.**  And when apps allow individual users to come together and

16 join in experiences together, you don't call that a game,

17 right?

18 **A.**  No, I wouldn't say that is a game.

19 **Q.**  I apologize if I asked you this.  Is Roblox still

20 available on the App Store today?

21 **A.**  To my knowledge, yes.

22 **Q.**  You are not aware of any guideline violations by Roblox

23 that implicate security concerns, right?

24 **A.**  Not at this time.

25 **Q.**  You are aware, of course, that there are a number of App

1    Stores that exist outside of the iOS ecosystem, right?

2    **A.**   Yes.

3    **Q.**   You are not aware of any study that exists as to security

4    issues with respect to the Google Play store, for example?

5    **A.**   I have recently seen some studies.

6    **Q.**   Are those studies that Apple commissioned or obtained?

7    **A.**   I don't believe so.

8    **Q.**   So with respect to Apple, Apple has not conducted or

9    commissioned any studies with respect to security issues with

10   regard to the Google Play store, right?

11   **A.**   I am not aware of the Apple commission study.

12   **Q.**   And you are not aware of any studies within Apple with

13   regard to security issues in connection with the Tencent

14   store, right?

15   **A.**   No, I don't believe I am.

16   **Q.**   And similarly, you are not aware of any studies within

17   Apple for -- about security issues for the Huawei store?

18   **A.**   Not that I am aware of.

19   **Q.**   With respect to the Epic Game store, you are aware that

20   the Epic Game store is also a store outside of Iowa?

21   **A.**   Yes.

22   **Q.**   And you are not aware of any studies that exist with

23   regard to security issues with respect to the Epic Game Store,

24   right?

25   **A.**   Correct.

1   **Q.**  You are not aware of any study that Apple has performed as

2   to any security issues relating to sideloaded apps on Android

3   phones, right?

4   **A.**  I'm not aware of any study that Apple has performed, but I

5   have seen studies on this.

6   **Q.**  I'm sorry, did you say that you are not aware of any

7   Apple-conducted studies?

8   **A.**  Correct.

9   **Q.**  Apple has not conducted any such studies, right?

10  **A.**  I'm not aware of them.

11  **Q.**  The App Store review guidelines require that digital goods

12  and services sold within an app must use Apple's in-app

13  purchase or IAP software, right?

14  **A.**  Yes.

15  **Q.**  If I refer to that as IAP, we are talking about the same

16  thing, the in-app purchase payment process inclusion?

17  **A.**  Okay.

18  **Q.**  That requirement is found in Section 3.1.1 of the

19  guidelines, right?

20  **A.**  Yes.

21  **Q.**  You are aware of apps that have been submitted without

22  including IAP that fall within 3.1.1 and thus should have

23  included IAP, right?

24  **A.**  I am aware of apps that -- provided unlocking or

25  purchasing of digital content and services without using an

1  in-app purchase that should have.

2  **Q.**  And you are aware of examples where that has happened that

3  those apps have been rejected on that basis, correct?

4  **A.**  Yes.

5  **Q.**  I have the small binder that is in front of you.  If you

6  can turn to what has been marked PX257 for identification.

7  **A.**  I see the document.

8  **Q.**  Thank you, sir.

9      This is an email that you received on December 14th, 2017;

10  is that correct?

11  **A.**  Yes.

12       **MS. MOSKOWITZ:**  Your Honor, I offer PX257 into

13  evidence.

14       **MS. MOYE:**  No objection.

15       **THE COURT:**  Admitted.

16      (Plaintiff's Exhibit 257 received in evidence)

17  **BY MS. MOSKOWITZ:**

18  **Q.**  The latest in time or top email on the chain is from

19  Mr. Friedman to you; is that right?

20  **A.**  That's right.

21  **Q.**  And there's a discussion in here about -- after the word

22  "whole."  Do you see that word in the middle?

23  **A.**  I do.

24  **Q.**  And after that, he says that WeChat and Facebook have both

25  tried to create dedicated pipes for out-of-band payments to

```
 1   unlock app features, e.g. subscriptions.  This breaks our
 2   rules.
 3       Do you see that?
 4   A.  I do.
 5   Q.  And, again, this is a reference to the rule of 3.1.1 that
 6   requires IAP for that, right?
 7   A.  I believe that's what Eric's referring to here.
 8   Q.  And there's an action item below?
 9   A.  I see this, yes.
10   Q.  It says, Apple creates a better experience for developers
11   to engage users and offer promotions.  It would have to be a
12   lot better to overcome the 30 percent hit, however.
13       Do you see that?
14   A.  I do see this, yes.
15   Q.  And by "it would have to be a lot better," he's saying the
16   experience for developers would have to be better on Apple in
17   order to justify the 30 percent commission, right?
18   A.  It's not clear to me what he is saying here.
19   Q.  Did you ask him?
20   A.  I don't recall.
21   Q.  Apple charges a 30 percent commission on all transactions
22   conducted with IAP, correct?
23   A.  No.
24   Q.  All apps that require IAP Apple charges a 30 percent
25   commission for all apps that use IAP.
```

1    **A.**  Their apps have subscriptions.  In year two, that

2    commission would be 15 percent.  There's also small business

3    program for developers and under a particular amount of

4    billings, that would also be 15 percent.

