UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                    Plaintiff, Counter-<br>                    Defendant<br><br>        v.<br><br>APPLE, INC.,<br><br>                    Defendant,<br>                    Counterclaimant. | Case No. 4:20-CV-05640-YGR<br><br>DECLARATION OF STEVEN SINGER IN SUPPORT OF NON-PARTY NINTENDO OF AMERICA INC.'S ADMINISTRATIVE MOTION TO SEAL PORTIONS OF DX-3464 |

I, Steven Singer, declare as follows:

1.      I am currently Senior Vice President Publisher & Developer Relations at Nintendo of America Inc. ("NOA").  NOA is one of many subsidiaries of Nintendo Co., Ltd. ("NCL"), a corporation based in Japan.  Although NCL and each of its subsidiaries (including NOA) are separate companies, for purposes of this declaration I will refer to NCL and its subsidiaries together as "Nintendo."  The facts stated in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify to those facts.

2.      In my current role at NOA, I am responsible for managing the relations between Nintendo and its numerous content developers throughout the United States and Latin America.  I have been employed with NOA since April 1999.  I joined as Vice President – Latin America and was responsible for overseeing operations in the Latin America region.  I also provided support for Nintendo's operations in Southeast Asia, India, and the Middle East.  In January 2007, I became Vice President – Licensing.  In that role, I was responsible for licensing activities relating to Nintendo's brand and accessories.  Based on my work experience, I am familiar with Nintendo's business strategies and security protocols relating to content development.  Nintendo keeps that information confidential to protect itself, its developer partners, and its content users from potential harm.

3.      I am also familiar with the Nintendo Switch Content License and Distribution Agreement between Nintendo and Epic, as well as the negotiations between Nintendo and Epic relating to that agreement.  I will refer to the Nintendo and Epic agreement as the "Epic CLDA." Nintendo keeps the negotiated terms of the Epic CLDA confidential because those terms are sensitive and specific to the relationship between the Nintendo and Epic.  Those terms are the result of significant negotiations between Nintendo and Epic that culminated in a carefully crafted agreement with unique terms and conditions acceptable to both parties.  The terms differ from Nintendo's default Content License and Distribution Agreement.  Disclosing those unique terms and conditions publicly would cause competitive harm to Nintendo.

4.      I understand that Apple may introduce a document designated DX-3464, which includes the Epic CLDA, as a trial exhibit in the above-captioned legal case.  I also understand NOA is filing a motion to seal negotiated terms found in the Epic CLDA, and I make this declaration in support of that motion.  I further understand that NOA has filed a highlighted and sealed copy of the Epic CLDA, which is the portion of DX-3464 labeled with production numbers EPIC_04503637-62, as Exhibit 1 to its motion to seal.  I have reviewed that version of the Epic CLDA.  The highlighted terms of the Epic CLDA are highly confidential and were negotiated between Nintendo and Epic to allow Epic to develop content for the Nintendo Switch platform.  The terms differ from the standard terms offered in Nintendo's default Content License and Distribution Agreement and reflect Nintendo's confidential business strategies, including the strategy for its relationship with Epic.  The Epic CLDA also describes negotiated terms relating to confidential security and privacy protections.

5.      Nintendo treats all versions of its Content License and Distribution Agreement as confidential.  Even before negotiations with a potential developer begin, Nintendo takes extensive steps to limit access to the terms of the Content License and Distribution Agreement and to protect those terms from becoming public.  Before obtaining access to the Content License and Distribution Agreement, a prospective content developer must follow several steps.  The developer must first formally apply to Nintendo's content developer program.  If Nintendo accepts the application, the developer must then sign a non-disclosure agreement.  Only then can

the developer view the Content License and Distribution Agreement.  With respect to its current platform, the Nintendo Switch, Nintendo also requires that developers submit a proposal regarding what they plan to develop along with their development history and prior experience, which Nintendo reviews before any developer is allowed further access into Nintendo's development ecosystem for the Nintendo Switch.  Approval by Nintendo is subjective and selective.

6.      Nintendo also treats the Epic CLDA as highly confidential business information because it reflects the terms the parties negotiated to form their relationship relating to content development for the Nintendo Switch.  The negotiated terms of the Epic CLDA are sensitive and not available to the public.  Every page of the Epic CLDA includes a "Confidential" designation in the top left corner, and the agreement itself requires Epic to treat its terms and conditions as confidential.  I also see that the version of the Epic CLDA that appears within DX-3464 is labeled at the bottom of each page with the designation "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."  The negotiated terms of the Epic CLDA would cause competitive harm to Nintendo if disclosed publicly.

7.      The sealed version of the Epic CLDA filed by NOA highlights terms negotiated by Nintendo and Epic.  Those terms are different from the standard contractual terms in the default version of the Content License and Distribution Agreement provided by Nintendo to prospective developers.  Nintendo and Epic engaged in extensive negotiations to modify many terms of Nintendo's default Content License and Distribution Agreement.  The resulting provisions are special to the Epic CLDA and unique to that agreement between Nintendo and Epic.  The negotiated contract provisions are competitively sensitive and non-public.  They reflect Nintendo's specific business strategy for its relationship with Epic.  Nintendo and Epic engaged in a lengthy negotiation to arrive at negotiated terms acceptable to both under the surrounding circumstances.

8.      Public disclosure of the negotiated terms of the Epic CLDA would lead to substantial competitive harm to Nintendo.  Nintendo and Epic's negotiations were non-public and intensive, with both parties enlisting the help of numerous lawyers and businesspeople.  If the

highly confidential negotiated terms of the Epic CLDA were publicly disclosed, competitors could use them against Nintendo to compete for developers by, for example, adopting Nintendo's strategy for establishing a mutually beneficial relationship with Epic to strengthen their own relationship with Epic or their relationships with other content developers.  That could lead to developers, including Epic, spending less time developing content for Nintendo and more time developing content for its competitors, which could adversely affect content generation for the Nintendo Switch and Nintendo's business.  In addition, if the negotiated terms of the Epic CLDA became public, a potential developer might use those terms to Nintendo's detriment during negotiations of a Content License and Distribution Agreement by insisting on negotiated terms described in the Epic CLDA, even though those terms are based on the specific circumstances of the relationship between Nintendo and Epic.  Similarly, existing developers might seek to renegotiate their agreements with Nintendo to obtain the same or similar negotiated terms as Epic, despite the unique circumstances of Nintendo's relationship with Epic.  As a result, public release of the negotiated terms of the Epic CLDA could disrupt Nintendo's negotiations with potential developers and relationships with existing developers, undermining Nintendo's ability to compete in the content development marketplace.

9.      Also, the sealed version of the Epic CLDA filed by NOA highlights negotiated terms relating to Nintendo's approach to data security and privacy, such as terms in Sections 3.7 and 9 and in Exhibit A.  Information security is a serious concern for Nintendo, especially as data breaches have become increasingly common.  To protect non-public information of its developers and users, Nintendo imposes strict security and privacy requirements for content developed for the Nintendo Switch.  If the negotiated security and privacy provisions of the Epic CLDA were made public, that could compromise Epic's information and Nintendo user data.  Releasing Nintendo's negotiated security and privacy protocols publicly would allow bad actors to attempt to defeat the protections and obtain private or proprietary information.

1       I declare under the penalty of perjury of the laws of the United States of America that the

2 foregoing is true and correct.

3       Executed this 10th day of May 2021 in Redmond, Washington.

4

5

6                                      Steven Singer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28