Steven L. Holley (*pro hac vice* pending)
(holleys@sullcrom.com)
Shane M. Palmer (SBN 308033)
(palmersh@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California  94303
Telephone:     (650) 461-5600
Facsimile:      (650) 461-5700

*Attorneys for Non-Party Spotify USA Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., <br><br>　　　　　Plaintiff, <br><br>　　v. <br><br>APPLE INC. <br><br>　　　　　Defendant. | Case No. 4:20-cv-05640-YGR-TSH <br><br>**DECLARATION OF BENJAMIN KUNG IN SUPPORT OF NON-PARTY SPOTIFY USA INC.'S ADMINISTRATIVE MOTION TO PARTIALLY SEAL SPOT-EPIC-00000932** |

SULLIVAN & CROMWELL LLP

DECL. OF BENJAMIN KUNG IN SUPP. OF NON-PARTY SPOTIFY'S ADMIN. MOT. TO PARTIALLY SEAL SPOT-EPIC-00000932
CASE NO. 4:20-CV-05640-YGR-TSH

I, Benjamin Kung, declare as follows:

1. I am a Director in the Financial Planning & Analysis ("FP&A") team at Spotify USA Inc. ("Spotify"), currently serving as our Head of Strategic Planning and Licensing Finance. I submit this declaration pursuant to Local Rule 79-5(d) in support of Spotify's Administrative Motion to Partially Seal SPOT-EPIC-00000932, submitted concurrently herewith.

2. I have worked at Spotify since March 2016 and have served in various roles within the FP&A team during that time. My current job responsibilities include overseeing teams that forecast and manage the economics of our music licensing deals, providing guidance and visibility to business teams and senior leadership on matters impacting Spotify's consolidated margins, and long-range strategic planning for the company. I have personal knowledge of the facts set forth in this declaration and can testify competently to those facts.

3. Spotify is an indirect, wholly-owned subsidiary of Spotify Technology S.A., a publicly-traded company incorporated in Luxembourg. Founded in Sweden, Spotify operates the most popular global audio streaming service. Spotify's streaming service first launched in Sweden in 2008 and launched in the United States in 2011. Spotify is available in 178 markets, and its platform is used by 356 million monthly active users.

4. The market for audio and music streaming apps and app distribution on various platforms is highly competitive and includes several of the largest tech companies in the world, including Apple. Because Spotify does not directly control a widely-used channel for distributing its audio streaming app to a large number of users, our business model not only depends on our ability to acquire content or negotiate licenses with content rights holders on favorable terms, but also requires us to simultaneously negotiate with distribution partners to keep distribution fees and commissions as low as possible. To optimize our distribution and user growth strategies against these variables, Spotify employs significant resources with respect to research and development, data collection, and analysis about user experience and behavior across various channels in order to successfully compete in the audio streaming market.

Sullivan & Cromwell LLP

1

Decl. of Benjamin Kung in Supp. of Non-Party Spotify's Admin. Mot. to Partially Seal SPOT-EPIC-00000932
Case No. 4:20-cv-05640-YGR-TSH

5. I understand that on May 9, 2021, Apple Inc. ("Apple") notified Spotify that it intends to disclose a document bearing Bates numbers SPOT-EPIC-00000932 through SPOT-EPIC-00000943 at trial.

6. I further understand that the document bearing Bates numbers SPOT-EPIC-00000932 through SPOT-EPIC-00000943 was produced by Spotify in response to subpoenas served on Spotify by Epic Games, Inc. ("Epic") on December 2, 2020, and by Apple on December 8, 2020; and that Spotify designated those documents as "SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY" pursuant to the Supplemental Protective Order Governing Discovery from Spotify that was filed jointly by Apple and Epic at Spotify's request and was entered by the Court in this litigation on February 11, 2021 ("Supplemental Protective Order") (Dkt. No. 407).

7. The document bearing Bates numbers SPOT-EPIC-00000932 through SPOT-EPIC-00000943 is a response by Spotify to an Information Request from the Japan Fair Trade Commission ("JFTC"), dated September 4, 2020, in connection with a fact-finding survey conducted by the JFTC of competition in digital platforms (the "JFTC Response"). Spotify provided this document to the JFTC with the understanding that the JFTC would maintain the document in confidence and not disclose it to the public, and Spotify branded each page of the document with the legend "STRICTLY CONFIDENTIAL – CONTAINS BUSINESS SECRETS."

8. The following chart lists the portions of Spotify's JFTC Response that are sealable for the reasons stated in this declaration, and the specific portions that are sealable are highlighted in yellow in the unredacted version of the JFTC Response that is attached as Exhibit A to the Declaration of Shane M. Palmer, submitted concurrently herewith:

Sullivan & Cromwell LLP

2

Decl. of Benjamin Kung in Supp. of Non-Party Spotify's Admin. Mot. to Partially Seal SPOT-EPIC-00000932
Case No. 4:20-cv-05640-YGR-TSH

| Portion of Document Sought to be Sealed | Evidence Offered in Support of Sealing |
|---|---|
| Response to Request 1, pages SPOT-EPIC-00000932 – '0934 | Declaration of Benjamin Kung ¶¶ 10–11, 16 |
| Response to Request 3, page SPOT-EPIC-00000935 | Declaration of Benjamin Kung ¶¶ 10, 16 |
| Response to Request 4(3), page SPOT-EPIC-00000938 | Declaration of Benjamin Kung ¶¶ 12–16 |

9. In an effort to narrowly tailor its sealing requests, Spotify does not request sealing of the JFTC Response in its entirety. Although certain information reflected in other portions of the JFTC Response not listed above is non-public, Spotify recognizes the Court's need to balance Spotify's interests against the public's interest in access to court records and has sought to narrow its sealing requests as much as possible.

