1  Steven L. Holley (*pro hac vice* pending)
   (holleys@sullcrom.com)
2  Shane M. Palmer (SBN 308033)
   (palmersh@sullcrom.com)
3  SULLIVAN & CROMWELL LLP
   125 Broad Street
4  New York, New York  10004
   Telephone:     (212) 558-4000
5  Facsimile:     (212) 558-3588

6  Brendan P. Cullen (SBN 194057)
   (cullenb@sullcrom.com)
7  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
8  Palo Alto, California  94303
   Telephone:     (650) 461-5600
9  Facsimile:     (650) 461-5700

10  *Attorneys for Non-Party Spotify USA Inc.*

11

12                    **UNITED STATES DISTRICT COURT**

13                    **NORTHERN DISTRICT OF CALIFORNIA**

14  EPIC GAMES, INC.,                              Case No. 4:20-cv-05640-YGR-TSH

15                         Plaintiff,              **REDACTED EXHIBIT A TO**
                                                   **DECLARATION OF SHANE M. PALMER**
16        v.                                       **IN SUPPORT OF NON-PARTY SPOTIFY**
                                                   **USA INC.'S ADMINISTRATIVE**
17  APPLE INC.                                     **MOTION TO SEAL SPOT-EPIC-00000932**

18                         Defendant.              **REDACTED VERSION OF DOCUMENT**
                                                   **SOUGHT TO BE SEALED**
19

20

21

22

23

24

25

26

27

28

SULLIVAN
&
CROMWELL LLP

REDACTED EXHIBIT A TO DECL. OF SHANE M. PALMER IN SUPP. OF NON-PARTY SPOTIFY'S ADMIN. MOT. TO SEAL
CASE NO. 4:20-CV-05640-YGR-TSH

STRICTLY CONFIDENTIAL - CONTAINS BUSINESS SECRETS
4 September 2020

**Information Request from the JFTC**

**Spotify's response**

1. **Results of Spotify's experiment of December 2018**

   **We would be grateful if you could submit the results of Spotify's experiment of December 2018 (extracted below)**



STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020



SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020



2. **Other Economic Analysis**
   **If there have been any new economic analysis and the results of such analysis
   have been submitted to any foreign authority (e.g., US, Europe and/or Australia)
   since the submission to the JFTC in May 2019, we would be grateful if you could
   submit the results of such new analysis.**

*Annex 1: Apple's Anti-competitive Restrictions Raise Spotify's Costs, AT.40437 –
Spotify's Response to RFI of 23 April Annex 2 – Confidential.xlsx*, and *Further
information on additional costs imposed by Apple's conduct* contain an economic analysis
of how Apple's anti-competitive conduct has, by raising Spotify's costs of acquiring and
converting users on iOS to Spotify's Premium service, further weakened the competitive

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    SPOT-EPIC-00000934

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020

constraints faced by Apple Music. This analysis was submitted in May 2020 to the European Commission.

3. **Payment Functions and Advertising Functions of Spotify Apps**
   **Is our understanding correct that the payment methods, and the advertising methods (or the display of advertisements) to encourage users to change to the Premium Plan, on Spotify apps do not differ globally, rather than significantly differ only for the Japan Market (in particular during the period when the experiment in December 2018 was carried out – but please let us know if there has been any significant change since December 2018)? Please respond for each of iOS devices and Android devices.**

The payments and advertising methods used by the Spotify iOS and Android apps in Japan are the same as those used by equivalent Spotify's apps in other countries, ███████ ████████████████████████████ In all of these countries, including during the time of the experiment:

- Android users are able to pay and subscribe to Spotify's Premium service via the Spotify app on Android. This is not strictly speaking an in-app purchase since the purchase does not take place inside the app as the app seamlessly redirects users to Spotify's organic check-out on the user's mobile browser, where they can choose from a range of payment options.
- iOS users are unable to pay and subscribe to Spotify's Premium service via the iOS app;
- Both Android and iOS users can pay and subscribe to Spotify's Premium service via Spotify's website;
- Spotify runs a bi-annual seasonal marketing campaign to invite users to convert to its Premium service, which includes banners displayed in the app. However, while the banner displayed in the Android app provides users with the price of Spotify's Premium service and information on how to subscribe to this service, the banner in the iOS app provides only generic information on Spotify's Premium service, and no information on the price of the service or how to subscribe to it;
- When Android users of Spotify's Free service try to access a Premium service feature in the Android app, the user is informed that this is a Premium service feature and given information and the opportunity to subscribe to the Premium service;
- When iOS users of Spotify's Free service try to access a Premium service feature in the iOS app, the user is informed that this is a Premium service feature, but not given any information or the opportunity to subscribe to the Premium service;

There have been no material changes to Spotify's payment methods in its iOS and Android apps in recent years. The most recent change to Spotify's app payment methods was in May 2016, when Spotify was effectively forced to disable IAP in Spotify's iOS app, meaning that iOS users were no longer able to convert in-app to Spotify's Premium service.

