VOLUME 6

Pages 1319 – 1583

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

```
EPIC GAMES, INC.,            )
                             )
         Plaintiff,          )   NO. C-20-5640 YGR
                             )
   vs.                       )   Monday, May 10, 2021
                             )
APPLE, INC.,                 )   Oakland, California
                             )
         Defendant.          )   BENCH TRIAL
_____)
APPLE, INC.,                 )
                             )
         Counterclaimant,    )
   vs.                       )
                             )
EPIC GAMES, Inc.,            )
                             )
         Counter-Defendant.  )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   **BY:  KATHERINE B. FORREST, ESQUIRE
                        GARY A. BORNSTEIN, ESQUIRE
                        YONATAN EVEN, ESQUIRE**

                   (Appearances continued.)

Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
                        Official Court Reporter
         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1   For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                             825 Eighth Avenue
 2                           New York, New York 10019
                        BY:  LAUREN A. MOSKOWITZ, ESQUIRE
 3                           JUSTIN C. CLARKE, ESQUIRE
                             W. WES EARNHARDT, ESQUIRE
 4                           BRENDAN BLAKE, ESQUIRE
                             JIN NIU, ESQUIRE
 5

 6   For Defendant:          GIBSON, DUNN & CRUTCHER
                             333 South Grand Avenue
 7                           Los Angeles, California 90071
                        BY:  RICHARD J. DOREN, ESQUIRE
 8                           DAN SWANSON, ESQUIRE
                             CYNTHIA RICHMAN, ESQUIRE
 9                           RACHEL BRASS, ESQUIRE
                             ARPINE LAWYER, ESQUIRE
10

11                           GIBSON, DUNN & CRUTCHER, LLP
                             2001 Ross Avenue, Suite 1100
12                           Dallas, Texas 75201
                        BY:  VERONICA S. MOYE, ESQUIRE
13
                             PAUL WEISS RIFKIND
14                           WHARTON & GARRISON LLP
                             2001 K STREET, NW
15                           Washington, DC 20006
                        BY:  KAREN DUNN, ESQUIRE
16                           JESSICA E. PHILLIPS, ESQUIRE

17

18   For Defendant:          PAUL WEISS RIFKIND
                             WHARTON & GARRISON LLP
19                           943 Steiner Street
                             San Francisco, California 94117
20                      BY:  ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| | | | Page | VOL. |
|---|---|---|---|---|
| 1 | Plaintiff's Witnesses: | | | |
| 2 | **Weissinger, Matthew** | | | |
| 3 | Direct Examination by Ms. Moskowitz (Resumed) | | 1331 | 6 |
| 4 | Cross-Examination by Mr. Doren | | 1352 | 6 |
| 5 | Redirect Examination by Ms. Moskowitz | | 1437 | 6 |
| 6 | Recross-examination by Mr. Doren | | 1444 | 6 |
| 7 | **Evans, David** | | | |
| 8 | Direct Examination by Mr. Bornstein | | 1448 | 6 |
| 9 | | | | |
| | | | EVD. | VOL. |
| 10 | **Plaintiff's Exhibits:** | | | |
| 11 | 0058 | | 1582 | 6 |
| 12 | 2435 | | 1344 | 6 |
| 13 | 2624 | | 1582 | 6 |
| | | | EVD. | VOL. |
| 14 | **Defendant's Exhibits:** | | | |
| 15 | 3222 | | 1398 | 6 |
| 16 | 3233 | | 1392 | 6 |
| 17 | 3254 | | 1404 | 6 |
| 18 | 3297 | | 1421 | 6 |
| 19 | 3457 | | 1396 | 6 |
| 20 | 3641 | | 1418 | 6 |
| 21 | 3933 | | 3933 | 6 |
| 22 | 4138 | | 1426 | 6 |
| 23 | 4167 | | 1422 | 6 |
| 24 | 4177 | | 1417 | 6 |
| 25 | 4374 | | 1582 | 6 |

| Defendant's Exhibits: | EVD. | VOL. |
|---|---|---|
| 4652 | 1437 | 6 |
| 5505 | 1582 | 6 |
| 5539 | 1365 | 6 |
| 5540 | 1381 | 6 |
| 5541 | 1361 | 6 |
| 5544 | 1373 | 6 |
| 5545 | | |

1    MONDAY, MAY 10, 2021                          8:00 a.m.

2                    P R O C E E D I N G S

3          THE CLERK:   Calling CV 20-5640, Epic Games, Inc., vs.

4    Apple, Inc.

5        Counsel, please state your appearances.

6          MS. FORREST:   Good morning, Your Honor.  Katherine

7    Forrest for Epic.

8          THE COURT:   Good morning.

9          MS. MOSKOWITZ:   Good morning, Your Honor.  Lauren

10   Moskowitz also for Epic.

11         THE COURT:   Good morning.

12       Mr. Sweeney, good morning.

13         MR. SWEENEY:   Good morning.

14         MS. MOSKOWITZ:   Jin Niu is also here.

15         MR. NIU:   Good morning, Your Honor.

16         THE COURT:   Mr. Niu, good morning.

17       Mr. Rudd, good morning.

18         MR. DOREN:   Good morning, Your Honor.  Richard Doren

19   for Apple.

20         MS. DUNN:   Good morning, Your Honor.  Karen Dunn for

21   Apple.

22         THE COURT:   Good morning.

23         MS. BRASS:   Good morning, Your Honor.  Rachel Brass

24   for Apple.

25         THE COURT:   Good morning.

1        **MS. DUNN:**   Your Honor, I wanted to introduce you this

2    morning to Ms.--

3        **THE COURT:**   Ms. Dunn, in the mic.

4        **THE CLERK:**   The mic is on on the table.

5        **MS. DUNN:**   Your Honor, I wanted to introduce you to

6    Ms. Arpine Lawyer, who is our young lawyer who will be

7    handling exhibits this morning.  She is with us at the table.

8    One thing I wanted to mention to Your Honor is while

9    Ms. Lawyer is admitted to the bar in California, she is not a

10   yet admitted in this district and has submitted her paperwork

11   this morning, and we have copies for the Court.

12       **THE COURT:**   Okay.  And how do I your spell your name

13   again, please?

14       **MS. LAWYER:**   A-R-P-I-N-E --

15       **THE COURT:**   Go to a mic.

16       **MS. LAWYER:**   A-R-P-I-N-E.

17       **THE COURT:**   Okay.  And --

18       **MS. LAWYER:**    Lawyer, L-A-W-Y-E-R.

19       **THE COURT:**   That's your name?

20       **MS. LAWYER:**    Yes, Your Honor.

21       **THE COURT:**   Okay.  Well --

22       **MR. KLEINBRODT:**    Your Honor, good morning.  Julian

23   Kleinbrodt, also for Apple.

24       **THE COURT:**   Okay.  And I don't have you on my list

25   either, sir.  Why don't we get your spelling as well.

1        **MR. KLEINBRODT:**   Sure, Your Honor.  Julian,

2   J-U-L-I-A-N, Kleinbrodt, K-L-E-I-N-B-R-O-D-T.

3        **MS. DUNN:**   We are also joined by Heather Grenier,

4   head of civil litigation at Apple.

5        **THE COURT:**   Good morning.

6        Do we still have Mr. Spalding back there?  Okay.

7        And then in the gallery we have Brittnay DeJong.

8        **MS. DEJONG:**   Good morning, Your Honor.

9        **THE COURT:**   And then we have Amy Miller from MLex.

10       **MS. MILLER:**   Good morning.

11       **THE COURT:**   And Dorothy Atkins from *Law360*.

12       Good morning, to everyone.  I hope you were able to enjoy

13   a little bit of the fresh air over the weekend.  We were busy

14   ourselves here.

15       I did issue some of the orders relating to your request to

16   seal, etc., over the weekend.  Why don't we go ahead and just

17   start so I can see if there is anything other than exhibits to

18   do this morning.

19       Ms. Forrest, do you have anything on your list of things

20   to do?

21       **MS. FORREST:**   Yes, Your Honor.  I have just two

22   things, and then actually a third thing that is really just to

23   let the Court know about an agreement the parties have

24   reached.

25       One is that we are doing our mightiest to turn around the

1    findings of fact as quickly as we can with the final

2    transcripts, and I think --

3              THE COURT:    Let me just interpose because I know that

4    there were issues, I think, in part because we are in a

5    situation, given COVID, where people who used to do scoping

6    and be in the background are shifting how they are doing

7    things.

8         So what if we just say, you know, the second business day

9    after you receive the transcript, if you can get it to me in

10   that way.  I know my court reporters are working very hard to

11   get this to you, and they are just struggling.  So if I do it

12   teed off when you get it, that would be helpful, and it -- you

13   know, it's really to just keep us on track.  I know it's extra

14   work, but I really do think that it's important, and I'm going

15   to start reading them next.  I was focused on the expert

16   reports.  But I want to have those things while it's all fresh

17   in our minds.  That's the goal.

18        So I didn't -- I did mean to cut you off, actually.

19             MS. FORREST:    That was very helpful because it

20   precisely solves the issue, Your Honor.  Thank you.

21             THE COURT:    Great.

22        What else?

23             MS. FORREST:    The other issue is I just wanted to go

24   back to something we spoke about pretrial was whether or not

25   the parties would have a closing, and we said well, we'll deal

1   with that during the trial.

2       I wanted to suggest to Your Honor that from our

3   perspective, we would like to save out of our time an hour,

4   potentially, to sum up.  We think it would be useful to pull

5   together what will then be a very substantial evidentiary

6   record and to do that in a way that is effective and

7   efficient, but we wanted to alert you to that.

8       We've spoken to Apple about that, and I don't know that we

9   have agreement on it, but I wanted to let you know that from

10  our perspective, we would like to save an hour and to alert

11  you to that now.

12      **THE COURT:**   Okay.

13      **MS. DUNN:**    Your Honor, I think from our perspective,

14  we have budgeted our evidence against the 45 hours.  Our

15  understanding of what the Court had said was if you wanted

16  closing, you may ask for it, and so our view is we don't think

17  at this point it is necessary, but of course if the Court

18  thinks it's necessary, obviously we would have that.

19      **THE COURT:**   All right.  Well, let me think about it,

20  and I'll get back to you.

21      **MS. DUNN:**   Thank you, Your Honor.

22      **MS. FORREST:**    The one last thing is in the nature of

23  an agreement the parties had reached, I believe, on Friday

24  which was that the documents will not go into the box until

25  5:00 as opposed to sort of immediately after being received

1    because sometimes there are some confidentiality things that

2    need to get dealt with.  They will go into the box on a daily

3    basis, but not until 5:00.

4              **THE COURT:**    I think my -- that's what my order said,

5    so, frankly, I was surprised when I learned that things had

6    gone into the box and there were things that had gone into box

7    that weren't supposed to go into the box, and the whole point

8    of my order was to give people the ability to resolve those

9    things before they did go into the box.  So that's fine with

10   me.

11             **MS. FORREST:**    Thank you.

12             **MS. DUNN:**    Thank you, Your Honor.

13             **THE COURT:**    Okay.  Over the weekend, I thought -- and

14   perhaps it didn't make it in, but I thought I -- we had sent

15   maybe an email or it was in one of the orders asking about the

16   evidence with respect to the experts because as I looked at

17   those reports, there are all sorts of exhibits to which the

18   experts relied that I have never seen, that is, I have never

19   seen in evidence yet.

20        So what is it that you are all doing and/or agreeing with

21   respect to all of those documents that have been identified

22   but are not yet in the record?

23             **MS. FORREST:**    Your Honor, from the perspective of

24   Epic, there is a substantial workstream that is currently in

25   process just outside here where there have been lots of

1    negotiations with Apple about some of these documents.  Some

2    of them were intended to come in later in the case through

3    witnesses yet to be called so they are subject to connection

4    and things of that nature.

5         We are working all of that out, and it will be, I believe,

6    quite clear to Your Honor when we're ready to proceed in that

7    manner.  So we are very mindful of the Court's order in this

8    regard.

9              THE COURT:   Ms. Brass.

10             MS. BRASS:    Your Honor, I agree with that.  I've been

11   handling those negotiations for Apple and just came in to

12   answer any questions but then will resume them as soon as we

13   are done with this session.

14             THE COURT:    The other thing, just a procedural issue,

15   I think with Ms. Forrest and Mr. Doren, people now know your

16   voices, most likely, but for everybody else who is just

17   listening in, it is helpful when you go to a mic to introduce

18   yourself.  And I would just suggest for examinations going

19   forward, sometimes lawyers introduce themselves, sometimes

20   they don't.  But for the attorneys, if you will make sure to

21   introduce yourself when you get to the mic, that just helps

22   the press and everybody else listening.  Okay?

23             MS. FORREST:   Yes, Your Honor.

24             MS. BRASS:    Yes, Your Honor.

25             THE COURT:    All right.  So I think there are a few

**WEISSINGER - DIRECT - MOSKOWITZ**

1    things that we will try to get to in the evenings.  I now have

2    a motion with respect to the Samsung request to seal.  I have

3    an outstanding evidentiary issue which I will deal with, and

4    then I believe I just have the objections on two experts

5    pending.

6            Anything else that you're waiting on from me?  Those are

7    the three things that I think I have in front of me.

8            **MS. DUNN:**   No, Your Honor.

9            **MS. FORREST:**   Nothing that I can think of,

10   Your Honor.  Thank you.

11           **THE COURT:**   We are five minutes ahead of schedule.

12   Shall we begin?

13           **MS. MOSKOWITZ:**   Yes, Your Honor.

14           **THE COURT:**   Let's bring the witness back in.

15       Mr. Weissinger, good morning, sir.

16           **THE WITNESS:**   Good morning, Your Honor.

17           **THE COURT:**   I will remind you that you remain under

18   oath.  Do you understand that?

19           **THE WITNESS:**   Yes.

20                          **MATTHEW WEISSINGER**,

21   called as a witness for the Plaintiff, having been previously

22   duly sworn, testified further as follows:

23           **THE COURT:**   All right, Ms. Moskowitz, you may

24   proceed.

25           **MS. MOSKOWITZ:**   Good morning, Your Honor.  Even

1    though you said my name, I will confirm, Lauren Moskowitz for

2    Epic.

3                    **DIRECT EXAMINATION**  (resumed)

4    **Q.**    Good morning, Mr. Weissinger.

5    **A.**    Good morning.

6    **Q.**    We left off on Friday speaking about the work that Epic

7    does to market and promote *Fortnite* on its own.  Did Epic do

8    any marketing in connection with any of its platform partners?

9    **A.**    Yes.

10   **Q.**    Does the level of support that Epic receives differ across

11   partners?

12   **A.**    Yes, it does.

13   **Q.**    How so?

14   **A.**    In general, we receive more support from our console

15   partners than we do from our mobile partners.

16   **Q.**    So let's focus for now on the consoles.  What are the ways

17   that consoles help market *Fortnite*?

18   **A.**    Sure.  There are a number of ways.  There's, you know,

19   kind of physical in-real-life support that we receive.  We get

20   digital support from the console partners.  We also receive

21   in-game support as well.

22   **Q.**    So in terms of the retailer physical, real life, as you

23   put it, can you describe what that looks like?

24   **A.**    Sure.  *Fortnite* is a digital-only game by and large, so

25   one of the ways that we partner with our console partners

**WEISSINGER - DIRECT - MOSKOWITZ**

1    that's really valuable to us is to secure kind of this in

2    real-life brick and mortar presence, and we partner with them

3    in a number of ways for that.

4          One example is through hardware bundles.  So we would

5    create some exclusive *Fortnite* content, and we would pair it

6    with a PlayStation or with an Xbox, the actual console, and

7    then we would put it all in a nice pretty package, and then we

8    sell it at retail at like your Best Buy or Wal-Mart or

9    something like that.

10          We also create a retail SKU, and this is like basically

11    when you think of a traditional video game that you are buying

12    in the DVD box, we create these with the first-party partners:

13    Nintendo, Microsoft, Sony.  That includes digital content.

14    And we in general create one every holiday and then we do

15    price promotions throughout the year on those bundles as well.

16          There is other ways we co-promote in real life.  An

17    example would be with Xbox.  Microsoft has Microsoft stores

18    that are in malls, and so we actually partnered with Microsoft

19    to do a Friday *Fortnite* series where every Friday, they would

20    host play sessions where people could come in kind of off the

21    street or within the mall, and they could play *Fortnite* and

22    win and earn prizes, and it was really successful for them and

23    us.  We re-upped that program multiple times with them.

24          PlayStation, we'll do similar stuff.  For the E3 Expo --

25    this is kind of the big consumer event -- *Fortnite* held an

1    event and -- at the L.A. Coliseum, and PlayStation went and

2    brought in this giant kind of semitruck with all these

3    PlayStations inside and consoles that people could play.

4        We partnered with them the opposite direction, too, where

5    we provided *Fortnite* characters who would actually appear at

6    the festival that PlayStation sponsors, the college football

7    festival every year, and they invite us and we participate,

8    and there is a number of ways we go back and forth with them.

9    Q.    I think one of the other categories you mentioned was

10   digital support.  Can you explain what that refers to?

11   A.    Sure.  We co-promote on our social channels with Fortnite

12   channels and the first party console platforms.  They have

13   really huge social channels as well.  They're probably on par

14   with ours in terms of just overall size and reach.

15       In addition to that, we partner with our console partners

16   on featuring on the consoles themselves.  And what that means

17   is when you actually boot up a PlayStation or Xbox, there are

18   certain tiles or images on the screen that Microsoft and Sony

19   will help provide for us.  And not only when you first boot

20   up, but also they have a separate area of -- on console called

21   like the Xbox Store or the PlayStation Store where they

22   provide additional featuring as well in that purchase

23   environment.

24   Q.    And how do you view the featuring within the console

25   stores?  Do you view that as helpful, meaningful?

**WEISSINGER - DIRECT - MOSKOWITZ**

**A.**   Yes, very.

**Q.**   How?

**A.**   The store featuring them would get -- and I'm saying in Xbox Store and Xbox or in PlayStation Store and PlayStations, very valuable because when you think about a player journey of somebody booting up their console and then they go in, and when they enter the store experience, they're definitely going in a purchasing mindset, and so it's a very qualified audience of folks who are looking to spend money and who are looking to buy an awesome experience or awesome content, and so when Microsoft and Sony provide those placements specifically, they are extremely valuable to us.

**Q.**   And I think you spoke about this on Friday, but just to remind everyone, what is available on the console digital stores with respect to *Fortnite*?

**A.**   Sure.  Another key thing to point out is that Xbox and PlayStation and Nintendo, they offer these Real Money Transactions, or the RMTs that I mentioned that are sold separately and alongside the client.  What is really important about that is Microsoft and Sony can then merchandise those offers within their store experience and lead to a direct player purchase of those packs, and so the key there is that in order to purchase something, somebody actually doesn't have to boot up in the *Fortnite* client and then wait for a load stream and then go to the item shop and then go make the

**WEISSINGER - DIRECT - MOSKOWITZ**

1    purchase.  They have this functionality where they can

2    merchandise the RMT separately and directly so it's a much

3    more quick and clean purchase for the user.

4    **Q.**    You also mentioned within *Fortnite* support that the

5    consoles provide.  Can you explain what that refers to?

6    **A.**    I'm sorry?  What was --

7    **Q.**    Within *Fortnite* that the consoles also provide support.

8    Can you describe what that refers to?

9    **A.**    Sure.  We've also partnered with, you know, Microsoft,

10   Sony, Nintendo, on in-game promotions so in the *Fortnite*

11   client in a number of ways.  One example is your competitive

12   tournaments.  So we will throw a PlayStation Cup or Xbox Cup

13   or Nintendo Switch Cup in partnership with those first

14   parties.

15        Competitive events are some of our most engaging events

16   that we do inside *Fortnite*, and we always see a really

17   exceptional response from the community that is manifested

18   also inside the game.

19        So when we ran -- for example, with Nintendo, we ran a

20   Switch Cup in Japan.  It was specially made for Japanese

21   region.  And at the time it led to the highest daily active

22   users of all time in Japan on Switch when we ran that

23   tournament with them.  So it's a really good engagement

24   program that we run with them.

25   **Q.**    Are there other types of work that you do with consoles

1    within *Fortnite* itself?

2    **A.**    Yes.  You know, I mentioned that we do a lot of IP

3    crossovers and collaborations.  We actually partnered with

4    Microsoft and PlayStation on a major IP crossover where they

5    actually contributed some of their own IP which was Master

6    Chief from the Halo franchise and Xbox and Kratos from the God

7    of War franchise and PlayStation.  These are like the Mickey

8    Mouse of PlayStation and Xbox, and so they actually provided

9    these characters to appear in *Fortnite*.  They were purchasable

10   on the other platforms as well, and they were playable on the

11   other platforms as well.  And we went and actually announced

12   that at the Video Game Awards, and it was kind of a big event

13   in the gaming communities to see that kind of collaboration

14   and crossover and all of it happening inside of *Fortnite*

15   thanks to the first parties.

16   **Q.**    So across all of these ways that you partner with

17   consoles, how do you go about actually achieving or activating

18   those -- that work with them?

19   **A.**    I'm sorry.  Would you repeat that once more?

20   **Q.**    Sure.  So how do those promotions sort of come about?  How

21   do you work with the console partners to achieve those

22   promotions?

23   **A.**    Sure.  We work very closely to basically review our

24   forward roadmaps with the first parties, and so we have weekly

25   meetings with console partners where I'd say we review more

**WEISSINGER - DIRECT - MOSKOWITZ**

1    block-and-tackle stuff.  This is when we are providing

2    creative assets for upcoming promotions, what the embargo

3    times are, what the approvals process kind of currently looks

4    like.  But then beyond that, we actually have biweekly and

5    monthly meetings with Microsoft and Sony where we review from

6    a business level our forward-looking content roadmaps, and

7    those are roadmaps that are breaken [sic] out -- broken out

8    almost on a daily basis in terms of the opportunities inside

9    of *Fortnite*, and we break it down in terms of kind of

10   platinum, gold, silver, bronze in terms of what the best

11   opportunities are from the *Fortnite* side, and then we kind

12   of -- we review that then with Microsoft and Sony, and then we

13   figure out which places we're going to be able to collaborate

14   and add additional promotional support around those major

15   beats.  So it's very in depth and detailed.

16   **Q.**    So let's turn to Apple now.  At what point in time did

17   *Fortnite* launch on iOS?

18   **A.**    I believe it was March of 2018.

19   **Q.**    How was *Fortnite* doing overall when it launched on iOS?

20   **A.**    *Fortnite* was doing incredible.  It was basically a

21   cultural phenomenon at the time.

22   **Q.**    When *Fortnite* was available on iOS, did Apple do anything

23   to market *Fortnite*?

24   **A.**    Yes, they did.

25   **Q.**    What did they do?

1    **A.**    They'll provide things like featuring.  They will provide

2    kind of news articles.  They will provide social support, are

3    some of the ways.

4    **Q.**    So, generally speaking, overall, how would you say Apple

5    was as a partner from a marketing perspective?

6    **A.**    I always felt like it was opportunistic.  I felt like it

7    was transactional, impersonal.  It always felt like in some

8    sense it was kind of fly-by-night where they could come in for

9    a particular promotion, they would show up, and they would ask

10    for assets and then there would be strings attached or caveats

11    attached of *well, we want to promote this thing but we require*

12    *an exclusive asset or we require exclusive content*, and those

13    requests would come in kind of late in the process, and it

14    would cause undue burden and stress on the team.  These were

15    requests that typically we don't receive from our console

16    partners.

17    And oftentimes we would receive requests for promotion

18    through some sort of like a notification tool that would say,

19    "Hey, featuring is coming.  We need an asset in some short

20    amount of turnaround time."  And it would just kind of arrive

21    and a lot of times people would say -- we'd have to spin

22    things up and say, "Hey, we got this request."  You know, "Can

23    we do it?  Why didn't we know about it sooner?"  "I'm not

24    sure.  It just arrived in the dashboard.  And can we get this

25    thing done?"  So it was just a different experience from our

WEISSINGER - DIRECT - MOSKOWITZ

1    console partners.

2    **Q.**    You mentioned the word "opportunistic" with respect to

3    Apple's support.  What do you mean by that?

4    **A.**    Yeah.  So in some of the instances where I think Apple

5    would lean in the most for a particular promotion, it

6    typically, to me, felt like it was around opportunities where

7    they had something else within their ecosystem to promote.

8            And there is a couple examples that I can think of for

9    that.  Most specifically it was around music collaborations

10   like Marshmello and Travis Scott where they would also want to

11   promote Apple Music, and they would ask for exclusive content

12   like playlists and stuff in support of that as well --

13                    **THE COURT:**    So, I take it, when you did these

14   collaborations with Microsoft and Sony, they weren't promoting

15   their things?  I mean they weren't promoting PlayStation and

16   Xbox?  How is it different?

17                    **THE WITNESS:**    It's almost like they're separate --

18   it's not like a PlayStation Music that they would be wanting

19   to promote --

20                    **THE COURT:**    But they were promoting their product,

21   weren't they, whenever you did collaborations with them?

22                    **THE WITNESS:**    I mean, it would be available on Xbox

23   and available on PlayStation, sure.

24                    **THE COURT:**    Is it one-sided only on *Fortnite* for

25   *Fortnite*'s benefit when you do collaborations with Microsoft

1    and Sony, or does it benefit both?

2           THE WITNESS:    No, you're right.  It benefits both.

3           THE COURT:    So how is it different that Apple is

4    trying to benefit both?

5           THE WITNESS:    It just seemed opportunistic that the

6    times that they wanted to support us was specifically around

7    content related to another part of the business as opposed to

8    helping collaborating the *Fortnite* business.

9           THE COURT:    Proceed.

10   BY MS. MOSKOWITZ:

11   Q.    You mentioned the social media aspect that Apple provided

12   some support in.  Have those been meaningful to *Fortnite*?

13   A.    No.  *Fortnite*'s channels again are extremely large, some

14   of the largest in all of entertainment.  Frequently I would

15   have my social media manager who would come to me and say,

16   "Hey, should we keep doing these promotions with the App

17   Store," because they would consistently ask for re-Tweets and

18   re-shares of content because *Fortnite* content gets a ton of

19   engagement, and so when we kind of re-Tweet and re-share their

20   content, it helps gain traction on their channels, and the

21   perception was that they were trying to meet some sort of

22   performance metrics of engagement on their channels, and so

23   they wanted to have *Fortnite* kind of constantly re-share their

24   content.

25   Q.    With respect to the featuring on the App Store, was

1    that -- was that meaningful to *Fortnite*, and how did it

2    compare to the engagement you had from the console stores?

3    **A.**    Yes.  In general, we -- we -- we don't turn down

4    featuring.  When you compare the featuring that's provided by

5    Apple, though, in comparison to Xbox and PlayStation, for

6    example, the featuring is just more valuable, and we see that

7    in terms of the users who are coming into the game.

8         The featuring that were provided by Xbox and PlayStation

9    provides players who continue longer and who monetize better

10   versus what we see at the App Store, and it's, you know -- my

11   general thinking is that the App Store has a very different

12   behavior for people who are going through that experience.

13   It's very much like a browsing behavior, and it's not

14   necessarily people making a purchase.  It also is like all

15   sorts of kinds of random folks who are going through that

16   experience.  It might be somebody looking for a fitness app or

17   finance app or something like that.  And so the featuring,

18   when it is provided, it's just to a kind of less qualified

19   audience.

20             **THE COURT:**    You mean consumers?  A less qualified

21   consumer?

22             **THE WITNESS:**    Yes.

23             **THE COURT:**    Okay.  And consumers who may not be

24   looking for gaming apps?

25             **THE WITNESS:**    Correct.

WEISSINGER - DIRECT - MOSKOWITZ

1            **THE COURT:**   Okay.  Thank you.

2            **THE WITNESS:**   Or entertainment apps or entertainment

3    experiences.

4    **BY MS. MOSKOWITZ:**

5    **Q.**    You said more valuable, and I'm not staring at a

6    transcript.  I just want to make it clear.

7            From your perspective, which featuring -- was it on

8    consoles or Apple that you viewed as more valuable?

9    **A.**    Consoles.

10   **Q.**    Have any problems ever arisen with respect to Apple's

11   featuring?

12   **A.**    Yes.

13   **Q.**    What are some examples?

14   **A.**    In multiple instances, Apple actually leaked our

15   promotional content ahead of our promotional beat.

16   **Q.**    Do you have any examples of those leaks?

17   **A.**    Sure.  In December of 2018, we had our Season 7 Launch.

18   This was kind of our Christmas holiday season launch.  It was

19   a big launch for us.  Apple leaked the Battle Pass key art

20   content, so all the characters that were coming with the new

21   season leaked in advance of the official *Fortnite* reveal.

22           Then in, I believe it was, February of 2019, for that same

23   Marshmello concert that I mentioned, Apple had requested an

24   exclusive plays -- playlist for Apple Music, and they pushed

25   that playlist before the concert and spoiled the set list and

1    the reveal for kind of our first major in-game concert.

2           The third one was related to our Chapter 2 Launch, and so

3    this was, I believe, October 2019.  For this particular beat,

4    the Chapter 2 Launch was basically the sequel launch of

5    *Fortnite*.  It was the biggest event that we had had since the

6    launch of the game, and it was something that we had planned

7    for and coordinated, you know, a year in advance.  And we had

8    all sorts of narrative elements that kind of came together

9    where *Fortnite* was going to get sucked into a black hole and

10   it was going to go down for 36 hours and it was going to kind

11   of disappear and then it was going to come up and all the

12   players were going to jump into the game and kind of see what

13   had happened, what changed on map and what new gameplay

14   features were in there.

15          Apple leaked the promotional key art prior to the

16   release -- prior to that release while we were in this kind of

17   black hole blackout period, and it really spoiled a lot of

18   hard work and efforts and coordination and sequencing.

19              **MS. MOSKOWITZ:**   Your Honor, I have a binder for the

20   witness and for the Court.  May I approach?

21              **THE COURT:**   You may.

22   **BY MS. MOSKOWITZ:**

23   **Q.**   Mr. Weissinger, if you could turn to PX2435 in your

24   binder.

25   **A.**   Okay.

**WEISSINGER - DIRECT - MOSKOWITZ**

1    **Q.**    This is an email you received on October 2, 2019.  Do you

2    see that?

3    **A.**    Yes.

4    **Q.**    Do you recognize this document?

5    **A.**    Yes.

6               **MS. MOSKOWITZ:**    Your Honor, I offer PX2435 into

7    evidence.

8               **THE COURT:**    Any objections?

9               **MR. DOREN:**    No objection, Your Honor.

10              **THE COURT:**    2435 is admitted.

11              (Plaintiff's Exhibit 2435 received in evidence)

12              **THE COURT:**    I did forget to go over the exhibits this

13   morning, so we will do Friday and Monday at the end of today.

14              **MS. MOSKOWITZ:**    Thank you, Your Honor.

15   **Q.**    If you could please focus on the bottom part of the page,

16   do you see that that's an email from Mike Schmid of Apple?  Do

17   you see that?

18   **A.**    Yes, I do.

19   **Q.**    If you could turn to the second page of the document,

20   PX2435.2, that last big paragraph that starts with, "If you

21   can secure us," do you see that?

22   **A.**    Yes.

23   **Q.**    What is Mr. Schmid communicating to Epic in this

24   paragraph?

25   **A.**    He is requesting assets for promotion of the Chapter 2

**WEISSINGER - DIRECT - MOSKOWITZ**

1    Launch, and he says he will take personal responsibility for

2    them and limit the exposure to the absolute minimum to the

3    amount of folks needed to cut and prepare an event for launch.

4    He says, "I know we have had issues in the past with a

5    significant art leak, but I will remain extremely close to

6    this and can assure you that that will not happen."

7    **Q.**    Do you recall Mr. Schmid promising he would take personal

8    responsibility for the Chapter 2 artwork?

9    **A.**    Yes.

10   **Q.**    And do you recall Mr. Schmid acknowledging a prior leak

11   had occurred at Apple in the past?

12   **A.**    Yes.

13   **Q.**    And do you recall him assuring you that it would not

14   happen with the Chapter 2 artwork?

15   **A.**    Yes.

16   **Q.**    Did Apple leak the Chapter 2 artwork?

17   **A.**    Yes.

18   **Q.**    So just circling back for a moment to the types of support

19   that Epic's console partners have offered *Fortnite*, did Apple

20   ever execute a hardware bundle that included *Fortnite* content?

21   **A.**    No.

22   **Q.**    Did Apple ever host any *Fortnite* events or promotions in

23   Apple's retail stores?

24   **A.**    No.

25   **Q.**    Did Apple participate in any in-*Fortnite* promotions such

**WEISSINGER - DIRECT - MOSKOWITZ**

1    as IP collaborations or competitive events?

2    **A.**   No.

3    **Q.**   From a user acquisition perspective, is there a platform

4    on which *Fortnite* has the biggest growth potential?

5    **A.**   Yes.

6    **Q.**   Which one?

7    **A.**   Mobile.

8    **Q.**   Why?

9    **A.**   I mentioned it on Friday, I believe, but we've reached,

10   you know, a point of basically full penetration on console,

11   and mobile represents the biggest growth opportunity, and, you

12   know, the best way to kind of put it is everybody has a mobile

13   device, and they have it with them at all times, but not

14   everybody has a console, and not everybody has a gaming PC.

15   **Q.**   So how does iOS within that mobile umbrella fit into your

16   user acquisition plans?

17   **A.**   It's hugely important.

18   **Q.**   When *Fortnite* was on iOS, do you recall how many users it

19   had?

20   **A.**   When we were live, I believe it was 2.5 million daily

21   active users on iOS.  I think over the life of iOS, we had

22   something like 2.86 billion hours of playtime on iOS.

23   **Q.**   And in terms of that daily active user statistic you gave

24   of 2.5 million, do you have a sense of what percentage of that

25   is overall of the daily active users?

**WEISSINGER - DIRECT - MOSKOWITZ**

1    **A.**    It was about 10 percent.

2    **Q.**    Has Epic been harmed by not being able to offer *Fortnite*

3    on iOS?

4    **A.**    Yes.  Absolutely.

5    **Q.**    How so?

6    **A.**    In a number of ways.

7         So I mentioned first of all that everybody has a phone but

8    not everybody has a console and not everybody has a gaming PC,

9    so already there was a portion of our population who only

10   played on iOS.  Then all of a sudden, we disappeared because

11   that was the only device they had.

12        In addition, there's just times of the day where normally

13   you would have your iPhone available as a device that you

14   wouldn't like you would an Xbox or a gaming PC, so imagine

15   you're commuting to work or you're outside or you're going to

16   a friend's house or something like that.  You just no longer

17   had this device that was on you at all times, and so there was

18   just less opportunity to play *Fortnite*.

19        In addition to that, once all those users -- once those

20   users left and those playtime windows shrunk, there were also

21   severed friend connections, so social connections.  And, you

22   know, I mentioned that also a little bit on Friday, just how

23   important social connections are.  The more you have, kind of,

24   more you play and want to play in *Fortnite*, and so there were

25   tens of millions of social connections that had been -- kind

**WEISSINGER - DIRECT - MOSKOWITZ**

1    of immediately were severed when Apple removed *Fortnite*, so

2    there was just separately --

3              THE COURT:    Tens of millions?  You said that 10

4    percent of 2.5 million were iOS users.  So how are there tens

5    of millions of severed connections?

6              THE WITNESS:    That's a good question.  It's because

7    each -- each player, each person has multiple friend

8    connections that goes out.

9              THE COURT:    And are you tracking people's

10   connections?

11             THE WITNESS:    Correct.

12             THE COURT:    You track that?  You have that data?

13             THE WITNESS:    Yeah.  And that's in order so that

14   people can chat with each other and they can match-make.  It's

15   basically this is your friends list inside of *Fortnite*.

16             THE COURT:    And is that data coming into evidence?

17             MS. MOSKOWITZ:    Not from us, Your Honor.

18             THE COURT:    And people know you're tracking them?

19   Yes?

20             THE WITNESS:    Yes.  Yes.  It's a totally opt-in

21   process -- I mean, it's the basic -- Lauren is jumping in, I'm

22   jumping in, we make a friend connection in the game, and the

23   next time we log in, we can see when the other is online, we

24   can chat with each other, but any particular player might have

25   multiple friends or lots of friends.  So when one mobile user

**WEISSINGER - DIRECT - MOSKOWITZ**

1    gets removed, all the social connections that were going out

2    with them go away, and so there is -- you basically have lost

3    a friend, but you have lost even more social connections

4    inside of the ecosystem.

5            **THE COURT:**   I see.

6    **BY MS. MOSKOWITZ:**

7    **Q.**    And just in case my -- the question and answer wasn't

8    clear, with respect to the 10 percent, the 2.5 million daily

9    active users is 10 percent of the overall daily active users?

10   **A.**    Correct.

11   **Q.**    So approximately how many overall daily active users do

12   you have?

13   **A.**    It was about 30 million.

14   **Q.**    Do you have a general understanding of what consoles

15   charge in terms of commissions on in-app purchases?

16   **A.**    Yes.

17   **Q.**    And what is that?

18   **A.**    30 percent.

19   **Q.**    And do you have an understanding of what Apple charges as

20   a commission on in-app purchases?

21   **A.**    Yes.

22   **Q.**    What is that?

23   **A.**    30 percent.

24   **Q.**    So are those -- aren't those the same commission?

25   **A.**    No.  They're two -- they're two completely different

**WEISSINGER - DIRECT - MOSKOWITZ**

1    business models.

2    **Q.**    So can you explain what you mean?

3    **A.**    Sure.  Generally how I understand how it works is

4    PlayStation, Xbox, Nintendo, they sell their hardware and they

5    subsidize it.

6            **THE COURT:**    So why did you say how you understand it

7    works.  Do you know or not?

8            **THE WITNESS:**    I do.  I mean, I haven't seen the

9    contracts because I have never worked on the first party side,

10   but in general, I -- working in the business as long as I

11   have, I have a general understanding.

12           **THE COURT:**    As long as you know, because I'm not

13   interested in if you don't have a foundation for what you're

14   about to say.

15           **THE WITNESS:**    Okay.

16           **THE COURT:**    Go ahead.

17           **THE WITNESS:**    Great.

18       So how it works is PlayStation, Xbox, and Switch subsidize

19   their hardware sales, which basically means they are selling

20   it at a loss when they first launch a console.  And so right

21   out of the gate, they're losing money in order to actually get

22   the most widespread adoption and penetration of consoles as

23   possible.  They are trying to expand that -- that

24   entertainment ecosystem as wide as possible.  So they are

25   losing money up front.

1        They make their money back when *Fortnite* and other apps

2    are sold on those platforms, and so they're only making money

3    when we're making money, and they are absolutely then aligned

4    and invested around assuring the success of the titles on

5    their platforms.

6        You contrast that with Apple.  They actually generate

7    profit on their hardware sales.

8             **THE COURT:**    And how do you know that?

9             **THE WITNESS:**    I believe they announce their hardware

10   profit margins in their earning reports.  And so Apple makes

11   profit on their hardware, but none of that revenue or dollars

12   are shared with app developers.

13        You know, the app ecosystem, that is one of the things

14   that is used to sell these devices and the value of these

15   devices.  And then apps like *Fortnite* put in a huge amount of

16   marketing effort, a huge amount of support to drive events and

17   people to download their apps.  We create all sorts of

