VOLUME 8

Pages 1827 - 2098-A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,            )
                             )
        Plaintiff,           )   NO. C-20-5640 YGR
                             )
   vs.                       )   Wednesday, May 12, 2021
                             )
APPLE, INC.,                 )   Oakland, California
                             )
        Defendant.           )   BENCH TRIAL
_____)
APPLE, INC.,                 )
                             )
        Counterclaimant,     )
   vs.                       )
                             )
EPIC GAMES, Inc.,            )
                             )
        Counter-Defendant.   )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   **BY:  KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**

                   (Appearances continued.)

Reported By:       Diane E. Skillman, CSR 4909, RPR, FCRR
                   Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                   Raynee Mercado, CSR 8258 RMR, CRR, FCRR

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    For Plaintiff:           CRAVATH, SWAINE & MOORE, LLP
                               825 Eighth Avenue
 2                             New York, New York 10019
                          BY:  LAUREN A. MOSKOWITZ, ESQUIRE
 3                             JUSTIN C. CLARKE, ESQUIRE
                               W. WES EARNHARDT, ESQUIRE
 4                             BRENDAN BLAKE, ESQUIRE
                               JIN NIU, ESQUIRE
 5

 6    For Defendant:           GIBSON, DUNN & CRUTCHER
                               333 South Grand Avenue
 7                             Los Angeles, California 90071
                          BY:  RICHARD J. DOREN, ESQUIRE
 8                             DAN SWANSON, ESQUIRE
                               CYNTHIA RICHMAN, ESQUIRE
 9                             RACHEL BRASS, ESQUIRE
                               ARPINE LAWYER, ESQUIRE
10

11                             GIBSON, DUNN & CRUTCHER, LLP
                               2001 Ross Avenue, Suite 1100
12                             Dallas, Texas 75201
                          BY:  VERONICA S. MOYE, ESQUIRE
13
                               PAUL WEISS RIFKIND
14                             WHARTON & GARRISON LLP
                               2001 K STREET, NW
15                             Washington, DC 20006
                          BY:  KAREN DUNN, ESQUIRE
16                             JESSICA E. PHILLIPS, ESQUIRE

17

18    For Defendant:           PAUL WEISS RIFKIND
                               WHARTON & GARRISON LLP
19                             943 Steiner Street
                               San Francisco, California 94117
20                        BY:  ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| Plaintiff's Witnesses: | Page | VOL. |
|---|---|---|
| **Athey, Susan** | | |
| Cross-Examination by Ms. Dunn (resumed) | 1836 | 8 |
| Redirect Examination by Mr. Even | 1864 | 8 |
| | | |
| **Defendant's Witnesses:** | | |
| **Schmalensee, Richard** | | |
| Direct Examination by Mr. Swanson | 1876 | 8 |
| Cross-Examination by Mr. Bornstein | 1906 | 8 |
| Redirect Examination by Mr. Swanson | 1990 | 8 |
| Recross-Examination by Mr. Bornstein | 1994 | 8 |
| **Lafontaine, Francine** | | |
| Direct Examination by Ms. Dunn | 2001 | 8 |
| Cross-Examination by Mr. Bornstein | 2028 | 8 |
| | | |
| **Hitt, Lorin** | | |
| Direct Examination by Ms. Richman | 2073 | 8 |
| **Plaintiff's Exhibits:** | EVD. | VOL. |
| | | |
| **Defendant's Exhibits:** | EVD. | VOL. |

1830

```
      1    Wednesday, May 12, 2021                        8:00 a.m.
7:44:15AM               P R O C E E D I N G S
8:00:11AM        THE COURT:  Let's go on the record and see who we
8:00:13AM    have.
8:00:17AM        Ms. Stone.
8:00:19AM        THE CLERK:  All right.
8:00:19AM        Calling civil action 20-5640, Epic Games, Inc. versus
8:00:27AM    Apple, Inc.
8:00:27AM        Counsel, please state your appearances.
8:00:29AM        MS. FORREST:  Good morning, Your Honor.  Katherine
8:00:30AM    Forrest for Epic.
8:00:32AM        THE COURT:  Good morning, Ms. Forrest.
8:00:38AM        MR. EVEN:  Good morning, Your Honor.  Yonatan Even
8:00:38AM    for Epic.
8:00:41AM        THE COURT:  Good morning.
8:00:41AM        MS. KLOSS:  Good morning, Your Honor.  Lauren Kloss
8:00:42AM    for Epic.
8:00:41AM        THE COURT:  Good morning.
     19        MS. COSCIA:  Good morning, Your Honor.  Monica Coscia
     20    for Epic Games.
8:00:49AM        MR. DIESSEL:  Good morning, Your Honor.  Ben Diessel
8:00:49AM    for Epic Games.
8:00:49AM        THE COURT:  So it's -- we have a new one.  Monica
8:00:51AM    Coskia [phonetic]?  Is that right?
8:00:52AM        MS. COSCIA:  Cosia [phonetic], Your Honor.  Yes.
```

8:00:52AM    Thank you.

8:00:52AM              THE COURT:  Okay.  And then -- sir, your name again?

8:00:52AM         MR. DIESSEL:  Ben Diessel, Your Honor.

8:00:52AM              THE COURT:  Hmm.  Okay.  I didn't have you on my

8:00:52AM    list.  How do you spell your last name?

8:00:52AM         MR. DIESSEL:  That's D as in David, i-e, double

8:00:52AM    s-e-l.

8:00:52AM              THE COURT:  Okay.  Good morning.

8:01:18AM         MR. DIESSEL:  Morning.

8:01:18AM              THE COURT:  Mr. Sweeney, good morning.

8:01:19AM        Mr. Rudd, good morning.

8:01:21AM         MR. RUDD:  Good morning.

8:01:21AM              THE COURT:  On the Apple side.

8:01:24AM         MR. DOREN:  Good morning, Your Honor.  Richard Doren

8:01:26AM    for Apple.  And we're joined this morning by Heather Grenier,

8:01:29AM    the head of commercial litigation.

8:01:31AM              THE COURT:  Okay.  Good morning.  Welcome back.

8:01:35AM         MS. DUNN:  Good morning, Your Honor, Karen Dunn for

8:01:37AM    Apple.

8:01:38AM              THE COURT:  Good morning.

8:01:38AM         MS. RICHMAN:  Good morning, Your Honor.  Cynthia

8:01:42AM    Richman for Apple.

8:01:43AM              THE COURT:  Good morning.

8:01:44AM         MS. DEARBORN:  And good morning, Your Honor.

8:01:45AM    Meredith Dearborn for Apple.

8:01:47AM        **THE COURT:**  Good morning.  Ms. Dearborn.

8:01:48AM     Mr. Schiller, good morning.

8:01:49AM        **MR. SCHILLER:**  Good morning, Your Honor.

8:01:51AM        **THE COURT:**  And Mr. Spalding.

8:01:53AM        **MR. SPALDING:**  Good morning, Your Honor.

8:01:55AM        **THE COURT:**  Good morning.

8:01:55AM     Okay.  Then we have -- I see Ms. Lawyer in the back.  I'm

8:02:00AM  going to remember your name.

8:02:01AM        **MS. LAWYER:**  Good morning, Your Honor.

8:02:02AM        **THE COURT:**  And then we have from the designated pool

8:02:05AM  reporters, do we have Sebastian Herrera from *The Wall Street*

8:02:09AM  *Journal*.  Good morning, sir.

8:02:11AM     And then Kellen Browning?

8:02:12AM        **MR. BROWNING:**  Morning, Your Honor.

8:02:14AM        **THE COURT:**  Good morning.  From the *New York Times*.

8:02:15AM     And then from the -- from the class action counsel,

8:02:21AM  Mr. Rifkin, are you back?  Yes you are.

8:02:25AM        **MR. RIFKIN:**  Good morning, Your Honor.

8:02:26AM        **THE COURT:**  Good morning.

8:02:26AM        **MR. RIFKIN:**  Good morning.

8:02:29AM        **THE COURT:**  Then we have one other person -- Do we

8:02:30AM  know who that is?

8:02:36AM        **THE CLERK:**  It's the witness back there.

8:02:37AM        **THE COURT:**  Oh.  I didn't -- could not see you that

8:02:39AM  far away.  Okay.

8:02:40AM    Good morning.

8:02:46AM    So what do we have in terms of administrative issues to

8:02:49AM  address, if anything, this morning?

8:02:50AM    Ms. Forrest?

8:02:53AM        **MS. FORREST:**  Yes, Your Honor.

8:02:53AM    One very brief just FYI for the court.  The parties have

8:02:59AM  conferred with regard to whether class and developer counsel

8:03:04AM  can have access to the sealed portions of the transcript which

8:03:07AM  have already occurred, should they desire to order those.

8:03:11AM    And the parties agree that because they are under the

8:03:14AM  protective order, they may.

8:03:15AM        **THE COURT:**  Okay.  So so ordered.

8:03:17AM    Mr. Doren, you agree?

8:03:19AM        **MR. DOREN:**  Agreed, Your Honor.

8:03:19AM        **THE COURT:**  Okay.  Any --

8:03:20AM            (Simultaneous colloquy.)

8:03:20AM        **THE COURT:**  Go ahead.

8:03:21AM        **MR. DOREN:**  One other point.  We had a discussion

8:03:23AM  this morning about the written directs of expert witnesses.

8:03:26AM  And if it's acceptable to the court, the parties are working

8:03:29AM  through the negotiations around the evidence and around other

8:03:32AM  redactions.  And rather than have them admitted conditionally,

8:03:37AM  we thought the parties would complete those negotiations and

8:03:39AM  then move to admit after we know what any issues are next

8:03:43AM  Monday -- to admit the written directs as -- as a group.

8:03:48AM        **THE COURT:**  Okay.  So the -- I guess the only

8:03:51AM  question is whether or not I will need to weigh in.  If I do,

8:03:59AM  then -- you know, then they're not going to -- they won't get

8:04:07AM  admitted on Monday.

8:04:08AM        **MR. DOREN:**  Agreed, Your Honor.

8:04:08AM    But we think we can at least present to the court a -- a

8:04:12AM  package with all issues framed to the extent issues remain.

8:04:17AM        **THE COURT:**  Okay.

8:04:17AM        **MS. FORREST:**  Agreed, Your Honor.  That's -- that's

8:04:19AM  the -- the intention.

8:04:21AM        **THE COURT:**  All right.  So -- so that's fine.

8:04:24AM    I had -- I've got trial order number 5 in draft form,

8:04:30AM  which I will amend to reflect that particular agreement.

8:04:34AM    What I was going to ask for in the next trial order,

8:04:37AM  because we keep getting these kind of ongoing requests to

8:04:42AM  seal, I can tell you usually motions for reconsideration are

8:04:49AM  denied unless there's something really very different

8:04:52AM  happening that we totally missed.

8:04:56AM    But my plan was to order that with respect to exhibits --

8:05:00AM  and we can carve this out, I guess -- that we receive any

8:05:05AM  motions by 6:00 p.m. on Friday, any third-party motions by the

8:05:11AM  next day so that we have the weekend to resolve them.

8:05:17AM    Given that this week's entire -- entirely experts or

8:05:21AM  pretty much entirely experts, I'm not sure that that makes --

8:05:24AM  that there will be much, but I am trying to get ahead of some

| | |
|---|---|
| 8:05:29AM | of the constant waves that we're seeing. |
| 8:05:33AM | **MS. FORREST:**  That timing, Your Honor, we can |
| 8:05:35AM | certainly, obviously, meet.  And we apologize for the -- for |
| 8:05:39AM | the wave.  Some of this information has come only to our |
| 8:05:42AM | awareness late, but we will comply with that timing. |
| 8:05:46AM | **MR. DOREN:**  That's fine, Your Honor. |
| 8:05:47AM | **THE COURT:**  Okay.  All right.  Thank you very much. |
| 8:05:51AM | Anything else? |
| 8:05:53AM | **MR. DOREN:**  No, Your Honor. |
| 8:05:54AM | **MS. FORREST:**  No, Your Honor. |
| 8:05:55AM | **THE COURT:**  Okay.  I don't have anything else either. |
| 8:05:57AM | And I didn't admit very many exhibits yesterday, so we'll |
| 8:06:03AM | defer going over exhibits. |
| 8:06:07AM | Professor Athey, you want to come back to the stand?  We |
| 8:06:11AM | can get started a little bit early. |
| 8:06:14AM | Good morning. |
| 8:06:42AM | **THE WITNESS:**  Good morning, Your Honor. |
| 8:06:43AM | **THE COURT:**  Okay.  So you should have some binders up |
| 8:06:45AM | there.  Before we get started, do you have the binders from |
| 8:06:49AM | yesterday? |
| 8:06:49AM | **THE WITNESS:**  Yes, these -- there were two binders. |
| 8:06:51AM | I have them. |
| 8:06:52AM | **THE COURT:**  Okay. |
| 8:06:53AM | I'll remind you, you're still under oath. |
| 8:06:56AM | **THE WITNESS:**  Yes. |

8:06:58AM            **THE COURT:**  Ms. Dunn, you may proceed with your

8:07:01AM   cross.

8:07:03AM           **MS. DUNN:**  Thank you, Your Honor.

8:07:03AM     For the court reporter, Karen Dunn for Apple.

9:57:46AM               <u>**SUSAN ATHEY**</u>,

9:57:46AM   called as a witness for the PLAINTIFF, having been duly sworn,

9:57:46AM   testified as follows:

8              <u>**CROSS-EXAMINATION (RESUMED)**</u>

9   **BY MS. DUNN:**

10   **Q.**  Welcome back, Dr. Athey.  Good morning.

8:07:08AM   **A.**  Good morning.

12   **Q.**  So yesterday we left off talking about how the web browser

8:07:13AM   is middleware.  Do you remember that?

8:07:15AM   **A.**  Yes.

8:07:15AM   **Q.**  And you have said that third-party app stores are

8:07:19AM   middleware.

8:07:19AM     You've said that, correct?

8:07:22AM   **A.**  Correct.

8:07:23AM   **Q.**  All right.

8:07:23AM     And a store within a store is also middleware, correct?

8:07:27AM   **A.**  Yes.  To -- to be clear, you know, middleware can have

8:07:33AM   many characteristics so, you know, different types of

8:07:37AM   middleware will -- will function in different ways, so I'm not

8:07:41AM   trying to define "middleware" by one of those specific

8:07:43AM   examples.

ATHEY - CROSS (RESUMED) / DUNN

8:07:44AM   **Q.**   Okay.  But to the extent that you use this --

8:07:47AM   **A.**   Yes.

8:07:47AM                   (Simultaneous colloquy.)

8:07:48AM           **THE COURT:**  One at a time, please.

8:07:50AM   **BY MS. DUNN:**

8:07:51AM   **Q.**   To the extent that you use this phrase, you would include

8:07:54AM   store within a store within your general notion of middleware,

8:07:58AM   correct?

8:07:58AM   **A.**   Yes.

8:08:01AM   **Q.**   And in your opinion, app stores can differentiate by

8:08:07AM   specializing in narrow categories of content, like games,

8:08:11AM   correct?

8:08:12AM   **A.**   Yes.

8:08:13AM   **Q.**   And in your report and in your written testimony, you

8:08:18AM   provide three case study examples.  One is Steam.  One is

8:08:22AM   GameClub.  And one is Epic Game Store, correct?

8:08:27AM   **A.**   Yes.

8:08:28AM   **Q.**   All right.

8:08:28AM        So we'll talk about Steam and GameClub in a moment, but

8:08:31AM   first, to be clear, you describe Epic Game Store as a

8:08:35AM   personalized gaming-focused multi-platform app store; is that

8:08:39AM   right?

8:08:39AM   **A.**   Yes.

8:08:43AM   **Q.**   And in your written direct testimony, you say that Apple

8:08:50AM   excludes multi-platform app stores like Steam, correct?

ATHEY - CROSS (RESUMED) / DUNN

8:08:54AM  **A.**  Yes.

8:08:58AM  **Q.**  And in your written direct testimony, you say Steam is a
8:09:02AM  specialized multi-platform app store.  Users can store their
8:09:07AM  purchase content in their Steam Library, store their payment
8:09:10AM  methods in their Steam Wallet, chat and text with other users
8:09:13AM  in real time with Steam Chat, and that by enabling users to
8:09:19AM  access games and purchase game content, Steam reduces users'
8:09:25AM  switching and mixing and matching costs, correct?

8:09:27AM  **A.**  I don't have it in front of me, but that sounds -- that --
8:09:31AM  yes, I agree with the content.

8:09:34AM  **Q.**  Great.
8:09:35AM  And I'm not --

8:09:35AM  **A.**  Yeah.

8:09:36AM  **Q.**  It's just for time.

8:09:37AM  **A.**  Yes.

8:09:37AM  **Q.**  I would be happy to put it up for you.

8:09:39AM  **A.**  No problem.

8:09:40AM  **Q.**  And in your direct testimony, you said that this is
8:09:42AM  available on the Mac, on Windows and on Linux, correct?

8:09:45AM  **A.**  Yes.

8:09:47AM  **Q.**  Okay.  So I'd like to now put on the screen a slide that
8:09:52AM  shows what happens when you search Steam in Apple's App Store.
8:09:58AM  And I'm asking Mr. Spalding to put that on the screen.

8:10:01AM  (Demonstrative published.)

8:10:02AM  **MS. DUNN:**  I don't know if your screen looks like

8:10:04AM     mine, but the color seems --

8:10:07AM              **THE COURT:**  Color seems off.

8:10:08AM          **MS. DUNN:**  -- very purple.

8:10:11AM              **THE WITNESS:**  Thank you.  I see it.  Thank you.

8:10:13AM     **BY MS. DUNN:**

8:10:14AM     **Q.**  Okay.

8:10:16AM          And I don't know if you can see this, given the --

8:10:21AM              **THE COURT:**  Is that us, or is that you, Mr. Spalding?

8:10:25AM          **MR. SPALDING:**  I believe the court.

8:10:31AM          **THE COURT:**  Okay.  We'll try to --

8:10:34AM          Do you have a physical copy of this one, Ms. Dunn?

8:10:39AM              **MS. DUNN:**  We do.

8:10:39AM          This is at -- at Defense Exhibit 5621 in your binder.

8:10:49AM          **THE COURT:**  We'll try to fix that.

8:10:52AM          **MS. DUNN:**  Thank you, Your Honor.

8:10:52AM                   (Exhibit published.)

8:10:53AM          **MS. DUNN:**  All right.  So, Dr. Athey, if you turn to

8:10:56AM     Defense Exhibit 5621 in your binder.

8:11:00AM     **A.**  Yes.

8:11:02AM     **Q.**  So if you look at this screenshot, you can see that we

8:11:05AM     search "Steam" in the Apple App Store.  "Steam" is in the

8:11:09AM     search bar.  And you can see that what comes up are three

8:11:12AM     Steam native apps available in the App Store.  One is called

8:11:16AM     Steam Mobile.  One is called Steam Link.  And the third is

8:11:20AM     called Steam Chat.

8:11:20AM       Do you see that?

8:11:21AM   **A.**   Yes.

8:11:23AM   **Q.**   Okay.  Now, if you'll turn to Defense Exhibit 5616.

8:11:34AM                      (Exhibit published.)

8:11:35AM   **BY MS. DUNN:**

8:11:36AM   **Q.**   This is a screenshot from Steam's website about Steam

8:11:39AM   Mobile.  And it describes Steam Mobile, which it also calls

8:11:49AM   "the Steam App," and you can see in the screenshot there's a

8:11:54AM   picture of an iPhone and an Android phone.

8:11:57AM       Do you see that?

8:11:57AM   **A.**   Yes.

8:11:58AM   **Q.**   All right.  It also says you can download the Steam App on

8:12:02AM   the App Store and on Google Play.

8:12:04AM       Do you see there at the bottom?

8:12:07AM   **A.**   Yes.

8:12:08AM   **Q.**   Okay.  And towards the top, it says that with the app, you

8:12:12AM   can manage your account, shop, and stay up to date with games

8:12:16AM   in the community.

8:12:17AM       Do you see that?

8:12:18AM   **A.**   Yes.

8:12:22AM   **Q.**   Okay.  And so prior to your report, were you aware that

8:12:27AM   this app existed?

8:12:45AM   **A.**   (Reviewing document.)

8:12:45AM       Sorry.  I'm just trying read all the -- all the material

8:13:19AM   here with the different apps.  These --

ATHEY - CROSS (RESUMED) / DUNN

8:13:21AM    **Q.**  I'm just --

8:13:22AM    **A.**  I'm sorry.

8:13:23AM    **Q.**  -- asking at this point about the Steam Mobile app.

8:13:25AM         Were you aware prior to your report that this app existed?

8:13:33AM    **A.**  (Reviewing document.)

8:13:33AM         Yes.

8:13:40AM    **Q.**  Yet you did not mention this in your report or in your

8:13:43AM    testimony; is that correct?

8:13:44AM    **A.**  This -- sorry.

8:13:50AM    **Q.**  Dr. Athey, this is just a "yes" or "no."

8:13:52AM         This is not mentioned in your report, and it was not

8:13:55AM    mentioned in your testimony, either your written direct

8:13:58AM    testimony or in your testimony yesterday, correct?

8:14:00AM    **A.**  My testimony describes the functionality, but I -- I

8:14:09AM    didn't specifically describe this app.

8:14:11AM    **Q.**  Right.  You did not mention that there is an app in the

8:14:14AM    App Store called Steam Mobile, correct?

8:14:16AM    **A.**  Correct.

8:14:18AM    **Q.**  And you did not mention that there was an app in the App

8:14:20AM    Store called Steam Link, correct?

8:14:23AM    **A.**  Correct.

8:14:24AM    **Q.**  And you did not mention, just to finish this out, that

8:14:27AM    there's an app in the App Store called Steam Chat, correct?

8:14:31AM    **A.**  Correct.

8:14:31AM    **Q.**  And yet you say you were aware of this before yesterday,

ATHEY - CROSS (RESUMED) / DUNN

8:14:35AM        correct?

8:14:35AM        **A.**   Yes.

8:14:36AM        **Q.**   Okay.

8:14:37AM            All right.  So --

8:14:40AM            **THE COURT:**  So, Ms. Stone, I -- I'm being told that

8:14:43AM        we have to restart the system, so let's put a pause on your

8:14:47AM        clock.  And we should go ahead and reboot it.

8:14:52AM            **THE CLERK:**  Okay.  All right.

8:14:53AM            **MS. DUNN:**  Thank you, Your Honor.

8:14:57AM                      (Pause in the proceedings.)

8:15:31AM            **THE COURT:**  So while we're waiting here, if I had a

8:15:34AM        jury, I would tell some kind of joke and they would laugh

8:15:37AM        because I'm a judge and I'm -- even though I'm not funny.

8:15:41AM            But I do want to correct for the record -- I know there

8:15:44AM        are lots -- lots of people are taking -- they're all trying to

8:15:52AM        figure out who all of us are.  I don't want to be in trouble

8:15:55AM        with my son, so I'll tell everybody he's an aerospace

8:15:59AM        engineer, not an aeronautical engineer.  I'd like the record

8:16:03AM        globally to be corrected.  He's an aerospace engineer.  I

8:16:06AM        misspoke one day and, apparently, that got picked up, so

8:16:09AM        really don't want to be in trouble with him.

8:16:11AM            So okay.  Now we have our thing back.

8:16:14AM            Thanks for that.

8:16:15AM            **MS. DUNN:**  Thank you, Your Honor.

8:16:16AM            **THE COURT:**  All right.  Ms. Dunn, proceed.

8:16:18AM   **BY MS. DUNN:**

8:16:19AM   **Q.**  All right.  Dr. Athey, are you aware that users can buy

8:16:24AM   games and manage their Steam Wallet account through this app?

8:16:35AM   **A.**  So this -- this app allows you, as it says on the -- on

8:16:41AM   the exhibit, to browse the Steam catalog of Windows, Mac, and

8:16:48AM   Linux titles from your phone.

8:16:51AM   **Q.**  Right.  I'm not asking you to read the screen.  I'm just

8:16:53AM   asking you to tell me whether you're aware that users can buy

8:16:57AM   games and manage their Steam Wallet account through this app.

8:17:00AM   That's the question.

8:17:03AM   **A.**  And -- I think the clarification is that they -- they

8:17:06AM   can't buy games -- they can't buy iOS games.  They can buy

8:17:10AM   Windows, Mac, and Linux games, which are games.

8:17:14AM   **Q.**  Right.

8:17:14AM       And you're aware, aren't you, even though it doesn't say

8:17:17AM   so here, that users can manage their Steam Wallet account

8:17:20AM   through this app, correct?

8:17:21AM   **A.**  Yes.

8:17:30AM   **Q.**  All right.

8:17:30AM       Let's move to the Steam Link app in the App Store, so I'll

8:17:36AM   ask you to turn to Defense Exhibit 5617.

8:17:41AM                    (Exhibit published.)

8:17:44AM   **BY MS. DUNN:**

8:17:44AM   **Q.**  Now, 5617 -- excuse me -- is a Tweet that Steam sent out

8:17:48AM   when they launched Steam Link.  This Tweet from Steam says the

ATHEY - CROSS (RESUMED) / DUNN

8:17:53AM      Steam Link app is now available for free on all iOS and -- for

8:17:57AM      all iOS and Apple TV users.  The app allows gamers to stream

8:18:04AM      their Steam library to their iPhone, iPad, and Apple TV.

8:18:08AM           And you can see on this Tweet that there's a picture of a

8:18:12AM      person playing Steam games on their iPhone using a controller

8:18:16AM      attachment, which are available in the market today.

8:18:18AM           You see that, correct?

8:18:19AM      **A.**  Yes.

8:18:21AM      **Q.**  Okay.

8:18:21AM           And are you aware that through Steam Link, iOS users can

8:18:30AM      play Steam games on their iPhones and iPads through Steam

8:18:33AM      Link, which is an app on iOS.

8:18:36AM           You're aware of that.

8:18:40AM      **A.**  Yes.

8:18:41AM      **Q.**  Right.

8:18:41AM           And you said that you were aware prior to yesterday that

8:18:45AM      this existed; is that -- that's what you said?

8:18:47AM      **A.**  Yes.

8:18:49AM      **Q.**  Okay.

8:18:50AM           All right.  Will you turn to Exhibit 5622.

8:18:54AM                          (Exhibit published.)

8:19:02AM      **BY MS. DUNN:**

8:19:03AM      **Q.**  All right.  5622 is a screenshot also from the Steam

8:19:06AM      website, and it describes Steam Link in more detail.  And it

8:19:10AM      says -- if you look under the word "install," it says "install

ATHEY - CROSS (RESUMED) / DUNN

8:19:13AM  the App to play your Steam games."

8:19:15AM      And then in extremely small print, it says under "Steam

8:19:20AM  Link," "stream games from your computer with Steam."

8:19:25AM      Do you see that?

8:19:25AM  **A.**  Yes, I can see that.

8:19:31AM  **Q.**  Okay.  That's in -- in the -- it's written there in the

8:19:34AM  mobile device.  You see that?

8:19:35AM  **A.**  I can see it, yes.

8:19:37AM  **Q.**  Okay.

8:19:37AM      And on the right, it says "extend your Steam gaming

8:19:42AM  experience to your mobile device, TV, or other PC.  All you

8:19:46AM  need is a local network or an Internet connection.  In

8:19:50AM  addition, Steam Link App now supports remote play together.

8:19:54AM  Now you can join games hosted on a friend's PC just by

8:19:59AM  clicking a link," correct?

8:20:00AM      You see that.

8:20:02AM  **A.**  Yes.

8:20:02AM  **Q.**  Okay.

8:20:02AM      And this also was not mentioned in your report, your

8:20:05AM  written direct testimony, or your testimony yesterday,

8:20:07AM  correct?

8:20:08AM  **A.**  So my report describes the overall set of features

8:20:18AM  associated with Steam.  But the -- the details of -- of

8:20:26AM  streaming from your own PC on to your device, I -- I don't

8:20:32AM  believe I've -- I put in those details, although I'd need to

ATHEY - CROSS (RESUMED) / DUNN

8:20:36AM  check to be sure.

8:20:37AM  **Q.**  Right.

8:20:37AM      And you -- all those details you mentioned, the ones that

8:20:40AM  you described, like using Steam Wallet, purchasing games,

8:20:44AM  playing your Steam games, that you can do through these apps

8:20:50AM  in the App Store, that was not mentioned in your report.

8:20:53AM      There's no place where you say Steam has apps in the App

8:20:55AM  Store, correct?

8:21:00AM  **A.**  So I would need to review to see exactly what's there.

8:21:07AM  I've referenced the -- the Steam documentation and so on.

8:21:13AM      But I would need to -- to -- to double-check to see

8:21:17AM  exactly which details are -- are included.

8:21:20AM  **Q.**  Okay.  Do you have any idea how many times a day Steam

8:21:22AM  Link is downloaded?

8:21:24AM  **A.**  I don't know that number now.

8:21:28AM  **Q.**  Okay.

8:21:29AM      If you'll turn to Defense Exhibit 5601.

8:21:33AM                      (Exhibit published.)

8:21:34AM  **BY MS. DUNN:**

8:21:34AM  **Q.**  -- in your binder.  And if you -- it's an article called

8:21:40AM  "75 Steam statistics from 2019 and 2020."

8:21:44AM      This is actually one of the source materials for your

8:21:49AM  report.  It's footnote 62 to paragraph 36, I believe.

8:21:56AM      And according to this source material, it says that Steam

8:22:00AM  Link, which allows users -- this is on page 3 -- it says that

ATHEY - CROSS (RESUMED) / DUNN

| | |
|---|---|
| 8:22:06AM | Steam Link, which allows users to play games on their mobile |
| 8:22:10AM | devices, has been installed 2 million times. |
| 8:22:12AM |     Do you see that? |
| 8:22:13AM | **A.**  Yes. |
| 8:22:16AM | **Q.**  And right beneath that, it says, on average Steam Link is |
| 8:22:20AM | downloaded at around 52,000 times daily. |
| 8:22:22AM |     Do you see that? |
| 8:22:23AM | **A.**  Yes. |
| 8:22:24AM | **Q.**  Okay. |
| 8:22:25AM |     And so you don't have any reason to -- to disagree with |
| 8:22:29AM | that, do you? |
| 8:22:29AM | **A.**  No. |
| 8:22:34AM | **Q.**  Okay.  If we could go to Defense Exhibit 5623. |
| 8:22:38AM |                 (Exhibit published.) |
| 8:22:39AM | **BY MS. DUNN:** |
| 8:22:41AM | **Q.**  This is a screenshot of Steam Chat also from the Steam |
| 8:22:45AM | website.  This is another app that you can download from the |
| 8:22:50AM | App Store and on Google Play. |
| 8:22:53AM |     You can see the icons that say "download on the App Store" |
| 8:22:57AM | and "get it Google play." |
| 8:22:58AM |     You see that? |
| 8:23:00AM | **A.**  Yes. |
| 8:23:00AM | **Q.**  All right.  And Steam Chat, it says, is a lightweight app |
| 8:23:04AM | focused on chatting with friends and groups. |
| 8:23:06AM |     You see that? |

ATHEY - CROSS (RESUMED) / DUNN

8:23:07AM    **A.**  Yes.

8:23:08AM    **Q.**  It offers rich chat, which always makes me think of

8:23:13AM    Mr. Doren.

8:23:14AM        Do you see that?

8:23:15AM    **A.**  I'm sorry.  Rich chat.

8:23:19AM    **Q.**  Rich chat.

8:23:19AM    **A.**  Yes.  Yes.

8:23:20AM    **Q.**  Okay.

8:23:20AM        And with Steam -- with the Steam Chat App, users can

8:23:25AM    accept invites and then play with their friends in Steam Link

8:23:29AM    on their iPhone.

8:23:29AM        Are you aware of that?

8:23:31AM    **A.**  Yes.

8:23:32AM    **Q.**  Okay.  And, in fact, that's what's happening in this image

8:23:36AM    over here on the iPhone, it says, "Ben from school has invited

8:23:41AM    you to play, and all you need to do is click that link and

8:23:45AM    you're in the game."

8:23:46AM        Do you see that?

8:23:49AM    **A.**  I see that you can accept the invite from your personal

8:23:51AM    computer, PC.

8:23:53AM    **Q.**  Right.

8:23:53AM        So you're not aware that if you click the link, you're in

8:23:56AM    the game?

8:23:56AM    **A.**  If -- if I have a PC with me.  Not if I'm at school if --

8:24:04AM    if I'm a kid or if I'm in the bus.  But if I was using a PC

8:24:10AM    and had that available.

8:24:13AM    **Q.** Well, Dr. Athey, you've never used this, correct?

8:24:19AM    **A.** I've used Steam.  But I haven't used Steam Chat.

8:24:23AM    **Q.** Right.  Or Steam Link.

8:24:23AM        And if you had used them, you would know actually that you

8:24:27AM    don't need your PC with you.  Your PC could be anywhere to do

8:24:31AM    this, so --

8:24:34AM    **A.** So -- I'm sorry.  I just -- I'm reading from the side,

8:24:37AM    "you can accept this invite from your PC."  So the -- the game

8:24:42AM    is being run in the PC.  The game -- the PC needs to be on if

8:24:47AM    it's -- you know, to -- to use this functionality.

8:24:51AM        So you need to have the -- if you're streaming a game from

8:24:56AM    your PC, the PC is involved.

8:25:00AM    **Q.** But it -- but you said --

8:25:02AM    **A.** Correct.

8:25:02AM    **Q.** -- it needs to be with you.  And that is not correct.

8:25:05AM        Are you aware of that?

8:25:06AM    **A.** So if it's -- you need to be able to have it on.  So if

8:25:11AM    you -- if -- yeah, if you have a laptop, for example, you

8:25:15AM    would need to be able to turn on your laptop, so I suppose if

8:25:19AM    you -- you know, if you've -- if laptop isn't being used by

8:25:25AM    anybody else and it's been -- it's been left on, that would be

8:25:28AM    a different scenario.

8:25:29AM        But if you're -- if you were carrying your laptop -- if

8:25:33AM    your laptop is in your locker or if your laptop is in your

ATHEY - CROSS (RESUMED) / DUNN

8:25:37AM    briefcase and it's off, then you can't -- you -- you would

8:25:41AM    need to make it available for that purpose.

8:25:43AM    **Q.** Right.

8:25:43AM         And I'm just saying you had said you need to have it with

8:25:47AM    you.  That's not correct.

8:25:48AM         And if you don't know, it's okay.

8:25:50AM    **A.** Sorry.  So you --

8:25:54AM    **Q.** I'm just asking --

8:25:55AM    **A.** Yes.

8:25:56AM    **Q.** -- whether you know that you don't need to have it with

8:25:59AM    you?

8:26:00AM    **A.** Not necessarily.  Depends on the circumstance.

8:26:02AM         **THE COURT:**  She's a professor at Stanford.  She

8:26:04AM    can -- there isn't any harassment going on here, Mr. Even,

8:26:08AM    so --

8:26:10AM         **MR. EVEN:**  Okay.

8:26:11AM         **THE COURT:**  So she can the answer questions, or she

8:26:15AM    can argue the way she is.  There's nothing objectionable.

8:26:18AM    This is cross-examination.

8:26:19AM         **MS. DUNN:**  Thank you, Your Honor.

8:26:20AM    **Q.** Dr. Athey, do any other companies have technologies like

8:26:25AM    Steam Link?

8:26:33AM    **A.** So if you're asking is it possible -- if you're talking

8:26:36AM    about, like, a functionality to do remote desktop, yes.

8:26:41AM    **Q.** Okay.

8:26:41AM         And so you must be aware that Playstation and XBox both

8:26:46AM    have native Apps on the iOS that allow playing of their games.

8:26:52AM         You're aware of that?

8:26:53AM    **A.**   Again, that's a -- that's a broad statement, so there are

8:26:59AM    specific ways that you could, for example, play a game on a

8:27:04AM    device that you own and -- and through a -- this kind of

8:27:10AM    remote-desktop-type functionality.

8:27:14AM    **Q.**   Okay.

8:27:15AM         I'd just like to put on the screen, and then we can move

8:27:19AM    on, DX5624.  This is Playstation's remote play from

8:27:25AM    Playstation.com.

8:27:27AM         Do you see that?

8:27:27AM                            (Exhibit published.)

8:27:28AM              **THE WITNESS:**  Yes.

8:27:28AM    **BY MS. DUNN:**

8:27:28AM    **Q.**   Okay.

8:27:28AM         And then if we can just put up Defense Exhibit 5620.

8:27:33AM                            (Exhibit published.)

8:27:33AM    **BY MS. DUNN:**

8:27:34AM    **Q.**   This is Microsoft's XBox remote play, which shows somebody

8:27:39AM    playing with a controller on a iPhone.

8:27:40AM         Do you see that?

8:27:41AM    **A.**   Yes.

8:27:41AM    **Q.**   Okay.

8:27:42AM         All right.  Dr. Athey, moving on from Steam, your third

8:27:46AM example is GameClub, which is currently available as a native

8:27:49AM App on iOS, correct?

8:27:51AM **A.** Yes.

8:27:53AM **Q.** All right.

8:27:53AM     And if you'll turn in your binder to Defense Exhibit 5608.

8:27:58AM                    (Exhibit published.)

8:28:00AM **BY MS. DUNN:**

8:28:00AM **Q.** On page 2.

8:28:01AM **A.** (Reviewing document.)

8:28:09AM **Q.** And I'm just reading from the description here.  This is

8:28:11AM from GameClub's press kit.

8:28:14AM     They say that GameClub is the all-you-can-play

8:28:17AM subscription home for mobile's top premium games, delivering

8:28:21AM unlimited exclusive access to over a hundred universally

8:28:25AM acclaimed titles, playable on both iOS and Android with new

8:28:30AM games added every week.  These games are optimized for the

8:28:34AM latest mobile devices and have no apps or in-app purchases as

8:28:39AM part of a single subscription that can be shared with up to 12

8:28:43AM family members.

8:28:43AM     And you can see at the end, that costs 4.99 a month, and a

8:28:48AM GameClub subscription, it says, is completely cross-platform

8:28:53AM with a single log-in that works anywhere.

8:28:55AM     Do you see that?

8:28:55AM **A.** Yes.  I believe that's the way I described it in my

8:28:59AM report.

ATHEY - CROSS (RESUMED) / DUNN

8:29:00AM    **Q.** I agree with that.

8:29:02AM        You also know that one GameClub account carries over

8:29:07AM    across both Android and iOS, correct?

8:29:10AM    **A.** Yes, that's a key feature.

8:29:12AM    **Q.** Right.

8:29:12AM        And you also know that GameClub has family-sharing, which

8:29:15AM    means a user can buy a game on iOS, and then their kids can

8:29:18AM    play on Android or vice versa, correct?

8:29:21AM    **A.** Absolutely.  Again, that's a key feature.

8:29:24AM    **Q.** Right.

8:29:25AM        And GameClub is a direct competitor to Apple Arcade, and

8:29:32AM    GameClub is available in the App Store today, correct?

8:29:35AM        You agree with that.

8:29:37AM    **A.** Yes.

8:29:40AM    **Q.** You take --

8:29:40AM    **A.** I'm sorry.  I -- it's -- I mean, I didn't perform a full

8:29:46AM    analysis of the substitution between the two, but, you know,

8:29:50AM    at a high level, yes.

8:29:52AM    **Q.** Okay.

8:29:52AM        But in your deposition, you agreed that GameClub competes

8:29:57AM    directly with Apple Arcade.

8:29:57AM        You remember that?

8:29:59AM    **A.** Yes.

8:30:00AM    **Q.** Okay.

8:30:00AM        You do take issue, however, with the requirement that each

ATHEY - CROSS (RESUMED) / DUNN

8:30:03AM    game be individually downloaded, which you refer to as a

8:30:06AM    friction.

8:30:06AM        That's true.

8:30:07AM    **A.**   Correct.

8:30:09AM    **Q.**   Okay.

8:30:10AM        So first of all, are you aware that Apple Arcade, Apple's

8:30:16AM    competing product, also requires individual download?

8:30:19AM    **A.**   I'm -- I'm sorry.  You're -- you're asking whether Apple

8:30:36AM    Arcade's -- sorry.

8:30:37AM        Can you restate the question?

8:30:39AM    **Q.**   I'm happy to.  It was, I'm sure, poorly formed.

8:30:42AM        So Apple has a competing product called Apple Arcade?

8:30:45AM    **A.**   Yes.

8:30:46AM    **Q.**   And you're aware that Apple Arcade also requires

8:30:49AM    individual download of games.

8:30:59AM    **A.**   So -- yes.

8:31:15AM    **Q.**   And your testimony is that there are unnecessary frictions

8:31:17AM    because there might be large incremental costs between one

8:31:22AM    click and two clicks, correct?

8:31:23AM    **A.**   Yes.

8:31:29AM    **Q.**   Right.

8:31:29AM        But you've done nothing to measure what the cost might be

8:31:32AM    of those frictions that you've described, correct?

8:31:35AM    **A.**   Not specifically for the purpose of this case.

8:31:42AM    **Q.**   There's some measurement that you did that you didn't

ATHEY - CROSS (RESUMED) / DUNN

8:31:45AM   include?

8:31:45AM   **A.**   I guess if the question is, you know, have I ever measured

8:31:50AM   frictions from -- from clicks or other types of frictions

8:31:55AM   in -- in my research or in my industry experience, you know,

8:32:00AM   yes, I have.

8:32:01AM   But I didn't perform that specifically for this case.

8:32:04AM   **Q.**   Okay.  So you agree that they're not part of your

8:32:07AM   testimony.

8:32:08AM   **A.**   I agree with that.  Yes.

8:32:09AM   **Q.**   Okay.

8:32:09AM   And at the time that you submitted your report and by the

8:32:12AM   time of your deposition, you hadn't ever used GameClub,

8:32:16AM   correct?

8:32:16AM   **A.**   No, I've not used GameClub.

8:32:19AM   **Q.**   Okay.

8:32:19AM   So I'm going to ask Mr. Spalding to pull up on the screen

8:32:27AM   GameClub.

8:32:27AM   (Demonstrative published.)

8:32:29AM   **BY MS. DUNN:**

8:32:29AM   **Q.**   And we found a game in here that we thought looked good.

8:32:33AM   It's called Hatch.  And I'm going to ask Mr. Spalding to click

8:32:37AM   on it within GameClub.  So if he clicks "play now," we go --

8:32:42AM   what happens is -- that's the -- the "play now" is what you

8:32:46AM   click, and then you're directed in the App Store to the app

8:32:53AM   for Hatch so that you can individually download it.

8:32:56AM        Do you see that?

8:32:57AM   **A.**  Yes.

8:33:00AM   **Q.**  All right.

8:33:01AM        And I want to talk to you, Dr. Athey, just for a few

8:33:04AM   minutes about this screen that you see when you -- when you

8:33:07AM   click to individually download.

8:33:08AM        So you can see a page from the App Store pops up.  And

8:33:11AM   then at the top, there's information for the users about

8:33:15AM   ratings, about what age the app is appropriate for.  Here it

8:33:19AM   says "four plus."  What kind of game it is.  Here it says it's

8:33:24AM   simulation game.  Who the developer is.

8:33:26AM        And if Mr. Spalding scrolls to the right, we'll see -- you

8:33:29AM   can also see what language it's in and how much size it's

8:33:33AM   going to take up on your device.

8:33:36AM        Do you see that?

8:33:36AM                  (Demonstrative published.)

8:33:36AM              **THE WITNESS:**  Yes.

8:33:36AM   **BY MS. DUNN:**

8:33:36AM   **Q.**  Okay.  And if you scroll down, you can see if there's

8:33:39AM   something new in the game.  You can see a preview.  You can

8:33:42AM   see the actual ratings and reviews.  There's a section on app

8:33:48AM   privacy, and -- and this is common to apps in the App Store,

8:33:52AM   where it tells you what privacy issues might be implicated by

8:33:58AM   the app.

8:33:59AM        If you scroll down, Mr. Spalding, you can see that there's

8:34:04AM   other information that's listed, including the seller of the

8:34:09AM   game, the size, the category, compatibility -- this says it

8:34:14AM   works on the iPhone -- again languages, the age rating,

8:34:18AM   whether in-app purchase is involved, what's the status of the

8:34:23AM   copyright.

8:34:23AM                    (Demonstrative published.)

8:34:23AM   **BY MS. DUNN:**

8:34:23AM   **Q.**   There's even a link for the developer website which you

8:34:27AM   can click and it would go there, and then privacy policy.

8:34:32AM        And at the bottom, you can see if there are more games by

8:34:35AM   that developer.

8:34:38AM        Do you see all of that?

8:34:39AM   **A.**   Yes.

8:34:40AM   **Q.**   Okay.

8:34:40AM        And you would agree with me, I presume, that there may be

8:34:44AM   a benefit to users in receiving this information, like for

8:34:48AM   example, whether the game is appropriate for ages four and up,

8:34:53AM   correct?

8:34:57AM   **A.**   (Reviewing document.)

8:34:57AM        So if -- if you're asking is -- about the way in which

8:35:01AM   this information is presented, I think there can be many ways

8:35:05AM   to make sure that users have this information.  The

8:35:09AM   information itself is useful as -- as far as -- as far as I

8:35:13AM   know.

8:35:14AM   **Q.**   Right.

ATHEY - CROSS (RESUMED) / DUNN

8:35:14AM      I -- I'm not -- I -- that's fair.  I'm not asking you

8:35:19AM  whether there's a different way to do it or a way you might

8:35:22AM  prefer.  I'm just asking whether you can acknowledge that

8:35:24AM  there's a benefit to users in being able to receive this

8:35:27AM  information.

8:35:31AM  **A.**  Receiving the information is -- is, from my -- from my

8:35:38AM  knowledge, these -- this kind of information would be valuable

8:35:41AM  to consumers, and having it well organized and -- and -- would

8:35:49AM  also be something that users might value; although I haven't

8:35:53AM  specifically analyzed, you know, individual pieces of this

8:35:57AM  information.

8:35:57AM  **Q.**  Right.  And I appreciate that.

8:35:58AM      And I think you also might acknowledge that this also

8:36:04AM  enables the developer to advertise other features to talk

8:36:10AM  about other games it has and to convey information to the

8:36:14AM  user.

8:36:14AM      You would agree with that, correct?

8:36:16AM  **A.**  So I think the -- there's constraints on the -- here on

8:36:30AM  the way that the developer provides that information.  But the

8:36:33AM  screen includes that information in -- in this case.

8:36:37AM  **Q.**  Including a link to the develop -- developer's own

8:36:40AM  website, correct?

8:36:41AM      You saw that part.

8:36:42AM  **A.**  Yes.

8:36:47AM  **Q.**  Okay.

8:36:49AM            All right.  Dr. Athey, your opinion is critical on

8:36:53AM     restrictions to interoperability.

8:37:00AM                         (Simultaneous colloquy.)

8:37:02AM     **BY MS. DUNN:**

8:37:02AM     **Q.**  Strike that.

8:37:03AM            Your opinion is critical of restrictions on

8:37:07AM     interoperability.

8:37:11AM     **A.**  That -- that's a broad statement, but the -- so I -- I'm

8:37:24AM     not -- I haven't said that operating systems need to be the

8:37:29AM     theme if -- if that's what you're asking.

8:37:33AM            But there are certain types of interoperability that would

8:37:37AM     be beneficial.

8:37:39AM     **Q.**  Okay.  So you say the inability to mix and match across

8:37:42AM     devices with different operating systems because of limited

8:37:45AM     interoperability and synchronization of apps and services

8:37:51AM     creates what I call an app barrier to mixing and matching,

8:37:54AM     correct?

8:37:55AM     **A.**  Yes.

8:37:55AM     **Q.**  And that seems critical of restrictions on

8:37:57AM     interoperability, does it not?

8:37:59AM     **A.**  Yes.

8:38:01AM     **Q.**  All right.

8:38:01AM            And in your written testimony, you've said users do not

8:38:06AM     benefit from frictions to switching.

8:38:08AM            Do you remember that sentence in your written testimony?

ATHEY - CROSS (RESUMED) / DUNN

8:38:12AM   **A.**   Yes.

8:38:13AM   **Q.**   At paragraph 52.

8:38:15AM   **A.**   Okay.

8:38:15AM   **Q.**   Okay.

8:38:15AM        And that's not a qualified statement you make in paragraph

8:38:19AM   52, which I can show to you.

8:38:25AM   **A.**   So the -- the sentence is in the context of the -- of the

8:38:31AM   setting that I'm describing.

8:38:35AM   **Q.**   All right.

8:38:35AM        So you disagree, Dr. Athey, that technical --

8:38:41AM   technological incompatibilities can increase competition by

8:38:46AM   providing consumers a choice.

8:39:02AM   **A.**   So that's a -- to -- to state -- to state the proposition

8:39:07AM   would be that consumers can be offered choices of -- between

8:39:16AM   different technologies, and having different technologies is a

8:39:23AM   potential benefit for consumers.

8:39:26AM   **Q.**   We definitely agree on that.

8:39:28AM        My question is whether you disagree with that

8:39:32AM   technological incompatibilities can increase competition by

8:39:38AM   providing consumers a choice.

8:39:49AM   **A.**   So a sentence like that would need to be taken in context.

8:39:52AM        So are you talking about incompatibility for its own sake

8:39:58AM   so the -- the phrasing of the sentence says "by providing

8:40:00AM   consumers a choice," which I think implies that there's

8:40:05AM   something that the consumer would choose, that there would --

8:40:10AM   something that they would value?

8:40:12AM       So, again, I -- I think if I was trying to -- that's not a

8:40:16AM   very precisely worded sentence without context around it,

8:40:23AM   but -- but I think I answered your question.

8:40:30AM   **Q.**  Sort of.

8:40:32AM       So what I'm saying is technological incompatibilities can

8:40:38AM   increase competition because they give consumers a choice.

8:40:42AM       Do you agree with that?

8:40:44AM   **A.**  I guess with the word "can" would -- could -- would refer

8:41:00AM   to the context in which a sentence like that is being stated,

8:41:03AM   so yes.

8:41:06AM   **Q.**  All right.

8:41:06AM       In your opinion, a failure to provide interoperability

8:41:10AM   could be illegal conduct.  That's your opinion.

8:41:18AM   **A.**  There are situations -- and -- and my understanding is

8:41:22AM   there are -- have been situations where a dominant firm has

8:41:28AM   been found to engage in illegal conduct around issues of

8:41:34AM   interoperability.

8:41:36AM   **Q.**  Right.

8:41:36AM       And it's your opinion that forced interoperability could

8:41:38AM   be a remedy in some antitrust cases, correct?

8:41:41AM   **A.**  I want to make sure we're clear on the term

8:41:46AM   "interoperability," but --

8:41:49AM           **THE COURT:**  Mr. Even, if you have an objection, just

8:41:52AM   say it "objection."

ATHEY - CROSS (RESUMED) / DUNN

8:41:54AM          **MR. EVEN:**  Okay, Your Honor.

8:41:55AM          **THE COURT:**  Because Ms. Dunn isn't looking behind

8:41:58AM   herself and she can't see you standing.

8:42:00AM          **MR. EVEN:**  I will do, Your Honor.  I was just trying

8:42:02AM   not to interrupt Ms. Dunn, but I do want to lodge an objection

8:42:05AM   that I think we're venturing far into legal opinion realm.

8:42:10AM          **THE COURT:**  Okay.  So -- and the other thing is if

8:42:12AM   you don't object after the question, then the witness is going

8:42:16AM   to answer.  So I can see you standing, but you need to object.

8:42:22AM       I certainly am not taking her testimony as legal opinion.

8:42:26AM       I don't know what the point of this, Ms. Dunn.  So if you

8:42:30AM   can rephrase with the point.

8:42:35AM          **MS. DUNN:**  Sure.  This was a discussion that we had

8:42:38AM   with Dr. Athey in her deposition about forced

8:42:41AM   interoperability, so I -- mainly just trying to discuss that

8:42:44AM   with Dr. Athey.

8:42:47AM   **Q.**  And I guess my -- my only question here is whether it is

8:42:51AM   your view that forced interoperability should be a remedy in

8:42:56AM   this case?

8:42:59AM          **MR. EVEN:**  Same objection, Your Honor.

8:43:02AM          **THE COURT:**  Well, have you expressed an opinion on

8:43:05AM   forced interoperability?

8:43:06AM          **THE WITNESS:**  So I -- that --

8:43:12AM          **THE COURT:**  I just want to know, have you expressed

8:43:14AM   an opinion?

8:43:15AM          **THE WITNESS:**  No.

8:43:19AM          **THE COURT:**  Okay.

8:43:21AM          **THE WITNESS:**  It -- well, let me make sure I -- can I

8:43:24AM     understand the question?  So my -- in my -- my summary of

8:43:27AM     opinions does not -- does not use the term "forced

8:43:35AM     interoperability."

8:43:35AM          I'm trying to understand, you know, the -- the question

8:43:38AM     and the -- the bounds of the term which would be important to

8:43:42AM     be precise.

8:43:43AM          So my opinion, which I tried to state clearly, was about

8:43:52AM     restrictions on middleware.  And so removing those

8:43:57AM     restrictions would be, in my opinion, beneficial for consumers

8:44:03AM     and developers.  So that -- my -- my opinion was about how

8:44:08AM     changing restrictions would affect consumers and -- and

8:44:13AM     developers.

8:44:14AM     **BY MS. DUNN:**

8:44:16AM     **Q.**  Right.

8:44:16AM          And my question is since you used the word

8:44:18AM     "interoperability" throughout your report and your testimony,

8:44:22AM     whether you understand that what Epic is asking for in this

8:44:26AM     case is for Apple to make its products interoperable.

8:44:30AM     **A.**  So, again, when I'm using the term "interoperability," I'm

8:44:36AM     using it in the context of a specific restriction or the

8:44:39AM     specific experiences of -- of a consumer, so I'm -- I'm

8:44:44AM     concerned with the -- the breadth of your language, that it --

8:44:49AM    it -- you know, am I saying that the -- you know, is

8:44:57AM    everything about Android the same as everything about the

8:44:59AM    iPhone, or would -- should it be that apps that run on Android

8:45:06AM    also run on iPhone.

8:45:07AM        So there's -- you know, without more context and

8:45:10AM    specificity, that term could be -- you know, saying you should

8:45:14AM    have forced interoperability could be interpreted in a lot of

8:45:19AM    different ways.  So I've tried to be specific about what kinds

8:45:24AM    of interoperability would be beneficial.  And I gave specific

8:45:30AM    examples of those, which I could give again if you -- if it's

8:45:34AM    not clear.

8:45:35AM    **Q.**  No.  That's unnecessary.

8:45:36AM        Your Honor, I pass the witness.

8:45:38AM            **THE COURT:**  Redirect.

8:45:39AM            <u>**REDIRECT EXAMINATION**</u>

8:45:43AM    **BY MR. EVEN:**

8:46:01AM    **Q.**  Good morning, Professor Athey.

8:46:03AM    **A.**  Good morning.

8:46:04AM    **Q.**  I want to ask you a few questions about some of the

8:46:06AM    questions that Ms. Dunn presented today and yesterday.

8:46:12AM        And let's start with the last point about

8:46:18AM    interoperability.  Have you given any opinions in your reports

8:46:21AM    or in your direct about any duty on Apple to make any of its

8:46:28AM    own software available on Android, for instance?

8:46:31AM    **A.**  No.

ATHEY - REDIRECT / EVEN

| | |
|---|---|
| 8:46:44AM | **Q.** Ms. Dunn asked you some questions about something called |
| 8:46:46AM | GameClub. |
| 8:46:47AM | Do you remember that? |
| 8:46:48AM | **A.** Yes. |
| 8:46:48AM | **Q.** And she said GameClub is available now on the iOS? |
| 8:46:54AM | **A.** Yes. |
| 8:46:58AM | **Q.** Do you remember from your report whether GameClub's entry |
| 8:47:05AM | into iOS was smooth? |
| 8:47:07AM | **A.** No.  In my report, I mention that GameClub's application |
| 8:47:13AM | to the App store was rejected more than 100 times. |
| 8:47:17AM | **Q.** And can GameClub under Apple's current restrictions offer |
| 8:47:23AM | any and all games? |
| 8:47:26AM | **A.** No. |
| 8:47:27AM | **Q.** What kind of games can GameClub offer? |
| 8:47:29AM | **A.** So GameClub needs to have an exclusive license to its |
| 8:47:36AM | games, and so it -- it can't offer -- the restrictions |
| 8:47:40AM | preclude third-party games, so there -- these are contractual |
| 8:47:47AM | restrictions not related to the -- you know, the game itself |
| 8:47:51AM | but whether the game developer has a contract with someone |
| 8:47:54AM | else. |
| 8:47:57AM | **Q.** Turning to Steam, you mentioned Steam on your direct |
| 8:48:02AM | testimony as a -- an example of a cross-platform app store, |
| 8:48:05AM | correct? |
| 8:48:06AM | **A.** Yes. |
| 8:48:06AM | **Q.** And if I remember correctly, you pointed out that it's |

8:48:10AM   something that you can download apps on to one operating

8:48:14AM   system and then port them to another operating system, right?

8:48:19AM   A.   That -- the -- that -- what the -- want to be careful with

8:48:30AM   the word "port," but as a user, you can -- say, if you switch

8:48:34AM   from a Mac to a PC or from a PC to the Mac, it facilitates

8:48:40AM   your downloading the game on whichever -- either platform and

8:48:43AM   playing it on that platform.

8:48:45AM   Q.   And you mentioned yesterday that you can do that as a

8:48:47AM   one-stop shop through something like Steam, correct?

8:48:50AM   A.   Correct.

8:48:51AM   Q.   And Ms. Dunn showed you the Steam app on iOS.  Can you

8:49:01AM   download iOS games through the Steam app?

8:49:04AM   A.   On the iOS, no.

8:49:06AM   Q.   Can you download Android games through the Steam store

8:49:11AM   through the app on Android?

8:49:13AM   A.   No.

8:49:20AM   Q.   And Ms. Dunn also asked you a few questions about Steam

8:49:23AM   Link, which allows you to, as we put it, stream games on to

8:49:28AM   your mobile device.

8:49:31AM        Where is this streaming from?

8:49:33AM   A.   From your PC.

8:49:35AM   Q.   And so you would need both the PC running the game and

8:49:39AM   your phone?

8:49:39AM   A.   Correct.

8:49:58AM   Q.   Want to turn to a couple of things that you were asked

8:50:01AM   yesterday.

8:50:02AM        You were asked a few questions about your work for

8:50:06AM   Microsoft.

8:50:06AM        Do you remember that?

8:50:07AM   **A.**   Yes.

8:50:11AM   **Q.**   And you remember that counsel for Apple asked you even

8:50:16AM   though it was your relationship with Microsoft that prevented

8:50:19AM   you from looking at Apple's confidential documents, you didn't

8:50:22AM   think you should disclose that on your C.V.

8:50:26AM        Do you remember being asked that question?

8:50:27AM   **A.**   Yes.

8:50:46AM   **Q.**   And you said yesterday that what prevented you from

8:50:49AM   looking at Apple's confidential documents was what you

8:50:51AM   referred to as a W2 work for Microsoft.

8:50:55AM        Do you recall that?

8:50:56AM   **A.**   Yes.

8:50:57AM   **Q.**   And by "W2," I -- I assume you meant that you were an

8:51:02AM   employee of Microsoft, correct?

8:51:04AM   **A.**   Correct.

8:51:07AM   **Q.**   When were you an actual employee of Microsoft?

8:51:10AM   **A.**   So the employment relationship comes through the Microsoft

8:51:18AM   research visiting researcher program, which is something like

8:51:24AM   if you take a leave of absence from your university or you

8:51:29AM   spend more than a certain amount of time with Microsoft

8:51:34AM   research, then you -- it becomes a employment relationship.

ATHEY - REDIRECT / EVEN

8:51:38AM        And so I had that relationship in 2008 and in one other

8:51:46AM   subsequent period.  I believe in 2011 or 2012.

8:51:57AM   **Q.**  And was your employment for Microsoft or your relationship

8:52:01AM   with Microsoft in 2008 and 2011 disclosed on your C.V. in this

8:52:06AM   case?

8:52:06AM   **A.**  Yes.

8:52:11AM   **Q.**  Are you presently engaged by Microsoft on any antitrust

8:52:14AM   matter?

8:52:14AM   **A.**  No.

8:52:18AM   **Q.**  Did you seek permission from Microsoft to serve as an

8:52:21AM   expert in this case?

8:52:21AM   **A.**  No.

8:52:26AM   **Q.**  Did anyone at Microsoft ask you to serve as an expert in

8:52:29AM   this case?

8:52:29AM   **A.**  No.

8:52:35AM   **Q.**  Did you get any direction from Microsoft about any of the

8:52:38AM   opinions you voiced in this case?

8:52:41AM   **A.**  No.

8:52:44AM   **Q.**  Has Microsoft been your primary consulting client in

8:52:47AM   recent years?

8:52:49AM   **A.**  No.

8:52:49AM   **Q.**  When was the last time that Microsoft was your primary

8:52:52AM   consulting client?

8:52:53AM   **A.**  It was scaling down during 2015, and so somewhere in that

8:53:03AM   range.

ATHEY - REDIRECT / EVEN

8:53:06AM  **Q.**  As far as you know, did your engagement by Epic have

8:53:09AM  anything to do with Microsoft?

8:53:10AM  **A.**  Not as far as I know.

8:53:23AM  **Q.**  Ms. Dunn asked you some questions yesterday about your

8:53:28AM  potential review of hypothetical confidential Apple documents

8:53:33AM  that hypothetically said how many people switched from Android

8:53:37AM  iOS or vice versa.

8:53:39AM     You remember that?

8:53:40AM  **A.**  Yes.

8:53:41AM  **Q.**  Is there public data concerning switching between iOS and

8:53:45AM  Android?

8:53:46AM  **A.**  Yes.

8:53:47AM  **Q.**  And as a tech economist, platform economist, do you

8:53:53AM  generally keep abreast of the data about switching between

8:53:56AM  those two platforms?

8:53:57AM  **A.**  Yes.

8:54:07AM           **THE COURT:**  Is all of that evidence attached to your

8:54:09AM  report?  That is, is it a part of the record in this case?

8:54:16AM           **MR. EVEN:**  I'm sorry.  Which data is that, Your

8:54:17AM  Honor?

8:54:19AM           **THE COURT:**  What you just asked her about, the data

8:54:21AM  about switching between the platforms.  Is that data that is

8:54:24AM  in the record in this case, Professor Athey?

8:54:27AM           **THE WITNESS:**  I -- I don't want to misspeak, but I --

8:54:38AM           **THE COURT:**  Well, and I just want to know what's in

ATHEY - REDIRECT / EVEN

8:54:40AM    the record.

8:54:45AM         **THE WITNESS:**  I believe that Dr. Evans has

8:54:49AM    information.

8:54:52AM         **THE COURT:**  Did you rely on Dr. Evans in establishing

8:54:55AM    your opinions?

8:54:55AM         **THE WITNESS:**  I relied on Dr. Evans for the market

8:55:01AM    definition and for the -- the switching costs and the -- the

8:55:10AM    market power in both the -- the foremarket and the

8:55:14AM    aftermarket.

8:55:15AM         **THE COURT:**  Did you review data and did you analyze

8:55:18AM    data?

8:55:18AM         **THE WITNESS:**  I did not do original analysis of data.

8:55:22AM         **THE COURT:**  And there's no data attached to your

8:55:23AM    report?

8:55:24AM         **THE WITNESS:**  No -- no original data, no.

8:55:28AM         **THE COURT:**  All right.  Thank you.

8:55:29AM    **BY MR. EVEN:**

8:55:46AM    **Q.**  You were also asked some questions about DX5612 and --

8:55:56AM    which talked about some bad news and good news about switching

8:56:02AM    between iOS and Android.

8:56:04AM         Do you remember that?

8:56:05AM    **A.**  Yes.

8:56:16AM    **Q.**  And in the good news, it said -- and I'm reading from

8:56:23AM    it -- "These days, most major productivity apps are readily

8:56:28AM    available on both platforms.  And once you are all set up with

8:56:31AM  Android, all of your apps and app data will automatically sync

8:56:35AM  with Google servers and follow you to any future Android

8:56:41AM  devices."

8:56:41AM      Do you see that?

8:56:43AM  **A.**  Yes.

8:56:44AM  **Q.**  Is that good news about the transfer from iOS to Android?

8:56:48AM  **A.**  No.

8:56:51AM  **Q.**  What is this good news about?

8:56:54AM  **A.**  The -- it's speaking about following between Android

8:57:02AM  devices.  So good news for switching among Android devices.

8:57:09AM  **Q.**  You were also asked by Ms. Dunn about some -- an article

8:57:15AM  from *The Guardian* that you cited in your report.

8:57:17AM      Correct?

8:57:18AM  **A.**  Yes.

8:57:20AM  **Q.**  So I'm putting up on the screen the relevant portion that

8:57:24AM  counsel for Apple directed you to.  And it's on page 3.

8:57:29AM                    (Exhibit published.)

8:57:31AM  **BY MR. EVEN:**

8:57:34AM  **Q.**  And you recall that counsel for Apple asked you some

8:57:39AM  questions suggesting that you omitted the parts that are bad

8:57:42AM  for you in this -- in the article?

8:57:45AM  **A.**  Yes.

8:57:46AM  **Q.**  And specifically, counsel for Apple pointed you to the

8:57:50AM  stuff that says that piracy on Android is a fact, correct?

8:57:54AM  **A.**  Yes.

8:57:55AM **Q.** So I'd like to maybe scroll down a little bit to the

8:58:00AM points that Ms. Dunn did not show you.

8:58:02AM        (Exhibit published.)

8:58:05AM **BY MR. EVEN:**

8:58:06AM **Q.** And do you see that after they say that piracy on Android

8:58:11AM is a fact, they say, yet, a, piracy is also a fact of the life

8:58:18AM on iOS through some elements of its jail-breaking community;

8:58:21AM b, it's always difficulty to work out how many pirates

8:58:24AM represent generally low sales would they have bought the app

8:58:28AM otherwise; and, c, if an app is free of premium, then piracy

8:58:33AM is much less of a headache.

8:58:36AM   Do you see that?

8:58:37AM **A.** Yes.

8:58:37AM **Q.** And then the article goes on to say only Android user less

8:58:42AM keen -- sorry -- on the Android user-less-keen-to-pay point,

8:58:45AM it's true that iOS is still more lucrative for developers.

8:58:49AM Apple has paid out more than ten billion to its developers

8:58:54AM while Google hasn't given comparable figures.

8:58:58AM   Do you see that?

8:58:59AM **A.** Yes.

8:58:59AM **Q.** Does the article reach a definitive conclusion about the

8:59:03AM point for which you cited it, which was the point about users

8:59:08AM paying more on iOS?

8:59:09AM **A.** Yes.  The article is consistent with the -- the -- the

8:59:17AM point that -- that developers make more on -- on iOS.

ATHEY - REDIRECT / EVEN

8:59:24AM    **Q.** And does the article reach a definitive conclusion that

8:59:28AM    Android piracy is a deterrent more so than iOS piracy?

8:59:36AM    **A.** I think it's suggesting that -- that piracy may be more

8:59:45AM    common, but also that because, you know, people who have less

8:59:51AM    money to spend might be substituting between piracy and not

8:59:56AM    using the game at all rather than piracy for -- for paying.

9:00:00AM    That's my -- my interpretation of this?

9:00:02AM         So although piracy may be more common, it doesn't

9:00:09AM    necessarily mean that fixing the piracy would make the

9:00:11AM    developers earn more. But that's -- in any case, that's --

9:00:20AM    that -- the point that I cited them about was that -- that iOS

9:00:28AM    developers often develop first on iOS, but also most of them

9:00:34AM    eventually go to Google, too, which is, you know, all

9:00:39AM    consistent with this.

9:00:40AM    **Q.** Okay.

9:00:43AM         You were asked some questions yesterday about whether

9:00:45AM    Apple would need to undertake any technical redesign efforts

9:00:50AM    for middleware to run on iOS, correct?

9:00:52AM    **A.** Correct.

9:00:54AM    **Q.** And one of the middleware instances you were talking about

9:00:59AM    were streaming services, correct?

9:01:01AM    **A.** Yes.

9:01:02AM    **Q.** And you testified yesterday that you reviewed Microsoft

9:01:06AM    trial testimony concerning streaming, correct?

9:01:08AM    **A.** Yes.

ATHEY - REDIRECT / EVEN

9:01:09AM    **Q.**  And that you reviewed Nvidia's testimony on the topic of

9:01:13AM    streaming, correct?

9:01:16AM         **MS. DUNN:**  Objection.  I think mischaracterizes the

9:01:18AM    record.

9:01:23AM         **THE COURT:**  Sustained.  I think you -- you said you

9:01:25AM    didn't listen to the testimony.  But did you read something

9:01:30AM    else?

9:01:30AM         **THE WITNESS:**  I --

9:01:32AM         **THE COURT:**  What is it that -- let's just get the

9:01:33AM    record clear.

9:01:35AM         **THE WITNESS:**  Sorry.

9:01:37AM         **MR. EVEN:**  I think, Your Honor, what --

9:01:39AM         **THE COURT:**  Just let -- she can answer.

9:01:40AM    **BY MR. EVEN:**

9:01:40AM    **Q.**  Go ahead.

9:01:41AM         **THE COURT:**  Was it Nvid- -- did you read the

9:01:44AM    testimony or something else?

9:01:46AM         **THE WITNESS:**  I read selections of testimony that

9:01:48AM    related to streaming.

9:01:49AM         **THE COURT:**  Okay.  For Microsoft and Nvidia.

9:01:52AM         **THE WITNESS:**  Yes.

9:01:52AM         **THE COURT:**  Okay.

9:01:53AM    **BY MR. EVEN:**

9:01:54AM    **Q.**  And based on your review of that testimony, do you have an

9:01:57AM    understanding whether technical design changes would need to

9:01:59AM  be done in iOS to support app streaming?

9:02:02AM  **A.**  My understanding was that these witnesses said that

9:02:10AM  technical design changes would not be needed, that -- I

9:02:15AM  believed that, you know, one of the apps accepted and --

9:02:20AM  and -- from Nvidia and then taken down, so --

9:02:29AM          **MR. EVEN:**  Thank you, Professor Athey.  I have no

9:02:32AM  further questions.

9:02:32AM          **THE WITNESS:**  Thank you.

9:02:33AM          **THE COURT:**  Any recross on those seven topics?

9:02:37AM          **MS. DUNN:**  No re-cross, Your Honor.  Thank you.

9:02:38AM          **THE COURT:**  All right.  Professor, you're excused.

9:02:41AM  Thank you.

9:02:42AM      If counsel will come and get those binders.

9:02:45AM      Next witness.

9:02:46AM              (Off-the-record discussion.)

9:03:04AM          **THE COURT:**  Ms. Forrest, next witness.

9:03:06AM          **MS. FORREST:**  Yes.  Your Honor, we now turn to some

9:03:09AM  of the economists from the Apple side.

9:03:12AM          **THE COURT:**  Okay.  Thank you.

9:03:13AM          **MR. SWANSON:**  Your Honor, as our next witness --

9:03:13AM  perhaps our first witness, we're calling Professor Richard

9:03:13AM  Schmalensee.

9:03:34AM          **THE COURT:**  You need to identify yourself for the

9:03:35AM  record.

9:03:36AM          **MR. SWANSON:**  Dan Swanson for Apple, Your Honor.

9:03:39AM      Good morning.

9:03:39AM           **THE COURT:**  Good morning.

9:03:45AM      Your witness, sir, is...?  So and you're calling.

9:04:02AM           **MR. SWANSON:**  I'm sorry.  Professor Richard

9:04:05AM  Schmalensee.

9:04:06AM           **THE COURT:**  Okay.  Thank you.

9:04:06AM                     **RICHARD SCHMALENSEE,**

9:04:08AM  called as a witness for the DEFENDANT, having been duly sworn,

9:04:08AM  testified as follows:

9:04:16AM           **THE CLERK:**  All right.  Please be seated and then if

9:04:18AM  you will put that mic below your plastic shield there and --

9:04:24AM           **THE WITNESS:**  Hello, hello, hello.  Does that work?

9:04:26AM  Okay.

9:04:26AM           **THE CLERK:**  State your full name and spell your last

9:04:28AM  name, please.

9:04:29AM           **THE WITNESS:**  Full name is Richard Schmalensee.  The

9:04:32AM  last name is spelled S-c-h-m-a-l-e-n-s-e-e.

9:04:38AM           **THE COURT:**  Good morning, sir.

9:04:39AM           **THE WITNESS:**  Good morning.

9:04:41AM           **THE COURT:**  You may proceed.

9:04:42AM           **MR. SWANSON:**  Thank you, Your Honor.

9:04:43AM                     **DIRECT EXAMINATION**

9:04:44AM  BY MR. **SWANSON:**

9:04:44AM  **Q.**  Professor Schmalensee, where are you currently employed?

9:04:48AM  **A.**  At the Sloan School of Management at the Massachusetts

9:04:50AM   Institute of Technology.

9:04:53AM   **Q.**   Okay.  And what is your current title?  And perhaps you

9:04:58AM   can give us a little bit of background.

9:05:01AM   **A.**   Well, I'm Howard W. Johnson Professor of Management

9:05:07AM   emeritus, Professor of Economics emeritus, and was formerly

9:05:11AM   Dean of the MIT Sloan School, so I'm Dean emeritus.

9:05:15AM   **Q.**   Okay.

9:05:15AM   We have a copy of Professor Schmalensee's C.V. which has

9:05:21AM   been marked as DX5548, which we would offer, Your Honor.

9:05:27AM         **MR. BORNSTEIN:**  No objection, Your Honor.

9:05:27AM         **THE COURT:**  5548 is admitted.

9:05:27AM         **MR. SWANSON:**  Thank you.

9:05:27AM      (Defendant's Exhibit 5548 received in evidence)

9:05:27AM            (Off-the-record discussion.)

9:05:35AM         **MR. BORNSTEIN:**  I'm sorry.  It's Gary Bornstein for

9:05:37AM   Epic.

9:05:37AM         **THE COURT:**  So just -- again, so the -- attorneys

9:05:41AM   know, not only is it important for people listening to

9:05:44AM   identify yourselves, but because we've had issues trying to

9:05:49AM   cover as much of the trial, we now have additional court

9:05:53AM   reporters, and they can use the additional identifications.

9:05:59AM      Thank you.

9:06:01AM      Proceed.

9:06:03AM   **BY MR. SWANSON:**

9:06:03AM   **Q.**   All right, Professor.  We have your C.V. in evidence, but

9:06:07AM   could you just briefly describe your -- your formal education.

9:06:09AM   **A.**   I have a bachelor's and a Ph.D. in economics from MIT.

9:06:14AM   **Q.**   Okay.

9:06:15AM   Have you ever testified as an expert in federal or state

9:06:18AM   court before?

9:06:19AM   **A.**   Yes, I have.

9:06:20AM   **Q.**   And generally speaking what was the subject of -- of your

9:06:24AM   prior testimony?

9:06:25AM   **A.**   Much of my testimony has concerned alleged violations of

9:06:29AM   the antitrust laws.  I suppose most notably, I was Microsoft's

9:06:34AM   expert in the *U.S. vs. Microsoft* case.

9:06:36AM   **Q.**   Have you ever been a consultant to any competition agency?

9:06:43AM   **A.**   Yes.  I was for a number of years consultant to the Bureau

9:06:46AM   of Economics at the Federal Trade Commission.  And I was one

9:06:49AM   of a few consultants -- I don't know how many -- to the

9:06:52AM   Antitrust Division of the Department of Justice in connection

9:06:55AM   with preparation of the 1992 Horizontal Merger Guidelines.

9:07:00AM   **Q.**   And speaking of consulting, have you ever been retained as

9:07:04AM   a consultant by Apple before this case?

9:07:06AM   **A.**   No.

9:07:08AM   **Q.**   Professor Schmalensee, have you ever served in the

9:07:10AM   government?

9:07:11AM   **A.**   Yes, I have.

9:07:12AM   **Q.**   And in what role?

9:07:14AM   **A.**   I was a member of the Council of Economic Advisors from

SCHMALENSEE - DIRECT / SWANSON

9:07:17AM  1989 through 1991.

9:07:19AM  **Q.**  And just briefly, what -- what is that?  What does that

9:07:22AM  role entail?

9:07:23AM  **A.**  Well, the -- it's fairly broad role.  The Council of

9:07:27AM  Economic Advisors is a three-person entity established in

9:07:30AM  1946.  It sits with a small staff in the Eisenhower Executive

9:07:38AM  Office building next to the White House and advises the

9:07:41AM  president on a broad range of economic policy issues.

9:07:45AM  **Q.**  Did that include competition policy issues?

9:07:47AM  **A.**  Occasionally.  I -- I was engaged with the antitrust

9:07:51AM  division on at least two international matters.

9:07:54AM  **Q.**  All right.

9:07:56AM  Have you been following the trial in this case?

9:07:57AM  **A.**  I have either read or listened to everything that's gone

9:08:02AM  on.

9:08:05AM  **Q.**  And one more question about your background in general.

9:08:10AM  What -- what has been the focus of your academic research?

9:08:14AM  **A.**  Well, as an economist, I've worked on a fairly wide range

9:08:19AM  of topics in the general field of industrial organization and

9:08:23AM  its application to public policy.

9:08:24AM  In the last 20 years or so, much of my work has focused on

9:08:28AM  platform economics.

9:08:31AM  **THE COURT:**  Professor.

9:08:32AM  **THE WITNESS:**  Platform businesses.

9:08:32AM  **THE COURT:**  Could you just slow down a little.

9:08:34AM          **THE WITNESS:**  I'm sorry.

9:08:35AM          **THE COURT:**  Okay.

9:08:35AM          **THE WITNESS:**  A bad habit.

9:08:41AM   **BY MR. SWANSON:**

9:08:41AM   **Q.**  And in connection with platform economics and writing,

9:08:47AM   what -- what can you point to by way of --

9:08:54AM   **A.**  Well, at least 3 books in the last 20 years or so.

9:08:57AM   "Invisible Engines" in 2006.  "Catalyst Code" in 2007.  And

9:09:03AM   "Matchmakers" published in 2015.

9:09:08AM   **Q.**  Did you have a coauthor?

9:09:10AM   **A.**  Dr. Evans, who's testified here, was coauthor on all three

9:09:15AM   books.

9:09:15AM   **Q.**  Okay.

9:09:16AM          Have you and Dr. Evans collaborated on anything beside

9:09:20AM   those three books?

9:09:21AM   **A.**  Well, in the last 20 years or so, we've -- we've written

9:09:25AM   together, I think -- what is it -- a half to -- 5 -- half

9:09:29AM   dozen journal articles, maybe 8 book chapters, 15 other

9:09:33AM   writings, including I guess most notably amicus briefs to the

9:09:39AM   Second Circuit in the *Saber* case and to the Supreme Court in

9:09:43AM   the *American Express* case.

9:09:46AM   **Q.**  And in what capacity did you and Dr. Evans submit those

9:09:51AM   amicus briefs?

9:09:53AM   **A.**  As economists commenting on the case and prior rulings.

9:09:59AM   **Q.**  And did you -- well, are you aware of whether your amicus

9:10:04AM   briefs were cited in any of the rulings that came in those

9:10:08AM   cases?

9:10:09AM   **A.**   I believe we were cited in the -- by the Second Circuit.

9:10:12AM   I know we were cited extensively, our writings, by the -- both

9:10:17AM   the majority and the dissent in the *AmEx* case.

9:10:24AM            **MR. SWANSON:**   Your Honor, I'd like to offer Professor

9:10:27AM   Schmalensee as an expert in antitrust economics and platform

9:10:30AM   economics.

9:10:32AM            **MR. BORNSTEIN:**   No objection, Your Honor.

9:10:33AM            **THE COURT:**   He's admitted.

9:10:36AM   **BY MR. SWANSON:**

9:10:37AM   **Q.**   Professor, did you hear Dr. Evans' direct testimony on

9:10:40AM   transaction platforms?

9:10:42AM   **A.**   I did hear his direct testimony.   I also read his written

9:10:44AM   testimony.

9:10:45AM   **Q.**   And -- and what -- what -- what did you read or hear on

9:10:51AM   the subject of transaction platforms, just in brief?

9:10:55AM   **A.**   Well, in his -- in his written testimony, he described the

9:10:59AM   App Store as a transaction platform linking developers and

9:11:03AM   consumers.

9:11:05AM       In his oral testimony, he seemed to describe the App Store

9:11:08AM   as a distribution ser- -- facility providing services to

9:11:13AM   developers.   That is to say, as a one-sided business.

9:11:17AM   **Q.**   Now, you mentioned your joint amicus brief with Dr. Evans

9:11:22AM   in the *AmEx* case.

SCHMALENSEE - DIRECT / SWANSON

9:11:24AM       Did you and Dr. Evans discuss transaction platforms in

9:11:29AM   that brief?

9:11:30AM   **A.**   We did.  That was -- I guess our central message was that

9:11:36AM   in that case or in general, when a business performs or

9:11:42AM   provides a service -- well, we said jointly and unseverably;

9:11:46AM   the Supreme Court said simultaneously -- to both sides, it is

9:11:52AM   providing a single product, transactions.  And that analysis

9:11:58AM   or -- or consideration of only one side in that platform would

9:12:03AM   lead to -- would lead to inaccurate conclusions.

9:12:08AM   **Q.**   Now, did you review Dr. Evans' testimony that Apple's iOS

9:12:13AM   business includes two distinct platforms, both connecting

9:12:18AM   developers and consumers?

9:12:19AM   **A.**   I did.

9:12:21AM   **Q.**   And -- and have you formed an opinion on that testimony?

9:12:27AM   **A.**   Yes.  I -- I don't think that's the right way to think

9:12:32AM   about the business, at least that's not the way I think about

9:12:35AM   the business or anybody else seems to think about the

9:12:37AM   business.

9:12:39AM       Apple's iOS business is clearly a platform linking

9:12:44AM   consumers and developers.  The iOS operating system is at the

9:12:51AM   core of that platform.  It's -- it -- it runs the devices, and

9:12:55AM   it links app -- applications programs or apps to those

9:13:01AM   devices.

9:13:02AM       The third element besides devices and the operating system

9:13:06AM   is the App Store, which is a transaction platform that

SCHMALENSEE - DIRECT / SWANSON

9:13:13AM       facilitates transactions between -- linkage between consumers

9:13:17AM       and app developers.

9:13:20AM       Q.   Do you agree with Dr. Evans that there is a foremarket in

9:13:23AM       which iOS competes with other operating systems for mobile

9:13:29AM       devices in which Apple has market power?

9:13:31AM       A.   No.  There -- there really isn't a market there.  I mean,

9:13:35AM       you think of a market as someplace where things are bought and

9:13:39AM       sold by buyers and sellers.  And the Apple iOS has never been

9:13:44AM       licensed separately or distributed separately from devices.

9:13:48AM            And the other system he considers, Android, has always

9:13:51AM       been free.  It -- it's just not -- not an ordinary market.

9:13:59AM            What is an ordinary market and comes close is devices in

9:14:03AM       which bundles of operating systems, so to speak, and hardware

9:14:07AM       are bought and sold and in which Apple has about a 15 percent

9:14:12AM       global share of smartphones -- smartphone unit sales, let me

9:14:16AM       be clear.

9:14:19AM       Q.   Changing the subject momentarily, Professor Schmalensee,

9:14:24AM       are you familiar with the term "IAP"?

9:14:26AM       A.   I am.  It's -- it's Apple's -- it stands for in-app

9:14:32AM       processing.  And it's the functionality that's part of the App

9:14:37AM       Store that handles payments for in-app transactions.

9:14:43AM       Q.   Do you -- in-app processing or in-app purchasing?

9:14:50AM       A.   I said "in-app transactions," but it's in-app purchasing

9:14:54AM       it handles the payment for.

9:14:56AM       Q.   Um-hmm.

9:14:56AM       And what do you understand about the functions that --

9:15:01AM   that IAP performs?

9:15:03AM   **A.**  Well, it's -- it's part of a larger system, and -- and

9:15:07AM   there are a lot of functions performed.  But a key function

9:15:12AM   and a function that's critical to this case is it

9:15:17AM   automatically and essentially frictionlessly collects the

9:15:22AM   commission due Apple on transactions involving in-app

9:15:27AM   purchases.

9:15:27AM           **MR. SWANSON:**  And the --

9:15:27AM               (Off-the-record discussion.)

9:15:28AM   **BY MR. SWANSON:**

9:15:28AM   **Q.**  And the amount of the commission is what?

9:15:36AM   **A.**  Well, the -- it's a -- typically a 30 percent commission,

9:15:40AM   although it's 15 percent in some cases.  But it's -- it's

9:15:45AM   important to recognize, and I must say I find these kind of

9:15:48AM   shocking figures, Apple engages with hundreds of thousands of

9:15:53AM   developers in 175 countries and regions.  The average

9:15:59AM   commission on a transaction handled by the App Store is a bit

9:16:05AM   under $3.  And the store handles well over a billion and a

9:16:11AM   half transactions of that sort a year, a billion and a half

9:16:15AM   small transactions from all over the world every year.

9:16:20AM   **Q.**  Is the 30 percent commission or the 15 percent commission

9:16:23AM   in instances where that is charged in your view charged and

9:16:29AM   collected only for payment processing?

9:16:31AM   **A.**  Not at all.  It -- it's a commission charged by Apple as

SCHMALENSEE - DIRECT / SWANSON

9:16:36AM   part of its pricing strategy.

9:16:38AM       You know, Epic executives were asked about that, and

9:16:43AM   Mr. Sweeney said that the -- the Epic Game Store commissions

9:16:49AM   were to cover all variable costs.  One of the other Epic

9:16:53AM   executives, I think Mr. Allison, said it -- the charge was for

9:16:58AM   admission to our audience.  However one wants to characterize

9:17:02AM   it, it's not payment processing.  It -- it's a commission on a

9:17:06AM   transaction.

9:17:08AM   Q.  Are you aware that Epic and Dr. -- well, Epic alleges and

9:17:13AM   Dr. Evans concludes that IAP is a separate tie product in a

9:17:21AM   market for solutions for accepting and processing payments for

9:17:25AM   digital content purchased within an iOS App?

9:17:31AM   A.  I am aware of that.  That may also be the longest market

9:17:34AM   definition I've ever heard, but I am aware of that, yes.

9:17:38AM   Q.  Well, does this -- it may be long, but does it describe a

9:17:42AM   plausible market in your opinion?

9:17:43AM   A.  It does not.  A market is where something -- some things

9:17:52AM   are bought and sold with buyers and sellers.  And the way

9:17:56AM   Dr. Evans describes this general area of commerce, let me just

9:18:02AM   say that, is that solutions are produced by payment processors

9:18:09AM   and app developers not bought and sold.

9:18:16AM       I don't know what IAP is.  It's not a payment processor.

9:18:21AM   It engages with a payment -- payment processors, so I'm not

9:18:25AM   sure what it is.  But I am sure that there's nothing bought

9:18:28AM   and sold in that market, as far as I can tell.

SCHMALENSEE - DIRECT / SWANSON

9:18:31AM  **Q.**  Is Dr. Evans' payment solutions market a single-brand

9:18:41AM  market?

9:18:42AM  **A.**  It's a single-brand market, and it's even narrower than

9:18:45AM  that because he excludes payment solutions employed by firms

9:18:51AM  that sell physical products on iOS Apps.  So it's a narrow

9:18:58AM  market, and it's a -- it's small.

9:19:01AM      Normally, if -- if there is a market, you think about,

9:19:06AM  well, how big is this thing relative to the market, to a

9:19:12AM  broader market?  And IAP handles at most 3 percent of the

9:19:18AM  dollar volume of in-app purchases, so it's -- it's small.

9:19:27AM  **Q.**  Now, both you and Dr. Evans have mentioned payment

9:19:33AM  processors.  You just mentioned it in your last answer.

9:19:36AM      Is IAP a payment processor?

9:19:39AM  **A.**  No.  IAP, the -- the closest analog I can come up with in

9:19:46AM  the brick-and-mortar world is it's like the credit card

9:19:51AM  terminal.  It connects to a payment processor.  Apple uses a

9:19:59AM  payment processor to authorize transactions and collect the

9:20:02AM  money.

9:20:04AM  **Q.**  Does it make sense to treat IAP as a separate product

9:20:09AM  distinct from the App store?

9:20:10AM  **A.**  It doesn't.  Because IAP is the essential way that Apple

9:20:16AM  collects its commissions.  It -- it is -- I'm not quite sure

9:20:24AM  how I can elaborate on this.  This is how Apple in a

9:20:27AM  automatic-and-seamless fashion collects the commissions its

9:20:30AM  owed, so it's -- it is an integral part of the store.

SCHMALENSEE - DIRECT / SWANSON

9:20:36AM    **Q.**  Now, Dr. Evans asserts -- concludes in his opinion that

9:20:43AM    there is a separate demand for payment solutions distinct from

9:20:49AM    the demand for facilitating app transactions.

9:20:55AM      Do you agree with his position?

9:20:56AM    **A.**  Well, what I've seen on that in his -- in his testimony in

9:21:03AM    its various forms is that developers would really rather not

9:21:07AM    pay the 30 percent and would like to find another solution,

9:21:12AM    another way to handle their own payments so they don't have to

9:21:15AM    pay Apple.

9:21:17AM      I don't view that as a separate demand for a service.  I

9:21:21AM    view that as a desire not to pay a commission.

9:21:27AM    **Q.**  Dr. Evans, certainly in his written direct, says that IAP

9:21:33AM    should, in fact, compete with third-party payment solutions on

9:21:38AM    the merits.

9:21:39AM      What is your -- what is your evaluation of that opinion?

9:21:43AM    **A.**  Well, this sort of seems to me to be a back-handed way to

9:21:48AM    once again say, oh, well, IAP is just about payment

9:21:51AM    processing.  But if you think about that kind of competition,

9:21:54AM    it can't possibly be on the merits.

9:21:57AM      Here is a IAP, which is tasked with collecting a

9:22:00AM    30 percent commission on many transactions.  Third-party

9:22:06AM    payment processors would not seek to collect a commission, at

9:22:09AM    least none that I've heard of.  So IAP would always be the

9:22:15AM    high priced alternative, and it's hard to see how IAP would

9:22:18AM    prevail in that sort of competition, which doesn't seem like

9:22:23AM   competition on the merits.

9:22:26AM   **Q.**  Has Dr. Evans, in your view, pointed to an example or any

9:22:30AM   example of this type of so-called competition on the merits?

9:22:34AM   **A.**  No.  He hasn't pointed to a single successful platform

9:22:41AM   that has nominally charged a commission and yet made it easy

9:22:46AM   for developers or the sellers on the platform to avoid that

9:22:51AM   commission.

9:22:54AM   **Q.**  Do any other two-sided platforms use a business model that

9:22:59AM   is similar to the App store's model?

9:23:01AM   **A.**  Well, lots of them.  I think Mr. Sweeney testified that --

9:23:06AM   that every app store through which Epic reaches consumers has

9:23:11AM   basically that model, charges a commission and automatically

9:23:16AM   collects that commission using its own payment system.

9:23:19AM       That would be -- and I'll see if I can -- if I can list

9:23:23AM   them all.  It's a long list.  But it would be Steam, it would

9:23:26AM   be the Google Play.  It would be the Microsoft Store.  It

9:23:31AM   would be the XBox Store, the Nintendo Store.  Google -- did I

9:23:41AM   say Google Play?  I might have said Google.

9:23:44AM   **Q.**  I think --

9:23:44AM                    (Simultaneous colloquy.)

9:23:45AM       **THE WITNESS:**  There are about eight of them that

9:23:46AM   Mr. Sweeney listed that Mr. Evans listed -- Dr. Evans listed.

9:23:52AM       In addition, in his -- in his written testimony, he listed

9:23:55AM   a number of platforms that sell physical goods maybe and

9:24:00AM   services.  And in his oral testimony, his cross-examination,

SCHMALENSEE - DIRECT / SWANSON

9:24:03AM   said, yes, indeed.  All of them charge commissions, and all of

9:24:07AM   them collect those commissions automatically by requiring use

9:24:11AM   of their own payment systems.

9:24:13AM   **BY MR. SWANSON:**

9:24:13AM   **Q.**   What do you conclude from this?

9:24:16AM   **A.**   Well, I conclude two things really.  First, that an -- in

9:24:21AM   an online business of this kind, that commission model is a

9:24:27AM   natural way to monetize.  In larger transactions, the store

9:24:31AM   makes more money, the seller makes more money, so the

9:24:35AM   percentage commission model seems natural, seems very common.

9:24:39AM       And second, when stores handle a large number of small

9:24:44AM   transactions, collecting those fees automatically seems to be

9:24:49AM   the natural model, seems to be the -- the obvious way to go.

9:24:56AM   **Q.**   And you'd mentioned the number of transactions that the

9:25:01AM   App Store collects annually.

9:25:03AM       What was that number again?

9:25:05AM   **A.**   Well, it's over a billion and a half.  And they're --

9:25:10AM   they're, on average, quite small.

9:25:13AM   **Q.**   Have you observed or analyzed transaction platforms that

9:25:18AM   are not online stores impose restrictions that serve purposes

9:25:25AM   similar to those served by the IAP requirement?

9:25:28AM   **A.**   Well, I guess not surprisingly American Express comes to

9:25:32AM   mind.  American Express operates -- offers a transaction

9:25:40AM   platform.  And American Express has anti-circumvention rules

9:25:44AM   to ensure that it collects its commission.

SCHMALENSEE - DIRECT / SWANSON

9:25:47AM     It collects its commission essentially automatically these
9:25:51AM  days and has rules against steering, so to speak, trying to
9:25:56AM  persuade customers to buy from a cheap -- through a cheaper
9:26:00AM  payment system.
9:26:01AM     It's the same -- it's the same rule.  I mean, the -- the
9:26:07AM  App store has rules to -- to avoid steering.  *AmEx* had a rule
9:26:12AM  to avoid steering.
9:26:14AM  **Q.**  Was that practice one that was at issue in the *AmEx* case
9:26:21AM  were you and Dr. Evans submitted the amicus brief?
9:26:25AM  **A.**  Yes, it was.
9:26:27AM  **Q.**  In your view as an antitrust economist, as a expert on
9:26:31AM  platforms, is Apple's IAP requirement anti-competitive?
9:26:35AM  **A.**  No.  Apple's IAP requirement is an efficient way to
9:26:40AM  collect a commission, and a commission-based business model
9:26:45AM  appears to be the natural business model for online stores.
9:26:50AM  **Q.**  When you testify that it's not anti-competitive, are you
9:26:58AM  specifically including in your opinion these so-called
9:27:04AM  anti-steering provisions that bar developers from steering
9:27:08AM  customers within the app to payment methods outside the app?
9:27:12AM  **A.**  I am.  It's exactly the same.  Exactly the same as the
9:27:15AM  anti-steering provisions at issue in *AmEx* that prohibited the
9:27:19AM  seller from trying to avoid the commission by persuading the
9:27:23AM  buyer, one way or another, to restructure the transaction in a
9:27:29AM  way that reduce -- would reduce the seller's commission.
9:27:34AM  **Q.**  Earlier --

SCHMALENSEE - DIRECT / SWANSON

9:27:36AM          **THE COURT:**  And *AmEx*, there wasn't a duopoly, though,

9:27:40AM   correct?

9:27:40AM          **THE WITNESS:**  I'm sorry, ma'am?

9:27:42AM          **THE COURT:**  I said in *AmEx*, there wasn't a duopoly.

9:27:45AM          **THE WITNESS:**  No.  In *AmEx* there were multiple

9:27:48AM   competitors, but it was the same rule.  The -- the rule said

9:27:51AM   the merchant can't say to a customer -- as has happened to me,

9:27:57AM   may have happened to you -- I'd really rather you didn't use

9:28:00AM   the AmEx card.  Could you use the Visa?  It will save me

9:28:04AM   money, please.

9:28:05AM       That's the kind of steering that was at issue in the *AmEx*

9:28:07AM   case.

9:28:08AM          **THE COURT:**  Right.  But when you go into a store, you

9:28:10AM   can see the sign that says, Visa, Mastercard, Discover, AmEx.

9:28:17AM   Maybe not Discover anymore.  Back then there, was Discover.

9:28:22AM          **THE WITNESS:**  Yes.

9:28:23AM          **THE COURT:**  So there were -- there were visual

9:28:27AM   indications of options.  Those visual indications of options

9:28:32AM   don't exist in this circumstance.

9:28:35AM          **THE WITNESS:**  Well, let me -- let me explain the

9:28:37AM   comparison.  In -- in the store, you're right, there was the

9:28:40AM   visual indications, Your Honor, that said, we accept American

9:28:44AM   Express.

9:28:44AM       The merchant was prohibited by contract to say -- to say,

9:28:50AM   even though we express -- accept American Express, would you

SCHMALENSEE - DIRECT / SWANSON

9:28:54AM   please use something else.

9:28:55AM       The analog here would be a button in the -- in an app that
9:29:02AM   says, well, you could buy through the IAP through the App
9:29:06AM   Store, but you'll save a lot of money if you go elsewhere.
9:29:10AM   That's the -- that's the call to action that the App Store's
9:29:15AM   rules prohibit.  And it's the same attempt -- could be --

9:29:20AM           THE COURT:  But it doesn't say "also available on our
9:29:23AM   website."

9:29:25AM           THE WITNESS:  Well, it could.

9:29:25AM           THE COURT:  "Also available on Steam."

9:29:28AM           THE WITNESS:  It could.  And that's what the rules
9:29:30AM   prohibit.  The rules prohibit saying you could save money if
9:29:33AM   you did X.

9:29:35AM           THE COURT:  That's what -- that's right.  That's what
9:29:36AM   the rules say, you cannot do.

9:29:38AM           THE WITNESS:  Correct.

9:29:39AM           THE COURT:  But if you were in a physical shop during
9:29:42AM   the AmEx time period, you would know that because when you
9:29:46AM   went to the register, it would show that there were other
9:29:48AM   payment options.

9:29:50AM           THE WITNESS:  It would, Your Honor, but -- but the --
9:29:52AM   the difference here is it wouldn't say the merchant would save
9:29:59AM   money if you use this rather than the other.

9:30:02AM       The merchant has to say that.

9:30:04AM           THE COURT:  But these are gradations.  I mean, there

SCHMALENSEE - DIRECT / SWANSON

9:30:06AM     is zero availability to know that you have a different option

9:30:11AM     with the -- with the -- on the app, whereas that did not

9:30:17AM     exist.  That zero availability did not exist.  And what's so

9:30:21AM     bad about it anyway, Professor?

9:30:23AM              THE WITNESS:  I'm sorry.  What's what about?

9:30:27AM              THE COURT:  I said what's so bad about it anyway, to

9:30:29AM     have consumers have choice?

9:30:31AM              THE WITNESS:  The reason is if consumers have choice,

9:30:33AM     if the app vendor can say, if you press this button, you can

9:30:39AM     buy this for less, that means the App store can't collect its

9:30:43AM     commission.

9:30:44AM         So you're giving the consumer a better deal, absolutely

9:30:47AM     right.  But you're undercutting the App Store's ability to

9:30:51AM     collect its commission and, thus, you're undercutting its

9:30:55AM     revenue stream.  That's what that does.

9:30:58AM         And the argument in *American Express* was if you let

9:31:01AM     merchants steer -- right?  American Express charges more to

9:31:05AM     merchants.  That's its model.  If you let merchants say, well,

9:31:09AM     I know we said we accepted American Express, but won't you

9:31:12AM     please use this other card, then American Express's model is

9:31:18AM     undercut.

9:31:19AM         Now, you may or may not like that model, but that's

9:31:22AM     American Express's model.  And as I understand it, the court

9:31:25AM     said, American Express is entitled to say if you advertise you

9:31:29AM     accept American Express, you have to accept it.

SCHMALENSEE - DIRECT / SWANSON

9:31:32AM          And the story here is, if you're on the App Store, then by

9:31:37AM     contract, you pay our commission.

9:31:40AM          You don't say, I know we're on the App store.  I know

9:31:43AM     we owe them money, but you and I can get a better deal if you

9:31:49AM     buy over here and avoid the -- and I avoid paying the

9:31:52AM     commission and you get a better deal.  It's analytically, I

9:31:55AM     think, exactly the same

9:31:57AM          **THE COURT:**  I don't think it's factually the same,

9:31:58AM     but proceed.

9:32:01AM     **BY MR. SWANSON:**

9:32:03AM     **Q.**  Now, earlier, Professor Schmalensee, you mentioned that

9:32:06AM     IAP does more than collect commissions.

9:32:09AM          Are there any pro-competitive benefits to the business

9:32:13AM     model?

9:32:14AM     **A.**  Well, there are.  Because Apple has the unique ability to

9:32:21AM     identify the hardware connected to the App Store, it can

9:32:25AM     implement the one-click session model that enables privacy and

9:32:33AM     security in simple transactions, easy transactions because it

9:32:38AM     prevents the automatic transmission of payment card

9:32:41AM     information to developers.

9:32:45AM          Because all Apps go through the App -- all iOS Apps go

9:32:52AM     through the App store, Apple can automatically transfers apps

9:32:56AM     to new devices, can permit family sharing, and -- fraud

9:33:04AM     protection features that relate to this as well.  But the fact

9:33:07AM     that they all go through the store means that you can keep

9:33:10AM    track of everything that's happened.

9:33:13AM    **Q.**  Could third-party providers also offer these

9:33:17AM    pro-competitive benefits?

9:33:18AM    **A.**  Well, third-party providers wouldn't have the same ability

9:33:22AM    that Apple has to detect the device, to know who's on the

9:33:27AM    other side automatically.

9:33:29AM        In addition, though information would have to be

9:33:32AM    transmitted, the level of privacy and security couldn't be

9:33:37AM    equaled.

9:33:38AM        In addition, if you had multiple providers, then you

9:33:42AM    couldn't automatically restore all purchases.  You couldn't

9:33:46AM    automatically share all purchases with family members.

9:33:51AM    **Q.**  All right.

9:33:53AM        I'm going to shift topics, Professor.

9:33:58AM            **THE WITNESS:**  Your Honor, may I have a sip of water?

9:34:01AM            **THE COURT:**  Absolutely.

9:34:02AM            **THE WITNESS:**  Thank you.

9:34:02AM    **BY MR. SWANSON:**

9:34:20AM    **Q.**  Professor, are you aware that in court filings, Epic has

9:34:26AM    stated that you conceded in your deposition that if the iOS

9:34:29AM    App distribution market defined by Dr. Evans is a valid

9:34:34AM    antitrust market, Apple is a monopolist; it has market power?

9:34:39AM    **A.**  I am aware of that.

9:34:41AM    **Q.**  Did you concede that?

9:34:43AM    **A.**  Well, I conceded it in the sense that I was asked in

SCHMALENSEE - DIRECT / SWANSON

9:34:47AM   deposition to make that assumption, and I replied with the

9:34:50AM   logical consequences of that assumption.  If it's a properly

9:34:53AM   defined market in which Apple is the only seller, then by

9:34:58AM   dictionary definition, it's a monopolist.  And because it's --

9:35:01AM   I was asked to assume it was a valid antitrust market, it

9:35:04AM   would have some market power.  That is, as I said in a

9:35:08AM   deposition, a tautology.

9:35:10AM   **Q.**  Did -- well, in your opinion, has Dr. Evans, in fact,

9:35:17AM   shown that his iOS app distribution market is a valid,

9:35:19AM   relevant market?

9:35:20AM   **A.**  No, he has not.

9:35:22AM   **Q.**  Okay.  Why not?

9:35:23AM   **A.**  Well, he's neglected the strength of indirect network

9:35:30AM   effects.  In his prior writings, he's shown correctly that to

9:35:35AM   do a proper market definition analysis involving a two-sided

9:35:40AM   platform, one needs to know not only that there are indirect

9:35:44AM   network effects but how strong they are.  And he really has in

9:35:50AM   effect ignored those effects.

9:35:53AM   **Q.**  Why -- why does it matter whether one takes into account

9:35:56AM   indirect network effects?

9:35:59AM   **A.**  Well, indirect network effects generally magnify the

9:36:05AM   impact of a price change.  So if a price is increased to one

9:36:09AM   side on a two-sided platform and there are indirect network

9:36:14AM   effects, the ultimate impact of that price will exceed the

9:36:18AM   initial impact, which means that when there are indirect

SCHMALENSEE - DIRECT / SWANSON

9:36:26AM   network effects present, there are limits -- additional limits

9:36:29AM   on the ability of a seller to raise price.

9:36:31AM       If you neglect those additional limits, markets tend to be

9:36:35AM   defined that are too narrow.

9:36:38AM   **Q.**  In your written testimony, you conclude that Dr. Evans's

9:36:43AM   aftermarket sniff test is not valid.

9:36:46AM       Would you explain the basis for that conclusion?

9:36:49AM   **A.**  Sure.

9:36:50AM       In an ordinary sniff test, you would want demand

9:36:54AM   elasticities.  You would want to know how demand responds to

9:36:57AM   changes in price.

9:36:58AM       In a platform, you want those demand own price

9:37:05AM   elasticities on both sides of the platform.

9:37:08AM       In addition, you want to know the indir- -- the strength

9:37:12AM   of indirect network effects.  How does one side react to

9:37:16AM   changes in the participation of the other side and vice versa.

9:37:20AM       So that's really four quantities.  Four price

9:37:24AM   elasticities -- two price elasticities, excuse me.  And two,

9:37:28AM   if you will, indirect network effects elasticities.

9:37:32AM       Professor Evans does have a price elasticity.  He relies

9:37:37AM   on Professor Rossi's survey, which I think is -- is far from

9:37:41AM   perfect.  But he relies on that survey to get a price

9:37:47AM   elasticity for consumers.

9:37:49AM   **Q.**  How can Dr. Evans claim to perform a valid sniff test in

9:37:54AM   that context without estimates of the other three quantities?

SCHMALENSEE - DIRECT / SWANSON

**A.**   Well, basically by -- by assuming that producers don't have much choice.  So if there's an increase in the App Store commission, he acknowledges that will reduce consumer demand.  That's that first price effect.

And it would have two effects on developers.  It would, first of all, reduce the demand for apps, but second of all, it would make sales of apps less profitable.  But he says, well, developers won't leave the -- the iOS system; therefore, developers don't react at all to these two changes.

But that's assuming that developers have only the choice of go or stay.  Developers can decide where to bring out products.  Developers can reallocate engineering resources.  Developers can reallocate marketing resources.  Developers have a lot of choices short of leaving or not leaving.

I think it's reasonable to assume that they would react to some extent.  Zero is too strong.  If they react to some extent, there is a feedback effect.

If they react by reducing resources devoted to the App Store, that will cause a further reduction in consumer demand.  That's the step that's missing, and that further reduction in consumer demand would, again, affect developers.

So by -- by giving developers no ability to react, he's shortcutting the proper sniff test.

**Q.**   Are you aware that Dr. Evans claims that Apple could raise its profits considerably by raising its commission rate?

SCHMALENSEE - DIRECT / SWANSON

9:39:43AM   **A.**  I am.  And that -- that sort of proves my point.  If the

9:39:47AM   App store were maximizing profit and his analysis were

9:39:51AM   correct, it would reveal that it couldn't profitably raise

9:39:56AM   price because it would have done so.

9:39:57AM       The -- the most probable reason he comes up with his

9:40:03AM   conclusion is that he has, in effect, neglected indirect

9:40:07AM   network effects, which, by the way, we both agree are strong

9:40:10AM   here.

9:40:12AM   **Q.**  Changing subject somewhat, Dr. Evans argues that the App

9:40:15AM   Store has very high operating profit margins and that this

9:40:19AM   shows that the App Store has monopoly power.

9:40:22AM       Do you agree?

9:40:23AM   **A.**  No.

9:40:24AM   **Q.**  Why not?

9:40:24AM   **A.**  Well, there's several reasons.  Let me -- let me tic them

9:40:30AM   off.  First, economists normally look at profitability as a

9:40:36AM   rate of return on investment and -- and recognize that

9:40:40AM   accounting measures of the rate of return on investment have

9:40:43AM   biases so that having a high accounting rate of return on

9:40:48AM   investment doesn't establish the existence of high economic

9:40:52AM   profits.

9:40:54AM       But that's not the main problem.  The main problem is the

9:40:57AM   operating margin is not a measure of profitability.  Simple

9:41:03AM   example:  Two factories producing the same product selling at

9:41:08AM   the same price in a competitive market.  One of them has

SCHMALENSEE - DIRECT / SWANSON

9:41:12AM   invested a lot in machinery and has one worker.  The other

9:41:16AM   factory really hasn't made much of -- by way of investment and

9:41:19AM   has a lot of workers.

9:41:21AM        Well, the mechanized factory is going to have lower

9:41:25AM   operating costs, so it's going to show a higher operating

9:41:29AM   margin.  That signifies nothing.  That signi- -- doesn't mean

9:41:34AM   it's more profitable.  It could have a really terrible rate of

9:41:38AM   return on all that machinery, but it will have a higher

9:41:41AM   operating margin.

9:41:41AM        It's just not a measure of profitability.

9:41:46AM   Q.  Professor, did you hear Dr. Evans argue that any biases in

9:41:51AM   the accounting data he relies on can be dealt with by

9:41:54AM   comparing documents that -- that have App Store -- the App

9:41:59AM   Store's operating margins with a set of other online market

9:42:03AM   prices?

9:42:03AM   A.  I'm aware of that.  And -- if they were really comparable,

9:42:09AM   fully comparable across the board, that might be a -- a fair

9:42:14AM   argument.  But he hasn't shown comparability.

9:42:16AM        And I -- I know a bit about these other stores, but it's

9:42:21AM   not in the record, so let me just say that Apple stands out as

9:42:26AM   selling devices, and Apple stands out as putting a lot of

9:42:31AM   R & D into devices and the operating system, which benefit and

9:42:37AM   pull transactions through the App Store.

9:42:39AM        I don't think any of the other comparisons that he has

9:42:45AM   have that characteristic, and he certainly hasn't shown that

SCHMALENSEE - DIRECT / SWANSON

9:42:50AM  they're sufficiently similar for his argument to be valid.

9:42:54AM  **Q.**  Did you hear or read Mr. Sweeney's testimony agreeing that

9:42:58AM  if someone were to point at one product or service that his

9:43:03AM  company offers and declare a precise profit margin for it,

9:43:07AM  that assessment would be fundamentally flawed?

9:43:10AM  **A.**  I did and -- and he gave the reason.  And that's because

9:43:13AM  in the -- in the Epic Game Store and the Epic operation,

9:43:17AM  the -- technology is developed -- it's used in multiple places

9:43:24AM  in the business, and you can't allocate that joint cost in any

9:43:28AM  way that's not arbitrary among products or services.

9:43:32AM  **Q.**  Does -- does the same problem affect the estimates of the

9:43:40AM  App Store's operating margin that Dr. Evans has relied on?

9:43:44AM  **A.**  Yes.  R & D that affects the -- that improves the

9:43:48AM  operating system, that improves the devices, is a joint cost.

9:43:52AM  It will benefit sales of those devices.  It will also benefit

9:43:57AM  transactions in the App Store.  And there are simply no

9:44:01AM  nonarbitrary way to allocate costs like that among lines of

9:44:06AM  business.

9:44:09AM  **Q.**  And why is the concept of joint costs relevant here?

9:44:14AM  **A.**  Well, let me say -- let me give the classic example of a

9:44:18AM  joint cost just to -- just to be -- be clear, if I may.

9:44:22AM      The classic example from somebody in the 19th Century is

9:44:27AM  raising steers to produce both meat and hides.  And the cost

9:44:33AM  of feed for the steer -- for a steer can't be allocated

9:44:39AM  between meat and hide.  There's no unambiguous way to --

9:44:43AM   there's no nonarbitrary way to do that.

9:44:46AM       Similarly, R & D that affects all aspects of Apple's

9:44:51AM   business can't be allocated to individual lines of business or

9:44:55AM   parts of the business in a way that isn't just arbitrary.

9:45:01AM   **Q.**  What -- what, then, would be the correct approach to

9:45:03AM   analyzing the App Store's economic -- economic profitability?

9:45:08AM   **A.**  Mr. Swanson, this is like asking me the best way to square

9:45:12AM   the circle.  You can't do it.  There is simply no economically

9:45:16AM   meaningful way to allocate joint costs among several products

9:45:22AM   or services.

9:45:25AM   **Q.**  Professor, do you believe it's important to consider

9:45:27AM   output in the analysis of competitive or alleged

9:45:31AM   anti-competitive effects?

9:45:32AM   **A.**  I do.  That was a major part of -- major argument in the

9:45:38AM   amicus brief that Dr. Evans and I filed in the *AmEx* case.

9:45:43AM   **Q.**  And, you know, what -- what was the point you made in that

9:45:46AM   amicus brief?

9:45:47AM   **A.**  Well, I -- I don't have the language off the top of my

9:45:51AM   head, but basically when -- when the price -- particularly

9:45:56AM   when the pricing system's complicated.  I don't think it was

9:45:59AM   that complicated in *AmEx*.  But when the pricing system is

9:46:02AM   complicated, it may be hard to figure out what is the price.

9:46:04AM   Did the price go up or down.

9:46:06AM       Here, you can argue about what the commission rate is

9:46:10AM   depending on how you treat free transactions.  But output is

SCHMALENSEE - DIRECT / SWANSON

9:46:15AM  typically an easier quantity -- at least the dollar value of

9:46:20AM  output is an easier quantity to measure.  And the argument

9:46:23AM  we -- we made is that without proof that there is an output

9:46:28AM  restriction flowing from the challenged practice, there's no

9:46:35AM  reason to think it's anti-competitive.  That ought to be a

9:46:38AM  first requirement.

9:46:40AM  **Q.**  In your opinion, has Dr. Evans assessed whether Apple's

9:46:43AM  conduct has restricted output?

9:46:45AM  **A.**  He hasn't.  I believe he's -- he's considered output, but

9:46:48AM  he hasn't really analyzed it.  And if you look at it, the

9:46:54AM  results are pretty dramatic.

9:46:56AM       I mean, in the *AmEx* case, the Supreme Court observed that

9:46:59AM  there was a 30 percent -- excuse me -- a 30 percent increase

9:47:03AM  in output over -- over five years.  I think that was in

9:47:08AM  payment card output, and it called that dramatic.  That is, I

9:47:14AM  think, a 5.4 percent annual rate of growth, which means that

9:47:18AM  output doubles in 13 years, more or less, which is pretty

9:47:22AM  dramatic.

9:47:23AM       Here, both developer revenue from game apps and developer

9:47:32AM  revenue from all apps increased at around 50 percent a year

9:47:36AM  from 2010, when Dr. Evans said the App Store became a

9:47:40AM  monopoly, through 2018.  That's doubling in less than 2 years.

9:47:45AM       If 5.4 percent is dramatic, this is wildly dramatic.  And,

9:47:53AM  you know, it was a good period for -- for IP in general and

9:47:57AM  for games in general, so one -- one wants to ask -- one wants

SCHMALENSEE - DIRECT / SWANSON

9:48:01AM   to look for a different benchmark.

9:48:03AM       There is a third-party estimate of total spending on

9:48:07AM   digital game transactions over that same period, 2010 to 2018.

9:48:13AM   And it shows industry-wide growth about half as rapid as

9:48:19AM   growth through the App Store.

9:48:21AM       Now, if when Apple became a monopoly in 2010, it put the

9:48:27AM   brakes on output growth in order to increase its profit, you

9:48:32AM   wouldn't expect that.  You would expect growth in the App

9:48:35AM   Store to be less than market wide growth.  Instead, as far as

9:48:40AM   we can tell, it was noticeably more rapid.

9:48:43AM       In any case, Dr. Evans has not shown any output

9:48:47AM   restriction.

9:48:51AM   Q.  Professor Schmalensee, just like to wrap this up with a

9:48:55AM   final question or two.  Your --

9:48:59AM       Well, let me -- let me ask you this generally.  Do

9:49:03AM   Dr. Evans' arguments in this case have economic implications

9:49:07AM   for the business models of the console manufacturers?

9:49:10AM   A.  Oh.  They do.  Dr. Evans argues that requiring all apps to

9:49:16AM   go through your App Store is -- is a violation, or -- or he

9:49:22AM   supports Epic's contention it's a violation and that using

9:49:25AM   your own -- requiring the use of your own payment system is a

9:49:29AM   tie.

9:49:29AM       The console manufacturers do both.  And he's attempted to

9:49:34AM   distinguish them.  He says, well, they're smaller.  That's

9:49:38AM   true.  And they don't make money on hardware.  That may well

9:49:43AM    be true.  It's the general understanding.  But what Dr. Evans

9:49:47AM    hasn't done is to show why that matters, to show why if

9:49:52AM    Apple's conduct is -- is illegal because of those aspects, why

9:49:57AM    the console manufacturers don't have the same problem.

9:50:03AM    **Q.**  Do Dr. Evans arguments have implications for the business

9:50:06AM    models of -- of any other online app stores?

9:50:09AM    **A.**  Well, they do.  And I gather Professor Rubinfeld's going

9:50:14AM    to discuss some broad implications.  But let me just say this:

9:50:18AM    I mentioned -- didn't manage a complete list, but I've

9:50:21AM    mentioned a number of online app stores that require use of

9:50:26AM    their own payment systems to collect commissions.

9:50:30AM        Dr. Evans would say that's a tie.  And he's argued that

9:50:34AM    that's a tie.  Well, if that's a tie, then both Apple and all

9:50:40AM    of these other stores have to try to figure out some other

9:50:44AM    way, likely more expensive way, to collect commissions.

9:50:51AM    **Q.**  And finally, Professor Schmalensee, do Dr. Evans'

9:50:56AM    arguments have implications for potential new operating system

9:51:01AM    entrants?

9:51:01AM    **A.**  Sure.  Dr. Evans has said that Apple didn't have to open

9:51:05AM    its system to third-party applications when it did in 2008.

9:51:11AM    But if it had, since it did, in 2010, it should have basically

9:51:17AM    adopted the remedy that Epic seeks, dropping the exclusivity

9:51:22AM    on distribution and dropping the requirement to use IAP.

9:51:28AM        Well, if I were a new entrant, I would realize that if I

9:51:34AM    opened my system to third-party app developers and if I were

SCHMALENSEE - CROSS / BORNSTEIN

9:51:38AM  successful and if Epic prevails here, then I would have to

9:51:43AM  radically change my business model if I were very successful.

9:51:47AM      The safe thing would be not to allow third-party apps in

9:51:51AM  the first place.  And given how successful the iOS ecosystem

9:51:59AM  has been with third-party apps for the benefit of consumers,

9:52:03AM  app developers, and indeed Apple itself, that would be an

9:52:06AM  unfortunate choice.

9:52:08AM  **Q.**  Right.

9:52:08AM      Thank you.  Professor Schmalensee.

9:52:10AM      I pass the witness.

9:52:12AM          **THE COURT:**  Cross?

9:52:12AM          **THE WITNESS:**  May I sneak a drink of water while

9:52:20AM  they --

9:52:21AM          **THE COURT:**  Absolutely.

9:52:21AM          **THE WITNESS:**  -- relief pitcher comes in?  Yeah.

9:52:24AM          **THE COURT:**  Any time you need it, just let us know.

9:52:27AM              (Pause in the proceedings.)

9:52:27AM          **THE COURT:**  You may proceed, Mr. Bornstein.

9:52:53AM          **MR. BORNSTEIN:**  Thank you, Your Honor.  Gary

9:52:54AM  Bornstein for Epic.

9:52:27AM                  **CROSS-EXAMINATION**

9:52:27AM  BY MR. BORNSTEIN:

9:52:27AM  **Q.**  Professor Schmalensee, nice to see you again.

9:52:57AM  **A.**  Good to see you again, Mr. Bornstein.

9:53:00AM  **Q.**  Almost in person this time with a little plexiglass

9:53:03AM   between us.

9:53:04AM   **A.**  Almost.  Almost.

9:53:05AM   **Q.**  Let me just start with the last topic you discussed with

9:53:08AM   Mr. Swanson.  Your testimony, if I understood it, was that a

9:53:12AM   potential new operating system entrant would look at the

9:53:16AM   possibility that Apple was required to open its system and

9:53:22AM   would decide that the right thing to do would be not to have

9:53:28AM   third-party apps at all?

9:53:30AM        Did I understand that correctly?

9:53:33AM   **A.**  I didn't say it would necessarily be the decision.  I

9:53:36AM   would say that the thought of having third-party apps and then

9:53:40AM   facing the -- the potential of having to change business

9:53:43AM   model -- after all, Apple only had the App Store for two years

9:53:47AM   before Dr. Evans said it was a monopoly.

9:53:50AM   **Q.**  I'm sorry.

9:53:50AM                        (Simultaneous colloquy.)

9:53:51AM            **THE WITNESS:**  -- consideration.

9:53:52AM   **BY MR. BORNSTEIN:**

9:53:52AM   **Q.**  -- just asked if I --

9:53:52AM   **A.**  I'm sorry.

9:53:52AM   **Q.**  -- if I understood your testimony correctly.

9:53:54AM   **A.**  May I hear your question.

9:53:58AM   **Q.**  Okay.

9:53:58AM        Did you testify that a -- a potential new entrant would

9:54:04AM   conclude that the right thing to do may be not to offer

SCHMALENSEE - CROSS / BORNSTEIN

| | |
|---|---|
| 9:54:09AM | third-party apps at all? |
| 9:54:10AM | **A.**  I didn't say it would conclude that the right thing to do |
| 9:54:16AM | would be to not be to offer third-party apps.  I said it would |
| 9:54:20AM | take that possibility into consideration. |
| 9:54:21AM | **Q.**  And it would weigh that against the indirect network |
| 9:54:24AM | effects that you've testified about so much, which would |
| 9:54:29AM | clearly benefit the operating system provider if it had |
| 9:54:33AM | third-party apps, correct? |
| 9:54:33AM | **A.**  It would benefit it until it got sufficiently successful |
| 9:54:39AM | to fall afoul of whatever would be established in this case if |
| 9:54:44AM | Epic prevails. |
| 9:54:45AM | **Q.**  And your testimony is that a -- an operating system |
| 9:54:48AM | provider would actually consider not having third-party apps |
| 9:54:51AM | in order to avoid the possibility that it would become so |
| 9:54:55AM | successful that it would at that point need to open up its |
| 9:55:01AM | system? |
| 9:55:01AM | Do you think that's a reasonable outcome here? |
| 9:55:03AM | **A.**  Well, I don't know what "so successful" is.  I do know |
| 9:55:06AM | that an alternative -- |
| 9:55:08AM | **Q.**  I'm sorry.  I didn't ask about an alternative.  I asked if |
| 9:55:11AM | you thought that was a reasonable outcome here. |
| 9:55:13AM | **A.**  It is a plausible outcome is -- it is a possible outcome. |
| 9:55:17AM | Is it inevitable?  No. |
| 9:55:21AM | **Q.**  And, in fact, in the real world, when Apple launched the |
| 9:55:23AM | iPhone without third-party apps, it quickly realized that in |

9:55:27AM    order to have the kind of success that it's had, it needed to

9:55:31AM    open the store, over Mr. Jobs' initial objection; isn't that

9:55:34AM    right?

9:55:35AM    A.   I'm unaware of the internal debate, but that is -- that is

9:55:40AM    certainly what happened.

9:55:41AM    Q.   Okay.

9:55:42AM    A.   It could --

9:55:43AM    Q.   Thank you?

9:55:43AM    A.   -- have engaged in --

9:55:45AM    Q.   Thank you.

9:55:48AM         MR. SWANSON:   Your Honor, can Professor Schmalensee

9:55:49AM    be allowed to finish his answers?

9:55:51AM         THE COURT:   You have -- he's a world-renowned expert.

9:55:55AM    I am sure he has dealt with cross-examination before.  He

9:55:57AM    seems to be managing just fine.  You'll have redirect.

9:56:00AM        Proceed.

9:56:02AM    BY MR. BORNSTEIN:

9:56:02AM    Q.   And I'll do my best not to be rude, so I'd just appreciate

9:56:05AM    if I have an answer to the question, and Mr. Swanson will give

9:56:08AM    you an opportunity to expound, if -- if that's appropriate.

9:56:10AM    A.   I recognize that.

9:56:11AM    Q.   Thank you.  I thought we did well last time.  Hope we do

9:56:15AM    well again.

9:56:15AM    A.   It was a civilized deposition.  I will say that.

9:56:18AM    Q.   Thank you.

SCHMALENSEE - CROSS / BORNSTEIN

9:56:20AM        I'd like to go back to a conversation that you had about

9:56:22AM   the anti-steering rules a little earlier this morning.

9:56:24AM        Do you remember that discussion?

9:56:26AM   **A.**  Vividly.

9:56:26AM   **Q.**  And you testified that your understanding of the rules --

9:56:29AM   again if I heard you correctly, was that they prohibit a call

9:56:33AM   to action saying that the -- the user may save money; is that

9:56:38AM   right?

9:56:38AM   **A.**  I think "call to action" may be the phrase in the rule, in

9:56:43AM   fact, yes.

9:56:43AM   **Q.**  Okay.

9:56:43AM        But the rule goes further than just prohibiting a call to

9:56:46AM   action and indicating that it would save the user money.

9:56:51AM   Right?  It goes further than that.

9:56:55AM   **A.**  Well, you'll to have quote me the rule.  I thought that

9:56:57AM   was the core of the rule.

9:56:59AM   **Q.**  Well, the rule also prohibits any call to action at all,

9:57:03AM   even if it doesn't say something about the price available on

9:57:05AM   to alternative platform.

9:57:06AM        Isn't that correct?

9:57:07AM   **A.**  I'd have to hear the rule to be sure.

9:57:11AM   **Q.**  Okay.  You don't know sitting here now?

9:57:14AM   **A.**  I've heard it, but I'd need to hear it again to be

9:57:17AM   positive.

9:57:17AM   **Q.**  Okay.

9:57:17AM        And so do you -- do you know one way or the other whether

9:57:20AM   the rule goes even further and prohibits targeted

9:57:25AM   communications outside of the app to users, such as through

9:57:30AM   email that have been registered through the app?

9:57:32AM        Do you know that?

9:57:33AM   **A.**   It does, I believe, prohibit that.  It doesn't -- it

9:57:38AM   prohibits taking advantage of the linkage to communicate the

9:57:43AM   existence of an alternative.

9:57:44AM   **Q.**   Right.

9:57:44AM        It prohibits communication sent to points of contact that

9:57:48AM   are targeted, such as targeted emails to users.

9:57:53AM   **A.**   That's my understanding.

9:57:58AM   **Q.**   Okay.

9:57:58AM        One other issue that you discussed with -- with

9:58:01AM   Mr. Swanson this morning I want to touch on, but -- actually,

9:58:04AM   maybe more than one.

9:58:07AM        You testified that the market that was at issue in the

9:58:15AM   in-app purchase payment solution field was -- I think you

9:58:22AM   testified relatively small; is that right?

9:58:24AM   **A.**   Well, I didn't endorse that market definition.  What I

9:58:34AM   intended to say was if anything's been foreclosed by IAP, IAP

9:58:40AM   is relatively -- is small relative to the universe of in-app

9:58:45AM   payment processing.

9:58:46AM   **Q.**   All right.  So you're talking about relative smallness

9:58:50AM   rather than absolute dollar figures.

SCHMALENSEE - CROSS / BORNSTEIN

9:58:52AM    **A.**  Absolutely.

9:58:52AM    **Q.**  Okay.

9:58:53AM        And do you know what the --

9:58:54AM    **A.**  That's what I -- that's what I said.  Sorry.

9:58:56AM    **Q.**  That -- that's fine.  That's why I asked the question.

9:58:59AM        Do you know what the absolute dollar figures are that have

9:59:00AM    been foreclosed by this conduct?

9:59:02AM    **A.**  Oh, I could estimate, but I don't know them off the top of

9:59:11AM    my head.  They're in the billions, obviously.  But I don't

9:59:13AM    have them on the top of my head.

9:59:15AM    **Q.**  The tens of billions, right?

9:59:17AM    **A.**  On that order, yes.  But "small" relative to the world of

9:59:22AM    online payment processing.

9:59:24AM    **Q.**  And earlier during Mr. Swanson's examination, you talked

9:59:29AM    about what I believe you called an iOS platform that had

9:59:32AM    multiple elements to it.

9:59:34AM        Do you recall that?

9:59:35AM    **A.**  I -- yeah, let me be clear.  I talked about the iOS

9:59:43AM    business as a platform that had multiple elements.

9:59:47AM    **Q.**  Fair enough.

9:59:47AM    **A.**  So I talked about the business, yeah.

9:59:49AM    **Q.**  And -- and you talked about three elements, correct?

9:59:52AM    **A.**  I did, yes.

9:59:53AM    **Q.**  And one of them was the device itself, the hardware,

9:59:55AM    correct?

SCHMALENSEE - CROSS / BORNSTEIN

9:59:56AM    **A.**   Correct.

9:59:57AM    **Q.**   One of them was the iOS operating system, correct?

10:00:01AM   **A.**   Correct.

10:00:02AM   **Q.**   And the third one was the -- the App Store; is that --

10:00:06AM   **A.**   Correct.

10:00:07AM   **Q.**   And those are three separate, identifiable pieces of

10:00:13AM   this -- of this iOS business; isn't that right?

10:00:16AM   **A.**   Well, they're identifiable in one sense that you can point

10:00:22AM   to them, as you just did, and we can say that the operating

10:00:26AM   system is distinct from the hardware.

10:00:28AM        They're not distinct in the sense that --

10:00:30AM   **Q.**   Thank you, sir.

10:00:30AM   **A.**   -- separate costs.

10:00:31AM   **Q.**   -- answered the question.

10:00:32AM   **A.**   Sorry.

10:00:33AM   **Q.**   Now, but let's take the -- take that -- that taxonomy and

10:00:40AM   apply it over to a different device.

10:00:42AM        So you're familiar with Microsoft, obviously, as you

10:00:48AM   testified, correct?

10:00:48AM   **A.**   It's been a while, Counsel, but, yes, I'm broadly familiar

10:00:52AM   with Microsoft.

10:00:53AM   **Q.**   So Microsoft has an operating system called Windows.

10:00:56AM   **A.**   They do.

10:00:56AM   **Q.**   And Windows runs on laptop computers like Lenovo

10:01:01AM   computers?

SCHMALENSEE - CROSS / BORNSTEIN

10:01:01AM  **A.**  Which is exactly what I have, yes.

10:01:04AM  **Q.**  I do, too.

10:01:05AM       And you can also get on your Lenovo computer running a

10:01:10AM  Windows operating system an online marketplace such as Steam,

10:01:15AM  correct?

10:01:15AM  **A.**  Yes.

10:01:16AM  **Q.**  And those are three separate elements of the platform that

10:01:21AM  you would then be using, correct?

10:01:23AM  **A.**  Well, I wouldn't consider Steam an element of the

10:01:26AM  Microsoft platform since Steam is owned by Valve, as I recall.

10:01:30AM  **Q.**  And so the only reason that you consider the three

10:01:36AM  elements of the iOS business as part of the platform is that

10:01:40AM  they're all owned by Apple?

10:01:42AM  **A.**  Right.  And they have joint costs and they -- there are

10:01:46AM  indirect network effects linking them and so on and so forth.

10:01:50AM  But that's why I described the business.

10:01:52AM  **Q.**  Right.

10:01:52AM       So it is the -- the integrated nature of this as a result

10:01:56AM  of Apple's choice as to how to run its business rather than an

10:02:02AM  inherent feature of any of these particular products, correct?

10:02:05AM  **A.**  Not sure what you -- sorry.  Not sure what you mean by an

10:02:10AM  inherent feature, but it is certainly Apple's choice as to how

10:02:14AM  to organize its business.

10:02:15AM  **Q.**  And it is Apple's choice as to how to organize its

10:02:18AM  business that is the reason that you testify that these are

SCHMALENSEE - CROSS / BORNSTEIN

10:02:21AM    integrated with one another, correct?

10:02:23AM    **A.**  I was describing Apple's business, yes.

10:02:26AM    **Q.**  Thank you.

10:02:26AM        Let -- let's turn back to two-sided platforms.  Am I

10:02:33AM    correct that the -- a two-sided analysis of the business is

10:02:41AM    neither pro-defendant nor pro-plaintiff?

10:02:45AM    **A.**  You asked that in my deposition, and I answered that is

10:02:48AM    correct, and it's still correct.

10:02:50AM    **Q.**  Great.

10:02:50AM        And in the wake of the *AmEx* decision that we've talked

10:02:55AM    about for some time, there were a number of commentators who

10:03:00AM    took a contrary view, correct?

10:03:02AM    **A.**  There were some, yes; that's correct.

10:03:07AM    **Q.**  And you took to the airwave, so to speak, or the -- the

10:03:12AM    print airwaves to dispute that notion, correct?

10:03:15AM    **A.**  Along with Dr. Evans, yes.

10:03:17AM    **Q.**  Yes, indeed.  And you said that the two-sided analysis

10:03:22AM    does not make platform bases a no-go zone for the antitrust

10:03:26AM    laws, correct?

10:03:27AM    **A.**  I don't know if I used those words or if John Troll used

10:03:31AM    those words, but I agree with them.

10:03:32AM    **Q.**  Great.

10:03:32AM        And you still agree with them today?

10:03:35AM    **A.**  I do.

10:03:36AM    **Q.**  And you have in this matter opined that if the core firms

SCHMALENSEE - CROSS / BORNSTEIN

10:03:43AM    under review are two-sided transaction platforms, then under

10:03:51AM    *AmEx* only other two-sided transaction platforms should be

10:03:55AM    considered in the market, correct?

10:03:56AM    **A.**  Well, let me be clear, Counselor.  My understanding was --

10:04:01AM    **Q.**  I'm sorry.  The question first, is that an opinion that

10:04:04AM    you have expressed in this case, sir?

10:04:05AM    **A.**  Let me -- if I used those words, then I used those words.

10:04:12AM    But it's a question of what "under *AmEx*" means.

10:04:15AM    **Q.**  Well, is -- is that a legal opinion that you offer?

10:04:17AM    **A.**  It would have been a legal opinion because it has been

10:04:22AM    argued that *AmEx* compels exclusion of single-sided competitors

10:04:27AM    from market definitions.  Single-sided competitors, obviously,

10:04:31AM    compete with two-sided platforms, as Dr. Evans and I have both

10:04:36AM    said.

10:04:36AM    **Q.**  Right.  So you -- you agree that single-sided businesses

10:04:41AM    can compete --

10:04:43AM    **A.**  Businesses.

10:04:43AM    **Q.**  -- with a two-sided platform in a single market, right?

10:04:48AM    **A.**  I do, yes.

10:04:49AM    **Q.**  And, in fact, you have taken the position that this case

10:04:52AM    presents such a market.

10:04:53AM        Correct?

10:04:54AM    **A.**  I've taken the position that direct distribution can, in

10:05:04AM    principle, compete with distribution through app stores, yes.

10:05:08AM    **Q.**  Right.

SCHMALENSEE - CROSS / BORNSTEIN

10:05:08AM        You -- you, in fact, have gone further than that, and you

10:05:11AM   said that direct distribution does compete with online market

10:05:16AM   places like two-sided platform app stores, correct?

10:05:21AM   **A.**  Where direct distribution happens, it competes with app

10:05:24AM   stores, yes.

10:05:26AM   **Q.**  Right.

10:05:26AM        It doesn't happen on the iOS platform because Apple

10:05:28AM   forbids it.

10:05:30AM   **A.**  That's why I was hedging.

10:05:32AM   **Q.**  All right.

10:05:32AM        And that makes the market at issue here, unlike the market

10:05:36AM   in *AmEx*, a hybrid market, consisting of both two-sided

10:05:41AM   businesses or two-sided platforms and single-sided businesses,

10:05:46AM   correct?

10:05:46AM   **A.**  I think that's right.  The market in *AmEx* was clearly

10:05:50AM   composed of two-sided platforms unless you include cash, and

10:05:56AM   then it gets be -- but it wasn't included.

10:05:58AM   **Q.**  And so as an economic matter, we're dealing with something

10:06:00AM   different from *AmEx* in that respect, correct?

10:06:02AM   **A.**  In that respect.

10:06:04AM   **Q.**  Very good.

10:06:05AM        Now, one of the things as we've talked about some this

10:06:08AM   morning that makes the analysis of two-sided platforms more

10:06:13AM   complicated is the existence of indirect network effects,

10:06:18AM   correct?

SCHMALENSEE - CROSS / BORNSTEIN

10:06:19AM    **A.** That's correct.

10:06:20AM    **Q.** And you talked a little bit about a feedback effect this

10:06:23AM    morning, correct?

10:06:23AM    **A.** I did.

10:06:25AM    **Q.** And depending on the particular platform at issue, those

10:06:31AM    feedback effects can be stronger or weaker, correct?

10:06:34AM    **A.** Correct. Except in the case of transaction platforms,

10:06:36AM    they're generally strong.

10:06:38AM    **Q.** And -- and there are particular names that economists use

10:06:44AM    to describe the -- the strengths of these things. You used

10:06:48AM    some this morning, like cross-price elasticity and so forth.

10:06:52AM    **A.** Well, I don't think I said "cross-price elasticity." I

10:06:55AM    could have, but we tend to use elasticities as a measure of

10:06:59AM    strength.

10:07:01AM    **Q.** And in analyzing a two-sided platform and the potential

10:07:10AM    competitive consequences of conduct relating to that platform,

10:07:14AM    it is important to consider the strength of the indirect

10:07:18AM    network effects at issue, fair?

10:07:19AM    **A.** Yes.

10:07:21AM    **Q.** And you haven't done anything in this case to analyze the

10:07:26AM    strength of the indirect network effects associated with the

10:07:29AM    App Store, correct?

10:07:30AM    **A.** As I think I said in my written testimony, I don't think

10:07:34AM    this record has information that would permit one to estimate

10:07:36AM    that strength.

SCHMALENSEE - CROSS / BORNSTEIN

10:07:37AM   **Q.**   But you do recognize, I believe, that most smartphone

10:07:42AM   users have either an iOS or an Android but not both, correct?

10:07:49AM   **A.**   I certainly recognize that.

10:07:50AM   **Q.**   And that's something that the antitrust folks like you --

10:07:53AM   excuse me -- the economics folks like yourself call

10:07:56AM   "single-homing," right?

10:07:58AM   **A.**   Yeah.   For unfortunate reasons, yes.

10:08:00AM   **Q.**   And in single-homing situations, competition between

10:08:06AM   customers is typically a winner-take-all struggle for all of

10:08:11AM   the business from the users on the single-homing side of the

10:08:16AM   platform, correct?

10:08:17AM   **A.**   It has aspects of that, but it depends in part on

10:08:20AM   switching costs.   The notion that a competitor will get all of

10:08:26AM   the buyers on one side requires special extra assumptions.

10:08:32AM   **Q.**   Right.

10:08:32AM   The higher the switching costs, the more likely it is that

10:08:36AM   there will be a winner-take-all situation, correct?

10:08:38AM   **A.**   Well, you need more than that.   You need there only to be

10:08:41AM   one or a dominant competitor trying to capture those folks

10:08:47AM   just because --

10:08:48AM   Well, let me stop there.

10:08:49AM   **Q.**   Okay.   Well, sir, you've written, haven't you, that

10:08:52AM   competition for single-homing customers is a winner-take-all

10:08:57AM   struggle for all of their business, right?

10:08:59AM   Those are your words.

10:09:01AM   **A.**   I must have said it if you -- if you tell me I said it.

10:09:05AM   It seems pretty careless to me because if there are two of us

10:09:09AM   competing, it's not obvious why one of us will get them all.

10:09:14AM   **Q.**   You don't dispute that you've written that -- that you've

10:09:17AM   written that in an academic journal, sir?

10:09:20AM   **A.**   Boy, I'd love to see the context.  It seems very -- a very

10:09:24AM   strange statement for me to make, because it doesn't make --

10:09:27AM   of course, I do make sentences that don't make a lot of sense.

10:09:30AM   But that one doesn't seem to make a lot of sense.

10:09:32AM       Could you show me the context in which I said it

10:09:35AM   because --

10:09:35AM   **Q.**   I'll give you a little more information to start, sir.

10:09:37AM       You remember an instant classic?  That's something you

10:09:40AM   wrote?

10:09:40AM   **A.**   Oh, yeah, yeah, yeah.  This is -- this is about -- okay.

10:09:44AM       Yeah.  This is --

10:09:46AM                         (Simultaneous colloquy.)

10:09:47AM   **Q.**   You remember writing that, sir.

10:09:49AM   **A.**   I'm happy to describe it and say why I said what I said,

10:09:52AM   if you like that.

10:09:53AM   **Q.**   Well, let me read to you first the prior -- well, we can

10:09:55AM   pull it up on the screen perhaps.  That might make things

10:09:59AM   easier.

10:09:59AM       PX1997.

10:10:01AM                         (Exhibit published.)

10:10:04AM  **BY MR. BORNSTEIN:**

10:10:04AM  **Q.**  And I'm looking at page 177.

10:10:08AM  (Exhibit published.)

10:10:18AM  **MR. BORNSTEIN:**  Great.

10:10:18AM  **Q.**  And we can see the prior sentence there in the middle of

10:10:20AM  the -- the middle paragraph on the middle of the page.  You

10:10:24AM  say, "In the case of smartphone operating systems, for

10:10:27AM  instance, most consumers single-home at any one time while

10:10:32AM  many developers multi-home by writing apps for both Android

10:10:36AM  and Apple's iOS."

10:10:38AM  **A.**  Ah.

10:10:39AM  **Q.**  And then you go on, "competition for single-homing

10:10:42AM  customers is a winner-take-all struggle for all of their

10:10:45AM  business."

10:10:45AM  Correct?

10:10:46AM  **A.**  Yeah.

10:10:48AM  **Q.**  That --

10:10:48AM  (Simultaneous colloquy.)

10:10:49AM  **THE WITNESS:**  I did say that, and I will now explain

10:10:51AM  that you -- you've kind of misinterpreted what I meant.

10:10:54AM  **BY MR. BORNSTEIN:**

10:10:54AM  **Q.**  Well, let me --

10:10:55AM  (Simultaneous colloquy.)

10:10:55AM  **BY MR. BORNSTEIN:**

10:10:55AM  **Q.**  Excuse me, sir.

SCHMALENSEE - CROSS / BORNSTEIN

10:10:57AM  **A.**  Can I explain what that means?

10:10:59AM  **Q.**  Well --

10:10:59AM       **THE COURT:**  Probably on redirect.

10:11:01AM       **THE WITNESS:**  Okay.  Then I do not doubt that I said

10:11:05AM  those sentences -- wrote those sentences.

10:11:07AM  **BY MR. BORNSTEIN:**

10:11:08AM  **Q.**  And it is, in fact, the case that when there are switching

10:11:13AM  costs that are high and when you have customers who

10:11:17AM  single-home for that reason, then the situation is much closer

10:11:24AM  to or resembles the situation in which there is a monopoly

10:11:28AM  provider, correct?

10:11:29AM  **A.**  Well, we're now completing mixing modes, and I'd say no.

10:11:32AM  I'd say this is completely unrelated to switching costs, and

10:11:35AM  we'll -- we'll spend some time on it on redirect, but it is

10:11:39AM  unrelated to switching costs.

10:11:41AM  **Q.**  Sir --

10:11:42AM  **A.**  It's a very simple point.

10:11:43AM  **Q.**  Sir, you do remember your deposition, right?  We talked

10:11:45AM  about it a little bit already.

10:11:46AM  **A.**  I do remember that, and I'm happy to say I said what you

10:11:50AM  said in my deposition.  I'm only saying that it's unrelated to

10:11:52AM  this.  And it says if there's -- if I can't switch platforms,

10:11:56AM  then the platform's a monopoly.

10:11:58AM  **Q.**  Right.  So --

10:11:59AM  **A.**  That's simple.

SCHMALENSEE - CROSS / BORNSTEIN

10:12:00AM    There may be multiple suppliers on the other side of the

10:12:03AM  platform.  But as far as the platform's concerned, if by the

10:12:07AM  assumption you gave me, I can't switch platforms, yeah, then

10:12:11AM  it's a monopoly.

10:12:13AM  **Q.**  Right.

10:12:13AM    And -- and what you testified was that if the reason

10:12:16AM  consumers single-home is that it's very difficult for them to

10:12:20AM  switch, then the situation resembles the situation with a

10:12:23AM  monopoly provider, correct?

10:12:25AM  **A.**  By definition.  By assumption.

10:12:28AM  **Q.**  And so when one side single-homes, the feedback effect

10:12:33AM  that you talked about earlier is weaker.  Correct?

10:12:35AM  **A.**  Those are not closely related.  Single-homing has to do

10:12:46AM  with what do you -- what do you normally do.  If you are

10:12:52AM  single-homing because there are strong switching costs, then

10:12:55AM  the feedback effects are attenuated.

10:12:58AM    And of course, different people will always have different

10:13:01AM  switching costs, but that's right.

10:13:03AM  **Q.**  All right.

10:13:03AM                    (Simultaneous colloquy.)

10:13:03AM        **THE WITNESS:**  Single-homing by itself doesn't do the

10:13:06AM  trick you want it to do.

10:13:07AM  **BY MR. BORNSTEIN:**

10:13:07AM  **Q.**  And that was my question, sir.  When you have

10:13:08AM  single-homing and there are high switching costs, then the

SCHMALENSEE - CROSS / BORNSTEIN

10:13:12AM   feedback effect is weaker, correct?

10:13:15AM   **A.**   That's correct.

10:13:16AM   **Q.**   All right.

10:13:16AM       And what you call the death spiral would be weaker,

10:13:20AM   correct?

10:13:20AM   **A.**   Well, I didn't use the "death spiral" this morning, but

10:13:23AM   it's in my testimony someplace.

10:13:25AM   **Q.**   And here, we have a situation in which developers on the

10:13:31AM   other hand are motivated to multi-home because consumers don't

10:13:36AM   often switch, right, between iOS and Android?

10:13:39AM   **A.**   Consumers do switch, but the switching probabilities are

10:13:42AM   relatively low under current conditions.

10:13:44AM   **Q.**   Consumers don't often switch.  "Yes" or "no," sir?

10:13:48AM   **A.**   The numbers are what they are.  And if you declare that

10:13:50AM   "not often," I'll accept your characterization.

10:13:53AM   **Q.**   Let's look at your deposition, sir.  I think it's --

10:13:56AM            **THE COURT:**   I need a copy of it.

10:13:58AM            **MR. BORNSTEIN:**   Of course, Your Honor.

10:13:59AM            **THE COURT:**   And you have two minutes.

10:14:07AM        Thank you.

10:14:12AM            **MR. BORNSTEIN:**   May I approach, Your Honor?

10:14:13AM            **THE COURT:**   You may.

10:14:15AM            **MR. BORNSTEIN:**   (Handing document.)

10:14:17AM            **THE WITNESS:**   Thank you.

10:14:21AM            **MR. BORNSTEIN:**   And, Your Honor, I'm looking at

10:14:22AM    page 48, starting at line 15.

10:14:37AM              THE COURT:  Well --

10:14:38AM              THE WITNESS:  Pagination's off.

10:14:39AM              THE COURT:  There are a couple of sentences there,

10:14:41AM    Mr. Bornstein.

10:14:41AM         What do you want him to do, just look at it?  He --

10:14:46AM              MR. BORNSTEIN:  I apologize, Your Honor.  I didn't

10:14:48AM    hear what you said.

10:14:49AM              THE COURT:  I said there are a couple of sentences

10:14:51AM    there.  I don't see impeachment.

10:14:53AM              MR. BORNSTEIN:  Well, I'll -- I'll read it into the

10:14:55AM    record, Your Honor, and we can go from there.

10:14:56AM         Question was "And what is the economic motivation that the

10:15:00AM    developer has to write for both devices?

10:15:03AM              "A.  Consumers don't often switch."

10:15:05AM         Did -- did you give that testimony, sir?

10:15:08AM              THE COURT:  But, Mr. Bornstein, that's why I said

10:15:10AM    there's not impeachment, because he then said they do switch

10:15:13AM    from time to time.

10:15:14AM              MR. BORNSTEIN:  Correct, Your Honor.

10:15:15AM              THE COURT:  Okay.  Which is consistent with what he

10:15:20AM    testified to.  That's why there was no impeachment.

10:15:22AM              MR. BORNSTEIN:  I understand what Your Honor is

10:15:24AM    saying.

10:15:25AM              THE COURT:  It's 10:15.

10:15:27AM          **MR. BORNSTEIN:**  Very good.

10:15:27AM          **THE COURT:**  Time for a break.  We'll stand in recess

10:15:29AM     for 20 minutes.

10:15:30AM                    (Recess taken at 10:16 A.M.)

10:15:30AM                  (Proceedings resumed at 10:35 a.m.)

6          **THE COURT:**  All right.  We are back on the record.

10:35:29AM     The record will reflect that the parties are present.  The

10:35:32AM     witness is on the stand.

10:35:33AM          Before we get started again, Mr. Bornstein, let me ask the

10:35:37AM     parties, there have been a number of exhibits that have been

10:35:40AM     referenced in the earlier exam and with you.  I know that I'm

10:35:47AM     agreeing to a stipulation, which is at Docket 635, that I

10:35:51AM     think has, like, four or five pages' worth of exhibits that

10:35:54AM     are coming into the record.

10:35:56AM          Are all of your documents in the record?  I mean, is this

10:36:03AM     something that we need to deal with during the course of the

10:36:06AM     testimony or not?

10:36:07AM          **MR. BORNSTEIN:**  I don't believe there is anything we

10:36:09AM     need to deal with during the testimony, because the experts

10:36:11AM     wouldn't be laying foundation for the documents.  The parties

10:36:14AM     are doing that through stipulation.  So I don't think we need

10:36:17AM     to get the documents admitted, unless the Court would like to

10:36:19AM     do it that way.

10:36:21AM          **THE COURT:**  That's fine.

10:36:21AM          Mr. Doren?

10:36:23AM          **MR. DOREN:**  Your Honor, I think this reverts back to

10:36:25AM   the issue we discussed this morning in terms of working

10:36:27AM   through the issues with the evidence.  So I agree with

10:36:31AM   Mr. Bornstein.

10:36:32AM          **THE COURT:**  Okay.  Then we'll just leave it at that.

10:36:35AM   Thank you.

10:36:35AM       You may proceed.

10:36:38AM          **MR. BORNSTEIN:**  Thank you, Your Honor.

10:36:40AM                      **<u>CROSS-EXAMINATION</u>**

10:36:42AM   **BY MR. BORNSTEIN:**

10:36:43AM   **Q.**  Professor Schmalensee, you have testified a number of

10:36:46AM   times before; correct?

10:36:47AM   **A.**  I have, yes.

10:36:48AM   **Q.**  Including in a courtroom?

10:36:49AM   **A.**  Including in a courtroom.  It's been a while, but I have.

10:36:52AM   **Q.**  Okay.  So you understand the rule that during your

10:36:54AM   cross-examination and on break, you're not supposed to discuss

10:36:56AM   the content of your testimony with counsel; is that right?

10:37:00AM          **THE COURT:**  Actually, that's not the rule.  There is

10:37:02AM   no rule, and I -- I instruct witnesses when they cannot talk

10:37:08AM   to counsel.  I did not instruct him that he could not talk to

10:37:18AM   counsel.

10:37:19AM          **MR. BORNSTEIN:**  Okay.  Thank you, Your Honor.

10:37:21AM          **THE WITNESS:**  Thank you, Your Honor.

10:37:23AM          **THE COURT:**  Lawyers are here for a reason.  They

10:37:25AM    represent people and they help people.  The only time that I

10:37:32AM    specifically instruct witnesses not to do that -- and I think

10:37:34AM    I've done that in this case maybe once or twice -- is when

10:37:37AM    we're in the middle of an exam where I think the factual

10:37:41AM    issues should not be influenced by lawyers.  And that's when I

10:37:45AM    make the instruction.

10:37:47AM        Proceed.

10:37:48AM            MR. BORNSTEIN:  Thank you, Your Honor.

10:37:49AM    Q.  I'll move to a new topic for the second half of the

10:37:52AM    morning session, which is market definition.

10:37:55AM        And am I correct, Professor, that your opinion on the

10:38:03AM    relevant product markets in this case relies on work done by

10:38:07AM    some of the other experts in this matter?

10:38:09AM    A.  Yes.

10:38:10AM    Q.  All right.  And in particular, you rely on empirical work

10:38:14AM    done by Professor Hitt.

10:38:16AM    A.  Yes.

10:38:17AM    Q.  You have not made an effort to redo or check the accuracy

10:38:20AM    of his empirical work; is that right?

10:38:23AM    A.  I have considered the methods he used.  I've reviewed his

10:38:26AM    testimony.  I haven't checked his calculations.

10:38:30AM    Q.  And you didn't go back and check the underlying sources on

10:38:32AM    which he relied and so forth?

10:38:35AM    A.  Oh, no, I did not.

10:38:36AM    Q.  You didn't go back and redo any of the analyses that

SCHMALENSEE – CROSS / BORNSTEIN

10:38:39AM   Professor Lafontaine did either; correct?

10:38:43AM   **A.**   I did not.

10:38:44AM   **Q.**   Now, you agree that there's a tool that economists often

10:38:47AM   use to define markets called a hypothetical monopolist test;

10:38:52AM   correct?

10:38:53AM   **A.**   Yes.

10:38:53AM   **Q.**   And in theory, at least, I believe you agree that it would

10:39:00AM   make sense to apply a hypothetical monopolist test to the

10:39:04AM   market for game transactions that Professor Hitt has defined;

10:39:09AM   correct?

10:39:10AM   **A.**   Yes.   That can be done in a number of ways, but, yes, it

10:39:14AM   would make sense.

10:39:15AM   **Q.**   Okay.   And you didn't do that here?

10:39:18AM   **A.**   I did not do that.

10:39:19AM   **Q.**   And Professor Hitt did not do that here either; correct?

10:39:23AM   **A.**   Professor Hitt didn't do it in any detail.

10:39:26AM   Professor Lafontaine did attempt to do that.

10:39:29AM   **Q.**   So we will hear from Professor Lafontaine, I believe,

10:39:32AM   later today, but your understanding is that she performed a

10:39:35AM   hypothetical monopolist test; correct?

10:39:37AM   **A.**   To the extent that the facts in the record permitted her

10:39:40AM   to do that, she attempted to do that.

10:39:43AM   **Q.**   All right.   And in your understanding, she did that by

10:39:47AM   looking at what you called substitution possibilities; right?

10:39:52AM   **A.**   Or reasonable interchangeability, substitutability, yes.

SCHMALENSEE - CROSS / BORNSTEIN

10:39:58AM  **Q.**  Okay.  But without looking at actual substitution;

10:40:00AM  correct?

10:40:01AM  **A.**  Well, actual substitution isn't very informative if

10:40:03AM  nothing changes, right?  Because you want to see how

10:40:06AM  responsive something might be to a price change, but it's hard

10:40:09AM  to estimate that if nothing changes.  An actual substitution

10:40:13AM  may not be very informative about what a reaction would be.

10:40:17AM  **Q.**  And you're saying actual substitution would not be

10:40:20AM  informative as a general matter, or you're saying actual

10:40:22AM  substitution would not be informative here because there is no

10:40:26AM  price change that you have identified?

10:40:28AM  **A.**  If there aren't price changes, actual substitution doesn't

10:40:31AM  tell you what you need to know, which is reaction to a price

10:40:33AM  change.

10:40:34AM  **Q.**  You could also have reaction to the introduction of a new

10:40:39AM  product involved, however; correct?

10:40:42AM  **A.**  You would expect to have a reaction, yes.

10:40:44AM  **Q.**  And that's a way that an economist could measure whether

10:40:47AM  or not there was actual substitution; correct?

10:40:52AM  **A.**  It might shed light on it, yes.

10:40:54AM  **Q.**  Okay.  And Professor Hitt actually tried to do that in

10:40:57AM  this case, did he not?

10:40:58AM  **A.**  Professor Hitt did some work on the reaction to the

10:41:03AM  introduction of the Switch device, as I recall.

10:41:06AM  **Q.**  And in particular, it was to the launch of the *Fortnite*

10:41:10AM    app on the Nintendo Switch; correct?

10:41:13AM    A.  Thank you for the clarification.  Yes, that is as I

10:41:16AM    understand.

10:41:16AM    Q.  And his conclusion was that the data that he reviewed

10:41:23AM    associated with the launch of *Fortnite* on the Switch showed

10:41:27AM    that users actually shifted play time and spending away from

10:41:33AM    iOS and towards the Switch; correct?

10:41:36AM    A.  Well, what he presented in the body of his expert report

10:41:39AM    showed that in percentage terms they shifted.  His Appendix G,

10:41:43AM    which I confess I hadn't focused on before my deposition,

10:41:48AM    deals with absolute levels of play and spending, but the text

10:41:52AM    deals with relative changes.

10:41:54AM    Q.  Right.  And are you aware that in the written testimony

10:41:58AM    that he submitted to the Court in this matter, he again states

10:42:03AM    that the results of his analysis clearly showed that users

10:42:08AM    shifted their play time and spending away from iOS following

10:42:12AM    the launch of *Fortnite* on the Nintendo Switch?

10:42:15AM    A.  I think that's based on an elaboration of the analysis

10:42:18AM    that was contained in Appendix G of his rebuttal report.  So I

10:42:22AM    do believe that's his conclusion, yes.

10:42:24AM    Q.  And that's a conclusion, as I think you said, about the

10:42:27AM    relative usage of the iOS device and the Switch device for

10:42:32AM    playing *Fortnite*; correct?

10:42:34AM    A.  No.  He called my attention and everybody's attention to

10:42:37AM    Appendix G in that original report, which deals with absolute

10:42:41AM   levels, not relative levels.  And I believed he -- I believe

10:42:44AM   he focused on that analysis of absolute levels in his written

10:42:48AM   testimony.

10:42:49AM   Q.  And the absolute levels of iOS use and *Fortnite* use show

10:42:58AM   that there was an increase in total play; correct?

10:43:02AM   A.  I believe that's right, yes.

10:43:04AM   Q.  So your conclusion from reviewing Professor Hitt's

10:43:10AM   materials was that the data he relied on did not support the

10:43:16AM   strong conclusion he had reached regarding actual

10:43:19AM   substitution; correct?

10:43:21AM   A.  The conclusion -- my testimony says that what was in his

10:43:25AM   report, since I kind of missed Appendix G, was all about

10:43:29AM   relative play, not about absolute play.

10:43:32AM   Q.  And then --

10:43:32AM   A.  And that's what I testified to, that the exhibits I had

10:43:36AM   seen didn't support a conclusion on absolute play, again,

10:43:40AM   having missed Appendix G.

10:43:42AM   Q.  So let's just be clear about what his testimony shows and

10:43:46AM   doesn't show.  And I'm not at all faulting you, sir, for

10:43:50AM   having missed an appendix.  I'd like to focus on the substance

10:43:57AM   rather than having missed an appendix here or there.

10:43:59AM   A.  Thank you.

10:44:00AM   Q.  On the substance, Professor Hitt testified, including in

10:44:03AM   his written testimony to the Court, that the relative decline

10:44:06AM   in iOS *Fortnite* play after the launch of *Fortnite* on the

SCHMALENSEE - CROSS / BORNSTEIN

10:44:12AM   Switch indicated actual substitution; correct?

10:44:18AM   **A.**   I'd have to review his written testimony to verify that

10:44:21AM   that's what he said.  And the question is did he, when he said

10:44:24AM   that, rely on an elaboration of that Appendix G analysis,

10:44:29AM   which I gather is in his written testimony less obscure than

10:44:33AM   in his rebuttal report.

10:44:35AM   **Q.**   Well, let's do the math, sir.

10:44:37AM       You said he looked at percentages, so that means in his

10:44:42AM   analysis, he looked at what percentage of people were playing

10:44:46AM   *Fortnite* on iOS and then what happened to that number after

10:44:51AM   *Fortnite* was launched on the Nintendo Switch --

10:44:54AM   **A.**   That was --

10:44:54AM   **Q.**   -- correct?

10:44:55AM   **A.**   That was one of his analyses, and that was the analysis I

10:44:58AM   was speaking of in my deposition.

10:44:59AM       He also looked at absolute levels --

10:45:02AM   **Q.**   Sir, one question at a time.  We'll get there.

10:45:04AM   **A.**   Well, but you're asking what he did, and he did two

10:45:06AM   things.

10:45:07AM   **Q.**   Right.  And I was trying to take them one at a time.

10:45:10AM   **A.**   Okay.

10:45:10AM   **Q.**   So that was one of the things that he did?

10:45:12AM   **A.**   Indeed.

10:45:13AM   **Q.**   And you believe that that analysis does not show actual

10:45:17AM   substitution; correct?

SCHMALENSEE - CROSS / BORNSTEIN

10:45:20AM  **A.**  That analysis shows a change in the percentage of time

10:45:24AM  played.  It doesn't show that what you would expect it to show

10:45:30AM  would be that there was a substitute -- a reduction in the

10:45:34AM  play of *Fortnite* --

10:45:35AM  **Q.**  And it's --

10:45:36AM  **A.**  Sorry.

10:45:36AM  -- on iOS.

10:45:38AM  **Q.**  It's almost a tautology -- in fact, perhaps is a

10:45:42AM  tautology -- that the total amount of time on iOS -- excuse

10:45:47AM  me -- the percentage of time on iOS would go down when there's

10:45:51AM  a new device that's introduced; correct?

10:45:54AM  **A.**  Assuming you use the new device, yes.  That goes by

10:45:58AM  arithmetic.

10:45:59AM  **Q.**  Right.  And that could happen even if all of the play on

10:46:02AM  the new device on the Switch comes from brand-new users or

10:46:08AM  comes from incremental new play time rather than people

10:46:13AM  switching over from one device to the other; correct?

10:46:16AM  **A.**  I believe that's right.

10:46:17AM  **Q.**  Just as a matter of math.

10:46:19AM  **A.**  Just as a matter of math.

10:46:21AM  **Q.**  And then when you look at the absolute numbers, what you

10:46:26AM  see is that when *Fortnite* was launched on the Switch, there

10:46:30AM  wasn't substitution, but there was a total absolute increase

10:46:34AM  in both play and spending; correct?

10:46:39AM  **A.**  I believe that's what Mr. Cragg's analysis showed.  Again,

SCHMALENSEE - CROSS / BORNSTEIN

10:46:44AM    I haven't tried to verify the accuracy of his numbers, but

10:46:47AM    that's what the exhibits showed.

10:46:48AM        Mr. -- Professor Hitt's analysis in his testimony

10:46:55AM    focuses -- takes a different cut at it, reaches a different

10:46:57AM    conclusion.

10:46:58AM    Q.  And that's a conclusion that you don't think is supported

10:47:01AM    by his analysis; correct?

10:47:03AM    A.  I don't think the conclusion he reached about absolute

10:47:06AM    play was supported by the analysis in the text of his rebuttal

10:47:10AM    report.

10:47:11AM        Whether it's supported by his analysis of levels, I think,

10:47:16AM    is a different matter.  And I confess I haven't looked at it

10:47:19AM    closely enough to have a firm opinion.

10:47:23AM    Q.  In the situation in which there is a total increase in --

10:47:31AM    in play time, that's going to include both new users and

10:47:37AM    people who are playing additional amounts of time.  Either of

10:47:41AM    those is possible; correct?

10:47:42AM    A.  Yes.

10:47:43AM    Q.  Rather than just people moving from one over to the other;

10:47:47AM    correct?

10:47:48AM    A.  Of course.

10:47:49AM    Q.  And so in the only instance that any one of Apple's

10:47:54AM    experts looked at of possible actual substitution, what

10:48:00AM    Professor Hitt found was there was an overall increase in play

10:48:04AM    and an insufficient basis to find actual substitution from one

10:48:08AM   device to the other; correct?

10:48:12AM   A.   The part of his analysis -- as I say, he did two pieces.

10:48:16AM   The first piece dealt with relative usage, and that didn't

10:48:19AM   show actual substitution.

10:48:20AM       The second piece, which is in that appendix and I believe

10:48:24AM   is also in his written testimony, again, I'm not as familiar

10:48:27AM   with it as I might be, but he would argue, and probably will

10:48:31AM   argue, that it shows absolute substitution.

10:48:32AM   Q.   And you don't know, as you sit here now, whether Appendix

10:48:37AM   G actually shows absolute quantities; is that right?

10:48:42AM   A.   Appendix G does, I believe, show absolute quantities.

10:48:45AM   Q.   And what it shows is there was an increase in overall

10:48:47AM   quantities; correct?

10:48:48AM   A.   It shows there was an increase in play, yes.

10:48:50AM   Q.   And in revenue.

10:48:52AM   A.   I believe, yes.  There were two charts in that appendix.

10:48:56AM   Q.   Going back to a hypothetical monopolist test, we've had

10:49:01AM   some discussion about a SSNIP test during the trial.

10:49:04AM       And a SSNIP test is a way to operationalize the

10:49:09AM   hypothetical monopolist test; is that right?

10:49:11AM   A.   Yes.

10:49:13AM   Q.   And it's at least possible to do a SSNIP test for a

10:49:16AM   two-sided market; correct?

10:49:19AM   A.   It is possible in theory.  Dr. Evans has written a couple

10:49:23AM   of papers that indicate how you would do that if you had the

10:49:27AM   data.

10:49:28AM   **Q.**  And you testified this morning and in your written direct

10:49:31AM   that you think Dr. Evans has not done that properly in this

10:49:34AM   case.

10:49:35AM   **A.**  I did testify and I hold that opinion.

10:49:38AM   **Q.**  And that's because, in your view, he didn't have

10:49:40AM   sufficient data to do it the right way.

10:49:44AM   **A.**  Well, I don't think any of us had sufficient data.  He

10:49:47AM   made strong assumptions in lieu of having actual quantitative

10:49:52AM   estimates.

10:49:53AM   **Q.**  And in Professor Lafontaine's hypothetical monopolist

10:49:57AM   test, which you believe she performed, she, too, did it

10:50:00AM   without having a precise elasticity; correct?

10:50:03AM   **A.**  Correct.

10:50:04AM   **Q.**  And she nevertheless came up with a market definition that

10:50:10AM   you are comfortable with; correct?

10:50:11AM   **A.**  Yes.

10:50:12AM   **Q.**  Okay.

10:50:13AM   **A.**  She looked at what people did, in fact, without data on

10:50:15AM   SSNIP tests.  She looked at reasonable interchangeability.

10:50:20AM   **Q.**  And you take it a step further, and in your written

10:50:24AM   testimony to the Court, you do a hypothetical, hypothetical

10:50:30AM   monopolist test; correct?

10:50:36AM   **A.**  I confess I didn't think of my testimony in that way, but

10:50:38AM   perhaps you can -- you can tell me what you have in mind.

10:50:42AM   **Q.**   Sure.  Well, you say that you're confident that if you had

10:50:46AM   the data to do a test and if you had done the test with that

10:50:51AM   hypothetical -- hypothetical data, then you're confident that

10:50:55AM   where it would land would be a market supportive of what

10:50:59AM   Professor Hitt and Professor Lafontaine have defined; correct?

10:51:03AM   **A.**   I don't think I went that far in my written testimony.

10:51:06AM       In my oral testimony this morning, I described why it --

10:51:12AM   you would get a larger output decline from a price increase.

10:51:17AM   I didn't take that to a market definition.

10:51:20AM   **Q.**   Well, what you testified in your written direct, sir, was,

10:51:24AM   "If the data were available, I believe that a properly

10:51:27AM   conducted hypothetical monopolist test would lead to the

10:51:30AM   conclusion that the relevant market for deemed transactions is

10:51:35AM   broader than the App Store."

10:51:36AM       Is that fair?

10:51:38AM   **A.**   That's fair.

10:51:40AM           **THE COURT:**  Mr. Bornstein, what paragraph?

10:51:42AM           **MR. BORNSTEIN:**  Oh, I apologize, Your Honor.  That is

10:51:44AM   paragraph 106.

10:51:46AM           **THE COURT:**  Thank you.

10:51:48AM   **BY MR. BORNSTEIN:**

10:51:48AM   **Q.**   The -- there was some discussion this morning about

10:51:51AM   Dr. Evans' testimony about distribution.

10:51:56AM       Do you recall that?

10:51:57AM   **A.**   I do.

SCHMALENSEE - CROSS / BORNSTEIN

10:51:58AM   **Q.**   And you took issue with that terminology both in his

10:52:04AM   testimony this morning and in some of his written papers;

10:52:06AM   correct?

10:52:07AM   **A.**   I did.   It seemed to suggest a one-sided business.

10:52:09AM   **Q.**   Okay.   But you acknowledge that Dr. Evans has not looked

10:52:15AM   only at the developer's side of the iOS platform in this

10:52:19AM   matter; correct?

10:52:21AM   **A.**   Well, it depends on the piece of the analysis, but by and

10:52:24AM   large, he did not do that.

10:52:25AM   **Q.**   Okay.   And, in fact, he testified even very directly in

10:52:29AM   response to a question from Mr. Swanson on cross-examination

10:52:33AM   yesterday.   Just tell me if you remember this:

10:52:38AM       "Q. Now, the App Store is a two-sided transaction

10:52:41AM   platform; isn't that right?

10:52:43AM       "A. Yes, it is."

10:52:45AM   **A.**   Yeah.

10:52:48AM   **Q.**   Do you recall that?

10:52:48AM   **A.**   I do recall that.

10:52:50AM   **Q.**   That was at page 1347 of the transcript.

10:52:54AM       Do you think that Dr. Evans is the first person to talk

10:52:58AM   about the App Store as a distribution platform?

10:53:04AM   **A.**   I have no idea.   I have not followed the discussion in the

10:53:07AM   wide world about the App Store.

10:53:09AM   **Q.**   All right.   Have you seen evidence in the record that

10:53:13AM   Apple talks about the App Store as a distribution platform?

SCHMALENSEE - CROSS / BORNSTEIN

10:53:21AM   **A.**   I don't honestly recall.  I might have done.

10:53:25AM   **Q.**   So you're not aware that even in the -- the very first

10:53:30AM   meeting in which it was decided with Mr. Jobs to restrict

10:53:35AM   distribution on -- on the iOS platform to the App Store, that

10:53:42AM   that's exactly how they phrased it, as "Distribution of Apps.

10:53:44AM   All apps will be distributed through iTunes or App Store on

10:53:50AM   the device.  No other distribution method."

10:53:52AM       You're not familiar with that?

10:53:55AM   **A.**   If I read it, it made no particular impression.

10:53:58AM   **Q.**   Okay.  And you're not familiar with the white paper, the

10:54:03AM   policy paper, that Apple put together entitled "Application

10:54:07AM   Distribution and Deployment on macOS X Embedded"?

10:54:14AM   **A.**   "macOS X" being the code name for what became the iOS?

10:54:18AM   **Q.**   That's right.

10:54:19AM   **A.**   Okay.  I've probably seen it.  I don't have a recollection

10:54:22AM   of the language in it.

10:54:23AM   **Q.**   So distribution is hardly a novel way to talk about the --

10:54:29AM   the App Store; fair?

10:54:31AM   **A.**   No.  I was just calling -- calling the language for what

10:54:34AM   it was.  It's a two-sided platform, and one wants to be clear.

10:54:37AM   But it is also clear that the Apple people treat it like a

10:54:40AM   two-sided transaction platform.

10:54:42AM   **Q.**   And it's clear that Dr. Evans also treated it like a

10:54:45AM   two-sided platform, as he testified; correct?

10:54:47AM   **A.**   By and large, yes.

SCHMALENSEE - CROSS / BORNSTEIN

10:54:50AM    **Q.**   Now, you agree that defining the relevant -- in defining

10:54:55AM    the relevant market, the starting point for an economist is

10:54:58AM    the conduct that's at issue; correct?

10:55:03AM    **A.**   Well, it's the conduct at issue and also the effects of

10:55:06AM    the conduct at issue.

10:55:09AM    **Q.**   And to -- to determine how broad the market should be, you

10:55:16AM    look at who the suppliers are that compete with the alleged

10:55:22AM    monopolist and who impose a constraint on that firm; fair?

10:55:31AM    **A.**   Well, you're -- you're making the assumption that all of

10:55:36AM    the -- first of all, that it's an alleged monopolist.  It's

10:55:39AM    not always an alleged monopolist.

10:55:41AM        But you take a look at the products supplied by the firm

10:55:44AM    or firms that are the focus of the investigation.  You do ask

10:55:49AM    about competitive constraints.  You might also ask whether it

10:55:52AM    makes sense to treat all of the products as a single entity or

10:55:57AM    whether there are submarkets -- well, I hate the phrase

10:56:00AM    "submarkets," but whether it makes more sense to divide,

10:56:03AM    rather than aggregate.

10:56:06AM    **Q.**   Right.  I appreciate that you want to get there, and I'll

10:56:09AM    give you the chance to.

10:56:10AM        In this case, the conduct at issue in which Apple has

10:56:14AM    engaged is -- that we're focusing on or here with respect to

10:56:21AM    app distribution, it applies to all apps; correct?

10:56:24AM    **A.**   That's my understanding, yes.

10:56:26AM    **Q.**   It's not like it's only games that are prohibited from

10:56:29AM   being downloaded directly onto the iPhone.  It's all apps;

10:56:33AM   right?

10:56:34AM   **A.**  That's my understanding, yes.

10:56:37AM   **Q.**  The reason, though, that you, nevertheless, look at a

10:56:40AM   market only for what you call game transactions is because

10:56:45AM   that is -- you're looking at the question of antitrust injury;

10:56:52AM   is that right?

10:56:53AM   **A.**  Well, I said that in my deposition.  I was being careless.

10:56:56AM   One looks at injury to competition, and so one wants to be

10:56:59AM   clear about where competition occurs.

10:57:02AM       I think it's not a matter of who's the injured party but

10:57:07AM   where is competition.  And the conclusion, which Dr. Hitt

10:57:13AM   defends at great length, Professor Hitt, is that the

10:57:16AM   competitive conditions are different between games and

10:57:19AM   non-games.  Indeed, you can argue there are differences in

10:57:22AM   non-games.

10:57:23AM   **Q.**  So, again, the question, sir --

10:57:24AM   **A.**  Sorry.

10:57:24AM   **Q.**  I let you go that time.

10:57:27AM   **A.**  Sorry.

10:57:28AM   **Q.**  The question was whether you did -- you came to that

10:57:29AM   conclusion because you were thinking about antitrust injury.

10:57:32AM   And that's -- that's what you testified at your deposition.

10:57:34AM   **A.**  I said at my deposition, I was being careless.  It was

10:57:38AM   competitive -- injury to competition, but I did say "antitrust

SCHMALENSEE - CROSS / BORNSTEIN

10:57:41AM    injury."

10:57:42AM    **Q.**  And you testified to that more than once; correct?

10:57:45AM    **A.**  I was careless more than once, yes.

10:57:48AM    **Q.**  You were careless about three or four times?

10:57:50AM    **A.**  Well, you've probably counted.  I haven't, but it's quite

10:57:53AM    possible.  I think I also said "injury to competition" a few

10:57:56AM    times.

10:57:57AM    **Q.**  Well, let's focus -- rather than on terminology, let's

10:58:00AM    focus on substance.

10:00:37AM        You did testify --

10:00:43AM            THE WITNESS:  Your Honor, may I hit the water again?

10:00:45AM    Thank you.

10:00:46AM            THE COURT REPORTER:   I'm sorry.  Could we stop for a

10:00:46AM    second?

10:00:46AM                    (Court reporter technical problems.)

10:00:46AM            THE COURT:  All right.  Question.

10:59:45AM            MR. BORNSTEIN:  Thank you, Your Honor.

10:59:46AM    **Q.**  So, Professor, if there were a different plaintiff here

10:59:53AM    who was not a company that developed game apps, it is

10:59:58AM    possible, in your view, that you would come to a different

11:00:00AM    conclusion as to the proper market definition; correct?

11:00:04AM    **A.**  Yes, indeed.  Given the differences between game apps and

11:00:08AM    non-game apps, if it were a producer of crochet apps, which

11:00:12AM    are available on the iOS platform, I would be inclined to

11:00:16AM    start there and see where one aggregates -- where one

SCHMALENSEE - CROSS / BORNSTEIN

11:00:19AM   broadens, rather.

11:00:21AM   **Q.**   Again, I let you give a nice answer, but that was a

11:00:24AM   yes-or-no question.

11:00:25AM   **A.**   Oh, I'm sorry.

11:00:29AM   **Q.**   So if, for example, I take your -- I will take you up on

11:00:31AM   what you said -- a crocheting app was the plaintiff here, you

11:00:36AM   would define the market at least starting with the category, I

11:00:40AM   suppose, of crocheting apps; right?

11:00:42AM   **A.**   I would start there.  I would probably broaden pretty

11:00:45AM   quickly.  Yes.

11:00:46AM   **Q.**   And if, for example, the Match Group were the plaintiff,

11:00:50AM   you would start with dating apps; correct?

11:00:54AM   **A.**   Again, that's the starting point, not the ending point.

11:00:57AM   **Q.**   And if there were a class action of developers, you would

11:01:02AM   start by looking at multiple apps and consider the possibility

11:01:06AM   of multiple markets; is that accurate?

11:01:10AM   **A.**   I might.  I mean, a class action raises a whole set of

11:01:15AM   issues about class certification and all, so I wouldn't want

11:01:18AM   to go too far down that road, having not done that in a long

11:01:21AM   time.  But I would want to look at differences, yeah.

11:01:26AM   **Q.**   And if the case were brought, for example, by the

11:01:29AM   Department of Justice, there, too, you would consider the

11:01:33AM   possibility of a market of all apps or of multiple categories

11:01:37AM   of markets; correct?

11:01:40AM   **A.**   Yeah, I would, just as when the Department of Justice

SCHMALENSEE - CROSS / BORNSTEIN

11:01:43AM   brought the Amex case, they considered a travel and

11:01:48AM   entertainment market as a possibility, which the Court did not

11:01:51AM   agree with.

11:01:51AM   **Q.**  Which the Court rejected.

11:01:53AM   **A.**  Right.

11:01:53AM   **Q.**  And landed instead on a broader market for all payment

11:01:58AM   transactions, correct -- or payment card transactions?

11:02:03AM   **A.**  Payment cards excluding debit cards, yes.

11:02:07AM   **Q.**  If you had a plaintiff who made both game apps and

11:02:10AM   non-game apps, that, too, might lead to a different ultimate

11:02:14AM   outcome than where you have landed in this case; correct?

11:02:18AM   **A.**  Well, Epic does do both game apps and non-game apps, of

11:02:23AM   course, but the question is predominantly game apps.  So if it

11:02:27AM   were a 50/50 split, for instance, you would look at both hard.

11:02:31AM   **Q.**  Sir, is that in your written testimony, that you look at

11:02:33AM   the predominant product of the plaintiff?

11:02:38AM   **A.**  I think it's implicit if I didn't use the language.

11:02:44AM   **Q.**  And if Epic were suing in its capacity as a distributor of

11:02:48AM   apps, as a store, well, then the right market would be

11:02:53AM   transactions market for all apps, full stop; correct?

11:03:00AM   **A.**  You know, I might have said that.  It's quite possible.

11:03:03AM   I've thought about it.  If I may give a complete answer of

11:03:06AM   what I think, or wait for redirect?

11:03:08AM   **Q.**  Well, let's do it in stages.

11:03:09AM        First of all, that was your testimony at your deposition;

SCHMALENSEE - CROSS / BORNSTEIN

11:03:12AM       correct?

11:03:15AM       **A.**   Could have been, yes.

11:03:16AM       **Q.**   Okay.  And since your deposition, you've thought about it

11:03:18AM       and had the opportunity to discuss that with counsel; correct?

11:03:21AM       **A.**   And colleagues and to cogitate, yes.

11:03:23AM       **Q.**   Okay.  And you testified also at your deposition that if

11:03:27AM       we were talking about Epic suing in its capacity as a

11:03:30AM       distributor of apps, the relevant market would be, quote, the

11:03:35AM       market for being an app store; is that right?

11:03:39AM       **A.**   Right, a market in which Epic is now active.

11:03:43AM       **Q.**   Right.

11:03:44AM       **A.**   Yeah.

11:03:45AM       **Q.**   A market in which it is currently not permitted to be

11:03:47AM       active; correct?

11:03:49AM       **A.**   It's an app store; it's just not permitted to distribute

11:03:52AM       iOS apps.

11:03:53AM       **Q.**   Or to do so on an iOS device.

11:03:56AM       **A.**   Right.  And in a sense, this is -- that exclusion is a

11:04:00AM       special case of the fact that nobody can distribute iOS apps,

11:04:04AM       so it doesn't really get you anyplace different, as I think

11:04:09AM       about it.

11:04:10AM       **Q.**   Anyplace different from --

11:04:11AM       **A.**   If you can't do it, then neither can anybody else.

11:04:14AM       **Q.**   Right.  And in any case, you would get to a land where it

11:04:17AM       would be a market for being an app store or for being a

SCHMALENSEE - CROSS / BORNSTEIN

| | |
|---|---|
| 11:04:20AM | distributor of all apps. |
| 11:04:21AM | That was your deposition testimony; correct? |
| 11:04:26AM | **A.** I could have said all apps. I'm not sure that's obvious |
| 11:04:30AM | when Epic is predominantly a -- when the Epic Games Store is |
| 11:04:35AM | predominantly a distributor of iOS apps. |
| 11:04:37AM | But in any case, this is sort of a -- sort of subsumed in |
| 11:04:42AM | the restriction that Epic complains of. It's not a new |
| 11:04:46AM | restriction. Epic can't do it; neither can anybody else. |
| 11:04:50AM | **Q.** That's right. |
| 11:04:50AM | And as a result, your testimony before and your testimony |
| 11:04:57AM | now is nobody else is able to distribute apps on an iOS |
| 11:05:03AM | device; correct? |
| 11:05:07AM | **A.** That's my understanding, yes. |
| 11:05:08AM | **Q.** And if Epic were suing in its capacity as a potential |
| 11:05:11AM | competitor in that activity, distributing apps on an iOS |
| 11:05:14AM | device, the relevant market would be the market for being an |
| 11:05:18AM | app store; correct? |
| 11:05:19AM | **A.** I think -- |
| 11:05:20AM | **Q.** That was your testimony before. |
| 11:05:22AM | **A.** Yeah, it probably was. And I think I got -- I'm happy to |
| 11:05:25AM | clarify, but I'm also happy -- |
| 11:05:28AM | **Q.** I think I will let you -- |
| 11:05:28AM | **A.** -- to let you go on and do it on redirect. |
| 11:05:31AM | **Q.** I think I will let you do that one with Mr. Swanson. |
| 11:05:33AM | **A.** Of course. |

SCHMALENSEE - CROSS / BORNSTEIN

11:05:35AM  **Q.**  What you -- what you land on, ultimately, is a games

11:05:39AM  transaction market; correct?

11:05:42AM  **A.**  Correct.

11:05:43AM  **Q.**  And that's because you believe that game transactions face

11:05:47AM  increased substitution possibilities as compared to certain

11:05:51AM  other types of app transactions; fair?

11:05:55AM  **A.**  Well, that's one reason.  There are different sort of

11:05:59AM  broad purposes.  There are different specialist providers and

11:06:02AM  so on.  But -- it's one reason, but it's not the only reason.

11:06:06AM  **Q.**  And it's a market that includes all games; correct?

11:06:12AM  **A.**  Yes.

11:06:13AM  **Q.**  So -- so -- and you didn't see any basis for narrowing the

11:06:17AM  market any further to some subcategory of game transactions;

11:06:23AM  correct?

11:06:23AM  **A.**  I didn't see a well-defined subcategory of game

11:06:27AM  transactions that -- that merited that treatment, just as the

11:06:33AM  plaintiff's definition doesn't narrow the all app category at

11:06:36AM  all.

11:06:37AM  **Q.**  Right.  And so you testified that you saw no basis for any

11:06:44AM  exclusion of a particular type of game category to narrow the

11:06:47AM  market further; correct?

11:06:49AM  **A.**  That's what I said.

11:06:50AM  **Q.**  Okay.  But you are aware that there are different types of

11:06:54AM  game apps; correct?

11:06:56AM  **A.**  Of course.

SCHMALENSEE - CROSS / BORNSTEIN

11:06:56AM  **Q.**  Some of them are the graphics-heavy, intensive, immersive

11:07:01AM  games like *Fortnite*, which we got to watch here in the

11:07:04AM  courtroom a few times.

11:07:06AM  **A.**  I missed that.  It must have been fun.  But I'm aware of

11:07:09AM  that app, yeah.

11:07:10AM  **Q.**  And some of them are simple kind of finger-swipe apps, and

11:07:15AM  I think you said you played *Tetris*; correct?

11:07:18AM  **A.**  I did have a brief addiction, yes.

11:07:20AM  **Q.**  Have you ever played *Fortnite*?

11:07:22AM  **A.**  I have never played *Fortnite*, no.

11:07:24AM  **Q.**  And then there are word games and other types of games, as

11:07:26AM  well; correct?

11:07:28AM  **A.**  Correct.

11:07:31AM  **Q.**  And there are different substitution possibilities for

11:07:33AM  those different types of games; correct?

11:07:36AM  **A.**  Well, let me try to answer a sharply -- a more sharply

11:07:42AM  posed question.  There are different substitutability

11:07:46AM  relationships.  You can always substitute, but consumers may

11:07:50AM  find some closer substitutes than others.

11:07:51AM  **Q.**  Well --

11:07:51AM  **A.**  I think that's what you meant.

11:07:53AM  **Q.**  Well, what I mean is -- I'm using the phrase that you used

11:07:56AM  to describe Professor Lafontaine's analysis, which was

11:07:59AM  "substitution possibilities"; right?  Those were your words?

11:08:03AM  **A.**  That may well have been, yeah.

SCHMALENSEE - CROSS / BORNSTEIN

11:08:05AM **Q.** And a graphics-intensive, immersive game like *Fortnite*,

11:08:11AM which is available on game consoles and PCs, it has greater

11:08:16AM substitution possibilities than, you know, a *Candy Crush* or a

11:08:22AM *Words with Friends*; correct?

11:08:29AM **A.** Well, if you mean because it's available on more platforms

11:08:32AM than those -- I don't know what they're available on -- then,

11:08:34AM yes, there is more substitution possibility.

11:08:36AM **Q.** Okay.  And having relied on substitution possibilities to

11:08:46AM divide the category of all apps into games, you chose not to

11:08:50AM go further and divide the game apps into categories using the

11:08:56AM same logic; fair?

11:08:58AM **A.** Well, I didn't just rely on that.  As I mentioned, there

11:09:01AM are different developer communities and different monetization

11:09:06AM strategies.  It's -- non-game apps are quite heterogeneous in

11:09:12AM that regard.

11:09:13AM **Q.** And within game apps, you actually didn't investigate the

11:09:16AM question of whether there are distinct producers or developers

11:09:20AM of games -- different types of games; right?

11:09:23AM **A.** I did not.

11:09:24AM **Q.** Right.  So at your deposition, for example, you didn't

11:09:26AM know how many of the developers of the top 25 iOS games also

11:09:32AM made console games.

11:09:36AM **A.** I may well not have known that.

11:09:38AM **Q.** And you didn't know the proportion of developers who

11:09:41AM choose to develop games only for mobile platforms versus for

11:09:44AM   multiple platforms.

11:09:45AM   **A.**  I didn't have that number.  Professor Hitt, I believe, has

11:09:50AM   that number, but I didn't have it on the top of my head.

11:09:53AM   **Q.**  And those were not issues on which you focused in forming

11:09:57AM   your opinion in this case either.

11:09:59AM   **A.**  Well, I read his early report.  I read his rebuttal

11:10:02AM   report.  I didn't remember the numbers.

11:10:04AM   **Q.**  Okay.  Did you, sir, consider the question of -- in

11:10:11AM   forming your opinion, did you consider the question of the

11:10:14AM   proportion of developers who made mobile games only versus who

11:10:17AM   made games for multiple platforms?

11:10:20AM   **A.**  I considered it.  I also considered the fact that many

11:10:24AM   developers multihome, to use the other side of the phrase you

11:10:28AM   dropped in the conversation, and so could switch between

11:10:33AM   platforms and could change -- not effortlessly, but could

11:10:37AM   change the menu or the set of platforms for which they

11:10:39AM   produced.  So it's possibilities, not just actual behavior,

11:10:43AM   that matters.

11:10:44AM   **Q.**  So, sir, I'd like to ask you to take a look at your

11:10:47AM   deposition, please.

11:10:48AM      Hopefully, I will do better this time, Your Honor.  And

11:10:51AM   I'm turning to page 386.  This is in Volume 2 of the

11:10:58AM   deposition, Your Honor.

11:11:06AM              **THE COURT:**  Lines?

11:11:08AM              **MR. BORNSTEIN:**  Beginning at line 4 through line 9.

11:11:11AM        **THE COURT:**  Okay.  You did better.

11:11:14AM        **MR. BORNSTEIN:**  Thank you, Your Honor.

11:11:17AM        **THE COURT:**  You can wait for him or you can just read

11:11:20AM   it into the record.

11:11:21AM        **MR. BORNSTEIN:**  I will wait for Professor

11:11:23AM   Schmalensee.

11:11:25AM   **Q.**  Do you have it?

11:11:25AM   **A.**  I have it.  Which lines?

11:11:27AM   **Q.**  I'm on page 386 --

11:11:28AM   **A.**  Yeah.

11:11:28AM   **Q.**  -- beginning at line 4.

11:11:31AM        And I asked you the question:

11:11:33AM        "Q. Did you consider that question in forming your opinion

11:11:36AM   about the proper market definition in this matter?"

11:11:38AM        Do you see that?

11:11:39AM   **A.**  I see that.  I'm not sure what that question was.  I'd

11:11:42AM   have to go back --

11:11:45AM   **Q.**  I was just going to clarify that.  So let's go back up --

11:11:48AM   **A.**  Yeah.

11:11:48AM   **Q.**  -- to page 385, line 13, where I asked you the question:

11:11:51AM        "Q.  Do you have any understanding of the proportion of

11:11:54AM   developers who choose to develop games for both mobile

11:11:57AM   platforms and consoles versus those who choose to develop

11:12:01AM   games for only one or the other?"

11:12:02AM        And you answered:

SCHMALENSEE – CROSS / BORNSTEIN

11:12:03AM      "A.  As I sit here, I don't have those figures off the top

11:12:07AM of my head."

11:12:07AM      Correct?

11:12:08AM **A.**  Yes.

11:12:09AM **Q.**  And that's pretty consistent with what you said just now.

11:12:12AM **A.**  That's consistent with my memory, yes.  Excuse me.

11:12:15AM **Q.**  And then I asked you at the lines that I identified

11:12:17AM before, page 386, line 4:

11:12:19AM      "Q.  Did you consider that question in forming your

11:12:22AM opinion about the proper market definition in this matter?"

11:12:24AM      And after your counsel objected, you said:

11:12:26AM      "A.  I didn't consider that specific question in forming

11:12:29AM my opinion."

11:12:31AM      Is that the testimony that you gave under oath at

11:12:34AM deposition, sir?

11:12:35AM **A.**  It is, indeed.

11:12:36AM **Q.**  Okay.  You have talked a few times and I've asked you

11:12:45AM questions a couple of times about the Amex case; right?

11:12:49AM **A.**  Indeed.

11:12:50AM **Q.**  A chestnut that you can look back on like Microsoft

11:12:54AM someday, perhaps.

11:12:56AM **A.**  There are differences, but never mind.

11:13:00AM **Q.**  And you believe that the App Store here is like the

11:13:06AM American Express network, in that it neither buys nor sells

11:13:12AM any content, but it facilitates transactions involving a wide

SCHMALENSEE - CROSS / BORNSTEIN

11:13:18AM   range of products; is that fair?

11:13:20AM   **A.**   I may have even used that language, yes.

11:13:23AM   **Q.**   The service that the App Store sells to developers and to

11:13:27AM   consumers is, to use a word in one of your books, matchmaking;

11:13:32AM   correct?

11:13:34AM   **A.**   Great word.  Yes.

11:13:35AM   **Q.**   It brings together developers and consumers and it

11:13:38AM   facilitates transactions between them; right?

11:13:41AM   **A.**   Correct.

11:13:42AM   **Q.**   And that -- that transaction service that the App Store

11:13:44AM   provides has nothing whatsoever to do with the content that

11:13:51AM   the developer then provides to the user; is that right?

11:13:56AM   **A.**   Well, the substitutability among transactions does have to

11:14:00AM   do with the content.

11:14:01AM   **Q.**   That wasn't my question.

11:14:03AM   **A.**   Oh, I'm sorry.

11:14:04AM   **Q.**   The question was whether the transaction service that the

11:14:06AM   App Store provides to the developers, whether that has

11:14:10AM   anything to do with the content of the transaction between the

11:14:15AM   developer and the consumer.

11:14:17AM       And if that was too convoluted, I can make that more

11:14:20AM   concrete.

11:14:22AM   **A.**   Oh, I think I know what you mean.  And I would say yes

11:14:24AM   except for the fact that the nature of the content may affect

11:14:28AM   whether a commission is owed or what level of commission.  But

SCHMALENSEE - CROSS / BORNSTEIN

11:14:34AM     that apart, no.

11:14:35AM     **Q.**  Fair enough.

11:14:36AM         But the transaction services that are provided by the App

11:14:38AM     Store are the same services whether the developer sells games

11:14:44AM     or music or coffee or crocheting materials, to take your

11:14:50AM     example; correct?

11:14:51AM     **A.**  Well, crocheting app.  But for the issue of a commission

11:14:56AM     and so forth, that's correct.

11:14:58AM     **Q.**  So just like when Amex facilitates payments between

11:15:03AM     merchants and customers, there, the credit card service is the

11:15:08AM     same no matter what the merchant sells; it's a restaurant,

11:15:11AM     it's a hardware store, it's a clothing boutique; right?

11:15:15AM     **A.**  It is the same.  The substitution implications may differ,

11:15:18AM     but the transaction service is the same.

11:15:20AM     **Q.**  And that is exactly the situation we find ourselves in

11:15:24AM     with the App Store as well, with the exception you noted that

11:15:27AM     sometimes a commission is due and sometimes it's not; right?

11:15:32AM     **A.**  And with the fact that substitution possibilities among

11:15:35AM     transactions and transaction types may differ here, as there.

11:15:39AM     **Q.**  As there.

11:15:39AM         And as you noted, the court rejected a narrower market in

11:15:44AM     the Amex case; correct?

11:15:46AM     **A.**  It did.

11:15:54AM     **Q.**  We've talked about Steam, the game platform available on

11:15:59AM     PCs.

SCHMALENSEE - CROSS / BORNSTEIN

11:15:59AM      You remember that?

11:16:01AM  **A.**  PCs and Macs and I think Linux.

11:16:05AM  **Q.**  And there was some talk about Steam this morning, as well,

11:16:07AM  with your predecessor on the stand, so we are having a steamy

11:16:11AM  day.

11:16:13AM          **THE COURT:**  And I thought my jokes were bad.

11:16:16AM          **MR. BORNSTEIN:**  You get to laugh because, first, your

11:16:19AM  joke was funny, and, second, you've got the robe, Your Honor.

11:16:22AM          **THE COURT:**  Exactly.  I said that before.  I almost

11:16:24AM  talked about the banana today, but decided...

11:16:29AM          **MR. BORNSTEIN:**  I was thinking about the banana

11:16:31AM  today, too.  I will keep it out of the exam now.

11:16:34AM          **THE WITNESS:**  I wish I had seen that.  But anyway...

11:16:36AM          **THE COURT:**  You can see it with and without the

11:16:37AM  tuxedo.

11:16:39AM          **THE WITNESS:**  Yeah, I know.  I heard that.

11:16:41AM          **MR. BORNSTEIN:**  Yeah.  Either way, it's PG or G.

11:16:44AM          **THE COURT:**  I'd say G.

11:16:45AM  **BY MR. BORNSTEIN:**

11:16:45AM  **Q.**  So Steam, Professor, it charged a 30 percent commission

11:16:49AM  for quite a long time; correct?

11:16:52AM  **A.**  That's my understanding, yes.

11:16:53AM  **Q.**  And, actually, Apple's counsel gave Steam some credit in

11:16:57AM  her opening statement for setting the 30 percent commission

11:17:00AM  rate about five years before the App Store opened.

SCHMALENSEE - CROSS / BORNSTEIN

11:17:03AM        Did you remember that from the statement?

11:17:05AM   **A.**   I remember that.  I'm not entirely sure that was right,

11:17:09AM   but I remember that.  I think that somebody else may have

11:17:11AM   beaten them to it.  But in any case, they were early.

11:17:15AM   **Q.**   And Steam was charging 30 percent for, we'll call it,

11:17:17AM   roughly 15 years; correct?

11:17:20AM   **A.**   Sounds right.

11:17:21AM   **Q.**   And then the Epic Games Store came along and started to

11:17:23AM   compete with Steam; correct?

11:17:25AM   **A.**   Correct.

11:17:26AM   **Q.**   And Steam reacted, as firms often do, to competition by

11:17:33AM   lowering its commission; correct?

11:17:36AM   **A.**   Well, you have the -- you have the temporal sequence

11:17:40AM   right.  I don't know what was in the head of the people at

11:17:43AM   Steam, but looked at from the outside, that's what it looked

11:17:45AM   like.

11:17:46AM   **Q.**   And, in fact, their change in the commission rate happened

11:17:50AM   within weeks or a few months of the entry of the Epic Games

11:17:55AM   Store; correct?

11:17:56AM   **A.**   It is certainly plausible that the entry was causal.

11:17:59AM   **Q.**   Causal to the change in commission rate.

11:18:02AM   **A.**   Yes.  That's what I meant.  Sorry.

11:18:05AM   **Q.**   But when the Epic Games Store launched and Steam lowered

11:18:10AM   its price, you're not aware of any change to the commission

11:18:14AM   rates on any of the consoles; correct?

SCHMALENSEE - CROSS / BORNSTEIN

11:18:19AM  **A.**  I'm unaware of any change.  It's my understanding that the

11:18:22AM  consoles are more prone than, say, the App Store to negotiate

11:18:28AM  special deals with individual suppliers, so there may have

11:18:31AM  been a change that's not visible.  But the headline rates

11:18:38AM  didn't change.

11:18:38AM  **Q.**  And the App Store didn't change its pricing when the Epic

11:18:44AM  Games Store entered and Steam reacted by lowering price;

11:18:47AM  correct?

11:18:48AM  **A.**  Correct.

11:18:48AM  **Q.**  And Google Play didn't change its pricing at that time

11:18:51AM  either; correct?

11:18:52AM  **A.**  Correct.

11:18:53AM  **Q.**  And, in fact, you're unaware of the App Store ever

11:18:56AM  changing its pricing in response to changes in the pricing of

11:19:01AM  gaming transaction platforms; correct?

11:19:04AM  **A.**  I am unaware of any such change.

11:19:07AM  **Q.**  Okay.  And, in fact, you've never seen any evidence of any

11:19:11AM  cross-platform price changes as a result -- in the gaming

11:19:17AM  transactions market that you've defined; correct?

11:19:23AM  **A.**  No, unless you want to count the Steam/Epic Games Store,

11:19:26AM  which is -- that's in the store business, but it's -- yeah.

11:19:32AM  **Q.**  But that's not cross-platform.  We're talking in both

11:19:35AM  instances about online marketplaces that are available on PCs

11:19:38AM  and Macs.

11:19:40AM  **A.**  That's correct, yeah.

SCHMALENSEE - CROSS / BORNSTEIN

11:19:41AM   **Q.**   And --

11:19:41AM   **A.**   Oh, I see what you mean.  No.  The correct answer is no.

11:19:44AM   **Q.**   All right.  And just so the record is clear, because it

11:19:46AM   seems I asked a potentially unclear question, you're not aware

11:19:53AM   of any evidence of platforms responding to pricing or other

11:19:58AM   term changes made by gaming transaction platforms that are

11:20:03AM   used on other devices; correct?

11:20:05AM   **A.**   I'm unaware of any such reaction.

11:20:08AM   **Q.**   Okay.  Now, you disputed this morning the notion that

11:20:12AM   there is a market for smartphone operating systems; correct?

11:20:18AM   **A.**   Correct.

11:20:20AM   **Q.**   And, in fact, in your -- your testimony, you called

11:20:24AM   Dr. Evans' discussion of the smartphone operating systems an

11:20:29AM   elaborate attempt to distract; correct?

11:20:31AM   **A.**   I may have gotten carried away, but I did say that.

11:20:34AM   **Q.**   And your testimony is that there is a market, perhaps,

11:20:39AM   that consists of bundles of hardware devices and operating

11:20:45AM   systems together; is that fair?

11:20:47AM   **A.**   That's what we buy and sell every day, yeah.

11:20:51AM   **Q.**   And you have previously acknowledged, however, that there

11:20:57AM   can be a market for operating systems themselves; correct?

11:21:03AM   **A.**   I haven't in the context of litigation.  I certainly have

11:21:08AM   speaking as shorthand probably in Microsoft, probably in

11:21:13AM   Invisible Engines, certainly the same way one talks about a

11:21:17AM   Chevy engine competing with a Ford engine.  But software

SCHMALENSEE - CROSS / BORNSTEIN

11:21:21AM  doesn't compete; organizations compete.

11:21:23AM  **Q.**  So this is another example of your being careless or

11:21:26AM  speaking in shorthand?  That's right?

11:21:28AM  **A.**  Well, I assume you have examples where I talked about

11:21:31AM  operating systems competing, and that would be exactly what it

11:21:34AM  was.  We probably said that in Invisible Engines.

11:21:38AM  **Q.**  And you probably said that a few other places, too; isn't

11:21:41AM  that right?

11:21:42AM  **A.**  I may well have, yeah.

11:21:43AM  **Q.**  So --

11:21:43AM  **A.**  It's a natural shorthand.

11:21:45AM  **Q.**  And there are, in fact, according to Professor Lafontaine,

11:21:51AM  natural intuitive groupings that are used in defining a

11:21:55AM  market, too.

11:21:56AM  **A.**  That's a rather different issue.  It has to do with -- not

11:22:00AM  with terminology but with natural aggregates.  But, yes.

11:22:04AM  **Q.**  Okay.  And you did refer to the Microsoft case, and in the

11:22:08AM  Microsoft case, one of the issues you analyzed was whether or

11:22:11AM  not the operating system from Windows was being priced at

11:22:16AM  monopoly levels; correct?

11:22:19AM  **A.**  Boy, that's been a long time ago, but, yes, we did.

11:22:22AM  **Q.**  Okay.

11:22:23AM  **A.**  Dr. Evans and I wrote a number of papers on that subject.

11:22:26AM  **Q.**  Right.  And after the case, you wrote a number of papers

11:22:28AM  in which you referred to an operating system market; correct?

SCHMALENSEE - CROSS / BORNSTEIN

11:22:32AM   **A.**  Might have done.

11:22:35AM   **Q.**  You said, by the way --

11:22:37AM   **A.**  I will say -- may I clarify?

11:22:39AM   **Q.**  Sure.

11:22:40AM   **A.**  Windows was sold.  There was a price.  So there was a

11:22:44AM   market.  It was an ordinary market.  The question is what did

11:22:48AM   it compete with.  But if it's a monopoly, then you can look at

11:22:52AM   its price and say is that a monopoly price?  That is what we

11:22:55AM   did.

11:22:56AM   **Q.**  Right.  And it competed with, for example, the Mac

11:23:00AM   computer together with the macOS; correct?

11:23:02AM   **A.**  Yeah.

11:23:03AM   **Q.**  And you see those two things as being in competition, a

11:23:06AM   bundled device and OS competing with an operating system all

11:23:10AM   by itself; correct?

11:23:12AM   **A.**  In those -- of course.  In those papers -- because Windows

11:23:15AM   is a three-sided platform and it's a little more complicated

11:23:19AM   business -- but in those papers, we didn't -- maybe we did,

11:23:22AM   but I don't think we, in the analysis, looked at a competitor.

11:23:26AM   We looked at is it a monopoly price, given what we know about

11:23:31AM   the demand it faces.

11:23:33AM   **Q.**  Well, maybe you didn't use the word "competitor," but did

11:23:36AM   you write that "few would dispute that Microsoft has a

11:23:39AM   short-run monopoly over PC software platforms even though

11:23:44AM   consumers could opt for Apple computers and the macOS"?

SCHMALENSEE - CROSS / BORNSTEIN

11:23:51AM    **A.**   That certainly sounds like something we would have

11:23:53AM    written, Dr. Evans and I.

11:23:55AM    **Q.**   And you distinguished the Windows operating system just

11:23:58AM    now as not having been free; correct?

11:24:03AM    **A.**   It was licensed for a price, yes.

11:24:05AM    **Q.**   And you've testified multiple times that Google gives away

11:24:08AM    the Android system for free; correct?

11:24:10AM    **A.**   That's my understanding, yes.

11:24:12AM    **Q.**   But it only gives it away for free from a monetary

11:24:15AM    perspective; correct?

11:24:20AM    **A.**   Well, if you're saying that Google operates a platform

11:24:24AM    that is profitable and part of that platform is to make the

11:24:28AM    operating system available at a zero price, I agree with that.

11:24:32AM    **Q.**   Well, it's a zero price in terms of a cash outlay, but

11:24:36AM    there are a number of obligations that OEMs take on when they

11:24:42AM    agree to license the Android operating system; isn't that

11:24:47AM    correct?

11:24:48AM    **A.**   There are.

11:24:48AM    **Q.**   For example, they are obligated to give preferential

11:24:52AM    treatment to certain Google services, to Google Play, to

11:24:56AM    certain Google apps, and those are all burdens that they take

11:25:00AM    on as part of the license agreement; correct?

11:25:02AM    **A.**   But they don't have out-of-pocket costs.  There are

11:25:04AM    burdens.

11:25:05AM    **Q.**   And those burdens are a non-monetary price that are paid

SCHMALENSEE - CROSS / BORNSTEIN

11:25:12AM   by OEMs in order to get access to the Android system, and in

11:25:17AM   that sense, Android is not free, is it?

11:25:21AM   **A.**   Well, unless I -- unless I misunderstand the nature of

11:25:25AM   those burdens, they are hardly substantial, and they're not

11:25:27AM   how Google monetizes that system in any case.  I'm not sure I

11:25:33AM   understand how Google monetizes that system entirely, but

11:25:36AM   that's not it.

11:25:36AM   **Q.**   But that isn't the issue in terms of how you decide

11:25:39AM   whether there is a market.  There is a price that's being paid

11:25:41AM   by those OEMs in order to get Android.  It just happens not to

11:25:46AM   be measured in dollars and cents; fair?

11:25:51AM   **A.**   That's a novel way to look at it, but I think it's

11:25:53AM   probably correct.

11:25:56AM   **Q.**   You mentioned earlier today that you've been listening

11:25:59AM   attentively to the testimony.

11:26:01AM   **A.**   I wouldn't go so far as to say "attentively."  Some parts

11:26:05AM   are more interesting than others.

11:26:07AM   **Q.**   Well, I hope you found the cross-examination of

11:26:09AM   Mr. Sweeney interesting.

11:26:11AM   **A.**   I did.

11:26:11AM   **Q.**   And you may not have been able to see this or be aware of

11:26:16AM   this because you were not in the courtroom, but did you know

11:26:19AM   that Apple's counsel used a demonstrative with Mr. Sweeney

11:26:25AM   during his cross-examination?

11:26:27AM   **A.**   I didn't see it.  I didn't know what they used.  If they

SCHMALENSEE - CROSS / BORNSTEIN

11:26:30AM    used it, I'm unaware of it.

11:26:32AM    **Q.**  All right.  Well, I'm going to pull up on the screen, if

11:26:35AM    Mr. Rudd can help me out with slide 2, a version of the

11:26:40AM    demonstrative, which I readily concede we put together in an

11:26:44AM    effort to faithfully represent what was used with Mr. Sweeney.

11:26:49AM    And I readily acknowledge some of the graphics are going to be

11:26:52AM    different, but I hope I got the substance of that right.

11:26:55AM         Do you have the demonstrative on the screen?

11:26:59AM    **A.**  I do.

11:26:59AM    **Q.**  Okay.  And Apple's counsel went through and had this sort

11:27:03AM    of filled out with Mr. Sweeney's help, and what it shows, for

11:27:08AM    the record, is five rows, "Xbox," "Sony," "Nintendo,"

11:27:15AM    "iPhone," and "Android."

11:27:17AM         Do you see that?

11:27:18AM    **A.**  I do.

11:27:19AM    **Q.**  And then for each one of those, it identifies the headline

11:27:22AM    commission rate -- that's a phrase you used earlier today;

11:27:25AM    correct?

11:27:26AM    **A.**  Yes.

11:27:26AM    **Q.**  And it identifies whether or not there is a complete

11:27:29AM    prohibition on third-party distribution.

11:27:31AM         Do you see that?

11:27:32AM    **A.**  I see it.

11:27:33AM    **Q.**  And then it indicates whether or not there is a

11:27:35AM    requirement to use the platform owner's in-app payment

SCHMALENSEE - CROSS / BORNSTEIN

11:27:39AM      solution.

11:27:39AM           Do you see that?

11:27:40AM      **A.**  I do.

11:27:41AM           **MR. BORNSTEIN:**  And it occurs to me, Your Honor, we

11:27:42AM      should give this a PDX number, which we can do at a break, if

11:27:46AM      that's acceptable.

11:27:48AM           **THE COURT:**  That's fine.  I don't know what the next

11:27:50AM      in order is.

11:27:51AM           **MR. BORNSTEIN:**  We'll figure that out.

11:27:53AM           **THE COURT:**  All right.  Proceed.

11:27:53AM           **MR. BORNSTEIN:**  Thank you.

11:27:56AM      **Q.**  Now, there are two very important platforms that are

11:27:59AM      missing from this demonstrative so far.

11:28:02AM           Do you agree with me on that?

11:28:04AM           **MR. DOREN:**  Your Honor, I will just object to the

11:28:06AM      assertion that this accurately reflects what was used with

11:28:10AM      Mr. Sweeney.  It is a different --

11:28:12AM           **THE COURT:**  So we can't hear you.

11:28:14AM           **THE CLERK:**  Hang on.  Let me get the mic.  Okay.

11:28:20AM           **THE COURT:**  Go ahead.

11:28:21AM           **MR. DOREN:**  Your Honor, I apologize for inserting

11:28:23AM      myself into this examination, but Mr. Swanson wasn't here for

11:28:27AM      Mr. Sweeney's cross-examination.

11:28:28AM           And I'll just -- I would like to assert an objection to

11:28:31AM      the assertion that this faithfully represents what was used

SCHMALENSEE - CROSS / BORNSTEIN

11:28:34AM   with Mr. Sweeney.  There are a number of differences, and I

11:28:38AM   just want that clear for the record.

11:28:40AM           **THE COURT:**  Okay.  Well, I don't know them off the

11:28:42AM   top of my head.  You can give that to -- you can give a copy

11:28:45AM   to Mr. Swanson, and if it's important, he will address it.

11:28:48AM           **MR. DOREN:**  Thank you, Your Honor.

11:28:49AM           **THE COURT:**  Proceed.

11:28:50AM           **MR. BORNSTEIN:**  Thank you.

11:28:52AM   **Q.**  So there are two platforms that are missing from the

11:28:57AM   slide, at least as I put it together.  I don't want to impugn

11:29:01AM   Mr. Doren and his team.

11:29:02AM       Is that fair?

11:29:03AM   **A.**  Yeah.  Mac and Windows are missing.

11:29:06AM   **Q.**  Okay.  Well, maybe Mr. Rudd can help us.  There we go.

11:29:09AM       Now, on Mac and Windows, there's direct distribution

11:29:15AM   available, correct, of software?

11:29:18AM   **A.**  Yes.

11:29:19AM   **Q.**  There are also stores that are available, and we've talked

11:29:22AM   about some today; correct?

11:29:23AM   **A.**  Yes.

11:29:24AM   **Q.**  And so fair to say that the commission rate for

11:29:27AM   distribution on Windows and Mac varies depending on how the

11:29:30AM   developer chooses to get its software out to users.

11:29:37AM   **A.**  I don't think the commission -- the headline commission

11:29:40AM   rate on the store varies.  Maybe I don't understand the stores

11:29:44AM   well enough, but the stores have a commission rate.  But the

11:29:47AM   developer can use third party or it can use other stores.

11:29:50AM   **Q.**  Sure.  So developers have choices, and as a result, the

11:29:55AM   available range of commission rates to a developer will vary,

11:29:58AM   depending on whether it wants to use an affiliated store, a

11:30:02AM   third-party store, or distribute directly.

11:30:06AM   **A.**  It will presumably vary.

11:30:08AM   **Q.**  Okay.

11:30:09AM   **A.**  Though I would say that -- that direct distribution has

11:30:13AM   its own costs so that labeling it headline commission rate

11:30:18AM   isn't necessarily the right way to go, but there are varying

11:30:23AM   costs depending on the developer's choice.

11:30:26AM   **Q.**  That's a fair clarification that I'll take, but since

11:30:29AM   Mr. Rudd can't change the slide on the fly, let's populate it

11:30:33AM   with the words "Varies by Store."

11:30:35AM       How about that?

11:30:36AM   **A.**  Well, that's partly true, but varies by choice of

11:30:39AM   distribution, yeah.

11:30:39AM   **Q.**  And I have to probably --

11:30:39AM   **A.**  And it does vary by store, as well.

11:30:42AM   **Q.**  I think yours is a better description, which I will adopt

11:30:45AM   and the record will reflect.

11:30:46AM       So let's go to the next one about the complete prohibition

11:30:49AM   on third-party distribution.  These, I hope, are easier,

11:30:52AM   because there is no such prohibition on either Windows or Mac;

SCHMALENSEE - CROSS / BORNSTEIN

11:30:56AM   correct?

11:30:57AM   **A.**   Correct.

11:30:57AM   **Q.**   All right.  Let's put those in there.

11:30:58AM        And then whether there is a requirement to use the

11:31:01AM   platform owner's in-app payment solution, on neither platform

11:31:07AM   is there such a requirement in all times, again, because the

11:31:11AM   developer can choose how to distribute its app; correct?

11:31:15AM   **A.**   Well, if you use the Windows Store or the Mac Store, there

11:31:18AM   is a complete prohibition.  If you do something else, then

11:31:21AM   there must -- there is something else.

11:31:24AM   **Q.**   Correct.

11:31:25AM   **A.**   But for those stores, there is a prohibition.

11:31:27AM   **Q.**   That, too, is a fair clarification.

11:31:29AM        But a developer does have a choice to take another route

11:31:32AM   and distribute directly; correct?

11:31:34AM   **A.**   Yes, or to use some store that -- as far as I know, the

11:31:38AM   main stores do have a requirement to use in-app, but direct

11:31:42AM   distribution obviously lets you do whatever you want.

11:31:44AM   **Q.**   And so, for example, on the Mac, 78 percent of apps are

11:31:49AM   distributed directly; is that right?

11:31:51AM   **A.**   That could be.  It's not a number I have in my head.

11:31:54AM   **Q.**   All right.  Well, let's go ahead and populate that.  I

11:31:56AM   predicted we would have gotten to know, but you've clarified

11:32:01AM   what -- what the facts are and I accept your clarifications.

11:32:04AM   **A.**   Okay.

SCHMALENSEE - CROSS / BORNSTEIN

11:32:05AM **Q.** Now, we filled in the bottom of the demonstrative, but I

11:32:08AM would like to fill in the right side, because there are some

11:32:10AM other categories that may be relevant to thinking about this.

11:32:14AM So "Type of OS" is the first column I'd like to add here.

11:32:18AM Am I right that you think about computer operating systems

11:32:27AM as a foundational platform that provide a platform for app

11:32:32AM developers and users to make all kinds of software?

11:32:36AM **A.** That may even be my language, but, yes.

11:32:39AM **Q.** Okay. And so you would be comfortable calling Windows and

11:32:43AM Mac, for example, general-purpose operating systems?

11:32:46AM **A.** Yes.

11:32:46AM **Q.** And does that apply for iPhone and Android, too, given the

11:32:50AM range of apps that are available?

11:32:52AM **A.** Given the range of apps, yes.

11:32:54AM **Q.** Okay. But for Xbox and Sony and PlayStation and the

11:32:57AM Nintendo Switch, those are different; right?

11:33:01AM **A.** Well, I don't know as a technical matter, but given the

11:33:06AM hardware/software bundles that are sold, they are not as fully

11:33:11AM functional as the bundles sold with the others.

11:33:14AM It may be that -- you can do a variety of things on Xbox

11:33:20AM beyond playing games, for instance. I don't know how much

11:33:22AM that has to do with the hardware or how much that has to do

11:33:25AM with the software.

11:33:26AM **Q.** But they're not designed and marketed primarily for that

11:33:29AM purpose, correct, for anything other than games?

SCHMALENSEE - CROSS / BORNSTEIN

11:33:33AM  **A.**  They are designed and marketed primarily for games, that's

11:33:36AM  correct.

11:33:36AM  **Q.**  And they're not what you would call foundational platforms

11:33:39AM  either; correct?

11:33:46AM  **A.**  I'd have to think about what that means.  I'm sure I used

11:33:50AM  the language, but I used the language in connection with the

11:33:54AM  operating systems at the bottom.

11:33:55AM  It's not -- they're not foundational for a wide range of

11:34:00AM  functions, so they're not foundational in that sense.  They're

11:34:04AM  foundational for a wide range of games and some of them for a

11:34:07AM  range of functions.  So not a technical term.

11:34:12AM  **Q.**  Fair enough.

11:34:12AM  As you predicted, those were your words.  I was assuming

11:34:16AM  that you would have a clearer definition in mind, but I won't

11:34:21AM  push you on it.

11:34:22AM  I will ask Mr. Rudd to populate the slide and see if we

11:34:25AM  can just be in general agreement here that the Xbox, the Sony,

11:34:28AM  PlayStation, and the Nintendo Switch are more special or niche

11:34:33AM  operating systems, and the remainders, the iPhone, the

11:34:36AM  Android, the Windows, and the Mac, are general-purpose or

11:34:39AM  foundational operating systems.

11:34:41AM  Would you agree with those characterizations?

11:34:43AM  **A.**  By and large, although I don't know how -- the extent to

11:34:46AM  which their special nature reflects the operating system or

11:34:49AM  reflects the hardware or reflects the -- some -- some mixture.

SCHMALENSEE - CROSS / BORNSTEIN

11:34:54AM   I just haven't looked.  As they are marketed, they're more

11:34:57AM   specialized.

11:34:58AM   **Q.**   That's a fair clarification, too.  Thank you, sir.

11:35:01AM        So let's pop in the last column there -- that's the only

11:35:04AM   one we have any more room for -- which I have titled "Business

11:35:07AM   Model."

11:35:07AM        And in the computer operating system business, Microsoft

11:35:15AM   provides developer tools for a nominal charge and receives

11:35:21AM   almost all of its income for Windows from licensing, from --

11:35:27AM   from OEMs, from computer makers; correct?

11:35:31AM   **A.**   Correct.

11:35:31AM   **Q.**   That's why you called it a three-sided platform?

11:35:33AM   **A.**   That's precisely right.

11:35:35AM   **Q.**   Mac and iPhone, the two Apple systems here, they get --

11:35:39AM   they also provide tools for a nominal charge to developers,

11:35:43AM   and they get the bulk of their revenues from the sale of

11:35:47AM   hardware; correct?

11:35:49AM   **A.**   Correct.

11:35:51AM   **Q.**   And Google, you've already said no one really knows how

11:35:54AM   they make their money --

11:35:55AM   **A.**   Right.

11:35:56AM   **Q.**   -- but it seems to be through advertising and information

11:36:01AM   gathering that comes from users, ultimately; correct?

11:36:04AM   **A.**   It seems to be the general industry understanding, yes.

11:36:07AM   **Q.**   Okay.  But the video game consoles, you testified this

SCHMALENSEE - CROSS / BORNSTEIN

11:36:12AM   morning the general understanding is that they sell their

11:36:16AM   hardware at a loss; correct?

11:36:19AM   **A.**   Or at least that's not where they make all their money.   I

11:36:22AM   did see that Microsoft document that came in which suggests

11:36:25AM   that at least one of them sells at a price that covers

11:36:31AM   incremental cost.   But that's not where they make their money.

11:36:35AM   **Q.**   They make their money from the developers; correct?

11:36:37AM   **A.**   Correct.

11:36:37AM   **Q.**   And that is, in fact, in your -- in your opinion, the

11:36:41AM   universal view as to how the video game consoles make their

11:36:46AM   money and run their business; correct?

11:36:48AM   **A.**   Despite the absence of audited financial statements, that

11:36:51AM   has been the general view for a long time.

11:36:54AM   **Q.**   And so let's populate that last column here, where the

11:36:59AM   video consoles have subsidized hardware and the

11:37:04AM   general-purpose operating systems on the bottom profit from

11:37:08AM   the users, from the hardware or, in Google's case, from the

11:37:12AM   advertising or from an OEM; correct?

11:37:18AM   **A.**   Yeah, for the bottom two and the top three, that seems

11:37:22AM   right.

11:37:22AM       Of course, as you will point out, the iPhone gets profit

11:37:26AM   both from the apps, both from developers, and from hardware.

11:37:31AM   **Q.**   Indeed.   So let's just divide up these things.   We've got

11:37:38AM   the general-purpose operating systems here on the bottom, the

11:37:42AM   bottom four:   The iPhone, the Android, the Windows, and the

11:37:46AM    Mac.

11:37:46AM        And your view, sir, is that the video game consoles on top

11:37:51AM    have a radically different business model; is that fair?

11:37:54AM    **A.**  I used that language, yes.

11:37:55AM    **Q.**  Well, why don't we finish up the slide.  Radically

11:37:58AM    different.

11:37:59AM        **MR. BORNSTEIN:**  And I don't know, Your Honor, if

11:38:00AM    now -- oh, we are not even close.  I thought we were -- oh,

11:38:04AM    we're an hour off.  But I'm happy to keep going.

11:38:07AM        **THE WITNESS:**  You must be hungry.

11:38:09AM        **MR. BORNSTEIN:**  I am a little bit.

11:38:10AM        We can take that down.

11:38:12AM    **Q.**  Now, sir, the -- you referred earlier to whether or not

11:38:15AM    there has been actual price changes on the App Store as an

11:38:23AM    opportunity where one might observe substitution going on.

11:38:26AM        Do you recall that?

11:38:27AM    **A.**  I do.

11:38:27AM    **Q.**  Right.  And your testimony to the Court has been that

11:38:33AM    Apple has only reduced elements of its price structure over

11:38:37AM    time; is that correct?

11:38:39AM    **A.**  That's correct.

11:38:41AM    **Q.**  And it's true Apple started with a 30 percent commission

11:38:45AM    back when the App Store was launched; correct?

11:38:47AM    **A.**  Yep.

11:38:48AM    **Q.**  And that commission, when it applies, has not yet gone

SCHMALENSEE - CROSS / BORNSTEIN

11:38:52AM   higher than 30 percent; correct?

11:38:54AM   **A.**  Nor has it gone lower as a headline commission.

11:38:57AM   **Q.**  But the range of transactions to which that commission

11:39:01AM   applies, that has changed; correct?

11:39:05AM   **A.**  Well, new functionality has been added, like

11:39:11AM   subscriptions, so yes.

11:39:13AM   **Q.**  Well, let's dig in on that, sir.

11:39:15AM        When the App Store was launched in 2008, it was possible

11:39:19AM   for developers to sell content to users from the app, in-app

11:39:28AM   purchasing; correct?

11:39:30AM   **A.**  I'm not sure that was true, but if it was, okay.

11:39:34AM   **Q.**  All right.  You don't know one way or the other?

11:39:37AM   **A.**  Well, my understanding is that if it was true, it was

11:39:39AM   subject to the commission.  But whether they, in fact, did and

11:39:43AM   didn't pay the commission, I don't know.

11:39:45AM   **Q.**  Well, the IAP mechanism, Apple's in-app purchase

11:39:51AM   mechanism, did not come into being until a year after the App

11:39:55AM   Store was launched; correct?

11:39:57AM   **A.**  That's certainly correct.

11:39:59AM   **Q.**  But prior to the launch of the IAP mechanism of Apple's,

11:40:06AM   it was still possible for people to do in-app purchases,

11:40:08AM   wasn't it?

11:40:10AM   **A.**  I don't know that.  It might have been.  If it was, I

11:40:12AM   didn't know -- I don't know.

11:40:14AM   **Q.**  All right.  And that's fair.

SCHMALENSEE - CROSS / BORNSTEIN

11:40:14AM        Now, I'll just ask you to assume for a moment that I have

11:40:17AM    that right.

11:40:17AM    **A.**   Yep.

11:40:17AM    **Q.**   In that instance, when Apple introduced IAP, it

11:40:23AM    effectively imposed a price increase on those transactions.

11:40:27AM    **A.**   On those -- on those people who had been doing in-app

11:40:30AM    transactions without paying anything.

11:40:32AM    **Q.**   Yes.

11:40:32AM    **A.**   If there were such people, they paid a higher price.

11:40:35AM    **Q.**   And you mentioned subscriptions.

11:40:37AM        There were people who were offering subscriptions through

11:40:40AM    their apps prior to the time that Apple imposed the IAP

11:40:45AM    commission requirement on the subscription sales; correct?

11:40:49AM    **A.**   My understanding was that the subscription -- the

11:40:53AM    subscription change was a new functionality.  Again, whether

11:40:58AM    they were offering subscriptions before Apple enabled

11:41:04AM    subscriptions as such, perhaps.  I'm unaware of any examples,

11:41:07AM    but if there were such examples, as I said in my deposition,

11:41:10AM    then those folks would have seen a price increase.  I'm

11:41:14AM    unaware that there were such.  Apple contends the subscription

11:41:17AM    functionality was a new feature for which it charged.

11:41:20AM    **Q.**   Right.  It was a new feature of having subscriptions run

11:41:24AM    through the App Store and run through IAP, but certainly you

11:41:27AM    realize people were able to have subscriptions available like

11:41:30AM    Netflix and Spotify, to take two examples.

SCHMALENSEE - CROSS / BORNSTEIN

11:41:33AM  **A.**  Well, as they do now, without needing to run them through

11:41:36AM  the App Store.

11:41:38AM  **Q.**  Right.  But before 2011, when Apple actually imposed this

11:41:43AM  requirement, they were able to run them from their iOS devices

11:41:46AM  as well; correct?

11:41:47AM  **A.**  I'm unaware of that.  My understanding is that that

11:41:49AM  functionality really wasn't there.  Those would have been

11:41:52AM  in-app purchases.  They would have -- they would have been

11:41:55AM  subject to the commission rate.

11:41:56AM      The subscription functionality, well, required Apple to

11:42:03AM  track subscriptions, which is different from a "and now you

11:42:07AM  buy it and now you buy it and now you buy it."  So I'm unaware

11:42:11AM  that they were able actually to offer subscriptions before

11:42:14AM  this functionality.

11:42:15AM  **Q.**  And you mean subscriptions through Apple's infrastructure;

11:42:20AM  correct?

11:42:21AM  **A.**  That's what I meant, yes.

11:42:22AM  **Q.**  Okay.  They were able to offer subscriptions, however;

11:42:25AM  correct?

11:42:25AM  **A.**  Well, I don't know how.  I mean, you can offer

11:42:27AM  subscriptions in the sense that people can subscribe on a

11:42:31AM  website or whatever, but whether they were able to offer

11:42:33AM  subscriptions in the way we think of a subscription, my

11:42:40AM  understanding was that you couldn't quite do that.

11:42:42AM      If you could and you didn't pay a commission -- you know,

SCHMALENSEE - CROSS / BORNSTEIN

11:42:47AM   Apple witnesses will have to clarify all of this -- if you

11:42:51AM   could do it and didn't pay a commission and then Apple said,

11:42:54AM   "If you do it, you pay a commission," by definition, that's a

11:42:58AM   price increase.  My understanding is the Apple people will say

11:43:00AM   that's wrong, but they're not here.

11:43:03AM   Q.  All right.  And I appreciate that, sir.  I don't mean to

11:43:06AM   debate the facts with you.  You're here to talk about the

11:43:09AM   economics, and I will try to keep my questions focused that

11:43:12AM   way, which is what I have been trying to do.

11:43:14AM        You talked a little bit about your analysis of Dr. Evans'

11:43:21AM   conclusion that Apple could profitably raise price on its

11:43:26AM   commission rate.

11:43:27AM        Do you recall that?

11:43:28AM   A.  I do.

11:43:29AM   Q.  You currently don't have any view as to whether the price

11:43:33AM   that Apple is charging right now is its profit-maximizing

11:43:37AM   price.

11:43:38AM        Is that accurate?

11:43:39AM   A.  Sure.  I have not done that analysis.

11:43:41AM   Q.  All right.  As a matter of economic principle, is it true

11:43:46AM   that determining the profit-maximizing price requires taking

11:43:51AM   into account all of the facts and circumstances that face the

11:43:53AM   business?

11:43:55AM   A.  That sounds like a deposition question to which the

11:43:57AM   correct answer is yes.

SCHMALENSEE - CROSS / BORNSTEIN

11:44:00AM  **Q.**  I hope it was an economic question, too.

11:44:03AM  **A.**  Yes, sir.

11:44:03AM  **Q.**  Keep to my -- keep to my promise.

11:44:05AM      Now, one of the facts and circumstances that a business

11:44:08AM  would rationally take into account in setting a

11:44:13AM  profit-maximizing price would be the possibility of regulatory

11:44:16AM  action; correct?

11:44:17AM  **A.**  If that's a real possibility, that's something that they

11:44:20AM  would take into account.

11:44:21AM  **Q.**  And it would be the possibility of legislative action;

11:44:24AM  correct?

11:44:25AM  **A.**  If it's a real possibility, you might take it into account

11:44:28AM  if your pricing would affect that possibility.

11:44:31AM  **Q.**  All right.  Well, let's take it from the hypothetical to

11:44:34AM  the actual, albeit historical.  Back to Microsoft.

11:44:41AM      You were an expert witness for Microsoft during its

11:44:45AM  antitrust battles; correct?

11:44:47AM  **A.**  I was.

11:44:47AM  **Q.**  And Microsoft went through extensive antitrust scrutiny in

11:44:51AM  the 1990s; correct?

11:44:52AM  **A.**  Oh, yes.

11:44:53AM  **Q.**  And it was widely recognized that the government's focus

11:44:57AM  on Microsoft's conduct led Microsoft to reign in its behavior;

11:45:02AM  correct?

11:45:12AM  **A.**  Recognized -- I must say some of Microsoft's behavior

SCHMALENSEE - CROSS / BORNSTEIN

11:45:15AM  didn't suggest a great recognition of that issue, but it was

11:45:19AM  certainly discussed.

11:45:20AM  **Q.**  All right.  And you know that Apple has been under

11:45:23AM  antitrust scrutiny here in the United States and around the

11:45:26AM  world on App Store-related issues for a number of years;

11:45:30AM  correct?

11:45:32AM  **A.**  Yeah.  I'm not sure how many years, but it's certainly a

11:45:35AM  number.

11:45:36AM  **Q.**  Well, we heard some testimony this week that Dr. Evans had

11:45:41AM  been retained to provide some economic consulting for a client

11:45:46AM  on this issue in 2016; right?

11:45:49AM  **A.**  We did hear that, yes.

11:45:51AM  **Q.**  And you're aware that last year in the summer, Mr. Cook,

11:45:57AM  Apple's CEO, testified before Congress; correct?

11:46:00AM  **A.**  I think that's right, yeah.

11:46:02AM  **Q.**  It was on TV, lots of news about it?

11:46:04AM  **A.**  Well, I didn't watch the TV coverage, but that sounds

11:46:08AM  right, yeah.

11:46:09AM  **Q.**  And Mr. Cook, are you aware, testified that Apple had

11:46:12AM  never increased commissions in the store since the first day

11:46:16AM  it operated in 2008.

11:46:19AM  **A.**  That sounds like what he said.

11:46:22AM  **Q.**  And if Apple had actually gone ahead and raised prices,

11:46:26AM  Mr. Cook would have lost that talking point, wouldn't he?

11:46:30AM  **A.**  He would have.  And as I said, I think Apple fact

SCHMALENSEE - CROSS / BORNSTEIN

11:46:34AM    witnesses will dispute the notion of a price increase as

11:46:38AM    opposed to a new function for which a price was charged.

11:46:40AM    Q.   Okay.   And if Apple had gone ahead and raised its headline

11:46:43AM    rate, its 30 percent, Mr. Cook wouldn't have been able to say

11:46:45AM    that to Congress and Apple wouldn't be able to give the

11:46:48AM    testimony that it has sponsored in this Court, that it has

11:46:51AM    never raised price; correct?

11:46:53AM    A.   That's certainly correct.

11:46:54AM    Q.   Now, your report draws a distinction -- you talked about

11:46:58AM    it this morning -- between economic profitability and

11:47:01AM    accounting profitability; correct?

11:47:03AM    A.   Correct.

11:47:04AM    Q.   To be clear, there is no particular bias in which

11:47:10AM    direction the difference between those two things goes; right?

11:47:13AM    Accounting profits can be higher or lower than economic

11:47:16AM    profitability; fair?

11:47:18AM    A.   That's right.   It depends on a lot of things.

11:47:20AM    Q.   Right.   Now, in your expert rebuttal report, you made the

11:47:25AM    statement that if most of Apple's R&D is devoted to the App

11:47:31AM    Store, then a revenue-based allocation of joint costs would

11:47:38AM    underestimate the expenses attributable to the App Store; is

11:47:41AM    that correct?

11:47:46AM    A.   I believe I said it, but could you read it to me again?

11:47:49AM    Q.   Sure.   What you said -- I'll get the exact language,

11:47:54AM    rather than a paraphrase -- was that "If most of Apple's R&D

SCHMALENSEE - CROSS / BORNSTEIN

11:47:59AM   is devoted to the App Store, then a revenue-based allocation

11:48:03AM   of R&D would underestimate the expenses attributable to the

11:48:07AM   App Store."

11:48:08AM   **A.**   Yeah.   That's sort of like a tautology, isn't it?   But,

11:48:13AM   yes, that's what I said.

11:48:15AM   **Q.**   Okay.   And I suppose the converse would be a tautology, as

11:48:18AM   well.

11:48:18AM   **A.**   Correct.

11:48:19AM   **Q.**   So if very little of Apple's R&D is devoted to the App

11:48:23AM   Store, then a revenue-based allocation would overestimate the

11:48:26AM   expenses attributable to the App Store; right?

11:48:29AM   **A.**   Attributable to, yes.

11:48:31AM   **Q.**   That was what I asked.

11:48:33AM   **A.**   Whatever that might -- whatever that might have meant to

11:48:35AM   me at the time, yes.

11:48:36AM   **Q.**   And are you aware that on the very last day of fact

11:48:40AM   discovery in this case, Apple produced to Epic a document that

11:48:46AM   contains actual allocations of R&D expenditures to the App

11:48:51AM   Store?

11:48:52AM   **A.**   I'm aware of that.

11:48:53AM   **Q.**   All right.   And sure enough, according to that document --

11:48:56AM   I won't release any numbers and I will be as careful as

11:48:59AM   Mr. Swanson would like me to be here -- according to that

11:49:03AM   document, very little of Apple's R&D was actually allocated to

11:49:07AM   the App Store; correct?

SCHMALENSEE - CROSS / BORNSTEIN

11:49:09AM  **A.**  That's my understanding, yes.

11:49:10AM  **Q.**  Okay.  And that was a document that was put together for

11:49:13AM  Mr. Cook and found in his files; correct?

11:49:17AM  **A.**  It was found in his files.  How and who it was prepared

11:49:21AM  for, I don't know, but I'm sure we'll all learn.

11:49:26AM  **Q.**  I didn't have the opportunity to ask Mr. Cook at his

11:49:28AM  deposition because it hadn't yet been produced, so perhaps we

11:49:30AM  will learn in due course.

11:49:33AM      If it is true that the revenue-based allocation of joint

11:49:39AM  costs overestimates expenses, then it would understate

11:49:43AM  profits, as a matter of math; correct?

11:49:47AM  **A.**  Well, as I said, the -- any statement of profit specific

11:49:52AM  to the App Store is arbitrary, so over or under really doesn't

11:49:57AM  have an economic meaning here.

11:49:59AM  **Q.**  Right, sir, but I'm basing this off of your language from

11:50:03AM  your rebuttal report.

11:50:05AM  **A.**  I make it a tautology because it's a question of what do

11:50:09AM  you mean by "attributable to."  I mean, if, in fact, most of

11:50:13AM  the R&D at the corporate level was for the benefit of the App

11:50:17AM  Store but yet you use a revenue-based allocation, well, then

11:50:24AM  that misses the point of where the R&D was aimed.

11:50:27AM      But I made the more general point this morning that R&D

11:50:31AM  anywhere in this ecosystem is going to benefit, to a first

11:50:34AM  approximation, all parts.  So the allocation is not very

11:50:38AM  meaningful.

SCHMALENSEE - CROSS / BORNSTEIN

11:50:39AM **Q.** Right. But it is an allocation that you are aware finance

11:50:44AM personnel at Apple have actually done in their jobs; correct?

11:50:49AM **A.** It does seem to have been done by personnel in Apple as

11:50:53AM part of their jobs.

11:50:54AM **Q.** And that's, in your experience, not at all uncommon for

11:50:58AM businesspeople to do allocation of joint costs for various

11:51:02AM purposes in running the business; correct?

11:51:04AM **A.** Well, it varies among businesses. I mean, this is

11:51:06AM managerial accounting, and the question is what's it for.

11:51:10AM It's usually for evaluating performance. And allocating joint

11:51:14AM costs is not real helpful in allocating -- in analyzing

11:51:19AM performance, but I'm sure we'll all learn why they did it.

11:51:23AM **Q.** My question, however, was it is something that people in

11:51:25AM the ordinary course, in your experience, do in businesses

11:51:29AM aside from Apple, just as a general matter, correct, to help

11:51:33AM run the business?

11:51:35AM **A.** Allocation of joint costs doesn't help you run the

11:51:37AM business. It is done. Even Mr. Sweeney said that, yes, his

11:51:41AM accountants sometimes do it, even though he considered those

11:51:43AM allocations meaningless. So it is done. Accountants love to

11:51:48AM do that sort of thing.

11:51:49AM But if you ask what's it good for, presumably, a business

11:51:53AM unit head has some control over revenue, has some control over

11:51:57AM direct costs, doesn't have control over allocated costs. So

11:52:00AM it's not obvious how useful it is, but it's done. I'll give

SCHMALENSEE - CROSS / BORNSTEIN

11:52:04AM   you that.

11:52:05AM   **Q.**  After disputing the relevance of accounting profitability

11:52:10AM   in your testimony in writing here, you do acknowledge that

11:52:18AM   persistently high economic profit is suggestive of market

11:52:22AM   power.

11:52:23AM   **A.**  I do, yes.

11:52:23AM   **Q.**  Okay.  And you stand by that?

11:52:25AM   **A.**  I do.

11:52:25AM   **Q.**  And you've said something like that now for 40 years;

11:52:28AM   correct?

11:52:29AM   **A.**  Well, I said something like that 40 years ago, and I stand

11:52:32AM   by that, as well.

11:52:34AM   **Q.**  Okay.  You remember being cross-examined about that once

11:52:36AM   before, I imagine.

11:52:39AM   **A.**  I've been cross-examined by that a couple -- on that a

11:52:40AM   couple of times.  It was in a 1983 Harvard Law Review article.

11:52:47AM   **Q.**  In discussing the profitability analysis from Dr. Evans,

11:52:53AM   one of the things that you did is you argued that successful

11:52:57AM   technology companies, large and small, earn similar and at

11:53:02AM   times higher operating margins than Apple as returns on their

11:53:06AM   intellectual property; correct?

11:53:08AM   **A.**  I did say that, yes.

11:53:09AM   **Q.**  Okay.  And you put together an exhibit, Exhibit 2 of your

11:53:13AM   written direct testimony, that was intended to offer

11:53:18AM   information about the operating margins of certain

SCHMALENSEE - CROSS / BORNSTEIN

11:53:20AM publicly-traded companies that have online stores; is that

11:53:23AM right?

11:53:24AM **A.** Yes.  I think I took the list of companies from

11:53:27AM Mr. Barnes' list of people who operated stores.  I think

11:53:31AM that's where that list came from.

11:53:33AM **MR. BORNSTEIN:** Okay.  And why don't we just -- can

11:53:36AM we put Exhibit 2 up.  I guess we've marked it DX4861 -- or

11:53:44AM Apple has marked it DX4861.

11:53:47AM **Q.** This is your Exhibit 2, sir?

11:53:50AM **A.** It looks like it, yes.

11:53:52AM **Q.** Great.  And what you've done -- first of all, this doesn't

11:53:57AM break out margins that constitute returns on intellectual

11:54:01AM property, which is the way you described it in paragraph 112

11:54:04AM of your report, does it?

11:54:05AM **A.** No.  There was no way to -- there is no way to do that.

11:54:11AM **Q.** And the profit margins reflected here -- in fact, all of

11:54:15AM the financial information reflected here is on a company-wide

11:54:18AM basis; correct?  It's not specific to the online stores that

11:54:22AM are run by these entities.

11:54:31AM **A.** You're right.  That was what was easily publicly

10:57:04AM available.

10:57:06AM **Q.** Right.  So, for example, just to take the first one,

10:57:09AM Samsung, they run a Galaxy Store, correct, on the Samsung

10:57:13AM phones; correct?

10:57:13AM **A.** That's correct.

10:57:13AM    THE COURT REPORTER:  I'm sorry, Your Honor, it went

10:57:13AM  out again.

10:57:13AM              (Court reporter technical problems.)

4           THE COURT:  Go ahead, Mr. Bornstein.

10:58:22AM    MR. BORNSTEIN:  Thank you.

10:58:22AM  Q.  So we were on -- we were on Samsung, and the -- I was

10:58:29AM  saying that the financial figure -- or asking you the

10:58:31AM  financial figures reflected for Samsung here are not limited

10:58:34AM  to the Galaxy Store; correct?

10:58:37AM  A.  That's correct.

10:58:38AM  Q.  This covers Samsung's TV business and washing machine

10:58:43AM  business and, if you go to Korea, you will discover they have

10:58:46AM  a toilet business, too.

10:58:47AM  A.  And I believe probably an insurance company, but yeah.

10:58:50AM  Q.  Indeed.

10:58:51AM      And this says nothing about the profitability of the

10:58:56AM  Galaxy Store; correct?

10:58:58AM  A.  That's correct.

10:58:59AM  Q.  Or the operating margin of the Galaxy Store; correct?

10:59:02AM  A.  That's correct.

10:59:04AM  Q.  And, in fact, Exhibit 2 as a whole, to your mind, doesn't

10:59:11AM  say anything about whether Apple does or does not have market

10:59:15AM  power in any individual line of business; correct?

10:59:19AM  A.  That's correct.  It just points out that Apple's operating

10:59:22AM  margin is not out of line with other operating margins of

SCHMALENSEE - CROSS / BORNSTEIN

10:59:25AM     companies large and small that are in the -- among other

10:59:29AM     things, in the online store business.

10:59:31AM     **Q.**   Okay.  Now, Apple --

10:59:33AM          You can take this down, Mr. Rudd.

10:59:36AM          Apple, as we've talked about just a little bit, does not

10:59:40AM     require developers to use the IAP function for the sale of

10:59:46AM     physical goods and services in the real world; correct?

10:59:48AM     **A.**   Indeed, it requires them not to use it.  It doesn't -- it

10:59:51AM     lets -- it requires them to use some other solution.

10:59:54AM     **Q.**   Indeed.  And that distinction that Apple has chosen to

10:59:58AM     draw you have called part of Apple's monetization strategy for

11:00:03AM     its products and services; correct?

11:00:06AM     **A.**   That's a fancy name, but it's how they choose to price.

11:00:09AM     **Q.**   Right.  It's how they have chosen to construct the

11:00:12AM     business --

11:00:12AM     **A.**   Yes.

11:00:13AM     **Q.**   -- correct?

11:00:13AM          And in your view, Apple could make a different choice;

11:00:18AM     yes?

11:00:20AM     **A.**   It could make a different choice.  There may be legal

11:00:23AM     constraints that I'm unaware of, but -- but subject to those,

11:00:27AM     it could choose a different strategy.

11:00:30AM     **Q.**   All right.  And to be clear, I'm asking you now just about

11:00:33AM     economics.

11:00:33AM     **A.**   Thank you.

SCHMALENSEE - CROSS / BORNSTEIN

11:00:34AM  **Q.** The legal job to decide is neither yours nor mine.

11:00:39AM      So let's put up Slide 13, Mr. Rudd, please, of what will

11:00:44AM  be the end of our examination here.

11:00:48AM      So for digital in-app purchases, which are the ones

11:00:52AM  subject to the IAP requirement, there is a 30 percent

11:00:56AM  charge -- typically, 30 percent charge that is collected;

11:00:59AM  correct?

11:01:00AM  **A.** Unless you are a small developer, that's correct.

11:01:02AM  **Q.** And so there is -- there has been some talk, I guess you

11:01:06AM  have heard, about that being a toll booth; correct?

11:01:09AM  **A.** I did hear that language, yes.

11:01:10AM  **Q.** All right.  Well, we've tried to be cute and put together

11:01:12AM  a car going through a toll booth.

11:01:15AM      So let's put the toll booth up.

11:01:18AM      Now, it's your view that if Apple wanted to -- again, as

11:01:22AM  an economic matter -- it could also -- for physical in-app

11:01:25AM  purchases, it could put up a toll booth, as well; correct?

11:01:30AM  **A.** Just like Amazon and Wal-Mart.

11:01:32AM  **Q.** Okay.  And in your view, for revenue generated through

11:01:38AM  advertising, Apple could put up a toll booth on that and

11:01:42AM  collect a portion, as well; correct?

11:01:45AM  **A.** Assuming it's technically feasible, assuming there is no

11:01:48AM  legal obstacle, it could set a price.

11:01:51AM  **Q.** All right.  And the same thing is true for transactions

11:01:54AM  that take place on the Safari browser on the iOS.  As you

SCHMALENSEE - CROSS / BORNSTEIN

11:02:00AM   understand it, as an economic matter, Apple could put up a

11:02:03AM   toll booth there, too; correct?

11:02:08AM   **A.**  It could.  It wouldn't seem to make a lot of sense, but,

11:02:11AM   again, it could try to post that.

11:02:12AM       It couldn't restrict the use of other browsers, which, of

11:02:15AM   course, are available on the -- on iOS, but if it wanted to do

11:02:21AM   that, it presumably could.

11:02:24AM   **Q.**  And when you say "it couldn't restrict the use of other

11:02:26AM   browsers," I assume there you are giving a legal opinion.

11:02:29AM   **A.**  No.  I'm reflecting the reality that there are other

11:02:32AM   browsers available.  If you're saying could it restrict other

11:02:36AM   browsers and charge for web purchases on Safari, I think that

11:02:40AM   is a legal question.

11:02:42AM   **Q.**  And you're aware for a long time Safari was the only

11:02:45AM   browser on the iPhone; correct?

11:02:46AM   **A.**  I'm not sure that it restricted it to be the only browser,

11:02:49AM   but it was the one that was pre-installed and, as an iPhone

11:02:53AM   user, it's okay.  I didn't look around.

11:02:56AM   **Q.**  Okay.  Again, you don't know, though, I take it, one way

11:02:59AM   or the other about whether there was a restriction making

11:03:02AM   Safari the only browser at one point in time?

11:03:06AM   **A.**  Well, certainly the only one pre-installed.  Whether they

11:03:10AM   barred the installation of other browsers, I'd be surprised,

11:03:12AM   but I don't know for a fact.

11:03:15AM   **Q.**  Okay.  And so as an economic matter, the only things that

11:03:18AM   are preventing Apple from putting up these toll booths are

11:03:23AM   competition, or the possibility of competition, and people's

11:03:27AM   willingness to pay; fair?

11:03:30AM   **A.**  I think that's probably right.  That's true of anybody's

11:03:33AM   pricing decisions.

11:03:36AM          **MR. BORNSTEIN:**  I have no further questions for the

11:03:39AM   professor.  Thank you.

11:03:43AM          **THE COURT:**  All right.  Redirect.

11:03:44AM                  **<u>REDIRECT EXAMINATION</u>**

11:03:46AM   **BY MR. SWANSON:**

11:03:48AM   **Q.**  Professor Schmalensee, Mr. Bornstein put before you an

11:03:53AM   article that you had written.

11:03:55AM       Were you the sole author of that article?

11:03:58AM   **A.**  Remind me which article this was.

11:04:00AM   **Q.**  I had -- well, I don't have the exhibit handy.

11:04:04AM       Mr. Bornstein, do you want to help me?

11:04:06AM          **THE COURT:**  Do you want to stay talking into the mic,

11:04:08AM   please.

11:04:11AM          **MR. SWANSON:**  Sorry.  I was asking Mr. Bornstein to

11:04:13AM   help me.  If you have a copy of the exhibit, the title of the

11:04:15AM   article.

11:04:17AM          **MR. BORNSTEIN:**  It's "An Instant Classic."  I was

11:04:20AM   asking Mr. --

11:04:22AM          **THE COURT:**  We really can't hear you, so if you want

11:04:23AM   that on the record...

11:04:24AM **BY MR. SWANSON:**

11:04:25AM **Q.**  It's -- Mr. Bornstein said the title of the article is,

11:04:28AM  "An instant classic."

11:04:30AM **A.**  Oh, sure.  I remember that and I remember what he asked

11:04:32AM  me.

11:04:32AM **Q.**  Okay.  And I just asked, was that an article you authored

11:04:35AM  alone or was that coauthored?

11:04:38AM **A.**  Oh, I might have coauthored it with David, but I --

11:04:43AM  Dr. Evans.  I don't recall.  I'm happy to take responsibility

11:04:47AM  for that statement, however, if I'm allowed to clarify it.

11:04:49AM **Q.**  Well, this is the time.  You used the phrase

11:04:53AM  "winner-take-all struggle," I believe, in that article.

11:04:56AM      What did you mean by that?

11:04:58AM **A.**  Well, let me give an example.  If somebody -- if people

11:05:02AM  typically eat both Cheerios and Cornflakes, then you're

11:05:06AM  normally competing, as the Cheerios person, for a little more

11:05:09AM  Cheerios and a little less Cornflakes.

11:05:12AM      If they -- if everybody eats either all Cheerios or all

11:05:17AM  Cornflakes, then you are competing for all of their business,

11:05:20AM  not for all of the market.  But for each consumer, it becomes

11:05:24AM  winner take all, either I get all of their business for

11:05:27AM  Cheerios or I lose it all to Cornflakes.  And it didn't have

11:05:33AM  to do with the market as a whole; it had to do with individual

11:05:36AM  customers.

11:05:36AM **Q.**  And what does that have to do with the intensity of

SCHMALENSEE - REDIRECT - SWANSON

11:05:40AM  competition?

11:05:41AM  **A.**  Well, both kinds can be intense.  Intense -- you can have

11:05:44AM  intense competition on the margin for different shares of

11:05:47AM  breakfast cereal, if you will, or in general, or you can have

11:05:52AM  competition for the whole show:  *I want to get them all.*

11:05:54AM      You see both kinds in the world, right?  People sign

11:05:58AM  exclusive deals and you want exclusive deals with you.

11:06:02AM  Sometimes you don't have exclusive deals and you're competing

11:06:05AM  for a piece of the pie as opposed to the whole pie.

11:06:09AM      But it's not taking over the market, which is what was

11:06:12AM  sort of implied.

11:06:14AM  **Q.**  Now, Mr. Bornstein asked you about Apple's rules regarding

11:06:20AM  in-app steering.

11:06:24AM      Have your opinions about whether or not those rules are

11:06:31AM  anticompetitive changed as a result of what -- of the

11:06:34AM  interaction you had with Mr. Bornstein?

11:06:36AM  **A.**  No.  He's very persuasive but not that persuasive.

11:06:42AM  **Q.**  Why not?

11:06:43AM  **A.**  Well, I mean, Apple posts a commission and Apple says, "We

11:06:49AM  want to collect the commission, and we are going to rule out

11:06:52AM  ways that you might try to avoid paying us."  And they list a

11:06:57AM  set of things, which you can consider reasonable or

11:06:59AM  unreasonable, that they rule out so as to make it likely they

11:07:02AM  will be able to collect their commission.

11:07:04AM      And that's exactly the same -- the same thing as Amex.  If

SCHMALENSEE - REDIRECT - SWANSON

11:07:10AM   you say you take the card, Amex says okay, you can't say you

11:07:15AM   take the card, benefit from having the decal in the window,

11:07:18AM   and then try real hard not to take the card.

11:07:20AM        Apple says if you're on the App Store and you sign the

11:07:25AM   contract and agree to pay the commission, we're going to limit

11:07:30AM   the things you can do to avoid paying.

11:07:32AM        We could talk about various things that might be done or

11:07:36AM   might not be done, but it's the same thrust.  You benefit from

11:07:41AM   having the decal in the window; you benefit from being on the

11:07:45AM   App Store and having access to Apple's intellectual property;

11:07:48AM   and in both cases, you're obliged to pay a commission, and

11:07:54AM   there are rules that say, no, no, you can't do things to avoid

11:07:57AM   paying.

11:07:58AM        So I -- I don't see the distinction.  As I said, he's very

11:08:03AM   persuasive, but he did not change my mind.

11:08:07AM   Q.  Professor Schmalensee, does Epic's Game Store being

11:08:10AM   unavailable on iOS call for a different market definition in

11:08:14AM   this case, in your opinion?

11:08:16AM   A.  No, for the reasons -- for the reasons I suggested.

11:08:19AM   They're -- the question is they want to be an app store, they

11:08:24AM   are an app store.  They are mostly a game app store.  So

11:08:30AM   they're in that business.

11:08:31AM        The complaint is Apple won't let other people distribute

11:08:36AM   iOS apps.  Well, that's precisely the complaint that they make

11:08:40AM   in their role as a potential iOS distributor.  It's precisely

11:08:48AM the same complaint.  So I don't see why it calls for a

11:08:50AM different market definition.

11:08:54AM       **MR. SWANSON:**  Thank you, Professor.

11:08:55AM   No further questions.

11:08:56AM       **THE COURT:**  Anything -- any recross, limited to the

11:09:00AM scope of redirect?

11:09:00AM **RECROSS-EXAMINATION**

11:09:02AM **BY MR. BORNSTEIN:**

11:09:03AM **Q.**  I just hope I can clarify that I didn't intend to mislead

11:09:06AM you, Professor.  Let me direct you to "An Instant Classic"

11:09:13AM just one more time.

11:09:14AM **A.**  Okay.

11:09:15AM **Q.**  And I'll clarify for the record that this was written just

11:09:17AM by yourself, as reflected on the front page of the exhibit.

11:09:22AM   Do you see that?

11:09:23AM **A.**  Yeah, that's what I thought.  I didn't remember a

11:09:25AM coauthor, but, hey...

11:09:27AM **Q.**  You've written so much with Dr. Evans, it's hard to keep

11:09:30AM track; right?

11:09:31AM **A.**  No, but I remember this one because -- well, for a variety

11:09:35AM of reasons.  But anyway...

11:09:36AM **Q.**  All right.  Let's just turn back to that language we

11:09:38AM looked at, and I will make this quick.

11:09:40AM   The sentence that I had focused on -- the two sentences I

11:09:44AM had focused on said, "In the case of smartphone operating

SCHMALENSEE - RECROSS - BORNSTEIN

11:09:48AM    systems, for instance, most consumers singlehome at any one

11:09:52AM    time, while many developers multihome by writing apps for both

11:09:57AM    Android and Apple's iOS."

11:09:59AM         That's the first sentence; right?

11:10:01AM    **A.**   Yes.

11:10:01AM    **Q.**   And then you say, "Competition for singlehoming customers

11:10:04AM    is a winner-take-all struggle for all of their business, while

11:10:08AM    competition for multihoming customers is competition on a

11:10:12AM    margin for a larger share of their business."

11:10:14AM    **A.**   It's as true here as it is true for breakfast cereals.  So

11:10:19AM    it's the same argument.

11:10:20AM    **Q.**   Great.  And I was not intending to suggest that it was a

11:10:23AM    winner-take-all struggle for the full market.  It's, in fact,

11:10:25AM    as you say, for all of their business --

11:10:27AM    **A.**   Right.

11:10:27AM    **Q.**   -- correct?

11:10:28AM    **A.**   Yes.

11:10:28AM    **Q.**   And that means for all of the business of a particular

11:10:30AM    singlehoming customer; correct?

11:10:32AM    **A.**   Precisely.

11:10:34AM    **Q.**   And that is in part because those people have trouble

11:10:36AM    switching from one side to the other and will stay and

11:10:38AM    singlehome with one operating system; correct?

11:10:44AM    **A.**   No.  It doesn't have to do with why they singlehome.  It

11:10:49AM    just has to do with the fact that they singlehome.  Switching

SCHMALENSEE - RECROSS - BORNSTEIN

11:10:52AM   could be effortless.

11:10:54AM        I -- I have some anecdotal experience on that, and let me

11:11:00AM   just say it has nothing to do with the difficulty of

11:11:02AM   switching.  If they decide that I am -- if I decide that today

11:11:07AM   I'm only going to use one of these two systems, then your

11:11:11AM   competition is to get me to change.  If I -- if I use them

11:11:16AM   both, then it's for a share of my business.  It doesn't have

11:11:19AM   to do with switching costs.

11:11:22AM   **Q.**  And in this market, it is your view that people don't use

11:11:27AM   both at the same time; fair?

11:11:30AM   **A.**  That's certainly true, they don't use both at the same

11:11:32AM   time.

11:11:33AM             **MR. BORNSTEIN:**  All right.  Nothing further,

11:11:34AM   Your Honor.

11:11:35AM             **THE COURT:**  Anything on the "Instant Classic"?

11:11:40AM             **MR. SWANSON:**  No, Your Honor.

11:11:41AM             **THE COURT:**  Okay.  Well, I have a question.

11:11:43AM             **THE WITNESS:**  Yes, ma'am.

11:11:44AM             **THE COURT:**  Or maybe a couple.

11:11:46AM             **THE WITNESS:**  Of course.

11:11:47AM             **THE COURT:**  So I have the ABA's antitrust law book up

11:11:52AM   here, and I've heard quite a bit of evidence throughout the

11:11:57AM   trial regarding how big Apple is, right, and how

11:12:05AM   anticompetitive it is.

11:12:08AM        I put in my preliminary injunction order a note with

11:12:13AM  respect to essential facilities.  Neither of the parties have

11:12:18AM  any interest in briefing or providing evidence on that topic,

11:12:25AM  but it says that "An essential facilities claim arises in a

11:12:34AM  vertical context" -- which is what we're dealing with; right?

11:12:38AM      THE WITNESS:  Right, like Aspen Ski, yes.

11:12:40AM      THE COURT:  -- "and a plaintiff alleges that a

11:12:42AM  monopolist has a duty to deal because its own facility or

11:12:46AM  input is so superior to anything else available that

11:12:50AM  competitors cannot succeed without accessing it."

11:12:55AM      THE WITNESS:  Right.

11:12:56AM      THE COURT:  So it sounds to me like what Epic is

11:13:00AM  saying is that we want Apple to allow us to deal on their

11:13:05AM  platform, their iOS, and there are only two of these

11:13:09AM  platforms, and, therefore, because there are only two

11:13:14AM  competitors, all of these competitors can't succeed without

11:13:18AM  access to these platforms, this one and Google.

11:13:23AM      To someone who has not practiced antitrust law for 40-plus

11:13:27AM  years, it seems to me that this is -- that this is something

11:13:34AM  which is in this doctrine, but apparently neither of the sides

11:13:38AM  are interested in that.

11:13:39AM      So why isn't it in that doctrine?

11:13:43AM      THE WITNESS:  Well, to someone who has never

11:13:44AM  practiced antitrust law, I can -- I can -- I can give it a

11:13:48AM  shot.

11:13:48AM      I mean, if you -- if you go back to the -- I guess the

SCHMALENSEE - RECROSS - BORNSTEIN

11:13:54AM    Terminal Railroad case way back, I think -- where I think this

11:13:57AM    doctrine had its origin -- I grew up near St. Louis, and there

11:14:01AM    was only one bridge across the river, and if you wanted, as a

11:14:05AM    railroad, to go west, you had to have that bridge.  There was

11:14:09AM    just no alternative.

11:14:10AM         And the Terminal Railroad Association was a group of

11:14:14AM    railroads -- it either owned the terminal or they owned the

11:14:17AM    bridge -- and they could block east/west access.

11:14:20AM         And the court said you have to have that.  It is --

11:14:25AM              THE COURT:  But here --

11:14:25AM              THE WITNESS:  -- of the -- it is of the nature of a

11:14:27AM    public utility.  You can't have competition without it.

11:14:30AM              THE COURT:  Here the argument is that everybody has a

11:14:32AM    communications device, that being a smartphone, and the only

11:14:37AM    way to access those billions of customers is through Android

11:14:41AM    or the iPhone.

11:14:43AM              THE WITNESS:  Well, but the essential facility

11:14:45AM    doctrine -- an essential facility claim seems to me to arise

11:14:50AM    here -- and this is sort of conversation over coffee with

11:14:53AM    other economists and lawyers, and take it for what it's worth,

11:14:56AM    it's -- it arises in Apple's claim that it's blocked competing

11:15:04AM    with the App Store.  It's blocked being a store.

11:15:07AM         And so for that to work, it seems to me it has to be able

11:15:11AM    to argue we can't be a viable store unless we can access those

11:15:17AM    products.  This is like Aspen Ski, right?  We can't be a

11:15:21AM    viable ski mountain unless we can have a joint pass with you.

11:15:26AM        But, of course, they are a store and Steam is a store and

11:15:32AM    there are lots of stores.  So I think the reason Epic is --

11:15:40AM    far be it from me to sit here as a poor economist and try to

11:15:44AM    judge why they have decided what to plead, but I think the

11:15:48AM    argument that we can't be in the store business without access

11:15:52AM    to iOS apps just fails.  I mean, they're in the store

11:15:55AM    business.  Other people are in the store business.

11:15:57AM        Can they not distribute apps and access consumers?  Well,

11:16:05AM    if they want to access iOS, they have to go through the store.

11:16:08AM    But they do, and they make a lot of money going through the

11:16:11AM    store.

11:16:11AM        So it's not essential -- you know, it could be -- let me

11:16:17AM    take another shot -- it could be that Apple nominally gives

11:16:22AM    them access but the terms are so unfavorable that as a

11:16:26AM    business matter, they can't function.  But they've made a lot

11:16:30AM    of money going through that store, so I think they have

11:16:33AM    trouble making the argument.

11:16:35AM        Apple hasn't briefed it because they haven't had to.  Epic

11:16:39AM    hasn't briefed it, I think, right -- take an economist's

11:16:43AM    advice on this?  I'm not sure -- but Epic hasn't briefed it

11:16:47AM    because I don't think there is a case there.  But you asked.

11:16:49AM        THE COURT:  I did ask, and that's my prerogative.

11:16:55AM        So, again, I know that neither of you are pursuing that

11:17:01AM    theory, but if you want, Mr. Bornstein, you're welcome to

SCHMALENSEE - RECROSS - BORNSTEIN

| | |
|---|---|
| 11:17:04AM | follow up. |
| 11:17:08AM | **MR. BORNSTEIN:** I don't have any questions for |
| 11:17:10AM | Professor Schmalensee on that. I would just want to make |
| 11:17:13AM | clear for the Court that we have not abandoned that theory. |
| 11:17:15AM | It's in our conclusions of law, and we -- |
| 11:17:19AM | **THE COURT:** I thought I had read that you did abandon |
| 11:17:21AM | it, but okay. |
| 11:17:22AM | **MR. BORNSTEIN:** I think you read Apple's |
| 11:17:24AM | characterization of our brief, Your Honor. |
| 11:17:25AM | **THE COURT:** Okay. |
| 11:17:26AM | Mr. Swanson, anything? |
| 11:17:29AM | **MR. SWANSON:** No. No, Your Honor. Thank you. |
| 11:17:31AM | **THE COURT:** All right. Well, thank you very much, |
| 11:17:32AM | sir. You are excused. |
| 11:17:36AM | **THE WITNESS:** Thank you, Your Honor. |
| 11:17:37AM | **THE COURT:** Next witness. |
| 11:17:54AM | **MS. DUNN:** Your Honor, Apple calls Dr. Francine |
| 11:17:56AM | Lafontaine. |
| 11:17:59AM | **<u>FRANCINE LAFONTAINE</u>,** |
| 11:18:29AM | called as a witness for the Defendant, having been duly sworn, |
| 11:18:29AM | testified as follows: |
| 11:18:30AM | **THE CLERK:** Please be seated. And then would you |
| 11:18:34AM | please state your full name and spell your last name, and then |
| 11:18:38AM | you're going to have to work that microphone so it's kind of |
| 11:18:41AM | below the shield there. Okay. |

LAFONTAINE - DIRECT - DUNN

11:18:44AM      **THE WITNESS:**  Francine Lafontaine, L-A-F-, as in

11:18:49AM   Frank, O-N-T, as in Tom, A-I-N-E.

11:18:54AM      **THE COURT:**  Okay.  Good afternoon.

11:18:56AM      **THE WITNESS:**  Good afternoon.

11:18:56AM      **THE COURT:**  You may proceed, Ms. Dunn.

11:18:57AM      **MS. DUNN:**  Thank you, Your Honor.

11:18:58AM                 <u>**DIRECT EXAMINATION**</u>

11:18:59AM   **BY MS. DUNN:**

11:19:00AM   **Q.**  Dr. Lafontaine, where do you currently work?

11:19:02AM   **A.**  I work at the University of Michigan, the business school.

11:19:06AM   **Q.**  And what's your position at the business school there?

11:19:09AM   **A.**  So I'm the William Davidson professor of business

11:19:13AM   economics, as well as the associate dean for business +

11:19:16AM   impact, and in less than two weeks I will be the interim dean

11:19:22AM   of the business school.

11:19:24AM   **Q.**  Congratulations on your new position.

11:19:26AM      Have you prepared slides for use in connection with your

11:19:29AM   testimony today?

11:19:30AM   **A.**  Yes, I have.

11:19:31AM   **Q.**  Okay.  And if you -- hopefully, you have a binder up

11:19:35AM   there.

11:19:36AM   **A.**  Yes.

11:19:41AM      **MS. DUNN:**  Your Honor, may I pass up the binders?

11:19:44AM      **THE WITNESS:**  Yeah.  This isn't mine.

11:19:54AM      Thank you.  Thank you.

LAFONTAINE - DIRECT - DUNN

11:20:01AM      **BY MS. DUNN:**

11:20:01AM      **Q.**   So you should have one binder with exhibits and one binder

11:20:05AM      that contains your report and other materials, and at the

11:20:08AM      front of that binder should be the slides that you prepared.

11:20:11AM          Do you see those?

11:20:14AM      **A.**   I'm not quite there yet.  I -- I'm sorry -- oh, got it.

11:20:36AM      **Q.**   Great.  They are also on the screen if that's helpful.

11:20:40AM      **A.**   Yes, that is helpful.

11:20:41AM              **MS. DUNN:**   And let's have the next slide.

11:20:43AM      **Q.**   All right.  Dr. Lafontaine, please explain to the Court

11:20:50AM      your background -- educational background and professional

11:20:54AM      background.

11:20:55AM      **A.**   So I have an undergraduate degree in business from the

11:20:59AM      University of Montreal in Canada, as well as a master's degree

11:21:03AM      from there, and a Ph.D. in economics from the University of

11:21:06AM      British Columbia in Vancouver, Canada.

11:21:09AM      **Q.**   And how about your work experience?

11:21:12AM      **A.**   So I have been at the University of Michigan now since

11:21:16AM      1991, so that has been a long time.  I spent a few years

11:21:21AM      before that at Carnegie Mellon University as a faculty member.

11:21:26AM          I also have -- was the director of the Bureau of Economics

11:21:31AM      at the Federal Trade Commission in 2014 and '15, and I have

11:21:37AM      served different roles in -- so I was the president of the IO

11:21:41AM      Society and things along those lines.

11:21:44AM      **Q.**   And as director of the FTC's Bureau of Economics, what

LAFONTAINE - DIRECT - DUNN

11:21:48AM    were your responsibilities?

11:21:49AM    **A.**  So my responsibilities was to work with the staff at

11:21:53AM    the -- in the Bureau of Economics and oversee the different

11:21:58AM    set of matters that they were working on as -- as they would

11:22:02AM    bring me information about the different matters, as I said,

11:22:06AM    and we would discuss and -- their analysis and I would support

11:22:10AM    and ask questions and they would let me know where things --

11:22:15AM    what they were finding, and I would also convey their

11:22:20AM    conclusions to the commissioners and as well as my own opinion

11:22:25AM    of the same.

11:22:26AM    **Q.**  And what specifically is your area of professional

11:22:29AM    expertise?

11:22:30AM    **A.**  So my field within economics is industrial organization.

11:22:37AM    **Q.**  Please describe for the Court just a few of your

11:22:39AM    publications in that field.

11:22:41AM    **A.**  So I've published a book entitled "The Economics of

11:22:44AM    Franchising."  I have also written a number of articles on

11:22:50AM    vertical contracts, distribution, franchising, as well as

11:22:57AM    retail and the public policy issues that come with that and

11:23:03AM    the entrepreneurship component of that.

11:23:08AM    **Q.**  And in your binder, there is Defense Exhibit 5546, which

11:23:11AM    I'll just ask you to identify as your CV.

11:23:26AM    **A.**  Yes.  Thank you.

11:23:29AM            **MS. DUNN:**  Your Honor, we move 5546.

11:23:32AM            **THE COURT:**  No objection?

11:23:35AM          **MR. BORNSTEIN:**  None, Your Honor.

11:23:36AM          **THE COURT:**  It's admitted.

11:23:37AM          (Defense Exhibit 5546 received in evidence)

11:23:37AM   **BY MS. DUNN:**

11:23:38AM   **Q.**  Dr. Lafontaine, I know that you have prepared written

11:23:41AM   direct testimony in this case on the topics of market

11:23:42AM   definition and market power.  In the interest of time today,

11:23:44AM   we're going to focus on market definition.

11:23:47AM       At a high level, when you are asked to define a product

11:23:50AM   market, where do you start?

11:23:52AM   **A.**  So I start with the product at issue and think about what

11:23:58AM   are possible substitutes from the perspective of consumers.

11:24:03AM   **Q.**  And what do you mean by "substitutes"?

11:24:05AM       And, actually, I will ask Mr. Spalding if you could put up

11:24:14AM   Slide 3.

11:24:15AM          **THE WITNESS:**  So the issue with substitutes is

11:24:16AM   whether products satisfy the same consumer need.  So you would

11:24:20AM   look for different suppliers, different sellers of a similar

11:24:25AM   product that consumers could substitute if ever the terms at

11:24:31AM   which the product at issue would deteriorate.  So price

11:24:36AM   increase, quality decrease, things like that.

11:24:38AM   **BY MS. DUNN:**

11:24:38AM   **Q.**  And from whose perspective should substitution be

11:24:42AM   examined?

11:24:43AM   **A.**  So substitution is about consumer welfare, so it should be

LAFONTAINE - DIRECT - DUNN

11:24:47AM   from the perspective of the customers of the product.

11:24:50AM        And in this case, because the App Store is a transaction

11:24:55AM   platform, the customers are both consumers and developers.

11:25:00AM   And so that's the set of people that -- or entities that you

11:25:07AM   would be looking at.

11:25:11AM              MS. DUNN:  Your Honor, I just received a note.  I

11:25:13AM   forgot to ask the Court to qualify Dr. Lafontaine as an

11:25:16AM   expert, so we would ask for that.

11:25:19AM              MR. BORNSTEIN:  No objection, Your Honor.

11:25:21AM              THE COURT:  She's admitted.

11:25:22AM              MS. DUNN:  Thank you.

11:25:25AM              THE COURT:  It's not technically required, but she is

11:25:28AM   admitted.

11:25:29AM              MS. DUNN:  I appreciate that.

11:25:31AM   Q.  Dr. Lafontaine, what, if any, role does the defendant's

11:25:36AM   conduct play in assessing market definition?

11:25:40AM   A.  So the conduct typically would be the reason why some

11:25:44AM   matter comes up; that is, there's a dispute of some sort.  So

11:25:48AM   the conduct would be part of that.

11:25:50AM        But the definition of a market has to begin with the

11:25:54AM   product around which we look for substitutes.

11:25:57AM   Q.  Okay.  And why would you not look at the alleged conduct

11:26:02AM   to figure out what products are good substitutes?

11:26:06AM   A.  Well, because conduct is not a product and therefore

11:26:09AM   consumers don't consume the conduct.  So what we need to look

LAFONTAINE - DIRECT - DUNN

11:26:14AM    at is what is the product that's affected by the conduct and

11:26:18AM    then think about what are the substitutes that consumers can

11:26:22AM    turn to.

11:26:23AM    Q.  Okay.  And is there -- do you have an example that you

11:26:26AM    could offer that would help us understand this?

11:26:28AM    A.  So, for example, while I was at -- well, so an example

11:26:38AM    would be something around a pair of shoes and needing

11:26:44AM    different types, so high heels versus flat shoes are the

11:26:49AM    substitutes for one another and what consumer need is being

11:26:54AM    satisfied is the question.

11:26:56AM    Q.  And can there be more than one market?

11:27:00AM    A.  Yes.  So conduct can affect more than one market.  So an

11:27:06AM    example of that would be a merger case that I was involved

11:27:11AM    with while I was at the Federal Trade Commission where it was

11:27:14AM    generic drug manufacturers producing different types of drugs

11:27:18AM    that were merging.

11:27:18AM        And so the question for the -- for the case was really to

11:27:24AM    look at all of the different kinds of molecules and products

11:27:27AM    that these firms were producing and examine, within each one,

11:27:32AM    how many competitors there were and whether the merger would

11:27:37AM    present a problem in each of them.  So they were looked at

11:27:41AM    separately, these different markets.

11:27:44AM    Q.  And your report addresses Dr. Evans' proposed market

11:27:50AM    definition in this case?

11:27:52AM    A.  Yes, it does.

LAFONTAINE - DIRECT - DUNN

11:27:53AM    **Q.**  And at a very high level, what did you conclude about

11:27:55AM    Dr. Evans' proposed market definition?

11:27:58AM    **A.**  That it is both too broad and too narrow.

11:28:03AM    **Q.**  Okay.  And at a very high level, can you explain what you

11:28:05AM    mean?

11:28:06AM    **A.**  Yes.  So it is too broad because it does include all types

11:28:09AM    of apps, and these are not all substitutes for one another, as

11:28:12AM    he's mentioned himself.

11:28:14AM       And it is too narrow because it focuses on only one place

11:28:17AM    where consumers can go and where developers can go, and that's

11:28:21AM    the iOS App Store.

11:28:26AM          **MS. DUNN:**  Mr. Spalding, if we could switch to the

11:28:29AM    next slide.

11:28:30AM    **Q.**  Dr. Lafontaine, you prepared this slide to address your

11:28:32AM    conclusion that the proposed market is too broad.

11:28:36AM       Can you explain the first -- the first point you have on

11:28:41AM    this slide.

11:28:44AM    **A.**  Right.  So as I said, in market definition, we start with

11:28:47AM    a product, and then we ask what are good substitutes for it.

11:28:51AM       iOS app transactions that involve different kinds of

11:28:57AM    apps don't meet the same consumer need, and, therefore,

11:29:00AM    they're not good substitutes for each other.  If I'm looking

11:29:03AM    to download a game, I'm not likely to substitute to a cooking

11:29:09AM    app, even though I enjoy cooking, or a spreadsheet.

11:29:14AM    **Q.**  And why do you say "good substitutes"?  What do you mean

LAFONTAINE - DIRECT - DUNN

11:29:16AM   by that?

11:29:17AM   **A.**  Well, you wouldn't want to include in the market something

11:29:19AM   that the consumer wouldn't consider at all, things that are

11:29:23AM   too far apart, but you also don't want to ask for substitutes

11:29:27AM   to be perfect.  That doesn't exist in most differentiated

11:29:32AM   markets.  Substitutes are, you know, not exactly what you

11:29:35AM   might have chosen, but given the change in price or

11:29:38AM   circumstances on the product that you might have chosen, you

11:29:41AM   may decide to switch to this instead.

11:29:43AM   **Q.**  Okay.  Let's move to your second point, which talks about

11:29:48AM   clustering.

11:29:49AM       Can you explain to the Court the second point.

11:29:52AM   **A.**  So, again, in -- in creating a market definition -- a

11:29:56AM   product market definition, we're looking for substitutes.  If

11:30:01AM   products are not substitutes for one another, then one of the

11:30:04AM   ways that we can put them in the same market is to create a

11:30:08AM   cluster market.  So we cluster all products together if they

11:30:14AM   have the same market conditions fundamentally.

11:30:18AM       So if the market conditions are going to be exactly the

11:30:21AM   same across different products that don't substitute -- that

11:30:25AM   are not substitutes for each other, then whether we do the

11:30:29AM   analysis separately for each one of them, we would get the

11:30:33AM   same answer many times.  So for analytical purposes and to

11:30:37AM   keep things a little bit more manageable, we put them together

11:30:40AM   in a cluster market.

LAFONTAINE - DIRECT - DUNN

11:30:41AM    **Q.**   Okay.   And I know you've prepared a couple examples to

11:30:44AM    help talk about clustering.

11:30:45AM         So if we could go to Slide 5.

11:30:48AM         What are we seeing here?

11:30:51AM    **A.**   So this is, again, a case that I was involved with when I

11:30:55AM    was at the FTC.   Staples and Office Depot proposed to merge

11:31:00AM    for the second time.   They have now proposed a third time.

11:31:05AM    And at the time -- the other two have been dropped, obviously.

11:31:08AM         At the time, the FTC looked at this particular merger and

11:31:13AM    was concerned about business customers in particular.   So they

11:31:18AM    found that business customers went to Staples and Office Depot

11:31:24AM    in a major way to buy all sorts of different kinds of office

11:31:31AM    supplies, so pen, paper pads, all sorts of things like that.

11:31:34AM    Obviously, these are not products that are substitutes for one

11:31:36AM    another, but they were products that were offered by the same

11:31:41AM    set of options in the market.   So Staples and Office Depot

11:31:46AM    were very -- were big players in that, and there were just a

11:31:50AM    few others, and they were the same for all these customers.

11:31:53AM         So the FTC proposed, and the court accepted, a cluster

11:31:59AM    market that consisted of all of the office supplies in

11:32:03AM    question.

11:32:04AM         At the same time, Staples and Office Depot also sold ink

11:32:08AM    and toner.   Ink and toner, though, business customers would go

11:32:13AM    and get that from other suppliers, as well as from Office

11:32:17AM    Depot and Staples.   So in particular, they would go and buy

LAFONTAINE - DIRECT - DUNN

11:32:21AM    that from printer and copier manufacturers, so there was a set

11:32:26AM    of options that was available for ink and toner that was not

11:32:30AM    available for Staples and Office Depot.

11:32:32AM        And as a result of that, the FTC and the court -- the FTC

11:32:38AM    proposed a market that did not include ink and toner, and the

11:32:42AM    court accepted that market because the market conditions were

11:32:45AM    different for that subset of products.

11:32:48AM    **Q.**  And how would you apply this example to this case?

11:32:54AM    **A.**  Well, we have a similar situation here in the sense that

11:32:58AM    for different kinds of apps, there are different opportunities

11:33:01AM    to transact.

11:33:02AM        So for game apps in particular, there are consoles, there

11:33:08AM    are stores that specialize in games, in addition to general

11:33:12AM    app stores, that make these transactions possible.

11:33:16AM        For other kinds of apps, there's a different set of

11:33:20AM    options that may be available, but it -- they don't have

11:33:24AM    exactly the same competitive -- well, they don't have the same

11:33:29AM    competitive conditions between games and non-games.  And as a

11:33:32AM    result of that, clustering is not a -- is not something you

11:33:37AM    could do here.

11:33:39AM        **THE COURT:**  In this example, what was the market

11:33:41AM    definition suggested by Staples and Office Depot?

11:33:44AM        **THE WITNESS:**  They wanted the ink and toner to be

11:33:47AM    included because that would have made it so that they had a

11:33:49AM    smaller share, because they had a smaller share given these

LAFONTAINE - DIRECT - DUNN

11:33:53AM | other sellers.

11:33:55AM |        **THE COURT:**  I see.  So they -- they were the ones

11:33:57AM | that suggested the ink and toner?

11:33:59AM |        **THE WITNESS:**  Yes.

11:34:00AM |        **THE COURT:**  Okay.

11:34:02AM |        **MS. DUNN:**  Your Honor, I have one more question on

11:34:04AM | this example, but I also note the time.

11:34:08AM |        **THE COURT:**  We have four minutes.

11:34:09AM |        **MS. DUNN:**  Okay.  Thank you.

11:34:11AM | **Q.**  Dr. Lafontaine, in this case, if a customer of ink and

11:34:15AM | toner had brought the lawsuit, as opposed to the FTC, would

11:34:19AM | that have required including ink and toner in the market,

11:34:23AM | along with the other office supplies?

11:34:26AM | **A.**  No.  So what would have happened then is that the case

11:34:28AM | would have been focused on the options that are available for

11:34:32AM | ink and toner customers, and that would mean both the printer

11:34:37AM | and copier sources, as well as Office Depot and Staples.  So

11:34:41AM | the market would have been defined around that market.

11:34:45AM | **Q.**  If we could go to the next slide, Slide 6.

11:34:50AM |     So your next slide represents a hypothetical that you

11:34:54AM | talked about in your report.

11:34:55AM |     Can you please explain to the Court what we're seeing on

11:34:58AM | this slide.

11:34:59AM | **A.**  Yes.  So this would be a hypothetical where we have a

11:35:03AM | supermarket that sells a variety of different kinds of

LAFONTAINE - DIRECT - DUNN

11:35:06AM   products, and it decides to impose a restriction on some of

11:35:10AM   their suppliers, some kind of exclusivity rule, for example,

11:35:15AM   or something like that.

11:35:16AM       And a wine distributor decides to challenge that.  Given

11:35:23AM   that the wine distributor would be the challenger in a case

11:35:26AM   like that, what would happen is that one could -- one would

11:35:31AM   have to, in thinking about what the right market definition

11:35:33AM   would be, think about not only -- well, think about the

11:35:37AM   different places where customers do go and buy wine and also

11:35:41AM   where distributors can make their wines available.

11:35:44AM       And so it wouldn't be limited to supermarkets, since in

11:35:48AM   most markets and most local markets, there would be some

11:35:51AM   liquor stores that also sell wine and other -- so there might

11:35:57AM   be other supermarkets that do -- that are definitely liquor

11:36:01AM   stores, so the market would be defined to include all of these

11:36:04AM   options since these are all ways in which consumers can get

11:36:09AM   access to the product.

11:36:12AM   Q.   Okay.  And you said earlier that focusing on conduct is

11:36:15AM   not the way you define a product market.

11:36:17AM       Can you apply that to this example?

11:36:21AM   A.   Yes.  So the supermarket might have made this restriction

11:36:25AM   quite general across a number of different product categories,

11:36:28AM   but what matters in terms of the specific case that we're --

11:36:32AM   that we would be talking about, which comes from the wine

11:36:35AM   distributor, is what is available to the wine distributor and

LAFONTAINE - DIRECT - DUNN

11:36:38AM   their customers.

11:36:39AM       So other products that are sold in the supermarket, even

11:36:43AM   if that constraint is imposed on that, that is not a relevant

11:36:49AM   part of the market.

11:36:50AM   **Q.**  Okay.  And so if a different kind of distributor, like a

11:36:53AM   flower distributor, brought the same case as the wine

11:36:56AM   distributor, what happens then?

11:36:58AM   **A.**  Well, if it's a flower distributor, the question is going

11:37:00AM   to be where else do flowers get sold.  And so you might have

11:37:05AM   flower shops in that market.  You probably would have other

11:37:09AM   supermarkets.  So you would have to look in that local

11:37:13AM   vicinity what are the options for the flower shop -- for the

11:37:17AM   flower distributor.

11:37:18AM   **Q.**  Okay.  And just to take this analogy one step -- and only

11:37:22AM   one more step -- further, what happens to the market

11:37:26AM   definition analysis for the wine if the liquor stores that

11:37:32AM   you've spoken about sell not only wine but some other items,

11:37:35AM   like crackers?

11:37:37AM   **A.**  Well, the liquor stores are still -- the crackers and

11:37:41AM   these other things are not the things that bring people to the

11:37:45AM   store.  That's not what the store is recognized as being

11:37:50AM   involved in.  It's mostly the wine and the liquor that brings

11:37:53AM   customers, because these are stores that portray themselves as

11:37:57AM   selling that.

11:37:57AM       And so as a consumer, I would go to those stores for wine

11:38:01AM   and liquor and not for the crackers specifically typically,

11:38:04AM   and so it doesn't really affect the market definition.

11:38:10AM   **Q.**  And what, if anything, does that have to do with

11:38:12AM   substitution?

11:38:14AM   **A.**  Well, it's still the case that as a consumer, my options

11:38:19AM   are to go across -- to go across the street to the liquor

11:38:24AM   store, to the other supermarket.  All these options are

11:38:27AM   substitutes, from my perspective.

11:38:28AM      And as a distributor, the same thing; fundamentally, all

11:38:32AM   these options are substitutes.  So I would include all these

11:38:35AM   options in the market.  It doesn't really change anything that

11:38:39AM   there are crackers or other things in the store -- in the

11:38:42AM   liquor store.

11:38:44AM          **THE COURT:**  Is this a good breaking point?

11:38:45AM      All right.  We will stand in recess for our second break.

11:38:49AM   I will have you back on the stand at 1:15.

11:38:53AM          **THE WITNESS:**  All right.  Thank you.

11:38:54AM          **THE COURT:**  We'll stand in recess.  Thank you.

11:38:55AM           (Luncheon recess was taken at 12:38 p.m.)

11:38:55AM                 (Resumed at 1:15 p.m.)

11:38:55AM          **THE COURT:**  We are back on the record.  The record

1:15:36PM   will reflect I have both parties back.  Professor is on the

1:15:42PM   stand.

1:15:42PM      You may proceed.

1:15:44PM          **MS. DUNN:**  Thank you, Your Honor.

1:15:45 PM  **BY MS. DUNN:**

1:15:46 PM  **Q.**  Professor Lafontaine, just to remind you where we were,

1:15:50 PM  you had just testified that if crackers were available and

1:15:56 PM  offered at the wine store, it would not change substitution

1:16:00 PM  patterns.  So that's a paraphrase, not to replace your actual

1:16:08 PM  testimony.  I want to ask you a similar question concerning

1:16:11 PM  the Epic Games Store.

1:16:13 PM     Does the recent edition of Spotify or other nongame apps

1:16:17 PM  over the past few weeks to the Epic Games Store change your

1:16:22 PM  analysis?

1:16:23 PM  **A.**  No.

1:16:23 PM        **THE WITNESS:**  Sorry, I haven't figured out where this

1:16:28 PM  was.  Can you hear me okay?

1:16:28 PM        **THE REPORTER:**  Yes.

1:16:28 PM        **THE WITNESS:**  All right.

1:16:28 PM     So it wouldn't change my analysis because, fundamentally,

1:16:33 PM  it's still the case that consumers would have the option of

1:16:37 PM  going to the Epic Games Store to buy games, that they can have

1:16:41 PM  options to go elsewhere to transact in game -- to engage in

1:16:46 PM  game transactions.

1:16:47 PM     And the Epic Games Store is still mostly, from the

1:16:53 PM  consumer's perspective, just like the liquor store, a place

1:16:56 PM  that they would think of to go for games, given what it has

1:17:01 PM  been.

1:17:03 PM  **Q.**  And did you -- in reviewing Dr. Evans' report, did you

LAFONTAINE - DIRECT - DUNN

1:17:12PM   also listen to his testimony?

1:17:14PM   **A.**  Most of it, yes.  I had to excuse myself for a couple of

1:17:20PM   meetings, but, yes, most.

1:17:21PM   **Q.**  Okay.  And did Dr. Evans find a cluster market in this

1:17:24PM   case?

1:17:24PM   **A.**  No.  He did not look for one.

1:17:27PM   **Q.**  Okay.  In a situation where a cluster market has not been

1:17:31PM   defined, can you define a market around a store with many

1:17:35PM   products simply by labeling the market distribution?

1:17:40PM   **A.**  No.  So you would still need to think about what are the

1:17:43PM   competitive opportunities -- what are the things that

1:17:47PM   consumers can substitute to.  So depending on the kinds of

1:17:50PM   products that are within the store, you would look at

1:17:53PM   different sets of them, just like the FTC did for the

1:17:59PM   pharmaceutical generic drug analysis.  They looked at the

1:18:04PM   different drugs and looked at whether there was competition in

1:18:10PM   each of these markets.

1:18:11PM   **Q.**  And what value, if any, does a SSNIP test have for a

1:18:15PM   proposed market of a large group of products that does not

1:18:18PM   meet the standard for a cluster market?

1:18:22PM   **A.**  Well, it's confusing to run such a test because you are

1:18:28PM   really mixing products that don't compete with one another,

1:18:31PM   that are not substitute for each other.  So I think you would

1:18:36PM   mostly get noise out of performing such a test.

1:18:40PM   **Q.**  Okay.  Now, you also said earlier that part of your

1:18:46PM   opinion is that Dr. Evans' iOS app distribution market is

1:18:51PM   too narrow.

1:18:52PM        And I know that you covered that in your written direct

1:18:56PM   testimony; is that right?

1:18:57PM   **A.**   Yes, I do.

1:18:57PM   **Q.**   Okay.  And --

1:19:03PM   **A.**   Do you want me to expand on that a little bit?

1:19:06PM   **Q.**   I think -- in the interest of time today, I think if you

1:19:08PM   could expand on it at a high level --

1:19:10PM   **A.**   Yeah.

1:19:10PM   **Q.**   -- that would be very helpful.

1:19:12PM   **A.**   So, basically, it is too narrow because it focuses on the

1:19:15PM   one platform, and consumers have options to go and transact on

1:19:19PM   other platforms.

1:19:20PM   **Q.**   And what are you relying on for your conclusions?

1:19:26PM   **A.**   So in terms of this particular aspect, there are

1:19:31PM   statements by Mr. Sweeney that he gave in deposition, as well

1:19:36PM   as a document from Microsoft, that talks about other platforms

1:19:41PM   competing with their own.  And so documents along those lines,

1:19:46PM   as well as the reports of my colleagues, Professor Hitt and

1:19:51PM   Professor Schmalensee.

1:19:56PM        **MS. DUNN:**  Mr. Spalding, if we can go to

1:19:57PM   Dr. Lafontaine's Slide 7.

1:20:00PM   **BY MS. DUNN:**

1:20:00PM   **Q.**   And I would like to follow up, Dr. Lafontaine, on what

LAFONTAINE - DIRECT - DUNN

1:20:03PM   you've talked about already with regard to the SSNIP test.

1:20:07PM        Can you please explain -- you see on the slide that you

1:20:11PM   prepared there's one part that talks about the hypothetical

1:20:16PM   monopolist test and another part that talks about SSNIP test.

1:20:19PM        What is the difference between these two things and how do

1:20:24PM   they relate?

1:20:25PM   **A.**  So the hypothetical monopolist test, one way to think

1:20:28PM   about that is it is not exactly a test, it is a framework or a

1:20:32PM   conceptual exercise.  It is trying to think about market

1:20:36PM   definition, what are the limits of the market, by looking at

1:20:41PM   if I was to combine in a single firm a set of products that

1:20:46PM   currently are not part of the same firm -- and you can see why

1:20:50PM   this was partially developed in the context of merger

1:20:55PM   analysis -- if we were to combine these products in a single

1:21:00PM   firm, would that firm have incentives to increase the price in

1:21:02PM   a -- would that be profitable for the firm to do.  So it's

1:21:08PM   kind of that conceptual notion, as opposed to an actual

1:21:13PM   quantitative test.

1:21:14PM        So people typically use SSNIP as a way of talking about a

1:21:20PM   specific quantitative version of the hypothetical monopolist

1:21:26PM   test in some sense, where the standard thing is to look for a

1:21:30PM   5 percent or a 10 percent increase in price, whether that

1:21:34PM   would be profitable.

1:21:35PM   **Q.**  And in defining a market, do you need to do a SSNIP test?

1:21:39PM   **A.**  No, you don't.  So a lot of the reasons for the SSNIP

LAFONTAINE - DIRECT - DUNN

1:21:44PM   test -- what the SSNIP test helps you see is whether the

1:21:49PM   market is too narrow.

1:21:50PM       The agencies, for example, in thinking about a variety of

1:21:57PM   monopolization and merger cases, have to very often have the

1:22:04PM   other side --

1:22:05PM           **MR. BORNSTEIN:**  Excuse me, Your Honor, I -- excuse

1:22:05PM   me.  I object -- to the extent the witness is talking about

1:22:09PM   the agencies from a legal perspective, I would object.  To the

1:22:14PM   extent she is talking economics, I have no objection at all.

1:22:18PM           **THE COURT:**  That is an appropriate objection.  I will

1:22:20PM   admit it for that limited purpose.

1:22:26PM           **THE WITNESS:**  So they often have to justify -- or

1:22:36PM   parties often want a broader market than what the agencies are

1:22:39PM   trying to define.  And as a result of that, trying to --

1:22:43PM   having a test that allows them to say whether it is too narrow

1:22:46PM   or not is really helpful.

1:22:48PM       So that said, it can be a very informative piece of

1:22:52PM   information, so I'm not trying to say anything other than

1:22:55PM   that.  The SSNIP test is a useful test to determine the

1:23:00PM   boundaries of markets, obviously.

1:23:02PM   **BY MS. DUNN:**

1:23:02PM   **Q.**  And from your perspective as an economist, what, if any,

1:23:06PM   value does a SSNIP test have in the single-brand market?

1:23:11PM   **A.**  So in the single-brand market, it's really puzzling to do

1:23:17PM   a SSNIP test in the sense that you've already stipulated that

LAFONTAINE - DIRECT - DUNN

1:23:21PM  you're just looking at a particular firm and its products.  So

1:23:25PM  that firm already has a hundred percent of the products that

1:23:29PM  you are talking about, and so the SSNIP test is -- just

1:23:33PM  conceptually, the exercise is not very valid.

1:23:38PM  **Q.**  Okay.  And did you do a SSNIP test in this case?

1:23:40PM  **A.**  No, I did not.

1:23:41PM  **Q.**  And can you apply the opinion you just stated to

1:23:45PM  Dr. Evans' SSNIP test in this case?

1:23:51PM  **A.**  So he has two tests that are one-sided tests of the iOS

1:23:57PM  app distribution market, which he defines to be just for iOS

1:24:01PM  and, therefore, are single-brand markets.  So those don't

1:24:07PM  provide much information.

1:24:09PM      What he finds at the end is that Apple could charge higher

1:24:14PM  commission, is what, according to his analysis, results from

1:24:20PM  the test that he performed on that particular market.  But,

1:24:23PM  again, even the conceptual exercise in that context is

1:24:29PM  problematic.

1:24:30PM  **Q.**  Okay.  Why is it problematic?

1:24:32PM  **A.**  Because you started by saying the firm has all of the

1:24:34PM  markets, so asking what would -- which -- what would the

1:24:39PM  company want to do if it had all the market, then it's

1:24:44PM  circular.

1:24:46PM      **MS. DUNN:**  All right.  Mr. Spalding, if we can go to

1:24:49PM  Dr. Lafontaine's Slide 8, please.

25

1:24:53PM   **BY MS. DUNN:**

1:24:53PM   **Q.**  So this slide refers to Dr. Evans' single-sided SSNIP

1:25:00PM   test.

1:25:01PM       Just clarify, if you would, why it says "single-sided."

1:25:04PM   **A.**  Well, so Professor Schmalensee has already discussed the

1:25:09PM   two-sided SSNIP tests that are done by Dr. Evans, so this

1:25:15PM   slide is mostly focusing on the other four, on four of his

1:25:22PM   seven tests.

1:25:23PM       So this slide is about the one-sided market tests.  And

1:25:28PM   the first point that it mentions is that given that he's

1:25:32PM   agreed that it -- that the App Store is a two-sided

1:25:36PM   platform -- transaction platform, the SSNIP tests don't take

1:25:40PM   into account the indirect network effects and, therefore, are

1:25:43PM   problematic.

1:25:44PM       So all four of these tests, the single-sided SSNIP tests,

1:25:48PM   suffer from the flaw and from the other three that I have on

1:25:52PM   there.

1:25:53PM   **Q.**  Okay.  What about this -- you just addressed the first

1:25:56PM   point.  What about the second point on the slide?

1:25:58PM   **A.**  So the tests that he is performing also don't allow -- the

1:26:06PM   information that he's using doesn't really give consumers or

1:26:10PM   developers the options to engage in the most obvious type of

1:26:15PM   substitution that they might want to engage in.

1:26:18PM       So for developers, for example, the test is testing -- is

1:26:23PM   arguing about leaving the platform entirely instead of

1:26:28PM   changing monetization or increasing price or something like

1:26:32PM   that.  For the consumers, the test is focused on not having

1:26:39PM   access to different activities and things like that.

1:26:44PM   So he's just not allowing -- he's not allowing the

1:26:49PM   consumers to just go and buy, for example, V-Bucks on the

1:26:53PM   website and then bring them back into the platform where they

1:26:58PM   might want to use them.  So there are other options that are

1:27:00PM   available to both consumers and developers that are not taken

1:27:04PM   into account in the way that he performed his analysis.

1:27:08PM   Q.  Thank you, Professor Lafontaine.

1:27:09PM   If you could explain your third point on the slide.

1:27:13PM   A.  So the third point is about the prices that he's going to

1:27:17PM   use.  So a SSNIP test starts from the price of a product and

1:27:23PM   asks if the firm would want to increase it by 5 or 10 percent.

1:27:29PM   So here, the -- for example, for the operating system, he

1:27:34PM   doesn't have a price for the OS -- the iOS, so he uses a

1:27:39PM   price for a product that was sold 10 years ago, which is the

1:27:43PM   Windows operating system.  The price he uses is from 10 years

1:27:49PM   ago and it's a price to makers of phones, so to OEMs, and the

1:27:56PM   price that he finds is 30 or $50.  So the SSNIP that he

1:28:01PM   applies to that is 10 percent, which means he says would it be

1:28:05PM   profitable to increase price by $3 or by $5.

1:28:10PM   And then having found that would be the right level of

1:28:13PM   price change to look at, he says, okay, well, 3 or $5 is so

1:28:20PM   small compared to the price of a phone that no one would

LAFONTAINE - DIRECT - DUNN

1:28:23PM   really react to that.  But the product that he was talking

1:28:28PM   about was the operating system, and he is then interpreting it

1:28:34PM   in terms of the -- relative to the price of the phone.  So

1:28:37PM   that kind of issue comes up in his tests.

1:28:41PM   **Q.**  And to finish this out, what about the fourth point?

1:28:46PM   **A.**  So Dr. Evans actually said that he doesn't have real-world

1:28:52PM   data on price changing -- price changes that would lead to a

1:29:00PM   change in -- that would lead to substitution.

1:29:02PM        And, in fact, that is the reason that the experts on

1:29:05PM   the -- that I didn't perform any SSNIP test, is that there

1:29:12PM   isn't really data on substitution patterns that we could use

1:29:14PM   to do that because there aren't price changes.

1:29:18PM   **Q.**  And are these four flaws with the single-sided SSNIP tests

1:29:23PM   the only flaws that you found?

1:29:25PM   **A.**  No, there are others.  They are described in my written

1:29:28PM   direct.  But these were things that applied to -- across the

1:29:35PM   tests.

1:29:39PM              **THE COURT:**  Do you know where he gets the $10 figure?

1:29:42PM              **THE WITNESS:**  Sorry.  Could you say that again?

1:29:44PM              **THE COURT:**  Do you know where he got the $10 figure?

1:29:48PM              **THE WITNESS:**  If I interpret that correctly, that

1:29:52PM   would be on the developer side.  He has a $10 SSNIP because

1:29:56PM   they pay $99 to get access.

1:29:58PM              **THE COURT:**  Okay.

25

LAFONTAINE - DIRECT - DUNN

1:30:02PM     **BY MS. DUNN:**

1:30:02PM     **Q.**  And, Dr. Lafontaine, do you have an example of a SSNIP

1:30:05PM     done with actual data?

1:30:10PM     **A.**  So I can think of one that colleagues have done.  The

1:30:14PM     Humana/Aetna case had a very nice illustration of -- they had

1:30:22PM     a lot of data, so they were able to calculate the whole demand

1:30:29PM     substitution pattern.  Fundamentally, that is the ingredient

1:30:30PM     that one needs to be able to do this, is to be able to see

1:30:35PM     price changes and reactions by consumers so that you can

1:30:39PM     estimate how consumers reallocate their choices when prices

1:30:43PM     change.  And so they had very detailed data about that across

1:30:47PM     different geographic markets, and they were able to estimate a

1:30:51PM     good demand system.

1:30:52PM         And once you do that, you are able to then really do a

1:30:55PM     comparison of what happens if these products are all owned and

1:31:01PM     managed by a single firm, so what are the prices they would

1:31:05PM     want to charge in that case, how high are they.  And then you

1:31:09PM     can compare, are they 5 percent higher, are they 10 percent

1:31:12PM     higher.  So they had all the detailed information that one

1:31:15PM     would need to be able to perform a very nice test.

1:31:19PM             **THE COURT:**  Was that a private case or a government

1:31:22PM     case?

1:31:23PM             **THE WITNESS:**  A government case, a DOJ case.

1:31:27PM             **MS. DUNN:**  Mr. Spalding, if you could put up

1:31:29PM     Dr. Lafontaine's Slide 9.

1:31:32PM    **BY MS. DUNN:**

1:31:32PM    **Q.**  I would like to switch gears and talk a little bit about

1:31:36PM    Dr. Evans' foremarket and aftermarket framework.

1:31:40PM       In your opinion, should the foremarket and aftermarket

1:31:40PM    framework be applied in this case?

1:31:45PM    **A.**  No, it should not.

1:31:46PM    **Q.**  Why not?

1:31:48PM    **A.**  So consumers don't really -- because of multihoming, which

1:31:53PM    I think has been discussed quite a bit in the previous

1:31:57PM    testimony, consumers don't really need to incur the cost of

1:32:01PM    changing their device or even switch the device that they are

1:32:05PM    using in order to transact.  So they can go buy V-Bucks on

1:32:10PM    Safari while on the phone, as well as being on a PC or

1:32:15PM    anything else.

1:32:16PM       So there are lots of ways that they can reach and make

1:32:21PM    transactions, and as a result of that, they don't -- there's

1:32:25PM    not a foremarket product that kind of locks them into the

1:32:29PM    aftermarket purchases having to be done in a particular way.

1:32:34PM          **THE COURT:**  And what data do you have for that

1:32:35PM    proposition?

1:32:37PM          **THE WITNESS:**  So we have data about game developers

1:32:45PM    being present on lots of different platforms.  I am relying,

1:32:50PM    in part, on Dr. Hitt's analysis on that.  And we have data

1:32:56PM    about consumers of games having other devices.  Dr. Henson's

1:33:02PM    survey elaborated on that.

LAFONTAINE - DIRECT - DUNN

1:33:06PM          THE COURT:  And that's all?

1:33:08PM          THE WITNESS:  There's been, in my understanding, some

1:33:11PM    testimony, as well, that presented that.

1:33:14PM          THE COURT:  Based -- aside from the other testimony,

1:33:17PM    I'm interested on what your opinion is based.  So your opinion

1:33:22PM    is based on Dr. Hitt --

1:33:25PM          THE WITNESS:  And Dr. Henson's survey.

1:33:28PM          THE COURT:  Okay.  Go ahead.

1:33:29PM          MS. DUNN:  Thank you.

1:33:30PM    BY MS. DUNN:

1:33:30PM    Q.  And, Dr. Lafontaine, when you say the issue is

1:33:34PM    transactions, as opposed to iOS app distribution, what do

1:33:38PM    you mean by that?

1:33:40PM    A.  Well, so this is a two-sided transaction platform.  What

1:33:47PM    the App Store allows consumers and developers to do is to meet

1:33:52PM    and transact on the platform.  So that makes -- that is a

1:33:59PM    different type of exchange than simply buying something and

1:34:07PM    owning it and not having further transactions about it.  So

1:34:12PM    it's a difference, in part, between pay and play, the fact

1:34:16PM    that you are able to -- like for certain products, you just

1:34:20PM    pay for them and take them home or you have them on your phone

1:34:24PM    or something.  But in a lot of cases that we have here, you

1:34:29PM    also have the opportunity to pay somewhere and then play

1:34:34PM    somewhere else.

1:34:37PM          MS. DUNN:  If we can go to your Slide 10.

1:34:39PM   **BY MS. DUNN:**

1:34:39PM   **Q.**  All right.  So you just explained that, in your opinion,

1:34:44PM   the foremarket/aftermarket framework does not apply, but for

1:34:49PM   the purposes of this question, let's assume it does apply.

1:34:52PM       Does that mean that there's anticompetitive harm?

1:34:56PM   **A.**  So economists usually think in terms of three factors

1:35:03PM   to -- as to determine whether that is an issue whether -- so a

1:35:11PM   foremarket/aftermarket context can arise without raising

1:35:15PM   anticompetitive concerns, as I've just said.

1:35:19PM       When trying to analyze whether it does, we would look at

1:35:23PM   whether there is competition in an appropriately defined

1:35:27PM   foremarket.  So an issue with the current framework that

1:35:30PM   Dr. Evans has proposed is that the market -- the operating

1:35:35PM   system is not something that consumers buy and it is also not

1:35:39PM   something that developers buy.  What consumers buy is a

1:35:43PM   device, and there is much more competition in the device

1:35:48PM   market than there is in the -- so there is competition in that

1:35:54PM   market.

1:35:56PM       You would also look to see whether information has been

1:35:58PM   available about the aftermarket terms and the costs of the

1:36:05PM   device after you've made the original purchase.  And there

1:36:10PM   is -- there are lots of websites, there is a lot of

1:36:14PM   information about phones and options, as well as there's

1:36:19PM   different ways to use the phone where you would use more or

1:36:21PM   less apps.  And so there are lots of ways in which one can

LAFONTAINE - CROSS / BORNSTEIN

1:36:28PM think about what their cost would be after having purchased

1:36:31PM the phone.

1:36:33PM     And then, finally, it's important to determine whether

1:36:36PM there's been changes in the aftermarket terms.  And what we've

1:36:41PM heard is that -- from Dr. Evans is that there has not been

1:36:47PM changes in the aftermarket terms.

1:36:51PM **Q.**  And when you say that, what are you speaking about

1:36:56PM specifically?

1:36:57PM **A.**  I'm speaking about the commission and the specific -- you

1:37:02PM know, the constraints that Dr. Evans has mentioned in terms of

1:37:06PM exclusivity.

1:37:10PM         **MS. DUNN:**  Your Honor, I pass the witness.

1:37:13PM         **THE COURT:**  Cross.  Mr. Bornstein, you may proceed.

1:37:13PM         **MR. BORNSTEIN:**  Thank you.

1:37:29PM              **CROSS-EXAMINATION**

1:37:32PM **BY MR. BORNSTEIN:**

1:37:39PM **Q.**  Gary Bornstein for Epic.  Professor, nice to meet you.

1:37:44PM **A.**  Nice to meet you as well.

1:37:45PM **Q.**  You just answered a question a bit ago from Apple's

1:37:50PM counsel about the Humana/Aetna transaction.

1:37:52PM     Do you recall that?

1:37:53PM **A.**  Yes.

1:37:54PM **Q.**  Is that in any of your expert reports?

1:37:57PM **A.**  That one specifically, that example, no.

1:38:01PM         **MR. BORNSTEIN:**  Your Honor, I'd move to strike that

LAFONTAINE - CROSS / BORNSTEIN

1:38:02PM    portion of the testimony.

1:38:04PM          **THE COURT:** Granted.

1:38:05PM    **BY MR. BORNSTEIN:**

1:38:07PM    **Q.** Professor, prior to this case, you've never served as an

1:38:14PM    expert in a Sherman Act matter, have you?

1:38:21PM    **A.** I think that that would be correct.

1:38:22PM    **Q.** Okay. And prior to this case, you've never served as an

1:38:26PM    expert providing an opinion on the subject of market

1:38:31PM    definition, correct?

1:38:32PM    **A.** Correct.

1:38:33PM    **Q.** And you've never served as an expert providing an opinion

1:38:37PM    related to two-sided platforms, correct?

1:38:39PM    **A.** Correct.

1:38:41PM    **Q.** And you've not published any articles on the subject of

1:38:48PM    market definition in antitrust, correct?

1:38:50PM    **A.** You're right.

1:38:51PM    **Q.** Nor have you published any articles on the subject of

1:38:55PM    two-sided platforms, correct?

1:38:56PM    **A.** Correct.

1:38:57PM    **Q.** And just to follow up on a question that you responded to

1:39:02PM    from the Court, so that it's clear, am I correct that you

1:39:08PM    haven't done any independent analysis of the market data here?

1:39:15PM    **A.** So my team worked with the team that supported Professor

1:39:19PM    Hitt, and I had questions at times that I would convey and

1:39:26PM    that I would get answers about. But I have not done analysis

LAFONTAINE - CROSS / BORNSTEIN

1:39:31PM    directly.

1:39:32PM    Q.  Okay.  And you're not offering an opinion based on any

1:39:38PM    data that you or even your team have constructed, you're

1:39:43PM    relying on the data work done by Professor Hitt and Professor

1:39:47PM    Hanssens; is that right?

1:39:49PM    A.  That's correct.  Just like I did when I was managing

1:39:52PM    people at the Federal Trade Commission, I relied on their

1:39:56PM    expertise.

1:39:57PM    Q.  Very good.

1:39:59PM        At the beginning of the examination by Ms. Dunn, there was

1:40:05PM    some discussion about whether market definition begins with

1:40:09PM    the product or with the conduct.

1:40:10PM        Do you recall that?

1:40:12PM    A.  I do recall.

1:40:13PM    Q.  And your testimony was that you don't begin with the

1:40:16PM    conduct; is that right?

1:40:17PM    A.  That's correct.

1:40:20PM    Q.  Do you recall saying in your rebuttal report that the

1:40:23PM    general role of market definition in antitrust matters is to

1:40:29PM    identify the competitive constraints relevant to the conduct

1:40:32PM    at issue?

1:40:33PM    A.  I do recall that.

1:40:34PM    Q.  And you continue to stand by that?

1:40:37PM    A.  Yes, because -- so what I was being asked about is product

1:40:42PM    definition, is my understanding.

LAFONTAINE - CROSS / BORNSTEIN

1:40:44PM **Q.** Well, this was your report, and you wrote -- and I am

1:40:47PM happy to show it to you if that's helpful. "The general role

1:40:50PM of market definition in antitrust matters is to identify

1:40:54PM competitive constraints relevant to the conduct at issue."

1:40:57PM Those are your words?

1:40:59PM **A.** Those are my words.

1:41:00PM **Q.** Okay. And do you stand by those words from your rebuttal

1:41:04PM report?

1:41:04PM **A.** I do.

1:41:05PM **Q.** Okay.

1:41:05PM **A.** The role of -- is -- so the role of market definition,

1:41:09PM what I was responding to was how -- how does product -- market

1:41:16PM definition, where does it -- how does it work.

1:41:22PM **Q.** So your testimony is in order to identify the competitive

1:41:27PM constraints relevant to the conduct, you start with the

1:41:31PM product.

1:41:31PM Am I understanding that?

1:41:33PM **A.** Yes, the product at issue.

1:41:34PM **Q.** Okay. So you didn't say anything in your written direct

1:41:40PM testimony along the lines of what appeared in your rebuttal

1:41:44PM report about identifying the constraints relating to the

1:41:47PM conduct at issue; is that right?

1:41:49PM **A.** That might be -- yes. I will take your word for that,

1:41:53PM yes.

1:41:54PM **Q.** Okay. So in this case, what is the product?

LAFONTAINE - CROSS / BORNSTEIN

1:42:00PM   **A.** So in this case, the product at issue is the capacity of

1:42:05PM   consumers and developers to transact.  So the product is

1:42:10PM   transactions.

1:42:13PM   **Q.** And is it any narrower than that or is it just

1:42:17PM   transactions?

1:42:18PM   **A.** Well, it is the set of transactions that are relevant to

1:42:20PM   the case at hand.  So given -- we need to think about what are

1:42:27PM   the ways in which consumers and developers in similar -- so

1:42:35PM   similarly situated is the expression that I used in my

1:42:39PM   report -- would be able to rely on in order to make these

1:42:44PM   transactions.

1:42:45PM   **Q.** Well, how do you decide which transactions are the product

1:42:51PM   here?

1:42:52PM   **A.** Well, so the product relates to what -- from a -- from the

1:43:03PM   perspective of consumer welfare, right, we need to think about

1:43:08PM   where the harm is, and that means which type of consumers are

1:43:16PM   going to be involved in these types of transactions as well,

1:43:19PM   right?

1:43:19PM      So the product at issue is the set of transactions that

1:43:25PM   are relevant to the parties in this case.

1:43:31PM   **Q.** And so your selection of the product depends on who the

1:43:41PM   plaintiff is; is that fair?

1:43:42PM   **A.** Well, just like in the case of the wine distributor, it

1:43:46PM   matters that I look at who else in the local market is

1:43:53PM   available for the wine distributor to sell their wine and --

LAFONTAINE - CROSS / BORNSTEIN

1:43:57PM   as well as consumers to buy the wine.

1:44:00PM       It does matter that -- I have to think about what options

1:44:06PM   are available to the similarly situated -- sorry, it is a word

1:44:13PM   I have trouble saying -- developers and consumers.

1:44:18PM   **Q.**  So I did my best not to interrupt, but I would appreciate

1:44:23PM   it if you'd just try and focus on the question.

1:44:26PM       What I had asked was, whether your determination of a

1:44:32PM   relevant product here for defining a market depends on the

1:44:36PM   identity of the plaintiff.  "Yes" or "no"?

1:44:39PM   **A.**  No, it does not.

1:44:41PM   **Q.**  Okay.  If a different plaintiff had brought this case, say

1:44:47PM   the Match Group, would you go about defining the market

1:44:52PM   beginning with game transactions?

1:44:54PM   **A.**  Just like I said for the flower case, I would be looking

1:44:58PM   for what the options are for flower shops.

1:45:02PM       So the answer to that would be that it would matter that

1:45:08PM   this is an entity that is engaged in a different set of

1:45:12PM   transactions.

1:45:14PM   **Q.**  So in that case, your process for defining the relevant

1:45:19PM   market does begin with the identity of the plaintiff and the

1:45:23PM   product that it is affected by; is that fair?

1:45:27PM   **A.**  So to me, that's not the identity -- it's the product that

1:45:32PM   determines what the market definition is.

1:45:36PM   **Q.**  All right.  I'll try and take that on board.

1:45:40PM       The way you go about defining the market depends on the

1:45:44PM   plaintiff's product; is that correct?

1:45:48PM   **A.**  So the -- in the sense of -- there's -- the conduct -- no,

1:45:57PM   sorry.  I'm struggling a little bit with trying to answer your

1:46:02PM   questions.  I'm trying my best.

1:46:05PM   It does matter that there is a set of options for this

1:46:10PM   product.  I need to think about what are the ways in which

1:46:13PM   consumers and firms can reach each other, and, therefore, it

1:46:16PM   does matter what product we're talking about.

1:46:20PM   So, yes, in that sense, just like I did for the wine

1:46:25PM   distributor, there is something about the fact that we are

1:46:28PM   talking about wine distribution that will matter in

1:46:31PM   determining what the right product market is, not in terms of

1:46:36PM   definition, but which one is relevant.

1:46:39PM   **Q.**  Well, there are a variety of products that are sold to a

1:46:45PM   heterogeneous set of customers; is that fair?

1:46:50PM   **A.**  You mean in the App Store?  Is that --

1:46:54PM   **Q.**  No, I mean in the abstract.

1:46:56PM   **A.**  Oh, okay.  Yes, there are lots of products in -- you know,

1:47:02PM   available to consumers in the market.

1:47:07PM   **Q.**  And there are markets in which the available consumer base

1:47:11PM   or customer base is heterogeneous, meaning there are all sorts

1:47:16PM   of different people who are consumers, correct?

1:47:20PM   **A.**  Yes.

1:47:21PM   **Q.**  And in a business-to-business-type market, there are

1:47:25PM   situations in which there are all sorts of different business

LAFONTAINE - CROSS / BORNSTEIN

1:47:29PM    customers who purchase a common input from a supplier,

1:47:33PM    correct?

1:47:33PM    **A.**   So you -- my difficulty here is that it might represent

1:47:44PM    something -- so the input in question may differ to some

1:47:52PM    degree across customers.

1:47:54PM       But I'm not sure exactly what you're trying -- so maybe I

1:47:59PM    should ask you to repeat your question.

1:48:01PM    **Q.**   I can try and give an example.  Maybe that will advance

1:48:05PM    things.

1:48:06PM       Assume a commodity market; somebody buys iron, somebody

1:48:13PM    sells iron.  And lots of people need the same iron.  Some

1:48:18PM    people are car makers, and some people make I-beams for

1:48:24PM    skyscrapers.  And let's just assume -- because it is over my

1:48:27PM    degree in metallurgy, let's assume it's all the same item,

1:48:30PM    okay?

1:48:30PM       There are markets like that where there are heterogeneous

1:48:34PM    businesses that purchase a common input, correct?

1:48:38PM    **A.**   Well, in your iron case or metal -- I'm also not good in

1:48:44PM    metallurgy -- there would usually actually be different

1:48:48PM    versions of this product that might be used by different types

1:48:50PM    of customers, and they might have different options as to what

1:48:54PM    they could use instead of the iron.  So...

1:48:58PM    **Q.**   Professor, I tried to deal with the first part of that by

1:49:01PM    asking you to assume that they are all buying the same

1:49:05PM    commodity, okay?

1:49:08PM   **A.**   Right.  So in the commodity market, we -- there would be a

1:49:13PM   more consistent -- there are not many commodities that -- out

1:49:21PM   there, but -- because most products are differentiated to some

1:49:27PM   degree.  But, yes, if it is a single commodity that everyone

1:49:31PM   is purchasing, you could have a market that is defined just

1:49:36PM   based on that one product.

1:49:39PM   **Q.**   Okay.  Let's transfer this discussion to American Express,

1:49:47PM   who we've talked about a lot in this case.

1:49:50PM       American Express provides credit card services, among

1:49:54PM   other things, correct?

1:49:55PM   **A.**   Yes.

1:49:56PM   **Q.**   And American Express provides credit card services to a

1:50:00PM   wide variety of merchants; is that right?

1:50:03PM   **A.**   Yes.

1:50:04PM   **Q.**   And they are all receiving or purchasing from American

1:50:09PM   Express the same thing, right?

1:50:16PM   **A.**   That -- you -- yes.

1:50:18PM   **Q.**   Okay.  And some of those customers of American Express are

1:50:25PM   businesses, right?

1:50:27PM   **A.**   Yes.

1:50:28PM   **Q.**   And they may be in a wide variety of businesses that don't

1:50:32PM   actually compete with one another, correct?

1:50:36PM   **A.**   Yes.

1:50:37PM   **Q.**   You can have a restaurant or a hotel or a bowling alley,

1:50:41PM   right?

LAFONTAINE - CROSS / BORNSTEIN

1:50:42PM     **A.**  Right.

1:50:44PM     **Q.**  Now, let's take that into the world of the App Store.

1:50:48PM          You claim that Dr. Evans' market is properly defined as a

1:50:58PM     cluster market -- well, I should say you say it --

1:51:00PM     **A.**  Would not be --

1:51:00PM     **Q.**  -- should be described as a cluster market, but that it is

1:51:03PM     not, in fact, properly a cluster market, fair?

1:51:06PM     **A.**  That would be fair.

1:51:08PM     **Q.**  Okay.  Tell me, what do you think he is clustering

1:51:11PM     together wrongly?

1:51:13PM     **A.**  He's clustering together apps that are not substitute for

1:51:18PM     one another and that don't face -- so on the cluster side,

1:51:23PM     they don't face the same competitive -- the transactions don't

1:51:28PM     face the same competitive conditions.

1:51:30PM     **Q.**  The apps are not the product here, correct?

1:51:33PM     **A.**  The transactions are the product.

1:51:35PM     **Q.**  The transactions are the product.

1:51:37PM          Which transactions are you talking about?  Who are the

1:51:41PM     parties to these transactions?

1:51:43PM     **A.**  Consumers and developers.

1:51:48PM     **Q.**  And what is the specific product that the App Store is

1:51:52PM     providing to these consumers and developers?

1:51:57PM     **A.**  Transactions.  Did I miss something?

1:51:59PM     **Q.**  No, the --

1:51:59PM     **A.**  Okay.

1:51:59PM  **Q.**  So what type of -- I'll do it this way.

1:52:02PM      The App Store is not, for example, selling coffee, right?

1:52:09PM  **A.**  No, I don't think so.

1:52:10PM  **Q.**  Okay.  And I promised no banana, but I can't resist.

1:52:13PM      The app store is not selling Agent Peely costumes, right?

1:52:18PM  **A.**  I agree with that.

1:52:19PM  **Q.**  Okay.  What the App Store is selling is it's selling

1:52:24PM  transaction services both to the Starbucks app and to users at

1:52:28PM  the same time, correct?

1:52:29PM  **A.**  Correct.

1:52:30PM  **Q.**  And the transaction services that it provides are things

1:52:33PM  like search and discovery, marketing promotion, and so forth;

1:52:38PM  is that fair?

1:52:39PM  **A.**  That would be fair.

1:52:40PM  **Q.**  And the App Store provides those same services to

1:52:44PM  Starbucks and to Waze and to *Fortnite* when *Fortnite* was on the

1:52:51PM  App Store, correct?

1:52:53PM  **A.**  Well, it actually highlights games in a separate tab and

1:52:57PM  makes them, you know, more visible to consumers who go in and

1:53:03PM  want to purchase games.  So it does actually separate out

1:53:07PM  different categories and treats them separately.

1:53:10PM  **Q.**  Well, it is providing a marketing service, and that is

1:53:12PM  just doing a marketing service.  It's not a different service

1:53:17PM  that it is providing, correct?

1:53:20PM  **A.**  Well, they have the game -- have their own manager at

LAFONTAINE - CROSS / BORNSTEIN

1:53:26PM     Apple that kind of oversees certain things about games that

1:53:31PM     may be different from what they need to look into for cooking

1:53:35PM     apps, for example.

1:53:36PM     **Q.**  And at the iron manufacturer, there may be somebody who is

1:53:40PM     responsible for overseeing the relationship with the

1:53:43PM     automobile manufacturers, but that doesn't make it a different

1:53:47PM     market, correct?

1:53:48PM     **A.**  Well, so in some sense, I think it still matters that the

1:53:56PM     automobile manufacturers, when you look at them as a set of

1:54:00PM     customers for the -- I think you said iron.  I don't know if

1:54:04PM     they buy iron.  So --

1:54:06PM     **Q.**  Neither do I.

1:54:07PM     **A.**  So if you look at these as customers, what are the options

1:54:12PM     that car manufacturers have when it comes to the usage of this

1:54:15PM     product, as opposed to what are the options that the consumers

1:54:19PM     would have if we're talking -- you talked about beams and

1:54:22PM     other things as well.

1:54:23PM     So it matters that there would be other options that are

1:54:29PM     available to the consumers in defining the market for these

1:54:34PM     different products/usage that customers might make of them.

1:54:42PM     **Q.**  All right.  So your testimony is that in the case of the

1:54:45PM     iron manufacturer, you might define a separate market for

1:54:49PM     automobile purchasers and beam purchasers and furniture

1:54:56PM     purchasers?

1:54:57PM     **A.**  And I do think that they would tend to have, potentially,

LAFONTAINE - CROSS / BORNSTEIN

1:55:00PM   slightly different products that they are using, as well.

1:55:03PM   But, yes, I would need to think about what are the options of

1:55:06PM   the consumers that are using this product.

1:55:11PM   Q.   And in the App Store circumstance, the -- let me go to

1:55:18PM   your Staples example.

1:55:20PM   A.   Mm-hmm.

1:55:20PM   Q.   In Staples, the product at issue or the products at issue

1:55:26PM   were not transaction platforms like with American Express and

1:55:31PM   the App Store, right?

1:55:32PM   A.   They were physical products.

1:55:34PM   Q.   Right.   And there were different actual physical products

1:55:37PM   being sold by these office superstores.   There were literal

1:55:40PM   staples and there were ink and toner, as you said, and other

1:55:48PM   things, correct?

1:55:48PM   A.   That's correct.

1:55:48PM   Q.   And the reason that it was feasible to divide the market

1:55:52PM   there or to come up with separate markets was because there

1:55:55PM   were separate products that were being sold.   One product was

1:55:59PM   a printer, another product was ink, and another product was

1:56:04PM   Scotch tape and so forth, correct?

1:56:06PM   A.   Well, using some of your logic, if I understand it

1:56:09PM   correctly, you could also say that --

1:56:11PM   Q.   I am sorry, Professor.   I just asked the question.

1:56:14PM   A.   Sorry, sorry.   I was trying to think through what that

1:56:17PM   meant.   So please repeat the question.

LAFONTAINE - CROSS / BORNSTEIN

1:56:20PM    **Q.**   Sure.  The question was in the Staples matter, there were

1:56:24PM    separate products being sold.  There was printer, there was

1:56:28PM    toner, there was Scotch tape, and so forth.

1:56:30PM    **A.**   Yes, I agree to that.

1:56:33PM    **Q.**   Okay.  And in the App Store case, there are not separate

1:56:36PM    products being sold.  You said a while ago the product is

1:56:40PM    transactions, correct?

1:56:41PM    **A.**   The product is transactions.

1:56:43PM    **Q.**   And so the two situations are simply not analogous,

1:56:46PM    because here we have just one product being sold to a

1:56:50PM    heterogeneous set of customers, correct?

1:56:56PM    **A.**   To me, game transactions have other competitive

1:57:01PM    conditions, and, therefore, that affects how I would define

1:57:08PM    the product for that set of transactions -- define the product

1:57:14PM    market.  Sorry.

1:57:14PM    **Q.**   But the product is the same, correct?

1:57:18PM    **A.**   It is transactions.

1:57:20PM    **Q.**   And then you break it out because you are saying that

1:57:24PM    there are different competitive conditions applicable to

1:57:28PM    different customers buying the same product; is that correct?

1:57:34PM    **A.**   There's -- there are -- yes, there are differences for the

1:57:40PM    set of options that these customers have.  I'm always starting

1:57:43PM    from the product and thinking about what options the customers

1:57:47PM    have.

1:57:48PM    **Q.**   Okay.  And is your games transaction market itself a

LAFONTAINE - CROSS / BORNSTEIN

1:57:53PM   cluster market?

1:57:59PM   **A.**  I would argue probably not.

1:58:03PM   **Q.**  But there are different competitive conditions that are

1:58:07PM   applicable to different games, fair?

1:58:11PM   **A.**  Yes.  But to -- and Dr. Evans, I think, has suggested, for

1:58:19PM   example, that *Fortnite* has more options, for example, than

1:58:24PM   other games would have.  I don't disagree with that, but I

1:58:29PM   think that, as I've said in my report, that one has to think

1:58:35PM   about some natural boundaries.

1:58:37PM   And so, you know, shoes, women's shoes, we have high

1:58:42PM   heels; we have flats.  It's -- you know, even though some

1:58:48PM   people might not see these different types of games as

1:58:53PM   similar.  It's also the case that in the aggregate, there is

1:58:56PM   substitution between them.  And the same thing with different

1:58:59PM   types of shoes, and we still treat them as shoes.

1:59:02PM   **Q.**  So if I understand the chain of logic, you have started

1:59:07PM   with game transactions because Epic is the plaintiff, correct?

1:59:14PM   **A.**  Not because Epic is the plaintiff, but because that is the

1:59:18PM   type of thing that Apple and Epic interact on.  That is the

1:59:24PM   product that they interact on.

1:59:26PM   **Q.**  Well, and the only reason you are looking at the product

1:59:30PM   that they interact on is because Epic is the plaintiff,

1:59:34PM   correct?

1:59:34PM   **A.**  It is part of what the case, yes, entails.

1:59:37PM   **Q.**  Okay.  So you start with game transactions because that's

2043

LAFONTAINE - CROSS / BORNSTEIN

1:59:41PM    the product that the plaintiff and Apple interact on, correct?

1:59:45PM    **A.**  Correct.

1:59:46PM    **Q.**  And you conclude that you shouldn't go any broader than

1:59:50PM    that because there are different competitive conditions,

1:59:55PM    correct?

1:59:55PM    **A.**  Yes.

1:59:56PM    **Q.**  Okay.  And you also conclude that you shouldn't go any

1:59:59PM    narrower than that, despite the fact that there are different

2:00:03PM    competitive conditions applicable to different types of games,

2:00:08PM    correct?

2:00:09PM    **A.**  Because there are other factors that one would want to

2:00:13PM    think about.  And in figuring out the boundaries of markets,

2:00:19PM    we want to think about the qualitative evidence, including,

2:00:23PM    for example, there is a -- it's a market that is recognized as

2:00:29PM    a separate market.  People don't break it into so many pieces.

2:00:36PM    There are trade associations, there's different types of ways

2:00:39PM    in which people recognize in the public that there's a game

2:00:46PM    market, a game transaction market.

2:00:48PM    **Q.**  It's just an intuitive and natural grouping, in your view.

2:00:52PM    **A.**  It is.

2:00:53PM    **Q.**  So the rule about competitive conditions doesn't apply

2:00:57PM    when you find a natural and intuitive grouping; is that how I

2:01:02PM    should understand the approach here?

2:01:04PM    **A.**  There are limitations in -- we want to be looking at what

2:01:11PM    people substitute between.  And that means that we can't --

LAFONTAINE - CROSS / BORNSTEIN

2:01:20PM    I'm trying to best answer your question.

2:01:25PM        It is -- there's a combination of qualitative/quantitative

2:01:28PM    evidence that we use to define the market, and there will be

2:01:33PM    some breaks in how we think about substitution across

2:01:38PM    different types of products.

2:01:40PM        And, again, if you think about -- so products are

2:01:45PM    differentiated.  So if you think about shoes again, high heels

2:01:50PM    and flats can be substitute for each other.  Some people will

2:01:54PM    buy only one kind; some other people won't.  And if you do

2:01:58PM    a -- you can do a demand estimation and find out what are the

2:02:02PM    substitution patterns between those products.

2:02:09PM    Q.  So I don't know if the answer to my question was yes or

2:02:12PM    no, Professor, so I will try it again.

2:02:14PM        The chain of logic here is that you have a -- you start

2:02:20PM    with competitive conditions being different, and so you,

2:02:22PM    therefore, stick with game transactions.  But then you don't

2:02:27PM    consider the different competitive conditions that are

2:02:29PM    applicable to individual games because you find that to be a

2:02:32PM    natural and intuitive grouping.

2:02:35PM        Is that a fair summary?

2:02:37PM    A.  So I will -- so what I said is that a market definition

2:02:41PM    includes -- involves finding the products that are substitutes

2:02:45PM    for each other.  If they are not substitutes for each other,

2:02:49PM    then you go to clustering.

2:02:50PM    Q.  Okay.  And the -- but the product here, I thought we

LAFONTAINE - CROSS / BORNSTEIN

2:02:53PM   agreed, was the transactions.

2:02:55PM   **A.**   Yes.

2:02:55PM   **Q.**   And the transactions are the same across all apps,

2:03:00PM   correct?

2:03:02PM   **A.**   The transactions are actually not exactly the same.  The

2:03:09PM   monetization of different apps are different.  There's

2:03:14PM   different ways in which people interact with transaction

2:03:17PM   platforms where they can engage in these.  So I see that as

2:03:22PM   differences in these things.  But --

2:03:22PM   **Q.**   So do I understand now correctly that the way you reach

2:03:29PM   the point of saying that the product here is game transactions

2:03:33PM   is because the transaction services provided to game apps are

2:03:36PM   different from the transaction services provided to other

2:03:41PM   kinds of apps?

2:03:44PM   **A.**   I mentioned that earlier, that there is a difference in

2:03:46PM   the way that the --

2:03:47PM   **Q.**   I apologize.  Is that the basis on which you've reached

2:03:51PM   your product market definition here?

2:03:53PM   **A.**   I am sorry, I'm going to have to ask you to repeat that

2:03:56PM   question, because that is very specific.  You want a "yes" or

2:03:58PM   "no" answer.

2:03:59PM   **Q.**   Sure.  Is -- are you now testifying that there are

2:04:03PM   differences in the transaction services provided to games as

2:04:08PM   compared to the transaction services provided to other kinds

2:04:10PM   of apps that form the basis of your conclusion as to the

LAFONTAINE - CROSS / BORNSTEIN

2:04:16PM   proper product market definition here?

2:04:22PM   **A.**   So there are similar services and there are additional

2:04:35PM   different services.  Yes, I would argue that.

2:04:37PM   **Q.**   And is that the basis on which you are defining a games

2:04:42PM   transaction market and excluding other transactions?

2:04:45PM   **A.**   No.  I used a lot of different kind of evidence to define

2:04:48PM   the game transaction market.

2:04:51PM   **Q.**   Okay.  And if there were a plaintiff who had a variety of

2:05:01PM   different kinds of apps, you would not necessarily reach the

2:05:08PM   same result in terms of your product market definition,

2:05:12PM   correct?

2:05:13PM   **A.**   So I would have to look at what are the different types of

2:05:17PM   transactions -- app transactions that they engage in and --

2:05:22PM   **Q.**   So you --

2:05:22PM   **A.**   -- create potentially different markets based on those.

2:05:25PM   **Q.**   All right.  And when you formed your opinion in this case,

2:05:29PM   you were not aware of all of the different kinds of apps that

2:05:35PM   Epic develops, correct?

2:05:37PM   **A.**   I was not fully aware, you're correct.

2:05:40PM   **Q.**   You did not have a list of the different types of apps,

2:05:43PM   correct?

2:05:44PM   **A.**   That's correct.

2:05:45PM   **Q.**   And you did not ask for such a list, correct?

2:05:47PM   **A.**   Correct.

2:05:48PM   **Q.**   And you did not ask if Epic had any nongame apps, correct?

LAFONTAINE - CROSS / BORNSTEIN

2:05:54PM   **A.**   Well, I was aware of the *Unreal Engine* --

2:05:59PM   **Q.**   Okay.

2:05:59PM   **A.**   -- correct.

2:06:01PM   **Q.**   And when you formed your opinion, you did not know that

2:06:04PM   Epic was the developer of the *Houseparty* app, correct?

2:06:07PM   **A.**   That's correct.

2:06:08PM   **Q.**   And you hadn't actually heard of *Houseparty* at the time of

2:06:12PM   your deposition, correct?

2:06:13PM   **A.**   That's correct.

2:06:13PM   **Q.**   Although *Houseparty* is mentioned in the Court's

2:06:16PM   preliminary injunction order, isn't it?

2:06:19PM   **A.**   I may have missed that.  Sorry.

2:06:21PM   **Q.**   You did review the preliminary injunction order, did you

2:06:23PM   not?

2:06:24PM   **A.**   I did.

2:06:25PM   **Q.**   And I guess you didn't ask what it was and nobody

2:06:28PM   mentioned it to you.

2:06:30PM   **A.**   I -- yes, I'll agree with that.

2:06:34PM   **Q.**   And you know now what *Houseparty* is, right?

2:06:37PM   **A.**   Vaguely, yes.

2:06:39PM   **Q.**   It is a social networking app with a video chat?

2:06:42PM   **A.**   Right.

2:06:43PM   **Q.**   And do you know that it is listed in the "Social

2:06:45PM   Networking" category on the App Store?

2:06:48PM   **A.**   I have not looked for that.

LAFONTAINE - CROSS / BORNSTEIN

2:06:51PM   **Q.** And had you known that Epic was the developer of a social

2:06:58PM   networking app, that's something that you would have

2:07:01PM   incorporated in the process of coming up with your market

2:07:04PM   definition, correct?

2:07:05PM   **A.** I would have considered what it was and what it means,

2:07:10PM   yes.

2:07:12PM   **Q.** And you said you knew about the *Unreal Engine*-related apps

2:07:18PM   that are on the App Store, correct?

2:07:21PM   **A.** No, I said I knew about *Unreal Engine* itself.

2:07:24PM   **Q.** Okay.  Are you not aware that there are *Unreal*

2:07:26PM   *Engine*-related apps that are on the App Store?

2:07:29PM   **A.** I am aware of that as well.

2:07:30PM   **Q.** Okay.

2:07:30PM   **A.** I was just clarifying what I said earlier.

2:07:34PM   **Q.** Thank you.

2:07:34PM       Were you aware of that when you formed your opinion in

2:07:36PM   this case?

2:07:37PM   **A.** I was aware that there are -- that *Unreal Engine* is used

2:07:42PM   to develop apps.  My understanding is that a lot of those

2:07:46PM   would also be games.

2:07:48PM   **Q.** Okay.  Slightly different question I'm trying to ask.  I'm

2:07:51PM   sure the miscommunication is mine.

2:07:54PM       Are you aware that there are Epic-developed *Unreal Engine*

2:08:02PM   apps that Epic makes available to developers on the App Store

2:08:08PM   for the developers to use in designing their own products?

LAFONTAINE - CROSS / BORNSTEIN

2:08:15PM   **A.**   Please say that again.  I am sorry.

2:08:18PM   **Q.**   Sure.  The question is whether you're aware that Epic

2:08:21PM   develops apps that are associated with the *Unreal Engine* that

2:08:25PM   go onto the App Store that are targeted for developers to use

2:08:31PM   in the developer's own work on their products.  They are tools

2:08:36PM   for developers.

2:08:36PM   **A.**   That's the way I understood what *Unreal Engine*

2:08:38PM   fundamentally is.

2:08:42PM   **Q.**   Okay.  And did you understand that there were apps for

2:08:44PM   that purpose that are on the App Store?

2:08:48PM   **A.**   I didn't inquire about that specifically.

2:08:51PM   **Q.**   So you didn't take that into account either in developing

2:08:55PM   your market definition in this case.

2:09:01PM   **A.**   So, again, if -- so --

2:09:05PM   **Q.**   Sorry, Professor.  Did you take it into account in

2:09:08PM   developing your market definition opinion in this case or not?

2:09:17PM   **A.**   My -- I don't know how to answer that question in part.  I

2:09:24PM   guess I'll say no.

2:09:27PM   **Q.**   But you weren't --

2:09:27PM   **A.**   That would be closest.

2:09:28PM   **Q.**   You weren't aware of the apps, so you couldn't have taken

2:09:30PM   them into account --

2:09:32PM   **A.**   I was --

2:09:32PM   **Q.**   -- isn't that fair?

2:09:32PM   **A.**   Again, I was aware of *Unreal Engine* itself, and so I knew

2:09:37PM   that that was being used by developers.  So I still, you know,

2:09:42PM   also heard a lot about *Fortnite* and other games that Epic has,

2:09:46PM   and so that was what I knew about -- yeah.

2:09:53PM   **Q.**  Okay.  Speaking of games, you don't provide a definition

2:09:56PM   of "game" in your testimony or any of your reports, correct?

2:10:00PM   **A.**  No, I do not.

2:10:01PM   **Q.**  Okay.  You had some discussion with Ms. Dunn about the

2:10:10PM   difference between a hypothetical monopolist test and the

2:10:13PM   SSNIP test.

2:10:13PM       Do you recall that?

2:10:15PM   **A.**  I do.

2:10:15PM   **Q.**  And you said that you had not done a SSNIP test in this

2:10:19PM   matter, correct?

2:10:19PM   **A.**  That's correct.

2:10:22PM   **Q.**  You also did not do a hypothetical monopoly test either,

2:10:26PM   correct?

2:10:30PM   **A.**  I think the correct answer to that would be that,

2:10:33PM   conceptually, thinking about what that would mean, I was not

2:10:45PM   worried that the market would be too narrow, is, I guess, the

2:10:50PM   main thing that I -- I didn't do an actual test, so I'm just

2:10:55PM   trying to answer your question but without -- so I would say I

2:11:02PM   did not.

2:11:03PM   **Q.**  Okay.  I think you answered it.  You did not do a

2:11:06PM   hypothetical monopoly test -- monopolist test in this case,

2:11:10PM   correct?

LAFONTAINE - CROSS / BORNSTEIN

2:11:11PM   **A.**  Well, again, you know, I considered whether the market

2:11:14PM   definition encompassed what I thought -- conceptually, I

2:11:25PM   thought about what that might mean.  But it -- I didn't do any

2:11:30PM   quantitative test.

2:11:31PM   **Q.**  Well, again, I'm not asking about quantitative test.  I

2:11:36PM   tried to stay away from that by not asking about the SSNIP.

2:11:36PM       You also did not do a conceptual hypothetical monopoly

2:11:42PM   test, correct?

2:11:43PM   **A.**  The boundary between doing one of those in your head and

2:11:47PM   kind of thinking through it and not is a little bit fuzzy to

2:11:50PM   me, so I have difficulty being very -- so I had -- again, I'll

2:11:59PM   just say no.  I think it's a simpler way to answer your

2:12:04PM   question.

2:12:07PM   **Q.**  I'm not looking for any particular answer; I just want to

2:12:10PM   understand what you did and didn't do, Professor.

2:12:16PM       You did --

2:12:19PM           **THE COURT:**  Can I ask, who came -- whose definition

2:12:22PM   came first, yours or Hitt's or Hanssens?

2:12:26PM           **THE WITNESS:**  Definition of the market?  Is that

2:12:29PM   what --

2:12:30PM           **THE COURT:**  Yes.

2:12:34PM           **THE WITNESS:**  I would say not Hanssens.  We had some

2:12:41PM   discussions, and I think we arrived, Hitt and Schmalensee and

2:12:48PM   I, working together, to that definition, I would say.

2:12:55PM           **THE COURT:**  All right.  Thank you.

2:12:56PM    **MR. BORNSTEIN:**  May I proceed?

2:13:00PM    **THE COURT:**  You may.

2:13:00PM    **MR. BORNSTEIN:**  Thank you.

2:13:03PM    **BY MR. BORNSTEIN:**

2:13:03PM    **Q.**  You said a little while ago in response to one of my

2:13:07PM    questions, if I recall, that you think it is appropriate to

2:13:09PM    define a market in intuitive and natural groupings, correct?

2:13:13PM    **A.**  Yes.

2:13:13PM    **Q.**  And the grouping that you have come up with here is a

2:13:17PM    market that includes transactions on game consoles, but only

2:13:24PM    if they are digital transactions on game consoles that

2:13:30PM    excludes retail games purchased for a game console and

2:13:36PM    excludes digital transactions on a game console if they are

2:13:41PM    not games.

2:13:42PM        Is that fair?

2:13:44PM        **MS. DUNN:**  Objection to form.

2:13:46PM        **THE COURT:**  Overruled.

2:13:47PM        **THE WITNESS:**  Sorry, I didn't hear the -- do I

2:13:49PM    answer?

2:13:50PM        **THE COURT:**  Yes.

2:13:51PM        **THE WITNESS:**  Thank you.

2:13:56PM        Could you repeat the question?

2:13:58PM    **BY MR. BORNSTEIN:**

2:13:59PM    **Q.**  Maybe.

2:13:59PM        The market that you've come up with that you say is

LAFONTAINE - CROSS / BORNSTEIN

2:14:02PM   intuitive and natural here is a market that includes

2:14:07PM   transactions on a game console, but only if they are digital

2:14:11PM   transactions, but not digital transactions for something other

2:14:15PM   than games, and excluding retail transactions for products to

2:14:22PM   be used with game consoles, like disks; is that correct?

2:14:26PM   **A.**   Okay.  So I -- yes in terms of the definition of the

2:14:34PM   market that I used.

2:14:35PM   **Q.**   And you consider that to be an intuitive and natural

2:14:38PM   grouping.

2:14:38PM   **A.**   I explained in my report that it was my understanding

2:14:44PM   that, given that this is a two-sided transaction platform,

2:14:49PM   the -- not necessarily based on economics, but from a legal

2:14:53PM   perspective, it would be considered appropriate to restrict it

2:14:59PM   to other two-sided transaction platforms.

2:15:02PM      I also explained if we include these others, it just means

2:15:06PM   that the Apple market share would be lower.

2:15:09PM   **Q.**   So two questions from that.

2:15:10PM      First of all, Professor, just do you consider that to be

2:15:13PM   an intuitive and natural grouping?  That was my question.

2:15:16PM   **A.**   Oh, I didn't understand that.

2:15:17PM      I do consider this to be an intuitive grouping, given

2:15:23PM   where these transactions can occur.

2:15:25PM   **Q.**   And yet you just testified that the reason you came to

2:15:28PM   this grouping was, in part, because of your understanding of

2:15:31PM   the law; is that correct?

LAFONTAINE – CROSS / BORNSTEIN

2:15:32PM  **A.**  I did mention in my report that because of what I

2:15:38PM  understood the law would require, I restricted it further than

2:15:43PM  what I might have done from an economic perspective.

2:15:48PM  **Q.**  And you landed on something that you think to be intuitive

2:15:51PM  and natural, but that you landed on only because of your

2:15:55PM  understanding of legal restrictions and you otherwise would

2:15:58PM  have landed somewhere else as intuitive and natural, correct?

2:16:03PM  **A.**  I might well have included more of the direct

2:16:06PM  distribution, yes.

2:16:08PM  **Q.**  Now, you've not seen data, Professor, about --

2:16:11PM         **MR. BORNSTEIN:**  I'm going to withdraw that question,

2:16:20PM  Your Honor.

2:16:20PM         **THE COURT:**  Okay.

2:16:22PM  **BY MR. BORNSTEIN:**

2:16:26PM  **Q.**  You're aware that there are certain iOS games that are

2:16:31PM  not available on consoles; is that right?

2:16:34PM  **A.**  Yes, I'm sure.

2:16:36PM  **Q.**  And you've not done any kind of analysis of how many of

2:16:39PM  the popular iOS games are or are not available on consoles?

2:16:46PM  **A.**  I have not.

2:16:47PM  **Q.**  Okay.  And aside from *Fortnite* and *Minecraft* and *Roblox*,

2:16:53PM  which I believe you mentioned in your deposition, you're not

2:16:57PM  aware whether or not any other iOS games are available on

2:17:01PM  gaming consoles; is that correct?

2:17:03PM  **A.**  As I said, I didn't do that analysis.

2:17:05PM   **Q.** Okay.  In your written testimony to the Court, you say in

2:17:14PM   paragraph 48 that "Apple doesn't prevent developers from

2:17:18PM   steering consumers to other platforms by charging less on

2:17:23PM   these platforms and more on the App Store."

2:17:26PM       Is that at least a close enough summary of your testimony?

2:17:31PM   **A.** My testimony -- I believe -- sorry, I'm having difficulty

2:17:38PM   with the microphone here.  I got stuck.  So the -- could you

2:17:46PM   repeat --

2:17:47PM   **Q.** Sure.

2:17:48PM   **A.** -- or point me to a particular section?  Is that something

2:17:51PM   you want to do?

2:17:52PM   **Q.** If you have it in front of you, that's fine.  I'm looking

2:17:55PM   at paragraph 48.

2:17:57PM   **A.** Of my rebuttal report?

2:17:59PM   **Q.** No, no, no, your written direct testimony to the Court

2:18:07PM   dated May 3rd -- well, no, trial date May 3rd.  It doesn't

2:18:11PM   seem to have a date on it.  Maybe if I look at your signature.

2:18:15PM       Do you have it, though?

2:18:16PM   **A.** Yes, I have it.

2:18:17PM   **Q.** Okay.  You have paragraph 48?

2:18:20PM   **A.** Yes, I have that.

2:18:21PM   **Q.** All right.  And in paragraph 48, you say in the second

2:18:25PM   sentence, "Nothing in Apple's license restricts developers

2:18:29PM   from offering transactions on other platforms or steering

2:18:32PM   consumers to other platforms by charging less on these

LAFONTAINE - CROSS / BORNSTEIN

2:18:37PM    platforms or more on the App Store."

2:18:40PM        I read that correctly?

2:18:43PM    A.  You read that correctly.

2:18:43PM    Q.  All right.

2:18:43PM    A.  So what -- but "steering" is in quotes.

2:18:46PM    Q.  Thank you for the clarification.  "Steering" is indeed in

2:18:50PM    quotes.

2:18:50PM        You are aware that while developers can price differently

2:18:54PM    on the App Store and other platforms, Apple does not allow

2:18:59PM    developers to tell users in the app that they have done so,

2:19:04PM    correct?

2:19:06PM    A.  That is correct.

2:19:07PM    Q.  And Apple does not allow developers to provide any kind of

2:19:12PM    link in their iOS app to other platforms on which

2:19:17PM    transactions can be had.

2:19:19PM    A.  That's my understanding.

2:19:20PM    Q.  And Apple does not allow targeted communications like

2:19:23PM    email to inform people of that either, correct?

2:19:27PM    A.  You have the word "targeted" in there, so yes.  Targeted

2:19:31PM    to iOS users, right.

2:19:34PM    Q.  You mentioned Dr. Hanssens and you relied on his survey,

2:19:40PM    in part, for your opinions in this case, correct?

2:19:44PM    A.  That's correct.

2:19:45PM    Q.  And in forming your opinions, you have the understanding

2:19:50PM    that Professor Hanssens survey was intended to address

2:19:55PM   consumers' access to and ownership of devices that support

2:20:02PM   game transactions; is that accurate?

2:20:05PM   **A.**   Yes.

2:20:06PM   **Q.**   And are you aware that -- well, there is nothing in the

2:20:12PM   survey that actually asks about ownership; isn't that right?

2:20:17PM   **A.**   That's not my recollection.

2:20:19PM   **Q.**   The survey asks whether consumers have just regularly used

2:20:24PM   a device in the last 12 months, without regard to ownership;

2:20:28PM   isn't that correct?

2:20:30PM   **A.**   That is correct.

2:20:30PM   **Q.**   And Professor Hanssens, in fact, has expressly disclaimed

2:20:35PM   any intention to ask about ownership, correct?

2:20:38PM   **A.**   I don't know.  I don't recall that part.

2:20:40PM   **Q.**   Okay.  You identify in your games transaction market three

2:20:50PM   different types of transactions:  In-app purchases, downloads,

2:20:55PM   and updates; is that accurate?

2:20:58PM   **A.**   That's correct.

2:20:59PM   **Q.**   Now, only one of those three types of transactions can

2:21:04PM   actually be done on a different device; isn't that accurate?

2:21:11PM   **A.**   So my understanding is that it's actually possible to

2:21:14PM   download an app on a different device from one's phone.  But I

2:21:22PM   am not well-versed in this.

2:21:25PM   **Q.**   So if I want to watch Netflix, I can sign into Netflix on

2:21:32PM   my PC, right?

2:21:34PM   **A.**   Maybe.  I've never tried, so -- yeah.

LAFONTAINE - CROSS / BORNSTEIN

2:21:35PM  **Q.**  Okay.  I've done it, but I'm not here to testify.

2:21:37PM     And -- assume with me it can happen.

2:21:41PM  **A.**  Yes.

2:21:41PM  **Q.**  And then if I want to watch Netflix on my iPhone, though,

2:21:45PM  I actually have to download the Netflix app onto my iPhone,

2:21:47PM  correct?

2:21:51PM  **A.**  I believe that's right.

2:21:52PM  **Q.**  I can't substitute a download on one device for a download

2:21:59PM  on the iPhone, correct?

2:22:01PM  **A.**  Since my deposition, I've heard that it's possible to

2:22:06PM  download certain apps from your phone to a different device,

2:22:10PM  but --

2:22:10PM  **Q.**  I deliberately asked it the other way around, Professor.

2:22:14PM  **A.**  Yeah, okay.  So then you're right.

2:22:15PM  **Q.**  The only way to download an app onto the iPhone is on

2:22:19PM  the iPhone; isn't that right?

2:22:20PM  **A.**  That is right.

2:22:21PM  **Q.**  There is no substitution possibility whatsoever for that

2:22:25PM  kind of transaction in your market, correct?

2:22:28PM  **A.**  It has to be done on the phone.  That's what you mean,

2:22:31PM  yes.

2:22:32PM  **Q.**  Yes.  And the same thing is true if you want to update the

2:22:35PM  app.  You have to go through the app store to update an app on

2:22:38PM  the iPhone.

2:22:41PM  **A.**  That's correct.

2:22:41PM  **Q.**  And those are transactions within the meaning of your

2:22:45PM  market definition, correct?

2:22:46PM  **A.**  They are.

2:22:47PM  **Q.**  And there is literally no competition for those

2:22:50PM  transactions other than to have them on the iPhone, correct?

2:22:55PM  **A.**  That's correct.  That's taken into account in the way that

2:23:00PM  market shares have been calculated.

2:23:02PM  **Q.**  And you also consider it to be an intuitive and natural

2:23:07PM  grouping to put in-app purchases together in the same market

2:23:12PM  with downloads and updates; is that accurate?

2:23:16PM  **A.**  Yes, because they contribute to satisfying the consumer

2:23:18PM  need, which is the capacity to play games.

2:23:30PM  **Q.**  I want to talk about substitution for a little bit.

2:23:34PM      For products to be in the same market, I think you said

2:23:39PM  earlier there have to be substitutes, or reasonable

2:23:43PM  substitutes, good substitutes, for one another; is that right?

2:23:45PM  **A.**  That's right.

2:23:45PM  **Q.**  And you view that from the perspective of the customers of

2:23:48PM  the product.

2:23:49PM  **A.**  Yes.

2:23:50PM  **Q.**  And one of the substitutes that you believe is a good

2:23:54PM  substitute for making a game transaction on your iPhone is to

2:24:02PM  make a game transaction on a console that belongs to a friend,

2:24:07PM  correct?

2:24:09PM  **A.**  I -- yes, it can be.

LAFONTAINE - CROSS / BORNSTEIN

2:24:11PM   **Q.**   So if I'm commuting to work, which I used to do before the

2:24:15PM   pandemic, and I want to buy a cool skin on *Fortnite*, or I want

2:24:23PM   to subscribe to *The New York Times* or boost my dating profile

2:24:27PM   if I had such a thing, one thing I can do is while I'm on the

2:24:31PM   train, I can just transact in the app on my phone, correct?

2:24:38PM   **A.**   Yes.

2:24:39PM   **Q.**   And an alternative is that after work, I could arrange to

2:24:44PM   go over to a friend's house and use her PC or game console.

2:24:48PM       That's what you consider to be a good substitute to my

2:24:51PM   engaging in the transaction right there on the train; is that

2:24:55PM   correct?

2:24:55PM   **A.**   Well, for many of the ones you've just mentioned, I think

2:24:59PM   you could engage on the -- with -- you could engage in these

2:25:01PM   transactions on the websites of the companies directly on your

2:25:05PM   phone as well.

2:25:06PM   **Q.**   Okay.   That wasn't my question.

2:25:10PM   **A.**   Sorry.

2:25:10PM   **Q.**   My question was whether or not you consider it to be a

2:25:13PM   good substitute for me to wait until after work and go to my

2:25:16PM   friend's house and use her PC or console.

2:25:24PM   **A.**   In some situations, it's going to be something that people

2:25:27PM   do.

2:25:28PM   **Q.**   And you think that a meaningful number of people would do

2:25:32PM   that in response to a 5 or 10 percent price increase in the

2:25:36PM   commission rate on transactions; is that your testimony?

LAFONTAINE - CROSS / BORNSTEIN

2:25:40PM   **A.**  You're using a specific example that is less likely to

2:25:44PM   occur, but there are others where people are playing together

2:25:48PM   on a console and they might well engage in transactions during

2:25:53PM   that time.

2:25:54PM     So there's -- people play games together, as well, and so

2:25:59PM   those are options that are available to them and can be good

2:26:05PM   substitutes under certain circumstances.

2:26:07PM   **Q.**  Again, you've now answered about some other set of

2:26:10PM   transactions.

2:26:11PM   **A.**  Yes.

2:26:12PM   **Q.**  Do you consider the ones that I talked about good

2:26:15PM   substitutes or not?

2:26:16PM   **A.**  I don't consider the ones you talked about to be great.  I

2:26:19PM   don't disagree with that.

2:26:21PM   **Q.**  In your expert rebuttal report, you noted that --

2:26:26PM       **MR. BORNSTEIN:**  I'm going to withdraw that one as

2:26:31PM   well, Your Honor.  Save a little time.

2:26:39PM   **BY MR. BORNSTEIN:**

2:26:39PM   **Q.**  So we talked a little about the foremarket and the

2:26:42PM   aftermarket with Ms. Dunn earlier, correct?  And I realize

2:26:47PM   that you don't think it is the right framework to analyze

2:26:51PM   these things here but let me just ask a conceptual question.

2:26:55PM     Do you agree that there are circumstances in which there

2:26:59PM   can be competition concerns that arise in an aftermarket?

2:27:04PM   **A.**  Yes.

LAFONTAINE - CROSS / BORNSTEIN

2:27:05PM   **Q.**  And one of the conditions that you say in your testimony

2:27:10PM   needs to apply is that locked-in customers are surprised by

2:27:16PM   unexpected changes in the aftermarket terms; is that correct?

2:27:22PM   **A.**  That's correct.

2:27:22PM   **Q.**  And in the context of the two-sided platform like the App

2:27:26PM   Store, the customers, as you said earlier, are the developers

2:27:30PM   and the users.

2:27:31PM   **A.**  That's correct.

2:27:31PM   **Q.**  So the developers are part of the customers.

2:27:34PM       And you are aware that when Mr. Jobs, Apple, announced the

2:27:40PM   App Store in 2008, he told the world that he intended to run

2:27:43PM   it -- or the company intended to run it on a break-even basis,

2:27:48PM   correct?

2:27:49PM   **A.**  I have heard that that was -- yes.

2:27:51PM   **Q.**  And he did that, very logically, because he anticipated

2:27:55PM   that having lots of apps would make the iPhone more attractive

2:27:59PM   and help Apple sell devices, right?

2:28:04PM   **A.**  I don't know what was on his mind, but this makes sense.

2:28:08PM   **Q.**  Okay.  That is a fair clarification.

2:28:09PM       And as it turned out, though, Apple has not run the App

2:28:14PM   Store on a break-even basis, correct?

2:28:18PM   **A.**  That is --

2:28:19PM   **Q.**  And the --

2:28:19PM   **A.**  Yes.  We don't have the clear profitability analysis, but

2:28:24PM   I will give you that.

LAFONTAINE - CROSS / BORNSTEIN

2:28:26PM  **Q.**  Right.  There's a lot of dispute perhaps about the precise

2:28:29PM  extent of the profit here, but can we at least agree that

2:28:33PM  Apple makes a lot of money off of the App Store?

2:28:38PM  **A.**  I'll grant you that it's been a profitable business.

2:28:40PM  **Q.**  Okay.  And that money comes from the developers, correct?

2:28:46PM  **A.**  Well, it's a two-sided transaction platform, so what side

2:28:55PM  pays is a design issue that -- you know, the goal is to

2:29:01PM  attract as many consumers as possible.  There is more benefit

2:29:05PM  this way for the developers, so I hesitate to pin it down on a

2:29:10PM  particular side of the market.

2:29:14PM  **Q.**  Well, I'll do it this way:  The money comes, at least

2:29:18PM  directly, from the developers; is that fair?

2:29:20PM  **A.**  I think that that is fair.

2:29:22PM  **Q.**  And the developers may pass on some portion of those costs

2:29:26PM  to their consumers, to the users, right?

2:29:30PM  **A.**  That is right.

2:29:30PM  **Q.**  Okay.  You agree that most consumers have an iOS or an

2:29:40PM  Android device, but not both at the same time, right?

2:29:44PM  **A.**  Yes, I agree.

2:29:45PM  **Q.**  And it is your view that you don't see a universe where

2:29:53PM  more than a quarter of iOS users switch to Android every

2:29:57PM  year, correct?

2:29:59PM  **A.**  I don't know about the universe.  I don't remember talking

2:30:03PM  about universes.

2:30:04PM  **Q.**  Did you testify at deposition that you don't see a

LAFONTAINE - CROSS / BORNSTEIN

2:30:08PM    universe where more than a quarter of iOS users switch over

2:30:13PM    to Android every year?

2:30:16PM    **A.**  As I stand here right now, I don't remember saying that,

2:30:19PM    but it's possible that I did.

2:30:23PM    **Q.**  Okay.  And I'll just ask you right now while you are here.

2:30:26PM    **A.**  Okay.

2:30:26PM    **Q.**  Do you see a universe in which a quarter of iOS users

2:30:31PM    switch over to Android every year?

2:30:34PM    **A.**  It would have to be the case that the technology is

2:30:36PM    deteriorating rapidly.

2:30:41PM    **Q.**  And right now, you have no reason to believe that that is

2:30:42PM    actually what's happening --

2:30:45PM    **A.**  Correct.

2:30:45PM    **Q.**  -- correct?  I'm sorry, I'm not sure if the court reporter

2:30:47PM    got your answer.

2:30:47PM    **A.**  Sorry.  I said correct.

2:30:47PM    **Q.**  Thank you.

2:30:47PM    **A.**  I keep banging into this.

2:30:51PM    **Q.**  Now, is it the case that for a game like *Fortnite*, users

2:30:57PM    have preferences as to which device they place on?

2:31:02PM    **A.**  I would -- yes, of course.

2:31:03PM    **Q.**  And it's your understanding that people who have a console

2:31:06PM    spend as much time as they can on that console, rather than

2:31:12PM    playing on a smartphone, at least when it was available.

2:31:17PM    **A.**  I would assume that that -- that they might -- again, I

2:31:25PM    don't know -- you know, I'm not in their heads, but consumers

2:31:32PM    may make that choice, yes.

2:31:34PM    **Q.**  Okay.  And you gave testimony at deposition --

2:31:36PM    **A.**  Yes.

2:31:36PM    **Q.**  -- to that effect, did you not?

2:31:38PM    **A.**  Yes.

2:31:39PM    **Q.**  Okay.  And you agree also that multihoming is not, on its

2:31:43PM    own, evidence of switching, correct?

2:31:48PM    **A.**  The two are not exactly the same, you're right.

2:31:51PM    **Q.**  So --

2:31:51PM    **A.**  I am not sure what you mean by "switching" in that

2:31:54PM    context.

2:31:55PM    **Q.**  Well, that one was an effort to be a quote from your

2:31:59PM    testimony, Professor.

2:32:00PM    **A.**  That's fine.  I'm just trying to be clear what you mean.

2:32:03PM    **Q.**  Very good.  I would like you to be clear.  I'll ask you to

2:32:05PM    take a look at paragraph 39 --

2:32:08PM    **A.**  Okay.

2:32:08PM    **Q.**  -- of your direct testimony, and it's four lines from the

2:32:15PM    bottom of that paragraph.

2:32:26PM    **A.**  Right.  So I just wanted to be clear that we are talking

2:32:29PM    about actual switching devices, and, yes, that is what this

2:32:34PM    says.

2:32:35PM    **Q.**  Very good.

2:32:35PM         And for there to be actual multihoming under the

LAFONTAINE - CROSS / BORNSTEIN

2:32:38PM  literature, there needs to be real use on both devices or

2:32:41PM  multiple devices, right?  Ownership or access is not enough,

2:32:45PM  correct?

2:32:46PM  **A.**  Multihoming implies that people are using both devices.

2:32:52PM  **Q.**  Turn to one last topic, Professor.

2:32:55PM  You've defined a geographic market that involves U.S.

2:33:04PM  consumers on the one hand and developers globally on the

2:33:08PM  other; is that right?

2:33:09PM  **A.**  That's correct.

2:33:10PM  **Q.**  And one basis on which you reach that conclusion is,

2:33:13PM  again, your understanding of the law and what the U.S.

2:33:17PM  antitrust laws are intended to achieve; is that correct?

2:33:22PM  **A.**  While I was at the FTC, the criteria that we used was --

2:33:25PM  **Q.**  Apologies.

2:33:25PM  **A.**  -- consumer welfare in the U.S., yes.

2:33:29PM  **Q.**  You asked -- you reached that conclusion, in part, based

2:33:31PM  on your understanding of the law; is that correct?

2:33:35PM  **A.**  I would say based on my experience at the FTC.

2:33:41PM  **Q.**  And at the FTC, you served as an economist, correct?

2:33:45PM  **A.**  Yes, yes.

2:33:45PM  **Q.**  Okay.

2:33:45PM  **A.**  I am not a lawyer.

2:33:47PM  **Q.**  Very good.

2:33:47PM  And you also formed your view on the geographic market

2:33:56PM  definition, in part, on the basis that developers have to

LAFONTAINE - CROSS / BORNSTEIN

2:34:01PM   compete for U.S. consumers on U.S. storefronts; is that right?

2:34:07PM   **A.**   Yes.

2:34:08PM   **Q.**   And U.S. consumers are unable to go to storefronts in

2:34:12PM   other countries, as you understand it, or it is difficult for

2:34:15PM   them to do so; is that correct?

2:34:17PM   **A.**   That's correct.

2:34:17PM   **Q.**   But you didn't take account at all of direct distribution

2:34:21PM   in defining your geographic market; am I right?

2:34:25PM   **A.**   Direct distribution by developers.

2:34:29PM   **Q.**   Correct.

2:34:33PM   **A.**   I'm not sure I fully follow, so if you could help me with

2:34:38PM   what you mean by --

2:34:39PM   **Q.**   Well --

2:34:39PM   **A.**   -- taking that -- I'm not understanding.

2:34:42PM   **Q.**   Sure.  I'm a U.S. consumer, and I can go on my PC now and

2:34:50PM   download anything I want from a developer overseas, right?

2:34:54PM   **A.**   Perhaps.  I've never tried, so I don't know.

2:35:00PM   **Q.**   Well, you understand there's direct distribution on the

2:35:03PM   PC, correct?

2:35:04PM   **A.**   Yes.

2:35:04PM   **Q.**   And it's not limited to -- by national boundaries, right?

2:35:12PM   **A.**   I actually don't know about that.

2:35:14PM   **Q.**   Right.  You don't know one way or the other.

2:35:17PM   **A.**   Right.

2:35:17PM   **Q.**   And so you did not take that into account --

LAFONTAINE - CROSS / BORNSTEIN

2:35:20PM   **A.**  That's correct.

2:35:20PM   **Q.**  -- in reaching your geographic market definition.

2:35:27PM   **A.**  That's correct.

2:35:27PM   **Q.**  Very good.

2:35:27PM         **MR. BORNSTEIN:**  Nothing else.  Thank you for your

2:35:29PM   time, Professor.

2:35:30PM         **THE WITNESS:**  Thank you.

2:35:30PM         **THE COURT:**  Redirect.

2:35:33PM         **MS. DUNN:**  No redirect, Your Honor.

2:35:34PM         **THE COURT:**  Okay.  Professor, you may step down.

2:35:35PM   You're excused.  Thank you.

2:35:36PM      Next witness.  Who do we have next?

2:35:59PM         **MR. DOREN:**  Professor Lorin Hitt, Your Honor.

2:35:59PM         **THE COURT:**  We are waiting for Professor Hitt.  Thank

2:36:06PM   you, Mr. Doren.

2:36:15PM      While we are waiting, having reviewed once your

2:36:19PM   conclusions of law, your briefing, your hundreds and thousands

2:36:24PM   of pages, I take it there is no definitive authority as to the

2:36:29PM   precise framework or the precise mechanism by which the Court

2:36:35PM   defines the market other than considerations.  That is why you

2:36:40PM   all are spending so much time on this.

2:36:42PM      Kind of like -- it reminds me of qualified immunity.  Lots

2:36:48PM   of things that we need to think about.  One side says it is

2:36:51PM   usually black, the other side says it is white; typically, the

2:36:55PM   answer is somewhere in the gray, for an analogy.

LAFONTAINE - CROSS / BORNSTEIN

2:36:59PM    But it's -- I haven't seen any Ninth Circuit or Supreme

2:37:03PM  Court authority that says this is the precise way in which you

2:37:08PM  define the market, and that's why you all are spending so much

2:37:12PM  time on this.

2:37:13PM    Am I right?

2:37:14PM    MR. BORNSTEIN:  Your Honor, I -- this is the first

2:37:17PM  time I'm speaking up here with my mask on.  Sorry.

2:37:19PM    I actually think it is not quite so complicated.  I don't

2:37:23PM  have our papers in front of me right now, having just gone

2:37:27PM  through two examinations, but I do believe there is a pretty

2:37:31PM  well-trodden framework for defining the market --

2:37:32PM    THE DEFENDANT:  There are certainly considerations,

2:37:34PM  but there -- I haven't seen anything, for instance, that says

2:37:42PM  you must look at it from the precise point of view of the

2:37:46PM  plaintiff or you must look at it from the precise point of

2:37:50PM  view of the product or you must look at it from the precise

2:37:54PM  point of view of competition.  There are lots of different

2:37:56PM  considerations that all go into trying to figure out what the

2:38:00PM  relevant market is.  If it was clear-cut, you would agree, but

2:38:03PM  you don't.

2:38:06PM    MS. DUNN:  Your Honor, in your PI order --

2:38:10PM    THE CLERK:  Let me turn your mic on.  I'm sorry.

2:38:20PM    THE COURT:  Go ahead, Mr. Bornstein.  You have the

2:38:22PM  mic.

2:38:23PM    MR. BORNSTEIN:  Oh, I am sorry, Your Honor.

2:38:24PM        I actually do think it is more clear-cut than perhaps it

2:38:28PM   appears based on the back-and-forth between the parties.  It

2:38:33PM   is not always agreed between the parties on how clear-cut

2:38:36PM   things are, but my understanding --

2:38:38PM               THE COURT:  What is your best case?

2:38:39PM               MR. BORNSTEIN:  I'm sorry?

2:38:39PM               THE COURT:  What is the case upon which you rely?

2:38:42PM               MR. BORNSTEIN:  Your Honor, as I said, I do not have

2:38:43PM   a case right now that I can give you at my fingertips, but I

2:38:47PM   can certainly get you one in the next five minutes when I just

2:38:50PM   go consult with my colleagues.

2:38:50PM               THE COURT:  So you think there is one case?

2:38:52PM               MR. BORNSTEIN:  I do believe there is a pretty

2:38:53PM   well-trodden framework.  A lot of times what people do is they

2:38:53PM   refer to the horizontal merger guidelines from the DOJ and FTC

2:39:00PM   that Professor Schmalensee referenced earlier today.

2:39:02PM        But the standard framework is to look to see what are the

2:39:07PM   substitutes that are available to constrain the conduct at

2:39:12PM   issue by the defendant in the case, which requires looking to

2:39:17PM   see -- which it requires looking to see what the options are

2:39:26PM   to constrain the conduct.

2:39:27PM        Ms. Forrest is passing me a note about Brown Shoe, which

2:39:31PM   is an old case --

2:39:32PM               THE COURT:  Old, old.  Very old.

2:39:33PM               MR. BORNSTEIN:  An oldie but a goody.  But the

2:39:36PM    framework is very much, in our view, starting with what is the

2:39:39PM    conduct at issue in assessing how you can decide what other

2:39:43PM    activity constrains the defendant from engaging in that

2:39:47PM    conduct.

2:39:48PM         THE COURT:  Right.  But if there was a flower market

2:39:49PM    down the street that didn't have any presence on an app, then,

2:39:54PM    obviously, that -- if they came in arguing some kind of

2:40:00PM    antitrust conduct, one would wonder what they were doing here,

2:40:04PM    given that they don't have any presence on the app.  So --

2:40:09PM         MR. BORNSTEIN:  That is true, Your Honor, but that's

2:40:09PM    an antitrust injury question.  That is a separate question

2:40:12PM    from market definition.  In order for a plaintiff to bring a

2:40:15PM    case, they need to have both Constitutional Article III

2:40:18PM    standing, of course, but also to have antitrust injury.

2:40:20PM         I don't think there is any dispute about antitrust injury

2:40:24PM    here.  Epic has certainly been harmed, but that is not a

2:40:28PM    market definition question.  And that was the point of one of

2:40:32PM    my questions to Professor Schmalensee.

2:40:35PM         THE CLERK:  So can you -- I'm sorry, I'm having a

2:40:37PM    problem with this X panel.

2:40:41PM         THE COURT:  All right.  Can you go to this --

2:40:41PM         THE CLERK:  You can go to the table or something.

2:40:41PM         THE COURT:  He won't -- Ms. Dunn, he won't bite.  Go

2:40:43PM    to that mic.

2:40:43PM         MR. BORNSTEIN:  Join me.

LAFONTAINE - CROSS / BORNSTEIN

2:40:44PM            **MS. DUNN:**  Gary and I will sit together.

2:40:44PM   Mr. Bornstein and I will share the space.

2:40:47PM       So in your PI order, Your Honor, you do cite a case -- and

2:40:53PM   I will look that up -- where the focus is supposed to be on

2:40:56PM   the commercial realities.  And so the commercial realities --

2:40:59PM   we think you got that right in the PI order -- they relate to

2:41:05PM   market definition and, frankly, to relevant market.

2:41:08PM       So in order to figure out what is the relevant market, you

2:41:13PM   look at, you know, the issues at hand.  And I think that is,

2:41:17PM   in part, what Dr. Lafontaine was talking about, which is we

2:41:22PM   need to figure out what is the product.  So --

2:41:25PM            **THE COURT:**  Do you have a case?

2:41:26PM            **MS. DUNN:**  We are looking it up.

2:41:30PM            **THE COURT:**  I've got old Brown Shoe --

2:41:31PM            **MS. DUNN:**  Yeah.

2:41:31PM            **THE COURT:**  -- and as we all know, just because it's

2:41:35PM   old doesn't make it any less the law, so we know that.  But

2:41:41PM   Hicks, what is it that you're -- okay.

2:41:46PM            **MS. DUNN:**  Yeah, so --

2:41:46PM            **THE COURT:**  You know, we can keep going.  I was just

2:41:47PM   trying to kill time since we were waiting.

2:41:51PM       Let's see.  Professor Hitt, is it, or Mr. Hitt?

2:42:08PM            **THE REPORTER:**  Can you tell me who you are?

2:42:08PM            **MS. RICHMAN:**  Good afternoon, Your Honor.  Cynthia

2:42:23PM   Richman for Apple.

2:42:23PM          Apple calls Professor Hitt to the stand.

2:42:23PM               THE COURT:  And if you'll remain standing.

2:43:19PM          (**LORIN MOULTRIE HITT**, called as a witness for the

2:43:19PM     Defendant, having been duly sworn, testified as follows:)

2:42:58PM               THE WITNESS:  I do.

2:43:00PM               THE CLERK:  Please be seated.  Make sure the mic is

2:43:02PM     adjusted under the shield.  All right?

2:43:05PM          Please state your full name and spell your last name.

2:43:08PM               THE WITNESS:  My name is Lorin Moultrie Hitt.  Last

2:43:09PM     name spelled H-I-T-T.

2:43:16PM               THE COURT:  Good afternoon, sir.

2:43:18PM               THE WITNESS:  Good afternoon.

2:43:18PM               THE COURT:  You may proceed, Ms. Richman.

2:43:21PM               MS. RICHMAN:  Thank you, Your Honor.

2:43:22PM          Good afternoon, Professor Hitt.

2:43:25PM          Before we get started, I would like to approach the

2:43:28PM     witness with a bottle of water and a binder with his written

2:43:32PM     Direct testimony in it.

2:43:34PM               THE COURT:  That's fine.

2:44:00PM                         <u>DIRECT EXAMINATION</u>

2:44:02PM     BY MS. RICHMAN:

2:44:02PM     **Q.**  Well, Professor Hitt, your ears must have been burning

2:44:02PM     this morning, there's been a lot of discussion about you, but

2:44:05PM     can you state your name for the record, please?

2:44:07PM     **A.**  Hi.  My name is Lorin Moultrie Hitt.

HITT – DIRECT / RICHMAN

2:44:12PM   **Q.**   And, Professor Hitt, where are you currently employed?

2:44:14PM   **A.**   I'm employed at the University of Pennsylvania, Wharton

2:44:15PM   School which is the business School that's connected with the

2:44:18PM   University of Pennsylvania.

2:44:20PM          **THE COURT:**   You'll have to slow down, Mr. Hitt.

2:44:22PM          **THE WITNESS:**   Will do.

2:44:22PM          **THE COURT:**   Go ahead.

2:44:22PM   **BY MS. RICHMAN:**

2:44:22PM   **Q.**   Let me repeat the question.

2:44:37PM          Professor Hitt, what's your title at Wharton?

2:44:39PM   **A.**   It's the Zhang Jindong Professor of Operations,

2:44:39PM   Information, and Decisions.

2:44:43PM   **Q.**   And can you please summarize your formal education for the

2:44:47PM   Court?

2:44:47PM   **A.**   Sure.

2:44:47PM          So I got my undergraduate and master's degree in

2:44:50PM   electrical engineering from Brown University.  Worked for a

2:44:53PM   few years, then went back and got my Ph.D. in management from

2:44:57PM   the MIT Sloan School of Management.

2:45:00PM          My area of specialty was information technology economics

2:45:04PM   and applied econometrics and my dissertation title was

2:45:08PM   "Economics of Information Technology and Organization."

2:45:11PM   **Q.**   And was your dissertation published?

2:45:14PM   **A.**   Yes.  It was the sort of classic economist three SA

2:45:16PM   Dissertation.  Two were published in top tier economics

HITT - DIRECT / RICHMAN

2:45:16PM    journals.  One in the top tier IS Specialty -- Information

2:45:24PM    Systems Specialty Journal.

2:45:26PM    **Q.**  What is the focus of your current research, Professor

2:45:28PM    Hitt?

2:45:29PM    **A.**  So, generally, economics of information technology and

2:45:32PM    industries affected by information technology.  I've done a

2:45:36PM    lot of work recently and in the past on the economics of

2:45:39PM    electronic commerce and internet-enabled commerce more

2:45:43PM    generally.

2:45:43PM    **Q.**  Have you done any research on app-related economic issues?

2:45:47PM    **A.**  Yes.  I've done work on the economics of software, in

2:45:52PM    particular pricing of digital goods.  I've worked in the area

2:45:55PM    of switching costs.  I've worked in the area of recommended

2:45:58PM    systems that are sort of interesting to electronic commerce to

2:46:04PM    the public (phonetic) --

2:46:04PM            **MS. RICHMAN:**  Are you having trouble?

2:46:04PM            **COURT REPORTER:**  I am.

2:46:04PM            **THE WITNESS:**  I'll slow down.

2:46:04PM            **THE COURT:**  And I think we are going to have to fix

2:46:11PM    this mic issue.  If you push it down --

2:46:14PM            **THE CLERK:**  It bends on the end.

2:46:16PM            **THE WITNESS:**  Is that better?

2:46:20PM            **THE COURT:**  I think that's better.

2:46:23PM    **BY MS. RICHMAN:**

2:46:23PM    **Q.**  Professor Hitt, it's okay to brag now.

HITT - DIRECT / RICHMAN

2:46:27PM    Have you received any teaching awards at the University of

2:46:30PM  Pennsylvania?

2:46:31PM  **A.**   Yes.  I'm a 12-time winner of the Wharton Excellence in

2:46:34PM  Teaching Award, which is annual.  I also won the Wharton wide

2:46:38PM  Hauck Award and the University wide Lindback Award, which are

2:46:38PM  the highest teaching awards in the Wharton School and the

2:46:46PM  University of Pennsylvania respectively.

2:46:48PM  **Q.**   Have you previously presented testimony in a case before a

2:46:52PM  federal or state court?

2:46:54PM  **A.**   Yes.

2:46:55PM  **Q.**   And what subjects did your prior testimony cover?

2:46:59PM  **A.**   The -- so one of the cases focused specifically on

2:47:02PM  smartphones.  And in particular, pricing and the economic

2:47:06PM  value of the smartphone features.  I've also done work related

2:47:09PM  to business practices in the information technology industry

2:47:13PM  more generally.

2:47:14PM  **Q.**   And when you testified previously, were you accepted by

2:47:17PM  the courts as an economic expert on those subjects in those

2:47:21PM  cases?

2:47:22PM  **A.**   Yes, I was.

2:47:22PM      **MS. RICHMAN:**  Your Honor, I would like to tender

2:47:25PM  Professor Hitt as an expert in information technology,

2:47:28PM  economics, and applied econometrics?

2:47:32PM      **THE COURT:**  Any objection?

2:47:34PM      **MR. EVEN:**  No objection.

2:47:36PM                  **THE COURT:**  He's admitted as such.

2:47:38PM                  **MS. RICHMAN:**  Thank you.

2:47:40PM   **BY MS. RICHMAN:**

2:47:40PM   **Q.**  Professor Hitt, did you analyze the competitive effects of

2:47:44PM   the conduct being challenged by Epic in this case?

2:47:48PM   **A.**  Yes, I did.

2:47:48PM   **Q.**  What are the indicia of competition that economists

2:47:54PM   typically look at in analyzing whether conduct has pro or

2:47:58PM   anticompetitive effects?

2:48:00PM   **A.**  So three common ways of looking at the outcome of

2:48:04PM   competitive conduct is to evaluate output, whether the market

2:48:08PM   is growing, shrinking, how much is it expanding, prices, what

2:48:11PM   are people paying, and then innovation and quality, is the

2:48:14PM   product improving over time.

2:48:16PM      And, in general, in a competitive market, you expect

2:48:18PM   output to expand, prices to be steady or falling, and quality

2:48:21PM   to improve.  And with anticompetitive conduct, you expect the

2:48:25PM   opposite.

2:48:26PM   **Q.**  And broadly speaking, what did you conclude about the

2:48:30PM   competitive effects of the conduct challenged by Epic in this

2:48:35PM   case?

2:48:35PM   **A.**  There's no evidence to suggest based on those metrics that

2:48:39PM   Apple engaged in anticompetitive conduct.

2:48:42PM   **Q.**  Professor Hitt, you understand that Epic and Apple are

2:48:45PM   offering different product definitions to the Court; is that

HITT - DIRECT / RICHMAN

2:48:48PM   correct?

2:48:48PM   **A.**   That's correct.

2:48:51PM   **Q.**   And do your conclusions on competitive effects turn on the

2:48:58PM   relevant market that the Court adopts in this case?

2:49:01PM   **A.**   No.   Regardless of whether you use a game transactions

2:49:05PM   market or an all apps market, those indexes of market outcomes

2:49:10PM   are generally consistent.   The numbers are different but you

2:49:13PM   still see the same general trends.

2:49:15PM   **Q.**   Okay.   Let's talk about how you arrived at that conclusion

2:49:18PM   and let's start by talking about data.

2:49:21PM       Can you describe the type of data you relied on in

2:49:25PM   conducting your analysis?

2:49:27PM   **A.**   Sure.

2:49:27PM       So the primary data source for one of the calculations on

2:49:32PM   output was a dataset of Apple transactions.   Is literally

2:49:36PM   every transaction that occurred on the Apple store for

2:49:41PM   downloads in-app purchases from the time the Apple Store

2:49:42PM   opened through the end of 2019?   That has about 60 billion

2:49:46PM   transactions in it.

2:49:48PM       In addition, I looked at market research service data as

2:49:52PM   well as public information.   It gives you information about

2:49:55PM   the overall market size as well as prices paid.   And for some

2:49:58PM   of the analyses in my report, I also looked at transactional

2:50:02PM   data provided by Epic that provided monthly data on *Fortnite*

2:50:07PM   transactions by user for several years at the monthly level.

HITT - DIRECT / RICHMAN

2:50:14PM    That's about 2.8 billion monthly observations.

2:50:17PM    **Q.**  And do you know whether Dr. Evans had access to the data?

2:50:24PM    **A.**  So I believe -- I believe he did, yes.

2:50:27PM    **Q.**  And do you know whether Dr. Evans analyzed these billions

2:50:31PM    of observations from the App Store to reach opinions on

2:50:35PM    competitive effects?

2:50:36PM    **A.**  Dr. Evans didn't really do anything on competitive effects

2:50:41PM    with the Apple transactions data.  He didn't look at output or

2:50:44PM    quality at all using those data.

2:50:47PM       He also did not use the full *Fortnite* data for any of his

2:50:50PM    analysis.  He instead used a 1 percent sample -- less than

2:50:53PM    1 percent sample which is different than the data I used,

2:50:56PM    which has all of *Fortnite* spending.

2:50:59PM    **Q.**  Thank you.

2:50:59PM       If we can go to slide 4.  Let's talk about output first.

2:51:04PM       Why is output an important measure of competitive effects?

2:51:11PM    **A.**  So it's a key measure of the amount of activity occurring

2:51:17PM    within a market.  And in particular, a hypothesis is that

2:51:19PM    monopolies will raise prices and thereby restrict output.  So

2:51:24PM    expanding output is an indication that would suggest that

2:51:28PM    there is not anticompetitive behavior when compared against an

2:51:33PM    inappropriate benchmark.

2:51:36PM    **Q.**  Are your findings summarized here on slide 4?

2:51:40PM    **A.**  Yes, they are.

2:51:42PM    **Q.**  How did you go about measuring output?

HITT - DIRECT / RICHMAN

2:51:46PM  **A.**   So there's two ways you can measure output in this market.

2:51:50PM  One, you can look at the number of transactions.  This is a

2:51:54PM  two-sided transaction platform.  So a natural measure of

2:51:56PM  output would be the number of transactions that occur.  So

2:52:00PM  that's one metric.

2:52:01PM      A second metric would be revenue, which is how much -- how

2:52:06PM  much actual -- the volume of commerce that's being conducted

2:52:09PM  which directly relates to the value that consumers and

2:52:12PM  developers are getting for performing these transactions.

2:52:15PM  **Q.**   Did you use zero price transactions in measuring output?

2:52:19PM  **A.**   Yes.  It's very common in two-sided markets for one side

2:52:23PM  or the other to participate in transactions but not pay a

2:52:29PM  price for that.

2:52:30PM      This is an important source of value created by the App

2:52:34PM  Store and a critical component of output.  So it's important

2:52:38PM  that when you're evaluating output, you incorporate free

2:52:40PM  transactions because that's a key part of what's being

2:52:44PM  delivered.

2:52:45PM  **Q.**   Let's go through these numbers one by one beginning with

2:52:47PM  game transactions.

2:52:49PM      First, how did you identify games in the Apple transaction

2:52:55PM  data?

2:52:55PM  **A.**   So, fortunately, developers self-identify.  So I was able

2:53:00PM  to identify game transactions because developers self-identify

2:53:05PM  their products as games.

HITT - DIRECT / RICHMAN

2:53:08PM  **Q.**  Can we have slide 5, please.

2:53:10PM      And is your analysis of -- your conclusions about output

2:53:15PM  of game transactions reflected in this slide?

2:53:19PM  **A.**  Yes, it is.

2:53:19PM  **Q.**  And what does it show?

2:53:21PM  **A.**  So there's two panels on the side.  The left-hand panel

2:53:25PM  has transactions.  The right-hand panel has revenue.  Across

2:53:29PM  the bottom is the passage of time.  The vertical axis is the

2:53:34PM  measure of output.

2:53:35PM      So if you look -- this is based on 60 billion data -- 60

2:53:36PM  billion transaction dataset reduced down to focus solely on

2:53:43PM  game transactions.  What you see in the left panel is that the

2:53:46PM  number of game transactions has been increasing over time.

2:53:50PM  And if you do a calculation over the span of this data, you'll

2:53:52PM  find that game transactions have expanded 1200 percent.

2:53:55PM  That's 12 times from the inception to current times.  And

2:53:58PM  that's generally an upward trend.

2:54:01PM      If you look at revenue, revenue has expanded even more at

2:54:05PM  2600 percent, and it's got a very steady increasing amount

2:54:08PM  from the time the App Store started through the end of the

2:54:11PM  period.

2:54:11PM      The window for which that calculation is done slightly

2:54:14PM  different so it can match different dataset.  This is from

2:54:19PM  July 2008 to September 2019.

2:54:23PM  **Q.**  As an economist, what conclusions do you draw from these

2:54:26PM     numbers?

2:54:27PM     **A.**  So output is expanding rapidly in this market for game

2:54:31PM     transactions.

2:54:31PM          Just a clarification, the 2600 percent is from 2010 to

2:54:37PM     2018.

2:54:38PM     **Q.**  And in your experience, are these large increases in the

2:54:43PM     amount of output?

2:54:44PM     **A.**  Yes.  These are enormous changes.

2:54:47PM          So if you think -- you know, compare the revenue figure.

2:54:49PM     A natural comparison would be, for example, the growth in the

2:54:53PM     U.S. economy.  Over 2010 to 2018, the U.S. economy grew about

2:54:57PM     50 percent.  So we're talking about a 50 plus times difference

2:55:01PM     in the rate of growth.  So this is a very, very rapid growth.

2:55:06PM     **Q.**  Just make sure we understand.

2:55:08PM          These measures just look at output on the App Store; is

2:55:12PM     that correct?

2:55:13PM     **A.**  This is just the App Store.

2:55:14PM     **Q.**  As an economist, is it important to look at market-wide

2:55:18PM     changes in output?

2:55:19PM     **A.**  Yes.  Anticompetitive conduct can affect the market as a

2:55:22PM     whole.  In addition, it provides a relevant benchmark to

2:55:27PM     evaluate these changes relative to the closest analog.

2:55:30PM     **Q.**  Did you examine output for digital game transactions more

2:55:35PM     broadly?

2:55:36PM     **A.**  I did.

HITT - DIRECT / RICHMAN

2:55:36PM  **Q.**  Can we have slide 6, please.

2:55:38PM      Is that what is reflected on the slide?

2:55:41PM  **A.**  Yes, it is.

2:55:43PM  **Q.**  And can you describe this slide for the Court, please?

2:55:46PM  **A.**  Sure.

2:55:47PM      So this is based on market research data that estimates

2:55:50PM  the total size of the digital games transactions market.

2:55:53PM      The data spanned 2010 to 2018.  That's the same period

2:55:58PM  which I calculated my 2600 percent number.  You see a steady

2:56:02PM  increase in size of this market where the total growth over

2:56:06PM  the period is 448 percent over these nine years.

2:56:10PM  **Q.**  And how does that level of growth compare to the level of

2:56:17PM  growth for the App Store?

2:56:18PM  **A.**  That's pretty fast.  But it's nowhere near the speed at

2:56:22PM  which the App Store output has been expanding, which is

2:56:24PM  2600 percent, about six -- the App Store has been growing

2:56:28PM  about six times as fast as the overall market for game

2:56:33PM  transactions.

2:56:34PM  **Q.**  So I would like to shift from digital game transactions

2:56:37PM  and talk about all iOS transactions.

2:56:40PM      Did you analyze changes in output in Dr. Evans' alleged

2:56:47PM  market?

2:56:47PM  **A.**  Yes.

2:56:49PM  **Q.**  And can we have slide 7, please?

2:56:50PM      And are your conclusions reflected on this slide?

2:56:56PM **A.** Yes, they are.  This is essentially the same analysis I

2:56:59PM showed a couple of slides back.

2:57:01PM     Transactions on the vertical axis, passage of time on the

2:57:05PM horizontal axis, transaction accounts on the left, developer

2:57:08PM revenue on the right.  Again, you see by either metric, the

2:57:13PM markets are expanding rapidly.  500 percent growth in

2:57:17PM transactions in all app transactions and 3700 percent in

2:57:21PM revenue.

2:57:22PM **Q.** Professor, have you been following the testimony in this

2:57:25PM case?

2:57:26PM **A.** Yes.

2:57:27PM **Q.** And did you hear Dr. Evans' testimony that Apple obtained

2:57:32PM significant market power in the iOS app distribution market

2:57:36PM in 2010?

2:57:38PM **A.** Yes.

2:57:39PM **Q.** And do you have an opinion as to whether Dr. Evans tested

2:57:43PM that claim?

2:57:45PM **A.** I don't believe he tested that claim, no.

2:57:47PM **Q.** Have you attempted to test that claim?

2:57:49PM **A.** Yes.  I have examined data that's related to that claim.

2:57:52PM **Q.** Can we have slide 8, please.

2:57:54PM     And does this slide reflect your analysis of Dr. Evan's

2:58:00PM claim?

2:58:02PM **A.** I think we are one slide ahead.

2:58:07PM **Q.** Can you flip back?

2:58:09PM   **A.**   There we go, perfect.

2:58:10PM        So this is just the same chart you saw before only zoomed

2:58:14PM   into a period that is two years before and two years after the

2:58:18PM   end of 2010.  Dr. Evans alleges that in 2010, Apple obtained

2:58:22PM   market power.  That's essentially right in the center of this

2:58:26PM   chart.

2:58:26PM        As you can see, on the left hand transactions were growing

2:58:31PM   before.  They continue to grow afterwards.  On the right, you

2:58:34PM   see revenue growing before.  It continues to grow afterwards.

2:58:37PM   There's no evidence of any kind of change or structural break

2:58:40PM   at the time they allegedly attained market power.

2:58:44PM   **Q.**   So we've gone through several measures of change in output

2:58:49PM   by number of transactions.

2:58:51PM        Did you examine other metrics of output other than the

2:58:55PM   number of transactions?

2:58:57PM   **A.**   Yes.

2:58:59PM   **Q.**   And did you look at changes in the number of games on the

2:59:03PM   App Store over time?

2:59:07PM   **A.**   Yes.  Another form of that output is simply the expansion

2:59:09PM   of product variety.

2:59:10PM        And what you find is, is that the App Store started at

2:59:13PM   about 131 apps.  And today -- game apps -- and there's about

2:59:14PM   300,000 available today.

2:59:20PM   **Q.**   Did Dr. Evans offer any analysis showing any restriction

2:59:24PM   of output of game transactions or iOS app transactions?

HITT - DIRECT / RICHMAN

2:59:28PM     **A.**   I don't believe he did any analysis on output restriction.

2:59:32PM     **Q.**   That's output.  Let's talk about pricing.

2:59:35PM          You also looked at pricing; is that right?

2:59:37PM     **A.**   That's correct.

2:59:38PM     **Q.**   And did you see any evidence that Apple charges a super

2:59:43PM     competitive commission?

2:59:44PM     **A.**   No.  They are generally at market price and the price has

2:59:48PM     been declining over time.

2:59:50PM     **Q.**   Can I have slide 9, please.

2:59:51PM          What did you assess in order to study the effect of

2:59:56PM     Apple's conduct on prices?

2:59:57PM     **A.**   So you can look at the commission rates that are stated --

3:00:01PM     the stated commission rate that Apple has by their policies.

3:00:05PM     You can look at the comparable commission rates for the

3:00:08PM     competitors.  You can look at what Epic paid to its -- to the

3:00:12PM     folks who do game transactions for *Fortnite* and other Epic

3:00:18PM     Games as well.

3:00:19PM          And then you can do a calculation of what I'm calling the

3:00:22PM     effective commission rate, which is what you get when you

3:00:25PM     consider transactions that are both free and paid and

3:00:28PM     construct a compositive of what the effective rate is paid

3:00:31PM     averaging those two together.

3:00:33PM               **THE COURT:**  Did you include the amount of support

3:00:37PM     that they provide?  That is, I think for the $99, they get

3:00:44PM     two -- developers only receive two technical services as

3:00:49PM    compared to others?

3:00:51PM         **THE WITNESS:**  So I didn't compare the developer's

3:00:54PM    support side in that particular way so I'm mostly focusing

3:00:58PM    here on sort of the top line prices that are being charged.

3:01:01PM    I do have a number of other analyses and all the things

3:01:05PM    Apple has done to improve the App Store.  I don't know if the

3:01:10PM    services to developers is factored into that, but there's lots

3:01:13PM    of other things that Apple has done to improve the quality of

3:01:15PM    the relationship with developers and to make new kind of games

3:01:19PM    available.

3:01:20PM         **THE COURT:**  Proceed.

3:01:21PM         **THE WITNESS:**  Did that answer your question?

3:01:23PM         **THE COURT:**  Proceed.

3:01:23PM         **MS. RICHMAN:**  Thank you, Your Honor.

3:01:25PM    **BY MS. RICHMAN:**

3:01:26PM    **Q.**  Professor Hitt, has Apple reduced its commission over

3:01:30PM    time?

3:01:31PM    **A.**  Generally, yes.

3:01:32PM    **Q.**  Can we have slide 10, please?

3:01:33PM    Can you describe your findings as reflected in this slide?

3:01:40PM    **A.**  Sure.

3:01:41PM    So when the App Store was started, the commission rate for

3:01:44PM    downloads was 30 percent.  When they added in-app payments,

3:01:51PM    the commission for that has been 30 percent, and those numbers

3:01:54PM    have stayed constant over time, generally.

3:01:56PM         However, there have been a number of specific app programs

3:01:59PM    that have reduced those commissions for certain kinds of

3:02:02PM    transactions.  In 2016, Apple reduced the commission rate for

3:02:07PM    subscription renewals after one year to 15 percent.

3:02:10PM         At about the same time, they introduced what's called the

3:02:13PM    video partner program where certain kinds of providers of

3:02:17PM    premium content, think Hulu maybe, pay a 15 percent commission

3:02:23PM    on transactions performed through the App Store for that

3:02:30PM    content.

3:02:30PM         Then more recently, Apple introduced the small business

3:02:32PM    developers program which reduces the commissions on all

3:02:34PM    transactions to -- all paid transactions to 15 percent for any

3:02:38PM    developer earning less than a million dollars a year on the

3:02:42PM    App Store.

3:02:43PM         THE COURT:  Did you see any documentation which

3:02:45PM    indicated that the 2021 change was contemplated prior to the

3:02:50PM    filing of this lawsuit?

3:02:53PM         THE WITNESS:  I have not seen documents one way or

3:02:55PM    the other on that.  I understand that they have explained that

3:03:01PM    they wanted to support innovation, and that was one of the

3:03:04PM    reasons, I don't know all the reasons that might be relevant

3:03:06PM    there.

3:03:06PM         THE COURT:  You saw nothing that suggested that this

3:03:09PM    change was contemplated prior to August of 2020.

3:03:15PM         THE WITNESS:  I don't recall -- to answer your

3:03:17PM  earlier question directly, I don't recall anything

3:03:20PM  specifically saying they were anticipating a lawsuit there.  I

3:03:23PM  don't know if those documents exist or not, but I haven't seen

3:03:26PM  them.

3:03:27PM           **THE COURT:**  Proceed.

3:03:27PM           **MS. RICHMAN:**  Thank you, Your Honor.

3:03:28PM  **BY MS. RICHMAN:**

3:03:29PM  **Q.**  Can we have slide 11, please?  Actually this is the one.

3:03:36PM  Thank you.

3:03:38PM       Professor Hitt, you said you look at Apple's commission

3:03:40PM  rate relative to other transaction platforms.  Is that what

3:03:46PM  you present in this slide?

3:03:48PM  **A.**  Yes.  This is a very simple presentation of different

3:03:51PM  transaction platforms that are available.  It's not all of

3:03:54PM  them but I think there's -- I identified about 14 including

3:03:58PM  the App Store, but here's a selection.

3:04:00PM       And the height of the bar is simply what the commission

3:04:04PM  rate is for digital transactions.  And what you see is the App

3:04:08PM  Store charges 30 percent.  Google Play charges 30 percent.

3:04:11PM  Samsung Galaxy Store, Microsoft Store, PlayStation Store,

3:04:17PM  Nintendo eShop, and Steam, which is the largest transaction

3:04:21PM  platform for PCs, all charge 30 percent.

3:04:25PM       The Epic Games Store, as we heard, has a 12 percent

3:04:28PM  commission.  But the 30 percent compares very favorably to

3:04:33PM  what used to be traditional retail where you'd get commission

3:04:37PM  rates that could exceed 50 percent.

3:04:40PM  **Q.**  Now we have a slide that's related to my next question,

3:04:44PM  but I ask that it not be put up because it contains

3:04:48PM  confidential information.

3:04:49PM        **MS. RICHMAN:**  But slide 12 in your binder, Your

3:04:54PM  Honor, is the one to reference although I expect this is not

3:04:58PM  going to be news to you.

3:04:59PM  **BY MS. RICHMAN:**

3:04:59PM  **Q.**  Professor Hitt, does Epic pay a 30-percent commission to

3:05:05PM  other game transaction platforms?

3:05:07PM  **A.**  Yes.  You've heard some discussion about Epic seeking

3:05:10PM  discounts and so forth.  But for the most part, Epic pays

3:05:13PM  30 percent on the transaction platforms where *Fortnite* is

3:05:16PM  distributed.  There are some exceptions, but in general, it's

3:05:21PM  30 percent.

3:05:22PM  **Q.**  Now you mentioned earlier that you were listening to the

3:05:25PM  trial testimony in this case, correct?

3:05:28PM  **A.**  Yes.

3:05:29PM  **Q.**  And did you hear Ms. Wright from Microsoft's testimony

3:05:35PM  last week that Microsoft does not earn a profit on the sale of

3:05:39PM  Xbox devices and only generates profits from commissions on

3:05:45PM  Xbox games?

3:05:47PM  **A.**  Yes, I did.

3:05:47PM  **Q.**  And does that impact your --

3:05:51PM        **MR. EVEN:**  Objection, Your Honor.

HITT - DIRECT / RICHMAN

3:05:52PM        **THE COURT:**  What's the objection?

3:05:56PM        **MR. EVEN:**  I believe it is outside the scope, Your

3:05:58PM   Honor.

3:06:02PM        **THE COURT:**  What part of his report covers this,

3:06:04PM   Ms. Richman?

3:06:11PM        **MS. RICHMAN:**  I believe he talks about it in

3:06:12PM   paragraph 164 of his written Direct testimony.

3:06:16PM        **THE COURT:**  His written Direct only -- Okay.  Hold

3:06:22PM   on.  164.

3:06:32PM        **MS. RICHMAN:**  Your Honor, I'm just pulling it up

3:06:33PM   myself.  Just generally reporting on the commission rates.  It

3:06:36PM   doesn't go to the testimony that Ms. Wright supplied last

3:06:42PM   week, but as an expert in this case, Professor Hitt has been

3:06:47PM   listening to the testimony and is prepared to offer opinions

3:06:53PM   about the economic implications on the testimony given to

3:06:56PM   date.

3:07:02PM        **THE COURT:**  I believe that I allowed -- I'm trying to

3:07:12PM   think -- Professor Athey to supplement.  So I will allow you

3:07:24PM   to answer that question.

3:07:26PM        **THE WITNESS:**  Okay.

3:07:27PM   **BY MS. RICHMAN:**

3:07:27PM   **Q.**  Do you need me to repeat it, Professor Hitt?

3:07:30PM   **A.**  Yes, please.

3:07:31PM   **Q.**  I was asking about Ms. Wright's testimony last week and

3:07:33PM   whether the fact that -- or not, depending on as it may be,

HITT - DIRECT / RICHMAN

3:07:38PM  Microsoft does not earn a profit on the sale of Xbox devices

3:07:43PM  changes your opinion on whether Apple's offering a competitive

3:07:48PM  commission rate on digital game transactions.

3:07:52PM  **A.**  No.  For at least three reasons.

3:07:54PM      One, it's as a matter of economics the market price is set

3:08:00PM  by supply and demand.  A high cost producer does not

3:08:05PM  necessarily have any ability to charge a higher price because

3:08:08PM  they are higher cost.  That doesn't follow from normal

3:08:12PM  economic reasoning.  You can argue for it, but ultimately the

3:08:15PM  market price depends on the entire market, not just a

3:08:19PM  particular producer.

3:08:21PM      Second, there's evidence in the record that normally all

3:08:23PM  consoles do not necessarily lose money.  I won't give the

3:08:27PM  figure because I understand that's sealed.

3:08:28PM      And then, finally, it's inconsistent with sort of

3:08:32PM  observational data.  There are platforms that subsidize

3:08:35PM  hardwares; those charge 30 percent.  There are platforms that

3:08:40PM  don't subsidize hardware; those also charge 30 percent.  There

3:08:42PM  are platforms that don't have any hardware, and they also

3:08:45PM  charge 30 percent.  At least the empirical evidence is

3:08:49PM  consistent with there being a 30 percent market price

3:08:52PM  regardless.

3:08:53PM  **Q.**  Can you provide an example of a transaction platform that

3:08:58PM  does not sell devices and charges a 30-percent commission?

3:09:02PM  **A.**  So, in general, Steam does not sell PCs, although there

HITT - DIRECT / RICHMAN

3:09:07PM    are some devices that they do sell elsewhere.

3:09:10PM    **Q.**  Do developers always pay a commission to Apple when they

3:09:14PM    make transactions through the App Store?

3:09:17PM    **A.**  No.  The commission we've been discussing applies very

3:09:21PM    specifically to downloads, paid downloads and paid in-app

3:09:27PM    digital transactions.  All the other ways in which developers

3:09:30PM    can earn revenue are not subject to these commissions.

3:09:35PM    **Q.**  And what are the other ways that developers can monetize

3:09:40PM    their apps without paying a commission to Apple?

3:09:43PM    **A.**  So developers can advertise in the app; many do.  That's

3:09:47PM    not subject to any commissions.

3:09:50PM        Developers have the ability to sell digital content

3:09:53PM    outside the app for the use -- for use inside the app.  Apple

3:09:57PM    doesn't place any restrictions on doing that, including

3:10:00PM    subscriptions, which you can sell outside the app and use in

3:10:03PM    the app.

3:10:03PM        There's other forms of monetization.  You can do

3:10:03PM    promotional partnerships.  You can do physical events, sell

3:10:03PM    stuff.  That's also not subject to it, but I think those two

3:10:07PM    are probably the big choices.

3:10:19PM    **Q.**  And did you measure, quantify the degree to which

3:10:23PM    developers actually pay Apple commission on App Store

3:10:28PM    transactions?

3:10:29PM    **A.**  Yes.

3:10:30PM    **Q.**  Can we have 513, please?  And the results of that analysis

HITT - DIRECT / RICHMAN

3:10:36PM   shown on this slide?

3:10:38PM   A.   Yes.  This is one of the analyses I did.  And this focuses

3:10:41PM   specifically on the monetization mechanisms that developers

3:10:45PM   are using for particular -- particular apps that are available

3:10:50PM   on the App Store.

3:10:55PM   Q.   This data was for a single year, fiscal year 2019; that's

3:10:59PM   what it says here, correct?

3:11:00PM   A.   That's correct.

3:11:01PM   Q.   And were these numbers in prior years similar to what we

3:11:05PM   see here?

3:11:06PM   A.   Yes.  I can take you through these just quickly to take

3:11:10PM   you through the numbers.

3:11:11PM       On the App Store in 2019, 91 percent of games are free to

3:11:16PM   download.  So they wouldn't incur a download commission.

3:11:21PM       What I think is really interesting is 76 percent of the

3:11:24PM   games on the App Store are totally free.  And that is the

3:11:27PM   sense they don't have the paid download and they don't have

3:11:30PM   any digital in-app payments either.  So these games are

3:11:31PM   distributed through the App Store.  No commissions generated

3:11:36PM   from Apple -- generated to Apple.

3:11:38PM       The comparable number for regular apps is 83 percent.  And

3:11:43PM   these things -- this has shifted over time as your question

3:11:46PM   would indicate.

3:11:50PM   Q.   Can you explain how?

3:11:51PM       And can we have slide 14 as well?

HITT - DIRECT / RICHMAN

3:11:57PM   **A.**   So this slide is, again, passage of time.  Starting at the

3:12:01PM   beginning of the App Store through the end of fourth quarter

3:12:03PM   2019 when the Apple transaction data ends.

3:12:07PM        It plots three things:  It's the proportion of App Store

3:12:11PM   games by different monetization methods.  The red line is the

3:12:14PM   number of paid-to-download apps.  In the early days, nearly

3:12:18PM   all apps were paid to download.  That's something like

3:12:20PM   80 percent.  These -- again, this is focusing on games.  So

3:12:24PM   nearly all games were paid to download.  That's at 80 percent.

3:12:28PM   That's dropped to less than 10 percent today.

3:12:31PM   **Q.**   Professor Hitt, is that the red line here?

3:12:33PM   **A.**   That is the red line.

3:12:35PM   **Q.**   Okay.

3:12:36PM   **A.**   Then two other lines on this chart, that 76 percent number

3:12:40PM   I talked about earlier corresponds to the free to download

3:12:47PM   game without in-app purchase.  That has been arising over

3:12:50PM   time.  And then again -- that's the green line.  Then the blue

3:12:53PM   line is the -- are games that are free to download, but

3:12:57PM   monetize at least from the App Store's perspective through

3:13:02PM   in-app purchase, and that has been rising over time as a

3:13:07PM   mechanism that developers are choosing.

3:13:10PM   **Q.**   Thank you.

3:13:11PM            **THE COURT:**  Excuse me.  Ms. Richman, two minutes.

3:13:15PM            **MS. RICHMAN:**  Thank you, Your Honor.

25

3:13:16PM

**BY MS. RICHMAN:**

3:13:16PM

**Q.**  Just try to get through one more slide.

3:13:18PM

Professor Hitt, did you look at Apple's average commission

3:13:22PM

rate on initial game downloads over time?  So I guess what's

3:13:26PM

reflected in the redline here?

3:13:28PM

**A.**  Yes.

3:13:29PM

**Q.**  Can we have slide 15, please?

3:13:32PM

**A.**  Yes, I did.

3:13:32PM

**Q.**  And is that what is depicted on the slide?

3:13:35PM

**A.**  Yes.  So what is depicted on the slide is, again, passage

3:13:39PM

of time, same period we have been talking about before.

3:13:42PM

Vertical axis is the average -- in effect, what I am calling

3:13:46PM

the average commission rate.  What that commission rate is, is

3:13:50PM

if a commission is paid a download, there's a positive

3:13:55PM

commission, I include that number.  That's typically

3:13:58PM

30 percent.  If there is a zero price download, if it is free,

3:14:02PM

that is averaged in as a zero.

3:14:05PM

This is the number you get when you average overall

3:14:07PM

transactions.  As you can see, it was a relatively low number

3:14:12PM

to start on average and has been declining over time.  And for

3:14:15PM

the obvious reason that, as we saw earlier, the percentage of

3:14:19PM

initial game downloads that are paid has also been falling

3:14:24PM

over time, which has reduced the effective commission rate.

3:14:24PM

The topline rate that people pay is constant, but the

3:14:28PM

effective rate has declined as developers have moved away from

3:14:33PM  paid downloads.

3:14:35PM          **MS. RICHMAN:**  Your Honor, would this be a good

3:14:37PM  stopping point for you?

3:14:38PM          **THE COURT:**  It would be.

3:14:40PM          **MR. BORNSTEIN:**  Professor Hitt, we start at 8:00.  We

3:14:43PM  take care of administrative matters and we start with

3:14:46PM  testimony after that.  Make sure to be back by 8:00.  You are

3:14:49PM  excused for the date.

3:14:51PM          **THE WITNESS:**  Thank you.

3:14:52PM          **THE COURT:**  Counsel, I've got a hearing on an

3:14:54PM  injunction starting in 15 minutes.  So we'll stand in recess

3:14:59PM  until 8:00 a.m. tomorrow except that I can see Ms. Forrest

3:15:04PM  wants to say something.

3:15:06PM          **MS. FORREST:**  It's only because my eyes now have

3:15:07PM  become more expressive in the COVID world with the mask on.

3:15:12PM      I wanted to just give Your Honor two pieces of information

3:15:16PM  very quickly.  One is, it is possible that we will be in

3:15:19PM  Apple's case by Friday.  I know Your Honor had been wondering

3:15:23PM  about that, and we will deal with Apple in terms of the order

3:15:27PM  of witnesses.

3:15:27PM      The other is to give Your Honor three citations.  I'll say

3:15:33PM  them slowly.  *Perry versus Leak* 488 U.S. 272 pin cite 282,

3:15:41PM  U.S. V. Sandoval 472 F. 3d 645, pin cite 651 Ninth Circuit.

3:15:53PM      And then lastly *Charlotte's Office* 425 F. 3d 1203, pin

3:16:01PM  cite 1212 Ninth Circuit.  On the issue we dealt with just

3:16:05PM   after lunch, Your Honor.

3:16:07PM            THE COURT:  Okay.  Thank you.

3:16:08PM            THE COURT:  And then tomorrow we'll finish up

3:16:12PM   Professor Hitt and then who do we move to, Rossi or Rubinfeld?

3:16:22PM            MR. DOREN:  Professor Rubinfeld, Your Honor.

3:16:23PM            THE CLERK:  Let me get your mic.

3:16:26PM            MR. DOREN:  Professor Rubinfeld, Your Honor.

3:16:28PM            THE COURT:  Then Cragg?

3:16:29PM            MR. EVEN:  Then Dr. Cragg Your Honor.

3:16:33PM            THE COURT:  And Rossi or is Evans coming back?

3:16:36PM            MS. FORREST:  It will be possibly, we think, Evans

3:16:39PM   coming back for a short time, Barnes, Rossi, Mickens.

3:16:45PM            THE COURT:  Okay.  All right.  Good enough.

3:16:47PM       We will stand in recess until 8:00 a.m. tomorrow.  Thank

3:16:52PM   you.

3:16:54PM                 (Proceedings concluded at 3:18 p.m.)

3:16:54PM

        18

        19

        20

        21

        22                 **CERTIFICATE OF REPORTERS**

        23

        24

        25          We, Diane E. Skillman, Pamela Batalo-Hebel, and

Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____
Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA BATALO-HEBEL_____
Pamela Batalo-Hebel, CSR, RMR, FCRR


_____/s/ Raynee Mercado_____
Raynee Mercado, CSR, RMR, FCRR


WEDNESDAY, MAY 12, 2021