VOLUME 9

Pages 2097 – 2346

UNDER SEAL PAGES 2335 – 2346

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. C-20-5640 YGR |
| | ) | |
| vs. | ) | Thursday, May 13, 2021 |
| | ) | |
| APPLE, INC., | ) | Oakland, California |
| | ) | |
| Defendant. | ) | BENCH TRIAL |
| _____ | ) | |
| APPLE, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| vs. | ) | |
| | ) | |
| EPIC GAMES, Inc., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   **BY:  KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**

                        (Appearances continued.)

Reported By:      Diane E. Skillman, CSR 4909, RPR, FCRR
                  Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                  Raynee Mercado, CSR 8258, RMR, CRR, FCRR

```
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

For Plaintiff:           CRAVATH, SWAINE & MOORE, LLP
                         825 Eighth Avenue
                         New York, New York 10019
                    BY:  LAUREN A. MOSKOWITZ, ESQUIRE
                         JUSTIN C. CLARKE, ESQUIRE
                         W. WES EARNHARDT, ESQUIRE
                         BRENDAN BLAKE, ESQUIRE
                         JIN NIU, ESQUIRE


For Defendant:           GIBSON, DUNN & CRUTCHER
                         333 South Grand Avenue
                         Los Angeles, California 90071
                    BY:  RICHARD J. DOREN, ESQUIRE
                         DAN SWANSON, ESQUIRE
                         CYNTHIA RICHMAN, ESQUIRE
                         RACHEL BRASS, ESQUIRE
                         ARPINE LAWYER, ESQUIRE


                         GIBSON, DUNN & CRUTCHER, LLP
                         2001 Ross Avenue, Suite 1100
                         Dallas, Texas 75201
                    BY:  VERONICA S. MOYE, ESQUIRE

                         PAUL WEISS RIFKIND
                         WHARTON & GARRISON LLP
                         2001 K STREET, NW
                         Washington, DC 20006
                    BY:  KAREN DUNN, ESQUIRE
                         JESSICA E. PHILLIPS, ESQUIRE


For Defendant:           PAUL WEISS RIFKIND
                         WHARTON & GARRISON LLP
                         943 Steiner Street
                         San Francisco, California 94117
                    BY:  ARPINE LAWYER, ESQUIRE
```

**Defendant's Witnesses:**                                    **Page**    Vol.

**Hitt, Lorin**

Direct Examination by Ms. Richman (resumed)       2107        9

Cross-Examination by Mr. Even                      2161        9

Redirect Examination Ms. Richman                   2226        9

Recross-Examination by Mr. Even                    2237        9

Further Redirect Examination by Ms. Richman        2247        9

**Cragg, Michael**

Direct Examination by Mr. Even                     2246        9

Cross-Examination by Mr. Swanson                   2290        9

Redirect Examination by Mr. Even                   2331        9

Further Redirect Exam. by Mr. Even (sealed)        2335        9

Recross-Examination by Mr. Swanson (sealed)        2339        9

Further Redirect Examination by Mr. Even           2341        9


**Plaintiff's Exhibits:**                                     **Page**    **Vol.**


**Defendant's Exhibits:**

1    <u>THURSDAY, MAY 13, 2021</u>                    <u>8:04 a.m.</u>

2                    P R O C E E D I N G S

3           **THE CLERK:**  Calling Civil Action 20-5640, Epic Games,

4    Inc., vs. Apple, Inc.

5       Counsel, please state your appearances.  And let me turn

6    on the mics here.  Okay.  Table mics are on.

7           **MS. FORREST:**  Good morning, Your Honor.  Katherine

8    Forrest for Epic.

9           **MR. EVEN:**  Good morning, Your Honor.  Yonatan Even

10   for Epic.

11          **MR. NIU:**  Good morning, Your Honor.  Jin Niu for

12   Epic.

13          **MR. CARVAJAL:**  Good morning, Your Honor.  Alex

14   Carvajal for Epics.

15          **THE COURT:**  You're new, Mr. Carvaja.  I haven't seen

16   you before.

17          **MR. CARVAJAL:**  I was here briefly yesterday,

18   Your Honor.

19          **THE COURT:**  Welcome to the courtroom.

20      Mr. Sweeney, good morning.

21          **MR. SWEENEY:**  Good morning, Your Honor.

22          **THE COURT:**  And, Mr. Rudd, good morning to you, sir.

23          **MR. RUDD:**  Good morning.

24          **THE COURT:**  On the Defense side.

25          **MS. RICHMAN:**  Good morning, Your Honor.  Cynthia

```
 1   Richman for Apple.
 2             MS. PHILLIPS:  Good morning, Your Honor.  Harry
 3   Phillips for Apple.
 4             THE COURT:  Mr. Phillips, I believe you're new as
 5   well; correct?
 6             MS. PHILLIPS:  Yes.  That's right.
 7             THE COURT:  Welcome to the courtroom.  Good morning.
 8             MS. DUNN:  Good morning, Karen Dunn for Apple,
 9   Your Honor.
10             THE COURT:  Good morning, Ms. Dunn.
11             MS. DUNN:  With us at counsel table is Heather
12   Grenier from Apple.
13             THE COURT:  Welcome back.  Good morning.
14             MR. DOREN:  Good morning, Your Honor.  Richard Doren
15   for Apple.
16             THE COURT:  Good morning.
17        And good morning, Mr. Schiller.
18             MR. SCHILLER:  Good morning, Your Honor.
19             THE COURT:  In the gallery then we have -- today is
20   Thursday, I believe.  Ms. Lopatto from *The Verge*.
21             MS. LOPATTO:  Good morning.
22             THE COURT:  Ms. Atkins from *Law360*.  Good morning.
23        From the class counsel, we have Mr. Harrington; correct?
24             MR. HARRINGTON:  Good morning, Your Honor.
25             THE COURT:  Good morning, sir.
```

1          And then I have in the back over there Mr. Spalding; yes?
2    No.
3               **MR. ELTISTE:**  No.  Mr. Eltiste.
4               **THE COURT:**  Eltiste, yes.  Thank you.
5          And we have our witness and Ms. lawyer.
6               **MS. LAWYER:**  Good morning, Your Honor.
7               **MS. FORREST:**  Your Honor, I'm not sure if we
8    introduced again Mr. Sweeney this morning or not.
9               **THE COURT:**  I said "good morning" to him.
10              **MS. FORREST:**  You did.  I apologize.
11              **THE COURT:**  Right, Mr. Sweeney?
12              **MR. SWEENEY:**  Yes, Your Honor.
13              **THE COURT:**  I want to make sure no one thinks I'm not
14   saying good morning to them.
15         Are there any issues to address on the record this
16   morning?  Ms. Forrest?
17              **MS. FORREST:**  We don't have any housekeeping matters
18   this morning, Your Honor.
19              **MR. DOREN:**  None here, Your Honor.
20              **THE COURT:**  All right.  And let's go ahead.
21         Mr. Hitt or Professor Hitt, I see you there in the
22   gallery.  If you want to come back, please.  Why don't I -- I
23   was waiting for Mr. Bornstein to get back.  Will he be in the
24   courtroom later this morning?
25              **MS. FORREST:**  Your Honor, he is back at our trial

1    site.  He can be here if you need him for something.

2              **THE COURT:**  Let me just -- let me just say something

3    here given that it impacts the rest of the trial, but it also

4    impacted Mr. Bornstein.  I saw him earlier, so I thought he

5    was going to be here.

6         The plaintiffs provided me with three case cites at the

7    end of yesterday.  I thought they related to market definition

8    and instead it related to the issue of witnesses talking to

9    counsel during break.

10        I have the following to say with respect to that and want

11   to make clear what my point was to Mr. Bornstein.

12        There is no Federal Rule of Evidence, no Federal Rule of

13   Civil Procedure or Criminal Procedure that mandates that a

14   witness cannot talk to their lawyers during a break.  It is

15   the trial court that has broad discretion to make a

16   determination whether or not that's appropriate.

17        In fact, generally during a pretrial conference, I

18   frequently have lawyers ask me what my practice is, and I

19   suspect they ask because trial judges have different

20   practices.

21        In my view, I am constantly -- at the end of any

22   examination before a break, I assess whether it is appropriate

23   or not to instruct a witness not to talk to parties or

24   counsel, and I do that on a daily basis.  I do that and have

25   done that for years.  That is the reason why I instructed Lori

1    Wright specifically not to talk to anyone because she was

2    right in the middle of an examination, although I did not

3    instruct her that she could not talk to her lawyer.

4        The case cites that were provided to me by the plaintiffs

5    say nothing that disagrees with that assessment.  There is a

6    common law rule, and the reason is that trial judges do, in

7    fact, have discretion.  That's what the cases stand for.

8        In *Charlotte's Office Boutique vs. CAR*, the Ninth Circuit

9    upheld a court's cautioning of a fact witness.  That's because

10   the court has discretion.

11       The same with respect to *U.S. vs. Sandoval*.  The trial

12   court, Court of Appeals said, "may prohibit communications."

13       In *Perry vs. Leeke*, the Ninth Circuit said -- actually,

14   that was the Supreme Court -- that it's entirely appropriate

15   for a trial judge to decide.  "The cross-examination is more

16   likely to elicit truthful responses if it goes forward without

17   allowing the witness the opportunity to consult with third

18   parties, including his or her own lawyer."

19       I frequently caution lawyers not to coach their witnesses.

20   It is the reason why I do not allow objections, speaking

21   objections, because I find that the way that lawyers

22   frequently try to coach their witness are with those speaking

23   objections, and I do not allow them.

24       None of those cases say I don't have discretion.  The

25   reason why I wanted to say this with Mr. Bornstein is that I

1    certainly did not see any prejudice or harm when I had a

2    seasoned expert witness who was testifying as to opinions, had

3    written testimony, had been deposed for hours, being

4    cross-examined by another seasoned antitrust lawyer.  Nothing

5    in that suggested to me that I needed an instruction for that

6    particular witness.  I don't see any prejudice.  I don't see

7    any harm.

8         So if you think going forward that you would like an

9    instruction, please ask me so I that I can consider whether it

10   would be appropriate.

11        Ms. Richman, you may proceed.

12             **MS. FORREST:**  Might I respond, Your Honor?

13             **THE COURT:**  As to whether or not I have discretion?

14             **MS. FORREST:**  Might I respond to the statement that

15   Your Honor just made?

16             **THE COURT:**  Okay, Ms. Forrest.

17             **MS. FORREST:**  Your Honor, we would respectfully

18   disagree with Your Honor's reading of the case law.  We think

19   that the Supreme Court has made it clear that at the heart of

20   the adversarial process is that when a witness has gone on to

21   cross-examination, that they should no longer be conferring

22   with counsel.  It doesn't require, we believe, a Rule of Civil

23   Procedure for that to occur.  We believe that that is set

24   forth in Supreme Court precedent, and there is no exception

25   that I'm aware of where there has been conferring that has

1    been allowed of that type.

2        We do believe that it's prejudicial to have coaching of

3    witnesses during the pendency of a cross-examination, and we

4    would ask for a standing order in that regard, Your Honor.

5            **THE COURT:**  Any objection?

6            **MR. DOREN:**  Cross-examination, Your Honor, no.

7            **THE COURT:**  All right.  That will be the order of

8    this trial.  Proceed.

9            **MS. RICHMAN:**  On the subject of market definition,

10   Professor Hitt is going to be turning to that shortly and

11   talking about the evidentiary basis for Apple's proposed

12   market definition, but I did want to circle back and say on a

13   basic level, we agree with what Mr. Bornstein said yesterday,

14   that really the heart of the matter comes from *Brown Shoe*,

15   although very gated.

16       It is true that the modern case law continues to hold that

17   plaintiffs have the burden of establishing the relevant

18   product market encompasses all reasonable substitutes.  That's

19   reaffirmed in *Microsoft*.  It's reaffirmed as recently by the

20   Supreme Court in *Amex* which talks about *Brown Shoe*.

21       And then I also would suggest, Your Honor -- you probably

22   already have looked at this -- but the Model ABA Jury

23   Instructions for civil antitrust trials contain a very, you

24   know, crisp summary of the basic test, recite the *Brown Shoe*

25   factors, and also emphasize the test is a practical one with

1    reference to the actual behavior of buyers and marketing

2    efforts of sellers.  I have a copy of that, if you would like.

3            **THE COURT:**  I don't need it.  Thank you.

4            **MS. RICHMAN:**  Okay.  Thank you.

5            **THE COURT:**  Proceed.

6    You are still under oath as a reminder.  And good morning.

7            **THE WITNESS:**  Good morning.

8            **THE COURT:**  Proceed.

9            **MS. RICHMAN:**  May I proceed, Your Honor?

10           **THE COURT:**  You may.

11                        <u>**LORIN HITT**</u>,

12   called as a witness for the Defendant, having been previously

13   duly sworn, testified further as follows:

14                   <u>**DIRECT EXAMINATION**</u>  **(resumed)**

15   BY MS. RICHMAN:

16   **Q.**  Professor Hitt, I think where we left off yesterday, we

17   were talking about your analysis of competitive effects.  Is

18   that your recollection as well?

19   **A.**  That sounds right.

20   **Q.**  Okay.  Well, let's just do a brief recap.

21       Can we have slide 4, please.

22       So, Professor Hitt, we talked about this slide yesterday,

23   and I believe you indicated it summarizes your findings on

24   output changes in the relevant market for digital game

25   transactions and for all App Store transactions as well.

1    Could you just walk the Court through this again.

2    **A.**   Sure.  So these are the summary statistics on the period

3    on some of those graphs you saw earlier.  At the top I report

4    the growth in game transactions and the growth in revenue for

5    game transactions.  These are 1200, 2600 percent.  Those

6    compare favorably to the overall U.S. spending on digital game

7    transactions, which is 448 percent, which is about six times

8    slower than the growth in game transactions in revenue.

9        You can also do the same kinds of calculations for all

10   apps, and you get numbers, you know, 500 percent growth in

11   transactions and 3700 percent growth in revenue indicating

12   there is substantial revenue in transaction growth and

13   therefore overall output growth in this market, regardless of

14   whether you define it as game transactions or all app

15   transactions.

16          **MS. RICHMAN:**   Your Honor, I would like to say I was

17   remiss in not mentioning this yesterday, but all of the

18   findings in Professor Hitt's slide are supported by citations

19   to exhibits that have been admitted by stipulation into the

20   record, and I'm happy to read those out loud as we go along as

21   they are in microscopic font here.

22          **THE COURT:**   I can read them.

23          **MS. RICHMAN:**   Okay.

24          **THE COURT:**   And if you think you need to read them

25   for purposes of the record, that's up to up.

HITT – DIRECT RESUMED – RICHMAN

1          **MS. RICHMAN:**  Okay.  Thank you, Your Honor.

2     **Q.**  Okay.  Well, let's jump forward then to our discussion of

3     prices which I believe you indicated was another indicator of

4     market outcomes; is that right?

5     **A.**  That's correct.

6     **Q.**  Okay.  Can we go to slide 9, please.  Can you just remind

7     the Court what analysis you did on commission rates?

8     **A.**  Yes.  So there were four general areas of information I

9     discussed regarding prices.  So I discussed Apple commission

10    rates, the 30 percent.  It's been steady or generally falling.

11    For game transactions, it's generally been steady.  For all

12    app transactions, it's steady or falling.

13         I discussed competitor commission rates, the commission

14    rates in other comparable app stores that sell games, and

15    those tend to be similar, for the most part.

16         I talked a bit about the commissions paid by Epic for the

17    distribution of their own games through these stores, and they

18    pay generally the posted rate at around 30 percent with a

19    couple of exceptions.

20         And then finally I think where we left off last time we

21    were talking about effective commission rates which are

22    essentially the commission rates that you get when you

23    consider some transactions are free and other transactions are

24    paid, and when you average them together, you get what I'm

25    calling an effective commission rate.

HITT – DIRECT RESUMED – RICHMAN

1    **Q.**   And what did you find when you looked at the average

2    commission rate for in-game purchases?

3    **A.**   I think should we go to the next slide.

4    **Q.**   Yes.  Let's go to slide 15, please.

5    **A.**   Okay.  So this was -- this was the slide on game downloads

6    where you see the average commission rate going down.  When

7    you talk about in-game purchases, the average commission rate

8    is generally steady.

9    **Q.**   Can we go to slide 16, please.

10       So this shows -- can you explain what this slide shows,

11   Professor Hitt?

12   **A.**   So this is a -- I think one of the more interesting

13   analyses that I did as part of the analysis of prices.  So

14   this graph shows over time -- that's the horizontal axis and

15   the vertical --

16       **THE COURT:**  Professor, you really are going to have

17   to slow down.

18       **THE WITNESS:**  Okay.

19       So horizontal axis is the passage of time.  The vertical

20   axis is either the price charged for the game, which is set by

21   developers, or the commission paid to Apple.

22       The green line is the price charged by developers.

23       The blue line is the commission that generates.

24       Now, keep in mind that Apple's commission has been steady

25   at 30 percent for these types of transactions, and what you

1  see over time is that the -- the commission actually in dollar

2  amounts per transaction has been steadily rising over time, up

3  to on the order of three dollars per transaction.

4  **BY MS. RICHMAN:**

5  **Q.**  Does that mean that Apple's commission has been rising on

6  in-game purchase transactions?

7  **A.**  No.  And that's the interesting thing.  What is driving

8  this is that developers have been able to charge higher prices

9  for in-game transactions over time.  The net effect is that

10  they're paying a higher commission; that they're also

11  generating greater revenue per transaction.

12      This is a good thing.  Developers are creating more value

13  for consumers, and they're able to charge more, and they're

14  earning more revenue as a result.  Apple, of course, because

15  its commission has been steady, also has been earning an

16  increased commission on those transactions.

17  **Q.**  And is that why the green line in this slide is going up?

18  **A.**  That's correct.

19  **Q.**  Okay.  Is Epic one of the developers that has raised its

20  prices over time?

21  **A.**  Yes.

22  **Q.**  Can we have slide 17, please.

23      And can you explain what this slide shows?

24  **A.**  So this slide is similar to the previous one.  Passage of

25  time on the horizontal axis and vertical axis is the average

1  and median prices charged by Epic for in-app in-game

2  purchases.

3      And what you see is that it's broadly rising over the time

4  period, but when *Fortnite* was released, there is a substantial

5  increase in the median and the average in-game transaction

6  price.  Effectively the median doubled from five to ten

7  dollars.

8  **Q.**  And can you explain the dotted dropdown line on this

9  slide?

10  **A.**  That's -- that's the release of *Fortnite* on iOS.

11  **Q.**  Okay.  And then do you have an estimate as to how much the

12  price of *Fortnite* increased after that?

13  **A.**  Again, the median doubled on in-app transactions.

14  **Q.**  On *Fortnite* as well?

15  **A.**  On *Fortnite*.

16  **Q.**  Okay.  Great.

17      What does this pricing information, taken as a whole, tell

18  you about whether Apple's conduct has had any anticompetitive

19  effects on in-game transactions?

20  **A.**  Well, what it says is that Apple's prices have essentially

21  been constant for in-game transactions, and developers are

22  making greater use of this service, and they're being -- they

23  are able to charge higher prices, so this does not suggest

24  that Apple has raised prices, and it does suggest that game

25  developers and consumers have been getting more value from

HITT – DIRECT RESUMED – RICHMAN

1    these transactions.

2    **Q.**  And we talked about the fact that you looked at the data

3    for in-game transactions.  Did you also do a similar analysis

4    for all iOS app transactions?

5    **A.**  Yes.  The data can be cut to games which we've been

6    discussing, but you can also do it for all app transactions,

7    and I did that analysis.

8    **Q.**  And what did you find when you did that analysis?

9    **A.**  So generally for all apps, the commission rates are -- are

10   steady or declining and the decline is due to the changes in

11   app policies regarding certain kinds of transactions.

12   **Q.**  So that's for initial downloads.  Did you also look at

13   average commission rate for in-app purchases for all apps?

14   **A.**  Yes.  And you get a similar -- in particular, you get a

15   declining commission there as well, steady or declining.

16   **Q.**  Based on your analysis of the evidence in this case, do

17   you have an opinion about how the average commission rate will

18   change in the future, if at all?

19   **A.**  So in general, you would expect the average commission

20   rate paid to decline for at least two reasons.  One is the

21   charges related to subscriptions are -- would have a long-term

22   effect because increasingly developers are finding ways to

23   monetize with subscriptions rather than other sources, and

24   that would make them subject to lower commissions upon

25   subscription renewal.

1       And then there is a small business program, small business

2   developer program, which has lowered commissions to 15

3   percent.  That's been rolling out this year.  That as more

4   developers take advantage of that program, you would expect

5   commission rates to decline as well.

6   **Q.**  Has Epic taken advantage of -- or if Epic was still in the

7   App Store with its present monetization strategies, do you

8   understand whether it could have taken advantage of one of

9   these lower commission rate models?

10  **A.**  There is always the potential in particular to offer

11  subscriptions, and so Epic could have taken advantage of

12  subscriptions, and I believe there are some types of

13  subscription products available now, but that's something they

14  can do.

15  **Q.**  And, Professor Hitt, did Dr. Evans analyze whether Apple's

16  conduct has increased prices over time?

17  **A.**  He has done very little analysis of Epic's prices.  I

18  think he did one calculation of an effective commission rate.

19  **Q.**  So did he calculate an effective commission rate like the

20  ones that you calculated, or is it something different?

21  **A.**  He did something different.  So in particular, the --

22  the -- one of the primary differences is he omitted free

23  transactions from his calculation.  His calculation does find

24  the commissions are going down, but the magnitudes are very

25  different because he does not include free transactions.

HITT - DIRECT RESUMED - RICHMAN

1   **Q.** I think you said Dr. Evans concludes that the commission

2   rate is going down, the average commission rate is going down

3   or the effective commission rate, in his terms?

4   **A.** Yes.  I believe that's consistent with his discussion.

5   **Q.** And do you have at the top of your head his average

6   commission rate?

7   **A.** I believe he calculated -- in 2019 I believe the average

8   commission rate is 27.7 percent.

9   **Q.** Okay.  And do you believe it's a problem that Dr. Evans

10  excluded free apps from his analysis?

11  **A.** Yes, I do.

12  **Q.** And why?

13  **A.** Well, free apps are an important part of what the App

14  Store provides, and many developers, in particular game

15  developers, take advantage of the ability to offer free apps,

16  at least on initial download.  And so to exclude that I think

17  misses a significant component of the services that are

18  provided by the App Store and makes the commission rates seem

19  higher than they really are.

20  **Q.** Could we have slide 18, please.

21     Does this slide show a comparison to Dr. Evans' effective

22  commission rate calculation?

23  **A.** Yes, it does.

24  **Q.** And can you summarize what you have shown on this slide?

25  **A.** Sure.  So the red bar is Dr. Evans' calculation, which is

1    essentially what he did in 2019.  I believe that specific

2    number is reported in one of his reports.  And I simply did

3    the similar calculation but restricted to game transactions in

4    one case and including free apps.

5        If you do that, the number becomes 8.1 percent.  If you go

6    to the far left, if you do it for all app transactions, which

7    I believe is consistent with his 27.7, the number falls to

8    4.7.  This difference is entirely driven by including free

9    transactions.  That's what's making the difference, and this

10   presentation is intended to highlight the fact that when you

11   consider free transactions, the effective commission rate is

12   lower.  And I think that's important to consider.

13   **Q.**  Last question on pricing before we move to a new topic.

14       Is any of the price evidence you have seen consistent with

15   Apple raising prices after 2010 when Dr. Evans claims Apple

16   gained monopoly power?

17   **A.**  No.  Apple's commissions have been steady or declining

18   throughout for game transactions, that's true.  It's also true

19   for -- and perhaps more true for all app transactions as they

20   take advantage of some of these commission reductions that

21   occurred over the last few years.

22   **Q.**  So, Professor Hitt, we've talked about output.  We've

23   talked about pricing.

24       **THE COURT:**  Can I just ask, all transactions, these

25   are all downloads plus all in-app transactions?

1          **THE WITNESS:**  Yes.  That's -- that's -- Dr. Evans'

2     approach is to mix the two together, and so I followed that

3     approach in this calculation.  So that's -- yes, it's all

4     apps.  All apps, all downloads, and all in-app purchases.

5          **THE COURT:**  Thank you.

6     **BY MS. RICHMAN:**

7     **Q.**  Professor Hitt, we've talked about output, we've talked

8     about pricing.  What is the third indicia of competitive

9     effects that economists typically look at to evaluate whether

10    conduct has a pro or anticompetitive effect?

11    **A.**  So you can also look at quality change, and in particular,

12    if you believe that a firm is engaged in anticompetitive

13    conduct, what they might do is fail to innovate and quality

14    would decline.

15    **Q.**  And is quality something that economists typically

16    analyze?

17    **A.**  Yes.  It's an important part of thinking about output, is

18    the quality of that output.

19    **Q.**  Slide 19, please.

20         What economic evidence did you consider to assess whether

21    Apple has reduced quality?

22    **A.**  So there is a number of different ways of going about it.

23    Quality is a little more difficult to directly measure, but

24    you can make some inferences from available data.  So one

25    thing you could look at is the same measures that indicate

HITT - DIRECT RESUMED - RICHMAN

1    increasing output provide information about increasing

2    quality.  Developers are increasingly -- developers and

3    consumers are increasingly choosing to transact in these

4    forms.  The ability to generate revenue from the developer has

5    increased over time.  They've been able to raise their prices

6    because consumers perceive the value in the products that

7    they're offering.  So that's -- that's a quality improvement.

8         There is also a variety of qualitative metrics you can

9    consider, so you can think about things like the fact that the

10   innovations in the iOS platform have enabled new types of

11   games to appear that essentially could not have been available

12   years ago.  I believe Mr. Sweeney himself testified that

13   *Fortnite* could not have been delivered in its current form on

14   an iOS platform with previous technology.

15        You could also look -- and that's -- that can be extended

16   more broadly.  There are a variety of innovations that Apple

17   has made to the App Store and to the iOS platform that has

18   made the types of products available and the quality of those

19   products has increased -- has enabled developers to increase

20   the quality of the products they're offering because of the

21   technological support of the iOS platform.

22   **Q.**  You mentioned, I believe, that you could use empirical

23   quantitative data to make -- draw conclusions about quality;

24   is that correct?

25   **A.**  That's correct.

1    **Q.**  And so did you use the 60-billion-transaction observations

2    produced by Apple in this case to draw any conclusions about

3    quality?

4    **A.**  So you can make the inferences that I discussed before

5    that the -- these transaction prices are increasing, the

6    volume of transactions are increasing.  There is also other

7    data that can be used to indicate, for example, that in games

8    like *Fortnite*, the -- well, at least quality comparison sense,

9    that the Apple App Store provides a greater level of

10   monetization per minute played, for instance, than other

11   games -- than other platforms.

12   **Q.**  What about innovation?  Has Apple reduced the speed of

13   innovation in the game transaction market, in your opinion?

14   **A.**  There's nothing to suggest that that is the case.  There

15   has been a dramatic improvement in the capabilities of the iOS

16   platform due to Apple's investments, and that has improved the

17   types of services that developers can access and the types of

18   games that can be made available, and that has increased the

19   quality of output in the games transaction market.

20   **Q.**  Could we have slide 20, please.

21       And have you observed evidence of innovative services

22   entering the game market?

23   **A.**  Yes.  One of the -- the relatively recent innovations, but

24   as I understand there is a variety of testimony that these are

25   growing rapidly, are these game streaming services.  These

HITT — DIRECT RESUMED — RICHMAN

1    services enable you to stream from a centralized server games

2    that are meant for consoles or PCs to a device, and including

3    the web browser on your iOS device.

4        So if you would like to be able to play some relatively

5    high-end games, one of the ways you can do so is you can

6    stream it through a web browser.  And there are services like

7    Google Stadia that also sells games.  Microsoft xCloud —— I

8    believe Ms. Wright talked about that as well —— that went to

9    open beta very recently.  Amazon Luna has been in beta for a

10   couple of months now.  And we heard the discussions from, I

11   believe, Mr. Patel from Nvidia was talking about the rapid

12   growth of GeForce Now that enables consumers to stream games

13   that they have purchased off, for example, Steam to various

14   devices, including through a web browser.

15   Q.  From your perspective as an economist, how would you

16   characterize the evolution of these services over time?

17   A.  I think at least the testimony we've heard is that these

18   services are rapidly improving and rapidly increasing in

19   volume.  I believe the Nvidia folks testified to that.

20   Professor Athey also indicated that as well.

21   Q.  Let's switch topics a bit.

22       Did you hear Dr. Evans and Professor Athey's testimony on

23   user lock-in?

24   A.  Yes, I did.

25   Q.  And they testified their opinion is that iPhone users are

1   locked in to iPhones; is that correct?

2   **A.**   That is correct.

3   **Q.**   Is that a conclusion you agree with?

4   **A.**   No, for −− for several different reasons.

5   **Q.**   Can you articulate those reasons, please.

6   **A.**   Sure.  So for one thing, consumers actually do switch.

7   There is evidence that is, I believe, in the record and a

8   variety of evidence that suggests that as many as 26 percent

9   of people switch platforms when they're at a potential

10   switching event.

11      Keep in mind, smartphones have a life cycle.  Some people

12   replace them faster than others, but at the end of that

13   replacement interval, you have a choice to replace it with

14   another device, and as many as 26 percent of people do.

15      There is other surveys that provide a range of numbers

16   from that, anywhere from single digits to that 26 percent

17   number.  But people do indeed switch platforms when they can.

18      There is also a group −−

19            **THE COURT:**  Where is the data?

20            **THE WITNESS:**  The data is cited in my report.  One,

21   the 26-percent number comes from an industry study by, I

22   believe, Kantar.  There is a number of other reports.  I

23   believe one of them is a sealed document that's a Google

24   document that has a different figure in it, and I won't say

25   anything more because I don't want to reveal anything I'm not

1    supposed to say.  But there is a number of sources.

2         Dr. Evans has a number of sources as well in his report

3    that I also quote, and what you see across them -- there is

4    probably four or five -- you get numbers on the order of -- I

5    think you can go as low as 4 and as high as 26 with many of

6    them in the sort of low single digits.

7              **THE COURT:**  Okay.  Thank you.

8    **BY MS. RICHMAN:**

9    **Q.**  So if you assume that, you know, the switching rate is

10   somewhere in the middle of that range, in terms of number of

11   devices per year or number of consumers a year, do you have a

12   rough estimate as to what that works out to be?

13   **A.**  So if you think about all the devices that are sold each

14   year, there is something like 78 million smartphones sold a

15   year, probably more now.  So that's 78 million new possible

16   choices.  Many of those consumers will choose to buy the

17   device, to stay within the ecosystem and the manufacturer

18   they've chosen before, but some can switch.

19        Also there is a substantial number of new consumers.

20   Another industry study indicated that as many as 21 percent of

21   buyers are new to the market.  So 78 million gives you both

22   new buyers, potential switchers, and people who are just happy

23   with their existing ecosystem.  That is a lot of opportunities

24   to make a different decision every year.

25   **Q.**  Professor Hitt, are high rates of customer retention a

HITT - DIRECT RESUMED - RICHMAN

1    sign of high switching costs?

2    **A.**   No.  There's -- there -- it could be switching costs, but

3    it's also plausible and likely that a lot of that is simply

4    customer loyalty or preferences for different products:  *I*

5    *stick with the product I have because I like the product I*

6    *have.  And I'll continue to use that until*, you know,

7    *something else changes*.

8    **Q.**   And is that a factor that either Dr. Evans or

9    Professor Athey considered in their analysis?

10   **A.**   I'm not sure if they considered it or not.  They generally

11   view a lot of the factors I consider to be drivers of loyalty,

12   they lump that into switching costs, and I think that's --

13   that's just not the right way to think about it.

14   **Q.**   And, Professor Hitt, you have, as we discussed yesterday,

15   experience in the smartphone industry that predated this case.

16   Do you -- are you aware of what smartphone makers do to

17   potentially address any switching costs of the sort referenced

18   by Dr. Evans and Professor Athey?

19   **A.**   Yes.  So as I mentioned, there is 78 million purchases up

20   for grabs every year and the smartphone manufacturers have a

21   lot of incentive to make that -- make it possible to switch

22   between platforms because a lot of people already have an

23   existing smartphone.

24       And so one of the things they do is they provide tools to

25   make that process easy.  Apple provides it.  I believe Samsung

HITT − DIRECT RESUMED − RICHMAN

1    has a product.  LG has a product.  Google has a product.  The

2    goal of these products is to make it possible to switch

3    between platforms as easily as you can.

4    **Q.**  Do developers have a role in facilitating consumer

5    switching?

6    **A.**  Yes, they do.  An important role.

7    **Q.**  And can you describe the role of app developers in that

8    facilitation?

9    **A.**  Sure.  I believe Dr. Evans and Professor Athey indicated

10   that either switching apps, locating apps, or moving data from

11   platform to platform is one of the things that might inhibit

12   people from switching.  Developers control, by their own

13   choices, a lot of those costs.  They can choose whether or not

14   to develop for one or another platform, and in many -- in

15   nearly all cases, the major apps are available on both

16   platforms.

17       There is also services that they can provide that make

18   that -- that type of movement easy.  They can offer

19   portability of content so they can have, you know, for

20   example, a single sign-on account that allows you to transfer

21   your information from one service to another.  In some cases,

22   they can offer portability of subscription content where I

23   have one account and I can access it on multiple devices.

24       So developers do have a lot of control as to how difficult

25   that switching process is.  It does vary by developer, but

1    these services are available, and many of the large developers

2    are on multiple platforms and many of them do offer these

3    kinds of services.

4    **Q.**   I think Professor Athey said that the cost of repurchasing

5    apps is a significant switching cost.  Is that a statement you

6    agree with?

7    **A.**   Generally no.  If consumers did have to buy apps and pay

8    up front for apps, in many cases that could be a cost, but if

9    you look, for example, in the games market, the vast majority

10   of games, for instance, are free to download and so they

11   wouldn't be incurring those costs at all.

12       And, again, the developers who have taken advantage of any

13   of those other types of services like common subscription and

14   so forth, that wouldn't -- you wouldn't be typically paying

15   for an incremental amount.  You may need to switch your

16   subscription in some cases, but you wouldn't be paying for a

17   new download.

18   **Q.**   Thank you, Professor Hitt.

19       Let's turn to market definition.

20           **THE COURT:**  Can I ask on that last point, though,

21   even if it's free to download, unless there's cross-platform

22   play in games or cross-wallets in games, then if you haven't

23   used all the money in your wallet on an app on an iOS device,

24   then you can't use that or you better use it before you switch

25   to an Android device because you won't be able to use it if

1    you switch to Android; right?

2         **THE WITNESS:**  Yes.  That's exactly right.  And the --

3    what I would add to that, however, is that's the call of the

4    developer.  Some developers facilitate that more.  Some

5    developers don't facilitate.  But, yes, you're absolutely

6    right.

