David P. Chiappetta, Bar No. 172099
DChiappetta@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7076
Facsimile: 415.344.7050

Judith B. Jennison, Bar No. 165929
JJennison@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: 206-359-8000
Facsimile: 206-359-9000

Attorneys for Non-Party
MICROSOFT CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

EPIC GAMES, INC.,

Plaintiff, Counter-defendant,

v.

APPLE INC.,

Defendant, Counterclaimant.

Case No. 4:20-cv-05640-YGR

**DECLARATION OF BRANDON KRESSIN IN SUPPORT OF MICROSOFT'S OPPOSITION TO APPLE'S MOTION FOR AN "ADVERSE CREDIBILITY FINDING"**

I, Brandon Kressin, declare as follows:

1. I am a partner at The Kanter Law Group PLLC ("KLG"). KLG's business address is 1717 K Street NW, Suite 900, Washington, DC 20006, and I currently practice out of my residence in Leawood, KS. I represented Microsoft Corporation ("Microsoft") in connection with Microsoft's response to Apple Inc.'s ("Apple") subpoena in the above-captioned litigation. The facts stated in this declaration are based on my own personal knowledge and, if called as a witness, I could and would testify to those facts.

2. On November 6, 2020, Apple served on Microsoft a Subpoena to Produce Documents, Information, or Objects or to Permit Inspect of Premises in a Civil Action (the "Subpoena"). The Subpoena consisted of 52 separate numbered requests, with an additional 114 subparts. The Subpoena is attached as Exhibit A.

3. On November 20, 2020, Microsoft served its responses and objections on Apple, through its counsel, Michelle Lowery, a partner at the firm McDermott Will and Emory. Microsoft objected on the grounds that the requests imposed an undue burden on Microsoft, a non-party to the litigation. Microsoft's response, however, indicated that the company was willing to meet and confer to regarding the scope of the Subpoena and a response that would be reasonable and commensurate with Microsoft's non-party status.

4. Between November 20, 2020 to February 12, 2021 (the date of Microsoft's final production of documents to the parties), I, along with other attorneys from KLG, participated in at least eight meet-and-confer phone calls with attorneys from MWE. During those discussions, we reiterated Microsoft's objections to the excessively broad scope of the subpoena. We also objected that, given the short time period allotted for discovery, it would not be feasible for Microsoft to respond in full to every request in Apple's subpoena. We therefore asked Apple to identify its highest priority requests and Microsoft focused its document collection efforts there. With respect to Apple's other requests, we asked Apple to either narrow the scope of its requests and specifically identify the types of documents it was seeking or to withdraw those requests. Each time, Microsoft made clear it would work in good faith with Apple. Apple never questioned or challenged Microsoft's efforts during these meet and confers.

5. Our first meet-and-confer phone call with Apple's attorneys took place on December 3, 2020. I was a participant on that call. During the call, we reiterated Microsoft's objections to the breadth of the Subpoena, both in terms of the categories of documents Apple was seeking and how far back in time Apple was seeking documents. We also asked Apple to withdraw specific requests for information that could be obtained more readily from the parties (*e.g.*, Requests 37, 38, 39, 42, and 43). Apple's attorneys acknowledged that the subpoena was long and indicated that they would work with us to narrow the scope to a reasonable level. They then

identified their highest priority requests as Requests 1 – 4, which ask for data regarding Microsoft's "APPS" and "APP MARKETPLACES." We explained that the definition of "APP" used in the Subpoena could be interpreted to encompass thousands of Microsoft products and services. We objected that requiring Microsoft to provide data on every one of those products and services would put an enormous strain on the company and likely would not be feasible considering the time constraints. We therefore asked Apple's attorneys to accept responses related to a limited subset of apps. Apple's attorneys asked Microsoft to suggest a list of apps, and we scheduled our next meet-and-confer for one week later on December 10, 2020. Prior to that next meet and confer, I communicated to Apple's attorneys an initial list of proposed apps. Epic had also served a second non-party subpoena on Microsoft that requested information regarding Microsoft's apps. Rather than impose the burden of pulling information and data on two sets of apps, given that the information was dispersed across different business segments, I informed both Apple's and Epic's attorneys that we would agree to a single list of apps for both subpoenas. The back-and-forth with Apple's attorneys (and later, Epic's attorneys) about which apps would be on the list consumed a significant portion of the next few meet-and-confers.

6. Our next full meet and confer with Apple occurred on December 10, 2020. Once again, we objected to the broad scope of the subpoena but confirmed that we would work with Apple's attorneys to facilitate a reasonable response. During this call, we discussed (and Apple agreed to) narrowing the date range for all but a few of Apple's requests. We also discussed the initial list of proposed Microsoft apps, and Apple's attorneys requested adding some additional apps to the list. Apple's attorneys reiterated that Requests 1 – 4 were their highest priority requests.

7. On December 15, 2020, having gathered some information from Microsoft regarding the availability of the data requested, I participated in another meet-and-confer call with Apple's attorneys. During this call, we again discussed the scope of the app list, in addition to some other requests. We also proposed answering several requests through written interrogatory responses, and Apple's attorneys were preliminarily receptive to the idea.

