# EXHIBIT 1
# TO NON-PARTY NINTENDO OF AMERICA INC.'S ADMINISTRATIVE MOTION TO SEAL PORTIONS OF REDLINED CONTENT LICENSE AND DISTRIBUTION AGREEMENT

# (REDACTED VERSION)

Confidential

~~You, as an authorized representative of Content Provider, indicate Content Provider's agreement to be bound by these terms by clicking the "Accept" button.~~

# Nintendo Switch
# Content License and Distribution Agreement

~~Last Updated: November 15, 2019~~

This Nintendo Switch Content License and Distribution Agreement (the "**Agreement**") governs the relationship between **Nintendo Co., Ltd.,** 11-1 Hokotate-cho, Kamitoba, Minami-ku, Kyoto, 601-8501, Japan ("**Nintendo**") and ~~you or the entity you represent~~ Epic Games, Inc. located at 620 Crossroads Blvd., Cary, NC 27518, U.S.A. ("**Content Provider**").

Nintendo and Content Provider are collectively referred to as the "Parties"; each a "Party".

**Nintendo and Content Provider agree as follows:**

1.    **Definitions**

    1.1 "**Activation Ticket**" means an activation code, download code, internet-based data validation mechanism and any other mechanism supported by Nintendo Entities which allows the Registration of a license for the Content by Nintendo Entities to the account of the end user presenting such Activation Ticket to Nintendo Entities.

    1.2 "**Affiliate(s)**" of a Party means an entity that directly or indirectly controls, or is controlled by, or under common control with that Party. "Control", for the purpose of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

    1.3  "**Assignment**" means any type or form of assignment, transfer, sale, sublicense, delegation, encumbrance, pledge, or hypothecation of this Agreement or of a Party's rights or obligations under this Agreement, whether occurring voluntarily or involuntarily.

    1.4 "**Authorized Developer**" means any ~~person~~ third-party developer or ~~entity~~ contractor that has accepted the Terms of Service and has a valid account to access the NDP.

    1.5  "**Claim**" means any and all threatened or realized third-party claims, demands, actions, suits or proceedings, including, without limitation, civil, criminal and regulatory matters, and those brought by governmental authorities, agencies or any third-party under any federal, state or foreign law or regulations, or the rules of any self-regulatory body (for example, the Entertainment Software Rating Board).

    1.6  "**Confidential Information**" means any information provided to a Party or to a Party's Affiliate ("**Receiving Party**") that is disclosed by the other Party or the other Party's Affiliate~~,~~ ("**Disclosing Party**"), or by any third-party under an obligation of confidentiality to Disclosing Party, that is designated as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential. Nintendo's Confidential Information includes, without limitation, the Development Materials, Guidelines, any materials and information available on the NDP (other than the Content), Nintendo User Data and the terms and conditions of this Agreement, but does not include Feedback. Confidential Information will not include any information which: (i) was in the public domain prior to Receiving Party's receipt of the same hereunder, or which subsequently becomes part of the public domain by publication or otherwise, except by the Receiving Party's act or omission; (ii) Receiving Party can demonstrate, through written records kept in the ordinary course of business, was in its possession without restriction on use or disclosure, prior to its receipt of the same hereunder, and was not acquired directly or indirectly from Disclosing Party under an obligation of confidentiality which is still in force; (iii) Receiving Party can show was received by it from a third-party who did not acquire the same directly or indirectly from Disclosing Party under an obligation of confidentiality; or (iv) Receiving

Party can show was independently developed by it without reference to or reliance upon any Confidential Information of Disclosing Party.

1.7 **"Content"** means: ███████████████████████████████████████████████ _as_ developed to be compatible with, and for use and operation solely on, the Nintendo System for distribution in digital or packaged form as authorized by Nintendo Entities. The Content includes any Patches, demonstration versions, and add-on content designed for use with such software program.

1.8 **"Content Capture"** means, collectively, screenshots, audio and/or video materials of the Content that end users may create by using a Nintendo System.

1.9 **"Content Provider Intellectual Property Rights"** means the Intellectual Property Rights owned, licensed, or otherwise held by Content Provider (excluding the Nintendo Intellectual Property Rights) in and to the Content.

1.10 "Content Provider Marks" means all registered and unregistered trademarks, service marks, trade names, domains, logos, and brand names owned by Content Provider or its Affiliates or graphic icons for representing the Content.

1.11 **"Currency"** means any form of resources, credits, monies, currency, or other units or items, whether physical or digital, and recognized by any entity or group of persons as representing any particular value outside the Content that can be transferred as a medium of exchange.

1.11 1.12 **"Development Materials"** means the development kits, programming tools, emulators, and other software, hardware, documentation, information, and materials of Nintendo Entities or third parties authorized by Nintendo Entities, that are made available from time to time by Nintendo Entities via NDP or other means designated by Nintendo Entities for the development of the Content under this Agreement.

1.12 1.13 **"Distribution Format"** means the format(s) of distribution (such as, discs, cartridges, digital software files, Activation Tickets, or any combination thereof) for the specific Content as designated by Content Provider and approved by Nintendo Entities.

1.13 1.14 **"Distribution Period"** means the period for the distribution of the ~~specific Content.~~

~~1.14 "Effective Date" means the date of the acceptance of this Agreement by an authorized representative of Content Provider by clicking the "Accept" button or through other means provided by Nintendo and explicitly identified by Nintendo for that purpose~~ Content.

1.15 "Effective Date" means the last date on which the parties have signed this Agreement.

1.16 **"Feedback"** means all ideas, comments, suggestions, or other feedback on the features or functionality of the Content that is provided to Content Provider from Nintendo Entities.

1.16 1.17 **"Free Software"** means software made available under licenses generally known as "free software," "open source," or "copyleft" licenses, including, without limitation, GNU General Public License, GNU Lesser General Public License, Common Public License, Eclipse Public License, Mozilla Public License, or Common Development and Distribution License, Creative Commons share-alike licenses, and substantially similar licenses.

1.17 1.18 **"Gameplay Data"** means all data or information generated from within the Content that is related ~~solely~~ to the gameplay action by or between players, ~~including~~ ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1.18 1.19 **"Guidelines"** means any ~~specification or~~ and all guidelines, specifications and documentation available on the NDP, or otherwise provided by Nintendo Entities to Content Provider in writing via NDP, applicable all of Nintendo's publishers with respect to the development ~~of~~, marketing, and distribution of software programs compatible with the Nintendo Systems, including any requirements regarding the Content, Marketing Material, and other materials necessary for distributing the Content by Content Provider under this Agreement.

Confidential

~~1.19 "Laws" means any and all applicable national, federal, state and international laws, rules, regulations, orders, ordinances, regulatory guidance, and industry self-regulations.~~

1.20 "**Intellectual Property Rights**" means any registered or unregistered rights or applications for rights owned, licensed, or otherwise held in patents, trademarks, service marks, copyrights, mask works, trade secrets, trade dress, moral rights, publicity rights, and any other similar rights, together with all inventions, discoveries, ideas, technology, know-how, data, information, processes, formulas, drawings and designs, licenses, computer programs, software source code, and object code, and all amendments, modifications, and improvements thereto for which such patent, trademark, service mark, copyright mask work, trade secrets, trade dress, moral rights, or publicity rights may exist or may be sought and obtained in the future.

1.21 "Laws" means any and all applicable national, federal, state, and international laws, rules, regulations, orders, ordinances, regulatory guidance, and industry self-regulations.

1.22 "Licensed Marks" means the Content Provider Marks or the Nintendo Marks, as applicable.

1.23 "**Marketing Material**" means images, audio and/or video materials, and any other materials regarding or relating to the Content either provided by Content Provider or created by Nintendo Entities and approved by Content Provider, in accordance with and for the purposes described in Section 6.3 below.

1.22~~~~1.24 "**NDP**" means Nintendo's developer support website and portal system, currently known as the Nintendo Developer Portal.

1.23~~~~1.25 "**Nintendo Entity (ies)**" means collectively or individually, Nintendo and/or its Affiliates.

1.24~~~~1.26 "**Nintendo Intellectual Property Rights**" means the Intellectual Property Rights owned, licensed, or otherwise held by Nintendo, related to the Development Materials, the Security Technology, any System Update, the Nintendo System, and the Nintendo Network.

1.25~~~~1.27 "**Nintendo Shop**" means any applications and services provided by Nintendo Entities whereby end users, through an Internet connection or by any other electronic means, can access, download or register a license for content; free of charge or against payment, using funds, Activation Tickets, credit cards, gift cards, or by any other means. Nintendo Shop includes "Nintendo eShop" and the content sales page of Nintendo's official website.

1.26~~~~1.28 "**Nintendo Marks**" means all registered and unregistered trademarks, service marks, trade names, domains, logos, and brand names owned by Nintendo Entities or graphic icons for representing specific feature of the Nintendo System or Nintendo Network.

1.27~~~~1.29 "**Nintendo Network**" means the Nintendo Shop and all games, applications, software, services, portals, data, website and other content, whether commercial or non-commercial content, of Nintendo Entities that is available to end users who connect to the Internet or by any other electronic means via a device manufactured by Nintendo or when accessing content identified as Nintendo Network content via other connected devices. For the avoidance of doubt, Nintendo Network in this Agreement covers games, applications, software, services, portals, data, website, and other content, whether commercial or non-commercial content, of Nintendo Entities that is available to users with a registered Nintendo Account, a registered Nintendo Network ID as well as via My Nintendo.

