VOLUME 7

Pages 1584 - 1826

UNDER SEAL PAGES 1729 - 1741

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,                )
                                 )
        Plaintiff,               )    NO. C-20-5640 YGR
                                 )
   vs.                           )    Tuesday, May 11, 2021
                                 )
APPLE, INC.,                     )    Oakland, California
                                 )
        Defendant.               )    BENCH TRIAL
_____  )
APPLE, INC.,                     )
                                 )
        Counterclaimant,         )
   vs.                           )
                                 )
EPIC GAMES, Inc.,                )
                                 )
        Counter-Defendant.       )
_____  )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                 **BY:  KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**

                 (Appearances continued.)

Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
                        Pamela Hebel, CSR, RMR, FCRR
         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    For Plaintiff:            CRAVATH, SWAINE & MOORE, LLP
                                825 Eighth Avenue
 2                              New York, New York 10019
                          BY:  LAUREN A. MOSKOWITZ, ESQUIRE
 3                             JUSTIN C. CLARKE, ESQUIRE
                               W. WES EARNHARDT, ESQUIRE
 4                             BRENDAN BLAKE, ESQUIRE
                               JIN NIU, ESQUIRE
 5

 6    For Defendant:            GIBSON, DUNN & CRUTCHER
                                333 South Grand Avenue
 7                              Los Angeles, California 90071
                          BY:  RICHARD J. DOREN, ESQUIRE
 8                             DAN SWANSON, ESQUIRE
                               CYNTHIA RICHMAN, ESQUIRE
 9                             RACHEL BRASS, ESQUIRE
                               ARPINE LAWYER, ESQUIRE
10

11                              GIBSON, DUNN & CRUTCHER, LLP
                                2001 Ross Avenue, Suite 1100
12                              Dallas, Texas 75201
                          BY:  VERONICA S. MOYE, ESQUIRE
13
                                PAUL WEISS RIFKIND
14                              WHARTON & GARRISON LLP
                                2001 K STREET, NW
15                              Washington, DC 20006
                          BY:  KAREN DUNN, ESQUIRE
16                             JESSICA E. PHILLIPS, ESQUIRE

17

18    For Defendant:            PAUL WEISS RIFKIND
                                WHARTON & GARRISON LLP
19                              943 Steiner Street
                                San Francisco, California 94117
20                        BY:  ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| | | |
|---|---|---|
| **Plaintiff's Witnesses:** | **Page** | **VOL.** |
| **Evans, David** | | |
| Direct Examination by Mr. Bornstein (resumed) | 1595 | 7 |
| Cross-Examination by Mr. Swanson | 1610 | 7 |
| Cross-Examination by Mr. Swanson (sealed) | 1729 | 7 |
| Redirect Examination by Mr. Bornstein (sealed) | 1737 | 7 |
| Recross-Examination by Mr. Swanson (sealed) | 1738 | 7 |
| Further Redirect Exam by Mr. Bornstein (sealed) | 1741 | 7 |
| Examination by the Court | 1742 | 7 |
| Further Redirect Examination by Mr. Bornstein | 1744 | 7 |
| Further Recross Examination by Mr. Swanson | 1744 | 7 |
| Further Redirect Examination by Mr. Bornstein | 1745 | 7 |
| **Athey, Susan** | | |
| Direct Examination by Mr. Even | 1749 | 7 |
| Cross-Examination by Ms. Dunn | 1793 | 7 |

| | | |
|---|---|---|
| **Plaintiff's Exhibits:** | **EVD.** | **VOL.** |

| | | |
|---|---|---|
| **Defendant's Exhibits:** | EVD. | VOL. |
| 5549 | 1624 | 7 |
| 5550 | 1626 | 7 |
| 5551 | 1676 | 7 |

1    TUESDAY, MAY 11, 2021                                    7:59 a.m.

2                          P R O C E E D I N G S

3                THE CLERK:    Calling CV 20-5640, Epic Games, Inc., vs.

7:59:22AM   Apple, Inc.

7:59:30AM       Counsel, please state your appearances.

7:59:33AM               MS. FORREST:    Good morning, Your Honor.  Katherine

7:59:36AM   Forrest for Epic.

7:59:39AM               THE CLERK:    Hold on.  I will turn on the mics on the

7:59:42AM   table.  All the mics are on.

7:59:44AM               THE COURT:    All right.  Good morning, Ms. Forrest.

7:59:47AM               MR. BORNSTEIN:    Good morning, Your Honor.  Gary

7:59:48AM   Bornstein for Epic.

7:59:51AM               THE COURT:    Good morning.

7:59:53AM               MS. KLOSS:    Good morning, Your Honor.  Lauren Kloss

7:59:55AM   for Epic Games.

7:59:56AM               THE COURT:    Ms. Kloss, next time into the mic.

7:59:59AM               MS. KLOSS:    Will do, Your Honor.

8:00:00AM               THE COURT:    That was Lauren Kloss.  And?

8:00:05AM               MS. GREENFIELD:    Good morning, Your Honor.  Jill

8:00:06AM   Greenfield for Epic Games.

8:00:08AM               THE COURT:    Say that again.

8:00:09AM               MS. GREENFIELD:    Good morning, Your Honor.  Jill

8:00:12AM   Greenfield for Epic Games.

8:00:14AM               THE COURT:    Okay.  So this is your first time

8:00:17AM   appearing here; right?

| | |
|---|---|
| 12:33:15PM | Who will be the next witness up, Ms. Forrest? |
| 12:33:21PM | **MS. FORREST:**  Your Honor, our next witness will be |
| 12:33:23PM | Dr. Susan Athey. |
| 12:33:27PM | **THE COURT:**  Okay.  We will do Dr. Athey after our |
| 12:33:30PM | second break, so we'll stand in recess until 1:15.  Thank you. |
| 1:15:01PM | |
| 1:15:01PM | (Recess taken at 12:33 p.m.; resumed at 1:15 p.m.) |
| 1:15:35PM | **THE COURT:**  Okay.  We are back on the record.  The |
| 1:15:39PM | record will reflect the parties are present. |
| 1:15:40PM | Counsel, your next witness. |
| 1:15:43PM | **MR. EVEN:**  Thank you, Your Honor.  Yonatan Even for |
| 1:15:46PM | Epic Games.  Epic Games at this time calls Professor Susan |
| 1:15:49PM | Athey to the stand. |
| 1:15:54PM | **THE COURT:**  All right. |
| 1:15:54PM | **MR. EVEN:**  Thank you very much. |
| 1:16:07PM | **THE CLERK:**  I will have you stand up and I'll swear |
| 1:16:09PM | you in. |
| 1:16:13PM | (**SUSAN ATHEY**, called as a witness for the Plaintiff, |
| 1:16:13PM | having been duly sworn, testified as follows:) |
| 1:16:21PM | **THE WITNESS:**  I do. |
| 1:16:22PM | **THE CLERK:**  All right.  Please be seated. |
| 1:16:23PM | And then if you will get your mask on.  If you will adjust |
| 1:16:30PM | the mic so that it's -- yeah, kind of goes underneath your |
| 1:16:35PM | shield there. |
| 1:16:36PM | All right.  And then please state your full name and spell |

ATHEY - DIRECT / EVEN

```
1:16:39PM    your last name.  And let me turn on your microphone.

1:16:45PM            THE WITNESS:  Susan Carleton Athey.  It's A-T-H-E-Y.

1:16:54PM            THE COURT:  Good afternoon.

1:16:55PM            THE WITNESS:  Good afternoon.

1:16:55PM            THE COURT:  You may proceed.

1:16:58PM            MR. EVEN:  Thank you, Your Honor.

1:16:59PM                      DIRECT EXAMINATION

1:16:59PM    BY MR. EVEN:

1:17:00PM    Q.  Good afternoon, Professor Athey.

1:17:01PM            Before we get into your direct examination, you provided a

1:17:07PM    written -- a written portion of your testimony in this case?

1:17:12PM    A.  I have.

1:17:13PM            MR. EVEN:  Your Honor, may I approach?

1:17:15PM            THE COURT:  You may.

1:17:15PM            MR. EVEN:  Thank you, Your Honor.

1:17:15PM    BY MR. EVEN:

1:17:28PM    Q.  Professor Athey, if you turn to the first tab in the

1:17:32PM    binder I just handed you.  And behind it is -- if you can

1:17:36PM    confirm -- is what seems like a true and correct copy of your

1:17:39PM    written direct testimony?

1:17:41PM    A.  It is.

1:17:43PM            MR. EVEN:  Your Honor, at this time, we ask to move

1:17:46PM    Professor Athey's direct testimony into evidence.

1:17:49PM            THE COURT:  All right.  The -- any objections or

1:17:51PM    anything -- everything has been resolved; is that correct?
```

ATHEY - DIRECT / EVEN

1:17:55PM          **MR. EVEN:**  I believe so, Your Honor.

1:17:57PM          **MS. DUNN:**  Your Honor, same objection as --

1:18:01PM          **THE CLERK:**  Let me turn on the mic.

1:18:04PM          **MS. DUNN:**  Your Honor, same objection as yesterday

1:18:06PM   with Dr. Evans, just to whether there will ultimately be a

1:18:12PM   factual basis for the opinions.  Otherwise, all other issues

1:18:15PM   have been resolved.

1:18:17PM          **THE COURT:**  Okay.  Well, then, as with the others,

1:18:21PM   I'll admit it once we have all these issues resolved.

1:18:25PM   Otherwise, it does not get admitted yet.

1:18:27PM      Proceed.

1:18:31PM          **MR. EVEN:**  Thank you, Your Honor.

1:18:31PM   **BY MR. EVEN:**

1:18:33PM   **Q.**  Professor Athey, what is your occupation?

1:18:35PM   **A.**  I'm the economics of technology professor at the Stanford

1:18:38PM   Graduate School of Business.

1:18:40PM   **Q.**  Thank you.

1:18:41PM      And have you prepared a demonstrative slide that

1:18:44PM   summarizes your background?

1:18:45PM   **A.**  I have.

1:18:47PM          **MR. EVEN:**  If I can bring up that slide.  Thank you.

1:18:49PM   **BY MR. EVEN:**

1:18:52PM   **Q.**  Can you please describe your educational background.

1:18:55PM   **A.**  Yes.  I have a bachelor's degree in economics, computer

1:18:59PM   science, and mathematics from Duke University and a Ph.D. in

1:19:04PM   economics from Stanford.

1:19:06PM   **Q.**   And when did you receive your Ph.D. from Stanford?

1:19:09PM   **A.**   In 1995.

1:19:12PM   **Q.**   How long have you been a professor?

1:19:14PM   **A.**   I've been a professor since then at Harvard, MIT, and

1:19:20PM   Stanford.

1:19:21PM   **Q.**   And how long have you now been at Stanford?

1:19:24PM   **A.**   Most recently, since 2013.

1:19:28PM   **Q.**   Have you won any awards, Professor Athey?

1:19:31PM   **A.**   I have.

1:19:32PM   **Q.**   Which awards have you won?

1:19:35PM   **A.**   I'm an elected member of the National Academy of Science,

1:19:38PM   and I've received the John Bates Clark Medal from the American

1:19:41PM   Economic Association.

1:19:44PM   **Q.**   And what is the John Bates award?

1:19:47PM   **A.**   It's for the economist -- American economist under the age

1:19:50PM   of 40 who has made the most significant contribution to

1:19:53PM   thought and knowledge.

1:19:56PM   **Q.**   Do you have a particular area of focus for your research

1:20:02PM   as a professor?

1:20:03PM   **A.**   Yes.   Generally, industrial economics, the economics of

1:20:06PM   digitization, the economics of platforms and marketplace

1:20:11PM   design, and the intersection of machine learning and

1:20:15PM   econometrics.

1:20:18PM   **Q.**   Have you taught any courses related to the economics of

ATHEY - DIRECT / EVEN

1:20:21PM    platforms?

1:20:22PM    **A.**   Yes.  I've taught a variety of courses to master students

1:20:26PM    and Ph.Ds and MBAs, including the economics of digitization,

1:20:34PM    topics in digital business, marketplaces for goods and

1:20:39PM    services, the economics of digital platform markets.

1:20:44PM        And, broadly, these classes study the forces that --

1:20:49PM    sources of profits for firms, the tactics that incumbents use,

1:20:56PM    and strategies that entrants might use to come into these

1:21:00PM    markets.

1:21:01PM    **Q.**   Thank you.

1:21:03PM        Do you do any work outside of academia?

1:21:06PM    **A.**   I do.

1:21:07PM    **Q.**   And can you please summarize for the Court your

1:21:10PM    nonacademic work experience.

1:21:14PM    **A.**   Yes.  I was consulting chief economist for Microsoft for

1:21:18PM    several years.

1:21:19PM        After that, I've served on boards of directors for a

1:21:22PM    variety of companies, including Expedia, which is a platform

1:21:28PM    for travel services; Rover, which is a platform for

1:21:33PM    pet-related services, such as dog sitting; Turo, which is a

1:21:38PM    platform for peer-to-peer car sharing; and some others.

1:21:43PM        I also advise a couple of venture capital firms on their

1:21:48PM    investments in technology-related businesses.

1:21:53PM    **Q.**   Thank you.

1:21:53PM        I see on the slide at the very bottom, it says "California

ATHEY - DIRECT / EVEN

1:21:57PM  Governor's Council of Economic Advisors.

1:22:01PM        What is that?

1:22:02PM  **A.**   That's a committee of academic economists who advise the

1:22:06PM  governor of California on policy issues.

1:22:10PM  **Q.**   Have you ever been retained as an economist by any

1:22:13PM  government agencies?

1:22:14PM  **A.**   Yes, I have, by the Department of Justice and the Federal

1:22:17PM  Trade Commission.

1:22:20PM  **Q.**   And have you ever presented to antitrust regulators in the

1:22:24PM  U.S. or outside of the U.S.?

1:22:26PM  **A.**   Yes, in many jurisdictions, including the United States,

1:22:29PM  Europe, Canada, and others.

1:22:33PM  **Q.**   Thank you.

1:22:34PM        **MR. EVEN:**   Your Honor, at this time, Epic Games

1:22:37PM  tenders Professor Susan Athey as an expert in industrial

1:22:37PM  organization, platform economics, and the economics of

1:22:43PM  technology.

1:22:45PM        **THE COURT:**   Any objection?

1:22:45PM        **MS. DUNN:**   No objection.

1:22:46PM        **THE COURT:**   She's admitted as such.

1:22:48PM        **MR. EVEN:**   Thank you, Your Honor.

1:22:49PM  BY MR. EVEN:

1:22:51PM  **Q.**   Professor Athey, what have you been asked to do in this

1:22:54PM  case?

1:22:55PM        **THE WITNESS:**   Can you go to the next slide, please.

ATHEY - DIRECT / EVEN

1:22:57PM          So my assignment was to analyze whether Apple's conduct

1:23:02PM    affects the competition faced by Apple's smartphone operating

1:23:06PM    system platform and, further, to consider how middleware

1:23:12PM    affects competition between mobile platforms and if Apple's

1:23:15PM    conduct impedes the development of middleware.

1:23:19PM    **BY MR. EVEN:**

1:23:19PM    **Q.**  And did you reach any conclusions?

1:23:22PM    **A.**  I did.  So at a high level, I have three main opinions.

1:23:28PM          The first is that --

1:23:30PM          **THE COURT:**  And to the extent you can, we tend not to

1:23:34PM    read.

1:23:34PM          **THE WITNESS:**  Yes.

1:23:36PM          **THE COURT:**  Try to just testify.

1:23:37PM          **THE WITNESS:**  Thank you.

1:23:40PM          **THE COURT:**  Go ahead.

1:23:41PM          **THE WITNESS:**  At a high level, switching and mixing

1:23:43PM    and matching costs are locking consumers in to the iOS

1:23:48PM    ecosystem.

1:23:50PM          Second, middleware is something that can meaningfully

1:23:55PM    reduce these costs for both users and developers.

1:23:59PM          And, third, restrictions that are imposed by Apple block

1:24:06PM    users and developers from using this middleware, and that has

1:24:10PM    a consequence that Apple can retain its market power over both

1:24:16PM    users and developers.

25

1:24:18PM   **BY MR. EVEN:**

1:24:19PM   **Q.**  So you start by talking about switching costs, so let's

1:24:25PM   start with that.

1:24:25PM          **MR. EVEN:**  And if we can go to the next slide.

1:24:27PM   **BY MR. EVEN:**

1:24:27PM   **Q.**  What are switching costs?

1:24:32PM   **A.**  Basically, switching costs are just the costs that you

1:24:35PM   bear when you leave one platform, like in this case iOS, and

1:24:39PM   go to a different platform, like Android.

1:24:43PM   **Q.**  So let's take a look at the steps that you have here on

1:24:46PM   the slide, and let's start with the first step.

1:24:49PM          Can you explain the first step that a user switching from

1:24:53PM   iOS to Android needs to take, as portrayed on the slide.

1:24:57PM   **A.**  So, first, a user has been consuming services with their

1:25:02PM   iOS, and so they are going to need to look and see, for each

1:25:07PM   of their apps, whether they can find those apps on Android.

1:25:11PM          Now, a typical user has more than a hundred apps, so they

1:25:17PM   need to determine for each one if they can find them on

1:25:21PM   Android.

1:25:23PM   **Q.**  At the time that the user is considering buying, for

1:25:26PM   instance, a Samsung Galaxy phone, why wouldn't the user

1:25:31PM   already know whether their apps are available on Android or

1:25:35PM   not?

1:25:36PM   **A.**  So when they are consuming an app on iOS, Apple's

1:25:41PM   restrictions prevent the developer from informing the user

ATHEY - DIRECT / EVEN

1:25:45PM        about what other platforms they might find that app on.

1:25:50PM            So they can't tell just from looking at their apps on

1:25:54PM        their iPhone where else they might be able to find that, in

1:25:59PM        particular, in this case, Android.

1:26:03PM    Q.  Going to the next step, you talk about identifying

1:26:07PM        alternatives.

1:26:08PM            What are you referring to in that step?

1:26:11PM    A.  So not every app that they have on iOS might be available

1:26:16PM        on an Android.  And so if there is an app that is not

1:26:22PM        available on Android, they would need to do the research to

1:26:26PM        figure out which new app they might buy.

1:26:29PM            Now, they've already made a purchase and own that app on

1:26:32PM        iOS, so they're going to be incurring a new cost to receive

1:26:36PM        similar services.  They will need to compare and determine

1:26:39PM        which app provides similar functionality and do a cost-benefit

1:26:44PM        analysis for their new purchase.

1:26:48PM    Q.  And can you provide the Court with an example of an app

1:26:54PM        that exists on iOS but doesn't exist on Android, for

1:26:58PM        example?

1:26:58PM    A.  Yes.  So one example is the Moleskine Flow, and this is an

1:27:03PM        app that students might use to take notes or draw figures or

1:27:08PM        diagrams in class.  And this app is available on the iOS,

1:27:12PM        but it's not available on Android.

1:27:17PM    Q.  Turning to the third step on this slide, you talk about

1:27:20PM        purchase, repurchase, and reinstall.  So let's take these one

1:27:24PM    by one.

1:27:25PM        What do you mean by "purchase."

1:27:27PM    **A.**   Well, so when you are buying a different app to replace

1:27:30PM    the functionality, then you need to buy it.   That's the

1:27:35PM    purchase.

1:27:35PM    **Q.**   And what do you mean by "repurchase"?

1:27:36PM    **A.**   So for other apps, you've purchased it on the iOS, but

1:27:43PM    if you -- even if the same app is available on Android, you

1:27:46PM    would need to purchase it again, pay that same price or

1:27:52PM    similar price for that app on Android, even though you already

1:27:57PM    bought it on iOS.

1:27:58PM        So an example like that would be *Minecraft.*   *Minecraft* is

1:28:02PM    a game where you pay before you download it.   If you had done

1:28:08PM    that, say paid 6.99 on iOS and purchased it, you own it on

1:28:14PM    iOS.   If you go to Android and you want *Minecraft*, you will

1:28:19PM    pay 6.99 again to have the game on Android.

1:28:26PM    **Q.**   Then you mentioned reinstalling or installing.

1:28:28PM        Which apps would you need to reinstall on the Android

1:28:34PM    device?

1:28:34PM    **A.**   All of them.

1:28:36PM    **Q.**   Let's go to the last step, "Transfer of app-related data."

1:28:43PM        What is that referring to?

1:28:46PM    **A.**   Well, so in some cases, transferring app-related data

1:28:49PM    might not be possible.   So with Moleskine, I have a library of

1:28:53PM    notes and drawings and sketches that I made while taking notes

1:28:56PM   in class, and so given that I won't have Moleskine, I can't

1:29:02PM   transfer that data.

1:29:03PM       But for other apps, you might have in-app purchases.  You

1:29:10PM   might have made progress, settings, customized it to your own

1:29:14PM   experience.  If you are in a game, you might have progressed

1:29:17PM   through levels or spent time earning yourself up.  And that's

1:29:20PM   the kind of data that could be transferred if possible.

1:29:29PM   **Q.**   What if you were buying a subscription -- and I apologize

1:29:31PM   for the East Coast example -- but let's say I have *The New*

1:29:36PM   *York Times* subscription that I bought through the App Store on

1:29:40PM   my iPhone.

1:29:40PM       What happens to that subscription if I want to switch to a

1:29:45PM   Galaxy phone from Samsung?

1:29:48PM   **A.**   So if I purchased that subscription on my iPhone, I need

1:29:51PM   to continue to manage that subscription through Apple, even

1:29:55PM   though I no longer have an Apple device to manage the

1:29:59PM   subscription.

