PAUL J. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
27th Floor San Francisco, CA 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

CHRISTINE A. VARNEY (*pro hac vice*)
cvarney@cravath.com
KATHERINE B. FORREST (*pro hac vice*)
kforrest@cravath.com
GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant
Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., | Case No. 4:20-cv-05640-YGR-TSH |
| Plaintiff, Counter-defendant, | **EPIC GAMES, INC.'S OPPOSITION TO APPLE INC.'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS** |
| v. | The Honorable Yvonne Gonzalez Rogers |
| APPLE INC., | |
| Defendant, Counterclaimant. | |

Apple Inc.'s ("Apple") Motion for Judgment on Partial Findings with respect to Epic Game Inc.'s ("Epic") essential facility claim (Count II) should be denied. Epic has proven all of the elements of its essential facility claim, including those specifically challenged by Apple's Motion. Apple obfuscates the basis for Epic's essential facility claim, arguing that the claim fails because Apple has provided access to iOS for apps like *Fortnite*. However, Epic's essential facility claim is not based on Epic's status as a *developer* seeking access for *Fortnite*; it is based on Epic's status as a potential *distributor* of iOS apps seeking access for the Epic Games Store ("EGS"). Epic has presented ample evidence related to this claim and established that Epic would expand EGS to distribute iOS apps but for Apple's restrictions preventing third-party distribution of iOS apps.

Epic has proven that iOS and access to the iOS ecosystem is controlled by a single firm—Apple—and that control has given Apple the power to eliminate competition in the downstream market. The evidence presented in this case clearly demonstrates that Apple has effectively locked both consumers and developers into the iOS ecosystem, which gives Apple the power to eliminate all competition in the downstream market for iOS app distribution. Apple then tightly controls developers, limits consumer education, raises prices by instituting new required features, and retaliates against developers that dare to challenge Apple's practices. Apple also denies access to competing app distributors like EGS, which has created for Apple a monopoly in the market for iOS app distribution. Apple's focus on Epic's opportunity to distribute *Fortnite* on iOS—while entirely ignoring that Apple has completely foreclosed Epic's ability to offer iOS consumers access to EGS—is a strawman. And Apple's attempts to confine the essential facility doctrine to "physical infrastructures of a finite availability" is unsupported by the caselaw. Finally, Apple's attempt to create a safe harbor in antitrust law for anticompetitive use of intellectual property rights has no basis in the law, and it is an exception that would swallow the rule for the world's biggest technology companies.

Contrary to Apple's assertions, Epic has not abandoned its essential facility claim. Moreover, at this late stage in the case, there is no good reason for the Court to adjudicate Epic's essential facility claim separate and apart from Epic's other claims. The Court has

already heard both parties' evidence in full, and the most sensible and efficient course is to decide Epic's claims all at once.

Apple's Motion therefore should be denied.

**I.       Epic Has Proven Its Essential Facility Claim at Trial.**

To establish an essential facility claim under Section 2 of the Sherman Act, a plaintiff must show that (1) the defendant is "a monopolist in control of an essential facility"; (2) the plaintiff "is unable reasonably or practically to duplicate the facility"; (3) the defendant "has refused to provide [the plaintiff] access to the facility"; and (4) "it is feasible for [the defendant] to provide such access". *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016). At trial, Epic presented evidence satisfying all four elements of its essential facility claim, which is laid out in detail in Epic's Proposed Findings of Fact and Conclusions of Law submitted to the Court. Epic addresses below only those elements and arguments specifically raised by Apple's Motion.

        a.   <u>iOS Is an Essential Facility.</u>

Under Ninth Circuit law concerning Sherman Act Section 2 claims, "[a] facility that is controlled by a single firm" is an essential facility "if control of the facility carries with it the power to *eliminate* competition in the downstream market". *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991); *see also Aerotec*, 836 F.3d at 1184 (holding that an essential facility is "critical[ ] to competition"). Based on the evidence presented a trial, iOS satisfies that definition. Apple controls the iOS platform: Apple develops iOS. (Forstall Dep. Tr. 64:19-21; PX880 at 10.) Apple installs iOS only on Apple devices, and does not license iOS to other original equipment manufacturers. (Schiller Trial Tr. 3107:12-13.) Apple establishes the terms and conditions upon which consumers and developers interact with iOS. (*See generally* PX2619 (DPLA); PX2790 (App Review Guidelines).) Apple also exercises its total control over iOS to eliminate competition in the downstream market for iOS app distribution. Apple technologically blocks consumers from downloading native apps through any channel except the App Store. (DX5492 at 97-98; Grant Trial Tr. 716:13-717:7.) Apple conditions all app developers' access to iOS on the developers' agreement to distribute their

