VOLUME 12

Pages 2906 – 3209

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. C-20-5640 YGR |
| | ) | |
| vs. | ) | Tuesday, May 18, 2021 |
| | ) | |
| APPLE, INC., | ) | Oakland, California |
| | ) | |
| Defendant. | ) | BENCH TRIAL |
| _____ | ) | |
| APPLE, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| vs. | ) | |
| | ) | |
| EPIC GAMES, Inc., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:           CRAVATH, SWAINE & MOORE, LLP
                         825 Eighth Avenue
                         New York, New York 10019
                    BY:  **KATHERINE B. FORREST, ESQUIRE**
                         **GARY A. BORNSTEIN, ESQUIRE**
                         **YONATAN EVEN, ESQUIRE**
                         (Appearances continued.)

Reported By:      Diane E. Skillman, CSR 4909, RPR, FCRR
                  Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                  Raynee Mercado, CSR 8258 RMR, CRR, FCRR

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

For Plaintiff:           CRAVATH, SWAINE & MOORE, LLP
                         825 Eighth Avenue

```
 1                                    New York, New York 10019
                             BY:   LAUREN A. MOSKOWITZ, ESQUIRE
 2                                 JUSTIN C. CLARKE, ESQUIRE
                                   W. WES EARNHARDT, ESQUIRE
 3                                 BRENDAN BLAKE, ESQUIRE
                                   JIN NIU, ESQUIRE
 4                                 BRENT BYARS, ESQUIRE

 5       For Defendant:            GIBSON, DUNN & CRUTCHER
                                   333 South Grand Avenue
 6                                 Los Angeles, California 90071
                             BY:   RICHARD J. DOREN, ESQUIRE
 7                                 DAN SWANSON, ESQUIRE
                                   CYNTHIA RICHMAN, ESQUIRE
 8                                 RACHEL BRASS, ESQUIRE

 9

10                                 GIBSON, DUNN & CRUTCHER, LLP
                                   2001 Ross Avenue, Suite 1100
11                                 Dallas, Texas 75201
                             BY:   VERONICA S. MOYE, ESQUIRE
12
                                   PAUL WEISS RIFKIND
13                                 WHARTON & GARRISON LLP
                                   2001 K STREET, NW
14                                 Washington, DC 20006
                             BY:   KAREN DUNN, ESQUIRE
15                                 JESSICA E. PHILLIPS, ESQUIRE

16

17       For Defendant:            PAUL WEISS RIFKIND
                                   WHARTON & GARRISON LLP
18                                 943 Steiner Street
                                   San Francisco, California 94117
19                           BY:   ARPINE LAWYER, ESQUIRE

20

21

22

23

24

25
```

| **Defendant's Witnesses:** | **Page** | **Vol.** |
|---|---|---|
| **Schiller, Philip** | | |
| Direct Examination by Mr. Doren (resumed) | 2924 | 12 |
| Cross-Examination by Ms. Forrest | 2934 | 12 |
| Redirect Examination by Mr. Doren | 3142 | 12 |
| Recross-Examination by Ms. Forrest | 3191 | 12 |
| Further Redirect Examination by Mr. Doren | 3196 | 12 |
| Examination by Court | 3200 | 12 |
| **Schmid, Michael** | | |
| Direct Examination by Mr. Srinivasan | 3202 | 12 |

| **Plaintiff's Exhibits:** | **Evd.** | **Vol.** |
|---|---|---|
| 056A | 2979 | 12 |
| 0101 | 2998 | 12 |
| 0108 | 3001 | 12 |
| 0505 | 2975 | 12 |
| 0842 | 2987 | 12 |
| 0879 | 2971 | 12 |
| 0890 | 2969 | 12 |
| 0897 | 3128 | 12 |
| 1813 | 3193 | 12 |
| 1815 | 3194 | 12 |
| 1817 | 2964 | 12 |
| 1818 | 3191 | 12 |
| 1849 | 3103 | 12 |
| 1854 | 3137 | 12 |

| | **Plaintiff's Exhibits:** | **Evd.** | **Vol.** |
|---|---|---|---|
| 1 | | | |
| 2 | 1855 | 3138 | 12 |
| 3 | 1856 | 3138 | 12 |
| 4 | 1883 | 3118 | 12 |
| 5 | 1890 | 3016 | 12 |
| 6 | 1891 | 2946 | 12 |
| 7 | 1893 | 2945 | 12 |
| 8 | 1894 | 3014 | 12 |
| 9 | 1895 | 3013 | 12 |
| 10 | 1896 | 3043 | 12 |
| 11 | 1897 | 3048 | 12 |
| 12 | 1899 | 3069 | 12 |
| 13 | 1901 | 3057 | 12 |
| 14 | 1906 | 3035 | 12 |
| 15 | 1907 | 3030 | 12 |
| 16 | 1908 | 3029 | 12 |
| 17 | 1909 | 3070 | 12 |
| 18 | 1910 | 3068 | 12 |
| 19 | 1913 | 3052 | 12 |
| 20 | 1914 | 3050 | 12 |
| 21 | 1916 | 3032 | 12 |
| 22 | 1917 | 3027 | 12 |
| 23 | 1922 | 3041 | 12 |
| 24 | 1932 | 3024 | 12 |
| 25 | 1937 | 3003 | 12 |

| | **Plaintiff's Exhibits:** | **Evd.** | **Vol.** |
|---|---|---|---|
| 1 | | | |
| 2 | 1938 | 3005 | 12 |
| 3 | 1939 | 3008 | 12 |
| 4 | 1940 | 3008 | 12 |
| 5 | 1941 | 3010 | 12 |
| 6 | 1947 | 3011 | 12 |
| 7 | 1948 | 3012 | 12 |
| 8 | 1949 | 3010 | 12 |
| 9 | 1950 | 3012 | 12 |
| 10 | 1978 | 3083 | 12 |
| 11 | 2057 | 3135 | 12 |
| 12 | 2194 | 3114 | 12 |
| 13 | 2202 | 3095 | 12 |
| 14 | 2273 | 3122 | 12 |
| 15 | 2274 | 3133 | 12 |
| 16 | 2303 | 3062 | 12 |
| 17 | 2316 | 2977 | 12 |
| 18 | 2338 | 3034 | 12 |
| 19 | 2356 | 2983 | 12 |
| 20 | 2366 | 3093 | 12 |
| 21 | 2389 | 3054 | 12 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

| DEFENDANT's  EXHIBITS | EVID | VOL. |
|---|---|---|
| 3060 | 3099 | 12 |
| 3462 | 2923 | 12 |
| 4400 | 3074 | 12 |
| 5568 | 3158 | 12 |

1    <u>TUESDAY, MAY 18, 2021</u>                          <u>8:00 a.m.</u>

2                    P R O C E E D I N G S

3         **THE CLERK:**  Calling Civil Action 20-5640, Epic Games,

4    Inc., vs. Apple, Inc.

5      Counsel, please state your appearances.  The mics are on

6    at the tables.

7         **MS. FORREST:**  Good morning, Your Honor.  Katherine

8    Forrest for Epic.

9         **THE COURT:**  Good morning, Ms. Forrest.

10        **MS. MOSKOWITZ:**  Good morning, Your Honor.  Lauren

11   Moskowitz for Epic.

12        **THE COURT:**  Ms. Moskowitz, good morning.

13        **MS. BUI:**  Good morning, Your Honor.  Samantha Bui for

14   Epic.

15        **THE COURT:**  Ms. Bui, good morning.

16        **MS. KLOSS:**  Good morning, Your Honor.  Lauren Kloss

17   for Epic.

18        **THE COURT:**  Good morning.

19      And, Mr. Sweeney, good morning.

20        **MR. SWEENEY:**  Good morning.

21        **THE COURT:**  Mr. Rudd, good morning.

22        **MR. RUDD:**  Good morning.

23        **THE COURT:**  Mr. Jordan, good morning.

24      On the Apple side.

25        **MR. DOREN:**  Good morning, Your Honor.  Richard Doren

```
 1    for Apple, and with me today is Kate Adams, the general

 2    counsel of Apple; Heather Grenier, the head of civil

 3    litigation; and Kate Kaso-Howard, in-house counsel.

 4              THE COURT:  Good morning.

 5              MS. DUNN:  Good morning, Your Honor.  Karen Dunn for

 6    Apple.

 7              THE COURT:  Good morning.

 8              MS. BRACHT:  Good morning, Your Honor.  Jennifer

 9    Bracht for Apple.

10              THE COURT:  Jennifer -- what is your last name again?

11    Bracht?

12              MS. BRACHT:  Yes, Your Honor.  Bracht, B-R-A-C-H-T.

13              THE COURT:  Okay.  Welcome to the courtroom.  I think

14    I saw you yesterday, but it may have been after the morning

15    session.

16              MS. BRACHT:  Yes, Your Honor.  That's correct.

17              THE COURT:  Okay.

18        Mr. Eltiste good morning.  Did I say that right?  I think

19    I said it wrong.

20              MR. SPALDING:  Mr. Spalding, Your Honor.  Good

21    morning.

22              MR. DOREN:  It's Mr. Spalding, Your Honor.

23              THE COURT:  Mr. Spalding.  Okay.

24        I see we have our witness back.  Okay.

25        So no media, it looks like, perhaps?
```

1      Mr. Manfriedi?

2                  **MR. MANFRIEDI:**  Yes, Your Honor.

3                  **THE COURT:**  Ms. Behringer, good morning.

4                  **MS. BEHRINGER:**  Good morning, Your Honor.

5                  **THE COURT:**  Let's begin as we always do.

6      Ms. Forrest, anything on your list of issues?

7                  **MS. FORREST:**  Yes, Your Honor.  There are three

8      things, two of which I'll handle and the third will be handled

9      by my partner, Lauren Moskowitz.

10                 **THE COURT:**  Okay.

11                 **MS. FORREST:**  The first is simply that we've got now

12     the binder of deposition designations with counters.  There is

13     a stipulation that the parties I believe have all but agreed

14     on.  I haven't actually received a signed copy of it from

15     Apple.

16         We could hold the binder until we receive that in case

17     there are any changes, but I told Your Honor it would be here

18     this morning so I wanted to be able to offer it.

19                 **THE COURT:**  I was hoping it wasn't going to be a

20     three-inch --

21                 **MR. DOREN:**  I think that's four, Your Honor.

22                 **MS. FORREST:**  It's got the documents in it,

23     Your Honor, as well.

24                 **THE COURT:**  And then what is the time designation,

25     Ms. Forrest?

1          **MS. FORREST:**  The run time is one hour -- we'll get

2     the exact minute.

3          **THE COURT:**  So an hour for Epic?

4          **MS. FORREST:**  It's -- yes.  Let me just make sure

5     we've got the exact time.

6          **MS. KLOSS:**  One hour and three minutes, Your Honor.

7          **MS. FORREST:**  For Epic.  And then I think just -- how

8     many minutes for Apple?  It's very little.

9          **MS. KLOSS:**  I'll find the time for Apple, Your Honor.

10         **MS. FORREST:**  There is a small amount of time for

11    Apple as well.

12         **THE COURT:**  Okay.

13         **MS. FORREST:**  Would you prefer I hold this until the

14    stipulation is signed?

15         **THE COURT:**  Sure.  That's fine.

16         **MS. FORREST:**  All right.

17      The second issue, Your Honor, has to do with a document

18    that we found last night after the testimony of Mr. Schiller,

19    and it relates to the Small Business Program.  I don't want to

20    say much more about it because there's an issue between the

21    parties as to whether or not it's privileged, at least in

22    part.  We've conferred on it, and I think there's agreement

23    that -- I'll hand it up to Your Honor -- that -- it's PX --

24    marked for identification PX1902.  So there was an agreement

25    on a piece of it not being privileged.  That agreement has

1 been withdrawn I understand now from Mr. Doren.

2   Our view of PX1902 is that while it has as the top email

3 the general counsel of Apple, Ms. Adams, the information under

4 the very first paragraph does not appear to be privileged

5 information.  Indeed, it starts with a phrase that is

6 suggestive of not being asked for legal advice.

7   I do agree that the paragraph below that under "privileged

8 and confidential," there is one paragraph beginning with the

9 word "there."  I believe that is privileged.

10   However, the email below that from Mr. Schiller consistent

11 with Judge Hixson's rulings on some other documents relating

12 to the new business -- Small Business Program we don't believe

13 is privileged.  And --

14    **THE COURT:**  So I haven't read this yet.  Is there a

15 debate about privilege?

16    **MR. DOREN:**  There is, Your Honor.

17    **THE COURT:**  If there is, then what I would suggest is

18 rather than me reading it, we ask Judge Hixson to rule on it

19 in an expedited way, and if you're agreeable to living with

20 his decision, then it can be redacted out to the extent that

21 there is privilege so that it's not considered by -- I mean,

22 look, I can read it and then not consider it.  We do those

23 kinds of things all the time.  But if you're concerned, then

24 we can send it to Hixson.  If not, I'll just decide.  But how

25 do you want to proceed?

1           **MS. FORREST:**  Your Honor, I don't have any problem

2    with it going to Judge Hixson so long as if Judge Hixson has a

3    portion of the ruling that allows me to question on at least a

4    portion of the document, if my examination of Mr. Schiller has

5    concluded, that I would be able to examine Mr. Schiller after

6    the fact on the document.  It would be very limited.  It

7    happens to fit in with something that I would be dealing with

8    obviously early -- relatively early in my examination, but I'm

9    content to avoid it for the moment.

10           **THE COURT:**  So what page are we -- what page --

11           **MR. DOREN:**  Your Honor, if I may be heard?

12           **THE COURT:**  You may.

13           **MR. DOREN:**  So the discussion this morning -- I was

14   presented this document about 15 minutes ago.  I accept

15   counsel's representation they found it last night.

16        The first email in the chain is --

17           **THE COURT:**  The one at 12:46 a.m?

18           **MR. DOREN:**  Actually, Your Honor, I'm at the back of

19   the chain but the first in sequence.  It's from Mr. Schiller.

20        My proposal to counsel, subject to an agreement, was that

21   we would permit this first note to be used with Mr. Schiller.

22           **THE COURT:**  The one from 1:32 p.m.?

23           **MR. DOREN:**  Yes, ma'am.

24           **THE COURT:**  Okay.

25           **MR. DOREN:**  Then the next email in the chain is from

1   Doug Vetter, who is an in-house lawyer.  He is adding a

2   gentleman named Kyle, who is also an in-house lawyer.

3   Mr. Schiller then responds with reactions and further input to

4   these communications from Doug Vetter.  There is then a note

5   from Lisa Jackson, who is in the government affairs area, and

6   last in this chain is an email from Kate Adams, the general

7   counsel of Apple.

8       So from our perspective, there's at least an argument as

9   to the first note from Mr. Schiller which he frames as an

10  update.  After that, it is a back-and-forth between in-house

11  counsel, and to the extent Mr. Schiller participates in that

12  back-and-forth, that doesn't make it any less privileged.

13          **MS. FORREST:**  And just on the substantive points,

14  since I really hadn't said anything on the substance, our

15  position would be that the Mr. Vetter portion of the email to

16  which Mr. Doren has pointed, which is on the bottom of page

17  ending 817, that that is not reflective of legal advice.  The

18  fact that a lawyer is on something can, in certain instances,

19  not necessarily mean that it's either giving or soliciting

20  legal advice and that it's not.

21      And certainly the portion above that from Mr. Schiller

22  appears to be simply just a recitation of a plan relating

23  directly to the new -- to the Small Business Program.

24          **MR. DOREN:**  Well, while I certainly agree that simply

25  having a lawyer's name on a document does not make it

```
 1    privileged, when there is a back-and-forth with lawyers within

 2    the company which are capped with observations from the

 3    general counsel, that falls pretty squarely within the four

 4    corners of the privilege.

 5              THE COURT:  Okay.  Hold on just a minute.

 6                       (Pause in proceedings.)

 7              THE COURT:  All right.  I have reached out to

 8    Judge Hixson.  Let's see if he is available in response.

 9       Okay.  What next?

10         MR. DOREN:  Thank you, Your Honor.

11         MS. FORREST:  Your Honor, we do now have the time for

12    the Apple portion of the deposition designations, and it's

13    thirty-two minutes.

14              THE COURT:  Okay.

15         MS. FORREST:  So it's one are hour and three minutes

16    for Epic and thirty-two minutes for Apple.

17       I will now turn it over, Your Honor, to my colleague,

18    Ms. Moskowitz, who has an issue.

19              THE COURT:  Okay.  Thank you.

20         MS. MOSKOWITZ:  Thank you, Your Honor.  Lauren

21    Moskowitz again for Epic.

22       A couple of issues with respect to the next witness and

23    the documents that were disclosed and demonstratives that were

24    disclosed by Apple in connection with that.

25              THE COURT:  The next witness is who?
```

1          **MS. MOSKOWITZ:**  Mr. Schmid, Michael Schmid.

2          **THE COURT:**  And who is Michael Schmid?

3          **MS. MOSKOWITZ:**  He works within the App Store,

4     Business Development Group.

5          **THE COURT:**  Okay.

6          **MR. DOREN:**  Your Honor, before we launch into this,

7     could I request that these issues be addressed prior to

8     Mr. Schmid's testimony when the attorney who is most suited to

9     discuss these issues is available?

10         **THE COURT:**  Okay.  How much longer do we have with --

11    give me the thumbnail, Ms. Moskowitz.

12         **MS. MOSKOWITZ:**  Yes.  Thumbnail is they are moving to

13    admit Mr. Schmid's declaration that was submitted to the Court

14    in connection with the preliminary injunction which is just

15    classic hearsay and is not able to be used by Apple.  A big

16    issue is about the demonstratives that they disclosed for

17    Mr. Schmid, and the thumbnail is that it appears that they're

18    going to use Mr. Schmid to do what they couldn't do on

19    redirect and couldn't do with their revision on Mr. Hitt's

20    written testimony, and they are going to use Mr. Schmid to

21    walk through what can and cannot be done on websites when he

22    was never disclosed in the initial disclosures for anything

23    along those lines, and this is a -- this is a surprise, and it

24    was dumped on us yesterday for the first time.

25         So he's not -- he's not a proper witness to be talking

```
 1    about what can and cannot be done on websites within --

 2         THE COURT:  I have received lots of evidence like

 3    that.

 4         MS. MOSKOWITZ:  Yes.

 5         THE COURT:  That is, we walked through the Fortnite

 6    website, we've -- so --

 7         MS. MOSKOWITZ:  Yes.

 8         THE COURT:  -- I'm not sure I agree with you on that

 9    topic.

10         MS. MOSKOWITZ:  Yes.  Well, he was not disclosed as a

11    witness with that subject matter in terms of what can and

12    cannot be done on the web browser.  He is a business

13    development employee who works with developers, and his

14    initial disclosures were focused on his relationship with Epic

15    and his relationship with developers, and he doesn't have --

16    he was not disclosed as having personal knowledge of what can

17    and cannot be done.  That was Mr. Hitt's expert testimony.  He

18    was disclosed on it.  He was examined on it.

19         THE COURT:  One doesn't have to be an expert to

20    figure out how a web works.  So -- and, frankly, I have lots

21    of questions still.  So I'm not -- I mean, I might give you

22    some time to prep on cross and require that he come back, but

23    I'm not sure that I would strike that on that basis.

24       The declaration, that sounds like it's not appropriate.

25         MR. DOREN:  And, Your Honor, Mr. Schmid is -- he
```

1    works in developer relations.  He is well-versed in all

2    aspects, as one would expect, since he works with gaming

3    developers in the different elements of games and how people

4    access them, and to suggest that he somehow wasn't disclosed

5    to be able to address the topic, which is his core competency

6    as an employee of Apple, would be a very fine read.

7            **THE COURT:**  Yeah, I -- look.  There are -- there seem

8    to be some discrepancies in terms of what the Epic witnesses

9    have said can and cannot be done and what is in the record,

10   and I'd just like to get clarity, so I would probably allow

11   the second, not the first.

12           **MS. MOSKOWITZ:**  Thank you, Your Honor.

13           **MR. DOREN:**  Thank you, Your Honor.

14           **THE COURT:**  Okay.  We're at 8:15.

15       It looks like I have at least one other of the pool

16   reporters now.  Is that Mr. Allyn or Mr. Sisco or both?  I

17   guess I see two now.

18           **MR. ALLYN:**  Yes.  Mr. Allyn.

19           **THE COURT:**  Welcome to the courtroom, gentlemen.

20       All right.  Let's continue.

21       Mr. Schiller, if you will come back.

22       Good morning, sir.

23           **THE WITNESS:**  Good morning, Your Honor.

24           **THE CLERK:**  Line 2 is down, the press line.

25           **THE COURT:**  Let's hold on.

```
1        I understand, counsel, that there is a problem with one of
2   the phone lines.
3                    (Pause in proceedings)
4        THE COURT:  Okay.  So we'll start the clock running
5   here, Mr. Doren, at 8:21.  Proceed.
6        MR. DOREN:  Thank you, Your Honor.
7        Your Honor, just cleaning up a couple of exhibits, I don't
8   believe that I moved to enter Exhibit 5567, which was one of
9   the two Fortnite emails, and I would make that motion now.
10       THE COURT:  5567.  No objection?
11       MS. FORREST:  No objection, Your Honor.
12       THE COURT:  Admitted.
13       MR. DOREN:  And then, Your Honor, secondly is the
14  excerpt from the video which we handed up yesterday which is
15  Exhibit 3462, and I would also move that exhibit into
16  evidence.
17       MS. FORREST:  No objection, Your Honor.
18       THE COURT:  Okay.  I had actually -- I checked my
19  notes.  I had admitted 5567 yesterday so today I will admit
20  3462.
21       MR. DOREN:  Thank you, Your Honor.
22       (Defense Exhibit DX3462 received in evidence)
23       THE COURT:  Proceed.
24
25
```

**PHILIP SCHILLER**,

called as a witness for the Defendant, having been previously

duly sworn, testified further as follows:

**DIRECT EXAMINATION**  (resumed)

BY MR. DOREN:

**Q.**   Good morning, Mr. Schiller.

**A.**   Good morning.

**Q.**   You have up in front of you the demonstrative that we

finished the day with yesterday, and I believe we had

discussed these various innovations and investments up through

ReplayKit.

        Sir, are you familiar with ARKit?

**A.**   Yes.

**Q.**   When was ARKit released by Apple?

**A.**   In 2017.

**Q.**   What did ARKit do?

**A.**   It is software technology for app developers to build

applications that take advantage of augmented reality within

their applications.

**Q.**   And how do developers use ARKit?

**A.**   Well, there are a number of ways.  Advanced developers can

take advantage of the APIs in ARKit to build their own

applications, and with ARKit, there is a number of advanced

technologies that allow for placing computer-generated

imaginaries in the real world as seen through your iPhone's

SCHILLER - DIRECT RESUMED - DOREN

1    camera, and it does many very technical cool things like

2    what's called people occlusion.

3        So, for example, that means that if you are throwing a

4    ball in space and it goes behind a real person, the graphics

5    will -- of that rendering of that ball will go behind the

6    person that you see, and that's all handled by ARKit.

7    **Q.**  And, Mr. Schiller, I'd like to show a demonstrative of

8    ARKit and ask you, please, to narrate what we're seeing.

9    **A.**  Yes.  This is an app in the App Store called Animal Safari

10   AR, and it allows you to place real life-size animals around

11   you, in your yard, in your home.  So what we're seeing here is

12   an example of a user would be holding up their phone and

13   looking in their yard and placing a lion and a penguin, a

14   zebra and here even an elephant that is properly lit by the

15   angle of the sun, casting shadows on the ground.  In this

16   learning and playful app, you can feed the animals, there are

17   appropriate kinds of food, and learn what they look like.

18   **Q.**  Can you tell us which parts of that video were real and

19   which were augmented reality?

20   **A.**  Yes.  Everything you see in that app is real except the

21   animals, so the ground is your patio, the yard is your yard,

22   with these animals now placed within them.

23   **Q.**  And is ARKit relevant to game developers?

24   **A.**  I believe so.

25   **Q.**  And does ARKit improve the attractiveness of the Apple App

SCHILLER – DIRECT RESUMED – DOREN

1    Store as a digital transaction platform for games?

2    **A.**   I think so, yes.

3    **Q.**   And have any new versions of ARKit been released since

4    2017?

5    **A.**   Yes.  We're up to Version 4 of ARKit.

6    **Q.**   And so how often has it been undated?

7    **A.**   Every year.

8    **Q.**   Next, sir -- or actually skipping over Core ML for a

9    moment, we see RealityKit and Reality Composer.

10   **A.**   Yes.

11   **Q.**   When were those two APIs released?

12   **A.**   Almost two years ago now in 2019.

13   **Q.**   What do they assist developers with?

14   **A.**   So these are further advancements in our tools for

15   augmented reality.  RealityKit is technology you would place

16   in your app to make it easier for the developer to take

17   advantage of these ARKit capabilities.

18           **THE COURT:**  Can I interrupt?  I have heard back from

19   Judge Hixson, and he is able to deal with this issue this

20   morning, so if you could have lawyers from each side join his

21   dial-in, I can give that you number right now.  Can I tell him

22   they will be there in about ten minutes?

23           **MR. DOREN:**  Yes, Your Honor.

24           **MS. FORREST:**  Sure.  Yes, Your Honor.

25           **THE COURT:**  Okay.  So his dial in is 888-684-8852,

SCHILLER - DIRECT RESUMED - DOREN

1    Passcode 2925506.  I'm sure you have his email.  You can send

2    him the document by email.

3              **MR. DOREN:**  Thank you, Your Honor.

4              **THE COURT:**  Do you need the number again or do you

5    have it?

6              **MR. DOREN:**  I have, Your Honor, 888-684-8582 and the

7    passcode of 2925506.

8              **THE COURT:**  That's correct.

9              **MR. DOREN:**  Thank you.

10       May I proceed, Your Honor?

11             **THE COURT:**  You may.  Thank you.

12   **BY MR. DOREN:**

13   **Q.**  Mr. Schiller, I believe you were discussing RealityKit and

14   Reality Composer.  Can you please describe those kits?

15   **A.**  Yes.  These are both advancements for ARKit, and they

16   allow it to make it even easier for perhaps the most -- not

17   the -- an advanced developer, someone who perhaps hasn't

18   worked with 3D objects before in their application

19   development.

20       So RealityKit is a library, a framework that you would put

21   into your application to then make it easier for you to use AR

22   without having to write all of that yourself.

23       Reality Composer is actually an application, a tool, that

24   you use as a developer to construct the 3D scene that you want

25   to use as augmented reality, so it's a tool that runs on the

SCHILLER – DIRECT RESUMED – DOREN

1    Mac, on the iPhone, on the iPad, and you use it to assemble

2    the scene you want in your application.

3    **Q.**   And do RealityKit and Reality Composer –– are they

4    relevant to game developers?

5    **A.**   I think so, particularly younger developers and/or smaller

6    developers as they're getting started and want to learn to do

7    3D-augmented reality applications and games.

8    **Q.**   And do RealityKit and Reality Composer make the Apple App

9    Store more attractive as a digital game transaction platform?

10   **A.**   I think so.

11   **Q.**   And let's circle back, sir, to Core ML.

12   **A.**   Yes.

13   **Q.**   First of all, are you familiar with that API?

14   **A.**   I am.

15   **Q.**   And when was it released by Apple?

16   **A.**   In 2017.

17   **Q.**   And has Apple continued to invest in improving Core ML?

18   **A.**   We have.

19   **Q.**   And can you describe what Core ML does, please.

20   **A.**   Yes.  The ML stands for machine learning, which we've

21   spoken about briefly a bit yesterday.  It is a branch of

22   augmented reality –– excuse me –– of artificial intelligence

23   that allows to you write software that would be very difficult

24   to do with traditional software programming techniques.  These

25   are tools that help software predict what may happen and then

1    respond appropriately for the user to help them do things not

2    possible with traditional software.

3        A simple example would be you want your application to

4    look through a photo the user took and help them find pictures

5    of their dog or of dogs in general, so what you do with

6    machine learning with this advanced software, you create a

7    model, and that model says here's a whole bunch of pictures of

8    dogs.  You now as a software know what dogs look like, and you

9    put that in your app and future photos of other dogs that can

10   then predict and say oh, there are more photos of dogs because

11   of the machine learning library that you've created.

12   **Q.**   And is Core ML relevant to game developers?

13   **A.**   Oh, I think so.  I think that we are going to see more and

14   more uses of predictive machine learning technology in

15   different kinds of experiences, including games.

16   **Q.**   Sir, I'd like to show you a demonstrative of Core ML and

17   ask you to tell the Court what we're seeing.

18   **A.**   Yes.  This is a really fun app to help somebody who is a

19   basketball player become a better shooter, and what you do --

20            **THE COURT:**  I did not know this was coming.

21            **THE WITNESS:**  And I did not know you were going to be

22   possibly interested in this.

23       It's called HomeCourt.  You hold the phone up, and we are

24   seeing what the phone is seeing.  It is watching a shooter

25   shoot across the court, just taking shots, and in realtime

SCHILLER - DIRECT RESUMED - DOREN

1    it's able to see the person, see the basket, see the ball,

2    measure the arm angle, the leg angle, the release angle of the

3    shot, how long it takes to release the shot, how fast the --

4    the shot is going, what height it is that the shooter is at

5    when they release.  These things would be impossible for a

6    coach to measure in realtime while someone is shooting.

7    Probably have to go back and analyze video for hours to do

8    this.

9        And now on the iPhone with machine learning technology,

10   the developer can create an app to do that right away in

11   realtime, and this is an app that's on the store.  It's really

12   great.

13   **BY MR. DOREN:**

14   **Q.**  That was my next question, sir.  Is what we just saw from

15   an app that is currently available on the App Store?

16   **A.**  It is.

17   **Q.**  What is the name of that app?

18   **A.**  HomeCourt.

19   **Q.**  Has Apple continued to invest in improving Core ML?

20   **A.**  We have.

21   **Q.**  And has the expense of developing any of these APIs and

22   SDK kits that we've discussed -- has any of that been

23   allocated to the App Store?

24   **A.**  It has not.

25   **Q.**  Sir, in looking at these examples and the other topics we

SCHILLER – DIRECT RESUMED – DOREN

1    discussed yesterday, have we covered everything that Apple has

2    done to benefit app developers and App Store customers since

3    2008?

4    **A.**   Oh, definitely not.

5    **Q.**   Can you just give us an overview, please, of the types of

6    efforts that Apple makes to benefit developers and users?

7    **A.**   Well, of course we make hardware with features that are

8    designed to help developers and users have new experiences,

9    new capabilities.  Every year we advance those.  We have core

10   software features, as we see here, and many more that are

11   designed to assist developers as they create whatever their

12   vision, their dream is of applications and tools for users.

13       It all adds up to all of us as users, over a billion

14   people, having better software, better experiences that we can

15   have on our devices.

16       We try to bring these out in ways that help developers

17   create them with documentation and training.  We put on

18   events, as we've discussed.  We have people assigned to assist

19   developers.  We actually do consulting engineering where we

20   sit down and help them with their code.  We have a lab for

21   helping with user interface design to help them make

22   better-looking applications.  We have tours we do around the

23   world where our teams go around in countries to help make sure

24   developers can learn directly about these technologies.  We

25   have built facilities around the world.  We talked about our

SCHILLER – DIRECT RESUMED – DOREN

1     accelerator labs.

2          We have schools we've created to help in both the high

3     school and college level around the world in Brazil, in

4     Indonesia, in Italy, in China, everywhere we can to help

5     create the next generation of developers to unleash their

6     visions in the world.

7          There is a very long list of things that we try to help to

8     do with app development.

9     **Q.**  Thank you, Mr. Schiller.

10         And does Apple take steps to protect its investment in

11    this intellectual property?

12    **A.**  We do.

13    **Q.**  And what does Apple do toward that end?

14    **A.**  Well, there's patents and copyrights, of course, to help

15    protect the technology.

16    **Q.**  And, sir, do you personally have any patents for your work

17    at Apple?

18    **A.**  Yes.

19    **Q.**  And can you describe that, please.

20    **A.**  Well, my first patent I was involved in was for the iPod,

21    working back on the iPod.  I helped come up with the idea for

22    the wheel that we used as a user interface design for iPod.

23    **Q.**  And why was that of import or use for the iPod?

24    **A.**  When we were working on the iPod, the previous first

25    generation music players only held 20, 25 songs, and you had a

SCHILLER – DIRECT RESUMED – DOREN

1    little up-and-down arrow buttons you could click to move along

2    the list of songs to play them.

3        When we came up with the idea for the iPod and were

4    conceptualizing it, we knew we were going to hold a thousand

5    songs or more.  Well, you couldn't use up-and-down arrows to

6    move through your song list, so we needed the idea of

7    something else as an input mechanism to find songs.  And

8    having an education in biology, I know that we have

9    semi-opposable thumbs and your thumbs can rotate around, and

10   that would be great for user interface for one-handed

11   operation of a long list of things, so it was my idea to come

12   up with a wheel for the iPod.

13   **Q.**  How was it, sir, that the head of marketing was involved

14   in that fundamental product design issue?

15   **A.**  The -- the -- the marketing function that I have been

16   responsible for over 20 years at Apple is, in part, a group

17   called Product Marketing.  And Apple Product Marketing is

18   entirely involved in the definition of our products, in the

19   creation of our products from the very first concept up to and

20   through when we bring it to market.  And Product Marketing

21   works hand-in-hand with engineering on all of our products.

22   **Q.**  Thank you, Mr. Schiller.

23       Your Honor, I pass the witness.

24           **THE COURT:**  Ms. Forrest, cross.

25           **MS. FORREST:**  Yes, Your Honor.  If I might have just

SCHILLER – CROSS – FORREST

```
 1    a moment to get my materials --
 2              THE COURT:  Of course.
 3              MS. FORREST:  -- organized.
 4        I will hand to counsel and to -- and to Your Honor's
 5    deputy a copy of the deposition transcript from Mr. Schiller.
 6              THE COURT:  Thank you.
 7              MS. FORREST:  Let's bring up if, if we could, the
 8    slide that we just saw, Mr. Rudd.
 9                        CROSS-EXAMINATION
10    BY MS. FORREST:
11    Q.  Good morning, Mr. Schiller.
12    A.  Good morning.
13    Q.  The last time I saw you was over Zoom in February of this
14    year.  Do you recall that?
15    A.  I do.
16    Q.  All right.  We had a nice conversation about AI.
17    A.  We did.
18    Q.  Right.  You know that I'm an AI aficionado?
19    A.  Absolutely.
20    Q.  All right.  So I want to talk a little bit about the
21    conversation you just had with Mr. Doren.
22        You just spoke about a host of APIs that Apple has
23    developed, as you've said, for the use with -- in a variety of
24    ways for people to make apps.
25    A.  Yes.
```

SCHILLER – CROSS – FORREST

1    **Q.**  Do you recall that testimony just now?

2    **A.**  Yes.

3    **Q.**  Now, you know there is a difference between a web app and

4    a native app; right?

5    **A.**  Yes.

6    **Q.**  And the tools that you've talked about are not tools that

7    by and large can be used for web apps; correct?

8    **A.**  Correct.  Most of these apply to native applications.

9    **Q.**  All right.  So let's go through those.

10       Do we have -- and maybe actually Apple's counsel -- the

11   hot-seat operator, could pull up number 6.  If you wouldn't

12   mind, sir, I apologize.  It would just be easier.

13            **MR. DOREN:**  No objection.

14            **MS. FORREST:**  Thank you.

15   **Q.**  All right.  So we're looking at the slide that says

16   "Innovations and Investments" on it, and I just want to go

17   across the top.

18       And, by the way, just so that the record is clear, the

19   reason that web apps and native apps have some differences is

20   because the web apps have to be rendered through a browser

21   correct?

22   **A.**  That's one difference.  There are others.

23   **Q.**  And that Apple requires that web apps actually use WebKit

24   which is a set of APIs that is Apple proprietary; correct?

25   **A.**  On iOS we require the use of WebKit as the underlying

SCHILLER - CROSS - FORREST

1    rendering engine for web browsers.

2    **Q.**   And WebKit does not allow all APIs that are available for

3    native web apps to be called upon; correct?

4    **A.**   I don't think that we do, no.

5    **Q.**   You don't?

6    **A.**   Correct.  Sorry.  I'm agreeing, yes.

7    **Q.**   So, for instance, SpriteKit, which is here on the top of

8    this demonstrative of Innovations and Investments, that can't

9    be used for a web app; right?

10   **A.**   I don't believe so, but --

11   **Q.**   Okay.

12   **A.**   I haven't -- okay.

13   **Q.**   And then Metal.  I'm going to cover a lot of stuff so I'm

14   going to move through some things relatively quickly.

15       So Metal as well also is not usable for a web app that is

16   rendered through WebKit; correct?

17   **A.**   I'm not certain whether Safari itself uses Metal for

18   accelerating graphics that are rendered through web apps.

19   **Q.**   You don't know?  Okay.  Okay.

20       Then how about GameplayKit; do you know whether or not the

21   native -- whether or not a web app can call on an API through

22   WebKit for gameplay?

23   **A.**   I do not know that they can.

24   **Q.**   All right.  How about for ReplayKit; do you know whether

25   or not WebKit can call on an API that would allow that to be

SCHILLER – CROSS – FORREST

1   utilized?

2   **A.**   I don't know that they can.

3   **Q.**   How about for ARKit; do you know whether WebKit will allow

4   an API to be called upon that would utilize ARKit?

5   **A.**   I do not know that it can.

6   **Q.**   And how about for Core ML; do you know whether or not

7   WebKit would allow an API to be called upon that would allow

8   Core ML to be used?

9   **A.**   I don't know that it can.

10  **Q.**   And how about RealityKit; do you know whether or not

11  RealityKit can be -- has an API within WebKit that would allow

12  it to be called upon as a web app?

13  **A.**   I do not know that it can.

14  **Q.**   And the same one for Reality Composer; do you know whether

15  or not there is an ability through WebKit to allow Reality

16  Composer to be utilized as a web app?

17  **A.**   Yes.   In this one, with Reality Composer -- it's actually

18  a tool, not a library, for an app, and with Reality Composer

19  you create 3D scenes, and there is an element of Reality

20  Composer that allows you to export those scenes for use in

21  industry-standard formats called USDZ.

22  **Q.**   So in that one you can?

23  **A.**   There is use for that in any kind of application, not just

24  native apps.

25  **Q.**   So what you are saying under oath is that WebKit has the

SCHILLER – CROSS – FORREST

1    ability to call on a Reality Composer API?  Is that what

2    you're saying?

3    **A.**   I did not -- Reality Composer isn't an API.  It's an

4    application to create scenes.

5    **Q.**   And can it be called on through WebKit?

6    **A.**   You don't call on an app.

7    **Q.**   Okay.

8    **A.**   So --

9    **Q.**   So then let's just do it this way.  Out of the eight --

10   one, two, three, four, five, six, seven, eight -- seven of the

11   ones that we've just talked about web app developers can't

12   use?

13   **A.**   Not to my knowledge.

14   **Q.**   Okay.  Let's just put that to the side now.

15       As long as we're on this topic, let's just do a couple of

16   other little pieces.

17       And you would agree with me, wouldn't you, that there are

18   different browsers?

19   **A.**   Yes.

20   **Q.**   Okay.  And Safari is the Apple browser; correct?

21   **A.**   Correct.

22   **Q.**   All right.  And you are not aware of any study by Apple

23   that compares the functionality of web apps to native apps,

24   are you?

25   **A.**   I am not.

SCHILLER – CROSS – FORREST

1    **Q.**  And also you're not aware of any store for streaming apps

2    that's offered as part of the App Store, are you?

3    **A.**  No, I'm not.

4    **Q.**  And you're not aware of any studies within Apple that have

5    examined latency of streaming apps in connection with

6    gameplay, are you?

7    **A.**  I am not.

8    **Q.**  All right.  Let's go now to something else that you spoke

9    about with Mr. Schiller just now –– I'm sorry –– Mr. Doren

10   just now, which is the IP.

11   **A.**  Yes.

12   **Q.**  You mentioned that Apple has IP?

13   **A.**  Yes.

14   **Q.**  And that Apple has use utilized this IP in connection with

15   its development of a variety of the innovations that you've

16   now spent quite a lot of time testifying about; correct?

17   **A.**  Yes.

18   **Q.**  You're aware, aren't you, that Apple relies upon the

19   innovations of many developers, many of whom are not Apple

20   developers, in developing the very innovations and investments

21   that you've shown to this Court, aren't you?

22   **A.**  I'm not sure what you mean by "relies on."

23   **Q.**  That they utilize –– that Apple utilizes, for instance, a

24   variety of open source software in connection with the

25   innovations that you described to this Court?

SCHILLER - CROSS - FORREST

1    **A.**   I'm aware that our Apple engineers take part in open

2    source projects quite frequently.

3    **Q.**   And that they in fact -- Apple has utilized a lot of open

4    source software and disclosed it?

5    **A.**   Yes.

6    **Q.**   All right.  And that that goes into all of these

7    innovations that you said are Apple innovations; isn't that

8    right?

9    **A.**   I -- I don't know that it's all of them.  I know that we

10   have on some.  I don't know which ones specifically.

11   **Q.**   Okay.  Let's -- you testified yesterday that you're

12   familiar generally with the Apple Developer Agreement, did you

13   not?

14   **A.**   Yes.

15   **Q.**   All right.  Let's pull up what's already in evidence as

16   PX2618, if we could, Mr. Rudd.

17        And let's go there to Section 4, and let's go to the

18   "notwithstanding" language under Section 4.

19        And do you see here it says that "Notwithstanding the

20   foregoing," which is the information that Apple considers

21   proprietary, "Apple confidential information will not include,

22   A, information that is generally and legitimately available to

23   the public through no fault or breach of yours; B, information

24   that is generally made available to the public by Apple; C,

25   information that is independently developed by you without the

1  use of any Apple confidential information" --

2          **THE COURT:**  Just a little slower.

3          **MS. FORREST:**  Oh, sorry.

4          **THE COURT:**  For the court reporter.  Thank you.  Go

5  ahead.

6  **BY MS. FORREST:**

7  **Q.**  "And, D, information that was rightfully obtained from a

8  third party who had the right to transfer or disclose it to

9  you without limitation; or, E, any third-party software and/or

10  documentation provided to you by Apple and accompanied by

11  licensing terms that do not impose confidentiality obligations

12  on the use or disclosure of such software or documentation."

13     You understand that that paragraph exists in the Apple

14  Developer Agreement that you testified about yesterday, don't

15  you?

16  **A.**  Yes, I do.

17  **Q.**  Okay.  And there's also a similar provision in the Apple

18  Developer License Agreement that you testified about

19  yesterday.

20     And let's pull up, Mr. Rudd, please, PX2619.

21     And let's look at Section 9 of that agreement.  And under

22  26 -- under Section 9 -- Mr. Rudd, if you could turn to

23  that -- all right.

24     It says, again under "notwithstanding" which appears in

25  the middle of the paragraph there, that "Notwithstanding the

SCHILLER – CROSS – FORREST

1    foregoing," again Apple information will not include some of

2    the same things, but there's a difference that I'll read out,

3    "1, information that is generally and legitimately available

4    to the public through no fault or breach of yours; 2,

5    information that is generally made available to the public by

6    Apple; 3, information that is independently developed by you,"

7    meaning the licensee, "without the use of any Apple

8    confidential information; 4, information that was rightfully

9    obtained from a third party who had the right to transfer or

10   disclose it to you," the licensee, "without limitation; or 5,

11   any FOSS," capital F-O-S-S, "included in the Apple software

12   and accompanying license terms that do not impose

13   confidentiality obligations on the use or disclosures of

14   FOSS."

15        Do you see that?

16   **A.**   I do.

17   **Q.**   All right.  And let's just turn back to the definition of

18   FOSS which is on page 2619.5.  And FOSS is defined as "free

19   and open source software."  And that means, quote, "any

20   software that is subject to terms that, as a condition of use,

21   copying, modification or redistribution, require such software

22   and/or derivative works thereof to be disclosed or distributed

23   in source code form, to be licensed for the purpose of making

24   derivative works, or to be redistributed free of charge,

25   including without limitation software distributed under the

1    GNU General Public License or GNU Lesser/Library GPL."

2         You're aware of that provision, aren't you, in the Apple

3    Developer License Agreement?

4    **A.**  I see that there, yes.

5    **Q.**  All right.  Now, there is a way to find the various

6    license agreements that Apple has that touch the iPhone.  Are

7    you aware of that?

8    **A.**  I'm not certain.

9    **Q.**  All right.  But you spent -- you've spent an awful lot of

10   time talking about sort of the innovations and the IP, so --

11   of Apple; correct?

12   **A.**  Yes, I did.

13   **Q.**  And it's not a surprise to you that there is somewhere a

14   disclosure of Apple licensing terms, is it?

15   **A.**  No.

16   **Q.**  In fact, you can find it on your very own iPhone, and we

17   can do that together.

18        Let's go to actually PX1893, and I'm going to hand out

19   binders for the Court and for counsel.

20        Here's one for the Court, Ms. Stone.

21            **THE CLERK:**  Okay.  Both of them?

22            **MS. FORREST:**  Just one.  I'm sorry.  There is two

23   volumes --

24            **THE COURT:**  I have 1 of 2.  Is that right?

25            **MS. FORREST:**  It should be 1 of 2 -- it's mislabeled.

SCHILLER - CROSS - FORREST

1    It's only 1 of 1.

2              **THE COURT:**  That's great.

3              **MS. FORREST:**  There is fatigue setting in.

4              **MR. DOREN:**  There is something to be grateful for

5    today.

6              **MS. FORREST:**  All right.

7    **Q.**  Let's turn, if you would -- the witness needs a binder.

8         Your Honor, may I approach Mr. Schiller?

9              **THE COURT:**  You may.

10   **BY MS. FORREST:**

11   **Q.**  And, Mr. Schiller, I'd ask you to turn to what's been

12   marked for identification as PX1893.  One day this will all be

13   digital.

14   **A.**  It's a little tight for space up here, but, yes, I have

15   it.  Thank you.

16   **Q.**  Do you have a page that is labeled "Apple Open Source" in

17   front of you?

18   **A.**  Yes, I do.

19   **Q.**  On the bottom on the left-hand side, do you see it says

20   opensource.apple.com?

21   **A.**  Yes.

22   **Q.**  All right.  Do you recognize opensource.apple.com as an

23   Apple -- portion of an Apple website?

24   **A.**  Yes.

25   **Q.**  All right.

1          And, Your Honor, I would seek to admit PX1893.

2               **THE COURT:**  No objection?

3               **MR. DOREN:**  No objection, Your Honor.

4               **THE COURT:**  Admitted.

5          (Plaintiff's Exhibit PX1893 received in evidence)

6     **BY MS. FORREST:**

7     **Q.**  And, Mr. Schiller, are you aware that the Apple open

8     source page that I have put in front of you lists the very --

9     various types of tools and products which have some amount of

10    open source software within them?

11    **A.**  Yes.  It looks like that, yes.

12    **Q.**  All right.  And including -- if we look at Darwin

13    Technologies over on the far right, it actually says "beneath

14    the easy-to-use interface of macOS is a rock-solid UNIX

15    foundation."  Do you see that?

16    **A.**  Yes, I do.

17    **Q.**  Now, that's one source of where one can find some

18    reference to Apple open source utilization of software.  But

19    let's go to the iPhone itself.

20         Are you aware, Mr. Schiller, that if one goes to one's

21    General Settings --

22    **A.**  Okay.

23    **Q.**  -- and scrolls down to "legal and regulatory" --

24    **A.**  All right.

25    **Q.**  -- and then scrolls down again to "legal notices" --

1    **A.**  Okay.

2    **Q.**  -- one comes up with PX1891, which is in your binder.

3    **A.**  All right.

4    **Q.**  All right.  And have you ever taken a look at the legal

5    notices that are resident on each and every iPhone that is

6    sold that lists the various licenses that touch the iPhone?

7    **A.**  I don't recall doing that.

8    **Q.**  Okay.  And let's turn for a moment -- but you're very

9    familiar with your iPhone; correct?

10   **A.**  Yes.  I think so.

11   **Q.**  And you would expect the information that Apple includes

12   under "legal notices" to be true and accurate, would you not?

13   **A.**  Yes.

14        **MS. FORREST:**  Your Honor, I seek to admit PX1891.

15        **THE COURT:**  No objection?

16        **MR. DOREN:**  No objection.

17        **THE COURT:**  Admitted.

18        (Plaintiff's Exhibit PX1891 received in evidence)

19   BY MS. FORREST:

20   **Q.**  Turn, if you would -- we are only going to go through a

21   few of these.  There are just dozens and dozens, and it's a

22   big, thick document, but we will just go through a few.

23        **THE COURT:**  Dozens and dozens of pages.

24        **MS. FORREST:**  Dozens and dozens of pages and of

25   references to open source software, but we will go through it

SCHILLER – CROSS – FORREST

1    with the witness so he can testify to it.

2    Q.  Let's turn to PX1891.9.  Do you see at the bottom it says

3    "attractive chaos"?

4            MR. DOREN:  Sorry, counsel.  I missed the page.

5            MS. FORREST:  1891.9.

6    Q.  And it says "Permission is hereby granted free of charge

7    to any person obtaining a copy of this software."  Do you see

8    that?

9    A.  I do.

10   Q.  And then it goes on.  Let's turn to another one on the

11   next page, 1891.10, "Stefano Barbato (mimetic), the MIT

12   license."

13       "Permission is hereby granted free of charge to any person

14   obtaining a copy of the software"?

15       Do you see that?

16   A.  I do.

17   Q.  You would expect that to be true and accurate; correct?

18   A.  Yes.

19   Q.  Turn on the same page at very bottom, Jess Beder,

20   B-E-D-E-R, "Permission is hereby granted free of charge to any

21   person obtaining a copy of this software."  Do you see that?

22   A.  Yes.

23   Q.  And then let's turn to a few others.  Turn to page

24   1981.14.

25       Do you see towards the bottom it says "John J. Boyer and

SCHILLER – CROSS – FORREST

1   Contributors, liblouis."  that?

2   **A.**  I see that.

3   **Q.**  It says "lib" -- L-I-B-L-O-U-I-S -- "is free software

4   licensed under the GNU."  Do you see that?

5   **A.**  Yes.  Just a detail.  It's "ga-nu".  Just the

6   pronunciation.

7   **Q.**  "Ga-nu"; right?

8   **A.**  Yes.

9   **Q.**  Although I thought it would be helpful to spell it out for

10  the court reporter.

11  **A.**  I know.

12  **Q.**  It says under that, "Everyone is permitted to copy and

13  distribute verbatim copies of this license document but

14  changing is not allowed."  Do you see that?

15  **A.**  I do.

16  **Q.**  And turn to Bates numbered page 1891.23 for Mr. Stephen

17  Celis for sqlite.swift.

18  **A.**  I see that.

19  **Q.**  It says "Permission is hereby granted free of charge to

20  any person obtaining copy of the software."  Do you see that?

21  **A.**  I do.

22  **Q.**  Turn to 1891.28, and this one is one of my favorites.

23  Lasse, L-A-S-S-E, Collins, for XZUtils, U-T-I-L-S.  And it

24  states, "This software includes code from XZUtils which is

25  provided under the followings terms.  You can do whatever you

SCHILLER – CROSS – FORREST

1   want with the files that have been put into the public domain.

2   If you find public domain legally problematic, take the

3   previous sentence as a license grant.  If you still find the

4   lack of copyright legally problematic, you have too many

5   lawyers."

6       Do you see that?

7   **A.**  I do.

8   **Q.**  Let's go on to the next one.  Let's just do a couple more.

9   1891.30 to Sammi De Guzman, Roadgeek, and it states,

10  "Permission is hereby granted free of charge to any person

11  obtaining a copy of this software and associated documentation

12  files."  Do you see that?

13  **A.**  Yes.

14  **Q.**  Let's go to the Free Software Foundation on 1891.40, and

15  it states, "Permission is hereby granted free of charge to any

16  person obtaining a copy of this software."  Do you see that?

17  **A.**  Yes.

18  **Q.**  And then on the right-hand side of the next page, 1891.41,

19  Ruoyu Fu, R-U-O-Y-U, last name Fu, F-U, it says, "Permission

20  is hereby granted free of charge to anybody" -- "any person

21  obtaining a copy of the software."  Do you see that?

22  **A.**  Yes.

23  **Q.**  And it goes -- you would agree with me that there are

24  still many pages left in this document; correct?

25  **A.**  There are.

SCHILLER – CROSS – FORREST

1  **Q.**  And I have only read a few of the entries; correct?

2  **A.**  Yes.

3  **Q.**  You would agree with me, Mr. Schiller, wouldn't you, that

4  Apple utilizes a lot of terrific innovation by third parties

5  in the various products that it has made and distributed to

6  the public?

7  **A.**  We use many open source projects.  I don't want to qualify

8  terrific or -- I hope they are.  I don't know what the things

9  you just read out refer to, so I don't want to qualify an

10  opinion on them.

11      **THE COURT:**  Ms. Forrest, can you tell me whether Epic

12  has -- is arguing that software is copyrightable?

13      **MS. FORREST:**  Epic has no doubt that software is

14  copyrightable.  Epic has no doubt that there is some

15  legitimate software that Apple has on its own that is

16  proprietary.

17      Our point is that Apple is taking total credit for all

18  innovations, and there is a substantial, very substantial

19  amount of third-party innovation, and Apple cannot

20  differentiate -- at this point there is nothing in the record

21  differentiating what is Apple proprietary IP from what is not

22  proprietary.

23      **THE COURT:**  I see.  Okay.  Thank you.

24      Mr. Doren, your perspective, too, is that software is

25  copyrightable?

1        **MR. DOREN:**  Yes, Your Honor.

2   **BY MS. FORREST:**

3   **Q.**  I would like to now circle back to where I was originally

4   going to begin today but wanted to take up the various matters

5   that had been raised most recently by Mr. Doren.

6        Mr. Schiller, over the past decade, you would consider

7   yourself to be one of the highest level executives at Apple;

8   correct?

9   **A.**  Yes.

10  **Q.**  And you, one of Apple's top executives, have sat through

11  this entire trial; correct?

12  **A.**  Yes.

13  **Q.**  And you have listened to all of the testimony?

14  **A.**  I have.

15  **Q.**  And you've heard the various themes and stories that

16  people have been telling on the stand on both sides, all the

17  experts, all the witnesses; correct?

18  **A.**  Yes.

19  **Q.**  And you sat in the room with counsel every morning and at

20  break over in the attorneys' lounge and talked with them;

21  correct?

22  **A.**  I -- many times.  I'm not sure if it was every time.

23  **Q.**  Okay.  You've sat with them many times in that room.  I

24  mean, you and I -- I've waved; correct?

25  **A.**  Yes.  Yes.

SCHILLER – CROSS – FORREST

1  **Q.** And you were head of marketing for a while at Apple;

2  correct?

3  **A.** Yes.

4  **Q.** Until you became an Apple Fellow; correct?

5  **A.** Yes.

6  **Q.** And in your position, you were essentially a salesman;

7  correct?

8  **A.** No.

9  **Q.** Well, you were selling Apple products; correct?  Not --

10 not in a door-to-door way and not in a way of going into a

11 store, but you were responsible for the marketing of Apple's

12 products; correct?

13 **A.** Marketing, yes, but not sales.

14 **Q.** Right.

15    Let's start our time together now by cleaning up a few

16 things from your testimony yesterday.

17    You'll recall that there was extensive discussion that you

18 had with Mr. Doren about two documents, PX79 and PX80.

19    And I'll ask Mr. Rudd to bring them up side by side.

20    And you recall the Goldman Sachs switching report, which

21 is PX79, and being questioned on that?

22 **A.** Yes, I do.

23 **Q.** You recall you were also shown PX80, which was a cover

24 email from you for that switching report; correct?

25 **A.** Yes.

SCHILLER - CROSS - FORREST

1    **Q.**   And that cover email is dated 20 June 2013; correct?

2    **A.**   Yes.

3    **Q.**   All right.  And you and I discussed these two documents at

4    your deposition in February; correct?

5    **A.**   That's right.

6    **Q.**   Or actually that portion of the examination may have been

7    by class counsel, but I was present during that examination;

8    correct?

9    **A.**   You were.

10   **Q.**   Because we shared time; right?  I only had three hours

11   with you during that deposition; correct?

12   **A.**   I don't remember the exact time.

13   **Q.**   We split up the time with the various class counsel?

14   **A.**   Yes.

15   **Q.**   Now, you recall saying in your deposition about PX79 --

16   and that's the Goldman Sachs report -- that you didn't

17   recognize it.  Do you remember that?

18   **A.**   I do.

19   **Q.**   And that you could not even recall if it had been sent

20   around internally; correct?

21   **A.**   That's right.

22   **Q.**   And then you were showed the email that is at PX80 that

23   appeared to show you sending it around to various executives

24   at Apple, and you said at your deposition you couldn't

25   remember that either; correct?

1    **A.**   That's true.

2    **Q.**   And you understand that you're here at this trial as a

3    fact witness; correct?

4    **A.**   I do.

5    **Q.**   Not an expert witness; correct?

6    **A.**   Yes.

7    **Q.**   And you're not an economist; right?

8    **A.**   I am not.

9    **Q.**   When was the first time, sir, that you looked at the

10   report that is at PX79 and devised the testimony that you gave

11   on it yesterday?

12          **MR. DOREN:**   Your Honor, I'm going to object to that

13   as inherently calling for attorney-client privileged

14   communications.

15          **THE COURT:**   Overruled.

16   **BY MS. FORREST:**

17   **Q.**   I just want the date.

18   **A.**   The date.  I can tell you what I did.  I don't know which

19   day of the week it was.

20   **Q.**   Well, why don't you tell me whether it was in the last

21   week.

22   **A.**   No.

23   **Q.**   Was it in the last couple of weeks?

24   **A.**   At least.

25   **Q.**   Okay.  And --

SCHILLER – CROSS – FORREST

1   **A.**   I'll be more precise.  It was after our deposition.

2   **Q.**   Okay.  And did you do it on your own, just thinking about

3   it?

4   **A.**   I did it after the deposition.  When you say –– I do

5   everything thinking about it.  I'm not sure what that means.

6   **Q.**   Let me put it this way.  Did you do it in consultation

7   with counsel?

8   **A.**   No.  I was on my own.

9   **Q.**   Okay.  All right.

10      Now, since you've testified about this document, let's

11   proceed to look at it then a little bit further, and we are

12   going to focus now on PX80 first.

13      And, Mr. Rudd, why don't you please just pull up PX80 so

14   we can see that clearly.

15      And you told other Apple executives that this was, quote,

16   "an interesting report," did you not?

17   **A.**   I did.

18   **Q.**   In 2013; correct?

19   **A.**   Yes.

20   **Q.**   And it was an "interesting report on the cost and

21   methodology to switch from iPhone to Android."  Do you see

22   that?

23   **A.**   Yes.

24   **Q.**   Those were words that you wrote?

25   **A.**   They are.

SCHILLER – CROSS – FORREST

1    **Q.**  And underneath that, you said in parentheses, "iTunes and

2    iCloud figure pretty big in the ability and the effort

3    involved to switch."

4        Do you see that?

5    **A.**  Yes.

6    **Q.**  And some of the individuals that you sent this to

7    included, for instance, Mr. Joswiak and Mr. Cue?

8    **A.**  Yes.

9    **Q.**  Mr. Fischer?

10   **A.**  Uh-huh.

11   **Q.**  "Yes"?

12   **A.**  Yes.

13   **Q.**  These are some high-level executives at Apple; correct?

14   **A.**  Yes.  These are some of my peers.

15   **Q.**  Okay.  Let's turn now to PX79, and that is the Goldman

16   Sachs report.

17       And do you see on the first page of this report under

18   "Implications," it states that, "Our conclusion suggests the

19   cost of switching platforms is significant, and, indeed, it

20   was not possible to transfer all of our content."

21       Do you see that?

22   **A.**  I do.

23   **Q.**  And yesterday you testified about all of the ways in which

24   there had been changes in the industry that now allowed

25   switching; right?

1    **A.**   Yes, I did.

2    **Q.**   Okay.  And they say for Goldman Sachs in 2013 that "the

3    cost of switching platforms is significant" and that it goes

4    on, "the explicit switching cost of our switch totaled

5    $79.85."  Do you see that?

6    **A.**   Yes.

7    **Q.**   Okay.  And now you testified yesterday at transcript page

8    2848 in the non-corrected version of the transcript -- a later

9    corrected version came out.

10             **THE COURT:**   That's fine.

11   **BY MS. FORREST:**

12   **Q.**   -- that there was a way somehow of switching movies over.

13   You could stream movies.

14   **A.**   I'm sorry.  I'm not sure that's exactly what I said.

15   **Q.**   You don't think that one can switch over movies, do you?

16   **A.**   Well, when you said "stream," I thought I said

17   yesterday -- I talked about how today we can now stream TV

18   shows and movies through many services.

19   **Q.**   Right.  But if I downloaded into my -- for my Apple TV and

20   I purchased a movie --

21   **A.**   Yes.

22   **Q.**   And that happens all day every day; correct?  At least

23   Apple hopes so.

24   **A.**   No.  It's, again, very -- I think very few people do that

25   anymore.  It's much more streaming service from music to --

SCHILLER – CROSS – FORREST

1   **Q.**  I must be an outlier.  Buying movies.

2       So if somebody buys a movie, they are offered for sale,

3   are they not?

4   **A.**  It's possible, yes.

5   **Q.**  Yes.  In fact, they are offered for sale or rent on Apple

6   TV; correct?

7   **A.**  Yes.

8   **Q.**  All right.  And so the world will now learn that you don't

9   expect people to actually buy them because you are expecting

10  them to use other services; correct?

11  **A.**  I'm just saying that that's what most people do now.

12  **Q.**  All right.  So -- but it can be done, people can buy them

13  and people can then have them resident in their iTunes

14  account; correct?

15  **A.**  Yes.

16  **Q.**  And they cannot move those to Android, can they?

17  **A.**  I don't know if they can or can't.

18  **Q.**  They cannot move them to Android, can they?

19  **A.**  Again, I don't know if they can or can't.

20  **Q.**  Let's find out from Mr. Cue and see whether or not you

21  disagree with Mr. Cue.

22      Mr. Cue is who?

23  **A.**  Eddy Cue is Senior Vice-President for our Internet

24  Services Team.

25  **Q.**  And you respect Mr. Cue?

1    **A.**   Absolutely.

2    **Q.**   And you would expect that he would have accurate

3    information on this question on whether or not movies can be

4    switched between an iPhone and an Android -- don't you?

5    **A.**   Yes.

6    **Q.**   Okay.  Let's listen to Mr. Cue.

7       (Whereupon, the video deposition was played as follows:)

8       "Q. Putting aside the reasons why, did you ever try to

9    move your library of movies and filmed entertainment from an

10   iPhone to an Android?

11      "A. I did not because I know that that doesn't work."

12   **BY MS. FORREST:**

13   **Q.**   Do you disagree with that testimony of Mr. Cue?

14   **A.**   No.

15   **Q.**   All right.  Now, you know, even though you don't expect

16   people to buy movies anymore on Apple TV, that they are

17   offered for a price; correct?

18   **A.**   Yes.

19   **Q.**   All right.

20      And I'm going to hand up, Your Honor, what's been marked

21   for identification as PX817 [sic].

22      And if I may approach the witness as well as Your Honor?

23          **THE COURT:**  You may.

24          **MS. FORREST:**  And just for humor, Your Honor, I did

25   put *My Cousin Vinny* as the first.

1    **THE COURT:**  I think it's a great movie.

2    **BY MS. FORREST:**

3    **Q.**  So last night I didn't have any time to actually watch any

4    movies, but I did actually go and look at what one could buy

5    on Apple TV, and so let's take a look at PX1817 together, Mr.

6    Schiller.

7      Do you see -- do you recognize this page as an example of

8    a movie that could be purchased through Apple TV onto one's --

9    and put in one's iTunes library?

10   **A.**  Yes.

11   **Q.**  And it's offered for buying at $14.99; correct?

12   **A.**  Yes.

13   **Q.**  If you turn to the next page, which is 1817.2, you see

14   there is another movie, *Emperor*, and you can buy that for

15   14.99 as well; correct?

16   **A.**  Yes.

17   **Q.**  We are now up to $28, $29, $30; correct?

18   **A.**  Yes.

19   **Q.**  Okay.  And then you can actually -- the next one -- I just

20   picked these randomly -- was *Deep Blue Sea*, maybe number 3,

21   and that's PX1817.3, and you can preorder that for 9.99;

22   correct?

23   **A.**  Yes.

24   **Q.**  And then the next on page .4 is *The Invisible Man* which

25   you can buy for 14.99; correct?

SCHILLER – CROSS – FORREST

1   **A.**   That's one option.  As you see, there is another option as

2   well.

3   **Q.**   Yes.  I'm only focusing on buying.

4        Now, *Monsters*, you know, *Love and Monsters*, you can buy it

5   for 9.99.  Do you see that on .5, page .5?

6   **A.**   Yes.

7   **Q.**   And on page .6, *Chaos Walking*, you can buy it for 14.99?

8   **A.**   Yes.

9   **Q.**   For whatever reason, it doesn't look like you can rent

10   that one.

11        The next one, *The Marksman*, 1817.7, you can buy that for

12   19.99.  Do you see that?

13   **A.**   Yes.

14   **Q.**   And the next one is *Top Gun*.  That's buying for $7.99.  Do

15   you see that?

16   **A.**   Yes.

17   **Q.**   The next one is *Paper Tigers* at 1817.9.  You can buy that

18   for 14.99?

19   **A.**   Yes.

20   **Q.**   And *John Wick 3* on .10, you can buy that for 7.99?

21   **A.**   Yes.

22   **Q.**   And under *Monster Hunter*, .11, you can buy it for 19.99;

23   correct?

24   **A.**   Sorry.  Yes.  I was just turning the page.

25   **Q.**   Okay.  And then *Hitman's Bodyguard*, you can buy that for

SCHILLER - CROSS - FORREST

1    12.99 at .12?

2    **A.**  Yes.

3    **Q.**  And then *Interstellar* you can buy for 14.99 on page .13?

4    **A.**  Yes.

5    **Q.**  And then there is actually a whole section where you can

6    buy all kinds of movies for different price points, and that's

7    on the last page at .14; correct?

8    **A.**  Yes.

9    **Q.**  It wouldn't take very much, Mr. Schiller, would you agree,

10   to exceed a hundred dollars in the value of one's iTunes

11   filmed entertainment library; correct?

12   **A.**  If that's how you choose to purchase, yes.

13   **Q.**  And that cannot be moved to Android; correct?

14   **A.**  No.

15   **Q.**  No, it cannot?

16   **A.**  I'm sorry.  No, it cannot.

17   **Q.**  All right.  And let's talk about for a moment the iCloud

18   service.

19       The iCloud service is an Apple service; right?

20   **A.**  It is.

21   **Q.**  And there are other Cloud services; correct?

22   **A.**  Yes.  There are many.

23   **Q.**  But the iCloud service is Apple's service; right?

24   **A.**  Yes.

25   **Q.**  All right.  If I'm an Android user, can I get the iCloud

1  service, not another Cloud service, but the iCloud service?

2  **A.**  I don't believe so.

3  **Q.**  And so if I'm in a family with Apple iPhone users, but I

4  choose to have an Android, and let's say we have four people

5  in the family, and we share an iCloud storage account -- which

6  can be done; correct?

7  **A.**  Yes.

8  **Q.**  I, as an Android user, cannot share that iCloud storage

9  account; correct?

10  **A.**  That's true.

11  **Q.**  Okay.  Now, let's go back to PX80, and let's again focus

12  on the bottom portion of that page where it says "iTunes and

13  iCloud figure pretty big in the ability and the effort

14  involved to switch."  Do you see that?

15  **A.**  I do.

16  **Q.**  They still do, don't they, sir?

17  **A.**  Not the same as at this time.

18  **Q.**  All right.  Thank you.

19  Now, let's move on --

20  **THE COURT:**  Do you want 1819 in evidence?

21  **MS. FORREST:**  Yes, Your Honor.

22  **THE COURT:**  No objection?

23  **MR. DOREN:**  No objection, Your Honor.

24  **THE COURT:**  Admitted.

25  It's actually 1817.  Sorry.

1          (Plaintiff's Exhibit PX1817 received in evidence)

2     **BY MS. FORREST:**

3     **Q.**  Now, there was another document that you testified about

4     yesterday, a couple of other documents.  You testified about

5     them at some length, which is surprising to me because you

6     didn't know anything about them at your deposition, so we will

7     talk about those.

8     **A.**  Yes.

9     **Q.**  Let's put PX417 up.

10         Now, do you recall telling me at your deposition that you

11    didn't recall your thoughts around this email at all?

12    **A.**  That sounds familiar.

13    **Q.**  Okay.  And you said you didn't recall the specific

14    thinking around this moment at all.  Do you remember that?

15    **A.**  Yes, I do.

16    **Q.**  And so I said, "So it would be fair to say that as you sit

17    here, the only thing you can tell me is what's written on the

18    page"; correct?

19    **A.**  True.

20    **Q.**  And you agreed with that; right?

21    **A.**  I believe so.

22    **Q.**  All right.  But yesterday you had a recollection of a

23    variety of content -- context.

24    **A.**  Yes.

25    **Q.**  All right.

SCHILLER – CROSS – FORREST

1       When did you come to that memory between February 11th and

2   today?

3   **A.**   After our deposition, a few of the documents that you

4   showed me were curious to me, and I went back in my email, and

5   I looked and I tried to recall and recollect what was this

6   about and what happened.

7   **Q.**   Okay.

8   **A.**   And so a few of them I remembered a few things.

9   **Q.**   Okay.  Good.

10      Let's go -- you had -- I guess it maybe happened with

11  PX882 as well.  Let's take a look at PX882.

12      And, by the way, the fact that I used them during my

13  opening was not part of what spurred you to want to have a

14  recollection about them?

15  **A.**   Absolutely not.

16  **Q.**   Okay.  All right.

17      So PX882, now you recall Mr. Doren asking you some

18  questions about this yesterday, too; right?

19  **A.**   Yes.

20  **Q.**   Okay.  And I used this document also in my opening;

21  correct?

22  **A.**   I don't recall if it was in your opening.

23  **Q.**   All right.

24      Let's highlight the phrase "the whole plan" there,

25  Mr. Rudd, if you could, in the second, third paragraph.  "The

SCHILLER – CROSS – FORREST

1    same as throwing out the whole plan."  Right there.  There you

2    go.  Okay.

3        Do you remember that I had referenced that in my opening?

4    **A.**  Yes.  I do recall that.

5    **Q.**  And Mr. Doren had sort of talked about my opening and that

6    portion of it yesterday when he was questioning you on this

7    document?

8    **A.**  Yes.

9    **Q.**  Okay.  Now, like the documents we've just seen at your

10   deposition on February 11th of this year, I put this in front

11   of you and you said you didn't remember this email.  Do you --

12   **A.**  That's right.

13   **Q.**  Do you remember that?

14   **A.**  Yes.

15   **Q.**  And then I specifically pointed to the language about the

16   plan, and you said you didn't recall your thoughts at the time

17   and could only refer to the words that were on the page.  Do

18   you recall that?

19   **A.**  Absolutely.

20   **Q.**  Okay.  And -- but at some point between February 11th and

21   today, you have had a recollection; is that right?

22   **A.**  Literally after the deposition, I wrote down the words

23   "the whole plan."  When you said that to me, it really stuck

24   in my mind, and then I went up and looked at this and said,

25   "What is she asking about?  What whole plan?"  And I read over

this again and tried to recollect what happened here, and I
remembered part of it.

**Q.** It's a memorable phrase, right, "the whole plan"?

**A.** You -- you certainly brought it up to me, yes.

**Q.** Yeah.  And it stuck in your mind?

**A.** I just wanted to remember what happened in this time.

**Q.** You wanted to make sure --

**A.** I hadn't seen this document for a decade.

**Q.** You wanted to make sure you knew how to explain it.

**A.** I just wanted to remember what you were asking about.

**Q.** You wanted to remember how to -- you wanted to learn how
to explain it.

**A.** No.

**Q.** Okay.  All right.  Let's go on.

Let's pause a little bit on PX882.

Now, you said in this document in the second paragraph --
if we could highlight that -- "there are many APIs out there
for apps"; right?

**A.** Yes.

**Q.** Okay.  And you mentioned some that were then competitors
of yours in 2008.  Sun has Java on the iPhone.  You are
saying -- let me read the whole thing.

"There are many APIs out there for apps.  By the same
logic, why not let Sun have Java on the iPhone?  Why not
Adobe's Air?  Why not Microsoft's Silverlight?  Why not

1    Qualcomm's Brew," etc., etc.  Do you see that?

2    **A.**  Yes.

3    **Q.**  Now, you knew at the time that you wrote this that Sun

4    Java had competitive APIs; correct?

5    **A.**  No.  You're --

6    **Q.**  No?

7    **A.**  That's not what I'm saying here.

8    **Q.**  Okay.  All right.

9        And Adobe Air was a competitor with APIs; correct?

10   **A.**  No.  Again, that's not what I'm explaining.

11   **Q.**  And Microsoft Silverlight was a competitor with APIs;

12   correct?

13   **A.**  Again, that's -- you're not explaining what I meant by

14   this.

15   **Q.**  Okay.  Well, I mean since you didn't understand -- and

16   maybe you've had a recollection about that as well, but at the

17   time of your deposition, you didn't remember any of that,

18   but --

19   **A.**  We didn't talk about those terms in the deposition.  I'm

20   happy to explain them now.

21   **Q.**  Well, your counsel can go back to it.

22       Now, what you were saying in this email was that Apple

23   only wanted to support its own API; correct?

24   **A.**  In addition to the web, yes.

25   **Q.**  Okay.  And your intent was to drive your cross-platform

SCHILLER – CROSS – FORREST

1    competitors out of the app business, wasn't it?

2    **A.**  Absolutely not.

3    **Q.**  All right.  Let's turn to another document.  I want to

4    stay with this idea of Apple's plan for a little longer

5    because I agree with you, it was a memorable phrase, and I

6    want to make sure that we don't think that the two documents

7    that we've just seen are the only documents on this topic, so

8    let's put up PX890.

9        Okay.  Do you recognize this document as a document that

10    you wrote to Mr. Jobs?

11    **A.**  Yes.

12    **Q.**  And you wrote it on or about 30th of June, 2008; correct?

13    **A.**  Yes.

14        **MS. FORREST:**  Your Honor, we would seek to admit

15    PX890.

16        **THE COURT:**  No objection?

17        **MR. DOREN:**  No objection.

18        **THE COURT:**  Admitted.

19        (Plaintiff's Exhibit PX890 received in evidence)

20    **BY MS. FORREST:**

21    **Q.**  And you say in this document that -- in the first

22    paragraph -- "When they have contacts in their app, these are

23    the only contacts on the iPhone and not a merge of contacts

24    from Google, right?  I think it would be a really bad idea for

25    something that looks like contacts to have contacts not on

SCHILLER – CROSS – FORREST

1    that iPhone and could lead people not using our contacts app

2    at all" -- "to people not using our contacts app at all.  We

3    may want to limit this in the license."

4        Now, you were concerned about users not using an Apple

5    app; correct?

6    **A.**  I was concerned with users opening up a contacts and not

7    seeing the contacts from their contacts app in that list of

8    contacts, and I thought that would be a bad experience.

9    **Q.**  You wanted them to use the Apple contacts app; correct?

10   **A.**  I was more worried, as I said, with the first part, which

11   is --

12   **Q.**  But not --

13   **A.**  It makes no sense.

14   **Q.**  So it wasn't about the Apple app?

15   **A.**  No.  That really wasn't --

16   **Q.**  Okay.  All right.

17       Now, you wanted to limit the ability to use the Google app

18   in the license; correct?

19   **A.**  I'm not sure which license I'm referring to there.  We had

20   both --

21   **Q.**  It was a license; correct?

22   **A.**  A license.

23   **Q.**  Okay.  So you wanted to use Apple's license to prevent a

24   third party, the user, from using a competitor's app

25   functionality; correct?

1    **A.**   No.  Again, I thought that maybe we want to.  I didn't say

2    we want to.

3    **Q.**   The answer is that was not what you were after.  Okay.

4        This was all about not using a competitor's product, was

5    it not?

6    **A.**   No.  This was about --

7    **Q.**   Okay.

8    **A.**   -- having contacts that made sense.

9    **Q.**   You don't think it was.  The document -- it is what it is.

10       Let's go to another one.  We've got more.

11       Let's turn to PX879.

12       Mr. Rudd, could you please bring up PX879.

13       Now, this document is a document that you wrote that was

14   back and forth between you and Mr. Forstall; correct?  Copies

15   to some others.

16   **A.**   Could I have a moment to look at it?

17   **Q.**   Yeah.  Sure.

18   **A.**   (Witness reviews document.)

19           **THE COURT:**  While he is looking, are you going to

20   offer this one?

21           **MS. FORREST:**  I am going to offer this one,

22   Your Honor.

23           **THE COURT:**  No objection?  Mr. Doren, no objection?

24           **MR. DOREN:**  I'm sorry, Your Honor.  No objection.

25           **THE COURT:**  Admitted.

1      (Plaintiff's Exhibit PX879 received in evidence)

2          **THE WITNESS:**  I just need a moment to look at it.  I

3   don't recall this off the top of my head.

4          (Witness reviews document.)

5   **BY MS. FORREST:**

6   **Q.**  And if it helps you at all, I really just want to talk to

7   you about just a little piece of it on the second page bearing

8   the Bates number at the end 592 and then to the first page.

9   **A.**  Sure.  We can try to do that.  I was just trying to

10  recollect the situation where this occurred.  It's been a long

11  time, and I haven't looked at it since 2008.

12  **Q.**  Okay.  But you see on August 5th, 2008, Mr. Forstall said

13  to you, "I called but didn't get ahold of you this evening."

14  Do you see that?

15  **A.**  Yes, I do.

16  **Q.**  Okay.  And then on the first page of PX879, you start your

17  email to him, "I didn't get any call."  Do you see that?

18  **A.**  Yes.

19  **Q.**  And then you go through what is essentially a debate about

20  app distribution; correct?

21  **A.**  I don't know which part are you referring to.

22  **Q.**  Well, let's go to paragraph -- the one, two, three,

23  four -- fifth -- sixth paragraph down that begins "You're

24  right.  Android will be completely open."  Do you see that?

25  **A.**  I do.

SCHILLER - CROSS - FORREST

1    **Q.**   Now, this is August of 2008; correct?

2    **A.**   Yes.

3    **Q.**   And these are your words; correct?

4    **A.**   It appears that way, yes.

5    **Q.**   And you say "You're right.  Android will be completely

6    open.  It will also be open source and may be free to handset

7    makers to change and ship.  I don't see how we can have

8    anything like their license and business model."  Those are

9    your words; right?

10   **A.**   Yes.

11   **Q.**   And you were referring not only to the license but to the

12   business model; correct?

13   **A.**   Licensing and operating system, yes.

14   **Q.**   And you say, "Why does it make sense to say that unlike

15   Android, the iPhone OS won't be open source, won't be licensed

16   to other handset makers, but the marketing language around

17   documentation and sample code is going to kill support for us?

18   Doesn't make sense to me."

19       Do you see that?

20   **A.**   I see that.

21   **Q.**   Okay.  And then you go on and you say, "This feels to me

22   just like the argument earlier this year around app

23   distribution."  Do you see that?

24   **A.**   I do.

25   **Q.**   That was the back-and-forth as to whether or not Apple

SCHILLER – CROSS – FORREST

1    would open iOS to third parties; correct?

2    **A.**   No.   I -- I think --

3    **Q.**   That's not -- no, no, no.   It's not, it's not.   You don't

4    think it's about -- a debate about opening it up to third

5    parties?

6    **A.**   No.   It's about --

7    **Q.**   Okay.

8    **A.**   -- stopping education programs.

9    **Q.**   Okay.   Okay.   Well, this says, "This feels to me just like

10   the argument earlier this year around app distribution";

11   correct?

12   **A.**   For education classes, yes.

13   **Q.**   Only for education classes?

14   **A.**   I believe that's what it was referring to.

15   **Q.**   It wasn't a debate about opening up, you're saying, app

16   distribution to third parties generally?

17   **A.**   No.   I do not believe so.

18   **Q.**   No.

19        At this point in time, August of 2008, did Apple have any

20   intent to open up iOS to third-party distribution outside of

21   the App Store?

22   **A.**   Not that I'm aware -- I recall, no.

23   **Q.**   Okay.   Now, let's go on because we've got some more.

24        Let's go to PX505.

25        And now Steve Jobs writes this to you on the 10th of

1    October, 2008; correct?

2    **A.**   Yes.

3            **MS. FORREST:**  Your Honor, I would offer PX505.

4            **MR. DOREN:**  No objection.

5            **THE COURT:**  All right.  It's admitted.

6            (Plaintiff's Exhibit PX505 received in evidence)

7            **THE COURT:**  And Forstall, remind me, who is Forstall

8    again?

9            **THE WITNESS:**  The Senior Vice-President of Software

10   Engineering.

11           **THE COURT:**  Okay.  Thank you.

12   BY MS. FORREST:

13   **Q.**   And the subject of this email -- can you get the subject

14   line?

15   **A.**   Yes.  I see that.

16   **Q.**   Okay.  "Is Google working to target iPhone ad market?"  Do

17   you see that?

18   **A.**   Yes.

19   **Q.**   Okay.  And Mr. Jobs says to you in the second sentence --

20   well, actually, the first sentence we can read in:  "Actually

21   the more energy they devote to iPhone, the better.  And the

22   more dependent they are on our choices, the better."

23           Do you see that?

24   **A.**   Yes.

25   **Q.**   All right.  Mr. Jobs and you and Apple wanted third

1   parties to be beholding to Apple at this time, didn't you?

2   **A.**   No.   That is not what he's talking about.

3   **Q.**   You were -- you and Mr. Jobs and others at Apple were

4   basking in what was now, early in 2008, your power to destroy

5   another company's business; correct?

6   **A.**   No.

7   **Q.**   Because the next part of the sentence says, "For example,

8   we could choose to provide an ad API for developers using a

9   Microsoft platform, ad platform back end, and where would

10  Google be then"?   Do you see that?

11  **A.**   I do.

12  **Q.**   Okay.   You weren't basking in the power to destroy another

13  company's business?

14  **A.**   No.

15  **Q.**   But this is October of 2008; correct?

16  **A.**   Yes.

17  **Q.**   Let's move forward in time.   Let's move to 2009.

18       And, Mr. Rudd, can you please put up PX2316.

19       Now, PX2316 is a document from you to Mr. Jobs dated 20

20  November 2009.   Do you see this?

21  **A.**   Hold on one second while I open the binder to that.

22  **Q.**   Sure.

23  **A.**   Yes.   I see this.

24  **Q.**   Okay.

25       Your Honor, I move to admit PX2316.

SCHILLER – CROSS – FORREST

1          **THE COURT:**  Any objection?

2          **MR. DOREN:**  No objection.

3          **THE COURT:**  Admitted.

4          (Plaintiff's Exhibit PX2316 received in evidence)

5     **BY MS. FORREST:**

6     **Q.**  And now it's 2009, it's late 2009; correct?

7     **A.**  Yes.

8     **Q.**  All right.  And it's still relatively early in the App

9     Store's history which was launched in 2008; correct?

10    **A.**  Yes.  Just over a year.

11    **Q.**  All right.

12    **A.**  Year and a half.

13    **Q.**  And you're still discussing the plan to keep iOS closed;

14    correct?

15    **A.**  No.

16    **Q.**  You're still discussing the fact that iOS was closed;

17    correct?

18    **A.**  That app distribution is through the App Store, yes.

19    **Q.**  And that app distribution -- the plan was to keep app

20    distribution through the App Store; correct?

21    **A.**  Again, I don't want to create some master plan.  You keep

22    trying to bring up that that's what we are doing.

23    **Q.**  You don't think it was a plan to keep the App Store a --

24    the only place where people could get apps?

25    **A.**  It was one of the many decisions we made.

SCHILLER – CROSS – FORREST

1    **Q.**  You don't think that that is the plan -- does the word

2    "plan" make you uncomfortable?

3    **A.**  No.  You just keep going back to that sentence you used

4    earlier, "the plan," as if that was one special plan that you

5    refer to.

6    **Q.**  Now, in this document 2316, you say -- well, actually

7    we'll start at the bottom.

8       The bottom of this email is a user of apps, a complaint

9    from an app user -- and let's highlight it, "Dear Steve" --

10   who is complaining that the app review process is preventing

11   him from playing two of his most frequently-used apps;

12   correct?

13   **A.**  Yes.

14   **Q.**  And if you turn back then up to the top of the page, your

15   response is the philosophical one, and you say in the second

16   paragraph, "In the end, it all really comes down to whether we

17   will ever open up the iPhone for developers to distribute apps

18   on their own, bypassing our store"; correct?

19   **A.**  Yes.

20   **Q.**  And those were your words; correct?

21   **A.**  It is.

22   **Q.**  All right.  And then you say in the two paragraphs down,

23   "Also last year we rejected the idea of publishing rules and

24   guidelines used to review apps.  It's very long and

25   complicated, but I think there will come a time when we are

1    better served to publish them than not.  At least we would be

2    more transparent and some of the issues would be reduced, not

3    all."  Do you see that?

4    **A.**  Yes.

5    **Q.**  And, in fact, you did publish then the first version of

6    the App Review Guidelines; correct?

7    **A.**  Yes, we did.

8    **Q.**  All right.

9         And, Jason, can you please put up PX56A, please.

10        And can you find that in your binder, Mr. Schiller?

11   **A.**  Yes.  I have that.

12   **Q.**  Okay.  And in 56A, if you look at the last page --

13            **THE COURT:**  Is 56A different from 56?

14            **MS. FORREST:**  It is different from 56, Your Honor.  I

15   apologize.  It was trying to make sure we had at one point

16   during the deposition process the complete set.  This is a

17   2010 -- it's the first version of the App Review Guidelines.

18            **THE COURT:**  Okay.  So I know I have 56 in evidence.

19   Are we looking for 56A in evidence as well?

20            **MS. FORREST:**  Correct, Your Honor.  I was about to --

21            **THE COURT:**  Any objection?

22            **MR. DOREN:**  No objection, Your Honor.

23            **THE COURT:**  Admitted.

24       (Plaintiff's Exhibit PX56A received in evidence)

25

SCHILLER – CROSS – FORREST

1    **BY MS. FORREST:**

2    **Q.**  Do you see on the last page, Mr. Schiller, that there is a

3    date at the very bottom, April -- Apple 2010?

4    **A.**  I do.

5    **Q.**  And if you turn back to the first page, does this appear

6    to be the first published version of the App Review

7    Guidelines?

8    **A.**  I believe it is.

9    **Q.**  Okay.  And do you see the second bullet from the bottom,

10   it says, "If your app is rejected, we have a review board that

11   you can appeal to.  If you run to the press and trash us, it

12   never helps."  Do you see that?

13   **A.**  Yes.

14   **Q.**  Okay.

15          **THE COURT:**  And this year was what year?

16          **MS. FORREST:**  2010 from the last page.

17          **THE COURT:**  Thank you.

18   **BY MS. FORREST:**

19   **Q.**  Now, over the years, App -- you would agree with me that

20   Apple stuck with its decision to keep apps available only

21   through the Apple App Store; correct?

22   **A.**  For native apps, yes.

23   **Q.**  Okay.  And it was apps that were a key to selling iPhones;

24   correct?

25   **A.**  Certainly very important feature of iPhone.

1    **Q.**   Okay.  So let's go to 2016 and see what happens over the

2    years.

3         So we're going to now move forward three years, three

4    years after the Goldman Sachs report; right?  That was 2013.

5    **A.**   Yes.

6    **Q.**   Okay.  We're in 2016.  And do you recall that in October

7    of 2016, you sent to three of the highest level executives at

8    Apple an article talking about "iMessage as the glue that kept

9    people stuck to the iPhone"?  Do you recall that?

10   **A.**   I don't recall those exact words.

11   **Q.**   Okay.  Let's try PX2356, Mr. Rudd.

12        All right.  Do you see the subject line of this is

13   "Subject:  iMessage is the glue that keeps me stuck to the

14   iPhone," and it's *The Verge*; correct?

15   **A.**   I do see that.

16   **Q.**   All right.  And *The Verge* is a -- is a publisher, a

17   periodical; correct?

18   **A.**   Yes.

19   **Q.**   And you're Mr. Schiller who is sending that; correct?

20   **A.**   I'm sending this news publication, yes.

21   **Q.**   And you're sending it on to Mr. Joswiak; correct?

22   **A.**   Yes.

23   **Q.**   And what was his position?

24   **A.**   Vice-President of Product Marketing.

25   **Q.**   And Mr. Federighi.  And what's his position?

1    **A.**  Senior Vice-President of Software Engineering.

2    **Q.**  And Mr. Cue.  What is his position?

3    **A.**  Senior Vice-President of Internet Services.

4    **Q.**  And they were all part of the Executive Team; correct?

5    **A.**  Not Mr. Joswiak at that time.

6    **Q.**  But he is now; correct?

7    **A.**  He is now.

8    **Q.**  And all -- in fact all four of you are still at Apple;

9    correct?

10    **A.**  Yes.

11    **Q.**  And all four of you are among the highest level executives

12    at Apple; correct?

13    **A.**  Yes.

14    **Q.**  All right.  And this is 2016.

15    And in 2016, you sent to those individuals an article that

16    said "iMessage is the glue that keeps me stuck to the iPhone";

17    correct?

18    **A.**  Yes.  I sent this article to them.

19    **Q.**  All right.

20    Now, let's fast forward to 2019.

21    **THE COURT:**  Do you want this one in evidence?

22    **MS. FORREST:**  I'm sorry -- I do, Your Honor.  Please.

23    Thank you.

24    **THE COURT:**  No objection?

25    **MR. DOREN:**  No objection.

SCHILLER – CROSS – FORREST

1          **THE COURT:**  Admitted.

2          (Plaintiff's Exhibit PX2356 received in evidence)

3   **BY MS. FORREST:**

4   **Q.**  Let's move ahead to 2019, and we have now had the App

5   Store in existence for more than a decade; is that right?

6   **A.**  Yes.

7   **Q.**  And the App Store -- they have been increasingly

8   sophisticated in how it does business; correct?

9   **A.**  Yes.

10  **Q.**  And, you know, Apple is also a company that's gone through

11  some changes during that time; correct?

12  **A.**  Yes.

13  **Q.**  All right.  And you know that by 2019, Apple had already

14  been found to have violated the antitrust laws in connection

15  with a price-fixing case; correct?

16  **A.**  Yes.

17  **Q.**  All right.  And that was the E-books case; correct?

18  **A.**  Yes.

19  **Q.**  And we're going to come back to this, perhaps, but the

20  E-books case -- you recall there the judge suggested that

21  high-level executives were directly involved in the

22  conspiracy; correct?

23          **MR. DOREN:**  Objection, Your Honor.  Relevance.

24  Hearsay.

25          **MS. FORREST:**  It's certainly -- certainly absolutely

1  relevant, Your Honor, to this line of questioning.

2          **THE COURT:**  Well, I'll allow it for now.

3  **BY MS. FORREST:**

4  **Q.**  You understand that the court suggested that the highest

5  level executives were directly involved in that conspiracy;

6  correct?

7  **A.**  Yes.

8  **Q.**  And you were one of the highest level executives, weren't

9  you?

10  **A.**  If by inference you're saying I had anything to do with

11  the E-books case, I did not.

12  **Q.**  You know a monitor was appointed in the E-books case;

13  correct?

14  **A.**  Yes.

15  **Q.**  And the monitor wanted to interview you; correct?

16  **A.**  I and many others, yes.

17  **Q.**  But you were one of the ones that he wanted to interview;

18  correct?

19  **A.**  Sure.

20  **Q.**  And you know that it took a year and a half for the

21  monitor to get an interview of you; correct?

22  **A.**  I do not know that.

23  **Q.**  And you don't know that the monitor repeatedly tried to

24  get an interview with you in particular and couldn't for over

25  a year and a half?

1    **A.**   I do not know that.

2    **Q.**   So we'll get to that.

3        Do you know that the monitor referenced the fact that he

4    wanted to interview you because you were one of the highest

5    level executives that had been referenced by the court in the

6    E-books case?

7                **MR. DOREN:**  Objection, Your Honor.  Relevance.

8                **MS. FORREST:**  I'm getting there.

9                **THE COURT:**  I'll give you some latitude.  Proceed.

10   Overruled.

11               **THE WITNESS:**  I don't know what the monitor said.

12   BY MS. FORREST:

13   **Q.**   Okay.  Now, you know that Mr. Cue was a primary witness in

14   the E-books case; correct?

15   **A.**   I believe so.

16   **Q.**   And you know that Mr. Cue was specifically called out in

17   the E-books case as a participant in the price-fixing

18   conspiracy; correct?

19   **A.**   I don't know exactly the language used.

20   **Q.**   All right.  And you know that Mr. Cue -- let's pull up

21   PX402.  It's in evidence.  I think it's in evidence,

22   Your Honor.  With the four-hour binder, I'm not sure if it

23   stayed in or stayed out.

24       It's not in evidence.

25               **THE COURT:**  Yeah.  I don't see it in evidence.

1          **MS. FORREST:**  Okay.

2     **Q.**  You know that Mr. Cue had -- had been part of the E-books

3     case; correct?

4     **A.**  Yes.

5     **Q.**  And he said --

6          **MR. DOREN:**  Your Honor, statements by Mr. Cue were

7     excluded by stipulation between the parties.

8          **MS. FORREST:**  They were only excluded, Your Honor,

9     from the four-hour binder.  They were not excluded from the

10    case as a whole.  And the point that I'm going -- I can make

11    the point now very quickly.  I'm on like the last connection

12    point.

13         **THE COURT:**  All right.  Proceed.

14    **BY MS. FORREST:**

15    **Q.**  All right.  Mr. Cue said that he would do what he did in

16    the E-books case all over again, but he'd take better notes.

17    Do you know that?

18    **A.**  No, I do not know that.

19    **Q.**  You don't know that he said that to *The Guardian*?

20    **A.**  No, I do not.

21    **Q.**  You don't know that he said that to me in my deposition of

22    him?

23    **A.**  No.  I did not know that.

24    **Q.**  All right.

25         Now, you also learned to be more careful in your writing;

SCHILLER - CROSS - FORREST

1   correct?

2   **A.**   I'm not sure what you mean.

3   **Q.**   By 2019, Apple has already been an adjudicated

4   price-fixer, and the notes played a role in that, and the

5   executives involved were much more careful with what they

6   wrote down and how they wrote it; isn't that correct?

7   **A.**   I'm not sure what you're referring to.  Again, I -- yeah.

8   I don't know what you mean.

9   **Q.**   All right.  Well, let's turn to PX842.

10      Now, here we have what I think of as the ultimate plan.

11  Do you see that it says "Subject:  Phishing emails are still

12  managing to catch everyone out"?

13  **A.**   Yes.

14  **Q.**   And it's from Mr. Federighi to you; correct?

15  **A.**   The -- the last email on it is, yes.

16  **Q.**   Okay.  On the first page; correct?

17  **A.**   Yes.

18  **Q.**   All right.  And that's dated December 1, 2019?

19  **A.**   Yes.

20  **Q.**   All right.

21      Your Honor, we would seek to admit PX842.

22          **THE COURT:**  No objection?

23          **MR. DOREN:**  No objection.

24          **THE COURT:**  Admitted.

25          (Plaintiff's Exhibit PX842 received in evidence)

**BY MS. FORREST:**

**Q.**  Now, if you turn to the second page at the very bottom, there's an email from Mr. Cook dated December 1, 2019.  Do you see that?

**A.**  I do.

**Q.**  And he says, "What could we do that would give us a long-term competitive advantage for both enterprise and consumer"?  Do you see that?

**A.**  I do.

**Q.**  All right.  And then go up to the top of that page, and it says -- actually the page before where it says "Tim."

     "Tim, our primary strategy here is to eliminate the use of user-entered passwords."  And then it goes on and it says, "If the user doesn't know a password to enter into a phishing site, they can't be phished for it".  Do you see that?

**A.**  Yes.

**Q.**  And he goes on in the next page, "We're doing this in two ways" -- at the top of the page -- "password auto generation and autofill in Safari and autosync via Keychain and sign-in with Apple."  Do you see that?

**A.**  Yes, I do.

**Q.**  Okay.  And then go down just -- the top -- the next paragraph just above "Craig," it says, "As for providing a long-term competitive advantage, while use of these features is likely to make our platform more sticky, the capabilities

SCHILLER - CROSS - FORREST

1    themselves are unlikely to be protectable differentiators

2    because heavy users of Chrome and Google ecosystem are likely

3    to have the Google Password Manager."  Do you see that?

4    **A.**  Yes.

5    **Q.**  Now, you know that most people, human beings in this

6    world, have a hard time remembering their passwords; right?

7    **A.**  Yes.

8    **Q.**  And you know that there are various kinds of

9    functionalities that can allow passwords to be saved on a

10   device and then to autofill; correct?

11   **A.**  Yes.  There are many methods.

12   **Q.**  And one of the issues in switching between devices is

13   actually being able to remember your password because

14   sometimes your app automatically comes up, it's got your

15   password right there, or you've got the Apple iPhone facial

16   recognition, and it sort of gets you automatically in, but if

17   you don't remember your password, that's an issue in switching

18   devices; correct?

19   **A.**  I don't think that's much of an issue, no.

20   **Q.**  Okay.  Well, you would agree with me that for most people,

21   they might have dozens of passwords; correct?

22   **A.**  Yes.

23   **Q.**  All right.  And you would agree with me that the strong

24   passwords that are autofilled are generally a jumble of

25   numbers and letters; correct?

SCHILLER – CROSS – FORREST

1    **A.**   By design, yes.

2    **Q.**   And you would also agree with me that when they are saved

3    to a device, they don't leave that device ecosystem.  So, for

4    instance, if I have an Apple iPhone and I pick auto-generating

5    my passwords, if I switch to another iPhone, it will transfer

6    automatically; correct?

7    **A.**   Yes.  We have that technology.

8    **Q.**   It doesn't transfer if I switch to an Android, does it?

9    **A.**   No.

10   **Q.**   So unless I remember all of those automatically-generated

11   passwords, I am out of luck with every single app, aren't I?

12   **A.**   No, you're not.  You just hit "reset password" and set up

13   a new password with the Google Password Manager.

14   **Q.**   Fifty times?

15   **A.**   Well, again, I don't think you do it all at once.  You do

16   it when you need them.

17   **Q.**   But you've got to do it for each and every app.  There is

18   that additional step of having to press to get the "find your

19   password," get the email, comply with whatever that particular

20   site's requirements are for whether it's a hashtag or a

21   question mark or a capital letter or a number, all of that;

22   right?

23   **A.**   Or use a third-party password manager that are

24   cross-platform as well.

25   **Q.**   Now, let's change topics.

1        You own a Mac, don't you?

2   **A.**   Yes.

3   **Q.**   And you keep some personal information on your Mac, don't

4   you?

5   **A.**   Not much that I can think of, no.

6   **Q.**   You keep a variety of personal information on your Mac,

7   don't you?  You told me that at your deposition.

8   **A.**   I believe I said that all my information that's on my Mac

9   is synched in the Cloud and it's kept in the Cloud and it's

10   accessible by all my devices.

11   **Q.**   Whether it's on the Cloud and on other devices, you've got

12   personal information on your Mac; correct?

13   **A.**   I can get to some from my Mac, yes.

14   **Q.**   And you keep some personal information on your Mac;

15   correct?

16   **A.**   Again, not much.

17   **Q.**   Okay.  But you don't think that whatever the amount is on

18   your Mac of personal information is endangered, do you?

19   **A.**   Yes.  Of course it is.

20   **Q.**   You think -- so you put that personal information on your

21   Mac and you put it there, and it's in danger every single

22   moment?

23   **A.**   I think there's risks with all technology, of course.

24   **Q.**   There's risks with all technology, of course; right?

25   **A.**   Yes.

SCHILLER – CROSS – FORREST

1    **Q.**   Including the Mac; yes?

2    **A.**   Absolutely.

3    **Q.**   Including iOS; yes?

4    **A.**   Sure.

5    **Q.**   Okay.  All technology; right?

6    **A.**   There is some element of risk with technology, yes.

7    **Q.**   Now -- and you have apps on your Mac?

8    **A.**   Yes.

9    **Q.**   And you get your Mac apps from where?

10   **A.**   Primarily through the App Store.

11   **Q.**   The Mac App Store; correct?

12   **A.**   Yes.

13   **Q.**   You have choice; correct?

14   **A.**   I do.

15   **Q.**   You have the choice whether you can -- you want to get

16   your Mac apps only from the Mac App Store; right?

17   **A.**   Yes.

18   **Q.**   Nobody's forcing you to go to third parties to get your

19   apps on your Mac; correct?

20   **A.**   Some third parties are.

21   **Q.**   Well, if they don't have it in the Mac Store?

22   **A.**   That's right.  They may force me to go to their site to

23   get one.

24   **Q.**   And if -- you could choose then whether or not it was

25   worth it; correct?

SCHILLER – CROSS – FORREST

1    **A.**   No.   I don't have a choice.   In that case I have to get

2    it.

3    **Q.**   Well, if you didn't trust it, you might not get it?

4    **A.**   True.   I might not be able to use it at all, yes.

5    **Q.**   Correct?   All right.   But that was a choice you could make

6    as a human being making a risk analysis; correct?

7    **A.**   Yes.

8    **Q.**   All right.

9        And you think people are smart enough, don't you, to make

10   choices, don't you?

11   **A.**   People are smart, but choices we may not all know the

12   tradeoffs.

13   **Q.**   Now, you've followed this case closely, have you not?

14   **A.**   Yes.

15   **Q.**   And yesterday you were asked about some testimony from

16   Mr. Sweeney.   Do you remember that?

17   **A.**   I was.

18   **Q.**   And you followed his testimony; correct?

19   **A.**   Yes.

20   **Q.**   And you followed the testimony of Mr. Grant and the

21   experts; correct?

22   **A.**   I did.

23   **Q.**   I want to make sure that we are on the same page about

24   what this case is about and is not about, and I'm asking this

25   because yesterday you testified about the App Review Process

1    and the App Store as if this case, if Epic won, would make

2    them go away or fundamentally change.

3    **A.**   Yes.

4    **Q.**   And you know that that is not true; correct?

5    **A.**   I do not agree with that statement.

6    **Q.**   Okay.  Let's -- let's just be clear.

7        Mr. Rudd, can you please pull up our demonstrative,

8    pages -- first page 2.

9        You know that if Epic were to prevail in this case, the

10   App Store could continue to exist; yes?

11   **A.**   Yes.

12   **Q.**   All right.  And App Review could continue to exist; yes?

13   **A.**   Yes.

14   **Q.**   And that IAP could continue to exist; yes?

15   **A.**   Yes.

16   **Q.**   And that other competitive stores and distributors, they

17   might, depending upon if we were to prevail and the judge were

18   to so order that -- they might be allowed; correct?

19   **A.**   Or all -- from any vendor --

20   **Q.**   I'm just saying other competitors, other competitors

21   stores, and other distributors; correct?

22   **A.**   Again, I'm not sure it's limited to that.

23   **Q.**   Okay.  But there would be other channels of app

24   distribution; correct?

25   **A.**   Again, I haven't heard discussion yet of what that is.  I

SCHILLER - CROSS - FORREST

1    heard discussion --

2    **Q.**  I understand.

3    **A.**  There wasn't a recommendation.

4    **Q.**  You understand we're seeking to allow other competitive

5    stores and other distribution channels; correct?

6    **A.**  Sure.

7    **Q.**  And, lastly, you understand that Epic is seeking

8    alternative payment solutions; correct?

9    **A.**  Yes.

10   **Q.**  To be available?  Yes?  Right?

11   **A.**  Yes.  I said "yes."

12   **Q.**  But not to the elimination of IAP; correct?

13   **A.**  Correct.

14   **Q.**  And not to the elimination of App Review; correct?

15   **A.**  Well, for many of them, yes.  Again, when you say "App

16   Review," right now all apps go through App Review, so --

17   **Q.**  But App Review for any apps in the App Store would

18   continue to exist; yes?  Apps in the App Store.

19   **A.**  You're missing a check box.

20   **Q.**  Apps in the App Store.

21   **A.**  Yes.  In the App Store.

22   **Q.**  All right.

23        Now, let's do one more thing.  You watched my opening?

24   **A.**  Yes, I did.

25   **Q.**  All right.  You saw my little gas station slide?

SCHILLER – CROSS – FORREST

1    **A.**   I did.

2    **Q.**   I've made another one.

3    **A.**   Oh, thank you.

4    **Q.**   Okay.  "Thank you."  Did you like it, the gas station

5    slide?

6    **A.**   Thank you for making another slide.

7    **Q.**   Okay.  All right.

8        So here on this slide, we've got an example of just for

9    the IAP, a version of the gas station where we now have the

10   gas station as the App Store and the gas pump is different

11   payment opportunities.

12       And you understand, sir, that what we're seeking is that

13   when the user leaves the App Store, they buy their app or get

14   it for free, that when they go to the gas pump other times,

15   that what we're seeking is the ability to have alternative

16   payment opportunities, but Apple's IAP would always or could

17   always be one of them.  You get that; right?

18   **A.**   Yes.

19   **Q.**   Okay.  All right.  Now, let's move on to something else.

20       Now, a few moments ago we discussed the App Review, the

21   2010 App Review Guidelines; right?

22   **A.**   We did.

23   **Q.**   And it's a pretty concise document.  All the App Review

24   Guidelines are relatively concise?

25   **A.**   I think so.

1  **Q.**  Okay.  But you know behind the scenes there is something

2  that is like a big, thick phone book that is called The App

3  Review Guidelines Book or something like that?

4  **A.**  I actually have not seen that.

5  **Q.**  I've got one for you.  Today is your lucky day.

6  **A.**  Thank you.

7  **Q.**  So let's get 101.

8     And, Your Honor, I believe PX101 is in evidence.  I'll

9  hand you a copy.  It's big.  If you don't want to be

10  burdened --

11        **THE COURT:**  So 101 is not in evidence.

12        **MS. FORREST:**  It's not?  Okay.  I had heard it was.

13  Okay.  We must have an error.

14        **THE COURT:**  I don't see it on your list, and I have

15  not admitted it in the last two days.

16        **MS. FORREST:**  I can take care of it from here,

17  Your Honor.  I have a foundation.

18  **Q.**  All right.  Mr. Schiller, do you see that you are the

19  addressee of the cover email from Mr. Shoemaker enclosing the

20  AR Guidelines on the 21st of April, 2010?

21  **A.**  I see that.

22  **Q.**  All right.  And this is PX101 for identification.

23     Do you have any doubt that you received this email?

24        **THE COURT:**  I don't know if there is going to be an

25  objection.  Is there?

1      **MR. DOREN:**  Yes -- no, Your Honor.  No objection.

2      **THE COURT:**  All right.  101 is admitted.

3      (Plaintiff's Exhibit PX101 received in evidence)

4      **MS. FORREST:**  Thank you, Your Honor.

5   **Q.**  Now, Mr. Schiller, do you recognize PX101 as the book that

6   provides additional resources in 2010 for app reviewers?

7   **A.**  I don't recall receiving this.  I see the email and don't

8   have any reason to doubt that I received it.  I just don't

9   recall this.

10  **Q.**  Okay.  And the first -- let's go back to the first page of

11  it, and it says underneath -- well, first of all, it says

12  "privileged and confidential."  Why is everything labeled

13  "privileged and confidential."  Any idea?

14  **A.**  Well, I wouldn't say everything is.  We have seen plenty

15  of things that you have shown us that aren't labeled

16  "privileged and confidential."

17  **Q.**  You weren't told to put "privileged and confidential" on

18  everything, were you?

19  **A.**  No.

20  **Q.**  Now, you see it says, "Phil, I was able to compress the

21  file down to 9 megabytes PDF"?

22  **A.**  Yes.

23  **Q.**  Do you see that?

24  **A.**  Yes.

25  **Q.**  Now, if you turn to Bates numbered page 650, you'll see --

1    well, throughout the whole thing, it tells you different

2    guidance.  And among the guidance, for instance, is on page

3    650, "apps that may need further investigation."  Do you see

4    that?

5    **A.**  One second, please.

6         I see this.

7    **Q.**  Okay.  And like the Dalai Lama and Tibet needs further

8    investigation.

9    **A.**  I see that.

10   **Q.**  Or apps that support Tibetan independence; right?

11   **A.**  Yes.

12   **Q.**  Or Taiwanese independence.  You see that?

13   **A.**  Yes.

14   **Q.**  Turn to Bates numbered page 673 on the bottom.

15   **A.**  Yes.

16   **Q.**  All right.  And it says -- on the right-hand side, there

17   is a "yes" and a "no," and we'll look at the "no."  It says,

18   "Do not submit to ERB."  That's the Executive Review Board?

19   **A.**  Yes.

20   **Q.**  And that was a board that would make some policy decisions

21   about what could or could not go in the App Store if there was

22   a question about it; correct?

23   **A.**  Correct.

24   **Q.**  All right.

25        And it says, "Do not submit to ERB," and then in the

1    second chunk down, it says, "Porn or adult stars equal

2    rejection."  Do you see that?

3    **A.**   I do.

4    **Q.**   And then underneath that, it says, "Sole purpose of app is

5    sex."  Do you see that?

6    **A.**   Yes.

7    **Q.**   And then it says, "Example, sex shop locators."  Do you

8    see that?

9    **A.**   Yes.

10   **Q.**   "Sex toy catalog."  Do you see that?

11   **A.**   I do.

12   **Q.**   "Escort services."  Do you see that?

13   **A.**   I do.

14   **Q.**   Actually, it was "escort services locator or catalog."  Do

15   you see that?

16   **A.**   Yes.

17   **Q.**   And the reason they did not need to be submitted to the

18   ERB was because they were going to be rejected; correct?

19   **A.**   Again, I don't recall seeing this document.  I assume

20   that's what that means.

21   **Q.**   Okay.

22        And you're familiar, generally speaking, with the content

23   of the apps in the App Store; correct?

24        **MR. DOREN:**  I don't mean to interrupt, Your Honor,

25   but we have indicated that there are portions of this exhibit

1    that we will seek to seal, so I would just ask that that be

2    addressed before this is posted.

3           **MS. FORREST:**  Absolutely, Your Honor.  No problem

4    with that.

5           **THE COURT:**  Provisionally admitted.

6    **BY MS. FORREST:**

7    **Q.**  Now, I want to -- I was saying you're generally familiar

8    with the apps on the App Store?

9    **A.**  Generally.

10   **Q.**  There are a lot of them, but you're familiar generally

11   with a number of them; correct?

12   **A.**  Yes.

13   **Q.**  All right.  And I want to clear up what kind of content is

14   on the App Store and what kind of apps the App Review Process

15   will allow to be on the App Store.  Okay?  Because we've

16   talked about Itch.io.  Do you remember that?

17   **A.**  We did.

18   **Q.**  And there is not a single piece of evidence actually in

19   the evidence about Itch.io -- what is actually on the site;

20   correct?  You haven't seen any evidence, have you?

21   **A.**  I don't recall that.

22   **Q.**  There was just some questioning by a lawyer that indicated

23   that there might be sexually offensive content; correct?

24   **A.**  I believe some specific content in it was referenced.

25   **Q.**  There was no words because they were too offensive to be

1    raised in court; correct?

2  **A.**   That's what I heard.

3  **Q.**   Do you know anything factually about Itch.io?

4  **A.**   I have not looked at Itch.io myself.

5  **Q.**   You've never seen it?

6  **A.**   I don't recall that.

7  **Q.**   You don't know whether Itch.io's content is better or

8    worse than the content in the App Store, do you, sir?

9  **A.**   I can't make a judgment of that sitting here today.

10  **Q.**   Now, this is not a case about keeping sexually explicit

11    content off the App Store, is it?

12  **A.**   I wouldn't agree with that.

13  **Q.**   Okay.  Let's be clear about what's actually in the App

14    Store.

15       So I did some searches, and I -- as you know, my book is

16    on algorithmic bias.

17  **A.**   Yes.

18  **Q.**   And I'm now concerned about the algorithm that will be

19    associated with my name forever; however, I have done some

20    searches in the App Store and will hand up binder 2.

21       Now, I searched a number of terms, and I'm going to assume

22    that if you don't know the term, we can talk about it.  We can

23    define it.

24       But if you turn first to PX1937, you can see the first

25    term I searched was "BDSM."  This is on the App Store.  Do you

SCHILLER – CROSS – FORREST

1    see that?

2    **A.**  Yes.

3    **Q.**  Do you recognize the pages that are associated with PX1937

4    as pages from the App Store?

5    **A.**  It appears to be, yes.

6    **Q.**  And I will represent to you that I didn't print off every

7    page associated with the term.  I just printed off some.

8         Your Honor, I move PX1937.

9              **THE COURT:**  No objection?

10             **MR. DOREN:**  No objection, Your Honor.

11             **THE COURT:**  Admitted.

12         (Plaintiff's Exhibit PX1937 received in evidence)

13   **BY MS. FORREST:**

14   **Q.**  And you see -- let's put up the whole page, if we could.

15        Do you see under the first one Kinky -- Kinkoo --

16   whatever.  It says, "Kinkoo", "Kinky."  Whatever.  I don't

17   need to read it.  It's on there.  There is also an in-app

18   purchase.  Do you see that?

19   **A.**  I see it says that.

20   **Q.**  Let's turn the page.  You see there is another one.  They

21   often have similar names under the BDSM, and the one at the

22   bottom also has an in-app purchase; correct?

23   **A.**  Yes.

24   **Q.**  You can also at the top get a membership to a particular

25   site for BDSM dating; correct?

SCHILLER – CROSS – FORREST

1   **A.**   I see that.

2   **Q.**   And then if you turn the page onto Bates number ending in

3   .3, it says, "Obedience, BDSM habit training."  Do you see

4   that?

5   **A.**   I do.

6   **Q.**   And there is an in-app purchase one can get for that;

7   correct?

8   **A.**   It appears to be, yes.

9   **Q.**   And turn the page.  And there is another series of apps

10  that again also have in-app purchases; correct?

11  **A.**   Yes.

12  **Q.**   And then you turn the page, and there is another one on .5

13  that has another membership subscription?

14  **A.**   Yes.

15  **Q.**   And the one at the bottom of that page has an in-app

16  purchase; correct?

17  **A.**   Yes.

18  **Q.**   And Apple's getting a 30 percent commission on any in-app

19  purchase if it's digital content consumed within the app;

20  correct?

21  **A.**   Yes.

22  **Q.**   All right.

23      And you turn the page, and there's some more; correct?

24  **A.**   Yes.

25  **Q.**   On page .6 and .7, there's some more; correct?

1    **A.**   Yes.

2    **Q.**   And .8 there's more; correct?

3    **A.**   I see that.

4    **Q.**   All right.  Turn to the next one, PX1938.  This is a

5    search of the word "escorts."  Do you see that?

6    **A.**   I do.

7    **Q.**   Do you recognize this and these pages as coming from the

8    App Store?

9    **A.**   It appears to be.

10           **MS. FORREST:**   Your Honor, I move in PX1938.

11           **THE COURT:**   No objection?

12           **MR. DOREN:**   No objection.

13           **THE COURT:**   Admitted.

14       (Plaintiff's Exhibit PX1938 received in evidence)

15   **BY MS. FORREST:**

16   **Q.**   Do you see that the first -- the first result here is

17   actually in blue, and it says ad.  Do you see that?

18   **A.**   I do.

19   **Q.**   That means that Apple was selling the term "escort" on its

20   search auction site; correct?

21   **A.**   Yes.

22   **Q.**   And for this -- for escorts here, it says, "Chat, meet,

23   find hookups"; correct?

24   **A.**   Yes.

25   **Q.**   And it also has an in-app purchase opportunity; correct?

1    **A.**  Yes.

2    **Q.**  And below that, it says -- there is another one "Eros

3    hookup, affair dating, and local hookups."  Do you see that?

4    **A.**  Yes.

5    **Q.**  And then you turn the page and there's "escort toys."  Do

6    you see that?

7    **A.**  I see that.

8    **Q.**  Okay.  And then let's just go on to PX1939.

9       Do you recognize -- I searched the word "fetish."  Do you

10   see that?

11   **A.**  Yes.

12   **Q.**  Do you recognize PX1939 as a series of pages from the App

13   Store?

14   **A.**  It appears to be.

15   **Q.**  And do you see on the first page it says -- there is --

16   the top app has an in-app purchase opportunity?

17   **A.**  Yes.

18   **Q.**  And the bottom one is a subscription?

19   **A.**  Yes.

20   **Q.**  And then you can just sort of maybe flip through the pages

21   a little bit, but you can see that there are various in-app

22   purchasing opportunities here, and if you turn to .4, it says

23   "pure hookup anonymous," and it says "try our video chats" at

24   the bottom.  Do you see that?

25   **A.**  Yes.

SCHILLER – CROSS – FORREST

1   **Q.**   Okay.  And at the top of that page it says, "fetish

2   dating."  Do you see that?

3   **A.**   Which page are we on now?  Four still?

4   **Q.**   .4, yes?

5   **A.**   Yes.

6   **Q.**   Okay.  And you can turn to just a couple of the other

7   pages and just sort of scroll through them.  They're all

8   consistent with the same -- the same topic; correct?

9   **A.**   Yes.

10  **Q.**   All right.

11       Let's turn to the next tab in your binder, PX1940, where I

12  searched the word "pornography."  Do you recognize these pages

13  as pages from the App Store?

14  **A.**   Yes.

15  **Q.**   And do you see the first -- the -- on the first page that

16  there is also in-app purchase opportunities; correct?

17  **A.**   Yes.

18  **Q.**   And that's the "Sex Positions 3D"; correct?

19  **A.**   Yes.

20  **Q.**   And then if you turn the page, it's "Lifestyle for Men

21  Magazine" with in-app purchase opportunities; correct?

22  **A.**   Yes.

23  **Q.**   And then there is also an in-app purchase opportunity in

24  the one below that; correct?

25  **A.**   Yes.

SCHILLER - CROSS - FORREST

1    **Q.**  And on the next page, which ends in .3, under a magazine,

2    "Kandy Magazine," there is also in-app purchase opportunities;

3    correct?

4    **A.**  Yes.

5          **MS. FORREST:**  Your Honor, I would move to admit

6    PX1940.

7          **MR. DOREN:**  No objection.

8          **THE COURT:**  1940 is admitted.  And 1939, in the event

9    that I didn't.

10   (Plaintiff's Exhibits PX1939 and PX1940 received in evidence)

11   **BY MS. FORREST:**

12   **Q.**  And do you see that on the next page, .4, there is a

13   private browsing full screen "Incognito Internet"?  Do you see

14   that?

15   **A.**  Yes.

16   **Q.**  And then there under -- if you turn to the next page, .5,

17   there's the "Adult bedtime story box, hot trending stories."

18   Do you see that?

19   **A.**  Yes.

20   **Q.**  And if you turn to .6, it says "VR tube."  Do you

21   recognize "VR" as "virtual reality"?

22   **A.**  That's what those letters mean, yes.

23   **Q.**  It says, "VR tube: 360 and 3D video."  Do you see that?

24   **A.**  Yes.

25   **Q.**  That also has in-app purchase opportunities; correct?

SCHILLER - CROSS - FORREST

**A.**   Yes.

**Q.**   We can just sort of flip through the rest quickly.

Let's go to the next tab, PX1941, and here is -- the word that I searched was the word "sex."  Do you recognize the page and the pages that are in PX1941 as pages from the App Store?

**A.**   It appears to be.

**Q.**   Okay.  And do you see that on the first page, it has "Sex positions 3D"?

**A.**   Yes.

**Q.**   And it has in-app purchase opportunities?

**A.**   Yes.

**Q.**   And below that is "Down 18-plus fantasy, wild hookup and date."  Do you see that?

**A.**   Yes.

**Q.**   And it's also got in-app purchase opportunities?

**A.**   Yes.

**Q.**   And then if you go a couple of pages forward to .3, and it says "Shake it, chat, meet, hookup dating apps."  Do you see that?

**A.**   Yes.

**Q.**   And it also has in-app purchase opportunities?

**A.**   Correct.

**Q.**   Okay.  And then you can just sort of flip through the remainder.

Let's go to the next -- if we haven't moved that one in,

SCHILLER – CROSS – FORREST

1    can I move that one in, Your Honor?

2              **THE COURT:**  1941, no objection?

3              **MR. DOREN:**  No objection, Your Honor.

4              **THE COURT:**  Admitted.

5         (Plaintiff's Exhibit 1941 received in evidence)

6    **BY MS. FORREST:**

7    **Q.**  Then let's go to an app that is on the App Store, TikTok.

8    Are you familiar with the app TikTok?

9    **A.**  Yes.

10   **Q.**  The app TikTok is often popular with a young adult, late

11   teen demographic; correct?

12   **A.**  Yes.

13   **Q.**  All right.  And turn to PX1949.  Do you see that?

14   **A.**  I do.

15   **Q.**  And do you see that TikTok is -- was -- do you recognize

16   this as TikTok being on the top of the charts of the App

17   Store?

18   **A.**  For -- for apps, yes.  For free apps.

19   **Q.**  All right.

20       Your Honor, I would move in PX1949.

21             **THE COURT:**  No objection?

22             **MR. DOREN:**  No objection, Your Honor.

23             **THE COURT:**  Admitted.

24        (Plaintiff's Exhibit PX1949 received in evidence)

25

1    **BY MS. FORREST:**

2    **Q.**  All right.  Let's turn to what you can find on TikTok if

3    you search some of the same words.

4         Let's turn to the next page, PX1947.  On TikTok do you

5    recognize this as what is returned for the result "BDSM"?

6    **A.**  I do not.  I do not use TikTok myself so I can't say

7    whether this looks like the TikTok screen.

8    **Q.**  You would agree with me that there is a variety of search

9    returns for the word "BDSM" under TikTok; correct?

10   **A.**  Again, this is your -- this is your -- your statement, not

11   mine.  I can't say whether this is true or not.

12              **MS. FORREST:**  Well, Your Honor, this is a public

13   record.  I would seek to move PX1947.

14              **MR. DOREN:**  Objection, Your Honor.  Foundation.

15              **MS. FORREST:**  Your Honor, a variety of public record

16   websites have come in through the parties on a variety of

17   topics.

18              **THE COURT:**  I don't have any reason to believe that

19   this isn't accurate.  I'll allow it.

20         (Plaintiff's Exhibit PX1947 received in evidence)

21   **BY MS. FORREST:**

22   **Q.**  And turn, if you would, to the next page, which is "fetish

23   challenge" under TikTok?

24   **A.**  Okay.

25   **Q.**  Do you recognize this page?

 1    **A.**  I do not.

 2           **MS. FORREST:**  Your Honor, we also move to admit this

 3    one on the same basis.

 4           **THE COURT:**  I'll admit it.

 5        (Plaintiff's Exhibit PX1948 received in evidence)

 6    **BY MS. FORREST:**

 7    **Q.**  Turn the page to PX1950.  Do you see that under the word

 8    "sex" on TikTok a variety of content appears?

 9    **A.**  I see this.

10    **Q.**  All right.

11       Your Honor, we move to admit it on the same basis.

12           **THE COURT:**  I'll admit it.

13        (Plaintiff's Exhibit PX1950 received in evidence)

14    **BY MS. FORREST:**

15    **Q.**  Let's turn the page to Instagram, PX1895.  Are you

16    familiar with Instagram?

17    **A.**  Yes.

18    **Q.**  All right.  And do you recognize PX1895 as a page from the

19    App Store showing that the Instagram app is available on the

20    App Store?

21    **A.**  Yes.

22    **Q.**  Do you use Instagram?

23    **A.**  Not in a few years.

24    **Q.**  All right.  Do you know that if you search certain words,

25    certain content comes up, puppies, kittens, things like that?

SCHILLER - CROSS - FORREST

1   **A.**   Yes.

2   **Q.**   Now, turn the page, if you would -- actually, Your Honor,

3   I would move to admit PX1895.

4          **THE COURT:**   No objection on this one?

5          **MR. DOREN:**   No objection, Your Honor.

6   **BY MS. FORREST:**

7   **Q.**   If you turn to page --

8          **THE COURT:**   Admitted.

9          (Plaintiff's Exhibit PX1895 received in evidence)

10  **BY MS. FORREST:**

11  **Q.**   Under Instagram if you search the word "sex," do you see

12  there are a variety of results?

13  **A.**   Yes.  I see that.

14  **Q.**   If you turn the page to .3 under "porn," there is a

15  variety of results?

16  **A.**   I see that.

17  **Q.**   Do you understand that Pornhub is a porn site?

18  **A.**   I do not know that.

19  **Q.**   Okay.  Turn the page to .4, "porn star," do you see there

20  are a variety of results?

21  **A.**   I see that.

22  **Q.**   And .6 under BDSM, there is a variety of results?

23  **A.**   I see that.

24  **Q.**   And under .7 under "fetish" there is a variety of results?

25  **A.**   I see that.

1   **Q.**  Under .8 under "fetish" there is some more results.  Do

2   you see that?

3   **A.**  Yes, I do.

4   **Q.**  Are you familiar with the website Reddit -- strike that.

5   Withdrawn.

6         Are you familiar with the app Reddit?

7   **A.**  Yes.

8   **Q.**  And Apple carries Reddit on the App Store; correct?

9   **A.**  Yes.

10  **Q.**  And turning in your binder to PX1894 --

11         **THE COURT:**  You have four minutes.

12         **THE WITNESS:**  I see that.

13  **BY MS. FORREST:**

14  **Q.**  Do you see this as a page from the App Store where one

15  could download Reddit?

16  **A.**  It looks like that, yes.

17  **Q.**  Have you ever used Reddit?

18  **A.**  Briefly for -- I tried it once, yes.

19  **Q.**  Okay.

20         Your Honor, I would seek to admit PX1894.

21         **THE COURT:**  No objection?

22         **MR. DOREN:**  No objection, Your Honor.

23         **THE COURT:**  Admitted.

24      (Plaintiff's Exhibit PX1894 received in evidence)

25

SCHILLER – CROSS – FORREST

1    **BY MS. FORREST:**

2    **Q.**  All right.  Turn the page, if you would, please, to the

3    second page of PX1894, and do you see that there are coins

4    that can be purchased and avatar gear?

5    **A.**  Yes.

6    **Q.**  Okay.  And the next page .3, again more coins that can be

7    purchased.  Do you see that?

8    **A.**  Yes.

9    **Q.**  Flip ahead to .5.  Have you ever seen this portion of the

10   Reddit site which is R/NSFW.  Have you seen that?

11   **A.**  I have not.

12   **Q.**  "Reddit not safe for work."

13   **A.**  I believe that's what the letters stand for, but I have

14   not seen this.

15   **Q.**  Do you see it has two-and-a-half-million members?

16   **A.**  Yes.

17   **Q.**  And it says "for the porn lover in all of us."  Do you see

18   that?

19   **A.**  I see that.

20   **Q.**  Turn the page.  Do you see it says R/Porn?

21   **A.**  I see that.

22   **Q.**  And it's got a million six members?

23   **A.**  Yes.

24   **Q.**  Turn the page.  Do you see it's R/Gone Wild?

25   **A.**  I see that.

SCHILLER – CROSS – FORREST

1    **Q.**   And it's got 3.275 million members?

2    **A.**   Yes.

3    **Q.**   Okay.  Now, the way that people can protect themselves

4    from content like this is through parental controls; correct?

5    **A.**   That's one way, yes.

6    **Q.**   Turn, if you would, to PX1890.  Do you recognize this as a

7    page from the Epic Game Store website that shows parental

8    controls?

9    **A.**   Yes.

10           **MS. FORREST:**  Your Honor, I would seek to admit

11   PX1890.

12           **THE COURT:**  No objection?

13           **MR. DOREN:**  No objection, Your Honor.

14           **THE COURT:**  Admitted.

15        (Plaintiff's Exhibit PX1890 received in evidence)

16           **MS. FORREST:**  Your Honor, this would be a good

17   stopping point.

18           **THE COURT:**  Okay.  We will stand in recess then for

19   20 minutes.  Thank you.

20      I understand, by the way, that Judge Hixson has made a

21   ruling, and we will move forward with his ruling.

22           **MS. FORREST:**  Yes.

23           **MR. DOREN:**  Yes, Your Honor.

24                (Recess taken at 10:14 a.m.)

25           (Proceedings resumed at 10:36 a.m.)

1            **THE CLERK:**  Remain seated.  Court is in session.

2  Please come to order.

3            **THE COURT:**  All right.  We're back on the record.

4  The record will reflect the witness is still on the stand.

5  Ms. Forrest at the podium, Mr. Doren is here.  The parties are

6  present.

7        Ms. Forrest, you may proceed.

8            **MS. FORREST:**  Thank you, Your Honor.

9  **Q.**  Now, yesterday, Mr. Schiller, you testified that the Small

10  Business Program was something which, in part, Apple wanted to

11  do because of the pandemic.

12        Do you remember that?

13  **A.**  Yes.

14  **Q.**  Okay.  And that you wanted to help out small businesses.

15        Do you remember that testimony?

16  **A.**  Yes.

17  **Q.**  But, really, the Small Business Program was designed to

18  help Apple out with regard to its competition issues that it

19  was facing worldwide.  Correct?

20  **A.**  I don't think those points are mutually exclusive.

21  **Q.**  It was in part an effort to help Apple out with regard to

22  its competition law issues worldwide, correct?

23  **A.**  As I stated, it was certainly a consideration of creating

24  it, was that we were hearing feedback worldwide.

25  **Q.**  All right.  Yesterday, you talked about the Epic lawsuit

1    possibly helping out with pushing it over the edge.  But in

2    fact, it wasn't just the Epic lawsuit, it was a cascade of

3    lawsuits and investigations that Apple was facing with regard

4    to the App Store that pushed it over the edge, correct?

5    **A.**   Those weren't my words.

6    **Q.**   Those are not your words.  I'm just asking you a question

7    whether or not you agree with it.

8    **A.**   I don't know about a cascade.  Certainly I mentioned there

9    are internationally people talking about the App Store and the

10   commission model.  And there -- certainly this case has been

11   going on.  And there is a pandemic going on.  I think these

12   are all factors that matter.

13   **Q.**   And you know the pandemic is never mentioned in any of the

14   documents about the Small Business Program apart from PR

15   documents, don't you?

16   **A.**   No, I don't, because I had multiple streams of

17   communication with my teams so I'm not sure that that's true.

18   **Q.**   All right.  Can you think of a document right now as you

19   sit here today other than a PR document that ever mentioned

20   the pandemic as a reason for the Small Business Program?

21   **A.**   I --

22   **Q.**   One document, just think of one document.

23   **A.**   I believe I had communication with the -- the team working

24   on it that this is one of the reasons that we're doing it, and

25   I don't know which document that was.

1  **Q.**  So we'll search your name right now.  I've got a very

2  handy team right here.  And we'll see if we can come up with a

3  single document with your name on it to your team mentioning

4  the word "pandemic" other than a PR document.

5      All right.  We'll turn -- return to it.

6      Now let's move on because I want to talk about the 70/30

7  split and whether it would last forever.  Do you recall that

8  in 2011, you raised the question whether the 70/30 split would

9  last forever, correct?

10 **A.**  Yes.

11 **Q.**  And you would agree with me that today, the question is no

12 longer if, but when.  Correct?

13 **A.**  I'm sorry.  Could you state that again?

14 **Q.**  That the 70/30 split that you mused in 2011 whether it

15 would last forever, today you know it's not going to last

16 forever, correct?

17 **A.**  No, I do not know that.

18 **Q.**  You know it's only a matter of time, correct?

19 **A.**  No, I don't know that.

20      **MS. FORREST:**  Let me hand out to the Court and to the

21 witness and to counsel another binder of materials.

22 **Q.**  Now your binder, Mr. Schiller, is organized by exhibit

23 number.  And we're going to go through it chronologically.  So

24 you're going to have to skip around.

25      But the first thing that we're going to start with is

1    PX417, and I'd like to pull up on the screen and then

2    highlight the language, "Do we think our 70/30 split will last

3    forever."  Correct?

4    **A.**  Yes.

5    **Q.**  Okay.  And then let's go to the next paragraph, too.

6                        (Exhibit published.)

7    **BY MS. FORREST:**

8    **Q.**  And then where it says, "If someday down the road we will

9    be changing 70/30, then I think the question moves from if to

10   when and how.  I'm not suggesting we do anything differently

11   today, but only that whenever we make a change, we do it from

12   a position of strength rather than weakness."

13       Do you see that?

14   **A.**  Yes.

15   **Q.**  Okay.  And those were your words in 2011, correct?

16   **A.**  Yes.

17   **Q.**  And one of the thoughts that you had at that time --

18           **MS. FORREST:**  In the next paragraph down, Mr. Rudd.

19   **Q.**  -- was a musing as to whether or not, just as a thought,

20   once we are making over 1 billion a year in profit from the

21   App Store, is that enough to then think about a model where we

22   ratchet down from 70/30 to 75/25 or 80 -- even to 80/20, if we

23   can maintain a $1 billion a year run rate.

24       Do you see that?

25   **A.**  I do.

1    **Q.**  And the App Store was wildly successful, wasn't it?

2    **A.**  Yes.

3    **Q.**  Okay.

4        And in 2011, it was already very successful, correct?

5    **A.**  I believe so.

6    **Q.**  Yeah.  And it's been successful each and every year since,

7    correct?

8    **A.**  Yes.

9    **Q.**  Okay.

10       And in fact, starting -- if you turn to in your binder,

11   PX406, also already in evidence.

12                    (Exhibit published.)

13   **BY MS. FORREST:**

14   **Q.**  There, that was the email from Mr. Cue to you in 2009

15   responding to a request for information from Mr. Jobs about

16   the App Store and whether it was making money, and Mr. Cue

17   told you in 2009, "We're definitely making money.  So we're

18   fine.  We can send" -- "and Mark can send you the data."

19       Do you see that?

20   **A.**  He wrote that.

21   **Q.**  Okay.

22       And you don't disagree that the App Store has been fine

23   since 2009, correct?

24   **A.**  I'm not sure what you mean by fine.

25   **Q.**  Has it been profitable?

SCHILLER – CROSS / FORREST

1    **A.**   I don't know that it's been profitable since 2009.

2    **Q.**   You're responsible for the App Store, correct?

3    **A.**   Yes.

4    **Q.**   And you've been responsible for the App Store for a very

5    long time, correct?

6    **A.**   Yes.

7    **Q.**   All right.

8         How is it that as the executive responsible for this major

9    business in the country, you don't even know whether or not

10   it's profitable.  How can that possibly be?

11   **A.**   Because it's not how I look at the business and not what I

12   measure the team on driving and what we do for our customers

13   and developers.

14   **Q.**   Doesn't anybody ever wonder, hey, is the App Store

15   profitable?  That never comes up?

16   **A.**   No.  It doesn't.

17   **Q.**   Doesn't it suggest to you that only a monopolist can ask

18   if a major line of business is not profitable?

19   **A.**   As we explained, Apple is one P&L.  It all contributes to

20   the profit of the company, and that's how we think about it.

21   **Q.**   All right.  Let's look at a press release that you folks

22   released in 2017.  So this does not go into any confidential

23   information.  And it's at PX1932.

24                       (Exhibit published.)

25

SCHILLER – CROSS / FORREST

1   **BY MS. FORREST:**

2   **Q.**  It might be in the big binder.  I think it's in the big

3   binder unfortunately.  It's like the only one I think that's

4   in the big binder.

5   **A.**  (Reviewing document.)

6   **Q.**  This is not in evidence yet.

7   **A.**  Is this the one that said 1 of 2 on it on the front?

8   **Q.**  It's –– you know what?

9   **A.**  On the side.

10          **MS. FORREST:**  Your Honor, can I go and remove the

11   excess binders and just take what he needs?

12          **THE COURT:**  You may.

13          **THE WITNESS:**  Thank you.

14                  (Pause in the proceedings.)

15   **BY MS. FORREST:**

16   **Q.**  And so we're turning to ––

17          **THE COURT:**  1932.

18          **MS. FORREST:**  1932.

19          **THE COURT:**  And you're correct, it's not in evidence.

20          **THE WITNESS:**  (Reviewing document.)

21      Okay.

22   **BY MS. FORREST:**

23   **Q.**  All right.

24      And do you see that this is a press release from Apple

25   dated June 5th, 2017?

1    **A.**  Yes.

2    **Q.**  And we're now in 2021, correct?

3    **A.**  Yes.

4    **Q.**  It's almost four years later, correct?

5    **A.**  Yes.

6    **Q.**  Okay.

7         You don't doubt that this is a true and correct copy of a

8    news release, do you?

9    **A.**  I -- I do not.

10             **MS. FORREST:**  Okay.  Your Honor, we would move in

11   PX1932?

12             **THE COURT:**  Any objection?

13             **MR. DOREN:**  No objection.

14             **THE COURT:**  Admitted.

15        (Plaintiff's Exhibit PX1932 received in evidence)

16   **BY MS. FORREST:**

17   **Q.**  Do you see on the first page towards the bottom, it says

18   in blue that Apple has paid out over $70 billion to developers

19   since the store launched in 2008?

20   **A.**  Yes.

21   **Q.**  And Apple got a commission itself from the billings that

22   led to the $70 billion that was given to developers, correct?

23   **A.**  Yes.

24   **Q.**  All right.

25        And if it's a 70/30 split but sometimes it might have been

SCHILLER - CROSS / FORREST

1    a 15/30 split, it could be in the range of 20-plus billion

2    dollars that Apple would have gotten, correct?

3    **A.**   That sounds about right, yes.

4    **Q.**   Okay.  So we're at least clear that by 2017, Apple had at

5    least received about 20-plus billion dollars in revenue from

6    the App Store, correct?

7    **A.**   That sounds likely, yes.

8    **Q.**   Okay.  And that's more than a billion dollars a year since

9    2008, correct?

10   **A.**   Yes.

11   **Q.**   But you don't know whether or not the $20 billion-plus

12   that Apple got from the App Store since 2008 up to 2017 put

13   the App Store within the realm of profitability.

14   **A.**   I've not looked at that, no.

15   **Q.**   Because it can't be done, right?

16   **A.**   I don't know how to start on that.  I know many of the

17   issues involved in that analysis.

18   **Q.**   So Apple can do accelerometers and machine learning and

19   have some of the most sophisticated technology around, and it

20   can't figure out if the App Store is profitable.  Is that what

21   you're saying?

22   **A.**   I'm not saying can't.  I'm saying hasn't.  We haven't done

23   that.

24   **Q.**   Because it's convenient not to, correct?

25   **A.**   No.

1    **Q.**  No?

2    **A.**  No.

3    **Q.**  You're facing regulatory actions all over the world where

4    one of your issues is whether or not the App Store is

5    profitable, and nobody can figure out how to determine whether

6    it is?

7    **A.**  We don't deny that it likely is.  It's just we haven't

8    managed the business that way.  We manage it as one P&L for

9    the company.

10   **Q.**  Okay.  All right.

11        In any event, you're aware that if we go back to your 2011

12   musing, that was in PX406 -- I'm sorry -- 417, 417, PX417 --

13                     (Exhibit published.)

14   **BY MS. FORREST:**

15   **Q.**  -- where it asked do we think our 70/30 split will last

16   forever, that the answer has got to be almost certainly no?

17   **A.**  No, I don't know that for a fact.

18   **Q.**  Okay.  So let's continue in our chronology of the -- of

19   the cadence towards the end of the 70/30 split.

20        Turn if you would, please, to PB1917.

21        And actually --

22             **THE CLERK:**  I'm sorry.  Did you say --

23             **MS. FORREST:**  1917.

24             **THE CLERK:**  Okay.

25                     (Exhibit published.)

1   **BY MS. FORREST:**

2   **Q.**   Okay.  And do you see that on March 13th, 2019, an app

3   developer filed an antitrust complaint against Apple relating

4   to control over apps in the App Store?

5   **A.**   I see that.

6   **Q.**   You're aware of the Spotify complaint, correct?

7   **A.**   Yes.

8   **Q.**   All right.  And that was in March of 2019, correct?

9   **A.**   (Reviewing document.)

10   Yes.

11   **MS. FORREST:**  All right.  Your Honor, we would seek

12   to move in PX1917.

13   **THE COURT:**  No objection, Mr. Doren?

14   **MR. DOREN:**  No objection, Your Honor.

15   **THE COURT:**  It's admitted.

16   (Plaintiff's Exhibit PX1917 received in evidence)

17   **BY MS. FORREST:**

18   **Q.**   Then turn the page -- I'm sorry -- turn to PX1908 in your

19   binder, please.

20   **MR. DOREN:**  And, Your Honor, I would just say subject

21   to the standing order on hearsay.

22   **THE WITNESS:**  (Reviewing document.)

23   **THE COURT:**  Noted.

24   **BY MS. FORREST:**

25   **Q.**   So it's PX1908.

SCHILLER – CROSS / FORREST

1    **A.**   Yes.

2    **Q.**   And do you see that this is from an individual named Josh

3    Rosenstock?

4    **A.**   Yes.

5         **MS. FORREST:**   And I don't know if all of the emails

6    are redacted.   If they're not, then don't put it up, Mr. Rudd.

7    Otherwise, you can put up 1908.

8    **Q.**   And do you see that you are one of the addressees?

9    After -- there's Mr. Cook.   Luca Maestri, he's a CFO?

10   **A.**   Yes.

11   **Q.**   All right.

12        And, Ms. Adams, she's a general counsel, correct?

13   **A.**   Yes.

14   **Q.**   Yourself?

15   **A.**   Yes.

16   **Q.**   Mr. Cook -- I mean, Mr. Cue?

17   **A.**   Yes.

18   **Q.**   And Lisa Jackson.   Who is she?

19   **A.**   She's head of our environmental affairs and government --

20   government affairs groups.

21   **Q.**   The government affairs group?

22   **A.**   Yes.

23   **Q.**   She runs the government affairs group?

24   **A.**   Yes.   I'm not sure she did at this time, but she does now.

25   **Q.**   Okay.

SCHILLER – CROSS / FORREST

1        All right.  And you see that -- you don't have any doubt

2    that you received this on or about June 3rd, 2019, do you?

3    **A.**  No.

4            **MS. FORREST:**  Your Honor, I would move in PX1908.

5            **MR. DOREN:**  No objection.

6            **THE COURT:**  No objection?  Admitted.

7        (Plaintiff's Exhibit PX1908 received in evidence)

8    **BY MS. FORREST:**

9    **Q.**  And you see here that in the first paragraph it states the

10   House Judiciary Committee confirmed it's launching an

11   antitrust investigation.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And do you see that if you go down one, two, three, four

14   paragraphs in that same email from Mr. Rosenstock --

15   Rosenstock of Apple, he says, "Separately speaking at the OECD

16   in Paris, Vestager commented on the power of platforms and

17   highlighted the need to keep that power under proper

18   democratic control.  Apple was not mentioned in her prepared

19   remarks, but she raised concern when the very same business

20   becomes both player and referee."

21       Do you see that?

22   **A.**  Yes.

23   **Q.**  Okay.  And this was sent to you as well as Mr. Cook and

24   others, correct?

25   **A.**  Yes.

1   **Q.**   Okay.   Turn if you would to PX1907.   We're now in August

2   of 2019.

3   **A.**   (Reviewing document.)

4                         (Exhibit published.)

5              **THE WITNESS:**   I see that.

6   **BY MS. FORREST:**

7   **Q.**   All right.   Do you see that?   The subject is "FAS," F-A-S,

8   "Investigation of Apple"?

9   **A.**   Yes.

10  **Q.**   And that it is addressed to you as well as Mr. Cook and

11  some others, dated August 8th, 2019?

12  **A.**   Yes.

13             **MS. FORREST:**   Your Honor, we would seek to admit

14  PX1907.

15             **THE COURT:**   No objection?

16             **MR. DOREN:**   No objection, Your Honor.

17             **THE COURT:**   Admitted.

18       (Plaintiff's Exhibit PX1907 received in evidence)

19  **BY MS. FORREST:**

20  **Q.**   Now, just for context, Mr. Sweeney's email, the first

21  email during the summer that led up to Epic being removed from

22  the App Store happens in June of 2020, right?

23  **A.**   I believe so.

24  **Q.**   And the Epic lawsuit comes almost a year later after this

25  email that we're looking at that's PX1907, correct?

SCHILLER – CROSS / FORREST

1    **A.**  Yes.

2    **Q.**  Okay.  I just wanted us to set the stage.

3        Now you understand that in this -- at the bottom of the

4    page in this email, Mr. Rosenstock is telling you and

5    Mr. Cook, among others, at the very bottom that Russia's FAS

6    has initiated a case against Apple.  Do you see that?

7                    (Reviewing document.)

8    **BY MS. FORREST:**

9    **Q.**  The bottom of page?

10   **A.**  I'm looking for that.  Hold on.

11                   (Exhibit published.)

12   **BY MS. FORREST:**

13   **Q.**  Right there.

14   **A.**  Yes.

15   **Q.**  Okay.  And turn the page.  And it says, "You're informed

16   the agency opted for launching an antitrust investigation

17   based on the corporation's operations in the iOS app

18   distribution market."

19       You see that, don't you?

20   **A.**  Yes.

21   **Q.**  So the first time that you ever heard of an iOS app

22   distribution market was not in the complaint in the Epic case,

23   was it?

24   **A.**  I see that it's in this email.

25   **Q.**  In 2019, correct?

SCHILLER – CROSS / FORREST

1   **A.**   Yes.

2   **Q.**   All right.

3        All right.   Let's go to PX1916.

4   **A.**   (Reviewing document.)

5                     (Exhibit published.)

6   **BY MS. FORREST:**

7   **Q.**   We're now into June, mid–June of 2020.   And you became

8   aware, didn't you, in June of 2020 that the European

9   Commission had opened a formal antitrust investigation of

10  Apple?

11  **A.**   I believe so.

12        **MS. FORREST:**   Okay.   Your Honor, I would move in

13  PX1916.

14        **MR. DOREN:**   With the same hearsay reservation, Your

15  Honor, no other objections.

16        **THE COURT:**   Noted.   Admitted.

17     (Plaintiff's Exhibit PX1916 received in evidence)

18  **BY MS. FORREST:**

19  **Q.**   All right.   And you understand, sir, that the European

20  Commission's formal antitrust investigation that is referenced

21  in this press release from the European Commission dated

22  16 June 2020 was to assess whether Apple's rules for app

23  developers on distribution of apps via the App Store violate

24  EU competition rules.

25        You knew that at the time, correct?   You learned that at

1    the time?

2    **A.**   I believe so.

3    **Q.**   Okay.

4        Let's go to the next document.  And I actually need the PX

5    number for that.

6                    (Off-the-record discussion.)

7            **MS. FORREST:**  If we can actually --

8                    (Pause in the proceedings.)

9            **MS. FORREST:**  I'll just move on.  I can move on, Your

10   Honor.  I'm not sure that I even need it.

11       So let's go to PX2338.

12                    (Exhibit published.)

13           **THE WITNESS:**  (Reviewing document.)

14   **BY MS. FORREST:**

15   **Q.**   Do you see that?

16   **A.**   I see this email.

17   **Q.**   And do you -- you see that we are still before the time

18   that Tim Sweeney's first email during the summer of 2020 comes

19   to Apple, correct?

20   **A.**   Yes.

21   **Q.**   All right.

22       So this is June 17th, 2020, and it's from you to several

23   people, correct?

24   **A.**   Yes.

25           **MS. FORREST:**  All right.  Your Honor, we would seek

1    to admit PX2338.

2              **MR. DOREN:**  No objection --

3              **THE COURT:**  No objection?

4              **MR. DOREN:**  -- Your Honor.

5              **THE COURT:**  All right.  Admitted.

6         (Plaintiff's Exhibit PX2338 received in evidence)

7                   (Off-the-record discussion.)

8              **MS. FORREST:**  And actually we'd go back, Your Honor,

9    to PX1906 for one moment.

10             **THE WITNESS:**   (Reviewing document.)

11   **BY MS. FORREST:**

12   **Q.**  This is the day before --

13                   (Exhibit published.)

14   **BY MS. FORREST:**

15   **Q.**  -- the document I just showed you, which is an email

16   from -- well, we don't show the emails, I guess, because they

17   probably aren't redacted, if they're not.

18        But it's from an Anne-Sophie Bolon to Tim Cook, yourself,

19   and other high-level executives at -- at Apple, correct?

20   **A.**  Yes.

21   **Q.**  All right.

22        And it's announcing to you that the EU had announced the

23   antitrust inquiry into the App Store and Apple Pay, correct?

24   **A.**  It's not announcing to us.  This is a person who -- every

25   single day just sends us press clippings of the news that

1    happened the previous day.

2    **Q.**  Okay.  And it's informing you of the inquiries into App

3    Store and Apple Pay, correct?

4    **A.**  It's showing us that story.

5           **MS. FORREST:**  All right.  So we would seek to admit

6    PX1906.

7           **MR. DOREN:**  No objection.

8           **THE COURT:**  Admitted.

9        (Plaintiff's Exhibit PX1906 received in evidence)

10   **BY MS. FORREST:**

11   **Q.**  All right.  We're back to PX2338.

12       And you learned in PX2338 that there had been a lot of

13   press around Apple's rejection of the developer Basecamp's Hey

14   app, correct?

15   **A.**  Yes.

16   **Q.**  All right.  And you knew that among the things that was

17   occurring was that on page -- Bates number page ending in 941,

18   there was a reference --

19                      (Exhibit published.)

20   **BY MS. FORREST:**

21   **Q.**  -- in the associated articles to the EU -- it's in the

22   third paragraph down -- the EU announcing that it was opening

23   two antitrust probes into the App Store dealings and looking

24   into the way Apple uses its platform to squash competitors.

25       Do you see that?

SCHILLER - CROSS / FORREST

1    **A.**  Well, I see that that's a -- a comment referenced to this

2    developer of the app.

3    **Q.**  Yes.

4        And do you see that on the last page, Basecamp -- there's

5    a quote from Basecamp, and it says, "There is never in a

6    million years a way that I am paying Apple a third of our

7    revenues."  Heinemeier Hansson said, quote, "That is obscene

8    and it's criminal and I will spend every dollar that we have

9    or make to burn this down until we get to somewhere better."

10       Do you see that?

11   **A.**  I do.

12   **Q.**  So you knew that there was press coverage of the Basecamp

13   Hey issue that was being raised against Apple, correct?

14   **A.**  Yes.

15   **Q.**  Turn, if you would, then to 1922 in our book --

16           **MS. FORREST:**  Did I move in -- I did.

17           **THE WITNESS:**  (Reviewing document.)

18   BY MS. FORREST:

19   **Q.**  Are you at PX1922?

20   **A.**  Yes.

21   **Q.**  And do you see it's from you -- I'm sorry -- it's from

22   Mr. Carson Oliver to you?

23   **A.**  Yes.

24   **Q.**  And it is entitled "Support of Developers," correct?

25   **A.**  Yes.

SCHILLER – CROSS / FORREST

1    **Q.**  And it's dated 21 June 2020, correct?

2    **A.**  It is.

3    **Q.**  That's nine days before Tim Sweeney sends his first email,

4    correct?

5    **A.**  I believe so.

6    **Q.**  Apple is out looking for supportive developers for its

7    competition issues before Epic begins its letters to Apple in

8    the summer of 2020, correct?

9    **A.**  I'm just reading this email.  One second, please.

10    (Reviewing document.)

11    **Q.**  Well, let's start --

12    **A.**  Well, there's nothing in here about competition.

13    **Q.**  Well, let's --

14    **A.**  It's just about app review comments.

15    **Q.**  -- let's -- let's start at the back of the email.

16    Okay.  So let's go to the June -- the very last email.

17    It's from you.  Again labeled "Privileged and confidential,"

18    as is the --

19    **A.**  Yes.

20    **Q.**  -- email above that from Mr. Fischer, also labeled

21    "Privileged and Confidential."

22    And you say in your email, "Are there some other

23    developers we could turn to quickly if we want to put

24    something we would some" -- and by the way, this is the way we

25    received it, we don't have a better copy.  We received it from

1   production --

2          **THE COURT:**  I don't know where you are.

3          **MS. FORREST:**  I'm sorry.  On the last page, 92 --

4   Bates numbered page 926.  I apologize.

5                    (Exhibit published.)

6   **BY MS. FORREST:**

7   **Q.**  "Are there some developers we could turn to quickly," and

8   then below that, "Would someone from Fastmail be willing to

9   speak positively about how we work to resolve our situation if

10  we asked anyone else?"

11  **A.**  Sure, you just --

12  **Q.**  Okay.  And you see that, right?  Yep.

13                  (Simultaneous colloquy.)

14         **THE WITNESS:**  -- skipped the setup sentence of what

15  this is about.

16  **BY MS. FORREST:**

17  **Q.**  That's okay.  Well, this is about the App Store work,

18  right?  You've got all kinds of App Store problems.  And

19  you --

20  **A.**  No.

21  **Q.**  -- want to show a positive story.

22      Well, your counsel will get to it and you can explain it.

23      Now, let's go above there.  And we see Matt Fischer.

24                    (Exhibit published.)

25

1    **BY MS. FORREST:**

2    **Q.**   Also "Privileged and Confidential."

3        And he says −−

4            **MS. FORREST:**   Same page, Mr. Rudd.

5    **Q.**   "We definitely have developers who would be willing to go

6    on the record to support us if we want."

7    **A.**   Yes.

8    **Q.**   And then there's a list of developers that goes on for

9    several pages as....

10        And then there is in the first very −− very first

11   paragraph on the first page, which is the email dated 21 June,

12   Mr. Carson Oliver says, "I've worked with Shaan and Tracey's

13   team to compile a list of developers that we feel are likely

14   to provide public statements of support for Apple.  In certain

15   cases, where noted, our teams have helped them successfully

16   navigate issues with app review policy.  There are also a few

17   developers provided by Alex's Arcade team including developers

18   with games in both App Store and Arcade in case there's any

19   interest including those devs too.  If you're okay with this

20   list, we can work with PR on developer outreach.  Note:  None

21   of these developers have proactively reached out to us."

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   And this was Apple's attempt to try and combat the press

25   you were getting from the developer Basecamp as well as the

SCHILLER - CROSS / FORREST

1    pressure that was building with the foreign and other

2    investigations, correct?

3    **A.**   I -- I wouldn't connect it to any of those things

4    directly.  Certainly we've been having criticisms about the

5    App Store, as you have noted.  And we had a developer reach

6    out to me proactively and say we love being on the App Store,

7    we'd love to talk publicly.  And so that led me to ask are

8    there other developers out there who'd love to talk publicly

9    about the App Store.

10   **Q.**   But something that --

11   **A.**   That's what this is about.

12   **Q.**   One of the reasons that you were doing that was because of

13   the bad press from Basecamp that was raising the competition

14   law issues directly and the other investigations, correct?

15   **A.**   I don't know this is connected to Basecamp at all.

16   **Q.**   Okay.

17        Do you think it's not related at all to the pressure that

18   Apple was feeling with regard to the competition issues?

19   **A.**   It has to do with everything to do with the App Store and

20   any -- certainly some people are complaining about it, and we

21   wanted to show there were also people who were really happy

22   with it.  That's all.

23   **Q.**   Apple was building its own cadre of developers, of

24   supportive developers, correct?

25   **A.**   No.  It is exactly what you see here in this email.

1    **Q.**  Let's go to PX1898.

2              **MS. FORREST:**  Your Honor, I would move in 1922.

3              **THE COURT:**  I was going to say do you want that in?

4         No objection?

5              **MR. DOREN:**  No objection.

6              **THE COURT:**  Admitted.

7              (Plaintiff's Exhibit PX1922 received in evidence)

8                        (Exhibit published.)

9    **BY MS. FORREST:**

10   **Q.**  You became aware, didn't you, sir, in June of 20 -- on

11   June 24th, 2020, that there were reports that the Justice

12   Department and a coalition of state AG's were focusing on the

13   company's, Apple's, ironclad control of its App Store; isn't

14   that right?

15   **A.**  I don't recall this story.

16   **Q.**  Whether or not you recall the particular *Politico* story,

17   you understand becoming aware in late June that the Department

18   of Justice and some state AG's were focusing on the App Store

19   and its policies, correct?

20   **A.**  I don't recall if I heard that at that time or since.

21   **Q.**  You -- you don't ever learn -- ever recall learning that

22   the DOJ and the state AG's were focusing on App Store

23   competition issues?

24   **A.**  I know that the DOJ certainly had a hearing, and so I was

25   very, of course, aware of that.  I know there've been a number

1    of states where there have been questions raised about it

2    as -- as promoted by the Coalition about fairness pushing for

3    that, yes.

4    **Q.**  Okay.  All right.  But you don't recall this story in

5    particular at all --

6    **A.**  No.

7    **Q.**  -- or learning anything about it in June?

8    **A.**  I don't recall that.

9    **Q.**  You don't think in that daily briefing that you were

10    getting of -- where that person was sending you the EU

11    competition authority had started a probe, didn't tell you

12    that the Department of Justice and state attorney generals

13    were also looking at App Store issues?

14    **A.**  Again, as I stated, I get -- we get a briefing email every

15    single day.  I don't remember which is in which one and when.

16          **MS. FORREST:**  All right.  Let's turn -- I don't need

17    to have that in evidence.  Let's turn to DX4477.  This is in

18    evidence, I believe.  If it's not, Your Honor, I would --

19        Is it in evidence?  It's in evidence.

20        Okay.

21    **Q.**  Okay.  Do you see that this is the --

22          **THE COURT:**  4477 is in evidence.

23          **MS. FORREST:**  Thank you.

24    **Q.**  Do you see that this is the email, the June 30th email

25    from Tim Sweeney?

1    **A.**   Yes.

2    **Q.**   All right.  Let's just go ahead now and go to PX1896.

3         And this is an email from you about App Store and

4    competition staffing.

5                        (Exhibit published.)

6              **THE WITNESS:**   (Reviewing document.)

7    BY MS. FORREST:

8    **Q.**   Dated 1 July, 2020.  Tell me when you're there.

9    **A.**   Yes.

10   **Q.**   All right.

11        Did you write this email to Mr. Sainz, S-A-I-N-Z, and then

12   copying a number of others?

13   **A.**   Yes.

14   **Q.**   And you did so on July 1st, 2020, correct?

15   **A.**   It looks to be that, yes.

16             **MS. FORREST:**   Your Honor, we would move to admit

17   PX1896.

18             **MR. DOREN:**   No objection.

19             **THE COURT:**   No objection?

20        (Plaintiff's Exhibit PX1896 received in evidence)

21   BY MS. FORREST:

22   **Q.**   All right.  And Mr. Schiller, in this email there is in

23   fact a direct competition between the App Store and

24   competition staffing, isn't there?

25   **A.**   In the PR team, yes.

SCHILLER - CROSS / FORREST

1    **Q.**  Okay.  And you say, "Fred," that's Fred Sainz, "Thanks.  I

2    do think we need to structure App Store PR to better help us

3    for the year ahead."  Correct?

4    **A.**  Yes.

5    **Q.**  Okay.

6       And you then talk in the third paragraph about the

7    GA/competition front.  Do you see that?

8    **A.**  Yes.

9    **Q.**  What was GA?

10    **A.**  Government affairs.

11    **Q.**  Okay.  And then below that, you -- you're talking about

12    who the particular staffing candidates should be, correct?

13    **A.**  Yes.

14    **Q.**  All right.

15       In the bottom of that page, Mr. Sainz says to you, "Phil,

16    we wanted to run some potential staffing additions for App

17    Store and competition PR by you before submitting them

18    formally in order to make sure we are" -- "we were aligned

19    with the App Store's business strategy for next fiscal year.

20    We met with Matt" --

21       Did you understand that to be Matt Fischer?

22    **A.**  Yes.

23    **Q.**  -- "and his leadership team as well as Tracey Hannelly to

24    understand the needs in the GO's."

25       Do you -- do you see that?

SCHILLER – CROSS / FORREST

1    **A.**   I do.

2    **Q.**   Okay.

3          And then if you turn the page --

4                          (Exhibit published.)

5    **BY MS. FORREST:**

6    **Q.**   -- and it says at the top, "We'd love to get your feedback

7    on the structure and roles necessary relative to the larger

8    App Store plan."

9          Do you see that?

10   **A.**   Yes.

11   **Q.**   And below that, it says, "Separately the Arcade team has

12   suggested that we add a position to exclusively focus on

13   influencers."

14         Do you see that?

15   **A.**   Yes.

16   **Q.**   What did you understand "influencer" to mean?

17   **A.**   Influencers tend to be people who create blogs on YouTube

18   and other social media channels.

19   **Q.**   All right.  And this is not all in response to Tim

20   Sweeney, is it?

21   **A.**   I do not think so.

22   **Q.**   No.  I mean this is in response to a whole variety of

23   building competition issues relating to the App Store,

24   correct?

25   **A.**   Well, yes.

SCHILLER – CROSS / FORREST

1    **Q.**   Okay.

2    **A.**   And --

3    **Q.**   Let's turn to PX1897.

4                       (Exhibit published.)

5             **THE WITNESS:**   (Reviewing document.)

6    **BY MS. FORREST:**

7    **Q.**   And do you see that this is something that was sent by

8    Mr. Sainz to Mr. Cook as well as you and others?

9    **A.**   Yes.

10   **Q.**   And it's dated July 29th, 2020, correct?

11   **A.**   It is.

12   **Q.**   All right.  And this is before Epic's lawsuit, correct?

13   **A.**   Yes.

14   **Q.**   All right.  And do you see that in -- at the bottom of the

15   page, it says that the *New York Times* editorial board had

16   suggested questions to the committee which was the committee

17   that was going to be a congressional committee that was

18   investigating and having big tech appear before it on

19   competition issues, correct?

20   **A.**   It looks that way, yes.

21   **Q.**   Okay.  That the *New York Times* had suggested questions,

22   listing only three for Apple.  One:  "Why does Apple permit

23   only its own App Store on iPhones?"

24        Correct?

25   **A.**   Yes.

SCHILLER – CROSS / FORREST

1  **Q.**  All right.  And that's a question that's at issue here in

2  this lawsuit, correct?

3  **A.**  Sure.

4  **Q.**  And then number two:  "Developers are generally required

5  to offer their in-app purchases and paid subscriptions through

6  Apple's App Store rather than on their own websites where they

7  may avoid Apple's commissions.  Apple has threatened to remove

8  Apps that don't abide.  How is this in the best interest of

9  consumers and app developers?"

10      Do you see that?

11 **A.**  Yes.

12 **Q.**  And that's also an issue in this lawsuit, correct?

13 **A.**  Yes.

14 **Q.**  And then it says -- and the next question is:  "Some app

15 developers have alleged that Apple uses the detailed data that

16 it collects about app downloads to copy their ideas and that

17 the company favors its own apps in searches.  Is this true?"

18      Do you see that?

19 **A.**  I see it.

20 **Q.**  Okay.

21      **MS. FORREST:**  Your Honor, we would -- have I moved in

22 1897?

23      **THE COURT:**  You've not.  And the record is not clear.

24 I did admit 1896.  And assuming no objection, Mr. Doren.

25      **MR. DOREN:**  Only with the standing order, Your Honor,

1   no other objection.

2             **THE COURT:**  1897 is admitted.

3         (Plaintiff's Exhibit 1897 received in evidence)

4             **MS. FORREST:**  Okay.  And that --

5                 (Off-the-record discussion.)

6   **BY MS. FORREST:**

7   **Q.**  Now, this was -- look at the -- if you look at the time of

8   1897, you see that it's at the 29th of July, 2020 at 2:14?

9   **A.**  I do see that.

10  **Q.**  Turn, if you would, then, to PX1915.

11  **A.**  (Reviewing document.)

12  **Q.**  And you'll see at PX1915 --

13                (Exhibit published.)

14  **BY MS. FORREST:**

15  **Q.**  -- there is an updated article.  It says July 29th, 2020,

16  7:30 -- 7:29 p.m.

17  **A.**  I see that.

18  **Q.**  And you became aware, didn't you, that Tim Cook had

19  testified in front of Congress at an antitrust hearing on or

20  about July 29th, 2020?

21  **A.**  I'm not sure the date of it, but I'm aware of that

22  hearing.

23  **Q.**  Okay.  And do you remember reading any press about it?

24  **A.**  I -- I don't remember any.  I -- I'm sure I read some

25  press, but I don't recall it.

1          **MS. FORREST:**  And, Your Honor, we would seek to move

2     in PX1915.

3               **THE COURT:**  No objection?

4               **MR. DOREN:**  No additional objections, Your Honor.

5     No.

6     **BY MS. FORREST:**

7     **Q.**  Turn, if you would, to PX1914.

8                    (Exhibit published.)

9               **THE WITNESS:**  (Reviewing document.)

10         I see this.

11    **BY MS. FORREST:**

12    **Q.**  All right.  And you see that this is an article that

13    references a Korean investigation of Google and Apple's in-app

14    payment systems.  Do you see that?

15    **A.**  I see that.

16    **Q.**  In August of 2020, did you become aware that Korea had

17    commenced an investigation into Apple's in-app payment system?

18    **A.**  I don't recall when I heard about that.

19    **Q.**  But you did hear about it at some point?

20    **A.**  I may have.  I just don't remember specifically.

21    **Q.**  Generally speaking, do you recall that there is an

22    investigation going on in Korea?

23    **A.**  I believe I may have heard it.  I'm not a hundred percent

24    certain.

25    **Q.**  Okay.

SCHILLER – CROSS / FORREST

1          **MS. FORREST:**  Your Honor, we would seek to admit

2     PX1914.

3          **MR. DOREN:**  No objection other than hearsay, Your

4     Honor.

5          **THE COURT:**  All right.  Admitted with the limitation.

6          (Plaintiff's Exhibit PX1914 received in evidence)

7     **BY MS. FORREST:**

8     **Q.**  Let's go to PX1903.

9     **A.**  (Reviewing document.)

10                 (Exhibit published.)

11    **BY MS. FORREST:**

12    **Q.**  And do you see there that this is an article referencing

13    that the App Store was now being investigated in Japan?

14    **A.**  I see this article.

15    **Q.**  And this is dated September 3rd, 2020, correct?

16    **A.**  (Reviewing document.)

17         I don't see that date.  Where should I look for that?

18    **Q.**  Well, I'm wondering where I got the date because I --

19         **THE COURT:**  Well, I do see a date on the very bottom

20    line, the website.

21         **MS. FORREST:**  Oh, you're right.  It's -- it's in the

22    website.  It's under the URL.

23         **THE WITNESS:**  (Reviewing document.)

24         Ah, there, yes.  September 3rd, 2020 in the URL.

25

SCHILLER – CROSS / FORREST

1  **BY MS. FORREST:**

2  **Q.**  And you became aware in September of 2020 that Japanese

3  authorities had begun to scrutinize the Apple App Store?

4  **A.**  I don't recall that.

5  **Q.**  Do you ever recall becoming aware that Japan had started

6  scrutinizing the App Store?

7  **A.**  Not sitting here today, I don't recall this.

8  **Q.**  You don't recall writing a PowerPoint in which you

9  specifically call out Japan as one of the big threats --

10  **A.**  No.  I --

11  **Q.**  -- to the App Store?

12  **A.**  I don't even use PowerPoint so I couldn't have written a

13  PowerPoint.

14  **Q.**  Or do you recall receiving a PowerPoint that suggested

15  that Japan in fact constituted one of the big threats?

16  **A.**  I don't recall that.

17  **Q.**  Well, we'll get there.

18      All right.  Let's go on.  I'm not going to move it in.

19      Let's go to PX1913.

20      Do you recall becoming aware that Australia in September

21  had --

22                     (Exhibit published.)

23  **BY MS. FORREST:**

24  **Q.**  -- begun its own inquiry into how Google and Apple run

25  their app stores for Android and iOS devices?

**A.**   Yes, I believe I heard of this.

     **MS. FORREST:**   All right.   Your Honor, I would move in PX1913.

     **MR. DOREN:**   No objection beyond hearsay, Your Honor.

     **THE COURT:**   Admitted.

     (Plaintiff's Exhibit PX1913 received in evidence)

**BY MS. FORREST:**

**Q.**   All right.   Now, you recall that in September on -- this is -- this last article that we looked at is September 8th, correct, 2020?

**A.**   Yes.

**Q.**   All right.

    So turn to 2389.

     **MS. FORREST:**   And let's not put it on the screen because it's subject to a sealing motion.   I don't know how much of it is subject to the sealing motion, but rather than take a chance, we'll just look at PX2389 on the -- in our binders.

     **THE WITNESS:**   Yes.

**BY MS. FORREST:**

**Q.**   Do you see that?

    And you see that that's dated September 9th, 2020, correct?

**A.**   I do.

**Q.**   Okay.   And do you see that this is from you, correct?

1    **A.**   The top sentence, it says thank you, yes.

2    **Q.**   Okay.  And it says from –– at the top, at the very top on

3    the first email, it's from Phil Schiller?

4    **A.**   Yes.

5    **Q.**   And the subject is "App Store Analysis"?

6    **A.**   Yes.

7    **Q.**   And it's to Carson Oliver, among others?

8    **A.**   Correct.

9    **Q.**   Okay.  And then below that are some other emails including

10   one from Carson Oliver and some others that follow, correct?

11   **A.**   Yes.

12   **Q.**   Including more from you?

13   **A.**   Yes.

14   **Q.**   Okay.

15       Now, you know that this was –– this particular email was

16   the subject of motion practice before Judge Hixson, correct?

17   **A.**   I believe so.

18   **Q.**   And that you put in a declaration that you said that this

19   was privileged, and he called your declaration

20   mischaracterizing, correct?

21   **A.**   I do not know that.

22   **Q.**   Nobody told you that?

23   **A.**   I don't –– no, I don't think I was told that.

24   **Q.**   Now, this email that is dated September 9th, 2020, is an

25   email that is evaluating the Small Business Program, is it

1    not?

2    **A.**   The --

3    **Q.**   The possibility of the Small Business Program?

4    **A.**   Yes.  It's exploring some of the elements of -- of a

5    proposal for it, yeah.

6    **Q.**   Okay.  And it was Apple's intent, would you agree, that

7    what it wanted to do was to find a way to try and have the

8    least financial impact possible on Apple while announcing the

9    Small Business Program?

10   **A.**   No, I don't agree with that characterization.

11   **Q.**   And you don't agree that Apple looked at various ways of

12   structuring look-back thresholds so that if a commissioner --

13   if a developer hit a commission rate and you had a look-back

14   of a certain period of time and they hit the commission rate

15   during the look-back period, they wouldn't get the reduction?

16   **A.**   Well, that was about defining what is a small business and

17   how do we measure that through sales at the App Store.

18   **Q.**   Okay.  So turn, if you --

19           **MS. FORREST:**  Your Honor, I would seek to move in --

20   to admit -- seek to admit PX2389, please.

21           **MR. DOREN:**  No objection, Your Honor.

22           **THE COURT:**  It's admitted.

23       (Plaintiff's Exhibit PX2389 received in evidence)

24   **BY MS. FORREST:**

25   **Q.**   All right.

SCHILLER – CROSS / FORREST

1          And turn to the second page of the document, sir.  And do

2     you see it says in the first bullet, "If a new developer were

3     to exceed a million dollars in the first month after

4     launch" --

5          **MS. FORREST:**  Is this particular bullet, Mr. Doren,

6     subject to sealing?

7          **MR. DOREN:**  I do not have the answer to that.

8          **MS. FORREST:**  All right.

9  **Q.**  Do you see that -- I won't -- I won't tarry on that.

10         Do you see that first bullet there that begins with the

11    word "if" --

12 **A.**  I do.

13 **Q.**  -- "a new developer"; do you see that?

14 **A.**  Yes.

15 **Q.**  All right.

16         Would you agree with me that there were various scenarios

17    that were being discussed about potential look-backs that

18    would potentially reduce the number of developers eligible for

19    the Small Business Program because their commissions would hit

20    the threshold at various look-back periods?

21 **A.**  I think that was one of the variables we were looking at.

22    It certainly wasn't the only one.

23 **Q.**  Let's turn to -- PX1901.

24 **A.**  (Reviewing document.)

25         I see that.

1   **Q.**   All right.  And do you see that this is to you from

2   Mr. Sainz again, dated 13 September 2020?

3   **A.**   Yes.

4   **Q.**   And that it concerns vetting various PR agencies?

5   **A.**   That I see.

6   **Q.**   And it's vetting a number of consumer-focused PR agencies

7   for support on the App Store.

8       Do you see that?

9   **A.**   Yes.

10  **Q.**   And then a couple of paragraphs down, it says, "MWW has

11  the right scale" -- "the right combination of scale and

12  media relationships to execute on the stories around

13  developers and technology that we're trying to tell."

14      Do you see that?

15  **A.**   Yes.

16  **Q.**   Okay.  And if you turn the page --

17                      (Exhibit published.)

18  **BY MS. FORREST:**

19  **Q.**   -- under "Scope of Work," it says "Mining developer

20  stories."

21      Do you see that?

22  **A.**   Yes.

23  **Q.**   Okay.  And then a couple below that, it says, "Telling app

24  stories across verticals, wellness, parenting, gardening, home

25  decor, et cetera."

SCHILLER – CROSS / FORREST

1        Do you see that?

2   **A.**   Yes.

3   **Q.**   Yet gaming isn't mentioned there, is it?

4   **A.**   I don't see that there, no.

5   **Q.**   This -- this effort here reflected in PX1901 doesn't have

6   anything to do with Epic, does it?

7   **A.**   (Reviewing document.)

8        I don't know that it does, no.

9        **MS. FORREST:**   Okay.   Your Honor, I would seek to

10  admit PX1901.

11       **THE COURT:**   No objection?

12       **MR. DOREN:**   No objection, Your Honor.

13       **THE COURT:**   Admitted.

14       (Plaintiff's Exhibit PX1901 received in evidence)

15  **BY MS. FORREST:**

16  **Q.**   All right.   On the -- if you turn to PX1912.

17  **A.**   (Reviewing document.)

18       **MR. DOREN:**   And, Your Honor, again apologizing for

19  the interruption, but for the record, I just wanted to be

20  clear that we have requested sealing on all of PX2389 which we

21  just addressed.

22       **MS. FORREST:**   So that will not go into the box.

23       **MR. DOREN:**   Thank you.

24       **MS. FORREST:**   Okay.

25       **THE COURT:**   All right.   It's sealed.

1                          (Exhibit published.)

2      **BY MS. FORREST:**

3      **Q.**   PX1912.  Are you there, sir?

4      **A.**   I am.

5      **Q.**   All right.  And do you see that here is a press release

6      from the House Judiciary Committee, it's the antitrust

7      subcommittee investigation?

8      **A.**   I see that.

9      **Q.**   And they had announced that they were completing a

10     16-month-long investigation?

11     **A.**   Yeah, I don't recall reading this.

12     **Q.**   But you do recall becoming aware in about October of 2020

13     that the House Judiciary Committee, the subcommittee on

14     antitrust had completed an investigation, correct?

15     **A.**   I don't recall exactly that, no, I don't.

16     **Q.**   You don't recall ever learning that the subcommittee on

17     antitrust had investigated competition in digital markets that

18     included Apple?

19     **A.**   (Reviewing document.)

20         Yes, I don't recall this, I'm sorry.

21     **Q.**   Okay.  You don't recall -- not whether you recall this

22     document.  Do you recall learning that the House Committee on

23     the Judiciary, or otherwise called the Judiciary Antitrust

24     Subcommittee, had completed an investigation into competition

25     in digital markets?

SCHILLER – CROSS / FORREST

1   **A.**   I don't recall that.

2   **Q.**   Okay.  Why don't you turn to PX2752.

3   **A.**   Is that in the same binder?

4        **MS. FORREST:**  I didn't -- I'm not going to seek to

5   admit the other exhibit, Your Honor, if he doesn't recall it.

6        **THE WITNESS:**  Is that in the same binder?  I'm sorry.

7   BY MS. FORREST:

8   **Q.**   In the same binder, 2752.

9        **THE COURT:**  It's not in that binder.

10        **MS. FORREST:**  Oh, it's in a different binder.

11   Which -- oh, it's in that one.

12   Oh, you know, I don't -- I don't actually need it.

13   **Q.**   If you don't recall the investigation of the subcommittee

14   and the report, then --

15   **A.**   No.

16   **Q.**   -- let's just move on.

17   Okay, now --

18        **THE COURT:**  And, Ms. Forrest, I take it the

19   subcommittee has not done anything after this; is that right?

20        **MS. FORREST:**  They're doing a variety of things, Your

21   Honor.  But it hasn't resulted in public -- additional public

22   action at this time that I'm aware of.

23        **THE COURT:**  Thank you.

24        **MS. FORREST:**  Okay.

25   Now, do we have 1904?

1          (Exhibit published.)

2          **THE COURT:**  1904 is not in this binder.

3          **MS. FORREST:**  No.  I'm going to hand it up, Your

4     Honor.  It was a late breaking --

5                    (Pause in the proceedings.)

6     **BY MS. FORREST:**

7     **Q.**  Now do you recognize what's been marked for identification

8     as PX1904, Mr. Schiller?

9     **A.**  Hold on one second.  Let me look through it.

10    **Q.**  We've attached the metadata that we received from Apple to

11    the back of this document, which shows you as the custodian in

12    terms of what was the production file that we received.

13    **A.**  (Reviewing document.)

14        I'm sorry.  I don't see that.

15    **Q.**  The metadata -- I'm sorry.  The metadata is a -- is

16    apparently a separate document.  I'll hand it up.

17        **THE COURT:**  And my copy is not legible.  I can -- I

18    can stay on the -- I can look at the screen, but if you could

19    get me a legible copy later, I'd appreciate it.

20        **MS. FORREST:**  Yes, Your Honor.

21        **MR. DOREN:**  Your Honor, I'm going to assert an

22    objection on privilege.  The email is from Kyle Andeer who is

23    in-house counsel for Apple on competition issues, to Phil

24    Schiller, with a copy to Doug Vetter who was one of the

25    authors of emails in the earlier exhibit which Judge Hixson

SCHILLER - CROSS / FORREST

1    found to be privileged.

2        MS. FORREST:  Well, Your Honor, the metadata that I

3    have does not show -- I don't know what metadata we handed

4    over.  The metadata I have does not show Mr. Vandevere

5    [phonetic].  Let me show you this.

6        MR. DOREN:  Your Honor, I'm simply looking at the

7    document I was just handed by counsel.  So if there are now

8    two versions of metadata, I really don't know what to do.

9        MS. FORREST:  Well, Your Honor, why don't we save

10   this?

11       THE COURT:  We're going to take a break here in an

12   hour.  He won't be done, right?

13       MS. FORREST:  I don't think he'll be done.  And so we

14   can save this and then resolve it.  I did not intend -- my

15   metadata, I can show Your Honor, that I have on my page does

16   not have anything other than just Mr. Schiller's name.  And so

17   I was unaware that there was metadata that had something

18   different.

19       THE COURT:  Okay.  Because the one you handed me is

20   the one with Vetter and Kyle Andeer.

21       MS. FORREST:  Yeah, just, Your Honor, so that my

22   credibility is not hit.

23       THE COURT:  I don't -- we'll figure it out.  Things

24   happen.

25       MS. FORREST:  I just wanted to let you know that mine

 1   did not have that.

 2            THE COURT:  Okay.  Thank you.

 3   BY MS. FORREST:

 4   Q.  Let's move on.

 5       And let's go to PX 2303.  This is also subject to a

 6   sealing request by Apple.

 7   A.  (Reviewing document.)

 8            THE COURT:  2303.

 9            MS. FORREST:  Correct.

10   BY MS. FORREST:

11   Q.  Do you have that?

12   A.  Yes.

13   Q.  All right.  And do you recognize this document,

14   Mr. Schiller?

15   A.  It appears to be a presentation.  We had many of them

16   during the time working on the Small Business Program.

17            MS. FORREST:  Okay.  And, Your Honor, we would seek

18   to admit and not have it go in the box, PX2303.

19            MR. DOREN:  No objection.

20            THE COURT:  Admitted.  And it's sealed.

21       (Plaintiff's Exhibit PX2303 received in evidence)

22   BY MS. FORREST:

23   Q.  And I'm going to ask you not to read the numbers out loud,

24   Mr. Schiller, but I'm going to point you to a particular page.

25   A.  All right.

1   **Q.**  And I want to look at the financial impact on revenue

2   that's reflected on Bates-numbered page 222.

3   **A.**  (Reviewing document.)

4   **Q.**  Do you see it says -- it has some words that refer to

5   potential financial impact?

6   **A.**  (Reviewing document.)

7       Yes, I see that.

8   **Q.**  All right.  And that's the middle of three sort of

9   horizontal columns?

10  **A.**  Yes.

11  **Q.**  Okay.  And do you believe that number to be accurate?

12  **A.**  At the time that this document model was created.  I'm not

13  sure it's accurate today, but it was then.

14  **Q.**  Okay.  Let's go on to PX1911.  We're now in March of 2021.

15          **THE COURT:**  Can you -- can you tell me, because

16  again, my version is very light --

17                      (Exhibit published.)

18          **THE COURT:**  -- the number in paren, is there -- there

19  are two numbers and a percentage.  Is there a dot in between

20  those two numbers?

21          **MS. FORREST:**  Yes.

22          **THE COURT:**  Okay.  Thank you.

23          **MS. FORREST:**  Yes.  And where it says "of total,"

24  there's a dot in between the two numbers.

25  **Q.**  Mr. Schiller, do you have that as well?

SCHILLER – CROSS / FORREST

1   **A.**   I'm sorry.  I had already moved forward to the next one

2   you asked me to go.  What number is it again?

3   **Q.**   It's --

4             **THE COURT:**  I was on that page.  It's 2303.4,

5   Mr. Schiller, and just making sure I understood the number.

6             **THE WITNESS:**  Yes.  One second, please.

7        (Reviewing document.)

8             **THE COURT:**  And I was asking --

9        **MR. DOREN:**  Your Honor, if Your Honor is asking

10  whether there's a decimal point in the number, in the middle

11  entry, I do not see one.

12            **MS. FORREST:**  Here's -- let me show you what --

13       **MR. DOREN:**  On -- there are two numbers on that line.

14  The number on the left has no decimal points.  The number on

15  the right as a percent does.

16            **THE COURT:**  It does have a decimal point?

17       **MR. DOREN:**  Yes.

18            **THE COURT:**  Okay.

19            **MS. FORREST:**  There's two numbers.  One on the left,

20  the bigger number.  And then one on the right, a smaller

21  number.  The smaller number has a decimal point in it.

22            **THE WITNESS:**  Yes.

23            **THE COURT:**  Okay.  Thank you.

24  BY MS. FORREST:

25  **Q.**   All right, turn, if you would, please, to PX 1911.

1    **A.**   (Reviewing document.)

2                        (Exhibit published.)

3           **THE WITNESS:**   I see this.

4    **BY MS. FORREST:**

5    **Q.**   All right.   And you -- you understand that in March of

6    2021, the United -- United Kingdom's CMA competition agency

7    also began an investigation of Apple over its operations of

8    the App Store?

9    **A.**   I did not see this story specifically, and I don't recall

10   if or when I heard about this CMA investigation.   I just do

11   not recall this.

12   **Q.**   But you recall at some point in time learning that the CMA

13   had commenced an investigation into App Store distribution?

14   **A.**   I don't recall that.

15   **Q.**   You don't recall ever learning about a CMA investigation

16   of the App Store in any way?

17   **A.**   I'm sorry, no, I do not.

18   **Q.**   Nobody ever told you that CMA is investigating the App

19   Store?

20   **A.**   I -- they may have, they may not.   I'm just saying sitting

21   here I don't recall hearing that.

22   **Q.**   All right.

23         How about Russia?   Did you ever learn that -- let's turn

24   to PX 1930.

25         Did you ever learn that Russia has now passed a law that

1   requires --

2                        (Exhibit published.)

3   **BY MS. FORREST:**

4   **Q.**   -- users to be allowed to put local apps on their iOS

5   devices?

6   **A.**   I have heard about a Russia law.  I would not describe it

7   as you just did.

8   **Q.**   You've heard that there's a law in Russia that requires

9   Apple to allow the download of certain apps other than those

10  which are Apple apps, correct?

11  **A.**   No, that's not a correct description of it either.

12  **Q.**   What is the correct description of it?

13  **A.**   There is a Russian law that requires smartphone makers

14  to -- as part of default starting up your -- your iPhone, be

15  offered a set that they define of Russian applications.  And

16  we had to build in a way to show users on the startup of a new

17  device, here's a list of Russian applications you can get from

18  the App Store.  You always could get them in the App Store,

19  it's just a prompt to encourage you to, from the government.

20  **Q.**   So now there has to be essentially a prompt that is almost

21  like a store within a store, it's a prompt that tells you what

22  to go to --

23  **A.**   No.

24  **Q.**   -- for certain Russian apps?

25  **A.**   No, it's nothing like a store within a store.

SCHILLER – CROSS / FORREST

1    **Q.**  Are you familiar with a hearing by Senator Klobuchar that

2    occurred in April of 2021?

3    **A.**  Yes.

4    **Q.**  Okay.  Let's turn to PX 1910.

5    **A.**  (Reviewing document.)

6       Yes, I'm there.

7    **Q.**  All right, you're there?

8       And you learned in April or even before April that Senator

9    Klobuchar was going to have a hearing?

10    **A.**  I don't recall when I learned of it, but I certainly heard

11    of it.

12    **Q.**  And you understood that it was going to relate in large

13    part to app stores?

14    **A.**  Yes.

15    **Q.**  And practices in app stores?

16    **A.**  Yes.

17    **Q.**  Including distribution practices in app stores including

18    Apple's App Store?

19    **A.**  Apple's App Store, yes.

20    **Q.**  And including also the requirement of Apple to have

21    developers utilize IAP for certain digital transactions.

22    **A.**  I believe IAP was discussed as part of it.

23         **MS. FORREST:**  All right.  Your Honor, we would seek

24    to admit PX1910.

25         **MR. DOREN:**  No objection other than hearsay, Your

1    Honor.

2              **THE COURT:**  Admitted, with that limitation as always.

3         (Plaintiff's Exhibit PX1910 received in evidence)

4    **BY MS. FORREST:**

5    **Q.**  And then turn to PX 1899.

6              **THE CLERK:**  1899?

7              **MS. FORREST:**  1899.

8              **THE CLERK:**  Okay.

9                   (Exhibit published.)

10             **MS. FORREST:**  I only have two more of these.

11   **Q.**  And do you see that this is dated April 27th, 2021?

12   **A.**  I do.

13   **Q.**  And that it's a *Barron's* article?

14   **A.**  Yes.

15   **Q.**  And it's referring to a Russian fine of the App Store for

16   abusing its -- I'm sorry, strike that -- that it refers to a

17   Russian fine of Apple for abusing its dominant position?

18   **A.**  I see the article says that.

19   **Q.**  And that it states in the fourth paragraph down, "Apple

20   was found to have abused its dominant position in the iOS

21   distribution market."

22        Do you see that?

23   **A.**  I do.

24   **Q.**  Did you learn of this fine by the Russian competition

25   authorities in the April time frame or May time frame?

1    **A.**  I believe so.

2          **MS. FORREST:**  All right.  Your Honor, we would seek

3    to admit PX1899.

4          **MR. DOREN:**  No objections other than the standing

5    order, Your Honor.

6          **THE COURT:**  Admitted.

7          (Plaintiff's Exhibit PX1899 received in evidence)

8    **BY MS. FORREST:**

9    **Q.**  And the last one that I have here is PX1909.

10                    (Exhibit published.)

11          **THE WITNESS:**  (Reviewing document.)

12    I see this.

13    **BY MS. FORREST:**

14    **Q.**  All right.  And you see it's dated April 28th, 2021?

15    **A.**  I do.

16    **Q.**  And did you learn that the Australian Competition and

17    Consumer Commission, known by the acronym A triple C, had

18    issued a -- an inquiry interim report finding that Apple's App

19    Store had significant market power in the distribution of

20    mobile apps in Australia?

21    **A.**  I believe so.

22          **MS. FORREST:**  Your Honor, we would seek to admit

23    PX1909.

24          **MR. DOREN:**  No objection --

25          **THE COURT:**  No objection?

SCHILLER – CROSS / FORREST

1        **MR. DOREN:**  -- your Honor.

2        **THE COURT:**  Admitted.

3        (Plaintiff's Exhibit PX1909 received in evidence)

4   **BY MS. FORREST:**

5   **Q.**  Now, the -- the Small Business Program was announced in

6   November of 2020, correct?

7   **A.**  Yes.

8   **Q.**  And it was pushed over the edge not by Epic, but by a wide

9   variety of judicial, congressional, and regulatory issues that

10  Apple was facing around the world; is that right?

11  **A.**  Well, it was pushed by me specifically.  If we wanted to

12  say who pushed it, it was me.

13  **Q.**  I'm talking about the events.  Yesterday you testified

14  that Epic helped push it over the edge.  And what I'm

15  wondering is isn't it more than Epic?

16       Isn't that an answer that was too narrow?  And that in

17  fact, what really pushed it over the edge was Apple's attempt

18  as a PR matter to have something out there in the face of a

19  cascade of congressional, judicial, and regulatory activity?

20  **A.**  As I stated yesterday, the Epic Games was a factor that

21  helped.  It wasn't the only thing that mattered.  And there

22  has been scrutiny and criticism of the App Store that mattered

23  from around the world.  And other factors mattered too, like

24  the pandemic.  These were all contributing topics to doing

25  this.

SCHILLER – CROSS / FORREST

1    **Q.**  All right.

2        Let's change topics.

3        You weren't aware, sir, of any marketing literature that

4    informs buyers of iPhones as to the amount that they are

5    likely to spend on apps over the life cycle of their phone,

6    are you?

7    **A.**  I am not aware of any marketing literature like that.

8    **Q.**  And you're not aware of any attempt by Apple to give

9    consumers the App Review Guidelines at the time that they

10   purchase an iOS device, are you?

11   **A.**  We do not send users the App Review Guidelines to read,

12   no.

13   **Q.**  Now, you spoke yesterday about privacy and about Apple's

14   interest in privacy.  Do you recall that?

15   **A.**  Yes.

16   **Q.**  And that privacy is important to Apple, correct?

17   **A.**  Very much so.

18   **Q.**  And you're aware, aren't you, that for Apple's own apps,

19   it tracks a large variety of user information, correct?

20   **A.**  I'm not sure if that's a fair characterization or not.

21   There is user data that we disclose as part of using

22   applications.

23   **Q.**  You disclose Apple's collection and retention of that

24   information, but users can't opt out of it, can they?  Not for

25   the Apple apps.

SCHILLER - CROSS / FORREST

1    **A.**   When you say "can't opt out," of course there are many

2    things you can opt out of.

3    **Q.**   The -- Apple collects a variety of information on Apple

4    apps that Apple -- there's a way that a user can find out what

5    information is collected, but there is not a way for the user

6    to opt out, correct?

7    **A.**   Well, there's a way to opt out of many of the data types

8    you're asked permission for, and you have a chance to opt out

9    of many of the sensitive private data types just like with my

10   application.

11   **Q.**   You're saying that for Apple apps like -- how about for

12   the news, that there is a way -- a prompt that allows a user

13   to opt out of the information collected by Apple for the Apple

14   news site?

15   **A.**   I don't know how all the prompts work on news.  I know

16   there are settings for personalization where you can turn it

17   off.  But I'm not sure.  I don't manage the news product, and

18   I don't know all the settings of how you do that.

19   **Q.**   Okay.  And let's just -- we're going to look at some

20   documents here that will sort of walk us through this.

21       But you're aware, aren't you, that Apple makes money

22   selling advertising on its news feeds, correct?

23   **A.**   When you say "news feed," the News app has advertising in

24   it with publishers.  And I'm not responsible for that.  I

25   don't know the intricacies of how that works.

1    **Q.**   But you understand that Apple monetizes that in some way,

2    the advertising?

3    **A.**   I believe so.

4    **Q.**   Okay.

5         And let's walk through some of the information that Apple,

6    in fact, collects.

7         So let's pull up DX4400, please.  It's in the big binder.

8         We're back to the big binder.  We don't need the little

9    binders any more.

10   **A.**   (Reviewing document.)

11   **Q.**   Do you recognize --

12              **MR. DOREN:**  I'm sorry.  Which binder?

13              **MS. FORREST:**  The big binder.

14              **MR. DOREN:**  This one?

15              **MS. FORREST:**  No.  That's --

16                   (Off-the-record discussion.)

17              **MR. DOREN:**  4400?

18              **MS. FORREST:**  Correct.

19              **THE COURT:**  Yeah, I don't have it in my binder.

20                   (Off-the-record discussion.)

21              **MS. FORREST:**  Oh, it's at the beginning.  Because

22   it's a DX -- because it's a DX, Your Honor, it's at the

23   beginning.  I apologize.

24              **THE COURT:**  I see it.  Thank you.

25              **THE WITNESS:**  I see it.

1   **BY MS. FORREST:**

2   **Q.**  All right.  And do you recognize this as a -- an article

3   from the Apple website?

4   **A.**  It's a support document.  I don't recognize it myself.

5   So -- so I don't recall this document.

6   **Q.**  But you have no doubt that it's actually an App -- App

7   Store support document.  It relates to App Store and privacy,

8   correct?

9   **A.**  Correct.

10          **MS. FORREST:**  All right.  We would seek to admit,

11   Your Honor, DX4400.

12          **THE COURT:**  Objection?

13          **MR. DOREN:**  No objection.

14          **THE COURT:**  Admitted.

15      (Defendant's Exhibit DX4400 received in evidence)

16   **BY MS. FORREST:**

17   **Q.**  Okay.  And I want to go down to the small print under the

18   two people who are -- look like they're sort of shaking hands.

19              (Exhibit published.)

20   **BY MS. FORREST:**

21   **Q.**  And let's walk through together whether or not you're

22   aware of these privacy policies.

23   **A.**  Yes.

24   **Q.**  It says, "We collect your personal information so that we

25   can provide you the content you purchase, download, or want to

1   update in the stores which include App Store."

2       And it goes on.

3   **A.**   Yes.

4   **Q.**   Do you see that?

5   **A.**   That's right.

6   **Q.**   And you would agree that was -- that's one of the reasons

7   why the information is collected, correct?

8   **A.**   Yes.

9   **Q.**   And it says, "We" -- underneath that, "We also use

10  information about your account, purchases, and downloads in

11  the store to offer advertising to ensure that search ads in

12  the App Store and ads in Apple News and Stocks, where

13  available, are relevant to you."

14      Do you see that?

15  **A.**   Yes.

16  **Q.**   Okay.  And it goes on.  It says, "You have choices with

17  respect to this advertising as described below."  Correct?

18  **A.**   Yes.

19  **Q.**   Okay.  Now, it says, "To help" -- in the next bullet, "To

20  help identify and prevent fraud, information about how you use

21  your device, including the approximate number of phone calls

22  or emails you send and receive, will be used to compute a

23  device trust score."

24      Do you see that?

25  **A.**   That's right.

SCHILLER - CROSS / FORREST

1    **Q.**  All right.  And when you -- "and when you attempt to

2    purchase."  Do you see that?

3    **A.**  Yes.

4    **Q.**  Okay.

5        "The submissions are designed so Apple cannot learn the

6    real values on your device.  The scores are stored for a fixed

7    time on our servers."

8        Do you see that?

9    **A.**  Yes.

10   **Q.**  Do you know that that fixed time is ten years?

11   **A.**  I do not know that.

12   **Q.**  Okay.  Well, we'll -- we'll -- we'll get there.  Okay.

13       And it says, "To find ways to improve the stores, we use

14   information about your browsing," which means searching,

15   right?

16   **A.**  Well, again, this is on the store, right, yes.

17   **Q.**  "Purchases," right?

18   **A.**  Yes.

19   **Q.**  "Searches"?

20   **A.**  Yes.

21   **Q.**  "And downloads," right?

22   **A.**  Right.

23   **Q.**  Okay.  "These records are stored with IP address," which

24   is associated with a device, correct?

25   **A.**  It's a location, but yes.

SCHILLER - CROSS / FORREST

1    **Q.**  Um-hmm.

2         "A random unique identifier," which means that a person's

3    name might not be stored, but they might be associated with a

4    hash of some sort, a series of numbers or letters of some

5    sort.

6    **A.**  Exactly, a random identifier.

7    **Q.**  And then underneath it, it says, "providing the stores."

8    Do you see that?

9    **A.**  I see that.

10   **Q.**  And it says, "We use your personal information to provide

11   the services and features in the stores."

12        Do you see that?

13   **A.**  Yes.

14   **Q.**  And then "improving the stores" underneath that.

15        It says, "To improve the experience in the stores, we

16   collect information about your usage of the stores, including

17   when you open or close a store, what content you search for,

18   and the content you view and download.  We also collect

19   information about your device such as the type of device, the

20   version of your operating system, and the amount of free space

21   on your device."

22        And then it goes down a couple and you see the indented

23   bullets below that?  "User search data makes it possible for

24   us to offer trending searches."

25        Do you see that?

SCHILLER – CROSS / FORREST

1    **A.**   Yes.

2    **Q.**   "And knowing what content you view or download makes

3    us" -- "makes it possible for us to offer personalized

4    features like more games you might like."

5        Do you see that?

6    **A.**   Yes.

7    **Q.**   Okay.  And this is all consistent with what you understand

8    the privacy policy to be, correct?

9    **A.**   Yes.

10   **Q.**   Okay.  And it says, "Additionally, if you have popular

11   Near Me enabled in location services, your iPhone will

12   periodically send locations when and where you have purchased

13   or used apps in an anonymous and encrypted form to Apple and

14   may be then used" -- "may then be used to offer

15   geographically relevant apps in other Apple products."

16       Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.

19       And now, if you -- so Apple basically can follow you

20   through location?

21   **A.**   No, that this is isn't about following you.  As it says,

22   it's able to --

23   **Q.**   It can find you.

24   **A.**   -- aggregate location so that it knows, for example, to

25   show you French apps in France.

SCHILLER - CROSS / FORREST

1   **Q.**  It knows where you are.

2   **A.**  I think that's a different interpretation.  It's not what

3   this is.  It's not about tracking where you are.

4   **Q.**  But it's --

5   **A.**  It's about geographically relevant applications.

6   **Q.**  But it knows where you are.  The phone can -- if it's with

7   you and location is on, it knows where you are, correct?

8   **A.**  Yes, but there are strict terms to have on how much

9   aggregated location data the team is able to provide these

10  services with.  It's not tracking where you are.

11  **Q.**  Now, let's look and see what a user can do --

12  **A.**  Okay.

13  **Q.**  -- with all of this information.

14       So it says -- a couple of paragraphs down, it's one, two,

15  three paragraphs above sharing with third parties.  It says,

16  "If you do not want to receive targeted ads" -- I'm sorry.

17  "If you do not want to receive ads targeted to your interests

18  from Apple's advertising platforms, you can choose to enable

19  limit ad tracking which will opt out your Apple I.D. out of

20  receiving such ads on devices where you are signed in with the

21  same Apple I.D.  If you choose to limit ad tracking, you will

22  still receive ads based on the search terms you entered."

23       Do you see that?

24  **A.**  Yes.

25  **Q.**  That means that Apple still collects all the data.  You

1    can just prevent getting the ads sent to you, doesn't it?

2    **A.**   This paragraph is only about the search ad feature, not

3    about where you set up what ad -- what information you provide

4    and what is collected.  That's independent of this point.

5    **Q.**   Okay.  So we'll go to that in a moment.

6        But basically what it's saying is you have a way to

7    prevent getting ads, but there's nothing in here that suggests

8    they're not going to collect it.

9    **A.**   On this point about limiting ad tracking, yes.

10   **Q.**   Okay.  Now let's go -- we talked about retention before.

11   Let's go to the next page, and it's Bates-numbered page 478

12   are it says "Retention."

13                      (Exhibit published.)

14   **BY MS. FORREST:**

15   **Q.**   And it says, "We retain personal information associated

16   with your purchases and downloads on the store for the periods

17   specified by applicable laws relating to financial reporting

18   which vary about country.  For most customers" -- by the way,

19   there's a period after the word country, so unclear whether

20   it's associated with this or not.  "For most customers, that

21   requires at least a ten-year retention period."

22       Do you see that?

23   **A.**   Yes.

24   **Q.**   And that's consistent with your understanding, correct?

25   **A.**   For purchases, yes.

SCHILLER – CROSS / FORREST

1  **Q.**  Okay.  So let's go to what information is actually

2  collected.  Okay?

3  **A.**  Okay.

4  **Q.**  And we can get there.  I think it takes a few steps, but

5  bear with me, and I think we can do this live.

6     The first thing we have to do in order -- if a user wants

7  to find out what's collected, it takes several steps.

8     First we're going to go into apple.com.

9                    (Demonstrative published.)

10  **BY MS. FORREST:**

11  **Q.**  Okay.  Do you recognize that as the apple.com home page?

12  **A.**  Yes.

13  **Q.**  Okay.  And then you have to actually sort of scroll down.

14                   (Demonstrative published.)

15  **BY MS. FORREST:**

16  **Q.**  This is how we're going to get to the transparency.

17     And do you see under "Apple Values," you can see

18  "Privacy"?

19  **A.**  Yes.

20  **Q.**  Okay.  We can click on that.  And then we have to scroll

21  down.

22                   (Demonstrative published.)

23  **BY MS. FORREST:**

24  **Q.**  Okay.  Keep scrolling, keep scrolling, keep scrolling.

25  Scroll, scroll.

SCHILLER – CROSS / FORREST

1          Okay.  Now.

2          The small print there that says, "See how apps from Apple

3     handle your data."  Click on that.

4                         (Demonstrative published.)

5     **BY MS. FORREST:**

6     **Q.**   Okay.

7          Now it says, "Transparency is the best policy."

8          Do you see that?

9     **A.**   Yes.

10    **Q.**   Transparency meaning we're going to tell you what we do,

11    but also meaning you can't control what we're going to do,

12    correct?

13    **A.**   No.  That doesn't necessarily -- this is a transparency

14    report that was created because we built in a privacy section

15    on the App Store for all apps in the App Store so that every

16    developer can share a preset set of privacy transparency with

17    the user.  And since not all of -- we want to make one place

18    on our web where Apple, all of Apple's apps, both what are on

19    the store and what are built into your device, have the same

20    information we share with everyone as well.

21         So this is the privacy panel in the App store being now

22    represented for all Apple apps too, and that's what this page

23    is about.

24    **Q.**   And there's no opt out for this information.  There's no

25    way -- there's no button a user can push to opt out of this

SCHILLER – CROSS / FORREST

1    collection, correct?

2    **A.**   That's not part of this privacy --

3    **Q.**   Okay?

4    **A.**   -- information, and it isn't on the App Store for any app

5    either.

6    **Q.**   Okay.  All right.  Let's go to -- let's go to App Store

7    first and find out what they collect about you.

8        Let's do it from the -- we can do it from the 19 --

9    PX1978.

10            **MS. FORREST:**  Your Honor, we would seek to admit

11   PX1978.

12            **THE COURT:**  No objection?

13                    (Exhibit published.)

14            **MR. DOREN:**  I'm just looking for the document in our

15   binder here.

16       No objection, Your Honor.

17            **THE COURT:**  Admitted.

18       (Plaintiff's Exhibit PX1978 received in evidence)

19   **BY MS. FORREST:**

20   **Q.**   All right.  We'll go to the App Store.  Let's look at the

21   information that is linked to you.  It includes contact

22   information, correct?

23   **A.**   Yes.

24   **Q.**   I won't go through all of it.

25       Purchases, correct?

SCHILLER – CROSS / FORREST

1    **A.**  Yes.

2    **Q.**  Search history, correct?

3    **A.**  Yes.

4    **Q.**  Financial information, correct?

5    **A.**  Yes.

6    **Q.**  And user content, correct?

7    **A.**  Yes.

8    **Q.**  And that's got like the -- the picture -- photograph --

9    **A.**  No.

10   **Q.**  -- icon.  What's the user content little icon mean?

11   **A.**  That's when you put in ratings and reviews on apps in the

12   App Store.  That's user-generated content.

13   **Q.**  Okay.  So it collects that.

14   **A.**  It has to have it.

15   **Q.**  And it also collects --

16   **A.**  It's how you display it.

17   **Q.**  -- user usage data?

18   **A.**  Yes.

19   **Q.**  Okay.  And identifiers, whatever that means, correct?

20   **A.**  Yes.  These are the random identifiers you were reading

21   about earlier.

22   **Q.**  And that just means that it associates some information

23   with every person, but it just doesn't have your name,

24   correct?

25   **A.**  It's more than that.  It's a random identifier that can,

SCHILLER – CROSS / FORREST

1    you know, protect user privacy.

2    **Q.**   Okay.  Well, they can always reassociate it back.

3    **A.**   Not always.  It depends on how it's implemented.

4    **Q.**   You don't really know, do you?

5    **A.**   I know it's possible to both do that or not do that.  It

6    depends on how it's implemented.

7    **Q.**   You don't know which way it's done at Apple, do you?

8    **A.**   I don't know which this one is -- that you're asking about

9    is specifically about.

10   **Q.**   Right.  Okay.

11       Let's go to Apple Books.  Let's find out what Apple Books

12   does.  Apple Books also tracks your purchases, your financial

13   information, your contact information.

14           **THE COURT:**  And I'm going to slow you down again.

15   **BY MS. FORREST:**

16   **Q.**   Your user content, your search history, your identifiers.

17   Correct?

18   **A.**   Yes.

19   **Q.**   All right.  Let's go to Apple Music.

20                   (Exhibit published.)

21   **BY MS. FORREST:**

22   **Q.**   Apple Music --

23           **MR. DOREN:**  What page?

24   **BY MS. FORREST:**

25   **Q.**   -- tracks your purchases, your financial information, your

1    location, your contact information, user content, your search

2    history, identifiers, et cetera.

3         Apple News --

4                          (Exhibit published.)

5    **BY MS. FORREST:**

6    **Q.**  -- tracks your purchases, your financial information, your

7    contact information, your identifiers.

8         Apple Podcasts --

9                          (Exhibit published.)

10   **BY MS. FORREST:**

11   **Q.**  -- tracks your financial information, user content,

12   identifiers.

13        Apple TV tracks your purchases, your financial

14   information, your contact information, your search history,

15   identifiers.

16                          (Exhibit published.)

17   **BY MS. FORREST:**

18   **Q.**  And Apple Wallet tracks your financial information, your

19   location, your user content, identifiers, and other data.

20   **A.**  And again --

21   **Q.**  That's --

22   **A.**  I'm not sure --

23                          (Simultaneous colloquy.)

24   **BY MS. FORREST:**

25   **Q.**  Well, I'll do the question.  Is this all consistent with

1    your understanding of the information disclosed on the privacy

2    or transparency of the apps in the Apple apps in the App

3    Store?

4    **A.**   I disagree with your use of the word "tracked" in this.

5    That's not how we define "tracked" and what it means.  So I

6    don't think it's appropriate to say --

7    **Q.**   Okay.

8    **A.**   -- any of this tracking but --

9    **Q.**   Let me just ask this question.  Is this information

10   consistent with what you understand about the transparency and

11   privacy that's of the Apple apps in the App Store?

12   **A.**   Absolutely.

13   **Q.**   All right.

14       That, to you -- these things, to you, constitute Apple's

15   commitment to privacy; is that right?

16   **A.**   This and more.  This is not all of what we've done.

17   **Q.**   Okay.  All right.

18       It's a lot of information, wouldn't you agree?

19   **A.**   No, I wouldn't agree.

20   **Q.**   Okay.

21       Now, you're aware that Apple gets paid for the App Store

22   in many different ways, correct?

23   **A.**   Gets paid -- I believe there are a number of ways we earn

24   revenue.

25   **Q.**   You don't get paid only -- the only way that Apple gets

1    paid is not through IAP.  That is not like your sole source of

2    revenue in the App Store, correct?

3    **A.**  Correct.

4    **Q.**  Because you get some amount from the developer license,

5    correct?

6    **A.**  Well, that's again the developer program.  It's not

7    directly related to any transactions or any apps on the App

8    Store directly.

9    **Q.**  Well, but it's -- there's no real P&L for the App Store so

10   it comes into the coffers based upon developing apps, correct?

11   **A.**  It's all part of the Apple's P&L, yes.

12   **Q.**  Right, okay.  I mean what's good for the goose is good for

13   the gander.  If it's coming in, then it gets --

14   **A.**  I'm sorry, I never understood that -- that analogy.

15   **Q.**  Okay.

16   **A.**  Or metaphor.

17   **Q.**  You -- you get -- you get money from the developer program

18   license agreement, correct?

19   **A.**  Yes.

20   **Q.**  Okay.

21       And if there's an enterprise program that's entered into,

22   you get paid for that, too, correct?

23   **A.**  Yes.

24   **Q.**  Okay.  And you also get paid for commissions for IAP under

25   certain circumstances, correct?

SCHILLER – CROSS / FORREST

 1   **A.**  Yes.

 2   **Q.**  And you also get paid for the sale of apps, a commission

 3   for the sale of apps, correct?

 4   **A.**  Paid apps for download, yes.

 5   **Q.**  Right.

 6        You also get paid for search advertising, correct?

 7   **A.**  Yes.

 8   **Q.**  All right.  And search advertising, as we've looked at,

 9   makes lots of money, correct?

10   **A.**  I haven't commented on the amount.  I believe that's

11   confidential information.

12   **Q.**  Well, we looked at a press release.  Then we backed out of

13   the press release that it had to be at least 20-something

14   million dollars-plus as of 2017, correct?

15   **A.**  I believe that was in a document somewhere, yes.

16   **Q.**  That was in a press release, correct?

17   **A.**  I believe so, yes.

18   **Q.**  Yeah, it wasn't anything confidential.

19        So Apple added to the ways in which it gets paid in the

20   App Store over time, right?

21        We'll take it --

22   **A.**  No.

23   **Q.**  -- one at a time.

24        Originally, there was no IAP, correct?

25   **A.**  Correct.

SCHILLER – CROSS / FORREST

1    **Q.**   And then IAP was implemented in 2009, correct?

2    **A.**   Yes.

3    **Q.**   And Apple started to get 30 percent commissions at that

4    point, correct?

5    **A.**   Yes.

6    **Q.**   And then in 2011, Apple added another way to get paid,

7    which was subscriptions, correct?

8    **A.**   Yes.

9    **Q.**   And then Apple also then added search advertising,

10   correct?

11   **A.**   Yes.

12   **Q.**   And then along the way, Apple has also added programs such

13   as the Apple Arcade with its subscription-based game site,

14   correct?

15   **A.**   Yes.

16   **Q.**   And it partnered with many of the game apps that were

17   already -- already -- that's okay -- that were already in the

18   App Store as well as some others.

19   **A.**   No.

20   **Q.**   And put some of them together.

21   **A.**   No, that isn't how we did it.

22   **Q.**   Some of the apps that were in the App Store went into the

23   Apple Arcade, correct?

24   **A.**   It -- no.  We launched with it a hundred games and all 100

25   games were brand-new.

SCHILLER - CROSS / FORREST

1    **Q.**  But there -- since that time, a number of the games that

2    were in the Apple App Store went into the Apple Arcade,

3    correct?

4    **A.**  Yes, we've added a few categories into it, yes.

5    **Q.**  Yes.

6         And now Apple has just announced podcasts, correct?  And

7    subscriptions for podcasts, correct?

8    **A.**  Yes.  But that has nothing to do with the App Store.

9    **Q.**  But it's a -- it has to do with iTunes, correct?

10   **A.**  Yes.

11   **Q.**  Okay.

12        And there's no app -- there's not -- there isn't a

13   Podcast -- an Apple Podcast app?

14   **A.**  There is on your -- on your iPhone.

15   **Q.**  Now, you're familiar with the phrase "flash report,"

16   aren't you?

17   **A.**  I believe so.

18   **Q.**  And you receive flash reports that set forth revenues

19   generated by search ads on a regular basis, correct?

20   **A.**  Yes.

21   **Q.**  All right.  And if you turn to -- in your binder to

22   PX2366.

23        We will not put it up.  I believe it's subject to sealing.

24   **A.**  (Reviewing document.)

25   **Q.**  Are you with me at PX2366?

SCHILLER – CROSS / FORREST

1    **A.**  Yes.

2    **Q.**  And you are copied on this document?

3    **A.**  I am.

4    **Q.**  All right.  And it's a document that relates to search ads

5    Q4 FY20 flash report?

6    **A.**  Yes.

7    **Q.**  All right.  It's for a one-week period, correct?

8    **A.**  (Reviewing document.)

9         I believe so.

10   **Q.**  September 11th to September 17th, correct?

11   **A.**  Yes.

12   **Q.**  Now, without -- do not say the number, but it says to

13   Eddie and Phil, correct?

14   **A.**  Yes.

15   **Q.**  All right.  And then it's got a reference to the amount

16   that search ads generated in this flash period which is this

17   one-week period, correct?

18   **A.**  Yes.

19   **Q.**  And do you see that number there?

20   **A.**  I do.

21   **Q.**  All right.  And you know what that N -- don't say it out

22   loud -- but you know what -- well --

23   **A.**  Well, you just did.

24   **Q.**  Forget it.

25        You understand that this information would be true and

SCHILLER – CROSS / FORREST

1   correct, right?

2   **A.**  I believe so.

3   **Q.**  All right.

4       And do you have any reason to believe that September 11th

5   to September 17th was an unusual period of time?

6   **A.**  I do not know if it was.

7   **Q.**  Nothing about that period of time sticks out in your mind

8   as unusual, correct?

9   **A.**  Nothing at this moment, no.

10  **Q.**  Let's turn our attention for a moment to IAP.

11      You testified --

12          **THE COURT:**  Do you want that in evidence?

13          **MS. FORREST:**  I'm sorry, Your Honor?

14          **THE COURT:**  Do you want that in evidence?  2366?

15          **MS. FORREST:**  We'd like to move it into evidence,

16  Your Honor.

17          **THE COURT:**  Yeah, I assumed so.

18      And it's sealed.

19      No objection?

20          **MR. DOREN:**  No -- no objection.  Just note on the

21  sealing, Your Honor.

22          **MS. FORREST:**  It will not go in the box.

23          **THE COURT:**  It's admitted.

24      (Plaintiff's Exhibit PX2366 received in evidence)

25

SCHILLER – CROSS / FORREST

**BY MS. FORREST:**

**Q.**   You testified quite a bit yesterday about IAP, correct --

**A.**   Yes.

**Q.**   -- Mr. Schiller?

And you're aware that IAP requires developers to choose a price from a price tier that Apple provides, correct?

**A.**   Yes.

**Q.**   And the price tiers are in denominations of 99 cents, correct?

**A.**   In the U.S., yes.

**Q.**   And so if a developer wanted to offer an in-app purchase for less than 99 cents, they can't do so, correct?

**A.**   Correct.

         **THE COURT:**   Well, other than for free, right?

         **THE WITNESS:**   Well, thank you.  I always forget that.

**BY MS. FORREST:**

**Q.**   Other than for free, yes.  There's zero to 99 and they can't choose anything other -- they can't choose from one cent to 98 cents, correct?

**A.**   For the IAP purchase.

And again we've talked about intermediary currencies as well.

         **MS. FORREST:**   Okay.  And is PX2202 in evidence?

         **THE COURT:**   We can't hear you.

         **MS. FORREST:**   I'm sorry.  I was asking my team if

1    PX2202 was in evidence.

2              **THE COURT:**  2202?  I don't show it in evidence.

3    **BY MS. FORREST:**

4    **Q.**  Okay.  Can you turn in your binder, Mr. Schiller, to

5    PX2202, please.

6    **A.**  Yes.

7    **Q.**  And tell me whether or not this chart reflects a list of

8    price tiers available for developers for in-app purchases?

9    **A.**  It looks like that, yes.

10             **MS. FORREST:**  All right.  We would seek to admit,

11   Your Honor, PX2202.

12             **MR. DOREN:**  No objection.

13             **THE COURT:**  My first page says it's withheld for

14   privilege.

15             **MS. FORREST:**  That, I believe, was the first page,

16   not the content of the pricing tiers.

17             **THE COURT:**  I see.

18             **MS. FORREST:**  If I understand -- as I understand it.

19             **THE COURT:**  So the pricing tiers are not sealed,

20   correct?

21             **MR. DOREN:**  Correct, Your Honor.

22             **THE COURT:**  Okay.  It's admitted.

23        (Plaintiff's Exhibit PX2202 received in evidence)

24   **BY MS. FORREST:**

25   **Q.**  All right.

SCHILLER – CROSS / FORREST

1           Now, yesterday, you testified that there was no ability to

2      make an in-app purchase before IAP.  Do you recall that?

3      **A.**  Correct.

4      **Q.**  Okay.  And you testified to that at page 2774 of the

5      transcript.  You were asked a straight-up question and you

6      said no.  Right?

7      **A.**  Correct.

8      **Q.**  Okay.  Now, you know Mr. Forstall, correct?

9      **A.**  I do.

10     **Q.**  And Mr. Forstall was at Apple at the time that IAP was

11     launched, correct?

12     **A.**  Yes.

13     **Q.**  All right.  And I want to know whether or not you would

14     agree with the following clip by Mr. Forstall.

15          Let's play clip 2, please.

16                         (Video clip 2 played as follows:

17     "Q  .  We discussed earlier that there were some apps on the

18     App Store prior to the release of IAP that were using their

19     own payment mechanisms for different kinds of purchases made

20     in the app, correct?

21               "A.  Correct.

22     "Q  .  And some of those then needed to switch over to IAP

23     once IAP was released, correct?

24               "A.  At some time frame.")

25

**BY MS. FORREST:**

**Q.**  Now, do you agree with Mr. Forstall that there was an ability to have some in-app purchases before the launch of IAP?

**A.**  I don't agree with that.

**Q.**  You're sure?

**A.**  As sure as I can recall, yes.

**Q.**  Now, yesterday you also testified that app subscriptions were not available until 2011.  Do you recall that?

**A.**  Yes.

**Q.**  And that was incorrect, wasn't it?

**A.**  No.  I'm sorry, I don't know what you mean.  That's my recollection.

**Q.**  Okay.  So let's -- let's just take it in pieces.

Do you recall that before Apple launched its subscription program in 2011, there were apps that actually offered subscriptions?

**A.**  Again, the -- what I recall, and I think I said this yesterday, is that apps before we launched our subscription feature had nonrecurring subscriptions using IAP on the App Store.  I do recall those.  Those existed.

People called them subscriptions, but they weren't the subscription features we launched with recurring subscriptions.  That's what I recall.

**Q.**  Well, what you said yesterday was, "And let's turn to

SCHILLER – CROSS / FORREST

1    subscriptions.  Could users purchase subscriptions through the

2    App Store when it first launched?

3              "A.  No."

4        There wasn't anything else that you said about it, right?

5    **A.**  I thought we were -- discussed that.  But, again, we

6    had -- there's recurring subscriptions.  There were no

7    recurring subscriptions before we launched that feature.  IAP

8    lets you one time buy something.  I thought I talked about

9    Major League Baseball as an example, where with the Major

10   League Baseball App, you could have --

11   **Q.**  Well, I just want to sort of cut to the chase, which is

12   before 2011, could an app developer offer a subscription?  Not

13   using IAP.  However they did it, through whatever mechanism

14   they got paid or whether it was for free, could they offer a

15   subscription?

16   **A.**  I don't recall any --

17   **Q.**  Okay.

18   **A.**  -- developer being able to offer subscriptions --

19   **Q.**  All right.

20   **A.**  -- other than with IAP.

21   **Q.**  Okay.  So let's -- let's go through some documents.

22       Because if they could offer subscriptions before 2011,

23   that would mean that when you put your program in place in

24   2011, you increased the cost to developers because you were

25   implementing a program that then began to charge them

1    30 percent on their subscriptions when they hadn't previously

2    had to pay that, correct?  That's what it means?

3    **A.**  I don't believe we allowed the ability to pay for any good

4    or -- digital good or service on the App Store without going

5    through the App Store at any time.  So -- so I'm not sure what

6    you're referring to.

7    **Q.**  Okay.  Well, let's first look at your press release for

8    when you announced digital subscriptions.

9         **MS. FORREST:**  And I have to hand these up.

10   They're -- it's DX3060 for identification.

11                     (Handing document.)

12        **THE WITNESS:**  Thank you.

13   **BY MS. FORREST:**

14   **Q.**  Do you recognize DX3060 as the press release for the

15   launch of Apple's subscription service for the App Store?

16   **A.**  Yes.

17                     (Exhibit published.)

18        **MS. FORREST:**  Your Honor, we would move into evidence

19   DX3060.

20        **MR. DOREN:**  No objection.

21        **THE COURT:**  Admitted.

22      (Defendant's Exhibit DX3060 received in evidence)

23   **BY MS. FORREST:**

24   **Q.**  Now, at the bottom of the page on the first page of this

25   document, it says, "Publishers" --

SCHILLER – CROSS / FORREST

1          **MS. FORREST:**  Right toward the bottom right there.

2                    (Exhibit published.)

3          **MS. FORREST:**  "Publishers" --

4       In the middle.

5       -- "must provide" --

6       Right there.  Um-hmm.

7                    (Exhibit published.)

8     **BY MS. FORREST:**

9     **Q.**  -- "their own authentication process inside the app for

10    subscriptions that have signed up outside of the app.

11    However, Apple does require that if a publisher chooses to

12    sell a digital subscription separately outside of the app,

13    that same subscription offer must be made at the same price or

14    less to customers who wish to subscribe from within the app."

15       That's suggesting, isn't it, sir, that there were

16    publishers who had previously provided subscriptions outside

17    of the app?

18    **A.**  (Reviewing document.)

19       No.  This is just saying what we've always said, which is

20    developers could sell content and services on their website

21    and our rules have been okay with that.  It's about what's

22    allowed in the app.

23    **Q.**  Okay.  Well, let's -- let's try a different one.

24       Let's try one from 2010.

25       And this is PX108 for identification.

1                      (Exhibit published.)

2                      (Handing document.)

3           **THE WITNESS:**  Thank you.

4    **BY MS. FORREST:**

5    **Q.**  And do you recognize this document, Mr. Schiller, as a

6    document -- as a business record of Apple's?

7    **A.**  I -- it sure -- it looks like an email from Mr. Shoemaker.

8    **Q.**  Okay.  And Mr. Shoemaker was who in -- in 2010, what

9    position did he hold?

10   **A.**  He was in charge of App Review.

11          **MS. FORREST:**  Okay.  Your Honor, we would seek to

12   admit PX108.

13          **MR. DOREN:**  No objection, Your Honor.

14          **THE COURT:**  Admitted.

15          (Plaintiff's Exhibit PX108 received in evidence)

16   **BY MS. FORREST:**

17   **Q.**  Now, here in the first paragraph, it says in connection

18   with the IAP transition plan for books, it says, "The one

19   change is regarding periodical subscriptions found in Zinio,

20   Nook, and Kobo."  That's periodical subscriptions found in.

21   And it says according to Phil, these -- Phil, that probably be

22   you.  Do you understand that to be you?

23   **A.**  It could be.

24   **Q.**  I mean Phillip Shoemaker used to go by Phillip and you

25   used to go by Phil to keep you guys separate, correct?

SCHILLER – CROSS / FORREST

1   **A.**  I don't know if people actually did that, but it could

2   have been either one of us.

3   **Q.**  Okay.  It says, "According to Phil, these should move over

4   to IAP for that content immediately."

5        Do you see that?

6   **A.**  I see that.

7   **Q.**  Okay.  And this does suggest that in 2010 there were

8   periodical subscriptions found, correct?

9   **A.**  Or it means that they were doing something against the

10  rules and it was found that they were doing something against

11  the rules.

12  **Q.**  Well, there was no rule yet, right, on subscriptions until

13  2011, right?

14  **A.**  The rule from the day we opened the store was all -- all

15  digital purchases within -- within apps or with apps at all on

16  the App Store need to use our payment model.  That's what has

17  always been the rule from the beginning.

18  **Q.**  All right.  Let's try another one.  We'll try PX1849.

19           **MS. FORREST:**  (Handing document.)

20           **THE WITNESS:**  Thank you.

21                    (Exhibit published.)

22  BY MS. FORREST:

23  **Q.**  Now, if we go to the press release, we said --

24           **THE COURT:**  What press release?

25           **MS. FORREST:**  I'm sorry.  I was just getting a note,

1    Your Honor.  I was just sort of reading this note.

2    **Q.**  DX3060, that press release that I handed up earlier on the

3    App Store launching the subscription service is dated

4    February 15th, 2011, correct?

5    **A.**  (Reviewing document.)

6    **Q.**  Correct?  Correct?

7    **A.**  Yes.

8    **Q.**  All right.  Now the document I've just handed you which is

9    PX1849 is dated February 10th, a few days before that, 2011,

10   correct?

11   **A.**  Yes.

12   **Q.**  All right.  And this is a document from you to Mr. Cue

13   dated February 10th, 2011, correct?

14   **A.**  It looks like that.

15        **MS. FORREST:**  Your Honor, we would seek to admit

16   PX1849.

17        **MR. DOREN:**  No objection.

18        **THE COURT:**  Admitted.

19      (Plaintiff's Exhibit PX1849 received in evidence)

20   **BY MS. FORREST:**

21   **Q.**  All right.  And in this document which is before the

22   announcement of the subscription service, towards the bottom

23   it says, the third bullet up:  "Anyone offering a subscription

24   service, e.g., WSJ," which I take -- do you understand that as

25   a *Wall Street Journal*, perhaps?

SCHILLER – CROSS / FORREST

1    **A.**   Yes.

2    **Q.**   Okay.

3         "-- who Rhapsody, Pandora, et cetera, will need to add our

4    new subscription billing within the app and remove all links

5    to their web sign-ups by," and then there's some X's, probably

6    for a date to be filled in, correct?

7    **A.**   That's right.

8    **Q.**   Doesn't that suggest to you, sir, that you fully

9    understood that there were in fact subscription services that

10   were being offered before Apple's own subscription program was

11   announced on February 15th, 2011?

12   **A.**   Again, not in any apps.  This is on their websites which

13   they can continue to use.  And this point is specifically

14   about whether a link is allowed, and that's all it's about.

15   **Q.**   So what you were doing was you were going to charge people

16   who had never chosen to make a subscription available within

17   the app, you were now going to require it.  If they had an

18   app --

19   **A.**   No.

20   **Q.**   -- and they offered a subscription elsewhere, they now had

21   to bring it within the app and you were going to charge them

22   30 percent.  That's what you're saying?

23   **A.**   No.

24   **Q.**   Well --

25   **A.**   These developers could --

SCHILLER - CROSS / FORREST

1   **Q.**  If it's no, it's no.  So I have -- I have it wrong.

2   **A.**  We still had the reader rule, and they did not have to

3   charge in the app.

4   **Q.**  It -- doesn't it seem, sir, that there were subscriptions

5   that existed in the world that the App Store didn't get a

6   piece of before February 15th, 2011, with entities that had

7   apps on the App Store, yes?

8   **A.**  Yes, and that continued afterwards.

9   **Q.**  In -- after February 15th, 2011, Apple began to charge

10  those same entities 30 percent?

11  **A.**  No.

12  **Q.**  Okay.  That's your answer.  Okay.  Let's go on.

13      Now let's talk about the 30 percent commission for a

14  moment.

15      You would agree with me that in connection with

16  determining what that commission would be for in-app

17  purchases, Apple did not consider costs?

18  **A.**  Correct.

19  **Q.**  It didn't consider the costs of tools, for instance,

20  correct?

21  **A.**  Correct.

22  **Q.**  Don't most businesses, when they're setting a price,

23  consider cost of the goods sold?

24  **A.**  Again, not when you're running it as one large P&L.  You

25  don't do that.  Again these are features of a product.

1   **Q.**   Okay.  And similarly, you would agree with me that in

2   connection with the commission that would be paid for in-app

3   purchases, you're unaware of the cost of services being taken

4   into consideration, correct?

5   **A.**   Correct.

6   **Q.**   And you would agree with me that when Apple set the

7   commission for 30 percent, it did not analyze the cost of

8   development of API's for iOS, correct?

9   **A.**   Correct.

10   **Q.**   You would agree with me that when Apple decided to drop

11   the commission for renewals of subscriptions to 15 percent, it

12   did that simply because it was simple to just cut it in half?

13   **A.**   Yes, that's one reason.

14   **Q.**   Okay.

15       Don't most companies have to look at how much it cost them

16   when they want to cut their price?

17   **A.**   Again, not if you're running it as one large P&L.  That's

18   a different way of measuring it.

19   **Q.**   And not when you're a monopolist getting monopoly profits

20   either, right?

21   **A.**   I don't agree with that.

22   **Q.**   Now, let's talk about third-party payment methods.

23   Yesterday you were asked about separate demand for Apple's

24   IAP.  Do you recall that?

25   **A.**   Yes.

SCHILLER – CROSS / FORREST

1    **Q.**  And you said Apple had never been asked by anybody to

2    license its IAP, correct?

3    **A.**  That's right.  I don't recall ever being asked for that.

4    **Q.**  But Apple's also known not to license its software,

5    correct?

6    **A.**  Yes.

7    **Q.**  So it's not surprising that nobody's going to come to

8    Apple to ask for a license that they know you're not going to

9    give, correct?

10   **A.**  Not true.  There are many business deals we've done with

11   companies around technologies where it makes sense.

12   **Q.**  You've never licensed iOS.

13   **A.**  Not iOS, no.

14   **Q.**  Okay.  And IAP is within the ecosystem of iOS, correct?

15   **A.**  It's a feature of the App Store.

16   **Q.**  And you've never licensed Apple OS, correct?

17   **A.**  Yes, we did once a long time ago.

18   **Q.**  You haven't -- at present, you don't currently license

19   Apple OS, correct?

20   **A.**  That's right.

21   **Q.**  All right.  Now, you're aware that in August 2020, Epic

22   introduced an alternative payment method in its Fortnite App,

23   correct?

24   **A.**  Yes.

25   **Q.**  And you're aware that there are other third-party

1   platforms that they themselves have come up with their own

2   alternative payment processing systems that they would like to

3   include in apps, correct?

4   **A.**   Yes.

5   **Q.**   And some of them want to just license their IAP or their

6   alternative payment processing system to others, correct?

7   **A.**   I don't know that.

8   **Q.**   PayPal.  You know PayPal, correct?

9   **A.**   Yeah.  I'm not sure they're trying to license their

10  payment model to others.  I don't know.

11  **Q.**   Are you aware if PayPal -- Apple uses PayPal as part of

12  its back end, correct?

13  **A.**   That's right.

14  **Q.**   And a lot of companies on the web use PayPal, correct?

15  **A.**   Yes.

16  **Q.**   It's not unreasonable to assume that PayPal would want to

17  grow its business and offer its services to those who might

18  want to use PayPal, correct?

19  **A.**   Yes.

20  **Q.**   Now, you're not aware of any analysis within Apple that

21  indicated that Epic's payment system that it introduced in

22  August of 2020, had any security vulnerabilities that risked

23  the iPhone, correct?

24  **A.**   I don't recall an analysis of that, no.

25  **Q.**   And you're -- and as I've said, you're aware that there

SCHILLER – CROSS / FORREST

1    are third parties who've also themselves attempted to submit

2    apps or have submitted apps with alternative payment

3    processing systems, correct?

4    **A.**   Yes.

5    **Q.**   Okay.  And if those alternative payment processing methods

6    related to an app that was selling digital consumable content,

7    then the app would be rejected, correct?

8    **A.**   If it's content that's digital and consumed on our

9    devices.

10   **Q.**   But you're not aware, are you, sir, of any studies that

11   have ever looked at any of the payment methods that were

12   submitted by these third parties relating to digital

13   consumable items to determine whether or not those third-party

14   payment methods introduced security vulnerabilities to the

15   iPhone, correct?

16   **A.**   I am -- yeah, I'm not aware of a study like that.

17   **Q.**   And you don't recall a single security analysis of a

18   third-party payment method for digital goods, do you?

19   **A.**   I have not read a security analysis of those things.

20   **Q.**   Apple does, however, allow apps that are selling physical

21   goods to use alternative payment processing methods, correct?

22   **A.**   Yes.

23   **Q.**   All right.  And you're not aware, though, are you, of any

24   analysis within Apple that has examined whether or not these

25   alternative payment processing methods utilized by sellers of

SCHILLER - CROSS / FORREST

1  physical goods have introduced security vulnerabilities into

2  the iPhone, correct?

3  **A.**   I'm not aware of an analysis like that.

4  **Q.**   And you would agree with me, wouldn't you, that there have

5  been times when developers that had apps in the App Store and

6  had their own payment processing system had to then change

7  over to IAP, correct?

8  **A.**   I'm aware of a few that there have been apps that have

9  violated the terms and we've had to do work with them to try

10  to get them in line with the guidelines, yes.

11  **Q.**   And one of the ways you've worked with them is to try to

12  sometimes you've given them some time to come into compliance,

13  correct?

14  **A.**   Depending on the situation, yes.

15  **Q.**   All right.  And you're not aware of any security issues

16  that were introduced by any of those apps which, for whatever

17  short period of time, had an alternative payment processing

18  system in their app, that any security issues that they

19  introduced into -- into an iOS device, correct?

20  **A.**   Correct.

21  **Q.**   Okay.  And you're not aware, are you -- let me strike

22  that.  Withdrawn.

23      You are aware, are you not, that one of the results of IAP

24  is that Apple actually has the customer information for the

25  customers that have entered into the IAP transactions?

SCHILLER – CROSS / FORREST

1    **A.**  Yes.

2    **Q.**  And you would agree with me that Apple has not done any

3    consumer survey relating to whether consumers prefer to have

4    Apple have their private information rather than a third

5    party, correct?

6    **A.**  Correct.

7    **Q.**  And you would agree that developers have told you that

8    from time to time, they don't want to pay the 30 percent

9    commission, correct?

10   **A.**  I've heard that, yes.

11   **Q.**  And you would also agree that some developers have taken

12   the position that they don't have the margin to support the

13   30 percent commission, correct?

14   **A.**  Yes.

15   **Q.**  So let's change topics again.

16       You're aware, are you not, of a number of instances in

17   which stores, app stores, were rejected by Apple pursuant to

18   the App Review Guidelines for being stores within stores?

19   **A.**  Yes.

20   **Q.**  Do you know how many?

21   **A.**  No, I do not.

22   **Q.**  Do you consider that output reducing?

23   **A.**  I do not know.

24   **Q.**  It can't be output enhancing?

25   **A.**  I'm sorry.  I thought you meant by reducing, getting fewer

1    over time.  Is that what you meant?

2    **Q.**  Fewer apps on the App Store as a result of not allowing

3    stores within stores, that's output reducing.

4    **A.**  Oh, no, I'm -- I do not know if that's the case or not.

5    **Q.**  Okay.  But when stores within stores are rejected, those

6    apps don't go onto the App Store, correct?

7    **A.**  I haven't looked to see whether they do or don't so I

8    can't say.

9    **Q.**  You would assume if they're rejected, that if the process

10   is working correctly it wouldn't go on, correct?

11   **A.**  No, no.  Again, the apps within the stores within stores

12   themselves can choose to be on the App Store.  I haven't

13   tracked whether apps within stores within stores -- sorry if

14   that's recursive -- gets onto the App Store.

15   **Q.**  Okay.  So let's just -- we're talking about -- I only want

16   to talk about stores for the moment.

17   **A.**  Okay.

18   **Q.**  Not the -- whatever the number of apps is that could be

19   within a store.

20   **A.**  Okay.

21   **Q.**  If a store is not -- submits an app and wants to get onto

22   the App Store -- and there have been instances like that,

23   right?

24   **A.**  Yes.

25   **Q.**  Epic Games Store was one, correct?

1    **A.**  Yes.

2    **Q.**  Okay.  And you don't allow the store onto the App Store,

3    that reduces the number of apps on the App Store, correct?  It

4    does not increase it, at least.

5    **A.**  Yes.

6    **Q.**  Okay.  Now you also know that you've rejected stores

7    within stores that are not game stores, correct?

8    **A.**  Yes.

9    **Q.**  Okay.

10       For instance, you're not surprised, are you, that a store

11   called "Knowledge Rocks," a music educating and technology

12   store, was rejected by Apple for being a store within a store,

13   correct?

14   **A.**  I don't recall ever hearing about that one.  And so I

15   don't know what that is.

16   **Q.**  Let's turn to PX2194, please.

17   **A.**  (Reviewing document.)

18        **MS. FORREST:**  And can I have that on the -- on the

19   screen?

20       It's not under any kind of sealing, is it?

21                    (Exhibit published.)

22   **BY MS. FORREST:**

23   **Q.**  Do you see, Mr. Schiller, that this is an email from you

24   to Mr. Okamoto dated February -- September 5th, 2013?

25   **A.**  Yes, I see that.

1    **Q.**   Okay.  And if you read down, do you see that there's an

2    email to Mr. Cook from Mr. -- from an individual dated

3    September 4th, 2013?

4    **A.**   Yes.

5         **MS. FORREST:**  All right.  Your Honor, I would offer

6    PX2194.

7         **MR. DOREN:**  No objection.

8         **THE COURT:**  Admitted.

9       (Plaintiff's Exhibit PX2194 received in evidence)

10   **BY MS. FORREST:**

11   **Q.**   And do you see that the email at least suggests that this

12   individual has a -- an -- in the second paragraph, "We've been

13   originally rejected in May as our in-app store was too similar

14   to Apple's own App Store and immediately redesigned our store,

15   fine-tuning it to the published guidelines.  Since

16   resubmitting the application in June, we've been rejected

17   again for the same reason, although our team has made the

18   utmost effort to differentiate our store from Apple's own."

19      Do you see that?

20   **A.**   Yes, but I don't believe this is about an app store within

21   the App Store.

22   **Q.**   Okay.  You know, it's 2013.  And you think you got a clear

23   memory of it?

24   **A.**   I'm just telling what I'm reading right here.

25   **Q.**   Okay.  Okay.

SCHILLER – CROSS / FORREST

1      Now, you've also rejected -- are you familiar with an app

2  called WeChat?

3  **A.**   Yes.

4  **Q.**   What's WeChat?

5  **A.**   It's a large, called a social network platform.  It's many

6  more things than that.

7  **Q.**   And do you know that WeChat was rejected for being a store

8  within a store?

9  **A.**   Yes.

10  **Q.**   Okay.

11      Now, you understand, don't you, that the store within a

12  store guideline would prohibit the Sesame Street store from

13  being on the App Store?  If there was going to be a Sesame

14  Street store that had cartoons and memorabilia and different

15  kinds of knowledge and preschool workbooks for kids, that

16  couldn't be on the App Store, right?

17  **A.**   No.  Everything you just described can be on the App Store

18  if they have memorabilia and workbooks and all of those things

19  are allowed.

20  **Q.**   How about a workbook store, and then next to that would be

21  a cartoon store, and next to that would be a -- another like

22  maybe a character store, and it was all collected underneath

23  something called Sesame Street?

24  **A.**   I don't know that that's against any rule.

25  **Q.**   So the -- a store within a store can collect multiple

SCHILLER – CROSS / FORREST

```
 1    stores within an app?
 2    A.   We have many stores within stores.  They're just not apps
 3    and games.  So we have bookstores.  We have music stores.  We
 4    have movie stores.  We have physical goods stores, including
 5    memorabilia.  So we have -- we have many cartoon bookstores
 6    and comic bookstores.  There are many kinds of stores.
 7    Q.   There are -- those -- all those stores have a -- an array
 8    of content that you buy from that store.  They don't have
 9    themselves a series of apps that you can download from that
10    store.  That's the difference, correct?
11    A.   Again, yes, the App Store is an app store.
12    Q.   Right.
13    A.   All other stores --
14                    (Simultaneous colloquy.)
15    BY MS. FORREST:
16    Q.   My point is if Sesame Street -- something that was branded
17    Sesame Street was an app, and inside that app was a series of
18    other apps, an app that was separately obtained from a third
19    party from Tallahassee relating to kindergarten workbooks, and
20    then there was another store from somebody off in Timbuktu
21    that had to do with characters, cartoon characters, and it
22    was -- these are all separate apps.
23    A.   Again --
24    Q.   Those separate apps --
25    A.   As you said, workbooks and cartoon, and then you said
```

SCHILLER – CROSS / FORREST

```
 1    apps.
 2    Q.   I'm saying they're all apps.
 3    A.   Okay.
 4    Q.   Can a store actually be in the App Store if it, itself,
 5    contains other apps?
 6    A.   As you know, no, we do not allow stores within stores for
 7    apps.
 8              THE COURT:   Three minutes.
 9              MS. FORREST:   What's that?
10              THE COURT:   I said three minutes.  I saw you look at
11    the clock.
12              MS. FORREST:   All right.
13    Q.   Now, we've talked a fair amount about the app review
14    process, correct?
15    A.   Yes.
16    Q.   And you know that one of the things that the human side of
17    app review process is supposed to stop is copycat apps,
18    correct?
19    A.   Yes.
20    Q.   And you would expect, wouldn't you, that at least for
21    really major apps that exist, that there would be some attempt
22    to try to catch them before they go up on the App Store,
23    correct?
24    A.   And there is, yes.
25    Q.   Okay.  Let me hand up a document that we have marked for
```

1    identification as PX1883.

2                         (Exhibit published.)

3                         (Handing document.)

4    **BY MS. FORREST:**

5    **Q.**  All right.  Do you recognize PX1883 as some apps that are

6    within the App Store?

7    **A.**  I do not know if all these apps are in the App Store.

8    I'll -- if you tell me that you -- that's where you got it

9    from, that would help.

10   **Q.**  You're familiar with the Minecraft App, correct?

11   **A.**  Yes.

12   **Q.**  And this appears to be a page from the App Store, correct?

13   **A.**  It does appear to be.

14   **Q.**  And the ad, the little blue ad is the kind of signifier

15   that there might be some advertising by Minecraft from time to

16   time.

17   **A.**  That may be a search ad from Microsoft Minecraft --

18              **MS. FORREST:**  Okay.  All right, Your Honor, we would

19   seek to admit PX1883.

20              **MR. DOREN:**  No objection, Your Honor.

21              **THE COURT:**  Admitted.

22        (Plaintiff's Exhibit PX1883 received in evidence)

23   **BY MS. FORREST:**

24   **Q.**  All right.  And you're familiar with Minecraft, aren't

25   you?

SCHILLER – CROSS / FORREST

1    **A.**   Yes.

2    **Q.**   Minecraft is a very popular building game?

3    **A.**   It is.

4    **Q.**   It's a game that has a creation aspect where there are

5    people who create worlds, correct?

6    **A.**   Yes.

7    **Q.**   Sort of like the Creative mode in Fortnite, correct?

8    **A.**   I'm not the one to make that comparison.  I'm not familiar

9    enough with both of them to say whether they're the same or

10   not.

11   **Q.**   I thought yesterday you said you played Fortnite quite a

12   lot?

13   **A.**   I did.  I played it in Battle Royale mode almost all the

14   time.

15   **Q.**   You never did Creative mode?

16   **A.**   No, I didn't find it interesting.

17   **Q.**   You didn't find -- how about Party Royale?

18   **A.**   Not really, no.

19   **Q.**   No?  What was your avatar?  What was your costume?

20   **A.**   There was a --

21   **Q.**   Banana?  Was it --

22   **A.**   No.  I used two predominantly.  There was a rogue agent

23   one that -- that the Fortnite team had done as a -- as a

24   promotion for a holiday promotion on the App Store.  So I used

25   that one.  And then there was a -- a New England Patriots

1    player that -- I'm a New England Patriots fan and so I was

2    happy to wear that.

3         **MS. FORREST:**  I understand that we are now at our

4    breaking point.

5         **THE COURT:**  Was there something you want to just do

6    quickly with this?  Or you'll start up again --

7         **MS. FORREST:**  I'll start up again later, Your Honor,

8    afterwards.

9         **THE COURT:**  Okay.  Let's go ahead and stand in recess

10   then for 40 minutes.  We'll stand in recess till 1:15.

11                    (Recess taken at 12:36 P.M.)

12                  (Proceedings resumed at 1:16 p.m.)

13        **THE CLERK:**  Remain seated.  Court is in session.

14   Come to order.

15        **THE COURT:**  Okay.  We are back on the record.  The

16   record will reflect that the witness is on the stand, the

17   parties are present.

18      Ms. Forrest, you were at PX1883.  You may proceed.

19        **MS. FORREST:**  Thank you.  Thank you, your Honor.

20   **BY MS. FORREST:**

21   **Q.**  Mr. Schiller, PX1883 appears to be a document that lists

22   several games.  Would you agree with me?

23      It's this -- actually it's the loose one.  I have another

24   copy if it's easier for you.

25   **A.**  I'm sorry.

1        Yes.  If you can give me another copy that would be great.

2    I have it.  Never mind.  Sorry.  I have it.

3    **Q.**  There's a lot of paper floating around up there.

4    **A.**  It's okay.  I apologize.

5    **Q.**  You would agree with me that some of the apps that appear

6    after the *Minecraft* app are quite similar and might be

7    characterized by some as copycat apps, correct?

8    **A.**  It's possible.  We'd have to look further than just this

9    to be sure.

10   **Q.**  All right.

11       But it's possible these are copycat apps that have made it

12   through, correct?

13   **A.**  It's possible.

14   **Q.**  From time to time, I think you told us before lunch,

15   copycat apps still do make their way through the process?

16   **A.**  Yes.

17   **Q.**  And you're aware of that from time to time a number of

18   different kinds of apps that shouldn't make their way through

19   the App Review process do, in fact, make their way through?

20   **A.**  Yes.

21   **Q.**  And you're aware, aren't you, that -- changing topics,

22   that in 2019, there was a leak of *Fortnite* content, correct?

23   **A.**  Yes.  I recall that.

24   **Q.**  And -- if you can turn in your book, if you would, please,

25   to PX2273.

SCHILLER – CROSS / FORREST

1    **A.**  I see that.

2    **Q.**  All right.

3        And do you see that you are the -- one of the addressees

4    of that email?

5    **A.**  Yes.

6    **Q.**  All right.  And the topic of the email is "*Forbes –*

7    *Apple's App Store May Have Just Leaked Fortnite's New Map For*

8    *Chapter 2.*"

9        Do you see that?

10   **A.**  Yes.  I don't think that title is correct, but I see that

11   title.

12   **Q.**  Okay.

13       You have no doubt that you received this email on or about

14   October 11th, 2019, do you?

15   **A.**  I do not doubt that.

16           **MS. FORREST:**  Your Honor, we would move the admission

17   of PX2273.

18           **MR. DOREN:**  No objection.

19           **THE COURT:**  Admitted.

20       (Plaintiff's Exhibit 2273 received in evidence)

21   **BY MS. FORREST:**

22   **Q.**  On the second page of this document, before we leave it,

23   you see that an individual from Epic indicates quote, "We have

24   suffered a major blow to the unveiling of our next season.

25   There were concerns about a leak coming from Apple in the lead

1   up to the season, and those fears ended up being

2   substantiated.  The media damage alone is significant."

3       Do you see that?

4   **A.**  I see that.  That's there.  Yeah.

5           **MR. DOREN:**  Your Honor, if I could just note, I

6   believe on this exhibit not all of the email addresses were

7   redacted.  And I would ask before it is posted, that that be

8   done.

9           **MS. FORREST:**  Absolutely, Your Honor.  That should

10  occur in every case.  We agree.

11  **BY MS. FORREST:**

12  **Q.**  Now, let's go back to something that we talked about just

13  before the break.

14          **THE COURT:**  Just so that I know, the last pages of

15  these documents seem to be misprinted; is that accurate?

16          **MS. FORREST:**  Yes, Your Honor.  That's the form in

17  which we received it during the production.  The portion that

18  I was most interested in was the portion before that.  So we

19  didn't have any deep concerns about the remainder.  So we just

20  gave the entire document in the form in which it was received.

21          **THE COURT:**  Okay.  Thank you.

22  **BY MS. FORREST:**

23  **Q.**  Let me go back, if I could for the moment, Mr. Schiller,

24  to something that we talked about with regard to TikTok,

25  Instagram, and Reddit.

SCHILLER – CROSS / FORREST

1          You remember that conversation earlier before the break?

2     **A.**   Yes, I do.

3     **Q.**   And you know that TikTok is available on the App Store and

4     we looked at a screenshot that showed that, correct?

5     **A.**   Yes.

6     **Q.**   And you know that the Instagram app is available in the

7     App Store, and we looked at a screenshot in that regard as

8     well, correct?

9     **A.**   Yes.

10    **Q.**   You know that Reddit is also an app available on the App

11    Store, and we looked at a screenshot in that regard as well,

12    correct?

13    **A.**   Yes, we did.

14    **Q.**   So if a user had downloaded the native app of any one of

15    those three, they would have then had that native app on their

16    iPhone, correct?

17    **A.**   Yes.

18    **Q.**   They would have been able to access the content then of

19    those apps, correct?

20    **A.**   Yes.

21    **Q.**   Let's talk again about the timing of when in-app

22    purchasing was first available to an app developer.

23         I want to separate out two things.  I want to make sure

24    that we are clear on this.

25         The App Store came out in 2008, correct?

SCHILLER – CROSS / FORREST

1    **A.**   Yes.

2    **Q.**   And at that time, Apple sold apps, or apps were free, and

3    Apple had a mechanism to get paid for those apps, correct?

4    **A.**   Yes.

5    **Q.**   And the mechanism often was via credit card, for instance,

6    of the purchaser, correct?

7    **A.**   That would be part of the payment method the user sets up

8    with the App Store, yes.

9    **Q.**   That worked perfectly well, correct?

10   **A.**   Nothing worked perfectly well.  I wouldn't say that.

11   **Q.**   It worked fine?

12   **A.**   It worked.

13   **Q.**   Okay.  You were able to generate revenue with a credit

14   card payment method?

15   **A.**   That's part of what Apple's commerce system does is

16   generate payments through credit card transactions.

17   **Q.**   Okay.

18       And then you learned at some point in time during the

19   period of time between 2008 and 2009 that there was -- there

20   were developers who were offering game levels and other kinds

21   of in-app purchases, correct?

22   **A.**   No.  What we showed was, in 2008 there was a presentation

23   I was given about what game developers were doing on other

24   platforms and their interest in in-app purchase as a new

25   model, as well as subscriptions.

SCHILLER – CROSS / FORREST

1    **Q.**  So let me show you a document that's been marked for

2    identification PX897.

3            **MS. FORREST:**  And this is part of the stipulation,

4    Your Honor, which the parties, I believe, have finalized, but

5    I don't think it's actually been signed.  At least that is my

6    understanding.

7    **BY MS. FORREST:**

8    **Q.**  Now PX897 has Mr. Forstall as the addressee, correct?

9    **A.**  Yes.

10   **Q.**  And we listened to the testimony of Mr. Forstall earlier

11   today, correct?

12   **A.**  Yes.

13   **Q.**  And in that testimony, Mr. Forstall indicated that it was

14   his understanding that IAP had occurred -- that there had been

15   in-app purchases that developers had done prior to the launch

16   of Apple's implementation of IAP, correct?

17   **A.**  I heard him say that, yes.

18   **Q.**  And you disagreed with that, correct?

19   **A.**  Yes, I do.

20   **Q.**  You see in this email here, which is dated January 30th,

21   2008, there is an indication that there are developers who are

22   distributing games and selling levels, et cetera, already.

23   **A.**  I see that it says that the customer purchases the app on

24   the website, and then gets an activation key; that there's

25   some way that they may be able to enter it into the app.

SCHILLER – CROSS / FORREST

1        So the purchase isn't happening in the app, it's happening

2   on the website is what this seems to refer to.  That's what it

3   says.

4   **Q.**  Okay.  But you don't doubt that that happened, correct?

5   **A.**  Well, I don't know.  I didn't receive this.  And it says

6   "potential" in it.  Says it looks like.  So there's nothing

7   definitive in here.

8   **Q.**  Let's take the example that you have just suggested, which

9   is that there's a developer who has an app, and it's before

10  IAP has been launched.  And that developer wants to offer an

11  additional game level.

12       You would agree with me that there were instances where a

13  user could go someplace to acquire that additional game level

14  through a purchase?

15  **A.**  No, I don't agree this is actually inaccurate.  I just see

16  this email says it is potential and there may be one instance

17  of it, but it isn't validated in this.  And I wasn't included

18  in this, so I can't speak to it directly.

19  **Q.**  Who is Mr. Forstall in January of 2008?  What was his

20  position?

21  **A.**  Senior vice president of software engineering.

22  **Q.**  Senior vice president of software engineering?

23  **A.**  Yes.

24  **Q.**  That is the same position that Mr. Federighi currently

25  occupies, correct?

SCHILLER – CROSS / FORREST

1    **A.**  Yes.

2    **Q.**  It's essentially the head engineer for all of Apple,

3    correct?

4    **A.**  He's the head of the software engineering team.

5    **Q.**  It's a very high position, correct?

6    **A.**  Yes.

7    **Q.**  Okay.  And in this -- well --

8          **MS. FORREST:**  Your Honor, I offer PX897 as a business

9    record while it's subject to a stipulation that has not yet

10   been entered yet, we should proceed this way.

11         **THE COURT:**  Any objection?

12         **MR. DOREN:**  No objection, Your Honor.

13         **THE COURT:**  Admitted.

14       (Plaintiff's Exhibit 897 received in evidence)

15   **BY MS. FORREST:**

16   **Q.**  In terms of this email, you would agree with me that there

17   is at least discussion of -- between Apple personnel of a

18   possible leak in the system?  And that is described as, on the

19   second page:

20         "Many games have a healthy after-market in additional

21         game levels, enhanced graphics for in-game

22         activities, and other data up to and including

23         completely new games that can be created from an

24         installed base game engine.  Many for a fee."

25       Right?

SCHILLER – CROSS / FORREST

1  **A.** Exactly.  And it continues.

2     "Some developers want" --

3                    (Simultaneous colloquy.)

4  **Q.** It continues.  My question was exactly.  I won't leave you

5  hanging.  Get to the punch Line.

6     "Some developers will want this for their iPhone apps,"

7  correct?

8  **A.** Yes.

9  **Q.** Now, it was, however, the case that there was a healthy

10 after-market in additional game levels.

11    You would agree with me that that occurred at that time?

12 **A.** I don't know what "healthy" means based on the knowledge

13 we had at the time.  There was some use case for it,

14 absolutely.  How big it was, I don't know.  And it definitely

15 was not on iPhone.

16 **Q.** Do you have any reason to believe that there was a way in

17 which developers could not have offered additional game levels

18 on their iPhone?

19    Was there some sort of technical or other prohibition that

20 prevented developers from offering in-app purchases prior to

21 2009?

22 **A.** Yes.

23 **Q.** What was the prohibition?

24 **A.** It was back then our guideline number was 11.1.  The

25 numbers changed around 2016.  It says that all -- all --

SCHILLER - CROSS / FORREST

1    basically all purchases need to happen through the App Store,

2    and you can't use other mechanisms to add features or

3    functionality.

4        That was a rule from the moment we started the App Store.

5    So they were not allowed to and that was something App Review

6    was supposed to review for and keep from being on the store.

7    **Q.**  That's exactly why there was a leak in the system,

8    referred to in PX897, right?  Because what was happening was

9    Apple, at that point in time, only had set up purchasing for

10   the app and had not yet set up purchasing for the in-game

11   opportunities.  So that was exactly the leak, correct?

12   **A.**  No.  That's the -- potentially that is being proposed --

13   **Q.**  Okay.  If your answer is no, it's no.  Okay.

14   **A.**  Thank you.

15   **Q.**  It's interesting that -- well, I won't comment on that.

16       So let's go on to another piece, which is, you would agree

17   with me that in connection with the Enterprise Program in

18   which individuals within an enterprise can download their apps

19   directly on to their iPhone, right, but you were unaware of

20   any security issues that had been introduced on to an iOS

21   device by virtue of that download, correct?

22   **A.**  I'm not sure if, when we talked about this previously,

23   that I agreed there is no security issue.  I think the fraud

24   that has happened around use of the Enterprise Program --

25   **Q.**  Let's hold on for a second because I was talking about --

1   we went back and forth on this in the deposition.

2       I'm talking about security issue on the iOS device.  I'm

3   not talking about fraud with notarizations.  I'm not talking

4   about misuse of the Enterprise Program in some other way.  I'm

5   talking about the fact that the Enterprise Program allows

6   third-party downloads directly on to an iPhone when it's done

7   appropriately, correct?

8   **A.**   Yes.

9   **Q.**   And it doesn't require going through the App Store,

10  correct?

11  **A.**   Correct.

12  **Q.**   That's one of the times that Apple actually allows a third

13  party to do a direct download on to the iPhone, correct?

14  **A.**   Yes.

15  **Q.**   And what I was talking about at your deposition, what we

16  went back and forth on, was whether or not you were aware of

17  any security issue on the device itself that had been

18  introduced as a result of that direct download.

19      And your answer was no, correct?

20  **A.**   I'm not aware of any exact security issues.  Just the

21  potential, but not actual issues that I researched.

22  **Q.**   Okay.  Now let's talk about gaming consoles for a moment.

23      You have never used a gaming console to make a phone call,

24  have you?

25  **A.**   No.

SCHILLER - CROSS / FORREST

1    **Q.**  And you're unaware of anyone who has made a

2    nongaming-related phone call on a console, correct?

3    **A.**  As long as we don't consider things like Skype and other

4    tools like that.

5    **Q.**  Nongaming -- you're unaware of anyone who has made a

6    nongaming-related call on a console, correct?

7    **A.**  Correct.

8    **Q.**  And you can't point to a single person who has ever used a

9    console for a banking app, correct?

10   **A.**  Correct.

11   **Q.**  You're unaware of anyone who has ever utilized a gaming

12   console to store their personal investment information,

13   correct?

14   **A.**  Other than, again, for purchases on the console that they

15   need to make the financial information.

16   **Q.**  Now, you said yesterday that you gamed from time to time,

17   correct?

18   **A.**  Yes.

19   **Q.**  And you do driving games sometimes, correct?

20   **A.**  That's one of the genre of games I like, yes.

21   **Q.**  You are aware, aren't you, that the F1 driving game

22   doesn't work very well on a phone, correct?

23   **A.**  There is a F1 driving game on the phone that I think

24   people like.

25   **Q.**  In 2017, you didn't think the F1 driving game worked well

SCHILLER – CROSS / FORREST

```
1   on the phone, correct?

2   A.  No.  That was actually the F1 watching game, for watching

3   F1 races -- application, not game.

4   Q.  Let's turn to -- let's go straight to the document.

5       PX2274.

6           MR. DOREN:  I'm sorry?

7           MS. FORREST:  PX2274.  It's in the big binder.

8   BY MS. FORREST:

9   Q.  Do you see the PX2274?

10  A.  I do.

11  Q.  And this is from you, correct?

12  A.  Yes.

13  Q.  And it is dated the 26th of November 2017, correct?

14  A.  It is.

15          MS. FORREST:  Your Honor, we seek to admit 2274.

16          MR. DOREN:  No objection.

17          THE COURT:  Admitted.

18       (Plaintiff's Exhibit 2274 received in evidence)

19  BY MS. FORREST:

20  Q.  In the email dated November 25th, 2017 at 9:19 p.m., you

21  write in part:

22          "The experience of driving games on a phone or tablet

23          isn't ideal.  (no wheel or controller, holding a

24          small display, not a loud speaker system, et cetera)

25          and the business model is not what most users want
```

1                    for mobile games.

2                    And then it says, "(F1 sucks as a sport now anyway."

3          Do you see that?

4     **A.**   Yes, I do.

5     **Q.**   And above that it says:

6                    "A mobile racing SIM" –– is that simulation game?

7     **A.**   Yes.

8     **Q.**   –– "that users pay for upfront isn't going to be popular

9          period.  Not on iOS, not on Android, not on Switch either."

10         Those are your words, correct?

11    **A.**   Yes.

12    **Q.**   Now we spoke a moment ago about IAP, and you indicated

13         that one of the issues with in-app purchases would have been

14         that it would have violated –– in 2009 or 2008, the date of

15         the email I showed you, it would have violated the guidelines,

16         correct?

17    **A.**   That's right.

18    **Q.**   The guidelines hadn't been published yet, correct?  They

19         weren't published until 2010, correct?

20    **A.**   Exactly.  Yes.

21    **Q.**   It would have been a secret guideline, correct?

22    **A.**   No, not a secret.  We would reject an app and tell the

23         developer why, and we handled it that way.

24    **Q.**   Developer wouldn't have had any advance notice as to how

25         to comply, correct?

SCHILLER - CROSS / FORREST

1    **A.**   Well, I do think we had advance notice.  I think

2    everything from Mr. Jobs' announcement about the --

3    **Q.**   Did anybody tell -- was there any public notice that you

4    are aware of that told developers they couldn't do in-app

5    purchases?

6    **A.**   We did a documents talking about the payment model of the

7    App Store at the time and it did not include that as an

8    option.

9    **Q.**   It did not include that, did it?

10   **A.**   As an option to do that.

11   **Q.**   Let me do one more document, which is 2057.

12         You recognize what has been marked as PX2057,

13   Mr. Schiller?

14   **A.**   I see this is an email.

15   **Q.**   And it's an email that was written to you on the 6th of

16   December, 2014, correct?

17   **A.**   Yes.

18              **MS. FORREST:**  Your Honor, we seek to admit PX2057.

19              **MR. DOREN:**  No objection.

20              **THE COURT:**  Admitted.

21         (Plaintiff's Exhibit 2057 received in evidence)

22   **BY MS. FORREST:**

23   **Q.**   Do you see that in the second to last paragraph it

24   states -- from an individual who had written to you --

25   actually to Mr. Cook.  Unfortunately it doesn't have his -- it

1    has his email address, but it's to Mr. Cook.  The following:

2             "The guidelines are vague.  Why not just allow users

3             to decide what they want on their devices?  Use App

4             Review to keep our malware, security risks, offensive

5             material, et cetera but there's no reason to filter

6             out useful extensions."

7        Do you see that?

8    **A.**  I see that.

9    **Q.**  All right.  He goes on and he says:

10            "Certainly it's put me off even considering touching

11            WatchKit."

12        That was for the watch apps?

13   **A.**  Yes.

14   **Q.**  (reading)

15            "The review process is just too broken and arbitrary

16            to invest any more of my time into this."

17        Do you see that?

18   **A.**  Yes.

19   **Q.**  There's an emoji that's sort of a sad face, correct?

20   **A.**  I see that.

21   **Q.**  Yesterday you testified that Apple did not allow search

22   ads for Apple products.

23        Do you remember that?

24   **A.**  That Apple applications don't take out search ads is what

25   I believe the rule is.

1    **Q.**  So the testimony on transcript page 2819 is -- you were

2    asked by Court:

3            "How do I know that Apple is fairly competing in that

4            same market for search?  I mean, does Apple just not

5            compete?"

6        You said:

7            "That's right.  We do not allow search ads from

8            Apple's products."

9        Do you see that?

10   **A.**  Yes.

11   **Q.**  You would agree with me that the algorithm that's in place

12   for Apple actually preferences Apple's products to make them

13   the number one return, correct?

14   **A.**  I do not agree.

15   **Q.**  Let me show you what has been marked for identification as

16   1854.

17       Do you recognize PX1854 as a series of printouts from the

18   App Store?

19   **A.**  Yes.

20           **MS. FORREST:**  Your Honor, we move to admit PX1854.

21           **THE COURT:**  No objection?

22           **MR. DOREN:**  No objection, Your Honor.

23           **THE COURT:**  Admitted.

24       (Plaintiff's Exhibit 1854 received in evidence)

25

SCHILLER – CROSS / FORREST

**BY MS. FORREST:**

Q.  You see that for the word "books" on the first page of
PX1854, the first return is a paid search return, and that's
not Apple, correct?

A.  That's right.

Q.  But Apple, in fact, comes up as the second -- the second
entry, which is the first algorithmic entry, right?  The first
organic entry?

A.  Exactly.

Q.  And on the next page of -- which is -- actually, I am
sorry, these are all marked separately.

          **MS. FORREST:**  PX1855, Your Honor, I would ask if we
can admit that one as well.

          **THE COURT:**  Admitted.  And 1856.

          **MS. FORREST:**  Thank you, Your Honor.

   (Plaintiff's Exhibits 1855 and 1856 received in evidence)

**BY MS. FORREST:**

Q.  For PX1855, you'll see that under music, Apple Music comes
up as the first organic result, correct?

A.  That's right.

Q.  PX1856, Apple News comes up as the first organic result,
correct?

A.  Yes.

Q.  Apple has changed the algorithm, haven't they, that
relates to the search, and preferences its own apps, does it

1    not?

2    **A.**   No.

3    **Q.**   It's just by chance that Apple happens to come up as the

4    first organic search result?

5    **A.**   It's not by chance, it's by an algorithm that looks at the

6    term to match the closest name of an app.  It looks at

7    popularity.  It looks at many factors.  I think there's 42

8    variables that the algorithm looks at to try to give the user

9    the best likelihood of finding what they are trying to find.

10   **Q.**   42 different factors, correct?

11   **A.**   That's right.

12   **Q.**   And popularity is only one, correct?

13   **A.**   It's one.  I don't know the ranking.  They're relatively

14   different to each other.

15   **Q.**   You don't know the weighting?

16   **A.**   I do not.

17           **MS. FORREST:**  Now, Your Honor, subject to -- we have

18   a document to work out that -- which is going to occur in the

19   ordinary course.  There was a clawback of the document that

20   had been handed up earlier that had the metadata attached.

21           During lunch that was -- we received a letter that

22   asserted privilege over that.  We will take that up in the

23   ordinary course between the parties, and do it very quickly,

24   obviously.  We need to resolve that.  We haven't had a chance

25   to meet and confer on the privilege basis.

1        And for the record, I want to let the Court know that the

2    first clip that we played today was from Mr. Cue, and it was

3    from page 126, line --

4            **THE COURT:**  It doesn't matter because she transcribed

5    it.

6            **MS. FORREST:**  Thank you, Your Honor.

7        I pass the witness at this time.

8            **THE COURT:**  Okay.

9        I tend not to -- my court reporters tend to transcribe

10   them when it is very small, when we get into long colloquies

11   or if it's a video and not testimony in a deposition.

12       I take it the document 1902 that was -- you weren't going

13   to ask questions on that given Judge Hixson's ruling; is that

14   right?

15           **MS. FORREST:**  That is correct, Your Honor.  There was

16   a portion of it that we were allowed to question on; however,

17   that is similar to something else that I had already used.

18       Thank you.

19           **THE COURT:**  Okay.

20       Mr. Doren, proceed when you are ready.

21           **MR. DOREN:**  Thank you, Your Honor.

22       My first glib comment in trial about being glad to hear

23   that the binder was misnumbered as one of two, and it turned

24   out to be one of about six.  So I just need a moment here.

25                       (Pause in the proceedings.)

1

2

3                          **REDIRECT EXAMINATION**

4     **BY MR. DOREN:**

5     **Q.**   Hello, Mr. Schiller.

6     **A.**   Good afternoon.

7     **Q.**   Why don't we take the first few points in reverse order.

8          You were just asked about not search ads but rather the

9     search algorithms in the App Store.  And you were shown three

10    examples where Apple native apps came up after a search ad.

11         Do you recall seeing that?

12    **A.**   Yes.

13    **Q.**   And can you explain a bit more why you believe that

14    occurred or rather how the search function works within the

15    App Store that would lead to that result?

16    **A.**   Yes.

17         I know from many meetings with the search ads team that

18    they have only one goal, to help the customer find what they

19    are most looking for.  That is their goal with the algorithms.

20         The algorithms use the name of the app, the name of the

21    developer, popularity, among other factors.

22         What's most interesting about those three apps is

23    something that surprised me.  I learned from the search ad

24    team.  Surprisingly a large number of people use search to

25    launch apps on their phone.  They will type in the name of an

1   app they have on their phone, and click the button that says

2   open; not get, it is open because it is already in their

3   device.

4       That also contributes to the ranking higher of apps

5   showing up in search that you already have in your phone

6   because that is what a large percentage of users are trying to

7   do.  Surprising to me that is what happens, but that is what

8   it does.

9   **Q.**  Are the algorithms rigged in any way to favor Apple native

10  apps?

11  **A.**  No, they are not.

12  **Q.**  Did these three examples, are they a fair sample of what

13  would happen for broader app searches?

14  **A.**  No, they are not.

15  **Q.**  Sir, you were also shown a loose document, which is

16  PX0897, from January 30th, 2008.  The one related to -- the

17  discussion around this was about the early days of in-app

18  purchases or in-app features.

19      Do you have that document there?

20  **A.**  One moment and I will get to that.

21      It is one of the loose documents?

22  **Q.**  It is.  It would have been one of the last ones, I

23  believe.

24  **A.**  It was.  I haven't collated my documents up here as well

25  as I should have.

SCHILLER – REDIRECT / DOREN

1    **Q.**  It was Exhibit 897, if that's helpful.

2          **THE COURT:**  It's the one about the leak in the

3    system.

4    **BY MR. DOREN:**

5    **Q.**  The re line is Potential Distribution Alternative.

6    **A.**  Yes.  Thank you.

7    **Q.**  Of course.

8          And you now have that in front of you, sir?

9    **A.**  I do.

10   **Q.**  And the date of this email is January 30th, 2008, correct?

11   **A.**  It is.

12   **Q.**  And do you recall that yesterday we looked at Exhibit

13   DX0888, which was the December 2008 deck?

14   **A.**  That's right.

15   **Q.**  And you see that this email is copied to Mr. Ron Okamoto,

16   correct?

17   **A.**  Yes.

18   **Q.**  Was it Mr. Okamoto that provided you with the deck which

19   was Exhibit 0888?

20   **A.**  He was.

21   **Q.**  And that was 12 months later, correct?

22   **A.**  Yes.

23   **Q.**  And at that time in-app purchases was being recognized as

24   something that could add value for the App Store and also for

25   developers, correct?

SCHILLER – REDIRECT / DOREN

1    **A.**  Yes.

2    **Q.**  And you're not on this email, are you?

3    **A.**  I am not.

4    **Q.**  And, in fact, the note at the top is from Jos to Scott.

5    And it says, "If this is accurate, it sounds like we will have

6    to make sure our terms don't allow this."

7         Do you see that?

8    **A.**  Yes.

9    **Q.**  And as of January 30th, 2008 did -- well, as of

10   January 30th, 2008 did the App Store exist?

11   **A.**  No, not yet.

12   **Q.**  And from day one, did the App Store's terms not allow IAP

13   purchases?

14   **A.**  They did not.

15   **Q.**  And they were ultimately allowed in 2009, correct?

16   **A.**  Yes.

17   **Q.**  You also were asked about the ability to do paid downloads

18   using a credit card.  I just want to make sure I understood

19   the question and your testimony.

20        Were a paid download transactions simply a credit card

21   transaction or was this put through the broader commerce

22   engine of Apple?

23   **A.**  Correct.  You did not use your credit card directly.  You

24   set up your payment method, whether it's a credit card or

25   something else, in your Apple account that you used for the

SCHILLER – REDIRECT / DOREN

1   Store, and then you use the commerce engine of the App Store

2   to make those purchases.

3   **Q.**  And was that the same commerce engine to which the

4   IAP/APIs were added in 2009?

5   **A.**  Yes.

6   **Q.**  Probably the most important question of the day, sir, is,

7   are there any iOS driving games you do like?

8   **A.**  Yes.

9   **Q.**  And can you name that or those?

10  **A.**  I think perhaps the best one would be real racing from EA.

11  They've done a pretty remarkable job with their modeling and

12  their physics in that game.

13  **Q.**  And things like the Taptic engine come into play in that

14  game?

15  **A.**  Yes.  And gyroscope and other controls.

16  **Q.**  Thank you.

17      You were also questioned about the Enterprise Program and

18  whether or not there were security issues related to the

19  Enterprise Program.

20      Do you remember that?

21  **A.**  Yes.

22  **Q.**  Can you remind us, please, what the qualifications or what

23  the requirements are for participation in the Enterprise

24  Program?

25  **A.**  We work with large-scale corporations.  We vet them.  We

SCHILLER - REDIRECT / DOREN

1    give them a special security key to allow them to download to

2    their devices.  They need to sign an agreement that the

3    applications they want to distribute are only to their

4    employees and contractors for their internal use, and never

5    out to consumers in the wild.

6        And it's a program to basically trust a large corporation

7    is not going to violate the security and privacy of their own

8    employees.

9    **Q.**  And do employees of large corporations often have

10   company-purchased devices?

11   **A.**  Yes.

12   **Q.**  And -- thank you, sir.

13       And are you aware of where there have been abuses of the

14   Enterprise Program?

15   **A.**  Yes.

16   **Q.**  And can you describe one or two of those?

17   **A.**  We have found cases where either employees of a company

18   have, unbeknownst to their employer, sold or given away their

19   keys for rogue sites to then set up distribution of pirated

20   software.  And we've seen actual malware attacks created by

21   stores that have used an enterprise key to get their software

22   on to a user's device, and unbeknownst to the users, try to

23   perpetrate malware attacks.

24   **Q.**  Is that a concern to Apple?

25   **A.**  Great concern.

SCHILLER - REDIRECT / DOREN

1   **Q.**  And has Apple ever considered tightening restrictions on

2   the Enterprise Program as a result?

3   **A.**  We have been tightening the program and trying to reduce

4   the risk of that as much as possible.

5   **Q.**  Sir, one of the last documents you were shown, and it's in

6   the large binder, was PX2057.

7   **A.**  Yes.

8   **Q.**  And this is a December 6th, 2014 email from -- well, the

9   top one is from Mr. Shoemaker to you with the subject of being

10  "re disappointed."

11      Do you see that?

12  **A.**  Yes.

13  **Q.**  In the email at the bottom of this two-email string is

14  from a developer, correct?

15  **A.**  It is.

16  **Q.**  That's not an internal Apple email?

17  **A.**  No, it is not.

18  **Q.**  And he says -- in the second paragraph from the bottom,

19  the developer says:

20          "The guidelines are vague.  Why not just allow users

21          to decide what they want on their devices?  Use App

22          Review to keep out malware, security risks, offensive

23          material, et cetera, but there's no reason to filt

24          out useful extensions."

25      Do you see that?

SCHILLER – REDIRECT / DOREN

1    **A.**   I do.

2    **Q.**   So this developer had no problem with App Review as a

3    concept, correct?

4    **A.**   Correct.

5    **Q.**   And Mr. Cook forwarded this email to you, correct?

6    **A.**   Yes.

7    **Q.**   And you, in turn, forwarded it to Mr. Shoemaker, correct?

8    **A.**   I did.

9    **Q.**   What was his response to you?

10   **A.**   We will reach out to him.

11   **Q.**   So upon receipt of this complaint, you had Mr. Shoemaker

12   reach out to this developer, correct?

13   **A.**   That's right.

14        Just to be clear, we keep talking about this developer.

15   So, A, it's great getting feedback like this.  I love getting

16   complaints because we make things better.  This is a developer

17   making an extension to a keyboard.  So it wasn't a regular app

18   you download.  We added the ability for developers to extend

19   the functionality of the iPhone.  And you could change out,

20   not only the standard keyboard that shows up when you type,

21   but you can put applications in those keyboards.

22        And our engineering team had asked us to be very careful

23   what developers start to do to change up the user's keyboards

24   that should only be appropriate things that make sense in the

25   keyboard.

1    So this developer was deciding to put a calculator in

2    place of your keyboard.  Maybe it's a good idea, maybe it's

3    not, but this extension was the discussion they didn't like

4    the rejection for that, and the team followed up with him to

5    try and help him get on the App Store with something

6    appropriate.  It's about a keyboard extension.

7  **Q.**  Was that in violation of the App Review Guidelines?

8  **A.**  It was for appropriateness use of the API and it's another

9    case where -- in this case, our engineers asked App Review to

10   manage the use of this API that took human review.

11   In the longer term, we actually increased the uses of this

12   keyboard extension because we were advocating for our

13   developers that we think they have some good ideas and can do

14   more with it than was originally defined by the engineering

15   team.

16  **Q.**  You also were asked about a leak of *Fortnite* art in 2019.

17   Do you recall that?

18  **A.**  Yes.

19  **Q.**  Do you recall that Apple actually identified a fake

20   *Fortnite* knock-off in 2019 as well?

21  **A.**  Yes.

22       **MS. FORREST:**  Objection to the form, Your Honor.

23   Leading.

24       **MR. DOREN:**  Counterfeit was the word I was struggling

25   for there, Your Honor, so I picked three others.

1          Let me try again.

2     **BY MR. DOREN:**

3     **Q.**  Mr. Schiller, do you recall that Apple identified a

4     counterfeit *Fortnite* game in 2019?

5               **MS. FORREST:**  Same objection.

6               **THE COURT:**  It's leading.

7     **BY MR. DOREN:**

8     **Q.**  Has Apple ever identified counterfeit *Fortnite* games?

9     **A.**  Yes, we have.

10    **Q.**  And do you recall the name of those -- of any of those

11    games?

12    **A.**  They were variance of the *Fortnite* name.  I don't remember

13    the exact term.

14    **Q.**  And during what step in the process were those counterfeit

15    games identified?

16    **A.**  Through App Review.

17    **Q.**  Were they prevented from getting on to the App Store?

18    **A.**  Yes.

19    **Q.**  Mr. Schiller, you were shown a lot of news articles about

20    various investigations.

21         Do you recall that?

22    **A.**  Yes.

23    **Q.**  And are you -- has the Coalition for App Fairness played

24    any role in terms of appearing or testifying in those

25    investigations?

1          **MS. FORREST:**  Objection, Your Honor, foundation.

2          **THE COURT:**  It's a pretty broad-based question.

3          **MR. DOREN:**  I can rephrase.

4          **THE COURT:**  Some of these he was familiar with and

5     others he was not.

6          **MR. DOREN:**  Fair enough, Your Honor.

7     **BY MR. DOREN:**

8     **Q.**  First of all, sir, do you know if any of the Coalition for

9     App Fairness members testified before Congress?

10    **A.**  Yes.

11    **Q.**  In the recent hearings?

12    **A.**  Yes.

13    **Q.**  And what Coalition for App Fairness members testified at

14    those hearings?

15    **A.**  Spotify did.  Tile did.  And Match did.

16    **Q.**  And do you know whether any of the Coalition App Fairness

17    members have been strong advocates before the EU against

18    Apple?

19    **A.**  I certainly have heard of Spotify and Match both being

20    strong advocates in front of the EU about Apple.

21    **Q.**  And has Epic complained to the EU about Apple?

22    **A.**  I believe they have.

23    **Q.**  And you were shown a document regarding a Russian

24    investigation.

25          Do you recall that?

1    **A.**   Yes.

2    **Q.**   And you were discussing a law that was passed in Russia.

3    And can you please describe what that legislation was?

4    **A.**   It required that smartphone makers pre-install or offer at

5    time of setup a list of Russian apps as defined by the

6    Government to encourage the Russian users to download Russian

7    apps.

8    **Q.**   And did that have anything to do with eliminating App

9    Review?

10   **A.**   No.

11   **Q.**   Did that legislation require that Apple permit third-party

12   apps into iOS?

13   **A.**   No.

14   **Q.**   Did that legislation require that developers be permitted

15   to place stores within the App Store?

16   **A.**   No.

17   **Q.**   And by the way, Mr. Schiller, do you question at all that

18   the App Store has added to the bottom line for Apple?

19   **A.**   No, I do not.

20   **Q.**   You were shown a rather extensive set of exhibits related

21   to, I believe, the search terms that counsel said were used

22   were fetish and BBDM.

23        Do you recall those?

24   **A.**   I do.

25   **Q.**   Do you recall the nature of those specific apps?

SCHILLER - REDIRECT / DOREN

**A.** Yes.  We certainly looked at a number of photos of apps on the App Store.

**Q.** And do any of those apps -- do any of those apps fall into the category for App Review purposes of dating apps?

**A.** Yes.

**Q.** Can you describe the dilemma or the tensions that you face in App Review in dealing with apps such as that?

**A.** Yes.  This is certainly always a difficult area for us and I think for any app store today.

There are categories of things that we do not want on our stores like pornography, like objectionable sexist content that would be offensive to many of us.  When you have categories of apps, for example, dating apps, then what we find is a number of the developers will try to find where's the line.  What can I get on the App Store.

So they will try apps that have total nudity and get rejected.  Then they'll try apps that have less nudity and get rejected until they can find what's okay.

So as an App Review team, you try to build a knowledge base and an understanding of where those lines are, but it's not an easy task.

**Q.** Can you reject a dating app because you take personal exception to the nature of the people who are trying to meet there who would otherwise fit your guidelines?

**A.** No.  It would be inappropriate for us to put our personal

SCHILLER - REDIRECT / DOREN

1    feelings about what is -- kind of dating app we like or don't

2    like.  It's against our rules.

3    **Q.**  You were also shown some apps or the front pages of apps

4    that came up under the search term, I believe, it was "porn."

5        Do you recall that?

6    **A.**  Yes.

7    **Q.**  And, first of all, do the app guidelines prohibit nudity

8    on the App Store?

9    **A.**  Mostly.  It's certainly allowed, for example, for medical

10   apps or appropriate education apps, just in that context.

11   **Q.**  And does the App Store prohibit pornography?

12   **A.**  Yes.

13   **Q.**  And, again, how do you, as the person in charge of the App

14   Store, work with intentions between what is and is not

15   pornography?

16   **A.**  It's a very difficult topic to be black and white on,

17   these things are, I think, for all of us.  But you try again

18   to set conditions for review, whether it comes to the display

19   of genitalia, the context of which the images are in the -- in

20   the context of the app, I believe, is definitions around

21   titillation and other things that I can't believe I have to

22   say in a Court environment, but there are terminology and

23   examples that are used to guide the teams to try and do a good

24   job of that.

25   **Q.**  And, sir, over lunch I became the pride owner of Sex

1    Positions 3D.

2        Do you know whether, in fact, the figures in that app are

3    fully clothed?

4    **A.**   I do not.  I would assume by our store rules they are.

5            **MS. FORREST:**  Objection, Your Honor, move to strike.

6            **THE COURT:**  Given he says it is an assumption, motion

7    to strike is granted.

8    **BY MR. DOREN:**

9    **Q.**   Mr. Schiller, if the App Review Guidelines are properly

10   applied, should there be any nudity in an app that comes up

11   under the search term "porn"?

12   **A.**   There should not.

13   **Q.**   And the only way to know whether there is any nudity in

14   the various apps for which you were shown the title page,

15   would be to actually open them and look; is that fair?

16   **A.**   Exactly.

17   **Q.**   And is that something -- is that a part of the app-review

18   process, by the way?

19   **A.**   It is.

20   **Q.**   Mr. Schiller, there was also discussion around TikTok.

21       Do you recall that?

22   **A.**   Yes.

23   **Q.**   Does TikTok have any guidelines about adult nudity and

24   sexual activities?

25   **A.**   Yes, I believe they do.

1              **MR. DOREN:**  Your Honor, I would ask for permission to

2      approach the witness with what is marked for identification as

3      DX5568.

4              **THE COURT:**  You may.

5      **BY MR. DOREN:**

6      **Q.**  Mr. Schiller, sir, if I could -- first of all, do you

7      recognize this to be a TikTok community guidelines?

8      **A.**  That's what it appears to be.

9      **Q.**  Please take a look at page 55 -- DX5568.010.

10     **A.**  Okay.

11     **Q.**  Do you see that, sir?

12     **A.**  Yes.

13     **Q.**  And the heading at the top, Adult Nudity and Sexual

14     Activities, correct?

15     **A.**  Yes.

16     **Q.**  And the document states that we strive to create a

17     platform that feels welcoming and safe.  We do not allow

18     nudity, pornography, or sexually explicit content on our

19     platform.  We also prohibit content depicting or supporting

20     nonconsensual sexual acts, the sharing of nonconsensual

21     intimate imagery, and adult sexual solicitations.

22          Is that consistent with your understanding of TikTok's

23     guidelines, sir?

24     **A.**  Yes.

25     **Q.**  It then goes on under subheading for sexual exploitation.

SCHILLER – REDIRECT / DOREN

                    "Sexual exploitation is defined as any actual or

                    attempted abuse of a position of vulnerability,

                    power, or trust for sexual purposes, including

                    profiting monetarily, socially, or politically from

                    the sexual exploitation of another.  We do not permit

                    sexually exploitive content."

       Is that consistent with your understanding of TikTok's

guidelines?

**A.**   Yes.

**Q.**   The next subheading says, do not post, upload, stream, or

share, and then there's a number of different entries

including anything that glorifies nonconsensual sexual acts,

that depicts, solicit, promote, normalize, or glorify the

sharing of nonconsensual intimate imagery, content that

depicts, normalizes, or glorifies sexual violence, and so

forth.

       Is that consistent with your understanding of TikTok's

guidelines?

**A.**   Yes.

**Q.**   And then the next heading is for nudity and sexual

activity involving adults, correct?

**A.**   Yes.

**Q.**   And the guidelines state that nudity and sexual activity

include content that is overtly revealing of breasts,

genitals, anus, or buttocks or behaviors that mimic, imply, or

1    display sex acts, correct?

2    **A.**   Yes.

3    **Q.**   And then below that is another subheading that says, do

4    not post, upload, stream, or share.  And it states, content

5    that explicitly or implicitly depicts sexual activities,

6    including erotic kissing, content that depicts sexual arousal,

7    content that depicts sexual fetish, conduct that depicts human

8    genitalia, content that contains sexually explicit language

9    for sexual gratification.

10        Is that all consistent with your understanding of TikTok's

11    community guidelines?

12   **A.**   Yes.

13        **MR. DOREN:**   And, Your Honor, I would move into

14   evidence Exhibit DX5568.

15        **MS. FORREST:**   No objection.

16        **THE COURT:**   Admitted.

17        (Defendant's Exhibit 5568 received in evidence)

18   **BY MR. DOREN:**

19   **Q.**   There was also discussion about Reddit and Instagram.

20        Do you recall that?

21   **A.**   Yes.

22   **Q.**   Sir, if I could ask you, please, to look to the App Review

23   Guidelines, which are DX2790.  And, specifically, if I could

24   draw your attention please to guideline 1.2, user-generated

25   content.

1    **A.**   Yes.

2    **Q.**   And, sir, you are familiar with this guideline, aren't

3    you?

4    **A.**   Yes.  I helped to write it.

5    **Q.**   And let's review it, please.  1.2 states:

6              "Apps with user-generated content present particular

7              challenges, ranging from intellectual property

8              infringement to anonymous bullying.  To prevent

9              abuse, apps with user-generated content or social

10             networking services must include."

11   And the first bullet point is:

12             "A method for filtering objectionable material from

13             being posted to the app."

14   Correct?

15   **A.**   Yes.

16   **Q.**   And does that apply to apps -- native apps such as Reddit

17   and Instagram?

18   **A.**   It does.

19   **Q.**   It also requires a mechanism to report offensive content

20   and timely responses to concerns, the ability to block abusive

21   users from the service, and published contact information so

22   users can easily reach the developer, correct?

23   **A.**   Yes.

24   **Q.**   And are those guidelines enforced?

25   **A.**   They are.

SCHILLER - REDIRECT / DOREN

1    **Q.**   And if you turn over to the next page, which is 2790.4,

2    the guideline goes on and states, that apps with

3    user-generated content or services that end up being primarily

4    for pornographic content -- here we go with the French word --

5    *Chatroulette*-style experiences, objectification of real

6    people, e.g., hot or not voting, making physical threats, or

7    bullying do not belong on the App Store and they may be

8    removed without notice.

9        And is that guideline enforced?

10   **A.**   It is.  It's Chatroulette.

11   **Q.**   Thank you very much, sir.  Canal plues (phonetic)

12       If your app includes user-generated content from a web

13   base service, it may display incidental mature "NSFW" content,

14   provided that the content is hidden by default and only

15   displayed when the user turns it on via your website.

16       Can you please explain that part of this guideline?

17   **A.**   Yes.

18       We have a number of social network environments like

19   Reddit that have long existed with this not-safe-for-work

20   sections of their own user base that they moderate and create

21   in safe areas for their users.

22       When they want to come on to our App Store, we tell them,

23   we respect what you are doing on the web is whatever you

24   choose to do, but it opens the potential to violate our rules

25   against pornography and other objectionable content.  So it

SCHILLER - REDIRECT / DOREN

1    needs to be shown by default -- not shown by default on iOS.

2    And if the user chooses to change that on your website because

3    that feature exists, then that's up to you and the user, but

4    natively in the iPhone app, you don't change it there.

5    **Q.**   And how would a user change it if they chose to do so?

6    **A.**   There are software switches on the websites of these

7    services that allow them to do that if they meet their

8    criteria for adult content.

9    **Q.**   Would they do that through the app or would they have to

10   go out to the website?

11   **A.**   They have to go out to the website.

12   **Q.**   So they have to leave the iOS website, go into the app,

13   find the switch, turn off the default, then go back into the

14   native app; is that correct?

15   **A.**   Yes.

16   **Q.**   That's what we call in this case friction; is that right,

17   sir?

18   **A.**   Yes.

19   **Q.**   You were also shown a rather thick document which was

20   PX101.  It had a binder of its own?

21   **A.**   Yes.

22   **Q.**   Sir, you mentioned that you were not familiar with this

23   document; is that correct?

24   **A.**   I don't know that I still have this binder.  We cleaned up

25   a bunch of them.

SCHILLER – REDIRECT / DOREN

1    **Q.**  You can look at this one, sir.  It is not marked up.

2    **A.**  Thank you.

3    **Q.**  Do you know what this document is?

4    **A.**  Yes.  I recall seeing this now.  Yes.

5        This was a PDF file that was sent to me of the backup of

6    the details of the processing guidelines that the app

7    reviewers were using at this time in 2010.

8    **Q.**  Does the App Store continue to maintain backup to assist

9    the app reviewers in enforcing the guidelines?

10   **A.**  They do.

11   **Q.**  And is that part of the app reviewers' training?

12   **A.**  It is.

13   **Q.**  You were also asked some questions about privacy

14   protection.

15       Do you recall that?

16   **A.**  Yes.

17   **Q.**  And you weren't given the opportunity to answer a number

18   of questions so I would like to provide you with that

19   opportunity now.

20       First of all, you were shown a number of things that

21   talked about Apple collecting user data.  Can you describe,

22   please, the circumstances under which Apple create and the

23   purpose for which Apple gathers user data?

24   **A.**  Well, as an example, there were a number pointed out, an

25   example, in the App Store, which I think is the most relevant

SCHILLER - REDIRECT / DOREN

1   here, the App Store needs to know if you have purchased an

2   app.  Because later on when you go to the App Store, you don't

3   want to have to pay for it again.  And that would make users

4   very unhappy.  So we need to track that.

5       There's also, as is mentioned in the terms that were read,

6   tax purposes and accounting purposes that that information is

7   required for.  We need to know if you post a rating and

8   review, that that is your rating and review and be able to

9   show it under the terms that you agreed to let us show it to

10  others and on and on.

11      There were a number of data sources required for the

12  proper use and function of the App Store.  That's the only

13  reason to do that is to help users get the service they want

14  to get.

15  **Q.**  And how is the user's private information protected when

16  Apple collects it?

17  **A.**  We have very strict guidelines at Apple internally about

18  that protection of that data, security of that data, isolation

19  of that data only to that service, and on and on.  There's

20  what we call the pillars of our internal privacy architecture.

21  **Q.**  Is that personal information visible to Apple employees?

22  **A.**  It is not.

23  **Q.**  How is that done?

24  **A.**  That is done through encryption and protected servers and

25  storage, and a number of methods that have been designed by

SCHILLER - REDIRECT / DOREN

1    our services engineering team -- I'm not the expert of it --

2    to make sure that no Apple employee has access to individual

3    personal data.

4    Q.   And there was discussion about Apple tracking people.

5         Does Apple track people?

6    A.   No.  And it's very important to have similar terminology.

7    Because in the industry of apps the word "tracking" refers

8    specifically to when a developer, whether it's Apple or any

9    app developer, needs information from you to deliver a

10   service, that's not tracking, that's just delivering the

11   service.

12        The tracking comes in when you sell or share that with

13   another party and that data leaves -- the user thought it was

14   being used for -- and then gets bought by data brokers or used

15   for other purposes away from the company you thought you let

16   have it.  That's where the term "tracking" comes in.  It's

17   about the buying and sharing of data with other parties.

18   Q.   And if you're vacationing in Paris, I guess is the example

19   that was used, how does -- tell us about the way in which the

20   iPhone knows that an iPhone user is now vacationing in France.

21   A.   So one of the features we have had for many years on the

22   App Store is the idea that you want to find apps around you.

23   Let's say you are on a vacation in Paris, and you open up the

24   App Store, you might be interested in French/English

25   translation app.  You might be interested in an app for

SCHILLER – REDIRECT / DOREN

1    visiting the Louvre.

2        So the ability to give you apps around where you are is a

3    discovery feature for developers at Apple that makes sense for

4    users.

5    **Q.**   And does your iPhone tell Apple or anyone else what street

6    corner you are standing on in Paris?

7    **A.**   No.

8    **Q.**   How does that work?

9    **A.**   Again, the data is anonymized.  The data -- much of it

10   stays on-device.  The data is aggregated to gross areas like a

11   major city or country so that it can properly give you what

12   you need.  It isn't about your individual location.

13   **Q.**   And when an iPhone user submits payment information, a

14   credit card number to Apple, how is that information stored?

15   **A.**   There is a payment processing system.  Again, I'm not the

16   expert of all that.  That's part of the commerce engine.  And

17   it's stored there in a secure manner.  And using technologies

18   like our Apple pay, we are even able to transact without your

19   credit card number being shared with a vendor in order to make

20   that transaction happen.  There's a bunch of processes around

21   protecting user privacy with payment transactions.

22   **Q.**   Do any Apple employees have access to that information?

23   **A.**   No.

24   **Q.**   Does Apple ever sell data?

25   **A.**   No.

SCHILLER - REDIRECT / DOREN

1   **Q.**   Does Apple ever share its data with data brokers?

2   **A.**   No.

3   **Q.**   And to the -- and are there -- and to the extent that a

4   user wishes to opt out of certain aspects of that data

5   collection, can they do that?

6   **A.**   Yes.  One of the great regulations is in Europe for data

7   protection that we apply worldwide to give the users, first of

8   all, the ability to remove their data from services.  And I

9   think that's been a great advancement to the whole world.

10          In addition, whenever you set up your iPhone or you set up

11  new services, there are choices that the user makes whether to

12  allow personal information to be used or not to personalize

13  those services, and Apple requires of ourselves the same thing

14  we do of all developers to follow the same processes to ask

15  for permission.

16  **Q.**   Thank you.

17          And you testified briefly about something that the

18  initials are ATT.

19          Do I have that right?

20  **A.**   Yes.

21  **Q.**   What is that?

22  **A.**   It's one of our newest privacy features called App

23  Tracking Transparency.

24  **Q.**   And if Apple tracked you, would that trigger the App

25  Tracking Transparency element of the iPhone?

SCHILLER – REDIRECT / DOREN

1  **A.**  Absolutely.

2  **Q.**  And what would the result of that be?

3  **A.**  The general idea of App tracking transparency, again, the

4  key word being "Tracking," is that if a developer, including

5  Apple, wanted to share or sell your personal information with

6  another party, you need to ask your permission before they do

7  so.  They can do it if the user gives permission.

8  **Q.**  Sir, if you could please look at -- let me make sure I

9  picked the right binder here first.

10     If you could look at your large binder that Ms. Forrest

11  provided you, and within that exhibit PX842.

12  **A.**  I have that.

13  **Q.**  And if you could please take a moment to refamiliarize

14  yourself with that document.

15  **A.**  Yes.  I see this document.

16  **Q.**  You see that you're one of the participants in this email

17  chain from December 2019?

18  **A.**  I am.

19  **Q.**  And at the bottom of that -- at the bottom of page 1,

20  Mr. Federighi writes:

21          "Our primary strategy here is to eliminate the use of

22          user-entered passwords, i.e., if the user does not

23          know a password to enter into a phishing site, they

24          can't be phished for it.  We are doing this in two

25          ways, password auto generation and autofill in

SCHILLER – REDIRECT / DOREN

1              Safari, in sync via iCloud keychain and secondly

2              Sign-in with Apple."

3         Do you see all of that?

4    **A.**  I do.

5    **Q.**  What was going on here?  What was this initiative, if you

6    will, in December of 2019?

7    **A.**  This email begins with a news story that Tim Cook saw

8    about phishing emails, which I think we all know is a scourge

9    on the world, all the emails we get that are spam, try to

10   steal your information and get your log-ons from websites and

11   services.

12        And Tim is asking, is there something we can do that's

13   competitive for Apple to be the best at helping stop phishing

14   spams from attacking our users.

15        Craig is responding with one of the best ways to do that

16   is to actually do a good job of protecting people's passwords

17   and making sure that those aren't easily given up to a

18   phishing scam.  Secondly, if we can have a way to set up your

19   email with services where that your personal email is actually

20   protected from the email used by that service to send you

21   things, then that gives you control later on of those phishing

22   attacks as well.  Because you can just change them, you don't

23   have to change your own email, which is the sign-in with Apple

24   service.

25        It's about those features.

1    **Q.**   Thank you.

2         And in the -- going over -- continuing on page 2, rather,

3    you were shown the sentence in the paragraph that begins "as

4    for providing."

5         Do you see that?

6    **A.**   Yes.

7    **Q.**   You were shown at least half of that.  It says:

8              "As for providing a long term competitive advantage

9              while use of these features is likely to make our

10             platform more sticky, the capabilities themselves are

11             unlikely to be protectable differentiators."

12        And then it goes on to say colon:

13             "Heavy users of Chrome and the Google ecosystem, for

14             instance, are likely to use the Google password

15             manager."

16        What did you understand Mr. Federighi to be telling you

17   with that sentence?

18   **A.**   He's simply pointing out that in terms of any advantages,

19   users may like to use our platform because it helps to protect

20   their password, but in truth, users of Google's ecosystem will

21   also get some good password management features as well, and

22   they will be good at it, too.

23   **Q.**   By the way, did Apple put this initiative in whole or in

24   part in place?

25   **A.**   Yes.

SCHILLER – REDIRECT / DOREN

1   **Q.**   And did it do that to stay competitive with Google and

2   others?

3   **A.**   Did it primarily because we are all worried about this

4   security risk for all of us as users.

5   **Q.**   When Mr. Federighi said that these features were likely to

6   make our platform more sticky, what did you take him to mean?

7   **A.**   Simply that if the users are better protected from

8   phishing scams on our systems, they are going to want to use

9   our systems to help protect them.

10  **Q.**   At the end of this paragraph, Mr. Federighi says, again,

11  on our devices access to these logins will be protected by

12  face ID/touch ID, but Google will offer some analogous

13  capability.

14      Correct?

15  **A.**   Yes.

16  **Q.**   I believe Ms. Forrest referred to this as the ultimate

17  plan document.  Assuming she's right, what was the plan here?

18  **A.**   If there's any plan here, it's simply to come up with new

19  features to help protect users from security and privacy

20  scams.

21  **Q.**   You also got a few questions about iMessage.  What is

22  iMessage?

23          **THE COURT:**   Can I just ask:  Can you use Google

24  password manager on the iPhone?

25          **THE WITNESS:**   You may.  I honestly don't know if they

1    have delivered a version.  There are cross-platform platform

2    managers.  The most popular one is called One Password.  It

3    works on iOS and Android and Mac and other platforms.

4            **THE COURT:**  What do you use?

5            **THE WITNESS:**  I use both the One Password as well as

6    Apple's built-in password storage features.

7            **THE COURT:**  Okay.

8        Go ahead, Mr. Doren.

9            **MR. DOREN:**  Thank you, Your Honor.

10   **BY MR. DOREN:**

11   **Q.**  Mr. Schiller, I was pivoting to iMessage.

12       Can you please describe what that is?

13   **A.**  iMessage is a communications service that Apple runs.

14   **Q.**  And does it -- is it something involved in the text

15   messaging part of my phone?

16   **A.**  Exactly.  Yes.

17   **Q.**  And so I've heard of SMS.  Can you tell us what SMS is?

18   **A.**  Sure.  Short message system.  It's an industry standard

19   protocol for sending messages primarily run by carriers and

20   they connect between different phone services.

21       So I think we are all used to the idea that on your phone,

22   even before smartphones, you could send a text message to your

23   family and friends, and SMS is the format for doing that.

24   **Q.**  And does iPhone with iMessage, does it receive -- is it

25   capable of receiving and responding to SMS messages?

SCHILLER - REDIRECT / DOREN

**A.**   Yes.

**Q.**   And so what is so special about iMessage?

**A.**   There are a lot of things special about it.

The way it started was, built into the iPhone was an app called messages.  And messages used SMS.  Just as I described, you can send messages back and forth.  The messages app added a second protocol, Apple's iMessage service, that we run on our servers.

So when I message with someone else, the two devices connect with each other.  And if they are different, it sends an SMS.  And if they are both iPhone or Apple-related devices, then it will send an iMessage and that gives added features.

So your question, if features where you can do more advance things with what we call Memoji.  They're 3D avatars of your face.  So rather than just a smiley face Emoji, you can send a more advanced Memoji that's based on AR of your face.

Or you could do what's called a slam and send -- your whole screen gets confetti if you want to give somebody congratulations.  There are a number of features that we have done unique for us in iMessage.

**Q.**   Is there an encryption element to it?

**A.**   Yes.  One of the benefits we were able to create with iMessage is complete end-to-end encryption for the users.

**Q.**   And with that encryption feature, can Apple access the

1   contents of its user's iMessages?

2   **A.**  No.

3   **Q.**  Because they are encrypted?

4   **A.**  Exactly.

5          **THE COURT:**  But there is no encryption with respect

6   to the others?

7          **THE WITNESS:**  SMS I do not believe has any

8   encryption.  There may be some work just called On The Wire,

9   Over The Air, but as it's stored, no.

10  **BY MR. DOREN:**

11  **Q.**  And having learned this myself over the course of this

12  case, how do you tell if you are receiving a message from an

13  Android device or an iPhone?

14  **A.**  The bubble that the message shows in is green if it's

15  using SMS and blue if it's using iMessage.  So the color is

16  different.

17  **Q.**  Other than that, in terms of receiving the message that

18  was sent, is there any difference?

19  **A.**  For text messaging, no, it supports the same kind of

20  experience.

21  **Q.**  If in a family, some people have Android phones and some

22  people have iPhones, are they able to communicate through

23  SMS messaging?

24  **A.**  Yes.

25          **THE COURT:**  Do you have a different protocol for

iPads versus iPhones?

**THE WITNESS:**  No.  It's the same.

**BY MR. DOREN:**

**Q.**  And why did Apple put the work in to create iMessage?

**A.**  We thought it created an extra experience for our users

that was unique and fun and better.  So we wanted to create a

unique feature for our customers who use our products.

**Q.**  If I can ask you, sir, please take a look now at PX2316

again in the large binder.

**THE COURT:**  One more follow-up on that.

**MR. DOREN:**  Of course.

**THE COURT:**  Who were you competing with when you

developed that?

**THE WITNESS:**  When we were developing it, I think it

was Blackberry Instant Messenger was the thing best known at

the time as a messaging service unique to their devices.

**THE COURT:**  Okay.  Thanks.

**BY MR. DOREN:**

**Q.**  Mr. Schiller, I'll ask you to look at 2316PX.

**A.**  Yes.

**Q.**  And this is an email from you to Steve Jobs on

November 20th, 2009.

Do you see that?

**A.**  Yes.

**Q.**  And this is in response to an email from a third party,

1   someone outside of the company, correct?

2   **A.**   Yes.

3   **Q.**   And you write to Mr. Jobs:

4           "We'll investigate these two app complaints and

5           resolve them.  In the end, it all really comes down

6           to whether we will ever open up the iPhone for

7           developers to distribute apps on their own, bypassing

8           our store."

9       And then down at the bottom -- and you were shown these

10  sentences during your cross-examination -- down at the bottom

11  it says:

12          "Also, it's very long and complicated, but I think

13          there will come a time where we are better served to

14          publish our guidelines at least we would be more

15          transparent and some of the issue would be reduced."

16      Do you recall this document?

17  **A.**   Yes.

18  **Q.**   Now at the top where you say, in the end, it all really

19  comes down to whether we will ever open up the iPhone for

20  developers to distribute apps on their own bypassing our

21  store, what were you thinking?  What were you communicating

22  here?

23  **A.**   That there is no perfect system; that we're going to do

24  our best to maintain safe users and a fair place for

25  developers, and that there will always be something that takes

SCHILLER - REDIRECT / DOREN

1   longer than we like or there's an accidental rejection that we

2   need to re-review again.

3       And unless you just want the developers to put whatever

4   they want on the phone, that's a byproduct of trying to do a

5   good job reviewing apps.

6   **Q.**  And did Apple ever consider once the original plan had

7   been put in place, or once the business model had been

8   created, did Apple ever consider opening up the iPhone for

9   developers to distribute apps on their own bypassing your

10  store?

11  **A.**  No.

12  **Q.**  Sir, I would ask you to take a look, please, at Exhibit

13  PX56A, which is towards the front of the same binder.  And it

14  was identified as the 2010 App Review Guidelines.

15      Let me know when you are there.

16  **A.**  Yes, I am there.

17  **Q.**  And the second bullet point from the front of the first

18  page, during cross-examination you were shown:

19              "If your app is rejected, we have a review board that

20              you can appeal to.  If you run to the press and trash

21              us, it never helps."

22      First of all, has this been in the guidelines any time

23  recently?

24  **A.**  No.

25  **Q.**  What was the purpose of this point?

**A.**   Around the time that we were putting out this update to the guidelines, I recall we had a few incidents where some developers had decided to go to the press with complaints about App Review but their recounting of it was less accurate than I think it could have been.  And all the facts weren't shared.

We decided that we did not want to ever get into a battle with developers in the press and say, no, that's not true, and best just let it be.  So Steve felt that it was -- it was a helpful thing to put in this writing that if you just run to be the press and trash us, it's not going to help us get the job done and work together.  That's what his intention was, what he asked me to put in the guidelines.

**Q.**   How long did that provision remain in the guidelines?

**A.**   I don't remember exactly how long.  I know when we re-setup the guidelines in at least 2016 it was gone.  It may have been gone before that.

**Q.**   Thank you.

If I could ask you, please, now to turn to Exhibit PX0879.  And this is another long ago and far away email from you to Mr. Forstall with a copy to Mr. Jobs, Mr. Joswiak, and Okamoto in August of 2008.

Do you see that?

**A.**   Yes.

**Q.**   And, again, you were asked to read the paragraph just

SCHILLER - REDIRECT / DOREN

1    below the large gap in the middle of the page, and you wrote,

2    you're right, Android will be completely open.

3        By the way, was this just about the time or shortly after

4    Android came to market?

5    **A.**   I think it might have been just before the -- the then

6    version of Android that was going to be like iPhone was coming

7    out.

8    **Q.**   You write:

9            "You're right.  Android will be completely open.  It

10           will also be open source and maybe free to handset

11           makers to change and ship."

12       That ended up being their business model, correct?

13   **A.**   Yes.

14   **Q.**   And you go on to say:

15           "I don't see how we can make anything like their

16           license and business model."

17       Do you recall that -- having that thought back in 2008?

18   **A.**   Sure.

19   **Q.**   And what was that thought?  Can you embellish on that,

20   please?

21   **A.**   Just that we weren't going to put iOS into open source

22   for other headset makers to make phones with our software.

23   **Q.**   Why didn't you want to do that?

24   **A.**   Because these were the features of the iPhone.  This is

25   the operating system that created the whole experience that we

SCHILLER - REDIRECT / DOREN

1    thought would be unique to us and a value to our product.

2    **Q.**  If you could please take a look, sir, at PX0890, a bit

3    further forward or toward the back, if you will, of your

4    binder.

5    **A.**  Yes.

6    **Q.**  And PX0890 is an email from Steve Jobs to Scott Forstall

7    with a copy to you, correct?

8    **A.**  Yes.

9    **Q.**  And -- from June 2008, correct?

10   **A.**  Correct.

11   **Q.**  And you were asked about this email which -- in which,

12   Mr. Jobs says:

13       "When they have contacts in their app, these are only the

14   contacts on the iPhone and not a merge of contacts from

15   Google, right?  I think it would be a really bad idea for

16   something that looks like contacts to have contacts not on

17   that iPhone and could lead to people not using our contacts

18   app at all.  We may want to limit this in the license."

19       You were asked about this on cross-examination but not

20   given an opportunity to explain.  Can you describe what was

21   being discussed in this email?

22   **A.**  Yes.

23       We were -- well, there's a bunch of things going on.  We

24   were working with Google on our maps application.  So that's

25   why we were meeting with the Google team on creating maps.

1       In addition to that, Google was beginning to make a number

2   of applications on iPhone.  And one of those applications was

3   going to have contacts in it.  It was the first time we were

4   met with the thought that you would end up with two contact

5   apps in your phone, maybe one from Apple that was built into

6   your phone and one from Google, and that when you went into

7   one contact app, you might not see the contacts from the

8   other, and that would be really a bad user experience.

9       And so we had many discussions about what's right here,

10  what do we do.  And that was the point -- it was brand new

11  thought.  We hadn't thought when we made the iPhone there

12  would be another contacts app, and these things wouldn't have

13  the same contacts in them.

14  **Q.**  How was this resolved?

15  **A.**  We let it go.  Many contacts apps you can have on the

16  iPhone.  There's no license limitation to that.  And it's

17  okay.  It worked out great.

18  **Q.**  So this was a thought, and you were kicking the idea

19  around but no limitation was put in place?

20  **A.**  Exactly.

21  **Q.**  If you can please take a look at PX0505.

22      And this is an October 10th, 2008 email from Mr. Jobs to

23  you.  And the subject is Google working to target iPhone ad

24  market.  And Mr. Jobs wrote:

25          "Actually, the more energy they devote to iPhone, the

SCHILLER – REDIRECT / DOREN

better and the more dependent they are on our choices

the better.  For example, we could choose to provide

an ad API for developers using a Microsoft ad

platform back in, and where would Google be then?"

Can you describe what's going on here?

**A.**  Again, early days here, brand new platform, brand new

things happened that no one had ever seen.  As you know, we

allowed for developers to make money in their apps with

advertising without Apple being involved at all.

And this is a first news story saying and Google is going

to start to build an app platform for developers for iPhone.

And so this is discussion around this first realization and

idea that Google will be doing that.

**Q.**  And to the extent there is an issue here, how was it

resolved?

**A.**  Nothing was done.  Google made an app platform as did

others.  Apple did not create an API for that, and it just

became the market we all know today.

**Q.**  And has Google ever been dependent on the choices that

Apple makes?

**A.**  No.

**Q.**  By the way, Mr. Forstall is on this email.  Is

Mr. Forstall with Apple any longer?

**A.**  No.

**Q.**  How long ago did he leave the company?

SCHILLER – REDIRECT / DOREN

1    **A.** I'm sorry, I don't remember the exact year.  Was it 2016?

2    Or somewhere around there.

3    **Q.** Thank you.

4    There was also some discussion around switching.  And you

5    may recall, sir, that the only topic around switching that you

6    were asked about was movies.

7    Do you remember that?

8    **A.** Yes.

9    **Q.** Do you recall being asked about the difficulties of

10   switching when it came to any other aspect of moving data or

11   anything else over to an Android operating system device?

12   **A.** No, I was not.

13   **Q.** And as to the movies, that would, as I understood the

14   discussion, relate solely to movies that were actually

15   purchased and downloaded.

16   Was that what you were discussing with counsel?

17   **A.** Yes, that is what we discussed.

18   **Q.** As opposed to anything that was streaming, such as Netflix

19   or anything else like that?

20   **A.** Correct.

21   **Q.** And as to those purchased movies, could they still be,

22   after the move to an Android device, could they still be

23   viewed on a PC through an app store or Apple TV app?

24   **A.** Sure.  We have Apple TV available on other platforms for

25   content you purchase through Apple.

SCHILLER - REDIRECT / DOREN

1    **Q.**  And that would include other Apple devices, correct?

2    **A.**  Yes.

3    **Q.**  And would it also include Window operating system PCs?

4    **A.**  Yes.

5    **Q.**  You also had a discussion with counsel about

6    subscriptions.  And at least from my vantage point over here,

7    the structure of the subscription program got a bit muddled

8    for me.  So I was hoping we could clear that up.

9        First of all, can you walk us through how, from 2011

10   forward, subscriptions work if the subscription is purchased

11   through a publisher's website?

12   **A.**  If you purchase a subscription at a publisher's website,

13   say you go to *The New York Times* and purchase a subscription

14   there, download the app on our device, you can get that

15   subscription and consume that content regardless of whether

16   *New York Times* chooses or doesn't choose to offer in-app

17   purchases or subscriptions in the app.

18   **Q.**  And I'm sorry if I missed this, but can you then read it

19   on your iPhone without Apple receiving any compensation?

20   **A.**  Yes, you can.

21   **Q.**  How does that work?

22   **A.**  Typically these websites, when you set up your

23   subscription, you set up an account usually through your email

24   address.  When you load the app on your device, you put in

25   your email address, and they give you access to the same

SCHILLER - REDIRECT / DOREN

1    content that you've already paid for.

2    **Q.**  And there was also discussion about what these

3    subscription feature when it was introduced, what

4    additional -- what service that provided to a publisher.

5    Can you please describe kind of the before and after

6    picture of the subscription initiative?

7    **A.**  Yes.

8    Before we officially launched subscriptions, you could

9    subscribe for content with in-app purchase but it was

10   nonrecurring.  It was a one-time purchase, and then you would

11   have to purchase again.

12   The big request from developers and of all types, games as

13   well as content, was to create a feature that was for

14   recurring subscriptions.  So there's the developer, you could

15   set up your price points and say the user can pay for it on a

16   weekly, a monthly, an annual basis, whatever your product is;

17   and then when the user signs up, they get that recurring

18   subscription, they get a notice from Apple, hey, you have now

19   subscribed to this, this is how much you will be billed, then

20   when it comes time to renew, let's say I did monthly, at the

21   end of the month, I'm going to see another bill that says you

22   are automatically renewed again so you have an awareness that

23   you are going to get billed again, but it's now automatically

24   renewing which is what many developers like in a subscription

25   program.

SCHILLER - REDIRECT / DOREN

1   **Q.** And you were asked some questions about the remedy being

2   sought by Epic here.  Have you read the injunction language

3   that Epic has submitted to this Court?

4   **A.** I did back when that all occurred.

5   **Q.** Back in the fall of 2020?

6   **A.** Yes.

7   **Q.** I now mean, sir, have you reviewed the language drafted by

8   Epic for the relief that it is seeking through this trial from

9   the Court?

10  **A.** No, I have not.

11  **Q.** So you don't actually know what request they have made to

12  this Court, correct?

13  **A.** I do not.

14  **Q.** Now, Ms. Forrest suggested to you that the relief being

15  sought did not attempt to limit App Review, correct?

16  **A.** Correct.

17  **Q.** But she also suggested that the relief being sought would

18  at least include having stores within stores, correct?

19  **A.** Yes.

20  **Q.** And how would having stores within stores impact App

21  Review?

22  **A.** Well, clearly, if there is a store within a store, all the

23  apps and services that are delivered through those stores are

24  not reviewed by App Review.

25  **Q.** And so, in fact, it would eliminate App Review to the

1   extent that third parties decided to put stores within the App

2   Store; is that fair?

3   **A.**   Yes.

4       And, further, we've tried on every rule of the App Store

5   to try to make rules that apply to all developers.  So the

6   part that we keep talking about adding stores within stores,

7   for me, it means an unbounded number of stores within stores.

8   Because if there's a rule that allows stores within stores, it

9   allows every developer to be a store within a store if they

10   choose to because it applies to all developers, big and small.

11       And so I don't know how this scales.  I don't know the --

12   how the idea of unreviewed apps within other apps in endless

13   amount of times can be reviewed and managed.

14   **Q.**   And Ms. Forrest also asked you whether -- about what they

15   wished to have or not have regarding IAP and whether it would

16   remain in place, correct?

17   **A.**   Correct.

18   **Q.**   And she suggested to you that perhaps third parties should

19   be permitted to have their own payment mechanism within the

20   App Store, correct?

21   **A.**   Yes.

22   **Q.**   And as a businessman, sir, do you have any objection to

23   that?

24   **A.**   Certainly.  I have a number of issues with that idea.

25   **Q.**   What are your issues?

SCHILLER – REDIRECT / DOREN

1 **A.** Well, first, I do think users value the features we

2 provide through in-app purchase that allow you to know what

3 purchases have occurred, manage those purchases, cancel

4 subscriptions, use apps to buy, use parental controls, on and

5 on.  There are a number of features that all work because it

6 all works and connects with that commerce engine.

7   Secondly, it matters to our -- all the Apple care agents

8 that handle refunds.  We've got 5,000 agents users call

9 looking for support for their refunds.  If Apple actually

10 didn't manage those transactions, it's just harder for us to

11 support that as well.

12   And we lose the ability to understand a number of the

13 fraud vectors that our fair team manages to look for,

14 fraudulent credit cards, fraudulent transaction across

15 applications, and so we'll just do a less good job for

16 customers there as well.

17   There are a number of ways it certainly concerns me.

18 **Q.** Sir, at the very beginning of cross-examination, you were

19 shown various licenses from other developers that were

20 disclosed within the iPhone documentation.

21   Do you recall that?

22 **A.** Yes.

23 **Q.** First of all, does Apple participate itself in any open

24 source projects?

25 **A.** Yes.

SCHILLER - REDIRECT / DOREN

1   **Q.**  Can you describe that, please?

2   **A.**  Well, open source projects allow you to collaborate with

3   the project creators on pieces of software.  Many of them are

4   Unix-based code repositories, they're server-based programs

5   for managing large scale deployments of software.  That's

6   where we see many of the projects we get involved in.

7       Often you contribute back to those projects.  It's not

8   just one directional.  You can provide changes and fixes back.

9   So having a large company like Apple or any other large

10  company take part in an open source project means that there's

11  a lot more bug fixing that can occur and support for that.

12      Two of the projects that we ourselves run, and there's a

13  number of them have been brought up, Darwin, so that's a core

14  operating system is an open source project that other

15  companies can build from the core operating system as well,

16  and Webkit, which is the basis for our web browser Safari is

17  an open source project.

18      Google's Chrome took from the same -- some of the same

19  source repositories to make Chrome.  It's a resource that we

20  contribute back to, our engineers work on, and share with

21  others.

22  **Q.**  We've seen examples of Apple's work in mechanical learning

23  and in augmented reality.

24      Does Apple participate in any open source or I'll call it

25  communal, for lack of a better term, research in those fields?

1  **A.**  Absolutely.  Our engineers are encouraged to publish

2  papers and share some of the original research and finding.

3     I know in particular the machine learning team has done a

4  lot of work taking part in conferences and sharing the

5  original research work they do with other machine learning

6  researchers.

7  **Q.**  To the extent Apple has received open source software or

8  code from other developers, does it build and improve around

9  that with its own technology and innovation?

10  **A.**  Certainly.

11     **MR. DOREN:**  Thank you, Mr. Schiller.  I pass the

12  witness, Your Honor -- wait.  I'm sorry, Your Honor.

13          (Pause in the proceedings.)

14  **BY MR. DOREN:**

15  **Q.**  Just one last question, sir.

16     **MR. DOREN:**  And, again, it's my turn, Your Honor, to

17  say one more.  I apologize for that.

18  **BY MR. DOREN:**

19  **Q.**  Mr. Schiller, in terms of -- again, back to switching for

20  a minute, in terms of moving movies purchased via Apple TV,

21  can those be transferred out of that app service through a

22  third-party service?

23  **A.**  There are a number of third parties, yes, that help users

24  migrate some of the content especially where their license

25  allow it to.

SCHILLER – RECROSS / FORREST

1   **Q.**  Are you familiar with an entity called Movies Anywhere?

2   **A.**  Yes, I've heard of it.

3   **Q.**  And can you tell me how that process works?

4   **A.**  I haven't used it myself, so I don't want to pretend to be

5   an expert on it.  I've heard of it.  I know it works, but I

6   haven't used it.

7       **MR. DOREN:**  Understood.  Thank you very much, sir.

8       Thank you, Your Honor.

9       **THE COURT:**  Recross.

10      **MS. FORREST:**  Yes, Your Honor.  If it is acceptable,

11  I will hand up three documents at the same time which I will

12  use seriatim.

13      **THE COURT:**  Okay.

14              **RECROSS-EXAMINATION**

15  BY MS. FORREST:

16  **Q.**  For the record, I've handed up for identification

17  Plaintiff's Exhibit 1818, Plaintiff's Exhibit 1813, and

18  Plaintiff's Exhibit 1815.

19      We'll start, Mr. Schiller, with PX1818 when you have had a

20  chance to take a quick look at it.

21      Do you see that it's a document addressed to you, among

22  others, from Mr. Haun, H-A-U-N, dated 3rd of March, 2009?

23  **A.**  Yes.

24  **Q.**  And do you see -- you have no doubt that you received

25  this?

1   **A.**   I do not.

2          **MS. FORREST:**   Your Honor, we would seek to admit

3   PX1818.

4          **MR. DOREN:**   No objection.

5          **THE COURT:**   Admitted.

6          (Plaintiff's Exhibit 1818 received in evidence)

7   **BY MS. FORREST:**

8   **Q.**   Do you see this 3, March 2009 document predates the

9   announcement of the Apple IAP by a couple of weeks?

10  **A.**   It does.

11  **Q.**   And do you see here in the first paragraph it says:

12          "Kindle reader app for iPhone, iPod touch is ready

13          for release.  Since they originally submitted they've

14          changed their app to mesh with out T's and C's"?

15      Do you understand that to be terms and conditions?

16  **A.**   Yes.

17  **Q.**   And it says they have removed their in-app commerce.

18      Do you see that?

19  **A.**   Yes.

20  **Q.**   And then it talks about them going on, and, instead, now

21  go to Safari.  And the standard website for purchasing

22  anything from Amazon.

23      Do you see that?

24  **A.**   I do.

25  **Q.**   Does that refresh your recollection that there was, in

SCHILLER – RECROSS / FORREST

1    fact, in-app commerce opportunities that were available for

2    certain apps in the App Store prior to IAP being formally

3    launched by Apple later in March of that year?

4    **A.**  No, that isn't what occurred here.

5    **Q.**  Okay.

6    **A.**  I will be happy to explain it if you like.

7    **Q.**  If it doesn't refresh your recollection, that's okay.

8    **A.**  I have a perfect recollection of it.

9    **Q.**  I'm going to go on -- let me go on to the next one.  All

10   right?

11            **THE COURT:**  Mr. Doren will give you an opportunity.

12            **THE WITNESS:**  Thank you.

13            **MS. FORREST:**  If it's of any importance to him.

14   BY MS. FORREST:

15   **Q.**  So PX1813, do you see this document?

16   **A.**  Yes.

17   **Q.**  All right.  You know who Shaan Pruden?

18   **A.**  Yes.

19   **Q.**  You also know who Mr. Okamoto is?

20   **A.**  Yes.

21   **Q.**  You see this document is dated 9, February, 2009?

22   **A.**  I see that.

23   **Q.**  Both of those individuals were employees of Apple; is that

24   right?

25   **A.**  Yes.

1          **MS. FORREST:**  Your Honor, we would offer PX1813 as a

2     business record.

3          **THE COURT:**  No objection?

4          **MR. DOREN:**  No objection, Your Honor.

5          **THE COURT:**  Admitted.

6          (Plaintiff's Exhibit 1813 received in evidence)

7     **BY MS. FORREST:**

8     **Q.**  Turn, if you would, please, to Bates number 928 at the

9     bottom.

10         And do you see second bullet from the top it says:

11              "Skyscape, need to remove in-app commerce

12              capabilities.  Working to have them change their

13              model for providing medical reference."

14         Do you see that?

15    **A.**  I see that.

16    **Q.**  You see that the front of the document is dated 9,

17    February, 2009?

18    **A.**  Yes.

19    **Q.**  Does this document refresh your recollection in any way

20    that there were in-app commerce opportunities prior to the

21    announcement by Apple in later November 2009 of their own IAP

22    service?

23    **A.**  No, I wasn't included on this.  I don't know what that

24    commerce capability means.

25    **Q.**  Okay.  Let's turn to PX1815, which is dated 23, February,

SCHILLER – RECROSS / FORREST

1    2009.  It's from Bob Borchers, B-O-R-C-H-E-R-S.  And he has an

2    Apple email address.

3         Do you see that?

4    **A.**  Yes.

5    **Q.**  And it's to Mr. Joswiak?

6         Do you see that?

7    **A.**  Yes.

8    **Q.**  And Mr. Forstall.

9         Do you see that?

10   **A.**  Yes.

11   **Q.**  And do you see that in the -- on the first page,

12   underneath "Hi Bob," it says I'm not --

13            **MS. FORREST:**  Your Honor, I would offer PX1815 as a

14   business record.

15            **MR. DOREN:**  No objection.

16            **THE COURT:**  Admitted.

17         (Plaintiff's Exhibit 1815 received in evidence)

18   **BY MS. FORREST:**

19   **Q.**  It says in the first page of PX1815, it says:

20            "Hi Bob, I have not heard back re the executive --

21            exec proposal.  On getting the revised Kindle app

22            they removed the in-app commerce.  They were in final

23            QA this weekend and they found a bug so they aren't

24            ready to upload."

25         Do you see that?

SCHILLER – REDIRECT / DOREN

1    **A.**  Yes.

2    **Q.**  Does that refresh your recollection that there was, in

3    fact, in-app commerce opportunities available for developers

4    prior to the launch of Apple's IAP in November of 2009?

5    **A.**  No.  I recall this differently than you're describing it.

6    **Q.**  All right.  So as you sit here today, it is your testimony

7    that there were not in-app commerce opportunities that

8    developers availed themselves of in their own way --

9    **A.**  For --

10   **Q.**  -- prior to November 2009, mid-November?

11   **A.**  For digital goods and services consumed on iPhone, yes.

12   **Q.**  All right.

13           **MS. FORREST:**  Nothing further, Your Honor.

14           **THE COURT:**  Redirect.

15       **MR. DOREN:**  Thank you, Your Honor.

16                    **REDIRECT EXAMINATION**

17   **BY MR. DOREN:**

18   **Q.**  Mr. Sweeney -- I've been waiting for three days to do

19   that.  I am sorry, sir.

20       And I am sorry, sir.

21       Mr. Schiller, if I could please direct your attention to

22   exhibit number 1818.

23           **THE COURT:**  Actually, I don't feel so bad now about

24   calling you Ms. Dunn.

25           **MR. DOREN:**  It didn't make much of an impression on

1    me at the time, Your Honor.  It was just fine.

2    **BY MR. DOREN:**

3    **Q.**  Do you have exhibit number 1818 in front of you?

4    **A.**  Yes.

5    **Q.**  And you mentioned that you recall this situation well.

6         Do I have that right?

7    **A.**  That's correct.

8    **Q.**  Can you please describe what was going on around the

9    Kindle reader in the spring of 2009?

10   **A.**  Yes.  The -- Amazon had a device called the Kindle reader.

11   And -- for reading books and magazines.

12        And we have always allowed in our App Store apps that

13   allow the developer to sell digital content that isn't

14   consumed on iPhone, but consumed somewhere else, on another

15   device.  Similar to we talked about with the Xbox app that

16   lets you buy or play or stream games from your Xbox.  There

17   was another device, the pebble watch, that allowed you to buy

18   apps on the phone to put on your pebble watch.

19        In those cases we don't take a commission because it's not

20   being consumed on our product.  That's just the view we have

21   always set up from the very beginning.

22        When the Kindle app was put on iPhone from Amazon, Amazon

23   assured us that the purchase of books was for the Kindle, not

24   for people to read on the iPhone.  They didn't expect anybody

25   to read books on an iPhone.  So that's why they put it in the

SCHILLER - REDIRECT / DOREN

1    store for that purpose to buy books, without commission to

2    Apple to read on your Kindle.

3        Later, people did start to read their books on the iPhone.

4    And when that changed, then they started to become a concern

5    for fairness to all other developers who, when they buy --

6    when consumers buy digital content to consume on the device,

7    need to use our commerce model.  And so we told Amazon, now

8    that you do have an app that users are starting to read on

9    their iPhone, you need to follow the same rules as everyone

10   else.  This isn't just for putting on a Kindle.

11       So they changed, and that is where the reader rule came in

12   because they wanted a rule that said, all right, we will buy

13   it on the Kindle and consume it on the iPhone, different

14   model, but we don't want to use your purchase methods to do

15   it.  So we said, again, we won't make a rule just for Amazon,

16   we have to make a reader rule for any developer who wants to

17   do the same thing.

18       So that's what occurred during all of this.

19   **Q.**  So to unpack that just a little bit, turning to kind of

20   the original model, if you will, with Kindle.

21   **A.**  Yes.

22   **Q.**  Was the idea that people would be purchasing Kindle books

23   through the iOS app but then reading them over on the

24   Kindle?

25   **A.**  Exactly.

SCHILLER – REDIRECT / DOREN

1   **Q.**   And why -- and did Apple expect to or request a commission

2   on those transactions?

3   **A.**   No.

4   **Q.**   Why not?

5   **A.**   Because, again, the digital content is not being consumed

6   by users of our products on our products.

7   **Q.**   And then subsequently, people began to read books on

8   their iPhones; is that right?

9   **A.**   Yes, exactly.  And Amazon started to encourage it, which

10  is fine, but they have to then follow the rules that all

11  developers follow.

12  **Q.**   How did the fact that Kindle readers, those who read on

13  Kindle, began to read their books on their iPhone change the

14  dynamic?

15  **A.**   That then, to be fair to all developers, they need to use

16  our same purchase models and apply the same commission.

17  **Q.**   And at that point, what did you tell Amazon had to happen?

18  **A.**   They had to change the app to either not allow the reading

19  of the books on the iPhone so that it stays with consumption

20  on the Kindle, or if they allow the reading, they have to use

21  one of our rules for how that business model works.

22  **Q.**   And back here in the -- in Exhibit 1818 and also 1815,

23  regarding discussions around Kindle in February and March

24  2009, what do you understand the references to in-app commerce

25  to be?

1    **A.**  Well, back then they wanted to do something with in-app

2    commerce and there was no model yet, so they went to the

3    reader rule, and that's what they had to do.

4             **MR. DOREN:**  Thank you, Mr. Schiller.

5             **THE COURT:**  Anything on that?

6             **MS. FORREST:**  Nothing further, Your Honor.

7             **THE COURT:**  Okay.

8                          **<u>EXAMINATION</u>**

9             **THE COURT:**  Earlier today, Mr. Schiller, you

10   mentioned or you were asked by Ms. Forrest about the new

11   program for podcasts, and that was actually referenced in an

12   article by the economist recently with some other content

13   issues.

14        Could you -- you then said, though, that it didn't relate

15   to the App Store.  Could you explain that to me?

16            **THE WITNESS:**  Yes.  Simply we were talking at that

17   point about the different ways Apple makes money off the App

18   Store.  And the podcast service is a separate service from the

19   App Store.  So it isn't really related to the App Store in

20   terms of a revenue business at all.

21            **THE COURT:**  But if -- people go to your App Store to

22   download podcasts.

23            **THE WITNESS:**  That's one way to get it, yes.  You can

24   get it on your phone automatically from the beginning or

25   download it, yes.

1       **THE COURT:**  Okay.  And you're going to allow them to

2  have subscribers; and how do they subscribe if not through the

3  App Store?

4       **THE WITNESS:**  Through the app directly.  You set up

5  your same Apple account, you can pay for your podcasts.

6       **THE COURT:**  And so how does that work logistically?

7       **THE WITNESS:**  Logistically you set up with Apple,

8  your ID, your one account.  And you put in your payment

9  method, say your Visa credit card.  You can use that Apple ID

10  on the App Store to pay for apps.  That's one model, one use

11  of your Apple ID.

12     You can also use it in other Apple services like podcasts,

13  like Apple music, like iCloud, you don't have to re-enter your

14  credit card.  So that same ID works there.

15     We don't think of those as related businesses, but it is

16  for the user one ID that works across all those things.

17       **THE COURT:**  And with respect to the podcasts then,

18  you're allowing subscriptions to happen, but they still have

19  to go through your payment structure?

20       **THE WITNESS:**  Yes.  It's the same -- again, it's the

21  payment engine that supports these businesses, yes.

22       **THE COURT:**  Okay.

23     Anything on that?

24       **MS. FORREST:**  Nothing from Epic, Your Honor.

25       **MR. DOREN:**  No, Your Honor.

1          **THE COURT:**  Okay.  You may step down.  You are

2     excused.

3          **THE WITNESS:**  Thank you.

4          **THE COURT:**  Are we going to start the next witness?

5     It's 3:00 o'clock.

6          **THE CLERK:**  Could you please stand, and I will swear

7     you in.

8        (**SCHMID, MICHAEL,** called as a witness for the defendant,

9     having been duly sworn, testified as follows:)

10         **THE WITNESS:**  I do.

11         **THE CLERK:**  Please be seated.  Be sure the mic is

12    underneath the shield.  And then please state your full name

13    and spell your last name.

14         **THE WITNESS:**  May name is Michael Gerard Schmid.  My

15    last name is spelled S-C-H-M-I-D.

16         **THE COURT:**  Good afternoon, sir.

17      Mr. Srinivasan, good afternoon.  You may proceed.

18         **MR. SRINIVASAN:**  Thank you, Your Honor.  Good

19    afternoon.  For the record, Jay Srinivasan of Apple.

                        <u>**DIRECT EXAMINATION**</u>

21    BY MR. SRINIVASAN:

22    **Q.**  Good afternoon, Mr. Schmid.  Can you please introduce

23    yourself to the Court?

24    **A.**  Sure.  Good afternoon.  My name is Mike Schmid.  I'm the

25    head of games business development for the App Store at Apple.

SCHMID – DIRECT / SRINIVASAN

1    **Q.**   What is your current position at -- when did you first

2    take on that role at Apple?

3    **A.**   I took on this role in late summer 2019.

4    **Q.**   What are your responsibilities in your current position?

5    **A.**   Simply put, my team and I relate developer advocate

6    internally at Apple and the Apple advocate externally to our

7    developers, specifically games.

8    **Q.**   And what was your role at Apple before your current one?

9    **A.**   I was on the developer marketing team.

10   **Q.**   And when did you take on that role?

11   **A.**   August 2017.

12   **Q.**   And can you -- that's when you started at Apple?

13   **A.**   Correct.

14   **Q.**   And can you briefly describe your background in the gaming

15   industry before you joined Apple in August of 2017?

16   **A.**   Sure.

17       So I began in the mobile games industry in late 2011 in a

18   community management and customer service role.  From there I

19   grew into a marketing role.

20       I moved over to a mobile analytics games studio -- sorry,

21   mobile analytics shop for a bit.  Before then transitioning to

22   lead a marketing team at a subsidiary of War Gaming called

23   Dropforge games.

24       I followed that by my last stint before joining Apple

25   which was Ember Entertainment where I led games marketing and

1    business development.

2    **Q.**  And did you have occasion to work with Apple while you

3    were working at these game development companies?

4    **A.**  Quite frequently.

5    **Q.**  And what was that experience like?

6    **A.**  It was a great experience.  We would often pitch new games

7    and show them to the business management team as well as the

8    editorial team and the marketing teams at Apple.  We would

9    solicit feedback on ideas that we had for games.  We would

10   have regular meetings and also meet them at industry events

11   like game developer conference in San Francisco.

12   **Q.**  And in your meetings with Apple, would they ask for your

13   feedback on how they were doing?

14   **A.**  They would often solicit feedback.  They had -- they

15   typically ended every meeting with that question, you know,

16   what can we be doing better as a platform?  How can we better

17   support you as a partner?  Those kinds of things.

18   **Q.**  In your current role, you meet with game developers

19   regularly; is that right?

20   **A.**  Correct.

21   **Q.**  And is it your practice to solicit feedback from game

22   developers today?

23   **A.**  Absolutely.  Similarly, we end every meeting -- we try to

24   end every meeting what can we be doing better, how can we be a

25   better partner.

1    **Q.**  I want to show you an exhibit.  I think we need to bring

2    you a binder.

3           **MR. SRINIVASAN:**  Your Honor, can I approach?

4           **THE COURT:**  You may.

5    **BY MR. SRINIVASAN:**

6    **Q.**  It's a mercifully thin binder for you, Mr. Schmid.

7           If you could turn to Exhibit DX5552.

8    **A.**  Okay.

9    **Q.**  Can you tell us what DX5552 is?

10   **A.**  It is a screenshot of our developer market -- sorry, our

11   developer portal on developer.Apple.com.  Specifically, this

12   is part of the App Store microsite around choosing a category

13   for your game or app submission.

14   **Q.**  Can you turn the page to page 2 and 3 of DX5552?

15   **A.**  Sure.

16   **Q.**  And there's a number of entries on the third page and

17   about half of the second page.  Can you tell the Court what

18   that is?

19   **A.**  So these are all the categories you can choose when

20   submitting your app on App Store connect.  They range from

21   books to navigation to games to food and drinks, sports,

22   travel, weather, et cetera.

23   **Q.**  And does a developer get to make the decision as to which

24   category to designate their app for?

25   **A.**  They do.

SCHMID – DIRECT / SRINIVASAN

1    **Q.**   And do you know, for example, what category of app Epic

2    chose for *Fortnite*?

3    **A.**   They chose games.

4    **Q.**   Okay.  On the App Store, are games treated differently

5    than other apps in any way?

6    **A.**   They are.  They have an entirely separate tab where an

7    editorial team can curate some of the best games.  There's

8    also a tab for apps where the apps editorial team curates some

9    of the best apps.

10       On the business management side, we are also split where

11   we have games business develop and apps business development.

12   **Q.**   And what about outside the App Store; in your experience

13   in the games development world, do you have any views on

14   whether games are treated differently than other apps?

15   **A.**   They are.  They are certainly a subset of technology

16   games, but there's tons of specific places you'd go for games

17   news, or games industry news, or places like Twitch that are

18   really just dedicated to the subculture of gaming.

19   **Q.**   And --

20           **THE COURT:**  So that I understand, of all these

21   categories you are saying all of the categories are in one

22   bucket, and games is a separate bucket.

23           **THE WITNESS:**  Correct, Your Honor.  I will say that

24   there is a kid's category where we put kids' games

25   specifically that are age appropriate.

1          **THE COURT:**  Okay.  Thank you.

2       Proceed.

3    **BY MR. SRINIVASAN:**

4    **Q.**  And can developers, and I'm talking about developers of

5    all apps, not just games, can they reach iOS consumers

6    through means other than the App Store?

7    **A.**  Yes.

8    **Q.**  What are some of those means?

9    **A.**  It ranges from consoles like PlayStation, Xbox, Switch.

10   There's always PC and the many stores that are on PCs.

11   There's the Android platform, with all of the Android market

12   places like Google Play, the Amazon App Store.  There's even

13   TV apps.  There's many platforms for TV like Roku where

14   streaming partners would put their app.

15   **Q.**  And what about nongame apps?  Can you give me some

16   examples of nongame apps that are available on multiple

17   platforms?

18   **A.**  Sure.

19       Apps like Yelp are available on the web, both mobile web,

20   desktop web, as well as having a native app.  There's apps

21   like Hulu that are available on mobile.  They're also

22   available on desktop web and tons and tons of TV platforms.

23   **Q.**  And how about game apps, can you give us some examples of

24   game apps that are available on various platforms?

25   **A.**  Sure.

SCHMID – DIRECT / SRINIVASAN

1        Games like Candy Crush are available on Android, desktop

2    web, as well as mobile -- I'm sorry, iOS on the App Store.

3    Then there's also games like Hearthstone that are on

4    Battle.net, on PC, on Mac, on iOS, on Android.  There's games

5    like Rec Room that are available in VR, PC, and on mobile.

6    **Q.**   And what is VR?

7    **A.**   Sorry.  Virtual reality.

8    **Q.**   And is it common for the same developer to develop

9    multiple apps for different platforms?

10   **A.**   On the game side it's very common.  Some of our biggest

11   game developers will have games on many different platforms.

12   Sometimes those games are cross-platformed.  Sometimes they

13   are specific to mobile or even exclusive to a console in

14   certain cases.

15       On the app side, same thing except it's more typical that

16   an app, for instance, like Yelp would be -- the entity itself,

17   the company, and the app would only be, you know, one app as

18   opposed to a game developer that would have many games.

19   **Q.**   You mentioned cross-platform.  What is a cross-platform

20   game in the way you use that term?

21   **A.**   In the way I use it, it would be a game that is accessible

22   on multiple platforms.  Ideally it would be a game that would

23   be the same exact game, parity across multiple platforms.

24   There are other ways to interpret cross-platform, but that

25   would be mine.

SCHMID – DIRECT / SRINIVASAN

1  **Q.**  And can you give us some examples of a cross-platform

2  game?

3  **A.**  Sure.

4      Hearthstone that I mentioned earlier is a great example.

5  Another one would be *Minecraft*.  That's very well-known.

6  That's available on almost every platform at this point.

7  Certainly Roblox is a very popular cross-platform game.

8  **Q.**  What about cross-wallet, have you heard that -- do you use

9  that term?

10  **A.**  We do.  We use it in a kind of similar way that we use

11  cross-platform.  If we are explaining cross-platform, we would

12  typically confirm that this game is also cross-wallet which

13  just means that the currency you purchase in that game will

14  transfer between platforms.

15  **Q.**  Okay.  And can you give us examples of games that have a

16  cross-wallet aspect to them?

17  **A.**  *Fortnite* certainly has cross-wallet capability where if

18  you purchase V-Bucks in one place it would be accessible in

19  another.

20      Another good example would be Roblox.  Roblox you can

21  purchase on the web or a gift card or on the iOS device and

22  that transfers everywhere.

23  **Q.**  Do you have any sense of why, sort of the in-app currency

24  cross-wallet games have become more prevalent?

25  **A.**  As games became more cross-platform, the wallet system or

1   the in-app purchase system became prevalent because it allowed

2   developers to control their entire economy across many

3   different platforms and in many different regions.

4       So rather than be tied to a platform's system of

5   purchasing and pricing, they could kind of simplify it by

6   making that intermediary currency available for purchase and

7   then pricing things accordingly across all platforms as they

8   wished.

9   **Q.**  Do all platforms, as far as you know, support cross-wallet

10  functionality?

11  **A.**  Most do.  I believe there might be some exceptions on the

12  console side.  I'm not a hundred percent certain.  But more

13  and more -- certainly on the mobile side, both Android and

14  iOS have had cross-wallet capabilities for a very long time.

15          **MR. SRINIVASAN:**  This is a good breaking point, Your

16  Honor.

17          **THE COURT:**  We will stand in recess then.  You are

18  excused for the day.  We will stand in recess until

19  8:00 o'clock tomorrow morning.

20          **MR. SRINIVASAN:**  Thank you, Your Honor.

21          **THE COURT:**  Thank you.

22

23          (Proceedings concluded at 3:15 p.m.)

24

25

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman, Pamela Batalo-Hebel, and Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.

_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR

_____/S/ PAMELA BATALO-HEBEL_____

Pamela Batalo-Hebel, CSR, RMR, FCRR

_____/s/ Raynee Mercado_____

Raynee Mercado, CSR, RMR, FCRR

Wednesday, May 19, 2021