VOLUME 13

Pages 3210 - 3511

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,                    )
                                     )
        Plaintiff,                   )    NO. C-20-5640 YGR
                                     )
   vs.                               )    Wednesday, May 19, 2021
                                     )
APPLE, INC.,                         )    Oakland, California
                                     )
        Defendant.                   )    BENCH TRIAL
_____)
APPLE, INC.,                         )
                                     )
        Counterclaimant,             )
   vs.                               )
                                     )
EPIC GAMES, Inc.,                    )
                                     )
        Counter-Defendant.           )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   BY:  **KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**
                        (Appearances continued.)

Reported By:        Diane E. Skillman, CSR 4909, RPR, FCRR
                    Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                    Raynee Mercado, CSR 8258 RMR, CRR, FCRR

     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue

```
 1                                   New York, New York 10019
                           BY:   LAUREN A. MOSKOWITZ, ESQUIRE
 2                               JUSTIN C. CLARKE, ESQUIRE
                                 W. WES EARNHARDT, ESQUIRE
 3                               BRENDAN BLAKE, ESQUIRE
                                 JIN NIU, ESQUIRE
 4                               BRENT BYARS, ESQUIRE

 5        For Defendant:         GIBSON, DUNN & CRUTCHER
                                 333 South Grand Avenue
 6                               Los Angeles, California 90071
                           BY:   RICHARD J. DOREN, ESQUIRE
 7                               DAN SWANSON, ESQUIRE
                                 CYNTHIA RICHMAN, ESQUIRE
 8                               RACHEL BRASS, ESQUIRE

 9

10                               GIBSON, DUNN & CRUTCHER, LLP
                                 2001 Ross Avenue, Suite 1100
11                               Dallas, Texas 75201
                           BY:   VERONICA S. MOYE, ESQUIRE
12
                                 PAUL WEISS RIFKIND
13                               WHARTON & GARRISON LLP
                                 2001 K STREET, NW
14                               Washington, DC 20006
                           BY:   KAREN DUNN, ESQUIRE
15                               JESSICA E. PHILLIPS, ESQUIRE

16

17        For Defendant:         PAUL WEISS RIFKIND
                                 WHARTON & GARRISON LLP
18                               943 Steiner Street
                                 San Francisco, California 94117
19                         BY:   ARPINE LAWYER, ESQUIRE

20

21

22

23

24

25
```

| | **Defendant's Witnesses:** | **Page** | **Vol.** |
|---|---|---|---|
| | **Schmid, Michael** | | |
| | Direct Examination by Mr. Srinivasan | 3221 | 13 |
| | Cross-examination by Ms. Moskowski | 3265 | 13 |
| | Redirect Examination by Mr. Srinivasan | 3343 | 13 |
| | Examination by the Court | 3349 | 13 |
| | Further Recross-examination by Ms. Moskowski | 3353 | 13 |
| | **Federighi, Craig** | | |
| | Direct examination by Mr. Lo | 3356 | 13 |
| | Cross-examination by Mr. Even | 3431 | 13 |
| | Redirect Examination by Mr. Lo | 3494 | 13 |
| | Recross-Examination by Mr. Even | 3510 | 13 |

| | **Plaintiff's Exhibits:** | **Evd.** | **Vol.** |
|---|---|---|---|
| 1 | | | |
| 2 | 0452 | 3335 | 13 |
| 3 | 0464 | 3490 | 13 |
| 4 | 0465 | 3487 | 13 |
| 5 | 0625 | 3341 | 13 |
| 6 | 0634 | 3329 | 13 |
| 7 | 0741 | 3480 | 13 |
| 8 | 0856 | 3334 | 13 |
| 9 | 1220 | 3494 | 13 |
| 10 | 2125 | 3324 | 13 |
| 11 | 2362 | 3327 | 13 |
| 12 | 2386 | 3489 | 13 |
| 13 | 2943 | 3298 | 13 |
| 14 | | | |
| 15 | | | |
| 16 | **Defendant's Exhibits:** | **Evd.** | **Vol.** |
| 17 | 2282 | 3478 | 13 |
| 18 | 2519 | 3419 | 13 |
| 19 | 3661 | 3262 | 13 |
| 20 | 3758 | 3256 | 13 |
| 21 | 4327 | 3254 | 13 |
| 22 | 5492 | 3454 | 13 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
1    Wednesday, May 19, 2021                        8:00 a.m.

2                      P R O C E E D I N G S

3              THE CLERK:  Calling civil action 20-5640, Epic Games,

4    Inc. versus Apple, Inc.

5         And counsel, please state your appearances.

6              MS. FORREST:  Good morning, Your Honor.  Katherine

7    Forrest for Epic.

8              THE COURT:  Good morning, Ms. Forrest.

9              MS. MOSKOWITZ:  Good morning, Your Honor.  Lauren

10   Moskowitz for Epic.

11             THE COURT:  Yes, good morning, Ms. Moskowitz.  Mr.

12   Even.

13             MR. EVEN:  Good morning, Your Honor.  Yonatan Even

14   for Epic.

15             MR. CARVAJAL:  Good morning, Your Honor.  Alex

16   Carvajal for Epic.

17             THE COURT:  Good morning.

18             MR. NIU:  Good morning, Your Honor.  Jin Niu for

19   Epic.

20             THE COURT:  Good morning.

21        Mr. Sweeney, good morning, sir.

22        Mr. Rudd, good morning.

23             MR. RUDD:  Good morning.

24             THE COURT:  All right.  On the Apple side.

25             MR. DOREN:  Good morning, Your Honor.  Richard Doren
```

1   for Apple.  And joining us this morning are Heather Grenier

2   and Stephanie Fine, in-house counsel at Apple.

3          **THE COURT:**  Okay.  So Stephanie, this is new, right?

4   Okay.  And the last name again, please?

5          **MS. FINE:**  Fine.  F-I-N-E.

6          **THE COURT:**  F-I-N-E.  Okay, thank you.  Good morning

7   and welcome.

8          **MR. SRINIVASAN:**  Good morning, Your Honor.  Jay

9   Srinivasan for Apple.

10         **THE COURT:**  Good morning.

11         **MS. YANG:**  Good morning, Your Honor.  Betty Yang for

12   Apple.

13         **THE COURT:**  Yang.  Welcome back.

14         **MS. YANG:**  Thank you, Your Honor.

15         **THE COURT:**  Mr. Spalding.

16         **MR. SPALDING:**  Good morning, Your Honor.

17         **THE COURT:**  Good morning.

18      Then is that Ms. Adams I see back there?

19         **MS. ADAMS:**  Good morning, yes.

20         **THE COURT:**  Good morning.

21      And maybe Mr. Phillips.

22         **MR. PHILLIPS:**  Yes, good morning, Your Honor.

23         **THE COURT:**  Good morning.

24      Okay, the other two I'm not sure I recognize.  Mr. Doren,

25   can you help me there?

```
1            MR. DOREN:  Oh, I'm sorry.
2       Jennifer Rho, Your Honor.  R-H-O.
3            THE COURT:  And one other?
4            MR. DOREN:  Oh, and Dana Li, L-I.
5            THE COURT:  Okay, welcome.
6       And then I believe it looks like we have a few more
7  people.
8       So today is Wednesday.
9       Mr. Manfredi, good morning, welcome back.
10      And then from the press, we have same as yesterday.  So
11 Mr. Cisco from the information.  Good morning.
12      And Bobby Ellen from NPR.  Good morning.
13      And then we have the witness.
14      And one other person in the courtroom.
15           MS. BESHLIAN:  Good morning, Your Honor.  Ana --
16           THE COURT:  Ms. Forrest?
17           MS. BESHLIAN:  -- Your Honor.
18           THE COURT:  Is -- is she with Epic?
19           MS. FORREST:  She is.  She is one of our paralegals
20 handling the logistics, Your Honor.
21           THE COURT:  And her name again, Ms. Forrest?
22           MS. FORREST:  Anna Beshlian.
23           THE COURT:  Okay.  Welcome to the courtroom.
24           MS. BESHLIAN:  Thank you.
25           THE COURT:  Ms. Forrest, do we have any issues to
```

1    address this morning?

2         **MS. FORREST:**  Not issues, Your Honor.  Just sort of

3    two points of information.

4        One is -- or and a request, on the essential facilities

5    motion that Apple had made yesterday, we wanted to ask Your

6    Honor when we should respond so that Your Honor can consider a

7    written response.  We plan to address it also orally on

8    Monday.

9         **THE COURT:**  Right.

10        **MS. FORREST:**  If Sunday works for Your Honor, we

11   could do it then.  But we don't want to presume that that's a

12   good time for Your Honor.  So we want to elicit what the

13   appropriate time would be.

14        **THE COURT:**  Maybe -- maybe today is the proper day

15   to -- in light of that -- to let folks know and -- and in part

16   people listening who are not familiar with the legal process,

17   that you will not have an answer on Monday and you will not

18   have an answer on Tuesday.  I believe Judge Koh's opinion in

19   the *Qualcomm* case was about 250 pages long.  I will go through

20   on Monday how much evidence is in this case and how much

21   evidence has to be reviewed and considered by me.  And I've

22   got a very tiny team helping me.

23       So Sunday is fine because there's just no way that I'm

24   going to rule automatically on it.

25        **MS. FORREST:**  Would Sunday at 6:00 p.m. then, Your

1    Honor, be acceptable?

2            **THE COURT:**  You know what, if you're going to do it

3    at 6:00 p.m., it doesn't matter when on Sunday you do it

4    because I won't look at it at 7:00.

5            **MS. FORREST:**  Would earlier in the day on Sunday mean

6    that Your Honor would have a chance to consider it before

7    Monday?  'Cause we could do any time.  I just -- I hesitate to

8    take up your Sunday but --

9            **THE COURT:**  I've worked every weekend since we've

10   started.

11       I think the other thing people should know is that federal

12   judges have hundreds of cases.  Our cases do not go away when

13   we're in trial.  I explain to jurors when I tell them that we

14   end the trial day at 1:30 with -- we go from 8:00 to 1:30, two

15   15-minute breaks, and it's not because I like to take long

16   lunches.  It's because I have hundreds of other cases to deal

17   with after we finish with our trial day.  And this doesn't --

18   this isn't any different.

19       So I -- I think noon is probably better.

20           **MS. FORREST:**  That works for us, Your Honor.  Thank

21   you.

22           **THE COURT:**  So I will look at it, I'll look at the

23   docket at noon on Sunday.

24           **MS. FORREST:**  The only other issue was just a point

25   of information is that on the document PX1904 that was clawed

1    back on privilege grounds yesterday -- that word is not a --

2    just for the record, the word "clawback" is the word that's a

3    technical term of art in the legal community for taking back a

4    document in terms of privilege.  So it's a perfectly

5    appropriate way for Apple to have done this.

6        Apple asserted privilege over the document, clawed it

7    back.  We are briefing that currently in front of Judge

8    Hixson, and we are -- the parties are engaged in the typical

9    we've sent Apple our portion, they will then send us their

10   portion, but it's happening in realtime.  We have now already

11   sent our portion to Apple.

12            THE COURT:  Okay.  And -- and yes, I agree with you.

13   That's a technical term in the legal community.

14           MR. DOREN:  Your Honor, just two administrative

15   matters.

16       The first is on the timing of Mr. Cook's testimony.

17           THE COURT:  Yes.

18           MR. DOREN:  We are hoping and requesting that he be

19   permitted to testify at 8:15 on Friday.  And if we -- we are

20   trying to bring everything in for a -- for a landing, to have

21   that be -- he be our last witness on Friday morning.

22       In the event for some reason, since we don't control

23   cross, if we haven't concluded by Thursday, we would still

24   like to start with Mr. Cook, and conversely if we finish a few

25   minutes early on Thursday, we would still request to start

1    with Mr. Cook at 8:15 on Friday.

2         **THE COURT:**  Any objection?

3         **MS. FORREST:**  We have no objection to that, Your

4    Honor.

5         Just so that the record is clear, we notified Apple this

6    morning that we may call, not will call, but we may call some

7    very short rebuttal witnesses.  And that could occur then

8    after Mr. Cook's testimony.

9         **THE COURT:**  Okay.

10        **MR. DOREN:**  And then secondly, Your Honor, purely on

11   the housekeeping end of things, I've been asked to ask when we

12   can start removing materials.  We thought the day would never

13   come.  If we could do that work Friday afternoon, if it won't

14   inconvenience the Court.  If it will, we would do it Monday.

15        **THE COURT:**  I -- I think the best person to ask is

16   Ms. Stone.  I don't know if her preference is for people to

17   slowly start taking it.

18        I've done numerous cases where we have lots of binders.

19   This kind of case might not be the case that I'd do it again

20   in this way.  But you're -- I'm not going to them anymore.  I

21   did initially, but I'm not anymore.

22        So you're welcome to take my set as long as you have

23   permission from Ms. Stone to access the courtroom.

24        **MR. DOREN:**  Thank you, Your Honor.  We will discuss

25   it with her.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1       **THE COURT:**  Okay.

2       **MR. DOREN:**  Thank you.

3       **MS. FORREST:**  Thank you.

4       **THE COURT:**  All right.

5       Hearing nothing else, let's go ahead and bring Mr. Schmid

6   back to the stand.

7       **THE COURT:**  Good morning, sir.

8       **THE WITNESS:**  Good morning, Your Honor.

9       **THE COURT:**  You are still under oath.  Do you

10  understand?

11      **THE WITNESS:**  I do.

12      **THE COURT:**  Mr. Srinivasan, you may begin.

13      **MR. SRINIVASAN:**  Thank you, Your Honor.

14      Jay Srinivasan for Apple.

15                    **DIRECT EXAMINATION (RESUMED)**

16  BY MR. SRINIVASAN:

17  **Q.**  Mr. Schmid, you testified yesterday that you are head of

18  games business development for the App Store.  Did I get that

19  right?

20  **A.**  Correct.

21  **Q.**  And in that capacity, how many game developers do you and

22  your team engage with?

23  **A.**  We engage with hundreds of developers globally many times

24  a year.  So often we'll meet with them weekly, sometimes

25  monthly, sometimes quarterly.  And then there's, you know, the

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1  occasional developer we'll only touch base with once every

2  year or so.

3  **Q.**  Okay.  And how about you personally, to what extent do you

4  engage with game developers?

5  **A.**  Every –- every day of my life.  So many of my friends

6  from, you know, before joining Apple are game developers, and

7  I've continued to foster those relationships as well as grow

8  many more relationships.  So I talk to developers every day.

9  **Q.**  Okay.  And –- and what type of game developers do you

10  engage with?

11  **A.**  I engage with developers of all sizes.  So we have, you

12  know, the Activisions of the world, the EA's of the world, and

13  then game developers like Chain Reaction Games in Indiana

14  which are a father and son team that we met at WWDC a few

15  years back.  Talk to them –- I'm sorry.  We talk to them on a

16  monthly basis too.  And, you know, we –- we try to focus our

17  energy in the places where we feel like we can do the most

18  good.

19  **Q.**  And is there a –- a set list of game developers that your

20  team meets with that's a fixed group?  Or is it some –-

21  some –- somehow different in how you decide who to meet with?

22  **A.**  The list is fairly fluid.  There are certainly developers

23  we've been meeting with for many, many years that have never

24  left our list.  But there's developers that kind of come and

25  go, again based on resources and what's driving the business

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    and what's popular on the App Store, et cetera.

2    **Q.**   Okay.  And you mentioned, I think, a global team.  Do you

3    and does your group interact with developers all over the

4    world?

5    **A.**   We do.  And we have a global team of business managers

6    that we work very closely with to engage with developers in

7    all regions and get local expertise and bring those expertise

8    to developers in other regions and help them expand.

9    **Q.**   And what are the subjects that you cover with developers

10   when you meet with them?

11   **A.**   We cover everything from monetization to marketing, to

12   localization, to first-time user experience, to editorial

13   support, to app review, to engineering support in some cases.

14   So it's quite a wide list of cat -- or of subjects.

15   **Q.**   Okay.

16       And you mentioned localization in that list.  Can you

17   explain what localization is?

18   **A.**   I'm sorry, yes.  So localization is kind of what I

19   referenced moments ago which is we'll -- we'll help a

20   developer expand to a new market that they may not be in.  In

21   order to do that, they have to localize and actually translate

22   the language in their game.

23       But we -- we actually prefer a term called culturalization

24   to take it a step further than just localization so we can

25   really have a developer more deeply engaged with that market.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1   **Q.**  And do you personally play video games?

2   **A.**  I do.  Maybe too much.

3   **Q.**  Well, I mean this sounds maybe like a silly question, but

4   can you estimate how many video games you've played over the

5   course of your career and life?

6   **A.**  Do you want me the start in, like, 1992?  I think that --

7           **THE COURT:**  Is that when your life started?

8           **THE WITNESS:**  No.  No, Your Honor.  My life started a

9   couple years before that.

10     But it took me to about five before I could start really

11   getting into games.

12     Thousands of games that -- and, yeah, of all ranges, all

13   sorts of categories of games.

14   **BY MR. SRINIVASAN:**

15   **Q.**  Okay.  And can you turn back to DX5552, which we looked at

16   yesterday?  I think it was the only exhibit we looked at.

17   **A.**  (Reviewing document.)

18   **Q.**  Can you remind us again what DX5552 was?

19   **A.**  This is the categories pages on the App Store microsite on

20   developer.apple.com.

21   **Q.**  Okay.  And do these categories include podcasts?

22   **A.**  There is no podcast category.  However, there are podcast

23   apps that could categorize themselves as news or

24   entertainment.

25   **Q.**  And these are apps on the App Store?

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1   **A.**   Correct.

2   **Q.**   And do these apps monetize, do you know?

3   **A.**   Some do.

4   **Q.**   Do you know how they do that?

5   **A.**   Apps, for instance, Overcast will monetize with a premium

6   subscription that gives you some additional features.  Some

7   other apps will monetize by unlocking content through an

8   in-app purchase or a subscription.

9   **Q.**   Okay.  And does Apple have a podcast app?

10  **A.**   We do.

11  **Q.**   Okay.  And is that app in the App Store?

12  **A.**   It comes directly on your phone when you purchase an

13  iPhone.

14  **Q.**   And do you know if Apple currently monetizes its podcast

15  app?

16  **A.**   They do not.  They have not certainly since I've been

17  using podcasts since the original iPod.  So podcasts actually

18  predates the App Store.

19  **Q.**   Okay.  And do you know if Apple has a plan to add to that

20  functionality?

21  **A.**   They do.  There is a -- a service called Podcast Plus that

22  will allow podcasters to monetize their podcast within the

23  podcast app.

24  **Q.**   And that's -- is that currently available?

25  **A.**   It is not.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **Q.**   Okay.   Back to this page DX5552, I just want to recap from

2    yesterday.   I think you mentioned that the App Store has a

3    single tab for the games category and that everything else,

4    all of these other categories, are going to be under the apps

5    tab.   Did I get that right?

6    **A.**   Correct.

7    **Q.**   And do you -- do you have an understanding of why that is?

8    **A.**   Games are the biggest category in the App Store.   And we

9    spend a lot of time and energy focused on, you know, games in

10   a very different way than we've focused on apps.   That's why

11   we split the teams, both on editorial and the business side,

12   but also those industries are fairly discrete as well.

13   **Q.**   When you say the industries are fairly discrete, what do

14   you mean by that?

15   **A.**   So game developers are quite separate from app developers

16   in many circumstances.   There are exceptions like big

17   organizations like Microsoft that, you know, have Microsoft

18   Office as well as, you know, Minecraft and other -- other

19   games.

20        But generally speaking, game developers are focused on

21   just developing games, and app developers are often focused on

22   a single app or a suite of apps.

23   **Q.**   Okay.

24        Other than games developers generally not making nongame

25   apps, anything else that sets game developers apart from other

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    developers?

2    **A.**   The technology so -- whoop, I'm so sorry.

3         The technology certainly sets them apart.  So game

4    developers will often use Unreal Engine or Unity.  And app

5    developers typically don't go that route.  They don't use an

6    off-the-shelf engine like that.

7         But also game developers tend to be a little bit more on

8    the what we call the bleeding edge as far as graphics

9    processing and technology generally.  I don't want to say

10   without caveat because there's certainly creative apps that

11   really push the limits of what graphics processing can do, but

12   game developers are certainly in a different category because

13   of that.

14   **Q.**   Okay.  And are game developers different in how they

15   monetize compared to other developers and app developers in

16   general?

17   **A.**   Often, yes.  So as I mentioned yesterday, there's in-app

18   purchase, and that's becoming a more frequent or more widely

19   used monetization path, a free app or game and then with

20   in-app purchase.  There's certainly still a premium market of

21   games where there will be a larger purchase up front, but many

22   app developers now are really focused on subscription revenue

23   and growing a subscription business, whereas game developers

24   not as much.

25   **Q.**   And I apologize if I covered this yesterday.  But I

SCHMID – DIRECT (RESUMED) / SRINIVASAN

believe you -- is it the case that game developers are using

in-app currency as part of their game?

**A.**   Correct.

**Q.**   And is that use becoming --

       **THE COURT:**   Can you hold on just a minute.

    I just received a note that our public line is not working

so let me stop the clock.

    And sometimes -- I just want to say, the Court does not

control the telephone line.   And sometimes something happens

in the ether and the line doesn't work.   So let's just hold on

a minute and make sure we get the line reconnected.

                    (Pause in the proceedings.)

       **THE COURT:**   Okay.   Do we have lawyers from LA?

    Okay, raise your hand.

    Okay.   Warriors are on tonight.

                    (Off-the-record discussion.)

                    (Pause in the proceedings.)

       **THE COURT:**   Okay.   It looks like -- I understand from

Ms. Stone that the line is up and running again.

    Yes, Ms. Stone?

    Let's see.   Okay.   I'm being told to wait.

                    (Discussion off the record.)

       **MS. FORREST:**   And, Your Honor, on the topic of what

might be different when the pandemic is over, I think it has

been eye-opening to see what can be done remotely in terms of

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    certain court proceedings that might not take a lot of time,

2    but my -- for, you know, counsel located all over the country,

3    otherwise have required lots of travel time.  So it's been, I

4    think, an eye-opening experience in that regard as well to see

5    what can be done once we resume.

6         **THE COURT:**  Yeah, I think so.  I mean I -- you know,

7    I was never one to allow -- to allow many people to appear by

8    telephone because I am -- I actually learn a lot when engaging

9    in person with lawyers, whether, you know, a case -- my case

10   management conferences, as you all know, are very substantive.

11   I like to know what's going on.  I try to understand kind of

12   the -- the whole purview of the cases.

13        And I just cannot -- I cannot -- I can't get the same kind

14   of information when I have people on a telephone line.  Once

15   I've established a relationship with the lawyers, then

16   telephone lines are easier to do because you know each other.

17        I don't mind Zoom as much.

18        **MR. SRINIVASAN:**  Yes.

19        **THE COURT:**  So -- okay.  So we have one -- okay.  So

20   now, I --

21             (Off-the-record discussion.)

22        **THE COURT:**  Let's make sure that time doesn't count

23   against counsel.

24        Looks like you can proceed now.  Thank you.

25        **MR. SRINIVASAN:**  Thank you, Your Honor.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **Q.**  Mr. Schmid, do you have an understanding of why in-app

2    currencies have become more prevalent in game apps?

3    **A.**  Yes.  As I mentioned yesterday, it allows a developer to

4    maintain more control over an economy that goes across many

5    platforms.  So I'll try to simplify it or explain it as simply

6    as possible, rather.

7        We have in game development or in free-to-play game

8    development sources --

9                    (Clarification by the court reporter.)

10                **THE WITNESS:**  Yes, I'm so sorry.

11       So in mobile game development, specifically free to play,

12   we have something called sources and syncs, the source being

13   that in-app currency that you purchase and the sync being

14   where you're spending that currency, so on an outfit or an

15   item in a game.

16       And that purchase, that in-app purchase is actually of

17   that source.  So that source currency is what you're

18   purchasing.  And that price can vary from region to region.

19   But what the developer prefers to do is stabilize the cost of

20   the item that you purchase using that in-app currency.

21       Did I explain that okay?

22   **BY MR. SRINIVASAN:**

23   **Q.**  That made sense to me.

24   **A.**  Okay.

25   **Q.**  So if a user doesn't want to pay a commission, for

1   instance, on the App Store to Apple, is it possible to make an

2   in-app purchases of an in-game currency in a way to avoid

3   that?

4   **A.**  Yes.

5        **MS. MOSKOWITZ:**  Objection.

6        **THE COURT:**  What's the objection?

7        **MS. MOSKOWITZ:**  Form.

8        **THE COURT:**  You mean in terms of leading?

9        **MS. MOSKOWITZ:**  In terms of leading and the terms

10   used in the -- in the first part of that question, which now

11   has exited the screen.

12        **MR. SRINIVASAN:**  I mean --

13        **THE COURT:**  You can rephrase.

14        **MR. SRINIVASAN:**  Sure.

15        **THE COURT:**  I don't think it's really objectionable.

16   But go ahead, rephrase.

17   **BY MR. SRINIVASAN:**

18   **Q.**  Is there a way for a user to avoid the Apple commission in

19   making an in-app currency purchase?

20   **A.**  Yes.

21   **Q.**  How would they do that?

22   **A.**  So a game developer may make an in-app purchase available

23   on many platforms aside from the App Store.  They can also

24   make that purchase available on desktop web or mobile web.

25   It's completely at the discretion of a game developer.  And

1    then a user can choose where they'd like to purchase.

2    **Q.**  And can you give us examples of games where that's

3    achievable?

4    **A.**  One example would be Hearthstone which allows you to make

5    purchases on Battle.net on your PC, also on mobile web, also

6    in the iOS app.

7        Another example would be Roblox which allows you to make

8    purchases on web, on the desktop app, as well as iOS.

9        Another example would be Candy Crush which makes –– allows

10   you to make purchases in the mobile app, on desktop web, and

11   on Android.

12       So most of the time when I'm mentioning games that are

13   cross-platform, on the mobile side you can almost guarantee

14   they would also be available both as the app itself on Android

15   and the same in-app purchases on Android.

16   **Q.**  Okay.  And maybe we can –– let's do –– if we may, let's do

17   a demonstrative of what you're talking about here.

18       If we could put up one of the disclosed demonstratives.

19                  (Demonstrative published.)

20   **BY MR. SRINIVASAN:**

21   **Q.**  This is with respect to Hearthstone.

22       Before we get going on this, I think you mentioned the

23   game Hearthstone in your list of apps that allow this type of

24   functionality; is that right?

25   **A.**  Correct.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **Q.**  And what is Hearthstone?

2    **A.**  It is a free-to-play game by Blizzard Entertainment.  It

3    is a card battler or a card collecting game.  So I call it a

4    card battler 'cause you're collecting packs of cards, building

5    a deck, and then battling others with that deck.

6    **Q.**  Okay.  And can players make purchases within Hearthstone?

7    **A.**  They can.  They can purchase expansion packs with content

8    as well as new cards or card decks.

9    **Q.**  And what channels can you make purchases on with -- for

10   Hearthstone?

11   **A.**  On the App Store.  You can also purchase the same decks on

12   Android on the Google Play Store, as well as on Battle.net on

13   your PC or on mobile web or desktop web.

14   **Q.**  Okay.  And this particular demonstrative that we have

15   here, did you create this demonstrative?

16   **A.**  I did.

17   **Q.**  And how did you do that?

18   **A.**  I recorded it on my phone.

19   **Q.**  Okay.  And do you recall when you did it?

20   **A.**  Two days ago.

21          **MR. SRINIVASAN:**  Okay.  And, Your Honor, if we can

22   run the video, and is it all right if Mr. Schmid sort of

23   narrates that as we run it?

24          **THE COURT:**  Okay, go ahead.

25                        (Video playing.)

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1          **THE WITNESS:**  Okay.  So we're entering Hearthstone,

2     which is on my phone.  I'm already logged into my account.

3     It's a Battle.net account with my email address.

4          I'm going to see that I have no packs available to open.

5     So if I click my open packs, there's nothing there.

6          However, I can go back to the shop and see all the packs

7     that are available for purchase or all the bundles as well.

8          So I'm going to find one that I like.  Scroll down here.

9     Forged in the Barrens is one of the newer expansion packs.  So

10    I'm going to look at the card packs for that.

11         It is 2.99 for two packs.  I'm not going to buy it here.

12    I'm going to exit the game.  And I'm going to go mobile Safari

13    where I go to Battle.net.  Again I'm logged into an account

14    that I've had since long before the App Store was around.

15         I click on Hearthstone, and I can see all the purchases

16    that are available on mobile web.  I click Forged in the

17    Barrens.  I buy a 2.99 pack.  And, again, because I've had

18    this account since before the App Store, my payment

19    information is already saved in there.  I click "pay now."

20         Okay.  Purchase was successful.  I go back to Hearthstone.

21    And upon log-in, it should immediately show the card packs.

22    It did in this case.

23         So card packs are granted.  And I can see that little "2"

24    flag next to open packs, which means I have some packs I can

25    open.  And I get to experience the joy of what is inside.  We

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    have Toad of the Wilds, Sada [phonetic], Devouring Plague,

2    very nice.

3        And then the second pack, I won't name all the cards, but

4    it's very exciting for me.

5    **BY MR. SRINIVASAN:**

6    **Q.**   So, and Mr. Schmid, I believe when you went to the web,

7    you purchased something, the card pack, for 2.99.

8        Was it the same card pack that you saw in the App Store?

9    **A.**   Yes.

10   **Q.**   Okay.  And let's -- let's just quickly do another demo if

11   Your Honor will indulge us.

12       The next one -- well, Mr. Schmid, I think you mentioned a

13   game called Candy Crush?

14   **A.**   Yes.

15   **Q.**   And what is Candy Crush?  Maybe that's a question

16   everybody in America knows but --

17   **A.**   It is a match-three puzzle game on the App Store.

18   **Q.**   Okay.  And can players make purchases in Candy Crush?

19   **A.**   They can.

20   **Q.**   And what is the currency of Candy Crush?

21   **A.**   Gold bars which then you can spend on boosts and other

22   items in the game.

23   **Q.**   Okay.  And where are these gold bars sold?

24   **A.**   They're sold on desktop web, on Android marketplaces so

25   like Google Play and other -- other Android stores, as well as

1    iOS and -- yep, that's it.

2            **MR. SRINIVASAN:**  Mr. Spalding, can you put up the

3    other demo, please.

4                    (Demonstrative published.)

5    **BY MR. SRINIVASAN:**

6    **Q.**  And before we get it rolling, can you tell us who created

7    this demo?

8    **A.**  I created this demo.

9    **Q.**  And how did you do it?

10   **A.**  I recorded on my phone two days ago.

11   **Q.**  Okay.

12           **MR. SRINIVASAN:**  And, Mr. Spalding, if we could play

13   it.

14                    (Video playing.)

15   **BY MR. SRINIVASAN:**

16   **Q.**  And, Mr. Schmid, if you could tell us what's happening.

17   **A.**  I'm logging into my Candy Crush account, which is very

18   sad, as you can see I'm only on level two.

19       But you notice in the top right, I have 30 gold bars in my

20   account.

21       And now I'm going to go to candycrush.com.

22       Oop, there we go.

23       Now I'm going to go to candycrush.com and request the

24   desktop website.  So Candy Crush and the developer King have

25   chosen to really not support mobile as much for the web

1   payment because they'd like to push the users to the native

2   app.  However, I could simply just click "request desktop

3   website," and I would receive the web version of Candy Crush

4   Saga.

5      Again I'm logged in.  So this is my same account.  I have

6   the same 30 gold bars.

7      Now I'm purchasing ten gold bars.  I'm going to use PayPal

8   which simplifies payment on web.  And then ten gold bars were

9   added to my account.

10     So if I go back to the native app, you could see a little

11  spinner, and then I have 40 gold bars.

12  **Q.** Thank you, Mr. Schmid.

13     We've –– we've looked at two examples now.  And are there

14  other games that allow this same functionality?

15  **A.** There are.  And it's completely at the discretion of a

16  game developer to pick if they'd like to offer purchasing on

17  mobile web or desktop web or any other platforms they choose.

18     PUBG MOBILE is a good example of another game that would

19  allow mobile web purchasing.  Call of Duty: Mobile.  There's

20  certainly a ton of examples.

21  **Q.** Okay.  And does Apple do anything to prevent or discourage

22  developers from providing users the option of going outside

23  the App Store to make these purchases?

24  **A.** Absolutely not.  So some developers will even bring the

25  question to us and will say this is what we're looking to do.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    And we'll say great, you know, you're more than welcome to

2    make your purchase available in any other platform and we'll

3    make sure that that source is recognized in the native app.

4    **Q.**  And other than going through the websites, as you showed

5    us, is there a way to obtain online currency in a

6    brick-and-mortar way as well?

7    **A.**  Yes.  There are some game developers, namely the biggest

8    ones like Roblox and Minecraft and Fortnite, that have gift

9    cards in brick-and-mortar stores.  And same thing, they can

10   redeem those gift cards on mobile web or on any platform web,

11   and then they can use those inside of the native app.

12   **Q.**  Okay.  Let's change gears a bit, and I'd like to talk

13   about what your team does for developers.

14       Broadly speaking, what are the ways in which Apple invests

15   in the success of developers?

16   **A.**  We invest tremendous amounts -- sorry -- a tremendous

17   amount of time and energy and money into building the best

18   platform for our game developers.  It's hard to -- it's hard

19   to break it down, but I could give you three avenues which I

20   think would simplify it to some degree.

21       So we have -- we -- I'm sorry -- we have business and

22   marketing support.  We have engineering support.  And then we

23   also -- I'm sorry -- we have tools, developer tools and

24   products.

25       So again to break that down so it's a little bit more

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    clear, developer tools and products, marketing and business

2    support, as well as engineering support.

3    **Q.**   Okay.  And is this just for game developers, or is this

4    all developers in terms of the App Store?

5    **A.**   It is all developers.

6    **Q.**   And we'll go through the categories you mentioned, but why

7    does Apple make these investments in developers?

8    **A.**   We want to be the best platform to develop a game or app

9    in the world.

10   **Q.**   Okay.  And does Apple have to compete for developers to --

11   to compete, in other words, for developers to come to the

12   platform?

13   **A.**   Absolutely.  I think that it would be silly to suggest any

14   developer that's looking to grow a business wouldn't be

15   thinking about mobile as a huge opportunity.

16        However, there's lots of options even within mobile.  We

17   want to do more than just be a -- a checkbox for a platform

18   that a developer is going to ship a game or app on.  We want

19   to be the -- the primary platform.  We want to be the place

20   where they're spending time and energy and -- and committing

21   to our user base that they're going to really focus on

22   building a great experience for our users on the App Store.

23   **Q.**   And with respect to the game space in particular, who does

24   Apple -- what other platforms does Apple compete with for

25   those developers?

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **A.**   We compete with Google Play and the other many Android

2    marketplaces.  We compete with the consoles, so Switch,

3    PlayStation, XBox.  We certainly compete with PC and the --

4    the PC stores like Epic Games Store or Steam.

5        And now more and more we're competing with cloud gaming

6    and -- and the many companies that are getting involved in

7    cloud gaming.

8    **Q.**   Turning back to the categories I think that you mentioned

9    of support that Apple provides, you mentioned tools.  What

10   sort of tools does Apple make available to developers?

11   **A.**   So we have tools like XCODE, which is how you build your

12   app and submit it to the App Store.  We have tools like the

13   many API's that we build, or application programming

14   interfaces.

15       We have certainly the product side.  So App Store Connect,

16   and the many ways that you can kind of build your app first --

17   or sorry -- build your business on the App Store.  As well as

18   TestFlight and -- there's -- there's very -- there's many of

19   them.

20   **Q.**   And -- and can you provide some examples of API's that

21   Apple makes available to developers?

22   **A.**   Sure.  The metal API which allows developers to really

23   create amazing graphics experiences on iPhone and iPad and

24   Mac.  We also have API's like Spatial Audio where a developer

25   can actually take advantage of the awesome technology that

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1   AirPods –– AirPods Pro allows, which is kind of to create a

2   really awesome 3D audio space.

3       We also have Core ML that many app developers can use for

4   machine learning.  There –– there's a lot of them.

5   **Q.**  Okay.

6       And –– and does Apple provide business tools in support

7   for developers?

8   **A.**  Yes.

9   **Q.**  And can you give us some examples of the type of tools

10  Apple –– Apple provides in this regard?

11  **A.**  Sure.  I mentioned App Store Connect which has things like

12  TestFlight to manage distribution of beta software.  We also

13  have App Analytics where you can get an understanding of

14  things like retention and –– and monetization of users.  And

15  then we also have Sales and Trends to actually manage the ––

16  the incoming revenue from your business.

17  **Q.**  And do you know if Epic in particular took advantage of

18  any of these tools and support opportunities?

19  **A.**  They did.

20  **Q.**  Okay.  And can you give us any details of the types of

21  tools they took advantage of on the business side?

22  **A.**  They certainly used TestFlight.  They also used App

23  Analytics.  And we supported them by answering questions about

24  how to –– how to analyze their analytics.  And then they also

25  used things like ARKit to experiment with augmented reality in

1    other apps and games that they're producing.

2    Q.  Okay.  I think you then mentioned as another bucket

3    engineering and business management support.  What kind of

4    engineering support does Apple provide developers?

5    A.  So we provide engineering support in a number of ways.  We

6    have our worldwide developer conference every year in which

7    developers can engage directly with our engineers on forums

8    and sometimes face to face when that was a thing.

9        And we also identify other situations in which our

10   engineering team can directly support a developer.  So that

11   could be a phone call or an email or in some cases even face

12   to face.

13   Q.  Okay.  And what are the types of problems that the

14   engineering team is looking to help the developer with?

15   A.  It certainly varies.  There's things as simple as input

16   control and understanding how to best use controllers for your

17   game.  There's things like the Metal Engineering Ecosystem

18   team that will engage with developers to help them better

19   optimize graphics performance on the device.

20       And then there's things like just developer technical

21   support which is a team under developer relations that can

22   engage with developers for all sorts of reasons.

23   Q.  And did Epic benefit from engineering support from Apple?

24   A.  Yes.

25   Q.  Can you provide us some examples of the way in which Apple

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    interacted with Epic on the engineering support front?

2    **A.**   Yes.  So from day one, when we began supporting Fortnite

3    on the store, we had engineering engaging with not just Epic

4    for the game, but also on the Unreal Engine.  And that was

5    support that grew over time.  So it went from phone calls to

6    emails to even in person where we sent engineers to Cary to

7    support Epic.

8    **Q.**   And were there any Epic-specific engineering issues that

9    Apple worked with Epic on to solve a problem?

10   **A.**   I can recall one specific around memory usage and the

11   memory footprint of Fortnite.  We were hoping -- we were

12   trying to have Epic update to a newer version of XCODE quicker

13   than they initially thought they could.  So in order to do

14   that, we worked with them to reduce the memory footprint of

15   Fortnite so they could more quickly update to the newer

16   version of XCODE.

17   **Q.**   Were the Apple and Epic engineers able to solve that

18   problem?

19   **A.**   We were.

20   **Q.**   Okay.  Let's now turn I think to the last item that you

21   mentioned which was, I think, marketing and editorial support.

22        What types of marketing and editorial support does Apple

23   provide to developers?

24   **A.**   There's two main buckets in which we provide marketing

25   support.  There's owned and paid marketing.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **Q.**  And what is owned marketing?

2    **A.**  So owned marketing or channels that we have ownership over

3    or don't have to pay for placement on.  So for instance, our

4    social media would be owned marketing.  Our -- our emails that

5    we send out would be owned marketing to, you know, the opt-in

6    list that we have users sign up for.  As well as the editorial

7    page itself.  So that's inventory that while it is not

8    traditional marketing and we don't have that under the

9    marketing umbrella, is owned placements that we do have

10   control over.

11   **Q.**  And did Apple deploy its owned marketing function on

12   behalf of Epic at any point?

13   **A.**  Quite often.

14   **Q.**  Okay.  And any examples, say, for example, on the -- I

15   think you mentioned on the editorial side?

16   **A.**  Editorial was very excited about Fortnite.  And they took

17   every opportunity that was a big moment to highlight it to our

18   users.  So for instance, season -- or -- Season 2 of

19   Fortnite -- I'm sorry -- Chapter 2 of Fortnite was a very big

20   moment on the App Store where we actually took over the Games

21   tab with all sorts of Fortnite art and also wrote a story on

22   the Today tab about Chapter 2.

23   **Q.**  And what about the social media channel?  Did Apple deploy

24   those efforts on behalf of Epic?

25   **A.**  We did.  We worked closely with Epic to -- to build a

SCHMID – DIRECT (RESUMED) / SRINIVASAN

```
1    strong social media strategy where we would tweet something
2    about Fortnite, they would retweet that.  Or vice versa, we
3    would ask them to -- we would ask them if we could retweet
4    something that they had posted about Fortnite.
5    Q.  Okay.  And is -- do you have any way to quantify Apple's
6    efforts in this regard?
7    A.  A really broad number would be --
8            MS. MOSKOWITZ:  Objection, foundation.
9            THE COURT:  Lay some foundation.
10           MR. SRINIVASAN:  Sure.
11   Q.  Are you aware specifically -- well, sir, did you work
12   directly on the Epic account?
13   A.  I did.
14   Q.  And were you aware of the social media engagements that
15   Apple was doing for Epic?
16   A.  I was.
17   Q.  Okay.  And can you quantify the degree of those
18   engagements on behalf of Epic?
19           MS. MOSKOWITZ:  Objection, foundation.
20           THE COURT:  Overruled.
21           THE WITNESS:  I can.  So broadly speaking, Apple sent
22   over 500 million marketing communications about Fortnite.
23   BY MR. SRINIVASAN:
24   Q.  Okay.  You also mentioned paid marketing.  What does paid
25   marketing include?
```

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1        **THE COURT:**  Okay.  I am going to follow up.  How do

2   you know that?  That's a pretty specific number.

3        **THE WITNESS:**  So I worked closely with the marketing

4   team, and we aggregated all the ways in which we communicated

5   with developer -- or sorry -- with users about Fortnite over

6   the time that it was on the store.

7      We were able to look historically and say, okay, between

8   our email -- and many of those -- those instances were

9   email -- between our email and our social media and our paid

10  marketing, it was over 500 million communications.

11       **THE COURT:**  When did you do this analysis?

12       **THE WITNESS:**  This was ongoing analysis.  So we would

13  often look and wrap those numbers up to present to Fortnite

14  and to other teams at Apple to give an overview of what we

15  were doing to support this business.

16     But that most -- that aggregate number that I came up with

17  was a conversation that I had with Steve McGuigan who leads

18  our marketing team about August of 2020.

19       **THE COURT:**  Proceed.

20  BY MR. SRINIVASAN:

21  **Q.**  What -- what does paid -- I think you mentioned owned

22  marketing and paid marketing.  What does paid marketing

23  include?

24  **A.**  Paid marketing is any instance in which we're paying for

25  that specific placement.  So it could be digital marketing

1    that's done on -- in a banner form on a website like the

2    *New York Times*.  Or it could be a billboard that's posted.  Or

3    it could be direct mail.  That's all kind of forms of paid

4    marketing.

5    **Q.**  Okay.

6        Do you have a sense of how much Apple spent on paid

7    marketing for Fortnite in particular?

8            **MS. MOSKOWITZ:**  Objection, foundation.

9            **MR. SRINIVASAN:**  I can lay some foundation, Your

10   Honor.

11           **THE COURT:**  All right.  Go ahead.

12   **BY MR. SRINIVASAN:**

13   **Q.**  Well, let me -- let me back up a little bit.

14       Do you -- do you recall, Mr. Schmid, when this lawsuit was

15   filed?

16   **A.**  I do.

17   **Q.**  Okay.  And do you recall when that was?

18   **A.**  August 2020.

19   **Q.**  Okay.  And do you recall that soon after this lawsuit was

20   filed -- well, I'll ask you open-endedly.

21       Well, do you recall whether you submitted a declaration in

22   connection with this lawsuit?

23   **A.**  I did.

24           **MS. MOSKOWITZ:**  Objection, Your Honor has ruled on

25   this.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1     **THE COURT:**  The fact of the submission is not
2     objectionable.  Overruled.
3     **MR. SRINIVASAN:**  Thank you, Your Honor.
4   **Q.**  And -- and do you -- do you recall whether you did some
5     investigation into Apple's efforts on behalf of Fortnite in
6     connection with that declaration?
7   **A.**  I did.
8   **Q.**  Okay.  And can you tell us the type of investigation you
9     did at that time?
10  **A.**  Yes.  So I worked with many of our cross-functional teams
11    to create an overview of all the support that we provided to
12    Epic over the course of our relationship.
13  **Q.**  And separate from that investigation, you were -- are
14    you -- where would you say you fall within the people at Apple
15    who deal regularly with Epic?
16  **A.**  I was certainly the most familiar with the account.  And I
17    dealt with them more regularly than any other person at Apple.
18  **Q.**  Okay.  So in connection with all of these efforts, did you
19    come to learn about Apple's specific efforts on behalf of
20    Fortnite from an advertising and marketing perspective?
21  **A.**  I did.
22  **Q.**  Okay.  And so with that in mind, Mr. Schmid, do you have a
23    sense of how much Fortnite -- or excuse me -- how much Apple
24    spent on marketing support to support Fortnite?
25  **A.**  Yes.  So in the last 11 months before Fortnite left the

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1   App Store, we'd spent just under a million dollars.

2   **Q.**   Okay.  And how did that support that Fortnite received

3   from Apple compare to other games on the App Store?

4   **A.**   It was far more than any other game I'd worked on at that

5   point and more than I've seen since.

6   **Q.**   And let's now turn actually to your relationship with

7   Epic.

8       When did you first get involved with Epic?

9   **A.**   I first joined the account in early 2018, roughly

10  February.

11  **Q.**   And what was the nature of your support of Epic when you

12  first got involved?

13  **A.**   At that point, I was still a member of the developer

14  marketing team, so my support focused largely on their

15  go-to-market strategy, helping them optimize their storefront,

16  doing some account or some system work on the back end with

17  them, and also just getting to understand their business.

18  **Q.**   And what was the nature of your support of Epic after

19  Fortnite launched?

20  **A.**   I would describe it as sort of a never-ending crescendo of

21  support.  So I -- I initially started on the developer

22  marketing team, but then moved on to the business management

23  team and took over the account full-time.

24  **Q.**   And was this a nine-to-five engagement in dealing with

25  Epic?

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1   **A.**  It was not.

2   **Q.**  What was it like in terms of the touch points with Epic?

3   **A.**  It was quite intense.  So there were 3:00 a.m. phone

4   calls, 5:00 a.m. phone calls, Christmas phone calls.  It was a

5   pretty demanding relationship.

6   **Q.**  And between the time you started working with Epic and the

7   time Epic was no longer in the App Store, what percentage of

8   your overall time would you say you focused on Epic?

9   **A.**  There were certainly moments where it was a hundred

10  percent of my week focused on Epic.  I eventually did bring

11  others onto the account, so two members of my team as well as

12  a member of the games team in Australia, to help kind of

13  alleviate some of those around-the-clock issues.

14      But some weeks it would be on maintenance mode, and it

15  would be 10 percent of my time would be focused on Epic.

16  **Q.**  And -- and how would you describe the overall relationship

17  between Apple and Epic during that two and a half period --

18  year period when Fortnite was on the App Store?

19  **A.**  Fairly tumultuous.  There was a lot of good times and a

20  lot of really stressful times.  But I would, yeah, overall

21  describe it as tumultuous.

22  **Q.**  And was it a net positive or a net negative that Fortnite

23  was on the App Store?

24  **A.**  Absolutely a net positive.

25  **Q.**  Okay.  And why -- why do you say that?

1    **A.**   This is an interesting one for me specifically.  So

2    Fortnite was the hottest game at the time.  I personally

3    played Fortnite.  My family played Fortnite.  We connected

4    over it.  My son played it on the iPad.  My wife played it on

5    PlayStation.  I played it on my iPad with the controller.  It

6    was a really awesome thing to be able to bring to the users on

7    the App Store.  So personally, I thought it was incredibly

8    exciting.

9         Professionally, it was an amazing game and it was awesome

10   to be able to highlight to our users.  It was also generating

11   lots of revenue.  So it was, in my opinion, worth that effort

12   to give them that nonstop support in order to bring this to

13   our users.

14   **Q.**   Okay.  And how many times, do you know, was Fortnite

15   reviewed during its time on the App Store?

16   **A.**   It was reviewed over 200 times.

17   **Q.**   Okay.

18        And are you a member of the app review team?

19   **A.**   I am not.

20   **Q.**   Did you have a role in app review with respect to

21   Fortnite?

22   **A.**   Only for advocating on their behalf.

23   **Q.**   In what way did you advocate on their behalf?

24   **A.**   So in a situation where there was some urgency around

25   getting Fortnite into review, I would often reach out to the

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    app review team and ask for their support in expediting a

2    review.  Not approving a review, but just expediting a review.

3    **Q.**  And how often did Epic request expedited app review?

4    **A.**  In 2020 alone, it was over 80 times.

5    **Q.**  Okay.  And do you know why there were so many expedite

6    requests from Epic on the Fortnite app?

7    **A.**  I do.  So I came from mobile game development.  I

8    understand and I empathize with our developers, especially

9    those that are kind of thriving on live ops.  It's a term we

10   use in gaming which generally means that the lifeblood of your

11   game is bringing new content to your game on a very frequent

12   basis.

13       Fortnite did this incredibly well.  They were always

14   bringing new content to the game.  And we knew that it was --

15   it was important for their business to continue to provide

16   that content to users.

17       And because they were so focused on bringing content to

18   their game, they often couldn't take a step back and fix some

19   systemic issues or some -- some planning issues around

20   submissions to the platforms, specifically our platform, the

21   App Store.

22   **Q.**  And I think you mentioned that there were 80-plus expedite

23   requests in 2020.  Did Apple address these requests in a

24   timely way?

25   **A.**  We did.

1   **Q.**   Okay.  I'm going ask you to turn back into your binder.  I

2   think hopefully everybody has their binders, DX3427, sir.

3   **A.**   (Reviewing document.)

4   **Q.**   And let me know when you've had a chance to pull that up.

5                         (Exhibit published.)

6               **THE WITNESS:**  Okay.  I'm there.

7   BY MR. SRINIVASAN:

8   **Q.**   Okay.  And can you tell us what this document is, DX3427?

9   **A.**   It is an exchange with myself, Mark Grimm from our

10  developer relations team, and Mary Ann Brunson from the app

11  review team.

12  **Q.**   Okay.

13  **A.**   The content of the document is basically just describing

14  the ongoing need for expedites and app review asking us or

15  really pushing back on us and asking if this is really

16  necessary.

17              **MS. MOSKOWITZ:**  Objection, Your Honor.  This is

18  technically not able to be used by Apple.  It's their own

19  hearsay.

20              **THE COURT:**  This document was admitted as a business

21  record, correct?

22              **MR. SRINIVASAN:**  We offer -- we're offering it as a

23  business record, Your Honor.  We haven't had it admitted yet,

24  but we'd like to do that.

25              **THE COURT:**  I'll admit it as a business record.

1          (Defendant's Exhibit DX4327 received in evidence)

2              **MR. SRINIVASAN:**  Thank you, Your Honor.

3     **Q.**  Mr. Schmid, did you participate in this chain?

4     **A.**  I did.

5     **Q.**  And what is the date of this email chain?

6     **A.**  March 27th, 2019.

7     **Q.**  And I think you already gave us a general sense of what

8     this chain was.

9          If you could -- if I can just turn you to the first page

10    of this document.

11                    (Exhibit published.)

12    **BY MR. SRINIVASAN:**

13    **Q.**  And at the bottom there, Ms. Brunson, I think it is, says

14    at the very last sentence on that first page, quote, "It

15    almost feels like they're abusing expedite requests due to a

16    systemic issue on their end in the development QA submission

17    process."

18         Did you agree with your colleague that Epic was abusing

19    the expedite process?

20             **MS. MOSKOWITZ:**  Objection.

21             **THE COURT:**  Overruled.

22             **THE WITNESS:**  I did not.

23    **BY MR. SRINIVASAN:**

24    **Q.**  Can you tell us why?

25    **A.**  Like I mentioned earlier, I truly understand the plight of

1    game developers especially that are operating at this speed.

2    So while I don't agree that they were abusing the expedite

3    request system, I do agree there was a systematic issue that

4    they were not addressing.

5         I would relate it to, you know, I'm -- I used to be very

6    late to things all of the time, and I would often have a

7    really good excuse.  And my wife would understand that excuse.

8    But she would also say I would really like to see something

9    change in your planning and your behavior in order to prevent

10   this from happening.  So if you know you're always late, you

11   should start planning things earlier.

12   **Q.**  Okay.  And let's turn to 3758 if you can turn to that in

13   your binder.

14   **A.**  To be clear, I'm still always late to things.

15        (Reviewing document.)

16                      (Exhibit published.)

17             **THE WITNESS:**  Okay.

18   **BY MR. SRINIVASAN:**

19   **Q.**  Can you tell us what 3758 is?  Well, let me stop.  Let me

20   ask first.  Is this an email chain that you were on,

21   Mr. Schmid?

22   **A.**  It is.

23   **Q.**  And what was the date of the email chain?

24   **A.**  It is my birthday, 2019, October 31st.

25   **Q.**  And is this an email chain you had with folks at Epic?

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **A.**  I did.

2            **MR. SRINIVASAN:**  Okay.  We'd like to move 3758 into

3    evidence, Your Honor.

4            **MS. MOSKOWITZ:**  No objection.

5            **THE COURT:**  Admitted.

6            **MR. SRINIVASAN:**  Thank you.

7        (Defendant's Exhibit DX3758 received in evidence)

8    **BY MR. SRINIVASAN:**

9    **Q.**  And what was the context for this chain, Mr. Schmid?

10   **A.**  Again, it was another example of an expedite request from

11   Epic in which Mark Grimm replied, explaining that, you know --

12   if I can read it.  "We've had this emergency -- we've had

13   emergency patches with critical fixes every week," and

14   "emergency" and "critical" are in quotes.

15       And then he said, "I worry that these words are losing

16   their meaning."  And then he expressed that there's concern

17   and we need to prioritize the submission to the App Store.

18   **Q.**  Well, thank you for that.

19       First of all, who is Mark Grimm?

20   **A.**  He is on our developer relations team, and he focuses on

21   games.

22   **Q.**  Okay.  And did you have an understanding of what Mr. Grimm

23   was conveying here in the email?

24   **A.**  Yes.

25           **MS. MOSKOWITZ:**  Objection.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1          **THE COURT:**  You can testify as to your understanding,

2     which is what I understood the question to ask.  Overruled.

3          **THE WITNESS:**  So my understanding -- and -- and Mark

4     and myself and the others on this account were very much in

5     lockstep on this.  My understanding was that he was saying

6     we're going to have a hard time continuing to justify

7     emergencies when every submission is an emergency.

8     **BY MR. SRINIVASAN:**

9     **Q.**  Okay.  Did you ever feel like you could push back and

10    simply not respond to the latest Epic emergency?

11    **A.**  No.

12    **Q.**  Why not?

13    **A.**  There was certainly the concern and sometimes the threat

14    that we would be left behind and that our users would not

15    receive the latest update to Fortnite and could not play with

16    the other platforms if we did not get an expedited review

17    going.

18         So it was never a situation where I felt like it was

19    appropriate to say, no, we're not going to expedite this or

20    we're not going to -- to bring this up with app review.

21    **Q.**  Okay.

22         In terms of the people you dealt with at Epic, what was

23    their reaction typically to Apple's various efforts to support

24    Epic and Fortnite on the App Store?

25    **A.**  Generally very positive.  The folks I worked with I became

1    quite close with.  Many of them I consider friends still.  And

2    it was a really close relationship.  We were -- we were

3    working together in tough times and in good times so you

4    develop a personal connection with them.

5    **Q.**  Okay.

6        Can you turn to DX4239, sir.

7                        (Exhibit published.)

8            **THE WITNESS:**  (Reviewing document.)

9        Okay.

10   **BY MR. SRINIVASAN:**

11   **Q.**  Okay.  And is 42 -- is this -- first of all, what is this

12   document, can you describe for us?

13   **A.**  This is an email from Haseeb Malik to myself, Mark Grimm,

14   and Alec Shobin who was on his team, and it was sent

15   August 1st of 2019.

16   **Q.**  Okay.  And do you recall participating in this email

17   chain?

18   **A.**  I do.

19           **MR. SRINIVASAN:**  Okay.  And Your Honor, we'd like to

20   move DX3958 into evidence.

21           **MS. MOSKOWITZ:**  No objection.  And, Your Honor, you

22   may note there has been a redaction so this will be subject to

23   a motion to seal.

24           **MR. SRINIVASAN:**  I believe that redactions are --

25           **THE COURT:**  So two things.  One, it's 4239.  Not 58.

1    Or unless I'm on the wrong one.

2              **MR. SRINIVASAN:**  We are on -- we are on 4239, Your

3    Honor.  Sorry if I misspoke.

4              **THE COURT:**  Second, the redactions that I see are not

5    objectionable.  Is there -- Ms. Moskowitz, is there an issue

6    with respect to the redactions?

7              **MS. MOSKOWITZ:**  No.  I was just noting that there was

8    one just beyond the emails that --

9              **THE COURT:**  Yes, and I see it and I think it's

10   appropriate.

11             **MS. MOSKOWITZ:**  Thank you.

12             **THE COURT:**  So it's granted.

13             **MR. SRINIVASAN:**  Thank you, Your Honor.

14   **Q.**  And what is this email chain about, Mr. Schmid?

15   **A.**  This is Haseeb thanking us.  The subject line is "Thank

16   You."  And it was after a -- you know, one of those moments

17   where we were working late and trying to get things through

18   the -- the pipeline, for lack of a better term, efficiently.

19        And he said, "in all of today's actions, it did not go

20   unnoticed that we propagated quickly.  There was a highlight

21   mentioning in weekly Fortnite's stakeholders meeting today.

22   These wins truly matter to our teams here."

23   **Q.**  And was Mr. Malik one of your primary points of contact at

24   Epic?

25   **A.**  He was.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1   **Q.**   And who were your primary contacts at Epic, by the way?

2   **A.**   When I first started on the account, Mark Hutcheson, who

3   was the director of marketing at the time, was my primary

4   point of contact.  He then moved over to the Epic Games Store

5   before leaving Epic.

6        After that, Brad Cummings who was on this team became the

7   main point of contact, who also moved over to the Epic Games

8   Store, and then left the company.

9        And then Haseeb Malik took over as director of mobile

10  marketing.  He was my main point of contact before leaving the

11  company.

12       And then finally Alec Shobin, who is my most recent

13  contact and has been at Epic for some time now.

14  **Q.**   And I'm -- was that four people that you listed --

15  **A.**   Correct.

16  **Q.**   -- at Epic?  And then of those four, three left in the two

17  and a half years that you worked with them?

18  **A.**   Correct.

19  **Q.**   Okay.  And then did you become -- I think you mentioned

20  this, but did you become personal friends with any of these

21  individuals?

22  **A.**   Yes.

23  **Q.**   Who are they?

24  **A.**   All of them.

25            **MS. MOSKOWITZ:**   Objection, relevance.

1          **THE COURT:**  Sustained.

2          **MR. SRINIVASAN:**  Okay.

3     **Q.**  Let's turn now to DX3661.

4     **A.**  (Reviewing document.)

5                     (Exhibit published.)

6     **BY MR. SRINIVASAN:**

7     **Q.**  And can you tell us what this document is, sir, when you

8     have a chance to get to -- get to it.

9     **A.**  (Reviewing document.)

10         This is an email from Adam Sussman to Nate Nanzer, Matt

11    Fischer, Matt Weissinger, Sima Sistani, Philip Piliero, and

12    Alec Shobin.

13    **Q.**  Okay.  And I think the -- the un- -- there's some

14    redactions here because I think you -- do you recall receiving

15    this email?

16    **A.**  I am also on this email, but it's redacted in this copy.

17    **Q.**  Okay.  And we can get that fixed, but what -- do you

18    recall participating in this email chain?

19    **A.**  I do.

20    **Q.**  And do you recall the date of this chain?

21    **A.**  It is May 16th, 2020.

22         **MR. SRINIVASAN:**  Okay.  And, Your Honor, we'd like to

23    move DX3661 into evidence.

24         **MS. MOSKOWITZ:**  No objection.

25         **THE COURT:**  It's admitted.

1          (Defendant's Exhibit DX3661 received in evidence)

2              **MR. SRINIVASAN:**  Thank you.

3    **Q.**  And who is Adam Sussman?

4    **A.**  I believe he is the president of Epic Games.

5    **Q.**  Okay.  And then on -- on page 2 of this email, if you can

6    go there.

7                        (Exhibit published.)

8    **BY MR. SRINIVASAN:**

9    **Q.**  Mr. Sussman writes you and your team an email that says,

10   quote, "Apple team, thanks again for your time today, your

11   engagement, and your tremendous support over the last few

12   weeks."  And then he goes on.

13       Do you know what -- do you have an understanding of what

14   Mr. Sussman was thanking your team for?

15   **A.**  Ongoing support.  Generally there were -- there were

16   pretty much endless live ops happening between all the -- the

17   games and apps that Epic was managing at that time.  So he was

18   thanking us, I believe, specifically for the In The House

19   campaign, which was a collaboration between their Houseparty

20   app and their Fortnite game.

21   **Q.**  Okay.  And -- and this -- and this email came roughly a

22   year ago; is that right?

23   **A.**  Correct.

24   **Q.**  And was Fortnite still on the App Store at this time?

25   **A.**  It was.

SCHMID – DIRECT (RESUMED) / SRINIVASAN

1    **Q.**  Okay.  And let's finally turn to DX3958.

2    **A.**  (Reviewing document.)

3                        (Exhibit published.)

4            **MS. MOSKOWITZ:**  Objection.  I object to this document

5    shouldn't be on the screen.  It's hearsay, former employee,

6    it's no party admission.

7            **MR. SRINIVASAN:**  Your Honor, we're happy to discuss

8    the non-hearsay aspect of this document.

9            **THE COURT:**  Well, why don't you discuss it first.  I

10   can decide --

11           **MR. SRINIVASAN:**  Sure.

12           **THE COURT:**  -- whether to let in it later.

13           **MR. SRINIVASAN:**  Okay.

14   **Q.**  And, Mr. Schmid, do you recall -- well, do you recall the

15   day on which the Fortnite hot fix took place?

16   **A.**  I do.  It was August 13th, 2020.

17   **Q.**  Okay.  And you mentioned a Mr. Haseeb Malik earlier.  Who

18   was he again?

19   **A.**  He was at that time the former director of marketing,

20   mobile marketing for Fortnite.

21   **Q.**  Okay.  And do you recall that he sent you communication

22   that day?

23   **A.**  He did.

24   **Q.**  Okay.  And do you recall -- first of all, what -- what did

25   he -- what did he communicate with you about in general?

1          **MS. MOSKOWITZ:**  Objection.  Relevance, hearsay.

2          **THE COURT:**  What is the point?

3          **MR. SRINIVASAN:**  The -- well, the point is what the

4     effect on Mr. Schmid was of the communication he received from

5     his former Epic colleague.

6          **MS. MOSKOWITZ:**  Relevance.

7          **THE COURT:**  Overruled.  Go ahead.

8     BY MR. SRINIVASAN:

9     **Q.**  And leaving aside what he said to you in particular, what

10    was your understanding of why Mr. Malik was communicating with

11    you on that day?

12    **A.**  It was extremely relevant to all the work that we had done

13    together to see what had happened, you know, with Fortnite

14    essentially doing the hot fix, as we're calling it.  He worked

15    so closely with our team to -- to do all these great things

16    together, that I'm sure he -- he felt some --

17         **THE COURT:**  You can't testify as to what he felt.

18    BY MR. SRINIVASAN:

19    **Q.**  Yeah.  What was your -- what was your takeaway from that

20    communication from Mr. Malik that day?

21    **A.**  My takeaway was that he was sympathizing for me and my

22    team after all the work that we had done.  So I felt validated

23    by his message and his understanding of the situation, his

24    intimate understanding of situation.

25         **MS. MOSKOWITZ:**  Objection.  Foundation.

1          **THE COURT:**  Well, he has no --

2          **MS. MOSKOWITZ:**  Move to strike.

3          **THE COURT:**  -- for his feelings, but it's -- I don't

4     know that it's really all that relevant.  Move on.

5          **MR. SRINIVASAN:**  Okay.  Thank you, Your Honor.  I --

6     I pass the witness.

7          **THE COURT:**  Cross.

8          **MS. MOSKOWITZ:**  May I proceed?

9          **THE COURT:**  Proceed, Ms. Moskowitz.

10         **MS. MOSKOWITZ:**  Lauren Moskowitz for Epic.  Thank

11    you.

12                        **CROSS-EXAMINATION**

13    BY MS. MOSKOWITZ:

14    **Q.**  Good morning, Mr. Schmid.

15    **A.**  Good morning, Ms. Moskowitz.

16    **Q.**  It's nice to see you again.

17    **A.**  It's nice to see you too.

18    **Q.**  Thank you.

19         A couple of upfront questions.

20         You spoke earlier on direct about your work for a number

21    of game developers before you went to Apple; is that right?

22    **A.**  Correct.

23    **Q.**  Those were all mobile game developers, right?

24    **A.**  Incorrect.

25    **Q.**  You developed -- you worked for developers of console

```
 1   games as well?

 2   A.   Correct.

 3   Q.   For the mobile development that you were doing, were you

 4   developing for both Apple and Android?

 5   A.   Yes.

 6   Q.   Were there any games that you did just for Android?

 7   A.   Not that I can recall.

 8   Q.   You said that Apple, in your view, competes with consoles

 9   and PC and other platforms on games.  Do you recall that

10   testimony?

11   A.   I do.

12   Q.   Has Apple ever offered a better commission rate to any

13   developer to meet any competitive aspects of the business?

14   A.   I can only speak to the game development side which is my

15   focus, and they have not.

16   Q.   You're familiar with Sign in with Apple?

17   A.   I am.

18   Q.   Sign in with Apple is a mechanism offered by Apple that

19   allows users to sign in to third-party apps under the user's

20   Apple I.D., right?

21   A.   Correct, or an obfuscated version of the Apple I.D.

22   Q.   And one of the benefits of that in Apple's view is that

23   it's more -- a private way to sign in to third-party apps,

24   right?

25   A.   Correct.
```

SCHMID - CROSS / MOSKOWITZ

1    **Q.**   For example, one of the features is the user can hide

2    their email from the third-party developer, right?

3    **A.**   Correct.

4    **Q.**   So with Sign in with Apple, you -- the user need not sign

5    up for an account with an individual developer in order to use

6    that third-party developer's app or even receive

7    communications in connection with that app, right?

8    **A.**   I think that's a misunderstanding.

9    **Q.**   So under Sign in with Apple, you do need to sign up to an

10   account with the third-party developer in order to use that

11   app and receive communications?

12   **A.**   So a developer is allowed to tie --

13   **Q.**   Yes or no?  Do you need to sign up for an account with a

14   third-party developer if you want to use Sign in with Apple?

15   **A.**   I don't think I can answer that question.

16   **Q.**   You're just not familiar enough with the CWEB, the Sign in

17   with Apple process?

18   **A.**   There's much more nuance than that a yes or no would allow

19   me to give you.

20   **Q.**   Okay.

21      Apple mandates that all apps that want to offer any other

22   third-party log-in option like Facebook or Google must also

23   offer Sign in with Apple, correct?

24   **A.**   Correct.

25   **Q.**   You don't require that when the app does not want to offer

SCHMID – CROSS / MOSKOWITZ

1    third-party log-in options, right?

2    **A.**   Correct.

3    **Q.**   You recall Epic, in fact, went through some issues with

4    setting up Sign in with Apple.  Do you recall that?

5    **A.**   I do.

6    **Q.**   And do you remember they were having issues because Sign

7    in with Apple wasn't letting Epic collect information it

8    needed to collect to comply with parental verification laws?

9    **A.**   I don't recall.

10   **Q.**   Do you recall that the Sign in with Apple process wasn't

11   allowing Epic to collect that information that Epic needed to

12   identify users' date of birth to link them?

13   **A.**   No.  This would have been something the developer

14   relation --

15                      (Simultaneous colloquy.)

16   **BY MS. MOSKOWITZ:**

17   **Q.**   -- don't remember that?

18   **A.**   This is not something my team would have handled.

19   **Q.**   Do you use apps that use Sign in with Apple yourself?

20   **A.**   Yes.

21   **Q.**   Do you use the Sign in with Apple to sign in to those

22   apps?

23   **A.**   I do.

24   **Q.**   Are there any that you don't use Sign in with Apple for?

25   **A.**   Yes.

SCHMID - CROSS / MOSKOWITZ

1    **Q.**  Why don't you use Sign in with Apple for those?

2    **A.**  Some accounts I've had since before Sign in with Apple was

3    available.

4    **Q.**  Is that the only instance?

5    **A.**  Yes.

6    **Q.**  Do you remember there was a question on direct about,

7    quote, users wanting to avoid commission to Apple and going

8    off of the native app to make purchases?  Do you remember

9    that?

10   **A.**  I do.

11   **Q.**  Users don't know about any commission that's going to

12   Apple, right?

13   **A.**  I could not tell you what broadly users are aware of and

14   not aware of when it comes to the commission rate.

15   **Q.**  So you can't tell me that Apple forbids developers from

16   telling consumers that they charge a -- Apple charges a

17   commission?

18   **A.**  That -- that is incorrect.  Apple does not prevent

19   developers from telling users anything --

20   **Q.**  Apple didn't stop Facebook from doing that?

21   **A.**  I'm sorry.  I could not speak to Facebook.  They're not a

22   game developer.

23   **Q.**  Okay.  So you don't know anything about developers that

24   are other than game developers?

25   **A.**  That is my focus.

1    **Q.**  So you don't know one way or the other whether that

2    happened with Facebook?

3    **A.**  Facebook is not an account that I am --

4                      (Simultaneous colloquy.)

5    **BY THE WITNESS:**

6    **Q.**  I'm not asking about whether they're an account you

7    handle.  I'm asking are you aware that that happened?

8    **A.**  I don't follow Facebook.

9    **Q.**  You are not aware that that happened, no?

10   **A.**  Can you repeat what you're asking --

11   **Q.**  Are you aware --

12            **THE COURT:**  Okay.  The two of you, do not talk over

13   each other.  And slow down.

14            **MS. MOSKOWITZ:**  Thank you.

15            **THE WITNESS:**  Sorry, Your Honor.

16   **BY MS. MOSKOWITZ:**

17   **Q.**  Are you aware that Facebook publicly stated that Apple had

18   told them that they were to not tell the public that Apple was

19   charging them a 30 percent commission?

20   **A.**  I'm actually not aware of that.

21   **Q.**  You testified on direct that certain developers that have

22   native apps on iOS do have currency or content available for

23   purchase on web sites.  You remember that?

24   **A.**  Yes.

25   **Q.**  And you have an understanding that Apple offered expert

SCHMID - CROSS / MOSKOWITZ

1   testimony about what can and cannot be done on iOS?

2   **A.**   I'm sorry?

3   **Q.**   Are you aware that Apple offered expert testimony that

4   what -- about what can and cannot be done on websites through

5   an iOS device?

6   **A.**   I am unaware of that.

7   **Q.**   So you're not aware that Candy Crush was the subject of

8   some debate last week in court?

9   **A.**   I am not aware of that.

10  **Q.**   You don't play Candy Crush, do you?

11  **A.**   I'm not a big Candy Crush player.

12  **Q.**   You're not a Candy Crush player at all, are you?

13  **A.**   I wouldn't say at all.  I dabble.  But I'm not a big Candy

14  Crush player.

15  **Q.**   The video we showed -- you showed earlier, was that your

16  account?

17  **A.**   That was a new account.

18  **Q.**   So that was not your account?

19  **A.**   No.  Unfortunately I lost the log-in to my original

20  account.

21  **Q.**   All right.  So let's talk about Candy Crush.

22          You said you made that video yourself two days ago?

23  **A.**   Correct.

24  **Q.**   Were any Ph.D. economists involved in helping you?

25  **A.**   They were not.

SCHMID – CROSS / MOSKOWITZ

1   **Q.**  Your video left a few things out, didn't it?

2   **A.**  It did not.

3   **Q.**  Didn't leave any steps at all out of the video?

4   **A.**  It did not.

5   **Q.**  All right.  Well, it didn't show you logging into an

6   account on the app, did it?

7   **A.**  Oh, I was already logged in, correct.

8   **Q.**  Yeah, you were already logged in.  Do you know how you

9   logged in to the app?

10  **A.**  I believe in that occasion, I logged in -- I actually

11  don't know.  I'm sorry, I can't recall exactly how I logged

12  in.

13  **Q.**  Do you know anything about what a user's options are to

14  log in to Candy Crush on the native app?

15  **A.**  There's -- they can certainly log in with a King account.

16  They can log in with some social media accounts.  And then

17  they can also log in with Sign in with Apple.

18  **Q.**  The video also didn't show you logging into the account on

19  the King.com website did it?

20  **A.**  It did not.

21  **Q.**  You were already logged in, right?

22  **A.**  Correct.

23  **Q.**  And do you know what a user's options are to log in to

24  Candy Crush on the website?

25  **A.**  I believe they are the same as I mentioned for the native

1    app.

2    **Q.**  You think that you can Sign in with Apple on the website?

3    **A.**  I could not say definitively.

4    **Q.**  Are you -- do you think you signed in with Apple on either

5    the native app or the website when you put that video

6    together?

7    **A.**  I could not say.

8    **Q.**  Are you aware that if a user does in fact Sign in with

9    Apple on the native app, your video doesn't work?

10   **A.**  I am not aware of that.

11   **Q.**  Are you aware that only a user who actually creates a King

12   account with their email and their password and logs in under

13   that King account on both the native app and the website does

14   that work?

15   **A.**  I could not tell you.

16   **Q.**  All right.  Well, why don't we do it.

17        Let's walk through this in realtime instead of an edited

18   video.

19        My colleague, Ms. Hauserman, is here.  And we're going to

20   do our best to connect the phone to the screen here and see if

21   we can figure that out.

22   **A.**  Would it be possible to use my phone?

23   **Q.**  No.

24   **A.**  Okay.

25             **MS. MOSKOWITZ:**  So, Ms. Hauserman, can you please

1    click on the Candy Crush app.

2                    (Demonstrative published.)

3    **BY MS. MOSKOWITZ:**

4    **Q.**  All right.  Mr. Schmid, you can see here she's not

5    currently logged in, right?

6    **A.**  Could you click play?

7                    (Demonstrative published.)

8              **THE WITNESS:**  She's going to have to go through the

9    first-time user experience in order to create an account.

10   **BY MS. MOSKOWITZ:**

11   **Q.**  Right.  Let's -- why don't we go back -- I'll be steering

12   the bus on this one.

13      Why don't you hit "Retrieve my progress" and see if she's

14   logged in.

15                   (Demonstrative published.)

16   **BY MS. MOSKOWITZ:**

17   **Q.**  Okay.  So when she does that, she's presented with some

18   sign-in options, right?

19   **A.**  Correct.

20   **Q.**  And none of this was shown in your video, right?

21   **A.**  I was already logged in, correct.

22   **Q.**  And you see there are three options available?

23   **A.**  Correct.

24   **Q.**  All right.  So sign up with Apple -- I'm sorry.  Sign in

25   with email is there in the green.  Do you see that?

1    **A.**  Yes.  It's the biggest one.

2    **Q.**  Continue with Facebook.

3    **A.**  Yes.

4    **Q.**  And continue with Apple.

5    **A.**  Yes.

6    **Q.**  And below that there's an alternative, it says log in with

7    email.

8    **A.**  If you already have an account, correct.

9    **Q.**  And the sign up with email in green and the log in with

10   email both refer to having a King account, right?

11   **A.**  I believe so, yes.

12   **Q.**  And at the top, do you see this banner, it says "don't

13   lose your progress"?

14   **A.**  Yes.

15   **Q.**  All right.

16         **MS. MOSKOWITZ:**  And if you scroll, Ms. Hauserman, to

17   the right, there's another part of that banner.  It says, "You

18   decide where to play."

19   **Q.**  Do you see that, Mr. Schmid?

20   **A.**  I do.

21   **Q.**  It says, "Use your King account to continue playing

22   anywhere and on any device."

23         Does that -- did I read that right?

24   **A.**  Correct.

25   **Q.**  You didn't show that in your video either, right?

1    **A.**  I did not.

2              **MS. MOSKOWITZ:**  All right.  Why don't you scroll,

3    Ms. Hauserman one more, and let's just see if there's anything

4    of note.

5    **Q.**  All right.  Mr. Schmid, it does not say anywhere in this

6    screen "Go buy gold bars on our website."  Does it?

7    **A.**  It does not.

8    **Q.**  In fact, it's against Apple's rules to say that, isn't it?

9    **A.**  So as I clarified earlier, the developer's choice was

10   to --

11   **Q.**  Sir?

12   **A.**  -- push users --

13   **Q.**  Sir?

14   **A.**  -- towards the native app --

15   **Q.**  Sir?

16   **A.**  I'm sorry.  Yes?

17                     (Simultaneous colloquy.)

18   **BY MS. MOSKOWITZ:**

19   **Q.**  I'm asking a yes or no question.  It's against Apple's

20   rules to tell users that they can go outside of the app and go

21   make purchases of in-app currency, right?

22   **A.**  Correct.

23   **Q.**  So when you said on direct that Apple doesn't do anything

24   to stop developers from offering currency outside of the

25   native app, Apple does in fact tell them that they cannot tell

1    users they're doing that, right?

2    **A.**   Only inside the native app.

3    **Q.**   Meaning if someone's in the native app, they cannot be

4    told within that app that there's something they can do

5    elsewhere to buy content.

6    **A.**   Correct.

7    **Q.**   All right.

8        So let's go, now we're back to these options.  Continue

9    with Apple's -- the same thing we were talking about when we

10   were talking about Sign in with Apple; is that right?

11   **A.**   Correct.

12   **Q.**   All right.

13       And you don't remember what you clicked for your video.

14   **A.**   I truly do not.

15   **Q.**   Well, let's see what happens if we try to do this with the

16   Sign in with Apple option.

17           **MS. MOSKOWITZ:**  If Ms. Hauserman could please click

18   on "Continue with Apple."

19                   (Demonstrative published.)

20           **MS. MOSKOWITZ:**  Okay.  And please go ahead and sign

21   in, Ms. Hauserman.

22                   (Demonstrative published.)

23   **BY MS. MOSKOWITZ:**

24   **Q.**   All right.  You see we're now logged in there, Mr. Schmid?

25   **A.**   I do.

1   **Q.**  All right.  And the game is now available to play and save

2   on the native app?

3          **MS. MOSKOWITZ:**  You can exit out that, Ms. Hauserman.

4   **Q.**  We now have the "My Account" screen and we're all logged

5   in, right?

6   **A.**  Correct.

7   **Q.**  All right.

8          **MS. MOSKOWITZ:**  So please exit the app,

9   Ms. Hauserman, and let's go see about going to candycrush.com

10  like we saw in the video earlier.

11         **THE WITNESS:**  Could you confirm the amount of gold

12  you have in the native app first?

13  **BY MS. MOSKOWITZ:**

14  **Q.**  Sure.

15                 (Demonstrative published.)

16  **BY MS. MOSKOWITZ:**

17  **Q.**  Twenty.  See that?

18  **A.**  Thank you.

19  **Q.**  Okay.  All right.  So we're going to navigate to

20  candycrush.com like we saw in the video.

21                 (Demonstrative published.)

22  **BY MS. MOSKOWITZ:**

23  **Q.**  And you see that redirects to you King.com, the

24  developer's website?

25  **A.**  Correct.

SCHMID – CROSS / MOSKOWITZ

1  **Q.**  All right.  The screen that comes up shows an install

2  button, right, that if pressed brings you back to the app,

3  right?

4  **A.**  Correct.

5  **Q.**  But your video showed us something else.

6  **A.**  No.

7  **Q.**  Your video showed something else happening after this

8  instead of going back to the App Store, right?

9  **A.**  Correct.

10  **Q.**  Okay.  So yours showed us that if you go to that bar that

11  says AA, there's a few options that appear, right?

12  **A.**  Yes.

13  **Q.**  All right.

14       **MS. MOSKOWITZ:**  So why don't you, Ms. Hauserman,

15  please hover over that and see what we have.

16  **Q.**  So the request desktop website is what you clicked, right?

17  **A.**  Correct.

18  **Q.**  And that option tricks your device into thinking it's a

19  desktop and is no longer restricted to what the mobile

20  websites are either choosing or permitted to display, right?

21  **A.**  It does not trick your device.

22  **Q.**  It tells your device, instead of the mobile default

23  website, that it's going to go fetch a desktop version, right?

24  **A.**  Incorrect.  It tells the website that this is a desktop

25  client.

SCHMID - CROSS / MOSKOWITZ

1    **Q.**  Right.  And it's not a desktop client, right?

2    **A.**  Correct.

3    **Q.**  And by the way, that's not the default setting, right?

4    **A.**  Correct.

5    **Q.**  Are you aware that certain desktop sites in fact don't

6    function on an iOS device?

7    **A.**  Could you elaborate?

8    **Q.**  Are you aware that some desktop sites don't allow you to

9    use your touch controls when used on an iOS device?

10   **A.**  Are you referring to like a flash website or --

11   **Q.**  Any -- any experience with this whatsoever?  You showed us

12   a whole bunch of things you can do on a website.  Have you

13   tried to use desktop sites for touch control activities?

14   **A.**  I have.

15   **Q.**  Okay.  And are you aware that sometimes that does not

16   work?

17   **A.**  I have not encountered that personally.

18   **Q.**  Okay.

19       And do you think that this request desktop website is

20   widely known by users of iOS devices?

21   **A.**  I do.

22   **Q.**  And what's your basis for that?

23   **A.**  It's my belief that it's clearly an option.  We don't hide

24   it in any way, shape, or form.  It's actually in a trafficked

25   area where we also put privacy reports and other settings.

1   **Q.**  So people click on that double A routinely, in your

2   experience?

3   **A.**  I certainly use it for Facebook.

4   **Q.**  Okay.

5       **MS. MOSKOWITZ:**  All right.  So why don't we go ahead

6   and click that request -- request desktop website dropdown.

7                (Demonstrative published.)

8   **BY MS. MOSKOWITZ:**

9   **Q.**  All right.  So now we're on the desktop version that the

10  phone now thinks it's a desktop?

11  **A.**  The website now believes the phone is a desktop.

12  **Q.**  Okay.  And so now we have a "play now" option.  Is that

13  what you showed on your video?

14  **A.**  It is.

15  **Q.**  All right.

16      **MS. MOSKOWITZ:**  So why don't we go ahead and go in

17  there.  Play now.

18                (Demonstrative published.)

19  **BY MS. MOSKOWITZ:**

20  **Q.**  And I guess just like your video, we're going to have to

21  resize the screen because the website still thinks we're on a

22  desktop, right?

23  **A.**  Correct.

24  **Q.**  All right.

25      **MS. MOSKOWITZ:**  And Ms. Hauserman, there's a little

1    icon, it looks like a disk, right?

2    **Q.**  Is that right, Mr. Schmid?  That's the save button on the

3    left?

4    **A.**  I believe so, yes.

5    **Q.**  All right.  So again we're not logged in, unlike what you

6    were on your video, right?

7    **A.**  Could you click on that, please?

8    **Q.**  Yeah, let's do that.

9                        (Demonstrative published.)

10   **BY MS. MOSKOWITZ:**

11   **Q.**  That pops up a log-in screen, right?

12   **A.**  Yes.

13   **Q.**  And why don't we make that a little bit bigger?  We still

14   have to tell our website that we're on a phone.

15       Okay.  So it says "save your progress."  Do you see that?

16   **A.**  I do.

17   **Q.**  And it gives you an option to either set up an account or

18   in -- or in -- or to log in to an existing account?

19   **A.**  Yes.

20   **Q.**  And those are King.com accounts, right?

21   **A.**  I believe so.

22   **Q.**  You don't see continue with Apple anywhere there.

23   **A.**  The developer has chosen not to provide that option.

24   **Q.**  Okay.  So there's no way for a user to log in to the Candy

25   Crush on the website through Sign in with Apple.

1   **A.**  Could you click on log in to existing account just so we

2   can verify?

3   **Q.**  Well, we're going to -- we're going to do that.

4   **A.**  Okay.

5   **Q.**  I'm just asking you, do you believe that there's any

6   evidence here that a Sign in with Apple option is available?

7   **A.**  I do not see any.

8   **Q.**  And logging in, of course, is a necessary step to

9   accomplish what you showed in your video, right?

10  **A.**  Correct.

11  **Q.**  You just didn't show that step in your video?

12  **A.**  Correct.

13  **Q.**  All right.  So let's just try.  Let's see what happens

14  when we log in with an existing account and we try to use our

15  Sign in with Apple.

16         **MS. MOSKOWITZ:**  Ms. Hauserman, can you please click

17  on the log-in button.

18                    (Demonstrative published.)

19  **BY MS. MOSKOWITZ:**

20  **Q.**  All right.  Enter the kingdom, it says, right?

21  **A.**  Yes.

22  **Q.**  So we're going to -- you want to us try our Sign in with

23  Apple, our Apple I.D. and password?

24  **A.**  I do not.

25  **Q.**  Okay.  Well, if we did that, it wouldn't work, right?

SCHMID — CROSS / MOSKOWITZ

1   **A.**   Correct.

2   **Q.**   Okay, so there's no option to sign in with Apple here.

3   **A.**   The developer has not provided one in this instance.

4   **Q.**   All right.  So is it fair to say that you were in fact

5   signed in with a king.com account for your video?

6   **A.**   Yes.

7   **Q.**   All right.

8        And a user then, if they wanted to do what you did in your

9   video, can't take advantage of the Sign in with Apple option

10  and all the privacy and hide your email benefits associated

11  with it if they want to do what you showed in your video,

12  right?

13  **A.**   At the developer's choice, they have not enabled that.

14  **Q.**   Not for Candy Crush, right?

15  **A.**   Correct.

16  **Q.**   All right.

17       You also talked about Hearthstone.  That's a game you

18  play, it sounded like?

19  **A.**   Yes.

20  **Q.**   All right.  So you picked that game?

21  **A.**   Yes.

22  **Q.**   All right.

23       So that game is rated 115th as of yesterday in the

24  category cards.  Would you dispute that?

25  **A.**   I could not tell you one way or another.

SCHMID – CROSS / MOSKOWITZ

1 **Q.** Okay.

2  And you're not under the impression that Epic is arguing

3 that there's not a single app that allows for virtual currency

4 to be purchased on an iOS web browser, are you?

5 **A.** No.

6 **Q.** Okay.

7  And again, that video -- we're not going to do the painful

8 reenactment -- also you were already logged in for that too,

9 right?

10 **A.** I'm always logged into Battle.net.

11 **Q.** Yeah, both on the app on the website, right?

12 **A.** Correct.

13 **Q.** All right.

14  And the options -- so just going back to that video as we

15 watched it, you scrolled through the shop within the app

16 first, right?

17 **A.** Correct.

18 **Q.** And the options to buy were right there.  They were one

19 click away as you were scrolling through, right?

20 **A.** Correct.

21 **Q.** And your payment options were already saved as well on the

22 website.

23 **A.** Correct.

24 **Q.** And they're also saved on the native app?

25 **A.** Correct.

SCHMID – CROSS / MOSKOWITZ

1   **Q.**  Counsel asked you if the same -- if the same price on the

2   website was the same price -- he used the words "as in the App

3   Store."  Do you remember that?

4   **A.**  I do.

5   **Q.**  You can't buy that stuff in the App Store, right?  Only in

6   the native app, right?

7   **A.**  I'm sorry?

8   **Q.**  You can't buy that pack on the App Store, can you?

9   **A.**  If the developer enabled promote an in-app purchase, you

10  could.

11  **Q.**  Within the app you purchase that, not on the App Store,

12  right?

13  **A.**  Promoted in in-app purchase allows you to sell in-app

14  purchases on the App Store directly.

15  **Q.**  I can go on the App Store and buy that pack?

16  **A.**  I could not tell you whether or not they have a promoted

17  in-app purchase for that pack.  But the technology certainly

18  enables it.

19  **Q.**  So are you aware of any games that are selling actual

20  content on the App Store itself right now?

21  **A.**  I could not --

22                    (Audio distortion.)

23          **THE WITNESS:**  Oop.

24      I know there are many.  We actually -- my team was focused

25  on in-app purchase a few years back as far as promoted in-app

SCHMID - CROSS / MOSKOWITZ

1    purchase on the App Store so we worked with developers --

2                    (Simultaneous colloquy.)

3    **BY MS. MOSKOWITZ:**

4    **Q.**  Are there any today?

5    **A.**  Certainly.

6    **Q.**  Okay.  When you were shopping around for the packs, there

7    was nothing on there that says "Go to our website and buy

8    those -- buy these packs."  Right?

9    **A.**  Correct.

10   **Q.**  And that again is against Apple's rules, right?

11   **A.**  Correct.

12   **Q.**  Hearthstone is a Blizzard-developed app, right?

13   **A.**  Yes.

14   **Q.**  And that's the same app developer, app division Blizzard

15   King, right?

16   **A.**  Yes.

17   **Q.**  And that's the same as Candy Crush?

18   **A.**  Correct.

19   **Q.**  These are -- this is a big company?

20   **A.**  Yes.

21         **THE COURT:**  Was the price the same?  Remind me.  Was

22   the price the same, Mr. Schmid?

23         **THE WITNESS:**  Oh, yes, Your Honor.  It was 2.99 on

24   the mobile website and 2.99 on the App Store.

25         **THE COURT:**  So the consumer paid the same?

1              **THE WITNESS:**  I do believe there was tax on the

2      mobile website that was added to the 2.99, whereas the App

3      Store it was included in the price.

4              **THE COURT:**  All right.

5         Go ahead.

6      **BY MS. MOSKOWITZ:**

7      **Q.**  And there's no commission due to Apple if the purchase is

8      made on the website, right?

9      **A.**  Correct.

10     **Q.**  And if they wanted to offer a discount, could they

11     advertise that discount within the app?

12     **A.**  A discount on a website --

13     **Q.**  Yes.

14     **A.**  -- within the app?  They could not.

15     **Q.**  Just one more question back on the Candy Crush.

16         You testified earlier that all of your new accounts that

17     you sign up for now that Sign in with Apple is available, you

18     use that to access third-party developer apps, right?

19     **A.**  Correct.

20     **Q.**  But you didn't do that for Candy Crush?

21     **A.**  So I actually recovered a password from another Candy

22     Crush account that was a new account I had not used but was

23     created prior to Sign in with Apple.

24     **Q.**  So the one that you used with the video, you went through

25     the steps to recover a prior email and password that you

SCHMID - CROSS / MOSKOWITZ

```
1   would -- used however long ago instead of using Sign in with
2   Apple?
3   A.  Correct.
4   Q.  We talked a little bit about Houseparty.  There was a
5   document you were shown by your counsel.  Do you remember
6   that?
7   A.  I do.
8   Q.  Houseparty is an app, right?
9   A.  It is.
10  Q.  And Fortnite, while on iOS, was an app, right?
11  A.  Correct.
12  Q.  Houseparty is not a game, right?
13  A.  It does have games inside of Houseparty.
14  Q.  Is it a game?
15  A.  It is not a game.
16  Q.  Okay.
17      So Epic has both games and nongame apps?
18  A.  They do.
19  Q.  All right.
20      You also testified yesterday, I think, that Roblox is a
21  cross-platform game, I think is the word you used?
22  A.  Correct.
23  Q.  And you talked about how developers get to choose their
24  own category, right?
25  A.  Correct.
```

1    **Q.**  So if -- when Fortnite was available on the App Store and

2    Epic had decided it was not a game and belonged in the general

3    app category, would Apple have permitted that?

4    **A.**  We would have permitted them to submit as such.  However

5    we may have recategorized them in the app review process.  But

6    I'm not a member of app review so I could not give you

7    specifics on how that would occur.

8    **Q.**  So even if a developer chooses how they're going to be

9    categorized, that might be overruled by app review?

10   **A.**  This is to prevent games like Fortnite from ending up in

11   the --

12                      (Simultaneous colloquy.)

13           **THE WITNESS:**  -- category --

14   **BY MS. MOSKOWITZ:**

15   **Q.**  Yes or no?

16   **A.**  -- or somewhere else like that.

17   **Q.**  I'm just asking yes or no.

18   **A.**  I'm sorry.  Could you repeat?

19   **Q.**  If a developer chose to submit their app as a specific

20   category that they viewed themselves in, that decision could

21   be overruled by app review and changed?

22   **A.**  Yes.

23   **Q.**  So, for example, if Fortnite -- and Epic thought Fortnite

24   should be in the entertainment category, for example, that

25   could have been overruled by app review?

SCHMID – CROSS / MOSKOWITZ

 1   **A.**   Yes.

 2   **Q.**   And Roblox, can they just -- they can't just move out of

 3   the games category if they want, right?   That might be

 4   overruled.

 5   **A.**   It could be overruled.   They may attempt to do so on their

 6   own -- at their own discretion.

 7   **Q.**   Are you aware that Roblox was escalated to the ERB to

 8   decide whether it was a violation of apps -- Apple's -- excuse

 9   me -- store within a store prohibition?

10   **A.**   I am generally aware of that.

11   **Q.**   Are you aware of what the outcome of that was?

12   **A.**   I am not aware of what the direct outcome was other than

13   Roblox is still on the store.

14   **Q.**   Why don't we -- actually we -- can you turn back to that

15   last tab in your binder.   I believe it was TX5552 [sic] that

16   was the categories.

17   **A.**   (Reviewing document.)

18       Sure.

19   **Q.**   Are you there?

20   **A.**   Yes, ma'am.

21   **Q.**   Great.

22       There's games, the games description you had called out

23   during your direct.   Do you recall that?

24   **A.**   The games category, correct.

25   **Q.**   Right.   And it's defined as apps that provide single or

SCHMID – CROSS / MOSKOWITZ

1    multiplayer interactive activities for entertainment purposes,

2    right?

3    **A.**   Correct.

4    **Q.**   Let's read entertainment, which starts unhelpfully on the

5    bottom of the prior page and continues onto the top, do you

6    agree with me, of the next page?

7    **A.**   Yes.

8    **Q.**   All right.  And entertainment, not games, right?

9    Entertainment is not a game?  That's --

10   **A.**   I'm sorry.

11   **Q.**   -- one of the other --

12   **A.**   Entertainment is a separate category, correct.

13   **Q.**   It's not within the games category?

14   **A.**   Correct.

15   **Q.**   And entertainment is defined as apps that are interactive

16   and designed to entertain and inform the user, et cetera,

17   right?

18   **A.**   Correct.

19   **Q.**   So both games and entertainment use the word "entertain"

20   in some form and "apps" and "interactive," right?

21   **A.**   Correct.

22   **Q.**   Are you aware that this trial is being covered by the tech

23   and gaming press?

24   **A.**   Yes.

25   **Q.**   And have you heard that there's been some testimony about

1   Roblox last week?

2   **A.**   I have not heard anything about testimony at all.

3   **Q.**   Did you read any of the press?

4   **A.**   I have not.

5   **Q.**   So you're not aware that Roblox was the subject of any

6   testimony?

7   **A.**   I am not.

8   **Q.**   So you're not aware then that Mr. Kosmynka testified that

9   Roblox is not a game?

10  **A.**   I am not aware of that.

11  **Q.**   Okay.

12      So I take it then you're not aware that since that

13  testimony, it has been reported that Roblox has fundamentally

14  changed how it describes itself on its own website?

15  **A.**   Could you elaborate?

16  **Q.**   Sure.

17          **MS. MOSKOWITZ:**   Your Honor, I'm going to hand up, if

18  I may approach, some binders for the testimony.

19          **THE COURT:**   Okay.

20              (Off-the-record discussion.)

21          **THE COURT:**   And I will note all witnesses were

22  instructed not to listen to testimony.  So it's a good thing

23  you followed my order.

24          **THE WITNESS:**   That gave me a break from the news,

25  Your Honor.

SCHMID – CROSS / MOSKOWITZ

```
 1                        (Handing binder.)

 2   BY MS. MOSKOWITZ:

 3   Q.   Why don't you please turn in your binder to PX1846.

 4   A.   (Reviewing document.)

 5        Okay.

 6   Q.   All right.  Do you see this is an article that was

 7   published on The Verge last week with the title "Apple said

 8   Roblox developers don't make games and now Roblox agrees"?

 9   A.   Yes, but I've never seen this article.

10   Q.   But I read the title correctly?

11   A.   Correct.

12   Q.   Okay.  So if you look at this article, you'll see there's

13   a reference in here on the second page to changes that Roblox

14   made on its website.  Do you see that?

15        MR. SRINIVASAN:  Objection, Your Honor.  He hasn't

16   seen it.  Well, I'll just object, foundation.

17        THE COURT:  Well, I need a question first.

18        So so far there's nothing objectionable.  Let's hear what

19   the question is.

20   BY MS. MOSKOWITZ:

21   Q.   So the question for now is do you see that there's

22   discussion of changes that Roblox made on its website?

23        THE COURT:  So you want him to read the whole thing?

24        MS. MOSKOWITZ:  No.  He can read the first full

25   paragraph on page 2.
```

1           **THE WITNESS:**   (Reviewing document.)

2      Just one moment, please.

3      Okay.

4  **BY MS. MOSKOWITZ:**

5  **Q.**   This article is describing changes that Roblox made on its

6  website, right?

7  **A.**   Yes.

8  **Q.**   And it's no longer -- it says it's no longer using the

9  word "game," Roblox is no longer using the word "game on its

10  website.

11  **A.**   To describe Roblox or the experiences within Roblox?

12  **Q.**   It says here, does it not, that the word "game" has been

13  replaced by "experience" across nearly the entire Roblox

14  website.

15  **A.**   But that's just the categories or the experiences within

16  Roblox.  It's not saying that Roblox has decided they are no

17  longer a game.

18  **Q.**   Have you gone to the Roblox website recently?

19  **A.**   I have, yes.

20  **Q.**   When's the last time you went there?

21  **A.**   Two days ago.

22  **Q.**   Two days ago, the same day you made the videos?

23  **A.**   Correct.

24  **Q.**   Was that in preparation for today?

25  **A.**   Actually it was multiple reasons, one being --

1                    (Simultaneous colloquy.)

2    BY MS. MOSKOWITZ:

3    Q.  Was it one of them in preparation for today?

4    A.  Yes.

5    Q.  Okay.  So you were preparing to talk about Roblox today.

6             MR. SRINIVASAN:  Objection, Your Honor.  This is

7    getting into privileged territory.

8             THE COURT:  Sustained.

9    BY MS. MOSKOWITZ:

10   Q.  Okay.  So are you aware that Roblox has user-generated

11   content within the app?

12   A.  I am.

13   Q.  Apple does not take the position that it has to review

14   that content as part of app review, right?

15   A.  In the specific case of Roblox, correct.

16   Q.  That's instead governed by the user-generated content

17   guidelines, right?

18   A.  Correct.

19   Q.  Is there any discipline being considered by Apple against

20   Roblox at the present time?

21   A.  Not that I'm aware of.

22   Q.  You interact with Roblox?

23   A.  Quite frequently.

24   Q.  You're familiar as a -- in your role with the DPLA, the

25   Developer Program License Agreement that developers have to

1    enter into if they wish to distribute apps to consumers,

2    right?

3    **A.**   Yes.

4    **Q.**   And the DPLA has a Schedule 2 that goes with it, right?

5    **A.**   I could not say for sure.

6    **Q.**   Okay.  Apple recently revised Schedule 2.  Are you aware

7    of that?

8    **A.**   I am not.

9    **Q.**   All right.  Let's look at PX2943.  It should be in your

10   binder.

11   **A.**   (Reviewing document.)

12        Okay.

13   **Q.**   You're with me?

14   **A.**   I am with you.

15   **Q.**   All right.

16        This is Schedule 2, dated March 31, 2021, on the bottom

17   there.  Do you see that?

18   **A.**   I do.

19        **MS. MOSKOWITZ:**  Your Honor, I offer PX2943 into

20   evidence.

21        **THE COURT:**  No objection?

22        **MR. SRINIVASAN:**  I'm looking, Your Honor.  I don't

23   know that -- we don't -- I don't think we have PX2943 in our

24   binder.

25        **THE COURT:**  I have it in mine.  Double-check.

1    It's --

2            **MR. SRINIVASAN:**  I have PX2906, counsel.

3            **THE COURT:**  Yeah, it's supposed to be right after

4    2906.

5            **MR. SRINIVASAN:**  I'm sorry.  We found it was stuck.

6    Apologies.

7        No objection.

8            **THE COURT:**  Admitted.

9        (Plaintiff's Exhibit PX2943 received in evidence)

10           **MS. MOSKOWITZ:**   Thank you.

11   **Q.**  Do you recognize this as the most up-to-date Schedule 2 to

12   the DPLA?

13   **A.**  I could not say.

14   **Q.**  This new Schedule 2 started to roll out in March of this

15   year, right?

16   **A.**  The date on the document is March.

17   **Q.**  March 31?

18   **A.**  Correct.

19   **Q.**  Have you -- do you make it your practice to get familiar

20   with the terms and conditions that are being imposed on

21   developers?

22   **A.**  When relevant to game developers, yes.

23   **Q.**  Okay.

24       Schedule 2 is relevant to game developers, right?

25   **A.**  I have not read through this so I could not say for sure.

1    **Q.**   Schedule 2 describes commissions, right?

2    **A.**   (Reviewing document.)

3         Would you like to give me one moment?

4    **Q.**   You're just not -- you don't know -- you don't know one

5    way or the other?

6    **A.**   Well, I'd like to at least quickly review it.

7    **Q.**   That's okay.  If you don't know, that's fine.  We're not

8    going to talk about the commission in this document.  I was

9    just asking if you were aware that this covers it or not.

10        Okay.  Let's look at section 7 on page PX2943.9.

11   **A.**   (Reviewing document.)

12   **Q.**   Section 7 is titled "Termination."  Let me know when you

13   get there.

14   **A.**   (Reviewing document.)

15        I am there.

16   **Q.**   All right.

17        Are you familiar with this clause?

18   **A.**   (Reviewing document.)

19        Just one moment.  I'm just reading over it.

20   **Q.**   I'm going to focus on 7.1.  If you could focus your

21   attention on that.

22   **A.**   (Reviewing document.)

23        Yes, I'm familiar.

24   **Q.**   Okay.

25        And you've read this before today?

SCHMID – CROSS / MOSKOWITZ

1  **A.**  I've not read the document, but I'm aware of that part of

2  the DLPA.

3  **Q.**  Okay.

4      This 7.1 is -- has new language, right?

5  **A.**  I could not say.

6  **Q.**  You think that the language in 7.1 has always been there?

7  **A.**  I could not say.

8  **Q.**  Okay.  But you're aware of the language in 7.1?

9  **A.**  As I read it today.

10 **Q.**  But it's not the first time you're familiar with the

11 contents of that?  Is that what you just testified?

12 **A.**  I'm familiar with this generally, yes.

13 **Q.**  All right.

14     The -- the language -- the new language at the end here

15 starts "If at any time."  Do you see where I am?

16 **A.**  I do.

17 **Q.**  It says, "If at any time Apple determines or suspects that

18 you" --

19                    (Exhibit published.)

20 **BY MS. MOSKOWITZ:**

21 **Q.**  -- "or any developers with which you are affiliated have

22 engaged in or encouraged or participated with" -- "with

23 other developers to engage in any suspicious, misleading,

24 fraudulent, improper, unlawful, or dishonest act or omission,

25 Apple may withhold payments due to you or such other

1     developers."

2          Did I read that correctly?

3     **A.**   Correct.

4     **Q.**   So under these new terms, Apple can withhold payments due

5     to developers that were paid by consumers if Apple even

6     suspects that a developer with which a developer is affiliated

7     has engaged in suspicious behavior, right?

8     **A.**   I personally never had to deal with this --

9                         (Simultaneous colloquy.)

10    **BY MS. MOSKOWITZ:**

11    **Q.**   Is that the import of this provision?

12    **A.**   Yes.

13    **Q.**   So let's break it up a little bit.

14         Starts out by saying "If at any time Apple even" --

15              **THE COURT:**   Ms. Moskowitz, are you representing to

16    the Court that this is -- was not in the prior version?

17              **MS. MOSKOWITZ:**   I am.

18              **THE COURT:**   Okay.  And what was the date of the prior

19    version?

20              **MS. MOSKOWITZ:**   This version -- any -- any iteration

21    of Schedule 2 that was in existence and entered into before

22    this new one came out in March 31st was the prior version.

23              **THE COURT:**   What was the -- what was the date of a

24    prior version?

25              **MS. MOSKOWITZ:**   I'll have to get the -- the last

1   release update date, and I will get that for Your Honor.

2            **THE COURT:**  Thank you.  Proceed.

3   **BY MS. MOSKOWITZ:**

4   **Q.**  So under the new terms here, the beginning says even if

5   Apple, quote, suspects, right?

6   **A.**  Determines or suspects.

7   **Q.**  Right.

8   **A.**  Correct.

9   **Q.**  Or suspects, right?

10  **A.**  Correct.

11  **Q.**  And there's nothing in here that states what standard

12  Apple will be applying to determinations or their suspicions,

13  right?

14  **A.**  I do not see that.

15  **Q.**  So let's look at the conduct it's talking about.

16            (Exhibit published.)

17  **BY MS. MOSKOWITZ:**

18  **Q.**  It says, "engaged in or encouraged or participated with

19  other developers," right?

20  **A.**  Correct.

21  **Q.**  And there's no definition of what it means to encourage,

22  right?

23  **A.**  I think it's pretty clear, but there is no definition,

24  correct.

25  **Q.**  Would a supportive tweet do it?

1          **MR. SRINIVASAN:**  Objection, foundation, Your Honor.

2          **THE WITNESS:**  I'm sorry.  I'm not a part of app

3    review, nor am I part of a legal team that could determine

4    something like that.

5    **BY MS. MOSKOWITZ:**

6    **Q.**  Okay.  The legal team gets involved?

7    **A.**  This is a legal document.

8    **Q.**  So you don't know whether someone sending out a supportive

9    tweet would be viewed as encouragement or not?

10         **MR. SRINIVASAN:**  Objection, foundation.

11         **THE COURT:**  Sustained.

12   **BY MS. MOSKOWITZ:**

13   **Q.**  All right.  So you don't know, though, what rises to the

14   level of encouragement, right?

15         **MR. SRINIVASAN:**  Same objection.

16         **THE COURT:**  All he can testify to is his

17   understanding.  Just like any developer, you can answer as to

18   your understanding.

19         **THE WITNESS:**  So my understanding of encourage?

20   **BY MS. MOSKOWITZ:**

21   **Q.**  No.  I'm asking if it's your understanding -- do you have

22   any understanding as it's used in this document about what

23   rises to the level of encourage in this provision?

24         **THE COURT:**  On behalf of Apple?  Is that what you're

25   asking?  Because that would be inappropriate.

1          **MS. MOSKOWITZ:**  In connection with his role as the

2     head of games, does he have an understanding as to what this

3     word means as used in Schedule 2.

4          **THE WITNESS:**  I'd like to correct you.  Head of games

5     business development.  So I don't focus on app review or any

6     matters that touch app review.

7     **BY MS. MOSKOWITZ:**

8     **Q.**  So is the answer that in that capacity you don't have any

9     understanding as to what this word means in Schedule 2 that

10    all developers sign?

11    **A.**  It would be inappropriate for me to make a determination

12    there.

13    **Q.**  So the answer is no, you don't.

14    **A.**  I'm sorry?

15    **Q.**  You don't have any understanding.

16    **A.**  Not in an official Apple capacity, I could not make that

17    determination.

18    **Q.**  So you would -- the only understanding you would have is

19    the English language; is that what you're distinguishing?

20    **A.**  I understand the English language, yes.

21    **Q.**  I am sure you do.  I guess I'm just asking is that what

22    you're distinguishing here?

23    **A.**  That was my distinguish -- yes.

24    **Q.**  Okay.  Is the same true for what "participation" means?

25    **A.**  Correct.

1    **Q.**  Okay.

2        Did you tell me when the last time is that you think you

3    saw this document, if you ever saw it?

4    **A.**  I've certainly signed it as a developer, but I do not make

5    it a habit to frequently read it.

6            **MS. MOSKOWITZ:**  Your Honor, I have the answer.

7            **THE COURT:**  Thank you.

8            **MS. MOSKOWITZ:**  The prior Schedule 2 is dated

9    June 22, 2020, and it's PX2621, which I believe is in

10   evidence.

11           **THE COURT:**  Great.  Thank you.

12           **MS. MOSKOWITZ:**  Thank you.

13   **Q.**  Okay.

14       So let's just continue on here and look at the conduct

15   that are the no-no's here.  It talks about suspicious,

16   misleading, fraudulent, improper, unlawful, or dishonest act

17   or omission, right?

18   **A.**  Correct.

19   **Q.**  And there are no definitions on any of those terms?

20   **A.**  Correct.

21   **Q.**  So this provision is basically guilt by association

22   provision, right?

23           **MR. SRINIVASAN:**  Objection, foundation.

24           **THE COURT:**  That's argumentative.  Sustained.

25

1  **BY MS. MOSKOWITZ:**

2  **Q.**  This applies not only to a developer, but all of the

3  developers that are affiliated with any developer who signs

4  this agreement, right?

5  **A.**  I could not make that determination.

6  **Q.**  Do you know how Apple defines "affiliates"?

7      **MR. SRINIVASAN:**  Objection, foundation.  I guess --

8      **THE COURT:**  Sustained.  I do get the point if you

9  want to move on.

10      **MS. MOSKOWITZ:**  Sure.

11  **Q.**  Just a few more questions on that.

12      Mr. Schmid, you used the word "affiliates" in your

13  declaration, right?

14  **A.**  I did.

15  **Q.**  Okay.  And we talked about the definition of "affiliates"

16  in your deposition?

17  **A.**  We did.

18  **Q.**  All right.  Your view is an affiliate is anyone who has

19  any stake in a company, right?

20  **A.**  That was a part of my definition, correct.

21  **Q.**  Okay.  So for Epic, for example, that would include

22  Tencent and Sony, for example.

23  **A.**  Correct.

24  **Q.**  And Sony, in turn, would have a number of affiliates.

25  **A.**  Correct.

SCHMID – CROSS / MOSKOWITZ

1   **Q.**   And similarly Tencent has a number of affiliates.

2   **A.**   Correct.

3   **Q.**   Activision Blizzard King might be one, right?

4   **A.**   Correct.

5   **Q.**   All right.

6        So this is not just a termination clause, though, right?

7   It also allows Apple to withhold payments due?

8             **MR. SRINIVASAN:**   Objection, foundation.

9             **THE COURT:**   You can answer if that's what you

10  understand by reading it.

11            **THE WITNESS:**   That is my understanding.

12  **BY MS. MOSKOWITZ:**

13  **Q.**   And Schedule 2 as well as all of the DPLA terms are

14  non-negotiable, right?

15  **A.**   Correct.

16  **Q.**   And it -- this Schedule 2 is not just given to new

17  developers, right?   It's given to all developers as soon as

18  they want to make an update to any of their apps, right?

19  **A.**   Correct.

20  **Q.**   So if a developer had been on iOS for years and had

21  invested in a number of apps, they have no choice if they want

22  to continue to offer those apps and update them to enter

23  Schedule 2.

24  **A.**   We give developers a reasonable amount of time to sign and

25  update their DLPA, correct.

SCHMID – CROSS / MOSKOWITZ

1  **Q.**  But they have to do it.

2  **A.**  They do have to do it.

3  **Q.**  You think that Apple's competing with other platforms, you

4  said?

5  **A.**  I do.

6  **Q.**  Have you ever seen a provision like this on any other

7  platform whatsoever?

8  **A.**  I could not tell you with certainty.

9  **Q.**  You testified about a number of tools that are available

10  to developers.  Do you recall that?

11  **A.**  I do.

12  **Q.**  So you don't know whether Apple's tools are funded by App

13  Store revenue, right?

14  **A.**  Could you clarify?

15  **Q.**  You don't know how those tools are funded, right?

16  **A.**  I don't deal with that whatsoever, correct.

17  **Q.**  And you, for example, have no idea whether any App Store

18  revenue is used to fund investment in those tools?

19  **A.**  I would have no knowledge of that, correct.

20  **Q.**  All right.

21        You're aware of the developer fee that developers pay to

22  become members of the developer program?

23  **A.**  I am aware of the $99 fee, yes.

24  **Q.**  And that's also not part of the App Store revenue, right?

25  **A.**  I'm not aware of that and I cannot speak to it.

SCHMID - CROSS / MOSKOWITZ

1    **Q.**  Okay.

2         You testified that Fortnite had some issues with memory

3    that some engineers were helping with.  Do you remember that?

4    **A.**  I do.

5    **Q.**  Unity had the same issue, right?

6    **A.**  I do not recall.

7    **Q.**  Aspyr, same issue?

8    **A.**  I'm sorry?

9    **Q.**  A-S-P-Y-R?

10   **A.**  Aspyr?

11   **Q.**  Sure.  Sorry, I'm not in the industry.

12        **THE COURT:**  You must not be a gamer either then,

13   Ms. Moskowitz.

14        **MS. MOSKOWITZ:**  I do play Candy Crush.

15        **THE WITNESS:**  What level are you?

16        **MS. MOSKOWITZ:**  Really high.  Embarrassingly high.

17        **THE WITNESS:**  I could not tell you whether Aspyr had

18   a memory issue.  I was -- at that point in time, I was only

19   managing the relationship with Fortnite and one other

20   developer.

21   **BY MS. MOSKOWITZ:**

22   **Q.**  And so you couldn't tell me if any other developers,

23   other -- other than those two had the similar issue?

24   **A.**  I -- the other developer I was managing did not have that

25   issue.  So I could only speak towards Fortnite.

SCHMID – CROSS / MOSKOWITZ

1   **Q.**  Do you recall that the issue was associated with iOS 11

2   that had certain memory allocations issues?

3   **A.**  I do recall, yes.

4   **Q.**  So -- and in iOS 12, there was a change in those

5   allocations.  Do you remember that?

6   **A.**  I do.

7   **Q.**  And that's what caused these memory issues with certain

8   developers?

9   **A.**  It functionally reduced the amount of available memory for

10  a developer to leverage in certain circumstances.  So that was

11  the crux of the issue, and we did help resolve it.

12  **Q.**  And you didn't just do that for Epic, you did that for a

13  number of developers who were having the same issue?

14  **A.**  I could not say.

15  **Q.**  You talked a bit about marketing support that Apple

16  provides.  Do you remember that?

17  **A.**  I do.

18  **Q.**  And I think you said that Apple spent close to a million

19  dollars on paid marketing for Fortnite.

20  **A.**  Correct.

21  **Q.**  Do you have an understanding as to what Apple made in

22  commissions offer of Fortnite during the life of Fortnite on

23  iOS?

24  **A.**  I do.

25  **Q.**  How much?

SCHMID – CROSS / MOSKOWITZ

1     **A.**   Over $100 million.

2     **Q.**   Okay.

3          So $1 million spent, a hundred million earned?

4     **A.**   $1 million spent in the final 11 months that Fortnite was

5     on the platform.

6     **Q.**   How long was Fortnite on altogether?

7     **A.**   Two and a half years.

8     **Q.**   Okay.  Do you have any understanding as to what the spend

9     was in the overall?

10    **A.**   I don't, but it was more than a million.

11    **Q.**   But you can't say how much more?

12    **A.**   I could not.

13    **Q.**   Apple doesn't pay to feature apps on the App Store, right?

14    **A.**   Correct.

15    **Q.**   When you gave the estimate of a hundred million, is that

16    based on your knowledge, or is that a guess?

17    **A.**   I said over -- over a hundred million.

18    **Q.**   Is it potentially over 200 million?

19    **A.**   It would be inappropriate for me to say for sure.  I do

20    know it's over a hundred million.

21    **Q.**   Okay.

22         And so Apple also, we were just -- I interrupted myself.

23    I asked you that Apple does not pay for featuring within the

24    App Store on iOS, right?

25    **A.**   Correct.

SCHMID – CROSS / MOSKOWITZ

1   **Q.** Okay. And Apple doesn't pay anyone to feature an app in

2   conjunction with Apple Music, for example?

3   **A.** Correct.

4   **Q.** Is it your testimony that Apple's marketing support in any

5   way drove Fortnite revenue?

6   **A.** Yes.

7   **Q.** Okay.

8   You don't have an -- any understanding one way or the

9   other as to how much of Fortnite's earnings on iOS are

10   attributed to marketing and promotional support provided by

11   Apple, are you?

12   **A.** That would be extremely difficult to calculate or

13   attribute.

14   **Q.** So the answer is no?

15   **A.** I do not.

16   **Q.** Okay. You have no understanding as to how many Fortnite

17   transactions within the iOS ecosystem were made as a result of

18   advertising by Apple, right?

19   **A.** I do not.

20   **Q.** Your team does not track how many revenue -- how much

21   revenue can be attributed to App Store placement or featuring,

22   right?

23   **A.** Not on a regular basis.

24   **Q.** They don't do it at all, right?

25   **A.** We can certainly look at what we believe --

```
 1                      (Simultaneous colloquy.)

 2   BY MS. MOSKOWITZ:

 3   Q.  I'm just asking if they -- if they do it?  Does your team

 4   track it?

 5   A.  Revenue associated with editorial featuring?

 6   Q.  Yes.

 7   A.  Yes.

 8   Q.  Okay.

 9        MS. MOSKOWITZ:  Your Honor, I handed up a deposition

10   binder.  And I will ask for Your Honor to look at page 127,

11   lines 4 through 11.

12                   (Pause in the proceedings.)

13        THE COURT:  Okay.  Go ahead.

14   BY MS. MOSKOWITZ:

15   Q.  Mr. Schmid, are you on page 127, lines 4 through 11?

16   A.  The small page 127?

17   Q.  I --

18   A.   -- page 127.

19   Q.  It should be the page of deposition marked 127 on maybe in

20   the upper right-hand corner.

21   A.  (Reviewing document.)

22        Okay.  I think I'm there, yes.

23   Q.  Okay.

24        You testified under oath at your deposition?

25   A.  I did.
```

SCHMID – CROSS / MOSKOWITZ

1  **Q.**  Lines from 4 to 11, you were asked the following question

2  and gave the following answer.

3          "Q.  From your perspective, Apple does not

4              attempt to track for games or other apps that

5              are offered through the App Store how much

6              revenue can be attributed to App Store placement

7              or featuring?

8          "A.  My team does not focus on that so I

9              couldn't speak for any other teams at Apple."

10  I read that correctly?

11  **A.**  You did.

12  **Q.**  You also testified on direct about some of the editorial

13  support that Fortnite received from Apple.  Do you recall

14  that?

15  **A.**  I do.

16  **Q.**  You don't know what the process is, though, for

17  determining which developers or which apps receive editorial

18  support, right?

19  **A.**  Editorial makes those decisions.

20  **Q.**  Right.  It's not even a conversation you're involved in,

21  right?

22  **A.**  We're involved in that conversation.

23  **Q.**  All right.

24          **MS. MOSKOWITZ:**  Your Honor, page 105, please,

25  lines 13 to 23.

1           Specifically 22 to 23.

2                     **THE WITNESS:**  If I could clarify.

3                **THE COURT:**  Hold on.

4                          (Pause in the proceedings.)

5                **THE COURT:**  Go ahead.

6      **BY MS. MOSKOWITZ:**

7      **Q.**  Mr. Schmid, you were asked the following question and gave

8      the following answer:

9                     "Q.  What is your understanding as to the

10               criteria that the editorial team lays out for

11               picking developers to be the recipients of

12               editorial support?

13                "A.  My understanding is that their main bar

14               is around quality, and quality being a number of

15               things within a game.  I couldn't say

16               specifically which editors have different levels

17               of what quality means to them or what criteria

18               they're looking for.  And it is not a

19               conversation I'm even involved in."

20      Did I read that correctly?

21      **A.**  You did.

22      **Q.**  You testified on direct about social media as well.  Do

23      you remember that?

24      **A.**  I do.

25      **Q.**  You have no understanding though, sir, of the size of App

SCHMID – CROSS / MOSKOWITZ

1   Store's social media channels relative to Fortnite's social

2   media channels, right?

3   **A.**   Off the top of my head, I do not.

4   **Q.**   And you do not have any understanding as to whether and to

5   what extent Apple's social media posts with respect to

6   Fortnite actually drive any purchases within Fortnite, right?

7   **A.**   I do not.

8   **Q.**   And you don't recall any studies being undertaken within

9   Apple to understand whether social media posts were driving

10   Fortnite purchases.

11   **A.**   I cannot recall.

12   **Q.**   You -- you talked about advertising and marketing support.

13   Let's talk about another aspect of a developer's experience on

14   the App Store.  You're familiar with paid search?

15   **A.**   Yes.

16   **Q.**   And that's an Apple program that lets developers submit

17   bids to have their apps come up in searches for certain key

18   words that a user might type into the search bar on the App

19   Store, right?

20   **A.**   Yes.  That is a separate team.

21   **Q.**   But you're familiar with it?

22   **A.**   I am familiar with it.

23   **Q.**   So, for example, if I'm Spotify, I'm -- well, I'm not

24   Spotify.  I'm -- say I'm a developer of Spotify and I want the

25   Spotify app to be one of the top results a user sees when they

SCHMID – CROSS / MOSKOWITZ

1   search, I can try to bid on a key word like "music," for

2   example?

3   **A.**  I could not speak to the direct key words you could bid

4   on.

5   **Q.**  Okay.  So you don't know if "music" is one?

6   **A.**  I've never bid on any key words outside of games

7   personally.

8   **Q.**  Okay.  So are you familiar with whether you can bid on

9   Spotify, the word?

10  **A.**  I am unfamiliar.

11  **Q.**  And if Spotify were available to bid and Spotify didn't

12  pay for that ad, something else would come up ahead of Spotify

13  in the search, right?

14  **A.**  I could not say.

15  **Q.**  You don't know how that works when you bid and you buy an

16  ad?

17  **A.**  We keep those teams very separate.

18  **Q.**  Have you done any searches ever on the App Store?

19  **A.**  I have.

20  **Q.**  And when you do that, do you notice sometimes you see an

21  ad-sponsored link come up before the natural search results?

22  **A.**  I do.

23  **Q.**  Okay.  Do you have an understanding that that's the result

24  of paid search?

25  **A.**  I do.

1   **Q.**   Okay.  So if a paid search has happened for a key word,

2   that result is going to appear first before natural organic

3   search results, right?

4              **MR. SRINIVASAN:**  Objection, foundation.

5              **THE COURT:**  It's —— well, sustained.  If you want to

6   spend your time, he's —— you can lay foundation if you want.

7   **BY MS. MOSKOWITZ:**

8   **Q.**   Did you look for Candy Crush in connection with creating

9   your video?

10  **A.**   I did not.

11  **Q.**   Would it surprise you if Pandora came up first in a search

12  for Spotify on the App Store?

13  **A.**   I would not be surprised.

14  **Q.**   Cause of paid apps —— paid ads.  Excuse me.

15  **A.**   In the paid section, yes, but it could also come up

16  organically based on being relevant.

17  **Q.**   But if an ad was paid for, that's going to come up first.

18  **A.**   I could not tell you with certainty.

19             **THE COURT:**  Well, isn't that the point, that the ads

20  come up first?

21             **MS. MOSKOWITZ:**  I agree.  I didn't think it was going

22  to be disputed.  But I'll move on.

23             **THE WITNESS:**  There's occasions where ads don't show

24  at all.

25             **THE COURT:**  If —— if the term is not purchased, then

SCHMID – CROSS / MOSKOWITZ

1    it won't come up at all?

2              **THE WITNESS:**  Correct.

3              **THE COURT:**  But if it's purchased, isn't that the

4    point of paying the money?

5              **THE WITNESS:**  I believe there's -- there's more to it

6    than just bidding on the key words as well.  But again I'm not

7    on the ads team.  I just have my historical knowledge of being

8    a buyer of those ads when I was a developer.

9              **THE COURT:**  Okay.

10   BY MS. MOSKOWITZ:

11   **Q.**  Apple benefited substantially from having Fortnite on iOS,

12   right?

13   **A.**  Correct.

14   **Q.**  And we talked about some numbers that are at least a

15   hundred million dollars in revenue to Apple?

16   **A.**  Correct.

17   **Q.**  And in fact, Apple Music also benefited at times from

18   Fortnite on iOS, right?

19   **A.**  Yes.

20   **Q.**  And Apple Music was involved, for example, in the

21   Marshmello concert?

22   **A.**  Correct.

23   **Q.**  And you referred to billboards.  That was an example of

24   Apple taking out a billboard, right?

25   **A.**  Correct.

SCHMID – CROSS / MOSKOWITZ

1    **Q.**   And Apple Music was featured prominently in that

2    billboard, right?

3    **A.**   Correct.

4    **Q.**   And it was Apple's idea to seek out the promotion for the

5    DJ Marshmello concert with Apple Music, right?

6    **A.**   It was a collaboration.  I could not say where the idea

7    originated.

8    **Q.**   If Matt Fischer testified that it was his idea, would you

9    have any basis to disagree with that?

10   **A.**   I would not.

11   **Q.**   And Apple -- you actually asked Epic if they could support

12   Apple Music during the Travis Scott concert on Fortnite,

13   right?

14   **A.**   I'm sorry.  Could you repeat that?

15   **Q.**   You asked Epic to support Apple Music for the Travis Scott

16   concert that happened on Fortnite, right?

17   **A.**   I believe I asked if there was another collaboration

18   possible.

19   **Q.**   Right.  You -- you approached Epic.

20   **A.**   I believe so.

21   **Q.**   If you could please turn to PX -- actually, give me one

22   moment.  I'll just ask a couple questions first.

23          Sorry?  Oh.

24          You also asked Epic a number of times for exclusive

25   Fortnite content for iOS, right?

SCHMID - CROSS / MOSKOWITZ

1    **A.**  Correct.

2    **Q.**  You asked for exclusive skins, for example?

3    **A.**  Outfits.

4    **Q.**  Outfits.  Okay.

5        You suggested one that could look like Steve Jobs even.

6    **A.**  I did not suggest that.

7    **Q.**  You didn't suggest that they do the Innovator that looks

8    like Steve Jobs?

9    **A.**  That came from a conversation that we had had prior.

10   **Q.**  Did you -- did you suggest it?

11   **A.**  I may have followed up on that, but it was not my idea.

12   **Q.**  Okay.  Whose idea was it?

13   **A.**  I could not recall.  I believe it was somebody from Epic.

14   **Q.**  Okay.  And you asked them to do it and you suggested that

15   Mr. Schiller would hate it so much.

16   **A.**  That is true.

17   **Q.**  So why don't you -- why don't we move on.

18       There was also something called the Rogue Agent Starter

19   Pack.  Do you remember that?

20   **A.**  I do.

21   **Q.**  And that was a bundle that consisted of both consumable

22   and non-consumable goods for Fortnite?

23   **A.**  Correct.

24   **Q.**  Okay.

25       And that made a lot of money as well, right?

SCHMID – CROSS / MOSKOWITZ

1   **A.**   It made a fair amount of revenue, correct.

2   **Q.**   And that revenue was 30 percent to Apple, right?

3   **A.**   Correct.

4   **Q.**   And do you recall there had been a time where Apple did

5   not allow bundles like that under its guidelines?

6   **A.**   Consumable and non-consumables combined, correct.

7   **Q.**   And Apple changed its policy and allowed that bundle on.

8   **A.**   It was actually an adaptation.

9   **Q.**   It changed the guideline.

10  **A.**   So we allowed for consumables and non-consumables to be

11  bundled in a consumable so that there couldn't be any chance

12  of fraud.  It was to protect developers.

13  **Q.**   So the Rogue Agent Pack was previously not allowed and

14  then became allowed.

15  **A.**   So when we make a change, we make that change for all

16  developers.  We don't have any exceptions to app review.

17  **Q.**   Rogue Agent Pack was previously not allowed and then

18  became allowed.

19  **A.**   So a developer may spearhead a change.  In this scen- --

20                   (Simultaneous colloquy.)

21  **BY MS. MOSKOWITZ:**

22  **Q.**   I'm not asking who caused the change.  I'm asking just the

23  fact that the Rogue Agent Starter Pack was previously not

24  allowed and then became allowed.

25  **A.**   Not the Rogue Agent Pack, incorrect.

SCHMID – CROSS / MOSKOWITZ

1  **Q.**  The Starter Pack?

2  **A.**  Correct.

3  **Q.**  Okay.  But packs of consumables and non-consumables

4  previously were not allowed and then became allowed.

5  **A.**  Correct.

6          **THE COURT:**  When was that?  When?

7          **THE WITNESS:**  Oh, I'm sorry, Your Honor.  I believe

8  it was shortly after Fortnite launched which would have been

9  May of 2018.

10          **THE COURT:**  Okay.

11          **THE WITNESS:**  I'm sorry.  March of 2018.

12  BY MS. MOSKOWITZ:

13  **Q.**  Why don't we go ahead and take a look at PX2125.

14  **A.**  (Reviewing document.)

15      Okay.

16  **Q.**  Is this what we were just talking about with respect to

17  Starter Pack?

18  **A.**  Correct.

19  **Q.**  Okay.  And the Starter Pack, this references in here that

20  it had been pulled from the App Store or from the app?

21  **A.**  Correct.

22  **Q.**  And in the time it was live, it had accounted for

23  33 percent of revenue and 58 percent of transactions?

24  **A.**  Correct.

25  **Q.**  And in three days alone, it generated $1.13 million in

1   billings?

2   **A.**   Correct.

3   **Q.**   And this was in April.  There was a discussion here in

4   April 2018.

5   **A.**   Correct.

6           **THE WITNESS:**  So, I'm sorry, Your Honor, it was April

7   or May.  My apologies.

8           **MS. MOSKOWITZ:**   Your Honor, I'll offer PX2125 into

9   evidence.

10          **MR. SRINIVASAN:**  No objection, Your Honor.

11          **THE COURT:**  Admitted.

12      (Plaintiff's Exhibit PX2125 received in evidence)

13  **BY MS. MOSKOWITZ:**

14  **Q.**   And so the Rogue Agent Pack came about in December of

15  2018?

16  **A.**   I believe so, yes.

17  **Q.**   Okay.

18  **A.**   But actually the Rogue Agent Pack was a prior pack

19  available on Fortnite and other platforms.  It first was

20  available on the App Store in December of 2018.

21  **Q.**   And do you recall that it was available on iOS for a

22  couple of days and was pulled?

23  **A.**   I don't recall.

24  **Q.**   Okay.

25      All right.  Why don't we just look at DX, which is in your

1    white binder, DX4243.

2    **A.**  (Reviewing document.)

3        Okay.  I'm there.

4    **Q.**  In the bottom of the page -- first page there, there's

5    some bullets about the Rogue Agent Pack.  Do you see that?

6    **A.**  I do.

7    **Q.**  And the third bullet says the pack was previously

8    available back in March but only ran for under two days before

9    app review had them pull it?

10   **A.**  Yes.

11   **Q.**  Okay.  That's about the Rogue Agent Pack?

12   **A.**  (Reviewing document.)

13       I believe so, yes.

14   **Q.**  Okay.

15       And so in that time, it generated slightly over 1 million

16   in billings.  See on the next page.

17   **A.**  (Reviewing document.)

18       Yes.  So I believe we're conflating Starter Pack -- or I'm

19   conflating Starter Pack with Rogue Agent in some scenarios.  I

20   apologize.

21   **Q.**  So there's some discussion in here about how Rogue Agent

22   coming back in December on iOS could drive substantial

23   conversion from nonpayers to payers, right?

24   **A.**  Correct.

25   **Q.**  And that's not just for Fortnite you're saying, but

SCHMID – CROSS / MOSKOWITZ

```
 1    potential –– potentially total App Store NTP, right?
 2    A.   Correct.
 3    Q.   Is that "new to pay"?
 4    A.   New to paying.
 5    Q.   And so you had expectation that this would be a big
 6    revenue driver for Apple, right?
 7    A.   And Epic.
 8    Q.   And Apple.
 9    A.   Correct, mutually beneficial.
10    Q.   Apple asked for Rogue Agent to be exclusive, right?
11    A.   We did.
12    Q.   Switching gears.  Just going to jump around a bit.  I
13    apologize in advance.
14         If you could turn to PX2362 in your binder, the nonwhite
15    binder.
16    A.   (Reviewing document.)
17    Q.   Also known as black binder.
18    A.   (Reviewing document.)
19         I'm sorry 2362?
20    Q.   Correct.
21              THE COURT:  You don't want 4243 in?
22              MS. MOSKOWITZ:  No, thank you, Your Honor.
23              THE WITNESS:   (Reviewing document.)
24         Okay.
25
```

SCHMID - CROSS / MOSKOWITZ

1    **BY MS. MOSKOWITZ:**

2    **Q.**  This is an email chain from November 14, 2009.  Do you see

3    that?

4    **A.**  I do.

5    **Q.**  And you're copied?

6    **A.**  I am.

7         **MS. MOSKOWITZ:**  Your Honor, I move PX2362 into

8    evidence.

9         **MR. SRINIVASAN:**  No objection, Your Honor.

10        **THE COURT:**  Admitted.

11        (Plaintiff's Exhibit PX2362 received in evidence)

12   **BY MS. MOSKOWITZ:**

13   **Q.**  Do you recognize this email chain?

14   **A.**  I do.

15   **Q.**  And what was going on here was Epic was requesting certain

16   details on payment processing.  Do you recall that?

17   **A.**  Yes.

18   **Q.**  And Apple -- there was discussion within Apple as to

19   whether it was willing to provide certain aspects of the

20   requested information, right?

21   **A.**  Correct.

22   **Q.**  And it shows that at least as of this time, two weeks had

23   gone by without responding to Epic's request.

24   **A.**  (Reviewing document.)

25        Let me just review the dates.

1  **Q.**  Sure.  I'll point you to it.  The first email in the chain

2  which is at the end is November 1, 2019 [sic].

3  **A.**  Correct.

4  **Q.**  Do you see that?

5      And as of November 14th, there was still debate going on

6  as to whether and to what extent Apple would respond?

7  **A.**  Yes.  So November 5th, a gentle reminder, and then

8  November 12th, a not so gentle reminder.  Yes.

9  **Q.**  November 14th, internal debate continues as to whether and

10 to what extent to provide information?

11 **A.**  Correct.

12 **Q.**  All right.  Can you please turn to PX634.

13 **A.**  (Reviewing document.)

14      Okay.

15 **Q.**  All right.

16      Do you recognize PX634 as a March 12th, 2020 email --

17 **A.**  Correct.

18 **Q.**  -- on which you're copied?

19 **A.**  I am.

20 **Q.**  Okay.  The subject is "Epic Games Tear Sheet for Sussman

21 Call"?

22 **A.**  Correct.

23          **MS. MOSKOWITZ:**  Your Honor, I offer PX634 into

24 evidence.

25          **MR. SRINIVASAN:**  No objections, Your Honor.

1            **THE COURT:**  It's admitted.

2            (Plaintiff's Exhibit PX634 received in evidence)

3            **MS. MOSKOWITZ:**  Thank you.

4        Two minutes-ish.

5            **THE COURT:**  Two.  Yes.

6            **MS. MOSKOWITZ:**  Thank you.

7   **Q.**  A tear sheet is a snapshot of business to date with a

8   developer that Apple uses to prepare employees at the director

9   level for a call with the developer, right?

10  **A.**  Correct.  It's not just business to date.  It can be that

11  quarter, it can be variations of it.  Just have bullet points

12  of updates and other news that they need to know.

13  **Q.**  Okay.  In the bottom right-hand corner, there's a chart

14  labeled "Fortnite Attribution Sources LTD," right?

15  **A.**  Yes.

16  **Q.**  Okay.  And we had a bit of debate at our time together at

17  our deposition about whether that was "launch to date" or

18  "live to date," but same idea, right?

19  **A.**  Correct.

20  **Q.**  Okay.

21      And this is reporting that a 115 million downloads of

22  Fortnite on iOS from launch through March 2020 occurred,

23  right?

24  **A.**  (Reviewing document.)

25  **Q.**  On the bottom there.

SCHMID - CROSS / MOSKOWITZ

1    **A.**  Correct.

2    **Q.**  And of those, 79 million were the result of search, right?

3    **A.**  Correct.

4    **Q.**  And by search, we mean someone going onto the App Store

5    and typing and searching for Fortnite itself, right?

6    **A.**  Potentially after watching an ad or other --

7    **Q.**  Sir?

8    **A.**  -- type of media --

9    **Q.**  Sir?

10   **A.**  -- so attribution is complicated, but, yes, that is

11   correct.

12   **Q.**  Search.  What's being reported in that number means --

13   were the result of someone going into the App Store and

14   searching for Fortnite, right?

15   **A.**  Correct.

16   **Q.**  So 69 percent of all of the iOS downloads in that period

17   were from users going to the App Store and typing in Fortnite

18   and then downloading it?

19   **A.**  Correct.

20   **Q.**  And it also refers to some numbers associated with the

21   games tab, right?

22   **A.**  Correct.

23   **Q.**  But you can't say how that's actually calculated, right?

24   **A.**  How the install from the games tab was calculated?

25   **Q.**  Right.

SCHMID – CROSS / MOSKOWITZ

1    **A.**   Again, there could be --

2    **Q.**   Do you know?  I'm asking do you know?

3    **A.**   It is a click to install.  That is how we would calculate

4    that.

5    **Q.**   Do you recall not knowing that at your deposition?

6    **A.**   So how we're attributing or how we're calculating?

7    Because I believe you asked how I attributed --

8                        (Simultaneous colloquy.)

9    **BY MS. MOSKOWITZ:**

10   **Q.**   Let's try again.  Let's try again.

11       Is that -- is it your testimony that that number there for

12   games tab is a result of someone clicking through the games

13   tab that was featuring Fortnite at a given time?  Yes or no?

14   **A.**   That would -- that would be how we determine the install

15   on the games tab but not the total percentage that came from

16   any specific tab per se.

17   **Q.**   All right.

18       You don't know, though, how that number was generated.

19   **A.**   I could not tell you how Mr. Micono generated this -- this

20   number.

21   **Q.**   Okay.  And the same is true for the today tab, you don't

22   know specifically how that was calculated?

23   **A.**   I could not tell you how.

24   **Q.**   And the referrals number, that 7 million, 6 percent, those

25   are downloads that explicitly came from outside of the App

1    Store, right?

2    **A.**   For instance, ads that Fortnite could have run.

3    **Q.**   Right.

4    **A.**   Or Apple could have run.

5    **Q.**   Right.  You can't tell, though, whether it was an

6    Epic-owned channel or an Apple-owned channel that resulted in

7    those referrals?

8    **A.**   I could not.

9         **THE COURT:**  Is now a good time?

10        **MS. MOSKOWITZ:**  Yes.  Yes, Your Honor.

11        **THE COURT:**  All right.

12    You are instructed, Mr. Schmid, not to have any

13    discussions with your attorneys or any party relative to your

14    examination during the break.  All right?

15    We'll stand in recess for 20 minutes, which brings to us

16    10:37.

17        **MS. MOSKOWITZ:**  Thank you.

18        **THE WITNESS:**  Thank you.

19        **MR. SRINIVASAN:**  Thank you, Your Honor.

20             (Recess taken at 10:17 A.M.)

21         (Continued next page; nothing omitted.)

22

23

24

25

1          ********************

2                    (Proceedings resumed at 10:37 a.m.)

3          **THE CLERK:**  Remain seated.  Court is in session.

4     Come to order.

5          **THE COURT:**  Okay.  We are back on the record.  The

6     record will reflect that the parties are present.  The witness

7     is on the stand.

8          Ms. Moskowitz, you may proceed.

9          **MS. MOSKOWITZ:**  Thank you, Your Honor.

10         (**MICHAEL SCHMID,** called as a witness for the Defendant,

11    having been previously duly sworn, testified as follows:)

12                    CROSS-EXAMINATION (Resumed)

13    **BY MS. MOSKOWITZ:**

14    **Q.**  Just going back to this engineering issue with iOS 12.

15         Do you remember we talked about that?

16    **A.**  Yes.

17    **Q.**  If you could turn -- I believe there should be some

18    documents in your binder at the end in a pocket.  PX856.  Let

19    me know if you can get to that.

20    **A.**  Yes.

21    **Q.**  And this is an email chain from February of 2019 with the

22    subject line "Hot iOS 12 Memory Accounting"?

23    **A.**  Yes.

24         **MS. MOSKOWITZ:**  Your Honor, I offer PX856.

25         **MR. SRINIVASAN:**  No objection, Your Honor.

 1              **THE COURT:**  856 is admitted.

 2              (Plaintiff's Exhibit 856 received in evidence)

 3              **MS. MOSKOWITZ:**  Thank you, Your Honor.

 4    **BY MS. MOSKOWITZ:**

 5    **Q.**  Mr. Schmid, if you could turn to the second page there.

 6    There's an email that discusses some background on the issue.

 7         Do you see that?

 8    **A.**  I see that.

 9    **Q.**  And it discusses what iOS 11 -- the allocations we were

10    discussing and some issues with iOS 12, right?

11    **A.**  Correct.

12    **Q.**  And these are issues that are -- were inherent in iOS

13    12, right?

14    **A.**  I wouldn't call it an issue.  It was just a change.

15    **Q.**  Okay.  A change that created some issues?

16    **A.**  Correct.

17    **Q.**  If you could turn then to PX452.  It also should be in the

18    same location.

19    **A.**  Yes.

20    **Q.**  Okay.  And this is an email chain from March 3, 2020.

21         Do you see that?

22    **A.**  Correct.

23              **MS. MOSKOWITZ:**  Your Honor, I offer PX452.

24              **MR. SRINIVASAN:**  No objection to the document, Your

25    Honor.

1         **THE COURT:**  Admitted.

2         (Plaintiff's Exhibit 452 received in evidence)

3         **MS. MOSKOWITZ:**  Thank you.

4    **BY MS. MOSKOWITZ:**

5    **Q.**  And this is -- if you go to the second email down on the

6    first page, there's an email to Mark Grinn, one of your

7    colleagues, right?

8    **A.**  Correct.

9    **Q.**  G-R-I-N-N.

10        It refers to the engineering work that's being done on the

11   same issue, right?

12   **A.**  Yes.

13   **Q.**  And it says that there's one full-time engineer working at

14   Apple, right?

15   **A.**  Yes.

16   **Q.**  And eight full-time engineers working at Epic on the

17   problem, right?

18   **A.**  Correct.

19   **Q.**  You talked about app review that *Fortnite* went through --

20   well, all developers went through, *but Fortnite* went through

21   when it was on iOS, right?

22   **A.**  The app review process?

23   **Q.**  Yes.

24   **A.**  Yes.

25   **Q.**  And every build for every app has to go through app

1  review?

2  **A.**  Every binary change has to go through app review.

3  **Q.**  And that's even if it's a small tweak, it still has to go

4  through?

5  **A.**  If it is a change to the binary, it must go through app

6  review.

7  **Q.**  You testified on direct that Apple's app review team

8  reviewed *Fortnite* updates, I think you said, 200 times?

9  **A.**  Correct.

10  **Q.**  But you remember at your deposition you couldn't tell me

11  how many times *Fortnite* had been reviewed, right?

12  **A.**  Correct.

13  **Q.**  That is something that comes from a back-end system that

14  you don't even know who owns, right?

15  **A.**  So --

16  **Q.**  Do you know who owns the system?

17  **A.**  I don't know who owns the system.

18  **Q.**  And that information comes from a back-end system, right?

19  **A.**  That information likely exists in multiple places.

20  **Q.**  Not in your head, right?

21  **A.**  It does not just exist in my head.

22  **Q.**  Does it exist at all in your head until you got it from

23  somewhere else?

24  **A.**  I had to receive that information from somewhere else.

25  **Q.**  The app review process can last up to 48 hours, right?

SCHMID – CROSS / MOSKOWITZ

1    **A.**   Yes.

2    **Q.**   And after an approval or rejection from the app review

3    process, an app then has to get released to the propagation

4    process, right?

5    **A.**   Yes.

6    **Q.**   So just -- I just want to make sure we are clear.

7         So app review happens, and then separate and apart from

8    app review, this thing called propagation happens.

9    **A.**   Correct.

10   **Q.**   And propagation can take up to 24 hours, right?

11   **A.**   That is our SLA.

12   **Q.**   And "SLA" is service-level agreement?

13   **A.**   Correct.

14   **Q.**   And that -- basically, what you mean by that is, that's

15   the standard time that you should tell developers to expect?

16   **A.**   Correct.

17   **Q.**   And so adding together the app review process and the

18   propagation process, you can be expected, if you are a

19   developer, to wait an average of 72 hours between submitting a

20   build and getting it out to the iOS users.

21   **A.**   For planning purposes, 72 hours would be prudent, correct.

22   **Q.**   And during those 72 hours, up to, until the process is

23   complete, the app or the update will not be available to iOS

24   users at large, right?

25   **A.**   Until it has been approven [sic] and propagated, correct.

1  **Q.**  You would disagree if someone said that app review should

2  only be expedited in extenuating circumstances.  You would

3  disagree with that statement, right?

4  **A.**  I would not disagree with that statement.

5  **Q.**  Okay.  So you would use that word?

6  **A.**  There's more than one reason, but extenuating

7  circumstances would certainly be a reason in which to expedite

8  app review.

9  **Q.**  Okay.

10       **MS. MOSKOWITZ:**  Your Honor, if you could please turn

11  to 153, lines 12 through -- well, it goes on to 154:3, but I

12  think the relevant language is through 18.

13       **THE COURT:**  Okay.  Go ahead.

14  **BY MS. MOSKOWITZ:**

15  **Q.**  Mr. Schmid, at your deposition, you were asked the

16  following question and gave the following answer:

17       "Question:  Is it your general understanding,

18       separate from Epic and *Fortnite* then, that developers

19       should only be making expedited requests in

20       extenuating circumstances?

21       "Answer:  I wouldn't use that language particularly,

22       especially nowadays."

23       And you go on, correct?

24       **THE COURT:**  You have to read the whole thing.

25       **MS. MOSKOWITZ:**  You want me to read the whole thing?

1  **BY MS. MOSKOWITZ:**

2  **Q.**  (Reading)

3         "I would suggest that if there is something along the

4         lines of a critical bug fix or something that is

5         impacting users, it is very important that we do

6         offer them that expedited option, again, at the

7         benefit of our users.  But we don't have any firm

8         criteria in which I'm aware of that would say, like,

9         only do it, you know, in certain circumstances, such

10        as X, Y, and Z, and lay it out specifically.  It is

11        very much at the discretion of developers when to ask

12        for such an expedite specifically."

13 Did I read that correctly?

14 **A.**  You did.

15 **Q.**  And you cannot recall a single instance where you refused

16 to pass along an expedite request from any developer for app

17 review, right?

18 **A.**  I cannot recall an instance in which I would refuse to

19 pass along that request, or at least make that request known.

20 **Q.**  You recognize Epic's need to sync *Fortnite* releases across

21 multiple platforms, right?

22 **A.**  Yes.

23 **Q.**  You understand, of course, that *Fortnite* is a

24 cross-platform game?

25 **A.**  Yes.

SCHMID - CROSS / MOSKOWITZ

1    **Q.**  And you understand that it was highly important to Epic to

2    have *Fortnite* content be available across all of its platforms

3    simultaneously?

4    **A.**  Yes.

5    **Q.**  And you understood that part of a model -- part of the

6    model for *Fortnite* is that there's frequent releases of new

7    versions of *Fortnite*, right?

8    **A.**  Yes.

9    **Q.**  And you understood specifically with respect to those

10   releases and because *Fortnite* is available on multiple

11   platforms, it is important for Epic to time the releases on

12   each platform to be synchronized.

13   **A.**  Correct.

14   **Q.**  And the propagation process following app review is the

15   process it takes for an app to basically get live and out to

16   iOS users.

17   **A.**  Correct.

18   **Q.**  So if you could please turn to PX625.

19          **THE COURT:**  Can you hold on just a moment?

20          **MS. MOSKOWITZ:**  Sure.

21       (Discussion off the record.)

22          **MS. MOSKOWITZ:**  Testing?

23          **THE COURT:**  Perfect.  All right.  Thank you.  Let's

24   proceed.

25

1    **BY MS. MOSKOWITZ:**

2    **Q.**   Mr. Schmid, if you could turn to PX625 in your binder.

3    **A.**   I'm there.

4    **Q.**   This is an email between you and Mr. Dobrin April 25,

5    2019.

6         Do you see that?

7    **A.**   Correct.

8              **MS. MOSKOWITZ:**   Your Honor, I offer PX625.

9              **MR. SRINIVASAN:**   No objection, Your Honor.

10             **THE COURT:**   Admitted.

11         (Plaintiff's Exhibit 625 received in evidence)

12   **BY MS. MOSKOWITZ:**

13   **Q.**   This is an email discussing a *Fortnite* release and

14   propagation issues with respect thereto, right?

15   **A.**   Correct.

16   **Q.**   And Mr. Dobrin makes a number of observations about

17   Apple's propagation system in here, right?  Second email from

18   the top.

19   **A.**   Say one observation.

20   **Q.**   He says here, "I can't believe we are relying on an

21   indexer to push data live in 2019," right?

22   **A.**   Yes.

23   **Q.**   And he says, "You can keep pestering engineering on the

24   shortcomings on the indexer system," right?

25   **A.**   Yes.

SCHMID – CROSS / MOSKOWITZ

1   **Q.**   And you wrote back:

2            "Agreed!  If we want more games to treat us as a

3            legitimate games platform, we've got to move to a

4            more reasonable system with a shorter SLA, at least

5            in line with the other major platforms."

6        Do you see that?

7   **A.**   I do.

8   **Q.**   And, again, "SLA" was referring to the time it takes

9    between submission and sort of getting it out to users.

10  **A.**   The maximum amount of time it should take.

11  **Q.**   You thought it should be shorter?

12  **A.**   Well, the SLA is 24 hours, but often propagation would

13   happen within 30 minutes.

14  **Q.**   But it often didn't, right?

15  **A.**   Not often.

16  **Q.**   You are aware that it took -- it took time for Epic's

17   *Fortnite* releases to be propagated, right?

18  **A.**   Most were propagated quite quickly.

19  **Q.**   Epic complained from time to time that there were issues

20   with propagation, right?

21  **A.**   Yes.

22  **Q.**   Consoles propagated *Fortnite* faster than Apple did.

23  **A.**   Yes.  They have many less apps and games.

24  **Q.**   And they could propagate in seconds or minutes at worst?

25  **A.**   Because they are only propagating one thing per day.

1    **Q.**  Sir --

2    **A.**  Yes?

3    **Q.**  -- they could propagate in seconds or minutes at worst,

4    right?

5    **A.**  I'm sorry.  Absolutely.

6    **Q.**  Thank you.

7        And because of propagation differences, sometimes Epic had

8    to decide whether to offer the update across all platforms or

9    wait for Apple.

10   **A.**  Correct.

11        **MS. MOSKOWITZ:**  Your Honor, I believe I can pass the

12   witness.  Thank you.

13        **THE COURT:**  Redirect.

14                    <u>**REDIRECT EXAMINATION**</u>

15   **BY MR. SRINIVASAN:**

16   **Q.**  Mr. Schmid, I would like to go back to those two videos we

17   showed, the videos that you recorded.

18        Do you recall those?

19   **A.**  Yes.

20   **Q.**  Okay.  Did you edit those videos in any way?

21   **A.**  No.

22   **Q.**  In other words, can you tell us from -- well, from when

23   you pushed "Record" to when you pushed "Stop," was there

24   anything you did in between there?

25   **A.**  I did not.

SCHMID – REDIRECT / SRINIVASAN

1    **Q.**   Okay.  And is that the case for both of those videos?

2    **A.**   Correct.

3    **Q.**   Now, I think you testified on cross-examination that you

4    took a step, I believe, on the App Store before you started

5    one of those videos.

6         Do you recall what that step was?

7    **A.**   Took a step on the App Store?

8    **Q.**   I think counsel said, "Did you do something before you

9    started recording?"

10        Do you recall that you testified that you did something

11   before you started recording on the App Store?

12   **A.**   I logged in to the games, but that was not on the App

13   Store.  That was within the game, specifically within Candy

14   Crush Hearthstone.  I was already logged in.

15   **Q.**   Okay.  So you logged in to the game, the native app; is

16   that right?

17   **A.**   Correct.

18   **Q.**   That's the only thing that you did before you recorded in

19   that one instance?

20   **A.**   Correct.

21   **Q.**   Okay.  No other editing or speeding up that you did?

22   **A.**   No.

23        **MR. SRINIVASAN:**  Your Honor, we would actually like

24   to move in those videos.

25        **THE COURT:**  Okay.

 1          **MS. MOSKOWITZ:**  Objection.  Those are demonstratives.

 2          **THE COURT:**  Did I allow yours, Ms. Moskowitz?

 3          **MS. MOSKOWITZ:**  I did not offer my demonstratives,

 4     Your Honor.

 5          **THE COURT:**  Have I allowed any videos from either

 6     side?

 7          **MS. MOSKOWITZ:**  Not that I am aware of, Your Honor.

 8     There was one -- Your Honor, there was one commercial that had

 9     aired that we did offer of the *Star Wars* one.  But that wasn't

10     a demonstrative, that was an exhibit that we had offered into

11     evidence.

12          **MR. DOREN:**  Your Honor, there have been a number of

13     videos admitted into evidence as recently as yesterday, which

14     was Mr. Sweeney presenting at WWC14, and then there were the

15     trailers created by Epic to -- for *Creative Mayhem* and the

16     original *Battle Royale Moon* trailer, as well, among others.

17          **MS. MOSKOWITZ:**  Your Honor, I think the distinction

18     is that the documents -- the videos, excuse me, that were

19     offered and entered into evidence were actually pre-existing,

20     not made for litigation purposes.  Those were pre-existing

21     facts and statements that could be entered.

22          **THE COURT:**  I don't think that we recorded Mr. Evans'

23     demonstration.  So, to be equal on both sides, I'm not going

24     to allow you to do it.  I'm sure some Court of Appeal law

25     clerk will try to replicate it themselves, and that will be

1       fine.

2                   **MR. SRINIVASAN:**  Thank you, Your Honor.

3       **BY MR. SRINIVASAN:**

4       **Q.**  Turning back to the demonstrative of *Candy Crush* that

5       counsel walked you through.

6            Do you recall that?

7       **A.**  Yes.

8       **Q.**  And do you recall that there were some various steps that

9       they asked you about in that examination?

10      **A.**  Yes.

11      **Q.**  Are those steps that -- would you -- are those steps the

12      type of steps that you might have to take the first time you

13      create an account for a particular game?

14      **A.**  Yes.  But, again, this is at the developer's discretion.

15      So in the instance provided, we do require that if you are

16      offering a third-party log-in, like Facebook log-in or another

17      social media log-in, that you must also add "Sign in with

18      Apple" as a service to our users to give them a

19      privacy-friendly option when they are signing up for an

20      account with any game or app.  However, at that point, then it

21      is the developer's choice whether to offer that log-in option,

22      as well, on their website and tie those experiences together.

23           In this circumstance, King chose to not use any

24      third-party log-in system on their website and to only offer

25      the king.com account, which is absolutely their choice.

SCHMID – REDIRECT / SRINIVASAN

1    **Q.**  Okay.  And is "Sign in with Apple," which you just

2    mentioned came up in your cross-examination, is that something

3    Apple makes available to developers, any developer?

4    **A.**  Yes, on web or native.

5    **Q.**  Is there any charge for "Sign in with" -- the use of "Sign

6    in with Apple"?

7    **A.**  There is not.

8    **Q.**  Do you know when the "Sign in with Apple" program was

9    instituted?

10   **A.**  I cannot give you an exact date.  It was over one year

11   ago.

12   **Q.**  Okay.  So within roughly about a year ago?

13   **A.**  It was definitely over one year ago, possibly two years

14   ago.

15   **Q.**  Okay.  With respect to the -- again, the steps that you

16   were taking, once a user initiates their log-in and password

17   for a website or the native app, is that something they have

18   to do every single time subsequently?

19           **MS. MOSKOWITZ:**  Objection.  Foundation.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  So a user can choose oftentimes to

22   remember their log-in and password.  Most developers will give

23   you that option on their website.

24       On the native app, it pretty much is always saved.  There

25   is occasions where you may prefer to log in each time.  And

SCHMID – REDIRECT / SRINIVASAN

1    then also on the website, bounce back to that we have *Keychain*

2    and other apps available to allow you to save passwords if you

3    prefer to log in and, you know, use face I.D., for instance.

4    **BY MR. SRINIVASAN:**

5    **Q.**  And in your specific case –– you are a gamer –– is it your

6    practice to save your passwords so you don't have to type them

7    in again?

8    **A.**  Yes.

9    **Q.**  And in your experience in the gaming industry, is it your

10   understanding that gamers typically keep their passwords

11   saved?

12   **A.**  Yes.

13   **Q.**  I want to turn to Exhibit 625, which I think was the

14   last –– PX Exhibit, 625, which was in the black binder,

15   Mr. Schmid, one of the last ones counsel asked you about.

16       Do you have it?

17   **A.**  You said 625?

18   **Q.**  It is on your screen.

19   **A.**  Okay.  Yes.

20   **Q.**  And at the top of Exhibit 625 –– well, first of all, let

21   me ask you this:  Do you believe that the iOS platform is a

22   legitimate games platform?

23   **A.**  I do.

24   **Q.**  Okay.  And can you tell us what you meant at the email on

25   the top of Exhibit 625 when you were discussing this issue?

SCHMID – EXAMINATION / COURT

1    **A.**   So one of my jobs is also to work with game developers

2    that aren't on the platform.  Sometimes this is developers

3    that have made console or PC games for years.  Oftentimes it

4    is an independent developer that's only had a game on Steam,

5    and they are used to a certain experience on the platforms

6    they exist on.

7         So what I meant by this was, if we want more game

8    developers to see iOS as a viable and really legitimate

9    gaming platform, these are the kind of things that we could

10   change to improve the experience to get there.

11   **Q.**   And what specific thing were you talking about here?

12   **A.**   In this case, I was talking about the propagation process.

13        There is also a lot to be said about how much more Apple

14   is processing through that propagation pipeline than any other

15   platform.  So we have many more apps, and it is just a much,

16   much bigger platform than the consoles or even, you know, a

17   direct-to-PC store would have.

18   **Q.**   So is this propagation issue at all related to the

19   capabilities or the technology or the graphics of the phone?

20   **A.**   No.

21        **MR. SRINIVASAN:**  No further questions, Your Honor.

22        **MS. MOSKOWITZ:**  Nothing further, Your Honor.

23                        <u>**EXAMINATION**</u>

24        **THE COURT:**  Okay.  So there's been a lot of

25   discussion about gamers in this trial.

1        Do you, as -- in your role, has Apple done any studies or

2    profiles in terms of gamers as a separate and distinct

3    customer base?

4            **THE WITNESS:**  Yes, Your Honor.

5            **THE COURT:**  And can you tell me, in terms of the

6    amount of money that developers and Apple are making on gamers

7    as a distinct customer base, what those numbers look like, I

8    mean, in terms of -- yeah, how is that base different from

9    anything -- anybody else who is using the iPhone?

10           **THE WITNESS:**  Sure.

11       So I think this is a very complicated question, but

12   something that is very important and I'm highly interested in.

13       So we look at revenue derived from games, you know, it is

14   very, very big.  It's a tremendous part of the platform.

15   It's, you know, the billions of dollars that -- generated that

16   we are -- that is mutually beneficial to Apple and our game

17   developers.

18       When you look at the title "gamer," which has some kind of

19   negative associations with it at times, and oftentimes those

20   are validated by things that we see in the gaming ecosystem, I

21   think that is where I get uncomfortable determining, like,

22   what that user base is.

23       So my wife, for instance, plays *Scrabble Go* every day.

24   She has not played a PC game or console game since *Fortnite*

25   was no longer in our house, but she plays *Scrabble Go* every

1 day.  Does that make her a gamer?  In the traditional sense,

2 maybe not, but she plays a game every day.

3  We don't look -- at Apple, we don't look at gamers as some

4 sort of the stereotypical teenager in their basement playing

5 games.  We look at gamers as people who enjoy games.  They may

6 also do other things with their phone and have, you know,

7 really important jobs, or they may just be killing time on the

8 bus.  That's a gamer to me.  That's somebody that enjoys

9 games.  It doesn't define them as a person.  Like, I'm a dad,

10 but I also play games.

11   **THE COURT:**  So of the entirety of that population,

12 where are the revenues coming from?

13   **THE WITNESS:**  So of the entire population of app

14 users or --

15   **THE COURT:**  Well, are you saying that all app users

16 are also gamers?

17   **THE WITNESS:**  Certainly not.

18   **THE COURT:**  Okay.  So of all app users, how many

19 would you say access, or you would put in a gamer category?

20   **THE WITNESS:**  I guess that truly depends on the

21 definition.  If we're saying a gamer is somebody that plays a

22 game once a week and if that is what we are going to use to

23 identify it, it is a very large percentage of users.

24  I couldn't give you an exact, but I think, you know, even

25 if you look anecdotally in your life how many people have a

SCHMID – EXAMINATION / COURT

1    game on their phone, it's almost all the people you speak

2    with.  There might be some exceptions and maybe they don't

3    play them very frequently, but...

4         **THE COURT:**  Okay.  So not anecdotally, then, Apple's

5    a business, developers are --

6         **THE WITNESS:**  Correct, Your Honor.

7         **THE COURT:**  -- you know, trying to -- you're trying

8    to make money.

9         **THE WITNESS:**  Correct.

10        **THE COURT:**  So in the context of revenue, what are

11   you finding?  Or do you do any analysis whatsoever?

12        **THE WITNESS:**  We do the analysis on the revenue from

13   games, but we don't look at the user-level activity, like what

14   does the gamer on our platform generate.  We don't split our

15   users in that same way.

16        **THE COURT:**  Okay.  So -- and then in terms of

17   revenue, do you make a distinction or have you done any

18   analysis between what happens with in-app purchases as

19   compared to initial downloads?

20        **THE WITNESS:**  So in referring -- if you are referring

21   to premium games that are purchased for a price versus in-app

22   purchase games, free-to-play games --

23        **THE COURT:**  Right.

24        **THE WITNESS:**  -- the vast majority would be

25   free-to-play games and the revenue derived from free-to-play

1    games.  Premium games is still a business on our store, but

2    it's a much, much smaller business today than it was a decade

3    ago.

4            THE COURT:  And how are subscriptions working into

5    that analysis?

6            THE WITNESS:  As far as games go, there is very few

7    games that are really able to crack that subscription model.

8    I think there are certainly more than there have ever been and

9    it is continuing to grow, mostly around battle passes like

10   *Fortnite* has and other things of that nature.  But it is still

11   a much smaller section than in-app purchase alone.

12           THE COURT:  Has Apple ever done any analysis of

13   issues related to impulse purchasing?

14           THE WITNESS:  Not that I am aware of.

15           THE COURT:  Okay.  Anything on those questions,

16   Ms. Moskowitz or Mr. Srinivasan?

17           MS. MOSKOWITZ:  Just a --

18           THE COURT:  He's first.

19           MR. SRINIVASAN:  Nothing here, Your Honor.

20           THE COURT:  All right.  Ms. Moskowitz, go ahead.

21           MS. MOSKOWITZ:  Thank you, Your Honor.

22                         RECROSS−EXAMINATION

23   BY MS. MOSKOWITZ:

24   Q.  The Court asked you a few questions, Mr. Schmid, about

25   where revenues are being generated from.

1       Is that -- do you remember those questions?

2   **A.**   Correct.  Yes.

3   **Q.**   Do you have personal knowledge of that information or is

4   that something that you have to look up in the systems?

5   **A.**   As far as like -- could you clarify?

6   **Q.**   Sure.  Could you tell me for any actual category of games,

7   sitting here right now, exactly how much revenue is generated?

8   **A.**   Oh, per category?

9   **Q.**   Sure.

10  **A.**   I could not give you that off the top of my head.

11  **Q.**   And vis-a-vis between games and nongame apps, as they are

12  currently categorized, you can't actually tell me any of the

13  numbers of revenue generated by those categories?

14  **A.**   Off the top of my head, I would not be able to do that.

15  **Q.**   And you would have to go look that up somewhere?

16  **A.**   Correct.

17          **MS. MOSKOWITZ:**  No further questions, Your Honor.

18          **THE COURT:**  Any follow-up?

19          **MR. SRINIVASAN:**  Nothing further, Your Honor.

20          **THE COURT:**  Okay, sir, you are now excused.  Now you

21  can listen to the news.

22          **THE WITNESS:**  Thank you, Your Honor.

23          **THE COURT:**  Okay.  Next witness.

24      A new witness is coming in, Mr. Lo?

25          **MR. LO:**  Good morning, Your Honor.  Jason Lo for

1    Apple.  We call as our next witness Craig Federighi.

2              **THE CLERK:**  If you will remain standing, I will swear

3    you in.

4         (**Craig Federighi,** called as a witness for the Defendant,

5    having been duly sworn, testified as follows:)

6              **THE WITNESS:**  I do.

7              **THE CLERK:**  Please be seated.

8         **MR. LO:**  Your Honor --

9              **THE CLERK:**  And if you'll be sure that mic is kind of

10   under the shield.

11             **THE WITNESS:**  Okay.

12             **THE CLERK:**  And then please state your fall name and

13   spell your last name.

14             **THE WITNESS:**  My name is Craig Michael Federighi.

15   The last name is spelled F-, as in Frank, E-D-E-R-I-G-H-I.

16             **THE COURT:**  Good morning, sir.

17             **THE WITNESS:**  Good morning.

18             **THE COURT:**  You may proceed.

19        **MR. LO:**  Thank you, Your Honor.

20        May I pass up some binders to the witness and to the

21   Court?

22             **THE COURT:**  Yes, you may.

23                        (Pause in the proceedings.)

24

25

FEDERIGHI – DIRECT / LO

1                    **DIRECT EXAMINATION**

2       **BY MR. LO:**

3       **Q.**  Good morning, Mr. Federighi.

4       **A.**  Good morning.

5       **Q.**  Could you please introduce yourself, please.

6       **A.**  Yes.  My name is Craig Federighi.  I work at Apple.

7       **Q.**  All right.  And what is your current position at Apple?

8       **A.**  I'm the senior vice president of software engineering.

9       **Q.**  Before we start talking about your work at Apple, can you

10      give us an overview of your education and work history.

11      **A.**  Sure.

12          I caught the computer bug when I was 10 and was sort of

13      self-taught and did some commercial work throughout junior

14      high and high school, and then went to UC Berkeley in computer

15      science.  I worked a little bit after that, then went back for

16      a master's in computer science, also at UC Berkeley.

17          And then went -- I worked at Oracle and then eventually at

18      NeXT Computer, which was a company founded by Steve Jobs

19      back -- I joined as a software engineer.

20          We were ultimately acquired into Apple.  I worked at Apple

21      for a while and then -- as a director of engineering,

22      ultimately, and then worked at Ariba for 10 years as a CTO

23      before returning back to Apple in 2009.

24      **Q.**  At Apple, what are your current responsibilities today?

25      **A.**  Well, so I lead our software engineering organization.  It

1    is a team responsible primarily for building the operating

2    systems that power Apple's products.

3    **Q.**   What is an operating system?

4    **A.**   Well, today the operating system is a massive piece of

5    software, hundreds of millions of lines of code, that really

6    take the raw potential that is a piece of hardware in an iPad

7    or a Mac or an iPhone and turn it into an experience, turn it

8    into the things that you are used to using, with graphics and,

9    you know, gestures and icons and built-in experiences and

10   apps.  So it is kind of top to bottom, a large software stack

11   that makes the device what it is.

12   **Q.**   And the people in this courtroom have heard a lot about

13   iOS and macOS already.

14        Can you tell us what those are?

15   **A.**   Yes.  So "iOS" refers to the operating system that

16   powers the iPhone.  There is also a variant of iOS called

17   iPad OS that powers the iPad.  And then macOS is the

18   operating system, of course, that powers the Mac.

19   **Q.**   And does your job responsibilities entail any work on

20   either macOS or iOS?

21   **A.**   Both.  Yes.

22   **Q.**   Okay.  Do your job responsibilities cover the security of

23   macOS and iOS?

24   **A.**   Yes.

25   **Q.**   Okay.  And at a high level, what does "security" mean for

1   you in the context of your work at Apple?

2   **A.**   So I -- my organization includes a team that leads --

3   focuses particularly on -- on device security, as well as an

4   overall security architecture for our devices.

5        Security, as a discipline for us, means protecting users'

6   data and protecting their control over the device, making sure

7   that what happens on their device is what the user intended

8   and isn't being manipulated by a bad actor.

9   **Q.**   At the time that iOS was developed, did macOS already

10  exist?

11  **A.**   Yes, the Mac precedes iOS by a grade.   Yes.

12  **Q.**   And do the two operating systems share the same core

13  operating system kernel?   Have you heard that phrase?

14  **A.**   Oh, yes, of course.   Yeah, they do.

15       So if you think of the operating system as a car or

16  something like this, you can think of the kernel maybe as the

17  engine, the low-level power plant.

18       And they do -- both of those operating systems share the

19  same kernel and apply it in somewhat different ways, just as

20  an automotive engine might end up in a car and a fighter plane

21  and a tank.

22  **Q.**   And given that macOS and iOS share the same operating

23  system kernel, did the initial iOS operating system share

24  the same security mechanisms as macOS, which had preceded

25  iOS?

FEDERIGHI – DIRECT / LO

1    **A.**   There were tremendous differences.

2    **Q.**   Why was that?

3    **A.**   Well, when –– and I'm going to speak –– I rejoined Apple

4    in 2009 after some of this work had already occurred.  But

5    since taking over leadership of it, I certainly have –– will

6    represent all of it for the Court.

7        When we set out to create iPhone, we recognized this was a

8    kind of once-in-a-generation opportunity to take what we

9    learned in security and really build a system for the next

10   generation.

11       The fundamental computer architecture of something like

12   the Mac and its security architecture has its roots going back

13   40 years.  We learned a lot with iOS.

14       And we also understood that the cell phone market was a

15   market of billions of devices.  It was going to touch many

16   more people in a wide range of age groups and a wide range of

17   kind of understanding of operating a computer, and so we

18   really had to think about a security architecture that could

19   protect all of them in that kind of context.

20   **Q.**   When the iPhone was first released, was it open to

21   third-party native apps?

22   **A.**   No, it was not.  It was –– just had built-in experiences

23   and web browsing.

24   **Q.**   And so when Apple subsequently opened up the iPhone to

25   native third-party apps, do you have an understanding of

1   whether that affected the security considerations for iOS?

2   **A.**   Oh, tremendously, yes.

3       We also wanted to really radically rethink people's

4   relationship with apps.  When you go back to a system like the

5   Mac, downloading software was a relatively infrequent event.

6   People usually installed a handful of applications.

7       For iOS, we envisioned that users would download lots of

8   little apps to solve all kinds of problems, that they would be

9   downloading software all the time.

10      And so we wanted to make that something that users could

11  do very easily without being particularly experienced or

12  thoughtful about the security consequences of performing those

13  kinds of downloads.  And so we had to engineer an end-to-end

14  system that could give customers that confidence.

15  **Q.**   Okay.  From the perspective of somebody who has to defend

16  iOS users against attacks, is there any kind of model that

17  you use to evaluate kind of what the attack situation looks

18  like, you know, from the perspective of the device user?

19  **A.**   Sure.

20      A common way when considering security is to think about

21  the threat model, who are the threat actors, what are they

22  trying to do, what are their motivations, what are their means

23  of attack, and then consider what sort of countermeasures or

24  obstacles can be created to frustrate that attack or make that

25  attack economically inviable for them.

1          **MR. LO:**  Okay.  If I could ask Mr. Spalding to put up

2     Slide number 2.  Thank you.

3     **BY MR. LO:**

4     **Q.**  Mr. Federighi, do you recognize what is on the screen

5     right now?

6     **A.**  I do.

7     **Q.**  And what is the information that's being conveyed here?

8     **A.**  Well, it is really getting to how an attacker often thinks

9     about the attractiveness of performing an attack.  A large --

10    the largest class of attackers are fundamentally economically

11    motivated cybercriminals, and I suppose, like any business,

12    they are concerned about return on investment, how big is the

13    economic opportunity, how big is the market.

14         And so the factors that will play into the analysis of how

15    worth it is it to mount an attack against a platform has to do

16    with how many customers are there for their malware, in other

17    words, how many devices can I hope to attack; how many

18    opportunities am I going to get to mount my attack, because

19    each of those are going to give me another sort of at bat,

20    hope to create an infection and accomplish my goals; and then

21    what is the kind of value of that access, if I succeed at that

22    attack, what kind of return could I expect for doing so.

23    **Q.**  Okay.  And let's take these one at a time in the context

24    of in iOS devices now.

25         What does the number of devices look like as a threat

1   model consideration for a potential attacker?

2   **A.**  Well, the iOS ecosystem is quite popular at this point.

3   There are well over a billion active devices out there.  And

4   so from an attacker's point of view, these are -- there's a

5   large market that is very attractive to potentially attack.

6   **Q.**  Okay.  And then what about the number of opportunities,

7   what does that mean with respect to iOS devices?

8   **A.**  Well, it essentially means how often is an attacker likely

9   to have contact with a user.  In a way, iPhone users are more

10   prone to download apps by far than typical, let's say, Mac or

11   PC users.

12      The iOS app ecosystem has been so successful that, you

13   know, we have a campaign called "There's An App For That,"

14   because kind of, hey, you've got a little thing you want to

15   do, download an app.  That is a very normal thing to do on

16   iOS.

17      But what that means for an attacker is potentially lots of

18   opportunities to convince someone, how about download my

19   thing.  And so for iOS, that is a very large factor.

20   **Q.**  Okay.  And then, finally, what does the value of access

21   mean in the context of iOS devices?

22   **A.**  Well, iPhones are very attractive targets.  They are

23   very personal devices that are with you all the time.  They

24   have some of your most personal information, of course your

25   contacts, your photos, but other things.  They have cameras on

1   them and microphones.  They are capable of knowing your

2   location.

3       And so they are also often -- because they are always with

4   you, they may be used as a key to get into your place of

5   business or an authentication token to unlock your bank

6   account.  All of these things make access or control of these

7   devices potentially incredibly valuable to an attacker.

8           **MR. LO:**  Okay.  Mr. Spalding, if you can put up

9   number 3.

10  **BY MR. LO:**

11  **Q.**  So we have been talking a little about the threat model

12  considerations for the iOS.  Let's briefly compare that to

13  macOS, and let's take those one at a time.

14      How does the iOS threat model compare to macOS devices

15  in terms of number of devices?

16  **A.**  Well, the Mac is a very successful product and I love it

17  very much, but there are well less than a tenth as many Macs

18  out there in active use than iOS devices.  So from an

19  attacker's point of view, iOS is a much more attractive

20  market in ways to go after.

21  **Q.**  And what about the number of opportunities for a malware

22  attacker to mount an attack on macOS versus iOS device users,

23  or the average macOS versus iOS device user?

24  **A.**  Well, as I mentioned earlier, Mac users and the habit of

25  how people approach software in the Mac is much -- you know,

1    has its roots in many, many years ago, when one was -- would

2    install a handful of applications to accomplish particular

3    tasks, but then it kind of steadies out.  They are not

4    downloading lots of apps all the time.

5        And Mac users are also typically much more wary about

6    downloading software.  They might be on the internet, and so

7    they wonder do I really -- do I really need this app or not.

8        iOS users are accustomed to just getting apps all the

9    time, and so we see iOS users installing dramatically more

10   applications, which, again, ultimately means as an attacker,

11   if I'm trying to convince you to download that one more app, I

12   have got a good chance that you are going to be willing to do

13   that.

14   **Q.**  And then, finally, what about the value of access as it

15   compares to those two classes of devices?

16   **A.**  I think, certainly, there's high value to data that exists

17   on Macs as well.

18       iOS devices have an additional level of value or

19   concern, in part by nature of the fact that it is a device

20   that is always with you.  And because it is always with you,

21   if someone wanted to track your location, if someone wanted to

22   have a live mic on you to capture your conversations, if they

23   wanted to get access to certain kinds of credentials and

24   tokens you use to access maybe work systems, those are likely

25   to be on your iOS device, not nearly as likely to be on the

FEDERIGHI - DIRECT / LO

1    Mac.

2        So, in general, the iOS is -- iOS devices are a more

3    attractive, higher-value target.

4    **Q.**   Okay.  Let's transition from talking about kind of the

5    incentives to attack and let's talk about the attacks

6    themselves.

7        In your work at Apple, do you -- have you gained an

8    understanding in terms of the types of attacks that may be

9    mounted against Apple device users?

10   **A.**   Yes, I have.

11        **MR. LO:**   Okay.  And if I could ask Mr. Spalding to

12   put up number 4.

13   **BY MR. LO:**

14   **Q.**   Mr. Federighi, what is on the screen right now?  What

15   information is on here right now?

16   **A.**   Well, this is an overview of some common sort of fan

17   varieties of attacks that are -- one sees across the computing

18   ecosystems in terms of different kinds of malware.

19   **Q.**   Okay.  And some of these may be more self-evident, but

20   I'll just go through them one at a time.

21        You have got up here on the upper left "scams."  What's a

22   scam in the context of an app?

23   **A.**   So scam is often software that's misrepresenting itself,

24   claiming to offer something that it doesn't actually deliver,

25   hey, give me this money and I will let you watch this video or

1    give you access to this discounted software, and, in fact,

2    it's really just misleading the user and taking their money

3    without giving them what they expected.

4    **Q.**  Okay.  What do you mean when you say "vandalism and

5    sabotage"?

6    **A.**  So some software is out there really to do damage.  Now,

7    this could be everything from someone who is just pulling a

8    destructive prank, maybe to get in the news or establish their

9    credibility with a certain community, but it can also be used

10   for really destructive purposes.  This could be trying to take

11   out a power plant.  There have been incidences of breaking

12   into systems in order to poison water, these kinds of things.

13       And so this is using the access to a computer to

14   ultimately maneuver around a network and maybe either destroy

15   the data on a computer or destroy a computer system or use the

16   computer system's controls to wreak even greater physical

17   havoc.

18   **Q.**  What is "ransomware"?

19   **A.**  Well, so ransomware is really, ultimately, getting someone

20   to pay money to either avoid embarrassing or confidential

21   information being released or to regain access to information

22   that an attacker has taken control of.

23       So a common scheme is to get access to a user's data --

24   maybe this is photos, maybe these are confidential

25   documents -- copy them up from the user's system up to the

FEDERIGHI – DIRECT / LO

1    attacker's system, and then say, oh, well, I found these

2    embarrassing details about your life.  Pay me or else I'm

3    going to release them.

4        Another form of ransomware is where the attacker actually

5    has your own computer encrypt the data with a key that only

6    the attacker has, and so you can no longer access your own

7    data.  Your precious photos, your critical business documents,

8    are now gone for you, and the attacker says, I have the key.

9    Pay me this much or I will destroy the key.  And this is a

10   common form of ransom.

11       This has been done, certainly, broadly against

12   individuals, as well as institutions like hospitals that have

13   a really urgent need to maintain their systems and access to

14   critical information, and that is why they are a target for

15   ransom.

16   **Q.**  And what is "surveillanceware"?

17   **A.**  Well, so surveillanceware takes advantage of if you can

18   get deep access to a device, get the user to give you perhaps

19   access to their camera or microphone, you might listen in on

20   them.  You might install what is called a keylogger to try to

21   get all the passwords you are typing or account numbers and

22   exfiltrate that information.

23   **Q.**  Okay.  And then, finally, what is "info stealing"?

24   **A.**  Well, it is kind of like what it sounds like.  It can be

25   stealing information of value.

1          A common subclass, a very popular one on Windows and

2     Android, are fake banking apps.  So you might think you're

3     downloading the banking app from your bank to let you manage

4     your account.  It's actually an attacker-controlled app, and

5     as you type in your account number, maybe your social security

6     number, your password to your bank, the attacker is actually

7     receiving that information and, behind the scenes, they are

8     using that information to empty out your bank account.

9     **Q.**  So these are kind of the various what -- you know, what

10    happens when the attacks actually happen.

11         Are you also familiar with some of the ways in which the

12    attackers will mount the attack itself?

13    **A.**  Certainly.

14    **Q.**  Okay.

15         **MR. LO:**  Mr. Spalding, if you could put up number 5.

16    **BY MR. LO:**

17    **Q.**  And, Mr. Federighi, what do we have on the screen here?

18    **A.**  Well, this is a high-level representation of the sort of

19    phases of the activity of an attacker.

20         They, of course, develop and package their malware; they

21    distribute their malware, find a way to get it to users for

22    users to download it; and then the malware, once installed and

23    run on the victim's device, goes about doing its harm.

24    **Q.**  Okay.  And so the "develop" part seems more self-evident,

25    an attacker sits down and writes the code.

1    So then what comes next?

2    **A.**  Well, so once they developed their attack, they ultimately

3    have to decide how to package it such that they could --

4    because no one -- if you advertise something as, here is some

5    malware, do you want it, very unlikely to get too many takers

6    for that.

7        And so part of what the attacker has to do is figure out

8    how to package that malware as something they can entice

9    someone to download.

10       One thing they might do is package it as a trojan, meaning

11   take something that the user already wants.  Here is a free

12   copy of Microsoft Word, of Adobe Flash Player or Photoshop,

13   and, in fact, you don't just get Photoshop, you get Photoshop

14   plus some extra malware added into it.  That would be one kind

15   of packaging.

16       Another packaging would be to create some app that they

17   think they can convince someone it's highly desirable.  We

18   have seen things like here is a video player to let you watch

19   free NFL games, or here is something to watch a certain kind

20   of, you know, salacious clip that they've teased you with, you

21   just need this custom player if you want to use it.  And what

22   that app actually is, it may do none of those things, but what

23   it does do is deliver malware.

24       Once they have the malware that they want the user to

25   install, of course, they have to get the user interested in

1    it.  They have to make that connection with the user.

2        And that gets to distribution.  And the internet is just a

3    very wide-open environment for distribution, and so very often

4    they will do things like Google search results where they will

5    find something you might be looking for, you know, maybe a

6    search for "Free Adobe Photoshop," "Free Microsoft Word," and

7    here is a search result that says, you know, you can have it

8    here.

9        And where it directs you is to a web page that looks

10   legitimate, might legitimately look like the real Microsoft or

11   the real Adobe, you think you are downloading this discount

12   software, you have actually just downloaded malware.

13       They might also phish you by sending you an email looking

14   like this is a notice from Apple computer saying, you know,

15   you need to update your computer with the following thing,

16   please install this.  And, again, you click a link that

17   they've made to look like it is from Apple, you download some

18   software, and you get not what you bargained for.

19       So there are many kinds of email-oriented -- it is

20   fundamentally web marketing techniques harnessing advertising

21   and marketing machinery to convince users to download

22   something different than what they thought they were getting.

23   Q.  So let's say the malware has been written through an ad or

24   otherwise, the victim has downloaded the software onto their

25   device.

1      Is there anything else that then needs to be done for the

2   attack to be culminated?

3   **A.**   Yes.   So there are a number of operating defenses that

4   seek to contain bad software.   And so, of course, the attacker

5   needs to make sure that they can circumvent those defenses to

6   accomplish their goal.

7      Now, if they have gotten you to download the software in

8   the first place, they have mounted -- and then to run that

9   software, they have mounted one of the critical hurdles.

10      The next thing they want to do is either exploit a bug in

11   the operating system to get around the operating system's

12   protections or very commonly fool you in a way we call social

13   engineering, fool you into giving that software the access it

14   needs.

15      So an example would be for that ransomware software, maybe

16   this app represents itself as a dating app and it says, oh, I

17   need access to your photo library so you can pick a profile

18   picture for your account on the dating app.

19      The operating system says the app has asked for access to

20   your photo library, do you want to allow that?   And you say,

21   well, I guess so, I really want to use this dating app.   I

22   say, okay.   Well, now the operating system has allowed access.

23   The attacker software now goes through all your photos, either

24   encrypts them for ransom, exfiltrates them to the attacker's

25   site for blackmail, et cetera.   So social engineering is

1   another way that they can get -- accomplish their harm.

2   Q.  So we have been talking about attacks now.  Let's

3   transition and talk about defense.

4       How would you describe Apple's approach to defending

5   against the various techniques and the attacks that we have

6   been talking about so far?

7   A.  Well, we use the term "defense in depth" --

8   Q.  Mr. Federighi, your microphone is hitting your lapel.

9   A.  Oh, I'm sorry.  Okay.  Thank you.

10      So we use the term "defense in depth," and this means

11  providing many, many layers.  Because at any given time, one

12  of those layers could be temporarily circumvented, and so you

13  want to have another layer and another layer.

14      And these layers also, in aggregate, create difficulty and

15  economic disincentive.  If the attacker constantly has to

16  fight at each of these layers, it may not be worth it in time

17  if their return can't be great enough.  So we try to stack up

18  many layers of defense.

19          MR. LO:  Okay.  And, Mr. Spalding, if you could put

20  up Slide number 7.

21  BY MR. LO:

22  Q.  Mr. Federighi, do you recognize what -- some of the

23  information that is on Slide number 7 that's on the screen

24  right now?

25  A.  Yeah.  So this represents three broad categories of

1    defenses.  And we have stacked them up here kind of to

2    represent a barrier that an attacker would have to get over to

3    accomplish their attack.

4    **Q.**  Okay.  Let's start from the bottom.

5        What is a "malware scan"?

6    **A.**  So a malware scan is analyzing a piece of software to

7    determine whether -- typically, programmatically analyze a

8    piece of software to try to determine whether it contains

9    known malware or malware patterns that have been seen before

10   so that you can reject the software.

11   **Q.**  What is referenced by "signed code"?

12   **A.**  So code signing is a cryptographic technique that can be

13   used so that when you receive, let's say, a program to run,

14   you can determine whether an entity that presented it to you

15   had been in possession of a certain signing certificate that

16   someone who you trusted had granted.

17       So say Apple gives a certificate to a registered

18   developer.  The developer signs the software with that

19   certificate, and when the operating system is asked to run the

20   software, it can determine, oh, this code was signed by

21   someone who had a certificate that was granted to them from

22   Apple.

23       And so that is a protection against an attacker throwing

24   random -- an untrusted entity, an unknown entity, throwing

25   some attack that had never been seen before, tries to

1  establish some level of legitimacy for the entity providing

2  software.

3  **Q.**  So if a user receives code that's signed by a trusted

4  developer or a big entity, say UC Berkeley, does that

5  typically mean that the code is safe to run on your computer?

6  **A.**  Unfortunately, often not.  The code signature is a

7  deterrent, but code signatures, the signing certificates

8  themselves, can be stolen.  They can fall into the wrong

9  hands.

10      If you look at something like some of the kinds of attacks

11  that you've seen where someone has gotten control of the

12  signing infrastructure of a given company or of an open-source

13  project and used it to sign software that was illegitimate.

14      The other problem is when you talk about a large developer

15  community -- and iOS has, you know, hundreds of thousands, a

16  million developers -- that is a lot of certificates that are

17  being granted and they're out in the environment.

18      It is difficult to, with total confidence, establish the

19  intents, motives, and authenticity of everyone who holds one

20  of those certificates.  And so in practice, it is common for

21  attackers to get ahold of these certificates, even though we

22  wish they didn't have them.

23      And then once a user -- if they were to try to look and

24  say, well, I think I'm downloading from UC Berkeley; let me go

25  look at what the certificate says -- honestly, most users

1    don't bother to read that –– but if they do, attackers, of

2    course, are clever enough to make sure that the name of their

3    business sounds conformant with the entity they are trying to

4    impersonate.

5        So is it UC Berkeley?  Is it Berkeley Technology Center,

6    Ltd.?  Is it –– I mean, there are any number of names that to

7    a user is like, oh, this sounds right, and, in fact, it is not

8    the real entity they thought they were trusting.

9    **Q.**  Got it.

10       And what is "sandboxing"?

11   **A.**  So I'm using "sandboxing" here in the broadest term, in

12   that containing software to execute in the manner that the

13   operating system is attempting to authorize.

14       Now, the root of the term is thinking about, let's say,

15   children playing in a sandbox.  A sandbox has a boundary to

16   it.  It has a set of toys.  If you're a child playing in this

17   sandbox, you don't get to reach out of the sandbox and do

18   something unsafe elsewhere, right?  You are kind of contained

19   in this safe playpen to make sure you don't do anything bad.

20       Well, the operating system has many mechanisms to attempt

21   to make sure that software that is running doesn't do anything

22   that the user hasn't authorized.

23   **Q.**  Does Apple use any of these mechanisms on macOS or iOS,

24   malware scanning, the signed code, and the sandboxing?

25   **A.**  Yes, we do.

FEDERIGHI – DIRECT / LO

1   **Q.**   Okay.  And is it iOS or macOS?  Which one?

2   **A.**   So both iOS and macOS have different variants of these

3   technologies.

4   **Q.**   There has been some testimony earlier in this case about

5   technology called address space layout randomization, ASLR.

6        Are you familiar with that?

7   **A.**   I am.

8   **Q.**   And what is that?

9   **A.**   So it's one of a broad class of anti-exploitation

10  techniques that try to make it difficult for an attacker to

11  get code execution in an environment where they weren't

12  supposed to have code execution.

13       An attacker will perhaps have -- present data to a part of

14  the system by perhaps doing a buffer overrun or use-after-free

15  attacks -- sorry, these are techie phrases -- but, in essence,

16  they ultimately try to get some code when they weren't

17  supposed to run code, and what they do is have their code try

18  to do jumps into operating system routines to do their work.

19       And in order to do that, though, they need to know the

20  address of those routines.  They need to know where they are

21  jumping to.  And in the old days, those addresses were

22  something you could know upfront, so the attacker could put

23  that in their attack and they could say, oh, if I want to do

24  this routine, I'm going to call here.

25       Address space layout randomization says that the operating

FEDERIGHI – DIRECT / LO

1    system, at startup, picks a random slide for each piece of

2    operating system code so that if I try to attack your system,

3    I don't know where that address is.  I could be jumping off to

4    the middle of nowhere and then the operating system says, hey,

5    something is fishy here, someone just jumped into the middle

6    of nowhere, I'm going to terminate execution.

7         So it's one of the protections to make sure that the app

8    is staying on its rails and behaving as expected.

9    **Q.**   And is ASLR represented on any of these defense mechanisms

10   that we've been talking about?

11   **A.**   Yeah.  In the broadest terms, sandboxing is meant to

12   represent all the kinds of things, like memory protections and

13   other things, to keep the code executing according to OS

14   permissions.

15   **Q.**   There's also been some testimony about mechanisms eXecute

16   Never and memory isolation.

17        Are you familiar with those mechanisms?

18   **A.**   Sure.

19   **Q.**   And what are those?

20   **A.**   So one technique an attacker will use is to try to send

21   code down or create code on the fly to execute and then try to

22   get the system to execute it.

23        This, of course, can bypass code signing, because if what

24   the operating system is supposed to be running is only code

25   that it had seen before and that had been signed and now

1    someone tries to jump into some new code, that would be a

2    problem.

3        By having the operating system ensure that any data pages

4    that the program allocates are marked for no execution, even

5    if the attacker writes code into those pages, if they try to

6    set the CPU to execute instructions in those pages, the

7    operating system says hold on, I'm not allowed to execute on

8    that page.  So it's yet another defense against a common

9    exploit.

10   **Q.**  Okay.  And are those represented on this slide, as well,

11   this wall?

12   **A.**  Yeah.  Again, in my mind, these are all part of the

13   sandboxing protections, keeping the process executing as

14   expected.

15   **Q.**  Okay.  And then, finally, there has been some testimony

16   about kernel integrity protection and page protection layers.

17       At a high level, what are those?

18   **A.**  So we talked earlier about the kernel -- operating system

19   kernel being kind of the engine of the car.  It is a

20   foundational part of the operating system.  And it is the

21   kernel that is enforcing many of these protections.  It is

22   enforcing code signing.  It is enforcing the walls of the

23   sandbox.

24       If an attack could breach the integrity of the kernel and

25   cause the kernel to stop executing those protections, now the

1    attacker would have free rein over the system.

2        So kernel integrity protection is one of the ways we block

3    tampering with the kernel, by making sure that once the kernel

4    has started up and its basic data structure has been

5    initialized, that those are locked down and unmodifiable so

6    that were an attacker subsequently to try to mount their

7    attack, the operating system won't allow that access.

8    **Q.**   Okay.  So these sound like pretty sophisticated mechanisms

9    against sophisticated attacks.

10       Are there certain types of attacks that sandboxing, signed

11   code, and malware scanning are not particularly good at

12   protecting against?

13   **A.**   Yes.  Well, certainly, as you say, there are many

14   protections, and as an industry, it's been an arm's race to

15   innovate in all of these layers.

16       But a challenge is that all the operating system can do is

17   enforce what the user says they want the software to be

18   allowed to do.  And so through social engineering attacks, an

19   attacker can often get access to things outside the sandbox by

20   explicitly telling the operating system that that is what they

21   want to have happen.

22       I offered the example earlier about an attack that, under

23   a pretense, asked for access to your photo library.  Under

24   normal circumstances, iOS doesn't allow an app, sandbox, to

25   reach out of the sandbox and touch your photos.  That is your

1    private information.  We don't want to give any app direct

2    assess to that.

3        But if it is an app that has a legitimate reason that you

4    want it to have access to your photos, there is a mechanism

5    for the app to ask -- tell the operating system to ask you.

6    The operating system will present you with a question.  If you

7    say "allow," the operating system will essentially open up a

8    hole in the sandbox, allowing the app to have access to the

9    data that you've authorized.

10       And so very often malware is operating not by

11   circumventing the kind of mechanisms we just discussed, the

12   technical mechanisms, but, rather, through social engineering,

13   fooling the user into giving them access to what they need.

14   **Q.**  Thank you.

15       Are you familiar with the notarization and gatekeeper

16   mechanisms on macOS?

17   **A.**  Yes, I am.

18   **Q.**  And let's start -- let's take one at a time.

19       At a high level, what is notarization for Mac iOS?

20   **A.**  Okay.  So notarization is a process where when a developer

21   has created some software that they wish to distribute, say,

22   over the internet from their website, they first sign that

23   software with their certificate and they then submit that

24   software to an Apple server.  And that Apple server performs

25   an automated scan of that software to identify whether it

1   contains any known malware.

2       If it has known malware, then that request is, you know,

3   dropped on the floor.  If the software is determined by the

4   automated scan to not have any previously identified malware,

5   then it is -- essentially, the app is notarized and gatekeeper

6   will then -- when the user subsequently downloads that

7   software and tries to run it, the operating system will say,

8   oh, look, this software has been notarized by Apple so I have

9   a higher confidence than I might otherwise in this software,

10  and the user's prompted and they can decide to go ahead and

11  run that software.

12  **Q.**  And on the macOS systems, is there malware scanning in

13  any process other than the notarization process?

14  **A.**  Yes.  So macOS has some malware scanning mechanisms that

15  predate the notarization service.  One of them is called

16  XProtect that checks, when a piece of software is run, whether

17  it matches a set of known signatures for malware.

18  **Q.**  Okay.  Let's take a look at the representation of the wall

19  in terms of defense mechanisms.

20      Are the notarization and gatekeeper mechanisms additional

21  measures on top of what we are looking at on the screen right

22  now?

23  **A.**  Notarization really fits in to the signed code and malware

24  scanning.  So notarization is a form of server-side malware

25  scanning, coupled with signing, and then gatekeeper is

FEDERIGHI – DIRECT / LO

1    enforcing the signing.

2    **Q.**   Okay.  And other than the notarization model, are there

3    other ways to get apps on macOS?

4    **A.**   Yes.  The Mac is a system that many hobbyists and software

5    developers use.  Sometimes they are developing their own

6    software and trying to run an application that isn't yet ready

7    for distribution to anyone else.  And so there are means for

8    developers to say, I want to run this software even though

9    it's not yet notarized.

10   **Q.**   And then does Apple also run an App Store for the Mac

11   system?

12   **A.**   We do, yes.

13   **Q.**   Okay.  Is that the Mac App Store?

14   **A.**   Correct.

15   **Q.**   Okay.  Let's go back to what is on the screen now.

16        You mentioned that iOS and macOS has all three of these

17   defense mechanisms.

18        Does iOS have any additional layers of protection beyond

19   what is available on macOS?

20   **A.**   It does.  And I think we did illustrate them in an

21   addendum to this diagram.

22   **Q.**   All right.  So let's take a look at Demonstrative number

23   8.

24        First, why does Apple add additional layers of defenses to

25   the iOS system above and beyond what is there for macOS?

FEDERIGHI – DIRECT / LO

1    **A.**   Well, what we are representing here is because of the

2    factors -- the economic factors that we talked about earlier,

3    the iOS ecosystem presents a very attractive target that

4    could fund a very large and active attacker base.  We have

5    seen this kind of thing formed in -- for Windows and Android.

6    And the attractiveness of iOS would attract a lot of those

7    red people.  Those red people are supposed to indicate bad,

8    bad attacker people.  And it's, in part, because of, you know,

9    the opportunity that is represented by those large number of

10   iPhones.  The Mac, on the other hand, attracts a lot less

11   attention.

12          **MR. LO:**  Okay.  Mr. Spalding, could you put up

13   number 9?

14   **BY MR. LO:**

15   **Q.**   What is represented on the screen now, Mr. Federighi?

16   **A.**   So this is showing both, on the left, the set of security

17   mechanisms on the Mac that we talked about earlier, and then

18   on the right, a high-level representation of the defense in

19   depth in the iOS ecosystem.

20   **Q.**   All right.  So let's take those one at a time.

21          One of these additional layers in defense is reliability

22   check.

23          What is that?

24   **A.**   So since software is part of app review, there are

25   automated checks that are performed against applications; for

1    instance, making sure they launch and they don't crash

2    immediately.

3         And when it comes to fraud, users don't want to pay for an

4    app maybe that doesn't even run at all, and so certain kinds

5    of automated checks can be performed to make sure that the app

6    is actually working.

7    **Q.**   Okay.  And then you've got a larger section called "human

8    policy review."

9         Briefly, what is represented by that?

10   **A.**   Well, there is a lot in there, and it represents the

11   combination of a set of policies for apps in the iOS

12   ecosystem embodied in the App Store policies and app review,

13   having humans look at software in order to enforce those

14   policies.

15        **MR. LO:**   Okay.  Mr. Spalding, if you could pull up

16   number 10.

17   **BY MR. LO:**

18   **Q.**   Mr. Federighi, I put up something else relating to the

19   human policy review.

20        At a high level, what is represented on this

21   demonstrative?

22   **A.**   So on the left is a reviewer, and they are using the app

23   review guidelines to assess an application that has been

24   submitted for review.

25        On the right are some illustrative kinds of things that

1    are -- they check as part of their review process that

2    contribute to our security defenses.

3    **Q.**  All right.  So let's take these one at a time.

4        The first one is "marketing description."

5    **A.**  Yeah.  And it's one that on the surface you might say what

6    does that have to do with security, but, in fact, it is

7    probably the single most important thing that foils attackers,

8    which is on the App Store, for an app to be reviewed, it has

9    to represent what it does.  It has to say, I am this app from

10    this developer.  I have this kind of functionality.  I have

11    these screenshots of what my app does.

12        And what a human reviewer can do is then take a look at

13    what the app is going to represent itself to the user as doing

14    and what the app actually does when it is run and say, these

15    two match.  This is doing the same thing.

16        This frustrates the attacker's most common technique,

17    which is to impersonate being someone else, distributing

18    something else.  An attacker cannot, with any long-term

19    success, hope to say I am Adobe Flash to the App Store and

20    have reviewers continuously approve that, oh, this is Flash,

21    because we know there's only one Flash and there is Adobe.

22    And a human reviewer can make that determination, which means

23    an attacker can't take that popular piece of software -- it

24    used to be popular -- and convince users, oh, you want to

25    download that, here it is.  Because the marketing description

1    is going to be rejected by the App Store and so the user is

2    never going to see that when they go to download.

3    **Q.**  Okay.  What is functionality in the context of human

4    policy review?

5    **A.**  Well, this is making sure that the app actually performs

6    the functions it alleges to perform.  If it doesn't, if it

7    says it is a calculator and it is not actually a calculator,

8    then this can be detected by a human reviewer.

9    **Q.**  Okay.  And then what about entitlements?

10   **A.**  Well, so we have talked about some of the ways that a

11   human can be socially engineered to authorize an app some

12   access, perhaps to personal information.

13        The way that is handled in iOS is governed by what we

14   call entitlements.  And so if a developer says, I have an app

15   that I want to -- I want this app to be able to ask users for

16   access to their microphone or I want to ask them for access to

17   their contacts, they have to include in the submission a

18   request for an entitlement, I wish to have the contact's

19   entitlement.

20        An app reviewer can then look at the purpose of the app

21   and the entitlements the author is asking for and say why is

22   this calculator asking for permission to ask for health

23   information?  Why is it asking for permission to access the

24   contacts?  This makes no sense for this calculator.

25        And at that point, the app won't be approved, and,

1    therefore, the app will never be able to ask for -- ask a user

2    and try to fool or socially engineer the user into that

3    request.  Because without the entitlement, they are not even

4    allowed to make the request at runtime.

5    **Q.**  And then finally on this list, what is "physical safety"?

6    **A.**  Physical safety refers to checking for a class of

7    applications that are inherently risky for users to run.

8        So there have been cases of apps, for instance, that are

9    speed test kind of things, to see how fast your car is going

10   and share it competitively with your friends.  You can imagine

11   that would bring about some pretty unsafe behavior and,

12   unfortunately, has.

13       And so those are the kinds of things that the App Store

14   will attempt to identify and block or take down if it's

15   identified that some got through.

16       **MR. LO:**  Okay.  Mr. Spalding, let's going to number

17   11.

18   **BY MR. LO:**

19   **Q.**  So I think you mentioned this a little bit earlier, but

20   what are some of the things that human policy review does for

21   security that may not be present in some of the other layers

22   that we have been talking about?

23   **A.**  Well, all of the mechanisms that are enforced on machine

24   are things that the machine really -- the human policy review

25   is the only place those can be accomplished.

1      Because a computer doesn't -- can't actually tell is this

2    an accurate marketing description.  Can't actually tell when

3    you run an app is this app doing what the marketing

4    description says.  Those technical protections at the bottom

5    are really only able to tell that the thing is doing what any

6    computer program can do, as opposed to the one that is being

7    represented to the user in that marketing description.

8    **Q.**   Okay.  And then on the right-hand side, representing

9    iOS, there's this "centralized distribution."

10      What is that in reference to?

11   **A.**   So centralized distribution is how the software is

12   actually distributed to the user, where the user goes to get

13   software.

14      I mentioned earlier that the Mac has a model where

15   software can be distributed, essentially, from anywhere.  You

16   could hand someone a USB stick with some software on it.  You

17   could point them at any website and they could download

18   software from those locations.

19      Centralized distribution refers to having a single point

20   of enforcement and a single location that the operating system

21   is required to go to in order to get software.  And this is

22   critical to actually ensuring that the user is getting the

23   software from a reliable source.

24   **Q.**   If sideloading were to be allowed for iOS and Apple did

25   not have centralized distribution, would that change have any

1   impact on the security of the platform?

2   **A.**   Oh, dramatically, yeah.  No human policy review could be

3   enforced, because if software could be signed by people and

4   downloaded directly, now there -- you could put an unsafe app

5   up and no one would have checked that policy.  You could

6   misrepresent -- and, as I said, the most common attack is to

7   say, hey, I'm Microsoft Word, here I am, and you could

8   represent it that way, and then you could even create a

9   website that was indistinguishable to the human eye as to

10  whether it was Microsoft or not.  And now you think you're

11  downloading legitimate software and, in fact, you are

12  downloading a trojan.

13  **Q.**   Mr. Federighi, are you aware that --

14         **THE COURT:**   So I'm going to ask the obvious question,

15  and because it has come up so many times during the trial.

16         There are multiple stores on the Mac, so that, then, could

17  happen on the Mac.  Why can't you -- you know, why should we

18  not allow the same stores to exist on the phone?

19         **THE WITNESS:**   Yeah, it certainly -- it is how it is

20  done on the Mac, and it is regularly exploited on the Mac.

21         iOS has established a dramatically higher bar for

22  customer protection.  The Mac is not meeting that bar today,

23  and that's despite the fact that Mac users inherently download

24  less software and are subject to a way less economically

25  motivated attacker base.

1          If you took Mac security techniques and applied them to

2     the iOS ecosystem, with all those devices, all that value,

3     it would get run over to a degree dramatically worse than is

4     already happening on the Mac.  And as I say, today we have a

5     level of malware on the Mac that we don't find acceptable, and

6     it is much worse than iOS.  Put that same situation in

7     place for iOS and it would be a very, very bad situation for

8     our customers.

9          **THE COURT:**  Okay.  Same question with the Android.

10          **THE WITNESS:**  So Android has a considerable malware

11     problem, something like, you know, 50 times the malware of

12     iOS.

13          Some of that is a nuisance; some of that is your bank

14     account got stolen and you are not quite sure how it happened;

15     and some of that is future risk of a cyberattack if someone

16     gets ahold of an Android execution on an Android phone and

17     uses it as a stepping stone to getting access to an industrial

18     system or something else.  So it is a problem for Android.

19          With iOS, we've aspired to create something far more

20     secure.  All indications are that we have succeeded in doing

21     so.  We certainly don't want to slide back to the level of

22     security that we are constrained to with a Mac-like product or

23     something like Android.

24          **THE COURT:**  Professor Mickens testified that there

25     was no real difference between the Android -- attacks on the

1   Android versus the iPhone.  So what quantitative analysis do

2   you have that would suggest otherwise?

3         **THE WITNESS:**  So, certainly, every report I've read,

4   including the recent Nokia report on malware, shows infections

5   of Android devices at something like 30 times that of iOS.

6   Previous reports have shown that to be even more skewed.

7      If you look at the list of top malware afflicting users,

8   you will see Windows, Android, Windows, Windows, Android,

9   Android on the list.  You won't see iOS on that list.

10     The results in the real world are just dramatically

11  different, and it is well understood in the security community

12  that Android has a malware problem, and that iOS has

13  succeeded in, so far, staying ahead of a malware problem.

14         **THE COURT:**  Proceed.

15         **MR. LO:**  Thank you.

16  BY MR. LO:

17  **Q.**  We were talking about the human policy review,

18  Mr. Federighi.

19     Are you aware that despite Apple's best efforts, sometimes

20  apps get through the human policy review that are against the

21  Apple guidelines?

22  **A.**  Yes, unfortunately, that certainly does happen.

23  **Q.**  And in that situation, does -- do any of these mechanisms

24  help Apple on the back end?

25  **A.**  Oh, absolutely, yeah.  From an attacker's point of view,

1    they are thinking about the sort of total lifetime revenue

2    earnings they can make from their malware, because it takes a

3    lot of effort to get through all of these defenses.

4        If -- with centralized distribution, out of the gate they

5    have a poor chance of getting through.  Some do.  Most -- the

6    vast majority don't.  But if they do, they can be pretty

7    confident that eventually they are going to get shut down.

8    And not only will this one instance of this one app get shut

9    down, but then we will have learned and put additional

10   improvements in place that mean that they can't follow up

11   immediately with the same attack over and over.

12       This is dramatically different than what we see on the

13   Mac, unfortunately, without centralized distribution.  So on

14   the Mac, we see an attack, we block that malware, and before

15   we have even finished blocking the old malware, they have

16   mutated their malware into a different piece of malware and

17   started distributing that one instead.  And it is just an

18   endless game of Whac-A-Mole, because they always have

19   distribution channels available to them to continue their

20   attacks.

21   Q.  Okay.  And with respect to iOS, does Apple's ability to

22   take corrective actions after the fact have any impact on

23   security, you know, ex ante, before the attack even happens?

24   A.  Absolutely.  I mean, this really gets to the deterrent

25   effect.  If attackers can't make a consistent business out of

FEDERIGHI - DIRECT / LO

1    attacking the platform, they are less likely to ever mount the

2    attacks in the first place.  And that is one of the reasons

3    there is just less malware ever presented to iOS users.

4    Q.  Okay.  Mr. Federighi, you testified earlier that one of

5    the reasons Apple has a higher defense wall for iOS than

6    macOS was the difference in the threat model.  Are there any

7    other reasons why the macOS has a different security design?

8    A.  Yeah, some historical and some based on the nature of the

9    product.

10       The Mac from the beginning has been part of a generation

11   of systems where the expectation is you can get software from

12   wherever, you can hand it to your friend on a floppy disk and

13   run it.  That's part of the expectation.

14       But Mac users also expect a degree of flexibility that is

15   useful to what they do.  Some of them are software developers,

16   some of them are pros running very unique tools, and having

17   that power is part of it.  I think of it as if, you know,

18   we -- the Mac is a car that you can -- you can take it off

19   road if you want, you can drive wherever you want, and that

20   comes with -- as a driver, you've got to be trained.  There's

21   a certain level of responsibility to doing that.  But that's

22   what you wanted to buy.  You wanted to buy a car.

23       With iOS, we were able to create something where, you

24   know, children -- heck, even infants can operate an iOS device

25   and be safe in doing so.  So it's really a different product.

1 **Q.** Okay.  On both the iOS side and the macOS side, you

2 mentioned earlier that there were -- there is malware

3 scanning, although implemented slightly different.

4  Is Apple equally successful at keeping out malware on

5 macOS and iOS devices?

6 **A.** No.  As I mentioned a moment ago, we -- unfortunately, we

7 have a significant larger malware problem on the Mac.

8 **Q.** And how does Apple know that?

9 **A.** So we, on the Mac, combat malware actively.  We have -- I

10 mentioned XProtect earlier.  We have another mechanism called

11 MRT, the Malware Removal Tool.

12  As we become aware of malware through our own scans, as

13 well as from reports from third-party antivirus and security

14 companies, we remove that malware.  We block that malware and

15 we remove that malware.

16  And in the case of the Mac, we find that we are having to

17 block many instances of malware, I mean, roughly a couple a

18 week and sometimes infecting hundreds of thousands of users'

19 systems.

20 **Q.** Okay.  On the iOS side, is there a Malware Removal Tool

21 as well?

22 **A.** There is not.

23 **Q.** Why not?

24 **A.** We have, honestly, never needed one.  The level of

25 malware -- you know, we do a parallel effort on iOS.  I

1    think during the last year, when the Mac had something like

2    130 unique pieces of malware we removed, iOS had three, I

3    think, and one of them wasn't through the App Store even.

4    **Q.**  So we have highlighted --

5         **MR. LO:**  You can take this down, Mr. Spalding.  Thank

6    you.

7    **BY MR. LO:**

8    **Q.**  We've highlighted some of the differences between iOS and

9    macOS.

10        Overall, is the macOS a safe platform?

11   **A.**  So I think, you know, safe if operated correctly.  I

12   think, much like that car, you know, if you know how to

13   operate a car and you obey the rules of the road and are very

14   cautious, yes.  If you're not -- you know, I've had a couple

15   of family members who have gotten some malware on their Macs.

16   But, ultimately, I think the Mac can be operated safely.

17   **Q.**  Okay.  Let's take a look at PX741, which is in your

18   binder, but I will ask Mr. Spalding to put it up, as well.

19       Do you recognize what is marked for identification as

20   PX741?

21   **A.**  I do.

22   **Q.**  Okay.  First, is this a document that you personally put

23   together?

24   **A.**  No, it's not.  I believe it's a marketing document from

25   our website.

1    **Q.**   Okay.  Let's turn to --

2              **MR. LO:**  I'll ask Mr. Spalding to just put up page 5

3    of this document.

4    **BY MR. LO:**

5    **Q.**   And, first, you said, Mr. Federighi, it is a marketing

6    document.

7         What product is this a marketing document for?

8    **A.**   This is for macOS.  It says at the top "macOS

9    Security."

10   **Q.**   Okay.  And I want to ask you about some of the contents of

11   page 5.  And let's start on the left-hand side, "Protection

12   starts at the core."

13   **A.**   Uh-huh.

14   **Q.**   There is a -- the first sentence here is:

15              "Technically sophisticated runtime protections in

16              macOS work at the very core of your Mac to keep your

17              system safe from malware."

18        Do you see that, sir?

19   **A.**   I do.

20   **Q.**   And do you know, generally, what that is in reference to?

21   **A.**   Yeah, all the kinds of protections we talked about

22   earlier, the sandboxing kinds of mechanisms, ASLR, gatekeeper,

23   et cetera.

24   **Q.**   Okay.  And then let's go to the third line from the

25   bottom.  There is a list of technologies, and this page says

FEDERIGHI - DIRECT / LO

1 that "make it difficult for malware to do harm and they ensure

2 that processes with root permission cannot change critical

3 system files."

4  What is meant by making it difficult for malware to do

5 harm?

6 **A.** Well, this is referring to --

7    **MR. EVEN:** Objection.

8    **THE WITNESS:** I am sorry, what was that?

9    **THE COURT:** What is the objection?  Lack of

10 foundation?

11    **MR. EVEN:** I think the witness just testified that

12 it's not his document, it is a marketing document that he

13 didn't write, and so I don't know how he is now going to

14 interpret it.  But...

15    **THE COURT:** Overruled.  I think he has got the

16 foundation to answer that question, Mr. Even.

17 **BY MR. LO:**

18 **Q.** Mr. Federighi, do you have an understanding of any systems

19 on the Mac that make it difficult for malware to do harm?

20 **A.** Yes.  So some of the things mentioned just above, like

21 ASLR, like execute disable, like system integrity protection,

22 are things that should malware end up on your system, that it

23 may contain the kinds of damage that the malware can do.

24  It mentions here not changing critical system files.

25 There are some protections on the Mac to try to block malware

1    from modifying the operating system itself.

2        But, again, with social engineering and other access

3    malware has, when it achieves the kinds of access that's

4    referred to here, it can often get access that's problematic.

5    Q.   All right.  Let's take a brief look at the right-hand side

6    of the same page.  And the header here is "Download apps

7    safely from the Mac App Store and the internet."

8        And let's just start at the bottom.  The last sentence

9    says:

10           "If there is ever a problem with an app, Apple can

11           quickly stop new installations and even block the app

12           from launching again."

13       Are you familiar with any technologies on the Mac that

14   matches that description?

15   A.   Yes.  So both things like XProtect, as well as the ability

16   in gatekeeper to revoke developer signing certificates, mean

17   that when malware gets on Mac systems and we become aware of

18   it, we can contain the spread by blocking, potentially, future

19   executions of that same malware before it mutates again.

20   Q.   Okay.  And then this paragraph starts with:

21           "Now apps from both the App Store and the internet

22           can be installed worry free."

23       Mr. Federighi, from a security perspective, do you have an

24   understanding of how Apple tries to position the Mac, as

25   opposed to other devices, PCs or laptops that, you know,

1    consumers might be shopping for?

2    **A.**  Yeah.  We believe, in PC-class devices, that we -- the Mac

3    is the safest platform available, and we aspire to build the

4    mechanisms to make it the safest platform of its type.

5    **Q.**  Thank you.

6         **MR. LO:**  And, Mr. Spalding, you can take that down.

7    **BY MR. LO:**

8    **Q.**  Mr. Federighi, the judge has heard a bit about so-called

9    on-device security.

10        Have you heard that phrase used in connection with iOS

11   before?

12   **A.**  Yes.

13        **MR. LO:**  And if I could ask Mr. Spalding to put back

14   up number 11.

15   **BY MR. LO:**

16   **Q.**  Going back to this demonstrative, Mr. Federighi, which of

17   the defenses on the screen would you characterize as on-device

18   security?

19   **A.**  Potentially, the bottom three.  As I mentioned, some

20   elements of the malware scan, signed code -- or code signature

21   verification, and sandboxing are enforced on-device on the

22   Mac.

23        In the case of iOS, the malware scan is actually provided

24   in the App Store review process as part of the submission

25   process, but all -- the bottom three can be executed on the

1   device.

2   **Q.**   Okay.  And if, going forward, iOS devices could rely

3   only on on-device security mechanisms, would that have any

4   impact on the security of iOS devices?

5   **A.**   Absolutely, yeah.  And that's the question I answered

6   earlier.  I mean, my feeling is with the sophistication and

7   the economic incentive of that red mob on the right, they can

8   absolutely surmount a wall or walk around the wall that is

9   there on the left.

10  **Q.**   There has also been some statements in this courtroom that

11  maybe what Apple could do is replace all of the mechanisms

12  for iOS with notarization gatekeeper technology, which

13  currently exists on the macOS.

14      And, again, just using kind of the representation that is

15  on the screen now, what would that look like in terms of the

16  defense layers for iOS if we were to replace that with the

17  notarization gatekeeper mechanisms?

18  **A.**   It would look like the diagram on the left.

19  **Q.**   Okay.  And what impact would that have on user experience?

20  **A.**   It would subject iOS users to a huge decrease in their

21  safety.

22  **Q.**   We have been talking about, and you've referenced several

23  times, economically motivated attackers.

24          **THE COURT:**  Do you keep stats on how many times you

25  catch something beyond the bottom three on-device security

1    gates?

2             **THE WITNESS:**  Yeah.  Yes, we do.

3        So as I mentioned with Malware Removal Tool, by the time

4    we get to the position of removing malware infections from

5    customer devices, it's because they -- that malware has,

6    essentially, surmounted the bottom three, right?  It has now

7    become malware that's successfully exploiting users' systems.

8        We -- I mentioned earlier that we issue about -- last

9    year, since last May, about 130 distinct kinds of Mac malware

10   had jumped over these fences or these parts of the wall, and

11   we had to remove them.  Just one of those had infected 300,000

12   systems, for instance.

13       There are also third parties.  Malwarebytes is one that

14   does reports on their estimates of malware that is actually

15   sighted or that they see in the wild.

16       So it's our direct on-the-ground experience in fighting it

17   where we see how much of it is occurring.

18       And we do see that a good part of that malware is

19   surmounting our notarization server defense, that something

20   like 110 instances last year were cases where they

21   successfully -- because it was unknown malware to us and it

22   had fake developer identities that had not been detected, they

23   actually passed notarization and were able to distribute their

24   malware and ultimately run on Mac systems.

25             **THE COURT:**  You have four minutes.  You have about

1    four minutes before we take a break.

2              **MR. LO:**  Okay.  Sure.

3    **BY MR. LO:**

4    **Q.**  We have been talking about economically motivated

5    attackers.

6         Does Apple have any concerns for iOS device users other

7    than against economically motivated attackers?

8    **A.**  We certainly do.  There is a class of sometimes

9    nation/state-level or espionage attacks that are very

10   targeted.  These are extremely well-funded attackers who will

11   perform extremely targeted attacks, often using unknown --

12   previously unknown zero day exploits to perhaps attack a

13   political rival, a dissident journalist.

14        And these are not the kinds of things that affect the

15   average -- the average person, of course, but there is a small

16   community that it can be, you know, obviously extremely

17   perilous to as technology is exploited in this way.  And so

18   it's another big thing that we fight.

19   **Q.**  And do these nation/state attacks, do they happen very

20   frequently?

21   **A.**  So compared to malware, no, because -- or traditional mass

22   economic-motivated malware, no.

23        The nature of these attacks are the attacker discovers a

24   very, very, very secret bug that costs often millions of

25   dollars to obtain, and they deploy that bug.  If that bug were

1    discovered by us -- and we often do discover them -- we

2    immediately shut it down.  We -- essentially, we call it

3    burning that vulnerability.  Now it is useless to them.  That

4    millions of dollars is useless to them.

5        So they have to be extremely surgical of when and where

6    they use it and, in other words, against how many people they

7    use it, because if they used it in a broad way, it immediately

8    gets discovered, and if it gets discovered, it immediately

9    gets shut down.

10   Q.  Okay.  And then just last question before the lunch break.

11       So for the average user, is the nation/state attack kind

12   of a common issue for the average user who is just buying the

13   phone from the Apple store?

14   A.  No, certainly not.  But it's -- I don't want to downplay

15   how important it is and how much we care in fighting it, but

16   it is not something the average user would ever confront.

17   Q.  Thank you.

18       MR. LO:  Your Honor, would this be a good time for

19   our break?

20       THE COURT:  Okay.  We will stand in recess, then,

21   until 12 -- oh, wait.  I'm off.  Sorry.  You've got to keep

22   going.

23       MR. LO:  Oh, all right.

24       THE COURT:  20 more minutes.  I was looking at 15

25   instead of 35.  Maybe that was just wishful thinking.  No

1    offense to you, Mr. Federighi.

2              **THE WITNESS:**  None taken.

3              **THE COURT:**  Okay.  20 more minutes.

4         **MR. LO:**  Thank you, Your Honor.

5         We are back, Mr. Federighi.

6              **THE WITNESS:**  Okay.  Quick break.

7    **BY MR. LO:**

8    **Q.**  Outside of attacks by either mass exploitation attackers

9    or nation/state attackers, are there other issues that Apple

10   is thinking about in terms of protecting iOS device users?

11   **A.**  Yes.  A major concern of ours is protecting users'

12   privacy, as well.

13   **Q.**  And when Apple is -- or when you're thinking about

14   protecting users' privacies, what is it that you are

15   protecting the user from or who are you protecting them from?

16   **A.**  Well, when you use different apps and websites, it is

17   possible for information to be collected about your activity,

18   have that combined with personal information, have that

19   collected and sold, for instance, to data brokers to build an

20   exhaustive profile that can learn things about you that would

21   probably, you know, surprise you could be known, and then use

22   that information for a lot of purposes.

23        So if -- and if your location could be determined at all

24   times, they could learn not just about where you live and

25   where you work and where -- what bars you go out to at night,

1   but whether -- what clinics you visited, what doctor you've

2   seen.

3      If they can monitor your internet searches, they may learn

4   a lot about your politics.  They may learn about a medical

5   condition you or a loved one has.  If they monitor your health

6   data, they may learn about your pregnancy or your sexual

7   habits or any number of things.

8      And this information could be used to simply try to sell

9   you more effective advertising, to target you more

10   effectively.  It often can embarrass you by revealing such

11   targeted advertising in front of other people.

12      But it also can be used to target you for, essentially,

13   riling people up into activating people politically,

14   activating them in ways that are detrimental to society, or

15   you can end up in a filter bubble where, because of how you

16   have been profiled, unbeknownst to you, you are only seeing

17   certain things.

18      And it can also mean that the kinds of products that are

19   offered to you, potentially the kind of insurance rates that

20   are offered to you, reflect things that no one else should

21   know about you.  And so we try to make sure users are in

22   control of their private information.

23   **Q.**  Okay.  And are you familiar with some of the ways that

24   Apple tries to protect user privacy?

25   **A.**  Yes, I am.

1          **MR. LO:**  Okay.  Mr. Spalding, if you wouldn't mind

2     putting up number 12.

3     **BY MR. LO:**

4     **Q.**  Mr. Federighi, what information is on this screen right

5     now?

6     **A.**  So these are what we call our security pillars, kind of

7     the leftmost bullets on this list.

8          Security is, of course, the foundation of privacy.  If an

9     attacker could access all your data without your control,

10    well, then all bets are off.

11         Data minimization is about making sure that apps only get

12    the data that they need to do their job and no more.

13         Transparency control.  Those are other pillars of ours for

14    protecting privacy.

15    **Q.**  Okay.  So let's start with data minimization.

16         What does that term mean?

17    **A.**  Well, it really means minimizing the amount of information

18    that any app gathers about you to be what it actually needs to

19    do the job.

20         So if you're playing a game but that game tries to gather

21    information about your location unnecessarily, why did it need

22    that?  If it tried to access your photo library unnecessarily,

23    why did it need that?  We try to restrict apps to only ask for

24    and only obtain from the user information that is actually

25    necessary for their purpose.

FEDERIGHI – DIRECT / LO

1   **Q.**   Okay.  And we talked about entitlements earlier, so let's

2   talk specifically about the incentivized access.

3           **MR. LO:**   And, Mr. Spalding, if you could put up

4   number 13.

5   **BY MR. LO:**

6   **Q.**   What are we looking at on the screen here, Mr. Federighi?

7   **A.**   Well, this is an example of a bad pattern that is against

8   App Store policy with respect to incentivized access, which is

9   while apps can ask for certain kinds of information, they are

10  prohibited from asking for information withholding

11  functionality, for instance, if the user doesn't give up

12  personal information.

13         So in this case, an app is saying, well, it would like

14  access to your contacts, and that's -- it asks the system to

15  ask the user.  And then the user, let's say, says don't allow,

16  why do I want this thing to have access to my contacts, in

17  this bad pattern, what this app then does is follow up with

18  what we call incentivized access, say, are you sure?  If you

19  just give us access to your contacts, we'll give you these

20  great features, like high-resolution photo backup, and so

21  forth.

22         This is incentivizing people to give up their privacy.

23  And you can imagine in the context of a game that a child is

24  playing to say can you just give me access to your location

25  and I'll give you access to the next level, and so forth.  And

1  so this is a pattern that the App Store has a policy against.

2  **Q.**  Okay.  And then moving down, what is transparency?

3  **A.**  So transparency means, essentially, making transparent to

4  the customer what access an app has to their data so they

5  understand kind of what bargain they are making, what the

6  consequences are of using that software.

7      One example of this, I guess, if we click to the next

8  slide, is the nutrition label.  Recently, Apple rolled out a

9  policy around what we call app privacy labels, and

10  colloquially nutrition labels, that kind of serve the same

11  purpose that nutrition summary information serves on the side

12  of a box of cereal.  You know, you might read the ingredients

13  and say, I'm not sure what monosodium glutamate and high

14  fructose corn syrup are, but you can look at the top and it

15  will say, okay, how many calories from sugar, how much

16  protein, how much fat, and then I can compare products in ways

17  that maybe I can reason about.

18      With privacy labels, we seek to do the same thing, have

19  developers submit accurate information to a set of coherent

20  categories that we can then represent to the user in a way

21  they can understand so that before they make the decision to

22  download an app, they have some understanding about how that

23  app treats their data.

24  **Q.**  Okay.  And what about control?  What is being represented

25  there?

**A.**  Well, control is -- it is one thing to have transparency
to know what an app might be doing, and you can make the
decision, well, based on that, I am not going to use the app
at all.  But control gives you finer-grained ability to say,
well, I do want to use this app, but I don't want to give this
app access to my location.

     Or, as we see -- and that is really what transparency,
consent, and control, or TCC, as we call it internally, is.
This example is Apple's own maps app.  Maps, of course, can
make productive use of your location to help you get from
where you are to maybe where you are going.  Maps has to ask
the system to ask the user to give access to location.  The
user could say, allow once, yep, for this time using the app,
tell it where I am, but next time ask me again; they could say
don't allow, I don't want this app to have access to my
location.  And the system will enforce that access, so that's
a form of control.

**Q.**  Okay.  And you mentioned app tracking transparency a
little bit earlier, but what is that?

**A.**  So app tracking transparency is an App Store requirement
that if an app is engaging in activities to attempt to
identify you and track your activities across multiple
vendors' apps and websites, the kind of interacting with data
brokers and trading information that we talked about earlier,
that they have to ask the user's permission.

FEDERIGHI – DIRECT / LO

1        And the user can say, allow that, sure, I'm okay with it,

2   or they can say, ask app not to track, in which case the App

3   Store policies say that the app is not allowed to then engage

4   in that activity.

5   **Q.**   Okay.  Do some of these privacy measures involve

6   mechanisms on the operating system and on the device?

7   **A.**   Yeah, it is a combination of really working hand in hand

8   between mechanisms in the operating system and enforcement

9   through app review and the teeth of centralized distribution.

10       **MR. LO:**   Okay.  And, Mr. Spalding, if you could put

11   up number 19.

12   **BY MR. LO:**

13   **Q.**   And we talked a little bit earlier about the human policy

14   review, and now we are seeing two more items down here.

15       What is being represented here, Mr. Federighi?

16   **A.**   So in addition to the security-oriented review items we

17   talked about before, the top four, we're showing that there

18   are additional items that are part of App Store review

19   policies that are enforced by app review, telling -- by

20   reviewing the app, is this app participating in incentivized

21   access?  Did this app present a nutrition label or not?

22       And these become criteria to now participate in the app

23   ecosystem, that you need to respect the user's privacy in

24   these ways with transparency and control.

25   **Q.**   Okay.  Earlier on when we were looking at the wall

1    representations, we talked about centralized distribution and

2    how that relates to security.

3        Is there any relationship between centralized app

4    distribution and privacy control measures?

5    **A.**  Yeah, absolutely.  Many of these policies are -- we know

6    of no way to purely enforce them on device.

7        It is important that a human can look and spot that

8    pattern of incentivized access.  No computer can run that

9    program and say, hold on, why are they trying to convince the

10   user to give up their email address before they can play this

11   level on the game.  A human can make that determination.

12       And without centralized distribution, there are many

13   entities who would love to get around these privacy

14   protections.  They have an economic incentive, potentially, to

15   do so.  If they could distribute outside the App Store and

16   thereby avoid having to deal with these App Store guidelines,

17   they likely would.

18       And so these protections really are only enforceable

19   through app review and centralized distribution.

20   **Q.**  Let's change subjects a bit.

21       Are you familiar with something called the Enterprise

22   Program?

23   **A.**  Yes, I am.

24   **Q.**  And what is it, at a high level?

25   **A.**  So the Enterprise Program for -- Developer Program for

1    iOS apps is meant to enable companies, larger companies, who

2    have apps they build for the use of their own employees.

3    These aren't apps they want to sell to the general public;

4    these are apps that either -- maybe it is the app to order

5    from their cafeteria and they've got an internal app for that

6    purpose, or maybe it's something that's much more like core

7    intellectual property, like Pixar building an app for

8    designers to use to do 3D modeling.  They want to build that

9    app internally, they want to provide it just to their

10   employees, but they don't want to sell it to others.  And the

11   Enterprise Program is meant to give them the ability to do

12   that.

13   **Q.**  Okay.  And the document's in your binder, but I'll ask

14   Mr. Spalding to put it up.  Let's take a look at PX2519 for

15   identification.

16       Mr. Federighi, do you recognize the document that is on

17   the screen right now?

18   **A.**  Yes.  It is a description of the Developer Enterprise

19   Program from Apple's developer website, I believe.

20   **Q.**  Okay.  And let's take a look at the bottom half of the

21   page where it talks about eligibility, and there is five

22   bullet points underneath that.

23       Can you explain just at a high level what the eligibility

24   requirements are for the Enterprise Program?

25   **A.**  Yeah.  Essentially, this is saying does this use fit the

1    criteria I described, which is are you a meaningfully large

2    organization, are you trying to develop software that's for

3    your internal employees' use, not to distribute outside, and

4    do you have systems to ensure that the only people that are

5    going to run these apps are, in fact, your employees and that

6    others aren't going to end up getting ahold of these apps.

7    **Q.**  Do you have an understanding of why Apple has these

8    restrictions in place for the Enterprise Program?

9    **A.**  Yes.  The primary protection here against this being used

10   to distribute malware, for instance, is that only -- we think

11   an employer typically will not be attacking their own

12   employees, that if you are developing software for your own

13   employees to run, there's a trust -- a specific trust

14   relationship and dependency between the employer and the

15   employee.  And as long as the software stays within that

16   relationship, you no longer have attacker/victim as the

17   dynamic.

18   **Q.**  Do Enterprise apps undergo Apple's human app review

19   process?

20   **A.**  They do not.

21   **Q.**  And if they don't undergo app review, is it fair to say

22   that the Enterprise Program apps are safe because the

23   on-device systems are plenty sufficient to protect end users?

24   **A.**  No, not at all.

25   **Q.**  Okay.  And so what mechanisms -- and you may have

1     mentioned a little bit already -- but what mechanisms are in

2     place to protect users of apps that are distributed through

3     the Enterprise Program?

4     **A.**   Well, the primary one is establishing the trust

5     relationship between the enterprise and the employee.  So for

6     an employee to run an app from their employer, they need to

7     install a -- what's called a profile on their device that

8     says, I am an employee of this organization and I trust the

9     software that they would provide to me, and then we are

10    relying on the enterprise themselves to safely use the

11    software and not distribute bad software to employees.

12        So you can think of the incentive system there to be

13    different than it would be for a malware attacker who is

14    trying to get onto any consumer's device.

15    **Q.**   Does Apple's Enterprise Program demonstrate that the iOS

16    platform can be perfectly safe even if there were widespread

17    distribution of apps without undergoing app review?

18    **A.**   Oh, not at all.  I mean, actually, quite the opposite.

19    This has been an area of significant abuse.

20        So even though we have the practices that are described

21    here, there has been a pattern of fake companies signing up

22    for these Enterprise accounts and using them to set up

23    alternate app stores, and those app stores are absolutely full

24    of trojan and virus software.

25        And, in fact, that recent Nokia report I mentioned

1    recently was talking about that it was these -- well, it was

2    third-party stores generally, in fact, in that case that were

3    the primary source of malware being distributed in the Android

4    environment, but in the iOS environment we have seen all

5    manners of attack through these both piracy kind of illegal

6    activity apps and very often malware.

7    **Q.**   And these Enterprise Program abuses where there is malware

8    and attacks, do they still involve the employer-employee

9    relationship where it's an employer attacking their employees?

10   **A.**   No.  In this case, this fraudulent entity that's claiming

11   to be a company sets up their app store and then tells their

12   broad clientele that aren't employees at all saying, hey,

13   look, if you want to get, you know, this cheap software or

14   free software or whatever it is, just install this profile --

15   they come up with some explanation for why that is okay -- and

16   then the user downloads it and then can download the software

17   as a now pretend employee of this pretend company.

18   **Q.**   Okay.  Thank you.

19            **MR. LO:**  Mr. Spalding, you can take that one down.

20            **THE COURT:**  So he has now mentioned these Nokia

21   reports a couple of times.  Are they in evidence?  Going to be

22   in evidence?

23            **MR. LO:**  Your Honor, they are on the stipulation that

24   has been submitted, and our expert, who is going to be two

25   witnesses after Mr. Federighi, will be discussing them live,

1    yes.

2                THE COURT:  Okay.  Thank you.  Proceed.  This time,

3    five minutes.

4                MR. LO:  All right.

5    BY MR. LO:

6    Q.  I want to ask you, Mr. Federighi, about the consequences

7    of opening up iOS to sideloading.

8         Suppose that going forward, anyone and everyone could

9    distribute apps directly to iOS device users.  What impact,

10   if any, would that have on overall security?

11   A.  As I mentioned earlier, I think it would be a pretty

12   devastating setback for iOS security.  I think we would see

13   the kinds of effects that have been experienced on Windows and

14   on Android, in that it would become commonplace for users to

15   be directed to download misleading/misrepresented software

16   from untrusted sources where they would be subject to malware.

17   Q.  What if we didn't open the gates wide open?  What if we

18   said that only certain selected and trusted stores could

19   operate, but it would be more than just Apple being able to

20   operate its App Store?

21   A.  I guess I'm not sure how that would work.  I mean, I'm not

22   sure who would identify -- does Apple get to pick who the

23   trusted stores are or does someone else?  And who would

24   validate that they are trusted and what enforcement mechanisms

25   would there be if they behaved in an untrustworthy manner?

1        And how would you -- as we have seen with the Enterprise

2    Program, where we have attempted to identify trustworthy

3    entities, in effect, there's a lot of fraud around where

4    non-trustworthy entities are constantly popping up.

5        And now, once that free distribution mechanism exists, you

6    get directed to a counterfeit app store.  You can easily get

7    fooled.

8    **Q.**  Okay.  If the app distribution were to be open to

9    alternate stores, couldn't some users who are more

10   conservative about security simply say, I'm just going to

11   continue to shop at the Apple App Store; I'm not going to go

12   to any other store?  Isn't that a possible choice that they

13   could make for their own security?

14   **A.**  Well, unfortunately, in practice, very often not.  If

15   developers wanted, for instance, to get around certain App

16   Store policies protecting privacy or other rules, they may

17   make their app only available through an alternate app store

18   or for sideloading.  And users may need that app.

19       Where today, that app will be on the App Store and will

20   conform with Apple's policies, in this future world, in fact,

21   many of those apps may no longer be available in the App

22   Store, maybe will no longer have gone through app review.  And

23   if the user needs that app for their job, for school, for --

24   to be in the right social group with their friends, whatever

25   it is, they may have no choice but to go get it from the only

1    place it is available, which may not be the App Store.

2    Q.   What if I defy the social conventions -- in other words, I

3    am strict about just going to the Apple App Store -- and even

4    if my job requires me to go to another app store to download

5    an app, I say, no, I'm just going to stick to the Apple App

6    Store.  If that is me, am I just as safe, say, a year from now

7    in an open distribution system as I am today shopping at the

8    Apple App Store?

9    A.   So from what we have seen happen in the Windows ecosystem,

10   unfortunately, the answer is no.  What is -- essentially,

11   there is an exploitation innovation economy out there.  If you

12   start feeding the blood supply of attackers with a revenue

13   model around exploiting our users, they start to develop sets

14   of people with that expertise, start developing tool chains,

15   start figuring out more and more ways to attack the platform.

16       Once that base of attackers gets highly funded and

17   develops those tools, they start to turn those tools on the

18   largest audience they can in any means they can.

19       And, you know, Microsoft had security problems back in the

20   day.  For the last 20 years, they have actually done a lot of

21   good work to try to improve their on-device security

22   mechanisms.  Nonetheless, to this day, they are the --

23   continue to be the most exploited platform, simply because

24   they built up that base of motivated, educated attackers that

25   mount ever more sophisticated attacks on the platform.

1        And iOS is an attractive enough ecosystem that it could

2   result in a similar thing if it gets that source of blood

3   supply from not a responsible user like you, but the rest of

4   the users who start the ball rolling.

5              **THE COURT:**  Okay.  Now is a good time.

6              **MR. LO:**  Yes, it is.  Thank you, Your Honor.

7              **THE COURT:**  All right.  We will stand in recess until

8   1:15.  Thank you.

9              **MR. LO:**  Thank you.

10                   (Recess taken at 12:36 P.M.)

11                   (Proceedings resumed at 1:15 p.m.)

12              **THE COURT:**  Okay.  We are back on the record.  The

13   record will reflect the witness is on the stand.  The parties

14   are present.  Mr. Lo is at the podium.

15        You may proceed.

16              **MR. LO:**  Thank you, Your Honor.

17        One housekeeping matter.  We would move Exhibit 2519 into

18   evidence.

19              **THE COURT:**  Mr. Even?  I think that's the --

20              **MR. EVEN:**  No objection, Your Honor.

21              **THE COURT:**  Okay.  Admitted.

22              **MR. LO:**  Thank you.

23              (Defense Exhibit DX2519 received in evidence)

24   **BY MR. LO:**

25   **Q.**  Good afternoon, Mr. Federighi.

1   **A.**   Hello.

2   **Q.**   Before the lunch break, we were talking about users'

3   ability to pick from among different stores.

4         **MR. LO:**   And I'm going to ask Mr. Spalding to put up

5   Slide No. 6.

6   **BY MR. LO:**

7   **Q.**   Mr. Federighi, could you tell us what we're looking at on

8   the screen here?

9   **A.**   Yes.   This is a screenshot of an actual website that was

10   used as a malware distribution mechanism.   There was a

11   commercial application called SketchUp where the attacker

12   turned it into a trojan by putting malware into SketchUp and

13   then created a website that was meant to exactly mirror the

14   look of the -- of an Apple site -- you can see even across the

15   top it looks like an Apple marketing site, with Mac, iPad,

16   iPhone, and Watch, etc. -- but where, when the user downloaded

17   this, they were actually not downloading from Apple, they were

18   downloading from an attacker site and were downloading

19   malware.

20   **Q.**   Thank you.

21         **MR. LO:**   You can take that down, Mr. Spalding.

22   **BY MR. LO:**

23   **Q.**   To continue our discussion regarding app distribution, if

24   Apple were to open up app distribution to all parties, would

25   that open up the possibility of users getting apps from other

1  users?

2  **A.**  Yes, certainly.  One of the ways software could be

3  distributed was via direct messaging or handing someone a, you

4  know, USB stick or equivalent for sure.

5  **Q.**  And does the ability for a user to download and install an

6  app directly from another user -- does that create any

7  security implications?

8  **A.**  It does, yes.  You could get access potentially to where

9  you think you're getting a message from a trusted friend, but

10  actually maybe the contact list has been pulled from your

11  friend's device and it's not really from him.  But you install

12  it because you trust him that he says this is a great app, and

13  that's the way you get the malware.

14  **Q.**  We've been talking a lot this morning or now this

15  afternoon about iOS device users.

16      If app distribution were to be opened up so that

17  sideloading is allowed for iOS devices, do you think that that

18  would have any impact on iOS developers?

19  **A.**  Certainly.  One of the great things about -- we think

20  about the App Store is it's a trusted source of apps.  And

21  because of that trust and that confidence that users have,

22  they are very free about trying out new software, about trying

23  new apps, about downloading lots of things.  And that's helped

24  build this really unprecedented scale of activity for

25  developers, of opportunity for developers, on the App Store.

1        If they become more wary, if they start having bad

2   experiences where they feel like they have to be careful and

3   don't trust downloading, this will mean they are less likely

4   to do so and this means less opportunities, especially for new

5   developers who might be trying to get recognized.  They might

6   be seemingly less trusted and they're less likely to have good

7   opportunity to reach users.

8   **Q.**  Okay.  So we've been talking about the various things that

9   Apple does to protect security.

10       Do you believe that the security functions are something

11   that Apple might be able to hand off to a third party to do?

12   **A.**  Certainly I think that there are parts of our security

13   stack that is integrated in a way end to end, really, from

14   silicon and operating system up through our code signing, our

15   services, and our review.  It would be difficult to accomplish

16   with an entity outside of Apple effectively.

17   **Q.**  And then what about for privacy issues?  Would you have

18   any concerns if the control over and the protection of user

19   privacy were handed off to a third party outside of Apple?

20   **A.**  I would have grave concerns.  I think there are a number

21   of -- of business entities who have really very different

22   philosophies about privacy than Apple do.

23       And, of course, users who -- who want those -- have that

24   expectation, they may choose to buy another product like an

25   Android phone.  But many people who buy an iPhone buy it

1    because of our unique values on security and privacy, and I do

2    fear that many companies would not enforce the same kinds of

3    guidelines that we believe customers -- our customers really

4    care about.

5    **Q.**  And let me just ask a variation of that.

6        If Apple, as well as third parties, were permitted to

7    distribute apps, would that have any impact on Apple's ability

8    to enforce its privacy policies?

9    **A.**  In practice for sure, because many developers may

10   choose -- if they want to engage in activities that are not

11   consistent with Apple's privacy policies, they would seek

12   distribution from distribution points that don't have those

13   protections, and now users would end up very often being

14   forced to download from those alternatives if they wanted to

15   get those apps.

16   **Q.**  Mr. Federighi, do you believe that Apple is incentivized

17   to protect the security and the privacy of iOS device users?

18   **A.**  Oh, absolutely.  I mean, it's completely central to what

19   we do.  We -- I think when users buy an Apple device, they're

20   buying it because they've chosen an intuitive consistent user

21   experience that's -- that's safe, that they can trust.  And

22   those are -- those are things we've invested tremendously in

23   creating and maintaining and that has great value to the

24   differentiation of our product.

25       If -- I don't think anyone else cares as much about

1   maintaining those -- those assets or that user promise as

2   Apple does for our customers.

3   **Q.**  We've been talking about security and privacy.  Let me

4   switch topics for a little bit.

5       As part of your work on the operating systems, do you have

6   any responsibility for the iOS human interface aspects?

7   **A.**  Yes.  So my team, as I mentioned earlier, the operating

8   system that we create really runs the gambit from the

9   low-level engine to the -- the icons on the screen, the

10  gestures you use to swipe between your home pages and launch

11  applications and so forth.

12      So working in concert with our human interface design

13  team, my team delivers all of those -- the iOS user

14  experience.

15  **Q.**  And you made a little bit of reference to it already, but

16  when you're talking about human interface in the context of an

17  iOS device, what do you mean by that?

18  **A.**  So it's -- it's how it looks, how it works, how you

19  interact with it.

20      So if you're familiar with your iPhone, you know about the

21  grid of apps and how you tap them and how they open and how

22  you exit an app, how you move between applications.  That --

23  that whole -- all the -- how the controls look.  All the

24  things that -- that make an iOS device really easy for so many

25  people to use, that's part of that user experience that we

1     define.

2     **Q.**   And in your work on the human interface aspects of the

3     operating system, do you have to consider streaming games from

4     time to time?

5     **A.**   This is definitely a new area that's come up over the last

6     few years, yes.

7     **Q.**   Okay.  And -- well, first, do you know whether iOS

8     supports streaming games?

9     **A.**   We do.

10    **Q.**   Okay.  And does Apple require streaming games to comply

11    with any human interface requirements?

12    **A.**   We do.  So all -- all apps that are distributed through

13    the App Store are required to meet our human interface

14    guidelines, which help maintain a consistent and easy user

15    experience for our customers when they download apps from the

16    App Store.  And, of course, streaming games are no different.

17    **Q.**   Are streaming games on iOS devices required to be

18    individualized?

19    **A.**   So yes.  So central to the iOS user model is this idea of

20    how apps are managed.  Really, apps are kind of the center of

21    the iOS experience.  You open your device and there's a bunch

22    of apps on that home screen.  You, as a user, are accustomed

23    to how you discover apps, how you launch apps, how you -- how

24    you delete them, how you switch between them, how you manage

25    them, all -- all of that.

FEDERIGHI - DIRECT / LO

1      And so for streaming apps, our policy is that each

2   streaming game which constitutes, for the user, a distinct

3   application experience be distributed as a distinct app that

4   they can discover in a consistent way from the App Store,

5   download, and launch independently from other games on the

6   streaming service.

7   **Q.**   Okay.  Outside of the -- just the experience aspect of

8   individualized apps, are there any privacy control reasons for

9   the individualized app requirement with respect to streaming

10   apps or games?

11   **A.**   Yes.  I -- there are certainly privacy and management

12   reasons.

13      Users certainly are accustomed to setting parental

14   controls, for instance, on a per-game limit or per-app limit.

15   They are accustomed to getting ask to buy notifications before

16   maybe their child would get access to another title or

17   screentime monitoring.

18      But also when it comes to privacy, when -- as we discussed

19   earlier, for each app, the user is given the -- a choice

20   whether -- what they allow the app to access.  So you might

21   say that if I were playing *Pokémon Go*, which involves finding

22   things in the real world, I might allow that app access to the

23   camera and access to location.  That's something that game

24   needs.

25      But I might be playing, I don't know, *Assassin's Creed* and

1   I would not give that app access to location or access to the

2   camera.  I get individual control if everything on the -- if

3   each app is managed distinctly as an app where the user has

4   privacy controls.

5   **Q.**  And so let me just ask the question from the other

6   perspective.

7       If a developer were permitted to lump all of their apps

8   together into a single app, what implications, if any, would

9   that have on Apple's privacy and control policies?

10  **A.**  Well, you -- you'd lose all of that individual management.

11  So now you'd have to give that aggregator app access to the

12  sum of all the permissions of any apps you used.  You'd have

13  to say, Well, I guess this app I play, the *Pokémon Go*, needs

14  location, so I'll give the aggregate app location.  And then,

15  Oh, this app needs my contacts and that's okay, so I'll give

16  it that.

17      But now they all have it, potentially.  There is no way at

18  the system level for us to enforce or give you visibility as

19  to which of these applications has that access.

20  **Q.**  Are you familiar with games that have user-created

21  content?

22  **A.**  Sure, things like *Minecraft* and -- yeah.

23  **Q.**  Yeah.  So can you explain what you understand user-created

24  content to mean in the context of game apps.

25  **A.**  Sure.  So very often, games define a kind of interface

1    style, a graphical style, a control scheme, kind of the way it

2    feels to use the game, the way the world -- the world works.

3        And then some games like -- like *Minecraft* let you

4    create -- modify the world, you know, maybe create another

5    place to play and a little -- little -- a level or an

6    adventure, for instance.  The mechanics are the same, the game

7    is, you know -- it's *Minecraft*, but you're playing in a

8    different area of *Minecraft*, essentially.

9    **Q.**   Okay.  And so then from a human-interface perspective, how

10   does Apple look at games with user-created content?

11   **A.**   Well, we -- we look at them as a -- given -- as long as

12   the experience is consistent where it feels more like

13   different parts of a common experience and common game, we

14   find that a user, in their mind, thinks of it as -- as one

15   game.

16       In other words, if -- if you asked a kid who was playing,

17   you know, some particular part of *Minecraft* and you said, What

18   are you playing, they're going to say, Well, I'm playing

19   *Minecraft*.

20       This is different than on a -- let's say a streaming

21   service that was aggregated, where if you were playing *Halo* or

22   you were playing *Pokémon Go* in the service, if I asked you

23   what you were playing, you would say, I'm playing *Pokémon Go*;

24   you wouldn't say, I'm playing, I don't know, Xcode Cloud or

25   something like that.

1    And so we want the user model and the interface model to

2    match.  That's what delivers an intuitive experience.

3    **Q.**  Now, Mr. Federighi, are you aware that on the iOS App

4    Store, there are certain apps that allow, for example,

5    streaming media, like Netflix?

6    **A.**  Of course, yes.

7    **Q.**  And apps like Netflix, are you aware that they may have

8    very different genres of shows or movies and, you know,

9    they'll have series and also movies and documentaries?  You're

10   aware they can have a variety of content there?

11   **A.**  Yes.

12   **Q.**  Okay.  So comparing to what -- the human interface aspects

13   of the streaming games you just talked about, how does Apple

14   view something like Netflix, which may have a variety of shows

15   of different genres?

16   **A.**  Yeah.  So media -- from the outset of the definition of

17   the iOS user experience, media, like music or video, has

18   always had -- been managed in collections as part of apps,

19   whether it's, you know, the Apple Music app or Spotify or the

20   video app.

21       And the experience -- those individual experiences, you

22   know, one song or another song, one video or another video,

23   these are not different application experiences, from the

24   user's point of view.  You know, there is a play button.

25   There is a pause button.  They play the same way.  They don't

1    require unique security permissions.  The user often doesn't

2    have with a single episode, let's say, the kind of, you know,

3    30- to a hundred-hour relationship they might have with a

4    given game title that they're coming back to repeatedly.

5        So we draw a real distinction between the user's

6    expectations for playing and managing apps than we do for

7    individual pieces of media for passive consumption inside of

8    something like Netflix.

9    **Q.**  And so when some -- when something like Netflix has

10   different movies or different shows, does Apple require them

11   to be separated out into individual apps?

12   **A.**  No.  No.  That wouldn't make sense.

13   **Q.**  Thank you, Mr. Federighi.

14        **MR. LO:**  Your Honor, pass the witness.

15        **THE COURT:**  Cross, Mr. Even?

16        **MR. EVEN:**  Thank you, Your Honor.

17        **THE COURT:**  While he is getting ready, I take it you

18   still have that opinion after everybody has been bing-watching

19   during the pandemic?

20        **THE WITNESS:**  There has certainly been a lot of

21   quantity, hasn't there.  But to answer your question directly,

22   yes, I still hold that opinion.

23        **THE COURT:**  Whenever you are ready, sir.

24        **MR. EVEN:**  Thank you, Your Honor.

25

1          **CROSS-EXAMINATION**

2     **BY MR. EVEN:**

3     **Q.**  Good afternoon, Mr. Federighi.

4     **A.**  Hi.

5     **Q.**  Good seeing you again.  Better in real life than over

6     Zoom.

7              **MR. EVEN:**  Your Honor, may I approach and provide

8     some --

9              **THE COURT:**  You may.

10             **MR. EVEN:**  -- binders?

11             **THE COURT:**  And maybe you can pick up the binders,

12    too, on your way back, Mr. Niu.

13    **BY MR. EVEN:**

14    **Q.**  So, Mr. Federighi, I'd like to start with a couple of

15    things that you went over on your direct.  And maybe I'll

16    start from the end.

17        I think you said that apps are the center of the iOS

18    experience; is that right?

19    **A.**  Correct.

20    **Q.**  And you said that in the context that Apple's current

21    model, you believe, is good for developers; correct?

22    **A.**  That wasn't the context in which I made that particular

23    remark.

24    **Q.**  That was your testimony, that the current model by Apple

25    is favorable to developers; correct?

FEDERIGHI – CROSS / EVEN

1    **A.**  Well, I believe broadly so, yes.

2    **Q.**  But Apple has gotten that testimony from you.  Apple

3    doesn't have a single developer coming in here and saying that

4    the developers support Apple's current model; correct?

5    **A.**  I'm sorry.  What's the question?

6    **Q.**  The question is does Apple have a single developer coming

7    into this court and saying that they believe that Apple's

8    current model is somehow good for developers?

9    **A.**  Oh, I actually don't know.

10   **Q.**  Okay.  The Court asked you about some data about malware,

11   etc.

12        Do you recall?

13   **A.**  Yes.

14   **Q.**  And you cited some Nokia report that obviously you have

15   not conducted; correct?  That's not a study you conducted?

16   **A.**  That's correct.  I did not.

17   **Q.**  And that's not a study you were involved with?

18   **A.**  No.  I just read it.

19   **Q.**  And obviously that study is not going to be in evidence,

20   but when I asked you in your deposition if you had any

21   statistics at all about the prevalence of malware in notarized

22   applications downloaded from third-party stores on the Mac,

23   you told me you have none; correct?

24   **A.**  That's not quite the way I answered the question at the

25   time.

1    **Q.**  Okay.

2    **A.**  What I described to you --

3    **Q.**  Okay, sir --

4    **A.**  Okay.

5    **Q.**  -- you have before you --

6          **MR. EVEN:**  Your Honor, I'd like to direct

7    Mr. Federighi to his deposition at pages 59, line 24, to 60,

8    line 5.

9          **THE WITNESS:**  I'm sorry.  Where are we going?

10         **THE COURT:**  So, Mr. Even, he needs direction.

11   **BY MR. EVEN:**

12   **Q.**  Sir, if you go to your deposition transcript, which I

13   believe is a separate spiral --

14   **A.**  Yes.

15   **Q.**  -- booklet, and if you go to page 59, line 24.

16   **A.**  Okay.

17   **Q.**  And do you see that I asked you, "Do you have any numbers

18   of the numbers of the prevalence of malware in signed,

19   notarized applications downloaded from third-party stores?"

20         And you answered, "I don't."

21         Do you see that?

22   **A.**  Yes.

23   **Q.**  And then I asked you, "Do you know if there have been

24   any?"

25         And you say, "I don't have any data on that at all."

FEDERIGHI – CROSS / EVEN

1          Correct?

2     **A.**   That's correct.  But I do have that data now.

3     **Q.**   That's what you said at the time?

4     **A.**   Yes, it is.

5     **Q.**   Thank you.

6          Now, you also were asked some questions about the

7     Enterprise Program; correct?

8     **A.**   Yes.

9     **Q.**   Now, the Enterprise Program works through a certificate

10    that Apple gives; correct?

11    **A.**   Yes.

12    **Q.**   And that certificate allows the developer to, essentially,

13    install an app on any phone that has the requisite profile;

14    correct?

15    **A.**   Correct.  The user first installs the profile and then

16    they can run an app distributed by that developer.

17    **Q.**   And that does not go through any process like notarization

18    or anything like that; correct?

19    **A.**   That's correct.

20    **Q.**   And when you say that there have been stores in China that

21    abuse that process, those stores have -- had to have been

22    vetted by Apple first before obtaining that certificate;

23    correct?

24    **A.**   They had to apply for an Enterprise Developer Certificate

25    and claim to be a business, correct.

FEDERIGHI – CROSS / EVEN

1    **Q.** Okay. And so to the extent these stores operated in

2    China, that was because Apple failed to do a thorough

3    background check on these stores; correct?

4    **A.** That's a very tough job.

5    **Q.** Is that a "yes," sir? That was a failure on Apple's part

6    to do a thorough background check; correct?

7    **A.** I wouldn't characterize it that way, but if we had done

8    a -- if we had figured out that those --

9    **Q.** Sir, it's a yes-or-no question.

10       That was because Apple failed to conduct a thorough enough

11   background check, isn't it?

12   **A.** Well, I can't really answer that as a yes/no.

13   **Q.** You don't know?

14   **A.** Sorry. I do know. You say "thorough enough." That

15   presupposes that if --

16   **Q.** Sir, these -- these stores received a certificate --

17   **A.** Yeah, correct.

18   **Q.** -- correct?

19   **A.** They did receive a certificate, that is correct.

20   **Q.** They received a certificate after validation by Apple;

21   correct?

22   **A.** That's correct.

23   **Q.** And as it turns out, they should not have received that

24   certificate; correct?

25   **A.** Ultimately, yes.

1    **Q.**  Thank you.

2        Now, you were -- I think you mentioned up front that from

3    1999 to 2009, you worked for a company called Ariba; correct?

4    **A.**  Yes.

5    **Q.**  And when you rejoined Apple in 2009, you worked on

6    engineering for the macOS; correct?

7    **A.**  Yes.

8    **Q.**  And at the time, you had very little responsibility for

9    iOS; correct?

10   **A.**  Yes.

11   **Q.**  And you did not take over direct responsibilities for iOS

12   until the 2011, 2012 time period; correct?

13   **A.**  That's correct.  It was actually late 2012.

14   **Q.**  Okay.

15   **A.**  I took over responsibility for parts --

16   **Q.**  That's enough, sir.

17   **A.**  Okay.

18   **Q.**  You answered the question.

19        And so you were not at Apple when the first iPhone was

20   launched in 2007; correct?

21   **A.**  That's correct.

22   **Q.**  And you were not at Apple when the iOS App Store launched

23   in 2008; correct?

24   **A.**  Yes, correct.

25   **Q.**  And in 2012, when you did take over responsibility for

1    iOS, you did not join what's called the ERB or Executive

2    Review Board that oversees app review; correct?

3    **A.**   Personally, no.

4    **Q.**   And, therefore, you have no personal firsthand knowledge

5    of any decisions concerning the launch of the iPhone; correct?

6    You were not there?

7    **A.**   Right.   I heard about it after the fact.

8    **Q.**   And you don't have any personal firsthand knowledge about

9    the launch of the iOS App Store; correct?

10   **A.**   Yes.   Correct.

11   **Q.**   And you have no firsthand knowledge of what considerations

12   went into the design process for opening of the App Store;

13   correct?

14   **A.**   Only from talking to the people who did the work.

15   **Q.**   I understand, sir.   My question was about your firsthand

16   knowledge.   You have none; correct?   You were not there.

17   **A.**   I was not there at the time, correct.

18   **Q.**   And you have no firsthand knowledge of any threat model

19   performed by the iOS security team at the time of the launch

20   of the iPhone; correct?

21   **A.**   Yeah.   Only retrospectively.

22   **Q.**   And any threat modeling that was done at the time was done

23   by the people who were there and in charge of security at the

24   time; correct?

25   **A.**   Correct.

FEDERIGHI - CROSS / EVEN

1    **Q.**  Now, at the time, the person who was tasked with

2    developing iOS was Mr. Forstall; correct?

3    **A.**  He headed up the program, yes.

4    **Q.**  And you do understand that Mr. Forstall at the time was a

5    proponent of using what's known as macOS 10 as the basis for

6    the iPhone OS; correct?

7    **A.**  Incorrect.

8    **Q.**  Okay.  If Mr. Forstall testified to that, was he wrong?

9    **A.**  He wanted -- I talked to Mr. Forstall about this --

10   **Q.**  Sir, if Mr. Forstall testified to that, was he wrong?

11   **A.**  I think he might have given -- he might have been

12   imprecise.

13   **Q.**  Sir, if you'd turn to your -- Tab 1 of your binder.  Go to

14   page 57 of Mr. Forstall's deposition.

15   **A.**  I'm sorry.  Could you tell me the page number again?

16          **THE COURT:**  He said Tab 1.

17   **BY MR. EVEN:**

18   **Q.**  Page 57 at line 2, do you see that I asked Mr. Forstall:

19       "Q.  And who was the main proponent of using the macOS 10

20   as the basis for the operating system for the phone?"

21       And he says:

22       "A.  I was."

23       Do you see that?

24   **A.**  No.  I'm not on your -- I'm not on your page.  I'm sorry.

25   One moment.

1      Yes, I found it.

2   **Q.**   Did he say that?

3   **A.**   That's what it says.

4   **Q.**   And do you have any reason to dispute that?

5   **A.**   Yes.

6   **Q.**   Do you believe Mr. Forstall was wrong in this response?

7   **A.**   No.  Again, Mr. -- he was just speaking --

8   **Q.**   Sir --

9   **A.**   -- overly generally.

10  **Q.**   -- was he wrong?  It's a yes-or-no question.

11  **A.**   He was imprecise.

12  **Q.**   Okay.

13       Now, in 2011, you took over the operating system software

14  outside of iOS; correct?

15  **A.**   Yes, and some of the foundations of iOS.

16  **Q.**   And at the time, your team delivered the shared components

17  between macOS and iOS; correct?

18  **A.**   Correct.

19  **Q.**   And that was more than half of the software that

20  underpinned iOS; correct?

21  **A.**   Yes.

22  **Q.**   And I think you testified already that both operating

23  systems shared the same kernel; correct?

24  **A.**   Yes.

25  **Q.**   Sir, do you recall a person who used to work under you by

1    the name of Mitch Adler?

2    **A.**  Not well.  The name is familiar, but I don't know him

3    well.

4    **Q.**  Okay.  Do you recall that Mr. Adler worked in the security

5    area and then left Apple around 2017 to work in the security

6    area for Google?

7    **A.**  I might be thinking of a person who did.  I'm not sure if

8    it was Mitch Adler.

9    **Q.**  Do you know a person by the name of John Wright, who I

10   believe still works there?

11   **A.**  The only John Wright that I can think of does not work at

12   Apple anymore.

13   **Q.**  Okay.  Then he left recently?

14   **A.**  No.  Quite a -- I mean, many years ago.

15   **Q.**  Okay.  And I know you know a person by the name of Dallas

16   DeAtley; correct?

17   **A.**  I do.

18   **Q.**  And he does still work at Apple?

19   **A.**  He does.

20   **Q.**  And he works on security; correct?

21   **A.**  No.  He works on compilers.

22   **Q.**  Okay.  He used to work on security; correct?

23   **A.**  He did, correct.

24   **Q.**  For many years?

25   **A.**  Yes.

1   **Q.**   And, for instance, when Apple first participated in Black

2   Hat in 2012, Apple sent Mr. DeAtley to speak at Black Hat;

3   correct?

4   **A.**   I believe that's the right date, yes.

5   **Q.**   And Mr. DeAtley was manager of the platform security team;

6   correct?

7   **A.**   Yes.

8          **THE COURT:**  Can you spell his last name for me?

9          **MR. EVEN:**  De, D-E, Atley, A-T-L-E-Y.

10          **THE COURT:**  Thank you.

11   **BY MR. EVEN:**

12   **Q.**   And if Mr. Forstall told me that in 2007, Mr. Adler,

13   Mr. Wright, and Mr. DeAtley oversaw security on both iOS and

14   macOS, you have no reason to dispute that; correct?

15   **A.**   I -- they ran different functions.  So there was an iOS

16   security organization and a macOS security organization.  So

17   he may have been speaking that collectively they owned it, but

18   they were two different teams at that time.

19   **Q.**   I understand.  Thank you for the clarification.

20          But jointly, they oversaw security on both sides of the

21   OS; correct?

22   **A.**   Correct.

23   **Q.**   Now, if you'd turn in your binder to the document marked

24   PX877.  I believe it's in Binder No. 1, so it's the same one

25   you looked for Mr. Forstall's deposition earlier.

FEDERIGHI – CROSS / EVEN

1    **A.**   Okay.

2    **Q.**   And do you see that it's a document or report entitled

3    "Third-Party Application on macOS 10 Embedded."

4         Do you see that?

5    **A.**   I do.

6    **Q.**   And I will represent to you this document, notwithstanding

7    what's on the cover, is from November 2007.

8    **A.**   Okay.

9    **Q.**   Now, you see on the cover that the document was prepared

10   by Mr. Adler, Mr. Wright, Mr. DeAtley, as well as some unnamed

11   others; correct?

12   **A.**   Yes, it says that.

13   **Q.**   And you understand that in this context, "macOS 10

14   embedded" refers to the iPhone operating system?

15   **A.**   I believe it does.

16   **Q.**   And if you turn to the second page, you see the first line

17   in the document states that Apple wants to, quote, allow third

18   parties to develop applications for the macOS 10 embedded

19   platform; correct?

20   **A.**   The first line where?  I'm looking at a page --

21   **Q.**   877.2.

22   **A.**   -- that says, "We want to allow third parties to

23   develop...."

24   **Q.**   "We want to allow third parties to develop applications

25   for the macOS 10 embedded platform."

1          Do you see that?

2     **A.**   I do.

3     **Q.**   And the "we" there is Apple; correct?

4     **A.**   I believe so, or this group.

5     **Q.**   And the document then contemplates, in the next couple of

6     lines, a transition from a closed system to an open model;

7     correct?

8     **A.**   It says that.

9     **Q.**   And given the timing, late 2007, do you understand this to

10    be a document from this security team discussing the opening

11    up of the iPhone to third-party applications?

12    **A.**   I think it's anticipating how they might architect such a

13    system.

14    **Q.**   Okay.

15         Now, the document then lays out two assumptions.

16         Do you see that under the heading "Assumptions"?

17    **A.**   I do.

18    **Q.**   And the first assumption is that "all code running the

19    device will be signed," and then they say, "We intend to sign

20    all applications that run on the device"; correct?

21    **A.**   Yes.

22    **Q.**   And you understand that by saying that "we intend to

23    sign," the model proposed here contemp- -- or the

24    architecture, as you call it, contemplates signing of every

25    application by Apple; correct?

1    **A.**   Yes.

2    **Q.**   Now, the paper goes on to explain that "By signing every

3    binary, we can uniquely identify running code.  We will know

4    who created it and we will have the ability to revoke its

5    access to the system"; correct?

6    **A.**   Yes.

7    **Q.**   Now, the second assumption is that Apple, quote, will

8    execute running code within a sandbox; correct?

9    **A.**   Yes.

10   **Q.**   And I think you touched on that on your direct.  The

11   purpose of an app being sandboxed is to restrict that app from

12   accessing files from other apps or from making changes to the

13   device itself; correct?

14   **A.**   Yes.

15   **Q.**   And it's also correct that sandboxing is an important

16   security feature because it restricts access to system

17   resources and user data to contain the image if an app becomes

18   compromised; correct?

19   **A.**   Yes.

20   **Q.**   So let's turn to the next section of the report that

21   speaks to goals.

22       And here, the paper lists that one of the goals is to

23   "encourage and foster development of applications by

24   individuals, third-party software vendors, and corporations";

25   correct?

1    **A.**  Uh-huh.  Yes.

2    **Q.**  And that's still a goal of Apple's today; correct?

3    **A.**  Yes.

4    **Q.**  And that's a goal of Apple because Apple understands that

5    apps add value to the iPhone; correct?

6    **A.**  Yes.

7    **Q.**  Now, turn to the second goal, "Malware Redaction."

8        Do you see that?

9    **A.**  I do.

10   **Q.**  And the security team writes that "in order to prevent --

11   prevent and discourage the deployment of malware on the

12   platform, code signing would provide a basis for identifying

13   and revoking bad applications"; correct?

14   **A.**  Yes.

15   **Q.**  And they go on to say that, "Apple will reiterate on a

16   sandbox model to protect users from malicious code before it

17   has the chance to cause problems"; correct?

18   **A.**  Yes.

19   **Q.**  The document also says that "Apple may choose to restrict

20   access to specific system services or interfaces," and

21   specifically gives the example of selective access to Edge;

22   correct?

23   **A.**  Yes.

24   **Q.**  And that limited access thing, I think you've spoken a

25   little bit about it in your direct.

FEDERIGHI — CROSS / EVEN

1          That's, essentially, the idea of entitlements; correct?

2     **A.**   Yes.

3     **Q.**   And the overall approach that we just discussed, signing

4     all codes, tight sandboxing, and system -- and a system of

5     limited entitlements, all of these are features of current iOS

6     architecture; correct?

7     **A.**   Yes.

8     **Q.**   So let's turn to the third page, which speaks to

9     distribution method.

10         Do you see that?

11    **A.**   I do.

12    **Q.**   In the first paragraph, the security team writes that

13    "Third-party applications can be distributed through iTunes,"

14    but then they write, "However, our model will allow for third

15    parties to distribute their own applications."

16         Do you see that?

17    **A.**   Yes.

18    **Q.**   And go down a couple of paragraphs, and you see that the

19    same team writes, "Signing does not imply a specific

20    distribution method, and it's left as a policy decision as to

21    whether Apple's signed applications are posted to the online

22    store or we allow developers to distribute on their own";

23    correct?

24    **A.**   Yeah, though I believe it says that iTunes will be the

25    distribution mechanism, or the preferred one.

FEDERIGHI – CROSS / EVEN

1    **Q.**  Sir, did I read this correctly?

2    **A.**  I think you skipped over a section.  "We will distribute

3    third-party applications through the iTunes Music Store,"

4    which is the name that then became the App Store.

5    **Q.**  Sorry, sir.  We're not talking about the same paragraph.

6    **A.**  Okay.  Apologies.

7    **Q.**  Go down to the third paragraph, and this is the portion

8    that I read and asked you to see.  "Signing does not imply a

9    specific distribution method, and it's left as a policy

10   decision as to whether Apple's signed applications are posted

11   to the online store or we allow developers to distribute on

12   their own."

13        Are you with me now?

14   **A.**  Yes.  I see that.  Thank you.

15   **Q.**  And I read that correctly?

16   **A.**  Yes.

17   **Q.**  Now, if you turn to 877.6, which is marked Appendix C --

18   **A.**  I'm sorry.  Could you give me a second?  877. --

19   **Q.**  It's the same document; it's just a couple of pages

20   forward.

21   **A.**  Which page?

22   **Q.**  877.6.  It says "Appendix C" at the top.

23            **THE COURT:**  It's the same document.

24            **THE WITNESS:**  Yes.  I'm there.  Thank you.

25

**BY MR. EVEN:**

**Q.**  Thank you.

And you see that this says "Developer Scenarios" on it?

**A.**  I do.

**Q.**  And one scenario is "Guy In His Basement"; correct?

Sounds improbable, but that's what it says on the paper.

Sir, do you see that?

**A.**  I do.

**Q.**  And if you go to Point 3 in "Guy In His Basement," it

speaks to "once the developer decides that they have a final

version to deploy, they submit to Apple for signing, then they

get signed image and deploy as they wish"; correct?

**A.**  That's what it says.

**Q.**  And the same idea is also reflected in the next set of

bullet points, which is headed "EA."

Do you see that?

**A.**  I do.

**Q.**  And in "EA," they have, "Get signed image and deploy," and

there are several options, using a customs team, freeware, or

deal with Apple for DRN.

Do you see that?

**A.**  I do.

**Q.**  And "EA" is what?

**A.**  I don't know.  It may refer to Electronic Arts.

**Q.**  That sounds like Electronic Arts; correct?

FEDERIGHI – CROSS / EVEN

1   **A.**   It may be.

2   **Q.**   Okay.  Electronic Arts is certainly an example of a big

3   developer, as opposed to the guy in his basement; correct?

4   **A.**   Yes.

5   **Q.**   And so the model contemplated in this white paper requires

6   Apple involvement in the form of signing, but separates that

7   signing by Apple from distribution; correct?

8   **A.**   It has that option, envisions the possibility of that

9   option.

10  **Q.**   And there is nothing in this document suggesting that this

11  security team recommends that distribution needs to be limited

12  to Apple's own App Store as a security issue; correct?

13  **A.**   It -- it did say in an earlier page that signing would not

14  solve all malware problems.

15  **Q.**   I agree.

16     But it doesn't say that the fact that they're opting for

17  signing and sandboxing and entitlement -- they don't say you

18  then need to distribute through Apple in order to make it

19  safe; correct?

20  **A.**   I don't think -- I don't see that it draws a conclusion

21  one way or the other in that regard.

22  **Q.**   Okay.

23     And nothing in this paper suggests that once an

24  application is signed, distribution through Apple would be

25  safer in any way than distribution through a different

1    channel; correct?

2    **A.**   I haven't read this whole paper, so I can't represent what

3    it says.

4    **Q.**   Well, certainly in the portions that we've read, you've

5    not seen anything like that; correct?

6    **A.**   The -- in the very little bit of this document that I've

7    read, the one thing I did read is where it said that signing

8    alone would not block all malware, which seems to me --

9    **Q.**   Sir, you need to answer my question.

10        My question is have you seen anything that suggests that

11   this team is saying that once an app is signed, distribution

12   through Apple would be safer in any way, shape, or form than

13   distribution through another channel?

14   **A.**   You haven't pointed me to any lines that said that.

15   **Q.**   Okay.  Before we move on, if you can turn back to 877.3.

16   **A.**   Okay.

17   **Q.**   And here, the document speaks to development.

18        Do you see that?

19   **A.**   I do.

20   **Q.**   And it says in the second paragraph that, quote, The

21   crucial problem to solve is allowing developers to run their

22   code on their devices without having to get it signed by Apple

23   every time they compile.

24        Do you see that?

25   **A.**   I do.

1  **Q.**  And the document then discusses the process of

2  provisioning.

3       Do you see that?

4  **A.**  Yes.

5  **Q.**  And that is a process that would allow developers to test

6  their app on a limited number of preselected devices; correct?

7  **A.**  Yes.

8  **Q.**  And that, too, is a process that's been adopted and is

9  still used today for iOS; correct?

10  **A.**  Correct.

11  **Q.**  Turning to 877.4, "Revocation."

12       Do you see that?

13  **A.**  I do.

14  **Q.**  And the document talks about how, quote, The main goal of

15  signing all of the code that runs on a device is that it

16  allows Apple to revoke specific applications later.

17       Do you see that?

18  **A.**  I do.

19  **Q.**  And so what the team is saying here is that their model

20  contemplates allowing Apple to so-called shut off the spigot

21  if it turns out that an app is misbehaving; correct?

22  **A.**  I didn't see it say "shut off the spigot."  Is that your

23  phrasing?

24  **Q.**  Those are my words.  I'm just saying --

25  **A.**  Oh, okay.

FEDERIGHI – CROSS / EVEN

1  **Q.**    -- that's the idea that's contemplated here, that Apple

2  can revoke --

3  **A.**    Yeah.

4  **Q.**    -- the signature and, essentially, stop the distribution

5  of an app if it goes bad; correct?

6  **A.**    That is -- that is one capability that signing provides.

7  **Q.**    Okay.  So I want to shift gears for a second and talk a

8  little bit about macOS.

9        And if you can turn --

10       **THE COURT:**  I'm sorry.  I thought we were talking

11  about macOS.

12       **MR. EVEN:**  No.  This was iOS, Your Honor.  This is

13  macOS embedded, which, as the witness, I believe, has

14  testified refers to the development of iOS.  That's just the

15  early name of iOS.

16       **THE COURT:**  Okay.  Thank you.

17  BY MR. EVEN:

18  **Q.**  And I don't want to misrepresent what you said, but I

19  believe you confirmed that that is how you understand the

20  document.

21  **A.**  I think that's what they're referring to here.

22  **Q.**  So now, please, let's talk about macOS.

23  **A.**  Okay.

24  **Q.**  And if you turn to DX5492, which is in your -- towards the

25  end of Binder No. 2, I believe.

1          **THE COURT:**  Do you not want this one in evidence?  Do

2     you not want 877 --

3          **MR. EVEN:**  I believe 877 is already in evidence,

4     Your Honor.  I believe it came in as part of the four hours,

5     Your Honor.

6          **THE COURT:**  It is.  Thank you.

7          **THE WITNESS:**  I'm there.

8     **BY MR. EVEN:**

9     **Q.**  Do you recognize DX5492 as the Apple Platform Security

10    white paper from 2020?

11    **A.**  That's what it appears to be, yes.

12    **Q.**  And the Apple Platform Security white paper is a document

13    that Apple releases annually to document security mechanisms

14    on Apple's various platforms; correct?

15    **A.**  Correct.

16    **Q.**  And it is your organization at Apple that releases this

17    document; correct?

18    **A.**  We work in concert with marketing, but, yes, we

19    participate.

20    **Q.**  And before the document is released, it's reviewed by you

21    and members of your team to ensure it is accurate and precise;

22    correct?

23    **A.**  That's our attempt, yes.

24         **MR. EVEN:**  Your Honor, I would like to move into

25    evidence DX5492 at this time.

1          **THE COURT:**  No objection?

2          **MR. LO:**  No objection.

3          **THE CLERK:**  I'm sorry.  5429?

4          **THE COURT:**  5492.

5          **THE CLERK:**  Okay.  Thank you.

6          **THE COURT:**   It's admitted.

7          **MR. EVEN:**   Thank you.

8               (Defense Exhibit DX5492 received in evidence)

9     **BY MR. EVEN:**

10    **Q.**   If you turn to page 1 of 3 of the document, so it's

11    5492.3.

12          And you see that this is the section that discusses app

13    security in macOS; correct?

14    **A.**  You need to give me a second to turn the page, please.

15    **Q.**  Sure.

16          **THE COURT:**  You said 103?

17          **MR. EVEN:**  103.

18          **THE WITNESS:**  Okay.

19    **BY MR. EVEN:**

20    **Q.**  Are you there?

21    **A.**  I am.

22    **Q.**  Good.

23          And do you see that this discusses app security in macOS?

24    **A.**  Yes.

25    **Q.**  And do you see that under "Overview," the first thing it

FEDERIGHI – CROSS / EVEN

1   says is, "App security on macOS consists of a number of

2   overlapping layers"; correct?

3   **A.**   Yes.

4   **Q.**   And the first layer it mentions is that the user has the

5   option to run only signed and trusted apps from the App Store;

6   correct?

7   **A.**   Yes.

8   **Q.**   And that option exists because even though macOS allows

9   distribution by third parties, macOS also features the macOS

10   store; correct?

11   **A.**   Mac App Store, yes.

12   **Q.**   And the Mac App Store is pre-installed on every single Mac

13   that is sold to a user; correct?

14   **A.**   It is.

15   **Q.**   And you understand, do you not, that if this Court were to

16   order Apple to open up iOS to third-party distribution, the

17   same option contemplated in this paper, to continue

18   downloading apps only from the App Store, would be available

19   to iPhone users; correct?

20   **A.**   I -- I don't actually know what the Court could order and

21   what would be possible --

22   **Q.**   Sir, that's not my question.

23        My question was if iOS were opened up such that there

24   would be third-party stores --

25   **A.**   Right.

1   **Q.**   -- that would not take out from the iPhone Apple's own App

2   Store; correct?

3   **A.**   It could not.  It might not, right.

4   **Q.**   Sir, you understand that Epic has not sought to remove the

5   App Store from the iPhone; correct?

6   **A.**   I actually don't know what remedy Epic is proposing.

7   **Q.**   Okay.  But you do understand that it is possible to open

8   up iOS without taking out Apple's own App Store; correct?

9   **A.**   Right, yes.

10  **Q.**   And if there is an App Store on the phone, a user can

11  decide to use only the App Store for all her apps; correct?

12  **A.**   It depends what apps that user wants.

13  **Q.**   Sir, the user can decide that she only goes to the Apple

14  App Store; correct?

15  **A.**   If they're willing to be limited to what apps --

16  **Q.**   Sir --

17  **A.**   -- they use, then yes.

18  **Q.**   Sir, she can go only to the App Store.  That's what you

19  said about macOS in this paper; correct?  That is the first

20  option you lay out, is a user can choose to only buy from the

21  Apple App Store; correct?

22  **A.**   Correct.

23  **Q.**   And for that user, the security level would not change;

24  correct?

25  **A.**   No.  I testified earlier as to why that is not correct.

1   **Q.**  Sir, if a user chose to purchase only from the App Store,

2   the user would have the same protections that the user enjoys

3   today; correct?

4   **A.**  No.  The environment would change.

5   **Q.**  Sir --

6           **MR. EVEN:**   Your Honor, may I show Mr. Federighi his

7   deposition transcript at 87, line 7?

8           **THE COURT:**  Yes.  You can read from 7 to 14.

9           **MR. EVEN:**  I'm sorry.  This is -- I'm sorry,

10  Your Honor.  I gave you the wrong -- I meant 17.  17 through

11  21.

12          **MR. LO:**  Your Honor --

13          **THE COURT:**  You may.

14          **MR. EVEN:**  Thank you, Your Honor.

15          **THE WITNESS:**  Sorry.  Where?

16  BY MR. EVEN:

17  **Q.**  Mr. Federighi, in your deposition, which is the big

18  spiral -- I know we have a lot of things moving -- page 87,

19  line 17.

20  **A.**  One moment.  Yes.

21  **Q.**  And you see that I asked you,  "If a user chose to

22  purchase from -- only from the App Store, the user would have

23  the same protections that the user enjoys today; correct?"

24      And you said, "Yes."

25      Do you see that?

FEDERIGHI – CROSS / EVEN

1    **A.**   Yeah.

2    **Q.**   Now, I gather you also don't know that Epic has not asked

3    anything in this case that would remove app review from the

4    App Store; correct?

5    **A.**   I could take your word for that.

6    **Q.**   Okay.  And I think you said on your direct that your

7    concern is that there are some apps that may not be available

8    and that may drive people to other stores.

9          Is that the issue that you see there?

10   **A.**   That's one of them, yes.

11   **Q.**   Now, the Mac App Store has far fewer apps than the iOS App

12   Store; correct?

13   **A.**   Yes.

14   **Q.**   By an order of magnitude; correct?

15   **A.**   Yes.

16   **Q.**   And nonetheless, in the Apple Platform Security white

17   paper that we just read and that you said you vet for

18   accuracy, that paper suggests that purchasing apps only on the

19   App Store is a viable option even on the Mac; correct?

20   **A.**   It is a choice the user can make.

21   **Q.**   It's the first choice that the user can make.  That's what

22   the paper says; correct?

23   **A.**   Well, it just says "first," but, yeah, sure.

24   **Q.**   And you understand that on the iOS App Store, there are

25   currently 1.8 million apps or thereabouts; correct?

FEDERIGHI – CROSS / EVEN

1    **A.**  Yes.

2    **Q.**  And yet you believe that people will need to go elsewhere

3    or have to go elsewhere because developers would leave the iOS

4    store; correct?

5    **A.**  Some would.

6    **Q.**  And that would mean that Apple was unable to compete for

7    the business of that developer; correct?

8    **A.**  That would not necessarily be the reason.

9    **Q.**  Well, if Apple could compete for the business of that

10   developer, that developer would sell either exclusively or

11   also through the iOS store; correct?

12   **A.**  If you mean compete by lowering privacy protections and so

13   forth, then I'll take your -- your characterization.  But,

14   certainly, it's compete in ways of lowering our standards for

15   protecting the user.

16   **Q.**  What about compete on price?

17   **A.**  That could be another factor.

18   **Q.**  Okay.  Sir, in the world as it is today, the iOS App Store

19   is the incumbent on iOS; correct?

20   **A.**  Yes.

21   **Q.**  In fact, it's the only store; correct?

22   **A.**  Other than pirate app stores from Enterprise certificate

23   abuse.

24   **Q.**  In China?

25   **A.**  Predominantly.

FEDERIGHI – CROSS / EVEN

1   **Q.**   And in the world as it exists today, if we open up iOS

2   tomorrow, Apple would be able to offer developers a much

3   bigger audience than any third-party store could; correct?

4   **A.**   It depends what you mean.  I'm not sure that's true.

5   **Q.**   I mean that there is going to be an App Store from Apple

6   on each and every phone; correct?

7   **A.**   Sure.

8   **Q.**   And there's not going to be an App Store from Epic, for

9   instance, or Steam on the phone pre-installed; correct?

10  **A.**   There is a web browser installed.  They could search for

11  any app they want that way.  So --

12  **Q.**   Sir, that's not what I asked.

13        There is not going to be a pre-installed Steam or Epic or

14  any other store, Adobe Store, on the iPhone; correct?

15  **A.**   That statement is correct.

16  **Q.**   And so other stores would have to compete to be

17  downloaded; correct?

18  **A.**   Not with sideloading.

19  **Q.**   Sir, other app stores, if they want to get on the iPhone,

20  would have to compete to be downloaded; correct?

21  **A.**   If it's only the app stores, sure.

22  **Q.**   Sir, I'm only asking about app stores.

23        My question is pretty simple --

24  **A.**   I thought you were -- apologies.

25  **Q.**   App stores, to get on the iPhone, would have to compete

1   and have the user somehow download them to the phone; correct?

2   **A.**   I think so.

3   **Q.**   And that's going to be true for every other store other

4   than the Apple App Store; correct?

5   **A.**   Not if it was a web-based store.

6   **Q.**   Sir, then they would need to get the user to somehow get

7   to them on the web; correct?

8   **A.**   Oh, sure.  But there is a web browser --

9   **Q.**   They won't have --

10  **A.**   -- built into the system --

11  **Q.**   Sir, they will not have the same access that Apple has

12  because Apple will continue to pre-install its own App Store

13  on each and every phone; correct?

14  **A.**   Apple will continue to pre-install, yes, I believe so.

15  **Q.**   And you say and you believe that the App Store today has a

16  reputation for security and privacy and reliability; correct?

17  **A.**   Yes.

18  **Q.**   And all other iOS app stores or distributors who want to

19  distribute an app are going to start essentially from scratch

20  to build such a reputation; correct?

21  **A.**   I don't know.  It depends on who the incumbent is.

22  **Q.**   Sir, they don't -- sorry.

23      Sir, the incumbent clearly right now is the Apple App

24  Store; correct?

25  **A.**   With respect to iOS, but if they're --

FEDERIGHI – CROSS / EVEN

1    **Q.**   I'm only talking about iOS, sir.

2          On iOS, the Apple App Store is the incumbent; correct?

3    **A.**   Yes.

4    **Q.**   It has the audience; correct?

5    **A.**   It does have the audience.

6    **Q.**   It has the apps; correct?

7    **A.**   Correct.

8    **Q.**   And it has the reputation, you say?

9    **A.**   I'd like to think so.

10   **Q.**   And all the other app stores are going to start from

11   scratch to try and build on that; correct?

12   **A.**   No.  Steam has a reputation.

13   **Q.**   Okay.

14   **A.**   The Epic Store has a reputation independent of being on

15   iOS.

16   **Q.**   Sir, they don't have any reputation on iOS right now;

17   correct?

18   **A.**   Right.  But that doesn't mean they're starting from

19   scratch.

20   **Q.**   Okay.

21          Sir, you understand that at bottom, this is Apple's market

22   to lose; correct?

23   **A.**   I -- I don't understand that characterization.

24   **Q.**   Okay.

25          Going back to the Apple Platform Security paper, same

1    page, 103, it next says that "macOS layers protections to

2    ensure apps downloaded from the internet are free of known

3    malware."

4           Did I read that correctly?

5    **A.**   Yes.   That speak about known malware, correct.

6    **Q.**   And "apps downloaded from the internet" here refers to

7    downloaded from places other than the App Store; correct?

8    **A.**   Correct.

9    **Q.**   And one security mechanism used to ensure this freedom

10   from malware is what you discussed that's known as

11   notarization or notary service; correct?

12   **A.**   Yes.

13   **Q.**   And notarization, the model there is that once the

14   developer has an app that is ready for release, she signs that

15   software with her Apple ID -- developer ID, sorry, and sends

16   it to Apple for notarization; correct?

17   **A.**   Yes.

18   **Q.**   And the notary service performs automated security checks

19   on the signed content; correct?

20   **A.**   Yes.

21   **Q.**   And when notarization is complete and successful, the

22   notary service can send back a ticket which the developer -- I

23   saw it referred to as staples to the binary and then can

24   distribute the binary in whichever way she wants; correct?

25   **A.**   That's correct.

1   **Q.**  And so in notarization, there's a separation between the

2   scanning and notarizing that Apple performs and the

3   distribution, which the developer can do in whichever way she

4   wants; correct?

5   **A.**  Correct.

6   **Q.**  And that's exactly what we saw that the paper from 2007

7   said would be possible in the model discussed there; correct?

8   **A.**  It's in the ballpark.  I don't think it's exact, but it's

9   in the ballpark.

10  **Q.**  Okay.

11       Now, in terms of substantive protection, notarization

12  requires the developer to adopt something known as hardened

13  runtime; correct?

14  **A.**  Yes.

15  **Q.**  And hardened runtime is something that iOS apps are

16  already subject to today as the default, and it's not -- the

17  developer can't change that; correct?

18  **A.**  That's correct.

19  **Q.**  And as part of the notary service, Apple also scans the

20  application for known malware.

21       I think you've testified to that in your direct; correct?

22  **A.**  Yes.

23  **Q.**  Now, the scope and depth of the malware scans performed by

24  Apple during the notary service are determined by Apple;

25  correct?

1    **A.**   Yes.

2    **Q.**   And it is Apple's decision whether to limit those scans to

3    a static malware scan like we discussed in your direct;

4    correct?

5    **A.**   There are technical and scalability limitations as well,

6    but we certainly have some flexibility into what we implement.

7    **Q.**   Okay.

8         For example, there is nothing preventing Apple from

9    running dynamic analysis on the code as part of the notary

10   service; correct?

11   **A.**   It's very challenging.  You need to exercise the app like

12   a user would, which you couldn't do in an automated way.  So

13   I'm not sure how that would work.

14   **Q.**   Okay.  So you would have some human to be involved in the

15   process?  Is that what you mean?

16   **A.**   I -- I don't know.  If what you're describing -- right now

17   the notary service is not designed for humans to run the apps.

18   **Q.**   Sir, that's not what I asked.  I understand what the

19   notary service is right now.

20        What I'm asking is, is there any technical limitation that

21   prevents Apple from saying tomorrow, Now we're going to apply

22   dynamic analysis to every app that's sent to us for

23   notarization?

24   **A.**   If we change the App Store to human app review, then we

25   could do those things, if that's what you're suggesting.

1   **Q.**  And there is nothing preventing Apple from scanning the

2   app for use of private APIs; correct?

3   **A.**  In practice, that's very difficult to do successfully.

4   **Q.**  Sir, that is what Apple does on the iOS side today;

5   correct?

6   **A.**  We try, but it's very hard to do successfully.

7   **Q.**  I understand.

8        But the same attempt that's being done on the iOS side

9   could be applied as part of notarization; correct?

10  **A.**  Sure.

11  **Q.**  And that's just a question of Apple deciding to do it;

12  correct?

13  **A.**  Correct.

14  **Q.**  And there's nothing preventing Apple from using a tool

15  like PhotoDNA, for instance, to scan the app for things like,

16  you know, child pornography that are being scanned all over

17  the place in places where -- with user-generated content;

18  correct?

19  **A.**  Incorrect.

20  **Q.**  Okay.  You don't know what PhotoDNA is?

21  **A.**  I do.

22  **Q.**  Do you know that sites with user-generated content use it

23  to ferret out especially child porn, since it's so sensitive

24  and illegal?

25  **A.**  PhotoDNA is only able to scan for a relatively small

FEDERIGHI – CROSS / EVEN

1  database of known past child pornography that fits specific --

2  **Q.**   And that's what --

3  **A.**   -- signatures --

4  **Q.**   And that's what -- that's what sites such as YouTube and

5  TikTok and places like that use PhotoDNA for; correct?

6  **A.**   They have other mechanisms, as well.

7  **Q.**   I understand.

8      But you could use PhotoDNA and you could use the other

9  mechanisms they use, as well; correct?

10  **A.**   I am not sure how the -- no.  No, that would not work.

11  **Q.**   Now, there is nothing that prevents Apple from having a

12  human review some or even all of the apps that are going into

13  the notary service; correct?

14  **A.**   Yeah.  You're now envisioning something that's nothing

15  like the notary service, but, yes, if we wanted to turn it

16  into app review, we could do so.

17  **Q.**   And there is nothing that stops you from doing so;

18  correct?

19  **A.**   Well, then it would be subject to policies that are not

20  currently enforced on the Mac --

21  **Q.**   I understand.  But you could do that tomorrow; right?  You

22  already have app review.  You know how to do it.  You could

23  apply the same thing to notary; correct?

24  **A.**   I don't think it's practical in scale.

25  **Q.**   Well, the scale of app review is far larger than

1    notarization; correct?

2    **A.**   Oh, yes.  But if you start having the dynamic --

3    **Q.**   Sir, that's correct?  The scale in iOS is much larger;

4    correct?

5    **A.**   That is correct.

6    **Q.**   And so you could apply a process to notarization that even

7    could involve some sort of human review; correct?

8    **A.**   Like I said, I think that would not be practical

9    because --

10   **Q.**   Sir --

11   **A.**   -- of scale.  Can I explain myself?

12   **Q.**   -- you could do that; correct?

13   **A.**   Sorry.  I'm trying to explain myself --

14   **Q.**   It's a yes-or-no question, sir.

15   **A.**   Okay.

16   **Q.**   Either you could do it or you couldn't do it.  If you're

17   telling me --

18   **A.**   I believe we could not do it.

19         **THE REPORTER:**   I'm sorry, I can't --

20         **THE COURT:**   She is not going to be able to take down

21   both of you.

22         **MR. EVEN:**   I'm sorry.

23         **THE COURT:**   So the way this works -- and I don't have

24   a jury sitting here -- your attorney is going to get up and he

25   is going to ask you, "Did you want to explain?"  You are going

1    to say yes.  You are going to explain.

2            Stop arguing with him.

3            Let's move on.  All right.  Your question, Mr. Even.

4    **BY MR. EVEN:**

5    **Q.**  Sir, you could even have a portion of notarization involve

6    some form of human review if you decided to change

7    notarization tomorrow; correct?

8    **A.**  I have said it's incorrect.

9    **Q.**  Okay.  Now, Apple distributes through the App Store a host

10   of apps that allow users to generate content; correct?

11   **A.**  You mean third-party apps?

12   **Q.**  Yes.

13   **A.**  Yes.

14   **Q.**  Like TikTok or Instagram or Twitter; correct?

15   **A.**  Yes.

16   **Q.**  And Apple itself does not moderate the content on any of

17   these apps; correct?

18   **A.**  Not directly, no.

19   **Q.**  Instead, Apple distributes them through the App Store and

20   requires that they themselves do some moderation; correct?

21   **A.**  That's correct.

22   **Q.**  And in the case of -- the famous case of Parler, for

23   instance, Apple ultimately removed Parler from the iOS App

24   Store and Apple decided that Parler was not adequately

25   moderating the content; correct?

1    **A.**   That's my understanding.

2    **Q.**   Now, on Mac, third-party stores like Steam have apps that

3    are notarized; correct?

4    **A.**   Yes.

5    **Q.**   And there's nothing that prevents Apple from requiring

6    such stores to perform their own screening of apps for

7    malware, for age restrictions, for child pornography; correct?

8    **A.**   I imagine we could have such a policy.

9    **Q.**   And so Apple controls the notary service and, as you said,

10   can have policies that demand one thing or another and perform

11   whatever checks are viable.

12   But once Apple is done performing notarization and the app

13   is fully vetted and notarized, Apple sends it back to the

14   developer for distribution through whatever channel the

15   developer chooses; correct?

16   **A.**   We send back a ticket that enables that, yes.

17   **Q.**   Now, to complement notarization service, Apple employs on

18   macOS a mechanism known as Gatekeeper; correct?

19   **A.**   Correct.

20   **Q.**   And Gatekeeper ensures that by default, only trusted

21   software runs on a user's Mac; correct?

22   **A.**   Trusted in the sense of does not contain known malware and

23   is from a registered developer, yes.

24   **Q.**   Sir, if you look at DX5492.104.

25   **A.**   I'm sorry.  You are going to have to say that more slowly

1    if you want me to go there.

2    **Q.**   It's the same white paper, the next page.  We were on 103,

3    this is on 104, and under "Gatekeeper."

4         Do you see it says "Gatekeeper"?

5    **A.**   Yes.

6    **Q.**   And do you see it says, "macOS includes a technology

7    called Gatekeeper which ensures that by default, only trusted

8    software runs on a user's Mac."

9         Did I read that correctly?

10   **A.**   You did.

11   **Q.**   And trusted software is software that has been either

12   signed by the App Store or signed by a registered developer

13   and notarized by Apple; correct?

14   **A.**   That's correct.

15   **Q.**   And Gatekeeper also ensures users that all software in

16   macOS is checked for known malicious content the first time it

17   is opened, regardless of how it arrives on the Mac; correct?

18   **A.**   That's correct.

19   **Q.**   And that security check is implemented regardless of

20   whether the app is coming from the store or through

21   notarization; correct?

22   **A.**   Yes.

23   **Q.**   Now, Gatekeeper can also be set to allow only software

24   installed from the App Store; correct?

25   **A.**   Correct.

FEDERIGHI – CROSS / EVEN

1    **Q.**   And so if a parent, for example, wants her child to only

2    be able to use software from the App Store, they can go and

3    set Gatekeeper to block even notarized software from that

4    child's computer; correct?

5    **A.**   Yes.

6    **Q.**   And that would take the child back to the first option

7    that we read about of being able to download only from Apple's

8    App Store; correct?

9    **A.**   That's right.

10   **Q.**   Now, Apple also runs something called XProtect in macOS;

11   correct?

12   **A.**   Yes.

13   **Q.**   And that's essentially an antivirus?

14   **A.**   Yes.

15   **Q.**   Now, Apple could implement notarization process in iOS;

16   correct?

17   **A.**   It could.

18   **Q.**   It is done through Xcode; correct?  The binaries are

19   submitted through Xcode; correct?

20   **A.**   That is part of the process, yes.

21   **Q.**   And Xcode is used to develop for both iOS and macOS;

22   correct?

23   **A.**   Yes.

24   **Q.**   So that is not going to be a big change for developers;

25   correct?

FEDERIGHI – CROSS / EVEN

1   **A.**   That piece would not be, correct.

2   **Q.**   In fact, you could implement all the mechanisms that are

3   currently in macOS on iOS; correct?

4   **A.**   Technically, yes.

5   **Q.**   Now, let's talk a little bit about your point on direct

6   about the user base for the Mac.

7       So Apple recorded record sales of its Mac line in 2020;

8   correct?

9   **A.**   Yes.

10  **Q.**   And Apple sold roughly 20 million Mac computers in 2020;

11  correct?

12  **A.**   I'm not sure of the precise numbers.

13  **Q.**   Do you recall that you sold 9 million just in the fourth

14  quarter?

15  **A.**   No, I don't.  I'm not familiar with those numbers.

16  **Q.**   Okay.  And you do recall that you told me in your

17  deposition that there are over a hundred million Mac users in

18  the world today?

19  **A.**   Active Macs, right.

20  **Q.**   And Apple tries to be truthful and transparent with its

21  Mac customers; correct?

22  **A.**   Yes.

23  **Q.**   And Apple publicly positions the Mac as a platform that

24  serves all different types of users, from families and

25  students to creative pros, businesspeople, and software

FEDERIGHI – CROSS / EVEN

1    developers; correct?

2    **A.**   That statement is correct.

3    **Q.**   And Apple is aware, isn't it, that all these different

4    groups of people, its customers, use their Macs to store a lot

5    of information about their lives and that Macs have access to

6    sensors that are security sensitive; correct?

7    **A.**   Yes.

8    **Q.**   Because we do internet searches on Macs; correct?

9    **A.**   Yes.

10   **Q.**   And we do telemedicine calls on Macs; correct?

11   **A.**   Could, yes.

12   **Q.**   And for the last -- I lost count, but I guess the last 14

13   or 15 months, we have all sort of lived on our PCs, whether

14   they are Macs or another PC; correct?

15   **A.**   Or iPads, sure.

16   **Q.**   Okay.  But a lot of us have lived on our PCs?

17   **A.**   Yeah.

18   **Q.**   Now, Apple also promotes its Macs as products for

19   learning; correct?

20   **A.**   Yes.

21   **Q.**   And it specifically markets its macOS products as products

22   appropriate for school children; right?

23   **A.**   Yes.

24   **Q.**   And, in fact, Apple has an entire web page on Apple.com

25   dedicated to marketing Macs and iPads side by side to school

FEDERIGHI – CROSS / EVEN

1   children; correct?

2   **A.**  Not directly to school children, but to --

3   **Q.**  For use by school children?

4   **A.**  Yes, correct.

5   **Q.**  So if you turn to PX2882 in your binder.

6   **A.**  Is that the first binder?

7   **Q.**  Yes.  It's in the first binder -- sorry.  This is the

8   second binder.  2882 is the second binder.

9   **A.**  2882.  Okay.

10  **Q.**  You're there?

11  **A.**  I am.

12  **Q.**  And you see this is a download of the Apple website

13  specifically for K through 12 education, as shown on the top

14  left of the screen; correct?

15  **A.**  Yes.

16  **Q.**  And right on the first page, Apple is saying that for

17  students K through 12, iPad brings the freedom while Mac

18  brings the power; correct?

19  **A.**  I think you kind of paraphrased there, but I think that's

20  kind of what it says.

21  **Q.**  And then it goes on to explain that both iPads and Macs

22  use applications; correct?

23  **A.**  Built-in apps, yeah, and intuitive software.  Yep.

24  **Q.**  And then if you turn to the next pages, there are a few

25  pages about iPads specifically; correct?

FEDERIGHI – CROSS / EVEN

1    **A.**   Yes.

2    **Q.**   And then if you go to page 16 -- that's 2882.16 -- you see

3    there is now a section that's devoted to Mac; correct?

4    **A.**   I see the start of a section.

5    **Q.**   And do you see that it says that Mac has been empowering

6    the world's leading engineers, artists, etc., and it's been

7    doing the same for students, too; correct?

8    **A.**   Yes, I do.

9    **Q.**   And if you turn to page 18, there's a section about

10   professional apps for students; correct?

11   **A.**   Yes.

12   **Q.**   And those include Office and AutoCAD and Photoshop and

13   others; correct?

14   **A.**   Yes.

15   **Q.**   And for Mac, Photoshop and AutoCAD are not available on

16   the Mac App Store; correct?

17   **A.**   I believe there is a version of Photoshop, a variant of

18   Photoshop, available on iPad.

19   **Q.**   Sir, I'm asking on Mac.

20   **A.**   Yeah.

21   **Q.**   This is the Mac section; correct?

22   **A.**   Oh, I'm sorry.  I thought when you said App Store, you

23   meant on the Mac App Store.

24   **Q.**   I think that's what I said.  If not, I apologize --

25   **A.**   I'm sorry.

1    **Q.**  Photoshop is not available on the Mac App Store; correct?

2    **A.**  I don't believe it is.

3    **Q.**  It's available from the Adobe -- the Adobe website;

4    correct?

5    **A.**  I believe that's true, yes.

6    **Q.**  And nothing in this page suggests that getting software

7    directly from Adobe or from Autodesk in the case of AutoCAD is

8    unsafe; correct?

9    **A.**  I don't see anything like that here, no.

10    **Q.**  And Microsoft Office is available both from the App Store,

11    the Mac App Store, and from Microsoft directly; correct?

12    **A.**  Yes.

13    **Q.**  And nothing in this page suggests that students should go

14    to one or the other; correct?

15    **A.**  Yeah.  I don't think this is really a security document,

16    but, no, it does not.

17    **Q.**  Sir, that's not what I asked.

18        Nothing in this page tells students that they should go to

19    the App Store because it's safer than going to Microsoft --

20    **A.**  It does not say that here, no.

21    **Q.**  In fact, the word "security" does not appear anywhere on

22    the web page for K through 12 school children except in

23    connection with iCloud.  And I'm going to represent that to

24    you.

25    **A.**  Okay.

FEDERIGHI - CROSS / EVEN

1   **Q.**   But you agree with me that nothing in this page suggests

2   that security is a vector that children or their parents or

3   their schools should consider when choosing between a Mac and

4   an iPad; correct?

5   **A.**   Not on these pages, no.

6   **Q.**   And you looked at -- sorry.

7           **MR. EVEN:**   Your Honor, may I move DX2882 at this time

8   into evidence?

9           **THE COURT:**   No objection?

10          **MR. LO:**   No objection.

11          **THE COURT:**   Admitted.

12          (Defense Exhibit DX2882 received in evidence)

13  BY MR. EVEN:

14  **Q.**   Now, in your direct, you spoke about PX741.

15          Do you remember that?

16  **A.**   I -- I'm sorry.  I'm not --

17  **Q.**   The Mac security --

18  **A.**   -- keeping track of what document you're talking about

19  when you --

20  **Q.**   The Mac security web page.

21          Do you remember that?

22  **A.**   Oh, yes.

23  **Q.**   And that's something I showed you in your deposition;

24  correct?

25  **A.**   Correct.

1    **Q.**   And that says that -- I'm sorry.

2         That document says that consumers can download safely from

3    the App Store and the internet; correct?

4    **A.**   I think it says they can do -- if you want to read the

5    exact line?  I don't have that.

6    **Q.**   It says, "Download apps safely from the Mac App Store and

7    the internet" --

8    **A.**   Okay.

9    **Q.**   -- correct?

10   **A.**   It says that.

11   **Q.**   And it says, "Now apps from both the App Store and the

12   internet can be installed worry free"; correct?

13   **A.**   It does say that, yes.

14   **Q.**   And in that page, that is about security.

15        At no point does Apple tell consumers that if they are

16   seeking security, they should forego the Mac and buy an iPad;

17   correct?

18   **A.**   It doesn't say that explicitly.

19   **Q.**   It doesn't say that impliedly either; correct?  It just

20   doesn't say that.

21   **A.**   It talks about malware on the Mac.

22   **Q.**   Sir, it doesn't suggest to anyone that they should go and

23   buy an iPad instead; correct?

24   **A.**   Correct.  That's what I tried to answer.

25   **Q.**   And it doesn't suggest anywhere that Macs are intended

1    only for experts or pros or hobbyists or developers; correct?

2    **A.**   It does not say that.

3    **Q.**   And it doesn't have anything that says, If you are a

4    novice, stay away, go buy an iOS device; correct?

5    **A.**   It does not say that.

6            **THE COURT:**   741 is not in evidence.  Do you want it

7    in evidence?

8            **MR. EVEN:**   Yes, Your Honor.

9            **THE COURT:**   It's admitted.

10           **MR. EVEN:**   Thank you.

11        (Plaintiff's Exhibit PX741 received in evidence).

12           **MR. EVEN:**   Mr. Lo has entered it, but --

13           **THE COURT:**   No, no, he had not.

14        And I'm assuming no objection?

15           **MR. LO:**   No objections.

16   BY MR. EVEN:

17   **Q.**   Now, we discussed briefly the idea of sandboxing.

18        Mac has a limited form of sandboxing for apps; correct?

19   **A.**   Yes.

20   **Q.**   And some apps on the macOS are not sandboxed at all;

21   correct?

22   **A.**   Correct.

23   **Q.**   And Apple today could not require full sandboxing on macOS

24   without breaking some software that users rely on; correct?

25   **A.**   Yes, correct.

1    **Q.**  Now, Apple considers apps that are not sandboxed to pose

2    greater threat to Mac users than apps that are sandboxed;

3    correct?

4    **A.**  Yes.

5    **Q.**  But Apple does not let users know whether an app they

6    download is or is not sandboxed; correct?

7    **A.**  Correct.

8    **Q.**  On iOS, by contrast, all third-party apps always have been

9    and still are sandboxed; correct?

10   **A.**  Yes.

11   **Q.**  And sandboxing has always been mandatory on iOS; correct?

12   **A.**  Correct.

13   **Q.**  And that's consistent with the Adler, Wright, DeAtley

14   paper we saw from 2007; correct?

15   **A.**  It is.

16   **Q.**  And because of that, the user -- sorry -- the developer

17   community on iOS, unlike on macOS, is used to implementing

18   complete sandboxing on all the apps that it writes; correct?

19   **A.**  Yes.

20   **Q.**  And if the Court were to order the opening of iOS

21   tomorrow, Apple could continue requiring complete sandboxing

22   in iOS; correct?

23   **A.**  Yes.

24   **Q.**  And sandboxing is important; correct?

25   **A.**  Yes.

FEDERIGHI - CROSS / EVEN

1    **Q.** Now, your -- your security white paper also talks about a

2    third option where users are free to operate within their

3    security model that makes sense for them, including running

4    completely unsigned and untrusted code; correct?

5    **A.** Yes.

6    **Q.** And having that option for consumers, for users, that's a

7    decision that Apple has made; correct?

8    **A.** Yes.

9    **Q.** And Apple certainly does not recommend to the average user

10   to install unsigned apps; correct?

11   **A.** Correct.

12   **Q.** And Apple has taken steps to make sure that a user will

13   not install unsigned code inadvertently or by mistake;

14   correct?

15   **A.** We try to make it difficult.

16   **Q.** For starters, we discussed that Gatekeeper, by default,

17   will not allow such installation; correct?

18   **A.** Correct.

19   **Q.** And to override this default, the user must undertake five

20   or six steps; correct?

21   **A.** There's a shortcut where you could do it in two.

22   **Q.** Well, you're going to get a warning first; correct?

23   **A.** Not in the shortcut path, no.

24   **Q.** Let's take a look at -- let's take a look at PDX005.  You

25   can look at it on the screen.

1    **A.**  Okay.

2    **Q.**  And so, first of all, the user is going to get a warning

3    prompt that says that whatever the app is cannot be opened

4    because it is from an unidentified developer; correct?

5    **A.**  This is one of the paths to opening.  There is a different

6    one.  I was referring to a shortcut.

7    **Q.**  Okay.  A shortcut is something that Apple instituted;

8    correct?

9    **A.**  Yes.

10   **Q.**  Okay.  Through this path, you're going to have to go into

11   settings, change the setting, get three more warnings, and

12   then another warning when you try to actually open the app for

13   the first time; correct?

14   **A.**  Uh-huh.

15   **Q.**  Is that a *yes*?

16   **A.**  I'm sorry.  Yes.

17              **THE COURT:**   Where --

18   **BY MR. EVEN:**

19   **Q.**  And just a reminder, this is all on macOS; correct?

20   **A.**  Yes, uh-huh.

21              **THE COURT:**  Mr. Even, where is this document from?

22              **MR. EVEN:**  This is PDX0005, and I believe it's in

23   our --

24              **THE COURT:**  I understand it is -- I understand the

25   number.  I'm -- there is no cover page.  I'm asking where it

1    comes from.

2              **MR. EVEN:**  It's just a printout from the web.  It's a

3    demonstrative.

4              **THE COURT:**  Okay.  Thank you.

5              **MR. EVEN:**  From Apple's own website.

6    **BY MR. EVEN:**

7    **Q.**  You spoke a little bit about app review process in your

8    direct; correct?

9    **A.**  Yes.

10   **Q.**  And you suggested that app review is very important -- a

11   very important aspect of Apple's security approach; correct?

12   **A.**  Yes.

13   **Q.**  And I believe you told me that you, yourself, were never

14   on the ERB; correct?

15   **A.**  Correct.

16   **Q.**  And you're not involved on the day-to-day running of the

17   app review process; correct?

18   **A.**  That's correct.

19   **Q.**  You understand, however, that human review is resource

20   intensive; correct?

21   **A.**  Yes.

22   **Q.**  And it takes time; correct?

23   **A.**  Yes.

24   **Q.**  Do you know how much time a user spends on each app these

25   days?

1    **A.**  No.

2    **Q.**  And the user -- the developer -- sorry -- the reviewer, in

3    whatever time they have, they need to make sure that Apple's

4    IAP policies are enforced; correct?

5    **A.**  I think among many other things, yes.

6    **Q.**  And they need to enforce the anti-steering rules; correct?

7    **A.**  I believe so, yes.

8    **Q.**  And they need to enforce, according to you, privacy and a

9    host of other rules; correct?

10   **A.**  Yes.  Either upfront or after the fact, yes.

11   **Q.**  I'm just talking about upfront right now.  That's the big

12   wall that you put in your slide.

13   **A.**  No, no.  The wall works both ways.

14   **Q.**  Okay.  You believe that app review people go back and

15   check the 1.8 million --

16   **A.**  No.  I believe the wall includes centralized distribution

17   that allows us to correct problems after the fact.

18   **Q.**  I see.

19       So -- and by "correct problems after the fact," you mean

20   revoke the app after something happened; correct?

21   **A.**  Correct.

22   **Q.**  And as we've seen in the paper by Mr. Adler, Wright and

23   DeAtley, that can be done even if there was no central

24   distribution; correct?

25   **A.**  Not thoroughly enough, no.

FEDERIGHI – CROSS / EVEN

1    **Q.**  In their model, this could be done.  That's what they

2    wrote; correct?

3    **A.**  That is what they wrote.

4    **Q.**  Thank you.

5        In any event, you came to this Court and you say that this

6    is a very important part of app review, but you don't know how

7    long a reviewer actually spends on each app; correct?

8    **A.**  It's changed over time.  I mean, I know it's been -- it's

9    varied over time, so I'm not sure what today's latest number

10    is.

11    **Q.**  Do you know a ballpark?

12    **A.**  It's minutes.

13    **Q.**  How many minutes?

14    **A.**  I don't know.

15    **Q.**  Okay.  Have you studied the error rate of app review?

16    **A.**  In terms of aggregate numbers of apps approved and number

17    of issues discovered later, I've seen that in aggregate, yeah,

18    that it's a small fraction.

19    **Q.**  You've seen an actual paper that says it's a small

20    fraction?

21    **A.**  I've seen internal analysis that talks about number of

22    apps approved and number of, I think, times we've had to take

23    apps down or take corrective action.

24    **Q.**  Sir, we better listen to Mr. Kosmynka on that point,

25    correct, not you?

FEDERIGHI - CROSS / EVEN

1    **A.**  I'm sorry.  What?

2    **Q.**  We better listen to Mr. Kosmynka on that point, he'll know

3    better?

4    **A.**  Oh, I think he would be an expert on that, yes.

5    **Q.**  Okay.

6        If you turn to PX465 in your binder.

7            **THE COURT:**  And do you not want 5 in evidence, or you

8    do?

9            **MR. EVEN:**  No, I do not.  It's a demonstrative,

10    Your Honor.

11           **THE WITNESS:**  Okay.

12   **BY MR. EVEN:**

13   **Q.**  And PX465 is an email chain between you and Mr. Phillip

14   Shoemaker dated August 28, 2013; correct?

15   **A.**  Yes.

16           **MR. EVEN:**  And, Your Honor, I would like to move

17   PX465 into evidence if it's not already in evidence.

18           **THE COURT:**  It's not.

19       No objection?

20           **MR. LO:**  No objection.

21           **THE COURT:**  It's admitted.

22       (Plaintiff's Exhibit PX465 received in evidence)

23   **BY MR. EVEN:**

24   **Q.**  And, sir, this email chain discusses an app that's passed

25   app review but then changed its behavior afterwards; correct?

1   **A.**  I believe so.

2   **Q.**  And in this case, the app was able to do this by receiving

3   server-side instructions to change behavior after it passed

4   the app review; correct?

5   **A.**  Yes.

6   **Q.**  And your view at the time was that any smart hacker could

7   implement this type of attack; correct?

8   **A.**  Yes.

9   **Q.**  And your conclusion was that there was nothing that app

10  review could do in advance to prevent this type of attacks;

11  correct?

12  **A.**  Correct, not upfront.

13  **Q.**  And instead, you believed that the more effective solution

14  is to monitor the malicious behavior in the wild, spot any

15  apps or SDKs that are misbehaving, and start blocking the apps

16  that use the misbehaving SDKs; correct?

17  **A.**  Yes.

18  **Q.**  And that all depends on Apple having the ability to

19  identify and trace this app back based on signing and, of

20  course, distribution; correct?

21  **A.**  Yes.

22  **Q.**  Sir, you're aware that -- and I think we discussed that

23  some -- that there are views within Apple that the Mac App

24  Store matters for distribution only of Apple's own apps and

25  those of developers that cannot create their own download

FEDERIGHI – CROSS / EVEN

1    store; correct?

2    **A.**   I could believe someone has said that.

3    **Q.**   Okay.  If you turn to PX2386.

4    **A.**   Okay.

5    **Q.**   Do you see this is an email in which Mr. Schiller actually

6    did say that; correct?

7    **A.**   I don't know.  Where would I be looking --

8    **Q.**   In the top email, sir.

9    **A.**   I see.  Where in the email?  The top line here?

10        I think he's questioning what it should be.

11   **Q.**   Do you see that Mr. Schiller says, and I quote, "The Mac

12   App Store matters for distribution of Apple's software and

13   third parties that can create their own download store";

14   correct?

15   **A.**   That's one of the sentences, yes.

16        **MR. EVEN:**  Okay.  Your Honor, I would like to move

17   PX2386 into evidence, please.

18        **THE COURT:**  Any objection?

19        **MR. LO:**  No.

20        **THE COURT:**  It's admitted.

21        (Plaintiff's Exhibit PX2386 received in evidence)

22        **THE COURT:**  Which of the pages were you reading from?

23        **MR. EVEN:**  The very first page, second sentence,

24   Your Honor.

25        **THE COURT:**  Thank you.

1    BY MR. EVEN:

2    **Q.**   Sir, you mentioned streaming apps in your direct.

3    **A.**   Yes.

4    **Q.**   There are currently no native streaming apps on the App

5    Store; correct?

6    **A.**   Not that I'm aware of.

7    **Q.**   Okay.  If you go to PX464.

8    **A.**   Okay.

9    **Q.**   And in this email -- first of all, this is an email from

10   August 22, 2017, between Mr. Stauffer and yourself; correct?

11   **A.**   Yes.

12               **MR. EVEN:**   Your Honor, I would like to move PX464

13   into evidence.

14               **THE COURT:**   No objection?

15               **MR. LO:**   No objection.

16               **THE COURT:**   Admitted.

17         (Plaintiff's Exhibit PX464 received in evidence)

18   BY MR. EVEN:

19   **Q.**   In this email, there is a discussion of a company called

20   LiquidSky that was a game-streaming service that believed that

21   their technology could support non-game-streaming apps;

22   correct?

23   **A.**   Could support -- what did you just say?

24   **Q.**   Non-game streamed apps.

25               **THE COURT:**   Where are we?

1          **THE WITNESS:**  Yeah.

2          **MR. EVEN:**  This is on page 3.

3     **BY MR. EVEN:**

4     **Q.**  We discussed this in your deposition.

5     **A.**  Where are you directing my attention?

6          **THE COURT:**  Was it in the big paragraph or where?

7     **BY MR. EVEN:**

8     **Q.**  So if you turn to page 3, do you see the email that begins

9     with, "Craig, I would like approval to engage LiquidSky"?

10    **A.**  I do.

11    **Q.**  And do you see that the second paragraph begins with,

12    "LiquidSky is a cloud gaming service founded by Ian McLoughlin

13    in 2014"?

14    **A.**  Yes.

15    **Q.**  And if you jump three sentences to the end of the third

16    line, do you see it says, "While their focus has been gaming,

17    they claim their technology supports a wider range of

18    PC-in-the-Cloud use cases."

19         Do you see that?

20    **A.**  Yes.

21    **Q.**  Okay.

22         **THE COURT:**  Mr. Even, I'm sorry.  What's the point

23    here?

24         **MR. EVEN:**  Your Honor, the document speaks to two

25    things:  One, the availability or at least thought process of

FEDERIGHI – CROSS / EVEN

1    people about non-game-streaming apps, and then there are other

2    portions of the email that are relevant because Mr. Federighi

3    explains why streaming apps are contrary to Apple's

4    business -- business incentives.

5            **THE COURT:**  Okay.

6            **MR. EVEN:**  But I am short on time.

7    **BY MR. EVEN:**

8    **Q.**  Now, finally, sir, you mentioned something called

9    nutrition labels --

10   **A.**  Yes.

11   **Q.**  -- privacy nutrition labels; correct?

12   **A.**  Yes.

13   **Q.**  And that is something that Apple requires developers to

14   submit; correct?

15   **A.**  That's correct.

16   **Q.**  And Apple then publishes whatever the developer submitted;

17   correct?

18   **A.**  That's correct.

19   **Q.**  Apple does not verify the label in any way, shape, or

20   form; correct?

21   **A.**  Well, we do some selective vetting, both of top apps and

22   of sort of random assortments of other apps.  We have

23   different techniques to do --

24   **Q.**  Sir, if you turn to PX1220.

25   **A.**  Okay.  Where -- 1220.

1   **Q.**   Sir, do you recognize 1220 as a privacy nutrition label

2   from a Disney app?

3   **A.**   I'm sorry.  I'm having difficulty finding 1220.

4              **THE COURT:**  It was the same book.

5   **BY MR. EVEN:**

6   **Q.**   Same book, the first book.

7   **A.**   Uh-huh.

8              **THE COURT:**  You just have to go -- it's in the

9   middle.  Numerical.

10             **THE WITNESS:**  Apologies.  I'm failing this particular

11  test.  Mine seems to jump from 800 to --

12  **BY MR. EVEN:**

13  **Q.**   That's okay, sir.  Do you see PX0877?  It's the next one

14  after that.

15  **A.**   Okay.  I'm there.  I see the developer, Disney.

16  **Q.**   Yes.  And do you see the second sentence is, "This

17  information has not been verified by Apple."

18     Do you see that?

19  **A.**   Yes.

20             **MR. EVEN:**  No further questions at this time,

21  Your Honor.

22             **THE COURT:**  Redirect?

23     I take it you don't want 1220 in, correct?

24             **MR. EVEN:**  Actually, I would, Your Honor.

25             **THE COURT:**  You do?

1          **MR. EVEN:**  Yes.

2          **THE COURT:**  All right.  1220 is admitted.

3          **MR. EVEN:**  Thank you.

4          (Plaintiff's Exhibit PX1220 received in evidence)

5          **THE COURT:**  You may proceed.

6          **MR. LO:**  Thank you, Your Honor.

7                    <u>**REDIRECT EXAMINATION**</u>

8     BY MR. LO:

9     **Q.**  Mr. Federighi, you were asked about two of your deposition

10    testimony, and I want to go through those first.

11         In your deposition -- and I think counsel for Epic pointed

12    out -- you were asked whether you had knowledge about signed,

13    notarized apps that had malware.

14         Do you recall that exchange with counsel?

15    **A.**  I do.

16    **Q.**  And then there was an implication that in the Nokia --

17    that your citation to the Nokia report was inconsistent with

18    your deposition testimony.

19         So let me just ask, does the Nokia report -- well, what

20    does it mean to have -- for it to be a signed, notarized

21    application as you were asked in your deposition?

22    **A.**  Yeah, I think -- excuse me -- during my deposition, there

23    was questions about whether we had statistics about malware on

24    the Mac, and then it was specifically narrowed to malware that

25    was -- not just gone through Gatekeeper, but that had also

1   been through the notarization process.

2         And in my deposition, I said that I believed that much of

3   it or most of it was because the Mac had shift requiring

4   notarization for -- for a couple of years.

5         And I was asked, Well, do you have a specific statistic

6   that says definitely that's what's happening?  And I said,

7   Well, I have every reason to believe it is, but I do not have

8   a specific statistic.

9         Since then, as I testified earlier today, we -- we got

10  that exact data and verified that, in fact, there were -- most

11  of the malware we had to pull with MRT, over a hundred

12  instances, were malware that made it through the notarization

13  process.  So I was able to subsequently get data to clarify

14  that point.

15  Q.  You were also asked about your deposition testimony that

16  if a user chose -- in a world in which there are other iOS

17  distribution sources other than the App Store, that if a user

18  were to purchase from only the Apple App Store, the user would

19  have the same protections that the user enjoys today.

20        Do you recall that exchange with counsel?

21  A.  I do.

22  Q.  Even if the user has the same protections from Apple in

23  this alternate world, is it possible that the level of attacks

24  might be different?

25  A.  Yeah, that's precisely my point.  The technical

1    countermeasures, the protections, would still be in place, but

2    the level of attack, the kind of attack, the sophistication of

3    attack, would be greater.  So the result for safety of the

4    user against malware would change.

5    **Q.**   Okay.  You were asked about the Enterprise Program and

6    certain abuses of the Enterprise Program, and there was a

7    series of questions about whether Apple conducted a -- I think

8    the words were "thorough enough check."

9         Do you recall that?

10   **A.**   I do.

11   **Q.**   Are there any challenges to Apple conducting a, quote,

12   thorough enough check with respect to enterprise applications?

13   **A.**   Yeah.  It's an inherently very difficult thing because, as

14   we discussed in the guidelines, this is a program that can

15   apply to businesses of a hundred or more people.  There are

16   many, many businesses around -- of considerable global scale

17   around the world that can claim to be such a business, and it

18   is difficult to assess whether such a business is -- you know,

19   startups happen all the time.  They hire employees.  Is this a

20   legitimate business?  Maybe it appears to be.  Maybe it

21   literally was, and then that certificate turns into something

22   else.

23        So even if we did a as thorough as possible evaluation

24   upfront, that doesn't mean that the certificate couldn't --

25   subsequently couldn't be abused as it transitions to another

1   entity after that.

2   **Q.**   Okay.  And just to follow up on that last point, even if

3   Apple were to correctly confirm that the enterprise

4   certificate is issued to a real business, are there any things

5   that could happen after the granting of the certificate that

6   may result in it being abused?

7   **A.**   Exactly.  The business could -- that was granted the

8   certificate could, themselves, sell that certificate to

9   someone else who values it to be used to create a pirate app

10  store.  The certificate could be secretly copied or stolen by

11  an employee.  The business itself may go out of business and

12  someone else may pick up the pieces and take that certificate.

13  So many things can happen after the fact that could cause that

14  certificate to become abused.

15  **Q.**   You were asked a series of questions about the threat

16  model for iOS, and the implication was that because you

17  weren't there at the inception of iOS, you wouldn't know.

18      So is the threat model, from a security perspective,

19  something that is only done once, or is that done more

20  frequently than the initial inception of the device?

21  **A.**   Oh, it's something we're continuously evaluating and have

22  to deal with in the external environment.

23  **Q.**   Okay.  And you also mentioned that while you were not

24  present at the inception of the iPhone, you gained, I think

25  you said, retrospective knowledge.

1        Can you explain what you mean by that?

2   **A.**   Oh, yeah.  So I spent a great deal of time with people

3   like Dallas DeAtley, Jacques Vidrine, many people who were --

4   John Wright, and talked about the decisions we made, why we

5   made those decisions, how we wanted to evolve the architecture

6   going forward.  And so through this, I gained a strong

7   appreciation for what we were trying to accomplish.

8   **Q.**   You were shown the deposition testimony of Mr. Scott

9   Forstall, and you characterized his wording in that testimony

10  as being imprecise.

11       What did you mean by that?  And I think this was about

12  using macOS 10 as a basis.

13  **A.**   Yeah.  So macOS, as we frame it externally to customers,

14  consists of a whole set of features, many of which we've

15  talked about today on the security point of view.  But

16  everything -- if you said what's macOS, macOS has multiple

17  overlapping windows, macOS drives multiple displays, macOS has

18  a whole set of SDKs, including application SDKs like AppKit.

19       These were not the things that Scott Forstall or anyone on

20  that team were advocating were going to go over to iPhone.  At

21  the time, the question was really do we use the Linux kernel

22  or do we use a macOS kernel or do we use something else.

23       And so this was about the kernel, Darwin really, not about

24  macOS, the larger system, as any of us would refer to it

25  either at that time or today.

1   **Q.**   Okay.  Would you turn to PX877.  And this was the -- this

2   is the document that has on the title "Third-Party

3   Applications on macOS X," although it's spelled as "X" on the

4   paper, "Embedded."

5   **A.**   PX877?

6   **Q.**   Correct.

7   **A.**   Okay.  We've established my poor skill at locating

8   documents in these binders, but I'm going to take another

9   pass.

10              **THE COURT:**  It should be in No. 1.

11              **THE WITNESS:**  Say again?

12              **THE COURT:**  The first volume.

13              **THE WITNESS:**  Yes, thank you.  I found it.

14   **BY MR. LO:**

15   **Q.**   Let's start with the title.

16          It was represented, I think, by counsel that this is

17   actually a document from 2007, and let's take that to be

18   accurate for now.

19          Has anything changed in the world of threats facing iOS

20   devices since 2007 to today?

21   **A.**   Well, absolutely.  I mean, we've learned a tremendous

22   amount in the 14 years since this document was originally

23   created, both in terms about how security threats have

24   evolved, how the -- and what techniques are available, how

25   attackers are manipulating the environment, and we've also

1  seen how successful iOS has become and, therefore, what a

2  large target it's become.

3  **Q.**  Okay.  Let's turn to the second page of the document,

4  PX877.2.

5  **A.**  Yes.

6  **Q.**  And you were asked to look at the paragraph under the

7  "Assumptions" on that page.

8       Do you recall that?

9  **A.**  Yes.

10 **Q.**  And I want to go just one paragraph lower to that.  And it

11 says that "code signing does not mean that we will solve all

12 of our security problems.  However, it does make it

13 significantly harder to deploy on a wide scale malicious code

14 that will affect our customers or partners."

15      Do you see that, sir?

16 **A.**  I do.

17 **Q.**  Do you know what that is in reference to?

18 **A.**  Yes.

19           **MR. EVEN:**  Objection.

20           **THE COURT:**  Overruled.  He can testify as to his

21 understanding, especially given --

22           **MR. EVEN:**  Okay.

23           **THE COURT:**  -- the cross.

24           **MR. EVEN:**  Thank you.

25           **THE WITNESS:**  Yes.  So it's describing that while

FEDERIGHI - REDIRECT / LO

1    this is essentially one -- one technique that can help

2    increase difficulty, that this alone is -- is not sufficient

3    to ensure users are protected from malicious code.

4    **BY MR. LO:**

5    **Q.**   And there was a back-and-forth exchange with counsel about

6    whether this document says that just because you have code

7    signing, it is required to have distribution through Apple.

8        Do you remember that exchange?

9    **A.**   Yes.

10   **Q.**   And I believe the ultimate agreement, if you'll call it

11   that, was the document was silent on this issue.  So let me

12   just ask you the question.

13       Even with code signing, do you have a view as to whether

14   it would be safer and more secure to have apps distributed

15   solely by Apple?

16   **A.**   Well, yes.  I have a very strong view that centralized

17   distribution and app review are critical to the safety of our

18   users.

19   **Q.**   Let's talk -- you were asked a series of questions about

20   macOS versus iOS.  Sir, let's start with the basics.

21       Does Apple believe that relative to its peer products,

22   Macs are secure products?

23   **A.**   Yeah.  When considered among PC-class products, let's say

24   running Microsoft Windows, we believe Mac is the safest

25   choice.

FEDERIGHI - REDIRECT / LO

1  **Q.**  Okay.  And there has been a lot of -- you were asked some

2  questions about the fact that the macOS has different and

3  perhaps lower security measures than iOS.

4       So how do you -- how does Apple reconcile its belief that

5  the Mac is a safe system when it's got lower levels of

6  protection or different levels of protections than iOS?

7  **A.**  Well, I mean, I talked earlier about the analogy of if you

8  want to buy a car, you understand what's involved in a car.

9  There are certain freedoms and -- but you're driving on public

10  roads, and you better -- you better be reasonably well

11  trained.

12      Even in environments like K through 12 or education, often

13  in those environments, those systems are -- are well locked

14  down.  Students aren't allowed to install applications in the

15  way that, of course, all iOS users would expect to do.  And so

16  they have to be managed carefully in those environments.

17  **Q.**  Okay.  And you were asked earlier some questions about

18  whether Apple could put in human review and add additional

19  measures of defenses to the macOS side.

20      Do you recall that discussion?

21  **A.**  I do.

22  **Q.**  Are there any reasons why Apple has not done that?

23  **A.**  The -- the expectation and scale around notarization is

24  very high.  Part of what developers expect if they're

25  distributing themselves is they may want to put out a patch in

FEDERIGHI – REDIRECT / LO

1    the middle of the night, and they found a bug and they want to

2    drive it through the system.

3        The notarization service on macOS does provide that

4    ability, because it's purely an automated scan, but the result

5    is the per-developer or per-app average submission rate to the

6    service is dramatically higher than the number of comparable

7    submissions to, say, the iOS App Store on a per-app basis,

8    because these developers are just driving these through at a

9    very high rate.

10       If you were to take the kind of human review process that

11   goes into the App Store and submit it to the kind of volume,

12   the multiplier, that we see on the notarization service, the

13   human cost would be tremendous and we wouldn't be able to

14   achieve the kinds of latencies that macOS developers, for

15   instance, expect from the notarization service.

16   **Q.**   If -- if Apple were to institute human review in the

17   notarization service, does the fact that -- that developers

18   are allowed to distribute apps outside of the notarization

19   service impact the effectiveness of any such human review that

20   Apple might implement?

21   **A.**   I'm sorry.  I think I lost you about halfway through that.

22   **Q.**   No problem.

23       You were asked -- we've been talking about the

24   hypothetical situation in which Apple instituted additional

25   human review --

FEDERIGHI – REDIRECT / LO

1    **A.**   Yes.

2    **Q.**   -- in the notarization process.

3         And one of the things you testified about earlier was that

4    outside of notarization, there is another way for apps to get

5    their -- developers to get their apps to users.

6    **A.**   Right.

7    **Q.**   And so my question is does the existence of sort of these

8    other channels of distribution impact the effectiveness of any

9    such hypothetical human review?

10   **A.**   Yes.  Certainly, on the Mac, if notarization were to

11   become a -- a bigger barrier for developers, they would be

12   more incented to take other forms of attack, for instance,

13   coercing users into bypassing Gatekeeper altogether.

14   **Q.**   Okay.  On iOS --

15            **THE COURT:**  How much longer do you have, Mr. Lo?

16            **MR. LO:**  I've got maybe 10 minutes or so, 15.

17            **THE COURT:**  Mr. Even, so far, do you have recross?

18            **MR. EVEN:**  Maybe one question, Your Honor.

19            **THE COURT:**   Pam, how are you doing?

20            **THE REPORTER:**   I'm okay if that's true.

21            **THE COURT:**  All right.  Let's try to finish up.

22            **MR. LO:**  Thank you.

23   **BY MR. LO:**

24   **Q.**   In the iOS model, once an application has undergone the

25   app review process, are there limitations on the developer's

1   ability to add new code to the software?

2   **A.**  Yes.  The operating system doesn't allow them to create

3   new executable code, although they do have mechanisms with

4   scripting, for instance, downloading JavaScript or other data

5   that could alter app behavior.

6   **Q.**  Okay.  And then do those same policies apply on the macOS

7   side with respect to notarization and Gatekeeper technologies?

8   **A.**  They certainly do, yes.

9   **Q.**  Okay.  If Apple were to institute just the Gatekeeper and

10   the notarization policies on the iOS, would that be an upgrade

11   or downgrade in terms of the level of security that are

12   offered to users?

13   **A.**  I believe it would be a significant downgrade.

14   **Q.**  Okay.  Let me ask you to turn to PX2882.  And this is the

15   one with the education note.

16   **A.**  Yes.

17   **Q.**  Okay.  And I'll just direct your attention to the first

18   page of 2882, and I want to read about the descriptions in

19   which -- the manner in which Apple describes the iPad versus

20   the Mac.

21   The first sentence reads that "the power and flexibility

22   of iPad gives students the freedom to explore and express new

23   ideas whenever and wherever inspiration strikes."

24   Do you see that, sir?

25   **A.**  I do.

1  **Q.**  And then the next sentence says, "Mac has the power to

2  bring their biggest ideas to life."

3  Do you see that, sir?

4  **A.**  Yes.

5  **Q.**  Are these two statements -- recognizing that these are, in

6  part, marketing materials, are these statements consistent

7  with the way in which Apple markets the iPad versus the Mac?

8  **A.**  I believe so, yes.

9  **Q.**  Okay.  And -- and with the reference to the Mac and the

10  power, what is the way in which Apple markets and positions

11  the Mac as a device to potential buyers and users?

12  **A.**  The Mac has the ability to -- lots of flexibility on

13  hardware capabilities, multiple monitors, peripherals, lots of

14  software flexibility, installing sophisticated pro

15  applications, accessing lower-level operating system

16  capabilities like the terminal in the shell, automation, and

17  even writing code with tools like Xcode to do powerful things

18  like custom software development.

19  **Q.**  And does -- do those sets of expectations by users require

20  certain tradeoffs in terms of control over the device and

21  perhaps security over the device?

22  **A.**  Yeah, certainly many of the things Mac Pro Mac users do

23  who are really harnessing the power of macOS do have that

24  property.

25  **Q.**  And then in terms of iOS and iPad, what is it that Apple

1    is trying to do in terms of that -- what is it that Apple --

2    how is it that Apple is trying to position those products, in

3    particular relative to, for example, Macs?

4    A.  Well, certainly, we see iPad as a product that touches a

5    wider audience that can be, certainly, a child's first device,

6    often before they can even read, and certainly can be some --

7    some older people's first devices, as well, if they previously

8    found computers inaccessible to them.

9         At the same time, iPad provides tremendous flexibility and

10   all the richness of apps on the App Store to accomplish all

11   kinds of cool activities that take advantage of pencil and

12   touch.  So it's a very versatile device in your life, very

13   portable.

14   Q.  Okay.  You were asked some questions about the app

15   privacy, and I think it was the nutrition labels?

16   A.  Yes.

17   Q.  Okay.  And then there were some questions in terms of what

18   Apple actually does in terms of those nutrition labels.

19        Can you explain what it is that Apple does with those

20   nutrition labels in terms of review?

21   A.  Yeah.  So our core stance is that these labels are the

22   responsibility of developers to submit accurate information,

23   and if we receive reports or have indication that that

24   information is incorrect, that we will work with the developer

25   to make corrections to their labels.  And we have certainly

FEDERIGHI - REDIRECT / LO

1    done that.

2         And our basic text on the user interface explains to users

3    that this is fundamentally a representation from the

4    developer, not a representation from Apple.

5         However, we do some auditing to try to catch problems.  We

6    don't change the label for a particular app to say Apple's

7    audited this one, but it's part of a process of finding

8    issues, whether it's from high-profile apps, apps that use

9    common high-volume SDKs and things like that.

10   **Q.**   Okay.  And then, sir, please turn to PX465.

11   **A.**   Yes.

12   **Q.**   Okay.  And this is the -- about the dynamic analyzer.

13       Do you recall that, sir?

14   **A.**   Yes.

15   **Q.**   Okay.  First, can you just explain the context of what's

16   being discussed here.

17   **A.**   So this is about sort of Jekyll and Hyde apps; in other

18   words, an app that is submitted looking like it is benign,

19   that it doesn't have any bad behaviors, but then is --

20   modifies its behavior after the fact, perhaps with a trigger

21   from the developer on their server.  So it's passed through

22   review and now it suddenly becomes doing something that app

23   review would have liked to have caught upfront.

24   **Q.**   Okay.  And did you understand this chain of emails to mean

25   that Apple has no ability to catch what you called this Jekyll

1   and Hyde behavior where behavior changes after the fact?

2   **A.**  No, just that sophisticated attackers that -- could

3   bypass -- it's a bit of a cat and mouse game with attackers

4   around trying to catch these kinds of abuses.

5   **Q.**  Okay.

6       And if Apple is able -- well, let me ask it this way.

7       What tools -- what tools does Apple have available to it

8   in terms of this type of behavior, either in deterring it or

9   stopping it?

10  **A.**  The most important deterrent is that the developer knows

11  that if they do manage to do this, they won't be able to do it

12  for very long.  It will -- the problem will get identified,

13  the app will be pulled down, and that the App Store human

14  review process will be updated to look -- be on the lookout

15  for copycats.

16      Our problem on the Mac is when we see one instance of this

17  and we block it at the code-signing level, the developer

18  simply slightly modifies the app and submits it again and

19  again and again through the notarization server.  And without

20  human review, our malware scan can't spot it, and so the

21  developer is undeterred.

22      With the human review and centralized distribution, the

23  developer is unlikely to be able to do this over and over

24  again, and so they are disincented from even trying.

25          **MR. LO:**  Thank you, Mr. Federighi.

1        Your Honor, I pass the witness.

2             **THE COURT:**  Mr. Even.

3                    **RECROSS-EXAMINATION**

4    **BY MR. EVEN:**

5    **Q.**  Sir, at the end of app review as it is currently

6    constituted, Apple has a binary that is fully reviewed and

7    vetted; correct?

8    **A.**  It's been through our review process, yes.

9    **Q.**  And it's fully reviewed and vetted by Apple; correct?

10   **A.**  What -- I don't know what "fully" means, but it is

11   reviewed according to our process, yes.

12   **Q.**  And then whether to send it to the App Store or back to

13   the distributor is entirely Apple's choice; correct?  That's a

14   yes-or-no question.  It's entirely Apple's choice; correct?

15   **A.**  Yes.

16             **MR. EVEN:**  No further questions, Your Honor, other

17   than I'm being told that I may have missed 5492, and if so, I

18   would like to enter it into evidence.

19             **THE COURT:**  No.  I admitted 5492.

20             **MR. EVEN:**  Thank you, Your Honor.

21             **THE COURT:**  Anything on that one -- on those two

22   questions?

23             **MR. LO:**  No, Your Honor.

24             **THE COURT:**  Okay, sir.  You're excused.  You may step

25   down.

 1          One thing that we should do before we finish off today.

 2     And I did not get these into a written order, but we're down

 3     to the short strokes.

 4          So with respect to the two outstanding experts, first,

 5     with respect to Dr. Rubin, paragraph 7, I understand the

 6     objection is to the opinion that others will lack incentives.

 7     That is sustained.

 8          With respect to paragraph 82, the first sentence is

 9     allowed.  The balance of the paragraph is sustained and is

10     stricken.

11          With respect to 84, the first sentence, the objection is

12     sustained.  The balance, it's overruled.

13          Then in response, Dr. Lee, the objections are overruled.

14          Okay.  That's it for today.  We will stand in recess until

15     8:00 a.m. tomorrow.

16               MR. LO:   Thank you, Your Honor.

17               MR. EVEN:   Thank you, Your Honor.

18               THE COURT:   Thank you.

19                    (Proceedings adjourned at 3:27 p.m.)

20

21

22

23

24

25

FEDERIGHI – RECROSS / EVEN

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman, Pamela Batalo-Hebel, and Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA BATALO-HEBEL_____

Pamela Batalo-Hebel, CSR, RMR, FCRR


_____/s/ Raynee Mercado_____

Raynee Mercado, CSR, RMR, FCRR


Wednesday, May 19, 2021