VOLUME 14

Pages 3512 – 3826

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,                    )
                                     )
          Plaintiff,                 )   NO. C-20-5640 YGR
                                     )
  vs.                                )   Thursday, May 20, 2021
                                     )
APPLE, INC.,                         )   Oakland, California
                                     )
          Defendant.                 )   BENCH TRIAL
_____)
APPLE, INC.,                         )
                                     )
          Counterclaimant,           )
  vs.                                )
                                     )
EPIC GAMES, Inc.,                    )
                                     )
          Counter-Defendant.         )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   BY:  **KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**
                        (Appearances continued.)

Reported By:       Diane E. Skillman, CSR 4909, RPR, FCRR
                   Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                   Raynee Mercado, CSR 8258 RMR, CRR, FCRR

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    For Plaintiff:         CRAVATH, SWAINE & MOORE, LLP
                             825 Eighth Avenue
 2                           New York, New York 10019
                        BY:  LAUREN A. MOSKOWITZ, ESQUIRE
 3                           JUSTIN C. CLARKE, ESQUIRE
                             W. WES EARNHARDT, ESQUIRE
 4                           BRENDAN BLAKE, ESQUIRE
                             JIN NIU, ESQUIRE
 5                           BRENT BYARS, ESQUIRE

 6    For Defendant:         GIBSON, DUNN & CRUTCHER
                             333 South Grand Avenue
 7                           Los Angeles, California 90071
                        BY:  RICHARD J. DOREN, ESQUIRE
 8                           DAN SWANSON, ESQUIRE
                             CYNTHIA RICHMAN, ESQUIRE
 9                           RACHEL BRASS, ESQUIRE

10

11                           GIBSON, DUNN & CRUTCHER, LLP
                             2001 Ross Avenue, Suite 1100
12                           Dallas, Texas 75201
                        BY:  VERONICA S. MOYE, ESQUIRE
13
                             PAUL WEISS RIFKIND
14                           WHARTON & GARRISON LLP
                             2001 K STREET, NW
15                           Washington, DC 20006
                        BY:  KAREN DUNN, ESQUIRE
16                           JESSICA E. PHILLIPS, ESQUIRE

17

18    For Defendant:         PAUL WEISS RIFKIND
                             WHARTON & GARRISON LLP
19                           943 Steiner Street
                             San Francisco, California 94117
20                      BY:  ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| 1 | **Defendant's Witnesses:** | **Page** | **Vol.** |
|---|---|---|---|
| 2 | **Hanssens, Dominique** | | |
| 3 | Direct Examination by Ms. Moye | 3525 | 14 |
| 4 | Cross-examination by Ms. Moskowski | 3548 | 14 |
| 5 | Redirect Examination by Ms. Moye | 3586 | 14 |
| 6 | Recross-examination by Ms. Moskowski | 3596 | 14 |
| 7 | **Malackowski, James** | | |
| 8 | Direct examination by Mr. Doren | 3600 | 14 |
| 9 | Cross-examination by Ms. Moskowski | 3646 | 14 |
| 10 | Redirect Examination by Mr. Doren | 3700 | 14 |
| 11 | Recross-Examination by Ms. Moskowski | 3713 | 14 |
| 12 | Further Redirect Examination by mr. Doren | 3714 | 14 |
| 13 | **Rubin, Aviel** | | |
| 14 | Direct Examination by Mr. Lo | 3717 | 14 |
| 15 | Cross-examination by Mr. Byars | 3770 | 14 |

16

17

18

19

20

21

22

23

24

25

| **Plaintiff's Exhibits:** | **Evd.** | **Vol.** |
|---|---|---|
| 1182 | 3716 | 14 |
| 1183 | 3716 | 14 |
| 5547 | 3716 | 14 |

| **Defendant's Exhibits:** | **Evd.** | **Vol.** |
|---|---|---|
| 3134 | 3628 | 14 |
| 3305 | 3623 | 14 |
| 3370 | 3716 | 14 |
| 4080 | 3624 | 14 |
| 4876 | 3624 | 14 |
| 4880 | 3719 | 14 |

 1    THURSDAY, MAY 20, 2021                           8:00 a.m.

 2                    P R O C E E D I N G S

 3         **THE CLERK:**  Calling Civil Action 20-5640, Epic Games,

 4    Inc. versus Apple, Inc.

 5       Counsel, please state your appearances.

 6         **MS. FORREST:**  Good morning, Your Honor.  Katherine

 7    Forrest for Epic.

 8         **THE COURT:**  Good morning.

 9       Good morning, Ms. Moskowitz.

10         **MS. MOSKOWITZ:**  Good morning, Your Honor.

11         **THE COURT:**  Good morning, Mr. Niu.

12         **MR. NIU:**  Good morning, Your Honor.

13         **THE COURT:**  And, Mr. Sweeney, good morning.

14         **MR. SWEENEY:**  Good morning, Your Honor.

15         **THE COURT:**  Mr. Rudd, good morning.

16         **MR. RUDD:**  Good morning.

17         **THE COURT:**  Okay.  On the Apple side, Mr. Doren.

18         **MR. DOREN:**  Good morning, Your Honor.

19         **THE COURT:**  And, Ms. Moye, good morning.

20         **MS. MOYE:**  Good morning, Your Honor.

21         **THE COURT:**  Ms. Dunn, good morning.

22         **MS. DUNN:**  Good morning, Your Honor.

23         **THE COURT:**  Ms. Adams?

24         **MS. DANSEY:**  Ms. Dansey.

25         **THE COURT:**  Ms. Dansey.

| | |
|---|---|
| 1 | And Ms. Grenier? |
| 2 | **MS. GRENIER:**  Yes.  Good morning, Your Honor. |
| 3 | **THE COURT:**  Good morning. |
| 4 | All right.  Mr. Spalding. |
| 5 | **MR. ELTISTE:**  No. |
| 6 | **THE COURT:**  No. |
| 7 | **MR. ELTISTE:**  It's Bret Eltiste. |
| 8 | **THE COURT:**  Eltiste.  Okay. |
| 9 | And then I think we've got Mr. Phillips back there? |
| 10 | **MR. PHILLIPS:**  Good morning, Your Honor. |
| 11 | **THE COURT:**  And who else? |
| 12 | **MS. RHO:**  Good morning, Your Honor.  This is Jennifer |
| 13 | Rho for Apple. |
| 14 | **THE COURT:**  I can't hear.  Maybe -- Ms. Moye, maybe |
| 15 | can help -- |
| 16 | **MS. MOYE:**  It's Jennifer Rho for Apple. |
| 17 | **THE COURT:**  Jennifer Rho.  Good morning. |
| 18 | **MS. MOYE:**  And Stephanie Fine at Apple. |
| 19 | **THE COURT:**  Okay.  Thank you.  Good morning. |
| 20 | **MS. FINE:**  Good morning. |
| 21 | **THE COURT:**  On the press side, we have Ms. Lopatto |
| 22 | from The Verge? |
| 23 | **MS. LOPATTO:**  Good morning, Your Honor. |
| 24 | **THE COURT:**  Good morning. |
| 25 | And Ms. Miller from MLex?  Good morning.  Welcome back. |

1          And then Betsy Manifold from the class counsel?

2               **MS. MANIFOLD:**  Good morning, Your Honor.

3               **THE COURT:**  Good morning.  Welcome back.

4          Ms. Behringer, good morning.

5               **MR. BEHRINGER:**  Good morning, Your Honor.

6               **THE COURT:**  Welcome back.

7               **MR. BEHRINGER:**  Thank you.

8               **THE COURT:**  I was also realizing that some of those

9     who are listening who aren't generally in courtrooms many

10    times find this boring.  You know, we judges do talk to people

11    and we do talk to our jurors.

12         But with so many people listening, I just generally feel

13    like judicial chatter is probably not the best thing to have

14    happen in the courtroom, so I don't.  But if you are ever in

15    my courtroom and you are a juror, we will have much more fun

16    discussions during the breaks.

17         We'll talk about the Warriors more, although I was very

18    disappointed.  I said last night it was too much stress to

19    watch them.  And then they were winning and they were winning

20    big, and I could hear my husband and my son yelling downstairs

21    so I turned it on, and then they started losing so I turned it

22    off.  And then the dog and I just went to the other room.

23         Anyway, so here we are.  Two more days and then argument.

24         Ms. Forrest, what do we have from your side?

25              **MS. FORREST:**  Your Honor, one point of just

1      information and also a request as to your preference.

2          On the expert submissions, Apple has filed theirs on the

3      docket.  We are prepared to do the same thing, but we also

4      wanted to ask Your Honor whether you would like hard copies of

5      those, or do you have more than enough paper?

6          **THE COURT:**  I don't want hard copies.  Look, I have

7      had the expert reports.  I read them before we started.  I'm

8      reading them again now because now they make more sense than

9      they did on the first go-around.  I was not planning on going

10     back.

11         I thought what you were filing on the docket primarily

12     were things that reflected sealing or other issues.  If there

13     are -- if there are material -- and I guess what I would do is

14     to the extent I am relying on something, I can go back to the

15     docket and figure out whether it was struck.  I mean, if there

16     are material issues that you think were not proven or upon

17     which there was no factual basis, then the easiest thing would

18     just be to point that out to me so I can go and look.

19         But I'm not going to look at additional copies.  I've got

20     my set.

21         **MS. FORREST:**  We -- you know, I think that makes

22     perfect sense, and we don't even need to file anything on the

23     docket if what we can do is rely upon just sort of the rulings

24     that Your Honor has made as to what is struck or not struck.

25         What has been filed on the docket so far has just been by

1    Apple, just literally copies of the expert reports with the

2    rulings reflected in the filed copies.  And we're prepared to

3    do the same thing if that would just make the docket complete.

4    But if Your Honor doesn't need that, we can stand down from

5    that.

6            **THE COURT:**  Well, I think the docket should be

7    complete, because I don't expect -- look, I really -- like I

8    said, everybody is trying to read my mind.  It doesn't matter.

9    You can't read it because I haven't decided what I am going to

10   do.  That's the best defense to anybody reading anything.

11       But whatever happens, one or both of you aren't going to

12   be happy with the answer, and so it's going to go to the Court

13   of Appeal.  So the docket has to be complete.

14       And I don't recall that those reports were ever filed.  I

15   think you provided me with copies of them per my request, but

16   I don't think they were filed.  So they do need to be filed.

17           **MS. FORREST:**  All right.  And Apple has filed theirs.

18   We will mirror that filing and not provide hard copies.

19       The second issue I just wanted to raise as a point of

20   information is we are actively determining whether or not we

21   will need to call any rebuttal witnesses.  Part of that

22   depends on, frankly, what happens today because of some

23   witnesses that are going today.  Our rebuttal witnesses would

24   be potentially responsive, and that's Mr. Lee and

25   Ms. Mathiowetz.

1          There is a possibility, Your Honor, of one other rebuttal

2     witness, who would have 10 to 15 minutes' worth of factual

3     testimony.  We don't yet know, because we've had to locate

4     this person, if we are going to call them, but we will know

5     today.

6          And they would be responsive to testimony that has only

7     just come up and that was not originally in the findings of

8     fact of Apple, so it wasn't something we could anticipate.

9     And we are -- I've notified Mr. Doren of this.  I think that

10    there may be a dispute as to whether we have missed the timing

11    cutoff for disclosure, but we have said we will let them know

12    as soon as possible and be prepared, if the person is called,

13    to make them available for deposition for an hour tomorrow

14    morning or something like that, very early, in advance.

15         We don't have to resolve this, the parties can continue to

16    have conversations about it, but I wanted to just let Your

17    Honor know that it is sort of out there in the ether.

18              **THE COURT:**  Okay.

19              **MR. DOREN:**  Your Honor, just so the record is clear,

20    there are two problems with that.

21         One is that in the stipulation filed at Docket 538, the

22    parties stipulated that Epic shall give Apple written notice

23    by 7:30 a.m. Pacific Time of any rebuttal witnesses to be

24    called on the trial day that begins 24 hours later, as well as

25    the order in which said witnesses will testify on that day.

1    That time has come and gone.

2        And that 24-hour period was negotiated as to rebuttal

3    witnesses specifically, as opposed to the 48-hour notice we

4    used for any case-in-chief witnesses.  So that deadline is

5    gone.  There should not be any surprise witnesses at this

6    time.

7        Secondly, the parties agreed that any witness that will

8    testify at trial would be deposed in advance of trial, before

9    trial, not during trial.

10       So for those two independent reasons, there should not be

11   any surprise rebuttal witnesses at this point in the case.

12           **MS. FORREST:**  Your Honor, we can take this up later,

13   but let me just sort of respond to that very briefly.

14       There was a finding of fact in Apple's findings of fact

15   which did not indicate the information that it now indicates

16   through a redline and that there was testimony about.  This

17   particular rebuttal witness would be directly responsive to

18   that.

19       We would ask that, based upon good cause, Your Honor --

20   this is an unanticipated event.  It would be 10 to 15 minutes.

21   We would give Apple the opportunity for a deposition, and it's

22   still TBD.

23           **THE COURT:**  There is nothing for me to rule on right

24   this second.

25           **MR. DOREN:**  Yes, Your Honor.

1          **THE COURT:**  Okay.

2     Mr. Doren, other issues from your side?

3          **MR. DOREN:**  Not at this time, Your Honor.

4          **THE COURT:**  While we were talking about -- we have

5     just a few minutes before we are supposed to start anyway, so

6     given that you were talking about process, let me ask for the

7     lawyers on both sides, maybe by the end of next week, it would

8     be helpful to me to have a joint email from the two sides

9     about what trial-related proceedings in terms of your

10    collaborations really worked and what didn't.

11         The reason that I ask that is, I have been asked to

12    participate in a course for judges dealing with antitrust

13    cases in the fall.  And as I've said before, I appreciate --

14    and I can see it from my end -- all of the collaboration and

15    professionalism that has happened in this particular case.  It

16    doesn't always happen in big commercial litigation trials.

17         And so to the extent that there are things that worked

18    very well for you, please let me know so I can let the judges

19    know and they can put those in pretrial orders.

20         So, like I said, it doesn't always happen, and to the

21    extent I can get better information on best practices, I would

22    be happy to communicate that.

23         **MS. FORREST:**  We'll put something together, Your

24    Honor.

25         **MR. DOREN:**  Agreed, Your Honor.  Thank you.

1          **THE COURT:**  Okay.  Anything -- we don't have anything

2     else.

3       Can you tell me what the list of witnesses is today,

4     please?

5          **MS. MOYE:**  Yes.  We are going to start with Professor

6     Dominique Hanssens.  Then we are moving to Professor Rubin --

7     Professor Malackowski and then Professor Rubin.

8          **THE COURT:**  Okay.  You may call your next witness.

9          **MS. MOYE:**  Apple calls Professor Dominique Hanssens.

10         **THE CLERK:**  If you will please remain standing, I

11    will swear you in.

12         **THE WITNESS:**  Sure.

13      (**DOMINIQUE HANSSENS**, called as a witness for the

14    Defendant, having been duly sworn, testified as follows:)

15         **THE WITNESS:**  I do.

16         **THE CLERK:**  Please be seated --

17         **THE WITNESS:**  Thank you.

18         **THE CLERK:**  -- and go ahead and get set.  I'll wait

19    until you get set there.  Be sure the mic is pointed

20    underneath the shield, and then would you please state your

21    full name and spell your last name.

22         **THE WITNESS:**  My name is Dominique Hanssens,

23    H-A-N-S-S-E-N-S.

24         **THE COURT:**  Good morning, sir.

25         **THE WITNESS:**  Good morning.

1          **THE COURT:**  Ms. Moye, you may proceed.

2          **MS. MOYE:**  Thank you, Your Honor.

3                    **DIRECT EXAMINATION**

4    BY MS. MOYE:

5    **Q.**  Good morning, Professor Hanssens.

6          **MS. MOYE:**  Your Honor, I have a book of exhibits that

7    may be used with the witness.  I would like to approach.

8          **THE COURT:**  You may.

9          **MS. MOYE:**  Your Honor, we also have a binder for you.

10   We will not hopefully need all of those materials, I assure

11   you.

12   BY MS. MOYE:

13   **Q.**  Good morning, Professor Hanssens.

14   **A.**  Good morning.

15   **Q.**  We have a deck of demonstratives that we would like to use

16   to aid with your testimony.

17         **MS. MOYE:**  So could I have the first demonstrative on

18   the screen, please.

19                    (Displayed on screen.)

20         **MS. MOYE:**  Thank you.

21   BY MS. MOYE:

22   **Q.**  Professor Hanssens, could you please tell us, what is your

23   current position?

24   **A.**  I am currently a research professor at UCLA at the

25   Anderson School of Management.

HANSSENS – DIRECT / MOYE

1  **Q.**  And would you please describe for us your educational

2  background?

3  **A.**  Yes.  I have an essential bachelor's degree in applied

4  economics from University of Antwerp in Belgium and a master's

5  and Ph.D. from Purdue University in management, with a focus

6  on marketing.

7  **Q.**  What are your particular areas of research and expertise?

8  **A.**  Well, in the field of marketing, I focus on empirical

9  research, on marketing effectiveness, consumer behavior.  And

10  I do that using either transactional data or survey data.

11  **Q.**  Have you designed and conducted surveys in the past?

12  **A.**  Yes, I've done that many times.  I've done that in the

13  context of some of my research articles; also in the context

14  of teaching, supervising a fairly large number of student

15  projects in our MBA program that are surveys; also in

16  commercial consulting engagements; and then, finally, in some

17  cases where I serve as an expert witness.

18  **Q.**  Thank you.

19      **MS. MOYE:**  And, Your Honor, we would like to tender

20  Professor Hanssens as an expert in marketing and surveys.

21      **THE COURT:**  No objection?

22      **MS. MOSKOWITZ:**  No objection, Your Honor.

23      **THE COURT:**  He's admitted.

24      **MS. MOYE:**  Thank you, Your Honor.

25

**BY MS. MOYE:**

**Q.**  Professor Hanssens, could you look at the written direct

testimony that is in your binder?  It should be behind the

second tab.

**A.**  I see it.

**Q.**  And, sir, is this the written direct testimony that you

prepared and submitted to the Court?

**A.**  Yes, it is.

**Q.**  And is it all truthful?

**A.**  Yes, it is.

**Q.**  Do you have any changes that you feel you need to make to

that report today?

**A.**  I do not.

          **MS. MOYE:**  Your Honor, my understanding is that the

written direct testimonies are the subject of a stipulation

between the parties.  We would ask that Professor Hanssens'

written direct be provisionally admitted pending that

stipulation.

          **THE COURT:**  So admitted.

          **MS. MOYE:**  And I think it bears the designation

"Expert 10" –– we are using different numbers for the

experts –– "Defendant Expert 10."

          **THE COURT:**  I think there is a document on the file

that has all of the exhibit numbers for the expert directs.

          **MS. MOYE:**  Okay.  Thank you, Your Honor.

1          **THE COURT:**  And rebuttals.

2          **MS. MOYE:**  Thank you, Your Honor.

3     And we have a number of exhibits that apply to Professor

4   Hanssens' work.  They are also the subject of a stipulation

5   between the parties that has been filed but not admitted.  So

6   we won't do that now.

7          **THE COURT:**  So this was -- it is on the docket now

8   and I have not yet addressed it.  Was it before Docket 635?

9          **MS. MOYE:**  I would have to get the specific docket

10  number for you, but, yes, my understanding is that it is

11  pending but has not yet been ruled upon.

12         **THE COURT:**  Oh, okay.  I'll double-check.

13    Go ahead.

14         **MS. MOYE:**  Thank you.

15    Could we have the second demonstrative, please?

16              (Displayed on screen.)

17  BY MS. MOYE:

18  **Q.**  Professor Hanssens, can you describe for the Court, what

19  was your assignment in this case?

20  **A.**  Yes.  In this matter, I was asked to do two things.

21    First of all, I was asked to design and conduct a survey

22  of iOS device users in the United States, those who are of

23  ages 13 and up.

24  **Q.**  And what was the second survey you were asked to prepare?

25  **A.**  The second survey was to do a review and also evaluate the

1    survey work that was done by Professor Rossi in this case.

2    **Q.**  Let's talk about the two surveys you designed.

3        What were they called?

4    **A.**  I am sorry.  There was one that was called the iOS app

5    survey.  And that is for people who meet this time that I've

6    already mentioned who actually visited the App Store and

7    downloaded at least one app in the last 12 months.

8    **Q.**  And the second survey?

9    **A.**  The second survey, which we call the iOS *Fortnite*

10   survey, that was done for people who actually play *Fortnite* on

11   the iOS devices, also in the last 12 months.

12   **Q.**  And what was the age range for the participants in your

13   surveys?

14   **A.**  In both cases, it was ages 13 and up.

15   **Q.**  And why did you select that age range?

16   **A.**  That age range was selected because the Epic Games, and in

17   particular *Fortnite*, is a game that is recommended for people

18   ages 13 and up, and, in fact, their major target demographic

19   includes that age, 13 and up.

20   **Q.**  Were males and females equally weighted in your iOS

21   *Fortnite* survey?

22   **A.**  No.  In the second survey there was a predominance of

23   males, because that is also the stated target market for

24   *Fortnite*.

25   **Q.**  Were you concerned at all about surveying those who were

1   younger than 17 or 18 years old?

2   **A.**   I was not, given that we had parental consent.

3   **Q.**   And can you just describe for the Court what steps were

4   taken to obtain parental consent?

5   **A.**   Yes.  These are steps that were -- that are sort of

6   standard procedure with the internet panel provider, as well

7   as the market research firm.  There are two kinds.

8      One is there are cases where the parents have previously

9   granted permission for their son or daughter to participate in

10   surveys, so that permission was granted previously.

11      And then there are also cases where the parent was

12   initially contacted and then was asked if the son or daughter

13   was available, if it would be okay for the son or daughter to

14   take the survey.  So the parental permission in this case was

15   sort of instant.

16   **Q.**   And you mentioned with respect to both of those surveys

17   asking for information about the last 12 months.

18      Why did you include a 12-month period in your surveys?

19   **A.**   I used 12 months because I wanted to filter out possible

20   seasonal effects in usage.  So, for example, if the last month

21   was one with a lot of vacation days in it, the usage of many

22   people might be different.  By that I mean, the electronic

23   device usage might be different from a month in which there

24   are very few holidays or none at all.  And so that can be

25   filtered out by taking a 12-month horizon.

1          **MS. MOYE:**  Okay.  Let's look at the third

2   demonstrative.

3   **BY MS. MOYE:**

4   **Q.**  And I would like to talk about the questions you asked in

5   the iOS app survey.

6          Can you tell us, what was the main goal of that survey?

7   **A.**  Well, the main goal was for those people who qualified,

8   however we defined that, the extent to which they use other

9   electronic devices, in other words, non-iOS devices, and,

10  specifically, the extent to which they use those other devices

11  on a regular basis.  That was the first goal.

12         And then the second goal was to find out if there were yet

13  other electronic devices that they could have used on a

14  regular basis because they were available, but they chose not

15  to.

16  **Q.**  And we see the phrase "regularly used."

17         Can you explain why you chose that language?

18  **A.**  Yes.  That language was chosen deliberately because it's

19  understood that a certain device may be used regularly by one

20  person, let's say, on a daily basis, and for another person it

21  may be on a weekly basis or even a monthly basis, but both of

22  them would be regular.

23         So the focus here is on the recurring behavior, not on the

24  frequency.  And that's why we used that term, which we

25  pretested and turned out to not be problematic at all.

1   **Q.**   You also have the language "available for regular use."

2       What does "available" mean there?

3   **A.**   Yes.  The -- "available," once again, is a very easily

4   understood English term, and we gave some examples to make

5   sure people understood the context.  Those were devices -- or

6   are devices that are, for example, present in the household of

7   the respondent or maybe at work, anyplace that -- where there

8   would be regular availability.

9       However, even though the device is available for regular

10  use, this -- or a particular respondent doesn't necessarily

11  use it on a regular basis.  So it expands the availability

12  set.

13  **Q.**   And did I hear you correctly, did you actually provide

14  some text to describe what "available" would mean?

15  **A.**   Yes, I gave examples.  I forget the exact wording, but it

16  is, "For example, your family members may have that device.

17  And so it hangs around the house, you can use it if you like.

18  Whether or not you do on a regular basis is up to you, as a

19  respondent."

20          **MS. MOYE:**   And let's look at the next demonstrative

21  and talk about the iOS *Fortnite* survey.

22  **BY MS. MOYE:**

23  **Q.**   Did you ask the same questions in that *Fortnite* survey as

24  you had in your iOS app survey?

25  **A.**   Well, the first two questions were pretty much the same,

1   yes, did they regularly use other electronic devices or did

2   they -- were there other devices that were available to them

3   that they did not regularly use.  Those are the same.

4       Then there was an additional question specifically for

5   iOS *Fortnite* users, and that is whether they play digital

6   games on any of these other electronic devices that they have

7   stated they regularly use.

8   **Q.**  And let's focus on the language regarding "other

9   electronic devices" in this iOS *Fortnite* survey.

10      Were "other electronic devices" defined the same way in

11  the *Fortnite* survey as in the iOS app survey?

12  **A.**  Yes.  Those are, basically, devices on which you can play

13  digital games.

14  **Q.**  Thank you, sir.

15      Now let's turn to your results.

16          **MS. MOYE:**  If we can have the next demonstrative.

17  BY MS. MOYE:

18  **Q.**  Could you describe for the Court what results you received

19  in your surveys?

20  **A.**  Sure.

21      This was a very straightforward survey, and so the results

22  are also easy to represent here in this one slide; that in

23  the iOS app survey, we see 92 percent regularly used other

24  electronic devices in the last 12 months; for the iOS

25  *Fortnite* survey, that number is a little higher, it is 97; and

1    then in both cases, 99 percent have other devices available to

2    them for regular use without necessarily using them.  So the

3    set is the same there in both cases.  And I think I summarized

4    that as referring to that as the vast majority.

5    **Q.**  Thank you, Professor Hanssens.

6         Did you do anything to check the robustness of your survey

7    results?

8    **A.**  Yes, I did.

9         **MS. MOYE:**  Could we see the next demonstrative,

10   please?

11        I am sorry, I skipped one item.

12   **BY MS. MOYE:**

13   **Q.**  Was there additional data from the iOS *Fortnite* survey

14   that you determined?

15   **A.**  Yes.  So as you may recall, there was one extra question

16   for the *Fortnite* players, and that was with respect to them

17   playing digital games on other electronic devices.  And that

18   number is 94 percent, as you see there.

19   **Q.**  Thank you, sir.

20        And now let's go back to robustness.

21        **MS. MOYE:**  Next demonstrative, please.

22   **BY MS. MOYE:**

23   **Q.**  Would you describe, please, what are the robustness checks

24   you did?

25   **A.**  Yes.  In survey research, when you draw conclusions, it is

1     important to satisfy yourself as a researcher that these

2     results hold for reasonable subsamples.  And that is exactly

3     what I did.

4          So, for example, if I look only at people who state that

5     they use an iPhone, do we still get that overall result,

6     versus people who only use an iPad, versus people who use

7     both.  That's the first breakdown there, compared themselves

8     to iOS device.

9          When it says "no material change," what I mean by that is

10    that we still find this substantial majority or vast majority

11    result, and so my conclusions are the same.

12         Secondly, and also in -- standard in market research, we

13    checked whether or not people who answered the survey

14    relatively quickly or very slowly might have been inattentive

15    or rushing through, et cetera.  And so we discarded those

16    people -- I think in my case it was people who answered the

17    survey in less than 2 minutes or more than 14 minutes -- just

18    to assure ourselves that those results are still similar.  And

19    they are.  There, again, we find the same results.

20    Q.  Did you -- you mentioned 2 minutes and a longer period of

21    time.

22         Did you also do an additional robustness check using a

23    different lower-range number?

24    A.  Well, I did, because there was some feedback on my work

25    from another expert who said that maybe you should check under

1   3 minutes.

2        And so I did that.  So it's the same test except now it is

3   anybody who answers the survey in under 3 minutes, as opposed

4   to 2.  And, again, the results were the same.

5   **Q.**  And then you have a final robustness check on our slide

6   here related to Microsoft Windows smartphones.

7        Could you describe that for the Court?

8   **A.**  Yes.  That check is also done in response to a comment by

9   another expert, and that comment was that while Microsoft does

10  have smartphones on the market, they have not been very

11  successful, commercially, that is.  And yet a number of people

12  indicated that either they were available to them or they

13  regularly used them, and so that number was perhaps somewhat

14  surprising.

15       And so as a result of that, I tested the possibility that

16  maybe these people didn't quite get it right or were

17  inattentive, and I excluded all of them.  In other words,

18  anybody who said that they either regularly used a Windows

19  phone or that they had access to one for regular use was

20  excluded, regardless of whether they were right or wrong about

21  that.

22       And when I do that test, once again, I find that the

23  results are basically the same as before.

24  **Q.**  Did Dr. Rossi collect usage data in the survey work he

25  did?

1   **A.** Yes, he did.

2       **MS. MOYE:** And if we can have the next demonstrative.

3   **BY MS. MOYE:**

4   **Q.** Did you look at the results he obtained in connection with

5   evaluating your work?

6   **A.** Well, yes, I did.

7   **Q.** Did Dr. Rossi collect the same type of usage data as you

8   had collected?

9   **A.** Well, it is similar, but it's not quite the same. You

10   know, his sample is a bit different. Also, he did not use the

11   word "regular use"; he just asked about use. And, finally, he

12   did not stipulate a timeline like I did with my 12 months; he

13   just said Which devices do you use?

14      But -- and in spite of these differences, you see that the

15   results, in essence, completely corroborate my findings of a

16   vast majority using either any electronic devices or non-Apple

17   electronic devices.

18   **Q.** And what percentage of the respondents in Professor

19   Rossi's survey reported usage of another electronic device?

20   **A.** That would be 98 percent.

21   **Q.** And what percentage of the respondents -- excuse me, I'm

22   having a little bit of an allergy issue here -- what

23   percentage of the respondents in Professor Rossi's survey

24   reported usage of other non-Apple electronic devices?

25   **A.** That would be 93 percent.

HANSSENS – DIRECT / MOYE

1  **Q.**  Okay.  Now, let's turn to the second part of your

2  assignment, which was evaluating Professor Rossi's work.

3      What did you find?

4  **A.**  Well, I found that in Professor Rossi's -- in the

5  execution of his work, there were several areas of concern to

6  me, especially since his survey is one in which he explores a

7  hypothetical scenario.  That's not something that I did; I

8  just did actual usage.  He looked at people's hypothetical

9  behavior under the conditions of a 5 percent price increase in

10  the App Store.

11          **MS. MOYE:**  Let's look at the next demonstrative.

12  **BY MS. MOYE:**

13  **Q.**  Did you do an evaluation in particular of whether

14  Professor Rossi had done a proper pretest for his survey

15  instrument?

16  **A.**  Yes, I did.

17  **Q.**  And could you explain to the Court what your conclusion

18  was on that?

19  **A.**  Well, the overall conclusion is that, like me, I did -- or

20  he did -- I am sorry -- he did a pretest on the first draft.

21  That's the top line you see there starting in December, on

22  December 23rd of last year.  He calls that an unstructured

23  pretest.  That really is just a pretest, just like I did.

24      But then subsequently, or as a result of this pretest, he

25  made some fairly substantial changes because of problems that

HANSSENS – DIRECT / MOYE

1    he discovered in that first version.  And as a result, he had

2    a rather different Version 1, as he calls it, and subsequently

3    Version 2 and subsequently Version 3.  So he had three rounds

4    of changes, but none of those were pretested.

5         Now, he says that he did structured pretests in those, as

6    you see there, but that is really a pilot test.  In other

7    words, it is a test of some people, but there is no subsequent

8    interview.  And that's -- so that -- by standard survey

9    language or jargon, those are not pretests.

10   **Q.**  And is this terminology, "unstructured pretests" and

11   "structured pretests," is that used in your industry?

12   **A.**  Well, it may be that I'm not aware of it.  It is certainly

13   not standard.

14   **Q.**  You have a column on testing with respondent interviews.

15       Do you see that?

16   **A.**  I do.

17   **Q.**  Are interviews always conducted in a pretest?

18   **A.**  Yes.

19   **Q.**  Are interviews an important portion of the pretest

20   process?

21   **A.**  Absolutely.

22   **Q.**  Did Professor Rossi conduct any interviews of those who

23   took -- of his final survey instrument?

24   **A.**  No, he did not.

25   **Q.**  And when was Professor Rossi's final Version 3 taken

1  through what he calls this structured pretest phase?

2  **A.**  His final pilot was on January 19 of this year.

3  **Q.**  And when did he actually deploy his final survey?

4  **A.**  It was the next day, January 20th.

5  **Q.**  Were there any changes made between that Version 3 on

6  January 19th, 2021, and then the version that went out in the

7  field for his results starting on January 20?

8  **A.**  No.  His Version 3 is the same as his final survey.

9  **Q.**  Do you believe, Professor Hanssens, that Professor Rossi's

10  failure to pretest his final survey instrument may have had an

11  impact on the reliability of his results?

12  **A.**  Yes, I do.

13  **Q.**  Let's look first at the hypothetical price increase

14  scenario presented in Question 16 of Professor Rossi's survey.

15  This says "V2," sir.

16      Would you identify which Question 16 this was?

17  **A.**  Well, it's printed there.  He shows the hypothetical with

18  the 5 percent price increase, and then he specifically asks --

19  you see that right below the box -- if that price increase

20  would cause you to make fewer purchases in the future.  So it

21  is a forward-looking question.

22  **Q.**  And is this the actual question that went out to the field

23  to get results?

24  **A.**  You mean for the final survey?

25  **Q.**  Yes.

HANSSENS – DIRECT / MOYE

1    **A.**   No.

2    **Q.**   So this was an earlier draft of the question, correct?

3    **A.**   It is V2, and it was changed in V3.

4    **Q.**   So in this draft, there was a hypothetical future price

5    increase that was inquired about; is that right?

6    **A.**   Yes.

7    **Q.**   And how would a respondent indicate that they would not

8    make a change in response to that hypothetical future increase

9    in this version of the question?

10   **A.**   Yeah.  Well, if you are a sticker, to use Professor

11   Rossi's language, you would answer "No."

12   **Q.**   And could you read for us the "No" answer that is there?

13   **A.**   Sure.  It says, "No, the price increase would not cause me

14   to make fewer purchases from the App Store."

15   **Q.**   Okay.  And let's look at this same question in the final

16   survey that Professor Rossi used to get his results.

17        **MS. MOYE:**  And I don't know if we can blow that up a

18   little bit.  It is at least hard to read on my screen.

19        Your Honor, the demonstratives are also behind the first

20   tab in your book, if that is easier.

21        **THE COURT:**  I have it.  Thank you.

22   BY MS. MOYE:

23   **Q.**   Was there still a future-looking hypothetical price

24   increase in the final survey?

25   **A.**   No.  That has changed.

1    **Q.**  And describe what kind of hypothetical price increase was

2    included.

3    **A.**  The hypothetical now goes as follows:  "Suppose that the

4    5 percent price increase had occurred 30 days ago," and then

5    it's a backward-looking question that basically says, "would

6    you have made the same purchases or not?"  So it's a

7    backward-looking question rather than a forward-looking

8    question.

9    **Q.**  And what answer would respondents select to indicate they

10   would not make a change in response to this backward-looking

11   hypothetical price increase in the final survey?

12   **A.**  Well, again, using Professor Rossi's language, if you are

13   a sticker, then this time you answered "Yes," as opposed to

14   "No."  I can read it.  "Yes, I would have made the same

15   purchases and spent" -- whatever.

16   **Q.**  Did the use of a backward-looking price increase scenario

17   cause you to have any concerns, Professor Rossi [sic]?

18   **A.**  Yes, it does.

19   **Q.**  Would you describe those concerns?

20   **A.**  Well, the concern is as follows:  When a consumer decides

21   to react or not to a price change and let's say they still go

22   with the purchase, they take the risk -- because it is a price

23   increase, they take the risk of not being satisfied with the

24   product and paying more for it.

25          If you move the clock back 30 days, then you already know

1   what your experience has been because you have actually

2   purchased that subscription or that particular app.  And so in

3   that case, two elements are conflated:  The notion of price

4   reaction and the notion of satisfaction with the existing

5   product.  And that conflation causes me some concern.

6   **Q.**  Could that kind of conflation result in any type of impact

7   on how many people would pick a solution that they would not

8   make a change?

9   **A.**  I believe so, yes.

10  **Q.**  And what impact would it have?

11  **A.**  Well, on the mild assumptions that these apps are pretty

12  good, you would see that people might say, well, okay,

13  5 percent more, but these were good experiences for me so I

14  would have done the same thing; in other words, I would not

15  have changed my behavior.  So it will increase the percent of

16  stickers, again in the Rossi language.

17  **Q.**  Have you done any assessment as to whether the changes

18  from a forward-looking hypothetical price increase with a "No"

19  answer for a sticker to a backward-looking hypothetical price

20  increase with a "Yes" answer for a sticker created any

21  concerns in the reliability of Professor Rossi's results?

22  **A.**  Yes, I have.

23          **MS. MOYE:**  Could we look at the next demonstrative,

24  please?

25                  (Displayed on screen.)

1   **BY MS. MOYE:**

2   **Q.**   Is this one of the assessments that you prepared?

3   **A.**   Yes, this is one of two assessments.

4   **Q.**   And would you explain what is conveyed here?

5   **A.**   Well, what is conveyed here is the difference in the

6   people who are saying "I don't know" to the question, which is

7   either -- to the hypothetical, which is either worded in V1

8   and V2 as forward-looking, as I mentioned earlier, or in V3

9   and the final survey as backward-looking.  And as you see, the

10  percentages go up from 4 to 10.

11       Now, Professor Rossi actually found out in his very first

12  pretests -- or I should say in his only pretest -- he found

13  that there was some confusion about the questions -- or that

14  question, and so -- and then he made these changes.

15       Well, he didn't really solve the confusion if now more

16  than twice as many people say, "I don't know."  So that causes

17  me some concern.

18  **Q.**   Thank you, sir.

19       And did you do any assessment to determine whether the

20  possibility of the "No" to "Yes" change may have impacted

21  Professor Rossi's results?

22  **A.**   Yes, I did.

23            **MS. MOYE:**  Could we see the next demonstrative,

24  please?

25                      (Displayed on screen.)

**BY MS. MOYE:**

**Q.**  Would you explain that assessment for the Court?

**A.**  Sure.

So you now see, again, V1, V2 combined versus V3 and final survey.  So the axes are the same.

Under the V1 and V2 scenario, which has the "No" as an answer to the stickiness question -- pardon my language -- is 51 percent.  So 51 percent of the people in that scenario say that they would not make fewer purchases as a result of the price increase.

But then when you go to the V3, which is also the final survey, now it's suddenly 73 percent.  And so that's -- and, by the way, the 73 is statistically different from the 51.  So the 73 is what he used in his final survey.  Had he used V1 or V2, he would have found 51.

**Q.**  Do you think, based on academic literature, that the change from a "No" answer to a "Yes" answer for a sticker actually mattered in terms of the outcome?

**A.**  Yes.  That is an example of something in the literature called acquiescence bias or, in popular terms, yea-saying. It's sort of the general tendency to be nice to the interviewer or to the surveyor and say -- and to go along with the question.  And that is an example here of what happened.

**Q.**  Do you believe the number of people who reported they would stick, that they would not make a change, could be

1  inflated as a result of Professor Rossi's decision to change

2  from a "No" to a "Yes" answer for a sticker?

3  **A.**  Yes, that number could be inflated.

4  **Q.**  And if the number of people that he determined were

5  stickers actually was inflated, what would be the impact on

6  any price elasticity calculation that he performed?

7  **A.**  Well, since you now have more people who say that they do

8  not react to the price increase, by definition, you will now

9  have a smaller elasticity in absolute value than otherwise.

10 **Q.**  Thank you, sir.

11     And the Court has heard testimony from Professor Rossi

12 where he uses a figure of 81 percent for those who would not

13 make a change.

14     Can you explain how that number compares to your

15 73 percent number?

16 **A.**  Yes.  That is just a definitional change.  His 81 percent

17 is among the deciders, whereas the 73 percent that you just

18 saw is among all those who answered the question.  So it is

19 just a different denominator.

20 **Q.**  Okay.  And, Professor Hanssens, how does your survey work

21 compared to Professor Rossi's?

22 **A.**  Well, I would say that setting aside sample differences

23 and execution differences, that the main difference is that

24 all I did was ask people about their actual usage -- it's

25 actually very straightforward -- whereas Professor Rossi

1  actually delved into the hypothetical of how you would react

2  to a hypothetical price -- 5 percent price increase.  I would

3  say that that is the major difference.

4  **Q.**  Did you pretest your survey instrument, Professor

5  Hanssens?

6  **A.**  Yes, I did.

7  **Q.**  And did you pretest the survey instrument that you

8  actually used in the field?

9  **A.**  Yes, I did.

10  **Q.**  In your expert opinion, Professor Hanssens, are the

11  results that Professor Rossi obtained from the

12  backward-looking hypothetical price increase scenario he

13  presented reliable?

14  **A.**  Well, for reasons I explained, I do not think they're

15  reliable.

16          **MS. MOYE:**  Thank you.

17      I pass the witness.

18          **THE COURT:**  Ms. Moskowitz.

19          **MS. MOSKOWITZ:**  Thank you, Your Honor.

20          **THE COURT:**  And with respect to the exhibits, there

21  is no objection -- I'm looking at -- this is Docket 641 -- I

22  take it, Ms. Moskowitz?

23          **MS. MOSKOWITZ:**  And that's referring to the

24  stipulation with the exhibits?  Yes, we are agreed.

25          **THE COURT:**  Okay.  So those will be admitted.  I

1    believe the order is being posted this morning.

2         **MS. MOYE:**  Your Honor, I have Docket 682 as the

3    expert --

4         **THE COURT:**  Okay.  Sorry.  There's --

5         **MS. MOYE:**  -- if it's related to this one.

6         **THE COURT:**  -- 641 and 682, but you're right.

7         **MS. MOYE:**  Thank you.

8         **MS. MOSKOWITZ:**  Your Honor, may I approach with some

9    binders?

10        **THE COURT:**  You may.

11        **MS. MOSKOWITZ:**  Thank you.

12    I fear there may have been some duplication between the

13    parties.  Maybe we will do that better next time.

14        **THE COURT:**  This has all the exhibits?

15        **MS. MOSKOWITZ:**  It does, Your Honor, all the exhibits

16    for Professor Hanssens.

17    Your Honor, may I proceed?

18        **THE COURT:**  You may.

19        **MS. MOSKOWITZ:**  Thank you.

20                          <u>**CROSS-EXAMINATION**</u>

21    BY MS. MOSKOWITZ:

22    **Q.**  Good morning, Dr. Hanssens.

23    **A.**  Good morning.

24    **Q.**  Okay.  You do not consider yourself an expert on general

25    survey design, correct?

HANSSENS – CROSS / MOSKOWITZ

**A.** On general survey design, if it's in marketing, the answer is yes. In general, probably not.

**Q.** Okay. So you do not consider yourself an expert on general survey design, correct?

**A.** Correct, yeah.

**Q.** And you don't recall if you've ever testified as an expert in any antitrust litigation, correct?

**A.** Antitrust, I cannot remember.

**Q.** And you do not recall ever having conducted a survey about smartphones, correct?

**A.** Do you mean in a litigation setting or do you mean in general?

**Q.** I mean you don't recall ever having conducted a survey about smartphones, right?

**A.** Well, I probably have in the context of --

**Q.** I'm not asking about probably; I'm asking if you recall having done so. And we can refresh your recollection on your deposition if you --

**A.** Okay.

**Q.** -- need it.

**A.** Specifically, no.

**Q.** Okay. All right. Let's talk about the surveys you are offering here today.

You did not speak to Professor Lafontaine at all in connection with this litigation, correct?

HANSSENS – CROSS / MOSKOWITZ

1  **A.**  That is correct.

2  **Q.**  You are not familiar with the market definition work that

3  Professor Lafontaine did, correct?

4  **A.**  That is correct.

5  **Q.**  You were not aware, when conducting -- designing or

6  conducting or writing your surveys or report, that your

7  results would be used by the Apple economist, Professor

8  Lafontaine, in her market definition exercise; is that right?

9  **A.**  That is right.

10  **Q.**  In fact, you still don't have an understanding as to how

11  your surveys were used by Apple's other experts in this case,

12  correct?

13  **A.**  That is correct.

14  **Q.**  You have not heard the phrase "SSNIP test" before, right?

15  **A.**  Actually, I have now.

16  **Q.**  In the deposition was the first time?

17  **A.**  Correct.

18  **Q.**  Okay.  And so other than me asking you about it in your

19  deposition, you had not heard of a test that studies small but

20  significant non-transitory increase in price, right?

21  **A.**  That's correct.

22  **Q.**  So it's fair to say, then, that you did not conduct a

23  SSNIP test here, right?

24  **A.**  I did not do a SSNIP test, that's correct.

25  **Q.**  And you do not recall ever being involved in any survey to

 1    obtain information that would be an input into such a study,

 2    correct?

 3    **A.**   That is correct.

 4            **MS. MOSKOWITZ:**   All right.   I have a set of

 5    demonstratives, as well.   I'm going to please ask Mr. Rudd to

 6    put up a slide showing the market definition exercise that

 7    Professor Lafontaine did.

 8    **BY MS. MOSKOWITZ:**

 9    **Q.**   Professor Hanssens, you've never seen this before, right?

10    **A.**   That is correct.

11    **Q.**   All right.   She writes here:

12            "Market definition is fundamentally about demand

13            substitution, whether customers are willing and able

14            to substitute if terms of trade worsen, including if

15            quality decreases or price increases."

16    Do you see that?

17    **A.**   I do.

18    **Q.**   All right.   So you see here Professor Lafontaine uses the

19    word "substitute."

20            Do you see that?

21    **A.**   I do.

22    **Q.**   Your surveys did not address substitution at all, right?

23    **A.**   That is correct.

24    **Q.**   She uses the phrase "able to substitute."

25            Do you see that?

1   **A.**   I am sorry, I didn't hear the word --

2   **Q.**   "Able to substitute."

3       Do you see those words?

4   **A.**   Oh, yes, "able to substitute."  Go ahead.

5   **Q.**   Okay.  Your surveys did not assess whether respondents

6   have the ability to make a substitution to other electronic

7   devices, correct?

8   **A.**   That, I'm not so sure, because I have an availability

9   statistic.

10  **Q.**   Okay.  Your surveys did not assess whether respondents

11  have the ability to make a substitution to other electronic

12  devices.  "Yes" or "No"?

13  **A.**   Ability -- that's -- I agree.  I forget if it is "Yes" or

14  "No."  I agree with your statement.

15  **Q.**   You agree that your surveys did not assess whether

16  respondents have the ability to make a substitution to other

17  electronic devices.

18  **A.**   Correct.

19  **Q.**   Thank you.

20      You asked respondents, you talked on direct, about their

21  device usage over the last 12 months, right?

22  **A.**   Yes.

23  **Q.**   And the 12-month reference period that you use does

24  include current use or availability, but it is not limited to

25  current use and availability, correct?

1  **A.**  That is correct.

2  **Q.**  So it is possible that by using that 12-month reference

3  period, your results may include devices that respondents used

4  or had available to them in the last 12 months but they do not

5  currently use or have access to, right?

6  **A.**  That is technically a possibility.

7  **Q.**  And you did not tell survey respondents to exclude devices

8  that they no longer use in their responses, right?

9  **A.**  That is correct.

10  **Q.**  You agree that an individual cannot substitute something

11  for something else if they do not have that something

12  currently available to them, right?

13  **A.**  Agreed.

14  **Q.**  Professor --

15       **MS. MOSKOWITZ:**  If we could keep that slide up.  I am

16  sorry.

17  **BY MS. MOSKOWITZ:**

18  **Q.**  Professor Lafontaine also uses the phrase "willing to

19  substitute."

20       Do you see that?

21  **A.**  Actually, I don't.

22  **Q.**  Sure.  The --

23  **A.**  Oh, the second --

24  **Q.**  -- second line.

25  **A.**  -- line.  Yeah, I see it now.

1    **Q.**   Okay.  Your surveys did not assess whether consumers are

2    willing to use other electronic devices, right?

3    **A.**   That is correct.

4    **Q.**   Your surveys did not assess whether respondents have the

5    desire or the preference to switch to another device, right?

6    **A.**   That is correct.

7    **Q.**   You talked on direct the phrase "available to regularly

8    use" was part of your survey, right?

9    **A.**   Yes.

10   **Q.**   So when you -- you talked a few times -- I think you

11   mentioned -- I think I counted twice that you said you studied

12   actual usage, right?

13   **A.**   Yes.

14   **Q.**   But you also asked people what they could have done but

15   did not do, right?

16   **A.**   Yes.

17   **Q.**   So that's the opposite of actual usage, right?

18   **A.**   Well, it's actual usage -- actual usage I've already

19   established, and then that other element is what was your

20   total availability.

21   **Q.**   Right, what could you have done but you didn't do it.

22   **A.**   Well, right.

23   **Q.**   Okay.  All right.  So you also mentioned you gave some

24   examples of what "available to regularly use" would be, right?

25   **A.**   Yes.

1    **Q.**  And on direct, I wrote it down.  You said household

2    devices or work.

3         Those were the examples you gave?

4    **A.**  As I recall, yes.

5    **Q.**  Yeah, and like family member?

6    **A.**  For example.

7    **Q.**  Right.  But you didn't mention the other example that you

8    actually gave your respondents, which was a friend, right?

9    **A.**  I am sorry, I haven't understood your question.

10   **Q.**  Do you remember that the actual language of what you gave

11   to your respondents said an example would be "the smartphone

12   of a member of your household or of a friend that you could

13   have regularly used, but that you did not regularly use in the

14   last 12 months."

15   **A.**  Agreed.

16   **Q.**  All right.  So the "friend" is one of the people that

17   might -- you wanted respondents to think about about their

18   devices.

19   **A.**  It's another example.

20   **Q.**  You did not try to understand, through your surveys,

21   though, the specific use for which a device may or may not be

22   available, correct?

23   **A.**  Correct with one exception.

24   **Q.**  It's not correct as I said it?

25   **A.**  Well, I did ask in the *Fortnite* survey if they used these

1   other electronic devices for game playing.  So that's a

2   specific use, if I understood your question correctly.

3   Q.  For availability, when you asked people what other devices

4   they had available to them, for the purposes of calculating

5   your 99 percent, you did not ask or try to ascertain the

6   specific use for which that device may or may not be

7   available, correct?

8   A.  That is correct.

9   Q.  So "available to regularly use" could have meant phone

10  calls or it could have meant any number of things you might do

11  with any of those devices, right?

12  A.  That is correct.

13  Q.  So, again, you did not try to ascertain for the friend

14  example, just to take it, what that respondent could have done

15  with that friend's device or for how long, right?

16  A.  That is correct.

17  Q.  And you didn't, for example, try to ascertain whether the

18  device was available -- was a personal device or a shared

19  device or whether it had any restrictions on it, for example?

20  A.  That is correct.

21  Q.  So if a shared device in the household even was available

22  to check emails, but not to sit down and play any games, you

23  can't ascertain that through your survey questions, right?

24  A.  I agree.

25  Q.  And that is because you just didn't care what respondents

1    were using their devices for, just that they had them

2    available for use, right?

3    **A.**  Well, it is not that I don't care, it's that I was not

4    asked to investigate that.

5    **Q.**  Okay.  So you weren't asked, and you didn't do it.

6    **A.**  I did not do that, correct.

7    **Q.**  So your surveys do not answer the question of whether

8    someone's willingness to use a different device might depend

9    on the circumstances, correct?

10   **A.**  That is correct.

11   **Q.**  And your surveys did not assess what respondents would do

12   in response to any set of circumstances, correct?

13   **A.**  Correct.

14   **Q.**  All right.  Are you aware -- did you listen to any of

15   Professor Lafontaine's testimony?

16   **A.**  No, I did not.

17   **Q.**  Okay.  So you're not aware that Professor Lafontaine

18   testified that she understood your survey to address

19   consumers' access to and ownership of devices that support

20   game transactions?

21   **A.**  I'm not aware of that.

22   **Q.**  Okay.  Your survey is about usage, not ownership,

23   according to you, right?

24   **A.**  That is correct.

25   **Q.**  You reminded me of that a couple of times during our

HANSSENS – CROSS / MOSKOWITZ

1    deposition together, right?

2    **A.**   Probably.

3    **Q.**   All right.  So if Professor Lafontaine says that your

4    survey is about ownership, that is wrong, right?

5    **A.**   That is not correct, yeah.

6    **Q.**   You concluded that 81 percent –– these are not numbers

7    that were on your slides, but they are in your written

8    direct –– 81 percent of iOS App Store users and 94 percent

9    of the iOS *Fortnite* players had regularly used at least one

10   type of other electronic device not manufactured by Apple in

11   the last 12 months, right?

12   **A.**   There is a lot packed in that question.  81 –– could you

13   repeat it?  There's a lot of information there.

14   **Q.**   Yes.  I'll help you out.

15       Your written direct should be in your binder, and I'll

16   point you to paragraphs 16 and 17 when you can get there.

17   **A.**   I'm there.

18   **Q.**   Okay.  So in those two bullets –– and I'm combining

19   them –– 81 percent of iOS App Store users and 94 percent of

20   iOS *Fortnite* players had regularly used at least one type of

21   other electronic device not manufactured by Apple in the last

22   12 months, right?

23   **A.**   That is correct.

24       **MS. MOSKOWITZ:**   Okay.  So I'm going to ask for

25   PDX0003.3 to be put up on the screen here, please.

1   **BY MS. MOSKOWITZ:**

2   **Q.**  So Professor Lafontaine, in her written direct and opening

3   report, again spoke about your surveys.

4        You've never seen those documents --

5              **THE COURT:**  Ms. Moskowitz, can you slow down, please?

6              **MS. MOSKOWITZ:**  Absolutely.  Sorry, Your Honor.

7   **BY MS. MOSKOWITZ:**

8   **Q.**  You have never seen either of those documents before,

9   right, Professor Lafontaine's written direct or her report?

10  **A.**  That's correct, I have not seen these.

11  **Q.**  Okay.  And Professor Lafontaine, in her written direct,

12  says, "Most iPhones users have access to other devices."

13       Do you see that?

14  **A.**  Yes.

15  **Q.**  And in her report, that second bullet, she refers to the

16  same numbers I just referred to from your report, 81 percent

17  and 94 percent, right?

18  **A.**  I see that.

19  **Q.**  And the way she describes it, she says those individuals,

20  quote, regularly access non-iOS devices, et cetera.

21       Do you see that?

22  **A.**  I do.

23  **Q.**  All right.  But when we look at your language that we just

24  saw in your written direct, you describe those numbers as

25  individuals who had regularly used in the last 12 months those

HANSSENS – CROSS / MOSKOWITZ

1   other devices, right?

2   **A.**   Well, yes, because it's the last 12 months, yeah.

3   **Q.**   Right.  So it is not the current tense.

4   **A.**   It's -- the current is included, but also the history,

5   yeah.

6   **Q.**   Right.  So it is not exclusively current.

7   **A.**   Not necessarily, yeah.

8   **Q.**   Okay.  And you also didn't use the word "access" in your

9   survey, right?

10  **A.**   I used the word "availability" --

11  **Q.**   Right.

12  **A.**   -- yeah.

13  **Q.**   So she, Professor Lafontaine, dropped the "in the last 12

14  months" when she described your survey, right?

15  **A.**   I'm just rereading that sentence.

16  **Q.**   Yes.

17  **A.**   That time window is dropped.

18  **Q.**   And removing "the last 12 months" when you describe

19  "regularly use" leaves that term open to interpretation and

20  ambiguous, in your view, correct?

21  **A.**   That, I would have to study.  I'm not sure.  I can't

22  really answer that question "yes" or "no."

23  **Q.**   Okay.  Do you remember answering it in your deposition?

24  **A.**   No.

25  **Q.**   Okay.

1          **MS. MOSKOWITZ:**  Your Honor, I believe you should have

2     the transcript.

3          **THE COURT:**  I do.

4          **MS. MOSKOWITZ:**  It is Page 131, lines 20, through

5     132, line 8.

6          **THE COURT:**  Okay.  You just need to read the whole

7     answer.

8          **MS. MOSKOWITZ:**  Yes, ma'am.

9     BY MS. MOSKOWITZ:

10    **Q.**  Professor Hanssens, do you recall being asked the

11    following question and giving the following answer at your

12    deposition?

13          "Question:  But if you just read someone saying that

14          they concluded that 81 percent of iOS App Store

15          users regularly use other devices, would you

16          understand that to mean in the last 12 months or

17          something other than that?

18          "Answer:  The way that you have now framed this, I

19          would -- I would interpret that as being subject to

20          interpretation, you know.  So what do you mean by

21          'regularly use,' okay?  Today?  Tomorrow?  Last week?

22          Et cetera.  So, yeah, the English is fine, but the

23          interpretation is more ambiguous than what I had used

24          in my definition."

25          Did I read that correctly?

1    **A.**  Oh, I don't know, but I'll assume so.

2            **MS. MOSKOWITZ:**  All right.  I'm going to put up

3    another slide here.  This is Slide 26 from Apple's opening

4    statement demonstratives.  It should be .4 in our slides here.

5        Okay.  So maybe I will come back to it.

6    **BY MS. MOSKOWITZ:**

7    **Q.**  Were you -- did you listen in to the opening statements?

8    **A.**  I am sorry, whose opening statement?

9    **Q.**  Apple's.

10   **A.**  No, I did not.

11   **Q.**  Okay.  So if they described your survey results as saying

12   that 95 percent of -- yes, here it is.

13       I'm looking at Slide .4 here, and the top here is Apple's

14   opening slide.  It's a little tough to read, but it says:

15           "95 percent regularly used or could have regularly

16           used devices other than their iOS device."

17       Do you see that?

18   **A.**  I do.

19   **Q.**  So that left out the last 12 months, as well, right?

20   **A.**  Well, it refers to the past, but it does not mention the

21   12 months.

22   **Q.**  Right.  And as we discussed, it does not include the fact

23   that there might be individuals who do not currently use or

24   access other devices, right?

25   **A.**  That is a possibility.

1    **Q.**   In Slide 5 of your demonstratives, you reported that

2    92 percent of iOS app survey respondents and 97 percent of

3    iOS *Fortnite* survey respondents regularly used other

4    electronic devices in the last 12 months, right?

5    **A.**   Yes.

6    **Q.**   Okay.  And you also report in that same slide that

7    99 percent of both of those sets of respondents regularly used

8    other devices and had other electronic devices available for

9    regular use in the last 12 months, right?

10   **A.**   It is an "or," regularly used or had it available.  I

11   guess -- yeah, agreed.

12   **Q.**   Okay.  Those are the same percentages that you report in

13   the summary of your opinions in your written direct,

14   paragraph 1, Opinion 1 and 2.

15       Does that sound familiar?

16   **A.**   My written direct?

17   **Q.**   Yes.

18   **A.**   I'm there.

19   **Q.**   Okay.  Did I accurately summarize what you said there?

20   That was a reference to that paragraph, right?

21   **A.**   Yes, I see it.  Yes, I agree.

22   **Q.**   And all of those figures, the ones I just read out and the

23   ones that were in your Slide 5, actually include other

24   electronic devices that are still iOS devices, right?

25   **A.**   I am sorry, I'm a little confused now.  The other --

1    **Q.**   The 92 percent --

2    **A.**   Yeah.

3    **Q.**   -- and the 97 percent and the 99 percent on both include

4    other electronic devices that are still manufactured by Apple.

5    **A.**   Ah, that are still manufactured by Apple, yes.

6    **Q.**   Right.  Okay.

7        You also put up a Slide 6 about the percentage of survey

8    respondents -- *Fortnite* survey respondents that play digital

9    games on other electronic devices.

10       Do you recall that?

11   **A.**   Yes.  Where --

12   **Q.**   Slide 6 of your demonstratives, which may be -- I think

13   you still have that binder if you need it.

14       There it is.  It is on the screen.

15       That look familiar?

16   **A.**   It does.

17   **Q.**   Okay.  So for -- just to be clear, you -- when you gave

18   the survey to individuals, on the gaming consoles in

19   particular, you didn't ask respondents whether they actually

20   used those devices to play games, right?

21   **A.**   That's correct.

22   **Q.**   Instead, you implicitly assumed that respondents who

23   regularly use a console use the device to play games.

24   **A.**   Just one second.

25       If they regularly used the console and they are a *Fortnite*

HANSSENS – CROSS / MOSKOWITZ

1  player, right?

2  **Q.**  They are an iOS *Fortnite* player through your screening.

3  **A.**  Correct.

4  **Q.**  Yes?

5  **A.**  Correct, yeah.

6  **Q.**  Okay.

7  **A.**  Then I assume that they used the console for games, fine,

8  but that doesn't stick to other uses.

9  **Q.**  Right.  But you assume that they play games.  You don't

10  know one way or the other whether they just used it to watch

11  Netflix, for example.

12  **A.**  That's correct.

13  **Q.**  Okay.  And you are aware that, in fact, consoles can be

14  used to watch Netflix, for example.

15  **A.**  So I'm told.

16  **Q.**  So you cannot actually swear under oath that 94 percent of

17  all of those respondents actually played digital games on all

18  of the other devices included in your survey, correct?

19  **A.**  I am sorry.  Could you repeat that?

20  **Q.**  We just established that some of the respondents of the --

21  using consoles may not have played games on those consoles.

22      You cannot tell me one way or the other whether they did,

23  correct?

24  **A.**  Unlikely, but okay.

25  **Q.**  Unlikely based on what?  You didn't test that in your

1  survey, did you?

2  **A.**  Well, look, it's -- I did not test it because these

3  consoles are designed specifically --

4  **Q.**  Because you --

5  **A.**  -- for game playing.

6  **Q.**  -- assumed it, right?

7  **A.**  I am sorry?

8  **Q.**  You assumed it.

9  **A.**  Yes.

10  **Q.**  Okay.  You didn't test it.

11  **A.**  Correct.

12  **Q.**  All right.  So you can't tell me how many of that

13  94 percent did or did not play games on those other devices,

14  right?

15  **A.**  But the question is about playing digital games --

16  **Q.**  But you didn't ask playing digital games for all of the

17  individuals who used consoles.  You didn't ask that question,

18  did you?

19  **A.**  I am sorry.  I'm confused about the breakdown here.

20      So it's those who report that they have a game console.

21  That's the subset now?

22  **Q.**  Included in your 94 percent are individuals who had

23  regularly used or had available for regular use consoles.

24  **A.**  That is correct.

25  **Q.**  And you didn't ask that set of individuals what they use

1    those consoles for.

2    **A.**  That is correct.

3    **Q.**  So you can't tell me whether the portion of that

4    94 percent that were -- owned or used consoles actually played

5    games on those consoles.

6    **A.**  Oh, okay.  No, I don't know that.

7    **Q.**  Okay.  Let's talk about "regularly."

8        You understood -- I think you mentioned this on direct --

9    that one person could use regularly in the sense of daily,

10   others could use weekly, et cetera, right?

11   **A.**  Correct.

12   **Q.**  You agree that if a term is vague or ambiguous, it can

13   correct confusion or guessing among respondents, correct?

14   **A.**  If a term is vague and ambiguous, it can do that, yes.

15   **Q.**  And you agree that clarity problems can arise when not all

16   respondents interpret a question the same way, right?

17   **A.**  Those can arise, yes.

18   **Q.**  You agree that vague wording can introduce error into your

19   responses, right?

20   **A.**  It can, yes.

21   **Q.**  It is important to try to avoid error in responses, would

22   you agree?

23   **A.**  I agree.

24   **Q.**  And you were trying to do that in your survey?

25   **A.**  I was.

HANSSENS – CROSS / MOSKOWITZ

1   **Q.**  You asked respondents about the devices that they

2   regularly use.

3       We just talked about that, right?

4   **A.**  I did.

5   **Q.**  But you did not provide respondents a definition of

6   "regular use," right?

7   **A.**  That is correct.

8   **Q.**  And you left it up to the individual, as we just

9   discussed, to answer whether they thought it was regular or

10  not, right?

11  **A.**  Yes.

12  **Q.**  You recall one of your pretest participants indicated that

13  they, quote, thought regular use was vague, end quote, right?

14  **A.**  In Question 1, I believe, yes.

15  **Q.**  And they indicated that "regular use" could mean different

16  things for different devices, right?

17  **A.**  That is correct.

18  **Q.**  And you did not probe into pretest respondents'

19  interpretation of the word "regularly," right?

20  **A.**  You mean respondent by respondent, probing what they mean?

21  That's -- those -- there are some of the respondents in the

22  pretest who spelled that out.

23  **Q.**  Right.

24  **A.**  And so that's kind of a partial yes, partial no.

25  **Q.**  Okay.  Well, so you had a set of questions for these

1    pretest interviews, right?

2    **A.**   Yes.

3    **Q.**   The interviewers asked these questions exactly as they

4    appeared, right?

5    **A.**   That is correct.

6    **Q.**   They were not allowed to go off script and ask any

7    follow-up questions, correct?

8    **A.**   Probably not.

9    **Q.**   No, definitely not, right?

10   **A.**   Well, I listened in, and in all conversations, sometimes

11   something needs to be repeated or something like that.  So

12   there is some ambiguity there.  But let's say in principle,

13   no.

14   **Q.**   Other than repeating a question if someone glitched on the

15   Zoom, they were -- those interviewers were sticking to the

16   script, correct?

17   **A.**   I agree with that.

18   **Q.**   Let's take a look at a slide here that we put together

19   which has a set of respondents from your pretest results for

20   the iOS app survey.

21        Can you read -- I definitely don't think you can read the

22   left, but we have pulled out some on the right.  Can you read

23   what is on the right?

24   **A.**   Yes, if you give me a minute.

25   **Q.**   I am just making sure you can see the words, not that you

HANSSENS – CROSS / MOSKOWITZ

1   have to read it all.

2   **A.**   Okay.

3   **Q.**   In your survey pretest, you asked, "Did you have any

4   problems understanding what is meant by the phrase 'regularly

5   used'?" right?

6   **A.**   Yes.

7   **Q.**   And do you recall that five out of six respondents

8   described regular use in terms of frequency of use?

9   **A.**   Yes.

10  **Q.**   And they actually gave varying frequencies, right?

11  **A.**   Varying frequencies, yes.

12  **Q.**   And so you do not know how often respondents were using

13  the devices and considering that usage regular, right?

14  **A.**   That is correct.

15  **Q.**   And you agree that an individual who does not use gaming

16  consoles, for example, except once a year they use the Xbox

17  when their family comes to visit, that could be regular use,

18  right?

19  **A.**   I'm sorry.  Are you saying that could be regular use?

20  **Q.**   Could be.

21  **A.**   I would say unlikely, but technically or theoretically

22  possible.

23  **Q.**   It could be regular, right?  It is up to the respondent,

24  right?

25  **A.**   You said once a year, right?

1    **Q.**   Yes.

2    **A.**   And my window is 12 months, so it would be once.

3    **Q.**   And it would be regular use, correct?

4    **A.**   I'm just going to say unlikely, but possible.

5    **Q.**   It's a repetitive activity, so you would leave it up to

6    that individual to answer if that is regular or not, right?

7    **A.**   That is correct.

8    **Q.**   Okay.  And you don't know, from looking at your responses,

9    whether someone within those respondents considered a

10   once-a-year device to be regular use, right?

11   **A.**   Well, that -- see, that is why I said unlikely, because if

12   the window is --

13   **Q.**   You don't know it, sir, right?  You can't tell from your

14   respondents, right?

15   **A.**   So I am going to answer your question.  It is --

16   **Q.**   No, you're going to -- I am just -- I'm asking --

17        **THE COURT:**  So the way this works -- have you ever

18   testified in court?

19        **THE WITNESS:**  Yes.

20        **THE COURT:**  Okay.  She gets to ask her question; you

21   need to answer her question.

22        **THE WITNESS:**  Yeah, okay.

23        **THE COURT:**  Your attorney will get up and let you

24   expand.  It is --

25        **THE WITNESS:**  Okay.

1          **THE COURT:**  -- not as if I'm new to this process

2    either.

3         Go ahead.

4    **BY MS. MOSKOWITZ:**

5    **Q.**  You do not know, from looking at your responses that you

6    got, whether someone considered a once-a-year device to be

7    regular use, correct?

8    **A.**  Okay.  Okay.  I mean correct.

9    **Q.**  Correct.

10        We talked about the example that you provided for

11   "available to use" a little bit, including the friend, right?

12   **A.**  Yes.

13   **Q.**  And you did not ask in your pretest a specific question as

14   to whether respondents thought the term "available to use" was

15   clear, right?

16   **A.**  I would have to take a look at the exact pretest

17   questions.  If there was a problem, they certainly could have

18   stated it.  But I may not have asked it specifically.

19   **Q.**  You did not ask it specifically, correct?

20   **A.**  Okay.  Yes.

21   **Q.**  You also did not ask respondents in your pretest if they

22   thought the example you provided for "available to use" was

23   clear, correct?

24   **A.**  That is correct.

25   **Q.**  And in response to the general question of whether any of

1    the questions were unclear, one respondent did, in fact,

2    indicate that they thought "available to use" was vague,

3    right?

4    **A.**  One said that, yes.

5    **Q.**  And you agree, again, just so we are clear, "available

6    to" -- "available to regularly use" includes devices that an

7    individual has never used, right?

8    **A.**  I am sorry.  I lost you on the question.  Can you repeat,

9    please?

10   **Q.**  Sure.  You agree that "available to regularly use"

11   includes devices that the individual has never used.

12   **A.**  That is, of course, a possibility.

13   **Q.**  And, for example, an old model of a phone sitting in a

14   desk drawer that is not used would qualify as available,

15   right?

16   **A.**  If the phone works, then yes.

17   **Q.**  You agree that the quality of respondents' answers depend

18   on their understanding of the survey questions, right?

19   **A.**  I do.

20   **Q.**  And if a pretest reveals that respondents do not

21   understand a question, you, as the survey designer, need to

22   resolve that problem, right?

23   **A.**  I agree.

24   **Q.**  And it's your opinion that surveys should be revised if

25   pretest respondents do not understand a question, right?

1    **A.**  Among other reasons, yes.

2    **Q.**  And it would be a highly unusual occurrence where a survey

3    does not need to be revised if pretest respondents do not

4    understand the questions being asked, correct?

5    **A.**  That seems fair.

6    **Q.**  You did not revise your questionnaire at all based on any

7    of your pretest responses, correct?

8    **A.**  That is correct.

9    **Q.**  You asked respondents in the screening questions to

10   identify the operating systems of the smartphones or tablets

11   that they had used in the last 12 months, correct?

12   **A.**  Yes.

13   **Q.**  And you included three smartphone and tablet operating

14   systems as options:  Apple iOS, Android, and Microsoft

15   Windows, right?

16   **A.**  I did.

17   **Q.**  You didn't do -- well, let's just take a step back.

18       You didn't do any focus groups or qualitative research

19   before you started designing your survey, right?

20   **A.**  No focus groups, that is right.

21   **Q.**  And so you didn't do any interviews or focus groups to try

22   to understand how people think about or talk about issues that

23   you were going to be presenting in your survey, right?

24   **A.**  That's fair.

25   **Q.**  And so you did not explore, before drafting your survey,

HANSSENS – CROSS / MOSKOWITZ

1    whether people think about devices that they use in terms of

2    the operating system, for example.

3    **A.**   That's fair.

4    **Q.**   Professor Rossi did do qualitative research, by the way,

5    right?

6    **A.**   He did -- there was a phase before the survey, yes.

7    **Q.**   Right.  Qualitative research, focus group, that type of

8    thing.

9    **A.**   That sort of thing, yes.

10   **Q.**   You skipped that step-in part because you believe that

11   people understand the difference between a computer, a

12   smartphone, and a tablet, right?

13   **A.**   I do.

14   **Q.**   But you, yourself, don't know whether a Microsoft Surface

15   is a tablet or a laptop, even though you used to have one,

16   right?

17   **A.**   I believe it's both, but...

18   **Q.**   You couldn't decide which bucket that fell in, right?

19   **A.**   Well, it's both.  But -- it was.

20   **Q.**   Okay.  So in terms of -- if you were taking the survey,

21   you wouldn't really -- you would just click both boxes?

22   **A.**   I am sorry, click what?

23   **Q.**   If you were taking your own survey and you had a Microsoft

24   Surface, you would have clicked both for tablet and for PC?

25   **A.**   For tablet and for laptop --

1    **Q.**  Okay.

2    **A.**  –– yes.

3    **Q.**  You would check both?

4    **A.**  Yes.

5    **Q.**  Okay.  So you found –– let's talk about your results for a

6    second.

7         **MS. MOSKOWITZ:**  And I think I have a demonstrative

8    for this, as well, .7.

9                   (Displayed on screen.)

10   **BY MS. MOSKOWITZ:**

11   **Q.**  You found that 13 percent of iOS App Store users and

12   19 percent of the iOS *Fortnite* players regularly used a

13   Microsoft Windows smartphone in the last 12 months, correct?

14   **A.**  That is correct.

15   **Q.**  And when you add in the respondents who indicated that

16   they had available to regularly use a Microsoft Windows

17   smartphone, those percentages went up to 30 and 43 percent

18   respectively, correct?

19   **A.**  Yes.

20   **Q.**  And I think –– I wrote it down, but I can't find my

21   note –– I think you said that was somewhat surprising.

22        Is that the words you used in direct?

23   **A.**  That is possible.  That struck me as high, yes.

24   **Q.**  Yeah.  It strikes you as high, right?

25   **A.**  Yeah.

1    **Q.**  All right.  And that is based on what you know about the

2    real world, right?

3    **A.**  Just based on the fact that Microsoft has a small market

4    share in smartphones.

5    **Q.**  All right.  You know that Microsoft Windows smartphones

6    are no longer being sold, right?

7    **A.**  The Microsoft are being sold, but not --

8    **Q.**  Microsoft Windows --

9    **A.**  Oh, Windows.  I'm sorry.

10   **Q.**  -- smartphones are no longer being sold, correct?

11   **A.**  My mistake.  Yes.

12   **Q.**  Okay.  And you are aware that the Microsoft Windows

13   smartphones are no longer even being serviced, right?

14   **A.**  I am -- so I'm told, yeah.

15   **Q.**  And you are aware that as of 2018, Microsoft Windows

16   smartphones' market share was 0.15 percent?

17   **A.**  I'm told that, yes.

18   **Q.**  Ah, I found my note.  "Somewhat surprising."  I got it

19   right.  Yes?  You said that was somewhat surprising, these

20   results?

21   **A.**  Yes.

22   **Q.**  Okay.  So you got those results from your survey and you

23   looked at them, right?

24   **A.**  I did.

25   **Q.**  All right.  But you didn't do any comparison of any of

1  your results in terms of what operating systems people had

2  said they used or had available to use against any external

3  benchmarks for other devices, right?

4  **A.**  That is correct.

5  **Q.**  All right.  And in your opening report, you didn't do

6  anything to address these Microsoft Windows smartphones

7  results, right?

8  **A.**  That is correct.

9  **Q.**  You -- didn't concern you at all to see these results.

10  **A.**  Well, but -- no, I did not do anything.

11  **Q.**  All right.  You didn't acknowledge that there was anything

12  even somewhat surprising about these results when you wrote

13  your original opening report, right?

14  **A.**  That is not mentioned in the original report.

15  **Q.**  And you didn't look at Apple's own data to see if they had

16  any information that would say that your results had no basis

17  in reality, right?

18  **A.**  That is correct.

19  **Q.**  So you -- Professor Mathiowetz pointed this out to you in

20  her rebuttal report, right?

21  **A.**  She did.

22  **Q.**  All right.  And so that is when you then took a look at

23  this, right?

24  **A.**  Yes.

25  **Q.**  And the only thing that you did in your written direct

1    testimony to address this issue was a sensitivity analysis

2    that you described on direct?

3    **A.**   Yes.

4    **Q.**   And by that, we mean -- you mean you excluded all of the

5    respondents who indicated that they regularly used or could

6    have regularly used smartphones operating by a Windows

7    Microsoft operating system, right?

8    **A.**   That is correct.

9    **Q.**   And that, again, was done after Professor Mathiowetz

10   critiqued your results, right?

11   **A.**   Yes.

12   **Q.**   And so this sensitivity analysis or robustness check -- I

13   think I've seen both terms used; is that fair?

14   **A.**   That is correct.

15   **Q.**   All right.  What you did was to eliminate every single

16   respondent from your results who indicated Microsoft Windows

17   operating system.

18   **A.**   For smartphones?

19   **Q.**   Yes.

20   **A.**   Yes.

21   **Q.**   Okay.  So in the iOS app survey, that was 30 percent of

22   all of the respondents, right?

23   **A.**   Just one second, please.  On the availability criteria,

24   yes.

25   **Q.**   You excluded all 30 percent in your sensitivity analysis,

HANSSENS – CROSS / MOSKOWITZ

1   right?

2   **A.**   That one, yes.

3   **Q.**   Okay.  And for *Fortnite*, you excluded all 43 percent of

4   those respondents who indicated that, right?

5   **A.**   That's correct.

6   **Q.**   So just to do the numbers, your total number of

7   respondents to begin with for the iOS app survey was 500,

8   right?

9   **A.**   Yes.

10  **Q.**   So you eliminated 151 of those 500 respondents in this

11  analysis?

12  **A.**   In the bottom right scenario, yes.

13  **Q.**   In the top right?

14  **A.**   Oh, the top right.  I am sorry.

15  **Q.**   Yes.

16  **A.**   I wasn't following you.  Yes.

17  **Q.**   All right.  So for the iOS app survey, you removed 151

18  of your 500 respondents, right?

19  **A.**   Yes.

20  **Q.**   And for your iOS *Fortnite* survey, that started with 490,

21  right?

22  **A.**   Yes.

23  **Q.**   And so you removed 211 of the 490.

24  **A.**   Yes.

25  **Q.**   You can't rule out the possibility that some or all of the

1    remaining 349 iOS app survey respondents or the 279 iOS

2    *Fortnite* survey respondents were confused or unsure with

3    respect to these questions in the survey, right?

4    **A.**   That is a long question.  Let me think about this for a

5    minute.

6    **Q.**   Okay.

7    **A.**   On that subset of people --

8    **Q.**   Let me try a different question.

9    **A.**   Yeah, because --

10   **Q.**   Okay.

11   **A.**   Yeah.

12   **Q.**   You kicked those people out of your results for this

13   analysis, right?

14   **A.**   For this robustness check, yes.

15   **Q.**   But you can't tell me that the people you left in

16   understood those questions, right?

17   **A.**   But I cannot assume that of any question -- you can never

18   assume that of any question or answer of any question in any

19   survey.

20   **Q.**   Okay.

21   **A.**   It is all self-report.

22   **Q.**   All right.  Let's talk about -- a little bit about -- I

23   think I have a few minutes -- about Professor Rossi's survey

24   that you critiqued.

25        You critiqued Professor Rossi's use of a hypothetical,

1    right?

2    **A.**   The way he executed it, yes.

3    **Q.**   You agree that hypotheticals are regularly used in survey

4    research, right?

5    **A.**   They are --

6    **Q.**   And you, yourself --

7    **A.**   -- regularly used, yes.

8    **Q.**   And you, yourself, have used hypotheticals in your -- in

9    surveys, right?

10   **A.**   Yes.

11   **Q.**   And hypotheticals are appropriate when they are an

12   inherent part of the survey, right?

13   **A.**   Well, that's a rather vague term, but let me go along with

14   it.  Fine.

15   **Q.**   Yeah, I'm actually using your own words --

16   **A.**   Okay.

17   **Q.**   -- so I wouldn't have asked it that way, but I tried to

18   use your words.

19        Agree?

20   **A.**   Okay.  That's -- then I agree.

21   **Q.**   Okay.  Professor Rossi did a couple of external benchmark

22   checks.

23        Do you recall that?

24   **A.**   Yes.

25   **Q.**   We discussed those at your deposition?

1   **A.**   Yes.

2   **Q.**   I'm going to take a flier and see if maybe I can get you

3   to just agree to the punchline, and I don't know if you will.

4        You agree that Professor Rossi used the RVC data that he

5   used at the appropriate time in his survey process, right?

6        He compared it to the right population?

7   **A.**   What was the last thing you said?

8   **Q.**   He compared it to the right population?

9   **A.**   I can't really recall that.  I am sorry.  The population

10  part.  I clearly recall that test --

11  **Q.**   Okay.

12  **A.**   -- but I can't recall, as I sit here, what exactly that

13  population was.

14  **Q.**   All right.  Let me try.

15       So you critiqued it in your written direct by saying that

16  it didn't reflect the relevant target population because it

17  wasn't limited to the people who made at-issue purchases; it

18  was only limited to the iPhone users, right?

19  **A.**   If that is what it is, then fine, yes.

20  **Q.**   I am referring to your --

21  **A.**   I don't recall exactly.

22  **Q.**   -- critique, sir.

23  **A.**   Yeah, I understand, but I cannot recall the --

24            **THE COURT:**  That's fine.

25       Can you give me a paragraph number?  And let him finish

1    his answer, please.

2              **MS. MOSKOWITZ:**  Sure.  This is paragraph 59A.  Just

3    setting the table.

4              **THE COURT:**  All right.  Proceed, but let him finish.

5              **MS. MOSKOWITZ:**  Yep.

6    **BY MS. MOSKOWITZ:**

7    **Q.**  59A.  Are you there?

8    **A.**  Yeah, I'm there.

9    **Q.**  Oh, okay.  So that's your critique?

10   **A.**  Yes, I see it.

11   **Q.**  Okay.  And so the RVC data was not limited to at-issue

12   purchases, right?

13   **A.**  That is correct.

14   **Q.**  So Professor Rossi was correct not to compare his final

15   sample of at-issue purchasers against the RVC data, right?

16   **A.**  I'm not following you here, because --

17   **Q.**  All right.  It's okay.  I'll move on.

18   **A.**  Okay.

19   **Q.**  Apple transactional data.

20        You critiqued Professor Rossi's benchmark against Apple's

21   own transactional data?

22   **A.**  Is that in the same paragraph there or --

23   **Q.**  Do you recall doing this?

24   **A.**  I need a little help here --

25   **Q.**  All right.

HANSSENS – CROSS / MOSKOWITZ

1    **A.**   -- on the transactional data.

2    **Q.**   That's okay.  If you are not focused on it, we can do one

3    other thing and then I can sit down.

4        You talked about Professor Rossi's questions that you said

5    in your Figure 9 corroborate your results.

6        Do you remember that?

7    **A.**   Oh, yes.

8    **Q.**   Okay.  And Professor Rossi collected that data in a set of

9    screener questions, right?

10   **A.**   That is correct.

11   **Q.**   And he didn't use the word "regular" and he didn't use "in

12   the last 12 months," right?

13   **A.**   Correct.

14   **Q.**   And Professor Rossi wasn't generating any point estimates

15   from those results, right?

16   **A.**   Well, he does have percentages.  Those are point

17   estimates.

18   **Q.**   Well, you calculated the percentages, actually, didn't

19   you?

20   **A.**   Yes, I did.

21   **Q.**   Or did someone do that for you?

22   **A.**   Well, that was done as -- in the regular preparation, but

23   yes.  Okay.  I did that, I agree.

24   **Q.**   Okay.  So Professor Rossi didn't report any point

25   estimates on this, correct?

1    **A.**  Not that I recall.

2    **Q.**  All right.

3        **MS. MOSKOWITZ:**  Your Honor, I will pass the witness.

4        **THE COURT:**  Redirect.

5                    **<u>REDIRECT EXAMINATION</u>**

6    **BY MS. MOYE:**

7    **Q.**  Now, Professor Hanssens, you were asked about whether it

8    was proper to do hypothetical questions in a survey.

9        You recall that line of questioning?

10   **A.**  I do.

11   **Q.**  And, sir, was there something different about Professor

12   Rossi's use of hypothetical that caused you concern?

13   **A.**  Something different from what?  I am sorry.

14   **Q.**  Well, the question you were asked was, is there a general

15   problem with using hypotheticals.

16       Do you remember that?

17   **A.**  Yes.

18   **Q.**  And did Professor Rossi, in your opinion, take the

19   appropriate approach to using a hypothetical question in his

20   survey?

21   **A.**  I see.  Okay.

22       Well, no.  I have already pointed out some specific

23   problems that I see with it.

24   **Q.**  Is it important, in doing a hypothetical question, that

25   you actually do a pretest, Professor Hanssens?

1   **A.**   Yes.

2   **Q.**   And did Professor Rossi do a pretest of his

3   backward-looking hypothetical price increase scenario survey

4   question?

5   **A.**   He did not.

6   **Q.**   And we talked earlier about an assessment that you did as

7   to whether that forward-looking to backward-looking change had

8   made an impact.

9       Do you recall that?

10  **A.**   I recall that.

11  **Q.**   And what was your conclusion based on that?

12  **A.**   Well, the main result is that the percent of the people

13  who -- I am sorry, this is on the forward versus backward --

14  is that it created more uncertainty around the question

15  because the number of people who say "I don't know" jumps from

16  4 to 10 percent as a result of that change.

17  **Q.**   Okay.  And let's talk about Microsoft.  You were asked a

18  lot of questions about the Microsoft questions in your survey.

19      Do you remember that?

20  **A.**   I do.

21  **Q.**   And did you do an assessment to determine whether any

22  possibility of confusion about the Microsoft Windows

23  smartphone had impacted your results?

24  **A.**   I did do that, yes.

25  **Q.**   And what did you conclude as a result of that assessment?

1   **A.**   That my conclusions remain the same.

2   **Q.**   And you were asked about a specific type of Microsoft

3   Windows phone.

4        Do you remember that?

5   **A.**   Yes.

6   **Q.**   Are you aware of whether or not Microsoft now has a

7   smartphone on the market?

8   **A.**   They have one on the market, or at least one.

9   **Q.**   So is it possible that those survey respondents could be

10  referring to this different Microsoft smartphone that is on

11  the market?

12           **MS. MOSKOWITZ:**   Objection.

13           **THE COURT:**   Overruled.

14  **BY MS. MOYE:**

15  **Q.**   You can answer, sir.

16  **A.**   Yes, that's quite possible.

17  **Q.**   Nevertheless, you did an assessment where you took out

18  those who referred to this different model of Microsoft phone;

19  is that correct?

20  **A.**   I did.

21  **Q.**   Thank you, sir.

22       And let's talk about ambiguity.  I'm going to try to get

23  the word out right.  And you were asked some questions about

24  whether "regularly used" was ambiguous.

25       You recall that line of questioning?

HANSSENS – REDIRECT / MOYE

1    **A.**  I do.

2    **Q.**  And, sir, is it your opinion that "regularly used" is

3    ambiguous in the context of your survey?

4    **A.**  It is not.

5    **Q.**  Could you tell us or describe for us again why you decided

6    not to include a definition of "regularly used" in your

7    survey?

8    **A.**  Well, there are two reasons for that.

9        First, because that is a very common English language

10   term; and, secondly, because I precisely wanted people to use

11   interpretives for what is relevant to them for a particular

12   device.

13       So if they use their smartphone daily but they use their

14   laptop only weekly, that is totally fine by me.  I recognize

15   that.  I did not want to impose a certain frequency cycle on

16   them, so I let them interpret it.

17       And I'm really only after identifying the device that they

18   associate with regular use, and that regular use could be

19   daily, weekly, monthly.  Those are all acceptable.

20   **Q.**  Thank you, sir.

21       And you were asked about frequency of use.

22   **A.**  Yes.

23   **Q.**  Would it, in your opinion, Professor Hanssens, have been

24   appropriate for you to define "regular use" with reference to

25   a specific frequency of use in your survey?

1  **A.**  No.

2  **Q.**  And can you explain why not?

3  **A.**  Well, that is related to what I said a minute ago, that if

4  you device –– I am sorry.  If you allow me to make an example.

5  I drink coffee regularly and I go to a certain dentist's

6  office four times a year.  Those are both regular, even though

7  their frequencies are totally different.

8      And so I specifically wanted respondents to respond in a

9  way that is relevant for them, not listening to some

10  instruction from me or any other researcher that says it must

11  be daily or it must be weekly.

12  **Q.**  Let me go back to Microsoft for a moment and ask, once you

13  excluded the respondents that referred to this particular

14  brand of Microsoft phone, was the sample size still

15  representative?

16  **A.**  It was still sufficient for me to draw an inference, yes.

17  **Q.**  So you had no problems with the size of the sample once

18  those respondents were eliminated?

19  **A.**  No, that is correct.

20  **Q.**  You were asked a lot of questions about whether you asked

21  respondents who said they have game consoles whether they play

22  games on their game consoles.

23      Do you remember that line of questioning?

24  **A.**  I do remember that, yes.

25  **Q.**  And can you explain to the Court why you didn't feel it

HANSSENS – REDIRECT / MOYE

1  necessary to ask those who had game consoles whether they play

2  games on their game consoles?

3  **A.**  Well, that's because these consoles are designed for

4  playing games, and I didn't want to cause, you know, confusion

5  by asking sort of the obvious, since I do ask about other

6  devices.  So it's just because these consoles are specifically

7  designed for game playing.

8  **Q.**  And you were asked a question -- and I think there was a

9  reference made to your written direct -- about whether you

10 included iOS devices in your definition of "other electronic

11 devices," and I think there may have just been some confusion

12 on counsel's part.

13    So can we just turn to your written direct really

14 quickly --

15 **A.**  Sure.

16 **Q.**  -- and have you explain to the Court what was included in

17 your definition of "other electronic devices."

18    Look at page 2, Footnote 2.  And can you tell us, what is

19 the definition of "other electronic devices" in your written

20 direct?

21 **A.**  Yes.  If you don't mind, I will just refer to Footnote 2.

22 It's smartphones and tablets other than iOS, and then it's

23 computers, gaming consoles, and handhelds.

24 **Q.**  Thank you, sir.

25    So it did include computers manufactured by Apple; is that

1    correct?

2    **A.**   Oh, it does, yes.

3    **Q.**   But it did not include other iOS devices; is that right?

4    **A.**   That's correct.

5    **Q.**   Thank you.

6         You were asked a series of questions about

7    Dr. Lafontaine's testimony.  And you were asked, I think,

8    specifically whether you could determine whether one sentence

9    in her testimony was ambiguous as a result of leaving out the

10   phrase "last 12 months."

11        Do you remember that?

12   **A.**   I do remember that.

13   **Q.**   And, sir, have you reviewed Dr. Lafontaine's testimony?

14   **A.**   I have not.

15   **Q.**   Have you reviewed her written direct?

16   **A.**   I have not.

17   **Q.**   Have you reviewed her deposition testimony?

18   **A.**   No.

19   **Q.**   Do you feel that you are in a position to determine

20   whether one sentence in her testimony, her written direct, or

21   her deposition was ambiguous because three words were left

22   out?

23             **MS. MOSKOWITZ:**  Objection.

24             **THE WITNESS:**  I am not in that position.

25             **THE COURT:**  The objection is overruled.

**BY MS. MOYE:**

**Q.** You were also asked whether you had spoken to Apple's other experts before you did your survey work.

Do you remember that?

**A.** Yes.

**Q.** And, specifically, I think you were asked about Dr. Lafontaine.

**A.** Yes.

**Q.** Is there a possibility that in speaking to another about the outcome, you could influence the design of a survey?

**A.** Is there a possibility?

**Q.** Let me ask it a different way.

**A.** Yeah.

**Q.** Do you believe it would have been appropriate for you to speak to Dr. Lafontaine or Apple's other experts to determine how they may use your data before doing your survey work?

**A.** No, that would not be appropriate.

**Q.** And why is that not appropriate, sir?

**A.** Well, because I -- what I need to do and have done is do an independent survey, with the emphasis on independence. I'm listening to the task. A certain task is given. If I feel competent to execute on that task, I accept the engagement, but I have no external influences on the subsequent use of that work.

**Q.** Thank you, sir.

1       And you were asked a series of questions about

2   substitutions and whether you did substitutability analysis.

3       Do you remember that?

4   **A.**  I do.

5   **Q.**  And, sir, do you believe your survey results are relevant

6   to an assessment of whether consumers can substitute between

7   devices?

8   **A.**  Yes, my results are.

9   **Q.**  And can you explain why?

10  **A.**  That's because of the availability question.

11          **MS. MOSKOWITZ:**  Objection.

12          **THE WITNESS:**  May I --

13          **THE COURT:**  Hold on.

14          **THE WITNESS:**  I'm sorry.

15          **THE COURT:**  What is the objection?

16          **MS. MOSKOWITZ:**  Foundation, given what he said on

17  cross and just now.

18          **THE COURT:**  Is this in his report?

19          **MS. MOYE:**  Yes, it is, Your Honor.

20          **THE COURT:**  Overruled.

21          **MS. MOSKOWITZ:**  Your Honor, it is not.  He does not

22  discuss substitution at all.  The word does not appear, and he

23  just testified on cross he didn't do it and it's not useful

24  for that.

25          **THE COURT:**  Okay.

1    **MS. MOYE:**  The question --

2    **THE COURT:**  Give me a paragraph.

3    **MS. MOYE:**  I am sorry?

4    **THE COURT:**  Give me a paragraph in his report if he

5    has already opined on this.

6    **MS. MOYE:**  I will move on.  I'll rephrase the

7    question.

8    **THE COURT:**  All right.

9    **BY MS. MOYE:**

10   **Q.**  Did your survey determine whether consumers had other

11   devices that they regularly used?

12   **A.**  Yes.

13   **Q.**  Is regular use of a device relevant at all to whether a

14   consumer could substitute for that device?

15   **MS. MOSKOWITZ:**  Objection.

16   **THE COURT:**  Yeah, if he doesn't use the word

17   "substitution," it is what it is, and the Court will evaluate

18   the data and determine whether or not it has any impact.

19   **MS. MOYE:**  Yes, Your Honor.  I believe he did, but we

20   won't take the time to find it now because I don't have the

21   paragraph in front of me.

22   **BY MS. MOYE:**

23   **Q.**  You were also asked about whether you were an expert in

24   general surveys versus marketing surveys.

25       Do you remember that?

HANSSENS – RECROSS / MOSKOWITZ

1    **A.**  I think the question was about general.

2    **Q.**  Yes.

3        And what is the difference between a general survey versus

4    a marketing survey?

5    **A.**  The difference is the area of application.  So, for

6    example, let's say designing surveys on employee satisfaction

7    in a company.  That would be in the field of human resource

8    management, which is different from marketing, and so that

9    would be outside my expertise.

10       But if it is a marketing issue, then I feel totally

11   confident doing survey work in that area.

12   **Q.**  And what kind of survey work were you doing here, general

13   survey work or marketing survey work?

14   **A.**  Definitely marketing.

15           **MS. MOYE:**  Thank you, Your Honor.  Pass the witness.

16           **THE COURT:**  Recross.

17                      **RECROSS-EXAMINATION**

18   BY MS. MOSKOWITZ:

19   **Q.**  Professor Hanssens, you do not use the word "substitute"

20   anywhere in your survey, correct?

21   **A.**  In the survey?

22   **Q.**  Correct.

23   **A.**  No, I don't think so.

24   **Q.**  And you don't use it anywhere -- anywhere -- in your

25   written direct, correct?

HANSSENS – RECROSS / MOSKOWITZ

1  **A.**  Best -- to the best of my knowledge or my recollection,

2  no.

3  **Q.**  It's -- sorry.  "No" meaning I am right, that the word

4  "substitute" or "substitution" is not used in your written

5  direct?

6  **A.**  To the best of my recollection, you're right.

7  **Q.**  And I just want to understand, is it your testimony that

8  it is not part of your job as a survey designer to have any

9  understanding as to how it might be used so that you can

10  understand if you are asking the right question?

11  **A.**  No, I don't need to know that.

12  **Q.**  Okay.  So let's just talk very briefly about the Microsoft

13  results.

14      You said -- you were asked whether you did an assessment

15  to see if the Microsoft results indicated possible confusion.

16      You remember that question on redirect?

17  **A.**  Well, I'm not sure if it is confusion, but it may be that

18  some of the answers were inaccurate for some reasons that

19  we've discussed.

20  **Q.**  All right.  But just so we are on the same page, the only

21  assessment you did in any way, shape, or form was to remove

22  all of the respondents who did indicate Microsoft Windows,

23  right?

24  **A.**  Correct.

25  **Q.**  That is the assessment you did.

HANSSENS – RECROSS / MOSKOWITZ

1    **A.**   That is the assessment.

2    **Q.**   You didn't actually assess anything about the

3    understanding of the remaining respondents, correct?

4    **A.**   That is correct.

5    **Q.**   Okay.  And, again, your survey showed 30 to 43 percent of

6    Microsoft Windows operating system smartphone availability or

7    use, right?

8    **A.**   I am sorry, that was a long statement.  Could you repeat

9    that, please?

10   **Q.**   Your survey showed between 30 and 43 percent across the

11   two surveys use or access to Microsoft Windows smartphones?

12   **A.**   Yes.

13   **Q.**   And you -- remember we talked about this -- the actual

14   market share three years before your survey was done was 0.15

15   percent.

16   **A.**   That is my understanding.

17   **Q.**   And you really think that removing people who, on the

18   order of 30 to 43 percent, thought that they regularly used or

19   had access to those phones was going to be sufficient to solve

20   the problems?

21   **A.**   Yes.

22         **MS. MOSKOWITZ:**  No further questions, Your Honor.

23         **THE COURT:**  Any redirect on those three topics?

24         **MS. MOYE:**  No questions, Your Honor.

25         **THE COURT:**  All right.  Professor, you are excused.

1    Thank you very much.

2              **THE WITNESS:**  Thank you.

3              **THE COURT:**  Next witness.

4              **MR. DOREN:**  Your Honor, Apple calls James

5    Malackowitz –– sorry, Malokowski.  My apologies, Your Honor.

6         Your Honor, while we are waiting, I just wanted to note

7    for the record that Mr. Schiller has been here all week, as

8    well, though Your Honor's comfort with his presence I think

9    has led to him being overlooked in the morning greetings.

10             **THE COURT:**  Good morning, Mr. Schiller.  I am sorry

11   about that.  I'm trying to remember the lawyers' names.

12        Ms. Moskowitz, can you get the binders?  Do you have

13   binders up here?

14             **MS. MOSKOWITZ:**  I will retrieve.

15             **THE COURT:**  Good morning.  If you will take the stand

16   and just remain standing.

17        (**JAMES EDWARD MALACKOWSKI**, called as a witness for the

18   Defendant, having been duly sworn, testified as follows:)

19             **THE WITNESS:**  I do.

20             **THE CLERK:**  Please be seated.  And then if you will

21   be sure that microphone is underneath the shield, and then

22   please state your full name and spell your last name.

23             **THE WITNESS:**  James Edward Malackowski,

24   M-A-L-A-C-K-O-W-S-K-I.

25             **MR. DOREN:**  Your Honor?

1          **THE COURT:**  Mr. Doren, you may proceed.

2      I was just looking at your name.  My college roommate was

3  Churnikowski (phonetic).

4          **THE WITNESS:**  Ah.

5          **MR. DOREN:**  Thank you, Your Honor.

6                     <u>**DIRECT EXAMINATION**</u>

7  BY MR. DOREN:

8  **Q.**  Good morning, Mr. Malackowski.

9  **A.**  Good morning, sir.

10  **Q.**  Where are you currently employed?

11  **A.**  I'm the chief executive of Ocean Tomo, LLC, headquartered

12  in Chicago.

13  **Q.**  Thank you, sir.

14      And for initial purposes, could I ask you to look to the

15  binder I just handed you under the tab which refers to your

16  written direct testimony.

17      And is this written direct testimony that you wrote, sir?

18  **A.**  It is.

19  **Q.**  And is it true and accurate?

20  **A.**  It is.

21  **Q.**  And are there any changes that you would like to make to

22  that testimony here this morning?

23  **A.**  No, sir.

24          **MR. DOREN:**  Your Honor, I would move to admit, on the

25  same conditions as all other expert written directs,

1    Mr. Malackowski's written direct testimony.

2              **THE COURT:**  Who is doing cross?

3              **MS. MOSKOWITZ:**  Oh, I am sorry.  It is Ms. Moskowitz.

4        No objection, Your Honor.

5              **THE COURT:**  And no objection to the four exhibits on

6        Docket 684?

7              **MS. MOSKOWITZ:**  That's right, Your Honor.  We

8        reserved -- we handled what we needed to handle on

9        reservations there.

10             **THE COURT:**  Okay.  So those are admitted.

11             **MR. DOREN:**  Thank you, Your Honor.

12   **BY MR. DOREN:**

13   **Q.**  Mr. Malackowski, can you please tell us the professional

14   path that brought you to your current position?

15   **A.**  Yes, sir.

16       So following undergraduate business program, I went to

17   Chicago and worked for a consultancy that was focused on

18   litigation damages.  And it was right after the Federal

19   Circuit was created, so I began to focus on patent damages.

20       After about three years, I saw an opportunity to move into

21   patent intellectual property valuation more broadly, as well

22   as strategy, so I actually started at age 25 what was the

23   country's first intellectual property dispute accounting and

24   valuation boutique.  We were fortunate.  We grew to just under

25   300 before we sold it.

MALACKOWSKI – DIRECT / DOREN

1      I then moved into the private equity and venture capital

2 industry, learning how intellectual property drives value in

3 business.  And then 18 years ago, I started Ocean Tomo.

4 **Q.**  Thank you, sir.

5      And have you prepared some demonstratives for use here

6 today?

7 **A.**  Yes, sir.

8         **MR. DOREN:**  And if we can put those up, please.

9 **BY MR. DOREN:**

10 **Q.**  And looking at slide number 2, can you please provide the

11 Court with some additional information about some of your

12 professional activities.

13 **A.**  Yes.  So Ocean Tomo we just referred to.  Today, we have

14 about 65 professionals focused on IP valuation, IP strategy,

15 and investment banking.

16      Outside of my employment, I'm very active in the

17 professional industry, a group called LES, which you've

18 probably never heard of, but it is the world's largest

19 technology transfer professional association.  And I'm in a

20 number of leadership roles there.

21      With respect to my fiduciary positions, I have been an

22 active and numerous board member for a number of companies,

23 the most well known being Ford's intellectual property

24 management business, Ford Global Technologies.  I was the

25 independent director where we managed all of the IP for Ford,

1    Jaguar, Volvo, Aston Martin, Mazda, all of the related

2    entities at that time.

3        Academically, I enjoy teaching, and so I teach at my alma

4    mater and work with their venture and innovation community,

5    but I have taught at a number of programs across the country.

6        And then, lastly, I hold a number of certifications.  I'm

7    an accountant by training, so I am a CPA, but as relevant to

8    the issues here, I am also a certified licensing professional,

9    which is a CLP.

10   **Q.**  And can you tell us a little bit more, please, about what

11   area of licensing is the focal point of the certified

12   licensing professional designation?

13   **A.**  Yes.

14       The CLP designation reflects the area of technology

15   transfer and intellectual property transfer, largely through

16   license.  It is based upon a skill set related to valuation,

17   business law, contracts.

18   **Q.**  Thank you, sir.

19       And if you would please take a look at -- in your binder

20   at DX4876.

21       And do you recognize that document, sir?

22   **A.**  Yes, sir.  That is a copy of my professional résumé or CV.

23   **Q.**  Thank you.

24       **MR. DOREN:**  And, Your Honor, we would tender

25   Mr. Malackowski as an expert on intellectual property

1    licensing and portfolio analysis.

2            **MS. MOSKOWITZ:**  No objection.

3            **THE COURT:**  Admitted.

4    **BY MR. DOREN:**

5    **Q.**  Mr. Malackowski, have you testified previously as an

6    expert witness?

7    **A.**  Yes.  Of the many cases I've worked on, I have sat in a

8    chair like this in District Court, State Court, International

9    Trade Commission, Bankruptcy Court, more than 50 times.

10   **Q.**  And have you appeared before this very Court before, sir?

11   **A.**  I have.  Your Honor may not recall, but I testified in the

12   *Netlist versus Diablo* case, which was just over five years

13   ago, I think.

14           **THE COURT:**  Well, I remember the case.  I do not

15   remember you, so....

16           **THE WITNESS:**  The case is --

17           **MR. DOREN:**  Well, we will try to make him more

18   memorable today, Your Honor.

19           **THE COURT:**  Well, that was a pretty memorable case,

20   but it was interesting for lots of other reasons.

21           **MR. DOREN:**  Thank you, Your Honor.

22   **BY MR. DOREN:**

23   **Q.**  And, Mr. Malackowski, have you previously worked for

24   Apple?

25   **A.**  I have.  I have testified at trial in one case on behalf

MALACKOWSKI – DIRECT / DOREN

1    of Apple related to patent infringement, and I have been a

2    consulting expert in a half a dozen other cases.

3    **Q.**   Thank you.

4         Now, in your experience, sir, and based on your training,

5    why, in your professional opinion, do companies invest in the

6    development of intellectual property?

7    **A.**   Well, at its core, intellectual property is a tool for

8    economic development.  And the U.S. Constitution itself

9    protects that tool by granting inventors or innovators a

10   limited period of exclusive rights.  And the whole purpose of

11   that is to encourage the investment that is necessary to

12   innovate.

13   **Q.**   And how do IP owners obtain a return on their investment

14   in intellectual property?

15   **A.**   Well, there's a continuum.  Most IP owners maintain those

16   rights as exclusive for their sole use and then use those

17   rights to compete in the marketplace.

18        At the other end of the continuum, there are owners who

19   will share those rights, and they are shared under an

20   intellectual property license to allow others to benefit from

21   their investment.

22   **Q.**   And then you mentioned there is a spectrum.

23        Are there various hybrid approaches in between?

24   **A.**   Yeah.  There is almost any endless list of hybrid

25   alternatives, and the IP owner has the opportunity to choose

MALACKOWSKI – DIRECT / DOREN

1  the path that's best suited for them.

2  **Q.**  And is it important for IP owners to have the right to

3  determine how their intellectual property will be used?

4  **A.**  Absolutely.

5  **Q.**  And why, sir?

6  **A.**  Well, ultimately, it comes down to that investment

7  decision and, really, business planning.  So if you are

8  running a business that requires innovation and investment to

9  innovate, you need to plan on that and the return that you can

10  expect to justify it.

11      If you lose control over your intellectual property

12  rights, you can no longer predict with any certainty what that

13  return will be.  And as a businessperson, you cannot justify

14  that decision and the business will no longer innovate.

15  **Q.**  And, sir, as part of your work, are there -- is there a

16  framework or any guidelines that you have considered regarding

17  the intersection between antitrust issues as they relate to

18  intellectual property licensing?

19  **A.**  Yes, there is.  That's referred to in my report.  It is

20  the DOJ FTC guidelines on antitrust matters, the same ones

21  that are used when we take the examination for the CLP.

22  **Q.**  And how do you -- how have you used those guidelines in

23  the course of your professional career?

24  **A.**  Well, those guidelines cover the fundamental interplay

25  between intellectual property and antitrust issues.  So for

MALACKOWSKI – DIRECT / DOREN

1    me, they come -- become relevant in two ways:  One in my

2    consultive or fiduciary capacity as a director for an

3    innovative company; and then, second, as an expert, I have

4    testified on matters related to intellectual

5    property-antitrust intersection, such as patent misuse,

6    step-downs under a Brulotte Rule, RAND compliance for license

7    agreements, a number of issues like that.

8         **MR. DOREN:**  And if we could please pull up DX3305.

9    **BY MR. DOREN:**

10   **Q.**  And, sir, do you recognize these to be the guidelines to

11   which you have referred?

12   **A.**  Yes, sir.

13        **MR. DOREN:**  And if we can please take a look at page

14   .007 to .008.  And if we can pull out, please, the paragraph

15   that begins with "Field of Use."

16   **BY MR. DOREN:**

17   **Q.**  Mr. Malackowski, is this one of the paragraphs or one of

18   the provisions of the guidelines that you cite in your report?

19   **A.**  It is.

20        And I won't read it, but, essentially, this reflects what

21   I have just described, which is this exclusivity associated

22   with intellectual property is what provides that incentive to

23   invest in innovation.  And it is important to protect that and

24   give the IP owner control over that opportunity.

25   **Q.**  Thank you, sir.

MALACKOWSKI – DIRECT / DOREN

1        And a bit over halfway down this paragraph, it states:

2            "The restrictions may do so, for example, by

3            protecting the licensee against free riding on the

4            licensee's investments by other licensees or by the

5            licensor."

6        Do you see that provision?

7   **A.**  I do.

8   **Q.**  And are you familiar with the concept of free riding?

9   **A.**  Yes, sir.

10  **Q.**  And what is that?

11  **A.**  Well, free riding, Your Honor, is actually when the

12  relationship between the inventor and the user breaks down.

13  There's no longer an agreed-upon contract or set of terms, and

14  so the free rider utilizes the invention without compensation

15  to the inventor.

16      And it breaks down because if that were permitted, then,

17  again, the inventor can't reasonably predict the return on

18  investment, so it can't reasonably and prudently invest in new

19  technology.

20          **THE COURT:**  Mr. Doren, can you tell me again where

21  you are?  I'm --

22          **MR. DOREN:**  Yes, Your Honor.  We're in your binder at

23  DX3305.  And these were not part of the stipulation.  They

24  were objected to as evidence, so that's why they are in the

25  binder we've handed up to you, if the Court was looking at the

1    stipulation.

2             **THE COURT:**  Okay.  Thank you.  I was on -- I had the

3    wrong exhibit.

4             **MR. DOREN:**  Thank you, Your Honor.

5    **BY MR. DOREN:**

6    **Q.**  And, Mr. Malackowski, have you taken these guidelines into

7    consideration in the course of your work in this case?

8    **A.**  Yes, in two ways:  One, in determining my affirmative

9    opinions that are reflected in the testimony; and, two, in my

10   review of the Epic Game expert work and opinions, I searched

11   high and low for their consideration of this interplay between

12   antitrust and intellectual property, and I found no mention of

13   intellectual property.

14   **Q.**  And just to be sure I'm clear on what you just said, sir,

15   did you review, for example, the expert testimony of

16   Dr. Evans?

17   **A.**  That was one example I referred to, yes.

18   **Q.**  And did you review or listen to the expert testimony here

19   in court of Dr. Athey?

20   **A.**  Yes, sir, it is another example.

21   **Q.**  And did you also read the written direct testimony of both

22   of those experts?

23   **A.**  I did.

24   **Q.**  And did you also read the written direct testimony of

25   Dr. Mickens?

MALACKOWSKI – DIRECT / DOREN

1  **A.**  That is a third example, yes, sir.

2  **Q.**  And did you also read or listen to the testimony here in

3  court of Dr. Mickens?

4  **A.**  Yes.  For all three, I've read or listened to their

5  testimony, reviewed their reports and their depositions.

6  **Q.**  And did any of the plaintiff's expert witnesses take into

7  account in any way this intersection between antitrust issues

8  and intellectual property rights?

9  **A.**  No, sir, not in any way.

10  **Q.**  And, Mr. Malackowski, what was your assignment in this

11  matter?

12  **A.**  Your Honor, my assignment was to, essentially, assess what

13  I call the innovation footprint for the Apple iOS ecosystem.

14  And by "innovation footprint," I am referring to the research

15  and development investment or commitment that was made, the

16  intellectual property that results, and the use of that

17  intellectual property either by Apple or by others through

18  license, including specifically Epic Games.

19  **Q.**  And for that end, sir, did you consider Apple's innovation

20  footprint as it relates to app developers and consumers?

21  **A.**  Yes, sir.

22  **Q.**  And did you also take into account Apple's IP ownership in

23  evaluating the issues in this case?

24  **A.**  Of course, very much as we discussed, understanding that

25  Apple would have control over their IP pursuant to those

1    guidelines.

2         **MR. DOREN:**  And, Mr. Eltiste, if we can please look

3    at Slide number 3.

4                        (Displayed on screen.)

5    **BY MR. DOREN:**

6    **Q.**  And can you please summarize for the Court the opinions

7    that you reached which you'll be testifying about here today?

8    **A.**  Yes, sir.

9         Your Honor, I ultimately focused on four opinions.  And I

10   won't read them verbatim, but the first one relates to that

11   investment by Apple in research and development and the IP

12   that results.

13        The second opinion focuses on whether or not that IP was

14   used or useful to app developers and consumers, and I found it

15   was.

16        Third, being more focused on this matter, whether or not

17   Epic made use of that intellectual property, and I found they

18   did.

19        And, fourthly, whether or not the requested remedies here

20   by Epic would be reasonable or would, rather, result in a

21   compulsory license without compensation and the impact that

22   would have to Apple's innovation footprint.

23   **Q.**  And, Mr. Malackowski, turning to your first opinion, and

24   specifically Apple's substantial and sustained investment in

25   research and development results in valuable IP, what did you

MALACKOWSKI – DIRECT / DOREN

1    do to evaluate or to reach this opinion?

2    **A.**   So the first thing I did is develop an understanding of

3    Apple's investment through their publicly available records

4    describing research and development.

5          **MR. DOREN:**   And let's take a look, please,

6    Mr. Eltiste, to Slide number 5.

7    **BY MR. DOREN:**

8    **Q.**   And are you referring, sir, in terms of this

9    demonstrative, to the information displayed on the left?

10   **A.**   Yes, sir.

11         **MR. DOREN:**   And can -- let's go ahead and pull that

12   out.

13   **BY MR. DOREN:**

14   **Q.**   And can you please describe where you obtained the

15   information reflected here.

16   **A.**   This information is actually publicly available.  It's in

17   the documents filed by Apple with the Securities and Exchange

18   Commission.

19   **Q.**   All right.  And can you please describe for the Court what

20   this demonstrative reflects.

21   **A.**   This demonstrative shows the investment by Apple in

22   research and development from 2005, roughly commensurate with

23   the start of the development of the iPhone, through the most

24   recent reported data in 2020.

25   **Q.**   And how much did Apple spend on R&D in 2005?

MALACKOWSKI – DIRECT / DOREN

1    **A.**   That was approximately $500 million.

2    **Q.**   And how much was spent in 2020?

3    **A.**   I believe Mr. Schiller described in his testimony, and as

4    shown on this chart, it was in excess of $18 billion.

5    **Q.**   And since we have a demonstrative here, can you describe

6    what trend the R&D spending had over those years?

7    **A.**   Well, it is fairly intuitive, in looking at the data, that

8    the trend was continual, upward, with a significant growth in

9    R&D each and every year.

10   **Q.**   And what was the total amount -- or what has been the

11   total amount spent on R&D by Apple during this 15-year period?

12   **A.**   It was in excess of $101 billion.

13   **Q.**   And why, sir, did you take the R&D expenditures by Apple

14   into account in your work?

15   **A.**   R&D reflects the raw materials or the input for the

16   creation of intellectual property.  So in my work, whether it

17   be as a board member or a strategy adviser, is to definitely

18   look to and understand the R&D footprint of the business as a

19   starting point.

20   **Q.**   And let's go back, please, to your dueling charts here.

21        And can you please tell us what you -- what the right-hand

22   chart reflects.

23   **A.**   The right-hand chart reflects Apple's patent applications

24   and grants for a similar period of time, reflecting as a proxy

25   the output of that R&D investment.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**  And how did you obtain this information, sir?

2    **A.**  This information is obtained through proprietary databases

3    that all trace back to Government-provided data by the U.S.

4    Patent Office.

5    **Q.**  And is that information again reflected in the right-hand

6    chart in this fifth slide?

7    **A.**  It is.

8    **Q.**  And does this chart include all active U.S. Apple patents?

9    **A.**  It does.  It includes all active utility patents, which

10    are the general invention patents most people think of; it

11    also includes their design patents, which, for example, covers

12    the look of the iPhone; and it covers also utility patent

13    applications.  In total, there are over 25,000 patent assets

14    that are reflected on this chart.

15    **Q.**  And why did you look at pending patent applications?

16    **A.**  Well, that is something I always do, because the patent

17    applications are often a prediction of future technologies and

18    an expectation of whether the innovation trend is plateauing

19    or continuing.  So it is very important to look at not only

20    what exists, but what is in process.

21    **Q.**  And you put these two charts, the R&D investment and the

22    Apple patent application and grants, on the same demonstrative

23    slide.

24    Why did you make that choice?

25    **A.**  Well, it's really not so much to note that they are

MALACKOWSKI – DIRECT / DOREN

1    similar, which, of course, they are in terms of trend line.

2    Your Honor, it is really more focused on the discontinuities.

3        For example, there are companies where you see R&D

4    continuing to grow significantly, but the number of patent

5    applications plateaus or even falls off.  And so that raises

6    an issue, as a licensing professional, as to whether or not

7    the R&D footprint has changed or has become less efficient.

8        Likewise, you may see cases where R&D will plateau, but

9    the number of patent applications keeps growing significantly.

10   That might tell you that those innovations are no longer core,

11   but, rather, are minor improvements on old technologies.  So,

12   again, as a starting point, it is important to understand the

13   input, the output, and how they relate.

14   **Q.**  And given that framework, sir, when you look at the

15   expenditures by Apple on research and development and you

16   compare that or analyze that in the context of Apple's patents

17   and pending applications, what conclusions do you draw?

18   **A.**  Apple has a significant and sustained commitment towards

19   innovation through both their investment and their efforts to

20   protect that innovation through proprietary intellectual

21   property.

22   **Q.**  Thank you, sir.

23       And with this foundation laid, did you conduct any further

24   technology-specific analysis of the Apple patents?

25   **A.**  Yes.  So what we see in the chart relates to Apple as a

1    company.  So next I needed to go deeper and focus on the

2    intellectual property focused on the iOS ecosystem

3    specifically.

4         **MR. DOREN:**  Mr. Eltiste, let's go to the next slide,

5    please.

6                        (Displayed on screen.)

7    **BY MR. DOREN:**

8    **Q.**  And, sir, does this demonstrative reflect your process in

9    terms of that research?

10   **A.**  It does.

11   **Q.**  And can you please describe your research process for the

12   Court.

13   **A.**  Yes.  It's an iterative process.  So it begins by

14   identifying the various technologies that are at issue in the

15   iOS ecosystem; conducting database inquiries using

16   proprietary programs offered in the market; testing those to

17   make sure the terms you used are accurate –– often, you will

18   need to modify that search criteria, run it again, test it

19   again iteratively; and then, ultimately, review the output

20   manually.

21   **Q.**  And that last point, sir, I believe is reflected in the

22   last box on the right, as well as your last statement.

23        Can you tell us about the manual review step?

24   **A.**  Yes.  In the end, there is no substitute to eyes on

25   patents, and so once it is narrowed down to a manageable set

MALACKOWSKI – DIRECT / DOREN

1   of data, I and the team working under my direction at Ocean

2   Tomo actually manually reviewed each and every patent to

3   confirm that it was relevant to our search criteria.

4   **Q.**   And, by the way, what data source is being searched to put

5   together that population?

6   **A.**   In the end, again, it all traces back to the U.S. Patent

7   and Trademark Office database.

8   **Q.**   And how is that database searched?  In other words, what

9   was involved in the search process?

10  **A.**   So the first thing is to identify the search terms from

11  the record of the case; to then compare those search terms to

12  the descriptions in the patent to make sure that it was

13  relevant to the iOS ecosystem or even games within the iOS

14  ecosystem.

15  **Q.**   And how many -- when you said to get the population down

16  to a manageable size for manual review, how many patents did

17  you and your team manually review?

18  **A.**   We went from the 25- to 30,000 we started with down to

19  3,500 to 4,000 that we actually manually reviewed.

20  **Q.**   And did you personally review each of those patents?

21  **A.**   I personally reviewed a number of them, but not all of

22  them personally, though staff, at my direction and training,

23  reviewed each of them with my supervision.

24  **Q.**   And was this the first time that you and your team have

25  done this sort of analysis?

MALACKOWSKI – DIRECT / DOREN

1    **A.**  No, not at all.  In fact, if you walked into our office

2    today, someone is doing this for some client.

3    **Q.**  And for what purpose does your firm do such analyses for

4    clients in the ordinary course?

5    **A.**  They would vary.  It would include litigated matters.  It

6    would largely include also strategy consulting or investment

7    decisions.  Unfortunately, sometimes we also have to do it for

8    bankruptcies and other disputes.

9    **Q.**  And was your patent search informed by your knowledge of

10   Apple's business?

11   **A.**  It was, yes, sir.

12   **Q.**  And how so?

13   **A.**  Well, patent owners, not surprisingly, have a continuum of

14   ways that they manage their intellectual property process.

15   There are some that we refer to as patent collectors, that,

16   when someone comes up with something cool, they decide to

17   patent it just because it is cool.

18       But on the other end, there are more sophisticated firms

19   who are very proactive, not reactive, and they have an

20   explicit policy to protect the innovations they create which

21   they would believe to be relevant and beneficial in the

22   market.  And Apple is in that latter category.

23       **MR. DOREN:**  And if we can look, please, at DX4080,

24   which should be in your binder and shortly on your screen.

25

**BY MR. DOREN:**

**Q.**  Can you tell us, please, sir, what this exhibit is.

**A.**  Yes.  This is something I note from the Apple website
where they describe their -- essentially, their mission
regarding intellectual property, and that Apple's mission is
to protect that innovation or that innovation is embodied in
intellectual property, including patent, trademarks, and
copyrights.

**Q.**  And why did you choose to include this among your
demonstratives to discuss this morning?

**A.**  Really, to emphasize that point, that there is a
purposeful connection between those R&D dollars and the
intellectual property that we've identified and the products
that are in the market.

**Q.**  And are you familiar with open-source software?

**A.**  Of course.

**Q.**  And did you take that into account over the course of your
work?

**A.**  I did in the sense that my work would focus on the
proprietary innovation of Apple and not include/consider the
open-source innovation, which is, obviously, utilized, as
well, but my summaries are based only on the proprietary Apple
IP.

**Q.**  And you've mentioned the iOS ecosystem.

In performing your work, what did you understand the iOS

MALACKOWSKI – DIRECT / DOREN

1    ecosystem to be?

2    **A.**   It is the integrated innovation that reflects the

3    hardware/software/connecting middleware, the SDKs, the APIs,

4    the code that represents iOS and the products that are

5    operating under it.

6    **Q.**   And did you find Apple's intellectual property to be

7    relevant to the iOS ecosystem?

8    **A.**   Absolutely.

9    **Q.**   And did you prepare a summary of your findings?

10   **A.**   Yes, sir.

11          **MR. DOREN:**   Mr. Eltiste, let's please look at

12   Slide 7.

13                     (Displayed on screen.)

14   **BY MR. DOREN:**

15   **Q.**   And, Mr. Malackowski, does this represent your findings

16   regarding the iOS ecosystem?

17   **A.**   At a summary level, yes, sir.

18   **Q.**   All right.  And if you could please walk us through your

19   conclusions.

20   **A.**   So narrowing from the 25- to 30,000 patents down to those

21   patents, copyrights, and trademarks that are specific to

22   iOS, I identified and present here categories that are iOS

23   specific that relate to the AppKit or App Store specific, and

24   then the larger collection of developer tools.

25   **Q.**   And I note that the first entry, if you will, on the left

MALACKOWSKI – DIRECT / DOREN

is "iOS."

First of all, what do you include in that category?

**A.** That would be all patents that specifically reference the iOS system as part of the specification or claims of the patent at issue. And you can see it totals over 1200 issued patents and over 550 patent applications.

**Q.** Thank you, sir.

And in the center, as I understood it, those would be patents that relate specifically to the App Store; is that correct?

**A.** That's true.

**Q.** And what were your findings there?

**A.** I found 165 granted patents and 91 patent applications.

**Q.** And then to the right are patents related to various developer tools; is that right?

**A.** Yes, sir.

**Q.** And what did you mean by "developer tools"?

**A.** That would include all of the various technologies that we have heard here, from in-app purchasing to core video, core motion, user interface kit, et cetera.

And when you total them all up, I found more than 2500 patents and nearly 700 patent applications.

**Q.** And then at the bottom of your slide, you reference "U.S. Copyrights and U.S. Trademarks."

Can you please tell us what your analysis was there and

MALACKOWSKI – DIRECT / DOREN

1    what your findings were.

2    **A.**   Yes.   The analysis was more straightforward because there

3    are, again, publicly available databases to gather that

4    information.

5       But using similar search terms, I found approximately 4900

6    registered copyrights related to iOS ecosystem and

7    approximately 1500 trademarks, all U.S.

8            **THE COURT:**   And on the patents, again, are those both

9    software and hardware?

10           **THE WITNESS:**   Yes, ma'am, it would include the entire

11   portfolio if it related to the technologies of iOS and the

12   issues here.

13           **MR. DOREN:**   Your Honor, I note the clock and I'm

14   about to go to a document.   Would you like to break now or --

15           **THE COURT:**   So -- yeah, so if it's a good time to

16   break, we can break.

17           **MR. DOREN:**   I think so.

18           **THE COURT:**   3305, are you offering that?   I don't

19   know that -- this is the DOJ document.

20           **MR. DOREN:**   Yes, Your Honor, we would like to offer

21   that in evidence.

22           **THE COURT:**   Any objection?

23           **MS. MOSKOWITZ:**   We do object to it, Your Honor.   It's

24   not evidence.

25           **THE COURT:**   Overruled.   3305 is admitted.

MALACKOWSKI – DIRECT / DOREN

1          (Defendant's Exhibit 3305 received in evidence)

2          **MR. DOREN:**  Thank you, Your Honor.

3      And also, as I understand it, Mr. Malackowski's CV,

4    DX4876, may not be in the stipulation, so we would move that

5    in, as well.

6          **THE COURT:**  Have I admitted CVs from all the other

7    experts?

8          **MR. DOREN:**  You have, Your Honor.

9          **MS. MOSKOWITZ:**  I don't think that is correct,

10   because we didn't actually think we should offer CVs.  But we

11   didn't object to Apple doing it, I guess is the bottom line.

12         **MR. DOREN:**  Your Honor, I will withdraw that it's

13   been uniform and complete, but it has occurred.

14         **THE COURT:**  Okay.  Well, are you withdrawing from --

15         **MR. DOREN:**  No, Your Honor.  I -- CVs have been

16   admitted.  Let me find out over the break, give the Court the

17   true facts, and you can make a decision.

18         **THE COURT:**  And on the other document, that is just

19   the first page of something I admitted before, correct?  I

20   think it is the one Ms. Forrest gave me, the huge entire

21   binder.  Is it 101, I think?

22         **MR. DOREN:**  Oh, no, Your Honor.  It -- we didn't

23   offer anything from 101.  I know the document you are talking

24   about.

25         **THE COURT:**  Okay.  So is there objection to 4080?

1          **MS. MOSKOWITZ:**  No, Your Honor.

2          **THE COURT:**  That's admitted.

3      (Defendant's Exhibit 4080 received in evidence)

4          **MR. DOREN:**  Thank you, Your Honor.

5          **THE COURT:**  Now we are at 10:15 --

6          **MR. DOREN:**  Thank you, Your Honor.

7          **THE COURT:**  -- so let's go ahead and take our break.

8   20 minutes.  Thank you.

9              (Proceedings concluded at 10:15 a.m.)

10             (Proceedings resumed at 10:36 a.m.)

11         **THE CLERK:**  Remain seated.  Court is in session.

12  Come to order.

13         **THE COURT:**  We are back on the record.  The record

14  will reflect that the parties are present.  Mr. Doren is at

15  the podium.  The witness is on the stand.

16     You may proceed.

17         **MR. DOREN:**  Thank you, Your Honor.

18     And on the CV issue, Your Honor, the CVs of Professors

19  Lafontaine and Dr. Schmalensee were admitted without

20  objection.  Epic has not offered any CVs.  And with that, we

21  would again offer DX4876.

22         **MS. MOSKOWITZ:**  No objection.

23         **THE COURT:**  It's admitted.

24         **MR. DOREN:**  Thank you, Your Honor.

25         (Defense Exhibit DX4876 received in evidence)

1    **BY MR. DOREN:**

2    **Q.**  Mr. Malackowski, could you please turn to DX3134 in your

3    binder.

4            **MR. DOREN:**  And, Mr. Eltiste, if you could please

5    pull that up on the screen.

6    **BY MR. DOREN:**

7    **Q.**  Do you have that before you, sir?

8    **A.**  Yes.

9    **Q.**  And can you tell us what this is?

10   **A.**  This is U.S. Patent No. 10,726,604.

11   **Q.**  And was this relevant to your research?

12   **A.**  Yes.  This was one of the patents that I identified as

13   relevant to the iOS ecosystem.

14   **Q.**  And can you please walk us through how that determination

15   was made, using this one patent as an example?

16   **A.**  Yes.

17       Your Honor, this patent actually relates to Metal or the

18   framework that we've heard testified about at trial.  And so

19   if you go towards the back of the patent -- I believe it's

20   Column 10 -- yes, at Column 10, you'll see that this patent

21   includes reference to a client application using the Metal

22   API.  And so that would be the trigger point that resulted in

23   this first being alerted to my attention.

24       And so with that, I would go back to the beginning of the

25   patent, the front page, and I can see that it is a patent for

MALACKOWSKI – DIRECT / DOREN

1    "controlling display performance using display statistics and

2    feedback."  That itself doesn't tell you Metal, which is why

3    you need to look further.  We can see that it's assigned to

4    Apple and that it was filed in 2016, so during the relevant

5    period.

6        If you turn to the specification or Column 1, what we can

7    see is what the technology relates to.  So first I noted that

8    it relates to mobile and handheld devices and that it

9    specifically focuses on display hardware.

10       We also learn the benefits of the patent, that this patent

11   is largely focused on that engineering compromise between

12   display quality and energy management.

13       If you look at Column 6, I believe, of the patent, what we

14   can see further is it's technology that is specific to 3D

15   games.  So, again, greater confidence that this is one that

16   would be relevant.

17       Likewise, if you go to Column 7, we can see that it's very

18   much specific to graphics rendering within the framework of

19   iOS.  By now, we're pretty convinced.

20       And then, lastly, Column 8.  This one is unique,

21   Your Honor, because it also talks about the integration of

22   patented technology to copyright protection, I think which

23   we'll talk about a little later in my direct.

24       So that's an exemplar of the type of review that we did

25   for the patents-in-suit.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**  And, Mr. Malackowski, if you could please turn back to

2    Column 1 for just a moment.

3        And one of your observations -- and this is on page .021,

4    and the first highlighted entry says, "However, in most

5    devices, particularly mobile and handheld devices, the display

6    hardware consumes a tremendous amount of the overall energy

7    budget of the device."

8        Do you see that?

9    **A.**  Yes, sir.

10   **Q.**  And then further below in that same paragraph, the last

11   sentence states, "Thus, for a mobile device, a high display

12   refresh can have a significant negative impact on

13   battery-based operating time."

14       And is that what you were referring to when you talked

15   about this patent relating to the tradeoff between graphics

16   and power consumption?

17   **A.**  It is.  And it also highlights some of the distinctions

18   between, say, iOS and macOS, which doesn't have the battery

19   problem.

20   **Q.**  And, sir, let's look at just one more example, please.  If

21   you could look at DX --

22           **MR. DOREN:**  And, Your Honor, we would move into

23   evidence 3134.

24           **MS. MOSKOWITZ:**  I thought that was already part of

25   the stipulation, but there is no objection.

```
 1              MR. DOREN:  I appreciate that.  I frankly --

 2              THE COURT:  It's not, so I will admit it.

 3              MR. DOREN:  Thank you, Your Honor.

 4         (Defense Exhibit DX3134 received in evidence)

 5    BY MR. DOREN:

 6    Q.  And, Mr. Malackowski, if you could please take a look at

 7    Exhibit DX3052.

 8              THE COURT:  You know what?  I was looking at the

 9    wrong list, so it may have been.

10              MS. MOSKOWITZ:  I'm not sure either, Your Honor.

11              THE COURT:  Keep going.

12              MR. DOREN:  Thank you.

13    BY MR. DOREN:

14    Q.  And, Mr. Malackowski, do you have Exhibit DX3052 before

15    you?

16    A.  I do.

17    Q.  And what is that?

18    A.  This is U.S. Patent 8,620,272.

19    Q.  And is this one of the patents that you and your team

20    reviewed in the course of your work?

21    A.  It is.

22    Q.  And, first of all, do you know what this -- what you

23    concluded this patent relates to?

24    A.  So here again, we look for that trigger search term.  I

25    believe, if memory is right, it's Column 18.  And we can see
```

1    in Column 18 we're talking about an application that relates

2    to the UIKit, which we've heard testimony about in this trial.

3    **Q.**   And can you tell us where that is on Column 18?

4    **A.**   Yes.  So you can see at -- it's at -- starting at line 56

5    of Column 18, there's reference to the "user interface kit" or

6    UIKit.

7    **Q.**   Thank you.

8         And were there other elements of this patent that were

9    part of your analysis?

10   **A.**   Yes.  If we could go back to the front cover.

11        Again, quickly looking at the title, this time we can

12   confirm that it is, in fact, for mobile devices; it is, in

13   fact, an Apple patent; and it was, in fact, filed during the

14   relevant time period or existed during the relevant time

15   period.  This one was filed in 2012.

16   **Q.**   And have you heard testimony in this trial regarding the

17   UIKit?

18   **A.**   Yes.  I believe that Epic Games executive Mr. Grant

19   testified regarding the UIKit, and specifically, Your Honor,

20   testified that Epic Games utilized the UIKit API.

21   **Q.**   And have you also heard trial testimony about Metal?

22   **A.**   Yes.  Substantial examples with Metal where that was also

23   used by Epic Games.  And, again, not just the kit, but in the

24   case of UI, for example, the underlying code as well.  So the

25   testimony was fairly detailed.

1    **Q.**  And setting aside patents for a moment, did you look at

2    other forms of intellectual property?

3    **A.**  Yes.  I looked to trademarks, copyrights, and trade

4    secrets.

5    **Q.**  And did you find that Apple has any copyrights or

6    trademarks relevant here?

7    **A.**  Yes.  With respect to the iOS platform, I identified a

8    series of copyrights, approximately 4900, if memory is

9    accurate; trademarks, approximately 1500.

10   **Q.**  And what is the interaction, if you will, between patents

11   and copyrights and trademarks?

12   **A.**  They're all part of the asset plan and portfolio that the

13   IP owner has to protect their innovation.  In some cases, they

14   work very distinctly, but in other cases, as we saw with

15   Metal, they are interactive, that there will be both

16   trademarks and copyrights and patents and trade secrets that

17   are all working together to protect the particular innovation.

18   **Q.**  Thank you.

19          **MR. DOREN:**  And, Your Honor, I believe 3052 is in

20   evidence.

21          **THE COURT:**  It is.

22          **MR. DOREN:**  Thank you, Your Honor.

23   **BY MR. DOREN:**

24   **Q.**  And, Mr. Malackowski --

25          **THE COURT:**  Well, it is per the stipulation.  I

1    believe the order has posted, so...

2              **MR. DOREN:**  Thank you, Your Honor.

3    **BY MR. DOREN:**

4    **Q.**  And, Mr. Malackowski, if we could look at Slide 8.

5         And is this a -- first of all, can you describe for the

6    Court what Slide 8 reflects?

7    **A.**  Yes.

8         Your Honor, this relatively detailed slide is an interim

9    schedule that I prepared showing a subset of the search terms

10   that I utilized, specifically those terms where I identified

11   patents that I wanted to consider.  So you can see in the

12   first column the term itself, and in the remaining columns,

13   the number of patents and patent applications.

14   **Q.**  And, sir, is this a -- a broader or longer list, if you

15   will, of what is reflected in your direct testimony?

16   **A.**  It is.

17   **Q.**  And by that I mean your written direct testimony.

18   **A.**  Yes, sir.

19   **Q.**  And let's take one example.  And we're all familiar with

20   Metal by now, so let's take a look at that, please.

21        And can you please describe or walk us through what this

22   reports or what your findings are regarding patents related to

23   Metal.

24   **A.**  Fairly -- as explained, that for the Metal technology, I

25   found 11 U.S. patents and 4 applications, for a total of 15

MALACKOWSKI – DIRECT / DOREN

1  assets.

2      And this is a good example because it also makes clear

3  that it doesn't include, for example, Your Honor, patents

4  related to Metal, like the back -- the material on the back of

5  a smartphone.  So part of the iterative process was to make

6  sure that those things were excluded and it really did just

7  relate to the APIs, SDKs, elements at issue here.

8  **Q.**  And is this API an example of the way in which -- or the

9  nature of the integrated iOS ecosystem?

10  **A.**  Yes.  Actually, Metal is a very good example because, as a

11  graphics API, it does interplay with both the hardware of the

12  device, the graphics processing engine, as well as the screen

13  technology, and then the software or middleware that connects

14  them.

15  **Q.**  And let's move on, sir, to your second opinion.

16      And can you please remind us of your second opinion on --

17  in which we have now moved on to Slide 9.

18  **A.**  Yes.  So after understanding the investment made and the

19  resulting IP, the next question, fairly intuitive, is was it

20  being utilized by developers and consumers.  And so I looked

21  to the record of the case in Apple's records to address that

22  question.

23  **Q.**  And what conclusion did you reach on that?

24  **A.**  Yes.

25  **Q.**  And what was the basis for that opinion?

MALACKOWSKI – DIRECT / DOREN

1    **A.**  First, relating to developers, I looked to the number of

2    apps that were posted to the iOS platform or App Store.

3    **Q.**  Let's take a look at Slide 10, please.

4        And can you please tell us what is illustrated on

5    Slide 10?

6    **A.**  So Slide 10 looks at the period 2008, shortly after the

7    launch of the iPhone, through the most recent data in 2020 and

8    the number of available apps in the App Store.

9        And what the chart shows is that starting in 2008, there

10   were approximately 500 available, which I think Mr. Schiller

11   testified exceeded their expectations at the time, but today,

12   it's over 1.8 million.  So steady, consistent, significant

13   growth.

14   **Q.**  And I notice you also have a third number there around the

15   2011 point or so.

16       And what's that number?

17   **A.**  We see an inflection point in 2011 of 350,000 apps, so,

18   again, reflecting the continued rapid growth.

19   **Q.**  And between 2010 and 2020, what has the overall growth

20   been of the number of apps available on the App Store?

21   **A.**  It's grown by more than 500 percent.

22   **Q.**  And did you find evidence that Apple's innovations

23   supported app developers and contributed to this growth?

24   **A.**  Yes.  In several ways.

25   **Q.**  And can you identify those for us, please.

MALACKOWSKI – DIRECT / DOREN

1    **A.**  First is a quantity factor, the ease of development.  So

2    these apps were useful to app developers to create

3    applications faster, easier.

4        And then at a second dimension, there is a quality

5    dimension, is that what they were creating was actual- --

6    actually of higher quality in terms of the number of features

7    that it could incorporate.  For example, we saw the

8    demonstration of the app related to the augmented reality of

9    the basketball shot and the APIs or machine-learning API

10   framework that was used for that.  That would be an example of

11   enhanced quality.

12   **Q.**  Thank you.

13       And did you reach any conclusions or do any analysis on

14   whether Apple's consistent innovation has benefited consumers?

15   **A.**  Yes.  So that was the last element I considered.  We know

16   there is investment, we know there's IP, we know there's

17   product, but is it on the shelf or are people using it.  So we

18   needed to look to the number of downloads.

19   **Q.**  And is one of the benefits to consumers what we see again

20   on Slide 10 the volume of available apps?

21   **A.**  Yes.  The first benefit is diversity of choice.

22   **Q.**  Let's please move on to Slide 11.

23       Can you please tell us what Slide 11 reflects.

24   **A.**  Slide 11 reflects the actual download by consumers from

25   the App Store on a cumulative basis starting in 2008 but

1    growing now through 2020 where it exceeds 180 billion -- B,

2    billion -- downloads.

3    **Q.**  And I note that you -- again, you've got a couple of

4    interim numbers.

5         Can you please tell us what those are.

6    **A.**  Sure.  In 2012, we have an inflection point starting at

7    about 25 billion, and then in 2015, '16, we have another

8    inflection point starting at 130 billion.

9    **Q.**  And aside from -- from the sheer number of downloads, are

10   there other ways that users or consumers have benefited from

11   the volume of apps?

12   **A.**  Yes.  It's not just quantity; again, it's quality.  And

13   the consumer quality benefit is largely focused on the

14   protections around security, which there's been significant

15   testimony about here, as well as privacy.

16        **MR. DOREN:**  Let's go on to the next slide, please.

17   BY MR. DOREN:

18   **Q.**  Mr. Malackowski, you have walked us through a number of

19   trend lines, one being the -- Apple's research and development

20   expenditures; correct?

21   **A.**  Yes, sir.

22   **Q.**  And then on this slide, what can you -- can you explain

23   what's in the upper right?

24   **A.**  In the upper right is the patent applications and grants.

25   **Q.**  And in the lower left?

1    **A.**   The App Store availability, product availability.

2    **Q.**   And in the lower right, please.

3    **A.**   The consumer downloads.

4    **Q.**   And can you describe generally –– again, this being a

5    demonstrative –– what each of those trend lines have shown us?

6    **A.**   Well, each of those trend lines bear some obvious

7    similarity in that they show consistent, sustained, and

8    significant growth over the mid 2000s through 2020 time

9    period.

10   **Q.**   And, sir, why did you elect to put these four different

11   slides that you've reviewed into this one?

12   **A.**   Well, it's actually not so much to draw out their

13   similarities, as I just did; it's more so to look to see if

14   there is any discontinuities.

15        So if you put these all together ––

16             **MR. DOREN:**   Let's go ahead and do that, please,

17   Mr. Eltiste.

18             **THE WITNESS:**   –– what you find is that there is a

19   relationship between that starting investment, the protection

20   of IP, the product originated, and the consumer use.  There is

21   no discontinuity.  None falls off while the others rise or

22   vice versa.

23   **BY MR. DOREN:**

24   **Q.**   Thank you, sir.

25        Let's turn to your third opinion and your 14th slide.

MALACKOWSKI – DIRECT / DOREN

1    And, Mr. Malackowski, can you please tell us what your

2    third opinion is that you're offering here today.

3    **A.**   Yes.  We're getting more specific.  So we're going from

4    the 25- to 30,000 patents overall to the 3500 to 4,000 patents

5    I identified for iOS to now a smaller subset that Epic itself

6    has admitted using the related technology.  And --

7    **Q.**   And what information did you have regarding Epic's

8    acknowledgments of this technology?

9    **A.**   There were three primary components of it.

10   First and foremost, the Epic witnesses testified to their

11   use of technology.  We've talked about some of those examples

12   already in Metal and UIKit.

13   Second, the Epic experts admit not only that the IP -- or

14   the technology, rather, was used, but that it would be

15   necessary to be used for Epic to house apps on the platform.

16   And then, third, in the legal process, we find in the

17   interrogatories by Epic Games a very detailed and specific

18   list of the technologies that they admit using.

19   **Q.**   And I'd like to show you, please, what's been marked as

20   DX3691.

21   **MR. DOREN:**   And, Your Honor, I believe that DX3691 is

22   in through stipulation.

23   **THE COURT:**   It is.

24   **MR. DOREN:**   Thank you, Your Honor.

25

**BY MR. DOREN:**

**Q.** And, Mr. Malackowski, is this exhibit the interrogatory responses that you referred to?

**A.** It is.

**Q.** And if you could please look at page 15 of this document. And do you recognize this information, sir?

**A.** Yes.  This --

      **MR. DOREN:** Let's go ahead and pull it out so we can all see it.

**BY MR. DOREN:**

**Q.** And could you please describe what is set out here.

**A.** Well, this is the beginning of several pages that identify the technology that's used.  I think the list starts best at line, you know, 17, where it describes in the iOS version of *Fortnite*, Epic has used APIs from the following frameworks in the game's executable code, and then it starts to list them.

**Q.** All right.  And let's take a look at the next page, please, page 16.

And can you tell us what page 16 reflects that was relevant to your opinions?

**A.** The admission goes on from APIs to the software development kit, SDKs, and Xcode, and it talks specifically about the fact that Epic made use of the SDKs and code.  It's starting at line 12.  "Epic has used the iPhone, iPad, and Mac SDKs to develop the iOS and Mac versions of *Fortnite*."

MALACKOWSKI – DIRECT / DOREN

1    **Q.**   Thank you.

2        And if you could please continue on to page 17, and can

3    you please tell us what is on page 17 that was relevant to

4    your work.

5    **A.**   Yes.  And, you know, just to finish that last answer

6    briefly --

7    **Q.**   Sure.

8    **A.**   -- in addition to admitting that they were used, they also

9    admit that you can't not use them if you want to be on the

10   platform.

11       And then this page talks about TestFlight and then really

12   emphasizes that the Apple technology, intellectual property,

13   is used at each step in the process.  It's used from the

14   initial design of the product to the testing of the product to

15   the loading of the product on the platform to the consumption

16   of the product on the platform to the consumer experience.

17   **Q.**   Thank you.

18       And how did the information contained on these pages

19   impact your work?

20   **A.**   They confirmed for me that there was that connection

21   between the technology and intellectual property to the Epic

22   product.

23   **Q.**   And what did you do with this information once you had it?

24   **A.**   So I then went back to the tool set that I had and I input

25   into my search engines the particular names that were

1    admitted, as well as then testing it, reviewing it, testing it

2    again, and then finishing with the manual review.

3    **Q.**  And did you, in fact, find patents that were relevant to

4    the various technology identified by Epic?

5    **A.**  I did.

6        **MR. DOREN:**  And let's look at Slide 15.

7    **BY MR. DOREN:**

8    **Q.**  And can you please tell us what Slide 15 reflects.

9    **A.**  Slide 15 is the summary of that work, which shows 235 U.S.

10   patents identified, 52 patent applications, and then some of

11   the technologies that are contained within that set, from Core

12   Motion, Core Video, game controllers, etc.

13   **Q.**  Okay.  And this is not an exhaustive list in terms of the

14   specific APIs; is that correct?

15   **A.**  No.  It's just a graphic exemplar.

16   **Q.**  Now, as the owner of this IP, does Apple have the right to

17   exclude others from using it?

18   **A.**  Absolutely.  That is the core grant of the U.S.

19   Constitution.

20   **Q.**  And does Apple, in fact, seek to exclude developers from

21   using its intellectual property?

22   **A.**  No.  Apple, in fact, is very proactive.  It's sharing its

23   intellectual property to the community through its agreements.

24   **Q.**  I'd like to show you, please, and ask you to turn to

25   PX2618, which I know for a fact is in evidence.

1    And do you recognize this document, sir?

2    **A.**  I do.  It is the Apple Developer Agreement.

3    **Q.**  And what do developers obtain through this license?

4    **A.**  Well, this is really the first agreement with Apple to

5    access their intellectual property.  It is primarily focused

6    on the Xcode and the SDKs, the software development kits,

7    which allows developers to consider whether or not they want

8    to build product to go on the platform.  It gives them a

9    chance to experiment and start their work.

10   **Q.**  And is there any fee to the developer in signing this

11   license?

12   **A.**  No, there is no fee, which explains, in part, the

13   extensive use of this license.  I think, again, Mr. Schiller

14   testified that 27 million developers have executed this

15   agreement without payment.

16   **Q.**  And does Apple offer a limited license to this

17   intellectual property?

18   **A.**  Yes.  It's limited in the sense it describes the scope of

19   what can be done with the IP.  It explains that the

20   disclosures are confidential and that the disclosures are

21   proprietary -- or the IP is proprietary to Apple.

22   **Q.**  Let's look at DX3900, which has also been admitted.

23       And do you recognize this document?

24   **A.**  Yes.  This is the developer program license agreement of

25   Apple, which has been frequently referred to as the DPLA.  And

MALACKOWSKI – DIRECT / DOREN

1  this is the second stage of agreement.

2  **Q.**  And what is the role of the DPLA?

3  **A.**  So the DPLA is used for those who have signed the

4  developer agreement but now want to move forward to have their

5  product or application considered on the platform, and so it

6  discloses or permits additional use of intellectual property,

7  the APIs, for example, additional Xcode, additional SDKs.

8  **Q.**  Is there a fee for entry into the DPLA?

9  **A.**  There is.  There is a $99-a-year program fee.

10  **Q.**  And here again, does Apple provide a limited license for

11  use of its intellectual property?

12  **A.**  It does.  And in particular, it requires that apps that

13  use this intellectual property to be put on the platform have

14  to go through app review and then be distributed only through

15  the platform.

16  **Q.**  And has Apple been consistent in the way that it's chosen

17  to license its IP to third-party app developers?

18  **A.**  Yes.  This agreement is used by way fewer than 27 million.

19  I think it's about a million developers have executed.  But

20  it's been consistent.

21  **Q.**  And what is the immediate benefit to the developer

22  provided by the DPLA?

23  **A.**  Access to that intellectual property to assist, as I

24  mentioned, at every phase of app development, including

25  through launch and technical support.

1    **Q.**  Now, over the course of your career, how many different

2    licensing agreements have you seen?

3    **A.**  I've been doing this for 35 years, so more than a

4    thousand, easily.

5    **Q.**  And is something like the DPLA unusual in the intellectual

6    property context, in your experience?

7    **A.**  No, not at all.  This is very consistent with what a

8    licensing professional would expect to see in circumstances

9    like this.

10   **Q.**  Let's turn to your fourth opinion.

11       And, sir, can you please tell us what your fourth opinion

12   is here this morning.

13   **A.**  Yes.  So, finally, I looked to the requested remedies that

14   Epic has put forward from a licensing perspective and have

15   concluded that they effectively ask for a compulsory or

16   de facto compulsory license without compensation to Apple and

17   that that would have impairment to innovation.

18   **Q.**  And why do you -- or how do you reach that conclusion?

19   **A.**  Well, I started by looking at the request, both in the

20   Epic Complaint and in the proposed injunctive order -- relief.

21   **Q.**  And what did you find that led you to that conclusion?

22   **A.**  I found that the requested relief would take away Apple's

23   control or Apple's provisions in its license agreement; would

24   force Apple to house, for example, a store within a store for

25   Epic Games under its control and terms.

1    **Q.**  And regarding Epic's request for a store within a store,

2    in what ways would that impair Apple's intellectual property

3    rights?

4    **A.**  Two ways, one of which has been talked about, but one of

5    which perhaps not.

6       So the first way it would impair Apple's intellectual

7    property is that they would no longer receive the compensation

8    that they negotiated for by using their IP.

9       But it's more than that.  It's not only that they would

10    lose out on the compensation, but they would be compelled to

11    continue to support Epic Games, for example, in its store not

12    only today, but into the future.

13       So many compulsive licenses are simply, Okay, you can use

14    my stuff, go away, I never want to hear from you again.  This

15    is not that.  It's, You can use my stuff and I have to keep

16    performing for you now and forevermore.  It's quite extreme.

17    **Q.**  What's wrong with that?

18    **A.**  Well, A, it breaks down that fundamental

19    constitutionally-protected benefit of your innovation.

20       But from a business standpoint, that breakdown means it's

21    no longer possible to predict what return you'll get on your

22    innovation and it's no longer, therefore, in many cases,

23    likely justified to invest in that innovation.

24    **Q.**  At the beginning of our discussion, you mentioned or we

25    saw in the IP guidelines a reference to "freeriding."

MALACKOWSKI – DIRECT / DOREN

1      Do you recall that?

2   **A.**   Yes, sir.

3   **Q.**   Does that have relevance to this point?

4   **A.**   Yes.   Essentially, the requested relief would allow Epic

5   Games to freeride on the investment in intellectual property

6   of Apple.

7   **Q.**   And are Epic's requested remedies consistent with

8   licensing practices generally?

9   **A.**   No.   It's, at a general level, a violation of that basic

10   agreement of disclosure to the government and a grant of

11   exclusive rights.

12      And at a more detailed level, it's inconsistent with the

13   guidelines that a licensing professional would use, including

14   the FTC/DOJ guidelines.

15   **Q.**   And does Epic's requested relief take into account Apple's

16   right to compensation for the IP it has licensed?

17   **A.**   Surprisingly, it does not.   In my review, I looked to the

18   requested relief and the Epic Games expert reports, and I see

19   in their but-for world no discussion of IP and no discussion

20   of compensation for IP.

21   **Q.**   And, sir, in your opinion, what would be the business

22   licensing impact if Epic's proposed injunction were granted?

23   **A.**   It would increase Apple's costs, reduce their

24   compensation, and remove their incentive to innovate through a

25   de facto compulsive license.

```
 1              MR. DOREN:  Thank you, sir.

 2        Your Honor, I pass the witness.

 3              THE COURT:  Cross.

 4              MS. MOSKOWITZ:  Your Honor, if I may just make one

 5    comment, since not everyone always gets to be present during

 6    the appearances in the morning.

 7        I had Colleen Kozikowski with me for Dr. Hanssens and

 8    Karla Doe is here today for Mr. Malackowski.  And that's their

 9    first time in the courtroom, so...

10              THE COURT:  Okay.  So I missed then -- Colleen

11    Kozikowski?

12              MS. MOSKOWITZ:  Kozikowski.

13              THE COURT:  Another "owski."

14        And then who else did you call first?

15              MS. MOSKOWITZ:  Karla Doe.

16              THE COURT:  Karla Doe.  I don't even have her on my

17    list, so how do you spell Karla Doe?

18              MS. MOSKOWITZ:  K-A-R-L-A D-O-E.

19              THE COURT:  Okay.  Welcome to the courtroom.

20              MS. MOSKOWITZ:  Thank you, Your Honor.

21              THE COURT:  You may proceed.

22              MS. MOSKOWITZ:  Thank you.
```

**CROSS-EXAMINATION**

```
24    BY MS. MOSKOWITZ:

25    Q.  Good morning, Mr. Malackowski.
```

MALACKOWSKI – DIRECT / DOREN

1    **A.**   Good morning, ma'am.

2    **Q.**   I write "slash afternoon" and I always say the wrong one.

3         Okay.  You talked about some of your prior testimony in

4    other cases.

5         Do you recall that?

6    **A.**   Yes, ma'am.

7    **Q.**   In addition to the case you mentioned, you provided expert

8    testimony in the *Acantha vs. D-E-P-U-Y Orthopaedics* case?

9    **A.**   A patent infringement case, yes, ma'am.

10   **Q.**   And in that case, the Eastern District of Wisconsin

11   rejected your testimony, in part; correct?

12   **A.**   In part, though I did, in fact --

13   **Q.**   Sir, in part it was rejected; right?

14   **A.**   Yes, ma'am.

15   **Q.**   And the court excluded your opinion on what a reasonable

16   royalty would be there; right?

17   **A.**   Generally, yes, that part.

18   **Q.**   The court concluded your damages methodology was, quote,

19   unreliable; correct?

20   **A.**   I don't recall the specific language, but it rejected a

21   license agreement I relied upon, yes.

22   **Q.**   The court held that the, quote, *ipse dixit* nature of your

23   conclusions would, quote, not assist a jury in determining a

24   disputed issue or understanding the evidence; correct?

25   **A.**   I accept that.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**  You also offered a damages opinion in *Prism Technologies*

2    *vs. AT&T Mobility*; correct?

3    **A.**  I did not testify in that matter, but I did offer a

4    report, yes, ma'am.

5    **Q.**  Right.  And in that case, you were entirely prohibited

6    from offering your opinion and testimony at trial; right?

7    **A.**  In that trial but not in the subsequent trials, yes,

8    ma'am.

9    **Q.**  The court found your reasoning was conclusory; right?

10   **A.**  I don't recall, but I accept that.

11   **Q.**  The court found that you, quote, offered no logical

12   underpinning, end quote, in your analysis; correct?

13   **A.**  I accept that.

14   **Q.**  And that your apportionment that you conducted was, quote,

15   methodologically flawed; correct?

16   **A.**  I do recall that.  That is the core issue that was --

17   **Q.**  Sir --

18   **A.**  -- changing at the time, yes.

19   **Q.**  Sir, that's what the court held?

20   **A.**  That's my recollection.

21   **Q.**  The *Rembrandt* case is another case that you had an opinion

22   excluded?

23   **A.**  Yes.  That --

24   **Q.**  Okay.  Yes?

25   **A.**  -- was a patent case, I recall.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**   Sir, yes?

2    **A.**   Yes.

3    **Q.**   And you offered a patent infringement apportionment

4    analysis there; right?

5    **A.**   Based on a survey, yes, ma'am.

6    **Q.**   And the court determined that you conducted an improper

7    apportionment when calculating a royalty base and that your

8    testimony must be excluded on that basis alone; correct?

9    **A.**   Rejecting the survey, yes, ma'am.

10   **Q.**   Sir, the expert -- when you calculated your royalty base,

11   the court said that it was improper and that your expert

12   testimony must be excluded on that basis alone; correct?

13   **A.**   Yes.

14   **Q.**   Okay.  And the court held that your testimony would be

15   unreliable under *Daubert* and Rule 702; right?

16   **A.**   Yes, ma'am.

17   **Q.**   The court found that the flaw in your opinion was not,

18   quote, merely a dispute of fact, end quote, but the, quote,

19   flaw was in the nature of your analysis; correct?

20   **A.**   Related to the survey, yes, ma'am.

21   **Q.**   Sir, you'll have a chance to explain on redirect.  I'm

22   just asking you if that's what the court found.

23        The court found the flaw was in the nature of your

24   analysis; right?

25   **A.**   I accept that you're reading from a document I don't have

MALACKOWSKI – DIRECT / DOREN

```
1    in front of me, so --
2    Q.  I'm reading from the opinion.  Did you read it?
3    A.  Can I -- if you can provide me the opinion, it will be
4    easier for me to --
5    Q.  Did you read the opinion?
6    A.  Not for years.
7           THE COURT:  Again, Ms. Moskowitz --
8           MS. MOSKOWITZ:  Yes, ma'am.
9           THE WITNESS:  I haven't seen that for a number of
10   years.
11   BY MS. MOSKOWITZ:
12   Q.  By failing to use the portion of the revenue stream
13   attributable to the infringing features, the entirety of your
14   damages analysis was found unreliable; right?
15   A.  I accept you're accurately reading it, ma'am, yes.
16   Q.  And the court wrote that allowing your testimony
17   regarding, quote, such inflated numbers, unquote, to be
18   provided to the jury will -- would be prejudicial, end quote,
19   even if you were cross-examined; right?
20   A.  I will accept that.
21   Q.  Your testimony was also excluded, in part, by a court in
22   the Northern District of California in the *Oracle vs. Google*
23   matter; right?
24   A.  In part, yes.
25   Q.  And there you were opining on copyright infringement
```

MALACKOWSKI – DIRECT / DOREN

1   damages?

2   **A.**  I think, in particular, it was future lost profits that

3   was excluded, yes.

4   **Q.**  You were doing an apportionment there?

5   **A.**  I don't recall if that was apportionment.  I recall it was

6   focused on lost profits.

7   **Q.**  All right.  The court there determined that your opinion

8   would, quote, simply invite the trier of fact to adopt an

9   apportionment methodology that is contrary to the facts, end

10  quote; correct?

11  **A.**  I don't recall the specific language.  I assume you're

12  reading it correct, so I will accept it.

13  **Q.**  But the court prevented the plaintiff from offering your

14  opinion that, quote, simply ignored the numerous critical

15  non-infringing elements, end quote, to which some of the

16  profits should have been apportioned; right?

17  **A.**  Again, without it in front of me, all I can do is accept

18  that you are reading it accurately.

19  **Q.**  And you don't remember that one either?

20  **A.**  I remember details as to the substance, but you're asking

21  me what the court specifically said from something several

22  years ago.  And if you could show it to me, I'd be happy to

23  confirm.

24  **Q.**  All right.

25          **MS. MOSKOWITZ:**  Your Honor, may I approach?

MALACKOWSKI – DIRECT / DOREN

1        **THE COURT:**  You may.

2   **BY MS. MOSKOWITZ:**

3   **Q.**  And where I will be pointing you first to talk about the

4   Oracle case is PX1173, which should be marked as such in a

5   tab.

6   **A.**  Yes.  I have it.

7   **Q.**  Okay.  So I'm looking at page *7.

8   **A.**  Page *7 or you mean .7?

9   **Q.**  I think I mean *7, but let me find it.  .7.

10  **A.**  I have 1173.7, yes, ma'am.

11  **Q.**  Yes.  Okay.  Let me catch up to you.

12       Ah, okay.  There we go.  It's on the screen, as well.

13  **A.**  That's on the prior page, .6.

14  **Q.**  Okay.  Great.

15       And the court here said that -- well, let me go back.  You

16  wanted to see it.

17       The court said that your apportionment would, quote,

18  simply invite the trier of fact to adopt an apportionment

19  methodology that is contrary to the facts; correct?

20  **A.**  You just took it off the screen.  Which paragraph?

21  **Q.**  You can -- you can look -- it's the -- on page .6 --

22  **A.**  Yes.

23  **Q.**  -- second paragraph on the right-hand side that starts *7,

24  last sentence.

25  **A.**  Yes, I see that.

1    **Q.**  And the court prevented the plaintiff from offering your

2    opinion that, quote, simply ignores the numerous critical

3    non-infringing elements, end quote, to which some of the

4    profit should have been apportioned; right?  That's in the

5    next paragraph, halfway down, "But Oracle...."

6    **A.**  So -- okay.  So it's talking about what I can do and what

7    I can't do.  Yes, I see that.

8    **Q.**  Right.  And it says you cannot be opining because your

9    opinion simply ignores the numerous critical non-infringing

10    elements; right?

11    **A.**  Well, it says I can opine to the 8.8 billion; I just

12    can't --

13    **Q.**  Sir --

14    **A.**  -- opine to that issue.

15    **Q.**  Sir, I'm only asking you about the issue I'm asking you

16    about.  Okay?

17        I'm saying the court said that "Oracle may not offer

18    Malackowski's opinion that simply ignores the numerous

19    critical non-infringing elements"; right?

20    **A.**  To that --

21    **Q.**  Did I read that correctly?

22    **A.**  To that issue.  But to be fair, your prior question was --

23    **Q.**  Sir --

24    **A.**  -- not opine at all, and that was not correct.

25    **Q.**  Sir, is what I just read correct?

1    **A.**  Yes, ma'am.

2    **Q.**  Okay.  And the court said that your testimony, quote,

3    would invite the jury -- and I'm now on .7, bottom right-hand

4    side, all the last sentence -- that such testimony would

5    invite the jury to expand the scope of its lost profits

6    finding beyond that which can be supported by the evidence.

7        Did I read that right?

8    **A.**  Yes, ma'am.

9    **Q.**  Okay.  Familiar with *Plexxikon vs. Novartis*?  Do you

10   remember that one?

11   **A.**  That is a currently ongoing matter related to patent

12   licensing.

13   **Q.**  And the Northern District of California excluded your

14   opinion in part there, too; right?

15   **A.**  Related to licensing, yes, ma'am.

16   **Q.**  That was just this past January; right?

17   **A.**  I believe so.

18   **Q.**  You didn't remember that at your deposition?

19   **A.**  I don't think I actually had seen that at my deposition.

20   **Q.**  Have you since looked at it?

21   **A.**  I have discussed it with my team.

22   **Q.**  Okay.  So you're familiar with what the court held?

23   **A.**  I haven't read it so we should look to the actual

24   language.

25   **Q.**  All right.  PX1175.

MALACKOWSKI – DIRECT / DOREN

1    **A.**  I have it.

2    **Q.**  .6.

3    **A.**  Page?

4    **Q.**  .6.

5    **A.**  Yes.  I have it.

6    **Q.**  All right.  There is -- bottom left-hand corner starts,

7    "Although...."  It's about seven or so lines up from the

8    bottom.

9         Do you see it?

10   **A.**  Yes, relating to the comparability --

11   **Q.**  Sir, I don't have a question yet.  I'm just asking if you

12   see where I am.

13   **A.**  I do.

14   **Q.**  Okay.  The court held that although you, Mr. Malackowski,

15   "purports to opine on the comparability of the license terms,

16   products, patents, and negotiation positions, much of that

17   evidence is superficial or insufficient to show

18   comparability"; correct?

19   **A.**  And then it continues, yes.

20   **Q.**  Correct.  Yes, I read it?

21   **A.**  The first sentence, yes.

22   **Q.**  I read what the court held; correct?  And she gave some

23   examples.

24   **A.**  The court's holding is the whole thing, but you read the

25   first sentence, yes.

MALACKOWSKI – DIRECT / DOREN

1   **Q.**   Okay.  All right.  Just this month, the court for the

2   District of Delaware excluded your opinion in the *CareDX vs.*

3   *Natera* case; right?

4   **A.**   I don't -- I'm not familiar with that decision, so you'll

5   have to show it to me.

6   **Q.**   All right.  You haven't heard about that one yet?

7   **A.**   No, ma'am.

8   **Q.**   All right.  That was May 7th, and it's PX1176.

9        So you're not aware that your damages opinions were

10   excluded there?

11   **A.**   Well, you'll have to show me --

12   **Q.**   I'm just asking if you're aware.

13   **A.**   I'm not aware --

14   **Q.**   Okay.

15   **A.**   -- if my damage opinions were excluded.

16   **Q.**   Okay.  All right.  So if you go to the first page of that,

17   there's a reference under "Memorandum Opinion" that there is a

18   *Daubert* motion pending to exclude your opinions related to,

19   quote, corrective advertising damages.

20        Do you see that?

21   **A.**   I do.

22   **Q.**   All right.  And on the next page, bottom left -- nope.

23   I'm on the next page -- oh, the third page -- sorry -- bottom

24   left.

25        It says, "The opinions...."  Do you see that sentence,

1   "The opinions are also inadmissible because they are not

2   reliable"?

3   **A.**   I see that.

4   **Q.**   All right.  And on the top right-hand corner of that same

5   page, there's a sentence three lines down, "Malackowski did

6   not engage in reasonable, let alone scientific, efforts to

7   verify the parties' cost estimates"; right?

8   **A.**   Correct.

9   **Q.**   Okay.  And then there is a conclusion that says your

10  testimony would be excluded under both Rule 702 and Rule 403;

11  right?

12  **A.**   I don't see that, but I accept that.

13  **Q.**   It's on the screen now.

14  **A.**   I see that.

15  **Q.**   Okay.

16      You testified that Apple has valuable IP.

17      That's one of your opinions; right?

18  **A.**   I believe that's true, yes.

19  **Q.**   All right.  And your testimony -- you testified that your

20  work in this case focused on providing an understanding of the

21  value of Apple's IP; right?

22  **A.**   Generally.

23  **Q.**   You testified -- well, let's just -- the word "valuable

24  IP" is used by you a number of times; right?

25  **A.**   I don't dispute that, no.  I think Apple's IP is valuable.

MALACKOWSKI – DIRECT / DOREN

1 **Q.**  All right.  But in connection with your work here, you did

2 not conduct a financial valuation of Apple's IP assets; right?

3 **A.**  Meaning an appraisal, correct, I did not.

4 **Q.**  Well, you used the word "financial valuation" in your

5 report.

6    Do you remember that?

7 **A.**  I'm sure I did, but I don't conduct an appraisal.  I don't

8 put a dollar figure on the IP, if that's your question.

9 **Q.**  Right.

10    You did not do any work to try to put a dollar amount on

11 any single or collection of Apple's IP; right?

12 **A.**  Correct.

13 **Q.**  And that's true also for Apple's in-app payment processor;

14 for example, you didn't do any financial valuation or

15 appraisal?

16 **A.**  I did not appraise the IAP technology, correct.

17 **Q.**  You testified that Apple's R&D has grown over time.  We

18 saw some slides on that.

19    Do you remember that?

20 **A.**  I do.

21 **Q.**  But you have not charted Apple's R&D relative to Apple

22 revenue; right?

23 **A.**  No, I did not.

24 **Q.**  And you did not consider Apple's R&D spend relative to

25 Apple's profits; right?

MALACKOWSKI – DIRECT / DOREN

1   **A.**   No, I did not.

2   **Q.**   And you didn't consider their R&D relative to Apple's

3   capitalization either; right?

4   **A.**   You mean the market capitalization?

5   **Q.**   Any version of capitalization.

6   **A.**   No.  That's not necessary.  I did not.

7   **Q.**   And you didn't consider Apple's R&D relative to its total

8   assets; right?

9   **A.**   Correct.

10  **Q.**   And you did not consider Apple's R&D related to any

11  comparable companies, for example, if there even is one.

12  **A.**   No.  That was not part of my assignment.  I did not.

13  **Q.**   All right.  And in the R&D numbers you included in your

14  demonstratives and in your report, you did not try to

15  disaggregate the R&D expenditures for different lines of

16  business at Apple; right?

17  **A.**   No.  Apple does not keep records that way.

18  **Q.**   Right.  You couldn't even do it?

19  **A.**   Well, you wouldn't do it from a substantive point of view

20  and you couldn't because the records don't exist.

21  **Q.**   You wouldn't do it from a substantive point of view even

22  if there is a set of IP that relates solely to the AirPods,

23  for example?  That is not relevant to you?

24  **A.**   No, your specific example would not be relevant.  I would

25  not expect to see R&D only to the AirPods.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**   Okay.  So if there were a set of R&D relevant to the

2    AirPods, you would not include it in your analysis?

3    **A.**   Well, I would include it in total corporate ID for the

4    reasons Mr. Schiller explained, that it's integrated.

5    Obviously, the AirPods work with the software and hardware of

6    the phone, but I would not have broken it out for you today.

7    **Q.**   And so it's appropriate, in your view, to include all IP

8    for even the AirPods and any other accessories in your

9    analysis here all together.

10   **A.**   Exactly, because it utilizes that same integrated set of

11   IP.

12   **Q.**   And you're basing the integration on Mr. Schiller's

13   testimony?

14   **A.**   In part, but also my review of the patents that, in the

15   specifications, describe that integration.

16   **Q.**   All right.  But you're -- that's just based on the

17   patents, not any internal Apple documents?

18   **A.**   Well, patents are essentially internal Apple documents.

19   They're public, too, but it's Apple who wrote those

20   specifications.

21   **Q.**   Other than the patents, then, I'm asking, are there actual

22   internal documents that you can't look up on a patent search

23   that you are including in that, other than Mr. Schiller's

24   testimony here?

25   **A.**   Well, there is other testimony in the record as well that

1    describes the integrated nature of --

2    **Q.**   So that's a "yes," then?

3    **A.**   Yes.

4    **Q.**   Okay.  Fine.

5       So you did not quantify in any way the amount of Apple's

6    investments in IP assets specifically associated with the App

7    Store; right?

8    **A.**   There is in my analysis a specific determination of

9    patents and copyrights --

10   **Q.**   Different question.

11   **A.**   -- to the App Store.

12   **Q.**   Different question.

13       You did not quantify the amount of Apple's investment in

14   IP assets specifically associated with the App Store; correct?

15   **A.**   Correct.

16   **Q.**   Okay.  And you did not quantify Apple's investment in

17   innovations that specifically relate to APIs; right?

18   **A.**   Well, I consider the patents an investment in innovation,

19   but I did not quantify the dollars of R&D specific to any API,

20   SDK, true.

21   **Q.**   And as far as you're aware, there is not even a specific

22   number anywhere for Apple's investment in tools and services

23   associated with the App Store that Apple keeps in the normal

24   course; right?

25   **A.**   Not any number that would reflect the answer to your

1    question.

2    **Q.**  And you did not ask anyone at Apple, your client, whether

3    it allocates or could allocate R&D spending to the App Store

4    specifically?

5    **A.**  Well, I ultimately did discuss that, for example, with

6    Mr. Schiller, but in preparing my analysis, I had the benefit

7    of knowing it wasn't done and the reasons it wasn't done.

8    That seemed reasonable to me.

9    **Q.**  All right.  But you didn't ask if they could do it for you

10   for this exercise?

11   **A.**  Understanding technology, I wouldn't ask that question

12   because I would find it meaningless.

13   **Q.**  Okay.  Documents and testimony that you reviewed confirmed

14   that the specific costs of development of Apple's IP was not

15   the basis for selecting 30 percent of the commission for the

16   App Store; correct?

17   **A.**  Correct.

18   **Q.**  You talked a bit about this but-for world or if we -- if

19   the remedy is granted, Epic is basically seeking a compulsory

20   license.

21      Do you remember that testimony?

22   **A.**  Yes.  The "but-for" term is from Epic's experts.

23   **Q.**  Okay.  But you understand what we mean by that, that we're

24   talking about in the event of the remedies being sought being

25   granted?

1   **A.**   I do.

2   **Q.**   Okay.  And you say that the result of that would be to

3   reduce the potential return to Apple from its innovations?

4   **A.**   I believe that's true.

5   **Q.**   So just to be clear, you're aware Apple currently

6   monetizes its IP across the entirety of its business, from

7   placing applications with customers, from selling devices, and

8   all that it does; right?

9   **A.**   As an integrated platform, yes, ma'am.

10   **Q.**   And you're familiar with the various fees that Apple

11   charges developers.

12        You talked about some of those earlier; right?

13   **A.**   Yeah.  The program fee, for example.

14   **Q.**   Like the $99 annual program fee for developers?

15   **A.**   That's what I was referring to.

16   **Q.**   Yes.

17        And also -- I don't think you talked about it -- you are

18   also familiar with the Enterprise account?

19   **A.**   I think that's 299, if I recall.

20   **Q.**   Per year; right?

21   **A.**   Yes, ma'am.

22   **Q.**   And those fees, taken together across developers, provide

23   Apple some return on its investment in IP associated with the

24   App Store; right?

25   **A.**   Well, it provides a return for its business generally,

1   which would include all contributions, including IP.

2   **Q.**   Including App Store?

3   **A.**   Everything.

4   **Q.**   Okay.  Apple's profits on sales of iOS devices are also

5   clearly part of Apple's return on its investment in the iOS

6   ecosystem, as well; right?

7   **A.**   I don't disagree with that.

8   **Q.**   And you understand that Apple makes significant profits

9   from iOS devices each year; right?  We're not going to say

10   numbers.

11   **A.**   "Significant" is not an accounting term, but they do make

12   profits each and every year that have been described in this

13   court.

14        **MS. MOSKOWITZ:**  Your Honor, just for confidentiality,

15   is it possible for me to point him to the deposition where the

16   number is said where he agrees, just so we can get that?

17        **THE COURT:**  Isn't it in the record, Ms. Moskowitz?

18        **MS. MOSKOWITZ:**  I'm not sure.  It might be.

19   Okay.  We can move on.

20        **THE COURT:**  I mean, you can.  I just assume that −− I

21   mean, I've got thousands and thousands of pages.  I was

22   assuming it's in the record somewhere.

23        **MS. MOSKOWITZ:**  You know, if it's not, we are going

24   to have to fix it.  So we will go back and confirm.

25        **THE COURT:**  We can do it quickly.

MALACKOWSKI – DIRECT / DOREN

1          **MS. MOSKOWITZ:**  No.  That's okay, Your Honor.  I

2     think I can move on.

3     **BY MS. MOSKOWITZ:**

4     **Q.**  You agree that profitability is informative of the return

5     associated with a particular innovation; correct?

6     **A.**  It can be.

7     **Q.**  And you did not find Apple's profits on sales of iOS

8     devices to be relevant to your analysis here; right?

9     **A.**  No.  I did not conduct that profit analysis.  It was not

10    relevant to my assignment.

11    **Q.**  And you have not presented an opinion as to what would be

12    a fair or reasonable compensation for use of Apple's IP under

13    this but-for scenario; right?

14    **A.**  No.  My only opinion in that regard --

15    **Q.**  No?

16    **A.**  -- is looking at Epic's experts.

17    **Q.**  Yes.  So "no"?

18    **A.**  No, I did not develop my own assessment of that.

19    **Q.**  And you were not even asked to quantitatively measure

20    Apple's return on its investment in the iOS ecosystem; right?

21    **A.**  True.

22    **Q.**  You talked about the DPLA on direct.

23         Do you recall that?

24    **A.**  I do.

25    **Q.**  And your testimony is that through the DPLA, Apple

MALACKOWSKI – DIRECT / DOREN

1  provides access to its IP; right?

2  **A.**  As well as through the developer agreement, that's true.

3  **Q.**  Okay.  Well, in terms of the DPLA, we'll talk about that

4  here.

5      I think in your binder you should have DX3370, which I

6  believe is the same one you looked at on direct.

7  **A.**  In your binder.

8  **Q.**  It should be in my binder, as well.

9  **A.**  If they're in numerical order, I don't.  So I --

10  **Q.**  They should be by PXs and then DXs.

11  **A.**  I have DX3305 and then -- oh, here we go.  This is -- yes.

12  **Q.**  You've got it?

13  **A.**  Yes.

14  **Q.**  Okay.  And that's the DPLA for developers?

15  **A.**  Yes, ma'am.  Yes.

16  **Q.**  I'm right, sir, am I not, that nowhere in the DPLA does

17  Apple list even one patent that it's licensing pursuant to

18  that agreement; right?

19  **A.**  True.  You would not see a list of patents specifically.

20  **Q.**  Okay.  Not you would not.  You do not see a list of one or

21  more patents at all in the DPLA; correct?

22  **A.**  Correct.

23  **Q.**  And so if I were a developer and I wanted to know what IP

24  I was licensing from Apple through the DPLA, I wouldn't find

25  it in the DPLA; right?

1    **A.**   No.  You could find it, but it wouldn't --

2    **Q.**   Sir --

3    **A.**   -- be in this agreement, that's true.

4    **Q.**   Okay.  I'm just asking if I would find it in the DPLA.

5    I would not; right?

6    **A.**   You would not.

7    **Q.**   All right.  And you testified about Apple's IP rights, and

8    I think you came up with about 3200 patents and patent

9    applications relating to app distribution and development.

10   Is that what you said?

11   **A.**   Related to app developer tools, yes.

12   **Q.**   And unlike Apple developers, you had access to internal

13   Apple documents and Apple employees; right?

14   **A.**   That is a true statement.

15   **Q.**   And, in fact, you conducted interviews with certain

16   current and former Apple employees; right?

17   **A.**   Correct.

18   **Q.**   But throughout the course of those interviews, no one at

19   Apple gave you a file that said, Here's the specific IP

20   licensed by Apple pursuant to the DPLA; right?

21   **A.**   True.

22   **Q.**   Nobody at Apple said, Here's the list.  Here are the

23   patents that we license pursuant to the DPLA; right?

24   **A.**   No one actually gave me that list, that's true.

25   **Q.**   And nobody told you that that list exists, did they?

MALACKOWSKI - DIRECT / DOREN

1    **A.**   Well, I knew that list exists in the Patent Office, but I

2    don't know if anybody directed me to it.

3    **Q.**   Other than searching terms -- other than searching

4    terms -- in the PTO, there does not exist, to your knowledge,

5    a list at Apple that says what IP is being licensed pursuant

6    to the DPLA; correct?

7    **A.**   I'm not aware of any such list.

8    **Q.**   Did you ask for it?

9    **A.**   No.

10   **Q.**   Would you agree that, generally speaking, licensing

11   agreements should clearly define what is being licensed and

12   the specific rights that the licensor is granting to the

13   license?

14   **A.**   Yes, but such does not require --

15   **Q.**   Sir --

16   **A.**   -- a list.

17   **Q.**   Yes, you agree?

18   **A.**   Sure.

19   **Q.**   Okay.  And you would agree, would you not, that the

20   patents to be licensed should be identified in the licensing

21   agreement?

22   **A.**   Identified by number, not necessarily.  Identified by

23   description at least, yes.

24   **Q.**   Okay.  And when many patents are involved, a specific list

25   of patents is often appended to licensing agreements; right?

MALACKOWSKI – DIRECT / DOREN

1   **A.**  Often that's the case generally when it's a very small set

2   of patents.

3   **Q.**  Okay.  So if it's too big, it doesn't get appended.

4   **A.**  Well, it's not really related to that.  It's if you are

5   licensing a set of patents only, it gets appended, but if you

6   are giving a general grant to anything we have and will

7   develop, then we don't provide that list.

8   **Q.**  And is that what is happening in the DPLA, a broad grant?

9   **A.**  Essentially as relates to the technology in the

10  development tools, yes.

11  **Q.**  All of the technology that you referenced in your report

12  is licensed pursuant to the DPLA?

13  **A.**  To the extent it exists within those development tools,

14  the patent rights are -- according to the terms of the

15  agreement provided, yes.

16  **Q.**  Well, the agreement doesn't talk about any specific IP;

17  right?

18  **A.**  For the reasons I described, true.

19  **Q.**  So I'm just talking now not about restrictions; I'm

20  talking about what the portfolio is that's encompassed.  So I

21  just want to focus on that for the question.

22      Is it your position that the entirety of every piece of IP

23  mentioned in your testimony, in your written direct testimony

24  and all the exhibits, is licensed under the DPLA?

25  **A.**  No.

MALACKOWSKI – DIRECT / DOREN

1   **Q.**   Okay.  How do I know which ones are and which ones are

2   not?  Do you say that anywhere in your written direct

3   testimony?

4   **A.**   Only through identification of the particular technologies

5   at issue.

6   **Q.**   Okay.  That's not in the DPLA.

7   **A.**   It is not, true.

8   **Q.**   You have a bunch of appendices that list the -- let's just

9   say the 165 patents and applications that you say are related

10  to the App Store.

11       Do you remember that number?

12  **A.**   I do.

13  **Q.**   Okay.  Every single one of those 165 patents are licensed

14  under the DPLA?  Yes or no?

15  **A.**   Generally, yes, that they would have a right to use that

16  technology consistent with the terms of the agreement, not a

17  broad license to do whatever they wish, but consistent with

18  the terms of the agreement.

19  **Q.**   And all of the 3200 patents and patent applications

20  related to tools are also licensed under the DPLA?

21  **A.**   My understanding is yes.  So you wouldn't be sued for

22  patent infringement if you used them consistent and pursuant

23  to the terms of the agreement.

24  **Q.**   Are private APIs something that you studied?

25  **A.**   I'm familiar with them.

1    **Q.** Are those included in the DPLA or not?

2    **A.** I don't have an opinion.  I did not compute those.

3    **Q.** Did you look to see whether those were the subject of IP

4    protection?

5    **A.** I did not.

6    **Q.** So what you did to try to identify the patents and patent

7    applications are you did a bunch of searches within the PTO

8    system; is that right?

9    **A.** My analysis included, quote/unquote, a bunch of searches,

10   yes.

11   **Q.** Well, the list you came up with of patents and patent

12   applications was generated from those searches; correct?

13   **A.** And the input and analysis I did related thereto, yes.

14   **Q.** But that's a whittling, not an expansion; correct?

15   **A.** Fair.  So the initial set of Apple patents came from the

16   USPTO based upon assignment.

17   **Q.** Okay.  So you took that broader list and you did some

18   things to narrow it down to what you present.

19   **A.** Sure.

20   **Q.** Okay.  So I'm just trying to be clear that the source for

21   all of those was public available searches on the PTO.

22   **A.** All of the patents are publicly available on the PTO, all

23   the ones that I considered, yes.

24   **Q.** They're not just available; that's how you generated the

25   list from which you did your work.

MALACKOWSKI – DIRECT / DOREN

1    **A.**   Well, more specifically, the list was generated through a

2    commercially available program that accesses and cleans those

3    databases, but they all tied back to the PTO.

4    **Q.**   Okay.  Queries were done by you or the system you used to

5    query the publicly available database to generate the list of

6    patents and patent applications; yes?

7    **A.**   No.  It's more complicated than that.  If you want me to

8    explain, I'm happy to.

9    **Q.**   I don't.

10       I just -- I'm just trying to understand that this is all

11   from public source -- searches of public sources; you did not

12   get any help or internal information to point you to any of

13   these patents and patent applications?

14   **A.**   Well, there is help provided by the commercial programs

15   that allow you to do those searches efficiently, and they all

16   do tie back to data that originates at the Patent Office, but

17   there are steps in between.

18   **Q.**   You used search terms to identify Apple patents or

19   applications that contained those search terms; right?

20   **A.**   True.

21   **Q.**   Okay.  And you did similar for trademarks?

22   **A.**   Yes, ma'am.

23   **Q.**   All right.

24       You showed a couple of examples of patents.

25       Do you remember that?

MALACKOWSKI – DIRECT / DOREN

1    **A.**  I do.

2    **Q.**  All right.  And I want to talk just for a moment about the

3    165 that are under the App Store app logo.

4        Do you remember that on your Slide 7?

5    **A.**  I do.

6    **Q.**  And you were asked on direct if that set, that 165, quote,

7    relates specifically to the App Store, and you said "yes."

8        Do you remember that?

9    **A.**  Generally, yes.

10    **Q.**  All right.  That's not quite right, is it?

11    **A.**  They relate to the terms that include the App Store, yes.

12    **Q.**  They reference App Store; correct?

13    **A.**  Of course.

14    **Q.**  But that's how they were generated, they reference the App

15    Store; right?

16    **A.**  That's the original reference, and it's -- it's more

17    specific than that.  It depends where and how they reference

18    it, but at a general level, you're right.

19    **Q.**  Why don't you look at your written direct, please,

20    paragraph 23.

21    **A.**  Yes, ma'am.

22    **Q.**  All right.  On the last bullet there, it says, "165 U.S.

23    patents and 91 U.S. patent applications referencing the App

24    Store"; right?

25    **A.**  Yes, ma'am.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**  Okay.  And the specific search term you used to identify

2    the patents referencing the App Store was, quote, App Store;

3    right?

4    **A.**  That would be the starting point, yes, ma'am.

5    **Q.**  Okay.  The starting point to generate the list that you

6    were then going to -- I think you put eyes on patent to

7    whittle down; right?

8    **A.**  And steps in between, but generally.

9    **Q.**  Okay.  So "App" -- the word "App Store" was used through

10   this complicated query mechanism and generated a set that you

11   then did some work on; right?

12   **A.**  Yes.

13   **Q.**  Okay.  And you say there is no substitute for eyes on

14   patent to confirm that the results were actually relevant to

15   what you were looking for; right?

16   **A.**  Generally, yes.

17   **Q.**  And you said you or someone on your team looked at the

18   results?

19   **A.**  Yes, ma'am.

20   **Q.**  On the 165, how many did you review?

21   **A.**  Oh, I don't have a specific count for you as I sit here.

22   It would have been a modest number.  Most of the review was

23   done by the team.

24   **Q.**  Ballpark "modest" for me.  Five?

25   **A.**  A dozen.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**   A dozen.  Okay.

2          And you acknowledge that your search could be

3    over-inclusive; right?

4    **A.**   And under-inclusive, yes.

5    **Q.**   Okay.  It could be over-inclusive, yes?

6    **A.**   Yes, ma'am.

7    **Q.**   Okay.  And one way it could be over-inclusive is if the

8    patent contains the word "App Store" but the patent actually

9    has nothing to do with the App Store; right?

10   **A.**   Technically possible, yes.

11   **Q.**   It wasn't supposed to happen, though, right, because you

12   had eyes on.

13   **A.**   Well, it depends on the specific patent.  So if you have

14   one in mind, we should look to it.

15   **Q.**   Sure.  PX1182.  Let me know when you're there, please.

16   **A.**   I am.

17   **Q.**   Okay.  This is a patent for the graphical user interface

18   for display screen or portions thereof?

19   **A.**   But most important, this is a design patent, not a utility

20   patent.

21   **Q.**   So that's not in your 165?

22   **A.**   I include those separately as well, yes.

23   **Q.**   So it's included in your set; right?

24   **A.**   It's included in my set overall, yes.

25   **Q.**   Okay.  And it's included in what is licensed under the

1    DPLA?

2    **A.**   To the extent that it's necessary for the designer, but,

3    generally, the app developers are not using Apple's design

4    patents.  Generally, those are used by Apple.

5    **Q.**  Okay.  So is there any way for me to tell from your

6    written direct testimony which of the 165 patents you actually

7    don't think are licensed under the DPLA?  Can you point me to

8    a paragraph?

9    **A.**   Well, the 165, I think, would be licensed.  But I can't,

10   as I sit here, tell you the design patent is included in your

11   list --

12   **Q.**  All right.

13   **A.**  -- because the design patent is segregated separately.

14   **Q.**  Right.  It's not my list, it's your list, so let's look at

15   it.

16       DX5447 is the spreadsheet that was produced.  And I saved

17   a couple trees and didn't print the printout, so we are going

18   to pull it up on the screen.

19       This is, I will represent, produced as the Apple App Store

20   patents, and there is 165 plus 91 patent applications.  If you

21   want to scroll down to the last row, which adds things up all

22   the way.

23       Okay.  All right.  Do you see that?

24   **A.**   I do.

25   **Q.**   Okay.  So if I find this patent on here, you would agree

MALACKOWSKI – DIRECT / DOREN

1   that you did include it in your list of patents referencing

2   the App Store, right, the 165?

3   **A.**   If this is that list, then, yes, of course.

4   **Q.**   Okay.  All right.  So why don't we search for the number.

5   And it's -- well, let's see.  Yeah, there are no commas, I

6   think, so if we search for 617334, will we find it maybe?

7   Yes, there it is.

8        Do you see that?

9   **A.**   Yes.

10  **Q.**   All right.  That's the one we were just talking about;

11  right?

12  **A.**   Yes, ma'am.

13  **Q.**   All right.  So now that we see it here, is it licensed in

14  the DPLA?

15  **A.**   So as a design patent, I would not expect it to be

16  utilized by a developer.  I would expect it to be part of the

17  intellectual property of Apple so included in that

18  intermediate dataset.

19       And because I wouldn't expect it to be used, I wouldn't

20  expect it to be specifically licensed to, say, Epic.

21  **Q.**   All right.  So should we delete that from the list?

22  **A.**   No, because --

23  **Q.**   Why not?

24  **A.**   -- this is the interim analysis before we get to that 252

25  that are specific to Epic.

MALACKOWSKI – DIRECT / DOREN

**Q.**  Why are we talking about Epic?  I'm just asking about the

DPLA.  Epic is not the only developer.  I imagine you know

that; right?

**A.**  I do.

**Q.**  There is actually, I think you said, 1.8 million apps

on --

**A.**  Yes, ma'am.

**Q.**  -- the App Store?

**A.**  Yes, ma'am.

**Q.**  How many are Epic's?  Do you know?

**A.**  A handful maybe.  I don't know.

**Q.**  Okay.  And I think you might have said a million

developers have entered the DPLA?

**A.**  Approximately.

**Q.**  Okay.  So they are all entering, I think you pointed out

very clearly, the same DPLA; right?

**A.**  Yes, ma'am.

**Q.**  Okay.  Are those developers, any of them, licensing this

patent under the DPLA?

**A.**  Again, I don't believe they would be utilizing this

patent.  This is a patent Apple would be utilizing as reflects

a design on their phone.

**Q.**  So if this list was to be used or tried to be used as the

list of patents being licensed to developers under the DPLA,

should I delete it?

1    **A.**   Well, you wouldn't delete it because it would depend upon

2    whether or not this developer had some special reason to use

3    this technology.

4           The DPLA is a broad grant that will give you access to IP

5    to develop your apps, would then review them, and if it's

6    using our IP and we post it, you have a license to that IP.

7           So you have to look at the app and compare it to the list.

8    This is the population.

9    **Q.**   Okay.  So you don't know what you are licensed until you

10   go through app review and get approved?

11   **A.**   Well, you don't know what you are licensed to unless you

12   know what you want to use.

13   **Q.**   Okay.  All right.  Well, okay.  We'll move on.

14          Why don't we look at the patent itself, which I think you

15   have in front of you, and I think we can put it up on the

16   screen, as well.

17          I'm looking on page 1 in the description.  After the

18   figures, there is a couple of trademark discussions.  It

19   starts, "The AT&T trademark...."

20          Do you see that?

21   **A.**   No.  I'm sorry.  Where are you at?

22   **Q.**   I'm on the --

23   **A.**   Oh, yes.

24   **Q.**   Right there.  Do you see that?

25   **A.**   I do.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**  Okay.  And about five lines down, it says -- starts, "The
2    App Store...."
3         Do you see that?
4    **A.**  Yes, sir.
5    **Q.**  "The App Store" --
6    **A.**  Yes, ma'am.
7    **Q.**  I won't take it personally.
8    **A.**  Sorry.  My fault.
9    **Q.**  "The App Store trademark on the bottom of the figures is
10   the property of Apple, Inc."
11        Do you see that?
12   **A.**  I do.
13   **Q.**  All right.  What if I -- should we just do the little
14   search for "App Store" and see if that appears anywhere else
15   in here?
16           **MS. MOSKOWITZ:**    Mr. Rudd, would you mind?
17   **BY MS. MOSKOWITZ:**
18   **Q.**  Okay.  So that's the only place "App Store" is in this
19   patent.
20        Would you agree with me?
21   **A.**  I'll accept that.
22   **Q.**  All right.  And would you agree with me that this is not a
23   patent related to the App Store?
24   **A.**  No.  I -- it explains that this is a design patent for --
25   you can see in the image --

1    **Q.**   Sir --

2    **A.**   -- how apps are displayed.  So --

3    **Q.**   Sir --

4    **A.**   -- I don't agree.

5    **Q.**   Okay.  So you believe this is about the App Store, this

6    relates specifically to the App Store?

7    **A.**   This relates to the iOS ecosystem in particular as it

8    relates to the design and display of apps on the iPhone.

9    **Q.**   I'm going to ask you again, then.

10          Is it your view and testimony that this patent relates

11   specifically to the App Store?  Yes or no?

12   **A.**   With the qualifier I just gave you, yes.

13   **Q.**   Okay.  Well, that will speak for itself.

14          Shall we look at another example, 1183, PX1183.

15             **MS. MOSKOWITZ:**   Why don't we -- before we even look

16   at it, since I think I'm going to have to prove to you that

17   it's in your list -- why don't we go back to the same

18   spreadsheet we were in, Mr. Rudd, which I believe is DX5447.

19   And why don't we go ahead and search for the number, 10368799.

20   **BY MS. MOSKOWITZ:**

21   **Q.**   All right.  Do you see that that patent is in there,

22   Mr. Malackowski?

23   **A.**   I do.

24   **Q.**   Do you see that it's titled "System for determining the

25   quality of sleep"?

MALACKOWSKI – DIRECT / DOREN

1    **A.**   I do.

2    **Q.**   Okay.  Now, why don't you please turn where I was

3    originally sending you, to PX1183.  And if you can confirm

4    that that's the same patent number and same description.

5    **A.**   Yes, ma'am, I believe it is.

6    **Q.**   All right.  And so do you agree with me that this is in

7    your list of 165 referring to the App Store?

8    **A.**   Yes, ma'am.

9    **Q.**   All right.  If you could turn to page 12 of this patent.

10              **MS. MOSKOWITZ:**   And, Mr. Rudd, if you could also pull

11   it up.

12   **BY MS. MOSKOWITZ:**

13   **Q.**   There is a "Summary of Invention" that you should come

14   upon.

15           Do you see that on the bottom there?

16   **A.**   I do.

17   **Q.**   Okay.  And it talks about an invention about "system and

18   method for effectively determining the quality of sleep of at

19   least one user."

20           Do you see that?

21   **A.**   I do.

22              **MS. MOSKOWITZ:**   Okay.  And let's do that search

23   again, Mr. Rudd.  Would you mind searching for "App Store" in

24   this document.

25           All right.  And let's zoom in.  Oh, yeah.  So -- hang on.

MALACKOWSKI – DIRECT / DOREN

**BY MS. MOSKOWITZ:**

**Q.**   Do you agree that we just have one instance of "App Store"

in here?

**A.**   Yes, ma'am.

**Q.**   Okay.  So let's go to that one.

          **MS. MOSKOWITZ:**   All right.  And, Mr. Rudd, if you

wouldn't mind blowing that up.

**BY MS. MOSKOWITZ:**

**Q.**   There's a discussion of some prior art devices in the

beginning of that paragraph.

     Do you see that?

     I'm still on page 12 above "Summary of Invention."  It's

right next to line 35.  Are you on page 12?

**A.**   I'm looking at your screen.

**Q.**   Okay.  Do you see that sentence, "There are also prior art

devices..."?

**A.**   Yes, ma'am.

**Q.**   All right.  If you keep going on down about six lines or

so, it talks about "the RestOn device."

     Do you see that?

**A.**   I do.

**Q.**   And it talks about the RestOn device using a strip of

sensors for this purpose, and it says, "However, it is not

very efficient for determining the exact body posture of the

user."

MALACKOWSKI – DIRECT / DOREN

1        Do you see that?

2   **A.**  I do.

3   **Q.**  It says, "This App is publicly available in the Apple iOS

4   App Store."

5        Do you see that?

6   **A.**  I do.

7   **Q.**  Are you going to agree with me that this one doesn't

8   relate specifically to the App Store?

9   **A.**  No.  If you look to the drawings of this patent, it talks

10  about how this technology is utilized on the iPhone to provide

11  additional, in this case, body motion signals for a user.

12  This would be an example of one of those tools that's made

13  available.

14  **Q.**  Okay.  Did you look at either of these two as the dozen

15  that you reviewed?

16  **A.**  I don't recall.

17  **Q.**  Okay.

18  **A.**  I don't recall them, so probably not.

19  **Q.**  All right.  We talked about how your list may be

20  over-inclusive.  It may be over-inclusive to the extent that

21  certain patents might be counted in multiple categories.

22       You would agree?

23  **A.**  I explicitly state that in my report, yes, ma'am.

24  **Q.**  Okay.  So you would agree with that?  Yes?

25  **A.**  Yes, ma'am.

1   **Q.**   You talked about trademarks.  I think you said 1500 or so

2   trademarks?

3   **A.**   Approximately.

4   **Q.**   And you said those are all part of the asset plan and

5   portfolio, I think were the words you used.

6        Do you remember that?

7   **A.**   I accept that.

8   **Q.**   Okay.  And you testified that Apple has IP rights relating

9   to its registered trademarks; right?

10  **A.**   Trademarks are a form of intellectual property, yes.

11  **Q.**   Okay.  And are those licensed in the DPLA?

12  **A.**   Not necessarily, no.

13  **Q.**   Okay.  Are some of them?

14  **A.**   I don't believe, generally speaking.  And, again, this is

15  just an assessment of what Apple's invested in.

16  **Q.**   Okay.  So you talk about the trademarks just to talk about

17  what Apple invested in but not what it's licensing to

18  developers.

19  **A.**   Well, it's more specific.  Developers do use the

20  trademarks.

21       For example, we saw testimony of Epic Games using the App

22  Store trademark to promote *Fortnite*, so it is possible.  It

23  does happen that Apple licenses its trademarks to developers.

24  **Q.**   All right.  Are they doing that in the DPLA?

25  **A.**   I don't believe it's specifically set forth in the DPLA.

MALACKOWSKI – DIRECT / DOREN

1    **Q.**  So how does a developer know whether it's licensed to use

2    a specific trademark?

3    **A.**  Well, as described by Mr. Schiller, there are teams at

4    Apple that coordinate with the developer teams to help them

5    with the tools and intellectual property that would be

6    valuable to them.

7         So to the extent that it was a design patent or a

8    trademark that's typically used by the company only and it was

9    appropriate for them to license it, they would.

10   **Q.**  All right.  So that's an ad hoc analysis?

11   **A.**  I don't think it's ad hoc because it's a systematic effort

12   to coordinate between the in-house teams and the developer

13   teams.  It's a very robust platform.

14   **Q.**  Okay.  But there is no document that says, I, developer,

15   have access to these trademarks for use of promoting my app,

16   for example?

17   **A.**  I think --

18   **Q.**  There is no way to find that?

19   **A.**  -- that would be a separate agreement from the DPLA.

20   **Q.**  Does it exist?

21   **A.**  I don't know.  It wasn't part of my consideration.

22   **Q.**  Yeah.  You have not seen anything?

23   **A.**  I have not seen a trademark license specifically.

24   **Q.**  Okay.  So it was not part of your analysis to understand

25   whether and to what extent Apple actually licenses its

1    trademarks to any developer?

2    **A.**   That's not true.  I explained how I considered it in my

3    analysis, but I did not seek to conduct an inventory of the

4    subset of trademarks that were specifically licensed to

5    developers.  That was not part of my assignment.

6    **Q.**   One of the trademarks you list is the one that we all

7    know, "There Is An App For That"; right?

8    **A.**   I mentioned that specifically in my report.

9    **Q.**   Is that a trademark that is licensed under the DPLA?

10   **A.**   I don't believe so.

11   **Q.**   Okay.  And how do I know that?  Do I find that in the

12   DPLA?

13   **A.**   As you've asked me and I have explained, I don't believe

14   the DPLA provides those trademark licenses.  I believe that's

15   a separate and distinct form of agreement.

16   **Q.**   All right.  Under the DPLA, you say that the developer

17   gets access to a comprehensive suite of developer tools,

18   software, and other intellectual property; right?

19   **A.**   Yes, ma'am.

20   **Q.**   And you talked about Epic's use of APIs.

21        Do you remember that?

22   **A.**   Yes, ma'am.

23   **Q.**   And I think we established that Epic is one of maybe a

24   million developers of apps for the Apple iStore -- Apple App

25   Store?

1  **A.**  One of a million entities that have executed the DPLA.

2  **Q.**  Okay.  How many developers currently have apps on the

3  Apple App Store?  Do you know?

4  **A.**  No.  It's obviously a subset of the total because many

5  have multiple apps.  We talked about --

6  **Q.**  Sir, I'm just asking if you know the number.  Do you?

7  **A.**  I don't know the exact number.

8  **Q.**  All right.  Well, I'll agree with you it's less than a

9  million, but you don't know how much less?

10  **A.**  Correct.

11  **Q.**  Okay.  Did you study any of the other less than a million

12  but more than one Epic's use of APIs in connection with your

13  work here --

14  **A.**  You mean specific developer use?

15  **Q.**  Sure.

16  **A.**  No.  My focus was on Epic.

17  **Q.**  Okay.  And Epic is one of, I think we can all agree, a

18  vast quantity of developers who develop apps for the App

19  Store?

20  **A.**  I accept that.

21  **Q.**  You talked a little bit about open source.

22  **Do you remember that?**

23  **A.**  Yes, ma'am.

24  **Q.**  Well, so you don't -- you don't think that Apple is

25  licensing open-source technology under the DPLA, or do you?

1    **A.**   I don't offer an opinion in that regard.  My work is

2    focused on the proprietary IP, not the open source.

3    **Q.**   Okay.  So the open source shouldn't be part of any of your

4    work here; right?

5    **A.**   The patents I identified are inventions incremental to the

6    open-source technology.

7    **Q.**   So in terms of, for example, WebKit, WebKit is one of the

8    technologies that's listed in your report; right?

9    **A.**   It is.

10   **Q.**   Okay.  And you're aware that WebKit is open source?

11   **A.**   Includes open source, sure.

12   **Q.**   Okay.  And same with Swift; right?

13   **A.**   Many APIs include open source.

14   **Q.**   All right.  And you didn't do any analysis to disaggregate

15   what the value of WebKit is that's attributable to the

16   open-source aspects, as opposed to what you might call

17   proprietary aspects; right?

18   **A.**   Well, "value" is a monetary term, so the answer is no, I

19   did not do that.

20   **Q.**   Did you do any qualitative distinction between the

21   open-source portions versus the proprietary portions?

22   **A.**   Only in totaling the proprietary portions, not

23   qualitatively putting them against each other.

24   **Q.**   Okay.  You just were talking about in terms of what you

25   just said, the number of patents that mention WebKit, for

1    example?

2    **A.**  Or trademarks or copyrights, yes.

3    **Q.**  Okay.  But we're just talking about the number that

4    reference it.

5    **A.**  Well, in part, true.

6    **Q.**  But in terms of when you said -- when you answered my

7    question about qualitative analysis, you pointed to the

8    tallying of the pieces of IP that reference that technology;

9    right?

10   **A.**  Meaning I focused on the Apple portion, not the

11   open-source portion.

12   **Q.**  You agree that not all IP is protectable; right?

13   **A.**  Sure.  The most obvious example would be an expired

14   patent.

15   **Q.**  Okay.  Well, also -- well, let's just talk about APIs.

16       Do you agree that not every piece of code or API software

17   is protectable under the IP laws?

18   **A.**  Yes.

19   **Q.**  Okay.  Some code, even if it is protectable, might still

20   be subject to fair use doctrine; right?

21   **A.**  That's a legal principle, but I'm generally familiar and

22   it may, yes.

23   **Q.**  Is that part of your certification process, understanding

24   that?

25   **A.**  Well, I worked on matters where that was at the core, the

1    *Oracle/Google* case you mentioned being one.

2    **Q.**   Yep.  Okay.

3         So fair use -- not looking for a legal opinion, but fair

4    use -- your understanding is that if something qualifies for

5    that, it can be used by a third party without violating the

6    author's IP rights; right?

7    **A.**   Consistent with the legal parameters of that finding, yes.

8    **Q.**   And you are familiar with instances, right, in which

9    courts have declined to enforce an author's copyright claim on

10   code because enforcing that copyright would risk harm to the

11   public by limiting the future creativity of new programs;

12   right?

13   **A.**   I'm aware of cases that address that issue, yes.

14   **Q.**   And *Google vs. Oracle* in the Supreme Court is one of them;

15   right?

16   **A.**   It is.

17   **Q.**   You read that one?

18   **A.**   I did.

19   **Q.**   All righty.

20        And, in fact, the Supreme Court, you're familiar, did, in

21   fact, find that some of Oracle's APIs are subject to fair use?

22   **A.**   I defer to the language, but, generally speaking, that's

23   my understanding.

24   **Q.**   And you have not done any analysis here to determine

25   whether any of the APIs that Apple has and may or may not

1  license to developers are, in fact, subject to fair use;

2  right?

3  **A.**  Correct.

4  **Q.**  We talked a bit about freeriding.

5  Do you remember that?

6  **A.**  I do.

7  **Q.**  And I think you said that one of the requested reliefs

8  that caused you some concern is that it would force Apple to

9  allow stores within a store.

10  Do you remember that?

11  **A.**  As an example, yes.

12  **Q.**  You have not cited or offered any evidence that shows that

13  the reason Apple chose not to allow third-party app stores

14  within the Apple App Store was to protect its IP; right?

15  **A.**  I'm sorry.  Did I offer evidence -- can you restate that

16  question, please?

17  **Q.**  Sure.

18  You have not offered any evidence or cited any evidence

19  that demonstrates that the reason why Apple prohibits stores

20  within a store was tied to protecting its IP; right?

21  **A.**  I think that's true.  My explanation was investment.  Yes.

22  **Q.**  You don't know that the prohibition on stores within a

23  store has anything to do with Apple trying to protect its

24  investment in IP?

25  **A.**  No.  I believe I do.  I believe that testimony was

MALACKOWSKI – DIRECT / DOREN

1    provided during this trial.

2    **Q.**   Okay.  You think Mr. Schiller said that?

3    **A.**   I don't recall if he specifically said, but I think,

4    generally it's been discussed as to why Apple does not want to

5    have a store within a store and the repercussions that would

6    have on its ability to provide adequate security and other

7    elements of technology protected by IP.

8    **Q.**   Okay.  That's a different point.

9         Security is not IP protection, it's security; right?

10   **A.**   But security tools are protected by IP.

11   **Q.**   Yeah.  I'm asking a very narrow question.

12        Set aside security.  I'm asking if you have heard or have

13   any evidence that the reason Apple prohibits stores within a

14   store is in order to protect against freeriding on Apple's IP?

15   **A.**   I believe that is true.  I don't recall if they said it

16   directly or indirectly through their control.  I don't know if

17   they used the word "IP."

18   **Q.**   Okay.  So if they didn't, it would be -- your only

19   evidence is if it happened in this trial in the live

20   testimony?  You haven't seen any document; right?

21   **A.**   I don't think it's a debatable point.  I don't recall

22   specific testimony or documents, but I do believe that Apple

23   is concerned about its IP rights if it was subject to the

24   requested --

25   **Q.**   Okay.

1   **A.**   -- injunctions.

2   **Q.**   So -- I'm not talking about the injunction right now --

3   **A.**   Equitable relief.

4   **Q.**   -- I'm talking -- I'm not talking about that either.

5        I'm talking about the justification for the prohibition

6   that exists right now that there can be no stores within a

7   store on Apple App Store.

8        Do you know that?  That's a prohibition that exists today;

9   right?

10  **A.**   Generally, yes.  I understand that.

11  **Q.**   Have you seen any evidence that the reason that

12  prohibition came into being was to protect Apple's IP rights?

13  **A.**   Not specifically using your words --

14  **Q.**   Okay.  Thank you.

15       And, similarly, you do not have any evidence or documents

16  that show that the reason Apple chose not to allow sideloading

17  on iOS devices was to protect Apple's intellectual property

18  rights; correct?

19  **A.**   No.  The IP protects those features from happening.

20  You're --

21  **Q.**   Sir --

22  **A.**   -- phrasing the question in a very odd way.

23  **Q.**   I'm phrasing it in the way I would like it answered.  If

24  you can't answer it, I will move on.

25       But I'm just asking if you have seen any documents or any

1    evidence that shows and connects the no sideloading policy to

2    protection of Apple's IP, that that's the reason they have

3    that restriction.

4         Have you seen that?

5    **A.**   I believe the -- yes.  I can't tell you they use those

6    exact words, but I believe that Apple wants to protect its

7    investment -- its IP-protected investment by preventing those

8    activities.

9    **Q.**   And you've seen references to their intellectual property

10   rights as opposed to security issues?

11   **A.**   That's why I said I can't tell if they used those exact

12   words at the trial, but the substance is the same.

13   **Q.**   I'm now -- not talking about trial; I'm now asking if

14   you've seen any documents.

15        Have you seen any documents?

16   **A.**   Yes.  Documents that talk about Apple protecting its

17   innovation through IP and having control over that, which

18   would include the licenses, the policy statement --

19   **Q.**   I'm going --

20   **A.**   -- the depositions.

21   **Q.**   I'm going to try one more time and then I'll move on.

22        Have you seen -- other than your belief that they have

23   innovation, that they have patent protection -- I'm not

24   disputing that there are patents out there.  I just want you

25   to understand.  I'm just asking if you have seen anything that

MALACKOWSKI – DIRECT / DOREN

1  says, I am going to -- I, Apple, am going to impose this

2  restriction on no sideloading on devices in order to make sure

3  that nobody takes advantage of my IP.

4  **A.**  I can't recall a document so specific to that language.

5  **Q.**  You also talked about what would happen on freeriding.

6  They would -- Apple would lose out on the negotiated-for

7  compensation.

8      Do you remember that?

9  **A.**  Yes, ma'am.

10  **Q.**  You know that Apple says that they don't negotiate their

11  compensation, though; right?

12  **A.**  They do not negotiate the 30 percent, for example, with

13  developers individually, that's true.

14  **Q.**  You've seen, I think you said, a thousand licenses in your

15  time?

16  **A.**  At least.

17  **Q.**  You would agree that royalty rate is a form of value that

18  sets a price at which licensors will allow others to use a

19  limited portion of their IP rights; correct?

20  **A.**  Yes.  That's a common definition.

21  **Q.**  And a royalty is a way for Apple to get paid for its use

22  of IP; right?

23  **A.**  It can be.

24  **Q.**  And have you -- you said you saw the DPLA.

25      Have you seen Schedule II to the DPLA?

MALACKOWSKI – DIRECT / DOREN

1    **A.**  I have.

2    **Q.**  And that sets forth a commission rate that developers must

3    pay; right?

4    **A.**  For in-app purchases for having apps on the platform, yes.

5    **Q.**  That's the only way Apple gets paid from people making

6    in-app purchases on the App Store; right?

7    **A.**  True.

8    **Q.**  Okay.  Why don't we take a look at it.  It should be the

9    same DX3370, I hope.  And it's going to be -- I'm going to

10   turn your attention to .083.

11   **A.**  I have it.

12   **Q.**  Do you see in Section 3.4 that it says, "Apple shall be

13   entitled to the following commissions in consideration for its

14   services as your agent and/or commissionaire."

15       Do you see that?

16   **A.**  Yes, ma'am.

17   **Q.**  They don't use the word "royalty"; right?

18   **A.**  Well, it's not a royalty.

19   **Q.**  Okay.

20       You think that Apple can charge whatever commission it

21   wants, right, even up to 90 percent?

22   **A.**  Theoretically a patent owner can charge whatever

23   commission the market will bear.

24   **Q.**  Yeah.

25   **A.**  90 percent --

1   **Q.**   I'm asking --

2   **A.**   -- is an extreme example, but theoretically.

3   **Q.**   Okay.

4        So Apple, in your view, is not restricted from charging 90

5   percent commission; right?

6   **A.**   Well, that's an extreme hypothetical.  I haven't studied

7   whether there would be any market or other restrictions

8   associated with such an extreme rate.

9   **Q.**   Okay.

10       You agree that there's a limited period of exclusivity

11   associated with the intellectual property grant; right?

12   **A.**   It depends upon the intellectual property.  There is no

13   limit for trade secrets, for example.  There is a 20-year

14   limit, essentially, for patents.

15   **Q.**   And you didn't itemize trade secrets because they are not

16   publicly available; right?

17   **A.**   They are secret.

18   **Q.**   Right.  So those aren't part of your analysis.

19   **A.**   Correct.  My analysis is understated or conservative by

20   not considering those.

21   **Q.**   And is it your position that the trade secrets are being

22   licensed by the DPLA?

23   **A.**   They can be.  In fact, in the interchange between --

24   **Q.**   Are they being licensed under the DPLA or -- yes?

25   **A.**   Yes.  They can be, yes.

1    **Q.**   Are they?

2    **A.**   It depends upon the need of the developer.

3    **Q.**   Okay.  And there is no time limit in the DPLA for how long

4    Apple gets commissions; right?

5    **A.**   I believe that's correct.

6    **Q.**   You talked about the IP guidelines.

7    **A.**   I did.

8    **Q.**   And you have even quoted a few parts with your counsel;

9    right?

10   **A.**   As well as in my report, yes.

11   **Q.**   But you agree and understand that those IP guidelines

12   specifically say that exercise of intellectual property rights

13   are not free from scrutiny under the antitrust laws; right?

14   **A.**   Absolutely agree, yes.

15   **Q.**   Certain types of conduct with respect to intellectual

16   property may have anticompetitive effects that the antitrust

17   laws can and do protect; right?

18   **A.**   Yes, ma'am.

19   **Q.**   And, in fact, restrictions in licensing agreements can

20   harm competition?

21   **A.**   It's possible.

22   **Q.**   And you're not offering any opinion here as to whether any

23   of Apple's restrictions are or are not anticompetitive; right?

24   **A.**   Correct.

25   **Q.**   Are you aware as to whether courts can reject the

1    justification from a company saying that they are taking

2    action to protect intellectual property as pretext if there is

3    no evidence that the firm's restrictive conduct was actually

4    motivated by its desire to protect its IP?

5    **A.**   I think there are cases that address such, and one of the

6    examples in the guideline addresses that.

7    **Q.**   Right.  And *Kodak* is the case you might be thinking of --

8    **A.**   It is.

9    **Q.**   -- as one example?

10   **A.**   As an example.

11          **MS. MOSKOWITZ:**   Okay.  Your Honor, I pass the

12   witness.

13          **THE COURT:**   Redirect.

14       And, Ms. Forrest, your team, my rough estimate, has 3

15   hours and 10 minutes left in this trial.

16                    <u>**REDIRECT EXAMINATION**</u>

17   **BY MR. DOREN:**

18   **Q.**   Hello, Mr. Malackowski.

19   **A.**   Hello.

20   **Q.**   Could I please ask you to turn back to DX3900, which is

21   the DPLA.

22   **A.**   Yes, sir.

23   **Q.**   First of all, are you familiar with something called a

24   portfolio license?

25   **A.**   I am.

MALACKOWSKI – REDIRECT / DOREN

**Q.**   And what is the DPLA?

**A.**   It would be more in the order of a portfolio as opposed to a patent-specific license.

**Q.**   And can you describe for the Court, please, what a portfolio license is?

**A.**   Yes, Your Honor.  It's what I was alluding to in cross-examination, that some patent agreements are asset-specific, so you're licensed to these patents, these trademarks, and they're identified; and others are portfolio licenses which you are licensed to the IP that suits your application or your need across anything in our portfolio.

**Q.**   And what is your understanding, based on your review of the DPLA, as to whether or not it is a portfolio license?

**A.**   It is.

**Q.**   And what is the utility of having a portfolio license as opposed to a -- one that enumerates specific patents within it?

**A.**   Well, there is a practical and a substantive utility.

The practical utility is the IP assets vary almost daily as new patents are issued or some are expired.

The substantive benefit is that your licensing partners know that they are not going to be restricted in whatever they develop because you will say, Well, that's not included.  So they have a broader right or access to your entire portfolio.

**Q.**   And, in fact, this is a portfolio -- or excuse me -- this

MALACKOWSKI – REDIRECT / DOREN

1    is a license that remains in place over time; is that true?

2    **A.**   It is.

3    **Q.**   And, therefore, what is the more practical approach to

4    licensing IP as it, too, evolves over time?

5    **A.**   Most agreements --

6              **MS. MOSKOWITZ:**  Objection, leading.

7              **THE WITNESS:**  -- the portfolio --

8              **THE COURT:**  It is leading.

9    BY MR. DOREN:

10   **Q.**   In that context, sir, what does the -- does a portfolio

11   license have any particular utility?

12   **A.**   Yes.  I would say, in fact, the majority of ongoing

13   cooperative license agreements between parties are

14   portfolio-based for that reason, that you tend to find

15   asset-specific licenses more in the resolution of a dispute or

16   for a historical issue.

17   **Q.**   And, sir, when -- on direct, I asked you -- and I will now

18   ask you again -- among the things that Apple seeks under the

19   DPLA in return for the license, you identified two particular

20   things.

21         Can you remind us what those were?

22   **A.**   Yes.  They were, first, the app review process, that you

23   have to submit your application developed with Apple's IP to

24   their review; and then, second, if it's determined that it can

25   be distributed, it must be distributed on the App Store, on

1    the platform.

2    Q.   And if I could ask you to look, please, at the first page

3    of Exhibit DX3900, and in particular, the first paragraph on

4    the first page under the bold heading "Purpose."

5    A.   Yes, sir.

6    Q.   And could you please read that paragraph to us.

7    A.   First paragraph, "Purpose.  You would like to use the

8    Apple software as defined below to develop one or more

9    applications as defined below for Apple-branded products.

10   Apple is willing to grant you a limited license to use the

11   Apple software and services provided to you under the program

12   to develop and test your applications on the terms and

13   conditions set forth in this agreement."

14   Q.   And, sir, you were asked earlier whether you were aware of

15   any indication in the DPLA that it was intended to protect

16   Apple's intellectual property.

17        Do you recall that?

18   A.   Yes, sir.

19   Q.   How do you view this first paragraph in the first page

20   under the bold heading "Purpose"?

21   A.   Well, it essentially sets forth the understanding that we

22   are talking about Apple's proprietary assets, and the purpose

23   of the agreement is to facilitate that sharing or permission

24   to use them, but they're Apple's assets.

25   Q.   And, sir, you described in direct your analysis of Apple's

MALACKOWSKI — REDIRECT / DOREN

1    intellectual property portfolio.

2         And can you remind us, please, what the first step in that

3    was.

4    A.   First step was to look to research and development

5    investment before looking to the actual patents.

6    Q.   And was there a step at which you narrowed the Apple IP to

7    that related to the iOS ecosystem?

8    A.   Yes.  So I began by looking at all of Apple's IPs, some

9    25- to 30,000 patent assets, for example.  Second step was to

10   narrow that to the iOS ecosystem, 3500 to 4,000 patents.  And

11   then there was a third step to narrow it further to Epic.

12   Q.   And we looked at conclusions that you had reached

13   regarding patents and other intellectual property protections

14   related to iOS, the App Store, and developer tools, each

15   category broadly.

16        Do you recall that?

17   A.   I do.

18   Q.   And were any of those findings specific to Epic?

19   A.   No.  That would be the third level, where there was Epic's

20   level findings.

21   Q.   And do you recall when you were shown a spreadsheet

22   related to API -- excuse me, pardon me -- to patents that

23   related to the App Store?

24   A.   I do.

25   Q.   And you testified in general about whether or not you

1   would have included most design patents on that; correct?

2   **A.**   I do.

3   **Q.**   And what was your intent regarding the inclusion of design

4   patents within, for example, the category for the App Store?

5   **A.**   Absolutely to include them.  I specifically call out

6   design patents in my summary as distinct from utility patents.

7   **Q.**   And you were shown, sir -- and I hate to make you switch

8   binders, but in the large black binder, you were shown a

9   document marked PX1182, which is "Graphical user interface for

10  a display screen or a portion thereof"; correct?

11  **A.**   Yes, sir.

12  **Q.**   And did you and your team conclude that this was relevant

13  to the App Store?

14  **A.**   Absolutely.  And I stand by that today.

15  **Q.**   And why is that?

16  **A.**   Aside from saying that it is is because when you look at

17  it, it is specifically addressing the design of the display of

18  the App Store on the iPhone and related applications.

19  **Q.**   And, sir, you were also shown PX1183.

20       Do you recall that?

21  **A.**   Yes, sir.

22  **Q.**   And that patent was identified as "System for determining

23  the quality of sleep."

24       Do you recall that?

25  **A.**   I do.

MALACKOWSKI – REDIRECT / DOREN

1  **Q.**  And you were shown a sentence regarding prior art and

2  being present and publicly available in the Apple iOS App

3  Store.

4      Do you recall that?

5  **A.**  I do.

6  **Q.**  So, first of all, sir, would an improvement in the ability

7  of the iPhone to administer systems for determining the

8  quality of sleep have any impact on app developers?

9  **A.**  Yes.  It would provide them additional Toolkit to use if

10  they wanted to address that issue in their apps.

11  **Q.**  So would this be an example, sir, of intellectual property

12  patented by Apple that is not specific to Epic?

13  **A.**  Correct.

14  **Q.**  And if you could look, please, sir, at Column 16 on page

15  .19 of that patent.

16  **A.**  Yes, sir.

17  **Q.**  And if you look at the neighborhood of line 15.

18  **A.**  Yes, sir.

19  **Q.**  And you see the statement, "Using the mobile phone" -- it

20  says, "Communicating the body motion signal from the

21  peripheral device to the mobile phone; and -- and using the

22  mobile phone to:  Determine respiration amplitudes from the

23  body motion signal; detect a change in the body motion signal

24  in a given window of time; detect an increase or an absence of

25  an increase in a respiration cycle" -- and so on and so forth.

MALACKOWSKI – REDIRECT / DOREN

1          Do you see that?

2     **A.**   I do.

3     **Q.**   In your opinion, sir, does this patent have relevance to

4     app developers?

5     **A.**   Absolutely without question.

6     **Q.**   How so?

7     **A.**   It is describing an invention that they may use if they

8     wish to take to advantage the gyroscope feature, essentially,

9     of the phone.

10    **Q.**   Now, sir, you produced your spreadsheets of all the

11    patents that were included in all the counts that you

12    testified about here today; correct?

13    **A.**   Yes, sir.

14    **Q.**   And how long ago did you produce those?

15    **A.**   With my report prior to my deposition, so weeks, if not

16    months, ago.

17    **Q.**   And you were shown two patents here today by plaintiff's

18    counsel; is that right?

19    **A.**   Yes, sir.

20    **Q.**   Mr. Malackowski, there was a discussion at the beginning

21    of your testimony about some prior cases in which the court

22    evaluated *Daubert* motions regarding your testimony.

23         Do you recall that segment of your examination?

24    **A.**   I do.

25    **Q.**   And, first of all, sir, do you -- are many of the cases

MALACKOWSKI – REDIRECT / DOREN

1    that you testify in patent cases?

2    **A.**   Yes, sir.

3    **Q.**   And in your professional experience, how often are *Daubert*

4    motions filed against experts in patent cases?

5    **A.**   In the level of case that I'm engaged in, *Daubert* motions

6    are essentially filed in every case against every expert.

7    **Q.**   And, sir, how many times have you testified?

8    **A.**   I have provided trial testimony more than 50 times, more

9    than 200 depositions.

10   **Q.**   Thank you.

11       Let's look at a couple of the specific cases that counsel

12   referenced.

13       The first was one called *Acantha v. Depuy*.

14       Do you remember that?

15   **A.**   I do.

16   **Q.**   From the Eastern District of Wisconsin in 2018.

17       Do you recall why your opinion was excluded in that case?

18   **A.**   Yes.

19       Your Honor, in that case, one of the licenses, the

20   original patent holder had signed an exclusive license with a

21   third party, and so there was an issue as to whether that

22   exclusive licensee would be the hypothetical negotiator of the

23   royalty because he had the rights at the time or whether it

24   should revert back to the patent owner.

25       The judge excluded my reliance and, therefore, any opinion

MALACKOWSKI – REDIRECT / DOREN

1    that stemmed from my view that they should be included.

2    **Q.**   And were you precluded from testifying at all in that

3    case?

4    **A.**   No.  I testified; I just didn't testify to that particular

5    license.

6    **Q.**   And, sir, you were also asked about *Prism vs. AT&T*.

7         Do you remember that?

8    **A.**   I do.

9    **Q.**   And that was a case from the District of Nevada back in

10   2014.

11        Do you recall that?

12   **A.**   I do.

13   **Q.**   And why -- was your opinion, in fact, excluded in that

14   case?

15   **A.**   In the first of the series, yes.

16   **Q.**   And why was that?

17   **A.**   That was a time when the apportionment standard for patent

18   infringement cases was evolving, and so I presented an

19   analysis that was based on the cost savings of the technology.

20   And the judge said, Clearly, this has never been used before,

21   which was correct, and then precluded me.

22        But by the time the second case came around, it was now

23   used frequently, and so I was let back in.

24   **Q.**   And, sir, was this one of a series of cases presenting the

25   same issue?

1  **A.**   It was.

2  **Q.**   And just to make sure I understand your testimony, you

3  were precluded in 2014 on that particular opinion; is that

4  right?

5  **A.**   That's right.

6  **Q.**   Have you offered that same particular opinion in the

7  subsequent cases in that same courthouse?

8  **A.**   Same court, same judge, same methodology.  It was -- I

9  ultimately was shown to be correct.

10  **Q.**   And *Rembrandt Social Media* was another case that counsel

11  brought up.

12     Do you recall that?

13  **A.**   I do.

14  **Q.**   That was the case that you spent the longest time

15  discussing with counsel.

16     Do you recall that?

17  **A.**   I do.

18  **Q.**   And that case is out of the Eastern District of Virginia

19  in 2013.

20     Do you remember that time frame?

21  **A.**   Yes, sir.

22  **Q.**   And why was your opinion excluded in that case?

23  **A.**   Well, that was the same time period as the *Prism* case, the

24  same issue of the evolving standards for apportionment.

25     In that case, I had relied upon a survey to do the

MALACKOWSKI – REDIRECT / DOREN

1    apportionment, and the judge said it was a first time we were

2    serving -- surveying all the way down to elements of the

3    patent claim, recognized that was a matter of first

4    impression, actually certified the *Daubert* ruling for

5    interlocutory appeal, recognizing it was a first time, and

6    then it went up to the Fed Circuit.

7    **Q.**   And, sir, what happened between the time that the court

8    granted interlocutory appeal and the end of the case?

9    **A.**   The case resolved itself.

10   **Q.**   And so, again, just to make sure I understand, it was the

11   exclusion order, the order excluding your testimony, that

12   prompted the interlocutory appeal?

13   **A.**   I believe that was the sole focus of the appeal.

14   **Q.**   And that was an appeal certified by that federal judge?

15   **A.**   It was.

16   **Q.**   And let's look, if we can, please, sir, lastly at *Oracle*

17   *vs. Google* out of the Northern District of California in 2016.

18       Do you recall that case?

19   **A.**   Yes.   That's the one that went to the Supreme Court.

20   **Q.**   Okay.   And why -- and was your testimony precluded in that

21   case?

22   **A.**   Only a portion of it, not the substance of the testimony.

23   **Q.**   And other than the time that you've spent before this

24   Court in past matters, how many other times have you testified

25   as an expert in the Northern District of California?

1    **A.**   I think eight times have actually gone to trial.

2    **Q.**   And, sir, very briefly on fair use, do you know whether

3    the question of fair use of a copyright is a fact-specific

4    inquiry?

5    **A.**   It is.  It's very much case specific.

6    **Q.**   And you did not specifically analyze whether any of

7    Apple's IP is subject to a fair use; correct?

8    **A.**   Correct.

9    **Q.**   And, finally, sir, have you been retained on other matters

10   by Epic's counsel in this case?

11   **A.**   Cravath?

12   **Q.**   Yes.

13   **A.**   Yes.  I have a lot of respect for Cravath.

14   **Q.**   And have you been retained by Cravath on a variety of

15   other matters over the years?

16   **A.**   Yes, sir.

17   **Q.**   Are you ever invited to speak at firm summits on

18   intellectual property?

19   **A.**   At Cravath summits?

20   **Q.**   Yes, sir.

21   **A.**   Yes, I have.

22   **Q.**   And can you tell us who the audience is at those summits?

23   **A.**   It is Cravath partners and associates, their clients,

24   academics, judges often, industry professionals.

25   **Q.**   And when was the last time you spoke at that summit?

MALACKOWSKI – RECROSS / MOSKOWITZ

1   **A.**   I think they invited me to their inaugural summit as a

2   speaker.  I participated in workshops subsequent, and I

3   usually go every year.  Last year was suspended because of

4   COVID, I believe.

5   **Q.**   And have you --

6   **A.**   I hope I get invited back again, since you are asking

7   these questions.

8   **Q.**   Have you been retained by Cravath on matters since these

9   exclusion orders that we've just discussed?

10   **A.**   Yes.

11          **MR. DOREN:**  Pass the witness, Your Honor.

12          **THE COURT:**  Six topics, so recross limited to that

13   scope.

14          **MS. MOSKOWITZ:**  Thank you.  I won't say the number of

15   questions, but I can say it's only one of those topics.

16                      **<u>RECROSS-EXAMINATION</u>**

17   BY MS. MOSKOWITZ:

18   **Q.**   The *Rembrandt* case --

19   **A.**   Yes.

20   **Q.**   -- that you talked about, and you talked about it being

21   certified for appeal?

22   **A.**   Yes.

23   **Q.**   You're aware that the Federal Circuit rejected the

24   interlocutory appeal on your damages issue; right?

25   **A.**   There was another case on the same issue at the same time,

1    and they resolved it in that case.  Yes.

2    **Q.**  Your exclusion -- the petition for interlocutory appeal of

3    the exclusion of your opinion was rejected by the Federal

4    Circuit; correct?

5    **A.**  Yes.

6         **MS. MOSKOWITZ:**  No further questions.

7         **THE COURT:**  Anything on that?

8         **MR. DOREN:**  May as well, Your Honor.

9                    **REDIRECT EXAMINATION**

10   BY MR. DOREN:

11   **Q.**  Mr. Malackowski, do you have an understanding as to

12   whether or not the issue that your trial judge in *Rembrandt*

13   certified was subsequently resolved by the Federal Circuit?

14   **A.**  Yes.  There was -- shortly after my case was submitted,

15   there was a ruling from the Federal Circuit that dealt with

16   the same apportionment issue, making my motion moot, in my

17   opinion.

18         **MR. DOREN:**  Thank you, sir.

19    No further questions, Your Honor.

20         **MS. MOSKOWITZ:**  Nothing further, Your Honor.

21         **THE COURT:**  All right.  You may step down, sir.

22         **THE WITNESS:**  Thank you, Your Honor.

23         **THE COURT:**  Thank you.

24    Okay.  We have ten minutes.  Next witness.

25    Ms. Moskowitz, all of those exhibits that you are talking

MALACKOWSKI – REDIRECT / DOREN

1    about, none of those are in evidence and none of them are on

2    the stipulation.  I just want to make sure you didn't want

3    them in evidence.

4         **MS. MOSKOWITZ:**  I think I do want some of them in

5    evidence, Your Honor.  Can I hand up a list?  Can I make a

6    list --

7         **THE COURT:**  So I --

8         **MS. MOSKOWITZ:**   -- and share it with counsel?

9         **THE COURT:**  I have the list.  Let's just -- maybe

10   this will end up being the last thing, Mr. Doren.

11      What I had is -- well, there are the patents and then

12   there are the case cites.  I don't know if we need the case

13   cites.  1175 is a case.  1176 was a case.

14        **MS. MOSKOWITZ:**  Your Honor, if you're not inclined to

15   take the cases, I don't think we need to offer them.  They're

16   certainly something we can cite in argument.

17        **THE COURT:**  And then 3370 --

18        **MS. MOSKOWITZ:**  I believe that one was in, if I'm not

19   mistaken.

20        **MR. DOREN:**  Is that another --

21        **MS. MOSKOWITZ:**  That was the DPLA.

22        **MR. DOREN:**   That was DPLA, I think.

23        **THE COURT:**  That must be another version of it.

24        **MS. MOSKOWITZ:**  Oh, I see.

25        **THE COURT:**  Okay.  So I'll admit it to the extent

1    it's not.

2           (Defense Exhibit DX3370 received in evidence)

3           THE COURT:   1182 was a design patent.

4    No objection?

5           MR. DOREN:   None here, Your Honor.

6           THE COURT:   That's admitted.

7           (Plaintiff's Exhibit PX1182 received in evidence)

8           THE COURT:   5547 I think was another patent.

9           MS. MOSKOWITZ:   The spreadsheet.  I believe that's

10   already in.

11          THE COURT:   It's not.  So I'll admit that.

12          MS. MOSKOWITZ:   Okay.  Thank you.

13          (Plaintiff's Exhibit PX5547 received in evidence)

14          MR. DOREN:   Thank you, Your Honor.

15          THE COURT:   1182, that was a patent -- 1183, I'll

16   admit that.  That was a patent.

17          (Plaintiff's Exhibit PX1183 received in evidence)

18          MS. MOSKOWITZ:   Thank you.

19          THE COURT:   That may have been -- that was it.

20          MS. MOSKOWITZ:   Okay.  Thank you, Your Honor.

21          MR. DOREN:   Thank you.

22          THE COURT:   Thank you.

23   Okay.  Let's get him sworn in -- or do you have a witness?

24          MR. LO:   Good morning, Your Honor -- or good

25   afternoon, Your Honor.  For our next witness, Apple calls

 1    Aviel Rubin.

 2              **THE COURT:**  Okay.

 3                    <u>**AVIEL RUBIN**</u>,

 4    called as a witness for the Defendant, having been duly sworn,

 5    testified as follows:

 6              **THE WITNESS:**  I do.

 7              **THE CLERK:**  Okay.  Please be seated.  And then make

 8    sure the mic is directed under the shield, and then please

 9    state your full name and spell your last name.

10              **THE WITNESS:**  My name is Aviel David Rubin,

11    R-U-B-I-N.

12              **THE COURT:**  Okay.  We are just going to go through

13    the preliminaries.

14         Go ahead, Mr. Lo.

15              **MR. LO:**  Thank you, Your Honor.

16         May I pass up some binders?

17              **THE COURT:**  You may.

18         I said you may proceed.

19              **MR. LO:**  Thank you, Your Honor.

20                    <u>**DIRECT EXAMINATION**</u>

21    BY MR. LO:

22    **Q.**  Dr. Rubin, would you please introduce yourself to the

23    Court, please.

24    **A.**  Yes.  Hi, my name is Avi Rubin.  I'm a computer science

25    professor at Johns Hopkins University, and I'm the technical

RUBIN – DIRECT / LO

1   director of our Information Security Institute.

2            **MR. LO:**   And if I could ask Mr. Eltiste to put up

3   Slide No. 2.

4            **THE CLERK:**   Hang on.  I have to switch it over.  Here

5   we go.

6            **MR. LO:**   No problem.

7            **THE CLERK:**   Okay.

8   BY MR. LO:

9   **Q.**   And while that is coming up, Dr. Rubin, could you give us

10   a brief summary of your background.

11   **A.**   Yes.  So I got all my degrees in computer science and

12   engineering from the University of Michigan, the last one

13   being my Ph.D. in 1994.

14            After grad school, I went to work at Bellcore and then

15   AT&T Labs as a research scientist.  I spent nine years in

16   industry and then moved to Hopkins to be a professor.  I've

17   been a professor at Johns Hopkins starting in 2003, and, as I

18   mentioned, I'm also the technical director of our Information

19   Security Institute.

20            I founded two companies, Independent Security Evaluators

21   and Harbor Labs, where I now also play the role of chief

22   scientist.

23   **Q.**   And, Dr. Rubin, in terms of your professional work, do you

24   have specific areas of focus?

25   **A.**   Yes.  My work is in computer and network security and more

1   broadly, computer science.

2   **Q.**   In your binder, sir, please turn to DX4880.

3   **A.**   Okay.

4   **Q.**   Do you recognize DX4880?

5   **A.**   Yes.   This is my CV.

6   **Q.**   Okay.   And is it accurate, to the best of your knowledge?

7   **A.**   Yes.

8   **Q.**   All right.

9        **MR. LO:**   Your Honor, we seek to admit DX4880.

10       **MR. BYARS:**   This is Brent Byars for Epic.   I believe

11   it was subject to the stipulation, so no objection.

12       **THE COURT:**   Admitted.

13       (Defense Exhibit DX4880 received in evidence)

14       **MR. LO:**   And, Your Honor, while we are on that

15   subject, with respect to Dr. Rubin's written direct and the

16   exhibits that are subject thereto, those are all going to be

17   part of the stipulation, so we will provisionally move those

18   into evidence, subject to the parties' usual methods here.

19       **THE COURT:**   All right.   Admitted provisionally.

20       **MR. LO:**   Mr. Eltiste, would you put up Slide No. 3.

21   **BY MR. LO:**

22   **Q.**   Dr. Rubin, what were you asked to do in this case?

23   **A.**   In this case, I was asked to look at Apple's app review

24   process, including the human manual review, as well as the

25   centralized App Store distribution, and then to determine

RUBIN – DIRECT / LO

1  whether or not it has an impact on security and, if so, what

2  impact, where security includes privacy, reliability, and

3  trustworthiness.

4  **Q.**   Okay.  And were you asked to do anything else?

5  **A.**   Yes.  I was asked to look for real-world data for studies

6  when forming my opinions.

7  **MR. LO:**   Okay.  And, Mr. Eltiste, if you could put up

8  Slide No. 4.

9  **BY MR. LO:**

10  **Q.**   And while he is doing that, Dr. Rubin, did you reach any

11  conclusions in this case?

12  **A.**   Yes, I did.

13  **Q.**   Okay.  And what were they, at a high level?

14  **A.**   I concluded that Apple's App Store review, with the human

15  manual review and the centralized app distribution model,

16  offers significant security benefits to iOS and results in

17  lower infection rates on phones, as well as a lower volume of

18  malicious or untrustworthy apps in the App Store.

19  **Q.**   Okay.  And we'll get into it in a little bit more detail,

20  but just briefly, what's the difference between saying lower

21  infection rates and lower volumes of -- of those types of

22  apps?

23  **A.**   Sure.  So the lower infection rates has to do with the

24  actual infection on a device, so if a phone has a piece of

25  malware on it, it's been infected; whereas lower volume of

```
1    malicious apps means that these apps that can potentially
2    infect a device are -- are in the App Store.
```

3              **MR. LO:**   Okay.  And maybe we'll do one more thing,

4    and, Mr. Eltiste, if you could put up Slide No. 5.

5    **BY MR. LO:**

6    **Q.**   Dr. Rubin, you've said the word "security" a couple of

7    times already.

8         For the purposes of your work in this case, what do you

9    mean when you say "security"?

```
10   A.   In this case, I took a broad look at security, and I look
11   at security as dealing with an adversary.  That means there is
12   somebody bad who wishes to cause harm.
```

13        And there are many different things that can cause

14   security issues.  One of the big security issues is safety.

15   Safety has to do with making sure that malicious code isn't

16   running on a device and isn't able to do any harm to a device

17   if it does run on a device.

18        "Privacy" is a term that we're all familiar with.  It has

19   to do with protecting confidential information, such as your

20   medical records and your location and all of the information

21   that really belongs only to you.

22        "Reliability" has to do with knowing that your device will

23   work when you need it.  For example, if you have an emergency

24   and you need to call 911, you don't want an app with malware

25   to prevent you from being able to do that.  Another quick

RUBIN – DIRECT / LO

1    example is if you're driving down the street late at night,

2    your car breaks down, you're like, Okay, well I have a phone,

3    and you try to call for help and the phone doesn't work

4    because of some malware on it.

5         And the last one, "trustworthiness," has to do with your

6    confidence that all of the security properties are going to be

7    there, that your device is going to be able to protect you,

8    your information, etc.

9    **Q.**   Thank you.

10        **THE COURT:**  Okay.  It's a short introduction.

11   We will stand in recess until 1:15.  Thank you.

12                   (Recess taken at 12:35 p.m.)

13                   (Proceedings resumed at 1:17 P.M.)

14        **THE CLERK:**  Remain seated.  Court is in session.

15   Come to order.

16        **THE COURT:**  Okay.  We are back on the record.

17   I see Mr. Doren at the podium.  Mr. Doren.

18        **MR. DOREN:**  Thank you, Your Honor.

19   The rebuttal witness issue that we spoke about earlier

20   this morning appears to have ripened.  At 10:34 a.m. as I was

21   standing at the podium preparing to resume my examination of

22   Mr. Malackowski, Ms. Forrest orally informed me that Epic

23   intended to call Shaan Pruden, a current Apple employee,

24   tomorrow.  And at 11:16 we received -- or 10:45 we received an

25   email with that notice, at 11:16 an emailed trial subpoena

1    which we have not accepted service of.

2        We were told this morning at 8:00 a.m. that the rebuttal

3    witness would be a third party, that we would have a chance to

4    depose them, that it would depend on whether what happened

5    today with the witnesses, that it was based in part on a

6    redlining in our findings of fact, and it does not appear that

7    any of that has come to pass.

8        Your Honor, our agreement was that notice of rebuttal

9    witnesses would be provided by 7:30 a.m. the day before.  This

10   was intentionally and provocatively several hours late, after

11   misleading statements made, after the deadline had already

12   been blown.  And, Your Honor, no rebuttal witness for which we

13   received notice after 7:30 a.m. this morning should be

14   permitted.

15       **MS. FORREST:**  Well, Your Honor, I –– I'm sorry to ––

16   that we are at a point where words like "misleading" and

17   "intentionally misleading" are now being used.  I would have

18   hoped that we would have been at a different point.

19       Let me just start by saying that the information this

20   morning related –– about whether or not the current witnesses

21   who were going on today would impact the rebuttal witnesses

22   had to do with two previously noticed rebuttal witnesses,

23   Dr. Lee and Ms. Mathiowetz.  Dr. Lee is somebody who's a

24   security expert and he would directly respond to Dr. Rubin,

25   hence that's why –– that was the witness to which I was

1    referring.  Apple has long been on notice of him.

2    Ms. Mathiowetz related to Mr. Hansen's.  So I was not in

3    any --

4            THE COURT:  This morning you talked about a -- what

5    you told me specifically related to a striking -- or a --

6    something that Apple had done in its findings of fact.

7            MS. FORREST:  Yeah, and now I will -- I wanted to now

8    get to that because what I first wanted to do was address the

9    idea that somehow it related to the witnesses of today.  That

10   had to do with Mathiowetz and Lee, not with this other person.

11       With what happened was in Apple's findings of fact

12   number 53 --

13           THE COURT:  All right.  What docket number?  Do I

14   have it on the docket?

15           MS. FORREST:  I don't know the docket number of their

16   findings of fact.

17           THE COURT:  Oh, wait.  Well, I can tell you.

18   Actually --

19           MS. FORREST:  The --

20           THE COURT:  -- I got them this morning.  Hold on.

21                   (Pause in the proceedings.)

22           THE COURT:  I thought I got them this morning.

23           MS. FORREST:  It was also sent yesterday at 3:15,

24   Your Honor, by email to chambers.

25                   (Pause in the proceedings.)

1          **MS. FORREST:**  And I can describe the issue, Your

2    Honor.

3          **THE COURT:**  All right.  Go ahead.  I'm not finding it

4    quickly.

5          **MS. FORREST:**  Your Honor, the issue has to do with

6    IAP.  And there had previously been in the findings of fact of

7    Apple that IAP was introduced in 2009, a fact which no one

8    really contested.

9      What was new was, as you may have seen, there was back and

10   forth with Mr. Schiller as to whether or not there was the

11   ability for in-app commerce opportunities prior to the launch

12   of the IAP functionality.

13     The importance of that is if there was an opportunity for

14   developers to have had the ability to have offered in-commerce

15   opportunities before IAP launched, then the launch of IAP

16   would have effectively increased the cost to the developers of

17   those in-commerce opportunities.

18     We introduced a number of documents which we believed

19   showed that IAP, after Mr. Schiller for the first time

20   testified that IAP had not been possible, an in-commerce

21   opportunity had not been possible prior to 2009, I introduced

22   several documents to try and refresh his recollection that, in

23   fact, a number of entities had utilized in-commerce

24   opportunities prior to the launch of IAP.

25         He then disagreed also with Mr. Forstall's testimony,

1    which we then played in court, who said that IAP in-commerce

2    had been available.

3         Ms. Pruden, we've pulled up now, we've got 20 documents.

4    And if they want to stipulate to the documents, we don't have

5    to call the witness.  They're business records.  We'd be

6    perfectly happy to have the documents simply come in.  Are

7    dated in the prior to the launch of IAP in November of 2009 or

8    whatever the date is, March of 2009.  And we just want her to

9    authenticate those documents to demonstrate the in-commerce

10   use by developers prior to the launch of the functionality of

11   IAP, that they were doing that.  That's the only purpose for

12   Ms. Pruden.  It would be 15 minutes.

13        If they will stipulate to those documents coming in, Your

14   Honor, we need not call her.

15        **MR. DOREN:**  Your Honor, in the original draft

16   findings of fact, we stated in September 2009, Apple

17   introduced in-app purchase IAP functionality which had not

18   previously been available.  And we've -- and Mr. Schiller was

19   off the stand two days ago.  He was crossed.  He was crossed

20   on documents related to this issue.  The Court can evaluate

21   this issues.

22        This is the first time I'm hearing any justification or

23   explanation for the notice that we received at 10:30 this

24   morning regarding Ms. Pruden, and I would suggest that I, at

25   least, was misled to think that any discussion about taking

1   depositions of third-party rebuttal witnesses this morning had

2   anything to do with the two previously deposed experts.  This

3   is sandbagging, pure and simple.

4       They've had a chance to cross-examine the witness that

5   testified that way.  They had a chance to put their documents

6   in the record.  They had a chance to put those documents in on

7   their exhibit list.  They had a chance to use Ms. Pruden's

8   deposition designations, which they did use for other purposes

9   in putting the -- the record before this Court.  Now is not

10  the time for them to be attempting to kick this door open.

11  It's not rebuttal.  Notice is late.  It shouldn't be allowed.

12          MS. FORREST:  Your Honor, this is absolutely not

13  misleading.  And --

14          THE COURT:  But it -- it may be late.  So this is --

15          MS. FORREST:  It's --

16          THE COURT:  -- what we're going to do.  This is what

17  we're going to do.

18      You're going to give me documents.  And I'm going to go

19  back and I'm going to look at the proposed findings of fact.

20  And you can give me one page about where to look for things.

21  So tell me what finding of fact you think was misleading and

22  on which you were not on notice.

23      Mr. Schiller testified for multiple days, the last of

24  which was May 17th which was three days ago.

25          MS. FORREST:  Your Honor, in the meantime, may I just

1   sort of -- I want clear up something.

2       We were actively interviewing third-party developers in

3   different parts of the country who had in fact offered

4   in-commerce opportunities.  We -- that was the issue about

5   whether or not they were going to depose somebody.

6       We thought we had located one.  We realized we could do it

7   through the documents and not inconvenience somebody flying

8   during a pandemic across the country.  That was what I was

9   referring to this morning.  This was not sandbagging --

10          **THE COURT:**  So --

11          **MS. FORREST:**  -- it was not misleading.

12          **MR. DOREN:**  All I'm hearing, Your Honor, is they

13  could have told us this morning or last night or two days ago

14  that they may want to call Ms. Pruden and we should be

15  prepared for that, and they didn't.

16          **MS. FORREST:**  Your Honor, these are all business

17  records.  The reason that there is such vehemence is because

18  that is a critical issue in this case.

19          **THE COURT:**  If it was so critical, right, if it was

20  so critical, you should have been prepared for it.

21      Hold on.

22      And I -- and I think that there was some preparation.

23  What I haven't seen is what you claim the -- I don't have in

24  front of me what you each have in front of you.

25      I understand you were dealing with this issue with

```
 1    Mr. Schiller.  I could see it on the 17th and on the 14th.  I
 2    knew where you were going.  So clearly you knew it was an
 3    issue --
 4              MS. FORREST:  Your --
 5              THE COURT:  -- on the 14th and on the 17th.
 6       It is an issue that I've highlighted that I have to figure
 7    out.
 8       So, one, I don't know if Apple's trying to hide anything.
 9    And, two, I don't know if you just didn't have the documents
10    in front of you or if you're so shocked at their -- at their
11    response.
12       Let me just say I cannot resolve it this second.  I will
13    enforce the order so we will not have any rebuttal witnesses.
14    At most, I'll allow the documents in.  That's what I will do
15    at most.
16              MR. DOREN:  And, Your Honor --
17              THE COURT:  No rebuttal witnesses.
18              MR. DOREN:  And to be clear, Your Honor, we have not
19    yet seen the documents either.
20              THE COURT:  Okay.
21              MS. FORREST:  Your --
22              THE COURT:  Get me the documents.  Get him the
23    documents.  And let me evaluate them.
24              MR. DOREN:  Thank you, Your Honor.
25              MS. FORREST:  Understood, Your Honor.
```

RUBIN – DIRECT / LO

1        And since they are business records, I assume that

2   Mr. Cook could also get them in tomorrow.

3        And let me --

4            **THE COURT:**  Well, frankly, there's your opportunity.

5            **MS. FORREST:**  All right.

6            **THE COURT:**  I --

7            **MS. FORREST:**  And one other thing, Your Honor, just

8   so that -- because my credibility is very important to me.  I

9   want to make it clear that when Mr. Schiller was testifying

10  and denied what we thought was an obvious point where

11  Mr. Forstall had actually obviously testified affirmatively to

12  it.  I had people running to the other room to grab the

13  documents, which was why they were not in the binder.  It

14  wasn't something that was planned and in binders and all

15  there.  We were in realtime grabbing those documents to try to

16  cross Mr. Schiller.

17       So I just want to assure Your Honor that it was not as if

18  I'd been preparing for two days for that cross-examination

19  module.  It came as a surprise to me that he would deny it so

20  vehemently.

21           **THE COURT:**  Okay.

22           **MR. DOREN:**  And just one closing note, Your Honor,

23  Mr. Schiller said the exact same thing in his deposition.

24           **THE COURT:**  All right.  Well, all right.

25       All right.  Mr. Lo.

1      **MR. LO:**  Thank you, Your Honor.

2      **THE COURT:**  You may proceed.

3      **MR. LO:**  Thank you.

4   **BY MR. LO:**

5   **Q.**  Good afternoon, Dr. Rubin.

6   **A.**  Good afternoon.

7      **MR. LO:**  Is this -- I don't think the microphone is

8   on.

9      **THE CLERK:**  Oh, sorry.

10     **MR. LO:**  Thank you.

11     **THE CLERK:**  I'll turn it up.  It's on.

12     **MR. LO:**  Testing.  Is it on now?  Okay.  That's all.

13  Thank you.

14  **Q.**  Dr. Rubin, before the lunch, you mentioned that some of

15  your work in this case related to app distribution methods.

16  Can you explain what you mean by that phrase?

17  **A.**  Yeah.  So app distribution method is the way in which that

18  apps get from developers who make the apps to the users'

19  devices who are using them.

20  **Q.**  And are you familiar with some of main ways in which

21  developers can distribute apps or software to potential users?

22  **A.**  Yes, I am.

23  **Q.**  Okay.

24     **MR. LO:**  And let me ask Mr. Eltiste to bring up

25  slide number 6.

1              (Demonstrative published.)

2    BY MR. LO:

3    Q.  So let's start here.  What information are we looking at

4    here, sir?

5    A.  This is first method of app distribution that I'm going to

6    talk about.  What we call this one is direct distribution.

7    And this is case where developers create apps.  They're

8    programmers so they write the program, they create the app.

9    And then the users get the app directly from the developers.

10       So if a user wants an app like this, they have to find the

11   developer who made that app and get it directly from them, and

12   then install it on their phone.

13            MR. LO:  Okay.  And Mr. Eltiste, if you could bring

14   up the next slide.

15              (Demonstrative published.)

16   BY MR. LO:

17   Q.  And this one is titled "Multiple App Store Distribution."

18   Can you describe what we're looking at here, Dr. Rubin?

19   A.  Yes.  So this is another model of app store distribution

20   or app distribution, I should say, and here we have developers

21   who are building apps, and there are multiple app stores,

22   they're numbered 1 through 5.

23       And so the developer can choose to send their app to app

24   store number 1 and app store number 3, whatever app stores

25   they want to send them to to publish them.

1            And then users have a choice of which app store to go to,

2       to download the app.  So they could get from it app store 1,

3       they could get another app from app store 3.

4            Occasionally there may be an app that is only available,

5       say, on app store 4.  And so the user would need to go to app

6       store 4 to get that app.

7       Q.   Are the first two models that we've been talking about

8       mutually exclusive?

9       A.   They are not.

10      Q.   Okay.  There's been some discussion of the Android system

11      in this case.  Do you know how apps are distributed in the

12      Android system?

13      A.   Yes.  In fact, the Android system uses a combination of

14      the two app distribution methods that I've been talking about.

15      So it uses multiple app stores, and it also uses direct

16      distribution.

17            MR. LO:  Okay, Mr. Eltiste, let's go to the next one,

18      please.

19                     (Demonstrative published.)

20      BY MR. LO:

21      Q.   And what do we have here, Dr. Rubin?

22      A.   So here we see another model of app distribution.  This is

23      the central model where there's only one app store.

24            So in this case, the developers send their apps to this

25      app store, the only one.  There are no other app stores.  And

1    the users, if they want to get apps to put onto their phones,

2    they go to that app store, and then they get their apps.

3    **Q.**   And relevant to this case, are there any popular platforms

4    that use the centralized model of app distribution?

5    **A.**   Yes.  The iOS App Store uses this model.

6            **MR. LO:**  Okay.  Mr. Eltiste, let's go to

7    slide number 9, please.

8                    (Demonstrative published.)

9    **BY MR. LO:**

10   **Q.**   So what we've been talking about, this, from the

11   perspective of developers getting apps or software to users,

12   let's talk about it from in terms of device configuration.

13       Does the choice of distribution method affect how user

14   devices need to be configured?

15   **A.**   Yes.

16   **Q.**   Okay.  And -- and how so?

17   **A.**   So if -- let's say that you're in the centralized app

18   distribution model.  Then the phones need to be set up so that

19   they can only accept apps from one app store, the centralized

20   app store.

21       And if you're in a different model, say a non-centralized,

22   remember, we talked about the direct distribution model where

23   the phones get the apps directly from the developer, well,

24   those phones have to be set up to receive apps directly.  And

25   if you took an -- a phone that was set up to only get apps

1   directly and tried to get a -- from a central store, that

2   wouldn't work because the phone has to be configured and set

3   up with respect to the type of app distribution system that

4   it's participating in.

5   **Q.**   Okay.  And we've been going through the main distribution

6   methods.  Let's talk a little bit about the security

7   implications of each one.

8          **MR. LO:**  And, Mr. Eltiste, if you could put up

9   slide 11.

10                 (Demonstrative published.)

11  **BY MR. LO:**

12  **Q.**   So let's --

13         **MR. LO:**  Slide 10.  I'm sorry.

14                 (Demonstrative published.)

15  **BY MR. LO:**

16  **Q.**   All right.  Let's talk about direct distribution.  What

17  are some of the security implications of allowing developers

18  to distribute apps directly to users?

19  **A.**   So in this model, there's no app store.  And the

20  developers can send their apps directly to the users.

21         So let's say that one of the developers, the one on the

22  bottom in this picture, is a bad developer meaning that they

23  have written a malicious app that does something that it

24  shouldn't do.

25         If we can move to the next slide.

1           (Demonstrative published.)

2           **THE WITNESS:**  We see this represented by a red

3    developer so that's our way of showing that they're bad.  And

4    they're sending this malicious app, shown here as the red box

5    with the warning sign inside of it, to the users.

6         Now, when the users receive this app, they'll install it

7    and they'll be infected with this malicious app.

8    **BY MR. LO:**

9    **Q.**  And in the case of direct distribution, are the developers

10   the only potential source of, I'll just say bad apps?

11   **A.**  No.  So what could happen is let's say that a user

12   installs one of these apps on their phone.  Because these

13   phones are enabled for direct distribution, they could then

14   infect other phones and other users.  So once a user gets

15   infected, that infection can then pass along to other phones.

16   **Q.**  Right.  And is that what's being shown in this diagram

17   here on number 12?

18   **A.**  On the right-hand side of this diagram, the infection

19   that's shown in the phone is then being shown infecting three

20   other phones.

21   **Q.**  Okay.  Let's take a look at slide 13.

22           (Demonstrative published.)

23   **BY MR. LO:**

24   **Q.**  And now let's talk about multiple app store distribution.

25         What -- are there any security implications of having

RUBIN – DIRECT / LO

1   multiple app stores distribute apps from developers to users?

2   **A.**   Yes.  I want to give you a similar kind of explanation to

3   this as I gave for direct distribution.

4        So when you have multiple app stores, let's look at the

5   case where one of the developers is bad, meaning that they

6   create a -- a malicious app.

7        So if we can move ahead in the presentation.

8                      (Demonstrative published.)

9            **THE WITNESS:**  Here we see again a malicious

10  developer.  And the malicious developer creates a malicious

11  app.  And we're no longer directly communicating with the

12  users.  We have app stores.  And this developer sends the

13  malicious app to four different app stores, the ones labeled

14  2, 3, 5, and 6.

15  **BY MR. LO:**

16  **Q.**   Okay.  And then so what happens after that?

17  **A.**   Well, let's move to the next slide.

18                      (Demonstrative published.)

19            **THE WITNESS:**  And we can see that app store number 2

20  sends out that malicious app to phones.

21       App store number 3 also receives the malicious app, but

22  that malicious app is not available on app store number 3.

23  And the reason for that could be that app store number 3 might

24  have some more strict security policy than app store number 2.

25  So they may scan the apps or do some other type of analysis

1    and determine that this app is inappropriate or malicious or

2    in some way not going to fit in with that app store's

3    policies.  And so that app store blocks that app.

4        And we see two more examples of that where app store

5    number 5 does distribute the app, but app store number 6 does

6    not for similar reasons.

7    **BY MR. LO:**

8    **Q.**   Okay.  And are you familiar with some of the tools that

9    attackers may use when they are in a system with multiple app

10   stores that are available for distribution?

11   **A.**   Yes.  Let me talk about that.

12            **MR. LO:**  So let's go to number 16, Mr. Eltiste.

13                 (Demonstrative published.)

14   **BY MR. LO:**

15   **Q.**   What's the information on here, Dr. Rubin?

16   **A.**   This is a list of different tools and techniques that the

17   malicious app developers are using today to get apps onto

18   users' devices.

19   **Q.**   All right.  Let's take these one at a time.

20       The first on the list is multiple listings.  What does

21   that mean?

22   **A.**   Right.  Well, we're familiar with the term multiple

23   listings from the real estate context very often.  And it's

24   the same idea here, that the malicious app developer will

25   submit a -- an app to more than one app store.  And what

1   they're thinking is not all the app stores have the same

2   security criteria, and so by sending to it more than one, they

3   increase the chance of spreading the malicious app.

4   Q.   Okay.  Second one looks similar, but it's multiple

5   listings with different variations.  What do you mean by that

6   as a tool?

7   A.   Sure.  And this is sometimes referred to as the good/bad

8   distribution.  And so the idea here is that what the developer

9   does is creates two versions of their app.  One of them is

10  benign, it's a good app.  And the other one is malicious.

11      And they post the good app on a -- on an app store that is

12  high profile and has a reputation and perhaps is known to do a

13  good job screening apps.

14      And they wait a while so that app becomes popular, common,

15  people are using it.  And then they distribute a bad version

16  of the app that's actually malicious, but it looks exactly the

17  same as the good app.  It has the same icon, the same name.

18      And what happens is now you have an app that has a good

19  reputation and that is known by people but it's actually

20  malicious if they get the one from the wrong store.

21  Q.   Okay.  And next one is listing in one and updating in

22  another.  What is that tool?

23  A.   Yes.  So this one is kind of a similar one, slightly

24  differently flavor of that same attack.

25      So what they do is they'll -- they'll post an app in

1    multiple app stores and wait until that app -- and the app is

2    benign at this point -- wait until the app is downloaded by

3    people and people start using it.

4        And then what they'll do is they'll, for the app stores

5    that are perhaps a little less -- known for not being as

6    secure, they will provide updates to the app, and the updates

7    will turn the app into being malicious.

8    **Q.**   Okay.  The next two here are both relating to imposters.

9    What do you mean by that?

10   **A.**   So an imposter app is an app that borrows from a

11   well-known app.  So, for example, let's say, the well-known

12   Evernote program.  It's an app that I use.  It has a

13   reputation of being a useful app and a safe app.

14       And an imposter app is a developer creates a malicious app

15   that does something bad.  And it calls it Evernote, and it

16   makes it look like Evernote.  And in fact, sometimes they go

17   so far as to create an experience in the app that looks just

18   like Evernote so you think you're running Evernote.  But

19   behind the scenes, something bad is happening.

20   **Q.**   Okay.  And then what about an imposter store?

21   **A.**   Imposter store is taking imposter app to the next level.

22       So what the attackers do is let's say that there is a -- a

23   store that's popular for having productivity apps, and it's

24   well-known.  They'll create an entire store that has the same

25   look and feel and a very similar name and put very similar

1   apps there.  And maybe at first they'll just put good apps

2   there until the traffic starts to show up, people start using

3   that app store, and then they're malicious so they can start

4   replacing the apps on there with imposter apps and malicious

5   apps.

6   **Q.**  Okay.  And then finally what does user infection mean in

7   this context?

8   **A.**  So we've heard about sideloading in this case.  And

9   sideloading is when there's direct distribution from the app

10  developer to a user.  And once a user is infected, that user

11  can then infect other users with the app.

12  **Q.**  Okay.  There's been some testimony by witnesses that if

13  app store distribution were -- were to be opened up, there

14  might be some competition, and as a result of that, some of

15  the stores might actually increase their security level.

16      Have you given thought to that as a possibility?

17  **A.**  I have considered that.  But that's not what we observe

18  when we look at the data.  We see that, in fact, the -- the

19  weakest link is really the problem because if you have

20  multiple app stores, some of them will -- will want to host

21  certain kinds of apps and other stores will have different

22  levels of security.  And we're not going to end up in a case

23  where they're all competing with each other on security.  And

24  if some of them are not, then those could end up being much

25  less secure places.

RUBIN – DIRECT / LO

1    **Q.**  All right.

2             **MR. LO:**  Mr. Eltiste, let's pull up number 17.

3                  (Demonstrative published.)

4    BY MR. LO:

5    **Q.**  All right.  So, Dr. Rubin, we've been talking about

6    security implications of the direct distribution, then

7    multiple app distribution.

8         What, if any, are the security implications of a

9    centralized app distribution model?

10   **A.**  A centralized app distribution model has several

11   advantages from a security perspective.

12        One of them is that the same security policy can be

13   applied to all of the apps that come in.  So the developers

14   don't have the opportunity to send their apps to an app store

15   that's less secure or to multiple app stores.  They all have

16   to go to this app store.  And if this app store does a good

17   job of reviewing the apps and filtering the apps, then it's

18   going to prevent a lot of malware from coming out.

19   **Q.**  In a centralized distribution model, is it possible that

20   the single app store may miss things from time to time?  So

21   they have a rule against something, but it somehow manages to

22   get through that store?

23   **A.**  Absolutely.  Nothing is going to be perfect when we talk

24   about software security.  There are always going to be ways

25   for the most clever attacker with the most resources to

1   bypass.

2       So the goal is not perfection.  It's to do as good a job

3   as possible.  And so in the centralized app store, you have

4   the opportunity to do as good a job as possible and not worry

5   that another app store is going to cause a security problem.

6   **Q.**  Okay.  In the centralized model, if an app manages to get

7   through the app store despite its best efforts, are there any

8   options there from a security perspective that are different

9   than in a multiple store distribution model?

10  **A.**  Yes.  I have some slides to illustrate this.

11          **MR. LO:**  Okay.  Let's go to number 19.

12              (Demonstrative published.)

13          **MR. LO:**  Let's go to 18 then.

14              (Demonstrative published.)

15          **THE WITNESS:**  Okay.  So here we see a malicious

16  developer creates a malicious app, sends it to the app store.

17      On the next slide --

18              (Demonstrative published.)

19          **THE WITNESS:**  -- we see another malicious developer

20  sends a malicious app to the app store.  And one of these

21  malicious apps manages to get through the app store despite

22  their security attempts.

23      And so what happens is that now that this malicious app

24  has gotten out, at some point it may become publicly known or

25  the app store managers may find out that this happened, and

1    when that happens the app store can then change their review

2    process so that if that particular app or even that kind of an

3    app is seen again, it will be blocked.

4        Furthermore, the app store could identify the developer

5    that sent in that app and ban that developer from the store.

6        So the centralized distribution allows for a process

7    that's dynamic which adjusts itself to information from bad

8    apps that do actually get through.

9    **BY MR. LO:**

10   **Q.**  And in the multiple app store distribution model, let's

11   say, you know, in your example store number 2, something gets

12   through.  Couldn't they also adjust their measures as well?

13   What's the difference between that and centralized

14   distribution?

15   **A.**  The big difference is that in centralized distribution,

16   you're always going to get the information and you're always

17   going to be able to block those apps.  But in a multi app

18   store model, store number 2 may have let the app through and

19   the information may be sent to store number 4, or store

20   number 2 may then adjust but then store number 4 didn't

21   adjust, and so that app could still get through store

22   number 4.

23   **Q.**  And so just from a security perspective, overall what is

24   your view in terms of the security differences between the

25   various models of app distribution we've been talking about so

1    far?

2    **A.**  My view is that the central model is the best for

3    security.

4    **Q.**  In the course of your work for this case, Dr. Rubin, did

5    you look at any data that either supports or undermines the

6    conclusion that you just gave right now?

7    **A.**  I did.  Part of my assignment, as I mentioned in the

8    beginning, was to look for data and use data in my analysis.

9    **Q.**  And you mentioned that you looked at the third-party data.

10   And if you need to, there's a copy of your written direct

11   testimony in your binder as well.

12       Did you address that data in paragraphs 47 through 51 of

13   your written direct testimony?

14   **A.**  I did.

15   **Q.**  Okay.

16           **MR. LO:**  Let's take a look at slide 24, please.

17               (Demonstrative published.)

18   **BY MR. LO:**

19   **Q.**  All right.  So what information is on the screen right

20   now, Dr. Rubin?

21   **A.**  So we see here some of the reports that I used in my

22   analysis.  And these are the cover pages from those reports

23   which I plan on talking about today.

24   **Q.**  Okay.  And have you -- in the course of your professional

25   work, have you relied on these types of third-party data

1    previously?

2    **A.**   Absolutely.  When I do my research, I often look to

3    industry studies that take measurements.  Oftentimes third

4    parties have access to more data and are able to do

5    comprehensive studies to provide statistics that I can then

6    use in my research.  And these reports are the types of

7    references that I typically use.

8    **Q.**   And -- and outside of your specific work, are you aware of

9    others in -- in your industry also relying on data such as

10   this?

11   **A.**   Yes.  I saw reports that cited these reports as well.

12   **Q.**   Okay.  Let's talk about these analyses in a little bit

13   more detail.

14        **MR. LO:**  And, Mr. Eltiste, if you could just put up

15   the cover of DX4975.

16   **Q.**   And, Dr. Rubin, we'll have these on the screen, but

17   they're also in your binder should you need to review them in

18   answering my questions.

19                    (Exhibit published.)

20   **BY MR. LO:**

21   **Q.**   First, do you recognize what's on the screen now as

22   DX4975?

23   **A.**   Yes.

24   **Q.**   And what is it?

25   **A.**   So this is the cover page of the Nokia Threat Intelligence

1    Report, which is a yearly report that they put out about

2    various malware that they have measured the instances of on

3    the Internet.

4    **Q.**   Okay.  And I think many of us know Nokia as a mobile

5    handset maker.  How is it that they have information about

6    malware?

7    **A.**   Nokia is a large company that also makes security

8    products.  And in fact, Nokia makes an appliance which is a

9    security device that is widely sold to backbone operators and

10   Internet service providers and are deployed in many places

11   around the world.

12        In fact, according to the report, their product has

13   visibility into 200 million devices, and they use the data

14   that they collect from managing those devices in their study.

15   **Q.**   Okay.  So let's -- let's break that down a little bit.

16        So Nokia has a product, and I think you mentioned that

17   Internet backbone providers install that.  Why are they

18   installing that type of equipment from Nokia, to your

19   understanding?

20   **A.**   So they are seeking out Nokia and purchasing this because

21   they want it to protect their network.  These appliances are

22   very sophisticated and they have anti-malware capabilities in

23   them.  So besides -- they're not completely passive.  Besides

24   just analyzing the data that comes across, they also block

25   malware.

1          And in fact, Nokia describes in this report that they have

2      a sandbox, a malware analysis lab.  So as they're monitoring

3      the Internet, and they have, like I said, 200 million devices'

4      traffic that they see, they can take samples that they find,

5      put them in their analysis lab sandbox, and take a look at

6      that.  And they use the information that they learn, in their

7      study.  They also are utilizing honeypots.

8  **Q.**  And what are honeypots?

9  **A.**  Honeypots are a very popular security tool.  I teach a

10     lecture on honeypots in my security course at Johns Hopkins.

11     And what a honeypot is, is a device that is on a hidden part

12     of the Internet.  So let me explain that.

13         We know that devices have IP addresses.  Your phone, your

14     computer, your smart fridge, all of these devices have an IP

15     address.  And the reason is so that they can communicate with

16     each other.

17         And what Nokia does with their honeypot is not all of the

18     IP addresses that are possible have been assigned.  And we

19     know that because when a new device comes up, it will get a

20     new IP address.  And so there has to be a space of unused IP

21     addresses.

22         So Nokia puts their honeypot computer, which is a server,

23     into an unused area of the Internet by giving it an unassigned

24     random IP address.

25         Now, what's really interesting about this is that any

1    traffic that arrives at that honeypot computer is, by

2    definition, going to be malicious traffic.  And the reason is

3    no legitimate computer is trying to communicate with this

4    because it has an unassigned IP address.  And so what happens

5    is that attackers are constantly generating random IP

6    addresses and sending traffic, attack traffic, to those

7    addresses.

8        When the honeypot collects malware that it receives, it's

9    malware that may not have ever been seen in the wild before.

10   They may get the fastest way to see new malware may be through

11   a honeypot.  And so the malware that's collected in the

12   honeypot is then taken into the sandbox analysis lab and --

13   and analyzed.

14   **Q.**  Okay.  Let's take a look at slide 25, then.

15               (Demonstrative published.)

16   **BY MR. LO:**

17   **Q.**  And so with the various data that Nokia was able to

18   collect, what were the data that the Nokia report shows for

19   the 2020 version of the report?

20               **THE COURT:**  Do you have a copy of the slide deck?

21           **MR. LO:**  Yes, Your Honor.

22               (Pause in the proceedings.)

23           **MR. LO:**  Your Honor, may I hand one to the clerks?

24           **THE COURT:**  You may.

25               (Pause in the proceedings.)

1          **THE COURT:**  Go ahead.

2          **MR. LO:**  Thank you.

3     **Q.**  Looking at slide 25, Dr. Rubin, what information is shown

4     on here?

5     **A.**  So this is information that appears in the Nokia report.

6     And this is some of their conclusions and some of their

7     measurements.

8          And what they showed is that on the iOS platform, around

9     1.7 percent of the infections that they observed on –– on the

10    Internet were from the iOS platform.  And the Android platform

11    had 26.6 percent of the infections on the devices that they

12    measured.

13         **THE COURT:**  Isn't that just a function of the fact

14    that there are more Androids?

15         **THE WITNESS:**  Well, the truth of the matter is that

16    in the studies that I read, the indications were that

17    globally, there are about three times as many Android devices

18    as iOS devices.  But here we see that the ratio is much bigger

19    for the infections on Android.

20         **THE COURT:**  So did you do the numbers based in terms

21    of percentage of devices?

22         **THE WITNESS:**  I did not do that calculation.  But

23    the –– if it's three times, then we would expect about

24    5 percent Android if we had 1.7 percent, and not 26.6.

25         **THE COURT:**  Okay.

1          **MR. LO:**  And, Mr. Eltiste, let's turn to DX4975 and

2     go to page 8, please.  And let's just focus in on the

3     right-hand side with these two pie charts.

4                    (Exhibit published.)

5          **THE WITNESS:**  Sure.

6     BY MR. LO:

7     **Q.**  And, Dr. Rubin, do you recognize the information that's on

8     the screen now which comes from page 8 of the Nokia report?

9     **A.**  Yes.

10         So the right-hand side pie chart is the one that I

11    produced in the previous slide.  It's just kind of clear with

12    the colors to look at.

13    **Q.**  Okay.  And does Nokia do a similar study every year, or is

14    this a one-off thing that Nokia does?

15    **A.**  My understanding, it's an annual study.  And on the left

16    we see the 2019 numbers.

17    **Q.**  And so what are the 2019 numbers with respect to Android

18    versus iOS?

19    **A.**  So here we see much greater difference.  On the Android

20    it's 47 percent.  And in the iPhone they said it was less than

21    1 percent.

22    **Q.**  Okay.  And, again, recognizing that you may not be able to

23    do the math on the spot, what does that tell you even if you

24    take into account the assumption that there are about three

25    times as many Android devices as there are iOS devices?

RUBIN - DIRECT / LO

1    **A.**  Right.  Then three times the iOS number would be less than

2    three.  And we have 47 percent for Android.

3        **THE COURT:**  So in IOT, the Internet of Things, what

4    do you understand that to be?

5        **THE WITNESS:**  So IOT is actually the -- the primary

6    area of my research these days, is IOT security.  And the

7    Internet of Things has to do with like your smart thermostat,

8    your refrigerator, your toaster, all of these things that if

9    you go into Best Buy and there's a section on Smart Home,

10   these devices are proliferating very, very rapidly.

11       **THE COURT:**  Okay.  Thank you.

12   **BY MR. LO:**

13   **Q.**  And Dr. Rubin, with respect to the IOT devices, those are

14   relatively high numbers relative to iOS.  Have you done any

15   study or analysis as to why that might be?

16   **A.**  Yes.  So the -- the IOT devices are based on Linux, the

17   Linux operating system.  The software is not very well

18   controlled.  Every one of the devices does its own update from

19   their manufacturer or from some app store that they choose.

20   **Q.**  Okay.

21       **MR. LO:**  Let's zoom out a little bit, Mr. Eltiste,

22   and let's take a look at the left-hand side of this page 8 of

23   DX4975.

24                    (Exhibit published.)

25

1     **BY MR. LO:**

2     **Q.**  Dr. Rubin, does the Nokia report provide any explanation

3     as to why the Android infection rate is higher than the iOS

4     infection rate?

5     **A.**  Yes.  If we look at the middle of the third paragraph that

6     starts with "However."

7                          (Exhibit published.)

8     **BY MR. LO:**

9     **Q.**  Yes.

10    **A.**  So, however the fact that Android applications can be

11    downloaded from just about anywhere still represents a huge

12    problems as users are free to download apps from third-party

13    app stores where many of the applications, while functional,

14    are Trojanized.

15         And then it goes on to say, "iPhone applications, on the

16    other hand, are for the most part limited to one source, the

17    Apple Store."

18         So the Nokia report attributes the difference in the

19    number of infections between Apple and Android to the

20    availability of multiple app stores in Android and the central

21    distribution in the Apple Store.

22    **Q.**  Is that a conclusion with which you agree?

23    **A.**  That is a conclusion with which I agree, yes.

24    **Q.**  Okay.

25              **MR. LO:**  Mr. Eltiste, if you could put up the first

1    page of DX4934.

2         And again, Dr. Rubin and Your Honor, this will be in your

3    binder.  So but we'll put it up on the screen so we can look

4    at it together.

5                         (Exhibit published.)

6    **BY MR. LO:**

7    **Q.**  Dr. Rubin, what is DX4934?

8    **A.**  So this is a report put out by an organization called

9    RiskIQ.  And what they do is they look at, like the title

10   said, the Mobile App Threat Landscape Report.

11        And the idea behind this report is to look at many, many,

12   many apps.  The report states that they looked at 2 billion

13   apps.  And they look at them in many different stores.  They

14   look at them in the Apple App Store.  They look in the Google

15   Play Store.  And in this particular study, they looked at over

16   120 different Android stores.

17   **Q.**  And when the RiskIQ group is looking at these stores, what

18   is it that they're looking for?

19   **A.**  So what they're looking for is what is referred to in the

20   study as blacklisted apps.  I'm not particularly fond of that

21   term, but that is what they call them in here.  So for the

22   purpose of this discussion, I will continue to refer to them

23   as the blacklisted apps.

24   **Q.**  And how does RiskIQ define a blacklisted app?

25   **A.**  So the RiskIQ report says that blacklisted apps are apps

1    that are publicly known to be suspicious or malicious or to

2    have some concern.

3        There's an organization that's very well-known that's

4    called Total Virus.  And they publish a list of blacklisted

5    apps.  And there are other sources as well where people submit

6    apps that they know are -- are bad in some way.

7    **Q.**  And when you say bad or I guess when RiskIQ says they're

8    bad, what kinds of behavior or things gets an app onto the bad

9    list?

10   **A.**  Sure.  So I'd actually like to turn to that section of the

11   report because they identify the type of apps that are

12   considered to be bad in the report.

13   **Q.**  All right.  So is that -- let's --

14             **MR. LO:**  Mr. Eltiste, let's go to 4934.2.

15                       (Exhibit published.)

16             **THE WITNESS:**  It's the last paragraph on this page.

17                       (Exhibit published.)

18             **THE WITNESS:**  And it talks about the threat actors

19   taking advantage of myopia, and I believe that refers to -- of

20   users, and produce rogue apps that mimic well-known brands or

21   otherwise purport to be something they're not.

22       If you recall when I talked about attacker tools, I

23   mentioned the idea of imposter apps, and that's what this is

24   referring to.

25       And it says that once an unsuspecting user downloads these

1   malicious app, threat actors can have their way phishing them

2   for sensitive information or uploading malware to their

3   devices.

4   **BY MR. LO:**

5   **Q.**   And what is phishing, with a "P"?

6   **A.**   Phishing with a "ph" is a term that's become pretty

7   common.  And the idea is that you've got an unsuspecting user

8   on the hook and you're trying to reel them in.  And so this is

9   a form of what's called social engineering where the attackers

10  are having the user help them in attacking the user.

11  **Q.**   Okay.

12       **MR. LO:**   Mr. Eltiste, let's go to page 6 of this

13  document.  And let's focus just on the top half with the bar

14  graph, please.

15                   (Exhibit published.)

16  **BY MR. LO:**

17  **Q.**   So we've talked a little bit about the methodology and

18  what the RiskIQ is looking for.  What information is on page 6

19  of the RiskIQ report, Dr. Rubin?

20  **A.**   So here we see the RiskIQ, recall that they downloaded

21  billions of apps and performed these measurements.  And what

22  they showed in this chart is the number of apps that were

23  already blacklisted at the time that this report was -- was

24  written and how many of those apps were found at different app

25  stores.

RUBIN – DIRECT / LO

**Q.**  Okay.  And who was the number one on this list?

**A.**  So the Google Play Store had over 10,000 blacklisted apps on it.

**Q.**  Okay.  And then number two is Xioami.  Are you familiar with them?

**A.**  Yes, I am.

**Q.**  And what is Xioami?

**A.**  Xioami is a device manufacturer.  They build a smartphone that runs the Android operating system, their version of it. And they also have an app store.

**Q.**  Okay.  And then number five on this list is Tencent.  Are you familiar with Tencent?

**A.**  Yes.

**Q.**  And what is Tencent?

**A.**  Tencent is a large company that also has an app store.

**Q.**  Okay.  And where did Apple fall on the list of blacklisted app offenders?

**A.**  Apple didn't make the list.

**Q.**  Okay.  And why is that?

**A.**  Because they didn't have enough blacklisted apps to register.

**Q.**  Okay.  Is it clear that the methodology of RiskIQ considered Apple, or -- or was this perhaps an Android-only study?

**A.**  It's pretty -- it's totally clear that they considered it

1    because in the beginning of the document, they said that they

2    looked at the Apple App Store, the Google Play Store, and over

3    120 other stores.

4        And then after this graph in the same report, they talk

5    about Apple and refer to Apple as Fort Knox.

6            **MR. LO:**  Okay, and let's turn to, Mr. Eltiste, to

7    page 5 of the document.  And let's go to the middle there.

8    There you go.

9                    (Exhibit published.)

10   **BY MR. LO:**

11   **Q.**  Is this what you were referring to in your testimony just

12   a minute ago, Dr. Rubin?

13   **A.**  Yes.

14   **Q.**  Okay.  And what does RiskIQ say about the Apple App Store?

15   **A.**  It says that "Apple treats its App Store like Fort Knox

16   and rarely hosts dangerous apps."

17   **Q.**  Okay.  So let's go back then to page 6.

18                    (Exhibit published.)

19   **BY MR. LO:**

20   **Q.**  And previously we were looking at the bar graph on the top

21   which gives -- gives the total numbers.

22       Does the RiskIQ report present its data in any other

23   fashion?

24   **A.**  Yes, it does.

25   **Q.**  And -- and how so?

1    **A.**   It also presents a ranking of the app stores based on the

2    concentration of blacklisted apps.

3    **Q.**   Okay.  So let's take a look at the bottom half of page 6.

4                        (Exhibit published.)

5    **BY MR. LO:**

6    **Q.**   First, what do you mean when -- or what does RiskIQ mean

7    when they're talking about the concentration of malicious

8    apps?

9    **A.**   The first bar graph that we looked at represented the

10   total number of blacklisted apps that were found.  The

11   concentration has to do with how many blacklisted apps there

12   are relative to the total number of apps.  So in particular,

13   if you are were to throw a dart at the app store, what is the

14   likelihood that you would hit a blacklisted app.

15   **Q.**   And you have may have suggested the answer already, but

16   from a security perspective, why does concentration matter as

17   opposed to just raw numbers?

18   **A.**   That's because the higher the concentration is of

19   malicious apps, the more likely you are to get a malicious app

20   from that app store if you're downloading apps.

21   **Q.**   And the five stores that are on the top five, are you

22   familiar with them from your work?

23   **A.**   I am.

24   **Q.**   And what kind of apps do they distribute?

25   **A.**   These are Android apps.

1    **Q.**  Let's turn to DX4956.

2          **MR. LO:**  And, Mr. Eltiste --

3          **THE COURT:**  Can you first, before you move --

4          **MR. LO:**  Yes.

5          **THE COURT:**  -- can you tell me anything about this

6    company RiskIQ?  Is it -- how can I be sure it's not biased?

7          **THE WITNESS:**  Well, RiskIQ is -- is pretty

8    well-known.  And when I was doing my research, I found other

9    sources that I cite in my report that cited RiskIQ.  I think

10   it's a pretty widely cited source.

11         **THE COURT:**  Do you know if it has any funding by

12   Apple?

13         **THE WITNESS:**  I don't know where they get their

14   funding.  My -- I think that they're an independent security

15   company, but I -- I don't know for sure.

16         **THE COURT:**  Okay.

17      Proceed.

18         **MR. LO:**  Thank you.

19   **Q.**  Let's then turn to DX4956.

20                   (Exhibit published.)

21   **BY MR. LO:**

22   **Q.**  And Dr. Rubin, what is DX4956?

23   **A.**  This is the study done by PurpleSec, which I do know is a

24   computer security company run by several security experts.

25   And they produced a study of statistics, data, and trends in

RUBIN - DIRECT / LO

1    computer security.

2    **Q.**  And what does the PurpleSec report tell you, or what did

3    it tell you in connection with your work in this case?

4    **A.**  So the statistic that I found the most interesting in this

5    report was that they say that 98 percent of -- of malicious

6    attacks on the Internet are related to social engineering.

7    **Q.**  And what are social engineering attacks?

8    **A.**  Social engineering attacks, as I alluded to earlier, these

9    are attacks where the attacker is fooling the user somehow and

10   getting the user to participate in attacking themselves.

11   **Q.**  Okay.  And do you have an example of one?

12   **A.**  Yes.  So let me give you an example from just a couple of

13   months ago of a high-profile social engineering attack that

14   happened with an Android app.

15       We all know that security experts are always telling us to

16   update our devices, right?  It's important from a security

17   standpoint if your phone needs to be updated, to update it and

18   get the latest security patches.

19       Well, the -- there was a malware on Android that disguised

20   itself as a systems update.  So what would happen is the user

21   would be looking at their phone, and a window would pop up and

22   say you need to update your system.  And then it would tell

23   the user as part of this update process, I'm going to need you

24   to enable your phone, your GPS, all of the different things

25   that normally you need, you know, entitlements in iOS for

1     those type of things.

2          And the user would then -- unsuspecting user would be,

3     "Well, I'm doing a system update, it must be true," and they

4     would click enable, enable, enable, enable.

5          Then what happened is the phone, basically there was --

6     there was malware in the payload of this app which would

7     connect it to what's called a botnet.  A botnet is a network

8     of compromised devices that are controlled by some malicious

9     party.  In this case, it was called Firebase, the Firebase

10    command-and-control botnet.

11         And the way this worked was that when the

12    command-and-control commands would come to the iPhone -- I'm

13    sorry, it wasn't an iPhone, it was an Android phone.  When the

14    commands would come to the compromised phone, it would then

15    listen to things like turn on the camera, and take a picture,

16    and send me the picture.

17         Another type of attack that was documented in this

18    particular social engineering attack was the

19    command-and-control could say launch attack number X, whatever

20    X is, and that attack would be:  Listen to the next phone

21    conversation, record both ends of the conversation, and send

22    the data file with that audio to the attackers.

23         So pretty much the device is completely owned at that

24    point and completely under the control of the attackers.

25    Q.  And so that's an example of a social engineering, and you

RUBIN - DIRECT / LO

1    mentioned that -- the -- the PurpleSec said that about

2    98 percent were social engineering.  Why was that statistic

3    relevant or important to you?

4    **A.**  Well, this statistic was very important to the work that I

5    did in this case because social engineering are the very types

6    of attacks that require the human manual app review and that

7    cannot really be stopped on a device because they're tricking

8    the user into doing things that are going to pass the

9    on-device checks.

10   **Q.**  Okay.  And do you have an understanding of why attackers

11   are now using those instead of just the traditional malware?

12   **A.**  Yeah, there are several reasons.  One is that social

13   engineering is very effective and those attacks are working.

14   And by employing the help of the user who is authorized to do

15   all kinds of things, the attackers are able to get the attacks

16   to be more successful.

17   **Q.**  And did you have an understanding of the methodology that

18   PurpleSec used to put together the information that's in the

19   report?

20   **A.**  Yes.  So in their report, they have a companion website

21   that lists all of their sources, they read all the industry

22   studies they can get their hands on, and they interview

23   security experts in the field.

24   **Q.**  Thank you.

25        And before we move on, I'm going to ask Mr. Eltiste to put

1    up the website of RiskIQ and just ask you to take a look at it

2    in response to the Judge's question.

3         Dr. Rubin, do you recognize this as the website of RiskIQ?

4              (Demonstrative published.)

5         **THE WITNESS:**  I do.

6    **BY MR. LO:**

7    **Q.**  And does this refresh your recollection as to whether

8    Apple has any involvement with the funding of RiskIQ?

9    **A.**  I -- I see a bunch of well-known venture capital firms

10   here.  I don't want to comment on relationships they might

11   have with Apple so I'm going to say that I just don't know.

12   **Q.**  All right.  Thank you.

13         **MR. LO:**  Let's go back to, Mr. Eltiste, to slide

14   number 4.

15              (Demonstrative published.)

16   **BY MR. LO:**

17   **Q.**  All right.  So we've put up here your conclusions.

18        And what I want to ask you, Dr. Rubin, is the various

19   studies that you looked at, what impact, if any, did they have

20   on the conclusions you reached in this case?

21   **A.**  The studies that I looked at reinforced the conclusions

22   that I came to in this case that the app review process, along

23   with central distribution, is going to result in lower

24   infection rates on devices and a lower volume of malicious and

25   untrustworthy apps.

1    **Q.**  And we've been looking at three reports today.  Did you

2    choose these reports because they had numbers that are

3    favorable to Apple?  How did you choose these reports?

4    **A.**  I chose these reports because I felt they had solid and

5    sound methodologies.  The reports that I looked at, other

6    reports were consistent with this.  I didn't see a single

7    report that showed the opposite of that.  And so that was the

8    method -- the method that I used to pick these reports.

9    **Q.**  Okay.

10        In your written direct testimony, you make reference to

11   some stores that are ad-based.  Do you recall that?

12   **A.**  Yes.

13   **Q.**  And can you describe what it means for a store to be

14   ad-based?

15   **A.**  It means that a store shows ads and so that they make

16   money by getting a lot of eyeballs on the site.

17   **Q.**  Okay.  And in the context of evaluating security, why are

18   you disgusting -- discussing stores that show ads?

19   **A.**  Because the goal of those stores is to get people to look

20   at ads.

21       **MR. BYARS:**  Objection, Your Honor.  Speaking to

22   incentives which Your Honor struck from his written direct

23   testimony.

24       **MR. LO:**  Your Honor, it's paragraph 84 of the written

25   direct, and it's in the binder that I handed up in -- in this

1    first tab.

2          **MR. BYARS:**  To be clear, I'm objecting to the oral

3    testimony about incentives that app stores may or may not

4    have.

5          **THE COURT:**  I struck some things and not others.

6       84?

7          **MR. LO:**  Yes, Your Honor.  And the Court struck the

8    first sentence.

9          **THE COURT:**  I struck the conclusion.  I didn't strike

10   just the data.

11      You can't -- so --

12         **MR. LO:**  Thank you, Your Honor.

13   **Q.**  So what -- what does ad-based stores have anything to do

14   with security?

15   **A.**  It's related to security because an app store that is

16   based on -- on getting eyeballs to see ads is not likely to

17   devote as much time to security as they are to other things.

18   **Q.**  How do ad-based stores make money, if you know?

19   **A.**  They make money by people looking at their -- their site

20   and getting eyes on the ads.

21   **Q.**  Do you have personal experience looking at some of these

22   stores?

23   **A.**  Yes, I do.

24   **Q.**  And what kind of apps are they selling or providing to the

25   public?

1    **A.**   Well, a lot of the stores have these imposter apps on the

2    stores or adult content, things like that.

3    **Q.**   Okay.  And things like adult content, while some people

4    might find them objectionable, does that have anything to do

5    with security?

6    **A.**   It does because there's a study I cite in my report that

7    shows a correlation between the type of content that's shown

8    on a -- on a -- in an app store and that can be download and

9    malware.  It seems to be much more prevalent when there's

10   adult and other inappropriate content.

11          **MR. LO:**   Mr. Eltiste, if you could put up

12   slide number 3, please.

13                    (Demonstrative published.)

14   **BY MR. LO:**

15   **Q.**   Dr. Rubin, we've been looking at app store distribution,

16   and we've talked a little bit about the real-world data that

17   you looked at.  You mentioned earlier that part of your

18   assignment related to evaluating Apple's app review, and I now

19   want to turn to that.

20          What, if anything, did you do to evaluate Apple's app

21   review?

22   **A.**   So what I did was I -- I spoke several times at some

23   length to Mr. Kosmynka who heads Apple's app review process.

24   I also looked at internal documents of theirs.  And I looked

25   at the App Review Guidelines and other public documents as

RUBIN - DIRECT / LO

```
 1   well.
 2   Q.  Did you conduct any comparative analysis between Apple's
 3   process and the process of anyone else?
 4   A.  I did.
 5   Q.  And what did you do?
 6   A.  I looked at Google's process in the Google Play store.
 7   Q.  Okay.  And, Dr. Rubin, I'll remind that you that that
 8   information is -- is confidential.  So I'm just going to ask
 9   you some questions and ask you to answer at a high level
10   without giving any detailed information if you could.
11   A.  Sure.
12   Q.  At a high level, what types of -- well, first, how is it
13   that you had access to Google internal materials?
14   A.  I signed the protective order in this case, and I got
15   access because of that.
16   Q.  Okay.  And at a high level, what types of information was
17   included in the Google internal information?
18   A.  I saw statistics about the human app review process and
19   some internal evaluations.
20   Q.  Okay.  And did you analyze the Google documents in your
21   written direct testimony?
22   A.  I do.  That can be found in paragraph 57.
23   Q.  And, again, without citing to any specific details,
24   what -- did you draw any overall conclusions in comparing
25   Google's review process and Apple's review process?
```

RUBIN – DIRECT / LO

```
1    A.   I did.  I found that Apple's app review process looked at
2    far more apps in human review.  In fact, Apple looks at all of
3    the apps.  And I found their process to be more effective.
4    Q.   Okay.  Thank you, Dr. Rubin.
5              MR. LO:  Your Honor, I pass the witness.
6              THE COURT:  Cross.
7       So I did take it from that last statement, that you -- the
8    distinction you're making is not at the automatic level of the
9    software, but specifically with respect to the human review?
10             THE WITNESS:  There are -- there is information that
11   I saw that I believe is protected that was broader than that
12   and -- and was relating to the entire app review process.
13             THE COURT:  In what paragraphs of your report?
14             THE WITNESS:  Fifty-seven.
15             THE COURT:  Okay.
16      Proceed.
17             MR. BYARS:  Your Honor, may I approach?
18             THE COURT:  You may.
19                       (Handing binder.)
20             THE COURT:  While you're getting set.
21      Mr. Doren, I'm going to need Mr. Schiller's deposition
22   transcript, please.
23             MS. FORREST:  Your Honor, I actually -- I actually
24   showed this --
25             THE COURT:  Okay.  We'll talk later then.  As long as
```

1    you all have it handy, we'll talk later.

2              **MR. DOREN:**  Thank you, Your Honor.

3              **THE COURT:**  Proceed.

4              **MR. BYARS:**  Thank you, Your Honor.

5                        **<u>CROSS-EXAMINATION</u>**

6    BY MR. BYARS:

7    **Q.**  Dr. Rubin, you referred to being the chief scientist --

8              **THE COURT:**  Counsel, remind me of your name.

9              **MR. BYARS:**  I'm sorry, Your Honor.  It's Brent Byars

10   for Epic.

11             **THE COURT:**  That's what I thought.  Just making sure.

12   Thank you.

13             **MR. BYARS:**  Thank you.

14   **Q.**  You referred to being the chief scientist of a company

15   called Harbor Labs; is that right?

16   **A.**  That's correct.

17   **Q.**  There's another company that you're a proprietor of called

18   Harbor Experts; is that right?

19   **A.**  That's right.

20   **Q.**  And through that company, you provide expert consulting

21   services in litigation; is that correct?

22   **A.**  That's right.

23   **Q.**  And you've actually given or been deposed in over

24   50 litigation matters as an expert; is that right?

25   **A.**  That's right.

RUBIN - CROSS / BYARS

**Q.** And 20 of those were in the last four years; is that correct?

**A.** That's right.

**Q.** And most of those have been in patent cases, right?

**A.** That's right.

**Q.** And you were giving an opinion on whether a patent was valid or infringed or both?

**A.** I have worked both defendant and plaintiff sides on both infringement and validity questions.

**Q.** But, sir, most of those cases were patent cases; is that right?

**A.** Yes.

**Q.** In some of those cases, Apple had hired you; is that correct?

**A.** I have worked on a patent case for Apple.

**Q.** Have you worked on more than one patent case for Apple, sir?

**A.** I'm -- I'm not sure.  None of the patent cases I worked for Apple really went any far -- very far.

**Q.** Okay.  So but there was more than one case in which you worked for Apple; isn't that right?

**A.** There may be one or two, I think.  But in one of those cases, I don't think I did anything.  I was retained and then the case settled or something.

**Q.** Okay.  Thank you.

RUBIN - CROSS / BYARS

1    So I've seen you on the Zoom during trial.  I infer you've

2    been following the testimony; is that right?

3    **A.**  I have been.

4    **Q.**  Did you see Dr. Mickens' testimony?

5    **A.**  I did.  I didn't see it, I heard it.

6    **Q.**  Thank you for that clarification.  Me as well.

7    You're familiar with Dr. Mickens' prior work, aren't you?

8    **A.**  Before this case?

9    **Q.**  Just his prior work generally that he's done previously.

10   **A.**  Yes, some of it.

11   **Q.**  And you agree he's an expert in computer security which is

12   the same field that you're in?

13   **A.**  Yes.

14   **Q.**  And even if you disagree with his opinions, you believe

15   he's qualified to offer them; isn't that right?

16   **A.**  Yes.

17   **Q.**  I just want to get some basics first and then we can talk

18   more detail.

19   You attribute iOS security to four aspects of the iPhone

20   security model, right?

21   **A.**  I -- I'm not sure which four specifically you're referring

22   to, but I -- but that sounds like I might have written that in

23   my report.

24   **Q.**  Okay.  Let's go through the four.  The first is identity

25   verification of developers, right?

RUBIN – CROSS / BYARS

1    **A.**  Yes.

2    **Q.**  The second is a manual and automated app review process,

3    right?

4    **A.**  That sounds right.

5    **Q.**  The third is certificate validation and code signing,

6    right?

7    **A.**  That sounds right.

8    **Q.**  And the fourth is on-device run time security protections,

9    correct?

10   **A.**  Yes.

11   **Q.**  And one on-device security protection is called

12   sandboxing; isn't that right?

13   **A.**  That is correct.

14   **Q.**  Sandboxing is a very important component of how iOS

15   devices are secured; isn't that right?

16   **A.**  Yes.

17   **Q.**  In fact, sandboxing, you believe, is one of the greatest

18   contributions in recent computer security, correct?

19   **A.**  I think that's right.

20   **Q.**  And you previously testified in one of these cases that

21   sandboxing has affected the lives of many people; isn't that

22   right?

23   **A.**  Yes.

24   **Q.**  Now, you talked about Android.  So let's -- let's dig into

25   that.  In your opinion, many non-iOS systems have less secure

1    runtime protections, correct?

2    **A.**   Yes.

3    **Q.**   Android is one of those systems with less secure runtime

4    protections; isn't that right?

5    **A.**   I think that's correct.

6    **Q.**   And you cited studies challenging Android's sandboxing

7    security, right?

8    **A.**   I did.  I cited two reports about escaping the sandbox and

9    bypassing sandbox securities.

10   **Q.**   Sir, I just need a yes or no, please.  Just so the record

11   is clear, you've cited studies challenging Android sandboxing

12   security, right?

13   **A.**   I did.

14   **Q.**   And if sandboxing in the Android iOS is weaker than it is

15   on iOS, that could contribute to security weaknesses on

16   Android devices, right?

17   **A.**   That could.

18   **Q.**   In fact, you spoke about one particular issue, what is

19   called a man-in-the-disk vulnerability, right?

20   **A.**   Yes.

21   **Q.**   You remember discussing that in your written direct

22   testimony?

23   **A.**   Yes.

24   **Q.**   And do you remember discussing that at your deposition

25   where we looked together at the report you had cited, and it

1   described that vulnerability as resulting from the use of

2   external storage on Android?

3   **A.**  Yes.

4   **Q.**  And external storage on Android, at least that time, was

5   not sandboxed, right?

6   **A.**  I think that's right.

7   **Q.**  And iOS, to your knowledge, does not have external

8   storage, right?

9   **A.**  I don't think it does.

10  **Q.**  And you had actually not assessed whether that

11  vulnerability, which you called a man-in-the-disk

12  vulnerability, could happen on iOS.

13  **A.**  I haven't done that analysis.

14  **Q.**  By the way, did you hear Dr. -- or sorry, Mr. Federighi's

15  conclusion yesterday that if app distribution were opened up,

16  Apple could continue requiring complete sandboxing in iOS?

17  **A.**  I heard his testimony.  I --

18  **Q.**  Sir, I'm just asking if you heard the testimony.

19                   (Simultaneous colloquy.)

20          **THE WITNESS:**  -- heard the testimony, yes.

21  BY MR. BYARS:

22  **Q.**  Do you defer to Mr. Federighi, who is responsible for iOS

23  engineering at Apple, on that issue?

24  **A.**  Yes.

25  **Q.**  Sir, you also believe that the uniformity of iOS operating

RUBIN – CROSS / BYARS

```
 1    contributes to iOS security; isn't that right?
 2    A.   That's right.
 3    Q.   And that's a contrast again with Android where there are
 4    many different device makers all using that same OS, right?
 5    A.   They're using variants of it.
 6    Q.   Thank you for that clarification.
 7         So all of the -- all of the device makers in Android are
 8    using variants of the operating system called Android?
 9    A.   Right.
10    Q.   And as a result, OS upgrades in the Android ecosystem
11    occur at irregular intervals, right?
12    A.   Did you say regular or irregular?
13    Q.   Thank you.  Irregular.
14    A.   Yes.
15    Q.   And sometimes they don't occur at all, right?
16    A.   Some people don't update.
17    Q.   And we could call that fragmentation of the operating
18    system, right?
19    A.   Yes.
20    Q.   And again, that makes Android more fragmented than iOS,
21    right?
22    A.   Yes.
23    Q.   And that fragmentation makes Android devices more
24    attractive targets for malware, right?
25    A.   It does.
```

RUBIN - CROSS / BYARS

1    **Q.**  You understand that Epic is not asking Apple in this case

2    to license the iOS to other device makers; isn't that right?

3    **A.**  I have been very confused about what Epic is asking for,

4    and I don't really understand what they want --

5    **Q.**  Okay.  Sir, just try to answer the question specifically.

6        You do not understand Epic to be asking Apple to license

7    the iOS to other device makers like occurs in the Android

8    ecosystem, right?

9    **A.**  I haven't heard that specific request.

10   **Q.**  Now, I think you testified on direct that Google Play has

11   a less stringent and comprehensive review process than Apple;

12   isn't that right?

13   **A.**  Yes.

14   **Q.**  And as a result you believe that Google Play Store has

15   distributed more malware than the App Store, right?

16   **A.**  That's part of it.

17   **Q.**  Okay.

18       So we've talked about three things that are specific to

19   Android that haven't occurred on -- on iOS, right?  We talked

20   about less secure runtime protections, right?

21   **A.**  Yes.

22   **Q.**  We talked about a more fragmented operating system, right?

23   **A.**  Right.

24   **Q.**  And we talked about a centralized app store that's using

25   less comprehensive review processes, right?

1    **A.**   Right.

2    **Q.**   And each of those things could be contributing to

3    incremental malware on Android, right?

4    **A.**   Yes.

5    **Q.**   I want to talk about another comparison you drew which is

6    the Android marketplace in China.  In your opinion, the

7    Android marketplace in China illustrates the real-life

8    consequences of fragmentation of app distribution, right?

9    **A.**   Yes.

10   **Q.**   And you observed that the centralized Android store,

11   Google Play, is banned in China, right?

12   **A.**   Yes.

13   **Q.**   And in its place, a variety of other app distribution

14   stores have popped up to replace it.

15   **A.**   Yes.

16   **Q.**   And in your opinion, as a result of this fact, China

17   itself faces a high risk of malware, right?

18   **A.**   Right.  It's not just my opinion, it was in the studies

19   that I looked at.

20   **Q.**   Sir, that's your opinion, isn't it?

21   **A.**   Yes.

22   **Q.**   But you understand that Epic is not asking in this case

23   that the Apple App Store be banned in China or anywhere else,

24   right?

25   **A.**   I -- I haven't heard that request from Epic.

1    **Q.**  Okay.  Thank you.

2       And you've heard -- you may have heard testimony about

3    there being black market app stores in China on iOS 2, right?

4    **A.**  I did.  There were people that were taking advantage of

5    the enterprise program.

6    **Q.**  Sir, the answer is yes?

7    **A.**  Yes.

8    **Q.**  Okay.  Thank you.

9       In that case, the App Store still would have been

10   available for use in China alongside those black market app

11   stores, right?

12   **A.**  The -- the App Store would not have been because these

13   were using the developer enterprise which doesn't go through

14   the App Store.

15   **Q.**  Okay.  Let me ask the question differently because I think

16   we may have had a misunderstanding.

17   **A.**  Okay.

18   **Q.**  So at the time when these black market app stores were in

19   China, the App Store was not banned in China, right?

20   **A.**  The iOS App Store?

21   **Q.**  Yes.

22   **A.**  Right.

23   **Q.**  So users could still have chosen to use the iOS App Store,

24   right?

25   **A.**  I believe users could have chosen any app store.

RUBIN – CROSS / BYARS

1    **Q.** Okay.  And even though that's a situation in iOS where the

2    iOS App Store still existed, you chose not to compare that,

3    the incidence of malware in that situation, right?

4    **A.** There's a good reason.

5    **Q.** You chose not to do it, sir, right?

6    **A.** Yes.

7    **Q.** Okay.  Another metric you've used to compare Android to

8    iOS is called comparative security -- sorry -- common

9    vulnerabilities and exposure, right?

10   **A.** Yes.

11   **Q.** Those are called CVE's in the trade?

12   **A.** Yes.

13   **Q.** Thank you.

14       And CVE is a broad term, right?

15   **A.** Well, it's actually a specific type of --

16   **Q.** Sir, is it a broad term?

17   **A.** It -- I can't just say yes or no there.

18   **Q.** Okay.  Is it a broad term that can include flaws in

19   software, hardware, or computer components?

20   **A.** Yes.

21   **Q.** Okay.  So the term is broader than apps, right?

22   **A.** It's a -- it's uncomparable.  It's a very different type

23   of term, I think.

24   **Q.** Okay.  The term does not only include problems of apps;

25   isn't that right?

RUBIN - CROSS / BYARS

1    **A.**  Yes.

2    **Q.**  Okay.  And you didn't, in your testimony, address the

3    proportion of CVE's that might be assigned to apps, right?

4    **A.**  I didn't look directly at that.

5    **Q.**  Okay.  And these CVE's are collected in what I'll call a

6    national database; isn't that right?

7    **A.**  Yes.

8    **Q.**  And members of the public can -- can submit CVE's, right?

9    **A.**  That's right.

10   **Q.**  In fact, anyone can, right?

11   **A.**  Yes.

12   **Q.**  And the -- the database only includes vulnerabilities that

13   have been reported by somebody, including a member of the

14   public, right?

15   **A.**  That's right.

16   **Q.**  The Android OS is open source, right?

17   **A.**  That's right.

18   **Q.**  And the iOS is mainly closed source, right?

19   **A.**  The iOS kernel is open source.  The rest of it, I believe,

20   is -- is closed.

21   **Q.**  So there's iOS code that is closed source, right?

22   **A.**  There is.

23   **Q.**  Okay.  And the fact that Android's OS is mostly public and

24   available to the public makes it easier for members of the

25   public to identify CVE's, right?

1    **A.**   Well, the -- I'm not sure I agree with that.

2    **Q.**   Okay.  Let me say it again.

3        The fact that Android OS's code is openly available to the

4    public might make it easier for members of the public to

5    identify CVE's correct?

6    **A.**   I think the answer would be nuanced.  I can't just say yes

7    or no.

8    **Q.**   Okay, sir, could I refer you --

9           **MR. BYARS:**  Your Honor, could I refer him to his

10   deposition, page 199?

11          **THE WITNESS:**  Which tab is it?

12   BY MR. BYARS:

13   **Q.**   So I believe we gave you a coil inside of our book.

14   **A.**   Okay.

15       (Reviewing document.)

16          **THE COURT:**  Page 199.

17             (Simultaneous colloquy.)

18          **MR. BYARS:**  199, lines 15 through 25, and

19   particularly 21 through 25.

20          **THE COURT:**  That's not -- wait.  21 through 25.

21       Okay.  Hold on.

22       Well, he didn't answer yes or no.  So --

23          **MR. BYARS:**  Your Honor, I asked him the specific

24   answer whether he thought that it might.

25          **THE COURT:**  Ah.  Okay.

1   **BY MR. BYARS:**

2   **Q.**   So, sir, were you asked this question and did you give

3   this answer?

4                      "Q.   Does the fact that Android -- Android

5                  OS code is openly available to the public make

6                  it easier for members of the public to identify

7                  CVE's?

8                    "A.   It might."

9   **A.**   I think that's what I'm saying here.

10  **Q.**   Okay.  So you stand by that answer?

11  **A.**   Yes.

12  **Q.**   Okay.  Thank you.

13      And you agree this may be why more CVE's are reported for

14  Android compared to iOS, correct?

15  **A.**   Could you please repeat the question?

16  **Q.**   Sure.

17      You agree that this may be why more CVE's are reported for

18  Android compared to iOS, correct?

19  **A.**   Well, if it is, I said that it might because the kernel in

20  Mac is --

21  **Q.**   Do you agree with that, yes or no?

22  **A.**   Again, this is -- this is --

23  **Q.**   Sir, I'm on --

24                      (Simultaneous colloquy.)

25

1   **BY MR. BYARS:**

2   **Q.**   -- a clock and I'm entitled to a yes or no answer to the

3   question.

4   **A.**   That would be misleading.

5         **THE COURT:**   If you can't say yes or no, that's fine.

6   Just say you can't.

7         **THE WITNESS:**   I can't say yes or no to that.

8         **MR. BYARS:**   Okay.   Your Honor, may I refer the

9   witness to page 200, lines 1 through 7 of his deposition?

10                (Pause in the proceedings.)

11        **THE COURT:**   Okay.   Are you there?

12        **THE WITNESS:**   I'm there.

13        **THE COURT:**   All right.   Question?

14  **BY MR. BYARS:**

15  **Q.**   Sir, did you -- were you asked this question and did you

16  give this answer?

17                "Q.   In that case, there might be more CVE's

18                reported for Android because more members of the

19                public are able to identify and submit them

20                than, for example, in iOS; is that right?

21                "A.   It wouldn't be possible if there weren't

22                vulnerabilities there.   But given that there are

23                vulnerabilities, I think that is right."

24        Were you asked that question and did you give that answer?

25  **A.**   Yes.

1   **Q.**  Do you stand by that answer?

2   **A.**  I do.

3   **Q.**  Okay.  Thank you.

4       I'd like to talk about the Nokia Threat Intelligence

5   Report that Apple's counsel showed you and the one that's

6   reproduced on slide 25 in your demonstrative.

7       Could you please look at DX4975 which was the Nokia

8   report?

9   **A.**  (Reviewing document.)

10      Okay.  I found it.

11  **Q.**  Okay.  So I know you were using this slide to compare

12  Android and iOS, but I'm interested in a different question.

13  Does this slide --

14  **A.**  I'm sorry.  Which slide?

15  **Q.**  I'm sorry.  I think I skipped ahead.  It's 4975.8.

16  **A.**  Okay.

17  **Q.**  Okay.  That's the slide that was -- you translated into

18  your demonstrative, right?

19  **A.**  Right.

20  **Q.**  Okay.  And you were using this to compare Android and iOS,

21  right?

22  **A.**  I -- I did make that comparison based on this slide.

23  **Q.**  Okay.  It's not possible to compare, using this slide, iOS

24  to Mac, is it?

25  **A.**  No.

RUBIN - CROSS / BYARS

1    **Q.**  Mac is not represented on the slide, is it?

2    **A.**  (Reviewing document.)

3        When I read this, I assumed it was built into the Windows

4    PC section.

5    **Q.**  Do you know that for sure, sir?

6    **A.**  They don't say that, but it does make sense considering

7    they have iPhone, IOT, Windows/PC, and Android.  But they --

8    think don't say one way or the other --

9    **Q.**  Okay.  So, sir, are you prepared to testify under oath

10   that you know Mac is included in Windows PC?

11   **A.**  No.

12   **Q.**  Okay.

13       I'd like you to flip the -- the page immediately prior

14   which is slide 7.

15   **A.**  (Reviewing document.)

16       Okay.

17   **Q.**  This one is titled "Malware in Mobile Networks."  Do you

18   see that?

19   **A.**  (Reviewing document.)

20       Yes.

21   **Q.**  And it says Figure 2, monthly mobile infection rates since

22   January 2019.

23       Do you see that figure?

24   **A.**  Yes.

25   **Q.**  And I'm actually a little confused.  Maybe you can help

1   me.  The time scale on the bottom actually goes back to

2   October 2017, right?

3   **A.**  Right.

4   **Q.**  So perhaps this figure is actually representing monthly

5   mobile infection rates since October 2017, is that right?

6   **A.**  (Reviewing document.)

7            **THE COURT:**  We're on Figure 2 at .007?

8            **MR. BYARS:**  Yes, Your Honor.

9            **THE COURT:**  The first sentence says it shows monthly

10   since January 2019.

11            **MR. BYARS:**  That's right, Your Honor.

12       But if you look at the figure, it goes -- it appears to go

13   all the way back to October 2017.

14            **THE COURT:**  So you're saying they have a typo in

15   their document?

16            **MR. BYARS:**  I'm con -- I'm simply confused.  I'm not

17   sure 'cause the figure is also labeled January 2019.  So I'm

18   asking actually the witness if he has investigated that, can

19   clear that up for us.

20            **THE WITNESS:**  (Reviewing document.)

21       I mean, it is -- it is showing it from October 17th, but

22   the rest of document is about 2019.  So perhaps they're just

23   including what led up to that for context.

24   **BY MR. BYARS:**

25   **Q.**  Okay.  So it's not clear, right?

RUBIN - CROSS / BYARS

1    **A.**   There's something going on here with the dates.

2    **Q.**   Okay.  And I take it you hadn't investigated and resolved

3    this with Nokia or anybody else before you testified today?

4    **A.**   I didn't notice that till you just now pointed it out.

5    **Q.**   Okay.  Thank you.

6         Am I right, though, that the line ends right about

7    .20 percent?

8    **A.**   I'm sorry.  I'm not sure what you just said.

9    **Q.**   Sure.  If you look at Figure 2.

10   **A.**   Okay.

11   **Q.**   The red line.

12   **A.**   Right.

13   **Q.**   Which represents monthly mobile infection rates since

14   January 2019; is that right?

15   **A.**   That's what it says.

16   **Q.**   And it ends -- it's hovering at the end of the time scale

17   around 0.20 percent; is that right?

18   **A.**   You're saying that the red line at the end is around .2 --

19   **Q.**   I am.

20   **A.**   -- on the Y axis, yes.

21   **Q.**   Okay.  And the text actually says in the second paragraph

22   on the left column, "In 2020 the average percent of devices

23   infected each month was 0.23 percent."

24   **A.**   Yes.

25   **Q.**   Do you see that?

1   **A.**   Yes.

2   **Q.**   And the red line never went over .5 percent during

3   whatever time scale the graph is the meant to represent; is

4   that right?

5   **A.**   That's what it looks like.

6   **Q.**   And your understanding of this slide is that it would

7   include all of the infections in malware on Android that you

8   described previously, right?

9   **A.**   (Reviewing document.)

10   Could I hear that again, please.

11   **Q.**   Sure.   This .2 percent figure would include all the

12   malware infections on Android and iOS and on any other mobile

13   device; is that right?

14   **A.**   (Reviewing document.)

15   I'm sorry this is taking so long.   I'm just trying to --

16   **Q.**   That's okay.

17   Is it appropriate to infer that despite the fact this page

18   is one page away from the graphics that counsel for Apple put

19   in your demonstrative, you haven't actually investigated the

20   meaning of this slide?

21   **A.**   That -- that is not true.   What I'm wondering is if

22   perhaps there is a decimal point that shouldn't be there, that

23   they meant 23 percent.   And that's what was taking me so long

24   to look to see if that made sense, if that was a typo.

25   **Q.**   Okay.   Slide 7 and slide 8 represent different figures,

RUBIN - CROSS / BYARS

1  right?

2  **A.**  (Reviewing document.)

3  Right.

4  **Q.**  Slide 8 represents infections by device, right?

5  **A.**  (Reviewing document.)

6  Yes.

7  **Q.**  So of the existing infections, those are the devices that

8  they're on, right?

9  **A.**  Right.

10  **Q.**  Slide 7 represents the percentage of infected mobile

11  devices observed monthly, right?

12  **A.**  Yes.

13  **Q.**  Okay.  So are you prepared to testify under oath that this

14  should actually be something higher than .2 percent?

15  **A.**  No.  No, I think that's right.

16  **Q.**  Okay.  Thank you.

17  And you said on direct, I believe you talked to Trystan

18  Kosmynka who heads app review for Apple, right?

19  **A.**  I did.

20  **Q.**  And if he had given testimony that there's malware that

21  doesn't actually activate or perform any malicious actions,

22  you wouldn't have any cause to dispute that, would you?

23  **A.**  I -- you're saying that there's malware but it doesn't do

24  anything?

25  **Q.**  I'm asking you if you he gave evidence that there was

1   malware that didn't actually activate and perform any

2   malicious actions, would you have cause to disagree with that?

3   **A.**   I'm trying to understand, are you saying latent malware

4   that hasn't done its --

5   **Q.**   Sir, I'm just asking if you have cause to disagree with

6   that.

7              **THE COURT:**   The question is confusing.

8              **MR. BYARS:**   Thank you, Your Honor.

9              **THE COURT:**   Say it again.

10  **BY MR. BYARS:**

11  **Q.**   There's malware that doesn't activate or perform any

12  malicious actions, right?

13  **A.**   There is.

14  **Q.**   Okay.  And so the -- of the .2 percent, some of that

15  malware may never activate or perform any malicious actions;

16  isn't that right?

17  **A.**   Well, that wouldn't have shown up in this study.

18  **Q.**   Do you know that for sure, sir?

19  **A.**   Based on their methodology, that is -- that's how I

20  understand it.

21  **Q.**   Okay.  Could you please look at slide 12 in this.

22  **A.**   (Reviewing document.)

23  **Q.**   Are you with me?

24  **A.**   Yes.

25  **Q.**   Okay.  So slide 12 says top 20 residential network

1   infections, correct?

2   **A.**   Yes.

3   **Q.**   And there is only one infection in this list of top 20

4   that is expressly associated with Mac, right?

5   **A.**   With what?

6   **Q.**   With the Mac.

7   **A.**   (Reviewing document.)

8   **Q.**   Can I help you out?

9   **A.**   I found it.  I just found it.

10  **Q.**   Okay.  What did you find?

11  **A.**   The Mac Downloader Shlayer.

12  **Q.**   Okay.  Are you familiar with this infection?

13  **A.**   I am not.

14  **Q.**   Okay.  So you're not aware that this infection achieved

15  some notoriety for being the first malware that was notarized

16  by -- by Apple?

17  **A.**   I'm not.

18  **Q.**   So you haven't investigated this infection?

19  **A.**   No.

20  **Q.**   Okay.  If you would look, please, at tab 1239 in your

21  binder, in the black binder.

22  **A.**   (Reviewing document.)

23          **MR. BYARS:**  And I'm going to ask Mr. Rudd not to

24  display this which is still marked confidential.

25          **THE WITNESS:**  (Reviewing document.)

1    **BY MR. BYARS:**

2    **Q.**   Sir, you haven't seen this document before, I take it?

3    **A.**   (Reviewing document.)

4         It does not look familiar to me.

5    **Q.**   Okay.  And without getting into details given its

6    confidentiality designation, this is an email among Apple

7    employees including Mr. Schiller and Mr. Federighi, right?

8    **A.**   I'm sorry.  I was on 1238.

9    **Q.**   I'm sorry.  1239 is where we should be.

10   **A.**   Okay.

11   **Q.**   Do you need the question again?

12            **THE COURT:**   I don't see this in evidence.

13            **MR. BYARS:**   It is not yet, Your Honor.

14            **THE COURT:**   Okay.

15            **THE WITNESS:**   I am not familiar with this document.

16   **BY MR. BYARS:**

17   **Q.**   Okay.  And this is an email, though, between Apple

18   employees, or appears to be, in your understanding, including

19   Mr. Schiller and Mr. Federighi?

20   **A.**   That's what it appears to be.

21   **Q.**   Okay.  And the bottom of the first page mentions Shlayer,

22   right?

23   **A.**   (Reviewing document.)

24        It says that.

25   **Q.**   Okay.  And I'll represent that this is what follows that

1    italics is actually copied from the *Wired* article that is

2    mentioned in the text.

3    **A.**   (Reviewing document.)

4    **Q.**   And I really want to point to you to one thing on page 2.

5    **A.**   I'm on page 2.

6    **Q.**   Okay.  And if you look at paragraph 5, it reads, and I'm

7    going to read this 'cause it's from the *Wired* article:

8        "Wardle notified Apple about the rogue software on

9    August 28 and the company revoked the Shlayer notarization

10   certificates that same day, neutering the malware anywhere

11   that it was installed and for future downloads."

12       Do you see that?

13   **A.**   I see that.

14   **Q.**   And then the last paragraph says:

15       "'Malicious software constantly changes, and Apple's

16   notarization system helps us keep malware off the Mac and

17   allow us to respond quickly when it's discovered,' the company

18   said in a statement.  'Upon learning of this adware, we

19   revoked the identified variant, disabled the developer

20   account, and revoked the associated certificates.  We thank

21   the researchers for their assistance and keeping our users

22   safe.'"

23       Do you see that?

24   **A.**   I see that.

25   **Q.**   Is that consistent with your understanding of how

1    notarization works on the Mac?

2    **A.**   This is more of a recovery from a notarization problem as

3    opposed to how notarization works.

4    **Q.**   It's a statement from Apple, though, right?

5    **A.**   It is.

6    **Q.**   So you would defer to their explanation of how

7    notarization works?

8    **A.**   Yes.

9    **Q.**   Okay.  Now if there are demonstratives that show the

10   various distribution methods, there was one that was direct,

11   one that was centralized, one that was multiple app stores,

12   none of those depicted the notarization process, right?

13   **A.**   Right.

14   **Q.**   I'd like to change topics and go to iOS threat model.

15        You believe -- and you understand what I mean by threat

16   model, right?  It's addressed in your written direct

17   testimony?

18   **A.**   I do.

19   **Q.**   Okay.  You believe it's industry best practice for device

20   manufacturers to perform a formal security analysis of a

21   product before bringing it to market, right?

22   **A.**   I do.

23   **Q.**   And a formal security analysis includes developing a

24   threat model, right?

25   **A.**   It is part of it.

1    **Q.**   And a threat model would enumerate vulnerabilities,

2    weakness, and defects in any computer system?

3    **A.**   That would be part of it.

4    **Q.**   Okay.  Is that it, though?

5    **A.**   No.

6    **Q.**   Okay.  Let me -- let me ask it again.

7          The threat model would do this, would enumerate

8    vulnerabilities, weaknesses, and defects, right?

9    **A.**   It would.

10   **Q.**   Okay.  And you believe that any evaluation of a security

11   of iOS must consider the threat model, right?

12   **A.**   I think an evaluation of a system needs to include a

13   threat model.

14   **Q.**   A system including iOS; isn't that right?

15   **A.**   Yes.

16   **Q.**   Okay.  Now in preparation for developing your opinions, as

17   you discussed previously, you had access to Apple engineers,

18   right?

19   **A.**   I did.

20   **Q.**   Okay.  And you spoke with several individuals to gather

21   information in forming your opinions, right?

22   **A.**   I did.

23   **Q.**   That included, as we said, Mr. Kosmynka, right?

24   **A.**   Yes.

25   **Q.**   Mr. Eric Friedman?

RUBIN - CROSS / BYARS

1   **A.**   Yes.

2   **Q.**   He runs the Apple fraud engineering algorithms and risk

3   team; is that right?

4   **A.**   Right.

5   **Q.**   And there may have been others, right?

6   **A.**   I think so.

7   **Q.**   Okay.  You did not discuss with any of these people

8   whether Apple had performed a formal security analysis before

9   the iPhone was brought to market, right?

10  **A.**   I did not discuss that.

11  **Q.**   Okay.  And you did not discuss with these people, these

12  Apple engineers, whether Apple developed a threat model before

13  the iPhone was brought to market, right?

14  **A.**   I did not have that discussion.

15  **Q.**   And you also had access to confidential Apple documents.

16  I believe you testified that you signed the protective order

17  earlier.

18  **A.**   Yes.

19  **Q.**   And they obviously -- Apple could have given you those

20  documents had they chose, right?

21  **A.**   I suppose so.

22  **Q.**   And do you remember at your deposition I asked you if you

23  have seen contemporaneous documentation of Apple having

24  performed a security analysis or developed a threat model

25  before bringing the iPhone to market?  Do you remember me

RUBIN – CROSS / BYARS

1  asking you that?

2  **A.**  I do.  I remember not understanding what contemporaneous

3  meant.

4  **Q.**  Okay.  Eventually we got there, though.  Didn't we

5  eventually get to the clear question?

6  **A.**  We did.

7  **Q.**  Okay.  And you were not able to identify one at that

8  point; isn't that right?

9  **A.**  That's right.

10  **Q.**  Now, another step in a security analysis is the

11  construction of a set of policy invariants, right?

12  **A.**  Yes.

13  **Q.**  Policy invariants describe how the system is supposed to

14  function as envisioned by its creators and stakeholders,

15  right?

16  **A.**  Yes.

17  **Q.**  And in this case, the creators and stakeholders refer to

18  the people who developed the iPhone, right?

19  **A.**  Yes.

20  **Q.**  You didn't ask anybody at Apple for their set of policy

21  invariants for the iPhone, right?

22  **A.**  Right.

23  **Q.**  You didn't see any such policy invariants for the iPhone,

24  right?

25  **A.**  Right.

RUBIN - CROSS / BYARS

**Q.**  In fact, you just assumed based on those conversations you

had that they had created policy invariants; isn't that right?

**A.**  Right.

**Q.**  Now, you believe iOS faces an extraordinary threat model,

right?

**A.**  An extraordinary threat.

**Q.**  It has an extraordinary threat model, right?

**A.**  Yes.

**Q.**  Okay.  And this threat model, in your view, has caused

Apple to employ extraordinary security features, right?

**A.**  Yes.

**Q.**  And that includes, as you described it, centralized app

distribution, right?

**A.**  Yes.

**Q.**  One reason you believe iPhone has an extraordinary threat

model is the number of apps available in the App Store today,

right?

**A.**  That's true.

**Q.**  Okay.  2 million today, right?  Or almost.

**A.**  I've heard that in this case.

**Q.**  Okay.  And you've actually testified to that in this case,

haven't you?

**A.**  I may have.

**Q.**  Okay.  All right.  Thanks.

        A number of -- another reason for the extraordinary threat

RUBIN – CROSS / BYARS

1    model of the iPhone is a number of app downloads today, right?

2    **A.**   Yes.

3    **Q.**   In your view, correct?

4    **A.**   Yes.

5    **Q.**   Now, if there were evidence in the case that Apple had no

6    reason to believe that there would be this many apps or this

7    many app downloads when they launched the App Store, those

8    numbers could not have affected their development of an iPhone

9    threat model before it was launched, right?

10   **A.**   I'm –– I'd like you to please clarify that question.

11   **Q.**   Yeah, sure.

12       So if Apple didn't know before they launched the iPhone

13   that there would be 2 million apps and 180 million app

14   downloads, and they didn't know that when they launched the

15   App Store, those numbers could not have affected their

16   development of a threat model, right?

17   **A.**   Not necessarily.

18   **Q.**   Let me try it again.

19       If there was evidence that these numbers were never

20   contemplated by Apple at the time they launched the App Store,

21   they could not have possibly taken those numbers into account

22   when they developed a threat model before they launched the

23   App Store, right?

24   **A.**   If they never contemplated it, they wouldn't have put it

25   in their threat model.

RUBIN - CROSS / BYARS

1    **Q.**   Okay.  Thank you.

2         Another reason you believe the iPhone has an extraordinary

3    threat model is that it has hardware features that could

4    expose a user in private moments, right?

5    **A.**   Yes.

6    **Q.**   For example, iPhones have built-in microphones, right?

7    **A.**   Yes.

8    **Q.**   They have built-in cameras, right?

9    **A.**   Yes.

10   **Q.**   The Mac also has a built-in camera, though, right?

11   **A.**   Right.

12   **Q.**   And the -- the Mac also has a built-in microphone, right?

13   **A.**   Yes.

14   **Q.**   So Macs also have hardware that could expose a user in

15   private moments, right?

16   **A.**   Well, there would be fewer private moments, but, yes.

17   **Q.**   That is correct, right?

18   **A.**   Yes.

19   **Q.**   Okay.  And one reason, in your opinion, there are fewer

20   private moments is where the device goes with the user, right?

21   **A.**   Right.

22   **Q.**   But Macs obviously are with users in their most private

23   moments, right?

24   **A.**   Mine isn't.  I don't know.

25   **Q.**   Okay.  So you don't know whether users use Macs in their

RUBIN - CROSS / BYARS

1  most private moments?

2  **A.**  I would imagine they don't.

3  **Q.**  Okay.  Are you prepared to testify under oath that they

4  don't?

5  **A.**  No.  I mean I'm being a little tongue in cheek because I

6  think it's pretty clear that your phone is with you in more

7  sensitive times than your Mac is.

8  **Q.**  Okay, sir, could you just focus on my questions, please.

9  **A.**  Sure.

10  **Q.**  Some people might use Mac in the office, right?

11  **A.**  Yes.

12  **Q.**  While they're working on confidential business, right?

13  **A.**  Yes.

14  **Q.**  Okay.  Some people might use Macs at home in their living

15  rooms, right?

16  **A.**  They could.

17  **Q.**  Some people might even use Macs at home in their bedrooms,

18  right?

19  **A.**  They could.

20  **Q.**  Okay.  And these are private moments, right?

21  **A.**  Yes.

22  **Q.**  Thank you.

23  Now when comparing threat models such as between the

24  iPhone and Mac, you would have to take into account the types

25  of information that people store on these devices, right?

RUBIN – CROSS / BYARS

1   **A.**   Yes.

2   **Q.**   And you'd agree that if one of the products stored more

3   information than the other, then their threat models would be

4   less similar than if they stored the same information,

5   correct?

6   **A.**   Yes.

7   **Q.**   In fact, if Mac stored the same kind of information as

8   iPhones did, that would affect your comparison of their threat

9   models, right?

10  **A.**   If it was exactly the same --

11  **Q.**   Sir, is it -- is it yes or no?

12  **A.**   Let me please hear it again.

13  **Q.**   Sure.

14      Whether Macs store the same information or similar

15  information would affect -- would be a factor you'd consider

16  when comparing their threat models, right?

17  **A.**   Yes.

18  **Q.**   Okay.  But you haven't conducted any empirical study to

19  compare the types of information that people keep on their

20  iPhones versus their Mac, have you?

21  **A.**   I am a very heavy user of both so I have an idea.

22  **Q.**   Okay.  But, sir, the question was you haven't conducted an

23  empirical study of that, have you?

24  **A.**   I have not.

25  **Q.**   Okay.

RUBIN - CROSS / BYARS

1      You do agree, however, that people can sync information

2    between their Macs and their iPhones?

3    **A.**   Yes.

4    **Q.**   Okay.  Like their photos, they can sync, right?

5    **A.**   Yes.

6    **Q.**   Their calendar information, they can sync?

7    **A.**   Yes.

8    **Q.**   Their contact information, they can sync?

9    **A.**   Yes.

10   **Q.**   You're also aware that people can store their passwords in

11   iCloud, right?

12   **A.**   Yes.

13   **Q.**   And they can also store credit card information in iCloud,

14   right?

15   **A.**   Yes.

16   **Q.**   And information that is stored on iCloud can be accessed

17   on any Apple device, right?

18   **A.**   Yes.  Well --

19   **Q.**   Including the Mac and the iPhone?

20   **A.**   Yeah, those two, yes.

21   **Q.**   At least those two, right?

22   **A.**   Yes.

23   **Q.**   Okay.  Thank you.

24        Users can also use their Apple devices to access their

25   same email and their messages on separate devices, right?

RUBIN - CROSS / BYARS

1   **A.**   They can.

2   **Q.**   Including on Macs and iPhones, right?

3   **A.**   Yes.

4   **Q.**   And you'd agree that people have sensitive information in

5   their email, right?

6   **A.**   They can.

7   **Q.**   Okay.  In your opinion, however, users cannot sync the

8   most sensitive information that is kept on iOS, right?

9   **A.**   Right.

10   **Q.**   That sensitive information includes payment information

11   that is used for Apple Pay, right?

12   **A.**   That's right.

13   **Q.**   It also includes biometric information that is used for

14   Touch ID?

15   **A.**   Yes.

16   **Q.**   And biometric information that is used for Face ID, right?

17   **A.**   Yes.

18   **Q.**   That information is stored on a special chip in an iPhone

19   called the Secure Enclave, right?

20   **A.**   Enclave, yes.

21   **Q.**   Enclave.  Thank you.  I was going to ask you if you knew.

22   I did not.

23       The Secure Enclave is designed to provide an extra layer

24   of protection for this most sensitive information, right?

25   **A.**   Yes.

RUBIN – CROSS / BYARS

1    **Q.**  The Secure Enclave is designed to keep the information

2    secure even if the application processor on the iPhone is

3    compromised, right?

4    **A.**  Yes.

5    **Q.**  The application processor is another chip that runs

6    applications on the iPhone, right?

7    **A.**  Yes.

8    **Q.**  Mac computers being sold today also have a Secure Enclave,

9    right?

10   **A.**  Yes.

11   **Q.**  Mac computers being sold today also offer Touch ID, right?

12   **A.**  Some.

13   **Q.**  Some of them do.  Some of the Mac computers being sold

14   today offer Touch ID, right?

15   **A.**  Yes.

16   **Q.**  And these Mac computers would store the same kind of

17   biometric information that would be stored on iPhone for

18   Touch ID, right?

19   **A.**  Yes.

20   **Q.**  And Apple Pay is also available on Mac computers being

21   sold today, right?

22   **A.**  Yes.

23   **Q.**  Now another reason you believe that iPhone threat model is

24   extraordinary is that iOS devices have sensor hardware that

25   tracks their users' location and movement patterns, right?

RUBIN - CROSS / BYARS

1    **A.**  Yes.

2    **Q.**  Macs also can detect the device's location, right?

3    **A.**  Not as well.

4    **Q.**  But they can do so, right?

5    **A.**  To a -- to a general approximation.

6    **Q.**  Okay.  And Mac apps and websites can gather and use this

7    location information that is -- that is identified by the Mac,

8    right?

9    **A.**  Right.

10   **Q.**  I want to talk about one of the other aspects of your

11   iPhone security model which is automated manual review.  One

12   of the opinions you offer in this case is that app review

13   provides significant security benefits, right?

14   **A.**  I -- I just don't know what you mean by automated manual

15   review.

16   **Q.**  Okay.  Perhaps we can work it out.

17       Do you have your rebuttal expert report in front of you in

18   one of the coils.

19   **A.**  (Reviewing document.)

20   **Q.**  I'm sorry you're so burdened with so much paper.

21   **A.**  It challenging with this microphone and the mask.

22   **Q.**  I understand.

23   **A.**  Let's see.

24       (Reviewing document.)

25       Okay.  I've got it.

RUBIN – CROSS / BYARS

**Q.** And could you please go to paragraph 99.

**A.** (Reviewing document.)

**Q.** Are you with me?

**A.** Yes.

**Q.** And you say here, "I attribute iOS security to four aspects of its security model."  Right?

**A.** Right.

**Q.** And we went over those earlier, one of which is a manual and automated app review process, right?

**A.** Right.  I didn't hear you say the word "and," so the confusion.

**Q.** It's probably the multiple layers of plastic between us, I'm guessing.

**A.** Yes.

**Q.** And I'll slow down a little too.

So app review enforces the App Review Guidelines, right?

**A.** Yes.

**Q.** That's its directive is to do that, from your understanding; is that right?

**A.** That's right.

**Q.** Some of the App Review Guidelines have a primary focus on something other than security; isn't that right?

**A.** That's correct.

**Q.** And you'd expect that app review enforces those guidelines too, right?

1   **A.**   Yes.

2   **Q.**   Now, I saw on your demonstrative, you -- and as you

3   described your assignment on direct, you said that one aspect

4   was to generate real-life data or to gather real-life data; is

5   that right?

6   **A.**   That was part of my assignment.

7   **Q.**   And you also were meant to evaluate app review, right?

8   And the security benefits it provides, right?

9   **A.**   Yes.

10  **Q.**   But you haven't done any empirical analysis of the

11  security of apps that are actually distributed through the App

12  Store, have you?

13  **A.**   I haven't done a review like that.

14  **Q.**   Okay.  You haven't done an empirical analysis, right?

15  **A.**   Right.

16  **Q.**   And you haven't done an empirical analysis of the privacy

17  of apps that are distributed right now through app review,

18  have you?

19  **A.**   Right.  That -- that wasn't my assignment.

20  **Q.**   Okay.

21       And you haven't done any empirical analysis of the

22  reliability of apps distributed through the App Store; is that

23  right?

24  **A.**   That's correct.

25  **Q.**   Now, Mr. Friedman, who runs Apple's FEAR team, is one of

RUBIN - CROSS / BYARS

1    the employees that you talked to in developing your opinions,

2    right?

3    **A.**   That's correct.

4    **Q.**   Now I notice you haven't addressed the evidence that

5    Mr. Friedman offered in this case; is that right?

6    **A.**   I'm sorry.  I haven't addressed it?

7    **Q.**   In your testimony, have you?

8    **A.**    I don't think I did.

9    **Q.**   Okay.  So you didn't address Mr. Friedman's observation

10   that app review was bringing a plastic butter knife to a

11   gunfight, have you?

12   **A.**   I didn't address that.

13   **Q.**   You didn't address Mr. Friedman's view to another Apple

14   employee that the employees should regard app review as a

15   little more than the equivalent of the TSA at the airport, did

16   you?

17   **A.**   I didn't address that.

18   **Q.**   You're familiar with what a KPI is?

19   **A.**   I -- I might need some context --

20                   (Simultaneous colloquy.)

21   **BY MR. BYARS:**

22   **Q.**   Okay.  What key performance indicator, does that help?

23   **A.**   Sure.

24   **Q.**   Okay.  You didn't address Mr. Friedman's finding in the

25   last few years that app review's KPI is how many apps we can

RUBIN - CROSS / BYARS

1    get through the pipe, right?

2    **A.**   I didn't address that.

3    **Q.**   Okay.  And Mr. Friedman's view that app review is not

4    being measured by what ex -- exotic exploits can app review

5    detect, right?

6    **A.**   Right.  I used Mr. Kosmynka for my understanding of the

7    app review process.

8    **Q.**   Okay.  And you ignored what Mr. Friedman had to say,

9    right?

10   **A.**   No, because he and I spoke about other things.

11   **Q.**   Okay.  You didn't speak about this evidence that he

12   offered in this case?

13          **THE COURT:**  Slow down, sir.

14          **MR. BYARS:**  I'm sorry, Your Honor.

15          **THE WITNESS:**  No.

16   **BY MR. BYARS:**

17   **Q.**   Okay.

18      Now, of the four aspects of the iOS security model that we

19   just went over again, you would agree that manual and

20   automated app review is the one that is most directly related

21   to the need for exclusive distribution, right?

22   **A.**   I think that's a fair comment.

23   **Q.**   Okay.

24      Let's talk about the automated portion of app review now.

25   That includes static and dynamic analysis, right?

RUBIN – CROSS / BYARS

1    **A.**   Right.

2    **Q.**   Those are common techniques in computer security, right?

3    **A.**   Yes.

4    **Q.**   You'd agree that these have an enormous impact on the

5    security of a system, right?

6    **A.**   They are able to identify many problems.

7    **Q.**   They have an enormous impact on security; isn't that

8    right?

9    **A.**   Yes.

10   **Q.**   But in terms of time and cost needed to use them, they are

11   negligible; isn't that right?

12   **A.**   In the larger scheme of things, they run pretty quickly.

13   **Q.**   Okay.

14        Let's talk about manual review now.

15        With respect to manual review, other app stores could

16   implement a manual review, right?

17   **A.**   They can't do Apple's, but they could do one.

18   **Q.**   Okay.  They could do a manual review.

19   **A.**   Yes.

20   **Q.**   And if they had all of Apple's resources and all of

21   Apple's money, they could put in their own manual review

22   process, right?

23   **A.**   They would still need access to Apple's knowledge base and

24   their familiarity with their platform.  But if you cloned

25   Apple and made another Apple --

1  **Q.**  Sir, sir, I'm sorry, I'm on a clock and I just want a yes

2  or no.  Right?

3  **A.**  Sure.

4  **Q.**  If they had the money and resources that Apple did, they

5  could implement their own manual process, right?

6  **A.**  They might need more.

7  **Q.**  Okay.  Sir, could I --

8       **MR. BYARS:**  Your Honor, may I refer the witness to

9  his deposition, page 109, line 25 through the next page 110,

10  line 6.

11       **THE WITNESS:**  (Reviewing document.)

12       **THE COURT:**  You can read that.

13       **MR. BYARS:**  Okay.

14  **Q.**  Sir, were you asked this question and did you give this

15  answer?

16           "Q.  They could implement their own human

17        manual review process in order to determine

18        whether the apps they distribute meet those

19        guidelines, right?

20         "A.  I think if they put in the time and the

21        resources and the money that it would take to

22        develop it the way Apple did, then they could do

23        that."

24  Did I read that correctly?

25  **A.**  You did.

RUBIN - CROSS / BYARS

1   **Q.**   Do you stand by that answer?

2   **A.**   I -- I think about it some more, I think they would need

3   more.

4   **Q.**   So you don't stand by that answer?

5   **A.**   I would revise that answer.

6   **Q.**   Okay.

7       In fact, though, you have not actually assessed whether

8   another App Store could have put in the investment had they

9   been allowed to participate in the iOS ecosystem, right?

10  **A.**   I don't think there are companies that -- too many

11  companies in the position to put in that investment.

12  **Q.**   Okay.  Sir, you haven't actually made an assessment of

13  that, have you?

14  **A.**   I -- I mean, I -- I follow the news.  I know Apple is the

15  largest company in the world.  So I -- I haven't done any

16  analysis like that.

17  **Q.**   Okay.  Well, let me ask you a different question.

18      You actually haven't conducted any empirical analysis of

19  the amount of resources that Apple puts into app review,

20  right?

21  **A.**   I have not done a study like that.

22  **Q.**   Okay.  You haven't done any study at all that I described,

23  right?

24  **A.**   That's what I said.

25  **Q.**   Okay.  And you have not compared the amount of resources

1    that Apple puts into app review with any other app store, have

2    you?

3              **THE COURT:**  Slow down again, Mr. Byars.

4              **MR. BYARS:**  I'm so sorry, Your Honor.

5              **THE WITNESS:**  I did compare it to the way Google's

6    app review goes, looking at some confidential documents.

7    **BY MR. BYARS:**

8    **Q.**  But you did not compare the amount of resources that Apple

9    puts into app review compared to any other app store; isn't

10   that right?

11   **A.**  In paragraph 57 of my written direct, I do compare the

12   resources that they put in.

13             **MR. BYARS:**  Your Honor, I'd like to refer the witness

14   to page 93, lines 14 through 25 in his deposition.

15             **THE WITNESS:**  (Reviewing document.)

16             **THE COURT:**  Go ahead.

17   **BY MR. BYARS:**

18   **Q.**  Sir, were you asked this question and did you give this

19   answer?

20                  "Q.  So have you conducted any empirical

21               analysis of the amounts of resources that Apple

22               puts into app review compared to other app

23               stores or app distributors?

24                  "A.  With my various conversations, I'm just

25               going to use first name, Trystan and other Apple

RUBIN - CROSS / BYARS

1             engineers, I got a sense of the amount of effort

2             and time they put in, but I have not compared

3             them to Google.

4                  "Q.  Okay.  Have you compared it to any

5              other app store?

6                  "A.  No."

7        Did you -- did you give those answers?

8    **A.**  I gave those answers.

9    **Q.**  Okay.  You stand by those answers?

10   **A.**  I would revise those answer.

11   **Q.**  Okay, this is another answer that you would revise?

12   **A.**  Yes.

13   **Q.**  Okay.

14            **THE COURT:**  Five minutes.

15            **MR. BYARS:**  Thank you, Your Honor.

16   **Q.**  In fact, you have no understanding of how much money Apple

17   puts into conduct human app review, right?

18   **A.**  I -- I don't know that number.

19   **Q.**  In fact, you don't know the financials, do you?

20   **A.**  I don't.

21   **Q.**  Okay.

22       Nor do you know -- I'm sorry.

23       Nor have you looked at what another hypothetical app store

24   that was allowed to participate in iOS could do or would have

25   done, have you?

RUBIN – CROSS / BYARS

1    **A.**  Could you please repeat the question?

2    **Q.**  Sure.

3        You have not looked at what another hypothetical app store

4    they were allowed on iOS would have or could do, isn't that

5    right?

6    **A.**  What they would have?

7    **Q.**  Yes.  What tools they would have, for example.

8            **MR. LO:**  Your Honor.

9            **THE COURT:**  Sir.

10           **MR. LO:**  This now calls for testimony that was

11   stricken under the Court's order last night.

12           **MR. BYARS:**  Your Honor, I'm not talking about

13   incentives.  I'm talking about resources.

14           **THE COURT:**  Well, then you better rephrase your

15   question.  Otherwise you're going to open a door and he's

16   going to be allowed to answer.

17           **MR. BYARS:**  Thank you for that warning, Your Honor.

18   I'll move on.

19   **Q.**  Now, sir, you would agree that Apple sells security and

20   privacy as a brand, right?

21   **A.**  Yes.

22   **Q.**  Other app stores that were allowed to participate in iOS

23   could also, if they wished, sell security and privacy as a

24   brand, right?

25   **A.**  I suppose they could.

RUBIN - CROSS / BYARS

1   **Q.**   And other app stores could educate people about what steps

2   they were taking to protect people, right?

3   **A.**   They could try.

4   **Q.**   They could, couldn't they?

5   **A.**   Yes.

6   **Q.**   Okay.

7       They could publish statistics, for example, about the

8   number of bad apps that they provide compared to others,

9   right?

10  **A.**   They could do that.

11  **Q.**   Sir, you've expressed the opinion -- correct me if I'm

12  wrong -- that bad apps distributed by another app store might

13  be blamed on the device manufacturer compared to the app store

14  that distributed it, right?

15  **A.**   Right.

16  **Q.**   Okay.  That's your view, isn't it?

17  **A.**   Yes.

18  **Q.**   And you gave an example, if you recall, the Baby Shaker

19  app.  Do you recall that?

20  **A.**   I do.

21  **Q.**   Okay.  And that was an app -- an iOS app, right?

22  **A.**   Yes.

23  **Q.**   It went through app review, right?

24  **A.**   Yes.

25  **Q.**   And it was an app that had a picture of a baby on it kind

RUBIN - CROSS / BYARS

1   of crudely drawn, right?

2   **A.**  I haven't seen it, but I understand that there was some

3   image of a baby.

4   **Q.**  Okay.  And if you shook the image of a baby hard enough,

5   there would be red X's over the baby's eyes, right?

6   **A.**  Right.

7   **Q.**  And you used this an example of people blaming a bad app

8   on the device maker as opposed to the app distributor, right?

9   **A.**  Right.

10  **Q.**  But you haven't actually looked at another example of

11  this, for example, in the Android ecosystem, right?

12  **A.**  I didn't give an example in my report.

13  **Q.**  This is the only example you gave, right?

14  **A.**  Yes.

15  **Q.**  But in the Android ecosystem, you could, in fact, have a

16  bad app that came from an app store that was not affiliated

17  with the device maker, that was not affiliated with the

18  operating system maker, right?

19  **A.**  You could.

20  **Q.**  Could be a Google OS, Android, right?  Samsung device,

21  right?

22  **A.**  Sure.

23  **Q.**  And say Aptoide App Store, right?

24  **A.**  It could be.

25  **Q.**  And you could have done a study to determine which app

1   store or device maker or Android -- or operating system maker

2   would be blamed for a bad app, right?

3   **A.**   I don't think I could do a study like that.

4   **Q.**   Well, you haven't done a study, right?

5   **A.**   Right.

6   **Q.**   In fact, you could have done a study like this.  You could

7   have tested this hypothesis, right?

8   **A.**   I don't do survey research.  I wouldn't know how to do

9   that study.

10  **Q.**   Okay.  That's not your area of expertise, right?

11  **A.**   I am an expert on security of mobile platforms, but not on

12  conducting surveys.  So I would -- if I needed a survey like

13  that, I would find someone to do that survey.

14  **Q.**   Okay.  So instead you used an example without conducting a

15  survey, right?

16  **A.**   I used an example to clarify the point I was making.

17  **Q.**   Okay.  And the point you were making, to be clear, is that

18  people are necessarily going to blame the device maker for a

19  bad app on their phone, right?

20  **A.**   I wasn't saying necessarily.  I was saying some people

21  will blame it.

22  **Q.**   Okay.  And the only example you came up with was a bad

23  app, it was on an Apple phone, and also got through Apple app

24  review, right?

25  **A.**   That's the example I gave.

1          **MR. BYARS:**  Your Honor, this may be a good place to

2     stop.

3          **THE COURT:**  How much more do you have?

4          **MR. BYARS:**  I would say at least 20, 25 minutes, Your

5     Honor.

6          **THE COURT:**  Okay.

7        All right.  And you understand, Mr. Rubin, that the first

8     witness for tomorrow will be Mr. Cook?

9          **THE WITNESS:**  I'm aware.

10         **THE COURT:**  Okay.  During the break, you are

11    instructed not to speak to anyone, including the lawyers or

12    anyone else, with respect to your testimony.  Do you

13    understand?

14         **THE WITNESS:**  Yes, Your Honor.

15         **THE COURT:**  All right.  Unfortunately, I don't know

16    if there's a basketball game on or something.  But you can't

17    do anything with respect to this case.  You understand?

18         **THE WITNESS:**  I understand.

19         **THE COURT:**  Okay.  At least not with anyone else.

20    Okay.

21         **THE WITNESS:**  Okay.

22         **THE COURT:**  All right.  Well, let's --

23       You can step down at this point.

24       Let me see.  I have some information now.

25       Mr. Doren, Ms. Forrest.

1    So I obviously have not read what was handed up to me by

2    Ms. Forrest with respect to the deposition testimony.

3         **MR. DOREN:**  Your Honor, in terms of the deposition,

4    two things.  First of all, I would also cite the Court to

5    403:14 to 17.

6         **THE COURT:**  Hold on.  Let me get it.

7         **MR. DOREN:**  Yes, Your Honor.

8         **MS. FORREST:**  I gave away both my copies so --

9         **MR. DOREN:**  You can have this one back.

10        **MS. FORREST:**  All right.  Thank you.

11        **THE COURT:**  All right.  So.

12        **MR. DOREN:**  403:14 to 17.

13        **THE COURT:**  Anything else, Mr. Doren?

14        **MR. DOREN:**  And in the second cite is 315:16 to 20.

15    No, I'm sorry, I went in reverse order there.

16        **THE COURT:**  Okay.

17    All right.  And Ms. Forrest, here you've got page 81.

18        **MS. FORREST:**  Yes, lines 18 to 21.

19    And, Your Honor, if it would be of any assistance, I can

20    walk very briefly through the thinking and the -- the line of

21    reasoning.

22              (Pause in the proceedings.)

23        **THE COURT:**  Okay.  So in these three segments, he

24    says first he couldn't recall whether there were in-app

25    purchases.  And then in response to Mr. Rifkin, he clearly

```
 1    says, it seems to me, that there were no in-app purchases.

 2    And then he says again at 403 there were no in-app purchases.

 3        So that's -- so he's saying there's no in-app purchases.

 4            MS. FORREST:  Your Honor.

 5            THE COURT:  That's what he says explicitly.

 6        So what's the issue?

 7            MS. FORREST:  The issue is that there's a difference

 8    between the functionality for in-app purchases, which did not

 9    exist and we don't dispute that it didn't exist before 2009,

10    and whether there were merchants who were offering in-app

11    purchasing opportunities prior to that, which clearly the

12    evidence demonstrates that it does.

13        So he was saying there wasn't in-app purchase

14    functionality in terms of the formal launch of that.  We don't

15    dispute that.  That occurred when Apple launched it.

16        But the record is clear that factually, app developers had

17    developed in-app purchasing opportunities through their own

18    methods prior to that and were using them actively.

19            MR. DOREN:  So --

20            MS. FORREST:  And Apple knew about that.

21            MR. DOREN:  So two points, Your Honor.

22        First of all, if the record is clear on that, there's no

23    need for a rebuttal case.

24        Secondly, Your Honor is correct in her reading of the

25    second two installments from Mr. Schiller's deposition where
```

1   there isn't a reference to IAP functionality.  It's questions

2   specifically about whether there were in-app purchases, and

3   that is what Mr. Schiller testified to.

4       Third, at trial, while Mr. Schiller was being crossed,

5   when the Forstall clip was played for him -- and by the way,

6   Your Honor, there's other Forstall testimony in the record

7   that puts that into context -- Mr. Schiller simply responded,

8   "I don't agree with that."  He got the question, "Are you

9   sure?"  And he said, "As sure as I can recall."

10          THE COURT:  All right.

11          MS. FORREST:  But -- but -- but, Your Honor, I just

12  want to make absolutely clear what we're saying, which is for

13  instance, page 403, line 14 to 17, there he is asked,

14  "Mr. Schiller, when the App Store launched, there was no IAP;

15  is that correct?"

16      "That is correct."

17      That, Your Honor, is absolutely consistent with what we're

18  saying.

19          THE COURT:  So here's the -- here's where I stand.

20  The record is the record.  Whatever it is, there will be no

21  addition.

22      I think it may be confusing.  I see where you were trying

23  to get with his -- with his examination, but I'm just going to

24  take the record as it is.

25      So everybody knew what was going on, and the fairest thing

1    is to leave the playing field as the playing field.

2              **MS. FORREST:**  Well, Your Honor, tomorrow during the

3    testimony of Mr. Cook, I take it we would not be prohibited

4    from proceeding with him as we would with any other fact

5    witness, particularly one who is an Apple percipient

6    witness --

7              **THE COURT:**  Correct.

8              **MS. FORREST:**  -- in this case.

9              **THE COURT:**  Absolutely.

10             **MS. FORREST:**  So we will then proceed in that manner,

11   Your Honor.

12             **MR. DOREN:**  And, Your Honor, earlier today you had

13   suggested, perhaps ordered, that Epic turn over the documents

14   that they thought stood for this proposition and that they now

15   make seek to use with Mr. Cook.  And we have not yet received

16   those documents so we would seek guidance from the Court on

17   that point.

18             **MS. FORREST:**  Well, now you're --

19             **THE COURT:**  It's cross-examination.

20             **MR. DOREN:**  All right.

21             **THE COURT:**  You can do your own search.  You know

22   what they're looking at.

23             **MR. DOREN:**  Very well, Your Honor.  Thank you.

24             **THE COURT:**  And, you know, Mr. Cook was also not

25   there in 2008, 2009.  So I don't know what kind of information

1   he's going to have.

2       But the playing field is the playing field.  And I'm not

3   going to let in something late.

4       Here's your deposition back.

5       Okay.  We'll stand in recess until 8:00 o'clock tomorrow

6   morning.

7           **MR. DOREN:**  Thank you, Your Honor.

8           (Proceedings were concluded at 3:24 P.M.)

9                   --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman, Pamela Batalo-Hebel, and Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA BATALO-HEBEL_____

Pamela Batalo-Hebel, CSR, RMR, FCRR


_____/s/ Raynee Mercado_____

Raynee Mercado, CSR, RMR, FCRR


Thursday, May 20, 2021