VOLUME 15

Pages 3827 – 4052

Under Seal Pages 3998 – 4014

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. C-20-5640 YGR |
| | ) | |
| vs. | ) | Friday, May 21, 2021 |
| | ) | |
| APPLE, INC., | ) | Oakland, California |
| | ) | |
| Defendant. | ) | BENCH TRIAL |
| _____ | ) | |
| APPLE, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| vs. | ) | |
| | ) | |
| EPIC GAMES, Inc., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:           CRAVATH, SWAINE & MOORE, LLP
                         825 Eighth Avenue
                         New York, New York 10019
                    **BY:  KATHERINE B. FORREST, ESQUIRE**
                         **GARY A. BORNSTEIN, ESQUIRE**
                         **YONATAN EVEN, ESQUIRE**
                         (Appearances continued.)

Reported By:        Diane E. Skillman, CSR 4909, RPR, FCRR
                    Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
                    Raynee Mercado, CSR 8258 RMR, CRR, FCRR

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1

 2    For Plaintiff:              CRAVATH, SWAINE & MOORE, LLP
                                  825 Eighth Avenue
 3                                New York, New York 10019
                            BY:   LAUREN A. MOSKOWITZ, ESQUIRE
 4                                JUSTIN C. CLARKE, ESQUIRE
                                  W. WES EARNHARDT, ESQUIRE
 5                                BRENDAN BLAKE, ESQUIRE
                                  JIN NIU, ESQUIRE
 6                                BRENT BYARS, ESQUIRE

 7    For Defendant:              GIBSON, DUNN & CRUTCHER
                                  333 South Grand Avenue
 8                                Los Angeles, California 90071
                            BY:   RICHARD J. DOREN, ESQUIRE
 9                                DAN SWANSON, ESQUIRE
                                  CYNTHIA RICHMAN, ESQUIRE
10                                RACHEL BRASS, ESQUIRE

11

12                                GIBSON, DUNN & CRUTCHER, LLP
                                  2001 Ross Avenue, Suite 1100
13                                Dallas, Texas 75201
                            BY:   VERONICA S. MOYE, ESQUIRE
14
                                  PAUL WEISS RIFKIND
15                                WHARTON & GARRISON LLP
                                  2001 K STREET, NW
16                                Washington, DC 20006
                            BY:   KAREN DUNN, ESQUIRE
17                                JESSICA E. PHILLIPS, ESQUIRE

18

19    For Defendant:              PAUL WEISS RIFKIND
                                  WHARTON & GARRISON LLP
20                                943 Steiner Street
                                  San Francisco, California 94117
21                          BY:   ARPINE LAWYER, ESQUIRE

