VOLUME 16

                                      Pages 4053 – 4193

                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,            )
                            )
        Plaintiff,          )    NO. C-20-5640 YGR
                            )
  vs.                       )    Monday, May 24, 2021
                            )
APPLE, INC.,                )    Oakland, California
                            )
        Defendant.          )    BENCH TRIAL
_____)
APPLE, INC.,                )
                            )    CLOSING ARGUMENTS
        Counterclaimant,    )
  vs.                       )
                            )
EPIC GAMES, Inc.,           )
                            )
        Counter-Defendant.  )
_____)


              REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   BY:  **KATHERINE B. FORREST, ESQUIRE**
                        **GARY A. BORNSTEIN, ESQUIRE**
                        **YONATAN EVEN, ESQUIRE**
                        (Appearances continued.)

Reported By:     Diane E. Skillman, CSR 4909, RPR, FCRR
                 Pamela Batalo-Hebel, CSR 3593, RMR, FCRR


        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    For Plaintiff:              CRAVATH, SWAINE & MOORE, LLP
                                  825 Eighth Avenue
 2                                New York, New York 10019
                            BY:   LAUREN A. MOSKOWITZ, ESQUIRE
 3                                JUSTIN C. CLARKE, ESQUIRE
                                  W. WES EARNHARDT, ESQUIRE
 4                                BRENDAN BLAKE, ESQUIRE
                                  JIN NIU, ESQUIRE
 5                                BRENT BYARS, ESQUIRE

 6    For Defendant:              GIBSON, DUNN & CRUTCHER
                                  333 South Grand Avenue
 7                                Los Angeles, California 90071
                            BY:   RICHARD J. DOREN, ESQUIRE
 8                                DAN SWANSON, ESQUIRE
                                  CYNTHIA RICHMAN, ESQUIRE
 9                                RACHEL BRASS, ESQUIRE

10

11                                GIBSON, DUNN & CRUTCHER, LLP
                                  2001 Ross Avenue, Suite 1100
12                                Dallas, Texas 75201
                            BY:   VERONICA S. MOYE, ESQUIRE
13
                                  PAUL WEISS RIFKIND
14                                WHARTON & GARRISON LLP
                                  2001 K STREET, NW
15                                Washington, DC 20006
                            BY:   KAREN DUNN, ESQUIRE
16                                JESSICA E. PHILLIPS, ESQUIRE

17

18    For Defendant:              PAUL WEISS RIFKIND
                                  WHARTON & GARRISON LLP
19                                943 Steiner Street
                                  San Francisco, California 94117
20                          BY:   ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| **Defendant's Exhibits:** | **Withdrawn** | **Page** | **Vol.** |
|---|---|---|---|
| 3734 | | 4192 | 16 |
| 5441 | 4192 | | 16 |
| 5447 | | 4192 | 16 |
| 5547 | 4192 | | 16 |

| | |
|---|---|
| 1 | <u>Monday, May 24, 2021</u>                    <u>7:57 a.m.</u> |
| 2 | P R O C E E D I N G S |
| 3 | o0o |
| 4 | **THE CLERK:**  Please rise.  Court is in session.  The |
| 5 | Honorable Yvonne Gonzalez Rogers presiding. |
| 6 | **THE COURT:**  Good morning, everyone. |
| 7 | **EVERYONE:**  Good morning, Your Honor. |
| 8 | **THE CLERK:**  Please be seated. |
| 9 | **THE COURT:**  Okay.  Let's go on the record. |
| 10 | **THE CLERK:**  Calling Civil action 20-5640 Epic Games, |
| 11 | Inc. versus Apple, Inc. |
| 12 | Counsel, please state your appearances.  The mics are on |
| 13 | at the table. |
| 14 | **MS. FORREST:**  Good morning, Your Honor.  Katherine |
| 15 | Forrest for Epic. |
| 16 | **THE COURT:**  Good morning. |
| 17 | **MR. BORNSTEIN:**  Good morning.  Gary Bornstein for |
| 18 | Epic, Your Honor. |
| 19 | **THE COURT:**  Good morning. |
| 20 | **MR. CLARKE:**  Good morning, Your Honor.  Justin Clarke |
| 21 | for Epic. |
| 22 | **MS. MOSKOWITZ:**  Good morning, Your Honor, Lauren |
| 23 | Moskowitz for Epic. |
| 24 | **THE COURT:**  Mr. Sweeney, good morning, sir. |
| 25 | **MR. SWEENEY:**  Good morning, Your Honor. |

1          **THE COURT:**  I have, it looks like, Mr. Niu.

2          **MR. NIU:**  Good morning, Your Honor.  Jin Niu For

3      Epic.

4          **THE COURT:**  Ms. Kloss.

5          **MS. KLOSS:**  Good morning, Your Honor.

6          **THE COURT:**  Mr. Rudd, good morning.

7          **MR. RUDD:**  Good morning, Your Honor.

8          **THE COURT:**  And there are more in the back.

9      Ms. Forrest, maybe you can introduce them as they stand.

10         **MS. FORREST:**  Yes.  Brendan Blake -- Your Honor, let

11     me also say that the first two -- the first two rows we have

12     our beachmasters who are the people who have handled the

13     logistics.  They have been extraordinary.

14         We have next to them, Jill Greenfield over here who has

15     been doing a lot of the expert work.  Brendan Blake doing

16     everything.  Paul Riehle, our local counsel here, you may

17     recognize from other matters.

18         Behind him, Brent Byars who you've seen doing

19     examinations.  Colin Herd who has been support for many of the

20     witnesses.  And Dan Ottaunick who's also been support for many

21     of the witnesses.  And I think I've got our folks.

22         **THE COURT:**  Way in the back you've got someone way in

23     the back, Ms. Forrest.  Yes, no?

24         **MS. FORREST:**  Those, Your Honor, back there are two

25     of our paralegals who are wearing masks and obscuring their --

1    Benjamin Rodriguez and Austin.

2         **THE COURT:**  Good morning, Ms. Behringer.  Come on

3    forward.

4         **MS. BEHRINGER:**  Thank you.

5         **THE COURT:**  All right.  Well, welcome to the

6    courtroom.  As I said, we are in the final stretches here, so

7    I'm being very lax with the rules.  And I'm sure the Chief

8    won't get too mad at me.

9       Okay.  So the Apple side.  Mr. Doren, good morning.

10        **MR. DOREN:**  Good morning, Your Honor.  We are also

11   joined today by Kate Adams from Apple.

12        **MS. ADAMS:**  Good morning, Your Honor.

13        **THE COURT:**  Mr. Schiller --

14        **MR. SCHILLER:**  Good morning.

15        **THE COURT:**  -- I would not forget you, sir.

16        **MR. SCHILLER:**  Thank you.

17        **MS. DUNN:**  Good morning, Your Honor.  Karen Dunn for

18   Apple.

19        **THE COURT:**  Good morning.

20        **MR. SWANSON:**  Good morning, Your Honor.  Dan Swanson

21   for Apple.

22        **THE COURT:**  Good morning.

23        **MS. MOYE:**  Good morning, Your Honor.  Veronica Moye

24   for Apple.

25        **THE COURT:**  Good morning.

1      We have Mr. Spalding.

2              **MR. SPALDING:**  Good morning, Your Honor.

3              **THE COURT:**  And Mr. Eltiste isn't here today.  Just

4      for fun?

5              **MR. SPALDING:**  Just me today.

6              **THE COURT:**  Who else do we have back there?

7              **MS. YANG:**  Good morning, Your Honor.  Betty Yang for

8      Apple.

9              **THE COURT:**  Okay.

10             **MR. DOREN:**  Your Honor, Heather Grenier, from Apple.

11             **THE COURT:**  Yes, good morning.

12             **MR. DOREN:**  And Cindy Richman counsel for Apple here.

13     She's with us of course and Mark Perry.

14             **THE COURT:**  Ah, illusive Mark Perry.

15             **MR. PERRY:**  Good morning, Your Honor.

16             **THE COURT:**  Good morning.  I see you at the very top

17     of all the filings, but I've never seen you here in person.

18             **MR. PERRY:**  That's why I sit in the back, Your Honor.

19             **THE COURT:**  Welcome to the courtroom.  And then I

20     believe we have the same -- let's see.

21      Ms. Manifold.

22             **MS. MANIFOLD:**  Good morning, Your Honor.

23             **THE COURT:**  Good morning.  And Dorothy Atkin from Law

24     360, good morning.

25      And Elizabeth Lopatto from Verge.

1    I think I have everyone.

2    Good morning, Ms. Behringer.

3         **MS. BEHRINGER:**  Good morning, Your Honor.

4         **THE COURT:**  Vicki Behringer has been a courtroom

5    artist for this District for a very long time, and I'm pleased

6    that the *Wall Street Journal* was able to recognize some of --

7    or at least one of your drawings.  It's an art that is -- if

8    we move into something more real, then we may not have

9    courtroom artists anymore, but I certainly have enjoyed having

10   her in the courtroom in this trial and other trials.

11   Thank you for being here.

12        **MS. BEHRINGER:**  Thank you, Your Honor.  It has been a

13   pleasure.  And it has been a pleasure to sketch all of you.

14        **THE COURT:**  Okay.  So are you going to have multiple

15   people do this argument or -- Ms. Forrest?

16        **MS. FORREST:**  Your Honor, for Epic, it will be Gary

17   Bornstein.

18        **THE COURT:**  All alone, Mr. Bornstein.  They are

19   leaving you out to dry, high or low, whatever it is.

20        **MR. BORNSTEIN:**  With tremendous support before this

21   moment.

22        **THE COURT:**  I'm sure.

23        **MR. DOREN:**  Your Honor, while Mr. Bornstein is last

24   to the mast, on this side I will be handling remedies,

25   Mr. Swanson will be handling market definition and market

1    power, and Ms. Moye will be handling conduct and effects.

2         **THE COURT:**  Okay.  So it takes three of them,

3    Mr. Bornstein.

4         **MR. BORNSTEIN:**  We are used to being outnumbered in

5    this case, Your Honor.

6         **MR. DOREN:**  As I look around the courtroom, I find

7    myself doubting that, Your Honor.

8         **THE COURT:**  Let's just say that, you know, as I was

9    thinking about it, clearly either set of teams could be

10   representing the other party.  Both sides are incredibly well

11   represented here in this case, and win or lose, you all at

12   least get to put that on your résumé.

13      Anyway, well, this is what I have -- this is where I'll

14   start.  I have questions which I assure you I will ask during

15   the course of these proceedings because I'm not capable to not

16   ask them if I have them.

17      But I do want to hear from you in terms of what you

18   think -- I'll give you two choices, that is, you tell me what

19   are the two issues that are on the top of your mind that you

20   would like time really to argue.

21      So, Mr. Bornstein, we'll start with you.  Just give me

22   your issues.  What are the top two issues you would like to

23   discuss?

24        **MR. BORNSTEIN:**  Your Honor, market definition and

25   remedies.

1          **THE COURT:**  All right.  And Mr. Doren?

2          **MR. DOREN:**  Your Honor, those seem like a good

3    starting place for us as well.

4          **THE COURT:**  Okay.  Ms. Moye is doing conduct,

5    Mr. Doren, you said you're doing remedies.

6          **MR. DOREN:**  Yes, Your Honor.

7          **THE COURT:**  So it's Mr. Swanson.  All right.  Well,

8    both of you can approach the two microphones, please.

9          **MR. BORNSTEIN:**  Your Honor, we have a set of slides

10   that contain both confidential and public information.  And so

11   with your permission, I would pass up a copy that has the

12   nonpublic information when we get to those portions.  If we

13   get to these portions, Your Honor can review them.

14         **THE COURT:**  I think that -- do you have slides as

15   well?

16         **MR. SWANSON:**  We do, Your Honor.

17         **THE COURT:**  I think probably the best thing to do

18   then is -- because we don't tend to go -- I don't tend to go

19   back and forth very much, and -- or I tend to go back and

20   forth.  So I don't want to have us necessarily wait on

21   Ms. Stone's ability to have the hot seat operator go back and

22   forth unless it is necessary.

23      So let's turn on the Elmo.  And with the Elmo, you will be

24   able to just open up your binders.  You can pop that, whatever

25   slide it is you want, on there and everybody can see it.

```
1    So -- see?  It works.  It's old school.  Do you not -- I
2    started off in a courtroom where we had to put the -- there
3    was no place for the jury, the judge, and the lawyers to see
4    the screen for the overhead all in the same place.  Someone
5    was always blocked.  So these federal courtrooms are wonderful
6    for trial cases.
7        Ms. Stone, why don't you show them how to use that before
8    we get started.  Can you show them how to use the Elmo?
9            MR. DOREN:  Your Honor, while counsel are relearning
10   how to use -- I guess my mic is not on.
11           THE CLERK:  Let me put --
12           MR. DOREN:  While counsel is relearning how to use an
13   Elmo, I just wanted to note that while we are fine starting
14   with these two issues, we do want to be sure to address
15   conduct and effects.  Thank you.
16                   (Pause in the proceedings.)
17           THE COURT:  Did you see that, Ms. Moye?  The little
18   thing on the front makes it smaller and larger, the little
19   wheel.
20           MS. MOYE:  Yes.
21           THE COURT:  It's not a little wheel like
22   Mr. Schiller's wheel on the iPod.
23       You know, Mr. Schiller, I will tell you a funny story:
24   That when I tried to a jury the iPod case, it had been so long
25   since I had seen an iPod that the clerks brought in the
```

1    physical iPod and I tried to turn it on.  I said, where's the

2    music?  They are like, no, you have to have ear buds in.  I

3    said, okay.  Totally forgot about that.  Such old technology

4    back then.

5        Okay.  So I have your two books.  Well, let's get started

6    with you, Mr. Bornstein.  And let's start with the foremarket.

7            **MR. BORNSTEIN:**  Sure, Your Honor.  Happy to start

8    that way in terms of our perspective on the right way to walk

9    through the market.

10       For the foremarket, we don't think there's a tremendous

11   amount to discuss.  We have testimony that we got in --

12   finally from Mr. Cook on Friday that, in fact, Apple does

13   compete on the operating system side against Google, at

14   transcript pages 3891 to -92.

15           **THE COURT:**  So they compete on the OS but they

16   also -- obviously they compete for -- in mobile devices on

17   phones, right?

18           **MR. BORNSTEIN:**  They do --

19           **THE COURT:**  You don't disagree with that, do you?

20           **MR. BORNSTEIN:**  I do not disagree that they compete

21   for the sale of phones, no.

22       But the competition in terms of the decision that gets

23   made by developers is what operating system am I going to

24   write for.  Am I going to write for iOS?  Am I going to write

25   for Android?  It is, I think, not disputed based on the

testimony of both side's experts that these days most
developers write for both.

The reason they do that is that's the only way they can
reach a broad, sufficiently broad spectrum of consumers.  And
that is a function of the fact that consumers will either be
on iOS or on Android, and rarely switch between the two.

**THE COURT:**  Okay.  So, Mr. Swanson, is there no issue
on the foremarket?

**MR. SWANSON:**  There's a big issue on the foremarket,
Your Honor, because we don't regard it as a relevant market.
There's no claim in this case that Apple has monopolized the
smartphone OS market.  There's no claim that Apple has
restrained trade.  In a smartphone OS market, device
competition is pertinent in this case.

The term "duopoly" has been thrown around.  But in device
competition, Apple faces multiple enormous companies that have
worldwide scope and scale:  Samsung, LG, Allway, Wappo.  If we
were to restrict attention to the operating system market that
Dr. Evans has defined, if you count up the operating systems,
Apple has a 15 or 16 percent share of operating systems in the
global-minus-China market that he defines.  And for every
single iPhone that Apple sells, Dr. Evans' market, Android
manufacturers, of which there are many, sell five or six.

So -- but the larger point is, the issue to focus on from
our standpoint is, the plaintiff's claim, what are the

1    restraints that would keep Apple --

2            **THE COURT:**  So are you saying that I have to find a

3    monopoly both in the foremarket and the aftermarket?

4            **MR. SWANSON:**  No.  I would say that --

5            **THE COURT:**  Can you -- can we both agree on that?

6    That is, there can be a foremarket and only monopolistic

7    conduct in the aftermarket?

8            **MR. SWANSON:**  I would say, as Professor Schmalensee

9    does, that it's a red herring.  The question is, what keeps

10   Apple from raising commissions in the App Store.

11       And the issue of device competition is out there, but

12   those are not the direct brands that we look to and that our

13   experts define the market to be that restrain Apple from doing

14   that in this industry.

15       The other brands are the console stores, the Steam store,

16   Google Play store, Samsung Galaxy store, the other stores that

17   are on PCs and Macs.  That's the issue.  Device competition

18   can be a constraint, but it is these other constraints that

19   are the first question for the Court in deciding whether or

20   not Epic's single brand iOS-only market is a viable market.

21   And single brand markets are legal unicorns in talking about

22   operating system competition is a distraction from the key

23   question before the Court.

24           **THE COURT:**  All right.  Mr. Bornstein.

25           **MR. BORNSTEIN:**  Well, first I'll note that in that

1    answer to Your Honor's question, not a word was said about

2    developer-side competition.  We have agreement here that we

3    are dealing with two-sided markets.  And all we heard was a

4    discussion about the consumer side and not the developer side.

5        I think it is inarguable that developers write for

6    Android.  They don't write for Samsung.  They don't write for

7    LG.  They don't write for Allway.  They don't write for Wappo

8    and Devo.  So on the developer side it's clear that it is a

9    smartphone operating system market.

10       In terms of whether it is relevant, there are extensive

11   allegations in our complaint about operating system side

12   competition and switching costs between iOS and Android, and

13   we believe for all the reasons we have laid out for the

14   entirety of the case that the foremarket/aftermarket framework

15   is the right way to think about this.

16       There is some discussion in the conclusions of law from

17   Apple that the aftermarket is kind of a brand new invention,

18   it wasn't previously disclosed, but it's discussed in Your

19   Honor's preliminary injunction opinion.  It has been in this

20   case since the fall.

21       And in terms of why the foremarket/aftermarket framework

22   is the right one, is because, as with razors and razor blades

23   or copiers and copier parts, there's a purchase of a durable

24   good or a decision by a developer to write for a particular

25   operating system and make that investment followed by a

subsequent market that happens down the line where the

developers and users, each of whom has made the decision to

enter the foremarket, then get matched with one another

through the app distribution services that Apple provides, and

right now that only Apple provides.

So it's not at all a distraction or a diversion to say

that we need to look in the first instance at the first

decision that consumers and developers make.  As Your Honor

said in the preliminary injunction opinion, one of the things

that you do is you look at the commercial realities.  And

that's something that the parties have actually agreed on in

the January 22 filing is, that reviewing the commercial

realities of the situation, including in connection with

whether you analyze a single brand market, is the right way to

go about about it.  That's page 13 of the January 22

submission where there's agreement between the parties on that

point.  And here, the commercial reality is that developers

make a decision and they write to an operating system,

typically both --

            **THE COURT:**  So in a developer-side competition,

though, you say developer-side competition.  With whom

specifically are they competing?

            **MR. BORNSTEIN:**  The developers are not competing with

each other, Your Honor.  The developers are making a decision

to write for iOS or for Android.   iOS and Android are

competing with one another.  The developer is the consumer and

this two-sided platform, the operating system is a two-sided

platform.  It has consumers and it has developers.

The consumers decide between iOS or Android when they

purchase their device.  They are then locked in at least for

two years or three years, and then when they make a new

purchase for a new device, they often stay with the operating

system they have chosen.  That's the consumer side of this

two-sided market.

The other side of the two-sided market on the operating

system level are the developers who are writing their apps for

use on a particular operating system.

So the developers are not competing with one another in

this description.  I'm talking about the developers of the

customers of the operating system.  They are one side of the

two-sided market.

**THE COURT:**  So are they customers or not,

Mr. Swanson?

**MR. SWANSON:**  The developers are a form of customer

in a two-sided transaction platform.  This is a two-sided

transaction market, and I'm glad Mr. Bornstein raised

developers because developers develop games across all the

platforms.  They develop for all three:  Consoles, they

develop for the Windows operating system, a variety of devices

that host stores on tablets and laptops and desktops that run

that system, macOS developers develop for that.

This is the game transaction, the digital game transaction market that Apple's experts have defined.  These are -- this is a market defined by substitution options for both consumers and developers.

And I would be remiss if I didn't point out that the -- I do think it is a red herring, if we are starting out and asking the question of device substitution, then we've reached the conclusion very quickly that consoles -- the consumers don't switch between consoles.  So on this approach to the market, every console would be a monopolist.

We know that this approach to the market is very litigation driven.  It is also designed to allow Epic to sue Google as a monopolist.  Apple is a monopolist.  Google is a monopolist.  All the consoles are monopolists.  That's not an appropriate approach as the Supreme Court and the Ninth Circuit have taught; we look at substitution, we look at reasonable interchangeability and we see game, game apps that are available across all of these platforms.  We see consumers who own all of these devices by and large, certainly have access to them.  There has been a ton of evidence like that in this case, and we have seen developers who develop across these platforms.  And that's the nature of competition.

