VOLUME 7

                                   Pages 1584 – 1826

                            UNDER SEAL PAGES 1729 – 1741

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )    NO. C-20-5640 YGR
                                 )
     vs.                         )    Tuesday, May 11, 2021
                                 )
APPLE, INC.,                     )    Oakland, California
                                 )
          Defendant.             )    BENCH TRIAL
_____ )
APPLE, INC.,                     )
                                 )
          Counterclaimant,       )
     vs.                         )
                                 )
EPIC GAMES, Inc.,                )
                                 )
          Counter-Defendant.     )
_____ )


              REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:              CRAVATH, SWAINE & MOORE, LLP
                            825 Eighth Avenue
                            New York, New York 10019
                      BY:  **KATHERINE B. FORREST, ESQUIRE**
                           **GARY A. BORNSTEIN, ESQUIRE**
                           **YONATAN EVEN, ESQUIRE**

                    (Appearances continued.)

Reported By:               Diane E. Skillman, CSR 4909, RPR, FCRR
                           Pamela Hebel, CSR, RMR, FCRR
          TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1    For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                             825 Eighth Avenue
2                            New York, New York 10019
                        BY:  LAUREN A. MOSKOWITZ, ESQUIRE
3                            JUSTIN C. CLARKE, ESQUIRE
                             W. WES EARNHARDT, ESQUIRE
4                            BRENDAN BLAKE, ESQUIRE
                             JIN NIU, ESQUIRE
5

6    For Defendant:          GIBSON, DUNN & CRUTCHER
                             333 South Grand Avenue
7                            Los Angeles, California 90071
                        BY:  RICHARD J. DOREN, ESQUIRE
8                            DAN SWANSON, ESQUIRE
                             CYNTHIA RICHMAN, ESQUIRE
9                            RACHEL BRASS, ESQUIRE
                             ARPINE LAWYER, ESQUIRE
10

11                           GIBSON, DUNN & CRUTCHER, LLP
                             2001 Ross Avenue, Suite 1100
12                           Dallas, Texas 75201
                        BY:  VERONICA S. MOYE, ESQUIRE
13
                             PAUL WEISS RIFKIND
14                           WHARTON & GARRISON LLP
                             2001 K STREET, NW
15                           Washington, DC 20006
                        BY:  KAREN DUNN, ESQUIRE
16                           JESSICA E. PHILLIPS, ESQUIRE

17

18   For Defendant:          PAUL WEISS RIFKIND
                             WHARTON & GARRISON LLP
19                           943 Steiner Street
                             San Francisco, California 94117
20                      BY:  ARPINE LAWYER, ESQUIRE

