THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
  vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN DETTMER, SBN 196046
  edettmer@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                    Plaintiff, Counter-<br>                    defendant<br><br>    v.<br><br>APPLE INC.,<br><br>                    Defendant,<br>                    Counterclaimant. | Case No. 4:20-cv-05640-YGR-TSH<br><br>**APPLE INC.'S NOTICE OF MOTION AND MOTION FOR STAY OF INJUNCTION PENDING APPEAL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

1

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 16, 2021 at 2:00 p.m., or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Yvonne Gonzalez Rogers, Courtroom 1, 14th Floor, United States District Court, 1301 Clay Street, Oakland, California, Defendant Apple Inc. will and hereby does move the Court to stay the September 10, 2021 Permanent Injunction (Dkt. 813) pending the resolution of appeals in this case.  This motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities that follows; the Declarations of Mark A. Perry and Trystan Kosmynka and exhibits thereto; the Proposed Order filed herewith; the pleadings and papers on file herein; and such other matters that may be presented to the Court at the hearing.

DATED:  October 8, 2021          By     */s/ Mark A. Perry*
                                        GIBSON, DUNN & CRUTCHER LLP
                                        Theodore J. Boutrous Jr.
                                        Richard J. Doren
                                        Daniel G. Swanson
                                        Mark A. Perry
                                        Veronica S. Lewis
                                        Cynthia E. Richman
                                        Jay P. Srinivasan
                                        Ethan D. Dettmer
                                        Rachel Brass

                                        *Attorneys for Apple Inc.*

1

**TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................................. 1

3

BACKGROUND ................................................................................................................. 1

4

    A.    The Court Enjoins Enforcement of Portions of Guidelines 3.1.1 & 3.1.3 ................... 3

5

    B.    Apple Addresses Anti-Steering In Other Venues ....................................................... 5

6

LEGAL STANDARD .......................................................................................................... 6

7

DISCUSSION ..................................................................................................................... 7

8

    A.    Apple Would Be Irreparably Harmed In The Absence Of A Stay .............................. 7

9

    B.    Apple Has A Substantial Case For Relief On The Merits .......................................... 10

10

        1.    There Is No UCL Violation............................................................................. 11

11

        2.    Epic Lacks Standing........................................................................................ 14

12

        3.    The Injunction Is Beyond The Equitable Authority Of The Court ................. 15

13

    C.    A Stay Will Not Injure Epic.................................................................................... 18

14

    D.    A Stay Is In The Public Interest .............................................................................. 18

15

    E.    In The Alternative, The Court Should Temporarily Stay The Injunction.................. 19

16

CONCLUSION................................................................................................................... 19

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987)...................................................................................................17

*Campbell v. Nat'l Passenger R.R. Corp.*,
No. 05-CV-5434, 2009 WL 4546673 (N.D. Cal. Nov. 30, 2009).................................................19

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...........................................................................................................11

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
817 F.3d 46 (2d Cir. 2016).......................................................................................................12

*Conservation Congress v. U.S. Forest Serv.*,
No. 11-CV-2605, 2012 WL 3150307 (E.D. Cal. Aug. 1, 2012)..................................................19

*Dameron Hosp. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
No. 12-CV-2246, 2013 WL 5718886 (E.D. Cal. Oct. 15, 2013) .................................................18

*Davis v. FEC*,
554 U.S. 724 (2008)................................................................................................................14

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012)..................................................................................................13

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir. 1996)....................................................................................................17

*eBay Inc. v MercExchange, LLC*,
547 U.S. 388 (2006)................................................................................................................16

*Elliot v. Williams*,
No. 08-CV-829, 2011 WL 5080169 (D. Nev. Oct. 25, 2011) .....................................................19

*Facebook, Inc. v. Brandtotal, Ltd.*,
No. 20-CV-7182, 2021 WL 2354751 (N.D. Cal. June 9, 2021) ..................................................11

*Gregory v. Albertson's, Inc.*,
104 Cal. App. 4th 845 (2002) ...................................................................................................11

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004).....................................................................................................14

*Hilton v. Braunskill*,
481 U.S. 770 (1987).................................................................................................................6

*Hunt v. Check Recovery Sys., Inc.*,
  No. 05-CV-4993, 2008 WL 2468473 (N.D. Cal. June 17, 2008) ................................................18

*Lair v. Bullock*,
  697 F.3d 1200 (9th Cir. 2012) ...................................................................................................6

*Levi Strauss & Co. v. Shilon*,
  121 F.3d 1309 (9th Cir. 1997) .................................................................................................16

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ...................................................................................................13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................................14

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .................................................................................................................17

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  141 S. Ct. 2141 (2021) ...............................................................................................................8

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ...........................................................................................2, 8, 9, 11, 13

*Piper Restoration Techs., LLC v. Coast Bldg. & Plumbing, Inc.*,
  No. 13-CV-499, 2018 WL 6012219 (C.D. Cal. Nov. 16, 2018) .............................................16

*Snapkeys, Ltd. v. Google LLC*,
  No. 19-CV-2658, 2020 WL 6381354 (N.D. Cal. Oct. 30, 2020) .............................................11

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ...................................................................................................16

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) .....................................................................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................................................................17

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................................14, 15

*Zepeda v. U.S. I.N.S.*,
  753 F.2d 719 (9th Cir. 1983) ...................................................................................................17

**INTRODUCTION**

Apple asks the Court to suspend the requirements of its injunction until the appeals filed by both Epic and Apple have been resolved. The company understands and respects the Court's concerns regarding communications between developers and consumers. Apple is carefully working through many complex issues across a global landscape, seeking to enhance information flow while protecting both the efficient functioning of the App Store and the security and privacy of Apple's customers. Striking the right balance may solve the Court's concerns making the injunction (and perhaps even Apple's appeal itself) unnecessary. A stay is warranted in these circumstances.

