1   CHRISTINE A. VARNEY (*pro hac vice*)
    cvarney@cravath.com
2   KATHERINE B. FORREST (*pro hac vice*)
    kforrest@cravath.com
3   GARY A. BORNSTEIN (*pro hac vice*)
    gbornstein@cravath.com
4   YONATAN EVEN (*pro hac vice*)
    yeven@cravath.com
5   LAUREN A. MOSKOWITZ (*pro hac vice*)
    lmoskowitz@cravath.com
6   JUSTIN C. CLARKE (*pro hac vice*)
    jcclarke@cravath.com
7   M. BRENT BYARS (*pro hac vice*)
    mbyars@cravath.com
8   **CRAVATH, SWAINE & MOORE LLP**
    825 Eighth Avenue
9   New York, New York 10019
    Telephone:  (212) 474-1000
10  Facsimile:  (212) 474-3700

11  PAUL J. RIEHLE (SBN 115199)
    paul.riehle@faegredrinker.com
12  **FAEGRE DRINKER BIDDLE & REATH LLP**
    Four Embarcadero Center
13  San Francisco, California 94111
    Telephone:  (415) 591-7500
14  Facsimile:  (415) 591-7510

15  *Attorneys for Plaintiff and Counter-defendant*
    *Epic Games, Inc.*

16

17              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
18                   **OAKLAND DIVISION**

19

20  EPIC GAMES, INC.,                    Case No. 4:20-CV-05640-YGR-TSH

21          Plaintiff, Counter-defendant,   **PLAINTIFF EPIC GAMES, INC.'S**
                                           **OPPOSITION TO DEFENDANT APPLE**
22          v.                             **INC.'S MOTION FOR STAY OF**
                                           **INJUNCTION PENDING APPEAL AND**
23  APPLE INC.,                            **MEMORANDUM OF POINTS AND**
                                           **AUTHORITIES IN SUPPORT THEREOF**
24          Defendant, Counterclaimant.
                                           Date:  Nov. 16, 2021, 2 p.m. (noticed date)
25
                                                  Nov. 9, 2021, 2 p.m. (stipulated date
26                                                pending Court approval)

27                                         Courtroom:  1, 4th Floor

28                                         Judge:  Hon. Yvonne Gonzalez Rogers

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND....................................................................................................3

      A.    The Court Found Apple Liable under the UCL and Issued a Permanent
            Injunction after Trial. ....................................................................................3

      B.    Apple Celebrated the Court's Ruling and Injunction. ...............................5

      C.    Epic Agrees To Comply with Apple's Rules, But Apple Refuses Epic's
            Return to the App Store. ...............................................................................5

      D.    Apple Files Its Motion To Maintain Its Anti-Steering Rules. ..................6

LEGAL STANDARD................................................................................................................6

I.    APPLE HAS NOT DEMONSTRATED THAT IT WOULD BE IRREPARABLY
    INJURED ABSENT A STAY. ....................................................................................7

II.   APPLE IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS
     CROSS-APPEAL. .......................................................................................................12

      A.    Epic Continues to Have Standing. ............................................................12

      B.    Epic Proved a Violation of the UCL...........................................................15

      C.    Granting the UCL Injunction Was Within the Court's Equitable Authority. ........20

III.  EPIC WOULD BE HARMED BY A STAY ...................................................................23

IV.  THE PUBLIC INTEREST WEIGHS IN FAVOR OF ENFORCING THE
     INJUNCTION AGAINST APPLE. ...........................................................................23

V.   THE COURT SHOULD DENY APPLE'S ALTERNATIVE REQUEST FOR A
    TEMPORARY STAY. ...............................................................................................25

CONCLUSION..........................................................................................................................25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Privacy Litig.*,
66 F. Supp. 3d 1197 (N.D. Cal. 2014) ................................................................. 15

*Biovail Corp. v. U.S. Food & Drug Admin.*,
448 F. Supp. 2d 154 (D.D.C. 2006) ....................................................................... 9

*Bos. Sci. Corp. v. BioCardia, Inc.*,
524 F. Supp. 3d 914 (N.D. Cal. 2021) ................................................................ 13

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ............................................................................. 22

*Campbell v. Nat'l Passenger R.R. Corp.*,
No. 05-CV-5434, 2009 WL 4546673 (N.D. Cal. Nov. 30, 2009) .......................... 25

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) .................................................................................... 15, 16

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*,
No. 14-CV-585 AJN, 2015 WL 5051769 (S.D.N.Y. Aug. 26, 2015) .............. 11, 12

*Costco Wholesale Corp. v. Hoen*,
No. C04-360P, 2006 WL 2645183 (W.D. Wash. Sept. 14, 2006)............................ 8

*Dameron Hosp. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
No. 12-CV-2246, 2013 WL 5718886 (E.D. Cal. Oct. 15, 2013)............................ 25

*In re Data Gen. Corp. Antitrust Litig.*,
No. MDL 369 (MHP), 1986 WL 10899 (N.D. Cal. July 30, 1986)........................ 20

*Deckers Outdoor Corp. v. Ozwear Connection Pty, Ltd.*,
No. CV 14–2307 RSWL, 2014 WL 4679001 (C.D. Cal. Sept. 18, 2014)............... 23

*Dickson, Carlson & Campillo v. Pole*,
83 Cal. App. 4th 436 (2000) ............................................................................... 22

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ............................................................................... 7

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir. 1996) ............................................................................... 22

*Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*,
493 U.S. 331 (1990)............................................................................................. 13

*Freitag v. Ayers*,
   468 F.3d 528 (9th Cir. 2006) ................................................................. 14

*Golden Gate Rest. Ass'n v. San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ................................................................. 8

*Haas Automation v. Denny*,
   No. 12-cv-04779, 2014 WL 2966989 (S.D. Cal. July 1, 2014) ................ 20

*Herr v. Nestle U.S.A., Inc.*,
   109 Cal. App. 4th 779 (2003) ................................................................. 23

*High Sierra Hikers Ass'n v. Blackwell*,
   390 F.3d 630 (9th Cir. 2004) ................................................................. 20

*Hunt v. Check Recovery Sys., Inc*,
   No. 05-CV-4993, 2008 WL 2468473 (N.D. Cal. June 17, 2008) .............. 25

*Kilgore v. KeyBank, Nat'l Ass'n*,
   718 F.3d 1052 (9th Cir. 2013) ................................................................. 20

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ................................................................................. 23

*LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*,
   No. 18-cv-02573-YGR, 2019 WL 160335 (N.D. Cal. Jan. 10, 2019) ........ 16

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ................................................................. 6, 7

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ................................................................. 15

*Montano v. Bonnie Brae Convalescent Hosp., Inc.*,
   79 F. Supp. 3d 1120 (C.D. Cal. 2015) ...................................................... 23

*Natural Res. Def. Council v. Sw. Marine, Inc.*,
   236 F.3d 985 (9th Cir. 2000) ................................................................. 20

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 6, 7

*ODonnell v. Harris Cty.*,
   260 F. Supp. 3d 810 (S.D. Tex. 2017) ...................................................... 10

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ............................................................................. 19

*Oracle USA, Inc. v. Rimini St., Inc.*,
   No. 2:10-cv-0106-LRH-VCF, 2016 WL 6650835 (D. Nev. Nov. 9, 2016) .......... 7, 12, 24

*Pipe Restoration Techs., LLC v. Coast Bldg. & Plumbing, Inc.*,
    No. 8:13-CV-00499-JDE, 2018 WL 6012219 (C.D. Cal. Nov. 16, 2018) .............................. 22

*Rubio v. Cap. One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ........................................................................................... 12, 13

*S. Or. Barter Fair v. Jackson Cty., Or.*,
    372 F.3d 1128 (9th Cir. 2004) ................................................................................................. 14

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ................................................................................................. 12

*Sundance Image Tech., Inc. v. Inkjetmall.com, Ltd.*,
    No. 02-cv-2258, 2005 WL 8173280 (S.D. Cal. Oct. 13, 2005)............................................... 16

*Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*,
    160 Cal. App. 4th 528 (2008) ................................................................................................. 22

*United States v. Am. Express*,
    838 F.3d 179 (2d Cir. 2016)..................................................................................................... 19

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
    248 F. Supp. 3d 720 (W.D.N.C. 2017) ................................................................................... 19

*United States v. Mitchell*,
    971 F.3d 993 (9th Cir. 2020) ..................................................................................................... 7

*Wang Labs. Inc. v. Mitsubishi Elecs. Am. Inc.*,
    No. CV 92-4698, 1993 WL 574424 (C.D. Cal. Mar. 24, 1993) ............................................... 9

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) .................................................................................................. 9

**Statutes & Rules**

Cal. Bus. & Prof. Code § 17200 ...................................................................................................... 16

Cal. Bus. & Prof. Code § 17203 ...................................................................................................... 22

Cal. Bus. & Prof. Code § 17204 ...................................................................................................... 12

**PRELIMINARY STATEMENT**

On September 10, 2021, this Court entered an injunction that provided consumers and developers with much needed—and long-awaited—relief.  This Court struck provisions in Apple's App Store Review Guidelines (the "Guidelines") that "contractually enforce[] silence" and "hide critical information from consumers and illegally stifle consumer choice". (Opinion ("Op.") at 2, 166.)  The Court gave Apple 90 days to comply.  In response to the Court's decision, Apple publicly declared "a resounding victory", dismissively describing the injunction as nothing more than "one or two sentences scratched out of an agreement". (Byars Decl. Exs. A, B.)  Now, after allowing nearly a third of the 90 days to elapse, Apple has changed course.

