THEODORE J. BOUTROUS JR., SBN 132099
   tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
   rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
   dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
   jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No. 24000092; *pro hac vice*)
   vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
   mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
   crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN DETTMER, SBN 196046
   edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
   rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>            Plaintiff, Counter-defendant<br><br>   v.<br><br>APPLE INC.,<br><br>            Defendant, Counterclaimant. | Case No. 4:20-cv-05640-YGR-TSH<br><br>**APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR STAY OF INJUNCTION PENDING APPEAL** |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ................................................................................................................................ 1

DISCUSSION ....................................................................................................................................... 2

    A.    Apple Would Be Irreparably Harmed In The Absence Of A Stay ............................... 2

    B.    Apple Has A Substantial Case For Relief On The Merits ............................................ 6

        1.    There Is No Legal Or Factual Basis For UCL Liability.................................... 6

        2.    Epic Lacks Standing........................................................................................... 8

        3.    The Equitable Relief Order Is Overbroad ........................................................ 11

    C.    A Stay Will Not Injure Epic........................................................................................ 13

    D.    A Stay Is In The Public Interest .................................................................................. 14

    E.    In The Alternative, The Court Should Temporarily Stay The Injunction................... 15

CONCLUSION ................................................................................................................................... 15

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987)..................................................................................................13

*Cal. Dental v. FTC*,
   224 F.3d 942 (9th Cir. 2000)......................................................................................................7

*Campbell v. National Passenger Rail Road Corp.*,
   No. 05-CV-5434, 2009 WL 4546673 (N.D. Cal. Nov. 30, 2009)..........................................15

*Conservation Cong. v. U.S. Forest Serv.*,
   No. CIV. S-11-2605 LKK, 2012 WL 3150307 (E.D. Cal. Aug. 1, 2012) ..............................15

*Coto Settlement v. Eisenberg*,
   593 F.3d 1031 (9th Cir. 2012)....................................................................................................9

*Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*,
   No. 14-CV-2307, 2014 WL 4679001 (C.D. Cal. Sept. 18, 2014) ..........................................13

*Dickson, Carlson & Campillo v. Pole*,
   83 Cal. App. 4th 436 (2000) ....................................................................................................12

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003)...................................................................................................................9

*Elliot v. Williams*,
   No. 2:08-CV-00829-GMN, 2011 WL 5080169 (D. Nev. Oct. 25, 2011)..............................15

*Facebook, Inc. v. Brandtotal, Ltd.*,
   No. 20-CV-7182, 2021 WL 2354751 (N.D. Cal. June 9, 2021) ..............................................6

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
   493 U.S. 331 (1990)...................................................................................................................9

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004)....................................................................................................11

*Hawkins v. Risley*,
   984 F.2d 321 (9th Cir. 1993)....................................................................................................10

*Hunt v. Check Recovery Sys., Inc.*,
   No. 05-CV-4993, 2008 WL 2468473 (N.D. Cal. June 17, 2008)...........................................14

*Lair v. Bullock*,
   697 F.3d 1200 (9th Cir. 2012)..............................................................................................6, 13

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Lozano v. AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ......................................................................................................8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................................................11

*Motorola Mobility LLC v. AU Optronics Corp.*,
    775 F.3d 816 (7th Cir. 2015) ......................................................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................................................13

*O'Donnell v. Harris County*,
    260 F. Supp. 3d 810 (S.D. Tex. 2017) ................................................................................4, 10

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ................................................................................................2, 5, 6, 8

*ProMedica Health Sys., Inc. v. FTC*,
    749 F.3d 559 (6th Cir. 2014) ......................................................................................................7

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ....................................................................................................6

*Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*,
    160 Cal. App. 4th 528 (2008) ...................................................................................................12

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................................................................................9

*Wisc. Educ. Ass'n Council v. Walker*,
    No. 11-CV-428-WMC, 2012 WL 13069917 (W.D. Wis. Apr. 27, 2012) ................................4

iii
APPLE INC.'S REPLY ISO MOTION FOR STAY OF INJUNCTION PENDING APPEAL, 4:20-CV-05640-YGR

# INTRODUCTION

Apple has already complied with one-half of the Court's injunction by striking the Guidelines restricting targeted out-of-app communications. Apple has moved to stay the other half of the injunction, which precludes Apple from enforcing the Guidelines' prohibition on in-app "buttons, external links, or other calls to action," because immediate implementation of that aspect of the injunction would upset the integrity of the iOS ecosystem. Epic has endorsed a broad interpretation of the injunction (so broad, indeed, that its own hotfix would be permitted under the injunction), yet it objects to Apple's request for a stay during the resolution of both parties' appeals. Epic's arguments against staying the injunction, however, are unavailing.

