# EXHIBIT C

1  huge factor in this. People are much more likely to make a
2  purchase if it is easy to make a purchase than if it's very
3  hard.
4        **THE COURT:** Okay. Keep going.
5  **BY MS. FORREST:**
6  **Q.** Mr. Sweeney, you were shown a document -- let's pull it
7  up, 4477 -- by Mr. Doren. And also I talked to you about this
8  yesterday.
9       And you were pointed to various portions of this document.
10 Let me ask you whether or not Epic is suing for damages in
11 this case.
12 **A.** No.
13 **Q.** And would Epic have accepted a deal from Apple prior to
14 the launch of the hot fix that related to relief just for
15 itself and its concerns about Apple's policies?
16 **A.** Yes. That is what Apple -- sorry. That's what Epic was
17 asking for in this document. And if Apple had granted us
18 permission, then we would have launched *Fortnite* direct
19 payment with Apple's blessing.
20 **Q.** Did Epic want a deal just for itself or for all
21 developers?
22 **A.** Didn't want a deal just for Epic. Expressed the hope that
23 Apple would make these options available to all developers.
24 **Q.** If Apple had told you that the deal would only be for you
25 and no other developers --

1         **THE COURT REPORTER:** Can you repeat?

2 **BY MS. FORREST:**

3 **Q.** If Apple had told you that it would offer you a deal for
4 you and no other developers, would you have accepted that
5 deal?

6 **A.** Yes, I would have.

7 **Q.** When did you first learn that the class action existed?
8 If you can recall?

9 **A.** Referring to the consumer?

10 **Q.** Consumer class action or the developer class action.

11 **A.** My recollection is a bit hazy, but I remember reading
12 about the Supreme Court matter on -- was it the developer
13 class action in 2018, I believe?

14 **Q.** And remind the Court when you first distributed on iOS.

15 **A.** I believe in March or April of 2018.

16 **Q.** And remind the Court when you first distributed any game
17 or product on iOS.

18 **A.** Sorry. 2010.

19 **Q.** And did Apple require Epic to enter into a developer
20 agreement at that time?

21 **A.** Yes.

22 **Q.** And you discussed that briefly with Mr. Doren yesterday.
23     Do you recall that?

24 **A.** Yes.

25 **Q.** All right. Did Epic have any ability to negotiate the

1   relief.  So part of the equitable relief that I've already
2   provided was to require that Apple keep the *Unreal Engine*
3   open.
4       What is your backup plan if I don't?  What is your backup
5   plan?
6           **THE WITNESS:**  If Epic -- if Apple's actions are
7   lawful, then I acknowledge Apple would have the right to
8   remove Epic from the developer program for any reason or no
9   reason, and then it would be up to Apple to decide.  If Apple
10  cut us off, then we would have to live with that, without
11  supporting the iOS platform.
12          **THE COURT:**  Okay.  Thank you.
13      Okay.  Now next witness.
14          **MR. EARNHARDT:**  Good morning, Your Honor.  Wes
15  Earnhardt for Epic Games.  We call Benjamin Simon.
16          **MS. FORREST:**  While they are getting their witness,
17  Your Honor, I will just remove the equipment over by the stand
18  so nobody trips on it.
19      (**BENJAMIN SIMON**, called as a witness for the Plaintiff,
20  having been duly sworn, testified as follows:)
21          **THE CLERK:**  Please be seated.  Please state your full
22  name and spell your last name.
23          **THE WITNESS:**  My full name is Benjamin Simon.  And
24  the last name is S-I-M-O-N.
25          **THE COURT:**  Good morning, sir.

1    And so -- also some users will choose to subscribe before they
2    ever get that email.
3        So because we can't advertise the website offer within the
4    app, we end up having -- again, roughly half of our users
5    subscribe the in-app purchase at the higher price.
6        That's correct.
7    **Q.**   So what is your view on that restriction?
8    **A.**   I think it, again, increases prices for our users and
9    reduces the number of subscribers.  For that particularly, we
10   also have evidence from the fact that on Android we do include
11   a link to purchase on our website.  And on Android, only about
12   10 percent of our users choose to use the in-app purchase
13   option.
14   **Q.**   Okay.  If you don't like the restriction that prevents you
15   from telling your users that you have lower prices elsewhere,
16   why did you agree with it?
17   **A.**   We don't feel that we have any other choice.
18   **Q.**   I'm going to show you one document now.
19   **A.**   Okay.
20            **MR. EARNHARDT:**  May I approach Your Honor?
21            **THE COURT:**  You may.
22            **MR. EARNHARDT:**  Your Honor, I have a binder for you,
23   but I understand --
24            **THE COURT:**  That's fine.
25

