*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Motion to Stay** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1 - 24 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, November 9, 2021 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:              Cravath, Swaine & Moore LLP
                            825 Eighth Avenue
                            New York, New York  10019
                     BY:   GARY A. BORNSTEIN, ATTORNEY AT LAW

For DEFENDANT:              Gibson, Dunn & Crutcher LLP
                            1050 Connecticut Avenue, N.W.
                            Washington, DC  20036-5306
                     BY:   MARK A. PERRY, ATTORNEY AT LAW

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1   Tuesday, November 9, 2021                          1:57 p.m.

 2                      P R O C E E D I N G S

 3                        (Zoom Webinar)

 4        THE CLERK:  Calling civil action 20-5640, Epic, Inc.

 5   versus Apple, Inc.

 6      Counsel, please state your appearances.

 7        MR. BORNSTEIN:  Good afternoon, Your Honor.  Gary

 8   Bornstein for plaintiff Epic Games.

 9        THE COURT:  Good afternoon, Mr. Bornstein.

10        MR. PERRY:  Good afternoon, Your Honor.  Mark Perry

11   for Apple.

12        THE COURT:  All right.  Good afternoon.

13      Okay.  Today's motion relates to Apple's motion to stay

14   the injunction pending appeal.

15      Mr. Perry, I'm not inclined to grant your motion, but I'll

16   go ahead and we'll go through the elements.  I'll hear any

17   arguments you both want to make in addition to the papers, and

18   then I'll get an order out pretty quickly.

19        MR. PERRY:  Thank you, Your Honor.

20        THE COURT:  So there are -- as you know, there are

21   four elements.  The first is the likelihood of success on the

22   merits.

23      What, if anything, do you want to say in addition to your

24   papers, Mr. Perry?

