**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EPIC GAMES, INC., | No. 21-16506 |
| *Plaintiff-counter-defendant-Appellant,* | D.C. No. 4:20-cv-05640-YGR |
| v. | |
| APPLE, INC., | ORDER |
| *Defendant-counter-claimant-Appellee.* | |

| | |
|---|---|
| EPIC GAMES, INC., | No. 21-16695 |
| *Plaintiff-counter-defendant-Appellee,* | D.C. No. 4:20-cv-05640-YGR |
| v. | |
| APPLE, INC., | |
| *Defendant-counter-claimant-Appellant.* | |

Filed July 17, 2023

Before: SIDNEY R. THOMAS and MILAN D. SMITH,
JR., Circuit Judges, and MICHAEL J. MCSHANE,[*]
District Judge.

Order;
Concurrence by Judge M. Smith

**ORDER**

Apple's Motion to Stay the Mandate (Dkt No. 247) is
GRANTED. Pursuant to Rule 41(d) of the Federal Rules of
Appellate Procedure, the mandate is stayed for 90 days to
permit the filing of a petition for writ of certiorari in the
Supreme Court. Apple must notify the Court in writing that
the petition has been filed, in which case the stay will
continue until the Supreme Court resolves the petition. *See*
Fed. R. App. P. 41(d)(2)(B)(ii). Should the Supreme Court
grant certiorari, the mandate will be stayed pending
disposition of the case. Should the Supreme Court deny
certiorari, the mandate will issue immediately. The parties
shall advise this Court immediately upon the Supreme
Court's decision.

---

[*] The Honorable Michael J. McShane, United States District Judge for
the District of Oregon, sitting by designation.

M. SMITH, Circuit Judge, concurring in the granting of the
motion for a stay of the mandate pending the filing of a
petition for certiorari:

Given our general practice of granting a motion for a stay
if the arguments presented therein are not frivolous, I have
voted to grant Apple's motion. *See United States v. Pete*,
525 F.3d 844, 850 (9th Cir. 2008) (it is "often the case" that
our court stays the mandate while a party seeks certiorari). I
write separately to express my view that, while the
arguments in Apple's motion may not be technically
frivolous, they ignore key aspects of the panel's reasoning
and key factual findings by the district court. When our
reasoning and the district court's findings are considered,
Apple's arguments cannot withstand even the slightest
scrutiny.   Apple's standing and scope-of-the-injunction
arguments simply masquerade its disagreement with the
district court's findings and objection to state-law liability as
contentions of legal error.

## I. STANDING

Because Apple's anti-steering provision negatively
affects the revenue Epic earns through the Epic Games Store,
Epic had standing to seek injunctive relief against that
provision pursuant to California's Unfair Competition Law
(UCL), Cal. Bus. & Prof. Code § 17200 *et seq*.

To establish standing, a plaintiff must have "suffered an
injury in fact that is concrete, particularized, and actual or
imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,
2203 (2021). "[M]onetary harms" are one of the "[m]ost
obvious" types of harm that satisfy the injury-in-fact
requirement. *Id.* at 2204.

Epic has "three primary lines of business, each of which figures into various aspects of [this case]." *Epic Games, Inc. v. Apple, Inc.* (*Epic II*), 67 F.4th 946, 967 (9th Cir. 2023). First, Epic is a "video game developer—best known for the immensely popular *Fortnite*." *Id.*  Second, Epic is the "the parent company of a gaming-software developer" (Epic International), which still has several apps on Apple's App Store.  *Id.*  Third, Epic is "a video game publisher and distributor," offering "the Epic Games Store as a game-transaction platform" on multiple devices.  *Id.* at 968.  In this last role, Epic is "a direct competitor" of Apple's App Store "when it comes to games that feature cross-platform functionality like *Fortnite*."  *Id.*

As the panel opinion explained, the second and third lines of business—not the first—give rise to an injury in fact. *See id.* at 1000.  As the parent company of Epic International, Epic is harmed because its subsidiary still has apps on the App Store that are subject to the anti-steering provision.  As a games distributor, Epic is harmed because app developers cannot direct, with the promise of lower prices, their users to the Epic Games Store, which takes a significantly lower commission on app purchases than the App Store.  As we explained: "[Epic] offers a 12% commission compared to Apple's 30% commission.  If consumers can learn about lower app prices, which are made possible by developers' lower costs, and have the ability to substitute to the platform with those lower prices, they will [almost always] do so— increasing the revenue that the Epic Games Store generates." *Id.*

Such monetary loss is hornbook injury-in-fact, and Apple's arguments to the contrary misconstrue both our decision and the record.  Apple asserts that Epic lacks standing because "Epic's developer program account has

been terminated," meaning Epic "has no apps on the App Store." But we did not conclude, as Apple's argument suggests, that Epic was injured in its role as a video game developer (*i.e.*, as the creator of the since-removed *Fortnite*). We recognized at the very start of our standing analysis that Apple had "terminated Epic's iOS developer account," and instead determined that Epic suffered an injury-in-fact in its role as a parent company and competing games distributor. *Id.* at 1000.

