THEODORE J. BOUTROUS JR.,
SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:  415.393.8200
Facsimile:  415.393.8306

MARK A. PERRY, SBN 212532
  mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice pending*)
  joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  202.682.7000
Facsimile:  202.857.0940

MORGAN D. MACBRIDE, SBN 301248
  morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
Redwood Shores Pkwy, 4th Floor
Redwood Shores, CA 94065
Telephone:  650.802.3044
Facsimile:  650.802.3100

MARK I. PINKERT (Fla. Bar No. 1003102; *pro hac vice pending*)
  mark.pinkert@weil.com
KATHERINE G. BLACK (Fla. Bar No.
1031465; *pro hac vice pending*)
  katie.black@weil.com
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone:  305.577.3100
Facsimile:  305.374.7159

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.<br><br>      Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>      Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**APPLE INC.'S MOTION FOR ENTRY OF JUDGMENT ON ITS INDEMNIFICATION COUNTERCLAIM**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

**TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE THAT on March 5, 2024 at 10:00 a.m., or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Yvonne Gonzalez Rogers, Courtroom 1 – 4th Floor, United States District Court, 1301 Clay Street, Oakland, California, Apple Inc. ("Apple") will and hereby does move that this Court, pursuant to the mandate of the Ninth Circuit, enter judgment ordering Epic Games, Inc. ("Epic") to pay Apple $73,404,326, plus additional amounts Apple is incurring during this ongoing litigation, under the indemnification provision of the Developer Program License Agreement.  *See* PX-2619.40 (§ 10).

This motion is based on this notice and supporting memorandum, the trial record, the appellate record, the Declarations of Mark Rollins (Apple), Carlyn Irwin (Cornerstone Research), Mark A. Perry (Weil), and Richard M. Pearl, and other information of which the Court may take judicial notice.

1

**TABLE OF CONTENTS**

2

Page

3    NOTICE OF MOTION ....................................................................................................... i

4    INTRODUCTION ............................................................................................................. 1

5    BACKGROUND ............................................................................................................... 3

     A.    Epic's Intentional Breach Of The DPLA ....................................................... 3

6

     B.    Apple's Entitlement To Indemnification Under The DPLA ........................... 8

7    LEGAL STANDARD .......................................................................................................... 9

8    ARGUMENT .................................................................................................................... 9

9    I.    Epic Is Obligated To Indemnify Apple For All Its Expenses and Costs—Without
     Limitation—Arising From or Related To Epic's Breach ......................................... 11

10

     A.    Apple Is Entitled To Its "Losses," Broadly Defined Under The DPLA .................... 11

11

     B.    Apple Is Also Entitled To Its Losses Under California Law Applicable To
     Post-Judgment Motions For Attorneys' Fees And Costs ............................ 18

12

   II.    Apple Has Substantiated The Amount Of Its Losses ............................................. 20

13

     A.    Apple's Records Show The Fees, Expenses, And Costs Of This Litigation .............. 20

14

     B.    The Total Amount Is "Reasonable" Under California Law ......................... 23

15    CONCLUSION ................................................................................................................ 27

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                                                      **Page(s)**

3

*Armada Bulk Carriers v. ConocoPhillips Co.*,
4         505 F. Supp. 2d 621 (N.D. Cal. 2007) ...................................................................................13

5

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*,
6         47 Cal. App. 4th 464 (1996) ...........................................................................................11, 20

7

*Bardin v. Lockheed Aeronautical Sys. Co.*,
         70 Cal. App. 4th 494 (1999) ...................................................................................................13

8

*Butler-Rupp v. Lourdeaux*,
9         154 Cal. App. 4th 918 (2007) .................................................................................................14

10

*Calvo Fisher & Jacob LLP v. Lujan*,
         234 Cal. App. 4th 608 (2015) ............................................................................................24, 25

11

*Cap. Bank, PLC v. M/Y Birgitta*,
12        2010 WL 4241584 (C.D. Cal. Oct. 18, 2010) .........................................................................12

13

*Cheema v. L.S. Trucking, Inc.*,
14        39 Cal. App. 5th 1142 (2019) .................................................................................................18

15

*Children's Hospital & Med. Ctr. v. Bonta*,
         97 Cal. App. 4th 740 (2002) ...................................................................................................26

16

*Crawford Fitting Co. v. J. T. Gibbons, Inc.*,
17        482 U.S. 437 (1987) .................................................................................................................11

18

*Doppes v. Bentley Motors, Inc.*,
         174 Cal. App. 4th 967 (2009) .................................................................................................15

19

*Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*,
20        2010 WL 11595919 (C.D. Cal. Nov. 23, 2010) .....................................................................14

21

*Eden Twp. Heathcare Dist. v. Eden Med. Ctr.*,
22        220 Cal. App. 4th 418 (2013) .................................................................................................19

23

*Fed–Mart Corp. v. Pell Enters., Inc.*,
         111 Cal. App. 3d 215 (1980) ..................................................................................................20

24

*Finjan, Inc. v. Juniper Network, Inc.*,
25        2021 WL 3674101 (N.D. Cal. May 20, 2021) ........................................................................14

26

*Ford v. Baroff (In re Baroff)*,
27        105 F.3d 439 (9th Cir. 1997) ..................................................................................................19

28

*Gabourel v. Bouchard Transp. Co.*,
    1996 WL 447991 (S.D.N.Y. Aug. 7, 1996) ................................................................12

*Goldberg v. Mallinckrodt, Inc.*,
    792 F.2d 305 (2d Cir. 1986) ................................................................12

*Hadley v. Krepel*,
    167 Cal. App. 3d 677 (1986) ................................................................24

*Harbour Landing-Dolfann, Ltd. v. Anderson*,
    48 Cal. App. 4th 260 (1996) ................................................................14

*Hegarty v. Transamerica Life Ins. Co.*,
    2021 WL 4899482 (N.D. Cal. Oct. 21, 2021) ................................................................13

*Horsford v. Bd. of Trustees of Cal. State Univ.*,
    132 Cal. App. 4th 359 (2005) ................................................................24

*Hot Rods, LLC v. Northrop Grumman Sys. Corp.*,
    242 Cal. App. 4th 1166 (2015) ................................................................11, 17

*Hsu v. Abbara*,
    9 Cal. 4th 863 (1995) ................................................................19

*Int'l Billing Servs., Inc. v. Emigh*,
    84 Cal. App. 4th 1175 (2000) ................................................................25

*J.P. Morgan Sec., LLC v. Baumann*,
    2015 WL 13916932 (C.D. Cal. Dec. 1, 2015) ................................................................9

*Ketchum v. Moses*,
    24 Cal. 4th 1122 (2001) ................................................................23

*In re Khaury*,
    2012 WL 2373655 (Bankr. N.D. Cal. June 22, 2012) ................................................................13

*Lovell v. Chandler*,
    303 F.3d 1039 (9th Cir. 2002) ................................................................12

*M.C. & D. Capital Corp. v. Gilmaker*,
    204 Cal. App. 3d 671 (1988) ................................................................14

*Martinez v. Extra Space Storage, Inc.*,
    2013 WL 6623889 (N.D. Cal. Dec. 16, 2013) ................................................................9

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) ................................................................24

*Minor v. Christie's, Inc.*,
    2011 WL 902235 (N.D. Cal. Jan. 29, 2011) ................................................................14

*Moore v. Jas. H. Matthews & Co.*,
   682 F.2d 830 (9th Cir. 1982) ........................................................................................24

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ....................................................................................................17

*Moreno v. City of Sacramento*,
   534 F.3d 1106 (9th Cir. 2008) ....................................................................................24

*Nemecek & Cole v. Horn*,
   208 Cal. App. 4th 641 (2012) .....................................................................................26

*Orozco v. WPV San Jose, LLC*,
   36 Cal. App. 5th 375 (2018) .......................................................................................25

*Pearson v. U.S. Bank Nat'l Ass'n*,
   2017 WL 8186764 (C.D. Cal. Aug. 14, 2017) ...........................................................12

*Peter v. NantKwest, Inc.*,
   140 S. Ct. 365 (2019) .................................................................................................12

*PLCM Grp. v. Drexler*,
   22 Cal. 4th 1084 (2000) .............................................................................................23

*Quevedo v. New Albertsons, Inc*,
   2015 WL 10939716 (C.D. Cal. May 27, 2015) .........................................................20

*Reynolds Metals Co. v. Alperson*,
   25 Cal. 3d 124 (1979) ................................................................................................20

*Roman v. Queen Mary*,
   2002 WL 787769 (Cal. Ct. App. Apr. 29, 2002) .......................................................14

*San Francisco CDC LLC v. Webcor Constr. L.P.*,
   62 Cal. App. 5th 266 (2021) .......................................................................................18

*Santisas v. Goodin*,
   17 Cal. 4th 599 (1998) ..........................................................................................11, 12

*Scholastic Inc. v. M/V Kitano*,
   362 F. Supp. 2d 449 (S.D.N.Y. 2005) ......................................................................12

*Silver Creek, LLC v. BlackRock Realty Advisors, Inc.*,
   173 Cal. App. 4th 1533 (2009) ...................................................................................19

*Singh v. Hancock Nat. Res. Grp., Inc.*,
   2017 WL 2275029 (E.D. Cal. May 25, 2017) ...........................................................13

*Skrbina v. Fleming Companies*,
   45 Cal. App. 4th 1353 (1996) .....................................................................................13

*Stonebrae, L.P. v. Toll Bros., Inc.*,
   2011 WL 1334444 (N.D. Cal. Apr. 7, 2011) ..........................................................24

*Stratton v. Beck*,
   30 Cal. App. 5th 901 (2019) ...............................................................................25

