GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
MICHAEL J. ZAKEN (*pro hac vice*)
mzaken@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

PAUL J. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

*Attorneys for Plaintiff and Counter-defendant*
*Epic Games, Inc.*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                    Plaintiff, Counter-defendant,<br><br>          v.<br><br>APPLE INC.,<br><br>                    Defendant, Counterclaimant. | Case No. 4:20-CV-05640-YGR-TSH<br><br>**PLAINTIFF EPIC GAMES, INC.'S NOTICE OF MOTION AND MOTION TO ENFORCE INJUNCTION**<br><br>Date:  April 30, 2024 (noticed date)<br><br>Courtroom:  1, 4th Floor<br><br>Judge:  Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on April 30, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, before the Honorable Yvonne Gonzalez Rogers, Plaintiff and Counter-Defendant Epic Games, Inc. will move this Court for an Order Granting Epic's Motion to Enforce Injunction.

This Motion is made on the grounds that Defendant and Counterclaimant Apple Inc. is in violation of this Court's order permanently restraining and enjoining it from "prohibiting developers from . . . including in their apps and their metadata buttons, external links, or other calls to action that direct customers to alternative purchasing methods, in addition to In-App Purchase".  (Dkt. 813.)

This motion is based upon the pleadings in this action, this Notice of Motion, the Memorandum of Points and Authorities filed herewith, the Declaration of Benjamin Simon ("Simon Decl."), the Declaration of Christian Bailey Owens ("Owens Decl."), the Declaration of Yonatan Even ("Even Decl.") along with its accompanying exhibits, all matters with respect to which this Court may take judicial notice, and such oral and documentary evidence as may be presented to the Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND...............................................................................................4

      A.     The Court's Rule 52 Order and UCL Injunction ......................................4

      B.     Subsequent Procedural History......................................................................5

      C.     Apple's "Notice of Compliance" ..................................................................5

      D.     Industry and Third-Party Reactions to the Notice of Compliance........................11

LEGAL STANDARDS .........................................................................................................13

ARGUMENT .........................................................................................................................14

I.     Apple's Updated Policies with Respect to External Links Violate the Injunction............14

II.    Apple's General Prohibition on Buttons and Calls to Action Other than External Links Violates the Injunction........................................................................................20

III.   Apple's Updated Guideline 3.1.3 Impermissibly Prohibits Steering................................21

CONCLUSION......................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT Security Servs., Inc. v. Security One Int'l, Inc.*,
Case No. 11-cv-05149-YGR (N.D. Cal.), ECF No. 185 ........................................................ 14

*Alter Domus, LLC v. Winget*,
2023 WL 4865590 (E.D. Mich. July 31, 2023) ................................................................ 17

*Buono v. Norton*,
364 F. Supp. 2d 1175 (C.D. Cal. 2005) ........................................................................... 14

*C.F.T.C. v. Saffron*,
2020 WL 495557 (D. Nev. Jan. 30, 2020) ....................................................................... 22

*Craters & Freighters v. Daisychain Enters.*,
2014 WL 2153924 (N.D. Cal. May 22, 2014) ................................................................... 13

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) ............................................................................................. 13

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ............................................................................................... 5

*F.V. v. Jeppesen*,
466 F. Supp. 3d 1110 (D. Idaho 2020) ............................................................................ 17

*Facebook, Inc. v. Power Ventures, Inc.*,
2017 WL 3394754 (N.D. Cal. Aug. 8, 2017) .................................................................... 13

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983) ............................................................................................ 13

*Gen. Signal Corp. v. Donallco, Inc.*,
787 F.2d 1376 (9th Cir. 1986) .......................................................................................... 14

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014) ............................................................................... 14, 17, 18

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) .......................................................................................................... 22

*John B. Stetson Co. v. Stephen L. Stetson Co.*,
128 F.2d 981 (2d Cir. 1942) ............................................................................................. 17

*Mendoza v. Hyundai Motor Co., Ltd.*,
2024 WL 189014 (N.D. Cal. Jan. 17, 2024) ..................................................................... 22

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
  2017 WL 3021024 (N.D. Cal. July 17, 2017) .......................................................................... 21

*OmniGen Rsch., LLC v. Yongqiang Wang*,
  2017 WL 5505041 (D. Or. Nov. 16, 2017) .............................................................................. 22

*S.E.C. v. Fehn*,
  97 F.3d 1276 (9th Cir. 1996) .................................................................................................. 22

*United States v. Bright*,
  596 F.3d 683 (9th Cir. 2010) .................................................................................................. 13

*United States v. Rescino*,
  2021 WL 4685385 (N.D. Cal. Oct. 7, 2021) ........................................................................... 22

*Zest Anchors, LLC v. Geryon Ventures, LLC*,
  2022 WL 16838806 (S.D. Cal. Nov. 9, 2022) ......................................................................... 18

1

## **PRELIMINARY STATEMENT**

2        Apple is in blatant violation of this Court's injunction.  Its new App Store policies

3  continue to impose prohibitions on developers that this Court found unlawful and enjoined.

4  Moreover, Apple's new policies introduce new restrictions and burdens that frustrate and

5  effectively nullify the relief the Court ordered.

6        In its September 21, 2021 order finding that Apple violated the California Unfair

7  Competition Law (the "UCL"), this Court found that Apple insulated itself from competition by

8  preventing developers from "communicat[ing] lower prices on other platforms either within iOS

9  or to users obtained from the iOS platform" and that Apple's conduct "'threaten[ed] an incipient

10 violation of an antitrust law' by preventing informed choice among users of the iOS platform".

11 (Dkt. 812 at 163-64 (the "Rule 52 Order").)  The Court reasoned that "[i]n the context of

12 technology markets, the open flow of information becomes even more critical . . . [because]

13 information costs may create 'lock-in' for platforms", and that "the ability of developers to

14 provide cross-platform information is crucial" to facilitate competition.  (*Id.* at 164.)  As a result

15 of Apple's anti-steering provisions and other restrictive policies, Apple had "excessive operating

16 margins under any normative measure", "the commission rate driving the excessive margins has

17 not been justified" and "the costs to developers are higher because competition is not driving the

18 commission rate".  (*Id.* at 163.)  To remedy Apple's violations of the UCL, the Court enjoined

19 Apple from prohibiting developers from including in their iOS apps "buttons, external links, or

20 other calls to action" that direct customers to alternative purchasing methods outside of the app.

21 (Dkt. 813 ¶ 1 (the "Injunction").)

