DocuSign Envelope ID: B473ABA8-98F4-4405-962B-01DD0DAA0A4A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., <br><br>    Plaintiff, Counter-defendant, <br><br>    v. <br><br> APPLE INC., <br><br>    Defendant, Counterclaimant. | No. 4:20-CV-05640-YGR-TSH <br><br> **DECLARATION OF CHRISTIAN BAILEY OWENS** <br><br> The Honorable Yvonne Gonzalez Rogers |

I, Christian B. Owens, declare as follows:

1. I founded Paddle.com Market Limited ("Paddle") in 2012 and serve as its executive chairman. Previously, I was the CEO of Paddle.

2. My responsibilities over the years have included making operational decisions for Paddle, overseeing its strategy, and making key decisions for the company.

3. I submit this declaration in support of Epic's Motion to Enforce Injunction.

**I. Introduction**

4. I submit this declaration because the steps Apple is taking purportedly to comply with the injunction entered by this Court do not realistically allow developers of iOS applications to make their users aware of, and link users to, web-based purchase options.

5. I understand this Court ordered Apple to remove from its App Review Guidelines Apple's prohibition on developers incorporating into their app "buttons, links and other calls to action" encouraging users to complete purchases outside the app rather than within the app. I understand the Court found that Apple's prohibition shielded Apple from competition by preventing developers from "communicat[ing] lower prices on other platforms either within iOS or to users obtained from the iOS platform."

6. Paddle has the capability to support payments for digital goods on iOS, including web purchases launched from iOS app developers' websites. It was Paddle's hope that with the injunction in place, Paddle could offer developers a payment solution that would help developers take advantage of their new ability to let users link out of their iOS apps to make web-based purchases.

7. I have reviewed the submission that Apple made with this Court on January 16, 2024, which Apple styled as its "Notice of Compliance" (the "Notice"). As set forth in that submission, Apple claims that it now allows developers to choose to use third-party payment solutions.

8. But this "choice" is illusory. Apple's revised App Review Guidelines and policies outlined in its Notice would still foreclose Paddle from offering its solution to iOS app developers who include an external purchasing link in their iOS app. Apple has encumbered any attempt at

DECLARATION OF CHRISTIAN B. OWENS    2                CASE NO. 4:20-CV-05640-YGR-TSH

linking outside of the app with so many layers of technical and financial hurdles that I would expect no or almost no developer to utilize the new external link entitlements Apple now offers. For example, Apple mandates that external links may not be displayed within any "purchase flow," which is where they might be useful to users; they may only utilize static URLs, preventing any dynamism in pricing, special sales, or even linking to any specific product page.

9.  Apple has also implemented a new 27% fee that it will charge if a user of an iOS app elects to use other web-based purchase options through an allowed link (or 12% for apps that qualify for Apple's Small Business Program). Apple's new fee means that to present any pricing benefit to developers and users, the developer would have to find a payment solution that would service payments on its website for less than a 3% fee. Paddle cannot charge a 3% commission for its services without losing money. Just the cost to clear transactions Paddle handles (i.e., out of pocket fees Paddle must pay to financial intermediaries) would amount to around 4%, on average, for the transactions likely to be carried out on an iOS app developer's website. This is without even accounting for Paddle's other substantial costs to run its business and offer other billing services. I expect that is true of other similarly situated providers, given the underlying economics of taking payments.

10. In short, Apple's new fee makes it financially unattractive for developers to choose a different payment solution than Apple's and would prevent any meaningful competition between payment solutions servicing web-based purchases and Apple's IAP. Apple's contemplated path forward would thus foreclose developers from using Paddle's solution or other potential alternatives.

**II. Overview of Paddle**

11. I have worked in the technology and software industry my whole career. I successfully started my first software company when I was 16. My company sold its software internationally, and I found that I was spending a lot of time resolving payment issues, like managing tax compliance and foreign exchange fees in different countries. This gave me the idea of creating a one-stop solution to help developers sell their digital products globally seamlessly. This idea ultimately became Paddle.

