# Exhibit A

1  Renata B. Hesse (SBN 148425)
   (hesser@sullcrom.com)

2  Brendan P. Cullen (SBN 194057)
   (cullenb@sullcrom.com)

3  SULLIVAN & CROMWELL LLP
   550 Hamilton Avenue

4  Palo Alto, California  94301
   Telephone:  (650) 461-5600

5  Facsimile:  (650) 461-5700

6  Shane M. Palmer (SBN 308033)
   (palmersh@sullcrom.com)

7  SULLIVAN & CROMWELL LLP
   125 Broad Street

8  New York, New York  10004
   Telephone:  (212) 558-4000

9  Facsimile:  (212) 558-3588

10 *Attorneys for* Amicus Curiae *Meta
   Platforms, Inc.*

11

12 Reid M. Figel (SBN 135684)
   (rfigel@kellogghansen.com)
   KELLOGG, HANSEN, TODD, FIGEL &

13 FREDERICK, P.L.L.C.
   1615 M Street, N.W., Suite 400

14 Washington, D.C.  20036
   Telephone:  (202) 326-7918

15 Facsimile:  (202) 326-7999

16 *Attorney for* Amicus Curiae *Microsoft
   Corporation*

17

18

Joel Kurtzberg (*pro hac vice* forthcoming)
(jkurtzberg@cahill.com)
John S. MacGregor (SBN 304330)
(jmacgregor@cahill.com)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420

William R. Warne (SBN 141280)
(bwarne@DowneyBrand.com)
DOWNEY BRAND LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone: (916) 444-1000
Facsimile: (916) 520-5617

*Attorneys for* Amicus Curiae *X Corp.*

Douglas J. Dixon, State Bar No. 275389
ddixon@hueston.com
HUESTON HENNIGAN LLP
620 Newport Center Drive, Suite 1300
Newport Beach, CA  92660
Telephone:    (949) 229-8640

Tate E. Harshbarger, State Bar No. 328622
tharshbarger@hueston.com
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA  90014
Telephone:    (213) 788-4340

*Attorneys for* Amicus Curiae *Match Group,
LLC*

19 **UNITED STATES DISTRICT COURT**

20 **NORTHERN DISTRICT OF CALIFORNIA**

21 EPIC GAMES, INC.,                          )   Case No. 4:20-cv-05640-YGR-TSH
                                             )
22                         Plaintiff,        )   **BRIEF OF *AMICI CURIAE* META
                                             )   PLATFORMS, INC., MICROSOFT
23         v.                                )   CORPORATION, X CORP., AND
                                             )   MATCH GROUP, LLC IN SUPPORT
24 APPLE INC.                                )   OF EPIC GAMES, INC.'S MOTION
                                             )   TO ENFORCE INJUNCTION**
25                         Defendant.        )
                                             )   Judge:         Hon. Yvonne
26                                           )                  Gonzalez-Rogers
                                             )   Hearing Date:  April 30, 2024
27                                           )   Hearing Time:  2:00 p.m.
                                             )   Courtroom:     1, 4th Floor
28

SULLIVAN
&
CROMWELL LLP

## TABLE OF CONTENTS

*Page*

INTEREST OF *AMICI CURIAE*.................................................................................1

INTRODUCTION.........................................................................................................2

ARGUMENT .................................................................................................................5

I.   THE APPLE PLAN KEEPS IN PLACE EXPRESS ANTI-STEERING
RULES THAT THIS COURT FOUND ANTI-COMPETITIVE ...........................5

A.  Apple Continues To Prohibit "Other Calls to Action" Informing
Consumers about, or Directing Consumers to, Lower-Cost Payment
Options ........................................................................................................5

B.  Apple Has Retained Its Prohibition on "Encourag[ing] Users To Use a
Purchasing Method Other than In-App Purchase"......................................7

II.  APPLE CONTINUES EFFECTIVELY TO PROHIBIT 'EXTERNAL
LINKS' DIRECTING CUSTOMERS TO LOWER-COST PAYMENT
OPTIONS.............................................................................................................8

A.  Apple's External Link Rules Dictate Where and How Developers
Communicate with Users about Alternate Payment Mechanisms,
Rendering External Links Impractical for Developers and Irrelevant to
Consumers....................................................................................................9

B.  Apple Imposes a 27% Commission on External Purchases, Eliminating
any Meaningful Price Competition with IAP ...........................................13

C.  The Apple Plan Suppresses Competition from Third-Party Payment
Alternatives with No Legitimate Justification ..........................................15

III. APPLE'S RESTRICTIONS WILL CONTINUE TO HARM
CONSUMERS AND APP DEVELOPERS ........................................................16

IV.  THE APPLE PLAN SHOULD BE REJECTED FOR FAILING TO
COMPLY WITH THE LETTER AND THE SPIRIT OF THE
INJUNCTION ....................................................................................................20

CONCLUSION ............................................................................................21

SULLIVAN
&
CROMWELL LLP

1

## <u>TABLE OF AUTHORITIES</u>

2

*Page(s)*

3

**Cases**

4

*B2B CFP Partners, LLC* v. *Kaufman*,
   2012 WL 1067904 (D. Ariz. Mar. 29, 2012) .............................................................................6

6

*Epic Games, Inc.* v. *Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ............................................................... *passim*

7

8

*Federal Trade Comm'n* v. *Productive Marketing, Inc.*,
   136 F. Supp. 2d 1096 (C.D. Cal. 2001) ...............................................................20

9

*Inst. of Cetacean Rsch.* v. *Sea Shepherd Conservation Soc'y*,
   774 F.3d 935 (9th Cir. 2014) ..........................................................................20, 21

10

*John B. Stetson Co.* v. *Stephen L. Stetson Co.*,
   128 F.2d 981 (2d Cir. 1942)...............................................................................20

11

12

*Zest Anchors, LLC* v. *Geryon Ventures, LLC*,
   2022 WL 16838806 (S.D. Cal. Nov. 9, 2022) ..............................................20, 21

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sᴜʟʟɪᴠᴀɴ
&
Cʀᴏᴍᴡᴇʟʟ LLP

Meta Platforms, Inc. ("Meta"), Microsoft Corporation ("Microsoft"), X Corp. ("X"), and Match Group, LLC ("Match Group") respectfully submit this brief as *Amici Curiae* in support of Plaintiff Epic Games, Inc.'s ("Epic") Motion to Enforce Injunction.[1]

## INTEREST OF *AMICI CURIAE*

Meta is a technology company, founded in 2004, whose mission is to give people the power to build communities and bring the world closer together.  Meta develops and operates some of the world's most popular apps, including Facebook, Instagram, WhatsApp, and Messenger, which are used daily by people worldwide to connect, find communities, and grow businesses.  Meta's products and services enable people to connect and share with friends, family, co-workers, and customers through mobile devices, personal computers, virtual reality headsets, and wearables.

