Karl Huth, *pro hac vice*
Matthew J. Reynolds, *pro hac vice*
Luke Rushing
huth@huthreynolds.com
reynolds@huthreynolds.com
lrushing@huthreynolds.com
**HUTH REYNOLDS LLP**
41 Cannon Court
Huntington, NY 11743
Tel: (631) 263-3648
Fax: (646) 664-1512

Of Counsel:

J. Lee Hill
lhill@huthreynolds.com
**HUTH REYNOLDS LLP**
41 Cannon Court
Huntington, NY 11743
Tel: (405) 826-3226
Fax: (646) 664-1512

*Attorneys for Digital Content Next*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>   Plaintiff, Counter-Defendant,<br><br>v.<br><br>APPLE INC.,<br><br>   Defendant, Counterclaimant. | **Case No.**: 4:20-CV-05640-YGR-TSH<br>**Judge**: Hon. Yvonne Gonzalez Rogers<br>**Hearing Date**: April 30, 2024<br>**Hearing Time**: 2:00 p.m.<br>**Courtroom**: 1, 4th Floor<br><br>**PROPOSED BRIEF OF *AMICUS CURIAE* DIGITAL CONTENT NEXT IN SUPPORT OF EPIC GAMES, INC.'S MOTION TO ENFORCE INJUNCTION** |

Digital Content Next ("DCN") hereby submits this brief as *Amicus Curiae* in support of Plaintiff Epic Games, Inc.'s ("Epic") March 13, 2024 Motion to Enforce Injunction, ECF No. 897 (the "Motion").[1]

## INTEREST OF *AMICUS CURIAE*

Founded in 2001, DCN is the only trade organization dedicated to serving the unique and diverse needs of high-quality digital content companies that enjoy trusted, direct relationships with consumers and advertisers. DCN's members[2] include many of the most trusted and well-respected publishing brands in the United States. Together, DCN's members have an unduplicated audience of 259 million unique visitors and reach 95 percent of the U.S. online population.

DCN's member list, the corporate logos of which are displayed on the next page, is a veritable "who's who" of the American media and publishing industry:

---

[1]  DCN is a non-profit, tax-exempt business association organized under Section 501(c)(6) of the Internal Revenue Code and based in New York, New York. DCN has no parent corporation, and no publicly held corporation has 10% or greater ownership in DCN. DCN affirms that no counsel for a party authored this brief in whole or in part, and no person other than DCN contributed any money to fund its preparation or submission.

[2]  *See* https://digitalcontentnext.org/membership/members/ for a listing of current DCN members.

# DCN Member Organizations



3

Br. Of *Amicus Curiae* DCN In Supp. of Epic's Mot. To Enforce Injunction
Case No. 4:20-CV-05640-YGR-TSH

Consumers seek out DCN member brands because they value trustworthy information that has gone through a rigorous editorial process, and publishers are held to account for the quality and trustworthiness of their news and entertainment by audiences who have high expectations. In light of Defendant Apple Inc.'s ("Apple") dominant market position in the United States, DCN's member companies must work extensively with and through Apple to promote and distribute their original content and apps, engage with existing subscribers and audiences, and find new audiences.

DCN and its members are directly impacted by Apple's App Store Review Guidelines (the "Guidelines") and have a substantial interest in ensuring that the Court's September 10, 2021 injunction against Apple is enforced. DCN's members have been subject to Apple's anti-steering restrictions for years, and Apple's anticompetitive behavior injures not only DCN and its members, but also the entire American public, which relies on DCN's member organizations for news and entertainment. DCN therefore has a unique perspective that can aid the Court in its resolution of Plaintiff's Motion to Enforce Injunction.

Apple's late, legendary leader Steve Jobs was often said to have a "reality distortion field" that kicked in whenever he committed his team to overcoming an obstacle. Apple, through its so-called "Notice of Compliance", Dkt. 871, is engaging in reality distortion on the grandest possible scale. Apple has done everything in its power to thwart and evade the injunction entered by this Court, and its "Notice of Compliance" brazenly flouts Apple's **non**compliance with this Court's Orders. DCN submits this brief to urge the Court to see through Apple's "reality distortion field" and enforce its injunction.

**RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

On September 10, 2021, following a three-week bench trial, this Court ruled that "Apple's conduct in enforcing anti-steering restrictions is anticompetitive" and, thus, a violation of California's Unfair Competition Law ("UCL"). ECF No. 812 at 180 (the

"Rule 52 Order"). At the time of trial, Apple's anti-steering provisions were in Sections 3.1.1 and 3.1.3 of the Guidelines and prohibited developers from (i) including "buttons, external links, or other calls to action" within their apps that directed customers to purchasing mechanisms, other than Apple's proprietary In-App Purchase programming interface ("IAP"), that could be used to purchase content to consume within their iOS apps or (ii) "encourag[ing] users to use a purchasing method other than [IAP]" either "within the app or through communications sent to points of contact obtained from account registrations within the app (like email or text)." PX-2790, ECF No. 871-4, Ex. 11 §§ 3.1.1, 3.1.3. Apple designed these restrictions to ensure that iOS users' purchases of in-app content took place through Apple's IAP, subject to Apple's commissions of up to 30%—rates that the Court found to be "excessive" and "unjustified." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 997, 1054 (N.D. Cal. 2021).

Also on September 10, 2021, the Court entered a Permanent Injunction enjoining Apple from prohibiting developers from including in their iOS apps "buttons, external links, or other calls to action" that direct customers to alternative purchasing methods outside of the app. ECF No. 813 ¶ 1 (the "Injunction" and, together with the Rule 52 Order, the "Orders"). This remedy was appropriate, the Court held, because Apple's anti-steering provisions "can be severed without any impact on the integrity of [Apple's] ecosystem"; that is, Apple's interests in protecting iOS users' safety and privacy while using iOS apps "[would] not be significantly impacted by the increase of information to and choice for consumers." *Epic Games*, 559 F. Supp. 3d at 1055, 1057. On April 24, 2023, the United States Court of Appeals for the Ninth Circuit affirmed the Court's Orders. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002–03 (9th Cir. 2023). On January 16, 2024, the United States Supreme Court denied Apple's petition for a writ of certiorari. *See* ECF No. 871-4, Ex. 20. Accordingly, this Court's Orders are now enforceable.

On January 16, 2024, in a purported effort to comply with the Court's Orders, Apple filed a Notice of Compliance announcing Apple's approach to complying with this Court's orders (the "Apple Plan"). *See* ECF No. 871 (the "Notice of Compliance" or "Notice"). The Notice is—probably deliberately—a lengthy and onerous document, but many of its provisions can be boiled down to three mechanisms designed to chill competition and ensure that Apple can continue to abuse its dominant position to extract anticompetitively high prices for its services. This brief colloquially describes those three mechanisms, which are described below, as (1) **the Gauntlet**, (2) **the Tax**, and (3) **the Scare**.

**The "Gauntlet"**

The Gauntlet—which takes its name from the gauntlet Apple would force developers to run before even becoming eligible to use external payment options—is described in Apple's Notice euphemistically as the StoreKit External Purchase Link Entitlement (US). This provision purportedly allows developers to apply for permission to include within their apps a link to an out-of-app purchase mechanism ("External Links" or "Links"). *Id*. at 5. But, as Apple's Notice describes in a lengthy disquisition covering nine pages and 2,900 words, the process includes dozens of requirements and limitations to which developers must adhere to be eligible to include an external purchase link within their apps. *Id*. at 6–15. Apple's requirements include provisions specifically designed to make External Links look inconspicuous and untrustworthy (and therefore unlikely to be used), including:

