DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:  415.393.8200
Facsimile:  415.393.8306

MARK A. PERRY, SBN 212532
  mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice*)
  joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  202.682.7000
Facsimile:  202.857.0940

MORGAN D. MACBRIDE, SBN 301248
  morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
Redwood Shores Pkwy, 4th Floor
Redwood Shores, CA 94065
Telephone:  650.802.3044
Facsimile:  650.802.3100

MARK I. PINKERT (Fla. Bar No. 1003102;
*pro hac vice*)
  mark.pinkert@weil.com
KATHERINE G. BLACK (Fla. Bar No.
1031465; *pro hac vice*)
  katie.black@weil.com
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone:  305.577.3100
Facsimile:  305.374.7159

Attorneys for Defendant APPLE INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC. | Case No. 4:20-cv-05640-YGR |
|      Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>     Defendant, Counterclaimant | **APPLE INC.'S OPPOSITION TO EPIC GAMES, INC.'S MOTION TO ENFORCE INJUNCTION**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Hearing Date: April 30, 2024 (noticed date)<br>Hearing Time: 2:00 PM<br>Courtroom 1, 4th Floor |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

    I.      LITIGATION HISTORY ...............................................................................2

    II.     APPLE'S COMPLIANCE WITH THE INJUNCTION ..............................4

        A.    In-App Communications ..................................................................5

        B.    Out-of-App Communications ..........................................................7

    III.    KNOWLEDGEABLE OBSERVER RESPONSE........................................7

ARGUMENT .......................................................................................................................8

    I.      THE EXTERNAL PURCHASE LINK ENTITLEMENT COMPLIES WITH THE INJUNCTION ....................................................................9

        A.    The Injunction Does Not Prohibit Apple From Charging A Competitive Commission For Its Tools And Technologies .................................................12

        B.    The Injunction Does Not Micromanage the Technical Details of the External Link Entitlement ........................................16

    II.     THE REVISED GUIDELINES ALLOW "LINKS," "BUTTONS," *AND* "CALLS TO ACTION".....................................................19

    III.    EPIC'S QUESTION ABOUT MULTIPLATFORM APPS HAS ALREADY BEEN ANSWERED.....................................................22

    IV.    EPIC'S *AMICI* ADD NOTHING MATERIAL..........................................24

        A.    Meta, Microsoft, X, and Match.....................................................24

        B.    Spotify............................................................................................27

        C.    Digital Content Next ("DCN") .....................................................28

    V.     EPIC'S ACCUSATIONS OF "CONTEMPT" ARE UNSUPPORTED AND ERRONEOUS......................................................30

CONCLUSION...................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Alivecor, Inc. v. Apple Inc.*,
   2024 WL 591864 (N.D. Cal. Feb. 13, 2024) ....................................................9, 13

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979)...........................................................................16

*Cal. Dep't of Soc. Servs. v. Leavitt*,
   523 F.3d 1025 (9th Cir. 2008) .......................................................................14

*Cal. Grocers Ass'n, Inc. v. Bank of Am.*,
   22 Cal. App. 4th 205 (1994) .........................................................................15

*Cooke v. United States*,
   267 U.S. 517 (1925).....................................................................................30

*Desert Healthcare Dist. v. Pacificare, FHP, Inc.*
   94 Cal. App. 4th 781 (2001) .........................................................................15

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...................................................................16, 29

*Godoy v. Horel*,
   2010 WL 890148 (N.D. Cal. Mar. 8, 2010)......................................................15

*In re Google Play Store Antitrust Litig.*,
   No. 21-md-02981-JD (N.D. Cal. Jan. 18, 2024)...............................................9, 18

*Institute of Cetacean Research v. Sea Shepherd Conservation Society*,
   774 F.3d 935 (9th Cir. 2014) ........................................................................31

*Int'l Union v. Bagwell*,
   512 U.S. 821 (1994).....................................................................................30

*L.A. Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ........................................................................24

*McKel v. Wash. Mutual, Inc.*,
   142 Cal. App. 4th 1457 (2006) ......................................................................15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009).................................................................................10, 29

*Reno Air Racing Ass'n v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) .......................................................................31

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)....................................................................................31

ii

*Stone v. City & County of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) ....................................................................30

*United States v. Apple Inc.*,
    No. 24-CV-4055 (D.N.J. Mar. 21, 2024).................................................24

*United States v. Bright*,
    596 F.3d 683 (9th Cir. 2010) ....................................................................30

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..............................................................................9, 16

*Zest Anchors, LLC v. Geryon Ventures, LLC*,
    2022 WL 16838806 (S.D. Cal. Nov. 9, 2022) .........................................31

**Statutes**

California Unfair Competition Law................................................3, 9, 12, 15, 32

Digital Markets Act...........................................................................................32

Sherman Act.......................................................................................................12

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)............................................................13

Federal Rule of Civil Procedure 65(d) .........................................................30, 31

# INTRODUCTION

Apple takes this Court's orders, including the Permanent Injunction, very seriously.  Well before the Injunction went into effect, Apple invested significant resources into developing a new framework that would comply with the Injunction while also protecting users and Apple's investment in the App Store.  When the Supreme Court denied review, Apple implemented that framework immediately.  To be transparent with the Court, Apple submitted a voluntary "Notice of Compliance" that detailed its compliance with the Injunction, supported by a declaration from the Head of Worldwide App Store explaining the changes.  Apple has amended its Guidelines to allow developers to communicate with consumers regarding alternative purchase options both within their apps and outside their apps.  And Apple has made materials available to developers to help them understand and take advantage of the new External Purchase Link Entitlement for apps on the U.S. storefront.  In short, Apple's development and implementation of its framework for compliance with the Injunction was undertaken in good faith.

The Court's Injunction prohibits Apple from preventing developers from (a) including in-app links, buttons, or calls to action that direct users to alternative purchase mechanisms for digital goods and services, and (b) communicating with users outside of the app about alternative purchase mechanisms using contact collected through account registration within the app.  Dkt. 871-3 ("Perry Decl."), Ex. 6 ¶ 1.  To comply with the Injunction, Apple deleted both of those Guidelines and replaced them with new ones that allow developers to communicate with users, both within and outside their apps, regarding alternative purchase options.

In implementing the changes required by the Injunction, Apple carefully analyzed what commission structure would be fair and competitive in view of the substantial value Apple provides to developers.  Apple is submitting herewith a declaration from its Vice President of Finance that summarizes the bases for the commission structure adopted by Apple.  Apple also put guardrails on in-app communications, which were implemented only after considering existing entitlements for in-app links and the security and privacy issues that links present.  The Injunction does not prohibit, or even speak to, these measures; to the contrary, the Court has expressly recognized that Apple may charge a commission and take steps to protect users.  The purpose of the Injunction is to make information regarding alternative purchase options more readily available, not to dictate the commercial terms on which Apple provides

access to its platform, tools and technologies, and userbase.  Apple's framework for injunction compliance was implemented in good faith, after extensive study, for the benefit of all platform participants.

Apple wants developers on the App Store to thrive, it wants users to enjoy a safe and secure iOS experience, and it wants to continue to allow all participants to benefit from the unique ecosystem it has developed.  Apple designed and implemented the External Purchase Link Entitlement to comply with the Court's Injunction with those things in mind.  Epic, in contrast, is not seeking to enforce the extant Injunction; rather, its complaints about the new framework ask this Court to micromanage Apple's business operations in a way that would increase Epic's profitability.  But the financial interests of one developer should not override the interests of other developers or users, nor the interest of Apple, in maintaining a safe, secure, and efficient ecosystem.  At bottom, Epic's Motion is its latest attempt to gain access to the iOS platform and userbase for free—Epic does not even suggest an alternative amount that Apple should be allowed to charge developers for use of and access to its tools and technologies.  Epic's *amici*, which are all enormous developers, similarly seek to pad their own profits without concern for consumers or the integrity of the iOS ecosystem.  This Court already rejected those arguments on the merits, and the limited anti-steering Injunction neither addresses nor provides a vehicle to revisit that decision.

In seeking to hold Apple in contempt, Epic has assumed the burden of showing, by clear and convincing evidence, that Apple did not make good-faith efforts to substantially comply with the Injunction.  Epic has not adduced any relevant evidence to that effect.  On the contrary, the undisputed evidence establishes Apple's good-faith compliance with the Injunction, following this Court's instructions in its orders to give developers greater ability to make users aware of alternative purchase mechanisms both within and outside their apps while continuing to prioritize privacy and security.  In view of the record, Epic's request to hold Apple in contempt is without merit.

Apple respectfully requests that the Court deny Epic's Motion in its entirety.

## BACKGROUND

### I.     Litigation History

To maintain the integrity of its iOS ecosystem, Apple has long required developers that use Apple's proprietary tools and technologies protected by intellectual property to abide by the terms of the

Apple Developer Program License Agreement ("DPLA") and the App Review Guidelines.  PX-2619 (DPLA); PX-2790 (Guidelines).  Epic sued in 2020 challenging two particular requirements—App Store distribution and IAP—of the DPLA.  After a bench trial, the Court held that those requirements did not violate state or federal antitrust laws, including the California Unfair Competition Law ("UCL").  Perry Decl. Ex. 5 ("Rule 52 Order") at 162, 179.  The Court further found that two specific anti-steering provisions in the Guidelines were unfair under the UCL: (1) "[a]pps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [IAP]" (Guideline 3.1.1), and (2) "[a]pps in this section cannot, either within the app or through communications sent to points of contact obtained from account registration within the app (like email or text) encourage users to use a purchasing method other than [IAP]" (Guideline 3.1.3).  *See id.* at 31, 168.

