1   GARY A. BORNSTEIN (*pro hac vice*)
    gbornstein@cravath.com
2   YONATAN EVEN (*pro hac vice*)
    yeven@cravath.com
3   LAUREN A. MOSKOWITZ (*pro hac vice*)
    lmoskowitz@cravath.com
4   JUSTIN C. CLARKE (*pro hac vice*)
    jcclarke@cravath.com
5   MICHAEL J. ZAKEN (*pro hac vice*)
    mzaken@cravath.com
6   M. BRENT BYARS (*pro hac vice*)
    mbyars@cravath.com
7   **CRAVATH, SWAINE & MOORE LLP**
    825 Eighth Avenue
8   New York, New York 10019
    Telephone:  (212) 474-1000
9   Facsimile:  (212) 474-3700

10  PAUL J. RIEHLE (SBN 115199)
    paul.riehle@faegredrinker.com
11  **FAEGRE DRINKER BIDDLE & REATH LLP**
    Four Embarcadero Center
12  San Francisco, California 94111
    Telephone:  (415) 591-7500
13  Facsimile:  (415) 591-7510

14  *Attorneys for Plaintiff and Counter-defendant*
    *Epic Games, Inc.*

15

16                    **UNITED STATES DISTRICT COURT**
                  **NORTHERN DISTRICT OF CALIFORNIA**
17                       **OAKLAND DIVISION**

18  EPIC GAMES, INC.,                          Case No. 4:20-CV-05640-YGR-TSH

19              Plaintiff, Counter-defendant,   **REPLY MEMORANDUM IN SUPPORT
                                                OF PLAINTIFF EPIC GAMES, INC.'S
20          v.                                  MOTION TO ENFORCE INJUNCTION**

21  APPLE INC.,                                 Hearing Date:  April 30, 2024

22              Defendant, Counterclaimant.     Courtroom:  1, 4th Floor

23                                              Judge:  Hon. Yvonne Gonzalez Rogers

24

25          **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

26

27

28

**TABLE OF CONTENTS**

**Page**

I.   Apple's Policies Regarding External Links Violate the Injunction ...................................2

    A.   Apple Cannot Justify Its New Commission on Linked Purchases .........................2

    B.   Apple Has Not Justified Its Myriad Restrictions on Linked Purchases..................6

II.  Apple Does Not Dispute that It Continues To Prohibit Two Forms of In-App Steering that the Injunction Requires It To Permit ..............................................................8

III. Apple Has Provided No Justification for the Ambiguous Language in Its Guidelines Concerning Multiplatform Services ...............................................................11

IV.  Apple Requests the Court To Ignore Reality Concerning Its Updated Policies................11

V.   Apple Should Be Found in Contempt and Ordered To Bring Its Policies into Compliance with the Injunction........................................................................................13

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.*,
    2015 WL 13022178 (E.D. Mich. Feb. 20, 2015)................................................................15

*Desirous Parties Unlimited Inc. v. Right Connection Inc.*,
    2022 WL 17417857 (D. Nev. Dec. 5, 2022)...................................................................15

*Facebook, Inc. v. Power Ventures, Inc.*,
    2017 WL 3394754 (N.D. Cal. Aug. 8, 2017) ........................................................11

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
    774 F.3d 935 (9th Cir. 2014) ...............................................................................3, 14

*Just Goods, Inc. v. Eat Just, Inc.*,
    2022 WL 614053 (9th Cir. Mar. 2, 2022).........................................................................8

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)..................................................................................................9

*In re Pangang Grp. Co., LTD.*,
    901 F.3d 1046 (9th Cir. 2018) ..............................................................................9

*Peterson v. Highland Music, Inc.*,
    140 F.3d 1313 (9th Cir. 1998) ..............................................................................14

*Richards v. Marshack*,
    644 B.R. 544 (C.D. Cal. 2022) ........................................................................14, 15

*Stone v. City of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) ...............................................................................12

*United States v. Bright*,
    596 F.3d 683 (9th Cir. 2010) ...............................................................................11

**Statutes & Rules**

Fed. R. Civ. P. 65(d) ...........................................................................................14

1          Epic's motion to enforce (Dkt. 897 ("Motion" or "Mot.")) established that Apple is

2     violating this Court's Injunction in multiple ways.[1]  Apple's new policies introduce a first-of-its

3     kind commission on out-of-app transactions and weigh down External Links with so many

4     restrictions and requirements as to render them unusable for developers and consumers.  Apple

5     also continues to prohibit two steering mechanisms that this Court's Injunction explicitly required

6     it to allow—"buttons" and "other calls to action".  And Apple has included language in its

7     updated policies that appears intended to dissuade certain developers from using the steering

8     mechanisms covered by the Injunction.  The factual basis of Epic's Motion was established by

9     Apple's own so-called Notice of Compliance as well as by two third-party declarations.  Epic's

10    Motion is also buttressed by the submissions of three sets of *amicus curiae* representing a wide

11    range of developers.

