UNITED STATES DISTRICT COURT   *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 1** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1 - 231 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, May 8, 2024 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                  BY:   GARY A. BORNSTEIN,
                        M. BRENT BYARS,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1            **A P P E A R A N C E S (CONT'D.)**

2

3    For Defendant:          Weil, Gotshal & Manges LLP
                             2001 M Street NW, Suite 600
4                            Washington, D.C.  20036
                        BY:  MARK A. PERRY,
5                            JOSHUA M. WESNESKI, ATTORNEYS AT LAW

6

7                            Gibson, Dunn & Crutcher LLP
                             333 South Grand Avenue
8                            Los Angeles, California  90071
                        BY:  RICHARD J. DOREN,
9                            JASON C. LO, ATTORNEYS AT LAW

10                           Gibson, Dunn & Crutcher LLP
                             1050 Connecticut Avenue, N.W.
11                           Washington, DC  20036-5306
                        BY:  CYNTHIA E. RICHMAN, ATTORNEY AT LAW

12

13

14

15

16                           --o0o--

17

18

19

20

21

22

23

24

25

# I N D E X

WEDNESDAY, MAY 8, 2024 - VOLUME 1

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| FISCHER, MATTHEW | | |
| (SWORN) | 10 | 1 |
| DIRECT EXAMINATION BY MS. MOSKOWITZ | 11 | 1 |
| CROSS-EXAMINATION BY MR. PERRY | 135 | 1 |
| REDIRECT EXAMINATION BY MS. MOSKOWITZ | 185 | 1 |
| | | |
| ROMAN, ALEX | | |
| (SWORN) | 196 | 1 |
| DIRECT EXAMINATION BY MR. EVEN | 196 | 1 |

--o0o--

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| CX-0001 | | | 23 | 1 |
| CX-0002 | | | 28 | 1 |
| CX-0003 | | | 27 | 1 |
| CX-0009 | | | 201 | 1 |
| CX-0013 | | | 24 | 1 |
| CX-0016 | | | 76 | 1 |
| CX-37 | | | 115 | 1 |
| CX-1005 | | | 195 | 1 |

--o0o--

```
 1   Wednesday, May 8, 2024                              8:29 A.M.

 2                     P R O C E E D I N G S

 3                           --o0o--

 4        THE CLERK:  Good morning.  Calling the matter of

 5   20-CV-5640, Epic Games vs. Apple, Incorporated.

 6      Parties, please step forward to the lecterns, state your

 7   appearances for the record.

 8             THE COURT:  Mr. Bornstein, good morning.

 9             MR. BORNSTEIN:  Good morning, Your Honor.

10             THE COURT:  Good to see you again.

11             MR. BORNSTEIN:  Nice to see you without the

12   plexiglass, Your Honor.

13             THE COURT:  Yes, that's -- that's right.  I'd

14   forgotten that.

15      So who do you have with you?

16             MR. BORNSTEIN:  I have at counsel table with me today

17   Lauren Moskowitz.

18             THE COURT:  There she is.

19             MS. MOSKOWITZ:  Good morning.

20             THE COURT:  Good morning.

21             MR. BORNSTEIN:  Allison Tilden.

22             MS. TILDEN:  Good morning.

23             THE COURT:  Good morning.

24             MR. BORNSTEIN:  Benjamin Wiley.

25             THE COURT:  Benjamin Wiley.  Okay.
```

| | | |
|---|---|---|
| 1 | **MR. BORNSTEIN:**  Michael Zaken. |
| 2 | **THE COURT:**  Good morning. |
| 3 | **MR. BORNSTEIN:**  And Yonatan Even. |
| 4 | **MR. ZAKEN:**  Good morning, Your Honor. |
| 5 | **THE COURT:**  Okay.  So not a Michael Byars? |
| 6 | He's in the back.  Okay. |
| 7 | All right. |
| 8 | Good morning, Mr. Perry. |
| 9 | **MR. PERRY:**  Good morning, Your Honor.  Pleased to see |
| 10 | you again. |
| 11 | **THE COURT:**  You too. |
| 12 | **MR. PERRY:**  Mark Perry for Apple. |
| 13 | **THE COURT:**  And with you? |
| 14 | **MR. PERRY:**  Today at counsel table we have Cynthia |
| 15 | Richman. |
| 16 | **THE COURT:**  Yes, Ms. Richman, good morning. |
| 17 | **MR. PERRY:**  Jason Lowe. |
| 18 | **THE COURT:**  Mr. Lowe, good morning. |
| 19 | **MR. PERRY:**  Joshua Wesneski. |
| 20 | **THE COURT:**  Okay.  Good morning. |
| 21 | **MR. PERRY:**  Richard Doren. |
| 22 | **MR. DOREN:**  Good morning, Your Honor. |
| 23 | **THE COURT:**  Mr. Doren, good morning. |
| 24 | **MR. PERRY:**  Mr. Phil Schiller, Apple's corporate |
| 25 | representative. |

```
 1              THE COURT:  Yes, good morning.

 2          MR. PERRY:  And Heather Grenier, vice president and

 3    head of legal, head of litigation at Apple.

 4              THE COURT:  Okay.  Good morning.

 5        All right.  Have you met and conferred in terms of

 6    presentation of evidence?

 7              MR. BORNSTEIN:  We have, Your Honor.

 8              THE COURT:  And...?

 9          MR. BORNSTEIN:  We have -- pursuant to the Court's

10    order, Epic will be going first.  We have a list of witness

11    order, if that would be helpful for the Court.

12              THE COURT:  That would be.  Let me just get my

13    witness list.

14        Okay.  Mr. Bornstein, go ahead.

15          MR. BORNSTEIN:  So we're going to start with the four

16    Apple witnesses.

17        The first will be Mr. Fischer.

18              THE COURT:  Okay.

19          MR. BORNSTEIN:  Followed by Mr. Roman.  Followed by

20    Mr. Schiller.

21              THE COURT:  Okay.  So that was on Apple's list?  Yes.

22          MR. BORNSTEIN:  Schiller was on Apple's list, and we

23    reserved the right to call anyone on their list.

24              THE COURT:  Okay.  So three is Schiller.

25          MR. BORNSTEIN:  And number four is Mr. Oliver, the
```

```
 1   last Apple witness.

 2            THE COURT:  Four.  Okay.

 3            MR. BORNSTEIN:  And then we move over to Mr. Simon

 4   from our list.

 5            THE COURT:  All right.

 6            MR. BORNSTEIN:  Mr. Shobin.

 7            THE COURT:  Okay.

 8            MR. BORNSTEIN:  And then the last witness is

 9   Mr. Barnes, who Your Honor will recall had a prescheduled

10   testimony today and will be here on Friday.

11            THE COURT:  Okay.

12            MR. BORNSTEIN:  Should the Court need him.

13            THE COURT:  Well, given what was submitted in

14   advance, I assume I will.

15            MR. PERRY:  We're in agreement, Your Honor, on the

16   witness order.  We've met and conferred with Epic many times.

17   I think we've resolved virtually all disputes.  We have one

18   outstanding evidentiary dispute if the Court would like to

19   hear it now.

20            THE COURT:  Is it going to be with the witnesses?

21   Which witness?

22            MR. PERRY:  We don't know, Your Honor.  If I could

23   describe it in one minute, on Epic's exhibit list there are

24   about 17 documents that appear to relate solely activities

25   outside the United States.  We don't know what they're going
```

 1 │ to do with that.  We think given the compressed time schedule

 2 │ here and the U.S. injunction, that it would be more efficient

 3 │ to focus on actions in the United States.

 4 │     Again, it may require resolution later.  I wanted to flag

 5 │ the issue now.  We did discuss it, and that is the one thing

 6 │ we'd like to -- we haven't reached an agreement on.  Let me

 7 │ put that it way.

 8 │         **THE COURT:**  All right.  That's fine.  We -- I may

 9 │ have questions about outside the United States myself, so --

10 │         **MR. PERRY:**  Very well, Your Honor.

11 │         **THE COURT:**  -- why don't we go ahead and wait.

12 │     It is typically my process to, with respect to all

13 │ evidentiary hearings, to make sure that there are no witnesses

14 │ in the courtroom who may be called.

15 │     I do see that you have the -- a corporate representative,

16 │ Mr. Schiller.  Have you met and conferred about that topic?

17 │         **MR. BORNSTEIN:**  We have not, Your Honor.  We

18 │ certainly believe it would be appropriate for Mr. Schiller to

19 │ join the proceedings only after he has testified.

20 │         **MR. PERRY:**  Your Honor, as the Court may recall,

21 │ Mr. Schiller attended the last trial as the corporate

22 │ representative.  Apple here is being accused of misconduct.

23 │ He is the representative of the company.  For these purposes

24 │ we think it's appropriate for him to be --

25 │         **THE COURT:**  You can call him first if you'd like.  Or

```
 1    otherwise I'll let him sit.

 2              MR. BORNSTEIN:  Okay.  We think it would be a more

 3    efficient presentation of the evidence to have it in the order

 4    in which we do.  So I understand the Court's ruling.

 5              THE COURT:  Okay.  All other witnesses are excluded

 6    from the courtroom until their testimony is completed.

 7         You can call your first witness.

 8              MR. BORNSTEIN:  Thank you, Your Honor.

 9         I would pass the microphone to Ms. Moskowitz for that.

10              THE COURT:  Okay.

11              MS. MOSKOWITZ:  Good morning, Your Honor.  Lauren

12    Moskowitz for Epic.

13         Epic calls Matthew Fischer from Apple.

14              THE COURT:  Who's going to cross?  Or who's going to

15    do -- Mr. Perry, that's you?

16              MR. PERRY:  Yes, Your Honor.

17              THE COURT:  All right.  Please make sure you have

18    access to an operating mic at the table.

19              THE CLERK:  Please raise your right hand.

20              THE COURT:  Stand up, sir.

21              THE CLERK:  Raise your right hand, sir.

22                        MATTHEW FISCHER,

23    called as a witness for the plaintiff, having been duly sworn,

24    testified as follows:

25              THE WITNESS:  I do.
```

 1          **THE CLERK:**  Thank you, sir.

 2      Please be seated and speak clearly into the microphone.

 3          **THE WITNESS:**  Thank you.

 4          **THE CLERK:**  Please state your full name and spell out

 5  your last name for the record.

 6          **THE WITNESS:**  Matthew Fischer, F-I-S-C-H-E-R.

 7          **THE COURT:**  Mr. Fischer, hello again.

 8          **THE WITNESS:**  Hello.

 9          **THE COURT:**  Good morning.

10      You may proceed.

11          **MS. MOSKOWITZ:**  Thank you, Your Honor.

12      If it's efficient, may I present the witness and counsel

13  and Your Honor with binders for the presentation?

14          **THE COURT:**  Yes, please.

15          **MS. MOSKOWITZ:**  Thank you.

16                      **DIRECT EXAMINATION**

17  BY MS. MOSKOWITZ:

18  **Q.**  And good morning, Mr. Fischer, while those are being

19  handed out.

20  **A.**  Good morning.

21  **Q.**  My name is Lauren Moskowitz and I represent Epic.

22              (Pause in the proceedings.)

23  BY MS. MOSKOWITZ:

24  **Q.**  Mr. Fischer, you are vice president, head of Worldwide App

25  Store at Apple; is that correct?

FISCHER – DIRECT / MOSKOWITZ

1    **A.**  Yes.

2    **Q.**  And you are familiar with the injunction that this Court

3    ordered in this matter; is that right?

4    **A.**  Yes.

5    **Q.**  And the injunction was entered after a trial in this case,

6    right?

7    **A.**  Yes.

8    **Q.**  And you testified at that trial?

9    **A.**  Yes, I did.

10   **Q.**  The injunction was ordered in September, September 10th,

11   2021; is that your understanding?

12   **A.**  Yes.

13   **Q.**  And there were three separate orders that were actually

14   entered that day, the permanent injunction, the Rule 52 order

15   after trial on the merits, and a judgment.

16       Are you aware of those three orders?

17   **A.**  Yes.

18   **Q.**  Did you read any of those?

19   **A.**  Yes, I did.

20   **Q.**  Which of those three did you read?

21   **A.**  I read the injunction -- or the part where Apple would

22   need to provide more capabilities to developers around

23   communications in and outside of the app.

24   **Q.**  And so was that the one-page injunction that told Apple

25   what it needed to change?

FISCHER - DIRECT / MOSKOWITZ

1    **A.**   Yes.

2    **Q.**   Did you read any of the 180-plus-page opinion?

3    **A.**   I believe it was 188 pages.  I -- I did read part of that.

4    And it was also summarized to me by members of Apple's legal

5    team.

6    **Q.**   Did you yourself read the section on the Unfair

7    Competition Law under California's law?

8    **A.**   I do not believe that I read that part myself.

9    **Q.**   Did you read the part of the order that set forth the

10   Court's concerns about Apple's anti-steering provisions?

11   **A.**   I believe that part was summarized to me.

12   **Q.**   Were you aware from the summary that the Court found that

13   Apple's anti-steering provisions hide critical information

14   from consumers and illegally stifle consumer choice?

15   **A.**   Can you repeat that question, please?

16   **Q.**   Were you aware from either reading it or having it

17   summarized to you that the Court found that Apple's

18   anti-steering provisions hide critical information from

19   consumers and illegally stifle consumer choice?

20   **A.**   Yes.

21   **Q.**   That was in the summary, or did you read that yourself?

22   **A.**   That was in the summary.

23   **Q.**   And were you aware that the Court stated that the

24   injunction it was ordering supported the public interest in

25   uncloaking the veil hiding pricing information on mobile

1   devices and bringing transparency to the marketplace?

2   **A.**   I don't recall those specific words.  No.

3   **Q.**   Okay.  So that wasn't in the summary?

4   **A.**   I just don't remember each of the words that you just

5   said, but I have no reason to not believe them.

6   **Q.**   So one of the things that the Court enjoined Apple from

7   doing in its injunction was prohibiting developers from

8   including in their apps and their metadata buttons, external

9   links, or other calls to action that direct consumers to

10   purchasing mechanisms in addition to Apple's IAP; are you

11   aware of that?

12   **A.**   Yes.

13   **Q.**   In other words, the Court enjoined Apple from enforcing

14   the anti-steering provisions that had been part of its

15   guidelines, right?

16   **A.**   Yes.

17   **Q.**   Now, Apple sought to reverse this Court's injunction on

18   appeal.  Are you familiar with that, those efforts?

19   **A.**   Yes.

20   **Q.**   And after Apple lost its appeal in the Ninth Circuit, it

21   sought to have the injunction reviewed by the United States

22   Supreme Court; are you aware of that?

23   **A.**   Yes.

24   **Q.**   And you're aware that Apple sought and received a stay

25   that prevented the injunction from actually going into effect

1    during the pendency of those appeals?

2    **A.**   Yes.

3    **Q.**   So in other words, Apple was not forced to comply with the

4    injunction while it proceeded on appeal.

5    **A.**   That's my understanding.

6    **Q.**   And your understanding is that Apple, in fact, did not

7    make any changes to any of its guidelines to attempt to come

8    into compliance with the Court's injunction during the

9    pendency of those appeals.

10   **A.**   Yes.

11   **Q.**   The Supreme Court declined to hear Apple's appeal on

12   January 16, 2024; is that your understanding?

13   **A.**   Yes.   That's my understanding.

14   **Q.**   And so from the date the injunction was entered on

15   September 10, 2021, until the appeals were exhausted in

16   January of this year, Apple did not update its guidelines to

17   comply with the Court's injunction, right?

18   **A.**   Yes.

19   **Q.**   And in fact, Apple this -- that whole time was adamantly

20   opposed to the injunction and was fighting to get it

21   overturned.

22   **A.**   That's my understanding, yes.

23   **Q.**   And are you aware that Apple argued on appeal that the

24   injunction was not necessary because developers are and always

25   have been able to communicate with their customers outside of

FISCHER – DIRECT / MOSKOWITZ

1   the app?

2   **A.**   Developers have been able to communicate with developers

3   outside of the app, yes.

4   **Q.**   With their consumers outside of the app, right?

5   **A.**   Yes.

6   **Q.**   And is that your view today that the injunction is not

7   necessary because developers can and always have been able to

8   communicate with their consumers outside of the app?

9   **A.**   We respect the injunction and we've complied with the

10  injunction.

11  **Q.**   Well, is it your view that the injunction is unnecessary

12  because developers have and have always been able to

13  communicate with their consumers outside the app?

14  **A.**   I don't think my opinion matters that much.  We -- we've

15  received an injunction and we've complied with the injunction.

16  **Q.**   Well, we'll just figure out if it matters, but I'm asking

17  is it your view that the injunction is unnecessary because

18  developers can and have been able to communicate with their

19  customers outside of the app?

20  **A.**   Developers are interested in communicating with developers

21  inside of the app.  That's what the injunction requires.  And

22  we've complied with that.

23  **Q.**   Do you believe that that's important, for developers to be

24  able to communicate purchase options with consumers inside the

25  app, not just outside the app?

FISCHER – DIRECT / MOSKOWITZ

1    **A.**   Developers have expressed an interest in communicating

2    with customers inside of the app in addition to outside of the

3    app.   So I know that that's something that's important to some

4    developers.

5    **Q.**   And I'm -- and I'm asking for your view.   Do you believe

6    that it's important for developers to be able to communicate

7    with their customers inside the app?   Or do you think it's

8    sufficient that they do so outside of the app?   Your personal

9    view.

10   **A.**   I'm not a developer so I can't say speak to what a

11   developer would want.   That would be a hypothetical.

12                    (Simultaneous colloquy.)

13          **THE COURT:**   Mr. Fischer, you're head of Worldwide App

14   Store.   Answer the question.

15          **THE WITNESS:**   Can you repeat the question, please?

16   **BY MS. MOSKOWITZ:**

17   **Q.**   As head of the App Store, do you believe that it is

18   important for developers to be able to communicate with their

19   consumers about, among other things, their purchase options

20   from with inside the app, or do you think it's sufficient for

21   them to do so only outside of the app?

22   **A.**   I think it is good for developers to communicate inside of

23   the app in addition to outside.

24   **Q.**   On January 16th, 2024, Apple filed a notice of compliance

25   with the Court's injunction, correct?

1    **A.**   Yes.

2    **Q.**   And that's the same day we just discussed the

3    Supreme Court decided or declined to take the appeal?

4    **A.**   That's my understanding, yes.

5    **Q.**   And you submitted a declaration in support of Apple's

6    notice on that same day, correct?

7    **A.**   Yes, I did.

8    **Q.**   And your declaration was submitted to support or to

9    justify Apple's compliance efforts?

10   **A.**   Yes.

11   **Q.**   Fair to say that the declaration had been prepared in

12   advance of that day and that Apple was waiting until the

13   court's decision -- the Supreme Court's decision whether or

14   not to take the appeal before submitting it?

15   **A.**   I'm not exactly sure where that was in the process.  Our

16   legal team led that process and then worked with me after that

17   January 16th date.

18   **Q.**   But fair to say that you didn't hear about the need to put

19   in a declaration for the first time after the Supreme Court

20   declined to hear the appeal?

21   **A.**   I believe that was discussed prior to that, yes.

22   **Q.**   And was the declaration, in fact, worked on before that?

23   **A.**   I believe it was worked on before that, yes.

24   **Q.**   When?

25   **A.**   I don't -- I don't recall exactly the time frame.

FISCHER - DIRECT / MOSKOWITZ

1    **Q.**   Months?

2    **A.**   I don't remember.

3    **Q.**   Was it more than a year before?

4    **A.**   I don't think it was more than a year, no.

5    **Q.**   Did you write the declaration yourself?

6    **A.**   No, I did not.

7    **Q.**   Did Apple's lawyers write that for you?

8    **A.**   Apple's lawyers wrote it, and then it was a collaborative

9    effort for the -- the finished declaration.

10   **Q.**   And in terms of who the collaborators were, were other

11   nonlawyers from Apple involved as well as you?

12   **A.**   Yes.

13   **Q.**   Was Mr. Schiller involved?

14   **A.**   Yes.

15   **Q.**   Who else from Apple was involved?

16   **A.**   In terms of other nonlawyers, I don't recall anyone else.

17   **Q.**   And -- and how was Mr. Schiller involved in the putting

18   together of your declaration that you submitted on that day?

19   **A.**   He was a participant, like I was, working with our lawyers

20   to write and finalize the declaration.

21   **Q.**   Do you remember what parts he worked on?

22   **A.**   Not specifically.

23   **Q.**   Um-hmm.  Do you remember what parts you worked on?

24   **A.**   Well, I worked on the entire declaration, as did -- as did

25   he, as did our lawyers.  So from the first word to the last

FISCHER - DIRECT / MOSKOWITZ

1    word, we reviewed it together as a -- as a collaborative

2    effort.

3    **Q.**  And did you have any input from Mr. Schiller on how it

4    should be written?

5    **A.**  I believe he provided some feedback along the process, as

6    did I, as did other people that -- that worked on it together.

7    **Q.**  Were there disagreements about the content that was the

8    subject of those discussions in that group?

9    **A.**  I don't recall any disagreements per se.  I mean we had

10   different perspectives on how we could communicate certain

11   aspects of the declaration.  But I don't -- I don't recall --

12   I wouldn't characterize anything as a disagreement.

13   **Q.**  Do you know why you were asked, instead of Mr. Schiller,

14   to put in a declaration?

15   **A.**  As the -- the head of the Worldwide App Store, I think

16   our -- our legal team felt it was appropriate that I sign the

17   declaration.

18   **Q.**  I apologize.  I asked you if there was anyone else other

19   than Mr. Schiller and lawyers that contributed or

20   collaborated, and I just blanked on what you said.  Did you

21   say there were and you just didn't remember?  I'm sorry.

22   **A.**  You had asked if any nonlawyers --

23   **Q.**  That's right.

24   **A.**  -- had worked on the declaration in addition to myself and

25   Mr. Schiller.  And I don't -- I don't think any other

 1   nonlawyers, but I don't -- I don't remember exactly.

 2   Q.   And -- and you did not read the full court opinion before

 3   submitting that declaration, you read part of it and had a

 4   summary; is that right?

 5   A.   For the full 188-page ruling, I -- I did not read the

 6   entire thing from start to finish.  I read part of it and it

 7   was summarized for me.  And then I did read the -- the full

 8   injunction.

 9   Q.   The one-page injunction?

10   A.   Yes.

11   Q.   Okay.  If a developer wants to make their app available on

12   the App Store, they have to follow certain requirements that

13   are imposed by Apple, right?

14   A.   Yes.

15   Q.   And some of those requirements are memorialized in the

16   DPLA, the Developer Program License Agreement?

17   A.   Yes.

18   Q.   And some of those requirements are memorialized in Apple's

19   app review guidelines?

20   A.   Yes.

21   Q.   And can we call those "the guidelines" from time to time,

22   you'll know we're talking about the app -- the app review

23   guidelines?

24   A.   Sure.

25   Q.   Great.

1        Now, in response to the Court's injunction, Apple made

2   certain modifications to the guidelines on January 16th, 2024,

3   correct?

4   **A.**  Yes.

5   **Q.**  And in the declaration you submitted, you submitted as an

6   exhibit the guidelines as they existed as of that day, right?

7   **A.**  Yes.  There were guidelines -- what the guidelines had

8   been and then what we were changing them to.

9   **Q.**  Okay.  Well, let's -- let's just look.  In your binder,

10  there should be a tab CX0001.

11  **A.**  Okay.  I have it here.

12  **Q.**  This is a printout of the Apple App Review Guidelines that

13  were updated as of January 16, 2024, correct?

14  **A.**  It says January 2024.  I -- I don't know the exact date in

15  January.

16  **Q.**  And that's the version of the guidelines that you attached

17  as Exhibit 1 to your declaration?

18  **A.**  Yes, I believe so.

19  **Q.**  If you want to see the date, you can look at page 40, and

20  it says January 16, 2024.  Let me know if you --

21  **A.**  Great.  Thank you.

22  **Q.**  -- can confirm.

23  **A.**  Thank you.  That was helpful.  Thanks.

24           **MS. MOSKOWITZ:**  Pardon me?

25           **THE COURT:**  By chance do you have another binder for

FISCHER - DIRECT / MOSKOWITZ

```
1    my law clerk or not?

2               MS. MOSKOWITZ:  Yes.

3               THE COURT:  I'd just like him to be able to follow

4    along.

5               MS. MOSKOWITZ:  Absolutely.  Oh, I'll take it.

6               THE COURT:  Thank you.

7               MS. MOSKOWITZ:  Thank you.

8               THE COURT:  Go ahead.

9               MS. MOSKOWITZ:  Thank you, Your Honor.

10   Q.  On page 40, do you see that the guidelines were dated

11   January 16, 2024?

12   A.  Yes, I do.  Thank you.

13              MS. MOSKOWITZ:  Your Honor, I move CX-0001 into

14   evidence.

15              THE COURT:  Admitted.

16          (Plaintiff's Exhibit CX-0001 received in evidence.)

17   BY MS. MOSKOWITZ:

18   Q.  Now if you could please turn in your binder to Exhibit

19   CX-0013, please.

20   A.  Okay.

21   Q.  And this is a printout of the Apple's App Review

22   Guidelines updated on April 5, 2024.  And if you need to check

23   the date, it's on page 27.

24          0 confirm?

25   A.  I just did that.  Thank you.  And I can confirm that this
```

FISCHER – DIRECT / MOSKOWITZ

 1    is the April 2024 update to the guidelines.

 2    Q.  And this is in fact the most current version of the

 3    guidelines as they exist today, correct?

 4    A.  Yes.

 5         MS. MOSKOWITZ:  And, Your Honor, I move CX-0013 into

 6    evidence.

 7         THE COURT:  Admitted.

 8       (Plaintiff's Exhibit CX-0013 received in evidence.)

 9         MS. MOSKOWITZ:  Thank you, Your Honor.

10    Q.  In response to the Court's injunction, Apple modified its

11    guidelines to add a new provision about links to other

12    purchase methods, correct?

13    A.  Yes.

14    Q.  Now let's look at page 12 of the Exhibit CX-13 that you

15    have in front of you.

16         MS. MOSKOWITZ:  And we can pull it up on the screen.

17    It's in evidence.

18         THE COURT:  We need to turn them on, I think.

19         MS. MOSKOWITZ:  Oh, okay.

20         THE COURT:  Will you turn on the screens, Mr. Cuenco.

21         MS. MOSKOWITZ:  Thank you.

22                   (Exhibit published.)

23    BY MS. MOSKOWITZ:

24    Q.  And I will be pointing your attention as it is on the

25    screen to Guideline 3.1.1A.

FISCHER - DIRECT / MOSKOWITZ

1       Do you see where I am?

2   **A.**   Yes.

3   **Q.**   And the title of that is "Link To Other Purchase Methods,"

4   right?

5   **A.**   Yes.

6   **Q.**   So this is the part -- the new part of the guidelines that

7   indicates that there's a process for developers in certain

8   regions to apply for an external purchase link entitlement,

9   correct?

10  **A.**   Yes.

11  **Q.**   And the first bullet under there that's highlighted is

12  talking about developers being able to, if they get the

13  entitlement, to include a link to the developer's website that

14  informs users of other ways to purchase digital goods or

15  services, correct?

16  **A.**   Yes.

17  **Q.**   And there's a sentence right after that, it says, "Learn

18  more about these entitlements," and the "entitlements" is a

19  hyperlink; do you see that?

20  **A.**   Yes, I do.

21  **Q.**   Now when you click "entitlements," that -- that hyperlink,

22  it takes to you to a landing page that includes a bunch of

23  different further hyperlinks depending on what region the

24  developer is interested in exploring; is that right?

25  **A.**   Yes.

1   **Q.**  And if you then click on the United States one, it will

2   take you to a page that describes in more detail the

3   requirements for the United States external link entitlement

4   that is the Apple's effort to comply with the injunction?

5   **A.**  Yes.

6   **Q.**  All right.  If you can turn in your binder to Exhibit

7   CX-0003.

8   **A.**  (Reviewing document.)

9   **Q.**  Are you there, sir?

10   **A.**  Yes, I am.

11   **Q.**  This is the developer support page regarding the store kit

12   external purchase link entitlement; is that right?

13   **A.**  Yes.

14   **Q.**  And this is in fact what, if you click the entitlement

15   hyperlink and then you click the United States, this is what

16   the developer then would land on to learn more about the

17   injunction compliance --

18   **A.**  That's --

19   **Q.**  -- entitlement?

20   **A.**  Yes, that's my understanding of the flow, yes.

21   **Q.**  Okay.

22          **MS. MOSKOWITZ:**  Your Honor, I move Exhibit CX-0003

23   into evidence.

24          **THE COURT:**  Admitted.

25   / / /

 1          (Plaintiff's Exhibit CX-0003 received in evidence.)

 2               **MS. MOSKOWITZ:**  Thank you.

 3   **Q.**  And you cited this developer support page in your

 4   declaration also as Exhibit 3, correct?

 5   **A.**  Yes.

 6   **Q.**  Now, in addition to the guidelines and this developer

 7   support page we were just looking at, the external purchase

 8   link entitlements are also governed by an addendum to the

 9   DPLA -- DLPA?

10   **A.**  DPLA is right.  Yes.

11   **Q.**  I said it right the first time.  I should just say the

12   words.

13        Okay.  Let's just look at that briefly.  If you could turn

14   to CX-002 in your binder, please.

15   **A.**  (Reviewing document.)

16        Okay.  I have it.

17   **Q.**  And this is the store kit external purchase link

18   entitlement addendum to the DPLA for United States apps,

19   correct?

20   **A.**  Yes.

21   **Q.**  And you cited this addendum in your declaration as

22   Exhibit 2 as well?

23   **A.**  Yes, I did.

24               **MS. MOSKOWITZ:**  Your Honor, I move CX-0002 into

25   evidence.

1            **THE COURT:**  Admitted.

2            (Plaintiff's Exhibit CX-0002 received in evidence.)

3            **MS. MOSKOWITZ:**  Thank you.

4   **Q.**  Now, just to pause on this for a moment, when is the

5   developer presented with this addendum to the DPLA to sign or

6   to acknowledge?

7   **A.**  I don't -- I don't manage the process, the developer

8   process for this.  I believe it's after they have received the

9   approval of their entitlement request form.

10  **Q.**  Okay.

11  **A.**  I don't manage that process so I don't know exactly where

12  it is in the flow.

13  **Q.**  So in terms of if I'm a developer and I'm trying to get my

14  arms around this new entitlement, I should be going to the

15  guidelines and the developer support page to figure out how to

16  make this work?

17  **A.**  Well, that's -- those are all resources where the

18  developer can be -- learn more and -- and be more informed

19  about that.

20       There's a request form that has a few fields, it's quite

21  simple to fill out, that the developer submits to be approved

22  for the entitlement.  Then they need to agree to the addendum

23  that you referred to.  And then they can take advantage of the

24  new capabilities provided by the entitlement.

25  **Q.**  But they have to already sort of comply with all the

FISCHER - DIRECT / MOSKOWITZ

1   requirements before that goes live, right?

2   **A.**   Before the -- the capabilities go live, yes, they need to

3   comply with the requirements.

4   **Q.**   So -- so let's just talk briefly about this process for

5   obtaining the entitlement.

6        Developers cannot just include an external purchase link

7   in their app without first going through this application

8   process to seek approval for the entitlement from Apple,

9   correct?

10  **A.**   Yes.

11  **Q.**   And Apple reserves its right in its sole discretion to

12  deny an application for a link entitlement, correct?

13  **A.**   I believe there's some language in the DPLA along those

14  lines, yes.

15  **Q.**   Yeah, it's section --

16  **A.**   Or in the addendum, yes.

17  **Q.**   It's section 2.3 of the addendum, correct?

18       And we can put that on the screen if it's helpful.

19                      (Exhibit published.)

20            **THE WITNESS:**  If you could give me just a moment --

21  BY MS. MOSKOWITZ:

22  **Q.**   Sure.

23  **A.**   -- to read this, that would be great.  Thanks.

24  **Q.**   The highlight is on the screen if it's helpful.

25  **A.**   The screen is not on here for me.

1    **Q.**  Hah.  Okay.  It might be asleep.

2    **A.**  I'm just referring to the binder right now, but that would

3    be great.

4              **THE COURT:**  Once in a while, you are talking over

5    each other.

6              **MS. MOSKOWITZ:**  Thank you.

7                        (Pause in the proceedings.)

8              **MS. MOSKOWITZ:**  No luck?

