*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 2** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 232 - 407 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, May 10, 2024 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:         Cravath, Swaine & Moore LLP
                       825 Eighth Avenue
                       New York, New York  10019
                  BY:  GARY A. BORNSTEIN,
                       M. BRENT BYARS,
                       YONATAN EVEN,
                       LAUREN A. MOSKOWITZ,
                       BENJAMIN WYLLY,
                       MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1                    A P P E A R A N C E S  (CONT'D.)

 2

 3   For Defendant:            Weil, Gotshal & Manges LLP
                               2001 M Street NW, Suite 600
 4                             Washington, D.C.  20036
                          BY:  MARK A. PERRY,
 5                             JOSHUA M. WESNESKI, ATTORNEYS AT LAW

 6                             Weil Gotshal & Manges LLP
                               1395 Brickell Avenue, Suite 1200
 7                             Miami, Florida  33131
                          BY:  MARK PINKERT, ATTORNEY AT LAW
 8

 9                             Gibson, Dunn & Crutcher LLP
                               333 South Grand Avenue
10                             Los Angeles, California  90071
                          BY:  RICHARD J. DOREN,
11                             JASON C. LO, ATTORNEYS AT LAW

12

13                             Gibson, Dunn & Crutcher LLP
                               1050 Connecticut Avenue, N.W.
14                             Washington, DC  20036-5306
                          BY:  CYNTHIA E. RICHMAN, ATTORNEY AT LAW
15

16

17

18

19                             --o0o--

20

21

22

23

24

25
```

<u>**I N D E X**</u>

FRIDAY, MAY 10, 2024 - VOLUME 2

| <u>**PLAINTIFF'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| ROMAN, ALEX | 238 | 2 |
| DIRECT EXAMINATION (RESUMED) BY MR. EVEN | 238 | 2 |
| CROSS-EXAMINATION BY MR. PERRY | 294 | 2 |
| REDIRECT EXAMINATION BY MR. EVEN | 367 | 2 |
| | | |
| BARNES, NED | | |
| (SWORN) | 379 | 2 |
| DIRECT EXAMINATION BY MR. BYARS | 380 | 2 |
| CROSS-EXAMINATION BY MR. PERRY | 391 | 2 |

--o0o--

```
1    Friday, May 10, 2024                          11:58 a.m.

2                       P R O C E E D I N G S

3                            --o0o--

4         THE CLERK:  Good morning, everyone.  These

5    proceedings are being court-reported by this Court.  Any other

6    recording of this proceeding, either by video, audio,

7    including screenshots or other copying of the hearing is

8    strictly prohibited.

9         Your Honor, now calling the civil matter 20-cv-5640-YGR,

10   Epic Games, Incorporated versus Apple, Incorporated.

11        Parties please step forward, state your appearances for

12   the record.

13        THE COURT:  Mr. Bornstein, welcome back.

14        MR. BORNSTEIN:  Thank you, Your Honor.  I think it's

15   now good afternoon.

16        THE COURT:  No, I still have two minutes.

17        MR. BORNSTEIN:  All right.  Good morning, Your Honor.

18   I'm joined today at counsel table by Yonatan Even,

19   Benjamin Wylly.  In the gallery is Brent Byars, Michael Zaken,

20   and Lauren Moskowitz.

21        MS. MOSKOWITZ:  Good morning, Your Honor.

22        THE COURT:  Good morning.

23        Okay.  Mr. Perry.

24        MR. PERRY:  Good morning, Your Honor.

25        THE COURT:  Good morning.
```

 1            **MR. PERRY:**  I'm joined today at counsel table by Josh

 2   Wesneski; Cynthia Richman; Jason Lowe; and Richard Doren,

 3   counsel for Apple.  We may swap out Mr. Pinkert, Mark Pinkert,

 4   halfway through.  And our corporate representative from Apple,

 5   Mr. Phil Schiller; and Apple's head of litigation, Heather

 6   Grenier.

 7            **THE COURT:**  Okay.  Still good morning.

 8            **MR. PERRY:**  Good morning.

 9            **THE COURT:**  All right.  I understand there's going --

10   or there were discussions among you to change the witness

11   presentation; is that right?

12            **MR. BORNSTEIN:**  That's correct, Your Honor.  We've

13   conferred because of scheduling constraints on some of the

14   witnesses.  So subject to the Court's approval, after

15   Mr. Roman, who's mid-testimony now, we have our expert,

16   Mr. Barnes.

17       And it is our understanding based on the pretrial order in

18   this matter, Your Honor, that the witness exclusion rule

19   should not apply to Mr. Barnes as an expert.  We discussed

20   that with Apple who had no objection.  So unless the Court has

21   any concerns, Mr. Barnes will be present for the testimony

22   today.

23            **THE COURT:**  That's fine.

24            **MR. BORNSTEIN:**  And after Mr. Barnes, we have

25   Mr. Oliver of Apple.

1          And if by some miracle we get through all that, we can't

2     have Mr. Schiller because of our agreement with Apple not to

3     hang him over the week, but so that we don't have any dead

4     air, we would then go ahead to Mr. Simon.

5          **THE COURT:**  Okay.  That's fine.

6          So we will go -- it's noon.  We'll go until 4:30 today.  I

7     understand that they're doing a system upgrade, and if we are

8     not done, then it -- none of this will be recorded, we may

9     have mics, I don't know if we'll have lights.

10         The other thing is given security protocols, if I don't

11    have you out of here by 5:00, you'll have to go in a very

12    roundabout way to get out of the courthouse building.  So

13    we'll finish by 4:30.  Everybody has to be out of the building

14    before 5:00 o'clock.  So if we go a few minutes over, that's

15    fine, but we need to make sure that you're packed up and out

16    by 5:00.

17         I did do some rearranging of my criminal calendar and

18    found another block for you next Thursday.  And we'll continue

19    to look at my calendar to see if I can get this in before my

20    criminal trial starts.

21         **MR. BORNSTEIN:**  Thank you, Your Honor.  We appreciate

22    that.

23         **THE COURT:**  Okay.  All right.  Let's get the witness

24    back and we'll keep going.

25         **MR. PERRY:**  May I step out to get him, Your Honor?

1       He's in the hall.

2                 THE COURT:  Yes, thank you, Mr. Perry.

3            Mr. Even, good afternoon.

4                 MR. EVEN:  Good afternoon, Your Honor.

5            Your Honor, if we may bring up a supplemental binder and

6       put the binders up with the witness.

7                 THE COURT:  You may.

8            Okay.  You may be seated, Mr. Roman.  Good afternoon.

9                 THE WITNESS:  Thank you.  Good afternoon, Your Honor.

10                THE COURT:  You understand you're still under oath.

11                THE WITNESS:  Yes.

12                THE COURT:  All right.  You may proceed when you're

13      ready.

14                MR. EVEN:  Thank you, Your Honor.

15

16                          **ALEX ROMAN**,

17      called as a witness for the PLAINTIFF, having been duly sworn,

18      continued testifying as follows:

19                      **DIRECT EXAMINATION** (Resumed)

20      BY MR. EVEN:

21      Q.  Good afternoon, Mr. Roman.

22      A.  Good afternoon.

23      Q.  Are you ready to proceed with the rest of your

24      examination?

25      A.  Yes, I am.

1  **Q.**  So if you turn, you will see or you should see before you

2  that you now have two binders, a big one and a small one.  Do

3  you see that?

4  **A.**  Yes.

5  **Q.**  And the small one contains some additional documents.  The

6  main one that is going to be of import for our examination now

7  is marked 0009A.

8  **A.**  Um-hmm.

9  **Q.**  You see that?

10  **A.**  (Reviewing document.)

11     Um-hmm.  Yes.

12  **Q.**  Yes.

13     And 009A is essentially the same price committee deck that

14  we discussed last time, correct?

15  **A.**  Correct.

16  **Q.**  And the only change you will see there is that there are

17  some highlightings.  The highlightings mark the portions about

18  which we are not allowed to speak out loud in public, and so I

19  will refrain from mentioning the numbers and words that are

20  covered in highlighting and I ask you do the same.

21     So we left off on Wednesday talking about the slide marked

22  009.12.  You remember that?

23                    (Exhibit published.)

24          **THE WITNESS:**  (Reviewing document.)

25     Yes, I do.

 1   BY MR. EVEN:

 2   Q.  And this slide shows your projections of an 18 percent of

 3   what you called an effective commission for linked purchases

 4   were Apple to adopt a 27 percent commission rate and a

 5   seven-day window, right?

 6   A.  That is correct.

 7         THE COURT:  And do you want this publicized?  Do you

 8   want it on the monitors?

 9         MR. EVEN:  Yes.  Thank you, Your Honor.  The monitors

10   will show the redacted version.

11         THE COURT:  That's fine.  I just -- other people

12   couldn't see it.  That's all.

13       Go ahead.

14         MR. EVEN:  Thank you, Your Honor.

15   Q.  And you mentioned on Wednesday that some of the

16   assumptions that went into this figure are presented in the

17   following slide, correct?

18   A.  That is correct.

19   Q.  So let's take a look at the next slide, and that's 009.13,

20   to see how Apple and you got to this 18 percent effective

21   commission rate.

22                         (Exhibit published.)

23   BY MR. EVEN:

24   Q.  Let's start by talking about entitlement billing, which is

25   the first line.  Do you see that?

 1   **A.**   Yes, I do.

 2   **Q.**   And entitlement billing is the projected annual value of

 3   all the transactions that users will make outside of the app

 4   at any point in time so long as such transactions were made

 5   after the user clicked on an external purchase link, correct?

 6   **A.**   That is correct.

 7   **Q.**   And in this slide, to get to this entitlement billings

 8   number, you begin your journey with the total United States

 9   App Store billings number, correct?

10   **A.**   That is correct.

11   **Q.**   And we can see that number if we look at CX-009.10,

12   correct?

13   **A.**   One clarification.  On Slide -- or on dot ten, this is the

14   baseline of the billings for fiscal year '23.

15          **THE COURT:**  Okay.  I want to you move that mic closer

16   to you, or you can move closer to it.  All right.

17      So you said back on .10A -- repeat what you just said.

18          **THE WITNESS:**  This is the U.S. portion of -- or this

19   is fiscal year '23 figures which is our baseline from which

20   comparisons would be derived.

21   **BY MR. EVEN:**

22   **Q.**   Understood.

23   **A.**   And entitlement billings on dot 13, we rolled that two

24   years into the future as we assume that there is going to be a

25   ramp.  So the numbers come from dot ten, but there is a

 1    calculation in the middle.

 2    **Q.**  Okay.

 3    **A.**  Or right at the starting point.

 4    **Q.**  All right.  And that calculation is not reflected anywhere

 5    in this slide deck, correct?

 6    **A.**  It is not.

 7    **Q.**  Okay.

 8        Ballpark, we can assume that you started your journey with

 9    the number at the top row marked App Store Billing under the

10    heading U.S. and on Slide 10?

11    **A.**  That is correct.

12    **Q.**  Okay.

13        Going back to Slide 009.13, what you did to get to the

14    entitlement billings on this slide is, first of all, you

15    multiplied the total billings number by -- well, it's a

16    two-step process, right?  You multiplied by two of your

17    financial assumptions, correct?

18    **A.**  That is correct.  And there is one additional step but --

19    roughly speaking, yes.

20    **Q.**  Okay.  Let's go through these -- through these

21    calculations.

22        So first of all, you multiplied the total billings by the

23    rightmost assumption on this page that is highlighted, and we

24    can't speak to the number, correct?

25    **A.**  Correct.

1    **Q.**   And that assumption on the right is your team's assumption

2    as to what portion of App Store billings will be made through

3    apps that have a purchase link option, correct?

4    **A.**   Not exactly.

5    **Q.**   Sir, if I understand correctly, the assumption here is

6    that that portion on the rightmost-hand side reflects the

7    proportion of billings that will go through apps or through

8    developers with apps that have adopted a purchase link,

9    correct?

10   **A.**   Almost.

11   **Q.**   And your correction is...?

12   **A.**   This would be the universe of all apps and billings going

13   through those apps that would enable the linkout entitlement.

14   **Q.**   Okay.  So roughly speaking, and I understand that

15   purchases are not evenly distributed, but roughly speaking

16   that number shows, ballpark, your assumption as to the

17   proportion of eligible developers that will implement a

18   purchase link in their app, correct?

19   **A.**   That is correct.

20   **Q.**   And eligible developers in this context is every developer

21   that has an app on the U.S. App Store front that offers in-app

22   purchases of digital goods and services, right?

23   **A.**   That is correct.

24   **Q.**   So without saying the number out loud, Apple's assumption

25   here is that a significant majority of eligible developers

1    will actually adopt and implement a purchase link in their

2    app, correct?

3    **A.**   That is correct.

4    **Q.**   Now, you do not present here any study or data to support

5    that assumption about adoption by a majority of developers,

6    correct?

7    **A.**   That is correct.

8    **Q.**   And you did not actually conduct any study to support that

9    assumption, did you?

10   **A.**   No, we did not.

11   **Q.**   Did your team come with that assumption by itself?

12   **A.**   In collaboration with the other people preparing this

13   deck, yes.

14   **Q.**   Okay.

15       But with no data to support it, correct?

16   **A.**   That is correct.

17   **Q.**   Okay.

18       Next, you multiply the product by the number showing in

19   the next assumption to the left, correct?

20   **A.**   That is correct.

21   **Q.**   And that number is the percentage of billings that Apple

22   estimated would be made outside the app rather than in the app

23   for apps implementing a purchase link, correct?

24   **A.**   Almost.

25   **Q.**   Well, let me ask it differently.

 1      Do you agree with me that at least as a ballpark, and I

 2   understand that purchases, just like sales, are not evenly

 3   distributed across users, but roughly speaking, this number

 4   reflects the proportion of the users that Apple estimated will

 5   click the purchase link if given the option, correct?

 6   **A.**   Roughly speaking, that's correct.

 7   **Q.**   So without saying that number out loud, Apple's assumption

 8   here is that even when the apps have the option, substantially

 9   less than half of all users making purchases in apps utilizing

10   purchase links would actually utilize those purchase links as

11   opposed to IAP, correct?

12   **A.**   That is correct.

13   **Q.**   You did not present any study or data supporting that

14   assumption in any way, correct?

15   **A.**   That is correct.

16   **Q.**   And you did not actually conduct any study to support that

17   assumption, correct?

18   **A.**   That is correct.

19   **Q.**   That's another assumption that you and your team

20   essentially made up, correct?

21   **A.**   That is correct.

22          **THE COURT:**   Now, what would help me, Mr. Even, just

23   because I'm sure I'm going to have to go back to the

24   transcript, is that perhaps we could number these blocks.  And

25   by that, I mean you have here on the screen dollar

1    projections.

2              **MR. EVEN:**  Yep.

3              **THE COURT:**  And underneath that, we have six blocks.

4    Maybe we could identify, you know, when we're talking about

5    them, talk about them as block one, two, three, four, five,

6    six.

7              **MR. EVEN:**  I will try to do that, Your Honor.

8              **THE COURT:**  Just because I'm -- it's hard to just

9    follow.

10             **MR. EVEN:**  Understood, Your Honor.  I will do my

11   best.

12             **THE COURT:**  Okay.  Thank you.

13   BY MR. EVEN:

14   **Q.**  So just to recap where we are right now, we took the

15   number on Slide 10, we multiplied it by the first financial

16   assumption, which is the rightmost financial assumption.  And

17   then we multiplied that by the second financial assumption.

18   And that lands us on what is block number 1, entitlement

19   billings, on Slide 13, correct?

20   **A.**  Roughly speaking.

21   **Q.**  And the roughly speaking is because we didn't actually

22   take the number at Slide 10, but we projected it forward by a

23   couple of years.

24   **A.**  That is correct.

25   **Q.**  Okay.  So now let's take a look at the next row on this

1   chart which is labeled "Commission on 100 percent of

2   entitlement billings."  Right?

3   **A.**  That is correct.

4   **Q.**  And this represents the commission that Apple estimated it

5   would have collected on linked purchases if there were no

6   seven-days window, meaning that it would continue to collect

7   the link purchase fee on out-of-app purchases in perpetuity,

8   correct?

9   **A.**  Not precisely.

10  **Q.**  What am I missing?

11  **A.**  The way I would describe it is these would be the

12  commissions that Apple would collect if there would be no

13  entitlement or no link out.  In normal course, this would be

14  the commission that Apple would collect.

15  **Q.**  Okay.  This would be the commission that Apple would

16  collect on purchases outside of the app, correct, at

17  27 percent?

18      Let me state it differently.

19      What you mean to say is if these purchases were just made

20  inside the app and we had a 27 percent and a 12 percent fee on

21  those instead of 30 and 15, that is the commission we would

22  have expected to collect, correct?

23  **A.**  That is correct.

24  **Q.**  All right.  You agree with me that that is the same like

25  saying I would just -- strike that.

ROMAN - DIRECT / ALEX

1        You agree with me that that is the same as saying this is

2    the commission that Apple would expect to charge on out-of-app

3    purchases assuming that it had hundred percent collection

4    and -- and no time limit -- no window?

5    **A.**  They would be very similar.

6    **Q.**  Okay.  And then to the right you show a percentage which

7    you call here effective commission, correct?

8    **A.**  That is correct.

9    **Q.**  And that percentage is showing the blended average between

10   purchases that Apple says would be at 27 percent and purchases

11   that would be at 12 percent, and that would be the effective

12   average commission, correct?

13   **A.**  That is correct.

14   **Q.**  All right.  Then you go to the next line and you are

15   talking about loss due to lower billings on -- in seven-day

16   attribution window, correct?

17   **A.**  That is correct.

18   **Q.**  This row, which is row 3, is Apple's projection for what

19   percentage of out-of-app purchases made after user clicked on

20   a link would take place more than seven days after the link

21   was clicked, correct?

22   **A.**  That is correct.

23   **Q.**  And so without stating the number out loud, you are

24   estimating here that most purchases made following the use of

25   a purchase link would be made outside of the seven-day window,

1    correct?

2    **A.**  That is correct.

3    **Q.**  I'll get back to this assumption in a second, but let's

4    first look at the rest of the slide.

5         So the next line, line 4, projected revenue, that is the

6    commission that Apple estimated it would collect if all future

7    sales are via direct web, meaning the user never goes back and

8    clicks the link again but keeps making purchases outside of

9    the app, correct?

10   **A.**  That is correct.

11   **Q.**  And that figure is just calculated by subtracting --

12   subtracting -- sorry -- row 3 from row 2, correct?

13   **A.**  That is correct.

14   **Q.**  And then the next two rows show an adjustment that Apple

15   is making by assuming that for future transaction, 50 percent

16   of users would actually click on the in-app link again,

17   correct?

18   **A.**  That is correct.

19   **Q.**  And that's what the 50 percent returning customer means in

20   the financial assumptions at the bottom of the slide, correct?

21   **A.**  That is correct.

22   **Q.**  In other words, if a user clicks a link in a game, for

23   instance, or in an app to buy some content on the web, and

24   then a month later they want to buy more of that content, your

25   assumption here is that there's a 50/50 chance that the user

1   will do that by going back into the app to click on the link

2   again rather than just going back to the developer's website,

3   correct?

4   **A.**   That is correct.

5   **Q.**   And you made this 50/50 estimate even though within the

6   app, developer is not allowed to ask the user or remind the

7   user, please don't click the app, that costs me a lot of

8   money.  The developer's not allowed to say that to users in

9   the app, correct?

10  **A.**   I am not sure.

11  **Q.**   You don't know the rules about what developers can tell in

12  the external link within the app?

13  **A.**   Not sure how developers would implement.

14  **Q.**   Okay.  And you made this assumption even though if

15  developer does not really have any way to incentivize the user

16  not to click the purchase link again, correct?

17  **A.**   That is correct.

18  **Q.**   And you also have -- as with your other assumptions, you

19  did not present any study or data to support your assumption

20  that most users would -- that most purchases would be made

21  outside of the seven-day window or that only 50 percent of

22  users would reclick on the purchase link?

23  **A.**   That is correct.

24  **Q.**   And you did not actually conduct any study to support

25  those assumptions, did you?

1    **A.**  No, we did not.

2            **THE COURT:**  Who -- who fed you your assumptions, if

3    anyone?  Because I don't understand how you can make

4    assumptions without understanding how the link entitlement

5    works.

6            **THE WITNESS:**  Your Honor, we usually have to make

7    assumptions when we don't have a good precedent.  In this

8    case, we met as a team and we debated around what would be the

9    potential outcomes that this could have.

10        There is inherent risk in our assumptions, but we all felt

11   that the answer could be close to the assumptions that we used

12   for these financial models.

13           **THE COURT:**  Don't you have to understand how the link

14   works to gauge your assumptions?

15           **THE WITNESS:**  Yes.

16           **THE COURT:**  But you just testified you did not

17   understand how the link worked.

18           **THE WITNESS:**  We relied on our business team to give

19   us that guidance.

20           **THE COURT:**  Proceed.

21   BY MR. EVEN:

22   **Q.**  Let's go back to Slide 9.12 for a second, okay?

23   **A.**  (Reviewing document.)

24   **Q.**  Because now we can understand it a little better.

25        First of all, the reason that the rate is 18 percent at

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1  24 hours, 72 hours, and seven days is because Apple assumes

 2  without any evidence that after an initial spike of purchases

 3  immediately after a link is clicked, there would be a very

 4  long tail of future purchases, most of which would occur

 5  outside the seven-day window, correct?

 6  **A.**  For that specific statement, we do have data that outlines

 7  for us what percentage of purchases is conducted in these time

 8  periods.

 9  **Q.**  You have data on what -- I just asked you that question

10  and you said you had no data and conducted no study that

11  allowed you to assume that most purchases are going to be made

12  outside of the seven-days window.  Are you changing that

13  testimony now?

14  **A.**  I understood your question to refer to other assumptions.

15  **Q.**  Okay.  So you are changing your testimony.  You're now --

16  now you have data that supports that most of the purchases are

17  going to be made after more than seven days without

18  reclicking?

19  **A.**  There is a difference between those two.

20  **Q.**  Okay.  Let me break that one by one.

21      Is your testimony now that you can support or you had

22  support, you believe, for the assumption that more than half

23  of purchases would be made outside of the seven-day window

24  after users clicked?

25  **A.**  Can you rephrase that question, please?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    Q.   No.   The question is very clear.   It's your testimony.

2    You are now telling me if -- contrary to what you told me two

3    minutes ago, that in fact you did have data supposedly

4    supporting the assumption that more than half of purchases are

5    going to be made after the seven-day window.

6    A.   Those data points we do have.

7    Q.   Okay.   You did not present those data points in any of

8    your -- in your declaration or in this deck, correct?

9    A.   That is correct.

10   Q.   And you still stand by your testimony that you had no

11   basis for the assumption that 50 percent of the people will

12   actually click again, correct?

13   A.   That is correct.

14   Q.   And you mentioned in response to the Court's question that

15   you obtained some data from the business team; is that what

16   you said?

17   A.   We discussed our assumptions with our business management

18   team.

19   Q.   Who is the business management team that you discussed

20   your assumptions with?

21   A.   This is a team that supports the App Store.

22   Q.   I need names, sir.   Who is on that team?

23   A.   Mr. Oliver.

24   Q.   Anyone else?

25   A.   There were several individuals involved.   Mr. Oliver and

1    Mr. Kim would have been the primary ones.

2    **Q.**   What is Mr. Kim's first name?

3    **A.**   Timothy.

4    **Q.**   Looking at this 18 percent number, now that we understand

5    the analysis, contrary to what the slide shows, your analysis,

6    even if it were somehow reliable, does not in fact suggest

7    that the effective commission rate for a developer subject to

8    a 27 percent fee would be 18 percent, correct?

9    **A.**   I disagree.

10   **Q.**   The slide doesn't show that a developer with a

11   27 percent -- subject to a 27 percent fee would in fact have

12   an effective fee of 18 percent, right?  The slide instead

13   suggests that Apple, on average, would see an 18 percent fee

14   because it imposes both a 27 percent fee and a 12 percent fee,

15   correct?

16   **A.**   It is my estimation that developers would observe this

17   commission rate, effective commission rate.

18   **Q.**   Sir, that effective commission rate is a weighted average

19   of what developers subject to 27 percent and developers

20   subject to 12 percent would see, correct?

21   **A.**   In addition to the billings that would occur after seven

22   days.

23   **Q.**   Sir, that 18 percent is a weighted average of the overall

24   effective commission that Apple would charge assuming a

25   27 percent standard fee and 12 percent reduced fee, correct?

1    **A.**   I believe the number that you're referring to is stated on

2    the following slide.

3    **Q.**   Sir, the following slide showed us a calculation that

4    assumed a weighted average between 27 percent and 12 percent,

5    correct?

6    **A.**   Correct.

7    **Q.**   And that's how you got to 18 percent, correct?  In

8    addition to other things, part of getting to 18 percent was

9    having a weighted average between 27 percent and 12 percent,

10   correct?

11   **A.**   That is correct.

12   **Q.**   And so a developer that's subject to a 12 percent fee

13   would actually see some kind of fee that's between 12 and 18,

14   and a developer that's subject to 27 percent would see some

15   kind of fee that's between 18 and 27 even if all your

16   assumptions were somehow real, correct?

17   **A.**   Almost.

18   **Q.**   You don't show anywhere in this slide deck what would be

19   the effective rate that would be seen by a developer that is

20   subject to a 27 percent fee even if all your assumptions were

21   correct; is that right?

22   **A.**   That is correct.

23   **Q.**   Let's turn to the slide labeled CX-009.14 and see what you

24   did in addition to this with your assumptions.

25                       (Exhibit published.)

1    BY MR. EVEN:

2    **Q.**  So this slide contains two different charts showing the

3    supposed projected impact on Apple's revenue and gross margin

4    of different standard commission rates and duration windows,

5    correct?

6    **A.**  That is correct.

7    **Q.**  And at the bottom of this chart, there are four financial

8    assumptions, correct?

9    **A.**  That is correct.

10   **Q.**  Two of those are the same as what we just looked at, at

11   the -- on Slide CX-009.13, correct?

12   **A.**  That is correct.

13   **Q.**  And the chart itself, what it shows us is essentially a

14   matrix saying, for instance, at a 27 percent rate with a

15   seven -- with a seven-days window, Apple will see a decline in

16   revenue of the number that's showing in white there, correct?

17   **A.**  That is correct.

18   **Q.**  And Apple will see a decline in margin as a percentage in

19   the numbers that are shown in red, correct, on the right-hand

20   side?

21   **A.**  That is correct.

22   **Q.**  So let's again begin with the assumption to the far right.

23   As we said, that assumption reflects your estimate that a

24   substantial majority of developers would implement a purchase

25   link within their apps, correct?

1   **A.**   That is correct.

2   **Q.**   And we have one number for that assumption here, correct?

3   **A.**   That is correct.

4   **Q.**   And so the assumption you applied here is that the same

5   substantial majority of developers would implement purchase

6   links within their apps regardless of the fee that Apple

7   imposed, whether it's 20 percent, 23 percent, 25 percent,

8   27 percent, 30 percent, adoption rate would remain constant,

9   correct?

10  **A.**   That is correct.

11  **Q.**   In other words, you did not assume that a lower fee would

12  encourage adoption.

13  **A.**   We assumed that --

14  **Q.**   Sir, you did not assume that a lower fee would encourage

15  adoption, correct?  You assumed that adoption would remain

16  constant regardless of the fee.

17  **A.**   That is correct.

18  **Q.**   And you did not assume that a high fee would deter

19  adoption, did you?

20  **A.**   Within this range, that is correct.

21  **Q.**   So you just ignored any effect pricing might have on

22  demand in this case.  You assumed it away.

23  **A.**   Given the benefit, we assumed that it would be similar

24  across the range.

25  **Q.**   Sir, you ignored any effect pricing might have on demand

 1    in this range, correct?  You assumed a constant adoption rate.

 2    **A.**   That is correct.

 3    **Q.**   Now, you have an MBA, right?

 4    **A.**   That is correct.

 5    **Q.**   You understand what is a demand curve?

 6    **A.**   I am familiar.

 7    **Q.**   You understand that generally speaking when prices go up,

 8    demand goes down?

 9    **A.**   Yes.

10    **Q.**   And you understand that when prices go down, demand goes

11    up?

12    **A.**   Usually.

13    **Q.**   And you understand that in general, in companies that sit

14    down to conduct pricing exercises, one of the most important

15    considerations is what is the demand curve we are facing,

16    right?  How do we price on the demand curve, right?

17    **A.**   That is correct.

18    **Q.**   But here you just assumed all of that away.

19    **A.**   That is correct.

20    **Q.**   Let's move to the next assumption which was your

21    assumption concerning how many users would click a purchase

22    link if given the option, right?

23    **A.**   That is correct.

24    **Q.**   And here, Apple is assuming that the same portion of users

25    will click a purchase link no matter what the standard

1   commission rate is, correct?

2   **A.**   That is correct.

3   **Q.**   Now, you understand that if a developer has to pay a high

4   fee to Apple on linked purchases, the developer could offer a

5   small discount, if any discount, on purchase links, correct?

6   **A.**   That is correct.

7   **Q.**   And if a developer were to pay Apple no fee or a low fee,

8   they could offer a larger discount to users, correct?

9   **A.**   At their discretion.

10   **Q.**   At their discretion, they could offer lower prices to

11   users if their costs went down, correct?

12   **A.**   They have that choice, that is correct.

13   **Q.**   And you understand that the discount the developer could

14   offer users would affect how many users would actually click,

15   correct?

16   **A.**   It could.  Correct.

17   **Q.**   It could, you said?  Okay.

18        This is again demand curve, correct?

19   **A.**   That is correct.

20   **Q.**   If price goes up, less people click, correct?

21   **A.**   That is correct.

22   **Q.**   And if price goes down, more people click, right?

23   **A.**   That is potentially true.

24   **Q.**   In fact you told us yesterday that you fully understood

25   that the idea here is that developers could offer lower prices

1   to users, right?

2   **A.**   That is correct.

3   **Q.**   But you just assumed that users would click at the very

4   same rate no matter if somebody offers them a 10 percent, a

5   5 percent, a 1 percent, or no discount, they will click at the

6   same rate.

7   **A.**   Depending on the developer choices.

8   **Q.**   No.   Depending on what you elected as the fee.

9   **A.**   Some developers -- or developer strategies will vary.

10  **Q.**   Sir, I'm not asking about developer strategies, and I

11  don't, with respect, think that you are qualified to speak to

12  developer strategies.

13       What I'm asking you is about your pricing exercise.   Your

14  pricing exercise assumed away the demand curve, assumed the

15  developers will not pass on any savings, and that the

16  developers' cost structure is not going to affect demand for

17  the developers' out-of-app purchases at all, correct?

18  **A.**   That is correct.

19  **Q.**   And just so we're crystal clear, your chart here goes all

20  the way up to 30 percent, correct?

21  **A.**   That is correct.

22  **Q.**   And so we're crystal clear, a predicate of the analysis

23  that Apple supposedly relied on and then submitted to this

24  Court is that there will be large-scale adoption of link

25  entitlement by developers even if Apple imposed a 30 percent

 1   fee on linked purchases, making linked purchases, by

 2   definition, more expensive to developers than IAP, correct?

 3   **A.**   I disagree.

 4   **Q.**   You disagree.  Okay.

 5       Apple has not presented any analysis in this Court showing

 6   that any developer would actually adopt linked entitlements at

 7   30 percent, correct?

 8   **A.**   That is correct.

 9   **Q.**   In fact, that same is true for 27 percent, correct?

10   **A.**   That is correct.

11   **Q.**   And Apple also has not offered any testimony from any

12   developer that intends to adopt link entitlements at the

13   current fee level, correct?

14   **A.**   I am not aware.

15   **Q.**   So I want to go back to that.  But before we do, let's

16   finish off the slide deck for a second.

17       So go to Slide 15, the next slide.

18                       (Exhibit published.)

19   **BY MR. EVEN:**

20   **Q.**   And here, we see your recommendation about program

21   eligibility, correct?

22   **A.**   That is correct.

23   **Q.**   And your recommendation is that developers that are

24   subject to the video partner program and the news partner

25   program will not be eligible, correct?

1   **A.**   That is correct.

2   **Q.**   And developers who are subject to those programs have a

3   standard rate of 15 percent instead of 30 percent, correct?

4   **A.**   That is correct.

5   **Q.**   In other words, if a subscription video app like *Disney*

6   *Plus* or a newspaper developer like the *New York Times* wants to

7   use external purchase links in their app, they will no longer

8   be eligible for the 15 percent commission for in-app

9   purchases, correct?

10  **A.**   That is correct.

11  **Q.**   Instead they will have to pay Apple twice, 30 percent, for

12  in-app purchases, correct?

13  **A.**   If they chose that, correct.

14  **Q.**   The price committee deck provides no explanation on why

15  you recommended that the video and news program members not be

16  eligible for external links, correct?

17  **A.**   That is something that is not part of the deck.

18  **Q.**   We looked at the language of the Court's injunction

19  yesterday, correct?

20  **A.**   That is correct.

21  **Q.**   Can you direct me -- I think it's in Slide 2 or 3 -- can

22  you direct me to the part of the Court's injunction that

23  permits Apple to double the IAP commission on any video or

24  news developer that chooses to steer users outside the app?

25  / / /

1    **A.**   (Reviewing document.)

2         I do not know.

3    **Q.**   Who told you that it's okay for Apple to determine

4    eligibility terms for benefits that Apple was directed by the

5    Court to provide to developers?

6         **MR. PERRY:**   Objection, Your Honor.   Calls for a legal

7    conclusion.

8         **THE COURT:**   Other than your lawyer.   You can answer

9    the question.

10        **THE WITNESS:**   In conjunction with our business team

11   and our legal team, we arrived at that determination.

12   **BY MR. EVEN:**

13   **Q.**   Who is it on the business team that told you that it's

14   okay for Apple to determine that certain developers would be

15   subject to a doubling of their IAP rates if they choose to

16   steer.

17   **A.**   We did not discuss that.

18   **Q.**   Sir, that is what you recommended.   It's your deck.   You

19   recommended that, right?   You recommended that people who have

20   a 15 percent fee would be subject to a penalty of doubling

21   their fee if they choose to steer.

22   **A.**   That's not how we discussed it.

23   **Q.**   You understand that's how it is, though, right?

24   **A.**   I do not know.

25   **Q.**   You don't know.

1              Well, if you were the *New York Times*, isn't that how you

2      would view this?

3      **A.**  I do not know.

4      **Q.**  You don't know.  Okay.

5              Did you ask anyone how come some developers are not

6      eligible to the benefits of a court-mandated injunction?

7      **A.**  We developed our recommendation in conjunction with our

8      business team and our legal team.

9                  **THE COURT:**  What factors did you discuss that led you

10     to distinguish between someone -- well, that led you to make

11     any distinguishing whatsoever?  What were the factors that you

12     discussed in making the determination to separate these

13     groups?

14                 **THE WITNESS:**  Your Honor, Mr. Oliver might be better

15     qualified --

16                 **THE COURT:**  You tell me what you discussed with them.

17     I don't -- I'll hear from him too.  I want to know what you

18     said and what you were part of those discussions.

19                 **THE WITNESS:**  Your Honor, the video partner program

20     and the news partner program offer deep integration with other

21     technologies and other operating systems.

22             For instance, the video partner program offers integration

23     with TBOS and the TV app and allows for content to be surfaced

24     in those platforms.  And it has a deeper integration overall

25     with the platform and with our offering.

 1          And we felt that in the spirit of the program, it was

 2     different than what this program was meant to represent

 3     compared to the entitlement.

 4          The same applies for the news partner program which offers

 5     a format for news publishers to provide their content in the

 6     news app which has its own benefits as well.

 7          **THE COURT:**  I don't recall receiving any indication

 8     from Apple to have permission to make a distinguish -- to

 9     distinguish between apps.  Did you discuss that?

10          **THE WITNESS:**  I did not discuss that.

11          **MR. EVEN:**  May I proceed, Your Honor?

12          **THE COURT:**  You may.

13          **MR. EVEN:**  Thank you.

14     **Q.**  Having gone through your deck I'd like to briefly talk

15     about what Apple did not do as part of the price committee

16     process.

17          So go back to Slide 009.6.

18                         (Exhibit published.)

19     **BY MR. EVEN:**

20     **Q.**  Do you have that?  It's also on your screen.  This one is

21     not redacted.

22     **A.**  (Reviewing document.)

23     **Q.**  Do you see it?

24     **A.**  Yes, I see it.

25     **Q.**  And as we discussed on Wednesday, for this bottoms-up

1    analysis that you've done, Apple identified and quantified

2    four categories of value, platform technology, developer

3    tools, distribution, and discovery, correct?

4    **A.**   That is correct.

5    **Q.**   Then Apple identified but refrained from qualifying --

6    from quantifying -- sorry -- the value of the payment services

7    delivered by Apple for developers using IAP, correct?

8    **A.**   That is correct.

9    **Q.**   And that shows up at the very bottom, and it specifically

10   says no valuation exercise undertaken, correct?

11   **A.**   That is correct.

12   **Q.**   Now because Apple decided not to assess the value of IAP

13   in this context, the price committee deck also does not

14   include any assessment of the cost to Apple of providing the

15   IAP solution to developers, correct?

16   **A.**   It is not discussed specifically.  It is part of our

17   underlying financial projections.

18   **Q.**   I understand you have a general P&L and somewhere in there

19   there's IAP, but there's no slide here that analyzes and says

20   we think IAP costs us X, correct?

21   **A.**   That is correct.

22   **Q.**   And because Apple did not set out to assess the value of

23   IAP, Apple also did not look at comparables to estimate the

24   costs of alternative payment solutions that developers will

25   need to procure to facilitate linked purchases, correct?

