UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 3** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 408 - 561 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, May 16, 2024 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                  BY:   GARY A. BORNSTEIN,
                        M. BRENT BYARS,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        BENJAMIN WYLLY,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1              A P P E A R A N C E S  (CONT'D.)

 2

 3    For Defendant:          Weil, Gotshal & Manges LLP
                              2001 M Street NW, Suite 600
 4                            Washington, D.C.  20036
                         BY:  MARK A. PERRY,
 5                            JOSHUA M. WESNESKI, ATTORNEYS AT LAW

 6                            Weil Gotshal & Manges LLP
                              1395 Brickell Avenue, Suite 1200
 7                            Miami, Florida  33131
                         BY:  MARK PINKERT, ATTORNEY AT LAW
 8

 9                            Gibson, Dunn & Crutcher LLP
                              333 South Grand Avenue
10                            Los Angeles, California  90071
                         BY:  RICHARD J. DOREN,
11                            JASON C. LO, ATTORNEYS AT LAW

12

13                            Gibson, Dunn & Crutcher LLP
                              1050 Connecticut Avenue, N.W.
14                            Washington, DC  20036-5306
                         BY:  HARRY PHILLIPS,
15                            CYNTHIA E. RICHMAN, ATTORNEY AT LAW

16

17

18

19

20                            --o0o--

21

22

23

24

25
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1                              **I N D E X**

2

3     THURSDAY, MAY 16, 2024 - VOLUME 3

4
      **PLAINTIFF'S WITNESSES**                    **PAGE**    **VOL.**
5

6     BARNES, NED

7     CROSS-EXAM (CONT'D.) BY MR. PERRY             414        3

8     REDIRECT EXAMINATION BY MR. BYARS             431        3

9

10    OLIVER, CARSON

11    (SWORN)                                       437        3

12    DIRECT EXAMINATION BY MR. EVEN                438        3

13    CROSS-EXAMINATION BY MS. RICHMAN              541        3

14

15

16                          **E X H I B I T S**

17
      **PLAINTIFF'S EXHIBITS**    **W/DRAWN**     **IDEN**    **EVID**    **VOL.**
18

19    CX-0014                                               505         3

20

21    **DEFENDANT'S  EXHIBITS**    **W/DRAWN**    **IDEN**    **EVID**    **VOL.**

22    CX-0015.1                                             549         3

23

24

25                            --oOo--

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

Thursday, May 16, 2024                                          9:29 a.m.

P R O C E E D I N G S

--o0o--

THE CLERK:  Good morning, everyone.  These proceedings are being court-reported by this court.  Any other recording of this proceeding, either by video, audio, including screenshots or other copying of the hearing is strictly prohibited.

Your Honor, now calling the civil matter 20-CV-5640-YGR, Epic Games, Inc. versus Apple Inc.

Parties, please step forward, state your appearances for the record, starting with the plaintiff.

MR. BORNSTEIN:  Good morning, Your Honor, Gary Bornstein for Epic.

THE COURT:  Good morning, Mr. Bornstein.

MR. BORNSTEIN:  Thank you.  I'm joined today by Lauren Moskowitz, Michael Zaken, Benjamin Wiley.

THE COURT:  Good morning.

MR. BORNSTEIN:  Yonatan Even.

MR. EVEN:  Good morning, Your Honor.

THE COURT:  There you are.  Good morning.

MR. BORNSTEIN:  And Brent Byars.

MR. BYARS:  Good morning, Your Honor.

THE COURT:  And good morning to you.  Your team sitting on the oak chairs back there.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **MR. BORNSTEIN:**  I have spared the court reporter

2    their names because they haven't entered appearances.  That's

3    the only reason I have not mentioned them by name.

4          **THE COURT:**  Well, good morning.

5       Mr. Perry, good morning.

6          **MR. PERRY:**  Good morning, Your Honor.  Mark Perry for

7    Apple.  With me at counsel table is Cynthia Richman, Richard

8    Doren.

9          **THE COURT:**  Yes.

10         **MR. DOREN:**  Good morning, Your Honor.

11         **MR. PERRY:**  Mark Pinkert.

12         **MR. PINKERT:**  Good morning.

13         **MR. PERRY:**  Later today, Your Honor, we also expect

14   Jason Lowe who was here last week and Harry Phillips, outside

15   counsel for Apple.

16      And then also at counsel table are Mr. Phil Schiller,

17   Apple's corporate representative, and Ms. Heather Grenier,

18   Apple's head of litigation.

19         **MS. GRENIER:**  Good morning, Your Honor.

20         **THE COURT:**  And then I had here Joshua Wesneski?

21         **MR. PERRY:**  Mr. Wesneski was here last week.  I

22   believe he'll be in the gallery today.

23         **THE COURT:**  Okay.  Well, good morning to you all.

24      I did receive your email.  Thank you.  And I've printed

25   those out and I reviewed them, but I did print them out.

```
 1        We have a witness.  And I could start, or was there
 2   anything we need to discuss?
 3        MR. BORNSTEIN:  No.  Just to alert Your Honor, we do
 4   continue to speak with Apple about those materials that Your
 5   Honor just referenced, and we may have more to discuss about
 6   that tomorrow once we conclude meeting and conferring.
 7   There's some information that Apple has -- still owes us, and
 8   when we get that we'll continue to talk.  And if we have
 9   something, we'll raise it then.
10        THE COURT:  Okay.
11        MR. BORNSTEIN:  And if we may, we just need to grab
12   the witness from the hall.
13        THE COURT:  That's fine.  Let's get going.
14      Mr. Barnes, good morning.
15        THE WITNESS:  Good morning, Your Honor.
16        THE COURT:  If you'll go ahead and have a seat.  I'll
17   remind you you're still under oath.
18        THE WITNESS:  Yes, Your Honor.
19        THE COURT:  And if you'll just pull that mic up and
20   let's have you state your name again so that way we know the
21   mics are working.
22        THE WITNESS:  Yes.  Ned Barnes.
23        THE COURT:  Okay.  You may proceed, Mr. Perry.
24        MR. PERRY:  Thank you, Your Honor.
25
```

1               **NED BARNES,**

2    called as a witness for the PLAINTIFF, having been duly sworn,

3    continued testifying as follows:

4               **CROSS-EXAMINATION** (Continued)

5    BY MR. PERRY:

6    **Q.**   Good morning, Mr. Barnes.

7    **A.**   Good morning, Mr. Perry.

8    **Q.**   When we left off last week, we were discussing the price

9    committee deck.  Do you recall that?

10   **A.**   I do recall us talking about that.

11   **Q.**   And in particular we were discussing the indicative P&L

12   that appears on -- or Slide 9 of that deck.  Do you recall

13   that?  Just to orient you.

14   **A.**   Yes, generally.

15              **MR. PERRY:**  And, Your Honor, that is CX-009.10 is the

16   page number.  And the redacted version is already in evidence

17   if we could publish it on the screen just for orientation.

18              **THE COURT:**  All right.  We'll open up the screens.

19   I'm assuming your people are managing what's actually being

20   published.

21              **MR. PERRY:**  That's correct, Your Honor.  And as

22   you'll recall, the Court has an unredacted version.

23              **THE WITNESS:**  Mr. Perry, just so you know, I don't

24   have my binder.  So I don't know if I need it.

25              **MR. PERRY:**  Mr. Barnes, if you need anything, let me

 1   know and we'll get it to you, but this is literally just to

 2   orient you where we are.

 3          **THE WITNESS:**  Absolutely.

 4          **MR. PERRY:**  Very good.

 5          **THE COURT:**  It's just that the one he's looking at is

 6   obviously redacted.

 7          **MR. PERRY:**  That is correct, Your Honor.

 8          **THE COURT:**  Okay.

 9   **BY MR. PERRY:**

10   **Q.**  And, Mr. Barnes, regarding this indicative P&L, do I

11   understand correctly last week on Friday, you expressed

12   basically two numbers -- two opinions about the numbers on

13   this slide.  And the first was that the allocation methodology

14   used for this price committee deck was different than the

15   methodology used for the documents you looked at at the time

16   of the trial.  Do I have that right?

17   **A.**  Significantly, yes.

18   **Q.**  Okay.  And the second opinion is that the margin

19   percentages on this indicative P&L are calculated differently

20   than the documents you looked at at the time of trial, right?

21   **A.**  I agree with that.  I believe my opinion was they're

22   calculated improperly.

23   **Q.**  Right.  And that's because they're calculated differently,

24   right?

25   **A.**  And because they're not consistent with the way

1    accountants would calculate because either gross margin

2    percentage or operating profit margin percentage.

3    **Q.**   Under GAAP, right?

4    **A.**   Certainly under GAAP.  Although I don't think GAAP gets

5    into how ratios are calculated.  But certainly the

6    determination of what the denominator would be and the

7    calculation as being limited to revenue actually recognized,

8    certainly it's inconsistent with GAAP to include App Store

9    billings.

10   **Q.**   Thank you, Mr. Barnes.  And we'll come back to that second

11   opinion in a minute.  I'd like to start with the first

12   opinion.  Is that okay with you?

13   **A.**   Sure.

14   **Q.**   All right.  Now, just to be clear, you have not testified,

15   have you, Mr. Barnes, that Apple maintains an enterprise-wide

16   P&L in its publicly reported financial statements in

17   accordance with U.S. GAAP that includes a fully burdened P&L

18   for the App Store, right?

19   **A.**   I have not testified that they -- that they publicly

20   disclose that, that is correct.

21   **Q.**   And Apple does -- it's a publicly traded company, right?

22   **A.**   Correct.

23   **Q.**   And it does publicly disclose its financials, its GAAP

24   financial reportings, in various forms, right?

25   **A.**   It does.

1    Q.   Including filings with the Securities & Exchange

2    Commission?

3    A.   Correct.

4    Q.   And last week you testified, in fact, about Apple's 2023

5    10-K, right?

6    A.   I don't remember the specific year, but I believe it was

7    the most recent fiscal year, yes.

8    Q.   In fact, you included a slide in your demonstrative set

9    drawn from that 10-K, right?

10   A.   Right.  That had a revenue recognition policy disclosure.

11   Q.   And just to be clear, Mr. Barnes, there is no fully

12   burdened P&L for the App Store in the 10-K, right?

13   A.   That is correct.

14   Q.   And just so we have our terminology straight, Mr. Barnes,

15   you would agree, wouldn't you, that the term "fully burdened"

16   describes the determination of operating margins that include

17   all identifiable direct costs as well as an allocation of

18   indirect or shared costs from which the relevant business or

19   business segment derives benefit?

20   A.   I generally agree with that.

21   Q.   Okay.  And you're not disagreeing, are you, Mr. Barnes,

22   with the Court's observation in the order post trial that

23   there are multiple ways to account for shared costs in a

24   business unit.  You agree with that, right?

25   A.   There are multiple methodologies for allocating shared and

1   joint costs, yes.

2   **Q.**  And you would also agree, Mr. Barnes, that it's ultimately

3   the decision of management or corporate finance to determine

4   what is most appropriate for a given type of expense, right?

5   **A.**  Generally speaking, there are times where disclosure

6   requirements come into play.  But that's generally speaking

7   that's true.

8   **Q.**  And it's in fact, Mr. Barnes, it's not unusual for

9   companies to determine that one or more types of methodologies

10  for allocating costs is appropriate, right?

11  **A.**  That's possible.

12  **Q.**  And if Apple has determined that a particular method of

13  allocation, for example, the revenue method -- you're familiar

14  with that, right?

15  **A.**  I am familiar with allocating costs, share costs on the

16  basis of revenue, yes.

17  **Q.**  And if Apple has determined that a particular method of

18  allocation is most appropriate for managing profitability at

19  the line of business level, then you wouldn't have any reason

20  to disagree with that, right, Mr. Barnes?

21  **A.**  Well, I think for me to -- I would need to understand more

22  about the specific allocations.  Costs -- costs are typically

23  allocated according to what the -- what management believes is

24  the most reflective driver of the cost.  So revenue could

25  certainly be a -- a good basis to allocate certain costs.

 1    There could be other costs where revenue is not an appropriate

 2    basis.  But I would need to understand more about what Apple

 3    is actually doing before I could opine on that.

 4    **Q.**  Understood.  Let me give it to you then as a hypothetical.

 5    You're an expert, right?

 6    **A.**  Yes.

 7    **Q.**  Mr. Barnes, if Apple has determined that revenue-based

 8    allocations are most appropriate for managing internal

 9    financial profits, profitability at the line of business

10    level, then you wouldn't have any reason to disagree with

11    that, right, Mr. Barnes?

12    **A.**  As I sit here today, I don't have any reason to disagree

13    with it, not knowing how the allocations are actually being

14    done that you're referring to hypothetically.

15    **Q.**  Now, Mr. Barnes, in allocating shared expenses across

16    profit centers or business units, you would agree that the

17    individuals with financial oversight for a particular business

18    unit need to exercise judgment in making those determinations

19    regarding allocations, right?

20    **A.**  That's generally true, yes.  It is -- it does require

21    judgment.

22    **Q.**  And the type of allocation that the managers or the

23    financial professionals may make may vary, V-A-R-Y, vary,

24    according to circumstances, right, Mr. Barnes?

25    **A.**  By circumstance and by the nature of the particular cost

1    centers, yes.

2    Q.   Now, you're not offering the opinion, Mr. Barnes, that the

3    way that the corporate FP&A allocated costs in 2019 in that

4    document you testified about on Friday is the only way to

5    allocate costs for the App Store, right?

6    A.   I don't think I've offered that opinion, but that is

7    certainly the most comprehensive and reconcilable allocation

8    of all of Apple's overhead and G&A costs that I've seen on my

9    work in this case.

10   Q.   And in light of that, you are not offering the opinion

11   that it's the only way to allocate costs to the App Store,

12   correct, Mr. Barnes?

13   A.   I have not offered that opinion, that's correct.

14   Q.   And you're not offering the opinion that the methodology

15   used in the 2019 corporate FP&A report is somehow binding or

16   fixed on Apple for all time and for all purposes, right?

17   A.   I have not offered that opinion.

18   Q.   It's not like a fly trapped in amber that could never --

19   never get out, right?

20   A.   I haven't offered that opinion.

21   Q.   Very good.

22       And you're not offering, Mr. Barnes, an independent

23   opinion of how costs should be allocated in 2024 for purposes

24   of the price committee analysis, right?

25   A.   I'm not offering a specific independent opinion as to the

1    methodology, but I have offered the opinion that it should be

2    based on the manner in which Apple allocates cost in the

3    ordinary course of business.

4    **Q.**  And in fact, the pre -- and by that you mean the 2019

5    corporate FP&A documents, correct?

6    **A.**  Among other documents, yes.

7    **Q.**  The other documents that form the basis of your previous

8    report, written direct testimony, and opinions, correct?

9    **A.**  Correct.

10   **Q.**  And in those documents you did not form the opinion, you

11   did not do an independent assessment of the underlying

12   allocations, you accepted them as accurate, right?

13   **A.**  It is partially true that I accepted the allocations

14   that -- that Apple business unit leaders had -- had utilized.

15   But I did, in connection with my work leading up to the trial,

16   conduct certain additional allocations as I believe we

17   discussed briefly last week.

18   **Q.**  That's correct.  I'm asking a different question,

19   Mr. Barnes.  You didn't do an independent allocation of joint

20   costs to the App Store separate from what Apple has ever done?

21   **A.**  Certainly not for all of the costs, correct.

22   **Q.**  Okay.  I'd like to move, Mr. Barnes, to your second

23   opinion.

24   **A.**  Okay.

25   **Q.**  And this is the calculation of the operating margin

1   percentages, right?

2   **A.**  Operating margin and gross margin.

3   **Q.**  Thank you for the clarification.  The margin percentages

4   of which there are two on the indicative P&L, correct?

5   **A.**  Correct.

6   **Q.**  All right.

7       Now just to reestablish where we are, I think on Friday

8   you agreed with me that you approached this -- these matters,

9   that is, the question of the App Store's profitability or

10  margins from an accounting context based on GAAP, right?

11  **A.**  Yes.

12  **Q.**  And as a general rule, under GAAP accounting -- so we're

13  in the world of GAAP accounting, Mr. Barnes, okay?

14  **A.**  Yes, sir.

15  **Q.**  All right.  In a general rule, there's two basically

16  approaches to revenue recognition.  You'd agree with that,

17  right?  For sales.

18  **A.**  If you're talking about specific to the type of -- of

19  business that the App Store is in, I believe that's correct.

20  I think if you're going to make that more general, there might

21  be -- I believe there are many different aspects of revenue

22  recognition.

23  **Q.**  And I appreciate that clarification, Mr. Barnes.  It's an

24  important one.  So for a company that sells products or

25  services like the App Store, there's two basic methods of

BARNES - CROSS (Continued)/ PERRY

1    revenue recognition, right?

2    **A.**   Generally, yes.

3    **Q.**   Right.  And one is the gross revenue method which is all

4    the dollars in the door before any deductions made, right?

5    **A.**   Correct.

6    **Q.**   And the other one is the net revenue basis which is

7    dollars in the door minus certain outlays before arriving at

8    net revenue, right?

9    **A.**   I would characterize it as -- as the -- the net income

10   that actually flows to the company that's -- that's conducting

11   the sale of goods or services.

12   **Q.**   And but in the accounting literature, it's called net

13   revenue basis, right?

14   **A.**   It is.

15   **Q.**   It is.  And you illustrated this in your hypothetical,

16   right, the difference between these two points?

17   **A.**   I did.

18   **Q.**   So if an app is sold for $10, or content within an app is

19   sold for $10, and $7 of that goes to the developer, roughly

20   speaking, the gross revenue is $10 and the net revenue is $3.

21   You agree with that, right?

22   **A.**   A company that's -- that's recognizing revenue properly on

23   a net basis, I would disagree with the characterization of the

24   gross revenue.

25   **Q.**   I didn't ask you which basis to apply.  I asked if you, in

1   that hypothetical, the gross revenue would be the $10 and the

2   net revenue would be the $3.  You do agree with that, right?

3   A.   Your hypothetical is incomplete.  I need to know which --

4   what type of -- what basis there -- the company, the subject

5   company in your hypothetical is recognizing revenue.

6   Q.   That's a fair point because recognition is a GAAP concept,

7   right?

8   A.   It is.

9   Q.   You can't recognize revenue if it does not comply with

10  GAAP.  So let's take recognition out of my hypothetical.  I

11  appreciate the clarification, Mr. Barnes.

12       Let's just say as a -- as a mathematical exercise, your

13  hypothetical, for example, in your demonstrative deck, not

14  revenue recognition, just counting dollars, $10 is gross

15  revenue, $3 is net revenue, correct?

16  A.   I would be comfortable with gross selling price.

17  Q.   Okay.  How about billings?  Would you be comfortable with

18  billings?

19  A.   Absolutely.

20  Q.   That's Apple's lingo for the concept we're discussing,

21  right?

22  A.   Correct.

23  Q.   And just to bring that back to where we're discussing this

24  indicative P&L, your basic criticism, if I understand it

25  correctly, and tell me where I've got it wrong, Mr. Barnes, is

1  that the Apple finance team calculated the margin percentages

2  based on billings rather than based on net revenue.  Do I have

3  that right?

4  **A.**  You do.

5  **Q.**  Okay.  Now, you don't dispute, though, the arithmetic on

6  the slide, in other words, the calculations are done

7  correctly, right?

8  **A.**  I didn't find a math error --

9  **Q.**  Okay.

10  **A.**  -- in this slide.

11  **Q.**  Okay.  So your opinion is not based on a math error.

12  **A.**  That's correct.  It's methodological error.

13  **Q.**  And that is so you're criticizing the decision, the

14  methodological decision to use billings rather than net

15  revenue to determine the margin percentages?

16  **A.**  Yes.  It's incorrect.

17  **Q.**  It's incorrect as a matter of GAAP, correct?  To be

18  specific.

19  **A.**  It's incorrect as a matter of any -- any reasonable basis

20  to analyze financial statement data.  I can't think of any

21  reason why you would want to -- to divide a profit or a gross

22  margin number by a denominator that doesn't reflect the

23  revenue of the company.

24  **Q.**  As an accounting matter.

25  **A.**  Sure.  That's why I'm here.

1  **Q.**  That's why you're here.  Thank you.

2      Now to be clear, the indicative P&L does show -- has a net

3  revenue line that says revenue, right?

4  **A.**  It does.  Well --

5  **Q.**  Yes.

6  **A.**  -- it says revenue.

7  **Q.**  The revenue -- it is your understanding, that is the net

8  revenue --

9      The revenue line, Mr. Barnes, on the indicative P&L,

10  that's the net revenue we've just been discussing, correct?

11  **A.**  I believe that is the case.  I don't have the backup for

12  this slide, but I believe that is the case, correct.

13  **Q.**  Thank you.

14      And if anyone wanted to determine the margin percentages

15  using the methodology that you have advocated, could they do

16  so from the information presented on the indicative P&L?

17  **A.**  Certainly.  I believe I've done that.

18  **Q.**  You've done that, right, and anybody with a calculator can

19  do that, correct?

20  **A.**  Some people could probably do it in their head, but, yes,

21  you could do it with a calculator.

22  **Q.**  We'll leave the in-the-head people for another -- another

23  concept -- context, Mr. Barnes.

24      Now, you would agree that a business may have many

25  purposes for estimating profit margins or operating margins,

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

BARNES - CROSS (Continued)/ PERRY

 1  correct?

 2  **A.**   That's possible.

 3  **Q.**   You don't disagree.

 4  **A.**   I don't have a basis to disagree that there can be

 5  multiple purposes for calculating a profit margin, correct.

 6  **Q.**   And one of those purposes could be business planning,

 7  right?

 8  **A.**   Certainly.