5    **Q.**  Subscriptions were charged at 30 percent for a time,

6    correct?

7    **A.**  Correct.

8    **Q.**  And that was changed in the last five years?

9    **A.**  I believe so, yes.

10   **Q.**  Generally speaking, other than two exceptions you gave,

11   30 percent is the commission charged by Apple on IAP

12   purchases, right?

13   **A.**  Yes.

14   **Q.**  The same 3.1.1 guideline we have been discussing also

15   forbids apps that offer digital goods for services for sale

16   within an app from offering any payment mechanism other than

17   IAP, right?

18   **A.**  Within the app, yes.

19   **Q.**  And Apple has aggressively rejected apps which use

20   third-party payments to bypass IAP, right?

21   **A.**  We aggressively uphold all guidelines.

22   **Q.**  Apple has aggressively rejected apps that use third-party

23   payments to bypass IAP, right?

24   **A.**  Yes.  We reject apps that use third-party payments to

25   avoid IAP.

1    **Q.**  Apple aggressively rejects apps that use third-party

2    payments to bypass IAP, right?

3           **MS. MOYE:**  Objection asked and answered.

4           **THE WITNESS:**  I don't agree with -- I don't see it

5    that way.

6    **BY MS. MOSKOWITZ:**

7    **Q.**  Why don't you turn to what has been marked as PX2114 for

8    identification, please.

9          Let me know when you are there, please.

10   **A.**  I see it.

11   **Q.**  This is your document?

12   **A.**  Appears that way.

13   **Q.**  And it's dated December 19, 2017?

14   **A.**  Yes.

15   **Q.**  And in it you write:  Phil, Eddy, we have aggressively

16   rejected apps/games which use third-party payments including

17   WePay to bypass IAP.

18         Those are your words, sir?

19   **A.**  Those are my words.

20   **Q.**  In fact, there have been thousands of guidelines 3.1.1

21   rejections, right?

22   **A.**  That's right.

23           **THE COURT:**  So you're not offering 2114 --

24           **MS. MOSKOWITZ:**  That was for impeachment, Your Honor.

25

BY MS. MOSKOWITZ:

**Q.** If you could please turn to PX300 for identification.

**A.** I can see the document.

**Q.** This document is titled iOS app reviewed summary?

**A.** Yes.

**Q.** And this is a document that is created periodically with the same title, right?

**A.** Yes.

**Q.** And it contains data that's been generated for the applicable time period covered by the report?

**A.** That's correct.

          **MS. MOSKOWITZ:** Your Honor, I offer PX300 into evidence.

          **MS. MOYE:** No objection.

          **THE COURT:** 300 is admitted.

     (Plaintiff's Exhibit 300 received in evidence)

          **MS. MOSKOWITZ:** Thank you, Your Honor.

BY MS. MOSKOWITZ:

**Q.** If you can please -- actually, I don't think I need to talk much more about this, so let me skip forward, please.

     Isn't it true that Apple has specifically terminated, since 2017, more than 1,000 developers on the basis that they incorporated a third-party payment mechanism into their app?

**A.** I think there would likely be more involved with those terminations if that feature was hidden, the termination, that

1    was something that was just discovered as part of a standard

2    review and the developer was not familiar with the guideline

3    that would not result in a termination.

4    **Q.**   So is it -- do you disagree that since 2017, there have

5    been thousands of developers specifically terminated on the

6    basis of incorporating a third-party payment mechanism into

7    their app?

8    **A.**   I would disagree with the word "specifically."

9    **Q.**   If you can please turn to what has been marked PX2948 for

10   identification.  It should be the last tab in the big binder.

11           **THE COURT:**   What is the number again?

12           **MS. MOSKOWITZ:**   PX2948, Your Honor.

13       I have a separate copy perhaps.

14           **THE COURT:**   I don't have that one.

15           **MS. MOSKOWITZ:**   May I approach?

16           **THE COURT:**   You may.

17   **BY MS. MOSKOWITZ:**

18   **Q.**   Are you there, Mr. Kosmynka?

19   **A.**   I believe so, yes.

20           **MS. MOSKOWITZ:**   Your Honor, are you there as well?

21           **THE COURT:**   I am.

22   **BY MS. MOSKOWITZ:**

23   **Q.**   If you could please turn to page 15.

24       Actually why don't I back up and let's get on the record

25   what this is.

1       This is Apple's interrogatory answers that it served to

2   Epic in this litigation, correct?

3   **A.**   Correct.

4   **Q.**   And, in fact, you are one of the individuals who verified

5   a number of the responses that were submitted in connection

6   with these interrogatories, right?

7   **A.**   Correct.

8   **Q.**   And in page 15, the last sentence says, attached as

9   Appendix A, is a list of the developers quote "specifically

10  terminated since 2017 on the basis of incorporating a

11  third-party payment mechanism into their app."

12      Do you see that?

13  **A.**   Yes.

14  **Q.**   And do you have Appendix A with you?

15  **A.**   I do see Appendix A.

16  **Q.**   Appendix A starts at page 19.  Are you with me?

17  **A.**   Yes.