10. The responses to Requests 1 and 3 of the JFTC Response describe the methodology and detailed findings of a proprietary analysis that was undertaken by Spotify to understand the impact of Apple's marketing restrictions on Spotify's ability to convince users to subscribe to Spotify's Premium audio streaming service. If this information were disclosed publicly, Spotify would be competitively harmed in its business because it would reveal the sophisticated types of analyses that Spotify performs to assess user behavior and the effectiveness of Spotify's marketing strategies. If Spotify's distribution partners knew the types of internal analyses that Spotify is capable of performing (and has previously performed), they might demand that Spotify undertake such analyses as a condition of continued partnership. This could undermine the value of Spotify's existing distribution partnerships, undercut Spotify's ability to negotiate favorable arrangements with new distribution partners, drive up the prices Spotify would pay (consequently impacting its revenues), and generally harm Spotify's ability to compete and grow its business.

11. Moreover, Spotify would be competitively harmed in its business if the specific quantitative findings of Spotify's proprietary analysis reflected in the response to Request 1 of the JFTC Response became public, because Spotify's audio streaming app competitors could

3

DECL. OF BENJAMIN KUNG IN SUPP. OF NON-PARTY SPOTIFY'S ADMIN. MOT. TO PARTIALLY SEAL SPOT-EPIC-00000932
CASE NO. 4:20-CV-05640-YGR-TSH

use this analysis to assess the effectiveness of Spotify's advertising for its Premium service on mobile devices and use that to inform their own business and marketing strategies with respect to product strategy, distribution, and advertising.

12. The response to Request 4(3) of the JFTC Response contains Spotify's proprietary, internal data and analysis concerning the percentages of first-time Premium subscribers who first used Spotify's Free service for a period of time, or who signed up directly for the Premium service, over a period of six years. This is highly sensitive information that Spotify keeps confidential and does not disclose to the public. Spotify was only willing to produce this information in this litigation subject to the protections of the Supplemental Protective Order, which restricts access to the documents to outside counsel, experts, and trial consultants for the parties and to the court and its personnel. To maintain the confidentiality of this data and analysis, Spotify invests in data security measures to prevent unauthorized outside parties from accessing the information. Spotify would be competitively harmed in its business if this data were disclosed to the public in the course of the trial in this action.

13. Spotify uses the information reflected in the response to Request 4(3) of the JFTC Response for a variety of strategic business purposes, including but not limited to:

  a. developing business strategies to compete with other audio and music streaming app providers, including Apple;

  b. identifying and negotiating with potential distribution partners to expand Spotify's subscription business; and

  c. planning strategic corporate investment decisions to drive sustainable growth and remain competitive in the marketplace.

14. If the information provided in response to Request 4(3), including the data in Table 3, were disclosed publicly, it would give Spotify's competitors insight into Spotify's internal data and analysis concerning its business operations, including trends in those areas over time. Such information could be used by Spotify's competitors to inform their own business and marketing strategies with respect to product strategy, distribution, and advertising. For example,

competing app developers could use the data to understand trends in Spotify's app usage and then selectively devote their resources to optimize their apps differently.

15. Additionally, public disclosure of the information in the response to Request 4(3) of the JFTC Response would also unfairly disadvantage Spotify in its negotiations with distribution partners (including original equipment manufacturers such as mobile, TV, gaming, and auto partners, as well as app providers and commercial partners). If this material were to fall into the hands of distribution platforms or partners, for example, it could undermine Spotify's position in negotiations, undercut deal terms, drive up the prices Spotify would pay (consequently impacting its revenues), and generally harm Spotify's ability to compete and grow its business.

16. Finally, the JFTC Response was created solely for the purpose of responding to specific requests from JFTC on a confidential basis. Although Spotify's responses were compiled from information that Spotify maintains in the ordinary course of its business, this document is not used or maintained by Spotify in the format in which it was produced to the JFTC, and it was not prepared with an eye towards providing a complete view of Spotify's business.

I declare under penalty of perjury that the foregoing is true and correct. Executed this May 11, 2021 in Brooklyn, New York.

/s/ Benjamin Kung
Benjamin Kung

**ATTESTATION**

I, Brendan P. Cullen, am the ECF User whose ID and password are being used to file this document with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories concur with this filing.

Dated:  May 11, 2021                                       /s/ Brendan P. Cullen
                                                                        Brendan P. Cullen

Sullivan & Cromwell LLP

Decl. of Benjamin Kung in Supp. of Non-Party Spotify's Admin. Mot. to Partially Seal   SPOT-EPIC-00000932
Case No. 4:20-cv-05640-YGR-TSH