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020

The marketing restrictions that Apple imposes on Spotify's iOS app have become increasingly restrictive over time. The most recent major restrictions were introduced by Apple in June 2017, when Apple amended its marketing guidelines to ban apps from i) directly or indirectly targeting iOS users to use other purchasing mechanisms, and ii) general communications designed to discourage the use of IAP. The broad brush nature of these restrictions materially increased Apple's discretion in deciding whether Spotify's iOS app is compliant with Apple's marketing guidelines. As a consequence, Spotify has been forced to make the ads in its iOS app more generic and anodyne and less informative, compared with the ads in Spotify's Android app. For example, to comply with Apple's marketing restrictions Spotify has created walled-off or sandboxed product pages that contain no hyperlinks, but just a "Learn More" button that leads the user to a walled-off page with basic information about the features of Spotify Premium (and no reference to how to purchase a subscription). Despite Spotify's efforts to make its in-app ads compliant with Apple's guidelines, Apple has increasingly rejected Spotify's app on the grounds that it is not compliant with Apple's broad interpretation of these guidelines.

## 4. Conversion rates

**(1) We assume (based on the results of Results of Spotify's experiment of December 2018) that the subscription rate of Android devices, where users are able to directly change to the Premium Plan on apps, is higher than that of iOS devices, where users are unable to subscribe the Premium Plan on apps but are only able to subscribe the Premium Plan on the website.**

The results of the Spotify experiment in December 2018 clearly demonstrate that as a consequence of Apple's anti-competitive behaviour a smaller proportion of users on iOS convert to Spotify's Premium service compared to Android. This is because:

- iOS users are unable directly to convert in-app to Spotify's Premium service, as Spotify has been forced to disable IAP for the reasons explained in Spotify's Complaint to the European Commission.
- Apple's anti-competitive marketing restrictions mean that Spotify is unable to use its iOS app effectively to advertise its Premium service to iOS users, which in Spotify's experience is the most effective form of advertising as the user is engaged with Spotify's service and trying to access a Premium service feature.

As Apple's anti-competitive behaviour has severely reduced Spotify's ability to convert users on iOS, Spotify has put significant efforts and expenditure into developing and deploying alternative means of converting users, especially on iOS in order to mitigate this negative effect on its business. These alternative methods primarily involve Spotify using paid advertising, for example, Google advertising and social media advertising, to convert users on iOS to its Premium service. Although Spotify does convert some iOS users as a result of using these alternative methods, this does not mitigate the effects of Apple's anti-competitive behaviour on Spotify's ability to convert iOS users to its Premium Service. Moreover, these alternative methods involve Spotify incurring considerable additional costs, which Spotify would not have incurred absent Apple's anti-competitive behaviour and which further limit the competitive constraint that Spotify

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020

places on Apple Music. These additional costs and how these affect Spotify's ability to compete with Apple Music are discussed in detail in *Annex 1: Apple's Anti-competitive Restrictions Raise Spotify's Costs* and *AT.40437 – Spotify's Response to RFI of 23 April Annex 2 – Confidential.xlsx.*

> **We would be grateful if you could provide the monthly or yearly subscription rates (or the conversion rates) of Android devices and iOS devices for the period from when Spotify launched in Japan to date.**

In the normal course of its business Spotify does not collect conversion data by platform. In the context of the European Commission investigation, Spotify used a proxy to estimate the number of conversions by platform, using information on its marketing campaigns for the period 2015-2019. These are estimates of worldwide annual conversions and are contained in the file *AT.40437 – Spotify's Response to RFI of 23 April Annex 2 – Confidential.xlsx.*

> **(2) According to para. 3.6.a. of "An economic assessment of the effects of Apple's License Agreement with Spotify" by Compass Lexecon dated 9 April 2019, "*The conversion rate [to Premium Services] includes Premium subscribers converted from the Free Tier and <u>those subscribers who signed up directly to the Premium service</u> (without first using the Free service).*" (emphasis added). Please elaborate this.**

The CL report dated 9th April 2019 contains a time series analysis of the overall conversion rate, which includes both users who converted to Spotify's Premium service from its Free service and users who directly subscribed to Spotify's Premium service without first using Spotify's Free service. The reason for using data on the total conversion rate is that Apple's anti-competitive conduct affects both users who converted to Spotify's Premium service from its Free service and users who directly subscribed to Spotify's Premium service, and CL sought to estimate the overall effect of Apple's anti-competitive behaviour on Spotify. For example, when Spotify disabled IAP, this would have had a negative effect on the likelihood of both iOS users of Spotify's Free service and iOS users who do not use the Free service but are interested in having a paid music streaming service, subscribing to Spotify's Premium service, since neither of these groups of users are able to directly sign-up for Spotify's Premium service from the iOS app.