18   engagement, hours of engagement inside of *Fortnite*, and then

19   at the last minute, kind of, Apple injects themselves and

20   says, "We require 30 percent on this as well."

21        And then I look at the promotional support that Apple is

22   doing to kind of earn that 30 percent, and I compare it to the

23   consoles, and it just seems like -- it just seems like a gross

24   imbalance, it seems unfair, and it seems unethical.

25             **MS. MOSKOWITZ:**    Thank you, Mr. Weissinger.

1    No further questions at this time, Your Honor.

2         **THE COURT:**   Cross.

3                    **CROSS-EXAMINATION**

4    **BY MR. DOREN:**

5    **Q.**   Good morning, Mr. Weissinger.

6    **A.**   Good morning.

7    **Q.**   My name is Richard Doren.  I don't believe we've had the

8    pleasure, but it's a pleasure to meet you today.

9    **A.**   You as well.

10   **Q.**   A few moments ago you were stating that Apple accounted

11   for about 10 percent, and by "Apple," I mean iOS devices

12   accounted for about 10 percent of *Fortnite* play while *Fortnite*

13   was on iOS; correct?

14   **A.**   Yes.

15   **Q.**   And, in fact, the revenue or the percentage of revenue

16   generated by those on iOS for Epic through *Fortnite* is about 4

17   percent of the total revenue during the time that *Fortnite* was

18   on iOS; correct?

19   **A.**   I can't confirm off the top of my head, but in general, it

20   probably was lower than the share of -- yeah, attached.

21   **Q.**   And you were just discussing the business model for

22   different console manufacturers.  Have you ever seen any

23   internal documents from Microsoft, Sony, or Nintendo that had

24   proven to you that consoles are sold at a loss?

25   **A.**   I have not.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   And, sir, are you aware that after testifying -- after

2   Ms. Wright testified on behalf of Microsoft in this courtroom,

3   that Microsoft has refused to make any public statements about

4   whether or not the consoles are sold at a loss?

5   **A.**   I'm not aware of that and I have not.

6   **Q.**   And so you have no personal firsthand knowledge that

7   Microsoft, Sony, or Nintendo sell their consoles at a loss;

8   correct?

9   **A.**   Only anecdotally.

10   **Q.**   Sir, you're aware this is the sixth day of this trial;

11   correct?

12   **A.**   Yes.

13   **Q.**   And you're the last of the Epic fact witnesses; right?

14   **A.**   I believe so.

15   **Q.**   Has anyone explained to you why no one from Epic has shown

16   this Court *Fortnite*?

17   **A.**   I'm not sure.

18            **MS. MOSKOWITZ:**   Objection.

19            **THE WITNESS:**   I think we showed some videos.

20   **BY MR. DOREN:**

21   **Q.**   And that's about the three or four five-second clips from

22   Friday afternoon?

23   **A.**   It was longer than that, but, yes.

24   **Q.**   Less than a minute, though; right?

25   **A.**   I'm not sure of the exact time, but it was about a minute.

**WEISSINGER - CROSS - DOREN**

1    **Q.**    What I would like, sir, is your assistance now, curiously

2    as the defendant in this case, to explain your game to this

3    Court.  All right?

4    **A.**    Sure.

5    **Q.**    And we've got a few demonstratives and a few exhibits to

6    help us in that effort, and I would ask -- I would direct your

7    attention to the monitor in front of you.  And this -- first

8    of all, do you have a name for this screen?

9    **A.**    "Submenu Select," I think.

10   **Q.**    All right.  And, in fact, do you see at the bottom of the

11   page the little bouncing message to "select a game mode";

12   correct?

13   **A.**    Correct.

14   **Q.**    And across this screen, we have three game modes; am I

15   right?

16   **A.**    Yes.

17   **Q.**    And all of these are within the *Fortnite* app; correct?

18   **A.**    Yes.  *Save the World* was not available on iOS.

19   **Q.**    Okay.  And *Save the World* was the first *Fortnite* game;

20   correct?

21   **A.**    *Save the World* is also not available on Switch.

22   **Q.**    Okay.  Thank you, sir.

23          *Save the World* was the first *Fortnite* game?

24   **A.**    It was the first version of *Fortnite*.

25   **Q.**    Yeah.  Thank you.  Well put.

**WEISSINGER - CROSS - DOREN**

1    And it -- it's a game in which people team up to shoot

2    zombies; correct?

3    **A.**    That's a good summary.

4    **Q.**    Okay.  It's a good summary, is that what you said, sir?

5    **A.**    Yes.

6    **Q.**    Thank you.

7    And then the next game is available on iOS, correct, and

8    that's *Battle Royale*?

9    **A.**    That's correct.

10   **Q.**    And *Battle Royale* is the game that made Epic games both

11   rich and famous; correct?

12   **A.**    I'd like to say we had some fame before then, but, yes,

13   this is the mode that people characterize with the success of

14   Epic.

15   **Q.**    And then within *Battle Royale* there is another mode,

16   something called *Party Royale*; correct?

17   **A.**    That's correct.

18   **Q.**    That's within *Battle Royale*; am I right?

19   **A.**    It is in the mode select within *Battle Royale* at the top.

20   **Q.**    Thank you.

21   And then on the right, we have *Creative*; correct?

22   **A.**    Correct.

23   **Q.**    And that's the third mode of *Fortnite*?

24   **A.**    As designated on this screen.

25   **Q.**    And as you've already described, *Save the World* is not

**WEISSINGER - CROSS - DOREN**

1    available on iOS and it's currently not available on Switch;

2    correct?

3    **A.**    That's correct.

4    **Q.**    All right.  So let's focus on *Battle Royale* and *Creative*

5    then for the rest of our time.

6    **A.**    Great.

7    **Q.**    And I'd like to go to the lobby, please, and for the

8    record, we are connecting and changing screens, and, sir, we

9    have in front of us a new set of images.  And what is this

10   screen showing?

11   **A.**    This is your matchmaking lobby.

12   **Q.**    Thank you.  And we have a large yellow banana here, don't

13   we, in a tuxedo?

14   **A.**    Yes.  That is Peely.

15   **Q.**    And that's Peely, did you say?

16   **A.**    Yes.

17   **Q.**    And, in fact, in the tuxedo he is known as Agent Peely;

18   correct?

19   **A.**    That's correct.

20   **Q.**    And we thought it better to go with the suit than the

21   naked banana since we are in federal court this morning.

22          And, sir, Agent Peely is actually an exclusive; in other

23   words, the Agent Peely persona over Peely, the banana, was an

24   exclusive for Chapter 2, Season 2 of *Fortnite*; correct?

25   **A.**    You know, even I am not sure, but I'll take your word for

**WEISSINGER - CROSS - DOREN**

1    it, and, yes.

2    **Q.**    And do you recall, sir, that Agent Peely came -- became

3    available with the Battle Pass from that season?

4    **A.**    Maybe this version of Agent Peely.  I believe Peely first

5    came in in -- he came in earlier than that.

6    **Q.**    Okay.

7    **A.**    The naked version that you are referencing.

8    **Q.**    And Battle Passes cost 950 V-Bucks; is that correct?

9    **A.**    That's correct.

10   **Q.**    And what does a Battle Pass get one?

11   **A.**    You get a whole host of cosmetics, maybe a hundred

12   different items to unlock, and you unlock them by playing

13   inside of the game.  In general, they come with seven outfits

14   so something like this.  You get seven characters, and then in

15   total, 100 different cosmetics that unlock as you play the

16   game.

17   **Q.**    And, by the way, Epic has also begun a subscription

18   service for *Fortnite*; correct?

19   **A.**    That's correct.  Fortnite --

20   **Q.**    And that -- pardon me.

21   **A.**    I'm sorry.  *Fortnite* Crew.  Yes.

22   **Q.**    That started in December of 2020; correct?

23   **A.**    That is correct.

24   **Q.**    And the monthly cost is $11.99; correct?

25   **A.**    Yes.  That is correct.

**WEISSINGER - CROSS - DOREN**

**Q.**   And from here I'd like to go to what at least I've been

calling the "game selector page."  Do you have a name for this

screen, sir?

**A.**   This is the "Mode Select."

**Q.**   Okay.  I was close.  I was close.

And the top row is our various *Battle Royale* formats;

correct?  Solo, Duos, Trios, Squads; correct?

**A.**   Correct.

**Q.**   And the second row I see includes *Party Royale*; true?

**A.**   Yes.

**Q.**   And then the bottom row is your various *Creative*

opportunities; correct?

**A.**   Yes.

**Q.**   All right.  So this is basically, as you've already said,

a menu of options for different games within *Fortnite*;

correct?

**A.**   What we would call them in general is "limited time

modes."

**Q.**   Thank you.  Turning specifically to *Battle Royale*, *Battle*

*Royale* launched in September 2017 on consoles and PCs; is that

right?

**A.**   That is correct.

**Q.**   And you joined the company in March 2016.  Do I have that

right?

**A.**   May 2016.

**WEISSINGER - CROSS - DOREN**

1    **Q.**   Thank you.

2          And you were hired as the director of marketing?

3    **A.**   That is correct.

4    **Q.**   And you have since been promoted to vice-president;

5    correct?

6    **A.**   That is correct.

7    **Q.**   And you were in charge of *Fortnite* marketing as of

8    September 2017; correct?

9    **A.**   Yes, I was.

10    **Q.**   And you were specifically in charge of the launch of

11    *Battle Royale* in September 2017; correct?

12    **A.**   Yes, I was.

13    **Q.**   And the marketing area put together a trailer for its new

14    game, *Battle Royale*; correct?

15    **A.**   Yes, we did.

16    **Q.**   And Epic Games maintains its own YouTube channel; is that

17    correct?

18    **A.**   Yes, we do.

19    **Q.**   In putting that trailer together, you wanted to generate

20    excitement around the new game; correct?

21    **A.**   Yes, that's correct.

22    **Q.**   But you also wanted to portray it accurately; true?

23    **A.**   Yes.

24    **Q.**   So you did your best to capture the game accurately and to

25    attract the audience that you hoped would play your game;

**WEISSINGER - CROSS - DOREN**

1    correct?

2    **A.**    Yes.

3    **Q.**    And do you recognize, sir, the page in front of you on the

4    screen which is entitled "Fortnite Battle Royale Gameplay

5    Trailer."  Do you recognize that as the, I'll call it, title

6    page, if you will, for that trailer?

7    **A.**    Yes.  That looks correct because it has 60 million views.

8    **Q.**    Thank you.

9          And do you see it's at about 60 million views; correct?

10   **A.**    Yes.

11   **Q.**    That's impressive.

12         And, Your Honor, I would like to mark this trailer as

13   DX5541.  I do have it on a thumb drive for the Court, and

14   after we've played it, I will move it into evidence.

15              **THE COURT:**    Okay.  That's fine.  Is there -- I take

16   it there is going to be words?

17              **MR. DOREN:**    There are not going to be words,

18   actually, Your Honor.  It's visual.

19              **THE COURT:**    Go ahead, then.

20              **MR. DOREN:**    Mr. Spalding, please.

21              (Whereupon, the video was played.)

22              **THE COURT:**    So the record should reflect there was

23   a -- some song playing in the background with words, and the

24   court reporter was relieved of her duties to transcribe those

25   words.

**WEISSINGER - CROSS - DOREN**

1          **MR. DOREN:**   Thank you, Your Honor.  And I apologize

2     for that oversight, and we will provide the Court with a

3     transcript of those lyrics.

4          **THE COURT:**   I don't know that that is necessary.

5     Ms. Moskowitz?

6          **MS. MOSKOWITZ:**   I agree.

7          **THE COURT:**   Any objection to 5541?

8          **MS. MOSKOWITZ:**   No, Your Honor.

9          **THE COURT:**   It's admitted.

10          (Defense Exhibit 5541 received in evidence)

11    **BY MR. DOREN:**

12    **Q.**   Mr. Weissinger, *Battle Royale* is generally referred to in

13    the video game field as a third-person shooter game; correct?

14    **A.**   It is a mode of play that can be played in third person or

15    first person.  There is a lot of other first person *Battle*

16    *Royale* games.

17    **Q.**   And the third person shooter mode is one where you are

18    kind of looking over the shoulder of the avatar that you are

19    steering; correct?

20    **A.**   That's correct.

21    **Q.**   And the point of *Battle Royale* is to be the last survivor;

22    correct?

23    **A.**   Yes.  The last player standing.

24    **Q.**   That's how you win?

25    **A.**   Uh-huh.

**WEISSINGER - CROSS - DOREN**

1    **Q.**    And the way that the game works is you're playing on an

2    island; correct?

3              **THE COURT:**    Is that "yes"?

4              **THE WITNESS:**    Yes.

5              **THE COURT:**    "Uh-huhs" can go either way.

6              **THE WITNESS:**    Sorry.

7              **MR. DOREN:**    Thank you, Your Honor.

8    **Q.**    And the game takes place on an island; correct?

9    **A.**    Yes.

10   **Q.**    And over the course of the game, the island is surrounded

11   by a storm; correct?

12   **A.**    Correct.

13   **Q.**    And the storm slowly closes in; true?

14   **A.**    Correct.

15   **Q.**    And so the players have to stay inside the storm, in the

16   eye of the storm, if you will; right?

17   **A.**    Yes.  So they take the image.

18   **Q.**    So they are driven together toward the middle of the

19   island so that ultimately whoever is left is squeezed together

20   and they shoot it out; right?

21   **A.**    Yes.  So the match will end.

22   **Q.**    So when we talked about getting together with your friends

23   to watch a match, you're getting together to watch this fight

24   to the death; correct?

25   **A.**    If you're playing *Battle Royale*, yes.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   Let's take a look, please, at *Party Royale*, and going to

2   the selection screen, which we were on before we played the

3   trailer, do you see in the upper right-hand corner Epic's

4   description of *Party Royale*?

5   **A.**   Yes, I do.

6   **Q.**   And it states, "Welcome to *Party Royale*, an experimental

7   and evolving space.  Leave your weapons and materials behind

8   and hang out with friends, play games and enjoy live

9   entertainment, catch live shows, race around obstacle courses

10  by land or sea, go fishing with friends, perfect your

11  skydive," etc.  Did I read that accurately?

12  **A.**   Yes.

13  **Q.**   Now, let's take a quick look, if we can, inside *Party*

14  *Royale*.

15                  (Whereupon, the video is playing.)

16  **BY MR. DOREN:**

17  **Q.**   And is this the street seen in *Party Royale*?

18  **A.**   This is -- yes.  They are in *Party Royale*.

19  **Q.**   Okay.  And our avatar now is running toward a skydiving

20  activity; correct?

21  **A.**   Yes.

22  **Q.**   Do you know this game, sir, the *Skydive Glide Drop*?

23  **A.**   Yes.

24  **Q.**   And our avatar is going through hoops, correct, and trying

25  to do it in as fast a time as possible; am I right?

**WEISSINGER - CROSS - DOREN**

1    **A.**    That's correct.

2    **Q.**    And, in fact, our avatar then gets a B rank and a message

3    that he set a new course record; true?

4    **A.**    Yes.

5    **Q.**    And then he has a dance; right?

6    **A.**    Yes.

7    **Q.**    And you recognize that dance as being by the name of

8    Slick, and it's available in the Items Store on *Fortnite*;

9    correct?

10   **A.**    Yes.

11   **Q.**    And it costs 500 V-Bucks to do this; right?

12   **A.**    I'm not sure of the exact cost, but, yes, I'll agree.

13   **Q.**    Thank you.

14         All right, sir.  Let's take a look now at *Creative*.

15         And, Your Honor, I -- we have before us -- let me ask you

16   first, Mr. Weissinger, do you recognize this as a screenshot

17   from Epic Games website?

18   **A.**    Not off the top of my head, but if you got it from

19   fortnite.com, then I agree.

20   **Q.**    Thank you.  And you recognize this, don't you, as an

21   accurate description of the Creative Mode?  Go ahead and take

22   a minute.

23   **A.**    Thank you.  Okay.

24   **Q.**    And do you agree that this is an accurate description of

25   the Creative Mode set out on this document?

**WEISSINGER - CROSS - DOREN**

1    **A.**    In general, yes.

2    **Q.**    Your Honor -- this is in your binder as DX5539, and I

3    would move for its admission.

4              **THE COURT:**    Any objection?

5              **MS. MOSKOWITZ:**    Your Honor, if I could just have one

6    moment, please.

7         I apologize.  We were just checking on confidentiality

8    issues.  I'm sorry for the delay.

9              **MR. DOREN:**    I can represent to counsel it is the

10   public website.

11             **MS. MOSKOWITZ:**    Yes.  Oh, sorry.  It was on the

12   screen.  No objection, Your Honor.

13             **THE COURT:**    Okay.  It's admitted.

14             (Defense Exhibit 5539 received in evidence)

15             **MR. DOREN:**    Thank you, Your Honor.

16   **Q.**    And the description states, "The Creative allows you to

17   design *Fortnite* games and experiences that can be published

18   and shared with friends online, recreate *Fortnite* with your

19   own vision using your rules on your own personal island.  You

20   can also play countless community-made games with your friends

21   by entering an island code or visiting the featured hub in

22   game."

23        Did I read that correctly?

24   **A.**    Yes, sir.

25   **Q.**    And do you agree with that statement?

**WEISSINGER - CROSS - DOREN**

1    **A.**    In general, yes.

2    **Q.**    And below that are some of the examples of featured

3    islands; correct?

4    **A.**    Yes.

5    **Q.**    And on the left we have something called "Space Adventure

6    Deathrun"; correct?

7    **A.**    Yep.

8    **Q.**    And on the right we have something called "Bird Cage

9    Deathrun"; correct?

10   **A.**    Yes.

11   **Q.**    And a "deathrun" is where the player has to make it across

12   the island without getting killed; correct?

13   **A.**    Yeah.  Think of it like a temple-run-type game.  You're

14   kind of going down a path and there is obstacles --

15   **Q.**    Kind of the run-or-die game?

16   **A.**    Correct.

17   **Q.**    Got it.

18          And so let's talk about the Create Mode.  We have heard a

19   lot about that.  And the Create Mode, as I understand it, is

20   where a player wants to create their own island.  They want to

21   landscape their own island, if you will; correct?

22   **A.**    Yeah.  They have a whole host of creation tools that they

23   can use to build their own experience.

24   **Q.**    So they get basically a big empty lot in the form of an

25   island, and then Epic has created features for them to place

**WEISSINGER - CROSS - DOREN**

1    there:  Grass, mountains, structures, trees, that sort of

2    thing?

3    **A.**    Yes.  A whole set of props.

4    **Q.**    Okay.  Can we take a look at the Create Mode.  Is what we

5    are looking at on the screen, an example of a player putting

6    together their island?

7    **A.**    Yes.

8    **Q.**    Okay.  And what we're looking at is someone with a device,

9    and there they are projecting a tree, and that tree then takes

10   shape in the landscape; correct?

11   **A.**    Yes.

12   **Q.**    And now it looks like they're building a building;

13   correct?

14   **A.**    Yes.

15   **Q.**    Putting up a number of walls?

16   **A.**    Yes.

17   **Q.**    And then inside that building, they are now generating

18   what looks like a loot box; is that right?

19   **A.**    Yes.  They did a chest.

20   **Q.**    Okay.  "Loot" being L-O-O-T like pirate loot; correct?

21   **A.**    Correct.

22   **Q.**    And then within that box there are various things, in this

23   case, guns, for example; correct?

24   **A.**    Yes.

25   **Q.**    And players, after creating their island, can also create

1   games on their island; right?

2   **A.**   Yes.

3   **Q.**   And that's actually a thing; right?  That's a big thing

4   like the Bird Cage Deathrun, that was a game created by a

5   player, a user; correct?

6   **A.**   Correct.

7   **Q.**   And then I believe the way we put it on the definition was

8   that these are community-made games that people then come and

9   play; am I right?

10  **A.**   Games and experiences.

11  **Q.**   Thank you.

12        And let's go back to Exhibit 5539, and the last line in

13  what is the Creative Mode paragraph talks about "visiting the

14  featured hub in-game."  Do you see that?

15  **A.**   Yes.

16  **Q.**   Let's go to the featured hub in-game.  Do you recognize

17  this on your screen, sir, as that hub?

18  **A.**   Yes.

19  **Q.**   And I'll describe for the record that our avatar is

20  standing in the middle of a round patio, if you will, and that

21  patio is surrounded by various layers or circles of walls,

22  each of which appears to contain a game title.  Is that an

23  accurate description?

24  **A.**   Yes.

25  **Q.**   All right.  And if we look over to the left, we have

**WEISSINGER - CROSS - DOREN**

1    something called "Practice" and various games there; right?

2    **A.**    Yes.

3    **Q.**    And if we look to -- a little further to the right, we see

4    the combat area; correct?

5    **A.**    Yes.

6    **Q.**    And if we look further to the right, we have what's called

7    "Variety"; am I right?

8    **A.**    It said "Highlights."  We skipped one.

9    **Q.**    Sorry.  Thank you, sir.  Let's do that.

10        To the right of "Combat" was "Highlights"; true?

11    **A.**    Yes.

12    **Q.**    And then to the right of that is "Variety"; correct?

13    **A.**    Yes.

14    **Q.**    I'm gathering we all know what combat is, so let's go over

15    to Variety and take a look.

16        And, sir, as I understand it, our avatar could enter any

17    of these islands through these doors; is that right?

18    **A.**    That's correct.

19    **Q.**    And here under "most popular," it's -- number two is

20    "prison breakout"; correct?

21    **A.**    Yes.

22    **Q.**    And it says, "Escape prison and cause mayhem in the city";

23    correct?

24    **A.**    Yes.

25    **Q.**    Or you can be a guard and keep everything under control;

**WEISSINGER - CROSS - DOREN**

1    correct?

2    **A.**    Yes.

3    **Q.**    Now, is this an experience or a game, sir?

4    **A.**    That looks like a game to me.

5    **Q.**    Okay.  Okay.

6            And let's look at the most popular in the variety of

7    categories.  It's called "Rockets vs. Cars."  Do you see that?

8    **A.**    Yes.

9    **Q.**    And it says, "Just like the Classic Mode" -- if Wobbly

10   Cello will get out of our way, we can read the rest of this.

11   And it says, "Now with snipers."  Do you see that?

12   **A.**    Yes.

13   **Q.**    And is the number one most popular game in the variety

14   category here "Cars Now With Snipers" -- is that a game or an

15   experience?

16   **A.**    That looks like a game to me.

17   **Q.**    Okay.  Thank you, sir.

18           And let's head over now to highlights, and let's go to the

19   first door on the left in highlights.  And I see that this one

20   is called "Creative Mayhem Regional Qualifier."  Are you

21   familiar with that, sir?

22   **A.**    Yes.  That's a promotion that we're running currently to

23   have basically community influencers play games or other

24   content from community creators, and they invite their

25   community audience in, and they all play together, and they

**WEISSINGER - CROSS - DOREN**

1    win prizes.  That's Creative Mayhem.

2    **Q.**    And there is a qualifying period for this tournament;

3    correct?

4    **A.**    For this promotion, yes.

5    **Q.**    And that qualifying period is from May 4th to about June

6    5th?

7    **A.**    I'm not sure, but that sounds right.  It was, I believe,

8    for the month of May.

9    **Q.**    And once you qualify for this promotion, then you go into

10   a bracket tournament and someone wins; right?

11   **A.**    Yes.

12   **Q.**    And this promotion started on May 4th?

13   **A.**    I believe it was around the month of May, but May 4th

14   sounds correct.

15   **Q.**    And for this event, are you also in charge of marketing

16   and promotions?

17   **A.**    Yes.

18   **Q.**    And did you also create a trailer for your YouTube

19   channel?

20   **A.**    We may have.

21   **Q.**    Let's take a look, sir, and see if I can refresh your

22   recollection.  And what I have here, sir, we're marking as

23   Exhibit 5544.  And do you recognize this as the title page for

24   the *Fortnite* trailer for Creative Mayhem?

25   **A.**    Yes.

**WEISSINGER - CROSS - DOREN**

1    **Q.**    And, in fact, you see that since -- you see that it's

2    dated May 4 in the lower left?

3    **A.**    Yes.

4    **Q.**    Does that refresh your recollection as to when this

5    launched?

6    **A.**    Yes.  Thank you.

7    **Q.**    May 4th?

8    **A.**    May 4th.

9    **Q.**    The second day of this trial?

10   **A.**    Yes.

11   **Q.**    Okay.  And since then, there have been over a half a

12   million views; correct?

13   **A.**    Yes.

14   **Q.**    And, once again, your goal here was to generate excitement

15   to attract people to the promotion; correct?

16   **A.**    We had a bunch of new Creative Mode features that arrived

17   into the game recently, and this was to help celebrate those

18   new features.

19   **Q.**    Excellent.  Thank you.

20        So you also wanted to accurately reflect those new

21   features and what could be done in Creative Mode; correct?

22   **A.**    Essentially there were new capabilities that were added to

23   Creative Mode recently that we wanted to highlight.

24   **Q.**    All right.

25        Well, why don't we watch your trailer, which is Exhibit

1  5544.

2                    (Whereupon, the video was played.)

3            **THE COURT:**    Our court reporter was relieved.

4            **MR. DOREN:**    Absolutely, Your Honor.

5  **Q.**    Mr. Weissinger, do you recognize Exhibit 5544 as the

6  trailer that was created to promote creative mayhem?

7  **A.**    Yes.

8            **MR. DOREN:**    And, Your Honor, I would ask to move into

9  evidence DX5544.

10           **THE COURT:**    No objection.

11           **MS. MOSKOWITZ:**    No objection.

12           **THE COURT:**    Admitted.

13           (Defense Exhibit 5544 received in evidence)

14  **BY MR. DOREN:**

15  **Q.**    Mr. Weissinger, if anyone were to state that Creative Mode

16  was solely for user creation, that would be untrue; correct?

17  **A.**    That it was solely for user creation?  Would you mind

18  repeating that question again?  I'm just not sure what you are

19  asking for.

20  **Q.**    Sure.  Let me try it differently.  Let me try it

21  differently.

22           If someone were to say that Creative Mode had no

23  competitive gameplay, that would be inaccurate; correct?

24  **A.**    That would be inaccurate.  There is competitive gameplay

25  in creative.

**WEISSINGER - CROSS - DOREN**

1    **Q.**    Thank you.

2    And one term I've learned in this case is something called

3    "game mechanics."  Are you familiar with that term?

4    **A.**    Sure.  In general.

5    **Q.**    In general.  It's kind of a general term, isn't it?

6    **A.**    Yes.

7    **Q.**    It means in general that game mechanics specify how a game

8    will work for the people who play it; right?

9    **A.**    Sure.

10    **Q.**    And there are plenty of game mechanics in Creative Mode,

11    isn't there?

12    **A.**    Yes, indeed.

13    **Q.**    And if we could please look at DX5540.  And, sir, you

14    have -- it's both in your binder and now on the screen in

15    front of you -- two Tweets from *Fortnite* Creative.  Do you see

16    that?

17    **A.**    Yes, sir.

18    **Q.**    And are Tweets within your domain as vice-president of

19    marketing?

20    **A.**    Yes.  They fall under my group.

21    **Q.**    And how often does Epic send out Tweets on *Fortnite*

22    generally?

23    **A.**    Multiple times a day.

24    **Q.**    And you mentioned, I believe, that you have about a

25    hundred million social media followers; is that correct?

**WEISSINGER - CROSS - DOREN**

1    **A.**    That is correct.

2    **Q.**    And on the left, we see a Tweet from October 16, 2020;

3    correct?

4    **A.**    Yes.

5    **Q.**    And this is about *Fortnite* Creative; correct?

6    **A.**    Yes.

7    **Q.**    And this Tweet says that they combine gameplay mechanics

8    with exciting visual; correct?

9    **A.**    Yes.  It says they combine gameplay mechanics with

10   exciting visuals, but it's unclear as to what "they" is.

11   **Q.**    Fair enough, sir.

12           Do you think that might be a reference to the game below,

13   *Overgrown Gunfight*?

14   **A.**    Yes.  It looks like it.

15   **Q.**    And you intend when these Tweets go out to have them be

16   accurate; correct?

17   **A.**    Yes.

18   **Q.**    And on the right, there is a Tweet from Epic regarding

19   *Fortnite* Creative from August 25, 2020; correct?

20   **A.**    Yes.

21   **Q.**    And this Tweet says, "Drop into this action-packed *Battle*

22   *Royale* with 9 unique points of interest, custom terrain, and

23   fun gameplay mechanics"; correct?

24   **A.**    Yes.

25   **Q.**    And Epic intended that to be accurate when it was posted

**WEISSINGER - CROSS - DOREN**

1    on August 25th, 2020; correct?

2    **A.**    Yes.

3    **Q.**    So if someone were to have said that there was nothing

4    resembling a game mechanic at all in *Fortnite* Creative, that

5    would be incorrect; true?

6    **A.**    It depends on the experience, but, yes.

7    **Q.**    If that person were to say that Creative is more like a

8    Barbie Fashion Designer but for the Fortnite universe, that

9    person would be incorrect; true?

10   **A.**    Well, I'm not sure what goes on in Barbie Fashion

11   Designer, unfortunately.

12   **Q.**    Fair enough.  Can't say I do either.

13         But we can agree, sir, that there are game mechanics in

14   Creative Mode; correct?

15   **A.**    Yes.  Our tools have enabled game mechanics.

16   **Q.**    The last element I want to talk with you about before we

17   move on to other things, which I intended to start with, are

18   in-app purchases.  And we've heard a lot about buying V-Bucks

19   in this case.  And I'd like to take you to a demonstrative

20   that shows what we think is the screen where one purchases

21   V-Bucks.

22         Do you recognize the demonstrative on the screen in front

23   of you?

24   **A.**    Yes.

25   **Q.**    And what this shows is under the heading of V-Bucks, four

**WEISSINGER - CROSS - DOREN**

1    tiles; correct?

2    **A.**    Yes.

3    **Q.**    One for a thousand V-Bucks, then 2,800, 5,000, and 13,500;

4    correct?

5    **A.**    Yes.

6    **Q.**    And with real money, as we seem to call it in the *Fortnite*

7    world of 7.99, 19.99, 31.99, and 79.99 respectively; correct?

8    **A.**    Yes.

9    **Q.**    And then in the upper right-hand corner there is a number

10   5400.  Did I read that right?

11   **A.**    Yes.

12   **Q.**    And I'll tell you, Mr. Spalding's 11-year-old son has been

13   quite pleased to have his account racking up V-Bucks while he

14   was preparing this slide.

15          And --

16              **MS. MOSKOWITZ:**    Objection, Your Honor.

17              **THE COURT:**    It's not a question.

18              **MR. DOREN:**    I will put it in the form of a question,

19   Your Honor.

20   **Q.**    Mr. Weissinger, let's go ahead and take a look at a

21   thousand V-Bucks, and let's click through that, please.

22          And take us to a screen entitled "Purchase."  Do you see

23   that?  Or it has a purchase button, should I say.  Do you see

24   that?

25   **A.**    Yes.

**WEISSINGER - CROSS - DOREN**

1  **Q.**    And so to purchase V-Bucks in *Fortnite*, one must click

2  through the amount they want.  Then they come to this screen;

3  correct?

4  **A.**    Yes.

5  **Q.**    Then they hit "Purchase."

6         Let's go ahead and do that, Mr. Spalding.

7         And you're then redirected to the Epic Games Store

8  checkout counter; correct?  This being a PC game that we're

9  playing today; correct?

10 **A.**    Yes.

11 **Q.**    And once there, there is credit card information already

12 entered, but before the purchase can be completed, it's

13 necessary to enter the CVV number from the back of that credit

14 card; correct?

15 **A.**    Yes.  It appears so.

16 **Q.**    All right.  And that's what is required here in the Epic

17 Games Store; true?

18 **A.**    For this particular transaction, it looks like yes.

19 **Q.**    And do you understand, sir, that that's also required on,

20 for example, the Nintendo switch when one purchases V-Bucks

21 there?

22 **A.**    I'm not sure off the top of my head.

23 **Q.**    And do you know whether or not that was required when one

24 purchased V-Bucks within iOS?

25 **A.**    I'm not sure off the top of my head.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   All right.

2         Now, let's talk about what one purchases with V-Bucks.

3   And, sir, that requires us to go to something called the

4   "Items Shop"; correct?

5   **A.**   Yes.

6   **Q.**   So one does not buy things -- skins, cosmetics -- while

7   playing; correct?  One must step out and go into the Items

8   Shop; true?

9   **A.**   Yes.  I believe that's the case currently, yes.

10  **Q.**   All right.  And once here, if you have V-Bucks in your

11  account, you can spend until you're out of V-Bucks; correct?

12  **A.**   Correct.

13  **Q.**   In other words, if you start the day with V-Bucks in your

14  account and you want to go into the Items Shop to buy

15  something, you don't need to go buy V-Bucks anywhere.  You can

16  spend those in your account; true?

17  **A.**   Yes.

18  **Q.**   Is there any limit on the number of V-Bucks one can have

19  in their account?

20  **A.**   I'm not sure if there is a limit on the total amount that

21  you can have.  There is a limit on the amount that you can

22  purchase.

23  **Q.**   And what is that limit?

24  **A.**   Off the top of my head, I -- I'm not remembering.  I

25  believe there is a daily and maybe a weekly limit that caps

**WEISSINGER - CROSS - DOREN**

1  spending inside the game.

2  **Q.**   But it's a limit.  You can play for quite a while without

3  having to purchase more V-Bucks; correct?

4  **A.**   You don't have to purchase any V-Bucks to play.

5  **Q.**   Fair enough.  Fair enough.

6        And so -- but the limit on V-Bucks again, that can be

7  spent over the course of time until those V-Bucks are

8  exhausted; true?

9  **A.**   Yes.

10  **Q.**   And as we scroll down through the Items Shop, first of all

11  we see a clock there next to "Featured."  It has 7:40 next to

12  it.  These features rotate out in 7 hours and 40 minutes from

13  now; correct?

14  **A.**   Correct.

15  **Q.**   So if you come back at 5:00 tonight, this will look

16  different; right?

17  **A.**   Yes.

18  **Q.**   And then as we scroll down, we see different packs, we see

19  different skins, we see different tools, and we see different

20  prices; true?

21  **A.**   Yes.

22  **Q.**   All right.  Thank you, sir.  I appreciate the tutorial and

23  the tour.

24        And, Your Honor, first of all I want to make sure I

25  remember to move DX5540 into evidence, which are the Tweets.

**WEISSINGER - CROSS - DOREN**

1          **THE COURT:**   No objection?

2          **MS. MOSKOWITZ:**   No objection, Your Honor.

3          **THE COURT:**   Admitted.

4               (Defense Exhibit 5540 received in evidence).

5          **MR. DOREN:**   Thank you, Your Honor.

6     **Q.**   Mr. Weissinger, as part of your job, you need to know your

7     customer base; correct?

8     **A.**   Yes.

9     **Q.**   And as you've already told the Court, you have data that

10    helps you figure out the nature of your customer base;

11    correct?

12    **A.**   Yes.

13    **Q.**   And it's important for you to understand who it is you're

14    marketing to so that you can market effectively; true?

15    **A.**   Yes.

16    **Q.**   For example, one of the problems that you say -- or one of

17    the weaknesses you said of promotions within the iOS

18    environment is that a lot of people on that iOS platform

19    simply aren't looking for games; correct?

20    **A.**   Going through the App Store environment.

21    **Q.**   Thank you.  I appreciate the clarification.

22          So within the App Store environment, many people simply

23    aren't looking for games; correct?

24    **A.**   I believe that to be correct.

25    **Q.**   And so you're looking for people that want to play games;

1    right?

2    **A.**    I'm looking for people who want awesome entertainment

3    experiences.

4    **Q.**    And that's one of the reasons why you said that your

5    marketing with Xbox and PlayStation is more effective because

6    that's a game-specific audience; true?

7    **A.**    Because the people there are automatically qualified as

8    looking for awesome entertainment experiences.

9    **Q.**    Meaning they are going there to play games, ultimately

10   qualified.  They are going there to play games?

11   **A.**    I don't know.  People use their Xbox and PlayStation to

12   play DVDs, and there is other apps on their stores that they

13   can install.  They watch Hulu and stream other stuff, I

14   believe.

15   **Q.**    Okay.  Okay.  Thank you, sir.

16          What percentage of *Fortnite* players currently are male?

17   **A.**    I actually don't know.

18   **Q.**    You have no ballpark?

19   **A.**    I would assume more male than female.

20   **Q.**    And what percentage of *Fortnite* players are under the age

21   of 18?

22   **A.**    I do not know.

23   **Q.**    You have no ballpark on that?

24   **A.**    I do not.

25   **Q.**    Sir, I would ask you to please look -- and how is that,

**WEISSINGER - CROSS - DOREN**

1   sir?  How is that, as the vice-president of marketing for

2   *Fortnite*, you have no idea what percentage of your users are

3   under the age of 18?

4               **MS. MOSKOWITZ:**    Objection.  Argumentive.

5               **THE COURT:**    Overruled.

6               **THE WITNESS:**    In general, we don't collect age

7   information on our players.

8   **BY MR. DOREN:**

9   **Q.**    You know, though -- to use your term before -- anecdotally

10  that your audience is primarily young boys, right, 13 to 17

11  years old?

12  **A.**    I do not know where exactly that bell curve fits.  It

13  could be 18 to 24 also.

14  **Q.**    Okay.  So if we were to say that your kind of core

15  demographic are boys to men from 13 to 25, would you agree

16  with that statement?

17  **A.**    Yes, I would.

18  **Q.**    Thank you, sir.

19          If I could please ask you to look in your binder at

20  Exhibit 3233.

21  **A.**    I might need another binder.

22  **Q.**    Oh, I'm sorry.  I have it here.

23          May I approach, Your Honor?

24               **THE COURT:**    You may.

25

WEISSINGER - CROSS - DOREN

**BY MR. DOREN:**

**Q.** Now, Mr. Weissinger, with the binder in front of you,

could you please turn to DX3233.  Do you have that in front of

you, sir?

**A.** Yes, sir.

**Q.** And this is a document entitled "Fortnite North America

Publishing Update April 2019"; correct?

**A.** Yes.

**Q.** And have you seen documents like this in the course of

your work at Epic?

**A.** Yes.

**Q.** And I'd ask you, sir, to turn -- let's start, please, with

DX3233.003 and specifically -- and that is a page entitled

"Fortnite 2018 By the Numbers"; correct?

**A.** Yes.

**Q.** And in -- under November, which is the second entry in the

right-hand column from the top, do you see that?  "NFL

Outfits" specifically?

**A.** Yes.

**Q.** And Epic entered into a promotion with the NFL; correct?

**A.** Yes.

**Q.** And it gave people the opportunity to wear NFL outfits

from their favorite player, for example; correct?

**A.** For the favorite team.

**Q.** Fair enough.  Fair enough.

**WEISSINGER - CROSS - DOREN**

1        And we won't get into player likeness issues.

2        And that gives Epic an opportunity to monetize those

3    images by selling those skins and cosmetics to players;

4    correct?

5              **MS. MOSKOWITZ:**   Objection to the preamble.

6              **THE COURT:**   Which preamble?

7              **MS. MOSKOWITZ:**   The player likeness issues.

8              **THE COURT:**   Okay.  Well, that particular line is

9    stricken.

10       Can you answer the question?

11             **THE WITNESS:**   I'm sorry.  Would you mind repeating

12   the question?

13             **MR. DOREN:**   I wouldn't at all.  I will leave the

14   preamble out this time, sir.

15   **Q.**   And Epic has the opportunity to monetize the sales of NFL

16   team likenesses; correct?

17   **A.**   Yes.

18   **Q.**   Here in fact by the time of this report in April 2019,

19   3.3 -- well, I'll take that back.  3.3 million units were sold

20   of NFL outfits in 2018; correct?

21   **A.**   Yes.  It looks like that based on this slide.  I cannot a

22   hundred percent confirm.

23   **Q.**   Sure.  But you would expect a presentation on an update on

24   North America Publishing to be accurate within Epic; correct?

25   **A.**   That's why I said it looks to be accurate.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   Thank you.

2          And these 3.3 million units would have been sold during

3   the months of November and December; correct?

4   **A.**   That sounds correct based on the timing that I remember

5   for the availability of those NFL outfits.

6   **Q.**   Thank you.

7          Please turn to page 00.6.  And, sir, on the left, you see

8   the category of Top 20 Youth Brands; correct?

9   **A.**   Yes.

10  **Q.**   And on the right, you see Top 10 Monthly Expenditures for

11  People 18 to 24 years old and 13 to 17 years old; correct?

12  **A.**   Yes.

13  **Q.**   And this data is being put forward because as we've

14  discussed, 13- to 24-year-olds are the core demographic for

15  *Fortnite*; correct?

16  **A.**   It is 13 to 24, yes, is interesting as a core demographic,

17  primary demographic for us.

18  **Q.**   And in the lower left, we have a box that says splurges

19  they don't regret; correct?  Same page, .006, do you see it?

20  **A.**   Yes.

21  **Q.**   For 13- to 17-year-olds, the first splurges they don't

22  regret is food; correct?

23  **A.**   Yes.

24  **Q.**   And the second is video games; right?

25  **A.**   Yes.  It looks like it.

**WEISSINGER - CROSS - DOREN**

1    **Q.**    And for the 18- to 24-year-olds, the fifth splurge they

2    don't regret is video games; correct?

3    **A.**    Correct.  That's what it looks like based on the report,

4    but I'm not sure where the report comes from.

5    **Q.**    Sure.  But this was important enough for it to be

6    published in this deck within Epic; correct?

7    **A.**    For this particular update it is included.

8    **Q.**    And the Top 5 list for those over 25 does not include

9    video games, does it?

10   **A.**    Based on this "splurges they don't regret" question, yes.

11   **Q.**    And then please look at page .007.  "Influencers are

12   important for teens."  That is the heading of this slide;

13   correct?

14   **A.**    Yes.

15   **Q.**    And there is a table that says who are they following.  Do

16   you see that?

17   **A.**    Yes.

18   **Q.**    And for those 13 to 17, 92 percent of them follow friends;