7         **THE COURT:**  All right.

8    Proceed.

9         **MS. RICHMAN:**  Thank you, Your Honor.

10   Let's have slide 21, please.

11   **Q.**  Professor Hitt, what is the relevant product market in

12   this case, in your opinion?

13   **A.**  It's my opinion, and I think consistent with

14   Professor Lafontaine, is the market for digital game

15   transactions.

16   **Q.**  And just to set the table, do you know what percentage of

17   the App Store revenues are the result of game transactions?

18   **A.**  The figure I recall is 62 percent of all revenue in the

19   App Store relates to game transactions.

20   **Q.**  And what framework did you apply to determine that the

21   relevant market is digital game transactions and not iOS app

22   distribution as Dr. Evans claims?

23   **A.**  So the framework I used -- and I relied heavily on

24   Professor Lafontaine -- is to look for substitutes for

25   performing digital game transactions.  So to look, Epic makes

1   a game.  *Fortnite* is a game.  They transact in the "games"

2   category on the App Store.  So then I looked at other services

3   that provide the ability to access game transactions.

4        Professor Lafontaine indicated that it is perfectly

5   appropriate and common to use the ability to substitute among

6   these types of services as an indication that they are in the

7   same market.

8        Now, in addition to that, this is a two-sided transaction

9   platform.  As a result, you have to think about who the

10  entities are that are engaged in this type of substitution.

11  In a two-sided market, you have to think about both sides,

12  so -- and this follows Professor Schmalensee's discussion of

13  two-sided platforms.  You have to think about the substitution

14  opportunities for developers on the one side and you have to

15  think about the substitution possibilities for consumers on

16  the other side and how these services are able to help them

17  meet and perform transactions.

18  **Q.**  And how did you go about doing that?

19  **A.**  So you can look at a variety of data, both transactional

20  data as well as market research data as well as qualitative

21  data and documentary evidence that provides information about

22  the extent to which developers can move across these plat --

23  well, you first have to identify the platforms.

24       The second thing is you can look at how developers move

25  across these platforms.  And then third, you can look at how

1    consumers can move across these platforms, and that

2    collectively gives you an indication of what the substitutes

3    are.

4    **Q.**  And in this slide, do you show your findings on the

5    relevant transaction platforms in your opinion?

6    **A.**  Yes.  So this -- this is a -- by the way, this is a common

7    way in which you depict two-sided markets so that's what this

8    presentation is based on.  I believe it's one, two -- seven --

9    seven of them are here.  There is 14 transaction platforms,

10   including the App Store, that at least I've identified, and

11   there are some more, but those are the major ones.

12        These are seven of the ones that I think are

13   representative of the types of services you see, the ones tied

14   to hardware, you know, such as Nintendo, Google Play which

15   services the Android ecosystem, Steam which services the PC

16   ecosystem, you have developer centric stores that also offer

17   transactions for other products like EA Origin, App Store,

18   Microsoft, Xbox Store.  And, again, this is just illustrative.

19   I have identified at least 14 other transaction platforms that

20   could be relevant.

21   **Q.**  And are all of these pathways, in your opinion, for

22   connecting game developers on the one hand and consumers who

23   want to buy a game on the other hand?

24   **A.**  Yes.  These -- these give you a variety of different ways

25   in which consumers can meet up with developers to transact.

1    Some developers may only offer their products on some of these

2    platforms which limits the choices for consumers on where they

3    can transact.  Others may make different choices and offer

4    them lightly, in which case consumers can have many different

5    choices.  And then on the other side, you have the fact that

6    consumers have many different devices which enables them to

7    access transactions on these different platforms.

8    **Q.**  Let's talk about developers, the developer side of the

9    two-sided transaction platform.

10        Could we have slide 22, please.

11        Do developers substitute across game transaction

12   platforms?

13   **A.**  Yes, they do.  They have a choice on where to offer their

14   games and under what circumstances, and I think they do

15   that -- there's documentary evidence that they do that in an

16   informed way considering things like, you know, what are the

17   customers on these various platforms; what's the potential to

18   purchase their games; what tools the platforms provide to

19   enable them to offer their -- their games there; the other

20   services they might provide, technical support, marketing and

21   promotion, those kinds of things; the capabilities of the

22   platform, like the underlying technology; and then the cost,

23   how much does it cost to develop, how much does it cost to

24   transact.

25   **Q.**  These are the factors that developers consider when

HITT – DIRECT RESUMED – RICHMAN

1   choosing which game transaction platform to transact on; is

2   that what I heard you say?

3   **A.**   Yes.  We're able to identify specific evidence for these

4   various points that developers consider these factors when

5   choosing where to participate, and ultimately it's their

6   choice based on their own, you know, business decision-making

7   as to which platforms to offer their products.

8   **Q.**   And I think you mentioned this also already, but do all

9   developers necessarily choose to transact on all platforms?

10  **A.**   No.  There are -- you can empirically observe a large

11  variety of choices.  So you have developers like Niantic who

12  offer Pokémon GO.  That's a pretty much mobile exclusive

13  because of the products they've chosen to offer.  You have

14  developers like Epic who offer their products on a variety of

15  different platforms.  There are other developers like that.

16  You also have changes over time.  So you can have four changes

17  across games so developers might offer some games on some

18  platforms and other games on other platforms.  And, for

19  example, again, Epic has made different choices.  Some games

20  are, for example, Xbox exclusive; others are offered broadly.

21  Those decisions can change over time as well.

22          **THE COURT:**   It would be hard to play a Pokémon GO

23  with a console.

24          **THE WITNESS:**   That is true.  That's right.  It is --

25  because it relies specifically on alternative reality

HITT – DIRECT RESUMED – RICHMAN

1   technology, but, you know, for example, the developer could

2   consider another type of game building on their intellectual

3   property that might be amenable to other platforms.  So it's

4   always a choice, but, again, technology might be an important

5   part of that choice for some developers.  Maybe less so for

6   others.  I think the Pokémon GO folks are pretty high on that

7   technological choice range.

8   **BY MS. RICHMAN:**

9   **Q.**  Have you heard any testimony in this trial that reflects

10   the fact that developers have these choices?

11   **A.**  Yes.

12   **Q.**  And do you recall what that was?

13   **A.**  So there's testimony that indicates that these games were

14   rolled out over different platforms over time and that

15   developer –– in particular Epic but others have chosen to

16   offer their games on different platforms in different times.

17       There is also other, for example, discussion, I believe in

18   the Microsoft testimony, regarding the availability of

19   different games at different times.

20   **Q.**  And is one example of this choice Epic's initial decision

21   to not make *Fortnite* available through Google Play?

22   **A.**  Yes.  Epic initially decided that they would use an

23   alternative means to reach users of the Android platform.

24   They later decided –– I understand that it was in conjunction

25   with Project Liberty –– to offer –– to begin offering their

HITT – DIRECT RESUMED – RICHMAN

1    games on Google Play.

2    **Q.**  Does Apple place any restriction on developers' ability to

3    develop applications for other game transaction platforms or

4    any platforms?

5    **A.**  No.  I mean, in some –– in some platforms, exclusivity is

6    a norm.  Apple does not require any –– any exclusivity for

7    games developed for iOS.

8    **Q.**  Okay.  Let's jump to the other side of the platform and

9    talk about consumer substitution.

10       Did you assess consumer substitution?

11   **A.**  Yes, I did.

12   **Q.**  And what did you consider in your assessment of consumer

13   substitution?

14   **A.**  Well, the –– you can think of the process as sequential so

15   first of all I looked at whether or not consumers have access

16   to or use many different kinds of devices.  That certainly

17   facilitates it to the extent that some platforms specifically

18   are focused on supporting certain kinds of devices.  And so

19   that –– that's a first step.  You know, can consumers move

20   across these platforms because they have the necessary

21   hardware.  That doesn't mean they can't acquire it and some

22   do, but that's –– that was a consideration.

23       Then you can look at whether or not consumers use these

24   multiple platforms to play games, and that use might be, you

25   know, cross-game.  Consumers might play different games on

HITT - DIRECT RESUMED - RICHMAN

1    different devices.

2        Or we have data that is a unique situation.  Here we have

3    data that indicate the extent to which consumers multihome.

4    That is basically use multiple platforms even for the same

5    game.  And so we can look at where they are and how they

6    allocate their time and their spending across different

7    platforms.

8        And the Epic data is particularly useful for that.  It's

9    one of the unique things we have available here, is we can

10   actually see how consumers go across platforms, at least for

11   one game.  But I wouldn't limit it to one game.  It is also

12   possible to do so for multiple games, and we have some

13   evidence that is the case as well.

14       Finally, we can examine whether or not consumers move

15   among these platforms when they have reason to do so.  Now,

16   keep in mind in the traditional substitution context -- I

17   think Professor Lafontaine talked about this in her testimony

18   as well -- when you're looking at, for example, substitution,

19   you will like to see a price change that drives consumers to

20   make different choices.  We don't have those here.  The prices

21   have been generally steady for game transactions.  So instead,

22   it's possible, and I think Dr. Evans agrees, to look at

23   situations where consumers have reasons to move among these

24   platforms, and we can see if they are able -- willing and able

25   to move across these platforms, again, consistent with them

1    being substitutes.

2    **Q.**   And you refer to those as natural experiments?

3    **A.**   Yes.  They're natural experiments.  Something happens in

4    the world that you can use to evaluate the response and that

5    can provide insight to the extent to which consumers, at least

6    in this case -- consumers move among these platforms.

7    **Q.**   Professor Hitt, is consumer-switching between games

8    relevant to your analysis?

9    **A.**   Yes.  So one of the things we find is indeed consumers

10   play the same game on multiple platforms, and that's really

11   interesting.  But it's also possible to move across games, and

12   that makes it -- makes these platforms potentially

13   substitutable, even if they are not playing exactly the same

14   game, and there is many different variations of that.  It

15   might be exactly the same game.  I think Ms. Wright testified

16   that, for example, some platforms will offer something else

17   derived from the same intellectual property, kind of like the

18   answer to your question, Your Honor, about Niantic.  And

19   others might simply substitute among other games: *If I can't*

20   *plate Fortnite, I'll play something else.  I will play PUPG or*

21   *something else that is interesting to me*.

22   **Q.**   Okay.  Let's start with the first item on this slide.

23   What evidence did you find that shows consumers own, use, and

24   have access to multiple devices on which they can make digital

25   game app transactions?

HITT – DIRECT RESUMED – RICHMAN

1   **A.**   So there's -- there's a variety of survey information.

2   Some of that survey information was done as part of this case

3   by Professor Hanssens.   Others have looked at, for example,

4   device ownership.   That's something that is of interest to

5   sort of game industry analysts.   And so there is those --

6   those research studies as well.

7   **Q.**   Your second point on this slide is that consumers

8   multihome even for the same game, and I think you said this,

9   but you analyzed this for *Fortnite*; correct?

10   **A.**   Yes.   That's one of the unique opportunities we have here

11   is because we can observe the same consumer across multiple

12   platforms, that's not something you normally are able to see.

13   And so you can see whether or not -- again, how consumers

14   allocate both their time and their spending across these

15   various platforms, and we have detailed data on that.

16   **Q.**   Would you like a water break, Professor Hitt?

17   **A.**   Yes, I would.   Thank you.

18       (Brief pause in proceedings.)

19   **BY MS. RICHMAN:**

20   **Q.**   Could we have slide 24, please.

21   **A.**   Okay.

22   **Q.**   So can you -- a lot of numbers on this slide,

23   Professor Hitt.   Can you walk us through what this depicts.

24   **A.**   So this is based on the *Fortnite* monthly transaction --

25   monthly data, monthly -- it is done at a consumer level by

HITT – DIRECT RESUMED – RICHMAN

1     month.  And what we did was we took this data and we counted

2     the number of distinct user -- users that are available --

3     that are listed for each of these platforms.  Now, this isn't

4     all the platforms, but it sort of cuts off at the major ones.

5          In addition, for each one of the platforms, I looked at of

6     the consumers who use that platform -- let's pick iOS, for

7     example; 115 million of them have adopted *Fortnite* on iOS --

8     how many of them have also played on another platform.  And in

9     this case, of that 115 million users, about 36 percent --

10    that's the number to the right at the top -- have played on

11    another platform.

12         And as you can see, if you go down, you see numbers, you

13    know, sort of in the range of 30 to 50ish percent for the

14    number of users who are on one platform and use another, and

15    this is done from each platform's perspective.  So some people

16    might be on multiple, but if it's iOS and at least one other,

17    that would go into that 35.9 percent.

18    **Q.**  Did you look at whether users who access *Fortnite* on iOS

19    made paid transactions on iOS versus other digital game app

20    transaction platforms?

21    **A.**  Yes, I did.

22    **Q.**  Could we have slide 25.

23         And is that what you show in this slide?

24    **A.**  Yes.  Now, this is something you don't normally get to

25    observe so I thought this and some of the other subsequent

1    analysis is -- is very interesting.  The -- so the first

2    thing -- what this is is this is of all consumers who use

3    *Fortnite* on iOS, where did they buy, if at all.  Now, first

4    thing not especially surprising, 76 percent of consumers don't

5    buy anything.  They play.  They do their thing.  They're fine.

6    They don't buy anything.

7        Of the remaining consumers that do purchase, about --

8    well, about 16 percent -- well, less than 16 percent play

9    *Fortnite* on iOS but never buy anything there.  Apple provides

10   them with the ability to download -- to provide and have

11   consumers download *Fortnite* for iOS.  Consumers play on it.

12   They don't have any transactions on iOS.  Apple earns no

13   commissions on any of those transactions because they occur on

14   other platforms.

15       There is a group of consumers, 5.6 percent -- that's kind

16   of the green pie -- that only buy on iOS, nowhere else.  And

17   then a smaller group that sort of do both.  2.8 percent, they

18   purchase on iOS and they also purchase on non-iOS platforms.

19       So, again, many people don't pay anything and a lot of

20   people purchase on other platforms, even though they

21   downloaded and played the game on iOS.

22   **Q.**  Professor Hitt, this data, this -- that's reflected in

23   this slide, is this a sample of the *Fortnite* data or is this

24   all of the *Fortnite* data?

25   **A.**  So it's restricted in time periods so we could capture

HITT - DIRECT RESUMED - RICHMAN

1    where we are sort of today.  But this is all transactions, so

2    there is no sampling here.  Among users who -- accessing

3    *Fortnite* in January of -- from January to July, right before

4    the hotfix event, this is where they were.  This is everyone.

5    So -- for one reason, that's why I don't have to, for example,

6    compute standard errors or any other statistics on it.  It is

7    what it is.  These are the numbers.

8    **Q.**  Can we have slide 26.

9        Did you look at the proportion of time played and the

10   amount of spending on other platforms by users who accessed

11   *Fortnite* on iOS?

12   **A.**  Yes.  That's -- that's depicted here.

13   **Q.**  And can you walk us through this -- again, a slide that is

14   full of numbers?

15   **A.**  Okay.  This is full of numbers.  So this is based on the

16   entire 2.8 billion transaction dataset which has monthly

17   expenditure by consumer.  And what I did was I looked to see

18   what fraction of time played and what fraction of revenue for

19   iOS users is on iOS versus other platforms.  If you recall

20   from the previous slide, that a lot of the iOS spending

21   actually -- a lot of the spending for consumers who are on iOS

22   is not made on iOS.  They play the game on iOS, but they don't

23   spend their money there.  Some do.  And so I did a calculation

24   as to what that is.

25       So this is restricted to consumers who have accessed the

1    game on iOS.  And what you find is that iOS is about 10

2    percent of the gameplay for these consumers and about 13.2

3    percent of the revenue for these consumers.

4        So there's, I think, two interesting things you can take

5    away from that, is that the vast majority of spending of these

6    consumers and the vast majority of play is on other platforms.

7    Epic is able to access, if you want to use that language,

8    these consumers on other platforms.

9        And the second thing is that the -- and I alluded to this

10   in the quality discussion, the iOS is slightly better at

11   generating revenue per unit of time played.  The percentage of

12   revenue is somewhat higher than the percentage of time played

13   than the typical platform, and, in fact, you can do a

14   calculation of revenue per minute.  You find that iOS tends to

15   be at the top.  But, again, most of the activity, both

16   gameplay and time, is on non-iOS platforms, even for iOS

17   users.

18   **Q.**  Professor Hitt, for your analysis, was it important to be

19   able to distinguish consumer paying and consumer playing, so

20   to speak?

21   **A.**  Yes.  There is -- there is an important distinction

22   between those two things.  I can play the game on a variety of

23   platforms, different time, different place, or even at the

24   same time.  I believe one of the gentleman from Epic says he

25   likes playing on his iPad even though he has a console

1    available.  So you can decide where you want to pay -- where

2    you want to play, and that might have some constraints on it,

3    but you can also make a separate decision as to where you are

4    going to pay.

5         Now, this indicates that a lot of consumers pay on other

6    platforms.  We also, I think, had a discussion before -- I

7    think Your Honor was involved -- about, you know, you can buy

8    V-Bucks on a web browser and so that disconnects -- so even if

9    you can't play *Fortnite* in a web browser, you can still buy

10   V-Bucks and transact for *Fortnite* on a web browser, and that

11   distinction is very important when you start talking about

12   where people perform game transactions.  You can still

13   download and have free apps on iOS, use all the services of

14   the Apple ecosystem, and transact elsewhere, and that's an

15   important part of thinking about the way this market works.

16   **Q.**  Could we have slide 27, please.

17        We talked earlier about natural experiments that show

18   consumer substitute.  How did you reach that conclusion?

19   **A.**  Okay.  So there's -- there were, you know -- one of the

20   challenges in this environment is you have an environment of

21   steady prices, and for game transactions, the prices have

22   generally been steady.  I think Dr. Evans agrees with me on

23   that point.  And so if you're trying to measure substitution,

24   you normally rely on a price change, but there isn't one, so

25   we are in a world where we look at what I'm calling natural

1    experiments, things that happen that give you an indication

2    can consumers move across these platforms when given a reason

3    to do so.

4        I was able to identify five -- five situations that could

5    be analyzed that can give insight into that.  Three of these

6    relate specifically to games so we can analyze, I think like

7    Dr. Evans did, what happened after the hotfix and iOS *Fortnite*

8    became essentially unavailable on iOS.  The introduction of

9    the Nintendo Switch.  Consumers had a new platform.  What did

10   they do?  There is a similar analysis that I do related to the

11   download of console or PC gaming applications, so I look at

12   consumers who did something to see what they did later.  That

13   "did something" is download one of these companion apps.  We

14   will talk about that probably a bit more later.  And then

15   there is two examples where certain -- where the developer or

16   the provider, depending on how you consider these, decided to

17   stop offering transactions through iOS.  You can examine what

18   happened to them subsequently.  Were they able to still serve

19   their customers as they had before?  And that applies to

20   Spotify and Netflix.  And it relates to the withdrawal of the

21   ability to transact in these subscriptions.

22   Q.  Okay.  We'll walk through each of these in more detail,

23   but before we do, just to set the table, Professor Hitt, do

24   you teach econometrics and empirical methods at Wharton to

25   Ph.D. students?

HITT - DIRECT RESUMED - RICHMAN

1  **A.**  Yes.  A big part of my Ph.D. class is devoted to empirical

2  methods for the study of the information economy.

3  **Q.**  What is econometrics?

4  **A.**  Econometrics is the use of statistics for evaluating

5  economic outcomes or predictions.

6  **Q.**  And in these natural experiments, did you use the best

7  practices and methods that you would use in your academic work

8  including with your Ph.D. students?

9  **A.**  Absolutely.  And we actually have a unique advantage

10  here -- is that we can work with entire populations rather

11  than samples which gives you a huge advantage.  It can

12  simplify things dramatically when you know everything that has

13  happened.

14  **Q.**  And you worked with all the available data for these

15  analysis as opposed to a sample; is that right?

16  **A.**  That's correct.  For -- for the Apple data, we had

17  available to the full transaction dataset all app

18  transactions.  For the Epic data, I used the full dataset for

19  there as well, 2.8 billion monthly observations.

20  **Q.**  And that's different from what Dr. Evans did; correct?

21  **A.**  So a lot of the analysis that was done by Dr. Evans was

22  using a sample, less than one-percent sample of *Fortnite*

23  transactional data.

24  **Q.**  Okay.  Could we have slide 28, please.

25       So let's talk about the *Fortnite* substitution analysis

1   that you conducted.  Can you just describe for the Court what

2   you did?

3   **A.**   Sure.  So after –– so *Fortnite* was available on iOS.  It

4   was available for the iOS for some time.  Then the hotfix

5   event occurred in August, and it made –– essentially made

6   *Fortnite* unavailable on the iOS platform.

7        And so what I did was an analysis that attempts to

8   evaluate what happened in terms of that spending that

9   consumers were doing on *Fortnite* both before and after.

10  Before they were buying wherever they wanted to on various

11  platforms.  Afterwards, the ability to transact on iOS –– it

12  didn't disappear entirely, but it was severely reduced.  And

13  so you can then look to see where, if anyplace, that spending

14  moved, and then you can do some calculations.

15       And the –– again, the critical part of this is trying to

16  figure out what would have happened had this not occurred.  So

17  there has to be some substantial corrections for the

18  differences across consumers and differences across time, but

19  ultimately the goal was to try to figure out how much the

20  expected spending was retained by Epic following the hotfix

21  event when people could no longer transact in a normal way

22  through iOS.

23  **Q.**   And what did you find?

24  **A.**   So what you find is –– is you –– of the user spending that

25  was occurring on iOS, depending on which month you look at ––

1   and it varies by month as you go out.  So it happened in

2   August -- you can do September, October, November, and

3   December.  We have data that runs through the end of the year.

4   Again, it varies by month, but month to month, you get between

5   22 and 51 percent of the spending relative to what it would be

6   was retained on other platforms or actually shifted to other

7   platforms.

8        Now, what's interesting about that is we've been talking

9   about the fact that a lot of iOS users are multi-platform.  It

10  turns out that if you focus solely on users that -- that

11  played on iOS, even 22 to 38 percent of their spending shifted

12  to another platform.  So these are people who had both to

13  adopt another platform or at least start playing on another

14  platform, and they shifted their spending as well.

15  **Q.**  Does this slide show that Epic lost more than half of the

16  spending for *Fortnite* from users who use iOS?

17  **A.**  Well, that's -- that's another interesting thing.  So not

18  all of the iOS spending moved over, but as we saw a few slides

19  back, a lot of the spending was already on other platforms for

20  iOS users, so an iOS user, say, who was playing on their

21  PlayStation and was spending on their PlayStation essentially

22  continued to do so.  There is some fluctuation, but that

23  continued to happen.

24       And then some of the spending that was happening on iOS

25  moved off iOS onto other platforms.  The net effect was -- is

HITT - DIRECT RESUMED - RICHMAN

1  that Epic retained between 81 and 88 percent of the expected

2  *Fortnite* spending following the hotfix event.

3  **Q.**  What do you conclude from that number?

4  **A.**  That consumers are willing to and able to move across

5  platforms when they have reasons to do so.

6  **Q.**  Did Dr. Evans also find evidence of substitution in his

7  *Fortnite* analysis?

8  **A.**  Yes.  And I think there's a couple of useful points there.

9  One is he describes this specifically as substitution.  I

10  think he used that word.  Second is he does -- does this with

11  a sample rather than using the full data, and he does a number

12  of different steps and regressions and assembles them

13  together.  But once you look at -- and gets a different

14  number, at least a bit different number.  I think his numbers

15  are like 30 and 16.3 depending on whether he makes one of the

16  corrections he suggests.

17      But if you look at the confidence intervals of his

18  estimates, they are not that different from my estimates.  So

19  he uses a different methodology.  I think there is issues with

20  it, but ultimately he reaches the same conclusion, which is

21  that consumers are willing to substitute when given reason to

22  do so.

23  **Q.**  Let's turn to your second analysis which I understand

24  relates to when *Fortnite* launched on the Nintendo Switch.

25  **A.**  That's correct.

HITT - DIRECT RESUMED - RICHMAN

1    **Q.**   Can we have slide 29, please.

2         What month did *Fortnite* launch on the Nintendo Switch?

3    **A.**   So *Fortnite* launched on the Switch first in June 2018.

4    **Q.**   What are you comparing on this slide?  I see a green line

5    and a blue line.  Can you just walk us through what those

6    lines reflect?

7    **A.**   Okay.  So let me quickly orient you to the chart.  So the

8    horizontal axis is the passage of time.  I started in March

9    2018 and went through March 2019.  Where you start doesn't

10   matter too much.  And what I looked at was two groups of

11   consumers.  I looked at consumers who access *Fortnite* on

12   iOS --

13        **THE COURT:**  It doesn't matter so much because you're

14   using a year?

15        **THE WITNESS:**  So you can -- so the -- you can do

16   sensitivity on it and try different starting points, and you

17   basically get to the same place.

18        **THE COURT:**  But I guess -- my question is, is the

19   full year an appropriate interval?

20        **THE WITNESS:**  So where you cut off isn't tremendously

21   critical.  I think it's nice to see how it evolves, but the

22   way -- one of the issues with this kind of analysis where you

23   have an event and you're watching what happens afterwards is

24   that when the event happens, you're pretty sure that it's --

25   whatever you're watching is related to the event.  As time

1    evolves, more things happen that kind of make it harder to

2    see.  So I think it's useful to see what happens afterwards,

3    but kind of the closer to the event is probably more important

4    than later after the event.

5              **THE COURT:**  Okay.  Thank you.

6              **THE WITNESS:**  So we have two groups of consumers.

7    One group of consumers accessed *Fortnite* on an iOS device in

8    June and did not access it on a Switch.

9    **BY MS. RICHMAN:**

10   **Q.**  That's green?

11   **A.**  Yes.  That's correct.  That's the iOS group.

12   **Q.**  Okay.

13   **A.**  And then another group of consumers, which is the blue

14   line, accessed *Fortnite* on iOS in June as well as on a Switch.

15   And so what we're comparing is that for the consumers who

16   adopted *Fortnite* for the Switch, did they change their

17   behavior relative to what had been done in the past.  Before

18   we actually discussed a little bit about this.

19        There is a couple of things about this analysis that is

20   important to understand.  One thing is, is that different

21   consumers are different.  Different groups of consumers might

22   spend more or less or so, and so what we're trying to compare

23   here is what somebody did relative to what they would have

24   done, and so it's important to account for differences across

25   consumers in doing so.

HITT – DIRECT RESUMED – RICHMAN

1    And to do so, I indexed consumers so that they start in
2    the same place in March of 2018 to account for these
3    differences so we can watch them evolve relative to the way
4    they were.
5        The second -- and it's really important, especially for
6    *Fortnite*, is that the spending on *Fortnite* -- and you can kind
7    of see it in this graph -- varies tremendously month to month.
8    And in particular, it's heavily driven by new releases and new
9    seasons.  So there was a new season in July, for example.
10   There is another one, as you might guess from the graph, in
11   December.  And that changes the way consumers behave, so one
12   of the other things that is important to do is to do your
13   analysis so that you account for the fact that behavior varies
14   over time.  So differences across consumers, variation over
15   time have to be accounted for to get a clean result.
16       So the way I did it was compared this group that had
17   *Fortnite* on iOS, compared it to the group that had *Fortnite* on
18   iOS and Switch, and looked at what happened when the Switch
19   becomes available.  And what you see is they're pretty close
20   beforehand, then they begin to diverge and they stay apart.
21   And what that indicates is that these consumers who adopted
22   the Switch are shifting some of their activity that they would
23   otherwise do from iOS to somewhere else, presumably to Switch,
24   and that's an indication of substitution.  Consumers have a
25   reason to move and they do.

HITT – DIRECT RESUMED – RICHMAN

1    **Q.**  Professor Hitt, yesterday there was discussion with

2    Professor Schmalensee as to whether this analysis showed

3    relative or absolute substitution.  Did you listen to that

4    testimony?

5    **A.**  Yes, I did.

6    **Q.**  And in your opinion as the one who conducted the study,

7    does this graph show absolute substitution?

8    **A.**  So in the sense it was being used, yes, this is absolute

9    substitution.  There was, you know, some confusion.  I

10   presented some data where I showed the fraction of consumers

11   accessing on different platforms, and there was some

12   discussion by Professor Schmalensee in his deposition

13   regarding whether you could use those percentages or not to

14   make these inferences and that really you shouldn't use

15   percentages of total spending, you should use total spending.

16   I think he testified that he was unaware that we had done

17   another analysis here.

18       I'd also mention that to the extent that there is any

19   difference between that analysis on total spending versus the

20   percentages, it is entirely driven by these season

21   introduction events and the not-surprising finding that people

22   spend more on *Fortnite* when they have a new season release and

23   they do it on all platforms.  So to the extent there might

24   have been any rise that would make this inconsistent with

25   other analyses, it's entirely driven by these season events.

HITT - DIRECT RESUMED - RICHMAN

1    **Q.**  Thank you, Professor Hitt.

2         Let's turn to slide 30 and your next analysis.

3         I understand you did an analysis on people who download

4    console and PC gaming companion apps.  Before we get into the

5    details, can you just explain what is a console or PC gaming

6    app?

7    **A.**  So there are apps that exist on the App Store that are

8    intended to be used alongside an Xbox or a PlayStation or when

9    you Steam, and the types of functionality you have are things

10   like you can use the app to instruct your Xbox to download a

11   game or you can, you know, interact with your Xbox in various

12   other ways.

13        The Xbox app is kind of neat because if you have a good

14   enough network connection, you can actually play Xbox games on

15   your phone through the Xbox app.  Your console has to be

16   running, but that's something you can do.

17        In any event, there is an Xbox app, there is a PlayStation

18   app, there is a couple of Nintendo apps, and there is a Steam

19   app.  And the nice thing is because we have detailed

20   transaction data from Apple, we can observe when consumers

21   downloaded these apps, and that provides a proxy or an

22   indication that consumers probably either have a console,

23   acquired a console, or are intending to do something with a

24   console, which would have prompted them to download one of

25   these apps.

HITT – DIRECT RESUMED – RICHMAN

1    **Q.**  And what are you comparing in this slide, slide 30?

2    **A.**  So what I look at is the two bars.  One group of consumers

3    downloaded one of these console apps in 2018; another group of

4    these consumers never downloaded one of these console apps

5    ever, at least over the span of the data we have.  And what

6    I'm comparing is their growth rate in spending on iOS between

7    2017 and 2019.

8        Again, it's important to do these in growth rate because

9    that accounts for the fact that different consumers have

10    different spending levels.  And what you find is that the

11    consumers who downloaded one of these console apps, the

12    right-hand, you know, dark blue bar, they are spending on iOS

13    group by 19 percent as a group.  The corresponding group that

14    did not have one of these apps spent -- grew by, in the same

15    period, 24 percent, but a five percent absolute difference

16    which is about a 20 percent difference in growth rate.  So

17    when you have an additional option, your spending on iOS apps

18    slows.  That indicates that consumers were substituting from

19    iOS to console.

20        The one other additional interesting thing about this is

21    because not all apps on iOS are available on console, this

22    gives you some indication that some of this may be related to

23    switching -- substituting across games, not just within the

24    same game across platforms.

25    **Q.**  Professor Hitt -- strike that.

1    Can we -- we don't need a slide right now.  Thank you.

2    Let's go to your final two natural experiments.  I think

3  you previously mentioned that those related to Spotify and

4  Netflix subscriptions; is that right?

5  **A.**  That's correct.

6  **Q.**  And can you just describe the nature of that analysis?

7  **A.**  These are pretty straightforward.  We have different data

8  from Spotify and Netflix so the analysis is a little

9  different.  It's in my written report, but essentially what

10  happened is that Spotify and Netflix decided to not offer new

11  subscriptions through the iOS app, so it's possible to see

12  whether that had any impact on their revenue or their ability

13  to obtain premium users on iOS and so forth, and what you see

14  is that after they switched subscriptions, they were able to

15  still continue to serve these customers, even consumers who

16  are using the iOS app.  No change in revenue and no indication

17  of any sort of change in the use of the iOS app when we had

18  that data available.

19  **Q.**  Spotify and Netflix are not gaming apps; is that correct?

20  **A.**  No.  No, they're not.  I think it's informative generally

21  as to whether consumers can move across platforms, but they're

22  not games.

23  **Q.**  Let's switch subjects and talk about a related topic, ease

24  of substitution.

25    We heard this week that Dr. Evans and Professor Athey are

HITT – DIRECT RESUMED – RICHMAN

1  of the view that consumers face high barriers to substitution

2  across transaction platforms.  Is that consistent with your

3  analysis?

4  **A.**  I think generally no.

5  **Q.**  And is -- have you considered that on both the developer

6  and the consumer side of the transaction platform?

7  **A.**  Yes.  And what you see is developers can serve customers

8  on multiple platforms and consumers have the ability to,

9  already do, move across these platforms and will move across

10  them if given reason to do so.

11      A lot of the discussion that we saw from Dr. Evans and

12  Professor Athey is indicating the difficulties of doing things

13  that consumers are already doing all by themselves without any

14  incentives to do so through price.

15  **Q.**  We heard a lot about frictions this week, and did you hear

16  the testimony that Mr. Sweeney does not consider out-of-app

17  transactions to be substitutes for in-app transactions?

18  **A.**  Yes, I did.

19  **Q.**  And that related to frictions; is that correct?

20  **A.**  I think they -- they've been described by a variety of

21  people as being frictions.

22  **Q.**  And was that testimony consistent with that you've heard

23  from other app developers in this case?

24  **A.**  Well, you know, other -- other app developers do indicate

25  that they're able to participate on multiple transaction

1    platforms.  The gentlemen, Yoga Buddhi, mentioned that he was

2    able to -- he was able to have consumers, for example,

3    transact through a web browser to buy their subscriptions, and

4    there has been others.  There is a lot of examples in the data

5    I've seen where, for example, consumers can buy V-Bucks

6    through a web browser.

7            THE COURT:  Is "friction" a term of art in your

8    industry?

9            THE WITNESS:  So yes and no.  It's a casual term that

10   is usually meant to relate to some kind of cost to do a

11   particular activity, so -- and there's this concept called

12   "frictional costs" that is sometimes used in the -- in the

13   switching cost literature.

14      So it's a term of art in the sense that it describes

15   something broadly, but then it immediately has to be

16   operationalized, what actually are you talking about here, how

17   difficult really is it to do X versus Y.

18           THE COURT:  But is that then a qualitative analysis

19   as opposed to a quantitative analysis?

20           THE WITNESS:  So it depends on what -- which

21   literature you're looking in.  So people have, for example,

22   done quantitative analysis on that.  You need pretty good --

23   it has to -- the stars kind of need to align on the empirical

24   data to do that, but there have been people who have done that

25   historically.  When you're talking in that literature, it's

1    often done qualitatively, but you can quantify it if you want

2    or at least you can get a metric that you can then make a

3    judgment to say, "Hey, this looks like it's a lot" or "that

4    doesn't seem like very much."