8. On December 18, 2020, I participated in another meet-and-confer call with Apple's attorneys. We nearly finalized the list of Microsoft apps, and we discussed some examples of

specific types of documents that might be responsive to some other requests. Apple's attorneys also agreed that Microsoft could provide interrogatory responses to several requests. Finally, we informed Apple's attorneys that Microsoft would not be responding to Request 49, because it was overbroad and requested communications with other non-parties that were not relevant to the litigation.

9. On January 6, 2021, I informed Apple's counsel that we had sent the information to the relevant teams for the finalized set of apps. I communicated that for apps, marketplaces, and devices, we were using a "go-and-get" approach for custodians. We noted we would send these "go-and-get" lists to identified custodians, see what they have, and then report back to see if it is sufficiently responsive. Apple did not object to this approach.

10. On this call, we also discussed whether Microsoft could provide written interrogatory responses to Requests 6, 15, 19, 20, 21, 22, 24, and 25 instead of producing documents. Apple's lawyer noted they were ok with almost all the requests with the exception of 22 and 25, in which case they noted "implied" in their requests was information for Xbox and deviations from the 30%, and requirements for use of Xbox IAP. Apple's lawyer noted these "implied" requests for Xbox information were a priority. During this call, we noted we would prioritize collection of the data requests regarding the agreed upon app list.

11. On January 12, 2021, I participated on another meet-and-confer call with Apple's counsel. During that call, we discussed several specific requests, and Apple agreed to withdraw some requests on the basis that it could seek the same information from parties to the litigation. On that call, I again explained to Apple's attorneys that we would be using a "go-and-get" approach to identifying documents that were potentially responsive to the outstanding requests. I explained that this process consisted of us working with Microsoft to identify the relevant custodians and sending them specific requests for information or documents. I also explained that, given the time constraints and the burdensome scope of the Subpoena, we felt this would be the most reasonable method for Microsoft to respond to the Subpoena. At no point during that call did Apple's counsel object to the "go-and-get" approach. While they did note that they may come back and ask for specific additional documents, I interpreted this to mean that they would either make additional

requests after Microsoft's productions but within the discovery window, or that they would file a motion to compel. At no point did I or anyone at KLG agree to produce additional documents after the close of discovery.

12. On January 20, 2021, during a telephone call with Apple's counsel, I communicated to Apple the status of Microsoft's document collection. I gave Apple's counsel an update on the status of our document collection. Apple's lawyer again stressed that their top priority was receiving data in response to Requests 1 – 4.

13. On January 28, 2021, I once again provided Apple's counsel an update on the timing of our likely productions. Apple's attorneys again requested that we prioritize our data responses to Requests 1 – 4. They also asked Microsoft to prioritize Request 22, which asks for information regarding exemptions or limitations on the transaction fees Microsoft charges to developers on its platforms.

14. Over the course of the next two weeks, I had numerous other calls with Apple's attorneys to give them updates on the timing of Microsoft's productions.

15. Without divulging the substance of any communications that are protected by attorney-client privilege, Microsoft's process of responding to the subpoenas as a non-party consisted of several steps. For most requests, we first worked with the company to identify employees who were likely to have access to relevant information, data, and documents. We then developed specific requests for those employees based on the language of the subpoena and our discussions with the parties' counsel. Those requests were then sent to the employees who had been identified. If those employees had any questions about the requests, we held calls to answer their questions.

16. The requests in Apple's Subpoena called for information, data, and documents from many different parts of the business. We thus issued requests to several separate teams from across Microsoft. After those employees produced materials they had identified as responsive, Microsoft's attorneys then reviewed the documents for production.

17. For certain requests—specifically those related to the Game Pass negotiations with Apple and Kevin Gammill's declaration—we also searched employees files on the "back-end" (*i.e.*,

accessing those employees' files through the company's servers rather than asking the employees to produce documents themselves). The custodians of those files would not have had any need to know that we were searching their files, nor would they have received any notice. As part of our collection efforts, we specifically searched Lori Wright's files in connection with her communications with Apple. We ultimately did not produce any of those documents to the parties, however, because the communications would have already been in Apple's possession.

18. Microsoft ultimately produced to Apple a total of 8,099 pages of documents, including data responsive to Apple's "priority" requests (RFP Nos. 1-4), written responses to Requests Apple agreed could be answered by interrogatory, and documents responsive to 20 other requests.

19. Microsoft made its first production of documents to the parties on February 10, 2021. I transmitted the production files to Apple and Epic at approximately the same time. The first production set consisted primarily of information regarding the agreed upon list of apps that was responsive to the requests Apple had identified as its highest priority.

20. Microsoft made its second production of documents to the parties on February 12, 2021. I again transmitted the production files to both parties at approximately the same time. The second production set was more extensive than the first. It consisted of several internal business documents, including high-level strategy and planning documents related to Xbox and the Windows Store on Xbox (the "Xbox Store"). Those documents touched on many topics covered by the Subpoena, including the Xbox Store business model, developer policies, privacy and security policies, pricing strategies, competition, and more. The second production also included several high-level documents relating to Game Pass and numerous other topics covered by the subpoena.