1.28~~~~1.30 "**Nintendo User Data**" means ███████████████████████████████████████████████ ██████████████████, that is collected, received, ~~processed,~~or accessed~~, used, stored, or maintained in connection with~~ solely from the operation or use of the Nintendo Systems or the Nintendo Network, including (a) all data related to a user's Nintendo Network or Nintendo System accounts, including, without limitation, (i) name, (ii) user name, email address, (iii) friend list, (iv) credit card number, (v) game play and Nintendo System usage data, (vi) transactional data, (vii) demographic information, photos, videos, voice recordings, IP address~~es~~, unique identifiers, and other similar information and (b) all data pertaining to a user's Nintendo System, including, without limitation, device identification number, MAC address, demographic information, photos, videos, voice recordings, ~~IP addresses,~~ unique identifiers, and other similar information, geolocation data ~~(including but not limited to geolocation data derived from a user's IP address)~~, system setting and performance data, error history, and crash report data~~, and data regarding a user's Internet connection~~. Notwithstanding the foregoing, Nintendo User Data does not include Gameplay Data.

Confidential

1.291.31 **"Nintendo System"** means the Nintendo Switch and its successor system(s) (i.e., systems ███████████████ designated by Nintendo in its sole discretion.

1.301.32 **"Patch"** means any bug fixes, updates, modifications, or new versions of the original Content, that is distributed free of charge to end users who have purchased and/or downloaded the Content.

1.311.33 **"Reverse Engineer (ing)"** means, without limitation, (a) the x-ray, electronic scanning, or physical or chemical stripping of semiconductor components, (b) the disassembly, decompilation, decryption, or simulation of object code or executable code, or (c) any other technique designed to extract source code or to facilitate the duplication of a program or product.

1.321.34 **"Registration"** of a license, or **"Registered"** means the grant of a license for a single copy of the Content to an account of an end user.

1.331.35 **"Schedule(s)"** means the Nintendo Shop Sales Schedule attached hereto as Schedule 1, any Packaged Content Schedule, and any other schedule entered into by Content Provider in accordance with Section 5.1.

1.341.36 **"Security Technology"** means the security features owned or licensed by Nintendo that are designed to minimize the risk of unlawful copying or other unauthorized or unsafe access or use of the Content or Nintendo System.

1.351.37 **"System Update"** means upgrades, bug fixes, or additional features that modify the operating system of the Nintendo System and/or are designed to optimize, enhance, or otherwise modify the operation or performance of the Nintendo Network or Nintendo System.

1.361.38 **"Term"** means the time period from the Effective Date through the expiration or termination of this Agreement in accordance with Section 14.

1.371.39 **"Terms of Service"** means the Terms of Service and Non-Disclosure Agreement accepted by Content Provider in connection with Content Provider's access to NDP.

1.381.40 **"Territory"** has the meaning as defined in the individual Schedules.

1.391.41 **"Third-Party Content Fees"** means any and all costs, expenses, royalties, and other payments (except for the payment by Nintendo to Content Provider under Section 3.3 (Payment) of the Schedule 1) that are or may become payable to an owner, licensor, music performance or collective licensing society, administrator, or any other third-party in respect of any rights existing in or relating to the Content or Marketing Material ████████████████████████████████████████ including, without limitation, any fees, royalties, and other payments that are payable in respect of any music, images, sound effects, video clips, or any other works in the Content or Marketing Material.

2. **Scope and Applicability**

2.1 This Agreement will apply to each item of Content developed by Content Provider.

2.2 This Agreement will take precedence over any other terms related to the Content submitted by Content Provider. Nintendo will not be bound by, and hereby objects to, any different and/or additional terms and conditions presented by Content Provider. Any such terms and conditions will become binding on Nintendo only if Nintendo explicitly accepts such terms and conditions in writing.

3. **Creation and Submission of Content**

3.1 Responsibility to Create Content: ███████████████. Content Provider is solely responsible for development, testing, quality, content, operation, and support of the Content. ████████████████████████████████████████████████████████████████████████████████

Confidential

3.2 <u>Grant of License by Nintendo.</u> Subject to terms and conditions under this Agreement, Nintendo grants Content Provider a non-exclusive, non-transferable, non-assignable, royalty-free, and limited license to the Nintendo Intellectual Property Rights solely to develop, market, and distribute the Content in accordance with this Agreement and applicable Schedule(s) hereto. Except as permitted under a separate written authorization by Nintendo, Content Provider will not use the Nintendo Intellectual Property Rights for any other purpose.

3.3 <u>Authorized Developers.</u> Content Provider may have Authorized Developers develop the Content; provided that, Content Provider will (i) notify Nintendo of such Authorized Developer in a manner and form designated by Nintendo, (ii) enter into a written agreement with such Authorized Developer which includes data security, confidentiality, and indemnification obligations no less restrictive than those applicable to Content Provider under this Agreement, and (iii) be liable for any act or omission of such Authorized Developers in connection with their development of the Content. Content Provider will not use any third-party developers or contractors in the development of the Content other than the Authorized Developers.

3.4 <u>Use of the Development Materials.</u> Nintendo Entities may make available the Development Materials to Content Provider solely for the purpose of supporting Content Provider in the development of the Content under this Agreement or other terms as may be agreed upon between Content Provider and a Nintendo Entity. Except as provided herein or in a separate agreement between Content Provider and a Nintendo Entity, Content Provider's use of the Development Materials will not create any right, title, or interest in the Development Materials for Content Provider. Except as permitted under a separate written authorization by Nintendo Entities, Content Provider will not (i) use the Development Materials for any purpose other than for the development of the Content under this Agreement, (ii) modify or create any derivative works of the Development Materials, (iii) Reverse Engineer the Development Materials (except as specifically permitted under the applicable Laws), or (iv) sell, lease, distribute, license, transfer, or otherwise make available the Development Materials to any third party. If there are conflicts between this Agreement and a separate agreement between Content Provider and a Nintendo Entity on a specific Development Material, the terms of the separate agreement will control with respect to such Development Material.

3.5 <u>Restrictions.</u> Except as permitted under this Agreement or otherwise approved in writing by Nintendo Entities, Content Provider will not, directly or indirectly:

(a)   grant access to, distribute, transmit, or broadcast ~~any~~ Content in any manner, except (i) as a part of wireless play on and among the Nintendo Systems, or (ii) for the purpose of facilitating the development of Content under the terms of this Agreement;

(b)   modify, install, or operate Content on any server or other device for the purpose of or resulting in the rental, lease, loan, or sale of rights of access to such Content;

(c)   embed, incorporate, or store the Content in any media or format other than the custom cartridge or any other media utilized by the Nintendo System, except as may be necessary as a part of the development process under this Agreement;

(d)   design, implement, or undertake any process, procedure, program, or act designed to circumvent the Security Technology; and

(e)   Reverse Engineer or assist in the Reverse Engineering of all or any part of the Nintendo System, including the hardware or software (whether embedded or otherwise), the Development Materials, or the Security Technology, unless expressly permitted under the Laws.

3.6 <u>Guidelines.</u> Content Provider will ensure that the Content and Marketing Material comply with all the Guidelines applicable to the respective items. Content Provider acknowledges and agrees that the Guidelines do not (a) represent legal advice in relation to the Content or Marketing Material, or (b) diminish, release or otherwise affect Content Provider's warranties, representations, indemnifications or other obligations under this Agreement.

Confidential

3.7 <u>Security.</u> In order to prevent unauthorized use of the Nintendo System or the Content, Nintendo ~~Entities~~ may~~,~~: (a) add Security Technology~~,~~ ████ System Updates~~, and~~ in ██████████████, (b)█ trademark, copyright, or customer notifications ██████████████ to the Content in accordance with the Guidelines, or (~~bc~~) prevent the Content from operating on the Nintendo System if, in Nintendo Entities' sole discretion, the Content may be exploited or used in a way that allows the unauthorized use of the Nintendo System or Nintendo Network.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████ finding and fixing bugs in the Nintendo System and evaluating technical and security issues in the Nintendo System or the Content.

3.8 <u>Content Rating.</u> Content Provider will obtain and provide to Nintendo Entities any applicable ratings for the Content for each country within the Territory, including any certificate of rating for the Content issued by the respective rating entity or statement confirming self-rating. Content Provider will immediately notify Nintendo Entities if Content Provider becomes aware that the Content or content that is wholly or substantially similar to the Content is censored or banned or if a censorship or banning procedure is initiated in any country in the Territory.

3.9 <u>Currency.</u> Content Provider will ensure that the Content does not permit the end user to obtain Currency within the Content, including but not limited to, for the purposes of gifting, exchange, redemption, transfer, use as a premium, or purchasing anything, whether within, or outside of, the Content or the Nintendo Network.

3.10 <u>Submission of the Content.</u> Content Provider may submit the Content to a Nintendo Entity only after Content Provider has completed development and testing of the Content. Content Provider will ensure that the Content complies with this Agreement, including all Guidelines. Nintendo Entities may, in their sole discretion, test the Content's compliance with the Guidelines and inform Content Provider whether any corrections or improvements are necessary or require additional information, including, but not limited to, evidence that Content Provider owns or has a license to all necessary Intellectual Property Right in such Content. Content Provider may make such corrections and improvements as are necessary and re-submit the revised Content to Nintendo Entities. Content Provider will not modify, make changes or add new features to the Content after the approval of the Content by a Nintendo Entity. Any bug fixes, updates, modifications, or new versions of the Content will be resubmitted to Nintendo Entities pursuant to this Section unless expressly authorized in writing by a Nintendo Entity. Within Europe, the Guidelines shall not impose any restrictions on artistic, subjective or conceptual aspects of the Content or Marketing Material other than in relation to ethical or safety concerns or the use of Nintendo Marks.