1:29:59PM       So I might need to find a different device and go to the

1:30:05PM   website, for example, and log in to Apple.  If I needed to

1:30:09PM   update my credit card or, say, add a feature, some extra

1:30:15PM   payment for, I don't know, a crossword puzzle, something like

1:30:19PM   that, on the *New York Times*, I would need to still go back to

1:30:23PM   Apple to manage that, even though I now have an Android device

1:30:27PM   and that's where I'm using it.

1:30:30PM          **THE COURT:**  Really?  I thought you could just go --

1:30:35PM   well, I guess I don't know Androids, but if it went the other

1:30:38PM   way, I thought all these subscription services just asked you

1:30:42PM   to put in your I.D. number, your password, and then it was

1:30:47PM   accessible.

1:30:49PM          THE WITNESS:  So that depends on which kind of

1:30:52PM   service and what kind of account management system the app has

1:30:56PM   created.

1:30:56PM      So you might be thinking of an experience like *Netflix*,

1:30:59PM   where you've signed up for *Netflix*, say through a browser, and

1:31:05PM   then when you log in to *Netflix* on the Android or the

1:31:08PM   iPhone --

1:31:09PM          THE COURT:  I'm talking about *The New York Times*.

1:31:11PM          THE WITNESS:  -- you can get that.

1:31:11PM      But so for the *New York Times*, you might have bought the

1:31:12PM   subscription in different ways.  So if you bought it

1:31:16PM   originally through the web, then the *New York Times* is

1:31:20PM   managing your subscription.

1:31:21PM      And so you've entered your payment details with *The New

1:31:24PM   York Times*, and then you could -- say you bought it a long

1:31:29PM   time ago on the web and now you want to use it on Android, you

1:31:32PM   would then authenticate that way.

1:31:34PM      But if you purchase a subscription through Apple, then

1:31:38PM   Apple has the payment information, and Apple's restrictions

1:31:43PM   would require, for example, that only Apple could provide a

1:31:47PM   refund or, you know, any other services around that payment.

1:31:54PM    So if you didn't have a computer, for example, or you

1:32:00PM  didn't have easy access to one, then what you might want to do

1:32:04PM  is instead manage it through an Android app.  At that point,

1:32:08PM  you would go to the Apple website.  When the subscription runs

1:32:14PM  out, you can cancel the subscription there and then create a

1:32:18PM  new subscription a different way.

1:32:20PM         **THE COURT:**  I see.  Thank you.

1:32:22PM  **BY MR. EVEN:**

1:32:26PM  **Q.**  Looking at the four steps that you've just laid out on

1:32:30PM  this slide, Professor Athey, how does this process compare to

1:32:35PM  the replacement of an older iPhone with a newer iPhone?

1:32:41PM  **A.**  It's very different.  If you upgrade to a new iPhone, all

1:32:46PM  of your apps automatically install and the app-related data is

1:32:54PM  automatically passed over in almost every case.

1:32:58PM    So you pick up your new iPhone, the apps are installed.

1:33:03PM  You haven't had to search for any of them.  Your app-related

1:33:07PM  data would also be transferred, your subscriptions, and so you

1:33:11PM  would just pick up right where you left off with the new

1:33:15PM  phone.

1:33:15PM  **Q.**  Thank you.

1:33:16PM    I believe in your conclusions, you also mentioned

1:33:21PM  something that you referred to as "mixing and matching costs."

1:33:25PM    What are mixing and matching costs?

1:33:27PM  **A.**  Yes.

1:33:27PM         **THE WITNESS:**  Can we go to the next slide, please.

1:33:30PM        So, broadly, this is just the cost to users of accessing

1:33:36PM   apps and services on multiple devices with incompatible

1:33:42PM   operating systems.

1:33:43PM   **BY MR. EVEN:**

1:33:44PM   **Q.**  And could you explain what you show in this scenario on

1:33:47PM   the slide here as it relates to mixing and matching costs?

1:33:52PM   **A.**  Sure.  So at different times of day, you're going to have

1:33:57PM   access to different devices or different devices may be more

1:34:02PM   convenient to you or, you know, devices may be shared within a

1:34:09PM   family, so you don't always have access to the same device.

1:34:13PM        So if you were in the park in the morning, you might have

1:34:16PM   access to an iPhone.  At a different time of day, say in the

1:34:21PM   afternoon, you might be doing productivity-related activities,

1:34:25PM   say on a laptop with a larger screen and a keyboard, where you

1:34:30PM   can input information.  And then at night before bed, you

1:34:33PM   might want a medium-size screen to read a book with larger

1:34:41PM   print or to watch a show.

1:34:42PM        So you'll be actively engaged with different devices for

1:34:48PM   different reasons, but you still might like to have access to

1:34:55PM   things like communications or apps that -- where you might

1:35:00PM   need to access information that had shared data, et cetera, at

1:35:04PM   these different places.

1:35:07PM        And so the mixing and matching costs here would be the

1:35:13PM   costs associated with trying to access those from different

1:35:18PM   platforms.

ATHEY - DIRECT / EVEN

1:35:20PM  **Q.** So can you speak to the bullet points on the right?  What

1:35:24PM  are the costs that you have identified here?

1:35:27PM  **A.** Well, so just for example, suppose that I have an iPhone

1:35:31PM  and I'm considering using a cheaper Android tablet for my

1:35:38PM  evening videos.  If I wanted to also be able to, you know,

1:35:43PM  access communications or things like that, then I would need

1:35:47PM  to think about identifying and locating cross-platform apps,

1:35:51PM  apps that would work across the iOS and Android.

1:35:57PM  And if I wanted any services on both of them, I would need

1:36:02PM  to repurchase apps as I described before.  So similar to the

1:36:06PM  switching scenario, but now I'm using different device types.

1:36:14PM  **Q.** So you mentioned that this can happen within families.

1:36:17PM  Have you prepared a slide explaining what are mixing and

1:36:23PM  matching costs within a family?

1:36:24PM  **A.** Yeah, so families are a very common example.  There's

1:36:26PM  other groups where this occurs too.

1:36:29PM  And in this kind of scenario, a family might acquire

1:36:33PM  different devices over time, so you might start out a parent

1:36:38PM  has a personal phone.  Maybe they have started out with an

1:36:41PM  iPhone.  There are scenarios where they have their iPhone

1:36:49PM  conveniently with them while they are waiting with their

1:36:52PM  child, and so they start buying apps for that child to use in

1:36:57PM  scenarios like that.  And so they accumulate a set of games

1:37:03PM  for their kid on their iPhone.

1:37:06PM  Now, later they might decide they want also a tablet for

1:37:12PM    the family to share.  If they were considering getting a

1:37:17PM    low-cost tablet, they would have to then contemplate the same

1:37:23PM    kinds of switching costs or mixing and matching costs I

1:37:29PM    previously described.  They would need to contemplate whether

1:37:31PM    they were going to purchase -- repurchase apps or stay within

1:37:35PM    the ecosystem.

1:37:37PM        So suppose they bought an iPad.  They could then bring

1:37:40PM    over the apps that they had already purchased on the iPhone

1:37:45PM    through family sharing, so they wouldn't have to repurchase

1:37:48PM    the apps in that case.  But they might buy some additional

1:37:54PM    games, so maybe they buy a subscription to *Minecraft* on the

1:38:00PM    family tablet.

1:38:01PM        Now later again, they might contemplate, as a child grows,

1:38:06PM    buying them their first phone, a phone to have available

1:38:10PM    for -- whether it's a Zoom call to school or, you know,

1:38:15PM    calling when they need to be picked up from an activity.

1:38:19PM        But if they wanted to buy a low-cost Android device,

1:38:24PM    again, worried they might lose it, crack the screen, don't

1:38:27PM    think you should be spending, you know, as much money on a

1:38:30PM    child's phone, instead of just being able to consider the cost

1:38:34PM    of the device, they would also have to consider the cost of

1:38:38PM    repurchasing apps that had already been accumulated.

1:38:41PM        And so in that way, the -- you have a disincentive to

1:38:47PM    switch as you accumulate devices within a family.

1:38:51PM    Q.   So I think you covered the third -- three points.

1:38:54PM   You also mention here on the slide "parental controls."

1:38:58PM   What are you referring to there?

1:39:00PM **A.** So in this scenario, of course, many parents want to limit

1:39:04PM the screen time of their children and they also want to make

1:39:08PM sure they are not exposed to inappropriate content.

1:39:10PM   So they might -- in the scenario where they had the iPhone

1:39:16PM and the iPad, they might be using parental controls from

1:39:23PM Apple.  But if they went to add a device outside, they would

1:39:29PM need to search for an app that would allow them to manage

1:39:37PM cross-platform and, again, potentially purchase that.

1:39:40PM **Q.** And can they search for an app that works cross-platform

1:39:44PM on the Apple App Store?

1:39:47PM **A.** No.  That information is not allowed to be shared with

1:39:51PM consumers, so when you are searching for those apps, the apps

1:39:56PM can't advertise what other platforms they might be on.

1:40:02PM   And so when making that original purchase, you might not

1:40:07PM have focused on the fact -- or adopt- -- making your initial

1:40:14PM adoption decision, you might not have focused on the fact that

1:40:16PM it wouldn't provide you that cross-platform functionality, and

1:40:21PM it would be difficult to know that.

1:40:25PM   **MS. DUNN:**  Objection, Your Honor.  Move to strike.

1:40:26PM That's an opinion that was not disclosed in Dr. Athey's

1:40:28PM report.

1:40:31PM   **THE COURT:**  So what paragraph of your report is it?

1:40:34PM Can I find it if it's there?

1:40:36PM       **MR. EVEN:**  I believe it's in paragraph 31 of the

1:40:40PM   written direct, which was stipulated to.  I can go back and

1:40:46PM   find it in the report itself, but...

1:40:48PM       **THE COURT:**  I'm looking at paragraph 31.  You mean of

1:40:50PM   the written or of the direct testimony?

1:40:52PM       **MR. EVEN:**  Of the written direct testimony.  In the

1:41:00PM   middle --

1:41:01PM       **THE COURT:**  Let me read, Counsel.

1:41:26PM       Is there a dispute that Apple prohibits advertising of

1:41:35PM   cross-platform apps?  Ms. Dunn, is there a dispute?

1:41:40PM       **MS. DUNN:**  Your Honor, no, but this witness has not

1:41:43PM   disclosed any opinions on that topic.

1:41:45PM       **THE COURT:**  Overruled.  I think it's within the

1:41:49PM   confines of 31, especially given there is no dispute.

1:41:52PM       Proceed.

1:41:54PM       **MR. EVEN:**  Thank you, Your Honor.

1:41:55PM   BY MR. EVEN:

1:41:56PM   **Q.**  So I want to switch a little bit.  You've talked a little

1:41:59PM   bit about the cost to the users.  Obviously, the Court has

1:42:04PM   heard a lot about how these markets have two sides to them.

1:42:08PM       And my question to you is, wouldn't the developers go out

1:42:13PM   of their way to solve these problems for the users?

1:42:17PM   **A.**  The developers have a strong incentive to try to solve

1:42:21PM   these problems for consumers.

1:42:23PM       **THE WITNESS:**  Can we go to the next slide, please.

1:42:26PM    So the reason a developer cares so much about this is that

1:42:31PM    the more the user can consume their services, the more value

1:42:37PM    the consumer gets from them.   So if they can access the app

1:42:43PM    both, you know, in the park and in bed at night, that's going

1:42:49PM    to create more value for the developer.

1:42:52PM    And if the developer can maintain a relationship with the

1:42:55PM    user, that -- that's also beneficial for the developer.   So

1:43:02PM    the developer wants to make it easy for their relationship to

1:43:06PM    go with the user wherever the user wants to go.

1:43:11PM    BY MR. EVEN:

1:43:12PM    Q.   And so what is the impediment to that?   And maybe let's

1:43:16PM    talk about the first two that you were alluding to on the

1:43:19PM    slide.

1:43:19PM    A.   Well, so the developer faces costs to making this happen.

1:43:26PM    So the first thing is that if the developer wants to

1:43:30PM    maintain a relationship with the user, they need an account

1:43:34PM    management infrastructure.   So they need, basically, a

1:43:38PM    database that helps them keep track of who the users are.

1:43:42PM    And they also need a payment infrastructure -- a

1:43:48PM    cross-platform payment infrastructure that will allow them to

1:43:53PM    make sure that things that a user has bought in one place

1:43:57PM    would be available in a different place.

1:44:00PM    Now, those things are costly.   Large developers would have

1:44:07PM    the scale economies, in principle, to justify the costs, but

1:44:14PM    smaller developers often wouldn't build those.

1:44:18PM     **Q.**   So going to the third point in your slide about reduction

1:44:21PM     in engagement, what might cause reduction in engagement for

1:44:26PM     the developer?

1:44:28PM     **A.**   Well, so it's a pain to create an account and come up with

1:44:33PM     a new password.   And if you're looking at an application,

1:44:36PM     considering it, and you haven't used it yet, you're not sure

1:44:41PM     what the value is going to be, a user might not want to bother

1:44:47PM     with going through this hassle of, you know, one more account.

1:44:51PM     And so in practice, that can really get in the way of an

1:44:58PM     application incentivizing the user to do it.

1:45:02PM          So putting those two things together, the infrastructure

1:45:05PM     is costly to build, which may not be economical for midsize or

1:45:10PM     smaller apps, and the fact that it's difficult to get the

1:45:13PM     consumers to do it, you see that even though they would like

1:45:17PM     it, small and midsize apps would typically not do this, even

1:45:22PM     some larger apps.

1:45:25PM     **Q.**   Going to the last point, "No one-stop shop," what are you

1:45:29PM     referring to on that?

1:45:32PM     **A.**   Well, the developers, all else equal, want to make things

1:45:36PM     easy for users.   But the problem that I described the user was

1:45:40PM     facing was not just bringing over one app from one platform to

1:45:45PM     the next, but bringing over all of the apps.   It's a big

1:45:49PM     collection of apps.

1:45:50PM          And so it's the sum of all of those frictions across lots

1:45:53PM     of apps, passwords, accounts, that friction, that can be an

ATHEY - DIRECT / EVEN

1:45:58PM      impediment to someone to switching.

1:46:01PM          And so solving that problem for a collection of apps is

1:46:06PM      not something that a single developer can solve, even though

1:46:10PM      they wish it was there.

1:46:12PM      Q.  Do developer also incur any costs simply for trying to

1:46:19PM      operate their apps on different platforms, on both iOS and

1:46:23PM      Android in this case?

1:46:25PM      A.  Yes.

1:46:25PM          So we go to the next slide, please.

1:46:28PM          So we've just been talking about costs to a developer from

1:46:33PM      trying to provide services to their users across two platforms

1:46:38PM      like iOS and Android.

1:46:42PM          To provide their services across two platforms, the

1:46:46PM      developers also have to port the code.  Different code runs

1:46:51PM      on iOS and Android, and it's costly to create that

1:46:56PM      additional code base.  So those are called porting costs.

1:47:01PM      BY MR. EVEN:

1:47:01PM      Q.  And so given these porting costs, can you explain why is

1:47:08PM      it that we still find many, many apps across both iOS and

1:47:15PM      Android?

1:47:16PM      A.  So a developer is going to consider the costs and benefits

1:47:20PM      from porting.

1:47:21PM          For big, mature, established platforms like iOS and

1:47:27PM      Android, there are lots of consumers there.  So, in general,

1:47:30PM      the benefits of porting your code are outweighed -- are higher

1:47:37PM   than the cost of doing the porting.

1:47:39PM       So today, you know, most important apps are on both

1:47:44PM   platforms and multihoming is common.   But those costs that --

1:47:50PM   we'll see a very different scenario when thinking about an

1:47:56PM   entering platform.

1:47:57PM       So an entering platform is going to face what's widely

1:48:01PM   known as the chicken and egg problem.   So the chicken and egg

1:48:07PM   problem is that a developer doesn't want to bother porting

1:48:12PM   their code to a platform without many users, but a user

1:48:17PM   doesn't want to go to a new platform without many developers.

1:48:21PM       So the porting costs lead to the app barrier to entry,

1:48:28PM   which is widely understood to be the barrier in this type of

1:48:36PM   market, and in particular, that app barrier to entry supports

1:48:40PM   the high profits that otherwise we would expect would invite

1:48:46PM   entry.

1:48:48PM   Q.   So trying to summarize a little bit, you talked about

1:48:53PM   switching costs, you talked about mixing and matching costs,

1:48:56PM   you talked about cross-platform management costs, and then you

1:49:00PM   talked about cross-platform porting costs.

1:49:03PM       In your opinion, how do these costs, in the aggregate,

1:49:07PM   impact competition between iOS and Android?

1:49:13PM   A.   So in my opinion, they stifle competition between iOS

1:49:18PM   and Android.   So we're talking about a scenario where we have

1:49:25PM   a stable duopoly where most users are already locked in and

1:49:33PM   where even the few new arriving users, like children coming of

1770

ATHEY - DIRECT / EVEN

1:49:40 PM   age, are already going to be influenced by the platform

1:49:44 PM   purchases of their parents.

1:49:47 PM        So in this environment with locked-in consumers, we have a

1:49:53 PM   scenario where the platforms are adding additional frictions

1:50:01 PM   to an environment where we already expected to have -- to have

1:50:08 PM   switching costs.  And these additional costs create --

1:50:11 PM   maintain market power over both users and developers.

1:50:18 PM        So from the user perspective, the fact that you have these

1:50:25 PM   switching costs means that you're going to be less sensitive

1:50:29 PM   to low prices or new features that a platform introduces.  You

1:50:38 PM   know, as your needs change over time, you might want to switch

1:50:42 PM   platforms and you might be attracted by a feature that meets

1:50:46 PM   your needs, but the switching costs impede the consumer's

1:50:50 PM   response to that and also thus create less incentive for firms

1:50:56 PM   to create them.

1:50:57 PM        On the developer side, thinking from that perspective,

1:51:00 PM   it's exactly locked-in consumers that creates the market power

1:51:07 PM   over developers.  The developers understand that even a

1:51:12 PM   popular developer can't induce consumers to switch platforms

1:51:19 PM   just to get that app and, as a result, an increase in consumer

1:51:25 PM   switching costs will increase the market power the platform

1:51:30 PM   can exert over developers.

1:51:33 PM   Q.  Thank you.

1:51:35 PM        Do you understand that some of the Apple experts in this

1:51:38 PM   case have criticized you for not ruling out the possibility

ATHEY - DIRECT / EVEN

1:51:42PM    that switching costs in this case are, in fact,

1:51:44PM    procompetitive?

1:51:47PM    **A.**  Yes.

1:51:48PM              **THE WITNESS:**  Excuse me.  Your Honor, the screen

1:51:52PM    seems to have gone blank.

1:51:55PM              **THE COURT:**  It may have.  I'm not -- I don't control

1:51:56PM    that.

1:51:56PM              **THE WITNESS:**  Yeah, sorry.  Yes.  Thank you.

1:51:58PM        Yes, I'm aware.

1:52:04PM    **BY MR. EVEN:**

1:52:04PM    **Q.**  And do you agree with that criticism?

1:52:06PM    **A.**  No.

1:52:07PM    **Q.**  And can you very briefly explain why you disagree with

1:52:11PM    that criticism?

1:52:13PM    **A.**  So the consensus of economists is that when you see a

1:52:19PM    setting where firms choose to impose additional switching

1:52:26PM    costs, artificial switching costs that create real costs for

1:52:31PM    consumers, they are doing that in pursuit of profits.  That's

1:52:36PM    why they choose to do so, for example, with high prices.  And

1:52:44PM    that can be harmful for consumers.

1:52:47PM        Now, the papers cited by Apple are consistent with that,

1:52:53PM    that now they -- in different settings, there can be edge

1:53:01PM    cases, cases in dynamic markets with, for example, entry or

1:53:06PM    frequent switching where the primary focus of competition is

1:53:12PM    new users and that's what's driving firm decisions.  In that

ATHEY - DIRECT / EVEN

1:53:16PM   case, introductory discounts can become a locus of

1:53:23PM   competition.

1:53:24PM        But that's the exact opposite of the case we have here,

1:53:27PM   where there are already high switching costs.  We don't see a

1:53:33PM   lot of switching, and the locus of competition on new users is

1:53:41PM   small and the incentives are shaped by the existing users.

1:53:46PM   **Q.**  Thank you.

1:53:46PM        So I would like to switch gears a little bit and turn to

1:53:50PM   your second conclusion that had to do with the effects or

1:53:55PM   potential effects of middleware.

1:53:56PM        And just to level set, what are you referring to when you

1:54:02PM   are talking about middleware?

1:54:05PM   **A.**  So middleware is technology that facilitates users and

1:54:10PM   developers interacting across different platforms, reducing

1:54:18PM   costs such as the switching and mixing and matching costs or

1:54:22PM   porting costs that we have been discussing.

1:54:26PM   **Q.**  So is middleware a well-understood concept in the area of

1:54:31PM   industrial economics?

1:54:33PM   **A.**  Yes, it's a well-understood concept.  When you say

1:54:38PM   "middleware" in economics, it's most closely associated with

1:54:42PM   the Microsoft antitrust case.

1:54:44PM        So the concept in that case centered around the idea that

1:54:51PM   middleware such as browsers could facilitate users and

1:54:56PM   developers interacting across platforms.

1:55:00PM        For example, if a user with -- on one of the incumbent

ATHEY - DIRECT / EVEN

1:55:06PM    platforms was using the web on their browser, say, on Windows,

1:55:10PM    the fact that they could also consume those apps through a

1:55:16PM    browser on an entering platform would reduce the barriers to

1:55:22PM    entry due to the chicken and egg problem.