1  apps solely through the App Store.  (PX2619 (DPLA) §§ 3.2(g), 3.3.2, 7.6; PX2790 (App
2  Review Guidelines) § 3.2.2(i).)  Apple has intentionally created an ecosystem that locks in
3  consumers as well as developers.  (*See, e.g.*, PX892 at 2 ("tie all of our products together to
4  further lock customers into our ecosystem"); Simon Trial Tr. 393:23-394:7.)  And Apple has
5  eliminated all competitive options in the downstream market for iOS app distribution.
6  (Kosmynka Trial Tr. 986:9-25 ("The only way to get a consumer app on the iPhone is through
7  the iOS App Store.").)  Further, Epic cannot possibly duplicate the iOS platform.  If Epic did
8  go to the enormous lengths necessary to develop a competing smartphone operating system, by
9  definition, it would give rise to an entirely different platform and app distribution market.  This
10 makes iOS an essential facility under Ninth Circuit law.
11        Apple's responses to this evidence fail.
12        *First*, Apple points to Epic's success in distributing *Fortnite* on other platforms as
13 evidence that iOS is not an essential facility.  Apple asserts that Epic "is free to distribute its
14 products (including by selling V-Bucks) to iOS customers over the internet", and that iOS
15 cannot be an essential facility because Epic would survive as a business even without access to
16 iOS.  (ECF No. 708 at 3-4.)  This argument is a strawman and is not supported by the caselaw.
17        As Apple is aware, Epic has brought its essential facility claim in its capacity as a
18 potential competing *distributor* of iOS apps, not as an app developer.  (*See* ECF No. 1 ¶ 197.)
19 It is the complete foreclosure of access to iOS by Apple for Epic's software distribution
20 business that is the basis for Epic's essential facility claim.  The relative importance of iOS to
21 the success of *Fortnite* (or Epic's other apps and in-app content) has no bearing on Epic's
22 essential facility claim.  Likewise, Epic's ability to distribute apps on other platforms or in
23 other product markets is irrelevant because Apple's control of iOS prevents Epic (and others)
24 from competing with Apple in the market for iOS app distribution.  *See Alaska Airlines*, 948
25 F.2d at 544 (stating a facility is essential if it "carries with it the power to *eliminate* competition
26 in the downstream market").
27        *Second*, Apple contends that "[e]ssential facilities typically are limited to physical
28 infrastructure of finite availability" and, therefore, iOS cannot be an essential facility.  (ECF

1  No. 708 at 2.)  But the courts have imposed no such limitation.  To the contrary, "[a]lthough the
2  doctrine of essential facilities has been applied predominantly to tangible assets, there is no
3  reason why it could not apply, as in this case, to [intangible items]" because the "effect in both
4  situations is the same: a party is prevented from sharing in something essential to compete".
5  *Bellsouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 719 F. Supp. 1551, 1566
6  (S.D. Fla. 1988), *rev'd on other grounds*, 999 F.2d 1436 (11th Cir. 1993); *see also Sumotext
7  Corp. v. Zoove, Inc.*, Case No. 16-cv-01370-BLF, 2020 WL 127671, at *10 (N.D. Cal. Jan. 10,
8  2020) (denying summary judgment and allowing essential facility claim to proceed to trial
9  where alleged essential facilities were (1) a database of leasable mobile telephone dial codes,
10 and (2) the associated toolkit and APIs for servicing the dial codes).  The extraordinary
11 exception Apple asks the Cour to create in this case would render the essential facility doctrine
12 meaningless in today's digital economy.

13 *Third*, Apple attempts to establish a false equivalence between essential facilities and
14 public utilities.  (ECF No. 708 at 2-3.)  At trial, Epic's economic expert Dr. David Evans
15 testified that he does not view iOS as a "utility" that should be subjected to public *regulation* in
16 the same way that local water or electric power companies are regulated.  (Evans Trial Tr.
17 2383:13-18.)  As Dr. Evans made clear, however, even if "foundational platforms" like iOS
18 need not be regulated as public utilities, they are still subject to the existing antitrust laws:  "I
19 would not advocate a regulatory solution.  I would not advocate breaking them up.  I'm a
20 strong believer that the antitrust laws, properly used, can deal with the problems with these
21 kinds of companies." (Evans Trial Tr. 2384:4-14.)  The question of whether Apple should be
22 subject to *new* regulation as a form of *public utility* has nothing to do with the question of
23 whether it is subject to *existing* Ninth Circuit law on *essential facilities*.

24 *Fourth*, Apple argues that that its ownership of intellectual property (such as its patents,
25 copyrights, or trademarks) related to iOS precludes the Court from finding that iOS is an
26 essential facility.  (ECF No. 708 at 3.)  That is not the law.  Apple is inviting the Court to make
27 an extraordinary exception to antitrust law that would exclude the majority of the modern
28 technology and digital economy.  Intellectual property rights only provide their owner with the

right to exclude others. *See Siemens Med. Sol. U.S., Inc. v. St.-Gobain Ceramics & Plastics, Inc.*, 647 F.3d 1373, 1375 (Fed. Cir. 2011) ("As we have long recognized, however, each patent grants only a right to exclude."). Where there is no market power, conduct related to patents raises no antitrust concerns. "[A] patent does not necessarily confer market power upon the patentee." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006).