22

23

24

25
```

| 1 | **Defendant's Witnesses:** | **Page** | **Vol.** |
|---|---|---|---|
| 2 | **Cook, Timothy** | | |
| 3 | Direct Examination by Ms. Moye | 3843 | 15 |
| 4 | Cross-examination by Mr. Bornstein | 3888 | 15 |
| 5 | Redirect Examination by Ms. Moye | 3963 | 15 |
| 6 | Recross-examination by Mr. Bornstein | 3976 | 15 |
| 7 | Further Redirect Examination by Ms. Moye | 3985 | 15 |
| 8 | Further Redirect Examination by Ms. Moye | 3995 | 15 |
| 9 | (Sealed Examinations) | | |
| 10 | Further Redirect Examination by Ms. Moye | 3998 | 15 |
| 11 | Further Recross-examination by Mr. Bornstein | 4001 | 15 |
| 12 | Further Redirect Examination by Ms. Moye | 4008 | 15 |
| 13 | **Rubin, Aviel** | | |
| 14 | Cross-examination by Mr. Byars (continued) | 4015 | 15 |
| 15 | Redirect Examination by Mr. Lo | 4025 | 15 |
| 16 | Recross-examination by Mr. Byars | 4026 | 15 |

17

18

19

20

21

22

23

24

25

| | **Plaintiff's Exhibits:** | | **Evd.** | **Vol.** |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 0089 | | 3854 | 15 |
| 3 | 1667 | | 3976 | 15 |
| 4 | 1677 | | 3894 | 15 |
| 5 | 1678 | | 3943 | 15 |
| 6 | 1701 | | 3958 | 15 |
| 7 | 1703 | | 3983 | 15 |
| 8 | 1709 | | 3960 | 15 |
| 9 | 1714 | | 3985 | 15 |
| 10 | 2390 | | 4003 | 15 |

| | **Defendant's Exhibits:** | **Withdrawn** | **Evd.** | **Vol.** |
|---|---|---|---|---|
| 13 | 4235 | | 4025 | 15 |
| 14 | 4327 | | 4045 | 15 |
| 15 | 5338 | 4052 | 4047 | 15 |
| 16 | 5573 | | 3887 | 15 |

1   <u>FRIDAY, MAY 21, 2021</u>                                    <u>8:00 a.m.</u>

2                          P R O C E E D I N G S

3          **THE CLERK:**   Calling Civil Action 20-5640, Epic Games,

4   Inc., vs. Apple, Inc.

5       Counsel, please state your appearances.

6          **MS. FORREST:**   Good morning, Your Honor.  Katherine

7   Forrest for Epic.

8          **THE COURT:**   Good morning, Ms. Forrest.

9          **MR. BORNSTEIN:**   Good morning.  Gary Bornstein for

10  Epic.

11         **THE COURT:**   Mr. Bornstein, welcome back.

12         **MR. EVEN:**   Good morning.  Yonatan Even for Epic.

13         **THE COURT:**   Good morning.

14         **MS. MOSKOWITZ:**   Good morning, Your Honor.  Lauren

15  Moskowitz for Epic.

16         **THE COURT:**   Okay.  Good morning.

17         **MR. KARIN:**   Good morning.  John Karin for Epic.

18         **THE COURT:**   John Karin.  Welcome to the courtroom.

19  First time, right?

20      Mr. Sweeney, good morning.

21         **MR. SWEENEY:**   Good morning, Your Honor.

22         **THE COURT:**   Mr. Rudd, good morning.

23         **MR. RUDD:**   Good morning.

24         **THE COURT:**   Okay.  On the Apple side.

25      Mr. --

1          **MS. MOYÉ:**   Good morning, Your Honor.  Veronica Moyé

2      for Apple.

3          **THE COURT:**   Good morning, Ms. Moyé.

4          **MS. YANG:**   Good morning, Your Honor.  Betty Yang for

5      Apple.

6          **THE COURT:**   Ms. Yang, welcome back.

7          **MR. DOREN:**   Good morning, Your Honor.  Richard Doren

8      for Apple.  And we are here with Kate Adams and Heather

9      Grenier and, of course, Mr. Schiller.

10         **THE COURT:**   Okay.  Good morning to each of you.

11      All right.

12      Mr. Spalding.

13         **MR. SPALDING:**   Good morning. Your Honor.

14         **THE COURT:**   It only took me three weeks to get the

15      two of you right.

16      I see Ms. Dunn back there.  Good morning.

17      Who else do we have in the back?

18         **MS. MOYÉ:**   Your Honor, we have our witness, Mr. Tim

19      Cook.

20         **THE COURT:**   Mr. Cook, good morning.

21         **MS. MOYÉ:**   We have Ms. Dunn, Karen Dunn; we have Kyle

22      Andeer from Apple; we have Kate Kaso-Howard from Apple; and we

23      have Lauren Dansey from Gibson Dunn, also for Apple.

24         **THE COURT:**   Okay.  Good morning to each of you.

25      And let's see.  We've got some additional folks in the

1   gallery.

2           So from the press, my notes show that we have Michael

3   Acton from MLex.

4               **MR. ACTON:**    Good morning, Your Honor.

5               **THE COURT:**    Good morning, Sir.

6   And then Dorothy Atkins from Law 360?

7               **MS. ATKINS:**    Good morning.

8               **THE COURT:**    Good morning.

9   Betsy Manifold is back for the plaintiffs' counsel.

10              **MS. MANIFOLD:**    Good morning, Your Honor.

11              **THE COURT:**    Good morning.

12          All right.  Then I see some additional folks.

13              **MS. FORREST:**    Yes.  Your Honor, I can -- since they

14  don't have mics, I can introduce them.

15          We have Brent Byars, who you remember from yesterday; and

16  Jessica Choi, also working with Mr. Byars on the witness;

17  Lauren Kloss, our beachmaster; and then Justin Clarke, one of

18  our partners.

19              **THE COURT:**    Okay.  Well, we are going a little bit

20  extra on people today, but I'm going to use my discretion and

21  allow it.

22              **MS. MOYÉ:**    Thank you, Your Honor.

23              **THE COURT:**    Good morning, Ms. Behringer.

24              **MS. BEHRINGER:**    Good morning, Your Honor.

25              **THE COURT:**    That is our courtroom artist, who is

here, as well.

Okay.  A few things to do before we get started.  I have my list.

Ms. Forrest, do you have a list of things to address?

**MS. FORREST:**   I do, Your Honor.  And I have conferred with Mr. Doren on these.

The first is just on the time sheet that we were given this morning.  I wanted to confirm that we had, according to the Court's numbers, 2 hours and 16 minutes left.  That should be -- 13 more minutes should be deducted from that because we'll hand up now the final finding -- deposition designation binder, and when we added in some additional testimony from Mr. Gray, it's 13 minutes.  So we actually have, I believe, 2 hours and 3 minutes.

Apple's counter-designations to Mr. Gray were minor.  They were 11 minutes, and so that brings them down to 6 hours and 38.

**THE COURT:**   Okay.

**MS. FORREST:**   And we're prepared --

**THE COURT:**   Agreed?

**MR. DOREN:**   Yes, Your Honor.

**MS. FORREST:**   And we're prepared to hand up, then, the final binder of the deposition designations.

**THE COURT:**   Great.  I'm glad I did not take it earlier.

1        Okay.  Next.

2                **MS. FORREST:**    All right.  The next is to then confirm

3    for Your Honor that the -- or confirm with Your Honor that the

4    expert direct testimony has now -- we would move the admission

5    of all of it.  It had been provisionally admitted previously.

6    We have two, Athey and Cragg, where we are waiting for the

7    final rulings, but subject to those final rulings, we would

8    move for the admission of all of the experts on both sides.

9                **MR. DOREN:**    And, Your Honor, obviously, we're fine

10   with that, subject to the Court's rulings.

11        The only administrative matter is that the versions of our

12   written directs before the Court still have highlighting on

13   them for which we were waiting for evidence, and we'd like to

14   submit clean copies to the Court either later today or over

15   the weekend.  But in terms of admission of the testimony, we

16   have no objection.

17                **THE COURT:**    Okay.  I believe that that was part of

18   the last filing of last night.  This is Docket 725, which

19   included additional exhibits, and then -- oh, no, these were

20   depos.  Okay.

21        So Docket 725 is -- is admitted just for purposes of the

22   record, because I've already updated my exhibit list.

23        With respect to -- well, let me go back to the experts.

24   In general, the request is fine, but I do want to -- I do want

25   to address something else with respect to their testimony.

1     What else do you have?

2         **MS. FORREST:**   All right.  I have three other just

3     sort of logistics and then one request.

4         On logistics, we've got the findings of fact that we've

5     been giving to Your Honor --

6         **THE COURT:**   Yes.

7         **MS. FORREST:**   -- periodically.

8         We were wondering whether or not we could have a couple of

9     extra days for the very final one so we could ensure that

10    we've done a complete sort of cite check.  And if we could

11    submit the final final on Friday of next week or any other day

12    that Your Honor would find acceptable, we would appreciate

13    that.  We'll be -- some people on our team will be traveling

14    back to the East Coast, which is why we had selected Friday.

15        **THE COURT:**   Yeah, I think that -- Mr. Doren?

16        **MR. DOREN:**   Sure.  Yes, Your Honor.  In light of the

17    travel, we're fine with that.

18        **THE COURT:**   I think that that's fine.  I don't -- one

19    of the reasons why -- why I ordered that you do it, in

20    addition to the suggestion from my colleague, Jeff White, for

21    whom I will give credit -- if you have any complaints, you can

22    come to me; if you want to give credit, you go to him -- is

23    because I think it has been helpful, at least with respect to

24    the parties, in terms of teasing out particular issues while

25    we were here in trial so we could address them.

1          At this point, having them on the 28th, which I think is a

2     week from today, the finals, is fine with me.  What I am going

3     to do, though -- it's the start of a long weekend -- I'm going

4     to order that you do them by noon on Friday.  That way you're

5     forced to get them done and then you can take a break.

6               **MS. FORREST:**   Very much appreciated, Your Honor.

7     Actually, we will --

8               **THE COURT:**    Noon our time, which is 3:00 p.m. East

9     Coast time.

10              **MS. FORREST:**   Very good.

11         And then two other logistics.  We believe it would be

12    useful to have the parties confer and confirm the final list

13    of admitted exhibits.

14              **THE COURT:**    Well, I wanted to do that today.

15              **MS. FORREST:**   Okay.  All right.

16              **THE COURT:**    I want us to be on the same page with

17    respect to that, so I'm hoping that we will finish at a

18    time -- but, again, I would like to have some junior lawyers

19    at the mics and we will go through my list.  You let me know

20    if you have something different.  But I also need to make sure

21    Ms. Stone is on the same page, etc.  So we'll do that this

22    afternoon.  That was on my list.

23              **MS. FORREST:**   The last logistic before the request is

24    on trial transcripts.  To the extent there are typos that are

25    not -- I wouldn't even call them typos -- more that a name

1    might be spelled differently or something of that nature that

2    the court reporter might not have been able to anticipate, the

3    parties could confer if there are any erratas to be submitted

4    to the Court for approval, again, by Friday.  I'm not sure

5    there will be any, but that would allow us -- it's not to

6    change testimony; it's really just to make sure we've got a

7    clean transcript.

8         **MR. DOREN:**    So long as they're fixing name spellings

9    and things like that, that's fine with me, Your Honor.

10        **THE COURT:**    Okay.  And I'm not going to ask the court

11   reporters to go back and change their work.  It will just be

12   on the docket for purposes of any appellate issues.

13        **MS. FORREST:**    Yes.

14        And then lastly, Your Honor, Monday is the date for the

15   closing with the back and forth.  We've submitted an agenda.

16   The cover note to the agenda asked if the Court had any

17   particular issues that you wanted us to focus on, and if so,

18   we would appreciate very much any direction.  There is sort of

19   a long list.  You may have more interest in some than in

20   others, and we would love to be able to focus appropriately.

21        **THE COURT:**    Yes.  It is an ambitious -- it's an

22   ambitious agenda.  I don't think we are going to get through

23   it.

24        **MS. FORREST:**    I have a copy if it would be helpful to

25   hand --

**THE COURT:**   No, I remember it.

And the -- I think remedies would be interesting to hear about; issues relating to, obviously, the nature of the market.  I don't need to hear too much with respect to Epic's approach in the sense that -- well, I guess as -- as Professor Schmalensee said, it's a tautology.  Of course they have a monopoly if it's their thing, so that doesn't need much argument.  The question is whether I accept that argument or not.

It is, under the law, the exception, not the rule.  It is the rare case, not the obvious case, so I don't know if you want to talk about whether this should be a rare case or not.

Issues of substitutes I think are -- are interesting and will be something that I spend some time on.

The lack of competition on the 30 percent is something that is troubling.  I don't put much weight on litigation moves, so, you know, I don't know that you want to spend a lot of time on those topics.

This is a dynamic market.  Things are changing rapidly.  I have a snapshot.  We are at a point in time in a moving stream.  So understanding what your perspectives would be for the Court's role in that dynamic environment, that would be interesting to me.

Those are questions that I might ask you if I wasn't forecasting right now.

1        It's also -- you know, there are a lot of facts that I've

2   said I have to go back and check whether there's any

3   substantiation for some of the positions that are being

4   asserted, and I haven't had the -- I haven't had the time to

5   do that, obviously.

6        Those are the things that come to mind.

7            **MR. DOREN:**    Thank you, Your Honor.

8            **THE COURT:**    I would be -- you know, I will let you

9   all drive the conversation.  I will push you faster through

10  topics which are of less concern, and I will spend more time

11  with you on things that are -- you know, that I'm debating

12  right now in the back.  But those are the things that come to

13  mind right now.

14           **MS. FORREST:**    All right.  Thank you, Your Honor.

15           **THE COURT:**    Mr. Doren, anything else from you?

16           **MR. DOREN:**    Nothing further, Your Honor.

17           **THE COURT:**    The one thing I wanted to talk about --

18  I'll circle back, Ms. Forrest, on the experts.

19       With respect to Cragg, the Spotify documents, Microsoft,

20  the Lori Wright testimony, and then I understand I have a

21  brand-new one on Professor Athey, I may not resolve those

22  issues by Monday.  And so what I would suggest is that -- I

23  may end up resolving them in the context of a final order or

24  as an adjunct to the final order.

25       I would suggest in your findings of fact and conclusions

1    of law that if you don't have a ruling for me or from me, that

2    you give alternatives; that is, that you didn't -- what you

3    didn't prove if I choose to strike it and what you did prove

4    if I don't.

5         Those things can be redacted.  The testimony can be

6    entered, given that these things are outstanding, in a

7    redacted form, and if I allow it ultimately and you think it's

8    important, then you can refile it in an unredacted form, but

9    that way, at least we have the testimony in the docket and on

10   the record.

11        There is -- I do want to put something on the record with

12   respect to the sidebar that we had earlier in the week -- I

13   have only done one -- because I said a couple of things to the

14   two of you at sidebar that I think are equally relevant to the

15   Spotify documents, and I want that in the record.

16        But out of respect for your request for a sidebar, I'm

17   just going to do that -- that particular portion on the record

18   under seal.  We can do that at the end of the day.  The rest I

19   will do in written order.

20        Okay?

21             MS. FORREST:   Very well.

22             MR. DOREN:   Thank you.

23             THE COURT:   All right.  It is 8:15.  Apparently the

24   media line is dead, so we are going to wait.

25        As I was driving in, I saw the cameras outside, clearly

1    not for me, although I wore a nice coat today.

2         **THE CLERK:**   It's now back on.

3         **THE COURT:**   It's now back on.

4      Mr. Cook, come on up, please.

5         **MS. MOYÉ:**   Thank you, Your Honor.  Apple calls

6    Mr. Tim Cook.

7         **THE CLERK:**   I will have you remain standing.  I will

8    swear you in.

9                   **<u>TIMOTHY COOK</u>**,

10   called as a witness for the Defendant, having been duly sworn,

11   testified as follows:

12        **THE WITNESS:**   I do.

13        **THE CLERK:**   Please be seated.

14        **THE WITNESS:**   Thank you.

15        **THE CLERK:**   And then would you just be sure that mic

16   is kind of pointed under the shield, your face shield, and

17   then please state your full name and spell your last name.

18        **THE WITNESS:**   Timothy Donald Cook, C-O-O-K.

19        **THE COURT:**   Okay, Mr. Cook, we can't hear you yet.

20        **THE CLERK:**   Let me turn on your mic.

21      Okay.  Now your mic is on.  Sorry.

22        **THE COURT:**   Go ahead.

23        **THE WITNESS:**   Timothy Donald Cook, C-O-O-K.

24        **THE COURT:**   Good morning, sir.

25        **THE WITNESS:**   Good morning.

1          **THE COURT:**    All right.  Let me just double check that

2     I've got that line -- do we have that line working?

3          **THE CLERK:**    Yes, they said it's working.

4          **THE COURT:**    All right.  Ms. Moyé, you may proceed.

5          **MS. MOYÉ:**    Thank you, Your Honor.

6                          **<u>DIRECT EXAMINATION</u>**

7     **BY MS. MOYÉ:**

8     **Q.**    Good morning, Mr. Cook.

9     **A.**    Good morning.

10    **Q.**    Can I bring you some water?  You may need some water

11    during your testimony.

12         Your Honor, can I approach the witness?

13         **THE COURT:**    You may.

14         **THE WITNESS:**    Thank you.

15    **BY MS. MOYÉ:**

16    **Q.**    Mr. Cook, what is your current role at Apple?

17    **A.**    Chief executive officer.

18    **Q.**    And what are your responsibilities as chief executive

19    officer?

20    **A.**    The overall direction and strategy of the company.

21    **Q.**    How long have you worked at Apple?

22    **A.**    Since 1998.

23    **Q.**    And under what circumstances did you come to work at

24    Apple?

25    **A.**    I was working at Compaq Computer at the time, and I got a

1    call out of the blue that Steve had come back to Apple and was

2    essentially replacing the executive team, and he wanted to

3    talk to me about being the operations chief.

4    **Q.**    And are you referring to Mr. Steve Jobs?

5    **A.**    Yes, of course.

6    **Q.**    What other positions have you held at Apple, Mr. Cook?

7    **A.**    Senior vice-president of worldwide operations, executive

8    vice-president of sales and operations, and the chief

9    operating officer.

10   **Q.**    And when did you become CEO?

11   **A.**    In 2011.

12   **Q.**    What kind of oversight do you have over the App Store?

13   **A.**    It's limited, obviously.  In a review capacity is the way

14   I would refer to it.

15   **Q.**    Do you have a role with respect to strategic direction for

16   the App Store?

17   **A.**    I have a role in strategic direction of the company and so

18   to some degree, but more on a review basis.

19   **Q.**    Can you describe for us, Mr. Cook, your education and

20   employment history?

21   **A.**    Sure.  Education is I have a Bachelor of Science in

22   industrial engineering from Auburn University and a Master of

23   Business Administration from Duke University.

24        My career started at IBM.  I worked there for about a

25   dozen years and then went to a small company called

**COOK - DIRECT - MOYÉ**

1    Intelligent Electronics in Denver for three years, and then to

2    Compaq for a very short period of time before joining Apple.

3    **Q.**    And where did you grow up, Mr. Cook?

4    **A.**    In Robertsdale, Alabama.

5    **Q.**    Robertsdale, you said?

6    **A.**    Robertsdale.

7    **Q.**    Mr. Cook, how would you describe Apple's mission?

8    **A.**    It's to make the best products in the world that really

9    enrich people's lives.

10    **Q.**    And what do you do to try and meet that mission?

11    **A.**    We do a number of things.  We invest like crazy in R&D.

12    We've invested a hundred billion dollars since -- since the

13    start of the iPhone development, and -- and that number is

14    just accelerated.  In fact, we've invested 50 billion in the

15    last three years.

16         In addition to that, we have a maniacal focus on the user,

17    in doing the right thing by the customer.  We integrate

18    hardware, software, and services, and we think that we do that

19    better than anyone else.

20         We take a lot of the complexity of technology away from

21    the user and make things simple, not complex.

22    **Q.**    Thank you, sir.

23         And what are the key commitments that Apple makes to its

24    customers?

25    **A.**    Simplicity, safety, security, privacy are key,

1    reliability, quality.  You know, the things that make the best

2    products in the world.

3    **Q.**    And why does Apple focus on security, safety, and privacy

4    in particular?

5    **A.**    Well, privacy, from our point of view, is, you know, one

6    of the most important issues of the century, and safety and

7    security are the foundation that privacy is built upon.

8         And if you -- if you look at what's happened today,

9    technology has the ability to sort of vacuum up all kinds of

10   data from people, and we -- we like to provide people tools

11   to -- to circumvent that.

12   **Q.**    And could you explain, why do you believe privacy is one

13   of the most important issues?

14   **A.**    I think that in a world where you view that everybody is

15   looking at your every move, you wind up doing less over time.

16   And so it really -- it goes to our civil liberties as

17   Americans, and it really begins to affect your freedom of

18   expression.

19   **Q.**    How does Apple go about ensuring it meets its safety,

20   security, and privacy commitments to its customers?

21   **A.**    Lots of investment, a ton of R&D investment.  Obviously we

22   build it in from the ground up, and so it's a core part of our

23   design process, not an add-on, sort of an after-the-fact kind

24   of thing.

25        And in the case of the -- in the case of the App Store, we

**COOK - DIRECT - MOYÉ**

1    review every app that goes on the store.

2    **Q.**    And why, sir, do you feel it's important to review every

3    app that goes on the store?

4    **A.**    Because there can be malicious things that occur.  There

5    can be things that vacuum up people's personal data.  There

6    can be malware.  You know, the list of -- parade of horribles

7    out there is pretty long of things that can happen.

8    **Q.**    Are computer tools able to replace human assessment for

9    app review, in your view?

10   **A.**    I don't think so.  You know, I think it's important to

11   have both.  But today, the -- it is -- despite the

12   advancements in machine learning, machine learning will not

13   address all of the issues on the App Store.  It still needs

14   human judgment.

15   **Q.**    Let's turn back to privacy for a moment.  You mentioned

16   its importance.

17       Can you give us an example or two of how Apple has

18   invested to improve customer privacy.

19   **A.**    Sure.  This just -- just recently, we went live with

20   Application Tracking Transparency, where it puts the user in

21   control of whether they're being tracked across apps or not.

22       We have a privacy nutrition label on the App Store, which

23   is sort of a simple, at-a-glance way of seeing what data is

24   being collected and what it's being used for, much like a

25   nutrition label in the grocery store would tell you what --

**COOK - DIRECT - MOYÉ**

1    what is in some food and so forth.

2          We also, several years ago, had Intelligent Tracking

3    Prevention, which looks at your browsing traffic.

4    **Q.**    And, sir, you mentioned that ATT, App Tracking

5    Transparency, was just introduced.

6    **A.**    Yes.

7    **Q.**    When was the privacy nutrition label introduced?

8    **A.**    It was introduced last fall, I believe.

9    **Q.**    What about ITP?

10   **A.**    I believe around three to four years ago, so probably in

11   2017, the fall of 2017, I believe.

12   **Q.**    How have developers responded to Apple's privacy

13   initiatives?

14   **A.**    Some applaud it and some are not happy with -- with it.

15   **Q.**    And what do you do when a developer disagrees with your

16   privacy initiatives?

17   **A.**    Well, we listen.  You know, we don't have a tin ear, but

18   we're making decisions in the best interests of the user.  And

19   I -- I think it's important that -- that -- to know that

20   sometimes there is a conflict between what the developer may

21   want and what the user may want.

22   **Q.**    And, sir, in your experience, how have consumers responded

23   to Apple's commitments to safety, security, and privacy?

24   **A.**    Overwhelmingly positive.  The number of notes I get about

25   the -- the actions we have taken are -- are truly, truly

COOK - DIRECT - MOYÉ

1    unbelievably positive.

2    **Q.**   Do you also conduct consumer surveys to get customer

3    feedback on these issues?

4    **A.**   We do.

5    **Q.**   And what do those surveys show?

6    **A.**   They would show that it's a very key factor, one of the

7    top factors of why people choose Apple.

8    **Q.**   Let's turn to the development of the iPhone and the App

9    Store.

10        Did Apple's safety, security, and privacy commitments

11   impact development of the iPhone?

12   **A.**   Oh, of course.  When we launched the iPhone in 2007, there

13   wasn't an App Store.  And so the way that you would have --

14   put an app on the phone was using a web app, instead of a --

15   using the App Store.

16       And it wasn't until the following year that we figured out

17   that we could implement such a process of app review that

18   would allow us to let native apps on there without having the

19   security and safety and privacy issues that go along with that

20   if you -- if you do it without a review.

21   **Q.**   How, sir, did the iOS system for the iPhone compare to the

22   preexisting macOS system when the iPhone was introduced?

23   **A.**   Well, it was different, you know.  The -- of course, the

24   internet existed when the iPhone was -- was brought out, and

25   so there was many more things you could do.

**COOK - DIRECT - MOYÉ**

1          But the -- the -- the iPhone is a different design point

2     than the Mac, clearly.  Mac came out in 1984, before much of

3     the technology was available, and the use cases for the Mac

4     obviously are different than that for a phone.  You have a

5     phone in your pocket or your pocketbook most of the time, and

6     you want instant service.

7          And so we felt that the -- both the use cases and

8     eventually the threat profile would be much greater on the

9     iPhone because of the number of iPhones that would exist in

10    the market.

11    **Q.**   And what steps did you take as a result of that view that

12    the threat level would be higher for the iPhone?

13    **A.**   We created the app review process and -- and also put in

14    an enormous amount of effort in the safety, security, and

15    privacy efforts on the phone, including some of these things

16    that I just talked about, like Application Tracking

17    Transparency and the privacy nutrition label, etc.

18    **Q.**   And you mentioned web apps in your earlier answer.

19         Were web apps available when the iPhone was introduced?

20    **A.**   Yes.

21    **Q.**   Were native apps -- that is, apps that used the iOS

22    software -- could third parties produce native apps when the

23    iPhone was introduced?

24    **A.**   No.

25    **Q.**   And at what point was that capability added, if you can

1    recall?

2    **A.**    It was one year later, in the -- I believe it was the

3    middle of 2008.

4    **Q.**    And you referenced this earlier.  Once Apple introduced

5    that ability for third-party native apps, what steps did it

6    take to ensure that it could continue to meet its commitments

7    to its customers?

8    **A.**    Well, we put in app review, and so we reviewed every app

9    that went onto the store.  And this was a combination of tools

10   and -- and human review, because we care so deeply about

11   the -- the safety, security, and privacy for our customers.

12   **Q.**    Is app review effective at protecting iPhone users, in

13   your view?

14   **A.**    Yes.

15   **Q.**    Do you have any data you can provide the Court on the

16   effectiveness level?

17   **A.**    Well, you can see in third-party data that if you look at

18   the malware that's on iOS versus Android versus Windows,

19   it's -- it's literally an off-the-chart level of difference.

20   Hopefully, that's come out at some time across the -- the

21   couple weeks here.

22   **Q.**    Sir, do you believe third parties can conduct app review

23   for the iPhone as effectively as Apple can?

24   **A.**    No.

25   **Q.**    And can you explain why not?

1          **THE COURT:**   Mr. Cook, what do you think the

2    third-party data shows?  You personally, the difference.

3          **THE WITNESS:**   It shows that the -- that -- from a

4    malware point of view, Your Honor, that there's about -- 1 to

5    2 percent of the malware is on the iPhone versus around 30 to

6    40 percent on Android and another 30 or 40 percent on Windows.

7          **THE COURT:**   Okay.  Go ahead.

8          **THE WITNESS:**   It's quite a difference.

9    **BY MS. MOYÉ:**

10   **Q.**   Mr. Cook, we were talking about third parties, which the

11   Court just asked you about also.

12         Do you believe, sir -- or can you explain why you believe

13   third parties cannot conduct app review as effectively as

14   Apple?

15   **A.**   I -- I think they're not as motivated as Apple is.  You

16   know, for us, the customer is everything.  And we're trying to

17   give a customer an integrated solution of hardware, software,

18   and services and deliver a brand promise of -- of privacy and

19   security and safety, and so I just don't think you replicate

20   that in a third party.

21   **Q.**   Sir, if a well-qualified third party said that they would

22   commit to conducting a thorough review of apps for submission

23   on the App Store, would you agree to that?

24   **A.**   No.

25   **Q.**   Is app review, in your view, a hundred percent effective

**COOK - DIRECT - MOYÉ**

1    at keeping problematic apps off the store?

2    **A.**    No, it's not a hundred percent.  It's not perfect.  You

3    will -- you will find mistakes being made.

4           But in the -- if you back up and look at it in the scheme

5    of things, with 1.8 million or so apps on the store, we do a

6    really good job.

7    **Q.**    What step -- do you from time to time learn that there are

8    problematic apps on the store?

9    **A.**    Sure.  I'm -- I get lots of reach-out from the public and

10   so forth, and if there's something on there, I do get a note

11   from a developer or a customer, many times direct to me, and I

12   always forward it on quickly for action in the company.

13   **Q.**    Let's look at, I believe, the first document in your

14   binder.  That's PX0089.

15   **A.**    PX?

16   **Q.**    Sir, it's actually not the first document in your binder.

17   It's further back, towards the end.

18          Let me know when you have that document.

19   **A.**    I have it.

20   **Q.**    And if you could look at the second page there.

21   **A.**    Yes, I see it.

22   **Q.**    And we see, it looks like, a note here to you from someone

23   outside the company?

24   **A.**    That's correct.

25   **Q.**    And would you explain what that individual is conveying.

**COOK - DIRECT - MOYÉ**

1    **A.**    He's making a point that our discovery is not as good as

2    it should be, that we should improve it.

3    **Q.**    What is the date on this document, sir?

4    **A.**    June 8, 2015.

5    **Q.**    And if you would scroll up, you'll see a note from you.

6    **A.**    Yes.

7    **Q.**    And who was that note written to?

8    **A.**    It's written to Phil Schiller and Eddy Cue.

9    **Q.**    And your note is dated June 9th, 2015; is that correct?

10   **A.**    That's correct.

11   **Q.**    And what are you conveying in your note to them?

12   **A.**    That it is something that we need to improve upon.

13   **Q.**    And, sir, was there an effort made to make improvements as

14   a result of this feedback you received?

15   **A.**    Yes, definitely.  We were -- as a matter of fact, we were

16   already working on a series of things, and that's what you see

17   in the beginning of the note.

18          **MS. MOYÉ:**   Your Honor, we would like to move PX0089

19   into evidence.

20          **THE COURT:**   No objection?

21          **MR. BORNSTEIN:**   No objection, Your Honor.

22          **THE COURT:**   Admitted.

23       (Plaintiff's Exhibit PX0089 received in evidence)

24   **BY MS. MOYÉ:**

25   **Q.**    You said you were already in the midst of a program to

1   improve by the time you received this feedback; is that

2   correct?

3   **A.**   Yes.

4   **Q.**   And can you describe what that effort was?

5   **A.**   It was -- it was a -- if I'm looking at this thing right,

6   we had a schedule that was going to time out in the fall and

7   over 2016 that would bring a number of different discovery

8   features to the -- to the App Store.

9   **Q.**   Has Apple --

10              **THE COURT:**   Let me interrupt you.

11       I have two binders, but they're identical.  So somehow --

12   and I don't know if he has two identical binders, as well, but

13   somehow there is a --

14              **MS. MOYÉ:**   If I can approach the witness to --

15              **THE COURT:**   You may.

16              **THE WITNESS:**   I only have one here, so I'm not sure

17   what these are.

18              **THE COURT:**   I don't have the binder that you're --

19   that has PX89 in it.

20       Oh, I see it.

21              **MS. MOYÉ:**   It's at the back of the binder.

22              **THE COURT:**   I see it now.  But it's only one binder?

23              **MS. MOYÉ:**   Yes, it's only one binder.

24              **THE COURT:**   Okay.  Thank you.  Sorry about that.

25              **MS. MOYÉ:**   Sorry.  I misdirected you.  I thought it

1    was at the beginning.

2    **BY MS. MOYÉ:**

3    **Q.**    We were talking about investments to improve the App Store