And the key question is, can Apple raise the commission in the App Store for game app transactions?  What are the

constraints?  Those constraints in the first instance are to
look at the other online stores that consumers and developers
can switch to, and to take account of indirect network effects
that the *AmEx* decision, the Supreme Court has taught act as a
constraint on any platform that tries to raise price.

You have to look at the impact that flows from both sides,
the ability of developers to move somewhere else, the ability
of consumers to switch somewhere else.

**THE COURT:**  Mr. Bornstein, the relevant market has to
include substitutes.

**MR. BORNSTEIN:**  I agree, Your Honor.

**THE COURT:**  So if your definition is -- seems to not,
at least on its face, include substitutes.

**MR. BORNSTEIN:**  On that one I disagree, Your Honor.

**THE COURT:**  Okay.  That's why I'm giving you the
opportunity to explain that.

**MR. BORNSTEIN:**  Yes.  So a few things.

First of all, I think it's critical that we make clear
what the product is in this market.  So in order to assess
what the substitutes are, we have to have agreement on
substitute for what.

And Mr. Swanson now, and Apple consistently throughout the
case, has been talking about game transactions.  And we have,
I think, a disagreement on whether that's appropriate and even
what that means.

1          The market that we have defined, and we believe to be the

2     appropriate market, is a market for app distribution.  That

3     means, at least for purposes of the -- some of the

4     restrictions in the case, the ones about the App Store being

5     the exclusive way to get apps on the phone.  And when I say

6     app distribution, I mean getting an app on the phone.

7          It's not the in-app purchase that happens down the line.

8     It's not buying Agent Peely.  It's not buying coffee from

9     Starbucks.  It's actually getting the *Fortnite* app, getting

10    the Starbucks app.  There is no substitute for getting the

11    *Fortnite* app, or the Starbucks app or the Netflix app on your

12    phone other than through an iOS app distribution path.

13    And --

14          THE COURT:  But that's only because you defined it

15    that way.

16          MR. BORNSTEIN:  Well, we defined it that way, Your

17    Honor, because we think that's an appropriate definition --

18          THE COURT:  Is there any definition that gets to the

19    problem where the product market has actual economic

20    substitutes?

21          MR. BORNSTEIN:  Well, Your Honor, our view, based on

22    the economic work that our folks have done, as we have said,

23    based on the commercial realities of the situation is, there

24    is no economic substitute for getting an app on the phone.

25    There are certainly substitutes for the App Store --

1          **THE COURT:**  Okay.  Look, so you agree that your

2     market definition does not include economic substitutes but

3     your argument is that it can't because that doesn't reflect

4     reality.

5          **MR. BORNSTEIN:**  I disagree with that articulation,

6     Your Honor.

7          **THE COURT:**  Tell me exactly what the economic

8     substitutes are.

9          **MR. BORNSTEIN:**  The economic substitutes for the App

10    Store would be direct distribution onto an iPhone and would be

11    an alternative app store if it were permitted to be on the

12    iPhone.

13       We do not believe, and we think we have proven, that

14    distribution of an app on an Android device or distribution of

15    an app on a console is not an economic substitute.  We agree

16    that economic substitute should be included, but we do not

17    believe those are economic substitutes because you would not

18    see switching in sufficient numbers in terms of app

19    distribution to constrain Apple's conduct.  In other words, if

20    Apple were to raise price for app distribution, you would not

21    see a sufficient number of people switching over to an Android

22    device, getting apps over on a console.

23         **THE COURT:**  The other issue is that your formulation

24    seems to ignore the reality that customers choose an

25    ecosystem, right?  I mean, there's a lot of evidence in this

trial that in the foremarket of devices, it is Apple's

business strategy to create a particular kind of ecosystem

that is incredibly attractive to its purchasers, it's

consumers.

And so if those consumers choose to enter into that

ecosystem, then your economic substitutes, as you've just

defined them, destroy the ecosystem into which they have made

a choice to enter.  Just like if you buy the Xbox, or you buy

into, you know, a variety of these particular walled-off

gardens, you know that that is what you are buying into and

you choose to make that decision.

Now, there seems to be competition that is -- and that's

why I said it's somewhat of a dynamic area right now because

competition is good, and people are trying to figure out ways,

right, to access those consumer choices.  But your economic

substitutes destroy that consumer choice.

**MR. BORNSTEIN:**  I'm not sure I understand the idea of

destroying the consumer choice.  What I think Your Honor is

saying, and let me know if I'm off base on this, is the

suggestion that people are making an informed decision to say

I want to go in and buy an Apple device and I know that if I

make that choice, I'm going to be locked into all of these

downstream consequences.

**THE COURT:**  Let's talk about knowledge and whether

it's required under *Eastman Kodak* and some of the circuits

that have followed.

Is it?

**MR. BORNSTEIN:**  In terms of defining a proper single brand market?

**THE COURT:**  Correct.

**MR. BORNSTEIN:**  So my understanding certainly of *Newcal*, which is the leading Ninth Circuit case applying *Kodak*, is that there are four factors that the Court will look at.

Some of them, I think, are not in dispute, but I'll go -- it's whether the restraint is only in the aftermarket.  It's whether the aftermarket is derivative of the foremarket.  It's whether the power that the monopolist has as a result of contracts that people willingly enter into, and in the last one, which is where I think Your Honor's question goes to, is the question of whether foremarket competition adequately disciplines conduct in the aftermarket, and knowledge is a piece of that.

And *Kodak* says and *Newcal* says that when there are information costs and when there are switching costs, then it is harder for the foremarket competition to discipline what happens in the aftermarket.

So to make that concrete here, for example, when people buy an iPhone, join the ecosystem as Your Honor described it, they don't know what the costs are going to be that they are

1    going to incur for app distribution and in-app purchases.

2         **THE COURT:**  You are assuming that.  We actually don't

3    have any evidence on that topic, do we?

4         **MR. BORNSTEIN:**  We do, Your Honor.  We have evidence

5    in the deposition of Mr. Cue who was asked that question, as I

6    recall, in terms of whether people are aware or whether Apple

7    makes efforts to inform people of this.  And he said they do

8    not.

9        And then we also have, I think, irrefutably the idea that

10   the costs that people incur for app distribution and in-app

11   purchase commissions are dwarfed by the costs that they incur

12   in deciding to buy an iPhone, for example.

13       And the economic evidence is pretty straightforward that

14   if you are thinking about a thousand dollar purchase of an

15   iPhone, then you are going to not be as interested in the

16   30 percent commission that you might pay on, you know, a bunch

17   of 99-cent in-app purchases or a $5 app at some point in the

18   future when you don't know how many you are going to buy, you

19   don't know what they cost because, I would say, perhaps until

20   this trial, there wasn't a lot of attention to the 30 percent

21   charge that was out there and the regulatory proceedings that

22   have been going on as well.  And people also don't have just

23   the base of information they need about the costs that they

24   are getting into in terms of the aftermarket costs.

25        **THE COURT:**  But isn't that -- but there is no

1  difference, really, in the aftermarket costs between if you

2  choose to buy an iPhone or an iOS phone versus choosing an

3  Android, the costs are the same.  That's why I say, don't they

4  make an informed choice at the beginning because those are --

5  they are two different ecosystems that they are moving into.

6          **MR. BORNSTEIN:**  Two things about that, Your Honor.

7     One, I don't think people understand whether the costs are

8  the same or not.  Because it's -- as is the testimony from

9  Mr. Cue shows, and I'm advised there's also trial testimony on

10  this from Mr. Fischer and Mr. Schiller, but as the evidence

11  shows, people are not focused on and not terribly aware of

12  these downstream costs.

13     If we are in a world in which there is competition, one

14  would expect also that iOS and Android would not have

15  exactly the same cost structure over time; there would be

16  competition on this front, and there's not.  And regardless of

17  whether people are knowledgeable about what the numbers are if

18  every consumer were perfectly informed that there was a

19  30 percent charge for most in-app purchases, people --

20          **THE COURT:**  But people aren't paying -- I mean, the

21  costs of the -- what they are -- of the games, et cetera, that

22  they are getting on the Android versus what they are getting

23  on the iOS, aren't distinctly different.  That is, there

24  isn't -- there isn't much movement across either platforms.

25     So from a consumer's perspective, the reason they don't

1    think about it is currently it is all the same.

2          **MR. BORNSTEIN:**  Right, Your Honor.  It's at least

3    largely the same in part because there's no competition.

4       But the one reason people don't think about it is because

5    it's opaque.  Another reason people don't think about it is,

6    because it is difficult for them to know what the costs will

7    be down the line.  Another -- in terms of the life cycle of

8    their ownership of the device.

9       Another reason people don't think about it is because

10   those numbers pale in comparison to the cost of the phone.

11   Perhaps most importantly, the issue is that if there were to

12   be a change in those prices, if, for example, Apple were to

13   say not 30 percent, but 35, or even contrary; if Apple were

14   benevolently to say we're done with 30, we're going to go down

15   to 20, there is very little reason to believe, based on the

16   economic and factual evidence in the case, that that's going

17   to cause switching.

18      What that means, because people don't pay attention to

19   these numbers and because they are so small, because those

20   changes won't lead to switching, it means competition in the

21   foremarket, in the selection of the operating system, doesn't

22   discipline what they do in the aftermarket.  That's the very

23   definition.  If Apple were to go to 35 percent, people

24   wouldn't go buy Android.

25          **THE COURT:**  Mr. Swanson.

1          **MR. SWANSON:** None of this is in evidence. That is

2    not the case Epic has proven up.

3          And there is, I think, no plausible case to be made that

4    developers, two-sided market developers and consumers don't

5    know and haven't known in the last 10 years that this device

6    and this ecosystem has been in operation.

7          All of these factors apply as well, as Dr. Evans admitted

8    when I cross-examined him, to the Mac. Every single one of

9    them. He said that doesn't prevent in any way the Mac from

10   being a device that is sold in a highly competitive market.

11         The other point I would make, Your Honor, if you would

12   indulge me, again, the whole discussion of foremarkets, we

13   would suggest misses the point that this is not the 1990s

14   with, you know, heavy duty copier machines. That's what those

15   cases are about. They're kind of a case for one device for

16   one era.

17         We're in the second or third decade of the 21st century,

18   and the evidence shows that iPhone owners, they all have PCs

19   or Macs, they have laptops. More than half of them, under the

20   results of Professor Hanssens' survey, have consoles. They

21   have non-iOS tablets, more than half, according to his survey.

22   Many of these points were confirmed by Dr. Evans in

23   cross-examination.

24         Professor Athey assumes the concurrent ownership of a

25   whole boatload of licenses. This is not a case where there's

1    one device out there, and if a part is missing, you are out of

2    luck unless you get a part for that machine.

3        The question here is, for market definition purposes, what

4    are the substitutes?  What if Apple tries to raise the

5    price -- raise the commission in the App Store for game app

6    transactions and consumers and developers don't have to wait

7    until they switch devices in order to impose constraints on

8    Apple?

9        Even Professor Rossi's flawed survey, which did not

10   measure a permanent price increase, therefore, which showed a

11   lesser response by consumers to a price increase, even that

12   survey showed that a 5 percent increase in price would cause

13   an 11 percent drop in sales in 30 days.  That means over a

14   tenth of the app store's revenues would vaporize in 30 days,

15   and that's just the first impact.

16       The number, under his confidence interval, could be as

17   high as 14 percent if he measured a true permanent increase in

18   price, which is what we look at, for market definition

19   purposes, could be 20 percent.  And if the App Store suffered

20   a 10 or 15 or 20 percent, 30-day drop in all of its revenues,

21   developers would take notice.  That's the import of the fact

22   that it's a two-sided transaction platform.  Developers would

23   not sit by.  That's what Dr. Evans assumed.  They just sit

24   there.  They wouldn't do anything.

25       That's the mistake the District Court made in the *AmEx*

```
 1    case, didn't take account of the fact that there are two

 2    sides, they react to each other --

 3          THE COURT:  Mr. Swanson, the 30 percent number has

 4    been there since the inception.

 5          MR. SWANSON:  And before.

 6          THE COURT:  And if there was real competition, that

 7    number would move, and it hasn't.

 8          MR. SWANSON:  I don't want to interrupt you.  That's

 9    my debate topic.

10          THE COURT:  So if the relevant market here is --

11    includes developer-side competition, why -- you know, what

12    is -- so far there doesn't seem to be anything that is in the

13    market itself that is pressuring Apple to compete for

14    developers.

15          MR. SWANSON:  I'm glad you asked that question.  I

16    think, at least in my own mind, I have a complete answer to

17    it.  It goes as follows:

18       First of all, in competitive markets -- we know that when

19    Apple chose the 30 percent, Dr. Evans said that's a

20    competitive price.  And that commission rate wasn't invented

21    by Steve Jobs, it was the commission rate that prevailed on

22    Steam, a PC app store.  It's also actually lower than the

23    commission rate that applied for things like box sales and the

24    distribution of software in games prior to that time.

25       So we start out with a rate that, again, by admission of
```

1   Epic's chief economic expert, is not a monopoly price, it's a

2   competitive price.

3       So one thing we wouldn't expect to see is that price going

4   up.  Now, Dr. Evans says Apple became a monopolist somehow,

5   some way in 2010.  Price didn't go up then.  And I know Your

6   Honor's not interested in hearing about the Small Business

7   program, but in the interim, price has gone down.

8       The reader rule was essentially a rule that allowed many

9   developers to put content into their iOS apps for free.

10   It's a zero price.  The multiplatform rule, which Epic

11   benefits from, allows developers to have content purchased on

12   other platforms.

13       If you look at Epic, if you look at *Fortnite*, over

14   70 percent of *Fortnite* users who accessed *Fortnite* through

15   iOS, at least, among other platforms, didn't spend a dime on

16   the App Store.  80 percent or more of the revenues that came

17   from folks who use *Fortnite* who accessed it through iOS,

18   perhaps along with other platforms, came in other platforms.

19       So zero price is very important.  Quality.  Apple has

20   incredibly increased the functionality, the sensors, the

21   software, the APIs that are available to developers.  We heard

22   testimony in this case about how the iPhone and the Android

23   phones can hold their own now with some of the best games on

24   consoles and PC.  That is quality competition.

25       Again, price has never gone up.  In the *American Express*

1    case, the whole issue was American Express had a high Merchant

2    fee model.  Merchants didn't like it.  Merchants wanted to

3    create what the dissent in that case called price competition

4    by switching people to lower cost cards.

5        The Supreme Court, in analyzing that, said it's a

6    two-sided market.  You have to look at both sides.  You have

7    to look at the benefits that come.  And here there are a ton

8    of benefits.  There are enormous number of zero price

9    transactions.

10       I know Your Honor has raised the issue of, well, who pays?

11   And that is always an issue in two-sided transaction

12   platforms.  The nature of two-sided transaction competition is

13   typically to create critical mass.  Someone gets a better

14   deal.  Someone -- sometimes pieces of both sides are benefited

15   from that.  You need to attract them to the platform.

16   Sometimes they get zero prices.  Sometimes they get a subsidy.

17       And that's not unusual.  It may not feel fair to the

18   people.  And here we've got essentially an enormously, you

19   know, well-resourced company that would like to pay less.  I

20   get that.  I understand the economics of that, but that

21   doesn't mean there isn't competition in this market.

22            THE COURT:  Well, I haven't -- Mr. Swanson, I haven't

23   seen the class certification motion that's due on, I believe,

24   June 1st.

25            MR. SWANSON:  That is a week off.

1          **THE COURT:**  It's a week off?

2          **MR. SWANSON:**  After this is over, we get a week off

3     and that comes.

4          **THE COURT:**  Apple's not just being sued by

5     Mr. Sweeney and his company, they are being sued by an entire

6     class of developers.  I don't know which ones they are, right?

7     I saw the survey so I know you have some big supporters, you

8     have some big detractors, and you have some people in the

9     middle.  So it's not just Mr. Sweeney.

10         One of the reasons why I ordered that class cert to be

11    filed was so that I could see what they were saying, all of

12    the developers beyond Mr. Sweeney who are in that class.

13         So you have zero price, and I understand that.  There is a

14    lot of free out there.  But these, I guess -- I guess what you

15    are saying is that qualitatively, because of the whole

16    package, price has gone down maybe.  I don't know.  I'm

17    expecting to hear from Mr. Bornstein that it certainly hasn't

18    gone down in an amount to justify super competitive profits.

19         So why don't you address that first.  Then I will let

20    Mr. Bornstein weigh in.

21         **MR. SWANSON:**  Sure.  I would just note on that point,

22    I guess, one other point, it's under seal, so I won't give

23    precise numbers?  But there was an average commission figure

24    for Steam that is in the record, and that number is within --

25    and that was after Epic entered and Steam reduced its

1    commission.

2         And that number is within 1 percent of Apple's average

3    commission.  And Dr. Evans said that Steam's number is a

4    competitive commission rate.

5         But on the profit issue, I think Your Honor has heard that

6    issue fully ventilated.  The numbers that Epic is seizing upon

7    are numbers that come from accounting data.  They are

8    accounting numbers that, you know, are numbers like

9    accountants put together.  Better or worst accountants do and

10   don't allocate cost.

11        This is an ecosystem case.  I think if we have heard

12   anything in this case, it's that the App Store helps

13   incentivize people to buy iPhones, and that the investments

14   in iPhones and software in-device capability and screen size

15   are all things that attract developers into the App Store, and

16   that bring consumers into the App Store, and all of those

17   things are joint matters.

18        And to allocate or not to allocate cost to the App Store

19   to treat it as a stand alone, that is essentially a revenue

20   number without allocating any of these enormous costs that go

21   to the whole ecosystem is just not right economically.

22        The case that everyone cites in this is the *Bailey versus*

23   *Allgas* case, and it's highly instructive.  It's certainly

24   recommended to Your Honor to look at.  It flags these issues,

25   it flags the issues of multiple products and joint costs.

```
1    Difficulty of measuring and the like, and all of those

2    problems exist here and now.

3         And, lastly, when I cross-examined Dr. Evans, I took him

4    through the profit numbers from the data he had access to for

5    the iPhone, for the iPad, and then added in those profits

6    that, you know, he relies upon for the App Store, from those

7    accounting documents.  You add all of that together, the

8    number is in the twenties.  It's not a number that is a very

9    high number that is relied upon as proof of monopoly power on

10   the part of Dr. Evans and Epic.

11             THE COURT:  All right.  Mr. Bornstein.

12             MR. BORNSTEIN:  All right, Your Honor.  There was a

13   lot there.  I have tried to keep notes.

14         I'll start, if I can, back on the subject of whether or

15   not Apple feels competition to lower its prices or to change

16   its terms in ways that are favorable to developers.

17         And I think the record is clear that there is nothing,

18   there's literally nothing except one document I'll talk about

19   where there are people at Apple saying to one another, gee, we

20   need to do something in order to stay competitive on price.

21         The one document that's an exception is Mr. Schiller's

22   comment in 2011 that maybe we aren't going to be able to keep

23   the 70/30 for a long time and we will have to bring it down

24   because there will be competition.

25         Obviously that never happened.
```

1        **THE COURT:**  But you can't ignore, right, the quality

2   issue.  I mean, Mr. Sweeney admitted himself that back in

3   2011, 2012 the nature of the games that he is creating could

4   not have been played on the iPhone.  There is an enormous

5   amount of innovation on the iPhone that is, in fact, allowing

6   these games to be played and which game developers are

7   benefiting from.

8        **MR. BORNSTEIN:**  There is, stipulated, a tremendous

9   amount of innovation on the iPhone.  There is not innovation

10  on the App Store.

11     This is a case not about innovation on the device or even

12  innovation on the operating system.  This is a case about a

13  monopoly on the distribution of the apps.  We saw the

14  developer surveys and we have got more in the record that we

15  can point the Court to that have been entered into the record

16  already where there is consistent dissatisfaction and no

17  progress by Apple to fix the problem because they don't feel

18  competition on the developer side to do so.

19     Sure, they innovate on the iPhone because they want to

20  sell more iPhones.  They want consumers to buy them and they

21  make them better.  There's no question about that.

22       **THE COURT:**  They make them better.  They increase the

23  size of the platform, and the developers benefit.

24       **MR. BORNSTEIN:**  True, Your Honor.  Both sides,

25  consumers and developers benefit from the innovation in the

1   device and the innovation in the operating system.  We are not

2   complaining about the device or the operating system.

3       The issue here is the monopoly that they have on the

4   distribution of apps onto that platform.  There is no path

5   onto that platform other than the one that they control.  That

6   has led to decreased innovation and higher prices.  That's why

7   you see the profits that we were talking about.