21

22

23

24

25
```

| 1 | **Plaintiff's Witnesses:** | **Page** | **VOL.** |
|---|---|---|---|
| 2 | **Evans, David** | | |
| 3 | Direct Examination by Mr. Bornstein (resumed) | 1595 | 7 |
| 4 | Cross-Examination by Mr. Swanson | 1610 | 7 |
| 5 | Redirect Examination by Mr. Bornstein | 1702 | 7 |
| 6 | Cross-Examination by Mr. Swanson (sealed) | 1730 | 7 |
| 7 | Redirect Examination by Mr. Bornstein (sealed) | 1737 | 7 |
| 8 | Recross-Examination by Mr. Swanson | 1738 | 7 |
| 9 | Further Redirect Examination by Mr. Bornstein | 1741 | 7 |
| 10 | Examination by the Court | 1742 | 7 |
| 11 | Further Redirect Examination by Mr. Bornstein | 1744 | 7 |
| 12 | Further Recross Examination by Mr. Swanson | 1744 | 7 |
| 13 | Further Redirect Examination by Mr. Bornstein | 1745 | 7 |
| 14 | **Athey, Susan** | | |
| 15 | Direct Examination by Mr. Even | 1749 | 7 |
| 16 | Cross-Examination by Ms. Dunn | 1793 | 7 |
| 17 | | | |
| 18 | **Plaintiff's Exhibits:** | **EVD.** | **VOL.** |
| 19 | | | |
| 20 | **Defendant's Exhibits:** | EVD. | VOL. |
| 21 | 5549 | 1625 | 7 |
| 22 | 5550 | 1626 | 7 |
| 23 | 5551 | 1676 | 7 |
| 24 | | | |
| 25 | | | |

1

2    <u>TUESDAY, MAY 11, 2021</u>                                    <u>7:59 a.m.</u>

3                        P R O C E E D I N G S

4            **THE CLERK:**    Calling CV 20-5640, Epic Games, Inc., vs.

5    Apple, Inc.

6        Counsel, please state your appearances.

7            **MS. FORREST:**    Good morning, Your Honor.  Katherine

8    Forrest for Epic.

9            **THE CLERK:**    Hold on.  I will turn on the mics on the

10   table.  All the mics are on.

11           **THE COURT:**    All right.  Good morning, Ms. Forrest.

12           **MR. BORNSTEIN:**    Good morning, Your Honor.  Gary

13   Bornstein for Epic.

14           **THE COURT:**    Good morning.

15           **MS. KLOSS:**    Good morning, Your Honor.  Lauren Kloss

16   for Epic Games.

17           **THE COURT:**    Ms. Kloss, next time into the mic.

18           **MS. KLOSS:**    Will do, Your Honor.

19           **THE COURT:**    That was Lauren Kloss.  And?

20           **MS. GREENFIELD:**    Good morning, Your Honor.  Jill

21   Greenfield for Epic Games.

22           **THE COURT:**    Say that again.

23           **MS. GREENFIELD:**    Good morning, Your Honor.  Jill

24   Greenfield for Epic Games.

25           **THE COURT:**    Okay.  So this is your first time

1    appearing here; right?

2              **MS. GREENFIELD:**   Yes, Your Honor.

3              **THE COURT:**   I had not highlighted your name yet.  All

4    right.

5         And, Mr. Sweeney, good morning, sir.

6              **MR. SWEENEY:**   Good morning.

7              **THE COURT:**   Mr. Rudd, good morning.

8              **MR. RUDD:**   Good morning.

9              **THE COURT:**   On the defense side.

10             **MR. DOREN:**   Good morning, Your Honor.  Richard Doren

11   for Apple.

12             **THE COURT:**   Good morning.

13             **MR. SWANSON:**    Good morning, Your Honor.  Dan Swanson

14   for Apple.

15             **THE COURT:**   Good morning, Mr. Swanson.

16             **MS. RICHMAN:**    Good morning, Your Honor.  Cynthia

17   Richman for Apple.

18             **THE COURT:**   Ms. Richman, good morning.

19             **MR. KLEINBRODT:**   Good morning, Your Honor.  Julian

20   Kleinbrodt for Apple.

21             **THE COURT:**   Hold on.  I did not -- here we go.  I

22   have that from yesterday.  Mr. Kleinbrodt.

23             **MR. DOREN:**   And along with Mr. Schiller, we are

24   joined by Scott Murray, in-house counsel for Apple.

25             **THE COURT:**   Mr. Murray, have I ever seen you before?

1    **MR. MURRAY:**   You have, Your Honor.  Good morning.

2    **THE COURT:**   Good morning.  In fact, I may have put

3    you on the spot a couple of times.  All right.

4    Mr. Schiller, good morning.

5    **MR. SCHILLER:**   Good morning, Your Honor.

6    **THE COURT:**   And Mr. Spalding?  No.  Do we have a

7    hot-seat operator?

8    **MR. ELTISTE:**   Yes.  Bret Eltiste.

9    **THE COURT:**   Got it.  Okay.  So let's see.  And then

10   in terms of the pool reporters today, we have Ms. Atkins back

11   from *Law360*.

12   **MS. ATKINS:**   Yes.

13   **THE COURT:**   Yes?

14   **MS. ATKINS:**   Yes.

15   **THE COURT:**   Good morning.  And Bobbie Allyn from *NPR*?

16   **MS. ATKINS:**   He's not here yet.

17   **THE COURT:**   Mr. Rifkin, good morning, sir.

18   **MR. RIFKIN:**   Good morning, Your Honor.

19   **THE COURT:**   All right.  And then I see Ms. Dunn and

20   Ms. Lawyer also in the courtroom.  Good morning.

21   **MS. DUNN:**   Good morning, Your Honor.

22   **MS. LAWYER:**   Good morning, Your Honor.

23   **THE COURT:**   Let's start, as we always do, with things

24   to do.  Just two housekeeping issues for me.  First of all, I

25   appreciate getting the pictures of witnesses per my standing

1    order from the plaintiffs, although I did note and not

2    unsurprisingly, I don't have pictures of Apple -- of the Apple

3    witnesses that you called.

4         And, Mr. Doren, I would like to get those pictures,

5    please, from your side.

6              MR. DOREN:    We will solve that immediately,

7    Your Honor.

8              THE COURT:    They're probably not here.  In general, I

9    like to have them taken the day of because sometimes all those

10   photos that people have for their corporate -- they don't

11   always look like we look in real life.

12             MR. DOREN:    We all just keep getting better looking,

13   Your Honor.

14             THE COURT:    Well, Dr. Evans, I think, has aged a

15   little bit from the pictures that we saw in the slide deck,

16   so... okay.

17        And then the binders.  We are collecting a huge number of

18   binders over here.  If each side would please send someone up

19   to collect theirs.  I think we still have some from -- well,

20   there is a whole stack.  Maybe two of you could come up and

21   grab those and then split them between you.

22        Okay.

23             MS. FORREST:    Would you like us to do that right now,

24   Your Honor, clear it off?

25             THE COURT:    You don't have to, Ms. Forrest.

1        **MS. FORREST:**   Well, I'm as good as anyone.

2        **THE COURT:**   Okay.

3        Well, Ms. Forrest, do you have anything on your list or

4    Mr. Bornstein?

5        **MS. FORREST:**   Your Honor, we do not have any

6    housekeeping matters this morning.

7        **THE COURT:**   Okay.  Mr. Doren, how about you?

8        **MR. DOREN:**   No, Your Honor.

9        **THE COURT:**   All right.

10       Do we know -- how are we doing in terms of witnesses on

11   timing?  Are we on track?  Not on track?  I have after Evans,

12   Professor Athey.

13       **MS. FORREST:**   Yes, Your Honor.  After Professor

14   Evans, we will have Ms. Athey, who we would expect to go on

15   the stand as soon as the -- Mr. Bornstein finishes and the

16   cross-examination is completed.

17       And then after that, we will go into the Apple experts.

18       **THE COURT:**   Okay.  All right.  Then, Mr. Evans, if

19   you come on back, I think we are ready for you.

20       Do we have a date certain when Mr. Cook will be here?  We

21   have been asked on that topic from the press.

22       **MR. DOREN:**   Let us do some math on that, Your Honor,

23   and report back.  It will be the last day of our case, we

24   believe.

25       **THE COURT:**   Okay.  All right.

1        So, sir, good morning.

2                **THE WITNESS:**   Good morning, Your Honor.

3                **THE COURT:**   You are still under oath.  Do you

4    understand that?

5                **THE WITNESS:**   I understand.

6                **THE COURT:**   Mr. Bornstein, you may proceed.

7                **MR. BORNSTEIN:**   Thank you, Your Honor.  I have just

8    two administrative matters to start with.

9        One is the parties have made great progress, I believe, in

10   dealing with some of the evidentiary issues dealing with the

11   expert directs, and with your permission, we would hand up

12   what is just an updated copy of the written direct from

13   Dr. Evans which now is almost completely unredacted and has

14   redacted only the materials that were the subject of the

15   objection that Your Honor sustained yesterday with respect to

16   the Korean issues, and we would ask that Court accept that in

17   lieu of the version that was provisionally entered yesterday.

18               **THE COURT:**   Okay.  Mr. Swanson, I take it?

19               **MR. SWANSON:**   Swanson, Your Honor.

20               **THE COURT:**   You are going to be doing this one?

21               **MR. SWANSON:**   I will be doing this one.

22               **THE COURT:**   That is acceptable to you, or you can

23   confirm?

24               **MR. SWANSON:**   I think under the same arrangement,

25   Your Honor, that it is provisional subject to connecting up

1    with matters that have not yet come into evidence.

2              THE COURT:    Okay.  So go ahead, Mr. Bornstein.

3         Do I take it -- will I get a redlined version of this, or

4    can I -- I would like a redlined version when we're all done,

5    and I say that because I've already read multiple times his

6    testimony and have my notes on the original one.  So perhaps

7    I'll read it again, but it would be very -- it would be much

8    easier for me if I know what was taken out so if once you're a

9    hundred percent done, if I could get a redlined version, that

10   would be helpful.

11             MR. BORNSTEIN:    Of course, Your Honor.  In the

12   interim, I can let the Court know right now the two are

13   identical, and in the one place where there is a change,

14   rather than taking it out, we have blacked out the paragraph

15   so we maintained the paragraph numbers.

16             THE COURT:    So it's all the same.  It's just been

17   redacted?

18             MR. BORNSTEIN:    Correct, Your Honor.

19             THE COURT:    I see.

20             MR. BORNSTEIN:    But we can provide the redline if

21   that is still helpful.

22             THE COURT:    No.  That's fine.  I don't need it, if

23   that's all it did.

24        You may proceed.

25             MR. BORNSTEIN:    I did have one other housekeeping

1    matter.

2         Your Honor yesterday requested that we identify for the

3    Court a document that Dr. Evans referred to from Microsoft.

4         **THE COURT:**   Yes.

5         **MR. BORNSTEIN:**   That's a document that actually, as

6    it turns out, both sides have on their exhibit list as to

7    which we have a 902(11) declaration from a custodian of

8    records at Microsoft.  So I would just offer the document into

9    evidence.  It's PX2477.

10        **THE COURT:**   2477.  No objection?

11        **MR. SWANSON:**   This was not offered during

12   Ms. Wright's testimony, Your Honor.  We understand that would

13   be accepted now not for the truth of the matters asserted

14   therein but as the basis for Dr. Evans's understanding that he

15   testified to yesterday.

16        **MR. BORNSTEIN:**   Your Honor, we have a 902(11)

17   declaration establishing that this is a business record, and

18   there has been no objection to the document.

19        **THE COURT:**   I am being told that there is an

20   identical document, 5523.

21        **MR. BORNSTEIN:**   Yes.  5523 is the same document,

22   Your Honor.

23        **THE COURT:**   It's already in evidence.

24        **MR. BORNSTEIN:**   Okay.  This is a few bad extra

25   minutes that we have now spent.

## EVANS - DIRECT RESUMED - BORNSTEIN

1    **THE COURT:**   Let me just double check that.  I don't

2    think there is a need if it's already in evidence.  So 5523.

3    No.  I don't show that as in evidence, but maybe it's -- we

4    will figure it out.  Let me figure it out, Mr. Bornstein, but

5    why don't you go ahead and proceed with your examination.

6            **MR. BORNSTEIN:**   All right.  Thank you, Your Honor.

7                     **DAVID EVANS**,

8    called as a witness for the Plaintiff, having been previously

9    duly sworn, testified further as follows:

10            **DIRECT EXAMINATION**  (resumed)

11   **Q.**   Dr. Evans, good morning again.

12   **A.**   Good morning to you.

13   **Q.**   When we finished yesterday, we were talking about

14   payments, and I thought it would be helpful -- can you tell us

15   if you put together a slide that summarizes the opinions that

16   you've reached regarding Apple's restrictions in the payment

17   solution area?

18   **A.**   Yes, I have.

19   **Q.**   All right.  Can we get slide 38, please.

20            Can you please walk the Court through the opinions that

21   you formed relating to the restrictions on in-app payment

22   solutions.

23   **A.**   Yes.  Just very quickly, I have identified two separate

24   products, IOS app distribution and iOS in-app payment

25   solutions.  I have determined that the relevant market is iOS

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    in-app payment solutions for digital content and that Apple

2    has been a power in that market.

3        I have determined that there have been anticompetitive

4    effects in the payment solution market.

5        And then finally, I have concluded that there is a tie

6    between iOS app distribution and iOS in-app payment solutions.

7    **Q.**    Great.  We're not going to cover all of these today, but I

8    do want to dive into a few.

9        First of all, on the question of separate products, are

10   there functional differences between iOS app distribution and

11   iOS in-app payment solutions that you have identified and that

12   were relevant to your analysis?

13   **A.**    Yes.  There are dramatic functional differences between

14   the two.

15   **Q.**    Okay.  So with reference to slide 39, can you explain the

16   functional differences that you're talking about?

17   **A.**    Yes.  I think we've covered this before so I will be very

18   brief on this.

19       So app distribution really involves the matching process

20   between app users and app developers via search and discovery,

21   ultimately concluding with the ability of the user to download

22   and then use an app.

23       In-app purchase is something that happens later and that

24   involves transactions that are between the app user who has

25   that app and the -- and the app developer who has supplied

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    that app, so those are transactions that take place between

2    those two parties after the app has already been distributed.

3    **Q.**    More generally, is there a principle that economists use

4    to assess whether or not two products are separate products or

5    not?

6    **A.**    Yes, there is.

7    **Q.**    And what is that?

8    **A.**    That is whether there is separate demand for those two

9    products, whether the markets can sustain separate demand.

10   **Q.**    Well, can you give -- to illustrate the point, can you

11   give an example of products that are sold together for which

12   there is not separate demand?

13   **A.**    So a trivial example are left shoes and right shoes.  They

14   could be provided separately, but a person or people would

15   like to get both left and right so they are provided together.

16   So there is single demand for left and right shoes.

17   **Q.**    How about shoes and socks?

18   **A.**    Those -- those are separate products.  They are separate

19   products because consumers typically buy socks separately from

20   shoes.  They may get them at the shoe store, but they could

21   also get them separately and often do.  So there is separate

22   demand for those two products, and that's how they are

23   supplied in the marketplace.

24   **Q.**    All right.  And how did you assess whether app

25   distribution and in-app purchase are separate products under

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    that principle?

2    **A.**    I looked at market evidence to determine whether there was

3    in fact separate demand for payment solutions versus app

4    distribution.

5    **Q.**    And do you have a slide that summarizes the evidence on

6    which you relied?

7    **A.**    I do.

8    **Q.**    Let's take a look at slide 40.  Let's take the first basis

9    you identified here which is that apps offering physical goods

10   and services use their own payment solutions and that they

11   cannot and do not use IAP.  Can you explain what that means?

12   **A.**    Yes.  Well, first of all, physical apps that are selling

13   things to their customers with the apps.

14   **Q.**    I'm sorry.  Can I interrupt you?  You used the phrase

15   "physical apps."  What do you mean by that?

16   **A.**    So I -- just as a shorthand for this, when I use the term

17   "physical apps," I'm using that shorthand to refer to apps

18   where the app is being used to ultimately sell a product or

19   service that is consumed in a physical setting.  So if I could

20   just use the term "physical app" that is shorthand, that would

21   save us a few words and a little bit of time.

22   **Q.**    Okay.  And so you were talking about how the physical apps

23   are treated.

24   **A.**    Yes.  Well, the physical apps are treated by Apple in that

25   they are not required to use IAP and, in fact, cannot use IAP

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    because Apple does not offer that payment solution to them.

2    Physical apps have their own payment solutions when they need

3    to take payment and they -- they develop those apps, they hire

4    their own payment processors.  In some cases, the developer is

5    also providing a similar app on -- on a PC, on Windows or Mac,

6    and they have a payment solution that they are using generally

7    for the purpose of their -- of their business.

8    **Q.**    Have you seen, in your review of this case, any evidence

9    of situations where Apple gave what you're calling physical

10   apps the option to use the IAP solution?

11   **A.**    Yes, I have.

12   **Q.**    And what evidence are you referring to?

13   **A.**    So a few years ago, Uber and Lyft both introduced a ride

14   subscription service where consumers could pay up front that

15   would enable them to get the discounts on rides and some other

16   benefits.  Apple initially decided to apply IAP to that and

17   require IAP to be used there.  Ultimately it backed out on

18   that, and instead what it did was it offered Uber and Lyft the

19   option of using IAP, and in both cases, Uber and Lyft decided

20   not to and to use their own payment solutions.

21   **Q.**    And so taking this altogether, how does the evidence that

22   we just talked about factor into your assessment of whether

23   there is separate demand for these two products?

24   **A.**    It provides evidence that there is separate demand for

25   payment solutions.  These are all situations where the --

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    where the developer of the physical app is also relying on the

2    App Store for distribution services.

3    **Q.**    Okay.  So what should we call the opposite of a physical

4    app?  Is that a digital app?

5    **A.**    I would call it a digital app if we want to save words.

6    **Q.**    Well, your second basis here on the slide says, "Apps

7    offering digital goods choose their own payment solution when

8    given a choice."  What evidence have you seen of that

9    happening?

10   **A.**    There are -- there are certain situations for both the App

11   Store and for the Google Play Store where apps that are

12   providing digital -- that are selling digital content in the

13   app have not had to use the payment solution of either of

14   those stores.

15   **Q.**    And did you put together a little chart showing some of

16   these -- some of these apps?

17   **A.**    I have.

18   **Q.**    All right.  Let's take a look at slide 41.  Are these

19   Amazon Prime Video, Altice One, and Canal+ the examples that

20   you saw on Apple?

21   **A.**    Yes.

22   **Q.**    What were the examples you saw on the Google Play Store?

23   **A.**    On the Google Play Store, up until recently, Google took

24   the position -- Google did not force its IAP.  Google did not

25   require certain apps to use Google Play billing in the sense

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    that it didn't enforce any requirement.  These apps are ones

2    that up until recently Google did not enforce the requirement.

3    In each of these cases, the app -- Tinder, Hulu, Netflix and

4    Spotify -- chose to use their own payment solution as opposed

5    to using Google Play billing, even though they had the option

6    of using either of those.

7    **Q.**    The third item on the prior slide referred to developers

8    seeking to use their own payment solutions.  What evidence did

9    you see of that?

10   **A.**    There -- there's evidence, I think in the record here that

11   we know about, that a number of -- a number of large

12   developers have come to Apple and have sought to use their own

13   payment solution.  Those include Facebook, Microsoft, Epic,

14   obviously Spotify, and so forth.

15   **Q.**    And then your last basis refers to consumers choosing

16   developer payment solutions when given the choice.  What

17   evidence did you see of that happening?

18   **A.**    So there are two pieces of evidence on that.  Tinder,

19   before it was required to use Google Play billing, offered

20   Tinder users on the Android app -- gave them the option of

21   using either the Tinder payment solution or using Google Play

22   billing.

23   **Q.**    And I'm going to interrupt you for just one second,

24   Dr. Evans, to alert you that there is a confidentiality issue

25   here where there is a matter that is under seal, so in

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    describing this, just don't reveal any numbers that you may be

2    aware of about the choices that consumers made.

3    **A.**    Okay.  So with that -- with that warning, a substantial

4    portion of consumer demand chose to use the Tinder payment

5    solution versus the Google Play billing solution.

6    **Q.**    Very good.

7         And, Your Honor, the specific numbers are in Mr. Ong's

8    testimony, but Your Honor granted a motion to seal that

9    specific number.

10              **THE WITNESS:**    If I could add one other -- one

11   important economic fact there.  In that case, the -- the price

12   that was offered to the consumer for both the Tinder payment

13   solution and for the Google Play option, those prices were the

14   same.

15   **BY MR. BORNSTEIN:**

16   **Q.**    Let's turn to your market definition here.  Just briefly,

17   what is the market that you have defined for purposes of

18   analyzing the payment restrictions?

19   **A.**    It is the -- it is the payment solution -- the provision

20   of payment solutions by Apple for iOS apps.

21   **Q.**    And --

22   **A.**    For digital content.

23   **Q.**    I see.  And how did you reach this market definition?

24   **A.**    I reached this market definition by thinking about this in

25   terms of a hypothetical monopolist who does the following

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    thing.  It -- it says to develop -- to digital content

2    developers that you must use my -- my payment solution and

3    asks the question whether that hypothetical monopolist would

4    be able to impose that on those digital content app developers

5    for iOS and be able to increase the price that those

6    developers would have to pay for a payment solution by a small

7    but significant amount.  So that's the starting point.

8            In this case, the hypothetical monopolist is the actual

9    monopolist for this, which is Apple, and I've done further

10   analyses to determine that Apple, as the actual monopolist,

11   has been able to increase the price for using payment

12   solutions by a significant amount.

13   **Q.**    And are the details of that analysis in your written

14   testimony?

15   **A.**    Yes, they are.

16   **Q.**    One other question on market definition.  You said this --

17   your market refers to -- or is bounded by payment solutions

18   for apps that offer digital goods; is that correct?

19   **A.**    That's correct.

20   **Q.**    Wouldn't it be possible for app developers that offer

21   items for sale through in-app purchase to evade this

22   restriction by changing their business model and offering

23   advertising or monetizing their app in some other way?

24   **A.**    Well, hypothetically anything is possible, but as a

25   practical matter and as a business matter, if they could do

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    that, they would have done that to evade the 30 percent

2    commission, but in addition to that, when an entrepreneur or

3    business comes into a market, they do that identifying a

4    business model and product and service that they're going

5    to -- to offer.  So saying that they could have done another

6    business is not really a very realistic thing to say to a

7    developer.

8    **Q.**    You testified that Apple is the actual monopolist in this

9    market.  Did you put together a slide summarizing the basis on

10   which you reached that conclusion?

11   **A.**   I did.

12   **Q.**    Let's take a look at slide 42, please.  Just very briefly,

13   Dr. Evans, can you summarize the grounds on which you relied?

14   **A.**    Yes.  For all intents and purposes, Apple is the

15   monopolist in terms of providing payment solutions to digital

16   content, digital content apps.  So it is -- it is the

17   monopolist.

18          **THE COURT:**    Well, not all digital content apps; its

19   own digital content apps.

20          **THE WITNESS:**    Yes.  That's correct.  Digital content

21   apps for iOS.

22          **THE COURT:**    For Apple products.

23          **THE WITNESS:**    For Apple products, that's correct.

24   **BY MR. BORNSTEIN:**

25   **Q.**    And when you say "for Apple products," are you talking

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    about apps that are offered on Apple devices, or do you mean

2    Apple-branded apps themselves?

3    **A.**    I mean third-party digital content apps that are being

4    distributed on the App Store.

5    **Q.**    Thank you.

6          And can you briefly summarize the remaining grounds on

7    which you relied here?

8    **A.**    Yes.  I have also determined that Apple has been able to

9    raise the fees for using payment solutions above what would

10   occur in a competitive market where digital content developers

11   are given the option of using IAP versus their own payment

12   solution.

13   **Q.**    And staying on the question of which apps are affected

14   here and whether they are third-party apps on iOS devices and

15   otherwise, did you see any evidence of the amount, total

16   amount of commerce that was affected by these restrictions?

17   **A.**    Yes.

18   **Q.**    And what was that?

19             **MR. SWANSON:**    Can I caution that I believe the

20   specific number is under seal?

21             **MR. BORNSTEIN:**    It is not my understanding.  It's an

22   app antedate.  It's not Apple-specific information, to my

23   understanding.

24             **MR. SWANSON:**    I believe it has been redacted from the

25   report.

**EVANS - DIRECT RESUMED - BORNSTEIN**

1        **THE COURT:**   Why don't we look at the report you just

2    handed me.  What is the paragraph number from his direct?

3        **MR. BORNSTEIN:**   Just one second, Your Honor.  It is

4    paragraph 288.  I see Mr. Swanson is correct, that this has

5    been sealed.

6        **THE COURT:**   Okay.  Let's have you ask a new question.

7        **MR. BORNSTEIN:**   Sure.

8    **Q.**   Have you put the amount of commerce that was affected by

9    this restriction in your written direct?

10   **A.**   I have.

11   **Q.**   Thank you.

12       Thank you, Mr. Swanson, for getting us around that problem

13   as well.

14       When you say that Apple has enforced its IAP requirement

15   by blocking developers, what are you referring to?

16   **A.**   To the extent that an app developer doesn't use IAP and

17   therefore Apple's payment solution for the purchases of in-app

18   content, either the app doesn't get approved for distribution

19   within the App Store, or if there is a modification to the app

20   which tries to use another payment solution, Apple blocks that

21   app from participating in the App Store.

22   **Q.**   Did you form an opinion on whether Apple's conduct with

23   respect to payment solutions has had any competitive effects?

24   **A.**   I have.

25   **Q.**   And do we have a slide that shows the basis on which you

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    reached that conclusion?

2    **A.**    Yes.

3    **Q.**    Let's pull up slide 43.  I think we just talked about the

4    first item here, the forclosure of competing payment solutions

5    and the volume that is reflected in the sealed number.

6          Can you tell us how you reached the conclusion that Apple

7    substantially raised the price of payment solutions?

8    **A.**    Yes.  I considered a very conservative counterfactual

9    where Apple did not require developers to use IAP and

10   considered the situation where a small portion of developers

11   then chose to use their own payment solutions, so I did a --

12   made a very conservative assumption that given the option that

13   20 percent of digital content apps by revenue use their own

14   payment solution and the remaining 80 percent decide to use

15   IAP at Apple's current prices.  So that's the counterfactual

16   competitive market which is very conservative because most

17   developers are still using IAP.  And I determined the

18   competitive price that would arise in that market which is the

19   weighted average of the price that the developers who chose to

20   use their own payment solutions would pay and the price that

21   developers that chose to use IAP would pay, and based on that,

22   I determined that the commission rate in that very, very

23   conservative scenario is -- and the precise number is in my

24   written direct -- are roughly 23 percent.  I think it's 23.2

25   percent, which is substantially lower than the commission rate

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    that Apple actually charges.

2    **Q.**    And to be clear, are you opining that that's what the

3    commission -- would you like some water?

4    **A.**    In a minute.  I think I'm okay for now.

5    **Q.**    Are you opining that that is the commission rate that

6    would actually occur in a competitive environment?

7    **A.**    No.  I think it would be much lower, but as I said, that

8    is a conservative scenario of what would happen in the absence

9    of the requirement.

10    **Q.**    Going on to the next -- a little further down on the items

11    on your slide, you refer to this restriction as impacting the

12    quality of payment solutions.  What are you referring to

13    there?

14    **A.**    I'm referring to a couple of the consequences of the

15    restriction on the ability of developers to offer good payment

16    solutions from their standpoint and also from the standpoint

17    of their -- of their customers.  So these are non-price

18    aspects of the consequences requiring developers to use the

19    Apple, in effect, one-size-fits-all solution versus going out

20    and having their own customized solutions.

21    **Q.**    And your last item here refers to reducing innovation.

22    What type of innovation is there in payment solution

23    technology and service?

24    **A.**    It's a very -- it's a very innovative business and has

25    been for about the last decade or so.  With the boom in

**EVANS - DIRECT RESUMED - BORNSTEIN**

1    E-commerce, there are a lot of innovative payment processing

2    firms who have come in the service online, and they work with

3    developers to create payment solutions that are customized to

4    their needs.  And both the ability of developers to go out and

5    work with these innovative online payment processors is a

6    source of innovation in this business, and it's also the

7    process of collaboration between a developer and -- and -- and

8    online payment processors because by collaborating, they can

9    work together to develop solutions that are new and improved

10   for that developer's business.

11       That kind of innovation isn't -- isn't available to

12   developers that are required to use Apple's IAP method and,

13   again, Apple's payment solutions that that's connected to.

14   **Q.**   And taking all of these effects together, what is your

15   opinion on how the IAP restriction that Apple imposes has

16   affected consumers?

17   **A.**   My conclusion is that it has harmed consumers by raising

18   prices to developers.  Developers pass on typically -- we

19   expect developers to pass on some portion of their fees on to

20   consumers in the form of higher prices so consumers end up

21   paying higher prices as a result of that, even though it's not

22   necessarily visible to them that that's a result of Apple's

23   behavior.

24       In addition, when we talk about payment solutions,

25   consumers are on the other side of the payment solutions so

**EVANS - CROSS - SWANSON**

1    when a consumer goes to a developer's mobile app, they are

2    interacting with the payment solution so things like the

3    problems with customer support that we talked about earlier in

4    the context of the Tinder versus Starbucks app, they are on

5    the other side of the -- of the developer not being able to

6    effectively handle customer complaint issues directly rather

7    than relying on Apple to do that.

8    **Q.**    Thank you, Dr. Evans.  I have no further questions.

9    **A.**    Thank you.

10            Your Honor, if I could just get a drink of water?

11            **THE COURT:**    Yes.  And while you are getting ready,

12   Mr. Swanson, I have previously admitted, with no objection

13   from Mr. Srinivasan, PX2477, which is the same document that

14   you were referencing, so I don't see the need to admit two.

15            **MR. BORNSTEIN:**    Very good.  Thank you, Your Honor.

16            **THE COURT:**    Thank you for the cite.

17                        <u>**CROSS-EXAMINATION**</u>

18   **BY MR. SWANSON:**

19   **Q.**    Good morning, Dr. Evans.

20   **A.**    Good morning, Mr. Swanson.

21   **Q.**    Let me adjust the mic so I can be heard.  Please let me

22   know if I my voice drops.

23            Dr. Evans, you're the chairman of a consulting firm,

24   Global Economics; correct?

25   **A.**    That's correct.

**EVANS - CROSS - SWANSON**

1    **Q.**    And you and your firm were engaged before this litigation

2    commenced; correct?

3    **A.**    That's correct.

4    **Q.**    You've also been retained in Epic's lawsuit against

5    Google; right?

6    **A.**    I don't know that we have been formally retained.  We

7    haven't done any -- we haven't done any substantive work on

8    that.  I guess we've been retained, but it's -- our particular

9    role in that is not -- is not laid out at this point.

10   **Q.**    So the answer is yes, you've been retained?

11   **A.**    Yes.

12   **Q.**    Now, you've never testified as an expert in an antitrust

13   case before a federal district court or a state court, for

14   that matter; correct?

15   **A.**    That's correct.

16   **Q.**    Dr. Evans, I'd like to focus first on your market

17   definition.  There is a lot of territory here to cover, and

18   I've got limited time, but that seems like a good place to

19   start.

20        You understand that Apple's experts have defined one

21   relevant market in this case; right?

22   **A.**    I do.

23   **Q.**    Okay.  And your opinion is that there are three different

24   relevant markets in this case:  Smartphone operating systems,

25   iOS app distribution, and payment solutions.  Is that fair?

**EVANS - CROSS - SWANSON**

1    **A.**    That's correct.

2    **Q.**    All right.  Let me start with the App Store.

3    You testified, at least in your written direct, that the

4    App Store is a two-sided platform; right?

5    **A.**    That's correct.

6    **Q.**    And you are an expert in platform economics, are you not?

7    **A.**    I am.

8    **Q.**    Okay.  Now, the App Store is a two-sided transaction

9    platform; isn't that right?

10   **A.**    Yes, it is.

11   **Q.**    Okay.  Now, in your opinion, the iOS operating system is a

12   distinct two-sided transaction platform; correct?

13   **A.**    Yes.

14   **Q.**    And you contend that the iOS operating system competes in

15   a relevant smartphone operating system market distinct from

16   the market where -- or markets in which the App Store

17   operates; is that correct?

18   **A.**    That's -- that's correct, where I understand the term

19   "distinct" as meaning that they are distinct relevant

20   antitrust markets.

21   **Q.**    Okay.  So your testimony to the Court is that there are

22   two relevant transaction platform markets, each having two

23   sides; correct?

24   **A.**    That's correct.

25   **Q.**    And the two sides of your two markets are the same, app

**EVANS - CROSS - SWANSON**

1    users and app developers; right?

2    **A.**    That's right.

3    **Q.**    And all of the developers who are on the one side of your

4    iOS app distribution market are also present in principle on

5    the developer's side of your smartphone OS market; right?

6    **A.**    Well, that's not -- that's not -- that's sort of right but

7    not precisely correct.  I would say that for the -- for the

8    smartphone OS market, there are app users and app developers

9    where the app developers are creating apps for the smartphone

10   OSs and the app users are using -- using those apps on that

11   platform, and then in the app distribution market, it's likely

12   that many of those, if not most, are also participating in app

13   distribution, although at different -- at different times.

14          So it's the same generic type whether -- you know,

15   particularly individuals are participating at the same time.

16   That's a different matter.  But there are definitely users and

17   developers on both sides, and there is certainly a significant

18   overlap between using the smartphone operating systems and

19   using app distribution related to those operating systems.

20          **THE COURT:**    If you are going to read from his

21   deposition, I need a copy.

22          **MR. SWANSON:**    Well, I was going to see if I need to

23   read from the deposition first, Your Honor.

24          **THE COURT:**    I'd like a copy.

25          **MR. SWANSON:**    I understand that.  Let's hand that up.

**EVANS - CROSS - SWANSON**

1          **THE COURT:**   Go ahead.  Ask your question.

2     **BY MR. SWANSON:**

3     **Q.**   I just want to make sure I understand your answer,

4     Dr. Evans.  So let me put the question to you with precision.

5          Are all of the developers who are on the one side of your

6     iOS app distribution market also present on the developer side

7     of your mobile OS market in principle?

8     **A.**   In -- if the question is intended to mean is each

9     individual --

10    **Q.**   Could you just tell me "yes" or "no"?

11    **A.**   No, and I can explain my reason for that.

12    **Q.**   All right.

13         Your Honor, I would direct the Court to page 243, line 24,

14    through page 244, line 5.

15         **THE COURT:**   Go ahead.  All you need to do is read the

16    question and answer.

17         **MR. SWANSON:**   Okay.

18         "Q. Are all of the developers who are on the one side of

19    your iOS app distribution market also present on the

20    developer's side of your mobile OS market?

21         "A. Well, in -- in principle, they are.  Whether they are

22    active participants is -- is a different matter, but in

23    principle, yes."

24    **Q.**   Now, let me --

25         **MR. BORNSTEIN:**   I'm sorry, Your Honor.  Is there a

1    question?

2              **THE COURT:**    There doesn't need to be for impeachment.

3    He gets to read the deposition transcript, which is what he

4    just did.

5              **MR. BORNSTEIN:**    I understand, Your Honor, but it's

6    improper impeachment is my objection.

7              **THE COURT:**    Your objection is overruled.

8    **BY MR. SWANSON:**

9    **Q.**    Dr. Evans, all of the users who are on one side of your

10   app distribution market are also present in principle on the

11   user side of your smartphone distribution market; isn't that

12   correct?

13   **A.**    Yes.  In principle they are.

14   **Q.**    Okay.  Now, you take the position that the transactions

15   between developers and users in your smartphone OS market are

16   not the same as the transactions in your iOS app distribution

17   market; right?

18   **A.**    If you could -- I had trouble hearing the first part of

19   that.  If you could just say that again.

20   **Q.**    Yes.  I would be happy to.  Let me know if you are having

21   difficulty.  I'm trying to adjust the mic here with my

22   welder's mask on.

23         Now, you take the position, do you not, that the

24   transactions between developers and users in your smartphone

25   OS market are not the same as the transactions in your iOS app

**EVANS - CROSS - SWANSON**

1    distribution market?

2    **A.**    That is -- that is correct.

3    **Q.**    Dr. Evans, are paid downloads in your iOS app distribution

4    market?

5    **A.**    Yes.

6    **Q.**    Are free download transactions in your iOS app

7    distribution market?

8    **A.**    Yes.

9    **Q.**    Do you consider --

10   **A.**    In the sense in both cases that there are services being

11   delivered by the App Store as part of the overall provision of

12   distribution services.

13   **Q.**    You say they are services.  They are transactions;

14   correct?

15   **A.**    They are transactions.

16   **Q.**    Do you consider in-app purchase transactions to occur in

17   your iOS app distribution market?

18   **A.**    I do not.

19   **Q.**    Where do you view those transactions -- which market do

20   you view those transactions to be taking place?

21   **A.**    So in terms -- in terms of -- of -- of transactions taking

22   place in the sense of Apple being paid for the use of IAP,

23   those transactions are taking place in the actual world under

24   the restraints in the iOS -- in the payment solutions market

25   for iOS apps.  That's where those transactions are taking

**EVANS - CROSS - SWANSON**

1    place given that there are restrictions.

2         But we need to be careful about talking about those as

3    transactions because for developers who don't want to be using

4    IAP, those are transactions only because Apple has insisted on

5    the use of IAP; otherwise -- otherwise you don't have a

6    willing buyer and willing seller and those transactions don't

7    occur.

8    **Q.**    Let me see if I can understand that.

9         You're saying that in-app purchase transactions in iOS

10   apps take place in your payment solutions relevant market?

11   **A.**    I think I don't understand when you're using the word

12   "transactions" the context in which you're using them, so

13   maybe if I could just maybe divide things up a little bit.

14        So -- so --

15             **THE COURT:**    Okay.  Keep going.  It's -- go ahead.

16             **THE WITNESS:**    There's a transaction that takes place

17   between a developer who wants to provide digital content to a

18   customer.  That was a transaction that was taking place

19   between that developer and that customer.  So that is a

20   transaction between those two.

21        In the case of the IAP restriction, Apple has required

22   that it process the payments for that, so it is providing a

23   payment solution to that developer for the purpose of that

24   transaction between the developer and its customer.

25        So the transaction from the standpoint of Apple is the

**EVANS - CROSS - SWANSON**

1    payment solution provider is the payment service that is

2    providing to that developer and to that user.

3    **BY MR. SWANSON:**

4    **Q.**   Dr. Evans, I think I need to ask the question again.

5         Do you consider in-app purchase transactions to occur in

6    your payment solutions market?  If the answer is "no" or the

7    answer is "yes," I'd just like to know which one it is.

8    **A.**   The -- the actual transaction between the developer and

9    the consumer for the exchange of digital content is not a

10   transaction in that market.  It is the provision of the

11   payment solution that is the -- that is the -- the service

12   that is being provided and is therefore the transactional

13   service that Apple is requiring the use of for that purpose.

14        **THE COURT:**   Is it "yes" or "no"?  I need to

15   understand your point of view, so is it -- you've already said

16   it's not in the second, so is it -- that is the iOS market,

17   distribution market.  So is it in the third or not?

18        **THE WITNESS:**   What I'm trying to distinguish,

19   Your Honor, it goes back to the AMEX case that I talked about

20   earlier.  I'm trying to distinguish between the provision of

21   the payment service, which is something that Apple is

22   providing, versus --

23        **THE COURT:**   Mr. Evans, it's a transaction; right?

24        **THE WITNESS:**   It is a transaction.

25        **THE COURT:**   So is the transaction in the third market

**EVANS - CROSS - SWANSON**

1    or not?

2                    THE WITNESS:    The -- the provision of the payment

3    solution for that transaction is in the third market.

4                    THE COURT:    What about the transaction itself?

5                    THE WITNESS:    The transaction itself is not in that

6    market.

7                    THE COURT:    Where is it?

8                    THE WITNESS:    It is in a market for --

9                    THE COURT:    Or does it not appear in any of your

10   three markets?

11                   THE WITNESS:    It doesn't appear, and it goes back to

12   the discussion we had earlier on between what developers are

13   doing with their customers versus the provision of the payment

14   service.  So if you think about it in terms --

15                   THE COURT:    None of the in-app purchase transactions

16   are in your three defined markets?

17                   THE WITNESS:    The provision of the payment solution

18   for those --

19                   THE COURT:    I understand you're saying that the

20   provision for the payment solution is different.  I'm asking

21   about these transactions themselves.

22                   THE WITNESS:    Those transactions themselves are in

23   that market for the purposes of the payment solution.  That's

24   correct.

25                   THE COURT:    You just said they weren't in that third

**EVANS - CROSS - SWANSON**

1    market.

2           **THE WITNESS:**   If I could go back to the *American*

3    *Express* example to --

4           **THE COURT:**   I tell you what, I'll stop talking.  Go

5    ahead.  Finish your examination, and perhaps Mr. Bornstein can

6    clarify for me, but I shouldn't take up any more of his time.

7       Go ahead.

8    **BY MR. SWANSON:**

9    **Q.**   Let me ask about a particular type of in-app transaction

10   subscription.  Do you view subscription transactions as

11   occurring in your iOS app distribution market?

12   **A.**   Yes.  They are in the iOS app -- say that one more time,

13   Mr. Swanson.

14   **Q.**   Yes.  Do you view subscription in-app transactions as

15   occurring in your iOS app distribution market?

16   **A.**   I do not.

17   **Q.**   Now, you said paid downloads are in your iOS apps

18   distribution market; right?

19   **A.**   That's correct.

20   **Q.**   I didn't hear any transactions that are in your smartphone

21   OS market.  Are there any between developers and consumers?

22   **A.**   There are in the sense that the word "transaction" is

23   being used in the definition of "transaction platforms."  So

24   the transactions from an economic standpoint that are taking

25   place in the smartphone OS market are the -- the interactions

**EVANS - CROSS - SWANSON**

1    between app users and app developers being able to standardize

2    on that operating system and being able to use the APIs

3    jointly and services provided by that -- by that operating

4    system.

5               THE COURT:   So on a technical point, can we have the

6    mic come down lower so people on the phone can hear you

7    better?  I think if you just put it slightly below your

8    shield, then it will pick it up.

9               THE WITNESS:   Like this?

10              THE COURT:   Ms. Stone will come and help you.

11              THE WITNESS:   If I could take a water break.

12              THE COURT:   Except she needs to --

13              THE CLERK:   You need to have that on.

14              THE COURT:   Go ahead.  Take your water.

15         He needs some water, Frances.

16              THE CLERK:   This bends down instead of through it, I

17    think.

18              THE COURT:   Okay.  That's probably much better.

19    Thank you.  All right.  Proceed.

20    BY MR. SWANSON:

21    Q.    So are there any paid transactions that take place between

22    developers and consumers in your smartphone operating system

23    market?

24    A.    No.

25    Q.    Dr. Evans, isn't it a fact that in this case, you've

**EVANS - CROSS - SWANSON**

1    sliced Apple's mobile app platform into two separate platforms

2    in three different markets?

3    **A.**    I have defined three separate markets for the purposes of

4    analyzing the anticompetitive conduct in this case, yes.