The Court presided over a 16-day trial in May. The CEOs of both Epic Games, Inc. and Apple Inc. testified, along with other top executives and numerous expert witnesses. Hundreds of exhibits were admitted into evidence. Based on this robust record, the Court issued a detailed 185-page opinion, concluding that Epic failed to prove that Apple violated any federal or state antitrust law. Dkt. 812 ("Op."). Apple was not found to be a monopolist. Observing that "[s]uccess is not illegal," Op. at 1, the Court ruled against Epic on nine of its ten claims and rejected Epic's request for a sweeping injunction that would have transformed the App Store's business model.

On Epic's tenth claim, the Court concluded that Apple's so-called anti-steering provisions—two sentences in the App Store Review Guidelines that restrict in-app and targeted out-of-app communications regarding alternative payment options—are contrary to California's Unfair Competition Law (the "UCL"). Epic barely mentioned that claim during the trial and offered no evidence that it was harmed by the anti-steering provisions. Nor did Epic present any evidence regarding how revisions to the Guidelines could or would be implemented, or the effects of any such changes on consumers, developers, or Apple. While recognizing that the trial record was less than fulsome, the Court concluded that the anti-steering provisions are "unfair" under the UCL. Op. at 163, 179.

As relevant here, the Court enjoined Apple from enforcing the Guideline that prohibits developers from including in-app "buttons, external links, or other calls to action"—while still permitting Apple to take steps to enhance information flow between developers and consumers without "impact[ing] the integrity of the [iOS] ecosystem." Op. at 163–64. However, precipitous

implementation of this aspect of the injunction would upset the careful balance between developers and customers provided by the App Store, and would irreparably harm both Apple and consumers. The requested stay will allow Apple to protect consumers and safeguard its platform while the company works through the complex and rapidly evolving legal, technological, and economic issues that any revisions to this Guideline would implicate.

Apple is likely to succeed on appeal. Epic's theory of liability under the UCL cannot be reconciled with the findings and conclusions the Court made elsewhere in its opinion, particularly in recognizing the procompetitive justifications for Apple's IAP requirement. Indeed, the Supreme Court has recognized the procompetitive effects of anti-steering provisions in particular, which fulfill the "promise of a frictionless transaction." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018). The undisputed evidence in this case established that operators of two-sided transaction platforms, like the App Store, commonly impose some kind of steering restrictions on platform participants. Epic's own expert witness agreed that common practices in competitive markets are efficient—i.e., procompetitive.

Epic will suffer no harm from a stay because, as authorized by the Court's decision, Apple recently rejected Epic's request to reinstate its developer program account; Epic has no live apps on the App Store and thus no standing to enforce the injunction. Moreover, the trial evidence establishes that Epic has never been harmed by the anti-steering provisions. And the public interest favors maintaining the status quo while the case works its way through the appellate process. Indeed, because Epic continues to seek broader relief, including an injunction against Apple's IAP requirement, it would be more prudent to wait and see how the appeals are decided before requiring Apple to implement any changes to the App Store.

There are many complexities to running the global iOS ecosystem, with close to 200 storefronts, millions of developers, and billions of customers. As the Court recognized, Apple operates in a dynamic environment, with the trial being a "snapshot" at a single point in time in a "moving stream." Trial Tr. 3839:19–23. Implementing the injunction on December 9 could have unintended downstream consequences for consumers and the platform as a whole. Apple is working hard to address these difficult issues in a changing world, enhancing information flow without compromising the consumer

experience.  A stay of the injunction would permit Apple to do so in a way that maintains the integrity of the ecosystem, and that could obviate the need for any injunction regarding steering.

## BACKGROUND

### A.    The Court Enjoins Enforcement of Portions of Guidelines 3.1.1 & 3.1.3

Epic brought this case alleging that a variety of "technical" and "contractual" restrictions set by Apple for its App Store violate Sections 1 and 2 of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law (the "UCL").  *See generally* Dkt. 1.  Although referenced only obliquely in Epic's complaint, Epic also challenged the so-called "anti-steering" provisions in the App Store Review Guidelines, which generally prohibit developers from (1) including external links, buttons, or other calls to action in an app directing the user to an alternative payment platform (Guideline 3.1.1), and (2) using information collected within the app (such as email addresses) to communicate with customers outside of the app regarding alternative payment platforms (Guideline 3.1.3).  *See id.* ¶¶ 130–31.  As the Court acknowledged from the outset, Epic's claims were at "the frontier edges of antitrust law in the United States."  Dkt. 118 at 10.  Importantly, Epic's challenge to those provisions did not stand alone, but instead was intertwined with its allegations that the IAP requirement was an anticompetitive restraint and that in-app payment functionality was tied to app distribution, which the Court properly rejected.  Dkt. 1 ¶ 132; *see also* Dkt. 407 (Epic's Pretrial Proposed Conclusions of Law) ¶ 418.

After a bench trial, the Court upheld Apple's practices under federal and state antitrust laws and concluded Epic breached its contractual agreements with Apple.  In its analysis, the Court recognized that Apple legitimately monetized its platform by requiring use of IAP for in-app purchases of digital goods.  Op. at 149–50.  The Court received substantial evidence that Apple enforced Guideline 3.1.1 to that end.  *See, e.g.*, Trial Tr. 1018:21–1019:4, 1019:24–1020:7, 1021:19–25, 1022:20–22, 1130:2–16 (Kosmynka).  This included Apple's removal of *Fortnite* when Epic breached (among other obligations) Guideline 3.1.1's prohibition on including buttons or external links to non-IAP purchasing mechanisms.  *See* Trial Tr. 2820:18–2821:4 (Schiller).  All of this was legitimate:  "The requirement of usage of IAP," the Court concluded, was the "easiest and most direct" way for Apple to collect compensation for "licens[ing] its intellectual property."  Op. at 150.