In its Motion for a Stay of the Injunction Pending Appeal (the "Motion" or "Mot."), Apple now claims that the Court's injunction would cause it irreparable harm.  Apple suggests that, during the requested stay, it may voluntarily take unspecified actions, in Apple's preferred way and on Apple's preferred schedule, to address (at least in part) the decade-old problem identified by the Court.  But the stay that Apple requests, until "the appeals filed by both Epic and Apple have been resolved" (Mot. at 1), could easily last many years.  During that time, there is no reason to expect that Apple will cease its longstanding unfair conduct, the legality of which it continues to vigorously defend.  As the Court found, "nothing other than legal action seems to motivate Apple" to reconsider its pricing or other restrictions on the App Store. (Op. at 36.)  A stay would simply let Apple off the hook, and perpetuate the harms to consumers and developers, for a substantial period of time.

Apple has not satisfied any of the requirements for a stay, much less all of them.

*First*, Apple must demonstrate that it would be irreparably harmed absent a stay.  It has not done so.  Apple asserts that its In-App Purchase solution ("IAP") provides benefits to consumers, and suggests that the injunction will interfere with those supposed benefits.  But the injunction does not prevent the use of IAP; it simply provides consumers increased information and choice.  Consumers can still use IAP if they so choose.  Better-informed consumer choice is not irreparable harm to Apple—it is competition.  Apple also argues that the injunction will undermine the security of iOS.  That is pretextual.  Apple already allows iOS apps that offer

1    physical goods and services to do exactly what it is now seeking to bar; countless apps on the App

2    Store currently contain "buttons, external links or other calls to action" regarding payment

3    solutions other than IAP.  Apple's assertion that it needs to keep consumers in the dark in order to

4    be compensated for its intellectual property is equally unavailing.  The injunction does not

5    prevent Apple from charging and collecting a price that the market will bear.  In sum, this request

6    for a stay is an effort to re-litigate issues that the Court already considered and rejected when it

7    found that "Apple's business justifications . . . will not be significantly impacted by the increase

8    of information to and choice for consumers".  (Op. at 166.)  (§ I below.)

9          *Second*, Apple must make a strong showing that it is likely to succeed on the merits of its

10   cross-appeal.  Apple has not done so.  At the outset, Apple's challenge to Epic's standing is pure

11   gamesmanship.  After removing *Fortnite* from iOS, Apple repeatedly told Epic, the Court and the

12   public for more than a year that Apple would permit Epic back on iOS if Epic promised to

13   comply with Apple's rules.  Following the Court's decision, Epic made this promise, paid the

14   Court's judgment in full and requested reinstatement of its Apple Developer Program account that

15   it used to distribute *Fortnite*, *Battle Breakers*, *Infinity Blade Stickers* and *Shadow Complex*

16   *Remastered* (the "'84 Developer Program account").  Apple refused.  Apple now asks this Court

17   to reward Apple's duplicity by arguing that Apple's change of course deprives Epic of standing.

18   That gambit fails, because Epic continues to challenge the termination of its '84 Developer

19   Program account and retains a concrete interest in bringing competition to the iOS ecosystem.

20   Moreover, even without its '84 Developer Program account, Epic continues to face injury through

21   its financial interest in its subsidiaries' apps that are on the App Store and in revenue earned from

22   the iOS apps of its *Unreal Engine* licensees.

23         In addition, Epic proved a violation of California's Unfair Competition Law ("UCL")

24   under both the tethering and balancing tests.  Apple's contention that the Court failed to consider

25   a proper market for analyzing its anti-steering provisions is incorrect.  The Court expressly found

26   that it was appropriate to consider all apps, and Apple does not make any substantive argument as

27   to why the Court was wrong to do so.  For example, Apple does not identify any reason why the

28

effect of the anti-steering provisions would be limited to gaming apps.  It was also well within this Court's broad equitable authority to grant the injunction.  (§ II below.)

*Third*, Apple must show that the issuance of the stay will not substantially injure Epic. But Epic would be harmed by a stay, as Epic continues to suffer injury from Apple's anti-steering provisions because, as noted above, it maintains a concrete, financial interest in its subsidiaries', partners' and licensees' ability to benefit from the injunction.  (§ III below.)

*Fourth*, Apple must show that the public interest weighs in favor of granting the stay.  It has not done so.  In fact, the public interest favors denying the Motion; an injunction is the only path to effective relief.  The Court gave Apple 90 days to comply with the injunction; nowhere in the Motion does Apple show that 90 days is insufficient.  Instead, Apple contends that it is "working hard to address these difficult issues in a changing world".  (Mot. at 2.)  History shows, however, that in the absence of an injunction, Apple will not make any changes.  The Court found that Apple does not face significant competitive pressure.  (*See* Op. at 144 ("Apple's maintenance of its commission rate stems from market power, *not competition.*" (emphasis in original)).) Indeed, the Court found that "nothing other than legal action seems to motivate Apple to reconsider pricing and reduce rates".  (Op. at 36; *see also id.* at 35 (citing Mr. Schiller's testimony that "'this lawsuit' helped 'get [the Small Business Program] done' along with 'scrutiny and criticism . . . from around the world'").)  (§ IV below.)

Based on the ample evidence at trial of the harm to consumers and developers and Apple's unwillingness to change without legal action, Apple's plea that the Court trust Apple to fix the problem on its own should be rejected.  Its Motion seeking to delay the effects of this Court's Permanent Injunction—for years—should be denied.

## **FACTUAL BACKGROUND**

### A.   **The Court Found Apple Liable under the UCL and Issued a Permanent Injunction after Trial.**

In August 2020, Epic filed suit against Apple, claiming violations of the Sherman Act, the Cartwright Act, and the UCL.  (Dkt. 1.)  Among the policies Epic challenged was Section 3.1.1 of Apple's Guidelines, to which developers must adhere when distributing apps on the App Store.

1   (*Id.* ¶ 130.)  Pursuant to this Guideline, Apple prohibited "buttons, external links, or other calls to

2   action that direct customers to purchasing mechanisms other than in-app purchase".  (*Id.*

3   (emphases removed) (quoting the Guidelines).)  Epic also challenged Section 3.1.3 of the

4   Guidelines, which provided that developers may not "directly or indirectly target iOS users to use

5   a purchasing method other than [Apple's] in-app purchase," and barred "general communications

6   [to users] about other purchasing methods . . . designed to discourage use of [Apple's] in-app

7   purchase".  (*Id.* ¶ 131 (emphases removed) (quoting the Guidelines).)[1]

8          After trial in May 2021, the Court made detailed findings regarding Guidelines 3.1.1.

9   and 3.1.3 (hereinafter, "the anti-steering provisions").  The Court found that these provisions

10   "hide critical information from consumers and illegally stifle consumer choice" (Op. at 2), "limit

11   information flow to consumers on the payment structure related to in-app purchases" (Op. at 3),

12   are used by Apple to "hide information on [its] commission rates from the consumers" (Op.

13   at 50-51), and "actively den[y]" users the choice of payment solution (Op. at 119).  The Court

14   also pointed to Apple's own documents and credited testimony from third-party developers

15   showing that the anti-steering provisions hinder developers from offering lower prices to

16   consumers.  (Op. at 93.)  Pursuant to these findings, the Court found that Apple violated the UCL,

17   which prohibits business practices that constitute unfair competition (Op. at 159), and issued a

18   permanent injunction enjoining Apple

19          "from prohibiting developers from (i) including in their apps and
20          their metadata buttons, external links or other calls to action that
            direct customers to purchasing mechanisms, in addition to In-App
21          Purchasing and (ii) communicating with customers through points
            of contact obtained voluntarily from customers through account
22          registration within the app".  (Permanent Injunction (Dkt. 813) ¶ 1.)