*First*, Apple would be irreparably harmed by immediate implementation of the injunction with respect to in-app messaging and, especially, mechanisms. Restrictions on linking out are inextricably tied to Apple's requirement that developers use IAP for purchases of digital content—a requirement this Court considered in detail and *upheld* against Epic's challenge. Eliminating these restrictions entirely would undermine the IAP requirement, force Apple to make its intellectual property available without compensation, and lessen the security and privacy afforded consumers. Epic's half-hearted attempt to dispute that Apple would suffer these harms is contradicted by the evidentiary record.

*Second*, the injunction is not likely to survive appellate review. Epic Games, Inc.—the sole plaintiff in this litigation—lacks standing to secure or enforce an injunction because its developer program account has been terminated and it has no apps on the App Store. Epic's termination was a direct result of its own misconduct in triggering the hotfix; Epic's CEO and corporate representative "acknowledge[d]" at trial "that Apple has the right to terminate Epic for any reason or no reason," and this Court confirmed that right in its declaratory judgment. Epic also failed to prove that the anti-steering provisions harm competition in any relevant market or that they constitute either actual or incipient violations of the antitrust laws. Moreover, Epic failed to prove any harm to itself—or, for that matter, to any of its subsidiaries or their licensees—from the anti-steering provisions and thus would not be harmed by a stay pending appeal.

Apple respectfully requests that the Court stay the injunction pending final resolution of the appellate proceedings.

# DISCUSSION

The injunction prohibits Apple from enforcing two provisions of the App Store Review Guidelines: A sentence in Guideline 3.1.1 regarding in-app mechanisms and messaging, and a sentence in Guideline 3.1.3 regarding targeted out-of-app communications. Apple has *already complied* with the second part of the injunction by deleting the provision and allowing developers to communicate with consumers outside the app. Reply Decl. of Mark A. Perry Ex. A. By this motion, Apple seeks a stay of the first part of the injunction pending appeal, to allow it to develop and implement a global solution to increased in-app communications without upsetting the integrity of the iOS ecosystem. Because all of the traditional factors are satisfied, the requested stay should be granted.

## A.     Apple Would Be Irreparably Harmed In The Absence Of A Stay

As Epic does not dispute, the portion of the injunction striking the Guidelines' prohibition on "buttons, external links, or other calls to action" has created confusion among developers regarding what Apple can and cannot do to run its business and protect consumers. *See* Mot. at 1. The injunction prohibits Apple from enforcing this provision, but does not address what Apple may do in its stead. Epic contends the injunction only "removes an artificial barrier that Apple had placed on consumers' ability to become aware of and choose [an alternative to IAP]," yet under Epic's construction, Apple would be required to permit developers to include links to external sites and even to install competing payment mechanisms—just as Epic did with the hotfix. Opp'n at 7–8. Apple would be harmed by precipitous implementation of the injunction, however construed, and Epic's broad interpretation in particular would visit irreparable harm on Apple and its users.

Epic does not dispute that Apple is entitled to collect a commission from developers for use of its platform, or that "IAP is the method" Apple has chosen to "collect[] its licensing fee from developers for the use of Apple's intellectual property" and that allowing other payment mechanisms would make it "more difficult for Apple to collect that commission." Op. at 150. Requiring Apple to allow other payment solutions in apps—or allowing links or other mechanisms directing consumers to alternatives outside the app—would undermine the "promise of a frictionless transaction," which in turn "endangers the viability of the entire [platform's] network." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018). In-app messaging regarding payment alternatives raise many of the same concerns, particularly

if Apple cannot constrain their placement, format, or content. Yet, if Apple imposes such constraints, it will face complaints from developers and possibly a contempt action from Epic. In light of this uncertainty, Apple faces harm regardless of how the injunction is construed and implemented. Kosmynka Decl. ¶ 10.

The harm is not, as Epic contends, that "IAP will have to compete on price and/or quality." Opp'n at 8. This is the same argument Epic repeatedly made at trial, Dkt. 777-3 (Proposed Conclusions of Law) ¶ 286—which the Court rejected, *see* Op. at 150. IAP is not a separate product, *id.* at 155, and, as Epic appears to acknowledge, Apple already competes with other platforms for purchases of digital content. Opp'n at 11; *see also* Op. at 71–72. Indeed, Apple itself has facilitated this competition by adopting its Multiplatform Rule and (unlike some consoles) allowing cross-wallet play. *See* Op. 13, 84, 123 n.571. The actual issue, as the Court found, is that "[t]he requirement of usage of IAP accomplishes [Apple's goal of collecting compensation for licensing its intellectual property] in the easiest and most direct manner." Op. at 150. Thus, the injunction threatens the integrity of Apple's monetization model itself, which the Court upheld. *See id.*