1  of my business management team.  And Carson reports directly
2  to me.
3  **Q.**  And it appears that Ms. Blumenthal has written a message
4  to you, a copy to Mr. Oliver regarding Lyft, the Lyft service.
5      Can you describe what that email is discussing there?
6  **A.**  Sure.
7      So I think for -- I would say the first 10 years or so of
8  the App Store, things were pretty easy to understand and kind
9  of black and white when it relates to what Apple felt we
10 deserved a commission for and what we didn't.
11     And so from the inception of the App Store, again,
12 predates my time.  I joined the team in 2010.  But the
13 decision was made that for an app that sells physical goods
14 and services, Apple didn't make sense for Apple to earn a
15 commission as part of that because we ultimately wouldn't know
16 whether the physical good or service would be delivered to the
17 end user, right?
18     Call for an Uber or a Lyft, go from point A to point B, we
19 have no visibility whether that happened or you order paper
20 towels from Amazon, we don't know if it shows up at your front
21 door.
22     With digital goods and services, we know when that
23 purchase takes place, because it happens through our commerce
24 engine.  We know when the goods have been delivered from the
25 developer to the end user in the case of in-app purchases or

1  in-app subscriptions, and we feel very justified we earned our
2  commission for those types of transactions.
3      But this was about something we have never seen before,
4  which is businesses that were primarily focused in the
5  physical goods and services space that were starting to create
6  what I called at the time, and how I still view it as hybrid
7  subscriptions where you've got, you know, part of the
8  subscription is for something physical, part of the
9  subscription is for something digital.
10     And at this time back in 2018, we were starting to see in
11 certain developers experiment with this and we were internally
12 trying to wrap our head around what this means and how can we
13 support these developers with what they want to do from a
14 business perspective while at the same time having kind of
15 clear guidance.
16     This was all about that time period.  In this particular
17 case, this was with the company Lyft, which clearly we would
18 all say they are in the physical goods and services space with
19 ride sharing, but they were testing some things that were kind
20 of, again, this hybrid of physical plus digital.
21     And so Lindsey is just relaying communication that she had
22 with Trystan Kosmynka who was and still runs app review.  And
23 what Lindsey wrote here, you know, Hi Matt.  Trystan confirmed
24 that IAP was optional for membership subscriptions so I
25 commuted this message to Lyft today.

1   And I was kind of using that some language in my response
2   and said, thanks. Unfortunately IAP being optional means that
3   no one will ever use it. What I meant was, you know, Apple's
4   commission.
5   And I think this is an example of what I acknowledged
6   earlier where sometimes I and others conflate the two. What I
7   meant was, if a developer has the option of sharing the
8   commission with Apple or not, then, you know, as a reasonable
9   business person, why would they share a commission.
10   **MR. SRINVASAN:** Thank you, Mr. Fischer. I have no
11   further questions at this time.
12   **THE COURT:** We have just three minutes. Do you want
13   to get started or --
14   **MS. FORREST:** Sure. I am happy to get started. I
15   won't finish, but I can get started.

### REDIRECT EXAMINATION

**BY MS. FORREST:**
**Q.** You had some questions from counsel on things that you
have responsibility for and don't have responsibility for.
   Do you recall that?
**A.** Yes, I do.
**Q.** All right. And you mentioned earlier and then again with
counsel that you are a member of the executive review board,
correct?
**A.** Yes, I am.

1  the absence of artificial barriers for consumers.  So that is
2  a starting point.
3       **THE COURT:**  Did you do an analysis in the but-for
4  world with the change being an anti- -- to eliminate the
5  anti-steering provision?
6       **THE WITNESS:**  In this part of the analysis, I did not
7  because I'm assuming in this part of the analysis that Apple
8  can have the IAP --
9       **THE COURT:**  I understand what this one is.  I am
10 asking a separate question, whether you did an analysis where
11 Apple maintained its App Store but eliminated the
12 anti-steering provision in their contract.
13      **THE WITNESS:**  I did not do a narrowly focused
14 analysis of that topic.
15      **THE COURT:**  All right.  Proceed.
16      **MR. BORNSTEIN:**  Thank you.
17 **BY MR. BORNSTEIN:**
18 **Q.**  Did you see evidence of efforts to enter the iOS app
19 distribution market that were blocked?
20 **A.**  Yes.
21 **Q.**  What were those?
22 **A.**  So in the last three years, several large companies have
23 tried to start what are essentially gaming app stores
24 on iOS.
25 **Q.**  I don't mean to make it a memory test, but which companies