25        MR. PERRY:  Your Honor, I will submit on the papers
```

1    as to that with one point I would like to stress.

2         The court said three times that subscriptions are not part

3    of this case.  In fact, Footnote 194 says subscriptions are

4    not part of this action.  And the only evidence regarding

5    steering came from two subscription app providers, Down Dog

6    and Match Group.

7         You know, whether or not a full -- quote, unquote, full

8    market definition analysis is required or something less, an

9    incipient antitrust violation requires a showing of

10   anti-competitive effects in a market that is relevant to the

11   plaintiff.

12        And there are significant differences between games and

13   subscriptions.  Games rely on impulse, in-app purchases.  Epic

14   admitted that its complaint, paragraph 116.  In fact when they

15   said developers games --

16             **THE COURT:**  Mr. Perry.

17        **MR. PERRY:**  Yes, Your Honor.

18             **THE COURT:**  We're not in the courtroom, so you can't

19   see that the court reporter is probably having a difficult

20   time keeping up with you.  If you'd slow down a little.

21        **MR. PERRY:**  I need to pull up my post-it note, Your

22   Honor, that says "slow down."  I apologize to both of you.

23        The subscription providers, Down Dog, for example, offer

24   different prices on their app.  The Down Dog fellow testified

25   that they offered a discount on the -- on the web not

1    available on the app.

2        Epic, on the other hand, offers the same price on all

3    platforms to avoid V-Bucks arbitrage.  They don't have the

4    same monetization model as subscriptions.  They don't have the

5    same injury, if any.

6        So even if there were injury to subscription apps from the

7    steering provisions, they are not part of this case.  The

8    court said that three times.  And they are not part of the

9    market the court defined for this case, and they're certainly

10   not part of the market in which Epic Games participants.

11       So, again, we've said that in the papers.  I just wanted

12   to elaborate on that point in particular.

13       And on the rest of the likelihood of success, unless the

14   court has questions, I don't want to re-argue the case.  I

15   think our position is fairly clear.  The standing and the

16   scope of the injunction also are significant problems for

17   Epic.

18           **THE COURT:**  Mr. Bornstein?

19           **MR. BORNSTEIN:**  Your Honor, given your comments, I

20   don't want take -- take much time.  I'll just point out that

21   the market-related argument that Mr. Perry made relates only

22   to the tethering test under the unfair prong of the UCL.

23       The court obviously also reached a conclusion under the

24   balancing test as to which that argument is not applicable.

25       In addition to that, under the tethering test, as we

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  pointed out in the papers, there are numerous cases, including

2  the *LegalForce* case from -- from Your Honor that do not go

3  through a detailed Sherman Act-style market definition process

4  before reaching a conclusion about unfairness under even the

5  tethering test.

6          **THE COURT:**  You know, I didn't see that you cited to

7  any cases on the standing issue, that someone can have

8  standing throughout the entire case and then somehow lose it

9  after the fact.

10      You know -- Mr. Perry, do you have any comments on that

11  front?

12          **MR. PERRY:**  Well, sure, Your Honor.

13      *Arizonans for Official English* holds that.  They lost

14  standing before they got to the Supreme Court.  They had

15  standing in the lower court.

16      There are many cases where a party loses standing along

17  the way.  In fact, the Supreme Court said in *Lujan* that a

18  party has to have standing at every stage of the proceedings,

19  the complaint, the trial, and the appeal.  And if something

20  happens along the way, new legislation or something else, that

21  deprives a party of standing, that must be taken into account,

22  particularly with respect to prospective relief, because

23  the -- the inability of a court to render a judgment that

24  redresses an injury to the plaintiff is a limitation of

25  Article III.  This is not a statutory issue.  This is not a

1    prudential issue.  This is a constitutional constraint on the

2    court's power.

3        And Epic, having been removed -- Epic Games, Inc. having

4    been removed from the App Store from the developer program

5    with no live apps and with possibility of applying for

6    reinstatement until this lawsuit is over cannot benefit from

7    this injunction.  It -- whether or not it ever approved

8    harm -- and we don't think it ever did -- but it cannot

9    benefit from the injunction going forward because it has no

10   apps on the store, and it will have no apps on the store for

11   the foreseeable future.

12       So if it ever had standing, a debatable proposition on

13   this point, it certainly does not now and this is, you know,

14   new information that came to light in light of the court's

15   declaratory judgment, a judgment to which Epic stipulated, and

16   the actions Apple took to enforce that judgment and the