Regarding these two bases on which we actually determined standing, Apple offers only the conclusory statement that "no trial evidence or findings by the district court" support them. However, that assertion is simply false. Regarding Epic's role as the parent of Epic International, the record contains screenshots showing that Epic International still has six apps on the App Store, even though the parent company's developer account has been terminated.

The record is also filled with support for the common-sense proposition that Epic is harmed as a competing games distributor because consumers would shift some of their spending from the App Store to the Epic Games Store if developers could communicate the availability of lower prices on the latter. To begin, Apple's own internal documents conclude that two of the "most effective marketing activities" are "push notifications" and "email outreach," which are the two practices prohibited by Apple's anti-steering provision. *Epic Games, Inc. v. Apple Inc.* (*Epic I*), 559 F. Supp. 3d 898, 1054 (N.D. Cal. 2021); *see also Epic II*, 67 F.4th at 1001. Moreover, before the district court, Apple defeated Epic's proposed market definition for its Sherman Act claims based on the very kind of factual findings that it now claims are non-existent. The district court found that video games increasingly can be "ported

across multiple devices" because of the growing prevalence of cross-platform functionality. *Epic I*, 559 F. Supp. 3d at 985; *see also Epic II*, 67 F.4th at 967 (describing "cross-play," "cross-progression," and "cross-wallet"). "[N]ot all games" feature cross-platform functionality, and some platforms have taken steps to limit it. *Epic I*, 559 F. Supp. 3d. at 985. But when it comes to the games that *do* offer such cross-platform functionality, app-transaction platforms (like the App Store and Epic Games Store) "are truly competing against one another." *Id.* The district court, therefore, rejected the contention that the App Store is a market unto itself and summarized its analysis as follows: "[N]either consumers nor developers are 'locked-in' to the App Store for digital mobile game transactions—they can and do pursue game transactions on a variety of other mobile platforms and increasingly other game platforms." *Id.* at 1026. Indeed, the district court found that *Fortnite* data provided a particularly vivid illustration: Between 32 and 52% of *Fortnite* users play the game on multiple devices, and, after *Fortnite* was removed from the App Store, 87% of *Fortnite* spending that had occurred on iOS devices was shifted to other platforms. *Id.* at 961 & n.277.[1]

Apple wants to have it both ways: On the merits, it argued that there was sufficient evidence to support a finding that consumers can, and do, substitute across various app-transaction platforms. But on standing, it now argues that

---

[1] On appeal, the panel majority did not address the district court's substitution factual finding, as we determined that Epic failed to make a required threshold showing for its proposed single-brand market: that the restrictions it alleged to cause consumer lock-in were "not generally known" to consumers when they purchased iOS devices in the foremarket. *Epic II*, 67 F.4th at 976–77, 980–81.

there would be absolutely no substitution if app developers could inform users of lower prices available on the Epic Games Store.

## II. SCOPE OF THE INJUNCTION

The district court did not abuse its discretion in enjoining Apple's anti-steering provision as to all iOS developers because doing so was necessary to fully remedy the harm that Epic suffers in its role as a competing games distributor.**[2]**

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Epic*, 67 F.4th at 1002 (setting forth the same rule). An injunction remedying a plaintiff's harm may "affect[] nonparties[] [if] it does so only incidentally." *United States v. Texas*, 2023 WL 4139000, at \*12 (U.S. June 23, 2023) (Gorsuch, J., concurring); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1988) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than the prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

---

[2] Apple argues in its motion for a stay that the injunction will subject iOS users to "scams, fraud, and objectionable content." But the district court expressly found that the anti-steering provision could be enjoined "without any impact on the integrity of the [iOS] ecosystem." *Epic I*, 559 F. Supp. 3d at 1055. Both the district court and our court upheld Apple's ability to control *what content* can be downloaded on iOS devices. The injunction against the anti-steering provision simply allows developers to let users know that certain content (which Apple has itself chosen to allow access to) can be purchased at a lower price elsewhere.