*Tax Servs. of Am., Inc. v. Mitchell*,
   2008 WL 2834271 (D. Colo. July 21, 2008) .........................................................12

*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*,
   185 Cal. App. 4th 1050 (2010) .....................................................................11, 13

*Travelers Indem. Co. v. Crown Corr, Inc.*,
   2012 WL 2798653 (D. Ariz. July 9, 2012) ...........................................................13

*Travelers Indem. Co. v. Lara*,
   84 Cal. App. 5th 1119 (2022) .............................................................................19

*Turner v. Schultz*,
   175 Cal. App. 4th 974 (2009) ..............................................................................20

*W. Va. Univ. Hosps., Inc. v. Casey*,
   499 U.S. 83 (1991)..............................................................................................12

*Windsor Pac. LLC v. Samwood Co.*,
   213 Cal. App. 4th 263 (2013) .............................................................................11

*Xuereb v. Marcus & Millichap, Inc.*,
   3 Cal. App. 4th 1338 (1992) ..................................................................11, 12, 18

**Statutes**

Cal. Civ. Code § 1717(a) .............................................................................9, 18, 19, 20

Cal. Civ. Code § 1717.5(a) ....................................................................................19

Cal. Civ. Proc. Code § 1021 .........................................................................11, 12

**Other Authorities**

Black's Law Dictionary (5th ed. 1979)....................................................................17

Fed. R. Civ. P. 54(d)(2)(B)(iii) .................................................................................9

**INTRODUCTION**

When Epic Games, Inc. entered into the Developer Program License Agreement ("DPLA") with Apple in 2010, it agreed to indemnify Apple for "any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, 'Losses'), incurred by [Apple] and arising from or related to . . . [Epic's] breach of any certification, covenant, obligation, representation or warranty in [the DPLA], including Schedule 2." PX-2619.40 (DPLA § 10). Only a few weeks after it renewed the DPLA in 2020, Epic willfully breached the contract as part of a multifaceted and worldwide attack against Apple and the iOS App Store.

One front in Epic's war against Apple was the lawsuit it filed against Apple in this Court. In that suit, Epic sought to have key provisions of Apple's DPLA—including Apple's right to collect a commission on in-app purchases of digital content—declared void and unenforceable under the antitrust laws. At trial, however, Epic lost on all of its antitrust claims, and Apple prevailed on its counterclaim for Epic's breach of contract. This Court found that Epic had intentionally breached the DPLA, even though (as the Court further found) it was not necessary for Epic to do so to bring this lawsuit. The Ninth Circuit affirmed the judgment in favor of Apple on Epic's antitrust claims and Apple's breach-of-contract counterclaim, and it held that Apple is entitled to recover its "Losses" arising from or related to Epic's breach under the indemnification provision in the DPLA. The court of appeals remanded solely for this Court to determine the amount of such Losses.

Because the DPLA's indemnification provision defines Losses broadly as "any and all . . . expenses and costs, including *without limitation*, attorneys' fees and court costs," Apple is entitled to recover *all* of its out-of-pocket expenses and costs arising from Epic's lawsuit. That includes all expenditures defending against Epic's claims, at both the trial and appellate level, as well as Apple's ongoing litigation of its indemnification counterclaim on remand. Further, under the plain terms of the DPLA, recoverable Losses encompass all of Apple's litigation "expenses . . . without limitation"—a term that includes not only attorneys' fees and court costs, but also expert fees, vendor costs, travel expenses, and other outlays actually made in connection with the litigation.

Apple has spent a total of $81,560,362 to defend against the United States litigation, from its

inception by Epic in August 2020 through October 31, 2023.   By this motion, Apple seeks to recover $73,404,326, or 90% of the total amount expended, plus additional amounts Apple is incurring during this ongoing litigation.  This 10% discount, while not required by the DPLA or California law, recognizes that Epic prevailed on 1 of the 10 claims it asserted.

The total amount of Losses is substantiated in the supporting declarations submitted with this motion.  Apple attests in its declaration to the amount of attorneys' fees and other costs that it actually paid in connection with this lawsuit to the vendors who submitted invoices directly to Apple. Cornerstone Research, a third-party expert in forensic accounting and data analytics, has corroborated that total amount based on its independent and extensive review of the billing records maintained by Apple and its vendors (including pass-through amounts).  Apple and Cornerstone, working with Apple's vendors to understand and/or reconcile billing and payment records, have made various reductions to ensure that every dollar sought by this motion falls within the DPLA's indemnification provision.  The total amount sought thus reflects both those downward adjustments and the 10% reduction—yielding a number below the amount Apple is contractually entitled to:

| Apple's Actual Payments | Adjusted Total | Adjusted Total Minus 10% |
|---|---|---|
| $82,971,401 | $81,560,362 | $73,404,326 |

Although the DPLA contains no reasonableness requirement, the Losses sought by Apple are "reasonable" under California law applicable to post-judgment motions for attorneys' fees and costs. The stakes in this lawsuit were enormous, and Apple's defense was appropriate in light of the challenge to Apple's business model.   Apple's total expenditures are also commensurate with Epic's own substantial investment in the litigation.  Both Epic and Apple chose to retain sophisticated law firms, multiple experts, and vendors capable of managing the huge quantity of documents and data produced in discovery.  The declaration of Richard M. Pearl, an expert on California attorneys' fees and court costs, further supports a finding of reasonableness.

Epic has no legitimate grounds to dispute the amount of Losses sought by Apple.  Accordingly, the Court should enter judgment on Apple's indemnification counterclaim in the amount of $73,404,326, plus the additional amounts related to the ongoing litigation that Apple has incurred and will continue to

incur from October 31, 2023 through final resolution.

## BACKGROUND

From approximately 2010 until the events that precipitated this lawsuit, Epic was a member of Apple's developer program and was a signatory to the DPLA.  That contract contains an express indemnification provision that requires each developer (referred to as "You" in the agreement) to reimburse Apple for, among other things, "attorneys' fees and court costs . . . arising from or related to" the developer's "breach" of any part of the DPLA.  The indemnification provision reads, in relevant part:

> To the extent permitted by applicable law, **You agree to indemnify and hold harmless**, and upon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from **any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs** (collectively, "**Losses**"), incurred by an Apple Indemnified Party and **arising from or related to** any of the following (but excluding for purposes of this Section, any Application for macOS that is distributed outside of the App Store and does not use any Apple Services or Certificates): **(i) Your breach of any certification, covenant, obligation, representation or warranty in this Agreement, including Schedule 2** and Schedule 3 (if applicable) . . . .

PX-2619.40 (DPLA § 10) (emphases added).  The Ninth Circuit has already ruled that Apple is entitled to recover its Losses under this provision.  The only issue before this Court on remand is the amount of such Losses.

### A.  Epic's Intentional Breach Of The DPLA

Apple's App Store is a two-sided transaction platform that allows third-party developers of apps built using Apple's proprietary software and technology to engage with consumers who use devices, such as iPhones, running Apple's iOS operating system.  Dkt. No. 812 ("Rule 52 Order"), at 28–29, 34.  Developers who wish to gain access to Apple's proprietary tools must join the Developer Program.  *Id.* at 93 n.462.  To develop and distribute iOS apps, developers must also sign and agree to the terms of the DPLA.  *Id.* at 28–29.  As of the time of trial, all native iOS apps must have been distributed through the App Store, and all in-app purchases of digital goods and services must have used Apple's IAP payment mechanism.  *Id.* at 29–33.  Apple charges a commission on downloads of paid apps and for transactions effected through IAP.  *Id.* at 35–36.  The DPLA includes certain "anti-steering" provisions to help Apple

1    enforce the IAP requirement.  *Id.* at 31; PX-2619.17; PX-2790.10.

2         Founded in 1991, Epic is a "multi-billion dollar video game company" and the developer of the

3    popular video game, *Fortnite*.  Rule 52 Order at 2–3.  In 2010, Epic entered into a DPLA with Apple,

4    which allowed Epic to leverage Apple's developer tools and technology to develop and produce iOS

5    games offered through Apple's App Store.  *See id.* at 18.  During the two years *Fortnite* was on the App

6    Store, Epic earned more than $700 million in revenue from iOS users.  *Id.* at 14.

7         Despite its commercial success on iOS, Epic had expressed objection to two core Apple policies

8    for developers: the requirements that iOS apps be distributed through the App Store and that in-app

9    purchases of digital goods and services be executed through IAP.  Rule 52 Order at 21, 25.  What Epic

10   really wants is to avoid paying Apple's commission.  *See id.* at 92 ("Epic games' theory [is] that no

11   commission should be levied").  In 2019, Epic devised a plan called "Project Liberty" to attack Apple's

12   App Store policies through public relations, lobbying, and litigation.  Epic had two primary motivations

13   for Project Liberty: first, its pursuit of "tremendous monetary gain and wealth"; second, its desire to

14   change the policies and practices of Apple, "which are an impediment to Mr. Sweeney's [Epic's CEO]

15   vision of the oncoming metaverse."  *Id.* at 19.  As this Court explained, the plan was multifaceted and

16   "highly choreographed" (*id.*), including to the point of having a Cravath antitrust partner, Gary

17   Bornstein, embedded at Epic's headquarters with an Epic e-mail address (Dkt. No. 779-1 ¶ 274.4).

18        After renewing its DPLA with Apple on June 30, 2020, Epic sent a letter that same day to Apple

19   executives requesting that Apple make "(i) competing payment processing options . . . ; and (ii) a

20   competing Epic Games Store app" available through the App Store.  Rule 52 Order at 24; Dkt. No. 779-

21   1 ¶¶ 276–77.  On July 10, 2020, Apple declined Epic's request, noting that not only "has [Apple] never

22   allowed this," but also that doing so would undermine the "safe[ty], secur[ity] and reliab[ility]" of the

23   iOS and App Store environments.  Rule 52 Order at 24 (citations omitted); Dkt. No. 779-1 ¶¶ 278.1–.4.