22        Compliance with the Injunction should have been simple; all Apple needed to do

23 was to remove the illegal anti-steering language from its App Store Review Guidelines (the

24 "Guidelines") so that developers could provide truthful information to users and enable them to

25 act on it.  But Apple chose a markedly different path.  On January 16, 2024—after its challenges

26 to the Injunction were exhausted—Apple filed a notice contending that it had updated its policies

27 to comply with this Court's mandate.  (Dkt. 871 (the "Notice of Compliance" or "Notice").)  In

28 fact, Apple's Notice is one of *non*-compliance.  As explained in the Notice, Apple replaced its

blanket prohibition on steering with an elaborate new scheme that is guaranteed to continue extracting excessive commissions from developers and prevent developers from "communicat[ing] lower prices on other platforms". (Dkt. 812 at 163-64.) Apple's new scheme so pervasively taxes, regulates, restricts and burdens in-app links directing users to alternative purchasing mechanisms on a developer's website ("External Links" or "Links") as to make them entirely useless. Moreover, Apple continues to completely prohibit the use of "buttons . . . or other calls to action" in direct contravention of this Court's Injunction. (*See* Dkt. 813 ¶ 1.)

Apple violates the Injunction in three ways. *First*, with respect to External Links, Apple has imposed a new fee and enacted a slew of new rules that work together to make the links commercially unusable. This new fee and accompanying web of restrictions subvert the purpose of the Injunction, allowing Apple to continue extracting its excessive commissions and making it effectively impossible for a developer to inform users about, and direct users toward, an alternative platform for making a purchase. Apple now requires a developer to:

- pay Apple a new fee of 27% on any purchases users make **outside** the app up to one week after clicking a Link;

- apply for and receive Apple's permission ("Link Entitlement") for the inclusion of any Link;

- abide by Apple's mandates concerning the language, look and location of any Link—Links may not be prominently displayed, may not pop up and may not be placed within any purchase flow (*i.e.*, in any context relevant to steering users to alternative purchasing mechanisms);

- present users with a "scare screen" intended to deter users from making purchases outside the app; and

- link users to a single static URL (*i.e.*, to a general landing page where users are neither logged in to their accounts nor presented with any specific product they were seeking to purchase).

Notably, Apple's new fee on purchases made outside the app, in and of itself, is enough to frustrate the very purpose of the Injunction; if Apple is allowed to tax out-of-app purchases, those purchases could never constrain Apple's pricing of IAP, and developers and consumers would not have any reason to use these alternative transacting options. The fact that, on top of this new fee, Apple has designed External Links to be so riddled with additional economic disincentives, technical requirements and user frictions further negates any incentives

developers could have to use such Links, as well as the benefits to consumers the Court sought to achieve by allowing developers to inform users of competitive options.  These policies collectively operate as a *de facto* prohibition on External Links, and violate the Injunction.

*Second*, Apple continues to categorically prohibit any steering using "buttons" or "other calls to action".  Specifically, Apple does not allow External Links that resemble a "button" in any way.  And developers are likewise prohibited from including in their apps simple statements—without any attendant link—stating truthfully that items or subscriptions may be purchased directly on the web at a lower price.  Apple's ban on "buttons" or "other calls to action" is a brazen violation of the Court's Injunction, which explicitly requires Apple to allow developers to use "*buttons*, external links, *or other calls to action*" that direct customers to purchasing mechanisms other than IAP.  (Dkt. 813 ¶ 1 (emphases added).)

*Third*, Apple's Guideline 3.1.3 still prohibits certain apps, including all multiplatform services (*i.e.*, apps that operate across multiple platforms and allow users to access the same content across these platforms, including popular games such as Minecraft), from "within the app, encourag[ing] users to use a purchasing method other than in-app purchase". (Dkt. 874 Ex. 1 § 3.1.3.)  This language expressly contravenes the Injunction by prohibiting any steering to alternative purchasing methods.  Apple has now stated in a separate website post that multiplatform services may obtain an External Link entitlement notwithstanding the express prohibition in Guideline 3.1.3. But Apple has refused repeated requests from Epic to amend the Guidelines themselves to remove the general prohibition on steering or to otherwise clarify that apps covered by Guideline 3.1.3 can still qualify for External Links.

With these new policies, Apple continues to charge unjustified fees and intentionally prevent the "open flow of information".  Apple's goal is clear:  to prevent purchasing alternatives from constraining the supracompetitive fees it collects on purchases of digital goods and services.  Apple's so-called compliance is a sham.  Epic therefore seeks an order (i) finding Apple in civil contempt, (ii) requiring Apple to promptly bring its policies into compliance with the Injunction and (iii) requiring Apple to remove all anti-steering provisions in Guideline 3.1.3.

# FACTUAL BACKGROUND

## A.    The Court's Rule 52 Order and UCL Injunction

Epic brought suit under both federal and state competition statutes, including the UCL, seeking an injunction against Apple.  (Dkt. 1.)  Epic's UCL claim challenged (among other things) Apple's anti-steering provisions, which stifled the ability of iOS app developers to communicate to their users the existence of alternative—and potentially cheaper—purchasing options outside of an app.  (*Id.* ¶¶ 130, 131; *see also* Dkt. 407 ¶ 27.)

On September 10, 2021, this Court found that "Apple's anti-steering provisions hide critical information from consumers and illegally stifle consumer choice".  (Dkt. 812 at 2.) The Court reasoned that the free flow of price information is a necessary competitive constraint on what it characterized as Apple's "excessive operating margins under any normative measure" and that "[t]he costs to developer[s] are higher because competition is not driving the commission rate".  (*Id.* at 163.)  The Court noted that "where consumers have the benefit of price advertising, retail prices often are dramatically lower than they would be without advertising".  (*Id.* at 164 (quotation omitted).)  However, Apple's anti-steering rules "enforced silence to control information and actively impede users from obtaining the knowledge to obtain digital goods on other platforms".  (*Id.* at 165.)

Accordingly, this Court issued an injunction striking Apple's Guideline prohibiting the inclusion within iOS apps of "buttons, external links or other calls to action that direct customers to purchasing mechanisms other than in-app purchase".[1]  (*Id.* at 163-64.)  In issuing the Injunction, the Court stated that its intent was to further the "public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace".  (*Id.* at 166.)

---

[1] Specifically, the Court enjoined Apple from "prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."  (Dkt. 813 ¶ 1.)