12. Paddle offers an end-to-end payment solution that allows developers to sell their products internationally over the web while maintaining compliance with different countries' legal, regulatory, and tax obligations. Paddle currently transacts in around 30 different currencies and regularly adds support for additional currencies when requested by developers.

13. Paddle handles every aspect of a transaction. This includes checkout, billing, invoicing, tax calculation and remittance, chargeback services, refunds, subscription management, analytics, and cross-platform support.

14. With respect to payment methods, Paddle accepts a wide range of credit cards, including Visa, Mastercard, American Express, Discover, and others. Paddle accepts Apple Pay on Safari and Google Pay in Google Chrome. Paddle also accepts PayPal, Alipay, IDEAL and wire transfers. With respect to payment processing, Paddle relies on trusted and secure payment processors such as PayPal and Stripe. Paddle does not itself directly process payments.

15. In connection with providing these services, Paddle serves as a merchant of record for software companies in connection with sales of their digital products. In other words, software companies sell their digital products to Paddle, and Paddle resells them to customers. By serving as the merchant of record, Paddle assumes liability for the transaction, including compliance with local laws in each jurisdiction. Paddle is able to serve as the merchant of record while still allowing the software companies that use Paddle to maintain a relationship with the customer in their capacity as licensor and developer of the product.

16. Paddle has grown significantly since its founding in 2012. Paddle is available in over 200 countries around the world. Paddle has hundreds of employees with offices in several countries, including in the UK, United States, and Argentina, and has thousands of customers. They range from small software developers who offer 99 cent apps to large enterprises such as 3Commas, Tailwind, and Geoguessr. Paddle's customers include companies that sell their digital products on a subscription basis, and Paddle offers sophisticated billing and customer service infrastructure to support those customers. Paddle has been used as a billing method in connection with tens of millions of transactions.

17. Paddle's solution is available across a variety of platforms. Paddle offers a web-

based solution. Paddle also offers a solution that is accessible through native apps on both PCs and Macs.

18. Paddle makes money by charging for its services on a per-transaction basis. Paddle's default fee is 5% of the purchase price plus a further $0.50 per transaction. Paddle also enters into bespoke pricing arrangements with certain developers. For example, Paddle charges lower prices to developers that have large transaction volumes and offers discounted pricing to certain smaller developers who sell digital products for very low prices—what we refer to in the industry as "microtransactions." For microtransactions, Paddle offers a fee based on a percentage of the purchase price (typically around 10% or lower), without an additional flat fee component. This makes it economical for developers to use Paddle even if their transactions are very small. Across all of our customers and transactions, the average effective commission Paddle charges is in the range of 6% to 7%.

19. Paddle's solution is highly secure. Paddle is in compliance with multiple industry security standards, including the Payment Card Industry Data Security Standard and the SOC 2 standard for internal controls. Paddle reviews all of the digital products that are sold using its solution and is routinely subject to successful external security audits by third parties. Paddle also has structured its solution to leverage the security advantages of trusted third parties. Specifically, as stated above, Paddle uses known and highly secure third parties like PayPal and Stripe to process transactions. Paddle also relies on secure third parties to store sensitive information such as credit card information. In addition, Paddle monitors transactions for indicia of fraud by allocating fraud scores and reviewing transactions as appropriate. Paddle also is in compliance with multiple stringent data security regulatory schemes, including the California Consumer Privacy Act (the "CCPA") and General Data Protection Regulation (the "GDPR").

**III. Paddle's Payment Solution for iOS App Developers**

20. Paddle has received many requests over the years from iOS app developers to use Paddle's solution. But, unfortunately, Apple's rules have historically restricted Paddle's use on iOS. These rules included, among other things, anti-steering restrictions that prohibited developers from directing potential purchasers of digital goods to the developers' own websites,

DECLARATION OF CHRISTIAN B. OWENS     5                CASE NO. 4:20-CV-05640-YGR-TSH

where alternative payment solutions such as Paddle's could be used.

21. As someone who has been in the payments industry for over a decade, and in connection with my role at Paddle, I carefully monitor developments within the payments industry. I had been monitoring this litigation at a high level with great interest, because, as I understood it, if Epic were to prevail, it could mean that app developers could include links in their iOS apps that would take users to a web-based purchase using Paddle's payment solution.