Microsoft is a technology industry leader, founded in 1975, that offers a wide range of services, software, and hardware products.  Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate.  Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Office, Surface, Xbox and Xbox Game Pass, and Bing.  Microsoft offers many of its products as mobile apps, including on iOS, such as Microsoft Office, Teams, the Xbox app, and games including Candy Crush and Minecraft.

X (formerly "Twitter") is an international technology company that operates an online discussion platform used by more than 500 million active users around the world.  X is a

---

[1]     Meta is a publicly traded company that does not have a parent corporation.  No publicly traded corporation owns 10% or more of the common stock of Meta.  Microsoft is a publicly traded company with no parent corporation.  No publicly traded corporation owns 10% or more of the common stock of Microsoft.  X is a privately held company, and its parent is X Holdings Corp.  No publicly traded corporation owns 10% or more of X Holdings Corp.'s stock.  Match Group, LLC, is a limited liability company.  The sole member of Match Group, LLC is Match Group Holdings II, LLC, which itself has a sole member, Match Group Holdings I, LLC.  The sole member of Match Group Holdings I, LLC is Match Group, Inc, a publicly traded company.  Match Group, LLC is not currently aware of any publicly held entity that owns 10% or more of Match Group, Inc.'s stock.  *Amici* affirm that no counsel for a party authored this brief in whole or in part, and no person other than *Amici* contributed any money to fund its preparation or submission.

SULLIVAN & CROMWELL LLP

BR. OF *AMICI CURIAE* META, MICROSOFT, X, AND MATCH GROUP IN SUPP. OF EPIC'S MOT. TO ENFORCE INJUNCTION
CASE NO. 4:20-CV-05640-YGR-TSH

real-time, open, public conversation platform that allows people to create, distribute, and discover content.  X allows users to create and share ideas and information instantly through various product features, including public posts and videos.

Match Group owns and operates online dating brands, including Tinder, which is Match Group's most popular dating brand.  The Tinder service is available to users at no charge, including on iOS mobile device applications and on the web.  Tinder users have the option of purchasing various subscription tiers as well as certain features on an á la carte basis.

*Amici* are each directly impacted by Apple's App Store Review Guidelines ("Guidelines") and have a substantial interest in ensuring that the Court's September 10, 2021 injunction against Apple is enforced.  As developers of some of the most popular apps on the App Store, *Amici* have been subject to Apple's anti-steering restrictions for years.  *Amici* therefore have a unique perspective that can aid the Court in its resolution of Plaintiff's Motion to Enforce Injunction.

**INTRODUCTION**

In September 2021, following a three-week bench trial, this Court issued an order (the "Trial Order") finding that certain anti-steering provisions in Apple's Guidelines had "numerous anticompetitive effects" and caused "considerable" harm to users of Apple's iOS mobile devices and to developers of apps designed to run on those devices.  *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1056 (N.D. Cal. 2021).  At the time of trial, Apple's anti-steering provisions were in Sections 3.1.1 and 3.1.3 of the Guidelines and prohibited developers from (i) including "buttons, external links, or other calls to action" within their apps that directed customers to purchasing mechanisms, other than Apple's proprietary In-App Purchase programming interface ("IAP"), that could be used to purchase content to consume within their iOS apps or (ii) "encourag[ing] users to use a purchasing method other than [IAP]" either "within the app or through communications sent to points of contact obtained from account registrations within the app (like email or text)."  (PX-2790, Dkt. No. 871-4, Ex. 11 §§ 3.1.1, 3.1.3.)  These restrictions were designed to ensure that iOS users' purchases of in-app content took place through Apple's IAP, subject to Apple's commissions of up to 30% — rates that the Court found to be

SULLIVAN
&
CROMWELL LLP

"excessive" and "unjustified." *Epic Games*, 559 F. Supp. 3d at 997, 1054. The Court observed that Sections 3.1.1 and 3.1.3 of Apple's Guidelines prevented app developers from informing consumers that iOS app content could be purchased at lower prices on non-Apple platforms, which — the Court recognized — had led to decreased innovation and higher costs to developers of iOS apps. *Id.* at 1054. As a result, the Court held that Apple's anti-steering rules violated California's Unfair Competition Law ("UCL").

To remedy Apple's UCL violation, the Court entered a permanent injunction expressly prohibiting Apple from restricting developers' freedom to inform customers about, and direct customers to, alternatives to Apple's IAP. Specifically, the injunction permanently enjoins Apple "from prohibiting developers from . . . including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing."[2] (*See* Dkt. No. 813.) This remedy was appropriate, the Court held, because Apple's anti-steering provisions "can be severed without any impact on the integrity of [Apple's] ecosystem"; that is, Apple's interests in protecting iOS users' safety and privacy while using iOS apps "[would] not be significantly impacted by the increase of information to and choice for consumers." *Epic Games*, 559 F. Supp. 3d at 1055, 1057. This Court's Trial Order, and the Ninth Circuit's opinion affirming the Court's judgment, explained that the injunction was intended to achieve at least three aims: (i) offer consumers transparency and choice, by lifting the "veil" that Apple has imposed on in-app communications; (ii) facilitate price competition that Apple's anti-steering rules have prevented; and (iii) enable third-party payment providers that compete with Apple's IAP to serve as alternatives for app developers and consumers.

But Apple's response to the injunction clearly violates the Court's orders. On January 16, 2024 — the same day that the U.S. Supreme Court declined to hear Apple's appeal of the Ninth Circuit's decision upholding this Court's injunction — Apple filed a Notice that

---

[2]     The injunction also enjoins Apple from prohibiting developers from "communicating with customers through points of contact obtained voluntarily from customers through account registration within the app." In 2021, in connection with its settlement of the *Cameron* v. *Apple* class action lawsuit, Apple eliminated Guidelines provisions that previously prohibited such communications. (*See* Apple's Notice, Dkt. No. 871, at 15.)

SULLIVAN
&
CROMWELL LLP

explained Apple's approach to complying with this Court's orders (the "Apple Plan").  (*See* Apple's Notice, Dkt. No. 871.)  The Notice announces that Apple has created a new process, called the StoreKit External Purchase Link Entitlement (US), through which developers can apply for permission to include within their apps a link to an out-of-app purchase mechanism.  (*Id.* at 5.) Over the next nine pages and 2,900 words, Apple's Notice describes dozens of requirements and limitations to which developers must adhere to be eligible to include an external purchase link within their apps.  (*Id.* at 6–15.)

The Apple Plan comports with neither the letter nor the spirit of this Court's mandate in its Trial Order and injunction.  As described in Epic's Motion to Enforce (Dkt. No. 897), the Apple Plan leaves in place anti-steering rules that this Court expressly found to be anti-competitive and imposes new restrictions on app developers that ensure the price competition that the injunction was designed to promote will never materialize.  The Court should reject the Apple Plan for at least three reasons.