- Prohibiting developers from placing payment links *near the purchase flow*—exactly where an External Link would be most relevant and likely to be used. *See* ECF No. 874 Ex. 2 § 3.3; Mot. at 7.
- Restricting developers to just a few generic template messages dictated by Apple. Apple specifically instructs developers that "the language used in your

- app must match the template", prohibiting any additional efforts to encourage users to employ External Links. ECF No. 874 Ex. 3 (Apple-permitted "Templates"); Mot. at 7.
- Prohibiting developers from customizing or using any "buttons" other than an unobtrusive "Plain" style that does not appear to be a button, at all. *See Buttons*, APPLE DEVELOPER BLOG (last visited Mar. 12, 2023), https://developer.apple.com/design/human-interface-guidelines/buttons#Platform-considerations (Apple's "button styles"); Mot. at 7.

Even if a developer painstakingly complies with each requirement, resulting in a milquetoast External Link that is unlikely to be noticed or used by consumers, the Gauntlet presents one final obstacle: Apple may, in its "sole discretion", **still** reject any application for a Link Entitlement. ECF No. 874 Ex. 2 § 2.3. Moreover, participants in developer programs such as Apple's Video Partner Program ("VPP") and News Partner Program ("NPP"), both of which are relevant to DCN's members, are still prohibited from applying for a Link Entitlement to direct consumers to an external third-party payment system. *See id.* § 2.1 ("You will need to request an Entitlement Profile on the Apple Developer Program web portal prior to use of links from Your Application to an external website for purchases. To use an Entitlement Profile, Your Application must . . . [n]ot participate in the Apple Video Partner Program or News Partner Program . . . .").

**The "Tax"**

Standing alone, the Gauntlet's abstruse and burdensome requirements demonstrate that Apple is not complying with the Orders in good faith, and instead continues to burden and chill developers' use of competitive external payment solutions. But the Apple Plan did not stop at simply relying on the Gauntlet to chill competition.

1  Rather, Apple, in a brazen attempt to maintain its pre-litigation ability to extract an
2  anticompetitive 30% transaction fee, recreated that fee in the form of the "Tax".

3  Echoing Apple's pre-suit commission scheme, the Tax institutes fees on
4  purchases made via External Links where payment is made within a seven-day period
5  following the "link out" to the third-party payment system: ***27% on all first-time charges***
6  ***and "recurring charges"[3] in the first year***, and 12% on recurring charges in the second
7  year or later or charges related to a small business. *See* ECF No. 874, Ex. 2 § 5.1.
8  Remarkably, that fee—which represents a whopping 90% of the original abusive 30% fee
9  that led to this lawsuit—applies to any sales of "goods or services [that] can be used in an
10 Application" (regardless of whether the consumer actually does use them within an iOS
11 app) that take place on the developer's website and are made within seven days after a link
12 out. *See id.* § 1 (defining "Transaction"). The Tax therefore is more than just a recreation
13 of Apple's anticompetitive commission scheme; it is an insidious mechanism to penalize
14 developers for using External Links by giving Apple a lien on ***all business transacted on***
15 ***the developer's own website in the following week***—regardless of whether such
16 transactions would ever have been made from the iOS app.

17 **The "Scare"**

18 Even if a developer successfully runs the Gauntlet, securing Apple's approval
19 for a watered-down and unobtrusive External Link, and is willing to pay the Tax, Apple
20 employs yet another method to protect its anticompetitive fee structure: a mandatory
21 "Scare" message designed to threaten consumers directly and dissuade them from
22 continuing to an external payment route. The Scare, which Apple euphemistically calls an
23 "in-app system disclosure sheet", states that Apple is not responsible for the security or

---

[3] Unless otherwise stated, as used herein the phrase "recurring charges" refers to subscription renewals.

privacy of any payments outside of its system nor will stored payment methods or refunds be available for such purchases. *See* ECF No. 874, Ex. 3. The Scare message, which is reproduced below, is plainly designed to "pop up" in a manner similar to warning messages about unsafe websites or files that one might see on a computer or mobile device, thereby baselessly giving consumers the impression that *any* External Link leads to an inherently unsafe transaction environment:



*Id.*

The Scare message is non-negotiable, regardless of how safe a developer's external payment process actually is. Indeed, the Scare screen could even be considered to be knowingly false and misleading, because Apple requires developers to implement a process for subscription management and refund requests to qualify for a Link Entitlement.