In so doing, the Court expressed that its key points of focus were consumer choice and information, because "[i]n the context of technology markets, the open flow of information becomes even more critical."  Rule 52 Order at 164.  The Court expressed concern that the two identified anti-steering provisions led to a "lack of information transparency about policies which affect consumers' ability to find cheaper prices, increased customer service, and options regarding their purchases."  *Id.* at 118.  The Court noted, however, that there was a balance between "preserving Apple's iOS ecosystem" and "increas[ing] competition, increas[ing] transparency, and increas[ing] consumer choice and information."  *Id.* at 179.

The Court also recognized that if they could circumvent the IAP requirement, "developers could potentially avoid the commission while benefitting from Apple's innovation and intellectual property free of charge"; but in such circumstances, "[t]he Court presumes . . . that Apple may rely on imposing and utilizing a contractual right to audit developers annual accounting to ensure compliance with its commissions, among other methods."  Rule 52 Order at 150 n.617.  The Court further found that "[e]ven in the absence of IAP, Apple could still charge a commission on developers," even if it "would seemingly impose both increased monetary and time costs to both Apple and the developers."  *Id.* at 150 & n.617.

The Injunction provides that Apple shall not prohibit app developers from (i) "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanism, in addition to In-App Purchasing," or (ii) "communicating with customers through points

of contact obtained voluntarily from customers through account registration within the app."  Perry Decl. Ex. 6 ¶ 1.  The Court characterized the Injunction as a "limited measure" that "balance[d] the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace."  Rule 52 Order at 166.  In imposing this "limited measure," the Court reiterated Apple's interest in maintaining the "integrity of the ecosystem."  *Id.* at 164, 166; *see also id.* at 150 (noting that the use of alternatives to the IAP "may reduce the quality of the experience" and "weaken[] the quality of the App Store to those that value this centralized system").  The Court further stated that the "measured remedy" of the Injunction "*does not require the Court to micromanage business operations* which courts are not well-suited to do as the Supreme Court has appropriately recognized."  *Id.* at 179 (emphasis added).

Apple sought a stay to "allow Apple to protect consumers and safeguard its platform while the company work[ed] through the complex and rapidly evolving legal, technological, and economic issues that any revisions to [the anti-steering] Guideline would implicate."  Dkt. 821, at 2.  As Apple explained, "[b]eyond the mere functionality of permitting external payment links, Apple would have to develop technical solutions to address . . . security and privacy vulnerabilities" *and* "engineer alternative solutions for collecting its commission."  *Id.* at 10.  In denying a stay, the Court stated that it could "envision numerous avenues for Apple to comply with the injunction and yet take steps to protect users," and reiterated that it was not "here to micromanage."  *See* Perry Decl. Ex. 7 ("Stay Order") at 3.  The Court also clarified that the Injunction "enjoined the prohibition to communicate external alternatives and to allow links to those external sites."  *Id.* at 4.  The Court acknowledged also that Apple may "need[] time to establish Guidelines," observing that "[l]inks can be tested by App Review."  *Id.*

The Ninth Circuit stayed the Injunction pending appeal (C.A.9 Dkt. 27), but ultimately affirmed the Injunction (C.A.9 Dkt. 222).  The mandate issued on January 17, 2024 (Dkt. 879), after the Supreme Court denied Apple's petition for a writ of certiorari (Dkt. 878).

## II.     Apple's Compliance With the Injunction

Before the Injunction became effective, Apple filed its Notice of Compliance with accompanying declarations and exhibits.  Dkt. 871.  Apple voluntarily made this submission to explain to the Court, and Epic, the steps it had taken to comply with the Injunction.  The following chart summarizes the key

Guidelines changes:

| Injunction | Former Guideline | New Guideline |
|---|---|---|
| Apple shall not prohibit developers from: | At time of trial: | Today: |
| (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to IAP; | ~~Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchase mechanisms other than IAP~~; (3.1.1) | Developers may apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for to purchase such items…. In accordance with the entitlement agreement, the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price. (3.1.1) |
| (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app. | ~~Apps in this section cannot … through communication sent to points of contact obtained from account registration within the app (like email or text) encourage users to use a purchasing method other than IAP~~. (3.1.3) | Developers can send communications outside of the app to their user base about purchasing methods other than in-app purchase. (3.1.3)<br>Apps may request basic contact information (such as name and email address) so long as the request is optional for the user … (5.1.1) |

### A.    In-App Communications

In compliance with the first clause of the Injunction, Apple deleted part of Guideline 3.1.1 and replaced it with a new Guideline that allows developers to "apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for to purchase" digital goods and services. Dkt. 871-1 ("Fischer Decl.") Ex. 1 § 3.1.1. Developers may use the link to "inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price." *Id.* Apple regularly uses entitlements, or specific grants of rights or privileges to developers to activate certain features, where "privacy, safety, and security concerns are heightened or where a requested feature carries additional risk to users." Fischer Decl. ¶ 15.

1    The terms and conditions of using the new entitlement are further detailed in the StoreKit Exter-

2    nal Purchase Link Entitlement Addendum for US Apps (the "Addendum").  Fischer Decl. Ex. 2.  Devel-

3    opers must provide specified information and meet certain threshold requirements to qualify for an Ex-

4    ternal Purchase Link Entitlement.  Fischer Decl. ¶¶ 16, 18.  Once approved, developers must ensure any

5    apps using the entitlement adhere to the requirements set forth in the Addendum.  For example, the

6    Addendum provides templates for developers to use when including an External Purchase Link, and also

7    provides the system disclosure sheet developers must show users when they tap on an External Purchase

8    Link to leave the app environment.  *Id.* ¶¶ 26, 29.  The terms of the Addendum "allow developers to

9    communicate pricing information to users using standardized language to avoid misleading or confusing

10   offers, and protect against false statements."  *Id.* ¶ 30.  These requirements further help Apple protect its

11   users by making clear the point at which the user is going to leave the App Store ecosystem.  *Id.* ¶ 22.

12   In addition to these technical requirements, Apple developed a new commission structure for

13   apps that use the External Purchase Link Entitlement.  The great majority (~84% at the time of trial) of

14   all App Store transactions will remain free and incur no commission at all.  Trial Tr. 2767:8–15 (Schil-

15   ler).  The over 90% of developers that qualify for the Small Business Program (*id.* at 2814:21–23 (Schil-

16   ler)) and developers offering subscriptions through their apps will pay a 12% commission on digital

17   goods and services transactions that take place on the developer's website within seven days after a user

18   taps through an External Purchase Link.  Fischer Decl. ¶¶ 33–34.  For the remaining developers, the

19   commission on purchases made through an External Purchase Link is 27%.  *Id.* ¶ 33.

20   The commission on linked transactions in the United States was established—as all of Apple's

21   prices are—following █████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28

1

2

3

4

5

6

### B.   Out-of-App Communications

Apple also complied with the second clause of the Injunction.  Apple agreed to delete the en-joined part of Guideline 3.1.3 in its settlement agreement in the *Cameron* class action (which included 99% of U.S. developers).  *See* Perry Decl. Exs. 13–14.  The amended Guideline allows developers to "[c]ommunicat[e] with customers through points of contact obtained voluntarily from customers through account registration within the app."  Fischer Decl. ¶¶ 40–41.  Those communications can include state-ments urging users to purchase digital goods and services directly from the developer's website, and can even include a link to the developer's website or some other landing page for making purchases outside of the App Store.  Thus, as of the date the *Cameron* settlement was approved by this Court, Apple was in compliance with the second clause of Injunction.  Apple further added Guideline 5.1.1, which requires that developers collect user information only with consent.  *Id.* ¶ 43.

## III.   Knowledgeable Observer Response

Epic claims that developers and industry participants "have decried" Apple's compliance efforts, but notably, none of the snippets Epic cites suggests that Apple is in violation of the Injunction.  *See* Mot. 11–12.  Epic and some other developers would of course like access to Apple's tools and technol-ogies and userbase for free.  But that is not what the Injunction requires.  In fact, a host of industry participants—including some who disagree with Apple's policies—have recognized that Apple is in compliance with the Injunction:

- "It's also worth mentioning that Apple is absolutely within its rights to do this.  It's also within the law.  The judge in the Epic versus Apple case made it clear the com-pany was entitled to charge for the use of its intellectual property."  https://ti-nyurl.com/4hhm8yjm.

- "It seems clear then that the right to a request a slice of sales income on the platform was never really in doubt—the only question is how high that fee should be."

https://tinyurl.com/yfpj8tkh.

- "Sweeney's description makes it sound as though Apple is demanding its commission from all web sales for apps and services that have an iOS app. They're not. They're only demanding the commission from web sales that occur within 7 days of a user tapping through to the web from the new External Purchase Links entitlement in an app. . . . But I think [the External Link Entitlement] *does* comply." https://perma.cc/9J93-CWT2.