12         Apple's opposition (Dkt. 915 ("Opposition" or "Opp.")) does not seriously dispute

13    Epic's and *amicus curiae*'s descriptions of Apple's new policies.  Instead, Apple argues that its

14    policies comply with the Injunction, but its arguments mischaracterize or ignore this Court's prior

15    orders and rely on sham justifications that do not withstand scrutiny.  For but a few examples,

16    contrary to Apple's assertions, this Court has never endorsed Apple's levying of an arbitrary

17    commission on Linked Purchases, especially where doing so will effectively prevent competition

18    from alternative payment solutions.  This Court has also never suggested that its Injunction does

19    not reach apps that offer subscriptions.  Additionally, this Court has never suggested that Apple

20    could comply with its Injunction by allowing some "links" but categorically prohibiting "buttons"

21    and "other calls to action".  And this Court has already found that Apple's anti-steering rules

22    allowed it to maintain App Store margins of more than 70%, which the Court found were

23    "excessive operating margins under any normative measure" (Dkt. 812 at 163)—and not the

24    13%-15% margins Apple now claims as purported justification for its new commission.

25         Apple's non-compliance with this Court's Injunction is only one example of

26    Apple's worldwide campaign to resist any effort to introduce competition that could constrain its

27

28         [1] Capitalized terms not defined herein have the same meaning as in Epic's Motion.

EPIC'S REPLY IN SUPPORT OF                          CASE NO. 4:20-CV-05640-YGR-TSH
MOTION TO ENFORCE INJUNCTION

1  App Store pricing.  This Court can and should find that Apple has failed to comply with the

2  Injunction and order it to immediately bring its policies into compliance with the Injunction.

3  **I.      Apple's Policies Regarding External Links Violate the Injunction**

4            **A.      <u>Apple Cannot Justify Its New Commission on Linked Purchases</u>**

5                 Epic's Motion showed that charging a commission on Linked Purchases would

6  interfere with the purposes of the Injunction, because it would allow Apple to prevent Linked

7  Purchases from serving as a competitive constraint on the commission that Apple charges through

8  IAP.  (Mot. at 14-15.)  In its Opposition, Apple cannot and does not dispute that the new

9  commission on Linked Purchases of 27% will prevent alternative payment solutions from being

10 price-competitive.[2]  Instead, Apple seeks to justify its new commission through a

11 mischaracterization of this Court's Rule 52 Order and Epic's prior statements in connection with

12 its litigation against Google, and a new purported pricing analysis—submitted for the first time in

13 connection with its Opposition—that is clearly made-for-litigation and is substantively

14 indefensible.  None of these efforts justifies Apple's new commission on Linked Purchases.

15                 *First*, Apple insists that this Court has already authorized Apple to charge a

16 commission for Linked Purchases.  (Opp. at 13.)  That is plainly wrong.  At the time of this

17 Court's Rule 52 Order, Apple prohibited all steering, and thus the Court never discussed Linked

18 Purchases—and never addressed (let alone endorsed) the possibility that Apple might impose a

19 commission on transactions that occur entirely *outside* of iOS apps.  Instead, this Court's Rule 52

20 Order related only to Apple's requirement that developers use IAP for *in-app-purchases*, and its

21 justification for imposing commissions on *those* purchases.  In that context, this Court found that

22 Apple had failed to justify the rate it charges to developers, finding that "with respect to the 30%

23 commission rate specifically, Apple's arguments are pretextual, but not to the exclusion of some

24 measure of compensation".  (Dkt. 812 at 114; *see also id.* at 118 ("Apple has not adequately

25 justified its 30% rate.").)  The Court also found that the 30% rate was supracompetitive, and was

26 sustained in part by a "lack of information and transparency".  (*Id.* at 118.)  The Court was clear

27
───────────────────────
28        [2] While Apple's commission is 12% on some Linked Purchases, Mr. Roman acknowledges in his declaration that 27% is the "standard" commission.  (Dkt. 916-5 at 1, ¶ 28.)

1   that one goal of ordering Apple to permit steering is to give consumers information and a choice

2   that will constrain Apple's ability to charge this unjustified 30% commission.  (*Id.* at 166-67.)

3   This goal would be completely frustrated if Apple were allowed to charge effectively the same

4   (unrestrained) commission for steered transactions.  (*See* Mot. at 15.)