9              **THE COURT:**  It's not working?

10             **THE CLERK:**  No, Your Honor.

11             **MS. MOSKOWITZ:**  Okay.  That's okay, we'll manage.

12             **THE COURT:**  Yeah.  I mean if you -- until we get this

13   fixed, you can look on that screen over there, and you can see

14   kind of where --

15             **THE WITNESS:**  I wish.  I wish I could do that, Your

16   Honor.

17             **THE COURT:**  But you have the book.

18             **THE WITNESS:**  I have -- I do have the -- the binder.

19   It's -- it's a long paragraph.

20             **MS. MOSKOWITZ:**  Yeah, so --

21             **THE WITNESS:**  If you could just let me know where in

22   the paragraph.

23   **Q.**  Sure.  It is about seven -- six lines down.  It says Apple

24   will review your request.

25        Do you see where I am?

 1   **A.**   That's very helpful.  Thank you.

 2   **Q.**   Okay.  Let me know when you're ready.

 3   **A.**   (Reviewing document.)

 4          **THE COURT:**  And this is in which exhibit?

 5          **MS. MOSKOWITZ:**  Exhibit 2, Your Honor.  CX-0002,

 6   section 2.3.

 7          **THE WITNESS:**  Thank you.  I've -- I've read it now.

 8   Thanks.

 9   **BY MS. MOSKOWITZ:**

10   **Q.**   So in section 2.3 of Exhibit 2, the addendum to the DPLA,

11   Apple reserves its right in its sole discretion to deny an

12   application for a link entitlement, right?

13   **A.**   Yes.

14   **Q.**   And Apple also reserves the right in its sole discretion

15   to revoke a link entitlement at any time.

16   **A.**   Yes.

17   **Q.**   Now, this application process that Apple requires, that's

18   not something that Apple requires all developers who have

19   links to external websites to go through, correct?

20   **A.**   There are some instances where a developer's link to their

21   website for things like account management, and that, in most

22   cases, did not require an entitlement.

23   **Q.**   Right.  Developers are just allowed to include links to

24   external websites for non-transaction purposes without

25   applying for any entitlement or otherwise getting permission

FISCHER - DIRECT / MOSKOWITZ

1    from Apple in advance.  Correct?

2    **A.**  Yes.

3    **Q.**  And for example, as I think you just gave the example, for

4    a developer to have an external link to its account management

5    or customer service, it need not apply for an entitlement.

6    **A.**  That's my understanding, yes.

7    **Q.**  And Apple also does not require developers who sell

8    physical goods or services to apply for any type of

9    entitlement before their app can link to a third-party payment

10   solution, correct?

11   **A.**  Yes.

12   **Q.**  So Apple treats links that may be used for transaction

13   purposes for digital goods differently than for physical

14   goods.

15   **A.**  Yes.

16   **Q.**  Developers have been able to apply for this entitlement,

17   this external purchase link entitlement, since January 16,

18   2024, correct?

19   **A.**  Yes.

20   **Q.**  We -- we took a look.  We looked through a bunch of top

21   apps in the App Store.  We couldn't find a single one that had

22   seemed to be making use of this entitlement.  Does that sound

23   right to you?

24   **A.**  I haven't looked at -- at all of the apps that you've

25   referred to, to see if those are live, no.

1  **Q.**  Okay.  I'll ask it a different way.  Do you know how many

2  developers have applied for the external purchase link

3  entitlement since it went live more than three months ago,

4  four months ago?

5  **A.**  So as of last week, I was told that we had received

6  38 applications for this U.S. link entitlement.  All 38 had

7  been approved and zero had been rejected.

8            **THE COURT:**  Out of how many?

9            **THE WITNESS:**  Out of 38.

10            **THE COURT:**  Out of how many total?

11            **THE WITNESS:**  Out of how many total --

12            **THE COURT:**  Apps.

13            **THE WITNESS:**  -- what, Your Honor?

14     Oh, we have -- I don't know the exact number of apps that

15  we have in the U.S. App Store.  I think it's -- it's close to

16  2 million.

17            **THE COURT:**  So 38 out of 2 million?

18            **THE WITNESS:**  Yes.  It -- it wouldn't apply to many

19  of those apps because the entitlement does not relate to many

20  of those apps but....

21            **THE COURT:**  What's the ballpark of the pool?

22            **THE WITNESS:**  The ballpark of the pool of apps that

23  would offer in-app purchases in the U.S. App Store, I'm -- I'm

24  sorry, I don't -- I don't have that number.  I would just be

25  guessing.

```
 1              THE COURT:  Who would have the number?

 2              THE WITNESS:  Probably someone on our -- on our data

 3     science and analytics team at Apple.

 4              THE COURT:  Who?

 5              THE WITNESS:  Ayman Khalil.

 6              THE COURT:  How do you spell that?

 7              THE WITNESS:  A-Y-M-A-N.  Last name I believe is

 8     spelled K-H-A-L-I-L.

 9              THE COURT:  Mr. Perry, Apple is ordered to get me

10     that figure.

11              MR. PERRY:  Thank you, Your Honor.  We will do that.

12              THE COURT:  Proceed.

13              MS. MOSKOWITZ:  Thank you, Your Honor.

14     Q.  So 38 applications as of last week; is that what you just

15     said?

16     A.  Yes.

17     Q.  And all of them have been granted, you just said?

18     A.  Yes.

19     Q.  Have any of those apps put or made live an actual external

20     payment link?

21     A.  I don't know.

22     Q.  Did you investigate that at all?

23     A.  I -- I'm not sure if -- if -- no, I did not investigate

24     it.  And I'm not sure if any of them are live.

25     Q.  Do you have any names of any of these apps so that we can
```

1    look into that?

2    **A.**   I don't have that list with me.  And I -- I didn't -- I

3    didn't memorize the list.

4            **THE COURT:**  Did you remember anyone on that list?

5            **THE WITNESS:**  There were -- there were many

6    developers that I was not familiar with on that list.  But I

7    looked at it very quickly.  No.

8    **BY MS. MOSKOWITZ:**

9    **Q.**   You were handed this list?

10   **A.**   I was sent this list.

11   **Q.**   Okay.  So you have this list somewhere, just not right

12   with you?

13   **A.**   That's right, yes.

14           **THE COURT:**  Do you have it in your email?

15           **THE WITNESS:**  Yes.

16           **THE COURT:**  On your phone?

17           **THE WITNESS:**  Yes.  I do not have my phone.

18           **THE COURT:**  Have it with you?

19           **THE WITNESS:**  No, I do not.

20           **THE COURT:**  Where is it?

21           **THE WITNESS:**  I gave it to someone before I came into

22   the courtroom.

23           **THE COURT:**  Okay.  So it's here in the building?

24           **THE WITNESS:**  Yes.  I --

25           **THE COURT:**  You'll find it at the break, and I want

1    to know the answer.

2              THE WITNESS:  Okay.

3              THE COURT:  Proceed.

4              MS. MOSKOWITZ:  Thank you, Your Honor.

5    Q.  I guess we'll revisit that after we see the list.

6         So let's walk through some of the requirements that Apple

7    puts on these link entitlements separate from the application

8    process, okay?

9    A.  Okay.

10   Q.  There's a couple places where these requirements are set

11   forth.  I think you may still have CX-0002 in front of you.

12   So we can start there.  That's the DPLA addendum.

13        Are you with me?

14   A.  Yes.

15   Q.  And section 3 that starts on page 3 but really is on

16   page 4 contains a list of those technical requirements.  Is

17   that fair?

18                   (Exhibit published.)

19              THE WITNESS:  (Reviewing document.)

20        Yes.

21   BY MS. MOSKOWITZ:

22   Q.  And where I would like to focus is if you would turn to

23   page -- pardon me, Exhibit 3, CX-3, page 4.  And that's in

24   evidence.  We'll put that on the screen.  That's the

25   developer's support page that we looked at earlier, right?

1    **A.**  Yes.

2                              (Exhibit published.)

3    **BY MS. MOSKOWITZ:**

4    **Q.**  And that contains a similar, same in substance list of

5    requirements that we just looked at from the addendum,

6    correct?

7    **A.**  (Reviewing document.)

8         Yes.

9    **Q.**  So let's start with near the top, there is a paragraph

10   that says "prior to each instance of linking."

11        Do you see where I am?

12   **A.**  Yes.

13   **Q.**  And there's a couple bullets underneath, the second of

14   which says that the developer must call the store kit external

15   purchase link API, et cetera.

16        Do you see that?

17   **A.**  Yes, I do.

18   **Q.**  And what it's saying it has to do once it determines the

19   user is in the United States, that it has to, quote, surface

20   the associated system disclosure.

21        Do you see that?

22   **A.**  Yes.

23   **Q.**  Now, this provision, basically what this is saying is that

24   the developer, before the user can actually go forward and

25   click on the link, they have to be presented with a screen,

1      correct?

2      **A.**  Yes, with a system disclosure, yes.

3      **Q.**  All right.  Let's look at what that system disclosure is.

4      If you could turn to page 5 of Exhibit 3.

5                          (Exhibit published.)

6      **BY MS. MOSKOWITZ:**

7      **Q.**  At the bottom of the page, you see an app system

8      disclosure sheet.

9          Do you see that?

10     **A.**  Yes.  The font is really small.

11     **Q.**  I know.  That's why we have this great technology.  It's

12     just unfortunately not helping at the moment.

13                 **THE COURT:**  So the IT is on their way.

14                 **MS. MOSKOWITZ:**  Thank you so much, Your Honor.

15     **Q.**  I will read it out loud for you when I need you to look at

16     the language just so you don't have to take my word for it.  I

17     have lots of people who can confirm if I've read it correctly.

18     Okay?

19     **A.**  Okay.

20     **Q.**  All right.

21         You can see that there's an image of the iPhone on the

22     right there?

23     **A.**  Yes.

24     **Q.**  All right.  That's the screen that's going to pop up for a

25     United States user who is interested in clicking on the

1   external purchase link?

2   **A.**   Yes.

3   **Q.**   Now, Apple dictates the content and the presentation of

4   this screen, correct?

5   **A.**   Yes.

6   **Q.**   Developers can't change anything about what this screen

7   looks like, correct?

8   **A.**   That's correct.

9   **Q.**   They can't change the font.  They can't change the size.

10  They can't change the words.  Right?

11  **A.**   Yes.

12  **Q.**   Now, just pausing on the size, this callout, this screen

13  is taking over the whole iPhone screen, right?

14  **A.**   Yes.

15  **Q.**   But Apple regularly presents users with consent screens

16  that are a fraction of this size, correct?

17  **A.**   We -- we do have consent screens that are smaller.  And

18  then we also, I believe, have system disclosure sheets that

19  also take over the full screen like this.

20  **Q.**   Well, for an app that wants to get permission to allow

21  location services or allowing notifications, those are a

22  fraction of this size, correct?

23  **A.**   I would need to see those.  I'm -- I'm not sure.

24  **Q.**   Okay.  I actually do have one I can show you in a

25  demonstrative, but I'll have to come back to that once we get

FISCHER - DIRECT / MOSKOWITZ

```
 1    the screen worked up because unfortunately I did not prepare a

 2    hard copy of that.

 3         But so we'll -- we'll come back to it.

 4              THE COURT:  Well, what --

 5              MS. MOSKOWITZ:  Pardon me.

 6              THE COURT:  Come on over, Rumar.

 7         Could you check his screen, please.

 8                     (Pause in the proceedings.)

 9              THE COURT:  Why don't we just take a short break.

10         Mr. Fischer?

11              THE WITNESS:  Yes, Your Honor.

12              THE COURT:  Go find your phone while we're taking

13    this break.

14              MS. MOSKOWITZ:  Thank you, Your Honor.

15              THE COURT:  Stand in recess for ten minutes.

16              MS. MOSKOWITZ:  Thank you.

17              THE CLERK:  Court is in recess.

18         (Recess taken at 9:11 A.M.; proceedings resumed at

19    9:11 A.M.)

20              THE COURT:  Oh, it's working.  No break.

21              THE CLERK:  Court is back in session.

22              MS. MOSKOWITZ:  Time flies.

23              THE COURT:  My plan is for us to use the basic

24    schedule that we use during trial.  So we'll go until 10:00

25    and take a break then.
```

 1          **MS. MOSKOWITZ:**  Thank you, Your Honor.

 2                       (Exhibit published.)

 3   **BY MS. MOSKOWITZ:**

 4   **Q.**  All right.  So you have on the screen the in-app system

 5   disclosure sheet and the screen itself?

 6   **A.**  Yes, I do.  Thank you.

 7   **Q.**  Okay.  That's great.

 8          So let me put on the -- on the screen a demonstrative

 9   CDX-3 for identification.

10                    (Demonstrative published.)

11   **BY MS. MOSKOWITZ:**

12   **Q.**  On the left-hand is the screen we were just looking at.

13   That's the in-app system disclosure sheet, right?

14   **A.**  Yes.

15   **Q.**  And on the right, this is just TodayTix.  It's kind of

16   like a Stubhub.  TodayTix, T-I-X, app that is presenting a

17   pop-up of whether it's allowed to track the user's activity

18   across other company's apps and websites.

19          Do you see that?

20   **A.**  Yes.

21          **MR. PERRY:**  Your Honor, I apologize for interrupting.

22   Objection.  We've never seen this demonstrative.  We had an

23   agreement to exchange yesterday at 3:00 o'clock, and Epic did

24   not provide this or any other to us.

25          **MS. MOSKOWITZ:**  It's cross.  That's why.

1    **MR. PERRY:**  Your Honor, we proposed to bring the

2    witnesses first.  They asked to bring them first.  This is

3    direct under the Court's order and the motion they made to the

4    Court.

5        **THE COURT:**  Mr. Perry, I'm looking at this

6    demonstrative.  I've seen these kinds of screens all the time.

7    He can answer the question.

8        **MR. PERRY:**  Your Honor, I don't have a problem --

9        **THE COURT:**  Objection's overruled.

10        **MR. PERRY:**  Thank you, Your Honor.

11   BY MS. MOSKOWITZ:

12   **Q.**  This is the type of pop-up that apps on the iPhone present

13   to users for things like tracking their activity across other

14   apps and platforms, right?

15   **A.**  That -- that's what this appears to -- to be, yes.

16   **Q.**  This isn't an anomaly, is it?  This is very common?

17   **A.**  I've seen, as I mentioned earlier, sizes of pop-ups like

18   this.  And I've also seen full-sheet system disclosures like

19   what we've done here.

20   **Q.**  Have you ever seen a full system disclosure that isn't for

21   either a payment for this new entitlement or for account

22   creation for reader apps?

23   **A.**  I don't recall the instances where I've seen the full

24   sheet system disclosure.

25   **Q.**  Okay.  But you know that it exists for account management

1    or account creation for reader apps like Netflix, for example?

2    **A.**  I don't know if that's the case.  I would -- I would want

3    to see that --

4    **Q.**  Okay.

5    **A.**  -- before I can answer.

6    **Q.**  I can help you with that in a -- in a moment.

7        But so you know you've seen them, you just can't name any

8    instances where you've seen them?

9    **A.**  That's correct.

10   **Q.**  The full-sized screen.

11       I'm sorry.  I sounded like I finished my question.  That

12   was my fault.

13       I just -- I'll start again.

14       So you know you've seen this full-size, pop-up, takeover

15   screen before.  You just can't tell me where it exists

16   actually in practice within iOS?

17   **A.**  That's right.

18   **Q.**  But you can also tell me that the one on the right, the

19   smaller callout, is also quite prominent and predominant for

20   notifications and allowing consents and things like that to

21   users of iOS devices.

22   **A.**  I don't know if it's predominant.  I've seen ones of

23   different sizes throughout the user experience on an iPhone.

24   **Q.**  You have an iPhone?

25   **A.**  Yes.

1   **Q.**  You use it?

2   **A.**  Yes.

3   **Q.**  You have apps?

4   **A.**  I do.

5   **Q.**  Things like allowing notifications looks like the screen

6   on the right, correct?

7   **A.**  Yes.

8   **Q.**  Allowing location services looks like the screen on the

9   right, correct?

10  **A.**  I believe so, yes.

11  **Q.**  And any reason to believe that when apps are asking to

12  track the user's activity across companies' apps and websites,

13  that looks exactly like the screen on the right?

14  **A.**  That -- that's what's on the screen here.  So yes.

15  **Q.**  And you believe that that's, in fact, how it appears in

16  other apps asking the same permission.

17  **A.**  Yes.  We try to create a consistent user experience across

18  apps --

19  **Q.**  All right.

20  **A.**  -- when they're asking for the same type of capabilities,

21  yes.

22  **Q.**  Okay.

23      And the pop-out screen on the right here, the one about

24  asking to track activity, is less than a third of the screen

25  or certainly less than half of the screen, correct?

1    **A.**   Yes.

2    **Q.**   It uses a much smaller font than the screen on the left,

3    right?

4    **A.**   Yes.

5    **Q.**   And you agree, wouldn't you not [sic], that the language

6    on the right-hand side is pretty neutral, pretty factual,

7    right?

8    **A.**   Yes.

9    **Q.**   Allowing an app, though, to track a user's activity across

10   all of these other companies' apps and websites, that's not a

11   trivial thing that it's asking permission for, right?

12   **A.**   I would not describe this as trivial, no.

13   **Q.**   But nonetheless, the pop-up that Apple has chosen and

14   determined is sufficient to inform users about their options

15   is on the right.  It's not a full-size take-over and it's not

16   scare tactic language, right?

17   **A.**   I do not believe it as -- as what you just described.

18   **Q.**   Okay.

19       So let's go back to the in-app system disclosure sheet

20   which we were just looking at on page 5 of CX-0003.

21                       (Exhibit published.)

22   **BY MS. MOSKOWITZ:**

23   **Q.**   And let's look at the language on the screen that users

24   are actually presented.  And let's try to unpack that a little

25   bit.

FISCHER - DIRECT / MOSKOWITZ

1      First, let me just start actually before we get to the
2  screen, there is a description of what the screen is doing in
3  the little blurb on the left-hand side; is that right?
4  **A.**  Yes.
5  **Q.**  So according to Apple, the purpose of this screen -- and
6  I'll highlight the language -- is to explain to the user that
7  they'll be leaving the app and going to an external website to
8  make a purchase through a source other than Apple, right?
9  **A.**  Yes.
10  **Q.**  So that's the purpose; is that correct, that that's the
11  purpose of this screen?
12  **A.**  Yes.
13  **Q.**  And so the language on the screen could have just said
14  that:  You'll be leaving the app and going to an external
15  website to make a purchase through a source other than Apple.
16  Right?  That could have been the language Apple used for the
17  pop-up, right?
18  **A.**  We could have done that, but we didn't feel that that was
19  going to be sufficient to properly inform the user of the
20  risks that they would be assuming and the benefits that they
21  would be losing if they make an external purchase on the open
22  Internet.
23  **Q.**  But the purpose on the left is just to explain to the user
24  that they'll be leaving the app and going to an external
25  website to make a purchase through a source other than Apple,

1  right?  That's the purpose?

2  **A.**  That is one of the purposes.  It is not the entirety of

3  what we -- we attempted to achieve.

4  **Q.**  I certainly agree, but that's all that's on that blurb.

5  **A.**  In the blurb on the left, yes, that's what's in the blurb.

6  **Q.**  And so there was -- there was lots more that you were

7  attempting to achieve with this screen; that's what you're

8  telling us?

9  **A.**  We felt that it was critical to inform the user of risks

10  that they would be assuming and benefits that they would be

11  losing if they made a purchase on the open Internet.

12  **Q.**  All right.  Well, let's -- let's talk about that.

13      So this screen only appears after a user has actually

14  clicked on a URL that Apple is requiring to be written out as

15  www.example.com, right?

16  **A.**  Yes.  We have provided templates to developers to use.

17  **Q.**  Right.  And the template requires that the actual link

18  that the user is clicking on has in the actual text

19  www.restofwebsite.com.  Right?

20  **A.**  Yes.

21  **Q.**  And it also requires it to have that little box with an

22  arrow, the linkout icon, as Apple calls it, right?

23  **A.**  Yes.

24  **Q.**  So the action, under Apple's rules, we have -- we have

25  lots of issues, as I think you know, with a lot of these.  But

1    under Apple's rules and templates, the action that immediately

2    precedes this screen, this pop-up, is a user clicking on a

3    hyperlinked URL that specifically says www.website.com.

4    Right?

5    **A.**   Yes.

6    **Q.**   So is it fair to say in today's day and age that everyone

7    understands that www.url.com is an external website on the

8    World Wide Web on the Internet?

9    **A.**   Yes.

10   **Q.**   Okay.  So they -- wouldn't you think that it's pretty

11   clear that a user clicking on that knows that they're going to

12   the open Internet?

13   **A.**   Yes.

14   **Q.**   But nonetheless Apple thinks it needs to display a screen

15   to explain to the user that they are headed to an external

16   website?

17   **A.**   That, as well as what risks they're taking on and benefits

18   that they're losing.

19   **Q.**   But Apple already trusts that its consumers know the

20   difference between apps and content that comes from Apple and

21   Apple's App Store, and an app or content that comes from their

22   browser; isn't that true?

23   **A.**   But in this case it's --

24   **Q.**   Well, not but.  Isn't that true?

25   **A.**   0 repeat the question, please?

1   **Q.**  Sure.  Apple already trusts that its consumers know the

2   difference between an app or content that's coming from Apple

3   or Apple's App Store and apps or content that comes from their

4   browser; isn't that right?

5   **A.**  I think most users would understand the difference.

6   That's not the case here.

7   **Q.**  So you do think that consumers of the iPhone understand

8   the difference between their apps that they're getting from

9   Apple and the World Wide Web; yes?

10  **A.**  Yes.

11  **Q.**  Okay.

12      But nonetheless you need to tell them that there's a big

13  difference?

14  **A.**  What you described is not what's happening in this

15  situation.  This is an app from the App Store.  They've had a

16  consistent purchasing experience.  Our users have had a

17  consistent purchasing experience of digital goods and services

18  for the past 15 years, and now this is a new experience, this

19  is a new capability.  And because --

20          **THE COURT:**  There's no difference between -- it's

21  redundant.  You're telling them twice.  You're requiring that

22  they be told twice, right?

23          **THE WITNESS:**  Respectfully, Your Honor, I disagree

24  with -- with that.  This is an app.  What -- what --

25          **THE COURT:**  They are clicking on a www.insert.com.

 1      That's an external link.

 2              **THE WITNESS:**  Yes.

 3              **THE COURT:**  Now, perhaps if the button said "Click

 4      for outside purchase" or something else, not that, not the

 5      requirement of the actual URL, then the first sentence would

 6      not be redundant.  But the first sentence is redundant.

 7          How is it not?  It's the exact same thing in a different

 8      form.

 9              **THE WITNESS:**  I've lost the screen again.  I don't

10      know if that can come up.

11              **THE COURT:**  I lost it too.

12              **MS. MOSKOWITZ:**  Me too.

13              **THE COURT:**  You can answer the question.

14              **THE WITNESS:**  For the first sentence on the system

15      disclosure sheet, we are making sure that the user understands

16      they're about to go to an external website.

17              **THE COURT:**  Isn't it redundant, is my question, the

18      first sentence with the requirement of the using the URL?

19              **THE WITNESS:**  I think if you just isolate the first

20      sentence, yes, I understand what you're saying.

21              **THE COURT:**  That was my question.  That was my

22      question.

23              **THE WITNESS:**  Yes, Your Honor, I understand.

24              **THE COURT:**  Proceed.

25              **MS. MOSKOWITZ:**  Thank you, Your Honor.

1    **Q.**  So the language of the warning after that first

2    sentence --

3           **MS. MOSKOWITZ:**  Okay, thank you.  Oh, nope.

4    **Q.**  After that first sentence, the language of the bold

5    warning that is appearing on this screen talks about Apple is

6    not responsible -- I was going to rely on the screen -- Apple

7    is not responsible for the privacy or security of purchases

8    made on the web.  Do you -- right?

9    **A.**  Yes, that's what it says.

10   **Q.**  People in society make lots of purchases on the web all

11   the time.  Would you agree with that?

12   **A.**  Yes.

13   **Q.**  And they -- they understand and Apple trusts that users

14   understand that the web is separate and apart and different

15   from Apple, even on an iOS device, right?

16   **A.**  I think most consumers would understand that distinction,

17   yes.

18   **Q.**  And so Apple is nonetheless telling them in this bold

19   warning that Apple is not responsible for the privacy or

20   security of purchases made on the web, right?

21   **A.**  Yes.

22   **Q.**  And what this is really communicating is not so much that

23   Apple is not responsible, but rather that their purchases on

24   the web may not be safe and secure or private and that

25   they're -- they are at risk.  Isn't what this is intending to

1  communicate?

2  **A.**  No.  This is simply intending to communicate that the

3  protections that Apple has provided to them for the past

4  15 years with in-app purchase and the purchasing of digital

5  goods and services, that protection will be different and that

6  we cannot claim responsibility over the privacy or security of

7  purchases made on the web.

8  **Q.**  Well, I think a moment ago you said that you really

9  thought it was important to tell users about risks, not just

10 Apple's role.  Right?  So you're telling them that there's a

11 risk that their transaction is going to put their safety,

12 security or privacy at risk.  Isn't that what you're

13 communicating here?

14 **A.**  That there is the potential of that, especially compared

15 to the safe and secure purchasing experience of in-app

16 purchase.

17 **Q.**  Well, let's just talk about what -- whether this is

18 accurate or -- or fairly informing users about these risks.

19     Before a developer is even allowed to show this screen to

20 a user, they had to apply for this entitlement, as we

21 discussed, right?

22 **A.**  Yes.

23 **Q.**  And Apple would have had the opportunity to review that

24 entitlement application, right?

25 **A.**  Yes.  In the case of this particular entitlement, it's an

1    automatic approval.

2    **Q.** Okay.  So you're not reviewing it?

3    **A.** For the -- the simple information that they put in the

4    entitlement request form, it's an automatic approval.  And

5    then there's the addendum --

6          **THE COURT:** Does it say it's an automatic approval?

7    Yes or no?

8          **THE WITNESS:** I don't know.  I -- I don't know in

9    honesty.  I don't know.

10   **BY MS. MOSKOWITZ:**

11   **Q.** The URL, the specific URL that the user is going to be

12   taken to is included in this application, right?

13   **A.** Yes.

14   **Q.** So Apple had to access to the precise URL that the user

15   was going to be sent to, right?

16   **A.** Yes.

17   **Q.** And Apple would have had the opportunity, whether they

18   take it or not, to review the content on the other end, right?

19   **A.** Yes.  That process takes place when the app is submitted

20   for distribution on the App Store.  So our app review team

21   would look at the -- the app and the link at that time.

22   **Q.** Right.  So before user one gets to see this screen, Apple

23   has already reviewed the app including the URL that is going

24   to be at the other end of this external link, right?

25   **A.** Yes.

FISCHER - DIRECT / MOSKOWITZ

1  **Q.**  And developers who get to do this entitlement also have to

2  certify that the third-party payment service provider that

3  they've contracted with for the actual transactions meets

4  level one payment card industry compliance, right?

5  **A.**  Yes.

6  **Q.**  And that's -- refers to these well established standards

7  promulgated by a counsel of representatives from companies

8  with global payment networks?

9  **A.**  That's right.  Payment networks like American Express,

10  Visa, Mastercard, Discover, JCBS.

11  **Q.**  So those companies approve and -- or set standards that

12  companies like PayPal or Stripe have to meet if they want this

13  level-one compliance.

14  **A.**  I'm not sure about PayPal and Stripe specifically, but

15  that -- that is my understanding, yes.

16  **Q.**  All right.  Well, you at least have heard of PayPal --

17  **A.**  Yes.

18  **Q.**  -- and Stripe, right?

19  **A.**  Of course.  Yes.

20      **THE COURT:**  Ms. Moskowitz.

21      **MS. MOSKOWITZ:**  Pardon.

22      **THE COURT:**  One at a time.

23      **MS. MOSKOWITZ:**  Yes.  Thank you.

24  **Q.**  All right.  So PayPal and Stripe are alternative payment

25  solutions that developers could use and do use all the time,

FISCHER - DIRECT / MOSKOWITZ

1    right?

2    **A.**   Yes.

3    **Q.**   And you are not aware of any study that Apple has done

4    with regard to whether PayPal has had any security issues as

5    an alternative payment processing method, right?

6    **A.**   I'm not familiar with any studies along those lines.

7    **Q.**   And you're not aware of any privacy study that Apple has

8    done with respect to PayPal as a payment solution.

9    **A.**   I'm not aware of any study like that.

10   **Q.**   You're not aware of any studies that indicate that Apple's

11   payment methods are more secure than PayPal's, right?

12   **A.**   I haven't seen a comparative analysis on the various

13   payment providers.

14   **Q.**   Right.  So you have no basis, as a result, to claim that

15   Apple's payment solution is more secure than PayPal's,

16   correct?

17   **A.**   I haven't seen any evidence along those lines.  I know

18   what we do to protect our users.

19   **Q.**   Understood, but you cannot say that it's more or better

20   than what PayPal does, correct?

21   **A.**   That's accurate.

22   **Q.**   And the same is true for Stripe.  You cannot speak to

23   whether Stripe is more or less secure or protective of privacy

24   than Apple, right?

25   **A.**   That's accurate.

1    **Q.**  So you have not done any analysis to confirm whether

2    third-party payment solutions on the web are any less safe,

3    secure, and private for users than Apple's IAP, right?

4    **A.**  I haven't seen any study or research along those lines,

5    but that's not what we said in the system disclosure sheet.

6    **Q.**  That wasn't my question.  So we'll just take these one at

7    a time.

8         You have not done any analysis, you cannot tell us that

9    any third-party payment solution on the web that might be used

10   by these developers is any less safe, secure, or protective of

11   user privacy than Apple's IAP, correct?

12   **A.**  I've personally not seen any of those types of reports.

13   Those reports might exist, but I have not seen them.

14   **Q.**  So the answer to my question is no, you cannot testify

15   that any third-party payment solution that a developer might

16   take advantage of for sending its users to make purchases on

17   the web is any less safe, secure, or protective of user

18   privacy than Apple's IAP, correct?

19   **A.**  Yes.

20            **THE COURT:**  And you approved this screen, I take it,

21   as given your position?

22            **THE WITNESS:**  I was part of a -- a group that weighed

23   in on -- on this screen and what we wanted to communicate on

24   this screen.  I did not make the final decision.

25            **THE COURT:**  Who did?

 1          **THE WITNESS:**  I think it was a group of -- of

 2     executives at Apple.

 3          **THE COURT:**  And but you made -- you and your group

 4     made a recommendation?  Or not?

 5          **THE WITNESS:**  No.  I mean this was a cross-functional

 6     effort with various groups at Apple that worked on this as

 7     well as -- as all of our efforts to comply with the

 8     injunction.  This was part of it.  So this was a combination

 9     of different groups at Apple that worked on this.

10          **THE COURT:**  I'm trying to understand your specific

11     role.

12          **THE WITNESS:**  My specific role was I was in a meeting

13     where we discussed this particular sheet and what was

14     communicated on the sheet.  I did not make the final decision

15     of what would be on the sheet.

16          **THE COURT:**  Who did?

17          **THE WITNESS:**  If I recall correctly, it was Tim Cook,

18     Phil Schiller.  I don't recall if there were -- were others

19     that made that decision.

20          **THE COURT:**  All right.  Proceed.

21          **MS. MOSKOWITZ:**  Thank you, Your Honor.

22     **Q.**  So do you agree that this is appropriate language, since

23     you didn't make the decision?

24     **A.**  One of the things that we really focused on with this was

25     to make sure that this was objective information to the user.

1          **THE COURT:**  How is it objective if you've not done

2     any studies to suggest that your process is any better than

3     PayPal or Stripe or any other well-known payment provider?

4          **THE WITNESS:**  Your Honor, we don't make any of those

5     claims on this sheet.

6          **THE COURT:**  Well, that's what you imply.

7          **THE WITNESS:**  Respectfully I disagree.  I don't -- I

8     don't -- I don't read this and think that that's implied.

9     We're just simply saying that Apple doesn't have the

10    responsibility for privacy or security of purchases made on

11    the web.  We don't say we're -- Apple's better.  We don't say

12    other offerings are worse or less private or less secure.

13    We're just simply stating that we're not responsible for

14    privacy or security of purchases made on the web.

15         **THE COURT:**  Proceed.