```
 1    A.   That is correct.

 2    Q.   Was it your decision to refrain from making any assessment

 3    of the value or cost of the payment solution and related

 4    services Apple provides through IAP?

 5    A.   No, it was not.

 6    Q.   Whose decision was that?

 7    A.   Our business team.

 8    Q.   Who derivative at the business team?  I need a name.

 9    A.   Mr. Oliver.

10    Q.   Mr. Oliver decided that?

11    A.   We did not include it in our benchmarking exercise.

12    Q.   I understand.

13                        (Simultaneous colloquy.)

14    BY MR. EVEN:

15    Q.   Was that a decision that was taken by Mr. Oliver?

16    A.   That is correct.

17    Q.   Okay.  Who is it that made the decision not to try to

18    assess how much it would cost developers to obtain alternative

19    payment systems for their purchase links?

20    A.   I do not recall.

21            THE COURT:  Can you tell me -- you said you were vice

22    president of finance.  Right?

23            THE WITNESS:  Yes, Your Honor.

24            THE COURT:  And you emphasized "a."  How many are

25    there?
```

1          **THE WITNESS:**  There is a few.

2          **THE COURT:**  How many, ballpark?

3          **THE WITNESS:**  Five.

4          **THE COURT:**  And to whom do you report?

5          **THE WITNESS:**  To our chief financial officer.

6          **THE COURT:**  Mr. Oliver is called a senior director.

7    In the hierarchy of Apple, is a vice president more senior

8    than a senior director or vice versa?

9          **THE WITNESS:**  A vice president is more senior.  But

10   at Apple, we don't pay that much attention to that hierarchy,

11   Your Honor.

12         **THE COURT:**  To whom does Mr. Oliver report?

13         **THE WITNESS:**  To Mr. Fischer.

14         **THE COURT:**  Okay.  Proceed.

15         **MR. EVEN:**  Thank you, Your Honor.

16   **Q.**  Now the price committee deck specifically reports on the

17   fact that the value of IAP or comparables is an analysis that

18   was not taken, correct?

19   **A.**  That is correct.

20   **Q.**  The price committee deck does not report on any other

21   analysis that was not taken, correct?

22   **A.**  That is correct.

23   **Q.**  Who is it that decided that the price committee deck

24   should include a specific mention of an analysis not

25   performed?

1    **A.**  The decision would have been made by Mr. Oliver.

2              **THE COURT:**  Who did the initial draft of this slide

3    deck?

4              **THE WITNESS:**  I do not recall, Your Honor.  But I

5    would be -- I would be almost sure that my team would have

6    started the first draft of this deck.

7              **THE COURT:**  Proceed.

8              **MR. EVEN:**  Thank you, Your Honor.

9    **Q.**  Did you ever ask anyone why Apple did not try to estimate

10   the value or the cost of alternative payment solutions?

11   **A.**  Yes, I did.

12   **Q.**  Who did you ask?

13   **A.**  Mr. Oliver.

14   **Q.**  And what did Mr. Oliver tell you?

15   **A.**  Because we're not charging for in-app purchase payments

16   through the linkout.

17   **Q.**  Well, sir, you understand, do you not, that a developer

18   that utilizes a purchase link to steer users outside the app

19   would have to bear the cost of an alternative payment solution

20   to -- to complete the transaction on their website, correct?

21   **A.**  That is correct.

22   **Q.**  And you understand that Apple's new fee for linked

23   purchase, which is only 3 percent less than the fees for IAP,

24   would make linked purchases more expensive than IAP for any

25   developer that is unable to obtain alternative payment

1   solutions for less than 3 percent, right?

2   **A.**  The effective rate is less than 27 percent.

3   **Q.**  Sir, we talked yesterday about the definition of linked

4   purchases, and we agreed, I believe, on the record that linked

5   purchases are purchases made within the seven-days window.  So

6   those are the purchases that I'm talking about.  Purchases

7   made within the seven-days window.

8       If a developer is subject to a 27 percent Apple fee and

9   can't obtain payments for less than 3 percent, those purchases

10  would be more costly to that developer than using IAP,

11  correct?

12  **A.**  For that specific period of time, that is correct.

13  **Q.**  And you're aware, are you not, that developers generally

14  cannot obtain payment solutions for 3 percent or less?

15  **A.**  Based on my information, there is a wide range.

16  **Q.**  All right.  Well, for example, are you aware that the

17  trial record in this case showed that Epic's average cost for

18  payment services in the U.S. was three-and-a-half percent?

19  **A.**  I was not aware.

20  **Q.**  That's not something that you looked into as part of your

21  work on the price committee?

22  **A.**  I did not.

23  **Q.**  That's not something you considered relevant to your work

24  on the fee that would apply to linked purchases?

25  **A.**  We did not consider it to be as relevant.

1  **Q.**  Are you aware that Mr. Ben Simon, the CEO of Down Dog, put

2  in a declaration here that said that he pays three-and-a-half

3  percent to six-and-a-half percent to Stripe and PayPal to

4  process payments for transactions that occur on its website?

5  **A.**  I have not seen his declaration.

6  **Q.**  Setting aside his declaration, did you look into the

7  prices of PayPal and Stripe during your work on the price

8  committee deck?

9  **A.**  I did not.

10  **Q.**  Are you aware that in November 2023 while you were working

11  on your deck, in a case between Epic and Google, witnesses

12  from Google testified that even Google, with all its scale,

13  bears a cost between 4 percent and 6 percent to provide

14  payment services to Android developers?

15  **A.**  I was not aware.

16        **THE COURT:**  Were you not even curious about this

17  topic as a vice president of finance?

18        **THE WITNESS:**  Your Honor, as part of our work

19  supporting the App Store payment processing and payment fees

20  is one of our largest costs, so that is something that we

21  actively manage with the networks and with financial

22  institutions.

23    The landscape is extremely fragmented and there's many

24  options out there.  Individual developer implementations, I'm

25  not as familiar with.  Everyone chooses a different payment

 1   stack.

 2   **BY MR. EVEN:**

 3   **Q.**  So everybody chooses a different payment system maybe, but

 4   you understand that Epic and Down Dog and Google and Spotify

 5   and Meta and Microsoft and Match all told this Court that

 6   developers cannot obtain payment solutions for less than

 7   three percent?

 8   **A.**  I was not aware.

 9   **Q.**  And you've not looked into any of that during your work on

10   the price committee deck.

11   **A.**  We did not.

12   **Q.**  By "we," you mean we, Apple did not, the team that worked

13   on this deck?

14   **A.**  That is correct.

15   **Q.**  And you're not aware of anyone else providing an analysis

16   of the value of IAP to the price committee, right?

17   **A.**  We did not provide that analysis in this deck.

18   **Q.**  That's not what I asked.  You're not aware of anyone else

19   outside of your team that somehow worked on this and provided

20   a different analysis to the price committee, correct?

21   **A.**  That is correct.

22   **Q.**  Now, on Wednesday, you told the Court that you fully

23   understood that a fundamental goal of the injunction was that

24   developers could charge and offer users lower prices on

25   out-of-app purchases, correct?

1   **A.**   That is correct.

2   **Q.**   But without undertaking any estimate of the cost to

3   developers of alternative payment solutions, you had no

4   ability to assess whether developers could or could not charge

5   or offer lower prices to users, could you?

6   **A.**   Based on our analysis, the effective commission rate is

7   lower.

8   **Q.**   The effective commission rate to Apple based on an

9   analysis on no evidence is lower, but you understand that

10  there are other cost lines including alternative payment

11  solutions, correct?

12  **A.**   That is correct.

13  **Q.**   And so if the fee to Apple, however you calculate it, even

14  if you accepted all your assessments, has to then be added to

15  the cost that the developer would bear on alternative payment

16  solutions in order to assess whether the developer actually

17  could offer lower prices to users, right?

18  **A.**   That is correct.

19  **Q.**   And you could not even take that step because you had no

20  clue what it would cost developers to obtain alternative

21  payment solutions because you chose not to undertake that

22  analysis, correct?

23  **A.**   The cost to developers to operate their website and to

24  provide alternative payment methods in conjunction with the

25  window and --

1   **Q.**  Sir --

2   **A.**  -- the process --

3   **Q.**  -- you understand that a developer here is facing two cost

4   lines, a fee to Apple and a fee to a payment solution,

5   correct?

6   **A.**  In addition to internal costs.

7   **Q.**  Sir, not what I'm asking.  The internal cost would exist

8   whether the purchase is outside the app, inside the apps,

9   whatever.

10      The difference between inside the app and outside the app

11   is that inside the app, there's a fee that's paid to Apple.

12   Outside the app, there's a fee that's paid to Apple now for

13   the first time and a fee that's paid to a payment solution,

14   correct?

15   **A.**  That is correct.

16   **Q.**  And you chose not to assess one of these two cost lines,

17   and yet you're telling this Court that you fully understood

18   that the goal was to set a fee that would allow developers

19   somehow to provide lower prices to users?

20   **A.**  The effective commission is lower.

21   **Q.**  Okay.  Sir, it's a yes-or-no question.  Is that your

22   testimony, that without going out and figuring out what the

23   other line item costs, you still could make the assumption

24   that your implementation of the injunction would bring about

25   lower prices to users?

 1   **A.**   That is correct.

 2   **Q.**   Okay.

 3           **THE COURT:**  How often do you do analysis without

 4   data?

 5           **THE WITNESS:**  Your Honor, it is frequent that to make

 6   some of these decisions, we do not have perfect information

 7   to --

 8           **THE COURT:**  You don't have any data.  It's not a

 9   question of perfect.  It's a question of -- I'm looking for

10   data, and it sounds like you all made lots of decisions with

11   no data.

12           **THE WITNESS:**  The amount of data, given that we do

13   not have a good precedent for this, Your Honor, is --

14                       (Simultaneous colloquy.)

15           **THE COURT:**  And the goal was then -- it sounds to me

16   as if the goal was to maintain, as you said last -- before,

17   the business model and the revenue that you had in the past.

18   Right?  Figuring out a different way to keep your revenue

19   stream.

20           **THE WITNESS:**  We knew that by this implementation,

21   Your Honor, there would be lower revenue.

22           **THE COURT:**  Well, not that much.

23      But go ahead.

24           **MR. EVEN:**  Thank you, Your Honor.

25   **Q.**  You knew that there would be less revenue based on the

 1    assumption of massive adoption by developers of the link,

 2    correct?

 3    **A.**   That is correct.

 4    **Q.**   Okay.

 5         Turn to Slide 009.5.

 6                        (Exhibit published.)

 7              **THE COURT:**   And to follow on, and obviously more

 8    revenue by those -- by massive refusal to adopt the link.  Or

 9    said differently, no revenue change if people did not adopt

10    the link.

11              **THE WITNESS:**   Your Honor, that would be correct.  If

12    nobody would adopt the link, the revenue would remain largely

13    the same.

14              **THE COURT:**   So you didn't have an incentive other

15    than the injunction to encourage adoption of the link, right?

16              **THE WITNESS:**   We -- Your Honor, we tried to comply

17    with the injunction.

18              **THE COURT:**   Go ahead.

19              **MR. EVEN:**   Thank you, Your Honor.

20         If we can blow up that Kardashians figure that's on

21    Slide 009.5.

22                        (Exhibit published.)

23    **BY MR. EVEN:**

24    **Q.**   Do you see that?

25    **A.**   Yes, I do.

1   **Q.** And that shows what the slide calls an implementation of

2   the entitlement policy, correct?

3   **A.** That is correct.

4   **Q.** And here you say to get 50 percent off go to

5   www.hulu.com/welcome; right?

6   **A.** That is correct.

7   **Q.** In putting this slide together, you fully understood that

8   a 50 percent off discount is nowhere near realistic given the

9   fees that you intended to recommend to the price committee, is

10  it?

11  **A.** I did not put the slide together.  However, I believe that

12  this is feasible.

13  **Q.** You believe that it's feasible when the difference, even

14  if we accept your statements, is between 30 percent and maybe

15  somewhere between 18 and 30?  That's the difference that

16  allows people to offer 50 percent off?

17  **A.** That is correct.

18  **Q.** Okay.  I take it your testimony is that you believe that

19  once this -- word of this got out on January 16, the massive

20  adoption would start, correct?

21  **A.** No.

22  **Q.** All right.  Developers can do the same calculation that

23  you did to get to 18 percent supposedly, right?

24  **A.** That is correct.

25  **Q.** And if a developer has an option between 30 percent or

ROMAN - DIRECT / ALEX

1    18 percent, they would prefer 18, correct?

2    **A.**   That is correct.

3    **Q.**   And you, in fact, estimated that there would be massive

4    adoption, correct?

5    **A.**   Over time.

6    **Q.**   Over time.   Okay.

7        Well, three months have passed between your -- the time

8    that you -- that the policy was put in place and your

9    declaration.   Have you made any effort to check whether your

10   projections concerning the rate of adoption hold up?

11   **A.**   We review from time to time.

12   **Q.**   And, well, let me ask you some questions based on that

13   review.

14       Do you have any idea how many of the top ten games in the

15   App Store now use link entitlements?

16   **A.**   Based on my last review, none of the top ten games have

17   adopted the linkout entitlement.

18   **Q.**   I think we can agree with that.   I checked and I agree.

19       Moving away from games, are you aware that none of the

20   major dating apps that offer in-app purchases, like Tinder and

21   Bumble, have purchase links?

22   **A.**   That is correct.

23   **Q.**   Are you aware that major apps like Adobe Photoshop,

24   Dropbox, ChatGPT, Twitch, all of which offer in-app purchases,

25   do not have external purchase links?

1    **A.**   That is correct.

2    **Q.**   Are you aware, in fact, that no major developer, none,

3    zero, has even applied for an external link entitlement, let

4    alone implemented a purchase link in their apps?

5    **A.**   That is correct.

6    **Q.**   So I want to put your projections in perspective for a

7    second.  This Court has now heard testimony that to date

8    38 developers have applied for an external link purchase,

9    right?

10   **A.**   Last time I checked it was over 30.

11   **Q.**   Okay.  The Court has heard -- let me represent to you that

12   the Court has heard that it's 38.  And that number is the

13   number of developers who have applied, not who have actually

14   implemented or incorporated a purchase link in their app,

15   correct?

16   **A.**   That is correct.

17   **Q.**   Now, Apple's counsel has advised the Court that -- and

18   Epic that there are over 65,000 developers and over 135,000

19   apps that are eligible to implement purchase links.

20        Are you familiar with those numbers?

21   **A.**   Yes, I am.

22   **Q.**   So even if every one of the developers who had applied for

23   a link entitlement had incorporated a purchase link into their

24   apps, your projections overestimated the rate of adoption of

25   link entitlements by more than three orders of magnitude,

1  correct?

2  **A.**  I disagree.

3  **Q.**  You disagree that 38 out of 65,000 is different from your

4  assessment of adoption by a factor of more than 1,000?

5  **A.**  The factor of adoption is based on a time frame in the

6  future, not today.

7            **THE COURT:**  What time frame?

8            **THE WITNESS:**  Your Honor, roughly two years.

9  BY MR. EVEN:

10  **Q.**  Sir, do you remember how long it took the App Store to

11  gain -- go from 60 -- from zero to 60 million downloads when

12  it was first announced?

13  **A.**  I do not remember that figure.

14  **Q.**  It was less than a week, wasn't it?

15  **A.**  I do not know.

16  **Q.**  Do you know how long before the App Store got to

17  50,000 apps?

18  **A.**  I do not know.

19  **Q.**  Okay.  You understand that this is a fast-moving space?

20  **A.**  I do not know.

21  **Q.**  You don't know that it's fast-moving space.  You have no

22  idea.

23  **A.**  For business model adoptions, our experience is different.

24  **Q.**  Sir, if you are right and the difference is between

25  18 percent and 30 percent, that would mean a 40 percent

1    reduction in cost, right, thereabouts?

2    **A.**   That is correct.

3    **Q.**   That's a major reduction in costs, right?

4    **A.**   That is correct.

5    **Q.**   People should flock to a 40 percent reduction in costs,

6    right?

7    **A.**   They will have to run analysis.  That is correct.

8    **Q.**   Okay.

9        In your history as a vice president of finance at Apple,

10   have you ever modeled anything, made any projection where you

11   turned out to be off by a factor of more than a thousand?

12   **A.**   No, I have not.

13   **Q.**   This is a first for you.  Okay.

14       And your explanation is time?

15   **A.**   That is correct.

16   **Q.**   Let me give you an alternative explanation.  Could it be

17   that the analysis you performed was not an actual attempt to

18   comply with the injunction or estimate adoption, but instead a

19   made-for-litigation analysis intended to support a preordained

20   27 percent fee that Apple knew would be prohibitive to

21   developers?

22   **A.**   I disagree.

23   **Q.**   You disagree.  All right.  Let's -- let's talk about that.

24       Is it actually your testimony that you and your team

25   worked on a clean slate where you developed the 27 percent

 1    standard commission for linked purchases from scratch?

 2    **A.**   That is correct.

 3    **Q.**   And is it your testimony that you were never told by

 4    anyone at any point what the fees for linked purchases should

 5    be, not even as a ballpark?

 6    **A.**   That is correct.

 7    **Q.**   Well, we saw on Slides 12 and 14 that in addition to

 8    27 percent, you presented some supposed analysis also for fees

 9    of 20 percent, 23 percent, 25 percent, and 30 percent,

10    correct?

11                        (Exhibit published.)

12            **THE WITNESS:**  That is correct.

13    BY MR. EVEN:

14    **Q.**   You don't include any analysis for fees below 20 percent.

15    **A.**   That is correct.

16    **Q.**   You don't include any analysis for zero percent.  Just no

17    fee, correct?

18    **A.**   That is correct.

19    **Q.**   And was it your decision not to examine any fee below

20    20 percent?

21    **A.**   In early drafts, we had a wider range.

22    **Q.**   Whose decision was it to cut off at 20 percent?

23    **A.**   In conjunction with the business team, we decided that

24    this range would be more representative.

25    **Q.**   More representative of what?

1    **A.**   Of the value and the benchmarking data that we provide

2    here.

3    **Q.**   Sir, you just explained to the Court that this was

4    unprecedented, which I kind of agree with.  For 15 years,

5    you've never charged anything.  Did you check the effect on

6    Apple of having a zero percent fee?

7    **A.**   No.

8    **Q.**   Yesterday, this Court was told that a major goal of the

9    analysis was to preserve Apple's business model.

10        You understand that?

11   **A.**   Yes, I do.

12   **Q.**   Apple's business model for 15 years had been that it

13   charges for in-app purchases and does not charge anything for

14   out-of-app purchases, correct?

15   **A.**   That is correct.

16   **Q.**   So to preserve the model, Apple should have charged zero,

17   correct?  That would be preservation of the model.

18   **A.**   Apple charges for the value it provides.

19   **Q.**   Sir, Apple provided the same value on the 15th of January

20   that it did on the 17th.  Nothing changed.  Correct?

21   **A.**   The same value is provided, correct.

22   **Q.**   And so the only value -- the only thing that changed was

23   that Apple woke up on the 16th of January of this year and

24   decided not to preserve its business model, but to radically

25   change its business model from charging zero to charging

1    27 percent.  Correct?

2    **A.**  I disagree.

3    **Q.**  Okay.  How low did you go in the early drafts when you had

4    a broader range, as you call it?

5    **A.**  I recall looking at a range starting at 15 percent.

6    **Q.**  Did you -- did the range also go to beyond 30 percent?

7    **A.**  Yes.

8    **Q.**  Whose decision was it not to model anything below

9    15 percent?

10   **A.**  That would have been my decision.

11   **Q.**  What was the basis for that decision?

12   **A.**  At 15 percent, the effective rate was already very low.

13   **Q.**  By effective rate, you mean the blended rate plus all the

14   assumptions about adoption, et cetera?

15   **A.**  That is correct.

16   **Q.**  Now, the deck doesn't actually state anywhere why the

17   recommended standard fee is 27 percent as opposed to

18   20 percent or 25 percent or 30 percent, correct?

19   **A.**  That is correct.

20   **Q.**  For that matter, the price committee deck does not say why

21   27 percent is better than zero percent or 5 percent or

22   10 percent, right?

23   **A.**  The materials included here would support the

24   recommendation.

25   **Q.**  That's not what I asked, sir.  What I asked was the deck

ROMAN - DIRECT / ALEX

1    does not say 27 percent is better than another rate, at any

2    rate, because of X, Y, and Z, correct?

3    **A.**   The deck does not state that.

4    **Q.**   And it's your testimony that 27 percent is because -- is

5    better because it reflects the value; is that -- am I

6    understanding that right?

7    **A.**   That is correct.

8    **Q.**   Your declaration also does not provide any explanation for

9    choosing 27 percent over any other number, correct?

10   **A.**   That is correct.

11   **Q.**   And in fact, the deck, if we accepted all the assumptions

12   in it, could easily support 30 or 35 percent, correct?

13   **A.**   It could.

14   **Q.**   And as you said, you analyzed things above 30 percent.

15   That was in consideration, that was at play.

16   **A.**   Early on.

17   **Q.**   Now, the 27 percent you recommended is the same rate that

18   Apple has used before in similar contexts, correct?

19   **A.**   That is correct.

20   **Q.**   For example, since early 2022, to comply with an order

21   from Dutch regulators, Apple allows developers distributing

22   dating apps in the Netherlands to include an in-app link

23   directing users to their website and charges 27 percent on

24   those purchases, correct?

25   **A.**   That is correct.

1    **Q.**  In the Netherlands, Apple presents its commission on

2    linked purchases simply as a reduction of its typical IAP

3    commission by three percent, correct?

4    **A.**  That is correct.

5    **Q.**  It didn't do any of the ground-up analysis that you

6    presented in your deck.  It didn't make any assumptions about

7    adoption, nothing like that, correct?

8    **A.**  It was a much smaller analysis.

9    **Q.**  And the analysis amounted to "We are reducing the fee by

10   3 percent," correct?

11   **A.**  That is correct.

12   **Q.**  In South Korea, Apple was forced by statute to allow

13   developers to use an alternative payment solution in their

14   app, correct?

15   **A.**  That is correct.

16   **Q.**  And following the same playbook it used in the

17   Netherlands, in South Korea Apple imposed a new 26 percent

18   commission on the price paid by the user, correct?

19   **A.**  That is correct.

20   **Q.**  And like in the Netherlands, in South Korea the 26 percent

21   rate was explained by Apple simply as a reduced rate, correct?

22   **A.**  That is correct.

23   **Q.**  And so in both these countries, this was what I would call

24   a top-down analysis rather than a bottom's-up analysis, right?

25   **A.**  Roughly speaking, that's correct.

1   **Q.**   Now, in your declaration and in the slide deck, the

2   Netherlands rate for linked purchases is just not mentioned,

3   correct?

4   **A.**   That is correct.

5   **Q.**   And the South Korea rate is not mentioned anywhere either,

6   correct?

7   **A.**   That is correct.

8   **Q.**   And it is your testimony, I take it, that the fees you

9   recommended in the United States had nothing to do with the

10  identical fees that Apple imposed in the Netherlands.

11  **A.**   That is correct.