 9  **Q.**   And business plans, internal business plans for business

10  lines that are not separately reported as segments in a

11  company's public financial statements are not required to

12  follow GAAP principles.  You'd agree with that, right?

13  **A.**   The transactions that give rise to the financials must

14  follow -- and how those transactions are accounted for must

15  follow GAAP.

16  **Q.**   I --

17  **A.**   The presentation of a set of financial statements or P&L

18  is not necessarily governed by GAAP unless there is a

19  disclosure requirement.

20  **Q.**   Thank you, Mr. Barnes.

21       So if the business line is preparing an internal business

22  plan, just to be clear, the second half of your answer, there

23  is no requirement to follow GAAP, right?

24  **A.**   That's generally true, again aside from the fact that the

25  transactions themselves are accounted for consistent with

1    GAAP.

2    Q.  And you're aware in your experience as a forensic

3    accountant that companies often do prepare business plans that

4    are not GAAP-compliant, right?

5    A.  I don't have a specific recollection of seeing that, as I

6    sit here today.

7    Q.  All right.

8    A.  I can't -- I can't foreclose it.

9    Q.  All right.  But you're not offering an opinion,

10   Mr. Barnes, that the price committee materials prepared in

11   context of what we've been discussing here were required to be

12   prepared in accordance with GAAP, correct?

13   A.  I haven't offered that opinion.

14   Q.  All right.

15       You have pointed out, I believe, just to confirm,

16   Mr. Barnes, that the 10-K indicates that the -- Apple

17   enterprise, the enterprise-level reporting under GAAP uses the

18   net revenue method of revenue recognition, right?

19   A.  With respect to the App Store in particular, not -- not

20   necessarily with respect to the sale of iPhones and iPads and

21   stuff like that.

22   Q.  And where -- where in the 10-K is there a statement

23   regarding the App Store in particular?

24   A.  Maybe I need to correct that.  I think it -- the statement

25   that I put up, I think, refers to the sale of digital content

1  or apps, or there's -- I forget the specific language, but

2  it's set forth on the slide --

3                    (Simultaneous colloquy.)

4  **BY MR. PERRY:**

5  **Q.**  -- the language in your demonstrative, right?

6  **A.**  Correct.

7  **Q.**  Okay.

8       But you also agree with me, right, Mr. Barnes, that the

9  App Store business unit does not have publicly recorded

10  financial statements, right?

11  **A.**  I think we've established that, yes.

12  **Q.**  Okay.  And, Mr. Barnes, you would also agree with me,

13  would you not, that how a company goes about managing its

14  profitability analysis and the extent to which it evaluates

15  the profitability of different profit centers or business

16  units doesn't really have any direct correlation to how

17  financial statements are reported on an enterprise level in

18  SEC filings or any other publicly disclosed financial filing,

19  right?

20  **A.**  That was a very long question, Mr. Perry.

21  **Q.**  Happy to give it back to you.

22  **A.**  Okay.  Try one more time.

23  **Q.**  Yes, sir.

24       Do you agree, yes or no, with this proposition,

25  Mr. Barnes:  How a company goes about managing its

1  profitability analysis and the extent to which it evaluates

2  the profitability of different profit centers or business

3  units doesn't really have any direct correlation to how

4  financial statements are reported on an enterprise level in

5  SEC filings or any other publicly disclosed financial filing?

6  **A.**  I don't think I can agree with the -- the word that you

7  put in there.  It doesn't have any direct correlation.  I mean

8  obviously there can be differences in how companies report

9  internally for a business unit versus the enterprise-wide.

10     But as I've testified here and in connection with the

11  trial, there are also information I reviewed specific to this

12  case that -- that Apple has maintained its analysis of

13  individual business unit profit and loss statements, including

14  the App Store, in a -- in a consistent and regular way that in

15  fact it rolls up to its enterprise-wide financial statements.

16  **Q.**  And that's the corporate FP&A documents that you're

17  talking about?

18  **A.**  That's one of them, yes.

19  **Q.**  Right.

20     And my question is not -- the corporate FP&A documents

21  were on -- they included more than just the App Store, right?

22  **A.**  Yes.  They include all of Apple's business units.

23  **Q.**  Right.  And the profitability analysis in the indicative

24  P&L, the price committee deck in general is limited to the App

25  Store business unit.  Do you agree that?

BARNES - REDIRECT / BYARS

1   **A.**  It's -- it's limited to the -- to the App Store business

2   unit although it does include, as we've discussed, App Store

3   billings which are not App Store business unit revenues.

4   **Q.**  They are the App Store billings.  You don't dispute that,

5   right?

6   **A.**  That is correct.

7   **Q.**  Okay.  Just to be clear.

8       And so are you disagreeing, Mr. Barnes, be clear, I want

9   to talk about the App Store financial analysis done for

10  purpose of the price committee, that how Apple goes about

11  managing that profitability analysis doesn't really have any

12  direct correlation to how financial statements are reported on

13  an enterprise level in SEC filings or other publicly disclosed

14  filings?

15  **A.**  This particular analysis, I don't have any reason to

16  believe it has a direct correlation, correct.

17  **Q.**  Thank you, Mr. Barnes.

18          **MR. PERRY:**  No further questions.

19          **THE COURT:**  Exam limited to the scope of cross.

20          **MR. BYARS:**  Thank you, Your Honor.

21                      **REDIRECT EXAMINATION**

22  BY MR. BYARS:

23  **Q.**  Mr. Barnes, I'd like to clear something up that Mr. Perry

24  asked you about, which is the contents of the Form 10-K.

25      We have that slide.  It's your demonstrative Slide 3 which

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

BARNES - REDIRECT / BYARS

1    was the 10-K.

2              **MR. BYARS:**  If you could display that, Mr. Lang.

3                   (Demonstrative published.)

4    **BY MR. BYARS:**

5    **Q.**  And, Mr. Barnes, does this excerpt from Apple's 10-K

6    contain a statement that's specific to the App Store about how

7    revenue is calculated with respect to App Store revenue?

8    **A.**  It does.  And I apologize, I forgot about that reference

9    in my previous testimony.

10   **Q.**  Okay.  Thank you.

11        Shifting to another topic Mr. Perry asked you about, which

12   is this references to GAAP.  I'm going to ask you the

13   definition of operating margin percentage, is that some

14   esoteric concept that's limited to GAAP, or can you encounter

15   that outside the context of GAAP in the accounting field?

16   **A.**  It's -- it's the latter.  Actually the -- the calculation

17   of a ratio or an operating margin percentage is not -- that's

18   not governed by GAAP.  GAAP is -- deals with how transactions

19   are accounted for and how they're presented in financial

20   statements.

21        But it is a -- it's not some vague unknown reference.

22   It's a -- it's a common ratio or percentage calculation that

23   accountants and finance professionals use all the time.

24   **Q.**  And to put a finer point on it, if I were to go back to

25   school and obtain a bachelor's degree in accounting or some

1    related field, would you expect that I encounter that concept

2    within that education?

3    **A.**   Almost certainly, yes.

4    **Q.**   And -- and would I do so very quickly?

5    **A.**   Yes.  I mean it would -- it would not be a high-level

6    accounting class that you would learn about ratio analysis.

7    **Q.**   Okay.  And have you, in all of your investigation for this

8    case, whether for this motion or in the course of trial, ever

9    seen anybody at Apple calculating operating margin percentage

10   by dividing by App Store billings rather than revenue, outside

11   of Mr. Roman's presentation?

12   **A.**   No.

13   **Q.**   And I'd like to -- I don't know if you remember from

14   Friday, Mr. Perry asked you some questions about what he

15   referred to as the App Store ecosystem.  So I just want to be

16   really clear about the scope of the statements that you're

17   responding to.  If you would -- and apologies, you don't have

18   a binder.

19          **MR. BYARS:**  Can you hand the binder.  Thank you.

20       May we approach the witness to hand a binder?

21          **THE COURT:**  You may.

22          **THE WITNESS:**  Thank you.

23   BY MR. BYARS:

24   **Q.**   And Mr. Roman's declaration is under CX-1020.  And I'd

25   like to refer you to paragraph 25 which is on page 6.

1    **A.**   (Reviewing document.)

2         I'm sorry.  Which paragraph?

3    **Q.**   Paragraph 25 on page 6.

4    **A.**   (Reviewing document.)

5    **Q.**   I'm sorry.  If you're looking at the bottom number, it's

6    7.

7    **A.**   Just give me a second.  My binder came apart.

8    **Q.**   Of course.

9    **A.**   (Reviewing document.)

10        Okay.  I'm there.

11   **Q.**   And without giving any of the numbers, is Mr. Roman, in

12   paragraph 25, purporting to represent the operating margins of

13   the App Store ecosystem, or is he purporting to present the

14   profit margins of the App Store itself?

15   **A.**   He says App Store.  And but these are not properly

16   calculated operating margin percentages.

17   **Q.**   Thank you.

18        In fact, he presents -- he purports to present that

19   calculation with respect to both the Worldwide App Store and

20   the U.S. App Store, right?

21   **A.**   That's correct.

22   **Q.**   And is Mr. Roman indicating to the Court that he's

23   calculating operating margins or some other metric that Apple

24   may use that doesn't actually involve calculating profits over

25   revenue?

1    **A.**  He specifically states operating margins.

2          **MR. BYARS:**  That's all, Your Honor.

3          **THE COURT:**  Anything with respect to those three

4    topics, or two topics, Mr. Perry?

5          **MR. PERRY:**  Nothing further, Your Honor.

6          **THE COURT:**  Any reason to keep this -- can I excuse

7    this witness?

8          **MR. PERRY:**  Nothing from Apple, Your Honor.

9          **MR. BYARS:**  That's fine, Your Honor.

10         **THE COURT:**  All right.  Sir, you're excused.  Thank

11    you.

12         **THE WITNESS:**  Thank you, Your Honor.

13         **THE COURT:**  Next witness.

14    While the witness is coming up, Mr. Bornstein, Mr. Perry,

15    have you all talked about -- have you met and conferred about

16    filing a -- your findings of fact with cross-references to the

17    transcript?

18         **MR. BORNSTEIN:**  We have not discussed that, Your

19    Honor.  We were not certain what kind of additional paper Your

20    Honor might want or not want.

21         **THE COURT:**  What I think I want is your perspectives

22    on the factual findings organized by each of the orders that

23    the Court issued.  So with respect to the claim of contempt,

24    they would be organized by -- you've got a proposal that

25    has -- well, two, could be more than two, but I want them done

BARNES - REDIRECT / BYARS

1    by category.

2           **MR. BORNSTEIN:**  So just to make sure I have that,

3    Your Honor, you mean the categories of items that Your Honor

4    laid out in the order the parameters for the hearing, Your

5    Honor had identified four topics on which you had wanted

6    testimony?  Or maybe you're referring to something else.

7           **THE COURT:**  I'm referring to the -- to the

8    injunction.  So I can go back and figure out what makes sense

9    in terms of -- I was looking at your proposed form of order --

10          **MR. BORNSTEIN:**  Oh, okay.  I misunderstood.

11          **THE COURT:**  -- that outlined the two elements.  I

12   think it's probably best for you all to just meet and confer

13   and then figure out whether you're going to do this

14   simultaneously or consecutively.

15          **MR. BORNSTEIN:**  We can talk this evening about what

16   makes sense for us.  Obviously if Your Honor has a preference,

17   we'll do whatever it is would be most useful for the Court.

18          **THE COURT:**  I just want them -- we can deal with

19   argument later, but I -- it would be helpful for me for you to

20   organize the testimony with the cross-references to the

21   transcript, and then I have that from both of you, with

22   respect to whether or not there's been a violation.

23          **MR. BORNSTEIN:**  Okay.  We'll speak with each other

24   and perhaps share with you tomorrow morning our thoughts on

25   that.

 1          **THE COURT:**  That will be great.  Thank you.

 2          **MR. PERRY:**  We agree, Your Honor.  Thank you.

 3          **THE COURT:**  Okay.  So who's the next witness?

 4          **MR. BORNSTEIN:**  We're calling Mr. Oliver, Your Honor.

 5          **MR. EVEN:**  And, Your Honor, may we approach with some

 6   binders?

 7          **THE COURT:**  You may.

 8          **MR. EVEN:**  Thank you.

 9                (Off-the-record discussion.)

10          **THE COURT:**  All right.  Let's get him sworn.

11          **THE CLERK:**  Please raise your right hand.

12

13                        **CARSON OLIVER,**

14   called as a witness by the plaintiff, having been duly sworn,

15   testified as follows:

16          **THE WITNESS:**  I do.

17          **THE CLERK:**  Thank you, sir.

18      Please be seated and speak clearly into the microphone.

19      Please state your full name and spell out your last name

20   for the record.

21          **THE WITNESS:**  My name is Carson Oliver.

22      And my last name is spelled O-L-I-V-E-R.

23          **THE COURT:**  Good morning.

24          **THE WITNESS:**  Good morning.

25          **THE COURT:**  You may proceed.

1          **MR. EVEN:**  Thank you, Your Honor.

2                          **DIRECT EXAMINATION**

3     BY MR. EVEN:

4     **Q.**  Good morning, Mr. Oliver.  My name is Yonatan Even.  I

5     represent Epic, and I'll be questioning you this morning.

6          Do you see that you have a binder or a couple of binders

7     before you?

8     **A.**  I do, yes.

9     **Q.**  Great.

10         Mr. Oliver, you're the senior director of business

11    management for the Apple App Store; is that right?

12    **A.**  That's correct.

13    **Q.**  And you report to Mr. Fischer in that role?

14    **A.**  Yes.

15    **Q.**  You're aware that you're here today in connection with a

16    motion that Epic filed to enforce the injunction that this

17    Court entered against Apple back in 2021, right?

18    **A.**  I am, yes.

19    **Q.**  And the injunction this Court issued restrained Apple from

20    prohibiting developers from including in their apps buttons,

21    external links, and other calls to action that direct

22    customers to purchasing mechanisms; are you aware of that?

23    **A.**  Yes.

24    **Q.**  In response to the injunction, Apple introduced a new

25    external purchase link entitlement program that developers

 1    could apply for, right?

 2    **A.**   Yes.

 3    **Q.**   And the use of the external purchase link entitlement

 4    under that program is conditioned on the developer's payment

 5    of a fee on any out-of-app purchases that a user makes within

 6    seven days of clicking on a purchase link, correct?

 7    **A.**   That's correct.

 8    **Q.**   And I'm going to refer to purchases that fall within that

 9    seven-day window as "linked purchases."  Is that okay?

10    **A.**   Yes.

11    **Q.**   Now, the fee that that will impose on link purchases,

12    27 percent for any purchase that would bear a 30 percent fee

13    if it were completed as an in-app purchase, correct?

14    **A.**   That's generally correct, yes.

15    **Q.**   And the fee that Apple imposed on link purchases is

16    12 percent for any purchase that would bear a 15 percent fee

17    if it were completed as an in-app purchase, correct?

18    **A.**   Correct.

19    **Q.**   So in both cases, the link purchase fee that Apple imposed

20    is 3 percent less than the fee Apple would impose on the same

21    purchase if it were completed through IAP within the app,

22    correct?

23    **A.**   I wouldn't say that.

24    **Q.**   I'm sorry.  I didn't hear you correctly.  You say you

25    would say that?

1    **A.**   I would not say that.

2              **THE COURT:**  It's not 3 percent less?

3              **THE WITNESS:**  It is 3 percent less for that duration

4    of the first seven days.  But that is not consistent with what

5    would happen if that purchase were made in the app.

6    **BY MR. EVEN:**

7    **Q.**   Sir, we already -- I already defined linked purchases as

8    purchases occurring within the seven-day period, and you

9    agreed to that definition, right?

10   **A.**   Yes.

11   **Q.**   And so I'm asking about linked purchases, the fee on

12   linked purchases, purchases occurring within the seven-day

13   window is 3 percent less than the fee Apple would impose on

14   the same purchase if it were completed within the app on IAP,

15   correct?

16   **A.**   Yes.

17   **Q.**   Thank you.

18        Now the price committee was convened to determine the

19   commission structure for Apple's link entitlement program,

20   right?

21   **A.**   That's correct, yes.

22   **Q.**   And you assisted in preparing a presentation for the price

23   committee that was given on January 16, 2024, correct?

24   **A.**   I did, yes.

25   **Q.**   And if I refer to that presentation as the price committee

OLIVER - DIRECT / EVEN

1   deck, you will understand what I'm referring to?

2   **A.**   Yes.

3   **Q.**   The price committee deck reflected certain information for

4   a report compiled by a consulting firm known as Analysis

5   Group, correct?

6   **A.**   Yes.

7   **Q.**   And you led a group at Apple that worked with Analysis

8   Group on this report, correct?

9   **A.**   Yes.

10   **Q.**   Now you understand that Apple designated you to testify

11   about the commission structure of the external purchase link

12   entitlement including the Analysis Group report and the deck

13   presented to the price committee, correct?

14   **A.**   Yes.

15   **Q.**   You did not put in a declaration in support of Apple's

16   notice of compliance, correct?

17   **A.**   That's correct.

18   **Q.**   And you also did not put in a declaration in support of

19   Apple's opposition to Epic's motion, correct?

20   **A.**   That's correct.

21   **Q.**   Now, the person who did put in a declaration is Mr. Roman

22   who put in both a declaration and attached the analysis in the

23   price committee deck, correct?

24   **A.**   That's correct.

25   **Q.**   And Mr. Roman is a vice president, right?

1    **A.**   That's correct.

2    **Q.**   And I take it that at least formally, that is a more

3    senior than you, correct?

4    **A.**   Yes.

5    **Q.**   And Mr. Roman was the person in charge of creating the

6    financial analysis that is reflected in the pricing committee

7    deck, correct?

8    **A.**   Mr. Roman's team, yes.

9    **Q.**   Mr. Roman's team led by Mr. Roman, correct?

10   **A.**   Correct.

11   **Q.**   And Mr. Roman presented the price committee deck to

12   Mr. Cook, Mr. Maestri, and Mr. Schiller on January 16 of this

13   year, correct?

14   **A.**   Yes.  That's when it was emailed to them.

15   **Q.**   You said that was when it was emailed to them?

16   **A.**   That's correct.

17   **Q.**   Do you understand that Mr. -- well, do you have an

18   understanding about whether Mr. Roman personally presented the

19   deck to them?

20   **A.**   I believe the meeting related to it was a few days earlier

21   than that.

22   **Q.**   When was the meeting, do you believe?

23   **A.**   I believe it was in mid-January where we discussed the --

24   the price committee and we emailed the deck on the 16th.

25   **Q.**   So January 16, I think for me at least, would be

 1   mid-January.  So how many days prior to January 16 do you

 2   believe the meeting occurred?

 3   **A.**   A few days earlier, four or five days, I believe.

 4   **Q.**   Is it your testimony that the recommendations in the deck

 5   were presented four or five days prior to January 16th?

 6   **A.**   They were discussed four or five days earlier, yes.

 7   **Q.**   And they were discussed in person four or five days

 8   earlier?

 9   **A.**   That's correct, yes.

10   **Q.**   And did the pricing committee actually adopt the

11   recommendations four or five days earlier?

12   **A.**   No.

13   **Q.**   When did the price committee adopt the recommendations?

14   **A.**   On the 16th.

15   **Q.**   So I'm trying to understand the timeline.  So there was a

16   meeting --

17   **A.**   Yes.

18   **Q.**   -- four or five days prior to January 16, correct?

19   **A.**   Correct.

20   **Q.**   Who attended that meeting?

21   **A.**   That meeting would have been attended by our legal team

22   including Kate Adams or Heather, our senior legal team.  It

23   would have included Tim Cook, Luca Maestri, our CFO, as well

24   as Phil Schiller.  It would have included me, a member of my

25   team, Tim O'Kim [phonetic].  It would have included Matt

1   Fischer.  It would have included Alex Roman and two members of

2   his team.

3   **Q.**  And that was the only meeting about this deck?

4   **A.**  They were prior meetings about the implementation which

5   covered elements of the factors that were covered in the final

6   deck.

7   **Q.**  How many meetings were there altogether?

8   **A.**  Numerous meetings.  I don't think I could count.

9   **Q.**  More than ten?

10  **A.**  Yes.

11  **Q.**  More than 20?

12  **A.**  Not all with that same group, to be clear, but yes.

13  **Q.**  How many meetings were there with Mr. Cooke, Mr. Maestri,

14  and Mr. Schiller?

15  **A.**  A handful.

16  **Q.**  So around five; is that a handful?

17  **A.**  It sounds roughly right.  But there were many meetings

18  that happened over the course of, you know, more than six

19  months.

20  **Q.**  When did the first meeting with the full price committee

21  occur?

22  **A.**  Well, I wouldn't call those price committee meetings.

23  Those were discussions of elements of the implementation for

24  this.

25  **Q.**  Okay.  When did the first discussion of certain elements

1   with Mr. Cook, Maestri, and Schiller occur?

2   A.   As early as April or May of 2023.

3   Q.   And this meeting on January 11th or 12th was the last

4   meeting, correct?

5   A.   To my memory, yes.

6   Q.   And you mentioned that Ms. Adams, Ms. Grenier were there.

7   And you then mentioned senior legal team.  Is that in addition

8   to Ms. Adams and Ms. Grenier?

9   A.   There -- there may be some -- there may have been other

10  members of the litigation team that were also there and as

11  well as our product counsel.

12  Q.   Who is that?

13  A.   Sean Cameron.  Potentially Lou on his team would have also

14  been there.  Maybe other members of Heather's team including

15  Jenny Brown.

16  Q.   Okay.  In the five or so meetings, the handful of meetings

17  that actually included Mr. Cook, Mr. Maestri, and

18  Mr. Schiller, was the makeup of the meeting similar in terms

19  of legal being there, you being there, Mr. Roman and his team

20  being there, et cetera?