18  **Q.**   And what follows is about, if I can do the math, 23 pages

19  of such developers?

20  **A.**   Yes.

21  **Q.**   Is it fair to say that there have been thousands, without

22  sitting here and counting, thousands of developers that are in

23  this Appendix A?

24  **A.**   Yes.

25  **Q.**   So there are thousands of developers that have been

1   specifically terminated since 2017 on the basis of

2   incorporating a third-party payment mechanism into their app,

3   correct?

4   **A.**   Not correct.  The document says Epic's hidden -- Epic

5   direct payment functionality.

6        So these would have been hidden --

7   **Q.**  Sir -- sir.  I am asking you a different question.

8        I am reading the sentence we just read.  Let's read it

9   again together.

10        Attached as Appendix A is a list of the developers

11   specifically terminated since 2017 on the basis of

12   incorporating a third-party payment mechanism into their app,

13   correct?

14   **A.**   That's what that says, yes.

15   **Q.**   Okay.  So thousands, which we just established are in

16   Appendix A, thousands of developers have been specifically

17   terminated since 2017 on the basis of incorporating a

18   third-party payment mechanism into their app, correct?

19   **A.**   That's what this document says.  Yes.

20   **Q.**   And that was verified by Apple employees?

21   **A.**   Correct.  But these apps are here because it's hidden --

22   **Q.**   Sir -- sir --

23        **THE COURT:**  I'm sure Ms. Moye will ask you to

24   clarify.

25        **THE WITNESS:**  Thank you, Your Honor.

**BY MS. MOSKOWITZ:**

**Q.**   Sir, there's a guideline in the app review guidelines that
prohibit developers from creating an app that is confusingly
similar to an existing Apple product interface app or
advertising theme, correct?

**A.**   That's right.

**Q.**   And that's guidelines 5.2.5?

**A.**   I believe so.

**Q.**   And you are aware of apps that have been rejected for
failing to comply with 5.2.5, right?

**A.**   Yes.

**Q.**   But you are not aware of whether anyone within Apple was
tasked with the job of looking at whether or not the apps that
were rejected on that basis were, in fact, functionally better
than the Apple product, right?

**A.**   No, I'm not aware of something like that.

**Q.**   That's not part of the app review process, right?

**A.**   No.  Our process is to review it against the guidelines.

**Q.**   And part of those guidelines do not inquire as to whether
the app is better than the Apple app?

**A.**   We hope that they are better than the Apple app.  I'm
happy to approve them if they are compliant.

**Q.**   But you don't approve them if they are confusingly similar
to an existing Apple product.

**A.**   I think if customers -- developers are trying to trick

1    customers into thinking something is an Apple product, that

2    would be confusingly similar.

3    **Q.**  Sir, that guideline, in fact, says don't create an app

4    that appears confusingly similar to an existing Apple product.

5         It doesn't talk about tricking, right?

6    **A.**  It's the purpose of the guideline, correct.

7    **Q.**  Any app that appears confusingly similar to an existing

8    Apple product, even if it is better than the Apple product,

9    still gets rejected, right?

10   **A.**  If an app is confusingly similar, it would be rejected.

11   **Q.**  Are you aware that third-party developers have complained

12   to Apple that Apple's apps are permitted to do things that

13   they themselves as a third-party developer are not permitted

14   to do on iOS?

15   **A.**  I've heard these complaints.

16   **Q.**  If you could please turn your binder to PX858 for

17   identification.

18   **A.**  I see the document.

19   **Q.**  Thank you.

20        This is an email from you to others within Apple on May 1,

21   2019, right?

22   **A.**  I think it was email to me which I responded, thanks for

23   sharing.

24   **Q.**  Sure.

25        I'm looking on page -- page dot one where you, I think,

1    attached this email to an email you initiated to Tom Reyburn

2    and Shaan Pruden, right?

3        And on the next page is what you forwarded, right?

4    **A.**   Looks that way, yes.

5    **Q.**   And in the bottom, this is an inbound complaint from

6    LinkedIn to Apple, right?

7    **A.**   Yes.

8    **Q.**   And LinkedIn is complaining that LinkedIn's design is very

9    much in line with Apple's own design but they got rejected,

10   right?

11   **A.**   Yes.

12   **Q.**   And they were asking, help me understand what is Apple

13   doing differently than we are?  Why are we being rejected,

14   right?

15   **A.**   Correct.

16   **Q.**   And Shaan Pruden forwards this on to you and says,

17   Trystan, developers, the latest LinkedIn, cannot fathom why

18   our apps are permitted to do things they are not, right?

19   **A.**   Yes.

20   **Q.**   And then Tom Reyburn responds as well saying Amazon is yet

21   another developer that's complaining about the same thing,

22   right?

23   **A.**   I see that.

24   **Q.**   And he says we need to have one set of rules that all apps

25   follow, whether or not they are from Apple or third-party

1    developers, right?

2    **A.**   That's what Tom wrote here, yes.

3            **MS. MOSKOWITZ:**  Your Honor, I offer PX858 into

4    evidence.

5            **MS. MOYE:**  No objection except for the hearsay

6    portions, Your Honor.