> **(3) Also, please let us know the breakdown of subscribers (between subscribers converted from the Free Tier and subscribers signed up directly to the Premium service).**

The following table contains annual figures for the period 2014-2019 on total first-time conversions, first-time conversions from Spotify's Free service and first-time direct to Premium conversions, as well as the latter two variables as a proportion of total first-time conversions. Total first-time conversions is the number of users who converted to Premium for the very first time (i.e. these users have only ever used Spotify's Free service or had not registered with Spotify prior to their conversion day), and consists of:

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020

- First-time conversions from Spotify's Free service, who are users who had been on and using Spotify's Free service for a while before converting to the Premium service for the first-time; and,
- First-time Direct-to-Premium conversions, who are users who registered with Spotify and then converted to the Premium service less than 14 days after registration and had one or zero listening days while on the free product (excluding 7 day trial listening days).



SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    SPOT-EPIC-00000938

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020

**5. At the meeting between Spotify and the JFTC on 26 February 2020, Spotify mentioned that Apple restricted Spotify from promoting to its users via email and it was because of 3.1.3 (a) and (b) of Apple's App Store Review Guidelines** (i.e., *"Apps may allow a user to access previously purchased content or content subscriptions[...], provided that [...] <u>your general communications about other purchasing methods are not designed to discourage use of in-app purchase.</u>"*).

**(1) Please confirm whether this restriction is still on-going.**

**(2) Please explain the current situation regarding Spotify's promotions via email in Japan, the United States, the EU and Australia, respectively for iOS users and Android users.**

**(3) Please explain the details of the restriction (e.g. promotions such as how to get on Spotify's playlists are not restricted but promotions such as how to subscribe for Spotify's Premium plan are restricted).**

From May 2016, right after Spotify disabled IAP, to September 2016, Apple rejected every app Spotify submitted. Throughout these months, Apple constantly changed its "justification" for the rejection, and most notably, amended the Guidelines to include a prohibition of "calls to action".

Spotify takes this opportunity to clarify the reference made during the JFTC's meeting with Spotify on 26 February 2020 with specific examples of how Apple has enforced its Guidelines beyond the iOS platform:

<u>Apple rejects app approvals due to emails in connection with 7-Day Trials</u>

In May 2016, Apple rejected a Spotify app update and kept rejecting it for several weeks. At an in-person meeting between Spotify's General Counsel at the time, Horacio Gutierrez, and Apple's then General Counsel Bruce Sewell in July 2016, Apple indicated that the reason for the rejection of Spotify's app update was that Spotify sends a so-called "solicitation" email to users shortly after registration of a new account. A few days later, Mr. Gutierrez wrote to ask for more specificity regarding the emails Apple objects to, given that Spotify, like most other service providers (including Apple), routinely carries out a number of email and other marketing campaigns aimed at all Spotify apps users across all platforms (e.g., Android, iOS, Windows) all over the world. In a follow-up email, Apple clarified that the email in question was the "welcome" email captured below:

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

SPOT-EPIC-00000939

STRICTLY CONFIDENTIAL - CONTAINS BUSINESS SECRETS
4 September 2020



Apple's stated grounds for continuing to reject Spotify's app update were not supported by the App Store Guidelines. There was (and there still is) nothing in Apple's rules that even purports to govern Spotify's *off-platform communications* with its customers. As Apple itself had previously stated to Spotify, Apple's App Store rules applied to links "inside of an app." Apple's objection, however, was to a link *in an email*.

Moreover, less than a week after the above meeting Spotify and Apple, Apple offered a different justification for rejecting Spotify's app to that presented only a week earlier. In a call with Spotify held on July 11, Apple pointed to "the functioning of the 7-day free trial and the associated emails" as the basis of the alleged violation of Apple's App Store rules.