19   correct?

20   **A.**    Yes.

21   **Q.**    78 percent of them follow family; correct?

22   **A.**    Yes.

23   **Q.**    And 63 percent of them in third place in this ranking

24   follow online celebrities and creators; right?

25   **A.**    Yes.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   That means they follow gamers; right?

2   **A.**   No.

3   **Q.**   Well, they follow creators; correct?

4   **A.**   I take creators to mean content creators like it could be

5   an Instagram personality, it could be a TikTok person.

6   **Q.**   It could be the guys in the box playing games and

7   screaming into the microphone that we saw on the trailer;

8   true?

9   **A.**   They are a subset of celebrities and creators.

10  **Q.**   And these days, online celebrities and creators are way

11  ahead of athletes, for example, in terms of the people that

12  13- to 17-year-olds follow; correct?

13  **A.**   I have no idea.  I think the top Instagram people are like

14  The Rock, Ariana Grande.

15  **Q.**   Well, sir, I direct you back to this Epic internal deck

16  where the second entry from the bottom rather than the third

17  from the top is athletes; correct?

18  **A.**   I see athletes.

19  **Q.**   And then, sir, if you would please turn to page .008, and

20  to keep this easy for us to stay on the same line, let's look

21  to the red bracketed information for June 2018.  All right?

22  **A.**   Yep.

23  **Q.**   And do you see, sir, that in June 2018, 79 percent of

24  *Fortnite* players were male; correct?

25  **A.**   I don't think that's what this chart is saying.  These are

1    not *Fortnite* player ages and male/female breakdowns.

2    **Q.**    What is this chart showing, sir?

3    **A.**    My recollection is that this is YouTube viewership of

4    *Fortnite* content.

5    **Q.**    All right.  So these are -- these are statistics for the

6    people who went to the YouTube channel for *Fortnite* and

7    watched that content; correct?

8    **A.**    I believe so.  It was a long time ago, though, so I'm not

9    exactly certain, but that's my recollection.

10   **Q.**    All right.  Well, based on your recollection here, sir, 79

11   percent of those that watched *Fortnite* content on YouTube are

12   male, correct, in June 2019?

13   **A.**    Yes.

14   **Q.**    And 57 percent of those were under -- were 24 or younger;

15   correct?

16   **A.**    Yep.

17   **Q.**    And 21 percent of those who went to *Fortnite* content on

18   YouTube were female; correct?

19   **A.**    Yes.  I believe so, based on this.

20   **Q.**    Thank you for helping us decode this, sir.

21   **A.**    Uh-huh.

22   **Q.**    Mr. Weissinger, prior to August 2020, you had never heard

23   anybody at Epic say that if not for Apple's 30 percent

24   commission, Epic could have captured more iOS users; correct?

25   **A.**    Yes.  That wouldn't have been the conversation that I

**WEISSINGER - CROSS - DOREN**

1    would have been involved in.

2    **Q.**    And you have never heard anybody at Epic say that it could

3    have retained more iOS users if not for Apple's 30 percent

4    commission; correct?

5    **A.**    Yes, but that's not to say those conversations didn't take

6    place.  It's just a conversation that I wasn't in.

7    **Q.**    But you're speculating, sir, that they might have but you

8    weren't present; correct?

9    **A.**    That's correct.

10   **Q.**    We've got a lot of "yeses" and "nos" flying here so let me

11   make sure the record is clear.

12        You, sir, have never been party to a conversation with

13   anybody at Epic where it was said that Epic could have

14   retained more iOS users if not for Apple's 30 percent

15   commission; is that correct?

16   **A.**    Yes.  Not that I can recollect.

17   **Q.**    And within *Fortnite* or at Epic regarding *Fortnite*, are you

18   familiar with the term "conversion," "converting a player"?

19   **A.**    Yes.

20   **Q.**    And that is when someone who has been playing for free and

21   has not purchased any V-Bucks becomes a paying player;

22   correct?  They buy V-Bucks?

23   **A.**    Yes.

24   **Q.**    And in your marketing efforts at Epic, you have never

25   heard anybody say that Epic could convert more iOS users if it

**WEISSINGER - CROSS - DOREN**

1   wasn't for Apple's 30 percent commission; correct?

2   **A.**   I believe I referenced in the deposition that there were

3   conversations around increased purchase velocity related to

4   lower price points.

5   **Q.**   You are referring now to the impact of the mega drop in

6   your communication strategy for the console manufacturers;

7   correct?

8   **A.**   Just in general.  I'm not sure exactly where or what in my

9   deposition you are referring to.

10              **MR. DOREN:**   Your Honor, page 142, lines 7 to 12.

11              **THE COURT:**   Go ahead.

12  **BY MR. DOREN:**

13  **Q.**   Reading from your deposition, Mr. Weissinger, at page 142,

14  lines 7:

15              "Q. In your marketing efforts at Epic" --

16  **A.**   I'm sorry.  Can I read along?

17              **THE COURT:**   He gets to read this.  Do you need the

18  page?

19              **THE WITNESS:**   Yes.  I'm sorry.

20              **THE COURT:**   142 is the page.

21              **MR. DOREN:**   Let me know when you are there, sir.

22              **THE WITNESS:**   It was DX --

23              **THE COURT:**   142, line 7.  He is going to read that.

24              **THE WITNESS:**   I'm in the wrong one.  I'm sorry.

25              **MR. DOREN:**   Your Honor, while we are waiting, I would

**WEISSINGER - CROSS - DOREN**

1    move to admit DX3233.

2              **THE COURT:**    No objection?

3              **MS. MOSKOWITZ:**    No objection, Your Honor.

4              **THE COURT:**    Admitted.

5              (Defense Exhibit 3233 received in evidence)

6    **BY MR. DOREN:**

7    **Q.**    Mr. Weissinger, do you now have your deposition open in

8    front of you?

9    **A.**    Yes.

10   **Q.**    I will now read from page 142, lines 7 to 12:

11             "Q. In your marketing efforts at Epic, have you ever heard

12   anybody say that we can capture more iOS new users but for

13   Apple's 30 percent commission?

14             "A. I am not aware of discussions taking place regarding

15   that."

16             Mr. Weissinger, as the VP of marketing at Epic, you have

17   never discussed whether your marketing efforts would be more

18   effective or successful if Epic could distribute iOS apps

19   outside of the App Store, have you?  Mr. Weissinger?

20   **A.**    I was just reading some of the context around it.  I'm

21   sorry.

22   **Q.**    Mr. Weissinger, the question pending is as the VP, the

23   vice-president of marketing at Epic, you have never discussed

24   whether your marketing efforts would be more effective or

25   successful if Epic could distribute iOS apps outside of the

**WEISSINGER - CROSS - DOREN**

1    App Store; correct?

2    **A.**    Yes.  I am not aware of --

3    **Q.**    Sir, I'm not asking you to read your deposition.  I'm

4    asking you to answer me here under oath today before God.

5         Now, as the vice-president of marketing at Epic, you have

6    never discussed whether your marketing efforts would be more

7    effective or successful if Epic could distribute iOS apps

8    outside of the App Store; correct?

9    **A.**    Correct.

10   **Q.**    All right, sir.

11        Let's turn briefly to marketing.  You agree that Apple has

12   promoted *Fortnite* season launches; correct?

13   **A.**    Yes.

14   **Q.**    And season launches occur about once a quarter; is that

15   right?

16   **A.**    Yes.  About every 10 weeks.

17   **Q.**    In *Fortnite* parlance, there are chapters and then there

18   are seasons within the chapters; right?

19   **A.**    Yes.

20   **Q.**    And we are in the second chapter of *Fortnite* at this point

21   in its life?

22   **A.**    That's correct.

23   **Q.**    And as part of those promotions, Apple would provide App

24   Store banners; correct?

25   **A.**    Yes.

**WEISSINGER - CROSS - DOREN**

1    **Q.**   And it would feature *Fortnite* on the game tab; correct?

2    **A.**   Correct.

3    **Q.**   And it would post to social media platforms; correct?

4    **A.**   Correct.

5    **Q.**   And it would take out paid ads as well; true?

6    **A.**   Yes.  I believe so.

7    **Q.**   And it would write editorial features within the App Store

8    regarding *Fortnite*; right?

9    **A.**   Yes.

10   **Q.**   Now, one of the things you said is that the area for

11   growth -- the area for growth is -- for *Fortnite* is among

12   mobile phones, correct, mobile platforms?

13   **A.**   Yes.

14   **Q.**   And we have heard that there are many hundreds of millions

15   of people who own currently own iPhones.  And is that your

16   general understanding, sir?

17   **A.**   Yes.  I believe over a billion.

18   **Q.**   And if each of these promotions were made on the App Store

19   on those iOS devices, they could be viewed by all those

20   hundreds of millions of people; correct?

21   **A.**   If they're going through the App Store.

22   **Q.**   If they had any interest in games; right?

23   **A.**   If they had interest in the entertainment experiences.

24   **Q.**   And, sir, Apple has provided Epic with what's called an

25   "App Store takeover"; correct?

WEISSINGER - CROSS - DOREN

1    **A.**    Yes.

2    **Q.**    And I'd ask you, please, sir, to look at Exhibit DX3457.

3    Do you have that document in front of you, sir?

4    **A.**    Yes.  3457?

5    **Q.**    Yes, sir.

6    **A.**    Yes.

7    **Q.**    And it's from Mr. Malik, and that's how he pronounces his

8    name; correct?

9    **A.**    I think it's "Ma-Leek."

10   **Q.**    I did, too, until I deposed him today, sir.  So I'm happy

11   to go with "Ma-Leek" here today.

12         It's from Mr. Haseeb Malik to you and others?

13   **A.**    Correct.

14   **Q.**    On September 27, 2019; correct?

15   **A.**    Yes.

16   **Q.**    And Mr. Malik reports "Exciting news.  After negotiating

17   with Apple, we have secured the opportunity to take over the

18   App Store on the release of Chapter 2.  Epic will be the first

19   to take over the latest iteration of the App Store.  We will

20   also be given creative control on what we want to display and

21   how."

22         Did I read that accurately?

23   **A.**    Yes.

24   **Q.**    And you understood that "the first to take over the latest

25   iteration" is a reference to the first since the 2017 redesign

**WEISSINGER - CROSS - DOREN**

1    of the App Store; correct?

2    **A.**    I am not sure.

3    **Q.**    All right.  And then under a summary of what is being

4    offered, it goes through various postings and banners and the

5    like; correct?

6    **A.**    Yes.

7    **Q.**    And it states that, "This takeover will remain in place

8    from the 15th to the 24th"; correct?  About 10 days?

9    **A.**    Yes.

10   **Q.**    And that in fact occurred, didn't it?

11   **A.**    There was some takeover.  I'm not sure of the exact timing

12   and what was actually delivered.

13   **Q.**    You don't doubt that it occurred, though, do you, sir?

14   **A.**    No.  There was support.

15            **MR. DOREN:**    Your Honor, I would move into evidence

16   3457.

17            **THE COURT:**    Any objection?

18            **MS. MOSKOWITZ:**    No objection.

19            **THE COURT:**    No objection?

20            **MS. MOSKOWITZ:**    No objection, Your Honor.

21            **THE COURT:**    Admitted.

22            (Defense Exhibit 3457 received in evidence)

23   **BY MR. DOREN:**

24   **Q.**    You talked about concerts and in fact Apple helped to

25   promote concerts hosted in *Fortnite*; correct?

**WEISSINGER - CROSS - DOREN**

1    **A.**    Yes.

2    **Q.**    It helped to promote the Marshmello concert; right?

3    **A.**    Yes.

4    **Q.**    And the Travis Scott concert; true?

5    **A.**    Yes.

6    **Q.**    And the Kenshi Yonezu concert; right?

7    **A.**    I believe so.

8    **Q.**    And Apple provided the same sort of marketing support for

9    those concerts that it would for a season launch; am I right?

10   **A.**    I'm not sure without looking at it, but I believe for

11   Marshmello and for Travis Scott, at least it was probably at

12   the same level of the season launch.

13   **Q.**    And you've already commented that Apple Music was brought

14   in to promote the playlist for both Marshmello and Travis

15   Scott after their concerts; correct?

16   **A.**    Yes.

17   **Q.**    And, in fact, for Marshmello, Apple promoted the *Fortnite*

18   playlist on a billboard in Times Square in New York City;

19   true?

20   **A.**    Yes, they did.

21   **Q.**    Would you please look at Exhibit DX3222 and the second

22   page of that exhibit, sir.  And is that a photograph of the

23   Times Square billboard?

24   **A.**    It looks like it, yep.

25   **Q.**    With a reference to the Marshmello extended *Fortnite* set;

**WEISSINGER - CROSS - DOREN**

1    correct?

2    **A.**    Yes.  A little bit smaller than Apple Music and the Apple

3    Music App.

4    **Q.**    And yet prominent; correct?

5    **A.**    I wouldn't say it's a primary read.

6    **Q.**    All right, sir.

7        And in the middle of that, we have in fact the *Fortnite*

8    Marshmello avatar; correct?

9    **A.**    Yep.

10        **MR. DOREN:**    Your Honor, I would move to admit Exhibit

11    3222.

12        **THE COURT:**    No objection?

13        **MS. MOSKOWITZ:**    No objection.

14        **THE COURT:**    Admitted.

15        (Defense Exhibit 3222 received in evidence)

16    **BY MR. DOREN:**

17    **Q.**    Sir, these concerts, they last about 15 minutes; correct?

18    **A.**    Yeah.  Roughly 10 to 15 minutes.

19    **Q.**    Ten to 15 minutes.  The artists are avatars; am I right?

20    **A.**    They're digital representations of themself, yes.

21    **Q.**    And the music is recorded; true?

22    **A.**    There was some live element to the Marshmello performance

23    where his voice was coming in live to the game.

24    **Q.**    But otherwise, this is recorded music; correct?

25    **A.**    Yes.  It is recorded and sequenced in advance.

**WEISSINGER - CROSS - DOREN**

**Q.**    And you mentioned how many millions of people attended,

for example, the Marshmello concert.  Do you remember that

generally, that testimony?

**A.**    I believe I referenced a number for Travis Scott.  I'm not

sure if I referenced one for Marshmello.

**Q.**    Thank you, sir.

          And what was that number?

**A.**    There were 12.3 million concurrents for Travis Scott.

**Q.**    That is give or take 3 percent of *Fortnite* accountholders;

true?  Maybe a little less?

**A.**    If you're starting from 400 million, then it sounds

roughly correct.  Those were also concurrents so everyone

logged in at once.

**Q.**    By the way, speaking of that, *Fortnite* can only

accommodate -- any one game can only accommodate a hundred

people; correct?

**A.**    Yes.  I believe that's the cap of the limits that we've

had.

**Q.**    So these 12 million people were in groups of 100 in

different *Fortnite* experiences; correct?

**A.**    Correct.  They were instances of the same thing playing at

once.

**Q.**    So lots and lots of groups of 100 or less; right?

**A.**    Correct.

**Q.**    And during the Marshmello concert, people couldn't shoot

1    each other; right?

2    **A.**    Weapons were disabled.

3    **Q.**    During the concert; correct?

4    **A.**    Yes.

5    **Q.**    During the Marshmello concert and the Travis Scott

6    concert; right?

7    **A.**    Yes.  I believe so.

8    **Q.**    All right.  But they weren't disabled until the concert

9    began, were they?

10   **A.**    I'm not sure about the Travis Scott playlist, if that one

11   was disabled the whole time, but my recollection is probably

12   that they were disabled at some point in the lead-up to the

13   concert or when the concert began.

14   **Q.**    But until then, sir, these hundred people were shooting

15   each other before the concert began, weren't they?

16   **A.**    They were -- they were just, yeah, playing *Fortnite*.

17   **Q.**    And playing *Fortnite*, shooting each other, right, or

18   clubbing each other or shooting arrows into each other; right?

19   **A.**    It was in the *Battle Royale* map, so the experience that

20   they started in was reflective of *Battle Royale* mode.

21   **Q.**    And that would add to their lifetime score in the game;

22   correct?

23   **A.**    Yes.  And there's --

24   **Q.**    In your -- I'm sorry, sir.  Are you done?

25   **A.**    Yes.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   You're familiar with the publication *The Verge*?

2   **A.**   Yes.

3   **Q.**   And what is *The Verge*?

4   **A.**   It's kind of an entertainment tech trade line.

5   **Q.**   For digital games?

6   **A.**   I'm not sure if they're focused only on games, but --

7   **Q.**   Digital content?

8   **A.**   They cover games.

9   **Q.**   Thank you.

10          And do you recall, sir, that after the -- after the Travis

11   Scott concert, *The Verge* reported that as with past events,

12   the preshow was a bloodbath with players killing each other to

13   kill some time?

14   **A.**   I'm not familiar with that.

15   **Q.**   That doesn't surprise you, though, does it?

16   **A.**   It does because there is no blood in *Fortnite*.

17   **Q.**   Got it.  Otherwise.  But for the bloodless nature of the

18   killing, that doesn't surprise you; correct?

19   **A.**   There is no killing.  There is eliminations.

20   **Q.**   Eliminations, did you say?

21   **A.**   Uh-huh.

22   **Q.**   Got it.

23          **THE COURT:**   Is there a difference?

24          **THE WITNESS:**   You teleport out and you warp out, and

25   it plays into the fiction of *Fortnite*.  So when you are

**WEISSINGER - CROSS - DOREN**

1    eliminated, you kind of digitally kind of fragment and

2    disappear.

3              **THE COURT:**    Okay.

4    **BY MR. DOREN:**

5    **Q.**    And, Mr. Weissinger, you talked about a leak of the

6    Marshmello playlist by Apple.  Do you recall that?

7    **A.**    Yes.

8    **Q.**    And that leak occurred a few hours before the concert;

9    correct?

10   **A.**    I believe so.

11   **Q.**    Not weeks before; correct?

12   **A.**    I believe so.

13   **Q.**    You believe I'm correct?

14   **A.**    Yes.  I believe you're correct.

15   **Q.**    And the -- it was the playlist, right, not the music

16   itself, not that recorded soundtrack?

17   **A.**    I think it was a playlist and a text description was

18   associated with that playlist.

19   **Q.**    And, in fact, within Epic, Epic had a leak of its own

20   related to the Marshmello concert; correct?

21   **A.**    I cannot remember.

22   **Q.**    Well, do you remember that a few days before the concert,

23   Epic distributed the soundtrack to various platform owners?

24   That would have been the timing; right?

25   **A.**    Soundtrack to various platform owners?  I can't recollect

**WEISSINGER - CROSS - DOREN**

1   that.

2   **Q.**   Well, do you recall that when console users hit "replay"

3   on *Fortnite* on January 30th, they could play the entire

4   concert on their console?

5   **A.**   I don't recollect that.

6   **Q.**   Let's take a look, please, sir, at Exhibit 3254.  Sir, do

7   you have that exhibit in front of you?

8   **A.**   Yes, I do.

9   **Q.**   And do you recognize this as an internal Epic email from

10  Mr. Sozio to various of your colleagues, including Tim Sweeney

11  at the bottom?

12  **A.**   Yes.

13  **Q.**   And do you see that it's regarding "Re Concert Music

14  Leak"?

15  **A.**   Yes.

16          **MR. DOREN:**   Your Honor, I move to admit DX3254.

17          **THE COURT:**   No objection?

18          **MS. MOSKOWITZ:**   Mr. Weissinger is not on this email

19  chain.

20          **THE COURT:**   Are you claiming this is not a business

21  record of Epic's?

22          **MS. MOSKOWITZ:**   No, Your Honor.  Just on the

23  sponsoring witness.

24          **THE COURT:**   Is this a business record or not?  What's

25  the objection?

**WEISSINGER - CROSS - DOREN**

1             **MS. MOSKOWITZ:**    Sponsoring witness.

2             **THE COURT:**    Overruled.  It's admitted.

3             (Defense Exhibit 3254 received in evidence)

4    **BY MR. DOREN:**

5    **Q.**    Mr. Weissinger, do you see at the bottom of the CC box,

6    there is Mr. Sweeney; correct?

7    **A.**    Yes.

8    **Q.**    There is also an entry for an email address -- and

9    apologies in advance to the Court -- for shithappens@epic.com;

10   correct?

11   **A.**    Yes.

12   **Q.**    What is that?

13   **A.**    It's an internal live ops escalation alias.

14   **Q.**    So, in other words, wherein a problem comes up, that

15   distribution list receives notifications and communication;

16   correct?

17   **A.**    That's correct.

18   **Q.**    That -- I presume that that name is tongue and cheek?

19   **A.**    I'm not sure of the original genesis of that name, but

20   it's used for live ops -- in general, live ops escalations.

21   **Q.**    Do you think it means that Epic takes those issues less

22   seriously than if it had another name?

23   **A.**    No.  Those are serious issues.

24   **Q.**    I would direct your attention to .005 on this document.

25   And do you see, sir, the email from Dom Acquarulo at the

**WEISSINGER - CROSS - DOREN**

1    bottom of that page?

2    **A.**    Yes.

3    **Q.**    "Hey all for awareness, players have managed to get the

4    concert set to play using replays"; correct?  Do you see that?

5    **A.**    Yes.

6    **Q.**    Immediately above that is a note from Mr. Sweeney, right

7    which, begins "Christ."  Do you see that?

8    **A.**    Yes.

9    **Q.**    "What happened to our plans to encrypt content?  Can we

10   not put relevant content into asset packages and encrypt them

11   together with music"?  That's what Mr. Sweeney said; right?

12   **A.**    Yes.

13   **Q.**    If you look over, please, in the middle of page .004,

14   Mr. Vogel, Mr. Vogel is the chief operating officer; correct?

15   **A.**    I don't think he would have been at the time but he is

16   now.

17   **Q.**    And Mr. Vogel wrote, "Video is encrypted on untrusted

18   clients -- PC, Mac, iOS, Android -- but not on consoles.

19   There is some sort of bug in replays that triggers the

20   sequence which on console will play the music."  Did I read

21   that accurately?

22   **A.**    Yes.

23   **Q.**    And, by the way, sir, it appears from this note that when

24   Epic has data that it wants to make sure is protected and it's

25   putting it on a mobile device, it takes extra steps to secure

**WEISSINGER - CROSS - DOREN**

1    it; right?

2    **A.**    I am not involved in the encryption process so I'm not

3    sure.

4    **Q.**    Mr. Weissinger, it's a fact, isn't it, that every partner

5    of Epic's has leaked a *Fortnite* season at some point?

6    **A.**    I wouldn't be surprised.

7    **Q.**    Sony has; right?

8    **A.**    Yes.

9    **Q.**    And Microsoft has; correct?

10   **A.**    Yes.

11   **Q.**    And Nintendo has; true?

12   **A.**    Yes.

13   **Q.**    And Tencent has; right?

14   **A.**    Correct.

15   **Q.**    The company that owns 40 percent of Epic; correct?

16   **A.**    Correct.

17   **Q.**    And Samsung has leaked a season as well; correct?

18   **A.**    I can't recollect.

19   **Q.**    It's leaked skins, hasn't it?

20   **A.**    I can't recollect.

21   **Q.**    All right, sir.

22          And, in fact, as recently as July 16, you stated that

23   relative to others, you personally had great confidence in

24   Apple's ability to keep Epic secrets, didn't you?

25   **A.**    When --

**WEISSINGER - CROSS - DOREN**

1    **Q.**    July 2020, two or three weeks before the hotfix was put in

2    place, sir, you stated that you personally had great

3    confidence in Apple's ability to keep Epic's secrets, didn't

4    you?

5    **A.**    I'm not sure.  I need to see or understand the context.

6    **Q.**    Understood, sir.

7          Let's take a look at 5537.

8          Actually, Your Honor, I'm sorry.  That's the incorrect

9    number.  Look's at 5542.

10         Sir, Exhibit 5542 is an email to you to Hans Stolfus at

11   the top of that page; correct?

12   **A.**    Yes.

13   **Q.**    And the bottom half of this email is from Hans Stolfus

14   talking about the possibility of getting marketing support

15   from Google for *Fortnite*'s launch of the Marvel season;

16   correct?

17   **A.**    I'm sorry.  I'm just reading to refresh.

18   **Q.**    No worries.

19   **A.**    Would you mind stating that once more?

20   **Q.**    Let's look down at the July 15, 2020, email from Hans

21   Stolfus.  Do you see that?

22   **A.**    Yes.

23   **Q.**    And that's talking about a meeting regarding marketing

24   opportunities with Google; correct?

25   **A.**    Okay.  I'm --

**WEISSINGER - CROSS - DOREN**

1    **Q.**    Sir, he states, "If all is successful, we should be able

2    to get ahead of the Marvel launch and acquire full marketing

3    support."  Do you see that?

4    **A.**    Yes.

5    **Q.**    And then he says, "if Project Liberty doesn't affect our

6    position and relationship of course."  He is referring to the

7    relationship with Google there; correct?

8    **A.**    Yes.

9    **Q.**    And then in your email at the top of this, you say, "I

10   know Apple can keep secrets.  I'm not as sure about Google";

11   correct?

12   **A.**    Yes.  I write that.

13   **Q.**    And you wrote that on July 16, 2020; correct?

14   **A.**    Yes, I did.

15   **Q.**    And that was after the various leaks that you talked

16   about; correct?

17   **A.**    Yes, it was.

18   **Q.**    And, sir, you became aware of what became known as Project

19   Liberty as early as 2019; correct?

20   **A.**    I am not sure of the timing of when I first --

21            **MR. DOREN:**    Your Honor, I would move to admit DX5542.

22            **THE COURT:**    No objection.

23            **MS. MOSKOWITZ:**    No objection, Your Honor.

24            **THE COURT:**    Admitted.

25            (Defense Exhibit 5542 received in evidence)

**WEISSINGER - CROSS - DOREN**

1    **BY MR. DOREN:**

2    **Q.**    Sir, if you could please take a look at DX3069.

3           And, Your Honor, this was already admitted through the

4    testimony of Mr. Malik.

5           Sir, do you have Exhibit 3069 in front of you?

6                       **THE COURT:**    Mr. Doren, do you mean the deposition?

7                       **MR. DOREN:**    The deposition destinations in the four

8    hours that the Court accepted and then the parties stipulated

9    to the admission of various exhibits to those depositions and

10   Your Honor granted that stipulation on the first day of trial.

11                      **THE COURT:**    I didn't have this --

12                      **MR. DOREN:**    It is in your binder, Your Honor.

13                      **THE COURT:**    Right.  But I didn't -- 3069.  I thought

14   you said 29.

15                      **MR. DOREN:**    I apologize.  I apologize.  My mouth is a

16   little dry.

17                      **THE COURT:**    It is admitted.  Go ahead.

18                      **MR. DOREN:**    Thank you, Your Honor.

19   **Q.**    Mr. Weissinger, do you have that exhibit in front of you,

20   Exhibiter 3069?

21   **A.**    Yes, I do.

22   **Q.**    And if you could please look at the last page, the email

23   dated September 24, 2019, from Alex Shobin.  Do you see that?

24   **A.**    Yes, I do.

25   **Q.**    And Mr. Shobin was employed in the mobile area for Epic

**WEISSINGER - CROSS - DOREN**

1    regarding mobile publishing; correct?

2    **A.**    That's correct.

3    **Q.**    And Mr. Shobin writes on September 24, 2019, "Do you know

4    how long it would take to make a build of *Fortnite* that could

5    function on Google Play but only support our existing payment

6    methods?  How would that user flow differ compared to normal

7    Google Play apps."  Did I read that correctly?

8    **A.**    Yes.

9    **Q.**    And "our existing payment methods" is a reference to

10   Epic's existing payment methods; correct?

11   **A.**    I'm not sure, but, yes, I would -- that would be my

12   assumption reading this.

13   **Q.**    And Mr. Shobin then goes on for context, "Store Team" --

14   and by the way, "Store Team" -- the store is the Epic Games

15   Store; correct?

16   **A.**    It looks like it reading this.

17   **Q.**    And that is a store run by Mr. Allison; correct?

18   **A.**    Yes.  Steve Allison.

19   **Q.**    Right.

20       So Mr. Shobin says on September 24, 2019 -- he says for

21   context, "Store Team was briefing Tim" -- is that Mr. Sweeney?

22   **A.**    Yes.  I would assume so.

23   **Q.**    -- "on the changes to the Android installer needed to

24   support more games.  He asked them to scope out what it would

25   take to make the build I described above (it gets around their

**WEISSINGER - CROSS - DOREN**

1    30 percent revshare cut)."

2          Did I read that accurately?

3    **A.**    Yes.

4    **Q.**    So you understand that by September 24, 2019,

5    Mr. Allison's Store Team had been brought -- read in, if you

6    will, to efforts to get around the 30 percent revshare cut;

7    correct?

8                **MS. MOSKOWITZ:**    Objection.  Mischaracterizes.

9                **THE COURT:**    Sustained as to the form.

10   **BY MR. DOREN:**

11   **Q.**    Mr. Weissinger, you would agree that as of September 4,

12   2019, the Store Team had been discussing ways to get around

13   the 30 percent revshare cut with Mr. Sweeney; correct?

14   **A.**    It looks like there are discussions related to that here,

15   yes.

16   **Q.**    Thank you.

17          And at the top of the page .002 there is a September 28,

18   2019, email from Mr. Malik.  Do you see that?

19   **A.**    Yes.

20   **Q.**    And he says, "Resurfacing this to the top of your

21   respective inboxes," and then two sentences later, he says,

22   "The directive is from Tim Sweeney, and we are due for an

23   update next week.  A separate thread with legal has already

24   kicked off with Canon."  Do you see that?

25   **A.**    Yes.

**WEISSINGER - CROSS - DOREN**

1  **Q.**   And you recognize the reference to Canon to be Canon

2  Pence, the general counsel of Epic?

3  **A.**   Yes.

4  **Q.**   And the last line is, "He says we will kick off a weekly

5  synch on this to get the right people in the room"; correct?

6  **A.**   Yes.  He writes that.

7  **Q.**   Again, that is getting the right people in the room to

8  create a build of *Fortnite* that would work around the 30

9  percent revshare cut that Google would otherwise take;

10  correct?

11  **A.**   That's pretty specific.  I don't -- he just said a weekly

12  synch on this to get the right people in the room.

13  **Q.**   I'm sorry, sir.  I can't hear you, but we'll move on.

14        At the top of the first page, Mr. Malik writes another

15  email; correct?

16  **A.**   Yes.

17  **Q.**   And at the bottom of that email, he says, "Now we are

18  going another route, and the goal is draw Google into a legal

19  battle over antitrust.  Once we are ready to submit, Epic will

20  announce publicly that we are going to Google Play.  If we are

21  rejected for only offering Epic's payment solution, the battle

22  begins.  It's going to be fun."

23        Did I read that correctly?

24  **A.**   Yes.

25  **Q.**   "Thanks for helping," Mr. Malik wrote.  "If you could help

**WEISSINGER - CROSS - DOREN**

1    me with a ballpark on time to submit/launch, I'd like to start

2    setting some expectations with Teams"; correct?

3    **A.**    Yes.

4    **Q.**    That's September 2019; right?

5    **A.**    Correct.

6    **Q.**    And, sir, your role in Project Liberty was to handle the

7    communications strategy; correct?

8    **A.**    In general, yes.

9    **Q.**    And you hired a PR consultant to help; correct?

10   **A.**    That is correct.

11   **Q.**    And that's a gentleman by the name of Lane Kasselman?

12   **A.**    That is correct.

13   **Q.**    Could you please take a look at Exhibit DX3933.

14            Do you recognize this document, sir?

15   **A.**    It looks like a subsection of some sort of strategy

16   document.

17   **Q.**    And this is a document that you and Mr. Kasselman

18   collaborated on; correct?

19   **A.**    I believe Lane created this and I had some edits to it.

20   **Q.**    All right, sir.

21            And if you would look, please, at page .002.  And do you

22   see under "Apple and Google are the entrenched incumbents" --

23   do you see that?

24   **A.**    Yes.

25   **Q.**    And this is under "Communications Challenges"; right?

**WEISSINGER - CROSS - DOREN**

1    **A.**    Correct.

2    **Q.**    And it states that, "Epic is not a sympathetic figure.

3    Epic is seen as a successful major company earning billions of

4    dollars a year and is not seen by press and players as an

5    immediate sympathetic figure in a royalty share battle."

6         Did I read that correctly?

7    **A.**    Yes, you read that correctly.

8    **Q.**    And was that, in fact, one of the communications

9    challenges that you understood you faced?

10   **A.**    It was one of the scenarios that we discussed.  It was the

11   idea -- from what I remember, it was based around the concept

12   of a billion-dollar company up against a trillion-dollar

13   company and people not really understanding the context

14   between those two, but there's a big difference between the

15   two.

16   **Q.**    And so, sir, under "Communications Strategy," number two,

17   the strategy was to build a coalition of developers; correct?

18   **A.**    I'm not sure.  Where do you see this?

19   **Q.**    Same page, .003 -- I'm sorry.  Next page, my fault, sir.

20   My fault.  Next page, .003, under "Communications Strategies."

21   Do you see Item 2, "build a coalition of developers"?

22   **A.**    Yes.

23   **Q.**    All right.  And that was to be one of the strategies to

24   deal with the communications challenges; correct?

25   **A.**    It was a communications strategy.

**WEISSINGER - CROSS - DOREN**

1   **Q.**   And you, in fact, sir, were offered as the corporate

2   representative related to the formation of that coalition;

3   correct?

4   **A.**   You're saying in the deposition process?

5   **Q.**   Yes, sir.  Yes, sir.

6   **A.**   Yes.

7   **Q.**   And you're familiar with the Coalition for App Fairness;

8   true?

9   **A.**   Yes.

10  **Q.**   And that was the coalition that you and Mr. Kasselman

11  formed; correct?

12  **A.**   I was involved in the early discussions for it.  I did not

13  myself form it.

14  **Q.**   Take a look, please, sir, at DX4177.  Do you have that in

15  front of you?

16  **A.**   Yes, sir.

17  **Q.**   These are notes that you typed up; correct?

18  **A.**   This is -- I had a habit or I still have a habit of

19  writing kind of random notes in email drafts that I use to

20  just kind of record.

21  **Q.**   That's how you keep your notes sometimes?

22  **A.**   Yeah.

23  **Q.**   And these are notes that you kept on May 15, 2020;

24  correct?

25  **A.**   It's unclear.  That's probably the last edit to this

**WEISSINGER - CROSS - DOREN**

1   document.

2   **Q.**   Sir, you created these notes; correct?

3   **A.**   Yes, I did.

4   **Q.**   All right.  And halfway down -- and you created them or

5   last edited them on May 15, 2020; correct?

6   **A.**   I believe so.

7   **Q.**   All right.  And there are a number of entries here, but

8   let's focus on the one that starts, "Go the nuclear option."

9   Do you see that, a little over halfway down?

10  **A.**   Yes.

11  **Q.**   It says, "Go the nuclear option.  It becomes the catalyst

12  for the coalition, which is up and running, and can

13  dimensionalize the battle for us.  That being said, we

14  recommend we go the nuclear option and submit onto Google

15  Play."

16       And that was you advising that the hotfix, the nuclear

17  option, should be adopted in order to create a good PR event;

18  correct?

19  **A.**   I have no idea of the context for that particular line in

20  this draft notes document.

21       **MR. DOREN:**   Your Honor, I would move into evidence

22  DX4177.

23       **THE COURT:**   No objection?

24       **MS. MOSKOWITZ:**   No objection, Your Honor.

25       **MR. DOREN:**   And DX3933 please.

**WEISSINGER - CROSS - DOREN**

1           **THE COURT:**   No objection?

2           **MS. MOSKOWITZ:**   No objection.

3        (Defense Exhibits 4177 and 3933 received in evidence)

4    **BY MR. DOREN:**

5    **Q.**   Sir, please take a look at DX3641.  Is this exhibit also

6    notes that you created?

7    **A.**   Yes.  It looks like that.

8    **Q.**   And either you wrote them or last edited them on May 22nd,

9    2020; correct?

10   **A.**   I believe so.

11   **Q.**   All right.  And you have the notation there "Create

12   narrative that we are benevolent," don't you?

13   **A.**   That is written there.

14   **Q.**   Yes.  And then the next line below "dimension" talks about

15   who can be founding members of the coalition; correct?

16   **A.**   What was the question again?  I'm sorry.

17   **Q.**   No.  We'll go on, sir.

18   **A.**   Okay.

19   **Q.**   Now, Epic initially -- Epic initially paid Greenbrier --

20   that's Mr. Kasselman's firm; correct?

21   **A.**   Yes.

22   **Q.**   And Epic paid them $100,000 for the PR consultation;

23   correct?

24   **A.**   I believe that's correct.

25   **Q.**   And it then hired an affiliated firm, a firm affiliated

1   with Greenbrier called The Messina Group; correct?

2   **A.**   Yes.

3   **Q.**   That firm was hired to create the coalition; correct?

4   **A.**   Yes.  To help with the creation of the coalition.

5   **Q.**   And at that point the spend went up to $300,000 from Epic

6   to both Kasselman and Messina, correct, The Messina Group?

7   **A.**   Yes.  I believe so.

8   **Q.**   Take a look, please, at DX3297.

9       And, Your Honor, I would move to admit 3641, though I

10  thought I just did.

11          **THE COURT:**   You did not.

12  No objection?

13          **MS. MOSKOWITZ:**   No objection.

14          **THE COURT:**   Admitted.

15          (Defense Exhibit 3641 received in evidence)

16          **MR. DOREN:**   Thank you, Your Honor, very much.

17  **Q.**   Mr. Weissinger, do you have Exhibit 3297 in front of you?

18  **A.**   Yes, I do.

19  **Q.**   And do you recognize this as a statement of work proposed

20  by The Messina Group to Epic?

21  **A.**   Yes, I do.

22  **Q.**   And do you recognize under the project scope, "The

23  consultant will work as directed by Matthew Weissenberg [sic]

24  or other Epic personnel so designated"?

25  **A.**   "Weissinger."  Yes.

**WEISSINGER - CROSS - DOREN**

1     **Q.**   I'm sorry, sir.

2     **A.**   No worries.

3     **Q.**   If you would look, please, at Exhibit .002 or page .002,

4     and you see the heading "Coalition Launch"?

5     **A.**   Yes.

6     **Q.**   And underneath that, it is stated, "The proven and tested

7     coalition formula is as follows:  Established to correct a

8     wrong plus media interest plus sustained public attacks equals

9     success."

10          Did I read that correctly?

11    **A.**   Yes.

12    **Q.**   It then goes on to say, "Thus, for the coalition to be

13    effective, consultant will help to establish a reason for it

14    to exist (either organic or manufactured)"; correct, sir?

15    **A.**   That's what it says.

16    **Q.**   And here the reason for the existence of the coalition was

17    wholly manufactured, wasn't it?

18    **A.**   No.  The principles have always existed.

19    **Q.**   Always existed; is that right, sir?

20    **A.**   Well, the principles as established exist.  There's no

21    manufacturing in that.

22    **Q.**   All right, sir.

23          The coalition was incorporated in August 2020; correct?

24    **A.**   I believe so.

25    **Q.**   And, again, it was named the Coalition for App Fairness;

**WEISSINGER - CROSS - DOREN**

1    true?

2    **A.**    Yes.

3    **Q.**    And at the time it was incorporated, Epic was the only

4    member; correct?

5    **A.**    I'm not positive, but I believe so.

6    **Q.**    Okay.  And it's existence was not publicly announced until

7    after the hotfix had been triggered; correct?

8    **A.**    Correct.

9    **Q.**    And it was kept under wraps until then because if Apple

10   gave in to the demands of Epic, the coalition would have

11   disappeared altogether; correct?

12   **A.**    Not necessarily.

13   **Q.**    But it could -- it was likely that it would have, correct,

14   sir?

15   **A.**    I mean, Google's still around, too.  There is other stores

16   that have the same, you know, issues with principles.

17   **Q.**    Well, sir, let's take a look at Exhibit 4167.

18          And, Your Honor, the version in the binders here is

19   actually a corrected version of this exhibit.  The one in the

20   main binder here did not print properly so we will hand one up

21   for the record as well.

22          **THE COURT:**    Okay.  And you've got two minutes before

23   our break.

24          **MR. DOREN:**    Thank you, Your Honor.

25          First of all, I would move to admit DX3297.

**WEISSINGER - CROSS - DOREN**

1          **THE COURT:**   Objection?

2          **MS. MOSKOWITZ:**   No objection.

3          **THE COURT:**   Admitted.

4          (Defense Exhibit 3297 received in evidence)

5          **MR. DOREN:**   I would also move to admit --

6     **Q.**   Actually, Mr. Weissinger, do you recognize DX4167?

7     **A.**   It looks like the website for the coalition.

8     **Q.**   And you recognize, sir, that nowhere in this document is

9     any company other than Apple referenced; correct?

10         **THE COURT:**   Apple?

11         **MR. DOREN:**   Apple.

12         **THE WITNESS:**   I'm not sure, but looking at it right

13    now, that looks to be the case.

14         **MR. DOREN:**   Your Honor, I have about five more

15    minutes.  We can stop here or I can finish up.

16         **THE COURT:**   Why don't we go ahead and stop.  The

17    court reporter needs a break.  So we will stand in recess for

18    20 minutes.

19         Ms. Forrest, could I by the end of the day receive a hard

20    copy color printout of your latest findings of fact?

21         **MS. FORREST:**   Yes.

22         **THE COURT:**   The redacted version.

23         **MS. FORREST:**   Yes.

24         **THE COURT:**   I would appreciate it.  Thank you so

25    much.

**WEISSINGER - CROSS - DOREN**

1    All right.  We will stand in recess for 20 minutes.  Thank

2  you.

3                    (Recess taken at 10:14 a.m.)

4                    (Proceedings resumed at      .m.)

5           ****************

6           THE COURT:

7

8

9           *************DIANE***************

10          (Recess taken at     .m.; resumed at 10:35 a.m.)

11          THE COURT:  Okay.  We are back on the record.  The

12  record will reflect the parties are present.  Witness is still

13  on the stand.  And, Ms. Forrest, I'm sure I misspoke.  I meant

14  redline, not redacted.

15          MS. FORREST:  Okay.  Thank you, Your Honor.  Thank

16  you.

17          THE COURT:  Thank you.  You may proceed.

18          MR. DOREN:  Thank you, Your Honor.  First I would

19  like to move to admit Exhibit DX4167.

20          THE COURT:  Any objection?

21          MS. MOSKOWITZ:  Sorry.  I'm just flipping back.  I

22  don't think so.  No objection.

23          THE COURT:  Admitted.

24          (Defendant's Exhibit 4167 received in evidence)

25

**WEISSINGER - CROSS - DOREN**