5           THE COURT:  So a qualitative analysis isn't

6    inappropriate?

7           THE WITNESS:  No.  I don't believe so.

8           THE COURT:  Proceed.

9    BY MS. RICHMAN:

10   Q.  Professor Hitt, did you evaluate Epic's claim that there

11   are frictions to making purchases outside the app for content

12   to use within the app?

13   A.  Yes.  You can look at what those -- those frictions might

14   be.  One of the -- the things that indicate those frictions

15   might be low is consumers actually do this, and you can think

16   of at least a couple scenarios.  For example, if you are on a

17   console, there is very little, if any, friction there.  And

18   then web browsers are, for example, widely available.  You are

19   able to log in, download, and transact on a web browser for if

20   you have a common currency and if the developer so chooses,

21   they can make that functionality available, and that's very

22   easy to do.

23       And it's important to put this in context.  You know,

24   we're talking about frictions in sort of a digital commerce

25   record, and maybe we have just gotten habituated that things

1    are easy to do, but if you think about the friction that is

2    leading to anticompetitive conduct is leaving an app and

3    spending a minute or two on a web browser, that -- you think

4    about what that looks like in the real world, you're talking

5    about, for example, how many convenience store -- there is no

6    way I'd go to another convenience store because it's just --

7    I'd have to walk across the street to do so.  That's, you

8    know -- the types of frictions we're talking about here that

9    are supposedly insurmountable seem very small compared to the

10   ones you would typically see in the real world.  So it's hard

11   to imagine that that is a substantial enough friction, but,

12   again, you can judge, you know, from what you observe

13   qualitatively whether you think that's the case.  And

14   certainly consumers are able to overcome this because they do

15   perform transactions on a wide variety of these platforms.

16   **Q.**  So, Professor Hitt, as an economist that tests for

17   evaluating frictions, it's not whether you could do something

18   with a baby on your shoulder; is that correct?

19   **A.**  I won't even go there.

20   **Q.**  You talked earlier about the role that developers can play

21   in easing these frictions.

22        Can we have slide 31, please.

23        What does this slide tell you about the developers' role

24   in easing frictions between switching -- substitution between

25   digital and transaction platforms, game transaction platforms?

HITT – DIRECT RESUMED – RICHMAN

1    **A.**   Right.  So as I mentioned, a lot of these frictions are

2    under developer control.  They can choose to offer services

3    that make it easy to move across these platforms if they so

4    choose.  Two of them -- I think this has come up before, but

5    just to quantify -- are do they offer the -- I think

6    Your Honor actually mentioned these explicitly.  Can I sign on

7    to my same account?  That is offered -- if you look at all

8    apps or even by game apps, that is typically offered.  And

9    then the other one is can I move my content across apps?  And

10   I did an analysis for the top 25 apps by downloads and revenue

11   for all apps and for game apps just to see how prevalent it is

12   for at least the common apps.  This is very labor intensive so

13   you could probably extend it to 50.  You could probably extend

14   it more, but I focused on the top 25.  And what you find is

15   that most apps, most of the large apps that are revenue

16   generating offer some form of single sign-on.  Sign on once.

17   My account is portable across the -- across devices and many

18   of -- most of them also, although not all, offer the ability

19   to transfer some or all content across these apps.

20        So I think you asked earlier about the extent to which you

21   can move your stuff off or whether you have to basically

22   liquidate your account before you move.  At least most of the

23   top 25 revenue-generating apps have some form that allows you

24   to move at least some of that, but not necessarily all and not

25   necessarily all of them.

1          THE COURT:  And what is the overlap between the top

2     25 game versus top 25 overall?

3          THE WITNESS:  I'd have to go back and look.  When

4     you're talking revenue, I believe that overlap is pretty good.

5     When -- and so revenue and downloads, that's pretty different

6     because you're talking about, you know, a lot of apps that

7     monetize, for example, with advertising, and so that will make

8     that group very different.

9        There is a fair amount on the revenue-generating apps

10    between games and all apps just because game apps tend to be

11    high-revenue generators.  I could probably do the calculation,

12    but it's not on the top of my head, and it's, you know,

13    calculable from the back up.

14          THE COURT:  Proceed.

15    BY MS. RICHMAN:

16    Q.  Professor Hitt, let's talk briefly about an exceedingly

17    popular app that no one in this courtroom has ever used,

18    Tinder.  Is Tinder one of the top 25 apps that you analyzed?

19    A.  Yes.  It's not a game, but it is a high-revenue-generating

20    app, yes.

21    Q.  Does Tinder have a single sign-on?

22    A.  Yes, it does.

23    Q.  And does Tinder allow users to make subscription and

24    non-subscription purchases outside of the app through its

25    website?

HITT - DIRECT RESUMED - RICHMAN

1   **A.**   It allows that as well.

2   **Q.**   And can you use Tinder in an iOS web browser?

3   **A.**   Yes.  I think the swiping is a little different in the

4   browser, but I think you basically poke a button, but, yes,

5   the functionality of Tinder is available through a web

6   browser.

7   **Q.**   From the standpoint as an economist, do you think that

8   these different sorts of transactions on Tinder involve

9   significant friction?

10  **A.**   My assessment would be that these frictions are very low

11  as you can move across these platforms easily depending on

12  what you choose to do, and certainly the developer made it

13  relatively easy to -- to do transactions in a variety of

14  places.

15  **Q.**   Okay.  Just a couple more questions, Professor Hitt.

16       Professor Hitt, you understand that there will be rebuttal

17  opinions offered by Dr. Cragg in this case; is that right?

18  **A.**   Yes, I do.

19  **Q.**   And does Dr. Cragg critique your analysis in his written

20  direct testimony?

21  **A.**   Yes.

22  **Q.**   And when was the most recent production for the backup of

23  Dr. Cragg's analysis produced?

24  **A.**   About a week ago.

25  **Q.**   And have you or your team had the opportunity to review

1   that backup data?

2   **A.**  Not completely.  We certainly looked at it, but we haven't

3   done a comprehensive analysis of what he did.

4   **Q.**  Have you had the opportunity to respond to Dr. Cragg's

5   critiques?

6   **A.**  No.  The timing was such that I wasn't able to respond

7   directly.

8          **MS. RICHMAN:**  Pass the witness, Your Honor.

9          **THE COURT:**  How much time would you need?

10         **THE WITNESS:**  Sorry?

11         **THE COURT:**  How much time would you need?

12         **THE WITNESS:**  So more than a week.  Several -- a

13  couple of weeks is typically the case.  In terms of doing

14  the -- you know, in general, doing reanalysis doesn't take

15  very much time, but the challenges, of course, in litigation

16  settings where you have to be extremely careful and get

17  absolutely everything right, that adds a little more time to

18  the point where we would have something we would be willing to

19  present.

20         **THE COURT:**  Okay.  While Mr. Even is getting ready

21  for cross-examination, do you want to go on the record about

22  whether you use Tinder?  Sorry.  You don't have to answer

23  that.

24         **THE WITNESS:**  It's surprising, the -- whenever I talk

25  about Tinder in my class, it's every one of my students, Ph.D.

1   students in particular, has access to Tinder.  You can have a

2   rich discussion.  I just can't participate as effectively.

3          **THE COURT:**  All right.  Cross.

4          **MR. EVEN:**  May we approach and provide some binders?

5          **THE COURT:**  You may.

6      When was the Cragg rebuttal report produced?

7          **MR. EVEN:**  I'm sorry, Your Honor.

8          **THE COURT:**  When was the Cragg report produced?

9          **MR. EVEN:**  At the same time as Professor Hitt's,

10  Your Honor.  It was an exchange in --

11         **THE COURT:**  No.  I'm talking about the rebuttal.

12         **MR. EVEN:**  That was a rebuttal, the exchange rebuttal

13  report.

14         **MS. RICHMAN:**  Your Honor, this is the analysis that

15  appeared in Dr. Cragg's written direct testimony, not his

16  rebuttal report.

17         **MR. EVEN:**  Your Honor, this was the analysis -- this

18  was backup to some of the analysis that used Professor Hitt's

19  own data that the parties have briefed as part of the

20  objections and Your Honor has ruled upon, and I can ask

21  another couple questions to Professor Hitt about it.

22         **THE COURT:**  Go ahead.

23                    <u>**CROSS-EXAMINATION**</u>

24  BY MR. EVEN:

25  **Q.**  Professor Hitt, the day that Apple asked for the backup

1   for Dr. Cragg, Epic asked for the backup for new charts in

2   your direct testimony.  Are you aware of that?

3   **A.**  I believe so, yes.

4   **Q.**  And when was that data produced?

5   **A.**  I don't recall.  I was aware of the request, but I don't

6   know when it actually was delivered.

7   **Q.**  Could it be that it hasn't been produced yet?

8   **A.**  I don't know.  I don't believe there are new analyses.  I

9   think I made a pie chart out of data in my report, and there

10  was a couple of drop lines and charts, but, again, I don't

11  know.  My research team was working to do that.

12  **Q.**  Okay.  So I want to go quickly over some things that you

13  mentioned in your direct as they are fresh in our mind and in

14  the Court's mind.

15      One was about -- you talked some about switching between

16  Android and iOS.  Do you recall that?

17  **A.**  Yes.  There was some discussion of it.  I don't think I

18  said it as explicitly as that, but, yes.

19  **Q.**  And I believe you mentioned the number 78 million new

20  phones sold every year; is that correct?

21  **A.**  That's correct.

22  **Q.**  And that's compared to the about 300 million or a little

23  more that there are in the U.S.; correct?

24  **A.**  That sounds right.

25  **Q.**  And you said that there is some studies that go between

HITT – CROSS – EVEN

1    low single digits to 26 percent of switching; correct?

2    **A.**   Yes.   That's correct.

3    **Q.**   And so if we take -- let's take 10 percent to make our

4    life easy.  So 10 percent of 78 million would mean that there

5    are about somewhere between 7 and 8 million switching every

6    year under that assumption; correct?

7    **A.**   Yeah.   I think that sounds right.

8    **Q.**   And that's about 7 or 8 million out of 300 million phones;

9    correct?

10   **A.**   I think your math is right.

11   **Q.**   Okay.   And what is that as a percentage?

12   **A.**   That's something like four percent of the installed base,

13   something like that.

14   **Q.**   Okay.

15   **A.**   Maybe three to four percent of the installed base.

16   **Q.**   You talked about some streaming services have great

17   innovation; correct?

18   **A.**   Yes.

19   **Q.**   And you agree that those streaming services are not -- not

20   able to be native apps on iOS; correct?

21   **A.**   That's correct.

22   **Q.**   And you agree with me that, for instance, if Netflix were

23   not allowed to be a native app on iOS, that would harm

24   Netflix; correct?

25   **A.**   I don't know for sure, but that is probably the case, yes.

HITT - CROSS - EVEN

1  **Q.**  And it would harm innovation and competition; correct?

2  **A.**  I'm not sure.  I haven't done an analysis that would go

3  that far.

4  **Q.**  You're not sure -- sorry?

5  **A.**  I don't know.  That's not something I've done.

6  **Q.**  You don't know if booting Netflix off the App Store would

7  be bad for innovation and competition?

8  **A.**  So it's -- I haven't done the analysis.  I would think

9  that it would be harder to access Netflix.  It would depend on

10  what their response was.

11  **Q.**  But based on Apple's position in this case, Apple could

12  decree tomorrow that Netflix is off the App Store; correct?

13  **A.**  I believe that's within their policies.  This is not

14  something that's happened.

15  **Q.**  I want to go back to slide 17 that you had put up.  Do you

16  recall that slide?

17  **A.**  If we could pull it up, that would be helpful.

18  **Q.**  It's on the screen.

19  Do you recall that slide?

20  **A.**  Yes, I do.

21  **Q.**  And in that slide, you mentioned that something wonderful

22  happened to Epic in March of 2018 or a little earlier, and

23  *Fortnite* came out and came out on iOS; correct?

24  **A.**  That's correct.

25  **Q.**  And that was in the -- in Epic's sphere, that was a big

1    innovative step for Epic; correct?

2    **A.**   Yes.

3    **Q.**   And I think you mentioned that that caused Epic to be able

4    to charge much more than it had before for in-app

5    transactions; correct?

6    **A.**   Yes.

7    **Q.**   And you said that that's a good thing, that means that

8    Epic was providing much more value to its customers than it

9    had before; correct?

10   **A.**   Yes.  Rising prices is consistent with greater consumer

11   value if people are willing to pay.

12   **Q.**   And -- sorry.  Didn't mean to cut you off.  Thank you for

13   that.

14       And if we see -- look at the median, I think you mentioned

15   that essentially Epic was able to sell something that

16   consumers valued at about five dollars up to March of 2018 and

17   about ten dollars after that; correct?

18   **A.**   That's correct.

19   **Q.**   And that is a hundred percent increase, even I understand

20   that; right?

21   **A.**   Sure.

22   **Q.**   Okay.  Now, what happened to the commission that Apple was

23   charging was that it went up from one and a half dollars to

24   three dollars on that day; correct?

25   **A.**   That's correct as well.  Commission price has been

1    constant.  Price of the app chosen by Epic has increased.

2    That followed.

3    **Q.**  So Apple started making a lot more money on each

4    transaction on -- on an Epic game; correct?

5    **A.**  That's correct.

6    **Q.**  The same hundred percent increase; correct?

7    **A.**  They are proportional under the commission rate scheme.

8    **Q.**  Now, the transactions that occurred in February 2018

9    weren't any different from the transaction service provided by

10   Apple in April of 2018; correct?

11   **A.**  So the transaction itself is very similar.  The capability

12   to offer games like *Fortnite* accumulated over many, many, many

13   years before.

14   **Q.**  I understand, sir.

15       In March of 2018, Apple did not introduce any new

16   innovation into the sphere of App Store transactions that

17   completely changed the value that it delivered to Epic;

18   correct?

19   **A.**  That's correct.

20   **Q.**  Thank you.

21       Now, this kind of pricing based on a percentage of the

22   transaction is somewhat common in specific licensing like IP

23   licensing; correct?

24   **A.**  It's a common economic mechanism that allows you to share

25   revenue without having to have a huge amount of information

1   about what your counterparties are doing.

2   **Q.**  And it is known as ad valorem commission; correct?

3              **THE COURT REPORTER:**  I'm sorry?

4              **THE COURT:**  He said "ad valorem."

5              **THE WITNESS:**  That's not a phrase I have used.  I

6   just think of it as a percentage commission.

7   **BY MR. EVEN:**

8   **Q.**  Okay.  Now, in the context of a patent license, for

9   instance, a patent runs out after 20 years; correct?

10  **A.**  Patents do have a duration.

11  **Q.**  But Epic -- but Apple's position is that it's entitled to

12  this 30 percent forever?

13  **A.**  For -- Apple's commission scheme is if you sell something

14  on the App Store, they get a 30 percent.  I don't think --

15  there is not a temporal element in that sense.

16  **Q.**  It doesn't have the same temporal element of the IP

17  license; correct?

18  **A.**  It's not a comparison I've drawn, but if you transact in

19  the App Store, you earn revenue, the commission is triggered

20  by that event.

21  **Q.**  I want to go back for a second to one of your other slides

22  where you suggested that Epic retained 81 to 88 percent of its

23  iOS revenue following the termination of Epic from the App

24  Store.  Do you recall that?

25  **A.**  Yes.

HITT - CROSS - EVEN

**Q.**   And I believe that was slide 28.  That was your opinion?

**A.**   Yeah.  That's a calculation.

**Q.**   Okay.  So I want to talk a little bit about this
calculation, if we may.

**A.**   Sure.

**Q.**   Can we bring up our Exhibit 13 demonstrative.  Our Exhibit
13 demonstrative.  The pie chart.  The pie chart.

  Okay.  Never mind.

     **THE COURT:**  If you don't have it, we can turn on the
ELMO.

     **MR. EVEN:**  I don't have it here.

**Q.**   So let's just use your numbers -- and that's okay.  If we
can turn to Hitt 25, slide number 25.  If you can open that
slide up, sir.  That's from these binders.  So unless there is
some difference between what I have and what they have, I
don't know.

     **THE COURT:**  Mr. Even, you have a physical copy?

     **MR. EVEN:**  I do have a physical copy and the witness
has a physical copy before him, I believe, so we can talk
about it like that.

     **THE COURT:**  So where -- you gave me two binders.  Do
I have a physical copy?

     **MR. EVEN:**  Your Honor, if I may step for a second to
Mr. Rudd?

     **THE COURT:**  You may.  Again, we also have the

1    capability of turning on the ELMO, the overhead, and you can

2    put it right on there.

3    **BY MR. EVEN:**

4    **Q.**  Sir, in slide 25 --

5               **THE COURT:**  Can we turn on the ELMO?

6               **MS. RICHMAN:**  Mr. Even, I don't believe that is slide

7    25 of Professor Hitt's deck.

8               **MR. EVEN:**  It said slide 25 in my binder.

9               **MS. RICHMAN:**  That was not used today.

10              **MR. EVEN:**  Okay.  But it's in my binder.

11              **MS. RICHMAN:**  It's not in my binder.

12              **MR. EVEN:**  Let me just put it up.

13              **MS. RICHMAN:**  No.  That is slide 25.  I was talking

14   about the one you had up before.  Sorry.

15              **MR. EVEN:**  That is slide 25 from today?

16              **MS. RICHMAN:**  Yes, it is.

17              **MR. EVEN:**  Thank you.

18   **Q.**  So, Professor Hitt, I just want to make sure we understand

19   exactly what you explain when you explain the 85 percent.  So

20   what we see here are purchasing behaviors of iOS *Fortnite*

21   users; correct?

22   **A.**  That's correct.

23   **Q.**  And what we have here is that you said 75.9 percent make

24   no purchases at all; correct?

25   **A.**  That's correct.

HITT – CROSS – EVEN

**Q.**   And 15.8 percent buy only on other platforms; correct?

**A.**   That's correct.

**Q.**   And so that is essentially somebody who, once in their life or maybe more, opened *Fortnite* on an iOS device but generally they only transact on other platforms such as the Sony PlayStation?

**A.**   I think you could make that a little firmer, which is to say they observe, at least in this period, only transactions on another platform.

**Q.**   Then we have 5.6 percent that transacted some on iOS and some on -- sorry -- only on iOS; correct?

**A.**   That's correct.

**Q.**   And 2.8 that transacted some on iOS and some on other platforms; correct?

**A.**   That's also correct.

**Q.**   All right.  And do you recall that in your report, you found that the 15.8 group of people who purchased only on the Sony and other devices accounted for 65.4 percent of the spend by people who ever accessed *Fortnite* on iOS; correct?

**A.**   Sorry.  Which -- which number are you referring to specifically?

**Q.**   I am referring to the 15.8 percent.

**A.**   Oh, divided by the sum of the three pies?

**Q.**   Yes.

            **THE COURT:**  And they accounted for what?

1        **MR. EVEN:**  I'm sorry, Your Honor?

2        **THE COURT:**  I was trying to understand your

3   statement, your question.  Of that 15.8 percent, 65 percent

4   did what?

5        **MR. EVEN:**  Not of the 15.8 percent, Your Honor.

6   **Q.**  Mr. Hitt, do you remember that in your report --

7   Professor Hitt, sorry -- you allocated revenue to these three

8   groups; correct?

9   **A.**  I've done calculations that focus on spending on iOS and

10   so forth.  I think you'd have to point me to the one that you

11   think -- that you're talking about, but, yes, I've done those

12   calculations.

13   **Q.**  And you found that 65.4 percent of all the spend by people

14   who accessed *Fortnite* on iOS spent all that money only on

15   other -- only on other platforms; correct?

16   **A.**  Let me just clarify.

17       So the number you're citing here is 15.8 divided by those

18   three pie charts, correct?  I'm just not sure which number you

19   are referring to.  That seems about right, but I'm not sure

20   what you're talking about.

21        **THE COURT:**  Which three pie charts are you talking

22   about?

23        **THE WITNESS:**  So -- well, I will leave it to Mr. Even

24   to explain, but I think that's the number if you take the

25   15.856 and 28, add them up, and then -- as the denominator and

```
 1    then 15.8 as the enumerator, but I'm not sure.
 2              MR. EVEN:  Your Honor, I'll move on.
 3              THE COURT:  Do you want us to switch back to
 4    Mr. Rudd, or do you still want the overhead?
 5              MR. EVEN:  I want the overhead for now.
 6              THE COURT:  Okay.
 7              MR. EVEN:  Thank you, Your Honor.  I apologize,
 8    Your Honor.
 9    Q.  Mr. Hitt, do you recognize Exhibit 13 from your rebuttal
10    report?
11    A.  Yes.  Good.
12    Q.  And do you see that here you said only from iOS, that's
13    the first group, that is 23.1 percent of spending by iOS users
14    on Fortnite; correct?
15    A.  Yes.  That's correct.
16    Q.  And these are people who only ever transacted in Fortnite
17    on iOS; correct?
18    A.  That's correct.
19    Q.  Is this --
20    A.  I'm sorry.  Sorry.  Which number are we referring to?
21    Q.  That 23.1 percent, sir.
22    A.  Oh, yes.  Yes.  Sorry.
23    Q.  And then we have 11.5 percent, and those are people who
24    transacted some on iOS and some on other platforms; correct?
25    A.  Yes.  That's correct.
```

HITT – CROSS – EVEN

**Q.**   And then we have 64.5 -- 65.4 percent of people who only

ever transacted on Sony PlayStation, Xbox, etc.; correct?

**A.**   That's correct.

**Q.**   Okay.  Now, you would agree with me that if Apple, for

instance, raised the price on the distribution of *Fortnite* on

iOS, that would not affect the people -- the transactions --

the 65.4 percent transactions; correct?  Those are

transactions that never touched iOS in any way, shape or form;

correct?

**A.**   So it wouldn't -- if the consumers continued to behave as

they have in the past, that would not affect that group.

**Q.**   Because if I sometimes opened my *Fortnite* on iOS but I

transact on Sony, the fact that Apple increased its prices, it

doesn't affect me; correct?

**A.**   Yes.  That's correct.  If you -- again, all else equal,

but, yes, that would be the case.

**Q.**   And so when you looked at what happened after August 13

and you started talking about the retention rate, you included

those transactions in the 85 number; correct?

**A.**   Yes.  I separated those numbers into the components, and

the 85 number does include that group, absolutely.

**Q.**   And by including those folks in your retained revenue

number, you begin your revenue retention exercise with a

guaranteed retention rate of 65.4 percent of all *Fortnite*

income from people who ever opened *Fortnite* on iOS; correct?

1  **A.**  No.

2  **Q.**  I'm sorry?

3  **A.**  No.

4  **Q.**  Sir, you began the exercise with a retention rate of 65.4

5  percent; correct?

6  **A.**  It doesn't work that way.  I can clarify, if you --

7  **Q.**  No, thank you.

8      Do you remember that you were deposed by me?

9  **A.**  Uh-huh.

10         **THE COURT:**  Is that a "yes"?

11         **THE WITNESS:**  Yes.

12  **BY MR. EVEN:**

13  **Q.**  And do you remember that in your deposition, I asked you

14  that question?

15  **A.**  I think you may have, yes.

16         **MR. EVEN:**  And, Your Honor, if I may --

17         **THE COURT:**  I'm getting it.  So you gave me two big

18  binders.  What I don't see is the deposition is supposed to be

19  Tab 7 and I only have through Tab 4.

20         **MR. CARVAJAL:**  Tab 2, Your Honor.

21         **MR. EVEN:**  Tab 2 I'm being told.

22         **THE COURT:**  I just need his deposition transcript.

23      Okay.  Mr. Even, page and line number?

24         **MR. EVEN:**  This is page 296, lines 13 to 24,

25  Your Honor.

1          **THE COURT:**  Okay.  Proceed.

2     **BY MR. EVEN:**

3     **Q.**  Professor Hitt, do you recall that I asked you, "That

4     would mean that by including those folks in your retention

5     number at the top row, you begin the exercise with a retention

6     rate of 65.4 percent; correct?"

7          And there is some colloquy, and then you say, "Yeah, I

8     believe that is correct, yes."

9     **A.**  Yes.  As a practical matter, that's correct.

10    **Q.**  Sir, did you give this answer?

11    **A.**  Yes.

12          **THE COURT:**  So, Professor Hitt, the way this works is

13    they get to read this and you can --

14          **THE WITNESS:**  Okay.

15          **THE COURT:**  -- be subject to redirect.

16          **THE WITNESS:**  Sorry.

17    **BY MR. EVEN:**

18    **Q.**  And, in fact, from the other two groups, the 23.1 percent

19    that Epic obtained from people who only ever purchased on iOS

20    and the 11.5 that sometimes purchased on iOS and sometimes on

21    others, Epic only retained about 50 percent; correct?

22    **A.**  That's correct.  That's the empirical result.

23    **Q.**  Sir, you hold a bachelor degree and graduate level degrees

24    in electrical engineering; correct?

25    **A.**  That's correct.

1   **Q.**   And a Ph.D. in management; correct?

2   **A.**   That's also correct.

3   **Q.**   And you previously taught at the Sloan School of

4   Management; correct?

5   **A.**   That's correct as well.

6   **Q.**   And you are now at the Wharton Business School; correct?

7   **A.**   Yeah.  The chronology is a little bit different than you

8   suggested.  I taught for one semester on leave, but I've been

9   at Wharton for 25 years.

10  **Q.**   Okay.  Thank you for that correction.

11      You've never been accepted as an expert witness by any

12  U.S. court on the topic of antitrust economics; true?

13  **A.**   That's correct.  No other cases I have been involved in

14  went to trial.

15  **Q.**   And prior to this case, you've never filed a report in any

16  case on the topic of market definition; correct?

17  **A.**   That's correct.

18  **Q.**   And you've never published any books or papers

19  specifically about market definition; correct?

20  **A.**   That's correct.

21  **Q.**   And, in fact, you've never published books or papers

22  specifically about antitrust; is that correct?

23  **A.**   Yes.  I think that's correct.  There is no publication I

24  have that is specifically antitrust.

25  **Q.**   And you have also never published books or papers

HITT – CROSS – EVEN

1  specifically about the antitrust implications of two-sided

2  markets; correct?

3  **A.**  That's correct.

4  **Q.**  Yesterday you were asked by the Court some questions about

5  the recent Apple small business plan.  Do you recall that?

6  **A.**  Yes.

7  **Q.**  And you told the Court that your understanding was that

8  Apple has explained that they wanted to support innovation

9  with that program.  Do you recall that?

10  **A.**  Yes.  That's my understanding.

11  **Q.**  And you presented the small business program in your slide

12  10, I believe, as an example of App Store commission

13  decreases; correct?

14  **A.**  I'll take your word on the slide, but, yes, I presented

15  that.

16  **Q.**  And you presented that as a sign of decreasing

17  commissions; correct?

18  **A.**  Yes.  30 to 15 for those developers who qualify.

19  **Q.**  And the small business program lowered the rate on the

20  developers making less than one million a year from 30 percent

21  to 15 percent; correct?

22  **A.**  Yes.

23  **Q.**  In late 2020 or early 2021, before the program was

24  adopted, are you aware of any other platform lowering its

25  commission rate?

HITT – CROSS – EVEN

1    **A.**   So I don't recall the precise timing, but I believe Valve

2    lowered its commissions for very large developers.  I don't

3    recall exactly when that occurred dropping from 30 to 25 to

4    20, depending on how large you were.  So I believe that's one

5    case.

6        I don't believe this -- I cited it in my report, but there

7    may have been a Microsoft announcement as well, but I only

8    vaguely recollect that.

9    **Q.**   And do you recall that the Epic decline was in 2018?

10   **A.**   What are you referring to is the Epic decline?

11   **Q.**   Sorry.  The Steam decline was in 2018?

12   **A.**   I don't remember when they announced that.  It's probably

13   in my report, but I don't have it off the top of my head.

14   **Q.**   Okay.  You're not aware of any relationship between the

15   Valve decision to lower its commission in 2018 and the small

16   business program; correct?

17   **A.**   I -- I have no information that would link them directly.

18   **Q.**   Okay.  And in late 2020 or early 2021, you are also not

19   aware of any decline in demand for apps or app transactions in

20   iOS; correct?

21   **A.**   There's -- again, it's not something specifically I

22   examined in that -- that narrow window, but there is nothing

23   to suggest that from the output data, no.

24   **Q.**   And Apple certainly in its public statements did not

25   suggest that it was lowering its commissions to meet any kind

HITT - CROSS - EVEN

1    of competitive threat; correct?

2    **A.**  I don't recall their full communication, but I don't

3    recall anything of that form.

4    **Q.**  Instead, Apple said it was doing it to support innovation;

5    correct?

6    **A.**  That's my understanding.  Again, I don't recall the

7    specific words, but my general understanding was that was one

8    of the reasons.

9    **Q.**  You testified yesterday that pricing is set by supply and

10   demand; correct?

11   **A.**  That's correct.

12   **Q.**  If Apple lowered its price to support innovation, that is

13   an example where Apple's price was not set by specific supply

14   and demand forces; correct?

15   **A.**  I wouldn't say that, no.  I disagree.

16   **Q.**  Okay.

17   **A.**  It is -- it's a response to -- to enhance the overall size

18   of the ecosystem which increases revenue.

19   **Q.**  Okay.  If Apple lowered its price to support innovation,

20   you believe its current price is profit maximizing?

21   **A.**  I don't have any specific opinion on that because I didn't

22   investigate that, but it -- it very well could be.

23   **Q.**  Apple believed that 30 percent apparently was the profit

24   maximizing price until January 2021; correct?

25   **A.**  I -- I don't know what Apple believed, but they did make a

HITT – CROSS – EVEN

1    decision to lower the price on a certain group, so --

2    Q.   Okay.

3    A.   -- they may have decided that some conditions had changed

4    at some point that would make that beneficial.

5    Q.   And have you seen any data to suggest that Apple could not

6    tomorrow increase the price back to 30 percent and that

7    increase would be profitable?

8    A.   I've seen no data on the feasibility or the impact of

9    that.

10   Q.   But it's not beyond the pale, is it?

11   A.   I don't like to speculate on things I haven't done, but,

12   you know, many things are possible.

13   Q.   People can raise prices from time to time and do it

14   profitably; correct?

15   A.   Given the market circumstances, yes.

16   Q.   In any event, Apple understood as of early 2021 that a

17   reduction in commission from 30 percent to 15 percent would

18   support innovation; correct?

19   A.   Again, that's my understanding broadly.

20   Q.   And you don't disagree with Apple that lowering Apple's

21   commission rate from 30 percent to 15 percent would support

22   innovation; correct?

23   A.   I have no reason to doubt that that's their motivation,

24   and it seems plausible to me.

25   Q.   Thank you.

1        Now, you showed the Court yesterday several charts showing

2    growth in game transactions, app transactions, developer

3    revenues.  Do you recall these?

4    **A.**  Yes.

5    **Q.**  In putting these slides together, have you done any work,

6    any modeling, for example, of how these indices would grow in

7    a but-for world without Apple's restrictions?

8    **A.**  So I haven't done a formal structural model, but there are

9    benchmarks that you can compare it to.

10   **Q.**  Have you done any work, sir, to model what those growth

11   rates would be without Apple's restrictions?

12   **A.**  No.  As I said, I haven't done a structural model or

13   anything of that form.

14   **Q.**  And you're aware, are you not, that in March 2008, Steve

15   Jobs publicly stated that Apple does not intend to make any

16   money from the App Store; correct?

17   **A.**  Yes.  I recall that quote.

18   **Q.**  And have you done any modeling to show how transactions

19   and developer revenue would have grown in a but-for world

20   where Apple kept Mr. Jobs' promise?

21   **A.**  I don't know if you -- I'd characterize it as a promise.

22   It's a statement.  But, no, I've done no modeling of that.

23   **Q.**  Now, sir, given your background, I'm assuming you are

24   familiar with Moore's Law; correct?

25   **A.**  Yes.  I teach Moore's Law.

HITT – CROSS – EVEN

1    **Q.**  And Moore's Law observes that the number of transistor

2    doubles every two years or so; correct?

3    **A.**  Good enough.  Yeah.  That's close enough.

4    **Q.**  And the transactions we're talking about are digital

5    transactions; correct?

6    **A.**  They are.

7    **Q.**  And they derive value from the improvements in iPhone

8    chips and iPhone screens and other iPhone hardware; correct?

9    **A.**  Yes.  And the integration thereof, sure.

10    **Q.**  Now, in putting together your slides, have you taken any

11    steps to control for Moore's Law or for the general immense

12    progress the iPhones and smartphones more generally have made

13    in the past 13 years?

14    **A.**  I'm not sure what you mean by control.

15    **Q.**  I mean you've looked at revenues from the App Store,

16    you've looked at number of transactions on the App Store.

17        Have you done anything to control for things that had

18    nothing to do with the App Store necessarily or with the

19    restrictions at issue such as the fact that iPhone's gotten

20    better?

21    **A.**  So I didn't do any modeling of that form.  I don't think

22    it's appropriate, but, no, I didn't do anything.

23    **Q.**  Okay.  And the transactions you analyzed are often done

24    over a cellular network; correct?

25    **A.**  They can be.  These are network devices, WiFi, cellular.

1   **Q.** And cellular connectivity and cellular network reach and

2   cellular bandwidth and cellular speeds have all grown

3   exponentially since 2008; correct?

4   **A.** That's correct, yes.

5   **Q.** And so, for instance, today we can stream movies which we

6   couldn't do in 2008; correct?

7   **A.** I'm not sure that statement is correct, but certainly the

8   capability has gotten better over time dramatically.

9   **Q.** Okay.  You recall Mr. Jobs standing and announcing the

10   second version of the iPhone and miraculously downloading a

11   picture in like 22 seconds?

12   **A.** I may have seen that in the past.  I don't recall.

13   **Q.** Okay.  That didn't seem like the technology was really

14   ready for streaming movies over cellular, did it?

15   **A.** Over cellular, not at full resolution and at full quality,

16   no.

17   **Q.** And today we can stream apps on cellular; correct?

18   **A.** Yes.  We're getting there.

19   **Q.** And we couldn't do that in 2008; correct?

20   **A.** I -- I think that's fair.

21   **Q.** And today we can have video chats over Zoom or FaceTime;

22   correct?

23   **A.** Perhaps too often, yes.

24   **Q.** And we couldn't do that over cellular connectivity in

25   2008, could we?

1   **A.**   I don't know.  I don't think it was widely available.  It

2   was -- you know, YouTube was accessible, but a lot of the

3   stuff we have now relies on heavy bandwidth.

4   **Q.**   YouTube can buffer; right?

5   **A.**   Yes.

6   **Q.**   And FaceTime cannot; correct?

7   **A.**   I don't want to speculate about that.  There existed video

8   technology that existed before, but I will not disagree that

9   it's gotten dramatically better.