21. After Microsoft's second production, I did not hear from Apple's attorneys regarding the scope of Microsoft's response to the Subpoena until after Epic identified and disclosed Lori Wright as a potential trial witness. Ms. Lowery then requested a call, and we spoke on March 23, 2021. During that call, she requested that Microsoft produce additional documents. We objected that the discovery window had closed, and we noted that Apple had also failed to file a timely motion to compel under the local rules. She then informed us that they would nevertheless

be filing a motion to compel before Magistrate Hixson, and we discussed the process of drafting a joint brief.

22. On the March 23, 2021 call, Apple's attorneys notified us that they would send us their initial draft of the letter brief within a day or two. I did not receive Apple's initial draft of the letter brief, however, until the evening of Friday, March 26, 2021 (the night before the beginning of Passover). I responded to Apple's attorneys with Microsoft's own draft of the letter brief on March 31, 2021. Apple then once again responded on a Friday evening (this time on April 2, 2021, the Friday before Easter weekend) with a revised draft of the letter brief. We had nearly finalized our own draft when, on April 6, 2021, Judge Hixson dismissed as untimely Apple's similar motion to compel additional documents from another third-party, Facebook. I then contacted Ms. Lowery to ask whether Apple still intended to move forward with the motion to compel additional documents from Microsoft. She told me to hold, and she subsequently withdrew Apple's motion to compel, telling me that Apple would be pursuing an alternative route. I later found out that she was referring to Apple's Motion For Pre-Trial Sanctions Against Epic Games, Inc. (Dkt. 419).

23. Following the issuance of the Court's Order Denying Defendant Apple Inc.'s Motion for Pretrial Sanctions on April 12, 2021, Apple did not move to compel or follow-up with me to seek the production of additional documents.

24. On April 16, 2021, in response to a deposition subpoena, Apple deposed Lori Wright. Pursuant to the Federal Rules, Ms. Wright was available for a full seven (7) hours of deposition testimony, but Apple's lawyer ended the deposition early.

25. A true and correct copy of the relevant excerpts of the Transcript of the April 16, 2021 Deposition of Lori Wright cited in Microsoft's Opposition to Apple's Motion for an "Adverse Credibility Finding" is attached as Exhibit B.

26. On May 5, 2021, in response to a trial subpoena issued by Epic, Lori testified at trial and Apple's attorney had the opportunity to cross-examine Ms. Wright.

27. A true and correct copy of the relevant excerpts of Ms. Wright's trial testimony are attached as Exhibit C.

28. At no point in my numerous meet and confers with Apple's attorneys did they ever request that Microsoft perform a full custodial search of any employee. At no point did Apple's attorneys object to our proposed "go-and-get" strategy for responding to the bulk of Apple's requests. And at no point did Apple's attorneys ever propose search terms or request that we suggest search terms. Indeed, the only employee whose documents Apple expressly requested that we search was Kevin Gamill, in connection with Request 45 regarding his declaration. We did conduct a search of Mr. Gamill's documents, but we did not identify any non-privileged documents that were responsive to Request 45.

29. None of the "priority" requests Apple identified covered the materials Apple now claims it needed. During the meet-and-confer process Apple did not request Xbox P&L statements, custodial searches of Ms. Wright's email and documents, notes taken by Ms. Wright's team about interactions with Apple regarding xCloud, documents about Xbox cloud gaming, or communications in Ms. Wright's files relating to Epic. Nor did Apple ask for any documents showing how much Microsoft charges for its Xbox devices or showing whether Microsoft takes a loss on its device sales. Despite identifying numerous "priority" requests, Apple never identified these particular items during our numerous meet and confers. I do not believe that such information is responsive to any of the requests in the Subpoena.

30. The Subpoena does request some documents that relate to competitors of Xbox and the Xbox Store, although it does not expressly ask Microsoft to identify all such competitors. Microsoft has produced, however, several documents that discuss its competitors and identify them as such.

31. Microsoft produced documents in response to both parties' subpoenas to both parties. At no time did Microsoft give Epic access to *any* documents other than those produced in response to the parties' respective subpoenas.

32. I am informed and believe that Apple has had extensive business dealings with Ms. Wright regarding the subjects of her testimony. In fact, Apple collected and produced to Epic some of its own emails with Ms. Wright. Despite knowing Ms. Wright's relevance even before discovery started, Apple never made any specific requests from Microsoft pertaining to Ms. Wright during

the negotiations over its subpoena, nor did it identify her as a custodian of interest during our numerous meet-and-confer sessions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was executed on May 17, 2021 at Leawood, Kansas.

DATED: May 17, 2021

By: /s/ Brandon Kressin
Brandon Kressin

**ATTESTATION**

I, David P. Chiappetta, am the ECF user whose ID and password are being used to file the above Declaration. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Brandon Kressin has concurred in the aforementioned filing.

/s/ David P. Chiappetta
David P Chiappetta