3.11 <u>Product Information.</u> In addition to the submission of each Content, Content Provider will also provide Nintendo Entities with all information necessary for distributing the Content, which includes, but is not limited to, Content meta-data (Application ID, rating for the Content, and the version of the Content), the title of the Content, the icon to be used with the Content, features and game-play mechanics, applicable languages, artworks, distribution countries, the Distribution Period and customer support information, support and licensing information and legal notice (so-called SLIM) (the "**Product Information**").

3.12 <u>Feedback.</u> In case a Nintendo Entity provides Content Provider with any Feedback or advice regarding the Content, Product Information, or Marketing Material, such feedback is provided "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND WHATSOEVER. Content Provider acknowledges and agrees that in no event will any Feedback or advice represent legal advice in relation to the Content, the Product Information, or Marketing Material, nor diminish, release or otherwise affect Content Provider's warranties, representations, indemnifications, or other obligations under this Agreement.

3.13 <u>Third-Party Content Fees.</u> As between Content Provider and Nintendo Entities, the Third-Party Content Fees are the sole responsibility of Content Provider. Content Provider will promptly and fully indemnify Nintendo Entities from any and all liability for the Third-Party Content Fees.

Confidential

3.14 Technical Support. Content Provider will provide, at no cost to Nintendo Entities, ███████ ████████████████████ technical support to Nintendo Entities relating the Content to enable Nintendo Entities to fulfill their rights and obligations under this Agreement.

## 4.   Online Service

4.1 Content Provider agrees and acknowledges that if Content Provider, subject to Nintendo's prior written consent, wants to develop Content for simultaneous or linked play between Nintendo Systems using the Nintendo Network or wants to include other online services into its Content using the Nintendo Network, the usage of such linked play and other services via the Nintendo Network is subject to end user's acceptance of the Nintendo Network related terms and conditions. Nintendo Entities reserve the right to provide the Nintendo Network to end users only against payment of a fee payable solely to Nintendo Entities. Access to Content Provider Online Services (as defined in Section 4.2) may be contingent on end user's access to the Nintendo Network, including the payment of such a fee to Nintendo Entities.

4.2 Content Provider may, at its own cost and subject to Nintendo's prior written approval (not to be unreasonably withheld or delayed), provide online services hosted by its own servers for end users of its Content ("**Content Provider Online Service**"). Content Provider will ensure that the Content Provider Online Service complies with the applicable Guidelines and be responsible for any and all aspects of the Content Provider Online Service (including, without limitation, its compliance with the applicable Laws).

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████

## 5.   Distribution of Content

5.1 Nintendo may offer different Distribution Formats to Content Provider which may include sales in Nintendo Shop in accordance with Schedule 1, distribution as packaged content, and the provision of Activation Tickets by Nintendo Entities to any third parties against the payment of the purchase price by such third parties and the digital distribution of Content to end users via the redemption of the Activation Tickets. The Parties agree that the distribution of the Content will be subject to the terms set forth in Schedule 1 attached hereto (Nintendo Shop Sale Schedule). If Content Provider wishes to distribute, or allow Content Provider's Affiliate to distribute, the Content in a Distribution Format other than in accordance with Schedule 1, subject to Nintendo's approval, Content Provider may enter into another Schedule, on behalf of itself or Content Provider's Affiliate, with Nintendo Entities that sets forth the additional terms and conditions applicable to a specific Distribution Format. To the extent Content Provider has entered into the applicable Schedule for the applicable Distribution Format, such Schedule governing such Distribution Format will become part of this Agreement. To the extent there is a conflict between a Schedule and this Agreement, the terms and conditions of the applicable Schedules will control with respect to such Distribution Format.

5.2 Nintendo Entities will make commercially reasonable efforts to support the distribution of the Content in accordance with this Agreement throughout the Territory and during the Distribution Period, provided however, Content Provider acknowledges that it may not be possible to distribute the Content at all times during the Distribution Period and in all Territories, because, for example, of disruption or discontinuation of the Nintendo Network. Nintendo Entities will not be liable if the Content is not distributed for any reason.

5.3 Notwithstanding the foregoing, Content Provider may distribute Patches through the Nintendo Network in accordance with the Guidelines. For the purpose of the Patch distribution, Content Provider grants to Nintendo Entities throughout the Territory a perpetual, irrevocable, non-exclusive, paid-up, royalty-free license in and to the Patch, and all of the Content Provider Intellectual Property Rights associated therewith, solely as necessary and sufficient to permit Nintendo Entities (and all third parties working on their behalf) to host and distribute the Patch in accordance with this Agreement. Notwithstanding the aforementioned, Content Provider acknowledges and agrees that: (i) a Nintendo Entity will not be in breach of this Agreement if it distributes the Patch to any end user or a third-party representing themselves to be within the Territory (e.g., by designating a false country setting on the account), even

Confidential

if they are not in fact within the Territory; (ii) Nintendo Entities do not restrict the territory in which the Patch is used by end users after the Registration of a license for the Patch; (iii) the termination of this Agreement dodoes not affect or restrict the distribution of the Patch via Nintendo Network to end users; (iv) the Patch may be hosted on servers located within and/or outside the Territory; (v) end users and Nintendo Entities (solely for the purpose of customer support for such end users) will be able to re-download the Patch, which they have downloaded, to their Nintendo System free of charge at any time for an unlimited period of time; and (vi) the Patch may be transferred from one Nintendo System to another Nintendo System if the account of an end user in the Nintendo Network is transferred from such one Nintendo System to such another Nintendo System for whatever reason.

5.4 <u>Customer Support.</u> Content Provider will be responsible for providing consumer support relating to the Content.

5.5 ██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████

## 6. Marketing

6.1 <u>By Content Provider.</u> Subject to the terms and conditions of this Agreement, Content Provider may in its sole discretion and at its expense, advertise, market, and promote the Content, provided, however, Content Provider may not use the Nintendo Marks in any way (including, without limitation, use in the Content, or in any marketing items or press release) other than as expressly permitted in the Guidelines without prior written approval by a Nintendo Entity.

6.2 Content Provider will not register or apply to register any trademarks or domain names in connection with the Content that are confusingly similar to trademarks or domain names or other intellectual property rights relating to the Nintendo Intellectual Property Rights.

6.3 <u>By Nintendo.</u> Content Provider grants Nintendo Entities during the Term and throughout the Territory, a non-exclusive, paid-up, royalty-free license in and to the Content, Product Information, Marketing Materials, Content Provider Marks and all of Content Provider Intellectual Property Rights associated therewith, in each case below only for the purpose of marketing, advertising, and promotion of the Content, to (i) utilize the Marketing Material in any and all media (including, without limitation, Nintendo Shop, websites operated by or on behalf of Nintendo, features of Nintendo Systems, and any other online or printed channels), (ii) publicly show the Content or any part thereof at conventions, events, trade shows, and any other publicly available demo-stations, and (iii) provide demonstration or trial version of the Content to end users via Nintendo Network or other method designated by Nintendo ███████████████████████████. Content Provider may, upon request of a Nintendo Entity, provide Marketing Materials to Nintendo Entities, and Nintendo Entities may adjust, modify and make derivative works of the Content, only for the advertising, marketing and promotional use described under this Section 6.3. In the event Nintendo creates Marketing Materials, Nintendo Entities will submit a sample of such materials to Content Provider for its approval, which will not be unreasonably withheld or delayed in advance. If Content Provider fails to respond within ten (10) calendar days of receipt, such Marketing Material will be deemed to be approved by Content Provider. ██████████████████████████ ████████████████████████████████████████████████

6.4 <u>Complimentary Copies.</u> Content Provider may request Nintendo Entities to issue and provide to Content Provider Activation Tickets for the purpose of advertising and promoting the Content. Nintendo Entities will charge a fee for issuance of the Activation Ticket in accordance with the complimentary Activation Ticket fee schedule which has been provided to Content Provider by Nintendo. Content Provider will pay Nintendo Entities the fee within thirty (30) calendar days after the receipt of a corresponding invoice issued from Nintendo Entities to Content Provider. Content Provider will not sell such Activation Tickets to any third-party. Nintendo Entities are entitled, without payment to Content Provider, to issue and use a reasonable number of the Activation Tickets for the purpose of testing the Content.

6.5 <u>Content Capture.</u> Content Provider acknowledges that the Nintendo System may allow end users to create, store, and publish Content Capture within the Nintendo System, the Nintendo Network or

Confidential

otherwise on the Internet by using the functionality of the Nintendo System, including any future functionality. Content Provider grants to Nintendo the non-exclusive, perpetual, world-wide, royalty-free, non-revocable, sub-licensable (subject to Section 15.4) right to create, store, publish, and utilize and permit end users to create, store, publish, and utilize, the Content Capture within the functionality of the Nintendo System, the Nintendo Network, or on the Internet. Content Provider will have the ability to disable or enable the Content Capture functionality within the Content during the development process (as applicable).

6.6 <u>Icons.</u> Content Provider acknowledges that icons or other image assets of the Content provided or approved by Content Provider are used as a graphical representation of the Content in the Nintendo System, Nintendo Shop or Nintendo Network. Content Provider grants to Nintendo the non-exclusive, perpetual, world-wide, royalty-free, non-revocable and sub-licensable (subject to Section 15.4) license to utilize the icons within the functionality of the Nintendo System, the Nintendo Shop and the Nintendo Network, including any future functionality, solely in connection with the Content.