1:55:25PM        From the developer side, because the developers could

1:55:27PM    create experiences through the browser, the developers were

1:55:32PM    willing to incur the cost of meeting the consumers on the

1:55:36PM    incumbent platform through the browser, but then they wouldn't

1:55:39PM    incur porting costs if the consumers went to a new platform.

1:55:43PM        So middleware has this prominent role as something -- one

1:55:49PM    of the things that can help a new entrant overcome the app

1:55:55PM    barrier to entry, and it thus plays a central role in platform

1:56:01PM    competition.

1:56:01PM        So that's exactly the concept as I'm using it here.  It's

1:56:08PM    a different technology today than in the '90s, but the

1:56:13PM    economic consequences and concept are the same.

1:56:17PM    Q.  So can you provide some examples of middleware that you

1:56:21PM    think are relevant to this case?

1:56:24PM    A.  So two types of middleware I focused on.  One is

1:56:29PM    cross-platform app stores and the other are app streaming

1:56:37PM    platforms.

1:56:37PM    Q.  So let's start with cross-platform app stores.

1:56:46PM        You mentioned -- strike that.

1:56:46PM        Can you -- maybe let's just start from the basics.  What

1:56:50PM    do you mean by "cross-platform app store"?

1:56:53PM   **A.**  Sure.

1:56:53PM           **THE WITNESS:**  The next slide, please.

1:56:55PM      So cross-platform app stores operate across multiple

1:57:02PM   platforms, and therefore they allow users to migrate and

1:57:06PM   synchronize their apps on all of those platforms, which has

1:57:11PM   the benefit of reducing the switching and mixing and matching

1:57:14PM   costs we talked about earlier.  The cross-platform app stores

1:57:19PM   can provide some or all of the services to help mitigate

1:57:26PM   those.

1:57:26PM   **BY MR. EVEN:**

1:57:26PM   **Q.**  So when you talk about cross-platform app stores, just so

1:57:30PM   we all understand what that's all about, how would that

1:57:35PM   actually work in reality?  What would a cross-platform app

1:57:39PM   store allow a user to do when they switch from an iOS phone

1:57:44PM   to an Android phone?

1:57:46PM   **A.**  So a cross-platform app store ideally would make it almost

1:57:49PM   as easy as upgrading your iPhone today.  So you -- going from

1:57:55PM   iPhone to Android, you would need to download --

1:58:00PM           **THE COURT:**  Just --

1:58:00PM           **THE WITNESS:**  I'm sorry.

1:58:00PM           **THE COURT:**  I'm going interrupt and then you can

1:58:04PM   finish off.

1:58:04PM      Is this the same thing, back to our *New York Times*

1:58:07PM   example, as if I had gone to *The New York Times*, gotten my

1:58:14PM   subscription directly from them, and then I could use it on

```
1:58:18PM       any device that I wanted?

1:58:19PM               THE WITNESS:  That would be one benefit, yes.

1:58:22PM               THE COURT:  But not just a benefit, that's an

1:58:24PM       alternative mechanism to get the same result, correct?

1:58:27PM               THE WITNESS:  For a single app, yes.

1:58:33PM               THE COURT:  So one of the problems is that on the

1:58:36PM       Android and the iPhone, The New York Times can't tell them,

1:58:42PM       Hey, go and sign up on our website and then you can have

1:58:48PM       access across devices.

1:58:50PM               THE WITNESS:  Yes.

1:58:50PM               THE COURT:  Okay.  So if they did that, then there

1:58:53PM       wouldn't really be the same kind of need for this

1:58:57PM       cross-platform app store that you're talking about.

1:59:02PM               THE WITNESS:  I think it -- that would be a big

1:59:06PM       benefit, I agree, that you could alert people to the most

1:59:12PM       efficient way to pay.  And if people valued cross-platform

1:59:16PM       access, that would be a benefit.  And if consumers understood

1:59:19PM       that, they would need to do it.

1:59:21PM               Consumers do get clutzy and disconnected and sensitive to

1:59:28PM       delays when trying to complete that type of activity, and so

1:59:33PM       making it easy, you know, being able to also, you know, get

1:59:38PM       there quickly would be helpful.  But yes.

1:59:40PM               THE COURT:  That would be, one, their choice, and,

1:59:43PM       two, because there are lots of various considerations in

1:59:48PM       antitrust law, that would be an alternative solution.
```

1776

ATHEY - DIRECT / EVEN

1:59:52PM        **THE WITNESS:**  To the problem of a single app.  And so

1:59:54PM   that would be helpful, I think, especially for the largest

1:59:57PM   apps.  So the --

2:00:00PM        **THE COURT:**  Proceed.

2:00:01PM   **BY MR. EVEN:**

2:00:04PM   **Q.**  So just to pick up on the Court's question, how -- you say

2:00:11PM   it would solve the problem for a single app.

2:00:14PM        Would that solve the problem for the -- what we refer to

2:00:17PM   as the one-stop shop problem?

2:00:20PM   **A.**  No.  So smaller and midsize apps, apps where the consumer

2:00:30PM   may be uncertain about the value that they are going to get,

2:00:34PM   would still find it difficult to induce consumers to go and

2:00:41PM   create those accounts.

2:00:42PM        And then, again, from the competition perspective, what's

2:00:48PM   important is the sort of aggregate switching costs the

2:00:51PM   consumer perceives.  So, you know, even if there was

2:00:55PM   cross-platform app store, a consumer might still be willing to

2:01:00PM   separately log in to *Netflix*, you know.  They are excited

2:01:05PM   about their show and, you know, they are going to get to the

2:01:07PM   next episode.

2:01:09PM        But they -- that would be -- it wouldn't solve the problem

2:01:16PM   for imagining figuring out all of your accounts and

2:01:19PM   successfully getting them over to there across a hundred apps.

2:01:24PM        **MS. DUNN:**  Objection, Your Honor.  I'm happy just to

2:01:27PM   state this for the record, because I think it's included in

ATHEY - DIRECT / EVEN

2:01:29PM    the prior objection, but there is a lot of testimony about

2:01:32PM    what consumers want and what consumers do.  So for these

2:01:36PM    purposes, we would just note that for the record.

2:01:40PM         THE COURT:  Well, again, Ms. Dunn, with respect to

2:01:44PM    the last objection, it didn't seem to me that there was any

2:01:48PM    dispute, so I didn't mind it.

2:01:50PM       Is what you are saying is that there is no evidence in the

2:01:53PM    record with respect to the consumers' perspective?  I haven't

2:02:00PM    memorized all these expert reports.

2:02:03PM         MS. DUNN:  I understand, Your Honor, and that's why I

2:02:04PM    wanted to flag for the Court.

2:02:06PM       Dr. Athey has testified quite a lot, subject to our

2:02:10PM    original objection, about what consumers think, what they

2:02:14PM    believe, what they are doing, and there's not evidence in the

2:02:18PM    record as to that and we don't believe there will be.  So it

2:02:22PM    is covered by the original objection, but it's happened so

2:02:24PM    much I just wanted to note it for the record.

2:02:27PM         THE COURT:  Well, have you done any survey evidence

2:02:30PM    or research with respect to consumer actions, and, if so, can

2:02:37PM    you point me to it in your direct testimony?

2:02:44PM         THE WITNESS:  So the number of apps, for example --

2:02:48PM         THE COURT:  Limited to your testimony.

2:02:48PM         THE WITNESS:  I'm sorry.  So I did not conduct an

2:02:58PM    original survey of consumers, if that was the first question.

2:03:07PM       The facts about consumers --

2:03:18PM          **MR. EVEN:**  Your Honor, if I may?

2:03:19PM          **THE COURT:**  No.

2:03:22PM          **THE WITNESS:**  Okay.  I want -- I'm going to try to --

2:03:22PM   I'll do my best to answer the question.

2:03:26PM          **THE COURT:**  You have your direct testimony in front

2:03:27PM   of you.

2:03:28PM          **THE WITNESS:**  Yes, yes.

2:03:28PM          **THE COURT:**  It's in your binder.

2:03:30PM          **THE WITNESS:**  Okay.  Thank you.

2:03:32PM          **THE COURT:**  I don't expect you to memorize the

2:03:34PM   paragraphs either.  I had a law professor who could do that,

2:03:39PM   but he was --

2:03:40PM          **THE WITNESS:**  Not me, no.

2:03:41PM          **THE COURT:**  And the question is, is there anything in

2:03:42PM   the direct testimony regarding consumer habits?

2:03:48PM          **THE WITNESS:**  Thank you.

2:04:16PM          **THE COURT:**  We can do it another way so that the

2:04:18PM   clock is not ticking.

2:04:19PM          **THE WITNESS:**  Sure.  Yes.

2:04:19PM          **THE COURT:**  The testimony with respect to consumer

2:04:20PM   habits is stricken except that which exists in the direct

2:04:25PM   testimony.  All right?

2:04:25PM      Let's proceed.

2:04:26PM          **MR. EVEN:**  Okay.

25

2:04:27PM   **BY MR. EVEN:**

2:04:28PM   **Q.**  Professor Athey, is research into consumers' preferences

2:04:34PM   and consumer behavior in the space of technology something

2:04:37PM   that you research in your day-to-day --

2:04:42PM        **THE COURT:**  It doesn't matter if she does or not.  If

2:04:45PM   it's not in the report and wasn't disclosed, it is not

2:04:48PM   properly in front of the Court.

2:04:49PM        **MR. EVEN:**  Oh, okay.  So I'm sorry, Your Honor, maybe

2:04:51PM   I misunderstood.  If the objection is outside the scope, we

2:04:54PM   can address that separately.  That's an easy objection.  I

2:04:57PM   don't think -- I don't think that's what the objection was.  I

2:05:01PM   thought the objection was that there isn't a basis for her

2:05:04PM   opinions, which --

2:05:06PM        **THE COURT:**  I understood it to be outside the scope.

2:05:09PM        **MR. EVEN:**  Okay.

2:05:11PM        **MS. DUNN:**  There's two objections here.

2:05:12PM     One is she is testifying outside the scope.

2:05:14PM     The second is she -- there is no basis for the assertions

2:05:21PM   about what consumers do and think.  And there's quite a lot of

2:05:26PM   this, and it is not going to be proven up by the factual

2:05:29PM   record --

2:05:29PM        **THE COURT:**  That's --

2:05:29PM        **MS. DUNN:**  -- nor is it --

2:05:29PM        **THE COURT:**  That's why I said it's outside the scope.

2:05:32PM   So --

2:05:33PM        **MS. DUNN:**  Thank you, Your Honor.

2:05:34PM        **THE COURT:**  -- again, the testimony is stricken

2:05:36PM    except to the extent that it is in the report.  I'm not -- she

2:05:40PM    couldn't find it quickly.  I want to keep moving.  It doesn't

2:05:44PM    sound like it's in the report.

2:05:45PM        But go ahead.

2:05:47PM        **MR. EVEN:**  Your Honor, I just want to make sure that

2:05:48PM    the record is clear to me as to what it is that we are

2:05:52PM    supposed to show.

2:05:53PM        The testimony that Professor Athey is providing about

2:05:58PM    users' switching costs, mixing and matching costs, and whether

2:06:02PM    they want to do something or not is all in the report.

2:06:06PM        **THE COURT:**  Correct.  And that's fine.  It's in the

2:06:09PM    report.

2:06:10PM        **MR. EVEN:**  Okay.  So what is it that -- I'm not

2:06:12PM    entirely sure -- what is it that we are currently missing?

2:06:14PM        If there is a question about a survey, I think Professor

2:06:21PM    Athey answered that, and I can lay foundation as to why she

2:06:24PM    has general 703 basis to attest to what consumers face and

2:06:31PM    don't face and how consumers behave more generally.

2:06:34PM        **THE COURT:**  If you want to go back to the report and

2:06:36PM    use your time that way, that's fine.  I can tell you that when

2:06:39PM    I read her report, I had lots of questions on this document

2:06:43PM    about the factual basis for the opinions, and I am trusting

2:06:46PM    that to the extent there is something there, you will all give

ATHEY - DIRECT / EVEN

2:06:49PM          it to me.

2:06:50PM                    MR. EVEN:  Okay.

2:06:50PM                    THE COURT:  Because you all know your case better

2:06:52PM          still, having lived with it for ten months, than I do.  If

2:06:57PM          there is not a factual basis, I will not consider it and

2:07:02PM          it's -- and it will ultimately be stricken.

2:07:05PM             But as I understood it, you all were still negotiating

2:07:10PM          over whether the factual basis is ever proved up in some of

2:07:15PM          these expert reports.  So I'm relying, in part, on you all.

2:07:22PM                    MR. EVEN:  And I appreciate that, Your Honor.  I'm

2:07:24PM          just not sure what is the factual basis that we want now,

2:07:27PM          other than Professor Athey's general assessment as a professor

2:07:31PM          of technology and economics, as to the incentives and what

2:07:36PM          consumers may or may not do facing these incentives.  That's

2:07:42PM          clearly in the report, Your Honor.

2:07:45PM                    THE COURT:  Then if it is in the report, you're all

2:07:47PM          good.

2:07:49PM                    MR. EVEN:  Okay.

2:07:53PM                    THE COURT:  And I should say and it's still subject

2:07:56PM          to your ongoing negotiations about the factual basis.

2:08:03PM                    MR. EVEN:  I understand, Your Honor.  I just want to

2:08:06PM          make sure that I understand the objection, because my

2:08:09PM          understanding is that somebody who researches what consumers

2:08:12PM          and technology firms do for a living can come into court and

2:08:16PM          testify to that based on their expertise.

2:08:20PM   THE COURT:  They can testify as to what they have

2:08:21PM  disclosed.

2:08:24PM        MR. EVEN:  Absolutely, Your Honor.  I don't really

2:08:25PM  think there is a disclosure issue here, but that's okay.  I

2:08:30PM  appreciate that.  I'll move on.

2:08:33PM  BY MR. EVEN:

2:08:34PM  Q.  Professor Athey, do you have any examples -- let me take a

2:08:41PM  step back.

2:08:41PM      Obviously, we don't have a cross-platform app store right

2:08:47PM  now, correct?

2:08:49PM  A.  Yes, correct.

2:08:50PM  Q.  And so have you seen any examples of a cross-platform

2:08:55PM  store that sells something other than apps?

2:09:01PM  A.  Yes.  So going back in history, when you used to watch

2:09:10PM  movies and shows on the iPhone, you would purchase individual

2:09:14PM  movies on iTunes, but you could watch those on -- in the iOS

2:09:20PM  system.

2:09:20PM      Today, there are services like *Amazon Prime Video* or

2:09:28PM  *Netflix*.  *Amazon Prime Video* at the beginning offered the same

2:09:34PM  kind of service to iTunes except you would buy movies or shows

2:09:40PM  one at a time, but it was cross-platform and so people could

2:09:43PM  buy on one device and move to another.  And that type of --

2:09:46PM  that type of cross-platform experience is also -- is an

2:09:54PM  example.

2:09:55PM      Now, that's allowed, so *Netflix* and *Amazon Prime Video* are

ATHEY - DIRECT / EVEN

2:09:59PM  allowed, but other types are not.

2:10:06PM  **Q.**  Okay.  Have you found any examples of cross-platform app

2:10:08PM  stores that are outside of iOS?

2:10:13PM  **A.**  I have.

2:10:14PM  **Q.**  And can you give the Court an example or two?

2:10:17PM  **A.**  Yes.

2:10:18PM          **THE WITNESS:**  So next slide, please.

2:10:20PM      So one example of a cross-platform app store is the Epic

2:10:29PM  Games Store.  This is a store that's available on the Windows

2:10:33PM  PC and the macOS.

2:10:36PM  **BY MR. EVEN:**

2:10:37PM  **Q.**  And can you speak to the cross-platform benefits provided

2:10:43PM  to users and developers by the Epic Games Store.

2:10:47PM  **A.**  Yes.  So the Epic Games Store builds the infrastructure I

2:10:54PM  described earlier that makes it possible for developers to

2:11:00PM  interact with their users through an account that would be

2:11:06PM  available across all devices.

2:11:09PM      So in the case of the Epic Games Store, the user has an

2:11:13PM  account with the Epic Games Store that allows them to access

2:11:17PM  their library of apps and have them easily available across

2:11:22PM  any platform that they choose to use.

2:11:27PM      Another service provided by the Epic Games Store is a

2:11:32PM  cloud service that, again, makes it possible for developers to

2:11:36PM  sync the users' data, app-related data, their purchases, what

2:11:44PM  levels they are at, across platforms.

2:11:46PM    So if you went -- if you decided to switch from Windows PC

2:11:53PM    to macOS, what you would do is you would just log in to the

2:12:00PM    Epic Games Store and you could pick back up right where you

2:12:04PM    left off.

2:12:06PM    There would also be a wallet service.  So if you had

2:12:08PM    entered your payment information when you had a PC, that would

2:12:14PM    also be available on the macOS, so just pick right up where

2:12:20PM    you left off.

2:12:20PM    **Q.**  Got it.  Thank you.

2:12:21PM    Now, you mentioned that the Epic Games Store is available

2:12:25PM    on the macOS.

2:12:26PM    How does the Epic Games Store compare, for instance, to

2:12:30PM    the Mac Apple App Store that's on Mac?

2:12:34PM    **A.**  It provides a similar set of services except that if you

2:12:39PM    buy things through the macOS store, they are locked into the

2:12:43PM    Apple ecosystem.  You can't use them across.

2:12:48PM    **Q.**  You also -- do you have another example of cross-platform

2:12:54PM    app store outside of iOS?

2:13:00PM    **A.**  Yes.

2:13:00PM    **THE WITNESS:**  So the next slide.

2:13:01PM    **BY MR. EVEN:**

2:13:05PM    **Q.**  So I see this is about Steam.  Where is Steam available?

2:13:09PM    **A.**  Steam is available on the Windows PC, the macOS, as well

2:13:14PM    as Linux PC.

2:13:17PM    **Q.**  And what services does the Steam store provide to users

ATHEY - DIRECT / EVEN

2:13:22PM   and developers so that they can work and transact across

2:13:28PM   platforms?

2:13:31PM   **A.**   So it provides the infrastructure so that users and

2:13:35PM   developers can interact in a similar way to what I just

2:13:38PM   described.   It provides services for account management,

2:13:43PM   allowing the user to access a library cloud and wallet.

2:13:49PM   It also has an additional service, family sharing, where

2:13:55PM   users can share apps and purchases across platforms within a

2:13:59PM   family.   So if one kid has a Windows PC, the other has to

2:14:04PM   switch to, you know, Apple to be compatible with school, they

2:14:08PM   can -- you know, they can share their apps and purchases in

2:14:13PM   that way.

2:14:14PM   **Q.**   All right.   So let's switch gears for a second.   You

2:14:17PM   mentioned also streaming services.   The Court has already

2:14:21PM   heard testimony about streaming services some, but can you

2:14:26PM   explain at a very high level, how would an app streaming

2:14:30PM   service operate?

2:14:32PM   **A.**   Yes.

2:14:32PM           **THE WITNESS:**   Next slide, please.

2:14:33PM      So this would feel a lot like a *Netflix* experience today

2:14:38PM   from a user's perspective.   They would be able to access a

2:14:43PM   wide variety of content.   They could easily switch between

2:14:49PM   different types of content, try things out.

2:14:53PM      And then, from the developer perspective, it's a very

2:14:58PM   different experience than regular apps because the developer

2:15:02PM   is writing code that runs on servers in the cloud.

2:15:05PM       So the developer's code is written to the cloud, and they

2:15:11PM   don't -- just like a movie producer can make a movie and not

2:15:16PM   worry about where people are going to watch the movie, a game

2:15:20PM   developer could develop once and then that game would be

2:15:26PM   available on, you know, any platform, and they wouldn't have

2:15:33PM   to worry about, say, you know, porting to a new or smaller

2:15:37PM   platform.

2:15:39PM   **Q.**  Thank you.

2:15:42PM       Are streaming services limited to games?

2:15:46PM   **A.**  No.

2:15:47PM   **Q.**  What other use cases could there be for app streaming

2:15:51PM   services?

2:15:52PM   **A.**  So these are nascent, I should say, and so they are coming

2:16:04PM   into -- so they are coming into play as a result of costs and

2:16:06PM   benefits.

2:16:07PM       What we see with games today is that they struggle with

2:16:15PM   some latency challenges.  There can be delays, so you need

2:16:20PM   high bandwidth; but on the other hand, they can provide an

2:16:25PM   immersive experience even on a device that is lower cost.

2:16:30PM       So taking those economic characteristics, there can be

2:16:37PM   many other applications that would also benefit from being

2:16:41PM   able to allow an immersive experience to be available on

2:16:47PM   lower-cost devices.

2:16:49PM       A situation where you might want to -- need to reach a lot

2:16:54PM    of people, say, on -- your cheap devices might be an

2:17:00PM    educational or a training experience, where, you know, it's

2:17:05PM    important that the student understand the physical

2:17:08PM    environment.

2:17:08PM        And so they want to have an immersive video experience

2:17:16PM    that's interactive, but you want to reach low-wage workers or

2:17:22PM    students with, you know, six-year-old hand-me-down phones.

2:17:28PM    And so you want to provide that experience on a low-cost

2:17:28PM    device.

2:17:31PM        So the general themes that we've heard about in terms of

2:17:34PM    games have analogs in other industries, but it's still very

2:17:39PM    early days.

2:17:39PM    Q.  So you mentioned now that it's nascent, that it's in early

2:17:59PM    days.  Can app streaming services solve switching and mixing

2:18:03PM    and matching costs today?

2:18:05PM    A.  No.  They are not big enough.

2:17:41PM        But, you know, the -- one of the big constraints has been

2:18:01PM    bandwidth.  And so if you think about a longer time horizon,

2:18:05PM    five to ten years, you know, we are trying to make a lot of

2:18:10PM    investments now to get bandwidth out there and more available.