Where a firm does have market power, as Apple does, intellectual property rights do not give that firm free rein to use their exclusionary rights to harm competition. Indeed, as the court in *United States v. Microsoft* recognized, a firm does *not* enjoy an "absolute and unfettered right to use its intellectual property as it wishes" and arguments to the contrary "border[] upon the frivolous". 253 F.3d 34, 63 (D.C. Cir. 2001); *see also Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-CV-05640-YGR, 2020 WL 5993222, at *10 (N.D. Cal. Oct. 9, 2020) ("intellectual property rights do not confer a privilege to violate the antitrust laws" (internal quotation marks omitted)). Here, Apple's intellectual property gave Apple the right to prevent all third parties from writing apps for use on iOS. But Apple chose not to exercise that right; instead, Apple chose to make its intellectual property widely available to developers, resulting in the emergence of an aftermarket in which Apple has used its control over iOS to monopolize iOS app distribution. The fact that Apple's control over iOS is related to its ownership of intellectual property is not a bar to Epic's essential facility claim.

Therefore, Epic has established that iOS is an essential facility that Apple has leveraged to eliminate competition in the downstream market for iOS app distribution.

   b. <u>Apple Has Denied Epic Access to iOS in Its Capacity as an App Distributor.</u>

Apple contends that Epic's essential facility claim also fails because Apple has provided Epic access to iOS for apps like *Fortnite*. Again, this is beside the point because Epic's essential facility claim is based on its EGS business and Epic's status as being a potential *distributor* of iOS apps. Epic witnesses testified at trial that Epic currently operates EGS for personal computer applications and Mac computer applications and that Epic would expand EGS to distribute iOS applications but for Apple's restrictions preventing third-party

1  distribution of iOS apps.  (Sweeney Trial Tr. 97:24-98:4; Allison Trial Tr. 1233:11-17, 1234:2-
8.)  In this respect, Apple clearly has denied EGS access to the iOS platform and its users.

There is no dispute that Apple prohibits third-party app distribution on iOS.  Apple conditions access to the App Store, and thus to iOS users, on the requirement that developers not compete with Apple in the downstream iOS App Distribution Market.  (PX2619 (DPLA) §§ 3.2(g), 3.3.2, 7.6; PX2790 (App Review Guidelines) § 3.2.2(i).)  Apple enforces these agreements and removes apps from iOS that operate as app stores.  (*See, e.g.*, Friedman Dep. 57:24-58:9 (describing responsibilities of Apple's Fraud Engineering Algorithms and Risk team as "preventing illicit distribution" on iOS such as "distribution outside of the App Store").).  Apple also has engineered iOS so that it is not technically possible to distribute apps to consumers outside the App Store because all apps must "be validated and signed by an Apple-issued" certificate.  (DX5492 at 98; Grant Trial Tr. 718:1-5.)  And numerous Apple witnesses confirmed at trial that Apple does not permit third-party distribution of Apps on iOS.  (*See* Fischer Trial Tr. 857:16-18, 900:14-20, 964:15-18; Kosmynka Trial Tr. 986:9-25; Schiller Trial Tr. 2738:12-14, 2980:19-22.)

Contrary to Apple's repeated assertions, this is not an instance where a plaintiff is merely complaining about the *terms* on which access is being afforded.  (*See* ECF No. 708 at 5 ("The real basis for Epic's claim is that it does not like the terms of the access it *does* have.").)  The terms Apple refers to apply to the *Fortnite* iOS app not EGS for iOS apps.  EGS is not permitted any access to iOS whatsoever.  Therefore the series of cases cited by Apple in which plaintiffs with access to a facility use the antitrust laws in an effort to secure "a better deal"[1] are wholly inapplicable to this case.

Therefore, Apple has denied Epic access to the iOS platform as a distributor of iOS apps.

---

[1] *See* ECF No. 708 at 5 (citing *Aerotec Int'l, Inc*, 836 F.3d at 1185; *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Ferguson v. Greater Pocatello Chamber of Com., Inc.*, 848 F.2d 976, 983 (9th Cir. 1988); *City of Coll. Station, Tex. v. City of Bryan, Tex.*, 932 F. Supp. 877, 888 (S.D. Tex. 1996)).