4    and you mentioned this enhancement for discovery.

5          Has Apple made other investments to improve the app review

6    process in the App Store?

7    **A.**    Oh, many, many improvements over the course of the time

8    since the App Store launched in 2008.

9    **Q.**    Have Apple's investments in research and development

10   changed over time, Mr. Cook?

11   **A.**    Massively.

12   **Q.**    Could you please take a look at the document DX4581 in

13   your binder.  And if you look at the page 3 of 70.  It's

14   DX4581.003.

15         Could you identify this document for the record?

16   **A.**    It's our 10-K for the fiscal year 2020.

17                **MS. MOYÉ:**    We would like to move DX4581 into

18   evidence.

19                **THE COURT:**    It's already in.

20                **MS. MOYÉ:**    It's already in.  Thank you, Your Honor.

21   **BY MS. MOYÉ:**

22   **Q.**    Does the Form 10-K contain information reporting on the

23   level of research and development investment?

24   **A.**    It does.

25   **Q.**    If you could turn to page 26.  That's DX4581.026.

**COOK - DIRECT - MOYÉ**

1        **MS. MOYÉ:**   And if we could blow up the "Research and

2   Development" line under "Operating Expenses."

3   **BY MS. MOYÉ:**

4   **Q.**   Mr. Cook, could you tell us, how much did Apple invest in

5   research and development in 2018?

6   **A.**   14.2 billion.

7   **Q.**   And how much did it invest in research and development in

8   2019?

9   **A.**   16.2 billion.

10   **Q.**   What was the percentage change in that investment between

11   2018 and 2019?

12   **A.**   14 percent.

13   **Q.**   And what was the level of investment in 2020?

14   **A.**   18.8 billion.

15   **Q.**   And what was the level of change in that investment

16   between 2019 and 2020?

17   **A.**   16 percent.

18   **Q.**   Did the percentage of total net sales represented by that

19   investment change from 2018 to 2020?

20   **A.**   Yes.  It moved from 5 percent to 7 percent.

21   **Q.**   Did that level of research and investment benefit the App

22   Store?

23   **A.**   Yes, of course.

24   **Q.**   Did you allocate -- exactly how much?

25   **A.**   We don't allocate like that.  We -- instead of having, you

1    know, many P&Ls throughout the company, we have one for the

2    full company to prevent sort of the debate back and forth

3    about how we allocate costs and also to run the company in --

4    in such a way that optimizes the total instead of optimizes

5    the different divisions.

6    **Q.**    Okay.  We'll come back to that in a little bit.

7         Before we leave the app review process, though, I wanted

8    to ask, does Apple do anything to protect consumers and

9    developers after an app is published on the App Store?

10   **A.**    Sure.  I mean, we have great feedback that goes on where

11   we would know whether something is going right or not.

12   **Q.**    Thank you, sir.

13        Let's talk a little bit about Apple's commission rate.

14        Has Apple's commission rate stayed the same over time?

15   **A.**    It's -- it's decreased.

16   **Q.**    And can you describe those decreases for us?

17   **A.**    Sure.  Maybe I should back up for a minute.

18        About 85 percent of the apps on the App Store are free, so

19   there's no -- there's no commission charged for those because

20   there's not individual transactions going on.

21        The rest of those are either 15 or 30 percent.  The -- the

22   ones that are 15 are the second year and beyond in

23   subscriptions, which was a reduction from the initial

24   subscription price of 30 percent.  And there's a Video

25   Partners Program that has a 15 percent rate.

1         And then most recently, we also lowered the rate to 15

2    percent from 30 for developers that have less than a --

3    $1 million of revenue per year, and that turns out to be the

4    vast majority of developers.

5    **Q.**    When did Apple first start to consider the Small Business

6    Program that you just referenced, the most recent commission

7    reduction?

8    **A.**    It probably has its origins from several years ago.

9    **Q.**    And why did Apple decide to implement that program now?

10   **A.**    What was in my mind at the time was I was very worried

11   about COVID and the effect of COVID on small businesses in

12   particular.

13   **Q.**    And did Apple consider litigation, regulatory issues when

14   deciding to implement the Small Business Program?

15   **A.**    It was -- it was, you know, things in my mind, sure.  That

16   was in the back of my mind.  But the primary reason was COVID.

17   **Q.**    Does Apple consider litigation and regulatory issues when

18   making all business decisions?

19   **A.**    Sure.

20   **Q.**    What percentage, if you know, of developers on the App

21   Store meet the criteria to pay the reduced 15 percent

22   commission in the Small Business Program?

23   **A.**    My recollection is that it's in the high 90s.

24   **Q.**    And did you consider how the commission reduction in that

25   Small Business Program would impact revenue in the App Store?

**COOK - DIRECT - MOYÉ**

1    **A.**    I think I saw an analysis at the time that -- that

2    estimated the reduction in revenue that would take part --

3    that would take place.

4    **Q.**    Have competitors for the App Store responded to the

5    commission reduction in the Small Business Program?

6    **A.**    Yes.

7    **Q.**    And how have they responded?

8    **A.**    I think Google also lowered it to 15 percent for the

9    developers underneath a million dollars, as one example.

10    I'm not sure about other app stores.

11    **Q.**    Have you gotten feedback from developers on the commission

12    structure, the 15 percent/30 percent commission structure?

13    **A.**    Sure.  People were universally pleased with the 30 to 15

14    percent move on small developers.  And, of course, I hear from

15    some large developers that, Well, we'd like to pay less than

16    30.

17    **Q.**    Let's talk a little about the App Store's impact.

18    What has been the App Store's overall impact, in your

19    view, sir?

20    **A.**    I think it's been an economic miracle.  When I think about

21    the way it started, with just 500 apps, and then now at

22    1.8 million and the number of jobs that it's created in the

23    United States, there's almost 2 million people in the U.S.

24    that are around the iOS job economy.  And the level of

25    commerce in the U.S. is $138 billion, according to one study,

**COOK - DIRECT - MOYÉ**

1     and worldwide it's over half a trillion.

2          And so it's likely been sort of, you know, one of the most

3     important job segments out there, from a growth point of view,

4     over the last decade.

5     **Q.**    How have the number of developers distributing on the App

6     Store changed since the introduction?

7     **A.**    Oh, significantly.  You know, we thought 500 was a really

8     good number of apps in the beginning, and now you look at it

9     with 1.8 million.  I believe the number of developers behind

10    that is over a million, if I remember correctly.

11    **Q.**    How has the share of revenue developers retain changed

12    since the App Store was introduced?

13    **A.**    It's only gone down.  It started with zero percent for the

14    free, but 30 percent for everything else.

15          But with the change of subscriptions with the Video

16    Partners Program, with the Small Business Program, with the --

17    things like the reader rule and the multiplatform rule, all of

18    these things drive down the price.

19    **Q.**    What about consumers?  How has the App Store impacted

20    them?

21    **A.**    I think it's given them an enormous level of innovation.

22    You know, we have the -- the developers do some incredible

23    work, and together with partnering with Apple, we're able to

24    deliver the customer even more innovation and -- and more apps

25    that enrich their lives.

**COOK - DIRECT - MOYÉ**

**Q.**    How have the prices consumers pay for software changed

since inception of the App Store?

**A.**    Oh, they've definitely gone down significantly.  Think

about the old world, where you'd buy a stretch route software

package in the local retailer.  The commissions on that was 60

or 70 percent or so for the retailer, and now, of course, that

is very different.

        But also because of the number of developers.  And the

competition for developers has also driven the price of the

software down.

**Q.**    How, in your view, has the Apple App Store performed as

compared to its competitors, similar app stores?

**A.**    I feel great about how it's performed.  I feel great

about -- I think it's a great opportunity for developers.

It's great for the user, you know, most importantly.

        And -- and, as I said, the breadth of apps and the number

of things you can do with them, it's hard to envision any part

of your life that you can't have an app to help you out at

this point.

**Q.**    How would you compare the output rate for apps on the App

Store to the output rate for apps on other stores operated by

others?

**A.**    You know, I feel great about ours because it is a key

component in delivering the significantly lower malware on

our -- on our platform than others have.

**COOK - DIRECT - MOYÉ**

1    **Q.**    Let's talk a little about IAP, in-app purchasing.

2            And Epic has raised claims against Apple based on its

3    in-app purchasing functionality.

4            You're aware of that; is that right, sir?

5    **A.**    Yes.

6    **Q.**    What is IAP?

7    **A.**    It's the in-app purchase that's a feature of the App

8    Store.

9    **Q.**    Is it a payment processor?

10   **A.**    No.  We have a payment processor, but it's called Apple

11   Pay.

12   **Q.**    Is there a fee for using IAP?

13   **A.**    No, there is no fee.

14   **Q.**    And to be clear to the Court, is the 15 percent or 30

15   percent commission that we just discussed -- is that a payment

16   processing fee?

17   **A.**    No.  No.

18   **Q.**    What is IAP's role with respect to the commission?

19   **A.**    IAP helps Apple efficiently collect the commission.  The

20   commission is for a number of different things, from developer

21   tools to the APIs and to the customer service that's provided.

22   And one of those things is obviously the payment processing

23   itself.

24           But all of these things, it enables Apple to efficiently

25   do it.  If not for IAP, we would have to come up with another

**COOK - DIRECT - MOYÉ**

1    system to invoice developers, which I -- I think would be a

2    mess.

3    **Q.**    Does the commission bear any relationship to Apple's

4    investment in research and development?

5    **A.**    Yes.  It provides a return on our -- our investment.

6    **Q.**    Would developers still have to pay a commission if there

7    was no IAP?

8    **A.**    Yes, of course.

9    **Q.**    Now, one question that has come up a few times is about

10   developers' abilities to contact customers outside the App

11   Store.

12        Can developers who have apps in the App Store contact

13   their customers to encourage them to use other payment

14   methods?

15   **A.**    Yes.  They can do mass marketing, provided that the

16   customer will let them have their email.  You know, Apple

17   can't provide the email from a privacy point of view, but if

18   the developer gets the customer to do that, they can -- they

19   can send them, along with all the other customers they've got,

20   marketing material.

21   **Q.**    Are developers allowed to include links in their app on

22   the App Store directing customers to other payment options?

23   **A.**    No.

24   **Q.**    And why is that, Mr. Cook?

25   **A.**    Well, it would be akin to Apple down at Best Buy saying,

**COOK - DIRECT - MOYÉ**

1    Best Buy, put in a sign there where we are advertising that

2    you can go across the street to the Apple Store and get an

3    iPhone.  It's the same kind of thing.  If the effort goes in

4    to transacting with the customer, it seems like it ought to

5    happen within the app.

6    **Q.**    Thank you.

7         I'd like to shift topics a little bit and talk about the

8    nature of competition that Apple faces.

9    **A.**    Sure.

10   **Q.**    Let's first talk about for mobile devices.

11        Does Apple face competition in the mobile device arena?

12   **A.**    It's fiercely competitive.

13   **Q.**    And who are some of your competitors?

14   **A.**    Samsung, Vivo, Oppo, Huawei, Google.  There is a whole

15   list of different handset competitors.  It's fiercely

16   competitive.

17   **Q.**    Does Apple have a dominant share in mobile devices?

18   **A.**    No, not at all.  Worldwide we have about a 15 percent

19   share.  And in the United States, it's more than that.  It's

20   more in the high 30s or so, but clearly not a dominant share.

21   **Q.**    What is the dominant operating system for mobile devices?

22   **A.**    It's Android.

23   **Q.**    Let's talk about the App Store in particular.

24        What competition does the App Store face generally?

25   **A.**    Well, it faces competition from other app stores, whether

**COOK - DIRECT - MOYÉ**

1     you're talking about Google or Samsung or -- you know, pretty

2     much all the device sites have an App Store.

3          It also -- from a developer point of view, it faces

4     competition from all of those as well.  And plus if you're

5     talking about games in particular, you have to get into Xbox

6     and PlayStation and Nintendo Switch.

7          And so there's a long list of competition, both at the

8     developer side and at the user side.

9     **Q.**   Focusing on game apps in particular, I think you mentioned

10    some of the competitors in your prior answer.

11         Does -- do you regularly monitor activity on other

12    platforms with respect to game app transactions?

13    **A.**   We look at that.

14    **Q.**   And you mentioned, I think, a couple.  Let me ask you

15    about a few more.

16         Are you familiar with any streaming game services,

17    Mr. Cook?

18    **A.**   Somewhat.  I'm not a gamer, but I have a -- you know, a

19    cursory view of it.

20    **Q.**   And do you consider those streaming game services

21    competitors to the game apps in the App Store?

22    **A.**   Yes.

23    **Q.**   What about developers' own app stores, like the Epic Games

24    Store, would you consider that to be a competitor to the game

25    apps in the App Store?

**COOK - DIRECT - MOYÉ**

1   **A.**   Sure.

2   **Q.**   And I think you mentioned consoles, Sony PlayStation,

3   Microsoft Xbox.

4          Are those also competitors?

5   **A.**   Yes.

6   **Q.**   Epic has repeatedly asserted before this Court that iPhone

7   users are somehow locked in and are not able to switch from

8   iPhones to competitive mobile devices.

9          To your knowledge, Mr. Cook, does Apple track whether

10  users switch to other smartphone competitors?

11  **A.**   We look at third-party data that does so.

12  **Q.**   Let me ask you to look at DX3084 in your binder.

13         **MS. MOYÉ:**   Your Honor, I believe this document is

14  already admitted into evidence.

15         **THE COURT:**   3084?

16         **MS. MOYÉ:**   Yes.

17         **THE COURT:**   It is.

18         **MS. MOYÉ:**   Thank you.

19  **BY MS. MOYÉ:**

20  **Q.**   Sir, could you identify the document for the record?

21  **A.**   It's a Kantar, who is a third party that does this type of

22  work, survey type of work, survey for the U.S. market in the

23  third calendar quarter of 2020.

24         **MS. MOYÉ:**   And, Your Honor, we have increased the

25  size of one page in this report because it was very difficult

1    to read.

2                  **THE COURT:**   Okay.

3            **MS. MOYÉ:**   It's labeled 3084A in the binder.

4                  **THE COURT:**   Great.  Thank you.

5         And in light of that, I'll admit 3084A, as well.

6                (Defense Exhibit 3084A received in evidence)

7            **MS. MOYÉ:**   Thank you, Your Honor.

8    **BY MS. MOYÉ:**

9    **Q.**   This is page .022 in that document.

10   **A.**   I see it.

11   **Q.**   Could you explain to the Court what this document conveys.

12   **A.**   Yes.  What it says is that in the -- this is from the

13   third calendar quarter of 2019 to the third calendar quarter

14   of 2020 by quarter.  And it says that of the people that

15   purchased smartphones that had an iPhone that quarter, that

16   were coming from an iPhone, that between 12 percent to 26

17   percent of the people switched to Android, depending upon the

18   quarter.

19   **Q.**   Does Apple make it difficult for consumers to switch

20   devices?

21   **A.**   No.

22   **Q.**   Is Apple making any efforts in that arena at all, the

23   switching arena?

24   **A.**   We're making efforts to get Android people to switch to

25   us.

**COOK - DIRECT - MOYÉ**

1   **Q.**   Of course.

2   **A.**   That's a very important task for us.

3   **Q.**   Have you heard of the Data Transfer Project?

4   **A.**   Yes.

5   **Q.**   Would you explain what that is to the Court?

6   **A.**   It's a group of companies, sort of the -- Google,

7   ourselves, I believe Facebook is in there, that are working

8   together to make sure that data is -- can be easily

9   transferred from service to service.

10       I think the first -- the first one that was being worked

11   on, at least from our point of view, is photos.  And so now

12   it's quite simple to move your photos from Apple to Google.

13   **Q.**   How has the ability to switch between iOS devices and

14   Android devices changed over time, in your view?

15   **A.**   It's gotten much easier because if you look at what people

16   are doing now, streaming is a key piece of it, like streaming

17   movies and streaming music.  And so it's easy to just

18   authenticate on another -- on another device.  And a lot of

19   the purchases of apps are in-app purchases and a lot of those

20   have their own authentication as well.

21   **Q.**   And is the Data Transfer Project an effort to make that

22   switching even easier?

23   **A.**   It -- it is.

24   **Q.**   And just so we're clear, other than Apple, are Android

25   developers participating in that project?

**COOK - DIRECT - MOYÉ**

1   **A.**   Yes.

2   **Q.**   Thank you.

3        And during the case, we've also seen references to

4   documents -- in documents to the terminology "sticky" and

5   assertions that "sticky" means locking customers in.

6        **THE COURT:**   Do I have documents with respect to this

7   Data Transfer Project?

8        **MS. MOYÉ:**   Your Honor, they're not exhibits in the

9   record.  There are public records on it, and we would be happy

10  to submit them.  There is a public website announcing the

11  project and the efforts that are being undertaken.

12       **THE COURT:**   Well, it's got to be in the record if I'm

13  going to consider it.

14       **MS. MOYÉ:**   Okay.  Thank you, Your Honor.

15  **BY MS. MOYÉ:**

16  **Q.**   We were talking about the term "sticky."

17       And have you heard that terminology used at Apple?

18  **A.**   Occasionally, but rarely.

19  **Q.**   What do you understand it to mean when it's used?

20  **A.**   It means to have such high customer satisfaction that

21  people don't want to leave.

22  **Q.**   Let me ask you to take a look at document PX0892.  It's

23  also in your binder.  It is towards the back.

24  **A.**   Oh, thank you.

25  **Q.**   The third one from the end.

**COOK - DIRECT - MOYÉ**

1    **A.**   Okay.

2           **MS. MOYÉ:**   Your Honor, I believe this document is

3   already also in evidence.

4           **THE COURT:**   Yes.  I'm double checking.

5    It is.

6   **BY MS. MOYÉ:**

7    **Q.**   Could you identify the document for us?

8    **A.**   It's an email from Steve Jobs to the executive team at

9   that time in 2010.

10   **Q.**   Were you --

11   **A.**   And it --

12   **Q.**   Sorry, sir.

13   **A.**   -- looks to be an agenda for a meeting.

14   **Q.**   And were you a member of the executive team at that point

15   in time?

16   **A.**   Yes.

17   **Q.**   Okay.  If you could look on -- at the bottom of that first

18   No. 1 item.  There is language, "Tie all our products together

19   so we further lock customers into our ecosystem."

20    Do you see that?

21   **A.**   I do.

22   **Q.**   What did you understand that to mean, sir?

23   **A.**   It means making all the products work so well together

24   people don't want to leave.

25   **Q.**   Is there, sir, in your view, anything Apple can do to lock

**COOK - DIRECT - MOYÉ**

1    customers in to iOS devices?

2    **A.**    Not that I'm aware of.

3    **Q.**    Let's look on the second page of that document.  There's

4    also reference to the terminology "sticky."  I believe it's

5    under item 6.

6          What did you understand that entry to mean?

7    **A.**    Could you point me to the --

8    **Q.**    It's item No. 6 on the second page.  It says, "MobileMe,

9    Cue, SJ, Roger Rosner," on the top.  It's also on your screen,

10   the screen in front of you.

11   **A.**    Oh, thank you.

12         It's the same thing.  It is to make the ecosystem have

13   such high, great customer satisfaction that people don't want

14   to leave.

15   **Q.**    Thank you, sir.

16         And going back to switching for a moment, does Apple offer

17   tools that help customers switch from Android devices to iOS

18   devices?

19   **A.**    Yes, we do.

20   **Q.**    Do you have an understanding as to whether Android device

21   makers, say Samsung, have tools that assist customers in

22   switching from Apple devices to Android devices?

23   **A.**    They do.

24   **Q.**    Let's look at another document, PX0416, also in the

25   binder.  It's right in front of this one.  And if we could go

1      to the second page of this document -- actually, maybe the

2      third page of this document.  There is some text in red.

3              And, again, Mr. Cook, you can see it on your screen, if

4      that's a little bit easier for you.

5              There is language, "And the number one

6      most-difficult-to-leave-the-Apple-universe app is iMessage."

7              Do you see that?

8      **A.**   I see it.

9      **Q.**   Do you agree with that, sir?

10     **A.**   No.

11     **Q.**   Do you have an understanding as to what this individual

12     was conveying here?

13                  **MR. BORNSTEIN:**   Objection, Your Honor.  Foundation.

14                  **THE COURT:**   Sustained.

15                  **MS. MOYÉ:**   Okay.  I'll back up.

16     **BY MS. MOYÉ:**

17     **Q.**   Mr. Cook, if you could look at the first page of the

18     document.  The top entry says, "From:  Tim Cook."

19              Do you see that?

20     **A.**   I do.

21     **Q.**   Is this a document that you received in the ordinary

22     course of business?

23     **A.**   It is.

24     **Q.**   And did you review the language that I just referenced

25     when you received it?

1     **A.**    Yes.

2     **Q.**    Okay.  Can you give us, then, your understanding of what

3     this individual was conveying.

4                 **MR. BORNSTEIN:**    Objection, Your Honor.  Still

5     foundation.

6                 **THE COURT:**    He can testify as to his understanding.

7     He cannot testify as to what the actual meaning is of

8     Mr. Rogers in the email.

9                 **MS. MOYÉ:**    Yes, Your Honor.

10    **BY MS. MOYÉ:**

11    **Q.**    Your understanding, Mr. Cook.

12    **A.**    My understanding is what he is saying is that when he

13    switched from iPhone to an Android unit, he left his iMessage

14    working and -- and messages were going there, but he wasn't

15    getting them.

16          I think that means that the setup was done incorrectly

17    because you can easily turn off your iMessage.

18    **Q.**    Do you believe, sir, that the availability of iMessage on

19    iOS devices has prevented customers from switching?

20    **A.**    No.

21    **Q.**    Is iMessage one of the highly ranked features of the

22    iPhone?

23    **A.**    It's -- it's a -- I would say it's a really good feature.

24    **Q.**    Can iMessage messages be transferred to an Android device

25    when a user switches?

1    **A.**    Yes.

2    **Q.**    Now, let's go back to Apple's 2020 10-K.  And I would like

3    to talk about some of the P&L and profitability issues that

4    have been raised with the Court.

5          The 2020 10-K is DX4581.

6    **A.**    4581.

7    **Q.**    And if we go to page .022 in that document.

8          Do you see information there for total net sales and net

9    income for 2020, Mr. Cook?

10   **A.**    Yes.

11   **Q.**    Can you use that information to determine what Apple's

12   profit margin was for fiscal year 2020?

13   **A.**    Yes.  If you divide the 57.4 billion by the 274.5, I

14   believe, if my memory serves me correct, you get to 20.9

15   percent.

16   **Q.**    And, sir, do you consider any other profit margin in

17   running the business?

18   **A.**    It's not the way we do it.

19   **Q.**    And does Apple prepare fully burdened P&L statements for

20   today's business units --

21   **A.**    No.

22   **Q.**    -- in the ordinary course of business?

23   **A.**    No.

24   **Q.**    Can you explain why not?

25   **A.**    Well, because, first of all, allocation of costs, of joint

**COOK - DIRECT - MOYÉ**

1    costs, are very difficult to do, and it's open for debate

2    about how to do it.  And so you would wind up getting the

3    company focused on arguing between the different areas about

4    where costs should be and it would be totally unproductive, in

5    my mind.

6           Steve actually did this when he came back to the company.

7    If I remember correctly, he told me a story once that he found

8    Apple losing a billion dollars a year but all of the divisions

9    all making money.  And so you can imagine what he then did.

10   He just -- he blew it up.

11          And I've never wanted to go back to that point.  We just

12   always kept it as one.

13   **Q.**   Has the practice of looking at the company's profitability

14   overall enhanced the company's abilities to compete, in your

15   view?

16   **A.**   I think so, because it means that we spend more time

17   focusing on customers and not focusing on each other.

18   **Q.**   Has Apple ever attempted to determine the specific

19   profitability of the App Store as a stand-alone business unit?

20   **A.**   No.

21   **Q.**   Do you believe the App Store is profitable?

22   **A.**   Yes, I do.

23   **Q.**   Are you able to give us a specific number on

24   profitability?

25   **A.**   No.  We haven't done that, but, you know, I have a feel,

1    if you will.

2    **Q.**    The Court has heard some testimony from one of Epic's

3    experts, a Mr. Barnes, about his interpretation of certain

4    documents.  And I'd like to turn to that now, starting with

5    PX2385 in your binder.

6                **MS. MOYÉ:**    Your Honor, the Court has admitted this

7    into evidence and has granted our motion to seal.  I would

8    just like to ask some general questions about the document now

9    on the public record, and we can go into a sealed session

10   later if there's a need for detailed examination.

11               **THE COURT:**    That's fine.

12   **BY MS. MOYÉ:**

13   **Q.**    So let's look at 2385, and if we could look at .6 in

14   particular.

15               **MS. MOYÉ:**    Do we have that up on the screen, page 6?

16               **THE COURT:**    So you want it on the screen?

17               **MS. MOYÉ:**    Yes, please.  I'm sorry.  That's just the

18   cover page.  I'm sorry.  Don't get alarmed.

19               **THE COURT:**    Okay.  Yeah.  No, I'm looking at it.

20               **MS. MOYÉ:**    There is no language on it that is

21   problematic, but let's not put it on the screen.

22   **BY MS. MOYÉ:**

23   **Q.**    Tell us, sir -- there's a description of the document.

24        What was the purpose of this presentation?

25   **A.**    I believe it was a one-off presentation that looked at

**COOK - DIRECT - MOYÉ**

1    profitability trends over -- over time.

2    **Q.**    Were you attempting to compare the relative profitability

3    of your products and services in this document?

4    **A.**    Well, we didn't try to allocate costs, as you can probably

5    tell from the document itself.  It's -- later in the document,

6    it makes it clear that that was not done.  And so it has a

7    limited use to it.

8    **Q.**    And you mentioned it was used to look at trends.

9         Can you explain that to the Court?

10   **A.**    Well, if you -- if you don't allocate, like we don't, and

11   you compare the numbers year to year to year to year, you can

12   draw certain inferences to those, as long as that allocation

13   methodology is the same.

14   **Q.**    Were documents like this PX2385 routinely prepared at

15   Apple?

16   **A.**    This is the only one that I recall.

17   **Q.**    And what is the date of this document?

18   **A.**    It is September of 2019.

19   **Q.**    Does this document include an assessment of the App

20   Store's profitability, sir?

21   **A.**    No.  Again, we don't do profitability at that level.

22   **Q.**    And Epic's expert, Mr. Barnes, testified that it showed

23   operating margins -- fully burdened operating margins for the

24   App Store.

25        Is that correct, sir?

**COOK - DIRECT - MOYÉ**

1  **A.**   No.

2  **Q.**   Let's look specifically at page .8.

3  **A.**   Yes.

4  **Q.**   Without going into any of the specifics, sir, I would just

5  like you to explain what is on this page.

6       Starting first with just the number -- the revenue

7  caption, what is captured there, again without going into the

8  detail for the document?

9  **A.**   Right.  It -- it shows a revenue by product and some of

10  the services and then sort of a -- catch-all categories, I

11  guess.

12  **Q.**   And the gross margin?

13  **A.**   Same thing, but -- but at the gross margin level.

14  **Q.**   What about opex?

15  **A.**   It shows an opex for the company that's in the -- sort of

16  the total, and then it shows only sort of an unallocated opex

17  methodology under it.

18  **Q.**   Does the number for the App Store in the "opex" column

19  include all of the expenses associated with the App Store?

20  **A.**   No, not at all.

21  **Q.**   Do you have an understanding of, in a general sense, which

22  categories of expenses are included in the opex as reflected

23  here?

24  **A.**   This would only be some of the very direct kind of costs.

25  Like app review would be in here, as an example.

**COOK - DIRECT - MOYÉ**

1    **Q.**    Operating margin on this document --

2    **A.**    Is just the simple arithmetic of gross margin minus opex.

3    **Q.**    Does this document convey an operating margin for the App

4    Store on a fully burdened basis after taking account of all of

5    its costs?

6    **A.**    It does not.

7    **Q.**    Let's look at page .24 in the document.

8         Does this page, sir, in your opinion, relate to the

9    allocation issue we were just discussing?

10   **A.**    It does.  You can see here clearly that the R&D and SG&A

11   allocation to services is very, very small.  And so it -- it's

12   just a reminder that this -- that's not the purpose of the

13   analysis.

14   **Q.**    And is there an entry in this document for the overall

15   opex for the App Store?

16   **A.**    There's not.

17   **Q.**    And on this opex product allocation page, is there an

18   entry for opex to the App Store?

19   **A.**    There is not.

20   **Q.**    Who reviewed this document, sir?

21   **A.**    It was a limited audience.  My recollection is it would

22   have been -- and if I look at the -- what reminds me is

23   looking at the distribution list of this document.  It was the

24   CFO and I and some of the CFO staff.

25   **Q.**    Did you share this document with any of the business unit

1    leaders?

2    **A.**    No.  Again, it -- it has a limited purpose to it, so I

3    don't believe any business leaders saw it.

4    **Q.**    Did you use the information in this document to make any

5    business decisions?

6    **A.**    No.

7    **Q.**    Let's look at two more pages of the document.  Let's look

8    at page .13.

9         Do you see a reference to the App Store there?

10   **A.**    I do.

11   **Q.**    Are the operating margin numbers reported there fully

12   burdened operating margins for the App Store as if it were a

13   stand-alone business unit?

14   **A.**    They are not.

15   **Q.**    Do the margins that are reported here for the App Store

16   refer to the iPhone App Store as well as the Mac App Store?

17   **A.**    They do.

18   **Q.**    Now, let's look at another document the Court has heard

19   some testimony about.  This is PX2392.

20        **MS. MOYÉ:**    This is similar, Your Honor.  It's been

21   sealed, and I just want to ask some general questions about

22   it.

23        **THE COURT:**    Proceed.

24        **MS. MOYÉ:**    I believe it has been admitted also,

25   Your Honor.

1    **THE COURT:**   It has.

2    **BY MS. MOYÉ:**

3    **Q.**   Sir, can you explain what this document is?

4    **A.**   It is a -- appears to be, like, a benchmarking exercise

5    from looking at reported operating margins from companies

6    that -- that would report for their full company, and then --

7    and then overlaying that to this unallocated view of OP margin

8    for Apple.

9    **Q.**   Does this document contain information about the App

10   Store's profitability?

11   **A.**   It does not.

12   **Q.**   And what are the margins referenced for the App Store in

13   this document?

14   **A.**   They are arrived at, I believe, by just taking the sum of

15   the direct opex and subtracting that from gross margin.  So

16   it's a very -- it's not fully loaded, as you point out.

17   **Q.**   Is the operating margin reported here higher than it would

18   be if there had been a fully loaded exercise?

19   **A.**   Yes, definitely.

20   **Q.**   Let's look at page 2392.3.  And, again, just some general

21   questions about it.

22       You mentioned that there is a comparison of margins for

23   other companies, and I see companies like Netflix there.

24       Are the margins for a company like Netflix directly

25   comparable to the margins for a business like the App Store?

1    **A.**    No.

2    **Q.**    And can you explain why not?

3    **A.**    Well, because Netflix's number would be their -- their

4    real total company-reported 10-K or 10-Q kind of number,

5    depending upon the year, where our number on here -- actually,

6    I don't see Apple on here, Apple, Inc.  Apple -- Apple, Inc.,

7    is not plotted here.