8           **THE COURT:**  So why doesn't the Reader Rule, that's

9   one thing, why doesn't that impact your analysis?

10          **MR. BORNSTEIN:**  I'm glad that Mr. Swanson mentioned

11  the Reader Rule, Your honor.  The Reader Rule is not a price

12  decrease at all.  The Reader Rule is a way of increasing

13  friction that doesn't need to exist.

14      There is no reduction in price with -- associated with the

15  Reader Rule.  What the Reader Rule is it says, okay, you can

16  go buy something somewhere else and then you can watch it or

17  read it on our device.  That's not a reduction in price.

18      We are talking about, for example, a situation where

19  Amazon, Kindle had books that you could buy on the iPhone.

20  You could purchase them on the iPhone without having to pay

21  anything because it was before IAP even existed.  And the

22  technology shows that they could make those purchases on the

23  iPhone before IAP.

24          **THE COURT:**  This is before 2010.  So I don't know

25  why -- there was a lot of focus on that, but even your own

experts say there was no monopolistic conduct prior to the end
of 2010.  So what?

**MR. BORNSTEIN:**  It's an example, Your Honor, of how
they have changed the pricing over time.  People have been
brought into the ecosystem and then there have been changes.

To fill out the point about the Reader Rule which actually
goes past 2010, what happened is, for a period of time, as the
documents in the record show, there was an exception that was
held out for Amazon to be able to encourage people to go buy
their -- where there was a link that was in the app so that
people could click the link and go buy elsewhere.  As we all
know, they eventually got rid of that, too, and now you can't
even have the link to go buy elsewhere.

And in terms of what caused the Reader Rule to exist even,
there's no evidence that it was a result of competition.  You
take a look at Steam, for example, yes, there was a price
reduction on Steam because competition came in.  Did that
cause Apple to lower its price?  No.  Mr. Cook didn't even
know who Steam was much less feel like he had to lower his
price because of competition.

There's no evidence whatsoever as Professor Schmalensee
conceded of any instance in which Apple felt pressure to lower
its price or change its terms because of something that
happened on the game console or something that happened on
PCs.

1        So while they say there's this cross-platform market and

2   they feel competition from these places, there's no evidence

3   that that has happened at all.  I'll give two examples just so

4   I can see if I can use my Elmo skills here.

5        So there was discussion -- even if we are thinking about a

6   market in which we are looking at the actual purchases that

7   get made in game rather than just the distribution of the app

8   itself, here are the facts from Dr. Cragg about the

9   availability of the top iOS games on other platforms.

10                     (Displayed on screen.)

11       They are all on Android.  That's clear because people who

12  are developers need to be on both devices in order to get to

13  people.

14       There are very, very few on the consoles, on the Switch.

15  And even on the personal computer.  Your Honor will remember

16  that Dr. Hitt had a very different analysis that he has now

17  withdrawn because it was shown to be incorrect.  There was an

18  effort to resuscitate it through Mr. Schmid, and I think that

19  fizzled, too.

20       As for the question -- so this just shows people can't

21  substitute for their games, even if we looked at games in the

22  way that Apple claims.  We obviously think we ought to be

23  looking at more than games.  We ought to be looking at Uber,

24  at Starbucks, and banking app, and all other apps that are

25  subject to these restrictions.

1          But if we are talking about a litigation-driven market,

2    here is a clear indication, Your Honor, which of the two

3    parties has the litigation-driven market.

4          **THE COURT:**   What about a market that was mobile

5    gaming as opposed to gaming generally?  Why not that market

6    given that you're not here on behalf of a class of developers,

7    just on behalf of *Fortnite*?

8          **MR. BORNSTEIN:**   Well, if the question is could the

9    market be defined as games that are on iOS --

10         **THE COURT:**   No.  I'm talking about games on mobile

11   devices:  Switch, iOS, Android.

12         **MR. BORNSTEIN:**   Your Honor, we would exclude Switch

13   from the concept of mobile devices because there is no

14   cellular connection and because people tend not to carry them

15   around with them all the time, and there is a very different

16   category of games that are available on Switch as the last

17   slide showed, as compared to iOS and Android devices.  There

18   are very, very few games that are on iOS and also on Switch.

19         **THE COURT:**   You would put iPads in the same category

20   as Switch?

21         **MR. BORNSTEIN:**   The iPads -- I'm not sure where

22   the iPads go, Your Honor.  I --

23         **THE COURT:**   They don't all have cellular connections,

24   do they?

25         **MR. BORNSTEIN:**   They don't all have cellular

connections but they do tend to have the same set of games on
iOS rather than the same set of games on Switch.  The
category of apps --

**THE COURT:**  Let's make it simple.  Android, iOS,
mobile gaming.

**MR. BORNSTEIN:**  So that market we think, Your Honor,
makes a lot more sense than a market that is sweeping in all
of the other non-mobile devices for all the reasons that
Dr. Evans talked about.

The mobile devices occupy a very different place in the
way that consumers use them.  They are able to use them while
they are out and about.  They're able to take advantage of the
capabilities that the smartphones have in a way that the other
devices don't have.

If we had a market that was limited to games on iOS and
Android, we would still have a market in which, although not
monopoly power, Apple still has very substantial market power
even in that two-brand market, which Dr. Evans walks through
in his report.  He does it admittedly in the context of all
apps rather than just games on the two platforms.

And given in a *Brown Shoe* and *Newcal*, one could even think
of iOS as a submarket in the broader mobile gaming market.
So while as Your Honor knows that is not the market that we
have advocated for, we certainly think that that makes a lot
more sense than the broader market that Apple has advocated

1   for here given the difference in the platforms.

2        **THE COURT:**   What about that market definition?

3        **MR. SWANSON:**   Well, certainly those platforms and the

4   online game stores that are available on them are included in

5   the market that our experts define, but we think the market is

6   broader than that.

7        And we look at the evidence, Your Honor, and I think the

8   evidence sustains that you, obviously, Professor Hitt gave the

9   panoramic view of the evidence on that point, but just

10   touching on a couple of things.  And actually Dr. Cragg's own

11   evidence, we went through the chart that showed what happened

12   after *Fortnite* debuted on the Switch after the Switch was

13   introduced.

14        And there was the first month when there was a brand new

15   season of *Fortnite*, so that one jumped up.  But when you

16   looked at the succeeding months, what you saw was Switch -- we

17   do think is a mobile device -- took market share.  It took

18   market share from all the other platforms, console, PC.  And

19   when you look at, again, *Fortnite* players, they play on all of

20   these platforms.

21        Again, going back to the study that Dr. Hitt -- Professor

22   Hitt had done, the great bulk of them have had access of

23   *Fortnite* through iOS spend on the other platforms, PCs,

24   consoles.  We also had Professor Hitt look at what happened

25   when iOS users download an app that is used for consoles, an

1    app that allows you to control your console, for example,

2    from iOS.  Those --

3          THE COURT:  How would it affect -- I understand you

4    are making factual distinctions.  If I decided that the

5    relevant market was mobile gaming, how does that impact your

6    analysis?

7          MR. SWANSON:  It would be very sad.

8          THE COURT:  What's that?

9          MR. SWANSON:  Not relevant.  I understand.

10         THE COURT:  It would be very sad is what you said.

11         MR. SWANSON:  I notice you are writing that down.

12         THE COURT:  I was looking at the realtime.

13         MR. SWANSON:  Okay.

14      The -- then the monopoly claims go away.  And obviously

15   the other remaining claims would have to be analyzed with

16   respect to a rather minimal degree of market power in that

17   context.

18      Again, we think that the other platforms, the other

19   devices which iOS and iPhone owners have, have at the ready

20   in case Apple were to try to raise commissions would come into

21   play and would stop that.  Again --

22         THE COURT:  That's a good segue, Mr. Swanson.

23      How does the UCL claims then get impacted?  If I decide

24   that a relevant market is gaming, there's not a monopoly but

25   there are other factors showing anticompetitive conduct, there

1    is a UCL claim.  And under the UCL claim, there are three

2    different prongs which are available to the Court.

3        One of which must be tied -- the unlawful prong must be

4    tied to existing law.  I would suspect that -- I have to say,

5    I didn't get through all thousand -- your thousand pages of

6    filings over the weekend, but I've done UCLs long enough to

7    know, the UC- -- the unlawful wouldn't necessarily be

8    available if there isn't a Section 1 or Section 2 claim, but

9    the unfair prong seems to me to be an available mechanism for

10   addressing anticompetitive conduct to the extent it exists.

11       Would you agree with that, Mr. Bornstein?

12           **MR. BORNSTEIN:**  I would, Your Honor.  As the Court

13   knows, we have made that claim.

14       There is a dispute between the parties as to which of

15   those prongs Epic is able to take advantage of given the

16   distinction between competitor and consumer.  It is our

17   position, and we think we've shown that we fit under both

18   categories, we are a competitor as a distributor, and we are a

19   consumer of their app distribution services and their payment

20   solution services in the two-sided market.

21       And when you then get to the unfair prong, as the Court

22   knows, there are different prongs of the unfair prong.  There

23   is the tethering test, which is very similar to the unlawful

24   prong, although I would note that the California courts have

25   been both clear and vague.  Clear in saying that it's a

1    broader and deeper statute than just the Sherman Act.  Vague

2    in not being precise about exactly how broader and how deeper

3    and in what ways.

4        But in addition to the tethering test, there is the

5    balancing test which, under Cel-Tech, does apply and requires

6    the Court to look at the harms that are caused and to consider

7    them in context with the benefits that are intended to be

8    achieved.  It's -- as the name says, it's a balancing test.

9        You look at the injury caused by the conduct, and balanced

10   against the utility of that conduct and the gravity of the

11   harm that's alleged.  So we certainly do think that that is an

12   important part of the analysis that the Court will ultimately

13   need to go through, or should ultimately go through if it

14   doesn't get through the Sherman Act.

15           **THE WITNESS:**  There is some California law that

16   suggests that incipient antitrust violations and conduct that

17   violates the spirit of the antitrust laws does, in fact,

18   constitute an UCL violation.

19           **MR. BORNSTEIN:**  Absolutely, Your Honor.

20           **THE COURT:**  Mr. Swanson, on the UCL.

21           **MR. SWANSON:**  Yes.

22       I mean, again, Epic is professing to sue as a prospective

23   competitor.  Certainly in our defined relevant market they are

24   an existing competitor with the Epic Games Store.

25       I think they are tied to the Cel-Tech standard.  I do

think they need to show an antitrust violation or at least a

near antitrust violation.  I think, Your Honor, in the *PNY*

*Technologies versus SanDisk* case dealt with a case where you

dismissed the UCL claim where the plaintiff's theories weren't

materially different from the federal antitrust claims that

has been the focus of this trial, and we think that the

federal antitrust claims, if dismissed as they should be,

would not sustain a *Cel-Tech* theory on the UCL --

**THE COURT:**  They are separate prongs and the analysis

is separate.

In the case, in the Sand Tech (sic) case that you cited,

if memory serves, there was a parallel state court action in

California that was addressing those state court allegations.

I was dealing with the federal antitrust allegations.  I was

not dealing with the state antitrust allegations.

And I believe, although I can go back and check, that I

dismissed to allow the state court to address it on its own

given that's what the state court was already doing.  So I

deferred to the state court with respect to the state case.

**MR. SWANSON:**  I come back to *Cel-Tech* on the

competitor claim.

And then on the balancing claim, Apple has advanced a

variety of legitimate business justifications for its conduct.

Apple has pointed to what we consider to be enormous

procompetitive effects --

1          **THE COURT:**  I understand that.  I just want to make

2     sure that I understand clearly your legal argument.

3          *Cel-Tech*, I thought, expressly stated that a violation of

4     antitrust law was not required for a finding of a UCL

5     violation.

6          **MR. SWANSON:**  It's a tethering, tethering to an

7     antitrust violation.  Agreed.

8          **THE COURT:**  Right.  That's why if there is some

9     incipient antitrust violation but not necessarily a technical

10    or -- violation, that might be enough.

11         **MR. SWANSON:**  Although, again, for injunctive relief,

12    some true threatened harm would be required.  Incipiency --

13    certainly under the federal antitrust statutes, which have

14    incipiency requirements like Section 7 of Clayton Act, like

15    the Robinson-Patman Act, when the Supreme Court has dealt with

16    those claims, it has required proof for those who are actually

17    seeking --

18         **THE COURT:**  This isn't federal law, it is California

19    law.

20         **MR. SWANSON:**  It is but they're incipiency -- they're

21    incipiency statutes so I guess I'm just arguing by analogy to

22    federal incipiency antitrust statutes when it comes -- when

23    the rubber hits the road, the plaintiffs still needs, if they

24    are going to get some relief, to show something that's a

25    concrete thread.

1        I would also add, Your Honor, there's a jurisdictional

2   issue.  This is conduct that is affecting far more than

3   California consumers, California businesses --

4        **THE COURT:**  So I could -- when I get to the remedy

5   portion I will let Mr. Doren argue that, but -- so I order it

6   in California and nowhere else, and all of Californians we can

7   take advantage and section us off, or something.

8        **MR. SWANSON:**  It certainly raises remedial issues.

9   I'm happy to punt that to Mr. Doren, but I would be remiss if

10  I didn't mention them.

11       **THE COURT:**  Okay.  Let's talk about something

12  slightly different:  The least or less restrictive

13  alternative.

14       What role, if any, does that play in a Section 2 analysis?

15       Mr. Bornstein.

16       **MR. BORNSTEIN:**  So, Your Honor, the law on Section 2

17  analysis for less restrictive alternative, as I say, has two

18  pieces that need to be addressed.

19       Number one, there is the Ninth Circuit *Image Tech* case

20  which is part of the whole *Kodak* line that says there is no

21  least restrictive alternative test in Section 2.

22       The Ninth Circuit has moved since then in 2008 in *Cascade*

23  *Health*, in a Section 2 case, the Ninth Circuit referred to the

24  procompetitive benefit needing to be achieved in not an

25  unnecessarily restrictive way and has certainly not let go of

1    the concept of less restrictive.

2        The other piece of this that I think is important,

3    however, is I think that Apple, by focusing on the specific

4    words "less restrictive alternative" is avoiding the more

5    important or kind of larger issue, which is whether the Court

6    in a Section 2 case does any kind of balancing or assessment

7    of the procompetitive justification and how it is achieved.

8        And the *Qualcomm* case, very recent obviously from the

9    Ninth Circuit, is very clear citing *Microsoft* and adopting the

10   reasoning there that there is a balancing that is supposed to

11   be done.

12       And so whether you call it less restrictive alternative or

13   whether you call it balancing, it is the case that in the

14   Ninth Circuit, as elsewhere, but certainly in the Ninth

15   Circuit you don't just look and see has the defendant

16   articulated some modicum of procompetitive benefit and then

17   put your pencil down.  That's not the law.  Otherwise Section

18   2 would be pretty close to a dead letter.

19       In fact, the Court does have to do an analysis that

20   assesses that procompetitive justification and how it is

21   achieved and think about that in the context of all of the

22   harm that is inflicted by it.  And that's what *Qualcomm* citing

23   and relying on *Microsoft* in the context, I should point out,

24   of a high technology case involving software, that is what

25   those cases teach.

1          **THE COURT:**  Mr. Swanson.

2          **MR. SWANSON:**  So I agree that *Image Tech* states what

3     we believe is the rule, that there is no less restrictive

4     alternative test under Section 2.

5          I think the Supreme Court has essentially echoed that

6     position in the *Trinko* case.  Supreme Court -- the conclusion

7     of that case said, Section 2 does not give a Court a

8     commission to restructure markets if it is believed that the

9     markets are more competitive.

10         In the *Qualcomm* case, the Ninth Circuit touched on

11    Qualcomm's justification for its conduct in a way that one

12    might look at as evaluating alternatives.  But the Ninth

13    Circuit said we don't need to reach that, we only need to

14    touch on this because the primary burden, the key burden, the

15    gating burden of the plaintiff is to show a substantial

16    anticompetitive effect.  That is the first step.

17         Now, if there are amazingly less anticompetitive or more

18    competitive alternatives, presumably that would jump out in

19    the first stage of the Section 2 analysis, but there is no

20    less restrictive alternative test under Section 2, and I would

21    certainly stand on *Image Tech* on that point.

22         **THE COURT:**  Any response?

23         **MR. BORNSTEIN:**  Well, Your Honor, starting with

24    *Qualcomm*, the reason the Court in *Qualcomm* didn't have to dive

25    into the details of whether or not there was a less

```
 1    restrictive alternative is because the FTC failed on prong

 2    one.

 3           THE COURT:  Because the FTC -- I didn't hear you.

 4           MR. BORNSTEIN:  I apologize.  I swallowed that

 5    sentence.

 6       The FTC failed on prong one.  It never showed the

 7    substantial anticompetitive effect that it would need to show

 8    in order for the Court to move to the next step of the

 9    rule-of-reason analysis.  And so there was no need ultimately

10    to get all the way down the line.

11       But in stating the rule, the Court was quite clear that

12    there is a balancing test or a balancing step to the Section 2

13    rule-of-reason analysis.

14           THE COURT:  So are you equating then balancing with

15    least or less restrictive alternative?

16           MR. BORNSTEIN:  Your Honor, I think they are largely

17    the same.  I know the courts have talked about them as

18    different things, but I think in practice if what you are

19    doing is you are looking to assess whether the restraint at

20    issue is on balance a problem, one of the things that clearly

21    you would do in making that judgment is think about what the

22    alternatives are to achieving the procompetitive benefit that

23    the defendant claims is the basis for the challenged

24    restraint.

25       So, although analytically you can -- there are cases that
```

describe each of them.  I think ultimately the inquiry is largely -- largely collapse.  And the particular label that you place on it, I think, is less critical than the substantive analysis that gets done in that final step of the rule-of-reason analysis under Section 2.

**THE COURT:**  Anything further on this?

**MR. SWANSON:**  I mean, I think one has to look long and hard to find a Section 2 case that goes beyond the first two prongs of anticompetitive effect and legitimate business justification.

The notion of a third balancing prong comes from the *Microsoft* case, and yet in the *Microsoft* case, every time Microsoft failed to offer legitimate business justification it lost, and every time it offered a legitimate business justification it won.  There was no balancing.

Balancing is -- it's a topic for antitrust scholars who all recognize there's no guidance about how to do it.  And courts, I think, do collapse it all into the first two prongs if there even is in reality a third prong.

And also add it is somewhat theoretical because Dr. Evans said, for example, he wasn't testifying to less restrictive alternatives.

**MR. BORNSTEIN:**  Again, that's a good example of how we are getting caught up in terminology.

Dr. Evans absolutely has in his testimony, the idea of

1    balancing and he did testify as to the alternative way, for

2    example, that Your Honor described the market in terms of

3    putting iOS and Android together, that's in his testimony at

4    paragraph 119, beginning there.  And whether one gets caught

5    up in the terminology of less restrictive alternative or not,

6    the substance of the balancing is very much -- is very much in

7    the record.

8         And I, although I heard Mr. Swanson talk about the outcome

9    in *Microsoft*, I did not hear a dispute as to the rule of

10   *Microsoft* which was then reiterated by the Ninth Circuit last

11   year in the *Qualcomm* case.  That is the law whether the courts

12   have yet to get to that step because of where things stand in

13   the particular cases they have analyzed on the preceding steps

14   is a matter that one can look through on a case-by-case basis.

15   But in terms of what the rule is, I don't think there's any

16   dispute that the Ninth Circuit definitively and

17   authoritatively articulated the rule just last year.

18        **THE COURT:**  So *Qualcomm* says that if a monopolist

19   asserts a procompetitive justification, then the burden shifts

20   back to the plaintiff to rebut the claim.  If plaintiff cannot

21   rebut the monopolist procompetitive justification, then the

22   plaintiff must demonstrate that the anticompetitive harm of

23   the conduct outweighs the procompetitive benefit.

24        It seems to me to be a balancing test.

25        **MR. SWANSON:**  That is what it says.  That's what

1      *Microsoft* says.  The courts, as I say, to find an actual

2      Supreme Court case that says that or a Ninth Circuit or a DC

3      Circuit case that actually precedes past finding a legitimate

4      justification of balancing is an exercise I've tried, and I

5      have come up short.

6            **THE COURT:**  Well, what it doesn't give is a lot of

7      guidance about what's in balancing.  It doesn't say that

8      you're -- it doesn't say that I am allowed to not balance or

9      that is, I'm required to do the balancing, it seems to me,

10     without a lot of guidance.

11           **MR. SWANSON:**  It -- and there is a burden of proof

12     there as well which comes into play.

13           **THE COURT:**  But you would admit I have to do it under

14     the law.

15           **MR. SWANSON:**  I would admit that the case law says

16     that if you get to that point.  If you get to that -- if you

17     get beyond -- I mean, if you -- certainly have to get beyond

18     the first prong to get there.