5    **Q.**    Is it your view that the relevant market or markets here

6    wouldn't change if the complaining party was another developer

7    instead of Epic?

8    **A.**    It is.

9    **Q.**    And you said that in your written direct; correct?

10   **A.**    That's correct.

11   **Q.**    Do you recall that Apple had to serve a subpoena on you

12   and move to compel to obtain the presentations you made to

13   U.S. antitrust regulators on behalf of a complainant about the

14   App Store other than Epic?

15   **A.**    I do.

16          **MR. SWANSON:**    Your Honor, we'd like to hand up a

17   binder of cross-exhibits.  If I can approach the witness to --

18          **THE COURT:**    You may.

19          **MR. SWANSON:**    -- hand one binder up.

20          **THE WITNESS:**    Would it be possible for me to qualify

21   that answer because it's not quite accurate?

22          **THE COURT:**    Okay.

23          **THE WITNESS:**    I was served a subpoena where that

24   subpoena would have covered the documents that Mr. Swanson has

25   just described.  At the point in time I got the subpoena,

1    those documents hadn't been disclosed; rather, the subpoena

2    implicated a set of documents that then were ultimately turned

3    over.

4    **BY MR. SWANSON:**

5    **Q.**    And in your deposition, Dr. Evans, you testified that you

6    had never communicated with the U.S. regulator about Apple App

7    Store matters; correct?

8    **A.**    I -- I may have.

9    **Q.**    Let me ask you to turn to Exhibit 5549.  It should be in

10   your binder.  Let me know when you've got that.

11   **A.**    I have it.

12   **Q.**    All right.  Do you recognize this document?

13   **A.**    Yes, I do.

14   **Q.**    And this is one of the documents that was produced

15   pursuant to Magistrate Judge Hixson's motion to compel order?

16   **A.**    That's correct.

17   **Q.**    And this document was redacted by you to protect the

18   identity of your client in this matter; correct?

19   **A.**    That is correct.

20   **Q.**    And, again, that client was not Epic; correct?

21   **A.**    That is correct.

22   **Q.**    It was another developer; correct?

23   **A.**    That is correct.

24   **Q.**    Not a game developer?

25   **A.**    No.

**EVANS - CROSS - SWANSON**

1    **Q.**    Now, the first page of this document is entitled "Economic

2    Analysis of Market Definition and Market Power Related to

3    Apple's Mobile App Platform."  Do you see that?

4    **A.**    I do.

5    **Q.**    And it says by David S. Evans.  That's you; right?

6    **A.**    That's correct.

7    **Q.**    This is dated January 25, 2016; correct?

8    **A.**    That's correct.

9    **Q.**    And, in your opinion, at this point, Apple had been a

10   monopolist for how many years?

11   **A.**    Based on the analysis that I've done in this matter, since

12   2010, so it would have been around six years.

13   **Q.**    Okay.  Now, is this paper submitted to a U.S. antitrust

14   regulator?

15   **A.**    Yes, it was.

16   **Q.**    Okay.  Do you know the identity of the regulator?

17   **A.**    Yes.  It was the Federal Trade Commission.

18   **Q.**    Now, in this paper, you use the term "edge provider" in

19   some instances to refer to certain types of developers.  Do

20   you recall that?

21   **A.**    I do.

22   **Q.**    What is an edge provider?

23   **A.**    So in the context of this paper, writing in 2016, an edge

24   provider is referring generally to internet-based businesses

25   that are providing services over the -- over the internet.

**EVANS - CROSS - SWANSON**

1          **MR. SWANSON:**    Your Honor, we would offer 5549, not

2     for the truth of the matter asserted but as evidence of

3     Dr. Evans's prior opinions on this subject matter related to

4     this case.

5          **THE COURT:**    Any objection?

6          **MR. BORNSTEIN:**    No objection for that purpose,

7     Your Honor.

8          **THE COURT:**    Admitted for that limited purpose.

9          (Defense Exhibit 5549 received in evidence)

10    **BY MR. SWANSON:**

11    **Q.**    Now, we will talk about 5549 in a moment, but can you flip

12    to Exhibit 5550, which should be the next in order in your

13    binder.

14    **A.**    Yes.  I have it.

15    **Q.**    Great.

16         Now, 5550 is a slide deck; correct?

17    **A.**    Yes, it is.

18    **Q.**    And this was also produced by you in response to

19    Magistrate Judge Hixson's order on a motion to compel;

20    correct?

21    **A.**    That's correct.

22    **Q.**    And this document, too, was redacted by you to protect the

23    identity of your client; is that correct?

24    **A.**    That's correct.

25    **Q.**    Was it the same client?

**EVANS - CROSS - SWANSON**

1    **A.**    It was.

2    **Q.**    Now, this slide deck is dated July 28th, 2016; correct?

3    **A.**    That's correct.

4    **Q.**    And you were involved in preparing this slide deck?

5    **A.**    I was.

6    **Q.**    And this slide deck was presented to the Federal Trade

7    Commission?

8    **A.**    Yes, it was.

9    **Q.**    And then if you would turn to slide 32.  You are probably

10   having a better -- probably doing better on that than I am.

11   One second.  There we go.

12        Are you there, Dr. Evans?

13   **A.**    I am.

14   **Q.**    Now, that's a slide starting a segment entitled "Economic

15   Analysis of Apple's App Store Business"; correct?

16   **A.**    That's correct.

17   **Q.**    And that segment is slides 32 through slides 36?

18   **A.**    That's correct.

19        **MR. SWANSON:**    Your Honor, we would offer DX5550 not

20   for the truth of matters asserted but as evidence of

21   Dr. Evans's prior understanding on a subject related to this

22   case.

23        **MR. BORNSTEIN:**    No objection, Your Honor.

24        **THE COURT:**    All right.  Admitted for that limited

25   purpose.

**EVANS - CROSS - SWANSON**

1          (Defense Exhibit 5550 received in evidence)

2     **BY MR. SWANSON:**

3     **Q.**     Now, let's go to 5549.  Can you, Dr. Evans, turn to the

4     first page of text, I guess that would be the second page of

5     the document.  Are you with me?

6     **A.**     I am.

7     **Q.**     Okay.  If you look at the numbered -- yes.  It's a

8     sentence or two in the first paragraph there.  Do you see

9     that?  "Apple has significant market power in the mobile

10    platform app services market."  Do you see that?

11    **A.**     I do.

12    **Q.**     And that was something that you conveyed to the FTC?

13    **A.**     Conveyed to the FTC in this paper, yes.

14    **Q.**     And you have a footnote to that statement, and the

15    footnote reads, "The mobile app platform is two-sided and

16    facilitates the interactions among app users and developers."

17    Did I read that right?

18    **A.**     That's correct.

19    **Q.**     And when you were referring there to the mobile app

20    platform, you were referring to the Apple mobile app platform;

21    correct?

22    **A.**     That's correct.

23    **Q.**     Now, I'd ask you to turn to page 5 of this document and

24    focus on heading 3.  Let me know when you're there.

25    **A.**     I'm there.

**EVANS - CROSS - SWANSON**

1    **Q.**    So heading 3 is "Apple's Mobile Platform."  Do you see

2    that?

3    **A.**    I do.

4    **Q.**    And there's a paragraph under that, and you indicate in

5    that paragraph that Apple operates a two-sided platform for

6    mobile app services; correct?

7    **A.**    That's correct.

8    **Q.**    Okay.  And in this paragraph, you convey to the FTC that

9    the Apple mobile platform consists of three components;

10   correct?

11   **A.**    That is correct.

12   **Q.**    And the three components that you identified were the iOS

13   mobile operating system, the App Store, and the iPhone and

14   iPad devices; correct?

15   **A.**    That is correct.

16   **Q.**    And you concluded that paragraph by saying that "Apple is

17   vertically integrated in the provision of the operating

18   system, the App Store, and the hardware"; correct?

19   **A.**    Yes.

20   **Q.**    All right.  You can put that to one side for the moment.

21         Now, I want to turn back to your current view that there

22   are three markets here.  You agree, don't you, that there is

23   no claim in this case that Apple monopolized a smartphone

24   operating system market?

25   **A.**    I do.

**EVANS - CROSS - SWANSON**

1   **Q.**   Now, you testified that the smartphone operating system

2   market is a duopoly between Apple and Android; right?

3   **A.**   That is correct.

4   **Q.**   In the operating system market you've defined, no

5   smartphone maker competes with Apple, does it?

6   **A.**   If you could say that one more time for me, please.

7   **Q.**   Sure.  In the smartphone operating system market that

8   you've defined, no smartphone maker competes with Apple;

9   correct?

10   **A.**   I -- I don't understand the -- the question because the

11   smartphone operating system market refers to operating systems

12   and not smartphone makers.

13   **Q.**   Okay.  So, for example, Samsung is not a competitor in

14   your relevant smartphone operating system market; right?

15   **A.**   It is not a competitor except insofar as Samsung is one of

16   the OEMs on which consumers can get an Android operating

17   system.

18   **Q.**   Well, does that make it an operating system competitor?

19   **A.**   It does not.

20   **Q.**   So it's not in your market; correct?

21   **A.**   That's correct.

22   **Q.**   And yet you used Samsung sales among those of other

23   smartphone OEMs in your slide showing Android market share

24   didn't you?

25   **A.**   That's correct.

**EVANS - CROSS - SWANSON**

1   **Q.**   You used device sales, not operating system sales, in your

2   slide; right?

3   **A.**   That's correct.

4   **Q.**   And you would agree, wouldn't you, that each smartphone

5   sold has just one operating system?

6   **A.**   That's correct.

7   **Q.**   Okay.  And you agree, don't you, that Apple accounts for

8   16 percent of smartphones sold in the world outside of China,

9   which is your -- it's your graphic market; right?

10   **A.**   Yes.  On a unit basis, that's correct.

11   **Q.**   And that's a figure that's taken from your opening report,

12   albeit not reported in your written direct; right?

13   **A.**   That's correct.

14   **Q.**   Okay.  And that figure, that 16 percent figure, is

15   actually much lower than the figure that applied in 2012 when

16   Apple had 22 percent of unit sales; correct?

17   **A.**   I believe that's correct.

18   **Q.**   Talking about devices, you don't deny that almost all game

19   console owners own smartphones, do you?

20   **A.**   No, not at all.  They do.

21   **Q.**   And you're not claiming that 60 to 90 percent of game

22   console owners only play games on consoles, are you?

23   **A.**   If you could read me that -- ask me that question one more

24   time.

25   **Q.**   Sure.  You are not claiming that 60 to 90 percent of game

**EVANS - CROSS - SWANSON**

1   console owners only play games on consoles, are you?

2   **A.**   I -- I am claiming, based on the *Fortnite* data, that

3   *Fortnite* app users who play on game consoles mainly play on --

4   on -- on game consoles.  I don't have the precise percentage

5   in mind, but it's a high percentage.

6   **Q.**   I understand you testified about *Fortnite*.  I'm trying to

7   clarify the scope of your testimony yesterday, so I'll repeat

8   the question.

9        You're not claiming that 60 to 90 percent of game console

10   owners only play games on consoles, are you?

11   **A.**   I am not.

12   **Q.**   Okay.  And you're not claiming that 60 to 90 percent of

13   game console owners only buy games on consoles, are you?

14   **A.**   I'm not making that claim.

15   **Q.**   Now, you've cited a survey in your written direct that

16   indicates that almost a third of smartphone owners also have

17   game consoles; correct?

18   **A.**   Yes.  I believe that's a U.S. figure.

19   **Q.**   And although it's not in your written direct, in your

20   opening report, you indicated that 50 percent of smartphone

21   owners also have a tablet.  Do you recall that?

22   **A.**   I do.

23   **Q.**   And you agree, don't you, based on numbers reported in

24   your opening report that in the United States, almost half, 44

25   percent of iPhone users own and use Macs; correct?

**EVANS - CROSS - SWANSON**

1    **A.**   That's correct.

2    **Q.**   And you agree that almost all iPhone users have a Mac or a

3    PC?

4    **A.**   I do.  If I could just qualify that by saying in the U.S.

5    **Q.**   In the U.S.

6          Now, you gave some testimony about switching costs

7    yesterday.  In your opinion, Mac owners face switching costs

8    as well; right?

9    **A.**   They do.

10   **Q.**   Up to the time of your deposition, at least, you had not

11   studied whether the switching costs were greater or less for

12   Mac owners than the switching costs that iPhone owners face;

13   right?

14   **A.**   That's correct.

15   **Q.**   And you agreed at the time of your deposition that many of

16   the switching costs that apply to iPhone owners that you have

17   identified also apply to Mac owners; right?

18   **A.**   That's correct.

19   **Q.**   And, in fact, all of the switching costs you identify in

20   slides 19 to 20 that we saw yesterday also apply to the Mac;

21   correct?

22   **A.**   The -- the opticals apply to the Mac, yes.

23   **Q.**   You don't claim that Apple has market power in the market

24   in which Macs are sold, do you?

25   **A.**   I do not.

**EVANS - CROSS - SWANSON**

1    **Q.**   Let's turn to app transactions in the App Store.

2         You indicated or you referred in your direct to the

3    Supreme Court's *American Express* case.  Do you recall that?

4    **A.**   I do.

5    **Q.**   And you expressed the view that you thought that the

6    court's approach in that case was generally correct as an

7    economic matter in your opinion; right?

8    **A.**   I don't recall making that statement in my -- in my

9    written direct.  It doesn't mean that I didn't, but I don't

10   recall making that statement.

11   **Q.**   Okay.  Well, let's take a look at your direct, paragraph

12   22, page 7.

13   **A.**   Excuse me, Mr. Swanson.  Again, which exhibit?

14        **THE COURT:**   It's your direct.  It should be

15   separately tabbed.

16        **MR. SWANSON:**   If you don't have it, I'm sure we can

17   find a copy for you.

18        **THE WITNESS:**   I have it right here.

19        **MR. SWANSON:**   Okay, great.

20        **THE COURT:**   It was in the binder that your attorney

21   gave to you yesterday.

22        **THE WITNESS:**   I have it.

23   **BY MR. SWANSON:**

24   **Q.**   Okay.  And could you -- well, take a look at paragraph 22,

25   and my question for you is were you not intending to convey by

**EVANS - CROSS - SWANSON**

1    this that you thought the Supreme Court's decision in *American*

2    *Express* was generally correct as an economic matter?

3    **A.**    So I believe the Supreme Court's decision in *American*

4    *Express* is generally correct as an economic matter.  This

5    sentence is a bit more precise than that, but I do agree that

6    the Supreme Court's decision in *American Express* is sound as

7    an economic matter.

8    **Q.**    All right.  Thank you, Dr. Evans.  Fair enough.

9          Now, as an economic matter, do you agree with *American*

10   *Express* that two-sided transaction platforms facilitate a

11   single simultaneous transaction between participants?

12   **A.**    I do.

13   **Q.**    And that is something the App Store does, don't you agree?

14   **A.**    I -- I do with the -- with the qualification that when

15   economists talk about simultaneous, it's a bit looser than the

16   word itself might suggest, but, yes, I do agree with that.

17   **Q.**    Okay.  Do you agree that two-sided transaction platforms

18   exhibit more pronounced indirect network effects?

19   **A.**    Yes.

20   **Q.**    And that is true of the App Store; correct?

21   **A.**    If I could maybe just qualify that a little bit.  So

22   two-sided transaction platforms generally have significant

23   indirect network effects.  It's not that they're more

24   pronounced.  It's that a characteristic of two-sided

25   transaction platforms is that they tend to have significant

**EVANS - CROSS - SWANSON**

1    indirect network effects between the two sides.

2    **Q.**    And that is true of the App Store?

3    **A.**    I believe so, yes.

4    **Q.**    I'm sorry.  Did you say "yes"?

5    **A.**    Yes.

6    **Q.**    Do you agree as an economist that transaction platforms

7    are better understood as supplying only one-product

8    transactions?

9    **A.**    I -- I do, with the qualification that the -- that the

10   product they're providing is generally a set of services that

11   is facilitating a transaction, so a payment card, networks

12   like American Express, is providing payment services that is

13   facilitating a transaction between two other parties in that

14   case.

15   **Q.**    Do you agree that the App Store is better understood as

16   supplying only one-product transactions?

17   **A.**    I believe those words don't really accurately characterize

18   what the App Store is doing as a -- as a distributor.  As a

19   distributor, they are providing distribution services that

20   facilitate the distribution of apps from developers to

21   consumers.  The term "transaction" gets then a little bit

22   bollixed up because we are using "transactions" in different

23   ways, but ultimately that is a transaction.

24   **Q.**    Well, there is no difference between distribution services

25   and transactions, as you use the term, is there?

**EVANS - CROSS - SWANSON**

1       **A.**     There is not.

2       **Q.**     So let me come back to it.  As an economist, then, how

3       many products is the App Store best understood as supplying?

4       **A.**     The -- the App Store is providing -- the Apple App Store

5       is providing two broad products.  One is app distribution

6       services and the other is the App Store is providing a -- a

7       payment solution for in-app payments.

8       **Q.**     Are those services complements or substitutes?  Shoes and

9       socks or left shoes and right shoes?

10      **A.**     I would -- I would not use the shoe and shock --

11      shoes-and-sock analogy there.  For -- for some developers,

12      those would be complements.  For other developers, they could

13      be independent goods.  But for some developers, some

14      developers might like to both get app distribution services

15      and might also like to get a payment solution, and in that

16      sense, they're -- they're complementary.

17      **Q.**     Dr. Evans, you stated in your written direct that your

18      analysis of competitive effects would not change if the app

19      distribution market you defined includes Android.  Do you

20      recall that?

21      **A.**     That's correct.

22      **Q.**     You refer to that as a two-brand market; right?

23      **A.**     That's correct.

24      **Q.**     And that's two-brand, in your term, app distribution

25      market?

**EVANS - CROSS - SWANSON**

1  **A.**    That is a two-brand app distribution market, that's

2  correct.

3  **Q.**    And in that two-brand market, Google Play would be a

4  competitor; right?

5  **A.**    Google Play would not be a significant competitor in that

6  market for the reasons I discussed in my written testimony.

7  We could define it as a two brand --

8  **Q.**    Dr. Evans, I just asked if Google Play would be a

9  competitor in the market.  Is the answer "yes"?

10  **A.**    It would not be a meaningful competitor.

11  **Q.**    I'm sorry.  I didn't hear you.

12  **A.**    It would not be a meaningful competitor.

13  **Q.**    So you're saying it would not be a competitor in the

14  two-brand market?

15  **A.**    I am saying it would not be a significant meaningful

16  competitor for the reasons I've identified.

17  **Q.**    Dr. Evans, I understand you want to characterize the

18  extent of competition, but I'm trying to understand what you

19  mean by a two-brand market.  So would Google Play be a

20  competitor in that market?

21  **A.**    It would not be a -- a significant meaningful competitor

22  in that market for the reasons I've discussed concerning

23  for-market competition.

24  **Q.**    Would the Samsung Galaxy store be a competitor in that

25  two-brand market?

**EVANS - CROSS - SWANSON**

1    **A.**    I would give you the same answer.

2    **Q.**    Would the Amazon App Store be a competitor in that

3    two-brand market?

4    **A.**    Same answer in terms of the -- the extent of competition.

5    **Q.**    Can you identify any Android App Store that would be a

6    competitor in that two-brand market?

7    **A.**    I cannot identify in that -- in that two-brand market any

8    Android App Store that would be a significant competitor and

9    therefore a material constraint on -- on Apple in that market.

10    **Q.**    In this two-brand market in which you say you'd reach the

11    same conclusions about competitive effects, would Android app

12    transactions be reasonably interchangeable with iOS app

13    transactions?

14    **A.**    They would not be.

15    **Q.**    So can you identify any competitor in your two-brand

16    market other than Apple?

17    **A.**    In my two-brand market, the -- the App Store doesn't face

18    any material competitive constraints.  We can list other --

19    other app stores for Android in that two-brand market, but I

20    would reach the conclusion that those app stores would not

21    provide a meaningful competitive constraint on the -- on the

22    App Store and would not be -- would not be substitute

23    suppliers for developers or users for the app -- for iOS app

24    users and developers.

25    **Q.**    Well, if you define a market to include two brands, don't

**EVANS - CROSS - SWANSON**

1    you need two substitute brands?

2    **A.**    The -- the answer is not necessarily.  So it's a --

3    **Q.**    That's your answer.  I understand.

4          Is Apple a monopolist in your two-brand market?

5    **A.**    Apple is in effect a monopolist in the two-brand market in

6    the sense that Apple has substantial -- has monopoly power.

7    **Q.**    Well, it has a hundred percent market share, in your view,

8    since there are no competitors; correct?

9    **A.**    In -- in the -- in the two-brand market, I am defining it

10   to say that in a hypothetical -- in a two-brand market with

11   the Android and iOS app distribution, that Apple is not really

12   a monopolist because I am saying there is also Android app

13   distribution out there.  However, I am also saying that if one

14   were to assume a two-brand market, that the Android app stores

15   are not meaningful constraints on Apple for all the reasons

16   that I identified with the single-brand market, and therefore,

17   Apple would have monopoly power in that market, even though it

18   would not literally be a monopolist just because we've made

19   this -- this distinction between one brand and two brands.

20   **Q.**    Can you just tell me what Apple's market share would be in

21   your two-brand market?

22   **A.**    Apple's market share of app distribution in the two-brand

23   market would be roughly -- roughly 50 percent, in the

24   two-brand market.

25   **Q.**    And so your opinion as an expert in antitrust economics is

**EVANS - CROSS - SWANSON**

1   that Apple would be a monopolist with a 50-percent market

2   share?

3   **A.**   My -- my testimony and my opinion is that were we to take

4   a two-brand market, that Apple would have monopoly power in

5   that market, but by definition since we are talking about a

6   two-brand market, it's not a monopolist in the sense of share,

7   but it has monopoly power because of the inability of

8   developers and users to substitute from the App Store to

9   Android stores.

10  **Q.**   So market share has no bearing on your conclusion about

11  monopoly power in that instance?

12  **A.**   In that instance, it does not.

13  **Q.**   Now, Dr. Evans, you stated in your written direct that it

14  doesn't matter to your ultimate opinions if the relevant

15  geographic market is a U.S. market instead of the global minus

16  China market that you've defined; correct?

17  **A.**   That's correct.

18  **Q.**   And similarly, you've indicated that none of your

19  conclusions would be affected if the smartphone OS market

20  you've defined is a U.S. market instead of a global minus

21  China market; correct?

22  **A.**   That's correct.

23  **Q.**   And you've also indicated in your written direct that your

24  ultimate opinions would not change if the app distribution

25  market you've defined is a single-sided market instead of a

**EVANS - CROSS - SWANSON**

1    two-sided platform market; is that correct?

2    **A.**     A single-sided -- a single-sided market that is linked

3    from the developer side to a single-sided market on the user

4    side, that's correct.

5    **Q.**     You agree that the iOS app distribution market that you

6    defined is not a cluster market; correct?

7    **A.**     That's correct.

8    **Q.**     So is it your opinion that all app transactions in the App

9    Store are substitutes for one another?

10   **A.**     No.  They're not substitutes for each other in the same

11   sense that transactions at a restaurant aren't substitutes for

12   transactions -- payment card transactions at a restaurant

13   aren't substitutes for payment card transactions at a clothing

14   store.

15   **Q.**     So the answer is "yes," in your opinion?

16   **A.**     There is no assumption that they're substitutes.  They're

17   different products.

18   **Q.**     Well, perhaps I'm not following you.

19         Is it your opinion then that none of the app transactions

20   on the App Store are substitutes for one another?

21   **A.**     That is not my -- that is not my testimony.  If we're

22   talking about -- if I could explain?

23   **Q.**     Well, I just want to make sure I heard it right.  I may

24   have misheard you.  Let me ask this question.

25         Is it your opinion that non-game app transactions in the

**EVANS - CROSS - SWANSON**

1    App Store are substitutes for game app transactions?

2    **A.**    The -- the -- I'm taking your word "transaction" to be

3    referring to app distribution services, and from the

4    standpoint of -- of -- of developers and users, distributing a

5    game app is not a substitute for distributing a non-game app.

6    The -- the game app is going to the App Store for distribution

7    services of its game-to-game players and the non-game apps are

8    going to the App Store for distribution of their apps to their

9    users?

10   **Q.**    This seems like an important point, so let me make sure I

11   nail it down and understand it.

12       Is it your opinion that non-game app transactions in the

13   App Store are not substitutes for game app transactions?

14   **A.**    You'll have to tell me substitutes for whom.  If we're

15   talking about from the standpoint of developers and users, the

16   answer is no.

17   **Q.**    In your view, is a download transaction from the App Store

18   of *Call of Duty: Black Ops - Zombies* a substitute for download

19   transaction of the Graphing Calculator Plus app?

20   **A.**    It is not for either the user or the developer.

21   **Q.**    In your opinion, when *Fortnite* was in the App Store, were

22   in-app transactions on *Fortnite* reasonably interchangeable

23   substitutes for in-app transactions on non-game iOS apps?

24   **A.**    Those transactions between developer and -- and users were

25   not.

**EVANS - CROSS - SWANSON**

1    **Q.**    When *Fortnite* was removed from the App Store, were in-app

2    purchases in non-game iOS apps better substitutes than

3    *Fortnite* in-app transactions on game consoles or PCs?

4    **A.**    No.

5    **Q.**    In your opinion, are game transactions on the App Store

6    not substitutes for digital game transactions on the

7    PlayStation Store or on Steam?

8    **A.**    If you could ask me that one more time, please.

9    **Q.**    In your opinion, are game transactions on the App Store

10   not substitutes for digital game transactions on the

11   PlayStation Store or on Steam?

12   **A.**    They are not significant substitutes in the way that we

13   use those terms for market definition.

14   **Q.**    So they're not in the same market, in your view?

15   **A.**    That's correct.

16   **Q.**    In your opinion, downloading *Star Wars: Knights of The*

17   *Old Republic* for $9.99 on Steam is not a substitute for

18   downloading *Star Wars: Knights of the Old Republic* for $9.99

19   on your iPad?

20   **A.**    It is -- it is the same answer, that when we talk about

21   substitute in an antitrust context, we are talking about

22   significant substitution and we're talking about in the

23   context of market definition, so in that context, the answer

24   is my opinion is -- is no.

25   **Q.**    And in your opinion, buying V-Bucks through your iPhone

**EVANS - CROSS - SWANSON**

1    browser is not a substitute for buying V-Bucks on your Windows

2    laptop in the *Fortnite* app?

3    **A.**    It's the same answer concerning meaningfulness and market

4    definition, that's correct.

5    **Q.**    So the answer is "no"?

6    **A.**    That's correct.

7    **Q.**    Dr. Evans, you had no data that you relied on that showed

8    actual substitution arising from relative price changes

9    between platforms; right?

10   **A.**    I want to make sure I -- if you could ask me that one more

11   time just to make sure I give you a precise answer to that.

12   **Q.**    Sure.  Can everyone hear me on --

13            **THE COURT:**    We can hear you fine.

14            **MR. SWANSON:**    Thank you.  I do have trouble with that

15   sometimes, especially with the mask.

16   **Q.**    Dr. Evans, you had no data you relied on that showed

17   actual substitution arising from relative price changes

18   between platforms; correct?

19   **A.**    That is correct.

20   **Q.**    You didn't have any transactional data from any of the

21   consoles; right?

22   **A.**    That is correct.

23   **Q.**    And Epic didn't seek that data, did Epic?

24   **A.**    That I don't know.

25   **Q.**    You didn't advise Epic --

**EVANS - CROSS - SWANSON**

1       **THE COURT:**   You didn't ask for it, did you?

2       **THE WITNESS:**   I did not.

3   **BY MR. SWANSON:**

4   **Q.**   And you didn't have any transactional data for any Android

5   App Store; correct?

6   **A.**   That is also correct.

7   **Q.**   And you didn't ask for that data, did you?

8   **A.**   That I really am not sure of because that's -- that's a

9   set of issues related to the -- to the Google case, but I

10  don't -- I can't -- I can't state factually whether we did or

11  not.

12  **Q.**   But you can limit it to this case.  That's what I'm asking

13  you about.

14  **A.**   For the purpose of this case, no.

15  **Q.**   And you didn't have any transactional data for any PC or

16  Mac App Store; correct?

17  **A.**   That is also correct.

18  **Q.**   And that includes Steam; right?

19  **A.**   Yes.

20  **Q.**   And you didn't ask for that data either; right?

21  **A.**   That's correct.

22  **Q.**   Now, you did have access to all of the Apple transactional

23  data, including every price charged for iOS app transactions

24  from the U.S. store from the inception of the App Store

25  through September 2019; right?

**EVANS - CROSS - SWANSON**

1    **A.**   That's correct.

2    **Q.**   And while you used Apple's transactional data to calculate

3    what you called "effective commission rates," you made no

4    other use of it in your analysis; correct?

5    **A.**   That is correct.

6    **Q.**   What you used for your SNIP test instead of any switching

7    data was Professor Rossi's survey; right?

8    **A.**   One more time, please, Mr. Swanson.

9    **Q.**   Sure.  What you used instead of switching data of the sort

10   we've been talking about was Professor Rossi's survey results;

11   right?

12   **A.**   So I agree with the part of your statement that I used

13   Professor Rossi's survey data to address consumer switching.

14   The part I don't agree with is that I used that instead of

15   something else.  I used Professor Rossi's data.

16   **Q.**   All right.  Fair enough.

17        Now, Professor Rossi's survey looked at in-app purchases

18   and subscriptions but not downloads; correct?

19   **A.**   That's correct.

20   **Q.**   Now, the iOS app distribution market you defined included

21   download transactions; right?

22   **A.**   That's correct.

23   **Q.**   That is the only thing you have told us definitively is in

24   your iOS apps distribution market; right?

25   **A.**   That's correct.

**EVANS - CROSS - SWANSON**

1    **Q.**    And Professor Rossi did not survey downloads; right?

2    **A.**    To answer that precisely, in the -- in the -- in the

3    survey he conducted of consumers, he did not ask a question

4    that was particular to app downloads, to paid app downloads.

5    **Q.**    Well, he didn't ask about them, period; right?

6    **A.**    He did not ask about paid downloads in his survey, period.

7    **Q.**    And Professor Rossi did not examine digital game

8    transactions specifically; right?

9    **A.**    That's correct.

10   **Q.**    Now, SNIP stands for "small but significant non-transitory

11   increase in price"; right?

12   **A.**    That's correct.

13   **Q.**    And Professor Rossi's survey asked respondents about a

14   price change during a 30-day period only; right?

15   **A.**    That's not correct.

16   **Q.**    What is your understanding that Professor Rossi -- what

17   was the time frame that you understand Professor Rossi used?

18   **A.**    He asked consumers to focus on the previous 30 days in

19   order to focus them on the -- on how much they had purchased

20   in order to provide a basis for a hypothetical price increase,

21   and he then indicated that was a permanent price increase.

22   **Q.**    Well, is that what question 16 of Professor Rossi's survey

23   states?  Does he use the term "permanent price increase"

24   somewhere?

25   **A.**    I'd have to go through the survey to go through the

**EVANS - CROSS - SWANSON**

1    various questions that were asked to get responses.  There

2    were a series of questions that were asked to get at various

3    different aspects of this.

4    **Q.**    Well, Professor Rossi's question was, "Thinking about the

5    same 30-day period, would you have made the same purchases of

6    IAP subscriptions from the Apple App Store with the higher

7    prices," do you think that would have been the wrong way to

8    present the question?

9    **A.**    No.  I've reviewed -- I don't have all the questions in

10   mind, but I've reviewed Professor Rossi's survey, and my -- my

11   reading of it is that the questions are being phrased in a way

12   where consumers are focused on the tangible effect of the

13   price increase in the previous 30 days, but the questions are

14   phrased in a way that it refers to a -- a permanent --

15   permanent price increase.

16   **Q.**    And --

17   **A.**    But I'd have to go through the survey to -- to remind

18   myself of the details of that.

19   **Q.**    Well, you relied on it so it would be very important for

20   you for the words "permanent price increase" to be in the

21   survey; right?

22   **A.**    No.

23   **Q.**    It would not?

24   **A.**    No.  From the standpoint of -- of doing a good survey, a

25   good survey expert phrases questions in a way that -- that

**EVANS - CROSS - SWANSON**

1    communicates things to consumers.  Whether -- whether the

2    phrase "permanent price increase" is a matter of good survey

3    design, that's really a question not for me but for a -- for a

4    survey expert.

5         There are a lot of details that go into how you phrase

6    things in surveys so that consumers don't get confused and so

7    forth, so these -- the precise words, that's really not

8    something for me to, as an economist -- to say.  That's more

9    of a survey design and survey expert question.

10              THE COURT:    But the topic of permanence was important

11   to you.  I'll go back and look at the survey myself.  So is

12   the topic of permanence important?

13              THE WITNESS:    Yes.  So in terms of -- of interpreting

14   the data from the survey, it's important to understand whether

15   consumers thought of this as being a -- permanent is a long

16   time, but a long-term price increase.  So that issue actually

17   is -- is important.

18              THE COURT:    Proceed.

19   BY MR. SWANSON:

20   Q.    And it's important because the SNIP test is designed to

21   analyze a non-transitory price increase; right?

22   A.    That's correct.

23   Q.    That's what the "N" stands for; correct?

24   A.    That's correct.

25   Q.    And it's generally agreed among economists that consumers'

**EVANS - CROSS - SWANSON**

1    responses to longer run price changes can be substantially

2    different from their responses to shorter run price changes;

3    right?

4    **A.**    That's true.

5    **Q.**    So a response to a 30-day price increase would likely be

6    different than a response to a permanent price increase;

7    correct?

8    **A.**    Yes.

9    **Q.**    Now, in her opening, Ms. Forrest said that

10   Professor Rossi's survey shows inelastic demand.  That's at

11   page 36 of the transcript.  That's not correct, is it?

12   **A.**    It is -- it is not precisely correct.  So an economist

13   would not -- would not use exactly those -- those words.

14   **Q.**    Well, economists consider the dividing point for elastic

15   and inelastic demand to be minus one; right?

16   **A.**    That is the -- that is the technical definition of elastic

17   versus inelastic demand.

18   **Q.**    And the point estimate from Dr. Rossi's survey of the

19   elasticity of demand was minus 2.19; right?

20   **A.**    That's correct.

21   **Q.**    So that means a 5-percent increase in price would result

22   in an 11-percent reduction in quantity demanded; right?

23   **A.**    That's correct.

24   **Q.**    That's elastic demand, isn't it?

25   **A.**    So this -- this is where the technical detail and how

**EVANS - CROSS - SWANSON**

1    economists, you know, talk about this differs a little bit.

2         Economists would refer to that as -- as relatively

3    inelastic demand.  It's not technically an elastic demand, but

4    since the elasticity can go up to a -- up to infinity, a minus

5    two, while it's not technically inelastic demand, is

6    relatively inelastic demand.  That's how economists would --

7    that's how economists would talk about it.

8    **Q.**    Are you seriously telling me, Dr. Evans, that you would

9    teach an undergraduate in an economics course that an

10   elasticity that results in a double drop in quantity demanded

11   as a result of a 5 percent price increase is relatively

12   inelastic?

13   **A.**    If I were talking to them about the kinds of elasticities

14   that economists ordinarily encounter in markets, sure, a minus

15   two is a relatively inelastic demand compared to -- compared

16   to other markets.

17   **Q.**    Let's talk about the statistical competence interval.

18   That was on Ms. Hora's slide.

19        Dr. Rossi's statistical competence interval includes an

20   elasticity of minus 2.85.  Do you recall that?

21   **A.**    I -- I don't recall the -- the -- the particular bounds of

22   the competence interval as I sit here now.

23   **Q.**    Well, do you recall that the competence interval included

24   an elasticity of almost minus three?

25   **A.**    On one side, yes.

**EVANS - CROSS - SWANSON**

1    **Q.**    Okay.  So a minus 2.85 elasticity means that a 5 percent

2    increase in price would result in a 14 percent reduction in

3    quantity demanded; right?

4    **A.**    I -- I didn't hear in what you just said what you're

5    assuming about the -- about the elasticity.

6    **Q.**    A minus 2.85 elasticity would mean that a 5 percent

7    increase in price would result in a 14 percent reduction in

8    quantity demanded; correct?

9    **A.**    That math sounds right.

10   **Q.**    Is that relatively inelastic to you?

11   **A.**    It's -- so -- yes.  So the elastic that one often sees in

12   markets, you know, generally are 4, 6, 8, 10 as -- as -- as a

13   practical matter.  So it's -- yeah.  It's certainly higher,

14   but it's in the range.

15   **Q.**    So your testimony is that generally when you look at any

16   product across the economy, you'd expect that a 5 percent

17   increase in price would result in a 20, 30, or 50 percent

18   reduction in quantity demanded or output?

19   **A.**    No.

20   **Q.**    Well, wouldn't that be an elasticity of 4, 6, or 8 --

21   sorry, 4, 6 or 10?

22   **A.**    For individual -- for individual brands, that's not an

23   uncommon elasticity.

24   **Q.**    Now, Professor Rossi actually didn't manage to convey that

25   the price change was permanent instead of a 30-day price

**EVANS - CROSS - SWANSON**

1    change.  The elasticity that he would measure would likely

2    have been higher than minus 2.19; correct?

3    **A.**    That's correct.

4    **Q.**    Now, Professor Rossi's survey supplied you with data that

5    didn't match your global geographic market; right?

6    **A.**    That's correct.

7    **Q.**    His survey was limited to U.S. consumers; correct?

8    **A.**    Yes.

9    **Q.**    You understand that Professor Rossi himself indicated that

10   it might be difficult to extend his results to other countries

11   since the survey was not designed for that purpose; right?

12   **A.**    To -- well, to do the survey in other countries, the

13   survey would need to be translated and customized a bit.  I

14   mean, it would be possible to do that survey in other

15   countries.

16   **Q.**    But Dr. Rossi hadn't done that; right?

17   **A.**    That's correct.

18   **Q.**    Now, in addition to the iOS app distribution and

19   smartphone OS markets we discussed, you also define a market

20   for solutions for accepting and processing payments for

21   digital content purchased within an iOS app.  That's the full

22   definition of the market; right?

23   **A.**    That's correct.

24   **Q.**    Do you agree that in two-sided transaction markets, only

25   one market should be defined?

**EVANS - CROSS - SWANSON**

1    **A.**    Just say that one more time, please.

2    **Q.**    Do you agree that in two-sided transaction markets, only

3    one market should be defined?

4    **A.**    Well, by definition, if it's a two-sided transaction

5    market, it's a two-sided transaction market and only one

6    market should be defined for that.

7    **Q.**    If a transaction platform didn't charge anything for

8    transactions on its platform, in your view, would there be any

9    tying issue?

10   **A.**    I don't -- I don't think I have enough -- enough details

11   to really understand what you're asking.

12   **Q.**    In your view, when a transaction collects payment for a

13   transaction, is it imposing a tying arrangement?

14   **A.**    Again, I don't have enough -- I could imagine lots of

15   different -- lots of different details of what you're talking

16   about, so if it's possible, if you could make it more precise

17   for me.

18   **Q.**    Okay.  Let's talk about ridesharing platforms.  You

19   mentioned Uber and Lyft numerous times in your reports, in

20   your written direct; correct?

21   **A.**    That's correct.

22   **Q.**    Uber and Lyft are platforms for drivers and riders to

23   enter into transactions; correct?

24   **A.**    Yes.

25   **Q.**    And you agree that Uber and Lyft are two-sided transaction

**EVANS - CROSS - SWANSON**

1   platforms?

2   **A.**   I do.

3   **Q.**   Uber and Lyft use their own payment solutions, to use your

4   term; correct?

5   **A.**   That's correct.

6   **Q.**   Uber and Lyft charge drivers commissions; correct?

7   **A.**   That's correct.

8   **Q.**   And drivers can't make the choice to avoid the commission

9   by taking cash from the rider or using a mobile payment device

10   like a credit card reader; correct?

11   **A.**   That's correct.

12   **Q.**   So in your terminology, Uber and Lyft don't give drivers

13   the choice to select their own payment solutions, do they?

14   **A.**   No.  In that case, it's like American Express providing a

15   service to those two sides and it's using its payment solution

16   in order to collect money for the transaction between the --

17   between the two parties.

18   **Q.**   So in your terminology, Uber and Lyft don't give drivers

19   the choice to select their own payment solutions?

20   **A.**   They do not.

21   **Q.**   And you view Lyft's and Uber's payment solutions to be

22   separate products?

23   **A.**   I do not.

24   **Q.**   Dr. Evans, in your written direct -- well, paragraph 238.

25   If you could turn to that that will help me frame my question.

**EVANS - CROSS - SWANSON**

1    **A.**    This is my...

2              **MR. SWANSON:**    I apologize for my awful posture.  I'm

3    thinking of my mother now.

4              **THE COURT:**    No.  I appreciate --

5              **MR. SWANSON:**    The platform is too low for me.

6              **THE COURT:**    Well, you're too high.

7              **MR. SWANSON:**    I'm too high, yes.

8              **THE COURT:**    238.  Are you there, sir?

9    **BY MR. SWANSON:**

10   **Q.**    So are you there, Dr. Evans?

11   **A.**    Yes.

12   **Q.**    You have listed here 11 popular physical apps.  Do you see

13   the list at the end of 238?

14             **THE COURT:**    The fourth line down.

15             **THE WITNESS:**    I must be at the wrong place.  I'm

16   looking at my --

17   **BY MR. SWANSON:**

18   **Q.**    Page 63.

19   **A.**    I apologize.  I must be looking at the wrong place.

20             **THE COURT:**    Do you have your direct in front of you?

21             **THE WITNESS:**    I have my written direct.

22             **THE COURT:**    Okay.  Paragraph 238, which is on page

23   63.

24        Do you want to help him, Mr. Bornstein?

25             **MR. BORNSTEIN:**    Your Honor --

**EVANS - CROSS - SWANSON**

1          **THE COURT:**    You can approach.

2          **THE WITNESS:**    So I have -- okay.  So I think the

3     paragraph and page numbers must be off.

4     **BY MR. SWANSON:**

5     **Q.**    Hopefully you've got the right version now.

6     **A.**    Now I do.

7     **Q.**    So page 63?

8     **A.**    Yes.  I have it now.

9     **Q.**    So do you see the list there:  Grubhub, Wish, StubHub,

10    Uber, DoorDash, Lyft, Instacart, Postmates, Amazon Shopping,

11    Wal-Mart, and eBay?  Do you see that list?

12    **A.**    I do.

13    **Q.**    Those are all two-sided transaction platforms; right?

14    **A.**    Yes, they are.

15    **Q.**    You say they all use their own payment solutions; right?

16    **A.**    They do.

17    **Q.**    Isn't it true that every one of these platforms mandates

18    the use of their own payment solution?

19    **A.**    They do.

20    **Q.**    And do you believe in each instance these platforms are

21    tying a separate payment solution product to the use of their

22    platform?

23    **A.**    Not at all.

24    **Q.**    And you are aware that multiple online game platforms use

25    their own payment solutions to collect their commissions on

**EVANS - CROSS - SWANSON**

1    in-app purchases; right?

2    **A.**    I am.

3    **Q.**    And even the Epic Games Store, when it opened, required

4    use of its own payment solution; correct?

5    **A.**    That's correct.

6    **Q.**    Epic's policy changed only in December of 2019; right?

7    **A.**    That's correct.

8    **Q.**    And since that time, at least as of your deposition, you

9    were aware of only one or two developers that had chosen to

10   use a different payment solution; right?

11   **A.**    That's true.

12   **Q.**    Do you agree, Dr. Evans, that the App Store does not tie

13   anything when it collects a payment for an initial download?

14   **A.**    I do.

15   **Q.**    So IAP is a separate product in your view, but the

16   software and systems Apple uses on initial downloads are not

17   separate products?

18   **A.**    I didn't follow that.  Try -- would you say it one more

19   time?

20   **Q.**    Okay.  So IAP is a separate product in your view, but the

21   software and systems Apple uses on initial downloads are not

22   separate products?

23   **A.**    I -- I think that mixes -- it mixes some apples and

24   oranges there.

25   **Q.**    Well, are they separate products or not?

**EVANS - CROSS - SWANSON**

1  **A.**     The provision of payment solutions for in-app -- in-app

2  transactions between the developer and the user as in between

3  Tinder as the developer, for example, and a user of Tinder,

4  those are -- those are -- those are different than paid

5  downloads.

6          The payment solution that is being provided for the

7  purposes of that transaction, which is after distribution,

8  that is a separate product from the provision of app

9  distribution services where the App Store as the -- as the app

10  distributor is providing a distribution service for the user

11  and developer.  Those -- those are just very different.  And

12  the -- the payment solution that Apple as the -- as the -- as

13  the App Store as a distributor is using for its transactions,

14  that payment solution is different than the -- is -- is -- is