The Court additionally held that in light of Epic's admission that it had breached sections 3.2, 3.3.2, 3.3.3, 3.3.25 of the DPLA, as well as section 1.1(a) and 3.4(a) of Schedule 2 to the DPLA, Epic was liable for breach of contract.  Op. at 168.  The Court found that Epic's "hotfix . . . clandestinely enabled substantive [payment] features in willful violation" of its contractual obligations.  *Id.* at 21.  The Court rejected Epic's argument that the relevant provisions of the DPLA were illegal, void as against public policy, or unconscionable, holding that its conclusions regarding the lawfulness of the challenged provisions under the Sherman Act and the Cartwright Act precluded those defenses.  *Id.* at 168–73.  The Court accordingly ordered Epic to pay damages in the amount of 30% of all revenues collected from users in the *Fortnite* iOS app from the implementation of the "hotfix" through the date of judgment, and issued declaratory judgment that "Apple's termination of the DPLA and the related agreements between Epic Games and Apple was valid, lawful, and enforceable" and that "Apple has the contractual right to terminate its DPLA with any or all of Epic Games' wholly owned subsidiaries . . . at any time and at Apple's sole discretion."  *Id.* at 179.

Acknowledging that the record "was less fulsome," however, the Court separately addressed Apple's anti-steering provisions under the UCL.  Op. at 163.  Although the Court concluded none of the contractual provisions Epic breached—one of which was Guideline 3.1.1's restrictions on links and buttons, Trial Tr. 2820:18–2821:4 (Schiller)—was unlawful, Op. at 169–70, the Court concluded that Apple's anti-steering provisions are "unfair" within the meaning of the UCL, *id.* at 164.  The basis for the Court's ruling was its concern about "the open flow of information."  *Id.*  The Court reasoned that with a more "open flow of information," users could more easily "discover[] the lowest cost seller" and could more accurately "attribute costs to the platform versus the developer."  *Id.*

On the basis of its finding of liability under the UCL, the Court issued a permanent injunction slated to take effect on December 9, 2021:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ('Apple'), are hereby permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

Dkt. 813.  The Court concluded that this was a "measured remedy" that would "increase competition, increase transparency, increase consumer choice and information while preserving Apple's iOS ecosystem which has procompetitive justifications" without "requir[ing] the Court to micromanage business operations."  Op. at 179.

The injunctive relief applies not just to Epic—which cannot even benefit from the injunction because it no longer has a developer program account with Apple or any live apps on the App Store—but to *all* developers in the United States.  Dkt. 813.  By its terms, the injunction will take effect ninety days from its issuance (i.e., December 9, 2021) and has no termination date.  *Id.*

Following the Court's decision, Mr. Sweeney stated publicly that "Fortnite will return to the iOS App Store when and where Epic can offer in-app payment in fair competition with Apple in-app payment, passing along the savings to consumer."  Perry Decl. Ex. A.  He continued: "Thinking much more about whether we're going to live in a world where two platform megacorps dictate software and world commerce to everyone or whether the digital world and the future metaverse will be a free world. Wouldn't trade that away to get Fortnite back on iOS."  Perry Decl. Ex. B; *see also id.* Ex. C.  Based on these and other statements, which make clear that Epic has no intention of complying with Apple's Guidelines notwithstanding any protestations to the contrary, Apple advised Epic that it would not be reinstating Epic's Developer Account or the *Fortnite* app.  Perry Decl. Ex. D.  Apple explained that "Epic committed an intentional breach of contract, and breach of trust, by concealing code from Apple and making related misrepresentations and omissions."  *Id.*  In light of Epic's adjudicated misconduct and Mr. Sweeney's post-decision statements, and as expressly authorized by the Court's decision, Apple "exercised its discretion not to reinstate Epic's developer program account at this time."  *Id.*  As a result, Epic has no live apps (including *Fortnite*) on the App Store.

Epic filed a notice of appeal on September 13, 2021.  Dkt. 817.  Apple filed a cross-appeal on October 8, 2021.

**B.     Apple Takes Steps To Enhance Information Flow Between Developers and Consumers**

Apple regularly reviews and revises its Guidelines in response to developer and consumer feedback, competitive developments, and other considerations.  Even before the Court's decision in *Epic*, Apple began exploring changes to the Guidelines applicable to developer-customer

communications.  These proposed changes are intended to allow for an increased flow of information to users while preserving the integrity of the ecosystem.

Most significantly, Apple reached a settlement in the developer class action asserting substantially the same claims as Epic.  *See* Motion for Preliminary Approval of Settlement, *Cameron v. Apple Inc.*, No. 19-CV-3074 (Aug. 26, 2021), Dkt. 396.  As detailed in the settlement, Apple has agreed (among other things) to "[p]ermit all U.S. Developers to communicate with their customers via email and other communication services outside their app about purchasing methods other than in-app purchase, provided that the customer consents to the communication and has the right to opt out." Stipulation of Settlement § 5.1.3 *Cameron*, No. 19-CV-3074 (Aug. 26, 2021), Dkt. 396-1 Ex. A.  The Court has scheduled a hearing on the developer class plaintiffs' motion for preliminary approval of the settlement for November 2, 2021.  *See* Order, *Cameron*, No. 19-CV-3074 (Sept. 28, 2021), Dkt. 433.