23   The injunction is to take effect on December 9, 2021.  (*Id.*)

24

25

---

26          [1] At the time of trial, Guideline 3.1.3 read: "Apps in this section cannot, either within the app
     or through communications sent to points of contact obtained from account registration within the
27     app (like email or text), encourage users to use a purchasing method other than in-app purchase."
     (PX-2790.)
28

1    The Court found for Apple on Epic's other counts.  (Op. at 179.)  The Court also found for

2    Apple on Apple's breach of contract and declaratory relief counterclaims.  (Op. at 173, 179.)

3    Epic appealed and Apple cross-appealed the Court's decision.  (Dkts. 816; 820.)

4    **B.      Apple Celebrated the Court's Ruling and Injunction.**

5    Following the Court's decision and accompanying injunction, Apple gave no indication

6    that it was displeased.  To the contrary, Kate Adams, Apple's general counsel, told reporters that

7    the result was "a resounding victory" that "underscores the merit" of Apple's business.  (Byars

8    Decl. Ex. A.)  Similarly, Tim Cook, Apple's CEO, told all Apple employees during a company-

9    wide meeting:  "I think the ruling will be very good to try to put some of the discussions to rest on

10   the App Store.  In terms of the one [claim] we lost, there were one or two sentences scratched out

11   of an agreement, that was the extent of it".  (Byars Decl. Ex B.)

12   **C.      Epic Agrees To Comply with Apple's Rules, But Apple Refuses Epic's Return
         to the App Store.**

13

14   In Apple's pending Motion, Apple declares that "Epic has no intention of complying with

15   Apple's Guidelines notwithstanding any protestations to the contrary".  (Mot. at 5.)  That is not

16   correct.  Epic promptly and fully complied with the Court's decision.  Within four days, Epic paid

17   Apple the damages the Court found to be due on Apple's breach of contract counterclaim.

18   (Op. at 179; Byars Decl. Ex. C.)  Epic disabled Epic Direct Pay in legacy copies of *Fortnite* on

19   iOS, promised to comply with Apple's App Store rules going forward and requested

20   reinstatement of its '84 Developer Program account.  (Byars Decl. Exs. C, D; Perry Decl. Supp.

21   Mot., Ex. C, Dkt. 821-4 ("Epic promises that it will adhere to Apple's guidelines whenever and

22   wherever we release products on Apple platforms.").)

23   As the Court found, prior to trial, Apple "repeatedly[] offered to allow Epic Games to

24   return *Fortnite* to the App Store, so long as Epic Games agreed to comply with its contractual

25   commitments".  (Op. at 26; *see also* Schiller Decl. (Dkt. 37) ¶ 15 ("[W]e informed Epic that

26   *Fortnite* could remain on the App Store if Epic simply removed the alternative payment option

27   and brought the *Fortnite* app back into compliance.").)  Apple repeated that offer at trial.  (*See*

28   Trial Tr. 58:6-9 (Dunn) ("Apple told Epic that Fortnite was welcome back into the App Store, as

EPIC'S OPPOSITION TO APPLE'S                        5              CASE NO. 4:20-CV-05640-YGR-TSH
MOTION FOR STAY

1   long as Epic would comply with the guidelines that apply equally to all developers. And that

2   offer still stands today."); Trial Tr. 3918:24-3919:6, 3919:15-19 (Cook) (acknowledging that he

3   "the whole time said that" "Epic [would still be] welcome to come back" to the App Store).)

4   Apple even reiterated this offer the day before the Court issued its ruling: "As we've said all

5   along, we would welcome Epic's return to the App Store if they agree to play by the same rules as

6   everyone else." (Byars Decl. Ex. E.) However, shortly after the Court's decision, Apple rejected

7   Epic's request for reinstatement of its Developer Program account and said it would not again

8   consider such a request until resolution of all appeals in this case—in other words, for years.

9   (Byars Decl. Exs. C, D.)

10          **D.     Apple Files Its Motion To Maintain Its Anti-Steering Rules.**

11          For four weeks, Apple proclaimed victory and minimized the significance of the Court's

12   injunction. Then, Apple filed its Motion seeking to delay implementation of the injunction and

13   professing that the injunction would cause it irreparable harm. The Motion does not satisfy the

14   requirements for obtaining a stay and should be denied.

15                              **LEGAL STANDARD**

16          As the party requesting a stay, Apple "bears the burden of showing that the circumstances

17   justify an exercise of [the Court's] discretion". *Nken v. Holder*, 556 U.S. 418, 433-34 (2009).

18   Courts analyze four factors when evaluating whether to grant a stay pending appeal: "(1) whether

19   the stay applicant has made a strong showing that he is likely to succeed on the merits;

20   (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

21   will substantially injure the other parties interested in the proceeding; and (4) where the public

22   interest lies". *Id.* at 426. While courts take a "flexible approach" when determining whether a

23   stay is appropriate, if the applicant "has not made a certain threshold showing regarding

24   irreparable harm . . . then a stay may not issue, regardless of [the] proof regarding the other stay

25   factors". *See Leiva-Perez v. Holder*, 640 F.3d 962, 965, 971 (9th Cir. 2011).

26          Apple cannot meet its burden on any of the four prongs for a stay pending appeal.

27   (§§ I-IV below.) Nor is Apple entitled to its alternative request for a stay pending a Ninth Circuit

28   decision on Apple's request for a stay pending appeal. (§ V below.)

EPIC'S OPPOSITION TO APPLE'S          6          CASE NO. 4:20-CV-05640-YGR-TSH
MOTION FOR STAY

1   I.   **APPLE HAS NOT DEMONSTRATED THAT IT WOULD BE IRREPARABLY**

2        **INJURED ABSENT A STAY.**

3        "[S]imply showing some possibility of irreparable injury" is insufficient for a stay.  *Nken*,

4   556 U.S. at 434 (internal quotation marks omitted).  Rather, Apple "must demonstrate that

5   irreparable harm is probable—as opposed to merely possible—if the stay is not granted; that is,

6   irreparable harm must be 'the more probable or likely outcome'".  *United States v. Mitchell*,

7   971 F.3d 993, 996 (9th Cir. 2020) (quoting *Leiva-Perez*, 640 F.3d at 968).  Apple "cannot meet

8   this burden by submitting conclusory factual assertions and speculative arguments that are

9   unsupported in the record".  *Doe #1 v. Trump*, 957 F.3d 1050, 1059-60 (9th Cir. 2020) (citation

10  omitted).  Here, Apple does not show that any harm is probable, let alone irreparable.

11       As an initial matter, Apple's allegations of irreparable harm are entirely inconsistent with

12  its post-decision statements.  In the days following the decision, it minimized the Court's

13  injunction against Apple's anti-steering rules, stating that it amounted to "one or two sentences

14  scratched out of an agreement, that was the extent of it".  (Byars Decl. Ex. B.)  Apple also stated

15  that it was "very pleased with the Court's ruling" and that "Apple's App Store business model has

16  been validated" by the Court.  (Byars Decl. Ex. A.)

17       In contrast to these repeated public statements, Apple now claims that: "[a]bsent a stay,

18  Apple would be forced to permit developers to engage in conduct that will disrupt Apple's lawful

19  App Store business model", and credits statements that "the fabric of Apple's App Store could be

20  forever changed".  (Mot. at 7.)  The Court should heavily discount Apple's current claims of

21  irreparable harm in light of its public statements, which acknowledge that the injunction will not

22  disrupt the App Store business model or its "fabric".  *See Oracle USA, Inc. v. Rimini St., Inc.*,

23  No. 2:10-cv-0106-LRH-VCF, 2016 WL 6650835, at *2 (D. Nev. Nov. 9, 2016) (refusing to stay a

24  permanent injunction in part because defendant was "disingenuous" when it "repeatedly made

25  statements to the public that the [court's] injunction would not prohibit" its business yet then

26  moved for a stay).  Rather, the injunction will promote competition in a market where Apple's

27  market power and anti-steering rules have, as the Court's findings of fact establish, allowed Apple

28  to charge supracompetitive prices and reduce innovation.  (*See, e.g.,* Op. at 118, 163.)