Epic attempts to miscast Apple's position as equating "consumers' increased awareness" with "irreparable harm." Opp'n at 11; *see also id.* at 1, 17 (suggesting the injunction will "simply provide[] consumers increased information" by enabling developers "to offer information and a choice"). But Apple does not seek to stay the injunction insofar as it allows developers to "communicat[e] with customers through points of contact obtained voluntarily from customers through account registration within the app." Dkt. 813. To the contrary, Apple has *already* stricken the Guideline provision restricting targeted *out-of-app* communications. Perry Reply Decl. Ex. A. This is directly responsive to the Court's concern with the information available to consumers. *See* Op. at 166. The other Guideline provision at issue, which speaks to *in-app* "buttons, [external links,] or other calls to action," Mot. at 7, raises significantly more difficult problems as Apple attempts to ensure that "other parts of the Apple ecosystem . . . will not be significantly impacted." Op. at 166. "Links" and "buttons," in particular, go far beyond *information* to include payment *mechanisms*. Epic's opposition conflates those two concepts, even though the Court's opinion consistently speaks of information rather than mechanisms. *See, e.g.*, Op. at 2–3, 50–51, 93, 117–19, 163–67, 179.

Epic also ignores the record in arguing that the injunction will not impair users' security or privacy. *See* Opp'n at 9. The Court found that "if Apple could no longer require developers to use IAP for digital transactions, Apple's competitive advantage on security issues, in the broad sense, would be undermined." Op. at 150 (citation omitted); *see also, e.g.*, *id.* at 65 ("Apple's IAP, as used here, is a secured system which tracks and verifies digital purchases, then determines and collects the appropriate commission on those transactions."). Epic unwittingly proves the point by touting the "innovat[ions]" other developers have already begun to announce, Opp'n at 24, while ignoring the serious risks that those alternatives entail. *See* Mot. at 7–8 & Perry Decl. Ex. H. Reportedly, multiple developers are creating systems with unknown protections, controls, and privacy measures (if any). Perry Reply Decl. Ex. F.

Even though Epic offers *only* digital products and services (such as V-Bucks), it notes that Apple already permits alternative payment options for apps that deliver physical goods and services. Opp'n at 10. But the security and privacy risks associated with external links and alternative payment mechanisms exist in connection with apps that deliver physical goods and services. The difference is that for digital goods, Apple has the ability to facilitate a secure transaction, because unlike physical goods delivered to a user's door, Apple can ensure the delivery of digital goods. Kosmynka Decl. ¶¶ 13–15; *see also* Perry Reply Decl. Ex. C at 958:6–960:9 (Fisher). The injunction thus could transform one of the most secure kinds of transactions on iOS into one of the least secure. Epic does not contest this, nor does it rebut Mr. Kosmynka's declaration; instead, Epic asks the Court to disregard that evidence. But Apple, as the stay applicant, is entitled to prove the harm that it would suffer from the injunction—particularly because Epic's proposed injunction did not even address Apple's so-called anti-steering provisions. *See* Dkt. 276-1. Apple therefore had no reason to submit the substance of Mr. Kosmynka's declaration at trial, and Epic's suggestion to the contrary is unfounded.[1]

Epic also calls Apple's security justification "pretextual." Opp'n at 6. But while the Court said

---

[1] In the sole case Epic cites, the defendants pursued a stay based on a waived argument that the plaintiff had failed to exhaust state-law remedies. *O'Donnell v. Harris County*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017). That says nothing about a party's ability to identify irreparable harm through a declaration in seeking a motion to stay, particularly where, as here, the relevant record "was less fulsome." Op. at 163; *see also, e.g.*, *Wisc. Educ. Ass'n Council v. Walker*, No. 11-CV-428-WMC, 2012 WL 13069917, at *4 (W.D. Wis. Apr. 27, 2012) (crediting declarations submitted with motion to stay injunction pending appeal).

an increase of information in general might not impair Apple's security, it made no findings about the specific security and privacy threats imposed by unrestricted linking out, in-app buttons, or other mechanisms. Nor did it have occasion to do so. Epic's evidence was "less fulsome" on anti-steering generally, Op. at 163, and non-existent on mechanisms as distinguished from information. Nor can Epic dismiss the security and privacy threats as harm to developers and users, not Apple. *See* Opp'n at 8. Just as Epic sought to do throughout trial, this argument ignores the nature of a two-sided transaction platform. The approach advocated by Epic and others will disrupt "the optimal balance" between the two sides of the App Store platform. *Amex*, 138 S. Ct. at 2281. This "risk[s] a feedback loop of declining demand." *Id.* Thus, making the platform less attractive to users or developers *is* an injury to Apple.