1       **THE COURT:** That's what I asked you about earlier but
2  you chose not to analyze that.
3       **THE WITNESS:** I chose not to analyze that separately,
4  but as part of the overall analysis that I've done.
5     So, for example, if Apple did not have those anti-steering
6  restrictions, then it would be possible for Tinder to message
7  the Tinder user and say, I have a great deal for you if you
8  just use -- go to the PC.
9       **THE COURT:** Right.
10      **THE WITNESS:** Apple prevents -- makes it very
11 difficult for that to happen and, therefore, the Tinder user
12 generally doesn't have enough -- wouldn't have enough
13 information to know that they could go somewhere else.
14      **THE COURT:** Unfortunately -- well, you can explain to
15 me, to the extent it exists, whether we've got good analysis
16 with respect to that issue.  Because it is distinctly
17 different than this but-for world analysis here, right?  Or
18 perhaps it is just a subset.
19      **THE WITNESS:** I do think it's a subset.  So one
20 possibility, in terms of the but-for world, if I could, Your
21 Honor, just put this in sort of straight antitrust terms --
22      **MR. SWANSON:** Your Honor, can I object to this?
23 Because I don't think this has been disclosed.  And if
24 Dr. Evans is going to talk about this, can we direct it to the
25 part of his report where he actually said this?

1    THE COURT: Okay.
2    THE WITNESS: There are certain apps where what
3 you've just described is right at the time -- for the time
4 being in the sense that there is a web version of the app and
5 it's possible to message people to go to the web app and so
6 forth. And in that case, if the anti-steering provisions went
7 away, that wouldn't -- that wouldn't eliminate the market
8 power that Apple has here, but it would certainly diminish it.
9    There are many, many other apps, including game apps, for
10 which it would not be -- would not be much of a solution at
11 all.
12    So, first of all, there are apps where there is no PC --
13 where there is no PC version, and then there are,
14 furthermore --
15    THE COURT: Have you done any study on this -- that
16 is, in terms of quantification, given that most apps are free
17 and things like that -- have you done any real analysis, or
18 was this your thinking about it overnight in response to my
19 questions?
20    THE WITNESS: No --
21    THE COURT: Which?
22    THE WITNESS: Yeah, I've been working in this area
23 for a long time, so if you're asking me whether I did a
24 specific study in the course of this case, I have seen data in
25 this case concerning the extent to which game apps are

1    **A.**   I don't know one way or the other.
2    **Q.**   Has Spotify ever been a client of yours, if you're free to
3    disclose that?
4    **A.**   I am not.  I am not free to disclose that.
5    **Q.**   The Amazon App Store also has anti-circumvention rules;
6    correct?
7    **A.**   I -- I don't know that for a fact either.  I haven't
8    looked at them.
9    **Q.**   Do you know if the Samsung Galaxy Store has
10   anti-circumvention or anti-steering rules?
11   **A.**   Same answer.  I haven't looked at them.
12   **Q.**   Are you aware if Airbnb has anti-steering or
13   anti-circumvention rules?
14   **A.**   I think in that case I do.
15   **Q.**   And they do, don't they?
16   **A.**   They do.
17   **Q.**   And eBay has anti-circumvention and anti-steering rules;
18   correct?
19   **A.**   They do.
20   **Q.**   You've written, haven't you, that "when practices are
21   common in pretty competitive markets, we have prior
22   information that these practices are efficient"?
23   **A.**   I agree with that statement.
24   **Q.**   Okay.  Shifting topics a bit, since we have bean dealing a
25   bit in metaphors, you would agree that a road, whether it has

1   **A.**   It was in March of 2018.
2   **Q.**   And was that during the -- the beta test, if you will, of
3   Fortnite on iOS?
4   **A.**   Yeah.  They had a phased rollout to sign users up as they
5   were ramping up their servers and support.
6   **Q.**   And then it was fully up to speed in April, if I recall
7   the record.  Do you recall that testimony?
8   **A.**   That sounds -- sounds familiar.
9           **MR. DOREN:**   And, Your Honor, in the front pocket of
10  the binder, you've been -- been handed is DX5567.
11          **THE COURT:**   I see it.
12          **MR. DOREN:**   Thank you, Your Honor.
13                  (Exhibit published.)
14  **BY MR. DOREN:**
15  **Q.**   And, Mr. Schiller, do you have Exhibit DX5567 with you?
16  **A.**   I do.
17  **Q.**   And can you please describe what this is?
18  **A.**   This is one of the emails that I received from Epic upon
19  signing up for Fortnite on my iPhone.
20  **Q.**   And March 14, 2018, was that essentially the day you did
21  sign up?
22  **A.**   It -- it may have taken one or two days from sign-up to
23  getting this invitation to now play.
24  **Q.**   And the email states, "Thanks for signing up.  Hey, there,
25  thank you for signing up for the Fortnite invite event on