17   underlying contract in light of the conduct proven at trial.

18           **THE COURT:**  Mr. Bornstein.

19           **MR. BORNSTEIN:**  Thank you, Your Honor.

20       I think we've addressed -- unless Your Honor has

21   questions, we've addressed adequately the gamesmanship aspect

22   of the standing argument in which Apple is engaging here.

23       I'll just take the opportunity barring any other questions

24   from the court to address two points that were in the reply

25   brief that we hadn't had the opportunity previously to respond

 1    to.

 2         The -- the first one is there -- there is a statement in

 3    the reply brief that Epic Games, Inc., the plaintiff in this

 4    case, does not earn any royalties from the Unreal Engine.

 5    That is incorrect.  There is evidence in the record.  It's

 6    DX4022.  It is the form license agreement for the Unreal

 7    Engine.  And then the first page, the third paragraph makes

 8    clear that for entities that are licensees who are domestic in

 9    the United States, the counter-party to that agreement is Epic

10    Games, Inc., the plaintiff here in this case.

11         So that's just a misstatement in the reply brief that I

12    wanted to be sure was corrected because I think it addresses

13    the technical point that -- that they're attempting to make.

14         The other point I would address is a -- a misstatement of

15    one of the cases in the reply brief.  We cited Your Honor to

16    the *Franchise Tax Board* case from the Supreme Court, which

17    discussed Article III standing of a parent corporation when

18    there is harm to the subsidiary.  And the court in two

19    paragraphs very succinctly addresses that point and finds that

20    there is Article III standing in that circumstance.

21         In its reply brief, Apple points to a different part of

22    that case that discussed the separate issue of prudential

23    standing, which the Supreme Court said it did not need to

24    resolve.

25         But all that Apple has argued here in both its and opening

1    its reply brief is an absence of Article III standing, and the

2    *Franchise Tax Board* case does, in fact, take that on directly.

3    The prudential standing issue, to which Apple refers in its

4    reply is -- is a different point.

5              **MR. PERRY:**  May I respond briefly to that, Your

6    Honor?

7              **THE COURT:**  You may.

8              **MR. PERRY:**  Thank you.

9        For once today Mr. Bornstein and I will agree.  He's

10   correct.  That's what *Franchise Tax Board* has both parts, and

11   we cited the prudential standing.  And I apologize.  I

12   realized that -- re-reading the case for this purpose.

13       However, on the Article III point, the court found that

14   the parent had Article III standing to enforce the rights of

15   the subsidiary because there was evidence that the economic

16   consequences of the tax regime flowed through the subsidiary

17   to affect the parent.

18       In other words, there -- there was actual injury to the

19   parent and the fact that a subsidiary was involved was not

20   preclusive of standing.

21       Here, in this case, we had a trial.  And the court heard a

22   little bit of evidence about the Epic Games, Inc. subsidiaries

23   and their apps, but there was no evidence that any of those

24   subsidiaries has ever been harmed by the steering provisions.

25       In fact, there was no discussion of the steering

1    provisions in connection with any of those subsidiaries.

2    There was also no financial information regarding the

3    ownership interest, pass-through rights, sharing of revenues

4    and profits, if any.  And we don't have any idea -- because

5    this is private company, of course, there's no SEC filings or

6    other things to look at -- what financial arrangements, if

7    any.

8        So Mr. Bornstein points to subsidiaries, and licensees for

9    that matter, but has not proven any harm to those entities,

10   much less any evidence that that harm could, did, or would, or

11   should flow through the Epic Games, Inc., which was their

12   burden at trial.

13            THE COURT:  Mr. Bornstein?

14            MR. BORNSTEIN:  Yes, Your Honor.

15       I think it's important to focus on the harm that Your

16   Honor found in the opinion which, applied not just to the Epic

17   subsidiaries, not just to Epic Games itself, through the

18   Unreal Engine license that I just discussed, but to other apps

19   as well.  And that harm is the super-competitive commissions

20   that result from the unfair anti-steering provisions that are

21   at issue on this injunction.

22       That harm applies to everybody who paid a commission using

23   the IAP system when consumers did not have sufficient

24   information to make a choice about an alternative platform.

25            THE COURT:  Okay.  Shall we move on?

1    The next element is irreparable injury absent a stay.

2    Mr. Perry?

3         **MR. PERRY:**   Thank you, Your Honor.

4    I would like to focus the court's attention on

5    Mr. Kosmynka's declaration.  The court heard, of course, from

6    Mr. Kosmynka at trial.  Mr. Kosmynka, the head of app review,

7    explained in significant detail the many harms that Apple

8    would suffer from a precipitous implementation of the second

9    half of the injunction.