Apple contends that the district court's injunction impermissibly allowed Epic's suit to proceed as a "de facto" class action in which Epic obtained nationwide injunctive "relief on behalf of others." To paint this picture, it argues that "the panel never explained" how harm to Epic's "subsidiaries justified an injunction applicable not only to . . . its subsidiaries, but also to all other U.S. developers." Like its standing argument, this argument overlooks aspects of the panel opinion's analysis that are inconvenient to its position and is incorrect. As the opinion explained, it was Epic's role as a competing games distributor—not its role as a parent company—that justified application of the injunction beyond just Epic's subsidiaries. As a games distributor, Epic is harmed by Apple's anti-steering provision's prevention of "other apps' users from becoming would-be Epic Games Store consumers." *Epic II*, 67 F.4th at 1003. Had the district court limited the injunction only to Epic's subsidiaries' apps on the App Store, the injunction would have "fail[ed] to address the full harm caused by the anti-steering provision." *Id.* The injunction is thus consistent with the minimally-burdensome principle because the injunction's "scope is tied to Epic's injuries." *Id*.

Apple's argument also overlooks that, in an antitrust suit brought by a competitor, injunctive relief will almost by definition have incidental benefits to non-parties—since antitrust law protects competition, not individual market participants. To be sure, it is the "the exception," not the rule, for injunctive relief to incidentally affect non-parties— and such cases will likely be few and far between in most areas of law. *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1084 (9th Cir. 2010). But injunctions with incidental benefits for non-parties are the inevitable result when a competitor-plaintiff

makes the difficult showing that it is entitled to injunctive relief pursuant to state or federal  competition law.  As a threshold matter, a competitor-plaintiff must prove that the defendant's conduct caused it a tangible injury *as a competitor*.  But to ultimately prevail and obtain relief, it must prove that the defendant's conduct harmed *competition* (*i.e.*, consumers).    This two-types-of-harm requirement necessarily means that relief will have two types of benefits—remedying the competitor's harm in the main, while benefitting consumers incidentally.

Begin with the statute at issue here: California's UCL. To establish statutory standing, a competitor-plaintiff must have "suffered injury in fact and . . . lost money or property," such that its bottom line as a competitor was negatively affected.  Cal. Bus. & Prof. Code § 17204.  But to win on the merits, a competitor-plaintiff must show that the defendant's conduct "threatens an incipient violation of an antitrust law, . . . violates [antitrust law's] policy or spirit . . . , or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186–87 (1999).    Because antitrust's goal is the "the protection of *competition,* not *competitors*," *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 (1986), a competitor-plaintiff will win on the merits only if it proves that the defendant's conduct harms consumers.  Therefore, by the time a court is fashioning injunctive relief in a UCL competitor suit, the court has already determined *both* that (1) the defendant's conduct caused the plaintiff-competitor to lose "money or property," *and* (2) that the same conduct harmed consumers.  Relief remedying (1) will necessarily have incidental benefits for the consumers found to have been harmed at (2).  If that were not the case, then the plaintiff-competitor would not have prevailed on the merits.

Federal law imposes a similar two-types-of-harm requirement. To establish Article III standing, a plaintiff-competitor must have "suffered an injury in fact," such as "monetary harm[]." *TransUnion*, 141 S. Ct. at 2203. But the plaintiff-competitor must also establish antitrust injury—that their "injury [is] of the type the antitrust laws were designed to prevent." *Cargill*, 479 U.S. at 111, 117 (lost profits caused by competitor's lower prices after merger are not antitrust injury). Similarly, on the merits, the competitor-plaintiff must prove the defendant's conduct harms consumers by, for example, decreasing output or raising prices. *See Epic II*, 67 F.4th at 983. If a competitor-plaintiff is able to serve two masters and establish Article III standing on the one hand and antitrust injury and liability on the other, then the competitor-plaintiff would have necessarily shown that the defendant's conduct harms *both* the plaintiff as a competitor *and* consumers. So again, it is hardly surprising that the injunctive relief granted in such a case will carry incidental benefits for consumers.

Consider, as an example, the Kodak-parts litigation that was the subject of the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). Independent service organizations (ISOs) alleged that Kodak violated federal antitrust law by "adopt[ing] policies to limit the availability of parts to [the] ISOs to make it more difficult for ISOs to compete with Kodak in servicing Kodak equipment." *Id.* at 455. The Supreme Court affirmed our court's denial of summary judgment, *id.* at 486; on remand, the ISOs prevailed in a jury trial and the district court entered an injunction requiring Kodak to sell its parts to ISOs on "reasonable and nondiscriminatory terms and prices." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1201 (9th Cir. 1997). The injunction remedied

the ISOs' harm: their inability to compete for "large contracts" because they lacked "sufficient parts." *Id.* at 1222.    But the injunction also incidentally benefited consumers by breaking up what the jury had found to be an unlawfully maintained monopoly. *See id.* at 1207–12. The injunction was challenged on several grounds, *see id.* at 1224–25, but there was no hint of the radical argument that Apple now advances: that a competition-law injunction is invalid if it benefits consumers.

## CONCLUSION

Apple's standing and scope-of-the-injunction arguments challenge an imagined panel opinion on an imagined record. When the panel opinion's reasoning and the district court's factual findings are fully considered, the motion's arguments fall far short of establishing legal error.