24   Epic replied a week later, promising to continue its crusade, but never "reveal[ing to Apple] its plans to

25   enable an alternate payment system" by subterfuge—despite tipping off Nintendo, Microsoft, and Sony

26   to Epic's impending "fireworks show."  Rule 52 Order at 23, 25 (citations omitted); Dkt. No. 779-1

27   ¶ 279.

28

1    The cornerstone of Epic's plan was a surreptitious "hotfix" that Epic "introduced . . . into the

2  *Fortnite* version 13.40 update [submitted for App Review] on August 3, 2020." Rule 52 Order at 25.

3  The hotfix "required extensive planning and testing," including "[s]pecialized engineers" and an

4  information security team whose sole purpose was to ensure that Apple's App Review Team could not

5  detect the embedded threat lurking in the version update. *Id.* at 23; *see also* Dkt. No. 779-1 ¶ 272 (Epic's

6  Project Liberty team comprised "about 100–200 [of its] employees"), ¶ 274.1 ("Epic 'investigated'

7  various ways it could surreptitiously implement an alternative payment system, 'like, obfuscating the

8  code' or 'encrypt[ing]' the relevant features."). This secret code "clandestinely enabled substantive

9  features in willful violation of [Epic's] contractual obligations" under the DPLA (Rule 52 Order at 21),

10  including "a direct pay option to Epic Games that would be activated when signaled by Epic Games'

11  servers" (*id.* at 25). The hotfix, in short, would "circumvent Apple's IAP system," once Epic "activated

12  the undisclosed code." *Id.*; *see also id.* at 21–22 ("'We submit a build to[ ] Apple with the ability to

13  hotfix on our payment method. . . . We flip the switch when we know we can get by without having to

14  update the client for 3 weeks or so.'" (citing DX-4419.002)). After "intentionally omitt[ing] the full

15  extent" of the changes in its "disclosure" to Apple—which relied upon Epic's misrepresentations in

16  approving the new version of *Fortnite*—Epic triggered the hotfix on August 13, 2020. *Id.* at 23, 25; Dkt.

17  No. 779-1 ¶ 300 (Epic notified Apple at 2:00 AM on August 13, 2020 of the hotfix, only after having

18  already activated it).

19    As this Court found, by implementing the hotfix, Epic "willful[ly] violat[ed its] contractual

20  obligations and guidelines" with Apple, as set out in the DPLA that Epic entered into with Apple in

21  2010. Rule 52 Order at 18, 21.

22    Apple removed *Fortnite* from its App Store on August 13, 2020, fewer than ten hours after Epic

23  implemented the hotfix. Dkt. No. 779-1 ¶ 301; Rule 52 Order at 25. That day, Apple sent a letter

24  notifying Epic that *Fortnite* had been removed from the App Store due to violations of the App Store

25  Review Guidelines. Dkt. No. 779-1 ¶ 302. Apple also explained how Epic could cure its breach:

26  removing the alternative payment feature and any other features hidden from Apple; clearly describing

27  the changes to *Fortnite* version 13.40; and resubmitting the new version of *Fortnite* for review. *Id.* Epic

28

1   responded in an email to Apple executives that threatened Apple would be "in conflict with" Epic on a

2   number of fronts—including legal.  *Id.* ¶ 303 (citing DX-3906.002).

3       Shortly after triggering the hotfix, Epic sued Apple under Sections 1 and 2 of the Sherman Act,

4   the California Cartwright Act, and the California Unfair Competition Law ("UCL").  Epic alleged that

5   Apple unlawfully maintained a monopoly over iOS app distribution and in-app payment markets, via the

6   App Store and IAP, and sought a declaration and injunction against the challenged DPLA provisions.

7   Rule 52 Order at 148, 151–52.

8       Apple sent another letter to Epic the following day, on August 14, 2020, providing additional

9   detail on how Epic's hotfix breached its agreements with Apple.  Dkt. No. 779-1 ¶ 309.  Reminding Epic

10  of Apple's app review process, Apple reiterated its rules regarding user privacy and security, and how

11  Epic had violated many provisions of the DPLA.  *Id.*  Apple also notified Epic that its membership in

12  Apple's Developer Program was suspended as a result of its actions, although Epic could still cure its

13  breaches within a fourteen-day period.  *Id.* ¶ 310.  But Epic declined to do so, and Apple subsequently

14  terminated Epic's Developer Program Account, along with its DPLA, on August 28, 2020.  *Id.* ¶ 311.

15      Along with its hotfix and this long-planned litigation, Epic simultaneously launched a "pre-

16  planned[] and blistering" global public relations campaign, and lobbied both legislatures and regulators

17  to impose new requirements on Apple.  Rule 52 Order at 25.  Epic sought to turn developer and user

18  opinions against Apple, including through public relations campaigns and other media, such as the "1980

19  Fortnite" video.  *See* Dkt. No. 779-1 ¶¶ 284.1–.3, 286–87.  Epic went so far as to host the

20  "#FreeFortniteCup" tournament, where it advertised Sony, Microsoft, PC, Nintendo, and Samsung

21  offerings as alternative platforms.  *Id.* ¶ 304.  Epic also created the so-called Coalition for App Fairness

22  to advance its arguments in various forums.  Rule 52 Order at 22; Dkt. No. 779-1 ¶¶ 283.1–.3, 285.  Epic

23  did all of this knowing its actions would make Epic "'not sympathetic'" (Dkt. No. 779-1 ¶ 280 (citing

24  DX-4177.011)), and that forcing Apple to block the *Fortnite* app due to the hotfix and ensuing breach

25  of contract would cause consumer sentiment to "'trend negative towards Epic'" (*id.* (citing DX-

26  4018.054)).  To avoid this, Epic worked with its public relations firm to create a narrative "'that [Epic

27  is] benevolent,'" and to "'[g]et players, media, and industry on Epic's side,'" and against Apple.  Rule

28

1   52 Order at 22 (citing DX-4561.020; DX-3641.001)).

2          In response, Apple brought counterclaims against Epic for breach of contract and indemnification

3   under the DPLA.  Specifically, Apple alleged—just as it had advised Epic in its letter on August 14,

4   2020—that Epic had breached several provisions of the DPLA, including DPLA §§ 3.2, 3.3.2, 3.3.3,

5   3.3.25, and 6.1.  *See* Dkt. No. 66 at 56; Dkt. No. 779-1 ¶ 309; Rule 52 Order at 178–79.  Among other

6   things, these provisions required Epic not to "'hide, misrepresent or obscure any features, content,

7   services or functionality' in their apps and not to 'provide, unlock or enable additional features or

8   functionality through distribution mechanisms other than the App Store'" and required Epic to pay Apple

9   a 30% commission of end-user payments through the App Store.  Rule 52 Order at 173 (citing PX-2619

10  §§ 3.2, 3.3.2, 3.3.3, 3.3.25).

11         Before this Court, Epic "d[id] not contest that it breached the DPLA and Schedule 2.  Nor d[id]

12  Epic contest that if the Court [found] the breached provisions enforceable against Epic in this matter,

13  then Epic would be liable to Apple for breach of contract."  Dkt. No. 407 ¶ 497; Dkt. No. 474, at 2.  Epic

14  instead defended its willful breach solely by claiming that the DPLA was unlawful and unenforceable

15  under the antitrust laws.  *See* Rule 52 Order at 172 ("Epic Games alleges that Apple's counterclaims

16  [including its breach of contract claim] are barred because 'the contracts on which Apple's counterclaims

17  are based are unconscionable' on the basis that they 'are contrary to the antitrust laws and unfair

18  competition laws[.]'" (citing Dkt. No. 106, at 17–18)).

19         After a 16-day bench trial involving 26 witnesses and 520 exhibits, the Court issued a 180-page

20  order rejecting Epic's antitrust claims in their entirety.  The Court also rejected Epic's challenge to the

21  app distribution and IAP requirements under the California UCL.  *See* Rule 52 Order at 162 ("Epic

22  Games' [UCL] claims based on the app distribution and in app payment processing restrictions fail for

23  the same reasons as stated for the Sherman Act").  But the Court found that Apple's anti-steering

24  provision violated the UCL and enjoined Apple from enforcing it.  *Id.* at 168.

25         In light of its rejection of Epic's antitrust claims, the Court also rejected Epic's defense to Apple's

26  breach-of-contract claim, holding that except for "one unrelated provision," the DPLA was not

27  "substantively unconscionable."  Rule 52 Order at 172.  Epic "admitted that it breached the DPLA in the

28

1   manner that Apple alleg[ed]," and thus the Court held that Apple prevailed on its breach-of-contract

2   counterclaim and was entitled to relief. *Id.* at 168.  The Court granted Apple relief in the form of damages

3   and a declaration that (i) Epic's DPLA and related agreements were lawfully terminated, and (ii) Apple

4   could lawfully terminate its DPLA with "any or all of Epic Games' wholly owned subsidiaries, affiliates,

5   and/or other entities [under its control]." *Id.* at 179.

6       The Court ruled against Apple on its counterclaim for indemnification based on Epic's willful

7   breach of the DPLA, concluding that Section 10 of the DPLA does not apply to intra-party disputes

8   between signatories, such as this dispute between Epic and Apple.  *Id.* at 176–77.