**B.    Subsequent Procedural History**

Apple moved this Court to stay the Injunction pending its appeal to the Ninth Circuit, which this Court denied.  (Dkt. 830.)  In its order denying the stay, this Court emphasized that "it should be [consumers'] choice" whether to use IAP or an external alternative, because "[c]onsumer information, transparency and consumer choice is in the interest of the public".  (*Id.* at 4.)  The Court further clarified that, while it did not limit the fee that Apple charges for IAP and did not enjoin Apple from requiring IAP to be used to process in-app purchases of digital goods and services, IAP had to "compete on pricing" with external alternatives.  (*Id.*)

On December 8, 2021, the Ninth Circuit granted Apple's motion to stay the Injunction pending appeal.  (C.A.9. No. 21-16695, Dkt. 14 at 2.)  On April 24, 2023, the Ninth Circuit affirmed the Injunction in all respects.  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002-03 (9th Cir. 2023).  Apple then filed a petition for writ of certiorari with the U.S. Supreme Court on September 23, 2023.  (Petition for Writ of Certiorari, *Apple Inc. v. Epic Games, Inc.*, No. 23-344 (Sept. 23, 2023).)  That petition was denied on January 16, 2024.  (*See* Dkt. 871-4 Ex. 20.)  The Injunction then came into effect.  (*Id.* Exs. 8, 19.)

**C.    Apple's "Notice of Compliance"**

On January 16, 2024, following the Supreme Court's denial of Apple's petition for a writ of certiorari, Apple filed a purported "Notice of Compliance" with this Court.  (Dkt. 871.)  The Notice of Compliance introduced updated Guidelines (*see* Dkt. 874 Ex. 1), a new StoreKit External Purchase Link Entitlement Addendum for US Apps (*see* Dkt. 874 Ex. 2 (the "Addendum")) and a printout of the Apple website's StoreKit External Purchase Link Entitlement (US) Support Page (*see* Dkt. 874 Ex. 3), which set forth Apple's updated policies regarding External Links.  These policies make clear that Apple continues to engage in enjoined conduct.

**1.    Apple's New Policies Regarding External Links**

The new policies nominally permit External Links, but only under a strict set of terms and conditions that make them unusable.  These include:

***New Commission.***  Developers are required to pay Apple a new percentage-based fee of up to 27% on all transactions for digital goods and services that take place *outside the app*

within seven days after the user clicks an External Link ("Linked Purchases").[2]  (Dkt. 871 at 12.)
This new fee on purchases made outside the app is set at a rate that is 3% lower than the
corresponding fee that Apple would charge on in-app sales utilizing Apple's In-App Purchase—
27% for purchases on apps not participating in any special programs (as compared to 30% for in-
app purchases), and 12% for subscription payments in the second year of the subscription or for
developers participating in the Small Business Program (as compared to 15% for in-app
purchases).  (*Id.* at 12-13.)  This is essentially the same fee that this Court found Apple has never
justified and is not driven by competition, only now it is being charged—for the first time—on
purchases that take place *outside* of an iOS app.  The amount of this fee removes the economic
incentive to incorporate an External Link into an app, because developers will have to pay more
than 3% just to process Linked Purchases.  (*See, e.g.*, Simon Decl. ¶ 32; Owens Decl. ¶¶ 9, 18, 26,
32, 33.)  As a result, developers would not be able to offer consumers lower prices on Linked
Purchases than they offer on in-app purchases processed through IAP.  (Simon Decl. ¶ 32.)

> ***Entitlement Requirement.***  Under Section 3.1.1(a) of the Guidelines, a developer
cannot include an External Link within its app unless it applies for, and is granted, a Link
Entitlement.  (*See* Dkt. 874 Ex. 1 § 3.1.1(a).)  Applying for the Link Entitlement is a separate
application process that a developer must complete in addition to the ordinary process for
submitting an app for review by Apple.  (*See* Dkt. 874 Ex. 3.)  Apple reserves the right, in its
"sole discretion", to deny developers' requests for Link Entitlements.  (Dkt. 874 Ex. 2 § 2.3.)

> ***Link Placement, Messaging and Appearance.***  Apple dictates every aspect of the
placement, messaging and appearance of External Links.  Specifically:

---

[2] Note that Linked Purchases need not be causally linked to the use of an External Link.
Instead, Apple collects its new 27% fee on any purchase made on the developer's website within
seven days of an External Link being clicked, even if such purchase was completed days later, in
a different browser window than was opened by the External Link, or even on a different device.
(*See* Dkt. 874 Ex. 2 § 1 (defining "Transaction" as *any* "sale of digital goods or services . . . on a
website You own or have responsibility for ('Your website'), provided that the sale was initiated
within seven (7) calendar days after a link out . . . from your [app]"); *id.* § 5.1 (stating that "Apple
shall be entitled to a commission equal to [up to] twenty-seven percent (27%) of all Transaction
proceeds made on Your website").)

- Placement:  Developers may **<u>not</u>** place a Link anywhere near a purchase flow, where steering is most relevant.  (*See* Dkt. 874 Ex. 2 § 3.3.)

- Messaging:  Developers may only convey to users one of the following five Apple-curated messages:[3]

---

**Templates**

Use the templates that best fits your use case. Aside from the price, percentage off, and your website URL, the language used in your app must match the template language. Don't modify or use the template in a manner that misleads customers.

Purchase template:
Purchase from the website at www.example.com ⧉

Special offer template:
For special offers, go to www.example.com ⧉
For a special offer, go to www.example.com ⧉

Lower price template:
Lower prices offered on www.example.com ⧉
Lower price offered on www.example.com ⧉

Percent off template:
To get XX% off, go to www.example.com ⧉

Specific price template:
Buy for $X.XX at www.example.com ⧉

---

- Appearance:  Developers may only include an External Link that follows Apple's "Plain Button Style"—**which is not a button at all**—as depicted below (permitted style in green enclosure):[4]



---

[3] Dkt. 874 Ex. 3 (Apple-permitted "Templates").  While Apple describes these templates as having seven different messages, there are in reality only five templates, two of which have alternate wording for the singular and the plural, depending on how many offers or products are available on the developer's website.

[4] *Buttons*, Apple Developer Blog (last visited Mar. 12, 2023), https://developer.apple.com/design/human-interface-guidelines/buttons#Platform-considerations (Apple's "button styles").

1   Collectively, these requirements prevent developers from designing their External Links in a way

2   that is effective in directing customers to cheaper, convenient purchasing alternatives.  (Simon

3   Decl. ¶¶ 28, 29.)

4            *Scare Screen.*  Developers are required to display a scare screen to every user that

5   clicks on an External Link, warning the user against the use of non-Apple purchasing

6   alternatives:[5]



20   This scare screen is intended to dissuade users from completing purchases on the web, and is

21   required even if the alternative payment processor on the linked website is just as secure, or even

22   more secure, than Apple's IAP.  (Simon Decl. ¶ 30; Owens Decl. ¶ 31.)