22. On September 10, 2021, this Court granted an injunction in this litigation restraining Apple from, among other things, prohibiting developers from including in their apps "external links, or other calls to action that direct customers to purchasing mechanisms."

23. After becoming aware of this development shortly after the Court entered its order, I set up a team within Paddle to look into how we might make our solution available to iOS app developers. We developed broad capabilities to support iOS app developers' use of Paddle. Our capabilities include making Paddle's solution available for the purchase of digital goods from an iOS app developer's website.

24. Based on my experience in the industry and feedback we have received from customers over the years, Paddle's solution would be an attractive option for iOS app developers. Paddle's solution, like Apple's existing one, could be used to handle transactions, subscription management, tax compliance, and pricing localization. But Paddle also can offer iOS app developers additional features not available with Apple's solution, including cross-platform support, direct customer support, and refund processing, among others.

25. With cross-platform support, iOS app developers could use Paddle's solution across a range of platforms where they sell digital products. By contrast, Apple's solution is limited solely to apps downloaded on Apple's App Store. Paddle's solution also would allow developers to continue to be in the driver's seat of their own customer relationships. They are able to offer input regarding bespoke refund policies and have greater access to their customers including fielding questions or concerns from customers. By contrast, Apple requires developers to essentially sever the link with their customers, such that their customers have to rely on Apple to manage the customer, end to end.

26. Paddle would also charge much less to iOS app developers than Apple does. For transactions completed on an iOS app developer's website, Paddle would utilize its default pricing of 5% + $0.50, or a 10% without any flat fee in the case of microtransactions. By contrast, Apple charges developers 30% (or 15% in some cases).

**IV. Apple's Notice**

27. Paddle has the capability to support transactions for digital goods made through an iOS app developer's website. But based on my review of Apple's Notice, the new hurdles that Apple imposes would as a practical matter prevent iOS app developers from using an external purchasing link within their app and then using Paddle's solution, or any other alternative payment option, on their website. These new hurdles include the following:

28. First, Apple mandates that any external links not be displayed within the normal "purchase flow," significantly limiting the ability of developers to direct users to such links. Apple instead requires that the link directing a customer to an external purchase option be located in only a single location within the app, and must direct the customer to a set location on the external website. *See* Notice. Ex. 1 at 44 (Apple's new App Store Review Guidelines). This is a significant concern because, based on my experience in the payments industry, purchasers of digital goods would ordinarily expect to be able to find available purchase options during the process of identifying and selecting a potential digital good for purchase. As a result, many potential purchasers who might otherwise be interested in a potential alternative payment solution may not find and use it. Moreover, this process would result in the customer having to essentially start a transaction from scratch from the website, including re-entering log-in information and re-locating whatever digital product they wished to purchase. This would introduce a tremendous amount of friction into the purchasing process, even for those potential users that successfully find and click an external purchasing link within the app. Notably, developers can only avoid these frictions by continuing to make their purchases in the app using Apple IAP.

29. These frictions also stand in stark contrast to the streamlined design of payment solutions like Paddle's. Paddle's solutions are designed to streamline the payment process, including when it occurs on a developer's website after a user clicks an external purchasing link.

DECLARATION OF CHRISTIAN B. OWENS     7          CASE NO. 4:20-CV-05640-YGR-TSH

1   We streamline the payment flow because it is common knowledge in the industry, and also our
2   experience, that customers will abandon transactions that are unduly cumbersome to complete,
3   such as those exemplified by the payment flow that Apple mandates.

4          30.     Second, Apple requires that any developer that wishes to include a link to its
5   website has to "complete and submit a request form to Apple providing details about its app, the
6   External Purchase Link it wishes to include, and the website domain to which the External
7   Purchase Link will direct users." *Id*. at 6. This application process is unduly onerous and I am
8   concerned that it will deter developers from seeking to use a payment solution like Paddle's.
9   Moreover, this process would limit external links solely to pre-approved static URLs. As a result,
10  developers would lose flexibility in how they use a solution like Paddle's on their website, as
11  Apple's process would preclude them from offering dynamic pricing or special sales.