*First*, the Apple Plan violates the express terms of the injunction.  Currently, the only way Apple permits developers to communicate with consumers within an iOS app to direct them to an alternative purchase method is by applying for an entitlement to include a link directly to the developer's website.  This interpretation of the Court's injunction ignores the prohibition against Apple's preventing developers from using, within their apps, "other calls to action" to direct users to purchasing methods other than IAP.  Furthermore, Apple's Guidelines retain the explicit anti-steering rules — prohibiting developers from "encourag[ing] users to use a purchasing method other than in-app purchase" — that the Court previously condemned.

*Second*, the Apple Plan also contravenes the injunction's fundamental purposes.  It imposes restrictions and conditions on developers' ability to link to an external payment mechanism that dictate every aspect of developers' communications with their users, stifling transparency and price competition, and denying meaningful consumer choice.  Further, by requiring developers to pay an inflated commission on out-of-app purchases made after a user clicks on an external payment link, Apple ensures that developers cannot offer consumers a viable alternative to IAP, much less a competitive alternative that could reduce prices for consumers.

SULLIVAN
&
CROMWELL LLP

And finally, by providing that any external links that a developer includes in its apps must direct users to a webpage owned by that developer — rather than to a third-party payment platform, which could spread operational costs across and process payments for multiple developers — Apple insulates itself from competition by existing rivals and prevents the emergence of new app transaction platforms.  Collectively, Apple's requirements discourage consumers from using alternatives to IAP, inflate the prices consumers would pay through alternative mechanisms, and allow Apple to maintain the high IAP commissions that the Court found to be excessive.

*Third*, Apple's restrictions will have real-world adverse impacts on both consumers and app developers that extend beyond the Epic Games Store, and beyond mobile gaming generally.  Because the Court's injunction applies to all apps, and not just gaming apps, *Amici* and other developers should be permitted to direct their users to lower-cost purchasing mechanisms on non-IAP channels, which would facilitate price competition and would serve as a check on Apple's IAP commissions.  If allowed to stand, the Apple Plan's new anti-steering restrictions will lead to inflated prices across a broad swath of the digital economy and harm consumers and small businesses throughout the United States.

Because the Apple Plan fails to meet the express requirements of the injunction and does not further its goals, it should be rejected.  Apple's new restrictions are plainly designed to render alternatives to Apple's IAP impractical for developers, and inaccessible and unappealing to consumers, thus circumventing both the spirit and underlying goals of the injunction.  Accordingly, *Amici* respectfully request that this Court grant Plaintiff's Motion to Enforce, reject the Apple Plan, and require Apple to fully comply with the terms of the Injunction.

## ARGUMENT

## I.    THE APPLE PLAN KEEPS IN PLACE EXPRESS ANTI-STEERING RULES THAT THIS COURT FOUND ANTI-COMPETITIVE.

### A.    Apple Continues To Prohibit "Other Calls to Action" Informing Consumers about, or Directing Consumers to, Lower-Cost Payment Options.

The injunction instructs Apple that it may not prohibit developers from "including in their apps and their metadata *buttons*, external links, *or other calls to action* that direct customers to purchasing mechanisms, in addition to In-App Purchasing."  (Dkt No. 813 (emphases added).)

Sullivan & Cromwell LLP

5

Br. of *Amici Curiae* Meta, Microsoft, X, and Match Group in Supp. of Epic's Mot. to Enforce Injunction
Case No. 4:20-cv-05640-YGR-TSH

The injunction thus plainly requires Apple to permit developers to take at least two kinds of actions, within their apps, to direct or encourage consumers to use alternatives to Apple's IAP: (i) including buttons or external links that "direct customers to purchasing mechanisms" other than IAP; and (ii) including information that apprises customers of alternative purchasing mechanisms, without offering a direct link to such mechanisms (*i.e.*, "other calls to action").  By requiring Apple to permit both types of actions, the Court sought to remove Apple's restrictions on providing truthful pricing information to consumers and to ensure the "open flow of information" about lower prices available on other platforms.  *Epic Games*, 559 F. Supp. 3d at 1055.

But under the Apple Plan, the *only* way for developers to direct customers to alternative payment options is the tightly circumscribed external link entitlement.[3]  Apple's interpretation of the injunction thus renders meaningless the Court's prohibition against restricting "other calls to action that direct customers to purchasing mechanisms."  The provision of even the most basic information about alternatives remains forbidden under the Apple Plan.  For example, a developer might wish to offer the following information within its app:  "*You can buy this product at a 30% discount on our website*" or "*Buy this service on the web to avoid a 30% Apple service charge on your total payment amount.*"  These simple calls to action would allow a developer to inform consumers about alternative payment options and are the kinds of statements that the Court clearly intended that Apple would allow.  By continuing to prohibit statements like these, the Apple Plan violates the maxim that injunctions must be construed "so as to give effect to every part of the document."  *B2B CFP Partners, LLC* v. *Kaufman*, 2012 WL 1067904, at *3 (D. Ariz. Mar. 29, 2012).

Preventing app developers from communicating truthful information about the prices available on other platforms also undermines the Court's desire to terminate restrictions that unlawfully suppress information about alternative payment methods and, in turn, competition to Apple's IAP.  *Epic Games*, 559 F. Supp. 3d at 1054 (citing a lack of competition among different payment mechanisms and observing that "competition is not driving [Apple's] commission rate").

---

[3]    The numerous problems with Apple's external link entitlement are described in Section II below.

Sullivan & Cromwell LLP

And there is no conceivable justification for Apple's prohibition of such statements (certainly, Apple offers none). In the examples noted above, the developer is merely conveying information to the consumer in a way that furthers price competition, without modifying the payment flow or any other aspect of the app experience. Yet Apple continues to prohibit such statements, in violation of this Court's injunction.

**B.**     **Apple Has Retained Its Prohibition on "Encourag[ing] Users To Use a Purchasing Method Other than In-App Purchase."**

In its Trial Order, this Court concluded that "Apple's conduct in enforcing anti-steering restrictions is anticompetitive," and that a "remedy to eliminate those provisions is appropriate." *Epic Games*, 559 F. Supp. 3d at 1068. The Trial Order makes clear that the offending anti-steering provisions in Apple's Guidelines included *both* Section 3.1.1, which at the time of trial provided that apps "may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase," *and* Section 3.1.3, which provided that apps "cannot . . . within the app . . . encourage users to use a purchasing method other than in-app purchase."[4]

In response to the injunction, Apple removed the offending language from Section 3.1.1, but inexplicably maintained it in Section 3.1.3. That section — which applies to "Multiplatform Services" (like Facebook and Instagram) that "operate across multiple platforms,"[5] and several other broad categories of apps[6] — still states that a developer "cannot, within the app, encourage users to use a purchasing method other than in-app purchase." (*See* Dkt. No. 874, Ex.