*See* ECF No. 874, Ex. 2 § 4.3. Nonetheless, Apple requires that, "[e]ach time" a customer uses an external payment link, Apple's Scare screen will pop up. ECF No. 874, Ex. 3.

Taken together, the Gauntlet, the Tax and the Scare amount to a comprehensive defense-in-depth of Apple's anticompetitive fees, and are obviously designed effectively to eliminate the Orders' impact on Apple's business model—and allow Apple to continue abusing its dominant position to the detriment of DCN's members and the public.

## ARGUMENT

In deciding whether an injunction has been violated, courts look to the "objective in issuing the injunction" and consider whether an enjoined party violated "the spirit of the injunction," even if "its strict letter may not have been disregarded." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (quoting *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)); *see also Zest Anchors, LLC v. Geryon Ventures, LLC*, 2022 WL 16838806, at *3 (S.D. Cal. Nov. 9, 2022) (defendants' "self-serving interpretation of their obligations" violated the injunction); *FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1108 (C.D. Cal. 2001) (ordering contempt sanctions where "clear and convincing evidence that [the defendant] ha[d] not substantially complied" with injunction).

As detailed herein, DCN has grave concerns with Apple's new fee structure and consumer experience plan as reflected in Apple's Notice. The Apple Plan is a thinly veiled attempt to skirt this Court's Orders, which found Apple's anti-steering restrictions to be anticompetitive, because the Apple Plan uses the Gauntlet, the Tax and the Scare to achieve the same result as the anti-steering restrictions that it was supposed to remedy; namely, steering consumers *away* from payment systems via External Links in favor of Apple's IAP.

DCN, as a publishing trade organization, is particularly concerned about how the Apple Plan would impact the public's access to information and DCN's member organizations' exercise of their free press rights. DCN's members, which include prominent publishers, news and original content providers, and press organizations, play a crucial role in publishing and disseminating information to the public. A strong and vibrant press is necessary for a functional, free, and open democracy, but Apple's dominant position has essentially placed Apple between the free press and the public it serves—and has allowed Apple to unfairly tax and limit the free expression of DCN's member organizations and other participants in the modern press. This Court's Orders sought to put a stop to Apple's abuses—but the Apple Plan thumbs its nose at those Orders and essentially recreates, through the Gauntlet, the Tax, and the Scare, the same abuses that led to the Orders in the first place.

The Apple Plan is especially damaging to DCN's members and their peers because it would directly tax and undermine the ability of publishers to disseminate and charge for their content at a time when the news industry is already under great economic duress. Without the ability to monetize their content, these publishers' ability to fulfill their role in supporting the public welfare will be stymied.

For the reasons discussed herein, DCN respectfully requests that the Court grant Epic's Motion.

## I. Apple's New Fee Structure Violates the Court's Orders.

The Apple Plan is inconsistent with the Court's Orders in several ways:

***First***, the "Tax"—Apple's 27% fee on payments made through External Links—is a brazen attempt to neuter the Court's Orders and insulate Apple from any competitive pressure that might result in lower prices for consumers. Apple's proposed fees are cynically structured to make payments made via External Links untenable for developers. Previously, when a consumer purchased a product or service using Apple's