The same day Apple filed its Notice of Compliance, Epic's CEO, Tim Sweeney, tweeted about some of the same issues Epic raises in its Motion. Wesneski Decl. Ex. 1. Despite having first learned of Apple's compliance submission just hours earlier, Mr. Sweeney promised that "Epic will contest Apple's bad-faith compliance plan in District Court." *Id.* Counsel for Epic and Apple thereafter met and conferred regarding Epic's forthcoming challenge, leading to Epic's filing of a "notice" that it intended to eventually file a motion at some indeterminate date challenging Apple's compliance. *See* Dkt. 883. On March 13, Epic filed its Motion asserting "blatant" violations of the Injunction. One week later, three sets of *amici*—consisting entirely of enormous developers—sought leave to file briefs with the Court. *See* Dkts. 904, 906, 908. This Court granted those motions on April 4. *See* Dkt. 913.

## ARGUMENT

This Court previously informed the parties that it is not "here to micromanage" Apple's business decisions in complying with the Injunction. Stay Order at 3; *see also Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (federal courts should not "act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited"). Judge Donato reiterated this point in Epic's separate lawsuit against Google:

> I would like to emphasize one thing, and I said this, I believe, earlier in the case. A United States district judge, whether me or anyone else or any Article III judge in the federal judiciary, is not going to micromanage Google. All right? So I'm not going to say—I said this before—I'm not going to say you can have four click-through screens and not eight. I can't do that. Okay? I can't say you can use this word but not that in the warnings that we saw.
>
> I have grave doubts—I'm willing to hear what you both have to say, but I have grave doubts that I am in any position to set a fee that developers might pay. Okay? These are all things that are beyond the ken of Article III judges.

Wesneski Decl. Ex 2, at 11:17–12:3 (Transcript, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD (N.D. Cal. Jan. 18, 2024)). Judge White made a similar point in a case brought against Apple

1  under the UCL, rejecting the plaintiff's "invitation to micromanage the algorithms Apple maintains on

2  watchOS."  *Alivecor, Inc. v. Apple Inc.*, 2024 WL 591864, at *17 (N.D. Cal. Feb. 13, 2024).

3        Epic's effort to impugn Apple's good-faith compliance with the Injunction, and its request that

4  this Court dictate the business terms on which the App Store is run, contravene these principles.  Apple

5  has deleted both enjoined Guidelines and replaced them with provisions that allow developers to com-

6  municate with consumers both within and outside of their apps.  That implementation was the result of

7  careful and thoughtful analysis undertaken over the course of many months, ███████████████

8  ████████████████████████████████████████████.  Epic does not

9  like how Apple complied with the Injunction:  Epic complains that Apple's commission is too high, that

10  the technical requirements for the External Link Entitlement are too specific, and that the Guidelines are

11  ambiguous on an issue that Apple has already clarified.  It wants this Court to affirmatively tell Apple

12  how to operate its business, even requesting that the Court prescribe the exact language Apple should be

13  required to include in its Guidelines.  *See* Mot. 22 n.18.

14        From start to finish, Epic's Motion misconceives both what the Injunction prohibits and the role

15  of this Court.  "As a general rule, businesses are free to choose the parties with whom they will deal, as

16  well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,

17  555 U.S. 438, 448 (2009).  The sole measure of Apple's compliance is the Injunction itself, and Epic's

18  motion raises no serious question that Apple's conduct is fully compliant with the Injunction, in letter

19  and spirit.  Apple has established its good-faith compliance with substantial evidence, none of which has

20  been disputed by Epic.  In contrast, Epic's Motion is supported only by attorney argument—Epic has no

21  relevant evidence of non-compliance, and certainly not the clear and convincing evidence the law re-

22  quires.

23  **I.**      **The External Purchase Link Entitlement Complies With the Injunction**

24        Epic wants to turn the Injunction from a *prohibitory* injunction, focused on two specific Guide-

25  lines provisions and designed to provide more information to users, into a *mandatory* injunction that

26  requires Apple to make its tools and technologies available to developers for free, while dictating Ap-

27  ple's policies and technical implementation.  Epic's complaints are untethered from the actual language

28  in the Injunction and this Court's previous orders regarding the issues implicated by the Motion, and

1   Epic cannot claim that there are any changed circumstances that would meet the standard for modifying

2   the Injunction.

3           Although it was not required to do so, Apple proactively advised this Court of the measures it

4   has taken to comply with the Injunction, including the rescission of the relevant Guidelines.  Apple

5   submitted a declaration from the Head of Worldwide App Store explaining what changes Apple was

6   making to the Guidelines and why each of those changes was consistent with the Injunction.  *See* Fischer

7   Decl.  Apple also put in a statement of compliance that included all the relevant documents and walked

8   through the Injunction's provisions and Apple's compliance efforts.  Dkt. 871.  Apple took these steps

9   because it wanted to be transparent with the Court—and with Epic—about what it was doing and how it

10  had complied with the Injunction.  Now that Epic has questioned the commission structure in its Motion,

11  Apple is submitting additional evidence explaining ███████████████████████████████

12  ████████████████████████████████████████████████████████████████████████

13  ████████████████████

14          Epic does not challenge any of Mr. Fischer's testimony, and offers no meaningful evidence to

15  support its accusations of non-compliance.  It submits a declaration from one developer—Down Dog—

16  that uses a subscription model and therefore is not even covered by the Injunction.  Dkt. 897-1 ¶¶ 11–

17  13; *see also* Rule 52 Order at 32 n.194 ("Apple's anti-steering provision as it relates to subscriptions is

18  found in Section 3.11 of the DPLA.  However, as shown herein, subscriptions are not part of the ac-

19  tion."); *id.* at 123 n.571 ("[T]he Court declines to consider subscriptions in this lawsuit because they are

20  a separate submarket for which there is insufficient evidence").  It submits another declaration from a

21  third-party payment processor, whose testimony says nothing about providing information to users.  *See*

22  Dkt. 897-2.  Epic puts in no other evidence except the Guidelines themselves.

23          This disparity in evidence is dispositive.  The Injunction is a targeted prohibition drafted by the

24  Court itself in response to specific concerns identified during trial on a "less fulsome record," because

25  Epic chose not to extensively litigate the anti-steering rules.  Rule 52 Order at 163.  The Court prohibited

26  Apple from enforcing two Guidelines, and Apple has deleted them.  But Apple was not required to leave

27  a vacuum, as Epic suggests; as the Court is aware, every decision Apple makes regarding the App Store

28  is part of a deliberative process that balances a variety of interests.  Users value Apple's high standards

1   for security and privacy.  *See* Trial Tr. 302:2–303:10 (Sweeney).  At the same time, Apple can and does

2   seek compensation when developers use its tools and technologies for their own financial benefit.  Rule

3   52 Order at 118, 150.  Apple explained these considerations with unrebutted evidentiary support.  Epic

4   responds with nothing but rhetoric.

5           Apple's compliance framework is fully in accord with both the letter and the stated purpose of

6   the Injunction:  to provide users with knowledge of alternative purchase mechanisms.  At trial, the Court

7   focused on the fact that the anti-steering provisions prevented developers from offering "visual indica-

8   tions of options" to users, akin to a sign at a store that says the store accepts Visa, Mastercard, Discover,

9   and American Express.  Trial Tr. 1891:5–1892:20 (Schmalensee).  When a witness observed that a store

10  accepting credit cards would not be permitted to "say the merchant would save money if you use this

11  rather than the other," the Court responded that "these are gradations," and that under the anti-steering

12  provision, "there is zero availability to know that you have a different option."  *Id.* at 1892:21–1893:4.

13  In the post-trial order, the Court accordingly held the anti-steering provisions unlawful because they

14  "prevent[ed] informed choice among users of the iOS platform."  Rule 52 Order at 164.  The anti-steering

15  provisions were, in the Court's view, a "prohibition on letting users know that [alternative payment]

16  options *exist*."  *Id.* at 165 (emphasis added).

17          The External Purchase Link Entitlement addresses those concerns by allowing developers to

18  communicate with users within the app about alternative purchase mechanisms, subject to some guard-

19  rails, and Apple's other changes to the Guidelines (ignored by Epic) allow communication to users *out-*

20  *side* of the app with virtually no limitations other than user consent.  Developers are not precluded from

21  providing information about alternative purchase options to users, both within and outside their apps,

22  allowing users to make informed choices about where to purchase digital content.  That is what the

23  Injunction contemplates, and that is what Apple delivers.

24          Epic sought a Sherman Act injunction that would have prevented Apple from requiring develop-

25  ers to pay a commission on in-app transactions and that would allow developers to bypass the App Store

26  when distributing iOS apps (Dkt. 276-1), but the Court rejected that request after finding that Epic failed

27  to prove its antitrust claims.  The Court also forcefully rejected Epic's claim that Apple's iOS platform

28  is an "essential facility," a ruling that Epic did not even attempt to challenge on appeal.  Rule 52 Order,

at 158–59.  But Epic never argued that the UCL requires Apple to make its tools and technologies available for free; indeed, Epic never sought any injunction at all regarding the anti-steering provisions.  Instead, after *rejecting* Epic's "broad sweeping relief" under the antitrust laws, the Court devised a "narrow" and "limited measure" (Rule 52 Order at 163, 166) under the UCL designed to remedy the Court's concern that there was "zero availability" for users to "know that [they] have a different option" for making app purchases.  Trial Tr. 1892:21–1893:4 (Schmalenesee).  Apple's compliance must be measured against the Injunction the Court actually entered.