5              *Second*, Apple selectively quotes a letter written by Epic's counsel to several State

6   Attorneys General in connection with proceedings against Google, claiming that Epic admitted

7   that this Court's Injunction does not prohibit Apple from charging a commission on Linked

8   Purchases.  (Opp. at 12 (citing Dkt. 871-4 Ex. 21).)  That is not correct.  While the letter urged the

9   Attorneys General not to settle with Google absent explicit assurances that Google would not

10  impose a new commission, Apple's has selectively excerpted that letter to omit a key point Epic

11  made, which is that a *settlement* with terms similar to Injunction here *could* permit Google to

12  charge a commission for linked purchases "*absent a strong anti-circumvention measure*".  (*See*

13  Dkt. 871-4 Ex. 21 at 4 (emphasis added).)  Here, the Injunction *has* a strong anti-circumvention

14  measure, which is the Court's ability to ensure compliance with its Rule 52 Order.  Unlike in the

15  potential States/Google settlement under discussion in Epic's letter, the Court has engaged in a

16  thorough analysis that sets forth the bases for, and purposes of, the Injunction, and the Court has

17  the power, under well-established precedent such as *Cetacean* and *Zest Anchors* (*see* Mot. at

18  17-18), to prohibit Apple from frustrating the spirit of the Injunction even if not violating its

19  express terms.[3]

20             *Third*, Apple attempts to justify its new commission on Linked Purchases through

21  a new declaration (the "Roman Declaration" (Dkt. 916-5)) and accompanying PowerPoint

22  _____

23       [3] Of course, this Court could not have anticipated the exact form or extent of Apple's
    circumvention efforts before Apple ever implemented them.  *See Inst. of Cetacean Rsch. v. Sea*

24  *Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014) ("The schemes available to
    those determined to evade injunctions are many and varied, and no injunction can explicitly

25  prohibit every conceivable plan designed to defeat it." (citations omitted)).  By contrast, by July
    2023, when Epic sent its letter to the State Attorneys General, the imposition of commissions on

26  transactions that use alternative payment solutions (typically within the app) had become a
    familiar part of Google's and Apple's playbooks for frustrating foreign regulatory bodies'

27  attempts to reign in their excessive commissions and create some semblance of competitive
    pressure on their respective mobile stores.  (*See, e.g.*, Dkt. 871-4 Ex. 21 at 2-3 & nn. 2-6.)

28

1   presentation (the "Price Committee Deck" (Dkt. 916-7)) that characterize the 27% commission as

2   a competitive rate for Apple's services other than payment processing.  These made-for-litigation

3   documents should be given no weight.



1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████

5 　　　██████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ████████████████████████████████████[4]███████████

10 ████████████████████████████████████████████████

11 ██████████████████████████████████████████████

12 ██████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ██████████████████████████████████████████

15 ████████████████████████████████ The Declaration of Ned S. Barnes, submitted

16 herewith, explains the accounting flaws in Apple's new analysis.

17 　　　　For all of these reasons, nothing in Apple's Opposition or the accompanying

18 submissions can or does justify its new 27% commission on Linked Purchases.  This commission

19 frustrates the purpose of the Injunction, and Apple should be ordered to remove any commission

20 from the in-app steering mechanisms that the Injunction mandates Apple to permit.

21 _____

22 [4] The Deck relies on a supposed study by Analysis Group, a consulting firm that supported one of Apple's testifying experts in this matter and that Apple has engaged since at least 2020 to commission studies intended to justify its App Store fees, notwithstanding this Court's findings that these justifications are pretextual.  *See*, *e.g.*, Jonathan Borck et al., *Apple's App Store and Other Digital Marketplaces* (July 22, 2020), https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf (Analysis Group study claiming Apple's fees are comparable to other stores); Juliette Caminade & Jonathan Borck, *The Continued Growth and Resilience of Apple's App Store Ecosystem* (May 2023), https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf (Analysis Group study that touts the size of the iOS App economy and claims, for example, that Apple's policies "have prevented billions of dollars in fraudulent transactions").

1

**B.      Apple Has Not Justified Its Myriad Restrictions on Linked Purchases**

2             In its Motion, Epic also set forth how the restrictions Apple has placed on External

3   Links render them so useless as to be a *de facto* prohibition.  (Mot. at 6-9, 16-17.)  Subject to

4   limited exceptions noted below, Apple does not challenge Epic's description of these restrictions.

5   Instead, Apple's principal response is to say that Epic seeks to have this Court "micromanage" the

6   details of the External Link Entitlement.  (Opp. at 16.)  That is not correct.  There are many ways

7   in which Apple could have complied with the Injunction, but a *de facto* prohibition on External

8   Links is not one of them.  It is not "micromanagement" to find that Apple's welter of restrictions

9   makes External Links so unattractive to developers as to be all but pointless.