16    **BY MS. MOSKOWITZ:**

17    **Q.**  So just your testimony is that you don't think a user --

18    whether -- whatever you intended, that a user reading this

19    couldn't take from this language in bold that their security

20    and privacy is at risk by proceeding through and hitting that

21    "continue" button?

22    **A.**  Maybe a reader could read this and take that that's their

23    takeaway.  I think a reader could read this and just simply

24    say, okay, I understand Apple's not responsible.  Apple is

25    responsible for the purchases that I've made for the past

1  15 years with in-app purchase, but now that this is on the

2  open Internet, Apple is no longer responsible.

3      That's how I would read it.  That's how I do read it.  And

4  when I participated in the group to explore ways that we could

5  inform our users, I felt all of this was objective

6  information.

7  **Q.**  Okay.  But the rest of your answer aside, the first part

8  of your answer was that you acknowledge that a user out there,

9  without your sophistication and without the benefit of your

10  meeting and all of the things you discussed about it, that a

11  user with their iPhone being presented with this screen in

12  bold could reasonably take away from this that I'm being told

13  that if I proceed to hit "continue" here, that my security and

14  privacy could be at risk.

15  **A.**  It is possible that a user could interpret it that way.

16  **Q.**  Let's look at the rest of the language that is below the

17  bold.

18                    (Demonstrative published.)

19  **BY MS. MOSKOWITZ:**

20  **Q.**  It goes into, and I've highlighted it here, your App Store

21  account, and it continues.

22      Do you see that?

23  **A.**  Yes.

24  **Q.**  So, and again, I want to just try to take this from the

25  perspective of a user out in the world being presented with

1    this language.

2         Would you agree with me that as drafted, a user might

3    interpret this very long sentence to be suggesting that

4    subscription management and refund requests might not be

5    available at all if they go through and complete their

6    purchase on the web?

7    A.  It's possible that could -- it could be read that way.  We

8    were being specific around App Store-related features.

9    Q.  So that was your intent, but you do agree that it could be

10   misread by a user to say, oh, my gosh, I'm not going to be

11   able to manage my subscriptions and I might not be able to

12   make a refund request.

13        That's a possible interpretation, right?

14   A.  Yeah.  The words "App Store" relate to the rest of the

15   sentence.

16   Q.  I understand that if we were going to parse this in

17   English class that you could make that argument.  I'm just

18   asking from just a user in the world with various levels of

19   sophistication, you agree with me that that user could get to

20   the end of that sentence and think to themselves, oh, my gosh,

21   I'm not going to be able to manage my subscriptions and do any

22   refunds if I actually go through with this purchase on the

23   web?

24   A.  It's possible that a user could interpret it that way.

25   These are all App Store-related benefits or features that will

FISCHER - DIRECT / MOSKOWITZ

1   no longer be available to the user.

2   Q.  Right, but the -- the features will still be available to

3   users, just not from Apple, right?

4   A.  Right.  This is all about App Store-related features.

5   Q.  Right.  But those same features, subscription management,

6   refund requests, those were going to be provided by the

7   developer, right?

8   A.  Yes.  Developers need to provide those types of -- that

9   type of customer support in order to take advantage of this

10  entitlement and the new capabilities.

11  Q.  Right.  So users -- you have already confirmed before they

12  get this screen that the user is in fact going to have

13  customer service, subscription management, and the ability to

14  make refunds from the developer before they get presented with

15  this screen, right?

16  A.  Yes.

17  Q.  Okay.  But again -- and I understand your caveats, but I

18  just want to make sure we're on the same page -- you agree

19  that a user reading this with all of the text on the page

20  could say, huh, I might not be able to get refunds if I keep

21  going here.  Right?  That's a possible interpretation.  Yes?

22  A.  I guess that's possible, yes.

23  Q.  What happens if the user clicks on the "learn more" button

24  at the bottom, or the link here at the end of that text,

25  right?  Do you know what that -- happens then?

 1   **A.**   I don't, no.

 2   **Q.**   You -- I was asking you earlier whether you were familiar

 3   with the screen that pops up for reader apps when users click

 4   on the external link to set up accounts or to subscribe

 5   through the app on the web?  Do you remember that question?

 6   **A.**   Yes.

 7   **Q.**   And I think you said you weren't recalling it, you'd want

 8   to look at it?

 9   **A.**   Yes, I don't recall what that system disclosure sheet

10   looks like.

11   **Q.**   All right.  And just so we're on the same page, it's been

12   a while, reader apps are apps where, like Netflix, where you

13   can consume the content on the app even if you have acquired

14   it outside of the app.  You can read it or consume it, like a

15   movie, right?

16   **A.**   Yes.

17   **Q.**   Now, Netflix, in fact, is one of the apps on iOS that does

18   have the entitlement to prompt users to go to its external

19   website to sign up for a new account or to subscribe, right?

20   **A.**   Not to subscribe, but to sign up for a new account.  The

21   entitlement is very specific that it's about account

22   management.

23   **Q.**   Okay.  So you don't let them link to -- users to

24   subscribe?

25   **A.**   The -- I'm not exactly familiar with what Netflix does.

FISCHER - DIRECT / MOSKOWITZ

```
 1    The entitlement that they've been granted is very specific
 2    that they can add a link in their iOS app to their external
 3    website specifically for account management.
 4    Q.   Okay.  Let's --
 5    A.   But not to sign up.
 6    Q.   Pardon me.
 7         Let's pull up a demonstrative which has been marked for
 8    identification as CDX-4.
 9         I'm going to pull up the Netflix app on this generic
10    iPhone here.
11                    (Demonstrative published.)
12              MR. PERRY:  Objection, Your Honor.
13              THE COURT:  Same objection?
14              MR. PERRY:  Yes, Your Honor.
15              THE COURT:  Overruled.
16              MR. PERRY:  Thank you.
17    BY MS. MOSKOWITZ:
18    Q.   And you see here it's presented with -- sorry, let's just
19    pause there.  It's presented with "Create a Netflix account
20    and more at netflix.com/more."
21         Do you see that?
22    A.   Yes.
23    Q.   All right.  Now let's click on that.  And it gets this
24    screen.
25              MS. MOSKOWITZ:  So let's pause it here.
```

1   **Q.**   This is familiar to you as the pop-up screen that's

2   presented for external link-outs for reader apps like Netflix?

3   **A.**   Yes.

4   **Q.**   And it's -- it's similar, but it's not quite exact replica

5   of what we were just looking at for the new external link

6   entitlement, right?

7   **A.**   Yes, there are some differences.

8   **Q.**   The substance, however, is quite similar, correct?

9   **A.**   Yes, there's some similarities and some differences.

10  **Q.**   It says you're about to leave the app and go to the

11  external website, right?  That's similar.

12  **A.**   Yes.

13  **Q.**   It tells you -- tells the user that they're not going to

14  be transacting with Apple and that the App Store account and

15  subscription management and refund requests may not be

16  available -- will not be available, right?

17  **A.**   Yes.

18  **Q.**   And it also says Apple is not responsible for the privacy

19  or security of the transactions made with this developer.

20  **A.**   Yes.  It looks like the order is a little bit different,

21  yes.

22  **Q.**   Right.  But the substance is there.

23  **A.**   Yes.

24  **Q.**   Okay.  And there's a "learn more" there as well.

25          **MS. MOSKOWITZ:**  So let's click on that.

1          That should come up in a moment.

2          All right.  Let's pause it there.

3                    (Demonstrative published.)

4    **BY MS. MOSKOWITZ:**

5    **Q.**  Does that look familiar to you?

6    **A.**  Vaguely.  I haven't -- I haven't seen this page in a long

7    time.

8    **Q.**  Do you have any reason to doubt that that's the exact same

9    presentation for a "learn more" when a user clicks on it for

10   the external link entitlement screen pop-up?

11   **A.**  No.

12   **Q.**  In other words, just so that I'm clear if I didn't do too

13   many double negatives, do you believe that this is the same

14   screen that would be presented to a user clicking on "learn

15   more" for the external link entitlement pop-up?

16   **A.**  Yes.

17   **Q.**  Thank you.

18         Now what's being presented here is a bright orange caution

19   symbol, a universal caution symbol; would you agree?

20   **A.**  Yes.

21   **Q.**  And it says that the text that follows is about app

22   transactions on external websites.  And the second sentence

23   reads:  If you create or manage your account on that external

24   website or make any purchases, you will not be using the

25   App Store's private and secure payment system for digital

 1    goods and services.

 2        Do you see that?

 3    A.  Yes.

 4    Q.  And let's keep scrolling down because it -- it does go on

 5    for a number of lines.

 6        There's more warnings there.  And let's keep going down

 7    about App Store payment features.

 8        And then all the way at the end, which we should be able

 9    to scroll down to in a moment, it starts with "if you are not

10    comfortable."

11                    (Demonstrative published.)

12    BY MS. MOSKOWITZ:

13    Q.  Do you see that?

14    A.  Yes.

15    Q.  It says at the end, "If you are not comfortable making an

16    account or purchase on an external website, you can contact

17    the developer and request support for App Store payments or

18    find apps that do support App Store payments."  Right?

19    A.  Yes.

20    Q.  So the "learn more" button on the screen that's going to

21    be popping up to users ultimately is steering users right back

22    to IAP by telling them they can ask the developer to use IAP

23    or find a different app altogether that already uses IAP,

24    right?  That's what this is communicating?

25    A.  I wouldn't -- I don't agree with your characterization

1  that this is steering.  This is simply about informing the

2  user of what they can do.

3  **Q.**  Right.  And what they can do is go right back and use IAP.

4  **A.**  If they're not comfortable, as it says here, making an

5  account or purchases on an external website.  I think many

6  consumers would be totally comfortable doing that.

7  **Q.**  We discussed early --

8      **MS. MOSKOWITZ:**  You can take that down.  Thank you.

9  **Q.**  We discussed earlier that Apple permits developers to link

10  to websites, external websites, that aren't for transactional

11  purposes.  Do you remember that?

12  **A.**  Yes.

13  **Q.**  And Apple does not require this pop-up screen for those

14  links, right?

15  **A.**  Yes.

16  **Q.**  And so you're not saying going to the web is inherently

17  problematic, right?

18  **A.**  That's right.

19  **Q.**  And we spoke about a few alternative payment solutions

20  like PayPal and Stripe.  Processing payments with PayPal and

21  Stripe is also not inherently dangerous, right?

22  **A.**  I know those are well-known companies.  I think those are

23  reputable companies.  I don't know much about those companies

24  though.

25  **Q.**  Right, but what we do know is that you don't know that

1    they're any less safe or secure or protective of privacy than

2    Apple's own IAP, right?  We talked about that, right?

3    **A.**  Yes, we did talk about that.

4    **Q.**  And you agreed.

5    **A.**  Yes.

6    **Q.**  And those same companies, PayPal and Stripe, are among the

7    payment solution providers that are used by developers to

8    sell -- to sell physical goods on the apps on iOS today.

9    **A.**  Is that a --

10   **Q.**  It's a question.

11   **A.**  -- question?

12   **Q.**  Yes.

13   **A.**  Okay.

14       I don't know.  I -- I'm not sure if lots of developers use

15   those services.  I would imagine that they -- that they would

16   if they're selling physical goods and services.

17   **Q.**  You -- you can't say, as the head of the App Store, that

18   in fact apps today on the iPhone selling physical goods or

19   services are not currently using PayPal and Stripe as some of

20   the payment solutions offered to consumers?

21   **A.**  I would imagine that they are.  I don't have visibility or

22   data around how many developers use those two specific

23   services.

24   **Q.**  So -- and you've not done any inquiry or investigation

25   into the prevalence or use of alternative payment solutions

1    currently in -- in play in the iOS ecosystem --

2                   (Simultaneous colloquy.)

3            **THE WITNESS:**  For physical goods and services, I

4    don't -- I don't have a lot of visibility into that part of

5    the business.

6    **BY MS. MOSKOWITZ:**

7    **Q.**  Understood, but -- but we're talking now about allowing

8    developers to link out to offer external payments.  And you

9    understand that they are likely to contract, because it's in

10   fact in the entitlement, with solutions like PayPal and Stripe

11   to process and facilitate these external payments?  You're

12   aware of that, right?

13   **A.**  Right, for digital goods and services, yes.

14   **Q.**  Right.  And so in your capacity understanding that and

15   talking about compliance and doing all the work here, you

16   didn't do any inquiry to understand how is this working, what

17   does it look like in the physical goods space on your very own

18   App Store?

19   **A.**  I personally did not conduct that research.  That research

20   might have happened, but I -- I did not participate in it

21   myself.

22   **Q.**  And you have no idea whether, in fact, any such analysis

23   was done.

24   **A.**  I'm not sure.

25   **Q.**  0 confirm or do you not know that Apple does not require

FISCHER - DIRECT / MOSKOWITZ

1   developers selling physical goods to users to display any

2   warning at all before users proceed to make a payment with a

3   third-party payment solution?

4   **A.**   0 repeat the first part of your question?  I just want to

5   make sure --

6   **Q.**   Sure.

7   **A.**   -- that I'm understanding it correctly.

8   **Q.**   Sure.  I'll just ask it maybe more simply.

9        Apple does not require developers selling physical goods

10   to display any warning at all before users proceed to make a

11   payment with a third-party payment solution; is that correct

12   to your understanding?

13   **A.**   Yes.

14   **Q.**   But Apple is requiring the developer to display this big

15   screen when linking to a payment with the same third-party

16   payment solution if the user is going to purchase a digital

17   good.

18   **A.**   Yes.  We view the distinction as very important.

19   **Q.**   Well, the reason you're actually doing that is to deter

20   the user from actually following through with the transaction

21   outside of the app for the digital goods; isn't that right?

22   **A.**   Not at all.

23   **Q.**   You're familiar with the concept of friction, are you not?

24   **A.**   Yes.

25   **Q.**   And friction refers to the phenomenon that increasing the

1    number of steps in a flow, like a purchase flow, for example,

2    increases the likelihood that users will become frustrated and

3    give up, right?

4    **A.**  Yes.

5    **Q.**  So the more steps a user is required to go through to

6    complete an out-of-app purchase transaction, the less likely

7    the user is to go through with it, right?

8    **A.**  That's possible, but that was not the intention of our

9    compliance here.

10             **THE COURT:**  It's the basic understanding in the

11   industry, correct?

12             **THE WITNESS:**  Yes.

13             **THE COURT:**  And Apple knows that.

14             **THE WITNESS:**  Around friction, Your Honor?

15             **THE COURT:**  Yeah.

16             **THE WITNESS:**  Yes.

17   BY MS. MOSKOWITZ:

18   **Q.**  Did Apple do any study or analysis to see how users would,

19   in practice, respond to the scare screen that's being put up

20   for these external links?

21   **A.**  I don't agree with the clarification -- the statement that

22   this is a scare screen.  I do not know if there was any

23   usability studies or anything like that around the user

24   experience here.

25   **Q.**  So you just don't know one way or the other whether anyone

FISCHER – DIRECT / MOSKOWITZ

```
 1   looked at this at all to understand what users would react to
 2   or drop off after seeing a screen like is going to be
 3   presented?
 4   A.   I have not seen any analysis like what you're referring
 5   to.
 6   Q.   Was there discussion in the room where the decision was
 7   made that Apple expected users to in fact not continue through
 8   to completion and to revert back to IAP?
 9   A.   I don't recall that coming up, no.
10   Q.   That's your expectation, isn't it?  That people are going
11   to be deterred by this screen and to go back and do it the
12   old-fashioned way and go through Apple's IAP?
13   A.   No.
14   Q.   You don't expect that to be the outcome here?
15   A.   That was not our intention.
16   Q.   Different question.  I'm not asking about your intention.
17   I'm asking about your expectation of the outcome.
18        Is it not your expectation that users will in fact fall
19   out of this process and go back and proceed through Apple's
20   IAP?
21   A.   It is possible that when the user is informed of the risks
22   that they're taking on or the benefits that they're losing,
23   that they may or may not move forward with the external
24   purchase.
25   Q.   And the risks we talked about are the risks to their
```

1   privacy and security?

2   **A.**   Yes.

3   **Q.**   Right.   And those risks, we already established, you have

4   no basis to say that proceeding on the web is any less safe

5   and secure and private than Apple's IAP, right?

6   **A.**   It's a risk.   It may be as safe or secure or -- or maybe

7   not.

8   **Q.**   Does Apple present a risk when users are using Apple's own

9   IAP that their transaction may not be safe and secure and

10  private?

11  **A.**   No, because we can back that up with the customer support

12  that we've provided to our users since the inception of the

13  App Store in 2008.

14  **Q.**   But you can't back up -- you cannot back up that any other

15  payment solution is any less safe, secure, or private, right?

16  **A.**   Again I've not seen any analysis along those lines.

17  **Q.**   But you still think it's appropriate to tell users that

18  it's a risk.

19  **A.**   Yes.

20  **Q.**   Moving on a bit.   Let's please go back to page 4 of

21  Exhibit CX-0003.   This is the requirements for the link.

22                    (Exhibit published.)

23            **MS. MOSKOWITZ:**   And we can blow it up a bit.

24  **Q.**   There's a link that says "The link you provide in your app

25  must," and I've also pulled that up on the screen for you,

1    sir.

2         Do you see where I am?

3    **A.**   I do.  Thank you.

4    **Q.**   And there's a number of bullets here.  And we're going to

5    jump around a bit.  I'd like to start with the one kind of in

6    the middle that says "Adhere to design and language

7    requirements.  See below."

8         Do you see that?

9    **A.**   Yes.

10   **Q.**   And the "see below" that I will be talking about is

11   page 5, and it has a number of things starting with "please

12   style an icon," which is right above that screen we were just

13   spending time on.

14        Do you see that?

15                       (Exhibit published.)

16            **THE WITNESS:**  Yes.

17   **BY MS. MOSKOWITZ:**

18   **Q.**   So this section includes some of the design requirements

19   that the developer must follow for their external purchase

20   link, right?

21   **A.**   Yes.

22   **Q.**   The first sentence says, "Your link must follow the plain

23   button style as specified in the human interface guidelines."

24        Do you see that?

25   **A.**   Yes.

1    **Q.**  And we'll -- we'll get there in a moment, but it continues

2    to say that "The link may not be closed in a shape that uses a

3    contrasting background fill."

4         Do you see that?

5    **A.**  I do, yes.

6    **Q.**  Okay.  So this is Apple telling the developer how to

7    design what users click on to go to their website.  Right?

8    **A.**  Yes.

9    **Q.**  So let's --

10             **THE COURT:**  And we'll keep going till 10:15.

11             **MS. MOSKOWITZ:**  Thank you, Your Honor.

12   **Q.**  Let's go to your binder CX-0016.

13   **A.**  (Reviewing document.)

14        Okay.

15   **Q.**  These are Apple's human interface guidelines for buttons;

16   is that right?

17   **A.**  Yes.

18   **Q.**  So you find that page if you click on the human interface

19   guidelines link that we just saw in Exhibit 3?

20   **A.**  I believe that link goes to the human interface

21   guidelines.  I don't know if that link specifically goes right

22   to this page.  But, yes, that's the intention, yeah.

23   **Q.**  The buttons in Exhibit 6 is in fact part of -- that we're

24   looking at in Exhibit 16 is part of the human interface

25   guidelines?

1    **A.**   Yes.

2    **Q.**   So your clarification is you don't know how many clicks it

3    takes to get there, but it's there?

4    **A.**   Yeah.  I don't -- I just haven't clicked on that

5    particular link to know definitively if it goes right to this

6    page that you're showing me.

7    **Q.**   Okay.

8            **MS. MOSKOWITZ:**   Your Honor, I move CX-0016 into

9    evidence.

10           **THE COURT:**   Admitted.

11       (Plaintiff's Exhibit CX-0016 received in evidence.)

12           **MS. MOSKOWITZ:**   Thank you.

13                   (Exhibit published.)

14   **BY MS. MOSKOWITZ:**

15   **Q.**   So let's go to on page 3, there's a section iOS on the

16   bottom and it has a chart of button styles, as Apple describes

17   it.

18       Do you see that?

19   **A.**   Yes.

20   **Q.**   And it says each style has a different level of visual

21   prominence.  Do you see that?

22   **A.**   Yes.

23   **Q.**   And the chart is presenting from least prominent to most

24   visually prominent left to right, correct?

25   / / /

1   **A.**   (Reviewing document.)

2        Yes.

3   **Q.**   And the -- the leftmost is the plain column.  Do you see

4   that?

5   **A.**   Yes.

6   **Q.**   Would you agree with me that in the world out there, users

7   would refer to the plain style as a link, not a button?

8   **A.**   We view this as -- as a button.  Some users might view it

9   simply as a link.

10  **Q.**   Yes.  Computer science sort of speak aside, a user, an

11  average user looking at what you call a plain button would

12  look at that and say, "This is a link."  Right?

13  **A.**   Some users might -- might say that.  That's not how Apple

14  views these guidelines.

15  **Q.**   Visually prominent buttons help people quickly identify an

16  action that they're most likely to want.  Would you agree?

17  **A.**   They can.

18  **Q.**   And Apple, in fact, encourages developers to use visually

19  prominent buttons for the most likely action its users are

20  most likely to want, right?

21  **A.**   I don't know if -- if Apple does that.  I'm not familiar

22  with what you're referring to.

23  **Q.**   Okay.  Let's go to page 2 of this exhibit.

24                      (Exhibit published.)

25  / / /

1    BY MS. MOSKOWITZ:

2    **Q.**   In "Style" section, and I'm in the paragraph starts "In

3    general."

4        It says, "In general, use a button that has a visible

5    background for the most likely action in a view.  Buttons that

6    have a fill or background shape tend to be the most visually

7    prominent, helping people quickly identify the action they're

8    most likely to want."

9        Do you see that?

10   **A.**   Yes.

11   **Q.**   That's Apple's guidance to developers, right?

12   **A.**   Yes.  Thanks for pointing this out.

13   **Q.**   You're welcome.

14       Are you aware of any analysis conducted by Apple of the

15   likelihood that a user would click a plain link-looking button

16   as compared to something that actually looks like a button?

17   **A.**   0 repeat the first part of your question, please?

18   **Q.**   Are you aware of any analysis conducted by Apple of the

19   likelihood that a user would in fact click a plain

20   link-looking button as compared to something that actually

21   looks like a button?

22   **A.**   I have not personally seen that analysis, no.

23   **Q.**   Do you have any reason to believe it exists?

24   **A.**   I'm not sure.

25   **Q.**   Developers linking out of an app for non-transactional

1   purposes, like customer support, for example, can use whatever

2   button style they want, right?

3   **A.**   I'm not sure what they can do for -- for that link, no.

4   **Q.**   You just have no idea about the restrictions or lack

5   thereof for that?

6   **A.**   I know that there's an entitlement for -- for reader apps,

7   but I'm not -- I don't know exactly what -- what requirements

8   exist for that.

9   **Q.**   Separate from reader apps, for a developer of a normal

10  in-app experience who wants to send their users out for

11  customer support, are you aware of any restrictions on what

12  type of button they can use to send those users out to the

13  web?

14  **A.**   No.

15  **Q.**   And developers linking or using a third-party payment

16  solution for physical goods or services can use whatever

17  button they want as well, right?

18  **A.**   Yes.

19  **Q.**   So there's no risk to users using PayPal for physical

20  goods by being presented with something that actually looks

21  like a button instead of something that is just a link, right?

22  **A.**   As I mentioned earlier, we view the distinction between

23  physical and digital goods and services differently.

24  **Q.**   Yeah, I get that, but I'm asking a different question.

25      There is no risk to people using PayPal for physical goods

FISCHER - DIRECT / MOSKOWITZ

1  being presented with something that actually looks like a

2  button instead of something that just looks like a link,

3  right?

4  **A.**  0 repeat the first part of the -- of your question again?

5  **Q.**  There is no risk to users that are using PayPal for

6  physical goods by being presented with an actual

7  button-looking button instead of just something that looks

8  like a link, right?

9  **A.**  I don't think the risk exists with the -- the visual

10  display per se.  It's more downstream.

11  **Q.**  Okay.  So there's no risk to what the button looks like

12  for people clicking to go buy a physical good or service with

13  PayPal on -- on the iOS device, right?

14  **A.**  0 repeat that?  Just the way that some of these are

15  phrased, I just want to make sure I'm answering and

16  understanding this correctly.

17  **Q.**  Yeah, I can't guarantee I'll do it exactly right.  I'm

18  just trying to understand for physical goods, a user can be

19  presented with whatever button, including the filled

20  contrasting background button, the one that we all think of as

21  a button, to use PayPal to buy socks, right?

22  **A.**  For physical goods, developers have flexibility in terms

23  of how that link appears.

24  **Q.**  And there's no risk for that user being presented with a

25  visually prominent button as compared to just being presented

FISCHER - DIRECT / MOSKOWITZ

 1   with a link.  That doesn't increase the risk to the user, does

 2   it?

 3   **A.**  Not to my knowledge.

 4   **Q.**  Okay.  But for purchasing digital goods outside of IAP,

 5   Apple is prohibiting developers from using a button that

 6   actually looks like a button, correct?

 7   **A.**  As we've said, we -- we view the plain style as a button

 8   style.

 9   **Q.**  Okay.  Let's -- let's step back.  Forget about Apple and

10   its -- and its guidelines for a second.

11        You're a citizen of society, right?

12   **A.**  Yes.

13   **Q.**  Okay.  You -- you may -- let's take it out of Apple.

14        Like you go on the web, presumably you've bought something

15   on the internet before.  Yes?

16   **A.**  Yes, I have.

17   **Q.**  Okay.  Like Amazon, for example, right?

18   **A.**  Yes.

19   **Q.**  Okay.  You -- when you add to cart, there's a button that

20   you press, right?

21   **A.**  Yes.

22   **Q.**  It looks like a button, it's contrasting color, it's like

23   "click me" to the user, right?

24   **A.**  It often is, yes.

25   **Q.**  Is it ever not that?  Is it ever just a hyperlink?

1    **A.**  I -- I make a lot of purchases on the Internet.  I -- I

2    don't spend a lot of time looking at the button styles.

3    **Q.**  0 think of any single example in your memory where you

4    have clicked to add to a cart or to actually buy something

5    where it wasn't a button that is filled with contrasting

6    background?

7    **A.**  No, I cannot.

8    **Q.**  And so what I'm just trying to understand is you would

9    agree with me that a button that has a contrasting filled

10   background is what lay people out there, users, would call a

11   button, right?

12   **A.**  Yes.

13   **Q.**  And would you agree with me, again, separate and apart

14   from the technical guidelines and what Apple does or does not

15   call it, just from user experience and user interface, general

16   public, that they do not call a hyperlink a button?

17   **A.**  Yes.

18   **Q.**  And so for purchasing digital goods on an external website

19   under this entitlement, Apple is saying to users that they

20   can't use -- sorry -- to developers, Apple is saying to those

21   developers that they cannot use what their consumers would

22   expect to see as an actual button, right?

23   **A.**  That's what the requirements are.  Yes.

24   **Q.**  And Apple is requiring that even though it goes against

25   its own guidance in its own human interface guidelines that

 1    tell developers to use visually prominent buttons, buttons

 2    that actually look like buttons, right?

 3    **A.**  Yes.

 4    **Q.**  And the reason Apple is imposing that restriction is that

 5    Apple wants to actually deprioritize those links and deter

 6    people from actually clicking on those links; isn't that

 7    right?

 8    **A.**  No.

 9    **Q.**  When Apple is telling people to use visually prominent

10    buttons when it wants people to click it, that's another way

11    of saying use the other styles when you don't want the users

12    to click on it or when you deprioritize those actions.

13        Isn't that the guidance?

14    **A.**  I wouldn't characterize it like that, no.

15    **Q.**  Isn't that your understanding of how these styles are

16    supposed to be used, that when you want someone to click on

17    it, you use visually prominent, and when you want to just

18    present something but you don't really need or want them to

19    click on it or you don't expect them to, you use the plain

20    style; isn't that the generally accepted practice?

21    **A.**  Lots of developers do lots of things in their apps.  I

22    don't know if it's generally accepted or not.

23            **THE COURT:**  I can't imagine a logical reason why

24    Apple would demand that of competitor apps.  What's a logical

25    objective reason for, not suggesting it, but demanding it?

 1          **THE WITNESS:**  I think we're in the early days of --

 2    of this -- these new capabilities.  This was the decision

 3    that -- that we made.

 4          **THE COURT:**  So I have -- you still haven't answered

 5    my question.

 6       Other than to -- to stifle competition, I see no other --

 7    I see no other answer.  0 give me one?

 8          **THE WITNESS:**  This was the decision that was made --

 9          **THE COURT:**  That's not my question.

10          **THE WITNESS:**  -- for the button.

11          **THE COURT:**  You were in those conversations.  0 give

12    me an answer or not?

13          **THE WITNESS:**  I did not make the decision.

14          **THE COURT:**  That's not my question.  When you were

15    all talking about this, was any -- was any rationale provided

16    for requiring this, not suggesting it, but requiring it when

17    you all know that what it will do is stifle competition?  Any

18    other reason given?  Because if you cannot identify one,

19    that's my assumption.

20          **THE WITNESS:**  I don't remember exactly what this

21    was -- in the discussion around the -- the button styles, Your

22    Honor.

23          **THE COURT:**  So the answer is no, you cannot think of

24    any other reason for requiring that.

25          **THE WITNESS:**  No.

```
 1            THE COURT:  Okay.

 2       I think that's a good place for a break.

 3            MS. MOSKOWITZ:  Thank you, Your Honor.

 4            THE COURT:  We'll stand in recess for 15 minutes.

 5       You are ordered not to talk to the lawyers.  You're in the

 6  middle of an examination.

 7            THE WITNESS:  I understand.

 8            THE CLERK:  Court is in recess.

 9       (Recess taken at 10:11 A.M.; proceedings resumed at

10  10:26 A.M.)

11            THE COURT:  Okay.  We are back on the record.

12       The record will reflect the parties are present.  You may

13  proceed.

14            MS. MOSKOWITZ:  Thank you, Your Honor.

15  Q.  If you go back to where we were before the break on page 5

16  of Exhibit 3, there's a section called "Templates" which has

17  an additional set of restrictions on the links.

18       Do you see where I am?

19  A.  (Reviewing document.)

20       Yes.

21  Q.  So this section has a series of wording, exact wording

22  that the developers must match for their external purchase

23  links, correct?

24  A.  Yes.

25  Q.  So developers can't use any words beyond those provided in
```

1    these templates to communicate with their users about the

2    external purchase availability.

3    **A.**  Yes.

4    **Q.**  So the developer couldn't say something like "buy cool new

5    stuff over here," right?

6    **A.**  Correct.

7    **Q.**  The developer couldn't say "unlock new and special

8    subscription content only when you describe [sic] on our

9    website"; they can't say that.

10   **A.**  Yes.

11   **Q.**  And one of the things you do allow them to say is to get

12   X percent off, go to the WWW et cetera, right?

13   **A.**  Yes.

14   **Q.**  But if -- if the developer wants to compete on price, not

15   by offering lower prices on the web, but by offering more or

16   extra stuff or extra benefits by going to the web, there's no

17   way for them to communicate that, correct?

18   **A.**  Correct.

19   **Q.**  And the templates also -- and the restrictions also limit

20   a developer from explaining to the user why they might want

21   the user to go on the website to avoid Apple's commission,

22   right?

23   **A.**  Correct.

24   **Q.**  And they couldn't explain why their prices were higher on

25   the I -- in-app purchases through IAP based on Apple's

1   commission; they can't communicate that, right?

2   **A.**   They can't communicate that in the app, but they can

3   communicate that outside of the app.

4   **Q.**   Right.   They can't -- anywhere where they're actually

5   trying to get the user to go to the website, they can't say

6   anything about why they want the user to go to the website if

7   it includes anything about Apple's 30 percent or its

8   commission or anything along those lines.

9   **A.**   Not in the app, but they can communicate -- they have a

10  lot of flexibility outside of the app.

11  **Q.**   I'm only talking, for these purposes, about what Apple

12  does and does not allow in connection with letting users click

13  on an external link to go to a website to make a purchase.

14  Okay?

15      Apple does not allow developers to communicate anything

16  about the fact that Apple charges a commission, why they might

17  have higher prices through IAP, or anything along those lines

18  in connection with sending a user to a website from the app.

19  Right?

20  **A.**   That's right.

21  **Q.**   So let's go back to the list on the prior page with the

22  bullets of the other restrictions.

23                      (Demonstrative published.)