12  **Q.**   And instead your testimony is that the linked purchase fee

13  in the United States is based on this complicated bottom's-up

14  analysis that we just went through with all its assumptions,

15  correct?

16  **A.**   That is correct.

17  **Q.**   Now, the bottom's-up assumptions in the price deck is

18  intended to show that Apple delivers to developers value that

19  justifies the standard 27 percent fee, correct?

20  **A.**   That is correct.

21  **Q.**   And in your declaration and in the deck, there's no

22  separate analyses that justifies the 12 percent fee, correct?

23  **A.**   Both of them are part of the same --

24  **Q.**   Sir, there is no analysis that is intended to lead to an

25  outcome of 12 percent, correct?

1    **A.**   That is roughly correct.  It's based on the same

2    proportion.

3    **Q.**   Three out of 30 is the same as three out of 15?

4    **A.**   From a pricing perspective, you want to have some

5    symmetry.

6    **Q.**   The 12 percent is, in fact, the reduced rate that the deck

7    recommended, correct?

8    **A.**   That is correct.

9    **Q.**   And it just so happens to be the reduced fee that Apple

10   charges on linked purchases in the Netherlands, correct?

11   **A.**   That is correct.

12   **Q.**   And that too is coincidence.

13   **A.**   That is correct.

14   **Q.**   So let me just make sure I understand your testimony of

15   how the 27 percent fee came to be on January 16, 2024.

16       On January 16, 2024 at around 6:30 a.m. Pacific time,

17   Apple woke up to learn that the Supreme Court ended its

18   appeal, correct?

19   **A.**   That is correct.

20   **Q.**   Now, you and your team then finalized your bottom's-up

21   analysis and made a decision for the first time to recommend

22   to Mr. Cook and to the price committee a standard fee of

23   27 percent and a reduced fee of 12 percent, correct?

24   **A.**   That is correct.

25   **Q.**   And you then presented and explained this complicated

1  analysis that we went through and your recommendation to

2  Mr. Cook, to Mr. Maestri, and to Mr. Schiller, correct?

3  **A.**  That is correct.

4  **Q.**  Did you personally present it to them?

5  **A.**  Yes, I did.

6  **Q.**  Was that an in-person meeting or over Zoom?

7  **A.**  It was in person.

8  **Q.**  You did not present the effect on total cost to developers

9  of using the purchase links based on these fees, correct?

10  **A.**  That is correct.

11  **Q.**  And you could not present that because you chose not to

12  look at one of the cost items, specifically the cost of

13  obtaining payment solution elsewhere, correct?

14  **A.**  That is correct.

15  **Q.**  You also did not present the effect on developers' ability

16  to charge and communicate lower prices to users, correct?

17  **A.**  Could you repeat that question?

18  **Q.**  You also did not present to Mr. Cook, Mr. Maestri, and

19  Mr. Schiller any analysis of how these fees would affect

20  developers' ability to charge and offer and communicate to

21  users a lower fee on out-of-app purchases.

22  **A.**  This is embedded throughout the presentation.

23  **Q.**  It's embedded in one slide that says that you believe

24  there's an 18 percent fee and some unknown payment fee on top

25  of that that you just have no idea what that is, correct?

1   **A.**   Our estimation of adoption takes into consideration some

2   of these factors.

3   **Q.**   I see.

4       So you told them that your estimation is that a vast

5   majority of developers would actually adopt this even though

6   you've conducted no analysis of that whatsoever.

7   **A.**   We communicated our assumption; that is correct.

8   **Q.**   I gather that Mr. Cook, Mr. Maestri, and Mr. Schiller

9   never asked you to present the effect of your recommendation

10  on cost to developers?

11  **A.**   That is correct.

12  **Q.**   And they never asked you to present the effect of your

13  recommendation on the ability of developers to offer lower

14  prices to users, correct?

15  **A.**   That is part of the discussion.

16  **Q.**   Nobody told you, "We think this is incomplete.  You should

17  go out there, figure out what the total cost to developers is,

18  how that affects their ability to offer lower prices, and then

19  come back."  Correct?

20  **A.**   In reviewing the assumptions, we discussed the impact that

21  this would have --

22  **Q.**   Sir?

23  **A.**   -- on developers.

24  **Q.**   Sir, did anybody tell you this is an incomplete analysis.

25  Go out there, undertake the analysis of cost to developers of

1    alternative payment solutions that you specifically chose not

2    to undertake, come back and talk to us when you know that and

3    have analysis of how that affects cost to developers?

4    **A.**   For cost of payments, that is correct.

5            **THE COURT:**  Were lawyers there when you presented?

6    Were lawyers there when you presented?

7            **THE WITNESS:**  Your Honor, yes.

8            **THE COURT:**  How many?

9            **THE WITNESS:**  I do not recall.

10           **THE COURT:**  How many people were there?

11           **THE WITNESS:**  We had roughly 12 people.

12           **THE COURT:**  What time was the meeting?

13           **THE WITNESS:**  It was in the morning.  I --

14           **THE COURT:**  How long did it last?

15           **THE WITNESS:**  Roughly 90 minutes.

16           **THE COURT:**  Tell me everybody who you remember who

17   was there.

18           **THE WITNESS:**  Mr. Cook, Mr. Schiller, Mr. Maestri,

19   Mr. Fischer, Mr. Oliver, from my team, Mr. Barton.

20           **THE COURT:**  How do you -- say that one again?

21           **THE WITNESS:**  B-A-R-T-O-N.

22           **THE COURT:**  Okay.  Thank you.

23           **THE WITNESS:**  Mr. Vij, that is V- as in Victor, I-J.

24      Those were the main people that discussed.  And there were

25   some other people, Your Honor, that I cannot recall at this

 1  stage.

 2          THE COURT:  Was anybody on Zoom?

 3          THE WITNESS:  Maybe.

 4          THE COURT:  For the 90 minutes, how long of that

 5  was -- was any part of that 90 minutes a briefing by legal

 6  counsel?

 7          THE WITNESS:  At the very beginning regarding the

 8  injunction.

 9          THE COURT:  And how long did that portion take?

10          THE WITNESS:  A few minutes, not very long.

11          THE COURT:  Five, ten?

12          THE WITNESS:  More or less.

13          THE COURT:  The balance of the meeting was a business

14  meeting?

15          THE WITNESS:  That is correct.

16          THE COURT:  Who made the legal presentation?

17          THE WITNESS:  I do not recall exactly.  I believe it

18  would have been Heather from our legal team.

19          THE COURT:  Okay.  Thank you.

20      Proceed.

21          MR. EVEN:  Thank you, Your Honor.

22  Q.  Mr. Roman, was the meeting recorded or transcribed in any

23  way?

24  A.  No.

25  Q.  Was it summarized in any way?

1    **A.**   No.

2    **Q.**   So it started at 6:30 a.m.  We now have a meeting of about

3    an hour and a half.  Then Mr. Cook, Mr. Maestri, and

4    Mr. Schiller considered your recommendation and ultimately

5    approved it, correct?

6    **A.**   That is correct.

7    **Q.**   And I take it in a setting like that, Mr. Cook would be

8    the decider, correct?

9    **A.**   All of price committee, Mr. Cook, as part of the price

10   committee, yes.

11   **Q.**   And Apple's lawyers then populated the previously unknown

12   27 percent figure into Mr. Fischer's ten-page declaration,

13   into Apple's 16-page notice of compliance, into the updated

14   addendum to the app developer program license agreement, and

15   into the new developer support page for the external link

16   entitlement addendum for the U.S. apps, correct?

17   **A.**   There was a lot of operational and communication tasks

18   that were undertaken that day, correct.

19   **Q.**   And then at 2:21, less than eight hours after the

20   Supreme Court announced its decision, Apple's lawyers filed

21   all of these documents with this Court, correct?

22   **A.**   I do not know.  I am not a manager of that process.

23   **Q.**   Okay.  If I represent to you it's 2:21, you have no reason

24   to dispute that, do you?

25   **A.**   I do not.

1   **Q.**  About eight hours to do all that sounds about right?

2   **A.**  That is correct.

3   **Q.**  And by sheer happenstance, a fluke, pure coincidence, the

4   standard fee that was populated in all these documents and

5   that you recommended and that Mr. Cook approved and the

6   reduced fee of 12 percent that was populated and approved and

7   Apple adopted on that hectic day in January just happened to

8   be identical to the fees that Apple had imposed in the

9   Netherlands two years earlier based on an entirely different

10   analysis.  That's your testimony?

11   **A.**  That is correct.

12          **MR. EVEN:**  I have no further questions at this time,

13   Your Honor.  Thank you.

14          **THE COURT:**  Your exam.  Who's examining?

15      Mr. Perry?

16          **MR. PERRY:**  Yes, Your Honor.

17          **THE COURT:**  We'll go for about half an hour,

18   Mr. Perry, and then take a break.

19          **MR. PERRY:**  Thank you, Your Honor.

20                        <u>**CROSS-EXAMINATION**</u>

21   **BY MR. PERRY:**

22   **Q.**  Good afternoon, Mr. Roman.

23   **A.**  Good afternoon.

24   **Q.**  We've heard earlier you're a vice president of finance.

25   Can you just briefly tell the Court how long you've been at

1    Apple and what you do there in addition to the price committee

2    work you've been talking about today.

3    **A.**   I've been at Apple almost ten years.  In my current

4    capacity, I am a vice president of finance that supports the

5    services business.  In that support, I provide business

6    controllership, budget, forecast.

7        There's also spend management, profitability improvements,

8    as well as financial analysis to support strategic and

9    operational decisions such as pricing, channel or region

10   expansions, among -- among any other things like commercial

11   arrangements and new product or feature introductions.

12   **Q.**   And do you have a -- a name or a description of what you

13   call that role that you play with respect to the business

14   lines within the services unit?

15   **A.**   That is correct.  We provide business support.

16   **Q.**   Business support.

17       And you mentioned pricing.  Can you explain generally to

18   the Court how pricing works at Apple within the services unit?

19   **A.**   Services, along with products, we have a process by which

20   every time that we have a major pricing decision, we establish

21   a price committee where we provide a -- we summon a price

22   committee together to make that determination of such price.

23       This price committee usually has a price committee deck or

24   presentation.

25   **Q.**   And does the price committee decks or presentations follow

1    a standardized format at Apple?

2    **A.**   Yes, it does.

3    **Q.**   Can you explain to the Court what a price committee

4    presentation generally entails?

5    **A.**   It usually has three or four elements.  A description of

6    what is being priced; competitive landscape and benchmarking

7    analysis of similar or relevant comparable services or

8    products; and a financial analysis of the pricing options;

9    sometimes a recommendation is also included in this deck.

10   **Q.**   And of those parts of a pricing analysis, what part are

11   you personally, Mr. Roman, and your team responsible for?

12   **A.**   The financial analysis of pricing options is the part that

13   we undertake.

14   **Q.**   And in your time at Apple, is this the first price

15   committee process you've participated in?

16   **A.**   No, it was not.

17   **Q.**   Do you have any sense of how many price committee

18   processes you have participated in?

19   **A.**   Over 50.

20   **Q.**   Now, you mentioned that you're a vice president of finance

21   and the Court asked you how many there are.  Are there

22   different finance groups or finance functions within Apple?

23   **A.**   Yes, there are.

24   **Q.**   Could you explain at a high level the structure of the

25   finance department within Apple.  And next question will be

1    your role in it if you want to keep rolling.

2    **A.**   At Apple, within finance, we're roughly structured into

3    two big segments.  One of them is corporate functions and the

4    other one is business support.

5         Corporate functions include tax, treasury, accounting,

6    corporate FP&A, investor relations, internal audit, all of

7    those things that serve as the total enterprise.

8         Business support, these are teams that embed -- that are

9    embedded across the businesses.  And in addition to sharing

10   responsibility of making sure that financial statements are

11   accurate and in accordance to accounting guidelines, also

12   provide budget and forecast, spend management, as well as

13   financial support for decision-making processes such as

14   pricing, commercial arrangements, market expansions, new

15   product introductions.

16   **Q.**   Now, you mentioned corporate FP&A.  Could you explain what

17   that is, please.

18   **A.**   Corporate FP&A is a team within our finance organization

19   that measures the performance of the enterprise, actual versus

20   forecast, does trend analysis.  They support external

21   reporting.  They set up targets of spend.  They coordinate the

22   annual plan process.  They take a view of the total

23   enterprise.  And that's the way that they try to keep

24   performance on track.

25   **Q.**   And you've mentioned enterprise a few times in that

1    answer.  What, in this context, does the enterprise mean,

2    Mr. Roman?

3    **A.**   That means the totality of Apple.

4    **Q.**   And are you, Mr. Roman, in the corporate FP&A group?

5    **A.**   No, I am not.

6    **Q.**   And when you described two broad functions, one was

7    corporate functions and the other was business support, you're

8    in the latter, right?

9    **A.**   I am in business support, correct.

10   **Q.**   Now, you -- were you ever in the product side of Apple?

11   **A.**   Yes, I was.

12   **Q.**   And does products also follow a price -- a pricing

13   strategy?

14   **A.**   Products also follow a price committee process.

15   **Q.**   And were you involved in any of the product pricing issues

16   while you were in products?

17   **A.**   Yes, I was.

18   **Q.**   Now, in -- you're now in services, correct?

19   **A.**   That is correct.

20   **Q.**   Could you explain to the Court what major business lines

21   are within services at Apple?

22   **A.**   In addition to the App Store, services also includes Apple

23   Music, Apple TV Plus, iCloud, Apple Card, Maps, Siri, among

24   many others.

25   **Q.**   And for which of those, if any, do you have primary

ROMAN - CROSS / PERRY

1    responsibility, Mr. Roman?

2    **A.**   I oversee all of them.

3    **Q.**   And you mentioned that the App Store is within services;

4    is that right?

5    **A.**   That is correct.

6    **Q.**   Now, in your work in business support, Mr. Roman, are

7    there ever instances in which Apple has occasion to determine

8    profitability or margins at the individual business line

9    level?

10   **A.**   Sometimes, yes.

11   **Q.**   And can you describe some examples of that?

12   **A.**   For instance, whenever we launch a new product or service,

13   we're interested to see if there is a route to profitability

14   for such services.  So we try to provide the best picture that

15   we can to assess such profitability.

16   **Q.**   And what's your process or what -- what's your team's

17   process for going through that exercise, in general?

18   **A.**   We take a look at what we call top of the funnel which is

19   the initial activity of where customer purchases or certain

20   income could be generated.  And then we take a look at the

21   cost and the spend structure to support such service.  Roughly

22   the same process given the access that we have to the systems.

23   **Q.**   Now, in conducting analysis of new product services or

24   features, do you always have perfect data or any data at all?

25   **A.**   More often than not, we do not have perfect data.

1   **Q.**  And how does your team go about analyzing business

2   decisions in the absence of perfect data or any data?

3   **A.**  Making decisions with imperfect information is usually

4   prevalent in this space.  We try to use all of the data points

5   at our disposal and then apply common sense and rationale to

6   see the ranges of potential outcomes.

7       We also derive sensitivity analysis to understand, if

8   we're wrong in some of our assumptions, what the impact could

9   be.

10  **Q.**  And in your job, do you advise the business lines and the

11  executives at Apple regarding these business decisions or the

12  financial impact of these business decisions?

13  **A.**  Yes, I do.

14  **Q.**  Now, if we could look, Mr. Roman, at the -- we've been

15  talking today about the new link entitlement, right?

16  **A.**  Yes.

17  **Q.**  And if we could look at the deck for that.

18          **MR. PERRY:**  And it was -- if we could use,

19  Mr. Stovall, CX-009A.

20                  (Exhibit published.)

21          **MR. PERRY:**  And, Your Honor, this -- if we could not

22  display this on the public gallery if there are highlighted

23  pages.

24      This is a version, Your Honor, that instead of having the

25  redactions completely blacked out, it has highlighting for the

1    confidential information so the Court may see the numbers if

2    the Court is interested.

3           **THE COURT:**  Okay.  So you don't want everybody in the

4    gallery to look at this because A is redacted.  I can see it

5    in my book.

6           **MR. PERRY:**  Correct.

7           **THE COURT:**  They can't see it in the audience.

8           **MR. PERRY:**  I'm -- that's correct, Your Honor.

9           **THE COURT:**  And that's what you want, you don't want

10   them to see it?

11          **MR. PERRY:**  Correct, Your Honor.

12          **THE COURT:**  Okay.  Do not -- do not publish.

13          **THE CLERK:**  Yes, Your Honor.

14      Witness will be okay, Your Honor?

15          **THE COURT:**  Just for the witness.

16      (Exhibit published to witness, counsel, and the Court.)

17   **BY MR. PERRY:**

18   **Q.**  Now, can you explain to the Court -- I know we've been

19   talking about it, but can we start from the front end,

20   Mr. Roman, and explain to the Court what is this document, how

21   was it created, what was your role in it?

22   **A.**  This document contains our recommendation and our

23   supporting summary for the determination of price for the

24   linkout entitlement.

25   **Q.**  And what was your role in preparing this?

1    **A.**  In addition to reviewing all of the document, I was --

2              **THE COURT:**  Hold on a minute.

3         Mr. Cuenco, what's wrong?

4              **THE CLERK:**  I got a request to turn the monitors off,

5    Your Honor, facing the gallery.  Sorry.

6              **MR. PERRY:**  Your Honor, we can -- before the break,

7    this will not come up.  We could just leave them on the public

8    ones.  And I don't think it will be an issue.  Actually we

9    can -- we can not put up those screens if it's not necessary.

10   I don't want to delay the proceedings with monitors, in other

11   words.

12             **THE COURT:**  So...

13             **MR. PERRY:**  Okay to publish.

14             **THE COURT:**  All right.  Then he's saying it's okay to

15   publish.  So go ahead and publish.

16   **BY MR. PERRY:**

17   **Q.**  This price committee deck, Mr. Roman, we've had some

18   discussion this morning about your role, Mr. Oliver's role.

19   Can you just describe more generally who was involved, the

20   team, and how -- how the process worked so the Court has an

21   understanding.

22   **A.**  Whenever we have a price committee, we work with a few

23   teams to provide the best information that we can to price

24   committee and to the decision-makers.

25        In this case, business management, which is a team that

1   supports the App Store, that is in charge of strategic

2   planning, business development, and other strategies for the

3   App Store, works very closely with finance to make sure that

4   we can generate the proper information for the different

5   segments.

6       The definition of what is being priced, that's usually

7   undertaken by business management.  The benchmarking

8   competitive landscape, it's another element that business

9   management actively provides.  From a finance perspective, we

10  review to make sure that is part of the range.  And then the

11  financial analysis is the portion that finance primarily

12  undertakes.

13  **Q.**  Now, this particular deck, Mr. Roman, is about 15 slides

14  long, right?  We went through some of those with Mr. Even.

15  **A.**  That is correct.

16  **Q.**  Is that typical for a pricing deck at Apple?

17  **A.**  That is typically the range of the summary.

18  **Q.**  Does that mean, Mr. Roman, that they can be put together

19  quickly?

20  **A.**  No, they cannot.

21  **Q.**  Could you give the Court a sense of the work that went

22  into this price committee deck, particularly from your team

23  and the finance section?

24  **A.**  We spent several months and involved a large segment of

25  our team.  There are thousands of calculations supporting all

1    of these numbers.  And we went through several iterations and

2    reviews to make sure that the numbers represented the best

3    picture we could.

4    **Q.**  And when you mention your team, how many people, do you

5    have a sense, Mr. Roman, from finance worked on this price

6    committee deck?

7    **A.**  Across all of the -- across all of the different segments,

8    must be over a dozen.

9    **Q.**  And we'll come back to this with specific assumptions, but

10   you discussed with Mr. Even some of the assumptions that were

11   made.  Do you recall that?

12   **A.**  Yes, I do.

13   **Q.**  And on Wednesday, you mentioned that the assumptions are a

14   consensus approach.  Do I remember that correctly?

15   **A.**  That is correct.

16   **Q.**  Could you just describe for the Court in general -- and

17   again we'll talk to some specifics -- how the assumptions in

18   your financial model were arrived at in connection with this

19   price committee deck.

20   **A.**  As we established the logic flow to derive our

21   projections, we identified where we needed to make assumptions

22   to be able to provide our analysis.  Each one of those

23   assumptions was subject to vigorous debate from the different

24   teams.

25       We used -- tried to use as much information as we could,

 1   internal, market, otherwise, and then we try to apply our

 2   judgment to make sure that these assumptions would provide the

 3   most likely outcome.

 4           **THE COURT:**  So you're telling me that a thousand

 5   people were involved and not a single person of that thousand

 6   said hey, don't you think we should consider the cost of IAP

 7   to a developer?  That -- that's what I'm supposed to believe?

 8           **THE WITNESS:**  Your Honor, we --

 9           **THE COURT:**  Just yes or no.  Am I -- that not a

10   single person raised that issue of the thousand that were

11   involved?  Yes or no?

12           **THE WITNESS:**  No.

13           **THE COURT:**  Go ahead.

14           **MR. PERRY:**  Thank you, Your Honor.

15   **Q.**  Now, in this process, were all of the underlying materials

16   available to the group that worked on it?

17   **A.**  Yes, they were.

18   **Q.**  And were they all presented ultimately to the price

19   committee that made the decision?

20   **A.**  Not all of those details were presented to price

21   committee.

22   **Q.**  And why is that?

23           **THE COURT:**  And I, you know, I said that probably

24   wrong.  Payment processing.  Not IAP.  Not a single person

25   expressed an issue or a concern about the cost of payment

1   processing to a developer, of the thousand?

2           **THE WITNESS:**  Your Honor, Your Honor, that did come

3   up.

4           **THE COURT:**  And you said it wasn't important and you

5   didn't care, it wasn't relevant to the analysis.

6           **THE WITNESS:**  After a debate, that's what we

7   concluded.

8           **THE COURT:**  Why not?

9           **THE WITNESS:**  As we proceeded through the analysis,

10  Your Honor, we realized that developers would have to make

11  several choices in terms of this implementation, the

12  implementation of the linkout entitlement.  That assumption

13  entails that they would have to enable their own payment

14  processing.

15      And based on our assumptions and our projections, it was

16  quick for us to determine that developers would be

17  incentivized to proceed with such linkout entitlements once

18  they were -- once they would be able to provide all of the

19  operational background to make such implementations.  Which

20  means that for payment processing, it would be tremendously

21  advantageous for developers to enable, to comply with this,

22  and to bear that cost even if it was, as mentioned before, in

23  that range.

24      Therefore, what we considered is that from a benchmarking

25  perspective, for us to align what is the value that the App