21  A.   Yes.  Many of those were largely driven and organized by

22  the legal team.

23  Q.   What happened between January 11th or 12th and the 16th

24  that led to an actual decision by the pricing committee?

25  A.   We finalized the details based on the discussion in the

1   price committee meeting and then presented the final proposal

2   over email.

3   **Q.**  So the final proposal, as we see in the deck that was

4   submitted to the Court, was only provided over email, not in

5   person?

6   **A.**  The final one, yes.

7   **Q.**  Was there a material difference between recommendations

8   in -- at any stage in the recommendations that were ultimately

9   adopted on May 16th?

10       **MS. RICHMAN:**  Objection, Your Honor.  I think that

11  calls for privileged communications.

12       **THE COURT:**  I would need -- I would need more from

13  you on -- on that to sustain the objection.

14      What I am concerned about is the data.  And regardless if

15  you have an attorney sitting there, when you're talking about

16  financial information, that's not legal advice.

17       **MS. RICHMAN:**  Understood, Your Honor.  I think the

18  question was, was there a material difference between

19  recommendations between the meeting on January 16th and in the

20  discussions earlier.  And this is about compliance with a

21  legal injunction.  And so that inevitably would reflect legal

22  advice.

23      I have no problem with Mr. --

24       **THE COURT:**  I'm going to ask you to rephrase.  Let's

25  see if you can put it in the context that would not have --

1    well, let's try a new question, see where we go.

2    **BY MR. EVEN:**

3    **Q.**  The ultimate decision was to land on one ultimate --

4           **THE COURT:**  Well, here's a question.

5       Do I have the deck from January 11th?  Let me see the deck

6    from January 11th, and perhaps I can figure out, and Mr. Even

7    can figure out, to what extent there's an appropriate

8    attorney-client objection being made.

9       So do you have it with you right now?

10          **MS. RICHMAN:**  No, I don't, Your Honor.

11          **THE COURT:**  Well, then get it.  So before his

12   testimony finishes, somebody email and figure out where it is

13   and get that deck.

14          **MS. RICHMAN:**  Yes, Your Honor.

15          **THE COURT:**  Proceed.

16          **MR. EVEN:**  Thank you, Your Honor.  If I may, just one

17   point on that.  Unless the decks actually include the legal --

18          **THE COURT:**  I agree.  But let's see it.

19          **MR. EVEN:**  Yeah, all I'm saying is it sounds like

20   there have been multiple iterations of the deck in at least a

21   handful of meetings, and so I don't know that the 11th alone

22   would suffice it.

23          **THE COURT:**  It may not.

24          **MR. EVEN:**  Okay.  I will proceed.

25   **Q.**  At the meeting on January 11th or 12th, Mr. Roman was the

 1   one who presented the deck to the pricing committee?

 2   **A.**  I believe I presented a couple of slides, but Alex

 3   presented most of the slides.

 4       (Clarification by the Certified Stenographic Reporter.)

 5            **THE WITNESS:**  Alex presented most of the slides, but

 6   I think I presented a couple of them.

 7   **BY MR. EVEN:**

 8   **Q.**  So if you turn to CX-0009 in your binder, that's already

 9   in evidence, and that is the deck that we do have which bears

10   the date January 16.

11       Do you see that?

12   **A.**  Sorry.  I think I have the wrong binder.

13       (Reviewing document.)

14       That's correct, yes.

15                      (Exhibit published.)

16   **BY MR. EVEN:**

17   **Q.**  If you can go through the slides and tell me which slides

18   did you present to Mr. Cook, Maestri, and Schiller at that

19   meeting on January 11th or 12th.

20   **A.**  It would have been Slide 5.

21            **THE COURT:**  Hold on.  Let me get it.

22       Okay.  And when you're -- do you see that tiny little

23   number that you can barely read on the document in the middle

24   on the bottom of the page.  So --

25            **THE WITNESS:**  I do, yes.

```
 1                THE COURT:  So if you can use that reference.

 2                THE WITNESS:  I will.  Thank you.

 3                THE COURT:  Thank you.

 4           Go ahead.

 5                THE WITNESS:  So it would be 9.6 -- oh, sorry.  The

 6      one on my binder is different.

 7           Do you want me to use the one on the screen?

 8           Okay.  It's 9.6.

 9                THE COURT:  So you presented this one?

10                THE WITNESS:  That's correct.

11      BY MR. EVEN:

12      Q.   Okay.  Any other slides that you presented?

13      A.   Yes.  9.7.

14      Q.   Okay.

15      A.   9.8.

16      Q.   All right.

17      A.   9.9.

18      Q.   Okay.

19      A.   I believe that's it.

20      Q.   Okay.  We'll get there, but all these slides that you've

21      just pointed out are slides reflecting information developed

22      by Analysis Group, correct?

23      A.   No.

24      Q.   Which of these slides that you just mentioned, in your

25      view, does not present information from Analysis Group?
```

1    **A.**   There are parts of Analysis Group's analysis that are

2    incorporated into 9.7 and 9.8, but those also incorporated

3    work that was done internally at Apple.

4    **Q.**   I understand.   That's not what I asked.

5    **A.**   Okay.

6    **Q.**   Mr. Oliver, my question was each of the slides that you

7    presented included information from the Analysis Group,

8    correct?

9    **A.**   And again on those two slides, and I'm not meaning to be

10   difficult, but we -- there is information that AG includes in

11   their report that mirrors information that was shown in these

12   two slides, but it was substantively prepared by my team, not

13   by the Analysis Group.   Just --

14                    (Simultaneous colloquy.)

15   **BY MR. EVEN:**

16   **Q.**   So what you're saying is that actually your team was the

17   source for some of this information and the Analysis Group

18   report, which we'll speak to later, actually got that

19   information from your team?

20   **A.**   No.   It was mirrored.   It was mirrored data that they had

21   also collected, but it didn't necessarily -- wasn't from that

22   source.

23   **Q.**   Okay.   Are those the only four slides that you presented?

24   **A.**   I believe so, yes.

25   **Q.**   Other than yourself and Mr. Roman, did anyone else present

1    any portion of the deck to the price committee on January 11th

2    or 12th?

3    **A.**   I don't believe so.

4         **THE COURT:**   Okay.  Hold on.  Hold on just a moment.

5      So who's having a problem hearing?

6         **THE CLERK:**   The audio.

7              (Off-the-record discussion.)

8         **THE COURT:**   Okay.  We're just going to take a short

9    break here so that they can reset the system.

10      We'll stand in recess for just a few minutes.  Don't go

11   too far.

12      (Recess taken at 10:23 A.M.; proceedings resumed at 10:41

13   A.M.)

14        **THE COURT:**   All right.  We're back on the record.

15   The record will reflect that the parties are present.  I hope

16   everybody enjoyed the break.  That was your first one.

17      Let's go.

18        **MR. EVEN:**   Thank you, Your Honor.

19   **Q.**   Mr. Oliver, I just want to make sure I understand your

20   testimony so far.

21      So somewhere in April or May of 2023, there was a group

22   assembled to work on the -- on the pricing committee

23   materials, correct?

24   **A.**   I would say we started working on the understanding how to

25   respond to the injunction.  And so that that was beyond just

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    pricing, it was considering a bunch of different factors of

 2    how we would respond to it.

 3              **MR. EVEN:**  Okay.

 4              **THE COURT:**  In April or May of 2023?

 5              **THE WITNESS:**  Correct.

 6    BY MR. EVEN:

 7    **Q.**  Now, in terms of the pricing committee deck which you're

 8    here to testify about, Mr. Roman led a finance team doing work

 9    on that deck, correct?

10    **A.**  That's correct.

11    **Q.**  You led a business team, I guess?

12    **A.**  That's correct.

13    **Q.**  Am I missing any other team that worked on that deck?

14    **A.**  There were other teams that were involved in additional

15    elements that went into the deck.  So product and others.  The

16    legal team of course was -- was actively involved in terms of

17    understanding how we would comply.

18         But we -- the -- that small working group between business

19    and finance was the primary group beyond those others.

20    **Q.**  Okay.  At the time you began working on this back in

21    spring of 2023, you were aware that the Court entered the

22    injunction after conducting a full trial, hearing evidence and

23    issuing findings of facts, correct?

24    **A.**  Yes.

25    **Q.**  In fact, you were deposed in that case, I believe, right?

 1   **A.**   That's correct.

 2   **Q.**   Now, have you read the Court's full post trial order

 3   including all findings of fact and conclusions of law in

 4   connection with your work on the external link entitlement

 5   program?

 6   **A.**   I read it before I started actively working on this, but

 7   yes.

 8   **Q.**   Do you understand that a fundamental problem this Court

 9   had identified with Apple's anti-steering rules was that they

10   resulted in higher costs to developers because competition was

11   not driving commission rates?

12   **A.**   I understood it slightly differently.

13   **Q.**   You did not understand that a fundamental problem this

14   Court had identified with Apple's anti-steering rules was that

15   they resulted in higher costs to developers because

16   competition was not driving commission rates?

17   **A.**   I think that was one of -- one of multiple elements.

18   **Q.**   I'm only asking whether you understood that element to be

19   something that this Court had found as a fundamental problem

20   with the anti-steering rules?

21   **A.**   Amongst others, but yes.

22   **Q.**   Did you understand that a fundamental problem this Court

23   had identified with Apple's anti-steering rules was that by

24   preventing steering, Apple prevented developers from

25   communicating to their users the lower prices that the

1   developers were able to offer to users for purchases outside

2   the app?

3   **A.**   Yes.

4   **Q.**   Now, the price committee deck does not mention either of

5   these goals, correct?

6   **A.**   No.   It mentions the injunction broadly but doesn't go

7   into detail about those.

8   **Q.**   And the price committee deck provides no analysis about

9   the ability of developers to offer users lower prices for

10  purchases completed outside the app, correct?

11  **A.**   No.

12  **Q.**   That's not correct?

13  **A.**   That's not correct.

14  **Q.**   You believe the price deck actually proposes an analysis

15  or reflects an analysis of developers' ability to offer users

16  lower prices for purchases completed outside of the app?

17  **A.**   Yes.

18  **Q.**   The only reference in the deck to the Court's injunction

19  is in a slide marked 009.4, and it's just a quote from the

20  language of the injunction itself, correct?

21  **A.**   That's correct, yes.

22  **Q.**   There's no slide that has a heading saying this is --

23  these are the prices that developers would be able to offer

24  users, is there?

25  **A.**   No.

1    **Q.**  And there is no analysis of the prices that developers

2    would have to pay alternative payment solutions to facilitate

3    and handle the purchases, the linked purchases made outside of

4    the app, correct?

5    **A.**  Can you repeat that question?

6    **Q.**  Sure.

7         There is no analysis in the deck of the cost to developers

8    of obtaining alternative payment solutions to facilitate their

9    out-of-app purchases?

10   **A.**  That's correct.

11   **Q.**  And you nonetheless believed that without that analysis

12   and that information, you could present an analysis of the

13   effect your fee would have on developers' ability to offer

14   lower prices outside the app?

15   **A.**  Yes.  Those factors were considered and discussed across a

16   variety of meetings, but they were not incorporated directly

17   into the presentation.  But we did have multiple slides

18   indicating that we felt that it would be feasible.

19   **Q.**  Sir, can you point me to a slide that indicates that you

20   thought that that would be feasible?

21   **A.**  (Reviewing document.)

22        Slide 9.12.

23                           (Exhibit published.)

24   **BY MR. EVEN:**

25   **Q.**  You believe that this slide indicates that developers

1    would be able to offer lower prices to users outside the app

2    even though it says nothing about the costs that developers

3    would bear for alternative payment solutions?

4    **A.**   Yes.

5    **Q.**   Okay.  Who was it that made the decision to only have that

6    slide as the only analysis that, in your view, even remotely

7    reflects the ability of developers to offer lower prices?

8    **A.**   The decision on the slides to include in this presentation

9    were made by Alex Roman and myself.

10   **Q.**   And I take it Mr. Cook or Mr. Maestri or Mr. Schiller

11   never asked you to analyze or present more clearly what the

12   effects of your recommended structure on developers' ability

13   to offer lower prices to users?

14   **A.**   We discussed those factors at length over a course of --

15   **Q.**   Sir, not what I'm asking.  Did they ask you to actually

16   present that analysis, including the price to developers of

17   obtaining alternative payments, at any point in time?

18   **A.**   In this meeting?

19   **Q.**   In this meeting, in this slide deck.

20   **A.**   We had discussed and presented those elements in other

21   meetings, not in this specific presentation.

22   **Q.**   Is there a reason that none of those presentations made it

23   to any of your filings or to court?

24   **A.**   I mean, we -- I -- I don't have any comment on what made

25   it to court.

OLIVER - DIRECT / EVEN

1   **Q.**   So it's your testimony that in some other meetings in some

2   other slide decks, there was in fact extensive analysis of

3   developers' ability to offer lower prices?

4   **A.**   Yes.

5   **Q.**   And that analysis went beyond what's in Slide 009.12?

6   **A.**   This is one of -- of multiple elements that were

7   considered.

8   **Q.**   So again my question is other decks that we don't have and

9   we've never seen and we've never heard about, in fact

10  Mr. Roman said don't exist, those slides, we just don't have

11  them, but they go beyond what's in here?

12  **A.**   Again, some of this was done in discussion, not

13  necessarily in specific presentations.

14  **Q.**   Sir, I'm only asking about slides because I can't reach

15  the discussions.

16       Do you actually have prior decks that show an extensive

17  discussion, as you call it, about the ability of developers to

18  offer lower prices beyond what's in Slide 9.12?

19  **A.**   No.

20  **Q.**   And you never had a slide like that at any point in time

21  between spring of '23 and January 16, 2024; there is not a

22  slide that discussed that -- discusses that more thoroughly

23  than what's on Slide 009.12?

24  **A.**   I don't have a specific memory of a single slide that

25  discusses that.

OLIVER - DIRECT / EVEN

```
 1              THE COURT:  Did you take notes?

 2              THE WITNESS:  I may have.

 3              THE COURT:  Did you keep your notes?

 4              THE WITNESS:  I -- I may have.

 5              THE COURT:  Okay.  Where would you have kept your

 6      notes?

 7              THE WITNESS:  In my notes file in my computer.

 8              THE COURT:  In an electronic notes file?

 9              THE WITNESS:  Yes.

10              THE COURT:  Have you deleted any of the notes

11      relative to these topics since May of -- or April of 2023?

12              THE WITNESS:  No.

13              THE COURT:  So they're still accessible?

14              THE WITNESS:  Yes.

15              THE COURT:  Did you keep them in a particular file

16      that related to this particular project?

17              THE WITNESS:  No.

18              THE COURT:  So how do you -- how did you keep them

19      filed?

20              THE WITNESS:  If -- if there is a meeting where I

21      need to keep notes, I will usually label the meeting

22      specifically, and then keep -- and take notes.  In general, my

23      note-taking is fairly light.

24              THE COURT:  Okay.  So today you'll go back and you'll

25      review your notes, and any notes that relate to this issue, I
```

 1    want produced.  Okay?

 2       Yes?

 3             **THE WITNESS:**  Yes.

 4             **THE COURT:**  You understand?

 5             **THE WITNESS:**  I do.

 6             **THE COURT:**  Proceed.

 7             **MR. EVEN:**  Thank you, Your Honor.

 8    **Q.**  If you turn to the slide of the price committee deck

 9    labeled 009.4.

10    **A.**  (Reviewing document.)

11                        (Exhibit published.)

12    **BY MR. EVEN:**

13    **Q.**  It's also on your screen.  Do you see it?

14    **A.**  I do.

15    **Q.**  This is summary slide of the deck, and I gather Mr. Roman

16    presented this particular slide to Mr. Cook, Maestri, and

17    Schiller, correct?

18    **A.**  I believe that's the case, yes.

19    **Q.**  Now, the slide lists the key pricing considerations on the

20    bottom right, correct?

21    **A.**  That's correct.

22    **Q.**  And those are commission rate, commission time window, and

23    program eligibility, right?

24    **A.**  Yes.

25    **Q.**  Who determined --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1                 THE COURT:  Let me just interrupt again, Mr. Even.

 2            MR. EVEN:  Sure.

 3                 THE COURT:  Did you send emails with respect to your

 4     work on this project?

 5                 THE WITNESS:  Perhaps.  I don't -- I don't remember

 6     specifically.

 7                 THE COURT:  Well, how is it that you all communicate

 8     if not by email?  Or do you text?  How is it that you

 9     communicate with each other on these issues?

10                 THE WITNESS:  We would often meet together in person.

11                 THE COURT:  Okay.  Do you communicate in any other

12     way?

13                 THE WITNESS:  Yes.

14                 THE COURT:  How?

15                 THE WITNESS:  Mostly email.

16                 THE COURT:  Okay.  Any other form?

17                 THE WITNESS:  Sometimes I message.

18                 THE COURT:  Okay.  Any other form?

19                 THE WITNESS:  Very rarely Slack.

20                 THE COURT:  All right.  So you're going to check all

21     of those other forms of communication as well and produce

22     anything that relates to your communications with respect to

23     these issues.