7            **MS. MOSKOWITZ:**  Well, Your Honor, there were no

8    objections disclosed.

9            **THE COURT:**  You mean the very bottom?

10           **MS. MOYE:**  Yes.  Yes, Your Honor.  The statements

11   from outside parties.  We'd just ask they not be taken for the

12   truth of the assertions.

13          **THE COURT:**  The document is admitted.  Once again,

14   I'll address the evidentiary issues using the code of

15   evidence.

16          (Plaintiff's Exhibit 858 received in evidence)

17           **MS. MOSKOWITZ:**  Your Honor, my understanding is that

18   Mr. Kosmynka will be taken as Direct and then I will have

19   Cross after that, but I can reserve that for after the Direct

20   testimony.

21          **THE COURT:**  That's fine.

22           **MS. MOSKOWITZ:**  Thank you, Your Honor.  No further

23   questions at this time.  Thank you, Mr. Kosmynka.

24          **THE WITNESS:**  Thank you.

25

<u>**CROSS-EXAMINATION**</u>

**BY MS. MOYE:**

**Q.**   Good afternoon, Mr. Kosmynka.

**THE COURT:**   Speak up, Ms. Moye.

**BY MS. MOYE:**

**Q.**   Good afternoon, Mr. Kosmynka.

**A.**   Good afternoon.

**Q.**   Let's pick up where Epic's counsel left off.  Let's talk about PX885 (sic).

   This is the document -- maybe I don't have the number right.

**THE COURT:**   Last one.

**MS. MOYE:**   It's 858.

**BY MS. MOYE:**

**Q.**   This is the document referencing LinkedIn?

**A.**   Yes.

**Q.**   Can you explain for the Court what is the situation that is being addressed here?

**A.**   The situation here is a developer emailed developer relations letting them know that they were rejected for what would have been clear and conspicuous pricing on a subscription page.

   So this is one of the guidelines that we require subscription apps to adhere to.  As part of their email, they let us know that it appears as though there are some Apple

1    services that appear to have similar issues, and they wanted

2    to make sure that we are applying the same rules everywhere.

3    **Q.**   What happened as a result of your email on this?

4    **A.**   So we do have a universal set of rules that we apply in

5    these types of cases selling subscriptions.  All apps have to

6    have clear and conspicuous pricing.

7        So in these cases we would work with the Apple developer

8    in the same way we work with a third-party developer to bring

9    it into compliance.

10       Now many first party apps are actually features in the

11   operating system so we are working in a much different

12   capacity because that's not an app that would be submitted

13   through the app review process.  It is built and integrated

14   into the operating system as a feature.

15   **Q.**   So was the Apple app that you were referencing in this

16   email, was it modified as a result of this feedback that you

17   sent?

18   **A.**   I don't recall in this particular case whether the app was

19   modified, but we see examples like this where the app is

20   certainly modified, the operating system is modified, and our

21   policy may also be modified.

22       In the case of like a first party app, when you buy a

23   phone and go to Apple music, it's built into the phone.  You

24   know that it's coming from Apple and you know that because the

25   payment flows potentially exist beyond just the app itself.

1    There is no really opportunity for misleading a purchase.

2        But policy could change, the products themselves could

3    change, but what we do our best to do is make sure that all of

4    the rules apply to all apps in the store.

5        Another thing that would have been done, we published

6    human interface guidelines to the entire developer community

7    on recommendations as to what a compliant subscription flow

8    could look like.  Because this is one of the -- there's a

9    human decision to determine whether the subscription page is

10   clear and conspicuous.

11       And so in this particular case, it could have been that

12   app review got it wrong, and maybe the only change that was

13   necessary was to process this as an appeal and approve the

14   app.

15       So there's a variety of outcomes there, but we treat them

16   all as an important investigation and we want to get it right

17   for our customers and our developers.

18   **Q.**   And were their changes made to ensure there were

19   consistency between the applications of policies for Apple

20   apps and the application for third-party apps as a result of

21   the feedback you gave in this document?

22   **A.**   Absolutely.

23   **Q.**   Thank you, Mr. Kosmynka.

24       Let's look back at the interrogatory responses you were

25   asked about.  This is PX2948 at the back of Epic's binder.

1       And if you would look at page 13.  You will see there's an

2   interrogatory number 12.  There's a question in there.  And

3   the answer for that goes on to page 15.

4       And on page 15, the last sentence is the sentence that

5   Epic's counsel was asking you about.  Correct, sir?  The

6   language that developers were specifically terminated since

7   2017?

8   **A.**  That's right.

9   **Q.**  And if you look at the verification that you were asked

10  about, that's on page 17 of the interrogatory?

11  **A.**  Yes.

12  **Q.**  You see your name at the top of the page?

13  **A.**  I do.

14  **Q.**  Does this document list the responses that you verified in

15  this interrogatory?

16  **A.**  Yes.

17  **Q.**  And which ones does it say you verified?

18  **A.**  Number six and eight, as well as Apple's reinstated

19  response to number 11.

20  **Q.**  Did you verify the response to interrogatory 12?

21  **A.**  No.

22  **Q.**  And you were trying to explain why you objected to the

23  language specifically.  Would you give us that explanation

24  now?

25  **A.**  Yes.