Unlike the "welcome" email referred to above, the 7-day free trial and associated emails were not being sent upon signup of a new account. Instead, users of the free app were allowed temporary enjoyment of certain Premium features, at no cost, only if and when they attempt to use a feature that is reserved to Premium subscribers. For example, if a user tried to skip a number of songs in a way that is not supported by Spotify's Free service, Spotify would suggest the 7-day free trial of Spotify Premium as follows:

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

STRICTLY CONFIDENTIAL - CONTAINS BUSINESS SECRETS
4 September 2020



If the user elected to try the Premium features and clicked on the "Ok! Let's Go!" button, Spotify activated a 7-day free trial of Premium. The 7-day trial did not involve any sort of financial transaction. There was no "sale" or subscription payment involved. Spotify did not take credit card information, and the 7-day trial did not lead to any payment of any kind, whether upfront, subsequent or recurring. At no point during the trial, or at its conclusion, did Spotify present to the user any in-app mechanism for conversion of the user to Spotify's Premium service.

Given the absence of any in-app mechanism for subscription, once again Apple had taken the position that even off-platform emails sent by Spotify to users of its free app violated Apple's App Store rules unless Spotify agreed to use Apple's IAP.

Yet, there was no contractual or legal basis for such assertion, and a ban of all such off-platform communications represented an unreasonable (and crippling) interference by Apple in the business of freemium app developers like Spotify, who depend upon such marketing efforts to build their business.

Apple rejects app approvals due to "Email me" button

In June 2016, Apple rejected Spotify's iOS app, alleging that its summer promotional campaign breached the App Store Review Guidelines (the "**Guidelines**"). The ad campaign that Apple took issue with was taking place **outside the app** and even outside the iOS environment itself. In particular, Apple claimed that Spotify was infringing the Guidelines by informing users on iOS of one of its regular seasonal promotions offered across all platforms. The promotion gave users the opportunity to purchase three months of Premium for EUR 0.99. Spotify had publicized this promotion widely, including by placing it on the opening screen on *spotify.com*. In the context of this promotion, Spotify gave users of its iOS app the opportunity to click on a button marked "Email Me" which,

when clicked, would prompt Spotify to send the user an email informing them about the promotion (see screenshot below).



According to Apple, enabling users to request information from Spotify through these external (off-platform) communications violated Rule 11.13 of the Guidelines (which would roughly correspond to Rule 3.1.1 of the current version of the Guidelines). This was despite no transaction taking place between the user and Spotify in the iOS app. Most notably, in a 7 June 2016 email, Apple took the drastic position that unless Spotify acted to remove this promotion, Apple would remove its app from the App Store. Notwithstanding the unreasonableness of Apple's position, Spotify, under threat of removal from the App Store, stopped communicating any information whatsoever about the three-month promotion through the iOS app. From that point on when free users hit a pay wall, Spotify displayed a message saying: "*You've discovered a Premium feature. You must have a Premium subscription to unlock it.*" When users clicked "got it," they would simply return to the Free service.

While in continuing negotiations with Spotify regarding the rejection of its app, Apple suspiciously made its first substantial amendment to Rule 11.13 of the (then) Guidelines on 13 June 2016. This is when Apple added the (vague) prohibition of "*calls to action directing users to mechanisms other than IAP*"; in the months and years that followed, Apple has continuously stretched the meaning of "call to action" at will, to prohibit any marketing activity by Spotify that it seeks to restrain.

Marketing promotions such as the one described above are still prohibited by Apple globally (including in Japan).

It should be clarified that Spotify is not generally prohibited from emailing its users with marketing materials (to the extent that each individual user has opted-in to marketing emails from Spotify) for instance, as part of the on-boarding process of a new user of Spotify's Free service.  These marketing materials can include references to Spotify

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY  SPOT-EPIC-00000942

STRICTLY CONFIDENTIAL · CONTAINS BUSINESS SECRETS
4 September 2020

Premium or ways to subscribe to Premium. Nevertheless, as it did in June 2016, if Apple perceived any such marketing emails from Spotify (containing information for subscribing to Spotify Premium) to be linked to the iOS platform in any way, however tenuous the connection, Apple would prohibit Spotify from sending them.

On Android, restrictions such as the one described above do not currently apply.

As noted in Spotify's submission of 23 April 2020, Spotify's strong view is that any remedy that does not entirely uncouple both the IAP Obligation and the Marketing Restrictions from developers' access to app distribution on iOS would not be effective in eliminating the anti-competitive harm that Apple's behaviour is generating.

Essential parts of an effective remedy would include Apple:

(a) removing the IAP Obligation with respect to in-app purchases on apps competing with Apple's proprietary services. In other words, Apple should allow app developers to offer in-app purchases to their users using any payment / billing system, not just IAP;

(b) allowing developers to mention the price of their paid services as part of in-app promotions; and

(c) allowing developers to notify users of non-IAP or out-of-app/platform purchasing options, including with reference to the price of these purchase options, and encourage users to use such options.

\*\*\*

SPOTIFY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    SPOT-EPIC-00000943