```
 1    BY MR. DOREN:
 2    Q.  Just a few more questions, Mr. Weissinger.  First of all,
 3    could you please take a look at DX4138?  Do you have that
 4    document in front of you?
 5    A.  Yes, I do.
 6    Q.  And you see that the top note is from you to Mr. Zobrist
 7    and others, correct?
 8    A.  Yes.  Yes, it is.
 9    Q.  This is an email that you wrote on August 4th, 2020,
10    correct?
11    A.  Yes, it is.
12    Q.  And if you would look, please, at the second page, you see
13    that there is a Google Calendar invite, correct?
14    A.  Yes.
15    Q.  Also dated August -- this one is dated August 3rd, 2020,
16    correct?
17    A.  Yes.
18    Q.  And you see down after the statement "The next steps
19    arising from today's meeting are"?
20         Do you see that?
21         Let me walk you down --
22    A.  Yes, I see.
23    Q.  Let's start with the date of 8/3/2020.  You see that on
24    page .002, correct?
25    A.  Yes.
```

**WEISSINGER - CROSS - DOREN**

1    **Q.**  And the subject is:  Project Liberty meeting next steps,

2    correct?

3    **A.**  Yes.

4    **Q.**  And then it says:  Sent by Google Calendar, correct?

5    **A.**  Yes.

6    **Q.**  And then below that, there's a dotted line.  And then

7    below that, there is more text, correct?

8    **A.**  Yes.

9    **Q.**  And on the third line of that text below the line, there

10   is the statement:  The 13.40 build has been approved by Apple

11   and will likely hear back from Google on Tuesday afternoon.

12       Did I read that correctly?

13   **A.**  Yes.

14   **Q.**  Then below that is the invite for a Project Liberty update

15   on August 3rd, 2020 from 3:00 p.m. to 4: p.m. Eastern,

16   correct?

17   **A.**  Correct.

18   **Q.**  You see you were an invitee at the bottom of the list of

19   addressees, correct?

20   **A.**  Yes, I'm listed as optional.

21   **Q.**  Do you remember that meeting, sir?

22   **A.**  It's hard to tell.

23   **Q.**  You attended a lot of Project Liberty meetings?

24   **A.**  Yes.

25   **Q.**  Let's go back to the first page, please, of 4138.  And do

**WEISSINGER - CROSS - DOREN**

1  you see the email from Maureen Maloney at Cravath on August 4,

2  2020 at 9:29 a.m.?

3  **A.**  Yes.

4  **Q.**  And it states that:  Gary asked if he could be added to

5  these emails (meeting updates, decks, next steps, et cetera).

6  Correct?

7  **A.**  Yes.

8  **Q.**  And then above that, Mr. Zobrist from Epic writes:  Yes.

9  For clarity, I go to the Project Liberty meeting invite and

10  hit send all with my note.  If Gary didn't get the note, does

11  that mean he wasn't on the meeting invitation list?  I could

12  swear he attended.

13      That is from Mr. Zobrist, correct?

14  **A.**  Yes.

15  **Q.**  And then Mr. Edrington at Epic Games said:  Oh, I see what

16  happened.  I sent all the invites to Maureen, who then

17  forwards to Gary or whoever can make it from Cravath, so the

18  email went to her and not to him, if that makes sense.

19      Do you understand that to be a reference to Maureen

20  Maloney, assistant to Gary A. Bornstein?

21  **A.**  I don't know if I know Maureen, but I see it in her email

22  signature.

23  **Q.**  Thank you.  Above that, you write:  Gary has this account

24  as well, which could be added to the invite, I think.

25  Gary.Bornstein@XAEpicGames.com.

**WEISSINGER - CROSS - DOREN**

1      Correct?

2  **A.**  Yes.

3  **Q.**  Mr. Bornstein had been given an Epic Games email account

4  during the course of Project Liberty.

5  **A.**  An external account within Epic Games internal.  That's

6  what XA, I think, stands for.

7  **Q.**  Thank you.  Thank you.  Sir, if you could look, please, at

8  DX4072.

9          **MR. DOREN:**  Your Honor, I would move DX4138 into

10  evidence, please.

11          **THE COURT:**  No objection?

12          **MS. MOSKOWITZ:**  No objection.

13          **THE COURT:**  Admitted.

14      (Defendant's Exhibit 4138 received in evidence)

15          **MR. DOREN:**  I believe it is already admitted into

16  evidence.

17          **THE COURT:**  Yes, it is.

18          **MR. DOREN:**  Thank you, Your Honor.

19  **BY MR. DOREN:**

20  **Q.**  Mr. Weissinger, do you have Exhibit 4072 in front of you?

21  **A.**  I do.

22  **Q.**  This is another Google Calendar invite, correct?

23  **A.**  Yes.

24  **Q.**  And rather than have you read through the addressee block,

25  I will assure you that you are there, as is Mr. Bornstein.

**WEISSINGER - CROSS - DOREN**

1    But I will ask you to turn to page 2 of the document.

2    **A.**   Okay.

3    **Q.**   And there is a list of invitees there, correct?

4    **A.**   Yes.

5    **Q.**   And do you see a little over halfway down, Matt

6    Weissinger?

7    **A.**   That's me.

8    **Q.**   Yes, sir.  At the very end of the list on page .003, the

9    last three names on the list are Tim Sweeney, correct?

10   **A.**   Yes.

11   **Q.**   Gary Bornstein, correct?

12   **A.**   Yes.

13   **Q.**   And Maureen Maloney, correct?

14   **A.**   Yes.

15   **Q.**   Let's go back, please, to page 1.  The subject of this is:

16   Liberty Block.  Do you see that?

17   **A.**   Yes.

18   **Q.**   And the third paragraph says, we've added you -- well,

19   first of all, the first sentence says:  Thanks for joining our

20   run of show review earlier.  True?

21   **A.**   Yes.

22   **Q.**   And the run of show is basically a review of each step

23   along the way in the launching of Project Liberty and the

24   firing off of the hot fix on August 13, 2020, correct?

25   **A.**   Yes.

**WEISSINGER - CROSS - DOREN**

1    **Q.**  And the third paragraph says:  We've added you all to this

2    meeting block tomorrow that includes the Zoom dial-in for our

3    war room.

4        So there was a virtual war room for purposes of the hours

5    around the hot fix implementation?

6    **A.**  Yes.

7    **Q.**  Additionally, we've added you all to our new private

8    hashtag Project Liberty war room Slack channel.  Correct?

9    **A.**  Yes.

10   **Q.**  The next paragraph says:  We have modified the run of show

11   reviewed earlier to have individual sheets for each phase and

12   scenario.  Correct?

13   **A.**  Yes.

14   **Q.**  This was a carefully planned, carefully orchestrated, and

15   carefully supervised undertaking, correct?

16   **A.**  Yes.

17   **Q.**  Mr. Weissinger, along with the coalition, you were also

18   responsible for console partner communications related to

19   Project Liberty, correct?

20   **A.**  Yes.

21   **Q.**  And if you could please look at Exhibit DX4652.

22   **A.**  Okay.

23   **Q.**  Do you have that in front of you, sir?

24   **A.**  Yes, sir.

25   **Q.**  And this is a document that you were using in 2020 to pull

**WEISSINGER - CROSS - DOREN**

1    together a communications strategy around informing partners

2    of the upcoming price changes, correct?

3    **A.**   I'm not sure.  There's not a lot of the context for the

4    document.  Were you asking if I created this or the substance

5    of it?

6    **Q.**   I'm asking if this is a document that you used to pull

7    together a communications strategy around informing partners

8    of the upcoming price changes.

9    **A.**   It looks like a version of a communication plan.  I'm not

10   sure if that is how it actually went down though.

11   **Q.**   Okay.  But this is a working document that you were using

12   at the time, correct?

13   **A.**   It looks like a planning document, but looking at it, I'm

14   not sure this is how it actually was communicated.

15   **Q.**   But this is a document that you were using to pull

16   together your communication strategy, correct?

17   **A.**   This was one of them.

18   **Q.**   Okay.  Thank you, sir.

19        And you see the reference to Liberty console partner

20   communications, correct?  At the top of the page, sir.

21   **A.**   Yes.

22   **Q.**   And you recognize that to be a reference to Project

23   Liberty, correct?

24   **A.**   Correct.

25   **Q.**   And you say:  Phase I, inform 1P console partners, Sony,

**WEISSINGER - CROSS - DOREN**

 1    Microsoft and Nintendo, about 20 percent pricing change and

 2    have that communication July 30 or later.

 3         That's what you wrote in this document, correct?

 4              **MS. MOSKOWITZ:**  Objection, foundation.

 5              **THE WITNESS:**  I don't know if I wrote it.

 6              **THE COURT:**  Hold on.  Your attorney made an

 7    objection.

 8         Lay some foundation.  Sustained.

 9    **BY MR. DOREN:**

10    **Q.**  Now, sir, this is a document that you used in pulling

11    together your communication strategy, correct?

12    **A.**  It is one document.

13    **Q.**  One of many, many documents, correct?

14    **A.**  Yes.

15    **Q.**  All right.  But this is one of the documents that you used

16    in pulling together your Project Liberty communication

17    strategy, correct?  One of the many.

18    **A.**  Yes, but I'm not sure this is how the communication

19    strategy actually went out.

20    **Q.**  You made that clear.  You've made that clear, sir.

21    **A.**  Okay.

22    **Q.**  And at this point in this document, the statement is:

23    Inform console partners about 20 percent pricing change

24    (July 30 or later).  Correct, that's what this says?

25    **A.**  That is what this says.

**WEISSINGER - CROSS - DOREN**

1    **Q.**  In fact, there was going to be an -- Epic had decided that

2    it would drop prices on V-Bucks by 20 percent on consoles even

3    though there would be no decrease in the 30 percent commission

4    on consoles, correct?

5    **A.**  Correct.

6    **Q.**  And then below that, Phase II was, inform all partners

7    about overall pricing efforts on August 13, correct?

8    **A.**  Correct.

9    **Q.**  And the pricing efforts included triggering the hotfix

10   within the App Store, correct?

11   **A.**  Correct.

12   **Q.**  And that -- on August 13th was when there was going to be

13   a communication with Apple, and not before, correct?

14   **A.**  There was going to be no communication prior to

15   August 13th.

16   **Q.**  Turn to page 3, please.  The third page of this exhibit, I

17   should say.

18   **A.**  Yes.

19   **Q.**  You see the Key Points colon?

20   **A.**  Yes.

21   **Q.**  And about -- the fourth bullet point is in a different

22   colored ink, correct?

23   **A.**  Yes, it is.

24   **Q.**  And it says:  Sony only, let's connect.  I'd love to

25   connect with you after the price drop.  Let's set some time on

**WEISSINGER - CROSS - DOREN**

1   the calendar for August 13th.

2       So Sony was going to have a special one-on-one

3   communication with Epic, correct?

4   **A.**   There was a communication with first party, but this is

5   Phase I exact's response, Phase I with Phil Spencer, Phil

6   Rosenberg, Steve Singer.  I'm not aware of that communication

7   taking place in advance, which is why this Phase I, I don't

8   think that is how the communication worked out.

9   **Q.**   Sir, the document says:  Sony only, let's connect.  Let's

10  set some time on the calendar for August 13th.  Correct?

11      That is what the document says?

12  **A.**   That is what this document says.

13  **Q.**   And this document was created after Sony invested its

14  first $250 million in Epic, correct?

15  **A.**   I'm not sure of the timing, but I believe it's public,

16  so --

17  **Q.**   And the next bullet point says:  The price cut is

18  beneficial because.  Do you see that?  The very next bullet

19  point under Key Points.

20  **A.**   Okay.  Yes.

21  **Q.**   That was intended to be a communication to all of your

22  partners, right?

23      Sir?

24  **A.**   These were some of the ideas that were discussed to be

25  communicated.  Whether or not they were communicated --

**WEISSINGER - CROSS - DOREN**

1   **Q.**   Thank you.  And by the way, as of the time this document

2   was created, you are still referring to Apple as a partner of

3   Epic's, aren't you?

4   **A.**   Yes.

5   **Q.**   And the first reason that the price cut is beneficial in

6   this document is an accelerator for purchase

7   velocity/frequency.  And, sir, does that mean that if the

8   prices are lower, people may buy more V-Bucks?

9   **A.**   Yes.

10  **Q.**   And they may make more purchases, more frequently?

11  **A.**   Yes.

12  **Q.**   And the next bullet point is:  An important -- do you

13  think that means "important," "an import"?

14  **A.**   I think it would be "an important."

15  **Q.**   An important lock-in tactic for Season 14 Battle Pass

16  conversion.

17       Do you see that?

18  **A.**   Uh-huh.

19  **Q.**   Sir, by using the term "lock-in tactic," did you mean that

20  people would not be able to leave *Fortnite* if they didn't like

21  the experience there?

22  **A.**   I believe that point was based around the economy being a

23  tough time for a lot of people, and that a price cut would be

24  beneficial for people to ensure that they continued to play

25  *Fortnite* when they're making limited purchase decisions.

**WEISSINGER - CROSS - DOREN**

1    **Q.**  You were looking to do things that would make people want

2    to stay in the *Fortnite* environment, correct?

3    **A.**  Yes.

4    **Q.**  So by "lock in," you simply meant you wanted to make the

5    game even more attractive to people, correct?

6    **A.**  Yes.

7    **Q.**  And you wanted to help promote their desire to be there

8    and to play the game and to make purchases within the game,

9    correct?

10    **A.**  Yes.

11    **Q.**  And, sir, you have an MBA from Harvard, don't you?

12    **A.**  MIT.

13    **Q.**  MIT.  My apologies.

14    Sir, you would not use the term "lock in" if you thought

15    there was anything wrong with it, would you?

16    **A.**  No.

17    **Q.**  And, sir, the third bullet point is:  Beneficial to the

18    long-term health of the *Fortnite* economy.

19    Did I read that correctly?

20    **A.**  Yes.

21    **Q.**  You believed it was beneficial to the long-term health of

22    the *Fortnite* economy because in 2019, revenues in *Fortnite* had

23    begun to lag, and you thought that this would perhaps increase

24    interest in purchases, true?

25    **A.**  Incorrect.

**WEISSINGER - CROSS - DOREN**

1    **Q.**   And then the fourth -- or the last solid bullet point

2    says:  The price cut should not impact forecast for 2020

3    because.  Do you see that?

4    **A.**   Yes.

5    **Q.**   It is stated here:  We have a huge IP pipeline for

6    Season 4 and 5.  Correct?

7    **A.**   Yes.

8    **Q.**   And what you mean there was that you would have a lot of

9    things to sell people in *Fortnite*, right?

10   **A.**   Yes.

11   **Q.**   And the second bullet point says:  The subscription is

12   still 11.99 and arrives in Season 5.  Did I read that

13   correctly?

14   **A.**   Yes.

15   **Q.**   And what you mean there is that subscriptions will provide

16   a baseline flow of revenue, and that won't change because of

17   this 20 percent decrease, correct?

18   **A.**   I don't know if that is exactly what I mean.  I think it

19   was just that subscription is -- the price is going to stay

20   the same and that it will arrive with Season 5 still, despite

21   these -- the price drop elsewhere.

22   **Q.**   Sir, in the last bullet point here, you say:  We have the

23   flexibility to create higher-priced bundles and new mythic

24   rarities, if needed.  Did I read that correctly?

25            **MS. MOSKOWITZ:**  Objection.  Continues to

**WEISSINGER - CROSS - DOREN**

1    misrepresent.

2         **THE COURT:**  Overruled.  He just read it.  He didn't

3    characterize it.

4         **MS. MOSKOWITZ:**  The "you say" part, Your Honor.

5         **THE COURT:**  Overruled.

6    **BY MR. DOREN:**

7    **Q.**  Mr. Weissinger, do you see that entry?

8    **A.**  Yes.

9    **Q.**  And we have the flexibility to create higher-priced

10   bundles.  In other words, while the price of V-Bucks may have

11   gone down, you could account for that by increasing the price

12   of skins and cosmetics to recapture that revenue, correct?

13   **A.**  I think it's just saying we have the ability to create

14   higher-priced bundles, if needed.

15   **Q.**  Right.  Because you can -- you have got a lot of IP in the

16   pipeline, and if revenue drags, you can put together some

17   bundles that you charge a higher price for to generate more

18   revenue through lower-priced V-Bucks, correct?

19   **A.**  Yes, in general.

20   **Q.**  Thank you, sir.

21        **MR. DOREN:**  I pass the witness, Your Honor.

22        **THE COURT:**  Limited to the scope of Cross.

23        **MR. DOREN:**  Your Honor, could I please move to admit

24   DX4652.

25        **THE COURT:**  No objection?

1          **MS. MOSKOWITZ:**  No objection, Your Honor.

2          **THE COURT:**  Admitted.

3          (Defendant's Exhibit 4652 received in evidence)

4                          **REDIRECT EXAMINATION**

5     **BY MS. MOSKOWITZ**

6     **Q.**  Hello again.  Mr. Weissinger, you were shown *Battle Royale*

7     mode on the screen in your cross-examination.  Do you recall

8     that?

9     **A.**  Yes.

10    **Q.**  Do *Fortnite* players have to play *Battle Royale* mode?

11    **A.**  No.

12    **Q.**  Even within *Battle Royale* mode, do the users within that

13    mode have to compete?

14    **A.**  No, they do not.

15    **Q.**  You were also shown some *Party Royale* mode.  I think that

16    was the skydiving practice clip.

17         Do you recall that?

18    **A.**  Yes.

19    **Q.**  Are there guns in *Party Royale*?

20    **A.**  No.

21    **Q.**  And are there social experiences in *Party Royale* that you

22    were not shown?

23    **A.**  Yes.

24    **Q.**  Are there entertainment aspects and elements of *Party*

25    *Royale* that you were not shown?

WEISSINGER – REDIRECT / MOSKOWITZ

1   **A.**  Yes.

2   **Q.**  Did we see some of those on Friday?

3   **A.**  Yes.

4   **Q.**  You were asked some questions about game mechanic tools.

5   Do you remember that?

6   **A.**  Yes.

7   **Q.**  When a user is using those tools to create in *Creative*

8   *Mode*, is there any game play happening?

9   **A.**  No.

10  **Q.**  Do users use *Creative Mode* -- other *Creative Mode* tools

11  for nongame creation uses?

12  **A.**  Yes.

13  **Q.**  Can you give us some examples again?

14  **A.**  I think I mentioned the fashion show, we mentioned some of

15  the virtual tourism.  Music composition was another one that

16  we mentioned.

17  **Q.**  Did we see some examples of that on Friday as well?

18  **A.**  Yes.

19  **Q.**  Is the game play that is happening in *Creative Mode* Epic

20  Games or user-created games?

21  **A.**  It is over one of 800,000 user-created island experiences.

22  **Q.**  Overall, do you view *Party Royale* and *Creative Modes* as

23  games?

24  **A.**  Repeat that again.

25  **Q.**  Overall, looking at *Party Royale* mode and *Creative Mode*,

WEISSINGER - REDIRECT / MOSKOWITZ

1    do you view those as games?

2    **A.**   No.  It is more than that.

3    **Q.**   Do you recall you were asked about DX3457, which if you

4    need to turn to it, it was a September 2019 email about the

5    Chapter 2 potential promotion?

6           **THE COURT:**  When you say, no, it is more than that,

7    do you mean that it is, but it's more?

8           **THE WITNESS:**  There are experiences beyond that, and

9    there are some experiences that are separate and excluded from

10   that as well.  So there are some that I don't think I would

11   qualify it as a game.

12          **THE COURT:**  But there are some that you do?

13          **THE WITNESS:**  Correct.

14          **THE COURT:**  Go ahead.

15   **BY MS. MOSKOWITZ:**

16   **Q.**   So, in other words, within *Party Royale* and *Creative Mode*,

17   there might be some components here and there that may qualify

18   as games, but overall, do you view them as games?

19          **THE COURT:**  Is there a percentage?

20          **THE WITNESS:**  I don't know if I have a definite

21   breakdown off the top of my head.

22          **THE COURT:**  Any sense?  50/50?  60/40?

23          **THE WITNESS:**  I am not sure.  The problem is it also

24   really depends on if there is like a *Party Royale* event

25   happening that day, you are going to see some oversized effect

1    of everybody watching the concert during the movie.  So it

2    might be --

3              THE COURT:  But, what, 15 minutes, you said, are the

4    concerts?

5              THE WITNESS:  Some of them are in content all

6    weekend.

7              THE COURT:  Excuse me?

8              THE WITNESS:  Some of them might be airing and

9    replaying content all weekend.

10             THE COURT:  So you don't have any way to quantify

11   game versus experience?

12             THE WITNESS:  Not off the top of my head.

13             THE COURT:  Well, do you have any documents anywhere

14   that quantify it?

15             THE WITNESS:  I believe we do.

16             THE COURT:  Okay.  Go ahead.

17   BY MS. MOSKOWITZ:

18   Q.  Let's come back to where I was just going.  You also were

19   asked about concerts, do you recall that?  Not about this

20   document, just generally.

21   A.  Yes.

22   Q.  And I think you were asked if all of the musicians or

23   performers in those concerts are appearing in their digital

24   representation of themselves, do you recall that?

25   A.  Yes.

WEISSINGER – REDIRECT / MOSKOWITZ

1   **Q.**  Do all of the performers appear as a digital

2   representation of themselves?

3   **A.**  Sorry.  You're correct.  Some of them will actually appear

4   through streaming video that comes into *Party Royale*, in which

5   case, some of those other actual likeness appearing digitally.

6   **Q.**  And while a *Fortnite* concert is going on, what are the

7   users doing?  What is happening in there?

8   **A.**  In general, people are dancing and emoting.  Sometimes we

9   have, like, some choreographed emotes that will occur in

10  sequence with some of the beats.  There is also kind of like

11  light shows and environmental effects that are going on in

12  there.  It is kind of like its own stadium experience.

13  **Q.**  Just going back to the document I was just asking you

14  about, if we can put that back up on the screen.  That is

15  DX3457.  That was September 27, 2019; is that right?

16  **A.**  Yes.

17  **Q.**  And if you could turn to PX2435, which is in your other

18  binder that we looked at in the direct testimony.  It is also

19  on the screen.  What is the date of that document, sir?

20  **A.**  October 2nd.

21  **Q.**  In the email from Mr. Malik to you and others, there is

22  some discussion about the Chapter 2 -- potential Chapter 2

23  promotion from Apple; is that right?

24  **A.**  Yes.

25  **Q.**  And what does it say here that Epic decided in the second

WEISSINGER – REDIRECT / MOSKOWITZ

1    paragraph?

2    **A.**  The group on this thread has met a few times and have

3    elected to turn down this placement opportunity because of the

4    risk of leaking an asset is high and would negatively impact

5    the Chapter 2 release.

6    **Q.**  And what, in fact, ended up happening with the assets for

7    Chapter 2, again?

8    **A.**  Apple leaked them.

9    **Q.**  You were asked about a number of other leaks.  Do you have

10   a sense of what the worst leak was that *Fortnite* experienced?

11   **A.**  That Chapter 2 leak.

12   **Q.**  You were also asked on Cross about, I think it was DX3069.

13   If you could turn to that in your white binder.

14   **A.**  Yes.

15   **Q.**  Now I just need to get there.  Sorry.

16       This is an email chain from September 27, 2019; is that

17   right?

18   **A.**  Yes.

19   **Q.**  Were you involved in this email chain?

20   **A.**  I do not see myself in this chain.

21   **Q.**  And do you recall being involved in the discussion that is

22   taking place within this email chain?

23   **A.**  I do not.

24   **Q.**  Do you have any understanding as to whether this was or

25   was not part of Project Liberty?

WEISSINGER – REDIRECT / MOSKOWITZ

1   **A.**   I do not.

2   **Q.**   Do you have any understanding whatsoever about the

3   discussion in this document?

4   **A.**   No, other than what is written there.

5   **Q.**   A little bit of a digression.  We talked about Peely, our

6   banana.  Do you remember that?

7   **A.**   I do.

8   **Q.**   And I think there might have been an implication that to

9   show Peely without a suit would have been inappropriate.  Do

10   you recall that?

11   **A.**   Yes.

12   **Q.**   Is there anything inappropriate about Peely without a

13   suit?

14   **A.**   No, there is not.

15   **Q.**   If we could just put on the screen a picture of Peely.  Is

16   there anything inappropriate of Peely without clothes?

17   **A.**   It's just a banana man.

18   **Q.**   Did you tell your other partners about the implementation

19   or the plan to implement Epic Direct Pay either in the iOS

20   app or the Android app before it happened?

21   **A.**   Not that I am aware of.

22   **Q.**   So what were the discussions that were being contemplated

23   with partners about before that happened?

24   **A.**   We were telling them in advance that prices were going to

25   be reduced by 20 percent.

WEISSINGER – RECROSS / DOREN

1    **Q.**   If you could turn to DX4652 that you were asked about.

2    Again, in your white binder.

3    **A.**   Yes.

4    **Q.**   On page 4652.001, you were asked about the title of that

5    document.  Do you recall that?

6    **A.**   Yes.

7    **Q.**   I think the only part that was read was "Liberty console

8    partner communications," do you see that?  On the top.

9    **A.**   Oh, the only -- that was read.  R-E-A-D.  Yes.

10   **Q.**   Are there other words that appear next to that title?

11   **A.**   "Speculative," "hypothetical."

12   **Q.**   Did you write this document?

13   **A.**   I don't remember.

14   **Q.**   You can't say one way or the other?

15   **A.**   No.

16            **MS. MOSKOWITZ:**  No further questions, Your Honor.

17            **THE COURT:**  Recross limited to the scope of redirect.

18         **MR. DOREN:**  Thank you, Your Honor.

19                          **RECROSS-EXAMINATION**

20   BY MR. DOREN:

21   **Q.**   Just a couple of questions, sir.  The dancing and emoting

22   at the concerts, are those abilities purchased in the item

23   store?

24   **A.**   Yes.

25   **Q.**   So those are paid for with V-Bucks?

1   **A.**   Some of them you can earn for free.

2   **Q.**   And, for example, with the Travis Scott concert, there was

3   also a Travis Scott skin that people could purchase in the

4   item store?

5   **A.**   Yes.

6   **Q.**   And we talked about creating islands.  Is that fun

7   creating an island?

8   **A.**   Yeah, it's awesome.

9   **Q.**   And so some people do it for fun, correct?  And some

10  people do it to create games for others to come play, true?

11  **A.**   I would say the large majority do it for fun.

12  **Q.**   Great.  For those who do it to create games, Epic pays

13  them 5 percent on any in-app purchases made within their game,

14  correct?

15  **A.**   I don't think it works like that.

16  **Q.**   You don't.  Okay, sir.

17       In terms of this Chapter 2 leak, again, we always have a

18  tendency to be speaking in generalities here, so let's be

19  specific.

20       What the Chapter 2 leak by Apple was, was that some art

21  appeared on the Italian storefront for a few minutes and

22  screenshots were captured of it by people there, correct?

23  **A.**   That's correct.

24  **Q.**   That is all it was, correct?

25  **A.**   That was a huge leak.

1    **Q.**   Nothing more than that, though, correct?

2    **A.**   It was the key art image of the Chapter 2 season.

3    **Q.**   Sir, my question is, is that all that happened?

4    **A.**   Yes.

5            **MR. DOREN:**   Thank you.

6            **THE COURT:**   Anything on those questions?

7            **MS. MOSKOWITZ:**   Nothing further, Your Honor.   Thank

8    you.

9            **THE COURT:**   All right, sir, you may step down.   You

10   are excused.

11           **THE WITNESS:**   Thank you, Your Honor.

12           **THE COURT:**   Next witness.

13           **MS. FORREST:**   Your Honor, Mr. Bornstein will be here

14   in just a moment.   We will be calling Dr. Evans.

15           **THE COURT:**   Stand, please, sir.

16      (**DAVID EVANS**, called as a witness for the Plaintiff,

17   having been duly sworn, testified as follows:)

18           **THE WITNESS:**   I do.

19           **THE CLERK:**   Please be seated.   And then would you

20   please state your full name and spell your last name.

21           **THE WITNESS:**   My name is David S. Evans.   E-V-A-N-S.

22           **THE COURT:**   Good morning, sir.

23           **THE WITNESS:**   Good morning, Your Honor.

24           **THE COURT:**   You may proceed, Mr. Bornstein.

25           **MR. BORNSTEIN:**   Thank you, Your Honor.

1    Ms. Greenfield is going to hand up a binder, if she may.

2         **THE COURT:**  She may.

3         **MR. BORNSTEIN:**  I have two brief housekeeping items

4    for the Court, if that is acceptable.  The first is just

5    relating to confidentiality.  We have some slides that are in

6    Dr. Evans' presentation which are the subject of the sealing

7    order.  How we propose to handle that is not to publish them

8    to the room but to have Dr. Evans speak to them without

9    revealing the specific numbers that are the subject of Your

10   Honor's order.  And, Your Honor, Dr. Evans and counsel for

11   Apple all have full, unredacted copies of the materials.

12        **THE COURT:**  Sounds fine, Mr. Bornstein.

13        **MR. BORNSTEIN:**  Thank you.  And then the other issue

14   is consistent with Your Honor's email over the weekend, we

15   prepared and have in the binder a version of the written

16   testimony that redacts out, or at least for Your Honor

17   highlights the materials for which there is not currently

18   admitted evidence in the record or 703 materials.

19        We have been working with Apple's counsel while

20   Mr. Weissinger was on the stand and we've, I believe,

21   succeeded in reaching an agreement in principle which we are

22   documenting that would allow us to unredact more of the

23   material.

24        And so consistent with Your Honor's email, we would intend

25   subsequently to submit an amended version that reflects the

EVANS – DIRECT / BORNSTEIN