10   **Q.**   Okay.  And today, we can play multiplayer games over

11   cellular such as *Fortnite* or *PUPG* or any other game like that

12   and we couldn't do that back in 2008; correct?

13   **A.**   That's correct.

14   **Q.**   And all of this growth in cellular technology had nothing

15   to do with Apple's restrictions on the App Store; correct?

16   **A.**   As you have narrowly defined the question, that's correct.

17   **Q.**   And when putting together your growth slides, have you

18   done anything to control for the immense growth in cellular

19   capabilities between 2008 and 2021?

20   **A.**   So there's -- there's no controls in there because, again,

21   I don't believe it's appropriate to remove the innovations

22   Apple has contributed.

23   **Q.**   Have you done any analysis that suggests that the growth

24   rates you showed yesterday had anything to do with Apple's

25   restrictions?

HITT – CROSS – EVEN

1    **A.**   Apple's restrictions?  No.  It's --

2    **Q.**   Thank you.

3    **A.**   The growth is part of the ecosystem.

4           **THE COURT:**  Two minutes, Mr. Even.

5           **MR. EVEN:**  I'm sorry, Your Honor.  Two minutes?

6    Thank you.  So I can do a quick thing.

7    **Q.**   You relied on some of Apple's other experts in forming

8    your opinions; correct?

9    **A.**   Yes, I did.

10   **Q.**   You relied on Professor Schmalensee?

11   **A.**   Yes, I did, for the two-sided market issues.

12   **Q.**   And you relied on Professor Lafontaine's framework for

13   market definition; correct?

14   **A.**   That's correct as well.

15   **Q.**   You relied on the results of Professor Hanssens' survey;

16   correct?

17   **A.**   Yes.

18   **Q.**   Now, before undertaking your engagement in this case, you

19   understood that the hypothetical monopolist test is a

20   well-accepted test that can be used to define a relevant

21   market; correct?

22   **A.**   Yes.  It has been for some time.

23   **Q.**   And just like Professor Lafontaine, you, too, did not

24   perform a hypothetical monopolist test in this case; correct?

25   **A.**   That's correct.

HITT – CROSS – EVEN

1   **Q.**  And you also have never done a SSNIP test in this case or

2   any case; correct?

3   **A.**  Yes.  I believe that's correct.

4   **Q.**  Now, before you decided not to undertake any type of

5   hypothetical monopolist test in this case, you did not make

6   any effort to investigate whether any U.S. court or antitrust

7   agency has defined or accepted a relevant market without

8   performing some kind of hypothetical monopolist test; correct?

9            **MS. RICHMAN:**  Objection.

10           **THE COURT:**  He either did –– what's the objection?

11  He either did or didn't consider it.

12           **MS. RICHMAN:**  He's an economist, not a lawyer.

13           **THE COURT:**  I understand that, actually, but I'm

14  assuming the answer here is no.

15      Did you?

16           **THE WITNESS:**  You are correct.  The answer is no.

17           **THE COURT:**  He's not –– okay.  Is this ––

18  BY MR. EVEN:

19  **Q.**  And you're not offering an independent opinion that a

20  hypothetical monopolist test is unnecessary in this case;

21  correct?

22  **A.**  Could I hear the question again, please?

23  **Q.**  You're not offering an independent opinion that a

24  hypothetical monopolist test is unnecessary here; correct?

25  You are relying on Professor Lafontaine for that?

1    **A.**   I'm not offering an opinion of that form.

2           **THE COURT:**  Is this a good place, Mr. Even?

3           **MR. EVEN:**  Yes, Your Honor.

4           **THE COURT:**  All right.

5       Per earlier discussion, I don't know if you heard, but,

6    Professor Hitt, you are instructed not to talk to any of the

7    parties or lawyers during the break.

8       We will stand in recess for 20 minutes.  Thank you.

9                    (Recess taken at 10:15 a.m.)

10                   (Proceedings resumed at 10:36 a.m.)

11          **THE COURT:**  We are back on the record.  The record

12   will reflect that the parties are present.  The witness is on

13   the stand.  You may proceed.

14          **MR. EVEN:**  Thank you very much, Your Honor.

15                   <u>**CROSS-EXAMINATION**</u>

16   BY MR. EVEN:

17   **Q.**  Professor Hitt, you believe that products that are central

18   to the conduct at issue must be within the product market,

19   correct?

20   **A.**  Yes.

21   **Q.**  And the products you focused on in this case are the

22   initial download, re-download, update and in-app purchases of

23   game content between developers and consumers, correct?

24   **A.**  Yes.

25   **Q.**  And transactions from nongame apps are not part of your

1    market, correct?

2    **A.**   They are not part of the games transaction market, no.

3    **Q.**   So Spotify, for instance, is outside the market, correct?

4    **A.**   That's correct.

5    **Q.**   And Netflix is outside the market, correct?

6    **A.**   Yes.

7         **THE COURT:**   Did you -- and I'll take this, but I'm

8    curious whether you did any clustering in testing the market

9    definition that you rejected in your informal discussions with

10   the others as you were collaborating in defining the market.

11        **THE WITNESS:**   So if you're meaning -- so there's two

12   types of things you can investigate.  You can investigate

13   whether games is too broad or too narrow.  It sounds like

14   you're suggesting it's too narrow.  There were some analyses

15   that I did to suggest that the underlying economic

16   considerations that apply to games are different than other

17   kinds of apps.

18        **THE COURT:**   But did you do, for instance,

19   entertainment or some kind of clustering of apps where in-app

20   purchases were driving the economics for the developers as

21   opposed to -- you know, as opposed to others where everything

22   is free?

23        **THE WITNESS:**   So -- so, yeah, I think you highlighted

24   on one of the things we did look at, which is the monetization

25   mechanisms.  Games, in particular are unique, at least very,

1   very different if you look at that, because they rely very

2   heavily on in-app purchases of individual items; whereas, for

3   example, entertainment is very subscription-driven.  And other

4   things, for example, social media is very advertising-driven.

5        So there is a sequence of analyses that I did where I

6   looked at the various genres and compared some of the

7   monetization schemes.  And games, especially on the IAP area,

8   really stand out as being very different from all the others.

9            **THE COURT:**  Are those tests that you did, were those

10  disclosed in your report?

11           **THE WITNESS:**  Yes.  There is a series of graphs in my

12  written direct.  And there's more in my rebuttal, but I

13  focused on -- the one you just alluded to is in there.

14           **THE COURT:**  Okay.  Mr. Even.

15           **MR. EVEN:**  Thank you, Your Honor.

16  BY MR. EVEN:

17  **Q.**  And you recall telling me in your deposition that if

18  Spotify brought the same complaint with the same allegations,

19  that would require a different market analysis, correct?

20  **A.**  Yes.  You would want to look at how Spotify -- what the

21  alternatives would be for Spotify as compared to an Epic or

22  other game provider.

23  **Q.**  Because the harm to Spotify is different than the harm to

24  Epic, in your view?

25  **A.**  I don't know that.  What I do know is that there is -- the

HITT – CROSS / EVEN

1    underlying economics could be different, and it is important

2    to evaluate that.

3    **Q.**   The focus is on the harm to the plaintiff and not to

4    competition generally?

5    **A.**   I don't know how to answer that one way or another.  I

6    would focus on -- I'm focused on the harm to competition, but

7    certainly you want to pay attention to what product is offered

8    by the plaintiffs so you can do the relevant part of relevant

9    market.

10   **Q.**   Okay.  When you decided to focus solely on games, you

11   understood that Epic publishes some *Unreal Engine* apps,

12   correct?

13   **A.**   Yes.

14   **Q.**   You understood those are not games?

15   **A.**   They support game development, but they are not games.  I

16   believe they are essentially DevTools.

17   **Q.**   That means they are not games, correct?

18   **A.**   They are not games.

19            **THE COURT:**  You said development tools?

20            **THE WITNESS:**  Yes.  I would have to go back and look

21   exactly what they are, but one looked like, for example, an

22   app that allows you to do testing.  There is some other things

23   like that, but I don't recall exactly all of them right now.

24   **BY MR. EVEN**

25   **Q.**   And you understand that *Unreal Engine* serves, beyond

HITT - CROSS / EVEN

1    games, other uses, correct?

2    **A.**   Yes.

3    **Q.**   And so these are DevTools for other kinds of apps,

4    correct?

5    **A.**   They could be.  The media -- I know it is used for media

6    content generation.  I haven't really thought about whether

7    that goes into an app or some other kind of media production.

8    **Q.**   But it could, correct?

9    **A.**   Presumably, yes.

10   **Q.**   You understood that Epic publishes *Houseparty*, correct?

11   **A.**   Yes.

12   **Q.**   And *Houseparty* is a social app which would not be within

13   the games market you've articulated, correct?

14   **A.**   That's correct.  There are some connections between

15   *Fortnite* and *Houseparty*, but it is a social media app.

16   **Q.**   You also have not analyzed the allegations related to

17   Epic's ability to offer EGS on iOS, correct?

18   **A.**   Not specifically, no.  I've analyzed the game market, but

19   I haven't focused on EGS as an app, for example.

20   **Q.**   You remember you told me in your deposition that you've

21   personally not analyzed the allegations related to entry of

22   the EGS?

23   **A.**   That's correct.

24   **Q.**   When a user on the Epic game store obtains an app that is

25   not a game, is that a digital game transaction?

1    **A.**   It's a digital transaction, but not a game transaction.

2    So that would be no.

3    **Q.**   You also didn't do any analysis on payment systems,

4    correct?

5    **A.**   That's correct.  That wasn't within my scope.

6    **Q.**   In defining a game transaction market, you have not

7    offered any kind of definition of what a game is, correct?

8    **A.**   Not specifically, no.  I rely on self-identification.  At

9    least for my analyses.

10   **Q.**   You assumed *Roblox*, for instance, is a game, correct?

11   **A.**   I don't assume.  I relied on classifications provided by

12   developers in doing my analysis.

13   **Q.**   And what was the classification that you relied on?

14   **A.**   There is a genre designator, and then within genre, there

15   is also subgenres.  And within games, there are many

16   subgenres.

17   **Q.**   Have you consulted with anyone at Apple whether they

18   consider *Roblox* a game or nongame?

19   **A.**   No.

20   **Q.**   You agree with me, sir, that as between the two market

21   definitions before the Court, Epic's and Apple's, only Epic's

22   market actually includes all the Epic apps that we just

23   discussed, correct?

24   **A.**   Yes.  *Houseparty* is outside the games transaction market.

25   So that would be yes.

HITT – CROSS / EVEN

**Q.**  You talked a little bit in your -- towards the end of your
testimony about friction.  Do you remember that?

**A.**  Yes.

**Q.**  It is fair to say, isn't it, that whatever you think of
the level of friction, if a developer believes it cannot move
enough of its customers to a different transaction platform in
the face of a price increase, then that friction is relevant
to antitrust analysis, correct?

**A.**  It could be, yes.

**Q.**  And you have not presented any data, for instance, on how
long the process of purchasing content outside a game app
would take, correct?

**A.**  I did, as part of my backup, examine how long it took to
purchase V-Bucks through a web browser, but I didn't do a
systematic analysis of all the other ways in which you might
go across platforms.

**Q.**  You haven't done any systematic study to see how many
transactions a game developer would lose if they tried to
encourage users to make purchases outside of the app instead
of in app, correct?

**A.**  I think the studies I've done would be -- on that
specifically would apply to media apps, so not specifically in
games.

**Q.**  Sir?

**A.**  Yes.

1    **Q.**  Do you remember I asked you this question in your

2    deposition?

3    **A.**  I actually don't recall, but you could have.

4    **Q.**  So you may turn to page 121, beginning on line 23 of your

5    deposition.

6             **THE COURT:**  Hold on.  Well, I had his deposition.

7             **MR. EVEN:**  I believe you had it twice by now, Your

8    Honor.  But if you need, I will get you his binder.

9             **THE COURT:**  Maybe it's just marked differently.

10            **MR. EVEN:**  It is supposed to be in binder 1, tab 2,

11   Your Honor, if that is helpful.  Okay.

12            **THE COURT:**  Okay.  I do have it twice.  You can send

13   this one back.  I think it belongs to Mr. Carvajal.  Line --

14   page --

15            **MR. EVEN:**  121, Line 23, Your Honor.

16            **THE COURT:**  Okay.  Go ahead.

17   BY MR. EVEN:

18   **Q.**  Sir, if you look at the cite that I just gave to the

19   Court, 121:23, you see that I asked you:

20            "Okay.  Have you done any kind of study to see how

21            many transactions a game developer could lose if he

22            did try to encourage to make purchases outside of the

23            app instead of in app?"

24        Ms. Richman objected.

25            You said:  "So -- so that is not a study I have

HITT – CROSS / EVEN

1           done."

2       Do you see that?

3    **A.**   Yeah, that is consistent with my prior answer.

4    **Q.**   Sir, did you see that you said that in your deposition?

5    **A.**   Would you give me the cite, please?

6    **Q.**   It is 121:23.

7           **THE COURT:**   You can either move on or -- unless you

8    want him to affirmatively admit that he said that.

9           **MR. EVEN:**   I will just stipulate that he said that

10   and move on, Your Honor.  Thank you.

11   **BY MR. EVEN:**

12   **Q.**   Sir, you agree that developers want to maximize their

13   profits, correct?

14   **A.**   In general, yes, that is a standard assumption.

15   **Q.**   If a game developer or another app developer could

16   convince enough users to execute their transactions on a web

17   browser instead of in app on iOS, that could save the

18   developer the cost of the 30 percent Apple commission,

19   correct?

20   **A.**   Yes.

21   **Q.**   So developers are highly incentivized to try and do that

22   if they think they can, correct?

23   **A.**   Yes.  That's fair.

24   **Q.**   And yet in your deposition, you were unable to identify a

25   single game developer that was actively trying or had tried to

1    encourage users to make purchases outside of their game,

2    correct?

3    **A.**   I don't recall the context, but it is not -- I've done

4    studies where developers can transact.  I don't believe I have

5    done anything about developers' intentions.  I can only

6    observe outcomes.

7    **Q.**   I didn't ask about intentions, sir.  I asked whether you

8    were able to identify a single game developer that was

9    actively trying or had tried to encourage people to go and

10   transact outside of the app.

11   **A.**   Right.  And it's the "trying" part is the part I haven't

12   done.  I have observed --

13   **Q.**   I'm sorry.  Trying is an observable issue, right?  When a

14   developer tries to encourage people to move somewhere, they

15   are not trying in their heart, they're not praying.  I mean

16   trying by actually advertising, pushing people to do it,

17   making the in-app purchase harder, giving a discount.  You

18   have not seen any of that, correct?

19   **A.**   Outside of Epic, no.  I didn't study that, though.

20   **Q.**   So I want to speak very quickly about some of the

21   substitution analysis that you presented today in court.  The

22   first one you said you used a proxy about downloading a --

23   what you called a companion app, correct?

24   **A.**   Yes.

25   **Q.**   And you said that's a proxy for people buying new consoles

HITT – CROSS / EVEN

1    or starting to play more, correct?

2    **A.**   Yeah, I think that is two of the scenarios, either

3    acquiring or intending to make greater use of that would

4    motivate the download of the app.

5    **Q.**   Before selecting that proxy, you never did any research to

6    validate the proxy as approximating the target population you

7    were trying to identify, correct?

8    **A.**   We discussed this in my deposition.

9        No, I used the logical connection.

10   **Q.**   You have not done any study, correct?

11   **A.**   That's correct.

12   **Q.**   In your Switch study you testified today, and you also

13   said so in your written testimony, that consumers that started

14   playing *Fortnite* once it became available on Nintendo Switch

15   shifted a substantial amount of time and money spent from

16   iOS to Nintendo Switch, correct?

17   **A.**   That's fair.

18   **Q.**   Now, you've identified roughly 150 million *Fortnite* users

19   that at some point sign into their account on iOS, correct?

20   **A.**   That's correct.

21   **Q.**   And of all of those *Fortnite* users on iOS, your Switch

22   analysis focused on under half a million iOS *Fortnite* users

23   who began playing on the Switch in June 2018, correct?

24   **A.**   That's correct.  I believe the number is 457,000.

25   **Q.**   So even if we were to accept your analysis as showing some

HITT – CROSS / EVEN

1   kind of switching, all it could show at most was that 0.3 or

2   0.4 percent of the iOS *Fortnite* user population moved some of

3   its *Fortnite* time to the Nintendo Switch after *Fortnite*

4   launched on the Switch, correct?

5   **A.**   That's literally true.  I believe it generalizes by --

6   **Q.**   Thank you.

7   **A.**   -- the nature of the experiment.

8   **Q.**   Thank you, Professor.

9        I want to talk briefly about your calculation of what you

10   call the average Apple commission rate, which you say

11   declined, correct?

12   **A.**   Depends on which one; but, yes, I understand probably.

13   **Q.**   And to calculate this rate, you took the commission rate

14   for each transaction and performed a simple average across

15   transactions in fiscal year 2019, correct?

16   **A.**   Which specific one are we talking about?  And then I can

17   be a bit sharper.

18   **Q.**   Regardless of the chart, what you've done to calculate the

19   average commission is to do a simple commission and then

20   assign a zero commission value to free transactions, correct?

21   **A.**   That's consistently true, yes.

22   **Q.**   So I want to talk briefly about -- and see how that worked

23   in reality.

24        And so if I can put on slide number 1.  And what we see

25   here is we have two transactions.  One is a $10 transaction at

1    30 percent where Apple takes a cut of three, right?  You see

2    that?

3    **A.**  Yes.

4    **Q.**  Is that a "yes"?

5    **A.**  Yes.

6    **Q.**  And the second transaction was at $0, and Apple collected

7    zero, correct?

8    **A.**  That's correct.

9    **Q.**  And you assigned to that a commission rate of 0 percent,

10   correct?

11   **A.**  That is also correct.

12   **Q.**  And then the total is that the developer has -- the total

13   revenue is $10; Apple's commission is $10, yet you find a

14   commission rate of 15 percent by averaging 30 and zero,

15   correct?

16   **A.**  The math is correct.  Yes.

17   **Q.**  Let's move to the second slide.

18       And so now I've added another transaction.  This time

19   let's say it is a video transaction.  So it is $20 at

20   15 percent, Apple collects $3, correct?

21   **A.**  Okay.

22   **Q.**  The math is correct?

23   **A.**  Yes.

24   **Q.**  And that brings us to a total revenue of $20; Apple's

25   commission is $3, and what you call the average commission

HITT – CROSS / EVEN

1    rate is again $15, correct?

2    **A.**   The math is correct, yes.

3    **Q.**   So we have here one set of transactions with $10 to

4    developers, 3 to Apple and a 15 percent rate, and one 20, 3

5    and 15 percent rate based on your calculations, correct?

6    **A.**   I believe -- I believe that is consistent with the slide.

7    **Q.**   Okay.  So now I want to bring up Figure 3, your written

8    direct testimony.

9        And if Mr. Rudd can help us with that.  You can enlarge

10   it.

11       And I want to talk a little bit about your testimony about

12   availability of top iOS games by revenue and by download.

13       And, first of all, what we can see here is that the

14   availability that you found for consoles is very low, correct?

15   **A.**   It is what it is, 16 and 12 percent, depending on how you

16   cut it.

17   **Q.**   12 percent means there are three games that are available,

18   correct?

19   **A.**   Yes.  In the top 25, yes.

20   **Q.**   And the other 23 -- sorry, 22 games are not available,

21   correct?

22   **A.**   Yes, that follows.

23   **Q.**   And 16 percent is four games, correct?

24   **A.**   That is also correct.

25   **Q.**   And the other 21 are unavailable, correct?

1    **A.**   Yes, among the top 25, that's correct.

2    **Q.**   Among the top 25.  One game that appears in both those

3    populations among the top 25 is *Fortnite*, correct?

4    **A.**   Yes, that is one of them.

5    **Q.**   So these percentages are now even lower because *Fortnite*

6    is no longer available in mobile, correct?

7    **A.**   I don't know what these percentages are.  The market has

8    changed over time.  But when this data was done, this was

9    correct.  *Fortnite* is not there.  There may be others in its

10   place.

11   **Q.**   Now, by contrast -- sorry, just one more thing.  And then

12   we go to availability on the iOS browser, the top 25 game

13   apps by revenue, and that too is very low, correct?

14   **A.**   On the revenue one, yes.  Well, very low is 12 percent.

15   **Q.**   12 percent.  That is, again, three games out of 25,

16   correct?

17   **A.**   That's correct.  Number of games you can play in the

18   browser is three -- is 12 percent.

19   **Q.**   By contrast, you say that for PCs, 72 and 88 percent,

20   respectively, are available, correct?

21   **A.**   Yes, that's correct.

22   **Q.**   And those numbers are pretty high, correct?

23   **A.**   They are certainly higher in approaching a hundred

24   percent.

25   **Q.**   That is the most meaningful statistic here, because

1    everyone understands that Android and iOS really are not

2    overlapping populations, correct?

3    **A.**   So I've seen that asserted.  What this shows is that

4    they -- most game apps and most popular apps are available for

5    both.

6    **Q.**   You don't know what is the overlap between iOS and

7    Android?

8    **A.**   It -- so I do.  At any given time, you are unlikely to

9    have both an iOS and an Android phone, but you might have

10   devices from both ecosystems and may switch.

11   **Q.**   That's what I meant.  You don't have both at the same

12   time, correct?

13   **A.**   With phones, yes, but other devices would expand this.

14   **Q.**   Professor Hanssens, who will testify here, and you relied

15   on him, he found that 22 percent of iOS users have access to

16   Android when that includes in the definition of access, access

17   with someone's -- with my friend's Android phone, correct?

18   **A.**   I believe that's right.  Yes.

19   **Q.**   And you say in your direct testimony, written direct

20   testimony that, based on this statistic, the vast majority

21   were also available on personal computers; i.e., developers

22   developed the same game for the PC, correct?

23   **A.**   Yes.  I think that's right.

24   **Q.**   So this statistic is intended to show the Court that

25   developers, when sitting down and thinking, as you said, about

HITT – CROSS / EVEN

1    their options, they say, I want to launch a mobile and PC

2    typically, correct?

3    **A.**   These are the choices they have made.  Some also launch on

4    console, some also provide a browser version depending on --

5    it is the developer's choice.

6    **Q.**   I understand.

7        The bulk in this sample of top 25 downloads and revenue,

8    you are suggesting, have made the choice to launch on both

9    mobile and PC, correct?

10   **A.**   The data are what they are.  Different developers make

11   different choices.

12   **Q.**   And 88 percent of the games that you found, for instance,

13   you think the developer made the choice to launch on both,

14   correct?

15   **A.**   I think that's generally right.

16   **Q.**   Now, you provided backup materials that contain sourcing

17   for your PC availability findings, correct?

18   **A.**   That's correct.

19   **Q.**   And this sourcing was generally in the form of hyperlinks

20   that are supposed to provide corroboration for each of your

21   availability assertions, correct?

22   **A.**   I believe there are something like 450 of them.

23   **Q.**   Okay.  I want to walk through some of those, if I may.

24   **A.**   Sure.

25            **MR. EVEN:**   And so, Your Honor, may I approach with

1    some materials for the witness?

2             **THE COURT:**  You may.

3             **MR. BORNSTEIN:**   Thank you.

4             **MR. EVEN:**   Thank you.

5    BY MR. EVEN:

6    **Q.**  While you are opening that up, it is going to be a little

7    cumbersome, I am afraid, but it is big, as you said.

8         So I am giving you what I represent to you is an excerpt

9    from your backup which corresponds with Figure 3.  And this

10   backup was produced with your rebuttal report and associated

11   with, I think, your rebuttal report, Exhibit 19, if I remember

12   correctly.

13        And Mr. Rudd can maybe put it up on the screen as well.

14   And we'll try and walk through it to try and understand what

15   you are showing.

16        So, first of all, we have two tabs here.  One is called

17   Data and one is called Sources, right?  That is on the screen,

18   Professor Hitt.  You are not going to see the tab name on the

19   printout.

20   **A.**  Okay.  It's there.  Okay.

21   **Q.**  And the first page that you have in what I handed to you

22   is the Data tab.  Okay?

23   **A.**  Okay.

24   **Q.**  And the last three pages are the Sources tab.  Okay?

25   **A.**  Okay.

HITT – CROSS / EVEN

1   **Q.**   And in the Data tab, we walk through it quickly, what we

2   see, first of all, is rank category, correct?

3   **A.**   Yes.

4   **Q.**   In rank category, we have essentially a number which is

5   the rank, correct?

6   **A.**   I believe that is correct, yes.

7   **Q.**   Then underscore and either "DL" or "REV," which stands for

8   download or revenue, correct?

9   **A.**   That's correct.

10  **Q.**   Then games, correct?

11  **A.**   Yes.

12  **Q.**   So, for instance, if I look at the first line, I see that

13  I have a game that is number 23 in downloads.  And if I go

14  then to row D, which is one to the right, I see that that app

15  is called Amaze with three exclamation marks, correct?

16  **A.**   That's correct.  I think the image on the screen is

17  damaged; but, yes, that's Amaze with three exclamation points.

18          **MR. EVEN:**  Mr. Rudd, if you can fix that, I would

19  appreciate it.

20  **BY MR. EVEN:**

21  **Q.**   Ms. Forrest is correcting me that, actually, if you look

22  at the very top of your sheet, you can see data and sources at

23  the very top on the printout as well.

24  **A.**   Yes.

25  **Q.**   And then going to row L, which is another one to the

1    right, and you see devices for usage, and you say for download

2    on desktop or laptop or through web browser, and it says "yes"

3    or "empty," correct?

4    **A.**  Yes.

5    **Q.**  And the ones that have "yes" next to them, those are the

6    ones that you have found out are on a PC or web browser, and

7    then that goes into the calculation of the 72 percent or

8    88 percent, correct?

9    **A.**  I think that's correct.

10   **Q.**  Okay.  So with that, let's please move to the Sources tab.

11   And row A is again the app name, correct?

12   **A.**  Yes.

13   **Q.**  And then row C, devices for usage, and we have a series of

14   links, correct?

15   **A.**  Yes.

16   **Q.**  And if I understand correctly, what we are going to see is

17   that wherever we have a "yes" in column L, we are supposed to

18   see some link here for an option to download or play on a web

19   browser the specific game, correct?

20   **A.**  Yes, you should.

21   **Q.**  That is the corroboration, correct?

22   **A.**  As far as I understand, yes.

23   **Q.**  Now, not all this information is for backing up the PC

24   claim, correct?  Because if you look, for instance, at Amaze

25   or *Aquapark.io*, you see the first two lines are an address in

HITT – CROSS / EVEN

1    the Apple App Store and in the Google Play store, correct?

2    **A.**   Yes.  There may be links that are used to identify things.

3    **Q.**   That is because you also gave statistics for Android, for

4    instance, correct?

5    **A.**   Yes, I think that's right.

6    **Q.**   So I want to go through a few of these lines.

7         Let's start close to the top, and if you look at the Data

8    tab, you see on what's marked as row 21, you see an app called

9    *BitLife*.  Do you see that?

10   **A.**   Yes.

11   **Q.**   And you see that in row L, *BitLife* you mark as "yes,"

12   correct?

13   **A.**   That's correct.

14   **Q.**   And then if you go to the Sources tab for *BitLife* that is

15   on row 14, you see that you only give a Google Store link,

16   correct?

17   **A.**   Yes, that's correct.  On this document, yes.

18   **Q.**   And so this document does not provide corroboration that

19   *BitLife* is available on PC, just on Android, correct?

20   **A.**   I'd have to look at the link to see if there is something

21   else there.  I do know that some of the links didn't make it

22   into the backup at one point.  I believe that was addressed.

23   **Q.**   Okay.  This is the latest that we have of this backup, but

24   we will continue researching.

25        Let's Google for a second.  I will ask Mr. Rudd to Google

1    *BitLife Life Simulator* on the App Store.  That is *BitLife* on

2    the App Store.

3        Do you see that?

4    **A.**  Yes.

5    **Q.**  And do you see that it is by a developer called

6    Candywriter, LLC?

7    **A.**  Yes.

8    **Q.**  And if we scroll down, Mr. Rudd, and go to the developer's

9    website, you see what has come up, Professor Hitt?

10   **A.**  Yes.

11   **Q.**  And do you see that that is Candywriter, the publisher,

12   saying:  Find all of our games in your favorite App Store.

13       The Apple App Store or Google Play, correct?

14   **A.**  That's correct.

15   **Q.**  And there is no link to a web browser and there is no link

16   to a PC download, correct?

17   **A.**  I don't see one here, no.

18   **Q.**  So we started at the top.  Let's jump towards the end of

19   the list.  And I want to go to something called *Words Story*,

20   which is on row 84.  Sorry, in the Data tab.  I'm in the Data

21   tab.  You see *Words Story*, Professor Hitt?

22   **A.**  Yes, I do.

23   **Q.**  You see *Words Story* is marked with a "yes" for a web

24   browser or PC?

25   **A.**  Yes.

HITT - CROSS / EVEN

1    **Q.**  Now let's go to the sources.  You are going to have to

2    flip a few pages, because that is the way W works, it is at

3    the end.  And let's start by following the official Apple

4    Store link that's on there.  That is the last one, I believe.

5    And let's look at it on the App Store for a second.  The App

6    Store.  And that is *Words Story*, correct?

7    **A.**  That looks right.

8    **Q.**  And you see that this is from a developer called

9    82Trillion, right?

10   **A.**  I think it is 89Trillion, but yes.

11   **Q.**  Okay.  89, sorry.  89Trillion.  You were correct.  Thank

12   you.

13       And let's try and go to the developer website here.

14   That's 89Trillion, correct?  And if you go to the Games tab

15   and scroll down, and let's try and find *Words Story*.  Do you

16   see it?

17   **A.**  Yes.

18   **Q.**  And do you see that it says that it's -- get it on Google

19   Play download on the App Store?  Correct?

20   **A.**  That's what's available on the developer's website, yes.

21   **Q.**  The developer does not point to a PC, correct?

22   **A.**  Not here, no.

23   **Q.**  And not to a web browser, correct?

24   **A.**  That's right.

25   **Q.**  All right.

HITT - CROSS / EVEN

1      Let's go back to the Sources tab.  This one you gave a few

2  more links, so let's try and exhaust this one.  And let's go

3  to the Microsoft com -- the Microsoft.com store.

4      And this is *Words Story* on the Microsoft store, do you see

5  that?

6  **A.**  Yes.

7  **Q.**  And that's by a developer called Super Free Hot Games.  Do

8  you see that?

9  **A.**  Yes.

10  **Q.**  And it says available on PC, correct?

11  **A.**  That's also correct.

12  **Q.**  So that is not an example of where the actual developer,

13  89Trillion, released the game on both PC and iOS, correct?

14  **A.**  I don't know the full background.  It is available through

15  the two mobile platforms as well as available from Microsoft.

16  I don't know what the developer's role in that --

17  **Q.**  Sir, this is not the same developer and not the same game,

18  is it?  This is what is called a fake game, what we see here,

19  right?

20  **A.**  It is on the Microsoft store.  And my research team did

21  look at these to see if they are comparable.  Yes, it does not

22  list the same developer.

23  **Q.**  Okay.  Can we go to the next address, which is Lagged?

24  You gave that one as well, right?

25  **A.**  Yes.

HITT - CROSS / EVEN

1   **Q.**   And do you see this is on a -- something called Lagged,

2   and they created a similar graphic and it is not 89Trillion,

3   and it says -- they are at least honest about it -- based on

4   the popular mobile game.  Do you see that?

5   **A.**   Yes.

6   **Q.**   Okay.  I want to jump now to the middle, since we have

7   been to the beginning and the end.  I'm going to try and do it

8   a little more quickly.  And let's go to a game called *Helix*

9   *Jump*.  That's in row 50.  And that is another game that you

10  say is available, correct, on the PC?

11  **A.**   Let me see.  Yes.

12  **Q.**   Okay.  So -- and let's look at *Helix Jump* from the App

13  Store.  And you see that this is from a developer called

14  Voodoo?

15  **A.**   Yes.

16  **Q.**   If we go to Voodoo.io, that is the developer website.  You

17  see it?  We go to their Games tab, and here is Helix.  You see

18  it?  *Helix Jump*, half a billion downloads, available on the

19  App Store and Google Play, correct?

20  **A.**   Yes.

21  **Q.**   No mention of PC, no mention of browser, correct?

22  **A.**   That's correct.

23  **Q.**   While we are here, you see on the right all these people

24  running under something called *Crowd City*?

25  **A.**   Yes.

HITT – CROSS / EVEN

1    **Q.**   And *Crowd City* is also on your list of games that are

2    available on PC?

3    **A.**   I'd have to look.  I'll take your word for it.

4    **Q.**   Well, it is row 32 of your Data tab.  Do you see that?

5    **A.**   Give me a moment.

6    **Q.**   It is on your screen now, I think.

7    **A.**   Yes.

8    **Q.**   If we go back to Voodoo, who is the developer, you will

9    see that *Crowd City* is offered by the developer only on the

10   App Store.  Do you see that?

11   **A.**   Yes, that's correct.

12   **Q.**   And if Mr. Rudd scrolls down the page, another game on

13   your list is Paper.io 2.  Do you see that on the right?

14   **A.**   Yes.

15   **Q.**   That is over a quarter billion downloads?

16   **A.**   Yes.

17   **Q.**   And all of them from the App Store and Google Play,

18   correct?

19   **A.**   Those are the two links that appear on the page.

20   **Q.**   No mention of PC or web browser, correct?

21   **A.**   Not here, no.

22   **Q.**   Let's next go to *Happy Glass* on the App Store.  That is

23   also on your list, correct?

24   **A.**   Again, I would have to see it.  It seems familiar.

25   **Q.**   And that's from a developer called Lion Studios.  Do you

1    see that?

2    **A.**   Yes.

3    **Q.**   And if Mr. Rudd follows the developer's link and goes into

4    games, and scrolls down to "Happy."  You can also search for

5    "Happy," I'm guessing.  You see *Happy Glass*?

6    **A.**   Yes.

7    **Q.**   And you see the developer says that it's available and

8    mentions only the App Store and Google Play store, correct?

9    **A.**   That's correct.

10           **MR. EVEN:**   And, Mr. Rudd, can you search for "bullet"

11   on the same page?

12   **BY MR. EVEN:**

13   **Q.**   See *Mr. Bullet*, Professor Hitt?  Do you see it?

14   **A.**   Yes.

15   **Q.**   And *Mr. Bullet* is on your list as something that is

16   available on PC, correct?

17   **A.**   I'd have to check to see if this is exactly the same game,

18   but it seems to be, yes.

19   **Q.**   And that, too, no mention of PC and no mention of web

20   browser, correct?

21   **A.**   Not on the developer site.

22   **Q.**   Sir, before putting this list together and representing to

23   the Court that there is 72 percent or 88 percent available,

24   have you done anything to check whether these things are

25   actually available on a PC from the same developer such that

HITT – CROSS / EVEN

1   it supports your statement that developers decide to

2   distribute on both mobile and PC?