6.7 <u>Bundling.</u> To protect the Nintendo Intellectual Property Rights, to prevent the dilution of Nintendo's trademarks, and to avoid use of the Nintendo Intellectual Property Rights giving rise to any implication of Nintendo's sponsorship, association, approval, or endorsement where this is not the case, Content Provider will seek and obtain Nintendo's written approval before marketing or distributing any Content displaying Nintendo Marks that is bundled with (i) any peripheral designed for use with the Nintendo System or (ii) any other product or service where Nintendo's sponsorship, association, approval or endorsement might be suggested by the bundling of the products or services. Provided, however, that Content Provider may always bundle Content with any peripheral that has been approved in writing by Nintendo or with additional Content also supplied by Content Provider in compliance with this Agreement, including bundling of Content in a set.

7. **Intellectual Property Ownership**

7.1 Except for those license rights expressly granted to Content Provider in this Agreement, Nintendo will retain whatever rights it owns or has been licensed, and Content Provider will obtain no rights, in or to, any Nintendo Intellectual Property Rights.

7.2 Except for those license rights expressly granted to Nintendo Entities in this Agreement, Content Provider will retain whatever rights it owns or has been licensed, and Nintendo will obtain no rights, in or to any Content, any copies thereof, or any Content Provider Intellectual Property Rights.

7.3 

7.3 7.4 Feedback from Nintendo Entities is not required and whatever Feedback that Nintendo Entities provide to Content Provider is voluntary. In the event Nintendo Entities provide Content Provider with Feedback, Nintendo hereby grants to Content Provider a fully paid, royalty-free, nonexclusive perpetual, non-revocable, non-exclusive, and freely sublicensable right in the Territory and license to use and

Confidential

exploit such Feedback for ███████████████ ████████████████████ Subject to the express licenses granted in this Agreement, Nintendo will retain all right, title, and interest in and to the Feedback (excluding any Content Provider's Confidential Information and Content Provider Intellectual Property Rights that is are included in such Feedback) and reserve all rights not expressly granted or assigned. Other than Feedback, the Parties do not anticipate joint efforts that may result in the creation of Intellectual Property Rights. Each Party will continue to own all rights to its respective Intellectual Property. Notwithstanding anything to the contrary herein Rights. For the avoidance of doubt, for purposes of this Agreement, Feedback will not include Nintendo's Confidential Information or Nintendo Intellectual Property Rights (including any enhancements or modifications thereto).

7.4 7.5 Content Provider hereby grants to Nintendo Entities a perpetual, non-exclusive, worldwide, irrevocable, royalty-free license, with the right to sublicense, to the Improvements for any purposes. "Improvements" mean any modification, improvement, addition, enhancement, invention (whether patentable or otherwise) or work based upon the Development Materials made by, on behalf of, Content Provider, Content Provider's Affiliates, or Authorized Developers used by Content Provider, including any modified, altered, enhanced, or adapted version of the Development Materials, or derivative work thereof based on the Development Materials, but expressly excludes any and all Content Provider Intellectual Property Rights.

## 8. Confidentiality

8.1 The Receiving Party will not use the Confidential Information other than strictly for the purpose authorized by this Agreement and or disclose the Confidential Information to any third-party other than to its directors, officers or employees who have a strict need to know of such Confidential Information for the purposes of this Agreement and ███████████████████████ in writing of the to confidentiality obligations no less protective than those in this Agreement.

8.2 The Receiving Party will take all steps reasonably necessary to ensure the Confidential Information is protected against unauthorized use or disclosure with at least the same degree of care used to protect its own confidential or proprietary information of a similar nature, but in no event less than a reasonable degree of care.

8.3 The Receiving Party will promptly notify the Disclosing Party of the unauthorized use or disclosure of any Confidential Information of the Disclosing Party by itself or any of its directors, officers, or employees, and will promptly act to recover any such information and prevent further breach of the obligations herein. The obligations of the Receiving Party set forth herein are in addition to and not in lieu of any other legal remedy that may be available to the Disclosing Party under this Agreement or applicable Law.

8.4 Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information if such disclosure is required by an authorized governmental or judicial entity, provided that the Receiving Party will provide the Disclosing Party with prompt written notice so that the Disclosing Party may seek a protective order or other appropriate remedy. The Receiving Party will use its best efforts to limit the disclosure to the greatest extent possible, consistent with its legal obligations, and if required by the Disclosing Party, will cooperate in the preparation and entry of appropriate court orders limiting the persons to whom Confidential Information may be disclosed and the extent of disclosure of such Confidential Information.

8.5 Notwithstanding anything to the contrary in this Section 8, Content Provider may disclose Nintendo's Confidential Information to its Authorized Developers who have a strict need to know of such Confidential Information for the purposes of performing its rights and obligations under this Agreement and ████████████ in writing of the to confidentiality obligations no less protective than those in this Agreement. Content Provider will be responsible for any breach of this Agreement by its Authorized Developers.

8.6 Notwithstanding anything to the contrary in this Section 8, a Nintendo Entity may disclose Content Provider's Confidential Information to other Nintendo Entities and any third-party working on a Nintendo Entity's behalf. ███████████████████████████████████ solely for the purpose of performing its rights and obligations under this Agreement and ██████

███████████████. Nintendo will be responsible for any breach of this Agreement by such Nintendo Entities and/or third-parties.

8.7 Press Release. Any public announcement or press release by ~~Content Provider~~ either Party regarding this Agreement or containing ~~Nintendo~~ Intellectual Property Rights of the other Party will be subject to the prior written approval of ~~Nintendo Entities~~ the other Party.

8.8 Parallel Development. Content Provider acknowledges that Nintendo Entities may independently consider, develop, or publish content similar ~~or identical~~ to the Content. Content Provider acknowledges and agrees that this Agreement will in no way impair the right of Nintendo Entities to develop, make use of, procure, market, sell, or distribute such content, and Nintendo Entities will in no way be liable to Content Provider in respect of any such independent and parallel consideration, development, or distribution, provided that, (i) ████████████████████ (ii) this subsection will not be deemed to grant to Nintendo Entities a license to any of the Content or under Content Provider's copyrights ~~or,~~ patents ~~unless expressly stated in this Agreement,~~ or other Intellectual Property Rights.

9. **Privacy and Information Security** As between Nintendo Entities and Content Provider, all right, title, and interest in and to Nintendo User Data is and will be owned solely by Nintendo Entities and Nintendo Entities may use the Nintendo User Data for any purpose. Content Provider will ███████████ or use the Nintendo User Data without prior written authorization by a Nintendo Entity. In the event ~~Content Provider collects, accesses or uses~~ that such prior written authorization is provided by a Nintendo ~~User Data~~ Entity, Content Provider is fully responsible for any authorized or unauthorized access, collection, use, storage, disclosure, deletion, and destruction (collectively, "Handling") of Nintendo User Data ████████████████████. In particular, Content Provider will comply with the terms of Exhibit A (Privacy and Information Security Terms) attached hereto.

10. **Representations and Warranties**

10.1 Content Provider's Representations and Warranties. Content Provider represents and warrants to Nintendo Entities ███████████ that:

10.1.1 If Content Provider is an individual, (a) he or she is at least legal age of majority in his/her country of residence, or (b) the legal guardian or parent accepts the agreement on behalf of the minor;

10.1.2 If Content Provider is a corporation or other legal entity, (a) it is a duly organized and validly existing entity and has the authority to enter into this Agreement and perform all of its obligations under this Agreement; and (b) a person who accepts this Agreement on behalf of Content Provider, has the right and authority to bind Content Provider to this Agreement;

10.1.3 The execution, delivery, and performance of this Agreement does not and will not violate or otherwise conflict with any agreement by which Content Provider may be bound;

10.1.4 Content Provider: (a) is the sole owner of all right, title, and interest in and to the Content, Product Information, and Marketing Material; or (b) throughout the Territory and during the Distribution Term, has obtained all necessary licenses or approval of third parties in writing, and will fulfill any obligation imposed by third parties as applicable, and fully paid any royalty, Third-Party Content Fee, or other sum, ███████████████████████████████ ███████████████████████ (i) use such third parties' Intellectual Property Rights in the Content, Product Information, and Marketing Material for the purposes contemplated by this Agreement, and (ii) grant to Nintendo Entities the rights set forth in this Agreement;

10.1.5 Content Provider will at all times comply with all applicable Laws of the Territory relating to or in connection with this Agreement, including, without limitation, those relating to data protection, laws against bribery including UK Bribery Act, privacy and export laws and regulations, and all Content, Product Information, Marketing Material, and all activities of Content Provider under this Agreement will at all times comply with this Agreement, the Guidelines, and all applicable Laws;

Confidential

10.1.6 None of the Content, Product Information, and Marketing Material misappropriate or infringe the Intellectual Property Rights of any third-party in the Territory; ███████████████████████████████████████████

10.1.7 The Content will be delivered to Nintendo Entities free of any ~~bugs, errors, or other~~ material operational defects that could materially ~~affect~~ diminish, disrupt, delay, or destroy the use and enjoyment of the Content, Nintendo System, and Nintendo Network;

10.1.8 The Content, Product Information, and Marketing Material do not contain (a) any material that ██████ to obscene, libelous or defamatory matter or ~~that discloses~~ the disclosure of ██████, or (b) ██████████ any computer virus, Trojan horse, spyware, or other contaminating, malicious, or destructive feature; and

10.1.9 The Content does not contain any Free Software that would, under the license terms associated with that Free Software, require the Development Materials, Nintendo System, Security Technology, or Nintendo Intellectual Property Rights or any portion or derivative work thereof, to be disclosed or distributed in source code form, to be licensed for the purpose of making derivative works, or to be redistributed free of charge.