2:18:15PM    The technology is improving.  And so some of the constraints

2:18:19PM    that have held it back could -- are expected to alleviate.

2:18:23PM        And so, you know, just like *Netflix* has transformed the

2:18:28PM    way that content is produced and consumed in movies and shows,

2:18:34PM    it could make a big difference.  And the bigger difference it

2:18:39PM  makes, the bigger impact it would have on mobile competition.

2:18:45PM  **Q.** Thank you.

2:18:46PM       Do iOS users currently have access to streaming

2:18:49PM  platforms?

2:18:50PM  **A.** Not in the way they are intended, no.

2:18:54PM  **Q.** And what do you mean by "not in the way they are

2:18:59PM  intended"?

2:18:59PM  **A.** Well, so some of the big benefits are that, you know, you

2:19:02PM  can have one app, similar to the *Netflix* app, and have lots

2:19:09PM  of -- access lots of different things seamlessly from a user

2:19:14PM  perspective.

2:19:14PM       But the Apple App Store restrictions require that in order

2:19:20PM  to offer multiple streaming games, it's necessary to -- for

2:19:28PM  the user to download a separate app.

2:19:31PM       So even though the separate app wouldn't have any

2:19:35PM  additional functionality, there would be an additional app for

2:19:38PM  each game.

2:19:41PM  **Q.** What would a similar policy mean for something like

2:19:45PM  *Netflix*, for instance?

2:19:47PM  **A.** That would mean that for every movie or show that I wanted

2:19:50PM  to watch, I would need to download a separate app. And if I

2:19:56PM  wanted to switch between one movie and another, I would need

2:20:02PM  to navigate to and switch to that separate app.

2:20:09PM  **Q.** Thank you.

2:20:09PM       You talked earlier about entry and some of the barriers to

2:20:17PM   entry and chicken and egg problem.

2:20:19PM       How would app streaming platforms affect, potentially --

2:20:25PM   if they come to -- become more mature, how could they affect

2:20:30PM   entry in this space?

2:20:33PM   **A.**   So remember, the chicken and egg problems arises because

2:20:37PM   consumers don't want to use a device where there is not enough

2:20:42PM   services.

2:20:43PM       But -- so if a consumer can go to a new platform and have

2:20:50PM   access to multiple services, that makes it easier to reap the

2:21:01PM   benefits of a low-cost device.

2:21:03PM       And so you could buy a low-cost device and then with a

2:21:08PM   single app, you would be able to access this library of

2:21:14PM   content, which would already be there because the developers

2:21:18PM   wouldn't bear any porting costs.   So as long as the streaming

2:21:23PM   service has got the streaming app on the new platform, just

2:21:27PM   one app needs to port, then the consumer suddenly would have a

2:21:32PM   library of content.

2:21:34PM       So if you thought about getting a low-cost tablet for your

2:21:38PM   child, imagine that it had, you know, *Amazon Prime Video* and a

2:21:45PM   game-streaming app, you know, and a browser.   Well, you know,

2:21:51PM   that might be good enough for your kid.   And so you could --

2:22:00PM   it would be rational for people to buy a low-cost tablet like

2:22:05PM   that for their child.

2:22:06PM       The more people bought low-cost tablets for their kids or

2:22:11PM   themselves, the more users there would be, and that could, in

ATHEY - DIRECT / EVEN

2:22:15PM    turn, induce additional entry.

2:22:19PM            THE COURT:  Do you still think we are in a chicken

2:22:21PM    and egg environment?

2:22:24PM            THE WITNESS:  Between iPhone and Android, absolutely

2:22:27PM    not.  Most apps support it.  So -- but now we have two firms

2:22:31PM    that have high profits, and so we're concerned about making it

2:22:38PM    possible for a third firm to enter.

2:22:41PM        And so for a third firm to enter, which is what you would

2:22:45PM    expect, given high profits, the third firm would have to

2:22:48PM    overcome the chicken and egg problem.  And for that, porting

2:22:53PM    could be a substantial barrier.

2:22:55PM        Now, for something like -- so Amazon has a tablet, the

2:23:00PM    Amazon Fire tablet, that's a low-cost tablet.  It's a modified

2:23:06PM    version of Android, and so there, the porting costs are

2:23:10PM    relatively low.  They have their own app store, has a couple

2:23:15PM    hundred thousand apps.

2:23:17PM        So for that type of situation, you know, you've got some

2:23:21PM    apps, you've got *Amazon Prime Video*, but you are missing some

2:23:25PM    stuff too.  And so, you know, something like a streaming app

2:23:30PM    that brought some really great games to it, you know, people

2:23:36PM    are already buying it, you know, for some use cases, but it

2:23:39PM    could expand the use cases.  So -- but this is really -- the

2:23:43PM    porting is about entry.

2:23:46PM        Did that answer the question?  Thank you.

        25

2:23:52PM

2:23:52PM

2:23:56PM

2:24:00PM

2:24:02PM

2:24:07PM

2:24:12PM

2:24:18PM

2:24:21PM

2:24:26PM

2:24:32PM

2:24:35PM

2:24:39PM

2:24:42PM

2:24:47PM

2:24:50PM

2:24:52PM

2:24:53PM

2:24:55PM

2:24:56PM

2:24:59PM

2:25:05PM

2:25:11PM

2:25:18PM

2:25:26PM

**BY MR. EVEN:**

**Q.** So switching to a separate topic, did you review any of the documents produced in this case?

**A.** Yes.

**Q.** And what was your process for reviewing these documents?

**A.** So I asked my research team to review nonconfidential documents and to identify documents that related to switching costs, mixing and matching costs, and the middleware, the themes -- and the other themes of my opinions.

**Q.** And why did you need to limit your review to nonconfidential documents?

**A.** Because years ago I was an employee of Microsoft, I understand that I am not allowed to review confidential information in this case.

**Q.** And did you identify any documents that you think bear on your opinions?

**A.** I did.

**Q.** Did you prepare a slide about one of those?

**A.** I did.

**Q.** Let's take a look at this slide.

And can you explain why you think this email from Mr. Cue is relevant to what you have opined on in this case?

**A.** Yes. So this is an email from Mr. Eddy Cue to Philip Schiller and Tim Cook, and the email is talking about switching costs related to apps.

2:25:28PM          And so it articulates the precise logic that I was

2:25:36PM   discussing, and it articulates that the considerations were

2:25:43PM   important both quantitatively and qualitatively for strategic

2:25:49PM   decisions as understood relative to the consumer behavior.

2:25:59PM          And so the specific part of the quote here about consumers

2:26:06PM   is:

2:26:06PM               "Who is going to buy a Samsung phone if they have

2:26:11PM               apps, movies, et cetera, already purchased?  They now

2:26:15PM               need to spend hundreds more to get where they are

2:26:20PM               today."

2:26:22PM       So they are expressing that the magnitude of these costs

2:26:28PM   are going to be important for consumer behavior and enough to

2:26:32PM   influence strategy.

2:26:34PM   Q.  So, as you said, this is an email, I think, from 2013.

2:26:39PM       Do you think this email is still relevant today?

2:26:44PM   A.  So the economics are spot on to what we are talking about,

2:26:50PM   but there is a difference.

2:26:53PM   Q.  What's the difference?

2:26:54PM   A.  So here, he's referring to movies.  As I mentioned

2:26:58PM   earlier, at that time, consumers who bought movies would be

2:27:04PM   through iTunes, the -- part of the subject of this email,

2:27:10PM   would be locked in to Apple.  So if they bought movies through

2:27:16PM   iTunes, that would create switching costs for moving to

2:27:23PM   Samsung.

2:27:23PM          Today, consumers have access to competition from

ATHEY - CROSS / DUNN

2:27:28PM    cross-platform sources of movies and shows, and consumers have

2:27:35PM    chosen those. You know, the market share is large for

2:27:46PM    cross-platform movies and shows. So that part wouldn't be the

2:27:52PM    main focus today, because consumers have cross-platform

2:27:57PM    alternatives.

2:27:57PM         But today, the logic would still apply to other types of

2:28:02PM    apps where these types of cross-platform services are not

2:28:07PM    available.  And so that would be the component today.

2:28:13PM    Q.  Thank you very much, Professor Athey.

2:28:14PM         MR. EVEN:  I will pass the witness.

2:28:18PM         THE COURT:  Pass the witness?

2:28:24PM         Ms. Dunn, cross.

2:28:37PM         MS. DUNN:  With the Court's permission, we would like

2:28:39PM    to hand the witness and the Court a binder.

2:28:43PM         THE COURT:  Yes.

2:28:44PM         MS. DUNN:  Thank you, Your Honor.

2:28:44PM         THE COURT:  Whenever you are ready, you may proceed.

2:28:44PM         MS. DUNN:  Thank you, Your Honor.

2:28:47PM                    **CROSS-EXAMINATION**

2:28:47PM    BY MS. DUNN:

2:29:35PM    Q.  Good afternoon, Dr. Athey.  How are you?  It's good to see

2:29:39PM    you.

2:29:40PM    A.  Good afternoon.

2:29:40PM    Q.  You submitted your expert report on February 16th of 2021;

2:29:44PM    is that right?

ATHEY - CROSS / DUNN

2:29:44PM   **A.**  That sounds right.

2:29:45PM   **Q.**  And you were deposed on April 3rd of 2021, about a month

2:29:48PM   ago and change?

2:29:50PM   **A.**  Sounds right too.

2:29:52PM   **Q.**  Okay.  And you testified on direct that after you

2:29:55PM   submitted your report and after you were deposed, you reviewed

2:29:58PM   some documents that had been dedesignated.

2:30:01PM       And we will potentially talk about some of those, but I

2:30:05PM   want to first talk about what you looked at when you were

2:30:09PM   formulating your opinions and writing your report.  Okay?

2:30:12PM   **A.**  Yes.

2:30:13PM   **Q.**  All right.  Before your report and in developing your

2:30:14PM   opinions, you did not review any of the Apple business

2:30:18PM   documents produced by Apple in this litigation, correct?

2:30:22PM   **A.**  Correct.

2:30:23PM   **Q.**  And before your report, you also did not review any Epic

2:30:27PM   documents produced in this case either, correct?

2:30:31PM   **A.**  Correct.

2:30:32PM   **Q.**  And --

2:30:33PM   **A.**  I'm sorry.  So I reviewed David Evans' redacted report.

2:30:40PM   **Q.**  Fair enough.

2:30:41PM       So with that exception, you have not reviewed any Epic

2:30:44PM   documents before your report.

2:30:45PM   **A.**  Any -- I don't believe so.

2:30:59PM   **Q.**  Okay.  And before your report, you also did not rely upon

2:31:03PM  any third-party documents produced in this case.  There are

2:31:06PM  none in your "Materials Relied Upon," if that helps you.

2:31:10PM  A.  Correct.

2:31:10PM  Q.  Okay.  So the result was that you didn't review any

2:31:15PM  contemporaneous Apple documents related to why the App Store

2:31:20PM  was structured in the way it was when you formulated your

2:31:23PM  opinions.

2:31:23PM     That's fair, right?

2:31:25PM  A.  I didn't review any confidential Apple documents about

2:31:28PM  that, no.

2:31:29PM  Q.  Right.  And so if there were confidential Apple documents

2:31:31PM  that say how many people switched from Android to iOS or

2:31:34PM  vice versa, you would not have seen those, correct?

2:31:38PM  A.  At the time of my report, correct.

2:31:40PM  Q.  Well, you would not have seen any surveys of consumers and

2:31:46PM  how often they switch, if those were produced by Apple --

2:31:50PM  A.  Correct.

2:31:50PM  Q.  -- correct?

2:31:51PM     And you also would not have seen any surveys or empirical

2:32:01PM  data that show that actually switching costs -- switching --

2:32:03PM  behavior of switching is significant, correct?

2:32:15PM  A.  I have not seen -- I've not seen evidence of significant

2:32:19PM  switching, no.

2:32:20PM  Q.  Right.  And if that evidence existed and was produced by

2:32:23PM  Apple, you would not have seen it, correct?

ATHEY - CROSS / DUNN

2:32:29PM   **A.**   As I sit here now, documents such as that might have been

2:32:35PM   alluded to in the redacted findings of fact or the direct

2:32:39PM   testimony of Apple witnesses, for example.  So that would be a

2:32:43PM   source of qualitative information, or summaries of documents

2:32:46PM   like that.

2:32:47PM   **Q.**   Right.  But in developing your opinions, you did not see

2:32:49PM   any of that.

2:32:50PM   **A.**   Correct.

2:32:51PM   **Q.**   And so in this case, you agreed to give opinions about the

2:32:54PM   procompetitive effects of eliminating Apple's restrictions

2:32:58PM   without reviewing any Apple confidential business documents;

2:33:01PM   is that correct?

2:33:02PM   **A.**   Yes.

2:33:05PM   **Q.**   Have you ever done that before, offered an opinion about

2:33:08PM   the procompetitive, or lack thereof, effects of a defendant's

2:33:13PM   conduct without reviewing any of their confidential documents?

2:33:19PM   **A.**   Just to be clear, I make -- give advice and offer

2:33:25PM   presentations, including to antitrust regulators or, you know,

2:33:31PM   other -- other industry participants about market conduct,

2:33:40PM   about expected industry structure --

2:33:45PM   **Q.**   I'm asking if you've ever done this before under oath in a

2:33:49PM   court.  Have you ever done that?

2:33:53PM   **A.**   No.

2:33:55PM   **Q.**   And by the time of your deposition on April 3rd of 2021,

2:33:57PM   you also had not read any of the deposition transcripts in

ATHEY - CROSS / DUNN

2:34:02PM   this case; is that right?

2:34:03PM   **A.**   Yes.

2:34:04PM   **Q.**   And before your deposition, you had reviewed none of

2:34:08PM   Apple's expert rebuttal reports, including the rebuttals to

2:34:11PM   your own opinions, correct?

2:34:12PM   **A.**   Correct.

2:34:13PM   **Q.**   And you didn't submit your own rebuttal report in this

2:34:16PM   case?

2:34:17PM   **A.**   That's correct.

2:34:17PM   **Q.**   All right.  Now, the reason you did not look at any of

2:34:20PM   Apple's produced documents was because of your relationship

2:34:22PM   with Microsoft, which is a competitor to Apple, correct?

2:34:29PM   **A.**   My understanding, it's because I was, at one point, a W-2

2:34:34PM   employee of Microsoft.

2:34:35PM   **Q.**   Right.  Because of your relationship with Microsoft, that

2:34:38PM   is why you did not look at Apple's confidential documents.

2:34:42PM   **A.**   Yes.

2:34:42PM   **Q.**   That's right.

2:34:43PM      All right.  Did you see the evidence from Ms. Wright's

2:34:48PM   testimony, the Microsoft 10-K, where Microsoft says they

2:34:52PM   compete with Apple in gaming?  Did you see that testimony?

2:34:57PM   **A.**   I didn't see that part of the testimony, no.

2:34:59PM   **Q.**   Okay.  Did you see any of the testimony?  Or, I'm sorry,

2:35:02PM   hear, where we can't see anything.  Did you hear any of that

2:35:06PM   testimony?

ATHEY - CROSS / DUNN

2:35:07PM    **A.**   I heard a bit about the description of streaming, but I
2:35:13PM    haven't reviewed the entire testimony.
2:35:16PM    **Q.**   And according to your C.V., which we can show you because
2:35:21PM    it might make this easier, you were with Microsoft Research
2:35:24PM    for ten years?
2:35:27PM    **A.**   In varying capacities, yes.
2:35:29PM    **Q.**   Right.  And you were a consultant with the Microsoft
2:35:33PM    Corporation for nine years.
2:35:35PM    **A.**   In varying capacities, yes.
2:35:40PM    **Q.**   Right.  And it says -- here, it says you were a consultant
2:35:40PM    to Microsoft Corporation from 2007 to 2016 and a consulting
2:35:44PM    researcher with Microsoft Research from 2008 to 2018, correct?
2:35:53PM    **A.**   Yes.
2:35:53PM    **Q.**   Okay.  And ultimately became a chief consulting economist
2:35:56PM    at Microsoft?
2:35:57PM    **A.**   So "ultimately" implies a timeline, so the -- so I was
2:36:01PM    consulting chief economist in an earlier period and then later
2:36:06PM    had different kinds of relationships, like consulting
2:36:10PM    researcher, in order to collaborate on academic papers with
2:36:15PM    Microsoft researchers.
2:36:16PM    **Q.**   Okay.  But one way or another, you have been working for
2:36:20PM    Microsoft in some way since 2007, correct?
2:36:25PM    **A.**   On and off.
2:36:26PM    **Q.**   And since August of 2020, you have continued to consult
2:36:29PM    for Microsoft; isn't that right?

ATHEY - CROSS / DUNN

2:36:34PM     **A.**   Again, on and off, but...

2:36:37PM     **Q.**   At your deposition, you said that since August of 2020,

2:36:41PM     you've done economic consulting work for Microsoft.

2:36:45PM          Is that true?

2:36:46PM     **A.**   Yes, that's correct.

2:36:47PM     **Q.**   Okay.  But that wasn't on the C.V. that you submitted to

2:36:50PM     the -- with your report.

2:36:59PM     **A.**   That is -- that is correct.  My -- not all of my

2:37:03PM     consulting clients are disclosed.  Sometimes there's a NDA or

2:37:20PM     there's not a public nature of the relationship --

2:37:22PM                    (Simultaneous colloquy.)

2:37:22PM     **Q.**   We just saw that you did disclose Microsoft, you just

2:37:28PM     didn't disclose your work subsequent to 2018, correct?

2:37:33PM     **A.**   I disclosed the time where I had a more extensive

2:37:37PM     relationship, and now they are just another client, which I

2:37:42PM     don't disclose all of my clients.

2:37:31PM     **Q.**   Right.  But you disclosed this one, just not that time

2:37:34PM     period; am I right about that?

2:37:37PM     **A.**   I've disclosed here all the time periods where I've had an

2:37:42PM     in-depth relationship with a company that went beyond an

2:37:49PM     ordinary arms-length relationship that you might expect from

2:37:52PM     someone who provides consulting services.

2:37:55PM     **Q.**   So just to put a fine point on this, even though it was

2:37:58PM     your relationship with Microsoft that prevented you from

2:38:00PM     looking at Apple's confidential documents, you didn't think

2:38:03PM    you should disclose that on your C.V.; is that correct?

2:38:10PM    A.   I don't have a separate C.V. for this case.  This is my

2:38:14PM    C.V. in which I present my important relationships.  And so on

2:38:20PM    this C.V., I'm reporting the relationship in a time at

2:38:27PM    which -- and it's a little bit generous, really, where my

2:38:32PM    relationship with Microsoft was not just project to project

2:38:35PM    or, you know, at their disposal, but we had an understanding

2:38:40PM    that I would, on an ongoing basis, be available for them for

2:38:45PM    consulting and participate in strategic decisions.  That time

2:38:49PM    actually really ended earlier than 2016, but it's being a bit

2:38:54PM    generous in the interest of academic disclosure, where you

2:38:58PM    want to make sure people understand your relationships.

2:39:03PM    Q.   Yeah, okay, Dr. Athey.  I think I understand.  Thank you.

2:39:06PM         So at your deposition, you also refused to answer whether

2:39:11PM    you're currently doing work for Microsoft that may bear on the

2:39:14PM    issues in this case.

2:39:16PM         Do you remember that?

2:39:18PM              **THE COURT:**  It goes to bias, Counsel.

2:39:20PM         So I saw you stand before I -- and then I saw you move

2:39:25PM    towards the microphone.  The objection, to the extent you

2:39:28PM    wanted to make it, is overruled.  It goes to bias.

2:39:31PM         Go ahead.

2:39:33PM    **BY MS. DUNN:**

2:39:33PM    Q.   You can answer.  Do you remember the question?

2:39:36PM    A.   If I recall my answer in the deposition, it was that I had

ATHEY - CROSS / DUNN

2:39:40PM     a nondisclosure agreement with Microsoft and I hadn't sought

2:39:45PM     their permission to disclose that, disclose the nature of my

2:39:51PM     relationship in that.  So....

2:39:57PM     **Q.**  Right.  And you recall you were instructed by Epic's

2:39:59PM     counsel not to answer?  You recall that?

2:40:03PM     **A.**  Yes.  My recollection is that they said that there was not

2:40:07PM     a Microsoft attorney present to determine whether the

2:40:13PM     information was confidential from Microsoft's perspective.

2:40:17PM     **Q.**  Okay.  So today before the Court, do you still refuse to

2:40:21PM     say whether your ongoing work for Microsoft bears on the

2:40:25PM     issues in this case?

2:40:27PM          **THE WITNESS:**  I'd feel more comfortable answering if

2:40:30PM     we had a closed session, since I don't have permission about

2:40:34PM     the NDA, Your Honor.

2:40:38PM          **THE COURT:**  All right.  We can do it at the end of

2:40:40PM     the day.

2:40:42PM          **MS. DUNN:**  There has been -- there are documents that

2:40:45PM     have been disclosed to us, and I don't believe that there is a

2:40:48PM     sealing issue that we can potentially discuss.  She can -- we

2:40:52PM     can hold the nature of her work if she feels more comfortable,

2:40:56PM     but this is documents that have already been disclosed.

2:41:00PM          **THE COURT:**  Okay.

2:41:00PM     **BY MS. DUNN:**

2:41:02PM     **Q.**  Dr. Athey, in October 2020 -- actually, I should -- I'll

2:41:07PM     start differently.

ATHEY - CROSS / DUNN

2:41:12PM        We have a document that was produced to us two weeks ago

2:41:15PM   after we moved to compel.  Judge Hixson granted our motion,

2:41:20PM   and this document was sent to us, along with a letter from

2:41:23PM   Epic's counsel, saying that it had been redacted by Microsoft.