## II. Epic Has Not Abandoned Its Essential Facility Claim.

At no point has Epic withdrawn, waived or otherwise abandoned its essential facility claim regarding iOS app distribution. (ECF No. 708 at 1, 6.) From the initial filing of its complaint through trial, Epic has maintained that Apple has violated Section 2 of the Sherman Act "through its unlawful denial to Epic and other app distributors of an essential facility— access to iOS". (ECF No. 1 ¶ 197.) Epic has briefed the essential facility claim in the Parties' January 22, 2021 Joint Submission Regarding Trial Elements, Legal Framework and Remedies (*see* ECF No. 276 § 8) and Proposed Findings of Fact and Conclusions of Law (*see* ECF No. 407 ¶¶ 215-245). Apple acknowledges this, having devoted a considerable portion of its proposed conclusions of law to responding to Epic's essential facility claim. (ECF No. 410 ¶¶ 385-419; *see also* ECF No. 708 at 1.) And Apple's assertion that Epic has produced "no factual, expert, or legal support for its theory of essential facility, and has effectively abandoned this claim" at trial (ECF No. 708 at 1) is belied by the record. As detailed above, as well as more fully in the updated versions of Epic's Proposed Findings of Fact and Conclusions of Law that Epic has submitted to the Court on a daily basis throughout trial, Epic has adduced significant evidence at trial that supports the various elements of its essential facility claim.

A single statement by Epic's economic expert, Dr. Evans, that he does not have a specific opinion as to whether iOS constitutes an "essential facility" within the meaning of the antitrust laws does not have any impact on Epic's claim. (Evans Trial Tr. 1673:4-11.) "Essential facility" is a legal term of art, *see City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992) ("[W]hat makes a facility essential is not the nature of the facility itself, but the effect upon competition that withholding the facility might have."), as confirmed by Apple's economic expert. Dr. Richard Schmalensee qualified his own testimony concerning the applicability of the essential facility doctrine by explaining he is "someone who has never practiced antitrust law" and that he could only offer "an economist's advice on this". (Schmalensee Trial Tr. 1997:22-24, 1999:19-22.) While Dr. Evans did not offer a specific opinion "connecting [his opinions] to the legal concept of essential facility" (Evans Trial Tr. 2390:16-2391:2), Epic's legal claim is not affected by the fact that Dr. Evans did not go outside

of his expertise to offer a legal opinion. To the contrary, Dr. Evans gave testimony at trial that is directly on point to issues that are relevant to Epic's essential facility claim. Dr. Evans testified that he believes iOS is a "foundational platform" of enormous significance to the digital economy and that Apple acts as a "gatekeeper" for iOS. (Evans Trial Tr. 2381:5-18, 2390:16-2391:2.) Dr. Evans also offered numerous opinions concerning the relevant product markets and Apple's conduct in those markets that directly support and provide the analytical framework for Epic' essential facility claim. In fact, Dr. Evan's testimony strongly supported Epic's essential facility claim.

### III. Granting Apple's Motion's Will Not Streamline the Issues for the Court to Decide.

Finally, Apple suggests that by granting its Motion the Court can streamline the issues for post-trial resolution. That simply is not the case. The evidence at trial showed that Apple is violating the Sherman Act in multiple ways. Its denial of an essential facility—iOS—to competing iOS app distributors is just one of them, and Apple has not moved against Epic's remaining claims. While Epic appreciates the Court's burden in evaluating the extensive record evidence, granting Apple's motion now will not reduce that burden or streamline the issues for the Court to decide. If the Court were to grant a judgment on partial findings on Epic's essential facility claim, the Court still would need to support that decision with findings of fact and conclusions of law—just as it will have to do for Epic's remaining claims. *See* Fed. R. Civ. P. 52(c) ("A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)."). Moreover, should the Court ultimately find for Epic on its other app distribution claims, it may not even need to reach Epic's essential facility claim to grant Epic its requested remedies. Therefore, given the Parties' extensive briefing of the issues in their respective proposed conclusions of law, and the substantial overlap between the factual bases for Epic's essential facility claim and its other app distribution claims, the most efficient path for the Court is to decide Epic's claims all at once.

### CONCLUSION

For the foregoing reasons, the Court should deny Apple's Motion for Judgment on Partial Findings with respect to Epic's essential facility claim (Count II).

Dated: May 23, 2021                               CRAVATH, SWAINE & MOORE LLP

                                                Christine Varney (*pro hac vice*)
                                                Katherine B. Forrest (*pro hac vice*)
                                                Gary A. Bornstein (*pro hac vice*)
                                                Yonatan Even (*pro hac vice*)
                                                Lauren A. Moskowitz (*pro hac vice*)
                                                Justin C. Clarke (*pro hac vice*)
                                                M. Brent Byars (*pro hac vice*)

                                  FAEGRE DRINKER BIDDLE & REATH LLP

                                    Paul J. Riehle

                                  Respectfully submitted,

                                  By:  */s/ Gary A. Bornstein*
                                           Gary A. Bornstein

                                    *Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*