8         But if it were on here, you could then compare Apple,

9    Inc., to Netflix by its total company.  But when you take the

10   operating margin as stated here, which only includes partial

11   of the allocation, it -- it has limited meaning.

12   **Q.**    Are you familiar with the type of accounting that one

13   would use if they were trying to account for the App Store as

14   a separate business unit?

15   **A.**    I'm aware of different ways to do it if we wanted to do

16   that.

17   **Q.**    Are you familiar with the term "agency accounting" or "net

18   basis accounting"?

19   **A.**    Yes.

20   **Q.**    Would you explain what that is, sir.

21   **A.**    Yeah.  In a -- in an agency model, the -- in this case, as

22   an example, as the App Store, the developer sets the price.

23   When the developer sets the price, we, Apple, only book the

24   net revenue.  And so in a case where there's 15 percent

25   commission, we would only book the 15 percent.

**COOK - DIRECT - MOYÉ**

1         In a regular accounting model, obviously, you would book

2    the -- if it's a dollar, you would book a dollar, and then you

3    would show the cost of the -- of the developer, which is 85

4    percent in this case or 85 cents, going to the developer.  And

5    so it -- it's a consequence of accounting that isn't that

6    obvious or intuitive.

7    **Q.**    And in general, if one were comparing a company that

8    reports on that agency or net basis and one that reports in

9    what you said is the by-sale or regular basis, how would the

10   margins compare for the same underlying economic facts?

11   **A.**    Well, you couldn't compare them, really.  They would not

12   be comparable.  You would have to go back and account for

13   things in the same manner in order to make the numbers

14   comparable.

15        When you book on a net basis, it has the effect of

16   increasing the margin obviously because you're taking the bulk

17   of the costs out and not showing it.

18   **Q.**    Understood, sir.

19        And then I would just like to turn to an issue that the

20   Court actually raised with us this morning, and it's the

21   nature of the relief that Epic seeks.

22        Epic, in this case, seeks an order requiring Apple to

23   permit sideloading of unreviewed apps on the iPhone and to

24   permit alternative app stores that would offer apps that have

25   not been reviewed by Apple.

**COOK - DIRECT - MOYÉ**

1    What, sir, would be the consequences of such an order, in

2 your view?

3 **A.** I think it would be terrible for the user because if you

4 look at it today, we reviewed a hundred thousand or so apps a

5 week and reject about 40,000 for different reasons.  You can

6 imagine if you turn review off how long it would take the App

7 Store to just become a toxic kind of a mess.  And that would

8 be terrible for the user.

9    It would also be terrible for the developer because the

10 developer depends on the store being a safe and trusted place

11 where customers want to come and feel good about transacting.

12 **Q.** What about Apple's IP rights?  What impact would such a

13 ruling have on Apple's IP rights?

14 **A.** It -- it -- I -- this is probably more of a legal

15 question, but it seems like it would be forcing us to license

16 our IP, and I can't imagine that.

17 **Q.** Does Apple license its iOS?

18 **A.** No.

19 **Q.** What would be the impact on Apple's ability to meet its

20 commitments to its customers, the safety, security, and

21 privacy commitments we talked about at the outset?

22 **A.** We could no longer make the promise because the -- the --

23 if you think about how we make the promise of safety,

24 security, and privacy, a large part of that is -- depends on

25 this app review.  And we believe customers want that.  I know

**COOK - DIRECT - MOYÉ**

1    they do because they tell me that.

2    **Q.**   Epic also asked the Court to enter an order that provides

3    Apple can no longer require developers to use IAP for

4    purchases of digital goods.

5          What would be the consequences of that ruling?

6    **A.**   Well, it would wind up where customers would then have to

7    place their credit card in all of these different -- for all

8    of these different apps, and so it would be a huge convenience

9    issue but also the fraud risk would go up dramatically if you

10   are taking your credentials and putting them in numerous

11   times.

12         Also, we'd have to come up with an alternate way of

13   collecting our commission.  And I strongly believe that IAP is

14   the most efficient way to collect it because you would then

15   have to figure out how to track what's going on and invoice it

16   and then chase the developer.  It seems like a -- a process

17   that doesn't need to exist to me.

18   **Q.**   Thank you, sir.

19         Then I would just like to go back to the Data Transfer

20   Project that the Court inquired about.

21              **MS. MOYÉ:**   Your Honor, may I approach the witness to

22   provide an exhibit?

23              **THE COURT:**   Yes, you may.

24              **THE WITNESS:**   Thank you.

25

1    **BY MS. MOYÉ:**

2    **Q.**    Mr. Cook, can you take a look at that and tell us whether

3    this is the public report about the Data Transfer Project you

4    mentioned earlier in your testimony?

5    **A.**    It is.

6            **MS. MOYÉ:**    And, Your Honor, this is marked as DX5573.

7    We would like to admit it into evidence.

8            **THE COURT:**    Any objection?

9            **MR. BORNSTEIN:**    One moment, if I could, Your Honor.

10   I'm seeing it for the first time just now.

11       No objection.

12           **THE COURT:**    Admitted.

13           (Defense Exhibit DX5573 received in evidence)

14           **MS. MOYÉ:**    Thank you.

15       Your Honor, we have a small amount of sealed testimony.

16   We would propose that we pass the witness for public cross

17   now, and then the parties can move into a sealed proceeding,

18   if necessary.

19           **THE COURT:**    All right.

20       Mr. Bornstein, cross.

21           **MR. BORNSTEIN:**    Your Honor, may Ms. Kloss approach

22   with a binder?

23           **THE COURT:**    She may.

24       All right.  Mr. Bornstein, you may proceed when you're

25   ready.

**COOK - CROSS - BORNSTEIN**

1        **MR. BORNSTEIN:**   Thank you, Your Honor.

2            And I, too, have some material that I am going to try to

3    do in the public record with Mr. Cook, if everyone is careful

4    about saying numbers out loud.

5            **THE COURT:**   I'm sure he is sensitive to that.

6                            **<u>CROSS-EXAMINATION</u>**

7    **BY MR. BORNSTEIN:**

8    **Q.**   Mr. Cook, nice to see you again --

9    **A.**   Good to see you.

10   **Q.**   -- in person this time.

11           I understand from the press it's your first time

12   testifying in court?

13   **A.**   It is.

14   **Q.**   Welcome.

15   **A.**   Thank you.

16   **Q.**   You should have, I think, a number of binders now in front

17   of you.

18   **A.**   I have two.

19   **Q.**   Okay.  Well, do you also still have the binder that

20   Ms. Moyé gave you?

21   **A.**   I do.  I just set it back there.

22   **Q.**   Okay.  Can I ask you to take a look at that one to start,

23   please.

24           And in that binder, there's a document labeled PX0089 that

25   Ms. Moyé asked you about.

**COOK - CROSS - BORNSTEIN**

1  **A.**  Yes.

2  **Q.**  Great.

3      And this was a document that related to discovery on the

4  App Store; correct?

5  **A.**  Yes.

6  **Q.**  And in the email at the top of the page from Mr. Fischer

7  you noted that there was some discussion about improvements to

8  discovery that Apple was considering planning at this time;

9  correct?

10 **A.**  Yes.

11 **Q.**  And Mr. Fischer notes that there are some exciting

12 announcements that he would like to be able to make at WWDC in

13 2016.

14     Do you see that?

15 **A.**  Yes.

16 **Q.**  And those were announcements about the enhancement of

17 discovery; correct?

18 **A.**  Yes.  I believe so.

19 **Q.**  And the big announcement at WWDC 2016 about the

20 enhancement of discovery was search ads, wasn't it?

21 **A.**  I don't recall when search ads were announced.

22 **Q.**  Search ads were --

23 **A.**  Somewhere around that time period.

24 **Q.**  Yeah.  Search ads are a feature that Apple introduced so

25 that developers can pay in order to achieve discovery on the

**COOK - CROSS - BORNSTEIN**

1    App Store; correct?

2    **A.**    Yes.

3    **Q.**    And so the big announcement that everyone was working

4    towards here to make things better for developers was another

5    way for Apple to make money off of discovery; correct?

6    **A.**    No.  I believe there were --

7    **Q.**    So your answer is no.  Thank you.

8         So when you said in your email, "We need to do something

9    to make discovery better," what happened is the very next

10   WWDC, Apple announced search ads so that developers then have

11   to pay in order to get their own apps discovered in a search

12   on the App Store.

13        Isn't that what happened, the sequence of events?

14   **A.**    I believe we also announced the "Today" tab, which also

15   did editorial and really -- really launched a lot of apps

16   through the editorial.

17   **Q.**    Together with search ads that require people to pay to

18   have their own app appear near the top of the search list;

19   correct?

20   **A.**    We have one paid slot for ads.

21   **Q.**    And that was announced in 2016; correct?

22   **A.**    I don't know that 2016 on that one.

23   **Q.**    So we had earlier in the week, sir, a number of -- excuse

24   me, last week -- time flies -- a number of economists come in

25   and talk about your business.  So I would like now to have the

**COOK - CROSS - BORNSTEIN**

1    opportunity to ask you a question or two about your business

2    instead.

3         And one of the things the economists have been debating,

4    as the Court mentioned this morning, is market definition.

5         So let me ask you directly, sir, does Apple compete

6    against Google in operating systems?

7    **A.**    We compete against their devices that they enable, and so

8    we compete against Samsung and LG and --

9    **Q.**    So your testimony is that you do not compete against

10   Google in operating systems or you do, sir?

11   **A.**    We obviously benchmark them, but customers don't buy

12   operating systems; they buy devices.

13   **Q.**    All right.  Do you recall giving an interview at the

14   Berkshire Hathaway shareholders meeting in 2019, sir?

15   **A.**    I don't.

16   **Q.**    All right.  Let's see if we can refresh your recollection.

17        **MR. BORNSTEIN:**    Mr. Rudd, can we please play the clip

18   we have marked as PX1721 for Mr. Cook.

19        (Video clip played as follows:)

20        "We compete on the operating system side with -- with

21   Google and Microsoft.  We compete in the hardware space with

22   Samsung and Huawei and many other prominent Chinese companies

23   in particular."

24   **BY MR. BORNSTEIN:**

25   **Q.**    So, Mr. Cook, my question for you is, was that you on the

**COOK - CROSS - BORNSTEIN**

1   video saying, "We compete against Google on the operating

2   system side"?

3   **A.**   It sure looked like me.

4   **Q.**   Great.  Sounded like you, too, sir.

5        You gave some testimony this morning about profitability,

6   quite a bit of it; correct?

7   **A.**   Yes.

8   **Q.**   Okay.  And you've testified that Apple does not maintain a

9   separate P&L for the App Store; correct?

10  **A.**   Correct.

11  **Q.**   And you've testified that Apple doesn't go through the

12  cost allocation process to know what the profitability of the

13  App Store is; correct?

14  **A.**   Correct.

15  **Q.**   Can we at least agree that you know the revenues for the

16  App Store?

17  **A.**   Yes.

18  **Q.**   Okay.  You track that information?

19  **A.**   Yes.

20  **Q.**   And you personally receive reports on revenue, correct, of

21  the App Store?

22  **A.**   Yes.

23  **Q.**   All right.

24        Now, you were invited, sir, to a Senate hearing last month

25  that was chaired by Senator Klobuchar; correct?

**COOK - CROSS - BORNSTEIN**

1   **A.**   No.

2   **Q.**   Apple was invited to go to the hearing; correct?

3   **A.**   Yes.

4   **Q.**   And the subject of that hearing was examining competition

5   in app stores; is that accurate?

6   **A.**   I believe so.

7   **Q.**   And you didn't go; Mr. Andeer, an in-house Apple lawyer,

8   attended on behalf of the company; is that correct?

9   **A.**   That's correct.

10   **Q.**   And when I say "attended," I believe he testified

11   remotely; is that accurate?

12   **A.**   He did.

13   **Q.**   And do you remember that Mr. Andeer was asked about App

14   Store revenues at that hearing?

15   **A.**   I don't remember that.

16   **Q.**   All right.  Let's see if we can refresh your recollection

17   on that one, as well.

18          **MR. BORNSTEIN:**   Mr. Rudd, can we please play the clip

19   of Mr. Andeer's testimony.

20          **THE COURT:**   Do I have --

21          **MR. BORNSTEIN:**   What's that, Your Honor?

22          **THE COURT:**   Is this identified?

23          **MR. BORNSTEIN:**   Yes.  This is going to be PX1677,

24   Your Honor.

25          And to that end, I'd like to move into evidence the

**COOK - CROSS - BORNSTEIN**

1    prior -- the prior clip that we played of Mr. Cook, which was

2    marked and we will provide to the Court, of course.  That one

3    was marked as PX1721.

4           **THE COURT:**    1721 is admitted.

5           (Plaintiff's Exhibit 1721 received in evidence)

6           **THE COURT:**    1677 will be.

7    **Go ahead.**

8           **MR. BORNSTEIN:**    Okay.  Thank you, Your Honor.

9           (Video clip played as follows:)

10    "Senator Klobuchar:  Do you know how much revenue it

11    generated last year?  I mean, it's relevant if we were talking

12    about a monopoly situation.

13    "Mr. Andeer:  Senator, understood.  You know, when we look

14    at the App Store, it's not a separate, stand-alone business

15    for us.  It's an integrated feature of our devices.  And so we

16    don't have a separate profit and loss statement for the App

17    Store."

18           **MR. BORNSTEIN:**    So, Your Honor, I would move 1677

19    into evidence, please.

20           **THE COURT:**    Admitted.

21           (Plaintiff's Exhibit PX1677 received in evidence)

22           **MR. BORNSTEIN:**    Thank you.

23    **BY MR. BORNSTEIN:**

24    **Q.**    Mr. Cook, Mr. Andeer gave the same statement that you did,

25    that there is no separate profit and loss statement for the

**COOK - CROSS - BORNSTEIN**

1    App Store; correct?

2    **A.**    Sounded like it.

3    **Q.**    But he did not give the revenue information that the

4    Senator asked for, did he?

5    **A.**    Not in that clip.

6    **Q.**    And do you understand he did it in some other part of the

7    hearing?

8    **A.**    I -- I don't know.

9    **Q.**    Okay.

10        Now, we've seen the documents that you testified with

11    Ms. Moyé about, this one-off presentation that you received,

12    correct, about profitability of the App Store and other

13    segments of your business?

14    **A.**    Yes.

15    **Q.**    All right.  I'd like to ask you to take a look at that.

16    And I'm going to give you a choice, sir.  It's in my binder

17    and it's in the one that Ms. Moyé gave you, whichever one

18    you'd like to look at.  It's labeled PX2385.

19        Do you have it?

20    **A.**    I do.

21    **Q.**    Oh, great.  Thank you.

22        Okay.  Now, first of all, this document begins with an

23    email that is directed to you and Mr. Maestri.

24        Do you see that?

25    **A.**    I do.

**COOK - CROSS - BORNSTEIN**

1    **Q.**   And Mr. Maestri is your chief financial officer?

2    **A.**   He is.

3    **Q.**   And the individual who sent this email -- I fear I might

4    botch her first name, so I will just say it's Ms. Casey?

5    **A.**   Saori Casey.

6    **Q.**   Thank you.

7         And she is someone who works with Mr. Maestri in your

8    finance department; is that right?

9    **A.**   She is.

10   **Q.**   And she heads the corporate FP&A group; is that right?

11   **A.**   That's correct.

12   **Q.**   That's corporate financial planning and analysis?

13   **A.**   That's right.

14   **Q.**   Okay.  And it was Ms. Casey who sent this information to

15   you; is that right?

16   **A.**   Yes.

17   **Q.**   And you had a meeting with Ms. Casey and others from the

18   finance organization about this document that we're looking

19   at; is that right?

20   **A.**   Yes.

21   **Q.**   I'd like to just go back and look at some of the portions

22   of the document that you discussed with Ms. Moyé.

23        First of all, you were looking with her at page .12.  Can

24   you go there, please?

25        Do you have .12?

**COOK - CROSS - BORNSTEIN**

1    **A.**    Yes.

2    **Q.**    Great.

3    And on this page -- and I'll do my best not to say -- to

4    say numbers out loud -- but on this page --

5    **A.**    Thank you.

6    **Q.**    -- Ms. Casey and her team at corporate financial planning

7    and analysis came up with what she's titled "Fiscal Year '20

8    Services Summary."  Yes?

9    **A.**    Yes.

10    **Q.**    And it breaks out into different quarters of this document

11    revenue, gross margin, operating expenses, and operating

12    margin for different services at Apple; correct?

13    **A.**    Correct.

14    **Q.**    Including the App Store?

15    **A.**    Yes.  App Store is listed.

16    **Q.**    All right.  And this is a -- a document that was prepared

17    for purposes of a meeting with you and Mr. Maestri; correct?

18    **A.**    Yes, I assume so.

19    **Q.**    Okay.  And your testimony about these materials is that

20    they were not representing a fully burdened P&L; is that

21    accurate?

22    **A.**    Yes, that's correct.

23    **Q.**    Okay.

24    Now, you have not reviewed the expert report from

25    Mr. Barnes that Ms. Moyé referred to, have you?

**COOK - CROSS - BORNSTEIN**

1  **A.**  I have not.

2  **Q.**  So you don't know what methodology he used to come to the

3  conclusion that these were, in fact, fully burdened numbers,

4  do you?

5  **A.**  I do not.

6  **Q.**  Okay.

7  Are you aware that he took account of the agency model

8  accounting issue that you described with Ms. Moyé this

9  morning?

10  **A.**  I do not.

11  **Q.**  And are you aware that he was able to tie out these

12  numbers to publicly-reported Apple financials?

13  **A.**  I'm not.

14  **Q.**  Okay.

15  Can I ask you to look at the next page of the document,

16  .13, please.

17  Do you have that?

18  **A.**  I do.

19  **Q.**  Okay.

20  Now, .13 is titled "Profitability Summary"; correct?

21  **A.**  Yes.

22  **Q.**  And it has on the right side of the document at the top a

23  chart titled "Services Operating Margin Percentage."

24  Do you see that?

25  **A.**  Yes.

**COOK - CROSS - BORNSTEIN**

1    **Q.**   And it has a number there, that I won't read out loud, for

2    the App Store; correct?

3    **A.**   It does.

4    **Q.**   And it tracks that over a period of five years?

5    **A.**   Yes.

6    **Q.**   Okay.  And, again, your view is these are not fully

7    burdened numbers; correct?

8    **A.**   That's correct.

9    **Q.**   Okay.  And I believe it was your testimony that Apple

10   doesn't allocate costs to be able to assess profitability;

11   correct?

12   **A.**   We don't allocate -- we fully don't allocate costs,

13   correct.

14   **Q.**   Okay.

15        Now, if you look at the bottom of the document, it says in

16   the center there, "Based on Method 2 for allocation opex."

17        Do you see that?

18   **A.**   I do.

19   **Q.**   Now, Method 2 is not actually described here on this page,

20   is it?

21   **A.**   It is not.

22   **Q.**   Okay.  And if you take a look at each of the next several

23   pages of the document, you will see it again says that the

24   allocation that's being done here is based on Method 2.

25        Do you see that?

**COOK - CROSS - BORNSTEIN**

1    **A.**   I do.

2    **Q.**   So your corporate financial planning and analysis group

3    does have, I guess, at least two methods, maybe more, for

4    allocating operating expenses; correct?

5    **A.**   I assume so.

6    **Q.**   Okay.  And they're so -- it is a methodology that is used

7    sufficiently frequently, apparently, that when Ms. Casey

8    presented it to you, she just listed "Method 2" without

9    further elaboration; correct?

10   **A.**   I think the chart that shows the allocation methodology is

11   the -- is the wave chart that we were looking at earlier.

12   **Q.**   Right.  You are talking about .24, sir?

13   **A.**   Let me take a look and make sure we're in sync.

14        Yes.

15   **Q.**   And you can see, sir, on .24 down at the bottom, your

16   corporate financial planning and analysis group again just

17   said "based on Method 2"; correct?

18   **A.**   Yes.  So I think it shows Method 2 here.

19   **Q.**   But you don't know that because you're not aware of what

20   Method 2 is and you're interpreting the document now on the

21   stand; is that right?

22   **A.**   I'm interpreting the document.

23   **Q.**   Okay.

24        Let's take a look at .18, please.  And you looked at this

25   one with Ms. Moyé, as well.

**COOK - CROSS - BORNSTEIN**

1       Do you recall that?

2       You looked at this one with Ms. Moyé, as well.  Do you

3   recall that, sir?

4   **A.**   I'm not sure we looked at this one.  .18?

5   **Q.**   18.  18.

6   **A.**   .18.  Yeah, I'm there.

7   **Q.**   Okay.  Great.

8       And this one has over on the left side in the middle,

9   again, operating margin numbers for the App Store broken out

10  separately; correct?

11  **A.**   It does.

12  **Q.**   And you were asked a question about whether this included

13  both the iOS App Store and the Mac App Store.

14      Do you recall that?

15  **A.**   Yes.

16  **Q.**   And I don't know if you're going to tell me that this is

17  confidential and we need to do it in sealed session, but what

18  portion of the revenues associated with the App Store come

19  from the Mac App Store versus the iOS App Store?

20          **MS. MOYÉ:**   Objection, Your Honor.  That calls for

21  information that has been sealed and needs to be done in a

22  sealed session.

23          **MR. BORNSTEIN:**   Okay, Your Honor.  I will ask --

24  maybe given Your Honor's rulings about sealing, I can ask the

25  following question.

**COOK - CROSS - BORNSTEIN**

**BY MR. BORNSTEIN:**

Q.   Do you have an understanding, sir, of the order of

magnitude of the iOS App Store versus the Mac App Store

revenues?

A.   The iOS would be larger.

Q.   How much larger, sir?

A.   A lot larger.

          **MR. BORNSTEIN:**   Okay.  We'll try and do the rest

under seal.  I don't want to trip over anything.

**BY MR. BORNSTEIN:**

Q.   Take a look -- let's go back to that chart, the wave

chart, as you called it, on .24 of this one-off presentation.

     Now, you were talking with Ms. Moyé about the R&D numbers

in your -- in your 10-K earlier.

     Do you recall that?

A.   Yes.

Q.   Now, those R&D numbers were for the company as a whole; is

that right?

A.   That's correct.

Q.   The allocation document here that we're looking at at .24

shows how at least your corporate financial planning and

analysis group allocated those R&D numbers to different

products within the company; correct?

A.   For purposes of this analysis.

Q.   Yes.

**COOK - CROSS - BORNSTEIN**

1            And so for purposes of this analysis, they sat down and

2    they actually allocated the R&D to different products within

3    the company; correct?

4    **A.**    They did something --

5    **Q.**    That's what they did.  They -- it's on the page; right,

6    sir?

7    **A.**    On the direct basis.  On some of the direct costs, to be

8    clear.

9    **Q.**    Okay.

10            So they allocated direct costs based on the top portion of

11    the document here and then they allocated shared costs and

12    they allocated allocated costs.

13            Do you see that?

14    **A.**    I see the document, yes.

15    **Q.**    All right.  And I am correct in describing it that they

16    allocated not just direct R&D, but shared and allocated R&D,

17    as well; correct?

18    **A.**    Shared for purposes of this analysis.

19    **Q.**    And they went through and they did this work for you;

20    correct?  It's here.

21    **A.**    They did the work for me, yes.

22    **Q.**    And in doing that work, sir, they have allocated a total

23    amount of R&D for the "rest of services" product that appears

24    on the bottom of the page that, as you said, is a very, very,

25    very small little purple sliver; is that right?

**COOK - CROSS - BORNSTEIN**

1    **A.**   Yes.

2    **Q.**   And "rest of services" is where the App Store lives;

3    correct?

4    **A.**   For this chart, yes.

5    **Q.**   Okay.  At this meeting that you had with Mr. Maestri and

6    Ms. Casey, you had some discussion about this document, sir;

7    correct?

8    **A.**   We had a meeting about it, yes.

9    **Q.**   And you or Mr. Maestri had some follow-up questions about

10   this, did you not?

11   **A.**   I don't recall that.

12   **Q.**   Well, take a look at the first page of the document, the

13   email from Ms. Casey.  And she says, "Hi, Tim, Luca.  Please

14   find below the three follow-up items from the profitability

15   meeting."

16        Do you see that?

17   **A.**   I do.

18   **Q.**   And she refers -- and I'm not going to read numbers

19   here -- but she refers -- in the first item, which refers to

20   iPhone profit, she says, "As discussed," and then she proceeds

21   to give some information.

22        Do you see that?

23   **A.**   Yes, I see it.

24   **Q.**   Okay.

25        And then she provides two other topics, followed by, "Any

1    other questions, please let us know."

2        Do you see that?

3    **A.**    Yes.

4    **Q.**    All right.  Does this refresh your recollection that you

5    and Mr. Maestri had some follow-up questions and considered

6    this sufficiently important to ask some follow-up questions

7    about?

8    **A.**    I don't remember the particulars, but I see that here.

9    **Q.**    Okay.

10        And then at this meeting, there was another document that

11    you went over.  It wasn't just this one-off presentation.  You

12    looked at something else, as well; isn't that right?

13    **A.**    Can you point me to a document?

14    **Q.**    Well, do you recall that?

15    **A.**    No, I don't.

16    **Q.**    Okay.  Great.

17    **A.**    Sorry.

18    **Q.**    So take a look, if you would, at 2392.  You looked at this

19    with Ms. Moyé, as well, the benchmarking document, you called

20    it.

21    **A.**    Yes.

22    **Q.**    And you see it has a date on it, September 25, 2019, on

23    the very first page?

24    **A.**    Yes, I see it.

25    **Q.**    All right.  And that's the same date as the meeting we

**COOK - CROSS - BORNSTEIN**

1    were just talking about; right?

2    **A.**    Yes.

3    **Q.**    Okay.  And this document, again, has information about the

4    profitability of the App Store on a stand-alone basis for the

5    purpose of this work; correct?

6    **A.**    No, not on a stand-alone basis.

7    **Q.**    Well, it has -- it has information that Ms. Casey and her

8    team calculated about the profitability of the App Store that

9    appears on page .3; correct?

10   **A.**    With the assumptions of that chart --

11   **Q.**    All right.

12   **A.**    -- which is not a fully loaded cost.

13   **Q.**    And, again, you haven't looked at the analysis that

14   Mr. Barnes did to assess whether it was fully loaded or not;

15   correct?

16   **A.**    I don't know what Mr. Barnes did --

17   **Q.**    Okay.

18   **A.**    -- but I do know that this is not fully loaded.

19   **Q.**    I understand your testimony on that, sir.

20   **A.**    Thank you.

21   **Q.**    And this wasn't a one-off presentation, though, was it,

22   sir?

23   **A.**    I don't remember having this type of presentation before.

24   **Q.**    How about since?

25   **A.**    I don't know.

**COOK - CROSS - BORNSTEIN**

1    **Q.**    All right.  Well --

2    **A.**    But it's not in the -- it's not in the quarterly cadence

3    of forecasts and actuals.

4    **Q.**    All right.  Well, let's take a look at what happened in

5    the quarterly cadence.

6          Take a look, please, sir, at PX2391.  This time I think

7    you will need to be in my binder because your counsel did not

8    include it in the one that they provided.

9    **A.**    Which binder number?

10   **Q.**    What binder number?  Apparently it's No. 1, sir.

11   **A.**    Okay.

12          **MS. MOYÉ:**   Which binder is it in, Counsel?

13          **THE COURT:**   No. 1.

14          **MR. BORNSTEIN:**   I just have one very large binder.  I

15   wish I had smaller ones myself.

16          **THE COURT:**   Well, if anybody knows where I can give

17   away lots of thick binders, let me know.  We just accumulate

18   them.

19   **BY MR. BORNSTEIN:**

20   **Q.**    Tell me when you've gotten there, please, sir.

21   **A.**    I'm there.

22   **Q.**    Okay.  So you have 2391 in front of you; correct?

23   **A.**    2391, yes.

24   **Q.**    Yes.

25          **MR. BORNSTEIN:**   And, Your Honor, this is in evidence

**COOK - CROSS - BORNSTEIN**

1    subject to a request from Apple to seal, so I'm again going to

2    try to be careful.

3          **THE COURT:**    All right.

4    **BY MR. BORNSTEIN:**

5    **Q.**    Now, I assume, sir, that you don't, as CEO of a two

6    trillion dollar-ish company, spend a lot of time reviewing

7    documents that you find not to be terribly informative?

8    **A.**    I spend some time doing that, but hopefully not a lot.

9    **Q.**    Okay.

10          And your team tries to give you things that they believe

11    you will find informative; correct?

12    **A.**    They do.  Of course.

13    **Q.**    Okay.

14          And you had asked Ms. Casey some follow-up questions about

15    the prior profitability analysis we were just looking at;

16    correct?

17    **A.**    I'm not sure I did or Luca did.

18    **Q.**    Fair enough.

19    **A.**    It's not clear.

20    **Q.**    That's fair enough.

21          But a member of the senior Apple management team asked her

22    some questions that she provided answers to; fair?

23    **A.**    That's correct.

24    **Q.**    Okay.

25          And the following quarter, this document here, 2391, was

**COOK - CROSS - BORNSTEIN**

1    dated December 18, 2019; correct?

2    **A.**   Yes.

3    **Q.**   You see that on the first page?

4    **A.**   Hold on.  December 18th of 2019.

5    **Q.**   And this is again from the corporate financial planning

6    and analysis group; correct?

7    **A.**   Correct.

8    **Q.**   And if you go, sir, to page .104, you will see something

9    labeled "Profitability"; correct?

10   **A.**   Yes, I see it.

11   **Q.**   Okay.  And then on page .105, you will see something that

12   looks an awful lot like what was on 2385.13, correct, another

13   chart with "Operating Margin Profitability Summary."

14        Do you see that?

15   **A.**   I see it.

16   **Q.**   Okay.  And this document has been updated by a quarter.

17   It's got another quarter's worth of information that your

18   corporate financial planning and analysis team put into this

19   material for you; correct?

20   **A.**   Yes.

21   **Q.**   Okay.  And, again, sir, they used, as you can see at the

22   bottom, Method 2 for allocation of opex; correct?

23   **A.**   Yes.

24   **Q.**   And they have come up again --

25   **A.**   I see it.

**COOK - CROSS - BORNSTEIN**

1    **Q.**    Sorry?

2    **A.**    I see it.

3    **Q.**    Great.

4          They have come up again with an operating margin for the

5    App Store that they are again presenting to you and others

6    at -- in the Apple management team; correct?

7    **A.**    Again, they're doing an analysis that is not fully loaded.

8    **Q.**    Okay.

9          But they have again, sir, come up a second time with a

10   profitability analysis of the App Store; isn't that right?

11   **A.**    That's not fully loaded.

12   **Q.**    They have come up with a profitability analysis of the App

13   Store that you're saying is not fully loaded; correct?

14   **A.**    Correct.

15   **Q.**    Okay.  And this document you know, sir, was found in your

16   files; is that right?

17   **A.**    I don't know that.

18   **Q.**    Do you know that your counsel produced this document to us

19   after your deposition had been taken on the very last day of

20   fact discovery in this case?

21   **A.**    I don't know that.

22          **MR. BORNSTEIN:**    Let me find a place to put my binder.

23   One second.

24   **BY MR. BORNSTEIN:**

25   **Q.**    Sir, you can probably put that away, too --

**COOK - CROSS - BORNSTEIN**

1   **A.**   Oh, okay.

2   **Q.**   -- so you can have some more space in front of you.

3   Would you agree with me that one of the benefits of the

4   IAP system that we've talked about some this morning is to

5   reduce friction for customers?

6   **A.**   By "friction" do you mean that they don't have to put in

7   their credentials in numerous different places?

8   **Q.**   Well, that's a form of friction, isn't it?

9   **A.**   I think of it as.  I just wanted to make sure we were in

10  sync.

11  **Q.**   Right.

12  And would you agree with me, then, that one of the

13  benefits of IAP for your customers is that it makes it easier

14  for them to make purchases?

15  **A.**   It would.

16  **Q.**   Okay.  And it's a -- a convenience for them; is that

17  right?

18  **A.**   Among other things.

19  **Q.**   And Apple doesn't want to make its customers leave the app

20  to go make a purchase if it's possible for them to make it

21  within the app; isn't that fair?

22  **A.**   They can -- they can leave the app if they want to.

23  Obviously, there are --

24  **Q.**   Sir, my question is Apple doesn't want the customers to

25  leave the app.

**COOK - CROSS - BORNSTEIN**

1    **A.**    We want them to do what they want to do.

2    **Q.**    Well --

3    **A.**    Our focus is on them.

4    **Q.**    -- it's a negative user experience, sir, if they have to

5    leave the app, isn't it?

6    **A.**    From my point of view, yes.

7    **Q.**    Okay.  And if they do leave the app, also Apple doesn't

8    make any money on the in-app purchases; isn't that correct?

9    **A.**    If they buy it off of the store, we would not make any

10   money.

11   **Q.**    Okay.  So fair to assume, sir, that Apple would prefer

12   that people make their purchases in the app so that Apple can