19           **THE COURT:**  Agreed.  But if I do, then you concede I

20     have to -- that is, in fact, the test.

21           **MR. SWANSON:**  I would -- I don't think that is

22     actually the law from the Supreme Court.  I don't think the

23     Supreme Court has opined on that.  I don't think the Court

24     would actually embrace that.  The Supreme Court has a case now

25     in front of it under Section 1 on less restrictive

1    alternatives.

2         **THE COURT:**  Which case is that?

3         **MR. SWANSON:**  It's the *NCAA* case, I think.  Not the

4    *O'Bannon* case but one of the follow-on cases.  I am having a

5    senior moment.

6         **MR. BORNSTEIN:**  I will help Mr. Swanson.  It's *NCAA*

7    *versus Alston*.

8         **THE COURT:**  We are going to get a ruling on that this

9    summer.

10        **MR. BORNSTEIN:**  We should get a ruling on that this

11   summer.  I would say I don't think it's going to affect Your

12   Honor's consideration very much given the substance of the

13   case.  And as Mr. Swanson accurately said, it is under

14   Section 1 and so it doesn't address the specific issue we are

15   addressing right now.

16        **THE COURT:**  Okay.  All right.  Well, they don't call

17   us the Wild West for nothing.

18      Okay.  Let's -- we are -- I gave an opening option for

19   Mr. Bornstein.  Do you want to move to something else in

20   particular, Mr. Swanson?

21        **MR. SWANSON:**  I think probably my colleagues might

22   step up and relieve me since Mr. --

23        **THE COURT:**  Hold on a minute.  Are we done on

24   relevant market?

25        **MR. BORNSTEIN:**  I had a few things I hoped to be able

1    to respond to that Mr. Swanson had said, if that's okay with

2    the Court.

3              **THE COURT:**  As long as it's efficient.

4              **MR. BORNSTEIN:**  I will do my very, very best.

5              **THE COURT:**  I'll interrupt you if not.

6              **MR. BORNSTEIN:**  I would expect no less, Your Honor.

7         One thing is just to address this concept of limiting the

8    relevant market to games at all, which, as the Court knows, we

9    have had a lot of discussion about.  I will make two points on

10   that.

11        One is Epic, of course, is not just a games company.

12             **THE COURT:**  I understand that argument.

13             **MR. BORNSTEIN:**  And then the other is, as we've said

14   at some length and we briefed, in deciding what the relevant

15   market is, one does not look at the plaintiff.  And I'll see

16   if I can do my Elmo work again.

17        This is what Your Honor said, and we think accurately, in

18   the Preliminary Injunction opinion; that antitrust law doesn't

19   focus on individual consumers or producers like Epic.  It

20   looks at market aggregates.

21        And what the Court needs to do in assessing what the

22   relevant market is, is to see whether there is sufficient

23   switching that could occur in order to discipline the conduct

24   that's at issue -- in our case the conduct at issue, of

25   course, applies to all apps.  So one needs to look at whether

1  there could be sufficient switching and identify all -- all of

2  the consumers and producers that are affected.  What one does

3  is look at the producers to see, as the Court said in *Newcal*,

4  what the alternatives are.

5     And here, limiting that to games, is cutting off part of

6  the market that is affected by the conduct solely on the basis

7  of who the plaintiff is.  Your Honor has a class, as you said.

8  It would be passing strange to define a different market in

9  the class action or in an action brought by a Government

10  regulator such as the EU which has defined an app distribution

11  market not limited to games.

12        **THE COURT:**  Well, it is also based upon the evidence

13  that's in the record.  And I am limited in that regard as

14  well.

15        **MR. BORNSTEIN:**  Your Honor, we have testimony from

16  Mr. Simon of Down Dog who has a yoga app.  We have evidence in

17  the record --

18        **THE COURT:**  The question is whether -- again, whether

19  I'm going to find it sufficient, one example, or a handful of

20  examples to somehow justify the conduct with respect to

21  hundreds of thousands, not thousands, right?  So it's an

22  assessment of evidence.

23        **MR. BORNSTEIN:**  Your Honor, obviously as in all of

24  this, you are going to have to assess the evidence.  The

25  guidance, as you said, in antitrust law is not always clear

1    and focusing on the facts as *Qualcomm* teaches us is the right

2    thing to do.

3        But here, in addition to Epic, we do have specific

4    testimony from other app makers:  Mr. Ong from Match Group,

5    Mr. Simon from Down Dog, and we have the aggregate evidence

6    from Apple which applies not just to games, but to all

7    developers.  So that survey, for example, that we looked at,

8    and there are multiple --

9        **THE COURT:**  I'll be spending quite a bit of time with

10   that survey and what it means and doesn't mean.  I don't know

11   because you all showed me one slide, and now I have to go see

12   what that means.  You know, I just don't know what it means

13   because I haven't had a chance to really investigate.

14       **MR. BORNSTEIN:**  Of course, Your Honor.  If I could, I

15   would actually like to give Your Honor citations to some other

16   surveys that are in the record if that would be helpful.

17       **THE COURT:**  I'm sure it's in your 500 pages.

18       **MR. BORNSTEIN:**  Very good.

19       **THE COURT:**  So a response on these -- on that topic.

20       **MR. SWANSON:**  Specifically on that topic, Epic

21   decided to define an all-iOS transaction market.  So they

22   have a single brand, and they say all of the app transactions

23   under that brand belong in the market.

24       Now, the rule is substitution, and yet Dr. Evans said, no,

25   they are not substitutes.  Game app transactions are

1   definitely not substitutes for non-game app transactions.

2        Now, the only escape hatch from that would be a cluster

3   market.  And Your Honor raised that in the PI motion or PI

4   order decision and put that to the parties.  Professor

5   Lafontaine addressed that in her expert report, said that

6   Epic's market definition is not a cluster market.

7        I asked Dr. Evans on cross:  Is it a cluster market?

8        He said, no.

9        Your Honor probed Dr. Evans and asked the same question,

10  another question, again more probing question, and he said, no

11  it's not a cluster market.

12       So Epic has decided to lump non-substitutes together

13  without any basis under the law.  If they had wanted to define

14  the game app transaction market and other markets that are

15  served on the platform, they could have done so.

16       Your Honor heard Mr. Sweeney, in fact, testify he wasn't

17  familiar with the competitive conditions for other apps, other

18  app developers.

19       I think the recent expansion of the scope of the Epic Game

20  Store falls under the category, if anything, of

21  litigation-driven developments.  But be that as it may, it is

22  Epic's burden and it is their burden to define a market.  It

23  failed to define a proper market.  They lose.  That is very

24  clear Ninth Circuit authority, and they have defined the wrong

25  market.

1          **MR. BORNSTEIN:**  Your Honor.

2          **THE COURT:**  Mr. Bornstein.

3          **MR. BORNSTEIN:**  Yes, thank you.

4      It is not a cluster market, and we haven't defined a

5  cluster market because a cluster market would be a mistake

6  here.

7      As Professor Lafontaine herself explained, when she talked

8  about the Staples matter she worked on at the FTC where a

9  cluster market was at issue, that was a place where the

10  defendant was selling multiple things.  It had ink.  It had

11  toner.  It had literal staples.  It had scotch tape.  It was

12  selling paper.  And the question was whether you put all of

13  those things together in a market or not.

14      Here, we are not dealing with that at all.  We are dealing

15  with the App Store which sells transactions.  Professor

16  Lafontaine said that as well.

17          **THE COURT:**  So has free apps which you all

18  consistently ignore.

19          **MR. BORNSTEIN:**  Absolutely not, Your Honor.  The free

20  apps are absolutely part of this market.  They, too, are stuck

21  with the App Store being the only way to get on the store.

22  They are just as stuck as the rest of us.

23          **THE COURT:**  I haven't heard any complaints about --

24  from entities -- again, I'll go back and look at the survey,

25  but I haven't heard any complaints from entities for whom they

1    aren't benefiting -- right, it's not part of their model to

2    make money from in-app purchases.

3            MR. BORNSTEIN:  That is true.  But in terms of app

4    distribution, Your Honor, there are tons of complaints in

5    these surveys from people who are not selling in-app

6    purchases.

7        People want search and discovery features that are better.

8    They don't want to have to pay in order to get their app

9    listed first when you type in the name of their app.  They

10   don't want to be stuck on page 25 because there are all of

11   these people who pop up earlier when you do search --

12           THE COURT:  How many apps are there, Mr. Bornstein?

13           MR. BORNSTEIN:  There are 1.8 million.

14           THE COURT:  Right.  1.8 million divided into 27

15   categories.  What is the math, do you know?

16           MR. BORNSTEIN:  Well, it is not even, obviously, so

17   they are lumpy categories.

18           THE COURT:  And so I hear you make that argument and

19   yet I think, as a practical matter, if you have a hundred

20   thousand apps in a category and people are complaining that

21   they are not at the top of the list --

22           MR. BORNSTEIN:  When someone types in, for example,

23   "Down Dog" I will use them because they came and testified,

24   and what they get, as, you know, the first five or six things

25   are not their app, even if someone types in the words "Down

```
 1    Dog" --

 2              THE COURT:  Right.

 3              MR. BORNSTEIN:  -- and they get five other apps that

 4    are not their app that precede them, that is a problem with

 5    the search feature.

 6              THE COURT:  That's -- that is an ad search feature.

 7    That is -- that is what happens when you go on Google.  It

 8    says "ad."  You can go down -- by the way, when you -- and I

 9    hope this is good advertising for Down Dog given that they

10    came in here.

11        When I typed them into mine this weekend, it came right

12    up.  That was the first thing.  Maybe people don't want to

13    compete with him anymore.  I don't know.

14        But it's not unreasonable when you have a hundred thousand

15    apps in a category to expect that, you know.  There's going to

16    be advertising.  It happens -- you know, really want to

17    travel, went to Travelocity this weekend.  First things that

18    come up are the paid apps.  This isn't something that's not

19    happening in the digital world.

20              MR. BORNSTEIN:  One of the things that a transaction

21    platform like the App Store is supposed to provide are quality

22    search and discovery features, quality marketing and promotion

23    features.

24        When you look at the surveys, Your Honor, you see

25    complaint after complaint on just those issues.  This is what
```

1    they should be providing, and these are the things that are

2    suffering as a result of the anticompetitive conduct.

3         **THE COURT:**  I'll look.  Anything else on this?

4         **MR. SWANSON:**  Just to add, I mean, that's exactly

5    right.  There are lots of apps on the App store.  Developers

6    are like everyone else.  More competition isn't always

7    welcome.

8         You ask Uber drivers.  The more Uber drivers there are in

9    the neighborhood, the more unhappy the Uber drivers are but

10   the happier consumers are.  And at the end of the day, the

11   better off Uber drivers are because that draws people to the

12   platform.

13        And as Mr. Simon with Down Dog found, he made an enormous

14   amount of money on iOS over the last year while he's

15   complaining.  And, yes, there are some complaints about

16   search.  Ms. Moye will talk a bit more about that.  Those same

17   surveys show developers are overwhelmingly happy with the App

18   Store.

19        **THE COURT:**  Mr. Bornstein, you wanted to make two

20   points.

21        **MR. BORNSTEIN:**  I think what's useful for me, from my

22   perspective, is finish the analytical point on clustering.

23        **THE COURT:**  Okay.

24        **MR. BORNSTEIN:**  The reason clustering doesn't apply

25   here is, unlike in Staples where they were selling multiple

things, the App Store is selling one thing.  It's selling

transactions.  It's selling these services that facilitate

developers and users coming together.  And it sells the same

thing to the Starbucks app.  It sells the same thing to the

developer of the Waze app.  It sells the same thing to Epic

and other developers of games and other apps.

And because it is the very same product that is at issue

here, there is no clustering of ink and toner and staples and

Scotch tape need to be put together or in the hospital example

that Professor Lafontaine gave.  It is not knee surgery and

intensive care for a car accident.  It's the same thing so

there is nothing to cluster together.  Everybody is buying the

same service.

The customers themselves are heterogeneous, to use the

economic term.  They do different things with what they buy.

But that's just like in *AmEx* where a restaurant gets credit

card services, and the clothing boutique gets credit card

services, and the hardware store gets credit card services,

they are all buying the same thing even though they then go on

in their business and don't compete with one another.

Same thing here.  The apps or the developers all buy the

same thing and they don't necessarily go on downstream in

their business and compete with one another.  So there's

nothing to cluster together because there is just one thing.

THE COURT:  You wanted to make one other point before

1    Mr. Swanson sits down?

2            **MR. BORNSTEIN:**   I guess the last point to make, Your

3    Honor, is just to go back to the character of the competition

4    here and on the 30 percent.

5        Really, what we have heard again and again is that we

6    don't think people should have to make these choices.   We

7    don't -- we don't think people should have to choose among

8    stores.   And in terms of the price that has been charged,

9    there's no evidence that people -- excuse me, that people at

10   Apple have felt the need to lower it as a result of developer

11   competition.   And we think that's very telling about the state

12   of where they are.

13       I haven't gone into the profit -- profit issue.   We have a

14   number of slides which I won't walk the Court through, but I

15   would commend you to Mr. Barnes' report where, contrary to

16   what we heard from Mr. Cook about whether those costs were

17   fully burdened, Mr. Barnes very carefully ties out the numbers

18   to the public filings.

19       I realize Mr. Barnes didn't work at Apple, as has been

20   pointed out a number of times, the numbers are not the numbers

21   and the numbers don't lie.

22            **THE COURT:**   But your own client said that that's not

23   a logical way to think about profitability when that's not

24   your business model.

25            **MR. BORNSTEIN:**   Not a logical way to think about how

1   to run their business, and I take Mr. Cook at his word that

2   they don't actually do regular profit and loss statements of

3   this type.  But when you are looking to see what the economic

4   profitability is, and you have people at Apple actually sit

5   down and do this work, they don't do that at Epic.

6   Mr. Sweeney spoke about Epic.  There's no evidence that

7   anybody at Epic has ever made that wave chart Your Honor saw

8   of the R&D kind of landing down in the rest of services

9   bucket.  I won't say the numbers, but Your Honor may remember

10  graphically what that looks like.

11      That work got done.  It got done multiple times despite

12  our being told it was a one-off presentation, and it was

13  used -- there were questions that were followed up about it.

14  It clearly got attention at the highest levels of Apple.  It

15  was not a waste of time.  It was done for a reason and it was

16  done again.

17      So to point to how Mr. Sweeney runs his business without

18  any factual evidence that anything like that happened at Epic

19  is a false equivalence where you have people at Apple who have

20  done this again and again and again.

21          THE COURT:  Any comment on that?

22          MR. SWANSON:  Two comments.  One on the claim that

23  all app transactions in the App Store are substitutes.  That's

24  not what Dr. Evans said at page 1641 of the transcript.  He

25  said, game app transactions in the App Store are not

1    substitutes for all the other transactions.

2        With respect to the profit issue, I boil it down to this:

3    Those numbers mean what Epic says they do, then what Mr. Cook

4    should do is sell the device business and double down on the

5    App Store.  That doesn't make any sense.

6            **THE COURT:**  Okay.  Let's then move to conduct.

7    Thank you, Mr. Swanson.

8            **MR. SWANSON:**  Thank you, Your Honor.

9            **MR. BORNSTEIN:**  I'm going to ask the question the

10   economist kept asking the court, which is whether I can have a

11   drink of water for a moment?

12           **THE COURT:**  Of course.

13           **MR. BORNSTEIN:**  Thank you, Your Honor.

14                   (Pause in the proceedings.)

15           **MR. BORNSTEIN:**  Thank you, Your Honor.

16           **THE COURT:**  Okay.

17       I'll let Ms. Moye start since you have had the floor for a

18   while.

19           **MS. MOYE:**  Thank you, Your Honor.  Good morning.

20           **THE COURT:**  Good morning.

21           **MS. MOYE:**  I would like to start by directly

22   addressing a couple of the factual points that came up in

23   Mr. Bornstein's presentation so far.

24       Starting with the question of developer surveys and

25   whether developers are satisfied or not, on Friday,

1    Mr. Bornstein provided the Court with a citation to a

2    particular page from a survey deck.  And this was a survey

3    done in 2017.  The exhibit number was DX3922 and Mr. Bornstein

4    referred the Court to page .072.

5        Your Honor, that slide reports the result in response to a

6    question regarding satisfaction with discovery of My Apps.

7    And, Your Honor, what I have for the Court now is the page

8    from that same survey that reports on App Store developer

9    satisfaction overall.  This is page DX3922.063.

10       I actually have a copy of the page for Your Honor.  I will

11   try to put it on the Elmo.  I confess I'm a little worried

12   about my abilities here.

13            **MR. BORNSTEIN:**  If I can do it, you can do it.

14                    (Displayed on screen.)

15            **MS. MOYE:**  It is not as clear, so Your Honor may want

16   a copy for yourself because the numbers are a little hard to

17   make out.

18       What this shows is that in this 2017 survey, 64 percent of

19   developers reported being satisfied and only 22 percent

20   reported some level of some dissatisfaction.  Your Honor,

21   that's a sustained level of satisfaction with the App Store.

22       If we look at the same survey results from 2018, I have

23   that slide also for the Court.  This is Exhibit DX3513, and

24   I'm referring specifically to page .015.

25                    (Displayed on screen.)

1      And you will see, Your Honor, here that in 2018,

2   65 percent of developers reported being satisfied with the App

3   Store while only 19 percent reported dissatisfaction.

4      So, Your Honor, the evidence on the level of developers

5   support, we submit, once the Court actually combs through the

6   evidence, you will see that developers are highly satisfied.

7   And there's also significant evidence in the record that Apple

8   has listened to and responded to developer feedback.

9      To refer to just one example, early survey reports

10  suggested that there was dissatisfaction with the time it took

11  to complete the app-review process from developers' points of

12  view.  And you heard Mr. Kosmynka talk about the major

13  investment that was made to improve that process so that Apple

14  now completes review of 96 percent of app submissions within

15  24 hours.

16     You also heard Mr. Kosmynka explain and Mr. Schiller

17  explain the significant investments that Apple has made in

18  improving the quality of the App Store; that there was a 2017

19  overhaul, 2016-2017 overhaul where many improvements were made

20  that categories have been created to enhance discoverability.

21     The record is replete with examples of investments and

22  responsiveness to developer feedback and also with developer

23  satisfaction with that.

24     The other issue that I thought I should address at the

25  outset is this assertion that there is no evidence that Apple

1    has made price changes in response to competitive pressure.

2        Your Honor, that is not true.  Mr. Schiller testified in

3    the trial testimony starting at 2808, line 4, that Apple

4    introduced the multiplatform rule in response to game

5    developers.  And the quote was "to continue to be competitive

6    with platforms that allow cross-wallet."

7        This move, this adoption of the multiplatform rule allowed

8    developers to sell content that could be used on the App

9    Store -- in their apps on the App Store without paying any

10   commission to Apple.

11       So rather than the 30 percent that would have been paid,

12   if IAP was used and if the content was purchased on the

13   platform, developers were able to sell that content at a price

14   of -- a price return to Apple of zero.  That's a remarkable

15   price decrease, and there is testimony in the record from

16   Mr. Schiller that that decrease was made in response to

17   competition.

18       The record also shows several examples of price reduction

19   by Apple since the introduction of the App Store.

20       I have one chart that I can walk through quickly, Your

21   Honor.

22           **THE COURT:**  After that I'll let you respond,

23   Mr. Bornstein.

24           **MR. BORNSTEIN:**  Thank you.

25                       (Displayed on screen.)

1        **MS. MOYE:**  Your Honor, what you will see here, and

2    this is also in the slides that we have handed up to the Court

3    if that's more convenient for you, but what you will see here

4    is the history of price reductions over time in the App Store.

5        Starting with the initial reductions, I will have to bring

6    it back.

7        Starting with 2011, when the Reader Rule was introduced,

8    the Reader Rule, of course, Your Honor also allows developers

9    to sell content outside the App Store, outside their apps on

10   the App Store -- thank you, outside apps on the App Store and

11   make it available to consumers on the App Store without paying

12   any commission to Apple.  So the Reader Rule also constituted

13   a commission reduction in certain circumstances from

14   30 percent to 0 percent.

15       We already talked about the multiplatform rule.  In 2016,

16   Apple reduced its commission to 15 percent for subscriptions

17   after the first year.  And in 2016, Apple introduced a

18   commission of 15 percent for participants in the Video Partner

19   Program.

20       And then finally this year, Apple announced a reduction in

21   commissions to 15 percent for small business developers.  Now,

22   I know the Court has expressed a view that that may have been

23   influenced by litigation or regulatory concerns.

24   Nevertheless, it is a real reduction that has had real impact.

25   And litigation and regulatory concerns are themselves a form

1    of competitive pressure.

2              **THE COURT:**  Does that mean we have to wait for people

3    to sue Apple?  I mean, that's not something that -- certainly

4    as a federal court I don't want to encourage litigation.  So

5    how can we reasonably say that that's -- that that should be a

6    competitive driver?