15  standing in a different way when Apple is using it as the app

16  distributor than when Apple is telling developers that they

17  need to use that payment solution for transactions with their

18  own customers.  Those are just different things.

19  **Q.**     Well, let me just see if I can get an answer to the

20  question.

21          IAP is a separate product in your view; right?

22  **A.**     To be precise on that, the -- the Apple payment solution,

23  which is what the IAP mechanism requires the developer to use,

24  is the -- is the separate product.  IAP itself is largely an

25  API that takes the developer to the Apple payment solution.

**EVANS - CROSS - SWANSON**

1    **Q.**    Okay.  And the software and systems or payment solution

2    that Apple uses on initial downloads is not a separate

3    product?

4    **A.**    It is not a separate product to the extent that -- that

5    Apple is using its internal payment infrastructure to -- to

6    process transactions that involve distribution on its App

7    Store.  It's no different -- it's no different than Wal-Mart

8    having its own payment method for transactions within a --

9    within a Wal-Mart store.  So that is -- that is at that point

10   not a product.  It is -- it is a -- it is an input that the

11   store has developed for the purpose of -- of transactions.

12        If Wal-Mart then takes its payment solution and markets it

13   elsewhere, then that's a -- that's a separate product, but if

14   it is just using its internal payment solution for

15   transactions within its own store, that's not a product.

16   That's just -- that's just part of the -- part of the Wal-Mart

17   business in that example.

18   **Q.**    Have you ever gone to the App Store?

19   **A.**    I have.

20   **Q.**    Have you ever looked at a variety of apps available for

21   download that have in-app purchases?

22   **A.**    Well, when I personally go to the App Store, I go there

23   because there's a particular app that I want to get, and, you

24   know, occasionally I'll go there because there's a category of

25   apps or some particular thing that I want to establish, and

**EVANS - CROSS - SWANSON**

1    I'll go there for that purpose.  I don't go to the App Store

2    and troll around for apps that have in-app purchases, just

3    speaking of me as a consumer.

4    **Q.**    Are you aware that in the App Store there are apps where

5    before you download, you can actually do an in-app purchase?

6    **A.**    I was not.

7    **Q.**    Now, it's your position that Apple has a one hundred

8    percent market share in your payment solutions market; right?

9    **A.**    That's correct.

10   **Q.**    The payment solutions market you define as another

11   single-brand market; correct?

12   **A.**    It is.

13   **Q.**    You don't recognize any actual competitors to Apple in

14   your payment solutions market; right?

15   **A.**    In the actual world, that's correct.

16   **Q.**    You don't consider the suppliers of payment solutions for

17   in-app purchases of physical goods or services in the App

18   Store to be competitors in your relevant market?

19   **A.**    They are not competitors in the relevant market as

20   defined, that's right.

21   **Q.**    You think that payment solutions for physical products are

22   separate products sold in a different market; right?

23   **A.**    No.  And in -- in answering this question, it's important

24   to distinguish what the world looks like between the actual

25   world and the -- and the but-for world.

**EVANS - CROSS - SWANSON**

1      So in the actual world, a digital content -- a digital app

2   developer is not able to go get a payment solution that, let's

3   say, Uber is using.  It can't go to those payment processors,

4   it can't do any of the stuff that Uber can do.

5      Now, in the but-for world where that restriction is

6   relaxed, then it is possible for the developer to create their

7   own payment solution and essentially do all the things that a

8   physical app developer could do.  So in the but-for world,

9   then -- then there are lots of payment solutions that are --

10   that are available.

11   **Q.**   Didn't you say in your written direct testimony that the

12   relevant market for evaluating exclusionary conduct is the one

13   that would exist in the absence of that conduct?

14   **A.**   It is.  That's correct.

15   **Q.**   So in the absence of the alleged tie, you certainly agree

16   that there are many competitors for payment solutions to

17   Apple?

18   **A.**   I agree with that statement, that in the absence of the

19   tie, there are many -- there are many payment processes

20   available and that developers would have the ability and would

21   develop their own payment solutions.

22   **Q.**   But even though you say that the relevant market should be

23   the one that would exist in the absence of the conduct, in

24   this case, you define the relevant market to include only

25   Apple; right?

**EVANS - CROSS - SWANSON**

1    **A.**    Yes, with the qualification that I define the relevant

2    market as the -- as the targeted group of developers that

3    Apple requires to use its in-app payment solution.

4    **Q.**    You don't consider the suppliers of payment solutions and

5    websites like Yoga Buddhis to be competitors in your relevant

6    market, do you?

7    **A.**    That is correct.

8    **Q.**    In your written direct, you state -- and Mr. Bornstein

9    took you through this earlier -- that the alleged tie

10   foreclosed competition for payment solutions for thousands of

11   developers for more than a certain amount of money, which that

12   amount is sealed.  Do you recall that?

13   **A.**    I don't think Mr. Bornstein said thousands, but I do

14   recall that.

15   **Q.**    Okay.  That's what your direct says; correct?

16   **A.**    Yes.  My -- my written direct says -- I think I can say

17   this -- it's in the hundreds -- hundreds of thousands.

18   **Q.**    Now, foreclosed competition for payment solutions requires

19   foreclosed competitors; correct?

20   **A.**    That's correct.

21   **Q.**    But you don't regard payment processors as competitors to

22   Apple, do you?

23   **A.**    The -- the -- I don't -- so I -- I don't consider -- I do

24   consider payment processors as part of the overall payment

25   solution for developers to be part of the competition for

1      Apple's payment solution.

2      **Q.**    That was not my question.

3          You don't regard payment processors as competitors to

4      Apple, do you?

5      **A.**    The difficulty I'm having with your question, Mr. Swanson,

6      is Apple is a -- is Apple is a very big company that is lots

7      of things, so I was hoping to maybe narrow the question down

8      to things that are -- that are particular to the payment

9      solution.

10     **Q.**    Well, you're not -- you're not asserting in your relevant

11     market to be defined here that Apple is a payment processor,

12     are you?

13     **A.**    That is not entirely correct.  And I can explain why?

14     **Q.**    Go ahead.

15     **A.**    So let's suppose hypothetically Apple decided to make its

16     payment solution available on a voluntary basis --

17     **Q.**    I'm not talking about hypotheticals.  I'm asking you if in

18     your relevant market, Apple is a competing payment processor?

19     **A.**    Largely no.

20     **Q.**    And it's not a trick question.  I'm trying to understand,

21     since you say that this alleged tie foreclosed competition --

22     I'm trying to understand who the competitors are.  So they're

23     not payment processors?

24     **A.**    They are -- they are payment solutions created by

25     developers in concert with payment processors where, in some

**EVANS - CROSS - SWANSON**

1    cases, those developers could turn to payment processors like

2    Apple which is a particular kind of payment processor that has

3    cards on file, and in a world where Apple made the payment

4    solution available, Apple would have a -- a payment solution

5    that is actually quite similar to -- quite similar to PayPal

6    so it would be a -- a competitor of PayPal as a payment

7    processor.  It would not be a competitor to, let's say,

8    Stripe, but it would be a competitor to PayPal.

9    **Q.**    My question was directed at understanding who the

10   competitors are in your relevant market.  Are the developers

11   the potential competitors?

12   **A.**    They are.  It is -- it is the developers who have the

13   ability to create their own payment solutions, which they can

14   do as an alternative and as a substitute for securing a

15   payment solution from a -- from a third party.  And they do

16   that in concert with payment processors.

17   **Q.**    In concert means they use payment processing as one of the

18   inputs into their payment solution?

19   **A.**    That's correct.

20   **Q.**    You're not claiming that Apple is trying to monopolize the

21   payment processing industry, are you?

22   **A.**    I am not.

23   **Q.**    It's true, isn't it, that Apple's digital App Store

24   transactions account for a miniscule percentage of the online

25   payment processing industry?

**EVANS - CROSS - SWANSON**

1      **A.**    That's true.

2      **Q.**    And don't you agree that there is a vibrant third-party

3      payment processing industry?

4      **A.**    Yes.  I agree with that.

5      **Q.**    On the topic of tying, Dr. Evans, you agree as an

6      antitrust economist, don't you, that tying claims are better

7      analyzed under the rule of reason than under the per se rule?

8      **A.**    I do.

9      **Q.**    And you've expressed that opinion many times, including to

10     the DOJ and the FTC; correct?

11     **A.**    Yes, in even -- even stronger terms than what you just

12     read.

13     **Q.**    It's a heartfelt conviction; right?

14     **A.**    It is.

15     **Q.**    Now, you agree that from Apple's standpoint, having

16     developers use IAP to collect its commission is efficient?

17     **A.**    I do.

18     **Q.**    And you haven't analyzed the additional costs that Apple

19     or, for that matter, developers and consumers would bear from

20     collecting commissions from developers in more than 170

21     countries around the world, have you?

22     **A.**    I have not considered that or that but-for world.

23     **Q.**    Let's --

24              **THE COURT:**    Has anybody in this case, to your

25     knowledge?

**EVANS - CROSS - SWANSON**

1          **THE WITNESS:**   No.  I don't think anyone in this case

2      has really analyzed that -- that question.

3          **THE COURT:**    Thank you.

4      And you have five minutes before the break.

5          **MR. SWANSON:**    All right, Your Honor.  Thank you.

6    **Q.**    Let's then change subjects.  Let's see if we can get five

7      minutes into your SNIP analyses.

8          In your written direct examination, Dr. Evans, you

9      testified that special issues arise in the context of applying

10     SNIP tests to two-sided platform businesses; right?

11   **A.**    That's correct.

12   **Q.**    Now, you've written in the past that you are "dubious that

13     the light generated by market definition analysis in markets

14     involving multisided platforms is worth the candle"; right?

15   **A.**    That -- that sentence does appear in a working paper I

16     did.

17   **Q.**    Okay.  And do you also recall that you have written that

18     "even if it is technically possible to extend the hypothetical

19     monopoly test to two-sided platforms, the challenges of

20     implementing the SNIP test empirically in two-sided markets

21     are likely to be overwhelming in practice"?

22   **A.**    I have, with the -- with the phrase "empirically" really

23     referring in that context to -- to sophisticated econometric

24     modeling efforts.

25   **Q.**    And you have done no sophisticated econometric modeling in

1    this case; right?

2    **A.**    That's correct.  Well, so --

3    **Q.**    On this issue?

4    **A.**    On -- on this particular -- on this particular issue,

5    that's -- that's correct.

6    **Q.**    And you agree that you think there's no consensus among

7    antitrust economists on how to formulate and apply the SNIP

8    questions to questions of the market definition in two-sided

9    markets; right?

10   **A.**    Well, at the time I wrote that, I -- I think that's right.

11   I think now there's been a lot of learning since then, and I

12   wouldn't say that there is a consensus, but I think there is a

13   consensus that it's obviously very fact specific and depends

14   upon the particular matter.

15   **Q.**    Well, didn't you say that in your deposition, that "there

16   is no consensus among antitrust economists on how to formulate

17   and apply the SNIP test to questions of market definition in

18   two-sided markets"?

19        **MR. BORNSTEIN:**    Objection, Your Honor.  Improper

20   impeachment.  He just said that.

21        **THE COURT:**    You can answer the question, that is, did

22   you say it or not just a couple months ago?

23        **THE WITNESS:**    Your question is did I say that in my

24   deposition?

25

**BY MR. SWANSON:**

**Q.**    Yes.  Did you say, "I don't think there is a consensus

among antitrust economists on how to do it"?

**A.**    Yeah.  I very well -- sounds like I said it.

**Q.**    So your SNIP analysis, based on the results of Dr. Rossi's

survey, as you interpret them, says that Apple could have

increased it's effective commission in 2019 to 35.9 percent

without sacrificing any profit; right?

**A.**    That -- that's correct.

**Q.**    And to have an effective commission of 35.9 percent, Apple

would have to have a list commission above that; right?

**A.**    That's correct.

**Q.**    You calculate that Apple would have raised almost a

billion dollars in additional profit in 2019 alone if it had

increased the effective commission rate to 35.9 percent;

right?

**A.**    Yes.  I think the actual estimate of the increase in

profits was about 800 million.

**Q.**    Okay.  And you believe that it's probably true that Apple

could have raised its effective commission even higher than

35.9 percent without reducing its profits?

**A.**    Yes, I do.

**Q.**    And on your view, you can't say that Apple would be

reducing its profits if it raised the effective commission

rate to 50 percent, can you?

**EVANS - CROSS - SWANSON**

1    **A.**    I -- I don't have any -- I don't have any basis for

2    answering that.

3             **THE COURT:**    Okay.  Good time to break?

4             **MR. SWANSON:**    All right.

5             **THE COURT:**    All right.  We stand in recess for 20

6    minutes.  We will be back on the record at 10:35.

7        Make sure you are back on the stand at that time.  Thank

8    you.

9                      (Recess taken at 10:16 a.m.)

10                     (Proceedings resumed at 10:36 a.m.)

11            **THE COURT:**    All right.  We are back on the record.

12   The record will reflect that the parties are present, as is

13   the witness.

14       You may continue.

15            **MR. SWANSON:**    Thank you, Your Honor.

16   **BY MR. SWANSON:**

17   **Q.**   Dr. Evans, you opine that Apple has a 100 percent market

18   share of your iOS app distribution market, correct?

19   **A.**   That is correct.

20   **Q.**   Apple's market share has always been 100 percent in that

21   market as you define it, right?

22   **A.**   That's correct.

23   **Q.**   When Apple had 100 percent market share in 2008, you agree

24   that Apple did not have monopoly power in that market, right?

25   **A.**   I do agree.

**EVANS - CROSS - SWANSON**

1   **Q.**   In your opinion, Apple did not obtain monopoly power in

2   the iOS app distribution market that you've defined until

3   around 2010; is that correct?

4   **A.**   That is correct.

5   **Q.**   Now, yesterday when you were testifying about your

6   smartphone OS market, you indicated that Apple did not have

7   significant market power until 2010, '11, or '12.

8        Did I hear that right?

9   **A.**   I think I did say that.

10   **Q.**   Okay.  Is that the same opinion or the same level of

11   precision that you've got around your estimate of the time

12   when Apple obtained monopoly power in your iOS app

13   distribution market?

14   **A.**   No.  If I had to restate that, I would time both of those,

15   as I did in my written Direct testimony, to 2000 and -- to

16   2010.

17        **MR. SWANSON:**   Can we put up Slide 18 from your

18   presentation yesterday.  That was the duopoly market slide.

19   **BY MR. SWANSON:**

20   **Q.**   Now, in 2010, on your estimation, Apple was overtaken by

21   Android in your smartphone OS market, right?

22   **A.**   No, that isn't -- that isn't correct.  This slide here is

23   showing -- is showing handset sales, primarily for the purpose

24   of showing that the market is converging to everyone using

25   iOS and Android devices.

**EVANS - CROSS - SWANSON**

1    The way I am analyzing market power for smartphone

2    operating systems isn't based on handset sales, although this

3    is illustrative and relevant data; it's based on the extent to

4    which there is market power for the app development platform

5    serving app users and app developers.  So that analysis is not

6    coincident with the handset -- handset sales.

7    **Q.**  Well, it's your opinion, I gather, that Apple became a

8    monopolist just at the point in time when Android devices

9    substantially overtook iOS devices in sales.

10    Isn't that demonstrated by your slide?

11    **A.**  So as a -- in terms of the facts that you have just

12    stated, it is -- it is correct -- the facts you've just stated

13    are correct in terms of this slide.

14    **Q.**  Okay.  Thank you.

15       **MR. SWANSON:**  You can put that down.

16    **BY MR. SWANSON:**

17    **Q.**  You don't calculate a market share for the digital game

18    transactions market defined by Apple's experts, do you?

19    **A.**  I do not.

20    **Q.**  And you take the position that one-sided businesses can

21    compete in the same market with two-sided platforms; is that

22    correct?

23    **A.**  As a -- you're stating that as a general proposition.  And

24    as a general proposition, I do agree with it.

25    **Q.**  Yes, I was asking the general question.  Thank you.

**EVANS - CROSS - SWANSON**

1          To make it specific, for example, you consider direct

2     downloading, sometimes called sideloading, to be one-sided

3     competition to two-sided PC platforms like Steam and Epic

4     Games Store, right?

5     **A.**   That is correct.

6     **Q.**   All right.  One point, Dr. Evans.  You didn't mention

7     essential facilities at all during your Direct or in your

8     written testimony, correct?

9     **A.**   That is correct.

10    **Q.**   Am I correct that you're not expressing any opinion on

11    anything termed an essential facility or anything related to

12    an essential facility claim in this case?

13    **A.**   That is correct.

14    **Q.**   Now, you concede that the contractual and technical design

15    practices that are challenged by Epic were benign when first

16    adopted by Apple, correct?

17    **A.**   They were benign in a -- in an antitrust sense.

18    **Q.**   In a competitive sense, correct?

19    **A.**   That's correct.

20    **Q.**   You're not offering any opinion that the technical design

21    of the original iPhone that was released in 2007 was

22    anticompetitive, are you?

23    **A.**   I am not.

24    **Q.**   And you're not offering any opinion that any

25    anticompetitive effects flowed from the original technical

**EVANS - CROSS - SWANSON**

1    design of the first iPhone released in 2007, right?

2    **A.**   That is correct.

3    **Q.**   And you don't claim that the technical features of the

4    iPhone 3G were anything other than competitively benign when

5    introduced in 2008, correct?

6    **A.**   That's correct.

7    **Q.**   Now, you understand that the challenged contractual

8    provisions in this case were present in the Developer Program

9    License Agreement, the DPLA, in or around March of 2008,

10   right?

11   **A.**   I do.

12   **Q.**   So the restrictions related to app distribution challenged

13   by Epic in this case date back to the original set of

14   contracts that were put in place in 2008, right?

15   **A.**   That is right.

16   **Q.**   And to the best of your knowledge, there have been no

17   subsequent changes to the language of the Developer Program

18   License Agreement that add provisions that anticompetitively

19   restrain app distribution.

20   **A.**   I believe that's correct.

21   **Q.**   And you would agree that Apple was not a monopolist in

22   2009 when it applied the 30 percent commission rate to in-app

23   purchases, correct?

24   **A.**   That is correct.

25   **Q.**   In your opinion, Apple did not possess monopoly or

1    substantial market power in your two-sided iOS app

2    distribution market, again, until around 2010.

3         That's your current view, right?

4    **A.**  That's correct.

5    **Q.**  Okay.

6              **THE COURT:**  Just so I am clear, when you say 2010,

7    are we talking January, June, or December?

8              **THE WITNESS:**  I can't say that I -- sitting here

9    today, I would give it a particular month.  When I say 2010, I

10   guess, in my mind, I'm thinking mid 2010.  I'm thinking about

11   the year; I'm not really thinking about January versus

12   December.

13             **THE COURT:**  Okay.

14   **BY MR. SWANSON:**

15   **Q.**  And you are thinking about the year as still being within

16   a range of years, or you're definitively narrowing it down to

17   2010?

18   **A.**  I'm narrowing it down to 2010.

19   **Q.**  So you're taking back your testimony yesterday about 2011,

20   2012?

21   **A.**  If you will, yes.  I'm focusing on 2010, as I have in my

22   written Direct, that's correct.

23   **Q.**  On your written Direct, you say not before 2010, right?

24   **A.**  That's correct.

25   **Q.**  So now you are saying it's 2010.

**EVANS - CROSS - SWANSON**

1    **A.**   That's correct.

2    **Q.**   Okay.  I would like to put another exhibit before you.  I

3    think this requires another binder, which we will hand around.

4              **MR. SWANSON:**  Your Honor, may I approach the witness?

5              **THE COURT:**  Are we done with Binder 1?

6              **MR. SWANSON:**  I think we will come back to it.

7              **THE COURT:**  Okay.

8              **MR. SWANSON:**  Not intensively, but....

9         So I am -- well, the document that I would like Dr. Evans

10   to look at is Tab 8 in the binder, and I am told we should

11   give it exhibit number DX5551.

12              (Defendant's Exhibit 5551 received in evidence)

13   **BY MR. SWANSON:**

14   **Q.**   Do you have that in front of you, Dr. Evans?

15   **A.**   I do.

16   **Q.**   Do you recognize DX5551?

17   **A.**   I do indeed.

18   **Q.**   This is an amicus brief that you and Professor Schmalensee

19   submitted to the Supreme Court in the Ohio versus American

20   Express matter, correct?

21   **A.**   That is correct.

22   **Q.**   And you submitted this brief in your capacity as an

23   economist, correct?

24   **A.**   Yes, I did.

25   **Q.**   Now, in the American Express case, you are familiar with

**EVANS - CROSS - SWANSON**

1    the facts of that case, right?

2    **A.**  I am.

3    **Q.**  Okay.  You recall that the evidence in that case was that

4    the output of credit card transactions grew by 30 percent from

5    2008 to 2013.

6        Does that sound fair?

7    **A.**  Yep.  Yes, it does.

8    **Q.**  Now, turning to page 6 of your amicus brief, I want to

9    focus you --

10   **A.**  If you could just give me a second, Mr. Swanson.

11   **Q.**  Yes, that's all right.  I'm dealing with the same thing,

12   so take your time.

13           **THE COURT:**  Tab 8, page 6.

14           **MR. SWANSON:**  Page 6.

15           **THE WITNESS:**  Yes.  I'm just dealing with -- some

16   part of the beginning fell out because the binder wasn't

17   sealed.

18           **MR. SWANSON:**  It's the page paginated --

19           **THE WITNESS:**  Thank you.  I got it.

20   **BY MR. SWANSON:**

21   **Q.**  So in the -- I wanted to focus you on a statement at the

22   end of the first full paragraph.  You state there that:

23           "Conduct that increases the overall output of a

24           service should be commended, not condemned, as that

25           is a central virtue of competition."

**EVANS - CROSS - SWANSON**

1           Do you see that?

2   **A.**   So I just want to make sure I'm in the right place.  I see

3   you've highlighted Footnote 11.  Is that where you want me to

4   look?

5   **Q.**   No.  I'm talking -- there is a page number at the top of

6   the page that says 6.

7   **A.**   Oh, 6.  I'm sorry.

8   **Q.**   If you've got highlighting, I apologize.  You can ignore

9   that.  But page 6, the first full paragraph, starts, "To

10  determine whether...."

11          Do you see that?

12  **A.**   I do.

13  **Q.**   And then the last sentence is what I'm focusing on:

14              "Conduct that increases the overall output of a

15              service should be commended, not condemned, as that

16              is a central virtue of competition."

17          Do you see that?

18  **A.**   I do see that.

19  **Q.**   And do you still subscribe to that view today?

20  **A.**   Absolutely.

21  **Q.**   Okay.  Now, in this amicus brief, writing as an economist,

22  you agreed with the Second Circuit's conclusion that the

23  plaintiff had failed to establish anticompetitive effects,

24  right?

25  **A.**   That is correct.

**EVANS - CROSS - SWANSON**

1    **Q.**   And the reason that you deemed most important as an

2    economist was that there was no evidence that the provisions

3    in question resulted in an overall decrease in the output of

4    transaction services, correct?

5    **A.**   That is correct.

6    **Q.**   Right.  That's at page 8, Footnote 11, right?  That might

7    have been where you were before.

8    **A.**   That is correct.

9    **Q.**   Okay.  And in the conclusion of your amicus brief at page

10   28 -- that is the second page of the conclusion -- you stated

11   that the Second Circuit's decision in favor of American

12   Express should be affirmed, particularly given the lack of

13   evidence that the challenged conduct reduced the output of

14   transaction services.

15        Do you see that?

16   **A.**   I do.

17   **Q.**   And that was your opinion?

18   **A.**   Yes, it was.

19   **Q.**   Okay.  Now, in this case, you agree, don't you, that

20   output was growing before 2010 in the relevant market or

21   markets that you define when you say that Apple obtained

22   monopoly power?

23   **A.**   Your question is -- I am sorry, your question again is

24   what?

25   **Q.**   Let me try again.

**EVANS - CROSS - SWANSON**

1        In this case, you agree, don't you, that output was

2   growing before 2010, which is when you say that Apple obtained

3   monopoly power in your iOS app distribution market.

4   **A.**  I agree that the -- I agree that the output in the app

5   distribution market, certainly along a number of metrics, has

6   grown enormously from 2008 to the present.

7   **Q.**  So you agree that output has grown since the time you say

8   that Apple obtained monopoly power, correct?

9   **A.**  We're not using the term "output" very precisely here, but

10  I think, you know, we can all agree that on a number of

11  metrics, output is increased.

12  **Q.**  And you would agree, and indeed you have written before,

13  have you not, that the output of the App Store has grown

14  explosively by any reasonable measure?

15  **A.**  It sounds like something I would have written, and it is

16  certainly a statement that I agree with.

17  **Q.**  Now, in the -- well, has output grown more than

18  30 percent?

19            **THE COURT:**  Over what time period?

20            **MR. SWANSON:**  Good question.  Since the opening of

21  the App Store in 2008 to the present.

22            **THE WITNESS:**  Certainly.

23  **BY MR. SWANSON:**

24  **Q.**  Do you know --

25  **A.**  If I could put this down?

**EVANS - CROSS - SWANSON**

1    **Q.**  Yes, you -- I'm sorry.  Yes, you can put it down.

2        Has output grown by more than 30 percent since 2010, when

3    Apple, in your view, obtained monopoly power in the iOS app

4    distribution market?

5    **A.**  I don't know for a fact what the numerical increase has

6    been, but I'm sure it has been more than 30 percent.

7    **Q.**  In the context of platform economics, critical mass is the

8    inflection point where rapid growth on a platform kicks in,

9    right?

10   **A.**  Yes, it is.

11   **Q.**  And you're going to have to help me on this, because you

12   gave a definition in your deposition that involved a little

13   bit of hand movement.

14       But you indicated that critical mass is the inflection

15   point where you kind of go along like this (indicating) and

16   then something happens and, whoosh, you go like that

17   (indicating).

18       Do you recall that?

19   **A.**  I recall that and I recall the hand motions, which you

20   have accurately mimicked.

21   **Q.**  Thank you.

22       **THE COURT:**  And the record should reflect that you

23   went from low to high.

24       **MR. SWANSON:**  I think it might have been a hockey

25   stick.

**EVANS - CROSS - SWANSON**

1          **THE COURT:**  All right.  Like a hockey stick.

2     BY MR. SWANSON:

3     **Q.**  Now, your take, Dr. Evans, is that the App Store obtained

4     critical mass sometime between 2009 and 2010, right?

5     **A.**  That sounds like the right -- that sounds like the right

6     time period.

7     **Q.**  And that is before Apple obtained monopoly power, in your

8     view, in 2010, correct?

9     **A.**  That is correct.

10    **Q.**  Now, you didn't study the trend in growth when Apple

11    obtained monopoly power, in your opinion, correct?

12    **A.**  I didn't understand your question.

13    **Q.**  You did not study the trend or any change in trend in

14    growth when, in your opinion, in 2010, Apple obtained monopoly

15    power?

16    **A.**  I did not.

17    **Q.**  Now, you'll agree that in 2010, in the market that you've

18    defined, output didn't contract, right?

19    **A.**  That's correct.

20    **Q.**  And you haven't made any claim in your report or your

21    deposition or your testimony here that output decelerated at

22    that time in 2010, have you?

23    **A.**  That's correct.

24    **Q.**  You haven't identified any hiccup in the output data at

25    the time that you say the App Store became a monopoly, right?

**EVANS - CROSS - SWANSON**

1    **A.**   That's true.

2    **Q.**   Now, you testified earlier yesterday that Apple at some

3    point provided poor quality distribution services.

4         Do you recall that?

5    **A.**   Yes.

6    **Q.**   You would agree, would you not, that Apple earns more in

7    commission fee revenue if it provides an increase in quality

8    that allows developers to sell more to users.

9    **A.**   In principle, that's right.

10   **Q.**   Okay.  And you said it in your second preliminary

11   injunction declaration, right?

12   **A.**   Remind me what I said in my preliminary injunction.

13   **Q.**   That Apple earns more in fee revenue if it provides an

14   increase in quality that allows developers to sell more to

15   users.

16        Do you recall that?

17   **A.**   I don't, actually, but....

18   **Q.**   Would you like to refresh your recollection on that?

19   **A.**   No, I will take your word for it.

20   **Q.**   Okay.

21   **A.**   If you say it is there, I'm sure it is there.

22   **Q.**   It's there.

23        Now, the reverse is true too, right, Apple earns less in

24   fee revenue if it provides a decrease in quality that allows

25   developers to sell less to users?  That's just logic, right?

1    **A.**   Again, in principle, as a theoretical matter, that's true,

2    uh-huh.

3    **Q.**   It sounds very practical, as well as theoretical, doesn't

4    it?

5    **A.**   I don't think it sounds practical, because I've had the

6    opportunity to actually examine the App Store and a lot of

7    evidence concerning the performance of the App Store in

8    conjunction with the App Store financials.  So I have a view

9    on what has, in fact, happened.

10    **Q.**   Well, if you conclude the App Store's quality is

11    decreasing, isn't it true that revenues earned by developers

12    would be decreasing too?

13    **A.**   No.  I think the way to look at it is whether, given

14    Apple's monopoly position, it -- it needs to provide as good

15    services to developers as it would if it was facing -- facing

16    more competition.

17        It is just the case that -- that monopolists, when they

18    don't -- don't face competition, can get away with providing

19    poor services to their customers.  I mean, that's also kind of

20    an obvious thing that we know.

21    **Q.**   So are you disagreeing that if the App Store's quality is

22    decreasing, that revenues earned by developers wouldn't be

23    decreasing too?

24    **A.**   I would characterize it in a different way.  I would

25    characterize it as -- as users and developers are harmed as a

**EVANS - CROSS - SWANSON**

1    result of the poor search and discovery services as the result

2    of just increased transactions cost and inefficient matching

3    and other things like that.  That's how I think about it.

4            **THE WITNESS:**  Yeah, let me adjust this.  Hopefully

5    this is -- is that better?

6            **THE REPORTER:**  Yes.

7            **THE WITNESS:**  Thank you.

8    **BY MR. SWANSON:**

9    **Q.**  Dr. Evans, merely charging a monopoly price is not

10   anticompetitive, right?

11   **A.**  It is not.

12   **Q.**  In your opinion, the 30 percent commission that Apple

13   charges, when adopted in 2008, was not anticompetitive, right?

14   **A.**  That's correct.

15   **Q.**  Or in 2009, correct?

16   **A.**  That's correct.

17   **Q.**  And your view is that in selecting a 30 percent commission

18   in 2008, Apple was maximizing profit in the context of getting

19   the iPhone business off the ground, right?

20   **A.**  I do.

21   **Q.**  A 30 percent commission model is used by several

22   transaction platforms that distribute game apps, right?

23   **A.**  As a headline rate, that's correct.

24   **Q.**  And the Mac App Store has a 30 percent commission, right?

25           **THE REPORTER:**  Excuse me, could you repeat that?

1    **MR. SWANSON:**  My last question?  I said, "The 30

2    percent commission model is used by several transaction

3    platforms that distribute game apps, right?"

4    **BY MR. SWANSON:**

5    **Q.**  And I believe your answer was the headline rate, yes?

6    **A.**  That's correct.

7    **Q.**  And the Mac App Store has a 30 percent commission,

8    correct?

9    **A.**  That's correct.

10   **Q.**  And you had no reason to believe that the 30 percent

11   commission for the Mac App Store is supercompetitive today,

12   right?

13   **A.**  That's correct.

14   **Q.**  In this case, Dr. Evans, you have not offered any analysis

15   that shows that Apple has sacrificed short-term profits in

16   order to limit competition by Epic or any other developer,

17   correct?

18   **A.**  That is correct.

19   **Q.**  You understand that developers must use Apple's

20   intellectual property to develop apps for the iOS ecosystem,

21   right?

22   **A.**  That is correct.

23   **Q.**  As an economist, you agree that compulsory licensing

24   occurs when an IP holder is forced to license its IP, correct?

25   **A.**  Repeat that, please.

**EVANS - CROSS - SWANSON**

1    **Q.**   As an economist, you agree that compulsory licensing

2    occurs when an IP holder is forced to license its IP, correct?

3    **A.**   I agree that's the definition of "compulsory licensing."

4    **Q.**   And that is the definition that economists use, correct?

5    **A.**   I don't know that that is a term economists generally use.

6    I mean, that is a term that an economist writing about

7    intellectual property matters would use because that's how it

8    is ordinarily described.  But it's not a....

9    **Q.**   Is it your opinion, as an antitrust economist, that when

10   Apple became a monopolist, according to you, in 2010, it had a

11   duty at that point to allow developers to offer an open,

12   competing iOS app stores?

13   **A.**   I'm not answering your question quickly because I'm

14   dwelling on the word "duty."

15       I can only answer that question in the context of an

16   analysis of anticompetitive conduct.  It doesn't have an

17   abstract duty to do that.

18       The question is, once it acquires monopoly power, are

19   there antitrust reasons why it would have to cease practices

20   that prevent competition in app distribution.  And if that

21   would determine that it had acquired monopoly power and that

22   it engaged in anticompetitive foreclosure, then in that

23   situation, as an economist, I would say then it has an

24   obligation to cease that behavior and do the things that are

25   necessary to end those foreclosure practices.

**EVANS - CROSS - SWANSON**

1  **Q.**  Let's break that down for this case.

2      It's your opinion that before 2010, it wouldn't be

3  anticompetitive for Apple, and it wasn't anticompetitive for

4  Apple, to decline to license developers to have competing

5  iOS App Stores, correct?

6  **A.**  Prior to having substantial market power, that's correct.

7  **Q.**  And, in fact, if Apple had decided not to license

8  developers at all, that, in your view, would not have been

9  anticompetitive, correct?

10  **A.**  That is correct.

11  **Q.**  Now, in your opinion, the only two competitive paths open

12  to Apple were to license developers to use iOS to compete

13  with the App Store once 2010 rolled around or never to license

14  developers at all; is that right?

15  **A.**  If you could just state those two choices for me one more

16  time, just so I have them precisely in mind before I give you

17  an answer.

18  **Q.**  In your opinion, the only two competitive paths open to

19  Apple were to license developers to use iOS to compete with

20  the App Store when 2010 rolled around or never to license

21  developers at all.

22  **A.**  Yes, I think you -- I think you could think of the choice

23  that way --

24  **Q.**  Are you familiar with the --

25  **A.**  -- as of 2010.

**EVANS - CROSS - SWANSON**

1    **Q.**  You're familiar with the so-called intellectual property

2    guidelines that are issued by the Department of Justice

3    Antitrust Division and the FTC?

4    **A.**  I am.

5    **Q.**  And you are aware that those guidelines indicate that the

6    antitrust agencies ordinarily will not require the owner of

7    intellectual property to create competition in its own

8    technology.

9        Is that a fair statement?  Are you aware of that?

10   **A.**  With an emphasis on "ordinarily" and the qualification

11   that the guidelines also talk about the obligations as a

12   result of anticompetitive tying.

13   **Q.**  And you agree with the principle that ordinarily, the

14   owner of intellectual property should not be required to

15   create competition in its own technology, right?

16   **A.**  I do.

17   **Q.**  You agree that Apple has established a reputation for the

18   quality of its products, don't you?

19   **A.**  I do.

20   **Q.**  Apple has established a reputation for customer security

21   for both its devices and its apps, right?

22   **A.**  It has established that reputation, uh-huh.

23   **Q.**  Protecting iPhone users from security threats is a

24   procompetitive benefit, right?

25   **A.**  It is.

**EVANS - CROSS - SWANSON**

1   **Q.**   In your opinion, Apple also, in recent years, has been a

2   vocal advocate for consumer privacy, correct?

3   **A.**   It has been.

4   **Q.**   And that support for consumer privacy differentiates Apple

5   from ad-supported platforms like Facebook and Google, right?

6   **A.**   It does.

7   **Q.**   Apple has also established the reputation for the

8   reliability of its products, right?

9   **A.**   Yeah, I think that's right.

10   **Q.**   And Apple's brand is consistently recognized as one of the

11   most valuable in the world.

12        You would agree with that too, wouldn't you?

13   **A.**   It is a very valuable brand.

14   **Q.**   And you are not withdrawing your statement, are you, that

15   there isn't much controversy that Apple's rules have enabled

16   it to create a high-quality app ecosystem for the iPhone?

17   **A.**   I am not withdrawing that at all.

18   **Q.**   Let me change topics.

19        **MR. SWANSON:**   Your Honor, at some point soon -- I'm

20   going to talk about profitability now with Dr. Evans, and at a

21   certain point, which I think will be at the end of my

22   examination, we will hit a point where I do want to ask some

23   questions that turn on --

24        **THE COURT:**   And how long will that portion be?

25        **MR. SWANSON:**   I think that it's as much a question

1    for Dr. Evans as me, but I would say -- I would hope not more

2    than 10 minutes.

3            THE COURT:  So what we will do, then, is you finish

4    up everything but that.  Then Mr. Bornstein will take him on

5    Redirect, and when we finish everything that can be open, at

6    that point, I will seal the courtroom for the short period of

7    time on those topics.

8            MR. SWANSON:  Okay.  Thank you.

9    BY MR. SWANSON:

10   Q.  Dr. Evans, Epic generates the vast bulk of its revenue

11   from the sale of V-Bucks, right?

12   A.  Yes.

13   Q.  You heard Mr. Sweeney testify that V-Bucks have no

14   marginal cost, didn't you?

15   A.  The currency has no marginal cost.

16   Q.  I'm sorry?

17   A.  The currency has no marginal cost.

18   Q.  And you heard Mr. Sweeney testify to that, didn't you?

19   A.  I did not.

20   Q.  Have you been reviewing the testimony in the case so far?

21   A.  I have not had the opportunity to read all the testimony.

22   I've -- I've looked at some things, but I have not read all

23   the testimony, or much of it.

24   Q.  Did you read Mr. Sweeney's testimony at all?

25   A.  I did.  So I have read the -- I was able to read the

1    proceedings for the first day, and that included Mr. Sweeney's

2    testimony.

3    **Q.**   Have you been able to read or listen to any of the

4    testimony after the first day, up to the point when you took

5    the stand?

6    **A.**   I have not.

7    **Q.**   So your testimony is not in reliance on anything -- any of

8    the evidence that has been received orally in the court since

9    the first day of the trial, correct?

10   **A.**   Yeah, I think that's correct.

11   **Q.**   Now, you agree with Mr. Sweeney that there's no marginal

12   cost for V-Bucks?

13   **A.**   I do.

14   **Q.**   And you understand that Epic sets the price of V-Bucks

15   without regard to marginal cost, correct?

16   **A.**   By definition, that has to be true.

17   **Q.**   And with no marginal cost, Epic has a near 100 percent

18   margin on V-Bucks sales, correct?

19   **A.**   By definition, that's true.  That's a very odd way of

20   thinking about a -- thinking about a digital currency for a

21   game platform that is monetizing itself through the sale of

22   in-app content.

23   **Q.**   Your answer is "yes," right?

24   **A.**   For the narrow purpose that you are making that statement,

25   yeah, I do.

**EVANS - CROSS - SWANSON**

1    **Q.**  You agree that a profit margin alone is not sufficient to

2    show monopoly power?

3    **A.**  I do.

4    **Q.**  In the past, isn't it true that you've written that using

5    profit margins or markups is a flawed approach to assessing

6    market power?

7    **A.**  I think the constellation of my writings on profit

8    measures and profit margins is that they should be used with

9    caution and that they should be used in recognition that

10   accounting profits can, in reporting cases, not be good

11   proxies for measuring economic profits.

12       I think if we took a look at the various things I've

13   written on this -- and I've written about this, I think, in a

14   number of papers -- that's a pretty good summary.

15   **Q.**  Well, you have written a lot on this, and my question was

16   about something specific.

17       Isn't it true that you've written that using profit

18   margins or markups is a flawed approach to assessing market

19   power?

20   **A.**  I may have written that.  I've written a lot of things.  I

21   don't recall that precise statement, but that is not the --

22   that is not the general view that is provided by me through

23   the many writings that I've done on this topic.

24   **Q.**  Well, haven't you claimed that using profit margins to

25   assess market power gives us a sense of scientific precision,

1    but it is false precision?

2    **A.**   It can be.

3    **Q.**   Well, haven't you written that?

4    **A.**   I think I've written close to 2 million words, Mr. Sweeney

5    (sic).  So whether I wrote those particular words, I don't

6    recall.  It's possible that I did.  I don't know.

7              **THE COURT:**  Mr. Swanson.

8              **THE WITNESS:**  Mr. Swanson.  I'm sorry.

9              **MR. SWANSON:**  If Mr. Swanson was Mr. Sweeney, I

10   wouldn't be standing here.

11             **THE WITNESS:**  I apologize to both Mr. Swanson and to

12   Mr. Sweeney.

13             **MR. SWANSON:**  Well done.

14   **BY MR. SWANSON:**

15   **Q.**   Now, business documents don't report economic profits,

16   right?

17   **A.**   That's correct.

18   **Q.**   And you're using business documents here as a proxy for

19   economic profits; is that correct?

20   **A.**   That's an -- I don't agree with those choice of words.

21   I'm using profit and loss statements presented in business

22   documents where those profit and loss statements provide

23   measures of profits as a proxy for economic profits.

24   **Q.**   Do the documents that you are using show profits as a

25   return on invested capital?

1   **A.**   They do not.

2   **Q.**   As an economist, would you normally focus on profit

3   measures that look at returns on invested capital?

4   **A.**   In certain circumstances, I would do that.

5   **Q.**   If the data were available, would you look at it?

6   **A.**   In circumstances where that was a valuable thing to do, I

7   would do so.

8   **Q.**   Well, would that be a valuable thing to do in this case?

9   **A.**   I -- I don't believe it would be a materially important

10  thing to do in this case, because the evidence here is that

11  there has not been, with regard to the App Store itself,

12  substantial investment aside from what was made early on.  I'm

13  not saying none.

14      But the -- you know, the profit and loss statements in the

15  business records, you know, provide some indication of the

16  operation of the business.  It's not like -- it's not like

17  some businesses where there are heavy investment costs in

18  building factories or doing research and development or the

19  things that you would ordinarily think of, you know, some

20  companies doing, you know, even developing video games.  It is

21  not that kind of a -- it's not that kind of a business.

22      So those investment costs are just not as materially

23  important here as they would be in situations where the

24  business was such that they would be.

25  **Q.**   So your testimony is that you didn't consider it important

**EVANS - CROSS - SWANSON**

1    to look at return on investment in this case?

2    **A.**   That is correct.

3    **Q.**   Now, you would agree, wouldn't you, that one problem for

4    an economist using accounting data about profit margins arises

5    when a company sells several related goods and services that

6    share common or joint costs?

7    **A.**   I do.

8    **Q.**   And you've written that accounting complications result

9    when considering pricing strategies designed to maximize the

10   sales of a group of related goods and services, rather than a

11   single product, correct?

12   **A.**   That's true.

13   **Q.**   Would you agree that iPhones, iPads, and iOS apps

14   are a group of related goods and services?

15   **A.**   I do agree they are a group of related goods and services.

16   **Q.**   You are familiar with the economic concept of joint costs,

17   correct?

18   **A.**   I am.

19   **Q.**   Joint costs are when a cost or investment serves several

20   products or activities, correct?

21   **A.**   That's true.

22   **Q.**   There is no meaningful economic method for allocating

23   joint or shared costs, correct?

24   **A.**   In the case of joint and shared costs, that's correct.

25   **Q.**   Economists regard allocations of joint costs as arbitrary,

**EVANS - CROSS - SWANSON**

1    don't they?

2    **A.**   If there are joint costs, the allocations of those joint

3    costs are arbitrary from an economic standpoint.  Companies

4    obviously do this, but....

5    **Q.**   Accountants do this all the time, right?

6    **A.**   Yeah, that's correct.

7    **Q.**   But economists view those allocations as economically

8    arbitrary, you agree?

9    **A.**   I do.

10   **Q.**   Now, you heard Mr. Sweeney testify when he agreed that any

11   effort to attribute the cost of developing shared technology

12   to a particular product use or service would be arbitrary?

13   Did you hear that testimony?

14   **A.**   I did.  Well, rather, I read that testimony.

15   **Q.**   Okay.  And you read Mr. Sweeney's testimony that he agreed

16   that within most parts of Epic, if someone were to point at