In addition, Apple is working on other changes to its Guidelines in resolution of an investigation by the Japan Fair Trade Commission, which was also reached before the Court issued its *Epic* decision. Perry Decl. Ex. E.  These changes, which require time to develop and implement, will go into effect in early 2022.  *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) authorizes a district court to stay enforcement of a permanent injunction pending appeal.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  A request for a stay is analyzed under four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).  The first factor requires the movants to show only "that there is a substantial case for relief on the merits"; "[t]he standard does not require the [movants] to show that it is more likely than not that they will on the merits."  *Id.* at 1204 (quotation marks omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DISCUSSION

The Court's injunction is in two parts, precluding Apple from enforcing (1) the Guideline prohibition against links, buttons, or other calls to action within an app; and (2) the Guideline prohibition against targeted communications outside the app.  Apple has already addressed targeted out-of-app communications in the *Cameron* settlement, which will result in the deletion of the clause that the Court has enjoined.  As to in-app communications, the injunction requires Apple to strike the "call to action" provision, but does not prevent the adoption of a solution that would result in enhanced information flow between developers and consumers while still constraining those communications in appropriate ways to preserve the integrity of the ecosystem.  Such a solution, however, is technologically and economically complex and requires consideration of events on the global stage. Accordingly, Apple respectfully requests that the injunction be stayed pending the appeal, during which Apple will continue to work on a solution that could render any injunction unnecessary.

### A.   Apple Would Be Irreparably Harmed In The Absence Of A Stay

Absent a stay, Apple would be forced to permit developers to engage in conduct that will disrupt Apple's lawful App Store business model.  While Apple is taking steps to increase the flow of information from developers to consumers, some developers (including Epic) misread the injunction to permit unconstrained in-app messaging or links.  Indeed, despite the Court's acknowledgment that its remedy was not intended to have "any impact on the integrity of the ecosystem," Op. at 164, some commentators have asserted that "the fabric of Apple's App Store could be forever changed" by the Court's injunction, *see, e.g.*, Perry Decl. Ex. F.  Mr. Sweeney has touted an expansive view of the Court's injunction that not only would require Apple to allow links directing customers to developer's websites but, apparently, also would permit developers to install competing payment mechanisms such as the one implemented by Epic's hotfix at the culmination of Project Liberty—notwithstanding that the Court held Epic liable for breach of contract as a result of the hotfix.  Perry Decl. Ex. C.

To be clear, Apple disagrees with this broad interpretation of the injunction, but Epic's apparent endorsement of this view threatens Apple's ability to operate its platform.  At least one other developer has already publicly announced its intention to offer an alternative payment system for digital goods and services transactions within iOS apps.  Perry Decl. Ex. G.  One of its selling points raises clear red

flags:  In contrast to Apple's strict rules surrounding privacy, that developer intends to provide access to user email addresses.  Perry Decl. Ex. H.  Moreover, in the weeks following the Court's decision, a number of developers have asked Apple to clarify what will and will not be permitted.  Kosmynka Decl. ¶ 9.  The Court has stricken one sentence of Guideline 3.1.1, but did not disable Apple from otherwise running its business or protecting consumers.

The approach advocated by Epic and others will disrupt "the optimal balance" between the two sides of the App Store platform.  *Amex*, 138 S. Ct. at 2281.  This is important in light of the Supreme Court's recognition that such balance "is essential for two-sided platforms to maximize the value of their services and to compete with their rivals."  *Id.*  Simply put, steering users to other payment solutions undermines the "promise of a frictionless transaction" and "undermine[s] the investments that [Apple] has made to encourage increased [customer] spending" on its platform.  *Id.* at 2289.

The Court expressly found that Apple is entitled to collect a commission from developers for use of its platform, regardless of whether that commission is collected through IAP.  *See* Op. at 150 ("[T]o the extent Epic Games suggests that Apple receive nothing from in-app purchases made on its platform, such a remedy is inconsistent with prevailing intellectual property law." (footnote omitted)).  As the Court recognized, payment methods that avoid IAP make it "more difficult for Apple to collect that commission."  *Id.*  And it further acknowledged that "if Apple could no longer require developers to use IAP for digital transactions, Apple's competitive advantage on security issues, in the broad sense, would be undermined and ultimately could decrease consumer choice in terms of smartphone devices and hardware."  *Id.* (citation omitted).

When considering the appropriateness of an injunction against allegedly anticompetitive conduct, courts must be cognizant of the fact that "[c]osts associated with ensuring compliance with judicial decrees may exceed efficiencies gained; the decrees themselves may unintentionally suppress procompetitive innovation."  *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2163 (2021).  Here, the costs to consumers and Apple are high.  Discouraging users to use IAP also would reduce the value of the benefits Apple offers to both developers and consumers.  "Suffice it to say, IAP is not merely a payment processing system, as Epic Games suggests, but a comprehensive system to collect commission and manage in-app payments."  Op. at 154.  Permitting developers to "steer" users to other

1   payment mechanisms "undermines the investments that [Apple] has made" in IAP, "which discourages

2   investments in [IAP] and ultimately harms both [users] and [developers]." *Amex*, 138 S. Ct. at 2289.