1    Setting aside the contradictory nature of Apple's statements in public and in its Motion,

2    Apple's irreparable harm arguments also fail on their own terms.

3    *First*, the core of Apple's irreparable harm argument focuses on the supposed benefits of

4    IAP and contends that users who decide not to use IAP would not receive those benefits.  (Mot.

5    at 9.)  This is not a harm to *Apple*.  Irreparable harm arguments must focus on harm to the stay

6    applicant, not purported harms to third parties.  (*See* Tr. of Proceedings on Mot. for TRO

7    (Dkt. 50) at 32:6-8 (The Court: "[I]rreparable harm is to the party.  [W]ith respect to the public

8    interest, that issue impacts the community."); *see also Golden Gate Rest. Ass'n v. San Francisco*,

9    512 F.3d 1112, 1116 (9th Cir. 2008) ("[W]e consider where the public interest lies separately

10   from and in addition to whether the applicant [for a stay] will be irreparably injured absent a

11   stay.") (internal quotation marks omitted)).)

12   In addition, Apple's argument does not identify a harm at all.  The Court's injunction does

13   not prohibit Apple from requiring that developers include IAP in their apps as a payment solution;

14   rather, it facilitates consumers' ability to choose alternatives.  Accordingly, developers and

15   consumers that value the services that Apple offers through IAP may continue to take advantage

16   of them.  But if developers wish to offer an alternative to IAP, the injunction removes an artificial

17   barrier that Apple had placed on consumers' ability to become aware of and choose that option.

18   (*See* Op. at 119 ("While some consumers may want the benefits Apple offers (*e.g.*, one-stop

19   shopping, centralization of and easy access to all purchases, increased security due to centralized

20   billing), Apple actively denies them the choice.").)

21   The "harm" that Apple asserts is simply that IAP will have to compete on price and/or

22   quality.  (*See* Trial Tr. 3935:1 (Cook) ("We'd have to differentiate in some way.").)  As the Court

23   put it, "loosening the [IAP] restrictions will increase competition as it will force Apple to compete

24   on the benefits of its centralized model or it will have to change its monetization model in a way

25   that is actually tied to the value of its intellectual property."  (Op. at 119.)  The fact that Apple

26   will become subject to such competition is not a cognizable harm to Apple.  *See Costco*

27   *Wholesale Corp. v. Hoen*, No. C04-360P, 2006 WL 2645183, at *5 (W.D. Wash. Sept. 14, 2006)

28   ("The mere existence of competition is not irreparable harm, in the absence of substantiation of

1    severe economic impact.'" (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,

2    559 F.2d 841, 843 n.3 (D.C. Cir. 1977))); *Wang Labs. Inc. v. Mitsubishi Elecs. Am. Inc.*, No. CV

3    92-4698, 1993 WL 574424, at *32 (C.D. Cal. Mar. 24, 1993) (ruling that irreparable injury would

4    require "potential economic loss. . . so great as to threaten the very existence of [the] business");

5    *see also Biovail Corp. v. U.S. Food & Drug Admin.*, 448 F. Supp. 2d 154, 164 (D.D.C. 2006)

6    (ruling that "the fact that [a party] will face competition in the market and may lose profits . . . is

7    insufficient to establish irreparable harm").

8          *Second*, Apple argues that the injunction could "adversely affect the integrity of iOS as a

9    whole" and would "impair Apple's ability to protect the iOS ecosystem".  (Mot. at 9.)  Each of

10   these security arguments was considered and rejected by the Court after trial.  For example, Apple

11   suggests that allowing external links will deprive it of data it receives from IAP, which it can use

12   to combat fraud.  (*See* Mot. at 9 ("The more data [Apple] has, the better it can protect its

13   consumers from fraud.").)  The Court found this argument wanting:  "[T]o the extent that scale

14   allows Apple to better detect fraud, other companies could do it better because they process more

15   transactions."  (Op. at 116.)  Apple also claims harm from its inability "to confirm that a

16   developer's payment page will adhere" to representations regarding users' private information.

17   (Mot. at 10.)  Here, too, the trial record makes clear that Apple's role in confirming developers'

18   statements about their users' private information is minimal, at best.  (Trial Tr. 3493:1-19

19   (Federighi) (acknowledging that Apple's privacy nutrition labels contain the following

20   disclaimer:  "This information has not been verified by Apple."), *id.* at 3507:19-3508:4

21   (Federighi) (explaining that Apple's "core stance is that these [privacy nutrition] labels are the

22   responsibility of developers to submit accurate information" and that "[Apple's] basic text on the

23   user interface explains to users that this is fundamentally a representation from the developer, not

24   a representation from Apple").)  Another security concern Apple points to is its inability "to

25   determine whether a user who clicks on an external link actually receives the products or features

26   she paid for".  (Mot. at 10.)  However, this supposed "harm" exists on iOS now; the Court found

27   that Apple does not "verify digital good transactions" for purchases made through IAP, as it had

28

claimed.  (Op. at 116-17.)  And, of course, even Apple acknowledges that it does not verify that users receive physical goods they pay for through iOS apps, and this does not harm iOS.

Apple also argues that the injunction would "impair Apple's ability to protect the iOS ecosystem" because "Apple has never permitted the implementation of external payment links for digital goods and services".  (Mot. at 9.)  But Apple ignores that it does allow such links for purchase of physical goods and services within apps.  During trial, Apple did not put forth any evidence showing that allowing payment mechanisms other than IAP for physical goods and services impeded its ability to "protect the iOS ecosystem".  (*See, e.g.,* Trial Tr. 3109:20-3110:3 (Schiller) (testifying that he was unaware of "any analysis within Apple that has examined whether or not . . . alternative payment processing methods utilized by sellers of physical goods have introduced security vulnerabilities into the iPhone").)  Apple still does not show that "links and buttons to alternate payment mechanisms" for digital goods "are fraught with risk" that is unique to these goods.  (Mot. at 9.)  For all apps, Apple can remove an app from the App Store if a developer includes an improper external link.  (*See* Trial Tr. 3509:10-13 (Federighi) ("The most important deterrent is that the developer knows that if they do manage to [change the app's behavior after it's been submitted for App Review], they won't be able to do it for very long. . . . [T]he problem will get identified, [and] the app will be pulled down."); Dkt. 742-5 (Written Direct Testimony of Aviel D. Rubin) ¶ 115 ("Apple can remove [malicious apps] from the App Store and revoke the developer's certificate, preventing them from uploading new apps or updates signed by the revoked certificate to the App Store.").)

Apple's effort to supplement the trial record on this point through a new declaration from Trystan Kosmynka, its head of App Review, does not solve the deficiencies in Apple's claim of irreparable harm.  A motion for a stay is not an appropriate vehicle to seek reconsideration of the Court's factual findings following trial, and the declaration and the arguments based on Mr. Kosmynka's declaration should be disregarded.  *See ODonnell v. Harris Cty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) ("As with a motion for reconsideration, a motion to stay should not be used to relitigate matters, submit new evidence, or raise arguments which could, and should, have been made before the judgment issued.") (internal citations omitted).  Moreover,

nothing in Mr. Kosmynka's new declaration should alter the Court's conclusions, as he simply describes supposed benefits of IAP and the Court has already concluded that the business justifications for IAP "will not be significantly impacted by the increase of information to and choice for consumers" arising from the injunction.  (Op. at 166.)

*Third*, Apple argues that the injunction would make it more difficult for Apple "to collect a commission from developers for use of its platform".  (Mot. at 8.)  At trial, however, Apple maintained that consumers have always had paths to purchase digital content for use on iOS devices, without Apple collecting a commission, and that those options constrained Apple's pricing.  (*See, e.g.*, Apple's Final Proposed Findings of Fact (Dkt. 779-1) ¶ 512 ("If Apple sought to raise its commission, for example, developers could monetize through content or digital currencies sold to consumers through another transaction platform or directly through a web browser.").)  Apple's position here—that consumers' increased awareness will cause it irreparable harm—cannot be reconciled with its trial representations that these alternatives have always been viable and procompetitive.  While Apple may be concerned that greater information flow to users will lead to more competition, having better informed consumers is not irreparable harm.