Nothing in Apple's "post-decision statements" suggest otherwise. Opp'n at 7. That Apple was "pleased with the Court's ruling," *id.*, is hardly surprising given that Epic's assault on the App Store's business model failed and the Court ruled against Epic on nine of the ten claims it asserted. Op. at 1. Indeed, Apple's statements were the natural corollary of Mr. Sweeney's admission that the Court's "ruling isn't a win." Perry Reply Decl. Ex. B. Whereas Apple has relied on Mr. Sweeney's very public statements on Twitter and elsewhere, Epic quotes an unauthorized report of one confidential statement by Mr. Cook, Byars Decl. Ex. B; but even assuming the statement was accurately reported, it correctly summarized the Court's injunction, which requires Apple to strike two sentences from Guidelines 3.1.1 and 3.1.3. *See* Dkt. 813. Nor do Apple's comments provide any basis to "heavily discount" Apple's arguments, Opp'n at 7, as none of them had anything to do with the challenges Apple faces in replacing the sentence in Guideline 3.1.1 with a framework that comports with the Court's opinion, provides clarity for developers, maintains Apple's business model, and protects iOS users. *See* Kosmynka Decl. ¶¶ 15-18. Apple would suffer irreparable harm from precipitous implementation of *that* aspect of the injunction.

At bottom, the Court's injunction was not intended to have "any impact on the integrity of the ecosystem." Op. at 164. But Epic does not, because it cannot, dispute that immediate implementation of the injunction's first clause would do just that, especially if it is interpreted as broadly as Epic has proposed. Apple has therefore made a more-than-sufficient showing that it will be irreparably injured

absent a stay. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

B.  **Apple Has A Substantial Case For Relief On The Merits**

This Court need not conclude that Apple will win its cross-appeal to enter the requested stay. Rather, the question at this stage is whether Apple has a substantial case for relief from the Ninth Circuit, and that question can only be answered in the affirmative. If anything, Epic's response to the stay motion confirms this point.

1.  **There Is No Legal Or Factual Basis For UCL Liability**

Epic does not dispute that the Court did not "identify a product market" before assessing the competitive effects of Apple's anti-steering provisions under the UCL; nor does Epic dispute that the identification of a product market is a threshold requirement in *any* assessment of competitive effects (including one under the UCL). *Facebook, Inc. v. Brandtotal, Ltd.*, No. 20-CV-7182, 2021 WL 2354751, at *15 (N.D. Cal. June 9, 2021) (dismissing UCL claim for failure to allege a cognizable market). While the UCL ruling is premised on the Court's conclusion that the anti-steering provisions are "anticompetitive," Op. at 163, "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition," *Amex*, 138 S. Ct. at 2285 (alterations and quotation marks omitted). Given that there is *no evidence* of competitive harm in the sole market the Court did identify (for mobile gaming apps), Apple will argue that the UCL ruling cannot stand.

Epic contends that it is sufficient that the Court observed no "principled reason" to limit the injunctive relief to mobile gaming apps. Opp'n at 16 (citing Op. at 167). Elsewhere in the opinion, however, the Court explained in detail the differing competitive conditions that justified separating mobile gaming app transactions from all other app transactions. *See* Op. at 61–64, 122–24. And the Court expressly excluded subscription apps from the relevant market. *See id.* at 123 n.571; *see also id.* at 61 n.310. Yet the *only* evidence of competitive effects on app developers came from representatives of companies offering subscription apps (Down Dog and Match Group). *See* Perry Reply Decl. Ex. C at 360:7–13 (Simon); Dkt. 667-1 at 24:17–26:5, 28:9–22 (Ong). If Apple's anti-steering provisions implicated a different product market than the one the Court adopted for all other purposes, it was incumbent on Epic to *prove* such a market. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989). Indeed, the Court *rejected* Epic's alleged "iOS In-App Payment

Processing Market," which was the *only* market that Epic suggested was relevant to its anti-steering contentions. *See* Dkt. 1 ¶¶ 10, 130–32, 227–28, 263–64; *see also* Dkt. 777-3 (Proposed Findings of Fact) ¶¶ 368, 419–22.

Epic's attempt to disavow its *own* allegation that game developers would be affirmatively harmed if users "were directed to" purchase mechanisms outside of the app is disingenuous. *See* Opp'n at 17 (citing Dkt. 1 ¶ 116). The point is not whether some game developers might prefer to include links to external payment solutions, but rather that the competitive considerations for requiring Apple to permit such links are different from those that apply to non-gaming apps. *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-66 (6th Cir. 2014). By Epic's own reckoning, whether Apple's anti-steering provisions are "unfair" vis-à-vis game transactions raises issues that the Court did not analyze. *See, e.g., Cal. Dental v. FTC*, 224 F.3d 942, 951–52 (9th Cir. 2000) ("[O]ur rule-of-reason case law usually requires the antitrust plaintiff to show some relevant data [of anticompetitive effects] from the precise market at issue in the litigation.").