1  iOS."
2      And then it states, "Email invites will start rolling out
3  soon.  The email invite will include a link to download the
4  game on the App Store.  If you don't receive an invite right
5  away, don't worry, we'll be getting to you."
6      And then down at the bottom, it states, "On mobile,
7  Fortnite is the same 100 player game you know from
8  PlayStation 4, XBox One, PC, and Mac.  Same game play, same
9  map, same content, same weekly updates.  Android will be
10 supported in the next few months."
11     And did I read that correctly?
12 **A.**  Yes, you did.
13 **Q.**  And does that disclosure, if you will, of other digital
14 game transaction platforms within this communication from Epic
15 to you, Mr. Schiller, did this breach any app review guideline
16 rule?
17 **A.**  It did not.
18 **Q.**  And why not, sir?
19 **A.**  Because we don't have any rule against any marketing they
20 want to do to their users and their user base to encourage
21 them to play on all of their platforms.
22         **THE COURT:**  Yeah, but what if this said, "If you
23 purchase on our" -- "if you go to Fortnite from your PC, you
24 can buy V-Bucks at a cheaper rate."  Would that violate it?
25         **THE WITNESS:**  Not if it's sent generally to the user

1  base.  If it's literally, I, Phil Schiller, just signed up on
2  the iPhone, and they sent just me an email saying you can go
3  cheaper over there, that would be against the rule we wrote.
4      If it was to all of us in this room, like you can all go
5  get it, then broad communications we've never had any concern
6  with.  It's just the targeting of the brand-new user that we
7  helped them get.
8           **THE COURT:**  Okay.  Proceed.
9      And did you want 5627 in evidence?
10          **MR. DOREN:**  Yes, please, Your Honor.  I'd move it in.
11          **THE COURT:**  No objection?
12          **MS. FORREST:**  No objection.
13          **THE COURT:**  It's admitted.
14          (Defendant's Exhibit 5627 received in evidence)
15 **BY MR. DOREN:**
16 **Q.**  And, Mr. Schiller, after this initial communication from
17 Epic, did you receive other emails from Epic?
18 **A.**  Yes.
19 **Q.**  For example, how many additional emails did you receive in
20 March 2018?
21 **A.**  I looked back at it, and I got five in the first two
22 weeks.
23 **Q.**  And have you continued to receive emails from Epic
24 regarding Fortnite ever since?
25 **A.**  Yes.

| | |
|---|---|
| 1 | **Q.** When -- when most recently did you receive such an email? |
| 2 | **A.** The last one I received was on April 29th. |
| 3 | **Q.** And, Mr. Schiller, if you could please look at |
| 4 | Exhibit DX5555, which is toward the very back of your binder. |
| 5 | **A.** (Reviewing document.) |
| 6 | (Exhibit published.) |
| 7 | **THE WITNESS:** Yes, I see that. |
| 8 | **BY MR. DOREN:** |
| 9 | **Q.** And, Mr. Schiller, is this the email that you see -- |
| 10 | received from Epic games regarding Fortnite on April 29th, |
| 11 | 2021? |
| 12 | **A.** Yes. |
| 13 | **Q.** And the subject line is "Go crazy, Neymar Junior is |
| 14 | unleashed"? |
| 15 | **A.** Yes. |
| 16 | **Q.** And we heard Mr. Weissinger testify about the new Neymar |
| 17 | scans, correct? |
| 18 | **A.** Yes. |
| 19 | **Q.** And among various information in this email, at the top of |
| 20 | the second page, there's a button there that says "get the |
| 21 | battle pass." Do you see that? |
| 22 | **A.** Yes, I do. |
| 23 | **Q.** And where would that button take you? |
| 24 | **A.** To Epic's website. |
| 25 | **Q.** And you could purchase the battle pass on their website |

1   through that button?
2   **A.** Any -- yes. Anything they'd like me to do on the website,
3   I can do.
4   **Q.** And no matter what price they charge; is that right, sir?
5   **A.** That's right.
6   **Q.** So this email which came to you did invite you to go to
7   the Epic website to make purchases; is that right?
8   **A.** Yes, it did.
9   **Q.** And is it your understanding from having received these
10  emails over the last two years that these are general
11  marketing emails sent to the entire user base?
12  **A.** I don't know what percentages --
13           **MS. FORREST:** Objection, Your Honor.
14           **THE COURT:** Sustained.
15  **BY MR. DOREN:**
16  **Q.** And, Mr. Schiller, have you received other emails that
17  include similar invitations?
18  **A.** Yes.
19  **Q.** Mr. Schiller, we've discussed --
20           **THE COURT:** I'm sorry, Mr. Doren. One more
21  question --
22           **MR. DOREN:** Of course.
23           **THE COURT:** -- on this.
24       I thought I heard testimony that Apple doesn't allow
25  developers to have email addresses.