10    I should have said at the outset we have complied with the

11    first half of the injunction.  We have made that change.  That

12    was part of the *Cameron* settlement.  That is -- it's already

13    done, so we're only talking about the in-app purchase part of

14    the injunction, the in-app messaging.

15    Mr. Kosmynka testifies in paragraph 10 of his declaration

16    that without thoughtful restrictions in place, quote, changing

17    Guideline 3.1, will harm users, developers, and the iOS

18    platform more generally, end quote.

19    "Will harm."  That -- that is evidence that we have put in

20    that Epic has not disputed.  They have said that it's

21    conclusory, but it's not.

22    Mr. Kosmynka goes on for many paragraphs.  In paragraph

23    16, he explains that this change would upset the integrity of

24    two-sided transaction platform by lowering user confidence and

25    that developers will suffer as well.  These are harms in a

1   platform situation to Apple because the platform provider has

2   to balance the interests on both side [sic] of the platform.

3       Mr. Kosmynka testifies, second, in paragraphs 12 and 13 of

4   his injunction that it would interfere with Apple's ability to

5   enforce the IAP requirement and to collect its commission.

6       Harm -- issues that this court found at page 150 of the

7   opinion were legitimate business objectives of Apple that it

8   was entitled to enforce in light of, among other things, its

9   intellectual property rights.

10      Third, Mr. Kosmynka testifies in paragraphs 14 and 18 of

11  his declaration, that it would interfere with Apple's ability

12  to provide services to consumers, such as parental controls

13  and family sharing and to prevent fraudulent transactions.

14  That is, harm to consumers is harm to Apple.

15      Fourth, Mr. Kosmynka testifies in paragraph 15, that links

16  and buttons in particular, mechanisms as opposed to

17  information, would introduce new and hitherto unknown security

18  and privacy risks into the iOS ecosystem.

19      These have never been allowed for digital content.  And

20  allowing them would -- would permit bad actors to hijack the

21  links, to take children and other users to places that none of

22  us wants them to be, to steal their money, to steal their

23  data, and to perform other bad acts.

24      It takes taking somebody from within an app, Apple's

25  property, outside into the wide world without controls without

1    restrictions, which is what Mr. Sweeney and Epic want.

2    Mr. Sweeney said that in -- in his statement to Mr. Schiller's

3    Exhibit C to my declaration.

4        There's a whole new world, that there's no evidence on

5    this at trial on buttons and links as opposed to information.

6    There was no evidence at trial, no evidence of the harm, no

7    evidence of the risks.  And Mr. Kosmynka explains that in

8    significant detail.

9        And, fifth, related to all of these, Mr. Kosmynka

10   testifies in paragraph 18 that it would require, quote,

11   substantial engineering and other changes to the App Store, to

12   app review and its tools, and to all of the platforms and

13   devices that interact with and rely upon the App Store to

14   unfectuate [phonetic] these changes, if they were even

15   possible.

16       And he explains further, Your Honor, and I think this is

17   very important, that Apple is actively investigating these

18   issues.  This is paragraph 17.  We are not sitting silent.  We

19   have already implemented half of the injunction, as I said,

20   and we are exploring other alternatives.

21       There are legislative and regulatory activities around the

22   world the court is aware of.  There's not -- they're not in

23   evidence, but I'm sure the court reads the papers.  That Apple

24   is responding to.

25       One example -- and this is in the -- in the record with --

1   with the stay papers, Apple has agreed as part of an agreement

2   with the Japanese Fair Trade Commission to allow links in a

3   small set of apps, reader rule apps, a few hundred apps.

4       This will be the first time that Apple has ever allowed

5   live links in an app for digital content.  It's going to take

6   months to figure out the engineering, economic, business and

7   other issues.  They won't even go into place until next spring

8   sometime, sometime in the first quarter of 2022.

9       It is exceedingly complicated.  There have to be guard

10  rails and guidelines to protect children, to protect

11  developers, to protect consumers, to protect Apple.  And they

12  have to be written into guidelines that can be explained and

13  enforced and applied.

14      And it's -- you know, we have experience with this.

15  We're -- we're watching it.  Out-of-app communications were

16  different.  We could -- we could remove that paragraph from

17  the guideline.  Developers can do whatever they want out of

18  the app.

19          **THE COURT:**  The problem is, Mr. Perry, you haven't

20  asked for additional time.  You've asked for an injunction,

21  which would effectively take years.

22          **MR. PERRY:**  Well, Your Honor, we've asked for the --

23  the injunction which would change the status quo to be held in

24  abeyance until the appeal is resolved because --

25          **THE COURT:**  Which is -- which is years.