9       **B.  Apple's Entitlement To Indemnification Under The DPLA**

10      Epic appealed this Court's decision dismissing its Sherman Act claims and entering judgment

11  for Apple on its breach-of-contract claim.  *See* C.A.9 Dkt. No. 41, at 29–32.  Apple cross-appealed this

12  Court's UCL judgment and injunction, as well as its rejection of the indemnification counterclaim under

13  the DPLA.  *See* C.A.9 Dkt. No. 93, at 101, 112.  On appeal, Epic again asserted its unconscionability

14  defense to its deliberate breach of the DPLA, arguing that "*Apple's breach of contract counterclaims*

15  *rise and fall on the determination of Epic's Sherman Act claims*."  C.A.9 Dkt. No. 163, at 84 (emphasis

16  added); *see also* C.A.9 Dkt. No. 41, at 13 ("Epic stipulated to its noncompliance with the DPLA, but

17  asserted that the relevant provisions are unlawful, void against public policy, and unconscionable

18  [because they are alleged to violate the Sherman Act]"); C.A.9 Dkt. No. 222, at 76–77.

19      The Ninth Circuit affirmed this Court's rulings that Epic's Sherman Act claims failed and that

20  those claims could not justify Epic's breach of contract.  C.A.9 Dkt. No. 222, at 77.  In so holding, the

21  panel expressly noted that "[t]he parties agree that Epic's illegality defense rises and falls with its

22  Sherman Act claims." *Id*.  The Ninth Circuit also affirmed the UCL judgment and injunction. *Id*. at 77,

23  83.

24      On Apple's counterclaim for indemnification, the Ninth Circuit held that the DPLA applies to

25  "intra-party disputes" and that "Apple is entitled to attorney fees pursuant to it." *Id.* at 87.  The Ninth

26  Circuit explained that while California courts presume that the words "indemnify" and "hold harmless"

27  obligate the indemnitor to reimburse the indemnitee for third-party claims, courts also look to the context

28

1   in which language appears and may find that the contract rebuts this presumption.  *Id.* at 85–86.  Here,

2   the Ninth Circuit concluded that clause (i) of Section 10 of the DPLA rebuts the presumption because it

3   "specifically provide[s] for attorneys' fees" in actions on the contract, and "contemplat[es] an intra-party

4   action for breach of contract" insofar as a third party could not sue Apple under clause (i).  *Id.* at 86.  In

5   holding that Apple is entitled to indemnification, the Ninth Circuit "express[ed] no opinion on what

6   portion of Apple's attorney fees incurred in this litigation can be fairly attributed to Epic's breach of the

7   DPLA."  *Id.* at 87 n.24.  Accordingly, it remanded for this Court to determine the amount of Losses that

8   Epic is contractually obligated to pay to Apple.  *Id.* at 10, 85–87.

9                                        **LEGAL STANDARD**

10          The Ninth Circuit has determined that Apple is entitled to indemnification under Section 10 of

11  the DPLA, and remanded for a determination of the amount of Losses that Epic is contractually obligated

12  to pay.  C.A.9 Dkt. No. 222, at 10, 85–87.  The substance of that inquiry is governed by the plain terms

13  of the parties' contract and by California law.  *See* PX-2619.45–46 (DPLA § 14.10); *see also* Cal. Civ.

14  Code § 1717(a) (governing recovery of attorneys' fees based on contract disputes).  While the DPLA

15  does not specify an indemnification procedure, the provisions of Federal Rule 54 provide a useful

16  analogue.  *J.P. Morgan Sec., LLC v. Baumann*, 2015 WL 13916932, at *3 (C.D. Cal. Dec. 1, 2015);

17  *Martinez v. Extra Space Storage, Inc.*, 2013 WL 6623889, at *1 (N.D. Cal. Dec. 16, 2013).  Accordingly,

18  Apple sets forth below and in the accompanying declarations "the amount sought."  Fed. R. Civ. P.

19  54(d)(2)(B)(iii); *see also* Civil L.R. 54-5.

20                                        **ARGUMENT**

21          Epic planned its campaign against Apple for almost two years before triggering the hotfix and

22  intentionally breaching the DPLA.  It retained one of the world's elite law firms (Cravath, Swaine &

23  Moore) to lead the charge.  *See* Dkt. No. 779-1 ¶ 274.4.  Epic also retained public and media relations

24  consultants to shift the blame from itself to Apple.  *See id.* ¶¶ 283–87.  Epic *knew* that the actions it was

25  contemplating would breach its contract with Apple—imposing enormous litigation costs on Apple—

26  and it went ahead anyway.  *Id.* ¶ 300; *see also* Rule 52 Order at 178–79 (internal documents showed that

27  Epic believed Apple would enforce its contract rights after the breach).  Epic decided to commit an

28

1   intentional breach even though, as this Court has already found, Epic *could* have continued performing

2   under the contract while it sued Apple for allegedly violating the antitrust laws.  Rule 52 Order at 178

3   ("Epic Games never showed why it had to breach its agreements to challenge the conduct litigated.").

4   The legal consequence of Epic's own intentional actions is that it must indemnify Apple for all Losses

5   as defined in the DPLA..

6   *First*, Epic signed and then intentionally breached the DPLA, knowing that it would be obligated

7   to indemnify Apple for all of its "Losses" "arising from" or "related to" that breach.  The contractual

8   term "Losses" that the parties agreed to is broadly defined to include "any and all" of Apple's expenses,

9   including attorneys' fees and other court costs, "without limitation."  Thus, *all* of Apple's litigation

10   expenses fall squarely within the scope of the DPLA's indemnification provision, and are recoverable

11   by contract.  And because Epic opposed Apple's contract counterclaim only on antitrust grounds, the

12   expenses Apple incurred in litigating the antitrust claims likewise falls within the scope of "Losses" and

13   are recoverable.  They are also recoverable under California law applicable to post-judgment motions

14   for attorneys' fees and costs.  California law requires the Court to award Apple, as the "prevailing party,"

15   its contractual indemnification for Epic's failed "action on the contract," meaning Epic's failed attempt

16   to have DPLA provisions declared void and unenforceable.

17   *Second*, Apple has substantiated the total amount of its Losses with supporting declarations and

18   records, which provide more than sufficient evidentiary basis for entry of judgment on the

19   indemnification counterclaim in the amount set forth herein.  That amount is also "reasonable" under

20   California law.  Epic challenged core aspects of Apple's business model and it sought to eliminate a

21   revenue stream by preventing Apple from collecting any commission from developers.  Accordingly,

22   Apple hired renowned law firms, experts, and vendors that were up to the considerable task.  Apple is

23   also a sophisticated party that negotiates its outside vendor rates, including involving its Corporate

24   Procurement function in the law-firm pricing negotiations, and then closely monitors its invoices, as its

25   supporting declaration explains.  And Apple did, in fact, pay the amount that it seeks to recover, evincing

26   the reasonableness of those fees and costs.  Richard M. Pearl, an expert on attorneys' fees and costs in

27   California has also closely reviewed the record and investigated Apple's billing practices in this case,

28

1   and he has offered his expert opinion that the amount Apple spent is reasonable under California law.

2   **I.   Epic Is Obligated To Indemnify Apple For All Its Expenses and Costs—Without**
3   **Limitation—Arising From or Related To Epic's Breach**

4   **A.  Apple Is Entitled To Its "Losses," Broadly Defined Under The DPLA**

5      The Ninth Circuit held that Apple is entitled to indemnification under the DPLA.  In relevant

6   part, the DPLA provides that Apple may recover "*any and all* . . . expenses and costs, including *without*

7   *limitation*, attorneys' fees and court costs."  PX-2619.40 (DPLA § 10) (emphases added).  The parties

8   thus agreed that *any* out-of-pocket payment that arose from or related to Epic's breach of the DPLA is

9   within the scope of the indemnification provision.  *See Thrifty Payless, Inc. v. Mariners Mile Gateway,*

10  *LLC*, 185 Cal. App. 4th 1050, 1066 (2010) ("[W]here sophisticated parties knowingly and intentionally

11  negotiate" broad indemnification provisions, "the intent of the parties should be upheld by the court");

12  *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 491–92 (1996)

13  (California law does not "prevent sophisticated parties from freely choosing a broader standard

14  authorizing recovery of reasonable litigation charges and expenses"); *see also, e.g., Crawford Fitting*

15  *Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987) (noting that parties may contract out of or expand

16  federal statutory definitions of "costs").

17     Under California law, "the measure and mode of compensation of attorneys and counselors at

18  law is left to the agreement, express or implied, of the parties."  Cal. Civ. Proc. Code § 1021.  Thus, a

19  contractual indemnity provision may provide for fees arising from contract-based claims—or, "if

20  worded[ ] broadly, [it] can also provide for a fee award in any litigation between the parties."  *Windsor*

21  *Pac. LLC v. Samwood Co*., 213 Cal. App. 4th 263, 273 (2013) (citing *Santisas v. Goodin*, 17 Cal. 4th

22  599, 608 (1998)).  California courts interpret attorneys' fee provisions "broadly," and in line with

23  "ordinary popular speech."  *Xuereb v. Marcus & Millichap, Inc.*, 3 Cal. App. 4th 1338, 1343–44 (1992);

24  *see also Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1181–182 (2015)

25  (phrases that are "quite broad" reflect the intent of the contracting parties).

26     Here, the applicable standard is as broad as could be: Epic expressly agreed to indemnify Apple

27  for "any and all" "expenses" *and* "costs," which include (but are not not limited to) attorneys' fees,

28  "arising from or related to" Epic's breach of the DPLA.  PX-2619.40 (DPLA § 10).  This broad language

1  must be given its full effect.  *See* Cal. Civ. Proc. Code § 1021; *Santisas v. Goodin*, 17 Cal. 4th at 608;

2  *see also Pearson v. U.S. Bank Nat'l Ass'n*, 2017 WL 8186764, at *6 (C.D. Cal. Aug. 14, 2017) (parties

3  may "validly agree that the prevailing party will be awarded attorney fees incurred in *any* litigation

4  between themselves, whether such litigation sounds in tort or in contract" (emphasis added)) (citing

5  *Xuereb*, 3 Cal. App. 4th at 1341); *Xuereb*, 3 Cal. App. 4th at 1344 (the phrase "gives rise to" is interpreted

6  "expansively," in keeping with "ordinary popular speech").