23            *URL Restrictions.*  External Links must link to a single website URL, with no

24   query parameters.  This means that the Link may not (a) transfer the user's login credentials or

25   (b) land the user on the page of the product they were browsing in the app.  Users who follow the

26   Link must navigate anew on the web page to find the purchase they want to make, and may also

27

28       [5] Dkt. 874 Ex. 3 (Apple's "In-app system disclosure sheet").

1  need to sign in again to make the purchase.  This will result in a frustrating experience that users

2  may abandon before completing a purchase (Owens Decl. ¶ 29) or may lead to users purchasing

3  products for the wrong accounts (Simon Decl. ¶ 31).  Furthermore, developers can only list a

4  single website URL, and that URL cannot be changed without resubmitting the External Link to

5  Apple.  (Dkt. 874 Ex. 2 § 3.3; Dkt. 874 Ex. 3.)  Accordingly, developers cannot engage in the

6  hallmarks of price competition—promotions, frequent changes to prices, etc.

### 2.      Apple's Continued Prohibition on Calls to Action Other than External Links

Apple's Notice of Compliance states that Apple now permits steering through

"buttons".  (Dkt. 871 at 1, 4, 5, 13.)  But as noted above and as depicted in the above figure, the

new Guidelines do not actually allow buttons, such as the buttons that fitness app developer

Down Dog previously included—with great success—in the Android versions of its apps.  (*See*

Simon Decl. ¶¶ 15-27.)

Further, Apple continues to prohibit developers from simply telling users, without

a Link, that other purchasing options are available.  In other words, simple truthful statements like

"Items available on our website at a discount" or "Go to [www.website.com] for lower prices"

remain prohibited.  The Notice states that Apple now permits "links *__with__* calls to action".

(Dkt. 871 at 1, 4, 5, 13 (emphasis added).)  But the Court's Injunction enjoins Apple from

prohibiting steering through "links[] *__or__ other calls to action*".  (Dkt. 813 ¶ 1 (emphasis added).)

As Apple has confirmed in meet and confers with Epic, Apple still does not allow any "other calls

to action" that are untethered to an External Link.  (Even Decl. Ex. 3 at 3.)

### 3.      Apple's Continued Prohibition on Encouraging Users To Use Purchasing Methods Other than IAP

New Guideline 3.1.3 still prohibits developers of certain types of apps from, within

the app, "encourag[ing] users to use a purchasing method other than in-app purchase".[6]  (Dkt. 874

---

[6] This prohibition in Guideline 3.1.3 covers purchase methods for Multiplatform Services, Enterprise Services, Person-to-Person Services, Goods and Services Outside of the App, Free Stand-alone Apps and Advertising Management Apps.  The Guideline recognizes a single exception, stating that "encouragement" of the use of other purchasing alternatives is allowed "as

Ex. 1 at 21.)  This language suggests that the apps covered in Guideline 3.1.3 are prohibited from using an External Link because doing so would "encourage" users to use a purchasing method other than IAP.  Among the apps covered by Guideline 3.1.3 are "Multiplatform Services", broadly defined by Apple as all "[a]pps that operate across multiple platforms [and] allow users to access content, subscriptions or features they have acquired . . . on other platforms or [the developer's] website, **including consumable items in multi-platform games**".  (Dkt. 874 Ex. 1 § 3.1.3(b) (emphasis added).)  This definition covers many of the most popular game apps on iOS, such as Minecraft, Candy Crush, Hearthstone, Roblox, PUBG Mobile and Call of Duty: Mobile.  (*See* Dkt. 779-1 ¶¶ 165, 514.)[7]

Epic raised this issue with Apple during meet and confers, and Apple stated that Multiplatform Services *may*, in fact, obtain an entitlement for External Links (so long as they meet all of the other requirements).  (Even Decl. Ex. A at 2, 3.)  Epic asked Apple to amend its Guidelines consistent with this representation.  (*Id.* Ex. A at 3.)  On March 5, 2024, Apple published amended Guidelines (the "Amended Guidelines").  (*See id.* Ex. B.)  However, the Amended Guidelines do not modify Section 3.1.3.  The only relevant change was to hyperlink the language "in-app purchases within the app" in Section 3.1.3(b) to Section 3.1.1.  (*Compare* Dkt. 874 Ex. 1 § 3.1.3(b) (the phrase "in-app purchases within the app" appears as plain text) *with* Even Decl. Ex. B § 3.1.3(b) (the phrase "in-app purchases within the app" appears as an internal

---

set forth in 3.1.3(a)".  Guideline 3.1.3(a) covers only Reader Apps, which are expressly allowed to use External Links (though not buttons or other calls to action).

[7] The Fortnite iOS app would also fall into this category if it were allowed on the Apple App Store.

link, which takes the user back to Section 3.1.1).)  The changed text is highlighted in the below

depiction of Section 3.1.3(b) of the Amended Guidelines:[8]

> **3.1.3(b) Multiplatform Services:** Apps that operate across multiple platforms may allow
> users to access content, subscriptions, or features they have acquired in your app on other
> platforms or your web site, including consumable items in multi-platform games, provided
> those items are also available as in-app purchases within the app.

The Amended Guidelines retain the language in Section 3.1.3 prohibiting

developers of covered apps from "encourag[ing] users to use a purchasing method other than

in-app purchase" and, aside from the hyperlink, otherwise leave Section 3.1.3(b) unchanged.  The

Amended Guidelines also make no changes to the other subsections of Section 3.1.3 to clarify

whether apps covered in those subsections can also qualify for an External Link.[9]  Apple has not

otherwise explained during meet and confers how the availability of the External Link entitlement

for apps covered by Guideline 3.1.3(b) is consistent with the prohibition on encouraging the use

of purchasing methods other than IAP.  (Even Decl. Ex. A.)[10]

### D.    Industry and Third-Party Reactions to the Notice of Compliance

Since Apple filed its Notice of Compliance, other developers and industry

participants have decried the onerous restrictions in Apple's compliance plan and its effect on the

free exchange of price information.  App developer Spotify stated that Apple's response to the

---

[8] Even Decl. Ex B § 3.1.3(b) (Section 3.1.3(b) of the Amended Guidelines, with highlighting added to language appearing as a link instead of plain text).