12         31.     Third, Apple would further discourage purchases on alternative platforms by
13  presenting users with what we in the industry call a "scare screen" if they were to follow a link
14  outside the iOS app. In this case, the scare screen would warn customers that they are about to be
15  directed to an external website whose security Apple cannot ensure. Notice at Ex. 3 (screenshot
16  from Apple's online developer guidelines). As described above, Paddle's solution is highly
17  secure. Yet the scare screen Apple proposes would unjustifiably cast doubt on the security of *any*
18  out-of-app purchase, including web-based purchases made through Paddle's widely used secure
19  solution.

20         32.     Fourth, Apple plans to introduce a new fee that would make purchases on
21  alternative platforms reached through a link financially unattractive to developers. In its Notice,
22  Apple says that "Apple will apply a 27% commission to transactions for digital goods and
23  services that take place on a developer's website within seven days after a user taps through an
24  External Purchase Link from the system disclosure sheet to an external website . . . . Developers
25  eligible for and participating in the App Store Small Business Program will be charged a 12%
26  commission on purchases made within seven days after a user taps on an External Purchase Link
27  and continues from the system disclosure sheet to an external website." Notice at 12. Apple
28  already charges a 30% fee (15% in some instances) for in-app purchases. In other words,

DECLARATION OF CHRISTIAN B. OWENS    8          CASE NO. 4:20-CV-05640-YGR-TSH

developers would be paying Apple the same fee as before, minus 3%. Apple's new fee is thus almost the same as its previous one, even though Apple would not be providing any payment services in connection with transactions that utilize alternative payment solutions.

33. This new fee puts solutions like Paddle's in an untenable financial situation. As a result of this economic structure, Paddle would have to reduce the commission it charges to less than 3% in order to even compete on price with Apple. But charging such a low commission would not be feasible for Paddle. Paddle's business model has certain fixed costs built in. The cost of paying payment processors to process the transaction, alone, is around 3% on average for our transactions today, and would likely be closer to 4% for our iOS solution based on the anticipated smaller transaction size for iOS transactions. Paddle also has additional costs to run its business and provide other services to its customers—services that Apple otherwise would be responsible for if Apple IAP were being used. As a result, Paddle would not be able to compete on price without losing substantial money. Based on my experience, I believe other payment solutions and payment processors would face the same structural economic problem, given that the cost of payment processing alone (without accounting for other payment services of the sort Paddle offers) typically costs around at least 3-4%.

34. Thus, even though Paddle has the capability to offer developers a payment solution that I believe is both better and cheaper than Apple IAP, the new fee that Apple now imposes will prevent iOS app developers from using an external purchasing link in their apps, and thus prevent Paddle from providing its payment solution for use with such links.

\*   \*   \*

35. In sum, the new hurdles that Apple now imposes make it all but impossible for iOS app developers to use an alternative solution like Paddle's. Apple's restrictions and requirements mean that using an external link to make purchases on an alternative platform would cost more to developers than Apple IAP and would be much more cumbersome for users and developers alike. Given my experience in the payments industry, I believe that the frictions and financial barriers that Apple imposes are not unique to Paddle, but would affect other payment solution providers in similar ways.

1     I declare under penalty of perjury of the laws of the United States of America that the
2 foregoing is true and correct. This declaration was executed this __13__ day of March 2024, in
3 `Bath, UK`.

4

5                                               CHRISTIAN B. OWENS

*(Signature: Christian Owens, DocuSigned, CC7986F5EE4947D...)*

DECLARATION OF CHRISTIAN B. OWENS    10         CASE NO. 4:20-CV-05640-YGR-TSH

I, Gary A. Bornstein, am the ECF User whose ID and password are being used to file this Declaration of Benjamin Simon in Support of Epic Games, Inc.'s Motion to Enforce Injunction. In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from the signatory.

                                            */s/ Gary A. Bornstein*
                                            Gary A. Bornstein