---

[4]     *Id.* at 1055 & n.635 ("As explained before, Apple uses anti-steering provisions prohibiting apps from including 'buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase,' [Section 3.1.1] and from 'encourag[ing] users to use a purchasing method other than in-app purchase' [Section 3.1.3] . . . . Thus, developers cannot communicate lower prices on other platforms . . . ."); *see also id.* at 944–45 (referencing both sections).

[5]     The definition would also appear to capture many gaming apps that are available on gaming consoles and/or other platforms and a broad range of other types of apps that can be accessed on the web, including news apps and audio- and video-streaming apps.

[6]     Indeed, the apps subject to Section 3.1.3's anti-steering restriction include all apps that, outside the narrow confines of Apple's new external link entitlement, are permitted to use purchase methods other than Apple IAP. (*See* Dkt. No. 874, Ex. 1 § 3.1.3.)

7

Br. of *Amici Curiae* Meta, Microsoft, X, and Match Group in Supp. of Epic's Mot. to Enforce Injunction
Case No. 4:20-cv-05640-YGR-TSH

Sullivan
&
Cromwell LLP

1 § 3.1.3.) Apple's Guidelines thus preserve the very anti-steering restrictions that this Court found

to be anti-competitive and that its injunction was intended to curtail.

## II.   APPLE CONTINUES EFFECTIVELY TO PROHIBIT 'EXTERNAL LINKS' DIRECTING CUSTOMERS TO LOWER-COST PAYMENT OPTIONS.

In the Trial Order, this Court envisioned that the appropriate remedy for Apple's

anti-steering provisions would be to "sever[]" or "invalidat[e] the offending provisions."  *Epic*

*Games*, 559 F. Supp. 3d at 1055, 1057.  Instead of striking the anti-steering rules from its

Guidelines, as the Court contemplated, Apple has put in place a new, but also anti-competitive,

scheme that continues to restrict price information.  The practical effect of Apple's new restrictions

— with which developers must comply if they wish to include links to external payment

mechanisms within their apps — is to prevent app developers from presenting alternatives to

Apple's IAP when consumers are making their decision whether to purchase in-app content.

Apple's new rules thus replicate the prohibition against directing consumers to alternative payment

mechanisms, even if that prohibition is no longer made explicit in the Guidelines.

Apple claims that compliance with Paragraph 1(i) of the injunction is fully achieved

with the introduction of the external link entitlement in Section 3.1.1(a) of its Guidelines, called

"Link to Other Purchase Methods."[7]  (*See* Apple's Notice, Dkt. No. 871, at 4.)  This change is the

sole accommodation Apple has made, independently of Apple's obligations under its settlement

of the *Cameron* v. *Apple* class action lawsuit, purportedly to address this Court's Injunction.  (*See*

*id.* at 15.)  But in reality, these links do nothing to give consumers true choice in selecting between

alternative payment options for in-app content.

There are at least three obvious problems with the Apple Plan as a means of

addressing the Court's goal to "increase competition, increase transparency, [and] increase

---

[7]      Section 3.1.1(a) now reads: "Developers may apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for in order to purchase such items. . . .  In accordance with the entitlement agreement, the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price.  The entitlement is limited to use only in the iOS or iPadOS App Store on the United States storefront.  In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase."

consumer choice and information." *See Epic Games*, 559 F. Supp. 3d at 1069.  *First*, the external link entitlement process is layered with so many requirements, and dictates how developers may communicate pricing information to such a degree, that it neuters developers' ability to present alternative payment options to users.  *Second*, purchases that take place on the developer's website within seven days after the consumer clicks on the external link remain subject to a 27% (or 12%, for qualifying purchases) commission.  This alone functionally renders external links ineffective as a means of directing customers to alternative payment options, and directly undermines the Court's goal of creating price competition.  *Third*, the Apple Plan unnecessarily requires that the external link send users to the app developer's website to complete a transaction, preventing developers from employing any alternative payment option outside of the developer's own website.

Each of these shortcomings alone would make it difficult for developers to implement external links in such a way that consumers might actually use an alternative payment mechanism to IAP.  Together, these restrictions restrict price competition and prevent the free flow of information so as to *ensure* that consumers will choose IAP over alternative payment options every time.

### A. Apple's External Link Rules Dictate Where and How Developers Communicate with Users about Alternative Payment Mechanisms, Rendering External Links Impractical for Developers and Irrelevant to Consumers.

The rules for Apple's external link entitlement contain dozens of onerous requirements, set out in an eight-page addendum to the Apple Developer Program License Agreement (*see* Dkt. No. 874, Ex. 2), dictating every aspect of how developers may present the external link within their apps.  (*See also* Epic Brief, Dkt. No. 897, at 5–11 (describing anti-competitive restrictions in Apple Plan).)  These elements require consumers to navigate a veritable obstacle course before completing a transaction using an alternative payment mechanism.  Many of these restrictions, even standing in isolation, would make it challenging for developers effectively to inform consumers about payment alternatives to Apple's IAP.  When combined, the requirements for the external link entitlement ensure that very few users will ever even *find* the

SULLIVAN
&
CROMWELL LLP

external link within an app in the first place — and those users who do find the link will not enjoy greater consumer choice because the link is not allowed to be part of any in-app purchase flow.

**Location and Appearance of the Link**.  Apple makes every effort to hide the payment links by prohibiting app developers from placing them in convenient locations where consumers would expect to find payment-related options or from using tools to help consumers locate them.  Apple requires that the link appear "on no more than one app page . . . in a single, dedicated location" and forbids developers from displaying the link "on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase." (Dkt. No. 874, Ex. 2 § 3.3.)  This restriction prevents the link from appearing where consumers would find it most convenient (*i.e.*, in an in-app payment flow) and impairs consumers' ability to engage in comparison shopping.  Because Apple forbids links from appearing on any page that is part of an in-app payment flow, consumers cannot make point-of-sale comparisons between Apple IAP and alternatives.  Instead, the scheme relegates the link to unexpected and inconvenient locations, such as an app's sign-in or account screens.[8]  In effect, users are forced to choose *in advance* whether to use IAP or an external payment method, without having the ability to compare payment options and pricing *at the time of purchase*.

Making matters worse, developers may not help users find the in-app purchase link; the link must be found at an "app page the user navigates to," and Apple's requirements forbid developers from displaying the link in an "interstitial, modal, or pop-up," or in a button of a color that contrasts with the app page background.  (*Id.*; *id.*, Ex. 3 (requiring that links "may not be enclosed in a shape that uses a contrasting background fill" and that "[t]he background surrounding the text must match the background of your app's page.").)  Apple also requires the link "[n]ot mimic Apple's in-app purchase system" (Dkt. No. 874, Ex. 2 § 3.3), but the meaning of this requirement is unclear; the streamlined checkout flow that IAP offers is by no means unique to IAP or proprietary to Apple.  These requirements regarding the *appearance* of the external payment link cannot have any reasonable justification, except to make it more difficult for users

---

[8]     *See* Dkt. No. 874, Ex. 3 (providing exemplar templates for an external link appearing within an app's sign-in screen and account screen).