IAP, Apple charged a 30% fee for new purchases and recurring charges in the first year, and a 15% fee for recurring charges in the second year or later. Today, under the Apple Plan, for purchases made via External Links Apple now charges a 27% fee for new purchases and first-year recurring charges and a 12% fee for recurring charges in the second year or later. These new fees amount to 90% of the fees charged by Apple for new purchases and first-year recurring charges in its own app store (*i.e.*, 27/30). However, third-party payment systems outside the App Store typically charge between 2% and 4% of the transaction amount plus a nominal flat fee per transaction to process payments.[4] These fees are set not only to cover the service of actually handling the transaction, but also to account for the risk of the transaction.[5] Apple, however, plans to charge an exorbitant fee of 27% (*i.e.*, approximately **10 times higher** than typical charges by external third-party payment systems) **despite Apple taking no role in the transaction and providing no additional benefits to consumers or developers**. Thus, the Apple Plan for payments made via External Links will mean that the total costs for a developer to employ an alternate payment system (and, in turn, the final price for a consumer) will, at best, remain the same or, more likely, increase—with Apple still getting 90% of its "cut" without even having to provide any payment processing services or assume any of the associated risks.

    **Second**, the "Gauntlet"—the onerous and unreasonable rules that dictate every aspect of how developers may present an External Link within their apps, still

---

[4]  *See, e.g.*, Eric Rosenberg & Bryce Colburn, *What is a third-party payment processor?*, USA Today BLUEPRINT, Oct. 24, 2023, *available at* https://www.usatoday.com/money/blueprint/business/credit-card-processing/third-party-payment-processor/ (Last accessed on March 22, 2024).

[5]  *See, e.g.*, Mehdi Punjwani & Alana Rudder, *What are credit card processing fees?*, USA Today BLUEPRINT, Oct. 24, 2023, *available at* https://www.usatoday.com/money/blueprint/business/credit-card-processing/credit-card-processing-fees/ (Last accessed on March 22, 2024).

explicitly reserves to Apple the "sole discretion" to reject any External Link, thus recreating the practices enjoined by the Court's Orders.[6] Even if Apple does decide to allow an External Link, the Gauntlet ensures that the link will be unobtrusive, nonspecific, suspiciously vague, and not called to the user's attention by any discernible button.

*Third*, Apple's required, non-negotiable "Scare" screen is designed to operate as an explicit steering mechanism to steer consumers back to the IAP environment and chill any competitive pressure from External Links. Apple requires that consumers who succeed in finding the purchase link and clicking on it must then confront and click past an alarming "in-app system disclosure sheet" Scare screen. *See* ECF No. 874, Ex. 3. The warning screen leads with the boldface alert: "**You're about to go to an external website. Apple is not responsible for the privacy or security of purchases made on the web**." *Id*. The Scare warning frames Apple's payment method as the norm and alternative payment methods as dangerous deviations. The pop-up further warns that App Store-related features, "**such as subscription management and refund requests, will not be available**", *id.*, conveying the misimpression that the developer does not offer subscription management and refund features of its own when, in fact, Apple requires developers to implement a process for subscription management and refund requests to qualify for a link entitlement. *See* ECF No. 874, Ex. 2 § 4.3. And although the pop-up recites the benefits that consumers will *lose* by using an alternative to Apple's IAP, it affords developers no space to describe any benefits consumers will *gain* by doing so.

*Fourth*, the Gauntlet, Tax, and Scare policies are designed to, and do, complement each other to accentuate the anticompetitive effects of the Apple Plan. For example, Apple states in its "Scare" message to consumers that Apple will not assume any liability for or make any effort to protect purchases made via External Links—while

---

[6] *See also* Mot. at 5–11 (describing anticompetitive restrictions in Apple Plan).

at the same time the Tax exacts exorbitant fees nominally for just such purposes, payable to Apple, which has promised to do nothing to earn its fees. *See* Notice at 11. At bottom, this "***pay Apple to do nothing***" policy proves two things: (1) that Apple's pre-suit fee environment was premised on abuse of Apple's dominant position, because Apple now explicitly demands 90% of its old rate in return for no consideration whatsoever; and (2) that Apple has failed to comply with the letter or spirit of the Orders, and instead has just put a flimsy new gloss on the very business practices that the Orders enjoined. *See* Rule 52 Order at 163.