## A.   The Injunction Does Not Prohibit Apple From Charging A Competitive Commission For Its Tools And Technologies

Epic's principal complaint is that the commission contravenes the "spirit" and "purpose" of the Injunction by supposedly "eliminat[ing] developers' ability to use External Links to offer lower prices to users." Mot. 15.  Yet Epic has never applied for the entitlement, so all of this is speculation.  Indeed, as explained below, unlike some platforms, Apple does not prohibit developers from charging a lower price on their websites for digital goods and services, and it now allows developers to communicate those lower prices to users both within and outside their apps.  If developers want to lure users away from the App Store with the promise of better prices elsewhere, they are free to do so—they are required to pay a commission only for transactions that use IAP or, under the External Purchase Link Entitlement, made within seven days after a user taps on an external link and continues to the developers' website.[1]

In the parallel litigation against Google, ***Epic admitted that the injunction entered by this Court does "not prevent [Apple] from . . . introducing a new fee . . . on linked out-of-app transactions."*** Perry Decl. Ex. 19, at 3–4 (emphasis added).  Considering this admission (which Apple called out in its Notice of Compliance, but Epic ignores in its Motion), Epic cannot argue that Apple's decision to charge a commission on linked transactions is a violation of the Injunction punishable by contempt or other sanctions.  Indeed, the Injunction enjoins Apple from prohibiting developers from including links within their iOS apps, but says nothing about whether or how Apple can charge a commission on transactions

---

[1] As it has done throughout this litigation, Epic erroneously dubs Apple's commission a "tax."  Mot. 2, 15.  A tax is a charge "imposed by the government" (Black's Law Dictionary, *Tax* (11th ed. 2019)); a commission is a firm's percentage compensation for use of its services or facilities.  Apple's commission is no more a "tax" than the commission Epic itself charges developers that distribute paid apps through the Epic Games Store.

facilitated by those links.  It certainly does not say anything about the *amount* of that commission.

This Court has already found that "the developer's use of the App Store platform . . . and access to Apple's user base . . . justifies a commission."  Rule 52 Order at 118.  This Court recognized that "under all models, Apple would be entitled to a commission or licensing fee, even if IAP was optional" (*id.* at 67), and that "[e]ven in the absence of IAP, Apple could still charge a commission on developers" (*id.* at 150).  Epic also does not dispute that the seven-day commission window is consistent with how other platforms address similar kinds of transactions.  Fischer Decl. ¶ 36; *see also* Roman Decl. ¶¶ 17–20.

In implementing the Injunction, ███████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████
           ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████████

2  ███████████████████████████████████████████████████

3  ███████████████████████████████████████████████████

4  ████████████████████████████████████████  Epic has *no* contrary evi-

5  dence.[2]

6       Epic does not dispute that developers use and benefit from Apple's tools and technologies each

7  time a user buys something through their apps.  That is, the iOS ecosystem provides value for iOS app

8  transactions whether they are conducted through IAP or facilitated through an External Purchase Link.

9  As this Court has already recognized, developers benefit from Apple's "enormous" investment in "tools

10  and features for iOS" (Rule 52 Order at 113–14), including "access to Apple's vast consumer base" (*id.*

11  at 14) and "the safe environment created by the App Store" (*id.* at 111).  And Epic does not deny that

12  linked transactions implicate the same considerations, because such transactions are made possible only

13  by the use of Apple's tools and technologies.  Fischer Decl. ¶¶ 35–36.  ████████████████████

14  ██████████████████████████████████  When developers make money through the App Store, it

15  is in significant part because Apple's tools and technologies enable them to do so.

16       Epic's objection to the commission reduces to the argument that it will deter developers from

17  offering lower prices on their websites than in the app.  Mot. 15.  This argument rings hollow given that

18  Epic itself does not lower its prices to reflect the commission it pays:  It charges the same amount for

19  V-Bucks on its own website and every platform, regardless of the commission rate.  *See* Trial Tr. 2410:3–

20  4 (Evans).  And because V-Bucks have no marginal cost, Epic's profit margin is 100%.  Rule 52 Order

21  at 11.  Moreover, over 90% of developers will qualify for the 12% commission rate (Trial Tr. 2814:21–

22

23

---

24  [2] Epic did not seek any discovery from Apple before filing the instant Motion, and cannot seek it now. Counsel for Apple met and conferred with Epic on several occasions, during which Apple offered to

25  (and did) answer questions from Epic regarding the External Purchase Link Entitlement.  Epic never raised *any* questions or issues regarding the commission, including Apple's bases therefor, and has im-

26  plicitly conceded by proceeding with its Motion that no discovery is necessary.  Moreover, discovery in aid of contempt is appropriate only after a party has raised "significant questions regarding noncompli-

27  ance" and can show that the requested discovery would provide "potentially favorable information." *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008) (quotation marks omitted).

28  Because Epic has raised no "significant questions" of compliance and has not shown that Apple has any evidence that would be "potentially favorable" to Epic, there would be no basis for discovery even if Epic had sought it (which it did not).

1   23 (Schiller)), meaning that Epic's arguments implicate only a small sliver of large developers. Accord-

2   ingly, the contention that Apple's commission affects Epic's ability to offer lower prices to its users is

3   not just unsupported by but contrary to the record evidence. Epic's objection is not that the commission

4   affects consumers, but that it affects Epic's own profits. Apple does not limit what developers can offer

5   on their own websites, and if Epic wants to charge a lower price on its website and advertise that price

6   to users within an authorized app, it is able to do so.

7   The Injunction does not speak to Apple's commission structure for good reason. The Injunction

8   was issued pursuant to the UCL, but the UCL "is not, and never was intended to be, a mechanism for

9   challenging the price of goods and services as simply 'too high.'" *McKel v. Wash. Mutual, Inc.*, 142

10  Cal. App. 4th 1457, 1474 (2006). Accordingly, courts have rejected UCL claims premised on the alle-

11  gation that the defendant charges too much for its product. *See Godoy v. Horel*, 2010 WL 890148, at

12  *3–5 (N.D. Cal. Mar. 8, 2010) (allegations of "price gouging" insufficient under the UCL). Courts

13  rightly refrain from using the UCL to weigh in on economic policy. *See Desert Healthcare Dist. v.*

14  *Pacificare, FHP, Inc.* 94 Cal. App. 4th 781, 795 (2001) ("Where a UCL action would drag a court of

15  equity into an area of complex economic policy, equitable abstention is appropriate"); *Cal. Grocers*

16  *Ass'n, Inc. v. Bank of Am.*, 22 Cal. App. 4th 205, 218 (1994) (it is "not a judicial function to determine

17  economic policy"). Epic is thus seeking to enforce a non-existent injunction that the Court could not

18  have entered even if Epic had requested it (which it did not).

19  Epic relies on this Court's statement that Apple's headline commission at the time of trial was

20  "supracompetitive," even though Apple had no obligation or burden to justify its commission in response

21  to Epic's antitrust claims. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 999 (9th Cir. 2020) (rejecting

22  contention that "royalties are 'anticompetitive'—in the antitrust sense—unless they precisely reflect a

23  patent's current, intrinsic value and are in line with the rates other companies charge for their own patent

24  portfolios"). But Epic, which has the burden of proving non-compliance by *clear and convincing* evi-

25  dence, has provided the Court with *no* evidence about what level of commission would be appropriate,

26  and *no* evidence that the structure adopted by Apple is inappropriate. As explained above, ████████

27  ████████████████████████████████████████████████████████████████████████████████████

28

██████████████.   Courts have consistently rejected efforts to use competition laws to sec-ond-guess such judgments.  *See Trinko*, 540 U.S. at 408 (rejecting theory that would require courts "to act as central planners, identifying the proper price, quantity, and other terms of dealing").  That is be-cause "judicial oversight of pricing policies would place the courts in a role akin to that of a public regulatory commission," a role courts "would be wise to decline . . . unless Congress clearly bestows it upon" them.  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979).  Epic wants to access Apple's tools and technologies for free—or at a price that it dictates—but that is not what the Injunction or the law requires.

### B.   The Injunction Does Not Micromanage the Technical Details of the External Link Entitlement

Epic next objects to various technical requirements of the Entitlement.  *See* Mot. 16–17.  But these objections have nothing to do with what the Injunction prohibits, which is the enforcement of two prior Guidelines regarding developers' ability to communicate alternative purchase options to users.  *See* Perry Decl. Ex. 6.  And they have nothing to do with what the Injunction was expressly intended to accomplish:  to "bring[] transparency to the marketplace" (Rule 52 Order at 166) by allowing developers to "communicate external alternatives" and provide "links to those external sites" (Stay Order at 4). Indeed, Epic admits that nothing in the Injunction "explicitly prohibit[s]" the features about which it complains.  Mot. 18 (emphasis added).  That ought to be the end of the matter.

*First*, Epic complains about Apple's use of the entitlement framework.  Mot. 16.  As explained in Apple's Notice of Compliance, entitlements are commonplace on iOS and are used for a variety of instances in which "privacy, safety, and security concerns are heightened or where a requested feature carries additional risk to users."  Fischer Decl. ¶ 15.  Apple has used the entitlement framework in other instances in which developers may include links within their apps, including for Reader Rule apps.  Epic ignores this evidence and identifies no burden associated with the entitlement process.  Because the Injunction says nothing about the mechanics of linking out, there is no substance to Epic's first technical objection.