10            Apple repeatedly cites to the declaration submitted by Matthew Fischer in support

11   of Apple's Notice of Compliance (Dkt. 871-1 ("Fischer Declaration")) as purported "evidence"

12   that its many restrictions are justified.  (Opp. at 16-18.)  The Fischer Declaration provides no such

13   evidence.  Instead, the Declaration merely contains conclusory statements of what Apple's

14   purported justifications are, without facts to support the necessity of the restrictions that Apple

15   has imposed.  Further, as explained in Epic's Motion, the justifications in the Fischer Declaration

16   are belied by the fact that Apple does not apply the same restrictions consistently across its

17   ecosystem.  For example, it is undisputed that none of the restrictions on External Links that Epic

18   challenges is imposed on in-app purchases processed through other payment providers, such as

19   when users make in-app purchases of physical goods and services.  (Mot. at 16, 19.)  Apple's

20   Notice and Opposition do nothing to distinguish Linked Purchases from in-app transactions for

21   physical goods, let alone explain why its multiple technical restrictions are necessary for the

22   former but not the latter.[5]

23            Perhaps most strikingly, neither the Fischer Declaration nor Apple's Opposition

24

25      [5] Take, for example, the scare screen that users must click through before going to a
developer's website after clicking an External Link.  Apple's Opposition characterizes Epic's
26   challenge to this requirement as "an exercise in micromanagement", falsely suggesting that Epic
seeks to have this Court dictate what Apple's scare screen can say.  (Opp. at 18.)  Apple does not
27   address the fact that its justifications in support of this scare screen are inconsistent with the fact
that Apple imposes no warning at all when a user makes an in-app purchase that is not processed
28   by Apple, such as purchases of physical goods or services.  (*See* Mot. at 16.)

1    makes *any* serious attempt to justify Apple's restrictions on the location of External Links within

2    an app, including the prohibition on placing External Links within the purchase flow, where users

3    would actually see them and be more likely to use them.  (*See* Mot. at 7, 16, 17, 20.)  The Fischer

4    Declaration says that the restrictions are meant to "minimize fraud, scams and confusion" and

5    "help ensure that users are not overloaded with duplicative information . . . and are not confused

6    about purchase options".  (Dkt. 871-1 ¶ 28; *see also* Opp. at 17.)  Apple does not explain how

7    placing an External Link within the purchase flow would lead to "fraud, scams [or] confusion".

8    Instead, Apple's true purpose is clear:  to "protect [its] continued investment in . . . the IAP

9    option" (Dkt. 871-1 ¶ 28) by preventing developers from utilizing the most logical and effective

10   place to tell a user that they could get a lower price outside the app.

11              Apple's response to regulations in the EU also shows that these requirements are

12   not needed to ensure user privacy and security.  For example, Apple's latest policies in the EU—

13   updated on April 5, 2024, after Epic submitted its Motion—specify that external purchase links in

14   music streaming apps in the EU do not have to follow Apple's "templates", so long as the

15   information included in connection with the links is accurate.  (Even Reply Decl. Ex. C at 5

16   (Apple only "recommend[s]" using the provided templates).)  Nothing in Apple's briefing

17   provides a basis for why Apple could not adopt a similar policy for External Links in the United

18   States.

19              One of the few instances in which Apple does challenge Epic's characterization of

20   its restrictions on External Links concerns Epic's description of the URL restrictions.  (*See* Opp.

21   at 18.)  However, Apple's carefully worded critique does not actually refute what Epic said about

22   the effect of these URL restrictions:  that the External Links cannot (a) transfer the user's login

23   credentials; or (b) land the user on the page of the particular product they were browsing in the

24   app.  (Mot. at 8.)  Instead, Apple states that "nothing stops a user from saving her login

25   credentials to automatically recognize her when she visits a developer's website".  (Opp. at 18.)

26   But this requires the user to have already visited the developer's website, and certainly does not

27   *transfer* the user's login credentials to that website automatically by clicking on an External Link.

28   Apple also says that "[n]othing stops a developer from including a link that lands the user on a

1 webpage for purchasing in-app products". (*Id.*)  This does not address the fact that Apple

2 prevents developers that sell multiple products from sending users to a webpage for the specific

3 product they were browsing within the app.  Thus, a user browsing an e-reader app such as Kindle

4 could use an External Link to the Amazon bookstore *generally*, but not to a webpage where the

5 user can purchase the specific title she was browsing within the iOS Kindle app.  As explained in

6 the Simon Declaration, Apple's URL restrictions substantially degrade the utility to developers

7 and users of External Links.  (*See* Simon Decl. ¶¶ 18, 31.)