24  **BY MS. MOSKOWITZ:**

25  **Q.**   The fourth bullet says that the link must be statistically

1    defined.  Do you see that?

2    **A.**   Yes.

3                            (Exhibit published.)

4    **BY MS. MOSKOWITZ:**

5    **Q.**   And what that basically means is that the website, the URL

6    that the link is going to send users to, has to be the same

7    website for every single user of the app, correct?

8    **A.**   Yes.

9    **Q.**   And it also has to be a generic landing page.  The --

10             **THE COURT:**   0 say that again?

11             **MS. MOSKOWITZ:**   Sure.  I can try.

12   **Q.**   The link has to send all users to the same URL for every

13   single user.  There's no way to give a tailored or specific

14   landing page for individual users, correct?

15   **A.**   That's my understanding of -- of what that means.  I'm not

16   an engineer.  This is a more technical requirement.  But

17   that's my understanding.

18   **Q.**   But this is among the requirements that you put a

19   declaration in to support Apple's compliance with the

20   injunction, correct?

21   **A.**   Yes.  I was reporting this requirement, yes.

22   **Q.**   And supporting and justifying this requirement, right?

23   **A.**   I said reporting, yes.  But, yes, communicating that this

24   requirement in the declaration, yes.

25   **Q.**   But you were also supporting its existence?

FISCHER - DIRECT / MOSKOWITZ

1    **A.**   Yes.

2    **Q.**   Okay.

3       Another aspect of what this means is that the user, a

4    specific user's log-in credentials cannot be ported over.

5    They have to start from scratch in a generic landing page,

6    correct?

7    **A.**   That's my understanding.  Yes.

8           **THE COURT:**  Does that -- is that also the case --

9    lots of times people save their passwords so it's always open

10   on the web, for instance.  Does this requirement undo that?

11   Or send it to a -- a page where if they hadn't kept their

12   account open, that somehow they would have to redo it?

13          **THE WITNESS:**  My understanding is that the first time

14   the user clicks on the link and then goes to the external

15   website of the developer, they need to enter their user name

16   and password, if that's the type of --

17          **THE COURT:**  Even if -- so let's take -- lots of

18   people keep their Amazon, you know, landing page open.

19      So if -- and obviously Amazon doesn't apply here.

20      But if this requirement existed, and you went from the

21   phone to the Amazon website, even though you generally have it

22   open, it would send it to somewhere elsewhere where you would

23   have to reopen it?

24          **THE WITNESS:**  I'm not sure technically exactly how

25   that -- how that works.  I -- I believe that the stored

1   credentials in your example, Your Honor, on Amazon would --

2   would work when the user clicks on the link from within the

3   app and goes to, in this example, Amazon.

4       I don't believe that they would need to enter their user

5   name and password again, but I'm not -- I'm not certain.

6           **THE COURT:**  Okay.

7   **BY MS. MOSKOWITZ:**

8   **Q.**  You are aware that as a technical matter there --

9   developers are able to program dynamic as opposed to static

10  links that would be able to take a user to a website where

11  they are already logged in, right?

12  **A.**  Yes.

13  **Q.**  But Apple just doesn't allow them to do that for these

14  external links.

15  **A.**  We were trying to come up with a scalable way to manage

16  these new capabilities, and that's really the purpose of these

17  requirements.

18          **THE COURT:**  I don't understand that.  What does it

19  matter to Apple in terms of scale if someone's already going

20  outside of Apple to their website?  Again, other than to

21  stifle competition, how is that at all a scalable issue?

22          **THE WITNESS:**  We're trying to create a consistent

23  user experience across lots of apps that are doing this.  And

24  so that's -- that's what we are trying to do with -- with some

25  of these requirements.  And also to protect user privacy.

1          **THE COURT:**  What does that have to do with anything

2     if -- if they're already in the app, they've chosen to go

3     externally, how does that have anything to do with privacy?

4     Those two concepts don't work together in this example.

5          **THE WITNESS:**  My understanding is that the -- the

6     third requirement here around not passing additional

7     parameters in the URL in order to protect the user is an

8     example of what I'm talking about.

9          **THE COURT:**  I don't even understand that.

10        But go ahead.

11    **BY MS. MOSKOWITZ:**

12    **Q.**  I confess I don't either.  But let me ask a slightly

13    different question.

14        Restricting developers from using a dynamic link that

15    would actually keep a user signed in when it opened this new

16    website, that is a possibility for the developer to do, right,

17    you're just not allowing it.  I just want to make sure we're

18    on the same page.

19    **A.**  These are technical questions.  I'm -- I'm not --

20        **THE COURT:**  So if you --

21        **THE WITNESS:**  -- the right person to answer these

22    questions.

23        **THE COURT:**  Mr. Fischer, if you're not the right

24    person, who is?

25        **THE WITNESS:**  Phil Schiller.

1    BY MS. MOSKOWITZ:

2    **Q.**   Mr. Schiller is a technical person?

3    **A.**   Mr. Schiller has a deeper understanding of some of these

4    requirements, technical requirements listed here, than I do.

5    **Q.**   So set aside the technical requirements.  Let's talk about

6    the app experience.

7        Would you agree that if a developer were able to direct a

8    user clicking on an external purchase link to a landing page

9    where they're already logged in and can receive bespoke

10   content directed to them, that that would be a better user

11   experience, right?

12   **A.**   Yes.

13   **Q.**   And so making a user go to a generic page, re-log on,

14   navigate to whatever they were actually looking for from

15   scratch is a worse user experience, correct?

16   **A.**   There is one link, one destination where these links can

17   go to are in these requirements so....

18   **Q.**   Yes, we established that.  I asked if it was a worse

19   experience for users to have to go to with this generic, same

20   page, log in from scratch, navigate from scratch to whatever

21   they were looking for, and complete a purchase.  That's worse

22   than having a dynamic link that sends them where they were

23   already interested in going already logged in.

24       Agreed?

25   **A.**   Yes.

FISCHER - DIRECT / MOSKOWITZ

1  **Q.**  Let's go to the bottom of that list.  The last bullet says

2  that the link may not be displayed on any page that is part of

3  an in-app flow to merchandise or initiate a purchase using

4  in-app purchase.  Do you see that?

5  **A.**  Yes.

6  **Q.**  I'm going to try to break this down.

7      The first part of the bullet is saying that the external

8  purchase link cannot be part of any user flow or page that --

9  where merchandise is sold; is that what that's saying?

10  **A.**  This is -- this is saying that in many apps there's

11  digital goods and services that are offered that require

12  in-app purchase and that these links cannot be positioned on

13  that same page where some of those digital goods and services

14  are being merchandised.

15  **Q.**  So for --

16          **THE COURT:**  I'm not understanding.

17          **MS. MOSKOWITZ:**  So, Your Honor, would you like me to

18  try with some questions?

19          **THE COURT:**  Sure.

20          **MS. MOSKOWITZ:**  Thank you.

21  **Q.**  So let's just say an app has an item shop where a user

22  could go shop for an outfit, new outfit, digital or, you know,

23  extra coins or something, right?  That you're with me so far?

24  **A.**  Yes.

25  **Q.**  And if -- before any of these external purchases, that

1   would be where they would go click that friendly button and

2   say, add to cart and buy with IAP.  Right?  That's what that

3   would look like?

4   **A.**  Yes.

5   **Q.**  Nowhere in that whole shop, that screen, can the external

6   purchase link appear.

7   **A.**  That's right.

8   **Q.**  So the purchase link -- purchase link has to be somewhere

9   completely outside of that environment within the app.  It has

10  to be buried in settings or maybe even on the home page, but

11  nowhere near anything that someone's actually going to want to

12  buy or try to buy.

13  **A.**  It can be on any other page within the app.  As you said,

14  it can on the home page.  So 100 percent of users that open up

15  the app could see for lower prices, you know, or, you know,

16  X percent off or the various templates that we provided.

17      So we certainly give the developers the ability to

18  communicate to users and reach 100 percent of them if that's

19  what they want to do.

20  **Q.**  But you don't --

21          **THE COURT:**  Again, the -- I'd like to know as you're

22  sitting here the business justification for that other than my

23  assumption which is to decrease competition.

24          **THE WITNESS:**  Well, I think when the user is in the

25  in-app -- in-app flow, they've selected to go through that

1    flow and use in-app purchase.  That's their choice because

2    they now have a choice.

3        And the developer could easily, before they ever get to

4    that page, communicate to the user of benefits and pricing

5    discounts and things like that before they get to that page.

6        So the user can be informed prior to that.  And we feel

7    that when they're in the in-app flow, they've made the

8    decision to go down that path and not pursue the benefits of

9    the external link.

10           **THE COURT:**  Well, it's certainly more profitable for

11   you that way.  But what -- on what grounds would you have a

12   basis for believing that the customer has made a choice to do

13   it that way?

14           **THE WITNESS:**  Well, if I open up an app --

15           **THE COURT:**  Yeah.

16           **THE WITNESS:**  -- and on the -- the front page, it

17   says for 50 percent off, go to www.example.com, I see that I'm

18   informed of that.  If I want to take action on that, I'll --

19   I'll tap on that.

20       If I'm then going through other parts of the app and then

21   I see different things merchandised, when I go through that

22   I'm in the in-app buy flow with in-app purchase, I've made --

23   I've made that choice.  So for me as a user, I feel like I've

24   made that choice.  I can go 50 percent off, I can go here.  Or

25   I can go through this flow and purchase it with IAP.

1          **THE COURT:**  Maybe I'm misunderstanding.

2      If they do it in the flow, there's less friction, right?

3  So if they stay in the -- in the app and make the purchase in

4  the app, then they just keep playing.  Less friction.  One may

5  say that that's more of an addiction model, but we won't go

6  there today.

7      If they choose to stop the flow and link out, that seems

8  to me to be the more realistic time that we actually know what

9  a consumer chooses to do because they can stay in the app,

10  they can keep going with all the adrenaline and everything

11  else, make their purchase, keep going, keep fighting, keep

12  playing, whatever.  Or they may make the economic decision to

13  stop that flow, go out, make the purchase at a discount and

14  then come back in.

15      Isn't that the more kind of realistic and actual choice

16  being made?  And aren't we, at that point, having more

17  certainty that consumers are doing what they want to do?

18          **THE WITNESS:**  I think there was some concern around

19  user confusion with having lots of different purchase options

20  all in one place.  So that wasn't our -- our perspective.

21  I -- I understand where you're -- where you're coming from.

22          **THE COURT:**  And obviously if it's in app, it's more

23  profitable for Apple, less profitable for the developers,

24  right?

25          **THE WITNESS:**  In terms of how our commissions work,

1    that -- that's -- that would be accurate, yes.

2             **THE COURT:**  Proceed.

3             **MS. MOSKOWITZ:**  Thank you.

4    **Q.**  I just want to make sure that it's clear.  So if I'm in an

5    app as a user, and maybe I saw this link on the home page

6    but -- but I'm moved on from that.  I'm in the app and I'm

7    saying, you know what, let's see what offers they have going

8    today.  And I go in the place, the shop, whatever they call

9    it, to go look for what is available.

10       And I see this for 199 with a button.  And I see that for

11   99 cents with a button.  Nowhere anywhere on that screen can I

12   be presented with a link to go to the developer's website to

13   buy that item, correct?

14   **A.**  Correct.  Not on that screen.  That's correct.

15   **Q.**  Right.  That's not part of the payment flow.  That's just

16   looking around at the shop of the app, correct?

17   **A.**  Well, we -- we feel the buy flow is where that content is

18   being merchandised, and so that's part of the -- of the in-app

19   flow there.

20   **Q.**  So you consider any app's shop to be already part of an

21   in-app purchase flow?

22   **A.**  Yes.  That's -- in -- in the requirement here, we view

23   in-app flow to merchandise or initiate a purchase using in-app

24   purchase as being part of that -- that page, yes.

25   **Q.**  So that's all one thing in this bullet?

FISCHER - DIRECT / MOSKOWITZ

1   **A.**   Yes.  As a part of an -- you know, quote, part of an

2   in-app flow to merchandise or initiate a purchase using in-app

3   purchase, that would be the type of page that you're -- that

4   you're describing.

5   **Q.**   Okay.  So anywhere that a user could actually go to look

6   at what might be available for purchase is something that

7   Apple believes it cannot allow a developer to actually present

8   the alternative payment option to a user.

9   **A.**   That is what is in our -- in our requirements here, yes.

10  **Q.**   And you're saying that that's to reduce confusion?

11  **A.**   Well, I think when there's lots of different, you know,

12  kind of purchase options, certainly a user can -- can be

13  confused.  If I go to the -- the shop as you've described --

14  **Q.**   Um-hmm --

15  **A.**   -- I see there's a bunch of in-app items that are

16  available.  And I say okay, that's great.  I just saw this,

17  you know, this link on the home page which I saw, if the

18  develop puts it on the home page.  I'll say, oh, I want to go

19  get 50 percent off of the items that I'm looking at, I'll go

20  back and I'll click on that link.

21  **Q.**   Do you -- do you really -- I mean, just really, do you

22  really think that in this hypothetical where the thing that

23  I'm looking at for $1.99, do you really think that it's a

24  better user experience or less confusing for me to have to

25  remember I saw something somewhere and go back to that place

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

FISCHER - DIRECT / MOSKOWITZ

1  to click that link, go to a generic landing page, find it

2  again, log in and buy it, that that's better than just having

3  a button right to the right that says cross out $1.33 with

4  that button?  I mean are you really saying that?  I just want

5  to understand.

6  **A.**  0 repeat that first part of --

7  **Q.**  Maybe.

8  **A.**  -- the question?

9  **Q.**  I'm going to try.  And I'm going to get yelled at for

10  taking too much time by my colleagues, not by the Judge.

11  Maybe.

12      So I just want to understand that in your view, do you

13  really believe that it is less confusing to users and/or a

14  better app experience for when that user is in this shop and

15  sees that item for a $1.99, that they have to remember that

16  they saw that there was some link that said maybe I can get

17  50 percent off, go back, find that link again, click on it, go

18  to the website, the generic website, log back in, find that

19  same item for that less money, click on it, buy it, close

20  Safari and go back to the app to have it, that all of that --

21  are you with me so far?

22  **A.**  You're describing --

23  **Q.**  Just -- sorry.  I'm not done.  Are you with me so far into

24  what this alternative state of the world looks like?

25  **A.**  Yes.

FISCHER - DIRECT / MOSKOWITZ

1    **Q.**  Okay.

2        That all of that is less confusing to users and better

3    user experience than just having a button right next to that

4    1.99 button for the 50 percent off right there that I could

5    click to link out to a website to make that purchase?

6    **A.**  I don't view it as difficult of -- of a process as -- as

7    you're painting it.

8    **Q.**  Do you think it's confusing for a user to be presented

9    with the actual other choice, that alternative payment option,

10   for them to be presented with that just next to the one that

11   Apple offers, IAP?  Is that so confusing?

12   **A.**  That can be confusing for -- for users.

13   **Q.**  It's not confusing.  It would just inform them that they

14   actually had a choice side by side.  Isn't that the problem

15   that Apple really has with it?

16   **A.**  No.  I guess you could say that certainly could have been

17   an option in our compliance plan here.

18   **Q.**  And you didn't choose that.

19   **A.**  We -- we did not do that.  We are providing another --

20   another solution.

21   **Q.**  And the other solution is to avoid consumers actually

22   being presented with their choice where they want and expect

23   to see it, correct?

24   **A.**  I would not characterize it as that, no.

25   **Q.**  You also require right above this that you can only

FISCHER - DIRECT / MOSKOWITZ

1   display the link once.  It can't be in a pop-up.  It can't

2   last in the app as the user navigates.  All of those

3   requirements are there as well, correct?

4   **A.**  Yes.

5   **Q.**  And so the reason is because you really don't want users

6   to be informed that they have this alternative purchase

7   option, correct?

8   **A.**  No.

9   **Q.**  Physical goods and services can tell their users in a

10  pop-up however many times they want, wherever they want, how

11  to make a purchase, correct?

12  **A.**  Yes.

13  **Q.**  So the only time you require all this is when you have a

14  competing app in-app payment processor, correct?

15  **A.**  As I have stated before, we view --

16  **Q.**  Sorry; is that correct?

17  **A.**  -- digital --

18  **Q.**  Is it correct, sir?

19  **A.**  0 repeat the question, please?

20  **Q.**  The only time you require all of these limitations on how

21  and where the user can be presented with an out-of-app

22  purchase experience is when Apple is offering a competing

23  payment processor, correct?

24  **A.**  Yes.  When in-app purchase is being offered.

25  **Q.**  The second bullet also prevents you from -- the developer

FISCHER - DIRECT / MOSKOWITZ

1   from opening a web view.  It has to open a separate Safari

2   page, right?

3   **A.**  Or the default browser on the user's device.  It doesn't

4   have to be Safari.

5   **Q.**  Okay.  It has to open a new window.  It can be a web view

6   within the app, correct?

7   **A.**  Yes.

8   **Q.**  There's no reason for that other than imposing friction,

9   correct?

10  **A.**  Well, if it were in a web view, the user could think that

11  they're actually still using Apple's in-app purchase system

12  and so we didn't want to potentially have a confusing user

13  experience.

14  **Q.**  Web views are extremely common in apps like Instagram and

15  all sorts of apps for when physical goods are presented,

16  correct?

17  **A.**  Yes.

18  **Q.**  Okay.  So there's nothing wrong with that; users can

19  understand what's going on there?

20  **A.**  For physical goods and services, yes.

21  **Q.**  Okay.  They just have no idea what's going on when it has

22  to do with digital goods, they're super confused there?

23  **A.**  As I've stated earlier, there's been a consistent user

24  experience around the purchasing of digital goods and services

25  in apps for the last 15 or so years in the App Store.  This is

1    a new -- this is a new world, this is a new experience.

2    Q.  So because you were forced to make changes, you've decided

3    to erect all of these other barriers for users to actually get

4    the benefit of what the Court is trying to achieve, correct?

5    A.  No.

6    Q.  All right.

7       Let's look at the third-from-the-bottom bullet.  You can't

8    discourage users from using Apple's in-app purchase.  Do you

9    see that?

10   A.  Yes.

11   Q.  So again the developer -- we talked about this a bit

12   earlier -- cannot include a message like "Apple charges

13   developers 30 percent for in-app payments.  Help us avoid

14   Apple's fee by going to our website."  Right?

15   A.  That's right.  We don't allow that.

16   Q.  And -- and users are not even aware that buying digital

17   goods on the web will result in a commission to Apple,

18   correct?

19   A.  I'm not sure what users are aware of.  Again, developers

20   can communicate whatever they want outside of their app.

21   Q.  Well, the Court, in issuing its injunction, was concerned

22   with that lack of knowledge.  The Court found that by

23   employing anti-steering provisions, consumers do not know what

24   developers may be offering on their websites, including lower

25   prices, right?

1    **A.**   Yes.

2    **Q.**   And also that consumers did not know that if they

3    subscribe to their favorite newspaper on the web, all the

4    proceeds go to the newspaper rather than the reduced amount by

5    subscribing on the iOS device, right?

6    **A.**   I don't have the document that you're referring to but --

7    **Q.**   Was that in the summary you got about the Court's ruling?

8    **A.**   I think something along those lines, yes.

9    **Q.**   And so the Court was concerned about Apple using that lack

10   of knowledge to exploit its position.  Do you -- are you aware

11   that that was what was going on behind the injunction, at

12   least in part?

13   **A.**   In part.

14   **Q.**   And so Apple's guidelines for these external links

15   continue to forbid developers from actually educating users

16   about Apple's prices and how Apple is charging developers from

17   within the app, correct?

18   **A.**   From within the app, that's right.

19   **Q.**   And a developer similarly could not include any message

20   about a superior refund process that a third-party payment

21   solution might offer, correct?

22   **A.**   Prior to this, that's correct.

23   **Q.**   What do you mean by prior to this?

24   **A.**   Well, we -- we now give developers a lot more flexibility

25   in terms of how they can communicate to users outside of the

1    app.  So they could communicate that type of thing to users if

2    that's what they want to do.

3    **Q.**  Okay.  And I'm really focused on what can happen inside

4    the app right now.  So inside the app, in anywhere near the

5    link or otherwise, a developer cannot communicate to its users

6    that they believe that they have a competitive payment

7    solution that is going to offer superior quality of services

8    like better refunds or faster refunds or anything like that.

9    Correct?

10           **THE COURT:**  Where do you get it from?

11           **MS. MOSKOWITZ:**  Me, Your Honor?

12           **THE COURT:**  Yes.

13           **MS. MOSKOWITZ:**  I'm getting it from the fact that the

14    template language, for example, that they cannot communicate

15    it.

16           **THE COURT:**  I need to know specifically because

17    you're highlighting a section that talks about the link.

18           **MS. MOSKOWITZ:**  Yes.

19           **THE COURT:**  So -- but your question seems to be

20    broader than just the link.  So what is the basis for the

21    question?

22           **MS. MOSKOWITZ:**  The basis for the question, Your

23    Honor, is that I believe that there is no ability to actually

24    steer anything other than through this link and that the link

25    restrictions are such that there is limited language that the

1    developers can actually communicate.  So the absence is what

2    I'm pointing to.

3           THE COURT:  So are you saying that it can't be on

4    a -- that the app can't have a page that says benefits of

5    going to our website?

6           MS. MOSKOWITZ:  To make purchases, that is my

7    understanding, that's what I was looking to con --

8           THE COURT:  True or not?

9           THE WITNESS:  As it relates to the purchase,

10   that's -- that is the case.  So we provided with -- we

11   provided developers with the templates that they can

12   communicate with the buttons or --

13          THE COURT:  Where do I find that -- where in all of

14   these documents are you communicating that to developers?

15          THE WITNESS:  So that is in the addendum and on the

16   developer support page.

17          THE COURT:  So they can never communicate in the app

18   the benefits; is that right?

19          THE WITNESS:  So as it relates to purchasing from the

20   developer website, we've -- we've provided with -- them with

21   that template language.  So that -- that is right, what you

22   said, Your Honor.

23          THE COURT:  All right.  Proceed.

24   BY MS. MOSKOWITZ:

25   Q.  And you understand that payment solutions might want to

1    compete with Apple's IAP by offering better or faster refunds

2    or other types of customer support services, right?

3    **A.**   I can imagine that some would want to do that, yes.

4    **Q.**   And they might want to get a better, safer, more secure or

5    better privacy than -- than Apple's IAP, they might want to

6    compete on that ground, too, right?

7    **A.**   I would imagine that they would want to compete on that,

8    yes.

9    **Q.**   And -- and developers would not be able to tell users

10   about those superior characteristics of those alternative

11   payment processors.

12   **A.**   Again, they can do that outside but not in the app.

13   **Q.**   So even though they can't say a peep about it, Apple has

14   no qualms telling users in pop-up screens that third-party

15   payment solutions might risk security or privacy without any

16   basis for that, right?

17   **A.**   We -- we talked about the system disclosure sheet earlier.

18   I don't believe that we have any language in that sheet that

19   talks about what other payment processors do or do not do.

20   We're just simply trying to provide objective information.

21   **Q.**   Do you agree that there may be instances where a developer

22   might want a call to action for a user to go to their website

23   about making a purchase but not want to send them there right

24   then and there, they might not want to include a link at that

25   time; you can imagine that, right?

 1   **A.**   I guess a developer might want to do that, yes.

 2   **Q.**   Right.  Like maybe a promotion, an end-of-the-week or a

 3   weekend promotion.  They put up a message on Monday saying go

 4   to our website on Friday for a great deal only available for

 5   purchase on our website, right?

 6   **A.**   Sure.

 7   **Q.**   Yeah, that's not allowed under Apple's guidelines,

 8   correct?

 9   **A.**   That's correct.

10   **Q.**   And is it your view that preventing that and restricting

11   developers from having that type of message is compliant with

12   the Court's injunction?

13   **A.**   As I stated at the beginning, I believe that we are in

14   compliant [sic] with the injunction.

15   **Q.**   You understand that the injunction prevents Apple from

16   prohibiting developers from including buttons, external links,

17   or other calls to action that direct consumers to purchasing

18   mechanisms outside of IAP, right?

19   **A.**   Can you repeat that question, please?

20   **Q.**   The words were buttons, external links, or other calls to

21   action, Apple was enjoined from prohibiting developers from

22   using any of those, right?

23   **A.**   Yes, and we now allow all of those.

24   **Q.**   But you don't allow other calls to actions that don't

25   include links, it must be a link and it must be exactly in the

1    form with the link itself under Apple's guidelines, right?

2    **A.**   They must be associated with the link, but we have

3    provided them with several templates that they can pick from

4    to communicate more specific information about what they're

5    offering.

6    **Q.**   Right.  But if they wanted to offer something that didn't

7    link at that time and just said go to our website on Friday,

8    but they didn't want to confuse users by having a link there

9    because it's not yet available, that's prohibited by Apple's

10   guidelines, right?

11   **A.**   Yes.  It's -- it's a package of a button or link and a

12   call to action.

13   **Q.**   The answer to my question is that that is prohibited,

14   right?

15   **A.**   What you've described is not allowed.

16   **Q.**   And you don't view that as a call to action that is

17   different from a link?

18   **A.**   I think for 50 percent off, go to website is a call to

19   action.

20   **Q.**   Okay.

21   **A.**   There's also a link there.

22   **Q.**   Well, there's not a link in my hypothetical, sir.  The

23   message that says go to our website on Friday and there's no

24   hyperlink, would you agree that that is a call to action to go

25   somewhere that has a different purchase mechanism than Apple

1   IAP?

2   **A.**  Yes.  I believe that that is a different example of a call

3   to action.

4   **Q.**  And that is prohibited by Apple under the guidelines.

5   Yes?

6   **A.**  Yes.  What was in the injunction was to provide a button

7   or link in a -- in a call to action, and that's what we've now

8   provided.

9           **THE COURT:**  I don't think I used the conjunctive.  I

10  think I used the disjunctive.  There's a difference between

11  the word "or" and "and."

12          **THE WITNESS:**  It's a button or link and a call to

13  action.

14          **THE COURT:**  That's not what it says.

15          **THE WITNESS:**  Okay.  But we've provided the

16  capability where our definition of a button, the plain button,

17  and a link and the call to action are all part of one package.

18          **THE COURT:**  Do you understand --

19          **THE WITNESS:**  I apologize if I misspoke.

20          **THE COURT:**  Do you understand that it was

21  disjunctive?

22          **THE WITNESS:**  A button and a link and a call to

23  action.

24          **THE COURT:**  Or.  The word was "or."  You understand

25  there's a difference?

 1              **THE WITNESS:**  I do.  I -- I apologize if I misspoke.

 2    I understand that they're the three things together.

 3              **THE COURT:**  They are three independent things which

 4    may at times be together.  Thus the use of the word "or."

 5         So if it just said "or calls to action," then it sounds to

 6    me like you would agree that you would be in violation of

 7    injunction because you're linking them; is that right?

 8              **THE WITNESS:**  I would like to go back to your

 9    injunction just so I can refamiliarize myself with the exact

10    wording.

11              **THE COURT:**  Well, I'm sure Ms. Moskowitz can bring it

12    up if she wants.

13         Go ahead.

14    **BY MS. MOSKOWITZ:**

15    **Q.**  I think I will save that for another time in the interest

16    of time.

17         I do want to spend a moment on a different section of the

18    guidelines.  And you can go to that in Exhibit 13, which is in

19    evidence.  It's 3.1.3 is the section I'd like to talk about.

20    And as that's navigating and will come up on the screen,

21    before we talk about the specific language, you're aware of

22    what a multi-platform app is, correct?

23                             (Exhibit published.)

24              **THE WITNESS:**  Yes.

25    / / /

1    BY MS. MOSKOWITZ:

2    Q.   And generally speaking, those are apps that operate across

3    multiple platforms and allow users to access content on each

4    platform no matter where they originally acquired that

5    content; is that generally right?

6    A.   Yes.

7    Q.   Okay.  And many of the App Store's largest

8    revenue-generating games are multi-platform apps, right?

9    A.   Yes, they are.

10   Q.   So now let's look at this 3.1.3, other purchase methods.

11        Are you with me?

12   A.   Yes.

13   Q.   And I want to focus on the second sentence here.  It says,

14   "Apps in this section cannot, within the app, encourage users

15   to use a purchasing method other than in-app purchase except

16   as set forth in 3.1.3.A."

17        Do you see that?

18   A.   Yes.

19   Q.   So what this language is saying is that apps that are

20   covered within 3.1.3 are not allowed to steer their users to

21   any payment method other than IAP unless you fall under this

22   subsection A, right?

23   A.   That's what it says here, yes.

24   Q.   And multi-platform apps fall under B, not A, right?  A is

25   reader apps, correct?

1    **A.**   That's correct.

2    **Q.**   So multi-platform apps, reading this, say I cannot, within

3    the app, encourage users to use a purchase method other than

4    Apple's IAP, right?

5    **A.**   Can you repeat that, please?

6    **Q.**   A multi-platform app developer looking at this provision

7    would understand it to be telling that developer that within

8    the app, that developer cannot encourage users to use a

9    purchasing method other than Apple's IAP, correct?

10   **A.**   I could see how a developer could be confused by that.

11   Multi-platform services can indeed use the link entitlement

12   and these new capabilities.

13   **Q.**   Yeah, that's -- we're getting there.  But I'm just looking

14   at this language, a reasonable multi-platform app developer

15   would say, this applies to me, I fall under this section, I'm

16   not allowed to encourage users to use a purchasing method

17   other than Apple's IAP, right?

18   **A.**   (Reviewing document.)

19        I could see how some developers would read it that way.

20   **Q.**   And so some developers could say I see this 3.1.1.A link

21   entitlement thing, but, gee, I'm covered very expressly under

22   this other section that says I'm not allowed to do this,

23   right?

24   **A.**   I believe that we sent out a news and announcements email

25   to developers to clarify this at some point over the past few

1   months.

2   Q.   Yeah, so that happened.  Epic was confused and reached

3   out.  Were you aware of that?

4   A.   That has been brought to my attention, yes.

5   Q.   So Epic asked Apple whether this section 3.1.3 meant that

6   multi-platform services were prohibited from actually applying

7   for the external link entitlement under 3.1.1.A, right?

8   A.   I understand that, that Epic did reach out about that, and

9   then we clarified that they can indeed use the link

10  entitlement.

11  Q.   Right.  So let's talk about what -- what happened there.

12  So in March of 2024 after that outreach, Apple provided an

13  update to its guidelines and a blog post; is that right?

14  A.   Yes.  I think we sent out an email to our developer

15  community through our news and announcements email program and

16  then updated the website as well.

17  Q.   The website meaning the -- the blog post?

18  A.   Yeah.  I don't call it a blog.  But yes.  That's -- the

19  developer support pages, yes.

20  Q.   All right.  Let's look at CX-37 in your binder.

21  A.   I'm here.

22  Q.   Is this the post from March 5, 2024, that announced the

23  change we were just discussing?

24  A.   Yes.

25        MS. MOSKOWITZ:  Your Honor, I offer CX-37 into

1    evidence.

2              **THE COURT:**  Admitted.

3         (Plaintiff's Exhibit CX-37 received in evidence.)

4         **MS. MOSKOWITZ:**  Thank you.

5    **Q.**  So the last -- the bullet here under the guidelines have

6    been updated says that you added a link to 3.1.1 to make clear

7    to 3.1.1.A applies and multi-platform services apps can use

8    the 3.1.1.A entitlement.  Do you see that?

9    **A.**  Yes.

10   **Q.**  But so in terms of the guidelines themselves, the only

11   change Apple actually made to that document, to supposedly

12   make this clear, was to add a hyperlink within section

13   3.1.3.B; is that correct?  And we can go back to CX-13 to look

14   at it.

15   **A.**  Yeah, that would be helpful.  Thank you.

16            **MS. MOSKOWITZ:**  Sure.  Let's pull that back up.

17   Let's go to 3.1.3.B, please, on the next page.

18                   (Exhibit published.)

19   BY MS. MOSKOWITZ:

20   **Q.**  That in-app purchases within the app at the end, do you

21   see that?  That's the hyperlink that was added, correct?

22   **A.**  That's my understanding, yes.

23   **Q.**  That's the only change that was made to the guidelines to

24   clarify this issue, correct?

25   **A.**  I'm not involved with the -- the writing or creation of

1    the guidelines so I don't know exactly what happened in this

2    particular situation.

3    **Q.**  You don't know that this is in fact the only change that

4    was made to the guidelines?