```
 1    Store provides, payment processing wouldn't be one of them
 2    because it's not included in the linkout entitlement.
 3            THE COURT:  So you know that people from Apple
 4    testified otherwise.  Do you understand that?
 5            THE WITNESS:  I -- I'm not aware.
 6            THE COURT:  Interesting.
 7        Proceed.
 8    BY MR. PERRY:
 9    Q.  Mr. Roman, earlier in response to the Court's question,
10    you mentioned that the payment processing market is
11    fragmented.  Do you recall that?
12    A.  Yes, I do.
13    Q.  Could you explain a little more about that.
14    A.  There are several options available nowadays for people
15    that want to obtain payment processing services.  Ranges are
16    wide.  These depend on volume.
17            THE COURT:  But they're not zero.  Right?  You admit
18    they're not zero.
19            THE WITNESS:  That is correct.
20            THE COURT:  Keep going.
21    BY MR. PERRY:
22    Q.  And you also mentioned, Mr. Roman, that you have -- you
23    personally have an understanding of the payment processing
24    market as a result of your work in finance; is that right?
25    A.  That is correct.
```

 1   **Q.** And could you explain a little more in response to the

 2   Court's question that the ultimate decision not to include a

 3   payment processing --

 4            **THE COURT:** Do not lead him. Do not lead.

 5            **MR. PERRY:** Yes, Your Honor.

 6   **Q.** Does your financial model that you built include payment

 7   processing?

 8   **A.** It does not.

 9   **Q.** And could you just explain why not.

10   **A.** For the value that the App Store provides in our analysis,

11   in a linkout entitlement Apple would not be providing payment

12   services. Therefore it was not part of the benchmarking of

13   what Apple would provide.

14   **Q.** Thank you, Mr. Roman.

15       Now, back to the price committee deck.

16            **THE COURT:** So are you saying that Apple's processing

17   of payments in app has zero value?

18            **THE WITNESS:** In the context of the linkout

19   entitlement, Your Honor --

20            **THE COURT:** No. For those who are doing it now, are

21   you saying that it has no value and therefore you could extend

22   that? Because it has no value, you didn't have to consider it

23   for payments outside of the app? You're providing a service

24   for free for all of these individuals who are using your

25   payment processing system now.

 1          **THE WITNESS:**  Your Honor, we believe that their

 2     payment processing does provide value.

 3          **THE COURT:**  But you don't put any value to it in

 4     terms of subtracting it when someone is no longer using it.

 5          **THE WITNESS:**  Your Honor, I believe that might be

 6     correct.  In the linkout entitlement we would not be providing

 7     with any payment services.

 8          **THE COURT:**  Do you understand -- maybe I'm not asking

 9     my question right.  You can't have it both ways.  You can't

10     say that we're providing you a service that has value when

11     you're using our payment processing system, and then ignore

12     that when you are valuing someone else using some other

13     third-party payment processing system.  You ignore it for

14     purposes of this deck, but you don't ignore it when you're

15     charging them for the value that they're receiving when they

16     actually use it.

17          **THE WITNESS:**  We did not consider it for purposes of

18     these calculations, Your Honor, for an impact to Apple other

19     than their absence in terms of what we provide.

20          **THE COURT:**  Because you weren't focused on the

21     developer, you were focused on Apple's revenues.

22          **THE WITNESS:**  That's how we provide the financial

23     analysis of the options, Your Honor, that is correct.

24          **THE COURT:**  I interrupted you, Mr. Perry.

25          **MR. PERRY:**  Thank you, Your Honor.

 1   **Q.**  Mr. Roman, in evaluating the pricing for the new link

 2   entitlement, what role did the Netherlands entitlement that

 3   Mr. Even asked you about play?

 4   **A.**  It did not come up.

 5   **Q.**  And you mentioned that the Netherlands issue was a much

 6   smaller analysis; did I get that right?

 7   **A.**  That is correct.

 8   **Q.**  And can you explain that a little bit.

 9   **A.**  The implementation was very narrow.  The Netherlands is

10   not a very large market.  And it was narrow to a very specific

11   app category.

12   **Q.**  Do you recall what category?

13   **A.**  Dating apps, if I am not mistaken.

14   **Q.**  And why did you and the team you've described choose to do

15   a different approach in the United States?

16   **A.**  The impact is materially larger.

17         **THE COURT:**  Impact on what?

18         **THE WITNESS:**  On our financial performance, Your

19   Honor.

20         **THE COURT:**  Right.  On your bottom line.

21         **THE WITNESS:**  That is correct.

22         **THE COURT:**  I don't see a slide in here about its

23   impact on your bottom line.  Where is that?

24         **THE WITNESS:**  (Reviewing document.)

25      CX-0009.14.

1          **MR. PERRY:**  And this is one, Your Honor, we would ask

2     not to be published to the gallery.

3          **THE COURT:**  Okay.

4      Thank you.

5      (Exhibit published to witness, counsel, and the Court.)

6     **BY MR. PERRY:**

7     **Q.**  Mr. Roman, since we're here --

8          **THE COURT:**  Why don't you take it off the screen.

9          **MR. PERRY:**  Thank you.

10    **Q.**  Mr. Roman, since we're here could you explain to the Court

11    what's being shown on that dot 14 slide in brief and we'll

12    come back to it a little bit later.

13    **A.**  For different combination of headline commission rates and

14    duration windows, each intersection shows the reduction in

15    annual revenue and the percentage that such revenue would

16    represent out of that forward projection that we have.  This

17    would be an annual impact.

18         **THE COURT:**  And at the time you presented this, what

19    were the publicly known gross revenues?

20         **THE WITNESS:**  We did not disclose the App Store

21    revenue isolated, Your Honor.  It's part of the overall

22    reporting of services.  That is the segment.

23     However, we can take a look at CX-0009.10 to give you a

24    perspective of the fiscal year '23 figures, Your Honor.

25         **THE COURT:**  Okay.  Thank you.

 1          You can continue, Mr. Perry.

 2          **MR. PERRY:**  Thank you, Your Honor.

 3   **Q.**  On .10, can you just explain to the Court what's being

 4   shown here in general?  And again we'll come back to it in

 5   more detail, Mr. Roman.  And let's look at the U.S. column

 6   just to focus the --

 7   **A.**  Correct.

 8          This schedule had multiple purposes.  It was meant to

 9   provide a baseline upon we which arrived [sic] the financial

10   impact.  It would show also our best estimation or

11   approximation of how much margin there is which is an

12   important consideration to understand the magnitude of the

13   impact.

14          And finally to show, potentially to a lesser degree of

15   importance, the total picture of the App Store from customer

16   purchases all the way to margin for Apple.

17   **Q.**  And just to focus on the revenue question the Court asked

18   about, you see that line, Mr. Roman?

19   **A.**  That is correct.

20   **Q.**  Are those -- are those numbers actual or projections?

21   **A.**  These numbers are actuals.

22   **Q.**  And for what year?

23   **A.**  Our fiscal year '23 which would have ended in September of

24   last year.

25   **Q.**  Thank you, Mr. Roman.

 1          As I said, we'll come back to those slides.  If we could

 2    go back to the beginning of the price committee deck.

 3          Now it's dated, Mr. Roman, January 16th.

 4          Mr. Even suggested that it is -- was everything done on

 5    January 16th?

 6    **A.**   No, it was not.

 7    **Q.**   And how long before did this begin; do you recall?

 8    **A.**   So the best of my recollection, sometime in the summer of

 9    2023 we started in earnest the analysis, potentially even a

10    little sooner.

11    **Q.**   And if we turn to the first slide of the deck, Mr. Roman,

12    I think you were asked on Wednesday who made this

13    recommendation; do you recall that?

14    **A.**   Yes, I do.

15    **Q.**   And I'm not sure you were able to answer.  Could you

16    explain a little more about who made the recommendation.

17    **A.**   Taken into consideration all the materials, the business

18    management team, finance team combined, we try to put the best

19    recommendation forward.  Our business management team and

20    Mr. Oliver, they led the recommendation.

21    **Q.**   Was the recommendation the subject of discussion before

22    January 16th?

23    **A.**   Yes, it was.

24    **Q.**   And can you explain a little bit about that.

25    **A.**   For a long period of time, we debated the several options

 1    that we had for pricing this linkout entitlement.  There's

 2    implications on operational teams, on all of our reporting

 3    infrastructure, and the things that we needed to communicate.

 4    Taking all of that into consideration, we tried to have

 5    meetings and reviews ahead of time to provide pieces of the

 6    analysis and to make sure that we were on the right track.

 7    **Q.**  Mr. Roman, the price committee deck contains several

 8    slides relating to the analysis group valuation studies; do

 9    you recall that?

10    **A.**  I do.

11    **Q.**  Can you explain from your perspective in finance the role

12    of the analysis group and these -- this part of the deck, at a

13    high level.

14    **A.**  The analysis group was commissioned by our business

15    management team to provide an overview of the competitive

16    landscape the benchmarking for the services provided of what

17    we were going to price.

18    **Q.**  And what role, if any, did the benchmarking portion play

19    in the finance group's analysis that you led?

20    **A.**  To help us understand the range of pricing options.

21    **Q.**  Mr. Roman, let's -- let's go to the slide --

22            **THE COURT:**  It now looks like you're switching gears?

23            **MR. PERRY:**  Yes, Your Honor.

24            **THE COURT:**  All right.  Why don't we go ahead and

25    take our break.  2:00 to 2:15.

 1          **MR. PERRY:**  Thank you, Your Honor.

 2          **THE COURT:**  Court is in recess.

 3      (Recess taken at 2:02 P.M.; proceedings resumed at

 4   2:15 P.M.)

 5          **THE COURT:**  All right.  Back on the record.

 6      Have a seat.  The record will reflect the parties are

 7   present.  The last session between me and going outside for

 8   some fresh air, Mr. Perry.

 9      Proceed.

10          **MR. PERRY:**  Thank you, Your Honor.

11   **Q.**  Mr. Roman, we were discussing the price committee deck,

12   and I'd like to direct your attention to the App Store

13   ecosystem indicative P&L which is on .10 of the exhibit.

14      Do you have that?

15   **A.**  Yes, I do.

16                       (Exhibit published.)

17   **BY MR. PERRY:**

18   **Q.**  Can you explain to the Court what an indicative P&L is?

19   **A.**  This means that this is an approximation, an estimate of

20   profit and loss.  In the case of the App Store, we had to

21   build one given that this is not available in normal course.

22   **Q.**  Now, the Court heard some evidence at the trial about some

23   other P&L's for the App Store.  Are you aware of that?

24   **A.**  Yes, I am.

25   **Q.**  And can you explain the relationship, if any, between the

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  document you created and those other documents?

2  **A.**  Different teams have provided profit and loss estimates

3  for the App Store.  There is also a difference in what

4  elements are included in such P&L's.  There are versions that

5  do not include any of the allocated expenses.  There are

6  versions, as I've been made aware, that have attempted to do

7  some of these allocations in the past.  This particular one is

8  more fit for purpose for this analysis.

9  **Q.**  And by "this analysis," what do you mean?

10  **A.**  For the pricing committee deck.

11  **Q.**  And did you base this indicative P&L on some preexisting

12  document, or how did it come to be?

13  **A.**  We developed this document and we developed this schedule

14  with all of the financial information we possess, but we did

15  not base it on prior analysis.

16  **Q.**  What was your goal, Mr. Roman, in putting together this

17  indicative P&L for the price committee deck?

18  **A.**  First, it was to provide a baseline for comparison

19  purposes, understanding the starting point of our analysis.

20      Second, it was to provide a full view of the App Store

21  from customer spend all the way to our operating margin.

22      And third, in outlining revenue, the adjusted gross margin

23  and the operating margin, to highlight those levels, to put in

24  context for the financial impact that would later be

25  presented.

1    **Q.**  And you mentioned customer spend.  Can you explain what

2    that means?

3    **A.**  This is reflected at the very top which is App Store

4    billings.

5    **Q.**  And what is that?  What is that number?  Where does it

6    come from?

7    **A.**  All of the purchases made by customers through the App

8    Store.

9    **Q.**  And why does Apple measure the billings or customer spend?

10   **A.**  For the App Store, I believe it's our primary metric to

11   understand activity and to understand performance.

12   **Q.**  Why is that?

13   **A.**  This is what reflects all of the customer transactions,

14   and this is what reflects all of the monetization that is

15   flowing through the App Store.

16   **Q.**  And in your indicative P&L, Mr. Roman, .10, are the App

17   Store billings, are these actuals or projections?

18   **A.**  These are actuals for fiscal year '23.

19   **Q.**  Okay.  And can you just explain to the Court what

20   deductions are made from -- what comes next in the analysis?

21   **A.**  The next row is called developer payouts.  This is the

22   portion of App Store billings that go to developers.

23        The next row is called contra revenue which are

24   adjustments that we make such as delinquency, chargebacks, or

25   gift card costs and reseller margins.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          That leads to revenue which is just a sum of the lines

2     above.

3     Q.   If I can pause you there, are these actual figures or

4     estimates that you're working with?

5     A.   These are actual figures.

6     Q.   Okay.  And the revenue line the Court asked you about

7     earlier, can you just explain what that reflects for the App

8     Store business?

9     A.   This would be the revenue that we would record for this

10    business.

11    Q.   What do you mean by record?

12    A.   This is the amount that would appear in our financial

13    statements or would be considered for the elaboration of our

14    financial statements.

15    Q.   And is that sometimes called net revenue?

16    A.   That is correct.

17    Q.   What happens next in your analysis of the indicative P&L,

18    Mr. Roman?

19    A.   We have another couple of deductions.  One of them is

20    other cost of goods sold.  These represents infrastructure,

21    engineering, product design costs that could be attributed to

22    the product.

23         The next line is credit card fees which is the cost of

24    networks and financial institutions regarding the credit card

25    purchases of customers referred above, and that leads to

1    adjusted gross margin.

2    Q.   And are those figures actuals or estimates?

3    A.   These figures are actuals.

4    Q.   And what business purpose or financial planning purpose,

5    if any, does the adjusted gross margin play, Mr. Roman?

6    A.   This is an important metric as it provides a good sense

7    for us of what is the first line of profitability for the App

8    Store before we make further deductions on other costs that

9    sometimes could be fixed or more operational in nature.

10   Q.   And is that the next set of calculations?

11   A.   That is correct.

12   Q.   And could you describe those for the Court, please.

13   A.   The next row is called "Direct Operating Expenses" which

14   are, roughly speaking, people-related cost, marketing, and

15   professional services that are associated with the App Store.

16   Q.   And is direct op ex, is that an estimate or an actual?

17   A.   It is an actual.  It does have some level of allocation,

18   but those allocations, we have good allocation keys to make

19   them.

20   Q.   Okay.  What comes next in the analysis, Mr. Roman?

21   A.   We have two rows to express research and development and

22   general and administrative expenses that are held at the

23   enterprise level.  We have attempted to apportion to the App

24   Store the relevant part.

25   Q.   And those both say allocated.  What does that mean?

1    **A.**   That means that we do not have a direct observation and we

2    have to work with a broad allocation key.

3    **Q.**   And is there a -- how do you do the allocation of R&D and

4    G&A as a financial modeling exercise?

5    **A.**   Given that we do not have a direct observation, we created

6    a couple of methodologies to make those assessments.

7    **Q.**   Is there one accepted way in the -- in the world of

8    finance or financial modeling to allocate these kinds of

9    expenses?

10   **A.**   No, there is not.

11   **Q.**   Why not?  Do you know why that is?

12   **A.**   It's very complex.  The underlying information is kept at

13   an aggregated basis.  Many of these are joint expenses that

14   are not kept for a specific business line.

15   **Q.**   And who performed the allocation on these two lines of the

16   indicative P&L, dot ten?

17   **A.**   I did.  My team did.

18   **Q.**   And did you explain the methodology that you used

19   somewhere?

20   **A.**   Yes.  That is provided in the following page.

21   **Q.**   Okay.  We'll get to that.

22        And so these are, I think it was clear from your answer,

23   but these two numbers are actuals or estimates?

24   **A.**   They are estimates.

25   **Q.**   Are they accurate?

 1                    **THE COURT:**  They're estimates.

 2                    **THE WITNESS:**  They would not be precise.

 3     **BY MR. PERRY:**

 4     **Q.**  Thank you.

 5          And then the product, Mr. Roman?

 6     **A.**  Once we performed that allocation, we have an operating

 7     margin -- an indicative operating margin in this page.

 8     **Q.**  And without saying the number out loud, can you tell the

 9     Court what does that number, for example, under U.S. method

10     one, what does that number, the dollar number, represent for

11     purposes of modeling the App Store business?

12     **A.**  It's the baseline profit that the App Store would generate

13     in a year.

14     **Q.**  And for what business planning purposes do you, Alex

15     Roman, use that operating margin dollars?

16     **A.**  We used it as a base to project one and two years out what

17     would be the profitability of the store and as a basis of

18     comparison for the alternatives that we explored.

19     **Q.**  Now, below both gross margin and operating margin dollars,

20     there are some percentages.  Do you see that?

21     **A.**  Yes, I do.

22     **Q.**  And can you explain to the Court what those represent?

23     **A.**  Those are the proportion of adjusted gross margin and

24     operating margin respectively as a ratio to App Store

25     billings.

1    **Q.**  Now, you're aware that Mr. Barnes, who's here today, has

2    criticized your calculation in this respect; is that right?

3    **A.**  Yes, I am.

4    **Q.**  And do you understand what the criticism is?

5    **A.**  Yes, I do.

6    **Q.**  Can you explain it to the Court what the issue is here

7    with regard to these calculations?

8    **A.**  From an external reporting and GAAP accounting

9    perspective, billings is not part of such reporting.

10   Therefore a more accounting-compliant calculation would be to

11   calculate these percentages on revenue.

12   **Q.**  And can you explain if that calculation could be made

13   based on the data presented on your chart?

14   **A.**  It can.

15   **Q.**  Now why did you choose to use -- or did you choose to use

16   billings rather than revenue?

17   **A.**  I did.

18   **Q.**  And can you explain to the Court the basis of that choice?

19   **A.**  To represent what is the margin of the store as a store,

20   as a business, starting with total customer spend.

21   **Q.**  Now, Mr. Barnes suggests that this is not compliant with

22   GAAP.  Do you recall that?

23   **A.**  I do.

24   **Q.**  Do you agree or disagree with him?

25   **A.**  I agree with him.

1   **Q.** And are your financial models built on GAAP principles in

2   general?

3   **A.** They are not.

4   **Q.** And why is that?

5   **A.** For estimate and for projection purposes, we try to focus

6   on economic value.  Sometimes such estimates are different

7   than GAAP.

8   **Q.** And can you give an example of how that would work in the

9   real world?

10  **A.** In this same page, credit card fees are usually reflected

11  as operating expenses.  That's the way that they are captured

12  in our disclosed and audited financial statements.

13      For purposes of this analysis, I believe that this is

14  closer to product cost, and hence it is better to reflect it

15  here as it would drive differences in scenarios more

16  appropriately.

17  **Q.** And is this the first time you've departed from GAAP in

18  creating a financial model?

19  **A.** No, it is not.

20  **Q.** Now, Mr. Roman, are you aware that the Court previously

21  found that Apple -- Apple's financial planning and analysis

22  team tracks revenues, fixed and variable costs, allocation of

23  IT and R&D and overheads to an App Store P&L statement?

24  **A.** I am aware.

25  **Q.** And do you understand what the financial planning and

1    analysis team is in that statement?

2    **A.**   Yes.

3    **Q.**   Can you explain what that is?

4    **A.**   This is the corporate FP&A team.

5    **Q.**   And have you reviewed some of the P&L's created by the

6    corporate FP&A team?

7    **A.**   Yes, I have.

8    **Q.**   Did you use any of those P&L's as the basis for the P&L

9    you created for the price committee?

10   **A.**   I did not.

11   **Q.**   Why is that?

12   **A.**   The information and the visibility that we have for the

13   App Store is better for purposes of this analysis.

14   **Q.**   And what do you mean by "better"?

15   **A.**   We have more granular information regarding direct

16   expenses, as well as a better sense of how the App Store

17   operates which is based on billings.

18   **Q.**   Mr. Roman, you mentioned a moment ago that the allocation

19   methodology was on the next slide; is that right?

20   **A.**   That is correct.

21   **Q.**   And this is for what's sometimes called joint or fixed

22   costs; is that right?

23   **A.**   That is correct.

24   **Q.**   Okay.  Let's turn to that.  It's Slide .11.

25                         (Exhibit published.)

1    BY MR. PERRY:

2    **Q.**  And can you just explain very briefly, Mr. Roman, what --

3    what's happening here and -- and if we could focus on either

4    method because I think you have two.

5    **A.**  We have a description of the different cost segments and

6    the different groups that are included in direct research and

7    development, general and administrative expenses.

8        We also list expenses that we excluded from this analysis.

9    And the different methodologies have estimates of what portion

10   of such expenses could be attributed to the App Store.

11   **Q.**  And who made these assumptions or allocations?

12   **A.**  I did.

13   **Q.**  And --

14          **THE COURT:**  All right.  Why don't we -- I don't know

15   if you're going to go through them or not, but is there an

16   explanation of what these initials stand for in this deck?

17          **MR. PERRY:**  There is not, Your Honor.  Would you like

18   that from the witness?

19          **THE COURT:**  Well, you have -- you've redacted it.  So

20   I take it you don't want that list known?  And is there a

21   basis for sealing that list?

22          **MR. PERRY:**  So the issue is this, Your Honor.  As a

23   confidentiality matter, R&D and G&A are reported at that level

24   in the public financial statements.

25       How Apple breaks out those two -- which are well

 1   recognized categories.  How Apple breaks them out by what's

 2   called your group, right, by function or type is not public

 3   and maybe competitively sensitive because it give insight into

 4   the way Apple maintains its business.  As Mr. Roman indicated,

 5   these are kept at the enterprise level, the corporate level,

 6   not at the business line unit which is why the allocation was

 7   necessary.  So the business considers these -- the breakdown,

 8   if you will, to be confidential.

 9       We could certainly provide to the Court a glossary of --

10   well, I should ask the witness that question, but we could

11   certainly provide a breakdown of what those are by -- by name

12   rather than initials if the Court would find it helpful.

13            **THE COURT:**  I'd appreciate that.

14            **MR. PERRY:**  Thank you, Your Honor.  We'll do that.

15   **Q.**  Mr. Roman, without specifying, you know, the types, can

16   you just explain to the Court generally what we will be

17   providing the explanations of.  What are these groups?

18   **A.**  For instance for R&D, these are all of the different teams

19   at Apple that perform R&D functions.  And this is outside of

20   services.  Some of these include teams on specific projects,

21   specific technologies, or specific organizations.

22   **Q.**  And do the acronyms that you have listed on your -- your

23   slide have meaning within Apple?

24   **A.**  Yes.

25   **Q.**  And is that something we could unpack, if you will, for --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    for informational purposes?

2    **A.**  Yes, we can.

3    **Q.**  Okay.  And just to make clear the Court's question,

4    because I answered it too quickly, do the definitions of the

5    acronyms appear in the deck itself?

6    **A.**  They do not.

7    **Q.**  And is there a reason for that?

8    **A.**  Within Apple and for price committee, they would be

9    understood.

10   **Q.**  These are Apple terms, if you will?

11   **A.**  Yes, they are.

12   **Q.**  Okay.

13       **MR. PERRY:**  Your Honor, would it be acceptable to

14   submit that at the end of the day, a list of those?

15       **THE COURT:**  That's fine.  We'll see where we are.  I

16   don't know if Mr. Even has any questions, but they're

17   meaningless to me unless I have the actual names.

18     So go ahead.

19       **MR. PERRY:**  Thank you, Your Honor.

20   **Q.**  Mr. Roman, between method one and method two, can you

21   explain the difference for the Court.

22   **A.**  For method one, this is a very simple allocation where we

23   have taken the proportion of billings into the total Apple

24   gross of revenue to indicate as a measure the level of

25   intensity that that would provide.

1    **Q.**  And there's a percentage figure stated there.  What does

2    that reflect in your financial model?

3    **A.**  It would be the proportion of each one of these categories

4    that would go into R&D allocated and G&A allocated.

5    **Q.**  And there's one percentage for method one.  Why is that?

6    **A.**  This is the simplest way that we could find to provide a

7    sense of the App Store in the sense of the total.

8    **Q.**  And method two is different how, Mr. Roman?

9    **A.**  Method two is comprised of individual assessments by the

10   people that we consulted to assign what percentage of that

11   specific group's activity could relate to the App Store.

12           **THE COURT:**  What are the other -- so it's the App

13   Store compared to what?  Hardware?  What are the other

14   ecosystems?

15           **THE WITNESS:**  For Apple, you would find iPhone, iPad,

16   Mac, wearables, home and accessories, and then the other

17   services me honor [sic] -- Your Honor.

18   **BY MR. PERRY:**

19   **Q.**  So, Mr. Roman, in the Apple enterprise financial

20   statements, how are these joint costs reported; do you know?

21   **A.**  They are all grouped together as R&D or G&A.

22   **Q.**  And are they separated by products and services?

23   **A.**  They are not.

24   **Q.**  Mr. Roman, who -- who came up with method two for purposes

25   of this allocation?

1   **A.**   We did.

2   **Q.**   And by "we," you mean...?

3   **A.**   The finance organization, yes, my finance team.

4   **Q.**   And why did you include in this price committee deck a

5   slide showing the allocation assumptions for these costs?

6   **A.**   To illustrate the range.  Given that it is not a precise

7   calculation, we wanted to have two indications to see if they

8   were too far apart, to see if our estimates are more or less

9   in line.

10  **Q.**   And if you turn back to the indicative P&L which is page

11  .10, what conclusions from a financial modeling perspective

12  did you draw between method one and method two?

13  **A.**   It gave us some comfort that with two different

14  methodologies, we were roughly in the ballpark of what this

15  allocations for research and development and G&A, and general

16  and administrative, expenses could be driving for the App

17  Store.

18  **Q.**   And between the two -- did you use one method or the other

19  for the analysis and the rest of the model?

20  **A.**   We did not.

21  **Q.**   Mr. Roman, on Wednesday, Mr. Even asked you about the

22  Court's findings that the App Store P&L prepared by corporate

23  FP&A indicated an operating margin of over 75 percent for

24  fiscal year 2019.

25       Do you remember that?

ROMAN – CROSS / PERRY

1    **A.**   I do.

2    **Q.**   And your answer was, quote, "It's irrelevant for this

3    analysis."

4         Do you remember that?

5    **A.**   I do.

6    **Q.**   And I think you were cut off at that point.  Would you

7    like to explain to the Court why you hold that view?

8    **A.**   The creation of that P&L was for a different purpose.  The

9    main goal for corporate FP&A is not to support pricing

10   decisions.

11   **Q.**   Why would a pricing decision have a different approach

12   than a corporate FP&A approach?

13   **A.**   Corporate FP&A needs to represent all information at the

14   enterprise level.  In other words, all estimates and all

15   reporting will conform to the total so that the numbers could

16   be compared across.

17   **Q.**   And did you prepare this indicative P&L to be compared

18   across business lines?

19   **A.**   No, I did not.

20   **Q.**   And if you could turn to the next slide again, .11,

21   which was your assumptions, right?

22   **A.**   (Reviewing document.)

23   **Q.**   Could you read for the Court that little tiny footnote in

24   the bottom left corner, Mr. Roman?

25   **A.**   Financial assumptions?

1   **Q.**   No, I'm sorry.  Dot 11.

2   **A.**   Oh.

3   **Q.**   The indicative P&L allocation assumptions.

4        We can blow it up on the screen for you, sir.

5   **A.**   Created for pricing analysis.

6   **Q.**   And why did you include that in your allocation