24          All right?

25                 THE WITNESS:  Yes.
```

 1                     **THE COURT:**  Go ahead.

 2                     **MR. EVEN:**  Thank you, Your Honor.

 3    **Q.**  Mr. Oliver, who determines that these three considerations

 4    on the deck -- on the slide here would be the key

 5    considerations to analyze for the pricing committee?

 6    **A.**  That was determined by the working group.

 7    **Q.**  Who specifically on the working group determined that?

 8    **A.**  It was me and Alex as probably the leaders of the working

 9    group.

10    **Q.**  Alex, you're referring to Mr. Roman?

11    **A.**  I am, yes.

12    **Q.**  Now, the key pricing considerations on page 9.4 are

13    correlated with the three different recommendations that are

14    presented on the preceding Slide 9.3, correct?

15    **A.**  That's correct, yes.

16                          (Exhibit published.)

17    **BY MR. EVEN:**

18    **Q.**  So the commission rate recommendation, for example,

19    reflects the recommendation the working group made to the

20    price committee as to the fee level that Apple would introduce

21    on linked purchases, correct?

22    **A.**  That's correct.

23    **Q.**  And the price committee then adopted the 27 percent

24    standard commission rate and the 12 percent reduced rate that

25    the working group recommended, correct?

1   **A.**   That's correct.

2   **Q.**   And you say that only happened on January 16.

3   **A.**   That's correct.

4   **Q.**   Was that by email?

5   **A.**   Yes.

6   **Q.**   Did you receive that email?

7   **A.**   I was copied on that email.

8   **Q.**   Who did the email come from?

9   **A.**   Alex Roman.

10         **THE COURT:**   Okay.   Let me -- I have to take another

11   quick break.

12       Just stand right there.   Come on forward.

13               (Pause in the proceedings.)

14         **THE COURT:**   You may proceed.   We're back on the

15   record.

16         **MR. EVEN:**   Thank you, Your Honor.

17   **Q.**   So I believe we left off when you said that Mr. Roman was

18   the one who conveyed to you the price committee's decision to

19   adopt your recommendations?

20   **A.**   Over email, yes.

21   **Q.**   Was Mr. Roman forwarding an email from somebody else?

22   **A.**   No.   He sent the email, and I was copied on the email.

23   **Q.**   Okay.   Mr. Roman was not himself on the price committee,

24   correct?

25   **A.**   That's correct.

1    **Q.**  So who actually made the decision and conveyed the

2    decision to Mr. Roman that the pricing committee had decided

3    to adopt your recommendations?

4    **A.**  It was over email approvals from Tim Cook, Luca Maestri,

5    and Phil Schiller.

6    **Q.**  Did you get that email?

7    **A.**  I was copied on those emails as well.

8    **Q.**  So I'm not clear now.  If you were copied on emails from

9    Mr. Cook, Maestri, and Schiller that they've adopted the

10   recommendations, what did Mr. Roman's email contribute?

11   **A.**  It was the final presentation that is included here with

12   the recommendations, and they approved that over email in

13   response.

14   **Q.**  When was the final deck as seen here actually sent to the

15   pricing committee over email?

16   **A.**  On the 16th.

17   **Q.**  The deck itself does not explain why 27 percent is the

18   recommended standard rate as opposed to 5 percent or

19   15 percent or 25 percent or 35 percent, right?

20   **A.**  No, I don't agree with that.

21   **Q.**  You don't believe that it explains it, or you don't

22   believe that it does not explain it?

23   **A.**  I don't believe that it does not explain it.  There are

24   multiple slides that factor -- that cover the factors that

25   guided towards 27 percent and the recommendation.

OLIVER - DIRECT / EVEN

1    **Q.**  Can you point us to a slide that, in your view, suggests

2    the 27 percent is distinctly better than 27 [sic] percent or

3    30 percent?

4    **A.**  I can point you to all the slides that -- that guide

5    towards 27 percent, if that would be helpful.

6    **Q.**  I think what would be helpful is a slide that you believe

7    actually says, "We think 27 percent is better than another

8    rate because of the following factors."  Do you have a slide

9    like that?

10   **A.**  We do not, no.

11   **Q.**  Who was it that ultimately decided that the recommendation

12   of the working group would be a standard rate of 27 percent?

13   **A.**  Who is it that finally approved that?

14   **Q.**  Who was it that decided that that would be the final

15   recommendation of your working group?

16   **A.**  That came out of consensus from prior discussions and

17   meetings.

18   **Q.**  Sir, you said that on the 16th at some point Mr. Roman

19   sent a final deck recommending 27 percent, correct?

20   **A.**  Correct.

21   **Q.**  Who was it that decided that 27 percent was the right

22   number to recommend to the pricing committee?

23   **A.**  It came out of prior consensus and discussions that we

24   had.

25   **Q.**  Consensus between whom, sir?

 1   **A.**   Between members of the team that met in prior meetings.

 2   Most specifically the last meeting that I mentioned.

 3   **Q.**   Sir, the last meeting that you mentioned already included

 4   the pricing committee folks, correct?

 5   **A.**   It did, yes.

 6   **Q.**   So I'm asking on the working group, who was it that

 7   decided the 27 percent would be the right number to recommend

 8   to the pricing committee?

 9   **A.**   That would -- the final decision on that would have been

10   me and Alex.

11   **Q.**   So it was a joint decision?

12   **A.**   Guided by consensus and discussion from prior meetings,

13   yes.

14   **Q.**   The deck does not present any analysis of how different

15   rates would affect developers' ability to charge lower rates

16   to users, correct?

17   **A.**   Will you repeat that question?

18   **Q.**   The deck does not present any analysis of how different

19   rates would affect developers' ability to charge lower rates

20   to users.

21   **A.**   That's not true.

22   **Q.**   Are you talking about Slide 12 again?

23   **A.**   Yes.

24   **Q.**   You think that slide is an analysis of how different rates

25   would affect developers' ability to charge lower rates to

1    users?

2    **A.**   Yes.

3    **Q.**   Okay.  That slide does not include any language that

4    actually suggests that a lower rate would allow certain lower

5    prices, a higher rate would not allow lower prices, or

6    anything to that effect, correct?

7    **A.**   Well, they all result in significantly lower effective

8    rates.  So they all allow for additional pricing.

9    **Q.**   Got it.  So even at 30 percent, in your view, based on

10   Slide 12, you all reached the conclusion that that allows

11   developers to offer significantly lower prices to users?

12   **A.**   When -- well, I didn't say significantly.  I said it

13   offered the ability based on the fact that the window was only

14   seven days.

15   **Q.**   The deck does not present any analysis of how different

16   pricing to users might affect the prevalence of use of linked

17   purchases by users, correct?

18   **A.**   The prevalence -- sorry, I missed what you said.

19   **Q.**   The deck does not reflect any analysis of how different

20   level of out-of-app prices to users would affect the adoption

21   of out-of-price -- out-of-app purchases by users, correct?

22   **A.**   That's correct.

23   **Q.**   There's nothing in the deck, for instance, that says we

24   think that at a 15 percent fee, most users would opt for this

25   because prices would be much lower at zero percent fee, even

1    more users would -- would adopt out-of-app purchases, and at

2    35 percent, no user would adopt it?

3    **A.**   We didn't make specific assumptions on pricing to guide

4    that.   We used the same assumptions across all scenarios.

5    **Q.**   The deck also does not present any analysis of how

6    different commission rates might affect adoption of linked

7    purchases by developers, correct?

8    **A.**   We used the same assumptions across all scenarios.

9    **Q.**   So that's a no, it doesn't include any analysis of how

10   different commission rates would affect the adoption, correct?

11   **A.**   We didn't look at sensitivities across different rates,

12   no.

13   **Q.**   Who is it that decided to forgo all of these analyses of

14   sensitivities and effects on the adoption rate by developers

15   or by users?

16   **A.**   They -- they weren't included in the deck, but the team

17   did many sensitivities to understand the effects of these

18   different levels of assumptions.

19   **Q.**   Is it your testimony that the team actually looked at how

20   different fee structures would affect the adoption of linked

21   apps by developers?

22   **A.**   We looked at variations on all of the assumptions, to the

23   best of my knowledge, that are included in this presentation.

24   **Q.**   That's not what I asked, sir.

25        I asked whether the team tried to figure out, ran any

1    analysis, used any data, to try and determine how different

2    fee structures would affect the takeup by developers of linked

3    purchases?

4    **A.**   And again, we looked at variations on the assumptions that

5    guide the adoption rate for both developers and customers

6    which would have applied to all scenarios.  So we look at that

7    variation of all those assumptions.

8    **Q.**   None of those analysis made it into the deck, correct?

9    **A.**   That's correct.

10   **Q.**   Going back to 009.4, the next key pricing consideration is

11   commission time window, correct?

12   **A.**   That's correct, yes.

13   **Q.**   And that pertains to how long after a user clicks a link

14   would an out-of-app purchase be considered a linked purchase

15   and be subject to the new commission, correct?

16   **A.**   That's correct.

17   **Q.**   Going back to 9.3, the recommendation here was for a

18   window of seven days, correct?

19   **A.**   That's correct.

20   **Q.**   And that recommendation too was adopted by the pricing

21   committee, correct?

22   **A.**   That's correct.

23   **Q.**   Now, the next line here says that this includes auto

24   renewals for subscriptions initiated during the time window,

25   correct?

1    **A.**   That's correct.

2    **Q.**   And I take it that means that if I click on a purchase

3    link, for instance, for something like Duolingo, and proceed

4    to buy a subscription to Duolingo within seven days, the fee

5    that you have imposed would apply to all auto renewals on

6    Duolingo in perpetuity, correct?

7    **A.**   Until a customer takes an -- an action, yes.

8    **Q.**   Until the customer cancels the subscription, for instance.

9    **A.**   There are additional actions that would cause the

10   commission to stop.

11   **Q.**   Okay.  Setting those aside, if I click during the seven

12   days on a subscription, on a link to a subscription, and

13   subscribe, all auto renewals in perpetuity would be subject to

14   Apple's fees, correct?

15   **A.**   That's correct.

16   **Q.**   Now, the vast majority of subscriptions in the store

17   automatically renew, correct?

18   **A.**   I don't -- I don't know if I would -- I don't know if vast

19   majority is correct, but the majority for sure, yes.

20   **Q.**   And so you agree with me that at least for subscriptions,

21   the purchase link fee window can cover payments made weeks,

22   months, even years beyond the initial seven-day window,

23   correct?

24   **A.**   That's correct.  But the churn rate for customers is

25   pretty meaningful for subscriptions.

1    **Q.**   We'll get to that.

2         Now, the first two key pricing considerations we spoke

3    about speak to the commission structure for linked purchases,

4    what the commission rate should be and what the time window

5    should be on that commission, right?

6    **A.**   That's correct.

7    **Q.**   And I take it that the working assumptions you operated

8    under was that Apple will charge a commission on linked

9    purchases, correct?

10   **A.**   It -- that's -- yes, that's the assumption in this.

11   **Q.**   And as a result, there's no consideration here of whether

12   to impose any commission on linked purchases, correct?

13   **A.**   That's correct.

14   **Q.**   Now, in the 14-plus years since IAP was launched, Apple

15   has never charged developers in the U.S. storefront for

16   transactions that did not use IAP, correct?

17   **A.**   To the best of my knowledge, yes.

18   **Q.**   Who was it that decided that in response to this Court's

19   injunction, Apple would begin charging developers in the U.S.

20   storefront a commission on linked transactions that occur

21   outside the app and that do not use an Apple payment solution?

22   **A.**   That was determined because this was a novel problem.

23         **THE COURT:**   That's not the question.  He said who.

24         **THE WITNESS:**   It was a consensus based on the

25   conversations with the working group.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    **BY MR. EVEN:**

 2    **Q.**   Sir, going into the working group, Apple has already

 3    decided that it's going to charge a commission on linked

 4    purchases, correct?

 5    **A.**   No.   That decision was made as part of the process of

 6    discussions that happened beginning in the spring of 2023.

 7    **Q.**   Okay.   Who was it that made the decision then in that

 8    consensus?   Consensus between who and who?

 9    **A.**   It would have been in meetings with the executive team and

10    the working group.

11    **Q.**   The executive team being Mr. Cook, Maestri, and Schiller?

12    **A.**   Yes, among others including Kate Adams and other members

13    of the legal team.

14    **Q.**   When was the decision to begin charging a commission on

15    linked transactions first made?

16    **A.**   It was an ongoing discussion, but that direction was made

17    in -- earlier in 2023, in the -- in the spring or early summer

18    of 2023.

19          **THE COURT:**   You described this as a novel problem.

20    What does that mean, a "novel problem"?

21          **THE WITNESS:**   So previously we charged a commission

22    on every sale of a digital good or service that occurred

23    within an app that was distributed through the store.

24          We had never charged for a digital good or service that

25    was purchased outside of the store but we allowed users to

1    consume those digital goods and services within apps.  And

2    that had been basically the -- the fundamental kind of

3    building blocks of Apple's monetization strategy for the

4    App Store.

5        This introduced a new element where a user was guided from

6    within an app to an outside payment option.  In the past, that

7    would have not been allowed and so they would have used IAP.

8    In this new world, they're being guided to an outside payment

9    option where we would have previously not charged.

10       And so we wanted to figure out a way to solve for the

11   problem that this was being initiated within the app but

12   ultimately was driving to an out-of-app payment option.

13           **THE COURT:**  What was the problem?

14           **THE WITNESS:**  The problem is that when you -- when we

15   had previously offered the ability to purchase and charge a

16   commission, it was for the services that were provided ongoing

17   to developers for use of the store.

18       And the ability to drive that business or those purchases

19   to the out-of-app communication through the out-of-app

20   communication channels and to the -- to the web indicated that

21   there was going to be a -- a challenge in kind of enforcing

22   what our prior rule was.

23           **THE COURT:**  A challenge in enforcing what?

24           **THE WITNESS:**  Our -- our prior monetization strategy.

25           **THE COURT:**  There are plenty of apps that you charge

1    nothing for.  So the problem was that you weren't going to be

2    getting the revenues that you'd like to get, and that was the

3    problem you were solving to figure out how to change the

4    manner in which you were receiving your revenue stream.

5              **THE WITNESS:**  We wanted to strike a balance between

6    allowing developers to guide users outside of the app and then

7    actually capture significantly more revenue from those

8    out-of-app channels than would have been -- than would have

9    happened if they had purchased within the app itself.

10             **THE COURT:**  You can go ahead.

11             **MR. EVEN:**  Thank you, Your Honor.

12   **Q.**  The problem you were trying to solve, sir, is the problem

13   that Apple could see a hit to its revenues because of

14   competition from purchases outside of the app that would put

15   pressure on their fees on IAP, correct?

16   **A.**  No.  No.

17   **Q.**  You mentioned that you believe that the problem here was

18   that people could initiate a purchase within the app and then

19   that purchase was made outside of the app, correct?

20   **A.**  That was the -- the introduction of the change from what

21   we had -- had had previously, yes.

22   **Q.**  Okay.  Apple allows reader apps today to point people

23   outside of the app, correct?

24   **A.**  That's correct.

25   **Q.**  And those purchases therefore are initiated in the click

1    within the app, and then there's a purchase outside the app,

2    correct?

3    **A.**   That is -- that is how reader apps work, yes.

4    **Q.**   And in the film [sic], that is zero, correct?

5    **A.**   That is correct.

6    **Q.**   And Apple allows physical goods to be sold within the app

7    or linked outside the app, to the developers' choice.  All of

8    these purchases are subject to a fee of zero, correct?

9    **A.**   That's correct.

10   **Q.**   There are potentially billions in sales of physical goods

11   on the App Store, correct?

12   **A.**   Yes, we believe so.

13   **Q.**   There are also sales in hundred of millions at least, if

14   not billions, on subscriptions and other things from reader

15   apps that are directed at iOS users, correct?

16   **A.**   That's a much smaller population.  I don't know how -- how

17   much revenue is generated by reader apps.

18   **Q.**   You understand that reader apps like Spotify and Netflix

19   have meaningful sales, correct?

20   **A.**   Yes.

21   **Q.**   And they have meaningful sales that then users can use on

22   the app on iOS, correct?

23   **A.**   That's correct.

24   **Q.**   And Apple does not charge anything for those, correct?

25   **A.**   Right, since we introduced the reader rule.

1   **Q.**   Apple does not charge for that for years, correct?

2   **A.**   That's correct.

3   **Q.**   And Apple now allows linking out for these apps and does

4   not charge anything still, correct?

5   **A.**   That's correct, but there's a distinction for reader apps

6   versus multi-platform apps.

7   **Q.**   Let's go to the third key pricing consideration, and that

8   one is program eligibility, right?

9   **A.**   Yes.

10  **Q.**   And here the question you were examining is whether

11  developers subject to certain Apple programs would be eligible

12  for the external purchase link program, correct?

13  **A.**   That's correct.

14  **Q.**   Now, the eligibility recommendation on Slide 3 is that

15  participants in the small business program in tenured

16  subscriptions are eligible to use purchase links, but

17  participants in the video partner program or news partner

18  program would not be eligible, correct?

19  **A.**   That's correct.

20  **Q.**   Who decided to make that recommendation?

21  **A.**   That was decided again amongst a consensus in discussion

22  with the working group and other executives.

23  **Q.**   Within the working group, would that be a consensus

24  between yourself and Mr. Roman?

25  **A.**   Yes.

1  **Q.**  The video partner program and news partner program are

2  programs that Apple announced that provide eligible developers

3  with a reduced 15 percent fee instead of the standard

4  30 percent fee, correct?

5  **A.**  That's correct.

6  **Q.**  And the recommendation here is that if a subscription

7  video app developer like Disney or a newspaper developer like

8  the *New York Times* wants to use external purchase links in

9  their app, they will not be able to do so unless they forgo

10  the 15 percent reduced IAP commission they're entitled to

11  under the specific program, becoming instead subject to the

12  standard IAP rate of 30 percent at least for the first year of

13  their subscription, correct?

14  **A.**  That's correct.  The difference is only in the first year.

15  **Q.**  So for those developers in those two programs, the use of

16  external links would result in a penalty of doubling their IAP

17  rate at least in the first year of any subscription, correct?

18  **A.**  I don't know -- so, again, if you start using the external

19  link entitlement, you would be subject to an effective rate

20  that is significantly lower than the standard rate.

21  **Q.**  Sir, not what I asked.

22       For the rate on IAP --

23  **A.**  Yes.

24  **Q.**  -- anyone who is in a video partner program or news

25  partner program that elects to use a purchase link --

OLIVER - DIRECT / EVEN

1   **A.**   Yes.

2   **Q.**   -- faces a penalty of their IAP rates doubling, correct?

3   **A.**   So that is also incorrect.  And the reason is that the

4   vast majority of the developers that are in the news and video

5   partner program have a significant percentage of tenured

6   subscriptions which means that those would not be subject to

7   any change in the rate.  It would only be for new customers

8   acquired.

9   **Q.**   For new customers acquired -- those are the people we care

10  about because they're new people who might use the link,

11  correct, to sign up?

12  **A.**   That's correct.

13  **Q.**   For all those people, those developers would see a penalty

14  of doubling their IAP rate from 15 percent to 30 percent at

15  least for the first year, correct?

16  **A.**   That's correct.

17  **Q.**   And just so we're clear, by moving from the 15 percent IAP

18  rate to a 30 percent IAP rate, that means that for the outside

19  purchase link, those developers would be subject to the

20  standard 27 percent rate and not to the reduced 12 percent

21  rate, correct?

22  **A.**   In the first year.  For subsequent retention, they would

23  be down to the 12 percent.

24  **Q.**   Sir, I understand you have a tenured subscription program.

25  Not what I'm asking about.

1      For the first year, all of these folks are going to be

2  faced with a 27 percent fee rather than 12 percent fee because

3  they elected to use a link and that kicked them out of the

4  videos or news program, correct?

5  **A.**   Yes.  The linkouts would be subject to a 27 percent rate.

6  **Q.**   All right.

7      So let's take a look at Slide 9.15 which is intended to

8  present an analysis of the financial implications of the

9  eligibility recommendation, correct?

10 **A.**   That's correct.

11 **Q.**   It's also on the screen before you.

12                      (Exhibit published.)

13          **THE WITNESS:**   Thank you.

14 **Q.**   And what this sort of Venn diagram is intended to show is

15 that Apple has a universe of developers that are subject to a

16 reduced 15 percent IAP fee under Apple's current policy that

17 fall into three main buckets:  The small business program, the

18 tenured subscription, and a video or news partner program;

19 correct?

20 **A.**   Correct.

21 **Q.**   And what the slide is also depicting is that your

22 eligibility recommendation is removing from eligibility that

23 middle-sized circle while leaving the small one and the

24 circles is eligible for both reduced fees and purchase link

25 entitlements, right?

1    **A.**   Correct.

2                      (Exhibit published.)

3    **BY MR. EVEN:**

4    **Q.**   I want to dig a little bit deeper to understand what is

5    actually going on here.

6         First, let's understand the numbers.

7         The small business program developers, that's the little

8    circle, correct?

9    **A.**   Yes.

10   **Q.**   Those developers are all eligible for a reduced 15 percent

11   fee on IAP, correct?

12   **A.**   That's correct.

13   **Q.**   And they represent a small percentage, about 5 percent, of

14   U.S. store billing, correct?

15   **A.**   Correct.

16   **Q.**   All right.  Next the middle-sized circle represents the

17   video and news partner program, correct?

18   **A.**   Correct.

19   **Q.**   And these developers are also all eligible for a reduced

20   fee of 15 percent on IAP, and they represent about 11 percent

21   of U.S. store billings, correct?

22   **A.**   That's correct.

23   **Q.**   So more than twice than the small business program,

24   correct?

25   **A.**   That's correct.

OLIVER - DIRECT / EVEN

1  **Q.**  Next let's look at the large circle.  And that is titled

2  "Tenured Subscriptions," right?

3  **A.**  That's correct.

4  **Q.**  But the slide actually shows store billings from all

5  subscriptions, whether they are in their first year and

6  subject to a 30 percent IAP fee, or already tenured and

7  therefore qualify for a reduced 15 percent IAP fee, correct?

8  **A.**  No.

9  **Q.**  You believe that this is all tenured?

10 **A.**  I believe it is, yes.

11 **Q.**  Do you see that under tenured subscription, it actually

12 says standard year one 30 percent?

13 **A.**  Yes.  So I am reading that to mean that it's clarifying

14 how subscriptions are handled.  But the percentage, I believe,

15 is only applying to tenured subscriptions.

16 **Q.**  Sir, you believe or you know?

17 **A.**  Well, knowing the business as I do, that is substantially

18 smaller than the subscriptions share of the total U.S.

19 business.  So I do not believe that is reflective of the total

20 U.S. subscription base.

21 **Q.**  Well, if we look at all of these together, you agree with

22 me that this would suggest that the ineligible developers

23 would be 11 percent billings out of about 34 percent billings

24 that are subject to a 15 percent fee?

25 **A.**  No.

1  **Q.**  Okay.  The reason I got to 34 percent is because I added

2  11, 18, and 5.  You understood that, correct?

3  **A.**  Yes.

4  **Q.**  And the reason that it's not actually outside of

5  34 percent is because actually there's material overlap

6  between these circles, correct?

7  **A.**  Correct.

8  **Q.**  And specifically, the most material overlap, which I think

9  you already mentioned, is that the small business program --

10  sorry -- that the video partner program and the news partner

11  program is in fact almost entirely subscriptions, correct?

12  **A.**  Well, not only subscriptions.  This actually shows tenured

13  subscriptions that overlap.

14  **Q.**  We will talk about that in a second.  But those are

15  subscription apps, by and large, correct?

16  **A.**  By and large, yes.

17  **Q.**  And so for those developers, what the video partner

18  program and news partner program does is that it gives them a

19  reduced fee from day one as opposed to the tenured

20  subscription program which gives them a standard rate for the

21  first year and then the rate drops, correct?

22  **A.**  That's correct.

23  **Q.**  Okay.  Now, the overlap between these two is much larger

24  than what's depicted here on the slide; you would agree with

25  me?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**   I think this was a representation from the team, but we

2    know that there is a significant overlap.

3         And, again, I want to be clear that the blue circle is the

4    representation of tenured subscriptions, not all

5    subscriptions.  And I think that's a critical distinction to

6    make.

7    **Q.**   Okay.  Sir, are you not aware that less than 15 percent of

8    store billings are actually subject to the reduced 15 percent

9    commission rate?

10   **A.**   Less than 15 percent of store billings.  I don't -- I

11   don't know the number off the top of my head.

12   **Q.**   Sir, you remember that the Analysis Group, with you,

13   calculated the effective rate for the whole store or the --

14   the weighted rate for the whole store?

15   **A.**   Yes.

16   **Q.**   Do you remember what that rate was, without saying it?

17   **A.**   I do, but I think that's a different effective rate than

18   what you're trying to calculate here.

19   **Q.**   I wasn't trying to calculate anything.

20   **A.**   Okay.

21   **Q.**   You remember that that rate was about six times closer to

22   30 percent than to 15 percent?

23   **A.**   I would have to look at the number.  Sorry.

24   **Q.**   All right so go to CX-0014.36.

25        And don't say any of numbers that are highlighted, please.

OLIVER - DIRECT / EVEN

```
 1    A.   Yes.

 2    Q.   And if you look at actual commission rate all the way

 3    down, do you see the actual commission rate that was

 4    calculated?

 5    A.   Sorry.  I see the effective commission rate.  But do you

 6    want -- you want me to look at the -- I need to pull this up

 7    on the --

 8         (Reviewing document.)

 9    Q.   You see there's an actual commission rate?

10                   (Document published.)

11         THE WITNESS:  Yes, I do.

12    BY MR. EVEN:

13    Q.   And you understand that's a blended average rate, correct?

14    A.   Yes, I do.

15    Q.   Now, you see that that rate is about six times closer to

16    30 percent than to 15 percent?

17    A.   I do, yes.

18    Q.   Now, I don't want to go all SAT's on you, but you

19    understand that if this is six times closer to 30 than to 15,

20    that means that the ratio between billings subject to

21    30 percent and billings subject to 15 percent is about six to

22    one?