1    A process, when we find hidden features, whether it be

2  hidden payments, hotfixes that introduce safety issues, such

3  that we try to work with the developer to get the issues

4  corrected, it's not simply because there's a third-party

5  payment in an app that an app would be terminated.

6    In fact, there's many cases where apps have introduced a

7  third-party payment and we've worked with the developer to get

8  those resolved.  So in this case, it would have been more than

9  the simple presence of a third-party payment that would have

10  resulted in termination of these particular developer

11  accounts.

12  **Q.**  Thank you, sir.

13    You were also asked about tools for scanning malware.  Do

14  you recall that question?

15  **A.**  I do.

16  **Q.**  And there was a reference to Source DNA.

17    Do you recall that questioning?

18  **A.**  Yes.

19  **Q.**  And you were asked whether the Source DNA tool that was

20  acquired by Apple was the tool that is now being used for app

21  review.

22    Do you recall that question?

23  **A.**  Yes.

24  **Q.**  Is it correct that the actual Source DNA tool that was

25  acquired is now the tool that's being used for app review?

**A.**   No.   We now use App Transparency which certainly has
similar capabilities and behaviors to what Source DNA was
offering, but this is something that was built by the now
Apple engineers post-acquisition of Source DNA.

**Q.**   Thank you, sir.

     And the tools that Apple uses for the app review process
now, are they tools developed by Apple?

**A.**   Yes.

**Q.**   Are they proprietary to Apple?

**A.**   Yes.

**Q.**   Do you attempt to keep those tools, secret?

**A.**   Yes.

**Q.**   Thank you, sir.

     Now let's turn to the issue of apps that may have
mistakenly made it through the app review process.

     You remember a reference to the Tribe app?   That was
Exhibit 301.

**A.**   I do.

**Q.**   And Epic's counsel asked you questions about whether that
was mistaken in the app review.

     Do you recall that?

**A.**   I do.

**Q.**   Mr. Kosmynka, are there occasions on which there are
mistakes in the app review process?

**A.**   Absolutely.   It's a human process.   We do make mistakes.

1   But we certainly try to rectified those mistakes when we learn

2   of them and do our best to prevent them from reoccurring.

3   **Q.**   And does the fact that there are mistakes cause you,

4   Mr. Kosmynka, to believe that the app review process is

5   ineffective?

6   **A.**   No.

7   **Q.**   Can you explain why not?

8   **A.**   I think there's a large variety of different types of

9   mistakes that can be made.  In this particular case, it

10  appears that an app was in violation of our rules, and that

11  could have impacted the customer experience.  And in this case

12  it really impacted the developer experience.

13      I think the human beings that reviewed the app, had we

14  caught it correctly when it was submitted, that would have

15  provided a much better developer experience.  Could have

16  prevented customer angst as well.

17      So the fact that mistakes exist means we've got to be

18  better at it and you need human beings to do that.  So I do

19  think that this is an incredibly important part of what we do

20  and why we do it.

21  **Q.**   Mr. Kosmynka, I want to see if we can give the Court an

22  understanding of how the mistakes that may have been made in

23  the app review process compare to the effectiveness of the

24  process.

25      I would like to start by looking at DX4374.  I'm asking

1   you to take a look at that document and identify it for the

2   record, please.

3   **A.**   This is the iOS apps reviewed summary.  This is a set of

4   statistics that we would review every week in ERB.  It's

5   effectively a status update on the app review process and what

6   we've seen thus far.

7   **Q.**   Can you tell us the date for this document?

8   **A.**   I believe this is 2017.

9        2019.  November '19.

10              **MS. MOYE:**   I would like to move DX4374 into evidence.

11              **MS. MOSKOWITZ:**   No objection, Your Honor.

12              **THE COURT:**   Admitted.

13          (Defendant's Exhibit 4374 received in evidence)

14   **BY MS. MOYE:**

15   **Q.**   Mr. Kosmynka, are summaries like this that we see on the

16   first page prepared every week?

17   **A.**   Every week.

18   **Q.**   And in the 2017 to 2019 time frame, were they prepared

19   every week?

20   **A.**   Yes.

21   **Q.**   And can you explain for the Court what is reflected here

22   on the first page of 4374?

23        Next to iPhone, we see approved, rejected, and some

24   numbers.

25   **A.**   So this would have been the number of submissions that we

```
 1    received in this particular week.  So we can see the total

 2    here is 112,501 and the iPhone, iPad, approved, rejected, this

 3    is the dimensions of what those numbers mean.

 4        So IPhone approved, we approved 5,461 apps.  The number

 5    of iPhone rejected apps that were new was 11,296.

 6    Q.  Mr.  --

 7             THE COURT:  It took me a while to find the document.

 8    What page are you on?

 9             MS. MOYE:  It is the first page of 4374.

10             THE COURT:  Okay.  And I am sorry, could you repeat

11    that very quickly?  So I see approved, rejected.

12             THE WITNESS:  Yes, Your Honor.  So approved, the

13    number of new apps that were approved to the store in this

14    weekly period was 5,641.

15             THE COURT:  Okay.  This is just a week's worth of

16    data?

17             THE WITNESS:  Yes.

18             THE COURT:  And the date again on this document?

19             THE WITNESS:  I believe this was November 2019.

20             MS. MOYE:  If we look at the second page of the

21    document.

22             THE COURT:  Okay.  Go ahead.  Thank you.

23    BY MS. MOYE:

24    Q.  And I believe you told us, Mr. Kosmynka, that these were

25    prepared on a weekly basis so that 52 weeks a year in the time
```

1  frame of 2017 to 2019; is that correct?