```
 1    additional material that the parties will present by
 2    stipulation.
 3             THE COURT:  Okay.  Well, until I see it, I'm not sure
 4    what my opinion is going to be on it, but let's proceed.
 5             MR. BORNSTEIN:  I understand, Your Honor.  Thank you.
 6                        DIRECT EXAMINATION
 7    BY MR. BORNSTEIN:
 8    Q.  Would you please introduce yourself one more time for the
 9    Court, please?
10    A.  Yes.  My name is David Evans.
11    Q.  And what is your area of expertise?
12    A.  I am an economist.  I specialize in an area called
13    industrial organization.
14    Q.  Do you have a particular area of focus within industrial
15    organization?
16    A.  Yes.  For about the last 20 years, I have been heavily
17    focused on platform economics, also antitrust economics.  And
18    then I've done a lot of work on two broad industries:  The
19    digital economy, which obviously covers a lot, and then the
20    entertainment industry.
21    Q.  Can I suggest that you bring the microphone a little
22    closer.
23    A.  Is this better?
24    Q.  That is better.  Thank you.
25             What is your educational background?
```

EVANS – DIRECT / BORNSTEIN

1    **A.**   I have a Ph.D. in economics from the University of

2    Chicago.  I also received my BA and MA degrees, also in

3    economics from there.

4    **Q.**   Have you published any books or articles or other writings

5    in the field of industrial organization?

6    **A.**   I have.

7    **Q.**   What have you published?

8    **A.**   I've published six major books and over a hundred

9    articles.  They don't necessarily all cover industrial

10   organization.  That is the scope of my writings.  Most of them

11   are industrial organization.

12          **MR. BORNSTEIN:**   Your Honor, we would offer Dr. Evans

13   as an expert witness in industrial organization and platform

14   economics.

15          **THE COURT:**   No objection?

16          **MR. SWANSON:**   No objection, Your Honor.

17      And Dan Swanson, to introduce myself, for Apple.

18          **THE COURT:**   Welcome to the courtroom.  He's admitted.

19          **THE CLERK:**   Counsel, the mic on the table is on,

20   okay, for you?

21          **THE COURT:**   I appreciate you standing, but we need to

22   have you at the mic.  Go ahead.

23          **MR. BORNSTEIN:**   Thank you, Your Honor.

24   **BY MR. BORNSTEIN:**

25   **Q.**   Dr. Evans, did you prepare any written testimony for this

EVANS – DIRECT / BORNSTEIN

1    matter?

2    **A.**   I have.

3    **Q.**   Who wrote that testimony?

4    **A.**   I did.

5    **Q.**   Does the written testimony accurately reflect the opinions

6    that you have formed about this case?

7    **A.**   Yes, it does.

8    **Q.**   Is there anything in your written testimony that you would

9    like to change?

10   **A.**   No.

11   **Q.**   Have you reviewed the written testimony submitted by the

12   experts retained by Apple?

13   **A.**   I've reviewed the written testimony by the economist

14   retained by Apple.

15   **Q.**   Thank you.

16       And is there anything in the economist's report submitted

17   by Apple that causes you to want to change anything in your

18   testimony?

19   **A.**   No, it does not.

20   **Q.**   Please take a look at the tab labeled Expert 1 in your

21   binder.

22       Please tell me what this is, sir.

23   **A.**   This is my -- this is my written direct testimony that I

24   prepared.

25              **MR. BORNSTEIN:**   Your Honor, we would offer Dr. Evans'

1    testimony into evidence at this point.

2           THE COURT:  Any objection?

3           MR. SWANSON:  Your Honor, I think we are still

4    working out the issues, and I know Your Honor said you wanted

5    to look at it as well, as to the extent to which the written

6    testimony actually reflects evidence that is in or will be in

7    the record.  So subject to the continuing negotiations, other

8    than that, we don't object.

9           THE COURT:  Okay.  So it is provisionally admitted.

10          MR. BORNSTEIN:  Thank you.

11          THE COURT:  I had an -- on April 28th, 2020, you

12   provided me with an unredacted version of that document.  Is

13   that -- has there been any change since April 28, 2021 to what

14   you are submitting now?

15          MR. BORNSTEIN:  There is no change whatsoever.  The

16   only change in the document we provided you today was an

17   effort to comply with Your Honor's email this morning.

18          THE COURT:  Thank you.  Proceed.  Proceed.

19   BY MR. BORNSTEIN:

20   Q.  Dr. Evans, what was your assignment in this matter?

21   A.  I was asked to address two issues.  The first concerns the

22   relevant market -- relevant markets for analyzing the two

23   kinds of conduct that are at issue in this case.  And the

24   second is, given those relevant markets, to examine the

25   competitive consequences of that conduct.

EVANS – DIRECT / BORNSTEIN

1          **THE COURT:**  Mr. Bornstein, do you have a copy of this

2     deck for me?

3          **MR. BORNSTEIN:**  It should be in your binder, Your

4     Honor.  If it is not, we will pass one up.

5          **THE COURT:**  Oh, I see.

6          **MR. BORNSTEIN:**  It should be labeled PDX41 for

7     identification.  We can put that on the record as well.

8          **THE COURT:**  Go ahead.  Thank you.

9          **MR. BORNSTEIN:**  Thank you.

10    **BY MR. BORNSTEIN:**

11    **Q.**  You referred just now to two sets of restrictions that you

12    were asked to look at.  Can you please identify what those

13    are?

14    **A.**  Yes.  The first set of restrictions concerns Apple's

15    restrictions on the ability of distributors, of app developers

16    and app users to distribute apps in ways other than through

17    the App Store.  The second restriction refers to the mandate

18    to use IAP and, therefore, the Apple payment solution.

19    **Q.**  We will cover quite a lot of ground on that, but I want to

20    start with an issue about which there has been some discussion

21    and testimony so far in the trial.

22         Can you first tell us what your aftermarket market

23    definition is that you described in your written testimony?

24    **A.**  Yes.  I concluded that the relevant aftermarket was the

25    market for the distribution of iOS apps.

EVANS – DIRECT / BORNSTEIN

1   **Q.**   And does that market definition include all iOS apps or

2   some narrower category of iOS apps?

3   **A.**   That includes all iOS apps.

4   **Q.**   So let's get to why that is.

5       Can you tell me where you start in the process of defining

6   a market as an economist?

7   **A.**   Yes.   As a general matter, in an antitrust case, the

8   starting point for market definition is the conduct at issue;

9   the supplier who is engaged in that conduct or the business,

10   if you will; and the product or products that are related to

11   that conduct and that supplier.

12   **Q.**   So for this aftermarket, what conduct did you start with?

13   **A.**   The conduct I started with were the Apple restrictions

14   that prevented other channels of distribution other than the

15   App Store.

16   **Q.**   And does that conduct apply to all apps or some narrower

17   category of apps?

18   **A.**   That conduct applies to all apps.

19   **Q.**   Let me ask you to take a look at a graphic which is on

20   slide 5 which we've adapted from the opening statement given

21   by Apple's counsel.

22       Incidentally, did you have the opportunity to review that

23   opening statement?

24   **A.**   I did.

25   **Q.**   Did you see those slides?

EVANS – DIRECT / BORNSTEIN

1  **A.**  I did.

2  **Q.**  And on this slide, we have the App Store as well as three

3  apps:  *Fortnite, Waze*, and *Starbucks*.  Can you explain the

4  economic relationship between the App Store and those apps?

5  **A.**  Yes.  The App Store is a supplier of distribution

6  services.  Those apps are customers of the App Store in the

7  sense that they are relying on the App Store for distribution

8  services.

9  **Q.**  Do those apps compete with one another, in your view?

10  **A.**  They do not.

11  **Q.**  So how is it that you form the conclusion that there is a

12  single market for app distribution on iOS consisting of

13  these and other apps?

14  **A.**  Because the App Store is providing, in effect, an input to

15  those three apps; namely, distribution services.  So they are

16  all customers of the app for that purpose.

17  **Q.**  Is it common or uncommon in economics for a market to

18  include customers that do not compete with one another?

19  **A.**  With regard to markets, we're talking about a B to B

20  relationship, so one business providing an import or a set of

21  services to another set of businesses, it is common for the

22  businesses to not compete with each other.

23        **THE COURT:**  Could you explain?  Are you saying -- you

24  said apps are customers.  Do you mean the developers of the

25  apps are customers?

1              **THE WITNESS:**  Yes.  Thank you for that clarification,

2     Your Honor.  That is absolutely correct.  It is the developers

3     that are the customers of the App Store, and it is the apps

4     that are the products.

5              **THE COURT:**  Thank you.

6              **THE WITNESS:**  That's correct.

7     BY MR. BORNSTEIN:

8     **Q.**  When you say the apps are the products, they are the

9     product of whom?

10    **A.**  The apps are the products of the developers, they're the

11    products that the developers have created.

12    **Q.**  So in this circumstance, the developers purchase something

13    from who?

14    **A.**  The developers obtain distribution services from the App

15    Store.

16    **Q.**  And then the developers turn around and provide what to

17    their customers?

18    **A.**  The developers provide apps to their customers, and those

19    apps provide services to those customers.

20    **Q.**  And in your answer a minute ago, you referred to a B2B

21    situation.  Can you just explain what that is and make sure

22    the court reporter got it?

23    **A.**  Yes, I am sorry.

24         So there are two kinds of markets typically.  There are

25    B2C markets where a business, a supplier, is selling things to

EVANS – DIRECT / BORNSTEIN

1    consumers, people.  There are also markets that are B2B in the

2    sense that you have a business that is a supplier that is

3    selling an input or services to other businesses.  And both

4    kinds of markets are, in fact, very important in the economy.

5    **Q.**  And is this market B2B or is it B2C?

6              **THE COURT:**  Which market?

7              **MR. BORNSTEIN:**  I apologize, Your Honor.

8    **BY MR. BORNSTEIN:**

9    **Q.**  The market in which the App Store provides services to the

10   developers these apps, is it a B2B or is it a B2C market?

11   **A.**  Because it is a platform market, it is different than what

12   I just said.

13       So on one side, the customers of the App Store are the

14   developer businesses, and on the other side of the App Store,

15   the other side of the platform, are consumers that want to get

16   those apps.

17   **Q.**  And let's step back from a platform situation and talk

18   about an ordinary single-sided business-to-business market.

19       Is it common in that circumstance to have a market in

20   which the customers do not compete with one another in their

21   businesses?

22   **A.**  Yes.

23   **Q.**  And can you give an example of such a circumstance?

24   **A.**  Yes.  An example is a steel manufacturer that is perhaps

25   selling steel plates or other steel supplies to a diverse

EVANS – DIRECT / BORNSTEIN

1    group of businesses that have a need for steel.

2    **Q.**  And in the circumstance we have on the slide of the steel

3    manufacturer and an I-beam, presumably a building supplier, an

4    auto maker and a furniture supplier, do those three customers,

5    in your view, the customers for steel, compete with one

6    another?

7    **A.**  No.  They are separate -- they're industries, they're

8    separate businesses that are using that input, steel, in just

9    different ways for their particular products.

10   **Q.**  And let's step back now into the world of platforms.  Can

11   you give an example of a different platform other than the App

12   Store in which there are business participants, customers, who

13   do not compete with one another?

14   **A.**  Yes.  So let me give an example of a platform.  The

15   American Express credit card network is an example of a

16   platform.  And it's similar to the App Store in the sense that

17   it is providing services to both business customers,

18   merchants, and to consumers, card holders.

19   **Q.**  And would you define a market in the Amex situation that

20   is segregated by different types of merchants?

21   **A.**  No.

22   **Q.**  What kind of market would you define instead for the

23   credit card network?

24   **A.**  Well, generally the credit card network, like the steel

25   manufacturer, is selling -- is selling an input to a diverse

EVANS – DIRECT / BORNSTEIN

1    group of customers.  In the case of -- in the case of Amex, on

2    the merchant side, it is selling it to restaurants, hardware

3    stores, shoe boutiques and so forth.  On the consumer side, it

4    is selling it to -- payment services to a diverse group of

5    card holders who can then use their cards at that diverse

6    group of businesses.

7    Q.  How would you compare the relationship that Amex has to

8    these various merchants on the slide to the relationship that

9    the App Store has to the various developers on the slide?

10   A.  It's similar.  In the credit card case, these are

11   merchants that are selling goods to consumers.  In the case of

12   the App Store, it is developers who are producing apps that

13   are providing services to consumers.

14   Q.  And in terms of the relationship that those merchants or

15   developers have to the platform supplier, is there any

16   difference, or are they the same?

17   A.  If you can ask me that question one more time, please.

18   Q.  I can ask you a better question, I hope.

19       Is the relationship that the merchants have to the credit

20   card network any different from the relationship that the

21   developers have to the App Store?

22   A.  They are getting different services from the platform, but

23   in terms of the general economic relationship of receiving --

24   getting an input from a supplier, no, it is similar in that

25   sense.

EVANS – DIRECT / BORNSTEIN

1    **Q.**   Let's turn to another issue upfront that has been the

2    focus of some testimony recently, which is whether or not this

3    app distribution market that you've defined includes the

4    distribution of apps on game consoles.

5        What is your opinion on whether the distribution of apps

6    on game consoles is in the same market as the distribution of

7    apps on an iOS device?

8    **A.**   That the distribution of apps for game consoles is not in

9    the relevant market for app distribution for iOS.

10   **Q.**  Can you tell us why, please?

11   **A.**   Yes.

12       So, fundamentally, we need to start with the device.  So a

13   game console versus a smartphone.  The key distinction between

14   a smartphone and game consoles and other devices is that the

15   smartphone can be used anywhere, any time.  And that means

16   that a consumer, no matter what time of day, no matter where

17   they are in the country, so long as they have a cellular

18   connection, can use the smartphone.  And that, in fact, is

19   what people do.

20       A game console, on the other hand, is typically a fixed

21   device that is not something people carry around.  There is an

22   exception in the case of Switch, which is mobile, but on the

23   other hand, doesn't have a cellular connection and, therefore,

24   while it can be moved around, it doesn't provide the

25   opportunity to use it anywhere, any time, as a smartphone

EVANS - DIRECT / BORNSTEIN

1  could.  There is a fundamental difference in that dimension.

2  Q.  And why is that difference that you just described

3  relevant to the question of market definition?

4  A.  It's relevant to market definition because a consumer who

5  is interested in using apps at various times and various

6  places during the course of their lives, there are many, many

7  situations in which the game console, even if it had a

8  relevant app available on it, is simply not a relevant device

9  for them to use in their daily lives.

10  Q.  Does that have any consequence on developers as well?

11  A.  Yes.  So a fundamental aspect of the developer business is

12  they need to be where the customers are.  So if the customers

13  are out and about and have a demand for using an app, then

14  they need to be there.  And if the only way to get to that

15  consumer at that point in time and place is a smartphone, that

16  is where they need to be.

17  Q.  Are there other reasons that you have come to the view

18  that the distribution of apps on game consoles is not in the

19  same relevant market for these purposes as the distribution of

20  apps on iOS?

21  A.  Yes.  It's not just that the smartphone and the operating

22  system can be used anywhere any time.  It's also that there

23  are unique features of the smartphone that developers can use

24  in order to provide services to consumers.  The one that

25  we're -- a lot of us are familiar with is Uber.  Having the

EVANS – DIRECT / BORNSTEIN

1  mobile device, having GPS and so forth, that's a real

2  convenience for consumers and, therefore, the smartphone but

3  not the game console is a relevant device for providing that

4  service to consumers.

5  **Q.**  And so what are the features of the smartphone that you

6  are referring to here, for example?

7  **A.**  The key ones is it's mobile, it fits in your pocket, it's

8  easy to carry around all the time.  But then the other very,

9  very important one is that it has cellular capability so that

10  it works with a cellular network and, therefore, in the U.S.

11  and most parts of the world, it is connected to the internet

12  pretty much all the time.

13  **Q.**  Is that true for game consoles?

14  **A.**  It is not true for game consoles in two ways.  The game

15  console is not mobile, and the game console also doesn't have

16  cellular connectivity.  So if you did carry it around, you

17  would need to have WiFi or cellular -- you would need to have

18  WiFi or a hotspot or something in order to be able to use it

19  if, in fact, you were thinking about carrying the game console

20  around.

21  **Q.**  Do those differences have any impact on the range of apps

22  that developers can write for the operating systems on those

23  devices?

24  **A.**  Yes.  If we just looked at what actually happens, there is

25  an enormous range of apps that have been developed for

EVANS – DIRECT / BORNSTEIN

1    smartphones and for the operating systems on smartphones and a

2    much smaller set of apps that have been developed for game

3    consoles and much more specialized ones.

4    **Q.**   Let's focus specifically on games for a moment.

5         *************Have you done any investigation or analysis

6    of the extent to which games that are on iOS devices are

7    also available on consoles?

8    **A.**   I have.

9    **Q.**   Have you put together any data or slides on this?

10   **A.**   I have.

11   **Q.**   Can we take a look at that slide, please.  And explain to

12   us what you found through your investigation.

13   **A.**   Yes.  I looked at the top iOS games in two ways, the 50

14   top iOS games based on how often they were downloaded and

15   then also the 50 top iOS games based on revenue.

16        And in both of those cases, the preponderance of those

17   games by number were not available on game consoles.  So only

18   four of the top downloaded games were available on any console

19   and only seven of the top 50 revenue-generating iOS games

20   were available on any console.  And the details of that by

21   console are reported in the table below.

22   **Q.**   So --

23             **THE COURT:**  So what are the four?

24             **THE WITNESS:**  So *Fortnite* -- so, I know the answer --

25   I know part of the answer to this question for the top

EVANS – DIRECT / BORNSTEIN

1   revenue-generating iOS games.  And if I can answer the

2   question for that.  The ones for the top downloaded games

3   doesn't immediately come to mind.

4           **THE COURT:**  So what are they?

5           **THE WITNESS:**  Those would be listed in my written

6   direct, I believe.

7           **THE COURT:**  So you don't know off the top of your

8   head?

9           **THE WITNESS:**  As I sit here today, for the top

10  downloaded games, I do not know.

11          **THE COURT:**  Okay.  Are they versions of the games or

12  are they just not available at all because they are Apple

13  games, or what?  Either the seven or the four.

14          **THE WITNESS:**  So in the seven -- so among these games

15  that are available -- among the top games that are available

16  on consoles includes *Fortnite*, *Roblox*, and I forget the other

17  few as I'm sitting here today.

18          **THE COURT:**  All right.  Proceed.

19  **BY MR. BORNSTEIN:**

20  **Q.**  And are the, for example, 46 games that are among the top

21  downloaded that are not on consoles, do you know whether there

22  are different versions of the game that appear on the

23  consoles?

24  **A.**  They do not.

25          **THE COURT:**  Can you direct me to the portion of his

EVANS – DIRECT / BORNSTEIN

1    written report, paragraph, please, where I can find this

2    information?

3            MR. BORNSTEIN:  Yes, Your Honor.  This specific

4    information, I believe, is in the -- this specific information

5    may be in the rebuttal report, but I'll get you a specific

6    page cite.  I don't think I have one with me --

7            THE COURT:  All right.  Keep going.

8            MR. BORNSTEIN:  -- right now.  Okay.

9    BY MR. BORNSTEIN:

10   Q.  Dr. Evans, why don't we move to a different subject.

11      I want to turn to the background of your --

12           MR. BORNSTEIN:  Actually, you know what, Your Honor,

13   I do see it is in his rebuttal report.  It's paragraph 119 of

14   the rebuttal report.  It is not in the opening report.

15           THE COURT:  I'm talking about the -- so is it in his

16   direct testimony or just in the report?

17           MR. BORNSTEIN:  That is in the report itself.

18           THE COURT:  So it is not in his testimony?

19           MR. BORNSTEIN:  The specifics of the games I don't

20   believe is in his testimony, that's right.  We do have a

21   document that we have in the record or will put in the record

22   that addresses this information.

23           THE COURT:  All right.  So you said written report,

24   paragraph what?

25           MR. BORNSTEIN:  The written rebuttal report paragraph

EVANS – DIRECT / BORNSTEIN

119.

        **THE COURT:**  119?  Thank you.  Go ahead.

        **MR. BORNSTEIN:**  We will have in the record as well DX4883, which has additional information on the subject.

        **THE COURT:**  Okay.

**BY MR. BORNSTEIN:**

**Q.**  So let's step back a bit to -- you mentioned that you do research and scholarship on the digital economy.  Can you explain what you mean by that phrase?

**A.**  Yes.  The digital economy is essentially all of the economic activity that takes place in some way that involves an internet connection.  A good example would be grocery shopping now, people use Instacart to do that.  Both the shopper and the customer who is using Instacart has an internet connection that is enabling that activity.

**Q.**  And let's rewind about 15 years.  How is it that most people at that time interacted with the digital economy?

**A.**  So 15 years ago, it was primarily personal computers, generally sitting at a desk.  A lot of activity involved using browsers or using an application that was downloaded on a personal computer that could then take advantage of the connection to the internet that the computer had.  And the connection was probably a fixed broadband connection, although even 15 years ago, WiFi was becoming popular.

**Q.**  Has that changed in the intervening years?

EVANS – DIRECT / BORNSTEIN

1    **A.**  It has changed absolutely dramatically.

2    **Q.**  How so?

3    **A.**  15 years later, almost everyone has a smartphone with an

4    operating system on it that supports a diverse set of

5    applications.  And the very important aspect of this is that

6    as a result of that, there's been a massive expansion going

7    back to a point I raised earlier in the time and places

8    where -- where people can use things that involve the internet

9    and where developers can supply applications that enable those

10   people to consume services, again, throughout time and

11   wherever they are.

12   **Q.**  Have you done any research to quantify these developments?

13   **A.**  I have.  I did a lot before this case, but I've updated

14   them for the purposes of this matter.

15   **Q.**  And what kinds of materials did you consult and research

16   in order to do that?

17   **A.**  Standard industry sources.  So, for example, the Nielsen

18   data, Comscore data.  There's a very reputable think tank

19   called the Q Foundation that conducts a lot of research in

20   this area.  There are various government sources; for example,

21   the FCC.  And some trade groups like the global organization

22   of cellular carriers.  I used diverse sources like that.

23   **Q.**  And are these sources that you rely on outside of

24   litigation contexts for your work?

25   **A.**  They are.

EVANS – DIRECT / BORNSTEIN

1   **Q.**   And are they sources that economists ordinarily rely on

2   more generally?

3   **A.**   They are sources that economists interested in this

4   particular area would rely on.

5   **Q.**   Very good.  Thank you.

6        Did you put together a slide to help illustrate what

7   you've discovered through this research?

8   **A.**   I have.

9   **Q.**   Let's take a look at slide 10, please.  And can you

10   explain the data that you have compiled here?

11   **A.**   Yes.  Well, first of all, this is 2019 data and it is for

12   the United States.

13        2019, 83 percent of adults had smartphones.  So not

14   complete penetration, but a very large portion of the

15   population had smartphones by 2019.

16        Very interesting development, which is by 2019, if we look

17   at the time that people are spending online with an internet

18   connection, as of 2019, 77 percent of that time is being spent

19   using a smartphone connected to the internet, either using an

20   app or using a browser.  So most time is being spent on

21   smartphones as opposed to being spent on personal computers.

22   **Q.**   And then of that time spent on smartphones, have you

23   looked to see how much is spent actually in an app versus on a

24   browser?

25   **A.**   Yes.  That has been the other very interesting development

EVANS – DIRECT / BORNSTEIN

1    is 89 percent of the time that people are spending online

2    using their smartphone is being spent with the app as opposed

3    to using the browser on the phone.

4    **Q.**   And so by 2019, how much time did the average United

5    States adult spend actually connected to the internet using a

6    smartphone?

7    **A.**   Roughly three hours a day.

8    **Q.**   Three hours a day for every person -- every adult in the

9    United States, on average?

10   **A.**   Well, you -- on average, yes.  So on average, on average

11   U.S. adults spend three hours a day using apps or the web on

12   their -- on their smartphone, obviously.  Some people -- some

13   people much less, and some people much more up to the limit of

14   the number of hours in the day.

15   **Q.**   The definition of an average.

16          **THE COURT:**  One hour on a personal computer, three

17   hours on a mobile device?

18          **THE WITNESS:**  That is roughly correct, yes.

19          **THE COURT:**  Do you take into account all the time

20   people spend -- or you probably don't -- working on PCs?

21          **THE WITNESS:**  Yes.  This is the consumer use of

22   personal computers.  This is the consumer use of personal

23   computers and smartphones.

24          **THE COURT:**  Okay.  Thank you.

25

EVANS – DIRECT / BORNSTEIN

**BY MR. BORNSTEIN:**

**Q.** Is this phenomena limited to the United States?

**A.** No, it is not.

**Q.** Can you give a flavor of what is happening in other parts of the world?

**A.** Some countries are way ahead of us.  South Korea and some Scandinavian countries are actually even further ahead than we are in terms of the digital economy.  But then a large portion of the world, developing countries are rapidly catching up.  A great example is India where a few years ago, there wasn't really much penetration of smartphones and usage, but now it has just exploded.  That is generally true around the world of the different pace of moving the smartphone, but it is a global phenomenon that is really affecting every nook and cranny of the earth.

**Q.** What effects have these developments had on the extent to which consumers access the digital economy?

**A.** I worry that I am repeating myself on this one.  I will say it again, which is there has been a massive expansion of the portions of the day where people can be participating in the digital economy and also the places during the day when they can do that.

**Q.** What impact, if any, does that have on developers who are looking to service those customers?

**A.** It goes back to the point I raised earlier, which is

EVANS – DIRECT / BORNSTEIN

1    developers have to be where the customer is.  So those --

2    those are -- there are substantial increases in consumer

3    demand that developers can then tap into.

4    **Q.**  Do you believe, based on your research, that Apple

5    deserves any credit for this set of developments in the

6    digital economy?

7    **A.**  Well, just not any credit.  I believe Apple deserves a lot

8    of credit for the creation of the iPhone and helping to create

9    a lot of the great things that are happening today.

10   **Q.**  And given the growth that you've described in the digital

11   economy, how is it now that people can -- are there changes in

12   how people can access this expanded range of economic

13   activity?

14   **A.**  There have been changes.

15   **Q.**  What do you have in mind?

16   **A.**  In one dimension, things haven't changed, and maybe it is

17   useful to level this up with that.  So the thing that hasn't

18   changed is just like with Windows and Mac computers, people

19   can -- all you need is money in order to go out and get a

20   smartphone.  Then you are able to use the operating system and

21   the app development platform that that supports.  So as a

22   consumer, you are off and running once you've bought a

23   smartphone.

24       If you're a developer, just as in the case of Windows, you

25   can go to -- you can go to Apple and you can go to Google and

EVANS – DIRECT / BORNSTEIN

1    you can get the tools of everything you need in order to be

2    able to create apps.  So that part of things is similar for

3    both consumers and developers.

4         Where it is different is after you have the Windows

5    computer or the smartphone or after the developer has created

6    a Windows app or created a smartphone app, that is where

7    things have changed.

8    **Q.**   How so?  How have they changed?

9    **A.**   In -- it used to be -- the way they've changed is that

10   with personal computers, it's always been possible to get

11   apps, whether they're web apps or whether they are personal

12   computer apps, from a whole variety of different channels.

13        What has happened with the rise of the App Store and

14   Google Play is that there are only two channels where

15   consumers that have smartphones and developers that are trying

16   to reach those consumers, there is only one channel where they

17   can go to in order to get apps.  And that has been a dramatic

18   change in the digital economy.  Because now there are really

19   two gatekeepers, in effect, for getting access to the things

20   that work with the -- work with the device and work with the

21   operating system and work with the app development platform.

22   **Q.**   You mentioned operating systems a few times.  I would like

23   to just do some terminology-type housekeeping here.

24        Have you done research over your career on operating

25   systems?

EVANS - DIRECT / BORNSTEIN

1    **A.**   Yes, I have.  I've done extensive research starting about

2    20 years ago on the economics of operating systems.

3    **Q.**   Have you written any books on the subject?

4    **A.**   I have, with Professor Schmalensee, who I believe we are

5    going to be hearing from, and another co-author.  I wrote a

6    book called Invisible Engines, where "invisible engine" refers

7    to the operating system or software platform that resides in

8    an -- in a device.  Wrote that book, yes.

9    **Q.**   Is there a distinction that people talk about between a

10   general purpose operating system and a special purpose

11   operating system?

12   **A.**   Well, in the economic literature, it is referred to in

13   different ways.  But, yes, there is a fundamental difference

14   between general purpose operating systems and specialized

15   ones.

16   **Q.**   Let's break that down.  What is a general purpose

17   operating system?

18   **A.**   It is one that supports lots and lots of different kinds

19   of apps in the sense that once a developer has access to the

20   operating system and the relevant tools and the API and all

21   the things that go into a modern operating system, they can do

22   whatever they want.  Whatever idea they have that can be

23   implemented with an app, they can do that with their -- that

24   operating system.

25        And, therefore, for general purpose operating systems, we

see a whole diversity of apps for all sorts of different purposes, ones that, you know, a few years ago, we couldn't even imagine, and ones that today we probably can't imagine the ones we will see in the future.

**Q.** What are some examples of general purpose operating systems?

**A.** The main ones we talk about nowadays are Windows and the Mac. Historically, there have been other general purpose operating systems, and talked a lot about those in the book with Professor Schmalensee.

**Q.** Are there mobile operating systems that qualify as general purpose operating systems?

**A.** Absolutely. There is the iOS operating system and there is the Android operating system. There are also general purpose operating systems in that same sense that they can support many, many different kinds of apps.

**Q.** And based on your economic research regarding operating systems, can you tell us if there is a typical way in which the developers and providers of these operating systems get paid and earn revenue from what they have done?

**A.** Yes. Typically for general purpose operating systems, the developers -- I am sorry. I may have misheard your question, because I thought you said developer as opposed to the operating system.

**Q.** I apologize. I said developer of the operating system,

EVANS – DIRECT / BORNSTEIN

1    and I'm sure I caused confusion that way.

2    **A.**   That caused confusion.

3    **Q.**   Thank you for being careful.  I will ask the question

4    again without doing that.

5        Based on your economic research into operating systems,

6    can you tell us if there is a typical business model that

7    operating system providers follow?

8    **A.**   Yes, there is.

9    **Q.**   What is that?

10   **A.**   I call it the user pay model.  That is more or less what

11   is described in the economic literature.

12   **Q.**   What is that?

13   **A.**   The operating system makes it as cheap and as easy as

14   possible for developers to write apps.  So they typically

15   either don't charge anything to the developers to get access

16   to the operating system to create apps, or if they charge

17   something, it is a nominal -- really nominal amount.

18       And they do that because that stimulates the supply of

19   apps, which then gets people, users interested in using those

20   operating systems and the devices on which those operating

21   systems reside.  And then they make their money on the user

22   side.  So the more users they get, the more money they can

23   make because they have different ways of making money off of

24   the user base.

25   **Q.**   Such as what?

EVANS – DIRECT / BORNSTEIN

1    **A.**  So one way an operating system supplier can do that is

2    they can license the operating system they have developed to a

3    diverse group of OEMs and computer manufacturers.

4        The other way they can do it is an operating system

5    supplier could sell its own device, and then they make money

6    from the sale of that device, which includes the operating

7    system.

8        And then the third way, which is really particular to what

9    Google has done with Android, is they make money from

10   advertising, which is still user related, because the idea is

11   you get a lot of devices out there with a lot of users.  The

12   users spend time on the device or run apps on the device in

13   which Google can sell advertising.  And Google makes money

14   from the advertisers, but as a result of monetizing, in

15   effect, the attention that they are getting from the users.

16   **Q.**  Are there any exceptions to this user pay model among

17   major general purpose operating systems?

18   **A.**  Not that I have ever seen.

19   **Q.**  Are there any differences to this business model among any

20   special purpose operating systems?

21   **A.**  Yes, there is.

22   **Q.**  What do you have in mind?

23   **A.**  Well, the big exception that -- the big difference that

24   the economic literature has identified for a long period of

25   time are game consoles which follow a very, very different

EVANS - DIRECT / BORNSTEIN

1    business model.

2    **Q.**   What is the business model that the economic literature

3    has recognized that game consoles follow?

4    **A.**   It is really the flip side of what I just talked about.

5    In the case of game consoles, the consoles themselves are sold

6    generally at break even or really oftentimes at a loss in

7    order to -- in order to stimulate the number of consoles that

8    are out there.  And then the game consoles --

9          THE COURT:  Dr. Evans, can you tell me where in the

10   record we actually have evidence of that fundamental

11   proposition?

12         THE WITNESS:  Yes.  So I'm confident that it is in my

13   written rebuttal testimony --

14         THE COURT:  Then I take it you've seen the records

15   from Microsoft that -- and Sony and Nintendo that prove those

16   facts?

17         THE WITNESS:  The only one where I have -- with

18   respect to current knowledge on this topic that is at the

19   level of specificity that you've just raised, the one evidence

20   I've seen is the evidence that, as I understand it, has been

21   submitted by Microsoft in this case.

22         THE COURT:  So you only have seen -- you've

23   personally seen it?

24         THE WITNESS:  I have.

25         THE COURT:  So you've seen evidence from Microsoft,

EVANS – DIRECT / BORNSTEIN

1    but you've seen no evidence from Sony and you've seen no

2    evidence from Nintendo?

3              THE WITNESS:  That's correct, with the qualification

4    that the document I saw from Microsoft gave Microsoft's

5    estimates of what they understood the profit margin to be for

6    Nintendo Switch and for Sony PlayStation in addition to the

7    Xbox.

8              THE COURT:  Because I've heard this now a number of

9    times.

10             THE WITNESS:  Yes.

11             THE COURT:  But we are in a court of law, and in a

12   court of law, you need facts.  So I don't know whether this is

13   based on your kind of understanding -- a generic understanding

14   of what is out there like many other people or whether I'm

15   actually going to be able to verify this theory that I've

16   heard now multiple times.

17             THE WITNESS:  If I could -- so let me start with the

18   most specific and then maybe back up a little, if I could.

19      With regard to my current knowledge of the facts as of

20   today at the level of knowing for a fact what the profit

21   margins are and the magnitude of the subsidies, if there are

22   any, my knowledge of that comes from the document that I just

23   indicated.

24             THE COURT:  Okay.  So what I would like to get is the

25   document reference, Mr. Bornstein.  Even though we don't need

EVANS – DIRECT / BORNSTEIN

1    to mention the specific, I do want the document reference.

2              **MR. BORNSTEIN:**  I don't have the document reference

3    to give you right now, Your Honor, but obviously we will get

4    it to you promptly.

5              **THE COURT:**  All right.  Thank you.  You may proceed.

6    **BY MR. BORNSTEIN:**

7    **Q.**  To follow up on the Court's question, what did you base

8    your -- or have you based your scholarship on, on this subject

9    of the different business models pursued by these different

10   operating systems?

11   **A.**  I based it on a number of sources.  So to begin with, my

12   work in this area really started back in 2003, 2004 when I

13   started work on Invisible Engines.  And at that time, I was

14   working also as a consultant to Microsoft and had access to

15   the Microsoft Xbox people, who told me what they did and their

16   understanding of how the business operated.

17        Subsequent to that, the topic of this business model in

18   video game consoles has been discussed extensively in the

19   literature over time because it is -- because it is so unusual

20   for operating systems.

21        Now, what I can't do as I sit here on the stand is

22   identify the underlying source material that people -- that

23   economists have relied on to make that judgment.  So I

24   wouldn't be able to say what that is, but I can say that the

25   proposition the game consoles are sold at cost or below cost

EVANS – DIRECT / BORNSTEIN

1    is a noncontroversial point in the economic literature that I

2    have seen on this topic.

3    **Q.**   Let me move to a different subject, also to get some

4    terminology clarified, which is you used the phrase in your

5    written testimony "app distribution."  Can you just explain

6    what you mean by that phrase?

7    **A.**   Yes.  At the simplest level, an app developer wants to get

8    their app in the hands of consumers, and the consumers want to

9    get their hands on apps that are useful to them.  There has to

10   be a distribution mechanism for that to happen.  And that

11   is -- that is the process of app distribution, connecting that

12   developer with an app to the consumer who wants an app.

13   **Q.**   Is there a distinction between app distribution and the

14   operating system?

15   **A.**   Absolutely.

16   **Q.**   What is that distinction?

17   **A.**   So the operating system has an app development platform

18   which enables developers to create apps and it enables

19   consumers with a -- with that operating system to then use

20   those apps.  That is what an operating system like Windows

21   and iOS and so forth does as an operating system.

22       App distribution is something that occurs later and

23   continuously.  And that is an activity of developers who

24   created an app wanted to have distribution channels to get

25   their apps into the hands of consumers.  So it is a -- that is

EVANS – DIRECT / BORNSTEIN

1    a retail or store-type activity whereas the operating system

2    is a software platform technology business.

3    **Q.**  Is this distinction you've just described relevant in any

4    way to the analysis you've done in this case?

5    **A.**  Yes, it is.

6    **Q.**  How so?

7    **A.**  It's relevant to the analysis in this case because Apple

8    has -- the conduct at issue in this case concerns app

9    distribution and it particularly concerns Apple's decisions on

10   the app distribution side to cut off certain channels of app

11   distribution.

12   **Q.**  Is that necessarily an anticompetitive act by Apple?

13   **A.**  It is not necessarily an anticompetitive act.  One needs

14   to do -- look at facts and do analyses in order to make a

15   determination of that as an economist, so it is not

16   necessarily anticompetitive.

17   **Q.**  Well, to that end, let me ask you to take a look at

18   slide 12, which is a slide taken directly from the opening

19   statement slides from Apple's counsel.

20       And I take no responsibility for the picture that they

21   have selected of you.

22       Can you -- do you recognize the publication there that is

23   attributed to you?

24   **A.**  Yes, that is a --

25   **Q.**  Sorry.  Just for the record, Vertical Restraints in a

EVANS - DIRECT / BORNSTEIN

1    Digital World, is that something you wrote?

2    **A.**   Yes, that is a paper I wrote.  It's based on a

3    presentation I gave at the Swedish Competition Authority at

4    the end of 2019, and it's published in a book that I'm

5    actually one of the editors of.

6    **Q.**   And is that sentence that is quoted there an accurate

7    quote from the article that you wrote?

8    **A.**   Yes, it is.

9    **Q.**   What was your reaction when you saw this slide?

10   **A.**   My reaction was that it would be a useful summary of how I

11   think about the antitrust analysis of vertical restraints if

12   it included the next sentence.

13   **Q.**   The next sentence?

14   **A.**   The next sentence.

15   **Q.**   Let's see if we can find out what the next sentence is

16   that was omitted from the slide.  Turn to PDX42 that we will

17   introduce for identification which is in your binder.

18   **A.**   I see it.

19   **Q.**   Can you tell the Court what that is, PDX42?

20   **A.**   I am sorry.  You want me to consult my binder?

21   **Q.**   Yes, please do.

22   **A.**   Yes.  This is a copy of the article in the published

23   volume.

24   **Q.**   Let me ask you to turn to page PDX42.30.  It is page 62 of

25   the underlying publication.

EVANS – DIRECT / BORNSTEIN

1  **A.**  Yes, I have it.

2  **Q.**  If you look at the second-to-last full paragraph on the

3  page, the very last sentence, is that the quote that Apple's

4  counsel put in their opening statement slides?

5  **A.**  Yes, it is.

6  **Q.**  And it says:  There isn't much controversy that Apple's

7  rules have enabled it to create a high-quality app ecosystem

8  for the iPhone.  Correct?

9  **A.**  That's correct.

10  **Q.**  Can you please read for the Court the very next sentence

11  that Apple omitted from the slides?

12  **A.**  Yes.  That doesn't mean, however, that Apple couldn't

13  abuse those rules.

14  **Q.**  Thank you, sir.  So let's proceed to dive --

15       **THE COURT:**  Mr. -- Dr. Evans, do you conclude in this

16  article that they did abuse the rules?

17       **THE WITNESS:**  No, that is not the purpose of the

18  article, Your Honor.  The purpose of the article was to

19  exposit how to think about vertical restraints in the digital

20  economy.

21     So what we just saw is one of three case studies that I

22  provided in the article.  And in each case, I really did not

23  intend to draw any conclusion, it was more instructional.

24     So in each case, I laid out the procompetitive explanation

25  for the practice I was analyzing and then I also exposited why

EVANS – DIRECT / BORNSTEIN

1   it could be anticompetitive without drawing a conclusion in

2   the article.  It was more of an instructional article, as I

3   said, to show how to go about thinking about this topic.

4           **THE COURT:**  Thank you.  In any of these articles --

5   in this article, do you ever address the overlay with patent

6   law and the kind of monopoly on a -- you know, 20 years of

7   return on your intellectual property?  Do you ever address

8   that?

9           **THE WITNESS:**  I have addressed that quite a bit in my

10  scholarly writings.  I haven't addressed it in this specific

11  article.

12          **THE COURT:**  Thank you.  Proceed.

13          **MR. BORNSTEIN:**  Thank you, Your Honor.

14  **BY MR. BORNSTEIN:**

15  **Q.**  Did you put together a slide that just summarizes the

16  opinions that you've reached regarding the restrictions on app

17  distribution that are at issue in this case?

18  **A.**  Yes.  I did.

19  **Q.**  Let's take a look at slide 13.

20          **THE COURT:**  Were you offering 42?

21          **MR. BORNSTEIN:**  I am not.  It was just for

22  identification.

23          **THE COURT:**  Actually, it is admitted.

24          **MR. BORNSTEIN:**  PDX42, I don't believe, is.

25          **THE COURT:**  This is a demonstrative.

EVANS – DIRECT / BORNSTEIN

1          **MR. BORNSTEIN:**  Correct, Your Honor.

2          **THE COURT:**  Okay.  Go ahead.

3          **MR. BORNSTEIN:**  Thank you.

4          **THE WITNESS:**  Would it be possible for me to take

5    just a quick glass of water?

6          **MR. BORNSTEIN:**  That is up to the Court.

7          **THE COURT:**  You may.

8          **THE WITNESS:**  Thank you.

9          **MR. BORNSTEIN:**  Thank you, Your Honor.

10              (Pause in the proceedings.)

11         **THE WITNESS:**  I've had to learn not to drink through

12   the mask.

13         **MR. BORNSTEIN:**  I've made that mistake, except when I

14   did it, it was coffee.  Not a very good scene.

15         **THE WITNESS:**  Okay.  Thank you very much.

16   BY MR. BORNSTEIN:

17   **Q.**  All right.  Can you just briefly summarize what the

18   opinions are that you reached regarding the app distribution

19   restrictions at issue in this case?

20   **A.**  Yes.  To begin with, I concluded that the relevant

21   antitrust framework as an economic matter was the

22   foremarket/aftermarket distinction.  Then within that

23   framework, I concluded that the relevant foremarket consists

24   of smartphone operating systems and that Apple has market

25   power -- substantial market power in that market.

EVANS – DIRECT / BORNSTEIN

1    **Q.**  Can you tell us what you mean by a foremarket/aftermarket

2    framework?

3    **A.**  Yes.  Just briefly, a foremarket involves getting

4    something generally -- let me just give you an example.  It is

5    easy to describe with an example.

6    **Q.**  Sure.

7    **A.**  Printer and toner.  So the foremarket is a consumer buys

8    the printer.  That is at a point in time it is a durable piece

9    of equipment that they are going to have for a while.  And

10   then after they have that printer, they have the need and the

11   opportunity to buy toner for that printer.  Those sales occur

12   in the aftermarket, where the terminology there is it is

13   occurring after the purchase of the initial product.

14   **Q.**  All right.  And with reference to slide 14 to illustrate

15   your point, can you tell us how that framework, in your

16   view -- or why that framework, in your view, applies in this

17   case?

18   **A.**  Yes.  So in this case, I view the foremarket as the

19   decision to get a smartphone operating system.  And that

20   generally involves the decision to get a smartphone that has

21   that smartphone operating system installed.  So that is the

22   decision.  And then I believe I'll discuss later that the

23   decision to use the smartphone operating system, that tends to

24   persist.

25        So that's the foremarket where the consumer is using a

EVANS – DIRECT / BORNSTEIN

1    particular smartphone operating system.

2    Q.   What about on the developer side?

3    A.   On the developer side, it is the same story.  At a point

4    in time, a developer is creating an app that works with a

5    particular operating -- with a particular smartphone operating

6    system.

7    Q.   And then on the consumer side, what's the aftermarket?

8    A.   So after the consumer has a smartphone and operating

9    system to support apps, they can install apps and they can do

10   that for a long time -- a long time with that device and any

11   subsequent device they get with the same operating system.

12   Q.   Then on the developer side, what is the aftermarket?

13   A.   The developer's already created an app, so the developer

14   has the opportunity over time to take that app and distribute

15   it to the consumers that have those smartphones, but it is

16   taking an app that's already been developed and then after

17   that, it has the opportunity to make it available to consumers

18   over a period of time.

19   Q.   So you testified here and in your written direct that the

20   foremarket that you've defined is smartphone operating system?

21   A.   That's correct.

22   Q.   To help understand how you got there, can you just briefly

23   explain -- briefly explain what the purpose is of defining a

24   market in the first place?

25   A.   The purpose of defining a market is to ultimately provide

EVANS − DIRECT / BORNSTEIN

1    information ultimately to the Court, but to provide

2    information for the Court and the economists doing an analysis

3    of the substitution options available to consumers in the

4    market and to help understand the extent to which those

5    substitutes provide the constraints on different suppliers,

6    including the supplier who is at issue in the case, to raise

7    the prices.

8    Q.   And in identifying substitutes for smartphone operating

9    systems, what did you look at?  And it may be helpful to do it

10   by reference to slide 15.

11   A.   So where I started from in terms of thinking about

12   potential suppliers is I started with the smartphone device

13   itself because that device is what the operating system sits

14   on and then provides services to consumers and developers.  So

15   I wanted to start by understanding the features of that

16   device.

17        And I think I've already really identified the key ones

18   here that are listed here in the slide.  But the key ones to

19   keep in mind is that it is mobile, and it has a cellular

20   connection that provides that anywhere, anytime productivity.

21   And then, furthermore, has various features included on the

22   phone that are useful to consumers and ultimately developers

23   when people are out and about doing things.

24   Q.   We also discussed the differences between smartphones and

25   game consoles.  I don't propose to repeat that discussion.

EVANS – DIRECT / BORNSTEIN

1    But have you seen any quantitative data that was instructive

2    to you about console ownership and smartphone ownership as you

3    considered substitution here?

4    **A.**   Yes, I have.

5    **Q.**   And what is that?

6    **A.**   I believe I have a slide on this.

7    **Q.**   If you do --

8    **A.**   Okay.

9    **Q.**   -- it may not be with us in court.  We had so many slides,

10   we had to eliminate some so we could get through this in a

11   reasonable time.

12   **A.**   Okay.  So I have looked at data on this.  And what I have

13   determined is that almost everyone who has a game console has

14   a smartphone.  And what that tells me is that if game consoles

15   were good substitutes for smartphones, people wouldn't need

16   the smartphone.

17   **Q.**   So having spoken about game consoles, let's spend just a

18   minute on personal computers.

19       Have you assessed whether the operating systems in

20   personal computers are a meaningful substitute for the

21   operating systems on smartphones?

22   **A.**   I have.  Frankly, that is a closer call than game

23   consoles, because the operating system on personal computers

24   can support a lot of apps.

25       But in this case, I've also concluded that the operating

EVANS – DIRECT / BORNSTEIN

1    system on personal computers -- in personal computers don't

2    provide a good substitute.  It goes back to the concept I

3    talked about earlier, which is for a lot of the things that

4    consumers want to do and can do now with smartphones, it is

5    not possible to really do with a personal computer just

6    because of the lack of portability, lack of the cellular

7    connection and so forth.

8        So that is a big difference that basically makes it not

9    possible for personal computers and their operating systems to

10   generally be a good substitute for smartphones and the apps on

11   smartphones.

12       As with everything, nothing is all or nothing, because

13   obviously sometimes people can engage in substitution, but by

14   and large, personal computers are just not a meaningful

15   substitute for smartphones for the full range of things that

16   people can and want to do with them.

17   **Q.**   And by people, I assume you mean consumers?

18   **A.**   By people, I mean consumers.

19   **Q.**   What about on the developer side of the market that you've

20   defined?

21   **A.**   On the developer side, it is the same story for two

22   related reasons which tie back to what I just talked about.

23       So the developer, again, needs to be where the customer

24   is, but they also need to able to provide the services that

25   the customer wants when they want them.  So personal computers

EVANS – DIRECT / BORNSTEIN

1    are not a good substitute for smartphone operating systems

2    from the developer standpoint because they can't reach the

3    consumer for a good portion of the time the consumer wants to

4    use an app on a smartphone.  And they, furthermore, don't have

5    as access to a variety of features on smartphones that

6    consumers want to use.  So there are services that developers

7    can't offer at all or nearly as well on an operating system on

8    a personal computer versus a smartphone.

9    **Q.**  Did you put together a slide that summarizes your

10   assessment of the qualitative evidence you relied on to define

11   the market for smartphone OSes?

12   **A.**  Yes, I have.

13   **Q.**  Let's look briefly at slide 16.  And I don't propose to

14   have you read everything on the slide, but is this an accurate

15   summary of your conclusions with respect to the qualitative

16   evidence in defining this market?

17   **A.**  Yes, it is.

18   **Q.**  Was this qualitative evidence, in your mind, sufficient to

19   support a conclusion that smartphone operating systems are the

20   right foremarket here?

21   **A.**  Yes, it did.  I don't believe it was a close call.  I

22   think the qualitative evidence, what we know about

23   smartphones, how they are used, how developers interact with

24   them, I think it's very clear that other operating systems do

25   not -- are not meaningful substitutes for smartphone operating

EVANS – DIRECT / BORNSTEIN

1   systems.

2   Q.  With that stated, did you do any quantitative analysis to

3   analyze this question?