3   **A.**  Yes.

4   **Q.**  Okay.  But none of it is in your backup and none of it is

5   what we saw on the developer website today?

6   **A.**  There were a few missing links.  Some of these things are

7   available from other sources.  And my research team did look

8   at those links, yes.

9   **Q.**  That is what you believe?

10  **A.**  That is my understanding.

11  **Q.**  Sitting here today, can you tell the Court under oath that

12  *Color Bump* is available on PC?  It is on your list.  I'm

13  telling you that my team has tried, we can't find it on PC.

14  We have found it on the developer website with the same

15  available on the App Store or the Google Play store.

16     Can you tell the Court under oath that it is available in

17  PC?

18  **A.**  I would have to follow the links to be absolutely sure.

19  My understanding was my research team --

20  **Q.**  Sir, it's a yes-or-no question.  Can you tell the Court

21  under oath that you've done the work to go and check and saw

22  this thing loaded on a PC from the same developer?

23  **A.**  From the same developer?  The developer names may be

24  different.

25  **Q.**  Sir, I am sorry, you put this testimony in and said this

HITT – CROSS / EVEN

1    shows that developers distribute on both -- the same games on

2    both web and PC and mobile.  That means to be the same

3    developer, correct?  That is the point of your testimony?

4    **A.**  The games are available on multiple platforms.

5    **Q.**  Sir, I asked you a question.

6    **A.**  What?

7    **Q.**  The point of your testimony is to show that the same

8    developer multihomes and distributes on both PC and mobile --

9    I'm sorry, on both PC and mobile, correct?  That is what you

10   said in your written testimony.  I can read it to you.

11   **A.**  Okay.

12   **Q.**  Developers develop the same game for the PC.  That is what

13   you testified, correct?

14   **A.**  Many do, yes.

15   **Q.**  None of the ones we saw, correct?

16   **A.**  I would have to look at the links.  Some of them are

17   available from other sources that are not the same developer.

18   **Q.**  Sir, I just went through 10 links with you on 10 games.

19   Can you tell the Court under oath today that *Run Race 3D*,

20   where the developer only mentions App Store and Google Store,

21   is available for PC?  You saw it with your own eyes?

22   **A.**  My research team did the investigation for that and did

23   find -- looked at specifically the availability of the game.

24   **Q.**  Sir, this is your testimony, not your research team's.

25   Can you give the Court the assurance that your 72 percent is

HITT - CROSS / EVEN

1   correct rather than about 25 percent that our team has been

2   able to find?

3   **A.**   So I disagree with that.   There are a number of these

4   games that are available through emulators.

5   **Q.**   Same question, sir, about *Fun Race 3D*.

6   **A.**   Okay.   It's on the chart, yes.

7   **Q.**   And can you give the Court sworn testimony that you have

8   seen with your own eyes this game from the developer who made

9   it for the App Store also being available on a PC or web

10  browser?   It is a yes or no?

11  **A.**   Not from the same developer, no.

12  **Q.**   Same question for *Toy Blast*.

13  **A.**   I am sorry.   What was that?

14  **Q.**   Okay.   Let's put that -- let's -- I want to switch gears a

15  little bit and I want to talk about Figure 8 of your written

16  direct testimony.   It is located at page 51.   You see

17  Figure 8?

18  **A.**   I see it on the screen.   Let me just grab it.

19  **Q.**   That figure is titled "Monetization and Portability of

20  Fiscal Year 2019 Top Game Apps in the App Store," correct?

21  **A.**   Let me just catch up.   Yes.

22  **Q.**   And this one in the third row goes directly to the Court's

23  question about whether there are many apps that are available

24  for somebody to go out of their app, go purchase something

25  online, on the web browser, on their iPhone and come back,

HITT – CROSS / EVEN

```
1    correct?

2    A.   I think that's right.

3         (Simultaneous Colloquy.)

4              THE WITNESS:   Let me -- they don't have to leave

5    their iOS device to go to a web browser.  Otherwise, that's

6    correct.

7    BY MR. EVEN:

8    Q.   Yes.  I said they have to leave the app, go to Safari on

9    their iOS device, purchase and come back, correct?

10   A.   That's correct.  Yes.

11   Q.   And I'm sorry if I misspoke.  You assert in this paragraph

12   that many game developers allow consumers to purchase digital

13   content that will be used within iOS from alternative

14   transaction platforms or through a website.  And you

15   specifically highlight Safari on iOS, correct?

16   A.   Yes.

17   Q.   And you say a full one-third offers direct purchases of

18   content through web browsers on the iOS device for content

19   that can be accessed on an iOS app.

20        That's what you said, correct?  Did I read that correctly?

21   A.   Yes.

22   Q.   So let's look at the numbers for a second here.  First we

23   looked at -- we see that for the top 25 by download, it is

24   only 8 percent, correct?

25   A.   That's correct.
```

HITT – CROSS / EVEN

1    **Q.** And that is again -- that is two apps that are available,

2    and the other 23 you can't do that, correct?

3    **A.** Yes, that follows.

4    **Q.** And for the top 25 by revenue, you say that 32 percent

5    make purchases available, correct?

6    **A.** That is also correct.

7    **Q.** And I guess 32 percent is what you're referring to as a

8    full one-third?

9    **A.** Yes, there may be truncation in there and rounding.

10    **Q.** So conveniently for us, the backup is the same backup.  If

11    you go to row AA -- sorry, column AA on the Data tab, you see

12    a few yeses there, correct?  And this is under "Sign-in

13    portability, purchase digital content within web browsers,

14    access through iOS app."  Do you see that?

15    **A.** Yes.

16    **Q.** And, again, where we see a "yes," that is something that

17    goes into the calculation of the 8 percent and 32 percent,

18    correct?

19    **A.** That's correct.

20    **Q.** And is it fair to say that altogether, you've identified

21    eight games out of this total population of 45 games that you

22    claim have this capability, correct?

23    **A.** Yes, that is consistent with 32 percent.

24    **Q.** Okay.  And that's because -- okay.  And the only ones that

25    are available for the top downloads are essentially

1    duplicates, right, because those are *Roblox* that is in the top

2    25 for both revenue and downloads and PUBG mobile, which is

3    also available in both, correct?  We have 10 yeses, but it is

4    for eight games, correct?  Sir, do you see that it's --

5    **A.**   There is a lot data on here.  Yes, I think that's correct.

6    **Q.**   Have you personally examined the possibility of going out

7    to an iOS Safari, buying something and going back into the

8    app for each one of those?

9    **A.**   Me personally, no.  My research team did look into the

10    availability of that option, though.

11    **Q.**   Okay.  So you have not personally checked *Big Fish Casino*?

12    **A.**   Not me personally.

13    **Q.**   Not *Candy Crush*, *Candy Crush Soda*, and *Clash Royale*,

14    et cetera?

15    **A.**   I think that's right, yes.

16    **Q.**   So I'm going to ask Ms. Houserman, if she is here, to help

17    me with this one and walk you through the process -- the

18    frictionless process that you've described during your direct

19    testimony.

20        And let's maybe start with *Candy Crush*.  Ms. Houserman,

21    can you Google *Candy Crush*?

22        And we see you can install Candy Crush.  It is in the App

23    Store.  And there is Twitter.  And then eventually we get to

24    www.king.com, *Candy Crush Saga* online?

25    **A.**   Yes, King is the developer.

HITT – CROSS / EVEN

1   **Q.**   If we click on it, it gives us the possibility to install,

2   correct?

3   **A.**   So it would seem.

4   **Q.**   If I press "Install," what happens, Professor Hitt?

5   **A.**   It looks like it takes you back to the iOS store.

6   **Q.**   Exactly.  So let's go back and scroll further down, and

7   you see a bunch of boxes here:  Apple App Store, Google Play,

8   Amazon, Microsoft store, Facebook, and Play on king.com.  Do

9   you see?

10  **A.**   Yes.

11  **Q.**   Let's try "Play on king.com," which sounds the most like a

12  web browser experience, correct?

13  **A.**   It could be.

14  **Q.**   Well, from the stores, I'm not going to get a web browser

15  experience, correct?

16  **A.**   Not from the iOS App Store.

17  **Q.**   And not from the Google and not from the Microsoft store,

18  correct?  They are going to sell me apps?

19  **A.**   I don't know about Microsoft, but the other two, yes.

20  **Q.**   Let's try king.com.  And what does it say, Professor Hitt?

21  You see what it says?

22  **A.**   Yes.  "Available on desktop."

23  **Q.**   Only available on desktop, correct?

24  **A.**   Yes, that's correct.

25  **Q.**   Okay.  Let's go back and find it on Facebook maybe.  And

1    this version, too, is only available on desktop, correct?

2    **A.**   That's what it says.

3    **Q.**   Okay.   That's part of the frictionless process that you

4    have envisioned, correct?

5    **A.**   I wouldn't characterize it that way.   My understanding is

6    you can transact through a web browser.

7    **Q.**   Do you want to tell Ms. Houserman where she should go to

8    do this?

9    **A.**   I would have to look through and go back --

10             **THE COURT:**   Is there not CandyCrush.com?

11             **MR. EVEN:**   No, it is king.com, Your Honor.   That is

12   the developer.   And we tried, and they don't do it.

13       Ms. Houserman, just if you can do king.com again so the

14   Court sees where we have tried.

15   **BY MR. EVEN:**

16   **Q.**   And that is the version that is only available on desktop,

17   correct, Professor Hitt?

18   **A.**   I am sorry.   Give me one moment.

19   **Q.**   Do you recall -- and you see on our screen that when we

20   try on king.com, it doesn't let us do it?

21   **A.**   I see what you're showing.   I would have to look through

22   the links in my backup.

23   **Q.**   I can try *Candy Crush Soda*, but let's try something from a

24   different developer.   Let's try *Clash Royale*.

25             And, again, we have a link to the App Store that is at the

1    top, always is, Install Now, *Clash Royale*, App Store, About,

2    they have a Wikipedia site, and eventually we get to

3    ClashRoyale.com, and that is the developer website, correct?

4    And we entered the arena.

5    **A.**   Okay.

6    **Q.**   Do you see that?

7    **A.**   Yes.

8    **Q.**   And if we can click on the top right-hand corner, you see

9    "About the Game"?

10   **A.**   Yes.

11   **Q.**   And if we go to "Parents Guide," you see that?

12   **A.**   Yes.

13   **Q.**   And let's go to "Privacy and Processing of Personal Data."

14        Do you see under Payment Information, it says:  "We do not

15   store any credit card information related to in-game

16   purchases, as the payment transactions are completed through

17   Apple's App Store or Google Play, depending on your device?"

18   Do you see that?

19   **A.**   Yes, that's correct.

20   **Q.**   And yet you believe that your team managed to go into a

21   website and buy legitimate *Clash Royale* money and go back to

22   the app?

23        That is your testimony?

24   **A.**   I would have to follow the links, but my research team

25   identified the links that that would enable you to do so.  I

1    would have to go back and look to be sure.

2    **Q.**  You understand, sir, that the typical user of *Clash Royale*

3    doesn't have a research team, correct?

4    **A.**  That's –– I would think so, yes.

5    **Q.**  So part of the frictionless process, sir, they cannot go

6    to a research team of five Ph.D. economists and ask them to

7    please find how to conduct this transaction, correct?

8    **A.**  They wouldn't have a research team, that's correct.

9    **Q.**  You believe we would get any different results if we tried

10   *Big Fish Casino*?

11   **A.**  Again, I would have to follow the links that are

12   highlighted in my report to see what the process is.

13   **Q.**  I'm telling you that our team, which includes quite a few

14   lawyers, have not been able to do so for *Big Fish Casino*.  Do

15   you have any reason to disagree?

16        Sir, do you have any reason to disagree?

17   **A.**  I'm looking at the document you gave me.

18   **Q.**  I hope it is not going to take so long on each one of

19   these because I have questions about the other five as well.

20   Professor Hitt, I'm on the clock.

21   **A.**  I'm looking at the document you provided me.  There is a

22   number of links in the monetization I would have to access.

23   **Q.**  Sitting here today, based on what you've seen, do you have

24   any reason to disagree with our conclusion that this cannot be

25   done for these other apps?

HITT – CROSS / EVEN

**A.**  My reason to disagree is my research team did investigate this and has a number of links which I would follow and want to re-investigate.

**Q.**  I think we have gone through a few links by your team, sir, haven't we?

**A.**  You've gone through -- I haven't done it systematically, so I don't know --

**Q.**  Let me move on to a different topic and try and finish.

You heard Professor Athey testify the other day that a developer would want to maintain a relationship with its customers and would, therefore, be incentivized to provide cross-wallet functionality, correct?

**A.**  Yes.

**Q.**  And Professor Athey also testified that many developers can't do so because there are expenses associated with it with developing and maintaining infrastructure necessary for such cross-wallet functionality and it's difficult to get consumers to engage in this kind of relationship.

Do you recall that?

**A.**  Broadly, yes.

**Q.**  And you recall that Professor Athey said that because of that, the vast majority of developers are not going to do that, and only the very big ones would, correct?

**A.**  I believe she said that, yes.

**Q.**  I can tell you that my team has found that this can be

 1   done for three apps.  One of them is *Fortnite*, no longer an

 2   app, and the other two are *Roblox* and *PUBG*, two of the biggest

 3   games in the world, and no one else does it on your list.

 4        Do you have any basis to dispute that, sir?

 5   **A.**  Which list are you specifically referring to?

 6   **Q.**  The list of eight games that you say can do it, we found

 7   three that actually work.  One of them is *Fortnite*, one of

 8   them is *Roblox*, one of them is *PUBG*.  The others, you can't do

 9   it.  As you just saw, one of them says, we are not going to do

10   it.

11        Do you have any reason to disagree, sitting here under

12   oath, sir?

13   **A.**  Yes, it is my understanding my research team did identify

14   those things in the backup.  I would have to go look at that

15   to confer.

16   **Q.**  That is your reason to disagree?

17   **A.**  That's my reason, yes.  I trust my research team has

18   followed these things and has investigated this.

19   **Q.**  Sir, you still trust your research team, even now?

20   **A.**  Absolutely.

21        **MR. EVEN:**  Thank you.  I have no further questions

22   for this witness.

23        **THE COURT:**  Redirect.

24        **MR. EVEN:**  Sorry, Your Honor, I made a mess.  It's

25   going to take me one minute to clear up.

1          **THE COURT:**  Maybe at the end of all this, we can get

2     the economists to give us their best jokes about economists.

3          **THE WITNESS:**  I will just tell the lamppost joke

4     again, so, you know, that's the classic.

5          **MR. EVEN:**  Your Honor, unfortunately, for each one of

6     those, we have 12 lawyer jokes, so we are in the minority --

7          **THE COURT:**  Unfortunately or not, okay.  I've heard

8     some good ones during some of these antitrust cases.  You may

9     proceed.

10                      **REDIRECT EXAMINATION**

11    **BY MS. RICHMAN:**

12    **Q.**  Professor Hitt, why don't we start where you ended with

13    Mr. Even.

14         Does anything you've seen change your analysis that the

15    majority of game apps in the top 25 list are available for

16    download both on PC and iOS?

17    **A.**  No.  My research team followed up on a number of those and

18    noted that some of them are available through emulators.  The

19    vast majority -- I think even -- there was another calculation

20    offered by plaintiffs that it's about 50 percent, by their

21    calculation, as I recall.

22    **Q.**  And did your team examine whether very similar or almost

23    identical games were available on different platforms but

24    published by different developers?

25    **A.**  Yes.  There's a number of examples of that, including some

1  fairly prominent ones like *PUBG*.

2  **Q.** And some of the games that were on Mr. Even's list just

3  now?

4  **A.** Yes, that is my understanding.

5        **THE COURT:** But that list, the big spreadsheet, those

6  were the 25 that are in here, right?

7        **THE WITNESS:** That's right. So my research team

8  would have gone out, looked at -- found the games and looked

9  at them to see if they believe they were comparable.

10 **BY MS. RICHMAN:**

11 **Q.** And why are sometimes very comparable, almost identical

12 games published by different developers?

13 **A.** Sometimes they license out the technology to others to

14 offer a same or similar game, and the experience can be very,

15 very similar. But some developers choose to let others do

16 that burden for them.

17 **Q.** And has anything you've seen here today changed your view

18 that developers have choices when deciding which platforms to

19 make their games available on?

20 **A.** Yes. Regardless, it indicates that these products can be

21 made available on a number of different platforms in a variety

22 of different ways, including through things like emulators and

23 other technologies.

24 **Q.** And, Professor Hitt, Mr. Even was showing you some

25 examples of friction associated with downloading games on

1    different platforms.

2        Is that your understanding?

3    **A.**   Yes.

4    **Q.**   And do you think what he illustrated demonstrates a

5    realistic -- or portrays a realistic view of the switching

6    costs -- and frictions between transaction platforms?

7    **A.**   I don't think it's broadly applicable.  There may be

8    certain circumstances where it's more difficult than others.

9    But certainly we also have examples where it's very, very

10   easy; for example, purchase of V-Bucks.

11   **Q.**   Did you yourself attempt to conduct any experiment

12   purchasing V-Bucks through a mobile browser?

13   **A.**   Yes.  I own a lot of V-Bucks.  I did try a couple of

14   different ways to buy V-Bucks and found that you can do that

15   within -- depending on whether you are logged in or not, in a

16   minute or two.

17   **Q.**   Okay.  Thank you.

18        **THE COURT:**  Did you try it for anything else?

19   Because it looked pretty difficult, given the examples he

20   provided.

21        **THE WITNESS:**  I personally didn't do these, but my

22   research team did go through and look at a lot of these.

23        **THE COURT:**  Do you have any logical explanation for

24   why we couldn't get to it during the Cross-Examination?

25        **THE WITNESS:**  So there were a number of other links

1    in there, and I recall going through this in detail with my

2    research team who had shown me games that are either very

3    similar or they would go through and find a way to do it.  I

4    would have to go through the links that are in the backup in

5    my report and investigate to see if any of those are, for

6    example, no longer valid or there was an oversight.

7         **THE COURT:**  Did you personally --

8         **MS. RICHMAN:**  All right.

9         **THE COURT:**  Go ahead.

10        **MS. RICHMAN:**  Go ahead, Your Honor.

11        **THE COURT:**  Go ahead, Ms. Richman.

12   **BY MS. RICHMAN:**

13   **Q.**  You said you personally went through the links -- many of

14   the links with your research team to verify this?

15   **A.**  We spent a fair amount of time going through links and

16   discussing things like games from multiple developers and

17   such.

18   **Q.**  Professor Hitt, were there any new analysis in your

19   written direct testimony?

20   **A.**  Not that I recall.  There were a couple of graphs and some

21   things that can be calculated from numbers, but I think that

22   was it.

23   **Q.**  But the underlying calculations, were they in your

24   rebuttal or introductory reports produced to the -- Epic?

25   **A.**  I believe so, yes.

HITT – REDIRECT / RICHMAN

1   **Q.**   Okay.  Do you remember when Mr. Even said something to the

2   effect of that Apple gets to charge 30 percent forever?

3   **A.**   Yes.

4   **Q.**   Has Apple made changes in its 30 percent commission since

5   the App Store was opened in 2008?

6   **A.**   Yes.  They've lowered commissions in a number of

7   circumstances, the small developer program, the various

8   subscription -- the reduction for subscriptions, the reduction

9   for video content.  So they have lowered their commissions

10  over time for certain kinds of content or certain kinds of

11  developers.

12  **Q.**   Do you remember, Professor Hitt, being asked about your

13  *Fortnite* substitution analysis?

14  **A.**   Yes.

15          **MS. RICHMAN:**   Can we get slide 28, please.

16  **BY MS. RICHMAN:**

17  **Q.**   And do you remember being asked about testimony in your

18  deposition related to your conclusions on your *Fortnite*

19  analysis?

20  **A.**   Yes.

21  **Q.**   In starting your *Fortnite* substitution analysis, did you

22  start with a 64.5 percent retention rate?

23  **A.**   No.  That was what I was attempting to clarify.

24     As a theoretical matter, I'm not starting with that

25  number.  It turns out, though, that most of that spending

HITT – REDIRECT / RICHMAN

1   stays on the platform.  So as an empirical matter, it is true,

2   but there's nothing that forced it to be true ex ante.

3   **Q.**  You were asked questions about growth in the market you

4   study.

5       Is that consistent with your recollection?

6   **A.**  Yes.

7   **Q.**  And did you do an analysis of output in a but-for world

8   that Epic has described?

9   **A.**  I'm not sure that the but-for world is described cleanly

10  by Epic, but I didn't do an alternative calculation in a

11  but-for world because I don't think a clean version of that

12  has been proposed.

13  **Q.**  You did not think it was necessary in this case?

14          **MR. EVEN:**  Objection, leading.

15          **THE COURT:**  Sustained.

16  **BY MS. RICHMAN:**

17  **Q.**  Did you think it was necessary in this case?

18          **MR. EVEN:**  Objection, leading.

19          **THE COURT:**  Sustained.  So don't answer.

20      The question is why.

21  **BY MS. RICHMAN:**

22  **Q.**  Professor Hitt, why did you not perform a but-for growth

23  rate analysis in this case?

24  **A.**  So for at least two reasons.  One is I think the available

25  data will support a comparison against the market as a whole.

1    I think that is a good and valid comparison.  It is unclear

2    what the specific but-for world is that is being articulated,

3    so I didn't do it there.

4        There were also a number of questions -- Mr. Even asked me

5    about why I didn't control for certain kinds of things.  I

6    think that's completely wrong.  Moore's Law is not magic.  It

7    happens because developers and hardware engineers and Intel

8    and Apple and Samsung and many other hardware manufacturers do

9    the engineering to make that happen.

10       Same thing with the telcos, same thing with everybody who

11   participates in the digital economy.  Everybody's input is

12   necessary to do so.  Apple has invested enormous amounts to

13   support their ecosystem.  As a result, we can benefit from the

14   continued improvements of these things.

15       So I do not think it's appropriate to remove that when

16   thinking about how Apple chooses to monetize and operate a

17   portion of the ecosystem that is fully integrated like iOS.

18   **BY MS. RICHMAN:**

19   **Q.**  Were the iPhone improvements relevant to the analysis of

20   competitive effects that you conducted in this case?

21   **A.**  Yes, they are.

22   **Q.**  And in what way?

23   **A.**  So in many cases, the way Apple will respond is to -- is

24   through innovation, to competitive effects.  We have a number

25   of documents indicating they identified, for example, some

1    kind of innovation by a competitor and would then evaluate and

2    think about doing something themselves.

3        In addition, there is a very active competition in the

4    smartphone devices themselves.  And the continued innovation

5    there is what makes it possible for certain kinds of

6    technologies in games and products to be available and

7    delivered through the iPhone.  So I think for at least those

8    two reasons, it is important to consider that.

9            **MS. RICHMAN:**  Can we have slide 6, please.

10   **BY MS. RICHMAN:**

11   **Q.**  Professor Hitt, did you use any benchmarks to gauge App

12   Store growth?

13   **A.**  Yes.  I think this depicts one of them is that, you know,

14   the simple observation that the game transactions of the App

15   Store is growing six times as fast as the market as a whole.

16   That is pretty strong evidence of expanding output.

17   **Q.**  And did you see any evidence in your analysis that output

18   would have been higher in a but-for world?

19   **A.**  No.  The -- so, for example, there is also the analysis

20   where you look at just the overall app transactions when

21   supposedly monopoly power was attained.  The other thing is,

22   keep in mind some of the numbers we are talking about here.

23   We are talking about, you know, 1200, 2600 percent --

24           **THE COURT:**  Slow down again.

25           **THE WITNESS:**  We are talking about very large growth

1    numbers.  And the argument would have to be that somehow that

2    is not fast enough, that this dramatic change in these markets

3    in terms of the expansion of volume of app transactions isn't

4    enough.

5        I don't find any evidence of that to be the case.  It is

6    growing faster than the market as a whole, so I think it is

7    reasonable to conclude -- at least there is no evidence that I

8    have seen that would indicate it would be slower.

9    **BY MS. RICHMAN:**

10   **Q.**  Did Dr. Evans conduct any empirical analysis on changes in

11   output?

12   **A.**  No.

13   **Q.**  And he didn't -- did he offer any analysis of what output

14   would have been in the but-for world?

15   **A.**  I don't believe so, no.

16   **Q.**  You were asked some questions about hypothetical

17   monopolist test and SSNIP.  Do you recall that?

18   **A.**  Yes.

19   **Q.**  Professor Hitt, why didn't you conduct a SSNIP test?

20          **MR. EVEN:**  Objection.

21          **THE COURT:**  Overruled.  You raised that.

22          **THE WITNESS:**  So for two reasons.  One, as Professor

23   Lafontaine had indicated, there are other methods that are

24   commonly used for defining market boundaries; the one we used,

25   which is substitution.

1         And, second, as Professor Schmalensee indicated, and is

2    consistent with my understanding, in order to do those kinds

3    of calculations in two-sided markets, even by the same methods

4    that Dr. Evans has proposed, you need parameters and

5    information that are just simply not available.  And, in

6    particular, you need to consider two-sided market effects.  It

7    is not clear you can do that.  That is extremely difficult.

8    And none of that was proposed here.

9    **BY MS. RICHMAN:**

10   **Q.**  Did Dr. Evans conduct a valid SSNIP, in your opinion?

11   **A.**  I evaluated only a couple of the empirical inputs to his

12   SSNIP, and I don't believe they are appropriate for the uses

13   he put them.  I believe Professor Schmalensee and Professor

14   Lafontaine addressed that and reached that conclusion, and

15   there's nothing -- I -- I disagree with that.

16   **Q.**  You were asked some questions about the small business

17   program.

18        Do you recall that?

19   **A.**  Yes.

20   **Q.**  And the questions related to your characterization of that

21   program as a price decrease.  Is that consistent with your

22   recollection?

23   **A.**  That seems consistent, yes.

24   **Q.**  What was the time period for the dataset that you used to

25   calculate Apple's average commission?

1  **A.**  It ends at the end of 2019.  Producing 60 billion

2  transactions in a dataset is kind of a challenging task, and

3  so the data cuts off at the end of 2019.

4  **Q.**  Does your analysis take into account any change in the

5  average commission as a result of the small business program?

6  **A.**  No.  We would not have seen it in our data.

7  **Q.**  Professor Hitt, you were asked about the Nintendo Switch

8  substitution analysis.  Do you recall that?

9  **A.**  Yes.

10  **Q.**  And I think there was a question about the number of

11  individuals in -- implicated in your analysis.  Do you

12  remember that?

13  **A.**  Yes.

14  **Q.**  And what was that number?

15  **A.**  I believe the number is approximately 457,000.

16  **Q.**  And in your experience, is that a large population for a

17  natural experiment?

18  **A.**  Yes.

19      So, first of all, that's not all of the Switch adopters

20  later, but I chose to focus on that because that would provide

21  the cleanest test of the event -- of the introduction of the

22  Switch.  So that was deliberately chosen.

23      In that case, I was not trying to find all Switch users or

24  do any calculations on that.  I was trying to identify the

25  population that would be most informative of the ability to, I

1    guess, switch upon the introduction of the Switch.  So that is

2    why that was chosen the way it was.  457,000 is a pretty big

3    number.

4    Q.  Thank you, Professor Hitt.

5            **MS. RICHMAN:**  Pass the witness.

6            **THE COURT:**  Recross limited to the scope of Redirect.

7    I show five topics.

8            **MR. EVEN:**  Thank you, Your Honor.

9                        **RECROSS-EXAMINATION**

10   BY MR. EVEN:

11   Q.  I believe you just explained to Ms. Richman that you

12   believe that there are similar or comparable games that are on

13   PC.  Were those the words that you used?

14   A.  Yes.  That -- that look similar or comparable, yes.  That

15   was my understanding that my research team --

16   Q.  I understand, sir.  This was a point -- you remember that

17   this is a two-sided market, correct?

18   A.  Yes.

19   Q.  And this was a point about the developer side, correct?

20   A.  I think it is -- yes, it is about the developer side.

21   Q.  And you understand that if somebody is playing *Fortnite* on

22   the iOS and then goes out to play something called *Fortnit*

23   that is really similar on a PC, that doesn't help Epic,

24   correct?

25   A.  I don't know if that is an actual example, but that would

HITT − RECROSS / EVEN

1    seem to be correct, yes.

2    **Q.**  So comparable games from a different developer, that's not

3    something that moves or advances the ball for a developer who

4    needs to pay the 30 percent to Apple, correct?  They need

5    their own game or their own store on PC in order to make this

6    work, sir, correct?

7    **A.**  I think for a particular developer, yes.  But it does

8    demonstrate the ability to offer these games in that format.

9    **Q.**  Sir, we are not arguing here there are no games on PC,

10   correct?  Nobody is arguing that.

11   **A.**  That's correct.

12   **Q.**  You also mentioned emulators.

13   **A.**  Yes.

14   **Q.**  And an emulator is a piece of software that takes my PC

15   and essentially turns it into an Android phone, correct?

16   **A.**  I wouldn't characterize it that way.  It allows you to,

17   for example, run Android APK files, I believe, on a PC.

18   **Q.**  Okay.  Does Microsoft make an Android emulator?

19   **A.**  I don't recall.  I don't know.

20   **Q.**  Does Apple make an Android emulator?

21   **A.**  Again, I don't know.

22   **Q.**  Does Citrix make an Android emulator?

23   **A.**  I don't know.

24   **Q.**  Does Adobe make an Android emulator?

25   **A.**  Again, I don't know.  I didn't research this.

HITT – RECROSS / EVEN

1   **Q.**   Does Google make an Android emulator for PCs?

2   **A.**   Again, I don't know.

3   **Q.**   Do you know who does make emulators?

4   **A.**   No.  I'm aware they are exist.  I don't know who the

5   developer is.

6   **Q.**   So you need a piece of open software from the web that

7   takes hold of your computer, a piece of middleware that runs

8   on top of your PC, and then you can access these games from

9   the Google Play store, correct?  That's your testimony?

10   That's the scenario you were thinking of about, about

11   availability on PC?

12   **A.**   No.

13   **Q.**   I was just asking because I'm still a little -- I still

14   remember the -- Apple's concern about the safety and security.

15   So that would not be conducive to Apple sending people to the

16   web to download emulators from the open web, correct?

17   **A.**   No, that is not what I was hypothesizing.  These are --

18   for example, you can find on the Microsoft Store, download

19   links to games that look like they're run on emulators.

20   **Q.**   Okay.  And by the way, when somebody is playing on an

21   emulator, using an emulator, that means that the option that

22   you are offering the developer is that the user will go out to

23   a PC and download the game with an emulator from the Google

24   Play store, right?

25   **A.**   No.  That is inconsistent with what I just said.

HITT – RECROSS / EVEN

1   **Q.**  That is what an emulator would be used for on a PC, right,

2   to download games or other apps from the Google Play store?

3   These are Android apps.

4   **A.**  Separated into two things.  Yes, that is something you can

5   do.  And, no, that is not what I was talking about.

6   **Q.**  Okay.  That would not be a good substitution for a

7   developer, correct?  The developer is already available on the

8   Google Play store, right?

9   **A.**  Yeah, that is not what I was hypothesizing.

10  **Q.**  You said you did not look -- in your Switch analysis, you

11  did not look to identify all Switch users, correct?

12  **A.**  I didn't use all Switch users.  They were not included for

13  the reasons I gave.

14  **Q.**  Okay.  But you did identify the big group of Switch users

15  on *Fortnite* who started the minute the game launched, correct?

16  **A.**  Yes, in that month.

17  **Q.**  Have you looked generally how many Switch users there are

18  on *Fortnite*?

19  **A.**  That data is available in my report.  I haven't focused

20  specifically on that in a while.  You can derive that from

21  some of the charts I have.

22  **Q.**  Do you remember a ballpark?

23  **A.**  I can look it up.

24  **Q.**  Is it anywhere near 150 million, sir?

25  **A.**  No.

1  **Q.**  Because the truth is that while a lot of people have

2  iPhones, not many people have the Switch, correct?

3  **A.**  I wouldn't characterize it as not many.  Certainly fewer;

4  that's correct.

5  **Q.**  By an order of magnitude fewer, correct?

6  **A.**  I'd like to be precise to be more than that, but I think

7  that is probably about right.

8  **Q.**  I would like to bring up slide 6.  And Ms. Richman asked

9  you a couple of questions about that.  And you were saying

10 that this is -- the store is growing six times faster than

11 U.S. consumer spending, right?

12 **A.**  Yes, that's correct.  It says what it says, which is the

13 growth in the App Store over the comparable period is six

14 times the figure reported here.

15 **Q.**  That is because the world is moving to digital, correct?

16 **A.**  Yes.  The world -- we are a much more digital world.

17 **Q.**  And you've not compared this, for instance, to any of the

18 matrix I asked you, correct?  You've not done a similar

19 comparison, for instance, for the sale of phones or for the

20 state of microprocessor, of the growth of cellular technology,

21 or anything like that, correct?

22 **A.**  I don't know if you did the sale of phones, but I have not

23 attempted to control for that, for the reasons I described.

24 **Q.**  I'm not asking now about control.  I'm just asking when

25 you put the comparison -- what you put before the Court is a

1   comparison between spending on the brand-new digital world

2   versus spending in your local Office Depot.  That is the

3   comparison you are drawing here, right?  You are not comparing

4   the App Store to something that's high tech and growing?

5   **A.**  So since you put the slide up, that is not the comparison

6   being drawn here.  I did mention the growth in GDP as a

7   benchmark -- as another benchmark, yes.  But you can also use

8   the game transactions market as another benchmark.

9   **Q.**  Sir, this comparison is to what matrix?

10  **A.**  It is growth rate and digital games sales.

11  **Q.**  Compared to?

12  **A.**  That's the -- that's the digital game sales in the games

13  transaction market as a whole relative to digital game sales

14  on the App Store.

15  **Q.**  That is a mature industry, correct?

16  **A.**  I am not sure that has any meaning.  This is an evolving

17  industry.  So -- and the entry of mobile, the entry of

18  streaming all has occurred.

19  **Q.**  Okay.

20          **MR. EVEN:**  I think I have no more questions.  Thank

21  you.

22          **THE COURT:**  Redirect limited to the Recross.  I show

23  three topics.

24          **MS. RICHMAN:**  Thank you, Your Honor.

25

### <u>FURTHER REDIRECT EXAMINATION</u>

**BY MS. RICHMAN:**

**Q.**  Just a couple of questions, Professor Hitt.

Are many of the games that Mr. Even mentioned –– that
Mr. Even mentioned were not available on PC actually available
for PC in the Microsoft store?

**A.**  Yes.  In many of the cases –– I don't know title by title,
but in many of the cases that would fall under the categories
identified by Mr. Even, they were available from the Microsoft
store.  And I think he showed one link that was.