10.2 Nintendo's Representations and Warranties. Nintendo represents and warrants to Content Provider that:

10.2.1 It is a duly organized and validly existing entity and has the authority to enter into this Agreement and perform all of its obligations under this Agreement; ~~and~~

10.2.2 The execution, delivery and performance of this Agreement does not violate or otherwise conflict with any agreement by which Nintendo may be bound; and

10.2.3 ████████████████████████████████████████████████████████████████████████████████████████████████

## 11. Disclaimers and Limitation of Liability

11.1 

11.2 Limitation of Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EXCEPT WITH RESPECT TO ████████████████████████████████████████████

Confidential



11.3  Content Provider acknowledges that it is not possible to control the use of stored or published materials related to the Content, including, without limitation, the Content Capture, by third parties, particularly on the Internet. Content Provider will not have any claims against Nintendo Entities arising from or relating to third parties using sound, image, video and other material created in accordance with this Agreement in any form, including, in particular, publishing it on the Internet, during or after the Term.

## 12. Indemnifications

12.1  Indemnification by Content Provider. Content Provider will defend, indemnify and hold Nintendo Entities (together with Nintendo Entities' respective officers, directors, employees and agents) harmless from any and all Claims, and any and all related losses, liabilities, damages, expenses, fees and costs, including, without limitation, attorney's fees and costs, ███████ arising out of, resulting from or in connection with (a) any breach of its obligations, representations, and warranties set forth in this Agreement; (b) infringement or alleged infringement of the Intellectual Property Rights of any third-party arising out of or in connection with the Content, the Product Information, or the Marketing Materials; (c) ███████████████████████████████████████ or other personal or property damage arising out of or in connection with any aspect of the Content or Marketing Materials (except to the extent solely based upon any Nintendo Intellectual Property Rights); (d) the design, development, advertising, promotion, or end users' use of the Content, the Product Information, or Marketing Materials, and (e) the Content Provider Online Service

12.2  Indemnification by Nintendo.  Nintendo will defend, indemnify and hold Content Provider (together with its respective officers, directors, employees and agents) harmless from any and all Claims, and any and all related losses, liabilities, damages, expenses, fees and costs, including, without limitation, attorney's fees and costs, to the extent arising out of, resulting from or in connection with (a) any breach of its obligations, representations, and warranties set forth in Section 10.2 above this Agreement;

12.3  Process of Indemnification. With respect to any Claim subject to indemnification under Sections 12.1 and 12.2 above, the indemnifying Party may select counsel and control the defense or settlement thereof; provided however, the indemnified Party will have the right to approve such counsel, such approval not to be unreasonably withheld. The indemnified Party may, at its own expense, participate in such action or proceeding with counsel of its own choice. The indemnifying Party will not, without the indemnified Party's express written consent, enter into any settlement of any Claim that would require the indemnified Party to take or refrain from taking any action or otherwise lead to a material negative impact on such indemnified Party.

12.4  For the avoidance of doubt, Nintendo may bring any action or proceeding relating to an infringement or potential infringement of the Nintendo Intellectual Property Rights without the consent of Content Provider. Content Provider may bring any action or proceeding relating to an infringement or potential

Confidential

infringement of the Content Provider Intellectual Property Rights without the consent of Nintendo. Each Party will have the right to retain all proceeds it may derive from any recovery in connection with such action or proceeding. Each Party will, at the other Party's request and expense, provide the requesting Party with reasonable cooperation and assistance in all such actions or proceedings.

**13. Changes to the Agreement**

13.1 Nintendo may change this Agreement from time to time ████████████████████████████████
████████████████████████████████ If Nintendo makes any changes to this Agreement that non substantially reduces Content Provider's rights or increases Content Provider's responsibilities, Nintendo will provide at least fourteen (14) calendar days' prior notice of the changes by sending to Content Provider's registered email address, putting the updated version of this Agreement on the NDP, and updating the "Last Updated" date. If Content Provider does not agree to the updated version of this Agreement, Content Provider will notify Nintendo in writing before the effective date of the changes and in that case each Party will have the right to terminate this Agreement upon reasonable notice to the other Party. If Content Provider continues to develop, distribute, sale, advertise, market or promote the Content after the effective date of the changes, the changes will be deemed to be accepted by Content Provider.

**14.    Term and Termination**

14.1 _Term._ This Agreement is effective on the Effective Date and continues for an initial period of three (3) years (the "Initial Term"), renewing thereafter automatically for additional one (1) year periods, unless either Party provides a written notice of non-renewal at least sixty (60) calendar days prior to the expiration of the then current period, or unless earlier terminated as provided for in Section 14.2.

14.2 _Termination._

14.2.1 ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

14.2.2 Without prejudice to any right or remedy a Party may have against the other Party, ███████████
████████████████████████████████████████████████████████████████████████

~~14.2.2~~ 14.2.3 _Termination by Nintendo._ Without prejudice to any right or remedy Nintendo may have against Content Provider, Nintendo may terminate this Agreement and/or any Schedule effective immediately by giving written notice to Content Provider, if:

(a)    Content Provider: (i) makes an assignment for the benefit of creditors; (ii) becomes insolvent; (iii) files a voluntary petition for bankruptcy; (iv) has an involuntary petition for its bankruptcy; or (v) cease to carry on business for thirty (30) consecutive calendar days;

(b)    Nintendo reasonably believes that Content Provider has developed, marketed, or sold a product or service that infringes the Nintendo Intellectual Property Rights anywhere in the world and provided that the Parties are not able to resolve such alleged infringement within thirty (30) calendar days after receiving written notice by Nintendo thereof;

(c)    Content Provider or any Content Provider's Affiliate initiates legal action against any Nintendo Entity concerning the Nintendo's Confidential Information or Nintendo Intellectual Property Rights; provided that, to the extent the legal action challenges the validity of patents, Nintendo may terminate this Agreement and/or any Schedule only if it reasonably considers that the action fundamentally undermines the relationship between Nintendo and Content Provider;

(d)    Content Provider is in breach of the Terms of Service or any other agreement between Content Provider and any Nintendo Entity relating to development or distribution of content for any past, current or future Nintendo system that is not cured within the time period for cure allowed under the applicable agreement; or

Confidential

(e) ~~in case of (i) a merger of Content Provider into another business entity or a merger of another business entity into Content Provider; (ii) the sale or transfer, or series of sales or transfers, of more than fifty percent (50%) of (A) the stock and/or share capital of Content Provider, (B) the assets of Content Provider, or (C) the ownership interest or control of Content Provider; or (iii) the sale, assignment or transfer of any of Content Provider's stock and/or share capital resulting in the acquirer, in each case either directly or indirectly, exercising a controlling influence over and/or holding the majority of voting rights in Content Provider. Content Provider is obliged to inform Nintendo without undue delay with regard to any change of control within the meaning of this Section 14.2.2(e).~~

14.2.3 (e)   ███████

14.2.4 Without prejudice to any right or remedy Nintendo may have against Content Provider, Nintendo may terminate Schedule 1 (Nintendo Shop Sale Schedule) in whole or with respect to a specific Content upon ninety (90) calendar days prior written notice.

14.3 <u>Effect of Termination.</u> Upon expiration or termination of this Agreement, (a) Content Provider will cease all use of the Nintendo Intellectual Property Rights and Nintendo's Confidential Information for any purpose, except expressly permitted under this Agreement or otherwise authorized by Nintendo in writing; and (b)



14.4 <u>Survival.</u> Sections ███████████████████████████████ and any other provisions that reasonably may be construed as surviving this Agreement will survive the expiration or termination of this Agreement.

15. **Assignment; Sublicense**

15.1 <u>No Assignment.</u> This Agreement and the subject matter of this Agreement are personal to the Parties hereto. No Assignment or attempted Assignment of this Agreement or a Party's rights or obligations hereunder will be valid or effective without the other Party's prior written consent, which consent may be withheld for any reason whatsoever in its sole discretion.

15.2 <u>Proposed Assignment.</u> Prior to any proposed Assignment of this Agreement, the requesting Party will give the other Party not less than thirty (30) calendar days prior written notice thereof, which notice will disclose the name of the proposed assignee, the proposed effective date of the Assignment and the nature and extent of the rights and obligations that the requesting Party proposes to assign. The non-requesting Party may, in its sole discretion, approve or disapprove such proposed Assignment. Unless written consent has been granted by an authorized representative of the non-requesting Party to a proposed Assignment, any attempted or purported Assignment will not be valid or effective.

15.3 <u>Assignment by Nintendo to other Nintendo Entity.</u> Notwithstanding Section 15.1 above, this Agreement may be assigned by Nintendo to any Nintendo Entity without notice or consent of Content Provider, provided that, any such Assignment will not release Nintendo from its obligations to Content Provider under this Agreement.

15.4 ███████████████████████

Confidential

████████████████████████████████████████████████████████████

~~15.4~~ 15.5 <u>Sublicense.</u> Nintendo will be entitled to sublicense any of the rights granted under this Agreement, including any Schedule, to any other Nintendo Entity and any third-party working on Nintendo Entity's behalf. Nintendo will remain liable for any act or omission of such Nintendo Entity or third-party.