2:41:27PM        And I'm just going to show you the first page of this

2:41:31PM   document.  It's Exhibit 5603.

2:41:36PM        Do you see the first page?

2:41:39PM   A.   I'm sorry, I have two binders.  Where should I look here?

2:41:40PM   Q.   That's right.  The small binder is your deposition and the

2:41:45PM   larger binder has exhibits.

2:41:47PM   A.   Great.  And, I'm sorry, which number?

2:41:52PM   Q.   5603.

2:41:53PM           MR. EVEN:  Sorry, what's the number?

2:41:53PM           MS. DUNN:  5603.

2:41:53PM           MR. EVEN:  Where is that?  Sorry.

2:42:07PM           THE WITNESS:  I'm sorry, there may be a tab missing.

2:42:11PM           THE COURT:  Yeah, that's not in the binder.

2:42:14PM           MS. DUNN:  So I only plan to use the title page,

2:42:19PM   which we can display because there is no information on it.

2:42:22PM   BY MS. DUNN:

2:42:23PM   Q.   All right.  Dr. Athey, this is a presentation that you

2:42:26PM   gave dated October 22nd of 2020.  It's entitled "Apple App

2:42:33PM   Store Restrictions and [Redacted] An Economic Perspective."

2:42:37PM        Do you see that?

2:42:38PM   A.   Yes.

1803

ATHEY - CROSS / DUNN

2:42:38PM  **Q.**  And these redactions, we were told by Epic's counsel, were

2:42:45PM  applied by Microsoft.

2:42:47PM     Have you seen this document in your files subsequent to

2:42:53PM  its redaction by Microsoft?

2:43:01PM  **A.**  Yes.

2:43:04PM  **Q.**  And you do not deny that Microsoft has redacted out the

2:43:13PM  word "Microsoft," correct?

2:43:18PM         **MR. EVEN:**  Your Honor --

2:43:19PM         **THE WITNESS:**  Honestly, I don't know what's under

2:43:20PM  that [Redacted], so I don't think I should testify to what's

2:43:25PM  there.

2:43:26PM  **BY MS. DUNN:**

2:43:26PM  **Q.**  Do you recall the presentation at all?

2:43:28PM  **A.**  I do.

2:43:29PM  **Q.**  Okay.  You recall that it talks about middleware?

2:43:32PM         **THE COURT:**  What's the objection, Counsel?

2:43:34PM         **MR. EVEN:**  Your Honor, I believe the order about

2:43:37PM  producing this document required that the name of the client

2:43:43PM  would be redacted.  I don't believe that we have disclosed the

2:43:47PM  name of the client to Apple.

2:43:48PM     I understand that counsel for Apple can do the math and

2:43:53PM  understand who the client is, but as far as I recall, at

2:43:57PM  least, I don't believe we disclosed it or the client disclosed

2:44:01PM  it, and I don't see why this needs to be done in open court

2:44:05PM  and disclose that.

2:44:06PM          **MS. DUNN:**  Your Honor, we have a letter from Epic's

2:44:08PM   counsel saying the redactions had been applied directly by

2:44:11PM   Microsoft.

2:44:13PM          **MR. EVEN:**  If I can see the letter, that would be

2:44:16PM   helpful, but -- and I will confer with my --

2:44:18PM          **THE COURT:**  Okay.  Well, I -- at this point, the

2:44:21PM   cat's out of the bag.

2:44:23PM          **MR. EVEN:**  I understand, Your Honor.

2:44:25PM          **THE COURT:**  I don't know why they -- I don't know

2:44:26PM   where that even came from, but -- that phrase, but it's out.

2:44:31PM   The bell has rung.  I like that one better.

2:44:34PM        Let's keep going.

2:44:35PM   **BY MS. DUNN:**

2:44:35PM   **Q.**  All right.  Dr. Athey, you recall this presentation,

2:44:37PM   correct?

2:44:37PM   **A.**  Yes.

2:44:38PM   **Q.**  Great.

2:44:38PM        And it is, in our version, heavily redacted, but you

2:44:43PM   recall that it talks about middleware, correct?

2:44:45PM   **A.**  Yes.

2:44:46PM   **Q.**  And you recall that it also talks about gaming, correct?

2:44:48PM   **A.**  Yes.

2:44:52PM   **Q.**  And you're not going to deny that this presentation from

2:44:55PM   Microsoft about Apple's App Store restrictions relates

2:44:59PM   directly to the issues in this case, are you?

2:45:01PM  **A.**  No.

2:45:02PM  **Q.**  And this is from October 22nd of 2020.

2:45:05PM       Was this before or after you were retained by Epic?

2:45:11PM  **A.**  Before.

2:45:13PM  **Q.**  All right.  Your testimony involves something that you are

2:45:15PM  calling "middleware," and you said that that's short for

2:45:19PM  "economic middleware."

2:45:25PM  **A.**  So I -- in my report, I define -- there is a concept which

2:45:30PM  I'm applying, and I use the term "economic middleware" and

2:45:34PM  "middleware" interchangeably.

2:45:37PM  **Q.**  You've never seen the term "economic middleware" used in

2:45:43PM  any economic literature, correct?

2:45:45PM  **A.**  I've seen -- the concept is described, as I testified

2:45:49PM  earlier.  The specific term, no.

2:45:51PM  **Q.**  Right.  And you told us in your deposition that you came

2:45:54PM  up with the definition of "economic middleware" for this case.

2:45:58PM       Do you remember that?

2:46:06PM  **A.**  So I need to see the exact words to make sure you're

2:46:10PM  quoting -- you're characterizing them correctly.

2:46:12PM       What I -- I'm sorry.

2:46:15PM            **MS. DUNN:**  I'm happy to direct you --

2:46:18PM            **THE WITNESS:**  Sure.

2:46:18PM            **MS. DUNN:**  -- if Your Honor will permit, to

2:46:18PM  Dr. Athey's deposition.  It's page 126, 7 through 15.

25

2:46:51PM  **BY MS. DUNN:**

2:46:52PM  **Q.**  Dr. Athey, do you see that?

2:46:59PM  **A.**  I'm sorry, which line were you referring to?

2:47:01PM  **Q.**  Lines 7 through 15.

2:47:03PM         **MS. DUNN:**  Your Honor, am I permitted to read it?

2:47:07PM         **THE COURT:**  Well, not quite yet.

2:47:08PM         **MS. DUNN:**  Once she gets there.

2:47:09PM         **THE WITNESS:**  I got it.

2:47:12PM         **THE COURT:**  Does that refresh your recollection that

2:47:14PM  you said -- that you agreed with that characterization?

2:47:24PM         **THE WITNESS:**  I'm sorry, I'm still not seeing the

2:47:26PM  quote, and I would, with thought, characterize it slightly

2:47:30PM  differently.  But that's -- so --

2:47:34PM  **BY MS. DUNN:**

2:47:35PM  **Q.**  I'm talking about the part where you say -- the question

2:47:37PM  was asked to you:  "This is a definition you came up with in

2:47:41PM  connection with carrying out your analysis in this case?"

2:47:44PM         And you say:  "Yes."

2:47:49PM  **A.**  So I used a precise definition in my report to avoid any

2:47:54PM  ambiguity about what I might mean.

2:47:56PM  **Q.**  Okay.

2:47:56PM  **A.**  And that was for this case, yes.

2:47:56PM  **Q.**  We can move on.

2:48:01PM         All right.  It is your opinion, Dr. Athey, that Apple

2:48:02PM  imposes a set of technical and contractual restrictions that

ATHEY - CROSS / DUNN

2:48:07PM   block the emergence of middleware, correct?

2:48:10PM   A.   Yes.

2:48:11PM   Q.   And those restrictions block third-party app stores on

2:48:16PM   iOS, correct?

2:48:17PM   A.   Yes.

2:48:18PM   Q.   And those restrictions also block third-party payment

2:48:22PM   systems for in-app purchases of digital goods and services,

2:48:25PM   correct?

2:48:29PM   A.   Yes.

2:48:29PM   Q.   And your opinion is that both the technical and

2:48:31PM   contractual restrictions independently block the emergence of

2:48:35PM   middleware, correct?

2:48:41PM   A.   Independently and reinforcing one another in the sense

2:48:44PM   that, you know, a contractual restriction can be enforced

2:48:49PM   through technical means that prevent access to something, for

2:48:53PM   example.

2:48:54PM   Q.   Okay.  And so if Apple were to get rid of the contractual

2:48:58PM   restrictions but continue the technical restrictions, that

2:49:01PM   would not be sufficient for Epic.  Apple needs to eliminate

2:49:05PM   both sets of restrictions, correct?

2:49:09PM   A.   Eliminating some contractual restrictions don't really

2:49:15PM   relate to -- directly to technical restrictions.

2:49:19PM       But other contractual restrictions may be encoded, as I

2:49:27PM   testified, in something, for example, like a database of, you

2:49:31PM   know, who has access or who has permission to do certain

1808
ATHEY - CROSS / DUNN

2:49:36PM   actions.

2:49:36PM   **Q.**  The question is really just Apple would need to get rid of

2:49:41PM   both kinds, and that's what Epic is asking for in this case.

2:49:45PM   **A.**  Well --

2:49:45PM   **Q.**  If you don't agree, just say you don't agree.  But if you

2:49:50PM   do agree, you can say that.  We're on the clock.

2:49:55PM   **A.**  It would be beneficial to competition to eliminate

2:49:58PM   contractual -- some contractual restrictions on their own, and

2:50:02PM   it would be additionally beneficial to eliminate further

2:50:06PM   technical restrictions.

2:50:07PM   **Q.**  Okay.  And it's your opinion that the technical design of

2:50:11PM   iOS makes it impossible for multiplatform app stores to

2:50:15PM   operate on iOS, correct?

2:50:17PM   **A.**  If I understood your question correctly, then no.

2:50:31PM   **Q.**  So you say in your written direct testimony, "Apple makes

2:50:34PM   it impossible for multiplatform app stores to operate on

2:50:38PM   iOS."

2:50:39PM       And so it's your testimony that Apple's technical design

2:50:42PM   has nothing to do with that?

2:50:45PM   **A.**  I didn't -- I don't believe that that's what I said.

2:50:47PM   **Q.**  Okay.  "Apple's technical design makes it impossible for

2:50:51PM   multiplatform app stores to operate on iOS."

2:50:56PM       Agree or disagree?

2:51:01PM   **A.**  So the second question was does the technical design have

2:51:06PM   anything to do with it, to which the answer is yes, it can.

2:51:11PM          If the question is does its technical design prevent that,

2:51:23PM     I guess, you know, I didn't -- I didn't -- I didn't provide a

2:51:33PM     full analysis of the code, but I did point out that there are

2:51:40PM     provisions on the iOS today that allow, say, developers or

2:51:47PM     businesses or educational institutions to release apps in the

2:51:54PM     iOS environment.  And so that's -- if the question is is it

2:51:59PM     possible --

2:51:59PM     **Q.**  Dr. Athey --

2:52:00PM                    (Simultaneous Colloquy.)

2:52:01PM     **Q.**  -- answer my question, and then your counsel can use his

2:52:05PM     time for greater explanation.  Okay?

2:52:07PM          So my question is, due to -- we'll make it more general --

2:52:12PM     due to aspects of the technical design of iOS, Apple does not

2:52:17PM     deal with third-party app stores on iOS, correct?

2:52:20PM     **A.**  I guess it depends on how you characterize a third-party

2:52:29PM     app store.

2:52:30PM     **Q.**  Well, why don't we characterize it how you have all the

2:52:32PM     way through your report and your written direct testimony.

2:52:35PM     **A.**  Sure.  So a cross-platform app store of the type that I

2:52:38PM     described in my report is generally prohibited by Apple.  Game

2:52:46PM     subscription services under some conditions are able to

2:52:50PM     operate.  *Netflix* is able to operate.

2:52:56PM          So there's -- I described the cross-platform app store not

2:53:02PM     as a single thing that must have every characteristic of

2:53:09PM     middleware, but, rather, that cross-platform app stores, as a

2:53:13PM   phenomenon, can offer different aspects of middleware.

2:53:20PM       But a general cross-platform app store is prohibited by

2:53:25PM   Apple's conditions unless there is some kind of carve-out as

2:53:28PM   we described.

2:53:28PM   **Q.**   Okay.  And not just Apple's conditions, but Apple's

2:53:33PM   technical design, correct?

2:53:39PM   **A.**   The word, I guess, "design" -- by "design," do you mean

2:53:41PM   the -- you know, the high-level design, as in there's this

2:53:47PM   piece over here and this piece over there, or do you mean

2:53:49PM   would any line of code need to change?  The answer depends on

2:53:53PM   how -- what you mean, "design."

2:53:56PM   **Q.**   Dr. Athey, have you reviewed Epic's proposed injunction in

2:54:00PM   this case?

2:54:02PM   **A.**   At a high level.

2:54:03PM   **Q.**   Have you reviewed it?

2:54:04PM   **A.**   Um --

2:54:05PM   **Q.**   Have you read the injunction?

2:54:09PM   **A.**   I've -- I reviewed it.  I may have paid more attention to

2:54:12PM   some parts than others, and so I'm not -- I don't have it

2:54:16PM   memorized for sure.

2:54:17PM   **Q.**   I'm just asking a "yes" or "no" question.

2:54:17PM       Have you read the injunction yourself, you've read it?

2:54:26PM   **A.**   I've -- I've looked at it.  I haven't -- "read" as in,

2:54:31PM   like, am I ready to testify about different components of it?

2:54:35PM   **Q.**   No, "read" as in "read."  Surely this is a "yes" or "no"

1811

ATHEY - CROSS / DUNN

2:54:37PM   question.  You've either read the injunction or you have not

2:54:40PM   read the injunction.

2:54:42PM   A.   Parts of it.

2:54:43PM   Q.   Okay.  All right.  Dr. Athey, from your background in

2:54:46PM   antitrust economics, it is your view that a refusal to deal is

2:54:49PM   a form of exclusionary conduct, correct?

2:55:00PM   A.   Yes.

2:55:02PM   Q.   All right.  And you understand that Apple has many APIs,

2:55:06PM   correct?

2:55:08PM   A.   Yes.

2:55:08PM   Q.   And you understand that it's not possible to put an app

2:55:11PM   onto the iOS platform without using Apple's tools and APIs,

2:55:15PM   correct?

2:55:16PM   A.   Yes.

2:55:20PM   Q.   All right.  And you understand that your economic

2:55:22PM   middleware would need to connect to iOS through APIs and,

2:55:26PM   therefore, have to use Apple's IP, correct?

2:55:34PM   A.   To the extent that -- to the extent that you characterize

2:55:37PM   the APIs as IP, yes.

2:55:40PM   Q.   Do you think APIs are not IP?

2:55:44PM   A.   I'm not offering a legal opinion about whether they are or

2:55:47PM   they're not.  I'm just answering the question.  So I'm not --

2:55:49PM   I want to avoid testifying on a legal matter.

2:55:52PM        So if we said that APIs are required to connect, we

2:55:59PM   could -- I mean, do you mean a patent?  Do you mean trade

ATHEY - CROSS / DUNN

2:56:03PM   secrets?  Do you mean -- you know, there's -- so I just want

2:56:06PM   to make sure I'm being clear.  Sorry.

2:56:08PM   **Q.**   Okay.  But you understand that your economic middleware

2:56:11PM   would need to connect to iOS through Apple's APIs, and to the

2:56:16PM   extent APIs are intellectual property, you would agree with

2:56:19PM   that, correct?

2:56:21PM   **A.**   Yes.

2:56:21PM   **Q.**   All right.  And you understand that Apple would need to

2:56:23PM   license its IP to multiplatform app stores as a remedy in this

2:56:28PM   case.

2:56:35PM   **A.**   Yes.

2:56:37PM   **Q.**   And here is a question:  In your but-for world, are you

2:56:43PM   saying that Apple can or cannot sue for patent infringement

2:56:47PM   third-party app stores that come on to iOS?

2:56:52PM           **MR. EVEN:**   Objection, Your Honor.

2:56:52PM           **THE WITNESS:**   I'm sorry, I -- whether or not somebody

2:56:55PM   can sue is not -- is not -- is not my expertise.

2:57:00PM   **BY MS. DUNN:**

2:57:01PM   **Q.**   Right.  I'm just -- Doctor, what I'm trying to get at is

2:57:04PM   you're imagining a world in which Apple needs to license its

2:57:10PM   IP to third parties.

2:57:11PM       And what I want to understand is in your world that you

2:57:16PM   posit, that you described, what's the plan?  Is Apple going to

2:57:20PM   be able to -- is the answer that they should just sue

2:57:22PM   everybody that comes onto the platform for patent

ATHEY - CROSS / DUNN

2:57:26PM     infringement?  Have you thought about that?

2:57:31PM     **A.**  I don't -- I'm fairly certain I didn't propose that Apple

2:57:35PM     sue everyone on the platform, no.

2:57:38PM     **Q.**  That's not something you thought about?

2:57:50PM     **A.**  If you're asking whether I thought about how it can work

2:57:53PM     to have a platform with apps on it.  Windows and Mac are --

2:57:59PM     **Q.**  I'm --

2:58:00PM     **A.**  I'm sorry.  You asked if I had thought about it --

2:58:04PM     **Q.**  I'm sorry.  I --

2:58:04PM     **A.**  -- and so -- you just want a yes, that I thought about it.

2:58:07PM     **Q.**  Yes.

2:58:08PM     **A.**  Okay.  Sorry.  Yes, I thought about it.

2:58:09PM     **Q.**  All right.  So in your direct testimony, you discussed

2:58:12PM     quite a lot about app-related switching costs, including the

2:58:13PM     cost of repurchasing apps and in-app purchases.

2:58:19PM          Do you remember that?

2:58:20PM     **A.**  Yes.

2:58:20PM     **Q.**  And your opinions about anticompetitive effects relate to

2:58:24PM     switchings costs at a high level, directly or indirectly,

2:58:27PM     correct?

2:58:29PM     **A.**  Yes.

2:58:30PM     **Q.**  And you're aware, aren't you, that there is an extensive

2:58:34PM     body of economic literature around switching costs?

2:58:37PM     **A.**  Yes.

2:58:38PM     **Q.**  And you cited no academic literature directly focused on

ATHEY - CROSS / DUNN

2:58:44PM   switching costs in your testimony, correct?

2:58:46PM   **A.**  That's correct.

2:58:46PM   **Q.**  Okay.  And actually, in your report, you relied on only

2:58:49PM   three academic sources.  One is an article about Android in

2:58:54PM   competition in the European Competition Journal; second is an

2:58:59PM   article about online streaming and music consumption; the

2:59:04PM   third is an article that you wrote with others about Apple

2:59:07PM   Pay; and the fourth, generously construed as an academic

2:59:11PM   source, is Walter Isaacson's Steve Jobs biography.

2:59:16PM       That's -- those are the academic sources that you list in

2:59:20PM   your report?

2:59:21PM   **A.**  That sounds right.

2:59:22PM   **Q.**  Okay.  And you don't quantify yourself the time costs and

2:59:25PM   other costs of identifying and installing apps on a new mobile

2:59:28PM   operating system platform, correct?

2:59:31PM   **A.**  I presented facts relevant to that, but I didn't come with

2:59:39PM   a bottom-line number.

2:59:42PM   **Q.**  I mean, we discussed this in your deposition.  You didn't

2:59:44PM   quantify it, correct?

2:59:46PM   **A.**  Correct.

2:59:47PM   **Q.**  Right.

2:59:47PM       And you don't have surveys or empirical data that say

2:59:52PM   switching costs outweigh porting costs, correct?

3:00:03PM   **A.**  I'm sorry, switching -- you're asking me about switching

3:00:07PM   costs outweigh porting costs?  I just want to make sure I

ATHEY - CROSS / DUNN

| | |
|---|---|
| 3:00:11PM | understood the question. |
| 3:00:11PM | **Q.**  Sure.  On your direct exam, you talked about switching |
| 3:00:14PM | costs and porting costs, and I'm just asking you whether -- my |
| 3:00:17PM | understanding is you've offered no empirical data that say |
| 3:00:21PM | that the costs of switching outweigh the cost of porting or |
| 3:00:26PM | trying to form any relationship between these two things. |
| 3:00:33PM | **A.**  Well, they both independently operate to support -- to |
| 3:00:37PM | support market power in mobile platform competition, so.... |
| 3:00:44PM | **Q.**  I'm just asking if you quantified either. |
| 3:00:46PM | **A.**  No. |
| 3:00:46PM | **Q.**  Okay.  You also did not quantify the amount of time it |
| 3:00:51PM | takes to switch from an iPhone or an Android or the dollar |
| 3:00:54PM | estimate for switching between an iPhone and Android, correct? |
| 3:01:00PM | **A.**  So I -- to be -- make sure I'm answering fully, the email |
| 3:01:06PM | that I proposed had a specific dollar value proposed by Apple |
| 3:01:13PM | executives, but in my report, I did not do that |
| 3:01:16PM | quantification. |
| 3:01:17PM | Is that -- was that the question? |
| 3:01:18PM | **Q.**  You're talking about the email you showed us from 2013? |
| 3:01:22PM | **A.**  Which -- |
| 3:01:22PM | **Q.**  Right. |
| 3:01:22PM | **A.**  So I -- were you asking me about my report or my |
| 3:01:25PM | testimony?  I'm sorry. |
| 3:01:26PM | **Q.**  I'm asking whether you did anything to quantify a dollar |
| 3:01:30PM | estimate for any amount of time it takes to switch between |

ATHEY - CROSS / DUNN

3:01:32PM    iPhone and Android.  Did you do any of that work?