13   earn some revenue and there can be a good user experience --

14   **A.**    Sure.

15   **Q.**    -- rather than have people go outside of the app?  Isn't

16   that fair?

17   **A.**    Well, we try to make it as easy as possible.

18   **Q.**    Okay.

19         And when it's easy as possible, it means people are more

20   likely to make a purchase; isn't that right?

21   **A.**    Probably.

22   **Q.**    Right.

23         And Apple will make the same 30 percent or maybe 15

24   percent, depending on the circumstances, whether it is a

25   spontaneous impulse purchase or whether it is a very

**COOK - CROSS - BORNSTEIN**

1    thoughtfully-considered decision; isn't that right?

2    **A.**    In either case.

3    **Q.**    All right.  And Apple has -- has no policy against impulse

4    purchases; isn't that right?

5    **A.**    We provide parental controls so that parents can make sure

6    their kids aren't using it for impulse purchases.

7    **Q.**    Great.

8         But you have the -- a system set up in order to achieve

9    that; correct?

10   **A.**    We have parental controls set up to make sure that it

11   doesn't happen with kids.

12   **Q.**    Right.  If the parents choose to enable it; correct?

13   **A.**    If the parent chooses to enable it.

14   **Q.**    And, in fact, in-app purchases using IAP constitute a very

15   substantial percentage of App Store revenue; is that correct?

16   **A.**    It would be the -- the dominant way of purchasing, I

17   believe.

18   **Q.**    And in terms of the revenue that Apple earns, it is the

19   dominant source of App Store revenue; fair?

20   **A.**    I think so.

21   **Q.**    Okay.  We can -- I can show you some documents in the

22   sealed session.  I didn't want to --

23   **A.**    Yeah.

24   **Q.**    -- get numbers out here now.

25        Am I right that Apple does not believe -- well, let me do

**COOK - CROSS - BORNSTEIN**

1    it this way.

2            You do not believe, sir, that it is as easy to buy virtual

3    currency or other items on the web as it is to buy them while

4    you are in an app on an iOS device; is that fair?

5    **A.**    It takes another click to leave the app, going to the --

6    to the web, but people do it.  A lot of people do it.

7    **Q.**    But taking another click is a form of friction; correct?

8    **A.**    It's another step.

9    **Q.**    Right.

10           And avoiding that kind of friction is actually quite

11   valuable in your industry; am I right about that?

12   **A.**    I'm not sure I follow your question.  What do you mean by

13   "valuable"?

14   **Q.**    Well, I will try and make it more concrete.  I mean money.

15   I mean, you earn money based on this, sir.

16           So, for example, Apple has an arrangement with Google

17   under which the Google search engine is the default search

18   engine on the iPhone; isn't that right?

19   **A.**    Yes.

20   **Q.**    Okay.

21           And that's a very lucrative arrangement for Apple;

22   correct?

23                **MS. MOYÉ:**    Objection.  Beyond the scope.

24                **THE COURT:**    This is cross.  Overruled.

25

COOK - CROSS - BORNSTEIN

**BY MR. BORNSTEIN:**

**Q.**   That's a very lucrative arrangement for Apple; correct?

**A.**   We -- we do so in the best interests of the user.

**Q.**   Sir, it's a very lucrative arrangement for Apple; am I

right about that?

**A.**   They pay us money, if that's what you mean.

**Q.**   They pay you -- and I'm going off public information here,

so this is not something to be sealed -- but the government

claims that they pay you upwards of $10 billion.

Is that accurate?

**A.**   I don't remember the exact number.

**Q.**   You don't know whether it's upwards of $10 billion?

**A.**   I don't know.

**Q.**   Okay.  But, now, this is just to establish the Google

search engine as a default.  That's what this is; correct?

**A.**   No.  It's the searches themselves.

**Q.**   But -- well, a user can change the default search engine

on their iPhone; correct?

**A.**   That's correct.

**Q.**   All right.  So I can -- I have an iPhone, sir.  I hope it

still works after the examination today.

But I -- I can go -- I can go onto my iPhone and I can go

into settings and I can change my -- my search engine;

correct?

**A.**   You can, yes.

**COOK - CROSS - BORNSTEIN**

1    **Q.**    All right.  But that's -- that is something that is

2    sufficiently friction-full, to coin a word, that Google pays a

3    lot of money to Apple to avoid; correct?

4    **A.**    That's not the way I look at it.

5    **Q.**    Okay.

6            But Google does pay a lot of money to Apple in order to be

7    the default so that people don't have to make that extra

8    click; right?

9    **A.**    They pay a lot for the searches that come across there.

10    **Q.**    Okay.

11            They pay a lot to be the default so that they get those

12    searches; right?

13    **A.**    You'd have to ask them what they pay a lot for, I guess.

14    **Q.**    All right.  So you don't have an idea, as the recipient

15    of these --

16    **A.**    I --

17    **Q.**    -- billions of dollars, why they are paying -- you don't

18    have an idea, sir, as the recipient of these billions of

19    dollars why it is that Google has entered into this deal?

20    That's what you're saying?

21    **A.**    Probably a better question for them.

22    **Q.**    Okay.  I asked you, sir, though.

23            You do have a pretty good idea why they pay billions of

24    dollars to Apple in order to be the default search engine,

25    don't you?

**COOK - CROSS - BORNSTEIN**

1              **MS. MOYÉ:**   Objection to the form.  Calls for

2    speculation.

3              **THE COURT:**   Overruled.

4       You can answer, if you know.

5              **THE WITNESS:**   I believe they are paying for the

6    searches, as I testified to.

7    **BY MR. BORNSTEIN:**

8    **Q.**   Okay.  Which they get because they're the default engine;

9    right?

10   **A.**   Well, they get if the customer leaves the default the

11   same.

12   **Q.**   All right.  This we will have to come back to so that I

13   can preserve your confidentiality.

14      You, sir, reviewed the decision that -- I'm switching

15   topics here.

16      You reviewed the decision that Apple made to terminate the

17   developer program account associated with Epic Games, Inc.; is

18   that correct?

19   **A.**   Yes.

20   **Q.**   And you agreed with that decision; yes?

21   **A.**   I did.

22   **Q.**   And you believe that the actions that Epic took in August

23   of 2020 before *Fortnite* was removed from the App Store were

24   malicious; is that correct?

25   **A.**   Yes.

**COOK - CROSS - BORNSTEIN**

1    **Q.**    And by "malicious," what you mean is it was planned and it

2    was deceptive and it was hidden; fair?

3    **A.**    Yes.

4    **Q.**    And you're aware, are you, sir, that Mr. Schiller told

5    this Court in a declaration in September that as a result of

6    those actions, it was critical for Apple to cut off Epic's

7    access to the App Store so that Epic could not continue to

8    jeopardize the iOS ecosystem.

9         You're aware of that?

10   **A.**    I'm not aware of exactly what he said, but it sounds --

11   sounds correct.

12   **Q.**    Okay.  And you're aware that Mr. Schiller told the Court

13   in that same declaration that the only viable option is for

14   Apple to cease doing business with Epic, including all

15   contracts that the companies had.

16        Is that something that you knew?

17   **A.**    Yes.

18   **Q.**    Okay.  And you also know that despite these very dire

19   warnings, Apple offered Epic the ability to come back to the

20   App Store with *Fortnite*.

21        Do you know that?

22   **A.**    Yes, I do.

23   **Q.**    Okay.

24        And, in fact, in your counsel's opening statement here a

25   few weeks ago, she repeated that invitation, turned to

**COOK - CROSS - BORNSTEIN**

1    Mr. Sweeney, let him know that Epic was still welcome to come

2    back.

3         Did you know that?

4    **A.**    Yes.

5    **Q.**    And did you authorize that?

6    **A.**    I've the whole time said that.

7    **Q.**    And you've said that even though you've told the Court

8    that Epic engaged in malicious activity and that the only

9    viable option that Apple had was to terminate business with

10   Epic entirely; right?

11   **A.**    Correct.

12   **Q.**    And if -- what you said about why you would be willing to

13   have Epic back is for the benefit of the users; is that right?

14   **A.**    Sure.

15   **Q.**    But if Epic were the bad actor that Mr. Schiller claimed,

16   it would not be to the benefit of users to have Epic back on

17   the store, would it?

18   **A.**    I think it would be to the benefit of the users to have

19   them back on the store if they abided by the rules.

20   **Q.**    But if they are a bad and malicious actor, sir, who

21   couldn't be trusted to come back such that the only viable

22   option was to terminate all contracts, how can it be to the

23   benefit of users to have Epic back?

24   **A.**    Because the user is caught in between two companies here,

25   and it's not the right thing to do with the user.

**COOK - CROSS - BORNSTEIN**

1  **Q.**    So your testimony, sir, is that you're going to have this

2  malicious actor back for the benefit of users and that the

3  hundreds of millions of dollars that Apple has made off of

4  *Fortnite* over the years had nothing to do with it?

5  **A.**    We weren't thinking about the money at all.

6  **Q.**    And the --

7  **A.**    We were thinking about the user.

8  **Q.**    -- the principles that you've articulated about the

9  integrity of the iOS ecosystem, they didn't survive -- they

10  wilted, really, when Apple saw the chance to have *Fortnite*

11  come back and continue to make money off of the -- the

12  purchases that people who play *Fortnite* and use *Fortnite* make;

13  isn't that right?

14  **A.**    No.

15  **Q.**    And your testimony is that you told the Court you had to

16  get rid of them, but you were still willing to take them back

17  just because you were thinking of users and not thinking of

18  the profit that you would make.

19  **A.**    We always put the user at the center of everything that we

20  do.

21  **Q.**    So that's your testimony, that you --

22  **A.**    That's my testimony --

23  **Q.**    -- would have them back for the users --

24  **A.**    Yes.

25  **Q.**    -- regardless of the amount of money that *Fortnite* has

**COOK - CROSS - BORNSTEIN**

1    made for you over the years?

2    **A.**    It has nothing to do with money.

3    **Q.**    Okay.

4         Sir, you testified before Congress last year; correct?

5    **A.**    I did.

6    **Q.**    Okay.  And do you recall at that testimony being asked

7    about whether Apple retaliates against developers?

8    **A.**    I don't.

9    **Q.**    Okay.  I will try and refresh your recollection again.

10   **A.**    Okay.

11         **MR. BORNSTEIN:**    This is PX1725 that I will ask

12   Mr. Rudd to play for you.  This is going to be a video, sir.

13         (Video clip played as follows:)

14         "Unidentified Speaker:  Has Apple ever retaliated against

15   or disadvantaged a developer who went public about their

16   frustrations with the App Store?

17         "Mr. Cook:  Sir, we don't -- we do not retaliate or bully

18   people.  It's strongly against our company culture."

19   **BY MR. BORNSTEIN:**

20   **Q.**    Sir, that was your testimony before Congress?

21   **A.**    Yes.

22         **MR. BORNSTEIN:**    Okay.  Your Honor, I would move

23   PX1725 into evidence.

24         **THE COURT:**    Admitted.

25         (Plaintiff's Exhibit PX1725 received in evidence)

**COOK - CROSS - BORNSTEIN**

1          **MR. BORNSTEIN:**    Thank you.

2     **BY MR. BORNSTEIN:**

3     **Q.**     And you maintain still, sir, that Apple did not retaliate

4     against Epic by threatening to shut down the *Unreal Engine*

5     after *Fortnite* was removed from the App Store; is that

6     correct?

7     **A.**     That's correct.

8     **Q.**     And you testified, as well, sir, that Apple did not

9     retaliate against *Down Dog*, the yoga app, for coming and

10    testifying here in this action?

11    **A.**     I'm sorry.  I'm not even familiar with that one.

12    **Q.**     Okay.

13    **A.**     Can you point me to something or --

14    **Q.**     I'll ask you a different question, sir, if you're not

15    familiar with it.

16          Are you familiar with your developer program license

17    agreement?

18    **A.**     No.

19    **Q.**     Okay.

20          Do you know what that is?

21    **A.**     I have a vague knowledge of it.

22    **Q.**     All right.  Let me see if I can prompt a little -- a

23    little something for you.

24          Look at PX2943, please.

25          **MS. MOYÉ:**    Did you say 33?

**COOK - CROSS - BORNSTEIN**

1          **MR. BORNSTEIN:**   2943, which is already in evidence.

2          **THE COURT:**   It is.

3     **BY MR. BORNSTEIN:**

4     **Q.**   Do you have that, sir?

5     **A.**   I found it, yes.

6     **Q.**   Great.  And this is labeled "Schedule 2."

7          Do you see that?

8     **A.**   Yes.

9     **Q.**   And this is Schedule 2 to the Developer Program License

10    Agreement that Apple requires developers who would like to use

11    the App Store to sign; is that right?

12    **A.**   I don't know.

13    **Q.**   Okay.  Let me ask you, then -- maybe -- maybe this will be

14    a quicker portion of the examination if you don't know, but

15    I'll direct you to one -- to one piece of it and see if we can

16    make a little bit of progress.

17    **A.**   Okay.

18    **Q.**   Paragraph -- excuse me -- paragraph 7.1 you'll find on

19    page .9.

20         Do you have that?

21    **A.**   I do.

22    **Q.**   Okay.  And I'll call your attention, sir, just to the

23    bottom right corner of the document.  You can see it's dated

24    March 31, 2021.

25         Do you see that?

**COOK - CROSS - BORNSTEIN**

1    **A.**    Yes.

2    **Q.**    So this is a recent version of your Schedule 2.

3            Are you aware that there was language added to this

4    document in this most recent version relating to the

5    circumstances under which Apple can terminate developers?

6    **A.**    No, I'm not.

7    **Q.**    All right.  Well, let me ask you to just look very

8    quickly, then, sir, at the last sentence of paragraph 7.1,

9    which states, "If at any time Apple determines or suspects

10   that you or any developers with which you are affiliated have

11   engaged in or encouraged or participated with other developers

12   to engage in any suspicious, misleading, fraudulent, improper,

13   unlawful, or dishonest act or omission, Apple may withhold

14   payments due to you or such other developers."

15           Did I at least read that correctly?

16   **A.**    Yes.

17   **Q.**    Okay.  And now you had no idea that this language was

18   added to the document?

19   **A.**    No.

20   **Q.**    Okay.

21           You understand now, in reading it, that this entitles

22   Apple, if -- if it is lawful, to withhold money from

23   developers or any of their affiliates when Apple suspects

24   conduct that it believes to be suspicious.

25           Do you see that?

**COOK - CROSS - BORNSTEIN**

1          **MS. MOYÉ:**   Objection.  Foundation.

2          **THE COURT:**   Overruled.

3          **THE WITNESS:**   I see it.

4   **BY MR. BORNSTEIN:**

5   **Q.**   Okay.

6        And the consequence of Apple's unilateral suspicion that

7   people are engaging in suspicious behavior or encouraging

8   suspicious behavior is that Apple can withhold payments both

9   to that developer and to all of its affiliates; isn't that

10   right?

11   **A.**   I don't know.

12   **Q.**   Okay.  And it is -- it is contrary to Apple's culture, as

13   you put it, to retaliate against people?

14   **A.**   Yes.  I stand by that.

15   **Q.**   Okay.

16        You said earlier today that you believe that consumers

17   value the app review process that Apple engages in; is that

18   right?

19   **A.**   They review the -- they like the output of it, which is

20   safer, more secure, and more privacy.

21   **Q.**   All right.  That's a fair enough clarification.

22        And you believe it's important for Apple to curate the App

23   Store; correct?

24   **A.**   I do, yes.

25   **Q.**   All right.  And you believe it gives customers trust and

**COOK - CROSS - BORNSTEIN**

1    confidence in what they're getting from the App Store?

2    **A.**    I do.

3    **Q.**    Now, how do we call a store with 1.8 million apps curated?

4    **A.**    You still have to -- they have to all live up to the

5    rules.

6    **Q.**    Well, curation is, at least in -- in the dictionary

7    something that's carefully gathered and sifted and chosen and

8    organized, right, like a museum exhibit.

9        Is that the ordinary meaning of the word, as you

10   understand it?

11   **A.**    I take it that that's the Webster definition that you're

12   using.

13   **Q.**    Okay.  And does that accord with your understanding of the

14   word, sir, "curation"?

15   **A.**    Yes.

16   **Q.**    Okay.

17       That's not a good description of a 1.8 million-app store,

18   is it, to say it's curated?

19   **A.**    I disagree.

20   **Q.**    So Apple has --

21   **A.**    You can curate something large as good as you can curate

22   something that's small.

23   **Q.**    So Apple has carefully gathered and chosen the apps, all

24   1.8 million of them, in the App Store?

25   **A.**    We've all made sure that they adhere to the guidelines of

**COOK - CROSS - BORNSTEIN**

1 the App Store.

2 **Q.** Right.

3 But you haven't gone through and selected and chosen and

4 made editorial decisions about which ones you think are

5 valuable for consumers and which ones maybe aren't as good;

6 right?

7 **A.** I think you're confusing curation and featuring.

8 **Q.** Well, I'm not, sir. I asked you just a question about

9 whether that's something that you do.

10 You don't go through and make editorial judgments about

11 which apps do and don't belong in the store on the basis of

12 whether they're good or fun or interesting or anything like

13 that?

14 **A.** Well, we feature apps.

15 **Q.** Sir, I understand you feature them. I'm asking about

16 whether you let them into the store on that basis or not.

17 **A.** No. We're not passing a moral judgment on them, if that's

18 what you're asking.

19 **Q.** Well, not just a moral judgment. You're not making

20 decisions about -- well, curation. You're not picking apps

21 that you think are ones that people will like more, for

22 example, or ones that will be of interest to people of a

23 particular -- who are interested in a particular type of

24 activity; right? You're just taking a whole bunch of apps

25 that come your way and deciding which ones comply with your

**COOK - CROSS - BORNSTEIN**

1    guidelines; right?

2    **A.**    We are deciding which ones apply to the guidelines and we

3    are applying the guidelines on an egalitarian basis.

4    **Q.**    Right.

5          And you're aware, though, there are other app stores out

6    there that do, in fact, engage in more curation in the form of

7    making judgment about which apps to have and not have on the

8    store based on content; correct?

9    **A.**    I -- I don't know.

10   **Q.**    Well, are you familiar with Good Old Games, for example?

11   **A.**    No.

12   **Q.**    Okay.  Are you familiar with an app store called SlideME?

13   **A.**    No.

14   **Q.**    Okay.

15         Are you aware that there can be stores with a subject

16   matter focus that can attract people tailored to their

17   individual interests?

18   **A.**    I -- I don't know such an app store.

19   **Q.**    Well, there is certainly not one on the iPhone; right?

20   **A.**    No.  I disagree.

21   **Q.**    There is one App Store on the iPhone, sir; correct?

22   **A.**    There is one App Store, but we recommend different apps

23   for people.

24   **Q.**    I understand that.

25         But there is just one App Store on the iPhone; right?

**COOK - CROSS - BORNSTEIN**

1    **A.**    There is only one App Store.

2    **Q.**    Okay.

3          And the only person who can make recommendations on the

4    App Store is Apple; right?

5    **A.**    Anybody can write about any app out in the wild.

6    **Q.**    Sure.  But the only people who can feature an app on the

7    App Store are the people who work at Apple.

8    **A.**    That's correct.

9    **Q.**    Okay.

10          **THE COURT:**    Is this a good breaking point?

11          **MR. BORNSTEIN:**    Of course.

12          **THE COURT:**    All right.  We will be standing in recess

13    for 20 minutes.

14          Mr. Cook, you may not speak to any lawyer, any party,

15    anyone about your testimony, given that you are currently on

16    cross-examination.  I'm sure you have plenty to do during

17    these 20 minutes.

18          **THE WITNESS:**    Thank you.

19          **THE COURT:**    Do not do anything relative to your

20    testimony.

21          Do you understand?

22          **THE WITNESS:**    Thank you.  Will do.

23          **THE COURT:**    We will stand in recess for 20 minutes.

24              (Recess taken at 10:16 a.m.)

25              (Proceedings resumed at 10:36 A.M.)

1          **THE CLERK:**  Remain seated.  Court is in session.

2    Come to order.

3          **THE COURT:**  Okay.  We are back on the record.

4        The record will reflect that Mr. Cook is on the stand,

5    Mr. Bornstein is at the podium, the parties are present.

6        You may continue.

7          **MR. BORNSTEIN:**  As soon as I finish wrestling the

8    binders.

9    **Q.**  All right.  Mr. Cook, before the break, we were talking

10   about users' value in the App Store.  Do you recall that?

11   And -- and app review.

12       I'll just ask you a fresh question.  I was just setting

13   the stage.

14       So it is your view that users want Apple to curate the App

15   Store; is that fair?

16   **A.**  Yes.

17   **Q.**  And that users value the fact that Apple engages in that

18   exercise, yes?

19   **A.**  Yes.

20   **Q.**  And in fact, you believe that users pay Apple to make

21   decisions for them; is that correct?

22   **A.**  I believe when they buy an iPhone, they expect certain

23   decisions to be made with them so that things become simple

24   and not complex.

25   **Q.**  Right.  You -- you -- do you believe that users pay Apple

1    to make decisions for them?

2    **A.**   It's probably not exactly the way I would say it, or

3    you've taken something out of context.

4    **Q.**   Well, let's take a look at your deposition, sir.

5    **A.**   Yes.

6            **MR. BORNSTEIN:**   Your Honor, do you have a copy?

7            **THE COURT:**   I believe I do.

8            **MR. BORNSTEIN:**   And I'm looking, Your Honor --

9    **Q.**   Do you have a copy, sir?

10   **A.**   Is it in one of the binders or --

11           **MR. BORNSTEIN:**   May Mr. Karin approach with a copy,

12   Your Honor, for the witness?

13          **THE COURT:**   You may.   And actually I don't think you

14   gave it to me.   But maybe the Apple folks did.

15           **MR. BORNSTEIN:**   Ms. Kloss has one if you would like.

16          **THE COURT:**   Yeah.   I do need it.   Thank you.

17      And page and line?

18           **MR. BORNSTEIN:**   Page 224 beginning at line 15.

19          **THE WITNESS:**   (Reviewing document.)

20          **MS. MOYÉ:**   224, what line?

21          **THE COURT:**   Well, so far he's stated something

22   consistent.   You can ask another foundational question.

23           **MR. BORNSTEIN:**   Well, I'll do it this way, Your

24   Honor.

25   **Q.**   Sir, when -- when people buy an iPhone and spend a

1    thousand dollars, or whatever it is, on an iPhone, you do, at

2    Apple, decide for them that they cannot download apps directly

3    from a developer to their own phone, correct?

4    **A.**  We do.

5    **Q.**  And you decide for them that they cannot go to a

6    third-party store other than your App Store to get an app for

7    their phone; is that right?

8    **A.**  Other than web apps.

9    **Q.**  Okay.

10   **A.**  They can -- they can do web apps themselves.

11   **Q.**  The only way -- you decide for them that the only way they

12   can get a native app is through your App Store, that right?

13   **A.**  That's -- that's correct.

14   **Q.**  But if people really value Apple's curation and Apple's

15   App Store, even if there are multiple stores, people could

16   still go shop at Apple, correct?

17   **A.**  Well, I would promise buying that iPhone would be gone.

18   **Q.**  Well, sir, the question --

19                    (Simultaneous colloquy.)

20   **BY MR. BORNSTEIN:**

21   **Q.**  The question, sir, is if there are multiple stores on the

22   iPhone and people really value the service that Apple provides

23   in curating the store, people who value it could go shop at

24   your store, correct?

25   **A.**  It seems like a decision that they shouldn't have to make.

COOK – CROSS / **BORNSTEIN**

1    **Q.**  Well, people can make that decision if they like your

2    store and they value what you're providing, then they can go

3    shop at your store, and if they want something else, then they

4    can make the choice to go somewhere else, right?

5    **A.**  When they -- when they buy an iPhone today, they just --

6    they buy something that just works.

7    **Q.**  Right, sir.  And it's -- is it is your -- is it your

8    understanding that people -- customers don't understand the

9    difference between the Apple App Store and a third-party store

10   if it were available on the phone?

11   **A.**  I think they buy into a total ecosystem when they buy an

12   iPhone.

13   **Q.**  But the question is whether they would understand the

14   difference, sir.  Would they understand the difference?

15   **A.**  I don't know.

16   **Q.**  All right.  Well, right now, for example, you have your

17   App Store on the phone, and you also have a Safari browser,

18   correct?

19   **A.**  Yes.

20   **Q.**  And as you said, people who want to get web apps can go to

21   their Safari browser and get them from any developer they

22   choose, correct?

23   **A.**  That's correct.

24   **Q.**  And they can also surf on a website and find all kinds of

25   horrible content on the web, correct?

1   **A.**   Yes.

2   **Q.**   All right.

3         And you trust that your consumers know the difference

4   between an app that comes from the App Store and an app or

5   content that comes from their browser, correct?

6   **A.**   I do.

7   **Q.**   Right.  And you don't know, however, whether people can

8   tell the difference between your App Store and a third-party

9   app store with other branding, right?  That's your testimony,

10  you don't know if people could tell?

11  **A.**   They've never had to do it before.

12  **Q.**   Right.  So you just can't --

13  **A.**   They bought into something that's an ecosystem system that

14  just works.

15  **Q.**   All right.  So you just can't be sure if people would be

16  able to make that distinction; is that your position?

17  **A.**   I'm saying I don't know.

18  **Q.**   All right.  And you don't know whether Apple's vast

19  marketing machine can educate consumers about the difference

20  between its App Store and other stores that might be

21  available; is that right?

22  **A.**   Seems like a complexity they shouldn't have to worry with.

23  **Q.**   If there were another app store or app stores available,

24  Apple would have to actually compete and persuade users that

25  it had the best offering, right?

1    **A.**  We'd have to differentiate in some way.  I don't know what

2    we would do.

3    **Q.**  Correct.  You'd have to differentiate in some way.

4         You testified earlier today to Ms. Moyé that no one else

5    would be as motivated as Apple to provide a safe and secure

6    store; is that right?

7    **A.**  Yes.  I believe that.

8    **Q.**  And you believe that no third party could do as good a job

9    as Apple in providing a safe and secure store; is that right?

10   **A.**  That's correct.

11   **Q.**  But you have no idea if that's true on the iPhone because

12   no one else has ever had the opportunity to do that, right?

13   **A.**  It's an experiment I wouldn't want to run.

14   **Q.**  Right.  And -- and therefore, sir, you have no idea

15   whether a third party could do a better job than Apple because

16   you've never given anybody the opportunity; isn't that right?

17   **A.**  I'm giving you my business judgment.

18   **Q.**  Right.  That's your judgment.  And the market could come

19   to a different judgment.  Isn't that right?  If there were a

20   market that you permitted to exist.

21   **A.**  The customers that have reached out to me on this topic

22   are all uniformly they want it to stay like it is because they

23   like the safety, security, and privacy.

24   **Q.**  And developers are in the same boat, all the developers

25   who've reached out to you like things the way it is too?

1    **A.**  I think some developers -- do love the way it is today.

2    **Q.**  And there are --

3    **A.**  And then you obviously have one that doesn't.

4    **Q.**  More than one, sir; isn't that right?

5    **A.**  There's a few.

6    **Q.**  Just a few?  That's -- that's your understanding?  There

7    are just a few developers who don't like the current system?

8    **A.**  That's the only ones that I know, yes.

9    **Q.**  Okay.  Well, how many developers, sir, have come in to

10   testify on Apple's behalf in this trial?

11   **A.**  I don't know.

12   **Q.**  Okay.  Would it surprise you to hear the answer is zero?

13   **A.**  No, it wouldn't surprise me.  I don't see that it would

14   be -- that there's a natural way to include them.

15   **Q.**  Okay.  Fortunately, we -- you have excellent counsel, sir,

16   who I'm sure could figure that out if there were developers

17   who were interested in supporting the system.

18        But as it stands, there's nobody else who has ever been

19   able to provide an app store on the iPhone and there's no way

20   to know, other than your business judgment, whether somebody

21   could do as good a job.  Fair?

22   **A.**  No.  I disagree.

23   **Q.**  Okay.  Let's turn --

24   **A.**  I disagree because --

25                      (Simultaneous colloquy.)

COOK – CROSS / **BORNSTEIN**

1   **Q.**  Let's turn to privacy, sir.

2       You can explain this to Ms. Moyé.  She will give you the

3   opportunity.

4       Let's turn to privacy which you've talked about a fair bit

5   today.  And you've said that Apple -- or you consider it one

6   of the most important issues of the century, correct?

7   **A.**  Yes.

8   **Q.**  And you said in other contexts -- I don't think you said

9   it today -- that Apple believes privacy is a basic human

10  right.

11  **A.**  Yes.

12  **Q.**  Okay.  Is it also the case that Apple believes that its

13  stance on privacy is a differentiator in the market for its

14  products?

15  **A.**  I think we're on an island on this one.  I think we care

16  more than others do.

17  **Q.**  And -- and do you think that helps you sell iPhones and

18  other products to consumers?

19  **A.**  I think there's some people that really want that and

20  therefore buy an iPhone because of it.

21  **Q.**  Right.  And it's -- and it's something that you at Apple

22  market to people to say, hey, we offer better privacy than

23  some of our competitors and that's a reason you should prefer

24  our device; isn't that right?

25  **A.**  For people that want privacy.

COOK – CROSS / **BORNSTEIN**

1  **Q.**  Yeah.

2  There are other app stores that could make a similar

3  commitment to privacy.  Fair?

4  **A.**  I haven't seen any that do.

5  **Q.**  That wasn't the question.

6  There are other people who could, right?  There's no

7  monopoly on privacy on Apple's part, correct?

8  **A.**  I don't know that anybody would.  They haven't thus far.

9  **Q.**  Apple doesn't have a unique ability to safeguard privacy,

10  does it?

11  **A.**  Sure, it does.

12  **Q.**  Apple doesn't have a unique ability to decide, other than

13  through its control of the system, which apps and which apps

14  are not safe and protective of user data and privacy, does it?

15  **A.**  We reject 40,000 a week.  And so there's a lot of work

16  that goes on in terms of doing that and there's a lot of

17  expertise that you build up over numerous years.

18  **Q.**  The 40,000 that you reject each week, they're not all on

19  privacy grounds, are they?

20  **A.**  No.  They would be for various different grounds.

21  **Q.**  They're on a variety of grounds.

22  And people who, if they had a choice, who value privacy

23  could decide to choose Apple because they value it, or they

24  could decide to choose somebody else's app store if they

25  thought somebody else was doing a better job, correct?

COOK – CROSS / BORNSTEIN

1   **A.**   Seems hypothetical.

2   **Q.**   Okay.  Well, there are circumstances, sir, in which

3   Apple's record on privacy is not perfect; is that fair?

4   **A.**   Our record is not perfect.

5   **Q.**   Right.  There are, for example, situations in which

6   Apple's stance on privacy does not coincide with its financial

7   interests, correct?

8   **A.**   I don't know what you're talking about.

9   **Q.**   Well, so, for example, there's a document in your binder,

10   which is labeled DX4400.

11   **A.**   Which binder?

12   **Q.**   The one that I gave you, number 1, I hope.

13   **A.**   (Reviewing document.)

14           **MR. BORNSTEIN:**  And this is in evidence, Your Honor.

15           **THE WITNESS:**  What folder should I look at?

16           **MS. MOYÉ:**  Is it the small binder or the big binder?

17   **BY MR. BORNSTEIN:**

18   **Q.**   It's DX4400, sir.

19           **MS. MOYÉ:**  Mr. Bornstein, which binder is it in?

20           **MR. BORNSTEIN:**  It's number 1, as I said.

21   **Q.**   Just let me know when you're there, please, Mr. Cook.

22   **A.**   I'm there.

23   **Q.**   Sorry.  You said you were there?

24   **A.**   Yes.

25   **Q.**   Great.  Then you beat me.

1      DX4400 -- is a document that we discussed some with

2   Mr. Schiller the other day and so we don't need to spend too

3   much time on it.

4      But do you recognize what this is?

5   **A.**  No.

6   **Q.**  All right.

7      Do you recognize -- are you aware that there is an App

8   Store and privacy policy that is made available to users?

9   **A.**  Sure.

10  **Q.**  Okay.

11         **MR. BORNSTEIN:**  And maybe we can put this on the

12  screen, Mr. Rudd, so it will help me as well.

13                    (Exhibit published.)

14  **BY MR. BORNSTEIN:**

15  **Q.**  If you look at the top of the second page -- oh, I guess

16  actually I guess it's on the bottom of the very first page,