7              **MS. MOYE:**  I am not suggesting it should be, Your

8    Honor.  I am just simply suggesting that to the extent the

9    Court considers it to be motivated by that, now the evidence

10   on that is to the contrary.

11       Mr. Cook testified about the primary motivation being a

12   desire to help the pandemic.  I just understood that during

13   the course of the hearings and the proceedings here, Epic has

14   suggested there was a different motivation and, thus, the

15   conduct should be discounted.

16       My only point is that the conduct exists regardless of the

17   motivations.  And that the conduct has, in fact, spurred

18   competition, again, regardless of the motivations.

19       Google has now announced that it is going to have a small

20   business program with this 15 percent commission.  So the

21   conduct spurred competition whether you look at it as

22   motivated by one factor or another.

23              **THE COURT:**  Okay.  Response.

24              **MR. BORNSTEIN:**  Thank you, Your Honor.

25       Two main points:  One with respect to the surveys and one

1   with respect to price reduction.  I'll try to get through

2   both.

3       With respect to the surveys, it is interesting to see the

4   survey results kind of an overall assessment of satisfaction,

5   but that doesn't tell the full story.  I will show one slide

6   which I have taken from a survey, which is in the record.

7   It's PX2284.

8                   (Displayed on screen.)

9       I'm going to have to take it out of my binder.

10      What this slide shows is a deeper dive on satisfaction.

11  And what it shows, and it shows pretty consistently over time,

12  as Your Honor will see from the surveys on the yearly cadence,

13  is there is satisfaction with some elements of the App Store.

14  And in particular, one element that tends to get satisfaction

15  from developers pretty regularly is the first one here, which

16  may be a little hard to read on the Elmo.  But what it says is

17  it refers to tools that are provided to develop the apps.  And

18  there does seem to be a level of satisfaction with the

19  software tools that Apple provides people.

20      But you can see in the other categories, the satisfaction

21  levels are down in the thirties and in the twenties.  These

22  are about profitability, about search and discovery, and about

23  marketing and promotion.  And these are important components

24  of this transaction platform.

25          **THE COURT:**  So this was five years ago, right, 2016?

1          **MR. BORNSTEIN:**  Yes, Your Honor.  I picked this one

2     just because it has everything on one page like this.  This is

3     not a format that Apple has done year after year, but the data

4     is in the survey in different formats in subsequent years.

5          **THE COURT:**  Okay.

6          **MR. BORNSTEIN:**  This one was graphically nice for a

7     slide.  And to say, you know, we have done a good job overall,

8     what it does is it masks the different vectors of competition

9     that would occur if there were other stores out there.

10         Somebody else could say, hey, I see that Apple is not

11    doing a great job on search and discovery so I'm going to

12    innovate and I'm going to come up with something that

13    developers and consumers will like.  Or I see that Apple's not

14    providing appropriate tools for marketing, and I'm going to

15    come up with something that developers will love that will

16    help them market their products.  And that is the kind of

17    vector by vector, factor by factor competition --

18         **THE COURT:**  Are you also saying that a store would be

19    able to develop the tools to develop the apps to exist on the

20    iOS platform?

21         **MR. BORNSTEIN:**  Your Honor, I don't think those tools

22    are part of the store.  I realize that Apple has characterized

23    them that way.  Those are part of the iOS platform.

24         And as Dr. Evans explained in some detail, the operating

25    system platform is very different from the App Store which is

a distribution channel to get apps out there.  You need look
no further than the Mac to see how that's so.

There are tools that are provided for developers to make
apps for the Mac.  But that's not part of the Mac App Store.
People get tools to develop applications for the Mac that they
can then distribute through Steam or the Epic Games Store or
directly from their own website.  So the tools are not part of
the store.  So that's how I think about the question that the
Court just posed.

As for developers being satisfied and the evidence we
have, I would ask, as I did to Mr. Cook, where are the
developers coming forward and saying to this Court, we love
what Apple is doing.  There are none.  Everybody who has come
here has been complaining, which is shocking, really, when you
think about the fact that the people who have come forward
have a lot to lose from Apple retaliating in the way that we
have shown that they have done against Epic, and in their
change to their developer program which entitles them to
continue to do that in the future notwithstanding the claim
that somehow that retaliation seems to have been required by
Japanese law, which didn't make any sense whatsoever.

The other point I would make, Your Honor, in broad
category of topics in response to Ms. Moye's comments, relates
to whether or not there has been competition that has been
felt and whether the price changes that have occurred have

been the result of competition.  A few comments on that.

First, Ms. Moye said that the conduct exists and that's enough to conclude that there has been competition.  Not so. There's no record evidence that these things that have happened have been the result of Apple feeling pressure in competition.

I do hear Ms. Moye cited some testimony here from Mr. Schiller, and it's interesting that he said that here, but there is nothing contemporaneous in the record that shows that Apple was feeling the pressure to lower its prices because of the possibility that developers would switch or go elsewhere.

What we see instead is effectively the -- it's like the benevolent overlord theory of antitrust law.  We are doing a good job so just let us keep doing it instead of what the antitrust laws expect, which is competition to spur people to do better than they are doing.

It's not enough to say, we're a great company, we have been doing well, and, you know, we are nice guys and we will give people a break because of COVID -- although, I think we all know that that justification didn't hold up to the documents -- but saying we are benevolent folks and we are talented is not enough to say we should get to have this market to ourselves.

What the antitrust laws assume is that if there is competition, then people will do better.  That's what forces

them to do better.  Mr. Cook said, I don't think people should

have to make that choice.  Mr. Cook said, seems like a

complexity people shouldn't have to deal with.

But when he was pressed, what would happen if there was

another store on the iPhone, he finally gave away the game.

No pun intended.  What he said at pages 3934 and -35 of the

transcript was quote, "We'd have to differentiate in some

way."

Well just so.  Mr. Cook got that exactly right.  If they

had competition, they would have to continue to work to

differentiate themselves, and that would be a good thing.

**THE COURT:**  So you've made a reference to in terms of

anticompetitive effect, so in terms of conduct, you've made a

reference to, obviously, the lack of price decrease.  So we

don't have -- there are different ways that you have all

sliced it in terms of increase or decrease, but we've got the

30 percent.  That's pretty obvious.

There's a substantial amount of evidence in terms of

output which is increased sometimes, right, among the factors

output can be reflective of anticompetitive conduct, so you

don't really have an output argument.  Now, whether or not it

is -- how it is relevant I haven't figured out, but output is

one.

Quality is another.  What, you know, what specifically --

what specific direct evidence is there of anticompetitive

effects.  List them.  Just list.

          **MR. BORNSTEIN:**  Just list you said?

          **THE COURT:**  Just list.

          **MR. BORNSTEIN:**  After my list I will make one point.

    In terms of specific anticompetitive effects, number one, higher prices.  There are higher prices than there would be for app distribution if there were competition.

    Number two, there would be more innovation in the market for app distribution.

    I want to be clear, that is the market that we are focused on when we are having this discussion.  There would be more innovation in app distribution.  We are not talking about innovation on the phone or innovation on the operating system. This is a case of an app distribution and we would see more innovation there.

    We would see more innovation with respect to the in-app payment solutions which we talked about on the other part of our claim.

    And you would see overall, once you have lower prices and once you have more innovation, you would see better output even than we have seen so far.

    This was the other point that I had wanted to make after my list, is it's not enough to say there has been a lot of output.  As Dr. Evans testified, you can't form a view on anticompetitive effects without considering what would happen

1    in the but-for world.  It's a comparative exercise.  Otherwise

2    you would never see an antitrust violation in a dynamic market

3    like this one.  We know that is not the case from cases like

4    *Microsoft* and others.

5            **THE COURT:**  How do you define "better?"

6            **MR. BORNSTEIN:**  I apologize, Your Honor?

7            **THE COURT:**  How do you define "better?"

8            **MR. BORNSTEIN:**  Lower prices, more innovation.

9            **THE COURT:**  That's one and two.

10           **MR. BORNSTEIN:**  Correct, Your Honor.  That's -- those

11   are the classic vectors on which you measure output in an

12   antitrust case:  Price and quality.  We have lower prices.

13   We'd have higher quality, and innovation is, of course, one

14   way of thinking about -- one way of thinking about quality.

15           **THE COURT:**  A response.

16           **MR. BORNSTEIN:**  Apologies.

17           **THE COURT:**  You gave me your list.  A response.

18           **MS. MOYE:**  Yes, Your Honor.

19      First I would like to briefly address a couple of the

20   points that Mr. Bornstein made about developer satisfaction.

21      Quickly, just the 2016 survey he showed.  Really, the

22   Court needs to keep in mind that there was a huge effort to

23   improve the App Store start in 2016.  So the latter data

24   should be the focus of the Court's analysis in terms of the

25   current state of affairs with respect to the App Store.

1         Also, Mr. Bornstein shared his view that the tools are not

2    a part of the store.  And I think that's interesting for

3    Mr. Bornstein to share that view, but Apple has testified,

4    Apple witnesses, numerous Apple witnesses have testified that

5    the tools are, in fact, an integral part of the store.  The

6    tools are provided to developers so that they can have apps on

7    the store.

8         Apple invests enormous amounts in research and

9    development, and the amount increases year over year, Your

10   Honor, in part to develop these tools that enable developers

11   to have wonderful offerings on the App Store.

12        So the notion that those tools are somehow separate and

13   can be disaggregated from the store, the evidence does not

14   support.

15        And then Mr. Bornstein criticized Mr. Cook's testimony

16   about differentiating its products.  And, Your Honor, that

17   testimony really gets to the heart of the issue before the

18   Court.  Because Apple very much wants to differentiate its

19   ecosystem system.  As the Court mentioned earlier, consumers

20   buy into that ecosystem with a specific expectation based on

21   Apple's longstanding brand promise of enhanced security,

22   enhanced privacy, enhanced safety.

23        And, yes, Apple very much wants its product to remain

24   differentiated from the type of Android product that Epic

25   wants to force it to offer.  Right now, in the marketplace,

consumers who want what Epic is advocating are free to obtain.

It is freely available.  Anybody who wants a system that would

allow the sideloading, that would allow these alternative

stores is free to go out and buy an Android device.

     The relief they are seeking here is to force Apple to take

a competitively differentiated product off the marketplace.

And, Your Honor, while it may not make sense to Mr. Bornstein,

it certainly makes sense to Apple and is kind of the heart of

Apple's competitive strategy.

          **THE COURT:**  Okay.  Response?

          **MR. BORNSTEIN:**  Yes, Your Honor.

     Two things.  First, I appreciate the fact that Apple

witnesses have come in and testified that the tools are part

of the store.  But it, frankly, doesn't make any sense in the

context of this industry as shown, as I said, by the Mac.

     People who have operating systems make tools so that

developers can write to the operating system.  It happens on

the Mac.  It happens on Windows.  That is how -- it happens on

Android.  People make tools so people can write to the

operating system, whether they have their own store or not.

These are two analytically separate things.

     It just so happens on iOS that there is no other store,

there is no direct distribution, and so there's no other way

to get your app onto the device unless you go through their

store.  But the tools are the tools.  And the tools are a set

1    of software that are used to write the app.

2        How that app then gets onto the device is an entirely

3    separate question.  So there's no -- there's no analytical

4    justification for this linking together of software tools to

5    create a program and the creation of the store itself.

6        In fact, there were tools that existed before the store,

7    right?  Apple wrote its own apps using tools to have apps on

8    the store -- excuse me, have apps on the phone before the App

9    Store even existed.

10            **THE COURT:**  Ms. Moye, I'll let you respond to that

11   and also I cut you off before you could respond to the

12   effects, namely, higher prices, less innovation.

13            **MS. MOYE:**  Yes.  Thank you, Your Honor.

14       In response to that point, I'd just remind the Court that

15   Epic, in its sworn interrogatories, has admitted that they

16   cannot develop apps for the App Store without the tools

17   embedded in Apple's IAP, the tools that Apple licensed to it.

18       I don't know why Mr. Bornstein thinks there's some

19   distinction in light of that admission, but that's the

20   evidence that is before the Court.  So, really, the parties

21   are aligned on this issue with respect to the tools.

22       And before turning to the issue of commissions, I have to

23   quickly mention, because we heard a reference to it now and we

24   heard it in Mr. Cook's cross-examination, why have no

25   developers come to Apple's defense.

1          And it is because we have not gone out in the world and

2     searched and jumped on airplanes and jumped through all the

3     hoops that Epic apparently did in a desperate attempt to get

4     some rebuttal witness to come into court on the last day of

5     trial.

6          I could have certainly asked Mr. Cook whether he was aware

7     that Epic was not able to scrounge up a witness at the last

8     minute after jumping on airplanes --

9          **THE COURT:**  That's not exactly true, right?  He's

10    talking about Down Dog.  They testified in their affirmative

11    case.  And then we've got deposition testimony from Match.  So

12    that's not quite fair.

13         **MS. MOYE:**  I agree, Your Honor, they have had

14    developers.  I'm just addressing the theatrics of asking a

15    witness whether they were aware of litigation strategy

16    decisions.  And, of course, I could have engaged in the same

17    theatrics but did not feel like that was appropriate.

18         Turning to the commissions and the output and the price

19    increase issues, first I would like to point out that Apple's

20    30-percent commission, the 30 percent rate that some pay has

21    always been competitive.  That 30-percent commission was

22    competitive when it was introduced, Your Honor, and it remains

23    competitive with the rate that is offered on all the platforms

24    that you see here.

25         This is a slide that was used in Mr. Hitt's testimony.

1     And you see the admission there from Tim Sweeney himself.

2           "30 percent is the most prevalent rate charged by the

3           stores, and it was then and it is now."

4     Your Honor, there is no evidence of any super competitive

5     price.  The evidence is unrebutted that the 30 percent is

6     competitive, and that there have been price increases over

7     time.

8                         (Displayed on screen.)

9     In terms of output, this is also a chart that may be

10    familiar to Your Honor.  This is a record of the output

11    effects in the digital games transaction market.

12    This is the market that we believe is appropriate for

13    assessment of Epic's claims.  And you will see there has been

14    an explosion in output in that market.

15    There are a 1200 percent increase between July 2008 and

16    September 2019 in the number of initial game downloads and

17    in-app purchases on the App Store.

18    There has been a 2600 percent increase in developer

19    revenue from App Store initial game downloads and in-app

20    purchases in that same time period.

21    And these output effects are not only limited when you

22    assess them in the market we propose, Your Honor, you see the

23    same type of staggering output in Epic's alternative

24    competitive market.

25          THE COURT:  So anti-steering provisions seems

1    anticompetitive.  I understand that *AmEx* held to the contrary,

2    but as I indicated, again, I'll go back and check the record,

3    in *AmEx* the market reality, I suspect, was not the market

4    reality here, which is that people don't know.  And Apple's

5    hiding of that information in a way that is not reflected to

6    the consumer directly seems to be anticompetitive.

7        So address that topic.

8        **MS. MOYE:**  Yes, Your Honor.  I would be happy to.

9    Just a couple of more slides on that.

10                        (Displayed on screen.)

11       First, Your Honor, just like to point out that there is

12   nothing unique or unusual about the use of anti-steering

13   provisions.  They are really common in digital marketplaces.

14       As Epic's expert Professor Evans testified, when you have

15   these kind of common practices, then you have prior

16   information that they are efficient, that they are used for

17   efficiency purposes.  Apple's witnesses --

18       **THE COURT:**  That's not for efficiency here.  Mr. Cook

19   conceded that it's not for efficiency.  He conceded that it

20   was a method of being compensated for intellectual property.

21       And I understand Apple has a right, in my view, to be

22   compensated for their intellectual property.  One of the

23   issues we will get to with Epic because they seem to be

24   wanting access to users without compensating Apple for that

25   access.  But he conceded that that was not the reason.

1          **MS. MOYE:**  Your Honor, you are correct.  I actually

2     have Mr. Cook's testimony to review with the Court.

3          **THE COURT:**  Okay.

4                    (Displayed on screen.)

5          **MS. MOYE:**  First, both Mr. Cook and Mr. Schiller

6     confirm the limited nature of the anti-steering provisions

7     that Apple employs.  Both confirmed that developers remain

8     free to engage in mass marketing to customers, mass marketing

9     that includes information about other payment options and

10    about lower prices on other platforms.

11         In fact, Mr. Schiller, I have his testimony for you,

12    confirmed that he himself receives mass marketing from Epic,

13    the plaintiff in this case.

14         So there is no gag in place, Your Honor.  Developers are

15    free to market to their customers in any way they see fit.

16    They can put out newspaper ads, they can put stuff on their

17    website.  The limitations that Apple has is that you can't

18    link directly on your app in the store to another payment

19    processor and that you cannot use a curated list of those

20    email addresses you are paying from registration on our

21    platform to do targeted marketing.

22         Here's the testimony on Apple's reasons for that.

23                    (Displayed on screen.)

24         Your Honor's correct that Mr. Cook said, if we allow

25    people to link out like that, we would, in essence, give up

1    our total return on our IP.  So, yes, we believe it's a

2    legitimate business justification to not have people have

3    links into their apps on the App Store asking people to

4    circumvent payment on the App Store --

5         THE COURT:  So maybe not a link.  Why not something

6    that merely says, more options available online?

7         MS. MOYE:  It would be the same rationale, Your

8    Honor.  It would be, as Mr. Schiller said, like asking

9    Nordstrom's to allow Macy's at the checkout counter to have a

10   sign that says, you can also buy over at Macy's for a lower

11   price.  Or maybe you want to consider purchasing elsewhere

12   right as you check out.  This is -- this is --

13        THE COURT:  But in the *AmEx* analogy, I go to the

14   checkout stand.  It says *AmEx*, MasterCard, Visa.  So you're

15   given options.

16        MS. MOYE:  And developers have options here.  There

17   are only two narrow limitations, Your Honor --

18        THE COURT:  Narrow?  I don't know that you can say

19   it's narrow given how profitable it is.

20        MS. MOYE:  Given how profitable?

21        THE COURT:  In-app purchases are.  Can you really say

22   narrow given how profitable it is?

23        MS. MOYE:  I understand that in-app purchases are

24   very profitable, Your Honor.

25        What I was referring to is that the limitations on

1    developers' conduct are narrow.  They remain free to engage in

2    all other types of competitive conduct.

3        **THE COURT:**  Can we get some clarity on this,

4    Mr. Bornstein, from your perspective?

5        The way that Ms. Moye has described mass marketing, I

6    thought I went back and read some of the testimony from Down

7    Dog.  It seemed to suggest that they thought that they

8    couldn't send emails to customers.

9        I would like to hear your perspective on this topic and,

10   again, I'll have to go back and check the record myself.

11       **MR. BORNSTEIN:**  Absolutely, Your Honor.

12       Just to commend the Court to the place to look with the

13   authoritative explanation of this, it is, of course the App

14   Review Guidelines and the relevant ones are 3.1.1 and 3.1.3.

15       And to address this specific question about email,

16   Ms. Moye referred to it here.  I won't comment on because I

17   frankly don't recall if she got it exactly right or not.

18       But the language in 3.1.3, it says that you cannot, either

19   within the app or through communications sent to points of

20   contact obtained from account registration within the app,

21   like email or text, encourage users to use a purchasing method

22   other than in-app purchase.

23       So when Mr. Cook, for example, kept saying you can do it

24   if they give you your email, what that means is the developer

25   needs to get the consumer's email through something other than

their signing up on iOS.  They have to find some other way

to get people's email so that they could then send them some

kind of mass marketing.

What Apple prohibits is sending mass marketing emails,

texts, and so forth to people at points of conduct that were

obtained within the app.

**THE COURT:**  *Fortnite*, there is evidence in the record

that *Fortnite* sends emails to Mr. Schiller who signs -- signed

up, I thought, through -- I would have to go back and check

how he signed up.

But if someone has the email which *Fortnite* requires as a

for instance because you sign in, I think, right, to your

*Fortnite* account with your email, then they can send that

information.

**MR. BORNSTEIN:**  So --

**THE COURT:**  So at least with respect to *Fortnite* we

know that it's not limited; is that right?

**MR. BORNSTEIN:**  So there are different categories of

apps under the rules.  3.1.1 and 3.1.3 cover different types

of apps.  And the limitations are not precisely the same in

the rules as to each type of app, which is why I started

commending the Court to look at what is in the guidelines

themselves.

What's clear is the restriction prohibits for apps in

3.1.3, those kinds of marketing communications.  For other

1    apps, the restrictions are not exactly the same.  You cannot

2    have a link --

3              THE COURT:  What are the categories?

4              MR. BORNSTEIN:  You cannot have a call to action --

5    I'm sorry Your Honor?

6              THE COURT:  What are the categories in 3.1.1 and

7    3.1.3?