17   one product or service that Epic offers and declare a precise

18   profit margin for it, that assessment would be fundamentally

19   flawed?  You read that?

20   **A.**   I did read that.  I don't recall the particular context

21   for it, but I did.

22   **Q.**   Okay.  Don't you agree, as an economist, that the iOS

23   ecosystem involves many joint or shared costs?

24   **A.**   With regard to the relationship between the App Store and

25   iPhone, I don't agree with that at all.  We have profit and

1    loss statements from Mr. Cook's files that actually show how

2    Apple thinks about this business, the extent to which Apple

3    thinks that there are joint costs -- I'm sorry.

4         Is it possible for me to respond to that question in a --

5    **Q.**  Well, I suspect Mr. Bornstein can ask you to elaborate.

6         My question was do you agree, as an economist, that the

7    iOS ecosystem involves many joint or shared costs?

8              **THE WITNESS:**  If I could just ask for guidance on

9    answering these questions, whether it's possible for me to

10   refer to the evidence that I actually have.

11             **THE COURT:**  So, first, just a foundational answer.

12   Is it shared costs or not?  "Yes" or "no"?

13             **THE WITNESS:**  Largely, no.

14             **THE COURT:**  Okay.

15   **BY MR. SWANSON:**

16   **Q.**  All right.  Dr. Evans, you mean you don't agree that

17   investments in Apple's iOS devices and technology help drive

18   the demand for both the devices and iOS apps?

19   **A.**  I do agree they do.

20   **Q.**  And, for example, didn't Apple's investments in technology

21   to make software by *Fortnite* playable on the iPhone drive both

22   app sales and iPhone sales?

23   **A.**  They did.

24   **Q.**  Don't you agree, as well, that investments in the App

25   Store serve to drive sales of iOS devices?

1   **A.**  I do.

2   **Q.**  Doesn't it make sense to you, as an economist, to look at

3   all iOS-related revenues and costs together, rather than

4   trying to isolate revenues and costs for individual products?

5   **A.**  No.

6   **Q.**  Well, did you tell the FTC that back when you made your

7   presentation in 2016 about Apple's mobile platform business?

8   **A.**  If you could remind me and if I could see the --

9   **Q.**  It would be in Binder 1, DX5550.  Let me find it as well.

10                 (Pause in the proceedings.)

11         **THE WITNESS:**  Thank you, Mr. Swanson.  I have the

12   document.  If you could refer me to the page.

13   **BY MR. SWANSON:**

14   **Q.**  Yes.  Could you turn to Slide 32.  So that's the start of

15   this segment when we looked at this before.  So this was the

16   presentation that you made, or at least submitted to the FTC,

17   entitled "Economic Analysis of Apple's App Store Business,"

18   right?

19   **A.**  I see it.

20   **Q.**  So now turn to Slide 34.

21         Now, there does appear to be at least half a line cut off

22   at the bottom.  This is how the document was produced to us,

23   so if there is an issue on this, we would ask you, Dr. Evans,

24   to check your files again and produce a clearer version.  But

25   at any rate, we can work with this slide.

**EVANS - CROSS - SWANSON**

1    In the presentation that you made to the FTC, you looked

2    at overall iOS-related revenue, including from device sales

3    and the App Store, correct?

4    **A.**   That's correct.

5    **Q.**   And you said here that Apple earns a small portion of

6    iOS-related revenue from the App Store, right?

7    **A.**   That is correct.

8    **Q.**   And by "iOS-related revenue," you meant App Store revenue

9    and iOS device revenue together, correct?

10   **A.**   That is correct.

11   **Q.**   And on the right-hand side of this slide, you say -- and

12   this, I think, is -- yeah, this is at the top:

13           "Apple's business model for App Store based on

14           selling handsets and driving positive feedbacks

15           effects."

16   Do you see that?

17   **A.**   That's correct.

18   **Q.**   And on the left side of that slide, are you telling the

19   agency to look at iPhone profits together with App Store

20   profits?

21   **A.**   So I'm not -- I would have to review the presentation more

22   carefully, but I believe what is going on here is I'm

23   describing -- I'm describing the -- Apple's business model

24   with regard to sale of devices and the operation of the App

25   Store.

**EVANS - CROSS - SWANSON**

1    I think that -- I think, unless I'm missing something, the

2    description here is consistent with my written testimony,

3    where I've been very clear that the App Store and apps are

4    highly related to the sale of iPhones.

5    **Q.**  Well, aren't you telling the FTC here that the App Store

6    generates a relatively small percent of Apple's total

7    iOS-related revenues, but the thing for the agency to focus on

8    is that Apple's business model is to drive the sale of

9    iPhones and the agency should look at iPhone profits, as well

10   as App Store profits?

11       Isn't that a fair read of this?

12       And if you can't characterize it, Dr. Evans, we can let it

13   speak for itself.

14   **A.**  So I -- the statement in the heading of the slide is what

15   I told the FTC, and it is what I believe.  Apple uses apps to

16   drive iOS device adoption and profits.  That's what it says

17   there.  I agree with that now, and that's the basic business

18   model that I have explicated in my written testimony in this

19   matter.  So I don't -- I just don't see the contradiction.

20   **Q.**  Well, Dr. Evans, this is the point at which I will have to

21   turn to confidential data.

22       **MR. SWANSON:**  So, Your Honor, I'll just provisionally

23   pass the witness at this point.

24       **THE COURT:**  And you may pass subject to that -- to

25   re-opening.

1    Redirect.

2              **THE WITNESS:**  May I just have a quick water break

3    while we --

4              **THE COURT:**  You may.

5         Whenever you are ready, Mr. Bornstein.

6              **MR. BORNSTEIN:**  Thank you, Your Honor.

7                         **REDIRECT EXAMINATION**

8    BY MR. BORNSTEIN:

9    **Q.**  Dr. Evans, let me begin with a few instances in which

10   Mr. Swanson showed you some material from your deposition in

11   an effort to impeach your testimony here today.

12        I'll start with on pages 27 and 28 of this morning's

13   transcript, you were asked a question as to whether all

14   developers on one side of the iOS app distribution market

15   are present -- are present on the developer's side of the

16   mobile OS market.

17        Do you remember that question?

18   **A.**  I do.

19   **Q.**  And do you remember you answered here in court today, "No,

20   but I can explain"?

21   **A.**  I do.

22   **Q.**  All right.  Let's just look for a moment at your

23   deposition, which you should still have in front of you.

24        Do you?

25   **A.**  I actually don't recall having my deposition.

EVANS - REDIRECT / BORNSTEIN

1    **THE COURT:**  So, Mr. Bornstein, you can't -- he can't

2    read his own deposition in court.  He needs to testify.

3    **MR. BORNSTEIN:**  That's fine, Your Honor.

4    **BY MR. BORNSTEIN:**

5    **Q.**  The -- Mr. Swanson then read to you a portion of your

6    deposition in which you answered that very same question, "In

7    principle, yes."

8        Do you recall that?

9    **A.**  I do.

10   **Q.**  All right.  Can you please give the explanation that you

11   offered to Mr. Swanson but he didn't let you give?

12   **MR. SWANSON:**  Objection, Your Honor.

13   **THE COURT:**  Well, it's -- the form is objectionable.

14   We just need the answer.  Can you tell us what the answer is?

15   This is Redirect, so now you can explain.

16   **THE WITNESS:**  Yes.  So in the -- in the smartphone OS

17   market, and just narrowing it down to developers and users who

18   are involved with iOS apps, the developer at that point in

19   time has created an app, consumers have an iPhone, they're

20   interested in getting apps.  That's the point in time.

21       Over time at various points, those developers are likely

22   to want to distribute those apps, so they probably are

23   distributing in the iOS distribution market, you know, so

24   long as they're still in business after creating the app, and

25   iOS consumers over time at various points are interested in

1    getting apps, not all at the same -- not all at the same point

2    in time.

3         So it's the same kinds of consumers and they are likely to

4    be participating in both markets, but there's nothing that

5    guarantees that they are going to be.  I mean, it could be

6    that -- I mean, there are many iOS -- there are some iOS

7    users who don't use apps very much and, therefore, at some

8    point in time, they actually may not be interested in iOS

9    app distribution services.

10   **Q.**   Well, Dr. Evans, let's take this outside of the iOS

11   universe and talk about Windows.

12   **A.**   Okay.

13   **Q.**   Are all developers on one side of the Windows OS platform

14   also on the developer side of, say, the Steam platform?

15   **A.**   No.

16   **Q.**   And why is that?

17   **A.**   So there's a whole bunch of developers who are not game

18   developers and, therefore, Steam is irrelevant.  And there are

19   many other app stores that they could turn to, including, in

20   the case of games, direct distribution.

21   **Q.**   And so if there were, counterfactually, multiple app

22   stores available on the iOS platform, would you have all the

23   same developers on the iOS platform as on the App Store

24   platform?

25   **A.**   No, of course not.  So some developers would use the iOS

1    App Store and some wouldn't.

2    **Q.**   And is there a distinction between the OS, the iOS

3    platform, and the App Store platform?

4    **A.**   A very large distinction.  One is an operating system

5    providing an app platform and the other one is a store,

6    distributor.

7    **Q.**   Mr. Swanson mentioned once or twice a subpoena that was

8    served on you, and you referred to some motion practice before

9    Magistrate Judge Hixson.

10        Did you personally resist producing any materials that

11   were requested by that subpoena?

12   **A.**   Not at all.

13   **Q.**   Do you happen to know what the subject matter of that

14   motion practice was?

15   **A.**   I believe so.  The issue was the material that I had was

16   confidential, and I didn't have the ability on my own to

17   provide confidential material.  These are the two documents

18   for the FTC that we talked about earlier today.

19   **Q.**   Speaking of the FTC, did you actually go in personally and

20   have conversations with people at the FTC about these matters?

21   **A.**   I did.

22   **Q.**   Okay.  The two-brand market in your written Direct got

23   discussed a few times.

24        Can you tell the Court what market you believe to be and

25   have opined to be is the right app distribution market that

EVANS - REDIRECT / BORNSTEIN

1   the Court should adopt here?

2   **A.**   It is the iOS app distribution market.  I believe it

3   should be the single-brand market.

4   **Q.**   Okay.  And why did you have any discussion at all in your

5   report of a two-brand market?

6   **A.**   Because the -- Apple's experts have raised the question on

7   whether it's inappropriate to define a single-brand market.

8   And my response to that was it could only be a two-brand

9   market because there is only one other operating system that

10   could be included in the market.

11       And if, for the sake of argument, one was to define a

12   two-brand market, I would still reach the same conclusion

13   because the second kind of app distribution was not a relevant

14   competitive constraint for iOS app distribution.

15   **Q.**   But the economics here lead you to conclude that the

16   proper market is, in fact, what?

17   **A.**   The iOS app distribution market.

18   **Q.**   Do you recall some questions from Mr. Swanson about

19   substitution among different types of apps?

20   **A.**   Yes.

21   **Q.**   He referred to, I think, a zombie game and a graphing

22   calculator, for example?

23   **A.**   I do recall that.

24       **MR. BORNSTEIN:**   Okay.  Can we call up Slide 7 from

25   yesterday's presentation, please?

EVANS - REDIRECT / BORNSTEIN

**BY MR. BORNSTEIN:**

**Q.** Can you explain -- do you believe that the fact that
people don't substitute zombie game transactions with graphing
calculator purchases, does that destroy your relevant market
here?

**A.** No. It's completely irrelevant.

**Q.** Okay. Can you explain why you believe that to be
completely irrelevant?

**A.** Because the market involves the provision of distribution
services to diverse apps. So the product that is the central
focus is not the apps; it's the product that is being
supplied, which, in the case of the App Store, is App Store
distribution services, and in terms of an iOS app
distribution market overall, is the provision of distribution
services to any app that is interested in using those
distribution services, and on the other side of the market,
the consumers who are looking for those apps.

**Q.** So in your market definition, what -- in the market you
have defined, what role does the developer of the zombie game
app play, for example?

**A.** They are a customer of the app -- they are a customer in
the app distribution market.

**Q.** And what role does the developer of the graphing
calculator app play?

**A.** They are a customer of the app distribution platform.

EVANS – REDIRECT / BORNSTEIN

1  **Q.** And are they any different, in terms of analyzing the

2  structure of this market, from, say, the restaurant or the

3  hardware store on the bottom part of the slide in connection

4  with Amex?

5  **A.** No, it's exactly the same. They are customers -- they are

6  all customers of a platform that is providing a common service

7  to all of them.

8  **Q.** Okay. And is it at all uncommon to have a

9  business-to-business market like this in which the customers

10 don't then compete with each other downstream?

11 **A.** It's utterly common.

12 **Q.** I'm sorry. Say that again?

13 **A.** It is utterly common.

14 **Q.** You said "utterly common"?

15 **A.** Yes.

16 **Q.** Okay.

17 **A.** I could have said very common, just to make it easier.

18 **Q.** "Utterly common" sounds too much to the court reporter

19 perhaps like uncommon. That's why I wanted to make sure the

20 record was clear.

21 **A.** Thank you.

22 **Q.** And they are in that respect no different, for example,

23 than the automobile manufacturer and the furniture

24 manufacturer here, who are customers of the steel

25 manufacturer; is that right?

EVANS - REDIRECT / BORNSTEIN

1    **A.**  That's correct.

2          **THE COURT:**  Before we leave this topic, I'm trying to

3    envision this, Mr. Evans.

4          It looks like you've got -- you know, on one side you have

5    all these developers who are developing apps.

6          **THE WITNESS:**  Yep.

7          **THE COURT:**  And then over here, you have billion -- a

8    billion set of customers.

9          And what we really have is we have a distribution

10   channel -- let's stay away from the "platform" word for a

11   moment -- but you've got a distribution channel that connects

12   these two groups.

13         With me so far?

14         **THE WITNESS:**  That's correct.

15         **THE COURT:**  It sounds like what you are saying is

16   that the connection of these two groups should have many

17   distribution channels, not just one.

18         **THE WITNESS:**  That is correct.

19         **THE COURT:**  But what Amex teaches is that really, in

20   this digital world, we have consumers and developers and in

21   between we have a platform, and so we are kind of dealing with

22   this overlay of a platform analogy.

23         And in this platform, Apple has put a toll booth and Apple

24   has said, If you want to make certain kinds of purchases,

25   you've got to go through my toll booth to get to the consumer.

1            THE WITNESS:  Or if I could interrupt there just to

2     clarify.

3         So Apple is doing two things:  It's saying that We're

4     going to be the -- our platform is going to be the only

5     distribution channel, and for our distribution channel, yes,

6     for a certain but not all -- a certain set of apps, we are

7     going to be not only the distribution -- in addition to being

8     the distribution channel for a certain set of apps, we are

9     going to erect a toll booth that charges for something else,

10    which is the transactions that the developer is doing with its

11    own consumer.

12            THE COURT:  But the platform and the channel is all

13    technology developed by the owner, and the owner of that

14    particular platform is Apple.

15            THE WITNESS:  That is correct.

16            THE COURT:  So in order for that channel to be used,

17    you have to use that technology.  That's all proprietary.

18            THE WITNESS:  That's correct.

19            THE COURT:  And they have set up various channels.

20    Some of those channels have no toll booth and some do, right?

21    But when we're looking at the market, we're looking at all of

22    these various channels that are going across proprietary

23    technology, right, to get to the consumer.

24            THE WITNESS:  I think I'm with you so far.

25            THE COURT:  And the objection is, is that on one of

1    these many channels, there's a toll booth, which doesn't exist

2    on all of them, but it exists on some of them.

3        And what you are saying is that, No, we want you to have

4    it either free or we want to develop our own channel over your

5    proprietary platform.  I'm just trying to envision what it is

6    you're saying.  That's what it sounds like you're saying.

7            THE WITNESS:  Yeah, if I could divide it into the two

8    different activities that's going on on here.  So let me just

9    try that.  Because I like the analogy to -- I like the analogy

10   to the channels.

11       One channel is app developers want to get their app into

12   the hands of consumers.  That's the distribution channel.  So

13   that's a distribution channel, and Apple has said, For iOS

14   apps, we are going to be the only distribution channel.  So

15   that's one thing that's going on.

16       Then the second thing that's going on is in addition to

17   our being the only distribution channel for apps, it is also

18   the case that now let's divide that channel into many channels

19   for something else, which are the transactions that the

20   customer who now has an app engages in with the developer

21   whose app they have, that Apple is going to set up a toll

22   booth for those particular transactions where that channel

23   within a channel are now the digital content apps.

24       So that's how I -- that's how I picture what you have just

25   said.

1          **THE COURT:**  Okay.  That time was on me,

2   Mr. Bornstein.  Go ahead.

3          **MR. BORNSTEIN:**  Thank you, Your Honor.

4   **BY MR. BORNSTEIN:**

5   **Q.**  Let me move to a -- what may be a related set of

6   questions.

7      You got some questions from Mr. Swanson this morning about

8   whether an Uber driver could choose to use her own payment

9   solution rather than one provided by Uber.

10     Do you recall that?

11  **A.**  I do.

12  **Q.**  And I think the implication was that that was supposed to

13  be an analogy to the App Store and in-app payment.

14     Do you agree with that?

15  **A.**  I agree that was the intent.

16  **Q.**  Let me give you a somewhat expanded hypothetical.

17     Suppose the Uber driver and the rider hit it off, and they

18  arrange that in the future, that driver is going to continue

19  to give that rider, you know, rides, and they exchange phone

20  numbers and maybe they set a regular schedule.

21     Would Uber require the driver, in that circumstance, to

22  continue to use its payment solution for those future rides

23  that they had arranged themselves?

24  **A.**  No.

25  **Q.**  Which one do you think is a better analogy to in-app

EVANS - REDIRECT / BORNSTEIN

1   payment, mine or Mr. Swanson's?

2   **A.**   Yours.

3   **Q.**   Okay.  Can you explain why?

4   **A.**   Because the Uber platform is providing a -- just like any

5   company is selling something to a set of customers, Uber is

6   providing a service to the riders and to the drivers, and it

7   has a payment solution for taking payment for that, which is

8   then using to divvy up between the driver and the consumer.

9   It's selling that service.

10      What you've described is something that's occurring later.

11   It's not part of that platform, it's not part of that

12   particular service; it's something that is happening

13   separately between the Uber driver and the -- between the

14   driver and the consumer.

15   **Q.**   So let's take those principles that you just articulated

16   and move them from the Uber context into the App Store

17   context.

18      Can you do that transposition for us?

19   **A.**   Yes.  In the App Store -- in the iOS distribution

20   context, there is the distribution process of the developer

21   getting the app to the consumer and all the search and

22   discovery technology and all that kind of stuff that stores

23   generally involved in -- online marketplaces and stores

24   generally engage in.

25      After that distribution has taken place, we have a

EVANS - REDIRECT / BORNSTEIN

1    consumer who has an app and -- let's say Tinder -- and we have

2    a developer who owns that app and has a relationship with that

3    customer.

4        And what IAP, then, is then for that different thing, with

5    the transactions between the developer and its own customer,

6    has, basically, a toll booth concerning --

7        **THE COURT:**  Mr. Evans, on *Fortnite*, just like your

8    Uber example, you can go to the web and get V-Bucks.  You can

9    go to Steam and get V-Bucks.  Just like in the Uber example

10   you just gave, they are not using the Uber app, right?  They

11   are not using the app itself for that subsequent transaction.

12       **THE WITNESS:**  That's correct.

13       **THE COURT:**  They made a phone call, they figured it

14   out, they've --

15       **THE WITNESS:**  Yep.

16       **THE COURT:**  -- figured out if they are going to give

17   him the physical credit card or not.

18       **THE WITNESS:**  Yep.

19       **THE COURT:**  Same thing happens in Epic Games.

20       **THE WITNESS:**  That's true.

21       **THE COURT:**  So there is nothing about that

22   distribution process that impacted differently, given your

23   Uber example, if I transpose that to Epic.

24       **THE WITNESS:**  Well, it does, really.  And the

25   difference is that if I have an iOS user -- an iOS app

EVANS - REDIRECT / BORNSTEIN

1    user of *Fortnite*, it is theoretically possible that that iOS

2    app user could go to the -- could go to their PC and buy

3    V-Bucks.  I agree that is a -- that is not just a possibility,

4    but that that sometimes happens.

5        The problem here is that two things are going on, and it

6    goes back to the discussion we had yesterday about

7    anti-steering provisions.  The iOS *Fortnite* user, Epic is

8    not able to message the iOS app user and tell them, You

9    could go to the web and get this more cheaply, or, I really

10   encourage you to go to the web and get V-Bucks there.

11       So the problem here is a combination of both requiring

12   Epic to use the IAP in the iOS *Fortnite* app, in combination

13   with also putting a whole set of barriers that doesn't make it

14   impossible, but that makes it much more difficult for Epic to

15   communicate to the iOS app user that they have another

16   alternative to go to.

17           **THE COURT:**  So if there was no anti-steering

18   provision, then that would be fine, because then the customer

19   could choose whether they wanted to stay and make the purchase

20   on the app or do it some other way, right?

21       Because, of course, antitrust law doesn't compare -- care

22   about Epic Games; it can -- it cares about competition.  It

23   cares about the consumer.

24           **THE WITNESS:**  I would agree with you with one

25   important qualification.

EVANS – REDIRECT / BORNSTEIN

1          **THE COURT:**  Okay.

2          **THE WITNESS:**  There are certain apps where what

3    you've just described is right at the time -- for the time

4    being in the sense that there is a web version of the app and

5    it's possible to message people to go to the web app and so

6    forth.  And in that case, if the anti-steering provisions went

7    away, that wouldn't -- that wouldn't eliminate the market

8    power that Apple has here, but it would certainly diminish it.

9       There are many, many other apps, including game apps, for

10   which it would not be -- would not be much of a solution at

11   all.

12      So, first of all, there are apps where there is no PC --

13   where there is no PC version, and then there are,

14   furthermore --

15         **THE COURT:**  Have you done any study on this -- that

16   is, in terms of quantification, given that most apps are free

17   and things like that -- have you done any real analysis, or

18   was this your thinking about it overnight in response to my

19   questions?

20         **THE WITNESS:**  No --

21         **THE COURT:**  Which?

22         **THE WITNESS:**  Yeah, I've been working in this area

23   for a long time, so if you're asking me whether I did a

24   specific study in the course of this case, I have seen data in

25   this case concerning the extent to which game apps are

EVANS – REDIRECT / BORNSTEIN

1    available on PCs.  So I've seen that data on game apps,

2    about -- actually, this is in Professor Hitt's report -- he

3    reports that 74 percent of game apps -- I'm sorry, 74 percent

4    of the top -- the top downloaded apps on iOS are also

5    available on PCs.  But -- you know, so I have seen data on

6    that.

7        But the other category that I was going to mention are

8    situations where a consumer is out and about and they are

9    interested in -- they are interested in buying something,

10   using their -- using their app.  So it's true that later on

11   they could go to their PC and do that, but when they are out

12   and about, then it is not convenient for them to do that.

13           THE COURT:  Right.  But being out and about, using a

14   mobile device for which someone has proprietary software, for

15   someone who invested the capital to create that software,

16   what's so bad about that?

17           THE WITNESS:  I'm not sure I follow that.

18           THE COURT:  Well, if they have the -- if they want to

19   wait, if they are the kind of person who is judicious with

20   their money and they want to wait until they get home, they

21   can wait; but if they want convenience, isn't that a fine

22   option for the consumer?  And, in fact, isn't it a fine option

23   for both parties; that is, the developer and the owner of the

24   software?

25           THE WITNESS:  I think in a lot of cases, it is not a

1    good option because, as I testified yesterday and as I go

2    through in my written testimony, while I take the point that

3    there are circumstances where using an app on a PC and moving

4    back and forth between a smartphone and PC, that that is an

5    option for people, by and large, in the world we live in now,

6    where it is smartphone based and app based for much of what

7    people do, I don't believe that's really a -- really a

8    realistic option.

9        It is not no option, so I don't want to go so far as to

10   say that it's not an option at all, but I am saying that in

11   terms of the world we live in now, it is not a great option,

12   and it is not a great source of substitution available to

13   smartphone -- to iOS users and iOS app developers.

14           **THE COURT:**  Proceed.

15           **MR. BORNSTEIN:**  Thank you, Your Honor.

16   **BY MR. BORNSTEIN:**

17   **Q.**  Let's move to a different subject.

18       You had some questions with Mr. Swanson about whether

19   Apple was a competitor in the field of payment solutions or

20   payment processing --

21   **A.**  Yes.

22   **Q.**  -- that shifted between the two.

23           **MR. BORNSTEIN:**  Can we call up Slide 37, please?

24   **BY MR. BORNSTEIN:**

25   **Q.**  Can you explain whether Apple would be a competitor for

1    payment solutions in the but-for world that you have used to

2    analyze the IAP restriction here.

3    **A.**   I believe it would be.  In the absence of the IAP

4    requirement, Apple had -- I haven't denigrated Apple's payment

5    solution.  I mean, it's -- for some developers, it's a great

6    solution.  I assume that in the but-for world, Apple has the

7    ability to compete on the merits, offer its own payment

8    solution, and would do so in competition with the payment

9    solutions that developers can create themselves or get from --

10   as a -- on a turnkey basis.

11   **Q.**   So you said on what kind of basis?

12   **A.**   Turnkey.

13   **Q.**   Turnkey?

14   **A.**   Yeah.

15   **Q.**   There were a number of questions about when Apple, in your

16   view, acquired market power in certain markets.

17       Do you recall those?

18   **A.**   I do.

19   **Q.**   Is it unusual in antitrust economics for conduct that is

20   engaged in by a firm without market power to be treated

21   differently from conduct that is engaged in by a firm that

22   does have market power?

23   **A.**   I guess I would characterize that as the intersection of

24   antitrust economics and antitrust law.

25   **Q.**   All right.  Well, let me not have you venture into law.

1    **A.**  I prefer not.

2    **Q.**  Good.  I'm sure the judge would prefer not, as well.

3          **THE COURT:**  Well, I'd just stop him.

4    BY MR. BORNSTEIN:

5    **Q.**  But to that end, let me ask you a question, because I fear

6    that did happen on cross-exam.

7          You were asked a question about whether Apple's choices

8    when it got to 2010 were either to stop licensing or to

9    license to everyone.

10         Do you recall that question?

11   **A.**  I do.

12         **MR. SWANSON:**  Objection, Your Honor.  The question

13   was about competitive options, not unadorned choices.

14         **THE COURT:**  You can recross.

15   BY MR. BORNSTEIN:

16   **Q.**  Do you and can you offer a legal opinion on that question

17   as to what Apple's permissible antitrust choices were at that

18   point in time?

19   **A.**  I can't and shouldn't offer legal opinion.

20   **Q.**  And is that what you were doing here today, offering a

21   legal opinion?

22   **A.**  I hope not.

23   **Q.**  Okay.  You were also asked some questions about whether

24   output had grown in app distribution.

25         Do you remember that?

EVANS - REDIRECT / BORNSTEIN

1    **A.**   I do.

2    **Q.**   And you had a bit of a discussion about whether or not

3    there was a precise definition of "output" that was being

4    used.

5        Do you recall that?

6    **A.**   I do.

7    **Q.**   Is it possible as an economist to look at the trajectory

8    by which a particular market has grown and form a definitive

9    view just on that basis, as to whether or not there have been

10   anticompetitive effects in that market?

11   **A.**   Of course not.

12   **Q.**   What's missing in terms of a step in that analysis?

13   **A.**   To determine whether there's a causal relationship between

14   conduct and anticompetitive effects is necessarily --

15   necessary to compare a but-for world in which that conduct

16   does not occur and an actual world in which it does.  So the

17   anticompetitive effects is based on the difference between the

18   but-for world and the actual world.

19   **Q.**   And can you think of other instances that you've

20   researched in your time as an economist where there have been

21   anticompetitive effects in a fast-growing market?

22   **A.**   Well, it's -- I would say there -- I can't identify any

23   particular -- well, so let me give you an example.

24       So a fast-growing market has historically been

25   telecommunications for a long period of time.  So many, many

EVANS - REDIRECT / BORNSTEIN

1    years ago when I was much younger, I worked on the AT&T case

2    for the U.S. Department of Justice and their allegations of

3    anticompetitive behavior by AT&T.  And that led to a

4    decision -- that led to a settlement that broke up AT&T.

5         But during -- you know, during the entire course of the

6    20th Century, there was a rapid growth in telecommunication

7    services, rapid growth in the quality of telecommunication

8    services, but that doesn't mean that there couldn't be

9    anticompetitive conduct, nor does it mean that the world

10   wouldn't be even better once that anticompetitive conduct is

11   eliminated.

12   **Q.**  Mr. Swanson asked you a few questions -- maybe more than a

13   few questions -- about prior writings that you had offered on

14   the subject of accounting profits and economic profits.

15        Do you recall that?

16   **A.**  I do.

17   **Q.**  Okay.  And Mr. Swanson read you a few sentences from

18   things that you had written, correct?

19   **A.**  He did.

20   **Q.**  And you said to him at one point that the sentences he

21   was -- that a particular sentence he had read you did not

22   reflect your general view as had been expressed in your

23   writings on the relevance of accounting profits to economic

24   profits.

25        Do you remember that?

EVANS - REDIRECT / BORNSTEIN

1    **A.**   I do.

2    **Q.**   Can you explain what you meant when you said that the

3    sentence that Mr. Swanson had plucked out of your writings did

4    not reflect your general view?

5    **A.**   I don't remember the particular sentence.  I do remember

6    my general view expressed in my writings, which is that it's

7    important to be cautious in interpreting accounting profits,

8    but that they -- but that doesn't mean that they can't be

9    used.

10   **Q.**   Well, Mr. Swanson focused you specifically once or twice

11   on shared costs and joint costs.

12        Do you recall that?

13   **A.**   Yes.

14   **Q.**   And I think the implication of those questions may have

15   been that -- well, I won't state the implication.

16        Do you remember questions about whether there is an

17   economically meaningful way to allocate shared costs and joint

18   costs?

19   **A.**   I do remember that question and answer.

20   **Q.**   Okay.  Given your understanding of the economics on that

21   issue, can you explain to the Court why it is that you do

22   believe, as you testified yesterday, that Apple's profits in

23   the App Store are relevant to whether or not Apple has

24   monopoly power in app distribution for iOS?

25   **A.**   Because I've reviewed -- I've reviewed profit and loss

1    statements, together with the testimony and other information

2    regarding those profits and information regarding the

3    existence of costs that need to be allocated.  So I've been

4    able to form an opinion that is informed by the information

5    that's in the record.

6    **Q.**  Okay.  Well, is it always the case that accounting profits

7    are a bad measure of economic profit?

8    **A.**  No.

9    **Q.**  And is it always the case that accounting profits are a

10   bad measure of monopoly power?

11   **A.**  No.

12   **Q.**  And are there tools that economists have to figure out

13   which case is which?

14   **A.**  Yes.

15   **Q.**  Have you done that here?

16   **A.**  Yes.

17   **Q.**  And have you explained that both yesterday and in your

18   written testimony?

19   **A.**  Yes.

20        **MR. BORNSTEIN:**  All right.  I think it's time for me

21   to turn the witness back over to Mr. Swanson.

22        **THE COURT:**  All right.  Recross on the scope of his

23   redirect.

24        **MR. SWANSON:**  I'll be brief.

25                          **RECROSS-EXAMINATION**

**BY MR. SWANSON:**

**Q.**   Dr. Evans, you said that Epic is not able to message iOS

app users to buy on the web.

    First of all, do you believe Epic has any desire to convey

to its customers generally that they can make buys on other

than an impulse basis?

**A.**   There was a first part of your question that I just wanted

to clarify, because if I said it in the way you said it, I

just want to make sure that I didn't say something

incorrectly.

    So when I referred to Epic's ability to message, I was

referring to Epic's ability to message within the iOS app

itself.  And if I didn't say that clearly on redirect, I

apologize, but that's what I intended to be talking about with

regard to the anti-steering restrictions.

**Q.**   Okay.  And I appreciate that clarification, because I've

written down exactly what I asked in my question.  So that

clarification is what I was seeking.

    Now, the provision that Apple has in its rules says that

there can be no call to action in the app, right?

**A.**   That's correct.

**Q.**   And it also says there can be no link in the app; is that

correct?

**A.**   That's correct.

**Q.**   And it says there can't be a button in the app.

1    **A.**   That's correct.

2    **Q.**   Now, do you think that a platform owner should be

3    required, as a matter of competitive activity, to advertise

4    the options that are available to the consumer in --

5         **MR. BORNSTEIN:**   Objection.

6    **BY MR. SWANSON:**

7    **Q.**   -- its own store?

8         You do?

9    **A.**   I didn't say anything.

10        **MR. BORNSTEIN:**   That was me.  I was just objecting to

11   the legal conclusion requested here.

12        **THE COURT:**   Well, I am not taking it for a legal

13   conclusion.

14        You can answer.

15        **THE WITNESS:**   It depends upon -- it depends upon the

16   context.  In the particular case here, the anti-steering

17   provisions on viewing as is facilitating practices, so they

18   are preventing a way to bypass -- bypass a tie that I view as

19   anticompetitive.

20        There could be other situations in which what you

21   described is perfectly innocuous, but in the context here,

22   it's, in my view, not innocuous at all.  It's tied up

23   intimately with the conduct that we're focused on here.

24   **BY MR. SWANSON:**

25   **Q.**   You agree that Epic, if it chose to, could take out an ad

EVANS – RECROSS / SWANSON

1    in the Wall Street Journal, to say, Buy V-Bucks on our

2    website, right?

3    **A.**   I do.

4    **Q.**   Epic could buy time on radio, television, internet

5    advertising to convey that message if it desired to do so,

6    correct?

7    **A.**   I do.

8    **Q.**   And you understand that Epic has only relatively recently

9    made web purchases available, don't you?

10   **A.**   I do.

11   **Q.**   Why do you think Epic didn't do that earlier?

12          **MR. BORNSTEIN:**   Objection, Your Honor.  Calls for

13   speculation.

14          **THE WITNESS:**   I don't know.

15   **BY MR. SWANSON:**

16   **Q.**   Do you have any economic insight into why Epic didn't make

17   its V-Bucks available on the web earlier in time?

18   **A.**   I don't.

19          **MR. SWANSON:**   Your Honor, that's what I've got,

20   subject to the --

21          **THE COURT:**   Okay.  Anything on those questions,

22   Mr. Bornstein?

23          **MR. BORNSTEIN:**   Nothing on those questions, Your

24   Honor.

25          **THE COURT:**   All right.  At this point, the Court will

1   seal the courtroom.  Let's see.  Mr. Rifkin, you may remain.

2   If I can have the press leave the courtroom, please,

3   Ms. Aktins.

4           (Sealed proceedings were heard on next page.)

1          (Proceedings under seal concluded.)

2          (Proceedings resume in open court.)

3                        **EXAMINATION**

4          **THE COURT:**  When you went to the FTC in 2016, what

5     was your purpose?

6          **THE WITNESS:**  I was retained by a -- by an app

7     developer who I believe has been disclosed in the redacted

8     documents as a streaming music provider.  That entity believed

9     that Apple had engaged in anticompetitive behavior with

10    respect to its business, and I was retained by them in much

11    the same capacity that I have been retained here to provide

12    economic analysis.

13        And as part of that process, I did a variety of work

14    regarding both market definition, but also the anticompetitive

15    effects of Apple's behavior.

16        And although, as is normally the case when one goes in to

17    the FTC as a complainant, it was preliminary, the purpose was

18    to talk to the FTC and provide background on why at least

19    based on the evidence that was available at the time, I

20    believed that Apple had engaged in anticompetitive conduct

21    with respect to a competing app.

22        So this is a situation where it's a music-streaming

23    provider that is competing with Apple music that had been

24    introduced about a year earlier before the FTC presentation.

25          **THE COURT:**  So the market definition was not

EVANS – EXAMINATION / COURT

1    identical to the market definition that you created here,

2    correct?

3            THE WITNESS:  It is not.  It's not --

4            THE COURT:  And the reason that you changed the

5    definition, even though they are both apps, is because there,

6    the circumstances were different.

7            THE WITNESS:  It's a combination of the circumstances

8    were different and the conduct to be analyzed was different.

9            THE COURT:  So you would agree that the Court -- and

10   any court -- when we're assessing these issues, we have to

11   look at the situation that is presented to us, correct?

12           THE WITNESS:  Absolutely.  Have to look at the

13   conduct.

14           THE COURT:  And did the FTC take action based upon

15   your recommendation?

16           THE WITNESS:  As far as I know, the FTC, at least at

17   this point in time, has not taken action.

18           THE COURT:  So they have declined and it has been

19   five years?

20           THE WITNESS:  I do not -- I do not know that.

21           THE COURT:  You don't know one way or the other.

22           THE WITNESS:  I do not.

23           THE COURT:  All right.  Anything on that,

24   Mr. Bornstein?

25

1

2                    **FURTHER REDIRECT EXAMINATION**

3     **BY MR. BORNSTEIN:**

4     **Q.**   In responding to the Court's question about whether the

5     Court needs to take account of the circumstances presented,

6     you said it is important to take account of the conduct at

7     issue.

8          Can you explain a little bit more what you meant by

9     referring to the "conduct at issue"?

10              **THE COURT:**  Well, that −− okay.  Go ahead.

11              **THE WITNESS:**  Well, the starting point for any

12    analysis is the conduct at issue, but I agree with the Court,

13    is the conduct at issue in the context of the, you know,

14    specific facts of the industry and all the issues that

15    surround that.  So the analysis has to be particular to the

16    case.

17    **BY MR. BORNSTEIN:**

18    **Q.**   Okay.  And does the market definition analysis, as an

19    economic matter, depend on who the plaintiff is?

20    **A.**   It does not.

21              **MR. BORNSTEIN:**  Nothing else, Your Honor.

22              **THE COURT:**  Go ahead.

23                    **FURTHER RECROSS-EXAMINATION**

24    **BY MR. SWANSON:**

25    **Q.**   In the complaint to the FTC, one of the issues that you

EVANS – FURTHER REDIRECT / BORNSTEIN

1    discussed was anti-steering, was it not?

2    **A.**   That's correct.

3    **Q.**   And that's something you've been discussing today and

4    yesterday in your testimony, correct?

5    **A.**   Yes.

6    **Q.**   And one of the issues raised by the complainant in that

7    instance in 2016 was alleged self-preferencing by Apple,

8    correct?

9    **A.**   That's correct.

10   **Q.**   And you've added -- you have a ten-page section of your

11   opening report on self-preferencing, don't you?

12   **A.**   I do.

13   **Q.**   And you have addressed self-preferencing in your written

14   direct, have you not?

15   **A.**   That's correct.

16          **MR. SWANSON:**  No further questions.

17          **THE COURT:**  Okay.

18          **MR. BORNSTEIN:**  If I may, Your Honor?

19          **THE COURT:**  You may.

20                    **FURTHER REDIRECT EXAMINATION**

21   BY MR. BORNSTEIN:

22   **Q.**   Do you know, Dr. Evans, whether any other competition

23   agencies have taken action with respect to the issues

24   presented in your matter to the FTC?

25          **MR. SWANSON:**  Objection.  U.S. agencies?

1          **THE COURT:**  So have you met with anyone else?

2          **THE WITNESS:**  I have.

3          **THE COURT:**  Okay.  Well, I need foundation.

4          **MR. BORNSTEIN:**  Okay.

5     BY MR. BORNSTEIN:

6     **Q.**  Dr. Evans, in addition to the FTC, have you spoken to or

7     provided submissions to any other antitrust regulators on the

8     subject of the complaint in the FTC presentation?

9     **A.**  Yes.

10    **Q.**  And can you tell the Court whether any of those other

11    antitrust regulators have actually chosen to initiate some

12    kind of action on that issue?

13    **A.**  Yes.

14    **Q.**  Can you identify the specific regulator?

15    **A.**  The European Commission.

16         **MR. SWANSON:**  Objection, Your Honor.  The non-U.S.

17    submissions by Dr. Evans were not produced in response to the

18    order by Magistrate Judge Hixson on the ground that they were

19    not relevant.

20         **MR. BORNSTEIN:**  That is incorrect, Your Honor.  I

21    reached an agreement with counsel for Apple that we would not

22    have to produce the European presentation, which is identical

23    to the FTC presentation, because the European Commission

24    otherwise would have sought to intervene.  And Apple decided

25    that it would prefer not to cause that to happen.

1          **THE COURT:**  Everybody knows that particular fact, so

2    it's fine.

3          It would be my intention to unseal the portion of the

4    transcript beginning with my questions, because there was

5    nothing sealable, nor were there any -- any of your questions

6    in response sealable related to those.

7          Any objection?

8          **MR. SWANSON:**  No objection.

9          **MR. BORNSTEIN:**  No, Your Honor.

10         **THE COURT:**  All right.  So the court reporter is

11   instructed that once the Court started asking questions, that

12   portion of the transcript will be unsealed.

13         The courtroom can be unsealed at this point, and that's

14   all for Mr. Evans.

15         Okay.  Let's go ahead and open -- Ms. Dunn, can you open

16   those doors, let them back in.

17         Sir, you may -- you're excused.

18         **THE WITNESS:**  Thank you very much, Your Honor.

19         **THE COURT:**  Do I have the public back in and the

20   attorneys.

21         For those coming into the courtroom and for the public and

22   media, the Court did ask a series of questions which I do not

23   believe warrant sealing.  When the transcript comes out, those

24   portions have been deemed unsealed.

25         We are at 12:33.  We are going to go ahead and we're going

1    to take our break.

2         Who will be the next witness up, Ms. Forrest?

3         **MS. FORREST:**  Your Honor, our next witness will be

4    Dr. Susan Athey.

5         **THE COURT:**  Okay.  We will do Dr. Athey after our

6    second break, so we'll stand in recess until 1:15.  Thank you.

7

8         (Recess taken at 12:33 p.m.; resumed at 1:15 p.m.)

9         **THE COURT:**  Okay.  We are back on the record.  The

10   record will reflect the parties are present.

11        Counsel, your next witness.

12        **MR. EVEN:**  Thank you, Your Honor.  Yonatan Even for

13   Epic Games.  Epic Games at this time calls Professor Susan

14   Athey to the stand.

15        **THE COURT:**  All right.

16        **MR. EVEN:**  Thank you very much.

17        **THE CLERK:**  I will have you stand up and I'll swear

18   you in.

19        (**SUSAN ATHEY,** called as a witness for the Plaintiff,

20   having been duly sworn, testified as follows:)

21        **THE WITNESS:**  I do.

22        **THE CLERK:**  All right.  Please be seated.

23        And then if you will get your mask on.  If you will adjust

24   the mic so that it's -- yeah, kind of goes underneath your

25   shield there.

1          All right.  And then please state your full name and spell

2    your last name.  And let me turn on your microphone.

3               **THE WITNESS:**  Susan Carleton Athey.  It's A-T-H-E-Y.

4               **THE COURT:**  Good afternoon.

5               **THE WITNESS:**  Good afternoon.

6               **THE COURT:**  You may proceed.

7          **MR. EVEN:**  Thank you, Your Honor.

8                              **DIRECT EXAMINATION**

9    **BY MR. EVEN:**

10   **Q.**  Good afternoon, Professor Athey.

11        Before we get into your direct examination, you provided a

12   written -- a written portion of your testimony in this case?

13   **A.**  I have.

14              **MR. EVEN:**  Your Honor, may I approach?

15              **THE COURT:**  You may.

16              **MR. EVEN:**  Thank you, Your Honor.

17   **BY MR. EVEN:**

18   **Q.**  Professor Athey, if you turn to the first tab in the

19   binder I just handed you.  And behind it is -- if you can

20   confirm -- is what seems like a true and correct copy of your

21   written direct testimony?

22   **A.**  It is.

23              **MR. EVEN:**  Your Honor, at this time, we ask to move

24   Professor Athey's direct testimony into evidence.

25              **THE COURT:**  All right.  The -- any objections or