3          IAP offers a number of protections for consumers, such as those against fraudulent

4   transactions. *See* Trial Tr. 2797:3–23 (Schiller).  Their effectiveness depends, in part, on information

5   Apple receives through IAP—the more data it has, the better it can protect consumers from fraud.  *Id.*

6   Deterring users from using IAP could thus adversely affect the integrity of iOS as a whole, including

7   for those users who transact exclusively using IAP.  And Apple offers a host of other user protections

8   and benefits—such as a "content check" feature to make sure a user has not made a duplicative

9   purchase, and an "ask to buy" feature that allow parents to approve or block a child's in-app purchase—

10  that are uniquely available through IAP.  Kosmynka Decl. ¶ 12.  As the Court observed, "'IAP supports

11  the ability of users to redownload apps and in-app purchase on new devices, share subscriptions and

12  in-app features with family members, view their entire purchase history, and manage subscriptions

13  from one place on their phone.'"  Op. at 115 (quoting Prof. Schmalensee).  These features enhance the

14  overall user experience, the security of a user's purchase, as well as the integrity of the platform as a

15  whole.

16         An erroneously broad interpretation of the injunction would also impair Apple's ability to

17  protect the iOS ecosystem and cause other irremediable harms.  Apple has never permitted the

18  implementation of external payment links for digital goods and services.  Kosmynka Decl. ¶ 15.  Such

19  links raise potential threats to Apple's ability to maintain "a trusted app environment," Op. at 111, and

20  the consequences of any related changes to the platform require careful consideration.  Kosmynka Decl.

21  ¶ 18.

22         Links and buttons to alternate payment mechanisms are fraught with risk.  Users who click on

23  a payment link embedded in an app—particularly one distributed through the curated App Store—will

24  expect to be led to a webpage where they can securely provide their payment information, email

25  address, or other personal information.  Kosmynka Decl. ¶¶ 13–14.  A developer may thus try take

26  advantage of user trust, carefully cultivated by Apple's safe and secure platform, and deceive users into

27  providing their payment information to a malicious platform.  *Id.* ¶ 14.  And while developers are

28

required to disclose their handling of users' privacy information within the app, there is no way for Apple to confirm that a developer's payment page will adhere to those representations. *Id.* ¶ 16.

Moreover, because external links operate outside of iOS—and outside of Apple's commerce engine—Apple has no visibility into their technological and financial functions, and limited ability to redress fraud by identifying and removing bad actors from the App Store. Kosmynka Decl. ¶ 15. While Apple could examine the links in the version of the app submitted for review, there is nothing stopping a developer from changing the landing point for that link or altering the content of the destination webpage. *Id.* Additionally, Apple currently has no ability to determine whether a user who clicks on an external link actually received the products or features she paid for. *Id.* Apple already receives hundreds of thousands of reports *each day* from users, and allowing links to external payment options would only increase this burden. *Id.* ¶ 12. In essence, the introduction of external payment links, particularly without sufficient time to test and evaluate the security implications, will lead to the very same security concerns that Apple combats with the use of IAP more generally, which the Court agreed were legitimate, procompetitive reasons for the design of the App Store. Op. at 149–50.

Finally, implementation of the injunction would require substantial technical and engineering changes. Kosmynka Decl. ¶ 18. Beyond the mere functionality of permitting external payment links, Apple would have to develop technical solutions to address the security and privacy vulnerabilities addressed above. *Id*. Apple would have to develop new App Review processes. Apple would have to write and enforce new Guidelines. *Id.* And Apple would have to engineer alternative solutions for collecting its commission—an undertaking the Court acknowledged could be costly. Op. at 150 & n.617; *see also* Trial Tr. 2721:18–2723:16, 2732:14–24 (Schiller) (Mr. Schiller describing the burden of developing and changing iOS). Once Apple invests these resources, it will not be able to recover them if the injunction ultimately is overturned on appeal (even in part).

## B.    Apple Has A Substantial Case For Relief On The Merits

In Apple's view, the Court's ruling on Epic's UCL claim cannot be reconciled with the findings and conclusions on other theories, especially Epic's challenges to the IAP requirement, or with the trial evidence (or lack thereof) regarding the anti-steering provisions. Apple's cross-appeal will ask the Ninth Circuit to set aside the UCL judgment, or vacate the injunction, on several grounds. This Court

need not agree with Apple's perspective on these issues to recognize that they present, at minimum, a substantial case for relief on the merits.

### 1.      There Is No UCL Violation

There is a substantial case that Epic failed to prove a violation of the UCL.  The imposition of liability under the tethering test was wrong as a matter of law.  The tethering test requires that the plaintiff prove that the conduct at issue is anticompetitive, i.e., that it "*significantly* threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) (emphasis added).  That is true whether the conduct is denominated as an "incipient" antitrust violation or as a violation of the "policy or spirit" of the antitrust laws.  *Id*. (conduct is "unfair" only if it threatens an incipient or policy violation or "otherwise significantly threatens or harms competition").  "As noted in *Cel-Tech*, the focus of the antitrust laws is on injury to competition.  To come within the letter or policy of these laws, it must be alleged that [defendant's] conduct had an adverse effect on competition."  *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 856 (2002) (citation omitted).

The Court construed the tethering test under § 17200 to apply without regard to the relevant market adopted for purposes of antitrust analysis.  Op. at 166.  But UCL jurisprudence *does require* that the tethering test be conducted by reference to the relevant market.  *See, e.g.*, *Facebook, Inc. v. Brandtotal, Ltd.*, No. 20-CV-7182, 2021 WL 2354751, at *15 (N.D. Cal. June 9, 2021) ("starting point" under tethering test is to "identify a product market"); *Snapkeys, Ltd. v. Google LLC*, No. 19-CV-2658, 2020 WL 6381354, at *3 (N.D. Cal. Oct. 30, 2020) ("In order to allege [under UCL tethering test] that conduct '*significantly* threatens or harms competition,' a plaintiff must allege harm to the market as a whole." (emphasis in original)).  The Supreme Court has held with specific application to anti-steering provisions that "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition."  *Amex*, 138 S. Ct. at 2285 (alterations and quotation marks omitted).