*Fourth*, Apple's arguments that "implementation of the injunction would require substantial technical and engineering changes" lack any factual basis in the record.  (Mot. at 10.)  All that Apple cites to support this argument is one paragraph of Mr. Kosmynka's declaration, which provides no detail regarding the required changes (Mot. at 10 (citing Kosmynka Decl. ¶ 18)), the resources involved or why Apple does not have "sufficient time to test and evaluate the security implications".  (Mot. at 10.)  This argument rings particularly hollow given that Apple already permits "buttons, external links, or other calls to action that direct customers to purchasing mechanisms" in apps selling physical goods and services.  Further, as noted above, Apple already has the technical means in place to effectively address any purported security and privacy vulnerabilities that may arise from compliance with this injunction, and indeed already allows non-IAP payment methods to purchase physical goods.  Independently, complaining of the monetary cost of complying with an injunction "[w]ithout evidence of the effect of the cost" does not establish irreparable harm.  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics,*

*GmbH*, No. 14-CV-585 AJN, 2015 WL 5051769, at *1-2 (S.D.N.Y. Aug. 26, 2015), *aff'd,* 836 F.3d 153 (2d Cir. 2016), and *aff'd,* 843 F.3d 48 (2d Cir. 2016) ("If the monetary cost of implementing an injunction, standing alone, were sufficient to justify a stay of injunction pending appeal, stays pending appeal would become routine, conflicting with the rule that such relief should be extraordinary" (internal quotation marks and citations omitted)); *Oracle*, 2016 WL 6650835, at *2 (quoting *Church & Dwight*, 2015 WL 5051769, at *2).

## II.   APPLE IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CROSS-APPEAL.

Apple is unlikely to succeed in overturning the Court's injunction. As the Court found, "Apple's anti-steering provisions hide critical information from consumers and illegally stifle consumer choice". (Op. at 2.) As a result of these provisions, "developers cannot communicate lower prices on other platforms either within iOS or to users obtained from the iOS platform". (Op. at 163-64.) Based on the trial record, the Court made detailed findings as to the anticompetitive effects of Apple's conduct, which amply justify the remedy the Court imposed. None of the purported errors asserted by Apple is likely to cause the Ninth Circuit to modify or vacate the injunction. *First*, Epic continues to have standing. (§ II.A below.) *Second*, Epic proved a violation of the UCL. (§ II.B below.) *Third*, the injunction is within the Court's equitable powers. (§ II.C below.)

### A.   Epic Continues to Have Standing.

"Article III standing requires an injury that is actual or imminent, not conjectural or hypothetical. In the context of injunctive relief, the plaintiff must demonstrate a real or immediate threat of irreparable injury." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286 (9th Cir. 2013) (citation omitted). Under the UCL, "a private plaintiff needs to have 'suffered injury in fact and . . . lost money or property as a result of the unfair competition'". *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quoting Cal. Bus. & Prof. Code.

1  § 17204).  The plaintiff must also show a "'causal connection' between [the defendant]'s alleged

2  UCL violation and [the plaintiff]'s injury in fact".  *Id.* at 1204 (internal citation omitted).

3        Apple contends that Epic lacks standing to enforce the injunction because "Epic is no

4  longer an iOS developer" and has "no apps on the App Store and no prospect of adding any until,

5  at the earliest after this litigation concludes".  (Mot. at 12, 14.)  However, Apple focuses only on

6  Epic's '84 Developer Program account and ignores the remainder of Epic's businesses, which

7  include subsidiaries with their own Developer Program accounts and iOS apps, and the *Unreal*

8  *Engine* business that supports the development and creation of iOS apps.  *First*, Epic has direct

9  subsidiaries with apps on the App Store, including *Unreal Remote*, *Unreal Remote 2*, *Unreal*

10  *Match 3*, *Action RPG Game Sample*, *Live Link Face* and *Live Link VCAM*, and at least one of

11  them—*Unreal Match 3*—currently offers in-app purchases.  (Byars Decl. Ex. H.)  A parent

12  company has standing when the harm is principally directed at its subsidiaries as long as the

13  parent faces "actual financial injury".  *Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*,

14  493 U.S. 331, 336 (1990); *see also Bos. Sci. Corp. v. BioCardia, Inc.*, 524 F. Supp. 3d 914, 917

15  (N.D. Cal. 2021) (noting that a parent company "has Article III standing arising from its financial

16  interest in and corporate relationship with" its subsidiary where the parent can "can claim 'actual

17  injury' within the meaning of Article III").  *Second*, many licensees of Epic's *Unreal Engine* are

18  currently listed in the App Store and will benefit from the injunction.  (Byars Decl. Ex. F, G;

19  Dkt. 17-8.)  Because Epic receives payments based on many of its licensees' revenue from in-app

20  purchases, Epic has a concrete interest in the injunction.  (*See* Op. at 5 (explaining that Epic

21  "charges a royalty on products that use any version of the *Unreal Engine*" and "profits in

22  perpetuity from any success a developer enjoys using the *Unreal Engine*").)

23        Moreover, Apple hinges much of its standing argument on the fact that the '84 Developer

24  Program account associated with *Fortnite* has been closed.  However, that account is closed

25  because *Apple closed it*, on grounds that Epic contends to be unlawful and that Epic continues to

26  challenge on appeal.  The dispute between the parties regarding the lawfulness of Apple's anti-

27  steering policies (and the other policies on which Apple relied to terminate Epic's '84 Developer

28  Program account) remains very much alive.  Accordingly, Epic continues to have standing.  *See*

1   *e.g.*, *S. Or. Barter Fair v. Jackson Cty., Or.*, 372 F.3d 1128, 1134 (9th Cir. 2004) (finding that the

2   plaintiff had standing to bring its claim because it had engaged in "ongoing efforts" and stated its

3   intent to carry on its desired conduct but was prevented from doing so by the defendant's

4   restrictions); *see also Freitag v. Ayers*, 468 F.3d 528, 547-48 (9th Cir. 2006) (finding that an

5   employee's property interest in employment was "not lost upon termination but continue[d] post-

6   termination pending the final resolution of the administrative proceeding" regarding the

7   lawfulness of that termination).  Crediting Apple's argument here to deny Epic standing would

8   allow many prevailing parties to evade appellate review by claiming that the very decision being

9   challenged rendered the other party's interest in the action moot.

10      Critically, Apple "repeatedly[] offered to allow Epic Games to return *Fortnite* to the App

11  Store, so long as Epic Games agreed to comply with its contractual commitments".  (Op. at 26;

12  *see also* Schiller Decl. (Dkt. 37) ¶ 15; Byars Decl. Ex. E.)  Apple felt this fact was important

13  enough for the Court's consideration of this case that it repeated its offer during its opening

14  statement at the beginning of trial and during Mr. Cook's testimony at the end of trial.  (Trial

15  Tr. 58:6-9 (Dunn); Trial Tr. 3918:24-3919:6, 3919:15-19 (Cook).)  Apple reiterated its offer the

16  day before the Court issued its ruling.  (Byars Decl. Ex. E.)  But, shortly thereafter, Apple

17  changed course by refusing to reinstate Epic's '84 Developer Program account, even after Epic

18  agreed to comply with Apple's rules, paid the monetary judgment in its entirety and fully

19  remedied its breach.  (Byars Decl. Exs. C, D.)  This appears to have been a tactical litigation-

20  driven decision, intended to divest Epic of standing and prevent Epic from enforcing this Court's

21  injunction, as well as to send a chilling message to any developer who dares to challenge Apple.

22      Apple also contends that Epic "failed to prove any past injury from Apple's anti-steering

23  provisions".  (Mot. at 14-15, 18.)  Not so.  The anti-steering provisions were in effect throughout

24  the decade during which Epic had apps on the App Store.  Epic paid over $300 million in

25  commissions to Apple just in the two years preceding this litigation (Op. at 14)—commissions

26  that the Court found were inflated by Apple's supracompetitive pricing, which Apple managed to

27  maintain by insulating itself from competition through its anti-steering rules.  (Op. at 118.)

28  Apple's contention that Epic was not harmed because Epic "has been successful in encouraging

1   cross-platform purchases" (Mot. at 15) misses the mark by a wide margin.  The Court's injunction

2   concerns steering of users *on the iOS platform*.  The case study regarding cross-platform play

3   described in Apple's Motion shows, at most, that *Fortnite* is popular on platforms other than iOS;

4   it says nothing about the extent to which Epic was able to inform *iOS users* of alternative payment

5   options, and it does not address the fact that Epic paid 30% of its revenues to Apple on iOS—a

6   commission that, as noted above, was kept at supracompetitive levels with the aid of the

7   anti-steering rules.