As to the purported evidence regarding the anti-steering provisions more generally, Epic insists that the "Court's factual findings were supported by substantial evidence in the record, including quantitative evidence." Opp'n at 18. But the representative from Down Dog testified only as to his anecdotal recollection of statistics from an indeterminate timeframe, and no witness offered any data regarding the effects of Apple's anti-steering provisions—notwithstanding that the Court "warned the parties in advance that actual data was an important consideration." Op. at 50. Epic further acknowledges that its lead economist, Dr. Evans, did not separately analyze the competitive effects of the anti-steering provisions, *see* Perry Reply Decl. Ex. C at 1552:3–14, 1574:1–4, 1716:15–20 (Evans), but attempts to excuse that evidentiary gap on the ground that "no rule of law requires a party to independently analyze from an economic perspective each of the defendant's anticompetitive acts," Opp'n at 18 (alteration and quotation marks omitted). As the Court recognized in the context of this case, however, "[e]valuating competitive effects . . . would require isolating the effects of a particular restriction." Op. at 144. Epic does not explain how two specific provisions in Apple's Guidelines can be deemed "unfair" without any independent economic analysis of *those* provisions—as distinguished from all other provisions challenged by Epic and actually analyzed by the parties and their experts.

Epic blithely asserts that the Supreme Court did not "hold that Amex's anti-steering provisions were procompetitive." Opp'n at 19. It does not even acknowledge the Court's statement that "there is *nothing inherently anticompetitive* about Amex's antisteering provisions," because those provisions "actually stem negative externalities in the credit-card market and promote interbrand competition." *Amex*, 138 S. Ct. at 2289. Indeed, anti-steering and anti-circumvention policies are commonplace among digital marketplaces, *see* DX-3120.016–.018, .025–.030—"prior information," in the words of Epic's economic expert, "that these practices are efficient," Perry Reply Decl. Ex. C at 2414:20–23 (Evans). As for the purported "enforced silence" regarding payment alternatives, Opp'n at 20 (quotation marks omitted), Epic does not respond at all to the undisputed evidence showing that although earlier versions of the Guidelines were less clear, Apple has long permitted developers to contact users, including regarding alternative payment options, *see, e.g.*, Perry Reply Decl. Ex. C at 2824:15–2828:18 (Schiller). Apple's recent amendment to the Guidelines makes explicit the ability of developers to engage in targeted out-of-app communications. At the same time, however, Epic cannot explain how compelling Apple to allow in-app messaging, which would transform the App Store into an advertising platform for its competitors, is consistent with *Amex*. Epic cites no case in which a firm was required to permit use of *its* facilities to advertise competitors' offerings.

Finally, Epic argues that the balancing test under the UCL can apply here, essentially making all inquiries into the competitive effects of the anti-steering provisions irrelevant. Opp'n at 15. The Ninth Circuit has been clear that it "agree[s] with the Fourth District [Court of Appeals in California] that *Cel-Tech* effectively rejects the balancing approach." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). The Ninth Circuit did go on to opine that for class certification purposes, the district court did not err in considering the predominance of common questions under the balancing test, but did not hold that the balancing test is, standing on its own, a viable test for unfairness under the UCL. *See id.* Even applying a free-floating balancing test, however, would not alter the outcome here because the Court expressly found that IAP, which is the very feature the anti-steering provisions are intended to protect, has procompetitive benefits for consumers. *See* Op. at 150.

### 2. Epic Lacks Standing

Epic argues that notwithstanding the fact that it no longer has an active developer account and

it introduced *no* evidence of harm to it *or its subsidiaries* arising from Apple's anti-steering provisions at trial, it nonetheless has Article III standing. Opp'n at 12–15. Epic's argument is contrary to precedent, common sense, and the evidentiary record (or lack thereof).

*First*, Epic argues that it has standing because its *subsidiaries* still have active developer accounts and apps on the App Store, and thus Epic, as their owner, will suffer indirect injury. Opp'n at 13. That contention is flatly inconsistent with settled law—a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Consequently, "shareholders do not have standing to assert the claims of the corporation, unless they do so through derivative actions." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1037 (9th Cir. 2012); *see also Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820 (7th Cir. 2015) ("American law does not collapse parents and subsidiaries" and "derivative injury rarely gives rise to a claim under antitrust law, for example by an owner or employee of, or an investor in, a company that was the target of, and was injured by, an antitrust violation"). In the case Epic cites to support standing, the court expressly did *not* reach the issue of whether a foreign parent corporation has standing to assert the interests of its shareholders. *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 338 (1990) ("We need not decide this dispute about respondents' stockholder standing . . . .").

There is one plaintiff in this case: Epic Games, Inc. It elected to pursue this litigation in its name only, and Apple has consistently taken the position that it cannot recover on behalf of (or otherwise rely on) its subsidiaries. *See* Dkt 779-1 ¶¶ 546–52, 718–722. Epic, as the master of its complaint, had ample opportunity to join subsidiary or affiliate companies as plaintiffs. Epic chose not to do so, and benefitted from that choice by (for example) not subjecting those companies to the discovery obligations imposed on parties to litigation. Epic may not now back its way into sweeping equitable relief by asserting some indirect financial interest in apps developed by legally distinct entities. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities.").