```
 1          MR. PERRY:  Well, it is --

 2          THE COURT:  You did not ask for a few months.  You

 3   didn't ask for six months.  You didn't ask for a limited

 4   amount of time.  You asked for a -- an across-the-board stay,

 5   which could take three, four, five years.  That's what you

 6   asked for.

 7          MR. PERRY:  Yes, Your Honor.  And -- let me be clear.

 8      We believe that, you know, these changes, if -- if Apple

 9   is forced to implement them will upset the platform.  They

10   will harm consumers.  They will harm developers.  That is a

11   fact.  It is going to happen.

12      And we are asking -- Mr. Kosmynka testifies to that, and

13   we think the trial evidence supports that.  Mr. Schiller's

14   testimony supports that.  We are asking for a stay for the

15   appeal.  We're going to win the appeal.  Neither of you have

16   to agree with me on that, but we're going to try.

17      We certainly have serious issues in the appeal.  You know,

18   no court has ever struck down steering provisions as

19   anti-competitive that we're aware of, and certainly Epic has

20   never cited any.  The Supreme Court upheld them.

21      Again, I don't want --

22          THE COURT:  -- was an entirely different case, and I

23   explained that.

24      Mr. Bornstein, any response?

25          MR. BORNSTEIN:  Yes, Your Honor.  I'll -- I'll be
```

1    brief on just two points.

2        The first one is -- although I could walk through the

3    series of five or six things that Mr. Perry went through, I

4    think there's a common theme that runs through all of them

5    that I can try to address together, which is each and every

6    one of the harms that he identifies -- or supposed harms that

7    he identifies and Mr. Kosmynka identifies, are harms that

8    would, if, in fact, harm at all, flow from consumers making a

9    choice with the benefit of additional information -- making a

10   choice to pursue an avenue that is already available right

11   now.

12       During the trial, Apple repeatedly said that it competed

13   against transactions that happened on the web.  It -- having

14   described this as competition during the trial, it can't now

15   claim to be irreparably harmed by the fact that people might

16   be more aware and be better able to take advantage of that

17   competitive alternative.  That is not irreparable harm under

18   the law.  And I think that covers a long list of things.

19       The other point I would just make, Your Honor, is about

20   the idea that Apple should be trusted to -- to sort this out

21   on its own.

22       It's very telling that in their papers, the only things

23   that they point to as steps that they have taken are in

24   response to the developer class action, in response to the

25   Japanese law enforcement action.  And even today, Mr. Perry

1    referred only to legislative and regulatory developments.

2          There is no evidence -- and to the contrary, Your Honor

3    has found that Apple does nothing unless it is forced to do

4    it, to reconsider its restrictions or pricing on the App

5    Store.

6          And as just one example -- well, two -- two points about

7    that.  One, they don't even promise to get it done in the

8    brief, Your Honor.  What they say is that what they're doing

9    may solve the court's concerns.  That's page 1 of their brief.

10   And it could obviate the need for the injunction.  That's page

11   3 and, again, on page 7.  No promise even that they'll get it

12   done.  Just maybe we should wait for years.

13         And that -- the last thing I'll say, Your Honor, is just

14   with this idea that they have already addressed the second

15   half of the injunction.  I would urge Your Honor to take a

16   look at Exhibit A to Mr. Perry's reply declaration.  We didn't

17   get a chance to comment on this in the papers 'cause it came

18   in the reply.

19         But Your Honor will see the last provision there, 5.1.1X,

20   what that provision does is it takes away with one hand what

21   Apple purports to be giving with the other.  While it says

22   that developers can now reach out and contact users through

23   email, what that new provision does is it restricts the

24   circumstances in which developers are allowed to get that

25   email from users in the first place.

1    So even when they are purporting to comply with the

2    injunction, they are playing games, Your Honor.

3         **THE COURT:**  Any response, Mr. Perry.

4         **MR. PERRY:**  Two points very briefly if I may, Your

5    Honor.

6    5.1.1 says that users have to consent.  We think that's a

7    principle that everybody should agree to.  And it is certainly

8    one that Apple holds dear and that Apple will enforce in all

9    of its proceedings.

10   Apple does not do -- and, second, Apple does many things

11   not under regulation, including many things relate to consumer

12   information.  The nutrition privacy labels, which was a major

13   Apple initiative, has nothing to do with litigation or

14   regulation or anything else.

15   It was around initiative undertaken by Apple, and it's now

16   under fire from its competitors to provider greater