7         The DPLA indemnification provision thus encompasses all of the categories of litigation outlays

8  that Apple now seeks, such as its expert fees.  At the outset, those outlays fall within the term "expenses,"

9  which is separate from and broader than "costs," a term-of-art typically defined by statute.  *See, e.g., Tax*

10 *Servs. of Am., Inc. v. Mitchell*, 2008 WL 2834271, at *5 (D. Colo. July 21, 2008) (holding that

11 "[a]lthough 'costs' is a term of art referring to only those costs recoverable pursuant to statute, the term

12 'expenses' is not so narrowly circumscribed" and allowing the prevailing party "to recover its costs and

13 expert witness fees") (citations omitted).   Thus, the Ninth Circuit has held that "the term 'litigation

14 expenses' normally encompasses expert witness fees." *Lovell v. Chandler*, 303 F.3d 1039, 1058 (9th

15 Cir. 2002) (discussing expense-shifting under the Americans with Disabilities Act).  The Supreme Court

16 has likewise indicated that "reasonable litigation expenses" includes expert witness fees. *W. Va. Univ.*

17 *Hosps., Inc. v. Casey*, 499 U.S. 83, 99 (1991) (suggesting such language would allow for recovery of

18 expert fees); *see also Peter v. NantKwest, Inc.*, 140 S. Ct. 365, 373–74 (2019) (citing this passage with

19 approval).   And numerous other courts have awarded expert fees based on contractual provisions or

20 common law doctrines providing for reimbursement of "expenses."  *See Scholastic Inc. v. M/V Kitano*,

21 362 F. Supp. 2d 449, 460–61 (S.D.N.Y. 2005) (awarding expert fees based on indemnification clause

22 allowing reimbursement of "expenses (including attorney's fees), suffered by the [defendant]");

23 *Gabourel v. Bouchard Transp. Co*., 1996 WL 447991, at *2 (S.D.N.Y. Aug. 7, 1996) (awarding

24 "litigation expenses" under common law doctrine and holding that "[p]lainly, expert fees and other costs

25 are litigation expenses"); *see also Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir. 1986) ("The

26 term 'expenses' is more suggestive of traditional litigation costs such as filing fees or fees paid to expert

27 witnesses"); *Cap. Bank, PLC v. M/Y Birgitta*, 2010 WL 4241584, at *6 (C.D. Cal. Oct. 18, 2010) (noting

28

1    that "courts regularly award expert witness fees where the parties' contract provides for the recovery of

2    costs," and holding that under English law, the phrase "all costs and expenses" encompasses expert fees);

3    *Armada Bulk Carriers v. ConocoPhillips Co.*, 505 F. Supp. 2d 621, 623 (N.D. Cal. 2007) (under New

4    York law, the phrase "all costs and expenses (including reasonable attorney fees)" includes expert fees).

5    Moreover, the DPLA covers not only "expenses," but "any and all . . . expenses . . . without

6    limitation."  Thus, although the DPLA specifies two frequently recurring categories of expenses (i.e.,

7    attorneys' fees and court costs), it was not necessary to specifically enumerate other categories of

8    expenses, in light of these catchall clauses.   The phrase "any and all" "could not be plainer," and includes

9    items not specifically enumerated.  *Skrbina v. Fleming Companies*, 45 Cal. App. 4th 1353, 1368–69

10   (1996) (rejecting plaintiff's claim that release of "any all claims" did not include plaintiff's causes of

11   action); *see also Bardin v. Lockheed Aeronautical Sys. Co.*, 70 Cal. App. 4th 494, 505 (1999) (rejecting

12   argument that release of "any and all" claims includes exception for claims grounded in fraud or malice).

13   The same is true of the phrase "without limitation," which is also clear on its face.  *See Hegarty v.*

14   *Transamerica Life Ins. Co.*, 2021 WL 4899482, at *3 (N.D. Cal. Oct. 21, 2021) (noting that the plaintiff

15   was "grasping at straws because 'without limitation' means 'without limitation,'" and thus a category

16   that is "without limitation" must "include[ ] *every type* of" that category);  *Travelers Indem. Co. v. Crown*

17   *Corr, Inc.*, 2012 WL 2798653, at *2 (D. Ariz. July 9, 2012) ("The phrase 'without limitation' means that

18   the terms listed are not the only terms included."), *aff'd*, 589 F. App'x 828 (9th Cir. 2014).  Epic therefore

19   cannot seek post-hoc limitations on Apple's Losses, after agreeing to the indemnification provision.  *In*

20   *re Khaury*, 2012 WL 2373655, at *1 (Bankr. N.D. Cal. June 22, 2012) ("The court interprets the words

21   'without limitation' as meaning just that, and prohibiting Khaury's post-hoc attempt to impose

22   limitations.").

23   Indeed, all of the categories of Apple's litigation expenditures—at both the trial and appellate

24   level—are well-recognized, "traditional" expenses that sophisticated parties may agree to by contract,

25   and that courts have awarded.  *See, e.g.*, *Singh v. Hancock Nat. Res. Grp., Inc.*, 2017 WL 2275029, at

26   *15 (E.D. Cal. May 25, 2017) (expert fees recoverable under contract); *Thrifty*, 185 Cal. App. 4th at

27   1066 (sophisticated parties may agree to include broad definition of costs, including expert fees);

28

1    *Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*, 2010 WL 11595919, at *6 (C.D. Cal. Nov.

2    23, 2010) (e-discovery cost recoverable under contract); *Roman v. Queen Mary*, 2002 WL 787769, at *4

3    (Cal. Ct. App. Apr. 29, 2002) ("travel expenses" and other costs recoverable under contract).  Thus,

4    under the plain and objective meaning of the DPLA—which governs and clearly covers all of the

5    categories of "expenses" that Apple now requests—Epic cannot credibly argue that it did not have a

6    reasonable expectation that "any and all . . . expenses and costs . . . without limitation" would include

7    such things as expert fees and other common categories of litigation expenses that courts have awarded

8    by contract.  Apple is not seeking any novel categories of expenses that were not reasonably foreseeable

9    by Epic.

10          For the same reasons, moreover, Apple is entitled to its expenses for the entire lawsuit, at all

11   *stages* of the litigation, in both this Court and on appeal in the Ninth Circuit.  The DPLA encompasses

12   "any and all . . . expenses and costs . . . without limitation," which necessarily includes expenses incurred

13   on appeal.  *See M.C. & D. Capital Corp. v. Gilmaker*, 204 Cal. App. 3d 671, 676–78 (1988) ("attorney's

14   fees on appeal are recoverable when authorized by statute or contract").  Moreover, this Court has

15   jurisdiction to adjudicate Apple's contractually based indemnification claim, and make an award of

16   Losses that includes expenses for the successful appeal.  *See* C.A.9 Dkt. No. 222, at 87 (remanding with

17   mandate to assess indemnification claim); *see also Harbour Landing-Dolfann, Ltd. v. Anderson*, 48 Cal.

18   App. 4th 260, 264–65 (1996) ("[C]ontractually authorized attorney fees . . . may either be requested of

19   the appellate court while the appeal is pending, or of the trial court upon issuance of the remittitur.  The

20   trial court has jurisdiction to award them, regardless of the lack of specific instructions in the opinion or

21   the remittitur."); *Butler-Rupp v. Lourdeaux*, 154 Cal. App. 4th 918, 927 (2007).

22          Apple is also entitled to its fees currently being incurred to enforce the indemnification provision.

23   Under California law, when fees are recoverable under a contractual indemnification provision, the

24   prevailing party can recover its fees for time spent preparing the fee application.  *See Minor v. Christie's,*

25   *Inc.*, 2011 WL 902235, at *6 (N.D. Cal. Jan. 29, 2011) ("[W]hen attorney's fees are authorized by

26   contract, courts allow parties to recover the reasonable expenses of preparing the fee application."),

27   *report and recommendation adopted*, 2011 WL 902033 (N.D. Cal. Mar. 14, 2011); *Finjan, Inc. v.*

28

*Juniper Network, Inc.*, 2021 WL 3674101, at \*12 (N.D. Cal. May 20, 2021) ("A litigant that is entitled to recover its attorney's fees is also generally entitled to recover fees on fees."), *report and recommendation adopted sub nom. Finjan, Inc. v. Juniper Networks, Inc.*, 2021 WL 3140716 (N.D. Cal. July 26, 2021), *aff'd sub nom. Finjan, LLC v. Juniper Networks, Inc.*, 2022 WL 17576350 (Fed. Cir. Dec. 12, 2022); *cf. Doppes v. Bentley Motors, Inc.*, 174 Cal. App. 4th 967, 1002 (2009) ("[W]hen attorney fees are recoverable by statute, the reasonable attorney fees incurred in preparing the motion are also recoverable."). Apple is therefore entitled to its fees in prosecuting this motion for judgment.

As detailed in the accompanying declarations, the amounts Apple actually spent on the principal categories of litigation expenses through October 31, 2023 are summarized below:

| CATEGORY | ACTUAL PAYMENTS | ADJUSTED TOTALS | MINUS 10% |
|---|---|---|---|
| Attorneys' Fees | ████████ | ████████ | ████████ |
| Expert Witness and Consulting Fees | | | |
| Document and Information Technology Expenses | | | |
| Travel and Meal Expenses | | | |
| Arbitration Expenses | | | |
| Other Expenses | | | |
| **LOSSES:** | $82,971,401 | $81,560,362 | $73,404,326 |

The DPLA also has no prevailing party limitation, and thus Apple is contractually entitled to recover 100% of these Losses arising out of or related to the litigation. In any event, Apple is unequivocally the prevailing party in this case, having won 9 out of 10 claims that Epic asserted challenging the DPLA, and having prevailed on its counterclaim that Epic intentionally breached the DPLA. C.A.9 Dkt. No. 222, at 77, 83, 87.