[9] While certain of the app types covered in Section 3.1.3 may not need to use an External Link because they are not required to use IAP to process in-app purchases (*e.g.*, apps selling physical goods and services, covered in Section 3.1.3(e)), other app types likely would benefit from External Links because they are still required to use IAP for in-app purchases (*e.g.*, Enterprise Services, covered in Section 3.1.3(c)).

[10] A March 5, 2024 post on Apple's website provides the following description of the change to Section 3.1.3(b) in the Amended Guidelines:  "3.1.3(b):  Added a link to 3.1.1 to make clear that 3.1.1(a) applies, and multiplatform services apps can use the 3.1.1(a) entitlement."  *Updated App Review Guidelines now available*, APPLE.COM (March 5, 2024), https://developer.apple.com/news/?id=flmb6ri3.  However, this note is not included in the Guidelines themselves, such that a developer would not receive this clarification if they reviewed only the Guidelines to understand their rights and obligations.  Developers cannot be expected to scroll back through old news posts to find this statement, which is inconsistent with the plain meaning of the Guidelines themselves.

Injunction "is outrageous and flies in the face of the court's efforts to enable greater competition and user choice"[11] and that "[o]nce again, Apple has demonstrated that they will stop at nothing to protect the profits they exact on the backs of developers and consumers under their app store monopoly".[12]  App developer Paul Haddad, founder of Tapbots, which develops apps such as Tweetbot, Pastebot and Calcbot, called Apple's new policies "downright insulting".[13]  App developer Nick Farina, co-founder of payment app Kuto, described Apple's new commission on linked purchases as a "farce" and that Apple's new policies regarding External Links "will be used by no one" because "[p]rocessing your own payments will cost you at least 3 percent (as Apple well knows), so you're back to giving them 30 percent, plus doing a bunch of dev work and special recordkeeping, then reporting to them on your own dime".[14]  Developer David Heinemeier Hansson, the creator of Ruby on Rails, similarly commented that Apple's new steering commission is going to "poison the one victory Epic secured in their lawsuit so bad nobody would ever think to use it".[15]

Other developers' and industry participants' perspectives are likewise that Apple's policies will not allow for effective steering to payment mechanisms other than IAP.  Benjamin Simon, President and CEO of fitness app developer Down Dog, explains that Apple's policies will not allow the use of in-app buttons similar to those Down Dog previously included in the Android versions of its apps.  (Simon Decl. ¶¶ 15-33.)  These buttons were highly effective in enabling users to save money by purchasing subscriptions on Down Dog's website rather than

[11] Sarah E. Needleman and Aaron Tilley, *Apple Changes Its App Store Policy: Critics Call the Moves 'Outrageous'*, WALL STREET J. (Jan. 17, 2024), https://www.wsj.com/tech/apple-changes-its-app-store-policy-critics-call-the-moves-outrageous-7c023e0c.

[12] Tom Gerken, *Spotify attacks Apple's 'outrageous' 27% commission*, BBC NEWS (Jan. 18, 2024), https://www.bbc.com/news/technology-68018618.

[13] Christopher Mins, *The Main Driver of Apple's Success Has Become Its Biggest Liability*, WALL STREET J. (Jan. 26, 2024), https://www.wsj.com/tech/personal-tech/apple-vision-pro-walled-garden-mac-iphone-app-store-c4838278.

[14] Emma Roth, *Apple thought it dealt with Epic v. Apple—has it really?*, THE VERGE (Jan. 24, 2024), https://www.theverge.com/24049014/apple-epic-court-ruling-developer-tax.

[15] *Id.*

1   through Google's in-app billing solution.  (*Id.* ¶¶ 21-24.)  Mr. Simon explains that Apple's new

2   fee on Linked Purchases is prohibitive to implementing External Links, because the 3%

3   difference between the fees Apple charges for IAP and those it now imposes on Linked Purchases

4   will not cover the cost of a payment solution on Down Dog's website, which ranges from

5   approximately 3.5% to 6.5% of the transaction price.  (*Id.* ¶ 32.)  Christian Owens, founder and

6   executive chairman of payment solution provider Paddle, explains why developers will be

7   unlikely to use External Links because of the added friction they introduce.  (Owens Decl.

8   ¶¶ 27-31, 34, 35.)  And, even if users were willing to overcome the frictions associated with

9   Linked Purchases, they still would not benefit from lower prices.  Paddle's own costs for its

10  services exceed the 3% differential between Apple's existing IAP fee and its new fee for Linked

11  Purchases, meaning that Paddle would have to charge developers more than 3%—and as a result

12  developers would have to pay *more* in fees for a Linked Purchase completed through Paddle's

13  payment solution than they would for a purchase made within their app using IAP.  (*Id.* ¶¶ 32-35.)

## LEGAL STANDARDS

15          This Court retains jurisdiction to enforce the Injunction.  Specifically, the Court

16  has broad powers to hold Apple in contempt, enforce the Injunction and clarify its application.

17  *Craters & Freighters v. Daisychain Enters.*, 2014 WL 2153924, at *1 (N.D. Cal. May 22, 2014)

18  (the Court "has the inherent authority to enforce compliance with its orders through a civil

19  contempt proceeding").

20          "[T]he party alleging civil contempt must demonstrate by clear and convincing

21  evidence that (1) the contemnor violated a court order, (2) the noncompliance was more than

22  technical or de minimis, and (3) the contemnor's conduct was not the product of a good faith or

23  reasonable interpretation of the violated order."  *Facebook, Inc. v. Power Ventures, Inc.*, 2017

24  WL 3394754, at *8 (N.D. Cal. Aug. 8, 2017) (citing *United States v. Bright*, 596 F.3d 683, 694

25  (9th Cir. 2010)).  The contempt "need not be willful, and there is no good faith exception to the

26  requirement of obedience to a court order".  *In re Dual-Deck Video Cassette Recorder Antitrust*

27  *Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quotation omitted).  In determining what sanction to

28  impose for civil contempt, a court "should weigh all the evidence properly before it determines

whether or not there is actually a present ability to obey and whether failure to do so constitutes deliberate defiance or willful disobedience which a coercive sanction will break". *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 n.6 (9th Cir. 1983). The court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction" in bringing about the result desired. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) (quotation omitted).

Separately from civil contempt, courts may also find that a defendant is violating an injunction when the plaintiff brings the defendant's conduct to the court's attention through a motion to enforce. In so doing, the court need not find the defendant in civil contempt in order to find that the defendant has violated the injunction and to enter appropriate relief. *See ADT Security Servs., Inc. v. Security One Int'l, Inc.*, Case No. 11-cv-05149-YGR (N.D. Cal.), ECF No. 185 (order denying motion for civil contempt but modifying preliminary injunction); *Buono v. Norton*, 364 F. Supp. 2d 1175 (C.D. Cal. 2005) (granting "motion to enforce" after finding defendant's conduct violated injunction, without finding defendant in civil contempt).