SULLIVAN
&
CROMWELL LLP

to identify the link and thus protect Apple's ability to funnel consumers towards IAP.

*Language Requirements*.   Apple also prescribes the precise language that developers must use in presenting the link, limiting developers to one of seven "templates" that dictate the exact wording surrounding the link.   For example, developers are limited to stating, "For special offers, go to www.example.com," or "Buy for $X.XX at www.example.com."   (*Id.* Ex. 3.)   Developers may not provide any additional detail about special offers that might be available or give consumers helpful information about the different products or services for sale. Apple also forbids developers from "encourag[ing]" consumers to use an alternative payment method (as discussed *supra*, Section I.B), and from "discourag[ing]" consumers' use of Apple IAP (*see* Dkt. No. 874, Ex. 2 §§ 3.1, 3.3).   Apple thus forbids developers from offering complete information about the products or services they offer on their websites and the prices at which such products or services are available.

By dictating the language developers must (and must not) use to inform users about alternative mechanisms, Apple perpetuates the very problem that the Court identified and sought to stop.   The Court found that Apple used its anti-steering rules "to hide information on [its] commission rates from the consumers," and it identified Apple's "general policy" of "prevent[ing] developers from informing users of its 30% commission" as among the restrictions on price information that should be "severed" from Apple's Guidelines.   *Epic Games*, 559 F. Supp. 3d at 959, 1055.   The Apple Plan prevents developers from informing consumers about "policies which effect consumers' ability to find cheaper prices," allowing Apple to continue to exploit consumers to extract supracompetitive IAP profits.   *Id.* at 1013.

*Consumer Warning Sheet*.   Apple further requires that consumers who succeed in finding the purchase link and clicking on it must then confront and click past an alarming "in-app system disclosure sheet" pop-up.   (*See* Dkt. No. 874, Ex. 3.)   The warning screen leads with the boldface alert: "You're about to go to an external website.   Apple is not responsible for the privacy or security of purchases made on the web."   (*Id.*)   The warning frames Apple's payment method as the norm and alternative payment methods as dangerous deviations.   The pop-up further warns that App Store-related features, "such as subscription management and refund requests, will not

SULLIVAN
&
CROMWELL LLP

be available," conveying the misimpression that the developer does not offer subscription management and refund features of its own when, in fact, Apple *requires* developers to implement a process for subscription management and refund requests to qualify for a link entitlement.  (*See* Dkt. No. 874, Ex. 2 § 4.3.)  And although the pop-up recites the benefits that consumers will *lose* by using an alternative to Apple's IAP, it affords developers no space to describe any benefits consumers will *gain* by doing so.

**Technical Restrictions**.  Apple also requires that, if a consumer clicks on the purchase link and proceeds past the warning pop-up, he or she must be directed to the developer's website, which must open in a new window rather than within an in-app web view.  (Dkt. No. 874, Ex. 2 § 3.3.)  Because Apple also prohibits developers from including URL parameters in the purchase link (*id.*), the developer's website will have no information about who the consumer is or the item he or she wished to purchase.  Rather than tapping one button leading to a screen where the consumer can complete a purchase — which is technically feasible — the consumer must instead find the static app page where the purchase link is located, tap the link, continue past Apple's warning sheet, enter his or her login information, search again for the particular item he or she wished to purchase, and complete the purchase on the developer's website.

Furthermore, it is not practical for *Amici* and other developers to direct app users who click an external payment link to a single checkout page listing all of the products or services available within the developer's app.  Apple's technical restrictions are especially problematic for developers of ad-supported apps like Meta's and X's that offer a disparate range of products, some of which are intended for consumers and others for advertisers.  As such, *Amici* would be forced to direct users to the home page for the browser version of their apps and hope that their users can find their way to the products or services they intended to purchase.  By restricting the information that can be passed from a developer's app to its website, Apple needlessly places roadblocks that prevent consumers from seamlessly completing their purchases, thereby making the use of alternatives to Apple's IAP still more undesirable.

All of these restrictions create unnecessary friction in purchasing through external links, which Apple plainly engineered to discourage consumers from even attempting to use

SULLIVAN
&
CROMWELL LLP

12

BR. OF *AMICI CURIAE* META, MICROSOFT, X, AND MATCH GROUP IN SUPP. OF EPIC'S MOT. TO ENFORCE INJUNCTION
CASE NO. 4:20-CV-05640-YGR-TSH

alternatives outside Apple's IAP.  These restrictions violate the injunction and continue to prop up Apple's "excessive" IAP commission rates.  *Epic Games*, 559 F. Supp. 3d at 1054.  As this Court recognized, "competition is not driving [Apple's] commission rate" of up to 30%, and Apple's restrictions "create the potential for anticompetitive exploitation of consumers."  *Id.* at 1054–55.  By attaching so many conditions and requirements to the external link entitlement, Apple has ensured that developers will not be able to use external links to direct customers effectively to alternative payment options, so that Apple will be able to continue to direct users towards IAP and its commission rates that this Court found to be "supracompetitive" and unjustified.[9]

## B.   Apple Imposes a 27% Commission on External Purchases, Eliminating any Meaningful Price Competition with IAP.

As if its design and technical requirements for the external purchase links were not enough, Apple also continues to impose commission rates similar to those it charges for IAP on purchases taking place through alternative mechanisms.  Under Apple's new rules, developers must still pay Apple a *27% commission* (or 12% for certain qualifying purchases), instead of the usual 30% (or 15%) commission charged on transactions made through Apple's IAP.  (Dkt. No. 874, Ex. 2 § 5.1.)  Remarkably, that commission applies to any sales of "goods or services [that] can be used in an Application" — regardless of whether the consumer *actually does* use them within an iOS app — that take place on the developer's website and are made within seven days after a link out.  (*Id.* § 1 (defining "Transaction").)  Within that seven-day window, the consumer might make multiple purchases of content that can be consumed within the developer's iOS app, including purchases made on desktop computers or even on Android devices.  Apple claims entitlement to collect its external purchase commission on each of those purchases, even if the consumer never ultimately decides to access the content within an iOS app.  In other words, Apple has used the injunction *to expand* the scope of transactions that are subject to its commissions.

---

[9]     *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 1056–57 ("This trial has exposed numerous anticompetitive effects which need not be recounted in detail. . . . Apple has not offered any justification for the actions other than to argue entitlement.  Where its actions harm competition and result in supracompetitive pricing and profits, Apple is wrong.  Accordingly, the harm from the anti-steering provisions outweighs its benefits, and the provision violates the UCL under the balancing test.").

SULLIVAN
&
CROMWELL LLP

This has several important implications.