***Fifth***, for some developers, even submitting to the Gauntlet, Tax, and Scare protocol is not an option. Under the Apple Plan, developers who participate in Apple's VPP or its NPP are still expressly prohibited from directing consumers to an external third-party payment system. *See* ECF No. 874 Ex. 2 § 2.1. Thus, Apple appears to be attempting to continue shielding some of its business offerings from further competition and preventing a significant number of video and news consumers from benefiting from the lower prices that such competition might bring. This prohibition is particularly relevant to DCN's member organizations who provide video and news content to the public—and injures both DCN's members and the public at large. For those members, the bad old days of Apple simply prohibiting external payment links are still here.

## II. The Apple Plan Would Adversely Impact the Critical Press Function Played by Many of DCN's Members and Their Associated First Amendment Rights.

In addition to violating the letter and spirit of the Court's Orders, the Apple Plan threatens to interfere with the critical role that many of DCN's members, as publishers and members of the press, play in disseminating information to the public. As the Court previously stated, the purpose of its Injunction is to further the "public interest in uncloaking the veil hiding pricing information on mobile devices and bringing

transparency to the marketplace." Rule 52 Order at 166. Apple's Notice, however, demonstrates that it seeks to do precisely the opposite: use the Gauntlet and the Scare to prevent External Links from being used, and use the Tax to ensure that, in the unlikely event an External Link is used, Apple will still take its supracompetitive fees.

As Epic described in its Motion, the Apple Plan has faced condemnation from broad swathes of developers and industry participants for its anti-competitive effects in the market. *See* Mot. at 16–18. The Apple Plan will chill efforts by reputable developers, including publishers and members of the press, to provide consumers with news and information at lower prices.

In the context of trusted media outlets such as DCN's member brands, the Scare screen is particularly damaging. DCN's members go to great lengths to earn and maintain consumer trust by producing quality content and creating secure, premium environments for consumers. Consumers spend billions of dollars on access to DCN member websites, including many leading news websites, without similar warnings being deemed necessary by the providers of web browsers, notably including Apple's own Safari web browser. Moreover, Apple ***requires*** any developer using an External Link to implement a process for subscription management and refund requests to qualify for a link entitlement. *See* ECF No. 874, Ex. 2 § 4.3. By raising the false specter of risk and vulnerability before an app user can venture outside of Apple's own ecosystem—even where there is no basis to suggest that the third-party payment system is not secure, and in fact Apple knows that the developer has had to take steps to ensure security and privacy—Apple's Scare popups would deter consumers from using External Links that could allow developers, including publishers and news organizations, to provide access to quality content at lower prices. The Apple Plan thus effectively chills the ability of DCNs' members to fulfill their critical First Amendment functions as publishers and members of the press.

**CONCLUSION**

The Apple Plan falls far short of the intended effect of the Court's Orders, and would continue to impede California consumers' ability to realize the benefits of greater competition in Apple's App Store. If allowed to stand, the Apple Plan would harm not only DCN's members and other participants in Apple's App Store, but also the public at large, which depends on Apple's dominant platform as a vital source for information and published content. Accordingly, DCN respectfully requests that the Court grant Plaintiff Epic's Motion.

Dated: March 22, 2024

Of Counsel:

J. Lee Hill
lhill@huthreynolds.com
HUTH REYNOLDS LLP
41 Cannon Court
Huntington, NY 11743
Tel: (405) 826-3226
Fax: (646) 664-1512

Respectfully submitted,

HUTH REYNOLDS LLP

*/s/ Karl Huth*
Karl Huth, *pro hac vice*
Matthew J. Reynolds, *pro hac vice*
Luke Rushing
huth@huthreynolds.com
reynolds@huthreynolds.com
lrushing@huthreynolds.com
41 Cannon Court
Huntington, NY 11743
Tel: (631) 263-3648
Fax: (646) 664-1512

*Attorneys for Digital Content Next*