*Second*, Epic complains that Apple has restricted the design and placement of the buttons and links permitted under the new entitlement.  Mot. 16.  Epic does not acknowledge, much less rebut, the

evidence submitted by Apple regarding these requirements.  As Mr. Fischer explained, these requirements "are designed to minimize fraud, scams, and confusion."  Fischer Decl. ¶ 28.  They "help ensure that users are not overloaded with duplicative information that may diminish the app experience, and are not confused about purchase options."  *Id.*  Mr. Fischer continued, explaining that the design requirements "allow developers to communicate pricing information to users using standardized language to avoid or confusing offers, and protect against false statements by developers," while also "enabl[ing] Apple to more efficiently review apps."  *Id.* ¶ 30.  The Court confirmed that Apple can "take steps to protect users" in complying with the injunction (Stay Order at 3), and that is what Apple has done.

Moreover, the Injunction neither dictates design and placement nor prohibits Apple from doing so; indeed, the Court expressly recognized that Apple can continue to mandate the use of IAP for transactions in digital content within the app. Stay Order at 4.  The only thing Epic says in opposition to the design requirements is that Apple requires that External links be "bland, inconspicuous and removed from the purchase flow."  Mot. 16.  But Epic cannot use a prohibitory injunction to now mandate that Apple create an entirely new template for buttons, links, or calls to action and make it available to developers.

Epic does not respond to any of these specific, factual points or the supporting evidence.  Instead, it broadly asserts that "Apple's restrictions cannot be justified by security, privacy or any rationale other than the anti-competitive objectives this Court found unlawful."  Mot. 19.  But Apple did support the design requirements with evidence, and Epic cannot rebut that evidence simply by citing to the Court's findings as to other requirements challenged in the underlying litigation.  *See id.*  Epic argues that Apple does not impose similar requirements for "apps selling physical goods or services" (*id.*), but Apple, like all businesses, must make judgments about how best to monetize its goods and services.  It made such a judgment here after several months of deliberation, and Epic has no standing to insist that it knows better. Apple has never before "permitted external payment links or other payment mechanisms for the purchase of digital goods and services within an app" (Perry Decl. Ex. 12 ¶ 15), and the introduction of that new feature requires thoughtful and measured security and privacy controls.  Epic's challenge to the design requirements is the kind of "micromanag[ing]" this Court previously rejected.  Stay Order at 3.

*Third*, Epic complains about the system disclosure sheet that informs users they are leaving the

1   Apple ecosystem when they tap on an External Link.  Mot. 16–17.  Yet Epic does not argue that anything

2   in the system disclosure sheet is inaccurate or unhelpful to users.  Contrary to Epic's insinuations other-

3   wise (*see id.* at 8), the system disclosure sheet does not caution users against making external purchases

4   or suggest that IAP is safer.  It simply makes clear that Apple cannot verify the security or privacy of the

5   purchase, and that Apple-specific features—including Family Sharing, Ask to Buy, and global parental

6   controls—will not be available for such a purchase.  Fischer Decl. ¶¶ 26–27.  The purpose of the Injunc-

7   tion was to increase users' awareness of their purchase options, and the system disclosure sheet does just

8   that by providing accurate information regarding real benefits that Apple provides to consumers that will

9   not be available through Apple outside of the app.  *See* Rule 52 Order at 166 (explaining that the Injunc-

10  tion is intended to promote "transparency to the marketplace").

11       Epic's challenge to the system disclosure sheet is an exercise in micromanagement.  Judge Do-

12  nato recognized as much in *Epic v. Google*, responding to similar complaints from Epic by advising that

13  he was "not going to say you can have four click-through screens and not eight."  Wesneski Decl. Ex 2,

14  at 11:22–23 (Transcript, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD (N.D. Cal. Jan.

15  18, 2024)).  Epic cannot seriously contend that Apple is not permitted to even tell users they are leaving

16  the app, using a single accurate disclosure sheet, in terms that express no view on the safety of out-of-app

17  transactions.  This Court—and certainly Epic—should not be called upon to specify the precise wording

18  of such a disclosure.

19       *Fourth*, Apple does not require developers to link users to a "generic page," as Epic claims.  Mot.

20  17.  What Apple requires is that the developers' link not "pass additional parameters," in order to "protect

21  the end user (for example, their privacy)."  Fischer Decl. Ex. 2 § 3.3.  What that means is that developers

22  are not allowed use the external link as an illicit tracking mechanism.  Nothing stops a developer from

23  including a link that lands the user on a webpage for purchasing in-app products, and nothing stops a

24  user from saving her login credentials to automatically recognize her when she visits a developer's web-

25  site.  Epic's assertion that "developers cannot engage in the hallmarks of price competition—promotions,

26  frequent changes to prices, etc." (Mot. 9) is simply false—Apple does not stop developers from changing

27  prices or offering promotions.

28

## II.        The Revised Guidelines Allow "Links," "Buttons," *and* "Calls to Action"

Epic's secondary contention is that while "links" are now permitted under the External Purchase Link Entitlement, Apple's revised rules "do not allow" developers to include "buttons" or "other calls to action" within their apps.  Mot. 20.  This contention is baseless.

As Mr. Fischer explained, the External Link Entitlement "allows developers to include in their apps buttons or links with calls to action directing users to out-of-app purchasing mechanisms."  Fischer Decl. ¶ 14.  New Guideline 3.1.1 allows developers to "inform users" about alternative purchase mech-anisms for in-app items as well as "the fact that such items may be available for a comparatively lower price."  Fischer Decl. Ex. 1 § 3.1.1.  The Addendum requires that links "[b]e accompanied by language [i.e., a call to action] *and* a button adhering to the requirements provided in the Apple Materials."  Fischer Decl. Ex. 2 § 3.3 (emphasis added).  The "button" is the visual display to the user, which must conform to one of the three preexisting "plain" button styles, specified in the Human Interface Guidelines.  Fischer Decl. Ex. 4.  The "call to action" is the language encouraging the user to make a purchase outside of the app—e.g., "For special offers go to [X]."  Fischer Decl. ¶ 29; *see also* Fischer Decl. Ex. 4.  And the "link" is the code that takes the user to the developer's external payment page when the user taps on the "button."

Epic admits that Apple does permit developers to include "buttons," but it argues that the "con-tent, style and appearance limitations" prevent developers from "*actually*" including buttons in their apps.  Mot. 20 (emphasis added); *see also id.* at 7 (the button is "not a button at all").  But nothing in the Injunction mandates the size, style, color, or any other characteristics of in-app buttons.  Apple allows developers to include visible in-app buttons—which users can "press" to be linked to external purchase methods—by reference to its Human Interface Guidelines, which pre-date the Injunction.  The buttons authorized by the External Purchase Link Entitlement are "buttons" by the plain terms of the Injunction.

Epic is asking the Court to add new requirements, which again, are nowhere to be found in the Injunction.  For one, Epic never sought this relief and never submitted evidence that Apple's preexisting button styles are unlawful or harmful.  Nor does Epic explain what it believes the archetypal proper button would look like or why such characteristics would make it a "real" button.  It only complains in

1   the abstract that Apple's buttons are not "actual[]" buttons.  Mot. 20.  This is exactly the type of "mi-

2   cromanage[ment]" of Apple's platform policies that the Court specifically expressed it wanted to avoid.

3   Stay Order at 4.

4       Epic also admits that Apple allows "calls to action," but argues that Apple must permit develop-

5   ers to include a free-floating message to users "*without* an accompanying link."  Mot. 20 (emphasis

6   added).  That objection is not grounded in the language of the Injunction and ignores the history of this

7   litigation.  Following entry of the Injunction, Apple raised concerns that allowing developers to include

8   external links could introduce new security and privacy concerns for users.  *See* Dkt. 821.  In opposition,

9   Epic urged that links were an important way for developers to make alternative purchase mechanisms

10  available to users, and even recognized that a link is a "type[] of 'call[] to action' that provide[s] direction

11  to consumers about alternatives."  Dkt. 824, at 20–21.  In denying the stay, the Court stated that the

12  Injunction "enjoined the prohibition to communicate external alternatives *and to allow links* to those

13  external sites."  Stay Order at 4 (emphasis added).  In other words, the Court required Apple to allow

14  links, explaining that "[u]sers can open browsers and retype links to the same effect," and that prohibiting

15  links was "merely inconvenient, which then, only works to the advantage of Apple."  *Id.* at 3.

16      Apple has followed the Court's clear direction in the Stay Order by allowing "links" that make

17  it easier for users to follow developers' "calls to action" and try alternative purchase options.  Ironically,

18  Epic now advocates for that inconvenience for users to navigate to alternative purchase mechanisms, by

19  requiring users to "open browsers and retype links."  Stay Order at 3.  Nothing in the External Purchase

20  Link Entitlement prevents users from doing just that, and Epic's objection has nothing to do with allow-

21  ing developers to "communicate lower prices on other platforms."  Rule 52 Order at 163; *see also id.* at

22  164 ("[T]he ability of developers to provide cross-platform information is crucial").  The External Pur-

23  chase Link Entitlement allows developers to communicate lower prices and provides the means for users

24  to take advantage of those prices.  Fisher Decl. ¶ 29 (developers may inform consumers about "special

25  offers" or "[l]ower prices").  In the Stay Order, the Court advised that this would be sufficient to comply

26  with the Injunction, which only "enjoined the prohibition to communicate external alternatives *and to*

27  *allow links to those external sites*."  Stay Order at 4 (emphasis added).