8
9
**II.        Apple Does Not Dispute that It Continues To Prohibit Two Forms of In-App
            Steering that the Injunction Requires It To Permit**

10 Epic's Motion established that Apple's policies violate the plain terms of the

11 Injunction by completely prohibiting two forms of in-app steering that the Injunction expressly

12 requires that Apple permit:  (i) buttons; and (ii) "other calls to action" (*i.e.*, calls to action other

13 than buttons or External Links).  (Mot. at 9, 20-21.)  Apple does not dispute that the only in-app

14 steering mechanism it allows is External Links.  Instead, it argues that allowing only External

15 Links (and certain out-of-app communications not relevant here) is all that the Injunction

16 requires. (Opp. at 19-22.)  Apple goes so far as to question the motives of any developer that

17 would want to include a "call to action" other than an External Link in their app, second-guessing

18 the Court's Injunction.  None of Apple's arguments can be squared with any good-faith

19 interpretation of the Injunction, which clearly requires Apple to permit buttons and other calls to

20 action in addition to links.  Apple is therefore violating the plain terms of the Injunction.

21 *First*, Apple argues that allowing only External Links is sufficient to comply with

22 the Injunction's mandates regarding in-app steering mechanisms.  This argument cannot be

23 squared with the plain language of the Injunction, which requires Apple to permit developers to

24 implement, within their apps, three distinct types of steering mechanisms—buttons, external links

25 *and* other calls to action.  (Dkt. 813 ¶ 1.)  Apple's assertion that an "external link" can

26 simultaneously also be a "button" and "other call to action" (Opp. at 19) renders the latter terms

27 superfluous.  Violating this basic canon of interpretation is not a good-faith interpretation of the

28 Injunction. *See Just Goods, Inc. v. Eat Just, Inc.*, 2022 WL 614053, at *1-2 & n.2 (9th Cir.

1  Mar. 2, 2022) (applying canons of contractual and statutory interpretation to affirm finding of

2  civil contempt where violations were not based on a "good faith" interpretation of prior order);

3  *cf., e.g.*, *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (describing the

4  "superfluity canon", which requires that courts "give effect to every word of a statute whenever

5  possible" (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004))).  Nonetheless, in support of its

6  argument, Apple twice quotes from this Court's order denying Apple's post-trial motion to stay

7  the Injunction (Dkt. 830 (the "Stay Order")), arguing that its policies comply with the Injunction

8  because External Links simultaneously allow a developer to "communicate external alternatives"

9  and "link[] to those external sites".  (Opp. at 20 (quoting Dkt. 830 at 4).)  But nothing in the Stay

10 Order suggests that Apple can comply with the Injunction by allowing just *one* steering

11 mechanism that simultaneously allows developers to "communicate external alternatives"[6] and

12 "link to those external sites", while continuing to prohibit *other* steering mechanisms that the

13 Injunction explicitly requires Apple to permit.  And in any event, the Stay Order did not modify

14 the plain language of the Injunction described above.

15         *Second*, Apple appears to argue that it need not allow "other calls to action"

16 because it believes that the likely motive for a developer to prefer such a call to action is to avoid

17 the commission.  (Opp. at 21.)  Apple's argument misses the point in at least two ways.  As a

18 threshold matter, developers may have many reasons for using unlinked calls to action—

19 especially given Apple's onerous restrictions on External Links.  For example, because Apple

20 requires any change to External Links to be vetted by Apple and implemented through an update

21 to the app, developers may wish to use unlinked textual "calls to action" that the developer can

22 easily change in real time, without any change to the underlying app itself (similar to how a news

23 app can update the articles or ads it serves to readers).  In this way, steering could be much more

24 dynamic—for example, announcing a specific discount on a specific product, a seasonal offering,

25 lower prices in response to competitors' sales, or other real-time promotions.  Even more

26

27         [6] External Links do not truly allow developers to "communicate external alternatives".
   Developers are permitted to accompany their External Links with one of only five short, Apple-
28 authored statements, which must be approved before it is included in the app.  (Mot. at 6-7 & n.3.)