5    **A.**  I believe that this was the only change made to the

6    guidelines.

7    **Q.**  And are you aware that when you click on that link, it

8    goes right to the heading of 3.1.1 and not to 3.1.1.A?

9    **A.**  I've not clicked on this link or seen what -- what happens

10   when a user or developer clicks on the link.

11   **Q.**  Okay.  So there's nothing in these guidelines that is

12   clear at all to multi-platform developers whether or not they

13   are exempt or excluded from this entitlement or allowed for

14   this entitlement.  They'd have to go to their email or this

15   blog -- or this other post, right?

16   **A.**  We update our guidelines all the time based on feedback

17   that we receive from developers.  If we can provide more

18   clarity on that in the guidelines, I'm sure that's something

19   that we would consider.

20        **THE COURT:**  Why is it there in the first place then?

21   This section talks about an exclusion.  And it's included

22   there.  So why is it there?

23        **THE WITNESS:**  So in -- in 3.1 -- if I can just pull

24   it up here.  3.1.3 covers other purchase methods.  Up until

25   this injunction and our compliance, multi-platform services

1   were an example of this.

2        And so, I mean, to me if there's -- if there's any

3   confusion, we should update 3.1.1 -- sorry -- 3.1.3.B around

4   multi-platform services to clarify that they can indeed use

5   this link entitlement and these new capabilities.

6            THE COURT:  You still haven't answered my question.

7   If it doesn't apply, why is it there?

8            THE WITNESS:  So it's specifically why is

9   multi-platform services --

10           THE COURT:  In this section.

11           THE WITNESS:  In this section?

12       I think this is a legacy situation, Your Honor, where it

13   was in this section prior to this.

14           THE COURT:  So wouldn't the thing be to delete it?

15           THE WITNESS:  Well, probably I think another option

16   would be to just add more clarification to 3.1.3.B.

17           THE COURT:  Back to my original question.  Why is it

18   there in the first place then?  If it no longer -- if

19   multi-platform services no longer applies given that they can

20   have these linked-out options, why is it here?

21           THE WITNESS:  Your Honor, the -- our guidelines are

22   global guidelines for our global App Store business.  We

23   operate in 175 countries.  We have developers all around the

24   world.  And the specific new capability around the link

25   entitlement and including external links is just applicable in

 1    the U.S.  So --

 2              THE COURT:  So then wouldn't it make more sense, be

 3    more clear, to say this section doesn't apply to U.S. apps?

 4    Is that what you're saying?

 5              THE WITNESS:  I think we could provide more clarity

 6    here.  I -- I don't -- again, I don't write the guidelines.  I

 7    don't decide where they go, how exactly they're --

 8              THE COURT:  Go ahead.

 9              THE WITNESS:  -- constructed.

10    BY MS. MOSKOWITZ:

11    Q.  Are you aware that we asked Apple to clarify the

12    guidelines and it refused?

13    A.  I'm not aware of that, no.

14    Q.  It did not make its way up to the ERB or anywhere in your

15    orbit?

16    A.  I'm not aware of that, no.

17              THE COURT:  What's an ERB?

18    BY MS. MOSKOWITZ:

19    Q.  The Executive Review Board; is that correct, Mr. Fischer?

20    A.  That is what ERB stands for, yes.

21    Q.  And from time to time, changes to the app review

22    guidelines get surfaced to that group for discussion?

23    A.  Yes.

24    Q.  Is that the group that you were referring to earlier that

25    was collaborating on what to do about this injunction?

 1   **A.**   No.   That was a -- a different group of individuals.

 2   **Q.**   Because is Mr. Cook not on the ERB?

 3   **A.**   No, he is not.

 4   **Q.**   So it was some members of the ERB plus even more senior

 5   folks that were involved in the injunction compliance?

 6   **A.**   Yes.

 7   **Q.**   Is the idea here for not clarifying multi-platform

 8   services can actually do this is to hope that the highest

 9   revenue-generating developers don't bother pursuing the link

10   because they think it doesn't apply to them?

11   **A.**   No.

12   **Q.**   So having walked through a bunch of these requirements, I

13   just want to be clear.   In order to present an external

14   purchase link, the developer must also present Apple's IAP,

15   correct?

16   **A.**   Yes.

17   **Q.**   It's not an option for the developer to only offer

18   external links for purchases.

19   **A.**   That's correct.

20   **Q.**   Now, let's talk about the fees that Apple's imposing for

21   the benefit of allowing developers to present both IAP and

22   this external link.

23        So if a user selects in-app purchase with IAP, the

24   developer has to pay a 30 percent fee to Apple on that

25   transaction.   Let's just set aside the small business program

1    for a moment.  Generally speaking, the developer is going to

2    pay 30 percent to Apple, correct?

3    **A.**  If you exclude that program and -- and some other use

4    cases where the commission is lower, yes, that would be

5    correct.

6    **Q.**  And the 30 percent applies to what percentage of all --

7    overall App Store purchases?  90 percent?  More?  What is it?

8    **A.**  I don't know.

9    **Q.**  It's 90 or more; is that right?  You don't know?

10   **A.**  I don't know.  I've -- I've never looked at that --

11   **Q.**  Okay.

12   **A.**  -- data before.

13   **Q.**  All right.

14       But if a user opts to make the purchase from after

15   clicking on the external link, the developer has to pay Apple

16   27 percent on that transaction, correct?

17   **A.**  For developers that pay 30 percent today, they pay --

18   developers would pay 27 percent of the commission during a

19   seven-day window.  So the seven-day window is a -- a new

20   addition that we have put forward here to comply with the

21   injunction.

22   **Q.**  Well, all of it is new, right?  Even the charge for a

23   purchase that's happening on an external website has never

24   been charged by Apple ever before in its entire history,

25   correct?

1    **A.**   No, that's not correct.

2    **Q.**   Apple has charged for purchases made on external websites

3    by users for in-app digital content?

4    **A.**   Yes.

5    **Q.**   Are you talking about reader apps?

6    **A.**   No.

7    **Q.**   What are you talking about?

8    **A.**   I'm talking about in the Netherlands, there was a law that

9    was passed --

10   **Q.**   Okay.

11   **A.**   -- where a specific set of apps could add links in their

12   apps for external purchases.  And we have a commission in

13   that -- in that jurisdiction.

14   **Q.**   Okay.  Thank you for that clarification.

15       Until Apple was forced by changes of law or court orders

16   to offer external payment options for certain apps, Apple

17   never before had imposed a charge on any purchases made on an

18   external website, correct?

19   **A.**   Correct.

20   **Q.**   Okay.  So this is new as of Apple being forced to allow

21   users to make purchases outside of the app on -- in certain

22   jurisdictions.

23   **A.**   That's correct.

24   **Q.**   And the seven-day window that you just referred to refers

25   to the fact that if a user clicks on that "continue" after

1    it's presented with that screen we went over earlier, that for

2    a seven-day period, any purchases made by that user on that

3    website, however they ended up getting there, is charged

4    27 percent commission to Apple.

5    **A.**  I would not say "however they ended up getting there."

6    They could access that website from -- it has nothing to do

7    with the app whatsoever and they're on the developer's website

8    already, they end up on that page, we get zero commission for

9    a user that does that.

10   **Q.**  That's not true, is it?  Once the user -- I just want to

11   make sure we understand this.  As I understood this, and you

12   can correct me, if a user clicks on that button "continue" and

13   they actually successfully open that page, that even if that

14   user says, "You know what, nah, this is annoying, I'm just

15   going to go back to the app," and then two days later they get

16   an email from a developer saying go to that same website for

17   web purchases, and that user buys stuff, Apple's getting

18   27 percent on that purchase, correct?

19   **A.**  In that hypothetical example, yes, because the -- the

20   transaction is happening during that seven-day window after

21   they clicked on the link inside of the app.

22   **Q.**  Right.  So no matter how that user ultimately navigates to

23   that website, whether it's actually through that link, whether

24   it's through email, whether it's just, oh, I remember, I had

25   this web open, or I remember there's a website, however they

1    went there, for seven days for every single purchase they make

2    for that seven days, 27 percent to Apple, correct?

3    **A.**   During that seven-day window and only during that

4    seven-day window, that's correct.

5    **Q.**   Even if they go to www.example.com from their home

6    computer, 27 percent to Apple if it's within that seven days

7    of the click.

8    **A.**   During that seven days after the click, that would be the

9    case, yes.

10   **Q.**   Okay.  So with that, that is -- that is a new charge that

11   Apple is doing on things that it had never charged before,

12   right?  You had never charged a user going to their home

13   computer and logging on to a website and buying something,

14   Apple's never collected a fee on that before all of these

15   legal changes.

16   **A.**   That's not accurate.  So in the Netherlands --

17           **THE COURT:**   Other than the Netherlands.

18           **THE WITNESS:**   Other than the Netherlands, yes, that

19   would be accurate.

20   **BY MS. MOSKOWITZ:**

21   **Q.**   And you don't do that for physical goods.  You don't make

22   that charge.  Right?  You don't get that commission, rather?

23   **A.**   That's correct.

24   **Q.**   And previously Apple's explained why it doesn't charge for

25   physical goods and services purchased in the app.  Do you

1    remember having discussed that topic previously?

2    A.   Yes.

3    Q.   That came up in your testimony at the trial in this case,

4    for example?

5    A.   I believe it did, yes.

6    Q.   And -- and Apple had decided as a business matter that it

7    didn't make sense for Apple to earn a commission on the sale

8    of physical goods because Apple was not involved in that

9    process, right?

10   A.   In the delivery of the -- the physical good or service,

11   yes, we're not involved in that process.  And that was the

12   decision that was made in the early days of the App Store, to

13   not have commissions on physical goods and services.

14   Q.   Right.  And another way of saying that is Apple justified

15   charging for digital goods sold using Apple's IAP because

16   Apple was handling the delivery of the item, could confirm the

17   user received the item, that they had paid for the item and

18   could provide customer support for that purchase, right?

19   A.   Yes.

20   Q.   And for physical goods, Apple -- it didn't make sense for

21   Apple to charge a fee because Apple was not doing any of those

22   things, right?

23   A.   That's right.

24   Q.   Apple does not verify that the user actually paid for

25   physical goods that are purchased in app, right?

1    **A.** We do not have any visibility into that -- that purchase

2    process.

3    **Q.** And you don't have any visibility into whether the user

4    receives the goods, right?

5    **A.** That's right.

6    **Q.** And Apple doesn't have a way to get involved in refunds or

7    returns for physical goods?

8    **A.** That's right.

9    **Q.** And so for sales of digital goods that are now going to be

10   purchased through this external purchase link, Apple is not

11   processing the payment for those digital goods, right?

12   **A.** What's an example where there would be digital and

13   physical goods in the --

14   **Q.** No, no. Sorry.

15   **A.** -- situation?

16   **Q.** I might have confused you. I'm now talking about for the

17   external link entitlement program --

18   **A.** Yes.

19   **Q.** -- for digital goods that are purchased through that

20   external website. Are you with me?

21   **A.** Yes.

22   **Q.** Okay. Apple is not processing the payment for that

23   transaction, correct?

24   **A.** That's correct.

25   **Q.** Apple does not verify that the user received that digital

1   content that it purchased on the web, right?

2   **A.**   That's correct.

3   **Q.**   Apple doesn't verify that the payment was made for that

4   digital good during that transaction, right?

5   **A.**   Yes.   We don't see -- have visibility into that purchase.

6   **Q.**   And Apple doesn't handle refunds or returns for those

7   purchases on the external website, right?

8   **A.**   Correct.

9   **Q.**   So there's no distinction between Apple's role or lack

10  thereof in digital goods purchased outside the app on an

11  external website and physical goods purchased through the apps

12  on Apple's App Store, right?

13  **A.**   The commission is in place to --

14  **Q.**   Sir, different question.   I'm just asking there's no

15  distinction between Apple's role or lack thereof in the

16  purchase flow of a digital good purchased on an external

17  website and a purchase of a physical good on Apple's apps,

18  correct?

19  **A.**   Right.   Besides the link that sent the user to the

20  developer's website.

21  **Q.**   So the only distinction that you're drawing is that

22  someone clicked on a link as opposed to was already in the app

23  and just bought the physical good, right?

24  **A.**   That -- that is a distinction, yes.

25  **Q.**   Okay.   But the distinction is they had to do something

1    even further away from Apple for the digital goods than when

2    they were already in the app for physical goods, right?

3    **A.**   Yes.   There's a process, as we've discussed, to purchase

4    the digital good on the developer's website.

5    **Q.**   I'm trying to just ask it a little differently.   For

6    physical goods sales, Apple is closer to that transaction than

7    sending the user out to buy a digital good from a third-party

8    website.   Apple is even more removed on the website purchase;

9    wouldn't you agree?

10   **A.**   Not necessarily.   It's -- we don't have visibility into

11   either -- either instance.

12   **Q.**   Okay.   But other than that, they're the exact same

13   involvement in both types of transactions by Apple, right?

14   Which is basically none, right?

15   **A.**   I wouldn't characterize it at that, no.

16   **Q.**   It's the same though, right?   For physical goods and for

17   digital goods purchased on the external website, Apple's role,

18   whatever you characterize it as, is the same?

19   **A.**   Apple's role as it relates to the payment transaction is

20   similar.

21   **Q.**   Okay.   And you're charging 27 percent for one and zero

22   percent for the other, correct?

23   **A.**   Correct.

24   **Q.**   In order for the developer to even offer purchases on this

25   external link, the developer has to set up a number of

1    payment-related services to handle those purchases, right?

2    **A.**   Yes.

3    **Q.**   They need to actually set up a way to facilitate the

4    actual payment processing, for example, right?

5    **A.**   Yes.

6    **Q.**   And they have to create a process or engage a third party

7    to handle refunds and customer service, right?

8    **A.**   They don't necessarily need to engage with a third party.

9    That's something that they could do themselves.

10   **Q.**   They have to have a process for it either developed

11   in-house or obtained through a third party, right?

12   **A.**   Yes.

13   **Q.**   And if they have to do it through a third party because

14   they don't have the scale or the ability to do it in-house,

15   they can contract with third parties and pay for that, right?

16   **A.**   Yes.

17   **Q.**   You understand that those third parties don't offer that

18   for free, right?

19   **A.**   I don't have a lot of visibility or experience into those

20   types of companies and what they offer.

21   **Q.**   Do you have any understanding as to the fact that those

22   companies do charge for those types of services?

23   **A.**   I would assume that that's part of their business model.

24   **Q.**   You have no understanding as to the range of fees that

25   they charge for those services?

FISCHER - DIRECT / MOSKOWITZ

 1    **A.**   I've seen some presentations where the payment services,

 2    you know, range of what some of those payment services charge.

 3    I was more specifically talking about customer service and

 4    handling refunds, which was part of your question.

 5    **Q.**   Okay.  That's fair.  So let's break it down.

 6         What have you seen the range for just the payment

 7    processing services?

 8    **A.**   It depends.  There's -- there's a lot of payment

 9    processing services.  And they charge a wide range of, you

10    know, capabilities and -- but I've seen some of those

11    presentations.  I haven't -- I haven't managed that process,

12    but I've seen some.

13    **Q.**   Understood.  What's the numbers that you've seen, the

14    range?

15    **A.**   I don't recall.  It was very wide range.

16    **Q.**   What's the bottom end that you saw?

17    **A.**   For part of the offerings, I think it was 1 percent or

18    something along those lines.  It kind of depends on the set of

19    capabilities that some of these payment service providers

20    offer.

21    **Q.**   Have you ever heard of Paddle as one of those service

22    providers?

23    **A.**   Yes.

24    **Q.**   Are you aware that Paddle put in a declaration in this

25    proceeding?

1  **A.**  I was told that, yes.

2  **Q.**  Did you look at it?

3  **A.**  I did not.

4  **Q.**  Were you told what it said?

5  **A.**  I remember that there was a number, I think around what

6  they charge, which seemed quite high.

7  **Q.**  It seemed quite high even though you have no idea what

8  these companies do and do not charge?

9  **A.**  As I stated earlier, I've seen in a presentation specific

10  examples of payment service providers and a range that they

11  charge for a wide variety of offerings and capabilities.

12      And then I was told what Paddle charges.  And I don't know

13  if those capabilities, what they offer, are comparable or not.

14  **Q.**  And you understand Paddle charges between 5 percent and

15  10 percent in the instance of micro transactions?

16  **A.**  I heard closer to the higher number that you just

17  mentioned.

18  **Q.**  Yeah.  The 10 percent was for micro transactions which

19  mean purchases under a dollar.  Is that familiar to you?

20  **A.**  I didn't see --

21  **Q.**  Okay.

22  **A.**  -- what they were charging 10 percent for specifically.

23  **Q.**  Did you go to PayPal's website to look at what they

24  charge?

25  **A.**  I have not gone to their website.  What PayPal does and

FISCHER – DIRECT / MOSKOWITZ

1    some other services were summarized in a presentation that I

2    saw.

3    **Q.**  Do you remember what the PayPal range was or number was?

4    **A.**  I do not.

5    **Q.**  Did you think it was relevant at all to whether Apple was

6    compliant with the injunction to understand what the

7    27 percent fee would mean in practice for developers who

8    offered alternative payment?

9    **A.**  Yes.

10   **Q.**  Okay.  So you thought it was relevant, but you didn't look

11   into what developers were actually going to face in the world

12   to obtain the services that it was going to need to provide

13   for these alternative payments?

14   **A.**  I did not lead the effort to do the analysis around some

15   of these third-party payment service providers.  As I

16   mentioned, I have seen a presentation where some of these

17   providers were listed and the range that they charge for some

18   of their services.  So that's the extent of my involvement

19   with that.

20   **Q.**  In the event of that the fees that are charged are more

21   than 3 percent, you understand that developers will have to

22   pay more to offer customers the choice to go outside of

23   Apple's IAP than just allowing IAP alone, right?

24   **A.**  When you factor in the seven-day window, they should be

25   paying significantly less than the 30 percent.

1  **Q.**  So the fact that you're charging for --

2        **THE COURT:**  I don't understand that statement.

3     It sounds like the seven-day window gives you more access

4  to more purchases and is a windfall.  How is it that there's a

5  significantly less anticipated -- I don't understand what

6  you're saying at all.

7        **THE WITNESS:**  Okay.  So, Your Honor, we've -- we've

8  conducted -- our finance team conducted significant analysis

9  into purchasing and kind of within the App Store typically

10  when we see purchasing take place.

11     And to comply with the injunction, we have reduced the

12  commission, you know, in the case of these larger developers,

13  from 30 to 27, and added a seven-day.  So instead of having a

14  27 percent commission in perpetuity, it's just a 27 percent

15  commission for these seven days.

16     So many -- we expect that many, many transactions will

17  take place after the seven-day window which would in essence

18  bring that 27 percent rate much lower to around 18 percent.

19  And so we call that an effective rate.

20     So when you combine the -- the commission and the window,

21  that actually brings the commission down.

22        **THE COURT:**  But you don't tell -- you don't allow the

23  developers to tell the consumers that, hey, we're paying

24  30 percent during a seven-day window, do you?

25        **THE WITNESS:**  Well, in this case they would be paying

1    27 percent during a seven-day window.  They can communicate

2    that outside of the app.  They have tons of flexibility with

3    that.  But you're right, we don't allow that within the app

4    itself.

5              **THE COURT:**  Proceed.

6    **BY MS. MOSKOWITZ:**

7    **Q.**  So just to understand it, your position is that under your

8    compliance efforts, you could have just charged people buying

9    things on this website forever and you've just been benevolent

10   in just doing it for seven days?  That's how I'm supposed to

11   understand that?

12   **A.**  I'm not going to use that characterization.  I'm talking

13   about how in-app purchases work today.

14             **THE COURT:**  Okay, maybe I'm missing something here.

15   I thought it was seven days from every time there was a click

16   on the link, not a one-time seven-day purchase as to the owner

17   of the account holder.  So it would be different, right, if --

18   if John Doe was playing his little video game and the first

19   time he clicked out, you are asking for 27 percent for seven

20   days and thereafter for that person, you would never get

21   anything again.  That wasn't my understanding.

22             **THE WITNESS:**  So --

23             **THE COURT:**  My understanding is that every time that

24   person clicks on that link, you get purchases for seven days

25   from the date of the click.  Yes or no?

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  Well, all right.  Keep going.

3   BY MS. MOSKOWITZ:

4   **Q.**  So for payment processors that are charging more than

5   3 percent, you agree with me that it is more expensive for the

6   developer to actually go off and offer these external payments

7   than it is for just using IAP; isn't that just math?

8   **A.**  Again, the way that we analyze this is we looked at that

9   seven-day window, and that had a significant impact on

10  reducing the effective rate to developers.

11  **Q.**  Is that what Mr. Roman is going to be talking about?

12  **A.**  I believe so.

13  **Q.**  Okay.  Is he the right person for us to be talking to

14  about that?

15  **A.**  Yes, he is.

16  **Q.**  So in terms -- so your position is that it is not more

17  expensive for developers to actually offer these external

18  links, still paying 27 percent to Apple every single time for

19  that seven-day window, and percentage fees to the payment

20  processors for every single one of those purchases; that's

21  your position?

22  **A.**  Yes.

23         **MS. MOSKOWITZ:**  Okay.  I'll pass the witness.  Thank

24  you, Your Honor.

25         **THE COURT:**  Mr. Perry, your exam.

1           <u>CROSS-EXAMINATION</u>

2    **BY MR. PERRY:**

3    **Q.**  Good morning, Mr. Fischer.

4    **A.**  Good morning.

5            **MR. PERRY:**  May I proceed, Your Honor?

6            **THE COURT:**  You may.

7            **MR. PERRY:**  Thank you.

8                   (Off-the-record discussion.)

9    **BY MR. PERRY:**

10   **Q.**  You talked to my friend Ms. Moskowitz for quite a while

11   there, Mr. Fischer.  I'd like to rewind the tape if we could

12   and start at the beginning of the process.  Is that okay with

13   you?

14   **A.**  Yes.

15   **Q.**  So you testified that you are familiar with the Court's

16   injunction, right?

17   **A.**  Yes.

18   **Q.**  And were you part of the team at Apple that had

19   responsibility for complying with the Court's injunction?

20   **A.**  Yes.

21   **Q.**  And we've heard lots of names this morning.  Could we just

22   orient a little bit on who did what, if you will, in the

23   injunction compliance program?

24   **A.**  Yes.

25   **Q.**  So in general, can you explain the group at Apple that was

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    responsible for injunction compliance.

2    **A.**   It's -- it was a cross-functional group across different

3    parts of the company, from business, which is more my -- what

4    my team and I focus on, product, design, engineering, finance,

5    legal.  And I think that's a good cross-section, you know,

6    description of -- of who was involved.

7    **Q.**   And did the group, in coming together for the injunction

8    compliance program, excuse me, develop any guiding principles

9    for the project?

10   **A.**   Yes.

11   **Q.**   And can you explain to the Court what -- what it was the

12   group aimed to achieve in setting up the injunction compliance

13   program?

14   **A.**   Yes.  We had clear goals.  First and foremost was to

15   comply with the injunction.  Second was to provide a

16   consistent and safe user experience.

17               **THE COURT:**  Hold on.

18                      (Off-the-record discussion.)

19               **THE COURT:**  All right.

20   **BY MR. PERRY:**

21   **Q.**   You were on the second principle, Mr. Fischer.

22   **A.**   So the first principle was to comply with the injunction.

23       The second was to provide a consistent and, as much as

24   possible, safe user experience across apps.

25       Third was to maintain the App Store's business model and

1    to continue earning a commission for the value that we provide

2    to developers.

3        And fourth was to provide developers with a more flexible

4    but scalable way to communicate with users both within the app

5    and with outside -- outside of their apps around alternative

6    purchase opportunities.

7    **Q.**  And you used that word "scalable" earlier, and the Court

8    asked you a question about it.  Could you explain a little

9    more what -- what you mean by a scalable for the various

10   developers that are transacting on the App Store?

11   **A.**  So we wanted to come up with something that could give us

12   visibility in terms of how developers wanted to take advantage

13   of these new capabilities, but also to be able to review these

14   as part of our app review process.

15       And so that's how we came up with things like the

16   templates that we provided to developers around how they could

17   communicate these types of offers in their apps.

18   **Q.**  And since you mentioned the templates, for example, how is

19   it that the template framework that you've discussed with

20   Ms. Moskowitz enables efficient app review?

21   **A.**  Well, by having templates and, you know, a number of them

22   but not a limitless number, that gives our review team a more

23   efficient way to review apps, make sure that they're using

24   this capability correctly, and -- and that we can protect our

25   mutual customers in the process.

1    **Q.**   Now, Ms. Moskowitz asked you some questions about, for

2    example, if a reputable app developer used a reputable payment

3    processor like PayPal or Stripe, why would Apple need to

4    review the template or the link or the various requirements

5    that we'll go into in a minute, but at a high level do you

6    understand that question?

7    **A.**   Yes.

8    **Q.**   And why does Apple, in setting up this injunction

9    compliance framework put guardrails, if you will, around the

10   process?

11   **A.**   We think that we've provided our -- our users with a -- a

12   clear and a consistent user experience around the purchasing

13   of digital goods and services since we introduced in-app

14   purchase back in 2009.  And this is a new user experience with

15   this external link.  It's a new capability, and we wanted to

16   make sure that this was something that was manageable in these

17   early stages.

18   **Q.**   Now, you mentioned in the -- in the list of guiding

19   principles, Mr. Fischer, that Apple wanted to be consistent

20   with the business model for the App Store, correct?

21   **A.**   Yes.

22   **Q.**   Can you expand for the Court a little bit on what that

23   business model is and how the new link entitlement fits in or

24   dovetails, if you will, with that business model?

25   **A.**   Sure.  So we believe that we provide a significant value

1    to developers.  We provide them with a safe marketplace to

2    distribute their apps to users all over the world.

3        And we provide them with many tools and technologies to

4    help them build their apps.  We provide them with services to

5    help them acquire and retain and reengage with users.  We

6    provide them with marketing support, editorial support.

7        And the commission is our way to monetize those

8    significant investments in our App Store and into our

9    ecosystem.

10   **Q.**  And if I could pause you on that, when you say "the

11   commission," do I understand you to mean the commission on

12   digital goods and services?

13   **A.**  Yes.

14   **Q.**  Do app developers who have periodicals or other content

15   also benefit from all of those tools, technology, platform

16   services, and the other things you described?

17   **A.**  Yes.

18   **Q.**  And do they pay a commission?

19   **A.**  In -- in the case of apps that sell physical goods and

20   services, they do not pay a commission.  Apps that are solely

21   financially supported with in-app advertising, they -- they

22   keep that commission.  Our commission is around digital -- the

23   sale of digital goods and services that are delivered in apps.

24   **Q.**  And Ms. Moskowitz asked you a number of questions about

25   that digital physical distinction, if you will, Mr. Fischer.

 1    Could you just explain for the Court at a business model level

 2    why that distinction exists and why it matters for the

 3    discussion we're having today?

 4    **A.**   Sure.  Well, the decision was made in the -- the earliest

 5    days of the App Store.  It was before I joined the team.  But

 6    as -- as came up earlier, the decision was made when -- when a

 7    developer is selling physical goods and services, we don't

 8    have visibility into those sales, we don't have visibility

 9    into whether that physical good or service was ultimately

10    delivered to the end users.  And so we didn't feel that it was

11    appropriate to charge a commission.  Same thing with -- with

12    in-app advertising.

13        Digital, we view very differently, and that was from the

14    very beginning of the store.  When a developer is selling an

15    app or when they are selling digital goods and services within

16    the app, that requires in-app purchase.  It's required in-app

17    purchase, you know, for -- since 2009 when in-app purchase

18    launched.  And that is an efficient way that we're able to

19    monetize the value that we deliver developers, which I talked

20    about a little bit earlier.

21    **Q.**   And if -- if -- when you say "in-app purchase," sometimes

22    referred to as the IAP requirement?

23    **A.**   Yes.

24    **Q.**   And when you say an efficient mechanism, what do you mean

25    by that, Mr. Fischer?

1    **A.**  So in the case of IAP, you know, customers are discovering

2    these types of offerings in apps all the time.  We actually do

3    a lot to support developers and highlight what they're doing,

4    you know, in their apps on the App Store itself.  And Apple

5    manages the transaction.

6        In those cases around IAP, we provide customer support.

7    We help them if there's any, you know, unauthorized

8    transactions or if they have questions about their purchase,

9    if they want a refund.  And there's many other features that

10   we provide to them when they're purchasing digital goods and

11   services.

12       **THE COURT:**  Mr. Fischer, at the trial it was clear

13   that your own internal survey showed that your developers were

14   not satisfied.  Has there been a survey updated since the

15   trial in this case?

16       And do you have any actual proof that Apple's developers

17   are now more satisfied?

18       **THE WITNESS:**  So we typically conduct developer

19   surveys on an annual basis.  So the trial was in -- in 2021.

20   I believe that we did surveys in 2022 and last year.

21       There are areas, you know, in the ecosystem where I think

22   developers are more satisfied.  There's other areas where, you

23   know, they -- they continue to give us constructive feedback.

24       **THE COURT:**  Any proof that what you're doing here is

25   satisfactory to the developers?

 1            **THE WITNESS:**  We have not conducted any surveys over

 2     the past few months around this specific new capability here

 3     in the U.S.

 4            **THE COURT:**  Proceed.

 5     **BY MR. PERRY:**

 6     **Q.**  Mr. Fischer, on the monetization structure that you were

 7     describing under IAP, that's focused on digital goods and

 8     services, right?

 9     **A.**  Yes.

10     **Q.**  And Ms. Moskowitz went through with you the guidelines.

11     Do you recall that?  The guidelines in effect at the time of

12     trial and today, and they've been amended; is that right?

13     **A.**  Yes.

14     **Q.**  And were certain amendments made specifically to comply

15     with the Court's injunction?

16     **A.**  Yes.

17     **Q.**  And did you help us prepare a demonstrative just to show

18     that graphically so we don't have to flip back and forth

19     between documents?

20     **A.**  Yes.

21            **MR. PERRY:**  Mr. Stovall, could we have the first

22     demonstrative, please.

23                      (Demonstrative published.)

24            **MR. PERRY:**  And, Your Honor, we have -- would you

25     prefer physical copies of the demonstratives?

 1              **THE COURT:**  I like both.  I write on the physical

 2     ones if you have it.

 3          But you can turn on the screens.

 4              **MR. PERRY:**  May my colleague approach, Your Honor?

 5              **THE COURT:**  Yes.  Thank you.

 6     **BY MR. PERRY:**

 7     **Q.**  And do you recall, Mr. Fischer, that the injunction

 8     broadly speaking has two parts or halves, if you will?

 9     **A.**  Yes.

10     **Q.**  And in-app communications and out-of-app communications,

11     right?

12     **A.**  Yes.

13     **Q.**  So on this first screen, we've put up the in-app part; is

14     that right?

15     **A.**  That's right.

16     **Q.**  And can you just remind us all, briefly of course, what

17     the rule was before the trial and what the rule is now as to

18     in-app communications regarding alternative purchase systems?

19     So before the trial, it was prohibited, right?

20     **A.**  Yes.  So at the time of trial, we had a guideline that

21     said, if you look at the left side, in apps that their

22     metadata may not include buttons, external links, or other

23     calls to action that direct customers to purchasing mechanisms

24     other than in-app purchase.

25     **Q.**  And I know you're not a lawyer, but the injunction then

1    had language that was relatively similar to that, correct?

2    **A.**   Yes.

3    **Q.**   And what was your understanding as a business person of

4    the consequences of that injunction as to the in-app

5    purchases?

6    **A.**   That we would --

7    **Q.**   Or in-app communications, excuse me.

8    **A.**   Yes.   That we would now need to allow developers, in their

9    apps and their metadata, buttons, links, or other calls to

10   action that direct customers to purchasing in addition to IAP.

11   **Q.**   And in response to the injunction first -- I'm not sure we

12   touched on this earlier -- did Apple delete the former

13   guideline provision in its entirety that was the subject of

14   the injunction?

15   **A.**   Yes.   We -- we deleted that -- that guideline and created

16   a new guideline to specifically address the injunction.

17   **Q.**   And why, Mr. Fischer, didn't Apple just delete the former

18   guideline and leave it as is?

19   **A.**   Well, the -- the new capabilities provided by the

20   injunction are just in the U.S.   And as I mentioned earlier,

21   these guidelines are global guidelines.   And so we wanted to

22   provide clarity to developers as to what they're now able to

23   do in the U.S. but remain consistent in other jurisdictions

24   around the world.