7   assumptions in indicative P&L?

8   **A.**   So that it would not be confused for any corporate

9   purposes.

10  **Q.**   Shifting gears, Mr. Roman, if we could turn to the next

11  slide in your price -- in the price committee deck, which is

12  .12 which is entitled "Projected Effective Commission on

13  Entitlement Transactions."

14       And you recall Mr. Even asked you some questions about

15  this, right?

16  **A.**   Yes, I do.

17  **Q.**   If we could start at a high level, and you -- just

18  proceeding through your model, we have an indicative P&L with

19  the assumptions.  This is the next slide, right?

20  **A.**   That is correct.

21  **Q.**   Why is that?  What -- what are you presenting to the

22  company with respect to the model?

23  **A.**   This was the most complicated part of the analysis.  This

24  is where we spent potentially the most time to derive.

25       After starting with the baseline P&L, we estimated that

1    enabling all of these changes would take time for developers.

2    We estimated that that would take around a couple of years.

3        We projected our P&L out a couple of years starting with

4    billings.  And then we overlaid assumptions to understand what

5    would be developer adoption and then customer adoption of the

6    linkout entitlement.

7        Then we ran a series of calculations to understand what

8    would be that effective commission rate as a percentage of

9    billings that would actually take place in each one of these

10   intersections.

11   **Q.**  And to be clear, when you say effective commission rate,

12   you mean the effective commission rate to Apple, right?

13   **A.**  That is correct.

14   **Q.**  And if, for example, the effective commission rate to

15   Apple is 18 percent, did you analyze what the effective

16   commission rate to a developer would be?

17   **A.**  We assumed that it would be similar.

18   **Q.**  Now, we'll get to the assumptions in a minute.  But why,

19   Mr. Roman, did you include this slide calculating the

20   effective commission rate?

21   **A.**  Given that the headline rates are 20 to 30 percent, there

22   is an impact from the duration window that needs to be

23   understood that would reduce such headline rate.  It was

24   important for us to outline that impact.

25   **Q.**  And I think Mr. Even touched on this.  Where did the

1   ranges on this slide come from, Mr. Roman?

2   **A.**  This was based on our competitive analysis and

3   benchmarking provided previously.

4   **Q.**  Now, can you explain just in common sense why -- why the

5   effective commission rate would be less than the headline

6   commission rate?  Is it just a matter of averaging the 27 and

7   the 12?

8   **A.**  It has a few additional elements.  For purposes of this

9   analysis and with the baseline that we had established, we had

10  an estimate of the total billings and the associated revenue

11  and commissions that Apple would be able to charge.  Providing

12  these change, providing these linkout entitlement and with

13  this pricing, those numbers would differ.

14      Developers would only pay for transactions happening in

15  these windows.  All subsequent transactions would not generate

16  an additional commission.  And that is the main reason why

17  these numbers would be lower.

18  **Q.**  And so for --

19          **THE COURT:**  That's only with respect to a single

20  click, correct?

21          **THE WITNESS:**  For each click.  You're correct, Your

22  Honor.

23  **BY MR. PERRY:**

24  **Q.**  And for the adopted rate of 27 percent and a seven-day

25  window, what did you calculate as the effective commission

 1   rate, Mr. Roman?

 2   **A.**   For that intersection, it is approximately 18 percent.

 3   **Q.**   And then at the bottom, there is a couple of assumptions,

 4   right?

 5   **A.**   Yes.

 6   **Q.**   Could you explain those to the Court, please.

 7   **A.**   The first assumption is that roughly half the customers

 8   would come back and tap or click on those links, which means

 9   that not all of the transactions would actually occur outside

10   of that window.  Or that customers would come back, tap again,

11   and reset the clock.

12       The second is that for purposes of calculating the

13   effective commission, we did not take into account that there

14   could be, for Apple, collection or measurement risk.

15   **Q.**   What does that mean, Mr. Roman, collection or measurement

16   risk?

17   **A.**   That means that now Apple has to collect from developers

18   these amounts.

19   **Q.**   And what's the risk part of that?

20   **A.**   Developers could be late in payments.  Developers now have

21   to measure that with their own systems, and their systems

22   might not be accurate, they might be underreporting.

23   **Q.**   And those are not included in these effective commission

24   rates, right?

25   **A.**   Not on this page.

1  **Q.**  All right, Mr. Roman.  The next page, .13, is entitled

2  Projected Effective Commission on Entitlement Transactions.

3      Do you have that?

4  **A.**  Yes, I do.

5                      (Exhibit published.)

6  **BY MR. PERRY:**

7  **Q.**  Now, can you just explain -- we jumped right into it

8  earlier.  Can you explain at a higher level what is this and

9  what relation, if any, does it have to that matrix we were

10  just looking at?

11  **A.**  This is an example for 27 percent and a seven-day window

12  of how the 18 percent would come about.  It provides a dollar

13  projection and it provides the percentage that underpins the

14  number in the previous slide.

15  **Q.**  And can you just walk the Court briefly through the

16  analysis or model that you created to make that calculation.

17  **A.**  The first row is entitlement billings.  We estimated at a

18  granular level two years in the future what percentage of all

19  billings would go through the linkout entitlement, making

20  assumptions on developer adoption or implementation as well as

21  the rate at which customers would tap on such linkout

22  entitlement.

23  **Q.**  And you list some of those assumptions on this slide,

24  right?

25  **A.**  That is correct.

ROMAN - CROSS / PERRY

1    **Q.**  And we'll unpack those a little bit.  Can you explain the

2    analysis, you know, with the assumptions, and then we'll talk

3    about how you get to the assumptions; is that all right?

4    **A.**  Yes.

5    **Q.**  Okay.  So we have entitlement billings.  What happens

6    next?

7    **A.**  Next we calculate what would be the commission on the

8    totality of the entitlement, in other words, if there was no

9    duration window.  Next --

10   **Q.**  Well, can I pause you on that one.

11        You see the projected -- you have dollars and then

12   projected effective commission percentage for that line for

13   the first time.  Can you explain how -- where that's derived

14   from?

15   **A.**  These would be derived out of the application of the

16   headline rate for -- applied on the entitlement billings

17   above, this would be the 27 percent.

18   **Q.**  And why is it lower than that headline rate?

19   **A.**  It is because we have programs as well.

20   **Q.**  And what do you mean by that?

21   **A.**  These programs assume that for small business program, for

22   instance, we would also have a lower headline commission.

23   **Q.**  Why -- well, that number is pretty close to the headline

24   rate, right?

25   **A.**  That is correct.

1   **Q.**  And why is that if we have these other programs -- if

2   Apple has these other programs?

3   **A.**  These programs in relation to the total billings are not

4   that large.

5   **Q.**  Do you have any sense in putting this together, Mr. Roman,

6   of the number of developers or -- or the developer population

7   that drives billings on the App Store?

8   **A.**  One measure that I have used in the past is that --

9                         (Phone interruption.)

10            **THE COURT:**  All right.  Whose phone is on?

11       Go ahead.

12            **THE WITNESS:**  One measure that I have used in the

13   past is that roughly our top 200 developers have almost

14   three-quarters of the billings on the App Store.

15   **BY MR. PERRY:**

16   **Q.**  And what commission rate do those 200 developers generally

17   pay; do you know?

18   **A.**  The vast majority would be paying 30 percent today.

19   **Q.**  Under the IAP regime?

20   **A.**  On their IAP, correct.

21   **Q.**  Okay.  So the second line -- back to your chart,

22   Mr. Roman, .13, the commission on 100 percent of entitlement

23   billings, we have a dollar and then an effective rate, right?

24            **THE COURT:**  I take it that those 200 top developers

25   compete with Apple?  Do they have space -- or are they

1    occupying or are they in categories of apps that compete with

2    Apple's own apps?

3         **THE WITNESS:**  Some of them might, Your Honor.

4         **THE COURT:**  Do you have -- the number 200 is a

5    relatively specific number.  Do you have a list?

6         **THE WITNESS:**  I do have a list.  It's not part of

7    this deck.

8         **THE COURT:**  And do you put them -- those 200 that

9    you've identified, on your list are there categories?

10        **THE WITNESS:**  Yes, there are.

11        **THE COURT:**  How many categories are there?

12        **THE WITNESS:**  There's many categories, Your Honor.

13   For instance, you have the gaming category.  That's a big

14   category.  You would have --

15        **THE COURT:**  Of the 200, how many do you think are in

16   the gaming category?

17        **THE WITNESS:**  I do not recall, Your Honor.

18        **THE COURT:**  I'll tell you what.  I'd like to see the

19   list.  We won't finish with you today, I'm sure.

20        Go ahead.

21        You can bring it next time.

22        **MR. PERRY:**  Yes, Your Honor.

23        **THE COURT:**  Proceed.

24   **BY MR. PERRY:**

25   **Q.**  Mr. Roman, the projected effective commission percentage,

1   I think Mr. Even asked you if that was a blended rate.  Do you

2   know what a blended rate is?

3   **A.**   Yes, I do.

4   **Q.**   And what -- how would you describe a blended rate?

5   **A.**   This would be the weighted average of the different

6   headline commission rates.

7   **Q.**   And is this a blended rate in that, using that

8   description?

9   **A.**   That is correct.

10  **Q.**   And what does "weighted average" mean in that definition

11  you just gave?

12  **A.**   It would be all of the billings multiplied by the

13  commission rate, divided by -- or each billings by developer,

14  multiplied by its headline commission, divided by all of the

15  billings.

16  **Q.**   And by "billings," do you mean the same way you used

17  billings on your indicative P&L?

18  **A.**   That is correct.

19  **Q.**   What is the next line and -- and the Court asked us to use

20  blocks.  I apologize.  So entitlement billings was column --

21  or row 1.  Commission on 100 percent is row 2.  And then row 3

22  is loss due to lower billings and seven-day attribution

23  window.

24       Could you explain to the Court what you were calculating

25  there?

 1   **A.**   These would be all of the commissions that would not go to

 2   Apple given that the transactions would happen outside of the

 3   window.

 4   **Q.**   And if they don't go to Apple, what happens to them?

 5   **A.**   They would stay with developers.

 6        **THE COURT:**   I still don't understand where you get

 7   this number.

 8        What is the -- it appears to -- yeah, where is the data to

 9   support this number?

10        **THE WITNESS:**   Your Honor, the data that we have for

11   this particular row is that we know from customer -- whenever

12   customers initiate purchases, how many of these purchases take

13   place in these different windows of time, in one day, three

14   days, seven days, 30 days, what proportion, for all of our

15   transaction businesses, our subscription businesses.

16        Leveraging that data, we have a good line of sight into

17   how many transactions would happen outside of this window.

18        **THE COURT:**   Who is the person most knowledgeable

19   about the detail of this seven-day window?

20        **THE WITNESS:**   Of the calculation of this number?

21        **THE COURT:**   Who is the person most knowledgeable

22   about the data that supports the seven-day window?

23        **THE WITNESS:**   This would be our analytics team, our

24   data analytics team, Your Honor.

25        **THE COURT:**   Is there a person who is in charge of the

1    data analytics team?

2              THE WITNESS:  Yes, there is.

3         THE COURT:  Who?

4         THE WITNESS:  His name is Ayman Khalil.

5         THE COURT:  Okay.  And how do you spell that?

6         THE WITNESS:  Last name is K-H-A-L-I-L.

7         THE COURT:  And first name?

8         THE WITNESS:  A-Y-M-A-N.

9         THE COURT:  Thank you.

10        Proceed.

11   BY MR. PERRY:

12   Q.  Mr. Roman, in your answer to the Court's question, you

13   have -- you said you have -- Apple has visibility into

14   transactional data.

15        Could you explain a little more about what you mean by

16   that?

17   A.  For this particular analysis, we have granular data in

18   terms of each transaction completed by a customer.  And we

19   have the frequency of such transactions as well.

20        Based on the cadence of frequency or the frequency of such

21   transactions, we know after a person would click or tap, for

22   instance, an in-app purchase, how much time would pass before

23   they tap or click again.

24   Q.  And did you and your team use that data in some way in

25   creating the summary table at page .13?

1    **A.**  Yes, we did.

2    **Q.**  And can you explain how the data got from data analytics

3    into finance and what -- what you, Alex Roman, and your team

4    did with it?

5    **A.**  We summarized the data in terms of each different window,

6    the percentage of, let's say, annual transactions that happen

7    in one day and across each time duration window.

8         And we deployed that to understand what portion of

9    commissions would actually be with Apple under this analysis,

10   which means that the remainder, the portion that would be

11   outside of this window is the number that would be reflected

12   here, aggregated for all of the different app categories.

13   **Q.**  And why didn't you just -- well, strike that.

14        Doing that analysis, how did it lead to this number, to

15   come back to the Court's question.  In other words, how was

16   the number derived from the date analysis project you just

17   described?

18   **A.**  With the results of that analysis, we had percentages.

19   Those percentages for each one of those windows would tell us

20   which portion of the commission on 100 percent of entitlements

21   would happen inside the window and outside the window.  And

22   those percentages were the ones that we used for this

23   analysis.

24   **Q.**  And do you have any recollection, Mr. Roman, of the size

25   of this data set or the number of observed transactions or any

1    kind of the -- the size of the box, if you will?

2    **A.**   It is very large.

3    **Q.**   How large?

4    **A.**   There are billions of transactions.

5    **Q.**   And how does your team work with a data set like that?

6    **A.**   We rely on our data analytics teams, who have tools and

7    the right equipment to be able to process large data like

8    that.

9            **THE COURT:**   I'm assuming that when they report -- did

10   he report to you, Mr. Khalil and his team?

11           **THE WITNESS:**   They do not, Your Honor.

12           **THE COURT:**   How did they give you the information

13   that led to what you put in this document?

14           **THE WITNESS:**   We work closely together, Your Honor.

15           **THE COURT:**   How?   What was the method of

16   communication?

17           **THE WITNESS:**   They sent us a report.

18           **THE COURT:**   When was the report sent to you?

19           **THE WITNESS:**   This would have been not too far away

20   from the -- when we started, Your Honor.   It would have been

21   around the summer.   But I do not recall the exact date.

22           **THE COURT:**   The summer of 2023?

23           **THE WITNESS:**   That is correct.

24           **THE COURT:**   How long is the report?

25           **THE WITNESS:**   The report would have been a summary,

1     which means it's short.

2              **THE COURT:**  How long is the summary?

3              **THE WITNESS:**  The summary, roughly a couple of pages.

4              **THE COURT:**  Great.  Bring that too.

5         Go ahead.

6              **MR. PERRY:**  Thank you, Your Honor.

7     **Q.**  Moving to line 4, or excuse me, row 4 of your analysis,

8     Mr. Roman, can you explain to the Court what that means.

9     **A.**  This line reflects what would be the projected revenue or

10    the commission, assuming that all future sales, in other

11    words, that Apple would only collect commission on the initial

12    link, on the initial tap of the customer on the link, which is

13    just a mathematical addition of the two rows above.

14    **Q.**  Okay.  And the next row, row 5?

15    **A.**  In discussions with the team, we realized that customers

16    could actually come back and tap on the link again.  Therefore

17    we needed to put an assumption regarding how many of these

18    customers would go and do so.

19    **Q.**  And did you have data for that?

20    **A.**  We did not.

21    **Q.**  Why not?

22    **A.**  This is not something that we would have ever observed.

23    **Q.**  Why would Apple not have observed customers tapping on

24    links to make transactions outside the app before?

25    **A.**  We do not have visibility into such data.

1   **Q.** And is there any analogous data at Apple that you could

2   have relied on for this purpose?

3   **A.** No.

4   **Q.** So without data, how did you proceed?

5   **A.** We knew this number was going to be more than zero.  And

6   we knew that this number was going to be less than 100.  And

7   we decided to provide visibility into this assumption and just

8   said that it was going to be 50 percent.

9   **Q.** Now, you discussed with Mr. Even earlier a little bit

10   about the process of making assumptions in connection with

11   your model; is that right?

12   **A.** That is correct.

13   **Q.** Is every assumption made the same way, or are there

14   differences among the assumptions?

15   **A.** There are differences between the assumptions.

16   **Q.** So you just described the returning customer assumption is

17   split the baby, if you will?

18   **A.** That is correct.

19   **Q.** Is that the same approach you applied to all the

20   assumptions?

21   **A.** No.

22   **Q.** Okay.  And we'll get to the other assumptions, but if we

23   could finish out the chart; is that all right with you,

24   Mr. Roman?

25   **A.** Yes, it is.

ROMAN - CROSS / PERRY

1   **Q.**  Very good.

2        So after that -- or applying that assumption, what is the

3   next line, row 5 on your chart, what does it represent?

4   **A.**  This would be the addition of the two rows above.  And it

5   provides our expectation or projected revenue, commission,

6   assuming that 50 percent of customers would tap again on the

7   links.

8   **Q.**  Okay.  And again, we're going to come to the assumptions

9   in a minute.  But just to summarize where the numbers come

10  from, if you will, row 1, the entitlement billings, that's

11  from the indicative P&L; is that right?

12  **A.**  Correct.

13  **Q.**  And it's rolled forward two years, you explained; is that

14  right?

15  **A.**  That is correct.

16  **Q.**  And can you just explain to the Court why you -- why is

17  the indicative P&L fiscal year '23 and your projections are

18  for two years in the future?

19  **A.**  The indicative P&L is anchored on our actuals, what we

20  have seen, the best numbers that we have to date.  It's a good

21  place to start our analysis.

22       For purposes of establishing the impact, we knew that

23  developers would take time to implement, generating their

24  systems, putting together reporting, understanding the value,

25  design work.

1       Hence we had to roll forward our P&L a couple of years to

2  make sure that we would capture what would be the steady state

3  of whenever all of these changes were in place and we would be

4  able to see what is the true impact on the App Store.

5  Q.  To do that, you made these assumptions then at the bottom

6  of the page.  Is that -- am I following the logic, Mr. Roman?

7  A.  That is correct.

8  Q.  Okay.  And let's talk about the assumptions, financial

9  assumptions.  Do you see that?  Let's start on the left.

10  Seven-day attribution window, what does that mean?

11  A.  That means that for seven days, all of the transactions

12  from the customer on the developer's website would basically

13  generate a commission.

14  Q.  And that's the window that was ultimately adopted?

15  A.  That is correct.

16  Q.  And the next one is 50 percent returning customers.  Is

17  that the same as the assumption that has a line item, if you

18  will, in the table?

19  A.  That is correct.

20  Q.  Okay.  And then the next one, Mr. Roman, is entitlement

21  billings.  Do you see -- or excuse me -- entitlement share.

22  And I know -- I know you covered this with Mr. Even, but can

23  you just explain to the Court in a little more detail first

24  what entitlement share is, and then second will be how you

25  made this assumption.

1    **A.**   Entitlement share is from all of the transactions that

2    customers would do on the apps -- or with the developers that

3    have implemented the linkout, what percentage of those

4    transactions would actually go through that link.

5    **Q.**   And how did you and your team -- or who -- first, who made

6    that assumption?

7    **A.**   This would be a collaboration between our finance team and

8    our business management team.

9    **Q.**   And were you personally involved in making this

10   assumption?

11   **A.**   I was not.

12   **Q.**   So do you know who was?

13   **A.**   I reviewed the assumption with this team.  This would be

14   my finance team.  And this would be Mr. Oliver.

15   **Q.**   Did you participate in the meetings concerning this

16   assumption?

17   **A.**   I did.

18   **Q.**   And how many were there, do you know?

19   **A.**   There were many.  Many meetings.

20   **Q.**   What does "many" mean in this context?

21   **A.**   Over a dozen.

22   **Q.**   Just on this assumption or on assumptions generally?

23   **A.**   Just on this one.

24   **Q.**   And can you describe for the Court how these meetings

25   generally progressed to reach this assumption?  What happened?

1    Why did you need a dozen meetings to reach this assumption?

2    **A.**   To arrive at consensus, to make sure that we have the most

3    accurate representation of what we expect would happen.

4    **Q.**   And do you have data underlying this assumption?

5    **A.**   For this one in particular, it was very hard for us to

6    obtain hard data.

7    **Q.**   And why is that?

8    **A.**   When faced with a choice for developers between different

9    options, it is unclear to us exactly how to calculate how

10   customers would make these decisions.

11   **Q.**   And do you have an understanding as to how the group, the

12   consensus, landed at 30 percent?  Is there a rationale, if you

13   will?

14   **A.**   Based on the recommended implementation of how the linkout

15   would be shown, where it would be shown, and how customers may

16   perceive the value of going through that link, we arrived at a

17   number that we knew was going to be less than 50 percent.

18       From there, we had further conversations around the

19   potential range of options.  We modeled several of them.  And

20   then through conversation, we landed on three out of ten --

21   **Q.**   Thank you.

22   **A.**   -- as a more-likely-than-not outcome.

23   **Q.**   Thank you, Mr. Roman.

24       And the next assumption listed is the billings entitlement

25   implementation, correct?

1   **A.**   That is correct.

2   **Q.**   And I'm not going to read that number out loud, but I

3   think Mr. Even accurately described it as a substantial

4   majority; is that right?

5   **A.**   That is correct.

6   **Q.**   And can you explain how you arrived at this assumption?

7   **A.**   Starting with the premise that this linkout entitlement

8   would provide value to all developers, the question here was

9   for whom it might not provide value.

10      And in here, we found a few different segments.

11      There are some developers that potentially are too small,

12  for whom it might not make sense to dress up all of the

13  infrastructure to potentially do it.

14      There is also programs, as we described, where developers

15  might derive a lot more value.

16      And also, as we know, despite having strong economic

17  motivations, some developers just don't do it.

18  **Q.**   Now, Mr. Even asked you earlier whether the adoption rate

19  a few months in cast doubt on this assumption, in your view.

20  And do you have a perspective on that?

21  **A.**   I do.

22  **Q.**   And what is that, Mr. Roman?

23  **A.**   This is too early to make that assessment.

24  **Q.**   And why is that?

25  **A.**   The changes that this would entail in the customer

1  experience in the back-end system for developers would take

2  time to assess and operationalize before they would go live

3  with a solution.

4         **THE COURT:**  Do you know of any developer who is

5  undertaking that?  Any?  Do you -- can you name a single one?

6         **THE WITNESS:**  There is a developer -- none of them

7  have gone live, Your Honor.  I know that a lot of customers

8  have -- a lot of developers have applied for this linkout

9  entitlement.

10         **THE COURT:**  Any of the 38 -- or no.  Any of the

11  200 that are on your list?

12         **THE WITNESS:**  Not yet, Your Honor.

13         **THE COURT:**  When do you anticipate seeing movement?

14         **THE WITNESS:**  Over --

15         **THE COURT:**  You say it's too early.  So when do you

16  anticipate seeing movement?

17         **THE WITNESS:**  I would expect that over the next few

18  months, Your Honor, we would see a lot more traction -- or

19  more traction and interest in this.

20         **THE COURT:**  I don't know what the difference is.

21  Explain that.

22         **THE WITNESS:**  In other words, my expectation would be

23  that the shape of adoption might follow not a straight line

24  but a low line in the beginning and stronger adoption after a

25  year, year and a half.

 1          **THE COURT:**  Go ahead.

 2     **BY MR. PERRY:**

 3     **Q.**  Do you have, Mr. Roman, any experience with new products

 4     or features or services at Apple to support that assumption?

 5     **A.**  Based on our own internal work and our release of

 6     features, we have noticed that for this particular segment,

 7     developers take time to make these assessments and to make

 8     sure that everything is operational and well established to

 9     provide the best customer experience.

10     **Q.**  Now --

11          **THE COURT:**  That's a pretty generic statement.  Or I

12     would say a pretty generic conclusion.  What kind of data do

13     you have to support that?

14          **THE WITNESS:**  For instance, Your Honor, when we

15     rolled out the small business program, adoption was not

16     immediate.  Even though the financial benefit would be large,

17     it took time for developers to go through the process, apply,

18     and make the right implementation even though that reduction

19     in headline rate was significant.

20          **THE COURT:**  Anything else?

21          **THE WITNESS:**  When we have launched other features on

22     the App Store, adoption from developers is not immediate.  It

23     takes time.

24          **THE COURT:**  Like what?

25          **THE WITNESS:**  In-app events, for instance.

 1           **THE COURT:**  I don't -- give me a specific.

 2           **THE WITNESS:**  I might not be able to do a good job

 3      doing that, Your Honor.

 4           **THE COURT:**  Well, then who would be the best person

 5      to give me the data?

 6           **THE WITNESS:**  Mr. Oliver.

 7           **THE COURT:**  All right.

 8        Go ahead.

 9           **MR. PERRY:**  Thank you, Your Honor.

10      **Q.**  Mr. Roman, is it possible that this litigation has any

11      effect on developers' adoption of the new program; do you

12      know?

13      **A.**  It is possible.

14      **Q.**  Why would that be?

15      **A.**  Developers might be interested and see any other rulings,

16      outcomes, or recommendations that might come out of it before

17      engaging in that type of work.

18      **Q.**  Now, Mr. Even asked you a question that suggested the

19      assumptions in your analysis were, quote, made up, end quote.

20        Do you agree with that, Mr. Roman?

21      **A.**  I disagree.

22      **Q.**  And why is that?

23      **A.**  We take a lot of care in providing our executives and

24      providing price committee with the best information that we

25      can to represent our expectation of how Apple will be impacted

 1    by these changes.

 2    **Q.**  Why, in putting together your financial model for the

 3    price committee, Mr. Roman, did you disclose these assumptions

 4    on the -- in your -- in your chart?  What's the purpose of the

 5    framework, if you will?

 6    **A.**  Changes to these assumptions would drive meaningful

 7    differences in the financial impact that the linkout

 8    entitlement might provide.

 9    **Q.**  And did you and your team run the model using different

10    assumptions?

11    **A.**  Yes, we did.

12    **Q.**  And how did you choose the set of assumptions that

13    ultimately was presented in this deck?

14    **A.**  After running all of those scenarios and simulations, we

15    concluded that these assumptions represented more of the

16    expected values, not too high, not too low.

17    **Q.**  Now, on that financial assumptions section of the

18    effective commission, Slide .13, Mr. Roman, do you see below

19    the assumptions it says, quote, the effective commission rate

20    does not account for measurement risk.  Do you see that?

21    **A.**  Yes, I do.

22    **Q.**  Can you explain what that means?

23    **A.**  This is all of the numbers on this page do not take into

24    account if developers have problems measuring the activity

25    after the window, for instance on the reporting, or if

 1    developers have problems paying the resulting commission.

 2    Q.   And is that the same as the measurement in collection risk

 3    that you mentioned with respect to a previous slide?

 4    A.   That is correct.

 5    Q.   Okay.  Mr. Roman, you mentioned that one of the goals was

 6    to establish, quote, the value for all developers.  Did you --

 7    did I get that right?

 8    A.   That is correct.

 9    Q.   And can you explain a little more about that.

10    A.   The value for all developers is all of the future flow or

11    all of the future customer purchases that could be derived out

12    of the linkout entitlement.

13         And one of the assumptions that we have made is that the

14    entitlement billings remain the same.  It is possible that

15    those entitlement billings could be different, even higher for