23    A.   Yes.

24    Q.   And six to one from a hundred percent is about

25    84 percent -- sorry -- 85 percent to 15 percent or 86 to 14,
```

OLIVER - DIRECT / EVEN

1    correct?

2    **A.**   Yes.

3    **Q.**   Does this remind you that actually the overall billings in

4    the store that are subject to a reduced 15 percent rate is

5    somewhere between 14 and 15 percent?

6    **A.**   I would point out that these numbers are --

7    **Q.**   Sir --

8    **A.**   -- a few years old --

9    **Q.**   Sir --

10   **A.**   -- in the Analysis Group report.

11   **Q.**   Sir, this is an Analysis Group Report that bears the date

12   January '24, correct?

13   **A.**   Yes.

14   **Q.**   All right.

15       Does -- do you understand that under the effective rate --

16   sorry -- the actual rate calculated by Analysis Group under

17   your supervision, this suggests that about 14 to 15 percent of

18   store billings are subject to a reduced rate, and all the

19   others, the 85 to 86 percent, are subject to a 30 percent

20   rate?

21   **A.**   That sounds about right, yes.

22   **Q.**   Okay.  And you understand, sir, that if only 14 to

23   15 percent of total store billings are subject to a reduced

24   rate, it can't be that 18 percent of store billings are

25   tenured subscriptions, right?  That just can't be.

1    **A.**   So I think a key element of --

2    **Q.**   Sir, do you understand that if total -- total store

3    billings subject to a reduced rate is 15 percent, then a slide

4    suggesting that 18 percent of store billings are subject to a

5    reduced rate just under tenured subscriptions can't be right?

6    **A.**   No.

7    **Q.**   You don't understand that?

8    **A.**   There's a key distinction between what is shown in the

9    slide and what is being calculated on this slide.

10   **Q.**   Sir, you understand that only about 15 percent of -- 14 to

11   15 percent of store billings are subject to a reduced rate?

12   We just went over that, correct?

13   **A.**   Yes.   The -- can I explain what the distinction is?

14   **Q.**   Your -- I'm sure your lawyer will elicit that testimony if

15   it's important here.

16         What I want to show or explain to this Court is that your

17   eligibility criteria, recommended eligibility criteria, took

18   out 11 percent out of about 15 percent of total -- total

19   apps -- total billings -- sorry -- that are subject to a

20   reduced fee.   Do you understand that?

21   **A.**   That's not correct.

22   **Q.**   I'm sorry.   You said that's not correct?

23   **A.**   That's not correct.

24   **Q.**   What do you believe is the percentage of store billings

25   that you took out of -- through this eligibility criteria?

 1   **A.**   It was less -- less than 10 percent.  I think it was in

 2   the range of 7 percent due to the inclusion or --

 3   **Q.**   Sir, we've already established that video partner program

 4   and news partner program represent 11 percent of the total

 5   store billings, correct?

 6   **A.**   In the U.S., yes.

 7   **Q.**   In the U.S.  And what I'm asking you is what is the

 8   denominator, in your view, how many other store billings are

 9   subject to a reduced rate, in your view?

10   **A.**   Are subject to a reduced rate --

11   **Q.**   Yes.

12   **A.**   -- in my view?

13   **Q.**   You've eliminated 11 percent out of what?

14   **A.**   So I would --

15            **THE COURT:**  Just the number.  What's the number?

16            **THE WITNESS:**   It's 23 percent.

17   BY MR. EVEN:

18   **Q.**   You think it's 23 percent.  So you took out about half,

19   just under half?

20   **A.**   In the U.S., which is not what is being calculated in the

21   Analysis Group report which is a global number.

22   **Q.**   So there's material change between the U.S. and the rest

23   of the world; that's your testimony?

24   **A.**   Yes, there is.

25   **Q.**   Okay.  And so instead of three-quarters of all billings,

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    you only took about half of all billings out of eligibility?

2    **A.**   No.

3    **Q.**   It's 11 out of 23, correct?

4    **A.**   It's not 11 because when you remove the VPP eligibility,

5    you still get the tenured subscription benefit.

6    **Q.**   Sir, I'm not talking about the tenured subscription.

7                         (Simultaneous colloquy.)

8    **BY MR. EVEN:**

9    **Q.**   The VPP is giving you a lower rate in the first year that

10   you don't get under the tenured subscriptions, correct?

11   **A.**   But the 18 percent shown here --

12   **Q.**   Sir --

13                        (Simultaneous colloquy.)

14              **THE WITNESS:**   -- tenured subscriptions.

15       Yes.

16   **BY MR. EVEN:**

17   **Q.**   Sir, the VPP gives you eligibility in year one for a

18   reduced rate that you don't get under the tenured

19   subscriptions, correct?

20   **A.**   That's correct.

21   **Q.**   And once a developer elects to go outside, all new

22   subscriptions are going to be subject to that 30 percent,

23   correct?

24   **A.**   That's correct.

25   **Q.**   And no developer is going to do that, and so they're never

1    going to get to be a tenured subscription, correct?

2    **A.**   That's not correct.

3    **Q.**   Okay.  You've done no analysis about how many people in

4    the video partner program or news partner program, if any,

5    would actually give up their favorable 15 percent rate to

6    steer people outside, correct?

7    **A.**   We have not.

8    **Q.**   The injunction does not exclude any developers from its

9    reach, correct?

10   **A.**   No.

11   **Q.**   And nothing in their Rule 52 --

12            **THE COURT:**  No, it doesn't?  Or no --

13            **THE WITNESS:**  It does not exclude any developers.

14            **THE COURT:**  So you agree with him?

15            **THE WITNESS:**  That all developers need to have access

16   to the injunction --

17            **THE COURT:**  Double negatives are a problem.

18            **THE WITNESS:**  Sorry.

19            **THE COURT:**  Do you agree with him or not?

20            **THE WITNESS:**  Do I agree with --

21   **BY MR. EVEN:**

22   **Q.**   Let me ask the question again.

23        The injunction applies to all developers, sir, correct?

24   **A.**   Correct.

25   **Q.**   Were you the person who decided that the working group

1    should identify developers that, in Apple's view, the

2    injunction should not reach, that they should be ineligible to

3    enjoy the benefits of the Court's injunction?

4    **A.**   No developer is ineligible.

5    **Q.**   Sir, that is the slide that you wrote, right?  I didn't

6    put these words.  You put these words on the slide.  It says,

7    "We recommend that VPP and NPP developers will not be

8    eligible."  That's in 9.3.  You can look it up.

9    **A.**   They're still eligible, just not as part of the program.

10   **Q.**   So now you're testifying that when you said "not

11   eligible," you meant actually eligible with an asterisk?

12   **A.**   As members of the program, they're not eligible.  They are

13   eligible --

14   **Q.**   As members of the program.  Was it you that decided that

15   certain developers, as members of certain programs that are

16   very beneficial to them, should be excluded from the Court's

17   injunction?

18   **A.**   I was not the sole decider, but I was part of the working

19   group that came to that recommendation.

20          **THE COURT:**  So you came to that recommendation

21   knowing that the injunction applied to all developers?

22          **THE WITNESS:**  Yes.

23   BY MR. EVEN:

24   **Q.**   Other than from lawyers, were you ever given any

25   explanation why Apple believed that it could exclude certain

1  developers from the benefits of the injunction?

2  **A.**  Again, I would not characterize this as excluding.

3  **Q.**  Sir, you've already characterized it as ineligible.  So

4  now let's just answer my question, please.

5      Other than from lawyers, were you ever given any

6  explanation by Apple, by anyone at Apple, why Apple believed

7  it could exclude certain developers from the benefits of the

8  injunction?

9  **A.**  Yes.

10  **Q.**  Who gave you that explanation?

11  **A.**  The -- I don't know.

12  **Q.**  You don't know who?

13  **A.**  I don't have a -- I don't have a specific person in mind,

14  but I know how we came to that recommendation.

15  **Q.**  Sir, no, it wasn't my question.  My question was were you

16  ever given an explanation by anyone other than lawyers why

17  Apple believed that it can decide unilaterally that certain

18  developers are not entitled to the benefits of the injunction?

19  **A.**  Again, our belief was not that anyone was excluded from

20  the benefits of the injunction.

21  **Q.**  Do you have some other definition that's internal to Apple

22  to the term "ineligible"?

23  **A.**  (No response.)

24  **Q.**  Let's move on.

25      Did Mr. Cook or Mr. Maestri or Mr. Schiller or anyone else

```
1    ever ask you for the basis of your recommendation to exclude

2    certain developers as ineligible to the benefits of the

3    Court's injunction?

4    A.   It was discussed with them, yes.

5         THE COURT:  Did they raise it, or did you raise it?

6         THE WITNESS:  I don't remember.

7    BY MR. EVEN:

8    Q.   You agree with me that Apple's decision to deem certain

9    developers ineligible to use the benefits of the injunction

10   was not an oversight, this was a deliberate, intentional

11   decision, correct?

12   A.   Yes.

13   Q.   Please turn to the slide labeled 009.13.

14                    (Exhibit published.)

15   BY MR. EVEN:

16   Q.   Here again you will see some highlighting.  Let's not

17   discuss the numbers that are highlighted.

18        At the bottom of the slide, do you see there are some

19   financial assumptions, quote, end quote.  Right?

20   A.   (Reviewing document.)

21        Yes.

22   Q.   These are the assumptions that the finance team used in

23   order to come up with the figures on this slide, correct?

24   A.   Yes.

25   Q.   And the same -- some of the same assumptions applied also
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1   to the slide we talked about in -- on page 9.12, correct?

 2   A.   That's correct.

 3   Q.   Turning to the individual assumption, let's go from right

 4   to left.  The first assumption is titled "Billing Entitlement

 5   Implementation," right?

 6   A.   That's correct.

 7   Q.   And that is, roughly speaking, Apple's assumption as to

 8   the proportion of eligible developers that would implement a

 9   purchase link in their app, right?

10   A.   That's not quite correct.

11   Q.   If that was Mr. Roman's understanding of what this stands

12   for, there's a reason for the discrepancy between your

13   testimony and his?

14   A.   I think it's just a clarification that it's the billings

15   coming from those apps or developers that have implemented the

16   entitlement.  So it's not a percentage of developers.  It's a

17   percentage of billings.

18   Q.   I understand, and I understand billings are not entirely

19   equally distributed.  But roughly speaking, the number of

20   billings would correlate with the numbers of developers,

21   correct?

22   A.   No.

23   Q.   You don't believe so?

24   A.   It depends on the developers.

25   Q.   Okay.  So you believe that this number speaks to the

1  billings that would come from developers rather than the

2  number of developers?

3  **A.** Correct.

4  **Q.** Okay. Do you have any reason to believe that the

5  distribution of billings and developers differ materially

6  between those who elect and do not elect to use the

7  entitlements?

8  **A.** I -- I suspect that this will be of most interest to the

9  largest developers who generate the most billings.

10 **Q.** Developers like Microsoft and Meta and Match and X?

11 **A.** Yes.

12 **Q.** All of whom told the Court that they're never going to

13 adopt this.

14 **A.** I don't know.

15 **Q.** You don't know.

16   You agree with me that the assumption here, without

17 speaking to the number, is that a substantial majority of

18 revenues would come from apps that actually implement a

19 purchase link?

20 **A.** Sorry. I don't know if I understood your question. Could

21 you repeat it?

22 **Q.** Looking at this number, but not mentioning it, you agree

23 with me that the assumption here is that a substantial

24 majority of U.S. store billings -- strike that.

25   You agree with me that this suggests that a substantial

1   majority of billings would come from apps that will now adopt

2   a purchase link.

3   **A.**   Yes.

4   **Q.**   Okay.  Now, you did not submit to the Court any study or

5   data supporting this assumption, correct?

6   **A.**   Not that I'm aware.

7   **Q.**   And by "you," I mean Apple did not submit anything like

8   that.  You're not aware of any data to support that, correct?

9   **A.**   I am aware of data points that we discussed internally to

10   get to that assumption.

11   **Q.**   Not what I'm asking.  My question was:  Sitting here

12   today, you're not aware of any study or data supporting that

13   assumption that was actually filed with the Court, correct?

14   **A.**   Not that I'm aware of, correct.

15   **Q.**   Now internally as well, you did not conduct any study to

16   support this assumption, correct?

17   **A.**   A formal study?

18   **Q.**   Formal study, an informal study, any study?

19   **A.**   Yes.  We looked at data points and analysis and discussed

20   those in coming up with these assumptions.

21   **Q.**   Sir, what are -- well, strike that.

22       When did you first discuss these so-called data points?

23   **A.**   As early as spring of 2023 once we started working on

24   this.

25   **Q.**   Who was the source of these data points?

1    **A.**   There were a variety of sources.

2    **Q.**   Is there any reason why Mr. Roman would not be aware of

3    these discussions about data points?

4    **A.**   I'm not sure.

5    **Q.**   Well, was Mr. Roman in the room, in your view, when those

6    discussions went on?

7    **A.**   In certain cases, yes.

8    **Q.**   Was his team in the room when those discussions went on?

9    **A.**   Yes.

10   **Q.**   Now you're aware that Apple told this Court that there

11   were nearly 136,000 apps on the U.S. storefront with at least

12   one in-app purchase between February and April of this year?

13   **A.**   That sounds correct.

14   **Q.**   And to get to the rate of adoption that Apple estimated in

15   the price committee deck, developers, assuming that developers

16   and revenue are similar, developers of roughly 100,000 apps

17   would need to opt in, correct?

18   **A.**   That's not correct.

19   **Q.**   That's not correct?

20   **A.**   The assumption that you made is not a good one.

21   **Q.**   All right.  Well, let's have it your way, given that

22   Mr. Roman thought that was a good assumption, but now we'll

23   deal with your assumption.

24        Your assumption is that this strictly speaks to revenues

25   and not to the number of developers, correct?

 1   **A.**   That's correct.

 2   **Q.**   All right.  You understand that to date, the uptick rate

 3   has been very slow with only 37 developers representing

 4   38 apps that even applied for a link, correct?

 5   **A.**   That's my understanding, yes.

 6   **Q.**   And so right now, the links that were applied to, not

 7   implemented, applied to represent billings of just about

 8   zero dollars, correct?

 9   **A.**   That's correct.

10   **Q.**   And zero dollars out of the total U.S. store revenue is

11   lower than the number that you assumed, correct?

12   **A.**   I should correct.  It's not zero dollars.  I thought you

13   were saying zero percent.  It's, you know, hundreds of

14   thousands of dollars.

15   **Q.**   You believe that these developers have made purchases --

16   have made apps that actually implement purchase links that

17   make hundreds of thousands of dollars?

18   **A.**   The purchase links don't make hundreds of thousands of

19   dollars, but the apps make hundreds of thousands of dollars --

20                       (Simultaneous colloquy.)

21            **THE WITNESS:**  -- which is reflective of what the

22   75 percent is.

23   BY MR. EVEN:

24   **Q.**   Sir, can you tell this Court how many apps actually

25   implemented a purchase link to date?

1    **A.**   None, as far as I know.

2    **Q.**   Okay.  So if none has adopted a purchase link, so far the

3    adoption rate represents zero dollars and also zero percent,

4    correct?

5    **A.**   If we're talking about the adoption of the link live in

6    the app.  I thought you were talking about the -- those who

7    had gotten the entitlement.

8    **Q.**   Well, now we understand each other.  I'm talking about

9    adoption, actually taking a link and putting it in the app and

10   exposing yourself to all the rigamarole that Apple put

11   together and the fees and all that.  Zero have implemented

12   that, correct?

13   **A.**   That's correct.

14   **Q.**   And those zero apps represent zero dollars in revenue, and

15   that's zero percent of the eligible apps that could do it,

16   right?

17   **A.**   Correct.

18   **Q.**   Now, you understand that a majority of these 37 developers

19   actually applied to the entitlement almost immediately upon

20   Apple's announcement, but since then the demand has actually

21   declined with only five applications in March and only six in

22   April?

23   **A.**   I'm not aware of the rate.

24   **Q.**   You don't have any reason to dispute what I'm telling you,

25   right?

1    **A.**   No.

2    **Q.**   Now, you said that this would appeal particularly to large

3    developers, right?

4    **A.**   Yes.

5    **Q.**   You understand that in the four months that have passed,

6    not a single large developer even applied for an entitlement,

7    let alone implemented a purchase link, correct?

8    **A.**   Yes.

9    **Q.**   Sitting here today in front of this Court under oath, is

10   it your testimony that you believe that large developers that

11   will account to the majority of store billings will implement

12   purchase links in the next 20 months?

13   **A.**   I believe it's likely.

14   **Q.**   You believe it's likely?

15   **A.**   Yes.

16   **Q.**   You have any evidence, data, anything to suggest that

17   that's actually going to happen?

18   **A.**   I -- I have evidence based on what I've seen from other

19   product feature rollouts.

20   **Q.**   Well, so far we're still at zero, correct?

21   **A.**   Correct.

22   **Q.**   Hope springs eternal, I guess.

23       Let's look at the next final assumption in the slide --

24                        (Exhibit published.)

25   / / /

1    BY MR. EVEN:

2    **Q.**   -- which is entitlement share.  Do you see that?

3    **A.**   Yes.

4    **Q.**   And roughly speaking, this is Apple's assumption as to the

5    proportion of users that would click a purchase link in their

6    app if given the option?

7    **A.**   It is the proportion of billings that would go out through

8    a link once a user has clicked on them.

9    **Q.**   So a little -- well, I'm not going to use the numbers, but

10   slightly less than half of billings would go out; that's your

11   assumption here?

12   **A.**   Yes.

13   **Q.**   Who came up with this assumption?

14   **A.**   The working group, led by me and my team.

15   **Q.**   You and your team and Mr. Roman, or just you and your

16   team?

17   **A.**   We came to a consensus on this.

18          **THE COURT:**  Have you had any discussions or inquiries

19   from any developer, any large developer, that supports your

20   assumption that anybody is going to participate?

21          **THE WITNESS:**  We've had a lot of questions from --

22          **THE COURT:**  I'm not talking about we.  I need to know

23   you.  Have you personally had any discussions with any large

24   developer about their use of this link?

25          **THE WITNESS:**  No.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

 1              **THE COURT:**  Go ahead.

 2              **MR. EVEN:**  Thank you, Your Honor.

 3   **Q.**  You did not submit to the Court any study or data

 4   supporting this assumption about how much of the revenues

 5   would flow outside of the app, correct?

 6   **A.**  That's correct.

 7   **Q.**  You agree with Mr. Roman that you did not conduct any

 8   study to support this assumption?

 9   **A.**  No formal study.  But we looked at internal data points

10   and case studies.

11   **Q.**  What is the internal data points that you believe you

12   looked at?

13   **A.**  We looked at a number of case studies around the shift of

14   customer spend from within an app to out of app due to

15   different scenarios.

16              **THE COURT:**  Did you document those?

17              **THE WITNESS:**  They were pulled from a variety of

18   different sources.

19              **THE COURT:**  Did you document them?

20              **THE WITNESS:**  In the preparation of this?  We -- we

21   have them documented, yes.

22              **THE COURT:**  You have work files somewhere --

23              **THE WITNESS:**  Yes.

24              **THE COURT:**  -- where you've documented all your

25   analysis?

 1        **THE WITNESS:**  Where -- where we had them, yes.

 2        **THE COURT:**  Okay.  Describe your documentation.

 3        **THE WITNESS:**  So we -- some of these case studies

 4   were prepared for other presentations and venues.  And we

 5   would then pull them in as reference points when coming up

 6   with this assumption.

 7        **THE COURT:**  That doesn't give me the information --

 8   any -- that's too ambiguous.

 9        **THE WITNESS:**  So for the purposes of understanding

10   our business at different points in time, we would look at

11   case studies that evaluated the shift of customer spend to

12   other app channels.

13      Sometimes those were from public sources.  Sometimes those

14   were from information that was provided to us by developers.

15   And using that information, we understood what we believed the

16   reasonable share of spend that could shift out of an app was.

17        **THE COURT:**  How much time did you spend on these case

18   studies to support your assumption?

19        **THE WITNESS:**  These were largely prepared for -- for

20   prior meetings and other venues.  They weren't -- we just

21   pulled them in as data points for this analysis.

22        **THE COURT:**  How much time did you spend on the issue?

23        **THE WITNESS:**  We spent hours talking about what

24   the -- what these assumptions would be.

25        **THE COURT:**  Three could be hours.  Three hours?  A

1    hundred hours?  Two hundred hours?

2              THE WITNESS:  Dozens to hundreds of hours coming up

3    with the assumptions that went into this.

4              THE COURT:  And if I asked you to get all of this

5    documentation, that would be an easy thing to do?

6              THE WITNESS:  Some of it we have readily available.

7    Others are public reference points that we looked at at the

8    time.  I don't know if there's a -- a file that contains

9    Everything.

10             THE COURT:  So you didn't keep a file?

11             THE WITNESS:  No.

12             THE COURT:  And there's no way to recreate your

13   assumption?

14             THE WITNESS:  We -- we have some -- we have some of

15   them, but they were discussed as amongst the working group.

16             THE COURT:  All right.  Well, produce those as well.

17      Go ahead.

18   BY MR. EVEN:

19   Q.  Mr. Oliver, here too, to date, four months in, zero

20   dollars have moved off the App Store through a purchase link,

21   correct?

22   A.  Correct.

23   Q.  Let's look at the next assumption which -- financial

24   assumption which is the assumption about 50 percent returning

25   customers.  Do you see that?

1   **A.**   That's correct.

2   **Q.**   And this is the assumption as to the proportion of users

3   that would go back inside the app and click the link again

4   before making a future purchase more than seven days after the

5   first click, correct?

6   **A.**   That's correct.

7   **Q.**   Apple did not submit any data or study backing up that

8   assumption either, correct?

9   **A.**   That's correct.