2  **A.**  That's correct.

3  **Q.**  Could you look at the document that's marked DX5467 in

4  your binder?

5      **MS. MOYE:**  Your Honor, we have a slightly revised

6  version of this document for the Court.  We had to correct

7  some typographical errors and totaled some numbers in it.

8  We've shared the revised version with Epic's counsel.

9      **THE COURT:**  Okay.  Mr. Kosmynka.

10 **BY MS. MOYE:**

11 **Q.**  Mr. Kosmynka, could you explain for the Court what we have

12 here in DX5467?

13 **A.**  This is a spreadsheet that looks like that summary we just

14 reviewed by week beginning early 2017.  And if we scroll down,

15 looks like this ends in early 2021.

16 **Q.**  Okay, sir.

17     And we have summarized those documents -- this document on

18 a demonstrative, but we would now like you to look at

19 demonstrative one.

20     And you will see here years, number of submitted apps,

21 rejection rate, and number of rejected apps.

22     Can you explain, starting with 2017, what do those numbers

23 reflect?

24 **A.**  That represents the sum of all of those weekly reports,

25 the total number of submissions for that particular year, the

1    total number of rejections for that particular year, and the

2    rejection rate is the ratio of those two.

3    **Q.**   So is it correct, sir, that in 2017 there were 5,176,583

4    submissions?

5    **A.**   That would be correct.

6    **Q.**   And of those submissions, 1,694,664 were rejected; is that

7    correct, sir?

8    **A.**   That's correct.

9    **Q.**   In 2017, there were 5,176,583 submissions?

10   **A.**   That would be correct.

11   **Q.**   And of those submission 1,694,664 were rejected; is that

12   correct?

13   **A.**   That's correct.

14   **Q.**   And the rejection rate was 33 percent?

15   **A.**   That's right.

16   **Q.**   And in 2018 we have compiled 4,793,826 submissions; is

17   that correct, sir?

18   **A.**   That's correct.

19   **Q.**   And there were 1,697,787 rejections.

20   **A.**   Yes.

21   **Q.**   For a rejection rate of 35 percent.

22   **A.**   That's correct.

23   **Q.**   And finally, in 2019, the number of submissions was

24   4,808,685.  The number of rejections was 1,747,278.

25          **MS. MOSKOWITZ:**   Objection, Your Honor.  Shouldn't the

1    witness be testifying here?

2              **THE COURT:**  You want to read the chart?  That's fine.

3    Sustained.

4    **BY MS. MOYE:**

5    **Q.**  Mr. Kosmynka, can you tell us the number of submissions,

6    the number of rejections, and the rejection rate for 2019?

7    **A.**  The number of submissions for 2019 was 4,800 -- 808,685.

8    The number of rejections in 2019 was 1,747,278.  And the

9    rejection rate for 2019 was 36 percent.

10   **Q.**  And Epic's counsel showed you a document referencing a

11   Tribe approval, one app approval in 2018.

12        Does that example cause you to have any concerns about the

13   effectiveness of the app review process?

14   **A.**  I take all mistakes seriously.  So I would say that any

15   incident like that causes concerns, but with respect to the

16   overall effectiveness of app review, no, a single incident

17   does not make me question the overall effectiveness.  That's

18   the necessity of the review process.

19   **Q.**  How would you, Mr. Kosmynka, compare the ratio between the

20   rejections that are appropriate because there's not compliance

21   with the guidelines and mistakes that have been made?

22   **A.**  I think there's a few different ways to look at the

23   mistakes, but one of the ways in which we look at them is the

24   amount of overall appeals that we receive.

25        And so we receive less than one percent of the rejections

 1   are appealed by developers, and usually those appeals are

 2   upheld, meaning they we've made the correct assertion on the

 3   rejection.

 4   **Q.**   How do you think mistakes, mistakes in the app review

 5   process, compare to the effectiveness rate?

 6            **MS. MOSKOWITZ:**   Objection to form, Your Honor.

 7            **THE COURT:**   Overruled.

 8            **THE WITNESS:**   So I think the number of mistakes are a

 9   small fraction of the overall effectiveness of the process.

10            **MS. MOYE:**   Thank you, Mr. Kosmynka.

11   **BY MS. MOYE:**

12   **Q.**   I would like to back up and give you an opportunity to

13   actually introduce yourself to the Court.

14       Could you tell us -- you told us that you became the

15   director of app review in 2016 at Apple.

16       Can you tell us an overview of your employment history,

17   post your education and prior to joining Apple?

18   **A.**   Yes.

19       Post education I started as a software engineer doing

20   automation and efficiency process engineering in oil and gas

21   in the energy industry.  And I guess shortly into that, it was

22   a few years, the iPhone launched and my interest certainly

23   shifted, and we started working on iOS apps.