4   A.  Yes.  I double-checked that conclusion using a step test

5   or a hypothetical monopolist test.

6   Q.  Are the details of those tests reflected in your written

7   direct testimony?

8   A.  Yes, they are.

9   Q.  What conclusion did you reach about the geographic market

10  to be applied here in the foremarket?

11  A.  Global market with the exception of China.  So global

12  minus China.

13  Q.  Is the basis for that reflected in your written direct

14  testimony?

15  A.  Yes, it is.

16  Q.  Let's talk about market power.

17      What did you conclude as to whether or not Apple has

18  market power in the smartphone operating foremarket?

19  A.  I concluded that Apple has substantial market power in the

20  smartphone operating system market.

21  Q.  And --

22  A.  Just a pet peeve from economists.  So all firms have some

23  market power, so for antitrust, we can only talk about firms

24  having substantial market power.

25  Q.  I stand pet-peeved.

EVANS - DIRECT / BORNSTEIN

1      Did you put together a slide summarizing the bases on

2   which you reached that conclusion?

3   **A.**   Yes, I did.

4   **Q.**   Let's take a look at slide 17.  Just briefly, Dr. Evans,

5   can you summarize the bases on which you reached the

6   conclusion that Apple has market power in this market?  And

7   then we can come back and dive in on a few of these.

8   **A.**   There are just two choices:  IOS and Android.  So it's a

9   duopoly.  Second of all, the app development platform for

10  iOS is very important in terms of accounting for the extent

11  to which users and developers want to interact is measured by

12  various forms of usage.

13  **Q.**   Dr. Evans, can I interrupt you for just one second?  Would

14  you mind bringing the microphone just a touch closer.  The

15  court reporter is struggling.

16  **A.**   Is this better?

17  **Q.**   Yes.

18  **A.**   I am sorry.

19  **Q.**   All right.  So you had gone through the duopoly and the

20  share of smartphone usage.  Can you discuss briefly the

21  remaining three items on your slide?

22  **A.**   Yes.  iOS and Android as operating systems are quite

23  differentiated from each other.  The fourth is that there are

24  barriers to entry getting into the smartphone operating system

25  market.  And then, finally, it's quite costly for consumers to

EVANS – DIRECT / BORNSTEIN

1    switch from one operating system to another and, in

2    particular, to switch from iOS to Android.

3    **Q.**  I would like to touch on just two of these.  Are they all

4    spelled out in your written direct testimony?

5    **A.**  They are.

6    **Q.**  On the first one about the duopoly, did you review

7    quantitative evidence regarding whether there is a duopoly in

8    this market?

9    **A.**  I have.

10   **Q.**  And did you put a slide together on that?

11   **A.**  I did.

12   **Q.**  Let's take a look at slide 18.  Can you tell us what we

13   see here?

14   **A.**  Yes.  Specifically what is shown here is the sale of

15   smartphones that have the iOS or Android or other operating

16   system installed on them.  That is tracked from 2008 to 2019.

17   **Q.**  And what does it show about the share for the past several

18   years?

19   **A.**  Really since about 2013, 2014, iOS and Android have

20   essentially a hundred percent share as measured by consumers

21   actually purchasing smartphones with those operating systems

22   installed.

23   **Q.**  This slide indicates that we are looking at data that's

24   global, excluding China.

25        Have you also reviewed data that's limited to the United

EVANS - DIRECT / BORNSTEIN

1    States?

2    **A.**  I have.

3    **Q.**  What does that show?

4    **A.**  It shows the same.  It shows the same path.  Essentially,

5    what has happened here is there were a few other smartphone

6    operating systems on the market at the beginning of the

7    period, but they all exited.  There had been a couple of entry

8    attempts that haven't worked, and the result of that is for a

9    very long period of time, close to a decade, there are really

10   only two operating systems in play:  IOS and Android.

11   **Q.**  This slide has Android about 60 percent globally,

12   excluding China, and iOS at about 40 percent globally,

13   excluding China.  Do you know what those data are for the

14   United States?

15   **A.**  I do.  I don't have the specific numbers planted in my

16   head.  They are in my direct testimony.  But the iOS, the

17   share of phone sales by revenue for iOS in the U.S. is north

18   of 50 percent now.

19   **Q.**  So let's skip ahead to the last of the items that were in

20   your summary, which was switching costs.  Can you explain,

21   first of all, what you mean, generally speaking and briefly,

22   by switching costs here?

23   **A.**  Yes.  In -- as a general matter, switching costs refer to

24   the obstacles of moving from one product to another product.

25   In this particular context, I think of it in two ways:  One is

EVANS – DIRECT / BORNSTEIN

1    consumers incur what I'll characterize as sunk costs --

2    **Q.**  Did you say sunk?

3    **A.**  Sunk, as in S-U-N-K.  Sunk costs.

4        -- when they get into a particular operating system

5    ecosystem.  They have to buy a phone, which is a durable piece

6    of equipment, expensive.  They have to spend time learning how

7    to use the operating system and the other things that go with

8    it, and while this is an aspect of time, there are also brain

9    cells.  There is the learning process for an operating system,

10   the tactile feel of the operating system and so forth that is

11   also something that people -- I used the term "sunk cost," but

12   let's say invest in upfront when they start using an operating

13   system.

14   **Q.**  You said you think about this in two ways.  The first was

15   sunk costs.  What is the second?

16   **A.**  So the sunk costs are costs that are switching costs

17   because consumers have to re-incur them if they more to

18   another operating system.  But then there is another category

19   where it is not so much sunk costs, it's just that there are a

20   number of things that are just obstacles in moving from one

21   operating system to another.

22   **Q.**  Have you put together and summarized what the sunk and

23   switching costs are that you have identified in this market?

24   **A.**  Yes, I have.

25   **Q.**  Can we just take a look briefly at -- starting on

EVANS − DIRECT / BORNSTEIN

1    slide 19.  I won't ask you to read the whole slide, but if you

2    can just briefly identify particular sunk or switching costs

3    that you found significant, that would be helpful.

4    **A.**  So just very briefly, we've already talked about buying a

5    new smartphone.  If you switched −− if you want to switch to

6    another ecosystem, want to switch from iPhone to Android, you

7    have to buy an Android phone, replace your iPhone with that?

8        When you do that, there are, for iOS users, potentially

9    important apps that you can't use anymore, and you lose the

10   data from them and so forth.  An example of that is

11   iMessage.  Transferring data in apps.  So, for example, if I

12   have my photos stored in iCloud, then those aren't going to

13   transfer over.

14       There is the whole issue of −− it is not impossible, but

15   there's the whole issue of learning a new set of user

16   interfaces and controls for the phone.  So those are good

17   examples for this first slide.

18   **Q.**  Okay.  And are there any worth highlighting on the second

19   slide here?

20   **A.**  Yeah, sure.  So when −− one of the other aspects of an

21   operating system ecosystem is there are generally other things

22   that are complementary to it under accessories and peripheral

23   devices and so forth.

24       So in the case of the iPhone, a person may have an Apple

25   Watch or they may have Air Pods.  In the case of the Apple

EVANS – DIRECT / BORNSTEIN

1    Watch, that does not really transfer over at all or very well

2    onto Androids.  Air Pods, my understanding is not very well

3    either.

4    **Q.**  Have you discussed these various switching costs in more

5    detail in writing in your written testimony?

6    **A.**  Very much so.

7    **Q.**  How are the switching costs relevant to the question of

8    market power?

9    **A.**  They are relevant to the issue of market power because

10   they provide information on what consumers who already have an

11   iPhone are using the iOS operating system and have apps

12   would consider doing in response to a price change.

13       And perhaps the best way to see this is consider the

14   reverse situation where it is very easy to switch between

15   operating systems and devices and so forth.  If that was the

16   case, then if the price of iOS app distribution services

17   went up or it became too inconvenient -- more inconvenient to

18   use iOS distribution services, then you can imagine in the

19   absence of switching costs and the absence of the things I've

20   talked about here, people say, oh, gee, I'll just dump my

21   iPhone and get an Android phone.

22       The importance of these switching costs is that consumers

23   do a much different calculation.  Their calculation is it

24   becomes more costly to -- for me to use iOS app distribution

25   or the quality of iOS app distribution has deteriorated.

1498

EVANS - DIRECT / BORNSTEIN

1     Switching to an Android phone isn't such a good option for me

2     because that's an expensive, costly thing for me to do.

3         And the result of that is that switching between

4     ecosystems isn't really much of a competitive constraint on

5     the iOS app distribution market.

6     **Q.**  The answer that you just gave was from the perspective of

7     consumers.

8     **A.**  Yes.

9     **Q.**  Can you explain with reference to slide 21 how this all

10    impacts developers in the market?

11    **A.**  Yes.  So developers are in a much -- are in a different

12    situation.  So smartphone users, to use an economic term from

13    platform economics, they single home.  And that simply means

14    that they're only using one platform.  So in this case, people

15    are an iOS user or they are an Android user, but they are

16    not both.

17        So that's single homing.

18        Developers, on the other hand, they engage in multihoming.

19    The reason they do that, again, is they need to be where the

20    customers are.  So developers, they have to create an iOS

21    app in order to reach those iOS users and they have to have

22    an Android app to reach the Android users.

23    **Q.**  What does that mean for the extent to which Apple does or

24    does not have market power over those developers?

25    **A.**  To the extent that the users don't switch much, that means

EVANS – DIRECT / BORNSTEIN

1    that the developers pretty much have to keep doing what they

2    are currently doing.

3        So if there was an increase in price and few or no users

4    actually switch from iPhones to Android phones, from iOS

5    to Android operating systems, then developers have to do what

6    they have always done, which is they have to make sure that

7    they have their iOS app available for the very large group

8    of iOS users.

9            **MR. BORNSTEIN:**  Your Honor, I'm going to move to a

10   new topic now.  We still have five, seven minutes before the

11   typical lunch break.  I am happy to continue.  I just wanted

12   to see if it would be more useful for the Court to break now.

13   Either way is fine.

14           **THE COURT:**  We can.  I just have a question back on

15   the duopoly market.

16       It looks like, according to your chart, there were a

17   number of -- a number of other players obviously in 2009 up

18   until about -- when would you say that Android and iOS had

19   antitrust market share, in your view?

20           **THE WITNESS:**  I want to make sure I understand the

21   question, Your Honor.  Are you asking me at what --

22           **THE COURT:**  If you look at this chart, right, back in

23   2008, you would not claim that they -- that those two devices

24   control the market, do you?

25           **THE WITNESS:**  That's correct.  I think I understand

EVANS - DIRECT / BORNSTEIN

1    what you are asking.

2             THE COURT:  It wasn't until -- so that is what I am

3    trying to figure out.  At what point do you think it shifted?

4             THE WITNESS:  Given the market dynamics and the

5    expectations of people in the market, it really shifted

6    significantly by about 2010.  If I can explain why?

7             THE COURT:  Okay.  Go ahead.

8             THE WITNESS:  What happened after the iPhone and

9    Android phone came in is developer -- developer interest

10   switched almost entirely to iPhones and Android phones.  So

11   they essentially really weren't developing for the other

12   smartphone operating systems on the market; for Symbian, for

13   Blackberry and Palm.  They knew that Android and iPhone were

14   eventually going to take over, so they shifted all of their

15   development effort, the preponderance of it, over to iOS and

16   to Android.

17       And from about 2008 to maybe about 2010, 2011, there were

18   still some people that really weren't ready to switch over.

19   Now I'm talking not about developers, but I'm talking about

20   people.  There were consumers who still weren't ready to

21   switch over to iPhones and Android in the 2008 to 2010

22   period, because Blackberry users like to be able to use the

23   keyboard and people weren't sure about the switch.  But by

24   2010, there was a dramatic movement really of people over to

25   these new devices.

EVANS – DIRECT / BORNSTEIN

1    And the third thing that is going on during this period of

2  time, which is leading to the consolidation of the market

3  with iOS and Android, is cellular connectivity.  The power

4  of the cell networks is vastly improving, and the result of

5  that is that being able to use all those apps on iPhones and

6  Android phones become -- became so much easier by about 2010,

7  2012.  All those things led to really the consolidation of the

8  business into iOS and Android by roughly the 2010 to 2012

9  period.

10    THE COURT:  All right.  Thank you.  Let's go ahead

11  and take a 40-minute break.  We will stand in recess until

12  1:10.

13    MR. BORNSTEIN:  Thank you.

14    (Recess taken at 12:31 p.m.; resumed at      .m.)

15

16  ***************.

17    THE COURT:  You may have a seat, Dr. Evans.  Thank

18  you.

19    Are you ready, Mr. Bornstein?

20    MR. BORNSTEIN:  I am sorry, Your Honor?

21    THE COURT:  Are you ready?

22    MR. BORNSTEIN:  Yes.

23    THE COURT:  Let's go back on the record.  The record

24  will reflect the parties are present.  Mr. Bornstein, you may

25  continue.

1          **MR. BORNSTEIN:**   Thank you, Your Honor.

2       I'd just like to start by giving the Court a citation that

3    you had requested.

4          **THE COURT:**   Thank you.

5          **MR. BORNSTEIN:**   There is in Dr. Evans' opening

6    testimony, the written testimony that you have, at

7    paragraph 53, romanette iii is the identification of the four

8    games that the Court had asked about that are on the consoles.

9          **THE COURT:**   Okay.  Great.  Thank you.

10         **MR. BORNSTEIN:**   Thank you.

11      May I proceed, Your Honor?

12         **THE COURT:**   You may.

13         **MR. BORNSTEIN:**   Thank you.

14   **BY MR. BORNSTEIN:**

15   **Q.**  All right.  Dr. Evans, let's turn to a new subject after

16   lunch, which is your opinions concerning the iOS app

17   distribution market.  First question is, does the iOS app

18   distribution market include in-app purchases?

19   **A.**  It does not.

20   **Q.**  Explain why, please.

21   **A.**  The iOS app distribution market refers to distribution of

22   the whole process that a store does of getting -- moving

23   product basically.  So for the App Store and for iOS app

24   distribution, that involves the whole process of enabling app

25   users to search and discover apps, to basically find them.  It

EVANS - DIRECT / BORNSTEIN

1    involves that same process from the standpoint of the

2    developers, the process of making their apps available in a

3    way where app users can potentially find them.

4        And after that matchmaking process takes place where the

5    consumer finds the app and the developer, you get the

6    potential customer, then there is the whole process of

7    delivering the app to the consumer, which is down- -- the

8    ability of the consumer to download and install the app from

9    the store and then later on to be able to update it.  So

10   that -- that is what I refer to as app distribution services.

11   **Q.**   What is the in-app purchase function?

12   **A.**   In-app purchase is now that the consumer has an app and

13   the developer has a relationship with that consumer, in-app

14   purchases, as a general matter, are the transactions that take

15   place later on between the developer and its customers.  So

16   those are separate from the distribution services.

17   **Q.**   From the distribution of the app itself?

18   **A.**   That's correct.

19   **Q.**   Okay.  With that definition of app distribution in mind,

20   please explain how you began, first step in defining this

21   market.

22   **A.**   So the first step in defining this market or any market is

23   starting with the supplier at issue, which is the App Store,

24   and the distribution product offered by the App Store and

25   considering the potential substitutes in a market for the App

EVANS – DIRECT / BORNSTEIN

1   Store.

2   **Q.**  Do we have a slide that lays out the way you thought about

3   considering substitutes?

4   **A.**  Yes, we do.

5   **Q.**  Let's take a look at that.  Slide 22.  I would ask you to

6   just explain briefly what each of these potential substitutes

7   is, and then we can dive in and touch on things a little bit

8   more detailed.

9   **A.**  So let me go through this from the perspective of the

10  consumer, the user of apps.

11      So the first one is app distribution on non-smartphone

12  operating systems.  So one possible source of substitution

13  that is available for an app user -- for iOS app user is the

14  possibility that there is a similar version of that app that's

15  available on another operating system; in particular, for

16  computers or for game consoles.  So that is a possibility that

17  the consumer could substitute to that other operating system

18  if they didn't like what was going on in iOS app

19  distribution.

20  **Q.**  Okay.  So that is number one.  What about number two?

21  **A.**  The second possibility is that they substitute to Android.

22  And that can happen in two ways, one of which I think is

23  trivial and the other one is definitely worth discussing.

24      So the trivial way is an iOS app user could say -- or an

25  iOS user could say, hey, maybe I will go to the Google Play

EVANS - DIRECT / BORNSTEIN

1    store and see if I can get an iOS app from them.  That's

2    technically not possible.  The Google Play store doesn't

3    distribute such an app, so that is not a possibility.

4    Q.  Sorry, Dr. Evans.  Let me just ask you to slow down just a

5    touch.  I have seen a couple of head nods from the court

6    reporter.

7    A.  Okay.  Thank you.  Sorry.

8    Q.  Please go ahead.

9    A.  The other possibility is something that is definitely

10   worth investigating.  So an iOS user who is not happy

11   because of prices or quality with iOS app distribution

12   could, going back to the foremarket, make a decision to get

13   rid of their iPhone, to disengage from the iOS ecosystem and

14   get an Android phone and to become part of that ecosystem and,

15   therefore, at that point be able to go to Google Play or an

16   Android store and get an app in that way.  So that's -- that's

17   the main thing I cover under the second category.

18   Q.  Okay.  And, briefly, what about number three?

19   A.  Well, the third category is to analyze a relevant

20   antitrust market.  We need to look at it in the absence of the

21   conduct -- we need to look at it in a competitive situation.

22        So in the absence of Apple's conduct, we need to consider

23   the possibility that there would be other iOS app

24   distributors operating in the market and that those other

25   iOS app distributors would be potential substitutes from the

EVANS - DIRECT / BORNSTEIN

1    standpoint of the customer to -- to the App Store.  That is

2    the third category.

3    **Q.**  Let's take each of these in turn.  We will spend a little

4    more time on some than on others.

5        First, in terms of app distribution on non-smartphone

6    OSes, what did you conclude about whether that is a

7    meaningful substitute for distribution of apps on smartphone

8    OSes -- excuse me, on iOS devices?

9    **A.**  I concluded that apps on personal computers and apps --

10   that -- that the distribution of apps for personal computers

11   and the distribution of apps for game consoles were not a

12   meaningful substitute from the standpoint of the consumer or

13   the developer, really for all the reasons that we talked about

14   in going through the issues in the foremarket.

15   **Q.**  Let me ask about one additional possibility that we

16   haven't covered already in the foremarket discussion.

17       What about the possibility that a developer has a similar

18   app that runs on a game console, for example, and a user goes

19   to the game console, spends some money, makes a purchase

20   there, and then comes back to her iOS device and uses what

21   she's purchased on the iOS device.  Is that a form of

22   substitution in the app distribution market?

23   **A.**  It is not really a form of substitution in the app

24   distribution market for the obvious reason that in order to

25   use that purchase on their iOS device, they have to have the

EVANS – DIRECT / BORNSTEIN

1    app.  So they still have to be participating in the app

2    distribution market in order to get that app on their iPhone.

3    **Q.**  So let's try that with an example.  Go ahead.

4    **A.**  Sure.  Let me give you the example of Netflix.  So I can

5    sign up for a subscription to Netflix on my personal computer.

6    In fact, I think that is how I did it.  But if I want to watch

7    Netflix while I am on the road on my smartphone, I have to be

8    able to find the Netflix app and download it on my iPhone.

9    That's the service that is provided by app distribution.

10   **Q.**  Let's move, then, to app distribution on Android, and I

11   will pass what you call the trivial issue and turn to the one

12   that you considered more significant.  Explain quickly how

13   Android could -- a competition between Android and iOS could

14   impose potentially a competitive constraint on Apple's conduct

15   with respect to distributing apps on the App Store.

16   **A.**  Well, the answer to that goes back to something I said

17   earlier, imagining a situation where there really aren't any

18   sunk costs in this business, where there aren't any switching

19   costs, there are a number of different options available to

20   the consumer.

21       In that kind of situation, if they -- if an iPhone user

22   wasn't happy with app distribution, they possibly make the

23   decision, easily make the decision to say, I'll get rid of my

24   iPhone and just go get an Android phone.

25   **Q.**  And is that the real world?

EVANS - DIRECT / BORNSTEIN

1    **A.**   That is not the real world.

2    **Q.**   Have you put together a slide for us that articulates the

3    ways in which the real world is different?

4    **A.**   I have.

5    **Q.**   Let's take a look at slide 23.  Can you explain what it is

6    that you considered significant in this respect?

7    **A.**   Yes.  So these all go back to concepts that we have

8    already talked about with respect to the foremarket.  There

9    are only two choices in the foremarket.  So there is not

10   intense competition.  There is just a choice between Android

11   and iOS.  Second, the sunk cost and the switching cost make

12   it very difficult for an iOS user to switch to Android for

13   the purposes of getting better distribution, let's say, on the

14   Android device.

15   **Q.**   What is the third issue about low relative cost of app

16   distribution?

17   **A.**   The basic idea is in the foremarket, if -- if -- once

18   again, let me take kind of the opposite example in order to

19   illustrate it.  If the -- if the product in the foremarket

20   wasn't really that expensive, but the costs in the aftermarket

21   were really big, then in making the decision to buy the

22   foremarket product, you would really worry about the -- and

23   really take into account the cost of the product being bought

24   in the aftermarket.

25       In the opposite case where the foremarket product is very

EVANS – DIRECT / BORNSTEIN

1    expensive, when a consumer is making a decision about what to

2    buy, the cost of what they are going to spend in the

3    aftermarket is a small portion of it and is going to be a

4    small portion of the consumer's decision on making -- making

5    that choice.

6    **Q.**   How does that apply here?

7    **A.**   It turns out here that the -- the cost of -- the cost of

8    apps in the aftermarket is -- the cost of app distribution in

9    the aftermarket is low relative to the cost of the product in

10   the foremarket.

11   **Q.**   And then your last item here on the slide is:  Hard to

12   assess life cycle costs.  What are life cycle costs?

13   **A.**   It's the overall cost of using, in effect, a system from

14   the point in time I buy the product in the foremarket,

15   including all the things I'm going to buy in the aftermarket

16   over the lifetime in which I'm going to be using the

17   foremarket product.

18   **Q.**   Why does it matter if it is hard for a smartphone buyer to

19   assess the life cycle costs?

20   **A.**   Well, to the extent it is hard to assess the life cycle

21   costs of joining an operating system ecosystem, including

22   buying the phone, then it will be hard to take those costs

23   into account in making -- making the decision to join that

24   ecosystem or then to make a decision to switch over from iOS

25   to Android.

EVANS – DIRECT / BORNSTEIN

1    **Q.**   So in light of all this, what is your opinion on whether

2    competition between Android and iOS constrains Apple's

3    conduct in the App Store, app distribution process?

4    **A.**   I conclude that the operating system foremarket is a very,

5    very limited constraint in the aftermarket.

6    **Q.**   So let's turn to the question of having eliminated

7    nonsmartphone OS app distribution and having eliminated

8    Android app distribution as substitutes.

9        Does that mean that the market you are defining here is

10   just the App Store itself?

11   **A.**   No.

12   **Q.**   Why not?

13   **A.**   In order to understand what the relevant market is, it's

14   important to understand what it would be if it was possible

15   for developers to have direct distribution and, of course,

16   possible for other App Stores to enter the market, because

17   that then describes the competitive -- the potentially

18   competitive situation that would exist in the absence of the

19   conduct and it also tells us the extent to which the App Store

20   in -- in that environment would have -- would have market

21   power.  We can't assume that it would.  We have to understand

22   that environment to understand whether in that environment,

23   the App Store would face -- would face substitutes or not.

24   **Q.**   What did you conclude the iOS app distribution

25   environment would likely look like, absent the restrictions

1   here?

2   **A.**   I concluded that in the absence of the restrictions, there

3   would be multiple alternative App Stores, as we see in other

4   environments where there are no restrictions or no meaningful

5   restrictions on app distribution, and that developers would

6   use direct distribution to get apps into the hands of

7   consumers.

8   **Q.**   Just so we have some terminology, what do you mean by

9   direct distribution?

10   **A.**   Direct distribution means that the -- let me give you a

11   non- -- let me give you a non-OS example just to kind of bring

12   it down to what we are familiar with.

13   **Q.**   Okay.

14   **A.**   If I want to buy a pair of sneakers, I can go to Nike.com

15   and, Nike.com can distribute that pair of sneakers directly to

16   me.  You have the same situation in app distribution.

17   Developers, when there aren't any restraints, commonly make

18   apps available on, for example, their websites and then

19   distribute those apps directly to consumers.

20   **Q.**   And so what -- taking all this into account, what did you

21   define to be the aftermarket that is relevant to analyzing

22   Apple's conduct with respect to the app distribution

23   restrictions?

24   **A.**   The iOS app distribution market includes all the channels

25   that consumers and developers would use, and that includes App

EVANS – DIRECT / BORNSTEIN

1    Stores operating as online marketplaces and direct

2    distribution.

3    **Q.**   Is this a single-brand market?

4    **A.**   It is.

5    **Q.**   And tell me, do you believe it's appropriate to define a

6    single-brand market here?

7    **A.**   Absolutely.  Given the business realities here, I think

8    it's absolutely the right way to define a market here and

9    would be wrong to define it in any other way.

10   **Q.**   And was the various qualitative issues and quantitative

11   matters that we just walked through sufficient to get you to

12   your opinion that this is the right market here?

13   **A.**   Yes.  To start with, when we talk about a single-brand

14   market here, it could only be a two-brand market because the

15   only possible choices are iOS and Android.  And for the

16   reasons we talked about, Android is really not a relative --

17   it is not really an important substitute for the reasons we

18   talked about, because you can't go to the Google Play store,

19   so that is not a substitute, and the foremarket competition is

20   limited.  So I would not include that second brand in that

21   market and, therefore, it is a single-brand market focused on

22   the distribution of iOS apps.

23   **Q.**   Did you, in addition, do any data analyses in assessing

24   the aftermarket here?

25   **A.**   I did.

EVANS – DIRECT / BORNSTEIN

1    **Q.**  And what were the data analyses that you did?  Could you

2    just list them?

3    **A.**  I did an analysis of *Fortnite* data, and I also did an

4    analysis of certain consumer data that were collected by

5    Professor Rossi in a survey he conducted.

6    **Q.**  And are the data that you looked at here the kind of data

7    that you would look at in the ordinary course of your work as

8    an economist?

9    **A.**  If I had access to these kind of data, sure.

10   **Q.**  Okay.  Fair.  So let me ask you first with respect to the

11   *Fortnite* data you are talking about.  Just very, very high

12   level, what are you referring to in terms of what the dataset

13   was?

14   **A.**  So *Fortnite* has available on its systems individual

15   account-level data.  And I was able to get a random sample of

16   that very, very, very large set of account data.

17   **Q.**  And you state in your written testimony that the account

18   data you looked at was anonymized.  Is that accurate, or did

19   you have access to individual people's information?

20   **A.**  It was anonymized.

21   **Q.**  Could you tell from looking at the *Fortnite* user data the

22   extent to which users switched regularly from iOS play to

23   using on another device or whether they tended to stay on a

24   single device most of the time?

25   **A.**  I did.

EVANS - DIRECT / BORNSTEIN

1    **Q.**  And can you tell the Court what you found?

2    **A.**  Yes, I did a number of analyses on that.  But let me

3    talk -- let me talk generally about what I found.  It is

4    easiest to describe it that way.

5    **Q.**  Let me stop you before you do.

6         Are the numerical details actually in your written

7    testimony?

8    **A.**  Yes.  They're in my written testimony.  There is

9    additional data in my rebuttal testimony.  But, yes, there's

10   data there.

11   **Q.**  With that background, please go ahead.

12   **A.**  So let me start generally, not just focusing on iOS but

13   thinking about all the different platforms that -- that

14   consumers can play *Fortnite* on.

15        What we see in the data is that generally people just use

16   one platform.  Not a hundred percent, but the predominant --

17   predominance of people use just smartphones, they use just

18   game consoles, they use just personal computers.  That is what

19   the preponderance of people do in each of those categories.

20   Then there are some people who do use multiple ones, but the

21   preponderance of the players are really just using one of

22   those.

23             **THE COURT:**  So "preponderance" in the legal

24   terminology, not the economic terminology, means 51 percent or

25   something beyond 51 percent.  What do you mean by that?

EVANS – DIRECT / BORNSTEIN

1      **THE WITNESS:**  I mean generally more like somewhere

2   between 65 to 90 percent.  Very high number.

3      **THE COURT:**  Okay.  That's also a very big

4   discrepancy.  That is like one-third of the -- that is a

5   30-point differential.

6                  (Simultaneous colloquy.)

7      **THE COURT:**  Maybe it doesn't matter if it's 60 versus

8   90, but it seems that that would be a pretty big berth.

9      **THE WITNESS:**  You've actually reminded me of

10  something.  I'm going to be getting to the 60 percent number

11  in a second.

12     **THE COURT:**  Okay.

13     **THE WITNESS:**  What I just said is in the range of 80

14  to 90 percent in the sense of if I include -- if I include

15  people who are only using -- only using a device over a long

16  period of time, that is the only one I see a game console or a

17  smartphone, if I also include people who the bulk of the

18  remaining time are also using just that one device, those

19  numbers are in about the 90 percent range.

20     **THE COURT:**  I'm not sure I understood that.  Go

21  ahead, Mr. Bornstein.

22  **BY MR. BORNSTEIN:**

23  **Q.**  Maybe it would help, can you take a look, Dr. Evans, at

24  paragraph 126 of your written testimony?

25     **THE COURT:**  Direct or rebuttal?

1           **MR. BORNSTEIN:**  Direct, Your Honor.

2   **BY MR. BORNSTEIN:**

3   **Q.**  And the question, once you've had the opportunity to

4   review it, is just whether this refreshes your recollection

5   about the data that you reviewed on the subject the Court was

6   asking you.

7   **A.**  Yes, it -- yes, it does.

8   **Q.**  And obviously the Court can read what is here.  Would you

9   just briefly explain what you found now that you have the

10  benefit of reviewing this again?

11  **A.**  Yes.  Apologies.  I'm pausing because I want to make sure

12  I don't cause any -- any -- any confusion.  So the second

13  sentence of this says that over the period of time I examined

14  this, which was a long period of time, that 82.7 percent had

15  played *Fortnite* only on a single platform, and that is true

16  across game consoles, smartphones and PCs.  So that is

17  overall.

18      The story is a little bit different, Your Honor, in the

19  case of if I just focus on consumers who had played with

20  iOS.  And let me see if I can solve the source of the

21  confusion here.

22      So if I look at users who are -- who have ever used iOS

23  to play *Fortnite*, those users fall into two groups:  There is

24  a group of users who, if I take minutes, they have only

25  played iOS for about 60 percent of those minutes.  And

EVANS – DIRECT / BORNSTEIN

1  depending upon the time period and so forth, sometimes the

2  data will show 60 percent or 62 percent, but it is in that

3  range, depending upon the time period.

4      Then there is the remainder who have used iOS, but have

5  also used other devices.  That remainder falls into two

6  categories.  One category are people that primarily use game

7  consoles or personal computers.  So they are mainly using

8  those devices.  But sometimes they also have iPhones.  And

9  sometimes those people will play *Fortnite* or use *Fortnite* on

10  their iPhones.

11      Then there's another category of users who are primarily

12  playing on their smartphones, not entirely, but who are

13  primarily playing on their -- on their -- on their

14  smartphones.  Those are the three groups.

15      Does that --

16          **THE COURT:**  So you said 60 percent are only using --

17  of iOS users.

18          **THE WITNESS:**  Of iOS users --

19          **THE COURT:**  60 percent are only using the one device.

20          **THE WITNESS:**  For the iOS *Fortnite* app, on -- for

21  the iOS *Fortnite* app, 60 percent of the minutes played

22  on iOS are accounted for by people who are only playing on

23  an iOS device.  And then there is an additional chunk of

24  people who are --

25          **THE COURT:**  People or minutes?  That's why I think

EVANS – DIRECT / BORNSTEIN

1    I'm getting confused.  I had first thought the 60 percent

2    referred to people, and then you said minutes.  Maybe they are

3    the same; maybe not.  I don't know.

4              THE WITNESS:  Your Honor, they are not.

5              THE COURT:  Okay.

6              THE WITNESS:  So if I look at accounts, which is

7    people, the percent of people who are using just their iPhone,

8    that percentage is higher.  But -- but the minutes result is

9    different because you have some people --

10             THE COURT:  60 percent of the minutes are iOS only,

11   which leaves 40 percent.

12             THE WITNESS:  Yes.

13             THE COURT:  Of that 40 percent, some of that is joint

14   play with consoles and some of that is joint play with PCs?

15             THE WITNESS:  So all of the remaining 40 percent are

16   accounts where the minutes are -- people are sometimes using

17   their iPhone and sometimes using a game console or PC.

18             THE COURT:  Okay.

19             THE WITNESS:  But with an important qualification for

20   that 40 percent, which is that one chunk of that 40 percent,

21   and I don't have the number handy, but it is somewhere in the

22   range of maybe 10, 15 percent, is coming from people who are

23   almost -- who are usually playing on a game console or a PC

24   and just sometimes using their iPhone.

25             THE COURT:  All right.  Go ahead, Mr. Bornstein.

EVANS – DIRECT / BORNSTEIN

1          **MR. BORNSTEIN:**  Thank you, Your Honor.

2     **BY MR. BORNSTEIN:**

3     **Q.**  Did you do any work to assess what happened to *Fortnite*

4     play after it was removed -- after *Fortnite* was removed from

5     the App Store?

6     **A.**  Yes, I have.

7     **Q.**  And can you tell us, first of all, just what you were

8     trying to measure?

9     **A.**  Yes.  I was trying to determine the extent to which -- the

10    extent to which those -- those consumers who are -- who are

11    only -- only using their iPhones, the extent to which those

12    people decided to make a switch, substituted from an iPhone to

13    a game console or PC.  I was interested in determining the

14    extent to which that dedicated group of iPhone users actually,

15    in fact, made a substitution decision to a game console or a

16    PC.

17    **Q.**  Before we dive into how you did that, can you just tell us

18    the punch line, what did you find?

19    **A.**  I found that a very small portion of the minutes that they

20    would have spent had they been able to continue using the new

21    season of *Fortnite*, a very small portion of those minutes

22    moved over to game consoles or PCs.

23         So it is not like there was no substitution; it's just

24    that there was not very much substitution.

25    **Q.**  Let's now see if we can dive into the details and make the

EVANS – DIRECT / BORNSTEIN

1    economics accessible to those of us who don't have the

2    economics degrees.

3        First of all, how did you construct this analysis?

4    **A.**   The starting point is an event, which is the removal of

5    the iOS *Fortnite* app from the App Store.  So that's a

6    central focus of this analysis.  And with that, I wanted to do

7    a before-and-after comparison of what were things before and

8    what were things after.

9        But I wanted to do that in a very -- in as rigorous and as

10   scientific a way as I could, given the -- given the data

11   that's available.

12   **Q.**   So what methodology did you use to do that?

13   **A.**   The technical term in economics is a diff-in-diff

14   analysis, but it is most easily seen by looking at something

15   that unfortunately we're maybe all too familiar with from the

16   press, which is looking at a treatment group and control

17   group, that is a set of terminology that we are seeing all the

18   time now because of drug testing of the vaccine.

19   **Q.**   Just so we have it on the record, what did you call the

20   technical term in economics?

21   **A.**   It's called differences in differences.

22   **Q.**   Thank you.  And so how did you go about applying that

23   methodology to analyze this situation?

24   **A.**   So I have a slide that illustrates this.  If I could go

25   back to the previous slide because that is the slide that

EVANS – DIRECT / BORNSTEIN

1    illustrates it.

2        I started with what I would call a treatment group.  In

3    this case, the treatment group isn't a good drug.  The

4    treatment group is something that is adverse, which is the

5    iOS-only players before the removal, who as a result of the

6    removal had the adverse event that they can no longer access

7    the new season of *Fortnite*.

8        So I started with that treatment group.  To do a careful

9    analysis, I needed to do -- I needed to have a control group

10   because there are -- there are many things that are happening

11   both with *Fortnite* and just generally with people and the

12   economy over time.  So I needed to have a control group to

13   make sure that I could determine what's the result of the

14   removal and what is the result of extraneous factors.

15   **Q.**  How did you construct your control group?

16   **A.**  So just as I had a group of iOS-only players, I had -- I

17   constructed a group of people who only played on PCs and

18   consoles, but in a -- in a particular methodical way to make

19   sure that I had a really, really good control group.

20   **Q.**  What was that?

21   **A.**  So I -- for each iOS-only player, I -- I went into the

22   data and found a console or PC player that prior to the event

23   behaved similarly in the sense that their app usage was

24   similar and in the sense that their change in -- in play over

25   time was similar?

EVANS – DIRECT / BORNSTEIN

1    So I tried -- I didn't get identical twins.  I didn't get

2    identical twins, but I tried to get iOS-only and console and

3    PC players that were as similar to each other as possible.

4    Q.  Again, did you have any personally identifying information

5    about these specific accounts available to you?

6    A.  None whatsoever.

7    Q.  So having put together your treatment group and your

8    control group and applying the treatment of the removal

9    of *Fortnite*, what did you find about whether or not people

10   engaged in substitution?

11   A.  If I can get to the next slide, the results of the

12   analysis are shown there.

13   So if I can go through the first row.

14   Q.  What is this first row?

15   A.  The first row is the estimate of how many iOS minutes

16   were lost as a result of iOS-only players not being able to

17   play *Fortnite*.  So they -- the estimate, based on the

18   comparison of the treatment and control group, is that there's

19   a reduction of 56.3 minutes.  Just to put that another way, if

20   the event hadn't happened, these individuals would have spent

21   56.3 minutes using the iOS *Fortnite* app.

22   Q.  Okay.  What does the second row on this chart show, which

23   reads:  Increase in non-iOS minutes, 9.4 minutes per week?

24   A.  So before the event, the iOS-only users had zero non-iOS

25   minutes by definition.  After the event, what we observe from

EVANS - DIRECT / BORNSTEIN

1    the data is that they actually go and substitute the game

2    consoles and PCs to an extent.

3         THE COURT:  Could you also tell me the time period

4    that you were testing?

5         THE WITNESS:  Yes.  To do this analysis, I looked at

6    the 10 weeks prior to August 13th, 2020, so that's the pre

7    period.  And then I looked at the 10 weeks after that.

8         THE COURT:  Did you factor in when my decision came

9    out with respect to whether or not I was going to

10   allow *Fortnite* to remain?

11        THE WITNESS:  Well, from the standpoint of these

12   users --

13        THE COURT:  Well, they may have been waiting.  That

14   is why I'm asking.

15        THE WITNESS:  So there is nothing that -- in this

16   analysis that factors in your decision.  It is what users can

17   actually do with their iOS app that's looked at in this

18   particular analysis.  So as of August 27th --

19        THE COURT:  So you did 10 weeks prior and 10 weeks

20   after?

21        THE WITNESS:  Yes.  I should have said this.  I'm

22   sorry.  These comparisons look at the change going out to the

23   10th week.  So I'm looking at the longest period possible with

24   the data.

25        To put that another way, as of the 10th week after the --

EVANS – DIRECT / BORNSTEIN

1   after the -- after the removal, that 56.3 minutes is how much

2   they would have spent had that removal -- they would have

3   spent playing *Fortnite* had that removal not taken place.

4           THE COURT:  Do I have some chart in the record that

5   shows the 9.4 or each of the weeks' analysis?  Do I have -- is

6   that somewhere in the record?  Or did you just -- do I have

7   that somewhere?

8           THE WITNESS:  I don't believe that in the written

9   testimony we provided the week-by-week analysis.  It's --

10          THE COURT:  Did you provide it in your report?

11          THE WITNESS:  It's in our work papers for sure that

12  have been provided.

13          THE COURT:  Okay.  Thank you.

14          THE WITNESS:  I don't recall whether the -- my

15  opening report -- I am sorry, whether my rebuttal report

16  reported the week-by-week data.

17          THE COURT:  Okay.  Thank you.  Proceed.

18          MR. BORNSTEIN:  Thank you, Your Honor.

19  BY MR. BORNSTEIN:

20  Q.  So we've covered the first two rows.

21      What does the third row that's titled Replacement Rate of

22  16.7 percent mean?

23  A.  What that means is out of the 56.3 minutes that would have

24  been spent on iOS, from the standpoint of Epic, they were

25  able to recover 9.4 minutes of that time as a result of those

EVANS – DIRECT / BORNSTEIN

1    players switching over to game consoles and PCs.

2        The replacement rate calculates the percent of the iOS

3    time that did, in fact, get substituted over to game consoles

4    and PCs.  And the calculation is 9.4 divided by 56.3, and that

5    says that 16.7 percent of the time that would have been spent

6    on the iOS *Fortnite* app ended up moving over to game consoles

7    and PCs.

8    **Q.**  Okay.  If we were to stop there for just a second and you

9    got to a replacement rate of 16.7 percent, what would that

10   mean to you as an economist in terms of the level of

11   substitution and defining a market?

12   **A.**  Well, that shows a very low level of substitution because

13   the -- more than 80 percent of the time was completely lost

14   and didn't get substituted over at all.

15   **Q.**  So now let's kick the tires a little bit on the

16   16.7 percent.

17       Did you form a view as to whether in the ordinary course

18   some of these non-iOS -- excuse me, some of these iOS-only

19   players would have wound up spending time on a non-iOS device

20   anyway?

21   **A.**  Yes, I did.

22   **Q.**  What is the basis of that conclusion, briefly speaking?

23   **A.**  So the thing I wanted to check here, with regard to this

24   analysis is, over time, people get into gaming and they just

25   ordinarily make decisions to go out and get game consoles.  So

EVANS – DIRECT / BORNSTEIN

1   I wanted to see the extent to which that phenomenon

2   happened -- happened here.

3   Q.  And so is there some portion, then, of the 9.4 minutes

4   that is attributable to people who just would have got a

5   gaming console anyway?

6   A.  Yes.  And just to be clear on this, these iOS-only users

7   who have been only iOS users for a fair amount of time, some

8   of those iOS-only users over the course of the next 10 weeks

9   would have made the decision regardless of what happened

10  to iOS -- *Fortnite* being in the App Store, they would have

11  made the decision to go out and get a game console just

12  because that's what some people -- some people -- some people

13  do.

14      And it turns out that a large portion of that 9.4 minutes

15  is actually accounted for not by -- not by people substituting

16  to game consoles and PCs because they couldn't play *Fortnite*,

17  the iOS version of *Fortnite*, but just because they would have

18  anyway gotten a game console and shifted -- shifted some time.

19  Q.  How did you assess whether people would have gotten a game

20  console or PC anyway?

21  A.  I also used the *Fortnite* data to do that.  And what I did

22  is, I went back from August 13th, I went back 42 weeks into

23  late 2019 and I identified iOS users who only

24  played *Fortnite* on iOS for the 32-week period.  So for 32

25  weeks, they are only using the iOS app to play *Fortnite*.

EVANS – DIRECT / BORNSTEIN

1      Then I wanted to know, well, what would happen to them

2  over the next ten weeks.  And so I looked.  So then over the

3  next 10 weeks, I observed the extent to which they moved their

4  time to game consoles and PCs.

5  **Q.**  To be clear, those people were moving before or

6  after *Fortnite* came off the App Store?

7  **A.**  I took this 42 weeks back from the removal of *Fortnite*.

8  So the end of the 10 weeks is before the removal of *Fortnite*

9  from the App Store.

10 **Q.**  If you assume that there would be a similar amount of game

11 console purchases after the removal of *Fortnite*, what does

12 that do to your numbers here?

13 **A.**  It actually knocks down that replacement rate quite a bit

14 from 16.7 percent to 3.1 percent.

15 **Q.**  Are the numerical details for that in your written

16 testimony?

17 **A.**  They are.

18 **Q.**  Let me kick the tires in one other way on this replacement

19 rate.

20     You talked in your written testimony about a SSNIP test,

21 right?

22 **A.**  I do.

23 **Q.**  And what is the typical price increase associated with a

24 SSNIP test?  What typical range of price increases are

25 associated with a SSNIP test?

EVANS – DIRECT / BORNSTEIN

**A.**   Economists usually use 5, 10 percent.

**Q.**   What is -- at a very high level -- what a SSNIP test used for?

**A.**   So a SSNIP test, which stands for small but significant non-transitory increase in price, that -- that -- that increase in price is used to assess the extent to which consumers would -- would switch to other -- switch to other products and whether they would do so to an extent that it would make it unprofitable for a firm to raise price.  Because if enough consumers switched over, then that would make it difficult for a firm to profitably raise price.

**Q.**   Let's focus, then, on the event that you looked at in your data analysis here, the removal of *Fortnite*.

Is that a SSNIP?

**A.**   So not to make things overly complicated, we often talk about price in antitrust cases, but the quality is also important.  And just as increasing price is bad for consumers, reducing quality is bad for consumers.  And actually sometimes in doing these kinds of tests, economists talk about a small but significant non-transitory decrease in quality.

So perhaps with too much background there.  In this particular case, the removal of *Fortnite* from the App Store, which prevented people from playing the new season, are characterized as a very, very large -- not very, very large -- is a substantial decrease in quality of the *Fortnite* app,

EVANS – DIRECT / BORNSTEIN

1    iOS *Fortnite* app from the standpoint of *Fortnite* players.

2    **Q.**  And how does the decrease in quality here of the removal

3    of *Fortnite* from the App Store compare to a typical 5 to

4    10 percent price increase in a SSNIP in terms of how impactful

5    it is on consumers?

6    **A.**  Well, you're just stating this may be in the -- in a

7    simple way.  A SSNIP test is a small change in -- in -- in

8    price or quality for the consumers.  What we have here is a

9    big change.  It's a big change.

10   **Q.**  And what does that mean to you for the representativeness

11   of this replacement rate that you've come up with?

12   **A.**  It means that what we are observing here with either the

13   16.7 percent or the 3.1 percent is substitution

14   that iOS-only players are making in response to a really big

15   adverse event from -- from their standpoint in terms of the

16   quality of the app that they can use.

17   **Q.**  What would you expect the substitution to look like if

18   instead of having *Fortnite* removed from the App Store it was

19   just a 5 to 10 percent increase?  Would it be more or less

20   substitution?

21   **A.**  It would be far less substitution.

22   **Q.**  We have been talking a lot about how consumers reacted to

23   the removal of *Fortnite*.

24       Did you do any analysis of the *Fortnite* data that bears on

25   the question of developer substitution?

EVANS – DIRECT / BORNSTEIN

**A.**  I did.

**Q.**  And just can you --

THE COURT:  Before we leave games, did you do any analysis about whether users just switched to a comparable game?  I mean, you have not -- you take an opposite view that I shouldn't focus on gaming.  So you are just talking about apps generally.

So did you do any analysis to see whether people decided, you know, we'll use PUBG or something similar to *Battle Royale*?  Did you do any analysis in that regard?

THE WITNESS:  No.  With the *Fortnite* data, I didn't have available to me information on anything these accountholders did outside of Epic.  It is possible that the iOS-only users switched to other iOS-only games, and I would expect that that is probably something that some of them did.

THE COURT:  How does that impact the analysis?  Let's assume for purposes of argument that all these users just decided, you know what, we are just going to play a different kind of game that we like.  Then how does that affect it?

THE WITNESS:  I think it affects it depending upon whether we are talking about iOS games or are we talking about games on consoles and PCs.  If I can take those in pieces.

If separate and apart from this analysis we learned that iOS-only users who couldn't play the *Fortnite* app decided

EVANS - DIRECT / BORNSTEIN

1    to play *Roblox* or a casual game on iOS, then that's

2    consistent with our market definition -- my market definition

3    here because they are basically substituting to

4    another iOS -- iOS game.

5            THE COURT:  But it could have been another third

6    party.  I mean --

7            THE WITNESS:  Yes.

8            THE COURT:  I mean, so some other gaming company

9    could have benefited, right?

10           THE WITNESS:  That -- that is -- that is possible.

11   That is possible.  So but here -- yeah, I'm not addressing

12   that particular issue here.  But that is correct that the

13   iOS-only users, I would expect that one of the things they

14   would, in fact, have done is to have thought about

15   substituting to other iOS games, because these are iOS --

16   these are iOS-dedicated users and, therefore, I would expect

17   that they could very well have considered using

18   another iOS-only game on their smartphone.

19      That wouldn't affect any of my -- that part of it would

20   not affect any of my conclusions.

21           THE COURT:  Okay.  You said there is a second part.

22           THE WITNESS:  So the second part is if those iOS-only

23   users switched to a -- switched to another game on a console,

24   then that's a different kind of substitution, but that seems

25   implausible here because if they are iOS-only and they are

EVANS – DIRECT / BORNSTEIN

1  using -- they are using *Fortnite*, it's not obvious that they
2  would switch to a game console version of it.  It is a
3  possibility, I can't exclude it, but it seems -- it seems
4  unlikely.
5          **THE COURT:**  All right.  Proceed, Mr. Bornstein.
6          **MR. BORNSTEIN:**  Thank you, Your Honor.
7  BY MR. BORNSTEIN:
8  **Q.**  Just one follow-up on the Court's question.
9      I believe I heard you say that if people who
10 were iOS-only *Fortnite* place players switched to other iOS
11 games that that would be supportive of your market definition
12 analysis; is that correct?
13 **A.**  That's correct.
14 **Q.**  Would you just explain briefly why it would be supportive
15 of your analysis?
16 **A.**  Yes.  Because it demonstrates that what they are
17 substituting to is another iOS game that they can get in
18 the iOS app distribution market and not looking for an
19 alternative from a non-iOS app distributor.
20 **Q.**  So they stay in the iOS ecosystem and don't go find games
21 somewhere else is your point; is that right?
22 **A.**  That's correct.
23 **Q.**  Okay.  Let's turn to the analysis that you did using
24 the *Fortnite* data from the developer perspective.
25     Can you explain what the test is that you constructed?

EVANS - DIRECT / BORNSTEIN

**A.**  Yes.  So from -- from Epic's standpoint, while Epic cares
about how much time people play, at the end of the day, what
they care about as a business is how much *Fortnite* -- *Fortnite*
users spend.

   So the other analysis I did is to examine the extent to
which spending shifted from just being spent on iOS devices
to being spent on game consoles or PCs.

**Q.**  Was that methodology similar to the methodology you just
described?

**A.**  Yeah, aside -- it's identical with the exception that I'm
focused on iOS-only revenue people as opposed to iOS-only
minutes.

**Q.**  And in what did you look to measure in this part of the
analysis?

**A.**  I looked to measure the extent to which spending for the
iOS-only users moved over to game consoles or PCs.

**Q.**  And what did you use that measurement, then, to assess in
terms of developer substitution?

**A.**  So for this part of the analysis, I'm looking at the
question of -- from the standpoint of Epic as a developer, if
Apple came to it and exercised market power by increasing