**Q.**  If a developer licenses a second developer to create a
similar game on PCs, the first developer benefits from
substitution; is that correct?

**A.**  Sure.  Gets their games on additional platforms, and that
is a perfectly reasonable strategy.

        **MS. RICHMAN:**  Can we put up slide 6, please?

**BY MS. RICHMAN:**

**Q.**  I think this eventually came out, but just for the sake of
clarity, are you comparing spending in a local Office Depot to
the App Store in this slide?

**A.**  No.  This is digital transactions.

**Q.**  Digital transactions in –– what –– what is –– what are the
parameters of that?

**A.**  Literally digital transactions in games.  There is a few
different metrics of it, but this is the one identified that

1    are specific digital transactions.  It omits, for example,

2    physical sales.

3    **Q.**  So this is digital game transactions.  And what does the

4    green arrow represent?

5    **A.**  The green arrow is the increasing rate that -- cumulative

6    growth rate -- total growth rate over that nine-year period is

7    448 percent.

8    **Q.**  And how does that compare to the growth rate in the -- of

9    digital game transactions in the App Store?

10   **A.**  It is one-sixth.  To the extent you can compare growth

11   rates like that, the App Store is growing six times faster.

12   The digital games market itself is growing, nine, eight and a

13   half times faster than the economy as a whole.

14   **Q.**  What does that tell you about the competitive effects of

15   Apple's conduct?

16   **A.**  That there is nothing to suggest that they have engaged in

17   anticompetitive conduct that has reduced output.

18          **MS. RICHMAN:**  No further questions, Your Honor.

19          **THE COURT:**  Any Recross on those topics?

20          **MR. EVEN:**  No, Your Honor.  Thank you.

21          **THE COURT:**  Are you sure?  The ping pong has stopped.

22       All right.  Professor Hitt, you are excused, sir.

23       Next witness.

24          **THE WITNESS:**  Thank you, Your Honor.

25          **THE COURT:**  If counsel from each side will come up

1    and grab your binders.

2         **MS. FORREST:**  Your Honor, while we are getting the

3    next witness, I just wanted to -- since Ms. Richman had

4    referred to certain case law relating to the issue of product

5    market definition, I wanted to just similarly, if I could,

6    while we are waiting for the witness to come in, suggest that

7    the cases in paragraph 31 of our --

8         **THE COURT:**  I'm not sure what you are talking about,

9    Ms. Forrest.  I didn't make a note about legal issues.  I'm

10   trying to focus on the factual issues.

11        **MS. FORREST:**  I understand.  Ms. Richman began her

12   examination of Dr. Hitt with a recitation of certain cases.

13   She referenced back to the product market definition.  And I

14   simply was just wanting to recite the Court to the cases in

15   paragraph 31 of our Conclusions of Law.  Those same cases

16   would meet the ones cited by Ms. Richman.

17        **THE COURT:**  Thank you.  Who is the next witness?

18        **MR. EVEN:**  Your Honor, Epic Games calls Dr. Michael

19   Cragg.

20        **THE COURT:**  Thank you.

21        **MR. EVEN:**  I apologize, Your Honor.  I just got a

22   note about some sealing issues, so I would like to make some

23   notes on my slides to make sure that I don't show anything I

24   should not.

25

1              (**MICHAEL CRAGG,** called as a witness for the Plaintiff,

2    having been duly sworn, testified as follows:)

3              **THE WITNESS:**  Yes, I do.

4              **THE CLERK:**  Please be seated.  And then will you be

5    sure that that microphone is underneath here or pointed

6    underneath your shield.

7              **THE WITNESS:**  Is that good?

8              **THE CLERK:**  Please state your full name and spell

9    your last name.

10             **THE WITNESS:**  My name is Michael Cragg.  My last name

11   is spelled C-R-A-G-G.

12             **THE COURT:**  Okay, sir.  Good afternoon.

13             **THE WITNESS:**  Hello.

14             **THE COURT:**  And as soon as Mr. Even is settled, he

15   will start his examination.

16             **MR. EVEN:**  I apologize for that, Your Honor.  Thank

17   you for bearing with me.

18                        **DIRECT EXAMINATION**

19   BY MR. EVEN:

20   **Q.**  Good afternoon, Dr. Cragg.

21   **A.**  Good afternoon.

22   **Q.**  Dr. Cragg, did you submit written testimony in connection

23   with this matter?

24   **A.**  Yes.

25             **MR. EVEN:**  Your Honor, may we approach?

1          **THE COURT:**  You may.

2          **THE WITNESS:**  Thank you.

3          **THE COURT:**  Then I take it -- have they removed the

4     binders?  Maybe right after he's done.  Did you get the

5     binders, Mr. Niu?

6          **MR. NIU:**  We will do that after.

7          **THE COURT:**  You may proceed.

8          **MR. EVEN:**  Thank you, Your Honor.

9     BY MR. EVEN:

10    **Q.**  Dr. Cragg, is this a true and correct copy of your written

11    testimony?

12    **A.**  Yes.

13    **Q.**  And does the testimony accurately summarize the opinions

14    you reached in connection with this litigation?

15    **A.**  Yes.

16    **Q.**  Did you hear or review the testimony of Apple's experts?

17    **A.**  I have.

18    **Q.**  And did anything in their testimony cause you to change

19    any of the opinions you expressed in this written portion of

20    your testimony?

21    **A.**  No.

22          **MR. EVEN:**  Your Honor, at this time, Epic moves to

23    submit into evidence -- or admit into evidence Dr. Cragg's

24    written testimony.

25          **THE COURT:**  Okay.  So provisionally admitted once you

CRAGG - DIRECT / EVEN

1    all let me know that all the sealing issues have been

2    resolved.  Proceed.

3              **MR. EVEN:**  Thank you, Your Honor.

4    **BY MR. EVEN:**

5    **Q.**  If we can, Dr. Cragg, if you can look at the screen or at

6    the slides in your binder, whichever is more convenient for

7    you.  Put up slide number 1.

8         Is this a summary of your background and experience?

9    **A.**  Yes, it is.

10   **Q.**  Can you please summarize your educational background?

11   **A.**  I have a Ph.D. in economics from Stanford and a master's

12   degree in economics from the University of British Columbia

13   and a bachelor's of engineering from Princeton.

14   **Q.**  When did you receive your Ph.D. in economics?

15   **A.**  In 1993.

16   **Q.**  And have you ever taught economics?

17   **A.**  Yes.

18   **Q.**  Where did you teach?

19   **A.**  I taught at Colombia and at U.C.L.A.

20   **Q.**  And what is your current employment?

21   **A.**  I'm currently a principal at The Brattle Group.

22   **Q.**  And what's The Brattle Group?

23   **A.**  The Brattle Group is an international economic consulting

24   firm.

25   **Q.**  And at a high level, can you describe for me your work at

1    The Brattle Group?

2    **A.**   Certainly.  It is similar to what I was doing as an

3    academic, where we do research on complex economic and

4    financial topics for clients.

5    **Q.**   How long have you been a consultant on economics?

6    **A.**   About 25 years.

7    **Q.**   And what is the focus area of your consulting work?

8    **A.**   There are two areas that I focus on.  One is industrial

9    organization, and the other is in corporate finance.

10        **MR. EVEN:**   Your Honor, at this time, Epic tenders Dr.

11   Michael Cragg as an expert in industrial organization

12   competition.

13        **MR. SWANSON:**   Dan Swanson, Your Honor, for Apple.  No

14   objection.

15        **THE COURT:**   It's admitted.

16   **BY MR. EVEN:**

17   **Q.**   Dr. Cragg, what was your assignment in this case?

18   **A.**   I was given a broad assignment to review the expert

19   reports of what I call the Apple experts, the Apple

20   economists, which include Professor Lafontaine, Professor

21   Schmalensee, Professor Rubinfeld, and Professor Hitt.

22   **Q.**   And were you asked to focus on any specific areas within

23   your analysis?

24   **A.**   I did.  There were two areas.  One was on market

25   definition and the other was on market power.

CRAGG - DIRECT / EVEN

**Q.**   And did you prepare a slide summarizing your opinions?

**A.**   Yes.

**Q.**   Let's turn to that slide.  And can you provide -- without reading, just state what, at a high level, are your opinions in this case?

**A.**   Sure.  There are two opinions that relate to the topics that we just discussed.  One is on market definition.  I concluded that the Apple experts' market definition is both too broad and too narrow at the same time.  And that, second, related to the other aspect of my assignment, I concluded that Apple has significant market power.

**Q.**   So let's begin with your opinions regarding market definition.

Is there a test that, in your view, the Apple experts could have performed to determine whether game app transactions on the App Stores should be analyzed separately from nongame transactions?

**A.**   Yes.  The standard test is the hypothetical monopolist test.

**Q.**   How would that test work to make that determination in this case?

**A.**   Well, in this case, the Apple experts start with a market definition that considers game transactions, digital game transactions on iOS.  And then the question for them is, is there a larger market, and that's where the hypothetical

CRAGG - DIRECT / EVEN

1    monopolist test comes into play.

2    **Q.**  And so how would you do that to try and distinguish

3    between game transactions and nongame transactions?

4    **A.**  Well, the way the test proceeds to answer that question

5    is -- it's, you know, the hypothetical monopolist.  So the

6    starting point is to ask the question of if a monopolist were

7    to monopolize the transactions market for games on iOS,

8    would they be able to profitably raise price.

9         What I mean by "profitably raise price" is that there

10   wouldn't be the effect of substituting away to alternative

11   game stores, which could include a general purpose game store

12   like the Apple App Store, or alternative specialty stores

13   which were not specialty stores in game transactions.

14   **Q.**  Are you talking about game -- sorry, about stores on iOS

15   now?

16   **A.**  Specifically stores on iOS, that is the starting point.

17   And after that, you would look -- ask -- if you answered the

18   question, no, then you would proceed by saying that, okay,

19   there's a market for games on iOS.  Now are there other

20   substitutes for stores that provide game transactions on other

21   platforms.

22   **Q.**  So let's begin in the iOS.  If there was a monopolist on

23   game transactions on iOS and other stores that are not

24   specialty stores on iOS, what would you think the

25   hypothetical monopolist tests shows us?

CRAGG - DIRECT / EVEN

1    **A.**   There is no defining characteristic for game transactions

2    from a store perspective, and so were that hypothetical

3    monopolist to raise their distribution price, naturally

4    publishers, namely game developers, would seek out an

5    alternative store.  For instance, the general purpose app

6    store that we discussed a couple of minutes ago.

7    **Q.**   So switching gears a little bit, the Court has heard a lot

8    about substitution and what substitution means.

9         Have you done any analysis to determine substitutability

10   between iOS transactions and transaction on other platforms?

11   **A.**   Yes, I have.

12   **Q.**   And were those data-driven?

13   **A.**   Those are data-driven.  I use a variety of techniques to

14   examine that question.

15   **Q.**   So did you prepare a slide summarizing those?

16   **A.**   Yes.

17   **Q.**   Let's put up the slide.  And that is -- let's go through

18   these one by one, if we may.

19        So let's begin with the first analysis, availability of

20   game apps on each platform.  Did you prepare summary slides of

21   that analysis?

22   **A.**   I did, yes.

23   **Q.**   Let's bring up the next slide.  If we can focus on the top

24   please, Mr. Rudd.

25        So what are you showing in this first slide?

1    **A.**   In this first -- in the first slide here, I have done

2    research to identify the most popular games that are

3    published, the lifetime of those games on each of the

4    platforms that are posited by the Apple experts.  So the

5    portion of the table that has been expanded here is

6    specifically for mobile games.

7    **Q.**  Okay.  Why did you --

8              **THE COURT:**  You took the games from Professor Hitt?

9              **THE WITNESS:**  No, I developed my own research for

10   this.

11             **THE COURT:**  Okay.  I thought you said -- I

12   misunderstood your testimony.  Thank you for the

13   clarification.

14             **THE WITNESS:**  I am sorry.

15             **THE COURT:**  Proceed.

16             **MR. EVEN:**  Thank you, Your Honor.

17   **BY MR. EVEN:**

18   **Q.**  And so looking at this list of games, let's start by, why

19   are you highlighting *Fortnite*?

20   **A.**  Well, *Fortnite*, as you can see on this fourth column,

21   which shows the platforms on which the game is available, is

22   in a unique position with respect to the other mobile games in

23   that it is also uniquely available for play -- actually, for

24   cross-platform play on a variety of different platforms.  So

25   it is in a different position than the vast majority of other

CRAGG – DIRECT / EVEN

1    mobile games.

2    **Q.**  And what did you find with respect to the nonmobile or

3    static platforms?

4        And maybe if we can scroll down, Mr. Rudd.  Thank you.

5    **A.**  So I call these static platforms because for the most

6    part, you have to -- to use their full functionality, you have

7    to be in a location where you have internet connectivity as

8    well as a power source.  Obviously the Switch is somewhat

9    mobile, but it doesn't have that internet -- it doesn't have

10   cellular capacity.

11   **Q.**  When you look platform by platform, one of the facts that

12   is evident is that for the static platforms, you don't see

13   that they also are publishing games on mobile devices.

14           **THE COURT:**  Did you do -- with respect to Switch, did

15   you do an analysis for Switch, both mobile and static, or you

16   just assumed static and never addressed the mobile issue?

17           **THE WITNESS:**  I assumed that the Switch would be

18   either played on the screen that comes with the Switch or that

19   it would be played on a screen in the household, for instance.

20   I didn't look at the difference between those two.

21           **THE COURT:**  So you never did an analysis including

22   Switch in the mobile context?

23           **THE WITNESS:**  I did look at Switch to see whether it

24   appears in that top 30 -- the list of top 30 games.  And vice

25   versa; do the mobile games appear on the list of games for

1    Switch.  And the crossover there is very limited.

2              **THE COURT:**  All right.  Proceed.

3    **BY MR. EVEN:**

4    **Q.**  Maybe let me try and clarify one thing here, Dr. Cragg.

5         If you know, are games for Switch different for the

6    mobile -- or portable, I should say, really, game play mode

7    versus the static play game mode or is it just that the device

8    changes and the game is the same?

9    **A.**  My understanding is that the device stays the same.  You

10   can augment the equipment, the ancillaries that are with it,

11   but the game functions in both a mobile and what I'm calling a

12   static capacity.

13        And the other aspect which is different is that the Switch

14   is primarily looking to capitalize on Nintendo's catalog where

15   you have some very old, well-known, well-branded franchises

16   like *Mario Cart* and so on.  And it is looking to capitalize on

17   that and it doesn't, as a company, look to do so on mobile

18   devices, for instance, or other platforms.

19   **Q.**  Okay.  Thank you.

20        Based on this slide we've just looked at of most popular

21   games and how many of these games are available where, what

22   does this tell you about the availability and substitutability

23   between these platforms?

24   **A.**  So there are two conclusions that I draw from this.  One

25   is that for mobile games, we see that all games are published

CRAGG - DIRECT / EVEN

1   on both Android and iOS, and they are published, in my view,

2   because that's the way a developer is going to access those

3   different populations.

4       So there isn't a substitution between those games from the

5   consumer's perspective.  Rather, the developer has to go

6   through these two channels to be able to reach each of these

7   different populations.

8       For the static games, the nature of those games is quite a

9   bit different than on a mobile device.  The static games are

10  more complex.  They take advantage of the fact that you have a

11  bigger screen, you have different ways of interacting with the

12  game.  And as a result, those games provide a different

13  experience which is differentiated in a substantial way from

14  the mobile devices.  So from that perspective, a platform does

15  not -- platform games do not act as a substitute for mobile

16  games.  They are just different experiences for the consumer.

17  **Q.**  Just a quick question.  You mentioned that they're more

18  complex.

19      Have you done any research as part of your analysis in

20  this case into the relative budget for making a mobile game

21  versus a console game?

22  **A.**  Yes.

23  **Q.**  And what is the difference between those?

24  **A.**  They are very much like producing a movie.  They are big

25  budgets.  For a console, it's -- can be upwards of a couple

1      hundred million to produce a game --

2              **THE COURT:**  Where is that data?

3              **THE WITNESS:**  That is in my written direct, Your

4      Honor.

5              **THE COURT:**  But I take it you have data --

6              **THE WITNESS:**  Yes.

7              **THE COURT:**  -- for that proposition?

8              **THE WITNESS:**  Yes, I do.

9              **THE COURT:**  You got that from the manufacturers, the

10     producers?

11             **THE WITNESS:**  Not from the manufacturers or

12     producers, but from the press, and the gaming industry has a

13     variety of consulting companies and other research

14     organizations that focus on providing information to game

15     developers.  And they provide advice for those who are

16     thinking of doing a mobile game, developing a mobile game and

17     contrasting that with what goes into developing a -- the

18     phrase that they -- the way they refer to static games are HD

19     games, getting across that these are, you know, full-on

20     absorbing entertaining experiences, and that's expensive to

21     produce.

22             **THE COURT:**  Proceed.

23             **MR. EVEN:**  Thank you, Your Honor.

24     BY MR. EVEN:

25     **Q.**  I am sorry, I'm not sure you finished your thought there,

1    Dr. Cragg.  So you explained that console games are like big

2    blockbuster movies, a couple of hundred million, I think you

3    said.

4    **A**.  Yes.

5    **Q**.  But I don't think you finished the thought about the

6    comparable or comparative cost of mobile games.

7    **A**.  Well, the comparative cost for mobile games is hundreds of

8    thousands of dollars and -- or less.  The games that are being

9    produced for the most part for mobile devices are simpler.

10   They are playing -- they are played on a much simpler -- the

11   experience has to be limited because of the size of the

12   screen.  And, second, the use of a mobile device tends to be

13   at a time when you're not looking to be absorbed in that

14   entertainment; but, rather, it's fleeting in experience.

15   **Q**.  Okay.  So let's dive a little bit more into the data and

16   let's look at the next slide which talks about usage.  And I

17   think you mentioned in your summary that you looked at both

18   spending and play time.  And let's start with the first column

19   because there are -- there's a lot of data on slide.  What do

20   we see in the first column?

21   **A**.  The first column, this is for *Fortnite* players, so this is

22   taken from the *Fortnite* dataset that was provided in

23   discovery.  The first -- I've taken that data and segmented it

24   into rows that correspond to the platform where *Fortnite* is

25   being played.

CRAGG - DIRECT / EVEN

1    **Q.**   And what do we see from the first column about average

2    minutes per week that is relevant to your analysis?

3    **A.**   Well, this is a -- the statistic here shows that the

4    average minutes per week that are played by someone on a

5    mobile device is typically less than an hour.  Whereas, those

6    who are playing it on PlayStation 4 or an Xbox or the Switch

7    are doing so in a much more absorbed way where it is several

8    times -- you know, six, seven hours of play on average for

9    those who are playing *Fortnite* on consoles.

10   **Q.**   And what does this first column tell you about

11   substitutability between these different platforms?

12   **A.**   Well, it demonstrates that these -- *Fortnite* is being

13   played in different ways on these platforms.  Therefore, the

14   platforms, from a consumer perspective, don't act as

15   substitutes for each other because the game play is done in a

16   different way.

17   **Q.**   All right.  So let's now look at the second and third

18   columns which you put a headline there by primary platform and

19   you talk about players thousands and average revenue.  Can you

20   explain what you see there that's relevant to your analysis?

21   **A.**   So the column labeled "Players" just tell us how many

22   players play iOS, almost a couple million.  And then the

23   column that is titled "Average Revenue" is the amount that is

24   spent on average for -- on each of these devices.

25   **Q.**   And what can you tell us about the trends that we see

CRAGG - DIRECT / EVEN

1    that iOS is a lot of players, but relatively small revenue

2    versus some of the consoles?

3    **A.**   Well, the lines, which is what I was just saying, is that

4    console players are more engaged in their play with *Fortnite*

5    and they spend more.  So it corresponds to, you know, the idea

6    that the play on these devices is being done in a way that

7    doesn't support there being substitutes for each other.

8    **Q.**   Okay.  So we're going to get our two-minute warning.

9    Let's try and do columns --

10            **THE COURT:**  Three minutes.

11            **MR. EVEN:**  Three minutes.  Thank you, Your Honor.

12   BY MR. EVEN:

13   **Q.**   We can leisurely do columns 4 and 5, Dr. Cragg.  What do

14   you show there about multiplatform users?

15   **A.**   This last group is a different set of players.  I'm

16   looking at players that use multiple platforms to play.  And

17   what we see in the fourth column, which corresponds to the

18   number of weeks that the platform was not used, is that

19   there's a substantial difference between the PlayStation and

20   Xbox consoles, for instance, and iOS.

21       So for iOS, four out of five weeks, the platform wasn't

22   played, and only one -- the last column here, the 10 percent,

23   corresponds to one out of ten weeks, it was the most played

24   platform.  So for these multiplatform players, they are not

25   really playing on iOS in the same way, by a long shot, as

1      those who play on a console.

2               THE COURT:  And what was the time period?  A year?

3      Or what were you doing, percentage of weeks?

4               THE WITNESS:  This would be the -- from the time that

5      I observed them going from a -- playing on a single device to

6      playing on multiple devices --

7               THE COURT:  What is the time period?

8               THE WITNESS:  The time period looking forward from

9      that trigger.

10              THE COURT:  What was the time period?

11              THE WITNESS:  Oh.  It is from the start of *Fortnite*

12     through to the beginning of last year.

13              THE COURT:  So to January 2020?

14              THE WITNESS:  Yes.

15              THE COURT:  Go ahead.

16         MR. EVEN:  So by my watch, I have ten seconds, Your

17     Honor, and I'm moving to a new slide.  Maybe this is a good

18     time to break.

19              THE COURT:  All right.  Good enough.  We will stand

20     in recess for 40 minutes.  We will be back on the record at

21     1:15.  Thank you.

22         MR. EVEN:  Thank you, Your Honor.

23                   (Recess taken at 12:35 p.m.)

24                   (proceedings resumed at 1:15 P.M.)

25              THE CLERK:  Remain seated.  Court is in session.

1    Come to order.

2              **THE COURT:**  Okay.  We are back on the record.

3         The record will reflect that the parties are present.

4    Mr. Cragg is on the stand.

5         Ms. Forrest is standing so -- as opposed to Mr. Even.

6         Yes, ma'am.

7              **MS. FORREST:**  Yes, very briefly, Your Honor.

8         Mr. Doren and I conferred during the lunch break, and he

9    has, subject to the Court's decision on this, graciously

10   agreed that from the Apple perspective they would not be

11   opposed if we were able to break after Mr. Cragg is off the

12   stand, which we don't expect to be before 2:45, between the --

13   Mr. Even's examination and the examination of Apple, to allow

14   us to prepare for the next witness which will be Mr. --

15   Dr. Evans.

16        We're trying very -- we're scrambling to get the right

17   people in place and the materials gathered.  It has gone

18   faster because of the events Your Honor is aware of and that

19   we were hoping that that time would not count against us.  And

20   that is really the nature of the agreement that Apple had

21   consented to if Your Honor is amenable.

22             **MR. DOREN:**  That's right, Your Honor.

23             **THE COURT:**  Okay.

24        Well, given the extraordinary circumstance, which I'm

25   assuming we'll deal with that later, I am agreeable.

1          It does -- we do have court issues and so that I am very

2     cognizant about trying to get you all done during the allotted

3     time.

4          So towards the end of this trial, we will have a jury in

5     the building.  We'll be down court reporters.  So it is

6     important that we try to stick with the schedule that I've

7     laid out.

8               **MS. FORREST:**  Understood, Your Honor.  Thank you very

9     much.

10              **THE COURT:**  All right.

11              **MR. DOREN:**  Thank you, Your Honor.

12              **THE COURT:**  Okay.  Mr. Even, you may proceed.

13              **MR. EVEN:**  Thank you, Your Honor.

14    **Q.**  Dr. Cragg, we were talking about your deep dive into the

15    data about usage and spending, and I think we're just about

16    done with that.

17         So why don't we move on to the next analysis and data cut

18    that you took, and that's Slide 6.

19              **MR. EVEN:**  If we can put that up, please.

20                   (Demonstrative published.)

21    **BY MR. EVEN:**

22    **Q.**  And what does this chart show us, Dr. Cragg?

23    **A.**  Well, Slide 6 is another way to look at a summary of how

24    users play Fortnite.  And so what I've looked at is, for each

25    month, how many users use one platform or two platforms or

CRAGG – DIRECT / EVEN

1    more.

2        And -- and then I have graphed that information.

3    **Q.**  So what are the big blue mountains that we see towering

4    over this slide?

5    **A.**  Well, these are users who play on a single platform.  And

6    so if you contrast the -- the navy line there with the teal

7    one where -- which corresponds to Fortnite users who play on

8    two platforms, you can see that there's an eightfold or more

9    difference in the -- in those populations.

10   **Q.**  And what, if anything, were you able to conclude from this

11   analysis regarding player multi-homing?

12   **A.**  Well, from a multi-homing perspective, on a month-by-month

13   basis, players don't really do that.  It's -- people play on a

14   single platform for the most part.

15   **Q.**  And what does that show you about people's willingness to

16   substitute?

17   **A.**  Well, the -- you know, the hypothesis of the Apple experts

18   is that multi-platform play, a -- you know, doing transactions

19   across platforms is a way of, you know, creating a

20   disciplining force for the Apple App Store.  And from a

21   practical perspective, that's just not happening in this

22   marketplace.

23   **Q.**  And this is obviously play time, as you explained.  How

24   can you deduce where people transact from where people play?

25   **A.**  Well, to play, you sign on to a -- a device.  So you log

1    in to Fortnite.  And so what we're seeing in this graph is

2    that the vast majority of people sign in to Fortnite on a

3    single device each month.

4        And so that says that they're not transacting across

5    platforms, the majority of people, but rather they're -- if

6    they're going to transact, it's going to be on the one -- you

7    know, the platform that they're on.

8            THE COURT:  So doesn't that also suggest that if

9    you're a single -- in terms of substitution, that a Fortnite

10   user, from a consumer's perspective, the consumer would use

11   the same platform for some other game if they wanted to game?

12           THE WITNESS:  Yes.  That would -- you know, depending

13   on whether they own more than one platform, that would be

14   true.

15           THE COURT:  Okay.  Keep going, Mr. Even.

16           MR. EVEN:  Thank you, Your Honor.

17   Q.  Let's talk about the regression models that you discussed

18   in your summary slide.  And maybe as a first step, can you

19   explain at a high level what a regression model does?

20   A.  Well, a regression model is the workhorse of economic

21   research, and it looks at the relationship between two

22   variables holding constant the effects of other things.

23       And so as an example, for instance, from earlier today

24   Professor Hitt had spoken about -- in looking at the Switch,

25   there's a need to, you know, if you can, hold constant the

1    release date, for instance, of new updates.  And so a

2    regression framework, which I've used, allows for controlling

3    that -- for those types of events.

4    **Q.**  Okay.  So what did you look at in your first regression?

5    **A.**  So I was interested in what is the impact of starting to

6    play on a -- an alternative device on how somebody experienced

7    Fortnite overall.  And so the first regression examines that

8    question of introduce another platform, what happens to total

9    play time.

10   **Q.**  Okay.  So let's turn to the next slide.

11                   (Demonstrative published.)

12   **BY MR. EVEN:**

13   **Q.**  And let's take this one by one.

14        So first of all, we see original platform at the top.  And

15   user adds a second platform on the left.  What does that mean?

16   **A.**  So across the top, if you -- let's take the top left entry

17   here, if your original platform was a mobile device, the rows

18   correspond to people who, you know, started playing on a

19   second mobile device or started playing on a Switch or a home

20   console or a PC.  So that's how the analysis is -- is focused.

21   **Q.**  Okay.  And so let's try and -- and see if we understand

22   what -- what are the plus marks, for instance, when you start

23   with a original platform mobile device, and I see four pluses

24   below it when the second device is either mobile, Switch,

25   home-owned console?  What do these pluses convey?

1    **A.**   So this is a summary of a bunch of coefficient estimates

2    which have the estimate and the standard deviation.  So that's

3    kind of what the output looks like.  Then consolidated that

4    and used the plus sign to indicate when there was a

5    statistically significant increase in total play on both the

6    original platform as well as the second platform.

7         And so that's what the plus indicates is an increase in

8    total play when you start using a second device.

9    **Q.**   If you go from your first device to the second device and

10   substitute play from one to the other, what would you expect

11   to see in terms of play time?

12   **A.**   You'd expect that play time would, you know, stay roughly

13   the same.

14   **Q.**   And what are we seeing here when the original platform was

15   mobile device and then whatever other platform was added?

16   **A.**   So for mobile devices, for every single platform type that

17   was introduced as a -- as a new place of play, we see an

18   increase in total play.

19   **Q.**   And what happened when the mobile device was the -- the

20   second platform, so if somebody played on something else and

21   then added a mobile device?

22   **A.**   And so conversely, the same pattern holds that if you were

23   playing on a Switch, for instance, and you started playing on

24   a mobile device as well, your total play time increased.

25   **Q.**   And so that additional -- that play would be incremental?

CRAGG - DIRECT / EVEN

1    **A.**   It's incremental, exactly.

2    **Q.**   Okay.  What are the double dashes that we see here, for

3    instance, from one home console to another?

4    **A.**   Yeah, that's -- the double dash indicates that there was

5    no statistically significant change in play.  So there isn't

6    a -- a meaningful change from introducing a second platform.

7    **Q.**   Okay.  And would that be -- would that be consistent with

8    substitution between the two platforms?

9    **A.**   It is.  So when you, for instance, introduce a -- a home

10   console, what we see when someone starts playing on a second

11   home console, which is a very similar type of experience in

12   contrast to a mobile device, we don't see a -- the -- the same

13   increase in total play that we did with a mobile device.

14   **Q.**   Okay.  What did you do next in term of your regression

15   analysis?

16   **A.**   Well, I was curious about the claim of the Apple experts,

17   and I looked directly at testing whether there was this

18   substitution effect.

19       And this is a particularly important case to look like --

20   look at because if there are any games where that hypothesis

21   would have held true, it would have been in the case of

22   Fortnite.  It's one of these unique platforms where there's

23   this possibility of switching between platforms of the -- of

24   the type that the Apple experts posited for why they should be

25   in the same market.

CRAGG – DIRECT / EVEN

1        If it's not true for this particular case study, which is

2   the best case study that, you know, if -- would be, you know,

3   the -- the most likely place you'd find this substitution, if

4   it doesn't hold true for this, it's unlikely to hold true for

5   the other games where the same type of play opportunity

6   doesn't exist.

7   **Q.**   Okay.  And specifically what did you look at in terms of

8   your second regression?

9   **A.**   So the second regression is very similar in structure

10  except that I looked at what happened to total play on the

11  original platform when you introduce a second platform.  And

12  so --

13  **Q.**   I see.

14  **A.**   -- this is analogous to kind of the closest thing that

15  we're going to get to the type of price change that, you know,

16  Professor Schmalensee discussed the other day.

17  **Q.**   Okay.  So let's go to the next slide and look at the

18  results of that particular regression.

19                   (Demonstrative published.)

20  **BY MR. EVEN:**

21  **Q.**   And let's first of all make sure we understand the

22  presentation.

23       And so here, for instance, I see that we have the same

24  original device and second platform -- original platform,

25  second platform structure as in the prior one, correct?

CRAGG - DIRECT / EVEN

1    **A.**  Yes.

2    **Q.**  And then in mobile device, for instance, I see that you

3    say okay for mobile device and I add another mobile device, it

4    says C.

5        What does C stand for?

6    **A.**  So C is shorthand for, you know, complementary.

7    Complementary in the sense that when you start playing on a

8    second mobile device, your play on the original mobile device

9    actually goes up.  And so there's a feedback between the two

10   where your -- you know, you've enhanced the experience on the

11   original device so it's not -- you don't substitute away to,

12   you know, playing on a new mobile device.  Instead you play on

13   both of them more vigorously.

14       So if you, for instance, add an -- an iPad to somebody who

15   had an iOS, they engaged in both on a -- on a more vigorous

16   basis.

17   **Q.**  Okay.  So I see the C for mobile -- when the first one is

18   mobile device and I add a -- another mobile device, and that's

19   along the lines of what you described.  I also see it for

20   mobile device to PC.

21       But then in the middle, I see for mobile device to Switch

22   or to home console, and I see the double dashes.  What does

23   that mean?

24   **A.**  So the double dash indicates that there is not a

25   significantly significant decline in play on the mobile device

CRAGG – DIRECT / EVEN

1    when you introduce a Switch.  So they're not substituting for

2    each other in the way that, you know, could have been, you

3    know, in the way that's posited by the Apple experts.

4    **Q.**  I see.  And so for this one essentially, if I understand

5    you correctly, what you're saying is if I started on the

6    mobile device and then I added the Switch, the Switch will be

7    incremental, but I keep playing on the mobile device just as I

8    had before.

9    **A.**  Exactly.

10   **Q.**  Okay.  And then I also see some S's between Switch and

11   home console, for instance.  What does -- what does the

12   S stand for?

13   **A.**  Well, the S stands for a substitution effect where the

14   play on the original device goes down.  And so for the static

15   devices, Switch, home console, and PC, when you introduce a

16   different static device, namely a gaming console, for each of

17   those original platforms we see a decline in their play.

18   **Q.**  Okay.  And what does all this tell you based on this

19   regression about substitutability between these platforms?

20   **A.**  Well, I think the most important piece is that other

21   platforms don't act as a substitute for iOS on -- on Fortnite.

22   **Q.**  So let's switch gears from your own data driven analysis

23   into some of the things that you've done specifically to

24   address some of the experts on the Apple side's work.

25        And let's start with Professor Hitt's console app

CRAGG - DIRECT / EVEN

1    analysis.  Did you hear some of Professor Hitt's testimony at

2    least this morning?

3    **A.**  I did, yes.

4    **Q.**  And at a very high level, do you recall that Professor

5    Hitt testified that he used some proxy to measure the changes

6    between two groups in consumption of iOS games?

7    **A.**  I did, yes.

8    **Q.**  And I know in your written direct, you have some reference

9    also or some thoughts about the proxy itself, but I want to

10   focus today on his actual results.

11       In your view, do his results show the substitution that he

12   posited?

13   **A.**  No.

14   **Q.**  And why not?

15   **A.**  Well, he focuses on the -- on the growth rate, which for a

16   study of consumption is not the typical way that an economist

17   would -- would look.  Instead, they are interested in how do

18   the levels actually change in the way that, for instance, I

19   had done in the regression analysis earlier.

20   **Q.**  And can you explain why growth rates might lead to

21   different results?

22   **A.**  Well, it depends or can depend on the starting point.  So,

23   you know, if it's both populations start at the same level,

24   it's -- you know, looking at the growth rate would be a direct

25   measure that correlates with the change in levels.

1          But if the starting point is different and significantly

2     different, you could draw, you know, a false inference.

3     **Q.**   Can you give me a -- a very simplified numerical example

4     of why you would draw the wrong inference?

5     **A.**   Yeah.  So let's consider a simple example that each

6     population's consumption went up a dollar from over the time

7     period of interest here.