16.    **Miscellaneous**

16.1 <u>Entire Agreement.</u> Except as otherwise set forth in this Agreement, this Agreement together with any applicable Schedules, Exhibits hereto, the Guidelines, and the Terms of Service constitute the entire agreement between the Parties with respect to subject matter of this Agreement. Any prior negotiations, representations, agreements and understandings are extinguished by, and completely expressed by this Agreement. Unless otherwise expressly provided herein, any amendment or modification to this Agreement must be in writing signed by ~~the~~ both Parties.

16.2 <u>Severability.</u> If any provision of this Agreement is held invalid, void, or unenforceable, wholly or in part, this will not affect the validity of the other provisions of this Agreement. Such invalid or unenforceable provision will be removed from this Agreement and replaced with a valid and enforceable provision which comes as close as possible to the Parties' intended commercial effect.

16.3 <u>No Waiver.</u> The failure of a Party to enforce any provision of this Agreement will not be construed to be a waiver of such provision or of the right of such Party to thereafter enforce such provision.

16.4 <u>Force Majeure.</u> Neither Party will be liable for any breach of this Agreement occasioned by any cause beyond the reasonable control of such Party, including governmental action, war, terrorism, riot, or civil commotion, fire, natural disaster, labor disputes, restraints affecting shipping or credit, delay of carriers, inadequate supply of suitable materials, or any other cause that could not with reasonable diligence be controlled or prevented by the Parties.

16.5 <u>Injunctive Relief.</u> ~~Content Provider~~ Each Party acknowledges that in the event of its breach of any provision of this Agreement ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████.

16.6 <u>Attorney's Fees.</u> In the event it is necessary for either Party to this Agreement to undertake legal action to enforce or defend any action arising out of or relating to this Agreement, the prevailing Party in such action will be entitled to recover from the other Party all reasonable attorneys' fees, costs and expenses relating to such legal action or any appeal therefrom.

16.7 <u>Third-Party Rights.</u> Except as expressly stipulated by this Agreement, this Agreement does not confer, and is not intended to confer, any right on any person existing now or in the future who is not a party to this Agreement.

16.8 <u>Notice.</u> Unless otherwise set forth in this Agreement, any notices relating to this Agreement will be in writing. All notices to Content Provider relating to this Agreement by Nintendo Entities will be ~~deemed~~ sufficiently given ~~by~~ when ~~sent to Content Provider at the email address or mailing address Content Provider registers on NDP~~ (a) personally served or delivered; (b) transmitted electronically, with an original sent concurrently by first class mail; or (c) deposited with a guaranteed air courier service, in each case addressed to Epic Games, Inc., 620 Crossroads Boulevard, Cary, North Carolina 27518, United States of America, Attention: General Counsel. All notices by Content Provider to Nintendo relating to this Agreement will be sufficiently given when (a) personally served or delivered; (b) transmitted electronically, with an original sent concurrently by first class mail; or (c) deposited with a guaranteed air courier service, in each case addressed to Nintendo Co., Ltd, 11-1 Hokotate-cho Kamitoba, Minami-ku Kyoto 601-8501, Japan, attention: General Manager of General Affairs Division. Notice will be deemed effective upon the earlier of actual receipt or three (3) business days after transmittal. Each Party may change its email address or mailing address by giving notice as described herein.

Confidential

16.9 <u>Governing Law / Jurisdiction.</u>

16.9.1 Americas. If Content Provider's head office is located in the Americas (as defined in Exhibit A of Schedule 1), this This Agreement and the relationship between Nintendo and Content Provider under this Agreement are governed by the laws of the State of Washington, United States of America, without regard to its conflict of laws provisions. Content Provider irrevocably consents to the jurisdiction and venue of the Federal, state, and local courts located in King County, Washington, U.S.A. in connection with any action, suit, proceeding, or claim arising under or by reason of this Agreement. Content Provider waives all defences for lack of personal jurisdiction and *forum non conveniens*. The United Nations Convention on Contracts for the International Sales of Goods will not apply to this Agreement.

16.9.2 Other countries. If Content Provider's head office is located in the countries other than the Americas, this Agreement and the relationship between Nintendo and Content Provider under this Agreement are governed by the laws of Japan without regard to its conflict of laws provisions. Content Provider irrevocably consents to the exclusive jurisdiction of the Tokyo District Court in connection with any action, suit, proceeding, or claim arising under or by reason of this Agreement. The United Nations Convention on Contracts for the International Sales of Goods will not apply to this Agreement.

16.10 <u>Language.</u> This Agreement is made in the English language and any translated version of this Agreement is provided for reference purpose only. In the event of any inconsistency between non-English version and the English version, the English version will control.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the Effective Dale.

| | |
|---|---|
| Nintendo: | Content Provider: |
| Nintendo Co., Ltd. | Epic Games, Inc. |
| By: _____ | By: _____ |
| Name:  Susumu Tanaka | Name:  Joe Babcock   |
| Title:  Senior Executive Officer, | |
| General Manager, Licensing Division | Title:  CFO _____ |
| Date:  JUN 22, 2018   | Date:  June 27, 2018   |

Confidential

**Exhibit A (Privacy and Information Security Terms)**

1.  <u>Handling of Nintendo User Data.</u> Content Provider will, at its own cost:

    1.1 Handle Nintendo User Data only as necessary to (a) perform its obligations under the Agreement, (b) to operate and make the Content available to end users of a Nintendo System, (c) ▮▮▮▮▮▮ or as otherwise agreed to in advance and in writing by Nintendo;

    1.2 Handle Nintendo User Data consistent with Nintendo's Privacy Policy applicable to the end users.

    1.3 Handle Nintendo User Data in accordance with all applicable Laws, including without limitation those which regulate or relate to the Handling of Nintendo User Data of children;

    1.4 treat all Nintendo User Data as Confidential Information;

    1.5 not disclose or otherwise make available in any form any Nintendo User Data to any third-party (except for Content Provider's or its Affiliates' employees or contractors that are subject to a written agreement imposing obligations that are no less protective than those herein) without first, except to the extent prohibited by applicable Laws, (i) notifying Nintendo Entities of the anticipated disclosure (so as to provide Nintendo Entities the opportunity to oppose the disclosure and obtain a protective order or seek other relief); (ii) obtaining Nintendo Entities' prior written consent to the disclosure; and (iii) imposing contractual obligations on the third-party recipient that are at least equivalent to those obligations imposed on Content Provider under this Agreement. Nintendo Entities will retain all rights not expressly granted in such prior written consent and neither this Agreement nor any such prior written consent will constitute a transfer of any title, ownership or interest in Nintendo User Data to Content Provider. For the avoidance of doubt, **Content Provider** will be responsible for any unauthorized use or disclosure of any Nintendo User Data that it provides to its or its Affiliates' contractors.

    1.6 at the direction of a Nintendo ~~Entities, cooperate~~ Entity, ▮▮▮▮▮▮ ▮▮▮▮ ssist Nintendo Entities in responding to any Nintendo Entities' user or other third-party's request to exercise their rights of access, rectification, erasure, restriction of Handling or data portability;

    1.7 ensure the reliability of all personnel who Handle Nintendo User Data, including without limitation, assigning ~~specific and~~ necessity-based access privileges to such personnel, ensuring that such personnel have undergone training in data protection and privacy ▮▮▮▮▮▮ and ensuring that such personnel are bound by obligations of confidentiality at least as protective as those imposed on Content Provider under this Agreement; and

    1.8 not transfer or cause to be transferred any Nintendo User Data from one jurisdiction to another jurisdiction unless ▮▮▮▮▮▮

2.  <u>Security Safeguards.</u> In accordance with a comprehensive ~~written~~ information security policy ("Content Provider's Information Security Policy"), Content Provider will establish and maintain administrative, physical, technical and organizational safeguards to ensure the security and confidentiality of Nintendo User Data and to prevent unauthorized or unlawful Handling of Nintendo User Data and loss, destruction of or damage to Nintendo User Data.

    2.1 Content Provider's Information Security Policy will meet ▮▮▮▮▮▮ and require, at a minimum, that Content Provider: (i) continuously assess risks to the security of Nintendo User Data by (x) assessing the likelihood and potential damage of such risks, taking into account the sensitivity of the Nintendo User Data, (y) identifying internal and external threats that could result in a Breach (as defined below), and (ii) take appropriate steps to protect against such risks.

    2.2 Content Provider will comply with Content Provider's Information Security Policy and represents and warrants that Content Provider's Information Security Policy is and will be in compliance with all applicable Laws.

Confidential

3.      Security Breach. In the event Content Provider has ███████████████
███████████████████████████████ f Nintendo User Data not authorized under this Agreement (each, a
"Breach"), Content Provider will ~~immediately~~ without delay (and ████████████████), at its cost:

3.1 notify Nintendo Entities of the Breach and, as applicable, any third-party legal processes relating to the
Breach;

3.2 ██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████

3.3 ██████████████████████████████████████████████████████████.

4.      The notification required under Subsection 3.1 above must include, ████████████████████
████████████████████████████████

(a)     a description of the Breach including the number of Nintendo Entities' users concerned, a
summary of the incident that caused the Breach, the date and time of the relevant incident;
the categories and number of data records concerned and the nature and content of the
Nintendo User Data affected;

(b)     a description of the circumstances that led to the Breach (e.g. loss, theft, copying);

(c)     a description of the measures proposed or taken by Content Provider to address the Breach;
and

(d)     any other information required by applicable Laws or necessary to allow Nintendo Entities'
users who may be affected by the Breach to understand the significance of the Breach and to
take steps to reduce their risk of harm.