3:01:36PM    **A.**  No.

3:01:37PM    **Q.**  Thank you.

3:01:37PM        You also did not calculate the average amount of app

3:01:42PM    purchases that must be repurchased in moving to a new system,

3:01:47PM    correct?

3:01:47PM    **A.**  I did not calculate that average, no.

3:01:50PM    **Q.**  And you said on direct to the Court that the average user

3:01:56PM    has a hundred apps, but the number of apps that users actually

3:02:01PM    use is far lower than that, somewhere in the 30s, correct?

3:02:07PM    And that comes from the same source material where you got the

3:02:10PM    number 100.

3:02:11PM        Are you aware of that?

3:02:14PM    **A.**  Yeah, that sounds about right --

3:02:16PM    **Q.**  Okay.

3:02:16PM    **A.**  -- although the -- that -- that statement by itself is not

3:02:21PM    fully precise because you have to define what it means to use

3:02:25PM    regularly and so on.  But I'm not disputing the

3:02:31PM    characterizations you have given there.

3:02:33PM    **Q.**  Right.  And you're aware that many apps are free to

3:02:36PM    download, correct?

3:02:37PM    **A.**  Yes, right.

3:02:37PM    **Q.**  And you said on direct that many apps are available on

3:02:41PM    both platforms, correct?

3:02:47PM    **A.**  Yes.

ATHEY - CROSS / DUNN

3:02:49PM   **Q.**   Okay.   Okay.   Let me -- if you would turn in your binder,

3:03:01PM   Dr. Athey, to Exhibit 5612.   And this is an article that you

3:03:16PM   cite in your report in support of your opinions about

3:03:18PM   switching.

3:03:19PM       You say at paragraph 86 in your report that the user has

3:03:28PM   to manually search for her apps, reinstall them, and

3:03:32PM   repurchase those that change -- I'm sorry, charge an upfront

3:03:35PM   price, and then this is the article that's footnoted to that.

3:03:39PM       If you look under "Apps" in this article, there's an -- on

3:03:48PM   page 7, it says under "Apps":  "The bad news:  Any apps you've

3:03:58PM   installed on your iPhone won't automatically transfer over to

3:04:02PM   Android and any apps you paid for on iOS will likely have to

3:04:07PM   be purchased again."

3:04:08PM       Do you see that?

3:04:09PM   **A.**   Yes.

3:04:09PM   **Q.**   All right.   So that's what you cite in your testimony --

3:04:12PM   your report, I'm sorry.

3:04:14PM       And then the next paragraph offers some good news.   It

3:04:18PM   says:  "These days, most major productivity apps are readily

3:04:21PM   available on both platforms, and once you're all set up with

3:04:26PM   Android, all of your apps and app data will automatically sync

3:04:29PM   with Google servers and follow you to any future Android

3:04:34PM   devices."

3:04:34PM       Do you see that?

3:04:36PM   **A.**   Yes.

ATHEY - CROSS / DUNN

3:04:36PM   **Q.**   Right.  So the report cites the bad news and leaves out

3:04:40PM   the good news, but I know that you are aware that there are

3:04:42PM   tools for switching.

3:04:44PM        You are aware of that?  "Yes" or "no"?

3:04:47PM   **A.**   Yes.

3:04:49PM   **Q.**   Okay.  So if you look, then -- actually, this may require

3:04:55PM   switching binders, so I will read it to you.  Paragraph 46 of

3:04:57PM   your report says:

3:04:59PM        "Users will need to check to see if their other

3:05:03PM        existing apps are available on the new platform.  For

3:05:07PM        example, developers frequently launch new apps on

3:05:12PM        iOS before Android due to the higher spending on

3:05:14PM        apps and in-app purchases by iOS users."

3:05:18PM        Do you see that?

3:05:19PM   **A.**   I'm not looking at it now, but I believe --

3:05:22PM   **Q.**   I apologize.  That's --

3:05:22PM   **A.**   That's fine.

3:05:22PM   **Q.**   -- paragraph 46 of your report.

3:05:24PM        All right.  So in support of the statement that

3:05:27PM   "developers frequently launch new apps on iOS before Android

3:05:30PM   due to higher spending on apps and in-app purchases," you cite

3:05:36PM   an article from The Guardian, and that's Footnote 15.

3:05:38PM        And so we can show that to you, as well.  That is

3:05:44PM   Exhibit 5605 in your exhibit binder.  And if you turn to

3:05:57PM   page 3, there's a heading that says "Developer Concerns About

ATHEY - CROSS / DUNN

3:06:01PM    Profits and Piracy."

3:06:04PM        And if you look at the paragraph in the middle of the

3:06:06PM    screen here, it says:  "It tends to be a two-prong thing.

3:06:11PM    First, the perception that Android users are less likely to

3:06:15PM    spend money on or in apps; and, second, the belief that paid

3:06:18PM    apps in particular suffer from crippling levels of piracy on

3:06:25PM    Android."

3:06:25PM        Then it goes on to say:  "Is this fair?  Piracy on Android

3:06:29PM    is a fact.  Developers of paid apps who keep a close eye on

3:06:34PM    their analytics often notice lots more people using them than

3:06:38PM    have actually bought them on a store like Google Play.  Games

3:06:43PM    suffer in particular from this."

3:06:45PM        So in your report, Dr. Athey, you talk about the first

3:06:48PM    prong, but you leave out the second prong even though it

3:06:50PM    appears in the same sentence, the part about crippling piracy

3:06:51PM    on Android.

3:06:53PM        Was there a particular reason for that, that you omitted

3:06:56PM    the part about the crippling levels of piracy on Android?

3:07:21PM    **A.**   Sorry.  Just rereading that.

3:07:22PM        The -- in my report, I'm talking about, at that point, the

3:07:43PM    users' choices and the frictions that the user faces when

3:07:50PM    moving between the two systems, as well as the -- between

3:07:55PM    iPhone and Android, as well as the costs that they may incur

3:08:01PM    and whether or not the apps would be there.

3:08:04PM    **Q.**   All right.

ATHEY - CROSS / DUNN

3:08:05PM   **A.**   So the piracy on Android is not directly relevant to

3:08:09PM   that -- to that point.

3:08:11PM   **Q.**   All right.  Let me read you the sentence from your report.

3:08:13PM         "Developers frequently launch new apps on iOS

3:08:17PM         before Android due to higher spending on apps and

3:08:20PM         in-app purchases by iOS users."

3:08:23PM   You say that to explain why users need to check whether

3:08:26PM   those apps are available.  So in your report, you're

3:08:30PM   explaining why developers launch new apps on iOS before

3:08:35PM   Android, and you say that that's due to higher spending on

3:08:37PM   apps and in-app purchases.

3:08:43PM         So you've taken this sentence.  You've used half of it,

3:08:46PM   you've left out the other half --

3:08:48PM   **A.**   So --

3:08:48PM   **Q.**   -- in support of the same point.  And I'm just asking you

3:08:53PM   if you realize that you did that.

3:08:57PM   **A.**   So the first -- this article confirms a fact of which I am

3:09:03PM   aware across, you know, many years of experience.  The fact

3:09:08PM   that iPhone users spend more than Android users is relevant

3:09:15PM   for understanding, you know, search engines and how they

3:09:20PM   monetize, it's important for understanding, you know, the

3:09:25PM   importance of developing -- spending more money on development

3:09:29PM   of an iPhone app than an Android app, and it's been important

3:09:34PM   for understanding the evolution of this industry from the

3:09:38PM   beginning.

3:09:38PM    So I've been following this industry, you know, since the

3:09:41PM    launch of the phones --

3:09:43PM    **Q.**  Right.  That's --

3:09:43PM    **A.**  -- and so just -- you asked me why, so I'm trying to

3:09:48PM    explain why -- because this fact that iPhone users spend more

3:09:54PM    is a kind of established fact that comes up over and over

3:09:57PM    across different settings.

3:10:02PM    **Q.**  So --

3:10:02PM    **A.**  So that's -- so piracy is something that, you know,

3:10:06PM    there's an assertion here, but it's not the primary thing that

3:10:12PM    would necessarily set the expectations of industry

3:10:16PM    participants --

3:10:17PM    **Q.**  Right.

3:10:18PM    **A.**  -- in my opinion.

3:10:20PM    **Q.**  In your opinion.

3:10:20PM    And so in your opinion, security, piracy, privacy, those

3:10:25PM    issues, were not relevant, but this other -- the first half of

3:10:32PM    this paragraph was.

3:10:35PM    **A.**  I don't think that's what I said.

3:10:36PM    **Q.**  Okay.  So the word "security," Dr. Athey, does not appear

3:10:42PM    at all in your written direct testimony; that's correct?

3:10:46PM    **A.**  I'll take your word for it.

3:10:48PM    **Q.**  Right.  And you didn't mention it in your testimony today,

3:10:54PM    and even though you've written about privacy yourself, how

3:11:03PM    important that is, that also doesn't appear in your testimony,

1822

ATHEY - CROSS / DUNN

3:11:06PM   correct?

3:11:11PM   **A.**  I don't believe so, no.

3:11:13PM   **Q.**  Right.  And the point of showing you this article is that

3:11:16PM   you focused on certain things but not others, even though in

3:11:20PM   the industry, security and privacy, which you do not mention,

3:11:24PM   are very important.

3:11:25PM   Do you disagree with that?

3:11:34PM   **A.**  I don't think that's a completely fair characterization,

3:11:37PM   because the reason that we're here to talk about competition,

3:11:42PM   the reason competition is important is that we need

3:11:49PM   competitive pressures to ensure that firms innovate and

3:11:53PM   provide features that people want.  Whether or not they have

3:11:58PM   in the past, we want to make sure that they continue to

3:12:01PM   innovate.  And so I gave --

3:12:04PM   **Q.**  And so do you --

3:12:05PM   **A.**  -- I gave an opinion about this, which I said in my

3:12:09PM   testimony --

3:12:10PM   **Q.**  Dr. Athey, thanks.

3:12:10PM   **A.**  Okay.

3:12:10PM   **Q.**  Are you aware, then, that with regard to the competition

3:12:14PM   analysis in this case, security and privacy are two of Apple's

3:12:19PM   asserted procompetitive justifications for the restrictions

3:12:23PM   that you discuss?  Are you aware of that?

3:12:26PM   **A.**  Yes.

3:12:26PM   **Q.**  Okay.  And did you hear Mr. Sweeney's testimony?

1823

ATHEY - CROSS / DUNN

| | |
|---|---|
| 3:12:31PM | **A.** No. |
| 3:12:31PM | **Q.** Okay. So you may not be aware that even he has said that |
| 3:12:35PM | privacy and security are competitive differentiators for |
| 3:12:38PM | Apple. |
| 3:12:40PM | **A.** That sounds -- |
| 3:12:41PM | **Q.** Were you aware -- |
| 3:12:41PM | **A.** -- right. |
| 3:12:42PM | **Q.** You agree with that, though? |
| 3:12:44PM | **A.** Today, yes. |
| 3:12:46PM | **Q.** Okay. In your direct testimony, you also talked about |
| 3:12:50PM | mixing and matching in family groups. |
| 3:12:52PM | Do you recall that? |
| 3:12:53PM | **A.** Yes. |
| 3:12:53PM | **Q.** All right. You didn't do an independent analysis, |
| 3:12:54PM | however, of what percentage of families already mix and match |
| 3:12:58PM | within the family group, right? |
| 3:13:04PM | **A.** No. |
| 3:13:05PM | **Q.** And, in fact, as you told us in your deposition, it's very |
| 3:13:10PM | common today for families to have devices in addition to |
| 3:13:12PM | phones that run different operating systems. |
| 3:13:14PM | You recall that? |
| 3:13:18PM | **A.** Yes, for example, phones and PCs. |
| 3:13:20PM | **Q.** Right. And your testimony is that when something |
| 3:13:23PM | facilitates synchronization across platforms, it reduces |
| 3:13:23PM | mixing and matching costs, correct? |

3:13:23PM             **THE REPORTER:**  Excuse me.  I'm sorry.  I need you to

3:13:23PM   repeat that.

3:13:23PM             **MS. DUNN:**  Sorry.

3:13:32PM             **THE COURT:**  Two minutes, Ms. Dunn.

3:13:34PM   **BY MS. DUNN:**

3:13:34PM   **Q.**  Well, I want to spend my two minutes clearing up something

3:13:36PM   that we've been talking about for -- since -- like the past

3:13:39PM   two weeks.

3:13:40PM      You agree V-Bucks can be purchased on one platform and

3:13:44PM   spent on another, correct?

3:13:49PM   **A.**  Not -- not all platforms.

3:13:52PM   **Q.**  But -- right.  Not on Sony and not Nintendo, but on other

3:13:55PM   platforms, V-Bucks can be spent -- bought on one platform and

3:13:59PM   spent on another.

3:13:59PM      You know that, right?

3:14:01PM   **A.**  On some, yes.

3:14:02PM   **Q.**  Okay.  And that's not just true on a PC; that's also true

3:14:05PM   on a web browser, which is right on the phone, correct?

3:14:12PM   **A.**  The phones have a web browser, yes.

3:14:14PM   **Q.**  Right.  And you can buy V-Bucks on the web browser.

3:14:17PM      You know that, right?

3:14:19PM   **A.**  Yes.

3:14:19PM   **Q.**  Okay.  And so even if you are out and about, you can buy

3:14:23PM   V-Bucks on your iPhone, not through the app store, correct?

3:14:27PM   **A.**  I don't know if you've ever tried to do that with a baby

ATHEY - CROSS / DUNN

3:14:30PM   on your shoulder, but in principle, yes.

3:14:33PM   **Q.**  I assure you I've tried to do everything with a baby on my

3:14:37PM   shoulder.

3:14:37PM        So the same thing with the *New York Times*.  You can

3:14:40PM   subscribe through the web browser on the phone, correct?

3:14:46PM   **A.**  If you're aware that that is a possibility.

3:14:48PM   **Q.**  Right.  And you have no data to say that consumers don't

3:14:52PM   know that's a possibility.  You've done a study of that?

3:14:59PM   **A.**  I have -- I have not studied the percentage of consumers

3:15:05PM   who are aware of their -- their options.

3:15:08PM   **Q.**  Right.  And the web browser itself is middleware.

3:15:10PM        You agree with that?

3:15:14PM   **A.**  Yes.

3:15:16PM            **THE COURT:**  Okay.  It's 3:15.

3:15:18PM            **MS. DUNN:**  Thank you, Your Honor.

3:15:20PM            **THE COURT:**  So you may step down for the day,

3:15:22PM   Professor Athey.  We start -- we'll have you back on the stand

3:15:27PM   somewhere between 8:00 and 8:15.  You can leave those binders

3:15:32PM   there and step down.

3:15:35PM            **THE WITNESS:**  Thank you, Your Honor.

3:15:37PM            **THE COURT:**  We have -- I have a calendar in 15

3:15:40PM   minutes, so we will stand in recess until 8:00 a.m. unless

3:15:43PM   there is something urgent I need to deal with.

3:15:50PM            **MR. EVEN:**  Nothing here, Your Honor.

3:15:50PM            **MR. BORNSTEIN:**  Nothing, Your Honor.

3:15:51PM          **MS. DUNN:**  Nothing, Your Honor.  Thank you.

3:15:51PM          **THE COURT:**  Okay.  Thank you very much.  We will

3:15:53PM    stand in recess until 8:00 a.m.

3:15:56PM               (Proceedings concluded at 3:15 P.M.)

3:15:56PM

3:15:59PM

3:15:59PM                     **CERTIFICATE OF REPORTERS**

3:15:59PM

3:15:59PM

3:15:59PM          We, Diane E. Skillman and Pamela Hebel, certify that

3:15:59PM    the foregoing is a correct transcript from the record of

3:15:59PM    proceedings in the above-entitled matter.  We further certify

3:15:59PM    that we are neither counsel for, related to, nor employed by

3:15:59PM    any of the parties to the action in which this hearing was

3:15:59PM    taken, and further that we are not financially nor otherwise

3:15:59PM    interested in the outcome of the action.

3:15:59PM

3:15:59PM                     _____/S/DIANE E. SKILLMAN_____

3:15:59PM               Diane E. Skillman, CSR, RPR, FCRR

3:15:59PM

3:15:59PM                     _____/S/ PAMELA HEBEL_____

3:15:59PM               Pamela Hebel, CSR, RMR, FCRR

3:15:59PM

3:15:59PM               Tuesday, May 11, 2021

3:15:59PM

VOLUME 8

Pages 1827 - 2098-A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,                )
                                 )
        Plaintiff,               )    NO. C-20-5640 YGR
                                 )
  vs.                            )    Wednesday, May 12, 2021
                                 )
APPLE, INC.,                     )    Oakland, California
                                 )
        Defendant.               )    BENCH TRIAL
_____ )
APPLE, INC.,                     )
                                 )
        Counterclaimant,         )
  vs.                            )
                                 )
EPIC GAMES, Inc.,                )
                                 )
        Counter-Defendant.       )
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   **BY:  KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**

                   (Appearances continued.)

Reported By:       Diane E. Skillman, CSR 4909, RPR, FCRR
                   Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                   Raynee Mercado, CSR 8258 RMR, CRR, FCRR

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                              825 Eighth Avenue
 2                            New York, New York 10019
                         BY:  LAUREN A. MOSKOWITZ, ESQUIRE
 3                            JUSTIN C. CLARKE, ESQUIRE
                              W. WES EARNHARDT, ESQUIRE
 4                            BRENDAN BLAKE, ESQUIRE
                              JIN NIU, ESQUIRE
 5

 6    For Defendant:          GIBSON, DUNN & CRUTCHER
                              333 South Grand Avenue
 7                            Los Angeles, California 90071
                         BY:  RICHARD J. DOREN, ESQUIRE
 8                            DAN SWANSON, ESQUIRE
                              CYNTHIA RICHMAN, ESQUIRE
 9                            RACHEL BRASS, ESQUIRE
                              ARPINE LAWYER, ESQUIRE
10

11                            GIBSON, DUNN & CRUTCHER, LLP
                              2001 Ross Avenue, Suite 1100
12                            Dallas, Texas 75201
                         BY:  VERONICA S. MOYE, ESQUIRE
13
                              PAUL WEISS RIFKIND
14                            WHARTON & GARRISON LLP
                              2001 K STREET, NW
15                            Washington, DC 20006
                         BY:  KAREN DUNN, ESQUIRE
16                            JESSICA E. PHILLIPS, ESQUIRE

17

18    For Defendant:          PAUL WEISS RIFKIND
                              WHARTON & GARRISON LLP
19                            943 Steiner Street
                              San Francisco, California 94117
20                       BY:  ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| | | |
|---|---|---|
| **Plaintiff's Witnesses:** | **Page** | **VOL.** |
| **Athey, Susan** | | |
| Cross-Examination by Ms. Dunn (resumed) | 1836 | 8 |
| Redirect Examination by Mr. Even | 1864 | 8 |
| | | |
| **Defendant's Witnesses:** | | |
| **Schmalensee, Richard** | | |
| Direct Examination by Mr. Swanson | 1876 | 8 |
| Cross-Examination by Mr. Bornstein | 1906 | 8 |
| Redirect Examination by Mr. Swanson | 1990 | 8 |
| Recross-Examination by Mr. Bornstein | 1994 | 8 |
| **Lafontaine, Francine** | | |
| Direct Examination by Ms. Dunn | 2001 | 8 |
| Cross-Examination by Mr. Bornstein | 2028 | 8 |
| | | |
| **Hitt, Lorin** | | |
| Direct Examination by Ms. Richman | 2073 | 8 |
| **Plaintiff's Exhibits:** | **EVD.** | **VOL.** |
| | | |
| **Defendant's Exhibits:** | EVD. | VOL. |
| 5548 | 1877 | 8 |

```
 1    Wednesday, May 12, 2021                          8:00 a.m.

 2                         P R O C E E D I N G S

 3            THE COURT:  Let's go on the record and see who we

 4    have.

 5        Ms. Stone.

 6            THE CLERK:  All right.

 7        Calling civil action 20-5640, Epic Games, Inc. versus

 8    Apple, Inc.

 9        Counsel, please state your appearances.

10            MS. FORREST:  Good morning, Your Honor.  Katherine

11    Forrest for Epic.

12            THE COURT:  Good morning, Ms. Forrest.

13            MR. EVEN:  Good morning, Your Honor.  Yonatan Even

14    for Epic.

15            THE COURT:  Good morning.

16            MS. KLOSS:  Good morning, Your Honor.  Lauren Kloss

17    for Epic.

18            THE COURT:  Good morning.

19            MS. COSCIA:  Good morning, Your Honor.  Monica Coscia

20    for Epic Games.

21            MR. DIESSEL:  Good morning, Your Honor.  Ben Diessel

22    for Epic Games.

23            THE COURT:  So it's -- we have a new one.  Monica

24    Coskia [phonetic]?  Is that right?

25            MS. COSCIA:  Cosia [phonetic], Your Honor.  Yes.
```

```
 1              THE COURT:  Ms. Dunn, you may proceed with your

 2      cross.

 3              MS. DUNN:  Thank you, Your Honor.

 4         For the court reporter, Karen Dunn for Apple.

 5                        SUSAN ATHEY,

 6      called as a witness for the PLAINTIFF, having been duly sworn,

 7      testified as follows:

 8                  CROSS-EXAMINATION (RESUMED)

 9      BY MS. DUNN:

10      Q.  Welcome back, Dr. Athey.  Good morning.

11      A.  Good morning.

12      Q.  So yesterday we left off talking about how the web browser

13      is middleware.  Do you remember that?

14      A.  Yes.

15      Q.  And you have said that third-party app stores are

16      middleware.

17         You've said that, correct?

18      A.  Correct.

19      Q.  All right.

20         And a store within a store is also middleware, correct?

21      A.  Yes.  To -- to be clear, you know, middleware can have

22      many characteristics so, you know, different types of

23      middleware will -- will function in different ways, so I'm not

24      trying to define "middleware" by one of those specific

25      examples.
```

ATHEY - CROSS (RESUMED) / DUNN

1    **Q.**   Okay.  But to the extent that you use this --

2    **A.**   Yes.