17  there's something that says "Improving the Stores."

18      Do you see that?

19  **A.**  (Reviewing document.)

20      I see "Improving the Stores."

21  **Q.**  And it indicates that to improve the experience in the

22  stores, Apple will collect information about your usage of the

23  stores, including when you open or close a store, what

24  contents you search for, and the content you view and

25  download.

1    Do you see that?

2    **A.**  I do.

3    **Q.**  And there is other -- so when I go to my phone -- got my

4    iPhone still -- when I go to my phone and I open the store,

5    Apple will log the fact that I have opened it at that point in

6    time, right?

7    **A.**  I'm not familiar with it.

8    **Q.**  Okay.  So you don't know whether when I type in a search,

9    like for -- for running or some other activity, that Apple

10    will log that so that it can provide personalized ads to me in

11    the store and other information that's tailored for me based

12    on my searches?

13    **A.**  Yeah, I'm not familiar.

14    **Q.**  Okay.

15    Let's try a different circumstance, then, where Apple's --

16    well, somebody -- let me, before I do that, sir.

17    Somebody else who we're going -- who is going to create an

18    app store could choose to collect less data about its users

19    than Apple does, correct?

20    **A.**  I don't know.  I think we generally collect the minimum

21    amount that we can.

22    **Q.**  And someone else could choose not to collect, for example,

23    information about what content you search for and the content

24    that you view and the content that you download, correct?

25    **A.**  If they did, they couldn't make recommendations.

COOK – CROSS / **BORNSTEIN**

1    **Q.**  All right.  But someone else could make that choice if

2    they value privacy, sir, right?

3    **A.**  It seems very hypothetical.

4    **Q.**  All right.  But somebody could do that.  You've chosen to

5    get this information so that you can make recommendations.

6    Somebody else could make a different choice; isn't that right?

7    **A.**  I don't know.

8    **Q.**  Okay.  Well, let's talk about another circumstance

9    relating to privacy, which is your iCloud service.  Apple has

10   an iCloud service, correct?

11   **A.**  We do.

12   **Q.**  And users can store data for a fee in -- in iCloud,

13   correct?

14   **A.**  They could also do it for free.

15   **Q.**  Depending on how much data they have, right?

16   **A.**  That's correct.

17   **Q.**  Okay.

18       Now, in China, the iCloud service is operated by a Chinese

19   company called GCBD; is that right?

20           **MS. MOYÉ:**  Objection, relevance.

21           **THE COURT:**  Overruled.

22           **THE WITNESS:**  Yes.

23   BY MR. BORNSTEIN:

24   **Q.**  Okay.  And GCBD is a company that is owned, at least in

25   part, by Chinese government entity, correct?

1    **A.**   They're a state-owned entity.

2    **Q.**   Okay.  And you have a user agreement, which we can -- I

3    think is in -- in your binder at PX1678.

4    **A.**   Which binder?

5    **Q.**   Same binder, number 1.

6    **A.**   (Reviewing document.)

7         **MR. BORNSTEIN:**  And we can call that up on the

8    screen, Mr. Rudd.

9                        (Exhibit published.)

10        **MR. BORNSTEIN:**  This is a public document for which

11   there's no confidentiality issue, Your Honor.

12   **Q.**   And, Mr. Cook, are you familiar with the iCloud operated

13   by GCBD terms and conditions?

14   **A.**   Peripherally, yes.

15   **Q.**   I'm sorry.  You said?

16   **A.**   Peripherally.

17   **Q.**   Peripherally.  Got it.

18        **MR. BORNSTEIN:**  Your Honor, we'd move PX1678 into

19   evidence.

20        **THE COURT:**  Any objection?

21        **MS. MOYÉ:**  No objection.

22        **THE COURT:**  Admitted.

23      (Plaintiff's Exhibit PX1678 received in evidence)

24        **MR. BORNSTEIN:**  Thank you, Your Honor.

25   **Q.**   Now, this document, sir, you can see in the second line

COOK – CROSS / **BORNSTEIN**

1   says that it governs your use of the iCloud product software,

2   services, and websites.  Correct?

3   **A.**  (Reviewing document.)

4       Yes.

5   **Q.**  And if you go to further down on the page, you will see in

6   the kind of last sentence of the second paragraph, it reads

7   that when iCloud is enabled, your content will be

8   automatically sent to and stored by GCBD, correct?

9   **A.**  Yes, that's what it says.

10  **Q.**  All right.  And so users' content is sent to and stored by

11  a Chinese state-owned entity for these iCloud users, correct?

12  **A.**  Correct.

13  **Q.**  And the data can be accessed and shared with GCBD,

14  correct?

15  **A.**  I'm not sure what their rules of that are.

16  **Q.**  Okay.

17      Apple also complies with requests from the Chinese

18  government to take down apps off of the App Store; isn't that

19  right?

20  **A.**  Occasionally we have apps on the store that are illegal

21  that we have to remove.

22  **Q.**  Okay.  So for example, Apple has taken down news apps

23  because they are contrary to Chinese government policy,

24  correct?

25  **A.**  Some.

1   **Q.**  And in fact, that's not an unusual occurrence, is it?

2   **A.**  I wouldn't say it's a regular occurrence.

3   **Q.**  All right.  Well, let's take a look at PX1659, please.

4           **MR. BORNSTEIN:**  Now let's not put this one up on the

5   screen because it was marked as highly confidential, and we

6   don't have Apple's position on this.

7           **THE WITNESS:**  (Reviewing document.)

8           **THE COURT:**  So this is not the document that Judge

9   Hixson dealt with?

10          **MR. BORNSTEIN:**  This is not the document that he

11  dealt with, Your Honor.

12          **THE COURT:**  All right.

13          **MR. BORNSTEIN:**  And, Your Honor, I suppose while

14  Mr. Cook is looking at the document, I could use guidance from

15  the Court on whether you would prefer that I just save this

16  for a sealed session or whether -- and maybe guidance from

17  Apple on whether --

18          **THE COURT:**  I've never seen it.

19          **MR. BORNSTEIN:**  -- we need to maintain

20  confidentiality.

21          **THE COURT:**  I've never seen it.

22          **MS. FORREST:**  Okay.

23          **THE COURT:**  So I don't have a position.

24          **MS. MOYÉ:**  Your Honor, I think we have designated it

25  confidential and so I believe it should be done in a sealed

COOK – CROSS / **BORNSTEIN**

1    session.

2              **THE COURT:**  Okay.

3    BY MR. BORNSTEIN:

4    **Q.**  That's fine.  We'll –– we'll save this now for –– for

5    confidentiality reasons, Mr. Cook.

6              **THE COURT:**  You do understand you're under an hour

7    total, right?

8              **MR. BORNSTEIN:**  I'm sorry?

9              **THE COURT:**  Your team is under an hour total in time

10   left in trial.

11             **MR. BORNSTEIN:**  Yes, I do.  Thank you, Your Honor.

12   BY MR. BORNSTEIN:

13   **Q.**  Mr. Cook, when –– when Apple agrees to share user data

14   with a Chinese state-owned entity and when Apple agrees to

15   take apps down off the App Store, that's a situation where its

16   commitment to privacy and its financial interests are in

17   conflict with one another, correct?

18   **A.**  No.

19   **Q.**  Okay.

20      So you –– you're not thinking about the money, to use your

21   phrase from earlier today, when you choose to comply with

22   these Chinese requirements; is that right?

23   **A.**  We have to comply with the laws in each of the

24   jurisdictions that we are –– operate in.

25   **Q.**  Well, sir, if there were multiple app stores and there

COOK – CROSS / **BORNSTEIN**

1   were direct distribution, governments would not be able to

2   come to Apple, to one source, to engage in this kind of

3   censorship, would they?

4   **A.**  If there were multiple app stores, they would go to

5   multiple people, I suppose --

6                    (Simultaneous colloquy.)

7   **BY MR. BORNSTEIN:**

8   **Q.**  Well, because --

9   **A.**  If you look at the Android stores, they do the same thing

10   with the Android stores.

11   **Q.**  Well, because people pay you to make decisions for them,

12   governments can come to you to make decisions for their

13   citizens; isn't that right?

14   **A.**  Governments have the right to pass laws for their

15   citizens.

16   **Q.**  Well, Apple doesn't have to follow or agree with or comply

17   with laws that it believes to be unjust or inconsistent with

18   its commitment to privacy, does it?

19   **A.**  We have to comply with the laws in the jurisdictions that

20   we operate in.

21   **Q.**  Sure.  But you make a decision to continue to operate in

22   those jurisdictions.

23   **A.**  Yes, and --

24   **Q.**  Correct?

25   **A.**  -- I strongly believe it's in the best interests of the

COOK – CROSS / **BORNSTEIN**

1  people there that we do operate.

2  **Q.**  Yes, you've said that previously, that it's better to be

3  there and -- rather than yell at the sidelines, I think was

4  your phrase, correct?

5  **A.**  That sounds like something I would say.

6  **Q.**  Okay.

7     Not every company makes that decision though, right?  Some

8  companies choose to take a principled stand of another sort

9  and not engage in that kind of decision-making.  Fair?

10  **A.**  I know of nobody in the smartphone business that is not

11  selling in China.

12  **Q.**  All right.

13     Well let's take a look, if you would, at Exhibit 16 --

14  PX1667.

15  **A.**  (Reviewing document.)

16  **Q.**  Do you have that, sir?

17  **A.**  I do.

18  **Q.**  Okay.  And this is an email that went to Mark Grimm at

19  Apple.  Do you know Mr. Grimm?

20  **A.**  I do not.

21  **Q.**  Okay.

22     You can see further -- it's the bottom of the page,

23  there's an email from Mr. Sweeney at Epic to -- to Mr. Grimm.

24  It says "Dear Mark."  Do you see that?

25  **A.**  I see the "Dear Mark."

1    **Q.**   Okay.  I take it you've never seen this document before?

2    **A.**   No.  I'm not on copy of it and have never seen it.

3    **Q.**   All right.  Well, let me just direct you, then, to the

4    second page, the last paragraph there.

5          **MR. BORNSTEIN:**  If you can put it on the screen,

6    Mr. Rudd, if you can.

7                          (Exhibit published.)

8    **BY MR. BORNSTEIN:**

9    **Q.**   There is an email from Mr. Sweeney that says:

10        "There are deep perils in Apple operating the only allowed

11   software distribution facility on iOS as it allows repressive

12   regimes to demand developer participation in their

13   surveillance and censorship programs using Apple as a proxy

14   for enforcement.

15        "This peril does not exist on other general computing

16   platforms such as Android, Windows, Mac, and Linux in which

17   users have the freedom to install software directly from

18   sources of their own choosing."

19        Do you see that?

20   **A.**   I see it written.

21   **Q.**   Okay.  And but this concept never made it to you at Apple?

22   **A.**   I've never seen this note before.

23   **Q.**   And have you heard this concept before, sir?

24   **A.**   No.

25   **Q.**   No.

1        And are you aware, sir, that Epic took a position where it

2    refused to engage in a –– in a business context where it was

3    going to be required to compromise user privacy and data?

4    **A.**   I'm not aware.

5    **Q.**   All right.  Look quickly, if you would, at the first page

6    of the document where Mr. Sweeney writes to Mr. Grimm at

7    Apple:

8        "We've looked into the requirements for obtaining a

9    Vietnam license for Fortnite under Decree 72 and have decided

10   that we can't ethically comply.  Obtaining the license would

11   force Epic to take actions violating the basic human rights of

12   our users and would impose censorship over Epic's own right to

13   creative expression."

14       Do you see that?

15   **A.**   I do not.  Where –– where are you?

16   **Q.**   I am on the bottom of the first page.  And it's on the

17   screen in front of you as well, sir.

18   **A.**   (Reviewing document.)

19       I see it.

20   **Q.**   All right.  And you weren't aware that Epic had taken

21   this –– taken this position?

22   **A.**   No, I'm not.

23   **Q.**   And I guess you disagree, you think Epic should –– should

24   be in Vietnam and –– and try to effect change rather than yell

25   from the sidelines.

1    **A.**  I don't take a judgment on what other people should do.

2    **Q.**  Fair enough.

3         Is it your view that there are no benefits whatsoever to

4    users in being allowed to download software from outside the

5    Mac App Store on their Macintosh computers?

6    **A.**  I think the Mac and the iPhone are very different.

7    **Q.**  Okay.  Question, though, is do you see any benefit at all

8    to users of the Macintosh in being allowed to download apps

9    from outside the Mac App Store?  Are there any benefits at

10   all?

11   **A.**  Today not all of the apps are on the Mac App Store, and so

12   there would be an availability point there.

13   **Q.**  Okay.  And do you think there are any benefits to users in

14   having a design that enables them to choose apps that are

15   outside the Mac App Store?

16   **A.**  I think it would be a lot safer if we did it the other

17   way.

18   **Q.**  So but the consumer choice element is not, in your view, a

19   benefit to Mac users?

20   **A.**  Well, today not all apps are on the store, and so there

21   might be a user benefit in having access to something that's

22   not on the store.

23   **Q.**  Are you aware, sir, that your counsel --

24        **MR. BORNSTEIN:**  Ooh.  *Gesundheit*, Your Honor.

25        **THE WITNESS:**  Bless you.

COOK – CROSS / BORNSTEIN

**BY MR. BORNSTEIN:**

**Q.** Are you aware, sir, that your counsel in this case has made the argument that accepting Epic's position would have the effect of also condemning the business models of the various game consoles?

**A.** Of condemning?

**Q.** Of -- of finding them to be unlawful.

**A.** It would make sense to me that that would be the case.

**Q.** You don't know one way or the other whether counsel has made that argument?

**A.** No.

**Q.** Okay.

And when I'm talking about the game consoles, you understand me to mean Xbox and PlayStation and the Switch, yes?

**A.** Correct.

**Q.** And now Xbox is owned by Microsoft?

**A.** Yes.

**Q.** And Microsoft, are you aware, is one of this third parties that came into court to testify here?

**A.** I am aware.

**Q.** And Microsoft -- the Microsoft witness who came is someone who had responsibilities for the Xbox.  Were you aware of that?

**A.** I haven't listened to the testimony.

1    **THE COURT:**  So Microsoft itself did not come in, as I

2    understood it.  She came in in her personal capacity.

3    **MR. BORNSTEIN:**  That's correct.  I -- yes, Your

4    Honor.

5    **Q.**  There was an individual from Microsoft who came in and

6    testified who was someone who had responsibility for the Xbox

7    in her job, correct?

8    **A.**  I have not listened to the testimonies.

9    **Q.**  Okay.  And you weren't aware one way or the other whether

10   there was such a person; is that correct?

11   **A.**  I knew somebody from Microsoft is coming in.

12   **Q.**  All right.  This person from Microsoft who's come in to

13   testify, fair to assume that at least she doesn't believe that

14   accepting Epic's position would wind up dooming the Xbox

15   business in its current model?

16   **MS. MOYÉ:**  Object to the form, foundation.

17   **THE COURT:**  Sustained.

18   **MR. BORNSTEIN:**  All right.

19   **Q.**  Sir, you testified before -- we talked about your

20   testimony at the House Judiciary Committee last summer already

21   once, correct?

22   **A.**  Yes.  You brought up a clip from it.

23   **Q.**  Yes.

24   Another question you were asked at the House Judiciary

25   Committee was what's to stop Apple from increasing its

1  commissions to 50 percent.  Do you recall that?

2  **A.**  No.  Could you point me to it?

3  **Q.**  Sure.

4         **MR. BORNSTEIN:**  I'll ask Mr. Rudd once again to play

5  the –- the clip of PX1725.

6         (Video recording was played.)

7  **BY MR. BORNSTEIN:**

8  **Q.**  And, sir, that was your testimony in Congress?

9  **A.**  Yes.

10  **Q.**  Okay.  And you said that:  We've never increased

11  commissions in the store.  Right?  That was your testimony,

12  correct?

13  **A.**  Yes, that's what I said.

14  **Q.**  Okay.  And it's true that Apple's never actually increased

15  the commission rate in the store, but Apple has expanded the

16  scope of transactions to which that commission applies,

17  correct?

18  **A.**  We've announced new product features, if that's what you

19  mean.

20  **Q.**  Well, for example, sir, prior to the launch of the IAP

21  system in 2009, developers were able to offer in-app commerce

22  in their own apps without paying a commission to Apple,

23  correct?

24  **A.**  Not to my knowledge.

25  **Q.**  All right.  Well, let's take a look, sir, at PX1701 in

1  your binder.

2  **A.**  (Reviewing document.)

3  **Q.**  Do you have 1701?

4  **A.**  I do.

5  **Q.**  Okay.  And do you know Ms. Pruden who is the recipient of

6  this email?

7  **A.**  I do.

8  **Q.**  And what's her role at Apple?

9  **A.**  She works in the worldwide developer relations area.

10  **Q.**  Okay.

11     And Ms. Pruden, in February of 2009, receives this email

12  regarding Skyscape.  Do you see that?

13  **A.**  Yes, I see it.

14  **Q.**  Okay.  And if you look on the second page of –- of the

15  document, you'll see it's a little hard to read.  I

16  understand.  But you'll see a series of screenshots from this

17  Skyscape app.  Do you see that?

18  **A.**  (Reviewing document.)

19     I –- I see it, but I can't see it.

20  **Q.**  Well, maybe we can have Mr. Rudd –-

21  **A.**  Is it possible to blow it up?

22  **Q.**  –- blow up that piece of it on the screen.

23        **MR. BORNSTEIN:**  Let's just keep it to that page and

24  we can focus in so we don't have anything confidential here.

25  Although it is from 2009.  And I'm on page 2, Mr. Rudd.

1          Do we not have that one?  Okay.

2     **Q.**  Well, I'll ask you, sir, I'll show you the part I'm

3     looking at.  It may take a little bit of squinting, but

4     fortunately you've got your glasses.

5          **THE COURT:**  So you have -- you can use the ELMO.  Old

6     school.

7          **MR. BORNSTEIN:**  I think we can get through it, Your

8     Honor.

9          **THE COURT:**  Okay.

10         **MR. BORNSTEIN:**  But thank you.

11    **Q.**  In the -- the top left corner of page 2, do you see

12    there's a section that says "Violations."

13    **A.**  (Reviewing document.)

14    **Q.**  Under the word Skyscape.

15    **A.**  I see it.

16    **Q.**  All right.  And it indicates that there's a store within

17    the app.  App on iPhone is free.  And then you purchase all

18    your content directly from Skyscape from within the app.  Do

19    you see that?

20    **A.**  I see it written.

21    **Q.**  Okay.  And were you aware that that was something that

22    developers could do, in fact, in February of 2009 --

23         **MS. MOYÉ:**  Objection.

24    BY MR. BORNSTEIN:

25    **Q.**  -- before the launch of IAP?

1          **THE COURT:**  He can --

2          **MS. MOYÉ:**  Objection, foundation.

3          **THE COURT:**  Overruled.  He can answer if he knows.

4          **THE WITNESS:**  I don't know.  When I -- as I look at

5   this today, it's not clear that it's on the store.  It looks

6   like it's going through a review.

7   BY MR. BORNSTEIN:

8   **Q.**  Well, let's look, then, sir --

9          **MR. BORNSTEIN:**  First of all, I'd move 1701 into

10  evidence, Your Honor.

11         **THE COURT:**  No objection?

12         **MS. MOYÉ:**  No objection subject to our hearsay

13  reservation, Your Honor.  Portions of this appear to be

14  prepared by third parties.

15         **THE COURT:**  Well, this looks like a business record.

16  Why is it not a business record?

17         **MS. MOYÉ:**  It's not clear whether this is

18  Apple-generated content with Sky -- Skyscape versus a

19  submission by Skyscape created by them.

20      The cover email is certainly a business record, Your

21  Honor.

22         **THE COURT:**  Okay.

23         **MR. BORNSTEIN:**  I assume --

24         **THE COURT:**  Admitted.  Admitted with the limitations

25  that I have on all the other hearsay documents attached.

1          (Plaintiff's Exhibit 1701 received in evidence)

2          **MR. BORNSTEIN:**  That's fine, Your Honor, although I

3    would argue that Skyscape certainly wasn't the one who

4    indicated that there was a violation.  That wouldn't make much

5    sense.

6          **THE COURT:**  So I don't know.

7          **MR. BORNSTEIN:**  I understand.

8          **THE COURT:**  And like I said, you know, we have rules

9    in litigation.  We follow the rules.

10          **MR. BORNSTEIN:**  Absolutely, Your Honor.

11   **Q.**  Well, let me turn you, then, given your answer, sir, to

12   1709, PX1709.

13   **A.**  (Reviewing document.)

14   **Q.**  Do you have that?

15   **A.**  Yes.  It's in front of me.

16   **Q.**  Great.  And do you know the recipient of this email,

17   Mr. Haun, C.K. Haun?

18   **A.**  Yes.  He was a long-time employee that I believe recently

19   retired.

20   **Q.**  Okay.

21          And the email to Mr. Haun, referring to an app called

22   Unbound Medicine, states that "The Unbound Medicine app used

23   to have an order form within the app which was actually a web

24   kit view loading an optimized website.  They have, as

25   instructed by us, changed that so now their app instead

1    launches Safari and the customer proceeds on the Unbound

2    Medicine website."

3        Do you see that?

4    **A.**  I do see it.

5    **Q.**  All right.  So safe to say this app at least was up on the

6    store, correct?

7            **MS. MOYÉ:**  Object to the form, foundation.

8            **THE WITNESS:**  It's not clear to me that it is.

9    BY MR. BORNSTEIN:

10   **Q.**  Well, sir, look down at the bottom of this page where

11   there is sort of a three-paragraph email.  Do you see that?

12   **A.**  Is it on the second page or --

13   **Q.**  No.  First -- first page, sir?

14   **A.**  First page.

15       (Reviewing document.)

16   **Q.**  It says, "Have you had a chance to step through the app as

17   it is now appearing on the App Store"?

18   **A.**  I see that.

19   **Q.**  And then it goes on to say, "It looks like it continues to

20   violate the T's and C's, specifically with in-app commerce.

21       Do you see that?

22   **A.**  I see it, yes.

23   **Q.**  Okay.  Does this refresh your recollection, sir, that

24   in-app commerce was available in apps in 2009 before the

25   launch of the IAP functionality?

COOK – CROSS / **BORNSTEIN**

1  **A.**  No, it doesn't refresh my memory.

2        **MR. BORNSTEIN:**  Your Honor, we'd move PX1709 into

3  evidence.

4        **THE COURT:**  No objection?

5        **MS. MOYÉ:**  No objection, Your Honor.

6        **THE COURT:**  Admitted.

7     (Plaintiff's Exhibit PX1709 received in evidence)

8  **BY MR. BORNSTEIN:**

9  **Q.**  All right.  And incidentally, sir, this says that Apple

10  instructed Unbound Medicine to change the app so it instead

11  launches Safari for a purchase.

12     See that in the top email?

13  **A.**  (Reviewing document.)

14     I see it in writing.

15  **Q.**  Okay.  So that's like Apple hanging that sign saying go

16  purchase this at Best Buy, isn't it?  Saying go buy this in

17  Safari instead of doing it in the app?

18  **A.**  I'm not familiar with this email at all.  I'm not on copy

19  of it.

20  **Q.**  Okay.  But you are aware now, sir, that this would not be

21  permitted to have a link to go to Safari to make a purchase,

22  correct?  Under your current rules?

23  **A.**  That's correct.

24  **Q.**  All right.

25     And your counsel asked you also about emails and whether

1   you can communicate by email to -- to consumers, correct?

2   **A.**   She did.

3   **Q.**   And you're -- you're aware that your current guideline

4   states that apps cannot, either within the app or through

5   communications sent to points of contact obtained from account

6   registration within the app, encourage users to use a

7   purchasing method other than in-app purchase.

8        Are you aware of that rule?

9   **A.**   As I testified earlier, you can mass market.

10  **Q.**   Okay.  But you can't mass market to emails that were

11  obtained from account registration within the app, correct?

12  **A.**   Sure you can.

13  **Q.**   So if I -- well, so is this an incorrect guideline that's

14  now no longer enforced?

15  **A.**   I think we may interpret that differently than you did.

16  **Q.**   Well, if somebody signs up to an app and shares their

17  email through account registration in the app, you can't then

18  send that person a communication encouraging them to purchase

19  elsewhere, correct?

20  **A.**   You can't do something like in one day you get the email

21  address and then the next day you always send that person a

22  direct marketing.  But you can -- you can direct market to

23  your base which includes that email, assuming the customer

24  gave you the email.

25  **Q.**   Right, as long as it doesn't come from account

1   registration in the app.  You have to get -- the developer has

2   to get the email through some other source, correct?

3   **A.**  If -- if the developer gets the email from the customer,

4   right, then they can use it.

5   **Q.**  Right.  But if they get it through registering on the app,

6   they can't, correct?

7   **A.**  I'm not sure what you mean by "registering on the app."

8   **Q.**  Well, the -- the language -- the language will speak for

9   itself in your guideline, sir.

10      Let me move to a -- to a different subject.

11          **MR. BORNSTEIN:**  Actually, Your Honor, I think I

12   should probably reserve some time for the sealed section.

13          **THE COURT:**  I was going to say you're -- you're at

14   33 minutes, so you might --

15          **MR. BORNSTEIN:**  I'll reserve some time for the sealed

16   section.

17          **THE COURT:**  Okay.

18          **MR. BORNSTEIN:**  And I'll pass the witness.

19          **THE COURT:**  All right.  So you want to do the cross

20   first with respect to --

21          **MS. MOYÉ:**  Yes, Your Honor.

22          **THE COURT:**  -- the public session?

23          **MS. MOYÉ:**  Yes, if that would be --

24          **THE COURT:**  Go ahead.

25          **MS. MOYÉ:**  -- acceptable.

1        Thank you.

2                        **REDIRECT EXAMINATION**

3    **BY MS. MOYÉ:**

4    **Q.**  Hello again, Mr. Cook.

5    **A.**  Hello there.

6    **Q.**  Just a few questions on subjects that were just covered by

7    Epic's counsel.

8        Let's start first with the questioning about search ads.

9    Was the introduction of search ads intended to help with app

10   discovery, sir?

11   **A.**  It was.

12   **Q.**  And when that search ad feature was offered at WWDC in

13   2016, were there other features that were offered to improve

14   discovery?

15   **A.**  My recollection was that that was the year that we

16   announced the "Today" tab which was a -- a way to do editorial

17   and feature apps.

18       I think it also changed the recommendation engine and some

19   other things that that would help in discovery as well.

20   **Q.**  Was there a filtering of installed apps that was announced

21   at WWDC also, in 2016, do you recall?

22   **A.**  A filtering of installed apps.  I don't recall.

23   **Q.**  Was there an effort made, and then we talked about app

24   discovery in the 2015, 2016 --

25   **A.**  Right.

COOK – REDIRECT / MOYÉ

1   **Q.**   -- time frame to improve the number of apps in the store,

2   to filter or --

3   **A.**   Yes.

4   **Q.**   That's the question I'm getting at.

5   **A.**   Yes, I think we went through quite a process to -- to take

6   out some of the apps in the store which would inherently

7   improve discovery as well.

8   **Q.**   Was there, at some point, a "Games" tab added to the App

9   Store?

10  **A.**   Yes, the separation of games and apps was also another way

11  to increase discovery.

12  **Q.**   Thank you, sir.

13      And then let's talk about the questioning about the Google

14  agreement.

15      Does Apple have agreements with other search engines as

16  well?

17  **A.**   We do.

18  **Q.**   And do those agreements have similar revenue to the Google

19  agreement?

20  **A.**   I -- I believe so.

21  **Q.**   And why does Apple make Google the default?

22  **A.**   Because they're the best search engine.

23  **Q.**   Thank you, sir.

24      Let's talk a little bit about the financial documents.

25      2385 is in my binder.

1          2392 is in my binder.

2     **A.**   (Reviewing document.)

3     **Q.**   And then there's a 2391 in the Epic binder.

4     **A.**   (Reviewing document.)

5          I've got 2385 in front of me, if that helps.

6     **Q.**   Maybe let's start with 2391 which is in Epic's big binder,

7     their --

8     **A.**   Okay.

9     **Q.**   -- binder 1.  It's their really big one.  It's the one

10    Mr. Bornstein was just asking you about.

11    **A.**   (Reviewing document.)

12         Okay.  I'm on 2391.

13    **Q.**   Now, Mr. Bornstein asked you whether this 2391 was the

14    same kind of document that we had looked at, 2385 and 2392.

15    Do you recall that line of questioning?

16    **A.**   I think he asserted it was, but I don't really see it like

17    that.

18    **Q.**   Could you explain?  Is it the same kind of document?

19    **A.**   No.  This is a quarterly P&L update for the company.  And,

20    yes, it has some other things in it, but -- but this is more

21    of a regular document versus this other thing was a

22    benchmarking kind of document, looking at other companies and

23    their operating margins, and that sort of thing.

24    **Q.**   Thank you, sir.

25         And who reviewed 2391?

COOK – REDIRECT / MOYÉ

1   **A.**   (Reviewing document.)

2   **Q.**   If you can recall.

3   **A.**   I don't recall this exact meeting.  But, generally, this

4   would have a broader audience to it than the other one.

5   **Q.**   Thank you, sir.

6        And there was questioning about whether 2385 and 2392 were

7   regular presentations.  Do you recall that?

8   **A.**   Yes.

9   **Q.**   Are there any other presentations like that that you're

10   aware of?

11   **A.**   I don't recall any.  I think it was the first time that it

12   happened.

13   **Q.**   And both of those were dated in September 2019?

14   **A.**   I think so, yes.

15   **Q.**   And have you seen any documents like that since

16   September 2019?

17   **A.**   I don't recall.

18   **Q.**   Mr. Bornstein asked you a lot of questions about whether

19   you understood what Epic's expert, Mr. Ned Barnes, had done in

20   his expert work.  Do you recall that?

21   **A.**   Yes.

22   **Q.**   Did Mr. Ned Barnes work at Apple in the 2019 time period?

23   **A.**   Not to my knowledge.

24   **Q.**   Did Mr. Ned Barnes provide any input into the three

25   profitability documents we looked at, 2385, 2391, and 2392?

COOK – REDIRECT / MOYÉ

1    **A.**   No.

2    **Q.**   Who, sir, do you believe is in a better position to give

3    truthful testimony to the Court on the meaning of those three

4    documents, you or Mr. Ned Barnes?

5    **A.**   I –– I am.   I was in the meeting.

6    **Q.**   Do those documents contain fully burdened P&L information

7    for the App Store as a stand-alone business unit?

8    **A.**   They do not.

9    **Q.**   And are you concerned at all that Mr. Ned Barnes came in

10   and said that he could compare some numbers in at least two of

11   those documents, 2385 and 2392, to publicly reported

12   documents?

13   **A.**   I don't see how that would be possible because the

14   publicly reported numbers are more of gross margin at the

15   services level, not operating margin per service type.

16   **Q.**   You were asked also some questions about offering Epic the

17   ability to come back into the App Store after it deliberately

18   breached its agreements with Apple.   Do you recall that

19   testimony?

20   **A.**   Yes.

21   **Q.**   And I believe you explained that you considered that

22   conduct to be malicious; is that right, sir?

23   **A.**   That's correct.

24   **Q.**   Do you still consider it to be malicious?

25   **A.**   I do.

1  **Q.**  Why did Apple offer Epic the opportunity to come back into

2  the store?

3  **A.**  Because we thought it would be the right thing for the

4  user and that the user was being put in the middle here of a

5  business dispute, and the -- that was a terrible thing to do

6  from the -- from the beginning.

7     And so we thought the business dispute should be settled

8  in -- in court, if it had to, like we've wound up, but not

9  have the user suffer from that.

10  **Q.**  Was the offer that -- that was made to Epic, "Epic, you

11  can come back into the App Store but continue malicious

12  conduct"?

13  **A.**  No, of course not.  They would have to commit to abiding

14  by the rules.

15  **Q.**  You were asked some questions about a Schedule 2 to the

16  developer program license agreement.  I think it's number

17  2943.  Do you remember that?  It's in the big Epic binder.

18  **A.**  29 -- let me just make sure of the -- I recall it

19  correctly.

20     Oh, this is the one I was asked questions about

21  termination?

22     (Reviewing document.)

23  **Q.**  Correct.

24  **A.**  Yeah, I have it in front of me.

25  **Q.**  Do you know whether or not Japanese law required the

1  addition of the language that Mr. Bornstein asked you about?

2        **MR. BORNSTEIN:**  Objection, foundation.

3        **THE COURT:**  Well, that's -- so lay some foundation.

4  Sustained.

5  **BY MS. MOYÉ:**

6  **Q.**  Sir, do you know what motivated the changes to that

7  license agreement provision that Mr. Bornstein asked you

8  about?

9  **A.**  My understanding is there was something in Japanese law

10  that required it.

11  **Q.**  Thank you.

12        You were asked about whether other companies could perform

13  app review as well as Apple.  Do you remember that line of

14  questioning?

15  **A.**  Yes.

16  **Q.**  Sir, do you believe Apple has a unique ability to protect

17  user privacy on iOS devices?

18  **A.**  I strongly feel that we do.

19  **Q.**  Can you explain why, sir?

20  **A.**  Well, we've been at the app review for -- since 2008.

21  We've built up a number of tools and we build up the -- the

22  human expertise to evaluate it.  We sort of -- we know a lot

23  of the things to look for.

24        And in terms of the operating system itself, I think the

25  results speak for itself in terms of the -- the malware that

COOK – REDIRECT / MOYÉ