8              MR. BORNSTEIN:  So my understanding is the 3.1.1 is

9    kind of the general rule and 3.1.3 carves out a narrower set

10   of categories, which are then listed in --

11             THE COURT:  Can you read them to me?

12             MR. BORNSTEIN:  -- point A, B, C, and so forth.

13             THE COURT:  Okay.

14             MR. BORNSTEIN:  I can read them to the Court.  I was

15   just trying to save Your Honor the tedium --

16             THE COURT:  I just want to have a sense because

17   earlier you said the clustering was not appropriate, and yet

18   if the anticompetitive effects impact certain categories of

19   apps that are not impacted by another -- by a different set,

20   then perhaps you're wrong that clustering is not appropriate.

21             MR. BORNSTEIN:  So I disagree with that, Your Honor.

22             THE COURT:  Okay.

23        Could you tell -- just generally, give me some sense of

24   the categories.

25             MR. BORNSTEIN:  Sure.

1          The ones that fall in 3.1.3 are things like the

2     multiplatform services that Ms. Moye and I think maybe

3     Mr. Swanson talked about a little earlier, which would include

4     an app like *Fortnite* where you can buy on one place and go

5     somewhere else.  The reader apps, which we talked about like

6     Kindle and I think even Netflix fits in that category,

7     although you are not reading, you're watching.  It covers what

8     are referred to as person-to-person services.  So if you take

9     a class and it's just one person and the teacher as opposed to

10    Down Dog where it's a teacher and a big group of people, that

11    is treated separately.

12         And there are a few others that I am less familiar with,

13    frankly -- Enterprise Services is another one that fits in

14    that category.

15              **THE COURT:**  Okay.

16              **MR. BORNSTEIN:**  There are a few more, and they are

17    all here in the guidelines.

18              **THE COURT:**  Okay.

19         So what does account registration mean?

20              **MR. BORNSTEIN:**  My understanding is it's signing up

21    for an account with the app.  A lot of apps ask you to sign

22    in.

23              **THE COURT:**  Is it defined in the Guidelines?

24              **MR. BORNSTEIN:**  Not that I'm aware of, but I am not

25    100 percent sure, Your Honor.  I don't believe so.

1          **THE COURT:**  Would you address that topic

2    specifically, please?

3          **MS. MOYE:**  Yes, Your Honor.

4                    (Displayed on screen.)

5      I have a copy of the Guideline provisions.  I thought it

6    might be helpful to put them up on the screen.

7      So, 3.1.1 applies to in-app purchases.  And you will see

8    that the language in 3.1.1 talks about linking out and calls

9    to action.  So if you are offering in-app purchasing on your

10   app, you cannot include those kind of links.

11     The 3.1.3 provision that relates to Epic is the

12   multiplatform rule.  Because, remember, Epic is allowed to

13   sell its products, its V-Bucks off the app and allow customers

14   to use them on the app.

15     So what this rule says is that you cannot -- I will have

16   to borrow it for a second -- directly or indirectly target

17   iOS users to use a purchasing method other than in-app

18   purchases.  And your general communications about other

19   purchasing methods must not discourage use of in-app purchase.

20     What Mr. Schiller testified, and Mr. Cook confirmed is

21   that they -- developers cannot use the email addresses that

22   they obtain when consumers register for an app there by

23   themselves to target those users; that developers are free to

24   send emails to their customers as long as they get the

25   customer's permission to send those emails.  That would

1    include those who initially registered within the app.

2       So as long as it is not a targeted solicitation based

3    solely on account registration within the app, then there's

4    not a steering concern.

5       And, Your Honor, I'd just like -- I know that this is an

6    issue we spent time on, but it's important to keep in mind

7    that Epic has not raised a legal claim here saying that it has

8    been harmed as a result of any anti-steering provision.  Epic

9    has neither claimed that and there's not a scintilla of

10   evidence in the record showing that Epic has suffered any harm

11   as a result of these anti-steering provisions.

12      In fact, there's no evidence in the record that anyone has

13   suffered any harm as a result of these anti-steering

14   provisions.  The evidence that is in the record --

15          THE COURT:  The Down Dog developer certainly said

16   that they were harmed by that.

17          MS. MOYE:  I have a snippet of his testimony, Your

18   Honor --

19          THE COURT:  I don't need to see it.  I'll go back and

20   read it.  You can respond.

21          MS. MOYE:  I believe his testimony was that his

22   purchases through the subscription option remain the same

23   before and after he had the availability --

24          THE COURT:  I thought he testified that there was a

25   measurable difference for those who were signing up on

Android.

**MS. MOYE:**  What I have here is his trial testimony at
416, starting at line 7.  I think it was in colloquy with the
Court.

**THE COURT:**  I can go back and read it myself.  But I
thought that there was some evidence with respect to that.
But I'll check.

I take your point that they do not claim this is an issue.
Agreed or not?

**MR. BORNSTEIN:**  Disagreed, Your Honor.

**THE COURT:**  Where in your --

**MR. BORNSTEIN:**  Interrogatory number 13 in response
to a request from Apple.  We made the point that this was one
of the provisions that we were challenging.  And in our
discussion in the findings of fact and conclusions of law, we
do address this restriction as well.

That's just incorrect as a matter of fact.

**THE COURT:**  Okay.

**MR. BORNSTEIN:**  Speaking -- if I can address a few
other points in there.

With respect to Down Dog, Your Honor is correct.  There
was a vast difference between the sign-ups on iOS versus
Android given the presence of the anti-steering restriction.
And Your Honor may recall that they actually conducted an
experiment where, for a period of time, they attempted to make

1    the Android app mimic iOS by removing the link that Android

2    allowed, and it resulted in a 28 percent overall drop in

3    subscriptions, overall output producing.

4          **THE COURT:**  So she gave me a slide that seemed to

5    indicate that all of those other platforms use antitrust -- I

6    mean anti-steering measures.

7          Your response on that point.

8          **MR. BORNSTEIN:**  Yes, Your Honor.

9          None of those other platforms, with the exception of

10   Google Play, has market power.  Just like *AmEx*, the Government

11   did not prove that *AmEx* had market power.  It's an entirely

12   different situation when you are dealing with an entity that

13   has market power versus an entity that doesn't.  This is

14   another situation where Apple is creating a false equivalence

15   like with the consoles and all of the Sturm und Drang around

16   the possibility that a ruling here that's adverse to Apple

17   would be bad for the console makers.

18         As we know there's one console maker who doesn't think so.

19   Because a business person from that entity came here and

20   testified and Apple has even gone so far as to say in a filing

21   recently that maybe Microsoft is behind this whole case and

22   Epic is a proxy plaintiff.  And it had gone to the level of

23   that kind of conspiracy theory, but if that were the case,

24   Microsoft sure would be acting against interest if this was

25   going to doom its own Xbox.

1          One other point I should make, Your Honor, so the record

2     is clear, I'm not sure why, but the version of the guidelines

3     that Ms. Moye just showed you is outdated.  Those were the

4     2020 guidelines as it says on her slide.  I have the 2021

5     version, which is in the record, as Exhibit 2790, and the

6     language is different.

7                         (Displayed on screen.)

8         I apologize for having the highlighted markup copy, but

9     this is my own personal copy that has received my attention

10    over the months.

11         But you can see, 3.1.3 has the language that I read to the

12    Court earlier, that it prohibits not only links within the app

13    or calls to action within the app, but also communications

14    obtained from account registration within the app.

15         It is worth noting, by the way, that this -- this

16    provision really only has bite where you have people who sign

17    up, right?  So if you have a multiplatform service, for

18    example, like *Fortnite*, or Netflix, that's when you can have

19    an email that you might, as a developer, want to send

20    something to.

21         If you have a one-off app that is not a multiplatform

22    service, you are much less likely to have the email in the

23    first place.  My -- my flight view app that I use to check if

24    my flight is on time, they don't have my email but it is not a

25    multiplatform service.

1      It is not uniformly true, but the multiplatform ones are

2    the ones you are much more likely to find yourself in this

3    situation.  And I presume that is why Apple has drafted the

4    guidelines this ways because that's when the developer might

5    have the email to send something --

6          **THE COURT:**  But the developer could ask for the

7    email.  There's no restriction in asking for the email.

8          **MR. BORNSTEIN:**  That is true.

9          **THE COURT:**  And then once they have the email, then

10    they can market through the email.

11          **MR. BORNSTEIN:**  That is my understanding.  It's an

12    extra kind of step of friction that the developer needs to go

13    through.

14          **THE COURT:**  Others might say privacy.

15          **MR. BORNSTEIN:**  Well, it's another step that needs to

16    be gone through to get that email.

17      There is no privacy issue here because the developers have

18    the email.  It is not a question of whether they get them,

19    right?  *Fortnite* has Mr. Schiller's email the moment he signed

20    up --

21          **THE COURT:**  Like you said, say the flight app doesn't

22    have your email.

23      So let's say the flight app all of a sudden wanted to sell

24    you currency to -- where you could buy things in the airports,

25    and they didn't have your email.

1        I'm just -- again, I'm just trying to understand, right?

2    So it sounds like if they asked you for your email and you

3    agreed to give it to them, then they could send you an email

4    that said, welcome to our app.  Here are some -- you know,

5    here are some offerings that might be of interest to you.

6        **MR. BORNSTEIN:**  Yes.  Although they couldn't -- they

7    couldn't do a targeting in the app for an app like that to

8    say, you know, we would like you to go purchase elsewhere.

9        You can't have a call to action in the app.  Even for an

10   app like the my flight app, which is not a multiplatform.

11       And just to address a little bit more on the

12   anti-steering, we have done some analogies about Nordstrom and

13   Macy's and the like.  I think if we are going to do kind of a

14   shopping analogy in a mall, a better way of looking at it

15   would be, when you go to the mall and you go shop at, you

16   know, a chain store like Under Armor, or whatever, there are

17   situations where the store will have a sign that says we have

18   stores elsewhere.  We are not only here, we have an outlet in

19   this other mall over there or we have an outlet downtown.

20   That is perfectly acceptable.

21       The reason I raise it is because stores often are required

22   to pay some portion of their revenue to the mall.  That's how

23   the mall makes money.  The mall doesn't prohibit you from

24   saying, hey, you can buy from us somewhere else.  That's

25   perfectly ordinary.

And the *AmEx* example is probably much more on point since we are talking about shopping.  As the Court has said in that circumstance, there are signs in the window or at the cash register that say you can use Visa, you can use *AmEx*, once upon a time, as the Court pointed out maybe you could use Discover, but those are possibilities.

So the rule that we are dealing with here is much more restrictive and it is imposed by a company, unlike *AmEx* and unlike the others on that slide Ms. Moye showed with one exception, a company that has market power.

**THE COURT:**  Ms. Moye.

**MS. MOYE:**  Yes, Your Honor.

Important to point out, what you did not hear in that response was any reference to evidence in the record that any anti-steering provision has harmed Epic.

Now, with respect to the testimony of Mr. Simon from Down Dog, I actually have the correct testimony for the Court.  It is trial transcript 418, starting at line 16.

"The Court:  Okay.  How long" --

**THE COURT:**  Don't read it to me.

418.  What's the --

**MS. MOYE:**  Line 16.

**THE COURT:**  All right.  I'll take a look.

**MS. MOYE:**  There he just confirms, Your Honor, he had a link up for a while and it had no impact on his sales on

```
 1    either platform.  So -- there's no evidence in the record to

 2    support harm.

 3        The final --

 4            THE COURT:  Your point?

 5            MR. BORNSTEIN:  If we are doing dueling cites to

 6    Mr. Simon's testimony --

 7            THE COURT:  Yes.

 8            MR. BORNSTEIN:  -- I would commend the Court to 359

 9    through -61 which is where he talks about the differentiation

10    between Android and iOS.  And then 363 through 367 where he

11    talks about the experiment and the actual concrete harm that

12    occurred when he removed the link.

13            THE COURT:  Okay.

14            MS. MOYE:  And just one -- sorry.

15            THE COURT:  You want to finish?

16            MS. MOYE:  I wanted to make one final point with

17    respect to this anti-steering assertion, that the assertion

18    that there's a concern about anti-steering is contradictory to

19    the assertion that there is an iOS-only market.

20        The fact that Apple feels the need to have an

21    anti-steering provision is absolute proof that the Apple

22    platform competes with those other platforms to which

23    consumers could be steered.

24        So Epic can't have it both ways.  They can't prevail on an

25    anti-steering claim while maintaining that there's an
```

1    iOS-only market.

2           MR. BORNSTEIN:  Your Honor, I've been relatively, I

3    hope, restrained in the language I've used so far, but that

4    little piece of it is kind of economic nonsense.

5       The market is defined by having sufficient substitution to

6    discipline the monopolist in exercising market power.  It does

7    not mean that there is absolutely no substitution at all.

8       Of course there is substitution at the margin, especially

9    when you have a monopolist who is already charging a price

10   that is above competitive levels.  But it is completely

11   incorrect to say that there is no need for an anti-steering

12   provision when there's just market.

13      Apple is absolutely interested in preventing the marginal

14   customer from switching over or shopping somewhere else.

15   Those two things are entirely consistent with one another.

16           THE COURT:  Okay.

17      I am going to give my court reporter a break.  As she

18   knows, I can keep going but that would not be nice to her, and

19   she's --

20           MR. BORNSTEIN:  Your Honor, I appreciate the break,

21   too.  Thank you.

22           MS. MOYE:  Thank you.

23           THE COURT:  Okay.  We will stand in recess for 15

24   minutes.

25        (Recess taken at 10:29 a.m.; resumed at 10:47 a.m.)

1    **THE CLERK:**    Remain seated.  Court is in session.

2    Come to order.

3    **THE COURT:**    Okay.  We are back on the record.  The

4    record will reflect that the parties are present.

5    Shall we move to remedies at this point, and then what we

6    can do is I will give each side time -- trying to be

7    uninterrupted at the end to make points that you might want to

8    make.

9    **MS. MOYÉ:**    That is fine, Your Honor.

10   **THE COURT:**    Okay.  Let's move to remedies.  I have

11   Mr. Doren at the podium with Mr. Bornstein.

12   Mr. Bornstein, we'll start with you.  One of the issues

13   that has concerned me throughout the course of this trial is

14   that your client does not seem to be interested in paying for

15   the access to customers who use iOS, and even if he is

16   interested, it's hard to see how we get there because he's

17   attacking the fundamental way in which Apple is generating

18   revenue, which I know you disagree that they are using it for

19   purposes that -- that assist, but there is a reasonable

20   argument that they're using these profits to benefit the whole

21   ecosystem.  So I know there's some disagreements, but I still

22   don't understand where you expect this to go; that is -- go

23   ahead.

24   **MR. BORNSTEIN:**    Sure, Your Honor.

25   So first there is just a level set -- as a level set on

1    that point.  Apple can charge.  Okay?  Full stop -- oh, can

2    you not hear me, Your Honor?

3              **THE COURT:**    Now I can.  Somehow you cut out.

4              **MR. BORNSTEIN:**    Sorry.  So Apple can charge.  There

5    is no effort here to say that Apple must give away all of its

6    stuff for free.  So just as a baseline, that is -- that is not

7    what Epic has advocated, is that they are obligated as a

8    matter of law to give things away for free.  It does happen to

9    be the case that most general-purpose platforms operate in

10   that way.

11        What Apple has done is structured its business

12   differently.  They're not obligated to follow a particular

13   business model.  What they are prohibited from doing is

14   structuring their charges in a way that has anticompetitive

15   effects.

16        So here we have a structure in which there are

17   anticompetitive effects in app distribution because they are

18   the only path to get onto the iPhone, and we have

19   anticompetitive effects in in-app payments because of the

20   requirement that developers who want to offer digital content

21   must use their solution.

22        So the issue is not can they charge something and the

23   issue is not can they charge people who make games.  The issue

24   is can they structure their business in a way that has the

25   effect of artificially increasing price and artificially

1    decreasing quality and innovation, and that's what we

2    challenge.  And as a remedy, we believe that the right thing

3    to do is to get rid of those particular anticompetitive

4    restrictions.

5          I have a slide I can put up and go through about the

6    specifics of the remedy, but I don't want to go do that if I

7    haven't been responsive to the Court's question yet.

8          **THE COURT:**    No.  Go ahead.

9          **MR. BORNSTEIN:**    Okay.

10    You should have a set of slides, Mr. Doren.

11         **THE COURT:**    What page is it?

12         **MR. BORNSTEIN:**    It's Slide 88.

13    And so what we've done here, Your Honor, is to try to

14    break this down into the two different restrictions that are

15    at issue and the type of remedies that are at issue for each.

16    And you'll see we have two columns. "App Distribution

17    Restriction".  That relates to the fact that the App Store is

18    the only way to get apps onto the phone.  And the "IAP

19    Requirement," which I think is obvious what that is intended

20    to cover.

21    And for each one, there is a primary remedy, some

22    anti-circumvention, and then some interim steps.  And this is

23    all, by the way, in our January 22 submission.  I've just

24    tried to make it simple as a conceptual matter rather than

25    more detailed.

1          So really all we're asking, Your Honor, is on the primary

2     remedy to prohibit the specific restrictions that have these

3     effects and then the anti-circumvention steps are just to

4     prevent Apple from getting around that main prohibition.  And

5     then on the interim steps, we have -- these are a little bit

6     more involved -- an effort to try to limit the extent to which

7     these restrictions will impact Apple's business going forward

8     but at the same time making sure that the remedy that the

9     Court enters is effective to address the built-up consequences

10    of the anticompetitive conduct that has existed for so long.

11         And if it's helpful, I can go in more detail to any of

12    these pieces, but they are all laid out in more detail in our

13    remedial submission from January 22.

14         But at the --

15         **THE COURT:**    But the effect of both of these is that

16    Epic Games would pay Apple nothing.

17         **MR. BORNSTEIN:**    That's not correct.  I disagree.

18         It may be the effect if that's where the market takes --

19    takes Apple and what Apple is able to charge in a market, but,

20    for example, Apple can charge, in a non-discriminatory way,

21    developers.  Apple could choose to -- to charge certain

22    developers more than others based on the advantage that they

23    take of the platform to try to be sensitive to that and to

24    price discriminate in an appropriate way, but what they can't

25    do is they can't charge in a way that has these

1    anticompetitive effects on app distribution and on payment

2    solutions.

3         So we're trying to be targeted to address only the

4    restrictions that we have challenged, and we expect, given the

5    innovation in Cupertino, that they would find ways to continue

6    to profit from their intellectual property and from their

7    other contributions but just not in a way that has these

8    anticompetitive effects and that would result in charges that

9    are driven by the market rather than being driven by the

10   monopoly.

11            **MR. DOREN:**   Your Honor, may I?

12            **THE COURT:**   Mr. Doren.

13            **MR. DOREN:**    Your Honor, it's a beautiful chart, but I

14   think what they want is simple enough, and it does come out of

15   Docket 276 and their Appendix A to that.  They want five

16   things.  They want there to be no prohibition on sideloading,

17   and in enforcement of that prohibition, they do not want Apple

18   to enforce contractual provisions, guidelines, or policies or

19   impose technical restrictions or financial penalties that

20   restrict, prohibit, impede, or deter the distribution of iOS

21   apps through a distribution channel other than the App Store.

22   They want a compulsory license of all of Apple's intellectual

23   property.

24         The second thing they want is that all stores get access

25   to all Apple functionality and features required to mirror the

1    experience of the App Store.

2           The next thing they want is that there be no warning signs

3    and no indication on apps that are not Apple-approved apps

4    that in fact they have not been through the app review process

5    or in any way touched by Apple.

6           The next thing they want is that they get the same rights

7    through the App Store itself; that other stores be able to be

8    put on the App Store with complete access to all necessary

9    Apple IP to mirror the App Store experience.  And they also

10   want that Apple be enjoined from restricting, prohibiting,

11   impeding, or deterring the use of in-app payment processors

12   other than Apple's IAP.

13          Now, we just heard a theoretical musing about how sometime

14   down the road the market might require take Epic Games Store

15   pay something to Apple, but as Your Honor has correctly

16   observed, what they want right now is to be able to put the

17   Epic Games Store on the Apple App Store.  They want to conduct

18   business without going through IAP, and we know what that

19   looks like.  They have their own payment button.  We've seen

20   it.  And under that model, nothing would be paid to Apple for

21   the use of its intellectual property, for the use of the

22   platform.  Nothing would be going to Apple for that.  And

23   Apple -- and we can talk about this when the Court is ready

24   to -- and Apple would not have an opportunity to conduct a

25   meaningful review of what's in those stores, and even if it

1    did, it would now be doing it for free in an attempt to

2    safeguard their customers but an attempt that would fall far

3    short of what it's capable of doing now.

4         So Your Honor is correct that what Epic Games is seeking

5    to do is not to compete on commission.  It's seeking to avoid

6    any commission.  They want to put their store on our platform

7    and charge their own commission of the people conducting

8    business within it.

9              **THE COURT:**    Response.