```
 1   anything -- everything has been resolved; is that correct?
 2            MR. EVEN:  I believe so, Your Honor.
 3            MS. DUNN:  Your Honor, same objection as --
 4            THE CLERK:  Let me turn on the mic.
 5            MS. DUNN:  Your Honor, same objection as yesterday
 6   with Dr. Evans, just to whether there will ultimately be a
 7   factual basis for the opinions.  Otherwise, all other issues
 8   have been resolved.
 9            THE COURT:  Okay.  Well, then, as with the others,
10   I'll admit it once we have all these issues resolved.
11   Otherwise, it does not get admitted yet.
12        Proceed.
13            MR. EVEN:  Thank you, Your Honor.
14   BY MR. EVEN:
15   Q.  Professor Athey, what is your occupation?
16   A.  I'm the economics of technology professor at the Stanford
17   Graduate School of Business.
18   Q.  Thank you.
19        And have you prepared a demonstrative slide that
20   summarizes your background?
21   A.  I have.
22            MR. EVEN:  If I can bring up that slide.  Thank you.
23   BY MR. EVEN:
24   Q.  Can you please describe your educational background.
25   A.  Yes.  I have a bachelor's degree in economics, computer
```

ATHEY – DIRECT / EVEN

1   science, and mathematics from Duke University and a Ph.D. in

2   economics from Stanford.

3   **Q.**   And when did you receive your Ph.D. from Stanford?

4   **A.**   In 1995.

5   **Q.**   How long have you been a professor?

6   **A.**   I've been a professor since then at Harvard, MIT, and

7   Stanford.

8   **Q.**   And how long have you now been at Stanford?

9   **A.**   Most recently, since 2013.

10  **Q.**   Have you won any awards, Professor Athey?

11  **A.**   I have.

12  **Q.**   Which awards have you won?

13  **A.**   I'm an elected member of the National Academy of Science,

14  and I've received the John Bates Clark Medal from the American

15  Economic Association.

16  **Q.**   And what is the John Bates award?

17  **A.**   It's for the economist -- American economist under the age

18  of 40 who has made the most significant contribution to

19  thought and knowledge.

20  **Q.**   Do you have a particular area of focus for your research

21  as a professor?

22  **A.**   Yes.  Generally, industrial economics, the economics of

23  digitization, the economics of platforms and marketplace

24  design, and the intersection of machine learning and

25  econometrics.

ATHEY - DIRECT / EVEN

**Q.** Have you taught any courses related to the economics of platforms?

**A.** Yes.  I've taught a variety of courses to master students and Ph.Ds and MBAs, including the economics of digitization, topics in digital business, marketplaces for goods and services, the economics of digital platform markets.

And, broadly, these classes study the forces that -- sources of profits for firms, the tactics that incumbents use, and strategies that entrants might use to come into these markets.

**Q.** Thank you.

Do you do any work outside of academia?

**A.** I do.

**Q.** And can you please summarize for the Court your nonacademic work experience.

**A.** Yes.  I was consulting chief economist for Microsoft for several years.

After that, I've served on boards of directors for a variety of companies, including Expedia, which is a platform for travel services; Rover, which is a platform for pet-related services, such as dog sitting; Turo, which is a platform for peer-to-peer car sharing; and some others.

I also advise a couple of venture capital firms on their investments in technology-related businesses.

**Q.** Thank you.

ATHEY – DIRECT / EVEN

1      I see on the slide at the very bottom, it says "California

2   Governor's Council of Economic Advisors.

3      What is that?

4   **A.**  That's a committee of academic economists who advise the

5   governor of California on policy issues.

6   **Q.**  Have you ever been retained as an economist by any

7   government agencies?

8   **A.**  Yes, I have, by the Department of Justice and the Federal

9   Trade Commission.

10  **Q.**  And have you ever presented to antitrust regulators in the

11  U.S. or outside of the U.S.?

12  **A.**  Yes, in many jurisdictions, including the United States,

13  Europe, Canada, and others.

14  **Q.**  Thank you.

15      **MR. EVEN:**  Your Honor, at this time, Epic Games

16  tenders Professor Susan Athey as an expert in industrial

17  organization, platform economics, and the economics of

18  technology.

19      **THE COURT:**  Any objection?

20      **MS. DUNN:**  No objection.

21      **THE COURT:**  She's admitted as such.

22      **MR. EVEN:**  Thank you, Your Honor.

23  BY MR. EVEN:

24  **Q.**  Professor Athey, what have you been asked to do in this

25  case?

1          **THE WITNESS:**  Can you go to the next slide, please.

2      So my assignment was to analyze whether Apple's conduct

3   affects the competition faced by Apple's smartphone operating

4   system platform and, further, to consider how middleware

5   affects competition between mobile platforms and if Apple's

6   conduct impedes the development of middleware.

7   **BY MR. EVEN:**

8   **Q.**  And did you reach any conclusions?

9   **A.**  I did.  So at a high level, I have three main opinions.

10      The first is that --

11          **THE COURT:**  And to the extent you can, we tend not to

12   read.

13          **THE WITNESS:**  Yes.

14          **THE COURT:**  Try to just testify.

15          **THE WITNESS:**  Thank you.

16          **THE COURT:**  Go ahead.

17          **THE WITNESS:**  At a high level, switching and mixing

18   and matching costs are locking consumers in to the iOS

19   ecosystem.

20      Second, middleware is something that can meaningfully

21   reduce these costs for both users and developers.

22      And, third, restrictions that are imposed by Apple block

23   users and developers from using this middleware, and that has

24   a consequence that Apple can retain its market power over both

25   users and developers.

1    **BY MR. EVEN:**

2    **Q.**  So you start by talking about switching costs, so let's

3    start with that.

4              **MR. EVEN:**  And if we can go to the next slide.

5    **BY MR. EVEN:**

6    **Q.**  What are switching costs?

7    **A.**  Basically, switching costs are just the costs that you

8    bear when you leave one platform, like in this case iOS, and

9    go to a different platform, like Android.

10   **Q.**  So let's take a look at the steps that you have here on

11   the slide, and let's start with the first step.

12        Can you explain the first step that a user switching from

13   iOS to Android needs to take, as portrayed on the slide.

14   **A.**  So, first, a user has been consuming services with their

15   iOS, and so they are going to need to look and see, for each

16   of their apps, whether they can find those apps on Android.

17        Now, a typical user has more than a hundred apps, so they

18   need to determine for each one if they can find them on

19   Android.

20   **Q.**  At the time that the user is considering buying, for

21   instance, a Samsung Galaxy phone, why wouldn't the user

22   already know whether their apps are available on Android or

23   not?

24   **A.**  So when they are consuming an app on iOS, Apple's

25   restrictions prevent the developer from informing the user

ATHEY – DIRECT / EVEN

1    about what other platforms they might find that app on.

2        So they can't tell just from looking at their apps on

3    their iPhone where else they might be able to find that, in

4    particular, in this case, Android.

5    **Q.**  Going to the next step, you talk about identifying

6    alternatives.

7        What are you referring to in that step?

8    **A.**  So not every app that they have on iOS might be available

9    on an Android.  And so if there is an app that is not

10   available on Android, they would need to do the research to

11   figure out which new app they might buy.

12       Now, they've already made a purchase and own that app on

13   iOS, so they're going to be incurring a new cost to receive

14   similar services.  They will need to compare and determine

15   which app provides similar functionality and do a cost-benefit

16   analysis for their new purchase.

17   **Q.**  And can you provide the Court with an example of an app

18   that exists on iOS but doesn't exist on Android, for

19   example?

20   **A.**  Yes.  So one example is the Moleskine Flow, and this is an

21   app that students might use to take notes or draw figures or

22   diagrams in class.  And this app is available on the iOS,

23   but it's not available on Android.

24   **Q.**  Turning to the third step on this slide, you talk about

25   purchase, repurchase, and reinstall.  So let's take these one

1    by one.

2        What do you mean by "purchase."

3    **A.**  Well, so when you are buying a different app to replace

4    the functionality, then you need to buy it.  That's the

5    purchase.

6    **Q.**  And what do you mean by "repurchase"?

7    **A.**  So for other apps, you've purchased it on the iOS, but

8    if you -- even if the same app is available on Android, you

9    would need to purchase it again, pay that same price or

10   similar price for that app on Android, even though you already

11   bought it on iOS.

12       So an example like that would be *Minecraft*.  *Minecraft* is

13   a game where you pay before you download it.  If you had done

14   that, say paid 6.99 on iOS and purchased it, you own it on

15   iOS.  If you go to Android and you want *Minecraft*, you will

16   pay 6.99 again to have the game on Android.

17   **Q.**  Then you mentioned reinstalling or installing.

18       Which apps would you need to reinstall on the Android

19   device?

20   **A.**  All of them.

21   **Q.**  Let's go to the last step, "Transfer of app-related data."

22       What is that referring to?

23   **A.**  Well, so in some cases, transferring app-related data

24   might not be possible.  So with Moleskine, I have a library of

25   notes and drawings and sketches that I made while taking notes

1    in class, and so given that I won't have Moleskine, I can't

2    transfer that data.

3        But for other apps, you might have in-app purchases.  You

4    might have made progress, settings, customized it to your own

5    experience.  If you are in a game, you might have progressed

6    through levels or spent time earning yourself up.  And that's

7    the kind of data that could be transferred if possible.

8    **Q.**  What if you were buying a subscription -- and I apologize

9    for the East Coast example -- but let's say I have *The New*

10   *York Times* subscription that I bought through the App Store on

11   my iPhone.

12       What happens to that subscription if I want to switch to a

13   Galaxy phone from Samsung?

14   **A.**  So if I purchased that subscription on my iPhone, I need

15   to continue to manage that subscription through Apple, even

16   though I no longer have an Apple device to manage the

17   subscription.

18       So I might need to find a different device and go to the

19   website, for example, and log in to Apple.  If I needed to

20   update my credit card or, say, add a feature, some extra

21   payment for, I don't know, a crossword puzzle, something like

22   that, on the *New York Times*, I would need to still go back to

23   Apple to manage that, even though I now have an Android device

24   and that's where I'm using it.

25           **THE COURT:**  Really?  I thought you could just go --

1   well, I guess I don't know Androids, but if it went the other

2   way, I thought all these subscription services just asked you

3   to put in your I.D. number, your password, and then it was

4   accessible.

5        **THE WITNESS:**  So that depends on which kind of

6   service and what kind of account management system the app has

7   created.

8        So you might be thinking of an experience like *Netflix*,

9   where you've signed up for *Netflix*, say through a browser, and

10  then when you log in to *Netflix* on the Android or the

11  iPhone --

12        **THE COURT:**  I'm talking about *The New York Times*.

13        **THE WITNESS:**  -- you can get that.

14       But so for the *New York Times*, you might have bought the

15  subscription in different ways.  So if you bought it

16  originally through the web, then the *New York Times* is

17  managing your subscription.

18       And so you've entered your payment details with *The New

19  York Times*, and then you could -- say you bought it a long

20  time ago on the web and now you want to use it on Android, you

21  would then authenticate that way.

22       But if you purchase a subscription through Apple, then

23  Apple has the payment information, and Apple's restrictions

24  would require, for example, that only Apple could provide a

25  refund or, you know, any other services around that payment.

ATHEY - DIRECT / EVEN

1            So if you didn't have a computer, for example, or you

2    didn't have easy access to one, then what you might want to do

3    is instead manage it through an Android app.  At that point,

4    you would go to the Apple website.  When the subscription runs

5    out, you can cancel the subscription there and then create a

6    new subscription a different way.

7            **THE COURT:**  I see.  Thank you.

8    **BY MR. EVEN:**

9    **Q.**  Looking at the four steps that you've just laid out on

10   this slide, Professor Athey, how does this process compare to

11   the replacement of an older iPhone with a newer iPhone?

12   **A.**  It's very different.  If you upgrade to a new iPhone, all

13   of your apps automatically install and the app-related data is

14   automatically passed over in almost every case.

15           So you pick up your new iPhone, the apps are installed.

16   You haven't had to search for any of them.  Your app-related

17   data would also be transferred, your subscriptions, and so you

18   would just pick up right where you left off with the new

19   phone.

20   **Q.**  Thank you.

21           I believe in your conclusions, you also mentioned

22   something that you referred to as "mixing and matching costs."

23           What are mixing and matching costs?

24   **A.**  Yes.

25           **THE WITNESS:**  Can we go to the next slide, please.

1        So, broadly, this is just the cost to users of accessing

2   apps and services on multiple devices with incompatible

3   operating systems.

4   **BY MR. EVEN:**

5   **Q.**   And could you explain what you show in this scenario on

6   the slide here as it relates to mixing and matching costs?

7   **A.**   Sure.  So at different times of day, you're going to have

8   access to different devices or different devices may be more

9   convenient to you or, you know, devices may be shared within a

10  family, so you don't always have access to the same device.

11       So if you were in the park in the morning, you might have

12  access to an iPhone.  At a different time of day, say in the

13  afternoon, you might be doing productivity-related activities,

14  say on a laptop with a larger screen and a keyboard, where you

15  can input information.  And then at night before bed, you

16  might want a medium-size screen to read a book with larger

17  print or to watch a show.

18       So you'll be actively engaged with different devices for

19  different reasons, but you still might like to have access to

20  things like communications or apps that -- where you might

21  need to access information that had shared data, et cetera, at

22  these different places.

23       And so the mixing and matching costs here would be the

24  costs associated with trying to access those from different

25  platforms.

1   **Q.**   So can you speak to the bullet points on the right?   What

2   are the costs that you have identified here?

3   **A.**   Well, so just for example, suppose that I have an iPhone

4   and I'm considering using a cheaper Android tablet for my

5   evening videos.   If I wanted to also be able to, you know,

6   access communications or things like that, then I would need

7   to think about identifying and locating cross-platform apps,

8   apps that would work across the iOS and Android.

9       And if I wanted any services on both of them, I would need

10   to repurchase apps as I described before.   So similar to the

11   switching scenario, but now I'm using different device types.

12   **Q.**   So you mentioned that this can happen within families.

13   Have you prepared a slide explaining what are mixing and

14   matching costs within a family?

15   **A.**   Yeah, so families are a very common example.   There's

16   other groups where this occurs too.

17       And in this kind of scenario, a family might acquire

18   different devices over time, so you might start out a parent

19   has a personal phone.   Maybe they have started out with an

20   iPhone.   There are scenarios where they have their iPhone

21   conveniently with them while they are waiting with their

22   child, and so they start buying apps for that child to use in

23   scenarios like that.   And so they accumulate a set of games

24   for their kid on their iPhone.

25       Now, later they might decide they want also a tablet for

1    the family to share.  If they were considering getting a

2    low-cost tablet, they would have to then contemplate the same

3    kinds of switching costs or mixing and matching costs I

4    previously described.  They would need to contemplate whether

5    they were going to purchase -- repurchase apps or stay within

6    the ecosystem.

7        So suppose they bought an iPad.  They could then bring

8    over the apps that they had already purchased on the iPhone

9    through family sharing, so they wouldn't have to repurchase

10   the apps in that case.  But they might buy some additional

11   games, so maybe they buy a subscription to *Minecraft* on the

12   family tablet.

13       Now later again, they might contemplate, as a child grows,

14   buying them their first phone, a phone to have available

15   for -- whether it's a Zoom call to school or, you know,

16   calling when they need to be picked up from an activity.

17       But if they wanted to buy a low-cost Android device,

18   again, worried they might lose it, crack the screen, don't

19   think you should be spending, you know, as much money on a

20   child's phone, instead of just being able to consider the cost

21   of the device, they would also have to consider the cost of

22   repurchasing apps that had already been accumulated.

23       And so in that way, the -- you have a disincentive to

24   switch as you accumulate devices within a family.

25   Q.  So I think you covered the third -- three points.

1          You also mention here on the slide "parental controls."

2          What are you referring to there?

3     **A.**   So in this scenario, of course, many parents want to limit

4     the screen time of their children and they also want to make

5     sure they are not exposed to inappropriate content.

6          So they might -- in the scenario where they had the iPhone

7     and the iPad, they might be using parental controls from

8     Apple.  But if they went to add a device outside, they would

9     need to search for an app that would allow them to manage

10    cross-platform and, again, potentially purchase that.

11    **Q.**   And can they search for an app that works cross-platform

12    on the Apple App Store?

13    **A.**   No.  That information is not allowed to be shared with

14    consumers, so when you are searching for those apps, the apps

15    can't advertise what other platforms they might be on.

16         And so when making that original purchase, you might not

17    have focused on the fact -- or adopt- -- making your initial

18    adoption decision, you might not have focused on the fact that

19    it wouldn't provide you that cross-platform functionality, and

20    it would be difficult to know that.

21         **MS. DUNN:**  Objection, Your Honor.  Move to strike.

22    That's an opinion that was not disclosed in Dr. Athey's

23    report.

24         **THE COURT:**  So what paragraph of your report is it?

25    Can I find it if it's there?

1           **MR. EVEN:**  I believe it's in paragraph 31 of the

2    written direct, which was stipulated to.  I can go back and

3    find it in the report itself, but...

4           **THE COURT:**  I'm looking at paragraph 31.  You mean of

5    the written or of the direct testimony?

6           **MR. EVEN:**  Of the written direct testimony.  In the

7    middle --

8           **THE COURT:**  Let me read, Counsel.

9       Is there a dispute that Apple prohibits advertising of

10   cross-platform apps?  Ms. Dunn, is there a dispute?

11          **MS. DUNN:**  Your Honor, no, but this witness has not

12   disclosed any opinions on that topic.

13          **THE COURT:**  Overruled.  I think it's within the

14   confines of 31, especially given there is no dispute.

15      Proceed.

16          **MR. EVEN:**  Thank you, Your Honor.

17   BY MR. EVEN:

18   **Q.**  So I want to switch a little bit.  You've talked a little

19   bit about the cost to the users.  Obviously, the Court has

20   heard a lot about how these markets have two sides to them.

21      And my question to you is, wouldn't the developers go out

22   of their way to solve these problems for the users?

23   **A.**  The developers have a strong incentive to try to solve

24   these problems for consumers.

25          **THE WITNESS:**  Can we go to the next slide, please.

1      So the reason a developer cares so much about this is that

2 the more the user can consume their services, the more value

3 the consumer gets from them.  So if they can access the app

4 both, you know, in the park and in bed at night, that's going

5 to create more value for the developer.

6      And if the developer can maintain a relationship with the

7 user, that -- that's also beneficial for the developer.  So

8 the developer wants to make it easy for their relationship to

9 go with the user wherever the user wants to go.

10 **BY MR. EVEN:**

11 **Q.**  And so what is the impediment to that?  And maybe let's

12 talk about the first two that you were alluding to on the

13 slide.

14 **A.**  Well, so the developer faces costs to making this happen.

15      So the first thing is that if the developer wants to

16 maintain a relationship with the user, they need an account

17 management infrastructure.  So they need, basically, a

18 database that helps them keep track of who the users are.

19      And they also need a payment infrastructure -- a

20 cross-platform payment infrastructure that will allow them to

21 make sure that things that a user has bought in one place

22 would be available in a different place.

23      Now, those things are costly.  Large developers would have

24 the scale economies, in principle, to justify the costs, but

25 smaller developers often wouldn't build those.

ATHEY - DIRECT / EVEN

1    **Q.**  So going to the third point in your slide about reduction

2    in engagement, what might cause reduction in engagement for

3    the developer?

4    **A.**  Well, so it's a pain to create an account and come up with

5    a new password.  And if you're looking at an application,

6    considering it, and you haven't used it yet, you're not sure

7    what the value is going to be, a user might not want to bother

8    with going through this hassle of, you know, one more account.

9    And so in practice, that can really get in the way of an

10   application incentivizing the user to do it.

11       So putting those two things together, the infrastructure

12   is costly to build, which may not be economical for midsize or

13   smaller apps, and the fact that it's difficult to get the

14   consumers to do it, you see that even though they would like

15   it, small and midsize apps would typically not do this, even

16   some larger apps.

17   **Q.**  Going to the last point, "No one-stop shop," what are you

18   referring to on that?

19   **A.**  Well, the developers, all else equal, want to make things

20   easy for users.  But the problem that I described the user was

21   facing was not just bringing over one app from one platform to

22   the next, but bringing over all of the apps.  It's a big

23   collection of apps.

24       And so it's the sum of all of those frictions across lots

25   of apps, passwords, accounts, that friction, that can be an

ATHEY – DIRECT / EVEN

1   impediment to someone to switching.

2      And so solving that problem for a collection of apps is

3   not something that a single developer can solve, even though

4   they wish it was there.

5   **Q.** Do developer also incur any costs simply for trying to

6   operate their apps on different platforms, on both iOS and

7   Android in this case?

8   **A.** Yes.

9      So we go to the next slide, please.

10     So we've just been talking about costs to a developer from

11  trying to provide services to their users across two platforms

12  like iOS and Android.

13     To provide their services across two platforms, the

14  developers also have to port the code.  Different code runs

15  on iOS and Android, and it's costly to create that

16  additional code base.  So those are called porting costs.

17  **BY MR. EVEN:**

18  **Q.** And so given these porting costs, can you explain why is

19  it that we still find many, many apps across both iOS and

20  Android?

21  **A.** So a developer is going to consider the costs and benefits

22  from porting.

23     For big, mature, established platforms like iOS and

24  Android, there are lots of consumers there.  So, in general,

25  the benefits of porting your code are outweighed -- are higher

ATHEY – DIRECT / EVEN

1    than the cost of doing the porting.

2       So today, you know, most important apps are on both

3    platforms and multihoming is common.  But those costs that --

4    we'll see a very different scenario when thinking about an

5    entering platform.

6       So an entering platform is going to face what's widely

7    known as the chicken and egg problem.  So the chicken and egg

8    problem is that a developer doesn't want to bother porting

9    their code to a platform without many users, but a user

10   doesn't want to go to a new platform without many developers.

11      So the porting costs lead to the app barrier to entry,

12   which is widely understood to be the barrier in this type of

13   market, and in particular, that app barrier to entry supports

14   the high profits that otherwise we would expect would invite

15   entry.

16   **Q.**  So trying to summarize a little bit, you talked about

17   switching costs, you talked about mixing and matching costs,

18   you talked about cross-platform management costs, and then you

19   talked about cross-platform porting costs.

20      In your opinion, how do these costs, in the aggregate,

21   impact competition between iOS and Android?

22   **A.**  So in my opinion, they stifle competition between iOS

23   and Android.  So we're talking about a scenario where we have

24   a stable duopoly where most users are already locked in and

25   where even the few new arriving users, like children coming of

1    age, are already going to be influenced by the platform

2    purchases of their parents.

3         So in this environment with locked-in consumers, we have a

4    scenario where the platforms are adding additional frictions

5    to an environment where we already expected to have -- to have

6    switching costs.  And these additional costs create --

7    maintain market power over both users and developers.

8         So from the user perspective, the fact that you have these

9    switching costs means that you're going to be less sensitive

10   to low prices or new features that a platform introduces.  You

11   know, as your needs change over time, you might want to switch

12   platforms and you might be attracted by a feature that meets

13   your needs, but the switching costs impede the consumer's

14   response to that and also thus create less incentive for firms

15   to create them.

16        On the developer side, thinking from that perspective,

17   it's exactly locked-in consumers that creates the market power

18   over developers.  The developers understand that even a

19   popular developer can't induce consumers to switch platforms

20   just to get that app and, as a result, an increase in consumer

21   switching costs will increase the market power the platform

22   can exert over developers.

23   Q.   Thank you.

24        Do you understand that some of the Apple experts in this

25   case have criticized you for not ruling out the possibility

1    that switching costs in this case are, in fact,

2    procompetitive?

3    **A.**  Yes.

4           **THE WITNESS:**  Excuse me.  Your Honor, the screen

5    seems to have gone blank.

6           **THE COURT:**  It may have.  I'm not -- I don't control

7    that.

8           **THE WITNESS:**  Yeah, sorry.  Yes.  Thank you.

9       Yes, I'm aware.

10   **BY MR. EVEN:**

11   **Q.**  And do you agree with that criticism?

12   **A.**  No.

13   **Q.**  And can you very briefly explain why you disagree with

14   that criticism?

15   **A.**  So the consensus of economists is that when you see a

16   setting where firms choose to impose additional switching

17   costs, artificial switching costs that create real costs for

18   consumers, they are doing that in pursuit of profits.  That's

19   why they choose to do so, for example, with high prices.  And

20   that can be harmful for consumers.

21       Now, the papers cited by Apple are consistent with that,

22   that now they -- in different settings, there can be edge

23   cases, cases in dynamic markets with, for example, entry or

24   frequent switching where the primary focus of competition is

25   new users and that's what's driving firm decisions.  In that

1    case, introductory discounts can become a locus of

2    competition.

3        But that's the exact opposite of the case we have here,

4    where there are already high switching costs.  We don't see a

5    lot of switching, and the locus of competition on new users is

6    small and the incentives are shaped by the existing users.

7    **Q.**  Thank you.

8        So I would like to switch gears a little bit and turn to

9    your second conclusion that had to do with the effects or

10   potential effects of middleware.

11       And just to level set, what are you referring to when you

12   are talking about middleware?

13   **A.**  So middleware is technology that facilitates users and

14   developers interacting across different platforms, reducing

15   costs such as the switching and mixing and matching costs or

16   porting costs that we have been discussing.

17   **Q.**  So is middleware a well-understood concept in the area of

18   industrial economics?

19   **A.**  Yes, it's a well-understood concept.  When you say

20   "middleware" in economics, it's most closely associated with

21   the Microsoft antitrust case.

22       So the concept in that case centered around the idea that

23   middleware such as browsers could facilitate users and

24   developers interacting across platforms.

25       For example, if a user with -- on one of the incumbent

ATHEY - DIRECT / EVEN

1    platforms was using the web on their browser, say, on Windows,

2    the fact that they could also consume those apps through a

3    browser on an entering platform would reduce the barriers to

4    entry due to the chicken and egg problem.

5        From the developer side, because the developers could

6    create experiences through the browser, the developers were

7    willing to incur the cost of meeting the consumers on the

8    incumbent platform through the browser, but then they wouldn't

9    incur porting costs if the consumers went to a new platform.

10       So middleware has this prominent role as something -- one

11   of the things that can help a new entrant overcome the app

12   barrier to entry, and it thus plays a central role in platform

13   competition.

14       So that's exactly the concept as I'm using it here.  It's

15   a different technology today than in the '90s, but the

16   economic consequences and concept are the same.

17   **Q.**  So can you provide some examples of middleware that you

18   think are relevant to this case?

19   **A.**  So two types of middleware I focused on.  One is

20   cross-platform app stores and the other are app streaming

21   platforms.

22   **Q.**  So let's start with cross-platform app stores.

23       You mentioned -- strike that.

24       Can you -- maybe let's just start from the basics.  What

25   do you mean by "cross-platform app store"?

1    **A.**  Sure.

2            **THE WITNESS:**  The next slide, please.

3       So cross-platform app stores operate across multiple

4    platforms, and therefore they allow users to migrate and

5    synchronize their apps on all of those platforms, which has

6    the benefit of reducing the switching and mixing and matching

7    costs we talked about earlier.  The cross-platform app stores

8    can provide some or all of the services to help mitigate

9    those.

10   **BY MR. EVEN:**

11   **Q.**  So when you talk about cross-platform app stores, just so

12   we all understand what that's all about, how would that

13   actually work in reality?  What would a cross-platform app

14   store allow a user to do when they switch from an iOS phone

15   to an Android phone?

16   **A.**  So a cross-platform app store ideally would make it almost

17   as easy as upgrading your iPhone today.  So you -- going from

18   iPhone to Android, you would need to download --

19           **THE COURT:**  Just --

20           **THE WITNESS:**  I'm sorry.

21           **THE COURT:**  I'm going interrupt and then you can

22   finish off.

23       Is this the same thing, back to our *New York Times*

24   example, as if I had gone to *The New York Times*, gotten my

25   subscription directly from them, and then I could use it on

ATHEY – DIRECT / EVEN

1    any device that I wanted?

2          **THE WITNESS:**  That would be one benefit, yes.

3          **THE COURT:**  But not just a benefit, that's an

4    alternative mechanism to get the same result, correct?

5          **THE WITNESS:**  For a single app, yes.

6          **THE COURT:**  So one of the problems is that on the

7    Android and the iPhone, *The New York Times* can't tell them,

8    Hey, go and sign up on our website and then you can have

9    access across devices.

10         **THE WITNESS:**  Yes.

11         **THE COURT:**  Okay.  So if they did that, then there

12   wouldn't really be the same kind of need for this

13   cross-platform app store that you're talking about.

14         **THE WITNESS:**  I think it -- that would be a big

15   benefit, I agree, that you could alert people to the most

16   efficient way to pay.  And if people valued cross-platform

17   access, that would be a benefit.  And if consumers understood

18   that, they would need to do it.

19      Consumers do get clutzy and disconnected and sensitive to

20   delays when trying to complete that type of activity, and so

21   making it easy, you know, being able to also, you know, get

22   there quickly would be helpful.  But yes.

23         **THE COURT:**  That would be, one, their choice, and,

24   two, because there are lots of various considerations in

25   antitrust law, that would be an alternative solution.

1              **THE WITNESS:**  To the problem of a single app.  And so

2      that would be helpful, I think, especially for the largest

3      apps.  So the --

4              **THE COURT:**  Proceed.

5      BY MR. EVEN:

6      **Q.**  So just to pick up on the Court's question, how -- you say

7      it would solve the problem for a single app.

8          Would that solve the problem for the -- what we refer to

9      as the one-stop shop problem?

10     **A.**  No.  So smaller and midsize apps, apps where the consumer

11     may be uncertain about the value that they are going to get,

12     would still find it difficult to induce consumers to go and

13     create those accounts.

14         And then, again, from the competition perspective, what's

15     important is the sort of aggregate switching costs the

16     consumer perceives.  So, you know, even if there was

17     cross-platform app store, a consumer might still be willing to

18     separately log in to *Netflix*, you know.  They are excited

19     about their show and, you know, they are going to get to the

20     next episode.

21         But they -- that would be -- it wouldn't solve the problem

22     for imagining figuring out all of your accounts and

23     successfully getting them over to there across a hundred apps.

24             **MS. DUNN:**  Objection, Your Honor.  I'm happy just to

25     state this for the record, because I think it's included in

1    the prior objection, but there is a lot of testimony about

2    what consumers want and what consumers do.  So for these

3    purposes, we would just note that for the record.

4          THE COURT:  Well, again, Ms. Dunn, with respect to

5    the last objection, it didn't seem to me that there was any

6    dispute, so I didn't mind it.

7       Is what you are saying is that there is no evidence in the

8    record with respect to the consumers' perspective?  I haven't

9    memorized all these expert reports.

10         MS. DUNN:  I understand, Your Honor, and that's why I

11   wanted to flag for the Court.

12      Dr. Athey has testified quite a lot, subject to our

13   original objection, about what consumers think, what they

14   believe, what they are doing, and there's not evidence in the

15   record as to that and we don't believe there will be.  So it

16   is covered by the original objection, but it's happened so

17   much I just wanted to note it for the record.

18         THE COURT:  Well, have you done any survey evidence

19   or research with respect to consumer actions, and, if so, can

20   you point me to it in your direct testimony?

21         THE WITNESS:  So the number of apps, for example --

22         THE COURT:  Limited to your testimony.

23         THE WITNESS:  I'm sorry.  So I did not conduct an

24   original survey of consumers, if that was the first question.

25      The facts about consumers --

1       **MR. EVEN:**  Your Honor, if I may?

2       **THE COURT:**  No.

3       **THE WITNESS:**  Okay.  I want -- I'm going to try to --

4    I'll do my best to answer the question.

5       **THE COURT:**  You have your direct testimony in front

6    of you.

7       **THE WITNESS:**  Yes, yes.

8       **THE COURT:**  It's in your binder.

9       **THE WITNESS:**  Okay.  Thank you.

10      **THE COURT:**  I don't expect you to memorize the

11   paragraphs either.  I had a law professor who could do that,

12   but he was --

13      **THE WITNESS:**  Not me, no.

14      **THE COURT:**  And the question is, is there anything in

15   the direct testimony regarding consumer habits?

16      **THE WITNESS:**  Thank you.

17      **THE COURT:**  We can do it another way so that the

18   clock is not ticking.

19      **THE WITNESS:**  Sure.  Yes.

20      **THE COURT:**  The testimony with respect to consumer

21   habits is stricken except that which exists in the direct

22   testimony.  All right?

23     Let's proceed.

24      **MR. EVEN:**  Okay.

25

1    **BY MR. EVEN:**

2    **Q.**  Professor Athey, is research into consumers' preferences

3    and consumer behavior in the space of technology something

4    that you research in your day-to-day --

5             **THE COURT:**  It doesn't matter if she does or not.  If

6    it's not in the report and wasn't disclosed, it is not

7    properly in front of the Court.

8             **MR. EVEN:**  Oh, okay.  So I'm sorry, Your Honor, maybe

9    I misunderstood.  If the objection is outside the scope, we

10   can address that separately.  That's an easy objection.  I

11   don't think -- I don't think that's what the objection was.  I

12   thought the objection was that there isn't a basis for her

13   opinions, which --

14            **THE COURT:**  I understood it to be outside the scope.

15            **MR. EVEN:**  Okay.

16            **MS. DUNN:**  There's two objections here.

17      One is she is testifying outside the scope.

18      The second is she -- there is no basis for the assertions

19   about what consumers do and think.  And there's quite a lot of

20   this, and it is not going to be proven up by the factual

21   record --

22            **THE COURT:**  That's --

23            **MS. DUNN:**  -- nor is it --

24            **THE COURT:**  That's why I said it's outside the scope.

25   So --

1          **MS. DUNN:**  Thank you, Your Honor.

2          **THE COURT:**  -- again, the testimony is stricken

3  except to the extent that it is in the report.  I'm not -- she

4  couldn't find it quickly.  I want to keep moving.  It doesn't

5  sound like it's in the report.

6          But go ahead.

7          **MR. EVEN:**  Your Honor, I just want to make sure that

8  the record is clear to me as to what it is that we are

9  supposed to show.

10         The testimony that Professor Athey is providing about

11  users' switching costs, mixing and matching costs, and whether

12  they want to do something or not is all in the report.

13         **THE COURT:**  Correct.  And that's fine.  It's in the

14  report.

15         **MR. EVEN:**  Okay.  So what is it that -- I'm not

16  entirely sure -- what is it that we are currently missing?

17         If there is a question about a survey, I think Professor

18  Athey answered that, and I can lay foundation as to why she

19  has general 703 basis to attest to what consumers face and

20  don't face and how consumers behave more generally.

21         **THE COURT:**  If you want to go back to the report and

22  use your time that way, that's fine.  I can tell you that when

23  I read her report, I had lots of questions on this document

24  about the factual basis for the opinions, and I am trusting

25  that to the extent there is something there, you will all give

1    it to me.

2              **MR. EVEN:**  Okay.

3              **THE COURT:**  Because you all know your case better

4    still, having lived with it for ten months, than I do.  If

5    there is not a factual basis, I will not consider it and

6    it's –– and it will ultimately be stricken.

7        But as I understood it, you all were still negotiating

8    over whether the factual basis is ever proved up in some of

9    these expert reports.  So I'm relying, in part, on you all.

10             **MR. EVEN:**  And I appreciate that, Your Honor.  I'm

11   just not sure what is the factual basis that we want now,

12   other than Professor Athey's general assessment as a professor

13   of technology and economics, as to the incentives and what

14   consumers may or may not do facing these incentives.  That's

15   clearly in the report, Your Honor.

16             **THE COURT:**  Then if it is in the report, you're all

17   good.

18             **MR. EVEN:**  Okay.

19             **THE COURT:**  And I should say and it's still subject

20   to your ongoing negotiations about the factual basis.

21             **MR. EVEN:**  I understand, Your Honor.  I just want to

22   make sure that I understand the objection, because my

23   understanding is that somebody who researches what consumers

24   and technology firms do for a living can come into court and

25   testify to that based on their expertise.

1          **THE COURT:**  They can testify as to what they have

2     disclosed.

3          **MR. EVEN:**  Absolutely, Your Honor.  I don't really

4     think there is a disclosure issue here, but that's okay.  I

5     appreciate that.  I'll move on.

6     **BY MR. EVEN:**

7     **Q.**  Professor Athey, do you have any examples -- let me take a

8     step back.

9          Obviously, we don't have a cross-platform app store right

10    now, correct?

11    **A.**  Yes, correct.

12    **Q.**  And so have you seen any examples of a cross-platform

13    store that sells something other than apps?

14    **A.**  Yes.  So going back in history, when you used to watch

15    movies and shows on the iPhone, you would purchase individual

16    movies on iTunes, but you could watch those on -- in the iOS

17    system.

18         Today, there are services like *Amazon Prime Video* or

19    *Netflix*.  *Amazon Prime Video* at the beginning offered the same

20    kind of service to iTunes except you would buy movies or shows

21    one at a time, but it was cross-platform and so people could

22    buy on one device and move to another.  And that type of --

23    that type of cross-platform experience is also -- is an

24    example.

25         Now, that's allowed, so *Netflix* and *Amazon Prime Video* are

1    allowed, but other types are not.

2    **Q.**   Okay.  Have you found any examples of cross-platform app

3    stores that are outside of iOS?

4    **A.**   I have.

5    **Q.**   And can you give the Court an example or two?

6    **A.**   Yes.

7              **THE WITNESS:**  So next slide, please.

8        So one example of a cross-platform app store is the Epic

9    Games Store.  This is a store that's available on the Windows

10   PC and the macOS.

11   **BY MR. EVEN:**

12   **Q.**   And can you speak to the cross-platform benefits provided

13   to users and developers by the Epic Games Store.

14   **A.**   Yes.  So the Epic Games Store builds the infrastructure I

15   described earlier that makes it possible for developers to

16   interact with their users through an account that would be

17   available across all devices.

18       So in the case of the Epic Games Store, the user has an

19   account with the Epic Games Store that allows them to access

20   their library of apps and have them easily available across

21   any platform that they choose to use.

22       Another service provided by the Epic Games Store is a

23   cloud service that, again, makes it possible for developers to

24   sync the users' data, app-related data, their purchases, what

25   levels they are at, across platforms.

ATHEY – DIRECT / EVEN

1    So if you went -- if you decided to switch from Windows PC

2    to macOS, what you would do is you would just log in to the

3    Epic Games Store and you could pick back up right where you

4    left off.

5    There would also be a wallet service.  So if you had

6    entered your payment information when you had a PC, that would

7    also be available on the macOS, so just pick right up where

8    you left off.

9    **Q.**  Got it.  Thank you.

10   Now, you mentioned that the Epic Games Store is available

11   on the macOS.

12   How does the Epic Games Store compare, for instance, to

13   the Mac Apple App Store that's on Mac?

14   **A.**  It provides a similar set of services except that if you

15   buy things through the macOS store, they are locked into the

16   Apple ecosystem.  You can't use them across.

17   **Q.**  You also -- do you have another example of cross-platform

18   app store outside of iOS?

19   **A.**  Yes.

20   **THE WITNESS:**  So the next slide.

21   BY MR. EVEN:

22   **Q.**  So I see this is about Steam.  Where is Steam available?

23   **A.**  Steam is available on the Windows PC, the macOS, as well

24   as Linux PC.

25   **Q.**  And what services does the Steam store provide to users

1    and developers so that they can work and transact across

2    platforms?

3    **A.**   So it provides the infrastructure so that users and

4    developers can interact in a similar way to what I just

5    described.  It provides services for account management,

6    allowing the user to access a library cloud and wallet.

7         It also has an additional service, family sharing, where

8    users can share apps and purchases across platforms within a

9    family.  So if one kid has a Windows PC, the other has to

10   switch to, you know, Apple to be compatible with school, they

11   can -- you know, they can share their apps and purchases in

12   that way.

13   **Q.**   All right.  So let's switch gears for a second.  You

14   mentioned also streaming services.  The Court has already

15   heard testimony about streaming services some, but can you

16   explain at a very high level, how would an app streaming

17   service operate?

18   **A.**   Yes.

19             **THE WITNESS:**  Next slide, please.

20        So this would feel a lot like a *Netflix* experience today

21   from a user's perspective.  They would be able to access a

22   wide variety of content.  They could easily switch between

23   different types of content, try things out.

24        And then, from the developer perspective, it's a very

25   different experience than regular apps because the developer

1    is writing code that runs on servers in the cloud.

2        So the developer's code is written to the cloud, and they

3    don't -- just like a movie producer can make a movie and not