Here, the only market the Court defined was the global market for digital mobile gaming transactions.  Op. at 1.  However, when evaluating Apple's anti-steering provisions under the UCL, the Court looked to the purported effects of those provisions without any reference to any defined market.  For example, the Court considered anecdotal evidence from Down Dog and Match Group regarding their experiences with off-platform purchase mechanisms, even though neither of them is a game

developer. *See id.* at 93. Moreover, both Down Dog and Match Group offer *subscription* apps, which the Court expressly ruled are *outside the scope* of the relevant market and which the Court declined even to consider in the remainder of its analysis. Op. at 123 n.571. And the injunction is disconnected from the Court's conclusions on the relevant market: It applies nationwide, and without regard to gaming or non-gaming apps. *Id.* at 167. The Court did not define the market in which it was analyzing these purported competitive effects, "which is essential for assessing the potential harm to competition from the defendants' alleged misconduct." *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (citation omitted). This is especially pertinent given that Epic itself admitted that relief from the anti-steering provisions that would allow links or buttons to alternative payment solutions outside an app would be affirmatively harmful to game developers in particular. Dkt. 1 ¶ 116 ("Mobile game developers particularly value the ability to provide users with engaging gameplay without imposing any burdens or distractions on consumers who wish to make in-app purchases. *Developers would be harmed if their app users were directed to process their purchases outside of the app* . . . ." (emphasis added)).

Beyond the lack of a cognizable market in which to evaluate the anti-steering provisions, there is a substantial case that Epic failed to prove the anti-steering provisions have anticompetitive effects. The principal evidence relied on by the Court was the testimony from Down Dog and Match Group, *see* Op. at 93. But the testimony from Match Group's representative that in-app sales have continued to dominate notwithstanding the firm's investment in marketing campaigns for web purchases, *see* Ex. Depo. (Ong) 24:17–26:5, 28:9–29:22, does not prove anticompetitive effects flowing from the anti-steering provisions. Indeed, there is no data provided to support this anecdotal evidence. *Cf.* Op. at 50. As for Down Dog's testimony regarding the percentage of iOS users who make purchases online, *see* Trial Tr. 360:7–13 (Simon), that testimony too is unsupported by any data. And the competitive effects of the anti-steering provisions as distinguished from all other effects of the iOS platform's design were never independently analyzed from an economic perspective. *See* Trial Tr. 1552:3–14, 1574:1–4, 1716:15–20 (Evans).

By contrast, the Supreme Court has recognized the *procompetitive* effects of anti-steering provisions in two-sided transaction markets. In *Amex*, the Supreme Court explained that "there is

nothing inherently anticompetitive about Amex's antisteering provisions," because "[t]hese agreements actually stem negative externalities in the credit-card market and promote interbrand competition." 138 S. Ct. at 2289; *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("[T]he primary purpose of the antitrust laws is to protect interbrand competition."). Directing users to other payment solutions, the *Amex* Court concluded, undermined the "promise of a frictionless transaction" and "undermined the investments that Amex has made to encourage increased [customer] spending" on its platform. *Amex*, 138 S. Ct. at 2289. This Court likewise has recognized the value of interbrand competition. *See* Op. at 145–46.

This Court distinguished *Amex* on the ground that Apple's anti-steering provisions are more akin to "a prohibition on letting users know that [other] options exist in the first place." Op. at 165. But Apple *does* allow developers to let users know about alternative payment platforms; the anti-steering provisions simply prohibit developers from using Apple's platform and resources to do so. Indeed, Phil Schiller testified that after downloading the *Fortnite* app, he received promotional communications directly from Epic. *See* Trial Tr. 2824:15–2828:18 (Schiller). Epic introduced no evidence whatsoever showing that Apple's anti-steering provisions have an anticompetitive effect on any defined market. And after the trial ended, Apple agreed to further clarify the ability of developers to send targeted out-of-app communications to customers.

Importantly, the tethering test, not the balancing test, controls here. The Ninth Circuit has agreed with decisions of the California Court of Appeals "that *Cel-Tech* effectively rejects the balancing approach." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). While awaiting definitive guidance from the California Supreme Court, the Ninth Circuit has merely held that consumer UCL claims may proceed where *both* tests are satisfied. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169–70 (9th Cir. 2012). But even under the balancing test, there is no basis for a finding of "unfair" conduct. There is no "quasi-consumer" harm to Epic (or to actual consumers), and thus there is nothing to balance. That is particularly true given the procompetitive benefits of IAP (as the Court found) and anti-steering provisions in general (as recognized by the Supreme Court in *Amex*). Under either approach, the Guidelines provisions at issue are not "unfair," and at the very least,

1    Apple has raised substantial legal and factual grounds for vacatur of the injunction that easily satisfy

2    the first factor for a stay.

3            **2.      Epic Lacks Standing to Enforce the UCL Injunction**

4            Epic Games, Inc.—the sole plaintiff in this lawsuit—lacks standing under Article III.  To have

5    standing, the plaintiff must show that (1) it has suffered some actual or threatened injury, (2) that injury

6    can fairly be traced to the challenged action of the defendant, and (3) the injury is likely to be redressed

7    by a favorable decision.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "In the context

8    of injunctive relief, the plaintiff must demonstrate a *real or immediate threat* of an irreparable injury."

9    *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (quotation marks

10   omitted) (emphasis in original).  Because standing is not "dispensed in gross," the plaintiff must

11   demonstrate standing for each claim "he seeks to press *and for each form of relief that is sought*."