8          **B.      Epic Proved a Violation of the UCL.**

9          Apple contends that the Court committed four errors in finding a violation of the UCL.

10   Apple is wrong on all four points.

11          *First*, Apple argues that "the tethering test, not the balancing test, controls here" and that

12   "[t]he Ninth Circuit has agreed with decisions of the California Courts of Appeals 'that *Cel-Tech*

13   effectively rejects the balancing approach.'"  (Mot. at 13.)  However, *Cel-Tech* "rejected the

14   balancing test . . . in suits involving unfairness to the defendant's *competitors*".  *Lozano v. AT&T*

15   *Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007) (emphasis added).  With respect to suits

16   involving unfairness in *consumer* actions, the Ninth Circuit found that courts may apply the

17   tethering test *or* the balancing test and that these options "are not mutually exclusive".  *Id.* at 736

18   ("In the absence of further clarification by the California Supreme Court, we endorse the district

19   court's approach to the law as if it still contained a balancing test"); *see also In re Adobe Sys., Inc.*

20   *Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (for consumer claims under the

21   unfairness prong of the UCL, "there are at least two possible tests: (1) the 'tethering test', . . . and

22   (2) the 'balancing test'").  The Court found that "Epic Games has standing to bring a UCL claim

23   as a quasi-consumer, not merely as a competitor" (Op. at 161) and, therefore, the Court's analysis

24   of Apple's unfair practices under the balancing test is entirely appropriate.  Apple does not

25   contend that Epic's claim fails the balancing test, except to argue that there is no harm to Epic at

26   all (Mot. at 13)—a contention that the Court has already rejected.  And, in any event, this Court

27   concluded that Apple violates the UCL under *both* tests.  (Op. at 162-66.)

28

*Second*, Apple argues that "[t]he Court construed the tethering test under § 17200 to apply without regard to the relevant market adopted for purposes of antitrust analysis". (Mot. at 11.) Since this Court also applied the balancing test, this critique can be ignored. Moreover, Apple misstates the Court's opinion. The Court did not analyze effects "without regard to" a relevant market. To the contrary, the Court expressly considered whether to limit its analysis to the market it defined for the Sherman Act claims and determined that it should not do so, and that it should instead look at the effect of the anti-steering provisions on all apps. The Court explained that it could not "discern any principled reason for eliminating the anti-steering provisions to mobile gaming only" because "[t]he lack of information and transparency extends to all apps, not just gaming apps". (Op. at 167.)[2]

Apple's Motion does not identify any such "principled reason" either. It does not make *any* argument—much less provide any evidence—as to why the effects of the anti-steering provisions would be different on gaming apps than on other apps. Thus, Apple's contention that the Court should not have relied on testimony from representatives of Down Dog and Match Group because they offer subscriptions and are not game apps (Mot. at 11-12) is misplaced. The Court was not laboring under a misunderstanding; the Court expressly acknowledged that Down Dog and Match Group offer subscriptions and do not develop game apps. (Op. at 93, 96.) For purposes of the anti-steering provisions, however, the Court found those distinctions not to matter—and Apple's Motion nowhere explains why that finding was wrong.

---

[2] If Apple is suggesting that the UCL's tethering test requires a court to conduct a full-blown market definition analysis applying Sherman Act standards of substitutability (*see* Mot. at 11), it is incorrect. Indeed, in the case that announced the tethering test, *Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th 163, 180, 187 (1999), the California Supreme Court allowed an unfair competition claim to proceed under that test without going through a formal market definition exercise. And other UCL cases applying the *Cel-Tech* tethering test have recognized cognizable threats to competition without conducting a Sherman Act-style market definition analysis. *See, e.g.*, *LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*, No. 18-cv-02573-YGR, 2019 WL 160335, at *18 (N.D. Cal. Jan. 10, 2019) (denying a motion to dismiss under the UCL unfairness prong under the *Cel-Tech* test without a full-scale market definition); *Sundance Image Tech., Inc. v. Inkjetmall.com, Ltd.*, No. 02-cv-2258, 2005 WL 8173280, at *9 (S.D. Cal. Oct. 13, 2005) (denying defendants' motion for summary adjudication of no unfair competition without conducting any formal market definition exercise).

1      The closest Apple comes to a substantive explanation is to contend that "Epic itself

2   admitted that relief from the anti-steering provisions that would allow links or buttons to

3   alternative payment solutions outside an app would be affirmatively harmful to game developers

4   in particular".  (Mot. at 12 (citing Dkt. 1 ¶ 116).)  This argument blatantly mischaracterizes Epic's

5   Complaint.  In the paragraph cited, Epic alleged that mobile game developers would be harmed if

6   users "were directed to" process their purchases outside of the app and had no other choice.

7   (Dkt. 1 ¶ 116.)  But the injunction obviously does not "direct[]" users to any particular payment

8   solution.  Rather, it facilitates developers' ability to offer information and a choice, and users'

9   ability to make an informed choice.  Epic did not allege that this *choice* would harm mobile

10  developers, and there is no sense in which it could harm them; any developer that believes itself

11  better off not providing information about options other than IAP need not do so.  The Court's

12  injunction does not *compel* developers to do anything.

13      *Third*, Apple argues that "Epic failed to prove the anti-steering provisions have

14  anticompetitive effects".  (Mot. at 12.)  Based on the evidence presented at trial, however, the

15  Court found many anticompetitive harms caused by Apple's anti-steering provisions.  For

16  example, the Court credited testimony from "both Down Dog and Match Group . . . that they have

17  been unable to entice users to other platforms with lower prices" and that "Apple's anti-steering

18  provision has prevented [Down Dog] from directing users to the cheaper price" for purchases.

19  (Op. at 93.)  Specifically, Down Dog's founder and CEO Ben Simon testified that when Down

20  Dog ran an experiment within its Android app in which it removed a link informing customers of

21  an option to subscribe online for roughly 33% cheaper, it observed a 28% reduction in the number

22  of subscribers, either on the app or on the web, showing that Apple's policies, including its

23  anti-steering restriction, cost Down Dog subscribers.  (Trial Tr. (Simon) 365:3-367:5.)  Adrian

24  Ong, the senior vice president of operations for Match Group, testified that Match Group has

25  explicitly asked for Apple's permission to send emails or push notifications to users steering them

26  to its website, where they would gain access to lower prices, and Apple has refused.  (Ex. Depo. 1

27  at 24:23-25:5, 158:4-159:14 (Ong).)  The Court found such evidence showed that "Apple's

28

1   anti-steering restrictions artificially increase Apple's market power by preventing developers

2   from communicating about lower prices on other platforms".  (Op. at 93.)

3          The Court also noted that "Apple's own records reveal that two of the top three 'most

4   effective marketing activities to keep existing users coming back' in the United States, and

5   therefore increasing revenues, are 'push notifications' (no. 2) and 'email outreach' (no. 3)".

6   (Op. at 163 (quoting DX-3922.057).)  The Court found that "Apple not only controls these

7   avenues but acts anticompetitively by blocking developers from using them to Apple's own

8   unrestrained gain" through its anti-steering provisions, which prohibit developers from

9   "communicat[ing] lower prices on other platforms either within iOS or to users obtained from the

10  iOS platform" and "prevent[] developers from informing users of its 30% commission".

11  (Op. at 163-64.)

12         Despite all this, Apple complains that the testimony from representatives of Match Group

13  and Down Dog was "unsupported by any data".  (Mot. at 12.)  Apple does not define what it

14  means by "data" and provides no support for its suggestion that such "data" is needed to find

15  anticompetitive effects.  The Court's factual findings were supported by substantial evidence in

16  the record, including quantitative evidence.  (Op. at 93 (finding that "while 90% of Down Dog's

17  Android users make purchases on the web, only 50% of its iOS users do so, even though about

18  half of its total revenues still come from iOS users"); *id.* (crediting testimony that "Match Group

19  has employed marketing campaigns and promotions for web purchases, but the app sales have

20  continued to 'dominate'"); *see also* Trial Tr. 365:3-367:5 (Simon).)