Notably, Epic does not point to any evidence in the record about purported injury to its *subsidiaries* from Apple's anti-steering provisions. *See* Op. at 6 n.28. Epic's witnesses mentioned

some of those subsidiaries (and their apps) at trial, but Epic made no effort to show (quantitatively or even anecdotally) that they were affected in any way by the anti-steering provisions. Instead, it attempts to introduce new evidence regarding its subsidiaries' apps that offer in-app purchases, apparently attempting to prove standing *after* the close of evidence. *See* Opp'n at 13. Unlike the declaration of Mr. Kosmynka—submitted by Apple to address one of the stay requirements that arose only after trial, when the Court imposed an injunction that was not proposed by Epic—Epic has sought to prove *a substantive element of its case* after the fact. Epic's own authorities foreclose this effort. *See O'Donnell*, 260 F. Supp. 3d at 815 (cited at Opp'n at 10).

*Second*, Epic posits that licensees of *Unreal Engine* that pay royalties to Epic might be harmed by the anti-steering provisions, thus giving Epic an interest in the injunction. Opp'n at 13. That is flat wrong—as the Court correctly recognized: "Epic Games profits from *Unreal Engine* by charging fees for paid content. *Separately*, Epic International charges a royalty on products that use any version of the *Unreal Engine* (typically 5% of gross revenue)." Op. at 5 (emphasis added). Epic once again is conflating *its* financial interests with those of its subsidiaries—Epic International is not a party to this litigation. And in any event, Epic introduced no evidence that any *Unreal Engine* licensee was injured in the past, or would be harmed in the future, by Apple's anti-steering provisions. There is no evidence that Down Dog or Match Group, the only developers who testified on steering, use *Unreal Engine*.

*Third*, Epic argues that because it has appealed the Court's order regarding the lawfulness of Apple's termination of Epic's developer account vests it with standing to continue to challenge the anti-steering provisions. Not so. The Court granted Apple's request for declaratory judgment that "Apple's termination of the DPLA and the related agreements between Epic Games and Apple was valid, lawful, and enforceable." Op. at 179. That is a final judgment, which Epic has not sought to stay pending appeal. The mere prospect that Epic *might* obtain a different result on appeal does not alter the preclusive effect of the Court's final judgment, *see Hawkins v. Risley*, 984 F.2d 321, 324 (9th Cir. 1993), and does not vest Epic with standing *now* to seek equitable relief for an entirely different claim. Moreover, the Court expressly found that "[t]his case does not involve retaliation," and that "Epic Games never showed why it had to breach its agreements to challenge the conduct litigated." Op. at 178. The issue of whether Apple's conduct is in violation of the antitrust laws is distinct from

the issue of whether Apple should be compelled to do business with an entity who has demonstrated a willingness to deceive Apple about its app's functionality.

Epic complains that, before the Court's decision was rendered, Apple offered to allow *Fortnite* to return to the App Store if Epic would play by the same rules as every other developer. Opp'n at 14. But Epic spurned that offer, refusing to adhere to the Guidelines even under the supervision of this Court. *See* Perry Reply Decl. Ex. D at 83:3–86:18. Epic also stipulated that Apple was entitled to terminate its account for breach of contract, *see* Dkt. 473, a point confirmed by Mr. Sweeney at trial upon direct questioning from the Court: "I acknowledge Apple would have the right to remove Epic from the developer program for any reason or no reason." Perry Reply Decl. Ex. C at 348:6–11 (Sweeney). And this Court entered a declaratory judgment confirming that Apple could terminate Epic's developer account. *See* Op. at 179. A key purpose of trials, and judgments, is to clarify the parties' respective rights and obligations. Apple has the right to terminate Epic's account, and it has exercised that right based on Epic's own intentional misconduct. As a consequence, Epic has no standing to benefit from or enforce the injunction. Both the "injury" and the "redressability" prongs of Article III are unsatisfied here. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992).

*Finally*, Epic argues that because it paid commissions to Apple while *Fortnite* was on the App Store, it suffered injury from the steering provisions. Opp'n at 14. As an initial matter, even if true, this would not vest Epic with standing to receive prospective, injunctive relief. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) ("In the context of injunctive relief, the plaintiff must demonstrate a *real or immediate threat* of an irreparable injury." (quotation marks omitted) (emphasis in original)). And in any event, the fact that Epic was required to pay Apple a commission does not establish standing—the Court found that "[b]ecause Apple has created an ecosystem with interlocking rules and regulations, it is difficult to evaluate any specific restriction in isolation or in a vacuum." Op. at 118. Epic did not even attempt to prove that any portion of the commissions it paid in the past were inflated by the steering provisions.

### 3. The Equitable Relief Order Is Overbroad

Finally, even if there were an adequate factual and legal basis for liability and standing under the UCL, Apple has a substantial case on the merits that the injunctive relief ordered is overbroad.