17   information to consumers.  We are in favor of consumer

18   information.  Apple is committed to providing more information

19   to consumers.  Your Honor, it is not going to take us three to

20   five years to get this done.  It is going to take us six

21   months to a year, but there are many moving pieces.

22   This is a -- a very much difficult juggling act on the

23   world stage.  And incremental approach is important because it

24   allows testing in the real world before the next step is made.

25   The JFTC settlement is going to give us for the first time

1    real data on how links work in real apps to digital content.

2         The *Cameron* settlement, which went into effect two weeks

3    ago, on the target out-of-apps communication.  Will give us

4    real data on both sides, by the way, for developers, for

5    consumers, for Apple, for competitors on whether that change

6    is sufficient.  We don't yet know whether it is or not because

7    it is being implemented.

8         We are committed to making changes.  I -- I want to be

9    clear about that.  The paper says "may" because we don't know

10   exactly what they are.  It's an incredibly complicated

11   problem, Your Honor.

12        It is not simply a matter of striking a sentence from the

13   guideline.  We can do that of course.  We can do that today.

14   The question is what do we replace it with.  What app review

15   rules and policies can be put in place to protect children and

16   other consumers, that protect developers, that protect the

17   ecosystem.

18        Simply striking that sentence of the guideline doesn't do

19   that.  That creates havoc.  That creates the harms that

20   Mr. Kosmynka has testified to.

21             **THE COURT:**  Third --

22             **MR. BORNSTEIN:**  Your Honor?  Oh.

23             **THE COURT:**  Oh.  Go ahead, Mr. Bornstein.

24             **MR. BORNSTEIN:**  I was -- I was just going to say,

25   I -- I urge Your Honor to read 5.1.1X.  It is not just a

1   consent provision.  What it does is it says that a developer

2   may not make the provision of features and other services on

3   the app conditional on getting email from the user.  There's

4   no consent issue in terms of whether or not a developer can

5   take the email without consent.

6       What it says is you can't have an app where you have to

7   sign up with an email that -- in order to get the services.

8   That's not permitted anymore under the rules.  That is a

9   substantial limitation on developers' ability to develop a

10  direct relationship with their users.

11      I realize that's not in front of the court right now.

12  It's not part of the -- of the matters that's been briefed.  I

13  just use it as an illustration of the way in which Apple is

14  attempting to thread the needle as they purport to comply.

15          **THE COURT:**  All right.

16      Third factor, injury to other parties interested in the

17  proceedings.

18          **MR. PERRY:**  Your Honor, we have a single plaintiff

19  case.  Epic chose to opt out of the developer class action.

20  At the time this action was filed, the court had pending

21  before it two actions, a consumer class action and a developer

22  class action.  The consumer class action did not and does not

23  challenge steering, so the consumers don't challenge steering

24  at all.

25      The developers had a steering challenge.  Before the Epic

1    decision was rendered, we went to settlement negotiations and

2    reached an agreement with them that expressly draws the same

3    line that we are urging in this motion between out-of-app

4    communications on the one hand, allowing that, and in-app

5    communications and -- and mechanisms on the other hand,

6    maintaining the prohibition against that.

7        Ninety-nine percent of the developers of paid apps agreed

8    to that restriction.  They agreed that that is consistent with

9    their business models and it is acceptable.

10       The court, once the preliminary approval order issues,

11   we'll hear from, you know, objectors and whether or not that's

12   the case.  But that is real-world evidence that the developer

13   community views this very distinction between out-of-app and

14   in-app the same way we do.  There are different things.  What

15   happens outside the app is the developer business.  What

16   happens inside the app is the shared business of Apple

17   consumers and developers.  And we urge the court that that

18   distinction is there.

19       So Epic opted out.  Epic brought this case.  We went to

20   trial.  Epic proved no harm to itself.  Epic proved no harm to

21   its subsidiary.  Epic proved no harm to its licensees.  Epic,

22   you know, had the chance and didn't do it.  So if they are

23   not -- since they have not proved harm from the steering

24   provisions to Epic in the first place, they certainly could

25   not prove harm to Epic from the stay we are requesting pending

1    appeal.

2       Because, you know, in addition to being off the store,

3    they can't have -- harmed at all, they never did prove harm in

4    the first place, so we think that third factor clearly weighs

5    in favor of a stay, Your Honor.

6          **THE COURT:**  Mr. Bornstein.