For reasons explained below, Apple has made certain reductions to the total Losses that it seeks, to ensure that every dollar is covered by the DPLA. And, although both "parties agree that Epic's illegality defense rises and falls with its Sherman Act claims" (C.A.9 Dkt. No. 222, at 77), in recognition of the fact that Epic prevailed on the UCL claim, Apple is also seeking only 90% of those adjusted

1    Losses arising out of or related to the lawsuit in this Court.[1]  Rather than undertake a costly and time-

2    consuming review of invoices in an effort to segregate out the UCL-related Losses from those

3    inextricably incurred in connection with the other claims, Apple is giving Epic the benefit of every doubt:

4    Epic brought 10 claims, losing 9 and winning 1.  For the sake of simplicity, Apple is willing to assume

5    that each claim resulted in equal Losses—even though the vast majority of the litigation and trial related

6    to the antitrust issues implicated by 9 of Epic's claims and its defenses to the contractual counterclaim.

7    Irwin Decl. ¶¶ 20, 39.  Because Apple won 9 of 10 claims (90%), it is seeking only a conservative 90%

8    of its total Losses.  Accordingly, the total amount actually sought by Apple as indemnification is only

9    $73,404,326, plus any additional Losses from the ongoing litigation that will be reflected in Apple's

10   supplemental filings.

11          Apple's contractual Losses are not mitigated by Epic's stipulation to liability for breach of

12   contract, as made clear by Epic's own representations to this Court and the Ninth Circuit.  Any such

13   argument would be erroneous, contrary to Epic's own representations to this Court and the Ninth Circuit,

14   and futile.  Epic brought its antitrust claims in an effort to have the DPLA declared unlawful; and the

15   breach-of-contract stipulation itself was subject to Epic's continued maintenance of an illegality defense

16   that hinged on its antitrust theories.  *See* C.A.9 Dkt. No. 163, at 84 ("Apple's breach of contract

17   counterclaims rise and fall on the determination of Epic's Sherman Act claims").  So while the stipulation

18   may have streamlined Epic's defense to Apple's breach of contract counterclaim, it did not in any way

19   minimize Apple's defense to the underlying antitrust claims—and it was these antitrust claims that Epic

20   relied on as a defense to Apple's breach of contract counterclaim.  Epic acknowledged, and the Ninth

21   Circuit recognized, that contract liability turned on antitrust liability.  *See* C.A.9 Dkt. No. 163, at 84;

22   C.A.9 Dkt. No. 222, at 76–77 (noting that "[t]he parties agree that Epic's illegality defense rises and falls

23   with its Sherman Act claims," and rejecting Epic's argument that its claims justified its breach of

24   contract).  Apple incurred substantial fees, expenses, and costs to defend and enforce the contract, in the

25   district court and Ninth Circuit, and it prevailed.

26   
27   [1] Apple is also seeking only Losses arising out of or related to the lawsuit filed in this Court.  Epic has
     initiated actions against Apple in the United Kingdom and Australia that have resulted in additional
28   Losses within the meaning of the indemnification provision, and Apple reserves all rights to recover
     such Losses in the appropriate tribunal.

1    Again, the indemnification provision of the DPLA is clear:  Apple is entitled to "any and all" of

2    its expenses and costs.  And the expenses and costs that Apple incurred defending against Epic's antitrust

3    claims all "arise from" and "relate to" Epic's intentional breach of the DPLA.  Indeed, Epic's *sole*

4    defense against Apple's breach-of-contract claim was that the contract was unenforceable under the

5    antitrust laws.  *See* Dkt. No. 111, at 95:19–21 ("[Epic is] conceding that if there has been—if we're

6    wrong about the antitrust claim, there's been a breach of contract.  We're conceding that.").  As Epic has

7    consistently admitted, its liability for breach of the DPLA "rise[s] and [f]alls on the determination of

8    [its] Sherman Act claims."  C.A.9 Dkt. No. 163, at 84; C.A.9 Dkt. No. 222, at 77.  Thus, even if Epic

9    had brought no antitrust claims of its own, Apple's breach-of-contract claim would have implicated all

10   of the antitrust issues that were the principal focus of the parties' litigation.  Accordingly, all of Epic's

11   antitrust arguments were inextricably intertwined with the contract counterclaim and fall within the

12   DPLA's indemnification provision.

13   Moreover, Epic's antitrust claims were part and parcel of Epic's broader campaign, Project

14   Liberty.  For months, Epic planned Project Liberty in secret, employing teams of engineers, lawyers, and

15   P.R. consultants to attack Apple and undertake an expensive legal battle.  *See, e.g.*, Dkt. No. 779-1

16   ¶¶ 275, 283, 284.  After implementing and activating the hotfix in violation of the DPLA, Epic "rush[ed]

17   to the courthouse," asserting its antitrust claims as its *sole* shield against its willful and stipulated breach

18   of contract.  Rule 52 Order at 25, 171.  Epic even framed the "key question before this Court" as "whether

19   Apple . . . violates the antitrust laws when it uses its control of iOS to determine how apps are distributed

20   and in-app payments are processed," and "urge[d] this Court to find that Apple's requirements,"

21   governed by the DPLA and Schedule 2, "violate antitrust law" such that Epic could prove the agreement

22   illegal.  Dkt. No. 407, at 1.

23   Thus, at every step, Epic's antitrust claims inescapably "arise from" and certainly are "related

24   to" its underlying breach of contract.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383

25   (1992) ("The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing

26   or concern; to pertain; refer; to bring into association with or connection with.'" (quoting Black's Law

27   Dictionary 1158 (5th ed. 1979)); *see also Hot Rods, LLC*, 242 Cal. App. 4th at 1181–82 ("quite broad"

28

1    phrases reflect the intent of the contracting parties); *Xuereb*, 3 Cal. App. 4th at 1344; *Cheema v. L.S.*

2    *Trucking, Inc.*, 39 Cal. App. 5th 1142, 1153 (2019) (language stating clause applies to "all claims 'arising

3    from or [in] relation to' the Agreement" covers arguably noncontract claims) (citation omitted); *San*

4    *Francisco CDC LLC v. Webcor Constr. L.P.*, 62 Cal. App. 5th 266, 286–87 (2021).  Epic engineered its

5    breach and subsequent lawsuit to attack Apple's App Store and IAP policy.

6         Indeed, Epic's ultimate goal in bringing its antitrust claims was to have this Court declare

7    provisions of the DPLA "unlawful and unenforceable," and enjoin enforcement of those provisions.  Dkt.

8    No. 1, at 61; *see also id.* ¶¶ 188, 197, 211 (claiming that the challenged provisions of the DPLA are

9    unlawful); Rule 52 Order at 151 (Epic alleged that Apple "unlawfully maintained [a] monopoly by

10   prohibiting iOS app developers from distributing their apps through alternative channels"), 152 (Epic

11   alleged that Apple "unlawfully maintained [a] monopoly by requiring 'iOS app developers that sell in-

12   app content to exclusively use Apple's In-App Purchase.'").  Epic wanted all the same access to iOS

13   consumers without paying Apple's commission.  The Losses that Apple incurred in defending against

14   that attack on a core aspect of its business model are recoverable under the DPLA.

15        In short, Epic intentionally breached the DPLA knowing that the clear terms of its contract would

16   require it to indemnify Apple for the full scope of expenses in this litigation, and knowing that Apple

17   would enforce its contractual rights once it breached the contract.  *See* Rule 52 Order at 178–79.  Epic

18   has no basis to limit its indemnification obligations now, by trying to argue that only certain claims or

19   aspects of this case *should be* covered.  All of the claims and counterclaims in this litigation—at all

20   phases of the case—and all of Apple's litigation expenditures are covered "Losses" for which Epic must

21   now legally repay Apple and, by extension, its shareholders.

### B.   Apple Is Also Entitled To Its Losses Under California Law Applicable To Post-Judgment Motions For Attorneys' Fees And Costs

24        As set forth above, the plain terms of the DPLA require that Apple be indemnified for all its

25   Losses—i.e., any and all of its attorneys' fees and court costs, without limitation, incurred in this

26   litigation.  California law applicable to *post*-judgment motions for attorneys' fees and costs would lead

27   to the same result.

28        California Civil Code Section 1717 governs post-judgment attorneys' fees and costs when the

1  parties' indemnification provision provides for fees specifically arising from "action[s] on a contract."

2  Section 1717(a) states that:

3     In any action on a contract, where the contract specifically provides that
       attorney's fees and costs, which are incurred to enforce that contract, shall
4      be awarded either to one of the parties or to the prevailing party, then the
       party who is determined to be the party prevailing on the contract, whether
5      he or she is the party specified in the contract or not, shall be entitled to
       reasonable attorney's fees in addition to other costs.
6

7  Cal. Civ. Code § 1717(a).  An "action on a contract" within the meaning of Section 1717 is not limited

8  to contract-based claims; it also includes a lawsuit in which one of the parties—here, Epic—invokes

9  non-contract law to seek a declaration that the contract is void.  *See, e.g.*, *Eden Twp. Heathcare Dist. v.*

10 *Eden Med. Ctr.*, 220 Cal. App. 4th 418, 426 (2013) (an action to avoid contract enforcement is an "action

11 on a contract"); *Travelers Indem. Co. v. Lara*, 84 Cal. App. 5th 1119, 1138-39 (2022) ("[A] complaint

12 alleging a contract is void under Government Code 1090 is an action 'on a contract' for purposes of

13 section 1717 regardless of whether contract claims are alleged"); *id.* ("[I]t is difficult to think of an action

14 that is more likely to be characterized as an 'action on a contract' than one in which the party bringing

15 the action explicitly seeks to have the subject contract declared void and invalid in its entirety") (citation

16 omitted); *see also, e.g.*, *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 442–43 (9th Cir. 1997).  Moreover,

17 declaratory relief actions that "seek[ ] to establish the parties' rights under a contract [are] action[s] to

18 enforce [a] contract."  *Silver Creek, LLC v. BlackRock Realty Advisors, Inc.*, 173 Cal. App. 4th 1533,

19 1538 (2009).