"In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014).

## ARGUMENT

### I. Apple's Updated Policies with Respect to External Links Violate the Injunction

Apple's policies negate price competition between in-app purchases and out-of-app purchases by burdening out-of-app Linked Purchases with the same exorbitant fees it imposes on in-app purchases—fees that this Court identified as "supracompetitive" and "untethered to [Apple's] intellectual property". (Dkt. 830 at 2.) Those fees—which are up to 27% on purchases made within seven days of users clicking an External Link—alone frustrate the purpose of the Injunction. Further, the web of technical requirements, economic hurdles and user frictions imposed through Apple's new policies mean that the External Links Apple now allows can never be an effective tool to disseminate competitive pricing information as contemplated by the

Injunction.  Because Apple's fees and restrictions eliminate developers' ability to use External Links to offer lower prices to users, Apple's new policies are a *de facto* prohibition on External Links.

This Court found that Apple's fee on purchases processed by IAP has never been justified and is not restrained by competition.  (Dkt. 812 at 163.)  This Court's Injunction required Apple to allow developers to steer consumers from IAP, which was encumbered by Apple's tax of up to 30%, to alternative platforms where purchases were unencumbered by Apple's tax.  While this Court allowed Apple to continue requiring IAP for in-app purchases, it entered the Injunction so that competition from unencumbered web purchases could "driv[e] the commission rate" (*id.*) and require Apple to compete on the merits with outside payment options (Dkt. 830 at 4).  Allowing Apple to charge *any* fee for these alternative purchasing mechanisms interferes with those goals because it gives Apple complete control over the price of the competitive alternative to IAP.  By imposing high fees that are not materially different from the fees it charges through IAP, Apple increases the cost of out-of-app purchases and negates the competitive pressure on IAP that the Injunction is intended to introduce.

As noted above, the new fee is only 3% lower than the fee Apple charges developers for in-app purchases using IAP, and the cost to developers of an alternative payment solution would typically meaningfully exceed 3%, resulting in Linked Purchases being more costly to the developer, and in turn, consumers, than in-app purchases using IAP.[16]  Further, acquiring and maintaining a Link Entitlement adds costs to developers, including that developers must maintain various specified data on Linked Purchases, report that data to Apple and possibly submit to an audit by Apple.  Simply put, instead of the Injunction resulting in competitive pressure that would force Apple to make IAP *cheaper*, Apple is using the Court-mandated links to

---

[16] For example, Paddle charges developers a fee of up to 10% for its payment solution (Owens Decl. ¶ 18, 26), and in Epic's lawsuit against Google, internal Google documents and trial testimony established that the average cost for processing payments is between 4%-6% (*see* Trial Exhibit 360, *Epic Games, Inc. v. Google LLC*, No. 21-md-2981-JD (N.D. Cal.), ECF No. 886-30 at 24; Trial Tr. at 726:19-22, *Epic Games, Inc. v. Google LLC*, No. 21-md-2981-JD (N.D. Cal.)), ECF No. 837.

make alternative purchasing avenues *more expensive*.  Make no mistake:  this is intentional.

Apple knows that under this scheme developers have no real incentive to, and will not, make use

of External Links.  And as noted above, this financial impact is exacerbated by Apple's decision

to impose the fee on all purchases made within seven days of a user clicking a Link—***even if the***

***purchase was made in a different browser window, or even on a different device, and for***

***reasons unrelated to the External Link***.

In addition to the new fees, Apple has imposed further restrictions on External

Links that ensure they will not be effective (and will not be used).  Together with the fees, these

restrictions operate as a *de facto* prohibition on steering that this Court ordered Apple to permit.

*First*, Apple's Link Entitlement review process puts a developer's ability to make price

competition available to users squarely within Apple's discretion and control.

*Second*, Apple's design restrictions completely defang External Links as an

effective marketing tool for alternative purchasing options.  Apple designed External Links to be

bland, inconspicuous and removed from the purchase flow in which the link would be meaningful

to users.  Apple's design of External Links is not intended to *promote* price competition; it is

intended to *stifle* it.

*Third*, if users do somehow locate and click an External Link, Apple's mandatory

scare screen will deter them from following through on their chosen out-of-app purchase.  Apple

claims the scare screen is necessary to make clear to users that their purchase will not be handled

by Apple.  But that excuse rings hollow in light of the lack of any similar warning when a user

utilizes an iOS app to purchase *physical* goods or services—a purchase handled by entities other

than Apple.  Indeed, Apple does not present users with *any* warning before they make purchases

in the iOS Amazon or Uber app, even though none of these purchases are handled by Apple.  In

fact, this Court already considered and largely rejected Apple's arguments at trial that mandating

the use of IAP for in-app purchases of digital goods and services increased security.  (*See*

Dkt. 812 at 116-17 (finding Apple's security justifications "cut both ways" and noting in

particular that Apple itself did not verify digital goods transactions, and thus "Apple ha[d] not

shown how [its] process is any different than other payment processors, and any potential for fraud prevention [wa]s not put into practice").)

*Fourth*, any user that makes it past the scare screen will be linked to a generic page of the developer's website.  To complete a purchase, the user would need to again (a) log into their account (even though they were already logged into their account in the app), and (b) search for the product they wanted to purchase.  These frictions will further deter users from completing a purchase on the developer's website if they even make it this far into the purchase flow.

Apple's *de facto* prohibition on External Links is a violation of the Injunction because it is clearly intended to subvert the purpose of the Injunction:  enabling external purchasing mechanisms to competitively constrain Apple's excessive IAP commission.  This sort of textbook circumvention of an injunction is plainly sufficient grounds for finding Apple in contempt.  *See Inst. of Cetacean Rsch.*, 774 F.3d at 949 (finding conduct violated an injunction where it was against "the spirit of the Injunction, even though its strict letter may not have been disregarded" (quoting *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)); *see generally Alter Domus, LLC v. Winget*, 2023 WL 4865590, at *6 (E.D. Mich. July 31, 2023) (collecting cases and noting that "[i]t has been said that a defendant that hews to the narrow letter of the injunction while simultaneously ignoring its spirit charts such a course at its own peril" (quotation marks, citations and alterations omitted)); *F.V. v. Jeppesen*, 466 F. Supp. 3d 1110, 1116 (D. Idaho 2020) (noting that "[t]he scope of an injunction is discerned from the language of the injunction itself, as well as from the objective of the relief granted therein" and that "[p]arties are expected to comply with both the letter and the spirit of a court's order").