   *First*, it will not be economically viable for developers to implement lower-cost, alternative payment options if they must pay a 27% commission to Apple.  This is because developers incur additional costs for transactions outside of their apps that would exceed the 3% "discount" to Apple's normal IAP commission in almost every case.  For example, payment processing fees alone often exceed 3% of the amount of the transaction.[10]  Beyond payment processing, developers may also incur additional expenses, such as the cost of providing customer service to troubleshoot payment issues.  As such, after including Apple's 27% commission, developers' costs of implementing a payment alternative would almost always be greater than 30%.  Apple's imposition of a commission that is effectively equivalent to or higher than Apple's own IAP commission means that a developer cannot afford to offer alternative payment solutions more cheaply than those available within iOS apps using Apple's IAP.

   *Second*, even those few developers who otherwise would be willing to pay Apple's 27% to implement their own payment mechanism will very likely be dissuaded from doing so because few, if any, consumers would ever choose an alternative payment option priced the same as or higher than the price through IAP.  Apple's IAP enjoys many inherent advantages:  for one thing, IAP is not subject to the restrictions that Apple places on external links.  As this Court recognized, IAP also offers other benefits to consumers, including the fact that their payment method(s) may already be saved with Apple (an advantage that can be attributed to Apple's years-long prohibition on alternatives to IAP and its anti-steering provisions).[11]  To overcome those advantages, alternative payment mechanisms would likely need to offer a significantly lower price to encourage consumers to overcome the barriers to forgoing IAP and complete transactions on a

---

[10] *See, e.g.*, *PayPal Merchant Fees*, PAYPAL, https://www.paypal.com/us/webapps/mpp/merchant-fees (last updated Oct. 23, 2023) (commercial transaction fee for payments in U.S. dollars of 2.99% plus $0.49 for credit and debit card payments, or 3.49% plus $0.49 for other commercial transactions); *Pricing*, STRIPE, https://stripe.com/pricing? (2.9% plus $0.30 fee for transactions through domestic cards and digital wallets, plus additional 0.5% fee for manually entered cards and other potential fees).

[11] *See Epic Games*, 559 F. Supp. 3d at 1055 (noting that "information costs" imposed by Apple's anti-steering rules "may create 'lock-in' for platforms as users lack information about the lifetime costs of an ecosystem").

SULLIVAN & CROMWELL LLP

14

BR. OF *AMICI CURIAE* META, MICROSOFT, X, AND MATCH GROUP IN SUPP. OF EPIC'S MOT. TO ENFORCE INJUNCTION
CASE NO. 4:20-CV-05640-YGR-TSH

developer's website.  Apple's imposition of a tax equivalent to or higher than Apple's own IAP commission all but guarantees that a developer cannot offer prices low enough to entice consumers to switch away from Apple's IAP, and therefore makes it significantly less likely that a developer will offer an alternative at all.

Third, for these two reasons, Apple's limited allowance of external links cannot possibly foster the price competition that this Court intended to facilitate through its injunction. The Court made clear that the purpose of the injunction is to provide consumers with information to enable price competition between Apple and alternative payment options.[12]  That purpose is clearly undermined if Apple can artificially distort competition by imposing a large tax on any alternative payment option.  By taxing the very act that is intended to enable competition (while offering a "discount" that is just small enough to ensure that any alternative payment mechanism nearly always costs as much as, or more than, IAP), Apple purposefully and directly undermines the price competition the Court intended to enable and raises prices for its rivals above what would be charged in a competitive market.  And by ensuring that payment alternatives are priced at or above the artificially high prices available on IAP, Apple can continue to keep consumers in the dark about how Apple's rules inflate pricing and maintain its own "unjustified" prices.  *Epic Games*, 559 F. Supp. 3d at 997.

### C.   The Apple Plan Suppresses Competition from Third-Party Payment Alternatives with No Legitimate Justification.

Finally, Apple unnecessarily requires that app developers direct consumers to the developer's own website to complete a purchase transaction. This distorts competition by insulating Apple from third-party competitors to IAP.  For example, many consumers may value the option of being redirected to a centralized payment site where they could manage all of their

---

[12]     *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 1014 ("While some consumers may want the benefits Apple offers (*e.g.*, one-stop shopping, centralization of and easy access to all purchases, increased security due to centralized billing), Apple actively denies them the choice. . . . Apple created an innovative platform but it did not disclose its rules to the average consumer.  Apple has used this lack of knowledge to exploit its position.  Thus, loosening the restrictions will increase competition as it will force Apple to compete on the benefits of its centralized model or it will have to change its monetization model in a way that is actually tied to the value of its intellectual property.").

SULLIVAN
&
CROMWELL LLP

app purchases — such as that offered by Stripe, PayPal, and other providers of third-party payment solutions — rather than having to visit each developer's site individually and enter their payment details multiple times.

There is no reason for this requirement aside from Apple's desire to protect itself from existing competitors and to prevent the emergence of new alternatives. The restriction cannot reasonably be explained by any of the purported privacy or security justifications that Apple asserts. (*See* Apple's Notice, Dkt. 871, at 6; *see also* Epic Brief, Dkt. No. 897, at 19–20.) In the Trial Order, this Court was skeptical that Apple's ability to protect users against fraud is superior to other payment providers. *See Epic Games*, 559 F. Supp. 3d at 1012 (finding that other companies could better detect fraudulent transactions, that Apple "has not shown" that its verification process for delivery of digital goods "is any different than other payment processors," and that "any potential for fraud prevention is not put into practice"). And in any event, the Court already balanced Apple's purported privacy and security justifications against the harms caused by its anti-steering rules and concluded that "the harm from the anti-steering provisions outweighs its benefits." *Id.* at 1056–57. Apple cannot now legitimately stand on privacy and security as the reason for continuing to deny consumers the ability to choose third-party payment providers over Apple's own IAP.

## III. APPLE'S RESTRICTIONS WILL CONTINUE TO HARM CONSUMERS AND APP DEVELOPERS.

The impact of Apple's refusal to comply with the Court's injunction reaches far beyond the Epic Games Store. The injunction's clear directive applies not only to gaming apps, but also to all other apps that offer digital products, features, and services to their users, including the apps offered by *Amici*. Like many other app developers, *Amici* permit users to access their services through both users' mobile devices and other means, such as personal computers. As such, *Amici* already offer many ways for users to purchase content to be used within their apps, many of which are much cheaper than Apple's IAP. But Apple's restrictions on where and how developers can communicate with their users about their options for purchasing in-app content create significant barriers to competition and artificially inflate prices.

***Meta.***   Meta offers several paid products within its apps that are impacted by Apple's anti-steering restrictions.  For example, Meta offers a product called "Boost Posts" that allow companies to "boost" their social media posts on Facebook and Instagram pages to better attract potential consumers.[13]  The businesses that choose to boost their posts are typically small businesses seeking simple methods to advertise their products and services.  Meta has therefore enabled businesses to boost posts not only through sophisticated ads tools like Facebook Ads Manager, but also through simplified interfaces accessible through Meta's Facebook and Instagram mobile apps and in its Facebook desktop experience.