28

1   Epic's real complaint is that the link allows Apple to know when users leave the app to make a

2   purchase on a developer's website, which is a purchase necessarily facilitated and made possible by use

3   of Apple's tools and technologies.  Fischer Decl. ¶¶ 35–36.  This Court previously recognized that Apple

4   could take measures to efficiently ensure developers are paying the required commission.  *See* Rule 52

5   Order at 65 (explaining that IAP allows Apple to track and verify digital purchase); *id.* at 148–54 (noting

6   that in the absence of IAP, Apple would still be permitted to collect a commission).  Indeed, this Court

7   explained that, in the absence of IAP, "Apple may rely on imposing and utilizing a contractual right to

8   audit developers annual accounting to ensure compliance with its commissions, among other methods."

9   *Id.* at 150 n.617 (observing that "any alternatives to IAP . . . would seemingly impose both increased

10  monetary and time costs to both Apple and the developers").  Epic's proposal to make Apple's commis-

11  sion collection more difficult—if not impossible—contravenes this Court's rulings.

12      Epic simply ignores that developers can bypass Apple's commission altogether by encouraging

13  users through out-of-app messaging to make purchases on the developers' websites (without using an

14  in-app link).  The second half of the Injunction enjoins Apple from prohibiting developers from "com-

15  municating with customers through points of contact obtained voluntarily from customers through ac-

16  count registration within the app."  Perry Decl. Ex. 6 ¶ 1.  Apple complied with that part of the Injunction

17  by amending Guideline 3.1.3 to provide, in relevant part, that "Developers can send communications

18  outside of the app to their user base about purchasing methods other than in app purchase."  Fischer

19  Decl. ¶ 40.  In addition to *telling* users about alternative purchase options in these out-of-app communi-

20  cations, developers are free to include a *link* for the user to tap and execute a transaction outside the App

21  Store.  And even for users that tap on an in-app link, the commission window is open only for seven

22  days—transactions executed on a developer's website after a week are not subject to a commission, so

23  long as the user does not return to the app to tap on the in-app link again.  In other words, a developer

24  could use out-of-app and in-app messaging to direct a user to use exclusively out-of-app purchasing

25  mechanisms and potentially pay *no* commission on those users' purchases ever again past the initial

26

27

28

1   seven-day window.[3]

2        Accordingly, if Epic (or its affiliates with apps still on the App Store) wants to avoid paying a

3   commission, it has tools to do so.  Epic can send messages to users *outside* the app, encouraging them

4   to buy directly from Epic's website—which is expressly permitted by the Guidelines but ignored by

5   Epic.  *See* Fischer Decl. ¶ 40 (describing Apple's Guideline that "Developers can send communications

6   outside of the app to their user base about purchasing methods other than in-app purchase").  And be-

7   cause the commission applies only to transactions effected seven days after the user taps on an external

8   link and proceeds to the developer's website, out-of-app purchases made by users beyond that window

9   are not subject to the commission.  If users really would prefer to retype a link in their browsers rather

10  than tapping on a link—as Epic seems to suggest—nothing is stopping them from doing so.

11  **III.   Epic's Question About Multiplatform Apps Has Already Been Answered**

12       Finally, Epic contends that Guideline 3.1.3 is unclear as to whether multiplatform apps can take

13  advantage of the External Purchase Link Entitlement.  Mot. 21–23.  Apple has made abundantly clear—

14  to Epic, and to developers at large—that such apps may use the new entitlement.  Epic's final complaint

15  thus raises no dispute for this Court to resolve, much less a question of injunction compliance.

16       Apple has been transparent about what developers are allowed to do.  Apple told Epic—and all

17  developers—in its Notice of Compliance that it now "permits developers with apps on the iOS or iPadOS

18  App Store U.S. storefronts to include buttons or external links with calls to action within their apps that

19  direct users to alternative, out-of-app purchasing mechanisms."  Dkt. No. 871, at 4.  When viewed in

20  connection with the requirement that apps using the External Purchase Link Entitlement offer in-app

21  purchases, that should have been clear enough.  After Apple filed its Notice, Epic raised the question

22  whether Guideline 3.1.3 might be ambiguous as to whether multiplatform apps could use the new enti-

23

24

25  [3] Beyond communications in the app or through contact points obtained through the App Store, devel-

26  opers can communicate with users in myriad ways that Apple does not (and could not) restrict.  They
    can put banners on their websites, purchase advertisements on other websites, make public statements,

27  run commercials, and do anything else that businesses routinely do to advise consumers about their
    products.  Apple's Guidelines go only to what developers can do *through* the App Store *in the* app.  The

28  notion that those Guidelines prevent multi-billion-dollar companies like Epic and its *amici*—Meta, Mi-
    crosoft, X, Match, Spotify, and DCN members such as Disney—from adequately communicating with
    American consumers is fantastical.

tlement; in response, Apple unequivocally represented to Epic, in writing, that "apps that provide Multiplatform Services may (if approved) use the StoreKit External Purchase Link Entitlement (US)." Wesneski Decl. Ex. 3.  And when Epic complained that other developers (who are not parties to this litigation) might be confused, **Apple made a public announcement, in writing, to all developers that "*multiplatform services apps can use the 3.1.1(a) entitlement*."**  Mot. 4 (citing https://developer.apple.com/news/) (emphasis added).  It also amended Guideline 3.1.3(b) to include a link to the External Purchase Link Entitlement.  Apple has been clear with developers:  Multiplatform apps can apply for and use the External Purchase Link Entitlement.

Considering this undisputed evidence, Epic has no basis for asserting in its Motion that Apple "prohibits developers of apps covered in [Guideline 3.1.3] from encouraging users to use a purchasing method other than IAP."  Mot. 21–22.  Epic does not claim that any multiplatform app has applied for the entitlement and been denied, and it does not identify any developer who claims to be confused.  In fact, one of Epic's *amici* admits that multiplatform apps can apply for the External Purchase Link Entitlement.  Dkt. 906-1 ("Spotify Br.") at 5 n.3.  Neither Epic itself (which no longer has a developer account) nor any of its affiliates have applied for the entitlement.  To gild its argument with a thin veneer of legal support, Epic cites cases regarding "voluntary cessation" and empty promises of future compliance efforts (Mot. 22), ignoring that Apple is in compliance *now*.

Epic does not identify any conduct by Apple that is in violation of the Injunction—it just does not like how Apple has worded its Guidelines.  Epic does not even try to hide this fact, arguing that the Court "can and should order Apple to further amend its Guidelines to remove this language or to explicitly state that the categories of apps in Guideline 3.1.3 have the same right to use in-app steering mechanisms as do all other apps," and even proposes the exact language it says Apple should be forced to adopt.  Mot. 22 n.18.  Setting aside that this new language would not change the meaning of the Guideline, the request exposes that Epic is not trying to enforce or even modify the existing Injunction, but rather asking for a new one.  Epic's suggestion that Apple is "violating" the Inunction in this (or any other) respect is unfounded.

## IV.   Epic's *Amici* Add Nothing Material

The Court's Injunction provides that "[i]f any part of this Order is violated by any party named herein or any other person, *plaintiff* may, by motion with notice to the attorneys for defendant, apply for sanctions or other relief that may be appropriate." Perry Decl. Ex. 6 (emphasis added).  While we recognize that the Court has allowed the filing of the three *amicus* briefs, these *amici* come as "friends of Epic," not friends of the Court.  The Court has already recognized that Epic gives preferential treatment to some developers.  *See* Rule 52 Order at 23 (Epic notified Microsoft ahead of the "hotfix").  More recently, evidence has come to light suggesting that Epic has attempted to coordinate with other game stores regarding commission rates.  *See* Rich Stanton, "Tim Sweeney emailed Gabe Newell calling Valve 'you assholes' over steam policies, to which Valve's COO replied internally 'you mad bro?'" PC Gamer (March 14, 2024), https://perma.cc/ELP6-NTSV.  The *amici* are not consumers (whom the Injunction is meant to benefit) and they are not small developers (who already settled with Apple on these very issues).  They are all billionaire companies that are seeking to grow their profits at Apple's expense.  Moreover, the *amicus* briefs largely just repeat Epic's arguments, which are already addressed above.  To avoid similar repetition, Apple responds to each *amicus* brief briefly here.[4]

### A.   Meta, Microsoft, X, and Match

Meta Platforms, Inc., Microsoft Corp., X Corp., and Match Group, LLC (collectively, "Meta *et al.*") filed a brief effectively repeating Epic's arguments.  *See* Dkt. 904-1 ("Meta Br.").  Meta *et al.* advocate solely on behalf of themselves, and not for the users the Injunction is intended to benefit.  Their brief adds nothing of substance and is misguided in several ways.