1 fundamentally, what Apple describes as developers' desire to avoid Apple's supracompetitive

2 commission is the very price competition that the Injunction is intended to achieve.  As noted

3 above, the Injunction was specifically directed at exposing Apple's IAP commission to

4 competitive constraints.  The *only* way to achieve that goal is if developers, when faced with an

5 excessive IAP commission, can inform users about out-of-app solutions in ways that do not

6 trigger Apple's excessive price—forcing Apple to account for the competitive threat and lower its

7 IAP commission to reduce such "leakage".  Apple cannot justify a policy that flouts the

8 Injunction by claiming that "other calls to action" might foster the very price competition that the

9 Injunction sought to achieve and that Apple seeks to avoid.

10         *Third*, Apple argues that it complies with the Injunction because—separate from

11 External Links—it also allows developers to communicate pricing information *outside* of the app

12 through contact information obtained from users within the app.  (Opp. at 22.)  But Apple's

13 policies with respect to these out-of-app communications implicate a separate prong of the

14 Injunction that is not at issue here.  (Dkt. 813 ¶ 1 (listing in-app steering mechanisms as prong

15 "(i)" and out-of-app steering mechanisms as prong "(ii)").)  Apple has no legitimate basis to argue

16 that its violations of the prong of the Injunction concerning in-app steering can be justified by its

17 compliance with the separate prong concerning out-of-app steering.

18         Finally, Apple asserts that it does allow "buttons" because the External Links are

19 plain text "which users can 'press' to be linked to external purchase methods".  (Opp. at 19.)  This

20 is a semantic sleight of hand.  While Apple faults Epic for not describing "what it believes the

21 archetypal proper button would look like" (*id.*), any user of the internet knows the difference

22 between a plain-text link and a graphic button.  For the reasons set forth in its Motion, the

23 External Links that Apple allows are not "buttons" under any reasonable interpretation—they are

24 mere links.  (*See* Mot. at 6-8, 20.)  Epic also included images of buttons in its brief and in the

25 declaration of Benjamin Simon that clearly illustrate the evident differences between buttons and

26 links.  (*See id.* at 7 & n.4; Simon Decl. Fig. 1.)  Apple knows very well what a button looks like.

27 Its existing design guidelines for app developers generally permit three different options that *do*

28 look like buttons.  But Apple prohibits External Links from following those designs.  (Mot. at 7 &

1    n.4.)  Apple has provided no explanation why it limits External Links to designs that look nothing

2    like buttons, despite an explicit order requiring Apple to allow the use of buttons for steering.  As

3    with its other restrictions on External Links, Apple's real justification for this limitation is

4    obvious:  It wants to prevent in-app steering mechanisms from being effective.

5
**III.    Apple Has Provided No Justification for the Ambiguous Language in Its Guidelines**
6    **Concerning Multiplatform Services**

7              In its Motion, Epic explained that Apple's App Review Guidelines prohibit

8    developers of Multiplatform Services from implementing External Links.  (Mot. at 11 & n.10,

9    21-23.)  Epic explained that while Apple separately stated it would allow apps providing

10   Multiplatform Services to apply for External Links, it should amend its Guidelines to reflect this.

11   (*Id.* at 21-23.)  Apple's Opposition argues that the correspondence and blog post that Epic cited in

12   its Motion provide sufficient assurances that developers of Multiplatform Services can apply for

13   External Links.  (Opp. at 22-23.)  As explained in Epic's Motion, Apple should be ordered to

14   make a simple amendment to the Guidelines to provide the same clarity that Apple has separately

15   provided in its blog post and correspondence with Epic.  (*See* Mot. at 11 & n.10, 21-23.)  A new

16   developer entering the space will look to Apple's Guidelines—not to Apple's blog—to determine

17   its rights and obligations.  Apple has offered no explanation for why a conceded ambiguity that

18   could run afoul of the Injunction should not be clarified in its Guidelines.

19   **IV.    Apple Requests the Court To Ignore Reality Concerning Its Updated Policies**

20             Throughout its Opposition, Apple repeatedly asks the Court to ignore relevant

21   information that helps put its new External Links policies into appropriate context.  This Court

22   can and should consider these sources of information in deciding Epic's Motion, particularly

23   because this information would assist the Court in determining whether Apple's violations of the

24   Injunction are the product of a good-faith interpretation of the Injunction (they are not), or are

25   instead just one tactic in Apple's worldwide campaign to circumvent efforts to introduce

26   competition to the iOS ecosystem (they are).  *See Facebook, Inc. v. Power Ventures, Inc.*, 2017

27   WL 3394754, at *8 (N.D. Cal. Aug. 8, 2017) (citing *United States v. Bright*, 596 F.3d 683, 694

28   (9th Cir. 2010)) (party alleging civil contempt must demonstrate that violations of prior court

1   order are "more than technical or de minimis" and "not the product of a good faith or reasonable

2   interpretation of the violated order"); *see also Stone v. City of San Francisco*, 968 F.2d 850, 856

3   (9th Cir. 1992) ("A district court has wide latitude in determining whether there has been a

4   contemptuous def[iance] of its order." (quotation marks omitted)).