25   **Q.**   And the new guideline, can you just quickly summarize what

 1   it is developers may now do?  It's developers on the

 2   United States storefront; is that right?

 3   **A.**   Yes.  For iOS and iPad iOS in the U.S. storefront, they

 4   may now, with the entitlement -- that was the process that we

 5   established -- are able to include a link to the developer's

 6   website that informs users of other ways to purchase digital

 7   goods or services.

 8       And then in accordance with the -- the new entitlement

 9   agreement, the link may inform users about where and how to

10   purchase those in-app purchase items and the fact that such

11   items may be available for a comparatively lower price.

12   **Q.**   And this is the guideline which is sort of the -- do I

13   understand it right -- the top level summary for developers of

14   what to do?

15   **A.**   Yes.  A summary of the new capabilities that -- that they

16   have in the U.S. App Store for iPhone and iPad.

17   **Q.**   And I'm sure the Court recalls from the trial that the

18   guidelines cover many, many other topics, right, in addition

19   to the one we've been focusing on today?

20   **A.**   Yes.

21   **Q.**   And is it common for the guidelines to include hyperlinks

22   and cross-references and bring in other materials for the

23   developers who are interested in those particular

24   functionalities?

25   **A.**   Yes.

1    **Q.**  Mr. Fischer, the other half of the junction is out-of-app

2    communications, right?

3    **A.**  Yes.

4          **MR. PERRY:**  Mr. Stovall, could we have the second

5    demonstrative for Mr. Fischer, please.

6                (Demonstrative published.)

7    BY MR. PERRY:

8    **Q.**  And just to orient us all, Mr. Fischer, can you remind us

9    what it is the old and new guidelines provided as to this and

10    the effect of the Court's injunction?

11    **A.**  Yeah.  So at the time of trial, the guideline stated, you

12    know, apps cannot either within their app or through

13    communications sent to points of contact obtained from account

14    registration within the app, like email or text, encourage

15    users to use a purchasing method other than in-app purchase.

16    **Q.**  So that by that former guideline, Apple put some

17    restrictions on what developers could do outside of the app;

18    is that right?

19    **A.**  That's right.

20    **Q.**  And the injunction spoke to that point?

21    **A.**  Yes, it did.

22    **Q.**  And what did Apple do in response to the injunction?

23    **A.**  So we -- we changed our guidelines to comply with the

24    injunction and to directly provide developers with more ways

25    to communicate outside of the app to their user base about

1    purchasing methods other than in-app purchase.

2    Q.   And, Mr. Fischer, there's -- there's a new guideline as

3    well on this slide; is that right?

4    A.   Yes.

5    Q.   And can you explain to the Court what -- what that is all

6    about?

7    A.   Yeah.  So we created a new guideline 5.1.1 that's listed

8    here to state that apps may request basic contact information

9    such as name and email address, as examples, so long as the

10   request is optional for the user.

11   Q.   And why did Apple adopt that?  Was that adopted at the

12   same time as the guideline change in response to the

13   injunction?

14   A.   Yes.

15   Q.   And why did Apple put in that new provision?

16   A.   We felt that it was important to include that to provide

17   clarity as to that developers needed to -- to make that type

18   of information optional to the user.  If it was -- the user

19   felt forced or if they were holding back certain features or

20   capabilities to extract that user information, that that --

21   that would not be okay.  But they're now able to collect this

22   type of information as long as it's optional.

23   Q.   Okay.  And, Mr. Fischer, we'll come back to out-of-app

24   communications in a few minutes if it's all right for you, but

25   I'd like to change gears and go back to in-app communications,

1   okay?  The first half of the injunction.

2        The new guideline refers to an entitlement, right?

3   **A.**  Yes.

4   **Q.**  And can you just explain to the Court what an entitlement

5   is within the Apple developer relations framework?

6   **A.**  Sure.  An entitlement is a right or privilege that's

7   granted to a developer to activate certain features or

8   capabilities or functionalities in their app that are

9   otherwise not available to developers.

10  **Q.**  And is this new link entitlement the only entitlement that

11  Apple uses?

12  **A.**  No, it's not.

13  **Q.**  And do you know how many there are?

14  **A.**  I think there's probably a few dozen.  I -- I don't have

15  knowledge of the exact number.

16  **Q.**  And could you give one or two examples of another

17  entitlement that Apple uses in the manner you just described?

18  **A.**  I know that we -- we have, you know, a number of

19  entitlements, as I said.  I specifically know about one that

20  is our health kit entitlement.  And so this requires

21  developers who seek access to users' health and activity

22  information and data, that they need to apply and receive for

23  an entitlement in order to solicit that type of data to users.

24  **Q.**  And does that entitlement provide other requirements that

25  would be limited to developers who apply for and receive that

1  entitlement?

2  **A.**  Yes.  So they -- in that case, developers need to, you

3  know, receive that entitlement, and then they can implement

4  that into their app.

5  **Q.**  Now, Ms. Moskowitz went through with you the entitlement

6  addendum which was CX2 in this proceeding.  Do you recall

7  that, the actual amendment -- well, let me ask it.

8      Is that right that it would be an amendment to the DPLA

9  for the entitled developers?

10  **A.**  Yeah.  We call it an addendum, yes.

11  **Q.**  Now, this has a number of requirements.  And my colleague

12  went through many of them with you, right?

13  **A.**  Yes.

14  **Q.**  We sort of jumped right into the specifics.  Could we go

15  back to the high level and explain to the Court the business

16  process by which Apple set out the framework here for the

17  requirements for this new link entitlement addendum?

18  **A.**  So developers that were interested in taking advantage of

19  these new capabilities complete a request form.  As I

20  mentioned earlier, they're automatically approved.  No one's

21  ever been rejected.  That's --

22          **THE COURT:**  It doesn't say automatic, right?

23          **THE WITNESS:**  That -- that was something that I -- I

24  don't know if we provide that.  So I think we need to clarify

25  that.  But that is in case -- the case of what happens.

```
 1        And they receive approval.  And then they need to sign the

 2    addendum which includes other requirements to be able to add

 3    the new capabilities in their app.

 4    BY MR. PERRY:

 5    Q.  Now, I'd just like to --

 6            THE COURT:  And where in the injunction did I say you

 7    could do that?

 8            THE WITNESS:  To -- to do what specifically, Your

 9    Honor?

10            THE COURT:  Create all sorts of requirements.  Where

11    did I say that?

12            THE WITNESS:  I don't -- I don't believe that you

13    stated that we could --

14            THE COURT:  I agree.

15            THE WITNESS:  -- add a --

16            THE COURT:  Proceed.

17            MR. PERRY:  Thank you, Your Honor.

18    Q.  Mr. Fischer, you mentioned before the Netherlands dating

19    app entitlement; is that right?

20    A.  Yes.

21    Q.  Had that been developed at the time that Apple was

22    considering its injunction compliance program here?

23    A.  Yes.

24    Q.  Can you very briefly explain what the Netherlands dating

25    app entitlement was?
```

1   **A.**   There are a number of similarities.   There's a law passed

2   in the Netherlands around specifically just dating apps.   I

3   believe it was in 2022 so a couple years ago.   And we needed

4   to allow dating apps the ability to add, in their apps if they

5   so chose, a link out to an external website that's managed by

6   the dating app developer for out-of-app purchases.

7   **Q.**   And in connection with that program, did Apple develop an

8   entitlement framework?

9   **A.**   Yes.

10   **Q.**   And did it have some or many of the same features as the

11   U.S. entitlement framework?

12   **A.**   Yes.

13   **Q.**   And in fact, Mr. Fischer, was the U.S. entitlement

14   framework based on that previous work in the Netherlands?

15   **A.**   Yes, it was.

16   **Q.**   And was the Netherlands entitlement developed solely by

17   Apple, or was it's also informed by discussions with the Dutch

18   regulators?

19   **A.**   It was informed by discussions with the regulator.

20   **Q.**   So Apple wasn't starting on a blank page here?

21   **A.**   Yes, that's correct.

22        **MS. MOSKOWITZ:**   Objection, Your Honor.   There's been

23   a lot of leading.   It's up to you, but objection.

24        **THE COURT:**   Look, this testimony on direct is quite

25   rehearsed.   I get that.   It moves us faster.   But if you want

1    me to somehow think it is less rehearsed, I would suggest that

2    you make and use more open-ended questions.

3         **MR. PERRY:**  Thank you, Your Honor.

4    **Q.**  Coming back to the U.S. link entitlement.  Can you

5    explain, Mr. Fischer -- or let's turn to the actual document,

6    if we could.

7         **MR. PERRY:**  And Mr. Stovall, it's CX-2.

8                    (Exhibit published.)

9    **BY MR. PERRY:**

10   **Q.**  It's in your binder and it will be up on the screen in

11   section 3.1.

12   **A.**  I have not been given a binder.

13                    (Simultaneous colloquy.)

14        **THE COURT:**  It's the binder --

15        **MR. PERRY:**  Same binder.

16        **THE WITNESS:**  Oh, same Binder.  Sorry.

17   okay.

18   **BY MR. PERRY:**

19   **Q.**  CX-2 in there is the link entitlement addendum, and

20   section 3.1 is the provision that Ms. Moskowitz discussed with

21   you regarding the discouraging users from making in-app

22   purchases.  Do you recall that?

23                    (Exhibit published.)

24        **THE WITNESS:**  Yes.

25   / / /

1   BY MR. PERRY:

2   **Q.**  Can you explain from the perspective --

3          **THE COURT:**  This is the old one, right?  Oh, no, this

4   is the addendum.

5      Okay, go ahead.

6          **MR. PERRY:**  Yes, Your Honor.  The addendum -- I

7   apologize.  The numbers 3.1 in the addendum is not quite the

8   same as 3.1 in the guidelines.

9   **Q.**  So as from the App Store business perspective,

10  Mr. Fischer, can you explain the purpose of the provision in

11  3.1, particularly the final clause that Ms. Moskowitz asked

12  you about?

13  **A.**  We wanted to maintain our -- our business model around

14  in-app purchases as a way to be monetized for the value that

15  we provided developers.

16  **Q.**  And why does Apple want to maintain that monetization

17  structure?  What is the business purpose that you understood?

18  **A.**  Well, that's -- that's -- that's our business.  That's --

19  that's how we -- we monetize our investments in the platform.

20  And we're running a business.

21  **Q.**  Why did Apple include the specific provision that

22  developers may not discourage end users from making in-app

23  purchases using the IAP mechanism, right?

24  **A.**  We didn't want developers to discourage or disparage users

25  or -- discourage end users from using IAP.  IAP is our

1    business model.  That's what we've chose to earn a commission

2    and manage our business.  And we didn't want developers to

3    discourage users or for developers to disparage in-app

4    purchase.

5              THE COURT:  I don't see the word "disparage."

6              THE WITNESS:  I added that, yes.  So we --

7              THE COURT:  Do you use the word "disparage" in these

8    guidelines?  Those are two different things.

9              THE WITNESS:  I understand, Your Honor.

10             THE COURT:  Do you ever use the word "disparage" as

11   opposed to "discourage"?

12             THE WITNESS:  I believe in this addendum, we use

13   "discourage."  I believe I've seen the term "disparage" in

14   another document.

15             THE COURT:  Proceed.

16             MR. PERRY:  Thank you, Your Honor.

17   Q.  Mr. Fischer, if a developer chooses to use the new link

18   entitlement and puts a link in the app -- Ms. Moskowitz went

19   through with you at some length the system disclosure sheet;

20   do you recall that?

21   A.  Yes.

22             MR. PERRY:  Mr.Stovall, do we have a demonstrative on

23   that point?

24                   (Demonstrative published.)

25   / / /

FISCHER – CROSS / PERRY

BY MR. PERRY:

Q.   And this is the system disclosure sheet that we spent a

long time on this morning, right?

A.   Yes.

Q.   Why does Apple require developers -- why does Apple

require the new link entitlement to have this system

disclosure sheet before a user goes out into the open

Internet?

A.   As I think I stated earlier, our customers have had a very

consistent user experience for the past 15 or so years around

purchasing digital goods and services, and that this new

capability is a departure from that user experience.  And so

we wanted to inform our users and make sure that they were

informed.  And as I stated earlier, also that they were aware

of risks that they may be taking on or benefits that they may

be losing as a result of purchasing on the open Internet.

Q.   And Ms. Moskowitz showed you a similar system disclosure

sheet from the new reader rule entitlement.  Do you recall

that?

A.   Yes.

Q.   And is that another example of where -- well, can you

explain what that is.

A.   It's a similar system disclosure sheet designed to inform

the user about what they're about to do.

Q.   And has that reader rule entitlement with the system

1   disclosure sheet been in place longer than this new link

2   entitlement?

3   **A.**   Yes.

4   **Q.**   And has Apple received significant complaints from

5   developers regarding that?

6   **A.**   I haven't heard of any complaints from developers about

7   that system disclosure sheet.

8   **Q.**   And has Apple received any significant complaints from

9   consumers regarding that system disclosure sheet?

10  **A.**   Not to my knowledge.

11  **Q.**   And as part of the App Store business, do you know whether

12  developers and consumers are in fact using that link

13  entitlement for reader apps that was put in place some time

14  ago?

15  **A.**   Yes, they are.

16  **Q.**   Do we know the same information -- does Apple know the

17  same information yet for the new link entitlement?

18  **A.**   Can you --

19  **Q.**   Certainly.

20  **A.**   -- clarify or rephrase the question?

21  **Q.**   Certainly.

22       You just mentioned that Apple has some experience with

23  the -- with the new reader link -- reader app entitlement,

24  right?

25  **A.**   Yes.

 1   **Q.**  Has the new link entitlement -- have a similar track

 2   record of experience?

 3        **THE COURT:**  The one that was just implemented a month

 4   ago --

 5        **MR. PERRY:**  Yes.

 6        **THE COURT:**  -- for the 38 people who have signed up

 7   for it?

 8        **MR. PERRY:**  Yes, Your Honor.

 9        **THE COURT:**  Okay.  If you know.

10        **THE WITNESS:**  I believe that the -- there is many

11   developers that are using the reader app link entitlement

12   that's been available for a longer period of time.

13   **BY MR. PERRY:**

14   **Q.**  And did the developer start using the reader app

15   entitlement right away, or was there a ramp-in period?

16   **A.**  I think there was a -- a ramp-in period, but I'm not sure.

17   I haven't spent a lot of time on that particular entitlement.

18        **THE COURT:**  But in the reader app, those developers

19   aren't receiving -- well, strike that.

20        Go ahead.

21   **BY MR. PERRY:**

22   **Q.**  You mentioned risks and benefits with respect to the

23   system disclosure sheet.  Could you unpack that a little bit

24   first, first with respect to the risks?

25   **A.**  Sure.  We just lost the system disclosure sheet on the --

1     the monitor.  I think it would be helpful to reference that.

2                          (Exhibit published.)

3     **BY MR. PERRY:**

4     **Q.**  Okay.

5     **A.**  Thank you.

6          So in terms of -- of some of the potential risks, I think

7     that's really around user privacy or security.  And so we --

8     we indicated that -- that here.

9          And then in terms of some of the benefits that they would

10    be losing, there's many things that we do based on our

11    knowledge around purchasing of digital goods and services.  So

12    things like subscription management or the ability to refund

13    customers if there's an issue with their purchase are a couple

14    examples that we -- that we included here on the sheet.

15    **Q.**  And does subscription management, Mr. Fischer, work

16    differently in the App Store than it might on the open

17    internet?

18    **A.**  Yes.

19    **Q.**  And can you explain that for the Court?

20    **A.**  So subscription management is -- it's a feature within

21    your account settings if you have an App Store account.  And

22    if you subscribe to -- if you pay to subscribe to apps using

23    in-app purchase.

24         And so we sought out to create a convenient kind of home

25    for users to be able to see all of the subscriptions that

1    they've -- that they have on the App Store.  And then they can

2    easily manage their subscriptions in that one location.

3    **Q.**  And did you ask us to prepare a demonstrative to show this

4    point, Mr. Fischer?

5    **A.**  Yes.

6         **MR. PERRY:**  Mr. Stovall, could we have the

7    demonstrative regarding -- there we go.

8                        (Demonstrative published.)

9    **BY MR. PERRY:**

10   **Q.**  And with respect to what you just explained, can you walk

11   the Court, please, Mr. Fischer, through the -- what's being

12   displayed on this?

13   **A.**  So what's displayed on the left is when a user goes into

14   his or her account page, there's an area called "Manage

15   Subscriptions," and so they've tapped Manage Subscriptions

16   prior to what we're looking at.

17       When you go to Manage Subscriptions, it lists out all of

18   the subscriptions that -- that you have access to.  We

19   actually include more things including things that have

20   expired already.  So you can manage all -- all of your

21   subscriptions.  You can easily cancel any of your active

22   subscriptions.

23        **THE COURT:**  But this is only for subscriptions that

24   you purchased through the iPhone, right?

25        **THE WITNESS:**  Subscriptions that you've purchased

1   using in-app purchase.

2          THE COURT:  Right.  So consumers who, for instance,

3   let's say they bought the *New York Times* on the web and didn't

4   buy it on the iPhone, and they don't see it here.  So they

5   understand that if they want to have the convenience of

6   managing everything on the iPhone, which they may think is a

7   positive thing, then they would choose to buy it on the iPhone

8   as opposed on the web, right?  That's a benefit?

9          THE WITNESS:  (Nods head.)

10         THE COURT:  But it's also their choice.

11         THE WITNESS:  Yes.

12         THE COURT:  Keep going.

13  BY MR. PERRY:

14  Q.  So the consumer has the ability for subscriptions

15  purchased through IAP on this single place screen; is that

16  where we were?

17  A.  That's right, yes.  And then if in this case, in this

18  example, you tap on F1 TV in the middle on the far left, you

19  go to that page which has more information about your active

20  subscription, you could upgrade your subscription, you can

21  downgrade your subscription if the developer happens to offer

22  other subscription plans.

23      As I mentioned, you can easily cancel your subscription.

24  And then, you know, on the right would be after you tapped

25  "Cancel Subscription" and then you can confirm that

1    cancellation.

2    Q.  Now, Mr. Fischer, if a developer put the new link in

3    and -- and a sub -- and a user tapped the link and subscribed,

4    as the Court indicated, on the Internet, would that

5    subscription show up on this list?

6    A.  No.

7            THE COURT:  No.  And you can also say on there, if

8    you don't see your subscription, you didn't buy it on the

9    iPhone, right?

10           THE WITNESS:  Sure.  Yes, we could do that.

11           THE COURT:  And that way, they could say, oh, heck,

12   I'm not seeing my subscription on here, and I would much

13   rather buy it on the iPhone so I can manage it.

14           THE WITNESS:  That's -- that's something that we

15   could do, Your Honor, you're right.

16   BY MR. PERRY:

17   Q.  Mr. Fischer, why did Apple develop the subscription

18   management feature in the App Store as part of its business?

19   A.  Well, I -- for -- for me, as a business person, for me as

20   a consumer, I think there's a lot of consumer frustration

21   around managing subscriptions.  And you don't know where to go

22   to cancel stuff or change your subscriptions.

23       And so at least in our -- in our area of the App Store, we

24   wanted to create one place where you could go to get all that

25   information, have transparency, be able to manage it

1   effectively as a user.

2   Q.  Are there other benefits -- subscription management is

3   mentioned in the system disclosure sheet, right?

4   A.  Yes.

5   Q.  Are there other benefits you believe the App Store

6   provides that are not mentioned in the system disclosure sheet

7   that also would be given up through a new link entitlement?

8   A.  Yes.

9   Q.  Can you give the Court an example or two?

10  A.  We have a feature called "Ask To Buy" which was really

11  designed for families.  So if a household leader, you know,

12  like a father, mother, parental guardian, would want to manage

13  the purchases that their child makes in the App Store, whether

14  it's downloading apps, or beyond downloading apps, purchasing

15  digital goods and services in apps, Ask To Buy is a feature

16  where the parent could set that up and be informed of and

17  receive a notification if the child wants to make a purchase

18  or something along those lines.

19  Q.  And has this been a popular feature of the App Store?

20  A.  Yes.

21  Q.  And would it be available if a user tapped on a link and

22  went to --

23          THE COURT:  How do you know?  I mean I'm assuming it

24  is, but how do you know that?

25          THE WITNESS:  We have our product marketing team that

1    is a different part of the company that invests a lot in

2    empowering parents with tools that they can use to manage

3    their children's use of iPhone or other Apple products.  It's

4    completely optional, you know, for those parents to use it, of

5    course.

6        And I've heard internally that we have many, many users

7    that use Ask To Buy and those other types of features,

8    parental controls and -- and other features like that.

9    **BY MR. PERRY:**

10   **Q.**  Thank you, Mr. Fischer.  If I could shift gears again.

11       **THE COURT:**  Well, if you're shifting gears, it's a

12   good time for a second break.

13       So we'll stand in recess until 12:30 and then we'll go to

14   2:15 and be done for the day.

15       **MR. PERRY:**  Thank you, Your Honor.

16       **THE CLERK:**  Court is in recess.

17       (Recess taken at 12:15 P.M.; proceedings resumed at

18   12:30 P.M.)

19       **THE COURT:**  All right.  We're back on the record.

20   The record will reflect the parties are present.  Feel free to

21   be seated.

22       I have a question on that last issue.  Does Apple,

23   Mr. Fischer, give parents the ability to turn off in-app

24   purchases for children?

25       **THE WITNESS:**  Yes, we do.

1          **THE COURT:**  And is that part of the guidelines that

2     are presented to other developers, that they have to have the

3     ability to somehow stop or give parents the ability to control

4     what their children are doing in -- in those kinds of apps?

5          **THE WITNESS:**  I'm sorry.  Can you repeat -- repeat

6     the question?

7          **THE COURT:**  So does -- is part of it -- you

8     implemented all sort of new guidelines for them to -- to

9     comply with, right?

10         **THE WITNESS:**  Yes.

11         **THE COURT:**  Among the guidelines that you -- that you

12    implemented, did you also include in there the ability of a

13    parent to control or monitor links out from those apps?

14         **THE WITNESS:**  No.  We -- we don't have -- we can't

15    see the transaction that takes place on the developer's

16    website so there's no way for us to do that.

17         **THE COURT:**  Okay.

18         Go ahead.

19    **BY MR. PERRY:**

20    **Q.**  Mr. Fischer, just quickly picking up on the Court's

21    question, you mentioned Ask To Buy.  Is that part of a larger

22    suite of parental control features?

23    **A.**  Yes.

24    **Q.**  And could you just explain a little more about that, how

25    it works in the App Store?

1   **A.**   So I think I explained Ask To Buy, how that works.   Is

2   your question about other aspects of parental controls?

3   **Q.**   Correct.

4   **A.**   Okay.   Parental controls are, yeah, a suite of features

5   and capabilities that parents can use to help manage their

6   child's experience across our ecosystem.   So it's not just

7   specific to the App Store.   There are other -- other features

8   that are available.

9   **Q.**   And for purchases, does that -- do those parental controls

10   work through -- work with IAP somehow?

11   **A.**   Yeah.   So those Ask To Buy and -- and any of those

12   features related to purchases only work with IAP and digital

13   goods and services.   Because we don't have visibility into

14   physical goods and, you know, services, purchases, we --

15   that's not part of what parental controls can cover.

16   **Q.**   And the Court asked you about activities, I believe,

17   taking place off Apple's platform on the website; is that

18   right?

19   **A.**   Yes.

20   **Q.**   And do any of the requirements in the entitlement

21   restrict -- excuse me -- restrict developer activity, for

22   example, on their own website?

23   **A.**   No.

24   **Q.**   And why is that?

25   **A.**   Well, part of the injunction is around out-of-app

 1    communications.  And so developers have tremendous flexibility

 2    in terms of how they communicate with their users outside of

 3    the iOS or iPad OS app.

 4    **Q.**  But what about, for example, a requirement that the

 5    developer stop or implement parental controls in the same way

 6    Apple does on its website?  Does Apple do that in this link

 7    entitlement?

 8    **A.**  We don't have that -- those capabilities.  If a developer

 9    would like to do that, then they can do that on their own

10    website or on whatever platform they operate on.

11    **Q.**  If we could go back, Mr. Fischer, to CX-2 which is the

12    link entitlement addendum, and particularly section 3.3.

13                      (Exhibit published.)

14            **THE WITNESS:**  Okay.

15    **BY MR. PERRY:**

16    **Q.**  And the very first line says, "The link you provide," and

17    goes on, right?  So this is regulating the link; is that

18    right?

19    **A.**  Yes.

20    **Q.**  And where does this link appear under the entitlement?

21    **A.**  This link is on the -- on -- in the app.

22    **Q.**  In the app on the App Store?

23    **A.**  Correct.

24    **Q.**  And the requirements imposed here are -- or laid out here,

25    do any of these apply on the developer's own website?

1    **A.**   No.

2    **Q.**   Where do the requirements in 3.3 take place?

3    **A.**   This is solely related to the link that's in the app on

4    the iPhone or iPad in the U.S. App Store.  This only covers

5    that.

6    **Q.**   And with Ms. Moskowitz, you went through a number of these

7    individually, but are they -- how would you think about these

8    requirements from a business perspective?

9    **A.**   These requirements are really a collection of -- of

10   requirements that are designed to protect the user from, you

11   know, frauds and scams or those types of things.

12   **Q.**   And why is Apple concerned that a link -- what is the

13   connection in Apple's view between the links being authorized

14   here and frauds or scams?

15   **A.**   Well, we, in operating the App Store --

16            **THE COURT:**  If you thought that they -- that the app

17   was a fraud or a scam, you don't let them on the platform in

18   the first instance.

19            **THE WITNESS:**  Right.  If -- if the app itself is --

20   yes, we -- we review for that and we reject apps all the time

21   if we see that in the submission process.

22            **THE COURT:**  Wouldn't you see the link in the

23   submission process?

24            **THE WITNESS:**  Yes, we would see the link.  But we

25   don't see any other activity that, in this particular example,

1  the developer is doing once it goes through our review

2  process.

3       We -- we see this all the time with bait-and-switch scams.

4  Developers submit something and then they change it

5  server-side, completely unbeknownst to us.  And if and when we

6  are informed of that, then we take action.  But unfortunately

7  a lot of that happens, you know, without us knowing.

8  **BY MR. PERRY:**

9  **Q.**  Mr. Fischer, the Court asked you about reviewing the link.

10  Who would review the link if -- if a developer used the new

11  link entitlement?

12  **A.**  So we have an app review process.  All apps and all app

13  updates go through that same process.  So our app review team

14  would be reviewing that app and, in this case, the link and

15  the associated communications.

16  **Q.**  And is there a connection between requirements in rule --

17  in 3.3 and the app review process?

18  **A.**  Yes.

19  **Q.**  And what is that?  Can you explain to the Court how that

20  works.

21  **A.**  So 3.3 -- and these are -- these are rules around what the

22  developer can do in their link, and then app review's job is

23  to make sure that the rules are being followed.

24  **Q.**  And in addition to the link requirements, I think

25  Ms. Moskowitz discussed with you some other requirements in

FISCHER - CROSS / PERRY

1   the addendum.  Do you recall that?

2   **A.**   Yes.

3   **Q.**   Including, for example, the templates; remember that

4   discussion?

5   **A.**   Yes.

6   **Q.**   And can you explain to the Court the business decision?

7   And you're head of the App Store business, right?

8   **A.**   Yes.

9   **Q.**   The business decision regarding the template process, if

10  you will.  Or how did these templates come out of the business

11  decision at the App Store?

12  **A.**   So the cross-functional team that worked on this came up

13  with these templates, you know, based on common ways that

14  companies, not just developers but -- but companies,

15  communicate offers to end users both within apps as well as

16  outside of apps.

17  **Q.**   And what do you mean by that?  How -- how developers

18  communicate.

19  **A.**   So how developers communicate their -- their offers using

20  in-app purchase.  So we've -- we've seen developers use these

21  types of communications associated with their -- the digital

22  goods and services that they sell via IAP.

23       We've seen this for, you know, a decade and a half.  So we

24  took some of those types of communications which helped inform

25  what templates we came up with.

1   **Q.**  Did Apple consider allowing developers to use free-form

2   language or no -- no template, whatever the opposite of

3   templates is?

4   **A.**  It certainly did come up.  We -- we did not think that

5   that would be a scalable way to do this at all from an app

6   review perspective.  And we also were concerned that that

7   could lead to some -- some ways that developers could, whether

8   intentionally or not, mislead customers around what they were

9   offering.

10         **MR. PERRY:**  If we could turn, Mr. Stovall, to CX-3

11  which is the developer support materials.

12      And if we could scroll down to page 4 where the three

13  screens are shown, please.

14                     (Exhibit published.)

15  **BY MR. PERRY:**

16  **Q.**  Do you recall discussing this with Ms. Moskowitz,

17  Mr. Fischer?

18  **A.**  I don't think this particular 3 app was discussed.

19  **Q.**  Okay.  Well, let's discuss it now.

20  **A.**  Okay.

21  **Q.**  Can you explain to the Court -- this is in the materials

22  the developers receive regarding the new link entitlement,

23  right?

24  **A.**  Yes.

25  **Q.**  Okay.  Can you explain to the Court what -- what examples

1  are being shown here, what's being displayed for developers

2  regarding the new link entitlement?

3  **A.**  So these are just some examples.  This is not an

4  exhaustive list by any means but just some examples of how

5  developers could integrate their language and button and --

6  and link in their apps.

7  **Q.**  And Ms. Moskowitz suggested that it has to be buried in

8  the settings screen.  Is that right?

9  **A.**  I recall something along those lines that she said.

10  That -- that's not accurate, though.

11  **Q.**  And what is the reality of where a developer can place the

12  new link entitlement within their app in the App Store?

13  **A.**  So they can put this on any page within their app with the

14  sole exception of the -- the in-app flow around a purchase.

15  **Q.**  And can you give some examples of where a developer could

16  put their link?

17  **A.**  Sure.  These are just three examples that we came up with.

18  The -- the sign-in screen, if -- if the app requires an

19  account, they could be on -- it could be on the home screen of

20  the app, the account screen, you know, really any page in the

21  app with the sole exception of that in-app flow around a

22  digital purchase.

23  **Q.**  And regarding the in-app flow, why did Apple elect to

24  include that restriction in the addendum regarding the

25  placement of the link?

1   **A.**   I think this came up earlier.  It was for a couple

2   reasons.  One, to try to avoid any confusion for the user, but

3   also to enable us to maintain our business model around IAP as

4   the most efficient way to collect a commission for the

5   investments we've made in the platform.

6   **Q.**   Now, in -- the link entitlement and the addendum and the

7   developer page are meant to be read all together; is that

8   right?

9   **A.**   Yes.

10  **Q.**   And what was Apple's business objective in putting

11  together that package?

12  **A.**   Well, it was really to ensure that we were thinking about

13  the user experience.  As I mentioned earlier, we wanted to

14  create a consistent user experience.  And this is not just

15  about one app.  This is about potentially hundreds, thousands,

16  tens of thousands, hundreds of thousands of apps that could

17  use this.

18       So we wanted to create a consistent user experience

19  around -- around that.  These are mutual customers that we

20  share with developers.  So the user experience is always

21  something that Apple has cared about.

22  **Q.**   When you say a consistent user experience, what do you

23  mean by that?  Or can you unpack that a little bit?

24  **A.**   Well, our users have had a consistent experience around

25  purchasing digital goods and services with IAP since we

1    introduced IAP in 2009.

2        And with these new capabilities, certainly this is a

3    different experience, but we wanted to try to have it be as

4    predictable for customers as possible.

5        These are lots of different types of developers that we

6    could envision using this, some very sophisticated, some maybe

7    less experienced, but trying to have a consistent user

8    experience, thinking about the user first and what that --

9            THE COURT:  Well, that's not exactly true, right?  I

10   mean consistent as long as there's increased friction so that

11   they don't actually want to move away from IAP.

12           THE WITNESS:  I disagree with that, Your Honor.

13           THE COURT:  Okay.

14       Proceed.

15           MR. PERRY:  Thank you, Your Honor.

16   Q.  Mr. Fischer, we've discussed the concept of friction a

17   couple times here.  Could you -- was Apple's intention to

18   create friction in these transactions?

19   A.  No.

20           THE COURT:  But there are plenty of alternative

21   approaches that would have less friction, right?