16    developers to do.  We did not make that assumption to be

17    conservative in our analysis from an Apple perspective.

18    Q.   Now, there's been considerable discussion today about

19    payment processing fees.  Do you recall that?

20    A.   Yes, I do.

21    Q.   Do you have a sense, by the way, Mr. Roman, what payment

22    processing fees are in the external market?  Do you know?

23    A.   I have a broad sense.

24    Q.   Can you explain that broad sense.

25    A.   There is fees that are collected by Visa and Mastercard,

1        for instance.  Those are very direct, published on their

2        website.  They depend on the amount of volume that goes

3        through them.

4            These fees have a percentage and they also have a specific

5        dollar amount, a few cents.

6            Deriving that percentage for individual developers would

7        require understanding a lot of things on how their

8        transactions flow and how much volume they would have to get

9        those arrangements.

10           In addition to direct relationships with these networks

11       and these financial institutions, there is providers that try

12       to aggregate some of these services together, someone like

13       Stripe.  And their fees are also -- there are standard fees

14       for smaller developers, but bigger ones are a range and are

15       negotiated.

16           The definition of payment fee sometimes varies.  Some

17       people include customer support for those.  Some people

18       exclude them.

19           That's why sometimes there is not a standard definition,

20       and it's important to understand the details behind to see

21       what is the actual cost incurred.

22       **Q.**  And in constructing the model for the linkout entitlement

23       pricing, did you and your team make any effort to model

24       payment processing fees?

25       **A.**  Given that payment processing is something that is not

1    offered by Apple in connection with the linkout entitlement,

2    we did not consider that this was value provided by Apple to

3    developers.  Hence, we did not spend a lot of time

4    understanding what that payment processing number might be.

5              **THE COURT:**  So the answer is no.

6              **THE WITNESS:**  That is correct.

7    **BY MR. PERRY:**

8    **Q.**   Now, Mr. Even suggested this morning that -- or this

9    afternoon, Mr. Roman, that if a developer were to pay

10   3.5 percent payment processing fee, the Apple link entitlement

11   model would be uneconomic.  Do you remember that question?

12   **A.**   I do.

13   **Q.**   And do you have a response to that?

14   **A.**   I don't believe that's accurate.

15   **Q.**   And why is that?

16   **A.**   Developers would have economic benefit out of adopting the

17   linkout entitlement.  Such economic benefit, especially for

18   developers in transactions, is large.  Developers in the

19   transactional business is large.  Therefore, even if the range

20   of payment processing is large, they would be able to continue

21   deriving that benefit.

22   **Q.**   Now, Mr. Roman, if the data you relied on in the

23   assumptions that you and your teams made are correct, what

24   does this slide show regarding effective commission rates?

25   And don't say the number.  Just what -- what does it -- what

1    is the bottom line, if you will, of this slide?

2    **A.**   There is a lower than the headline rate in a meaningful

3    way.

4    **Q.**   And is the percentage number in row 6, does that bear some

5    relationship to the matrix that appears on .12?

6    **A.**   Yes, it does.

7    **Q.**   And can you explain to the Court the relationship between

8    those two slides, please.

9    **A.**   That is the intersection on CX-0009.12 of 27 percent and

10   seven days.

11   **Q.**   And did you and your team perform a similar calculation

12   for all the other cells on the matrix?

13   **A.**   That is correct.

14   **Q.**   And is that where these numbers are derived from?

15   **A.**   That is correct.

16   **Q.**   Okay.

17       Now, if we look at slide -- back at another your more

18   detailed table, Mr. Roman, .13.

19                    (Exhibit published.)

20   **BY MR. PERRY:**

21   **Q.**   Slide 1 is the entitlement billings.  Can you just explain

22   very briefly again, what is that number?

23   **A.**   That would be all of the billings that would be generated

24   by the developers that would adopt the entitlement.

25   **Q.**   And if you turn back to your indicative P&L at .10.

 1                    (Exhibit published.)

 2   **BY MR. PERRY:**

 3   **Q.**  The App Store billings line -- sorry, I'm going to ask you

 4   to do some quick math without saying the numbers out loud.

 5        Can you do the percentage between those two numbers,

 6   Mr. Roman?

 7   **A.**  It's larger than a fifth.

 8   **Q.**  Than a fifth?

 9   **A.**  Yeah.

10   **Q.**  So 20-plus -- your model is showing that 20-plus percent

11   of billings two years from now would flow through the link

12   entitlement; is that right?

13   **A.**  That is correct.

14   **Q.**  Mr. Roman, you were asked a couple of questions about

15   program eligibility.  Do you recall that?

16   **A.**  Yes, I do.

17   **Q.**  Can a developer who is a member of one of the special

18   programs, for example, the video partners program, take

19   advantage of the new link entitlement if they choose?

20   **A.**  Yes, they do.

21   **Q.**  How would they do that?

22   **A.**  They would have to opt out from their current program and

23   adopt this one.

24   **Q.**  So it's a one or the other situation?

25   **A.**  That is correct.

1  **Q.**  And why is that?  Could you just -- what's the logic

2  behind it?

3  **A.**  Mr. Oliver would be able to provide more details.

4      I can tell you that in our discussions, these developers

5  derive benefit from deeper integration with Apple in, for

6  instance, in the video partner program with a TV app, the

7  needed inclusion in TVOS.

8      And there are certain customer features, like single sign

9  on, that would make a very awkward customer experience trying

10 to have a linkout entitlement while actually trying to stay

11 within that program.

12 **Q.**  Okay.  Thank you.

13     If you could turn in your deck, Mr. Roman, to Slide .14,

14 which is entitled "Steady State Net Impacts on App Store

15 Financials."  Do you have that?

16 **A.**  Yes, I do.

17 **Q.**  Now, let's start at the bottom in the assumptions.

18 Returning customers, is that the same as we've already

19 discussed?

20 **A.**  Yes, it is.

21 **Q.**  And entitlement share, is that the same as we've already

22 discussed?

23 **A.**  Yes, it is.

24 **Q.**  And billings entitlement implementation, is that the same

25 as we've already discussed?

1    **A.**   Yes, it is.

2    **Q.**   And here, what about measurement impact?

3    **A.**   This is the assumption we were discussing around the

4    developers' inability to pay for having problems with

5    measuring the portion of the commission that they would need

6    to send to Apple.

7    **Q.**   So in the previous slides, I think we saw that the

8    measurement risk was not included; is that right?

9    **A.**   That is correct.

10   **Q.**   Why did you include measurement risk in this final slide?

11   **A.**   It is more relevant to understand such measurement risk

12   when we are calculating the dollar delta or the dollar impact

13   for Apple.

14        In calculating the effective commission rate, it might be

15   less relevant given that that might not be the same view that

16   a developer might look.

17   **Q.**   And without saying the number, how did you and your team

18   come up with the measurement risk percentage that is shown on

19   the footnote to Slide .10 -- or excuse me -- Slide .14?

20   **A.**   We have a -- a couple of data points.  One of them is from

21   a credit perspective, credit defaults, that is a number that

22   we have visibility into.  And then from an underreporting

23   perspective, we made a conservative assumption of what that

24   might be.

25   **Q.**   And that's based on -- when you say credit defaults, for

1  example, our -- where does that data come from?

2  **A.**   There is publicly available information on bankruptcies,

3  defaults, and then problems with payments.

4  **Q.**   Now, Mr. Even asked you why the assumptions don't change

5  as the rates and windows change.

6      Do you recall that question?

7  **A.**   Yes, I do.

8  **Q.**   And do you have an answer?

9  **A.**   Yes.  In looking at this analysis and considering the

10  price elasticity impact that it might have from a developer

11  perspective, in these ranges, even though that the percentage

12  may look wide, in trying to run elasticity models it was

13  difficult for us to see that there would be significantly

14  different adoption rates or adoption percentages.

15      Likewise, whenever it comes time for understanding

16  customer adoption and the strategies that developers might

17  pursue to communicate to customers that price, those would

18  vary quite a bit over the range and over time.

19      Therefore to simplify the analysis, given that even

20  understanding some of that elasticity didn't provide a major

21  impact on this page, we decided to leave it unchanged.

22  Changes to other assumptions on this page would have a wide,

23  larger impact.

24  **Q.**   You referred on the developer side, I think, Mr. Roman, to

25  elasticity; is that right?

1    **A.**   That is correct.

2    **Q.**   Could you explain to the Court what you meant by

3    elasticity?

4    **A.**   Price elasticity could be understood as the percentage of

5    change in demand given a percentage change in price.

6    **Q.**   And how did you measure or model elasticity in connection

7    with this pricing determination you were assisting with?

8    **A.**   We do not have a good sense of elasticity in this context

9    given that we do not do these price changes often.

10        However, we do have a few other data points.  We have

11   noticed that -- and this is in some markets -- whenever we

12   have foreign exchange or changes in taxes and other things

13   that change the prices a little bit, there's not a wide change

14   in ultimate customer-facing prices.  That's one of the data

15   points that we know and we have.

16        And from a developer perspective, it is about

17   understanding what will happen in a year, what will happen in

18   two years.  Many developers use measures such as customer

19   lifetime value to understand the impact that this might have.

20        Hence we decided to stay in a tight range and simplify the

21   analysis.

22   **Q.**   Did you actually conduct a model or create a model of

23   elasticity?

24   **A.**   Early on we tried, and it did not give us that much

25   incremental information.

1  **Q.**  And on the customer side, can you explain that a little

2  more too?

3  **A.**  When developers find good price points for the digital

4  goods or subscriptions, they tend to be very optimized

5  already.  For them to drive a meaningful change, it could be

6  observed more as promotion sometimes, they could be observed

7  as temporary changes.

8      Every developer has a very unique circumstance.  Therefore

9  observing the impact on customers on a broad basis is very

10  difficult to model.

11  **Q.**  Did you make an assumption regarding whether and how

12  developers would incorporate any commission into their

13  pricing?

14  **A.**  We did not.

15  **Q.**  And why is that?

16  **A.**  The overriding assumption was if there was a financial

17  benefit for developers, even in current state, that they would

18  start work and development to take advantage of the linkout

19  entitlement.

20  **Q.**  And in zooming back, if we could, to the -- to the chart

21  on the page .14A, could you explain to the Court what it is

22  you are showing to the company on this slide.

23  **A.**  For instance, on the left side, for revenue, each

24  intersection of headline rate and duration window expresses

25  the decrease in revenue compared to our baseline projection

1    given the adoption of linkout entitlement.

2    **Q.**  And the Court asked earlier, Mr. Roman, whether Apple's

3    goal was to maintain its revenue.  Do you remember that?

4    **A.**  Yes, I do.

5    **Q.**  What does this chart and, for example, looking at the cell

6    for the intersection actually chosen tell us -- tell you about

7    the -- Apple's understanding of the likely revenue effect of

8    this new link entitlement?

9    **A.**  Our expectation is that --

10   **Q.**  I'm sorry.  Without saying the number out loud, please.

11   **A.**  Our expectation is that we will not sustain current levels

12   of revenue.  They will be lower.

13           **THE COURT:**  Right, but the higher the percentage, the

14   more you make, obviously.

15           **THE WITNESS:**  That is correct.

16           **THE COURT:**  So it's -- it is -- if Apple is intending

17   or hoping to maintain as high a revenues as it can, then the

18   higher the commission rate, the better for Apple.

19           **THE WITNESS:**  That is correct, Your Honor.

20           **THE COURT:**  Go ahead.

21           **MR. PERRY:**  Thank you, Your Honor.

22   **Q.**  Mr. Roman, the slide .14A calculates the expected

23   revenue impact.  And is this, by the way, a one-time number or

24   an annual number?

25   **A.**  This is an annual number.

1    **Q.**   And this is over -- compared to what, Mr. Roman?

2    **A.**   This is compared to the expected number without a linkout

3    entitlement roughly two years out.

4    **Q.**   Okay.  And do you know, Mr. Roman, what the -- strike

5    that.

6         Why did you measure this on both a revenue basis and a

7    gross margin basis, Mr. Roman?

8    **A.**   These are the two lines that would show the most

9    meaningful change compared to the indicative P&L.  Billings,

10   our assumption is that they would remain roughly the same.

11   Now a portion of billings would be transacted directly in the

12   developers' website, but the overall customer activity is

13   assumed to remain constant.

14        Revenue, important to understand the impact on commission.

15   And for gross margin, given that we would not be processing

16   payments for these transactions, this would be the only change

17   that would ensue.

18        And hence these are the two metrics that we provide with

19   all of the deltas to understand the impact on the indicative

20   P&L.

21   **Q.**   Mr. Roman, if the assumptions in your model hold and we're

22   two years down the road, what does the revenue impact slide

23   tell you about the impact of the new link entitlement on

24   Apple -- on the App Store's revenues?

25   **A.**   It is a large impact.

1    **Q.**  Thank you, Mr. Roman.

2              **MR. PERRY:**  No further questions, Your Honor.

3              **THE COURT:**  Any reexamination?

4              **MR. EVEN:**  Yes, Your Honor.  I'll try and be brief.

5                        <u>**REDIRECT EXAMINATION**</u>

6    **BY MR. EVEN:**

7    **Q.**  I apologize in advance, Mr. Roman.  I tried to be somewhat

8    linear in my direct.  I'm not going to be successfully linear

9    on my recross.  I'm going to jump around a little bit so try

10   and bear with me.

11        I want to start with something that I'm not sure I heard

12   correctly.  But I think what you told Mr. Perry is that you

13   chose to run your own analysis of P&L rather than go to the

14   FP&A P&L because you have better view of the data.  Correct?

15   **A.**  That is correct.

16   **Q.**  Okay.  That is not what you said in your declaration, is

17   it?  In your declaration, you said that Apple cannot produce a

18   fully burdened P&L.  And that's why you have what you have

19   here, correct?

20   **A.**  That is correct.

21   **Q.**  In fact, two days ago I asked you if you were aware of

22   this Court's finding that not only can Apple conduct a fully

23   burdened P&L, that Apple did and does conduct such P&L's at

24   the FP&A, and you told me you were not aware of that.  Do you

25   remember that?

1    **A.**   I do.

2    **Q.**   And so in the two days that have passed, you've now

3    developed an awareness of the FP&A P&L's and retroactively

4    decided that actually you chose not to use them because you

5    have better line of sight into the data?

6    **A.**   Those P&L's, even when they try to make a fully burdened,

7    they are not --

8    **Q.**   Sir, they did not try to make a fully burdened.  This

9    Court has already found that they did and do make a fully

10   burdened P&L.  And you were not even aware of those P&L's.

11   That's what you told me.

12   **A.**   That is correct.

13   **Q.**   Sir, did you speak to your lawyers or anybody since

14   Wednesday?

15   **A.**   I did not.

16   **Q.**   Talked a little bit about the bundled or weighted fee

17   rate, correct, with Mr. Perry?

18   **A.**   Yes.

19   **Q.**   Yes.  And you explained, I believe, that the blended rate

20   is a weighted average between 30 percent and 15 percent,

21   correct?

22   **A.**   Can you clarify --

23   **Q.**   Yes.

24   **A.**   -- what are --

25   **Q.**   When you talk about Apple's blended rate, that is a

 1    weighted average between 30 percent and 15 percent, correct?

 2    **A.**   That is correct.

 3    **Q.**   All right.

 4         Now, that blended rate, by definition, is going to be

 5    below 30 percent, correct?

 6    **A.**   That is correct.

 7    **Q.**   But for a developer that is subject to a 30 percent fee,

 8    they would still pay 30 percent, correct?

 9    **A.**   That is correct.

10    **Q.**   And so the blended rate only reflects what Apple collects

11    on average.  It does not reflect what developers actually pay.

12    Correct?

13    **A.**   That is correct.

14    **Q.**   Now, on the slides where you calculate or show 18 percent,

15    18 percent is a blended rate, correct?

16    **A.**   That is correct.

17    **Q.**   And that means that a developer that is subject to

18    27 percent is not actually going to pay 18 percent.  They're

19    going to pay some number between 18 percent and 27 percent

20    even if we accepted all your calculations and estimations in

21    that slide, correct?

22    **A.**   Oddly enough, for some developers that are paying the

23    headline rate --

24    **Q.**   Sir?

25    **A.**   -- they might --

1   **Q.**  It's a simple question.  The 18 percent is a blended rate

2   between 27 and 12.  Correct?

3   **A.**  That is correct.

4   **Q.**  And so a developer that pays 27 percent is not actually

5   going to pay 18 percent.  They're going to pay something

6   between 18 and 27, if we accept all your assumptions?

7   **A.**  The answer is it depends.

8         **THE COURT:**  Well, look, I don't need to have you all

9   sparring.  Although it's part of the game.

10      My understanding is that you are trying -- what I -- what

11  I think you're trying to do is somehow suggest that if

12  developers receive revenues or billings outside of the

13  seven-day period for which they pay nothing, then you're using

14  that calculation to decrease the rate of 27 percent.  Because

15  on every single sale that they make during that seven-day

16  period, if Apple audits their books, they must pay 27 percent,

17  period, right?

18         **THE WITNESS:**  That is correct, Your Honor.

19         **THE COURT:**  Okay.

20  BY MR. EVEN:

21  **Q.**  And what I'm asking you is even if we then apply all your

22  estimates and all your assessments, somebody who's subject to

23  a 27 percent fee is not going to go all the way down to

24  18 percent.

25  **A.**  My answer is that not always.  And it's complicated.

1    **Q.** For most developers subject to 27 percent, for most

2    revenues, they're going to pay more. Otherwise we have a

3    bunch of developers on the other side that clearly pay less

4    and you need to land at 18, correct?

5    **A.** The 18 is a blended average.

6    **Q.** Correct. And therefore what I'm saying is some developers

7    are going to pay more than 18 percent. Some developers are

8    going to pay less than 18 percent, right?

9    **A.** That is correct.

10   **Q.** Okay. I'm glad we got that sorted out.

11       Now we talked earlier that there are two cost lines for a

12   developer, correct?

13   **A.** Yes.

14   **Q.** One of them is the fee to Apple, the other is the fee to a

15   payment solution other than Apple when they're taking their

16   purchase outside of the app, correct?

17   **A.** That is correct.

18   **Q.** Now, we've already established that you did not do

19   anything to calculate that second line item, correct?

20   **A.** That is correct.

21   **Q.** And now what you're telling me is that you've not shown

22   what any particular developer is going to see for the first

23   line of the Apple effective rate because it's somewhere

24   between, some will pay more than 18, some less than 18, and

25   you can't peg it?

1    **A.**   The 18 percent, as you pointed out, as we've discussed, is

2    a blended average.   Individual developer calculations could be

3    derived.

4    **Q.**   I understand they could be, but they haven't been derived,

5    correct?

6    **A.**   For purposes of this analysis, we care about the aggregate

7    impact to Apple.

8    **Q.**   I understand that you care about the aggregate impact to

9    Apple.   But to understand if developers will see a higher cost

10   and will be able to use -- to charge and offer lower prices,

11   the question is not the aggregate impact on Apple.   The

12   question is the individual impact on developers.

13        Do you understand that?

14   **A.**   I do.

15   **Q.**   And that is not something that you -- that you presented

16   to Mr. Cook in any way, shape, or form, right?   You did not.

17   **A.**   We did not provide individual calculations.   That is

18   correct.

19   **Q.**   You did not provide a specific number even on average just

20   for the folks who are subject to 27 percent as opposed to

21   12 percent.   That's nowhere in your deck, correct?

22   **A.**   That is correct.

23   **Q.**   You mentioned that the Netherlands was a much smaller

24   analysis, right?

25   **A.**   That is correct.

1   **Q.** And that's because it was limited, you said, to dating

2   apps, right?

3   **A.** That is correct.

4   **Q.** Now, Korea actually has a lower fee to Apple, 26 percent,

5   and is not limited at all to any type of apps, correct?

6   **A.** That is correct.

7   **Q.** So when you said that there was no precedent and there was

8   nothing to look at for adoption rates, in fact, there is both

9   Korea and the Netherlands, right?

10  **A.** They do not have the same concept of --

11  **Q.** You did not look at either, did you?

12  **A.** We did not consider them as relevant for this analysis.

13  **Q.** Okay.  You're not representing to this Court that the

14  large majority of developers selling apps in the Korean App

15  Store have adopted alternative payment solutions, are you?

16  **A.** I am not.

17  **Q.** No one is; right?  No one has come here and did that.

18  That's not in Apple's papers.  It's not in Apple's

19  declarations.  You haven't looked at it because you thought

20  for some reason the only place in the world where you actually

21  charge 26 percent on people not using your payment solution is

22  irrelevant, nobody's offering that testimony here.

23  **A.** That is correct.

24          **THE COURT:**  And how long has that one been employed?

25          **THE WITNESS:**  Your Honor, I am not completely sure,

 1    but it --

 2            **THE COURT:**  Give me a ballpark.

 3            **THE WITNESS:**  I would say a year.

 4    **BY MR. EVEN:**

 5    **Q.**  Sir, the Netherlands has been in play since January of

 6    2022.  Are you aware of that?

 7    **A.**  I was referencing Korea, your last statement.

 8    **Q.**  Okay.  I believe Korea was June.  I'm not sure if it was

 9    2022 or 2023, but I'm sure Apple can find that out and let us

10    know.

11        Mr. Perry asked you about -- suggested that I told you

12    that your estimates were made up and whether you agreed with

13    it.  I didn't tell you that.  I asked you and you said yes.

14        So are you changing your testimony on that as well?

15        I asked you your assumptions were essentially made up.

16    You said that's correct.  Do you recall that?

17    **A.**  Our assumptions are a combination of data points and

18    information that we have to make the most accurate estimates.

19    **Q.**  Okay.  And data points, you mean these very long meetings

20    with multiple people that got in a room and decided that a

21    large proportion of developers are going to adopt this?

22    **A.**  That is correct.

23    **Q.**  You understand that a thousand people can meet a thousand

24    times, if they have zero data they're not going to get any

25    closer to a real assumption, are they?

1    **A.**   Doesn't prevent from trying to find the data.

2    **Q.**   I understand it doesn't prevent anyone from trying to do

3    anything, but you understand that if we get a lot of people in

4    a room multiple times but provide them no data, they're not

5    going to get any closer to a correct answer.  Right?

6    **A.**   That is possible.

7    **Q.**   Now, you told the Court that in fact a large number of

8    developers applied.  The large number is the 38 that we

9    discussed earlier, correct?

10   **A.**   Correct.

11   **Q.**   That's what you call a large number?

12   **A.**   It's a good number.

13   **Q.**   It's a good number.  Okay.

14       It's a good number for Apple.  You agree with that, right?

15       You mentioned some studies about the seven-day window and

16   you said you have a good line of sight into when people begin

17   and end a purchase process, right?

18   **A.**   That is correct.

19   **Q.**   Is it actually your testimony that Apple has data that

20   shows that people click on IAP to buy something but then don't

21   go through with the transaction for more than seven days, and

22   that happens for most clicks?

23   **A.**   The data is -- the data point is slightly different than

24   what you mentioned.

25   **Q.**   How is it different?

 1   **A.**   The data point represents from the amount of purchases

 2   that a customer would do in a time period, let's say a year --

 3   **Q.**   Sir --

 4   **A.**   -- how --

 5   **Q.**   -- the fact that I go back to Amazon every seven days

 6   doesn't say anything about whether I'm going to go back to

 7   Amazon with a click, without a click, through a link, whether

 8   I'm going to do that on other apps at all.  It just shows that

 9   if I like Amazon, I'm going to go back, right?

10   **A.**   If you're purchasing every single day or if you're

11   purchasing every seven days or every 30 days, it would make a

12   difference.

13   **Q.**   Sir, the relevant question is not whether people are going

14   to make more purchases from the developer.  The question is

15   whether they're going to make more purchases from the

16   developer without clicking on the link that got them there in

17   the first place.  That's what makes the difference, right?

18   **A.**   Or at least preserve the same amount, correct.

19   **Q.**   Okay.  But so what is the data that suggests to you that

20   in fact people are going to go -- not only going to go back,

21   but are going to go back in a completely different way from

22   the way they got there in the first place?  Where is that

23   data?

24   **A.**   It is our estimation that developers would be

25   incentivized --

1    **Q.**  I'm not asking about estimation, sir.  Where is that data?

2    Do you have data, actual data, a good line of sight, as you

3    said, into the fact that people click on something and then go

4    and make a -- an identical purchase using a completely

5    different mechanism than they did in the first instance?

6    **A.**  The data that we have is how many times a customer would

7    start the transaction, click in a given period of time as a

8    proportion of a larger time frame such as, let's say, a year.

9    **Q.**  Sir, I understand that the first time I click on Amazon,

10   that's not going to show a large proportion of my purchases if

11   I click then a thousand additional times and buy other items.

12   That's not the question here.

13       The question here --

14             **THE COURT:**  So, Mr. Even.

15                   (Simultaneous colloquy.)

16   **BY MR. EVEN:**

17   **Q.**  -- is whether I'm going to get to Amazon in a different

18   way.

19             **THE COURT:**  I'm going to allow you to cross him when

20   I get the report.  Can we just get the report and move on.

21             **MR. EVEN:**  Yes, Your Honor.  I -- at least as to move

22   on, which I think is in my purview.

23   **Q.**  You said that your assumptions about adoptions were about

24   a two-year horizon, time horizon, right?

25   **A.**  That is correct.

 1    **Q.**  Did you do any kind of modeling to see how quickly

 2    developers would adopt this if the fee was zero?

 3    **A.**  We did not.

 4            **MR. EVEN:**  No further question, Your Honor.

 5            **THE COURT:**  All right.  Any re-exam?  I have seven

 6    topics.  And he will, at the end of the day step down, but he

 7    is not excused and he cannot talk to lawyers or anyone else

 8    about his testimony until I get those reports and decide

 9    whether he needs to be examined on them.

10            **MR. PERRY:**  Your Honor, we will get you the reports.

11    No further questions from me at this time.

12            **THE COURT:**  All right.  Do you understand my

13    instruction?

14            **THE WITNESS:**  Yes, I do, Your Honor.

15            **THE COURT:**  I'll see you back here on Wednesday, next

16    Wednesday, the 22nd, at 9:00 a.m.  You'll have those reports

17    and we'll see if we have any more questions.

18        Oh, sorry.  Thursday.

19            **THE CLERK:**  As I understand, Your Honor --

20            **THE COURT:**  What time.

21            **THE CLERK:**  -- the 16th at --

22            **THE COURT:**  Okay.  Yeah, so the next day that I've

23    cleared for you all, so we do the 16th, the 17th, and then

24    I've now cleared Wednesday, May 22nd from 9:00 to 1:30.

25        So I'll see you Thursday.

1          **THE WITNESS:**  Thank you, Your Honor.

2          **THE COURT:**  Thank you.

3     Okay.  We have 30 minutes.  Who do you want to take?

4          **MR. BORNSTEIN:**  Your Honor, our next witness is

5     Mr. Barnes.

6          **THE COURT:**  And with respect to that last issue,

7     Mr. Perry, if you'll send those documents on Monday, then you

8     all can meet and confer and decide whether any examination is

9     necessary.

10          **MR. PERRY:**  Yes, Your Honor.

11          **THE COURT:**  If you all agree there's no exam

12     necessary, then the witness can be excused.

13          **MR. PERRY:**  Thank you, Your Honor.

14          **MR. BYARS:**  Your Honor, Brent Byars for Epic.  Epic

15     calls Ned Barnes.

16          **THE COURT:**  Please remain standing.

17          **THE CLERK:**  Please raise your right hand, sir.

18

19                         **NED BARNES,**

20     called as a witness for the plaintiff, having been duly sworn,

21     testified as follows:

22          **THE WITNESS:**  I do.

23          **THE CLERK:**  Thank you.  Please be seated.  And speak

24     clearly into the microphone.

25          **MR. BYARS:**  Your Honor, may we hand some binders?