10  **Q.**   To the extent you conducted any analysis about that

11  particular assumption, I gather that would be in the documents

12  that the Court has now asked for?

13  **A.**   This one was the toughest for us to come to a reasonable

14  assumption on.  So the team used -- had less data points

15  available to them relative to the other assumptions.

16  **Q.**   Did the team have any data points?

17  **A.**   Yes, we had a few.

18  **Q.**   What do you view as those data points?

19      Let me strike that.  Let me take a step back.

20      Who was the source of these data points?

21  **A.**   Again, the working group pulled in data points for

22  discussion as they thought it was relevant.

23  **Q.**   I understand that, sir.  That wasn't my question.

24      Who was the source?  When the team pulled in data points,

25  who did they pull the data points from?

1    **A.**   A variety of different sources.

2    **Q.**   Can you give me the top sources that provided you with

3    data points purportedly supporting the 50 percent reclick

4    assumption?

5    **A.**   One of the data points that we referenced was the win-back

6    rate for subscriptions.

7    **Q.**   Can you explain what the win-back rate is?

8    **A.**   Sure.  When a customer leaves the App Store -- sorry.  If

9    a customer has subscribed to a App Store subscription through

10   IAP and then they churn out for any reason, they decide to

11   stop that subscription, there is a large proportion of

12   developers that are won back.  And that was in a range close

13   to what we have for this assumption.

14   **Q.**   So you believe that the fact that some subscription apps

15   are able to enlist people to sign up again, that has any

16   bearing on whether people would make additional purchases

17   using a link or not using a link?

18   **A.**   It's -- the question is whether they come back to the same

19   source to initiate a transaction.  And so from that

20   perspective, it felt like a relevant data point.  But I will

21   admit it wasn't perfect.

22   **Q.**   Okay.  So now I want to talk a little bit about the

23   Analysis Group.

24   **A.**   Yes.

25   **Q.**   You said that you led the team at Apple that worked with

1    Analysis Group, correct?

2    **A.**   Yes.

3    **Q.**   And if you turn to Exhibit CX-0014 in your binder.

4    **A.**   (Reviewing document.)

5    **Q.**   That's a presentation titled "App Store Commission Rates

6    and the Value of Apple and the App Store to Developers Detail

7    Presentation"?

8    **A.**   Yes.

9    **Q.**   Do you see that?

10   **A.**   I do.

11   **Q.**   And that is the long form or detailed version of the

12   report that Analysis Group prepared for your work group,

13   correct?

14   **A.**   That's correct.

15                      (Exhibit published.)

16        **MR. EVEN:**   Your Honor, I move to admit

17   Exhibit CX-0014 into evidence at this time.

18        **THE COURT:**   It's admitted.

19      (Plaintiff's Exhibit CX-0014 received in evidence.)

20        **MR. EVEN:**   Thank you, Your Honor.

21   **Q.**   Now, Analysis Group is a firm that Apple has used from

22   time to time to prepare public reports about its App Store

23   business, right?

24   **A.**   That's correct.

25   **Q.**   Have you worked with Analysis Group on prior reports

1    commissioned by Apple?

2    **A.**   Yes.

3    **Q.**   Have you worked on a July 2020 Analysis Group report that

4    tried to suggest that Apple's rates are in alignment with

5    other stores?

6    **A.**   I was only lightly involved in that report.

7    **Q.**   Now, the reports that Analysis Group prepares for Apple

8    are then published in -- on Analysis Group's website, Apple's

9    website sometimes, correct?

10   **A.**   Yes.

11   **Q.**   And those are essentially kind of public relations pieces,

12   correct?

13   **A.**   It depends.   Sometimes they are amplified by our public

14   relations team.

15   **Q.**   Well, the reports invariably are commissioned by and paid

16   for entirely by Apple, correct?

17   **A.**   I believe so, yes.

18   **Q.**   And that's true for the report that's now on the screen as

19   well, correct?

20   **A.**   Yes.

21   **Q.**   And the report invariably support Apple's policy and

22   litigation positions, correct?

23   **A.**   I can't say one way or the other.

24   **Q.**   You don't know?

25   **A.**   I -- I -- again, I don't know what specific points and

1  litigation positions you're talking about.

2  Q.  Well, let me ask it in reverse.  Have you ever seen

3  Analysis Group come out with one of these reports and say we

4  think Apple is wrong about the following five things?

5  A.  No.

6  Q.  You understand that Apple uses the reports for lobbying

7  and PR purposes?

8  A.  Yes.

9  Q.  And Apple employees work with Analysis Group and review

10 and comment on the various reports before they're published,

11 correct?

12 A.  Yes.

13 Q.  And Apple employees worked with Analysis Group under your

14 guidance and supervision and reviewed and commented on this

15 report, correct?

16 A.  Yes.  We had feedback.

17 Q.  And Apple never suggested that the Analysis Group's

18 continued retention by Apple depends -- does not depend --

19 sorry -- on the reports being favorable to Apple, correct?

20 A.  No.

21 Q.  No, not correct?  Or yes, this is correct?  Apple has

22 never suggested that it will continue to retain Analysis Group

23 even if Analysis Group's conclusions are bad for Apple?

24 A.  We have never had any discussion about Analysis Group's

25 conclusions being unfavorable or favorable to Apple.

1    **Q.**  The reports are not peer-reviewed in any way, right?

2    **A.**  I don't know.  Not that I'm aware.

3    **Q.**  Certainly this report was not peer-reviewed by anyone,

4    right?

5    **A.**  That's correct.

6    **Q.**  And the reports do not purpose to meet any kind of

7    scientific standard, right?

8    **A.**  They're prepared by the economists at the Analysis Group.

9    I don't know what standard you're discussing.

10          **THE COURT:**  Have you ever worked with consultants?

11   Management consultants?

12          **THE WITNESS:**  No.

13          **THE COURT:**  We should take a ten-minute break for the

14   court reporter.  So we'll go back on the record at 12:15 and

15   then we'll have that be the last session.

16          **MR. EVEN:**  Thank you, Your Honor.

17          **THE CLERK:**  Court is in recess.

18      (Recess taken at 12:05 P.M.; proceedings resumed at

19   12:18 P.M.)

20          **THE COURT:**  Okay.  We're back on the record.

21      You may be seated.

22      The record will reflect that all the parties are present.

23      Proceed.

24          **MR. EVEN:**  Thank you, Your Honor.

25   **Q.**  Mr. Oliver, we saw that the Analysis Group report is dated

 1    January 2024.  How long did you work on this report with

 2    Analysis Group?

 3    **A.**  We started in the spring of 2023.

 4                         (Exhibit published.)

 5    **BY MR. EVEN:**

 6    **Q.**  Who at Apple reviewed and commented on the report?

 7    **A.**  It was largely me and my team, though we worked in

 8    conjunction with the legal team as well.

 9    **Q.**  Did Mr. Roman review the report and comment on it?

10    **A.**  I believe he was -- had some involvement, but it was

11    primarily led by my team.

12    **Q.**  Did Mr. Fischer review the report and comment on it?

13    **A.**  I don't believe so.

14            **THE COURT:**  So you edited their report?

15            **THE WITNESS:**  I did not edit the report.

16            **THE COURT:**  You -- you and legal gave them feedback

17    with respect to the content of their report?

18            **THE WITNESS:**  It was largely questions and clarify --

19    clarifications.

20            **THE COURT:**  Proceed.

21    **BY MR. BORNSTEIN:**

22    **Q.**  Did Mr. Schiller review and comment on the report?

23    **A.**  Not to my knowledge.

24    **Q.**  Please turn to slide number 2 on the report.

25                         (Exhibit published.)

OLIVER - DIRECT / EVEN

**BY MR. EVEN:**

Q.   The slide identifies three goals:  Estimating the value provided by Apple; comparing Apple's commission with those of other app stores; and providing an economic framework for considering alternative pricing options.  Do you see that?

A.   I do, yes.

Q.   Who determined that those would be the goals of this study?

A.   That was me and my team.

Q.   Did you clear it with anyone before you made that decision, or was it -- did the buck stop with you?

A.   We discussed, just for clarification, this with -- with AG just to make sure they understood the goals, but I think it was primarily me and my team who made that final call.

Q.   So let's talk about each of these goals briefly.  Let's begin with the first one which was valuation of Apple's services.

                    (Exhibit published.)

**BY MR. EVEN:**

Q.   And if you turn to Slide 4, it explains that to achieve the first goal, the report attempts to calculate the value that Apple provides to developers through four buckets of services:  Platform technology, developer tools, distribution and discovery.  Correct?

A.   Correct.

1    **Q.**  By contrast, the analysis does not seek to measure the

2    value Apple delivers to developers through IAP and what

3    Analysis Group refers to as "care and support," correct?

4    **A.**  Correct.  Payments and commerce are -- are independent.

5    **Q.**  Who was it that decided that Analysis Group should not

6    assess the value of Apple's IAP and related services?

7    **A.**  That was me and my team.

8    **Q.**  Now, because they did not try to assess the value of

9    payments and commerce, Analysis Group also did not try to

10   estimate what it might cost developers to obtain these

11   services from another company for benchmarking or for any

12   other reason, correct?

13   **A.**  We did look at some comparisons that AG brought to our

14   attention.

15   **Q.**  Sir, does the Analysis Group report contain any analysis

16   of the -- or estimates what it might cost developers to obtain

17   these services, payments and commerce services, from another

18   company?

19   **A.**  Yes.

20   **Q.**  This report contains that?

21   **A.**  It has some comparables for that in a second section.

22   **Q.**  Can you direct us to the slide that you believe that

23   includes that?

24   **A.**  14A-37.

25                       (Exhibit published.)

OLIVER - DIRECT / EVEN

1   BY MR. EVEN:

2   Q.   That is a slide that talks about benchmarking for platform

3   fee structures?

4   A.   Yes.

5   Q.   And it talks about Google Play, Shopify, Etsy,

6   booking.com, ONE Store?

7   A.   Correct.

8   Q.   Okay.  It has no analysis of actual payment solution

9   providers like Stripe or PayPal or anybody like that, correct?

10  A.   So it's -- it's looking at the --

11  Q.   Sir?

12  A.   -- paying service providers for each of these overall

13  platform fee providers.  So Shopify Etsy, Booking, Google

14  Play, and ONE Store, et al. looks at what the cost to provide

15  payment and commerce services.

16  Q.   Sir, it looks at incremental fees when payments occur on

17  platform, correct?  That's --

18  A.   That's --

19  Q.   -- that's what the slide says?

20  A.   That's to cover the cost of payment processing and

21  associated commerce services.

22  Q.   Sir, none of these companies actually provide standalone

23  payment or commerce services, correct?  They're not companies

24  that a -- that a developer can say for my linked purchase, I'm

25  going to go use Etsy to handle payments on my website,

1    correct?

2    **A.**   I don't think any of these would handle those in this

3    instance, in the linkout instance, that's correct.

4    **Q.**   And so I'm going back to my question.  This slide deck, in

5    Analysis -- as reflects Analysis Group's work, does not

6    include any analysis of what it would cost a developer to

7    obtain payment and commerce services from an alternative

8    source for their linked purchases, correct?

9    **A.**   That's correct.

10   **Q.**   Who was it that decided that Analysis Group should not

11   assess what it would cost developers to procure payment and

12   commerce services from other providers to service their linked

13   purchases?

14   **A.**   That was me and my team.

15   **Q.**   Did anyone on the pricing committee ever ask you why you

16   decided not to commission Analysis Group while they're at it

17   to also look at that particular issue?

18   **A.**   We talked about the Analysis Group's evaluation, yes.

19   **Q.**   And nobody suggested that Analysis Group should actually

20   be tasked in trying to figure out what would be the cost for

21   developers to obtain alternative payment solutions to service

22   their linked purchases?

23   **A.**   We -- we discussed why it wasn't included in the analysis.

24   **Q.**   Not my question, sir.

25        Nobody suggested to you or told you you should task

1    Analysis Group with a study of what it would cost developers

2    to procure alternative payment and commerce solutions to

3    handle their linked purchases?

4    **A.**   No.

5    **Q.**   Analysis Group also did not do anything to calculate the

6    value that developers provide to Apple, correct?

7    **A.**   No.

8    **Q.**   Sir, we have the double negative again.  I'm correct, the

9    Analysis Group did not do anything to calculate the value the

10   developers provide to Apple, right?

11   **A.**   That's correct.

12   **Q.**   And for example there's no assessment in this report about

13   how developers make apps that make the Apple ecosystem more

14   attractive, correct?

15   **A.**   No, I don't believe so.

16   **Q.**   There's also no assessment of how the apps developed --

17   sorry -- how the apps the developers make help Apple sell more

18   iPhones, correct?

19   **A.**   No.

20   **Q.**   And there's also no assessment of the sums the developer

21   pay to Apple to advertise in the App Store or outside of it,

22   correct?

23   **A.**   No, I don't believe so.

24   **Q.**   And again, you don't believe that the report incorporates

25   any analysis of these sums developers pay to Apple to

 1    advertise in the App Store or outside of it, right?

 2    **A.**  I believe that's correct.

 3    **Q.**  So let's go to Slide 6 now.

 4                     (Exhibit published.)

 5    **BY MR. EVEN:**

 6    **Q.**  And here, under results -- well, step back.

 7        This is talking about the first goal which is valuation of

 8    the stack of services that Apple provides, correct?

 9    **A.**  That's correct.

10    **Q.**  And under "Results," Analysis Group summarizes the value

11    analysis estimating that Apple provides developers with

12    specific values in each bucket, correct?

13    **A.**  That's correct.

14    **Q.**  And that summary of the valuation was replicated pretty

15    much verbatim, I think, in the price committee deck, correct?

16    **A.**  Roughly, yes.

17    **Q.**  Now, the largest share of value by far comes from the

18    platform technology bucket, correct?

19    **A.**  Yes, with a bunch of caveats.

20    **Q.**  Okay.  And the headline rate here, at least, is 30 percent

21    of value, correct?

22    **A.**  Yes, but that is inclusive of other -- all the other

23    buckets in that instance.

24    **Q.**  Okay.  Let's go to Slide 9 where Analysis Group is using

25    benchmarking to assess the value of Apple's platform

 1    technology.

 2                        (Exhibit published.)

 3    BY MR. EVEN:

 4    Q.   And Analysis Group begins the slide by explaining that one

 5    way to benchmark the value of Apple's platform technology is

 6    to consider the prices that comparable platforms charge

 7    sellers, correct?

 8    A.   Yes.

 9    Q.   And Analysis Group identifies three benchmarking

10    comparables here, right?

11    A.   Correct.

12    Q.   And those are game consoles, like the Xbox, right?

13    A.   Correct.

14    Q.   E-commerce services like Shopify, right?

15    A.   Yes.

16    Q.   And physical retail areas like shopping malls and

17    airports, correct?

18    A.   Correct.

19    Q.   So let's start with consoles.

20         Are you aware that this Court has already determined that

21    consoles are not useful benchmarks for mobile because the

22    economics and nature of consoles and mobile devices are very

23    different?

24    A.   I'm aware, yes.

25    Q.   But you didn't tell that to Analysis Group when they ran

OLIVER - DIRECT / EVEN

1    this analysis?

2    **A.**  We didn't incorporate that into our instructions to them.

3    **Q.**  Okay.  Going next to e-commerce platforms like Shopify,

4    Shopify provides developers with the tools to build online

5    stores, correct?

6    **A.**  Yes.

7    **Q.**  And so Shopify helps developers to manage inventory, run

8    marketing campaigns, et cetera, right?

9    **A.**  Amongst a variety of other things, yes.

10   **Q.**  Okay.  Those are services that are very different from the

11   platform technology provided by the iOS ecosystem, correct?

12   **A.**  Yeah.  iOS is -- is unique.

13   **Q.**  Then Analysis Group goes to airports and malls, correct?

14   **A.**  Yes.

15   **Q.**  Agree that these are not very close comparables?

16   **A.**  They're all relevant for different reasons.

17   **Q.**  Sir, malls and airports are not really platforms and they

18   don't provide technology, right?

19   **A.**  They provide a place for merchants to sell their goods.

20   **Q.**  I understand, but we're doing comparable benchmark for

21   platform technology.  They're neither a platform nor

22   technology providers, right?

23   **A.**  They are a platform.

24   **Q.**  They're a platform in your view?

25   **A.**  Yes.

1    **Q.**   Okay.

2         Let's think together if Analysis Group could find better

3    comparables to platform technologies that power computing

4    devices like the iPhone.

5         Can you think of a computing device that's not in here?

6    **A.**   A computing device that's not in here?

7    **Q.**   Yes.

8    **A.**   Sure.

9    **Q.**   For example, a PC is not here, correct?

10   **A.**   Correct.

11   **Q.**   And Microsoft Windows is not here, correct?

12   **A.**   Correct.

13   **Q.**   And you agree that Windows is Microsoft's platform

14   technology for PC's, right?

15   **A.**   It's -- it's their operating system layer.

16   **Q.**   I understand it's their operating system layer.  And that

17   operating system provides platform technology for developers

18   who want to build applications for Windows, correct?

19   **A.**   Correct.

20   **Q.**   And on a PC, if a developer writes an app and offers an

21   executable on its website or through the Adobe Store or the

22   Steam Store or the Epic Store, Microsoft charges the app

23   developer nothing for access to Windows, correct?

24   **A.**   That's my understanding, yes.

25   **Q.**   All right.  Analysis Group also chose not to include Mac

 1    computers and the macOS in benchmarking the value of the

 2    iPhone platform technology, correct?

 3    **A.**   That's correct.

 4    **Q.**   You would agree that macOS is Apple's platform technology

 5    for Mac computers, right?

 6    **A.**   Yes.

 7    **Q.**   And if a user downloads an app to their Mac from any

 8    source other than the Apple App Store itself, Apple charges

 9    the app developer nothing for access to the Mac, to the macOS,

10    to the macOS API's.  Even notarization is free, right?

11    **A.**   That's correct.

12    **Q.**   But I take it that according to this slide, if you really

13    want to understand the value that the iPhone platform

14    delivers, you should benchmark not to the macOS or Windows,

15    but to the cost of renting retail space at the Foothill Square

16    Mall or at SFO Airport?

17    **A.**   We asked the Analysis Group to look at a variety of broad

18    comparables.  So this is what they came back with.

19    **Q.**   You asked them to ignore the comparables that are actually

20    similar?

21    **A.**   No.  They include some of those same comparables in other

22    parts of this report.

23    **Q.**   Okay.  We will get there.

24         If we go back to Slide 6.

25                          (Exhibit published.)

1    BY MR. EVEN:

2    Q.   Looking at the other three value buckets below platform

3    technology, Analysis Group presents broad ranges of values,

4    right?

5    A.   Yes.

6    Q.   And let's take a quick look to see if we can understand

7    what causes these broad ranges.  So turn to Slide 14.

8                        (Exhibit published.)

9    BY MR. EVEN:

10   Q.   And you see that here Analysis Group calculates the value

11   of developer tools and services as being between 11 and

12   16 percent for small developers, but between only 3 and

13   5 percent for large developers, correct?

14   A.   That's correct.

15   Q.   If you turn to Slide 20, Analysis Group here calculates

16   the value of distribution.  Do you see that?

17   A.   I do, yes.

18   Q.   And here, the value is between 13.5 and 24.7 percent for

19   small developers, but only between 3.8 and 3.9 percent for

20   large developers, right?

21   A.   Yes.

22   Q.   And if you go to Slide 27 which talks about discovery, and

23   here again, we have a large disparity between small developers

24   that have a value according to Analysis Group of 13.7 percent

25   and 21.4 percent and large developers that derive only

1    4.8 percent and 7.5 percent, correct?

2    **A.**   Yes.

3    **Q.**   So for each of these value buckets, even accepting all of

4    the Analysis Group's numbers at face value, the value

5    delivered to large developers is a small fraction of the value

6    delivered to small developers right?

7    **A.**   No.

8    **Q.**   You don't -- didn't see that on this slide?

9    **A.**   I -- I don't agree with what you just said.

10   **Q.**   You don't agree that the slide right now on the screen

11   suggests that there is much more value provided to small

12   developers than to large developers?

13   **A.**   I don't.

14   **Q.**   Okay.  Assuming for now that the Analysis Group actually

15   does say that larger value is provided to small developers,

16   that would suggest that small developers, if Apple wanted to

17   put a commission based on value, that small developers should

18   face a higher commission than large developers, correct?

19   **A.**   No, I don't agree with that.

20   **Q.**   You don't agree with that?

21   **A.**   That's what the -- no, I don't.

22   **Q.**   Okay.  You understand that Apple does the exact reverse,

23   correct?

24   **A.**   In -- in terms of the commission?

25   **Q.**   Correct.  Well, let's take a step back.

1        We saw this morning that small developers are responsible

2    for roughly 5 percent of the billings on the U.S. App Store,

3    correct?

4    **A.**   That's correct.

5    **Q.**   By extension, large developers are responsible for the

6    other 95 percent, correct?

7    **A.**   Sorry, I don't remember the numbers but --

8    **Q.**   Well, if small developers account for 5 percent, the rest

9    is 95 percent, correct?

10   **A.**   Those are small developers that are in the small business

11   program.

12                      (Simultaneous colloquy.)

13   **BY MR. EVEN:**

14   **Q.**   I understand.

15                      (Simultaneous colloquy.)

16   **BY MR. EVEN:**

17   **Q.**   There may be some small --

18           **THE COURT:**   One at a time.  One at a time.

19           **MR. EVEN:**   Okay.  I apologize, Your Honor.

20   **Q.**   The slide that we saw suggested that 5 percent of billings

21   account for small developers, correct?

22   **A.**   That's correct.