24       And through that, I started -- ultimately we built

25   probably a dozen iOS apps, but we went to WWDC one year,

1  which is Apple's development conference, and we learned about

2  a technology Apple had released, and we understood that

3  there's a potential to take that technology and turn it into

4  what we call a beta testing service, so that iOS developers

5  could distribute betas to testers, and that that could be a

6  potential tool that the entire developer ecosystem for iOS

7  could use.

8      So we created a product out of it.  It was called Test

9  Flight.  So for, you know, the future up until Apple, I was

10  with Test Flight.

11 **Q.**  And can you tell me what was the business of Test Flight?

12 **A.**  So our whole goal at Test Flight was to make sure that we

13  are efficiently empowering developers to distribute beta iOS

14  apps to their testers.

15      So what historically would have been a dozen steps or so,

16  Test Flight turned into a few steps.  Back in early iOS

17  development, to install a beta to your phone, you actually had

18  to tether via USB to iTunes, you'd have to get a device

19  identifier from the device.

20      And it was a challenge.  It was a really manual process

21  for a tester and it was a really manual process for a

22  developer.  And we automated a lot of that and we made that

23  very efficient to the point where a developer could send a

24  tester in email, inviting them to test the beta.  The tester

25  could say install, and it would just work.  This was really, I

1    guess, the magic of Test Flight.  And my goal was to help

2    developers make better apps by iterating faster and getting

3    feedback.

4    **Q.**  Did Test Flight develop a native iOS app?

5    **A.**  We did.  We built a native iOS app prior to the official

6    launch of Test Flight.

7    **Q.**  And did Test Flight submit its native iOS App to Apple

8    for the Apple review process -- for the app review process?

9    **A.**  Yes, we did.

10   **Q.**  What was the result of that?

11   **A.**  The result was an app review rejection, a couple phone

12   calls as well.  I believe we appealed and that was the end

13   result of the store's submission.

14   **Q.**  What did Test Flight do --

15          **THE COURT:**  You appealed and then they reversed?

16          **THE WITNESS:**  The appeal was upheld.  The native app

17   did not make it to the App Store.  The rejections were upheld.

18   **BY MS. MOYE:**

19   **Q.**  Was Test Flight able to continue in business even though

20   it's native iOS app was not allowed on the --

21   **A.**  Yes.

22   **Q.**  What business model did you change to?

23   **A.**  So I wouldn't describe it as a business model.  Our

24   business model didn't change.  But in terms of a distribution,

25   that did.  We moved to a full screen web app on iOS.

1  And there's a couple of things that I felt I needed from

2  the native app in order to make this work, but I felt there

3  was a path to get those things all with a web app.

4  **Q.** Was Test Flight able to be successful using just a web

5  app?

6  **A.** Absolutely.

7  The Test Flight was used by developers and testers

8  worldwide.  I think that the web app experience, we would get,

9  personally get, you know, customer emails and developer emails

10  where they would have an issue with a particular beta they

11  were testing, and in that they would say, I downloaded this

12  beta from the Test Flight app, and we would chuckle because it

13  wasn't a native app, it was always a web app after the native

14  app was not accepted.

15  **Q.** What was your title or position at Test Flight?

16  **A.** I was a founder and CTO.

17  **Q.** And how did you come to be employed by Apple?

18  **A.** Ultimately Apple acquired Test Flight as a product and a

19  company, so I joined through that acquisition.

20  **Q.** I believe you were asked, but just so we have a clear

21  record, what was your first job at Apple?

22  **A.** I was the engineering manager.

23  **Q.** And at some point while you were in the engineering group,

24  did you come to have responsibility related to the App Store?

25  **A.** Specifically to App Store review, yes.

**Q.**   And what were your responsibilities?

**A.**   So in -- when I started as an engineering manager, I was responsible for some things with Test Flight, but also for app analytics which is a feature for developers.  And shortly thereafter, I think it was within a year, I was asked to run our app review tools team.  And those responsibilities included tools, automation.

And after some time doing that, there was an opportunity within developer operations to run the app review team.  So I think that was 2016 where I took on those responsibilities.

**Q.**   Okay.  Let's talk about the app review team that you lead now.

First I would like to discuss the different functional units within your team.  And we have a demonstrative on that issue also that we would like to use.

**MS. MOYE:**   Before I get to that, I think I neglected Your Honor to move DX5467 into evidence.

**MS. MOSKOWITZ:**   No objection, Your Honor.

**THE COURT:**   5467 is submitted.

(Defendant's Exhibit 5467 received in evidence)

**THE COURT:**   And you have about two minutes.  You can decide whether you want to start.

**MS. MOYE:**   Your Honor, I think it's probably best for us to start tomorrow.  It will take us more than two minutes to get through the slide.

1              **THE COURT:**  All right.  I don't know how to say your

2  last name again.

3              **THE WITNESS:**  Your Honor, Kosmynka.

4              **THE COURT:**  Kosmynka.

5              **THE WITNESS:**  Perfect.

6              **THE COURT:**  You are excused for the day.  You are

7  ordered to return tomorrow.

8              **THE WITNESS:**  Thank you.