commissions, for example, would Epic be able to resist that
exercise of market power by simply deciding on its own
outside, of course, of the litigation context, exiting on its
own from the App Store.

EVANS – DIRECT / BORNSTEIN

**Q.**   And what did you find?

**A.**   I found that, in theory, that would be possible if enough
of that revenue moved over to game consoles and PCs, but that,
in fact, not nearly enough revenue did, in fact, move over to
game consoles and PCs to enable Epic to profitably make a
decision to say to Apple, no, we're going to just jump.

**Q.**   Are the numerical details of that analysis in your written
testimony?

**A.**   Yes.  They are.

**Q.**   We have been talking a lot about *Fortnite* for perhaps
obvious reasons, but does looking at *Fortnite* as the basis for
doing all this analysis have any particular bias on the
results of your work?

**A.**   Yes, it does.

**Q.**   In what way?

**A.**   It's a very conservative bias.  The reason being that,
compared to other iOS app developers, *Fortnite* has a number
of advantages in terms of resisting -- resisting market power
from Apple.  Had has a well-developed game console business, a
well-developed PC business, has a lot of users on both of
those platforms.  And, therefore, unlike most apps, has the
possibility that -- that iOS-only users could find another
home within Epic by moving to a -- *Fortnite* on a game console
or *Fortnite* on a PC.

**Q.**   If you were to do a comparable analysis with one of the 46

EVANS – DIRECT / BORNSTEIN

1    games we saw on that chart that doesn't actually appear on

2    gaming consoles, how would the results there compare to the

3    results you found here?

4    A.   Those developers would have a -- relative to Epic, a much,

5    much more difficult time resisting an exercise of market power

6    because they -- their customers don't have another app on

7    another device to turn to.

8    Q.   And let's go outside the game context.

9         If you did the same analysis with an app like Uber that

10   relies so heavily on the attributes of smartphones, what would

11   you expect to find in terms of substitution?

12   A.   Even less likely than the example I gave you.

13   Q.   What seems like quite a long time ago now, you mentioned

14   that you had also looked at a survey that had been done by

15   Professor Rossi.  We will hear from Professor Rossi about the

16   survey in due course.  But can you explain to me what you did

17   with the results of his survey?

18   A.   Yes.

19        Professor Rossi conducted a survey that examined really

20   the consumer side of this across-all-apps.  And basically what

21   he did is -- let me describe it this way.

22        Consider a very large increase in the commission rate to

23   developers that results in their passing through some portion

24   of that cost.  He examined the situation in which under

25   particular assumptions that -- that we made would result in a

EVANS – DIRECT / BORNSTEIN

1    5 percent increase in the cost of apps to consumers and

2    examine what substitution decisions iOS app users made with

3    respect to iOS apps.

4    **Q.**  And with the benefit of the data that he collected, what

5    did you conclude?

6    **A.**  I concluded that there was very little -- very, very few

7    consumers -- going back to our earlier conversation on

8    switching -- responded to that price increase by moving over

9    to Android -- Android devices or said that they would.  This

10   is a survey asking a hypothetical.  A very small portion said

11   that they would, in response to that price increase, switch

12   over to an Android device.

13   **Q.**  Did you also perform a SSNIP test using the data from

14   Professor Rossi?

15   **A.**  I did.

16   **Q.**  And are the details of that in your written testimony?

17   **A.**  They are.

18   **Q.**  So we will spare ourselves a little bit of numbers.

19   Generally speaking, what is it that you found?

20   **A.**  I found thinking about this in the hypothetical monopolist

21   framework that that price increase, the increase in the

22   commission rate that I talked about, would be profitable to

23   Apple because this test is obviously conducted with respect to

24   the App Store, which is the only distributor consumers can

25   use, that that price increase would be profitable to Apple

1  because there would not be enough substitution by consumers to

2  either Android devices or through the reduction of spending in

3  response to that price increase.

4  **Q.**  All right.  So did you come up with a slide that

5  summarizes your overall conclusions regarding the aftermarket

6  here?

7  **A.**  I did.

8  **Q.**  Can we talk a look at slide 26?  Can you just spend one

9  moment and make sure we put a pin in this in the end and

10  describe what you found the aftermarket to be?

11  **A.**  The aftermarket includes App Stores, which would include

12  the app.  It includes third-party app stores, which would

13  include the App Store, and it includes direct distribution.

14  That is what it includes.  What it does not include is

15  channels of distribution for non-iOS apps such as for other

16  operating systems, including Android, PCs, Windows and Macs,

17  and gaming consoles.

18  **Q.**  Is the geographic market here covered in your written

19  testimony?

20  **A.**  It is.

21  **Q.**  Let's turn to monopoly power or market power.

22       **THE WITNESS:**  Would it be possible, Your Honor, for

23  me to just have another sip of water before we move on?

24       **THE COURT:**  Of course.

25       **MR. BORNSTEIN:**  I'm going to take the opportunity to

EVANS – DIRECT / BORNSTEIN

1    do the same.

2    **BY MR. BORNSTEIN:**

3    **Q.**  Okay.  Back behind the shields.

4        Let's talk about market power.  Did you form a view about

5    whether Apple has market power in this iOS app distribution

6    market?

7    **A.**  Yes, I do.

8    **Q.**  What was your opinion?  What is your opinion?

9    **A.**  My opinion is Apple has monopoly power in the iOS app

10   distribution market.

11   **Q.**  Is there a difference between monopoly power and market

12   power?

13   **A.**  There's a difference between monopoly power and

14   substantial market power, where monopoly power is much greater

15   than -- than substantial market power.

16   **Q.**  Do we have a slide that shows the basis for your

17   conclusion that Apple has monopoly power in the iOS app

18   distribution market?

19   **A.**  Yes, this is the slide I prepared.

20   **Q.**  This -- this information appears in your written

21   testimony; is that right?

22   **A.**  It does.

23   **Q.**  Rather than go through all of them, I would like to focus

24   on just one of the items here, which is number three, high and

25   persistent profit margin.

EVANS – DIRECT / BORNSTEIN

1          Can you just step back a bit and explain to the Court why

2     it is that profit margin is something that you featured in

3     your analysis here?

4     **A.**   I featured it in my analysis here because it is relevant

5     not just for the topic we are talking about now, monopoly

6     power, but it is relevant for other issues.  In particular, in

7     this particular case, there's the issue of the representation

8     by Mr. Jobs early on that the App Store was going to operate

9     on a break-even basis.

10    **Q.**   What -- specifically, what representation are you talking

11    about or representations are you talking about?

12    **A.**   So in 2008 when the App Store was announced, Mr. Jobs got

13    a question from reporters about:  Isn't this a problem because

14    it is a monopoly?

15         And his response to that question:  It would be great if

16    we had a -- let me do the quick summary and then we can turn

17    to the quote, if you like.

18         His response to that question was essentially, we're

19    planning to operate the App Store in a way where we are not

20    really going to make money from it.

21    **Q.**   Why does that -- is this slide here the representation

22    you're talking about from PX880?

23    **A.**   Yes.  In the answer to the question, Mr. Jobs says, we

24    don't intend to make money off the App Store.  Then he says,

25    we're basically giving all the money to developers here, and

EVANS – DIRECT / BORNSTEIN

1   if that 30 percent of it pays for running the store, well,

2   that would be great.

3   **Q.**   So is it your understanding that Mr. Jobs was running a

4   charitable enterprise here at the App Store?

5   **A.**   No, not at all.

6   **Q.**   As an economist, what do you understand would be the basis

7   for someone in his position to tell developers that they would

8   be running the store for free?

9   **A.**   This is the standard user pay model.  So as a really good

10  businessperson, Mr. Jobs recognizes, just like other operating

11  system suppliers have -- let me state that a little bit

12  differently.

13      So what Mr. Jobs is announcing here is consistent with the

14  user pay model where the idea is to make it as easy as

15  possible for developers to create apps, not charge them, and

16  then make money from the user side.

17      So the whole idea is I can get a lot of developers to

18  write apps, and that is going to make the platform more

19  interesting to users.  And in this particular case, it

20  means -- and Mr. Jobs himself said this elsewhere, means that

21  they can sell devices, iPhones.

22  **Q.**   What are you referring to when you say Mr. Jobs has said

23  this elsewhere?

24  **A.**   I believe I've seen statements from Mr. Jobs where he

25  talks specifically about the interest of Apple and the

EVANS – DIRECT / BORNSTEIN

1   developers being aligned in the context of this particular

2   issue.

3        **THE COURT:**  Mr. Bornstein, this question and response

4   are not actually adjacent to each other in the underlying

5   document, and that underlying document is not yet in evidence.

6   Can you pull up the actual document?

7        **MR. BORNSTEIN:**  Yes, Your Honor.  I believe Mr. Rudd

8   can do that.  I was under the impression this was entered,

9   Your Honor, through some of the deposition designations that

10  came in.

11       **THE COURT:**  Okay.  Perhaps it is.  I don't have it up

12  here.

13       **MR. BORNSTEIN:**  This was discussed in Mr. Forstall's

14  testimony, one of the Apple witnesses who worked with

15  Mr. Jobs.

16       **THE COURT:**  You're right.

17     Mr. Rudd, can you move to the appropriate page where this

18  came from?

19       **THE COURT:**  Thank you.

20       **MR. BORNSTEIN:**  Don't block it.

21       **THE COURT:**  I wanted to see what is in between them.

22       **MR. BORNSTEIN:**  Don't block it.

23       **THE COURT:**  Okay.  Thank you.

24       **MR. BORNSTEIN:**  Would Your Honor like a hard copy?

25       **THE COURT:**  No, I'm sure I have it in one of these

EVANS – DIRECT / BORNSTEIN

1    hundred binders here.

2              **MR. BORNSTEIN:**  I'm confident you may have more than

3    one, Your Honor.

4    **BY MR. BORNSTEIN:**

5    **Q.**  Okay.  I'm going to move on to what actually happened in

6    the real world.

7         Did Apple actually run the App Store on a break-even basis

8    as Mr. Jobs had said?

9    **A.**  They did not.

10   **Q.**  Where is it that you got data about the App Store profit

11   margins?

12   **A.**  I got data on the App Store profit margins from discovery

13   in this case.

14   **Q.**  And, specifically, did you do calculations based on

15   documents that you received from Apple?

16   **A.**  I've done calculations related to this topic.  I have not

17   done any calculations that manipulated or modified the profit

18   and loss figures that Apple itself report.

19   **Q.**  So to be clear, do you use profit margin data that comes

20   directly from Apple documents without any change whatsoever?

21   **A.**  That's correct.

22   **Q.**  Okay.

23             **MR. BORNSTEIN:**  I would like to put up on the -- not

24   put up on the screen, Your Honor, but refer the Court to some

25   information that is subject to a sealing order here.

1    And, Dr. Evans, I would ask you, please don't say any

2    numbers out loud.  We will try and get --

3         **THE WITNESS:**  I can do that.

4    **BY MR. BORNSTEIN:**

5    **Q.**  We will try and get through this testimony honoring the

6    sealing order.

7         First of all, take a look, you have a copy in front of

8    you, I believe, a hard copy of slide 29 of the demonstratives.

9    It should be in your binder.

10   **A.**  Could you point me to a --

11   **Q.**  It is -- PDX41 is the tab that has the slides behind them.

12   I will draw your attention to slide 21.

13   **A.**  I'm sorry, I'm not with you yet.

14        **MR. BORNSTEIN:**  May I approach, Your Honor, to give

15   Dr. Evans a hand?

16        **THE COURT:**  You may.  I'll say again for the record

17   what I've said in my orders, which is that all sealing orders

18   are subject to change if I decide ultimately in writing my

19   order that I need to release information to make the reasoning

20   transparent.

21        Proceed.

22        **MR. BORNSTEIN:**  Thank you, Your Honor.

23   **BY MR. BORNSTEIN:**

24   **Q.**  So, again, without revealing any numbers at all, can you

25   tell us what it is we see here on slide 29?

EVANS – DIRECT / BORNSTEIN

1    **A.**   Yes.  Let me start on the right-hand side.  I received

2    profit and loss statements prepared by Apple for the years

3    2013 to 2020 with 2020, I believe, being forecasted numbers.

4        They came in two groupings:  One was a grouping that I

5    received prior to the submission of my opening report in this

6    matter, and those were P&Ls that were presented to senior

7    executives at Apple and prepared by finance people at Apple

8    for presentations to those senior executives.

9    **Q.**   That is the blue group we see here?

10   **A.**   That's correct.

11   **Q.**   What does the orange group reflect?

12   **A.**   On the date on which my opening report was due, there was

13   also a production of other P&Ls that came from Mr. Cook's

14   files, and those provide additional profit and loss statements

15   for several -- for several years.

16   **Q.**   And just to circle back now that we have the information

17   in front of us, are the numbers that appear here that we

18   cannot say out loud numbers that you took directly from

19   Apple's own documents?

20   **A.**   Absolutely.

21   **Q.**   And they reflect profit margins?

22   **A.**   They do.

23   **Q.**   Do they reflect profit margins of other parts of Apple's

24   business like the sale of iPhones or Apple Music?

25   **A.**   The profit margins that are displayed on this exhibit are

EVANS – DIRECT / BORNSTEIN

1   specific to the App Store.  They do not include or reference

2   other parts of Apple's business.

3   **Q.**  So did these profit margins give you any relevant

4   information as an economist to help assess whether Apple has

5   market power in iOS app distribution?

6   **A.**  They do.

7   **Q.**  Please explain how it was relevant to your thinking here.

8   **A.**  They provide evidence of market power because in the –- in

9   a competitive environment, I would have expected that over

10  time the margins would have declined in the face of

11  competition, either as a result of prices falling or as a

12  result of substantial investments being made in the App Store

13  that would improve its quality from the standpoint of

14  developers and consumers.

15  **Q.**  Do we see a decline in profit margin on this slide?

16  **A.**  No.

17  **Q.**  Did you do any other work to assess how these profit

18  margins bear on the question of market power?

19  **A.**  Yes, I did.

20  **Q.**  What was that?

21  **A.**  So to begin with, as an economist just looking at these

22  profit margins before I had done anything else, they are

23  obviously high relative to other businesses and industries

24  that I've worked on.  But I didn't want to stop there.  I

25  wanted to come up with a comparison group to assess –- to

EVANS – DIRECT / BORNSTEIN

1    assess the extent to which they were high and to just make

2    sure that I wasn't missing something in terms of the operation

3    of this kind of a -- this kind of a business.

4    **Q.**   How did you go about constructing a comparison group?

5    **A.**   I asked another expert in this case to collect financial

6    information on --

7    **Q.**   Who is the other expert?

8    **A.**   Mr. Ned Barnes.

9    **Q.**   What did you ask him to collect?

10   **A.**   I asked him to focus on online marketplaces, because the

11   App Store's an online marketplace, so I wanted to focus on

12   that as a comparison group and on my marketplaces that did

13   their accounting in a way similar to the App Store.  And let

14   me just clarify what that means.

15       There is an issue on how revenue is booked when you are a

16   commission-based business versus a markup-type business.  So I

17   wanted to make sure that we're making a comparison that --

18   that was on a comparable basis.

19   **Q.**   Okay.  And let me ask you, Dr. Evans, and the Court to

20   turn to slide 30, which we are also going to keep off the

21   screen because part of the information there is subject to a

22   sealing order.

23       Does slide 30 reflect the comparable online marketplaces

24   that Dr. Barnes -- excuse me, that Mr. Barnes identified with

25   the benefit of your instructions?

EVANS – DIRECT / BORNSTEIN

1    **A.**  Yes.  And just to be clear, when I say comparable online

2    marketplaces, these are online marketplaces with similar

3    accounting metrics that provide a benchmark group for

4    comparison to the App Store.  I'm not suggesting that any of

5    these -- that any of these entities are exactly like the App

6    Store.  They are online marketplaces.  They are not

7    pharmaceutical companies.  They are not software companies.

8    They are online marketplaces.  They are obviously not

9    identical to the App Store.

10   **Q.**  Do you believe that there's a sufficient similarity for

11   these to provide a relevant benchmark for your thinking?

12   **A.**  Yes, I do.

13   **Q.**  Why is that?  Or is there anything beyond what you've

14   already said about why that is?

15   **A.**  They're online marketplaces basically also selling digital

16   transactions.  There are a number of other attributes of them

17   that make them comparable.  Unlike a pharmaceutical company,

18   they are not R&D -- heavily R&D intensive.  They are not the

19   kind of businesses that are taking on enormous risk in

20   developing -- developing new products like a motion picture

21   company would do, or some software company might do.  They are

22   comparable in that sense.

23   **Q.**  What are the comparables that Mr. Barnes identified?

24   Which companies?

25   **A.**  There are five:  Alibaba; eBay; Mercado Librea, which is a

EVANS – DIRECT / BORNSTEIN

1    large online marketplace in Latin America; Rakuten, which is a

2    Japanese company but with branches outside of Japan; and then

3    Etsy, which is arts and crafts kind of stuff.

4    **Q.**   And based on the profit margins for these companies and

5    the App Store reflected on slide 30, what conclusion did you

6    draw with respect to Apple's market power?

7    **A.**   That Apple's profit margin was vastly higher than this

8    benchmark group of companies, including even the most

9    successful one of these companies.  It's -- it's a multiple of

10   the middle group that's shown on this slide.

11   **Q.**   You're being very careful in not saying numbers, which I

12   think the Apple team appreciates.

13   **A.**   I'm trying to.

14   **Q.**   The -- you referred to accounting a few times.

15       Do accounting profits necessarily correspond to economic

16   profits?

17   **A.**   Not necessarily.  There are situations where -- so let me

18   step back just a little -- just a little bit.

19       So accounting profits and economic profits are not the

20   same thing.  But accounting profits can be a really good or

21   not so good proxy for economic profits.

22   **Q.**   Okay.  And how do you tell whether they are a good proxy

23   or a not-so-good proxy?

24   **A.**   There are certain situations where economists have

25   identified where accounting profits really give a bad

EVANS – DIRECT / BORNSTEIN

1    indication of economic profits.  I touched on a couple of

2    those.  So for industries that are R&D intensive or very

3    advertising intensive, where there is a lot of investment

4    taking place upfront in the business and then that is being

5    depreciated over time, there are situations where, because of

6    the depreciation schedules and what happens in fact relative

7    to how things are actually booked for accounting purposes,

8    that can lead to -- that can lead to biases.  So that's a

9    potential issue.

10       Then the other issue that is often related to that is the

11   extent to which companies are making very risky investments.

12   So you see a successful company that has a high rate of

13   return; what you don't see are all the other ones that placed

14   a bet, like drug manufacturers commonly, and turned out not to

15   be successful.

16   **Q.**  Okay.  And are any of the red flags recognized in the

17   literature about accounting profits not being a good

18   reflection of economic profits present here?

19   **A.**  No.

20   **Q.**  Let's turn to a new topic, anticompetitive effects.

21       What conclusion did you reach about whether or not Apple's

22   conduct in these markets that we've discussed has had

23   anticompetitive effects?

24   **A.**  So with regard to the iOS app distribution aftermarket,

25   I've concluded that Apple's restrictions harm competition and

EVANS – DIRECT / BORNSTEIN

1    through that, harmed the two major customer groups served

2    by iOS app distribution; namely, the developers, the app

3    developers and the app users.

4    **Q.**  Do we have a slide that shows specifically what types of

5    harms you have identified?

6    **A.**  Yes, I prepared this slide.

7    **Q.**  What are -- just to again to start the conversation here,

8    what are the harms that you identified in the market?

9    **A.**  At a high level, higher prices than would have existed in

10   the absence of those restrictions, less and poorer

11   distribution services provided to developers and ultimately

12   users, and slower pace of innovation than I would have

13   expected to have occurred in a market where there was more

14   competition.

15   **Q.**  And you talked about higher rates and poorer distribution

16   service and less competition.  What -- those are comparative

17   words.  What did you use as the benchmark for comparison here?

18   **A.**  So to say anything about whether Apple's practices caused

19   anticompetitive harm, I needed to compare the actual world

20   with those practices to what I would call a but-for world

21   where those practices didn't exist.  And it's the -- it's the

22   difference between the but-for world and the actual world that

23   provides evidence that the -- that the practices caused harm.

24   **Q.**  So with reference to slide 32, can you explain what

25   but-for world you assumed for this analysis?

**A.**   Yes.

For the purposes of this analysis, I am, of course, assuming that there is an Apple App Store, I am assuming that the App Store continues to be bundled with the iPhone.  I have every reason to assume that in the but-for world, the App Store has its guidelines and app-review process and so forth.

And for the purposes of this analysis, we'll talk about it later, I believe, for the purposes of this analysis, I assumed that the App Store can have the IAP requirement.  It may choose not to, given competition, but it can have the IAP requirement in the but-for world that I'm talking about here.

**Q.**   So what's different?

**A.**   There is only one thing that is different.  The only thing that is different is that the App Store faces competition.

**Q.**   And how did you form the view that if you took away the restrictions that are at issue in this case that there would, in fact, be competition for iOS app distribution against the App Store?

**A.**   Well, at a very basic level, that just follows from sound economics.  We know from economics, both theory but also practical experience, in situations where there are barriers to competition and they're removed that what typically happens and what you would expect to happen is that once competition is possible and those barriers are removed, that prices tend to fall, quality tends to improve, things just get better in

EVANS - DIRECT / BORNSTEIN

1    the absence of artificial barriers for consumers.  So that is

2    a starting point.

3            THE COURT:  Did you do an analysis in the but-for

4    world with the change being an anti- -- to eliminate the

5    anti-steering provision?

6            THE WITNESS:  In this part of the analysis, I did not

7    because I'm assuming in this part of the analysis that Apple

8    can have the IAP --

9            THE COURT:  I understand what this one is.  I am

10   asking a separate question, whether you did an analysis where

11   Apple maintained its App Store but eliminated the

12   anti-steering provision in their contract.

13           THE WITNESS:  I did not do a narrowly focused

14   analysis of that topic.

15           THE COURT:  All right.  Proceed.

16           MR. BORNSTEIN:  Thank you.

17   BY MR. BORNSTEIN:

18   Q.  Did you see evidence of efforts to enter the iOS app

19   distribution market that were blocked?

20   A.  Yes.

21   Q.  What were those?

22   A.  So in the last three years, several large companies have

23   tried to start what are essentially gaming app stores

24   on iOS.

25   Q.  I don't mean to make it a memory test, but which companies

EVANS – DIRECT / BORNSTEIN

1    are you thinking of, to the extent you can recall?

2    **A.**   I can definitely recall.  So Facebook, Google, Amazon,

3    Nvidia, and Microsoft.

4              **THE COURT:**   You said gaming app stores specifically.

5    Has anybody else ever attempted any other kind of store other

6    than gaming?

7              **THE WITNESS:**   I do not know for -- I do not know the

8    answer to that.

9              **THE COURT:**   All right.  Proceed.

10   **BY MR. BORNSTEIN:**

11   **Q.**   You talked about the basic principles of what would happen

12   in the event barriers are pulled down.

13       Have you seen evidence of the kind of price competition

14   you described in app distribution outside of the iOS

15   environment?

16   **A.**   Yes.

17   **Q.**   What are you thinking of?

18   **A.**   Let me give you a couple of examples.

19       Outside of -- outside of iOS app distribution, there is

20   an interesting situation in PCs where the leading firm is

21   Steam.  And back in 2018, Epic entered with the Epic Games

22   store.  That is a situation where there is entry taking place

23   into the market.  And what we know from that, I can't say

24   anything publicly about the details, as I understand it, but

25   the result of the entry of the Epic Games store is that there

EVANS – DIRECT / BORNSTEIN

1    was a substantial decrease in commissions following that.

2    **Q.**  Are there any other examples that you identified through

3    your research where there was a reduction in app distribution

4    commissions as a result of competition?

5    **A.**  Yes.  Sticking specifically to the case where there is

6    entry and that has an effect on the market.

7       The other good example, interesting example is in South

8    Korea.  So in South Korea, the equivalent of Google and the

9    mobile carriers in South Korea --

10          **MR. SWANSON:**  Your Honor, I would like to object to

11   this because this is a part of the testimony that has not

12   previously been placed in evidence, and it relates to

13   newspaper articles in South Korea as to which we have an

14   objection under 702 as improper reliance materials.

15          **THE COURT:**  Sustained at this point.  You can come

16   back later if either you get it resolved or I allow it later.

17   But that is not something that's in front of me yet, so

18   provisionally sustained.

19          **MR. BORNSTEIN:**  Thank you, Your Honor.  Just so our

20   record is clear, we believe the materials are properly

21   considered under Rule 703, but we'll obviously deal with it

22   with Apple and not take up time with the Court now.

23   BY MR. BORNSTEIN:

24   **Q.**  Let's pass over the South Korean example in light of the

25   objection.

EVANS - DIRECT / BORNSTEIN

1       Did you look at what commissions are actually charged on
2  operating systems where there is competition in distribution
3  of apps?
4  **A.**  Yes, I have.
5  **Q.**  And did you provide the details on that in your written
6  testimony?
7  **A.**  Yes, I have.
8  **Q.**  I will pass over it for now.
9       Have you seen any Apple evidence or Apple documents
10 contemplating the possibility that Apple might need to reduce
11 App Store commissions?
12 **A.**  Yes, I have.
13 **Q.**  Let's take a look at slide 33.  Is this the evidence that
14 you are referring to?
15 **A.**  Yes.  This is an email from Mr. Schiller dating back to, I
16 believe, 2011.
17 **Q.**  Okay.  How does this constitute evidence, in your view,
18 that is supportive of the idea that competition could lead to
19 a reduction in commission rates?
20 **A.**  Well, Mr. Schiller's email is relevant in two ways.  He
21 specifically contemplates that given the possibility of having
22 to worry about competition, that there could be a need to
23 lower the commission rate down to 25 percent or 20 percent.
24 **Q.**  And you said there were two ways.  What is the second way
25 that this is relevant?

EVANS – DIRECT / BORNSTEIN

1    **A.**   The other way it's relevant is he conjectures the

2    possibility of capping the profits.  Basically -- I'm not

3    stating this specifically from the email, but I'm just

4    inferring what -- what it implies, essentially capping the

5    profits at $1 billion and then running the store that way.

6    **Q.**   And did you do a calculation to figure out what Apple's

7    commission rate would be if the billion-dollar cap

8    hypothesized here were actually put into effect?

9    **A.**   Yes, I did.

10   **Q.**   What would that commission have been in 2019?

11   **A.**   In 2019, the commission rate -- if the only thing that

12   Apple did was to lower the commission rate, that commission

13   rate would be 6.8 percent.  A 6.8 percent commission rate

14   would result in a situation where the App Store had a billion

15   dollars of profit.

16   **Q.**   And what operating margin would that have corresponded to?

17   **A.**   That would correspond to 30.1 percent.

18   **Q.**   Have you done other analyses that are in your written

19   testimony about what would happen to Apple's commission rates

20   and profits in the event of entry into iOS app distribution?

21   **A.**   Yes, I did.

22   **Q.**   Did you also look at innovation in app distribution?

23   **A.**   I have.

24   **Q.**   And, specifically, what did you consider about innovation?

25   **A.**   So the first thing I considered was the extent to which

EVANS – DIRECT / BORNSTEIN

1    the App Store is, in fact, investing in research and

2    development.  Research and development is what companies often

3    do when they're trying to create new features and trying to

4    improve things and generate innovation.  It is not necessarily

5    the only way that happens, but research and development

6    spending is an important one.

7    **Q.**  Okay.  I'm going to ask you to look, unfortunately, in

8    that book again, because we have a slide that is subject to

9    a -- contains information that is subject to a sealing order.

10   And I'll direct you, please, to slide 34 --

11   **A.**  I have someone else's book here.

12   **Q.**  I think you put the book on the ground.

13   **A.**  Let me see if I can do this myself this time.  The exhibit

14   is?

15   **Q.**  It's Exhibit PDX41 of the slides.  And I'm on slide 34.  I

16   will caution you not to say any numbers out loud in this part

17   of the discussion.

18   **A.**  Okay.  I have it.

19   **Q.**  Great.  Can you tell us, first of all, what is reflected

20   here in this blue circle with a little red wedge?

21   **A.**  Yes.  It is intended to show the profits for the App Store

22   based on the financials for 2019 in the left column that we

23   talked about before.  The costs that are reflected in those

24   financials and an estimate of the portion of the pie that goes

25   to R&D.  I just want to make sure that I'm clear about one

EVANS – DIRECT / BORNSTEIN

1    thing.

2        The blue number corresponding to the profits and the

3    bracketed cost amount, those are based on the -- on the actual

4    Apple financial documents that I -- that I talked about

5    before.

6        The other number, referring to R&D, is identified in the

7    chart to the right, and I would need to explain what that is

8    because that is -- that is an estimate for the App Store as

9    opposed to a number that is just taken off of the P&Ls that we

10   talked about before.

11   **Q.**  So the blue number and the bracketed number come directly

12   from an Apple document?

13   **A.**  That's correct.

14   **Q.**  Where does this red number come from?

15   **A.**  The red number comes from what -- I probably won't use the

16   right terminology from an Apple standpoint, but the red number

17   comes from the organization that the App Store is part of.  So

18   the App Store is part of a higher-level organization, which is

19   iTunes.

20       I have in a separate document research and development

21   data for iTunes overall.  And in 2019, I also had information

22   that told me that the App Store accounted for roughly

23   two-thirds of the revenue for iTunes.  So I used -- I used the

24   overall R&D dispending (phonetic) ratio for iTunes as an

25   estimate of the R&D spending for the App Store.

EVANS – DIRECT / BORNSTEIN

1    **Q.**   And having identified those numbers from the Apple

2    documents or made this estimate, what did you conclude that is

3    reflected here on slide 34?

4    **A.**   That the R&D-to-sales ratio or R&D-to-spending ratio -- I

5    am sorry, that the R&D-to-sales ratio which is described here

6    as R&D as a percentage of total revenue is very low, and the

7    R&D-to-sales ratio is the common metric that economists use to

8    measure research intensity across businesses.

9    **Q.**   What is your basis for saying that the R&D-to-sales ratio

10   for the App Store is very low?

11   **A.**   Again, I compared the App Store to a benchmark group of

12   entities, the same group of entities we talked about before.

13          **MR. BORNSTEIN:**   Gesundheit, Your Honor.

14          **THE COURT:**   Sorry about that.

15   **BY MR. BORNSTEIN**

16   **Q.**   You are saying you compared to a benchmark?

17   **A.**   I compared to the five companies we talked about before.

18   As the benchmark for each of those companies, I determined the

19   R&D-to-sales ratio for those companies.  I took the median of

20   those and I compared that to the App Store.

21   **Q.**   And I'll do my effort not to say a number out loud here,

22   but the number in the bottom right corner, is that the extent

23   to which these other companies -- the multiple by which these

24   other companies have an RD-to-sales ratio compared to the App

25   Store?

EVANS – DIRECT / BORNSTEIN

1  **A.**  Yeah, that is the multiple.

2  **Q.**  Why does R&D expenditure and the RD-to-sales ratio matter

3  in assessing the competitive effects of Apple's conduct?

4  **A.**  It doesn't have to, but it is an indicator of the extent

5  of effort that is going into -- into innovation and doing the

6  things we talked about before, coming up with new features for

7  the store, improving technologies and so forth.  So it's an

8  important ingredient in leading to all those things.

9  **Q.**  Speaking to all the things that flow from R&D, did you do

10  any work to assess the quality of App Store services?

11  **A.**  I did.

12  **Q.**  And let's focus on one issue that you've mentioned a few

13  times about what distribution platforms provide.  Search and

14  discovery.  Just to level set, why is search and discovery --

15  first of all, what is search and discovery in the context of

16  an online distribution platform?

17  **A.**  So search and discovery is the core element of what any

18  store does, because ultimately consumers need to be able to

19  find things.  So that is the core service that is being

20  provided.

21      For an online marketplace with lots of different things in

22  it, the search and discovery technology is what enables

23  consumers to find apps that they are interested in and it's

24  the technology that developers rely on to make sure that

25  consumers can find their apps.

EVANS – DIRECT / BORNSTEIN

1    **Q.**  What did you conclude about the quality of App Store

2    search and discovery based on the evidence you reviewed?

3    **A.**  Based on the evidence I reviewed, I concluded that there

4    were significant -- that developers perceived significant

5    problems with search and discovery in the App Store and that

6    that set of problems has persisted really for the past decade.

7    **Q.**  Let's pull up slide 35, please.  And I would ask you to

8    tell me, does this reflect some of the evidence that you

9    looked at on this point?

10   **A.**  It does.

11   **Q.**  What are we looking at here on slide 35?

12   **A.**  We're looking at the results of a survey that Apple did in

13   2017 of developers to assess their views concerning the

14   performance of the App Store.  And this particular slide

15   refers to their satisfaction with discoverability of apps,

16   which is a reflection of that search and discovery technology.

17   **Q.**  What do the results of this survey conducted by Apple tell

18   you about the quality of search and discovery features, at

19   least in 2017?

20   **A.**  So the bars show the percent that reported various levels

21   of satisfaction ranging from very dissatisfied to very

22   satisfied.  And focusing on the right, a total of 36, it

23   actually gets rounded up into 37 based on the actual numbers,

24   but 36 percent, based on the bars here, indicated that they

25   are either somewhat or very satisfied.  So figure roughly a

1    third of developers expressed the opinion that they are

2    satisfied, which means the others weren't.

3    **Q.**   To be fair, the middle ground says what?

4    **A.**   Says neither.

5    **Q.**   Okay.  And was this an anomaly, this May 2017 survey?

6    **A.**   It was not.

7    **Q.**   What other evidence did you see in terms of surveys of

8    developers and their satisfaction with search and discovery?

9    **A.**   I looked at similar surveys in earlier years the surveys

10   and the results are recorded in my written direct testimony,

11   but I had similar surveys over the 2010s.

12   **Q.**   And what does it tell you this level of dissatisfaction

13   continued for, as you said, over a decade?

14   **A.**   Well, it's consistent with the R&D results in the sense

15   that it seems to be a reflection that the store isn't getting

16   better over time, there isn't investment taking place to deal

17   with -- with issues related to a core technology of the -- of

18   the store.

19   **Q.**   Are there other pieces of evidence relating to search and

20   discovery that are in your written direct?

21   **A.**   Yes, there are.

22   **Q.**   Are there other pieces of evidence relating to other

23   quality metrics that appear in your written direct?

24   **A.**   There are.

25   **Q.**   What is all of this mean for consumers?

EVANS – DIRECT / BORNSTEIN

1    **A.**  Well, consumers are on the other side.  So if search and

2    discovery technology isn't working well, if there's problems

3    with that, it just makes it harder for consumers to find the

4    app that they want to meet the needs that they have.

5    **Q.**  And based on the various pieces of evidence of quality

6    that you talked about today and in your written direct, what

7    did you conclude about how an innovative company like Apple

8    was behaving in its App Store business?

9    **A.**  Well, it's surprising.  Because, I mean, Apple is in, in

10   the hardware side, is a very innovative business.  It was

11   surprising to see the App Store kind of languishing during

12   this period of time.

13   **Q.**  Let me switch to a very different subject now, which is

14   payments.

15   **A.**  Would it be possible, Your Honor, for me to take my, I

16   promise, my last drink of water?

17           **THE COURT:**  Take as much as you need.

18           **MR. BORNSTEIN:**  May I proceed, Your Honor?

19           **THE COURT:**  Yes, of course.

20           **MR. BORNSTEIN:**  Thank you.

21   **BY MR. BORNSTEIN:**

22   **Q.**  So payments.  Prior to this case, Dr. Evans, have you had

23   any experience with the payments industry?

24   **A.**  Yes, I have.

25   **Q.**  Can you explain what that prior experience is, please?

EVANS – DIRECT / BORNSTEIN

1    **A.**   Yes.  I've been conducting research, doing scholarly

2    writings, consulting in the payments industry since -- since

3    1991, 30 years.

4    **Q.**   So let's focus on payments for online businesses.

5        What is, for an online business, a payment solution?

6    **A.**   A payment solution for an online business is basically the

7    solution that goes from having a user interface that's

8    available to consumers to enter their card credentials as part

9    of the completion of order and buying process to not only

10   accepting those payment credentials but then ultimately being

11   able to get the money from the consumer and, in particular,

12   from the -- from the funding source for the payment credential

13   that is being presented, such as the bank that issued the

14   card.

15   **Q.**   Is there a difference between a payment solution and a

16   payment processor?

17   **A.**   Yes.

18   **Q.**   What is the difference?

19   **A.**   So a payment solution is all the things that go into

20   interacting with the consumer and interacting with the

21   whole -- whole process of trying to get conversions from

22   consumers for the developer.

23       Payment processing is a specialized business.  So no

24   developer really has the skill set to actually authenticate

25   cards and go out and collect the money.  That's the job of a

EVANS – DIRECT / BORNSTEIN

1   payment processor.  So a developer would ordinarily hire one

2   or more payment processors to help them with that.

3       The payment processor authenticates the card and then it

4   knows how to actually go up the line, fetch the money, and

5   then ultimately put that money into the developer's bank

6   account.

7   **Q.**  So focusing on that payment processing piece, do online

8   businesses typically work with just one payment processor?

9   **A.**  Typically they work with several of them.

10  **Q.**  What's the thinking -- what's the economic reason for

11  that?

12  **A.**  One reason is, a lot of developers are selling

13  internationally and people use different payment methods in

14  different geographies.

15      You often need to hire multiple payment processors in

16  order to make sure you can cover all the possibilities for

17  customers that you want to interact with on a worldwide basis.

18      And the other reason is that the payment processors

19  specializing in different things.  And there are reasons why

20  you might want to use particular payment processors just

21  because they do some things better than other payment

22  processors.

23  **Q.**  Do payment processors compete with one another to win

24  business from developers?

25  **A.**  Absolutely.

EVANS – DIRECT / BORNSTEIN

1    **Q.**   Have you seen evidence of that kind of competition in this

2    case?

3    **A.**   I did.

4    **Q.**   And what are you thinking of?

5    **A.**   So Epic has a payment solution for their game console and

6    PC business and for the Epic Games Store.  And as part of that

7    payment solution, they have gone out and have solicited

8    bids -- solicited offers from payment processors.

9    **Q.**   Take a look in your binder, if you would.  There's a

10   document that is labeled PX2451.  Do you see that?

11        **MR. BORNSTEIN:**  This is in evidence already, Your

12   Honor.

13        **THE WITNESS:**  Yes, I have it.

14   **BY MR. BORNSTEIN:**

15   **Q.**   Okay.  What is this document?

16   **A.**   I just want to go through the rest of the document here.

17        **MR. BORNSTEIN:**  We should probably take this document

18   off the screen.  I believe it's subject to a sealing motion

19   that's pending from a third party.

20        **MR. DOREN:**  I believe this exhibit is in evidence,

21   not for the truth of the matters asserted therein.

22      I think it was received for those purposes that be the

23   Court deems it ultimately to bear.

24        **THE COURT:**  Did this come in, again, through

25   deposition testimony?

EVANS – DIRECT / BORNSTEIN

1          **MR. BORNSTEIN:**  No.  This came in through Mr. Ko who

2    testified last week.

3          **THE COURT:**  2451?

4          **MR. BORNSTEIN:**  Yes, Your Honor.

5          **THE COURT:**  I didn't have that one.  Okay.

6       Ms. Stone, do you show 2451?

7          **THE CLERK:**  That's the one the numbers got inverted.

8    It was on the 6th.  It was admitted.

9          **THE COURT:**  Oh I admitted it provisionally?

10         **MR. BORNSTEIN:**  That's correct, Your Honor.  The

11   provisional nature of your order related to the pending

12   sealing request from the third party.

13         **THE COURT:**  Okay.

14   **BY MR. BORNSTEIN:**

15   **Q.**  Dr. Evans, have you had a chance to take a look at the

16   document and tell us what it is?

17   **A.**  Yes, I have.

18   **Q.**  All right.

19   **A.**  This is an email and attachment from PayPal that is

20   responding to the tender issued by Epic.

21      I should just say here that it's PayPal, but the part of

22   PayPal that is particularly relevant here is an entity known

23   as Braintree, which is a specialized payment processor.

24   **Q.**  And this -- the attachment that you referred to is a

25   response from PayPal to Epic's request for a bid essentially;

EVANS – DIRECT / BORNSTEIN

1    is that right?

2    **A.**   Yes.

3         We're -- where bid -- just bid a dollar amount, it's a

4    tender in the sense that Epic says, here are all of the things

5    that we're interested in a payment processor doing, tell us

6    how you can serve our business.  Price is one aspect of that,

7    but it's actually many other things that are relevant for Epic

8    Games and that are being proposed by, in this case, PayPal.

9    **Q.**   This document is dozens of pages reflecting the kinds of

10   things that PayPal believes it can offer; is that right?

11   **A.**   That's right.

12   **Q.**   Is that typical in terms of how payment processors compete

13   with lots of different vectors of competition?

14   **A.**   Just to be clear on my knowledge, it is consistent with my

15   knowledge that payment processors compete for business

16   extensively in terms of visibility.  And to this level of

17   detail in the tender process, I don't have that.  But in terms

18   of my general knowledge that payment processors compete for

19   business from developers, absolutely.

20   **Q.**   That's fair.  I appreciate the clarification.

21        So let me ask the question:  Do developers who offer iOS

22   apps have the same range of choices for payment solutions as,

23   for example, Epic does for its PC solution?

24   **A.**   Yes, many do.

25   **Q.**   For example, which ones?

EVANS - DIRECT / BORNSTEIN

1    **A.**   So the developers that are selling physical apps -- I'm

2    sorry, the developers who have apps that are providing

3    physical services, Uber, for example, those apps have the

4    ability and do go out and develop their own payment solution

5    and hire their own payment processors.

6    **Q.**   Are there some apps that are treated differently?

7    **A.**   Yes.

8    **Q.**   So let's take a look at slide 36, please, just to

9    illustrate the discussion we are about to have.

10        So what -- first of all, do you recognize the two app

11   icons on the top of slide 36?

12   **A.**   I recognize Starbucks.  Not until my team told me what the

13   icon was on the left that I know, but that is Tinder.

14   **Q.**   No personal experience?

15   **A.**   I have no personal experience.

16        I have lots of personal experience with Starbucks, not

17   Tinder.

18   **Q.**   Tinder is a dating app, correct?

19   **A.**   It is a dating app.

20   **Q.**   The first line of this chart refers to the flexibility to

21   set price of products.

22        Why does Tinder have a X and Starbucks has a check?

23   **A.**   Starbucks can do anything it wants with its app.  It

24   doesn't have any restrictions.  It goes out and gets its own

25   payment solution.

EVANS – DIRECT / BORNSTEIN

1    Tinder is subject to the IAP requirement and, therefore,

2    needs to go through a process that Apple has set up to use its

3    payment solution.  And as part of that process, Apple has a

4    set of guidelines that basically requires that developers

5    basically fit their prices into a set of templates that Apple

6    has both for the U.S. but also internationally.

7    **Q.**   The second line refers to the ability to select payment

8    processing services.

9        Again, why does Tinder have an X and Starbucks has a

10   check?

11   **A.**   Starbucks can hire whoever it wants.  Tinder has to use

12   the Apple payment solution to which the developer's connected

13   through IAP.

14   **Q.**   And the last one here refers to the ability to provide

15   payment-related customer service.

16       Again, why does Tinder have an X but Starbucks has a

17   check?

18   **A.**   Let's take Starbucks.  If there are any issues with your

19   Starbucks mobile app in terms of upping the amount of money

20   you have in the app or having your order fulfilled or anything

21   like that, Starbucks is in full control of that relationship.

22   They can take care of you, its customer.

23       Tinder, on the other hand, has Apple basically standing in

24   the middle for the purposes of payments between it and its

25   customers.  So if its customers have a problem with

1571

1   subscriptions or anything else involving payments --

2           THE COURT:  So is it -- what else is it other than

3   subscriptions?

4           THE WITNESS:  In the case of Tinder, I believe it

5   is -- I believe it is almost entirely subscriptions.  I don't

6   have a deep enough knowledge of Tinder to be sure that they

7   are on some other add-on features that Tinder has.  But the

8   main thing that Tinder has is several subscription --

9           THE COURT:  Can you buy the subscription on the web

10  and then still use the app?

11          THE WITNESS:  In the -- in the case of -- in the case

12  of Tinder, I believe that's correct.

13          THE COURT:  So you can?

14          THE WITNESS:  Yes.

15          THE COURT:  You can use the app without anybody

16  paying Apple anything if you subscribe somewhere else?

17          THE WITNESS:  That's correct.

18          THE COURT:  All right.  Proceed.

19  BY MR. BORNSTEIN:

20  Q.  So what do you understand the difference to be between why

21  Tinder is treated one way and Starbucks is treated another?

22  A.  Ultimately because Apple has made the decision to do that.

23  Q.  And the basis for that distinction in Apple's guidelines

24  is what?

25  A.  Roughly speaking, apps that are providing digital content

EVANS – DIRECT / BORNSTEIN

1    within the app are required to use IAP for transactions

2    between the developer and its customers for the iOS app.

3    **Q.**  In analyzing the effect of these restrictions, associated

4    IAP restrictions, did you again construct a but-for world?

5    **A.**  I did.

6    **Q.**  What was the but-for world that you assumed for your

7    analysis?

8    **A.**  So just briefly, since I have gone over the other ones, in

9    this case I'm assuming that the App Store is the exclusive

10   distributor of iOS apps, and the only difference is that in

11   my but-for world, Apple cannot require developers to use IAP.

12       And just to be clear on that, I am assuming in my but-for

13   world that Apple is fully able to offer IAP and its payment

14   solution, it just can't require it.

15           **THE COURT:**  So I don't understand.  You just told me

16   that you can get the app off the web and still use the app on

17   the iOS system.

18           **THE WITNESS:**  Yes.

19           **THE COURT:**  So they are not requiring it.

20           **THE WITNESS:**  They are -- so they are within the app.

21       So just to be clear on what IAP means -- means here, it's

22   a requirement with regard to transactions that take place

23   within the app.  You are correct, Your Honor, that a user

24   could go to the web and subscribe to Tinder and then use the

25   Tinder app on their iPhone.  But to the extent that a Tinder

EVANS - DIRECT / BORNSTEIN

1    user --

2            **THE COURT:**  So how does that real world example that

3    you have on your own chart function in your theoretical world?

4            **THE WITNESS:**  It functions in the theoretical world

5    in a couple of ways.  So many people must take Tinder, just

6    stick with Tinder just to go through this concretely.

7        A user downloads the Tinder app on their smartphone, and

8    that is what most people -- most people do.  Because most of

9    the use of Tinder is when people are out and about and they

10   are using it on their smartphone.  So the Tinder app is on the

11   smartphone.

12       Then at that point, the Tinder user can sign up for

13   different tiers of subscriptions from Tinder that basically

14   range from different levels of dating services and related

15   things.

16       So the user can purchase those subscriptions within the

17   iOS app.  And in those cases, when they make the decision to

18   purchase it within the iOS app, the developer's required to

19   use IAP and use Apple's payment solution.

20       Now, there is another possibility, which you've touched

21   on, which is the Tinder user could go to a website, pay for

22   the subscription on their PC, and then they would have the

23   subscription on their smartphone.

24       Here's where another problem comes in, though.  Apple has

25   a number of anti- -- essentially anti-steering restrictions.

1           THE COURT:  That's what I asked you about earlier but

2    you chose not to analyze that.

3           THE WITNESS:  I chose not to analyze that separately,

4    but as part of the overall analysis that I've done.

5       So, for example, if Apple did not have those anti-steering

6    restrictions, then it would be possible for Tinder to message

7    the Tinder user and say, I have a great deal for you if you

8    just use -- go to the PC.

9           THE COURT:  Right.

10          THE WITNESS:  Apple prevents -- makes it very

11   difficult for that to happen and, therefore, the Tinder user

12   generally doesn't have enough -- wouldn't have enough

13   information to know that they could go somewhere else.

14          THE COURT:  Unfortunately -- well, you can explain to

15   me, to the extent it exists, whether we've got good analysis

16   with respect to that issue.  Because it is distinctly

17   different than this but-for world analysis here, right?  Or

18   perhaps it is just a subset.

19          THE WITNESS:  I do think it's a subset.  So one

20   possibility, in terms of the but-for world, if I could, Your

21   Honor, just put this in sort of straight antitrust terms --

22          MR. SWANSON:  Your Honor, can I object to this?

23   Because I don't think this has been disclosed.  And if

24   Dr. Evans is going to talk about this, can we direct it to the

25   part of his report where he actually said this?

EVANS – DIRECT / BORNSTEIN

1        **THE COURT:**  Well, did he, did you?

2        **THE WITNESS:**  Yes.  I discussed anti-steering

3    restrictions in the report.

4        **THE COURT:**  Okay.  We're getting to the end anyhow.

5    So why don't I just leave it at that.

6        Do you want to ask a wrap-up question and we'll continue

7    tomorrow?

8        **MR. BORNSTEIN:**  Of course, Your Honor.

9    BY MR. BORNSTEIN:

10   **Q.**  If I may, I have a follow-up question on the Court's

11   question about Tinder where I'm perhaps going to reveal the

12   fact that I've never used it myself, but there is testimony in

13   the record for Mr. Ong about how it works.

14       Let's suppose hypothetically that a Tinder user is able,

15   while out and about on his or her smartphone, to purchase

16   extra likes.  So they find somebody attractive on the device

17   and they want to spend 99 cents or a dollar 99 so there is a

18   better chance that that person will see their profile.

19       Is that the kind of purchase that somebody could go make

20   on their PC back at home, or do they need to do it right then

21   and there on the app?

22   **A.**  They need to do that right then and there on the app.

23       **THE COURT:**  But does Tinder, and I haven't used

24   Tinder either, is it like *Fortnite* where they have an account

25   and like the V-Bucks, you have an account that you can draw on

1    so you don't have to do individual transactions?  So perhaps

2    it was, you know, $20 in your Tinder account that you could

3    have bought off the web that you can then apply $2 for extra

4    likes?

5         **THE WITNESS:**  So since I'm in the same position as

6    everyone else, my knowledge on the opportunities is what I

7    have discovered from going to the Tinder website where what I

8    see is several different tiers of subscriptions which provides

9    these likes.

10        So, in Mr. Bornstein's example, it would be upgrading to a

11   different tier of subscription that would give me more likes.

12   But I honestly don't know the answer to your question whether

13   there is something beyond the subscriptions that you could do

14   with the Tinder app.  And my ability to investigate that is

15   hindered for various reasons.

16        **MR. BORNSTEIN:**  My husband would be horrified that we

17   were having this conversation.

18        Your Honor, is this an appropriate place to stop?

19        **THE COURT:**  It is.

20        So, Dr. Evans, we will resume again tomorrow.  You may

21   step down for the evening.

22        **THE WITNESS:**  Thank you, Your Honor.

23        **THE COURT:**  Be back at 8:00.  We will usually have

24   you back on the record at 8:15.

25        If I could just briefly have Ms. Lawyer, is she here?  Is