8               **THE COURT:**  But before you do that, your consumption

9     is playing time, not dollars.

10              **THE WITNESS:**  No, now I'm looking at dollars.  So

11    we've left the Fortnite data and we're now looking at the

12    Apple iOS transaction data that Professor Hitt looked at.

13              **THE COURT:**  Okay.  Go ahead.

14         I'm sorry.  You can start repeating.

15              **MR. EVEN:**  That's okay.  Thank you, Your Honor.

16    **Q.**   So you were, I think, trying to explain an example, a

17    simplified numerical example of why looking at growth rate

18    might give someone the wrong impression about what actually

19    happens with the underlying numbers.

20    **A.**   Right.  So imagine the year-over-year change for Professor

21    Hitt's populations were a dollar.  So they're the same for the

22    download group as well as the non-download group.  So you say

23    there's no change that -- across, you know, no difference

24    across the two populations.

25         But suppose the group that didn't download started

1    originally in 2017 at a dollar and the other group started at

2    $10.  So the console players were already spending more.

3         In that case, the dollar-over-dollar change, a hundred

4    percent increase would be what you would observe for the --

5    for the nontreatment group.  And then the treatment group,

6    which, you know, download the console app, you'd have a dollar

7    on 10-dollar increase, and so it'd only be a 10 -- a

8    10 percent increase.

9         So a hundred percent increase for the non-download group,

10   a 10 percent increase for the download group, you know, that's

11   where you end up having the wrong inference because, in fact,

12   they both had the same change in year-over-year consumption.

13   **Q.**  Okay.  And did you represent the data that was used by

14   Professor Hitt to see whether the focus on growth rate caused

15   some misperception here?

16   **A.**  Yes, I did.

17   **Q.**  And so if you open your binder, this is one that I believe

18   we cannot put up on the screen subject to a motion to seal.

19        But at a high level, without speaking to the specific

20   numbers --

21             **THE COURT:**  Which slide?

22             **MR. EVEN:**  This is Slide 9, Your Honor.

23             **THE COURT:**  Okay.

24   BY MR. EVEN:

25   **Q.**  And so Slide 9, I believe, is Professor Hitt's growth

1    rate, correct?

2    **A.**   Yes.

3    **Q.**   And --

4    **A.**   So --

5    **Q.**   -- he reports 24 percent for one group, the blue group,

6    and 19 percent to the -- for the other group?

7    **A.**   That's right.  The -- the group that downloaded the app,

8    he views that as a decline in their consumption.

9    **Q.**   Okay.

10        And now, without mentioning the dollar numbers, because I

11   believe those are subject to that seal motion -- sealing

12   motion, if you turn to Slide 10, what happens if we look at

13   the actual dollar numbers?

14   **A.**   So the actual dollar number shows that the group that did

15   download the app actually bought more in 2019 than the group

16   that didn't.  And so it's not the $1/$1 example that I gave

17   earlier.  It's $1 and a larger amount for the group that

18   downloaded the app.

19        So it reverses the conclusion that Professor Hitt would

20   make from this analysis.

21   **Q.**   Okay.  And have you drilled down to look at the actual

22   numbers of change?

23   **A.**   Yes.

24   **Q.**   So if we look at the next slide.  And again, don't speak

25   to the actual numbers.  But is what you see this difference in

1   starting point that you described?

2   **A.**   Exactly.  That's the cause of the incorrect inference that

3   Professor Hitt makes that the control group, just like in my

4   example, was spending more -- spending less in 2017 than the

5   console download group was in 2017.  So the console group was

6   spending more.

7        And then in 2019, after the treatment effect, they spent

8   even more relative to the control group.

9   **Q.**   And just so we make sure we understand, when you say

10  the -- the console group, that is the -- the group that

11  Professor Hitt, assuming his proxy worked, identified as

12  people who started playing more on the console?

13  **A.**   Yes, that they -- the -- the hypothesis is that by

14  downloading the app in 2018, he can infer that that group also

15  was playing games on iOS.

16  **Q.**   Okay.

17       And you see that that group actually spent more than the

18  group who didn't, correct?

19  **A.**   Yes.

20  **Q.**   All right.

21       So let's turn to Professor Hitt -- Hitt's Nintendo Switch

22  substitution analysis.

23       And here, if we look -- if we bring up Slide 12.

24                      (Demonstrative published.)

25

**BY MR. EVEN:**

**Q.** And that is the slide that we looked at this morning. And you weren't here, I believe, Dr. Cragg, but you've seen this slide before, correct?

**A.** I have, yes.

**Q.** And what is Professor Hitt describing in this slide?

**A.** Well, this is going -- now we're going back from the Apple data to the Fortnite data, so the data that we had examined before. And we're looking at a subset of that data. So the subset is the set of people who played on Fortnite in June of 2018.

And -- and that's the -- that's the month that the Switch was released.

**Q.** And what is Professor Hitt's claim with respect to this data?

**A.** Well, with this -- and I'll just call this the manipulated data because it not the actual underlying data, it's data that's been manipulated -- he claims that the introduction of the Switch led to a substitution between iOS and -- and the Switch.

So we've already seen the regression results which are, I think, really the right way to examine this, but I'm following now Professor Hitt's methodology just to look at a high level at -- at his graph.

**Q.** And Professor Hitt explained to the Court today why it's

CRAGG - DIRECT / EVEN

1   crucial in econometrics to index everything to a hundred

2   percent here to get a correct comparison.

3        Do you agree with that?

4   **A.**  No.  I wouldn't describe this as an econometric analysis.

5   This is really a fairly rudimentary review of numbers.

6   Econometrics refers to analyses where you have standard

7   errors, where you do regressions, that type of thing, and

8   that's not what this is.

9   **Q.**  And speaking to the indexing itself, what's wrong with

10  indexing everything to a hundred here?

11  **A.**  Well, indexing is similar to looking at growth rates.

12  You -- you take all the data and, you know, make it equal in

13  March of 2018, and then you, you know, express all the future

14  data in relationship to that March 2018 starting point.

15       And so to the extent that March 2018 as a starting point

16  is substantially different, this can lead to a real

17  misinterpretation of the data.

18  **Q.**  And did you take Professor Hitt's data for this analysis

19  and re-present it in a different way?

20  **A.**  That's right.  I simply take the -- like I did before, I

21  started with what was the actual -- what did the actual

22  consumption data look like.  And so that's what I did.  That's

23  kind of a first step to look at his analysis.

24  **Q.**  And when you say actual consumption, what -- what is the

25  matrix for consumption here?

1   **A.**   Well, this is spending on iOS.

2   **Q.**   Okay.  So this is dollar value?

3   **A.**   Dollar value.

4   **Q.**   Okay.  So let's take a look at the next slide, Slide 13.

5                     (Demonstrative published.)

6   **BY MR. EVEN:**

7   **Q.**   And that are two charts that we see here?

8   **A.**   Well, on the left is simply a reproduction of Professor

9   Hitt's analysis where the -- the green line corresponds to iOS

10  users that accessed Fortnite in June 2018 but excluding the

11  Switch users.

12       And then the blue line is below it is the set of people

13  who, you know, played -- accessed Fortnite on both iOS and

14  Switch.

15  **Q.**   And I see that the blue line is at the bottom on Professor

16  Hitt's slide but at the top on your slide.  Why is that?

17  **A.**   Well, the reason for that is this indexing issue.  So the

18  people that accessed both -- accessed Fortnite on both iOS and

19  Switch spent more on the game in March 2018 and that that

20  pattern holds true all the way through the period.

21       So by the time that they start playing on the Switch in

22  June of 2018, they're spending more than twice as much as the

23  group that didn't start playing on the -- on the Switch.

24  **Q.**   And why did you put these two red circles around the

25  beginning in March 2018?

CRAGG - DIRECT / EVEN

**A.**   Because it shows that the starting point is substantially different.  So for the group that doesn't play on the Switch in March 2018, they were spending, you know, on the order of, you know, between 25 cents and 50 cents; whereas the other group, the group that by 2018 -- by June were playing on the Switch, they were spending on the order of three times as much.

And so that's a very -- in this type of indexing exercise that starting point is a substantial difference.

**Q.**   Okay.

In both of these -- in both of these analyses we just looked at, have you used any data other than Professor Hitt's data?

**A.**   No.

**Q.**   Okay.  Did you also take a look at what actually happens in terms of spend on iOS in June of '18?

**A.**   Well, we can see that in this graph.  So for the -- the group that didn't buy a Switch, their spending increased from about $1.75 to 2.25, so a 50-cent increase.  Whereas those who started playing on the Switch saw an increase that was, you know, over a dollar.  So a substantial difference in spending between the two groups.  And the -- the Switch group spent even more than the non-Switch playing group.

**Q.**   Okay.

So let's take a look at the next slide, that's Slide 14.

1        (Demonstrative published.)

2   **BY MR. EVEN:**

3   **Q.**   And what are you showing here?

4   **A.**   Well, here I'm again looking at the total spending for

5   this population of iOS users in June of 2018 where they spend

6   earlier in the year and then where they spend later in the

7   year.

8        And so this is those people who started playing on the

9   Switch in June.  And we're looking at, well, what did they

10  spend in the other months but, you know, immediately before

11  and after this event.

12  **Q.**   Okay.

13       And what are the two rectangles that are -- have sort of

14  the yellow highlighting around them?

15  **A.**   Well, that's -- that teal, again, is iOS users.  So this

16  is the spending by people who make Fortnite purchases on iOS.

17  And you can see that there's an increase from June to July.

18  **Q.**   And what happened with Switch?  Where do we see the Switch

19  use during that time?

20  **A.**   Well, the Switch is the, you know, the fire engine red at

21  the top.  And in -- in June, they're spending about a million

22  dollars on Fortnite purchases.  And -- and this group then

23  increases their -- their purchases on Fortnite as we go into

24  July.

25  **Q.**   Okay.  So let's switch gears again and turn to a different

1   point from Professor Hitt.

2       And specifically I want to point -- turn to Slide 15.

3                   (Demonstrative published.)

4   **BY MR. EVEN:**

5   **Q.**   And this is reflecting Apple's opening Slide 47 and Hitt

6   Figure 55.

7       And this says that the App Store's effective commission

8   has decreased to 8.1 percent.

9       Do you see that?

10  **A.**   I do see that, yes.

11  **Q.**   And do you have an understanding as to how Professor Hitt

12  calculated his effective gamed commission rate matrix?

13  **A.**   Yes.

14  **Q.**   And how did he go about doing that?

15  **A.**   He averages together the commission on app downloads as

16  well as IAP transactions.  And then he averages it -- that in

17  with those transactions where there's no commission rate

18  charged either -- you know, it's an undefined number.  He --

19  he blends all of that together to generate the 8.1 percent.

20  **Q.**   And what is the commission rate that he assigns or

21  ascribes to free downloads?

22  **A.**   Zero.

23  **Q.**   And is that, in your view, a correct way of doing an

24  average on a commission?

25  **A.**   No.  And there's a -- I think a -- you know, a reason for

1    that, which is ordinarily economists think of the following

2    check, which is you should be able to multiply the revenue

3    base times the average commission rate to get Apple's take.  I

4    mean that's -- that would be, you know, from an economist's

5    perspective, the self-evident test.

6        You cannot do that with this effective commission rate.

7    You can't go from Apple's -- the App Store total revenues,

8    multiply it by this 8.1 percent to get Apple's return.  It

9    just doesn't compute.

10   **Q.**   Okay.

11       So setting aside that -- that particular error, does the

12   8.1 percent in and of itself show that commissions have

13   decreased?

14   **A.**   No.  You need a change over time to make that statement.

15   **Q.**   And did you do a time series analysis to determine how

16   Professor Hitt's commission rate changed over time?

17   **A.**   I did.

18   **Q.**   And what methodology did you use to check for that?

19   **A.**   I -- I replicated what Professor Hitt did.  So independent

20   of my critique of that, I simply took his method and applied

21   it to the -- you know, the data over time to see what would

22   happen, whether the statement at the top is actually

23   consistent with the 8.1 percent.

24       Because it could easily have been the case that, you know,

25   earlier on, the -- you know, the effective commission rate

1  could have been lower and so the statement would be correct

2  even though data wasn't presented.

3  **Q.**  Okay.  So if you turn in your binder, because we have

4  another slide that's subject to sealing, but if you turn in

5  your binder to Slide 16.

6      And does that reflect the calculation that you did using

7  Professor Hitt's methodology --

8  **A.**  Yes, it does.

9  **Q.**  -- over time?  Sorry.

10     So what are you -- what are you showing the Court here in

11  this slide?

12  **A.**  Here, I'm simply replicating Professor Hitt's calculation

13  for not only 2018 where you can see the 8.1 percent on the

14  graph, but I've done that calculation for the other years from

15  2008 through 2019.

16  **Q.**  So setting aside your disagreement with Professor Hitt's

17  calculation, what does this charge show you about Apple's

18  claim that the commission rate has declined?

19  **A.**  Well, it -- it's not right.  Professor Hitt's calculation,

20  his approach actually shows that the effective commission rate

21  increases over time.

22  **Q.**  Okay.

23     So now let's go to the next slide again in your binder.

24  This is Slide 17.

25     And what is it that you're showing here under the heading

CRAGG - DIRECT / EVEN

1    "Average Quarterly Commissions for IAP Have Increased"?

2    **A.**  So here I'm looking at actual transaction cost on a -- a

3    dollar basis.  So on a transaction-by-transaction basis in IAP

4    and then calculating what the average transaction cost was for

5    each year.

6    **Q.**  And that essentially asks how much money Apple gets to

7    keep of every paid transaction?

8    **A.**  Exactly.

9    **Q.**  And what are you showing here?

10   **A.**  Well, here I'm showing that the transaction cost increases

11   over time --

12   **Q.**  And --

13   **A.**  -- for IAP.

14   **Q.**  For IAP.  Okay.

15       And you heard testimony today from Professor Hitt that he

16   showed analyses that are very similar to this one, correct?

17   **A.**  Yes.

18   **Q.**  So he agrees with you that Apple's take per transaction,

19   per IAP transaction, increased over time in terms of dollars,

20   correct?

21   **A.**  Yes.  And that's -- that's also true for the initial

22   download as well.

23   **Q.**  Okay.  And he said that that's great because that shows

24   that -- that developers deliver value, correct?

25   **A.**  Yes.

1   **Q.**   Okay.  And that's certainly great for Apple, correct?

2   **A.**   Well, it is.  They're providing the same service but

3   getting more for it.

4   **Q.**   Okay.

5       So with that, Dr. Cragg, I'd like to turn to the next

6   slide.

7           **THE COURT:**  By the same token, they provided that

8   service for a game developer who chooses not to charge

9   anything for free, right?

10          **THE WITNESS:**  That's right.

11          **THE COURT:**  So it's a business model decision.

12          **THE WITNESS:**  It is.

13  **BY MR. EVEN:**

14  **Q.**   Well, just so -- so we're clear about this, the -- the

15  slide that you've shown does not look at original downloads,

16  correct?

17  **A.**   That's correct.

18  **Q.**   This looks at in-app purchases happening after the -- the

19  initial download.

20  **A.**   Exactly.  So for the game developers where this is the

21  predominant form of transaction where they receive revenues

22  through in-app purchases, there are no zero transactions in

23  this graph.

24          **THE COURT:**  Well, there are if -- so -- so what about

25  the instance where -- well, I guess not.  I mean because in

CRAGG - DIRECT / EVEN

1    Fortnite, you can -- you can have purchases even -- you can

2    have purchases if your wallet is full.  And Apple gets

3    nothing.  How did you account for those, if at all?

4         **THE WITNESS:**  I didn't.  This is all of Apple's data.

5    So it's not just the Fortnite data.

6         Of the overall that --

7         **THE COURT:**  But that circumstance is not reflected in

8    this chart.  In-app purchases --

9         **THE WITNESS:**  No, that's right.  Exactly.  So if you

10   were in the Fortnite game playing -- accessing it through iOS

11   and you had V-Bucks that you had bought somewhere else so

12   you're transacting with -- within the Fortnite system, you

13   would not be doing a transaction through -- through Apple at

14   that stage.

15        **THE COURT:**  Keep going.

16        **MR. EVEN:**  Thank you, Your Honor.

17   Q.  So, Dr. Cragg, turning to the last slide, you say Apple's

18   market power is indisputable.  What leads you to believe that?

19                  (Demonstrative published.)

20        **THE WITNESS:**  Well, there really two things that --

21   in my analysis that I've identified.

22        So, one, in a variety of different ways, you see

23   increasing prices from -- from Apple, which is -- you know, is

24   a direct measure of market power.  As well I measured high and

25   sustained margins by the App Store.  And then there's this

1    absence of competitive pressure from other app stores because

2    of the lack of substitution of transactions across platforms.

3        All of that together is a -- to me, a -- a, you know,

4    strong evidence of there being monopoly power.

5    **Q.**  Okay.  So couple of last questions.

6        In his written testimony, Professor Hitt testified that

7    developers can use websites for pay transactions with

8    consumers even for in-game content that is used in an iOS app.

9        Do you agree with Professor Hitt that that's a reasonable

10   substitute?

11   **A.**  No.

12   **Q.**  And have you seen any data going to that?

13   **A.**  Yes.

14        **MR. SWANSON:**  I'll object to this, Your Honor.

15        **MR. EVEN:**  Your Honor --

16        **MR. SWANSON:**  This goes to one of the issues about

17   whether or not evidence is actually in the record.  And I have

18   every reason to believe that this is aiming toward a document

19   that Spotify submitted to the Japan Fair Trade Commission that

20   was not disclosed in Dr. Cragg's initial report, his rebuttal

21   report, which has been included in his direct -- written

22   direct which we object to both as undisclosed but also as

23   hearsay document as to which we've had no opportunity to take

24   discovery, it should not be relied upon and certainly not

25   brought into evidence.

```
1              THE COURT:  Okay.  What paragraph are we dealing

2      with, with the direct?

3              MR. EVEN:  This is, I believe, paragraph 71, Your

4      Honor, in the direct.  But I'm working off of memory.

5          Yes, 71, I'm told.

6              MR. SWANSON:  That's -- that's the one.

7              MR. EVEN:  And I believe Apple has moved against

8      other parts and including parts relating to Spotify, I was

9      actually going to ask to do this portion in closed session

10     since we can't really discuss the document itself.

11             THE COURT:  Okay.  Let's -- let's go ahead, and I'll

12     reserve on that one and we'll deal with it in a -- well, we'll

13     deal with it later but not right this second.

14         Are you done?  That was the last topic?

15             MR. EVEN:  That's the last topic that I need the

16     closed session for.  So yes.

17             THE COURT:  All right.  Do you need -- are you

18     otherwise finished with your direct?

19             MR. EVEN:  I am otherwise finished.

20             THE COURT:  Okay.  Cross-examination.

21             MR. EVEN:  Thank you Dr. Cragg.

22         Thank you, Your Honor.

23             THE COURT:  Go ahead, Mr. Swanson.  And make sure to

24     identify yourself for the record when you come back.

25             MR. SWANSON:  My welder's mask.
```

CRAGG - CROSS / SWANSON

**CROSS-EXAMINATION**

**BY MR. SWANSON:**

**Q.**   Dr. Cragg, good afternoon.

**A.**   Good afternoon, Mr. Swanson.

**Q.**   So, Dr. Cragg, you have held no academic position since 1998, right?

**A.**   That's right.

**Q.**   Okay.  And you've never been a -- you've never held a tenured position at a university, correct?

**A.**   That's right.

**Q.**   You're a consultant, right?

**A.**   That's what I've been doing for the last 25 years.  I do some publications and some research, but the bulk of my professional life is serving clients.

**Q.**   And you state in the C.V. you attached to your expert report that you've been qualified in federal court as an expert in antitrust, correct?

**A.**   Yes.

**Q.**   And -- and can you identify the federal court where you were qualified as an expert in antitrust by a federal judge?

**A.**   It was in an administrative court.

**Q.**   Was that an administrative law judge before the Drug Enforcement Agency?

**A.**   I think that's the right -- I don't remember the exact venue, but it was to -- it was in a matter that involved

CRAGG - CROSS / SWANSON

opiates, and so that -- that could have been the right venue.

I just don't remember.

**Q.** That was a case before an ALJ regarding the application

for registration by your client for importing raw opium; is

that correct?

**A.** That's right.

**Q.** That was not an antitrust case, was it?

**A.** Issues of antitrust were at the -- some of the core

principles that were at issue.

**Q.** That was not an antitrust case, was it, Dr. Cragg?

**A.** Oh, I see what you mean.  It wasn't a, you know, a Sherman

Act violation, a case about that.

**Q.** It was a case involving the Drug Enforcement Agency and

opium importation, correct?

**A.** Yes.  And the competitive relationships in that market.

**Q.** And that's the basis on which you represented in the

report in this case that you were qualified in federal court

as an expert in antitrust, correct?

**A.** Yes.  I was using the phrase there as economists do to

indicate the analysis of competitive conditions.

**Q.** You've never assisted the DOJ in an antitrust matter, have

you?

**A.** I don't think I have.

**Q.** Have you looked at the resume that is available on The

Brattle Group's website?  We put in it front of you at your

CRAGG - CROSS / SWANSON

1    deposition.

2    **A.**  I remember you putting a -- a resume in front of me.

3    **Q.**  Do you remember the resume states that you have assisted

4    corporations, the FTC, and the U.S. Department of Justice in

5    antitrust and IP matters; you recall that --

6    **A.**  Yes.

7    **Q.**  -- don't you?

8         That's not true, is it?

9    **A.**  It is true.

10   **Q.**  I just asked you in what matters have you assisted the

11   U.S. Department of Justice that are antitrust matters.

12   **A.**  Oh, I see.  Yeah, with -- with respect to the DOJ, I don't

13   think I've worked on a matter on behalf of the Justice

14   Department.

15   **Q.**  So that's not true.

16   **A.**  Yes, if that's -- the "and" should not be there, I guess.

17   **Q.**  And you were aware of that since the time I took your

18   deposition, correct?

19   **A.**  Yes.

20   **Q.**  And you left it on your website, correct?

21   **A.**  I don't manage my resume on the website.

22   **Q.**  Aren't you the former chairman of The Brattle Group?

23   **A.**  Yes.

24              **THE COURT:**  Did you not ask someone to remove it?

25              **THE WITNESS:**  I didn't.  I haven't updated my resume

1  since I've -- I should say our marketing department is the one

2  that updates resumes.

3          **THE COURT:** And I take it if you asked them to

4  clarify and fix that, they would say yes, right?

5          **THE WITNESS:** Yes. I would assume they would.

6          **THE COURT:** So you'll do that today?

7          **THE WITNESS:** Yes.

8  BY MR. SWANSON:

9  **Q.** Dr. Cragg, you served as an expert in economics at a

10 recent matter before the United States Tax Court, correct?

11 **A.** Yes.

12 **Q.** One of your principal areas of expertise is valuation,

13 correct?

14 **A.** Yes.

15 **Q.** And in that matter, you were engaged on behalf of the

16 Coca Cola Company?

17 **A.** That's right.

18 **Q.** And last November, the U.S. Tax Court issued a decision in

19 the case where you were an expert, correct?

20 **A.** That's right.

21 **Q.** Do you recall that the court rejected your economic

22 opinions?

23 **A.** I don't recall them not -- rejecting them. The court had

24 to -- there -- there were substantially different perspectives

25 of the two parties, and so the -- the court had to choose

CRAGG – CROSS / SWANSON

1   between one set of analyses versus another set of analyses,

2   and didn't adopt the approach that I was using.

3   **Q.**  So you don't recall the court stating, "We perceive many

4   deficiencies in Dr. Cragg's analysis"?

5   **A.**  I do remember that.

6   **Q.**  Okay.

7       And do you recall that the court found your economic

8   opinions to be wholly unreliable?

9   **A.**  I don't think that's how they described my opinions but

10   rather a part of the analysis.

11       And as we had talked about in our -- in the deposition,

12   given the choice that the court had to make in terms of how it

13   was going to interpret Coca Cola's contracts, this would have

14   to be a conclusion that it would draw about economic analysis.

15   **Q.**  And -- and you don't recall the -- or do you recall the

16   U.S. Tax Court finding that your methodology led to absurd

17   results?

18   **A.**  Yeah, I -- I do recall that, and that was referring to one

19   of the specific calculations that related to one country out

20   of all the countries that I had looked at.

21   **Q.**  Now, Dr. Cragg, you were retained by Epic as a rebuttal

22   expert in November or December last year, right?

23   **A.**  I think that's the right time period.

24   **Q.**  Okay.  And you indicated earlier in response to Mr. Even's

25   question that you followed the expert testimony in this case?

CRAGG - CROSS / SWANSON

1   **A.**  Yes.

2   **Q.**  So have you been listening to any other testimony in the

3   case or reading it?

4   **A.**  I have, yes.

5   **Q.**  Okay.  Have you read -- well, what have you been doing?

6   Listening?

7   **A.**  I read the transcripts from the first -- I think the first

8   five days.  And then from there on, I listened.

9   **Q.**  Okay.

10      Now, part of the expertise that you indicate you bring to

11  this case comes from your study of platform economics

12  including the American Express decision, correct?

13  **A.**  Yes.

14  **Q.**  You agree, don't you, that the Supreme Court set forth a

15  reasonable definition of a transaction platform in *American*

16  *Express*, right?

17  **A.**  I -- yes, the -- the way that they characterize what the

18  transaction -- the relevant transaction in the *American*

19  *Express* case and how you'd go about examining that

20  marketplace, I thought was -- was reasonable.

21  **Q.**  Okay.

22      And you agree with Dr. Evans that the App Store is a

23  two-sided transaction platform, right?

24  **A.**  Yes.

25  **Q.**  But you don't consider the iOS operating system to be a

CRAGG - CROSS / SWANSON

1    distinct two-sided transaction platform, correct?

2    **A.**   Yeah, there where I see the distinction coming in is that

3    there's clearly transactions of the sort -- of the *American*

4    *Express* sort happening in the App Store on iOS that's

5    currently not the environment.

6    **Q.**   Now, you agree that not all transactions provided by a

7    transaction platform necessarily belong in the same product

8    market, right?

9    **A.**   Could you say that again, please?

10   **Q.**   You agree that not all transactions provided by a

11   transaction platform necessarily belong in the same product

12   market, right?

13   **A.**   Yes.

14   **Q.**   Depends on the platform and the types of transaction at

15   issue, correct?

16   **A.**   Yes.  The -- I think it -- it's hard to make a -- a

17   sweeping statement about platforms because they're of all

18   different types and structures.

19   **Q.**   Now, you agree that the central economic question in

20   defining a market is one of substitutability, correct?

21   **A.**   Yes.

22   **Q.**   And substitution is a matter of degree, right?

23   **A.**   It is.

24   **Q.**   Products in the same market don't need to be perfect

25   substitutes, do they?

CRAGG - CROSS / SWANSON

**A.**   No.   They have to impose price discipline on the other products in the marketplace.

**Q.**   You would agree that products in the relevant market must be reasonably interchangeable?

**A.**   From the -- it depends on what -- in a transaction market, there's a degree of -- there, the product there are transactions and from the store's percept -- perspective, they have to be reasonably interchangeable.

**Q.**   Well, when there is a two-sided transaction platform market, you need to look at substitution by both sides of the market, right?

**A.**   Not always.

**Q.**   Well, is it necessary to take account of indirect network effects in a two-sided transaction platform market?

**A.**   Yes, if there -- if those network effects exist, taking account of those, considering those, is important.

**Q.**   Do you agree that with respect to transaction platforms, that network effects are pronounced?

**A.**   As I say, not always.

**Q.**   And that's an opinion that you and your consulting team sponsored in the *Sabre* case, right?

**A.**   The expert I supported took that perspective.

And just to -- I think there's a point here that's important, which is, it depends on whether the indirect network effects at the margin are important.   So early on in

CRAGG – CROSS / SWANSON

1    the life cycle of a platform, indirect network effects are

2    important.  Later on, once those have been exhausted, it no

3    longer is an issue that's -- is relevant.

4    Q.  And that's a market maturity theory of network effects, is

5    it not?

6    A.  No, that's exactly following the -- the literature where

7    they look -- the pricing depends on the marginal indirect

8    network effect.

9    Q.  Well --

10   A.  If that network effect has died off, then it no longer --

11   the theory is that it no longer is a important part of the

12   pricing of the platform.

13   Q.  And the consulting team that you led in the *Sabre* case

14   sponsored expert testimony by Professor Stiglitz that the

15   network effects had died off in that particular market,

16   correct?

17   A.  That's right.  That at the margin, this indirect network

18   effect, the feedback between the two sides was no longer

19   important in the sense that you had all the airlines and so an

20   additional airline was not going to have an impact on how

21   travel agents considered the platform and vice versa.

22   Q.  And -- and your client was whom in that case?

23   A.  U.S. Airways.

24   Q.  And U.S. Airways prevailed at trial on that theory?

25   A.  They did.

CRAGG - CROSS / SWANSON

1    **Q.**  And do you recall that Professor Schmalensee and Dr. Evans

2    submitted an amicus brief urging reversal of that result?

3    **A.**  I do.

4    **Q.**  And do you recall the Second Circuit reversed?

5    **A.**  They did, but not for the reasons that Professors Evans

6    and Schmalensee were proposing.

7    **Q.**  Well, we'll leave that to lawyers to figure out.

8         You believe all iOS game app transactions are identical

9    substitutes with one another, correct?

10   **A.**  Yes, from the perspective of the Apple App Store, you

11   know, the rules apply to all of transactions and, you know,

12   there -- there are different rules for some transactions, but

13   it's the same set of rules that apply to all the transactions.

14   **Q.**  Well, we've heard that a number of times.  It's not

15   correct that the same set of rules apply to all transactions,

16   is it?

17   **A.**  I -- there are a couple of negotiated outcomes.

18   **Q.**  And -- and what are you referring to?  Negotiated

19   outcomes?

20   **A.**  That Apple has negotiated with in some instances.  And in

21   other instances, they've chosen to apply the rules in a way

22   that are inconsistent.

23   **Q.**  Well, have you heard of the reader rule?

24   **A.**  Yes.

25   **Q.**  And what is the reader rule?

CRAGG - CROSS / SWANSON

**A.**   It allows for, as I recall, the downloading and reading of
content.

**Q.**   What kind of content?

**A.**   I don't recall the specific description of what that
applies to.

**Q.**   Well, would you --

**A.**   But I'd rather look at a specific rule rather than trying
to, you know, do it from memory.

**Q.**   Well, that -- that particular rule allows apps that fall
under it to have content used within an iOS app even though it
was purchased elsewhere without paying Apple a commission,
correct?

**A.**   That's my understanding.

**Q.**   And that content does not apply -- that rule does not
apply to all apps, correct?

**A.**   It -- it falls -- it applies to all apps.  To the extent
that it differentiates between one app and another that meets
the rule, some are going to -- it's going to apply to some
that meet the rule and some that don't meet the rule.

**Q.**   You're aware of the multi-platform rule, correct?

**A.**   Yes.

**Q.**   Can you explain what that is?

**A.**   Well, I think of it in a number of different ways, the
rules that relate to multi-platforms.  There are some which
relate to restrictions on how you can steer people.  There are

CRAGG - CROSS / SWANSON

1    other rules that allow for using currency for instance, in --

2    in cross play.  There are other rules that also relate to what

3    you can advertise about pricing in other areas of the app

4    ecosystem.

5        So by app ecosystem, I mean broadly speaking that if it

6    were the case that you could go to a developer's website and

7    download an app for cheaper, you wouldn't be allowed to

8    advertise that.

9    **Q.**  Well, the multi-platform rule is a rule that allows

10   developers who are not subject to the reader rule to have --

11   for example, as you say, a virtual currency that is paid for

12   on another platform but used within the iOS app, correct?

13   **A.**  Yes.  I think I mentioned that.

14   **Q.**  But that's another rule that does not apply to all apps

15   equally, correct?

16   **A.**  Well, it applies to all apps to the extent that you have

17   designed your app to either, you know, use the exception or

18   not.

19   **Q.**  Now, you conclude that all nongame app transactions in the

20   App Store are substitute for game app transactions, right?

21   **A.**  Yes.  From the perspective of this being a transaction

22   market, as I discussed with Professor Evans -- not

23   Professor -- Mr. Even -- Mr. Yanaton.  Too many Evans floating

24   around -- that, you know, the hypothetical monopolist test

25   that I had thought about in terms of the substitutability of

CRAGG - CROSS / SWANSON

1    app stores indicates that they're in the same market.

2    **Q.**  Now in your direct, you said that the -- that you applied

3    a hypothetical monopolist test and that it was the standard

4    economic methodology?

5    **A.**  Yes.

6    **Q.**  Or words to that effect?

7         Now, isn't it true that there's no consensus among

8    economists about the correct way to formulate and apply the

9    hypothetical monopolist test to questions of market definition

10   in two-sided markets?

11   **A.**  That's right.  So the hypothetical monopolist test is the

12   adopted methodology, but for any implementation it's going to

13   be a facts and circumstances implementation.

14        So, you know, sometimes it's a specific econometric

15   analysis that lets you to do a sniff.  Another time it could

16   be the demonstration of a lack of substitution.

17   **Q.**  The hypothetical monopolist test you've described was a

18   thought experiment, in your words, right?

19   **A.**  I -- it was an economic analysis of the market.

20   **Q.**  You described it as a thought experiment in your

21   deposition, didn't you?

22   **A.**  Yes.  In the sense of I didn't apply data to it, but

23   rather applied economic analysis through the lens of my

24   discipline which, you know, involves thinking about what could

25   have happened in the hypothetical price increase.

CRAGG - CROSS / SWANSON

1  **Q.**  Now, you've -- you've read what the hypothetical

2  monopolist entails in the -- in the Merger Guidelines, right,

3  that's where it's taken from?

4  **A.**  Well, the Merger Guidelines have adopted that.

5  **Q.**  Right.  And you understand that the hypothetical

6  monopolist test requires you to assume a single firm was the

7  only present and future seller of the relevant product,

8  correct?

9  **A.**  Yes.  It -- the monopolized -- the -- the experiment is

10  monopolized a set of products, the smallest set of products,

11  and then ask is there the possibility of properly raising

12  price.

13  **Q.**  But your hypothetical monopolist test did not assume a

14  single hypothetical seller of digital game transactions, did

15  it?

16  **A.**  I -- I imagined a single store.

17  **Q.**  Well, in your written direct, you say you assume two

18  hypothetical monopolists.  Don't you recall that?

19  **A.**  Yes, I had -- the experiment I was thinking of was a --

20  one where you had one monopolist of games considering, you

21  know, and -- and another monopolist of the rest of the market,

22  the way I described it.

23  **Q.**  Well, the rest of the market as you described it was

24  another monopolist that sells other apps and game apps, right?