IN THE EVENT OF A BREACH, NINTENDO ENTITIES HAVE THE RIGHT TO CONTROL THE BREACH
NOTIFICATION ████████████████████████████████████████, UNLESS
APPLICABLE LAWS DICTATE OTHERWISE, AND NOTHING IN THIS AGREEMENT WILL BE
CONSTRUED TO LIMIT OR OTHERWISE PREVENT NINTENDO ENTITIES FROM INVESTIGATING,
REMEDYING, MAKING NOTIFICATIONS TO PUBLIC AUTHORITIES (INCLUDING DATA PROTECTION
AUTHORITIES) OR TAKING ANY OTHER ACTIONS IN RELATION TO THE BREACH. ████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████.

5.      Content Provider's Representation and Warranties. Content Provider represents and warrants to
Nintendo Entities that:

5.1 Content Provider is, and will remain, in compliance with the data security rules of any applicable payment
network or organization, including without limitation ████████████████

5.2 Content Provider will encrypt all Nintendo User Data in electronic form, both at rest and during
transmission, with a minimum of 128-bit SSL encryption or in accordance with industry encryption
standards (whichever is more protective). If the Laws in the Territory provide for a stricter standard,
Content Provider will apply such standard as requested by the Laws.

Confidential

5.3 Content Provider shall not sell any Nintendo User Data for monetary or other valuable consideration.

**Exhibit B (Anti-Social Forces)**

This Exhibit B will be applied to Content Provider if it is located in Japan.

1.     Content Provider represents and warrants to Nintendo Entities that:

(i)     it is not and will not be an Anti-Social Force (defined below);

(ii)     any of its employees, directors and officers are not and will not be an Anti-Social Force;

(iii)     it will not give monetary benefits or any other favors to an Anti-Social Force; and

(iv)     it does not and will not, directly or indirectly; (a) make violent demands, make unreasonable demands beyond the legal liability of Nintendo Entities; (b) use threat or violence in connection with transactions; (c) damage the credit or interfere with the business of Nintendo Entities by spreading false rumors, using fraud or force; or (d) any other acts equivalent to any of the foregoing.

"**Anti-Social Force**" means an organized crime group ("Boryokudan"), a member of a Boryokudan ("Boryokudanin"), a sub-member of a Boryokudan ("Boryokudan jyunkoseiin"), a corporation related to a Boryokudan ("Boryokudan kanren gaisha"), a racketeer attempting to extort money from a company by threatening to cause trouble at the general stockholders' meeting ("Soukaiya") or acting as if advocating legitimate social causes ("Shakai undou nado hyoubou goro"), or a special intelligence organized crime group ("Tokusyu chinou boryoku syudan"), or other group or person equivalent to any of the foregoing.

2. If Content Provider breaches the representations and warranties above, Nintendo will be entitled to immediately terminate the Agreement without notice and demand Content Provider to indemnify Nintendo against all damages. Nintendo will not be liable for any damages, losses or expenses incurred by Content Provider in connection with the termination of this Agreement by Nintendo under this Section.

**Schedule 1:**
**Nintendo Shop Sale Schedule**
**to**
**Nintendo Switch Content License and Distribution Agreement**

If Content Provider submits Content for Distribution in the Nintendo Shop, the following terms apply;

1.  **Distribution of the Content**

    1.1 Nintendo as Commission Agent. Content Provider hereby appoints Nintendo as Content Provider's sale commission agent ~~Furthermore,~~ and Nintendo hereby appoints Nintendo Entities as sub-commission agents, to perform Sale and Distribution in Nintendo Shop to end users located in countries listed on Exhibit A to this Schedule (the "**Sub-Commission Agent**"). Each Nintendo Entity will operate as Content Provider's sales commission agent or Sub-Commission Agent (as applicable) for all Sales in the Nintendo Shop in their respective countries as listed in Exhibit A. Nintendo Entities will Sell the Content in their own name, but for the account of Content Provider. Content Provider agrees, and Nintendo will ensure, that any and all rights and obligations of Nintendo acting as Content Provider's sales commission agent under the Agreement and this Schedule will apply respectively to any Sub-Commission Agent, but without Sub-Commission Agent becoming a party to the Agreement and/or this Schedule. The respective sales commission agent or Sub-Commission Agent (as applicable) will be the contracting party with the end user in relation to the Sale of the Content in the Nintendo Shop. Only the respective sales commission agent or Sub-Commission Agent (as applicable) will have a payment claim for such Sales against the end user. Content Provider acknowledges that (i) Nintendo may update or modify the Exhibit A from time to time by posting notice via NDP or sending written or email notice to Content Provider, and (ii) Distribution of Content may not be possible throughout all parts of the Territory and that Nintendo Entities assume no liability in this regard.

    1.2 Pricing. Content Provider alone will set the price at which the respective Nintendo Entity will Sell the Content in the Nintendo Shop. Content Provider may change the price from time to time in its sole discretion. Content Provider will follow Nintendo's standard process for price changes which has been communicated to Content Provider by Nintendo, and changes will be processed by Nintendo in accordance with such standard process as further described in the Guidelines and/or in memorandums provided by Nintendo to Content Provider.

    1.3 Content Registration. Content Provider will register via NDP or other means designated by Nintendo, all Product Information deemed reasonably necessary by Nintendo Entities to market, offer and Sell the Content in accordance with this Schedule.

    1.4 Content Removal. Nintendo Entities may at any time without notice to Content Provider, remove the Content from the Nintendo Shop for all or a part of the Territory if Nintendo Entities reasonably deem such removal necessary, including, but not limited to, when Nintendo Entities reasonably believe that the Content (i) violates or infringes the Intellectual Property Rights of any third-party, (ii) violates any Laws, the Agreement or the Guidelines, or (iii) contains bugs, errors, or security risks that materially affect the Content, Nintendo System or Nintendo Network.

    1.5 Termination or Cancellation of Sale. Nintendo Entities may terminate or cancel any Sale (including the termination of any Registered license for the Content) and make a Refund in whole or in part, if Nintendo Entities reasonably deem such termination, cancellation, or Refund desirable.

2.  **License Grant by Content Provider**

    2.1 Content Provider grants to Nintendo Entities during the Distribution Period and throughout the Territory, a non-exclusive, paid-up, royalty-free license in and to the Content, and all of Content Provider~~'s~~ Intellectual Property Rights associated therewith, solely as necessary and sufficient to permit Nintendo Entities (and all third parties working on their behalf) to (a) host the Content on one or more servers owned, controlled, or authorized by Nintendo Entities; (b) offer the Content for Sale via the Nintendo Network for end users' use; (c) Register a license of the Content; (d) advertise, market, and promote the Content; and (e) Sell and Distribute the Content.

Notwithstanding the above, Content Provider acknowledges and agrees that:

(i) a Nintendo Entity will not be in breach of the Agreement and/or this Schedule if it Distributes, Sells, advertises, markets, or promotes the Content to any end user or a third-party representing themselves to be within the Territory (e.g., by designating a false country setting on the account), even if they are not in fact within the Territory;

(ii) Nintendo Entities do not restrict the territory in which the Content is used by end users after the Registration of a license for the Content;

(iii) any limitations concerning the Distribution Period do not affect or restrict the use of the Content by end users after the Sale has been completed; and

(iv) the Content may be hosted on servers located within and/or outside the Territory and, for re-download of the Content under Section 5 below, Nintendo Entities may continue to host the Content during and after the Distribution Period.

3. **Commission; Payments**

3.1 <u>Commission.</u> Nintendo, as Content Provider's sale commission agent, will receive from Content Provider the Commission for each Sale in the Territory.

3.2 <u>Reports.</u> Each calendar month, Nintendo will provide Content Provider with a report listing all Sales of Content in the Nintendo Shop and the Final Payable Amount in the preceding calendar month. Content Provider will not alter the report received by Nintendo in any way.

3.3 <u>Payment.</u> Nintendo will pay the Final Payable Amount in the preceding calendar month to Content Provider within thirty (30) calendar days of each month; provided however, if the Final Payable Amount to Content Provider is less than the Minimum Payment Amount, Nintendo may in its sole discretion withhold making such payment until (i) payments due under this Section exceed the Minimum Payment Amount, or (ii) this Schedule expires or terminates; whichever is earlier. Notwithstanding the above, if the Final Payable Amount shows a positive balance in favor of Nintendo, Content Provider will pay to Nintendo the respective amount within thirty (30) calendar days after its receipt of the monthly report.

3.4 <u>Payment Currency.</u> All payments by Nintendo to Content Provider under this Schedule will be made in the Payment Currency set forth in the Payment Currency Schedule as updated from time to time by Nintendo by posting notice via NDP or sending written or email notice to Content Provider. For Sales in currencies other than the Payment Currency, the foreign currency price and the applicable Transaction Taxes for Sales will be converted to the Payment Currency based upon the monthly average exchange rate posted by OANDA.com for the month such Sale occurs. For example, for a Sale transaction in January, Nintendo would use the OANDA's monthly average rate for January to calculate the currency conversion.

3.5 <u>Transaction Taxes.</u> In the event the Sale is subject to the Transaction Taxes, responsibility for remittance of the Transaction Taxes will be determined in accordance with <u>Exhibit C</u> to this Schedule. Exhibit C is subject to change in compliance with the applicable Laws including local tax laws. Content Provider will promptly and fully indemnify, defend and hold Nintendo Entities harmless against any and all claims by any tax authority in connection with the Transaction Taxes Content Provider is responsible for remitting.