3                     (Simultaneous colloquy.)

4              **THE COURT:**   One at a time, please.

5    BY MS. DUNN:

6    **Q.**   To the extent that you use this phrase, you would include

7    store within a store within your general notion of middleware,

8    correct?

9    **A.**   Yes.

10   **Q.**   And in your opinion, app stores can differentiate by

11   specializing in narrow categories of content, like games,

12   correct?

13   **A.**   Yes.

14   **Q.**   And in your report and in your written testimony, you

15   provide three case study examples.  One is Steam.  One is

16   GameClub.  And one is Epic Game Store, correct?

17   **A.**   Yes.

18   **Q.**   All right.

19        So we'll talk about Steam and GameClub in a moment, but

20   first, to be clear, you describe Epic Game Store as a

21   personalized gaming-focused multi-platform app store; is that

22   right?

23   **A.**   Yes.

24   **Q.**   And in your written direct testimony, you say that Apple

25   excludes multi-platform app stores like Steam, correct?

ATHEY - CROSS (RESUMED) / DUNN

1  **A.**  Yes.

2  **Q.**  And in your written direct testimony, you say Steam is a

3  specialized multi-platform app store.  Users can store their

4  purchase content in their Steam Library, store their payment

5  methods in their Steam Wallet, chat and text with other users

6  in real time with Steam Chat, and that by enabling users to

7  access games and purchase game content, Steam reduces users'

8  switching and mixing and matching costs, correct?

9  **A.**  I don't have it in front of me, but that sounds -- that --

10  yes, I agree with the content.

11  **Q.**  Great.

12      And I'm not --

13  **A.**  Yeah.

14  **Q.**  It's just for time.

15  **A.**  Yes.

16  **Q.**  I would be happy to put it up for you.

17  **A.**  No problem.

18  **Q.**  And in your direct testimony, you said that this is

19  available on the Mac, on Windows and on Linux, correct?

20  **A.**  Yes.

21  **Q.**  Okay.  So I'd like to now put on the screen a slide that

22  shows what happens when you search Steam in Apple's App Store.

23      And I'm asking Mr. Spalding to put that on the screen.

24              (Demonstrative published.)

25          **MS. DUNN:**  I don't know if your screen looks like

1    mine, but the color seems --

2            **THE COURT:**  Color seems off.

3            **MS. DUNN:**  -- very purple.

4            **THE WITNESS:**  Thank you.  I see it.  Thank you.

5    **BY MS. DUNN:**

6    **Q.**  Okay.

7        And I don't know if you can see this, given the --

8            **THE COURT:**  Is that us, or is that you, Mr. Spalding?

9            **MR. SPALDING:**  I believe the court.

10           **THE COURT:**  Okay.  We'll try to --

11       Do you have a physical copy of this one, Ms. Dunn?

12           **MS. DUNN:**  We do.

13       This is at -- at Defense Exhibit 5621 in your binder.

14           **THE COURT:**  We'll try to fix that.

15           **MS. DUNN:**  Thank you, Your Honor.

16                   (Exhibit published.)

17           **MS. DUNN:**  All right.  So, Dr. Athey, if you turn to

18   Defense Exhibit 5621 in your binder.

19   **A.**  Yes.

20   **Q.**  So if you look at this screenshot, you can see that we

21   search "Steam" in the Apple App Store.  "Steam" is in the

22   search bar.  And you can see that what comes up are three

23   Steam native apps available in the App Store.  One is called

24   Steam Mobile.  One is called Steam Link.  And the third is

25   called Steam Chat.

1            Do you see that?

2    **A.**   Yes.

3    **Q.**   Okay.  Now, if you'll turn to Defense Exhibit 5616.

4                         (Exhibit published.)

5    **BY MS. DUNN:**

6    **Q.**   This is a screenshot from Steam's website about Steam

7    Mobile.  And it describes Steam Mobile, which it also calls

8    "the Steam App," and you can see in the screenshot there's a

9    picture of an iPhone and an Android phone.

10           Do you see that?

11   **A.**   Yes.

12   **Q.**   All right.  It also says you can download the Steam App on

13   the App Store and on Google Play.

14           Do you see there at the bottom?

15   **A.**   Yes.

16   **Q.**   Okay.  And towards the top, it says that with the app, you

17   can manage your account, shop, and stay up to date with games

18   in the community.

19           Do you see that?

20   **A.**   Yes.

21   **Q.**   Okay.  And so prior to your report, were you aware that

22   this app existed?

23   **A.**   (Reviewing document.)

24           Sorry.  I'm just trying read all the -- all the material

25   here with the different apps.  These --

1    **Q.**  I'm just --

2    **A.**  I'm sorry.

3    **Q.**  -- asking at this point about the Steam Mobile app.

4         Were you aware prior to your report that this app existed?

5    **A.**  (Reviewing document.)

6         Yes.

7    **Q.**  Yet you did not mention this in your report or in your

8    testimony; is that correct?

9    **A.**  This -- sorry.

10   **Q.**  Dr. Athey, this is just a "yes" or "no."

11        This is not mentioned in your report, and it was not

12   mentioned in your testimony, either your written direct

13   testimony or in your testimony yesterday, correct?

14   **A.**  My testimony describes the functionality, but I -- I

15   didn't specifically describe this app.

16   **Q.**  Right.  You did not mention that there is an app in the

17   App Store called Steam Mobile, correct?

18   **A.**  Correct.

19   **Q.**  And you did not mention that there was an app in the App

20   Store called Steam Link, correct?

21   **A.**  Correct.

22   **Q.**  And you did not mention, just to finish this out, that

23   there's an app in the App Store called Steam Chat, correct?

24   **A.**  Correct.

25   **Q.**  And yet you say you were aware of this before yesterday,

1    correct?

2    **A.**   Yes.

3    **Q.**   Okay.

4         All right.  So --

5              **THE COURT:**  So, Ms. Stone, I -- I'm being told that

6    we have to restart the system, so let's put a pause on your

7    clock.  And we should go ahead and reboot it.

8              **THE CLERK:**  Okay.  All right.

9              **MS. DUNN:**  Thank you, Your Honor.

10                   (Pause in the proceedings.)

11             **THE COURT:**  So while we're waiting here, if I had a

12   jury, I would tell some kind of joke and they would laugh

13   because I'm a judge and I'm -- even though I'm not funny.

14        But I do want to correct for the record -- I know there

15   are lots -- lots of people are taking -- they're all trying to

16   figure out who all of us are.  I don't want to be in trouble

17   with my son, so I'll tell everybody he's an aerospace

18   engineer, not an aeronautical engineer.  I'd like the record

19   globally to be corrected.  He's an aerospace engineer.  I

20   misspoke one day and, apparently, that got picked up, so

21   really don't want to be in trouble with him.

22        So okay.  Now we have our thing back.

23        Thanks for that.

24             **MS. DUNN:**  Thank you, Your Honor.

25             **THE COURT:**  All right.  Ms. Dunn, proceed.

1    BY MS. DUNN:

2    Q.  All right.  Dr. Athey, are you aware that users can buy

3    games and manage their Steam Wallet account through this app?

4    A.  So this -- this app allows you, as it says on the -- on

5    the exhibit, to browse the Steam catalog of Windows, Mac, and

6    Linux titles from your phone.

7    Q.  Right.  I'm not asking you to read the screen.  I'm just

8    asking you to tell me whether you're aware that users can buy

9    games and manage their Steam Wallet account through this app.

10   That's the question.

11   A.  And -- I think the clarification is that they -- they

12   can't buy games -- they can't buy iOS games.  They can buy

13   Windows, Mac, and Linux games, which are games.

14   Q.  Right.

15       And you're aware, aren't you, even though it doesn't say

16   so here, that users can manage their Steam Wallet account

17   through this app, correct?

18   A.  Yes.

19   Q.  All right.

20       Let's move to the Steam Link app in the App Store, so I'll

21   ask you to turn to Defense Exhibit 5617.

22                        (Exhibit published.)

23   BY MS. DUNN:

24   Q.  Now, 5617 -- excuse me -- is a Tweet that Steam sent out

25   when they launched Steam Link.  This Tweet from Steam says the

ATHEY - CROSS (RESUMED) / DUNN

1    Steam Link app is now available for free on all iOS and -- for

2    all iOS and Apple TV users.  The app allows gamers to stream

3    their Steam library to their iPhone, iPad, and Apple TV.

4        And you can see on this Tweet that there's a picture of a

5    person playing Steam games on their iPhone using a controller

6    attachment, which are available in the market today.

7        You see that, correct?

8    **A.**  Yes.

9    **Q.**  Okay.

10       And are you aware that through Steam Link, iOS users can

11   play Steam games on their iPhones and iPads through Steam

12   Link, which is an app on iOS.

13       You're aware of that.

14   **A.**  Yes.

15   **Q.**  Right.

16       And you said that you were aware prior to yesterday that

17   this existed; is that -- that's what you said?

18   **A.**  Yes.

19   **Q.**  Okay.

20       All right.  Will you turn to Exhibit 5622.

21                         (Exhibit published.)

22   **BY MS. DUNN:**

23   **Q.**  All right.  5622 is a screenshot also from the Steam

24   website, and it describes Steam Link in more detail.  And it

25   says -- if you look under the word "install," it says "install

1    the App to play your Steam games."

2         And then in extremely small print, it says under "Steam

3    Link," "stream games from your computer with Steam."

4         Do you see that?

5    **A.**  Yes, I can see that.

6    **Q.**  Okay.  That's in -- in the -- it's written there in the

7    mobile device.  You see that?

8    **A.**  I can see it, yes.

9    **Q.**  Okay.

10        And on the right, it says "extend your Steam gaming

11   experience to your mobile device, TV, or other PC.  All you

12   need is a local network or an Internet connection.  In

13   addition, Steam Link App now supports remote play together.

14   Now you can join games hosted on a friend's PC just by

15   clicking a link," correct?

16        You see that.

17   **A.**  Yes.

18   **Q.**  Okay.

19        And this also was not mentioned in your report, your

20   written direct testimony, or your testimony yesterday,

21   correct?

22   **A.**  So my report describes the overall set of features

23   associated with Steam.  But the -- the details of -- of

24   streaming from your own PC on to your device, I -- I don't

25   believe I've -- I put in those details, although I'd need to

1  check to be sure.

2  **Q.**  Right.

3      And you -- all those details you mentioned, the ones that

4  you described, like using Steam Wallet, purchasing games,

5  playing your Steam games, that you can do through these apps

6  in the App Store, that was not mentioned in your report.

7      There's no place where you say Steam has apps in the App

8  Store, correct?

9  **A.**  So I would need to review to see exactly what's there.

10  I've referenced the -- the Steam documentation and so on.

11      But I would need to -- to -- to double-check to see

12  exactly which details are -- are included.

13  **Q.**  Okay.  Do you have any idea how many times a day Steam

14  Link is downloaded?

15  **A.**  I don't know that number now.

16  **Q.**  Okay.

17      If you'll turn to Defense Exhibit 5601.

18                    (Exhibit published.)

19  **BY MS. DUNN:**

20  **Q.**  -- in your binder.  And if you -- it's an article called

21  "75 Steam statistics from 2019 and 2020."

22      This is actually one of the source materials for your

23  report.  It's footnote 62 to paragraph 36, I believe.

24      And according to this source material, it says that Steam

25  Link, which allows users -- this is on page 3 -- it says that

ATHEY - CROSS (RESUMED) / DUNN

```
1    Steam Link, which allows users to play games on their mobile
2    devices, has been installed 2 million times.
3        Do you see that?
4    A.   Yes.
5    Q.   And right beneath that, it says, on average Steam Link is
6    downloaded at around 52,000 times daily.
7        Do you see that?
8    A.   Yes.
9    Q.   Okay.
10        And so you don't have any reason to -- to disagree with
11    that, do you?
12    A.   No.
13    Q.   Okay.  If we could go to Defense Exhibit 5623.
14                        (Exhibit published.)
15    BY MS. DUNN:
16    Q.   This is a screenshot of Steam Chat also from the Steam
17    website.  This is another app that you can download from the
18    App Store and on Google Play.
19        You can see the icons that say "download on the App Store"
20    and "get it Google play."
21        You see that?
22    A.   Yes.
23    Q.   All right.  And Steam Chat, it says, is a lightweight app
24    focused on chatting with friends and groups.
25        You see that?
```

ATHEY - CROSS (RESUMED) / DUNN

1    **A.**  Yes.

2    **Q.**  It offers rich chat, which always makes me think of

3    Mr. Doren.

4         Do you see that?

5    **A.**  I'm sorry.  Rich chat.

6    **Q.**  Rich chat.

7    **A.**  Yes.  Yes.

8    **Q.**  Okay.

9         And with Steam -- with the Steam Chat App, users can

10   accept invites and then play with their friends in Steam Link

11   on their iPhone.

12        Are you aware of that?

13   **A.**  Yes.

14   **Q.**  Okay.  And, in fact, that's what's happening in this image

15   over here on the iPhone, it says, "Ben from school has invited

16   you to play, and all you need to do is click that link and

17   you're in the game."

18        Do you see that?

19   **A.**  I see that you can accept the invite from your personal

20   computer, PC.

21   **Q.**  Right.

22        So you're not aware that if you click the link, you're in

23   the game?

24   **A.**  If -- if I have a PC with me.  Not if I'm at school if --

25   if I'm a kid or if I'm in the bus.  But if I was using a PC

ATHEY - CROSS (RESUMED) / DUNN

1    and had that available.

2    Q.  Well, Dr. Athey, you've never used this, correct?

3    A.  I've used Steam.  But I haven't used Steam Chat.

4    Q.  Right.  Or Steam Link.

5        And if you had used them, you would know actually that you

6    don't need your PC with you.  Your PC could be anywhere to do

7    this, so --

8    A.  So -- I'm sorry.  I just -- I'm reading from the side,

9    "you can accept this invite from your PC."  So the -- the game

10   is being run in the PC.  The game -- the PC needs to be on if

11   it's -- you know, to -- to use this functionality.

12       So you need to have the -- if you're streaming a game from

13   your PC, the PC is involved.

14   Q.  But it -- but you said --

15   A.  Correct.

16   Q.  -- it needs to be with you.  And that is not correct.

17       Are you aware of that?

18   A.  So if it's -- you need to be able to have it on.  So if

19   you -- if -- yeah, if you have a laptop, for example, you

20   would need to be able to turn on your laptop, so I suppose if

21   you -- you know, if you've -- if laptop isn't being used by

22   anybody else and it's been -- it's been left on, that would be

23   a different scenario.

24       But if you're -- if you were carrying your laptop -- if

25   your laptop is in your locker or if your laptop is in your

1    briefcase and it's off, then you can't -- you -- you would

2    need to make it available for that purpose.

3    **Q.**  Right.

4        And I'm just saying you had said you need to have it with

5    you.  That's not correct.

6        And if you don't know, it's okay.

7    **A.**  Sorry.  So you --

8    **Q.**  I'm just asking --

9    **A.**  Yes.

10   **Q.**  -- whether you know that you don't need to have it with

11   you?

12   **A.**  Not necessarily.  Depends on the circumstance.

13          **THE COURT:**  She's a professor at Stanford.  She

14   can -- there isn't any harassment going on here, Mr. Even,

15   so --

16          **MR. EVEN:**  Okay.

17          **THE COURT:**  So she can the answer questions, or she

18   can argue the way she is.  There's nothing objectionable.

19   This is cross-examination.

20          **MS. DUNN:**  Thank you, Your Honor.

21   **Q.**  Dr. Athey, do any other companies have technologies like

22   Steam Link?

23   **A.**  So if you're asking is it possible -- if you're talking

24   about, like, a functionality to do remote desktop, yes.

25   **Q.**  Okay.

1          And so you must be aware that Playstation and XBox both

2     have native Apps on the iOS that allow playing of their games.

3          You're aware of that?

4     **A.**  Again, that's a -- that's a broad statement, so there are

5     specific ways that you could, for example, play a game on a

6     device that you own and -- and through a -- this kind of

7     remote-desktop-type functionality.

8     **Q.**  Okay.

9          I'd just like to put on the screen, and then we can move

10    on, DX5624.  This is Playstation's remote play from

11    Playstation.com.

12         Do you see that?

13                         (Exhibit published.)

14              **THE WITNESS:**  Yes.

15    **BY MS. DUNN:**

16    **Q.**  Okay.

17         And then if we can just put up Defense Exhibit 5620.

18                         (Exhibit published.)

19    **BY MS. DUNN:**

20    **Q.**  This is Microsoft's XBox remote play, which shows somebody

21    playing with a controller on a iPhone.

22         Do you see that?

23    **A.**  Yes.

24    **Q.**  Okay.

25         All right.  Dr. Athey, moving on from Steam, your third

ATHEY - CROSS (RESUMED) / DUNN

1   example is GameClub, which is currently available as a native

2   App on iOS, correct?

3   **A.**   Yes.

4   **Q.**   All right.

5        And if you'll turn in your binder to Defense Exhibit 5608.

6                          (Exhibit published.)

7   **BY MS. DUNN:**

8   **Q.**   On page 2.

9   **A.**   (Reviewing document.)

10  **Q.**   And I'm just reading from the description here.  This is

11  from GameClub's press kit.

12       They say that GameClub is the all-you-can-play

13  subscription home for mobile's top premium games, delivering

14  unlimited exclusive access to over a hundred universally

15  acclaimed titles, playable on both iOS and Android with new

16  games added every week.  These games are optimized for the

17  latest mobile devices and have no apps or in-app purchases as

18  part of a single subscription that can be shared with up to 12

19  family members.

20       And you can see at the end, that costs 4.99 a month, and a

21  GameClub subscription, it says, is completely cross-platform

22  with a single log-in that works anywhere.

23       Do you see that?

24  **A.**   Yes.  I believe that's the way I described it in my

25  report.

ATHEY - CROSS (RESUMED) / DUNN

1    **Q.**  I agree with that.

2         You also know that one GameClub account carries over

3    across both Android and iOS, correct?

4    **A.**  Yes, that's a key feature.

5    **Q.**  Right.

6         And you also know that GameClub has family-sharing, which

7    means a user can buy a game on iOS, and then their kids can

8    play on Android or vice versa, correct?

9    **A.**  Absolutely.  Again, that's a key feature.

10   **Q.**  Right.

11        And GameClub is a direct competitor to Apple Arcade, and

12   GameClub is available in the App Store today, correct?

13        You agree with that.

14   **A.**  Yes.

15   **Q.**  You take --

16   **A.**  I'm sorry.  I -- it's -- I mean, I didn't perform a full

17   analysis of the substitution between the two, but, you know,

18   at a high level, yes.

19   **Q.**  Okay.

20        But in your deposition, you agreed that GameClub competes

21   directly with Apple Arcade.

22        You remember that?

23   **A.**  Yes.

24   **Q.**  Okay.

25        You do take issue, however, with the requirement that each

1    game be individually downloaded, which you refer to as a

2    friction.

3        That's true.

4    **A.**  Correct.

5    **Q.**  Okay.

6        So first of all, are you aware that Apple Arcade, Apple's

7    competing product, also requires individual download?

8    **A.**  I'm -- I'm sorry.  You're -- you're asking whether Apple

9    Arcade's -- sorry.

10        Can you restate the question?

11   **Q.**  I'm happy to.  It was, I'm sure, poorly formed.

12        So Apple has a competing product called Apple Arcade?

13   **A.**  Yes.

14   **Q.**  And you're aware that Apple Arcade also requires

15   individual download of games.

16   **A.**  So -- yes.

17   **Q.**  And your testimony is that there are unnecessary frictions

18   because there might be large incremental costs between one

19   click and two clicks, correct?

20   **A.**  Yes.

21   **Q.**  Right.

22        But you've done nothing to measure what the cost might be

23   of those frictions that you've described, correct?

24   **A.**  Not specifically for the purpose of this case.

25   **Q.**  There's some measurement that you did that you didn't

ATHEY - CROSS (RESUMED) / DUNN

1    include?

2    **A.**   I guess if the question is, you know, have I ever measured

3    frictions from -- from clicks or other types of frictions

4    in -- in my research or in my industry experience, you know,

5    yes, I have.

6        But I didn't perform that specifically for this case.

7    **Q.**   Okay.  So you agree that they're not part of your

8    testimony.

9    **A.**   I agree with that.  Yes.

10   **Q.**   Okay.

11       And at the time that you submitted your report and by the

12   time of your deposition, you hadn't ever used GameClub,

13   correct?

14   **A.**   No, I've not used GameClub.

15   **Q.**   Okay.

16       So I'm going to ask Mr. Spalding to pull up on the screen

17   GameClub.

18                    (Demonstrative published.)

19   **BY MS. DUNN:**

20   **Q.**   And we found a game in here that we thought looked good.

21   It's called Hatch.  And I'm going to ask Mr. Spalding to click

22   on it within GameClub.  So if he clicks "play now," we go --

23   what happens is -- that's the -- the "play now" is what you

24   click, and then you're directed in the App Store to the app

25   for Hatch so that you can individually download it.

1       Do you see that?

2   **A.**   Yes.

3   **Q.**   All right.

4       And I want to talk to you, Dr. Athey, just for a few

5   minutes about this screen that you see when you -- when you

6   click to individually download.