```
1    hits iOS versus the malware that hits other -- other operating
2    systems.
3    Q.  Thank you, sir.
4        And then you were asked some questions about China and
5    Chinese law.  Do you remember that?
6    A.  I do.
7    Q.  Sir, does Apple have an option whether it can or cannot
8    decide to follow Chinese law?
9    A.  No.
10   Q.  Does any company, to your knowledge, have the option to
11   defy Chinese law?
12   A.  No.  And -- it -- a little bit more here.  We ship the
13   same iPhone in China that we ship everywhere else in the
14   world.  It has the same encryption on it.  iMessage is the
15   same.  FaceTime is the same.  And so the product, other than
16   the cloud piece, is the same.
17   Q.  And you were asked about complying with requests to take
18   down from the Chinese government.  Do you recall that line of
19   questioning?
20   A.  I do.
21   Q.  And in that situation, what is your understanding of why
22   the Chinese government is making that request?
23   A.  Because in their view it's not lawful.
24   Q.  And are you asked to take down apps based on legal
25   requests in other jurisdictions as well?
```

COOK – REDIRECT / MOYÉ

1   **A.**   Yes.

2   **Q.**   And do you make any difference in determining whether

3   you're going to follow the law in China versus any other

4   jurisdiction?

5   **A.**   No.  We have to follow the law in each jurisdiction that

6   we're in.

7   **Q.**   And is it your understanding that that's the same for all

8   companies?

9   **A.**   Yes.

10  **Q.**   Does Apple take steps to protect user privacy in China?

11  **A.**   Yes, of course.  We have the same app tracking

12  transparency that I reviewed earlier.  That's in China.  The

13  intelligent tracking prevention is in China.  The app

14  nutrition label is in China.  The bulk of things we do are the

15  same everywhere around the world.

16  **Q.**   You were asked some questions about whether developers can

17  communicate with their customers about other payment options.

18  Do you remember that from Mr. Bornstein?

19  **A.**   Yes.  Yes.

20  **Q.**   And would you explain for the Court, can developers send

21  email communications to their customers?

22  **A.**   Yes, of course, as long as they have the email address.

23  As long as the customer freely gives them their email address.

24  **Q.**   Thank you, sir.

25       And you were asked about the availability of in-app

1    commerce on the App Store prior to the introduction of the IAP

2    functionality.  Do you remember that?

3    **A.**  I do.

4    **Q.**  And you were shown a document, it's 1709, I believe.

5    **A.**  (Reviewing document.)

6         Yes.

7    **Q.**  And that document, the third paragraph from the bottom has

8    the following language:

9         "Have you had a chance to step through the app as it is

10   now appearing on the App Store?  It looks like it continues to

11   violate the T's and C's, especially with in-app commerce."

12        Do you see that language?

13   **A.**  I do.

14   **Q.**  Does that language suggest to you that in-app commerce was

15   allowed on the App Store?

16   **A.**  No.  It was --

17             **MR. BORNSTEIN:**  Objection, leading.

18             **THE COURT:**  Sustained.

19   **BY MS. MOYÉ:**

20   **Q.**  And what is your testimony?  What is your understanding as

21   to whether in-app commerce was allowed on the App Store prior

22   to the introduction of IAP?

23   **A.**  That it was not allowed.

24   **Q.**  Have you seen any document here today that causes you to

25   change that judgment?

1   **A.**   No, not at all.

2   **Q.**   You were also asked about a Skyscape app.

3       I have to find the exhibit number.  It's Exhibit

4   number 1701.

5   **A.**   (Reviewing document.)

6   **Q.**   Do you have it, sir?

7   **A.**   I have it.

8   **Q.**   Thank you.

9       Now, Mr. Bornstein asked you some questions about

10  references to in-app commerce in that document.

11      You recall that?

12  **A.**   Correct.

13  **Q.**   I'd like to you take another -- a look at another document

14  related to Skyscape.  This is PX1813.

15  **A.**   1813.

16          **MS. MOYÉ:**  It's not in your binder, sir.  I'm going

17  to have to bring you a copy --

18          **THE WITNESS:**  Okay.

19          **MS. MOYÉ:**  -- with the Court's permission.

20          **THE COURT:**  You may.

21          **THE WITNESS:**  Thank you.

22                  (Pause in the proceedings.)

23  BY MS. MOYÉ:

24  **Q.**   Do you have that document, sir, PX1813?

25  **A.**   I do.

COOK – REDIRECT / MOYÉ

1    **Q.**   And this is dated February 9, 2009; is that correct?

2    **A.**   That's correct.

3    **Q.**   And it also copies Ms. Shaan Pruden who's referenced in

4    the other document?

5    **A.**   It does.

6    **Q.**   If you would turn to the page .3.

7    **A.**   (Reviewing document.)

8    **Q.**   Do you see the language there, "Skyscape.  Need to remove

9    in-app commerce capabilities.  Working to have them change

10   their model for providing medical reference."

11       Do you see that?

12   **A.**   I do.

13   **Q.**   Look at page 1813.2.

14   **A.**   (Reviewing document.)

15   **Q.**   Do you see the language, "Challenges.  Modality has

16   started to lose some bigger licensing deals to Skyscape who

17   sells content from within their free app.  Working with

18   Skyscape on updating their app to be compliant with current

19   T's and C's."

20       Do you see that language?

21   **A.**   I do.

22   **Q.**   One other document that I want to ask you about, and

23   before I do, do you receive messages of support from

24   developers, Mr. Cook?

25   **A.**   Yes, of course.

1    **Q.**  And are you familiar with Snap?

2    **A.**  Yes.

3    **Q.**  Okay.  I'd like to show you another document, DX5577.

4         **MS. MOYÉ:**  Your Honor, if I could approach the

5    witness.

6         **THE COURT:**  You may.

7                   (Handing document.)

8         **THE WITNESS:**  Thank you.

9    **BY MS. MOYÉ:**

10   **Q.**  Sir, do you recognize this into -- do you recognize this,

11   I'm sorry, as a publication dated May 21st, 2021?

12   **A.**  Yes.

13   **Q.**  From today.

14   **A.**  (Reviewing document.)

15   **Q.**  And what is the caption of this article?

16        **MR. BORNSTEIN:**  Your Honor, I object.  This is a news

17   article that came out while Mr. Cook was on the witness stand.

18   He's never seen it before.  And it's hearsay.

19        **MS. MOYÉ:**  Your Honor, Mr. Cook was asked about how

20   developers respond.  He was also asked why no developers had

21   shown up.  I think this is proper redirect in light of those

22   line of questioning.

23        **THE COURT:**  It's hearsay.

24     Sustained.

25     There's other evidence in the record.  So --

1          **MS. MOYÉ:**  Your Honor, we would like to move PX1813

2     into evidence.

3          **THE COURT:**  It was already in.

4          **MS. MOYÉ:**  It's already in?

5          **THE COURT:**  Yes, it is.

6          **MS. MOYÉ:**  Thank you, Your Honor.

7       Just one second, please.

8                    (Pause in the proceedings.)

9          **THE WITNESS:**  Do I have this one?  1813?

10         **MS. MOYÉ:**  We've already moved it into evidence so we

11    don't need to deal with it anymore.

12         **THE WITNESS:**  Oh.

13         **MS. MOYÉ:**  Thank you, sir.

14      Okay.  We pass the witness.

15         **THE COURT:**  Any recross on those topics?

16         **MR. BORNSTEIN:**  Your honor, before I begin recross, I

17    was advised that I neglected to move PX1667 into evidence.

18    This was the email exchange between Mr. Sweeney and Mr. Grimm

19    relating to Vietnam.

20         **THE COURT:**  1667 is admitted.

21         **MR. BORNSTEIN:**  Thank you.

22      (Plaintiff's Exhibit PX1667 received in evidence)

23                    <u>**RECROSS-EXAMINATION**</u>

24    BY MR. BORNSTEIN:

25    **Q.**  Mr. Cook, can you look again briefly at PX2391.  This is

COOK — RECROSS / BORNSTEIN

1    in the binder that I gave you.

2    **A.**   (Reviewing document.)

3    **Q.**   This is the December 2019 presentation from your corporate

4    financial planning and analysis group, correct?

5    **A.**   Yes, I see it.

6    **Q.**   All right.  And this one you said was different from the

7    ones in September, correct?

8    **A.**   Yes.

9    **Q.**   But it does have at the back, beginning at page .104,

10   the same type of profitability analysis that we saw in PX2385,

11   correct?

12   **A.**   Could you give me the page number.

13   **Q.**   Begins at .104.

14   **A.**   (Reviewing document.)

15        104.

16        (Reviewing document.)

17   **Q.**   Do you have that now, sir?

18   **A.**   I do.

19   **Q.**   And this is the same kind of profitability analysis that

20   was discussed at your meeting with Mr. Maestri and Ms. Casey

21   in September of 2019, correct?

22   **A.**   The other one had a benchmarking exercise on it which

23   showed a bunch of different companies --

24   **Q.**   True.  And it had this information that appears here as

25   well, just one quarter back, correct?

COOK – RECROSS / BORNSTEIN

1    **A.**  I'd have to look back at that one again.

2    **Q.**  All right.  But -- and this one, the December 1, you said

3    wasn't just you and Mr. Maestri and Ms. Casey.  You said this

4    one went to a broader audience, correct?

5    **A.**  The first part of this one.

6    **Q.**  So you're saying only the first part of the document went

7    to the broader audience and this profitability part got cut

8    off when it was distributed to everybody else?

9    **A.**  I don't know.

10   **Q.**  Okay.

11   **A.**  I know the long-range forecast --

12                         (Simultaneous colloquy.)

13   **Q.**  But you --

14   **A.**  -- more people.

15   **Q.**  Right.  But you don't know whether this went to the

16   broader audience or not?

17   **A.**  I don't.

18   **Q.**  Despite your testimony earlier?  That it went to a --

19   **A.**  I testified --

20   **Q.**  -- broader audience.

21   **A.**  -- earlier to the earlier document.

22   **Q.**  Okay.

23   **A.**  To the previous document.

24   **Q.**  Mr. Cook, earlier you testified that you didn't know about

25   the addition of the language on termination to section 7.1 of

COOK – RECROSS / BORNSTEIN

1   Schedule 2, correct?

2   **A.**  I didn't know when it was done.

3   **Q.**  Well, you also said you hadn't seen the language before,

4   correct?

5   **A.**  I don't think I have seen the language.

6   **Q.**  Okay.  And you didn't know why the change had happened,

7   correct?

8   **A.**  I was reminded with counsel that we had a change because

9   of a regulatory issue in Japan.

10  **Q.**  Right.  That -- that was something you didn't remember

11  when you were on the stand before, and you remembered only

12  when counsel prompted you, correct?

13  **A.**  Correct.

14  **Q.**  Okay.

15      Staying on 2391, sir, take a look at .86, please.

16  **A.**  (Reviewing document.)

17  **Q.**  Do you have that page?

18  **A.**  I do.

19  **Q.**  All right.  And you testified in response to questions

20  from Ms. Moyé that you have search-related deals with

21  companies other than Google, correct?

22  **A.**  Yes.

23  **Q.**  All right.

24      Now, if you look on .86, you'll see about a third of the

25  way down, there's a line that says licensing.

COOK – RECROSS / BORNSTEIN

1    Do you see that?

2    **A.**   I do.

3    **Q.**   And that's your search deals, correct?

4    **A.**   (Reviewing document.)

5        It's definitely the search deals.  It may have something

6    else in it as well.  I'm not sure.

7    **Q.**   Okay.  And I'm not going to read the numbers there, but

8    you can see that the Google number is quite a bit larger than

9    other licensing, correct?

10   **A.**   Yes.  It is.

11   **Q.**   And the Google deal is far and away the largest of your

12   search deals, correct?

13   **A.**   Yes, it is.

14   **Q.**   Okay.

15       And the last document I'll direct you to, sir, Ms. Moyé

16   said that there was, I believe, no document that reflected the

17   fact that there was in-app commerce capability prior to 2009.

18   Is that -- to the launch of IAP in 2009.  Do you recall that?

19   **A.**   Yes.

20   **Q.**   And then she read to you from PX1813 something that says

21   that Skyscape sells content from within their free app.

22       Do you recall that?

23   **A.**   Could you give me the number again?

24   **Q.**   Sure, PX1813.2.

25   **A.**   (Reviewing document.)

1      1813.

2   **Q.**   It was something that Ms. Moyé handed you loose.

3   **A.**   Oh.  Yes.

4   **Q.**   Okay.

5   **A.**   Sorry.

6   **Q.**   And you see near the top of the second page, it says,

7   "Modality has started to lose some bigger licensing deals to

8   Skyscape who sells content from within their free app."

9        Do you see that?

10  **A.**   I see it.

11  **Q.**   So it was possible at this time for apps like Skyscape to

12  sell content within their free app, correct?

13  **A.**   It was definitely against the rules.  I have no idea

14  whether they were doing it or not.

15  **Q.**   Okay.  Well, let's take a look, then, at, in my binder --

16  **A.**   Yeah.

17  **Q.**   -- PX1703.

18       Do you have that?

19  **A.**   I do.

20  **Q.**   Okay.  And this one is another email that went to

21  Ms. Pruden, whom we've discussed, correct?

22  **A.**   (Reviewing document.)

23       Yes.

24  **Q.**   Okay.  And you can see the individual who wrote this

25  email, Mary Beth Janes, has an Apple email address, correct?

COOK – RECROSS / BORNSTEIN

1  **A.**  She does.

2  **Q.**  All right.

3      And what she writes to Ms. Pruden, you can see at the

4  bottom, is that -- an individual associated with the Stanza

5  app wants to know which of these three he should be using as

6  his model.

7      Do you see that?

8  **A.**  No.  Could you point me to the right place?

9  **Q.**  It's the third-to-last paragraph on page 1.

10  **A.**  (Reviewing document.)

11  **Q.**  I tried not to pronounce the gentleman's name, but it

12  looks like Mark Prudamo [phonetic].

13  **A.**  (Reviewing document.)

14      I -- I see it.

15  **Q.**  Okay.  And according to Ms. Janes, this person wanted to

16  know which of these three he should be using as his model.

17      Do you see that?

18  **A.**  Yes, I see it.

19  **Q.**  Okay.  And then there are a couple of options, including

20  the Amazon Kindle, which has free sample chapters of books

21  with a "Buy Now" button enabling the transaction in the app

22  with one-click purchasing.

23      Do you see that?

24  **A.**  I do see it.

25  **Q.**  And Apple allowed the Amazon Kindle app to have purchasing

1    within the app before the launch of IAP, correct?

2             **MS. MOYÉ:**  Objection, foundation.

3             **THE COURT:**  Overruled.

4             **THE WITNESS:**  Not to my knowledge.

5    **BY MR. BORNSTEIN:**

6    **Q.**  Okay.  I'll have to try one more then, sir.

7             **MR. BORNSTEIN:**  But first, Your Honor, I'd move

8    PX1703 into evidence.

9             **THE COURT:**  No objection?

10            **MS. MOYÉ:**  No objection.

11            **THE COURT:**  Admitted.

12        (Plaintiff's Exhibit PX1703 received in evidence)

13   **BY MR. BORNSTEIN:**

14   **Q.**  Take a look, sir, then at PX1714.

15   **A.**  (Reviewing document.)

16   **Q.**  Do you have that?

17   **A.**  I do.

18   **Q.**  Now this is in November of 2010 after the launch of IAP,

19   correct?

20   **A.**  I don't recall when IAP was launched.

21   **Q.**  All right.

22        I'll make a representation to you, sir, that I believe it

23   was launched in 2009.

24        Does that sound at least plausible to you?

25   **A.**  Yeah, it seems like somewhere around there.

COOK – RECROSS / BORNSTEIN

1    **Q.**   Okay.  And you can see in the top email here from

2    Mr. Shoemaker –– do you remember who he is?

3    **A.**   I don't recall him, but I know that he had something to do

4    with app review for a while.

5    **Q.**   Okay.  And now this is now again after IAP has been

6    announced.  He writes, "For e-books, we allow them to do what

7    Amazon's Kindle app does.  They kick you out to their website

8    to purchase the actual book."

9        Correct?

10   **A.**   I see the writing.  I don't know whether it's correct or

11   not, to be clear.

12   **Q.**   Do you know whether at this point in time, Apple's policy

13   was to allow e-books like Amazon to have users purchase from

14   the web, to get kicked out of the app and purchase from the

15   web?

16   **A.**   This –– this sounds like the reader rule today.

17   **Q.**   Okay.

18   **A.**   And I don't recall exactly the dates on that.  But the

19   reader rule allows someone to buy off the platform and consume

20   the content on the platform.

21       **MR. BORNSTEIN:**  Your Honor, I have nothing else

22   within the scope of the examination.

23       **THE COURT:**  Okay.

24       **MR. BORNSTEIN:**  Saving for the sealed portion.

25       **THE COURT:**  All right.

1    And that last exhibit, did you want it in?  17 --

2         **MR. BORNSTEIN:**  Oh, yes, please.

3         **THE COURT:**  1714, is it?

4         **MR. BORNSTEIN:**  Yes, Your Honor.  That's correct.

5         **THE COURT:**  Admitted.

6      (Plaintiff's Exhibit PX1714 received in evidence)

7         **THE COURT:**  All right.  Redirect limited to the scope

8    of this recross.

9              **FURTHER REDIRECT EXAMINATION**

10   BY MS. MOYÉ:

11   **Q.**  I hate to ask you, but take one more look at PX2391.  It's

12   in Apple's big binder, Mr. Cook.

13   **A.**  2391.

14      (Reviewing document.)

15      Yes.

16   **Q.**  And if you go to page .104 in that big book.

17   **A.**  (Reviewing document.)

18      Yes.

19   **Q.**  There's a section of that document that refers to the

20   services line of business; is that correct?  It starts on that

21   page.

22   **A.**  Yes.

23   **Q.**  Was that portion of this document shared with any of the

24   heads of the business units in that services line of business?

25   **A.**  Not to my knowledge.

1  **Q.**  And there is a notation of an operating margin on

2  page .105 for the App Store and for various other areas in

3  the services line of business.

4      Do you see that, sir?

5  **A.**  I do.

6  **Q.**  And just to be clear with the Court, does that margin on

7  that page reflect a fully burdened allocation of cost for the

8  App Store?

9  **A.**  It does not.

10  **Q.**  Thank you, sir.

11        **MS. MOYÉ:**  Nothing more.

12        **THE COURT:**  Anything on that one question?

13        **MR. BORNSTEIN:**  No, Your Honor.

14        **THE COURT:**  So, Mr. Cook, it was odd to me that you

15  did not remember anything about that termination provision

16  before the break, and it was only by the prompting of your

17  attorney's question that somehow you remembered it.

18      What is it that you remembered, if anything?

19        **THE WITNESS:**  I remember something happening in Japan

20  where we needed to make a change in the termination clause.

21        **THE COURT:**  That's it, that's all you remember?

22        **THE WITNESS:**  That's the extent of my memory.

23        **THE COURT:**  At the beginning of your testimony, you

24  indicated that you wanted to focus on users.  I've seen

25  evidence that a significant portion of revenue from in-app

1    purchases come from gamers.

2         Have you seen evidence to that effect?

3              **THE WITNESS:**  I have, Your Honor.

4              **THE COURT:**  And it's incredibly significant.  As

5    compared to all other users, revenue is coming from gamers

6    more than anyone else.  Am I right in my current

7    understanding?  And -- and you see all these binders?  I still

8    have to review them.

9              **THE WITNESS:**  The majority of the revenue on the

10   App Store comes from games.

11             **THE COURT:**  Okay.  And in-app purchases in

12   particular, right?

13             **THE WITNESS:**  Correct.

14             **THE COURT:**  So what is the problem -- well, I would

15   say the other thing you said is you want to give users

16   control.  Is that right?

17             **THE WITNESS:**  That's right.  For their data.

18             **THE COURT:**  So what is the problem with allowing

19   users to have choice, especially in the gaming context, to

20   find -- to have a cheaper option for content?

21             **THE WITNESS:**  I think they have a choice today.  They

22   have a choice between many different Android models, the

23   smartphone, or an iPhone.  And that iPhone has a certain set

24   of principles behind it from safety to security to privacy.

25   And --

1        **THE COURT:**  But if they wanted to go and get a

2   cheaper Battle Pack or cheaper V-Bucks, and they don't know

3   that they've got that option, what is the problem with Apple

4   giving them that option?

5        **THE WITNESS:**  You mean in terms --

6        **THE COURT:**  At least that information that they can

7   go and have a -- you know, a different option for -- for

8   making purchases.

9        **THE WITNESS:**  If we allowed people to link out like

10  that, we would in essence give up the -- our total return on

11  our IP.

12       **THE COURT:**  Right, but you --

13       **THE WITNESS:**  Or --

14       **THE COURT:**  But you could also monetize it a

15  different way, couldn't you?  I mean, that is, the gaming

16  industry seems to be generating a disproportionate amount of

17  money relative to the IP that you're giving them and everybody

18  else.  In a sense, it's almost as if they're subsidizing

19  everybody else.

20       **THE WITNESS:**  The -- the bulk of the apps on the App

21  Store are free.

22       **THE COURT:**  That's right.

23       **THE WITNESS:**  And so you're right, there is some sort

24  of subsidy there.  However, the way that I look at that, Your

25  Honor, is that by having such a large number of apps that are

1    free on the store, it increases the traffic to the store

2    dramatically.

3        And so the benefit somebody gets that's charging is they

4    get a much higher audience to -- to sell to than they would

5    otherwise if there weren't free apps there.

6            **THE COURT:**  So your logic, then, is that they don't

7    get the customer base so -- it's more of a customer base, not

8    an IP then?

9            **THE WITNESS:**  It's both.  Because we -- we need a

10   return on our IP.  I mean, we have a 150,000 API's to create

11   and maintain and numerous developer tools, and the customer

12   service piece of -- of dealing with all these transactions.

13   And so there's a lot of --

14           **THE COURT:**  Right, but let me ask you.

15           **THE WITNESS:**  Sure.

16           **THE COURT:**  So banking apps.  Wells Fargo is based

17   here.  I have a -- I have multiple banking apps.  I haven't

18   paid for them.  But I suspect, what, other than the $99, you

19   don't charge Wells Fargo, right?

20           **THE WITNESS:**  That's correct.

21           **THE COURT:**  Or Bank of America?

22           **THE WITNESS:**  That's correct.

23           **THE COURT:**  But you're charging the gamers to

24   subsidize Wells Fargo.

25           **THE WITNESS:**  Well, in the gamer's example, they're

1    transacting on our platform.

2         **THE COURT:**  People are doing lots of things on your

3    platform.  So –– so ––

4         **THE WITNESS:**  But this is a digital transaction with

5    a observable change in –– in currency.

6         **THE COURT:**  It's just –– it's just a choice of a

7    model.

8         **THE WITNESS:**  We've –– we've made a choice, yeah.

9    There are –– there are clearly other ways to monetize and we

10   chose this one because we think this one overall is the best

11   way.

12        **THE COURT:**  Well, it's quite lucrative.  But it seems

13   to be lucrative and –– and focused on –– on purchases that are

14   being made frankly on an impulse basis –– that's a totally

15   different question about whether that's a good thing or not,

16   not really ripe for antitrust law.  But it does appear to be

17   disproportionate.

18       I understand this notion that somehow Apple is bringing

19   the customer to the gamers.  Right?  The users.

20       But after that first time, after that first interaction,

21   the gamers are keeping the customer with the games, that is,

22   the developers of games are keeping their customers.  Apple is

23   just profiting off that, it seems to me.

24        **THE WITNESS:**  I view it differently than you do, Your

25   Honor.

1          THE COURT:  You need to speak into the mic.

2          THE WITNESS:  Oh, I'm sorry.

3     I view it differently than you do.  I view that we're

4  creating the entire level -- entire amount of commerce on the

5  store, and we're doing that by focusing on getting the largest

6  audience there.  We do that with a lot of free apps.  And so

7  they bring a lot to the table.  And despite we don't collect

8  any commission from them, they bring a lot to the table.

9     And then we have the majority of other people, the vast

10  majority of other people that pay 15 percent.  And only the

11  people that are really profiting in a major way are paying 30.

12          THE COURT:  Yeah, but the 15 percent, right -- you

13  would agree with the basic proposition that competition is

14  good.

15          THE WITNESS:  I think competition is great.  We have

16  fierce competition in our business.

17          THE COURT:  You don't have competition in those

18  in-app purchases, though.

19          THE WITNESS:  Sure.  I mean, somebody could go, if

20  they're on -- if they're a gamer, they can go buy on the Sony

21  PlayStation or the Microsoft XBox or the Nintendo Switch.

22          THE COURT:  Well, only if they -- only if they know.

23  Right?

24          THE WITNESS:  But -- well, but that's up to the

25  developer to communicate.

COOK – FURTHER REDIRECT / MOYÉ

1    **THE COURT:**  And only if they decide to switch in

2    terms of how they do things, right?

3    **THE WITNESS:**  Usually people have both.

4    **THE COURT:**  The issue with the $1 million Small

5    Business Program, at least from what I've seen thus far, that

6    really wasn't the result of competition.  That seemed to be a

7    result of the pressure that you're feeling from

8    investigations, from lawsuits, not competition.

9    **THE WITNESS:**  It was the result of -- of feeling like

10   we should do from a COVID point of view, and then electing to,

11   instead of doing something very temporary, just do something

12   permanent.

13   And of course we had those things -- the lawsuits and all

14   the rest of the stuff in the back of my head, but the thing

15   that triggered it was we were very worried about small

16   business.

17   **THE COURT:**  Okay.  But it wasn't competition.

18   **THE WITNESS:**  It was competition after we did ours to

19   15, it was competition that made Google drop theirs to 15.

20   You can tell the --

21   **THE COURT:**  I understand perhaps that -- that Google

22   did, you know, that Google changed its price.  But your action

23   wasn't the result of competition.

24   **THE WITNESS:**  It was the result of feeling like we

25   should do something for small business, which in our -- which

1    in our vernacular is small developer.

2            **THE COURT:**  So when other stores reduced their price,

3    Steam reduced their price, you felt no pressure, right, to

4    reduce your price?

5            **THE WITNESS:**  I'm not familiar with Steam

6    and their –– and their financial model.

7        There's one of the things that's missed here, I think, is

8    there's a huge competition for developers.  So it's just not

9    the competition with the user side.  It's also with the

10    developer side in addition to the users.

11        You can imagine if –– if we had an above market kind of ––

12    of commission, people just wouldn't develop for us.

13            **THE COURT:**  Well, let's talk about developers.

14        I've seen evidence in the record that did a survey of

15    developers.  I'm going to –– I'm going to share with you ––

16    the results of this bar graph that was presented to me.  I

17    don't know how accurate it is because I looked for the source

18    document and couldn't find it.

19        But this survey indicated that 39 percent of developers

20    were either very dissatisfied or somewhat dissatisfied with

21    Apple's distribution services.  36 percent were somewhat

22    satisfied or very satisfied.  And 19 percent didn't go either

23    way, they're in the middle.

24        So with 39 percent of all your developers dissatisfied,

25    how is that acceptable?  And how is it, assuming those numbers

1    are true, how is it that you're again feeling any motivation

2    or incentive to address their needs?

3           THE WITNESS:  I'm not familiar with the document that

4    you're referencing, and so it's hard to -- to comment on

5    certain specifics.

6       But keep in mind that on a weekly basis, we're rejecting

7    40 percent.  And so there is definitely some friction in the

8    system, but this friction is what produces a curated

9    experience for users that they love and they can go somewhere

10   and be -- be assured that it's safe and trusted.

11      So sometimes the -- the developer and the user are not

12   necessarily in -- the interests don't intersect.  And we

13   always lean --

14          THE COURT:  But it doesn't seem --

15          THE WITNESS:  -- on the user.

16          THE COURT:  It doesn't seem to me that you feel,

17   again, real pressure or competition to actually change the

18   manner in which you act to address the concerns of the

19   developers.  Again, if these numbers are right.

20          THE WITNESS:  Yeah, I would -- I would look at that

21   very differently.  We turn the place upside down for

22   developers.  You could probably look at a complaint that I

23   might get and look at the amount of time it takes to -- for a

24   change to be made in the company.  It's amazing actually.

25          THE COURT:  Do you -- we've seen a number of profit

1    and loss statements.  Do you have -- and again, you see the

2    hundred binders behind me.

3        I don't recall seeing any other surveys or any other

4    business records showing that you routinely conduct surveys

5    regarding developer satisfaction and that you in fact move or

6    make changes.

7        I take with a grain of salt each side's anecdotal

8    evidence.  What I'm looking for are aggregates.

9        Do you do that?

10           **THE WITNESS:**  I don't know if we do that.  That would

11   be something that Phil would know.

12           **THE COURT:**  Well, you certainly, as a CEO, then don't

13   receive regular reports on that?

14           **THE WITNESS:**  That's correct.

15           **THE COURT:**  Okay.  Before we move into closed

16   session, Ms. Moyé, any questions on my questions?

17           **MS. MOYÉ:**  Just a couple, Your Honor.

18                   **FURTHER REDIRECT EXAMINATION**

19   BY MS. MOYÉ:

20   **Q.**  Mr. Cook, are developers allowed to sell their services,

21   their things that they offer in-app, outside the app on the

22   App Store to consumers?

23   **A.**  Yes.

24   **Q.**  And are developers allowed to make those offerings at

25   lower prices than those that are offered on the app on the

1   App Store?

2   **A.**   Yes.

3   **Q.**   And are developers allowed to communicate with their

4   customers about those lower price offerings?

5   **A.**   Yes.

6   **Q.**   Are consumers allowed to purchase, outside the App Store,

7   content at lower prices that they can then use on the App

8   Store?

9   **A.**   Yes.

10  **Q.**   Does Apple continue to provide services to developers

11  after an app is first published?

12  **A.**   Yes.

13  **Q.**   Can you describe the nature of the services?

14  **A.**   Well, they're constantly doing updates to apps, and so the

15  app review is not a one -- one and done kind of thing.

16  There's a continual kind of process.

17      Also, the API's, the API's that they're using and that

18  we're creating each year is a massive effort.  Developer tools

19  is another one.  These things are under constant improvement.

20  **Q.**   Are you aware as to whether or not game developers in

21  particular benefit from innovations and new offerings of API's

22  by Apple?

23  **A.**   Yes, of course.  Significantly.

24      **MS. MOYÉ:**  Thank you.  Nothing else, Your Honor.

25      **MR. BORNSTEIN:**  No questions, Your Honor.

1          **THE COURT:**  Okay.

2       All right.  Ladies and gentlemen, for those of you

3    listening, we will be moving into closed session here.

4       As is normal, we will take our second break at 12:35.  So

5    I do not know whether we will be back on the public record

6    before that break.  So just an FYI.

7       At this point, we'll move into closed session.  That means

8    the media will please need to leave the courtroom.

9       Ms. Manifold, you're entitled to stay.

10      I would ask the courtroom deputy to mute or turn off the

11   lines, the public access lines.

12                   (Pause in the proceedings.)

13          **THE CLERK:**  Okay.  All the audio lines are now in the

14   waiting room, Your Honor.

15          **MS. FORREST:**  Your Honor, could we just get a time

16   for the Epic clock?  I know we're close but --

17          **THE COURT:**  Twenty-three minutes.

18          **MS. FORREST:**  Twenty-three?  Thank you.

19      (Proceedings held under seal on the following page:)

20

21

22

23

24

25

1              (Proceedings held in open court.)

2              (Recess taken at 12:26 P.M.)

3              (Proceedings resumed at 1:16 p.m.)

4          **THE CLERK:**  Court is in session.  Please be seated.

5          **THE COURT:**  I hope you enjoyed your leisurely lunch.

6      All right.  We are back on the record.  The record will

7      reflect that the parties are present.  I have my witness back,

8      Mr. Rubin?

9          **THE WITNESS:**  Yes, Your Honor.

10         **THE COURT:**  And, Mr. Rubin, I will just remind you,

11     sir, that you remain under oath.

12         **THE WITNESS:**  Okay.

13         **THE COURT:**  Okay.  Mr. Byars.

14         **MR. BYARS:**  Yes.  Thank you, Your Honor.

15         **THE COURT:**  All right.  You may proceed with your

16     examination.

17         **MR. BYARS:**  Thank you, Your Honor.

18                 **CROSS-EXAMINATION (Continued)**

19     **BY MR. BYARS:**

20     **Q.**  Dr. Rubin, good to see you again today.

21         You provided an opinion about the security of Apple's

22     in-app payment processing system in your written direct

23     testimony; is that right?

24     **A.**  Yes.

25     **Q.**  I don't recall you testifying to that orally yesterday.

1        Is that correct?

2   **A.**   It's in my written direct, but it wasn't in my oral.

3   **Q.**   Okay.  Thank you.

4        And one reason you believe that Apple's payment system is

5   more secure is that introducing other options would limit the

6   amount of data that Apple can aggregate and analyze overall;

7   isn't that right?

8   **A.**   Yes.

9   **Q.**   Now, you may have heard evidence that there are physical

10  goods being sold on -- through Apple devices, right?

11  **A.**   That's correct.

12  **Q.**   Including the iPhone, right?

13  **A.**   Yes.

14  **Q.**   And there are various other ways in which people can make

15  purchases of these physical goods on the iPhone, right, other

16  than IAP?

17  **A.**   Yes.

18  **Q.**   And, in fact, you have not analyzed the relative

19  transaction volume of these other payment processors that can

20  be used to conduct the purchase of physical goods, have you?

21  **A.**   I have not.

22  **Q.**   So you have not compared the data that might be collected

23  by those payment processors to Apple's IAP system, right?

24  **A.**   That's correct.

25  **Q.**   For example, you haven't looked at the volume of

RUBIN – CROSS / BYARS

1    transactions that might be handled by somebody like PayPal,

2    right?

3    **A.**   That's correct.

4    **Q.**   But you understand that PayPal may be used to conduct

5    physical transactions on iOS, right?

6    **A.**   Transactions for physical goods --

7    **Q.**   That's --

8    **A.**   -- yes.

9    **Q.**   -- correct, right?

10   **A.**   Yes.

11   **Q.**   And PayPal can be used off iOS, right?

12   **A.**   What do you mean by that?

13   **Q.**   PayPal can be used in other places other than Apple's

14   iOS operating system, right?

15   **A.**   Yes.

16   **Q.**   Okay.  It can be used on websites through a PC, right?

17   **A.**   Yes.

18   **Q.**   Could be used in a browser on iOS, right?

19   **A.**   It can be.

20   **Q.**   Now, you haven't assessed the security of any other

21   alternative payment processing system other than IAP, right?

22   **A.**   Not in this case, I haven't.

23   **Q.**   Okay.  You haven't offered testimony about that, right?

24   **A.**   Right.

25   **Q.**   Okay.  And you're not going to offer an opinion about that

RUBIN – CROSS / BYARS

1     in this case, are you?

2     **A.**   I am not.

3     **Q.**   Okay.  You also haven't analyzed whether Epic's payment

4     solution is a secure payment method, right?

5     **A.**   I did not look into that.

6     **Q.**   Okay.  Now, it would be possible to analyze whether any of

7     these payment methods were compliant with something called a

8     PCI standard; isn't that right?

9     **A.**   Yes.

10    **Q.**   And the PCI standard provides a uniform baseline for how

11    payment information is protected by these payment systems,

12    correct?

13    **A.**   That's right.

14    **Q.**   Now, I saw in your report, though not in your testimony,

15    that you've offered the opinion that one of the benefits of

16    IAP is that it provides a frictionless experience; isn't that

17    right?

18    **A.**   Yes.

19    **Q.**   Specifically, it provides a frictionless experience to

20    customers, right?

21    **A.**   That's right.

22    **Q.**   And by "frictionless," you mean that it minimizes the

23    amount of effort that a consumer has to put in in order to

24    make a purchase, right?

25    **A.**   That's correct.

1    **Q.**  And when I asked you at your deposition how you

2    understood -- or how you came to that understanding of that

3    term, you said that Mr. Trystan Kosmynka, the head of app

4    review, told you about that term, right?

5    **A.**  It was one of the Apple engineers.  It may have been him.

6    **Q.**  Okay.  But you have not evaluated other payment systems

7    and whether they might cause friction when customers make

8    transactions using them, right?

9    **A.**  I did not.

10   **Q.**  Okay.  I'd like to ask you about something in your written

11   direct testimony.

12       You provided an opinion that Epic apparently explored the

13   possibility of using the Enterprise Program.

14       Do you recall that?

15   **A.**  Yes.

16   **Q.**  Okay.  Specifically, you said that they explored using the

17   Enterprise System to more conveniently distribute their apps,

18   eventually via sideloading, right?

19   **A.**  That sounds like something I said.

20   **Q.**  Okay.  And, in fact, you provided the opinion that this

21   consideration appeared to be financially motivated, didn't

22   you?

23   **A.**  Can you point me to my report?

24   **Q.**  I can.  It's actually in your written direct testimony,

25   paragraph 67.

1   **A.**   Yes.

2   **Q.**   Okay.  So is it correct that you gave the opinion that

3   Epic's consideration of this appeared to be financially

4   motivated?

5   **A.**   It is correct.

6   **Q.**   Okay.  And then you refer to two defendant's exhibits,

7   which you'll agree were Epic internal documents?

8   **A.**   I believe so.

9   **Q.**   Okay.  And if you were going to -- let me take a step

10   back.

11       This is just your impression based on these documents,

12   right?

13   **A.**   Well, also based on other things that I heard in the case.

14   **Q.**   Okay.  In this written direct testimony, had you heard

15   anything in this case when you --

16   **A.**   I'm sorry.  I thought you were asking me my opinion now.

17   And you're asking me about when I wrote this?

18   **Q.**   Yes.

19   **A.**   Yes, that was what I was basing it on.

20   **Q.**   Okay.  You were purely interpreting the documents you

21   cited in this paragraph; isn't that right?

22   **A.**   I'm sure that I also took into account other information

23   that I had heard in discussions.  I'm not going to say that I

24   had a complete blank slate when I read these documents.

25   **Q.**   Okay.  But you didn't cite anything else in this

1    paragraph, right?

2    **A.**   That's correct.

3    **Q.**   Okay.  And did you look for other documents concerning the

4    circumstances that you describe here?

5    **A.**   I don't recall looking for other documents.

6    **Q.**   Okay.  But it would be important, you would agree, to give

7    an opinion based on a complete record of the situation, right?

8    **A.**   Yes.

9    **Q.**   Okay.  Could I refer you, please, to DX4235, which is in

10   our black large binder.

11       Are you on 4235?

12   **A.**   I think so.  Yes, I am.

13   **Q.**   And you see that this is an email from Mr. Grant.  It also

14   involves others at Epic, including Mr. Sweeney.

15       Do you see that?

16   **A.**   I do.

17   **Q.**   And there's an extensive set of communications within this

18   document among Epic employees, right?

19   **A.**   Yes, but this -- I have a redacted version here.

20   **Q.**   Yes, that's right.

21   **A.**   Okay.

22   **Q.**   And if you look at .004 in this document.

23   **A.**   Okay.

24   **Q.**   You see about halfway down the page, there is a

25   communication from Mr. Grant where he's describing the

1    enterprise certificate that is provided by Apple under the

2    Enterprise Program, right?

3    **A.**   I'm not sure where exactly to look for that.

4    **Q.**   Sure.  There's a communication that says "August 30th,

5    2018, at 8:30 a.m., Andrew Grant wrote."

6    **A.**   Okay.

7    **Q.**   Are you with me now?

8    **A.**   Yes.

9    **Q.**   And he's describing the fact that Epic has an enterprise

10   certificate?

11   **A.**   I see that.

12   **Q.**   Okay.  And can you tell from this that they are

13   describing -- or, sorry, that this communication relates to

14   Epic's use or potential use of the Enterprise Program?

15   **A.**   I don't remember all of the context around this, but it

16   does look like he's talking about the Enterprise Program when

17   he mentions an enterprise certificate.

18   **Q.**   Okay.  And then do you see the communication from

19   Mr. Sweeney, the one right above that on August 30th, 2018, at

20   9:31 a.m.

21       Do you see that?

22   **A.**   Yes.

23   **Q.**   Do you see that Mr. Sweeney wrote:

24           "Adding Mike Atamas in, Mike is investigating what

25           exactly the Apple terms say about all of this."

RUBIN – CROSS / BYARS

1          Do you see that?

2     **A.**  I see that.

3     **Q.**  He then writes:

4               "The goal here isn't some scheme to siphon money away

5               from the iOS App Store, but to find a way to truly

6               treat iOS as an open platform."

7          Do you see that?

8     **A.**  I see that.

9     **Q.**  But you didn't consider this when you gave the opinion

10    that Epic's contemplation or consideration of the Enterprise

11    Program appeared to be financially motivated?

12    **A.**  I think I -- that this supports that.

13    **Q.**  You believe the statement that the point is not to siphon

14    away money from the iOS App Store supports your conclusion

15    that it was financially motivated?

16    **A.**  Well, the rest of the sentence, where it says "to truly

17    treat iOS as an open platform."

18         iOS is not an open platform, and so they are trying to

19    avoid paying the commissions, is how I understand why they

20    wanted to do this.

21    **Q.**  Okay.

22         That's just your understanding of this document, right?

23    That's just your interpretation of this document.

24    **A.**  Based on what I understood about the case, yes.

25    **Q.**  Okay.  And your understanding is -- your role as a

1    computer security expert is not to ascribe motivations to

2    people in the case?

3    **A.**   As a computer scientist and a professor, I think that

4    sometimes when you look at the adversarial model, you take --

5    **Q.**   Sir, sir, I'm --

6    **A.**   -- motivation --

7    **Q.**   -- I'm just asking, do you understand that your role in

8    the case is not to ascribe motivations to people in the case?

9    **A.**   That's not my primary role.

10   **Q.**   Is that any of your role?

11   **A.**   I use motivations as part --

12   **Q.**   Sir, just answer the question.

13   **A.**   I think it's part of looking at a security analysis, yes.

14   **Q.**   Okay.

15        I'll just ask you again, though, you are doing nothing

16   more than looking at the document in front of you, right?

17   **A.**   I mean, I based it on my understanding of what was

18   happening in the case and this document.

19   **Q.**   Okay.  Thank you.

20             **THE COURT:**  You want 4235 in evidence?

21             **MR. EVEN:**  I do, Your Honor.

22             **THE COURT:**  No objection?

23             **MR. LO:**  No objection.

24             **THE COURT:**  Admitted.

25

1          (Plaintiff's Exhibit 4235 received in evidence)

2              **MR. BYARS:**  I pass the witness, Your Honor.

3              **THE COURT:**  Redirect.

4                      **REDIRECT EXAMINATION**

5     **BY MR. LO:**

6     **Q.**  Dr. Rubin, you were just asked about paragraph 67 of your

7     written direct testimony.  And the question was posed to you

8     what was your basis for reaching the -- an assumption that

9     Epic was looking to the Enterprise Program in order to save

10    money.

11         Was there anything in the documents, other than what

12    you've just talked about with counsel, that specifically

13    related to Epic's motivation in that regard or that informed

14    you as to Epic's motivations?

15    **A.**  Yes.  I cited page 2 of the document specifically, but I

16    have now closed my binder so I'm going to have to find it

17    again.  What was the exhibit number?

18    **Q.**  Well, we can take a look at 4066.

19             **MR. LO:**  And if I can ask Mr. Eltiste to put that up,

20    DX4066.

21    **BY MR. LO:**

22    **Q.**  And I believe that will also be in the binder that

23    Mr. Byars gave to you.

24             **MR. LO:**  And let's go to the last page of this

25    document, Mr. Eltiste, and at the very bottom.

1              (Displayed on screen.)

2    **BY MR. LO:**

3    **Q.**  So, first, Dr. Rubin, do you recognize that this is 4066,

4    which is the document that you are citing to in paragraph 67

5    of your written direct?

6    **A.**  Yes.  This is .002, which is what I cited.

7    **Q.**  Right.

8         And is there anything on this page that you looked at in

9    order to discern whether Epic's motivation in looking at the

10   enterprise certificate was to save money?

11   **A.**  Yes.

12   **Q.**  And what is it?

13   **A.**  So we see here:  Also, if we're looking at ways to reduce

14   the 30 percent cut that Apple take, then we should consider

15   what either removing all purchases from within the app might

16   look like or whether the subscription model drops to a 15

17   percent cut after year one could be interesting.

18   **Q.**  Right.  Thank you, Dr. Rubin.

19            **MR. LO:**  Your Honor, no further questions.

20            **THE COURT:**  Anything back on that topic --

21                  **RECROSS-EXAMINATION**

22   **BY MR. BYARS:**

23   **Q.**  Dr. Rubin, do you know whether Epic actually used the

24   Enterprise Program in the way you've opined about?

25   **A.**  I -- just from what I heard in this trial.

1   **Q.**   Okay.  And you understand that Mr. Grant works for

2   Mr. Sweeney, right?

3   **A.**   Yes.

4   **Q.**   Do you understand the document I showed you was after the

5   document that counsel for Apple showed you?

6   **A.**   I don't know.

7   **Q.**   Okay.  You didn't cite the document I showed you in any of

8   the testimony reports, right?

9   **A.**   I did not.

10   **Q.**   Okay.

11         **MR. BYARS:**  Thank you, Your Honor.  No further

12   questions.

13         **THE COURT:**  Anything on that topic?

14         **MR. LO:**  No, Your Honor.  Thank you.

15         **THE COURT:**  All right, sir.  You're excused.  You may

16   step down.

17         **THE WITNESS:**  Thank you, Your Honor.

18         **THE COURT:**  Ms. Forrest, Mr. Doren, do each of you

19   rest pending resolution of exhibits?

20         **MS. FORREST:**  Yes, Your Honor, Epic does rest.

21         **MR. DOREN:**  Apple also rests, Your Honor, subject to

22   the expert report comment -- or expert testimony comment we

23   made earlier.

24         **THE COURT:**  All right.

25      So for the public, who is not used to trials, that means

4028

1    that the evidentiary portion of this trial is now concluded.

2        On Monday, counsel have agreed to have closing argument in

3    a sense by discussing topics relative to the evidence that has

4    been submitted in the context of antitrust law to assist the

5    Court in my evaluation of the evidence and the arguments that

6    are being made.

7        As I've said before, I have a considerable amount of

8    evidence to review in more detail than just being -- hearing

9    it during trial and then doing the legal analysis in that

10   framework of the evidence and what evidence is persuasive

11   versus what evidence is not.  That will take some time and my

12   decision will be in writing when it is all said and done.

13       I am picking a jury on June 7th, so while I am in trial, I

14   obviously won't be working on this case.  But I am not one to

15   let things sit around.  I think it is important to try to get

16   these things resolved while everything is still fresh, and so

17   I will work hard to try to get you a decision as soon as is

18   reasonably possible, but no promises as to exact dates.

19   Hopefully before August 13th, but you never know.  That was a

20   little joke.  Just a little one.

21       All right.  At this point, I do want to make sure -- this

22   is going to be tedious, so those of you who are listening in

23   may not want to listen anymore, but I do want to go through so

24   that I make sure I have all of the exhibits.  I spent some

25   time on this last night.

1          I have someone from each side and we can go through these,

2     and then we will stand in recess for the day once we do that,

3     unless there is something else.

4          Ms. Forrest, anything else on your side?

5               MS. FORREST:  Nothing else apart from the exhibits,

6     Your Honor.  Thank you.

7               THE COURT:  Mr. Doren, anything else from your side?

8               MR. DOREN:  No, Your Honor.

9               THE COURT:  Okay.

10         All right.  Counsel, if you will -- once the mics are up,

11    if you will state your appearances for the record.

12              MS. CHOI:  Good afternoon, Your Honor.  Jessica Choi

13    for Epic.

14              THE COURT:  Ms. Choi, good afternoon.

15              MR. PHILLIPS:  Good afternoon, Your Honor.  This is

16    Harry Phillips for Apple.

17              THE COURT:  Okay.  Mr. Phillips, good afternoon.

18         All right.  I will do this numerically, and we do it in

19    hundred series.  Okay?

20         So in the first hundred series, what I show is the

21    following admitted into evidence:  6, 8, 9, 30, 41, 42, 43,

22    46, 47, 48, 52, 56 through 61, 63, 64, 66, 72, 79, 80, 89, 98,

23    and 99.

24         Ms. Choi, anything else?

25              MS. CHOI:  I did not have 8 on my list.

4030

1          **MR. PHILLIPS:**  We do not have 8 on our list either.

2          **THE COURT:**  Okay.

3          **MR. PHILLIPS:**  And, Your Honor, I'll just -- if you

4    wouldn't mind reading those again.  I took a second to find

5    where you were reading from, so apologies for that.

6          **THE COURT:**  Okay.  I will do it one more time.

7       If you all -- Ms. Stone, do you show 8 by any chance?

8          **THE CLERK:**  I don't have it and I don't see it on

9    their list, so I don't know.

10         **THE COURT:**  Okay.  So I will remove that from my

11   list.

12      All right.  One more time.  Are you with me, Mr. Phillips?

13         **MR. PHILLIPS:**  I am.

14         **THE COURT:**  6, 9, 30, 41, 42, 43, 46, 47, 48, 52, 56,

15   57, 58, 59, 60, 61, 62, 63, 64, 66, 72, 79, 80, 89, 98, and

16   99.

17      All right.  Anything -- Mr. Phillips, anything you see?

18         **MR. PHILLIPS:**  No, none missing now.

19         **MS. CHOI:**  Your Honor, I apologize.  I missed

20   something from before.  I wanted to check PX56A.  We have that

21   on our list, and I don't --

22         **THE COURT:**  Okay.  Do you have 56A?

23         **MR. PHILLIPS:**  Oh, yes.  Sorry.  Yes, we also have

24   56A.

25         **THE COURT:**  All right.  56A.

1          Anything else?

2                    **MS. CHOI:**  No, that is it.  Thank you, Your Honor.

3                    **THE COURT:**  And, Ms. Choi, speak up.

4                    **MS. CHOI:**  Okay.

5                    **THE COURT:**  All right.  The hundred series.  101,

6     102, 104, 111 through 117, 119, 131, 133, 137, 140, 144, 146,

7     174, 176, 191, 197, 198.

8                    **MS. CHOI:**  108 I had on my list.

9                    **MR. PHILLIPS:**  Yeah, we also had 108, Your Honor.

10                    **THE COURT:**  Okay.  108 is added.

11          Anything else?  That's a no?

12                    **MS. CHOI:**  That's a no.

13                    **MR. PHILLIPS:**  No.

14                    **THE COURT:**  Okay.  200 series.  201 and 202, 250

15     through 257, and 276.

16                    **MR. PHILLIPS:**  That's all present and correct on our

17     side.

18                    **THE COURT:**  Present and correct on the Apple side.

19                    **MS. CHOI:**  Present and correct for Epic.

20                    **THE COURT:**  Okay.  Never heard it that way, but we

21     are good.

22          300 series.  300, 301, 305, 314, 315, 326, 335, 347, 364,

23     -65, -67, and 371, -72, -73, and -74.

24                    **THE CLERK:**  And 70?  The last one was?

25                    **THE COURT:**  -74.