10             **MR. BORNSTEIN:**    Yes, Your Honor.

11        The -- the description of the different pieces of what

12   was -- that Mr. Doren went through is, I would say, a

13   paraphrase of what's in our -- our Exhibit A.

14        It is the case that we do think that there needs to be a

15   prohibition on the restriction currently in place that makes

16   the App Store the only store, and we do think there needs to

17   be a restriction -- excuse me -- a prohibition on the

18   requirement that IAP be the only way that people can offer

19   digital content.

20        We absolutely are not saying, and do not say, that Apple

21   is prohibited from charging people for its intellectual

22   property, full stop.

23             **THE COURT:**    Are you asking for a compulsory license?

24             **MR. BORNSTEIN:**    No, Your Honor.  Absolutely not.

25   Apple is more than free to choose not to license its IP.  Any

1       patent holder can say *I won't license my IP*.  That's just

2       fine.  But when someone chooses to license its IP, it is

3       subject to the antitrust laws.  It cannot impose conditions on

4       those licenses in a way that has anticompetitive effects.

5            Your Honor made that point in the preliminary injunction

6       opinion.  In *Microsoft* the way the court responded to the

7       argument that intellectual property was a free pass was to

8       call the argument bordering on frivolous.

9            Conditions that are imposed on the licensing of IP are

10      routinely scrutinized under the antitrust laws and for good

11      reason, because you cannot -- although there are things that

12      you could choose to do unilaterally, like withholding your IP

13      or refusing to deal, you cannot place conditions on those

14      things if the conditions with anticompetitive effects.

15                 **MR. DOREN:**   Your Honor --

16                 **MR. BORNSTEIN:**    And *Kodak* makes that clear as well in

17      Footnote 8.

18                 **MR. DOREN:**   Apologies.

19                 **THE COURT:**   Go ahead, Mr. Doren.

20                 **MR. DOREN:**    Your Honor, the IP guidelines make clear

21      that the only time a -- that the incidents which would have

22      anticompetitive effects are where the license eliminate

23      competition that would otherwise exist but for the license and

24      but for the license being in place.  And here, Your Honor, but

25      for the license, there would be no apps other than Apple's

1    native apps on the iOS platform.

2         Apple has chosen to license -- it's made its choice.  It

3    could have kept it internally.  It could have made all apps

4    its own, but it made the business model decision to make apps

5    available to consumers through -- from third parties and to

6    make the platform available to third parties to the great

7    benefit of all, to everyone, including Apple, including

8    consumers and including developers.  And to the extent we're

9    asking whether or not Apple is being asked to provide a

10   compulsory license, I once again take the Court back -- and

11   here I am not paraphrasing -- to lines at 276-1 at page 4,

12   "The prohibition must prohibit Apple from enforcing

13   contractual provisions, guidelines, or policies or imposing

14   technical restrictions or financial penalties."

15        Now, a moment ago we heard counsel try to subdivide

16   Apple's intellectual property, the IAP -- the intellectual

17   property reflected in IAPs away from the store in an apparent

18   attempt to get around the fact that they have admitted on the

19   face of their discovery that they could not be on the store

20   but for that intellectual property.  They could not have IAP

21   purchases but for the StoreKit API.  And that it is integrally

22   and fundamentally a part of the store.  It is a compulsory

23   license.  It is an attempt to profit from Apple's intellectual

24   property without any compensation.  And it is pro-competitive

25   for Apple to have the business model that it has, as Ms. Moyé

1   has discussed and can discuss at some additional length.

2            **MR. BORNSTEIN:**   Your Honor, what I hear Mr. Doren

3   saying is *we have IP, we can license it however we want,*

4   *competitive consequences be darned.*  That's it.  Full stop.

5   *It's ours.  We can do with it what we want, even if it has*

6   *anticompetitive consequences.*

7            That is so facially obviously not the law.  It is shocking

8   to hear Apple stand here and say it.  Of course --

9            **THE COURT:**   Mr. Bornstein, I don't hear him saying

10  that.  What I -- you all agree or disagree as to whether there

11  are anticompetitive effects.

12           **MR. BORNSTEIN:**   True.

13           **THE COURT:**   I don't think that Apple thinks --

14  they've argued very hard that there are no anticompetitive

15  effects, and so if there are -- let me ask, Mr. Doren, if

16  there were anticompetitive effects, do you concede that IP is

17  not a defense?

18           **MR. DOREN:**   What I concede, Your Honor, is if there

19  were anticompetitive effects in a market in which there would

20  be competition but for that license, that would be something

21  the Court should take into account in its antitrust analysis,

22  but that's not the case here.

23           **THE COURT:**   Response.

24           **MR. BORNSTEIN:**   Yes, your Honor.  That respectfully

25  was not responsive to the Court's question.

4163

1          I agree with the way Your Honor phrased this a moment ago

2    in clarifying what I said.  Of course I understand Apple

3    disputes the existence of anticompetitive effects.  A hundred

4    percent I agree that is their position.

5          We are having a conversation now about remedy, which means

6    we've reached the point of concluding liability has been

7    found.  If there is no liability, the discussion Mr. Doren and

8    I are having with the Court is academic.

9          So if there is liability that means there are

10   anticompetitive effects, and if there are anticompetitive

11   effects of the sort that leads to liability, the existence of

12   IP is simply no defense.  And the argument based on the IP

13   guidelines or the interpretation of the IP guidelines that

14   Mr. Doren is articulating would have the effect of resulting

15   in a world in which an IP owner could license in a way that

16   has anticompetitive effects and then turn around and say *but*

17   *there is nothing you can do about it because I achieved those*

18   *anticompetitive effects using my intellectual property*, and

19   that is just not the law.

20             **THE COURT:**   Mr. Doren.

21             **MR. DOREN:**    Your Honor, as this Court explained in

22   the jury instructions in the Apple iPod antitrust litigation,

23   "a company has no general legal duty to assist its

24   competitors, including by making its product interoperable,

25   licensing to competitors, or sharing information with its

1   competitors."  And that was a jury instruction given in the

2   *iPod* case.

3        That remains the law today.  Apple retains rights to use

4   its intellectual property to compete in the business model it

5   has chosen, the legitimate business model that was fashioned

6   before anyone has ever asserted it had any sort of market

7   power, and which has proved to be a great success for

8   consumers and developers and Apple over the last 12 years.

9        **MR. BORNSTEIN:**   There is no general legal duty to

10  help competitors.  I agree.  It's also completely irrelevant

11  to the question before the Court.

12       We're not asking for the Court to order Apple to help us

13  in the abstract.  We're in a world now where we found

14  liability.  That's why we are having the remedy discussion.

15  And the only point that I'm making in response to the question

16  the Court has posed is does the existence of intellectual

17  property somehow restrain the Court from remedying the

18  anticompetitive harms that it will have found in the liability

19  phase.

20       The answer to that is no.  This discussion about general

21  legal duty to help competitors, it's not a remedy issue.  It's

22  a question of whether there is a duty to deal.  It's a

23  liability question.  We are now having a conversation about

24  remedy where liability has already been concluded.  IP is just

25  not a defense.

4165

1            **MR. DOREN:**    As Your Honor has already noted, Apple

2   does not claim that intellectual property is a global

3   immunization, a vaccine, one might say, to antitrust

4   liability, but under the facts here, the intellectual property

5   is being properly used, properly licensed under a legitimate

6   business model, and what Epic seeks here is a compulsory

7   license without compensation.

8            **MR. BORNSTEIN:**    If Mr. Doren is correct that it's

9   being properly licensed and properly used and not having

10   anticompetitive effects, then he's correct and we lose on the

11   merits on liability.  But if he's not correct about those

12   things, then we win on the merits on liability, and the Court

13   needs to be able to impose a remedy and not be handcuffed or

14   restricted in the remedy that it imposes simply because IP is

15   at issue.

16            I think, actually, Mr. Doren and I are kind of coming to

17   agreement on this point.

18            **THE COURT:**    So let me ask, where courts have found

19   antitrust liability in -- let me take a step back.

20            Courts do not run businesses.  I mean, maybe the

21   administrative office of the courts run the business of the

22   courts, but trial courts and appellate courts don't run

23   businesses.

24            In the cases where courts have found antitrust conduct,

25   how have the courts fashioned remedies to deal with the

1     antitrust conduct?  Have they, in fact, said *You*

2     *billion-dollar company, trillion-dollar company, you must*

3     *fundamentally change the business model under which you are*

4     *operating*?  Are courts doing that?  Have they ever done that?

5            **MR. BORNSTEIN:**   So the typical thing a court will do

6     is impose a prohibition or a set of prohibitions on conduct

7     that has anticompetitive effects.  The characterization of

8     "change a business model" or so forth, that is a

9     characterization of the conduct.  I mean, you can look, for

10    example, at --

11           **THE COURT:**    So give me an example.

12           **MR. BORNSTEIN:**    Sure.  As an example, it was reversed

13    on the merits, but in terms of the remedy phase in -- or the

14    remedy decision in the *Qualcomm* case.

15           **THE COURT:**    That doesn't help me.  It's not binding

16    authority, and it wasn't upheld, and perhaps they did it on

17    the liability, but perhaps they didn't like the remedy and

18    found that it would be easier to address the liability.

19         So give me some example that has survived appellate review

20    where the court has engaged in such a way to either prohibit

21    something or to fundamentally change the economic model of a

22    monopolistic company.

23           **MR. BORNSTEIN:**    So *Microsoft* is an example that

24    survived appellate review in part.  I recognize the most

25    extreme remedies were reversed by the D.C. Circuit, but the

1    court identified anticompetitive conduct there and upheld

2    prohibitions on Microsoft's -- Microsoft's licensing and

3    bundling practices and so forth with respect to Windows.  And

4    the case subsequently settled following the appellate

5    decision, but there is a D.C. Circuit opinion governing --

6    governing the remedy there, and that is -- that is probably

7    the signal example because it's one of the -- these cases

8    don't come along every day, obviously, Your Honor.

9              **THE COURT:**   Let's talk about *Microsoft*.  Again, let's

10    assume liability.

11             **MR. DOREN:**   All right, Your Honor.

12        Well, first of all, Your Honor, that was a government case

13    not a private-party case.  And the courts, in imposing an

14    injunction in private-party litigation, as a threshold matter,

15    the litigation -- the -- any sort of injunction should be as

16    narrow as possible to address the complaints of the parties.

17        But going to -- and secondly, Your Honor, as counsel just

18    stated, *Microsoft* involved discrete prohibitions.  Now, that

19    is not what we have here, and in *Trinco* of course the Supreme

20    Court told us "that enforced sharing requires antitrust courts

21    to act as central planners identifying the proper price,

22    quantity, and other terms of dealing, a role for which they

23    are ill suited."

24        And if I might, Your Honor, I would like to make a few

25    record references.  During the trial, there was some

1    acknowledgment, at least by plaintiff's experts, that truly

2    bad apps should not be permitted on the App Store.

3        Now, Dr. Evans -- Professor Evans agreed that in his

4    hypothetical but-for world, Apple could have an objective set

5    of criteria to apply to rogue apps and other bad behavior, but

6    as Your Honor may recall, he thought the question of whether

7    or not those criteria could cover pornography and what that

8    might be was a really tough question.

9        Dr. Mickens testified that -- and I'm quoting him now --

10   "It's important to realize that there is a spectrum because

11   it's not just binary whether it's prohibited or whether it's

12   not.  We either don't have third-party channels, in other

13   words, we have what is currently the App Store, or on the

14   other end of the spectrum we do and then we just have this

15   absolute mayhem where anything goes."

16       Then he was asked, "How should it be dealt about?"

17       And, by the way, Your Honor, with apologies, this is at

18   2709, line 19, to 2710, line 8.

19       And Dr.-- Professor Mickens was then asked, "And in your

20   view as a security expert, who decides which end of the

21   spectrum we end up in in the world where Apple does not get to

22   centralize distribution," to which he responded, "Well,

23   ultimately I think it is the court who would decide.  I think

24   the court should consult with security experts and people who

25   are experts in content moderation."

1        Professor Evans simply sidestepped the issue, and he said

2   that, "Well, to me, it would be -- if we're talking about this

3   case, it would be the ordinary situation in an antitrust

4   remedy where there are ground rules typically set, in my

5   experience, with antitrust revenues concerning preventing --

6   preventing the party from engaging in anticompetitive behavior

7   and typically when remedies are established, there that's

8   something that -- that's thought about."

9        **THE COURT:**   You need to slow down.

10        **MR. DOREN:**   I apologize.

11        The point being, Your Honor, that Professor Evans'

12   testimony was you can do whatever you want so long as it's not

13   anticompetitive, and what that means in the context of this

14   case begs about every question in the case.

15        Professor Mickens, on the topic of pornography, said that

16   "If in the instance where Apple does" -- he is asked, "Where

17   Apple doesn't want native apps with pornographic content on

18   its devices and a third party wants to distribute it, do you

19   have a view which view should prevail?"  And his response was,

20   "I think that's a complex policy issue.  So I think it -- you

21   know, I think the Court and the two sides would have to come

22   to some agreement on that."  That's 2680, line 19, to 2681,

23   line 10.

24        On privacy, Dr. Mickens was asked, "If Apple takes the

25   privacy view that a user should opt in before an app is

1    permitted to track them but a third-party App Store app writer

2    thinks *no, the user should have to opt out before I stop*

3    *tracking*, do you have a view on which policy should prevail if

4    Apple were required to open up iOS app distribution?"  His

5    response was, "It's a policy issue that once again the court

6    would have to decide."

7        Dr. Evans, in response to a similar question, said "I'm

8    not really prepared to go through a list of what they can or

9    can't do."

10       This isn't about prohibitions, Your Honor.  This isn't

11   about anything binary, as Professor Mickens explained.  It's

12   about the difference between where we don't have third-party

13   channels, which is the status quo, and then when we do, we

14   just have this absolute mayhem where anything goes.  That's

15   Professor Mickens.

16       And it's up to this Court on an issue-by-issue,

17   case-by-case, app-by-app, policy-by-policy basis to determine

18   where we end up between absolute mayhem where anything goes

19   and the current business model that has been such a success.

20       **MR. BORNSTEIN:**   So the strategy, Your Honor,

21   obviously is to scare the Court, right?  The strategy here is

22   to say *This is so complicated, this is going to be on*

23   *Your Honor's desk for the next 20 years.*  That is not --

24       **THE COURT:**   Well, that I don't know that it will be

25   20 years.

1          **MR. DOREN:**    Three, anyway.  Maybe more.

2          **MR. BORNSTEIN:**    That is, Your Honor, just a strategy.

3    Let me explain in a couple of ways.

4          Number one, it's clear that what Apple did was to take

5    Professor Mickens, a computer science expert, and ask him a

6    bunch of legal questions and policy questions, and I commend

7    him for not actually answering them outside of his expertise.

8    We can't take Professor Mickens' views as a computer scientist

9    who was here to talk about security on how to structure a

10   remedy as a terribly serious set of arguments.

11         And the same thing goes for Dr. Evans, who was here to

12   talk about the economics of the restraints at issue and not to

13   advise the Court on the legal question of how to fashion a

14   remedy.

15         What we are not doing here, however, is being completely

16   at sea between the lockdown nature of the store right now and

17   an absolute Wild West open, to use Mr. Doren's words, absolute

18   mayhem situation.

19         **MR. DOREN:**    Professor Mickens, actually.

20         **MR. BORNSTEIN:**    We have something -- we have

21   something, and it's called a Mac.  There is a model that

22   exists in the world that this -- this very company, that Apple

23   has said is safe, is -- people can go to and download with

24   comfort and assurance.  We've seen the marketing materials

25   which they have used around the world that are on their

website today, at least they were the last time I checked, if

they haven't changed, telling people that the Mac is a safe

model for people to use.

Now, I know --

**THE COURT:**   Mr. Bornstein let me ask you this.

Epic has sued Google, and that action is pending in front

of my colleague.  On Google's platform, there are many stores,

and yet Epic sued them anyway.

One of the arguments that has been made in this case is

that the iPhone should be like Android, where they have many

stores.

How does that address anything given that Epic has also

sued Google on the exact model that you're arguing should be

the result in this case?

**MR. BORNSTEIN:**   So there are two important things in

there that are responsive to the Court's question.

Number one, we are not arguing that iOS should be just

like Android.  There is a feature of Android which we think

is -- is appropriate in the sense of getting rid of the

restriction that makes iOS the only -- excuse me -- that makes

the App Store the only path for getting onto the iPhone, but

that does not mean, as Apple has repeatedly said, that this is

going to turn iOS into Android.  There are lots of things that

Apple could continue to do in the Mac model.

Second point is the reason that there is a lawsuit against

1   Google is because Google has a set of anticompetitive

2   restrictions of its own that it applies on the Android

3   ecosystem in certain jurisdictions in the world, including the

4   United States, that have similar, although not the same,

5   anticompetitive effects by limiting in a material way the

6   ability of developers and users to access app distribution

7   outside of Google Play.  It is not exactly the same, but there

8   are all sorts of restrictions that are detailed in our

9   Complaint in that case that explain how Google Play is not

10  precisely the same as the App Store but also engages in

11  conduct that is very similar in restricting app distribution

12  and in-app payments.

13            **THE COURT:**   How is it that -- I mean -- okay.

14            **MR. DOREN:**   Your Honor?

15            **THE COURT:**   Yes, Mr. Doren.

16            **MR. DOREN:**   First of all, I guess I would start by

17  noting that Mr. Bornstein's primary citations to proof that

18  the App Store would remain somehow intact is all from

19  cross-examination questions of our witnesses asking if they

20  knew that app review would remain in place.  There certainly

21  wasn't any foundation to what they know about what -- what it

22  is that Epic seeks to do here or what this Court has been

23  asked to order.

24       They presented no witness at all on what remedy they want

25  or why it would be workable.  They've only had security

1   experts come in to talk about the iOS operating system, and

2   Dr. Mickens, who is a security expert, did testify on the

3   record that on-device security would not protect against apps

4   that encourage teenagers to commit suicide, apps targeting

5   young children that ask whether their parents are home and

6   where they keep the jewelry, scam apps, pirated apps, apps

7   that are promoted for purchase via fake reviews, and that's at

8   the trial transcript at pages 2673, line 10, to 2675, line 13.

9          We aren't characterizing the testimony of these witnesses.

10  We are merely quoting it.

11         And as to macOS, Mr. Federighi testified, in an area in

12  which he is greatly confident and competent, as to exactly why

13  the threat model for macOS is different and why there are

14  historic differences between macOS and iOS, and those were not

15  refuted anywhere.

16         Moreover, to the extent Epic now tells this Court that all

17  we need to do is treat this as if it were macOS, they leave

18  out the part of their injunction where they specifically state

19  that there can be no warning -- warnings on the App Store that

20  you're about to go into an uncertified, unreviewed,

21  unnotarized app which there are on macOS when people try to do

22  that.

23         Here they want to strip that out of the equation, making

24  it even more bare than the macOS PC environment.

25         And in terms of Your Honor's comments about turning the

1    App Store into Android, first of all, Apple agrees with you in

2    terms of the goal at a high level, but the evidence is, the

3    record is, the being-sought injunction is to actually take the

4    App Store far beyond where Android is right now.

5        In paragraph 57 of Dr. Rubin's testimony, the written

6    testimony, he described that in fact Android has some human

7    review.  It has various steps to find things like apps that

8    ask or tell or encourage teenagers to commit suicide.  It's

9    not as good, it's not as successful as Apple's, it's not as

10   effective as Apple's, but basically what Epic wants to do is

11   it wants this Court to tell Apple to drop its arms to its

12   side, it can continue to search for malware but nothing more.

13   It wants that order to be published and made known worldwide,

14   and it wants to see if Apple can manage to hold off the

15   attacks that hit every day as both Mr. Federighi -- as

16   Mr. Federighi described.

17       The one thing we know -- and this takes us to part of the

18   dynamic market concept -- the one thing we know is that there

19   are many threats today and tomorrow there will be all the

20   threats there are today and new ones as well and the day after

21   and the day after.  And what Epic wants to do is for Apple to

22   drop its gloves, stand in the middle of the arena, and take

23   what comes without any meaningful defense.

24       **MR. BORNSTEIN:**   So a number of things, Your Honor.

25   First of all, again, the strategy is very clear; it's to

1    scare the Court into thinking that a remedy here will somehow

2    break the iPhone or otherwise cause harm to consumers and

3    developers.

4         It's not the case.  We hold up the Mac not as what Apple

5    must do but as an example of a model that works that Apple

6    could do.  What we're asking the Court to do is simply to

7    prohibit certain conduct that has anticompetitive

8    consequences.