4    worry about where people are going to watch the movie, a game

5    developer could develop once and then that game would be

6    available on, you know, any platform, and they wouldn't have

7    to worry about, say, you know, porting to a new or smaller

8    platform.

9    **Q.**  Thank you.

10       Are streaming services limited to games?

11   **A.**  No.

12   **Q.**  What other use cases could there be for app streaming

13   services?

14   **A.**  So these are nascent, I should say, and so they are coming

15   into -- so they are coming into play as a result of costs and

16   benefits.

17       What we see with games today is that they struggle with

18   some latency challenges.  There can be delays, so you need

19   high bandwidth; but on the other hand, they can provide an

20   immersive experience even on a device that is lower cost.

21       So taking those economic characteristics, there can be

22   many other applications that would also benefit from being

23   able to allow an immersive experience to be available on

24   lower-cost devices.

25       A situation where you might want to -- need to reach a lot

ATHEY – DIRECT / EVEN

1    of people, say, on -- your cheap devices might be an

2    educational or a training experience, where, you know, it's

3    important that the student understand the physical

4    environment.

5        And so they want to have an immersive video experience

6    that's interactive, but you want to reach low-wage workers or

7    students with, you know, six-year-old hand-me-down phones.

8    And so you want to provide that experience on a low-cost

9    device.

10       So the general themes that we've heard about in terms of

11   games have analogs in other industries, but it's still very

12   early days.

13   **Q.**  So you mentioned now that it's nascent, that it's in early

14   days.  Can app streaming services solve switching and mixing

15   and matching costs today?

16   **A.**  No.  They are not big enough.

17       But, you know, the -- one of the big constraints has been

18   bandwidth.  And so if you think about a longer time horizon,

19   five to ten years, you know, we are trying to make a lot of

20   investments now to get bandwidth out there and more available.

21   The technology is improving.  And so some of the constraints

22   that have held it back could -- are expected to alleviate.

23       And so, you know, just like *Netflix* has transformed the

24   way that content is produced and consumed in movies and shows,

25   it could make a big difference.  And the bigger difference it

1    makes, the bigger impact it would have on mobile competition.

2    **Q.**   Thank you.

3          Do iOS users currently have access to streaming

4    platforms?

5    **A.**   Not in the way they are intended, no.

6    **Q.**   And what do you mean by "not in the way they are

7    intended"?

8    **A.**   Well, so some of the big benefits are that, you know, you

9    can have one app, similar to the *Netflix* app, and have lots

10   of -- access lots of different things seamlessly from a user

11   perspective.

12         But the Apple App Store restrictions require that in order

13   to offer multiple streaming games, it's necessary to -- for

14   the user to download a separate app.

15         So even though the separate app wouldn't have any

16   additional functionality, there would be an additional app for

17   each game.

18   **Q.**   What would a similar policy mean for something like

19   *Netflix*, for instance?

20   **A.**   That would mean that for every movie or show that I wanted

21   to watch, I would need to download a separate app.  And if I

22   wanted to switch between one movie and another, I would need

23   to navigate to and switch to that separate app.

24   **Q.**   Thank you.

25         You talked earlier about entry and some of the barriers to

ATHEY – DIRECT / EVEN

entry and chicken and egg problem.

How would app streaming platforms affect, potentially -- if they come to -- become more mature, how could they affect entry in this space?

**A.** So remember, the chicken and egg problems arises because consumers don't want to use a device where there is not enough services.

But -- so if a consumer can go to a new platform and have access to multiple services, that makes it easier to reap the benefits of a low-cost device.

And so you could buy a low-cost device and then with a single app, you would be able to access this library of content, which would already be there because the developers wouldn't bear any porting costs. So as long as the streaming service has got the streaming app on the new platform, just one app needs to port, then the consumer suddenly would have a library of content.

So if you thought about getting a low-cost tablet for your child, imagine that it had, you know, *Amazon Prime Video* and a game-streaming app, you know, and a browser. Well, you know, that might be good enough for your kid. And so you could -- it would be rational for people to buy a low-cost tablet like that for their child.

The more people bought low-cost tablets for their kids or themselves, the more users there would be, and that could, in

1    turn, induce additional entry.

2              THE COURT:  Do you still think we are in a chicken

3    and egg environment?

4              THE WITNESS:  Between iPhone and Android, absolutely

5    not.  Most apps support it.  So -- but now we have two firms

6    that have high profits, and so we're concerned about making it

7    possible for a third firm to enter.

8         And so for a third firm to enter, which is what you would

9    expect, given high profits, the third firm would have to

10   overcome the chicken and egg problem.  And for that, porting

11   could be a substantial barrier.

12        Now, for something like -- so Amazon has a tablet, the

13   Amazon Fire tablet, that's a low-cost tablet.  It's a modified

14   version of Android, and so there, the porting costs are

15   relatively low.  They have their own app store, has a couple

16   hundred thousand apps.

17        So for that type of situation, you know, you've got some

18   apps, you've got *Amazon Prime Video*, but you are missing some

19   stuff too.  And so, you know, something like a streaming app

20   that brought some really great games to it, you know, people

21   are already buying it, you know, for some use cases, but it

22   could expand the use cases.  So -- but this is really -- the

23   porting is about entry.

24        Did that answer the question?  Thank you.

25

1    **BY MR. EVEN:**

2    **Q.**  So switching to a separate topic, did you review any of

3    the documents produced in this case?

4    **A.**  Yes.

5    **Q.**  And what was your process for reviewing these documents?

6    **A.**  So I asked my research team to review nonconfidential

7    documents and to identify documents that related to switching

8    costs, mixing and matching costs, and the middleware, the

9    themes -- and the other themes of my opinions.

10   **Q.**  And why did you need to limit your review to

11   nonconfidential documents?

12   **A.**  Because years ago I was an employee of Microsoft, I

13   understand that I am not allowed to review confidential

14   information in this case.

15   **Q.**  And did you identify any documents that you think bear on

16   your opinions?

17   **A.**  I did.

18   **Q.**  Did you prepare a slide about one of those?

19   **A.**  I did.

20   **Q.**  Let's take a look at this slide.

21       And can you explain why you think this email from Mr. Cue

22   is relevant to what you have opined on in this case?

23   **A.**  Yes.  So this is an email from Mr. Eddy Cue to Philip

24   Schiller and Tim Cook, and the email is talking about

25   switching costs related to apps.

1    And so it articulates the precise logic that I was

2    discussing, and it articulates that the considerations were

3    important both quantitatively and qualitatively for strategic

4    decisions as understood relative to the consumer behavior.

5        And so the specific part of the quote here about consumers

6    is:

7            "Who is going to buy a Samsung phone if they have

8            apps, movies, et cetera, already purchased?  They now

9            need to spend hundreds more to get where they are

10           today."

11       So they are expressing that the magnitude of these costs

12   are going to be important for consumer behavior and enough to

13   influence strategy.

14   **Q.**  So, as you said, this is an email, I think, from 2013.

15       Do you think this email is still relevant today?

16   **A.**  So the economics are spot on to what we are talking about,

17   but there is a difference.

18   **Q.**  What's the difference?

19   **A.**  So here, he's referring to movies.  As I mentioned

20   earlier, at that time, consumers who bought movies would be

21   through iTunes, the -- part of the subject of this email,

22   would be locked in to Apple.  So if they bought movies through

23   iTunes, that would create switching costs for moving to

24   Samsung.

25       Today, consumers have access to competition from

1    cross-platform sources of movies and shows, and consumers have

2    chosen those.  You know, the market share is large for

3    cross-platform movies and shows.  So that part wouldn't be the

4    main focus today, because consumers have cross-platform

5    alternatives.

6        But today, the logic would still apply to other types of

7    apps where these types of cross-platform services are not

8    available.  And so that would be the component today.

9    **Q.**  Thank you very much, Professor Athey.

10               **MR. EVEN:**  I will pass the witness.

11               **THE COURT:**  Pass the witness?

12        Ms. Dunn, cross.

13               **MS. DUNN:**  With the Court's permission, we would like

14    to hand the witness and the Court a binder.

15               **THE COURT:**  Yes.

16               **MS. DUNN:**  Thank you, Your Honor.

17               **THE COURT:**  Whenever you are ready, you may proceed.

18               **MS. DUNN:**  Thank you, Your Honor.

19                         **CROSS-EXAMINATION**

20    **BY MS. DUNN:**

21    **Q.**  Good afternoon, Dr. Athey.  How are you?  It's good to see

22    you.

23    **A.**  Good afternoon.

24    **Q.**  You submitted your expert report on February 16th of 2021;

25    is that right?

ATHEY - CROSS / DUNN

1    **A.**   That sounds right.

2    **Q.**   And you were deposed on April 3rd of 2021, about a month

3    ago and change?

4    **A.**   Sounds right too.

5    **Q.**   Okay.  And you testified on direct that after you

6    submitted your report and after you were deposed, you reviewed

7    some documents that had been dedesignated.

8         And we will potentially talk about some of those, but I

9    want to first talk about what you looked at when you were

10   formulating your opinions and writing your report.  Okay?

11   **A.**   Yes.

12   **Q.**   All right.  Before your report and in developing your

13   opinions, you did not review any of the Apple business

14   documents produced by Apple in this litigation, correct?

15   **A.**   Correct.

16   **Q.**   And before your report, you also did not review any Epic

17   documents produced in this case either, correct?

18   **A.**   Correct.

19   **Q.**   And --

20   **A.**   I'm sorry.  So I reviewed David Evans' redacted report.

21   **Q.**   Fair enough.

22        So with that exception, you have not reviewed any Epic

23   documents before your report.

24   **A.**   Any -- I don't believe so.

25   **Q.**   Okay.  And before your report, you also did not rely upon

1    any third-party documents produced in this case.  There are

2    none in your "Materials Relied Upon," if that helps you.

3    **A.**  Correct.

4    **Q.**  Okay.  So the result was that you didn't review any

5    contemporaneous Apple documents related to why the App Store

6    was structured in the way it was when you formulated your

7    opinions.

8        That's fair, right?

9    **A.**  I didn't review any confidential Apple documents about

10   that, no.

11   **Q.**  Right.  And so if there were confidential Apple documents

12   that say how many people switched from Android to iOS or

13   vice versa, you would not have seen those, correct?

14   **A.**  At the time of my report, correct.

15   **Q.**  Well, you would not have seen any surveys of consumers and

16   how often they switch, if those were produced by Apple --

17   **A.**  Correct.

18   **Q.**  -- correct?

19       And you also would not have seen any surveys or empirical

20   data that show that actually switching costs -- switching --

21   behavior of switching is significant, correct?

22   **A.**  I have not seen -- I've not seen evidence of significant

23   switching, no.

24   **Q.**  Right.  And if that evidence existed and was produced by

25   Apple, you would not have seen it, correct?

ATHEY - CROSS / DUNN

1    **A.**   As I sit here now, documents such as that might have been

2    alluded to in the redacted findings of fact or the direct

3    testimony of Apple witnesses, for example.  So that would be a

4    source of qualitative information, or summaries of documents

5    like that.

6    **Q.**   Right.  But in developing your opinions, you did not see

7    any of that.

8    **A.**   Correct.

9    **Q.**   And so in this case, you agreed to give opinions about the

10   procompetitive effects of eliminating Apple's restrictions

11   without reviewing any Apple confidential business documents;

12   is that correct?

13   **A.**   Yes.

14   **Q.**   Have you ever done that before, offered an opinion about

15   the procompetitive, or lack thereof, effects of a defendant's

16   conduct without reviewing any of their confidential documents?

17   **A.**   Just to be clear, I make -- give advice and offer

18   presentations, including to antitrust regulators or, you know,

19   other -- other industry participants about market conduct,

20   about expected industry structure --

21   **Q.**   I'm asking if you've ever done this before under oath in a

22   court.  Have you ever done that?

23   **A.**   No.

24   **Q.**   And by the time of your deposition on April 3rd of 2021,

25   you also had not read any of the deposition transcripts in

ATHEY – CROSS / DUNN

1    this case; is that right?

2    **A.**   Yes.

3    **Q.**   And before your deposition, you had reviewed none of

4    Apple's expert rebuttal reports, including the rebuttals to

5    your own opinions, correct?

6    **A.**   Correct.

7    **Q.**   And you didn't submit your own rebuttal report in this

8    case?

9    **A.**   That's correct.

10   **Q.**   All right.  Now, the reason you did not look at any of

11   Apple's produced documents was because of your relationship

12   with Microsoft, which is a competitor to Apple, correct?

13   **A.**   My understanding, it's because I was, at one point, a W-2

14   employee of Microsoft.

15   **Q.**   Right.  Because of your relationship with Microsoft, that

16   is why you did not look at Apple's confidential documents.

17   **A.**   Yes.

18   **Q.**   That's right.

19       All right.  Did you see the evidence from Ms. Wright's

20   testimony, the Microsoft 10-K, where Microsoft says they

21   compete with Apple in gaming?  Did you see that testimony?

22   **A.**   I didn't see that part of the testimony, no.

23   **Q.**   Okay.  Did you see any of the testimony?  Or, I'm sorry,

24   hear, where we can't see anything.  Did you hear any of that

25   testimony?

**A.**   I heard a bit about the description of streaming, but I haven't reviewed the entire testimony.

**Q.**   And according to your C.V., which we can show you because it might make this easier, you were with Microsoft Research for ten years?

**A.**   In varying capacities, yes.

**Q.**   Right.  And you were a consultant with the Microsoft Corporation for nine years.

**A.**   In varying capacities, yes.

**Q.**   Right.  And it says -- here, it says you were a consultant to Microsoft Corporation from 2007 to 2016 and a consulting researcher with Microsoft Research from 2008 to 2018, correct?

**A.**   Yes.

**Q.**   Okay.  And ultimately became a chief consulting economist at Microsoft?

**A.**   So "ultimately" implies a timeline, so the -- so I was consulting chief economist in an earlier period and then later had different kinds of relationships, like consulting researcher, in order to collaborate on academic papers with Microsoft researchers.

**Q.**   Okay.  But one way or another, you have been working for Microsoft in some way since 2007, correct?

**A.**   On and off.

**Q.**   And since August of 2020, you have continued to consult for Microsoft; isn't that right?

1    **A.**   Again, on and off, but...

2    **Q.**   At your deposition, you said that since August of 2020,

3    you've done economic consulting work for Microsoft.

4        Is that true?

5    **A.**   Yes, that's correct.

6    **Q.**   Okay.  But that wasn't on the C.V. that you submitted to

7    the -- with your report.

8    **A.**   That is -- that is correct.  My -- not all of my

9    consulting clients are disclosed.  Sometimes there's a NDA or

10   there's not a public nature of the relationship --

11                    (Simultaneous colloquy.)

12   **Q.**   We just saw that you did disclose Microsoft, you just

13   didn't disclose your work subsequent to 2018, correct?

14   **A.**   I disclosed the time where I had a more extensive

15   relationship, and now they are just another client, which I

16   don't disclose all of my clients.

17   **Q.**   Right.  But you disclosed this one, just not that time

18   period; am I right about that?

19   **A.**   I've disclosed here all the time periods where I've had an

20   in-depth relationship with a company that went beyond an

21   ordinary arms-length relationship that you might expect from

22   someone who provides consulting services.

23   **Q.**   So just to put a fine point on this, even though it was

24   your relationship with Microsoft that prevented you from

25   looking at Apple's confidential documents, you didn't think

1    you should disclose that on your C.V.; is that correct?

2    **A.**   I don't have a separate C.V. for this case.  This is my

3    C.V. in which I present my important relationships.  And so on

4    this C.V., I'm reporting the relationship in a time at

5    which -- and it's a little bit generous, really, where my

6    relationship with Microsoft was not just project to project

7    or, you know, at their disposal, but we had an understanding

8    that I would, on an ongoing basis, be available for them for

9    consulting and participate in strategic decisions.  That time

10   actually really ended earlier than 2016, but it's being a bit

11   generous in the interest of academic disclosure, where you

12   want to make sure people understand your relationships.

13   **Q.**   Yeah, okay, Dr. Athey.  I think I understand.  Thank you.

14       So at your deposition, you also refused to answer whether

15   you're currently doing work for Microsoft that may bear on the

16   issues in this case.

17       Do you remember that?

18           **THE COURT:**  It goes to bias, Counsel.

19       So I saw you stand before I -- and then I saw you move

20   towards the microphone.  The objection, to the extent you

21   wanted to make it, is overruled.  It goes to bias.

22       Go ahead.

23   **BY MS. DUNN:**

24   **Q.**   You can answer.  Do you remember the question?

25   **A.**   If I recall my answer in the deposition, it was that I had

ATHEY – CROSS / DUNN

1    a nondisclosure agreement with Microsoft and I hadn't sought

2    their permission to disclose that, disclose the nature of my

3    relationship in that.  So....

4    **Q.**  Right.  And you recall you were instructed by Epic's

5    counsel not to answer?  You recall that?

6    **A.**  Yes.  My recollection is that they said that there was not

7    a Microsoft attorney present to determine whether the

8    information was confidential from Microsoft's perspective.

9    **Q.**  Okay.  So today before the Court, do you still refuse to

10   say whether your ongoing work for Microsoft bears on the

11   issues in this case?

12        **THE WITNESS:**  I'd feel more comfortable answering if

13   we had a closed session, since I don't have permission about

14   the NDA, Your Honor.

15        **THE COURT:**  All right.  We can do it at the end of

16   the day.

17        **MS. DUNN:**  There has been -- there are documents that

18   have been disclosed to us, and I don't believe that there is a

19   sealing issue that we can potentially discuss.  She can -- we

20   can hold the nature of her work if she feels more comfortable,

21   but this is documents that have already been disclosed.

22        **THE COURT:**  Okay.

23   BY MS. DUNN:

24   **Q.**  Dr. Athey, in October 2020 -- actually, I should -- I'll

25   start differently.

1      We have a document that was produced to us two weeks ago

2   after we moved to compel.  Judge Hixson granted our motion,

3   and this document was sent to us, along with a letter from

4   Epic's counsel, saying that it had been redacted by Microsoft.

5      And I'm just going to show you the first page of this

6   document.  It's Exhibit 5603.

7      Do you see the first page?

8   **A.**   I'm sorry, I have two binders.  Where should I look here?

9   **Q.**   That's right.  The small binder is your deposition and the

10   larger binder has exhibits.

11   **A.**   Great.  And, I'm sorry, which number?

12   **Q.**   5603.

13          **MR. EVEN:**  Sorry, what's the number?

14          **MS. DUNN:**  5603.

15          **MR. EVEN:**  Where is that?  Sorry.

16          **THE WITNESS:**  I'm sorry, there may be a tab missing.

17          **THE COURT:**  Yeah, that's not in the binder.

18          **MS. DUNN:**  So I only plan to use the title page,

19   which we can display because there is no information on it.

20   **BY MS. DUNN:**

21   **Q.**   All right.  Dr. Athey, this is a presentation that you

22   gave dated October 22nd of 2020.  It's entitled "Apple App

23   Store Restrictions and [Redacted] An Economic Perspective."

24      Do you see that?

25   **A.**   Yes.

1    **Q.**  And these redactions, we were told by Epic's counsel, were

2    applied by Microsoft.

3        Have you seen this document in your files subsequent to

4    its redaction by Microsoft?

5    **A.**  Yes.

6    **Q.**  And you do not deny that Microsoft has redacted out the

7    word "Microsoft," correct?

8            **MR. EVEN:**  Your Honor --

9            **THE WITNESS:**  Honestly, I don't know what's under

10   that [Redacted], so I don't think I should testify to what's

11   there.

12   **BY MS. DUNN:**

13   **Q.**  Do you recall the presentation at all?

14   **A.**  I do.

15   **Q.**  Okay.  You recall that it talks about middleware?

16           **THE COURT:**  What's the objection, Counsel?

17           **MR. EVEN:**  Your Honor, I believe the order about

18   producing this document required that the name of the client

19   would be redacted.  I don't believe that we have disclosed the

20   name of the client to Apple.

21       I understand that counsel for Apple can do the math and

22   understand who the client is, but as far as I recall, at

23   least, I don't believe we disclosed it or the client disclosed

24   it, and I don't see why this needs to be done in open court

25   and disclose that.

1           **MS. DUNN:**  Your Honor, we have a letter from Epic's

2   counsel saying the redactions had been applied directly by

3   Microsoft.

4           **MR. EVEN:**  If I can see the letter, that would be

5   helpful, but -- and I will confer with my --

6           **THE COURT:**  Okay.  Well, I -- at this point, the

7   cat's out of the bag.

8           **MR. EVEN:**  I understand, Your Honor.

9           **THE COURT:**  I don't know why they -- I don't know

10  where that even came from, but -- that phrase, but it's out.

11  The bell has rung.  I like that one better.

12      Let's keep going.

13  **BY MS. DUNN:**

14  **Q.**  All right.  Dr. Athey, you recall this presentation,

15  correct?

16  **A.**  Yes.

17  **Q.**  Great.

18      And it is, in our version, heavily redacted, but you

19  recall that it talks about middleware, correct?

20  **A.**  Yes.

21  **Q.**  And you recall that it also talks about gaming, correct?

22  **A.**  Yes.

23  **Q.**  And you're not going to deny that this presentation from

24  Microsoft about Apple's App Store restrictions relates

25  directly to the issues in this case, are you?

1    **A.**   No.

2    **Q.**   And this is from October 22nd of 2020.

3          Was this before or after you were retained by Epic?

4    **A.**   Before.

5    **Q.**   All right.  Your testimony involves something that you are

6    calling "middleware," and you said that that's short for

7    "economic middleware."

8    **A.**   So I -- in my report, I define -- there is a concept which

9    I'm applying, and I use the term "economic middleware" and

10   "middleware" interchangeably.

11   **Q.**   You've never seen the term "economic middleware" used in

12   any economic literature, correct?

13   **A.**   I've seen -- the concept is described, as I testified

14   earlier.  The specific term, no.

15   **Q.**   Right.  And you told us in your deposition that you came

16   up with the definition of "economic middleware" for this case.

17          Do you remember that?

18   **A.**   So I need to see the exact words to make sure you're

19   quoting -- you're characterizing them correctly.

20          What I -- I'm sorry.

21          **MS. DUNN:**  I'm happy to direct you --

22          **THE WITNESS:**  Sure.

23          **MS. DUNN:**  -- if Your Honor will permit, to

24   Dr. Athey's deposition.  It's page 126, 7 through 15.

25

1    **BY MS. DUNN:**

2    **Q.**   Dr. Athey, do you see that?

3    **A.**   I'm sorry, which line were you referring to?

4    **Q.**   Lines 7 through 15.

5          **MS. DUNN:**   Your Honor, am I permitted to read it?

6          **THE COURT:**   Well, not quite yet.

7          **MS. DUNN:**   Once she gets there.

8          **THE WITNESS:**   I got it.

9          **THE COURT:**   Does that refresh your recollection that

10   you said -- that you agreed with that characterization?

11         **THE WITNESS:**   I'm sorry, I'm still not seeing the

12   quote, and I would, with thought, characterize it slightly

13   differently.  But that's -- so --

14   **BY MS. DUNN:**

15   **Q.**   I'm talking about the part where you say -- the question

16   was asked to you:  "This is a definition you came up with in

17   connection with carrying out your analysis in this case?"

18         And you say:  "Yes."

19   **A.**   So I used a precise definition in my report to avoid any

20   ambiguity about what I might mean.

21   **Q.**   Okay.

22   **A.**   And that was for this case, yes.

23   **Q.**   We can move on.

24         All right.  It is your opinion, Dr. Athey, that Apple

25   imposes a set of technical and contractual restrictions that

ATHEY - CROSS / DUNN

1    block the emergence of middleware, correct?

2    **A.**   Yes.

3    **Q.**   And those restrictions block third-party app stores on

4    iOS, correct?

5    **A.**   Yes.

6    **Q.**   And those restrictions also block third-party payment

7    systems for in-app purchases of digital goods and services,

8    correct?

9    **A.**   Yes.

10   **Q.**   And your opinion is that both the technical and

11   contractual restrictions independently block the emergence of

12   middleware, correct?

13   **A.**   Independently and reinforcing one another in the sense

14   that, you know, a contractual restriction can be enforced

15   through technical means that prevent access to something, for

16   example.

17   **Q.**   Okay.  And so if Apple were to get rid of the contractual

18   restrictions but continue the technical restrictions, that

19   would not be sufficient for Epic.  Apple needs to eliminate

20   both sets of restrictions, correct?

21   **A.**   Eliminating some contractual restrictions don't really

22   relate to -- directly to technical restrictions.

23       But other contractual restrictions may be encoded, as I

24   testified, in something, for example, like a database of, you

25   know, who has access or who has permission to do certain

ATHEY – CROSS / DUNN

1    actions.

2    **Q.**  The question is really just Apple would need to get rid of

3    both kinds, and that's what Epic is asking for in this case.

4    **A.**  Well --

5    **Q.**  If you don't agree, just say you don't agree.  But if you

6    do agree, you can say that.  We're on the clock.

7    **A.**  It would be beneficial to competition to eliminate

8    contractual -- some contractual restrictions on their own, and

9    it would be additionally beneficial to eliminate further

10   technical restrictions.

11   **Q.**  Okay.  And it's your opinion that the technical design of

12   iOS makes it impossible for multiplatform app stores to

13   operate on iOS, correct?

14   **A.**  If I understood your question correctly, then no.

15   **Q.**  So you say in your written direct testimony, "Apple makes

16   it impossible for multiplatform app stores to operate on

17   iOS."

18       And so it's your testimony that Apple's technical design

19   has nothing to do with that?

20   **A.**  I didn't -- I don't believe that that's what I said.

21   **Q.**  Okay.  "Apple's technical design makes it impossible for

22   multiplatform app stores to operate on iOS."

23       Agree or disagree?

24   **A.**  So the second question was does the technical design have

25   anything to do with it, to which the answer is yes, it can.

1      If the question is does its technical design prevent that,

2    I guess, you know, I didn't -- I didn't -- I didn't provide a

3    full analysis of the code, but I did point out that there are

4    provisions on the iOS today that allow, say, developers or

5    businesses or educational institutions to release apps in the

6    iOS environment.  And so that's -- if the question is is it

7    possible --

8    **Q.**  Dr. Athey --

9                    (Simultaneous Colloquy.)

10   **Q.**  -- answer my question, and then your counsel can use his

11   time for greater explanation.  Okay?

12        So my question is, due to -- we'll make it more general --

13   due to aspects of the technical design of iOS, Apple does not

14   deal with third-party app stores on iOS, correct?

15   **A.**  I guess it depends on how you characterize a third-party

16   app store.

17   **Q.**  Well, why don't we characterize it how you have all the

18   way through your report and your written direct testimony.

19   **A.**  Sure.  So a cross-platform app store of the type that I

20   described in my report is generally prohibited by Apple.  Game

21   subscription services under some conditions are able to

22   operate.  *Netflix* is able to operate.

23        So there's -- I described the cross-platform app store not

24   as a single thing that must have every characteristic of

25   middleware, but, rather, that cross-platform app stores, as a

1    phenomenon, can offer different aspects of middleware.

2       But a general cross-platform app store is prohibited by

3    Apple's conditions unless there is some kind of carve-out as

4    we described.

5    **Q.**   Okay.  And not just Apple's conditions, but Apple's

6    technical design, correct?

7    **A.**   The word, I guess, "design" -- by "design," do you mean

8    the -- you know, the high-level design, as in there's this

9    piece over here and this piece over there, or do you mean

10   would any line of code need to change?  The answer depends on

11   how -- what you mean, "design."

12   **Q.**   Dr. Athey, have you reviewed Epic's proposed injunction in

13   this case?

14   **A.**   At a high level.

15   **Q.**   Have you reviewed it?

16   **A.**   Um --

17   **Q.**   Have you read the injunction?

18   **A.**   I've -- I reviewed it.  I may have paid more attention to

19   some parts than others, and so I'm not -- I don't have it

20   memorized for sure.

21   **Q.**   I'm just asking a "yes" or "no" question.

22       Have you read the injunction yourself, you've read it?

23   **A.**   I've -- I've looked at it.  I haven't -- "read" as in,

24   like, am I ready to testify about different components of it?

25   **Q.**   No, "read" as in "read."  Surely this is a "yes" or "no"

ATHEY – CROSS / DUNN

1    question.  You've either read the injunction or you have not

2    read the injunction.

3    **A.**  Parts of it.

4    **Q.**  Okay.  All right.  Dr. Athey, from your background in

5    antitrust economics, it is your view that a refusal to deal is

6    a form of exclusionary conduct, correct?

7    **A.**  Yes.

8    **Q.**  All right.  And you understand that Apple has many APIs,

9    correct?

10   **A.**  Yes.

11   **Q.**  And you understand that it's not possible to put an app

12   onto the iOS platform without using Apple's tools and APIs,

13   correct?

14   **A.**  Yes.

15   **Q.**  All right.  And you understand that your economic

16   middleware would need to connect to iOS through APIs and,

17   therefore, have to use Apple's IP, correct?

18   **A.**  To the extent that -- to the extent that you characterize

19   the APIs as IP, yes.

20   **Q.**  Do you think APIs are not IP?

21   **A.**  I'm not offering a legal opinion about whether they are or

22   they're not.  I'm just answering the question.  So I'm not --

23   I want to avoid testifying on a legal matter.

24       So if we said that APIs are required to connect, we

25   could -- I mean, do you mean a patent?  Do you mean trade

ATHEY - CROSS / DUNN

1    secrets?  Do you mean -- you know, there's -- so I just want

2    to make sure I'm being clear.  Sorry.

3    **Q.**  Okay.  But you understand that your economic middleware

4    would need to connect to iOS through Apple's APIs, and to the

5    extent APIs are intellectual property, you would agree with

6    that, correct?

7    **A.**  Yes.

8    **Q.**  All right.  And you understand that Apple would need to

9    license its IP to multiplatform app stores as a remedy in this

10   case.

11   **A.**  Yes.

12   **Q.**  And here is a question:  In your but-for world, are you

13   saying that Apple can or cannot sue for patent infringement

14   third-party app stores that come on to iOS?

15           **MR. EVEN:**  Objection, Your Honor.

16           **THE WITNESS:**  I'm sorry, I -- whether or not somebody

17   can sue is not -- is not -- is not my expertise.

18   BY MS. DUNN:

19   **Q.**  Right.  I'm just -- Doctor, what I'm trying to get at is

20   you're imagining a world in which Apple needs to license its

21   IP to third parties.

22       And what I want to understand is in your world that you

23   posit, that you described, what's the plan?  Is Apple going to

24   be able to -- is the answer that they should just sue

25   everybody that comes onto the platform for patent

1    infringement?  Have you thought about that?

2    **A.**  I don't -- I'm fairly certain I didn't propose that Apple

3    sue everyone on the platform, no.

4    **Q.**  That's not something you thought about?

5    **A.**  If you're asking whether I thought about how it can work

6    to have a platform with apps on it.  Windows and Mac are --

7    **Q.**  I'm --

8    **A.**  I'm sorry.  You asked if I had thought about it --

9    **Q.**  I'm sorry.  I --

10   **A.**  -- and so -- you just want a yes, that I thought about it.

11   **Q.**  Yes.

12   **A.**  Okay.  Sorry.  Yes, I thought about it.

13   **Q.**  All right.  So in your direct testimony, you discussed

14   quite a lot about app-related switching costs, including the

15   cost of repurchasing apps and in-app purchases.

16       Do you remember that?

17   **A.**  Yes.

18   **Q.**  And your opinions about anticompetitive effects relate to

19   switchings costs at a high level, directly or indirectly,

20   correct?

21   **A.**  Yes.

22   **Q.**  And you're aware, aren't you, that there is an extensive

23   body of economic literature around switching costs?

24   **A.**  Yes.

25   **Q.**  And you cited no academic literature directly focused on

1    switching costs in your testimony, correct?

2    **A.**   That's correct.

3    **Q.**   Okay.  And actually, in your report, you relied on only

4    three academic sources.  One is an article about Android in

5    competition in the European Competition Journal; second is an

6    article about online streaming and music consumption; the

7    third is an article that you wrote with others about Apple

8    Pay; and the fourth, generously construed as an academic

9    source, is Walter Isaacson's Steve Jobs biography.

10        That's -- those are the academic sources that you list in

11   your report?

12   **A.**   That sounds right.

13   **Q.**   Okay.  And you don't quantify yourself the time costs and

14   other costs of identifying and installing apps on a new mobile

15   operating system platform, correct?

16   **A.**   I presented facts relevant to that, but I didn't come with

17   a bottom-line number.

18   **Q.**   I mean, we discussed this in your deposition.  You didn't

19   quantify it, correct?

20   **A.**   Correct.

21   **Q.**   Right.

22        And you don't have surveys or empirical data that say

23   switching costs outweigh porting costs, correct?

24   **A.**   I'm sorry, switching -- you're asking me about switching

25   costs outweigh porting costs?  I just want to make sure I

1    understood the question.

2    **Q.**  Sure.  On your direct exam, you talked about switching

3    costs and porting costs, and I'm just asking you whether -- my

4    understanding is you've offered no empirical data that say

5    that the costs of switching outweigh the cost of porting or

6    trying to form any relationship between these two things.

7    **A.**  Well, they both independently operate to support -- to

8    support market power in mobile platform competition, so....

9    **Q.**  I'm just asking if you quantified either.

10   **A.**  No.

11   **Q.**  Okay.  You also did not quantify the amount of time it

12   takes to switch from an iPhone or an Android or the dollar

13   estimate for switching between an iPhone and Android, correct?

14   **A.**  So I -- to be -- make sure I'm answering fully, the email

15   that I proposed had a specific dollar value proposed by Apple

16   executives, but in my report, I did not do that

17   quantification.

18       Is that -- was that the question?

19   **Q.**  You're talking about the email you showed us from 2013?

20   **A.**  Which --

21   **Q.**  Right.

22   **A.**  So I -- were you asking me about my report or my

23   testimony?  I'm sorry.

24   **Q.**  I'm asking whether you did anything to quantify a dollar

25   estimate for any amount of time it takes to switch between

ATHEY - CROSS / DUNN

1   iPhone and Android.  Did you do any of that work?

2   **A.**   No.

3   **Q.**   Thank you.

4       You also did not calculate the average amount of app

5   purchases that must be repurchased in moving to a new system,

6   correct?

7   **A.**   I did not calculate that average, no.

8   **Q.**   And you said on direct to the Court that the average user

9   has a hundred apps, but the number of apps that users actually

10  use is far lower than that, somewhere in the 30s, correct?

11  And that comes from the same source material where you got the

12  number 100.

13      Are you aware of that?

14  **A.**   Yeah, that sounds about right --

15  **Q.**   Okay.

16  **A.**   -- although the -- that -- that statement by itself is not

17  fully precise because you have to define what it means to use

18  regularly and so on.  But I'm not disputing the

19  characterizations you have given there.

20  **Q.**   Right.  And you're aware that many apps are free to

21  download, correct?

22  **A.**   Yes, right.

23  **Q.**   And you said on direct that many apps are available on

24  both platforms, correct?

25  **A.**   Yes.

ATHEY - CROSS / DUNN

1    **Q.**  Okay.  Okay.  Let me -- if you would turn in your binder,

2    Dr. Athey, to Exhibit 5612.  And this is an article that you

3    cite in your report in support of your opinions about

4    switching.

5        You say at paragraph 86 in your report that the user has

6    to manually search for her apps, reinstall them, and

7    repurchase those that change -- I'm sorry, charge an upfront

8    price, and then this is the article that's footnoted to that.

9        If you look under "Apps" in this article, there's an -- on

10   page 7, it says under "Apps":  "The bad news:  Any apps you've

11   installed on your iPhone won't automatically transfer over to

12   Android and any apps you paid for on iOS will likely have to

13   be purchased again."

14       Do you see that?

15   **A.**  Yes.

16   **Q.**  All right.  So that's what you cite in your testimony --

17   your report, I'm sorry.

18       And then the next paragraph offers some good news.  It

19   says:  "These days, most major productivity apps are readily

20   available on both platforms, and once you're all set up with

21   Android, all of your apps and app data will automatically sync

22   with Google servers and follow you to any future Android

23   devices."

24       Do you see that?

25   **A.**  Yes.

ATHEY - CROSS / DUNN

1  **Q.**  Right.  So the report cites the bad news and leaves out

2  the good news, but I know that you are aware that there are

3  tools for switching.

4       You are aware of that?  "Yes" or "no"?

5  **A.**  Yes.

6  **Q.**  Okay.  So if you look, then -- actually, this may require

7  switching binders, so I will read it to you.  Paragraph 46 of

8  your report says:

9            "Users will need to check to see if their other

10            existing apps are available on the new platform.  For

11            example, developers frequently launch new apps on

12            iOS before Android due to the higher spending on

13            apps and in-app purchases by iOS users."

14       Do you see that?

15  **A.**  I'm not looking at it now, but I believe --

16  **Q.**  I apologize.  That's --

17  **A.**  That's fine.

18  **Q.**  -- paragraph 46 of your report.

19       All right.  So in support of the statement that

20  "developers frequently launch new apps on iOS before Android

21  due to higher spending on apps and in-app purchases," you cite

22  an article from The Guardian, and that's Footnote 15.

23       And so we can show that to you, as well.  That is

24  Exhibit 5605 in your exhibit binder.  And if you turn to

25  page 3, there's a heading that says "Developer Concerns About

ATHEY – CROSS / DUNN

1    Profits and Piracy."

2        And if you look at the paragraph in the middle of the

3    screen here, it says:  "It tends to be a two-prong thing.

4    First, the perception that Android users are less likely to

5    spend money on or in apps; and, second, the belief that paid

6    apps in particular suffer from crippling levels of piracy on

7    Android."

8        Then it goes on to say:  "Is this fair?  Piracy on Android

9    is a fact.  Developers of paid apps who keep a close eye on

10   their analytics often notice lots more people using them than

11   have actually bought them on a store like Google Play.  Games

12   suffer in particular from this."

13       So in your report, Dr. Athey, you talk about the first

14   prong, but you leave out the second prong even though it

15   appears in the same sentence, the part about crippling piracy

16   on Android.

17       Was there a particular reason for that, that you omitted

18   the part about the crippling levels of piracy on Android?

19   **A.**   Sorry.  Just rereading that.

20       The -- in my report, I'm talking about, at that point, the

21   users' choices and the frictions that the user faces when

22   moving between the two systems, as well as the -- between

23   iPhone and Android, as well as the costs that they may incur

24   and whether or not the apps would be there.

25   **Q.**   All right.

ATHEY - CROSS / DUNN

1    **A.**   So the piracy on Android is not directly relevant to

2    that -- to that point.

3    **Q.**   All right.  Let me read you the sentence from your report.

4              "Developers frequently launch new apps on iOS

5              before Android due to higher spending on apps and

6              in-app purchases by iOS users."

7       You say that to explain why users need to check whether

8    those apps are available.  So in your report, you're

9    explaining why developers launch new apps on iOS before

10   Android, and you say that that's due to higher spending on

11   apps and in-app purchases.

12      So you've taken this sentence.  You've used half of it,

13   you've left out the other half --

14   **A.**   So --

15   **Q.**   -- in support of the same point.  And I'm just asking you

16   if you realize that you did that.

17   **A.**   So the first -- this article confirms a fact of which I am

18   aware across, you know, many years of experience.  The fact

19   that iPhone users spend more than Android users is relevant

20   for understanding, you know, search engines and how they

21   monetize, it's important for understanding, you know, the

22   importance of developing -- spending more money on development

23   of an iPhone app than an Android app, and it's been important

24   for understanding the evolution of this industry from the

25   beginning.

1    So I've been following this industry, you know, since the

2    launch of the phones --

3    **Q.**  Right.  That's --

4    **A.**  -- and so just -- you asked me why, so I'm trying to

5    explain why -- because this fact that iPhone users spend more

6    is a kind of established fact that comes up over and over

7    across different settings.

8    **Q.**  So --

9    **A.**  So that's -- so piracy is something that, you know,

10   there's an assertion here, but it's not the primary thing that

11   would necessarily set the expectations of industry

12   participants --

13   **Q.**  Right.

14   **A.**  -- in my opinion.

15   **Q.**  In your opinion.

16       And so in your opinion, security, piracy, privacy, those

17   issues, were not relevant, but this other -- the first half of

18   this paragraph was.

19   **A.**  I don't think that's what I said.

20   **Q.**  Okay.  So the word "security," Dr. Athey, does not appear

21   at all in your written direct testimony; that's correct?

22   **A.**  I'll take your word for it.

23   **Q.**  Right.  And you didn't mention it in your testimony today,

24   and even though you've written about privacy yourself, how

25   important that is, that also doesn't appear in your testimony,

ATHEY – CROSS / DUNN

1    correct?

2    **A.**   I don't believe so, no.

3    **Q.**   Right.  And the point of showing you this article is that

4    you focused on certain things but not others, even though in

5    the industry, security and privacy, which you do not mention,

6    are very important.

7        Do you disagree with that?

8    **A.**   I don't think that's a completely fair characterization,

9    because the reason that we're here to talk about competition,

10   the reason competition is important is that we need

11   competitive pressures to ensure that firms innovate and

12   provide features that people want.  Whether or not they have

13   in the past, we want to make sure that they continue to

14   innovate.  And so I gave --

15   **Q.**   And so do you --

16   **A.**   -- I gave an opinion about this, which I said in my

17   testimony --

18   **Q.**   Dr. Athey, thanks.

19   **A.**   Okay.

20   **Q.**   Are you aware, then, that with regard to the competition

21   analysis in this case, security and privacy are two of Apple's

22   asserted procompetitive justifications for the restrictions

23   that you discuss?  Are you aware of that?

24   **A.**   Yes.

25   **Q.**   Okay.  And did you hear Mr. Sweeney's testimony?

ATHEY – CROSS / DUNN

1  **A.**  No.

2  **Q.**  Okay.  So you may not be aware that even he has said that

3  privacy and security are competitive differentiators for

4  Apple.

5  **A.**  That sounds --

6  **Q.**  Were you aware --

7  **A.**  -- right.

8  **Q.**  You agree with that, though?

9  **A.**  Today, yes.

10  **Q.**  Okay.  In your direct testimony, you also talked about

11  mixing and matching in family groups.

12      Do you recall that?

13  **A.**  Yes.

14  **Q.**  All right.  You didn't do an independent analysis,

15  however, of what percentage of families already mix and match

16  within the family group, right?

17  **A.**  No.

18  **Q.**  And, in fact, as you told us in your deposition, it's very

19  common today for families to have devices in addition to

20  phones that run different operating systems.

21      You recall that?

22  **A.**  Yes, for example, phones and PCs.

23  **Q.**  Right.  And your testimony is that when something

24  facilitates synchronization across platforms, it reduces

25  mixing and matching costs, correct?

1824

ATHEY – CROSS / DUNN