12   *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotation marks omitted) (emphasis added).  Moreover, a

13   plaintiff must establish "injury *to himself*, even if it is an injury shared by a large class of other possible

14   litigants."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (emphasis added).  Because Epic is no longer an

15   iOS developer, however, it can neither show harm nor benefit from the injunction.

16           Whether or not Epic had standing at some earlier stage of the litigation, at this time Epic cannot

17   show that it faces a "real or immediate threat" of irreparable injury from the anti-steering provisions,

18   or that the injunction entered by the Court would redress any such injury.   Following the

19   implementation of Project Liberty in August 2020, *Fortnite* was removed from the App Store and

20   Epic's developer program account was terminated.  Op. at 26.  This Court's judgment confirmed

21   Apple's right to terminate Epic's developer account, *see id.* at 179, and Apple has rejected Epic's

22   request to reinstate its developer program account and informed Epic that it would not entertain a

23   further request until all appeals have been exhausted, Perry Decl. Ex. D.  With no apps on the App

24   Store and no prospect of adding any until, at the earliest, after this litigation concludes, there is no

25   threat of immediate injury to Epic from the continued enforcement of Apple's anti-steering provisions.

26           Epic also failed to prove any past injury from Apple's anti-steering provisions.  Although the

27   Court credited evidence from witnesses associated with two other developers (Down Dog and Match

28   Group), *see* Op. at 93, an injury to "other possible litigants" is not sufficient for Article III purposes,

*Warth*, 422 U.S. at 501.  And Epic itself has been successful in encouraging cross-platform purchases. Of the iOS *Fortnite* users who made a purchase between March 2018 and July 2020 on any platform, "*only 13.2% made a purchase on an iOS device—meaning that Epic Games was able to transact with 86.8% of paying Fortnite users without paying any commissions to Apple.*"  Op. at 14 (emphasis in original).  Similarly, "the vast majority of Epic Games' *Fortnite* revenue (93%) is generated on non-iOS platforms."  *Id.* at 14.  There is no evidence that Epic ever suffered harm from Apple's anti-steering provisions.

Accordingly, Apple has a substantial case for relief on the merits, as Epic lacks Article III standing to obtain the relief ordered.

### 3.    The UCL Injunction Is Beyond The Equitable Authority Of The Court

Finally, Apple respectfully submits that the Court exceeded its equitable authority in issuing the injunction.

*First*, even if the provisions prohibiting in-app communications are deemed "unfair" under the UCL, there is no evidence and no findings by the Court supporting the injunction with respect to striking Apple's Guideline prohibiting external links and buttons within an app.  The Court found that the alleged "lack of competition has resulted in decrease[d] information which also results in decreased innovation relative to the profits being made."  Op. at 163.  Pointing to Apple's anti-steering provisions, the Court opined that "developers cannot communicate lower prices on other platforms either within iOS or to users obtained from the iOS platform."  *Id.* at 163–64.  But offering a link in an app has nothing to do with communication with users; it has to do with the *accessibility* of alternative payment mechanisms *through iOS*—Apple's intellectual property.

Moreover, the Court's analysis of the procompetitive effects of IAP forecloses any claim that the prohibition on external payment links is anticompetitive.  In discussing IAP, the Court observed that "IAP is the method by which Apple collects its licensing fee from developers for the use of Apple's intellectual property," and that absent IAP, "[i]t would . . . be more difficult for Apple to collect that commission."  Op. at 150.  The same is true for external payment links—if developers can take users directly from the app to their own external payment mechanism, it will be difficult—if even feasible— for Apple to collect a commission for those purchases.  *See* Trial Tr. 2798:11–13 (Schiller).  The Court

also observed that "if Apple could no longer require developers to use IAP for digital transactions, Apple's competitive advantage on security issues, in the broad sense, would be undermined." Op. at 150 (citation omitted). Again, that is equally true of the prohibition on external payment links, as described below. The Court further stated that modifying Apple's extant rules to introduce other payment solutions "may reduce the quality of the experience for some consumers by denying users the centralized option of managing a single account through IAP," *id.*, another feature at risk from external payment links. The Court's findings regarding IAP demonstrate the procompetitive effects of the prohibition on external payment links.

*Second*, in issuing injunctive relief, the Court did not examine whether Epic had proved "irreparable injury" as required for entry of injunctive relief. *eBay Inc. v MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837 (9th Cir. 2020) (holding that federal common law equitable factors apply to injunctive relief under the UCL). Although the Court stated that it "finds the elements for equitable relief are satisfied," Op. at 166, it did not actually analyze or make findings regarding the threat of irreparable injury. The Court indicated that "[t]he injury has occurred and continues," *id.*, but this statement (a) does not refer to any alleged injury *to Epic* and (b) does not speak to whether the injury is irreparable.

In addition, the Court did not analyze Apple's equitable affirmative defense of unclean hands. As Apple explained in its Proposed Findings of Fact and Conclusions of Law, Dkt. 779-1, the doctrine of unclean hands precludes equitable relief where the defendant establishes that "(1) the plaintiff engaged in inequitable conduct; and (2) the conduct 'relates to the subject matter of its claims,'" *Piper Restoration Techs., LLC v. Coast Bldg. & Plumbing, Inc.*, No. 13-CV-499, 2018 WL 6012219, at *9 (C.D. Cal. Nov. 16, 2018) (quoting *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997)). The doctrine of unclean hands applies squarely here: Rather than file a lawsuit for declaratory and injunctive relief and await the outcome, Epic developed a sophisticated plan to surreptitiously deliver a Trojan horse update of *Fortnite* to Apple, and then later activate a "hotfix" to bypass Apple's IAP system. Op. at 19–26. As this Court recognized, "Epic Games never adequately explained its rush to the courthouse or the actual need for clandestine tactics." *Id.* at 171. Epic engaged in inequitable conduct, and that conduct relates directly to the subject matter of its claims, barring any equitable relief.