21         Apple also contends that "the competitive effects of the anti-steering provisions as

22  distinguished from all other effects of the iOS platform's design were never independently

23  analyzed from an economic perspective".  (Mot. at 12.)  But no rule of law requires a party to

24  "independently analyze[] from an economic perspective" each of the defendant's anticompetitive

25  acts; accordingly, Apple cites no authority in support of such a rule.  There is also ample record

26  evidence demonstrating the anticompetitive effects of Apple's anti-steering provisions, both

27  factual (discussed above) and economic (*see* Trial Tr. (Evans) 1715:11-16 (explaining that the

28  anti-steering provisions "make[] it much more difficult for Epic to communicate to the iOS app

1    user that they have another alternative to go to"), 1726:16-18 (explaining that Apple's "anti-

2    steering provisions . . . are preventing a way to bypass . . . a tie" that requires developers to use

3    Apple's IAP), 2408:20-2409:5 ("Apple's "anti-steering restrictions . . . prevent the developer

4    from informing the consumer that there is another alternative available to them"), 2436:5-6

5    (testifying that a firm with market power—such as Apple—has incentives to impose anti-steering

6    rules "to prevent customers from . . . seeking . . . other alternatives")).  Nothing more is required.

7         *Fourth*, Apple suggests that this Court incorrectly discounted the claimed procompetitive

8    effects of its anti-steering provisions.  (*See* Mot. at 12-13.)  Apple points to *Amex*, but the

9    Supreme Court did not establish a rule there that anti-steering provisions are *per se*

10   procompetitive.  *See, e.g.*, *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d

11   720, 723-25, 731-32 (W.D.N.C. 2017) (evaluating defendant's steering restrictions that "limit

12   insurance companies' ability to inform their customers about, or incentivize them to use, other

13   health-service providers which may be able to provide better or more affordable service" and

14   distinguishing its opinion from the Second Circuit's decision in *United States v. Am. Express*,

15   838 F.3d 179 (2d Cir. 2016), because the Second Circuit's analysis was "deeply rooted in the

16   details and dynamics of the credit-card industry, using specific hypothetical examples from that

17   industry" and "involved a different product and a different market (credit cards in a global

18   market)").  The Supreme Court did not even hold that Amex's anti-steering provisions were

19   procompetitive; it merely recognized that anti-steering provisions *could be* procompetitive, and

20   rejected the plaintiffs' claims because they failed to prove anticompetitive effects by focusing on

21   the detrimental effects on one side of the market (merchants) but ignoring any procompetitive

22   effects on the other side of the market (consumers).  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

23   2290 (2018).

24        Here, after hearing the evidence at trial, the Court found that Apple's anti-steering

25   provisions harm both developers *and* users, and are therefore *not* procompetitive.  To the

26   contrary, they "harm competition and result in supracompetitive pricing and profits".  (Op.

27   at 166.)  As the Court noted, "[i]n retail brick-and-mortar stores, consumers do not lack

28   knowledge of options" (Op. at 165) because, among other things, "you can see the sign that says

Visa, Mastercard, Discover, Amex" (Trial Tr. 1891:13-15 (Schmalensee)).  But "[t]echnology platforms differ" (Op. at 165), including because "[t]hose visual indications of options don't exist" (Trial Tr. 1891:17-19 (Schmalensee)), making the payment solutions on iOS "a black box" (Op. at 165).  With the anti-steering provisions, Apple "enforced silence to control information and actively impede users from obtaining the knowledge to obtain digital goods on other platforms.  Thus, the closer analogy is not American Express' prohibiting steering towards Visa or Mastercard but a prohibition on letting users know that these options exist in the first place".  (*Id*.)

## C.   Granting the UCL Injunction Was Within the Court's Equitable Authority.

"A district court has 'broad latitude in fashioning equitable relief when necessary to remedy an established wrong.'"  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (quoting *Natural Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 999 (9th Cir. 2000)); *see also In re Data Gen. Corp. Antitrust Litig.*, No. MDL 369 (MHP), 1986 WL 10899, at *4 (N.D. Cal. July 30, 1986) ("Broad equitable remedies have received . . . approval in private antitrust actions.").  Similarly, "[t]he UCL authorizes broad injunctive relief to protect the public from unfair business practices".  *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1059 (9th Cir. 2013); *see also Haas Automation v. Denny*, No. 12-cv-04779, 2014 WL 2966989, at *9 (S.D. Cal. July 1, 2014) ("A trial court has very broad discretion in formulating equitable relief in unfair competition law actions." (quoting *Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1277 (2007))).  Apple points to three alleged errors, which purport to show otherwise.  These arguments fail.

*First*, Apple contends that "there is no evidence and no findings by the Court supporting the injunction with respect to striking Apple's Guideline prohibiting external links and buttons within an app" because they supposedly "ha[ve] nothing to do with communication with users".  (Mot. at 1, 15.)  But that is plainly not what Apple believed when it wrote the Guideline at issue.  Guideline 3.1.1 states that apps and their metadata may not include "buttons, external links, *or other calls to action* that direct consumers" to payment solutions other than IAP.  (Op. at 31 (emphasis added).)  This shows that buttons and links are in fact two types of "calls to action" that

provide direction to consumers about alternatives.  Everyday experience confirms this to be true:
for example, online news articles routinely contain links to related stories to provide readers with
additional information.  Further, Apple's contention that buttons and links would circumvent
Apple's ability to collect a fee for the use of its intellectual property (Mot. at 15) is inconsistent
with Apple's existing practices.  As Apple repeatedly asserted at trial, it already allows users to
make purchases *on iOS devices* without paying a commission, as long as those purchases are
made through the web rather than in an app.  (*See, e.g.*, Trial Tr. 299:9-25 (Sweeney), 399:2-15
(Simon); 475:5-17 (Patel); 1824:17-1825:13 (Athey); 2025:8-18 (Lafontaine).)  Apple should not
be heard to complain that buttons and links are too effective at informing users about that option.
The Court was well within its discretion to provide relief on all three items in Apple's unfair
Guideline—"buttons, external links, or other calls to action".

    *Second*, Apple argues that "the Court did not examine whether Epic had proved
'irreparable injury' as required for entry of injunctive relief".  (Mot. at 16.)  To the contrary, this
Court expressly found irreparable injury to Epic:  the lack of competition arising from the
anti-steering provisions "has resulted in decrease[d] information which also results in decreased
innovation relative to the profits being made.  The costs to developer[s] are higher because
competition is not driving the commission rate."  (Op. at 163.)  The Court further found that
Apple "hides information for consumer choice which is not easily remedied with money damages.
The injury has occurred and continues and can best be remedied by invalidating the offending
provisions".  (Op. at 166.)  During the decade that Epic apps were on iOS, Epic was required to
use Apple's IAP and suffered the harm of inflated commissions and decreased innovation.

    Apple also faults the Court for not "analyz[ing] Apple's equitable affirmative defense of
unclean hands".  (Mot. at 16.)  In fact, the Court *did* consider this defense and rejected it.  The
Court expressly noted its disapproval of certain Epic conduct, stating that "Epic Games never
adequately explained its rush to the courthouse or the actual need for clandestine tactics", but the
Court nevertheless granted an injunction, which it called "a measured alternative to plaintiff's
overreach" and one that would "maintain[] the provisions that require honesty to control the
parties' relations and the coding of apps".  (*Id.* at 171.)  Thus, the Court considered Apple's

1   unclean hands argument when fashioning its remedy, which is all the law requires. *See*

2   *Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 544-45 (2008)

3   ("[T]he trial court *has the discretion* to consider equitable defenses such as unclean hands in

4   creating the remedies authorized by Business and Professions Code section 17203." (emphasis

5   altered)); *Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 447 (2000) ("The decision

6   of whether to apply the [unclean hands] defense based on the facts is a matter within the trial

7   court's discretion.").  Notably, in the only case cited by Apple, the court found unclean hands did

8   *not* bar the plaintiffs from asserting their claims. *See Pipe Restoration Techs., LLC v. Coast Bldg.*

9   *& Plumbing, Inc.*, No. 8:13-CV-00499-JDE, 2018 WL 6012219, at *10 (C.D. Cal. Nov. 16,

10   2018).  Here, Epic has remedied its breach by promptly paying Apple.  Further, a strict

11   application of the unclean hands defense would be strongly contrary to the public interest:  Epic

12   temporarily withheld $6 million from Apple, whereas Apple has made ***billions*** of dollars charging

13   supracompetitive commissions over the course of more than a decade and would continue to do so

14   absent the Court's injunction.

15        *Third*, Apple complains that "the injunction is overbroad in that it extends beyond Epic

16   and affects all developers in the United States".  (Mot. at 17.)  In Apple's view, market-wide

17   relief cannot be granted outside the context of a class action.  (Mot. at 17.)  That is not the law.