*First*, even if *some* relief were appropriate with respect to Apple's anti-steering provisions, the Court made no findings regarding the prohibition of buttons and external links within an app (*i.e.*, mechanisms as distinguished from information). As Epic does not dispute, the Court's emphasis was on the availability of *information* to users about alternative payment options. *See* Op. at 163–64. Buttons and external links have nothing to do with providing users information, but instead are *mechanisms* for accessing alternatives. Even if Apple were constrained in restricting in-app *information*, nothing in the trial record or the Court's opinion speaks to the Guidelines prohibition on in-app mechanisms. On the contrary, the Court recognized the *pro*competitive effects of Apple's policy against external in-app purchasing options. *See id.* at 150.

*Second*, Epic urges that the Court "expressly found irreparable injury to Epic," and then cites a passage from the opinion that mentions neither irreparable injury nor Epic. Opp'n at 21 (citing Op. at 163). Epic does not dispute that irreparable injury to the plaintiff must be found before injunctive relief may issue, and the only excerpts Epic cites to plainly do not contain such a finding. With respect to the defense of unclean hands, Epic incorrectly claims that "the Court *did* consider this defense and rejected it." *Id.* Once again, though, Epic cites to a passage that says nothing about unclean hands whatsoever, *see* Op. at 171, and there is no passage in the Court's order addressing the defense. In Epic's view, because the Court (a) recognized Epic's "clandestine tactics" and (b) ultimately granted the injunction, it must necessarily have rejected Apple's equitable defenses. Opp'n at 21. It cites no precedent for this proposition except two cases holding that the application of the unclean hands defense is within the trial court's discretion. *See id.* at 21-22 (citing *Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 544-45 (2008); *Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 447 (2000)). Neither of those cases suggests that a court satisfies its responsibilities under Rule 52(a)(1) by failing to address entirely a fully briefed and litigated defense to injunctive relief. Notably, Epic does not dispute that both of the elements of unclean hands are satisfied here.

*Third*, the injunctive relief impermissibly extends to all developers. Epic opted out of the pending class action suit brought on behalf of developers, instead making an affirmative election to seek relief *only* for itself. *See* Perry Reply Decl. Ex. C at 338:3–6, 337:13–19 (Sweeney); *see also* Op. at 23–24 ("Epic Games decided it would rush to court with its own plan to protect its self-avowed

interests" while it "ignored" the then-pending consumer and developer class actions). The Federal Rules expressly provide for a mechanism—Rule 23(b)(2)—for plaintiffs seeking injunctive relief on behalf of an entire class, but Epic elected not to seek class certification here. And while a plaintiff may, in certain situations, receive relief that extends beyond the individual plaintiff, that is so only where "*breadth is necessary to give prevailing parties the relief to which they are entitled*." *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (emphasis in original). Epic contends that a broad injunction is necessary here because it could lead Apple to lower its commission, Opp'n at 14–15—even though Epic made clear at the outset of the case that it was not "actually challeng[ing] specifically the 30 percent," Perry Reply Decl. Ex. D at 22:14–16. But if Epic were able to inform users that digital content for *Fortnite* could be purchased elsewhere, any alleged harm from Apple's anti-steering provisions would be ameliorated as to Epic. The effects, if any, on *other* developers are irrelevant to the appropriate scope of equitable relief in this single-plaintiff case, because an Epic-only injunction would resolve any (unproven) injury suffered by Epic itself. Indeed, the developer class agreed to a settlement that includes no changes to the Guidelines restrictions on in-app mechanisms and messaging.

### C.   A Stay Will Not Injure Epic

Epic's only theory of harm is that its *subsidiary* will suffer financial losses in licensing *Unreal Engine*. Opp'n at 23. Yet as noted above, Epic's subsidiaries, including Epic International, are distinct entities with distinct rights and distinct interests—and they are not parties to this litigation. *See supra* pp. 9–10. Epic cannot rely on supposed injuries to third parties in opposing a stay. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("[T]he traditional stay inquiry calls for assessing the harm to *the opposing party*.") (emphasis added). Moreover, Epic did not prove at trial any particular loss—to itself, to its subsidiaries, or to any other developer—attributable to the anti-steering provisions themselves, and it cites nothing more now. *See* Op. at 118. Epic's claim to harm from a stay is purely speculative.

To distract from the absence of any harm to itself, Epic argues that the "injunction merely requires Apple to comply with the law." Opp'n at 23. That is irrelevant to whether "the stay will substantially injure" Epic. *Lair*, 697 F.3d at 1203. Indeed, the only case Epic cites considered whether to issue an injunction as part of a default judgment—not a motion to stay. *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, No. 14-CV-2307, 2014 WL 4679001, at *13 (C.D. Cal. Sept. 18, 2014).

As Apple explained above and in its motion, immediate implementation of the injunction, especially as Epic construes it, would irreparably harm Apple. *See supra* pp. 2–6; Mot. at 7–10.