7          **MR. BORNSTEIN:**  Yes, Your Honor.

8       This really treads ground I think we've already covered.

9    The harm to Epic comes from the supercompetitive commissions

10   that flowed from the anti-steering provisions, which Your

11   Honor has addressed at great length in the opinion.

12      And we think the trial record adequately supports -- more

13   than adequately supports that conclusion.  And as to whether

14   or not the developer community has signed on to the

15   distinction that Mr. Perry is articulating, three

16   observations.

17      The first is that settlement has yet to be -- had its

18   tires kicked with the developer community.  That is what the

19   notice and objection process is for.  At this point in time,

20   it's just the named plaintiff developers who have agreed with

21   that distinction.

22      Second, it is, of course, a settlement.  A settlement is a

23   compromise.  It's what they were able to attain in their

24   negotiations with Apple.  It is by no means a reflection of

25   what they believe to be appropriate final relief had they

1   litigated the case.

2       And third, as to the repeated statement that Epic opted

3   out of the developer class, I should just point out.  Epic is

4   not a member of the class that is purported to be certified.

5           **THE COURT:**  Well, it was a member of the class that

6   was defined in the consolidated complaint.

7                   (Simultaneous colloquy.)

8           **THE COURT:**  It did, in fact, opt out of that.

9           **MR. BORNSTEIN:**  That -- that is correct, Your Honor.

10  And I don't mean in any way to suggest that -- that Epic is

11  intending to try to participate in the developer class.  But

12  in terms of assessing Epic's position here and its ability to

13  assert its own rights, it is at this point in time not in any

14  way bound by the class settlement.

15          **THE COURT:**  Okay.

16      And then finally, public interest, which in many ways, in

17  my view, overlaps with everything that's already been

18  discussed, but if there's something new --

19      Mr. Perry?

20          **MR. PERRY:**  Your Honor, no.  We -- we think it does

21  rap up all of these considerations, including -- and I'm just

22  going to say the word "global solution" one more time.

23      Apple is trying to keep a unified store front.  You know,

24  we have 200 store fronts across all these countries with a

25  billion users, with very minor exceptions, Apple has been able

1    to keep the same rules for developers and consumers across

2    those store fronts.

3        This issue threatens to fracture that.  Apple is trying

4    hard to find a uniform global solution.  It is going to take

5    more time than between now and December 9th to do that.

6    That's just reality.

7        Now, we asked for a full stay.  I mean -- and -- and I'm

8    not going to change that request, Your Honor, but the truth is

9    we'll know more in six months.  We'll know more in a year.  We

10   may be done in six months or a year.  I can only say that

11   because Mr. Kosmynka tells me they're working on it.

12            **THE COURT:**  Mr. Bornstein?

13            **MR. BORNSTEIN:**  Your Honor found at page 166 of your

14   opinion that this injunction would further the public interest

15   already.  It will come as no surprise to anyone on the Zoom

16   platform right now that Epic agrees with that conclusion and

17   the basis on which it was reached.

18            **THE COURT:**  Okay.

19       Like I said, I'll get something out very quickly here in

20   writing.  And I don't know.  Will I see you, Mr. Perry, in two

21   weeks?  Who will I be seeing for that argument?

22       I mean, I see you guys, you know, at least -- these days,

23   I'm seeing you every week.  I really did need a break from you

24   all to rest and get some other work done.  You know, I have a

25   few other cases other than the Apple cases, but --

1          **MR. PERRY:**  I think after next week, you're quit of

2      us for a while, Your Honor, and we'll try to get some new --

3      new faces on the Zoom platform for you as well.

4          We -- we, like our friends on the other side, have a -- a

5      great team and look forward to discussing additional issues.

6          **THE COURT:**  All right.

7          Taken under submission.  You'll hear from me in writing.

8          We're adjourned.

9          **MR. BORNSTEIN:**  Thank you, Your Honor.

10          (Proceedings were concluded at 2:27 P.M.)

11                          --o0o--

12

13

14                  **CERTIFICATE OF REPORTER**

15

16          I certify that the foregoing is a correct transcript

17      from the record of proceedings in the above-entitled matter.

18      I further certify that I am neither counsel for, related to,

19      nor employed by any of the parties to the action in which this

20      hearing was taken, and further that I am not financially nor

21      otherwise interested in the outcome of the action.

22

23      _____

24          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25              Wednesday, November 17, 2021

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*