20     Accordingly, Epic's entire lawsuit—including its antitrust claims—was an "action on the

21 contract," within the meaning of the statute.  And, again, Apple was clearly the prevailing party in Epic's

22 "action on the contract," having defeated all of Epic's antitrust claims at trial and on appeal.  Rule 52

23 Order at 1, 179; C.A.9 Dkt. No. 222, at 3–4; *see also* Cal. Civ. Code § 1717.5(a) ("The prevailing party

24 on the contract shall be the party who recovered a greater relief in the action on the contract."); *Hsu v.*

25 *Abbara*, 9 Cal. 4th 863, 876 (1995) ("[W]hen a defendant defeats recovery by the plaintiff on the only

26 contract claim in the action, the defendant is the party prevailing on the contract under section 1717 as a

27 matter of law").  Section 1717 thus compels the same result as the plain meaning of the DPLA—that

28 Apple is entitled to recover its fees under the DPLA's indemnification provision for that defense at both

the trial and appellate level.  *See Turner v. Schultz*, 175 Cal. App. 4th 974, 980 (2009) ("Where an attorney fee clause provides for an award of fees incurred in enforcing the contract, the prevailing party is entitled to fees for any action 'on the contract,' whether incurred offensively or defensively").  And, again, because of the DPLA's indemnification provision expanding the coverage beyond the statutory definition, Apple would be entitled under Section 1717, not just to "attorneys' fees and costs" under that statute, but "any and all expenses without limitation."  *See Arntz*, 47 Cal. App. 4th at 491–92 (California law does not "prevent sophisticated parties from freely choosing a broader standard authorizing recovery of reasonable litigation charges and expenses").

Last, as noted above, Apple has applied a 10% discount to account for the Court's decision on the UCL claim.  But, just as under the DPLA, those Losses are recoverable under California law because (1) Apple is the prevailing party in the case and (2) the attorneys' fees and court costs from Epic's sole successful claim in this case cannot be readily segregated from the other nine that it lost.  *See Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 126–30 (1979) ("Attorney fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed."); *see also Quevedo v. New Albertsons, Inc*, 2015 WL 10939716, at *2 (C.D. Cal. May 27, 2015) ("[W]here attorney fees are recoverable for one cause of action but not another, a court need not apportion fees between the causes of action if there is an issue common to the causes of action or the issues are so interrelated that it would be impossible to separate them"); *Fed–Mart Corp. v. Pell Enters., Inc*., 111 Cal. App. 3d 215, 227 (1980) (fees need not be apportioned where it would be "impracticable, if not impossible, to separate the multitude of conjoined activities into compensable or noncompensable time units").

## II.     Apple Has Substantiated The Amount Of Its Losses

### A.  Apple's Records Show The Fees, Expenses, And Costs Of This Litigation

In support of this motion for entry of judgment, Apple has submitted a declaration attesting to the total amount Apple actually paid directly to each individual law firm and other vendor that submitted invoices directly to Apple.  Rollins Decl. ¶¶ 32–39.  The total amount that Apple paid has been verified by Apple's billing records and its forensic accounting expert, Cornerstone.  Irwin Decl. ¶¶ 13–14.  The

1    vendors who submitted invoices (and the "pass-through" vendors on those invoices) are summarized in

2    a separate declaration from one of Apple's lead counsel.  Perry Decl. ¶¶ 8, 13, 16, 22, 27.

3        Cornerstone is a third-party economic and financial consulting firm with expertise in forensic

4    accounting and data analytics.  Irwin Decl. ¶¶ 1, 3.  Ms. Carlyn Irwin is a senior advisor with Cornerstone

5    and a Certified Public Accountant with substantial experience analyzing financial, economic, and

6    accounting issues, preparing valuations and damages claims, and conducting financial forensic analysis.

7    *Id*. ¶¶ 3–5.  Cornerstone conducted a rigorous data collection and review of Apple's bills and invoices,

8    as well as the underlying data, and Ms. Irwin confirms the total amount that Apple paid its vendors.  *Id*.

9    ¶¶ 13–14, 21–25.

10       During their extensive review process, Ms. Irwin and her team of nine Cornerstone experts

11   analyzed Apple's billing and invoice records from the *Epic* litigation.  Irwin Decl. ¶¶ 8, 10, 21–25.  Apple

12   provided Cornerstone with electronic files containing over 50,000 line items from more than 200

13   invoices.  *Id*. ¶ 22.  Ms. Irwin's team had conversations with Apple representatives, to gather all relevant

14   data from Apple and to understand Apple's data, as well as with the individual vendors to confirm the

15   relevant payment amounts and reconcile any discrepancies.  *Id*. ¶ 24.  Using programmatic methods, Ms.

16   Irwin and her team processed the data and identified each vendor paid by Apple, aggregating the fees

17   and expenses into totals by vendor and by expense category (i.e., attorneys' fees, document expenses,

18   expert witnesses, etc.).  *Id*. ¶¶ 30–37.

19       The total amount Apple paid those vendors also closely matches the total cost for the work

20   actually performed on this matter, at the rates negotiated and agreed to by each vendor.  Irwin Decl.

21   ¶¶ 13–14; Rollins Decl. ¶¶ 22–27.  As detailed in its declaration, Apple has extensive billing and provider

22   policies, as well as a rigorous, multi-step payment review process to ensure that its vendors comply with

23   the policies and submit accurate and timely invoices.  Rollins Decl. ¶¶ 6–21.  Apple's policies include

24   meticulous instructions, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28

██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ This unusually rigorous billing process demonstrates that Apple's calculated Losses are highly accurate, particularly for a matter of this size and with this many timekeepers and billing entries.

Still, as noted above, Apple is seeking less than its calculated Losses—i.e., actual payments made to vendors.  As part of the review process, Apple and Cornerstone have coordinated with Apple's vendors to understand and/or reconcile any discrepancies between the amount that Apple actually paid to vendors and each vendor's assessment of the work performed for the domestic *Epic* litigation, and have made certain adjustments to avoid any dispute as to whether the amounts sought are covered by the DPLA's indemnification clause.  Irwin Decl. ¶¶ 16, 31, 36; Rollins Decl. ¶ 30.  Those downward adjustments ensure that the total amount sought by this motion is an even more conservative calculation of Losses, ensuring that every dollar falls comfortably within the DPLA's indemnification provision.

| Apple's Actual Payments | Adjusted Total | Adjusted Total Minus 10% |
|---|---|---|
| $82,971,401 | $81,560,362 | $73,404,326 |

The two declarations submitted by Mr. Rollins and Ms. Irwin thus confirm that the total amount

1    sought in this motion is accurate and that it represents the total Losses that Apple incurred.  Apple's

2    invoice payment process is extensive and rigorous, and Cornerstone's review of Apple's billing and

3    payments during the *Epic* litigation was likewise painstaking.  The fact that Apple and Cornerstone

4    worked with vendors to reconcile any remaining discrepancies in billing data and payments, and that

5    Apple has made only downward adjustments from Apple's total payments to vendors, further ensures

6    that Apple is seeking indemnification only for DPLA-defined Losses.[2]

7        **B.  The Total Amount Is "Reasonable" Under California Law**

8        Because the DPLA does not include a "reasonableness" limitation in its definition of "Losses,"

9    the Court need not determine whether the total expenses in this matter are reasonable under California

10   law.  Nonetheless, Apple's Losses are reasonable.  This Court can make that finding on Apple's motion

11   and supporting evidence:  "It is well established that the determination of what constitutes reasonable

12   attorney fees is committed to the discretion of the trial court."  *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084,

13   1096 (2000) (citations omitted); *see also Ketchum v. Moses*, 24 Cal. 4th 1122, 1133 (2001) (noting that

14   "fee awards should be fully compensatory").

15       *First*, Apple's request is reasonable because this case involved Apple's DPLA and core aspects

16   of its business model.  Accordingly, Apple put forth a vigorous defense, and one that was commensurate

17   with Epic's significant investment in developing and bringing its long-premeditated lawsuit.  As this

18   Court noted, "[t]hese are billion and trillion dollar companies" involved in a business dispute that

19   presented a distinct threat to Apple's entire business model.  *See* Rule 52 Order at 172.  Epic thought

20   this litigation was worth forgoing $350 million in annual revenue from *Fortnite* on iOS.  *Id.* at 14; *see*

21   *also id.* at 3 (*Fortnite* "generated an immensely profitable revenue stream for Epic Games").  The threat

22   to Apple's business model—particularly from Epic's effort to prevent Apple from collecting any

23   commission (*see id.* at 92)—was significant.  Epic's lawsuit threatened a significant source of Apple's

24   revenue, as this Court recognized.  *See id.* at 1, 73, 125.  Accordingly, Apple retained law firms, experts,

25   and vendors whose credentials and resources were and are proportional to the task.