*Cetacean* is illustrative.  There, a conservation group defendant was enjoined from "physically attacking any vessel engaged by [p]laintiffs", an operator of whaling ships.  The defendant transferred certain assets to a foreign entity it knew was likely to use those assets to attack the plaintiffs' vessels.  774 F.3d at 941.  The Ninth Circuit held that this conduct violated the injunction by "giving others [the defendant] knew were highly likely to violate the injunction the means to do so".  *Id.* at 949.  The court further found that a finding of contempt was appropriate because, despite ample opportunity, the defendants "did not seek clarification of their

1  obligations" under the injunction before acting.  *Id.* at 954.  The court also warned that "[t]he

2  schemes available to those determined to evade injunctions are many and varied, and no

3  injunction can explicitly prohibit every conceivable plan designed to defeat it".  *Id.* (citations

4  omitted).

5           Similarly, in *Zest Anchors, LLC v. Geryon Ventures, LLC*, the district court issued

6  a preliminary injunction prohibiting the defendant from selling certain products, among other

7  actions.  2022 WL 16838806, at *1 (S.D. Cal. Nov. 9, 2022).  After the injunction was issued, the

8  defendants stopped selling one of the finished products at issue but continued to sell components

9  used to make that product.  *Id.*  The court found that the defendants' behavior constituted a

10  violation of the injunction and held the defendants in civil contempt, noting that the

11  "[d]efendants' reading of the Preliminary Injunction and continued sales of their [individual

12  component parts] constitutes an impermissible end-run around the Preliminary Injunction because

13  even though [the d]efendants sell non-infringing, individual components to foreign distributors,

14  they know that these parts will be combined into an infringing whole for sale to customers in the

15  United States".  *Id.* at *2.

16           As with the defendants in *Cetacean* and *Zest Anchors*, Apple is determined to

17  circumvent the Injunction.  Its conduct violates the Injunction by introducing a new fee on

18  purchases made outside the app set at effectively the same supracompetitive price that the

19  Injunction was designed to constrain.  As a result, Linked Purchases will not be any cheaper than

20  IAP.  While the Court did not explicitly prohibit this scheme, it goes against the purpose of the

21  Injunction, which was to open up Apple's service fees to competition.  Similarly, Apple's conduct

22  violates the Injunction by creating a *de facto* prohibition on one of the three steering mechanisms

23  that this Court explicitly required Apple to permit.  As discussed in Section A above, the Court

24  was clear that the purpose of the Injunction was to allow competition to finally restrain the fee

25  Apple charges for purchases processed through IAP by increasing the free exchange of "pricing

26  information on mobile devices and bringing transparency to the marketplace".  (Dkt. 812 at 166.)

27  Far from complying with the Injunction in good faith, Apple has introduced effectively the same

28  fee for External Links and otherwise erected so many barriers and imposed so many costs on

developers who seek to use External Links that no developer actually will.  That is a violation of the Injunction.[17]

Apple's restrictions cannot be justified by security, privacy or any rationale other than the anti-competitive objectives this Court found unlawful in its Rule 52 Order.  Indeed, the Court already weighed Apple's supposed privacy and security concerns against the negative impacts of its anti-steering provisions in determining that those provisions violated the UCL, concluding that "the harm from the anti-steering provisions outweighs its benefits".  (Dkt. 812 at 165-66.)  Further, as noted above, Apple imposes none of the frictions discussed above on apps selling physical goods or services, even though those sales are not handled or monitored by Apple in any way.  (*See* Dkt. 871-4 Ex. 11 § 3.1.3(e) ("If your app enables people to purchase physical goods or services that will be consumed outside of the app, you *must* use purchase methods other than in-app purchase to collect those payments . . . ." (emphasis added)).)  And as Apple itself admits, "developers are already permitted to (and do) include within their apps certain external links, directing customers to websites for support and other services" (Dkt. 871 at 4), and this Court has likewise recognized that "[c]onsumers are quite used to linking from an app to a web browser" (*id.* (quoting Dkt. 830 at 3)).  If Apple had legitimate privacy and security concerns, it would have similar restrictions apply to all apps, links and purchasing mechanisms—not just to the type of links that could threaten Apple's "excessive operating margins".  (*See* Dkt. 812 at 163.)

---

[17] Apple's deliberate efforts to frustrate the purposes of laws and rulings intended to open up the iOS ecosystem to competition do not end with its response to this Court's Injunction.  Apple recently announced that, pursuant to the European Union's Digital Markets Act—a new law intended to open up app distribution and payment solutions to competition in European markets— it would allow competing app stores on iOS in Europe, but would impose new fees on any download of such stores and on downloads of apps *from* such stores.  Moreover, a European Epic subsidiary, Epic Games Sweden AB, applied and was approved for a developer account with the stated intent of developing the Epic Games Store and Fortnite for iOS in European markets.  On March 2, 2024, Apple terminated Epic Games Sweden's account, citing Epic's public statements disagreeing with Apple's DMA compliance plan and the new fees Apple imposed.  Apple reinstated the account only after the European Commission announced it was investigating Apple's conduct.  *See UPDATE: Apple Reinstates Epic Developer Account After Public Backlash for Retaliation*, EPICGAMES.COM (Mar. 8, 2024), https://www.epicgames.com/site/en-US/news/apple-terminated-epic-s-developer-account.

Moreover, Apple has not argued, and cannot argue, that some of its restrictions—such as its incredibly particular restrictions on the aesthetic and size of External Links—serve any legitimate purpose other than to hide and disadvantage External Links.  This is especially true with respect to Apple's requirement that External Links not appear within the purchase flow of an app, which Apple's Notice does not even attempt to justify.

## II.   Apple's General Prohibition on Buttons and Calls to Action Other than External Links Violates the Injunction

Apple's purported compliance plan also violates the letter of the Injunction, which requires Apple to allow developers to include in their apps not only external links, but also "buttons" and "other calls to action".  (Dkt. 813 ¶ 1.)  Apple's updated policies do not allow either.  By continuing to prohibit such in-app steering mechanisms, Apple is in clear violation of the plain text of the Injunction.

As noted in Section C.2 above, Apple's updated policies do not allow in-app "buttons" to direct users to purchasing mechanisms other than IAP.  Instead, Apple's Guidelines and other materials refer repeatedly only to a "Link Entitlement".  The content, style and appearance limitations Apple places on these links mean that a developer cannot actually include a "button" in their app.