For years, Apple did not apply its requirement to use IAP and to pay the associated 30% commission to advertising products like Boost Post.  In fact, in its April 2021 proposed findings of fact and conclusions of law in this litigation, Apple acknowledged its longstanding policy that free apps that "monetize through an advertising model . . . pay Apple nothing."  (Dkt. No. 410 ¶ 48.3.)  But in 2022, Apple reversed its position and revised its policies to require that all Boost Post purchases made on Apple devices use IAP.[14]  This policy change harms the small businesses and other advertisers that use Boost Post by increasing the cost of using boosted posts to promote their products and services, among other problems.  Under the Court's injunction, Meta should be permitted to direct its users to purchasing mechanisms on non-IAP channels, which would facilitate price competition, allow small businesses that advertise on Meta's social networks to save on advertising costs, and alleviate the other problems that Apple's 2022 policy change created.  But Apple's continued use of non-steering restrictions as part of the Apple Plan — as well as its 27% commission — means that Apple's policy change will continue to harm Meta and its users.

***Microsoft.***   Apple's failure to comply with the terms of the injunction has also made it effectively impossible for Microsoft to offer its users alternatives to Apple's IAP that could

---

[13]     This product is referred to as "Promoted Post" on Instagram.

[14]     Ben Lovejoy, *Facebook and Instagram boosts now have to give Apple a cut; Meta calls it a tax*, 9ᴛᴏ5Mᴀᴄ (Oct. 26, 2022), https://9to5mac.com/2022/10/26/instagram-boosts/#:~:text=Apple%20now%20wants%20a%2030,maker%20gets%20a%2030%25%20cut.

SULLIVAN
&
CROMWELL LLP

benefit users.  For example, Microsoft offers a number of cross-platform services by subscription.  Under Apple's Guidelines, Microsoft could not steer iOS users to payment platforms where it could offer better promotions, discounts, or ways to manage their subscriptions.  That remains true under the Apple Plan:  Microsoft has no ability to effectively direct users to a separate Microsoft platform for payment, and, even if it did, Microsoft cannot offer users discounts or other incentives to use alternative payments because it obtains no cost savings.  Microsoft also offers games and gaming services that are largely monetized through in-app purchases; the terms of the Apple Plan make it virtually impossible for Microsoft to steer iOS gamers to other payment mechanisms.

*X.*  X offers its users a similar range of in-app products that are negatively impacted by Apple's anti-steering restrictions and its anti-competitive 27% "tax" on purchases through an external link.  Among other paid subscription products on X, users have access to various Premium Subscriptions and Creator Subscriptions.  Under the Apple Plan, if an X user subscribed to any of these products through an external payment platform accessed by clicking an external link within the app, the subscription would be subject to Apple's 27% commission and anti-steering restrictions.  Apple's onerous terms thus eliminate any economic justification for X to encourage users to pay through an external link within the app, in effect nullifying the injunction that Epic obtained against Apple.

Indeed, Apple's anti-steering restrictions and commissions harm not only X itself but its users directly.  For example, through Creator Subscriptions, X allows users to subscribe to other users' (known as "creators") original content, including exclusive video, live spaces, newsletters, real-time breaking news, and other content.  X does not currently take a cut of Creator Subscription revenues, and instead passes 100% of Creator Subscription revenues, net of fees, along to the creators themselves.  Creators on the X platform are thus particularly harmed by Apple's 27% commission, since the commission means that creators will receive at most 73 cents on every dollar of subscription revenue they generate through users seeking to subscribe through the Apple ecosystem.

Moreover, the dozens of restrictions Apple places on external payment links, as set forth in Apple's external link entitlement, ensure that no viable external payment system for

SULLIVAN & CROMWELL LLP

BR. OF *AMICI CURIAE* META, MICROSOFT, X, AND MATCH GROUP IN SUPP. OF EPIC'S MOT. TO ENFORCE INJUNCTION
CASE NO. 4:20-CV-05640-YGR-TSH

creators can develop on the X platform for iOS users.  Under the weight of these many restrictions that are designed to create maximum friction between a user and their available payment options, X is strongly disincentivized from linking to out-of-app payment options at all.  Accordingly, the Apple Plan all but guarantees the very same anti-choice outcomes that this Court found to be "supracompetitive" and unjustified.  *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 1056–57.

**Match Group.**  Developers like Match Group offer users the ability to purchase services such as subscriptions and á la carte features as they use the app.  Yet the Apple Plan forces these developers    into placing a single external link on a static app page within tightly circumscribed template language, and not in places users are already presented with purchase options using Apple's IAP.  (Dkt. No. 874, Ex. 2 § 3.3.)  Thus, under the Apple Plan "developers cannot communicate lower prices on other platforms" in the many instances where consumers would make a purchase, and "Apple's [new] policy also prevents developers from informing users of its [27]% commission" anywhere within their apps.  *Epic Games*, 559 F. Supp. 3d at 1055.  These restrictions on Match Group and other developers prevent full and fair cross-platform price competition.

Apple appears to read the injunction as requiring that Apple permit developers to merely allow just one of (i) buttons, (ii) external links, or (iii) calls to action "that direct customers to purchasing mechanisms."  (*See* Dkt. No. 813.)  However, the injunction "restrain[s] and enjoin[s]" Apple from "prohibiting developers from" each of the three methods "that direct customers to purchasing mechanisms".  (*Id.*)  Apple's selective limiting of the injunction violates the injunction's letter and spirit, and it prevents developers like Match Group from including buttons and other calls to action that would facilitate cross-platform information to consumers, which this Court has found "is crucial."  *Epic Games*, 559 F. Supp. 3d at 1055.

And, as shown *supra* (*see* § II.B), Apple's imposition of a 27% commission results in total costs that are effectively equivalent to, or higher, than Apple's own IAP commission, which stymies price competition and makes the external link out option an unattractive option for developers.

The Apple Plan similarly will impact many thousands of other developers and their

SULLIVAN
&
CROMWELL LLP

19

Br. of *Amici Curiae* Meta, Microsoft, X, and Match Group in Supp. of Epic's Mot. to Enforce Injunction
Case No. 4:20-cv-05640-YGR-TSH

millions of users, frustrating the injunction's purpose of enhancing price competition across all digital transactions.