As an initial matter, Meta *et al.* have no cognizable interest in this litigation.  This is a single-plaintiff, non-class action.  The Injunction was entered—and could be entered—only to remedy alleged harm to *Epic*.  *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011).  The Ninth Circuit held that Epic was affected by the anti-steering provision in two ways:  first, by "increasing the costs of Epics' subsidiaries' apps that are still on the App Store," and second, by "preventing other

---

[4] A complaint recently filed against Apple by the Department of Justice contains several references to this Court's injunction.  *See* Compl. ¶¶ 123, 135, *United States v. Apple Inc.*, No. 24-CV-4055 (D.N.J. Mar. 21, 2024).  The government does not allege that Apple failed to comply with the Injunction or that its response to the Injunction is unlawful.  Accordingly, those untested allegations are entirely irrelevant to the instant Motion.

1   apps' users from becoming would-be Epic Games Store consumers."  C.A.9 Dkt. 222, at 85.  None of

2   Meta *et al.* are subsidiaries of Epic, and none of them purport to have apps on the Epic Games Store.

3   Whether Apple's compliance efforts further their interest is irrelevant to the pending Motion.

4        Three of the group—Microsoft, X, and Match—complain principally about the effect Apple's

5   Guidelines have on their ability to steer users to alternative purchase mechanisms for app *subscriptions*.

6   *See* Meta Br. 17–19.  But "Apple's anti-steering provision as it relates to subscriptions is found" in a

7   separate provision of the DPLA that is not even covered by the Injunction, because "subscriptions are

8   not part of the action."  Rule 52 Order at 32 n.194.  The Court was clear:  It would not "consider sub-

9   scriptions in this lawsuit because they are a separate submarket *for which there is insufficient evidence*."

10  *Id.* at 123 n.571 (emphasis added).  The effect of Apple's compliance on subscription apps is immaterial

11  to the pending Motion.

12       Beyond that, Meta *et al.*'s first two objections are based on a misreading of the Guidelines.  *See*

13  Meta Br. 5–8.  Meta *et al.* claim that Apple does not allow developers to "communicat[e] truthful infor-

14  mation about the prices available on other platforms," including statements such as "*You can buy this*

15  *product at a 30% discount on our website*."  *Id.* at 6.  That is simply false:  The new Guidelines expressly

16  allow developers to include a link in their app that "inform[s] users about where and how to pur-

17  chase . . . in-app purchase items, and the fact that such items may be available for a comparatively lower

18  price."  Fischer Decl. Ex. 1 § 3.1.1(a).  The support materials for the Guidelines explain that developers

19  can include statements like:  "To get XX% off, go to www.example.com."  Fischer Decl. Ex. 4.  That is

20  almost verbatim the language Meta *et al.* inaccurately claim Apple does not allow.  To the extent Meta

21  *et al.* assert that developers should be allowed to include such information "without offering a direct link

22  to such mechanisms" (Meta Br. 6), that is not what the Injunction requires.  Nor, as explained above,

23  does it make sense why Meta *et al.* would want to make it *harder* for users to access alternative purchase

24  mechanisms—unless their mission is to avoid Apple's commission altogether.

25       Meta *et al.* also assert that Apple has "preserve[d]" the anti-steering provision in Guideline 3.1.3

26  for multiplatform apps (Meta Br. 8), notwithstanding that Apple has explicitly stated that "multiplatform

27  services apps can use the 3.1.1(a) entitlement" (Mot. 4 (citing https://developer.apple.com/news/)).

28

These *amici* are simply ignoring the evidence of compliance while criticizing Apple's good-faith imple-mentation framework.

Meta *et al.* next attack the technical details of the External Purchase Link Entitlement, objecting to things like the appearance of the links and the requirement that developers advise users they are leav-ing the app and will not be transacting with Apple.  Meta Br. 9–13.  Like Epic's arguments of the same kind, these objections are not tethered to the Injunction, and Meta *et al.* do not acknowledge—much less rebut—the Fischer Declaration explaining the basis for each of the challenged requirements.  *See* Fischer Decl. ¶¶ 25–32.

Also like Epic (and all the other *amici*), Meta *et al.* take umbrage with the commission Apple collects on purchases made after a user taps on a link in an iOS app.  Meta Br. 13–14.  Their arguments fail for the same reasons as Epic's.  Apple's commission is ███████████████████████████████ ███████████████████████████████████████.  Meta *et al.* do not dispute that Apple is legally entitled to charge developers for use of its tools and technologies, that developers use and benefit from Apple's tools and technologies when a user taps on an external link and makes a purchase, or that the commission amounts represent a fair estimation of the value Apple provides.  Meta *et al.*'s contention that Apple should be forced to subsidize competing platforms by making its tools and tech-nologies available for free, by contrast, has no basis in the law or facts.

Meta *et al.*'s final objection regarding the requirement that users be directed to a developer's landing page likewise falls flat.  *See* Meta Br. 15–16.  Meta *et al.* again ignore the Fischer Declaration, which explained that this requirement is intended to make developers "take responsibility for the linked website."  Fischer Decl. ¶ 28.  Allowing developers to include links to third-party payment websites would invite the kind of confusion and security concerns the technical requirements of the External Purchase Link Entitlement are intended to prevent.  In any event, Meta *et al.* do not even argue that they would seek to send users to a third-party payment processor website if allowed—all of them are large developers who presumably could conduct these transactions in-house.

Meta *et al.* close their brief by misframing the issue, urging the Court to "reject[]" the "Apple Plan."  Meta Br. 20–21.  Apple's compliance efforts are not before this Court for "approval" or "rejec-tion" by this Court.  The burden is on Epic, as the moving party, to establish Apple's non-compliance

by clear and convincing evidence.  Epic has not done so, and the *amici* offer no *evidence* in support of the Motion.  Apple, in contrast, has documented its compliance with substantial evidence that is not rebutted (indeed, it is barely addressed) by Epic or any of the *amici*.

**B.     Spotify**

The *amicus* brief from Spotify is even further afield from any issues before the Court, because "Spotify pays Apple nothing."  Apple Statement, "The App Store, Spotify and Europe's Thriving Digital Music Market" (March 4, 2024), https://perma.cc/4SM6-YZ7T.  Spotify's app is a "reader" app (Mot. 1), which is governed by an entirely different Guideline (3.1.3(a)).  Guideline 3.1.3(a) allows reader apps to apply for a *different* "External Link Account Entitlement," which allows qualifying developers to include links *in their apps* to external websites for the purpose of creating or managing an account. Fischer Decl. Ex. 1 § 3.1.3(a).  This Guideline, the Court found, allows qualifying apps "to bypass Apple's restrictions and commission altogether," creating an "economic distinction[]" from the apps on which the trial evidence was focused.  Rule 52 Order at 122–23.  Account subscriptions purchased through a reader app link are *not* charged a commission, and in fact, because Spotify long ago migrated away from in-app paid transactions, it *does not pay commissions to Apple*.  *See* Dkt. 742-1 ¶¶ 102–04 Reader apps have nothing to do with the Court's Injunction—or indeed with any of the issues at trial, except as background—and a developer who opts to take advantage of the External Link Account Entitlement (while paying not one dime in commission to Apple) *instead* of the External Purchase Link Entitlement has no grounds to complain about the former in this Court.

Moreover, the *only* in-app purchases Spotify purports to offer relate to subscription services. Spotify Br. 6.  As set forth above, however, "subscriptions are not part of the action."  Rule 52 Order at 32 n.194.  Spotify broadly asserts that the Injunction should apply to "all apps, without exception" (Spotify Br. 4), but neither acknowledges nor explains this Court's statements excluding subscriptions from consideration in this lawsuit.  All of Spotify's arguments concern subscription apps and are thus inapposite.

But even setting aside *both* of those problems, Spotify's brief is still unpersuasive, because it simply repeats the same arguments from Epic, all of which remain beyond the scope of the Injunction. The only new argument Spotify makes is that developers seeking to use the External Purchase Link

Entitlement "would have to assume that *any* transactions completed on its website, originating from any type of device, might be subject to Apple's [commission]."  Spotify Br. 8.  That is incorrect and unsupported:  The commission window is limited to seven days after the user taps on a link and continues to the developer's website.  *See* Fischer Decl. Ex. 2 §§ 1, 5.1.  If developers invest in outreach and communications to drive users to their websites to purchase digital goods and services, they can avoid paying a commission to Apple in many circumstances.

## C.   Digital Content Next ("DCN")

The final brief—from DCN, a trade organization consisting of larger publishers—is perhaps the least germane.  The brief is full of inflammatory rhetoric, accusing Apple of engaging "in reality distortion on the grandest possible scale" (Dkt. 908-1 ("DCN Br.") 4), "threaten[ing] consumers directly" (*id.* at 8), and installing "an insidious mechanism to penalize developers for using External Links" (*id.*).  That is not the language of a friend of the Court—it is self-interested advocacy from a non-party seeking to further its members' commercial interests in an unrelated dispute between two private parties.

Like the other *amici*, DCN's complaints are largely focused on Apple's treatment of subscriptions (DCN Br. 8, 11–12), which are not covered by the Injunction.  DCN doubles down on that error by insisting that participants in Apple's Video Partner Program and/or its News Partner Program should be eligible for the External Purchase Link Entitlement.  *See id.* at 7, 14.  Both of those programs, however, are limited to *subscription* services.  *See Apple Video Partner Program*, https://developer.apple.com/programs/video-partner/; *Introducing the News Partner Program*, https://developer.apple.com/apple-news/program/.  Moreover, Apple is not required to allow participants in those programs—who pay a reduced commission—to take advantage of the External Purchase Link Entitlement:  Developers can choose to pay a reduced commission through the programs, or they can choose to follow the generally applicable rules, but they cannot demand the benefits of both.  ██████████████████ ████████████████████████████████████████████████████ ██████████████████████  DCN, as *amicus*, cannot ask this Court to second-guess that informed exercise of business judgment.