5              *First*, Apple argues that this Court should ignore the submissions of *amicus curiae*

6   because their briefs "add nothing material" and are submitted by developers of subscription apps

7   and Reader Apps, which Apple asserts have no basis to complain about Apple's External Links

8   policies.  (Opp. at 24-30.)  Apple is wrong on both grounds.  As to the former argument, Apple is

9   simply relitigating whether this Court should even consider *amicus curiae*'s briefs, which the

10  Court has already permitted to be filed.  (Dkt. 913.)  These developers have relevant perspectives

11  regarding how Apple's policies will impact them and their users, which this Court can and should

12  consider in deciding Epic's Motion.  As to the latter argument, this is another instance where

13  Apple refuses to accept the law of the case.  Apple has repeatedly argued, to no avail, that

14  evidence submitted by developers of subscription apps is irrelevant because subscription apps are

15  outside of the antitrust market defined by this Court.  (*See* Dkt. 821 at 12 (Apple's motion to stay

16  Injunction, arguing that "Down Dog and Match Group offer *subscription* apps, which the Court

17  expressly ruled are *outside the scope* of the relevant market . . . ." (emphasis in original)); C.A.9.

18  No. 21-16695, Dkt. 93 at 109 (Apple's briefs on appeal to the Ninth Circuit, arguing that "[t]he

19  only fact witness Epic presented on the anti-steering provisions were developers of non-gaming

20  *subscription* apps—which the district court expressly ruled 'are not part of this case'" (emphasis

21  in original, citations omitted).)  These arguments were not accepted by this Court or by the Ninth

22  Circuit, and for good reason:  "UCL jurisprudence does not require that the Court import [its

23  antitrust] market limitation."  (Dkt. 812 at 167.)  The Injunction, accordingly, applies to *all*

24  developers of *all* apps; it in no way excepts apps selling subscriptions.

25             *Second*, Apple counters the many public statements made by industry participants

26  decrying Apple's new policies that Epic cited in its Motion (*see* Mot. at 11-12) with Apple's own

27  citations to responses by so-called "knowledgeable observers" (*see* Opp. at 7-8).  In reality, the

28  authors of the statements highlighted by Apple are simply tech bloggers, not industry participants

EPIC'S REPLY IN SUPPORT OF                           12              CASE NO. 4:20-CV-05640-YGR-TSH
MOTION TO ENFORCE INJUNCTION

1   (let alone legal authorities).[7]  Epic's Motion shows that the great weight of the public's reaction is

2   that Apple will do everything it can to avoid giving up its 30% commission on in-app

3   purchases—a sentiment generally shared even by Apple's own "knowledgeable observers".[8]

4           *Third*, Apple argues that actions by regulators in the United States and abroad

5   concerning Apple's conduct are "irrelevant to the injunction compliance issues raised by Epic's

6   Motion".  (Opp. at 32 n.5 (citing Mot. at 19 n.17).)  But while regulatory developments do not

7   shed light on the meaning and scope of this Court's Injunction, they are very relevant to an

8   understanding of Apple's playbook, as they show that Apple is now engaged in a multi-

9   jurisdictional campaign of noncompliance and circumvention with the singular goal of avoiding

10  all efforts to place competitive constraints on its IAP commissions.  It is in this light that the

11  purported *bona fides* of Apple's compliance plan should be viewed.  And it is those global efforts

12  that illustrate that only a clear mandate from this Court could cause Apple to bring its policies into

13  compliance with the Injunction.

14
    **V.      Apple Should Be Found in Contempt and Ordered To Bring Its Policies into
             Compliance with the Injunction**
15

16          Apple concludes its Opposition by arguing that it should not be held in contempt

17  because nothing in the Injunction explicitly prohibits the features of Apple's policies about which

18  Epic principally complains.  (Opp. at 30.)

19          In the first instance, this argument ignores the fact that Epic's Motion clearly

20  identified portions of Apple's policies that violate the plain language of the injunction.  (*See* Mot.

21

22      [7] Apple also misleadingly suggests that all of its "knowledgeable observers" have concluded
    Apple's conduct is permitted under the Injunction, omitting the fact that one of them stated he
23  was "genuinely curious whether Judge Yvonne Gonzalez Rogers sees Apple's solution as
    complying with her injunction against their prior anti-steering rules".  John Gruber, DARING
24  FIREBALL, *Coming to Grips with Apple's Seemingly Unshakeable Sense of Entitlement to Its
    Commissions from Third-Party iOS Apps* (Jan. 17, 2024), https://perma.cc/9J93-CWT2.
25

26      [8] *See, e.g.*, Jason Aten, INC.COM, *Apple to Developers:  Show Me the Money* (Jan. 18, 2024),
    https://tinyurl.com/4hhm8yjm ("This is definitely one of those things that, when you read about it,
27  makes you think, 'They're really doing what?'  Then, you remember that this is Apple, a
    company that will defend—at almost any cost—its ability to collect 30 percent of everything that
28  happens on the iPhone.  It really isn't that surprising at all.").