22           THE WITNESS:  I think that's right, Your Honor, yes.

23   BY MR. PERRY:

24   Q.  Did Apple consider a variety of alternatives before

25   settling on this one, Mr. Fischer?

1    **A.**   Yes.

2    **Q.**   And can you just explain to the Court how long the process

3    took in general for coming to rest where the company did?

4    **A.**   This was the result of, you know, cross-functional effort

5    and certainly several months of explorations, discussions,

6    analysis, meetings, getting feedback from executives from

7    meetings --

8            **THE COURT:**   But no developers took part in this,

9    correct?  Or did -- did you have independent developers weigh

10   in?

11           **THE WITNESS:**   I don't recall including developers in

12   that -- in that process, Your Honor.

13   **BY MR. PERRY:**

14   **Q.**   Did Apple conduct any external studies regarding this

15   process?

16   **A.**   Yes, we did.

17   **Q.**   And can you explain that briefly, including your role in

18   it?

19   **A.**   Sure.  So we had a team that worked with an independent

20   third-party research company to look at market comparables,

21   you know, other marketplaces, the commission that they -- that

22   they use, what services do they provide to justify their

23   respective commissions.  And -- and that -- that work was led

24   by a group at Apple.

25   **Q.**   And who -- who led that group at Apple?

1    **A.**   Carson Oliver.

2    **Q.**   And he'll be testifying in this proceeding; is that your

3    understanding?

4    **A.**   Yes.

5    **Q.**   And Ms. Moskowitz asked you some questions about the

6    commission.  Were you directly involved in setting the

7    commission, Mr. Fischer?

8    **A.**   No.

9    **Q.**   Can you explain to the Court, as the head of App Store

10   business, how it worked with the commission -- the commission

11   piece of this compliance project?

12   **A.**   Sure.  So the cross-functional team that worked on this,

13   you know, put information that -- that we had gathered from

14   this external third party, along with some financial analysis

15   around the commission and various -- various options around

16   the commission level, as well as some of the things that we've

17   covered already, the system disclosure sheet and -- and some

18   of the policies.  And this was all put together in a

19   presentation that went to the price committee at Apple.

20   **Q.**   And do you sit on the price committee?

21   **A.**   No.

22   **Q.**   Okay.  Thank you.

23        Mr. Fischer, I'd like to switch gears, if we could, to

24   out-of-app communications.  Is that okay?

25   **A.**   Yes.

1            **MR. PERRY:**  And if we could look back, Mr. Stovall,

2    to the second demonstrative that shows out-of-app

3    communications.

4                    (Demonstrative published.)

5    **BY MR. PERRY:**

6    **Q.**  These are the new guidelines, right?

7    **A.**  Yes.

8    **Q.**  Can you explain for the Court what a developer can do

9    regarding alternative purchase systems -- or excuse me --

10   payment systems outside of the app?

11   **A.**  They can -- they can communicate with their customers

12   however they see fit.  They have -- they have a lot of

13   flexibility in terms of how they can communicate alternative

14   payment options outside of the app.

15   **Q.**  And what would those include?  Do you have any sense from

16   your developers you deal with how they communicate outside the

17   app?

18   **A.**  Developers communicate with customers all the time.  Apple

19   itself is a developer.  So things like email or, you know,

20   push notifications or -- or TV commercials, or just lots of

21   different ways that -- that developers communicate with

22   customers.

23   **Q.**  And does the new link entitlement place any restrictions

24   on what developers can say in those communications outside of

25   the app?

1    **A.**  No.

2    **Q.**  Can a communication outside of the app include a link to a

3    purchase option?

4    **A.**  Of course.

5    **Q.**  And is that link subject to the requirements of the new

6    link entitlement?

7    **A.**  No.

8    **Q.**  Mr. Fischer, changing gears once again.  You've discussed

9    a few times the importance of security and privacy; is that

10   right?

11   **A.**  Yes.

12   **Q.**  Can you explain to the Court the App Store's business view

13   on user security and privacy?

14   **A.**  It's part of the -- the value proposition that we provide

15   to our -- our customers around the world.  Our -- our goal

16   from day one of the App Store was to create a safe and trusted

17   place for customers to discover, download, and pay for apps

18   and in-app purchases.

19   **Q.**  And do you believe that the new link entitlement affects

20   that concern in any way?

21   **A.**  From a -- from a payment standpoint, I think that -- that

22   risks are heightened with this link.

23   **Q.**  Why is that?

24   **A.**  Because of what could happen.  I'm not going to say it

25   will happen, by any means.  But there's the possibility of it

1    being less safe or less secure from a purchasing standpoint

2    than Apple's in-app purchase system.

3    **Q.**  And is that because of the payment processor like PayPal

4    or Stripe that Ms. Moskowitz identified; is that where the

5    concern lies?

6    **A.**  Personally my concern is not with those types of -- of

7    payment processors.  It's more about what the developers could

8    potentially do to mislead or cheat or scam our mutual

9    customers.

10   **Q.**  And does Apple have any experience with developers

11   misleading, cheating, or scamming customers?

12   **A.**  Yes.

13   **Q.**  How do you know that?

14   **A.**  We have an antifraud team at Apple that specifically works

15   on this 24/7/365.  There's -- there's always work to do in

16   this area to protect our customers.

17   **Q.**  And does Apple provide any public statements or public

18   information regarding those efforts?

19   **A.**  Yes.

20   **Q.**  And can you describe that for the Court?

21   **A.**  I can't remember exactly when it started, but a few years

22   ago we started publishing an antifraud report.  And we've been

23   trying to do that on an annual basis since then.

24         **MR. PERRY:**  And, Your Honor, I got this far and I'm

25   almost done, but I'm going to need to hand up a binder, if I

```
 1    may, with some new exhibits.

 2              THE COURT:  Okay.

 3              MR. PERRY:  If my colleague may approach?

 4              THE COURT:  He may.

 5    BY MR. PERRY:

 6    Q.  Mr. Fischer, in your binder there's an exhibit that

 7    labeled on the tab CX-1005.  Can you find that?

 8    A.  Yes.

 9              MR. PERRY:  Mr. Stovall, can we publish the front

10    page of that on the screen, please.

11              MS. MOSKOWITZ:  Your Honor, I object to this document

12    being offered into evidence.

13              THE COURT:  Why?

14              MS. MOSKOWITZ:  It's hearsay.

15              THE COURT:  Overruled.

16                   (Exhibit published.)

17    BY MR. PERRY:

18    Q.  Can you explain -- do you recognize this document,

19    Mr. Fischer?

20    A.  Yes.

21    Q.  And can you explain to the Court what this is?

22              THE CLERK:  Your Honor, okay to publish?

23              THE COURT:  Yes.  I don't have a jury here.  It's

24    fine.

25              THE WITNESS:  So this is a fraud report that we
```

1    published in the middle of May of last year on antifraud

2    activities from the prior year in 2022.

3    **BY MR. PERRY:**

4    **Q.**   And can you give some examples to the Court of some of

5    experiences in this or some of the information reported in

6    this report?

7         **THE COURT:**  Well, were you on -- do you have -- does

8    he have foundation for this particular one?

9    **BY MR. PERRY:**

10   **Q.**   Mr. Fischer --

11        **THE COURT:**  Can he be cross-examined on any of

12   details should Ms. Moskowitz --

13        **MR. PERRY:**  Thank you, Your Honor.  Let me lay the

14   foundation.

15   **Q.**   Mr. Fischer, which organization within Apple publishes the

16   fraud report?

17   **A.**   We have a fraud organization in our -- in our services

18   group at Apple.

19   **Q.**   And what is the relationship between the fraud

20   organization and the services group at Apple and the App Store

21   business that you -- you head?

22   **A.**   Sure.  So that -- that group is adjacent to my team.  I

23   don't oversee that team.  And they are working on antifraud

24   efforts across the App Store but many more services that Apple

25   provides which is why they're located in a central -- central

1   organization.

2   Q.   And services at Apple is a -- is a descriptor, right?

3   A.   Yes.

4   Q.   And what else is in services besides the App Store?

5   A.   We have many other services, Apple Music, Apple TV Plus,

6   iCloud, Apple News, Apple Podcast.

7   Q.   And does the fraud team within services provide

8   information to you, Mr. Fischer, regarding fraud on the App

9   Store?

10  A.   Yes.

11  Q.   And how often or in what cadence does that happen?

12  A.   So we have some ongoing meetings throughout a year where

13  the fraud team is giving updates on -- on various things that

14  they're doing, the status of those, those efforts.

15      And then we've wanted to publish this and -- and share

16  this work more over the last couple of years in the form of

17  these annual fraud reports.

18  Q.   And when you say "we," who is we in that sentence, we

19  wanted to publish these reports?

20  A.   Just speaking more broadly, Apple -- the decision was made

21  that as a company we wanted to -- to provide more transparency

22  and visibility, that -- that there's a lot that we're doing to

23  try to protect our customers as best we can.

24  Q.   And do you personally review these annual fraud reports

25  before they are released to the public?

1   **A.**   Yes.

2   **Q.**   Did you personally review this 2022 report that was

3   published in May of '23 before it was released to the public?

4   **A.**   Yes.

5   **Q.**   And are you familiar with the data and information

6   summarized in here as a result of the work you just described

7   running the App Store and coordinating with the fraud group?

8   **A.**   Yes.

9   **Q.**   Thank you.

10      Mr. Fischer, on page 2 of this document, do you see the

11   blue box there?

12   **A.**   Yes.

13   **Q.**   What information is being reported here?

14   **A.**   So there's a couple data points that we're sharing.  The

15   first is that we terminated 428,000 developer accounts for

16   potentially fraudulent activity in 2022.  That we --

17   **Q.**   I'm sorry.  That's in 2022, developer accounts.

18   **A.**   In 2022, so in that year alone, the fraud team terminated

19   428,000 developer accounts for potentially fraudulent

20   activity.

21   **Q.**   Okay.  And what's the center box telling us?

22   **A.**   That the team blocked 105,000 developer accounts from

23   being created because of issues of fraud.

24   **Q.**   And if you turn, Mr. Fischer, to page 4 of this document,

25   the text at the top carryover paragraph, do you see where it

1  says -- do you see what it says there?

2  **A.**  Yes.

3  **Q.**  Could you read that last sentence in that carryover

4  paragraph?

5  **A.**  "Nearly 24,000 apps were blocked or removed from the App

6  Store for bait-and-switch violations such as these in 2022."

7  **Q.**  And I think you mentioned bait-and-switch earlier in your

8  testimony today; is that right?

9  **A.**  Yes.

10 **Q.**  And can you explain just again what a bait-and-switch is

11 from a developer fraud perspective?

12 **A.**  It's when a developer indicates something to the user and

13 then changes it unbeknownst to the user.

14 **Q.**  And what relation, if any, does the information like this

15 have to the technical and other requirements in the new link

16 addendum?

17 **A.**  So when a -- when a developer, you know, let's say uses

18 one of the templates that we provided and it says, you know,

19 for 50 percent off go to, and then, you know, www.example.com,

20 they could tap on that and then when they got to the developer

21 website, it could be a totally different, you know, different

22 offering.  That's an example of -- of the user being misled in

23 that particular example.

24 **Q.**  And more generally, what do statistics like these in this

25 report tell you about the subject of today's discussion?

1    **A.**   Well, this type of -- of information has led us to believe

2    that -- that concerns around user safety, privacy, security

3    are heightened as a result of this.

4    **Q.**   And is it your view as head of the App Store or do you

5    have a view as head of the App Store as to whether these link

6    entitlement requirements will help or hinder that effort?

7    **A.**   I think that this effort poses some increased risk to

8    users.

9    **Q.**   And those risks, would they be greater or lesser without

10   the link entitlement as we've been discussing it today?

11   **A.**   Well, without the link entitlement, I think the risks

12   would be mitigated.  With -- with the link entitlement, I

13   think the risks are potentially greater.

14   **Q.**   Let's unpack that a little bit.

15        If developers could do anything they want, would there be

16   more risk or less risk?

17   **A.**   I believe there would be more risk.

18   **Q.**   And if the developers follow the requirements of the link

19   entitlement, is there more risk or less risk than in the

20   previous situation?

21   **A.**   Less risk.

22   **Q.**   Thank you, Mr. Fischer.

23        **MR. PERRY:**   No further questions, Your Honor.

24        **THE COURT:**   Your exam, Ms. Moskowitz.

25        **MS. MOSKOWITZ:**   Thank you, Your Honor.

1                    **REDIRECT EXAMINATION**

2    **BY MS. MOSKOWITZ:**

3    **Q.**  Mr. Fischer, I may jump around a bit.  If I lose you, just

4    let me know and I'll try to circle back.

5              **MS. MOSKOWITZ:**  And, Your Honor, before I forget

6    because I'll kick myself, can we be provided the 38 developer

7    list by Apple at the close of this hearing so that we can do

8    our work with that?

9              **THE COURT:**  Did you not get that?

10             **THE WITNESS:**  I haven't -- I haven't been with anyone

11   to get my phone, Your Honor.

12             **THE COURT:**  Okay.

13             **MR. PERRY:**  We will provide it to Cravath and the

14   Court at the end of the court session today, Your Honor.

15             **THE COURT:**  Okay.  Go ahead.

16             **MS. MOSKOWITZ:**  Thank you.

17   **Q.**  I think I heard you say just a moment ago that there are

18   hundreds of thousands of apps that might use this entitlement;

19   did I hear that right?

20   **A.**  As I said earlier today, I don't know the exact number

21   that offer in-app purchase.  So that's something else that I

22   think was requested by Your Honor.

23   **Q.**  Yeah, that's what I was trying to figure out.  You said

24   hundreds of thousands of apps so I was trying to figure out

25   did you get the answer, or was that just an off-the-cuff?

1    **A.**   That was an off-the-cuff.

2    **Q.**   Okay.  So you don't know the number of apps that are

3    actually eligible for this link entitlement because they offer

4    in-app purchases of digital content?

5    **A.**   I do not have that number, no.

6    **Q.**   You were asked a bit about parental controls.  Does Apple

7    offer a parental control that allows a parent to block access

8    to the Safari browser altogether?

9    **A.**   I'm not sure.

10   **Q.**   If that -- if that were a control that Apple imposed, that

11   would prevent the external link from also going to the

12   Internet?

13   **A.**   The way that the entitlement link works is whatever the

14   default browser is of the user, that could be Safari or -- or

15   something else.

16   **Q.**   Right.  But if the parental control were able to block

17   access to the Internet for the user, they similarly would be

18   blocked from using it through the external link, right?

19   **A.**   If that's something that we provide.  I'm not an expert on

20   non-App Store-related issues around parental controls.

21   **Q.**   Okay.  So you just don't know one way or the other?

22   **A.**   I don't know.

23   **Q.**   You were asked about reader apps and the pop-up screen

24   that comes in connection with that entitlement.  Do you

25   remember that?

FISCHER - REDIRECT / MOSKOWITZ

1   **A.**   Yes.

2   **Q.**   And we had talked about that earlier today as well, right?

3   **A.**   Yes, we did.

4   **Q.**   Was that reader app entitlement, link entitlement required

5   to be offered by a law or a court-ordered injunction?

6   **A.**   I don't remember what led to the creation of that

7   entitlement for reader apps.

8   **Q.**   As far as you know, was it a court-ordered injunction that

9   required Apple to open up reader apps to enable external links

10   for account management?

11   **A.**   I don't know.

12   **Q.**   You talked again a bit about risks that you perceive to

13   user security and privacy.  I think we've covered that

14   adequately so I'm not going to go back there.  But you also

15   talked about the benefits that users were losing, right?

16   **A.**   Yes.

17   **Q.**   And the benefits that you talked about included

18   subscription management.  That was one?

19   **A.**   Yes, it was.

20   **Q.**   And did you also mention the refunds, or was that just in

21   the language?  I don't remember if you touched on it in

22   direct.

23   **A.**   I didn't.  I wasn't asked about refunds.

24   **Q.**   But that's one of the services that -- or the benefits

25   that users are also losing?

FISCHER - REDIRECT / MOSKOWITZ

1   **A.**   Yes.  App Store refunds would be lost as a result of this.

2   **Q.**  And you're aware that Apple has received a number of

3   complaints from developers about Apple's refund process,

4   right?

5   **A.**  I see developer feedback all the time.  I'm not -- I'm not

6   sure what you're referring to.

7   **Q.**  You don't recall ever getting feedback about refunds?

8   Negative feedback?

9   **A.**  In my 15 years or so of managing the App Store business,

10   I've had a couple meetings, one handful, where developers have

11   complained to me personally about our refund process.

12   **Q.**  And you talked about the subscription management, and we

13   looked at the whole screens on the demonstrative about how

14   great Apple's subscription management tool is; is that right?

15   **A.**  We showed the Court what we do to help users manage

16   subscriptions.

17   **Q.**  It's possible that PayPal or another solution could offer

18   their own subscription management, right?

19   **A.**  I would imagine so.

20   **Q.**  And they could compete with Apple's own internal

21   subscription management on that feature, right?

22   **A.**  Yes.  I could imagine they could do that.

23   **Q.**  And just on the subscriptions point, are you aware that

24   Apple opposed the very motion that we're here to talk about

25   today because it thinks subscriptions are completely

FISCHER - REDIRECT / MOSKOWITZ

1  irrelevant to the injunction?

2  **A.**  No.

3       **THE COURT:**  You're not aware, or it didn't?

4       **THE WITNESS:**  I'm not aware.

5  BY MS. MOSKOWITZ:

6  **Q.**  Did you read Apple's opposition to this motion?

7  **A.**  I did not read the -- the specific submission that we --

8  that we provided.

9  **Q.**  All right.  So let's talk a little bit about the

10 justifications that you gave.  I think you referred a number

11 of times to minimizing fraud and scams and things like that;

12 is that right?

13 **A.**  Yes.

14 **Q.**  Those frauds and scams occur in all sorts of apps

15 including ones that are not covered by Apple IAP that offered

16 physical goods or purport to, right?

17 **A.**  I don't have a lot of visibility in -- into apps that sell

18 physical goods and reports around frauds and scams.

19 **Q.**  So the whole exhibit we just looked at and the whole team

20 that reports about this out of services, they don't include

21 physical good apps?

22 **A.**  That team's focus is around when Apple is managing the

23 purchasing experience, in this case with IAP.  That's what

24 that team's focused on.  They're not focused on other

25 companies' issues around fraud or scams.

FISCHER - REDIRECT / MOSKOWITZ

1   **Q.**  App review is looking at all apps including physical,

2   right?

3   **A.**  Yes.

4   **Q.**  And they are also charged with identifying fraudulent

5   apps, scam apps, et cetera?

6   **A.**  Yes.

7   **Q.**  And with respect to the -- the physical goods apps, apps

8   that sell physical goods, you are aware that there at least

9   are fraudulent examples and scam examples that have been

10  identified on the Apple App Store or through the review

11  process?

12  **A.**  I'm not aware of -- of -- of that type of report around

13  physical goods.  Sometimes I read reports that companies that

14  sell physical goods have issues of -- of fraud, but I haven't

15  read anything specific to their apps that are available in the

16  App Store.

17  **Q.**  So you just can't speak to that at all in terms of the

18  prevalence, what's done, what's not done about that, you just

19  can't speak to any of that?

20  **A.**  If we are brought, you know, aware by our customers that

21  they're having issues with any apps in the App Store, we take

22  that incredibly seriously, and we'll work with the developer

23  to address whatever feedback we're getting from customers.

24  **Q.**  Well, I'm just -- I'm asking a broader question.  You

25  talked about this rapport and how much work is done about how

1    prevalent fraud apps and scam apps are.

2        You can't speak one way or the other whether that's also

3    happening on the apps that may sell physical goods or try to

4    sell physical goods, or all of that; you just don't know?

5    **A.**  My focus in -- in managing the App Store business is

6    really around developers that are selling digital goods and

7    services using in-app purchase and now using this new

8    capability.

9    **Q.**  So to the extent that there are instances of fraud and

10   scams, at least you're aware that no efforts have been made to

11   add any of the restrictions that you are imposing on the

12   external links, correct?

13   **A.**  As it relates to payment-related fraud -- there's lots of

14   forms of fraud unfortunately -- as it relates to payment

15   fraud, our visibility is into the payment fraud related to

16   digital goods and services.

17   **Q.**  I'm just asking whether you have taken any steps, Apple,

18   to your knowledge, to impose any of the same requirements that

19   you are imposing for the external link entitlement for all

20   apps because there are fraud and scams everywhere across all

21   apps?

22   **A.**  I personally don't have visibility into any of those

23   efforts if they have happened.

24   **Q.**  Of if they haven't.

25   **A.**  Or if they haven't.

1    **Q.**   You mentioned app review as part of the justification

2    and -- and factoring into scalability.  Is that generally

3    right, how that came up?

4    **A.**   Yes.

5    **Q.**   I just want to be clear.  App review is not part of your

6    organization at Apple, correct?

7    **A.**   That's correct.

8    **Q.**   And you don't lead the app review team?

9    **A.**   No, I do not.

10   **Q.**   And you're not aware of the costs or expenses of the app

11   review process or team?

12   **A.**   Yeah, because I don't manage that team, I don't have

13   visibility into -- into that.

14   **Q.**   So you can't speak to whether app review is -- how more --

15   withdrawn.

16       You cannot speak to how quickly or more quickly the app

17   review team can get through apps with the templates versus not

18   with the templates.

19   **A.**   I think these are early days of these new capabilities,

20   and so I think we're -- we're learning as we go.

21   **Q.**   So you're not aware of any analysis that Apple has done in

22   regards to how faster app review will go because of these

23   restrictions that you've imposed, correct?

24   **A.**   I'm not aware of any of those types of efforts.

25   **Q.**   And we just agreed that the app review team covers

1  physical goods, not just digital goods, apps?

2  **A.**  The app review time reviews all apps regardless of the

3  business model of the app.

4  **Q.**  And so they review apps that have all sorts of language

5  that deviates in infinite ways from the templates you're

6  imposing, correct?

7  **A.**  Yes.

8  **Q.**  And they -- they manage that in the current status quo?

9  **A.**  I think it's fair to say that they don't -- they might not

10  as closely look at some of that language in physical goods and

11  service because again the payment is taking place outside of

12  Apple's in-app purchase process.  But again, I don't manage

13  that team, don't have visibility into exactly everything that

14  they look for.

15  **Q.**  And the same is true for external purchases.  That's also

16  happening outside of Apple's IAP, right?  For digital?

17  **A.**  For the purchase itself, yes.  With -- with this

18  entitlement, yes, the purchase would take place on the open

19  Internet.

20  **Q.**  This article about the fraud, I just also wanted to be

21  clear.  I think you did say it, but I just want to make sure

22  it's extra clear.  You're not responsible for preventing fraud

23  in the App Store, that's not your responsibility, correct?

24  **A.**  That is correct.

25  **Q.**  And you're not responsible for remedying issues relating

FISCHER - REDIRECT / MOSKOWITZ

1    to fraudulent apps, right?

2    **A.**   That's not my responsibility.  Sometimes the fraud team

3    will come to me with different ideas that they have for how

4    they can fight fraud, and I can weigh in with my perspective.

5    But, yes, I don't -- I don't manage that team.

6    **Q.**   And you're not responsible for privacy or security for the

7    App Store, right?

8    **A.**   The privacy and security, what specifically are you

9    talking about?

10   **Q.**   You're just not responsible for those functions for the

11   App Store, security or privacy, correct?

12   **A.**   Correct.

13   **Q.**   You were asked a few questions about the risks to users

14   and how the degree of risk is big when developers can say

15   whatever they want and less when they're restricted; am I

16   getting that generally right?

17   **A.**   I wouldn't describe it as big.  I just think our -- our

18   concerns are heightened.  It doesn't mean that there's more

19   or -- or not, but our concerns are heightened.

20   **Q.**   And your -- you think that the injunction is really a bad

21   idea because it's heightening risks to users, right?

22   **A.**   I don't think the injunction is a bad idea.  I think that

23   some of the -- some of the implications of the injunction

24   might create more risk to users.

25   **Q.**   And so in terms of how Apple has complied as it thinks

1   it's complied with the injunction, it is not taking any action

2   with respect to those same risks for any other type of app

3   like physical goods?

4   **A.**   That's correct.

5           **MS. MOSKOWITZ:**  No further questions, Your Honor.

6           **THE COURT:**  Reexam limited to the scope of the prior.

7           **MR. PERRY:**  No further questions, Your Honor.

8       But I neglected to request permission to move into

9   evidence CX-1005 which is the fraud report.

10          **THE COURT:**  It's admitted.

11          **MR. PERRY:**  Thank you, Your Honor.

12      (Plaintiff's Exhibit CX-1005 received in evidence.)

13          **THE COURT:**  You're provisionally excused.  I do want

14  that list, and if I need to hear back from you on that, I will

15  ask for it.  But I'll let you know after I get it.

16      All right.  Thank you.  You may step down.

17          **THE COURT:**  Mr. Roman is next, I believe.  Alex

18  Roman.

19          **MR. EVEN:**  Yes, Your Honor.

20      And, Your Honor, we have some binders, if we may.

21          **THE COURT:**  All right, Mr. Even.  Thank you.

22                  (Pause in the proceedings.)

23          **THE COURT:**  So if you'll look this way, and he'll

24  swear you in.

25          **THE CLERK:**  Please raise your right hand, sir.

```
 1              THE COURT:  Stand, please.

 2              THE CLERK:  -- raise your right hand.

 3                           ALEX ROMAN,

 4    called as a witness for the PLAINTIFF, having been duly sworn,

 5    testified as follows:

 6              THE CLERK:  Thank you.

 7         Please be seated and speak clearly into the microphone.

 8         Please state your full name and spell out your last name

 9    for the record.

10              THE WITNESS:  Alex, last name Roman, R-O-M-A-N.

11              THE COURT:  Good afternoon.

12              THE WITNESS:  Good afternoon.

13              THE COURT:  You may proceed.

14              MR. EVEN:  Thank you, Your Honor.

15                         DIRECT EXAMINATION

16    BY MR. EVEN:

17    Q.  Good afternoon, Mr. Roman.  My name's Yonatan Even.  I

18    represent Epic Games.  I don't believe we met before, but I'm

19    going to have the pleasure of asking you some questions this

20    afternoon.

21         In January of this year, in response to this Court's

22    injunction, Apple introduced a new external purchase link

23    entitlement program, right?

24    A.  That is correct.

25    Q.  And the use of the external purchase link entitlement is
```

1    conditioned on the payment of a fee on any out-of-app

2    purchases that a user makes within seven days of clicking on a

3    purchase link, correct?

4    **A.**   That is correct.

5    **Q.**   And I'm going to refer to purchases that fall within that

6    seven days window as "linked purchases."  Is that okay?

7    **A.**   That is okay.

8    **Q.**   Now, the fee that Apple imposes on linked purchases is

9    27 percent for any purchase that would be subject to a

10   30 percent fee if it were completed as an in-app purchase,

11   correct?

12   **A.**   That is correct.

13   **Q.**   And the fee that Apple imposes on linked purchases is

14   12 percent for any purchase that would be subject to a

15   15 percent feet if it were completed as an in-app purchase,

16   correct?

17   **A.**   That is correct.

18   **Q.**   Now, you submitted a declaration in support of Apple's

19   opposition to Epic's motion to enforce the injunction; is that

20   right?

21   **A.**   That is right.

22   **Q.**   And your declaration is intended to explain Apple's

23   decision-making process leading up to the adoption of the fee

24   structure that Apple applied to linked purchases; is that

25   right?

```
 1    A.   That is correct.
 2    Q.   Now, in your -- in your declaration in paragraph 3, you
 3    talk about how when Apple needs to make a pricing decision,
 4    the leaders responsible for that product or service will
 5    convene what Apple sometimes refer to a price committee.
 6         Do you remember that?
 7    A.   Yes, I do.
 8    Q.   And I take it from that description that the pricing
 9    committee -- pricing committees, I should say, are convened
10    ad hoc at Apple, correct?
11    A.   Whenever we have major pricing decisions.
12    Q.   And a price committee was convened in this instance to
13    determine the commission structure for linked purchases,
14    correct?
15    A.   That is correct.
16    Q.   And you're not yourself a member of the price committee
17    that was convened to determine Apple's commission structure
18    for linked purchases, right?
19    A.   I was not.
20    Q.   Who were the members of the price committee?
21    A.   Mr. Cook, Mr. Schiller, and Mr. Maestri.
22    Q.   And we all know Mr. Cook and Mr. Schiller.
23         And what is the role of Mr. Maestri?
24    A.   He is our chief financial officer.
25              THE COURT:  We know him as well.
```

1   **BY MR. EVEN:**

2   **Q.**  Now, Apple did not put in a declaration from any member of

3   the pricing committee in support of its opposition to the

4   motion, correct?

5   **A.**  That is correct.

6   **Q.**  Your declaration attaches what you referred to as the

7   price committee deck, correct?

8   **A.**  That is correct.

9   **Q.**  And you assisted in preparing the price committee deck?

10  **A.**  That is correct.

11  **Q.**  If you turn to Exhibit CX-0009 in your binder.

12  **A.**  Give me a minute.

13          **THE COURT:**  All right.

14      Now, this was filed under seal.  Is there an agreement

15  between the parties?  If not -- and I do not want to close

16  these proceedings -- I would ask that questions be asked in a

17  way that we can keep the proceedings open with just a generic

18  reference to what's in the document.

19          **MR. EVEN:**  Your Honor, we met and conferred, and I

20  believe we have an agreement.  And I will ask my questions in

21  a way that respects that agreement.

22          **THE COURT:**  And the agreement is...?

23          **MR. PERRY:**  The agreement is, Your Honor, the -- we

24  have a redacted version of the price committee deck that we

25  would be submitting to the Court that covers the specific

1    numbers which are current business figures, pursuant to the

2    Court's rulings at the trial and unredacts almost everything

3    else in it.

4        We would ask for the -- in court -- and we're happy to

5    have the discussions in open court.  We would ask that the

6    deck not be displayed to the public for those pages that have

7    the redactions.  I'm not sure if the Court has the redacted

8    version.  We'd be happy to provide one.  I -- but that was --

9    the agreement was redact a few numbers -- that the specific

10   current numbers and not the rest of the deck.

11       **THE COURT:**  Okay.

12       Well, I don't have the redacted version, so I will leave

13   it to the two of you to make sure that the agreement's

14   followed.

15       **MR. PERRY:**  I apologize if I have to pop up every now

16   and then, but we'll -- I think we have -- we definitely have

17   an agreement.  It's just a matter of which specific things.

18       **THE COURT:**  Go ahead.

19       **MR. EVEN:**  And by all means, that is my intention,

20   Your Honor.

21   **Q.**  So CX-0009 is the price committee deck that you prepared,

22   correct?

23   **A.**  That is correct.

24   **Q.**  And this presentation bears the date January 16, 2024, and

25   is entitled "Price Committee StoreKit External Purchase Link

1    Entitlement U.S."

2         Is that right?

3    **A.**  That is right.

4           **MR. EVEN:**  And, Your Honor, I would like to move

5    CX-009 [sic] into evidence at this point.

6           **THE COURT:**  It's admitted.

7         (Plaintiff's Exhibit CX-0009 received in evidence)

8           **MR. EVEN:**  Thank you, Your Honor.

9    **Q.**  Now January 16, 2024, is the day that Apple filed its

10   notice of compliance with this Court, correct?

11   **A.**  I believe so.

12   **Q.**  And that is also the day that Apple actually made the new

13   link entitlement program available to the developers, correct?

14   **A.**  That is correct.

15   **Q.**  And that is also the very same day that the Supreme Court

16   essentially ended Apple's efforts to appeal the injunction,

17   and so the injunction went into effect, right?

18   **A.**  I believe that is right.

19   **Q.**  Now, Apple didn't know obviously in advance when the

20   Supreme Court would decide Apple's attempts to appeal,

21   correct?

22   **A.**  That is correct.

23   **Q.**  And so the deck was, in fact, prepared sometime prior to

24   January 16 of 2024, correct?

25   **A.**  We worked until this date.

```
 1   Q.  When did you begin working on the deck?

 2   A.  Several months in advance.

 3           THE COURT:  Before --

 4   BY MR. EVEN:

 5   Q.  Do you recall if it was during --

 6       Sorry.

 7           THE COURT:  Can I just ask, before or after the Ninth

 8   Circuit's decision?

 9           THE WITNESS:  Your Honor, it was after.

10           THE COURT:  Okay.

11   BY MR. EVEN:

12   Q.  And I take it that Apple decided to impose a 27 percent

13   fee on linked purchases prior to January 16, 2024, correct?

14   A.  The decision was made that day.

15   Q.  It's your testimony that up until January 16, 2024, Apple

16   had no idea what -- what fee it's going to impose on linked

17   purchases?

18   A.  That is correct.

19   Q.  Okay.

20       You understand that the Court entered its injunction

21   against Apple after conducting a full trial and issuing a

22   detailed order, correct?

23   A.  That is correct.

24   Q.  And that order included findings of facts and conclusions

25   of law over nearly 200 pages, correct?
```

1   **A.**  I am not familiar with the details, but I believe that is

2   correct.