```
 1              THE CLERK:  Please state --
 2              MR. BYARS:  Apologies.
 3              THE CLERK:  Please state your full name and spell out
 4     your last name for the record.
 5              THE WITNESS:  Ned Barnes, B-A-R-N-E-S.
 6              THE COURT:  You may approach.
 7              MR. BYARS:  Thank you, Your Honor.
 8              THE COURT:  All right.  Counsel, if you'll remind me
 9     of your name.
10              MR. BYARS:  It's Brent Byars, Your Honor.
11              THE COURT:  You may proceed when you're ready.
12              MR. BYARS:  Thank you, Your Honor.
13                          DIRECT EXAMINATION
14     BY MR. BYARS:
15     Q.  Mr. Barnes, did you testify at the trial in this matter?
16     A.  I did.
17     Q.  Can you please remind us the areas of your expertise.
18     A.  Yes.  I'm a CPA and a Certified Fraud Examiner, and I have
19     been practicing as a forensic accountant for close to
20     30 years.
21     Q.  And did you have an opportunity to review the declaration
22     and presentation submitted by Mr. Roman?
23     A.  I did.
24     Q.  And do you have a general understanding of why Mr. Roman
25     presented the data relating to profits in those materials?
```

BARNES – DIRECT / BYARS

1   **A.**   Yes, I do.

2   **Q.**   What is that general understanding?

3   **A.**   Very generally, my understanding is that his analysis of

4   profits flows into the broader pricing analysis that was the

5   subject of much of his testimony today.

6   **Q.**   Did you form an opinion about the reliability of

7   Mr. Roman's statements about App Store profitability?

8   **A.**   Yes, I did.

9   **Q.**   And what are the opinions that you formed about those

10  statements?

11  **A.**   I have two principal ones.

12        First, Mr. Roman has suggested that Apple cannot and does

13  not maintain a fully burdened P&L for the App Store in the

14  regular course of business.  My research contradicts that.  My

15  testimony contradicts that.  And this Court agreed with my

16  testimony.

17  **Q.**   What was the other opinion you referenced?

18  **A.**   The second opinion is that Mr. Roman presents gross margin

19  percentages and operating margin percentages that he suggests

20  are meaningful in some way that are substantially materially

21  lower than what Apple, in its own ordinary course of business,

22  calculates as its -- both its gross margin percentage and its

23  operating margin percentage, and which I calculated in

24  connection with my testimony in this trial and, again, with

25  which the Court agreed.

1    **Q.**  And were you able to determine why Mr. Roman's metrics

2    were so much different from those that you had determined?

3    **A.**  I was.

4    **Q.**  And could you give the Court a general background or

5    summary of that?

6    **A.**  Yes.  There are -- there are two, again, two principal

7    reasons.

8        One is Mr. Roman has suggested, I believe, he had two

9    methodologies for allocating operating expenses to the App

10   Store.  Neither one of those methodologies is in any way close

11   to what Apple has done in the ordinary course of business

12   based on my investigation and research and testimony.

13       I don't want to go into numbers, I don't think I can go

14   into numbers, but they're -- he's suggesting a materially

15   larger amount of operating expenses are being allocated to the

16   App Store than what Apple actually does, which is therefore

17   decreasing his reported margins.

18       The second is he -- he doesn't calculate gross margins or

19   operating margins correctly.

20   **Q.**  And before we ask you to explain that a little further,

21   could you give the Court some background starting with what is

22   an operating profit margin?

23   **A.**  So let's first talk about operating profit.  So operating

24   profits nominally or on dollar terms are the revenues that a

25   company or business unit generates, less all of the cost of

1    goods sold and operating expenses that are related to the

2    ongoing operations of that company or business unit.  And the

3    sum of all that data results in an operating margin.

4    **Q.**   Could you explain how to calculate an operating margin.

5    **A.**   Yeah.  So an operating margin percentage, then, is when

6    you divide the nominal operating profits that we just

7    talked -- that I just discussed by the amount of revenue that

8    a company or business unit generates.

9        So it's the proportion of the revenue generated by the

10   company or business unit that actually flows all the way down

11   and goes into operating profits.

12   **Q.**   And if either of those numbers, operating profits or

13   revenue, is incorrect, can you get to a correct operating

14   margin percentage?

15   **A.**   No.  It's not going to be meaningful.

16   **Q.**   And did you have an opportunity to identify how Apple

17   calculates revenue for the App Store, first of all?

18   **A.**   Yes, I did.

19   **Q.**   How -- how does Apple do so in the ordinary course of

20   business?

21   **A.**   In the ordinary course of business, and this is consistent

22   with accepted -- generally accepted accounting principles, is

23   Apple recognizes revenue only to the extent of the commissions

24   that they retain from App Store transactions.  That's just

25   limited to App Store revenue, not the company-wide revenue,

1   but for the App Store revenue.

2   Q.  Thank you.

3       And to use an example, let's say a user makes a

4   transaction of $10 for a digital good through the App Store

5   and Apple collects, say, $3.00, 30 percent.  What portion of

6   that would -- would Apple recognize as revenue?

7   A.  It would recognize $3.

8   Q.  And then from there, how does Apple, in the ordinary

9   course of benefit -- of business, calculate App Store profits?

10  A.  So then what -- what Apple would do -- or what Apple does

11  is they, on a regular basis, they maintain and identify those

12  revenues that we just discussed, as well as all of the cost

13  of -- cost of goods sold that relate to the App Store activity

14  that they incur and operating expenses that include both

15  direct operating expenses and indirect operating expenses that

16  may be allocated or shared across other businesses.

17  Q.  At trial you testified about the App Store profit margins.

18  Could you please remind what you testified those App Store

19  profit margins were?

20  A.  Yes.  For the last two years that I had access to data,

21  they were somewhere in the 77 to 79 percent range.

22  Q.  Okay.  Now let's look at Mr. Roman's calculations in his

23  presentation.

24          MR. BYARS:  This is included, Your Honor, in

25  Mr. Barnes' demonstrative which is the first tab in Your

1        Honor's binder.

2           And Apple has asked us not to display this publicly so

3       we'll just look at it in the binder.

4       **Q.**  As Slide 1, can you please explain what slide 1 is?

5       Actually Slide 2, CDX-184-2.

6       **A.**  (Reviewing document.)

7           Right.  This is the slide from Mr. Roman's -- that was

8       attached to Mr. Roman's declaration that he calls an App Store

9       ecosystem indicative P&L.

10      **Q.**  And could you explain how Mr. Roman calculated operating

11      margin percentage on this slide?

12      **A.**  Yes.  He flows through to get to, as he walked through the

13      different lines, to get to operating margin in dollars, which

14      again, there's issues with how he identifies operating

15      expenses here.

16          But when he gets to operating margin, he then divides that

17      by App Store billings, not revenue.  And App Store billings

18      does not represent revenue for Apple.

19      **Q.**  And is it correct to calculate operating margin percentage

20      by dividing by App Store billings rather than revenue?

21      **A.**  It is not.  It's a mischaracterization.

22      **Q.**  And have you ever seen Apple, in the course of your

23      investigation, calculate operating margin percentage in that

24      way?

25      **A.**  No, I haven't.  And I saw many examples where Apple

1   prepared App Store P&L's and calculated App Store operating

2   margin.  They never did it that way.

3   **Q.**  And does Apple report to the public the way in which it

4   calculates revenue for the purposes of its -- of its P&L's?

5   **A.**  Yes, they do.

6         **MR. BYARS:**  And, Your Honor, I'd like to refer you to

7   the next slide, CDX-184.3.

8                    (Exhibit published.)

9   **BY MR. BYARS:**

10  **Q.**  Mr. Barnes, could you please explain what's on this slide?

11  **A.**  Yes.  This is an excerpt from Apple's, I believe, most

12  recent 10-K SEC filing.  And this basically sets forth what's

13  called a revenue recognition policy.

14      And the highlighted portion here describes Apple's revenue

15  recognition policy with respect to the digital goods sold on

16  the App Store.  And this sets forth what we just discussed,

17  that Apple recognizes revenue, only its commission that it

18  retains, not the amounts that go to the developers.

19  **Q.**  And does Apple have a choice about whether to include all

20  of the developer payouts or just its commission when it's

21  calculating revenue?

22  **A.**  They don't have a choice.  There -- there's guidance

23  that's issued by -- by the accounting regulations that set

24  forth criteria that companies are supposed to evaluate to make

25  that determination.

 1       And here, I believe Apple correctly has applied those

 2   criteria.  It's -- it's not really a close call that in this

 3   case, they would only recognize revenue on their commissions.

 4   **Q.**  And were you able to identify the key criteria that Apple

 5   applies that requires it to recognize only the commissions as

 6   revenue?

 7   **A.**  Yes, I believe there are probably several of the criteria

 8   that weigh in the favor, but the most significant is that

 9   Apple doesn't take control of the digital goods that pass

10   through on the App Store.

11   **Q.**  And if we could go to the next slide, could you explain,

12   with the help of this slide, the impact of Mr. Roman's change

13   from the ordinary practice on the margin percentages he

14   calculates?

15                     (Exhibit published.)

16           **THE WITNESS:**  Yes.  So this is a hypothetical example

17   I put together just to -- just to point out how significant it

18   is with the -- what I believe is a mischaracterization by

19   Mr. Roman.

20       So if we start at the top line, which is App Store

21   billings, and we assume that Apple's commission percentage was

22   30 percent, that would result in revenue for the App Store at

23   $300.

24       And then I have oversimplified here, but I've estimated

25   direct and indirect costs at 60.  That's roughly 20 percent of

 1   the Apple's App Store revenue, which is consistent with my

 2   historical analysis of the App Store's profit and loss

 3   statements.  And that would produce operating margin dollars

 4   of 240.

 5       So then, if you calculate operating margin percentage

 6   correctly, you would take the 240 and divide it by the 300.

 7   And that would produce an operating margin percentage of

 8   80 percent.

 9       If you calculate it incorrectly and you take the $240 and

10   divide it by 1,000, which is what Mr. Roman does, you would

11   get an operating margin percentage of 24 percent.

12   **BY MR. BYARS:**

13   **Q.**  And did you have opportunity to read Mr. Roman's testimony

14   from Wednesday as well as see him testify here today?

15   **A.**  I did.

16   **Q.**  And was there anything in his testimony that either

17   contradicted or confirmed your assessment?

18   **A.**  Well, I believe he did indicate at one point that if you

19   divided the App Store operating margin or operating profits by

20   revenue, you would get -- he thought they could be above

21   75 percent.

22       And I certainly agree with that.  In fact, that's the only

23   way to calculate operating margin percentage.

24   **Q.**  And could you please briefly summarize the other issue you

25   referred to with Mr. Roman's calculations regarding

1    allocations?

2    **A.**   Yeah.  So Mr. Roman just not too long ago walked through

3    the two, what he called the two methods for allocating

4    operating expenses, various operating expenses such as R&D and

5    G&A to the App Store.  And neither one of those methods are

6    reasonable or close to the way that Apple has done it in the

7    ordinary course of business, based on my investigation which,

8    again, I testified to at this trial and the Court accepted.

9    **Q.**   And I have the next slide which I'm going to ask Mr. Lyon

10   not to display, an example from the evidence at trial.  This

11   is CDX-184.5.

12       I understand some people call this a Sankey diagram.

13   Could you please explain what this diagram depicts?

14   **A.**   Yeah, so this diagram on the left-hand side shows

15   basically a lot of the operating expenses by group function

16   that Apple maintains.

17       And what it's purporting to show graphically -- I don't

18   have the underlying data for how this graph was put together.

19   But it shows graphically how those various operating expense

20   categories flow to the various products and services that are

21   on the right-hand side of the graph.

22       And so you can just see at an order -- on an order of

23   magnitude where the operating expenses are being allocated to

24   the different products and services.

25       And just one thing real quick, Mr. Byars.

1    Q.   Please.

2    A.   This is -- I was able, as I believe I testified at trial,

3    to reconcile this particular document with Apple's SEC

4    filings.  So if anyone is suggesting that this is not relevant

5    or reliable data, this information was communicated to their

6    shareholders and the investing public.

7    Q.   And just for clarity, without using any of the details,

8    their product groups on the right side, where does the App

9    Store live among the products?  And perhaps you could just

10   identify it by identifying where it is on the chart.

11   A.   It's in the very lower right-hand corner called "rest of

12   services."

13   Q.   And so does this diagram show only direct costs that are

14   being allocated to that product group or further costs beyond

15   direct costs?

16   A.   No.  It has -- it has actually three classifications of

17   how they're being spread.  They're either direct, they are

18   shared, which typically might be one or two or three products

19   or services sharing a cost, or there's allocated where they

20   might be being allocated across a larger swath of products and

21   services.

22   Q.   Mr. Roman testified about some specific categories of

23   costs that he had allocated to the App Store.  Does this chart

24   depict some of those categories that Mr. Roman had allocated?

25   A.   Yes.  It depicts research and development, R&D, as well as

BARNES - CROSS / PERRY