23   **Q.**   And I understand there may be some small developers that

24   choose to pay 30 percent instead of 15 even though they are

25   entitled to 15, but that would not take us far above

1   5 percent.  Do you agree with that?

2   **A.**  It's very disproportionate from the number of developers

3   that benefit from that.

4   **Q.**  Sir, not what I asked at all.  You understand that small

5   developers do not account for anything that is far larger than

6   5 percent, correct?

7   **A.**  I don't agree with that.

8   **Q.**  You don't agree with that, but that's what your slide

9   showed today, that 5 percent is for small developers, correct?

10  **A.**  As a percentage of U.S. store billings, not the number of

11  developers that have access --

12  **Q.**  I'm not talking about number of developers at all, sir.

13  I'm only talking about billings.

14      Small developers account for roughly 5 percent of U.S.

15  store billings, correct?

16  **A.**  Correct.

17  **Q.**  And by extension, large developers account for roughly

18  95 percent of U.S. store billings, correct?

19  **A.**  Developers who are not members of the small business

20  program, yes.

21  **Q.**  And yet your recommendation was that the small developers

22  be subject to a 12 percent commission whereas large developers

23  that account for the vast majority of revenue of billings --

24  sorry -- will be subject to a commission of 27 percent.

25  Right?

1    **A.**   That's not true.

2    **Q.**   That's not true that small developers are subject to

3    12 percent reduced fee whereas large developers that accounted

4    for the bulk of revenue and the bulk of billings would be

5    subject to a 27 percent under your recommendation?

6    **A.**   A much larger share of billings are subject to tenured

7    subscriptions which would also get the same benefit as small

8    businesses under the small business program.

9    **Q.**   Developers, correct?

10   **A.**   Correct.

11   **Q.**   And your recommendation is that those large developers be

12   subject to a fee that's more than twice the fee -- than the

13   fee that you recommend would apply to small developers,

14   correct?

15   **A.**   Again, no.  Because many of those large developers are

16   also subject to the tenured subscription benefit which is at

17   the same rate as small businesses.

18   **Q.**   Sir, even if we took tenured subscriptions under your

19   reading of what that slide that we looked at earlier showed,

20   and small businesses, together those would be subject -- those

21   would cover only 23 percent of U.S. store revenue, correct?

22   **A.**   That's correct.

23   **Q.**   And so the other 77 percent would come from folks who are

24   subject to a higher fee, correct?

25   **A.**   Correct.

1    **Q.**  And your recommendation is that the 77 percent, at least,

2    would be subject to a 27 percent fee and only the rest are

3    going to be subject to the reduced 12 percent fee, correct?

4    **A.**  They would be subject to the standard fee with the time

5    window which significantly changes that.

6    **Q.**  Sir, I wasn't asking about a time window.

7    **A.**  But I wanted to be clear.

8    **Q.**  Sir, I wasn't asking about the time window.

9        You understand that your recommendation is that

10   notwithstanding what Analysis Group found about value to small

11   and large developers, that 77 percent of App Store billings

12   would be subject to a 27 percent standard fee if taken off

13   platform?

14   **A.**  For the first seven days.

15   **Q.**  That's a yes?

16   **A.**  Yes.

17   **Q.**  Let's quickly move to benchmarking to other stores.

18   That's part two of the Analysis Group analysis.

19       If you turn to Slide 30, this and the next few slides show

20   the details of Analysis Group's benchmarking exercise, right?

21                    (Exhibit published.)

22           **THE WITNESS:**  That's correct.

23   **BY MR. EVEN:**

24   **Q.**  And Slide 30 describes the headline commission rate for

25   different app stores, correct?

1    **A.**   The headline commission rate and -- yes.  And some of

2    their program rates, correct.

3    **Q.**   Now you would agree with me that an analysis that's based

4    on headline commission rates is suspect?

5    **A.**   Why so?

6    **Q.**   Would you agree with me that an analysis that is based on

7    headline rates is suspect?

8    **A.**   No.

9    **Q.**   Are you aware that Apple tried to present a similar

10   comparable analysis at trial and the Court rejected that and

11   found that it's suspect?

12   **A.**   I'm not aware of that, no.

13   **Q.**   You said that you read the decision, right?

14   **A.**   I did, yes.

15   **Q.**   You're not aware that the Court found as just one example

16   that Amazon Store's average rate was only 18 percent even

17   though the headline rate was presented then and is still here

18   is 30 percent, for example?

19   **A.**   I don't remember that specifically, sorry.

20   **Q.**   We already discussed how the Court found that consoles are

21   not good comparables.  Are you aware that the Court also found

22   that consoles frequently negotiate special deals for large

23   developers that deviate from the headline rate?

24   **A.**   I am, yes.

25   **Q.**   Are you aware that the Court found that Apple's own expert

 1    in this case, Dr. Schmalensee, agreed that benchmarking to

 2    headline rates of other stores is problematic or suspect

 3    because these headline rates are frequently negotiated down?

 4    **A.**   I remember the point about negotiation, yes.

 5    **Q.**   Do you know who supported Dr. Schmalensee at trial?

 6    **A.**   No.

 7    **Q.**   Would it surprise you that it was Analysis Group?

 8    **A.**   I don't have any opinion on it.

 9    **Q.**   Do you have an understanding why Analysis Group, in a

10    benchmarking exercise intended to support compliance with an

11    injunction issued by this Court, relied on a methodology that

12    was rejected by this Court?

13    **A.**   No.

14    **Q.**   As the person that was overseeing the Analysis Group work,

15    did you sit down with Analysis Group when they began working

16    and told them that they may not provide analysis that this

17    Court has already rejected as unreliable?

18    **A.**   No.

19    **Q.**   And you're not aware of anyone at Apple doing such a

20    thing, sitting down with Analysis Group telling them you can't

21    rerun the same analysis that this Court has already rejected?

22    **A.**   I'm not aware of that, no.

23    **Q.**   Let's go back to Slide 2 for a second.

24                        (Exhibit published.)

25    / / /

1    BY MR. EVEN:

2    Q.   The third subbullet under the heading "A Post Epic

3    Injunction World" has a number of questions, right?

4    A.   Yes.

5    Q.   One of those question is what pricing could make linking

6    out an actual option for developers to comply with the

7    injunction?  Do you see that?

8    A.   I do, yes.

9    Q.   So at least Analysis Group understood, and presumably you

10   understood, that in a post injunction world, linked purchases

11   have to be an actual option for developers in order to comply,

12   correct?

13   A.   That's correct, yes.

14   Q.   Despite posing that question on Slide 2, there's no

15   assessment by Analysis Group of whether Apple's external link

16   program makes purchase links an actual option for developers,

17   correct?

18   A.   That's correct.

19   Q.   That's another thing that you did not ask Analysis Group

20   to perform, correct?

21   A.   That's correct.

22   Q.   Let's talk briefly about the third goal of the report to

23   provide an economic framework for considering alternative

24   pricing options.

25        So by the time Analysis Group was retained, you agree with

OLIVER - DIRECT / EVEN

1    me that Apple has already decided that it's going to impose a

2    fee at whatever rate on linked purchases, correct?

3    **A.**   I don't believe that's the case.

4    **Q.**   You think that Analysis Group was retained when Apple was

5    still considering whether to impose a fee?

6    **A.**   Yes.

7    **Q.**   That's nowhere in the deck, correct?

8    **A.**   Correct.

9    **Q.**   Let's turn to Slide 44.

10                        (Exhibit published.)

11   **BY MR. EVEN:**

12   **Q.**   That slide is titled "Leakage Risk," correct?

13   **A.**   That's correct, yes.

14   **Q.**   Now in the second bullet, Analysis Group defines leakage

15   as what happens when participants meet on a platform but take

16   their transactions off platform to avoid paying the

17   commission, right?

18   **A.**   Correct.

19   **Q.**   And historically, Apple certainly viewed diversion of

20   transactions from within the app to the web as a form of

21   leakage, right?

22   **A.**   Correct.

23   **Q.**   And the goal of Apple's anti-steering provision was in

24   fact to prevent this leakage, correct?

25   **A.**   Correct.

1    **Q.**   Now, if you turn further below on the slide, Analysis

2    Group provides some guidance on what factors determine the

3    potential magnitude of leakage as relevant to the App Store,

4    correct?

5    **A.**   Correct.

6    **Q.**   In the first bullet below, Analysis Group warns that, in

7    the second sentence, quote, high fees incentivize parties to

8    transact off platform, end quote, right?

9    **A.**   Correct.

10   **Q.**   High fees incentivize leakage because they create a large

11   disparity between the cost of on-platform transactions and

12   off-platform transactions, correct?

13   **A.**   Correct.

14   **Q.**   Now, to avoid that disparity and the resulting leakage, a

15   platform may want to lower its own platform fees, correct?

16   **A.**   Sir, is that reference to the slide?  Or is that a

17   separate question?

18   **Q.**   It's just a question, sir.  In order to avoid that

19   disparity between the price of on-platform and off-platform

20   transactions, a platform may want to lower its on-platform

21   fees, correct?

22   **A.**   It depends.  They may.  They may not as well.

23   **Q.**   So, yes, they may want to lower their own fees?

24   **A.**   It depends.

25   **Q.**   But lowering their own fees would minimize that disparity,

1   correct?  That's one way of addressing the disparity and

2   costs, correct?

3   A.   Yes.

4   Q.   And the flip side of what's on this slide is that low fees

5   incentivize parties to transact on the platform, correct?

6   A.   You're taking that assumption not from the slide but,

7   from --

8                    (Simultaneous colloquy.)

9        MR. EVEN:   Sorry.  I didn't mean to speak over you.

10  I apologize.

11  Q.   The slide says that high fees incentivize parties to

12  transaction off the platform.  The flip side of that is that

13  low fees incentivize parties to transact on the platform.

14  Correct?

15  A.   It doesn't say that.

16  Q.   I'm not saying that it says that.  You understand that

17  that is the flip side of what Analysis Group is saying?

18  A.   There are --

19                    (Simultaneous colloquy.)

20  BY MR. EVEN:

21  Q.   If you don't understand, tell me you don't understand,

22  sir.  But do you understand?

23  A.   I don't want to assume.  There are a lot of reasons why

24  parties would be incentivized to transact on the platform.

25  Pricing is one of those factors.

1    **Q.**  As far as pricing is concerned, if high prices, high fees

2    incentivize parties to transact off the platform, the

3    implication is that low fees incentivize parties to transact

4    on the platform, correct, all else being equal?

5    **A.**  I think it depends on a number of factors, but I think

6    it's fine to make that assumption.

7    **Q.**  Now, you understand that the Court found that Apple's high

8    commission on IAP did not cause a threat of leakage because

9    developers could not communicate to users that there were in

10   fact much lower prices on other platforms such as the web,

11   correct?

12   **A.**  I don't remember the inclusion of the language around

13   leakage in the Court's decision.

14   **Q.**  That's not what I asked, sir.  You understand that the

15   gist of the Court's finding was that Apple's high commission

16   on IAP did not cause a threat of leakage because developers

17   could not communicate to users that there were lower prices on

18   other platforms, correct?  That's what the Court said when the

19   Court stated that IAP pricing is not driven by competition.

20   **A.**  I'm sorry.  That question was -- was very long.  So I just

21   want to make sure that I'm answering your question directly.

22   **Q.**  Sir, do you really not understand my question?  My

23   question is pretty simple.

24        You understand that the Court voiced a concern, stated a

25   concern about the fact that IAP prices are not driven by

OLIVER - DIRECT / EVEN

```
 1    competitive pressure from off-app purchases.  Do you
 2    understand that?
 3    A.  Yes.
 4    Q.  And you understand that off-app purchases is what Analysis
 5    Group refers to here as leakage, right?
 6    A.  (Reviewing document.)
 7    Q.  Transactions off the platform, that's leakage.  I think we
 8    already established that.
 9    A.  (Reviewing document.)
10         I think it's slightly different.
11    Q.  Sir, do you really not understand that part of the concern
12    in the Court's decision and the injunction was that
13    anti-steering rules prevented communicating lower prices
14    outside of the app which in turn prevented leakage?
15    A.  I -- I guess generally, yes.
16    Q.  And so you understand that a part of the Court's
17    injunction, one of the goals, was to increase the threat of
18    leakage so that IAP would feel the competitive pressure from
19    transactions outside the app, correct?
20    A.  My understanding was that the Court -- no.
21    Q.  Sir, no, you don't understand that?
22    A.  I understood it differently.
23    Q.  So we talked about the possibility of lowering the price
24    on the platform as one way of preventing this leakage threat
25    that Analysis Group had identified.
```

1           Of course another way to minimize the disparity between

2     the cost of off-platform and on-platform transactions if the

3     platform has the power to pull it off would be for the

4     platform to raise the cost of transacting off the platform,

5     correct?

6     **A.**   I don't know.

7               **THE COURT:**  Did you understand the fundamental point

8     was to increase competition?

9               **THE WITNESS:**  Yes.  Yes.

10    **BY MR. EVEN:**

11    **Q.**   And do you not --

12              **THE COURT:**  Go ahead.  It doesn't seem like you do.

13        But go ahead.

14    **BY MR. EVEN:**

15    **Q.**   Do you understand that competition from outside of the app

16    purchases is leakage as Analysis Group defines it?

17    **A.**   I'm happy to take that definition.  I think their

18    definition is -- is slightly different, but I think that's

19    fine.

20    **Q.**   Their definition is when participants meet on a platform

21    but take their transactions off platform to avoid paying a

22    commission, right?

23    **A.**   Correct.

24    **Q.**   And at the time the Court issued its injunction, in fact

25    Apple viewed, and that was the nature of off -- outside of app

1   transactions, they were people who met on the platform within

2   the app, but then took their transactions off platform because

3   there was no app commission there, correct?

4   **A.**   Did they necessarily meet within the app?  They could have

5   met outside of the app.

6   **Q.**   Sir, they certainly had an app, correct?

7   **A.**   Correct.

8   **Q.**   So at some point they met in the app as well, at the very

9   least?

10  **A.**   I assume so.

11  **Q.**   And you understand that part of the Court's concern was

12  that the anti-steering rules prevented or minimized leakage to

13  out-of-app purchases?

14  **A.**   Yes.

15  **Q.**   Okay.  And you understand that in the first bullet point,

16  value of typical transaction, Analysis Group is explaining to

17  you that high fees incentivize parties to transact off the

18  platform.  Do you understand that?

19  **A.**   Yes.

20  **Q.**   And you understand that by high fees, what causes the

21  incentive is that there's a big disparity between the fees on

22  purchases happening in -- on the platform and purchases

23  occurring outside the platform, correct?

24  **A.**   Yes.

25  **Q.**   And you understand that one way to reduce this -- that

1    disparity is to lower the price of transacting on the

2    platform, correct?

3    **A.**   Yes.

4    **Q.**   And you understand that another way of reducing that

5    disparity, if you have the means to do it, is to increase the

6    cost of transacting off the platform.

7    **A.**   Yes.

8    **Q.**   And you understand, don't you, that that is exactly what

9    Apple did here?  It understood the economic framework, as

10   Analysis Group calls it, and it raised the cost of out-of-app

11   transactions by imposing a fee on those transactions.

12   **A.**   I don't agree that.

13   **Q.**   You don't understand that a fee, any fee, by Apple on

14   out-of-app linked purchases makes those purchases more

15   expensive to developers than the state of the world prior to

16   the injunction where they paid no fees to Apple?  You don't

17   understand that?

18   **A.**   Previously those users would have been making purchases

19   within the app.  And so the fee that they're subject to when

20   they're linked out outside of the app is lower than they would

21   have previously been subject to.

22   **Q.**   Sir, it's been a long day.  I think you need to answer my

23   question.

24   **A.**   I'm trying.

25   **Q.**   Do you not understand the basic economic fact that once

 1   there is a fee by Apple on off-platform transactions, that

 2   renders those transactions, by definition, more expensive for

 3   developers?  It's a pretty basic question.

 4   **A.**  I -- I don't agree that the comparison is correct.

 5   **Q.**  Sir, I had a very simple question.  Do you understand that

 6   any fee on off-app transactions make those transactions more

 7   expensive for developers?

 8   **A.**  They're less expensive than the -- than the fees that they

 9   would have charged for transactions in the app where this was

10   initiated.

11   **Q.**  Sir, not what I asked.

12       I'm only comparing on-platform transactions with other

13   on-platform transactions and out-of-platform transactions with

14   other out-of-platform transactions.

15       Do you understand that prior to the injunction, if

16   Duolingo sent me to duolingo.com and I purchased something

17   there that were cheaper for Duolingo than if I did the same

18   thing through a linked purchase that is subject to a 27 or

19   15 percent fee -- or 12 percent fee.  Sorry.

20   **A.**  I don't agree.

21   **Q.**  Okay.

22       Do you understand that Apple's fees that you recommended

23   reduced the incentive of parties to transact off the platform

24   as compared to a zero percent fee?

25   **A.**  If we had put a zero percent fee in the linkout

1    transaction, is that -- is that the question?

2    **Q.**   Yes.

3    **A.**   I assume there -- there would be greater interest from

4    developers if there was a zero percent transaction fee on the

5    linkout.

6    **Q.**   Let's turn to the last bullet.  Another economic framework

7    from Analysis Group.

8        This one says that the more friction between parties, the

9    higher the value of transacting on the platform.

10       Do you see that?

11   **A.**   I do, yes.

12   **Q.**   Now, you understand that the Court's goal was that the

13   injunction would lower the friction of making purchases

14   outside the app by allowing steering, correct?

15   **A.**   Correct.

16   **Q.**   And you understand that the elimination of friction, as

17   the slide suggests, would increase the threat of leakage?

18   **A.**   Correct.

19   **Q.**   And you also understood that the Court was banking on the

20   injunction to increase this threat of leakage by uncloaking

21   the veil hiding pricing information and bringing transparency

22   to the marketplace, correct?

23   **A.**   Correct.

24   **Q.**   And here again, Apple took the Analysis Group framework

25   and applied it by adding significant friction to the process

1    of completing linked transactions, correct?

2    **A.**   Can you repeat that question?

3    **Q.**   Apple took the Analysis Group framework that's in this

4    third bullet and applied it by adding significant friction to

5    the process of completing linked purchases?

6    **A.**   That's not correct.

7    **Q.**   Apple does not allow the developer to place the link

8    within the purchase flow, correct?

9    **A.**   That's correct.

10   **Q.**   That's friction, correct?

11   **A.**   That is a distinguishing between a IAP purchase and a

12   linkout to --

13   **Q.**   I understand, and that distinction adds friction to

14   completing a transaction through a linked purchase, correct?

15   **A.**   Correct.

16   **Q.**   Apple does not allow the developer to use a pop-up or

17   interstitial to present the user with purchase links, correct?

18   **A.**   Correct.

19   **Q.**   And that increases the friction to complete a linked

20   transaction as compared to a world where the developer could

21   use pop-ups or interstitials, correct?

22   **A.**   It's possible.

23   **Q.**   It's possible?

24   **A.**   Yes.

25   **Q.**   You're not sure?

 1   **A.**   I'm not sure.

 2   **Q.**   Okay.  Apple pops up a screen that warns the user against

 3   following the purchase link, correct?

 4   **A.**   It gives them information about what they have and don't

 5   have access to when they use purchase the link.

 6   **Q.**   It doesn't give them any information about what they have.

 7   It only gives them information about what they won't have.

 8   **A.**   Correct.

 9   **Q.**   All right.  And that is friction imposed on the linked

10   purchase process, correct?

11   **A.**   It's customer information.

12          **THE COURT:**  It's friction, isn't it?

13          **THE WITNESS:**  I -- I don't know if it adds friction.

14          **THE COURT:**  Wouldn't every step be friction?

15          **THE WITNESS:**  That -- possibly, yes.  But I don't

16   know -- I don't know exactly what level of friction it

17   provides.

18          **THE COURT:**  I didn't ask level.  I asked whether it

19   existed.

20          **THE WITNESS:**  Yes.

21   **BY MR. EVEN:**

22   **Q.**   All of these steps add friction to the process of linked

23   purchases, making leakage less likely, correct?

24   **A.**   Yes.

25          **MR. EVEN:**  I pass the witness.  Thank you.

 1              **THE COURT:**  Ms. Richman, you can proceed when you're

 2       ready.

 3                         **CROSS-EXAMINATION**

 4       **BY MS. RICHMAN:**

 5       **Q.**  Good afternoon, Mr. Oliver.

 6       **A.**  Good afternoon.

 7       **Q.**  Before we jump in to the substance, you mentioned that you

 8       reviewed the Court's entire decision in this matter.  Do you

 9       recall that?

10       **A.**  Yes.

11       **Q.**  And did you review the entire thing?

12       **A.**  Yes.

13       **Q.**  When did you first review the decision?

14       **A.**  Immediately following the decision coming out.

15       **Q.**  And you reviewed it subsequent to that?

16       **A.**  Yes.

17       **Q.**  Did you consult with it when you were working on the

18       injunction compliance process?

19       **A.**  Yes.  At specific points in time, yes.

20       **Q.**  And did you review the Court's injunction order as well?

21       **A.**  Yes.

22       **Q.**  How has Apple historically monetized the App Store?

23       **A.**  It charges for the sale of paid apps or games as well as

24       for the sale -- the sale of digital goods and services sold

25       within app.

1   **Q.**   And do you know why Apple originally adopted that model?

2   **A.**   Yes.  It provided a monetization model that was good for

3   developers and allowed us to provide the ongoing services,

4   tools and technologies both for the store and off the store to

5   developers.

6          **THE COURT:**  Were you working there when that -- when

7   that was employed?

8          **THE WITNESS:**  I was not.

9          **THE COURT:**  So someone just told you that?

10         **THE WITNESS:**  Yes.

11  **BY MS. RICHMAN:**

12  **Q.**   Mr. Oliver, when did you start working at Apple?