9              **THE COURT:**  You may step down.

10      So with respect to just a few housekeeping things, the two

11  lawyers from each side, if I can have them here in the

12  morning, I think we should go through the exhibits I admitted.

13  I admitted a huge number of exhibits today, and I want to make

14  sure my records match your records.  So if we can do that

15  first thing in the morning.

16      Second, there were a number of exhibits that Ms. Forrest

17  referenced this morning where she indicated that there were

18  confidentiality issues.  I don't know if those issues are

19  things that I have to resolve or if they are resolved and we

20  just didn't seal the courtroom because you were able to

21  navigate them.  It is not clear to me.

22              **MS. FORREST:**  Your Honor, my understanding is that

23  there were some confidentiality issues asserted by Apple.  And

24  I didn't want to have to close the courtroom, thought I could

25  navigate them.  I don't know if Apple will maintain those, but

1  I, to date, to this point, they had been maintained as

2  confidential.

3          THE COURT:  So what is the agreement with respect to

4  the downloading of exhibits at the end of today's proceedings?

5          MS. FORREST:  Your Honor, my understanding, subject

6  to counsel, is that they will -- the confidential documents

7  will not be put into the box; that we will confer as to

8  whether there are any appropriate redactions that can be made.

9  And if there can be redactions made to those which have been

10  received, then we will so indicate to Your Honor in open court

11  tomorrow?  We will provide you with appropriate copies, and

12  they will only go into the box in redacted form.

13          THE COURT:  Okay.

14          MS. MOYE:  Your Honor, with respect to that issue,

15  DX314 that was just used in Mr. Kosmynka's examination by

16  Epic, has some confidentiality issues also.  No issues that

17  were discussed in open court, but they will -- that document

18  will need to be a part of the confer process before it's put

19  up on the box also.

20          THE COURT:  314.  Okay.

21      The issue with respect to the deposition transcript for

22  the hot seat operators.  So depositions can be used for a

23  number of purposes.  One is for impeachment and one is that

24  they are just admissions, and they can be read.

25      Unless lawyers tell me that this -- that the portions of

```
 1    depositions are, in fact, party admissions, then the only

 2    other reason that they can go up is for impeachment.  And you

 3    can't show them for impeachment until I decide whether or not

 4    the request to impeach is proper.  That's why I keep asking

 5    you not to put it up until I know.  Just so that you

 6    understand what's happening here.

 7        So if you tell me in advance that the person who is

 8    deposed was there as a 30(b)(6) witness, if I know that, then

 9    it doesn't matter because it's impeachable or not impeachable,

10    the witness can sit there and read the deposition transcript

11    to them.

12        But unless I am told that they are there in their 30(b)(6)

13    capacity, it doesn't go up until I say it can.

14        All right?  We are on the same page?

15             MS. DUNN:  Yes, Your Honor.

16             THE COURT:  Then, I believe, there are two documents

17    that are outstanding that I will get briefing on.  Correct,

18    Ms. Forrest?

19             MS. FORREST:  That is correct.  Your Honor, we will

20    have that for you in the morning.

21             THE COURT:  Okay.  And then I'll get some kind of

22    response, I take it, from Apple.

23             MR. DOREN:  Yes, Your Honor.  I'm trying to think

24    about timing given their submission in the morning, but if we

25    can have until the end of the day?
```

1          **THE COURT:**  That's fine.  We are here for a couple of

2    weeks.

3          **MR. DOREN:**  Thank you.

4          **THE COURT:**  Again, my issue is not -- as you all can

5    see, I've been admitting, I think, quite a bit.  There's

6    documents by definition are out-of-Court statements frequently

7    offered for their truth.

8          When they are party admissions, they come in.  When they

9    are business records they come in.  The ones that I am

10   concerned about are the ones that are not -- where there is no

11   other party communication on those documents, and that, that

12   is the concern.

13         Federal rules require that business records show or at

14   least the basis for the foundation for business record is that

15   it is prepared in the ordinary course.  Because I don't

16   have -- because it's a third party and I don't have that

17   person on the witness stand, I don't know if it is prepared in

18   the ordinary course.  It suggests to me it is hearsay.  It

19   doesn't mean it can't be used in trial.  It doesn't mean the

20   content can't be used in the proper context of an examination,

21   but that doesn't mean that the document comes in.  I know

22   lawyers think all emails come in, they don't.  At least not in

23   my Court.

24         All right.  Any questions?

25         **MR. DOREN:**  Your Honor, I just wanted to raise that

1  we have resolved the issue regarding class counsel on Apple

2  side, and we are fine with their presence during sealed

3  sessions.

4          **THE COURT:**  Okay.  I'm sure that Ms. Manifold is just

5  overjoyed.

6      Anything else?

7          **MR. DOREN:**  Not here, Your Honor.

8          **MS. FORREST:**  Not from Epic, Your Honor.

9          **THE COURT:**  Okay.  Have a good evening.  We will

10  stand in recess until 8:00 o'clock tomorrow morning.

11

12              (Proceedings adjourned at 3:20 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman and Pamela Hebel, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA HEBEL_____

Pamela Hebel, CSR, RMR, FCRR


FRIDAY, MAY 7, 2021