```
1    she?  Yes?  And who do I have on the plaintiff's side so we

2    can go through these exhibits very quickly?

3              MR. NIU:  Jin Niu will be representing Epic.

4              THE COURT:  Okay.

5         Why don't you state your appearances.

6              MR. NIU:  Good afternoon, your honor.  Jin Niu for

7    Epic Games.

8              THE COURT:  Good afternoon.

9              MS. LAWYER:  Arpine Lawyer on behalf of Apple.

10             THE COURT:  Good afternoon.  Okay.  So this is what I

11   show on my notes from Friday, May 7th.  And these are in the

12   order of appearance, as you might see in a movie as opposed to

13   numerical.

14        335, 2235, 326, 4399, 442, 446, 2084, 2029, 372, 371, 364,

15   365, 2371, 315, 2469 which is also subject to sealing, or it

16   was then, 3399, the same, 5396, the same, 4638, 3993 subject

17   to sealing, 3681, 3783, and I also had 3642.

18             MR. NIU:  Your Honor, we have 2783, I believe.

19             THE COURT:  2783?

20             MR. NIU:  As opposed to 3783.

21             THE COURT:  Yes.  That's right, 2783.  I misspoke.

22        Anything else, Mr. Niu?

23             MR. NIU:  Can Your Honor repeat the last number,

24   please?

25             THE COURT:  3642.
```

1      How about you, Ms. Lawyer, do you have anything else?

2           **MS. LAWYER:**  I don't believe Your Honor said 3955.

3           **THE COURT:**  3955.

4      Ms. Stone, do you have 3955?

5      Mr. Niu, how about you?

6           **MR. NIU:**  I have 3955, but I actually do not have

7      3642.

8           **THE COURT:**  3642 may have been from another day.  I

9      had -- I do have in evidence 3955.

10     Ms. Stone?

11          **THE CLERK:**  Yes.  I have it 3955, yes.

12          **MR. NIU:**  If I can confirm 3642 is from a different

13     date.

14          **THE COURT:**  Okay.  So we are good on Friday?  Do you

15     have something else?

16          **MS. LAWYER:**  Yes, Your Honor.  Instead of 3399, we

17     have 4399.

18          **THE CLERK:**  She did say that.  She said 4399.  She

19     also said 3399.  She said both those numbers.

20          **THE COURT:**  I have both of them.  One at the

21     beginning of the day, one towards the end.

22          **MR. NIU:**  Epic has the same.

23          **THE COURT:**  Okay.  So both, Ms. Lawyer.

24     So for today then, we started off with 2435, 5441, 5539,

25     5544, 5540, 3233, 3457, 3222, 3254, 5542, 3933, 4177, 3641,

```
 1    3297, 4167, 4138, 4652.

 2        Anything, Ms. Lawyer?

 3            MS. LAWYER:  No, Your Honor.

 4            MR. NIU:  I may have misheard.  Did Your Honor say

 5    5541 or 5441?

 6            THE COURT:  I have 5441.

 7            MR. NIU:  Okay.  I have 5541, but I can confirm that.

 8            MS. LAWYER:  Your Honor, I have that as well.

 9            THE COURT:  Which?

10            MS. LAWYER:  5541.

11            THE COURT:  Okay.

12        Ms. Stone?

13            MR. NIU:  I apologize --

14            THE COURT:  Hold on.

15            THE CLERK:  It was a video.  5541, a video.

16            THE COURT:  Okay.  5541.

17        All right.  Anything else?

18            MR. NIU:  I apologize if your Honor has said these

19    numbers, but I have additionally 3069 --

20            THE CLERK:  Speak into the mic.

21            MR. NIU:  Additionally I have 3069, 3233, and 4072.

22            THE COURT:  Hold on.  You have what?  3069.  Are you

23    sure it wasn't from before?

24            MR. NIU:  Yes, my apologies.  We said those were

25    already admitted.
```

1    The only one I have additionally is 3233.

2            **THE CLERK:**  I have that.  I had that one.

3            **THE COURT:**  I have it in as well.  I don't know if it

4    was from a different day, 3233.

5            **THE CLERK:**  Yes.

6            **THE COURT:**  I said that one.

7            **MR. NIU:**  Okay, great.

8            **THE COURT:**  Okay.  Thank you.

9            **MR. NIU:**  There's one more thing if we may raise with

10   Your Honor about the numbers.

11       We had -- the parties have met and conferred and talked

12   about a couple of amendments to prior numbers.  In particular,

13   there were just like four corrections that we would like to

14   raise to the Court's attention.

15           **THE COURT:**  Okay.

16           **MR. NIU:**  One is Exhibit 2624, which was admitted on

17   Page 411 of the depo -- of the trial transcript.  And that

18   number, we believe, was missing from the prior reconciliation

19   session.

20           **THE COURT:**  Ms. Stone, do you have 2624?

21           **THE CLERK:**  From Friday?

22           **MR. NIU:**  This would have been from last week,

23   possibly Monday or Tuesday.

24           **THE CLERK:**  I would have to look.  I have four minute

25   sheets.  2624.

1    **MR. NIU:**  It's on Page 411 of the trial transcript.

2    **THE CLERK:**  Of the transcript, right?

3    **MR. NIU:**  Yes, ma'am.

4    **THE CLERK:**  I have it was admitted on the 4th.  If

5    you look back on the minutes on page 2 and 3, Document 600, I

6    listed exhibits there.

7    **MR. NIU:**  Okay.  We just want to make sure it is

8    reflected on the record.

9    Additionally we have Exhibit 5505, which is also on the

10   same page, page 411.  We believe that that was not read last

11   time.  I just wanted to make sure the record reflects that

12   that document has been admitted into evidence.

13   **THE COURT:**  Okay.  Ms. Lawyer, you agree with both of

14   those?

15   **MS. LAWYER:**  I do, Your Honor.

16   **MR. NIU:**  I have two more.  I apologize.  One is

17   Exhibit 58 which we also show as having been admitted on page

18   838 of the transcript.

19   **THE COURT:**  Do you agree?

20   **MS. LAWYER:**  Yes, I do.

21   **THE COURT:**  I show that one as well.

22   **THE CLERK:**  So 58 --

23   **MR. NIU:**  Yes, ma'am.

24   **THE COURT:**  I showed 58.

25   **MR. NIU:**  Lastly, Epic would like to note that for

1    the May 6 Bench Trial Minute, a document was written as 4373

2    which we believe is a typo for 4374 which was admitted that

3    day.

4              **THE COURT:**  All right.  So just for your own sake,

5    Ms. Stone, to the extent that it wasn't previously noted on

6    the minutes, I will admit 2624, 5505, 58, and 4374?

7              **MR. NIU:**  Yes, Your Honor.

8              **THE COURT:**  You agree with the last one, Ms. Lawyer?

9              **MS. LAWYER:**  Yes, Your Honor.

10             **THE COURT:**  Okay.

11        (Plaintiff's Exhibit 2624, 5505, 58, and 4374 received in

12    evidence)

13             **THE COURT:**  And the 4374 was instead of?

14        I have that.  So okay.  Good enough.

15        Anything else?

16             **MR. NIU:**  Nothing from Epic.

17             **MS. LAWYER:**  Nothing from Apple.

18             **THE COURT:**  Thank you very much.

19             **MR. NIU:**  Thank you, Your Honor.

20             **MS. LAWYER:**  Thank you, Your Honor.

21             **MS. FORREST:**  Your Honor?

22             **THE COURT:**  Ms. Forrest.

23             **MS. FORREST:**  I have the binder that you'd requested

24    earlier today, the redline.  I'll explain for one second the

25    color coding.

1          **THE COURT:**  Okay.

2          **MS. FORREST:**  Which is in black, what we did is we

3     put the entire thing in light blue.  Then we released into

4     black things as they came into evidence.  There's also

5     additional things that were unanticipated came in, we put them

6     into -- they are underlined in dark blue.  And things that did

7     not come are struck out with red.

8          **THE COURT:**  Okay.

9          **MS. FORREST:**  We have a copy for Apple as well so

10    they can have exactly what the Court has and we will hand it

11    over.

12         **THE COURT:**  Great.  Thank you so much.  My printer

13    cartridges are going low.

14       Anything else you want to handle right now?  If not, we

15    will start again in the morning.

16       Mr. Bornstein?

17         **MR. BORNSTEIN:**  I'm not aware of anything else right

18    now.

19         **THE COURT:**  Apple side?

20         **MR. DOREN:**  Nothing, Your Honor.

21         **THE COURT:**  Everybody then have a good evening.  We

22    will stand in recess until 8:00 a.m. tomorrow morning.

23       Thank you.

24              (Proceedings adjourned at 3:28 p.m.)

25

### CERTIFICATE OF REPORTERS

We, Diane E. Skillman and Pamela Hebel, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA HEBEL_____

Pamela Hebel, CSR, RMR, FCRR


Tuesday, MAY 11, 2021