25  **A.**  If that's what you're concluding, then I wrote it

CRAGG - CROSS / SWANSON

1    inartfully.  The way I described it earlier is exactly how --

2    what I was trying to convey in that section.

3    **Q.**  Well, let's take a look.  This would be at your direct

4    testimony, paragraph 21.  I assume you've got a copy -- copy

5    of that in front of you?

6    **A.**  Yeah, I think it's in this binder.

7    **Q.**  I'll bet you it is.

8    **A.**  You bet me?

9    **Q.**  Yeah, I do.

10   **A.**  I'm not going to take the over/under on that.

11       All right.

12   **Q.**  So you say here:

13          The direct way to answer the Court's question

14          and test whether the distribution of games and

15          distribution of non-games are in the same market is

16          to imagine separate distribution channels for each

17          and apply a sniff test to the game distribution

18          channel, specifically consider a monopolist of game

19          app distribution including iOS game app distribution

20          versus a monopolist of general purpose app

21          distribution that may distribute games too as the

22          app store does.

23   **A.**  Yes.

24   **Q.**  You're assuming not a single seller of game apps, you're

25   assuming a seller that sells only game apps and a seller that

CRAGG - CROSS / SWANSON

1    sells game apps and other apps, correct?

2    **A.**   Yeah, what I mean here --

3    **Q.**   Correct, Doctor?  Can you just confirm that?

4    **A.**   Well, I'm trying to explain what I mean too --

5    **Q.**   Well --

6    **A.**   -- because I'm not sure you explained it right.

7    **Q.**   Well, I was reading it.

8    **A.**   Yeah.  And it -- to the extent you don't understand it, I

9    wanted to explain it.

10   **Q.**   But is -- is this inartful?

11   **A.**   I see what might be a -- a misreading that -- that -- what

12   I have in mind is a general purpose store --

13   **Q.**   Can we just find out --

14   **A.**    -- that sell all transactions.

15   **Q.**   Are there -- is there one or are there two sellers of game

16   transactions in your hypothetical monopolist test?

17   **A.**   There are one seller of what are called labeled game

18   transactions and another general purpose store that's selling

19   transactions.

20   **Q.**   So this is --

21                    (Simultaneous colloquy.)

22            **THE WITNESS:**  What's that?

23   **BY MR. SWANSON:**

24   **Q.**   This is a hypothetical duopolist test?

25   **A.**   It's a hypothetical monopolist test for something called

CRAGG - CROSS / SWANSON

1    games transactions.  And I'm --

2    **Q.**  So you --

3    **A.**  -- asking can you differentiate a game transaction from

4    other transactions.

5    **Q.**  Well -- well, let's figure out how this works.

6        So you have one store that's a monopolist of game

7    transactions and it raises the price of game transactions,

8    correct?

9    **A.**  Yes.

10   **Q.**  And then you ask is there another source of competition

11   that will keep that monopoly price from being sustained.  And

12   your imaginary hypothesis is that a second store that has game

13   transactions in it along with other app for sale which is not

14   raising price will constrain the game transactions in the

15   first store.

16   **A.**  Exactly.  So the undifferentiated transaction store, what

17   I'm calling a general purpose transaction store, disciplines

18   the price of the store that is trying to label a set of

19   transactions as game transactions.

20   **Q.**  So your thought experiment says that game transactions

21   can't be a relevant market because consumers and developers

22   would turn to game transactions in another store.

23   **A.**  That's right.  They would shift what the monopolist is

24   trying to label as a game transaction -- they would shift that

25   to the general purpose store.  Because there's no way to

1    differentiate transactions to constrain that description.

2    **Q.**  So you're saying that retail gas couldn't be a relevant

3    market because a hypothetical single seller of retail gasoline

4    couldn't raise price because everyone would go to Costco which

5    sells a lot of other things and gasoline.

6    **A.**  No.  So I think a better example in the gas context is to

7    consider the lower prices that are sold to agricultural

8    consumers, and, there, the way agricultural purchases of gas

9    are identified is through coloring the gas.

10       So you've -- you've got colored gas versus uncolored gas.

11   By differentiating them that way, you are able to sell at --

12   at a lower price.

13           **THE COURT:**  I have no idea what you mean by that.

14   I'm sorry.

15           **THE WITNESS:**  So in a -- in the real world, there are

16   subsidies that allow for some gas to be purchased at a lower

17   price than the retail price that's available to the two of us.

18       That gives the incentive for somebody who buys that low

19   gas -- cost gas to resell it to us at a higher price.  The way

20   that is constrained from us purchasing it is by coloring the

21   gas.  So you and I can't buy red gas.

22           **THE COURT:**  Mr. Swanson.

23   **BY MR. SWANSON:**

24   **Q.**  Let's -- let's switch topics.

25       Dr. Cragg, you indicated that the popularity of games by

CRAGG - CROSS / SWANSON

1   genre is a metric that determines users' ability to substitute

2   across platforms.  This was in your written direct.  Do you

3   recall that?

4   **A.**  Sorry.  I missed the beginning of that, if you could.

5   **Q.**  Sure.  You said in your written direct that the popularity

6   of games by genre is a metric that determines users' ability

7   to substitute across platforms.  Do you recall that?

8   **A.**  If you could point me to the specific paragraph?  I don't

9   remember that specific sentence.

10  **Q.**  Paragraph 80, it's page 29 to 30 of your written direct.

11  **A.**  (Reviewing document.)

12  **Q.**  Are you there?

13  **A.**  Yes.

14  **Q.**  Now do you remember it?

15  **A.**  I do.

16  **Q.**  And do you recall Figure 11 which is on page 30?

17  **A.**  I do.

18  **Q.**  That was a -- a figure that you put together to depict

19  various games within various genres on the various platforms?

20  **A.**  That's right.  So I'm taking the EEDAR data and

21  identifying within the EEDAR characterization of games what

22  the industry descriptions, how they correlate with the

23  different platforms.

24  **Q.**  And you point to the relative popularity of core,

25  mid-core, and casual games, right?

CRAGG - CROSS / SWANSON

1    **A.**  Yes.

2    **Q.**  Are you asserting that transactions for casual games in

3    the App Store are not substitutes for transactions for core

4    games and mid-core games?

5    **A.**  No.

6    **Q.**  You're not attempting to define submarkets, are you?

7    **A.**  No.  I'm -- I'm -- here I'm identifying that mobile

8    devices for gaming purposes are used for a very different

9    experience than a platform, and therefore the platform --

10   sorry -- than a console and therefore the console and the

11   mobile games aren't in the same market because consumers are

12   looking to interact with -- with a device in a different way

13   and therefore the -- the related stores aren't substitutes for

14   each other.

15   **Q.**  Well, let's start with the -- with mobile.  Core,

16   mid-core, and casual games you say are reasonably

17   interchangeable on mobile, correct?

18   **A.**  Yes.  Those are all -- those games tend to be simple in

19   the way they're played, and the duration of the way they're

20   played is similar.

21   **Q.**  Well, you heard me, core, mid-core, and casual games --

22   **A.**  Oh, sorry.

23   **Q.**   -- are all reasonably interchangeable in the mobile

24   environment, correct?

25   **A.**  I -- I apologize.  I didn't listen carefully enough to

1    your question.  Core games are different than casual games.

2    **Q.**  All right.  Then let's take a step back because I asked

3    you whether or not these were substitutes for each other, and

4    I thought you said yes.

5    **A.**  That's why I was -- I thought you thought I said yes, and

6    that's why I was correcting myself.

7    **Q.**  Let me -- let me ask you that question again then.

8        Are you asserting that transactions for casual games in

9    the App Store are not substitutes for transactions for core

10   games and mid-core games?

11   **A.**  From the perspective of a transaction that is running

12   through the App Store, they are substitutes.

13   **Q.**  Thank you, Dr. Cragg.

14       All right.  So core, mid-core, and casual games are

15   available on each of the four indicated platforms, right,

16   console, PC, mobile, and hand-held?

17   **A.**  Yes.

18   **Q.**  And puzzle games are casual games, right?

19   **A.**  Yes.

20   **Q.**  And you're aware that puzzle games are available on every

21   platform, right?

22   **A.**  Yes.

23   **Q.**  In fact, the data underlying your summary says puzzles are

24   the most popular games among mobile and PC users, correct?

25   **A.**  I -- I'm not sure where you're seeing that but --

1    **Q.**  Well, it's actually in your report, but it's also in the

2    data.  Do you need to look back to your report?  Feel free.

3       Take a look at, I believe, paragraph 80.

4       So at the top of page 30, Figure 11 shows that casual

5    games such as puzzle games are the most popular on iOS and

6    mobile devices.

7    **A.**  Yes.

8    **Q.**  So that -- that reminds you of that conclusion, right?

9    **A.**  Yes.  I thought you had said consoles.  So I may have

10   misheard you.  If I did, I -- I apologize.

11   **Q.**  No.  No worries.

12      Now, arcade games are available on every platform, right?

13   **A.**  Yes.

14   **Q.**  And, again, the data underlying your summary says arcade

15   games are about equally popular among all of the devices,

16   correct?

17   **A.**  Where are you reading that?  I just wanted to make sure

18   I'm at the same place --

19   **Q.**  Well, you did look at the underlying data for this

20   document, right?

21   **A.**  Yes.  There's a lot of it.

22   **Q.**  Okay.  And my question is are you aware that the data

23   underlying your summary says arcade games are about equally

24   popular among every device?

25                    (Simultaneous colloquy.)

1          **THE WITNESS:**  I don't remember that quote.  If you

2    could show me the source, I could comment on it within its

3    context.

4    **BY MR. SWANSON:**

5    **Q.**  Simulation games are available on every platform, right?

6    **A.**  I don't -- I can't read it on this diagram.  And -- and so

7    if the word "simulation" shows up on it in each category, the

8    answer is yes.

9    **Q.**  Well, the word "simulation," the word "strategy," skill

10   and chance, battle royale, fighting games, racing games,

11   they're all available on every platform, correct?

12   **A.**  As I say, I don't -- I can't read the font here, but if --

13   you know, if I -- if there -- if that's what's in each of

14   those categories, the answer is yes.  So it's a matter of just

15   reading what's on the diagram.

16   **Q.**  You've used several slides in your direct today that

17   involve an analysis you made of play time on Fortnite when a

18   consumer acquires a second device.  Do you recall that?

19   **A.**  Yes.

20   **Q.**  And I believe the slides at issue here are Slides 7 and 8.

21        Those slides, that analysis, contains no study of the

22   relationship between price and change in demand, correct?

23   **A.**  That's right.  The -- we don't observe that.  So we're

24   kind of doing the next best thing, which is asking the

25   question of what happens when, you know, the -- the

CRAGG - CROSS / SWANSON

1      opportunity set changes for the consumer.

2   **Q.**  You identify when a consumer adds a second device.

3   **A.**  Yes.  When they start playing on a second device.

4   **Q.**  So do you have any information about when that device was

5      acquired or purchased?

6   **A.**  We don't.

7   **Q.**  You don't know whether the user had already owned the

8      so-called second device even prior to beginning to play on the

9      first device?

10  **A.**  That's right.  You -- you have to -- that's not available

11     in the data, and so the next best thing is to look at how play

12     changed.

13  **Q.**  You made an assumption, right?

14  **A.**  Sorry.  I may have.

15  **Q.**  You made an assumption that once an account was created

16     for a second device, that that device had actually been

17     acquired after the first device?

18  **A.**  No, I didn't make the assumption.  I understand the point

19     you're making that we can't observe that specific event.  And

20     so to test the assumption of was this correlated with the

21     purchase of a platform, there's not a way to test that within

22     the Fortnite data.

23  **Q.**  And you don't know the reason why the user began to play

24     on the second device, correct?

25  **A.**  That's right.  There are some things that you observe in

CRAGG - CROSS / SWANSON

1   the data.  So for instance, the -- the season, the time of

2   year, that type of thing.  But beyond that, you know very

3   little about the actual consumer.

4   **Q.**  Do you agree that the relevant economic question here is

5   not whether one device is substitutable for another device?

6   **A.**  Yes.  The -- the question is about the substitution of

7   stores.  And my understanding of why the Apple experts were

8   focused on transactions was to be able to infer whether

9   platforms are substitutes for each other and then make the

10  next step of inferring if they are, then the stores are

11  substitutes for each other.

12  **Q.**  Now, game play which you studied with respect to these

13  analyses in Slides 7 and 8 is not a transaction, correct?

14  There's no payment associated with mere play, right?

15  **A.**  That's -- that's right.

16  **Q.**  In your rebuttal report, you said that you had analyzed

17  consumers' expenditures on transactions in addition to their

18  play time when they acquire another device, right?

19  **A.**  Not in my final report.  I amended the report.

20  **Q.**  Yeah, we'll get to that.  I'm asking you about your

21  original rebuttal report.  That's what you said, right?

22  **A.**  Yes, and I corrected it.

23  **Q.**  And -- well, let's -- let's walk through that sequence.

24      Now in your initial report, you didn't present any

25  regression that you reported on consumers' expenditures,

CRAGG - CROSS / SWANSON

1   correct?

2   **A.**  Correct.

3   **Q.**  That was your deposition testimony, right?

4   **A.**  Yes.

5   **Q.**  And then your counsel, after the deposition, served an

6   errata deleting the reference in your report where you

7   referred to a consumer expenditure analysis, correct?

8   **A.**  That's correct.

9   **Q.**  And that led to a motion to compel before Magistrate Judge

10  Hixson, which was granted, and you were ordered to appear for

11  a second deposition to clarify the confusion and discrepancy

12  between your initial report, the deposition testimony, and

13  your errata, right?

14  **A.**  I had a deposition.  I -- the -- all of the steps that led

15  to the deposition, I was not part of the reasoning behind that

16  so I can't comment on that.

17  **Q.**  Well, you were part of the actual testimony at the first

18  deposition, correct?

19  **A.**  Yes.

20  **Q.**  And --

21  **A.**  But I -- I identify the -- the error.

22  **Q.**  Well, Magistrate Judge Hixson said you didn't identify an

23  error.  Do you dispute that?

24  **A.**  I -- I don't know what the Magistrate said.

25  **Q.**  You didn't read his decision?

CRAGG - CROSS / SWANSON

1    **A.**   No.  I just --

2    **Q.**   Right.

3    **A.**   I was told that there was another deposition on a narrow

4    topic.

5    **Q.**   And you testified in that second deposition that you

6    didn't run any regression using expenditure instead of play

7    time, right?

8    **A.**   That's right.

9    **Q.**   And you also testified -- and let me ask you if this

10   remains correct -- that you don't know what the results would

11   have been if you had done a regression using consumer

12   transaction expenditures.

13   **A.**   That's right.  I haven't done that analysis.

14   **Q.**   Dr. Cragg, when two products are complements, what happens

15   to demand for the second product when the price of the first

16   product goes up?

17   **A.**   The -- the typical definition would be that the demand for

18   the second product also goes down.

19   **Q.**   Well, it -- it doesn't also go down.  It goes down when

20   the other goes up, right?

21   **A.**   I thought you said when the price of the first goes up --

22   **Q.**   Yes.

23   **A.**    -- then if they're complements, the quantity consumed for

24   both goods goes down.

25   **Q.**   And do you agree -- well, let's take an example.

1        If the price of hot dogs goes up, the demand for hot dog

2   buns goes down, right?

3   **A.**   Yes.

4   **Q.**   They're complements --

5   **A**   No.

6   **Q**   -- correct?

7   **A.**   You'd have to do the analysis, but I certainly get the --

8   you know, the notion that you're getting at.

9   **Q.**   Is it your opinion that transactions in the Fortnite on

10  mobile devices are complements for transactions in Fortnite on

11  PC's?

12  **A.**   I -- we'd have to look at -- sorry.

13       Could you repeat that one more time?

14  **Q.**   Is it your opinion that transactions in Fortnite on mobile

15  devices are complements for transactions in Fortnite on PC's?

16  **A.**   So I generally --

17            **THE COURT:**   Could you just answer "yes" or "no"

18  before you explain?

19            **THE WITNESS:**   I don't remember the sign on the

20  regression.

21            **THE COURT:**   Okay.  Go ahead.

22  **BY MR. SWANSON:**

23  **Q.**   Well, if -- if you have indicated they are complements,

24  Dr. Cragg, is it your opinion that if the price of

25  transactions in Fortnite increased on mobile devices, that

1    demand for Fortnite transactions would drop on PC's?

2    **A.**   That would be my expectation.  But as I say, I haven't

3    done the analysis.

4    **Q.**   That's your expectation?

5    **A.**   Yeah, if they're complements, and the price on one

6    platform -- or the first platform goes up, then the

7    consumption on both platforms would go down.

8    **Q.**   You -- ask you about a slide that you had on the launch of

9    Fortnite on the Switch.  This is in your -- the same figure as

10   in your direct testimony at Figure 6, page 21.  I don't know

11   if we can put the slide up, but we can look at your report.

12   **A.**   (Reviewing document.)

13        Sorry.  Did you say Slide 21?

14   **Q.**   No, I said --

15                        (Simultaneous colloquy.)

16   **BY MR. SWANSON:**

17   **Q.**   Looking at the figure in your report.

18   **A.**   Oh.  Oh.

19   **Q.**   The same thing, Figure 6 on page 21.

20   **A.**   Yes.

21   **Q.**   So this is -- this is the figure that shows that the

22   Switch release of Fortnite was on June 12th, 2018, right?

23   **A.**   Yes.

24   **Q.**   And then in the next month, July, there's a big jump up in

25   total revenue.  That's the first full month with the Switch,

CRAGG – CROSS / SWANSON

1    right?

2    **A.**   Yes.

3    **Q.**   Is there anything else noteworthy about that month?

4    **A.**   I believe there's a new release as well.

5    **Q.**   There was a new season of Fortnite, correct?

6    **A.**   That's -- I think that's right.

7    **Q.**   And in fact, you can identify another new season of

8    Fortnite by looking at this figure, correct?

9    **A.**   I --

10   **Q.**   There was another one in December, wasn't there?

11   **A.**   Well, there are two effects happening.

12   **Q.**   Could you just --

13   **A.**   Well, I don't know -- so I don't know if there's a season

14   release in December.  But there's a seasonal pattern that's

15   going on in the game for game consumption.

16   **Q.**   Well, there's a pattern when Fortnite releases a new

17   season, isn't there?  Which is it attracts old players back --

18   back to the game, for example, and it drives a surge in

19   revenue; you know that, don't you?

20   **A.**   Yes.  Yes.

21   **Q.**   All right.  So that's what we're seeing in July of 2018,

22   correct?

23   **A.**   Yes.

24   **Q.**   That's not a good test for whether or not Fortnite on

25   Switch is a substitute for Fortnite on the other devices;

2320
CRAGG - CROSS / SWANSON

1    you'd agree with that, wouldn't you?

2    **A.**  It's not a perfect test in the sense that, you know,

3    looking at expenditures more directly is closer to the

4    definition of -- of what an economic substitute and complement

5    are.

6    **Q.**  Well, let's see if we can find a better test.

7        Let's take the month before Fortnite was released on the

8    Switch.  That would be May.  And that's actually handy because

9    there's a -- there's a line there, May 2018 total.  Do you see

10   the total revenues?  And that was for -- there's no Switch

11   there, right?  That was before Fortnite was released on the

12   Switch?

13   **A.**  That's right.

14   **Q.**  So we're looking at that line there which again is the

15   month before the introduction on the Switch.

16       If you look at September, that bar is almost exactly the

17   same height as the bar in May, right?

18   **A.**  Yes.

19   **Q.**  This is after the introduction of Fortnite on the Switch,

20   right?

21   **A.**  Yes.

22   **Q.**  And this includes revenues on the Switch, correct?

23   **A.**  It does.

24   **Q.**  So since it's actually just a smidge below the bar in

25   May --

1              (Demonstrative published.)

2    **BY MR. SWANSON:**

3    **Q.**  -- that implies and it includes revenues on the Switch

4    that revenues on all the other platforms have declined,

5    correct?  That's math.

6    **A.**  Yes.  In aggregate, since they're very close to each

7    other, the Switch consumption is, as you say, taking up some

8    fraction of the total and pushing down the fraction of all

9    else.

10   **Q.**  It's taking share from all four other options here, isn't

11   it?  At least the visible ones.  IOS is smaller than it was in

12   May, correct?

13   **A.**  It is, yes.

14   **Q.**  And that's called substitution, isn't it?

15   **A.**  It -- it could be.  The issue is why I did the regression

16   analysis of the time played as to control for, you know, the

17   various factors that you can.

18   **Q.**  Well, you told us that this figure supports your view,

19   right?  Without doing a regression analysis?

20   **A.**  Yes.  Around the event date, it does support my view.  As

21   you get further away from the event date, other things are

22   happening.

23   **Q.**  Dr. Cragg, you're familiar with the Brown Shoe factors for

24   market definition?

25   **A.**  You'll have to remind me of what those are.

1    **Q.**  Well, for example, do you agree that industry recognition

2    of a market's boundaries is relevant to market definition?

3    **A.**  Oh, I see what you're saying.  Yeah, there's some -- I do

4    understand there are a number of factors that -- that can be

5    pointed to.

6    **Q.**  Okay.  Well, at the time you wrote your expert report, you

7    didn't know whether Google regards Google Play as a competitor

8    to the App Store, correct?

9    **A.**  I don't know how Google perceives itself relative to

10   Apple.

11   **Q.**  And you don't know whether Apple regards Google Play as a

12   competitor of the App Store, right?

13   **A.**  That's right.

14   **Q.**  You didn't look into whether Sony regards the Playstation

15   Store as a competitor of the App Store, right?

16   **A.**  I -- when I was answering those questions -- look, I

17   don't -- I don't know what their actual thinking is.

18   **Q.**  And you don't know what Nintendo regards the Nintendo

19   online store, whether it regards the Nintendo online store as

20   a competitor of the App Store, correct?

21   **A.**  I don't.

22   **Q.**  Now you have an ongoing engagement with Microsoft, right?

23   **A.**  Yes.

24   **Q.**  And you told me at your deposition that you're relying on

25   your continued work for Microsoft as part of the overall

CRAGG - CROSS / SWANSON

1   experience you bring to this engagement, correct?

2   **A.**   Yes.

3   **Q.**   Now, that work for Microsoft includes studying every part

4   of the company's portfolio, business, including the XBox

5   business, right?

6   **A.**   I don't think I answered that question because it's

7   confidential what parts of the business exactly we're

8   studying.  And so I described it as we're analyzing the

9   company overall.

10  **Q.**   Are you saying that the answer to my question is yes but

11  that you weren't being accurate?

12  **A.**   No.  As I sit here today, I don't -- I think our

13  confidentiality agreement with Microsoft would -- I don't have

14  it in front of me, but I don't think it would allow me to

15  answer with specificity what exactly we're analyzing in the

16  business.

17          **MR. SWANSON:**   Your Honor, do you need a copy of the

18  deposition?

19          **THE COURT:**   I have his deposition here, at least the

20  first one.

21          **MR. SWANSON:**   Oh, yes, it's -- it was already handed

22  up.

23      Yes, that will do the trick.  Well, we'll see.

24      We are looking at page 40, lines 16 to 23.

25          **THE COURT:**   You may proceed.

CRAGG - CROSS / SWANSON

1    **BY MR. SWANSON:**

2    **Q.**  All right.  Line 16, page 40:

3    "Q  .  Are you studying carefully every part of the company's

4    portfolio businesses?

5             "A.  Yes.

6    "Q  .  So that would include the XBox business?

7             "A.  As I -- as a -- as -- is your question --

8             is -- is it one of Microsoft's portfolio

9             products, yes.  And I'm examining its entire

10            portfolio of assets."

11       Now, Dr. Cragg, your work for Microsoft includes analyzing

12   the competitive properties of the markets in which Microsoft

13   participates, correct?

14   **A.**  Sorry.  I missed -- I didn't hear the beginning of the

15   question.

16   **Q.**  And your work includes analyzing the competitive

17   properties of the markets in which Microsoft participates,

18   your work for Microsoft?

19   **A.**  Yes.

20   **Q.**  And your work for Microsoft includes the pricing of

21   Microsoft's whole portfolio of products, correct?

22   **A.**  Yes.

23   **Q.**  Now you stated at your deposition that because of your

24   confidentiality agreement, you weren't able to answer certain

25   questions about your work for Microsoft, correct?

CRAGG - CROSS / SWANSON

1    **A.**   That's right.

2    **Q.**   You wouldn't answer questions about pricing, about

3    competitive advantages held by Microsoft; is that correct?

4    **A.**   Yes.

5    **Q.**   Now, even though you have worked extensively for Microsoft

6    and have access to confidential information that you will not

7    share, you cannot say that Microsoft does not view the

8    App Store as a competitor of the XBox marketplace, right?

9    **A.**   That's right.

10   **Q.**   In fact, you testified at your deposition that you don't

11   know whether the XBox marketplace is viewed as a competitor of

12   the App Store.

13   **A.**   That's right.

14   **Q.**   Let me switch topics.  And flip pages.

15       So you indicated that it was your opinion that Apple

16   has -- is it market or monopoly power?

17   **A.**   I said monopoly power.  And I was speaking as a -- in

18   reference to the iOS transaction market.

19   **Q.**   Is -- is that the relevant market that you have defined?

20   **A.**   I'm following Professor's -- Evans' market definition

21   there.

22   **Q.**   Well, you indicated earlier that you didn't believe that

23   the iOS operating system was a transaction platform, right?

24   **A.**   Yes.

25   **Q.**   Separate transaction platform.  You don't believe that,

CRAGG - CROSS / SWANSON

right?

**A.**   That's right.   Under the current conditions, there aren't transactions happening on iOS.

**Q.**   And in -- in your opinion, when did Apple obtain monopoly power in the iOS transactions market?

**A.**   I haven't identified that.

**Q.**   When did Apple raise prices to a monopoly level, in your opinion?

**A.**   I -- I've observed that the transaction prices rising, the commission rate as calculated by Professor Hitt is rising.   I haven't identified whether that's -- you know, it's hit the maximum price that it could charge profitably.

**Q.**   So in your opinion, Apple is not restrained by the glare of public scrutiny from raising prices in this market you define, correct?

**A.**   Over the course of the last few months, I've observed Apple getting greater scrutiny.   I don't know whether that's constraining its pricing or not.

**Q.**   Do you agree that monopoly power is the power to raise price by restricting output?

**A.**   That's one definition, yes.

**Q.**   Do you agree that the App Store's explosive growth over the last decade is extraordinary?

**A.**   Yes.

**Q.**   Now, the Epic Game Store charges a 12 percent commission,

1   right?

2   **A.**  Yes.

3   **Q.**  And you concede that the Epic Game Store's 12 percent

4   commission is below cost, right?

5   **A.**  Below its current average cost.

6   **Q.**  Now you have testified that Apple's prices have been

7   increasing, correct?

8   **A.**  I have.

9   **Q.**  Did you read Dr. Evans' testimony, either his written

10   testimony or his oral testimony?

11   **A.**  I heard the oral testimony.

12   **Q.**  Did you read his written testimony?

13   **A.**  I didn't read it in its full -- you know, I didn't read it

14   carefully.

15   **Q.**  Well, did you recall in the oral testimony that Dr. Evans

16   spoke to a slide he had about the reasons why Apple had

17   monopoly power?

18   **A.**  I don't remember that specific slide.

19   **Q.**  Well, do you remember him talking about his fourth point

20   on that slide which was stable pricing?

21   **A.**  I don't remember that.

22   **Q.**  Do you agree that Apple's pricing has been stable in the

23   market that you've defined?

24   **A.**  So I didn't hear his testimony.  The commission rates have

25   been stable.

CRAGG - CROSS / SWANSON

1    **Q.** And in fact, you state in your written direct that while

2    Apple's actual commission rates remain -- remain largely

3    unchanged, Apple's average commission per download in dollar

4    terms has dramatically increased.  That's your view, right?

5    **A.** Yes.

6    **Q.** And that's what you depict in Slide 17, correct, that

7    next-to-last slide we saw?

8    **A.** Yes.

9    **Q.** Now, you would agree, would you not, that the developer

10   sets the price for in-app purchases?

11   **A.** Yes.

12   **Q.** And --

13   **A.** To some extent.  There are limitations on how it can do

14   that.

15   **Q.** They have to have a price that ends in 99, right?

16   **A.** Yes.

17   **Q.** Okay.  Other limitations?

18   **A.** Well, that's a U.S. limitation.  Then there are analogs in

19   other currencies.

20   **Q.** And you -- did you hear Dr. Hitt's testimony earlier

21   today?

22   **A.** I heard much of it.  I didn't -- I didn't hear the

23   redirect.

24   **Q.** Okay.  And -- and you've seen his written direct?

25   **A.** Yes.

CRAGG - CROSS / SWANSON

**Q.**  You read that.

And you've seen his exhibit showing that from 2009 to 2019, developers on average increased the amount charged for in-app purchases by 4- to 500 percent.

**A.**  I -- I do recall him presenting an increase in the prices charged by developers.  I just don't remember the numbers.

**Q.**  Well, that increase in prices by developers is the reason why you say that Apple's dollar value commission on in-app purchases has increased dramatically, is it not?

**A.**  That's right.  The -- the IAPs are the product of a percentage and the -- the final consumer price.

**Q.**  Have you assessed the average price of a game app download on the Epic Games Store?

**A.**  No.

**Q.**  Well, you -- you looked at prices on consoles and you talked about it and -- and PC's, right?  You talked about that in your written direct?

**A.**  Yes.

**Q.**  Prices -- prices --

**A.**  Yes.

**Q.**  -- of download, right?

And isn't it true that the average price of a game app download on the Epic Games Store would be in the neighborhood of $25?

**A.**  Of a -- of a game or a in-app purchase?

1    **Q.**  Of a game.

2    **A.**  Oh, I -- I haven't looked at what the average price is for

3    app downloads in the store.

4    **Q.**  Okay.

5       So you don't know what commission Epic would attain in

6    absolute dollar terms when that 12 percent commission is

7    applied, right?

8    **A.**  I don't.

9    **Q.**  But if the average price of a game app download is $25,

10   Epic's commission would be $3, right?

11   **A.**  Yes.

12   **Q.**  And $3 is more than Apple charges for an -- an average

13   download, correct?

14   **A.**  I don't remember the relative numbers.

15   **Q.**  Well, it's in your report.  Turn to your direct report at

16   paragraph 83, page 31.

17   **A.**  (Reviewing document.)

18      Paragraph 83, you said?

19   **Q.**  Yes.

20   **A.**  Yes.

21   **Q.**  Do you -- do you see the figure there, less than a dollar?

22   **A.**  Oh.  I see that the average pay to iOS game download is

23   49 cents.

24   **Q.**  Right.  And 30 percent of that is 16 cents, right?

25   **A.**  That's right.

1   **Q.**  All right.

2          **MR. SWANSON:**  No further questions, Your Honor.

3          **THE COURT:**  Redirect?

4                      **REDIRECT EXAMINATION**

5   **BY MR. EVEN:**

6   **Q.**  Dr. Cragg, you were asked couple of questions about what

7   happens in the interplay between PC's and Fortnite if price

8   goes up on one and what happens on the other.  Do you recall

9   that?

10  **A.**  I -- I recall discussing not the price of a PC and the

11  price of Fortnite, but rather the price of Fortnite across

12  platforms.

13  **Q.**  And if I misspoke, I apologize.

14      So if the price of Fortnite transaction on iOS goes up,

15  what would that -- how would that affect consumption of

16  Fortnite on iOS?

17  **A.**  It would lead to a reduction in iOS purchases.

18  **Q.**  And so the people who play PC, Fortnite on PC, and whose

19  best friends play Fortnite on iOS, what's going to happen to

20  them?

21  **A.**  Well, those -- you know, the types of purchases, you know,

22  reduces the -- the quality of experience and so it would go

23  down.

24  **Q.**  And that's how complementarity works, correct?

25  **A.**  Yes.

1   **Q.**   Your -- strike that.

2        Have you ever done any transfer pricing work?

3   **A.**   I have.

4   **Q.**   Including for DOJ?

5   **A.**   Yes.

6   **Q.**   And did that involve IP?

7   **A.**   Yes.

8   **Q.**   Okay.  And the line on your resume says that you've done

9   work for corporations, the FTC and DOJ in antitrust and IP,

10   correct?

11   **A.**   I don't remember but --

12   **Q.**   Okay.

13   **A.**   -- I represented to the Judge that I would make sure that

14   what's on our website is accurate.

15        **MR. EVEN:**   Thank you, Dr. Cragg.

16      No further questions in open.

17        **THE COURT:**   Anything on his -- on those two

18   questions?

19        **MR. SWANSON:**   No.  Nothing further, Your Honor.

20        **THE COURT:**   Okay.

21      With respect to the other issue, we can move into sealed

22   session.  There's only 15 minutes left of today's proceedings

23   in any event.

24      I believe what I had done in pretrial order 4 was that

25   I --

1          **THE CLERK:**  Should I --

2          **THE COURT:**   -- overruled the objections that Apple

3     had to Mr. Cragg's report, but I did seal, I believe, the --

4     the figure that we're discussing.

5          Let me just say, and you've heard me ask questions of many

6     witnesses throughout this trial, that I frequently ask for

7     what is the source material.  Sometimes I get data.  Sometimes

8     I don't.

9          I think it is prudent to allow the information to come in,

10    and then with the luxury of more time to evaluate the basis of

11    all these opinions, and then ultimately I'll have to put all

12    of this obviously in an order.  And any appellate courts can

13    then see it as well.

14         So I think that I will allow the testimony.  That doesn't

15    mean that I will find it ultimately persuasive.  And you can

16    cross him on the source of his information.  And I will

17    consider that just as I will consider the timing of events,

18    the lack of disclosure of information.  I will do all of that

19    in due course.

20         But it is not prudent, I think, to do it on the fly.  I

21    think it is better to have it in the record.

22         Okay?

23         So we will go into closed session at this juncture.

24         For those listening, we will start again tomorrow, as

25    always, at 8:00 a.m.

CRAGG - REDIRECT / EVEN

1   So I'd ask the reporters if they could please leave at

2   this point.  Thank you for being here.

3   And counsel can stay from the class actions.

4   Mr. Harrington, you can stay in the courtroom, sir.

5   **MR. HARRINGTON:**  Thank you, Your Honor.

6   (Pause in the proceedings.)

7   **THE CLERK:**  I have both the listening lines are now

8   in the waiting room.

9   **THE COURT:**  Okay.

10   You can actually -- well, that's fine.

11   All right.  The courtroom is sealed.

12   (The transcript at pages 2335 through 2346 are under seal.)

13   (Open Court proceedings adjourned at 3:24 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CRAGG - REDIRECT / EVEN

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman, Pamela Batalo-Hebel, and Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA BATALO-HEBEL_____

Pamela Batalo-Hebel, CSR, RMR, FCRR


_____/s/ Raynee Mercado_____

Raynee Mercado, CSR, RMR, FCRR

Thursday, May 13, 2021