3.6 <u>Withholding Taxes.</u> Content Provider is solely responsible for paying all taxes that are levied on Content Provider in compliance with applicable Laws. In the event that any payment by Nintendo to Content Provider or by Content Provider to Nintendo is subject to any withholding or other similar tax levied by any applicable jurisdiction, the payer will withhold such tax and pay the payee the amount of money after deducting such withholdings. The payer will not be obliged to make gross-up payments to the payee. If reduction of withholding taxes is available in accordance with an applicable treaty, both parties will cooperate in mitigating any withholding tax burden. In the event any withholding tax is levied on the payment from the payer to the payee, payer will provide payee copies of relevant tax documents evidencing withholding of such taxes.

3.7 <u>Payment Withhold.</u> Without prejudice to any remedies of Nintendo, Nintendo may withhold payment to Content Provider ████████████████████████████████████████████████████

████████████████████████████████████ the bank account information of Content Provider is not provided or is incorrect. Such withholding may continue until such time as the respective problem has been resolved. Nintendo will have no obligation to pay any interest on any amount withheld. In addition, Content Provider will be responsible for any fees (including bank transfer fees) in connection with the payment of any amount withheld.

3.8 ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

4. **Subscription Service and Consumable Item** If Content Provider provides the Content Provider Online Service in accordance with Section 4 (Online Service) of the Agreement, Content Provider may offer a service in which end users pay a fee in exchange for obtaining (i) the right to access, use, and/or play all or a part of the Content for a certain period (i.e. subscription service) and/or (ii) consumable item which is limited to a specific number of uses or otherwise intended to be used up or consumed during use or play of the Content. The terms and conditions of the Agreement and this Schedule with respect to the Content will apply to the Distribution and Sale of the ticket for such subscription service and/or consumable item via the Nintendo Network.

5. **Re-download** Content Provider acknowledges that end users and Nintendo Entities (solely for the purpose of customer support for such end users) will be able to re-download the Content, which they have downloaded, to their Nintendo System free of charge at any time for an unlimited period of time. Such re-download will not be subject to any payment to Content Provider.

6. **Transfer of Content and Device Activation** Content Provider acknowledges that the Content may be transferred from one Nintendo System to another Nintendo System if the account of an end user in the Nintendo Network is transferred from such one Nintendo System to such another Nintendo System for whatever reason and such transfer will not be subject to any additional payment to Content Provider. Content Provider also acknowledges that the Content may be accessible by an end user in the Nintendo Network on multiple Nintendo Systems at different times or simultaneously and such access will not be subject to any additional payment to Content Provider

7. **Survival** In addition to those provisions specified elsewhere in the Agreement, Sections ████████████ ████████████████████████████ of this Schedule will survive any expiration or termination of this Schedule.

8. **Definitions** Capitalized terms not defined below in this Section 8 of this Schedule have the meanings set forth Section 1 of the Agreement.

   8.1 "**Commission**" means the percentage set forth in <u>Exhibit B.</u>

   8.2 "**Distribute**," "**Distributed**," or "**Distribution**" means a delivery of a single copy of the Content and the Registration of a license for the Content to the account of an end user by a Nintendo Entity, in each case for the Nintendo Systems.

   8.3 "**Final Payable Amount**" means the total amount of payment a Nintendo Entity actually received for Sales from end users during the applicable month, reduced by (where applicable): (i) the Transaction Taxes, (ii) the Commission, (iii) the Refunds, (iv) withholding taxes, and (v) Third-Party Content Fees paid by Nintendo Entities to any third party.

   8.4 "**Minimum Payment Amount**" means the threshold amount of payment set forth in the Payment Currency Schedule.

   8.5 "**Payment Currency**" means the currencies used for the payment by Nintendo to Content Provider. The list of the Payment Currency is specified in the Payment Currency Schedule.

8.6 "**Payment Currency Schedule**" means the current version or any future version of the list of the Payment Currency and Minimum Payment Amount.

8.7 "**Refund**" means (i) any payment by a Nintendo Entity to a third-party, representing the return of the purchase price received by a Nintendo Entity from a third-party in .relation to a Sale, where such Sale has been terminated or cancelled; or (ii) any payment by a Nintendo Entity to the credit card issuing institution, representing the return of the purchase price received by the Nintendo Entity from an end user in relation to a Sale, where such end user requested a charge back at the end user's credit card issuing institution.

8.8 "**Sale**" means the Registration of a license for the Content in exchange for the payment of the purchase price by an end user to Nintendo Entity via the Nintendo Shop.

8.9 "**Sell**" or "**Sold**" means the completion of a Sale. The download of the Content to a Nintendo System and the Registration of a license for the Content via the redemption of an Activation Ticket by end users are not considered a Sale.

8.98.10 "**Territory**" means NCL Region, NOA Region, NOE Region, NAL Region, NOK Region and/or NHL Region (each as defined in Exhibit A) as selected by Content Provider for the distribution of the specific Content.

8.108.11 "**Transaction Taxes**" means in relation to a Sale, all applicable value-added taxes, consumption taxes, sales taxes, or similar transaction-based taxes.

**Exhibit A to Schedule 1: Appointment as Commission Agent**

| Nintendo Entity that has been appointed as sale commission agent | Territory | |
|---|---|---|
| Nintendo Co., Ltd. | NCL Region | Japan and other countries where Nintendo Entities offers the Nintendo Shop services except for the Sub-Commission Agent's Territory listed in the below table. |

| Nintendo Entity that has been appointed as Sub-Commission Agent | Territory | |
|---|---|---|
| Nintendo of America Inc. | NOA Region | Americas where Nintendo Entities offer the Nintendo Shop services (except for Canada) |
| Nintendo of Canada Ltd. (as appointed by Nintendo of America Inc.) | | Canada |
| Nintendo of Europe GmbH | NOE Region | Europe and Africa where Nintendo Entities offer the Nintendo Shop services |
| Nintendo Australia Pty. Limited | NAL Region | Australia and New Zealand |
| Nintendo of Korea Co., Ltd. | NOK Region | Korea |
| Nintendo (Hong Kong) Limited | NHL Region | Hong Kong and Taiwan |

For the Distribution of Content to end users located in countries in Europe or Africa, Nintendo is the Content Provider's sale commission agent ("*Kommissionär*" in the sense of sec. 383 para. 1 German Commercial Act *["Handelsgesetzbuch"]*) for such Content and the agent and Sub-Commission Agent will apply reasonable efforts of a prudent businessperson to support the Distribution of the Content in accordance and subject to the Agreement and this Schedule; in particular, with regard to the Distribution of Content to end users located in countries in Europe or Africa, the agent and Sub-Commission Agent will apply the care of a prudent businessperson when removing Content in accordance with Section 1.4 of this Schedule and when terminating or cancelling any Sale in accordance with Section 1.5 of this Schedule.

"**Americas**" means following countries: Anguilla, Antigua and Barbuda, Argentina, Aruba, Bahamas, Barbados, Belize, Bolivia, Brazil, Canada, British Virgin Islands, Cayman Islands, Chile, Colombia, Costa Rica, Curacao, Dominican Republic, Grenada, Grenadines, Ecuador, El Salvador, Falkland Islands, French Guiana, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Netherlands Antilles, Panama, Paraguay, Peru, St. Kitts and Nevis, St. Lucia, St. Vincent, Suriname, Trinidad and Tobago, Turks and Caicos, Uruguay, United States and its Territories and Possessions, and Venezuela.

"**Europe**" means the following countries: Republic of Albania, Principality of Andorra, Republic of Armenia, Republic of Austria, Republic of Azerbaijan, Republic of Belarus, Kingdom of Belgium, Bosnia and Herzegovina, Republic of Bulgaria, Republic of Croatia, Republic of Cyprus, Czech Republic, Kingdom of Denmark, Republic of Estonia, Republic of Finland, French Republic, Georgia, Federal Republic of Germany, Hellenic Republic, Hungary, Republic of Iceland, State of Israel, Ireland, Italian Republic, Republic of Kazakhstan, Republic of Latvia, Principality of Liechtenstein, Republic of Lithuania, Grand Duchy of Luxembourg, Republic of Macedonia, Republic of Malta, Republic of Moldova, Principality of Monaco, Montenegro, Kingdom of the Netherlands, Kingdom of Norway, Republic of Poland, Portuguese Republic, Romania, Russian Federation, Republic of San Marino, Republic of Serbia, Slovak Republic,

Republic of Slovenia, Kingdom of Spain, Kingdom of Sweden, Swiss Confederation, Republic of Turkey, Ukraine, United Kingdom of Great Britain and Northern Ireland.

"**Africa**" means the following countries: Republic of Chad, Republic of Djibouti, State of Eritrea, Republic of Mali, Islamic Republic of Mauretania, Republic of Niger, Federal Republic of Somalia, Republic of South Africa and Republic of Sudan.


**Exhibit B to Schedule 1: Commission**

Thirty percent (30%) of the amount Nintendo Entity actually received for each Sale from end users, net of any Transaction Taxes.

In addition, the Commission paid to Nintendo by Content Provider located in Japan will be subject to Japanese Consumption Tax.


**Exhibit C to Schedule 1: Transaction Taxes**


**1.**     Content Provider will be solely responsible for remitting the Transaction Taxes to the appropriate tax authorities as required by the applicable local Laws for Sales to end users located in the following countries:


Japan


2.     The respective Nintendo Entity will remit the Transaction Taxes to the appropriate tax authorities for Sales to end users located in the following countries:


Countries in which Nintendo Entities offer the Nintendo Shop services other than the countries listed in Section 1 of this Exhibit C above.