7       So you can see a page from the App Store pops up.  And

8   then at the top, there's information for the users about

9   ratings, about what age the app is appropriate for.  Here it

10  says "four plus."  What kind of game it is.  Here it says it's

11  simulation game.  Who the developer is.

12      And if Mr. Spalding scrolls to the right, we'll see -- you

13  can also see what language it's in and how much size it's

14  going to take up on your device.

15      Do you see that?

16                    (Demonstrative published.)

17              **THE WITNESS:**  Yes.

18  **BY MS. DUNN:**

19  **Q.**   Okay.  And if you scroll down, you can see if there's

20  something new in the game.  You can see a preview.  You can

21  see the actual ratings and reviews.  There's a section on app

22  privacy, and -- and this is common to apps in the App Store,

23  where it tells you what privacy issues might be implicated by

24  the app.

25      If you scroll down, Mr. Spalding, you can see that there's

ATHEY - CROSS (RESUMED) / DUNN

1    other information that's listed, including the seller of the

2    game, the size, the category, compatibility -- this says it

3    works on the iPhone -- again languages, the age rating,

4    whether in-app purchase is involved, what's the status of the

5    copyright.

6                    (Demonstrative published.)

7    **BY MS. DUNN:**

8    **Q.**  There's even a link for the developer website which you

9    can click and it would go there, and then privacy policy.

10        And at the bottom, you can see if there are more games by

11   that developer.

12       Do you see all of that?

13   **A.**  Yes.

14   **Q.**  Okay.

15       And you would agree with me, I presume, that there may be

16   a benefit to users in receiving this information, like for

17   example, whether the game is appropriate for ages four and up,

18   correct?

19   **A.**  (Reviewing document.)

20       So if -- if you're asking is -- about the way in which

21   this information is presented, I think there can be many ways

22   to make sure that users have this information.  The

23   information itself is useful as -- as far as -- as far as I

24   know.

25   **Q.**  Right.

1    I -- I'm not -- I -- that's fair.  I'm not asking you

2    whether there's a different way to do it or a way you might

3    prefer.  I'm just asking whether you can acknowledge that

4    there's a benefit to users in being able to receive this

5    information.

6  **A.**  Receiving the information is -- is, from my -- from my

7    knowledge, these -- this kind of information would be valuable

8    to consumers, and having it well organized and -- and -- would

9    also be something that users might value; although I haven't

10   specifically analyzed, you know, individual pieces of this

11   information.

12 **Q.**  Right.  And I appreciate that.

13   And I think you also might acknowledge that this also

14   enables the developer to advertise other features to talk

15   about other games it has and to convey information to the

16   user.

17   You would agree with that, correct?

18 **A.**  So I think the -- there's constraints on the -- here on

19   the way that the developer provides that information.  But the

20   screen includes that information in -- in this case.

21 **Q.**  Including a link to the develop -- developer's own

22   website, correct?

23   You saw that part.

24 **A.**  Yes.

25 **Q.**  Okay.

1        All right.  Dr. Athey, your opinion is critical on

2   restrictions to interoperability.

3                    (Simultaneous colloquy.)

4   **BY MS. DUNN:**

5   **Q.**  Strike that.

6        Your opinion is critical of restrictions on

7   interoperability.

8   **A.**  That -- that's a broad statement, but the -- so I -- I'm

9   not -- I haven't said that operating systems need to be the

10  theme if -- if that's what you're asking.

11       But there are certain types of interoperability that would

12  be beneficial.

13  **Q.**  Okay.  So you say the inability to mix and match across

14  devices with different operating systems because of limited

15  interoperability and synchronization of apps and services

16  creates what I call an app barrier to mixing and matching,

17  correct?

18  **A.**  Yes.

19  **Q.**  And that seems critical of restrictions on

20  interoperability, does it not?

21  **A.**  Yes.

22  **Q.**  All right.

23       And in your written testimony, you've said users do not

24  benefit from frictions to switching.

25       Do you remember that sentence in your written testimony?

ATHEY - CROSS (RESUMED) / DUNN

1    **A.**   Yes.

2    **Q.**   At paragraph 52.

3    **A.**   Okay.

4    **Q.**   Okay.

5          And that's not a qualified statement you make in paragraph

6    52, which I can show to you.

7    **A.**   So the -- the sentence is in the context of the -- of the

8    setting that I'm describing.

9    **Q.**   All right.

10         So you disagree, Dr. Athey, that technical --

11   technological incompatibilities can increase competition by

12   providing consumers a choice.

13   **A.**   So that's a -- to -- to state -- to state the proposition

14   would be that consumers can be offered choices of -- between

15   different technologies, and having different technologies is a

16   potential benefit for consumers.

17   **Q.**   We definitely agree on that.

18         My question is whether you disagree with that

19   technological incompatibilities can increase competition by

20   providing consumers a choice.

21   **A.**   So a sentence like that would need to be taken in context.

22         So are you talking about incompatibility for its own sake

23   so the -- the phrasing of the sentence says "by providing

24   consumers a choice," which I think implies that there's

25   something that the consumer would choose, that there would --

1861
ATHEY - CROSS (RESUMED) / DUNN

1   something that they would value?

2       So, again, I -- I think if I was trying to -- that's not a

3   very precisely worded sentence without context around it,

4   but -- but I think I answered your question.

5   **Q.**  Sort of.

6       So what I'm saying is technological incompatibilities can

7   increase competition because they give consumers a choice.

8       Do you agree with that?

9   **A.**  I guess with the word "can" would -- could -- would refer

10  to the context in which a sentence like that is being stated,

11  so yes.

12  **Q.**  All right.

13      In your opinion, a failure to provide interoperability

14  could be illegal conduct.  That's your opinion.

15  **A.**  There are situations -- and -- and my understanding is

16  there are -- have been situations where a dominant firm has

17  been found to engage in illegal conduct around issues of

18  interoperability.

19  **Q.**  Right.

20      And it's your opinion that forced interoperability could

21  be a remedy in some antitrust cases, correct?

22  **A.**  I want to make sure we're clear on the term

23  "interoperability," but --

24          **THE COURT:**  Mr. Even, if you have an objection, just

25  say it "objection."

1    **MR. EVEN:**  Okay, Your Honor.

2    **THE COURT:**  Because Ms. Dunn isn't looking behind

3    herself and she can't see you standing.

4    **MR. EVEN:**  I will do, Your Honor.  I was just trying

5    not to interrupt Ms. Dunn, but I do want to lodge an objection

6    that I think we're venturing far into legal opinion realm.

7    **THE COURT:**  Okay.  So -- and the other thing is if

8    you don't object after the question, then the witness is going

9    to answer.  So I can see you standing, but you need to object.

10   I certainly am not taking her testimony as legal opinion.

11   I don't know what the point of this, Ms. Dunn.  So if you

12   can rephrase with the point.

13   **MS. DUNN:**  Sure.  This was a discussion that we had

14   with Dr. Athey in her deposition about forced

15   interoperability, so I -- mainly just trying to discuss that

16   with Dr. Athey.

17   **Q.**  And I guess my -- my only question here is whether it is

18   your view that forced interoperability should be a remedy in

19   this case?

20   **MR. EVEN:**  Same objection, Your Honor.

21   **THE COURT:**  Well, have you expressed an opinion on

22   forced interoperability?

23   **THE WITNESS:**  So I -- that --

24   **THE COURT:**  I just want to know, have you expressed

25   an opinion?

1           **THE WITNESS:**  No.

2           **THE COURT:**  Okay.

3           **THE WITNESS:**  It -- well, let me make sure I -- can I

4    understand the question?  So my -- in my -- my summary of

5    opinions does not -- does not use the term "forced

6    interoperability."

7       I'm trying to understand, you know, the -- the question

8    and the -- the bounds of the term which would be important to

9    be precise.

10      So my opinion, which I tried to state clearly, was about

11   restrictions on middleware.  And so removing those

12   restrictions would be, in my opinion, beneficial for consumers

13   and developers.  So that -- my -- my opinion was about how

14   changing restrictions would affect consumers and -- and

15   developers.

16   BY MS. DUNN:

17   **Q.**  Right.

18      And my question is since you used the word

19   "interoperability" throughout your report and your testimony,

20   whether you understand that what Epic is asking for in this

21   case is for Apple to make its products interoperable.

22   **A.**  So, again, when I'm using the term "interoperability," I'm

23   using it in the context of a specific restriction or the

24   specific experiences of -- of a consumer, so I'm -- I'm

25   concerned with the -- the breadth of your language, that it --

1    it -- you know, am I saying that the -- you know, is

2    everything about Android the same as everything about the

3    iPhone, or would -- should it be that apps that run on Android

4    also run on iPhone.

5        So there's -- you know, without more context and

6    specificity, that term could be -- you know, saying you should

7    have forced interoperability could be interpreted in a lot of

8    different ways.  So I've tried to be specific about what kinds

9    of interoperability would be beneficial.  And I gave specific

10   examples of those, which I could give again if you -- if it's

11   not clear.

12   **Q.**  No.  That's unnecessary.

13       Your Honor, I pass the witness.

14           **THE COURT:**  Redirect.

15                   <u>**REDIRECT EXAMINATION**</u>

16   **BY MR. EVEN:**

17   **Q.**  Good morning, Professor Athey.

18   **A.**  Good morning.

19   **Q.**  I want to ask you a few questions about some of the

20   questions that Ms. Dunn presented today and yesterday.

21       And let's start with the last point about

22   interoperability.  Have you given any opinions in your reports

23   or in your direct about any duty on Apple to make any of its

24   own software available on Android, for instance?

25   **A.**  No.

ATHEY - REDIRECT / EVEN

1    **Q.**  Ms. Dunn asked you some questions about something called

2    GameClub.

3        Do you remember that?

4    **A.**  Yes.

5    **Q.**  And she said GameClub is available now on the iOS?

6    **A.**  Yes.

7    **Q.**  Do you remember from your report whether GameClub's entry

8    into iOS was smooth?

9    **A.**  No.  In my report, I mention that GameClub's application

10   to the App store was rejected more than 100 times.

11   **Q.**  And can GameClub under Apple's current restrictions offer

12   any and all games?

13   **A.**  No.

14   **Q.**  What kind of games can GameClub offer?

15   **A.**  So GameClub needs to have an exclusive license to its

16   games, and so it -- it can't offer -- the restrictions

17   preclude third-party games, so there -- these are contractual

18   restrictions not related to the -- you know, the game itself

19   but whether the game developer has a contract with someone

20   else.

21   **Q.**  Turning to Steam, you mentioned Steam on your direct

22   testimony as a -- an example of a cross-platform app store,

23   correct?

24   **A.**  Yes.

25   **Q.**  And if I remember correctly, you pointed out that it's

1   something that you can download apps on to one operating

2   system and then port them to another operating system, right?

3   **A.**   That -- the -- that -- what the -- want to be careful with

4   the word "port," but as a user, you can -- say, if you switch

5   from a Mac to a PC or from a PC to the Mac, it facilitates

6   your downloading the game on whichever -- either platform and

7   playing it on that platform.

8   **Q.**   And you mentioned yesterday that you can do that as a

9   one-stop shop through something like Steam, correct?

10  **A.**   Correct.

11  **Q.**   And Ms. Dunn showed you the Steam app on iOS.  Can you

12  download iOS games through the Steam app?

13  **A.**   On the iOS, no.

14  **Q.**   Can you download Android games through the Steam store

15  through the app on Android?

16  **A.**   No.

17  **Q.**   And Ms. Dunn also asked you a few questions about Steam

18  Link, which allows you to, as we put it, stream games on to

19  your mobile device.

20      Where is this streaming from?

21  **A.**   From your PC.

22  **Q.**   And so you would need both the PC running the game and

23  your phone?

24  **A.**   Correct.

25  **Q.**   Want to turn to a couple of things that you were asked

ATHEY - REDIRECT / EVEN

1    yesterday.

2        You were asked a few questions about your work for

3    Microsoft.

4        Do you remember that?

5    **A.**  Yes.

6    **Q.**  And you remember that counsel for Apple asked you even

7    though it was your relationship with Microsoft that prevented

8    you from looking at Apple's confidential documents, you didn't

9    think you should disclose that on your C.V.

10       Do you remember being asked that question?

11   **A.**  Yes.

12   **Q.**  And you said yesterday that what prevented you from

13   looking at Apple's confidential documents was what you

14   referred to as a W2 work for Microsoft.

15       Do you recall that?

16   **A.**  Yes.

17   **Q.**  And by "W2," I -- I assume you meant that you were an

18   employee of Microsoft, correct?

19   **A.**  Correct.

20   **Q.**  When were you an actual employee of Microsoft?

21   **A.**  So the employment relationship comes through the Microsoft

22   research visiting researcher program, which is something like

23   if you take a leave of absence from your university or you

24   spend more than a certain amount of time with Microsoft

25   research, then you -- it becomes a employment relationship.

1868
ATHEY - REDIRECT / EVEN

1    And so I had that relationship in 2008 and in one other

2    subsequent period.  I believe in 2011 or 2012.

3    Q.  And was your employment for Microsoft or your relationship

4    with Microsoft in 2008 and 2011 disclosed on your C.V. in this

5    case?

6    A.  Yes.

7    Q.  Are you presently engaged by Microsoft on any antitrust

8    matter?

9    A.  No.

10   Q.  Did you seek permission from Microsoft to serve as an

11   expert in this case?

12   A.  No.

13   Q.  Did anyone at Microsoft ask you to serve as an expert in

14   this case?

15   A.  No.

16   Q.  Did you get any direction from Microsoft about any of the

17   opinions you voiced in this case?

18   A.  No.

19   Q.  Has Microsoft been your primary consulting client in

20   recent years?

21   A.  No.

22   Q.  When was the last time that Microsoft was your primary

23   consulting client?

24   A.  It was scaling down during 2015, and so somewhere in that

25   range.

1869

1    **Q.**  As far as you know, did your engagement by Epic have

2    anything to do with Microsoft?

3    **A.**  Not as far as I know.

4    **Q.**  Ms. Dunn asked you some questions yesterday about your

5    potential review of hypothetical confidential Apple documents

6    that hypothetically said how many people switched from Android

7    iOS or vice versa.

8         You remember that?

9    **A.**  Yes.

10   **Q.**  Is there public data concerning switching between iOS and

11   Android?

12   **A.**  Yes.

13   **Q.**  And as a tech economist, platform economist, do you

14   generally keep abreast of the data about switching between

15   those two platforms?

16   **A.**  Yes.

17             **THE COURT:**  Is all of that evidence attached to your

18   report?  That is, is it a part of the record in this case?

19             **MR. EVEN:**  I'm sorry.  Which data is that, Your

20   Honor?

21             **THE COURT:**  What you just asked her about, the data

22   about switching between the platforms.  Is that data that is

23   in the record in this case, Professor Athey?

24             **THE WITNESS:**  I -- I don't want to misspeak, but I --

25             **THE COURT:**  Well, and I just want to know what's in

1870
ATHEY - REDIRECT / EVEN

```
1    the record.
2              THE WITNESS:  I believe that Dr. Evans has
3    information.
4              THE COURT:  Did you rely on Dr. Evans in establishing
5    your opinions?
6              THE WITNESS:  I relied on Dr. Evans for the market
7    definition and for the -- the switching costs and the -- the
8    market power in both the -- the foremarket and the
9    aftermarket.
10             THE COURT:  Did you review data and did you analyze
11   data?
12             THE WITNESS:  I did not do original analysis of data.
13             THE COURT:  And there's no data attached to your
14   report?
15             THE WITNESS:  No -- no original data, no.
16             THE COURT:  All right.  Thank you.
17   BY MR. EVEN:
18   Q.  You were also asked some questions about DX5612 and --
19   which talked about some bad news and good news about switching
20   between iOS and Android.
21       Do you remember that?
22   A.  Yes.
23   Q.  And in the good news, it said -- and I'm reading from
24   it -- "These days, most major productivity apps are readily
25   available on both platforms.  And once you are all set up with
```

1    Android, all of your apps and app data will automatically sync

2    with Google servers and follow you to any future Android

3    devices."

4         Do you see that?

5    **A.**   Yes.

6    **Q.**   Is that good news about the transfer from iOS to Android?

7    **A.**   No.

8    **Q.**   What is this good news about?

9    **A.**   The -- it's speaking about following between Android

10   devices.  So good news for switching among Android devices.

11   **Q.**   You were also asked by Ms. Dunn about some -- an article

12   from *The Guardian* that you cited in your report.

13        Correct?

14   **A.**   Yes.

15   **Q.**   So I'm putting up on the screen the relevant portion that

16   counsel for Apple directed you to.  And it's on page 3.

17                    (Exhibit published.)

18   **BY MR. EVEN:**

19   **Q.**   And you recall that counsel for Apple asked you some

20   questions suggesting that you omitted the parts that are bad

21   for you in this -- in the article?

22   **A.**   Yes.

23   **Q.**   And specifically, counsel for Apple pointed you to the

24   stuff that says that piracy on Android is a fact, correct?

25   **A.**   Yes.

1872

ATHEY - REDIRECT / EVEN

```
1    Q.  So I'd like to maybe scroll down a little bit to the
2    points that Ms. Dunn did not show you.
3                    (Exhibit published.)
4    BY MR. EVEN:
5    Q.  And do you see that after they say that piracy on Android
6    is a fact, they say, yet, a, piracy is also a fact of the life
7    on iOS through some elements of its jail-breaking community;
8    b, it's always difficulty to work out how many pirates
9    represent generally low sales would they have bought the app
10   otherwise; and, c, if an app is free of premium, then piracy
11   is much less of a headache.
12       Do you see that?
13   A.  Yes.
14   Q.  And then the article goes on to say only Android user less
15   keen -- sorry -- on the Android user-less-keen-to-pay point,
16   it's true that iOS is still more lucrative for developers.
17   Apple has paid out more than ten billion to its developers
18   while Google hasn't given comparable figures.
19       Do you see that?
20   A.  Yes.
21   Q.  Does the article reach a definitive conclusion about the
22   point for which you cited it, which was the point about users
23   paying more on iOS?
24   A.  Yes.  The article is consistent with the -- the -- the
25   point that -- that developers make more on -- on iOS.
```

1873

ATHEY - REDIRECT / EVEN

1    **Q.**  And does the article reach a definitive conclusion that

2    Android piracy is a deterrent more so than iOS piracy?

3    **A.**  I think it's suggesting that -- that piracy may be more

4    common, but also that because, you know, people who have less

5    money to spend might be substituting between piracy and not

6    using the game at all rather than piracy for -- for paying.

7    That's my -- my interpretation of this?

8         So although piracy may be more common, it doesn't

9    necessarily mean that fixing the piracy would make the

10   developers earn more.  But that's -- in any case, that's --

11   that -- the point that I cited them about was that -- that iOS

12   developers often develop first on iOS, but also most of them

13   eventually go to Google, too, which is, you know, all

14   consistent with this.

15   **Q.**  Okay.

16        You were asked some questions yesterday about whether

17   Apple would need to undertake any technical redesign efforts

18   for middleware to run on iOS, correct?

19   **A.**  Correct.

20   **Q.**  And one of the middleware instances you were talking about

21   were streaming services, correct?

22   **A.**  Yes.

23   **Q.**  And you testified yesterday that you reviewed Microsoft

24   trial testimony concerning streaming, correct?

25   **A.**  Yes.

ATHEY - REDIRECT / EVEN

1    **Q.**  And that you reviewed Nvidia's testimony on the topic of

2    streaming, correct?

3            **MS. DUNN:**  Objection.  I think mischaracterizes the

4    record.

5            **THE COURT:**  Sustained.  I think you -- you said you

6    didn't listen to the testimony.  But did you read something

7    else?

8            **THE WITNESS:**  I --

9            **THE COURT:**  What is it that -- let's just get the

10   record clear.

11           **THE WITNESS:**  Sorry.

12           **MR. EVEN:**  I think, Your Honor, what --

13           **THE COURT:**  Just let -- she can answer.

14   **BY MR. EVEN:**

15   **Q.**  Go ahead.

16           **THE COURT:**  Was it Nvid- -- did you read the

17   testimony or something else?

18           **THE WITNESS:**  I read selections of testimony that

19   related to streaming.

20           **THE COURT:**  Okay.  For Microsoft and Nvidia.

21           **THE WITNESS:**  Yes.

22           **THE COURT:**  Okay.

23   **BY MR. EVEN:**

24   **Q.**  And based on your review of that testimony, do you have an

25   understanding whether technical design changes would need to

1   be done in iOS to support app streaming?

2   **A.**  My understanding was that these witnesses said that

3   technical design changes would not be needed, that -- I

4   believed that, you know, one of the apps accepted and --

5   and -- from Nvidia and then taken down, so --

6             **MR. EVEN:**  Thank you, Professor Athey.  I have no

7   further questions.

8             **THE WITNESS:**  Thank you.

9             **THE COURT:**  Any recross on those seven topics?

10             **MS. DUNN:**  No re-cross, Your Honor.  Thank you.

11             **THE COURT:**  All right.  Professor, you're excused.

12   Thank you.

13        If counsel will come and get those binders.

14        Next witness.

15                   (Off-the-record discussion.)

16             **THE COURT:**  Ms. Forrest, next witness.

17             **MS. FORREST:**  Yes.  Your Honor, we now turn to some

18   of the economists from the Apple side.

19             **THE COURT:**  Okay.  Thank you.

20             **MR. SWANSON:**  Your Honor, as our next witness --

21   perhaps our first witness, we're calling Professor Richard

22   Schmalensee.

23             **THE COURT:**  You need to identify yourself for the

24   record.

25             **MR. SWANSON:**  Dan Swanson for Apple, Your Honor.