```
 1              THE CLERK:  Okay.  Thank you.

 2              MS. CHOI:  That's everything for Epic.

 3              MR. PHILLIPS:  Yeah, we did not have -47 on our list,

 4     but --

 5              THE COURT:  Do you show 347?

 6              MS. CHOI:  I do.  I thought I heard that one.

 7              THE COURT:  Okay.  You can add that one to yours,

 8     Mr. Phillips.

 9         400 series.  403 through 408, 411, 413 through 418, 420,

10     -21, and -22, 428, 432, 436, 438, 442, 446, 452, 464, and 465.

11              MS. CHOI:  That's everything for Epic.

12              MR. PHILLIPS:  Yes, everything here.

13              THE COURT:  Okay.  500 series.  505, 523, 526, 533,

14     544, and 545.

15              MS. CHOI:  That's everything for Epic.

16              MR. PHILLIPS:  Yes, same here.

17              THE COURT:  Okay.  600 series.  602 through 612 and

18     634.

19              MS. CHOI:  625 for Epic, Your Honor.

20              MR. PHILLIPS:  And Apple also has 625.

21              THE COURT:  All right.  I will add 625.

22         700 series.  721, 741, 744, 747, 756.

23              MS. CHOI:  That's everything for Epic.

24              MR. PHILLIPS:  And everything for Apple.

25              THE COURT:  800 series.  827, 842, 854, -55, -56,
```

1  −57, and −58, 863, −64, −65, 868 through 872, 874 through −77,

2  879 through 883, 886, −88, −90, −92, −97, and −98.

3  **MS. CHOI:** That's everything for Epic.

4  **MR. PHILLIPS:** Yes, that lines up here, as well.

5  **THE COURT:** Okay. 1000 series. 1000 through 1012,

6  1017, 1022 through −27, 1030, −32, −34 through −37, 1045, −47,

7  −49, −50, −54 through −57, −59, −61, −66, −69, −70, 1074

8  through −80, 1084 through −92.

9  **MS. CHOI:** That is everything for Epic.

10  **MR. PHILLIPS:** Yes, everything for Apple, as well.

11  **THE COURT:** Okay. Moving to the 1100 series. 1164,

12  −65, −82, and −83.

13  **MS. CHOI:** That's everything for Epic.

14  **MR. PHILLIPS:** Everything here, as well.

15  **THE COURT:** 1220, that is the only one in that

16  series.

17  **MS. CHOI:** Correct.

18  **MR. PHILLIPS:** Yes, we have that one.

19  **THE COURT:** From today, there were three in the 1600

20  series of 1677, −78, and −67.

21  **MS. CHOI:** Correct.

22  **MR. PHILLIPS:** Sorry. Could you just read those once

23  again, Your Honor? Sorry.

24  **THE COURT:** Sure. Chronologically, then, 1667, 1677,

25  and −78.

1          **MR. PHILLIPS:**  I'm not seeing -- oh, yes, there I

2     have -78.  Got them all.  Thanks.

3          **THE COURT:**  Yep.  That was from today.

4        Also from today, 1701, 1703, -09, -14, -21, and -25.

5          **MS. CHOI:**  That's everything for Epic.

6          **MR. PHILLIPS:**  Everything for Apple, as well.

7          **THE COURT:**  1800 series.  1813, 1815, 1817 and 1818,

8     1849, 1854 to -56, 1883, -91, -93 through -97, and -99.

9          **MS. CHOI:**  1890, Your Honor?

10         **MR. PHILLIPS:**  We have 1890, as well.

11         **THE COURT:**  All right.  I will add that, 1890.

12      1900 series.  Ready?

13         **MS. CHOI:**  Yes.

14         **THE COURT:**  1901, 1906 through 1910, 1913 through

15    1920, 1922, 1932, 1937 through -41, 1947 through -50, and

16    1978.

17         **MS. CHOI:**  That's everything for Epic.

18         **MR. PHILLIPS:**  Everything for Apple, as well.

19         **THE COURT:**  Okay.  Moving to the 2000 series.  2001,

20    2017, 2029, 2031, -48, -52, -57, -60, -62, -65, and then I

21    think I have question marks on -63 and -66.

22      Do you show either of those?

23         **MS. CHOI:**  I do not have those on my list.

24         **MR. PHILLIPS:**  We don't have those either.  We do

25    have 2016 on our list.

4035

```
1              THE COURT:  Okay.  Let me finish.  I have four more.
2    So I have 2076, -84, -90, and -93.
3       Do you have 2016?
4              MS. CHOI:  I have 2060.
5              THE COURT:  Oh, -6-0?
6              MS. CHOI:  Correct.
7              THE COURT:  That one I do have already.
8       Mr. Phillips, were you -- you said you had another one?
9              MR. PHILLIPS:  Yeah.  We had 2016, as well, 2-0-1-6.
10             MS. CHOI:  I do not have 2016.
11             THE COURT:  I didn't show 2016 either.
12      Ms. Stone?
13             THE CLERK:  Well, actually, I do on May 6.  2-0-1-6
14   on May 6.
15             THE COURT:  Okay.
16             MR. DOREN:  I believe it went in with Mr. Fischer,
17   Your Honor.
18             THE COURT:  All right.  2016 is admitted.
19      Okay.  Anything else?
20             MS. CHOI:  That's it, Your Honor.
21             MR. PHILLIPS:  Nothing else.
22             THE COURT:  2100 series then.  2109, 2116, -18, 2123,
23   -25, -26, -42, -73, -74, -76, 2185, -89, -90, -94, and -97.
24             MS. CHOI:  That is everything for Epic.
25             MR. PHILLIPS:  Also for Apple.
```

1              **THE COURT:**  Okay.  2200 series.  2202, -17, -18, -35,

2      -73, -74, -80, -84, and -96.  I had a question mark on -81.

3              **MS. CHOI:**  Epic does not have 81 on the list.

4              **MR. PHILLIPS:**  We have a question mark on 81, as

5      well, Your Honor.  I'm not sure it was --

6              **THE CLERK:**  Your Honor, I had just I.D.'d on that

7      one.

8              **THE COURT:**  Okay.  So that is not admitted.

9         2300 series.  2300, 2302, -03, -09, -11, 2325, -26, -28,

10     2333, -37, -38, -50, -56, -62, -65, -66, -67, -71, -74, -78,

11     -85, -86, and then -89 through -92.

12             **MS. CHOI:**  Epic has 2316 on the list.

13             **MR. PHILLIPS:**  And we also have 2316.

14             **THE COURT:**  Okay.  I will add that.  2316.

15        2400 series.  2421, -35, -50, -51, -52, -55 through -58,

16     -63, -69, -76, and -77.

17             **MS. CHOI:**  That's everything for Epic.

18             **MR. PHILLIPS:**  We have all those, too.

19             **THE COURT:**  Okay.  2500 series.  2500, -08, -19, -29,

20     -31, -34, -35, -45, -47, -57, -58, -67 through 70, -75 through

21     -79, -81 through -85, -87 through -91, -98, and -99.

22             **MS. CHOI:**  That is everything for Epic.

23             **MR. PHILLIPS:**  Everything for Apple.

24             **THE COURT:**  2600 series.  2600 through 2603, 2618,

25     -19, -21, -22, -24, and -68.

```
 1              MS. CHOI:  Everything for Epic.

 2              MR. PHILLIPS:  Everything for Apple, as well.

 3              THE COURT:  2700 series.  2756, -76 through -78,

 4     2783, and -90.

 5              MS. CHOI:  Everything for Epic.

 6              MR. PHILLIPS:  Everything for Apple.

 7              THE COURT:  2800 and 28 -- I'm sorry, strike that.

 8     2826 and 2882.

 9              MS. CHOI:  Everything for Epic.

10              MR. PHILLIPS:  Everything for Apple.

11              THE COURT:  2900 and -43, -46, -51, -52, and -53.

12              MS. CHOI:  Everything for Epic.

13              MR. PHILLIPS:  Everything for Apple.

14              THE COURT:  3000 series.  3052, -55, -60, -67 through

15     -69, -72, -77, -83, -84, -84A, -94, -98 --

16              MS. CHOI:  That's everything for Epic.

17              THE CLERK:  I'm sorry.  -84A and then --

18              THE COURT:  -94 and -98.

19              THE CLERK:  -94.  Okay.  Thank you.

20              THE COURT:  Mr. Phillips?

21              MR. PHILLIPS:  Yes, yes, everything for Apple as

22     well.

23              THE COURT:  Okay.  3100 series.  3115, -20, -22, -24,

24     -25, -29, -31, -33, -34, -38, -40, -44, -50, -52, -61, -66,

25     -74, -79, -73 -- well, strike that -- -93, -97, -98, and -99.
```

```
 1              MS. CHOI:  Your Honor, Epic has 3176 and 3177 on the
 2     list.
 3              MR. PHILLIPS:  We have 3177, as well, on the list.
 4              THE COURT:  Do you have a date?  I had -77 and then I
 5     had it scratched off.  There were some withdrawals.  I don't
 6     know if that --
 7              MR. PHILLIPS:  3177 was entered yesterday as part of
 8     the stipulation, Docket 682.
 9              THE COURT:  Okay.  So 3177.
10              MR. DOREN:  That went in with Mr. Schiller, Your
11     Honor.
12              THE COURT:  Yes, I'm seeing that here.
13         Someone has 3176.  Do --
14              MR. BYARS:  Your Honor, that's not in.  That was in
15     Rubinfeld's materials and he has been withdrawn, so that one
16     should be withdrawn.
17              THE COURT:  Okay.
18              MR. BYARS:  I believe 3177 went in with
19     Mr. Malackowski.
20              THE COURT:  Right.  I saw that.  Okay.  So 3177 is
21     in; 3176 is not.
22         Okay.  3200 series.  Okay.  3202, -16, -21, -22, -29, -30,
23     -33, -41, -42, -43, -48, -54, -55, -56, -58, -69, -87, -93,
24     -97, -98.
25              MS. CHOI:  That is everything for Epic.
```

1              **MR. PHILLIPS:**  And everything for Apple, as well.

2              **THE COURT:**  3300 series.  3308, -17, -24, -28, -32,

3    -43, -59, -63, -64, -70, -90, -93, and -99.

4              **MS. CHOI:**  Epic does not have -70 on the list.

5              **MR. PHILLIPS:**  We do have -70.  It apparently came in

6    with Mr. Malackowski yesterday.

7              **THE CLERK:**  I have it yesterday, yes.

8              **THE COURT:**  I show it came in on the 19th.  Okay.  So

9    that is in, 3370.

10        3400 series.  3409, -11, -12, -14, -21, -22, -25, -26,

11   -27, -33, -37, -41, -42, -48, -51, -53, -56, -57, -60, -62,

12   -63, -64, -65, -67, -68, -72, -73, -78, -91, -94.

13             **MS. CHOI:**  That is everything for Epic.

14             **MR. PHILLIPS:**  Everything for Apple, as well.

15             **THE COURT:**  Okay.  3500.  3505, 3512, -13, -19, 3535,

16   3536, -50, -52, -56, -59, -82, -83, -84, -85, -92, and -98.

17             **MS. CHOI:**  That is everything for Epic.

18             **MR. PHILLIPS:**  Yeah, everything for Apple.

19             **THE COURT:**  3600 series.  3606, -16, -20, -29, -32,

20   -36, -39, -41, -42, -50, -57, -59, -60, -61, -64, -76, -81,

21   -84, -91, -95, -96.

22             **MR. PHILLIPS:**  We also have 3679.

23             **MS. CHOI:**  Epic has that, as well.

24             **THE COURT:**  Okay.  I had that one and again I crossed

25   that off; that is, it looked like it was withdrawn.

1          **MR. PHILLIPS:**  I don't know if that one was --

2          **THE COURT:**  Let me just check.

3          **MR. BYARS:**  Your Honor, we have that associated with

4    Professor Rubinfeld also.

5          **MR. DOREN:**  I show it as Rubin, actually.

6          **MR. PHILLIPS:**  Yeah, we have it as Rubin.

7          **THE COURT:**  So in Docket -- well, maybe both of you

8    used it, that's why -- in Docket 641, it shows 3679 withdrawn.

9          **MR. BYARS:**  I think it may have been a mistake.

10   Apparently, it was on the stipulation for Professor Rubin and

11   Rubinfeld.  I don't have it in my binder for Professor Rubin,

12   so I'm not sure if they meant to associate it with him or not.

13   We do know it was associated with Professor Rubinfeld, so it

14   should be withdrawn if it was his document.

15         **MR. DOREN:**  Well, with all due respect for counsel's

16   binder --

17         **THE COURT:**  Well, it's in -- so Mr. -- I don't know

18   if it matters, but, Mr. Doren, I did show it as withdrawn

19   through your stipulation.

20         **MR. DOREN:**  Ah.  Thank you, Your Honor.

21         **THE COURT:**  That's why I had it and then crossed it

22   off.

23         **MR. DOREN:**  Yeah, I note, too, it is the App Store

24   review guidelines, so there is probably not too much room for

25   debate because I think it is in elsewhere, as well.

1          **MR. PHILLIPS:**  While we are just checking numbers, I

2    have been asked to confirm that 3305 was submitted.  I think

3    we did cover that one, but I just wanted --

4          **THE COURT:**  So, again, that one I had in and then it

5    was withdrawn.  So I did not reference that one.

6       So in Docket 641 on page 4 of 7, there are a series of

7    eight, nine -- there are a series -- all of the Rubinfeld ones

8    were withdrawn.  So what I don't know is whether these came in

9    with other people.  But when it said withdrawn, I deleted

10   them.

11         **MR. DOREN:**  Your Honor, the notes I am receiving say

12   that it went in with the final expert stip related to Rubin.

13         **MR. BYARS:**  I'm sorry.  What number are we on now?

14         **MR. DOREN:**  Oh, we are still on 3679.

15         **MR. BYARS:**  If it's just the app review guidelines,

16   I'm sure that there is no objection to that.

17         **THE COURT:**  Okay.

18         **MR. DOREN:**  Thank you, Counsel.

19         **MR. BYARS:**  Going back to 3305, we show that it was

20   actually admitted with Mr. Malackowski during his direct on

21   the 20th.  So it may have been withdrawn and then later

22   admitted through a witness.

23         **THE COURT:**  Okay.  So 3305 is in.

24      All right.  3500 series.  3505 --

25         **THE CLERK:**  Your Honor, you did -- you were up to

```
 1    3600 you did.

 2              THE COURT:  Thank you, Frances.  So I'm at 3700?

 3              THE CLERK:  Right.

 4              THE COURT:  3700 series.  3706, -09, -10, -12, -24,

 5    -32, -33, -43, -46, -50, -56, -58, -60, -64, -65, -68, -74,

 6    -77, -78, -81, -82, and -96.

 7              MR. PHILLIPS:  Apple also had 3795.

 8              MS. CHOI:  Epic does not have 3795.

 9              MR. PHILLIPS:  In with Mr. Allison.

10              THE COURT:  Give me a day.  Can you give me a day?

11              MR. PHILLIPS:  May the 7th.

12              THE CLERK:  I have it I.D.'d on the 7th, 3795.

13              MR. PHILLIPS:  Ah.  Well, now I read more closely, I

14    see that it is just I.D.'d.  So apologies for the confusion

15    there.

16              MS. CHOI:  Your Honor, Epic has 3743.

17              MR. PHILLIPS:  Yes.

18              THE COURT:  I do have --

19              MS. CHOI:  Okay.

20              MR. PHILLIPS:  We also have that one.

21              THE CLERK:  That is in.  She read it.

22              THE COURT:  Okay.  3800.  3800 itself, 3808, -11,

23    -14, -15, -18, -22, -23, -36, -46, -51, -52, -67, -77, and

24    -79.

25              MS. CHOI:  That's everything for Epic.
```

1              **MR. PHILLIPS:**  Everything for Apple.

2              **THE COURT:**  3900 series.  3900 itself, 3901, –05,

3     –06, –13, –17, –18, –22, –32, –33, –38, –43, –50, –51, –55,

4     –61, –68, –86, –89, and –93.

5              **MS. CHOI:**  That's everything for Epic.

6              **MR. PHILLIPS:**  Everything for Apple.

7              **THE COURT:**  4000 series.  4002, –10, –11, –13, –15,

8     –18, –22, –24, –28, –36, –63, –66, –69, –72, –74, a question

9     for me on –78, –80, –88, –89, –89A, –94, and –96.

10        So do you all show –78?

11             **MS. CHOI:**  I do not have –78 on my list.

12             **MR. PHILLIPS:**  I don't have –78 either.

13             **THE COURT:**  All right.  So not –78.  Okay.

14        Otherwise we are good, Ms. Choi?

15             **MS. CHOI:**  That's everything for Epic.

16             **MR. PHILLIPS:**  Did you –– sorry, Your Honor.  Did you

17     say 40- –– the one with the A at the end.  Was that 4089A?

18             **THE COURT:**  Yes, 4089A.

19             **MR. PHILLIPS:**  And did that come in with Mr. Cook

20     today?

21             **THE COURT:**  Yes.

22             **MR. PHILLIPS:**  Yes, we have that one.

23             **THE COURT:**  Okay.  4100 series.  4114, –15, and –16,

24     –19, –20, and –21, –28, –31, –33, –36, –38, –40, –54, –62,

25     –67, –68, –70, –72, –74, –77, –78, –92, and –99.

4044

```
1              MS. CHOI:  That is everything for Epic.

2              MR. PHILLIPS:  Everything for Apple.

3              THE COURT:  4200 series.  4200 itself, -17, -19, -34,

4    -39, -49, -70, -75, -78, -82, -85, and -87.

5              MS. CHOI:  We have -31 on Epic's list.

6              MR. PHILLIPS:  Yeah, -31 is on our list, as well.

7              THE COURT:  I must have missed it, but, yes, I have

8    that.  I show -31.

9         Okay.  4300 series.  4301, -03, -04, -08, -10, -12, -22,

10   -25, -29, -33, -35, -44, -48, -56, -61, -62, -63, -71, -74,

11   -76, -84, -89, -99.

12             MS. CHOI:  Your Honor, I have -25 and -27.  Apologies

13   if I missed it.

14             THE COURT:  I show -25.  I don't show -27.

15             MR. PHILLIPS:  We don't have -27.  We do have -25.

16             MS. CHOI:  I have the date admitted date of May 19th

17   for Schmid, direct examination.

18             THE COURT:  Yeah, I don't show that admitted.

19        Ms. Stone?

20             THE CLERK:  I don't have either one, so --

21             THE COURT:  So it is 4327?

22             MS. CHOI:  Yes, Your Honor.

23             THE COURT:  Is there an objection?  I don't even know

24   what it is.

25             MR. DOREN:  It is a DPLA, Your Honor.  No objection.
```

1          **THE COURT:**  Okay.  4327 is admitted.

2          (Defendant's Exhibit 4327 received in evidence)

3          **THE COURT:**  4400 series.  4400 itself, -01, -03, -07,

4    -11, -19, -24, -25, -33, -34, -35, -47, -49, -51, -57, -63,

5    -68, -69, -77, -80, -88, -89, a question on -93, -95, -96,

6    -97, and -99.

7          **MS. CHOI:**  That's everything for Epic, and I do have

8    -93 on my list.

9          **MR. PHILLIPS:**  We have -93, as well.

10         **THE COURT:**  Okay.

11      4500 series.  4519, -21, -26, -30, -55, -58, -61, -64,

12   -66, -69, -79, -81, -86, and -95.

13         **THE WITNESS:**  That's everything for Epic.

14         **MR. PHILLIPS:**  Everything for Apple.

15         **THE COURT:**  Okay.  4600 series.  4600 itself, 4608,

16   4610, -14, -16, -19, -23, -26, -27, -32, -37, -38, -41, -49,

17   -50, -52, -61, -62, -63, -65, -69, -71, -72, -74, -79, and

18   -80.

19         **MS. CHOI:**  That's everything for Epic.

20         **MR. PHILLIPS:**  Everything for Apple.

21         **THE COURT:**  4700 series.  4713 through -16, 4753

22   through -61, -63, -65, -66, -67, -69, -70 and -71, -73, -74,

23   -75, -77, -80, -82, -86, -87, -92 through -98, but I do have a

24   question on -97.

25         **MS. CHOI:**  That's everything for Epic, and I do have

1    -97 on the list.

2            **MR. PHILLIPS:**  We have -97 on the list, as well.

3        4775 was actually withdrawn as an exhibit at Docket 704.

4            **THE COURT:**  Okay.  So I'll take out -75.

5        Yes, Ms. Choi?

6            **MS. CHOI:**  Yes, Your Honor.

7            **THE COURT:**  Okay.  4800 series.  4800 itself, -02,

8    -03, -06 through -13, -4815 through -19, -22 through -24, -55

9    through -59, -61, -66, -68, -71, -72, -75, and -78.

10           **MS. CHOI:**  Your Honor, I have -876 on the list.

11           **MR. PHILLIPS:**  Yeah, we have -876, as well.

12           **THE COURT:**  4876?

13           **MS. CHOI:**  Correct.

14           **MR. PHILLIPS:**  Yes.  And we also have 4880.

15           **MS. CHOI:**  Epic has that, as well.

16           **THE COURT:**  All right.  So I'll add -76 and -80.

17       4900.  4909, -18, -20 and -22, -31, -34, -56, -59, -62,

18   -66, -69, -75, -76, and -82.

19           **MS. CHOI:**  That's everything for Epic.

20           **MR. PHILLIPS:**  Everything for Apple.

21           **THE COURT:**  Then we jump to 5300; is that right?

22           **MS. CHOI:**  Correct.

23           **MR. PHILLIPS:**  Yep.

24           **THE COURT:**  5322, -26.  I have a question mark on

25   -32.

```
1        Do either of you show that?
2            MS. CHOI:  I do not have -32 on the list.
3            MR. PHILLIPS:  We do not have -32 either.
4            THE COURT:  Okay.  Take that out.
5        5335 and -63.
6            MS. CHOI:  Epic has -38 on the list.
7            MR. PHILLIPS:  We do not have -38 on the list.
8            THE COURT:  You do not.
9        So where do you show that one from?
10           MS. CHOI:  I have this as part of the -- admitted on
11       May 20th as part of the Lafontaine materials relied upon.
12           THE COURT:  So that is from a stipulation?
13           MS. CHOI:  Correct, Docket number 715.
14           THE COURT:  I don't see it.
15       Is there an agreement on this one?
16           MR. PHILLIPS:  So there was 5338.  Yeah, we are
17       seeing that on the stipulation, as well, so we should have it
18       on our list and no objection.
19           THE COURT:  Okay.  5338.
20       (Defendant's Exhibit 5338 received in evidence)
21       5400 series.  5441, -67, -69, -71 through -88, and -92.
22           MS. CHOI:  That's everything for Epic.
23           MR. PHILLIPS:  Everything for Apple.
24           THE COURT:  Diane, we are almost there.
25       Okay.  5500 series.  5505, -18, -23, -32, -35, -36, -39,
```

```
1    -40, -41, -42, -44, -46 through -50, -52, -55 through -62,

2    -67, -68, and -73.

3            MS. CHOI:  Epic has 5527 on the list and 5627.  Oh,

4    sorry, I jumped ahead.

5            MR. PHILLIPS:  I don't have 5527.

6            THE COURT:  So where do you show that from?

7            MS. CHOI:  I have that admitted on May 17th during

8    Mr. Schiller's testimony.

9            THE COURT:  I have a 5627 --

10           THE CLERK:  I have 5627 on the 17th.

11           THE COURT:  -- but I don't have 5527.

12           MR. BYARS:  Your Honor, we are checking the

13   transcript.  Perhaps we can come back to that one in a moment.

14           THE COURT:  Well, the final one of the day, 5627.

15   Yes?

16           MR. PHILLIPS:  5527.

17           THE COURT:  I have 5627.

18           MR. BYARS:  That's right, Your Honor.  We just

19   searched the transcript for 5527, so that might have been a

20   typo.  We do have 5627.

21           MR. PHILLIPS:  And I just need to check.  5627.

22           THE COURT:  That was the one I admitted on the 17th.

23           MR. PHILLIPS:  We have that one.

24           THE COURT:  We are all good?

25       Okay.  Hooray.  We are done with exhibits.  Really
```

```
 1    important.  I tell you I cringed when I read about -- I think

 2    it was a judge in Chicago and all the exhibits that went back

 3    to the jury were wrong.  He had to retry the entire case.  It

 4    was a patent case, I think.  So I am a little bit neurotic

 5    about exhibits.

 6              MR. PHILLIPS:  On the subject of that, Your Honor, I

 7    just wanted to check one final exhibit, if you will indulge

 8    us.  PX1659, which came up during Mr. Cook's testimony today.

 9    We do not have that as admitted.  I just wanted to confirm.

10              THE COURT:  You know, I didn't have the spreadsheet

11    for that one.  Hold on.

12         So I show from today three in the 1600 series, 1667, -77,

13    and -78.

14              MR. PHILLIPS:  We have those.

15              THE COURT:  So what were you asking about?

16              THE CLERK:  1659.

17              MR. PHILLIPS:  Yes.  And I was just -- we did not

18    think that was admitted, and I just wanted to check.  I think

19    I missed it when you were going through that series.

20              THE COURT:  I did not call out that one.

21              MR. PHILLIPS:  I think we are all on the same page,

22    then.  Thank you.

23              THE CLERK:  I have a group in the 5600 series with

24    Dr. Athey on the 12th.

25              THE COURT:  The only thing I show on --
```

1          **THE CLERK:**  Oh, wait.  They are marked for I.D.  I'm

2    sorry.  I.D. only.  Sorry.  Sorry.

3          **THE COURT:**  That's okay.  That is why we are doing

4    this.

5       Okay.  Could I ask each side, it seems to me, is going

6    to -- will have to have a file with all of the admitted

7    exhibits in any event, so if you wouldn't mind giving us a

8    flash drive with those electronic exhibits maybe sometime

9    Monday or Tuesday?

10          **MR. BYARS:**  We will do that, Your Honor.  I assume

11    you don't want another physical set.

12          **THE COURT:**  No, no.  Now, after how many weeks, did

13    you know that?  I am -- yeah, I really don't.  I tried really

14    hard to make this work, but it just didn't work.  So...

15          **MR. BYARS:**  Your Honor, I'm sorry.  Just to clarify,

16    you would like all of the exhibits in whatever form --

17          **THE COURT:**  I'm happy to have two flash drives, one

18    from each of you, with respect to your admitted set --

19          **MR. BYARS:**  Okay.  Thank you.

20          **THE COURT:**  -- that we have just gone through in

21    excruciating detail.  Very important, though.  Really

22    important.

23       So, Ms. Stone, you now have the list.  If there is -- if

24    you don't have a file number with them, just let us know.

25    They should have been delivering to you physically --

1          **THE CLERK:**  Yeah, yeah, I have lots of exhibits here.

2          **THE COURT:**  So we will verify.

3          **THE CLERK:**  There's a couple more coming, a couple

4   more boxes coming.  So yes.

5          **THE COURT:**  Okay.  We will verify that so that we

6   have that for any appeal.

7       Okay.  Well, I really -- I guess I really do wish I could

8   have joked around a little bit more with you all during the

9   course of this trial, but so many people listening, I really

10  thought it was important to make sure that they understood how

11  serious a process this is.

12      But you're all excellent trial lawyers.  It has been

13  really a pleasure.  It's always a pleasure to have good trial

14  lawyers in the courtroom, and believe me, I don't always get

15  good trial lawyers in the courtroom.  So I appreciate that.  I

16  look forward to Monday.  It should be fun.

17      And is there anything else we need to do?

18          **THE CLERK:**  What time on Monday?

19          **THE COURT:**  I'm happy to start a little bit later at

20  9:00 if you want.

21          **MS. FORREST:**  Whatever time Your Honor would like is

22  fine with us.

23          **MR. DOREN:**  The same, of course, Your Honor.

24          **THE COURT:**  Well, I guess everybody who is listening

25  is used to our normal schedule, so we will go ahead and do our

1    normal schedule.

2            **MR. DOREN:**  And, Your Honor, I just got a note that I

3    guess Exhibit DX5338 was withdrawn by Stipulation 682, Docket

4    number 682.

5            **THE COURT:**  5338?

6            **MR. DOREN:**  5338.

7            **THE COURT:**  Okay.  I will withdraw that.

8            (Defendant's Exhibit 5338 withdrawn.)

9            **MR. DOREN:**  Thank you, Your Honor.

10           **THE COURT:**  Anything else?

11           **MR. DOREN:**  That's all I have.

12           **MS. FORREST:**  Nothing else from Epic, Your Honor.

13           **THE COURT:**  Okay.  Everybody have a good weekend.  We

14    will stand in recess until 8:00 o'clock on Monday morning.

15

16           (Proceedings concluded at 2:25 p.m.)

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman, Pamela Batalo-Hebel, and Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.

_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR

_____/S/ PAMELA BATALO-HEBEL_____

Pamela Batalo-Hebel, CSR, RMR, FCRR

_____/s/ Raynee Mercado_____

Raynee Mercado, CSR, RMR, FCRR

Friday, May 21, 2021