9         Apple can still do app review to its heart's content.

10   Apple can still have an App Store on the phone and encourage

11   people to use it.  If people value what Apple is providing --

12   and I'm sure there are some who do on the developers' side and

13   on the consumers' side -- those people can continue to shop at

14   the App Store.  People who would like to shop somewhere else

15   because perhaps they do a better job than Apple does or

16   because they have content that Apple doesn't have but that

17   they are interested in accessing, those people can make a

18   choice to go elsewhere.

19        So there is nothing that prevents Apple from curating its

20   store, if that word is acceptable or appropriate.  There is

21   nothing that prevents Apple from protecting its App Store

22   consumers.  That's fine.  It can do that.  There's nothing

23   that stops Apple from imposing a set of guidelines on what

24   types of apps it would like to have on its store, just like,

25   you know, the grocery store who wants to stock stuff on its

4177

1    shelves.

2           The problem is they are the only store in town, the only

3    store that there is to be able to get apps out there onto the

4    iPhone.  And it's that restriction that is at issue, and

5    consumers, once they have choice, developers, once they have

6    choice, can make determinations about whether they value what

7    Apple is providing or, frankly, whether Apple will do a better

8    job because it has to compete because, as Mr. Cook said, "we

9    would have to differentiate ourselves in the face of

10   competition."  That's how it should work.  That's what the

11   antitrust laws are designed to encourage.

12           **THE COURT:**   But you haven't shown me a single

13   antitrust case where the kind of relief that you are

14   requesting has been granted by a court when a private

15   plaintiff comes in who may or may not have ulterior motives --

16   we haven't even talked about that because it's not

17   particularly relevant -- but I do think that Mr. Sweeney's

18   testimony made clear that he would not be here today had that

19   side deal been cut.

20           It is a pretty significant step that courts haven't done.

21           **MR. BORNSTEIN:**   So two things, Your Honor.

22           First, quickly as to Mr. Sweeney's testimony and the

23   so-called side deal, there are two points.

24           One is it's very clear from his email to Mr. Cook and

25   others that he was hopeful that there would be an opportunity

4178

1    for this to be extended to all developers.  What Mr. Sweeney

2    had hoped to achieve if he got the deal was to make sure that

3    that was a deal that became available for everybody.

4            As to the substance of whether there are other cases out

5    there that are like this one, I don't have a precise example

6    where a court in a case involving a private party as opposed

7    to a government party like Microsoft and I'm reminded of AT&T

8    as well, which was obviously a quite significant remedial

9    order that was entered, that has had precisely the same kind

10   of impact, but that's because we're dealing here with a pretty

11   unique situation where we have a company of the size and scale

12   of Apple that is engaging in conduct that has the size and

13   scale of the conduct in which Apple is engaging.  And there

14   are --

15           **THE COURT:**    It can stop the United States government

16   from engaging in these topics if it wants.  Be clear, right?

17           Epic is here because if this -- if relief is granted, they

18   go from a multi-billion-dollar company to a significantly

19   maybe trillion-dollar company, who knows, but they don't do it

20   out of the kindness of their heart.

21           **MR. BORNSTEIN:**    Your Honor, there is -- certainly it

22   would be to Epic's financial advantage, as it would be to the

23   financial advantage of every developer, to cease to be out

24   from under the yoke of monopolistic conduct.  But it is, I

25   hope, clear from the testimony and the documents that Epic and

Mr. Sweeney have a commitment to this issue that has existed

for many, many years.  There's the email back from 2015 when

Mr. Sweeney reached out to Mr. Cook who I gather didn't

remember who Mr. Sweeney was at the time and said, you know --

this very same set of issues were bothering him.

Your Honor may remember the email Mr. Sweeney sent about

Vietnam and his concerns that having centralized distribution

could cause problems with respect to censorship and

repression.  There is a long history of communications on this

topic.

I won't deny that it would be in the financial interest of

a developer like Epic or every other developer not to be

subject to anticompetitive consequences, but I think it would

be unfair to suggest that that is the only motivation here.

Epic has obviously suffered great financial harm from not

being on the App Store now for eight, nine months, whatever it

has been.

**MR. DOREN:**   Your Honor, if I may?

**THE COURT:**   You may.

**MR. DOREN:**   First of all, as on many other topics

this morning, the only witness on whether or not this would

break the iPhone is Mr. Bornstein.  There has been no

testimony offered by Epic on that.  We do have the testimony

of Mr. Federighi and Mr. Kosmynka describing exactly the sort

of harms to ecosystem and the potential harms to consumers and

1    developers which would be caused.

2          Secondly, in terms of no other developers would be harmed

3    and may benefit greatly, this takes us back again to the

4    testimony of the economists where we have here a two-sided

5    platform which is built on the indirect network effect where

6    because it's an attractive platform, people come here to do

7    business.  There is no predicting what happens when the iOS

8    environment is polluted with a variety of unpoliced different

9    app stores from different sources, none of which we know.

10         Third, Mr. Bornstein said that Apple can do app review --

11         **THE COURT:**    How is that -- how is that perspective

12   even accurate given that that's what Android does, and Android

13   survives and, in fact, has a larger market share than Apple?

14         **MR. DOREN:**    Well, Your Honor, again, this takes us

15   back to consumer choice, and consumers who choose to

16   participate with Android and the things that it offers, they

17   can make that choice and they can choose the less-secure

18   environment and have.

19         The consumers that have elected to purchase Apple devices,

20   we all know -- it's not a mystery, it's not hidden; Mr. Cook

21   said it here under oath here the other day -- that Apple's

22   brand and trade is on maintaining people's privacy and the

23   security of their information and a secure ecosystem.  And

24   that is Apple's marketplace and that is its niche, if you

25   will, compared to the broader, larger Android business model.

1          Here the proposal, as Your Honor has already noted, is to

2    turn iOS into something resembling more Android but to go even

3    further, and so those people who depend on Apple to do exactly

4    what it's doing, who have chosen Apple because of what it

5    does, will then be confronted without the choice that they

6    currently have because the iOS environment would be turned

7    into the equivalent or perhaps even a poor imitation of

8    Android and that eliminates consumer choice.

9          And, finally, Your Honor, in terms of the app review to

10   Apple's heart's content, you know, let's take just as an

11   example the Epic Games Store.  If Epic Games Store were to

12   come into the App Store, first of all, Epic Games would have

13   to agree to provide Apple with all of the binary code from

14   each of the games on it.  That means each developer would have

15   to agree to provide all of the binary code for each game in

16   the Epic Games Store.  We have no relationship -- Apple has no

17   relationship with those developers.  Those developers have no

18   obligation to Apple to provide it.

19         Then let's talk about Itch.io which has tens of thousands

20   of different games which is in the Epic Games Store, so now we

21   have a store within a store within a store.  And Apple has no

22   access to the binary code for those tens of thousands of

23   games.  It has no relationship with those developers.  It has

24   no way to conduct app review on even -- even a malware scan,

25   Your Honor, even a malware scan, much less something looking

1    for improper social engineering.

2           So this would be an unsolvable problem, it would be a huge

3    problem, and this notion that Apple can simply conduct app

4    review on those -- those developers who choose to send them

5    their code and so there's no problem here at all is to blow

6    right by the main issue.

7           And, in fact, Your Honor, in terms of where consumers

8    might -- might purchase these apps, it comes down to if -- if,

9    for example, Epic Games Store ceases to offer any games on the

10   App Store, then consumers if they want those games on iOS are

11   going to have to go to different untrusted stores within the

12   iOS ecosystem.

13          And, lastly, Your Honor, the comment that Epic has been

14   damaged by not being on the App Store since August 2008 --

15   where are we at now -- 2020 -- it hardly bears mention, but I

16   will anyway.  They clearly could have come back on to the

17   store, they could have litigated these claims while continuing

18   to offer *Fortnite* to its customers and to other iOS platform

19   users, and it consciously chose to disregard the interests of

20   all of those entities and all of those constituents for the

21   headline value of refusing to rejoin the store.

22          **THE COURT:**   Okay.

23       I will give each of you a few minutes to make closing

24   remarks.

25       Mr. Bornstein.

1            **MR. BORNSTEIN:**    I might start just responding quickly

2   to Mr. Doren.

3            First of all, the fact that *Fortnite* is not currently on

4   the App Store is a manifestation of the principles that

5   Mr. Sweeney and Epic have been demonstrating throughout this

6   entire process, which is they believe these restrictions are

7   unlawful and they believe that the right way to go about

8   dealing with them is to bring them to the Court and not

9   continue to -- to abide by them.  And I think that's been

10  clear.

11           What everyone may think about the way in which the case

12  has begun, it was a product and a function of the principles

13  of not continuing to abide by restrictions that the company

14  believes to be anticompetitive.

15           As for the substance of the remedial points that Mr. Doren

16  made, first, there is a lot of discussion about a store within

17  a store within a store.  That is misguided in two respects.

18           First, the primary remedy here is that there will be

19  stores that are available outside of the App Store.  Apple

20  will continue to have the ability to review whatever is in the

21  App Store to its heart content -- to its heart's content.  To

22  the extent there is a request for a limited period of time to

23  have stores within the App Store to deal with the

24  anticompetitive consequences that have accrued over time,

25  customers will certainly be able to know when they are

1    downloading something from another store as compared to when

2    they are downloading something from Apple.

3         Apple has more than enough ability to make sure that

4    consumers know who they're getting something from and what

5    they're getting.  And those people who value what Apple offers

6    can choose to buy from Apple and can continue to do that.

7         As for the other security points, it's, first, clear that

8    the issue that has arisen around having the App Store be the

9    only store was not a decision that was made entirely based on

10   security but rather based on policy, and that goes back to

11   PX877 which was that white paper that was put together by the

12   security experts at Apple back when this decision was being

13   made, and they made clear that this was a policy decision as

14   to whether Apple should distribute outside the store.

15        And Mr. Federighi admitted on cross-examination that there

16   are other ways, using his words, to turn off the spigot of

17   apps that have gone bad, and that's, for example, through code

18   signing.  That's at 3452 of the transcript.

19        But to step back more broadly, Your Honor, as I said, the

20   theory here seems to be to make the Court concerned about

21   stepping too far to deal with the anticompetitive consequences

22   of the conduct that are at issue.  And I acknowledge, Epic

23   acknowledges, that this is an important case, that there is an

24   important set of conduct, and that a remedy that would be

25   entered of the sort that Epic has requested would be important

1    and significant, but that is because the issue affects such a

2    large number of consumers, such a large number of developers,

3    and has persisted for such a long period of time.  And

4    remedying that conduct is of necessity a more robust endeavor

5    and exercise than your typical injunctive relief because the

6    conduct and the harm is more robust than the Court would

7    typically face.

8              MR. DOREN:    Your Honor, the -- the theory here or the

9    strategy here, just to make the Court aware of what Epic is

10   asking -- and if that is scary for Apple's iOS customers and

11   for Apple's developer community and for Apple and for this

12   Court, that is simply a consequence of what it is Epic is

13   asking for.

14        Even in this last narrative, we heard things that have

15   never been said before and are in no filing with this Court,

16   such as a comment about it's not that there is no ability to

17   look at stores within a store.  If it's necessary to have

18   stores within the App Store for a limited time while -- while

19   the anticompetitive effects are worked out, I don't know where

20   that's coming from and I don't know what it's referring to.

21        And then there is the statement that Apple certainly has

22   the resources to tell people if they will be using things from

23   an untrusted source, but their injunction specifically demands

24   that there be no attempt to discourage the use of any of these

25   other apps.

1          Epic is talking out of both sides of its mouth on this

2     when the -- the impact and the results and the way this will

3     play out in practicality are plain and are simple.

4          Dr. Rubin testified that the vast majority, more than 90

5     percent of app attacks are based on social engineering, and

6     the only thing that Epic is willing to permit Apple to do for

7     any apps that are not submitted to the App Store is to do some

8     sort, they don't describe what, of malware review.  That does

9     nothing for the social engineering issues, as admitted by

10    professor Mickens.  And that is the iceberg under the water,

11    not the tip of it, which in Apple's case, because of its

12    excellence, is malware.

13         And, finally, Your Honor, on this topic, I would just say

14    that the law protects technological incompatibility as

15    pro-competitive.  That is how consumers are given a choice.

16         Your Honor, I would commend the Court to *Foremost Pro*

17    which was the basis of the jury instruction back in the *iPod*

18    case, and that case follows *Trinco* and its progeny.  And,

19    Your Honor, I would also point out that *Qualcomm* was decided

20    in the first instance on the absence of a duty to deal.

21         Your Honor, Apple's business model was developed long

22    before it had anything that anyone claims was market power.

23    It has served its customers and developers well, and Epic is

24    now attempting to pro hac dismantle that without any clear

25    requests of the Court and without any clear testimony or

1    guidance as to what the impact of that attack would be.

2                **MR. BORNSTEIN:**    Your Honor, if I could respond to one

3    point, which is the accusation that this is a new request.

4          I'm not sure where that comes from.  I'll show you our

5    January 22 remedy filing.  Paragraph 4 specifically says that

6    "To remedy Apple's past misconduct and its anticompetitive

7    effects and to restore competition, Epic is requesting that

8    the Court grant time-limited relief for a period of three

9    years to have apps on the App Store."  Precisely the point

10   that I made earlier.  This is by know means a new request.

11   It's also what appears on the slide that's been up on the

12   screen for a little while.

13                **MR. DOREN:**    Your Honor, I -- pardon me.

14                **MR. BORNSTEIN:**    But ultimately, the -- ultimately

15   what I continue to hear as the theme from Apple is *We're doing*

16   *a really good job, Your Honor.  Please let us continue to do a*

17   *really good job,* even if -- they're not saying *even if we're a*

18   *monopolist*, I realize that, but this is the undertone.  *We're*

19   *a good guy.  We're the benevolent overlord of this ecosystem.*

20   *Let us continue to do it without competition because it's*

21   *worked out okay so far.*

22          That is not a defense under the antitrust laws where

23   competition is what's supposed to drive excellence, not our

24   just trusting that Apple will be excellent on its own.

25                **MR. DOREN:**    Last comment, Your Honor?

1      **THE COURT:**   That's okay.  All right.

2           You don't have a benevolent overlord and anticompetitive

3      effects.  They're not really benevolent if you've got

4      anticompetitive effects, are they?

5           **MR. BORNSTEIN:**   Well, Your Honor, that's actually not

6      so.  I disagree with that.  You have -- you have them

7      pretending to be a benevolent overlord and saying *We don't*

8      *think anybody should compete.  We are trying to do a good job*.

9      But the point is you have to compare.  You have to decide

10     whether what they're doing is what it would be in the face of

11     competition, and they're saying *Trust us, we're doing as*

12     *well -- as well as we otherwise woul*d.

13          **MR. DOREN:**   Your Honor, all I wanted to say on that

14     point was I thank counsel for the clarification.  I had

15     actually thought three years was for all relief sought.  Turns

16     out it's only time-limited in one instance and the rest is

17     without any time limitation at all.

18          **THE COURT:**   Mr. Bornstein, it's your burden.  You get

19     the last word.

20          **MR. BORNSTEIN:**   Your Honor, I'll just use as the last

21     word the opportunity to thank the Court for the time that

22     you've given us in hearing this case.  We know the tremendous

23     amount of work that Your Honor has done to hear it and to give

24     it the consideration that we think it deserves, and we really

25     just want to express our appreciation for that, so thank you.

1          **MR. DOREN:**    And on this point, Mr. Bornstein and I

2      can agree.  And both the Court, its staff, its clerks, we

3      appreciate all of the effort that the Court's put into this

4      matter and all the effort that we know the Court has yet to

5      go.

6          **THE COURT:**    Well, on that front -- and I've said this

7      now, I think, a couple of times, and it doesn't hurt to say it

8      again.

9          I did and do find that the lawyers in this action on both

10     sides have really been a terrific example of what lawyering is

11     and can be.  Having been a partner in a big firm, I know that

12     that's not always the case and it's unfortunate.

13         In this court actually was an antitrust case when I first

14     took on, the Lithium Ion Battery MDL.  I had come over from

15     the state court, and I had a set of professional rules of

16     conduct that I used, and I was told, when my arm was twisted

17     to take that MDL because I thought it would never be given to

18     a new federal judge -- I told the lawyers that I expected that

19     and I asked them to write a professional set of rules and

20     guidelines that they as lawyers could abide by, and they did.

21     And those guidelines became the Northern District's

22     guidelines.

23         So it's important to me, I think it's important to the

24     bar, and we can be and you can be fierce advocates and yet

25     still professional, and that's important if you're all going

1    to survive long careers.

2            So I know -- I think I have a reputation for being a

3    little tough, but it's all with the best intent to get to the

4    right answer for folks and for litigants.

5            There is a lot of material, so I made a joke the other day

6    about August 13th, which was the date of the hotfix.  Not

7    everybody got the joke so I am not promising to have this by

8    August 13th, but I am going to try, as I said to you -- I want

9    to try to get to this while the memories of the testimony are

10   fresh and while your arguments are fresh, but we do have

11   thousands and thousands of pages to review.  I believe my

12   staff told me we had 4500 pages of testimony, and so there

13   is -- there is quite a bit of work still to do.

14           So you will receive my -- my decision in writing.  What I

15   tell me jurors, and perhaps for those folks who are listening

16   who are not lawyers -- but I do tell my jurors at the

17   beginning of a trial, you know, opening arguments, the lawyers

18   tell you what the cover of a puzzle looks like.  I like

19   puzzles.  Physical puzzles more.  And during the course of the

20   trial, right, I tell them -- I say now pretend here we are.

21   We haven't taken any evidence.  We have an empty box.  That's

22   it.  It is empty.  The lawyers can tell you they think what

23   the evidence is going to show, but we've heard nothing.

24           And then during the course of the trial when I have to

25   remind them not to go do their investigation or find out

1    things on their own, I tell them, you know, our box is getting

2    full with puzzle pieces.

3         And by the end of the trial, I said okay, that's it, no

4    more pieces.  There are no more pieces in that box.  You may

5    have wanted other pieces, you may think pieces are irrelevant,

6    but that's it.

7         And then during closing argument, the lawyers explain what

8    they still think the cover of the box is, but it's up to the

9    jury, and in this case, it's up to the Court to figure out how

10   all those pieces come together and what the cover of that box

11   actually looks like based upon the evidence.

12        So that's -- for those listening who have not been in

13   trials, that's what we're doing.  We are taking all of that

14   evidence, all of that testimony, all of those documents, and

15   putting it together in a way that seems to make sense in the

16   context of the law.  That's what we do.

17        So it will take me a while to do that, but I do appreciate

18   everything and of course your support of the Court, your

19   support of the staff.  It's been tiring but a real pleasure,

20   and I hope to see you all at some other point as these -- as

21   all our careers continue to progress.

22        Okay.  We are adjourned.

23             **MR. DOREN:**   Your Honor, I -- I hate to raise a

24   mundane issue like three exhibits because I'd rather leave

25   with that warm glow, but I believe I'm speaking for both

1    parties on three points.

2          DX5447 was referenced when -- when first admitted as

3    DX5547, so that needs to be corrected.  5547 is not in

4    evidence.  5447 is.

5          THE COURT:   Okay.

6                (Defendant's Exhibit 5547 withdrawn)

7          (Defense Exhibit DX5447 received in evidence)

8          MR. DOREN:   DX3734 is also admitted, and I don't

9    believe it's currently on the list.  That was admitted by

10   stipulation of Docket 635 of May 11.

11         (Defense Exhibit DX3734 received in evidence)

12         THE COURT:   Okay.

13         MR. DOREN:   And then DX5441 was a spreadsheet that

14   was used with Mr. Malackowski and it was referenced as in

15   evidence, but none of us have a record of it being placed in

16   evidence so that should be removed from the exhibit list.

17         (Defendant's Exhibit DX5441 withdrawn)

18         THE COURT:   So 5447 is out, 5441 is out, 5547 is in,

19   and 3734 is in.

20         MR. DOREN:   Thank you.

21         THE COURT:   I understand also I'm meeting with some

22   of the newer lawyers to the profession tomorrow.  There was a

23   request, I think -- what I just ask, Ms. Forrest, if you and

24   Mr. Doren will confer on that last issue.  Whatever is fine

25   with you all is fine with me, and I'll see them here in the

1    courtroom tomorrow morning.

2              **MR. DOREN:**   Thank you again for that, Your Honor.

3              **THE COURT:**   All right.  Safe travels.  We're

4    adjourned.

5                   (Proceedings adjourned at 11:51 a.m.)

## CERTIFICATE OF REPORTERS

We, Diane E. Skillman and Pamela Batalo-Hebel,
certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.  We
further certify that we are neither counsel for, related to,
nor employed by any of the parties to the action in which this
hearing was taken, and further that we are not financially nor
otherwise interested in the outcome of the action.


_____/S/DIANE E. SKILLMAN_____

Diane E. Skillman, CSR, RPR, FCRR


_____/S/ PAMELA BATALO-HEBEL_____

Pamela Batalo-Hebel, CSR, RMR, FCRR


Monday, May 24, 2021