```
 1              THE REPORTER:  Excuse me.  I'm sorry.  I need you to
 2      repeat that.
 3              MS. DUNN:  Sorry.
 4              THE COURT:  Two minutes, Ms. Dunn.
 5      BY MS. DUNN:
 6      Q.  Well, I want to spend my two minutes clearing up something
 7      that we've been talking about for -- since -- like the past
 8      two weeks.
 9          You agree V-Bucks can be purchased on one platform and
10      spent on another, correct?
11      A.  Not -- not all platforms.
12      Q.  But -- right.  Not on Sony and not Nintendo, but on other
13      platforms, V-Bucks can be spent -- bought on one platform and
14      spent on another.
15          You know that, right?
16      A.  On some, yes.
17      Q.  Okay.  And that's not just true on a PC; that's also true
18      on a web browser, which is right on the phone, correct?
19      A.  The phones have a web browser, yes.
20      Q.  Right.  And you can buy V-Bucks on the web browser.
21          You know that, right?
22      A.  Yes.
23      Q.  Okay.  And so even if you are out and about, you can buy
24      V-Bucks on your iPhone, not through the app store, correct?
25      A.  I don't know if you've ever tried to do that with a baby
```

ATHEY - CROSS / DUNN

1    on your shoulder, but in principle, yes.

2    **Q.**  I assure you I've tried to do everything with a baby on my

3    shoulder.

4         So the same thing with the *New York Times*.  You can

5    subscribe through the web browser on the phone, correct?

6    **A.**  If you're aware that that is a possibility.

7    **Q.**  Right.  And you have no data to say that consumers don't

8    know that's a possibility.  You've done a study of that?

9    **A.**  I have -- I have not studied the percentage of consumers

10   who are aware of their -- their options.

11   **Q.**  Right.  And the web browser itself is middleware.

12        You agree with that?

13   **A.**  Yes.

14             **THE COURT:**  Okay.  It's 3:15.

15             **MS. DUNN:**  Thank you, Your Honor.

16             **THE COURT:**  So you may step down for the day,

17   Professor Athey.  We start -- we'll have you back on the stand

18   somewhere between 8:00 and 8:15.  You can leave those binders

19   there and step down.

20             **THE WITNESS:**  Thank you, Your Honor.

21             **THE COURT:**  We have -- I have a calendar in 15

22   minutes, so we will stand in recess until 8:00 a.m. unless

23   there is something urgent I need to deal with.

24             **MR. EVEN:**  Nothing here, Your Honor.

25             **MR. BORNSTEIN:**  Nothing, Your Honor.

1          **MS. DUNN:**  Nothing, Your Honor.  Thank you.

2          **THE COURT:**  Okay.  Thank you very much.  We will

3     stand in recess until 8:00 a.m.

4               (Proceedings concluded at 3:15 P.M.)

5

6

7                    **CERTIFICATE OF REPORTERS**

8

9

10          We, Diane E. Skillman and Pamela Hebel, certify that

11     the foregoing is a correct transcript from the record of

12     proceedings in the above-entitled matter.  We further certify

13     that we are neither counsel for, related to, nor employed by

14     any of the parties to the action in which this hearing was

15     taken, and further that we are not financially nor otherwise

16     interested in the outcome of the action.

17

18               _____/S/DIANE E. SKILLMAN_____

19          Diane E. Skillman, CSR, RPR, FCRR

20

21               _____/S/ PAMELA HEBEL_____

22          Pamela Hebel, CSR, RMR, FCRR

23

24               Tuesday, May 11, 2021

25