*Third*, the injunction is overbroad in that it extends beyond Epic and affects all developers in the United States.  In its Proposed Findings of Fact and Conclusions of Law, *see* Dkt. 779-1 ¶ 719, Apple directed this Court to binding precedent regarding the scope of a district court's equitable authority holding that "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown."  *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs."). Accordingly, injunctive relief may be "no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted) (emphasis added); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.").

Here, the injunctive relief extends farther than necessary to remedy any conceivable harm to Epic.  If Epic were, in fact, injured by the anti-steering provisions because of the limitations on its ability to communicate with customers, it would be made whole by an injunction prohibiting Apple from applying those limitations to Epic; in contrast, Epic receives no benefit from having those limitations lifted with respect to *other* developers.  If Epic had intended to seek injunctive relief on behalf of other developers, it could have attempted to proceed under Federal Rule of Civil Procedure 23(b)(2).  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (Rule 23(b)(2) applies "when a single injunction or declaratory judgment would provide relief to each member of the class").  But Epic *opted out* of the developer class action (which has now settled), signifying its intent to proceed on its own, and not on behalf of other developers.  Mr. Sweeney testified, in fact, that Epic would have been content with a special deal for Epic and no other developers.  Trial Tr. 338:3–6, 337:13–19 (Sweeney).  Having chosen to go it alone, Epic may not now obtain or retain injunctive relief that extends beyond Epic to reach other developers.  The injunction, if it is otherwise valid at all, is overbroad, and there is a substantial case on appeal for significantly narrowing it.

**C.      A Stay Will Not Injure Epic**

There is no risk of harm to Epic if a stay is issued.  As set forth above, Epic does not even have standing to obtain injunctive relief, because it no longer has an active developer account and no longer has any apps on the App Store.  Just as it cannot benefit from an injunction, it would not be harmed by a stay.  And even when *Fortnite* was still available on the App Store, Epic was extremely successful in encouraging users to make purchases through other payment platforms (e.g., Xbox, Switch, PlayStation).  As the Court itself recognized, Epic's challenge to the anti-steering provisions was less than full-throated, and "the record was less fulsome" than with respect to the other challenged provisions.  Op. at 163.  There is no threat of injury to Epic from a stay.

**D.      A Stay Is In The Public Interest**

As noted throughout this submission, Apple is carefully studying options to enhance user access to information while maintaining the integrity of the ecosystem, in the context of a dynamic and changing global environment.  Apple has already taken concrete, specific steps in the direction indicated by the Court's opinion—including by agreeing to eliminate the prohibition on targeted out-of-app communications.  These issues require the application of business judgment informed by this Court's analysis, Apple's experience, feedback from developers and users across the world, as well as technological and economic considerations.  Kosmynka Decl. ¶ 18.  Apple anticipates reaching a global solution, and the public interest would be served by allowing Apple sufficient time to do so.

Moreover, "a stay would avoid the parties and the Court wasting taxpayer resources on a litigation which might be mooted on appeal."  *Hunt v. Check Recovery Sys., Inc.*, No. 05-CV-4993, 2008 WL 2468473, at *5 (N.D. Cal. June 17, 2008); *Dameron Hosp. Ass'n v. State Farm Mut. Auto. Ins. Co.*, No. 12-CV-2246, 2013 WL 5718886, at *2 (E.D. Cal. Oct. 15, 2013) ("Judicial economy outweighs any prejudice [the non-moving party] may experience from a routine stay.").  Given the substantial likelihood that the UCL injunction will be vacated or reversed, it would be a poor use of resources to require Apple to comply with the injunction on the timeframe ordered by the Court and invite near-inevitable litigation from Epic regarding the scope of Apple's compliance.  On the other side of the ledger, Epic will be seeking more expansive injunctive relief on appeal.  While Apple is confident that the Sherman Act and Cartwright Act rulings will be sustained, it would be better for all

participants in the iOS ecosystem to await the outcome of both appeals—Epic's and Apple's—before mandating changes to the App Store.  There is no reason to expend resources on these issues when the legal framework is undergoing appellate review.  Rather, a stay would maintain the status quo while the appellate process progresses to completion.

**E.** **In The Alternative, The Court Should Temporarily Stay The Injunction**

If the Court determines that a stay pending appeal is inappropriate, Apple requests that the Court temporarily stay enforcement of the injunction while Apple seeks a stay from the Ninth Circuit.  Courts routinely grant such requests.  *See, e.g.*, *Conservation Congress v. U.S. Forest Serv.*, No. 11-CV-2605, 2012 WL 3150307, at *2 (E.D. Cal. Aug. 1, 2012); *Elliot v. Williams*, No. 08-CV-829, 2011 WL 5080169, at *10 (D. Nev. Oct. 25, 2011); *Campbell v. Nat'l Passenger R.R. Corp.*, No. 05-CV-5434, 2009 WL 4546673, at *2 (N.D. Cal. Nov. 30, 2009).

## CONCLUSION

For the foregoing reasons, Apple requests that the Court stay the injunction pending the disposition of the appeals noticed by both Epic and Apple from the Court's judgment.

DATED:  October 8, 2021          By      */s/ Mark A. Perry*
GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Mark A. Perry
Veronica S. Lewis
Cynthia E. Richman
Jay P. Srinivasan
Ethan D. Dettmer
Rachel Brass

*Attorneys for Apple Inc.*