18   As Apple's own cases note, "an injunction is not necessarily made over-broad by extending

19   benefit or protection to persons other than prevailing parties in the lawsuit—*even if it is not a*

20   *class action*—if such breadth is necessary to give prevailing parties the relief to which they are

21   entitled". *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (emphasis altered); *see also*

22   *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (same).

23   Providing relief to Epic in this context means remedying the circumstances that have led to

24   supracompetitive commissions.  If Epic were the only developer released from the anti-steering

25   provisions, the cost of using IAP would remain inflated by Apple's anticompetitive conduct.

26   Only a market-wide injunction will lead to increased competition and lead Apple to lower its

27   commission from its current supracompetitive rate.  (Op. at 119.)

28

1    Indeed, courts have recognized that such public injunctive relief is appropriate under the

2    UCL.  *See Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1134-35

3    (C.D. Cal. 2015) (UCL injunctive relief extended to other residents of plaintiff's nursing home

4    facility); *Herr v. Nestle U.S.A., Inc.*, 109 Cal. App. 4th 779, 790 (2003) (affirming a UCL

5    company-wide injunction that prohibited discrimination on the basis of age).

6    **III.    EPIC WOULD BE HARMED BY A STAY.**

7    Apple argues that "[t]here is no risk of harm to Epic if a stay is issued".  (Mot. at 18.)

8    However, this argument fails for the reasons explained above.  (*See* § II.B.)  Epic maintains a

9    concrete, financial interest in the ability of its subsidiaries and its *Unreal Engine* licensees to take

10   advantage of the increased competition created by the Court's injunction.  Thus, a stay that would

11   allow Apple to continue charging a supracompetitive rate for IAP because of the anti-steering

12   provisions unquestionably harms Epic's financial interest.  And such harm is irreparable—any

13   extension of time during which Apple can continue to impose its anticompetitive rents will result

14   in harms that Epic will never recover.

15   Moreover, Apple has not shown that it would suffer any harm, irreparable (*see* § I) or

16   otherwise, from denial of a stay.  The Court made factual findings that Apple "enforced silence to

17   control information and actively impede users from obtaining the knowledge to obtain digital

18   goods on other platforms" and that such actions are illegal because they "harm competition and

19   result in supracompetitive pricing and profits".  (Op. at 165-66.)  Thus, the injunction merely

20   requires Apple to comply with the law—and Apple cannot complain of having to do so.  *See*

21   *Deckers Outdoor Corp. v. Ozwear Connection Pty, Ltd.*, No. CV 14–2307 RSWL, 2014 WL

22   4679001, at *13 (C.D. Cal. Sept. 18, 2014) ("There is no hardship to a defendant when [an] . . .

23   injunction would merely require the defendant to comply with law.").

24   **IV.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF ENFORCING THE
         INJUNCTION AGAINST APPLE.**

25

26   The public interest weighs heavily against a stay because it would deprive consumers and

27   developers of much-needed relief, possibly for years.  *See Landis v. N. Am. Co.*,

28   299 U.S. 248 (1936) (requiring that any delay in justice be "not immoderate in extent [nor]

1   oppressive in its consequences").  The Court's injunction increases consumer choice on a

2   platform where Apple had "actively denie[d]" it for more than a decade.  (Op. at 119.)  As the

3   Court wrote: "this measured remedy will increase competition, increase transparency, increase

4   consumer choice and information".  (Op. at 179.)  And the Court expressly found that its

5   injunction will further "the *public interest* in uncloaking the veil hiding pricing information on

6   mobile devices and bringing transparency to the marketplace".  (Op. at 166 (emphasis added).)

7   Granting a stay would deprive consumers of information and allow Apple to continue extracting

8   supracompetitive profits from consumers who are kept in the dark.  Moreover, developers have

9   praised the Court's injunction and already started to innovate.  (*See* Byars Decl. Exs. J, K.)

10        Apple argues that staying the injunction will not harm the public interest because "Apple

11   anticipates reaching a global solution, and the public interest would be served in allowing Apple

12   sufficient time to do so".  (Mot. at 18.)  But Apple had many years to do so, and has done nothing.

13   Nor does Apple say when it will make available this "global solution" or what it will entail.  If

14   Apple's vague promise were enough, every antitrust defendant could avoid an injunction by

15   making the same promise.  An empty promise of some change that may not occur for years is an

16   insufficient replacement for the consumer protection that the Court found necessary now.  *See*

17   *Oracle*, 2016 WL 6650835, at *2 (rejecting defendant's "steadfast[]" argument that "an injunction

18   was not necessary to curtail its [conduct] because *it had already* changed its business model to a

19   non-infringing alternative" (emphasis added)).  As noted, Apple is very unlikely to provide *any*

20   relief to consumers and developers, absent a Court order.  (*See* Op. at 36 ("nothing other than

21   legal action seems to motivate Apple to reconsider pricing and reduce rates").)[3]

22        Apple also argues that "it will be a poor use of resources to require Apple to comply with

23   the injunction on the timeframe ordered by the Court".  (Mot. at 18-19.)  As noted above, Apple

24   has not supported with evidence its assertion that significant resources will be spent complying

25   with the injunction.  (*See* § I.)  Denying consumers and developers the benefits of the injunction

26

27        [3] As another example of its recalcitrance, Apple recently flouted a new South Korean law that requires app market businesses, like the App Store, to allow alternate payment methods.  (Byars Decl. Ex. L.)

28

far outweighs whatever resources Apple might need to expend to comply with the injunction, particularly given Apple's failure to quantify those resources.

Finally, the cases Apple cites are inapposite.  Both *Hunt* and *Dameron* (Mot. at 18) concerned stays pending *interlocutory* appeals on controlling questions of first impression, rather than appeals of a permanent injunction.  *See Hunt v. Check Recovery Sys., Inc*, No. 05-CV-4993, 2008 WL 2468473, at *3 (N.D. Cal. June 17, 2008); *Dameron Hosp. Ass'n v. State Farm Mut. Auto. Ins. Co.*, No. 12-CV-2246, 2013 WL 5718886 (E.D. Cal. Oct. 15, 2013).  Now that Apple has been found liable after trial, the Court should not delay its remedy further.

## V.    THE COURT SHOULD DENY APPLE'S ALTERNATIVE REQUEST FOR A TEMPORARY STAY.

Apple waited a month to move to stay.  It cannot now complain that it has insufficient time to appeal denial of a stay before the December 9, 2021 deadline for compliance with the Court's injunction.  For that reason, as well as the reasons stated above for denying Apple's main request, the Court should deny Apple's alternative request.  *See Campbell v. Nat'l Passenger R.R. Corp.*, No. 05-CV-5434, 2009 WL 4546673, at *2 (N.D. Cal. Nov. 30, 2009) (denying a stay pending appeal after finding that "the public's interest is best served" by compliance with the injunction, and stating that "[i]f Defendant intends to seek a stay from the Ninth Circuit, it must do so within" ten days from this order).

## CONCLUSION

For the foregoing reasons, Epic respectfully requests that the Court deny Apple's Motion.

1   Dated:  October 22, 2021                    Respectfully submitted,

2                                               By:   /s/ *Gary A. Bornstein*
                                                   _____
3

4                                               **FAEGRE DRINKER BIDDLE & REATH**
                                                **LLP**
5
                                                Paul J. Riehle ( SBN 115199)
6                                               paul.riehle@faegredrinker.com

7                                               Four Embarcadero Center
                                                San Francisco, California 94111
8                                               Telephone:  (415) 591-7500
                                                Facsimile:  (415) 591-7510
9

10                                              **CRAVATH, SWAINE & MOORE LLP**

11                                              Christine A. Varney (*pro hac vice*)
                                                cvarney@cravath.com
12                                              Katherine B. Forrest (*pro hac vice*)
                                                kforrest@cravath.com
13                                              Gary A. Bornstein (*pro hac vice*)
                                                gbornstein@cravath.com
14                                              Yonatan Even (*pro hac vice*)
                                                yeven@cravath.com
15                                              Lauren A. Moskowitz (*pro hac vice*)
                                                lmoskowitz@cravath.com
16                                              Justin C. Clarke (*pro hac vice*)
                                                jcclarke@cravath.com
17                                              M. Brent Byars (*pro hac vice*)
                                                mbyars@cravath.com
18

19                                              825 Eighth Avenue
                                                New York, New York 10019
20                                              Telephone:  (212) 474-1000
                                                Facsimile:  (212) 474-3700
21

22                                              ***Attorneys for Plaintiff and Counter-defendant***
                                                ***EPIC GAMES, INC.***
23

24

25

26

27

28