### D. A Stay Is In The Public Interest

A stay will allow Apple to study the effects on the iOS ecosystem, including on both developers and consumers, posed by various options while the company evaluates changes that address the Court's concerns with user access to information regarding alternative payment options. *See* Mot. at 18. Epic calls this "[a]n empty promise of some change that may not occur for years." Opp'n at 24. That is incorrect. Apple has made actual, concrete commitments with actual, concrete timelines. For example, Apple agreed as part of the *Cameron* settlement to allow targeted communications outside apps. Stipulation of Settlement § 5.1.3 Cameron, No. 19-CV-3074-YGR (Aug. 26, 2021), Dkt. 396-1 Ex. A. And Apple *already has deleted* the enjoined clause from Guideline 3.1.3 and added a clarifying provision that "[a]pps may request basic contact information" subject to certain conditions. Perry Reply Decl. Ex. A. Apple also has agreed, as part of a settlement with the Japanese Fair Trade Commission, to allow certain links in reader apps in early 2022. Perry Reply Decl. Ex. E. These are meaningful steps to address the Court's concerns.

Apple is pursuing a global solution to best serve developers and users across the world. *See* Mot. at 18; *see also* Kosmynka Decl. ¶¶ 10 & 17. This is far from a "vague promise" that "every antitrust defendant" could use to "avoid an injunction." Opp'n at 24. Apple's actions speak for themselves: The *actual* steps Apple has *already* taken—including complying with one-half of the Court's injunction—show that the company is working in good faith to improve consumers' access to information in a way that will preserve the integrity of the ecosystem, including Apple's monetization structure and the security and privacy benefits that differentiate Apple's platform from its competitors. *See* Op. 104. At the same time, the App Store operates globally and Apple must balance the competing regulatory and other demands made in multiple jurisdictions.

Moreover, Epic offers no evidence or authority to displace the obvious fact that "a stay would avoid the parties and the Court wasting taxpayer resources on a litigation which might be mooted on appeal." *Hunt v. Check Recovery Sys., Inc.*, No. 05-CV-4993, 2008 WL 2468473, at *5 (N.D. Cal. June 17, 2008). That the *Hunt* court made this remark in connection with a preliminary injunction,

Opp'n at 25, is a distinction that does not make a difference; there, as here, the costs of compliance with the injunction—and the follow-on litigation that Epic's broad interpretation would all but ensure—will be avoided with a stay. Indeed, Epic does not contest, and therefore tacitly concedes, that a stay would merely maintain the status quo while the appellate process progresses to completion. *See* Mot. at 19.

### E.   In The Alternative, The Court Should Temporarily Stay The Injunction

Ignoring that temporary stays are routinely entered to allow an appellant to seek relief from the Court of Appeals, Mot. at 19, Epic's only argument is that Apple waited a month to move for a stay, Opp'n at 25. Of course, Apple's motion was hardly tardy. Apple noticed this motion less than halfway through the time allotted between judgment and the injunction's effective date. *See* Dkt. 813. And Apple was not idle during that time, implementing new Guidelines that comply with the injunction and exploring other options (well in advance of any need to do so under the settlement agreement). *See supra* p 3.

Apple merely asks that, if the Court denies a stay, it allows a temporary stay so that the Ninth Circuit can hear a prompt request from Apple rather than an emergency motion. This is what happened in the case both parties cite: In *Campbell v. National Passenger Rail Road Corp.*, the court *did stay* the injunction's effective date for ten days precisely to allow the defendant to seek a stay from the Ninth Circuit. No. 05-CV-5434, 2009 WL 4546673, at *2 (N.D. Cal. Nov. 30, 2009); *see also Conservation Cong. v. U.S. Forest Serv.*, No. CIV. S-11-2605 LKK, 2012 WL 3150307, at *2 (E.D. Cal. Aug. 1, 2012) (providing twenty-one days for the same purpose); *Elliot v. Williams*, No. 2:08-CV-00829-GMN, 2011 WL 5080169, at *10 (D. Nev. Oct. 25, 2011) (sixty days). Epic provides no reason why a different result—that will disrupt the orderly adjudication of this case—is needed here.

### CONCLUSION

For the foregoing reasons, Apple requests that the Court stay the injunction pending the disposition of the appeals noticed by both Epic and Apple from the Court's judgment.

| | | | |
|---|---|---|---|
| 1 | DATED:  October 29, 2021 | By | /s/ Mark A. Perry |
| 2 | | | GIBSON, DUNN & CRUTCHER LLP |
| | | | Theodore J. Boutrous Jr. |
| 3 | | | Richard J. Doren |
| | | | Daniel G. Swanson |
| 4 | | | Mark A. Perry |
| | | | Veronica S. Lewis |
| 5 | | | Cynthia E. Richman |
| 6 | | | Jay P. Srinivasan |
| | | | Ethan D. Dettmer |
| 7 | | | Rachel Brass |
| 8 | | | *Attorneys for Apple Inc.* |