26   _____

27   [2] If the Court deems it necessary, Apple can supplement the evidence submitted with this motion with
     additional data or declarations, which will further confirm the amounts stated herein.  Apple also reserves

28   the right to supplement its submission to establish the amount of additional Losses incurred after October
     31, 2023.

1    *Second*, "the items on a verified cost bill are prima facie evidence the costs, expenses and services

2    listed were necessarily incurred." *Hadley v. Krepel*, 167 Cal. App. 3d 677, 682 (1986). "[T]he verified

3    time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear

4    indication the records are erroneous." *Horsford v. Bd. of Trustees of Cal. State Univ.*, 132 Cal. App. 4th

5    359, 396 (2005). Courts "defer to the winning lawyer's professional judgment as to how much time he

6    was required to spend on the case." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

7    As noted above, Apple and Cornerstone have verified the amount spent based on its well-kept billing

8    and invoice records. Rollins Decl. ¶¶ 33–38; Irwin Decl. ¶¶ 13–14, 31–37.

9        *Third*, where the fees and costs incurred have been reviewed and monitored by a sophisticated

10   commercial party who is actually paying the bills, there is a strong presumption that they were reasonable

11   and appropriate. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 774 (7th Cir. 2010); *see*

12   *also Stonebrae, L.P. v. Toll Bros., Inc.*, 2011 WL 1334444, at *6 (N.D. Cal. Apr. 7, 2011), *aff'd* 521 Fed.

13   App'x 592 (9th Cir. 2013); *Calvo Fisher & Jacob LLP v. Lujan*, 234 Cal. App. 4th 608, 617 (2015)

14   (specifically noting that a client's review of bills and efforts to minimize fees and maximize

15   effectiveness). Here, Apple is a sophisticated client and purchaser of legal services, and it negotiated

16   the rates its counsel and vendors charged. Rollins Decl. ¶¶ 5–6, 25. Apple's in-house counsel were

17   closely involved in the litigation, closely supervised Apple's outside law firms and vendors, and

18   monitored and approved their activities throughout the course of the case. *Id*. ¶¶ 17–21, 26 (describing

19   Apple's multi-step review process, adhered to during the *Epic* litigation); *see generally* Perry Decl.

20   (describing the broad scope of work performed by each vendor).

21       *Fourth*, the strong presumption that the amount is reasonable is "particularly forceful where, as

22   here, the fees were billed to and *actually paid by the [litigant]* during the course of the litigation, the

23   relationship between counsel and the [client] was a valid business relationship, and the [client]

24   exercise[d] business judgment in retaining and paying counsel." *Stonebrae*, 2011 WL 1334444, at *6

25   (emphasis added); *see also Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (a fee

26   award should compensate "every item of service which, at the time rendered, would have been

27   undertaken by a reasonable and prudent lawyer to advance or protect his client's interest" (citation

28

1    omitted)).  Here, Apple ultimately paid its bills, reflecting its satisfaction with its firms' and vendors'

2    work product.  Rollins Decl. ¶¶ 22, 25–27; Irwin Decl. ¶¶ 13–14, 31–37.  And, where necessary, Apple

3    revised bills and wrote-off costs, further establishing the reasonableness of the total amounts that it

4    ultimately paid.  Rollins Decl. ¶ 26; Irwin Decl. ¶¶ 15–16, 35.

5        Apple's sophistication, its close involvement in the litigation and monitoring of its vendors, and

6    its payment of bills in this high-stakes case all constitute powerful—if not dispositive—evidence of

7    reasonableness.  But Apple has also submitted the declaration of Richard M. Pearl, an expert on

8    attorneys' fees, who also found that Apple's indemnification request is reasonable.  Pearl Decl. ¶¶ 30,

9    58, 59, 78, 80.

10       Mr. Pearl is one of the leading experts on attorneys' fees and costs in California.  He has decades

11   of experience litigating, researching, and writing about attorneys' fees, and has written extensively on

12   the topic, including authoring treatises and manuals.  Pearl Decl. ¶¶ 4–8.  Several courts have referred to

13   one of his treatises as "[t]he leading California attorney fee treatise."  *Calvo Godwin & Jacob LLP*, 234

14   Cal. App. 4th at 621; *see also Int'l Billing Servs., Inc. v. Emigh*, 84 Cal. App. 4th 1175, 1193 (2000)

15   ("the leading treatise"); *Stratton v. Beck*, 30 Cal. App. 5th 901, 911 (2019) ("a leading treatise"); *Orozco*

16   *v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 409 (2018) ("a leading treatise on California attorney's

17   fees").  Mr. Pearl has appeared as the counsel of record in over 150 attorneys' fee applications in state

18   and federal courts, and dozens of courts have cited his testimony favorably.  Pearl Decl. ¶ 9.  He has

19   briefed and argued five successful attorneys' fees appeals in the California Supreme Court.  *Id.*

20       In reaching his conclusion that Apple's indemnification request here is reasonable, Mr. Pearl

21   conducted an extensive review of Apple's billing and payment policies and data from Apple's vendors

22   regarding the rates charged and scope of work performed.  Pearl Decl. ¶¶ 3, 24–27.  That review led him

23   to conclude that Apple paid reasonable rates for the legal services performed and that the hours billed to

24   the matter were reasonable.

25       To begin, Mr. Pearl found that Apple paid reasonable rates for its legal services.  Mr. Pearl

26   examined the case record, Apple's policies, and the billing attorney's qualifications, background, and

27   experience, and reviewed case documents and conferred with Apple's in-house counsel.  Pearl Decl.

28

¶¶ 3, 24–27.  Based on his review, he determined that Apple is a sophisticated consumer of legal services with knowledge of the legal marketplace, and that the rates that it pays are reasonable.  *Id*. ¶¶ 27, 31–35, 38, 40, 47.

As he explained, moreover, California courts consider whether the requested attorneys' fees are "within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work."  *Children's Hospital & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 746 (2002).  In other words, "the reasonable market value of the attorney's services is the measure of a reasonable hourly rate."  *Nemecek & Cole v. Horn*, 208 Cal. App. 4th 641, 651 (2012) (citation omitted).  Mr. Pearl found that counsel's rates were consistent with and often *below* those charged by comparable firms for comparable work, and in line with rates found reasonable by courts around the country.  Pearl Decl. ¶¶ 36–58.  ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████.

Mr. Pearl also concluded that the amount of hours for which Apple paid its law firms was reasonable.  Mr. Pearl closely examined the case record and obtained firsthand knowledge of Apple's billing practices from its in-house counsel.  Pearl Decl. ¶¶ 3, 61.  As he explained, Apple closely monitored the attorneys' work and scrutinized their invoices to ensure the bills did not include unreasonable or extraneous hours, and to ensure that each bill complied with Apple's service policies.  *Id*. ¶ 61–62.  Apple's policies impose high standards of quality *and* efficiency on its vendors, and ██ ███████████████████████████████████████████████████████████████ ██████████████████.  *Id*. ¶¶ 61–62, 70, 75–77.  Further, Mr. Pearl examined the stakes of the case, the complexity of the legal issues, the quality of the work, the intensity of the litigation, the major work streams, and the results that Apple's counsel and vendors achieved.  This holistic review of the case led him to conclude that Apple paid for a reasonable number of hours (at the rigorously-negotiated rates) in this case.  *Id*. ¶ 59; *see generally* Perry Decl. (describing the roles and work performed by Apple's vendors).

1    Mr. Pearl also found that Apple's other "expenses" were reasonable.  Based on his review of

2  various factors (i.e., the complexity of the case, the stakes, and the results), Mr. Pearl concluded that

3  Apple's outlays were reasonable.  Pearl Decl. ¶ 80.  For one, ██████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  Further, Apple has negotiated rates with its vendors, and closely monitored and scrutinized costs, just as

8  it does with its law firms.  Pearl Decl. ¶¶ 80–84.

9    Finally, although it would be reasonable for Apple to seek the total amount of its Losses in this

10  matter, it has provided a 10% discount in recognition of Epic's win on one out of ten of its claims.  This

11  10% overall reduction is extremely generous, given the undisputed fact that the UCL claim did not

12  constitute nearly 10% of the litigation, as this Court recognized.  *See* Rule 52 Order at 163.  Using seven

13  relevant search terms, Ms. Irwin and her team searched the 50,000+ invoices, finding that line items with

14  those UCL-related search terms represented only $275,030 or approximately 0.33% of the total expenses

15  in the billing data—i.e., substantially less than 10% of the total amount Apple paid in connection with

16  the *Epic* litigation.  Irwin Decl. ¶¶ 20, 39; Pearl Decl. ¶ 78–79.

17                                               ***

18    Just as Epic has no basis to contest the scope or the total amount of Losses—after it willfully

19  breached its contract with a clear and broad indemnification provision—Epic also has no grounds to

20  dispute reasonableness at this stage.  And certainly Epic could not do so without presenting evidence of

21  the amounts that it chose to spend on the litigation.  Apple reasonably defended against Epic's long-

22  planned, expensive, and multifaceted attack against Apple's business model.  To do so, Apple needed to

23  retain sophisticated law firms, world-class experts, and vendors to match those hired by Epic.  Apple

24  negotiated, monitored, and ultimately paid its bills as they became due.  California law requires Apple

25  to be fully compensated for those reasonable expenses.

26                                   **CONCLUSION**

27    For the foregoing reasons, Apple respectfully requests that the Court award Apple $73,404,326

28

1  in Losses under the DPLA, plus all additional Losses that Apple incurs during the ongoing litigation,

2  which will be reflected in supplemental filings.

3

4  Dated: January 16, 2023                          Respectfully submitted,

5                                                    By:   */s/ Mark A. Perry*
                                                    WEIL, GOTSHAL & MANGES LLP
6
                                                    Mark A. Perry
7
                                                    Attorney for Apple Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28