Apple's updated policies also continue to prohibit "calls to action" other than External Links.  A developer is prohibited from informing users about the ability to purchase a digital good or service on the developer's website except by using one of Apple's "templates" in conjunction with an External Link.  (*Supra* Section C.1.)  In other words, a developer who otherwise qualifies for a Link Entitlement can include a link in their app that states "To get 30% off, go to [*link to website*]", but that same developer is prohibited from simply including in their app, without an accompanying link, a message such as:  "To get 30% off, go to our website"; "In-App prices are 30% higher due to Apple's 30% fees"; or "We prefer that you purchase on our website".  Indeed, Apple is continuing to prohibit these "other calls to action" even though Epic has, from the very beginning of this litigation, specifically focused on Apple's prohibition on "other calls to action" as distinct from buttons or external links.  (*See* Dkt. 1 ¶ 130 (describing,

1   with emphasis in the original, Apple's policy that "Apps and their metadata may not include

2   buttons, external links, *or other calls to action that direct customers to purchasing mechanisms*

3   *other than in-app purchase*").)

4   The Injunction is crystal clear.  There is no reasonable, good-faith interpretation of

5   the Injunction that allows Apple to continue to ban two of the three in-app steering mechanisms

6   that were expressly identified by the Court.  Yet that is exactly what Apple has done, without any

7   justification or explanation.  Apple is therefore violating the express terms of the Injunction and

8   should be held in civil contempt for this reason as well.  *See Nat'l Abortion Fed'n v. Ctr. for Med.*

9   *Progress*, 2017 WL 3021024 (N.D. Cal. July 17, 2017), *aff'd*, 2022 WL 3572943 (9th Cir.

10   Aug. 19, 2022) (finding defendant in civil contempt where they violated the express terms of a

11   preliminary injunction and there was "no argument that the short, simple commands of the

12   Preliminary Injunction are vague or ambiguous").

13   **III.    Apple's Updated Guideline 3.1.3 Impermissibly Prohibits Steering**

14   As noted above, Section 3.1.3 of Apple's App Store Review Guidelines, as

15   reflected even in the March 5, 2024 Amended Guidelines, prohibits apps covered by that

16   Guideline (except Reader Apps, as noted above) from, "within the app, encourag[ing] users to use

17   a purchasing method other than in-app purchase".  (Even Decl. Ex. B § 3.1.3.)  This language

18   plainly and impermissibly prohibits all steering within apps covered by the Guideline.  (*See*

19   Section C.3.)  In fact, this Court's Rule 52 Order specifically identified Guideline 3.1.3 as an

20   illegal anti-steering rule, noting that Apple violated the UCL by "prohibiting apps from . . .

21   '*encourag[ing] users to use a purchasing method other than in-app purchase*'".  (Dkt. 812 at 163

22   & n.635 (emphasis added) (citing PX-2790 § 3.1.3).)

23   Apple has taken the position that multiplatform games and apps can still qualify

24   for External Links (subject to the myriad requirements discussed above).  (*See* Section C.3.)  But

25   this representation is inconsistent with the plain language of the Guidelines.

26   Apple's recent amendment to the Guidelines does nothing to cure the issue.  The

27   new link from Section 3.1.3(b) to Section 3.1.1 says nothing about the availability of External

28   Links for apps covered by Section 3.1.3(b) and does not change the fact that Section 3.1.3 plainly

prohibits developers of apps covered in that Section from encouraging users to use a purchasing method other than IAP.  If anything, the fact that Apple issued the Amended Guidelines and accompanying blog post describing the amendment to Section 3.1.3(b) is an admission that the plain language of Section 3.1.3 contravenes the Injunction.  Apple's failure to make any change to the text of that Section, despite this inconsistency between the language and its stated intent, only highlights the problems with Apple's Guidelines.

Further, Apple's private assurance to Epic in a meet and confer between counsel that Apple would not enforce the plain language of its own Guidelines does not alleviate the need for enforcement of the Injunction.  *See C.F.T.C. v. Saffron*, 2020 WL 495557, at *2 (D. Nev. Jan. 30, 2020) (finding defendants in civil contempt and ordering full compliance with preliminary injunction where defendants had merely "offered excuses and promises" with respect to their violations and future compliance efforts); *cf. S.E.C. v. Fehn*, 97 F.3d 1276, 1296 (9th Cir. 1996) ("[S]incere assurances of an intent to refrain from aiding and abetting future violations are insufficient, without more, to militate against an injunction."); *OmniGen Rsch., LLC v. Yongqiang Wang*, 2017 WL 5505041, at *20 (D. Or. Nov. 16, 2017) ("A defendant's voluntary cessation of activity is not a ground for denial of a permanent injunction.").

Thus, this Court can and should order Apple to further amend its Guidelines to remove this language or to explicitly state that the categories of apps in Guideline 3.1.3 have the same right to use in-app steering mechanisms as do all other apps.[18]  Such an order is within the Court's inherent authority to ensure compliance with its Injunction.  *See United States v. Rescino*, 2021 WL 4685385, at *3 (N.D. Cal. Oct. 7, 2021) ("A district court has the inherent authority to enforce compliance with its orders through a civil contempt proceeding" (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-28 (1994))); *see also Mendoza v.*

---

[18] The most straightforward manner of clarifying Apple's policies would be to modify Guideline 3.1.3 so that it simply follows the text of the Injunction.  Specifically, Guideline 3.1.3 could be modified to state as follows (with emphasis for modified language):  "The following apps may use purchase methods other than in-app purchase.  ***Developers can include in their apps and metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase***.  Developers can ***also*** send communications outside of the app to their user base about purchasing methods other than in-app purchase."

1    *Hyundai Motor Co., Ltd.*, 2024 WL 189014, at *2 (N.D. Cal. Jan. 17, 2024) ("[A] federal court

2    administering a permanent injunction has discretion to clarify or modify an injunction if a party

3    enters upon transactions which raise doubts as to the applicability of the injunction." (quotation

4    omitted)).

5                                    **<u>CONCLUSION</u>**

6            For the foregoing reasons, Epic requests the Court enter an order (1) holding Apple

7    in contempt for violating the Court's Injunction; (2) requiring Apple to promptly bring its policies

8    into compliance with the Injunction; and (3) requiring Apple to remove all anti-steering

9    provisions in Guideline 3.1.3.

1  Dated:  March 13, 2024

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By:   /s/ *Gary A. Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*