## IV.   THE APPLE PLAN SHOULD BE REJECTED FOR FAILING TO COMPLY WITH THE LETTER AND THE SPIRIT OF THE INJUNCTION.

As described above and in Epic's Motion to Enforce, Apple has ignored the express mandate of this Court's injunction by continuing to disallow "other calls to action" that "encourage users to use a purchasing method other than in-app purchase," and the Apple Plan places obstacles in the path to achieving the greater transparency and price competition that the injunction was intended to foster.  (*See* Epic Brief, Dkt. No. 897, at 20–23.)   The Apple Plan ensures the preservation of the *status quo*, notwithstanding this Court's clear imperative that Apple remove barriers to the dissemination of truthful information about prices and alternative payment options. Instead, Apple continues to maintain anti-steering provisions in its Guidelines (including provisions expressly condemned by this Court) and creates so many restrictions on the provision of information to consumers about alternative payment options that it puts developers in essentially the same position they were in before the injunction.

Although Apple's failure to comply with the express terms of the injunction, standing alone, provides sufficient basis for rejecting the Apple Plan, the Court should also reject the Apple Plan for violating the spirit of the Court's injunction and Trial Order.   In deciding whether an injunction has been violated, courts look to the "objective in issuing the injunction" and consider whether an enjoined party violated "the spirit of the injunction," even if "its strict letter may not have been disregarded."  *Inst. of Cetacean Rsch.* v. *Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (quoting *John B. Stetson Co.* v. *Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)); *see also Zest Anchors, LLC* v. *Geryon Ventures, LLC*, 2022 WL 16838806, at *3 (S.D. Cal. Nov. 9, 2022) (defendants' "self-serving interpretation of their obligations" violated the injunction); *Federal Trade Comm'n* v. *Productive Marketing, Inc.*, 136 F. Supp. 2d 1096, 1108 (C.D. Cal. 2001) (ordering contempt sanctions where "clear and convincing evidence that [the defendant] ha[d] not substantially complied" with injunction).

Thus, in *Zest Anchors*, the court found that the defendant had violated an injunction

SULLIVAN & CROMWELL LLP

20

Br. of *Amici Curiae* Meta, Microsoft, X, and Match Group in Supp. of Epic's Mot. to Enforce Injunction
Case No. 4:20-cv-05640-YGR-TSH

restraining it from selling products subject to a trade dress claim in the United States.  2022 WL 16838806, at *1.  To get around the express letter of the injunction, the defendant sold "non-infringing, individual components to foreign distributors," knowing that the parts would "be combined into an infringing whole for sale to customers in the United States." *Id.* at *2.  Though the injunction did not "specifically address[]" the defendant's conduct, the court held that "the intent behind the [injunction] was clear" and found the defendant in contempt for adopting a "self-serving interpretation of their obligations" that ignored the "spirit" of the injunction.  *Id.* at *4.

The Apple Plan does exactly the same thing.  This Court issued its injunction based on evidence that Apple's "anti-steering provisions" "showed anticompetitive effects and excessive operating margins under any normative measure." *Epic Games*, 559 F. Supp. 3d at 1054.  As a result, the "costs to developers are higher because competition is not driving the commission rate," and therefore "the commission rate driving the excessive margins has not been justified." *Id.* Rather than opening up iOS to price competition for alternative payment mechanisms for in-app content, as the Court intended, Apple has instead adopted a series of rules and restrictions that together "nullify" the injunction by preventing developers from communicating price information to consumers in a way that could actually lead to greater competition, and hamstringing any developer's efforts to create lower-cost alternatives in the first place. *Zest Anchors*, 2022 WL 16838806, at *3 (quoting *Institute of Cetacean Research*, 774 F.3d at 954).  Even if the Apple Plan could be viewed as "technically" complying with the injunction (it does not), Apple has undoubtedly violated the spirit of the injunction and undermined this Court's stated goal of increasing price competition.  Although Apple asserts that the Apple Plan satisfies the injunction by allowing the sharing of price information in certain limited circumstances, the burdensome, labyrinthine restrictions on third-party price sharing mean, for all practical purposes, that Apple's anti-steering rules remain in effect.

## CONCLUSION

Under the Apple Plan, developers will be left with only one of two options: (i) continue to subject themselves to Apple's IAP and pay Apple's "supracompetitive" commission, or (ii) set up an alternative payment mechanism that is subject to effectively the same

21

Br. of *Amici Curiae* Meta, Microsoft, X, and Match Group in Supp. of Epic's Mot. to Enforce Injunction
Case No. 4:20-cv-05640-YGR-TSH

SULLIVAN
&
CROMWELL LLP

"supracompetitive" commission, but also has numerous other Apple-dictated disadvantages relative to IAP.  *See Epic Games*, 559 F. Supp. 3d at 1056–57.  Apple will not be forced in either of these scenarios to "compete on the benefits of its centralized model" as this Court intended.  *Id.* at 1014.  Rather, Apple will continue to operate in exactly the manner this Court found to be unlawful, "hid[ing] critical information from consumers and illegally stifl[ing] consumer choice." *Id.* at 922.  For these reasons, *Amici* respectfully request that this Court reject the Apple Plan.

Dated:  March 20, 2024

/s/ *Brendan P. Cullen*
Renata B. Hesse
Brendan P. Cullen
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California  94301
Telephone:  (650) 461-5600
Facsimile:  (650) 461-5700
Email:   hesser@sullcrom.com
             cullenb@sullcrom.com

Shane M. Palmer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
Email:    palmersh@sullcrom.com

*Attorneys for* Amicus Curiae *Meta Platforms, Inc.*

/s/ *Reid M. Figel*
Reid M. Figel
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone:  (202) 326-7918
Facsimile:  (202) 326-7999
Email:    rfigel@kelloghansen.com

*Attorney for* Amicus Curiae *Microsoft Corporation*

SULLIVAN
&
CROMWELL LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joel Kurtzberg
John S. MacGregor
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
Facsimile:  (212) 269-5420
Email: jkurtzberg@cahill.com
          jmacgregor@cahill.com

/s/ *William R. Warne*
William R. Warne
DOWNEY BRAND LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:  (916) 444-1000
Facsimile:  (916) 520-5617
Email: bwarne@DowneyBrand.com

*Attorneys for* Amicus Curiae *X Corp.*


/s/ *Douglas J. Dixon*
Douglas J. Dixon
HUESTON HENNIGAN LLP
620 Newport Center Drive, Suite 1300
Newport Beach, CA  92660
Telephone:     (949) 229-8640
Email:  ddixon@hueston.com

Tate E. Harshbarger
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA  90014
Telephone:     (213) 788-4340
Email:  tharshbarger@hueston.com

*Attorneys for* Amicus Curiae *Match Group, LLC*

SULLIVAN
&
CROMWELL LLP

**ATTESTATION**

I, Brendan P. Cullen, am the ECF User whose ID and password are being used to file this document with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories concur with this filing.

Dated:  March 20, 2024

/s/ *Brendan P. Cullen*
Brendan P. Cullen

SULLIVAN
&
CROMWELL LLP

24

BR. OF *AMICI CURIAE* META, MICROSOFT, X, AND MATCH GROUP IN SUPP. OF EPIC'S MOT. TO ENFORCE INJUNCTION
CASE NO. 4:20-CV-05640-YGR-TSH