DCN claims that Apple's commission applies even where Apple is "taking no role in the trans-

1  action and providing no additional benefits to consumers or developers." DCN Br. 12 (emphasis omit-

2  ted). That is wrong: ███████████████████████, every commissioned transaction takes place as

3  a result of a developer's use of Apple's tools and technologies to design an iOS app, distribute it to users,

4  and attract users. This Court has already recognized that "the developer's use of the App Store plat-

5  form . . . and access to Apple's user base . . . justifies a commission." Rule 52 Order at 118. Apple is

6  no longer providing one aspect of the transaction—payment processing and management—but is still

7  allowing developers to use its tools and technologies to earn revenue. In view of the value Apple pro-

8  vides to developers, the commission ████████████████ is not subject to challenge by third

9  parties. *See Qualcomm*, 969 F.3d at 1000 (upholding royalties where the defendant's "patent licenses

10  have value—indeed, they are necessary to the [original equipment manufacturer's] ability to market and

11  sell its cellular products to consumers—regardless of whether the [original equipment manufacturer]

12  uses [the defendant's] modem chips or chips manufactured and sold by one of [the defendant's] rivals").

13      DCN also makes much of the fact that Apple retains "discretion" to reject an applicant for the

14  External Purchase Link Entitlement. DCN Br. 7, 12–13. Like all businesses, Apple retains the right to

15  "choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."

16  *Pac. Bell Tel. Co.*, 555 U.S. at 448. If, for example, a developer fails to discharge its obligations under

17  the DPLA, the App Review Guidelines, or any applicable entitlement, Apple may exercise its discretion

18  not to extend further entitlements (or to take other action, including termination of the developer program

19  account). The Injunction does not limit that right; on the contrary, the Court elsewhere expressly con-

20  firmed Apple's right to terminate the DPLA with Epic and any of its affiliates as a consequence of Epic's

21  intentional breach of contract. Rule 52 Order at 178–79. DCN presents no evidence that Apple has used

22  its discretion to circumvent the Injunction, nor that *any* developer applicant has been denied on discre-

23  tionary grounds.

24      Most unpersuasive is DCN's attempt to invoke the First Amendment. DCN Br. 14–15. Apple's

25  decision to charge a commission for use of its services does not stymie the First Amendment rights of

26  DCN's members. News organizations, like every business, must pay service providers for their services.

27  ████████████████████████████████████████████████████████████

28

██████████████████████████████████████████████████ The First Amendment provides no basis for DCN to assert otherwise.

## V.   Epic's Accusations of "Contempt" Are Unsupported and Erroneous

Epic's unsupported complaints about Apple's compliance with the Injunction are meritless under any standard, but Epic has gone too far by asking this Court to hold Apple in *contempt*.  A contempt proceeding is not a forum for litigants to air their business disputes; it is an evidence-based examination of whether a party has deviated so far from the Court's express directives as to warrant a disciplinary order.  In view of the extensive record of Apple's good-faith compliance with the letter and spirit of the Injunction here, there is no basis for Epic even to suggest that Apple has violated the Injunction, much less to seek contempt (or other) sanctions.

An accusation that one's adversary is in contempt of court is among the most serious charges a party can levy in civil litigation.  For that reason, the moving party's burden is a significant one:  It must establish that (1) the enjoined party violated the injunction, (2) the violation was "beyond substantial compliance," and (3) the conduct was "not based on a good faith and reasonable interpretation of the injunction."  *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010) (quotation marks omitted).  All of this must be established by "clear and convincing *evidence*."  *Id.* (emphasis added; quotation marks omitted); *see also Stone v. City & County of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (movant must establish "by clear and convincing evidence that the contemnors violated a specific and definite order of the court").  The "proper practice" when a litigant seeks an order of contempt is for the Court—upon request of and sufficient *prima facie* showing by the movant—"to issue a rule to show cause," containing "enough to inform the defendant of the nature of the contempt charged."  *Cooke v. United States*, 267 U.S. 517, 537 (1925).  The accused contemnor is then entitled to "notice and an opportunity to be heard" (*Int'l Union v. Bagwell*, 512 U.S. 821, 827 (1994)), typically at a live evidentiary hearing.

Epic admits that nothing in the Injunction "explicitly prohibit[s]" the commission or other features about which it primarily complains. Mot. 18 (emphasis added).  That is fatal to Epic's request for sanctions or any other relief premised on non-compliance:  Federal Rule of Civil Procedure 65(d) requires that every injunction "state its terms specifically" and "describe in reasonable detail—and not by

referring to the complaint or other document—the act or acts restrained or required."  Consistent with this requirement, the Ninth Circuit has held that "[i]f an injunction does not clearly described prohibited or required conduct, it is not enforceable by contempt."  *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (Rule 65(d) is designed "to avoid the possible founding of a contempt citation on a decree too vague to be understood").  By seeking sanctions for conduct that is not prohibited by the Injunction, it is Epic—not Apple—that fails to follow the law.

The cases Epic cites in support are not to the contrary.  *See* Mot. 17–18.  *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 942, 949 (9th Cir. 2014), held that the defendants could not avoid an injunction by transferring assets to foreign affiliates with the intent that those affiliates undertake actions in violation of the clear language of the injunction.  *Zest Anchors, LLC v. Geryon Ventures, LLC*, 2022 WL 16838806, at *2 (S.D. Cal. Nov. 9, 2022), held the defendant in civil contempt when it circumvented a trade dress non-infringement injunction by selling non-infringing components to foreign distributors with the knowledge that "these parts will be combined into an infringing whole for sale to customers in the United States."  In both cases, the defendants devised ways to allow affiliates and business partners to violate the injunction as written.  Neither case suggests that a party may be held in contempt through vague references to the overall "purpose" of the injunction.

Epic has not adduced any relevant evidence, much less the "clear and convincing" evidence required to support a contempt accusation (or any other sanctions request).  Epic has offered only attorney argument, and even admits that most of its complaints are not even tied to what the Injunction says.  It has not sought an order to show cause, or an evidentiary hearing on any particular issue.  Viewed through the standards applicable to contempt proceedings, Epic's contentions that Apple has "violated" the Injunction—which are divorced from both the evidence and the Injunction's language, and are not supported by any relevant evidence—are nothing but hyperbole.  Tellingly, Epic all but ignores the actual elements of contempt and does not point to any "clear and convincing evidence" of bad faith or substantial noncompliance by Apple.

Epic has repeatedly made clear that what it wants is access to and use of Apple's tools and technologies without having to pay for them.  It claimed such a right under the antitrust laws even though it

1   has never denied the significant benefits it receives from the iOS ecosystem—including access to Ap-

2   ple's large and loyal user base.  It took that battle all the way up to the Supreme Court and lost.  So now

3   it seeks to commandeer this Court's limited UCL order prohibiting Apple from enforcing two specific

4   provisions in the Guidelines that Epic never even sought to enjoin, hoping to accomplish the same ends

5   by other means.  But that is not the Injunction the Court ordered, and Epic never sought to modify the

6   Injunction following judgment.  Epic can make whatever policy arguments it wants to regulators and

7   legislators, but its rights in this Court are limited to the Injunction.  And nothing in that Injunction gives

8   Epic the kind of control of Apple's business that it now demands.[5]

9          Apple understands its obligation to comply with the Court's orders.  That is why it invested

10  substantial resources to develop a comprehensive regime that complies with the letter and spirit of the

11  Injunction while also protecting users and allowing Apple to collect a lawful commission for developers'

12  use of its tools and technologies.  When the Injunction became effective, Apple filed a statement with

13  this Court detailing every aspect of its compliance efforts, with evidentiary support, even though it was

14  not required to do so; and Apple has submitted more evidence with this Opposition.  Apple ▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Every aspect of Apple's compliance frame-

17  work was thoroughly considered, including its interaction with other Guidelines and the rest of the

18  DPLA.  As always, Apple prioritized the security and privacy of its users, as well as the integrity of the

19  iOS platform.  Apple acted in good faith at every step to fulfill the letter and purpose of the Injunction.

20  On this record, Epic's Motion should be denied.

21                                    **CONCLUSION**

22          For the reasons set forth above, the Court should deny Epic's Motion to Enforce Injunction in its

23  entirety.

24

25

26

27   [5] Epic gratuitously contends that Apple is failing to comply with the Digital Markets Act.  Mot. 19 n.17.
     Such contentions must be addressed to an appropriate tribunal in the European Union, not this Court.
     Indeed, this Court rejected Epic's bid for a worldwide injunction and expressly limited its UCL Injunc-
28   tion to the United States.  Events outside America's borders are therefore irrelevant to the injunction
     compliance issues raised by Epic's Motion.

1

Dated: April 12, 2024

Respectfully submitted,

2

By:   */s/ Mark A. Perry*
WEIL, GOTSHAL & MANGES LLP

3

Mark A. Perry

4

Attorney for Apple Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28