1    at 20 ("Apple's purported compliance plan . . . violates the letter of the Injunction, which requires

2    Apple to allow developers to include in their apps not only external links, but also 'buttons' and

3    'other calls to action'.").)  No further evidence is necessary (or, for that matter, could even be

4    helpful) for this Court to determine whether Apple is in contempt of the Injunction by continuing

5    to prohibit "buttons" or "calls to action" other than External Links.  *Richards v. Marshack*, 644

6    B.R. 544, 551 (C.D. Cal. 2022) ("Due process does not require an evidentiary hearing prior to

7    imposing civil contempt sanctions where the violation is not in dispute and the contemnor has not

8    'described any new evidence that they could present at a hearing, nor any existing evidence that

9    they would challenge, if such a hearing were to be ordered.'" (quoting *Peterson v. Highland*

10   *Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998))).

11            Apple's arguments concerning its External Link policies are likewise

12   unconvincing.  Apple first argues that it cannot be held in contempt for engaging in conduct that

13   is not explicitly prohibited by the terms of the Injunction.  (Opp. at 30-31 (citing Fed. R. Civ.

14   P. 65(d)).)  This runs directly contrary to the Ninth Circuit's holding in *Cetacean*.  *See* 774 F.3d at

15   954-55 (holding defendants in contempt and finding that "[b]y construing their obligations

16   narrowly to include only refraining from acts specifically enumerated in the injunction, and not

17   acts likely to nullify the injunction, the Defendants assumed the risk that their attempts at

18   technical compliance would prove wanting").  Even if Apple had found ways to frustrate the

19   goals of the Injunction that did not necessarily violate an explicit prohibition, that would not

20   warrant letting Apple off the hook.  To the contrary, Apple's strategy of making External Links

21   substantively useless while presenting a veneer of compliance exemplifies the type of bad-faith

22   non-compliance that warrants a clarifying order enforcing both the letter and spirit of the

23   Injunction.

24            Apple next argues that *Cetacean* and *Zest Anchors* are distinguishable because

25   both cases were limited to defendants who circumvented an injunction by allowing affiliates and

26   business partners to violate the injunction as written.  (Opp. at 31.)  But nothing in the reasoning

27   of these cases is so limited, and courts have applied *Cetacean* to other forms of circumvention,

28   including circumvention that did not involve a breach (by the enjoined party or any affiliates) of

1   the written terms of the injunction.  *See, e.g., CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 2015

2   WL 13022178, at *5-6 (E.D. Mich. Feb. 20, 2015) (applying *Cetacean* and finding defendants in

3   contempt where their own conduct violated the spirit of the injunction); *see also Desirous Parties*

4   *Unlimited Inc. v. Right Connection Inc.*, 2022 WL 17417857, at *3 (D. Nev. Dec. 5, 2022)

5   (finding defendants in contempt where they "evaded compliance with the spirit of the

6   [injunction]").  The Ninth Circuit's holding in *Cetacean* therefore clearly governs.

7           Finally, Apple claims that Epic has provided only attorney argument in support of

8   its Motion.  (Opp. at 31.)  Not so.  Epic has offered declarations from industry participants (*see*

9   Dkts. 897-1, 897-2), introduced its own evidence in the form of Apple's updated App Review

10  Guidelines (*see* Dkt. 897-3 Ex. B) and relied on the evidence that Apple submitted to the Court

11  through its Notice of Compliance (*see* Dkts. 871-4, 874).  And in any event, none of Apple's

12  conduct is in material dispute; the only dispute is whether that conduct violates the Injunction.

13  *See Richards*, 644 B.R. at 551.

14                              *      *      *

15          In sum, Epic's Motion demonstrated that Apple is blatantly violating both the letter

16  and the spirit of the Injunction.  Apple's Opposition and accompanying submissions do not

17  meaningfully dispute Epic's description of its policies; instead, Apple wrongfully argues that it is

18  in compliance or that it is entitled not to comply with portions of the Injunction that it believes are

19  misguided.  Apple's defenses should be rejected; it may not rely on sham justifications and bad-

20  faith interpretations to avoid or circumvent court orders.  The Court should issue a clear mandate

21  that Apple must promptly bring its policies into strict compliance, rather than engage in a

22  continued game of circumvention intended to frustrate the goals of the Injunction.

23

24

25

26

27

28

Dated:  April 22, 2024

Respectfully submitted,

By:    /s/ *Gary A. Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*