3   **Q.**  And that would be my next question.  Have you read the

4   Court's post-trial order and findings of facts before you

5   began working on the price committee deck?

6   **A.**  I did not.

7   **Q.**  Did anyone ever explain to you that a fundamental problem

8   that this Court had identified with Apple's anti-steering

9   rules was that they resulted in higher costs to developers

10  because competition was not driving down Apple's commission

11  rate?

12  **A.**  We had some discussions.

13  **Q.**  That's not my question, sir.

14      Did anyone ever explain to you that a fundamental problem

15  this Court has identified as necessitating the injunction is

16  that Apple's anti-steering rules was that they resulted in

17  higher costs to developers because competition was not driving

18  down Apple's commission rates on IAP?

19  **A.**  The answer is no.

20  **Q.**  Did anyone ever explain to you that another fundamental

21  problem that this Court had identified with Apple's

22  anti-steering rules was that by preventing steering, Apple

23  prevented developers from communicated [sic] to their users

24  the lower prices that developers were able to offer to users

25  on purchases outside the app?

1   **A.**   I believe that part is the basis of the price committee

2   decision.

3   **Q.**   You believe that that part, meaning the part where this

4   Court found that the anti-steering rules prevent developers

5   from communicating lower prices outside of the App Store to

6   users, that was communicated to you?

7   **A.**   This is in our price committee deck.

8   **Q.**   Well, in the price committee deck, if we go to page --

9             **THE COURT:**   And, Mr. Even, the --

10            **MR. EVEN:**   -- 009.4.

11            **THE COURT:**   Okay.   Thank you.

12   **BY MR. EVEN:**

13   **Q.**   Are you on that page?

14                     (Exhibit published.)

15            **THE COURT:**   It's really tiny.   It's the third page

16   even though it says 4.

17            **MR. EVEN:**   And it's on your screen now.

18            **THE WITNESS:**   I see it on my screen.

19   **BY MR. EVEN:**

20   **Q.**   And here, the summary is that "Resulting from the Epic

21   injunction, Apple is permanently restrained and enjoined from

22   prohibiting developers from including in their apps and their

23   metadata buttons, external links, and et cetera, right?

24   **A.**   That is correct.

25   **Q.**   And that is the only mention of the injunction in this

1  deck, correct?

2  **A.**  That is correct.

3  **Q.**  And this does not talk at all about the need of developers

4  to communicate lower prices specifically for purchases outside

5  the app, correct?

6  **A.**  That is correct.

7  **Q.**  And so my question is, did anyone explain to you that a

8  major goal of this injunction was that developers would be

9  able to communicate lower prices to users for purchases

10  completed outside the app?

11  **A.**  I believe that is covered by this text.

12  **Q.**  You believe that this text there on the screen talks about

13  lower price in some way?

14  **A.**  (Reviewing document.)

15       Yes.

16  **Q.**  Can you point me to the part of this text that speaks to

17  the lower prices?

18  **A.**  Or other calls to action that direct customers to

19  purchasing mechanisms in addition to in-app purchasing.

20  **Q.**  You understand, don't you, that historically, the reason

21  developers could offer lower prices on purchases made outside

22  of the app, rather than in the app, was that purchases made

23  outside the app were not subject to any fees imposed by Apple,

24  correct?

25  **A.**  That is correct.

1    **Q.**   And, in fact, you understand that at least in the U.S.,

2    from the time IAP was launched back in 2009 and until

3    January 16 of this year, purchases made within the app were

4    subject to a 30 percent or 15 percent fee, whereas purchases

5    made outside the app on the web were not subject to any fee,

6    correct?

7    **A.**   That is correct.

8    **Q.**   And you understand that that reality is what allowed

9    developers to offer lower prices on out-of-app purchases,

10   correct?

11   **A.**   Could you rephrase your question.

12   **Q.**   You understand that this disparity between the 30 percent

13   fee in the app purchase and 0 percent fee outside the app is

14   what allowed developers historically to offer lower prices to

15   users on purchases completed outside the app?

16   **A.**   I do not.

17   **Q.**   You don't understand that?

18   **A.**   I don't think that that's necessarily the case.

19   **Q.**   Okay.

20         As you were engaging in your work of assessing the proper

21   fee and recommending it, was it clear to you that whatever fee

22   you would impose or you would recommend that Apple imposes

23   must allow developers to offer users lower prices on purchases

24   outside the app?

25   **A.**   Yes.

1    **Q.**  But that's nowhere in your deck, correct?

2        The word "lower prices" doesn't appear in your deck, the

3    words?

4    **A.**  They do not appear in the deck.

5    **Q.**  Now, nothing in the price committee deck assesses the

6    effect that the fee you recommend would have on the likelihood

7    that developers would actually use purchase links, correct?

8    **A.**  Could you rephrase that question?

9    **Q.**  I think the question is clear.

10       Nothing in the price committee deck CX-009 shows an

11   assessment the effect of the fee that you recommended would

12   have on the likelihood that any developer would actually use

13   purchase links.

14   **A.**  As part of the process of assessing the financial

15   impact --

16   **Q.**  Sir, it's a simple question.

17       Nothing in the deck shows any kind of assessment that says

18   "if we impose a fee of 0 percent, we expect X number of

19   developers to adopt this; if we impose a fee of 27 percent, we

20   expect a Y number of developers to adopt this"?

21   **A.**  We had to make an assumption regarding the adoption rate

22   of this link out entitlement.

23   **Q.**  Sir, that's not what I asked.

24       If you made any assumptions.  I'm asking whether anything

25   in the deck shows any kind of assessment, analysis, study, of

1    how the fees you're going to impose or recommend to impose

2    would, in fact, affect the adoption rate of the purchasing

3    links.

4    **A.**  I believe we have taken that into consideration in our

5    analysis.

6    **Q.**  Sir, that's not what I'm asking.

7        It's a simple question.  Is there anything in this deck

8    that shows some kind of study or assessment of how adoption is

9    going to be affected by the fee that you recommended to the

10   pricing committee?

11   **A.**  The answer is no.

12   **Q.**  Thank you.

13       Now, there's also nothing in the price committee deck that

14   assesses the effect of the recommended commission structure on

15   developers' ability to charge or communicate lower prices to

16   users, correct?

17   **A.**  Could you rephrase that question again?

18   **Q.**  Sir, I --

19   **A.**  I'm trying to be --

20   **Q.**  There's nothing in your deck that conveys to the pricing

21   committee that at certain levels of fees, developers may or

22   may not be able to offer their users lower prices on purchases

23   made through purchase links.

24   **A.**  We did not make references to -- explicit references to

25   lower prices that could be offered by developers.

1  **Q.**  Thank you, sir.  That's a "no," then.  The answer to my

2  question is no, there's nothing in the deck that assesses the

3  effect of the recommended commission structure on developers'

4  ability to charge and communicate lower prices to users,

5  correct?

6  **A.**  That is correct.

7  **Q.**  Thank you.

8  Now, if you go to the -- back to slide number 009.4 --

9  (Exhibit published.)

10  **BY MR. EVEN:**

11  **Q.**  -- at the bottom right, there is something that says "Key

12  Pricing Considerations."

13  Do you see that?  It's very large on your screen, if it's

14  helpful?

15  **A.**  Yes, I do.

16  **Q.**  And under "Key Pricing Considerations," you mention here

17  "commission rate," "commission time window," and "program

18  eligibility," correct?

19  **A.**  That is correct.

20  **Q.**  Who decided that those were the key pricing

21  considerations?  Was that you?

22  **A.**  As part of the elaboration of the price committee deck,

23  several teams were involved, and jointly, we decided to show

24  what were the key pricing components --

25  **Q.**  Who was --

```
 1                    (Simultaneous colloquy.)

 2   BY MR. EVEN:

 3   Q.  -- the decision-maker that decided that these are the key

 4   pricing considerations for your work for the price committee?

 5   A.  There's a consensus process to make sure that the

 6   information provided is relevant, so all of us agree.

 7   Q.  You don't have a name of a decision-maker that decided

 8   that these are the key considerations?

 9   A.  I do not.

10   Q.  That includes Alex Roman.  You were not the decider on

11   this?

12   A.  I definitely approved and contributed.

13   Q.  Contributed.  Okay.

14       The question whether to charge a commission for linked

15   purchases is not one of the key considerations on this page,

16   correct?

17   A.  That is correct.

18                     (Exhibit published.)

19   BY MR. EVEN:

20   Q.  Was it part of your task to determine whether Apple should

21   charge any commission on purchases that Apple has never before

22   charged a commission on through linked purchases?

23   A.  It was not.

24   Q.  Who was it that decided that the key considerations for

25   the pricing committee were only how much to charge and not
```

1   whether to charge anything for linked purchases?

2   **A.**  We started this process with the assumption that there

3   will be a commission rate.

4   **Q.**  I understand that, sir.  And what I'm asking is who

5   provided that assumption to you.

6       Who at Apple made the decision that your work and the

7   pricing committee work would focus on how much to charge

8   rather than whether to charge?

9   **A.**  I do not recall conversations regarding whether we needed

10  to charge.

11  **Q.**  Do you understand who at Apple would have the authority to

12  make the decision to charge on something that Apple has never

13  charged on for 15 years?

14  **A.**  Pricing committee could make that request.

15  **Q.**  Okay.

16      You just don't have a name of anyone who made the decision

17  to focus on how much to charge rather than whether to charge?

18  **A.**  I do not.

19  **Q.**  And that person, to the best of your knowledge, did not

20  put in a declaration in support of Apple's opposition,

21  correct?

22  **A.**  That is correct.

23  **Q.**  And to the extent of your knowledge, that person may not

24  even be here in court to offer testimony 'cause you don't know

25  who that is, right?

1    **A.**   That is correct.

2    **Q.**   I want to talk briefly about the -- some of the analysis

3    that you performed in this price committee deck.

4         First of all, you begin in your declaration by stating

5    that Apple's commission has always been set based on Apple's

6    evaluation of the value of its service and the pricing of

7    competitors in comparable platforms.

8         Do you remember stating that?

9    **A.**   Yes I do.

10   **Q.**   That statement is not true, is it, sir?

11   **A.**   Could you rephrase?

12   **Q.**   Yes.  Your statement that Apple's commission has always

13   been set based on Apple's evaluation of the value of its

14   service and the pricing of competitors on comparable platforms

15   is false, isn't it?

16   **A.**   I don't believe so.

17   **Q.**   Okay.

18        You understand that this Court has already found that the

19   30 percent commission that Apple charges for digital good

20   transactions was not set by competition?

21   **A.**   I am not here to dispute the findings of the Court.

22   **Q.**   I'm not asking if you're here to dispute.  I'm asking

23   whether you are aware that the Court has already found that

24   after conducting a three-and-a-half-week trial.

25   **A.**   I was not aware.

1    **Q.**  Were you aware the Court has already found that it was

2    undisputed that Apple chose the 30 percent commission it

3    charges for digital good transaction without regard to or

4    analysis of the costs to run the App Store?

5    **A.**  I was not aware.

6    **Q.**  Do you understand that after the same

7    three-and-a-half-week trial, the Court already found that

8    Apple provided no evidence that the rate it charges bears any

9    quantifiable relation to the services provided by it?

10   **A.**  I was not aware.

11   **Q.**  Do you also understand that contrary to your claim about

12   competitive pricing, this Court has already found that there

13   appears to be no market forces to test Apple's pricing?

14   **A.**  I was not aware.

15   **Q.**  You're not aware that, in fact, the lack of market forces

16   to test Apple's pricing was part of the rationale of this

17   injunction?

18   **A.**  I was not aware.

19   **Q.**  I want to turn to the first portion of your analysis in

20   the declaration, and that begins on paragraph 8 of your

21   declaration.

22       Your declaration, by the way, is under CX-1020 in your

23   binder if you want to look at it.

24       You state that "Apple considered ... the unique stack of

25   products and services provided by Apple's ecosystems to

1    developers," right?

2    **A.**   That is correct.

3    **Q.**   And this section of your declaration is intended to

4    describe the information on the slide of the price deck --

5    price committee deck that is labeled 009.6; is that right?

6                        (Exhibit published.)

7              **THE WITNESS:**  That is correct.

8    **BY MR. EVEN:**

9    **Q.**   Now, your declaration describes four categories of

10   services where you believe Apple provides value to developers.

11   Those are platform technology, developer tools, distribution,

12   and discovery; is that right?

13   **A.**   That is correct.

14   **Q.**   And looking at the values that are on this slide, you see

15   that there are pretty broad ranges here for the buckets, the

16   different buckets, correct?

17                        (Exhibit published.)

18             **THE WITNESS:**  That is correct.

19   **BY MR. EVEN:**

20   **Q.**   And, in fact, if we add up the lowest and highest numbers

21   in each category, the range of values the slide reflects is

22   between 12.3 percent and 92 percent, correct?

23   **A.**   One caveat on the slide that you will find in the bottom

24   left is that you cannot add these categories as --

25   **Q.**   I understand --

```
 1                    (Simultaneous colloquy.)

 2    BY MR. EVEN:

 3    Q.  But my question is very different.  My question is pretty

 4    simple.

 5        If I add all the minimum numbers on the range of each

 6    range, or I add the maximum of the numbers of each range, I

 7    get a range that is between 12.3 percent and 92 percent,

 8    right?  That's just a math question.

 9            THE COURT:  I'm not following how you get your math,

10    Mr. Even.

11            MR. EVEN:  Okay.

12    Q.  So if we take -- on the left-hand side, sir, we see that

13    the rates are 3 to, believe, 16 percent, 4 to 25 percent, 5 to

14    21 percent, correct?

15    A.  For three of the categories.

16    Q.  For three of the categories.

17        If we add those up, they add up to 12 percent, correct?

18    A.  That is correct.

19    Q.  And if I take the lowest number in the top bucket, which

20    is 0.3 percent for platform technology with no demand

21    origination -- or generation, sorry -- that brings me to

22    12.3 percent, the very minimum, correct?

23    A.  That is correct.

24    Q.  And if I add up 30 percent with 10 percent, 25 percent,

25    and 21 percent -- sorry -- with 16 percent, 21, and 25, that
```

1  brings me to 92 percent, correct?

2  **A.**   That is correct.

3  **Q.**   Now, you agree with me that had a range between 12 percent

4  and 92 percent is not very informative?

5  **A.**   That is correct.

6  **Q.**   And it's certainly not a number that can refute or support

7  a fee of 27 percent, correct?

8  **A.**   That is correct.

9  **Q.**   So turning to the next section of your declaration at

10  Exhibit CX-1020 in paragraph 13, you claim that Apple

11  considered the commission rates charged by other integrated

12  marketplace competitors, right?

13  **A.**   That is correct.

14  **Q.**   And here, you claim that the commission rates across

15  market places typically fall between 15 percent and

16  30 percent, right?

17  **A.**   That is correct.

18  **Q.**   And what you're describing here is what's reflected in the

19  slides of the pricing committee deck labeled CX-009.7 and

20  009.8, correct?

21                     (Exhibit published.)

22          **THE WITNESS:**   That is correct.

23  BY MR. EVEN:

24  **Q.**   Now, the 15 to 30 percent number you quote goes to the

25  rate that all of these platforms charge when they handle both

1     distribution section and payments, correct?

2     **A.**   That is correct.

3     **Q.**   Of all the comparables on slides -- on these slides, only

4     three routinely break out distribution and payment solution,

5     and those are Microsoft, Epic, and the ONE Store, correct?

6     **A.**   That is correct.

7     **Q.**   Now, Epic charges nothing when developers use a different

8     payment solution, correct?

9     **A.**   Based on our findings, yes.

10    **Q.**   And Microsoft charges nothing when a developer uses a

11    different payment solution, correct?

12         Do you see that it says "0 percent for non-gaming apps

13    with third-party billing"?

14    **A.**   On the Microsoft store for PC.

15    **Q.**   Correct.

16    **A.**   That is correct.

17    **Q.**   That is the only place where you have an actual price from

18    Microsoft for distribution without payments, correct?

19    **A.**   On this slide; that is correct.

20    **Q.**   And the ONE Store, according to these slides, charges

21    5 percent when developers use a third-party payment solution,

22    correct.

23    **A.**   That is correct.

24    **Q.**   And so the range for fees that are imposed when stores

25    provide distribution but not payments is not between 15 and

1    30 percent, as you say in your declaration, but between 0 and

2    5 percent, correct?

3         Those are the only examples in your slides.

4    **A.**   An additional consideration --

5    **Q.**   Sir, the only numbers that you have for stores that supply

6    distribution but not payments fall in the range of 0 to

7    5 percent, according to your slides, correct?

8    **A.**   Correct.

9    **Q.**   You agree with me that a range of 0 to 5 percent from

10   comparables does not justify a commission of 27 percent?

11   **A.**   I don't believe the range is zero to five.

12   **Q.**   I'm sorry.  I didn't get that.

13   **A.**   I don't believe that the range we were looking at for

14   comparables was zero to five.

15   **Q.**   Okay.

16        You agree with me -- that was not my question.

17        You agree with me that a range of 0 to 5 percent, if that

18   is the range, does not support a comparable of 27 percent,

19   correct?

20   **A.**   If that would be a reasonable range.

21   **Q.**   If that were a reasonable range or the only range that you

22   present in your slides, that cannot justify a fee of

23   27 percent, correct?

24   **A.**   I disagree.

25   **Q.**   You think that a 0 to 5 percent -- you're changing your

1  answer?  Now 0 to 5 percent can justify 27 percent range?

2  **A.**   Zero to 5 percent is not a comparable range for

3  27 percent.

4  **Q.**  Sir, 0 to 5 percent is the only range that you have in

5  your slides.

6       And what I'm saying, if this is the only range in your

7  slides, that range cannot support a fee of 27 percent,

8  correct?

9  **A.**   I'm confused by your question.

10  **Q.**  Sir, my question is very -- is very simple.  If the only

11  range in your slides for stores providing distribution but not

12  payments is 0 to 5 percent, that is the only comparable you

13  have, that comparable cannot support a fee of 27 percent,

14  correct?

15  **A.**   If they were providing the same amount of value --

16  **Q.**  Sir, I didn't choose the comparables in your slides.  You

17  did.

18       The only comparables that you identified charge either 0

19  or 5 percent.  You agree with me that 0 and 5 percent -- a

20  range of 0 to 5 percent does not support a 27 percent fee.

21  Correct?

22  **A.**   Zero to 5 percent is different than 27 percent.

23  **Q.**  In fact, 0 to 5 percent is even different from 12 percent,

24  correct?

25  **A.**   That is correct.

1    **Q.**   In the next section of your declaration in paragraphs 17

2    to 20, you talk about the seven days' window and how Apple

3    analyzed that, correct?

4    **A.**   That is correct.

5    **Q.**   Now, just for context, your recommendation, which Apple

6    adopted, was that any out-of-app purchase made within seven

7    days after purchase link was clicked by the user anywhere will

8    be subject to Apple's linked purchase fee, correct?

9    **A.**   That is correct.

10   **Q.**   And for an -- for example, if a user could click a link on

11   an app today, and then other -- under Apple's rules, any

12   purchase the user makes from the developers on any platform

13   between now and May 15th would be subject to a 27 percent fee,

14   correct?

15   **A.**   That is correct.

16   **Q.**   In paragraphs 17 to 20 of your declaration, you explain

17   how Apple benchmarked that seven-day window, correct?

18   **A.**   That is correct.

19   **Q.**   And in this context, you say that Apple looked at time

20   Windows used by affiliate programs and by advertisers, right?

21   **A.**   That is correct.

22   **Q.**   And I don't want to go into too much detail about what

23   affiliate programs and advertisers do, but you agree with me

24   that, generally speaking, affiliate programs and advertisers

25   are examples where one party, a platform, for instance, or a

1    search engine or an influencer tries to steer users to make

2    purchases from another party, correct?

3    **A.**   Broadly speaking.

4    **Q.**   And in that context, the window needs to be set to

5    determine during what window of time a purchase would be

6    attributed to the steering party, correct?

7    **A.**   That is correct.

8    **Q.**   Apple, by contrast, is not trying to steer user towards

9    out-of-app purchases, correct?

10   **A.**   That is correct.

11   **Q.**   In fact, Apple is trying to deter users from using

12   out-of-app purchases, right?

13   **A.**   Under this recommendation, Apple will allow developers to

14   steer users.

15   **Q.**   I understand that it allows it nominally, but it's trying

16   to deter people from actually using it, correct?

17   **A.**   I disagree.

18   **Q.**   So this has been covered at length.  I don't want the

19   belabor the point.  But you understand, for instance, that

20   Apple does not allow the user to put the purchase link

21   anywhere near the purchase flow?

22   **A.**   The developer or the user?

23   **Q.**   The developer may not put the purchase link in their app

24   anywhere near the purchase flow?

25   **A.**   That is correct.

1    **Q.** And Apple does not allow the developer to use a pop-up or

2    an interstitial to present its purchase link, correct?

3    **A.** That is correct.

4    **Q.** And Apple limits the size and the look and the content of

5    the link, correct?

6    **A.** I believe there are specific guidelines.

7    **Q.** And Apple pops up a scare screen that warns users against

8    following the purchase link, correct?

9    **A.** Can you rephrase that question?

10   **Q.** Sure.

11       Apple pops up a screen that warns users that they're about

12   to go to an external website, that they may not have refunds,

13   that they are going to lose some of their benefits, et cetera,

14   et cetera, correct?

15   **A.** That is correct.

16   **Q.** In other words, Apple is nothing like an affiliate or an

17   advertiser, right?  Apple is taking pains to prevent people

18   from going to the -- to follow the purchase link.  It's not

19   trying to encourage them to do it, correct?

20   **A.** I disagree.

21   **Q.** You believe that Apple treats purchase links the same way

22   that Google, for instance, treats a search advertising -- a

23   search ad?

24   **A.** That's correct.

25              **THE COURT:**  Mr. Even, you're -- now you're defending

1   Google?

2           **MR. EVEN:**  I'm not, Your Honor.  Trust me, I'm not.

3           **THE COURT:**  I get the point.  Let's move on.

4   **BY MR. EVEN:**

5   **Q.**  It was mentioned this morning that prior to January 2024

6   in the Netherlands, Apple also had purchase link entitlements,

7   correct?

8   **A.**  I believe so.

9   **Q.**  Do you know what is the window that Apple selected to use

10  in the Netherlands prior to January 2024?

11  **A.**  I am not aware.

12  **Q.**  You don't know one way or the other whether it's seven

13  days or more or less?

14  **A.**  I do not recall.

15  **Q.**  In the last section of your declaration beginning

16  paragraph 21, you state that Apple estimated the App Store

17  ecosystem indicative profits and losses as well as effective

18  commission on entitlement transactions to arrive at the

19  appropriate commission for linked purchases, correct?

20  **A.**  That is correct.

21  **Q.**  And you begin your testimony in this respect in paragraph

22  22 to 23 of your declaration where you state that Apple does

23  not maintain a fully burdened P&L for individual services and

24  cannot create a fully burdened P&L for the App Store, correct?

25  **A.**  That is correct.

1   **Q.**  Do you understand that that statement has already been

2   found to be false?

3   **A.**  Not here to dispute any prior findings.

4   **Q.**  Sir, this is a predicate of the analysis that you created

5   and that Apple sent you to testify about, and so I'm asking

6   you, do you understand that your statement about Apple's

7   inability to create fully burdened P&L's is false, has already

8   been found to be false?

9   **A.**  I can only speak for the analysis that we have provided

10  here.

11  **Q.**  Sir, you're the VP of finance at Apple, correct?

12  **A.**  I'm a VP of finance at Apple.

13  **Q.**  Okay.

14      And as a VP of finance at Apple, are you not aware that

15  this Court already heard and already rejected very similar

16  testimony from Mr. Cook and Mr. Schiller?

17  **A.**  I can affirm that we do not have a way to systematically

18  create a fully burdened P&L for the --

19  **Q.**  And what I'm asking you is do you understand that Mr. Cook

20  and Mr. Schiller sat where you're sitting today and made the

21  same statement under oath, and this Court has already found

22  these statements to be incorrect?

23          **MR. PERRY:**  Objection, Your Honor.

24          **THE COURT:**  What's the objection.

25          **MR. PERRY:**  I don't think that characterizes the

1    testimony in the trial for Mr. Cook and Mr. Schiller.

2            **THE COURT:**  Let's cut to the chase here.

3        You were required to comply with the injunction, and that

4    means that whether or not you agree with it, you need to

5    comply with it.  So if you don't know what's in it, that's a

6    problem for you.

7        Did you know about the finding or not?

8            **THE WITNESS:**  Your Honor, I did not.

9            **THE COURT:**  Proceed.

10   **BY MR. EVEN:**

11   **Q.**  You nonetheless present your own calculations of -- of

12   Apple's supposed -- or the App Store -- sorry -- margin,

13   correct?

14   **A.**  That is correct.

15   **Q.**  And are you aware that this Court has already found that

16   the App Store margin is over 75 percent?

17           **THE COURT:**  You're under oath.

18           **THE WITNESS:**  As a percentage of revenue?  It's

19   possible that it's that number.  Yes.

20   **BY MR. EVEN:**

21   **Q.**  Sir, that's not what I asked.  I appreciate the answer,

22   but that's not what I asked.

23       I asked when you sat down and drafted a deck -- a deck for

24   the pricing committee to decide how to approach this Court's

25   injunction, you created a P&L for the App Store, correct?

1    **A.**   That is correct.

2    **Q.**   And what I'm asking you is when you created that, were you

3    aware that this Court has already determined that the App

4    Store's fully burdened operating margin is over 75 percent?

5    **A.**   There is a couple of important considerations.

6    **Q.**   Sir, it's a "yes" or "no" question.

7         Were you aware that this Court has made that finding?

8    **A.**   I believe that finding is irrelevant for this analysis.

9                     (Simultaneous colloquy.)

10        **THE COURT:**   That wasn't the question.  You can --

11   Mr. Perry is an excellent lawyer.  He will ask you questions

12   so you can explain what you want to explain.

13        The question is, were you aware, "yes" or "no"?

14            **THE WITNESS:**   Your Honor, I -- I believe that I was.

15            **THE COURT:**   All right.  Then answer the question so

16   we don't have to sit here for a longer period of time.

17   **BY MR. EVEN:**

18   **Q.**   All right.

19        So without getting into the numbers, because I can show

20   them, but they are on slides CX-10, I believe.  CX-009.10.

21   You can look at the numbers.

22        When you put those -- together these numbers for the price

23   committee and then put them in a declaration under oath to

24   this Court, did you understand that the numbers you are

25   presenting are markedly different -- without going to the

1    actual numbers markedly different from the findings of this

2    Court?

3    **A.**   Yes, I do.

4    **Q.**   Okay.

5       You didn't mention that in your declaration anywhere,

6    correct?

7    **A.**   No, I did not.

8    **Q.**   If we go to slide 009.12.

9                        (Exhibit published.)

10   **BY MR. EVEN:**

11   **Q.**   And I believe that one can be on the screen.

12      Here, you calculate some effective commission on

13   entitlement transactions, correct?

14   **A.**   That is correct.

15   **Q.**   Now, the basis for this calculation lies in all the way at

16   the bottom where you say that the financial assumption is

17   50 percent returning customers, correct?

18   **A.**   That is correct.

19   **Q.**   And by "returning customers," that means you assume that

20   50 percent of the people who have clicked on a link and went

21   out to a store once will then return to the store again

22   multiple times without clicking on a link again, correct?

23   **A.**   It's a different assumption.  It assumes that 50 percent

24   of those customers can tap on a link out entitlement would go

25   back and tap again on a link out entitlement.

1   **Q.**  Well, if they tap again, they trigger the 27 percent

2   again, correct?

3   **A.**  That is correct.

4   **Q.**  Yet you arrive at some other calculation -- by some

5   calculation at 18 percent effective rate?

6   **A.**  That is correct.

7   **Q.**  Okay.

8       So you don't -- you make no assumption as to how many

9   customers will return and make additional purchase --

10  purchases outside the seven days?

11  **A.**  We do make an assumption on that.

12  **Q.**  And what is that assumption?

13  **A.**  That is embedded in our calculations.

14  **Q.**  I understand it's embedded.  What's the assumption?  What

15  is the numerical assumption that you make about how many

16  people actually return to make more purchases outside the

17  seven days such that the effective rate goes down 27 percent

18  to 18.

19  **A.**  It's included in some of the assumptions that we have.

20  **Q.**  Sir, I understand it's included.

21      My question is, can you tell me what that assumption is.

22  **A.**  It's a combination of a couple of figures.

23  **Q.**  Sir, let me make it clear -- easier.  This assumption is

24  nowhere on this slide, correct?

25  **A.**  Not on this slide.

1    **Q.**  And it's not in this deck, correct?

2    **A.**  It is on the following slide.

3    **Q.**  Okay.

4        And what is the number that you see on the following slide

5    that makes that assumption?

6                        (Exhibit published.)

7    **BY MR. EVEN:**

8    **Q.**  Just give me the row or the description.  Don't talk to

9    the numbers.

10   **A.**  Under "financial assumptions," you will see foreign

11   numbers.  The last two numbers include the question that

12   you're asking.

13   **Q.**  Okay.  We'll get to those later.

14       You have -- as to those two numbers, you present no study

15   to back up those numbers in this slide deck, correct?

16   **A.**  That is correct.

17   **Q.**  And you included no such study or mention such study in

18   your declaration, correct?

19   **A.**  That is correct.

20   **Q.**  Now, in this slide, we see that the effective commission

21   is the same at 24 hours, 72 hours, and 7 days, correct?

22   **A.**  They round to the same number, correct.

23   **Q.**  So if it's a rounding error, why did you choose the

24   longest window or rather than the middle window or even the

25   shortest window?

1    **A.**   The consideration was what amount of value was similar in

2    these different windows and deciding based on the benchmarking

3    that we had seen, what would be a reasonable window --

4    **Q.**   The benchmark to affiliates and advertiser?

5    **A.**   That is correct.

6    **Q.**   Okay.

7            **THE COURT:**  Mr. Even, you have about five minutes, so

8    I don't know where you -- whether you want to start something

9    or not.

10        Or do you have time to finish?

11          **MR. EVEN:**  I'm not going to have time to finish, I'm

12   afraid, Your Honor.

13          **THE COURT:**  Okay.

14       Is now a good breaking point?

15          **MR. EVEN:**  Sure.

16          **THE COURT:**  All right.

17       Mr. Roman, you are instructed not to have any discussions

18   with any attorneys or any Apple personnel regarding these

19   proceedings until you have been excused from your testimony.

20       Do you understand?

21          **THE WITNESS:**  I do, Your Honor.

22          **THE COURT:**  Okay.

23       If today is any indication, I'm not sure when we are going

24   to get through this.  Given what's at stake, I need to have a

25   comprehensive record.  Apparently I write a lot.  I will try

```
 1    not to write so much the next time.

 2         My schedule is quite jam-packed this May.  And I am

 3    heading into a three- to four-month trial on June 3rd.  The

 4    defense lawyers are asking for a continuance, so they are

 5    hoping that I give them one.  If I do, I will have more time

 6    in June.  If not, my days are limited.

 7         So we'll see where we get on the 10th and the 17th and

 8    then I will let you know when I have time.  And we'll just

 9    take it from there.

10         Okay?

11              MR. EVEN:  Understood, Your Honor.

12              THE COURT:  All right.  We'll stand in recess, then,

13    until Friday.

14              (Proceedings were concluded at 2:13 P.M.)

15                        --o0o--

16                 CERTIFICATE OF REPORTER

17         I certify that the foregoing is a correct transcript

18    from the record of proceedings in the above-entitled matter.

19    I further certify that I am neither counsel for, related to,

20    nor employed by any of the parties to the action in which this

21    hearing was taken, and further that I am not financially nor

22    otherwise interested in the outcome of the action.

23    _____

24         Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25                   Thursday, May 9, 2024
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**