```
 1   G&A.
 2   Q.  And just to make sure we're clear and our record is clear,
 3   are the allocations depicted in this diagram different from
 4   those that Mr. Roman used when he put together his price
 5   committee deck?
 6   A.  Materially.
 7   Q.  And in your opinion as an accountant and a forensic
 8   accountant, would it be at all reasonable for Mr. Cook or
 9   Mr. Maestri or Mr. Schiller to rely or base any business
10   decisions on the profit margin percentages that are presented
11   by Mr. Roman?
12   A.  No.  They're not -- they're not accurate or reliable.
13           MR. BYARS:  Thank you.  I'll pass the witness, Your
14   Honor.
15           THE COURT:  All right.
16       Exam?
17           MR. PERRY:  Me again, Your Honor.
18           THE COURT:  Mr. Perry.
19                       CROSS-EXAMINATION
20   BY MR. PERRY:
21   Q.  Good afternoon, Mr. Barnes.
22   A.  Good afternoon, Mr. Perry.
23   Q.  You're a CPA, right?
24   A.  Yes, sir.
25   Q.  Forensic accountant, correct?
```

 1   **A.**   Yes, sir.

 2   **Q.**   You say in your declaration that you based your opinions

 3   that you've just explained today on your previous analysis in

 4   this case, right?

 5   **A.**   In my declaration, in large part that was the case,

 6   correct.

 7   **Q.**   In your declaration, right.  Because today you offered

 8   some new opinions that are not in your declaration, right?

 9   **A.**   I believe I offered some opinions in response to

10   Mr. Roman's testimony, yes.

11   **Q.**   And they're not in your declaration, just to be clear?

12   **A.**   Correct.

13   **Q.**   Okay.  So we'll get to that.

14        But are those opinions also based on your prior analysis?

15   **A.**   In part, but they would be based on my further analysis of

16   what Mr. Roman testified to today.

17   **Q.**   The further analysis in the last six minutes.

18   **A.**   Correct.

19   **Q.**   Okay.  And is that consistent with your prior work in this

20   case and analysis?

21   **A.**   Yes.

22   **Q.**   Okay.  And that analysis was set forth in an expert report

23   that you filed or served on February 16th, 2021.  Do you

24   recall that?

25   **A.**   I don't recall the specific dates, but I did submit an

1    expert report in this case, yes.

2  **Q.**  You remember that.  Okay.

3       And you also submitted written direct testimony in this

4    case.  You remember that, right?

5  **A.**  I did.

6  **Q.**  And you were deposed in this case on March 26, 2021.  You

7    remember that, right?

8  **A.**  I remember being deposed.  I don't recall the date.

9  **Q.**  Take my word for it?

10  **A.**  I do.

11  **Q.**  Okay.  And you testified in the trial in this case, right?

12  **A.**  I did.

13  **Q.**  If I tell you May 14th, 2021, which was roughly almost

14   exactly three years ago, would you -- would you go along with

15   me, Mr. Barnes?

16  **A.**  I absolutely would.

17  **Q.**  Okay.

18       Now, your previous analysis on which your current

19   opinions, I take it, are -- are based, right, it's consistent

20   with, was solely in an accounting context, accounting

21   profitability under GAAP.  Do you recall that?

22  **A.**  I -- I'm sure -- yes, I analyze financial and business

23   records from an accounting standpoint.  That's my expertise.

24   So that wouldn't surprise me that I would have characterized

25   it that way.

1    Q.   Okay.  Accounting context, accounting profitability under

2    GAAP.  That was your testimony, that was your analysis then,

3    and it's your testimony today in fact, right?

4    A.   I don't disagree with that.

5    Q.   Okay.  In your previous analysis when you mentioned you

6    viewed many Apple -- excuse me -- P&L's.  You recall that

7    testimony at trial, right, that you gave?

8    A.   I do.

9    Q.   And in the report that you filed, your original report,

10   that was largely based on two Apple documents, right?  Do you

11   remember that?

12   A.   There were two documents that were certainly exemplary of

13   many other documents, but there were two that I focused on in

14   presenting the data, yes.

15   Q.   Two that you focused on.  Fiscal year, 1920, business

16   planning documents.  And if I tell you the exhibit numbers,

17   are you going to remember them from three years ago,

18   Mr. Barnes?

19   A.   I'm not.  Sorry.

20   Q.   I'm going to say them anyway.

21   A.   Okay.

22   Q.   PX-208.  Excuse me.  PX-602 and PX-608.  You don't

23   remember those, right?  But will you take my word for that?

24   A.   I have a fairly good recollection of the documents

25   themselves.  I don't -- but I take your word for the document,

1    for the exhibit numbers.

2    **Q.** We can pull them out and show them to you, but maybe it

3    would be better to move along.

4    **A.** It's your call.

5    **Q.** Okay.  Thank you, sir.

6    And then after you filed your report and before your

7    deposition, you came up with some supplemental opinions based

8    on some more recently produced documents.  Do you remember

9    that?

10   **A.** I do.

11   **Q.** And there were three of those documents that you primarily

12   relied on, right?  Do you remember that?

13   **A.** I recall primarily relying on one, but perhaps there were

14   two others.

15   **Q.** Okay.  You testified about three.  And, yes, you jumped

16   ahead to my next question, sir.  I appreciate that.  You

17   primarily testified about one which was the fiscal year '20,

18   products and services, profitability deck, that you included

19   three slides from your demonstratives, right?

20   **A.** I believe so, yes.

21   **Q.** Okay.  And that's the one that you talked about today in

22   your testimony, right?

23   **A.** It is.

24   **Q.** And that, you're aware, was prepared by Apple's corporate

25   FP&A group, right?

BARNES - CROSS / PERRY

1    **A.**   It was.

2    **Q.**   Okay.  And that was -- if we could look at your

3    demonstrative .5, what year is that for?

4    **A.**   (Reviewing document.)  .5.

5    **Q.**   184.5.

6    **A.**   Yeah, 184.5, this was -- it was I believe prepared in

7    2019.  It was looking forward to fiscal year 2020.

8    **Q.**   So four or five years ago.

9    **A.**   Correct.

10   **Q.**   Okay.  And you've not looked at any more recent internal

11   Apple financial documents since then, right?

12   **A.**   No.  I'm not aware that there's any available for my

13   review.

14   **Q.**   And the only thing you submitted with your declaration and

15   you talked about today that's more recent, that's even

16   remotely recent, is the 10-K that was filed with the SEC,

17   right, for fiscal year '23?

18   **A.**   That's correct.

19   **Q.**   Okay.  Now, none of the documents -- certainly none of the

20   five documents on which you primarily relied, were price

21   committee decks or presentations, right?

22   **A.**   Other than what Mr. Roman presented, that's correct.

23   **Q.**   In fact, of all the documents cited in your report and

24   discussed at your deposition and cited in your written direct

25   testimony, there is not one price committee deck, right?

 1    **A.**  Not that I recall.

 2    **Q.**  And you've never analyzed for purposes of this case a

 3    price committee deck, correct?

 4    **A.**  I don't have a recollection, I can't foreclose -- I can't

 5    foreclose the possibility that there was not something in the

 6    production that I reviewed in this case --

 7    **Q.**  That's fair.  That's fair.  And in fact, in your expert

 8    report, you have a list of materials relied on, right?

 9    **A.**  I believe so.  The Federal Rules require that.

10    **Q.**  Right.  So everybody knows.  And there's no price

11    committee decks in there, right?

12    **A.**  I don't know that --

13                          (Simultaneous colloquy.)

14                          (Off-the-record discussion.)

15             **THE COURT:**  Oh, so I get it.  He didn't look at a

16    price committee report.  Why don't you move on?

17             **MR. PERRY:**  Thank you, Your Honor.

18    **Q.**  Your declaration in this proceeding, moving forward three

19    years now, Mr. Barnes, is in response primarily to

20    Mr. Barnes' -- excuse me -- Mr. Roman's declaration, right?

21    **A.**  That is correct.

22    **Q.**  And then as you just mentioned, you've added some new

23    opinions in the last six minutes in response to his testimony,

24    right?

25    **A.**  I'm not sure I agree with the six minutes but --

1    **Q.**   Okay.  Twenty -- 21 minutes.  I apologize.

2    **A.**   Okay.  He was on the stand since 12:00 o'clock so...

3    **Q.**   I know, but you just offered them in the last 21 minutes,

4    right?

5    **A.**   Oh, absolutely.

6    **Q.**   Okay.  Now, you reviewed Mr. Roman's entire declaration,

7    right?

8    **A.**   I did read the entire thing, yes.

9    **Q.**   But you don't address the entire declaration in your

10   report.

11   **A.**   No.  I focused on the issues within his declaration that

12   were within my area of expertise which had to do with the

13   profitability analysis.

14   **Q.**   Okay.  And just so we're clear on what you are and aren't

15   disagreeing with, let's go to Mr. Roman's declaration.

16        And I believe it's in the binder counsel already gave you,

17   but I just need to grab it.

18        Do you see CX-1021.020, Mr. Barnes, in that?

19   **A.**   Yes, sir.

20   **Q.**   That's Mr. Roman's declaration that you're responding to,

21   right?

22   **A.**   Yes, it is.

23   **Q.**   And you reviewed this in your professional capacity?

24   **A.**   I did.

25   **Q.**   And you wrote a declaration responding to it, right?

1    **A.**   I did.

2           **MR. PERRY:**   Your Honor, I move the admission of

3    CX-1020.

4           **MR. BYARS:**   Objection, Your Honor.

5           **THE COURT:**   His declaration?

6           **MR. PERRY:**   No.  Mr. Roman's declaration that he's

7    offering his opinions on.

8           **THE COURT:**   Okay.  It's hearsay.

9           **MR. PERRY:**   It is?

10          **THE COURT:**   So the answer would be no.

11          **MR. PERRY:**   Okay, Your Honor.

12          **THE COURT:**   I mean, why do I need the declaration?  I

13   mean it's part -- I'm considering it.  It's part of the

14   docket.

15          **MR. PERRY:**   Yes, Your Honor.  It is the motions

16   hearing.  Hearsay is a valid objection, but not the same as at

17   trial.  It is hearsay, but it is the hearsay on which he based

18   his declaration.

19       It doesn't --

20          **THE COURT:**   Just ask him questions.

21          **MR. PERRY:**   Thank you, Your Honor.

22   **Q.**  You focused not on the front half, if you will, of the

23   declaration.

24   **A.**  I don't really have it committed to memory as far as front

25   half and back half.  But as I mentioned, I focused on his

 1    discussion of profitability issues which is within my area of

 2    expertise.

 3    **Q.**  And just to help you out, Mr. Barnes, on page CX-1020-6,

 4    it's in the bottom right corner.

 5    **A.**  (Reviewing document.)

 6    **Q.**  Do you see the heading "Apple estimated the App Store

 7    ecosystems indicative profits and losses as well as effective

 8    commission on entitlement transactions"?

 9    **A.**  I see that title.

10    **Q.**  And then there are paragraphs 21 through 28 in that

11    section.

12    **A.**  I see that.

13    **Q.**  You agree with me that that's the part of the Mr. Roman's

14    declaration you're responding to?

15    **A.**  Principally, along with the exhibit that we referenced

16    earlier.

17    **Q.**  And the exhibit that we -- that was referenced earlier is

18    the price committee deck that Mr. Roman testified about,

19    correct?

20    **A.**  Yes, sir.

21    **Q.**  Okay.

22        And in the price committee deck, you discussed with

23    Mr. Byars primarily the indicative P&L slide, right?

24    **A.**  The indicative P&L slide and the slides related to the

25    allocation of R&D and G&A.

1    **Q.**  The following slide?

2    **A.**  Correct.

3    **Q.**  Thank you.

4         All right.  Now you're not actually making any opinions as

5    a CPA and forensic accountant regarding Mr. Roman's

6    credibility, right?

7    **A.**  I'm not assessing his -- I'm not here to assess anyone's

8    credibility.  I'm analyzing his work product.

9    **Q.**  Okay.  And the work product is you first criticized his

10   statement that Apple does not have a fully burdened P&L for

11   the App Store; is that right?

12   **A.**  That they don't -- that they can't and do not maintain

13   one, correct.

14   **Q.**  And your criticism really is that you were able to

15   reverse-engineer such a document for the purpose of the trial

16   and therefore Mr. Roman is wrong now in 2024 about what exists

17   within Apple; is that about it?

18   **A.**  That's not the entirety of it.  I also was able to

19   identify within Apple's own ordinary course business documents

20   that they maintain and report to the highest levels in the

21   company an App Store P&L, and the Court agreed with me.

22   **Q.**  Absolutely.  I was asking a different question.

23        The App Store P&L's that you identified and that were sent

24   to the highest levels of the company are not fully burdened,

25   right?

1    A.   That's -- that's incorrect.

2    Q.   What you had to do, you said -- you testified earlier a

3    reconciliation.  You said you could reconcile them to the SEC

4    filings, right?

5    A.   I was able to reconcile the CF&P document to the -- to the

6    SEC filings.

7    Q.   You had to make some adjustments to do that, right?

8    A.   I did not.

9    Q.   Okay.

10        And that's what the Court referred to as

11   reverse-engineering in the Court's opinion.  Do you recall

12   that?

13   A.   That was with respect to two other App Store P&L's that

14   were maintained that Mr. Rollins from Apple had indicated that

15   he thought there might be some certain minor cost calculations

16   that had not been reflected.  So I attempted to account for

17   his testimony.

18   Q.   So you adjusted those.

19   A.   I did.

20   Q.   And specifically you adjusted the allocation methodology

21   for G&A and R&D, right?

22   A.   That may be true.  I don't have a specific recollection.

23   I'd have to go back and look at my work product from back

24   then.

25   Q.   Okay.

1          Now, one of the reasons you relied on the documents that

2     you've identified, the App Store, P&L's, is that they were

3     communicated to the highest levels of the C suite.  I think

4     you just said that, right?

5     **A.**  Yes.

6     **Q.**  And you think it's important that if Apple financial

7     professionals communicate a document to senior executives, it

8     is entitled to some weight, right?

9     **A.**  Certainly.  And certain -- sometimes to the board of

10    directors as well.

11    **Q.**  Okay.  Now, the Court's finding regarding fully burdened

12    P&L's was based on documents, as you just testified, I

13    believe, prepared by Apple's corporate FP&A group, right?  Do

14    you remember that?

15    **A.**  That question might be better asked to the Court.  I -- my

16    recollection is that the Court's finding was based on my

17    testimony.

18    **Q.**  Well, you were here for Mr. Roman's testimony just a few

19    minutes ago, right?

20    **A.**  Yes.

21    **Q.**  And I read to him the Court's statement -- I'll read for

22    you too, Mr. Barnes.

23         Apple's financial planning and analysis team are tracking

24    revenues, fixed and variable operating costs, and allocation

25    of IT, research and development, and corporate overheads to an

 1    App Store P&L statement.

 2        Do you remember that finding by the Court?

 3    **A.**  Yes.  I don't think that references the question you asked

 4    me just a minute ago.

 5    **Q.**  My question was:  Were the documents that you relied on

 6    prepared by Apple's corporate FP&A team?

 7    **A.**  One of them was, yes.

 8    **Q.**  Yes.  The one that you said didn't require an adjustment,

 9    right?

10    **A.**  Correct.

11    **Q.**  And Mr. Roman testified that that reference in the Court's

12    opinion is to the corporate FP&A team, right?

13    **A.**  I'm not following you, sir.  I don't know --

14    **Q.**  I'm just asking you very simple question.

15    **A.**  Okay.

16    **Q.**  The one document, PX-2385 that you referred to in the

17    demonstrative you talked about 26 minutes ago, was prepared by

18    Apple's corporate FP&A team, correct?

19    **A.**  Yes, it was.

20    **Q.**  Okay.  Thank you.

21        Now, the point of that prior testimony, of your prior

22    testimony, was that Apple has, on occasion, and you've offered

23    up this chart on CDX-184.5, created a P&L for the App Store

24    that allocates joint fixed or shared costs, depending on

25    how -- terminology you prefer, two various business lines

1    including the App Store, right?

2    **A.**   Yes.   That document and several others that I testified to

3    at trial.

4    **Q.**   Right.   Okay.

5        Now, Mr. Roman's estimated or indicative P&L also

6    allocates joint costs to the App Store, right?

7    **A.**   It purports to, yes.

8    **Q.**   It purports to.

9        And the new opinion you've offered today is that that

10   allocation is incorrect.

11   **A.**   It's inconsistent with my prior investigation and work in

12   this case.

13   **Q.**   Okay.   It's inconsistent with your prior investigation and

14   work in this case.

15   **A.**   Correct.

16   **Q.**   And what part of your prior investigation and work in this

17   case is it inconsistent with?

18   **A.**   My review and analysis of other App Store P&L's including

19   the corporate finance and planning version that document the

20   amount of allocated R&D and allocated G&A that go to the

21   App Store.

22   **Q.**   Okay.   So let's just make sure I've got this right.

23       It uses a different allocation than the document included

24   on CDX-184.5.   Is that your opinion?

25   **A.**   Mr. Roman's allocations allocate materially higher amounts

1    of R&D and G&A than do all of the other individual App Store

2    P&L's that I reviewed, including that one.

3    **Q.**   All of the other?

4    **A.**   Yes.

5    **Q.**   And where have you set forth that analysis?

6    **A.**   It's in my trial testimony.

7    **Q.**   Your trial testimony could not have referred to

8    Mr. Roman's indicative P&L that he prepared in the fall of

9    2023 and presented to the price committee to make a decision

10   in January of 2024, could it, Mr. Barnes?

11   **A.**   No, it could not.

12   **Q.**   Okay.  Where have you set forth the analysis that

13   Mr. Roman's indicative P&L has a materially higher allocation

14   of R&D and G&A than any document that you reviewed in this

15   case?

16   **A.**   Because I know the numbers.  And I -- I don't think I'm

17   allowed to say the numbers out loud.

18   **Q.**   Okay.  I didn't ask you that question.

19        Where have you set forth the analysis?

20   **A.**   The analysis is that I did the work, I have the -- I know

21   what they actually do in the ordinary course of business.  I

22   can compare those numbers to what Mr. Roman has advanced here.

23   And what Mr. Roman has advanced here is materially higher.

24   That's an analysis that's -- it's in my head.

25   **Q.**   Okay.  When did -- oh, it's in your head.  Have you ever

1    written it down?

2    **A.**   I believe I did write it down in my declaration.

3    **Q.**   Oh, you did.  Okay, let's look at that.

4    **A.**   Okay.

5            **THE COURT:**  How much longer are you going to go,

6    Mr. Perry?

7            **MR. PERRY:**  A fair bit, Your Honor.

8            **THE COURT:**  All right.  Then we'll go ahead and

9    recess for the day.

10       Mr. Barnes, you are under cross-examination.  You are

11   ordered not to have any discussions with the lawyers at this

12   juncture until you're released.  Do you understand?

13           **THE WITNESS:**  Yes, Your Honor.

14           **THE COURT:**  Okay.

15       I will see everybody again.  We'll stand in recess until

16   May 16th at 9:30.

17       Thank you.

18           **THE CLERK:**  Court is in recess.

19               (Proceedings were concluded at 4:32 P.M.)

20                           --o0o--

21

22

23

24

25

BARNES - CROSS / PERRY

1

2

3

4

5                          **CERTIFICATE OF REPORTER**

6

7              I certify that the foregoing is a correct transcript

8       from the record of proceedings in the above-entitled matter.

9       I further certify that I am neither counsel for, related to,

10      nor employed by any of the parties to the action in which this

11      hearing was taken, and further that I am not financially nor

12      otherwise interested in the outcome of the action.

13

14      _____

15            Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

16                       Friday, May 10, 2024

17

18

19

20

21

22

23

24

25