13  **A.**   2012.

14  **Q.**   And in what capacity was your initial employment at Apple?

15  **A.**   I was a member of the business management team.

16  **Q.**   For the App Store?

17  **A.**   Yes.

18  **Q.**   So you've worked at the -- on the App Store issues since

19  then?

20  **A.**   Correct.

21  **Q.**   Okay.  Thank you.

22         And so you mentioned that you thought that the Apple

23  monetization model was good for developers.

24         Can you expand on that?

25  **A.**   Yes.  It allows developers to leverage a variety of tools

1    and technologies in a way that allows them to build great apps

2    and deliver those apps to users all over the world.  And we

3    charge a commission only when developers begin building a

4    digital goods and services business.

5    **Q.**  Does Apple charge a commission on the sale of physical

6    goods that take place through the app?

7    **A.**  We do not.

8    **Q.**  And Apple has -- does Apple have other exceptions to the

9    commission that's levied on digital goods and services?

10   **A.**  I don't believe so.

11   **Q.**  I apologize.  My question was not clear.

12       What percentage of apps on the App Store are free?  If you

13   know?

14   **A.**  The vast majority, roughly 85 percent.

15   **Q.**  Okay.  And do you know what percentage of apps on the App

16   Store monetize using IAP and selling digital goods and

17   services?

18   **A.**  It's roughly 15 percent.

19   **Q.**  Okay.  Thank you.

20       Mr. Oliver, how do the changes that Apple was required to

21   make by the Court's injunction affect its historic business

22   model?

23   **A.**  Yes.  Historically, as we discussed earlier, we only

24   commissioned the sale of digital goods and services that were

25   sold directly within apps that were distributed through the

OLIVER - CROSS / RICHMAN

1   App Store.

2       For all other digital goods and services sold outside the

3   App Store, there was no commission.  And the basic principle

4   there was that if we provided a user to a developer, that we

5   were commissioned on those users that purchased within --

6   within the app, and where the developer was able to guide a

7   user outside of the store to a sale of the digital goods or

8   service, they were welcome to use that within their own app.

9   **Q.**   When transactions that may be facilitated through the link

10   entitlement, were those transactions that Apple previously

11   monetized?

12   **A.**   They were, yes.

13   **Q.**   Okay.  Did Apple, in crafting its injunction compliance

14   plan, consider charging no commission on linked transactions?

15   **A.**   We did, yes.

16   **Q.**   And why did Apple decide to charge a commission on linked

17   transactions?

18   **A.**   We determined that we -- the value of the services that we

19   provide, independent of payments and commerce, were

20   substantive and ongoing for developers.  And we felt like it

21   was a reasonable approach to provide a commission on

22   linked-out transactions as long as that -- those linked-out

23   transactions ended -- the commission ended at a certain period

24   of time.

25   **Q.**   And what was your understanding as to whether the Court's

OLIVER - CROSS / RICHMAN

1    injunction allowed Apple to charge a commission for the

2    services it provides to developers?

3    **A.**   It was our understanding that we -- the Court found that

4    we would be able to charge a fee for our tools, technologies

5    and intellectual property even if we weren't offering in-app

6    purchase.

7    **Q.**   Did you understand that in its post trial order, the Court

8    found that even in the absence of IAP, Apple could still

9    charge a commission on developers?

10   **A.**   Yes.

11   **Q.**   And did that understanding inform your recommendation --

12          **THE COURT:**   Well, I don't recall seeing any slide so

13   far that identifies the value to a single developer.

14          **THE WITNESS:**   The value to a single developer of...?

15          **THE COURT:**   Of whatever it is the value is.

16          **THE WITNESS:**   So that --

17          **THE COURT:**   Your model has one group of developers

18   subsidizing everyone else.  Right?  Because you don't charge

19   many developers anything other than the application fee or the

20   developer fee.

21          **THE WITNESS:**   That's correct.

22          **THE COURT:**   So is there any -- there was no analysis

23   done about the value given to an independent developer, right?

24          **THE WITNESS:**   I would point to the Analysis Group's

25   report where they looked at the different --

OLIVER - CROSS / RICHMAN

```
 1              THE COURT:  For an individual developer?

 2              THE WITNESS:  Well --

 3              THE COURT:  Not for all developers.  For an

 4     individual developer.

 5              THE WITNESS:  We were trying to represent what

 6     individual developers received from that value analysis.

 7              THE COURT:  What page?

 8              THE WITNESS:  If you go to Slide 6 of the Analysis

 9     Group report, that looks at the different components of value

10     in terms of distribution discovery.

11         I'm also happy to provide more clarity as to what those

12     buckets represent.

13              THE COURT:  I don't see any numbers on that slide.

14              THE WITNESS:  14.7?

15              THE COURT:  I don't see any reference to IP or

16     anything.

17              THE WITNESS:  Platform technology developer tools and

18     services distribution --

19              THE COURT:  The 30 percent number came out of thin

20     air.  That was the testimony from the -- from Apple.  So that

21     number is meaningless.

22              THE WITNESS:  Okay.

23              THE COURT:  You read -- you read that, right?  That's

24     what people testified to from Apple.

25              THE WITNESS:  Yes, I read that.
```

1          **THE COURT:**  So where is the analysis?

2          **THE WITNESS:**  So the ranges that are shown below the

3    30 percent number represent the Analysis Group's understanding

4    of what it would cost to go out and acquire comparable

5    services across discovery, distribution, and other tools and

6    services, and then looked at that across both large and small

7    developers and game and nongame developers to try to

8    understand what was the value of the services that Apple

9    provides.

10         **THE COURT:**  Where is the value of the IP?

11         **THE WITNESS:**  The way that IP is charged for -- and

12   I'm not -- not an intellectual property expert -- is through a

13   variety of different models, business models.  And that could

14   include SaaS models that charge for a per-seat model as many

15   developer tools do.  It could be a commission model as many

16   kind of marketplaces or payments in commerce service providers

17   use.

18       But it could also be on a per -- per-user model as -- or

19   per-call model as certain API libraries use.

20         **THE COURT:**  Go ahead.

21   **BY MS. RICHMAN:**

22   **Q.**  Well, why don't we step back and talk about the process

23   that Apple went through with respect to setting a commission

24   on linked transactions.

25       You were part of that process, correct?

1  **A.**   I was, yes.

2  **Q.**   And you -- I think you mentioned earlier, but who did you

3  work with on that process?

4          **THE COURT:**  He's already said.  Let's move on.  We

5  have 15 minutes today.  That's it.

6          **MS. RICHMAN:**  Thank you, Your Honor.

7  **Q.**   Mr. Oliver, can you explain why Apple decided to engage

8  Analysis Group as an outside consultant here?

9  **A.**   Yes.  It was clear that we needed to do more work to

10  justify the fees that we were charging, and so we wanted to

11  make sure that we had additional perspectives on different

12  ways to approach the pricing of the commission for linkout.

13  **Q.**   And I think you said this, but just to be clear, are you

14  aware that in its post trial order the Court found that Apple

15  had not adequately justified its 30 percent rate?

16  **A.**   Yes, I am.

17  **Q.**   And did that inform your decision to retain AG?

18  **A.**   It did, yes.

19  **Q.**   And there was extensive discussion of your prior work with

20  AG.  Do you remember that?

21  **A.**   I do.

22  **Q.**   Why did you choose to retain Analysis Group for this

23  project specifically?

24  **A.**   Yes.  Analysis Group had specific expertise in terms of

25  their understanding of the app ecosystem, as well as the

 1    specific components of value that Apple provided to

 2    developers, based on their prior work.  And so we felt like

 3    they were in the best position to go deeper in some of those

 4    areas for this analysis.

 5    **Q.**  Okay.  Mr. Oliver, I'm going to hand up a binder of

 6    documents -- oh, you have it already.  I think it's the

 7    smaller version.  It has the same documents as Mr. Even's but

 8    it's a little bit more manageable because it's not as

 9    voluminous.

10        Okay.  We're going to talk about the documents at tab 1

11    and 2.

12        I believe the report at tab 1 has already been entered

13    into evidence and that you spoke to Mr. Even about that.

14        Could you just turn to tab 2 for a moment?

15    **A.**  Yes.

16    **Q.**  And do you recognize this document?

17    **A.**  I do, yes.

18    **Q.**  And what is this document?

19    **A.**  This document is the short form of the report provided by

20    Analysis Group.

21            **MS. RICHMAN:**  And, Your Honor, I'm not sure that this

22    one has been entered into evidence so I would offer it.  It's

23    CX-0015.1.

24            **THE COURT:**  It's admitted.

25        (Defense Exhibit CX-0015.1 received in evidence.)

1    **BY MS. RICHMAN:**

2    **Q.**  Okay.  Let's look at Slide 2 of the long deck which you

3    spoke to Mr. Even about.

4    **A.**  Yes.

5    **Q.**  And can you summarize what the key question was that you

6    asked AG to explore here?

7                       (Exhibit published.)

8            **THE WITNESS:**  Yeah, the key question was how can

9    Apple fairly charge for the value that it provides to

10   developers through a -- while implementing a linkout to allow

11   them to purchase from the web.

12   **BY MS. RICHMAN:**

13   **Q.**  Okay.  And I'm going to just walk through the goals so you

14   can provide explanation to the Court as to why you set these

15   three goals.

16       So, number one, if you can just read that aloud.

17   **A.**  Yes.  The first goal was to estimate the value of services

18   provided by the Apple ecosystem to developers, focusing on

19   digital goods and services.

20   **Q.**  And why did you ask AG to do that?

21   **A.**  Again we wanted to take a more robust approach to

22   justifying the rate that we were going to charge for linking

23   out.  And so we decided that we wanted to take both a

24   bottoms-up approach that looked at the subcomponents of value

25   as well as taking another look at the comparisons that other

OLIVER - CROSS / RICHMAN

1    marketplaces would demonstrate.

2    **Q.**   And what about the -- the second goal?

3    **A.**   The second is to compare Apple's commission with those of

4    other app marketplaces and digital marketplaces.  Sorry.  App

5    stores and digital marketplaces.

6    **Q.**   And why did you ask AG to examine on that issue?

7    **A.**   While this is work that they had done previously, we

8    wanted to make sure that we had all the latest relevant

9    information from the market.

10   **Q.**   And then the third goal, the economic framework, can you

11   explain what that was intended to do?

12   **A.**   Yes.  Again, I mentioned that there was a novel element to

13   this in terms of basically driving users from within an app to

14   outside of an app for the purposes of making up a transaction.

15   And so we wanted to understand if other markets or other

16   parties had dealt with similar problems.

17   **Q.**   Okay.  Thank you.

18       Let's go ahead and walk through the -- the short deck that

19   Analysis Group prepared.  So could you please turn to tab 2.

20   **A.**   Yes.

21   **Q.**   And if you go to Slide 1.

22                        (Exhibit published.)

23   **BY MS. RICHMAN:**

24   **Q.**   What does this slide show?

25   **A.**   Slide 1 shows a summary of the valuation for the different

1    subcomponent buckets that Analysis Group defined.

2    **Q.**   And what are those buckets?

3    **A.**   Platform technology, developer tools and services,

4    distribution, discovery, care and support.

5    **Q.**   And are -- these are the value buckets that you asked AG

6    to analyze?

7    **A.**   Yes.  We worked with them to define the specific buckets,

8    but they had already done prior work here that helped to

9    articulate these buckets.

10   **Q.**   And I think you tried to explain this earlier, but

11   could -- is there some degree of overlap among these buckets?

12   **A.**   Yes.

13   **Q.**   And can you elaborate on that?

14   **A.**   So some of these buckets and the business models

15   associated with them end up crossing over into buckets.  For

16   example, most providers of platform technology also provide

17   tools and services to allow developers or other parties to

18   interoperate with that platform technology.  So oftentimes the

19   AG team found that there was overlap in the way that -- that

20   those service providers charged.

21   **Q.**   Did Analysis Group reach any conclusions about the cost to

22   developers of substituting these services that are provided by

23   Apple?

24   **A.**   They did, yes.

25   **Q.**   And what were their findings, broadly speaking?

OLIVER - CROSS / RICHMAN

1   **A.**   Broadly speaking they found that the reasonable cost of

2   replacing these or paying for them from other service

3   providers was between 3 percent -- or actually .3 percent and

4   25 percent, depending on the bucket.

5   **Q.**   And do you have an understanding as to why these findings

6   are reported as ranges?

7   **A.**   Yes.  So the methodology that the Analysis Group team used

8   converted a variety of other business models into a comparable

9   fee per developer revenue.  And so that allowed -- or

10   percentage of developer revenue -- to allow us to more easily

11   compare the fees to the commission that we charge

12   traditionally for sales of in-app goods and purchases -- or

13   digital goods and purchases.

14       And so they -- using that methodology, they looked at

15   different cohorts of developers including small and large

16   developers and game and nongame developers, which led to the

17   ranges that you see here.

18   **Q.**   Do these ranges reflect costs to individual developers?

19   **A.**   This is a cost that a developer would assume based on

20   their revenue.

21   **Q.**   Okay.  Are there any -- well, you spoke about this

22   earlier.  You did not ask Analysis Group to evaluate the value

23   of IAP and the commerce stack, correct?

24   **A.**   We did not.

25   **Q.**   And why was that?

1    **A.**   That was because we knew that as part of this linkout

2    transaction that was occurring, we would not be providing

3    payment and commerce services for those sales.

4    **Q.**   And did you -- do you have any understanding as to what

5    developers would have to pay to replace the commerce services

6    that Apple provides to developers through IAP?

7    **A.**   Yes, we do.

8    **Q.**   And where does that information come from?

9    **A.**   A variety of different data points.  I talked earlier

10   about one datapoint available to us which was provided as part

11   of this report where AG found that the reasonable range of

12   offer or using a service provider as payment options was

13   between one and four percent.  But we also looked at other

14   analysis and data points that had been gathered in other

15   instances.

16   **Q.**   And you did not estimate -- ask AG to estimate the cost of

17   value for care and support; is that correct?

18   **A.**   That's correct.

19   **Q.**   And why was that?

20   **A.**   Well, actually AG determined that it was too hard to

21   independently quantify the value of care and support.  And

22   they instead suggested that we consider that as part of the

23   elements that would guide us within a range of the other

24   buckets.

25   **Q.**   Okay.  Why don't we walk through each of the value buckets

 1    that AG did identify and attempt to value.

 2        The first one is platform technology.  Do you see that

 3    on -- on Slide 2?

 4                        (Exhibit published.)

 5             THE WITNESS:  I do, yes.

 6    BY MS. RICHMAN:

 7    Q.  Can -- can you explain to the Court what AG means by

 8    platform technology here?

 9    A.  Sure.  So AG's definition of platform technology is common

10    technology infrastructure that both consumers and merchants,

11    in this case, developers, can use to expand the capabilities

12    that developers can offer, and that in certain cases actually

13    create specific demand for the goods and services being sold

14    by those merchants or developers.

15    Q.  Do you have a understanding as to why AG focused on these

16    three examples of platform technology on -- on Slide 2?

17    A.  Yes.  We wanted them to take as broad a view of market

18    comparables as possible, again in -- with the goal of

19    providing as much justification about how our fee that we were

20    approaching would be considered reasonable.

21    Q.  And does -- is this an exhaustive list of all the possible

22    benchmarks for platform technology?

23    A.  These were three that they found and were able to

24    specifically value.  They note a couple of other examples

25    including cloud services that they were not able to

1    independently value in this way.

2    **Q.**   And Mr. Even asked you about operating systems, macOS,

3    Microsoft.  Did you consider those as potential benchmarks for

4    valuing platform technology?

5    **A.**   Those were considered, but they were largely captured in

6    other areas of the report.

7    **Q.**   Okay.  What does AG conclude about the value of platform

8    technology on this slide?

9    **A.**   They conclude that there is a significant value in

10   platform technology though it often overlaps with the business

11   models of the other value buckets and that that can range

12   anywhere from .3 percent to 6 percent of -- for platform

13   technology with no demand generation, in between 5 and

14   20 percent for those with demand generation.

15   **Q.**   What do you mean by no demand generation and demand

16   generation?

17   **A.**   Sure.  So one key element from AG's work was clarifying

18   that they believe there was different value if the common

19   infrastructure served to bring in customers for merchants.

20       So part of the reason, a key reason why developers began

21   purchasing iPhone were the capabilities that were completely

22   independent of the App Store and third-party developers.  In

23   fact, those didn't exist when we launched the iPhone.

24       It was things like the camera and access to Safari and

25   other first-party technologies that drove initial demand for

OLIVER - CROSS / RICHMAN

```
 1   the iPhone.  And so they wanted to acknowledge that there was

 2   value associated with that demand generation.

 3   Q.   Is there a relationship between the estimated value to

 4   developers of platform technology and whether or not the

 5   platform generates demand or not?

 6   A.   Yeah.  Based on AG's findings, they saw an increase in the

 7   amount paid by developers for platform technology where there

 8   was demand generation.

 9   Q.   Now, I think you said that the -- the range here was

10   between .3 and 20 percent; is that correct?

11   A.   That's correct, yes.

12   Q.   The first -- the first row, game consoles, includes a

13   percentage of revenues of 30 percent; is that right?

14   A.   That's correct, yes.

15   Q.   And why did you not include that in the range you

16   provided?

17   A.   Well, as I referenced earlier, that 30 percent is unique

18   in that it is something that cuts across every other value

19   bucket.  And so just in terms of refining the range relative

20   to just the elements of platform technology, I left it out.

21   Q.   That range, .3 to 20 percent, it's a very broad range.

22   How -- what is that informative of, if anything?

23   A.   It's informative of the fact that there is a variety of

24   different ways that platform technology providers can approach

25   the services that they offer, and there's a big disparity in
```

1    that -- in that potential value to developers.

2    **Q.**   And how did you use that range to gauge the value of the

3    platform technology that Apple provides to developers?

4    **A.**   This is just one of multiple data points -- data points

5    that we considered when trying to evaluate a reasonable

6    commission rate for the linkout entitlement.

7    **Q.**   Okay.  Could you please turn to the next slide, Slide 3.

8                        (Exhibit published.)

9              **THE WITNESS:**  Yes.

10   **BY MS. RICHMAN:**

11   **Q.**   Which is 15.4.

12             **THE COURT:**  Can you give me an example of a developer

13   for whom the .3 applies versus 20?

14             **THE WITNESS:**  So -- so the .3 example is from Shopify

15   and Adobe Commerce, and so those are examples where there was

16   no demand generation.  So there is a variety of tools and

17   technologies provided to developers as part of this platform

18   technology.  In this case, those are e-commerce capabilities

19   that allow them to build and operate specific e-commerce

20   stores.

21        However, they are not actually bringing in customers to

22   those websites.  That's not part of what a developer is paying

23   for when they're paying for Shopify or Adobe Commerce.  So

24   they will independently pay for that demand generation from

25   other -- from other sources.

 1          **THE COURT:**  20 percent?

 2          **THE WITNESS:**  So 20 percent in this case comes from

 3     physical retail environments where actually the creation of a

 4     high-end mall, for example, with a number of attractions like

 5     a movie theater and -- and, you know, and nice facilities,

 6     actually attracts users to that shared environment as a

 7     meeting place and as a place to -- to buy goods.  And that

 8     attracts, that makes it more compelling for merchants to be a

 9     part of that environment because there's demand generation

10     that the foot traffic provides.

11          **THE COURT:**  So why not treat them differently?

12          **THE WITNESS:**  Why not treat what differently?

13          **THE COURT:**  Well, you don't charge a different

14     commission.

15          **THE WITNESS:**  So the comparison for us with the

16     platform technology provided by Apple would be the iPhone and

17     the operating system.

18        As I discussed previously, we -- we believe and the

19     evidence is that customers come to Apple's phone and

20     technology because of a variety of the offerings that we

21     provide in addition to the value that third parties provide

22     that are distributed through the store.

23        And so we would -- we believe that there is demand

24     generation as part of the offering that Apple provides to

25     users.  So that would put us at a higher end of this range.

1          **THE COURT:**  Proceed.

2          **MS. RICHMAN:**  Thank you.

3   **Q.**  Mr. Oliver, just one quick question back on platform

4   technology.  Did you agree with AG that shopping malls and

5   airports were relevant benchmarks?

6   **A.**  Again, we asked them to take a very wide view of potential

7   benchmarks, recognizing that some of these were further afield

8   to kind of Apple's core offering.

9   **Q.**  Okay.  Thank you.

10         Can we please turn to the next slide.

11         Unless, Your Honor, we're at time.  I don't know if --

12         **THE COURT:**  If you're going to shift, I think we

13  probably should.  All right.

14         We'll stand in recess until 1:00 o'clock tomorrow.  I've

15  got my MDL in the morning and I'll deal with you all in the

16  afternoon.

17         **MS. RICHMAN:**  Your Honor, may I make one request?

18  Mr. Oliver, of course, is admonished not to talk to counsel

19  while he's under oath.  May we speak with him about

20  identifying the folders that you asked us to produce so that

21  we can expeditiously provide them to Epic and to Your Honor?

22         **THE COURT:**  You may.  Thank you for asking.

23         **MS. RICHMAN:**  Thank you.

24         **THE COURT:**  All right.  We'll see you tomorrow.

25         **THE CLERK:**  Court is in recess.

1          (Proceedings were concluded at 1:30 P.M.)

2                              --o0o--

3

4

5                    **CERTIFICATE OF REPORTER**

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8     I further certify that I am neither counsel for, related to,

9     nor employed by any of the parties to the action in which this

10    hearing was taken, and further that I am not financially nor

11    otherwise interested in the outcome of the action.

12

13    _____

14         Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

15                    Thursday, May 16, 2024

16

17

18

19

20

21

22

23

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**