UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 4** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 562 - 710 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, May 17, 2024 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                 BY:  GARY A. BORNSTEIN,
                      M. BRENT BYARS,
                      YONATAN EVEN,
                      LAUREN A. MOSKOWITZ,
                      BENJAMIN WYLLY,
                      MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:       Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

| | |
|---|---|
| 1 | **A P P E A R A N C E S (CONT'D.)** |
| 2 | |
| 3 | For Defendant:          Weil, Gotshal & Manges LLP |
| | 2001 M Street NW, Suite 600 |
| 4 | Washington, D.C.  20036 |
| | BY:  MARK A. PERRY, |
| 5 | JOSHUA M. WESNESKI, ATTORNEYS AT LAW |
| 6 | Weil Gotshal & Manges LLP |
| | 1395 Brickell Avenue, Suite 1200 |
| 7 | Miami, Florida  33131 |
| | BY:  MARK PINKERT, ATTORNEY AT LAW |
| 8 | |
| 9 | Gibson, Dunn & Crutcher LLP |
| | 333 South Grand Avenue |
| 10 | Los Angeles, California  90071 |
| | BY:  RICHARD J. DOREN, |
| 11 | JASON C. LO, ATTORNEYS AT LAW |
| 12 | |
| 13 | Gibson, Dunn & Crutcher LLP |
| | 1050 Connecticut Avenue, N.W. |
| 14 | Washington, DC  20036-5306 |
| | BY:  HARRY PHILLIPS, |
| 15 | CYNTHIA E. RICHMAN, ATTORNEY AT LAW |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | --o0o-- |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1                          I N D E X

 2


 3


 4     FRIDAY, MAY 17, 2024 - VOLUME 4

 5
       PLAINTIFF'S WITNESSES                    PAGE    VOL.
 6

 7     OLIVER, CARSON

 8     CROSS-EXAMINATION (CONTINUED) BY MS. RICHMAN  571     4

 9     REDIRECT EXAMINATION BY MR. EVEN        625     4

10     RECROSS-EXAMINATION BY MS. RICHMAN      659     4

11

12     SCHILLER, PHILIP

13     (SWORN)                                 670     4

14     DIRECT EXAMINATION BY MR. BORNSTEIN     670     4

15

16

17                        E X H I B I T S

18
       PLAINTIFF'S EXHIBITS    W/DRAWN    IDEN    EVID    VOL.
19

20     CX-54                                   636     4

21

22

23                         --o0o--

24

25
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1    Friday, May 17, 2024                           12:59 p.m.
 2                    P R O C E E D I N G S
 3                          --o0o--
 4
 5        THE CLERK:  Good afternoon, everyone.  These
 6    proceedings are being court-reported by this court.  Any other
 7    recording of this proceeding either by video, audio, including
 8    screenshots or other copying of the hearing, is strictly
 9    prohibited.
10        Your Honor, now calling the civil matter 20-CV-5640-YGR,
11    Epic Games Inc. vs. Apple, Inc.
12        Will the parties please state your appearances for the
13    record, starting with the plaintiff.
14        MR. BORNSTEIN:  Good afternoon, Your Honor.  Gary
15    Bornstein for Epic.  And I'm joined by the usual contingent,
16    Ms. Moskowitz, Mr. Zaken, Mr. Wiley, and Mr. Even.
17        THE COURT:  Okay.  Good afternoon to the crew of you.
18        Mr. Perry, good afternoon.
19        MR. PERRY:  Good afternoon, Your Honor.  Mark Perry
20    for Apple.  I'm joined at counsel table by Cynthia Richman,
21    Richard Doren, Mr. Phil Schiller, Ms. Heather Grenier, and
22    then later today we'll be joined by Jason Lowe and a new
23    person, Jacqueline Sesia, S-E-S-I-A.
24        THE COURT:  Great.  Good afternoon.
25        Okay.  Anything to deal with before we continue?
```

 1          **MR. BORNSTEIN:**  Yes.  Just briefly, Your Honor.

 2     We've been talking about two issues that came up yesterday.

 3     One is the production of the documents that the Court had

 4     ordered, and the other is the findings of fact that the Court

 5     had requested.

 6          **THE COURT:**  Okay.

 7          **MR. BORNSTEIN:**  With respect to the documents, Apple

 8     has advised us that they aim to produce the documents next

 9     week but have not yet been able to identify when during the

10     week we will get them.  So we may have an issue with respect

11     to recalling or keeping witness testimony open in the event

12     after we get the documents, we determine that it would be

13     efficient or useful to examine witnesses on them.

14          **THE COURT:**  Okay.

15          **MR. BORNSTEIN:**  And then with respect to the findings

16     of fact, the parties have agreed that it would be sensible for

17     us, subject to the Court's approval, to have three weeks

18     following the close of evidence to submit those to the Court.

19     The one wrinkle we have on that is what exactly the close of

20     evidence will be, given what I just said.

21          **THE COURT:**  Well, that's what I wanted to talk about

22     today.

23          **MR. BORNSTEIN:**  Okay.  But we're happy to take Your

24     Honor's guidance on how we can do that.  We're obviously

25     interested in getting this done as efficiently and quickly as

1    possible under the circumstances.

2           THE COURT:  Mr. Perry.

3           MR. PERRY:  We agree with that, Your Honor.

4    Particularly getting it done as quickly and efficiently as

5    possible.  I'm happy to talk about the documents or anything

6    else.  We agree on the briefing schedule, and I think we had

7    in mind simultaneous briefs, Your Honor, one round for the

8    Court, unless the Court has other guidance for us.

9           THE COURT:  I think that that works.  And then if you

10   don't give me something that I want, then I can ask for

11   additional briefing.

12      It may be helpful if you all agree on what the outline or

13   framework would be and then stick to that framework for both

14   sides so that I can compare apples and apples or bananas and

15   bananas, one of the two.  But in any event, it's helpful when

16   I can see things side by side.  So that would be of great use.

17          MR. BORNSTEIN:  We can do that, Your Honor.

18      May I ask one question about that?  Which is does the

19   Court want to receive legal briefing in addition to the

20   factual findings based on the testimony?  We've done the legal

21   briefing in the papers already submitted.  I don't want to be

22   duplicative.  Of course we're happy to do it if it would be

23   useful.

24          THE COURT:  I don't know that that's necessary.  It

25   may be that, you know, we'll have a short -- short oral

```
 1    argument.  But if the framework is all the same, then I don't
 2    need you to repeat that.
 3         MR. BORNSTEIN:  Great.  We'll focus on the facts.
 4    Thank you.
 5         MR. PERRY:  If I could just offer one thing on that,
 6    Your Honor.  We've started --
 7                   (Off-the-record discussion.)
 8         THE COURT:  Just a reminder for everyone.  We went on
 9    the record in the MDL this morning at 8:00 a.m. so please be
10    kind to the court reporter and not rush.
11         MR. PERRY:  Thank you.
12      We will definitely confer and I'm sure we'll come to
13    agreement on the framework.  Some of the framing, if you will,
14    might be guided by the legal standards, just thinking about
15    how it will work here.  So I'm not sure it's going to be
16    completely purely facts, in other words, because there are
17    legal framing issues.
18      But we take the Court's guidance, and we'll work with
19    Mr. Bornstein to come up with a --
20         THE COURT:  Okay.
21         MR. PERRY:  -- bananas-to-bananas comparison.
22         THE COURT:  All right.
23      Okay.  How much time do you think you need?  Have you all
24    talked about that?
25         MR. BORNSTEIN:  For this -- for the papers, Your
```

1    Honor?

2              **THE COURT:**  No, no, no.  For the -- for evidence.

3              **MR. BORNSTEIN:**  We had a brief discussion about it.

4    We have remaining Mr. Oliver, and then there are three other

5    witnesses, Mr. Schiller, of course, from Apple, and two who

6    Epic is calling, a third-party developer, and somebody from

7    Epic.

8         I raised the question with Mr. Perry this morning as to

9    whether we -- we actually need all of those witnesses, which

10   is something that we will discuss.  And to the extent Your

11   Honor has any thoughts or guidance on that, of course it would

12   be welcome.

13        But assuming we are to keep all of those witnesses, my

14   hope would be that we could get done on Wednesday.  But given

15   the pace that we've been going so far, I obviously can't be

16   sure of that.  I can't imagine it would take more than another

17   session with the Court if we needed it.

18             **THE COURT:**  Mr. Perry?

19             **MR. PERRY:**  Your Honor, we -- assuming we call all

20   the witnesses, and we heard that for the first time this

21   morning so we'll certainly discuss, but assuming we have all

22   of them, given the pace we've had so far, it seems unlikely we

23   would finish on Wednesday.  So it seems likely we would need

24   one more session with the Court.

25             **THE COURT:**  Okay.  Why don't you all plan -- I need

```
 1    to do some shuffling, but let's plan on the afternoon of
 2    May 23rd.
 3              MR. BORNSTEIN:  Your Honor, may I raise one issue
 4    about that day?  We are scheduled to appear in the Google case
 5    before Judge Donato for a hearing beginning at 11:00 a.m. on
 6    the 23rd.  I don't know how long he will want us to go.  I
 7    would not raise a scheduling issue were it not that matter and
 8    one of your colleagues, Your Honor.
 9              THE COURT:  I'll send him a note and see if he can
10    somehow accommodate.  I -- I can't -- I can't move it, and I'm
11    out the 24th.  So I guess the alternative would be, and I
12    could do it, is the following week.  So the following week, I
13    could do it on Friday, May 31st, if we don't finish on the
14    22nd.
15              MR. BORNSTEIN:  Okay.  Thank you very much, Your
16    Honor.
17              MR. PERRY:  Thank you, Your Honor.
18              THE COURT:  Okay.  So we'll say we'll put it on for
19    9:00 a.m. on Friday, May 31st, and hopefully that will be the
20    end of it.
21              MR. BORNSTEIN:  And, Your Honor, I -- just as a point
22    of just in casedness [sic], we have a third-party witness.  I
23    will need to just check with Mr. Simon's schedule.  If it
24    turns out that he can't do the 31st, we will work to make sure
25    he goes on the 22nd.
```

OLIVER - CROSS (Continued)/ RICHMAN

1  **THE COURT:**  Okay.  All right.  Let's get started.

2  **MR. PERRY:**  Thank you, Your Honor.

3  **THE COURT:**  Do we have a witness?

4  (Pause in the proceedings.)

5

6  **CARSON OLIVER,**

7  called as a witness by the plaintiff, having been previously

8  duly sworn, testified as follows:

9  **THE COURT:**  Mr. Oliver, good afternoon.

10  **THE WITNESS:**  Good afternoon.

11  **THE COURT:**  I'll remind you, sir, you're still under

12  oath.  Do you understand that?

13  **THE WITNESS:**  I do.  Thank you.

14  **THE COURT:**  All right.  You may proceed, Ms. Richman.

15  **MS. RICHMAN:**  Thank you, Your Honor.

16  **CROSS-EXAMINATION** (Continued)

17  BY MS. RICHMAN:

18  Q.  Good afternoon, Mr. Oliver.

19  A.  Good afternoon.

20  Q.  When we left off yesterday, we were talking about the

21  analysis that AG performed for -- at your direction.  Do you

22  remember that?

23  A.  I do, yes.

24  Q.  And we were talking about the different value buckets that

25  AG identified.  Do you recall?

1    **A.**   I do.

2    **Q.**   We had just talked about the platform technology bucket,

3    and I just want to return to that briefly before we move on.

4         First, would developers who sell digital goods and

5    services through the entitlement link use Apple's platform

6    technology?

7    **A.**   Yes.

8    **Q.**   And how would they do that?

9    **A.**   Developers who sell through the entitlement link would

10   continue to use Apple's platform technology, including the

11   operating system and the hardware technology as part of their

12   delivery of the app and the continued use of the app on those

13   devices.

14   **Q.**   And so is that a one-time service provided by Apple or an

15   ongoing service?

16   **A.**   It's an ongoing service.

17   **Q.**   Okay.  Can you please turn to the short AG deck in your

18   binder that is tab 2, Slide 3.

19                        (Exhibit published.)

20            **THE WITNESS:**  Yes.

21   **BY MS. RICHMAN:**

22   **Q.**   Okay.  What does this slide reflect?

23   **A.**   This slide reflects a summary of the developer tools and

24   services analysis that AG performed.

25   **Q.**   And what are some examples of developer tools and services

1    that Apple provides to developers?

2    **A.**   They provide everything from an integrated development

3    environment and programming languages which help developers to

4    build their apps for Apple's devices.

5        They also provide a variety of frameworks and API's which

6    are used by developers to interoperate with Apple's devices.

7        And then they also provide things like testing and

8    analytics that help developers to optimize the performance of

9    their apps for users.

10   **Q.**   Would developers who implement the link entitlement

11   continue to use Apple's developers' tools and services?

12   **A.**   Yes, they would.

13               **THE COURT:**  Do you have any evidence that the top 200

14   that are generating -- the top 200 developers that are

15   generating the income actually use these tools?

16               **THE WITNESS:**  Yes, we do.

17               **THE COURT:**  Okay.  Where is that data?

18               **THE WITNESS:**  There is some data that is in the long

19   form report that looks at a summary of the use of the tools

20   and technologies.

21               **THE COURT:**  What page?

22               **THE WITNESS:**  Let's see.

23                         (Reviewing document.)

24   **BY MS. RICHMAN:**

25   **Q.**   Is that on page 59, Mr. Oliver, 58 and 59?

1   **A.**   Hold on a second.

2   **Q.**   Slide number 57 and 58, I should say.

3   **A.**   Fifty-seven and 58.

4                    (Exhibit published.)

5             **THE WITNESS:**  Give me one second.

6        I was thinking of Slide 14.

7   **BY MS. RICHMAN:**

8   **Q.**   Okay.

9             **THE COURT:**  So CX-14-14?

10            **THE WITNESS:**  I'm sorry.  CX-14.15.

11       But 14. -- 14 also includes kind of an overview of all the

12  tools that are relevant from Apple and then comparable

13  services.

14       And then what the AG did as part of their analysis was

15  estimate, based on information from experts at Apple, the

16  typical data use of tools and services.

17       So they split it out into three buckets, including basic

18  or common tools.  Those are things like the use of X code

19  which is used to help build apps.  And then also looks at

20  advanced and specialized features likes ARKit and CoreML, and

21  then testing and analytics features including TestFlight and

22  App Analytics.

23  **BY MS. RICHMAN:**

24  **Q.**   And, Mr. Oliver, if you could turn to the backup

25  Slides 57, 58, 59, and 60, are those -- contain additional

1    data related to these -- this issue?

2    **A.**  They do.  They don't look specifically at usage as the --

3    as the Judge asked for, but they look at the different types

4    of tools, the comparable pricing for those tools, and -- and

5    estimates of -- for small and large developers.

6    **Q.**  Thank you.

7         **THE COURT:**  So hold on.  The specialized features

8    that shows 6 to 10 -- only 6 to 10 percent of large developers

9    use those, where -- where do I find the corollary on your

10   pricing issue?

11        **THE WITNESS:**  So this was -- so the way that AG

12   looked at this was they segmented the tool types.  And then

13   what was reflected in the analysis was that there is less

14   usage and lower prices or no prices for some of those advanced

15   tools and services.  But they assumed that --

16        **THE COURT:**  I don't understand that.

17        **THE WITNESS:**  Sure.

18        **THE COURT:**  I'm looking at your document CX-14.15 --

19        **THE WITNESS:**  Yes.

20        **THE COURT:**  -- where you're talking about usage,

21   right?

22        **THE WITNESS:**  Yes.

23        **THE COURT:**  And in this bucket of advanced

24   specialized features were only -- the features that are

25   offered, not basic tools, but these advanced tools from --

1    from Apple --

2              **THE WITNESS:**  Yes.

3              **THE COURT:**  -- for the large developers only using

4    them 6 to 10 percent, is there a corollary to that bucket in

5    your pricing slides at -- in the 50s that is a one-for-one --

6              **THE WITNESS:**  Yes.

7              **THE COURT:**  Okay.  What page?

8              **THE WITNESS:**  So if you go to pages 60 -- 14.60,

9    14.61.

10             **THE COURT:**  Let's look at 14.60.

11             **THE WITNESS:**  So in these cases, this looks -- so

12   14.60 is looking at the cost estimate for game developers and

13   both -- and they look at small developers and large

14   developers.

15             **THE COURT:**  I want to focus on large.

16             **THE WITNESS:**  Okay.  You can see that for frameworks

17   and innovative technologies, on the lower bound, they don't

18   include frameworks.

19             **THE COURT:**  I don't see that.

20             **THE WITNESS:**  So the line item frameworks.

21             **THE COURT:**  I want to make sure we're on the same

22   page.  Okay.  So frameworks.

23             **THE WITNESS:**  Yes.  So there is no -- on the lower

24   bound for large developers, there is no -- there's no use --

25   or no cost for frameworks.  And in the upper bound, there is a

```
 1   cost for frameworks.
 2            THE COURT:  I don't -- okay.  So explain what that
 3   means.
 4            THE WITNESS:  So they used, you know, proxies for
 5   the -- the tools and services provided by Apple to basically
 6   cost out what these different elements might cost a developer.
 7      And so they went into a kind of hypothetical pricing
 8   scenario based on the number of developer seats.  You can see
 9   that above.  Twenty developer seats for a large developer.
10      And they use that to price in what they believed the cost
11   of the use of frameworks would be for a large developer.
12            THE COURT:  Where does the word "frameworks" appear
13   on 14-15?
14            THE WITNESS:  It is represented in the advanced and
15   specialized features.
16            THE COURT:  How do I know that?
17            THE WITNESS:  I -- see.  So some of the -- if you go
18   into the Slide 14.14, the list of frameworks that are provided
19   there CloudKit, MapKit, GameKit, those are also some of the
20   ones listed under advanced and specialized features.
21                    (Exhibit published.)
22            THE COURT:  So it says here on 14-60, "Because of
23   fixed costs, developer tools and service costs may be as much
24   as 18.5 percent of revenues for small developers."  Right?
25            THE WITNESS:  I'm sorry.  What page are we on?
```

1          THE COURT:  I'm still on 14-60.

2          THE WITNESS:  14.16.

3          THE COURT:  Right?

4          THE WITNESS:  14.16?

5          THE COURT:  Six zero.

6          THE WITNESS:  Oh, 60.  Sorry.

7          THE COURT:  Right?

8          THE WITNESS:  Yes.

9          THE COURT:  By that same token, then if I'm

10   understanding this chart, because of this cost, developers

11   tools and services may be as little as 5.7 for large

12   developers, right?

13         THE WITNESS:  Actually 5.1 percent which is the lower

14   bound of that range.  But that -- that's generally correct.

15         THE COURT:  Not 30 percent.

16         THE WITNESS:  No, not 30 percent.

17         THE COURT:  Not 27 percent.

18         THE WITNESS:  Not -- not 27 percent.

19         THE COURT:  Five-point -- between 5.1 and 5.7, right?

20         THE WITNESS:  For just for the developer --

21         THE COURT:  Agree?

22         THE WITNESS:  -- tools and services stack, correct.

23         THE COURT:  Keep going.

24         MS. RICHMAN:  Thank you.

25   Q.  Just a point of clarification, Mr. Oliver.

 1      Are other services included in the 27 percent commission

 2   besides developer tools and services?

 3   **A.**  Yes.

 4   **Q.**  Okay.  Let's talk about the next one, distribution.

 5      Can you go to Slide 4 of your short deck.

 6      Just let me know when you're there.

 7         **THE COURT:**  And by Slide 4, you mean 15.4?

 8         **MS. RICHMAN:**  I'm sorry, Your Honor.  It's 15.5 of

 9   the short deck.

10         **THE COURT:**  Okay.  Let's use that number, please.

11         **MS. RICHMAN:**  Yes.  Yes, Your Honor.

12         **THE WITNESS:**  Give me one second.

13             (Exhibit published.)

14         **THE WITNESS:**  Yes, I'm here.

15   **BY MS. RICHMAN:**

16   **Q.**  Okay.  And what does this slide reflect?

17   **A.**  This slide reflects the Analysis Group's valuation of the

18   distribution capabilities provided by the App Store to

19   developers.

20   **Q.**  What kind of distribution services does Apple provide to

21   developers?

22   **A.**  Apple provides the safe and secure downloading from the

23   App Store onto devices for over a billion devices globally.

24   It also provides seamless updating to those devices for users

25   who continue to get updates as developers update their apps

 1   with new features and technologies.

 2   **Q.**  Did AG identify any benchmarks for these types of

 3   services?

 4   **A.**  Yes, they did.

 5   **Q.**  And what are those?

 6   **A.**  They looked at both distribution technologies that would

 7   provide data transfer and storage.  And they also looked at

 8   hosting technologies.

 9   **Q.**  Mr. Oliver, could you please turn to -- back to the long

10   deck to 14.18.

11          **THE COURT:**  On that slide, 15.5, you say large

12   developers are assumed to have over $1 million in annual

13   revenues or over 1 million downloads.  Where does the download

14   number come from?

15          **THE WITNESS:**  The download data is provided by Apple.

16          **THE COURT:**  Where is that in the materials?

17          **THE WITNESS:**  It's incorporated into the segmentation

18   that Analysis Group uses to come up with the developer cohorts

19   they use for calculations.

20          **THE COURT:**  Where is that?  What page?

21          **THE WITNESS:**  I think we'd need to go into the

22   appendix of the long deck to show that.

23      So if you go to Slide 14.18.  So this looks at a breakdown

24   between small developers and large developers and looks at an

25   average number of downloads, redownloads, and updates per

1    developer based on data provided by Apple.

2    **BY MS. RICHMAN:**

3    **Q.**  Mr. Oliver, what is the weekly -- the number of weekly app

4    updates that Apple distributes on behalf of developers?

5    **A.**  It's 41 billion.

6         **THE COURT:**  Okay.  But how much of that is paying

7    apps, that is, the developers that are at issue that are being

8    charged the 27 percent?  Not all of them.  The ones who are

9    actually paying money.  So let's -- let's focus on games, you

10   can do non-games, too.

11        But --

12        **THE WITNESS:**  So I -- I don't have that number.

13        **THE COURT:**  Did you look at that number?

14        **THE WITNESS:**  We looked at an average for large and

15   small developers which incorporates that.

16        **THE COURT:**  You understand there's a difference

17   between developers who pay nothing other than the -- the kit

18   and developers who were paying for purchases on the device?

19        **THE WITNESS:**  I do, yes.

20        **THE COURT:**  Okay.  So do -- do any of these slides

21   break that information down for me?

22        **THE WITNESS:**  It looks at averages.  And the averages

23   would be applied to those -- that developer.  And our

24   assumptions are that those developers have the same

25   distribution in terms of downloads, redownloads, and updates

OLIVER - CROSS (Continued)/ RICHMAN

1    as developers who are selling digital goods and services as

2    those who do not sell digital goods and services.

3              **THE COURT:**  What is that assumption based on?

4              **THE WITNESS:**  It's based on our knowledge of the

5    ecosystem.

6              **THE COURT:**  So the answer to my question is no,

7    there's no slide that gives me that information.

8              **THE WITNESS:**  Not specifically.

9              **THE COURT:**  Keep going.

10             **MS. RICHMAN:**  Thank you, Your Honor.

11   **Q.**  Mr. Oliver, can you explain what's encompassed in Apple's

12   discovery services?

13   **A.**  Yes.  Discovery services incorporate a number of different

14   things.  They incorporate --

15             **THE COURT:**  Which slide are we on?

16             **MS. RICHMAN:**  Can we turn to Slide 15.6, please.

17                        (Exhibit published.)

18             **THE WITNESS:**  Yes, so they incorporate the app page

19   or product page which is effectively the home page of an app

20   on the App Store, and all the associated services like ratings

21   and reviews that are available to customers on that product

22   page.

23        There is also the curation and personalization that Apple

24   provides through the App Store largely through its browse tabs

25   including the today tabs, apps tab, and games tab.  In

1    addition to that, includes the optimization and measurement

2    tools that are provided to developers to help them optimize

3    their discovery.

4        And then even beyond the App Store, there are additional

5    discovery tools provided in the OS, things like Spotlight

6    search.

7            **THE COURT:**  Do you understand there was substantial

8    amount of testimony that said that Apple -- that indicated --

9    suggested that Apple because, of the lack of competition, was

10   favoring its own apps over those of third parties?

11           **THE WITNESS:**  I'm aware of that.

12           **THE COURT:**  So how is that helpful at all to these

13   other apps, to these other developers?

14           **THE WITNESS:**  The evidence that we have is that there

15   is a significant amount of discovery value that is provided to

16   third parties.

17           **THE COURT:**  What evidence and where is it?

18           **THE WITNESS:**  So if we want to go into the appendix

19   for discovery, I think that would help to -- on the long deck.

20           **THE COURT:**  Since the trial, what steps has Apple

21   taken to increase discovery of third-party apps over their own

22   given the problems that were disclosed?

23           **THE WITNESS:**  We have made a number of different

24   investments for discovery on the App Store since the trial.

25       A -- a few to call out, we've continued to improve our

1    search results by updating the algorithm with more signals to

2    make it more efficient in terms of helping users to discover

3    the apps and games that they want.

4        We've continued to update the browse tabs of the App Store

5    with additional personalization.  And we've continued to

6    provide more tools for developers like custom product pages

7    and product page optimization which allows them to better

8    understand and optimize their browse and discovery performance

9    on the App Store.

10            THE COURT:  But because you've not done any survey of

11   any of the developers, there's no evidence then it's been

12   successful in any way.

13            THE WITNESS:  We have quantitative evidence that

14   those -- all the things that I just listed have continued to

15   improve the browse performance on the store in terms of

16   driving better conversion for developers when customers find

17   their apps on the store and then also continue to drive more

18   overall actions and downloads from the store.

19            THE COURT:  And where is that evidence?

20            THE WITNESS:  It's not in this binder.

21            THE COURT:  Yeah.  Okay.

22   BY MS. RICHMAN:

23   Q.   Mr. Oliver, would developers who implement the link

24   entitlement to make transactions continue to benefit from

25   Apple's discovery services?

1    **A.**   Yes, they would.

2    **Q.**   How -- how would they do so?

3    **A.**   We actually see that the majority of actions that are

4    taken on the App Store are not for initial downloads.  They're

5    actually for ongoing reengagement and engagement with apps

6    that a user may have downloaded previously but uninstalled or

7    actions that allow them to open up and rediscover content or

8    features that are in apps that they already have on their

9    device.

10   **Q.**   Do large developers who are well-known benefit from

11   Apple's discovery services?

12   **A.**   Yes, they do.

13   **Q.**   And how?

14   **A.**   They are provided with the features and functionality that

15   I just talked about, including a significant amount of

16   exposure to customers through the browse tabs, which benefits

17   from both personalization as well as the developer tools and

18   services that help to optimize that discovery.

19   **Q.**   Okay.  Switch gears a bit.

20        Could you please turn to Slide 15.7.  That's tab 2.

21   **A.**   Yes.

22   **Q.**   Did you ask AG to undertake benchmarking analysis of

23   comparable market places?

24   **A.**   We did, yes.

25   **Q.**   And why did you ask them to do that in addition to the

1    valuation analysis?

2    **A.**  We wanted to take multiple approaches to understanding the

3    value provided to developers.  So the first section really

4    looks at a bottoms-up approach by valuing each subcomponent of

5    value that Apple provides.

6        And this approach helped us to triangulate with what other

7    marketplaces, and obviously there are some that are closer

8    comparables like Google Play, but also for those that are

9    further afield like other digital marketplaces.

10   **Q.**  And do you recall that Mr. Even asked you why you didn't

11   use effective commission rates in conducting the benchmarking

12   exercise?

13   **A.**  I do, yes.

14   **Q.**  Are effective commission rates of your competitors

15   something that's publicly available?

16   **A.**  No.

17   **Q.**  Okay.

18       Let's --

19           **THE COURT:**  -- important and relevant?

20           **THE WITNESS:**  Yes.

21           **MS. RICHMAN:**  If we could go to or -- go to -- stick

22   with 15.7 for a minute.

23                   (Exhibit published.)

24   **BY MS. RICHMAN:**

25   **Q.**  And if you look at the third main bullet on the slide, so,

1    like, at the bottom.

2    **A.**   Yes.

3    **Q.**   Starts with "Some platforms."  Do you see that?

4    **A.**   I do.

5    **Q.**   And what is being conveyed there?

6    **A.**   One of the things that we asked the Analysis Group to look

7    into is to whether any of these other marketplaces had allowed

8    for developers to use their own payments and commerce services

9    versus their own.  And we found a few examples -- or Analysis

10   Group found a few examples.  And they estimated the value of

11   those options based on a share of customer -- of developer

12   revenue.

13   **Q.**   And can you please flip to 15.10, CX-15.10.

14   **A.**   Yes.

15   **Q.**   And what does this slide show?

16   **A.**   This slide shows five examples that Analysis Group found

17   that offer both their own payment processing and commerce

18   services to merchants as well as those that offer a direct

19   option.

20   **Q.**   And why was this information relevant to the work that you

21   asked AG to perform?

22   **A.**   It was relevant as a data point in understanding for

23   developers that would use a linkout with the entitlement, what

24   the market rate for those similar services would be,

25   independent of payment processing and commerce.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

OLIVER - CROSS (Continued) / RICHMAN

1    **Q.**   And do you remember when Mr. Even asked you why services

2    like Stripe and PayPal were omitted from this slide?

3    **A.**   Yes.

4    **Q.**   And what's the reason for that?

5    **A.**   The reason is because we were looking at examples of

6    marketplaces that offer this option and what the pricing they

7    used around that option was.

8    **Q.**   Okay.  And what did AG find about the fee structures of

9    these platforms?

10   **A.**   Sorry.  Are we talking about the --

11   **Q.**   I'm sorry.  Going back to the -- on Slide 15.10.

12   **A.**   They found that the fee structures were between one and

13   four percent of developer revenue.

14   **Q.**   Okay.  Let's go to 15.11, next slide.

15   **A.**   Yes.

16                      (Exhibit published.)

17   **BY MS. RICHMAN:**

18   **Q.**   Does this slide address the third goal of AG's study that

19   we discussed yesterday, the economic framework for entitlement

20   transactions?

21   **A.**   It does, yes.

22   **Q.**   And do you see the first bullet there, how to charge a

23   commission or fee for a purchase that happens after the user

24   clicks out of the app?

25   **A.**   I do.

1   **Q.**   How does that relate to AG's analysis here?

2   **A.**   What we asked AG to look into was how other comparable

3   industries and groups had solved for a similar -- a problem

4   that we were looking to solve for with a linkout entitlement,

5   which was to provide a reasonable way to associate a link from

6   one source to a reasonable fee structure associated with that

7   referral.

8   **Q.**   Did AG identify any benchmarks for out-of-app

9   transactions?

10   **A.**   They did, yes.

11   **Q.**   And what are those?

12   **A.**   They found affiliate programs and ad campaigns run by

13   developers use -- were useful comparables.

14   **Q.**   Can you please explain what an affiliate program is?

15   **A.**   Sure.  An affiliate program is a program that a service

16   provider or marketplace would use to encourage marketing

17   partners, often called affiliate partners, to bring traffic or

18   purchases back to those service providers.

19   **Q.**   And why was that a relevant benchmark for Apple's

20   entitlement program?

21   **A.**   Because affiliate programs were also dealing with the fact

22   that they had to find a reasonable way to compensate their

23   marketing partners for driving discovery of the services back

24   to the service provider.

25   **Q.**   Could you provide the Court with an example of an

 1  affiliate program?

 2  **A.**  Sure.  One example might be a newspaper service that sells

 3  a subscription for a physical and digital newspaper.  They

 4  might allow blogs or other affiliate partners to basically

 5  link to a subscription page for that -- for that newspaper.

 6  And then any purchase that happens within a period of time

 7  from that affiliate partner would be -- would be paid back --

 8  there would be a fee paid back to the affiliate partner.

 9  **Q.**  If you look down to the third bullet, tracking windows is

10  bolded.  Do you see that?

11  **A.**  I do, yes.

12  **Q.**  It says tracking windows or cookie durations determine the

13  time period within which affiliates can earn a commission.

14  Correct?  Do you see that?

15  **A.**  I do, yes.

16  **Q.**  And can you explain what a tracking window is in this

17  context?

18  **A.**  Sure.  So a tracking window is the period of time from the

19  moment a user clicks on an affiliate link that a -- any

20  subsequent purchase would be paid a fee to the affiliate

21  partner.

22  **Q.**  And why do affiliate programs have a tracking window?

23  **A.**  Because the affiliate partner needs to know when the

24  action or discovery that they provided to a customer can be

25  tied back to that service that they provided.

1    **Q.**   The second benchmark you mentioned was developer ad

2    campaigns; is that right?

3    **A.**   That's correct.

4    **Q.**   And what are those?

5    **A.**   An ad campaign is most commonly when a developer pays for

6    an ad and an install occurs based on that ad.

7    **Q.**   And do ad campaigns also rely on tracking windows?

8    **A.**   They do, yes.

9    **Q.**   Okay.

10       Let's look at the next slide, CX-15.12.

11                      (Exhibit published.)

12           **THE WITNESS:**  Yes.

13   BY MS. RICHMAN:

14   **Q.**   Are you there?

15   **A.**   Yes.

16   **Q.**   What does this slide show?

17   **A.**   This slide shows comparables that Analysis Group found of

18   first-party affiliate programs.

19   **Q.**   And what's a first-party affiliate program?

20   **A.**   A first-party affiliate program is when the service

21   provider themselves are operating an affiliate program, so

22   like the newspaper that we talked about earlier.

23   **Q.**   And what did AG find about the tracking window for

24   first-party affiliate programs?

25   **A.**   They found that the tracking window for first-party

1    affiliate programs was between 14 and 90 days.

2    Q.  And can you please look at CX-15.13.

3         THE COURT:  And does the tracking window just track?

4    That is, do any of these windows also mean that they are

5    charging commissions in the window the same way that Apple's

6    trying to?  Or does it just mean that they're tracking data?

7         THE WITNESS:  It's actually -- so you can see on the

8    right-hand side that the --

9         THE COURT:  Right-hand side of which slide?

10        THE WITNESS:  Of 15.12, Your Honor.

11   So you can see that the fee structure varies depending on

12   the affiliate program.  Some use a flat fee and some use a

13   commission model which is a percentage of sales.

14        THE COURT:  So Norton, are you saying that what

15   Norton does is charges 20 percent for the 30 days after a

16   linkout?

17        THE WITNESS:  Correct.  And they pay that back to the

18   affiliate partner for driving the discovery of that -- of that

19   service and the purchase of that service.

20   BY MS. RICHMAN:

21   Q.  While we're on that subject, Mr. Oliver, did AG consider

22   the price of affiliate programs and ad campaigns in its

23   analysis?

24   A.  It is included in their analysis, yes.

25   Q.  Were those data points relevant to your recommendation to

1   the price committee?

2   **A.**   To some degree but only as a portion of the value that's

3   provided by Apple.

4   **Q.**   Let's --

5          **THE COURT:**   Are you saying then from Microsoft, that

6   Microsoft only charges one to seven percent over a 14-day

7   period?  Am I reading that properly?

8          **THE WITNESS:**   That's correct.  And I think there's

9   actually more detail in the appendix about how that varies by

10  category.

11         **THE COURT:**   So I put Apple on this chart Apple,

12  Apple's would say seven days, 27 percent.

13         **THE WITNESS:**   So --

14         **THE COURT:**   Is that right?  Am I reading that

15  properly?

16         **THE WITNESS:**   I would interpret it differently.

17         **THE COURT:**   Well, then what is this one to seven

18  percent by Microsoft?

19         **THE WITNESS:**   So that represents, in my view, the

20  discovery capabilities that are offered by the App Store.  It

21  does not incorporate a reasonable fee for the developer tools

22  and technologies nor the distribution capabilities which would

23  be in addition to that.

24         **THE COURT:**   Where's -- what's the basis for that

25  information?

 1              **THE WITNESS:**  When we discussed the use of this data

 2      with Analysis Group, they made it clear to us that this was a

 3      relevant benchmark only for discovery services.

 4              **THE COURT:**  Where is the information about what

 5      Microsoft is charging?

 6              **THE WITNESS:**  Your Honor, it's --

 7              **THE COURT:**  Other than the one percent to

 8      seven percent.

 9              **THE WITNESS:**  I'm sorry.  I don't understand the

10      question.

11              **THE COURT:**  I'm trying to understand -- I'm trying to

12      get some comparables here.

13              **THE WITNESS:**  Yes, Your Honor.  So if you go to the

14      prior slide, Slide 15.11, you can see the bottom bullet by AG

15      which makes the point that I'm maybe trying to explain

16      inefficiently.

17              **THE COURT:**  Go ahead.  What am I supposed to look at?

18              **MS. RICHMAN:**  Why don't you go and read it aloud,

19      Mr. Oliver.

20              **THE WITNESS:**  The goal of a typical affiliate program

21      or ad campaign run by developers is discovery which is

22      believed to be effective during a limited time window.

23      Platform tech, developer tools and services, and distribution

24      may contribute continuously to purchases of digital goods and

25      services used on the platform and provide value beyond any

 1   time window.

 2           **THE COURT:**  So are you saying that Microsoft doesn't

 3   provide any other service other than discovery and that's why

 4   they're only charging one to seven percent?

 5           **THE WITNESS:**  So this affiliate program is actually

 6   Microsoft's affiliate program for their first-party software

 7   products like Office 365.

 8       So what I'm saying is that Microsoft's one to

 9   seven percent affiliate program represents the value of

10   discovery that they're willing to pay for from their affiliate

11   partners.

12   BY MS. RICHMAN:

13   **Q.**  Mr. Oliver, maybe it would be helpful if you could give us

14   a concrete example of how Microsoft's affiliate program would

15   work.

16   **A.**  Sure.  So Microsoft sells a variety of different software.

17   So let's use Office 365, which is a set of productivity tools

18   like Excel and Word.

19       They want to drive discovery of the -- of the sales of

20   Office 365, and so they are working with affiliate partners or

21   marketing partners to drive discovery from different websites

22   or other sources of discovery back to Microsoft.

23       And Microsoft is willing to pay either a flat fee or a

24   percentage of fee depending on the product that is being sold.

25   And so when they are paying for a subscription to Office 365,

OLIVER - CROSS (Continued)/ RICHMAN

1    it represents the value of the discovery that the affiliate

2    partner is bringing.

3    **Q.**   Can you please turn to 15.13.

4    **A.**   Yes.

5    **Q.**   And this slide is titled "Platform Affiliate Programs."

6        Can you explain what a platform affiliate program is as

7    compared to a first-party affiliate program?

8    **A.**   Sure.  A platform affiliate program is very similar to a

9    first-party affiliate program, but it's one that a marketplace

10   operates directly rather than the first-party service

11   provider.

12   **Q.**   And does this slide show AG's findings with respect to

13   platform affiliate program tracking windows?

14   **A.**   It does, yes.

15   **Q.**   And what's that range?

16   **A.**   That's between 24 hours and 30 days.

17       And let's move to the next slide, 15.14.

18                   (Exhibit published.)

19          **THE WITNESS:**  Yes.

20   **BY MS. RICHMAN:**

21   **Q.**   What does this slide show?

22   **A.**   This looks at the tracking windows for two different

23   categories within developer ad campaigns, both MMP's and

24   self-attributing ad networks.

25   **Q.**   And what did AG find with respect to the tracking window

1    for ad campaigns?

2    **A.**   They found that the tracking window was anywhere from one

3    day for view through lookback windows up to 30 days for click

4    lookback windows.

5    **Q.**   And can you just describe what the difference is between a

6    click lookback window is and a view-through lookback window?

7    **A.**   Sure.  There are different ways to measure and pay for ad

8    campaigns.  One way to pay is when a customer actually clicks

9    on an ad and goes directly to the website or the app store to

10   make that download.

11        Another one would be when a user is -- only views the ad

12   so they have an impression of the ad.  And then at some point

13   in time later, they also make a download of that ad -- or of

14   that app.

15   **Q.**   And how are these ad programs relevant to the analysis

16   that AG undertook with respect to the entitlement program?

17   **A.**   Well, similar to affiliate programs, we were looking for

18   comparables where a user clicks from one specific place and

19   then is driven to another to make a purchase.

20        And in this case, the click lookback window provided a

21   relevant time window for us.

22   **Q.**   We're going to do another jump back to the long deck.  If

23   you could go to 14.46, please.

24   **A.**   (Reviewing document.)

25        Yes.

1    **Q.**  And what's the title of this slide?

2                     (Exhibit published.)

3              **THE WITNESS:**  "How to price with leakage and

4    collection risks."

5    BY MS. RICHMAN:

6    **Q.**  And do you recall that Mr. Even asked you about the

7    concept of leakage?

8    **A.**  I do, yes.

9    **Q.**  Can you just remind us what that means.

10   **A.**  Leakage is the fact that, depending on different

11   variables, a -- for pricing and other things, that a service

12   provider uses, there is risk that a -- a both seller and a

13   buyer move off platform to complete their transactions rather

14   than completing through the platform.

15   **Q.**  Could you flip back a page to 14.45.

16   **A.**  Yes.

17   **Q.**  And what does the first bullet there say?

18   **A.**  "If Apple charges a commission for off-app purchases,

19   leakage may become an issue and reduced commissions charged."

20   **Q.**  And do you agree with this statement?

21   **A.**  Yes.

22   **Q.**  And is that important -- is that observation reflected in

23   the price committee deck?

24   **A.**  Yes.

25   **Q.**  Is there current leakage on the App Store?

1    **A.**    Yes.

2    **Q.**    How do you know that?

3    **A.**    We see various examples of the billings that would

4    otherwise go through the App Store that are happening through

5    out-of-app channels due to a variety of different developer

6    communication methods.

7    **Q.**    Do you have a view as to how the introduction of the link

8    entitlement will affect the leakage rate on the App Store?

9    **A.**    We believe it would increase the leakage rate on the App

10   Store.

11            **THE COURT:**  What's the data for your first

12   sentence -- or the statement you made just before the last?

13            **THE WITNESS:**  In terms of leakage?

14            **THE COURT:**  Yeah.  Where's your data?

15            **THE WITNESS:**  So can I give you some examples?

16            **THE COURT:**  No.  I want to know -- I'm sure you can

17   find an example for anything.  Where's the data supporting the

18   statement?

19            **THE WITNESS:**  So one -- one data point actually comes

20   in AG's report, if we want to look at that.

21            **THE COURT:**  Okay.  What page?

22            **THE WITNESS:**  So if we looked at the effective

23   commission rate slide.

24            **THE COURT:**  Where is your data that you are -- that

25   you are experiencing leakage from all of the developers now?

1    Or at least before you implemented the 27 percent?

2         **THE WITNESS:**  So I can give you examples that AG has

3    found based on our multi-platform rule which is a broader

4    review of that data.  Or I can give you individual case

5    studies that I -- I find to be very helpful to understand how

6    that works.

7         **THE COURT:**  Like I said, I think you can find an

8    example for anything.  Examples don't persuade.

9         **THE WITNESS:**  Sure.

10        So if you look at our effective commission rate that

11   Analysis Group calculated --

12        **THE COURT:**  Where?  I need a page number.

13        **THE WITNESS:**  I have to find it.

14        So if we go to Slide 14.36.

15        I believe I'm not supposed to read the numbers here, but

16   what I would direct Your Honor to is the difference between

17   the actual commission rate shown, which is the fourth column

18   in the table, and the effective commission rate shown.

19        **THE COURT:**  Where is the historical data?  Where's

20   the data from 2023, from 2022 showing that there's leakage?

21        **THE WITNESS:**  This -- this -- this is one

22   demonstration of -- of that.

23        So the -- the -- what -- what this shows is what AG has

24   effectively calculated here is the actual revenue that is

25   being commissioned based on billings flowing through Apple and

1  the usage of digital goods and services that are happening for

2  out-of-app transactions.

3     And so what they have done is reflect that in the

4  effective commission rate, which is in every case lower than

5  the actual commission rate.

6     And what that means is that users who are purchasing

7  outside of the app are using the digital goods and services

8  purchased outside of the app using Apple's multi-platform

9  rule, and the consumption and usage of those digital goods and

10 services is significantly higher in the app than the

11 percentage of revenue that Apple is capturing for commissions

12 on those.

13 **BY MS. RICHMAN:**

14 **Q.**  Mr. Oliver, is there data available to you about what

15 percentage of revenues developers are able to steer to their

16 website?

17 **A.**  Yes.  We see examples that range from 25 percent up to

18 50 percent.

19 **Q.**  Is that data or your -- the case studies that you're

20 referring to?

21 **A.**  Those are the case studies I'm referring to.

22 **Q.**  And is there any repository of data that you have access

23 to that would show that?

24 **A.**  Not that I know of.

25 **Q.**  Apple doesn't have visibility into that?

1   **A.**   No.  Which is a part of the reason that we had to hire AG

2   to help us understand that.

3   **Q.**   And so has your team endeavored to study leakage?

4   **A.**   We have, to the best of our ability.

5   **Q.**   And how have you done that?

6   **A.**   When we have -- one, we've worked with parties like AG on

7   understanding the overall kind of business that flows through

8   the App Store and -- and getting a better view on that.

9       We also have received a variety of different data points

10   from different developers and other public sources that help

11   us understand leakage across different categories.

12   **Q.**   And do you understand that some of that -- those case

13   studies are among the materials that the Court has asked you

14   to produce?

15   **A.**   Yes.

16   **Q.**   Okay.  All right.  Why don't we switch away from the AG

17   report and go to the price committee deck.

18       How did AG's work inform the working group's

19   recommendation to the price committee?

20   **A.**   We use it in a couple of different ways.

21   **Q.**   Can you explain the ways?

22   **A.**   Yes.  I'm sorry.  So first, on Slide 9.6.

23           **MS. RICHMAN:**  I apologize for the size of the font,

24   Your Honor.

25           **THE WITNESS:**  So in this slide, we incorporated the

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    data points provided by AG and their bottoms-up value

2    comparables analysis that we just walked through.  And that is

3    reflective of the costs of replacement for developers of the

4    subcomponents of value that Apple provides to developers.

5            **THE COURT:**  So why didn't you have here when you

6    presented this deck, looking just at the discovery since we

7    were talking about that, that the estimated costs for

8    developers, at least large developers, was 5 percent, not

9    21 percent?  Why didn't you divide that out?  Or did you do

10   that somewhere else in this deck?

11           **THE WITNESS:**  We talked about it as a factor that --

12   that guides us to the lower end of the boundary shown on -- on

13   the deck.

14           **THE COURT:**  Where?

15           **THE WITNESS:**  So we talked about one of the

16   reasons -- like the 5 percent was the larger developers.  So

17   that was one of the factors that we discussed in presenting

18   this.

19           **THE COURT:**  You discussed it orally, it's not in the

20   deck?

21           **THE WITNESS:**  That's correct.

22           **THE COURT:**  And is that the same for the distribution

23   at scale, the 4 percent relates to large developers, the

24   25 percent to small?

25           **THE WITNESS:**  That's generally correct, yes.

 1              **THE COURT:**  And is that the same for the 3 and 16,

 2     that the 3 percent is for large developers and the 16 percent

 3     relates to small?

 4              **THE WITNESS:**  Yes.

 5              **THE COURT:**  So if I added up those on the low end for

 6     large developers, five plus four plus three, that would be 12?

 7              **THE WITNESS:**  That's correct.  But there are other

 8     factors that influence the -- where you land in the range.

 9     **BY MS. RICHMAN:**

10     **Q.**  And, Mr. Oliver, have you endeavored to add up the low end

11     and the high end of this range here?

12     **A.**  Yes.

13     **Q.**  And do you know what the ranges are?

14     **A.**  It's -- it's a pretty large range.  It goes from I think

15     about 18 percent all the way up to 90-plus percent.

16              **THE COURT:**  I thought it was 12.3.

17              **THE WITNESS:**  Sorry.  12.3, yes.  Apologies.

18     **BY MS. RICHMAN:**

19     **Q.**  Just to focus on the first category of platform

20     technology, would the category --

21              **THE COURT:**  Hold on.  Hold on.  Hold on.  So

22     12.3 percent relative to the large developers, right?

23              **THE WITNESS:**  Again, that's one factor is the size,

24     but, yes.

25              **THE COURT:**  12.3 percent to the set of developers who

1   you're charging 27 percent, right?

2            THE WITNESS:  For the first seven days.

3            THE COURT:  Okay.  So where is the delta between the

4   27 percent and the 12.3 percent?  How did you justify the

5   other 15 percent that you're charging them?  Where is that?

6            THE WITNESS:  So there are a variety of different

7   factors.  Some of them are included in the notes here that

8   guide us within the range that is provided here.

9        I would argue that the 5, 4, and 3 percent numbers that

10  you're referencing are not reflective of some key unique

11  attributes to Apple's ecosystem and tools and technologies.

12  Our focus on user trust and privacy and those elements are not

13  valued in the comparables, as AG notes here.

14  BY MS. RICHMAN:

15  Q.  Mr. Oliver, under the category of platform technology,

16  there are a couple of ranges there.  Do you see that?

17  A.  I do, yes.

18  Q.  And one is 5 to 20 percent?

19  A.  Yes.

20  Q.  And the other is .3 to 6 percent?

21  A.  That's correct.

22  Q.  And what do those different ranges reflect?

23  A.  As we discussed yesterday, that reflects the different

24  ranges for platform technology with and without demand

25  generation.

1   Q.   And does the App Store provide demand generation?

2   A.   I would clarify it's not the App Store but Apple's

3   platform technology provides demand generation, yes.

4   Q.   So is .3 the correct lower bound to incorporate into the

5   calculation?  Or is it 5 percent?

6   A.   No.  We thought the -- the appropriate range was 5 to

7   20 percent when we were looking at this.

8   Q.   Okay.  Thank you.

9        And if you add up 5 percent plus 3 percent plus 4 percent

10  plus 5 percent, what does that equal?

11  A.   That's 17 percent.

12  Q.   Where else --

13            THE COURT:  You're charging 27.

14            THE WITNESS:  Yes, Your Honor.

15            THE COURT:  Yeah, so you're still charging an extra

16  third.

17            THE WITNESS:  I would argue that the effective rate

18  is 18 percent.

19            THE COURT:  Well, that's a big assumption.  The

20  actual price that they're paying on every sale within a

21  seven-day period is 27 percent.  Right?

22            THE WITNESS:  That's correct.

23            THE COURT:  And your assumptions are just that,

24  they're assumptions.  There's actually no data for it.

25            THE WITNESS:  That's not true.

1    BY MS. RICHMAN:

2    Q.  Why don't we jump to that.

3        Can you please go to Slide 9.12.

4    A.  Yes.

5    Q.  And what does this slide reflect, Mr. Oliver?

6    A.  This slide reflects the view of the effective commission

7    rate for different commissions and time durations.

8    Q.  And how did the effective commission rate analysis inform

9    your recommendation of a 27 percent commission rate during a

10   seven-day window?

11           THE COURT:  I can't see that number.  I need the

12   CX number.

13           MS. RICHMAN:  CX-9.12, Your Honor.

14           THE COURT:  Thank you.

15           THE WITNESS:  Can you repeat the question?

16   BY MS. RICHMAN:

17   Q.  Yes.

18       I asked how, if at all, did the effective commission rate

19   analysis affect your selection and your recommendation of the

20   27 percent commission rate over a seven-day window?

21   A.  So based on our analysis using internal data and other

22   sources, we thought we had a good view of the amount of

23   transactions that would flow through the linkout entitlements

24   and would be subject to a commission relative to all billings

25   that were -- or a customer spend that was flowing from the

1    linkout entitlement, and we were able to calculate an

2    effective rate which gave us a sense of what developers would

3    actually be paying in commission to Apple.

4           THE COURT:  So why not do 24 hours or 72 hours?  Why

5    extend it to seven days?

6           THE WITNESS:  That's a great question.  We looked at

7    actually all of the time windows shown here, and we had a few

8    different data points that guided us to seven days.

9       We thought that, one, there was a big jump up in terms of

10   the amount of customer spend subject to the commission after

11   seven days.  So we wanted -- we knew that we wanted to guide

12   below seven days.

13      And then we also saw that there -- or we believe that

14   there was a reasonable risk of developer fraud and abuse below

15   seven days which --

16          THE COURT:  What was the data for that?

17          THE WITNESS:  That data was based on our internal

18   expertise.

19          THE COURT:  Okay.  Any documents in front of me to

20   support that?

21          THE WITNESS:  No.

22   BY MS. RICHMAN:

23   Q.  Mr. Oliver, can you please turn to CX-9.13.

24   A.  Yes.

25   Q.  And do you see the small font at the bottom of this page?

1    **A.**  I do, yes.

2    **Q.**  Are these the assumptions that underlie the effective

3    commission rate analysis?

4    **A.**  Yes, they are.

5    **Q.**  Okay.  And what was your role in coming up with the

6    assumptions?

7    **A.**  My role in coming up with the assumptions was to help

8    guide the analysis using internal and public data sources to

9    help understand how we could come up with the most reasonable

10   and conservative assumptions.

11   **Q.**  What kind of data did you use to ground these assumptions?

12   **A.**  A variety of different -- we have public and internal data

13   points that were available to us.

14   **Q.**  Let's start with the -- the first one on the right.

15   Please don't say the number out loud.  But it's for the

16   percentage of billings entitlement implementation.

17       Do you see that?

18   **A.**  I do, yes.

19   **Q.**  Can you describe the analysis you undertook to arrive at

20   this assumption?

21   **A.**  Yes.  There were a couple of key data points that guided

22   us here.  The first one was a review that the team had done of

23   the number of top games that had leveraged web stores or

24   direct-to-consumer payments and commerce capabilities over a

25   recent time period.

1    And that helped and we found that that number was very

2    much in line with the number that is shown here, which gave us

3    confidence that many of the largest developers had the

4    capabilities already existing to take advantage of these

5    new -- these new options under the link entitlement.

6             **THE COURT:**  Do I have that data?

7             **THE WITNESS:**  I think it is being --

8             **THE COURT:**  Produced?

9             **THE WITNESS:**  -- produced.

10            **MS. RICHMAN:**  If not, Your Honor, we'll make sure it

11   is.

12            **THE COURT:**  Let me be clear.  If I don't have the

13   data, I'm not considering it.

14            **MS. RICHMAN:**  Understood, Your Honor.

15            **THE WITNESS:**  The second thing that we considered was

16   the -- we looked at a variety of different features that had

17   been launched for developers to understand what a steady state

18   adoption might be from a percentage of billings perspective.

19    And so some of those were existing case studies.  And in

20   other places, we used kind of data boards and data tools

21   available to us to understand the ramp-up.  And that --

22   those -- those data points also were in line with the numbers

23   shown here.

24   **BY MS. RICHMAN:**

25   **Q.**  And do you remember when Mr. Even was asking you about the

1  rate of adoption reflected in the billings entitlement

2  implementation?

3  **A.**  Yes.

4  **Q.**  And I think he asked you a question suggesting that

5  100,000 -- developers of 100,000 apps would need to opt in, in

6  order to reach that percentage?

7  **A.**  Yes.

8  **Q.**  Is that correct?

9  **A.**  No, it's not.

10  **Q.**  And how -- how was -- what is this percentage a function

11  of?

12  **A.**  Because of the distribution of billings or spend within

13  different apps and games on the store, a fairly small

14  percentage of developers adopting this feature could get to

15  this number.

16  **Q.**  Are there fewer than 500 developers that fall within this

17  assumption?

18  **A.**  That would be -- that would be in line with this

19  assumption, yes.

20  **Q.**  Are there fewer than 250?

21  **A.**  Those would be equivalent to this assumption, yes.

22  **Q.**  I think you mentioned that there were some precedents that

23  you referenced to inform your view of the rate of developer

24  adoption?

25  **A.**  Yes.

OLIVER - CROSS (Continued)/ RICHMAN

1    Q.   Can you describe those, please.

2    A.   Yes.  So similar to what we talked about previously, there

3    are a number of different case studies that we've looked at

4    internally to understand how long it takes for a product

5    feature to reach its steady state of developer adoption.

6         And that varies pretty dramatically depending on the

7    feature.  But in our reasonable range is anywhere from two to

8    five years to hit a steady state adoption for feature

9    adoption.

10   Q.   There was a lot of talk yesterday about the number of

11   developers who have applied for the entitlement program.

12        Do you remember that?

13   A.   I do, yes.

14   Q.   And do you recall how many it was?

15   A.   It was 38, I believe.

16   Q.   And do you think this assumption of billings entitlement

17   implementation is still sound in light of the developer

18   adoption rate to date?

19   A.   I do, yes.

20   Q.   The Court asked you yesterday whether you personally had

21   spoken to any large developers about the link entitlement.

22        Do you remember that?

23   A.   I do, yes.

24   Q.   And what is your understanding as to whether there have

25   been conversations with large developers about the link

1    entitlement?

2    **A.**   Yes.  My team mass fielded dozens of conversations with

3    large developers about the link entitlement.

4    **Q.**   Let's move to the assumption to the left of that one,

5    "Entitlement Share."

6        Do you see that?

7    **A.**   I do, yes.

8    **Q.**   And what does entitlement share refer to?

9    **A.**   Entitlement share is for the apps that have adopted the

10   entitlement link, what percentage of the revenue from

11   customers that exist within the app today shifts out.

12           **THE COURT:**  Actually, on that last question --

13           **THE WITNESS:**  Yes.

14           **THE COURT:**  -- given that it's hearsay, do you have

15   any documents reflecting the conversations, any customer

16   notes, any real time memorialization of those conversations?

17   Do they exist?

18           **THE WITNESS:**  I don't believe so.

19   **BY MS. RICHMAN:**

20   **Q.**   But is that your -- your understanding, that there's been

21   dozens?

22   **A.**   Yes, it is.

23           **THE COURT:**  But you weren't a party to them so you

24   actually don't know?

25           **THE WITNESS:**   It was just reported to me by my team.

OLIVER - CROSS (Continued)/ RICHMAN

1    I was not a party to them.

2             THE COURT:  Go ahead.

3       And do you always -- do you all not keep notes about your

4    conversations?

5             THE WITNESS:  It depends on the topic.

6             THE COURT:  And on this topic, you chose not to keep

7    notes?

8             THE WITNESS:  No, no.  I just haven't -- I'm not

9    aware of any notes that exist on this specific topic.

10             THE COURT:  And is it not the practice of people who

11    are gathering this kind of information to keep notes?

12             THE WITNESS:  So it depends on the -- the business

13    practices for every different individual on the team.

14    Oftentimes these conversations are happening live so they're

15    on the phone with the developer and talking about -- answering

16    questions, not necessarily taking notes.  There are --

17             THE COURT:  And are they sending them emails, or do

18    they have their personal phone numbers?

19             THE WITNESS:  It's both usually.

20             THE COURT:  So there may be emails, but you don't

21    know?

22             THE WITNESS:  I don't know, yes.

23             THE COURT:  You can keep going.

24             MS. RICHMAN:  Thank you, Your Honor.

25    Q.  On the entitlement share, how -- how did you arrive at

1   that assumption?

2   **A.**  We had a few different data points that we used to help

3   guide to the entitlement share.  We had a -- a few case

4   studies related to out-of-app communications and web stores in

5   the gaming space.

6        Some of those were from public sources that are available

7   in -- in news and other areas from some publicly traded

8   companies.  Other were from case studies that were provided to

9   us directly by developers and other sources internally.

10       And what we found from those case studies is that

11  developers using only out-of-app communication channels were

12  able to shift between 25 to 30 percent and sometimes upwards

13  of 30 percent of their billings outside of the app.

14  **Q.**  Did you have any case studies that looked at developers

15  using in-app communications to shift to consumers outside the

16  app?

17  **A.**  We do.  There were a few examples of out-of-policy

18  implementations that had happened previously within the

19  App Store, and so we also looked at some of those examples.

20  **Q.**  And what did those show, roughly speaking?

21  **A.**  Those showed an even higher rate of shift of spend outside

22  of the app, upwards of 50 percent.

23  **Q.**  The assumption to the left of that is the 50 percent

24  returning customers assumption.  Do you see -- yes, 50 percent

25  returning customer assumption.  Do you see that?

1    **A.**   I do, yes.

2    **Q.**   And I think you explained to Mr. Even yesterday what the

3    basis for that was, but if you could just briefly remind us.

4    **A.**   Yes.  Again, this was, of all the assumptions, the one

5    that we had the less -- the least firm data on.  So the team

6    looked at a variety of different sensitivities around the

7    number to understand its impact to developers.  But we did

8    have some more anecdotal data points around customer churn and

9    win-backs that helped us to get comfortable with where we

10   landed.

11           **THE COURT:**  Okay.  But once again, no documents to --

12   that are in front of me to support that statement.

13           **THE WITNESS:**  I believe those are in the ones that

14   we're looking to produce.

15           **THE COURT:**  All right.

16   **BY MS. RICHMAN:**

17   **Q.**   And, Mr. Oliver, what do you mean by consumer churn?

18   **A.**   Sure.  So a meaningful percentage of our business is from

19   subscription customers.  And there is a -- a fairly high

20   number of customers who subscribe and then churn out of

21   subscriptions.  And one data that was relevant to this was the

22   percentage of those customers who come back to resubscribe

23   through the same channel.

24   **Q.**   Let's talk about the time window assumption, seven days.

25   **A.**   Yes.

1    **Q.**   What does that assumption or that determination rely on?

2    Why did you select seven days for the attribution window?

3    **A.**   Yeah, so there were a couple of different data points

4    relevant here.  We first looked at the Analysis Group's report

5    which provided a range anywhere from 24 hours all the way up

6    to 90 days.

7        And then we also looked at the customer spend distribution

8    over different periods of time ranging from the current

9    session all the way out to a year.  And that gave us some

10   sense of how much of the customer spend might be subject to a

11   commission in a linkout entitlement scenario.  And we used

12   those data points to help inform our decision of seven days.

13   **Q.**   And can you please flip back to Slide 9.12.

14   **A.**   Yes.

15   **Q.**   That data you just described about cumulative spend, is

16   that reflected anywhere in this analysis?

17                      (Exhibit published.)

18          **THE WITNESS:**  Yes.  That's how we determined the

19   effective rate for the -- for the commission at different

20   scenarios.

21   **BY MS. RICHMAN:**

22   **Q.**   And can you explain -- I know it's complicated, but can

23   you explain how that works?

24   **A.**   Yes.  So we assumed that a -- for every customer that was

25   exposed to a linkout entitlement, that a -- they would --

OLIVER - CROSS (Continued)/ RICHMAN

1  we -- we used the transactions over the first seven days that

2  we could see internally as a proxy for the transactions that

3  would be commissioned by Apple.

4      And then we -- and then we assumed that the remaining

5  transactions for the non-subscription business would no longer

6  be commissioned by Apple, but that 50 percent of customers

7  would return back to the linkout so we'd see another

8  commissioning event again.

9  **Q.** And do you understand that that data has now been

10 produced?

11 **A.** I do, yes.

12 **Q.** Okay.  Let's jump back to the beginning.  If you could go

13 to Slide CX-9.3.

14 **A.** Yes.

15 **Q.** Does this reflect the recommendation that you made to the

16 price committee?

17 **A.** It does, yes.

18 **Q.** And I want to ask you about program eligibility, which is

19 something that came up yesterday.

20     What was the recommendation on program eligibility?

21 **A.** The recommendation was to allow for the small business

22 program and tenured subscriptions to be eligible, but for the

23 video partner program and news partner program to not be

24 eligible.

25 **Q.** And can you flip to Slide CX-9.15.

1    **A.**   Yes.

2    **Q.**   And there was a lot of time spent on this slide yesterday.

3    Let's just clarify.

4        Are participants in Apple's video partner program and news

5    partner program eligible to implement the link entitlement?

6    **A.**   Yes, they are.

7    **Q.**   Is any developer excluded from participating in the link

8    program?

9    **A.**   No, they're not.

10   **Q.**   Can you please explain then why it says here that VPP and

11   NPP developers are not eligible?

12   **A.**   This meant that the program participants would only be

13   eligible if they were to go outside of the program and the

14   specific benefits and requirements of that program.

15   **Q.**   So the recommendation is that a developer cannot be part

16   of the VPP/NPP program and be a -- participate in the link

17   entitlement program simultaneously?

18   **A.**   That's correct.

19   **Q.**   Okay.  And why -- what was the basis for that

20   recommendation?

21   **A.**   So the video partner program and news partner programs are

22   unique in terms of their goals compared to the other programs

23   shown on this slide.  They are specifically intended to create

24   a differentiated user experience on Apple's platforms.

25       And they actually require developers to take on a

1  significant amount of work to participate in the program.  So

2  for example, members of the video partner program have to do

3  special integrations with the Apple TV app, with series

4  search, with Spotlight, and with technologies like AirPlay.

5      And because they are participating in the program and

6  taking on all of that additional work, they get specific

7  benefits including the reduced commission as well as their

8  presence of their -- their shows and feeds within new

9  discovery services like the TV app.

10  **Q.**  Is there any special integration with Apple's commerce

11  stack?

12  **A.**  Yes.  They -- they have a kind of deep integration with

13  Apple's commerce stack and take advantage of all the

14  capabilities that are available to users on -- with IAP.

15  **Q.**  On this slide, I -- just asking -- I want to ask a few

16  clarifying questions.

17      Do you recall Mr. Even asking you about the relationship

18  between the VPP/NPP developers and tenured subscriptions?

19  **A.**  I do, yes.

20  **Q.**  And can you provide the explanation -- I think you wanted

21  to yesterday -- on that issue?

22  **A.**  Yes.  So what is represented by the Venn diagram on the

23  left here is the billings, both as an absolute number and as a

24  percentage of the U.S. storefront billings.

25      And what I -- I think I can say is that the VPP and NPP

1    has a meaningful overlap with tenured subscriptions.  And that

2    means that the participants in the video partner program and

3    news partner program often have great retention.  And so they

4    have a significant percentage of their customer base that is

5    already at the reduced commission due to the fact that they

6    are year two subscribers or beyond.

7    **Q.**  Do you recall the questions that you were asked yesterday

8    about the interaction between auto renewing subscriptions and

9    link entitlement?

10   **A.**  I believe so, but you might need to remind me.

11   **Q.**  Sure thing.

12       Do you recall that Mr. Even characterized the commission

13   on auto-renewing subscriptions as lasting in perpetuity?

14   **A.**  Yes.

15   **Q.**  And do you agree with that characterization?

16   **A.**  I don't, no.

17   **Q.**  And can you explain why not?

18   **A.**  There are a few different reasons.  The first is that any

19   customer action including an unsubscribe to a subscription,

20   what we call churn, a price change or a -- an action like a

21   plan change would actually stop the commissioning of a

22   auto-renewing subscription.

23       And specifically for churn, we know that a meaningful

24   percentage of customers churn out after only a few months.

25   **Q.**  Okay.  Thank you, Mr. Oliver.

1          On -- could you just go to Slide 9.12 again.  Sorry to be

2     doing jumping with you.

3     **A.**   Yes.

4                        (Exhibit published.)

5     **BY MS. RICHMAN:**

6     **Q.**   Can you explain how the commission rate range reflected

7     here was determined?

8     **A.**   Yes.  So when we looked at the bottoms-up analysis that we

9     discussed earlier provided by AG, as well as the subjective

10    factors that we believe guided us within that range, that got

11    us comfortable being above 20 percent in the range.

12         Though we -- we obviously knew that there were market

13    comparables from other stores and marketplaces that were

14    relevant to us which cap the range at 30 percent.

15    **Q.**   And then on the time duration column, from current session

16    to 30 days, did you select that range for consideration by the

17    price committee?

18    **A.**   Yes, we did.

19    **Q.**   And how was that determined?

20    **A.**   Again, we relied heavily on the AG's data for that.  Their

21    comparables, both for affiliate programs and for advertising,

22    showed that a reasonable range could be between 24 hours and

23    90 days.  And so we actually took a -- a reduction in the top

24    end of that range to 30 days.

25    **Q.**   And can you explain for the Court why you recommended --

1    ultimately recommended that the link entitlement bear a

2    commission rate of 27 percent over a seven-day time period?

3    **A.**   Yes.  So we looked at a variety of different factors to

4    help triangulate here.  Looking both at kind of what the

5    services provided that were unique to Apple which guided us to

6    the higher end of the commission range, things like the trust

7    and safety, the privacy elements, the things that were not

8    available in any of the other commission comparables that we

9    looked at.

10        And then we looked at kind of what the effective rate

11   would be based on our knowledge of customer spend that was

12   happening within the app.

13        And that gave us confidence that developers would have an

14   opportunity to capture significant amount of value from the

15   out-of-app transactions occurring after the seven-day window.

16   **Q.**   And what does the effective commission rate tell you about

17   whether linking out is a viable option for developers?

18   **A.**   This gave us certainty or confidence that the commission

19   rate that developers were going to be paying to Apple was a

20   significant reduction from the commission rate that they would

21   be paying for in-app transactions.  And that gave us

22   confidence that they would have the ability to take advantage

23   of those capabilities.

24   **Q.**   And what is your understanding as to whether Apple's

25   charging a fee on off-app transactions makes the transactions

1    more expensive for developers?

2    **A.**  My view is it makes it cheaper for developers.

3    **Q.**  And can you explain why?

4    **A.**  Previously any customer that was in the app would have

5    been required to transact within the app to -- to buy a

6    digital good and service.  A digital good and service.

7        In this new scenario, customers are starting within an app

8    but are being guided to purchase outside of an app.  And so

9    because we are only charging for the first seven days, that

10   allows developers to capture significant amount of value with

11   no commission paid to Apple after those first seven days.

12       And we believe that that significantly reduced the

13   commission that they would be paying versus the in-app

14   transactions that would normally be commissioned at the

15   standard rate.

16           **MS. RICHMAN:**  Thank you, Mr. Oliver.

17       Pass the witness.

18           **THE COURT:**  Mr. Even.

19                (Pause in the proceedings.)

20           **THE COURT:**  You know, why don't we go ahead and --

21   since -- so that we don't break up your flow, why don't we go

22   ahead and take our break.

23       We'll stand in recess for 15 minutes.

24           **THE CLERK:**  Court is in recess.

25       (Recess taken at 2:21 P.M.; proceedings resumed at

 1    2:37 P.M.)

 2              **THE COURT:**  You may be seated.

 3        We're back on the record.  The record will reflect that

 4    all the parties are present.

 5        Mr. Even, you may proceed.

 6              **MR. EVEN:**  Thank you, Your Honor.

 7        May we approach and provide one more exhibit to the

 8    witness?

 9              **THE COURT:**  You may.  Thank you.

10              **MR. EVEN:**  Thank you, Your Honor.

11                      <u>**REDIRECT EXAMINATION**</u>

12    BY MR. EVEN:

13    **Q.**   Good afternoon, Mr. Oliver.

14    **A.**   Good afternoon.

15    **Q.**   You covered a lot.  I will try and jump around as little

16    as I can, but I'm going to have to do some jumping so try and

17    bear with me, please.

18        And I see you have the additional document that we placed

19    before you.  You also have the binders before you.  Correct?

20    **A.**   I do, yes.

21    **Q.**   Okay.  So I actually want to start where you ended your

22    testimony, if I may.  And that is in your analysis of the

23    costs to Apple and the effective rate to developers.  Do you

24    remember that you discussed that with Ms. Richman?

25    **A.**   Yes.

OLIVER - REDIRECT / EVEN

```
 1    Q.   Now, you agree with me that Apple's total cost of handling

 2    payment services for in-app transactions is roughly 3 percent?

 3    A.   I believe it's below 3 percent.

 4    Q.   Okay.  It's close to 3 percent?

 5    A.   I believe it's below 3 percent.  I don't know exactly the

 6    cost.

 7    Q.   Well, if you look at CX-54.38 that's before you.

 8    A.   Thirty-eight.

 9                        (Exhibit published.)

10    BY MR. EVEN:

11    Q.   And you see some numbers there that I can't repeat, but --

12    A.   Yes.

13    Q.   -- do you see that if I add card fee blended to total

14    support cost of all issues, I get to roughly 3 percent, almost

15    3 percent?

16    A.   (Reviewing document.)

17         So you're adding the card fee plus the support costs?

18    Q.   Correct.  That is about 3 percent?

19    A.   No.  It's below 3 percent.

20    Q.   It's just below.  Very close?

21    A.   Well, within 3 percent, it's a significant percentage

22    below that.

23    Q.   Okay.  Sir, I understand that I can't say the number.  Do

24    you understand that that number is within 5 percent of

25    3 percent?
```

1    **A.**  In absolute points or as a percentage relative to

2    3 percent?

3    **Q.**  Never mind.  The Court has the document.  The Court will

4    see the number.

5    **A.**  Yes.

6    **Q.**  Is it your testimony that Apple -- Apple's cost is far

7    below 3 percent?

8    **A.**  I didn't say far below.

9    **Q.**  Okay.

10   **A.**  It's below 3 percent.

11   **Q.**  All right.  So and you understand that roughly speaking,

12   for instance, in the Netherlands Apple said we're going to

13   charge 27 percent because the 3 percent delta reflects more or

14   less our cost of providing payment services; are you aware of

15   that?

16   **A.**  It was payment services plus a reasonable margin, if I

17   remember the approach.

18   **Q.**  Okay.  But you understand that that's what Apple said

19   about how it got to 27 percent in the Netherlands?

20   **A.**  It was -- it was the cost of payments, the support costs

21   and margin on top of that.

22   **Q.**  Okay.

23   **A.**  That's my recollection.

24   **Q.**  That's not what Apple told the world, right?  What Apple

25   told the world was we're reducing 3 percent to reflect the

OLIVER - REDIRECT / EVEN

1  cost of payment services, correct?

2  **A.**  I think that's the simplified version.  I think what we --

3  **Q.**  Yes, sir, that's the simplified version.  I understand.

4       Is that a yes, that's what Apple told the world at the

5  time?

6  **A.**  I don't remember what the specific public statement was.

7  **Q.**  You understand that at 27 percent, Apple makes roughly the

8  same money on a linked purchase within the seven days as it

9  does on an IAP purchase, correct?

10 **A.**  Yes, roughly.

11 **Q.**  And you understand that for a developer, transactions

12 within the seven days are going to cost roughly the same or

13 more on linked transactions as compared to IAP, correct?

14 **A.**  Yes.

15 **Q.**  And the reduction in Apple's revenue and margins that you

16 calculated in the price committee deck come primarily from the

17 assumption that in fact many, many linked-out transactions

18 would occur outside of the seven-day window and therefore

19 would not be subject to any commission, right?

20 **A.**  Correct.

21 **Q.**  And that same assumption is also the driver behind the

22 18 percent effective commission calculated in the price

23 committee deck, correct?

24 **A.**  Correct.

25 **Q.**  So I want to understand the scenario that's envisioned

1    here.  I play *Boom Beach*.  Nobody knows.  It's a confession

2    here.  I play *Boom Beach* regularly.  You know the game?

3    **A.**  Yes.

4    **Q.**  Okay.  In *Boom Beach*, you understand that I can purchase a

5    diamond package to upgrade my base, my weapons, et cetera,

6    correct?

7    **A.**  Yes, that sounds right.

8    **Q.**  And if the developer Supercell adopted purchase links and

9    I found that link, I could do so -- I could purchase that by

10   clicking on the link and going to a web store, correct?

11   **A.**  Correct.

12   **Q.**  I would then spend those diamonds over time, correct?

13   **A.**  Correct.

14   **Q.**  Now, the next time I would actually need diamonds would

15   occur while I am playing *Boom Beach* again, correct?

16   **A.**  It depends, but, yes, usually.

17   **Q.**  I don't need the diamonds for *Boom Beach* anywhere outside

18   of *Boom Beach*, do I?

19   **A.**  I don't think so.

20   **Q.**  And in the scenario that you envision is that instead of

21   me going back to the link that took me to the store the first

22   time, I would get out of *Boom Beach*, open Safari, manually

23   type in www.supercell.com/BoomBeach, or whatever is the

24   relevant URL, and go to the store that way?

25   **A.**  Correct.  Or through other communication channels driven

OLIVER - REDIRECT / EVEN

1   by --

2   **Q.** And --

3   **A.** -- the developer.

4   **Q.** And you think that roughly 50 percent of people would do

5   that.

6   **A.** No.

7   **Q.** I apologize.  You think roughly 50 percent of transactions

8   would be made that way.

9   **A.** No.

10  **Q.** Okay.  Let me try again.

11       Your assumption is that 50 percent of revenues are going

12  to come from people who followed the manual process I just

13  described or get to the store through some other way but not

14  by simply following the link within *Boom Beach*, correct?

15  **A.** I -- I just want to clarify that --

16  **Q.** Sir, it's a yes or no question.  That's your assumption,

17  that 50 percent of people would click again, the other

18  50 percent will not click, correct?

19  **A.** The clarification is the 50 percent would click again only

20  of the percentage of customers that have already gone through

21  the linkout for the first time.

22  **Q.** I understand.

23  **A.** But it's --

24                        (Simultaneous colloquy.)

25            **THE COURT:** Hey.

 1    BY MR. EVEN:

 2    Q.  Sir --

 3            MR. EVEN:  I apologize, Your Honor.

 4            THE COURT:  Do not --

 5       Go ahead.

 6    BY MR. EVEN:

 7    Q.  Sir, in my example, I already clicked once.  I already

 8    have diamonds from a linked purchase.  In your assumption,

 9    there's a 50 percent chance that I click again for my next

10    purchase, correct?

11    A.  Correct.

12    Q.  And that means that there's a 50 percent chance that I

13    won't click again for my next purchase, correct?

14    A.  Correct.

15    Q.  And instead of clicking again, I will have to open up

16    Safari, manually type the URL and get to the store or get some

17    email or something like that, correct?

18    A.  Correct.

19    Q.  You presented no evidence or analyses suggesting that any

20    people would do that, let alone 50 percent, correct?

21    A.  We had significant evidence.

22    Q.  Sir, I'm not asking what you had.  I'm asking did you

23    present in this court any analysis suggesting that people

24    would actually do that, not go to the same link, but instead

25    open up -- get out of the app, open up Safari, type a manual

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  URL, and go to the store a different way?

2  **A.**  I believe we were asked to produce that evidence

3  yesterday.

4  **Q.**  Sir, the answer is no, you have not provided any such

5  evidence to the Court so far?

6  **A.**  I was asked to produce it yesterday.  So I don't know if

7  it's been produced yet.

8  **Q.**  Okay.  You have not presented any such evidence in court?

9  **A.**  We discussed the assumptions underlying that.

10  **Q.**  Sir, you have not presented such evidence in court,

11  correct?

12  **A.**  In my last section I just talked about the evidence

13  that --

14          **THE COURT:**  He's talking about the evidence, physical

15  evidence.

16          **THE WITNESS:**  Then no.

17  **BY MR. EVEN:**

18  **Q.**  Now, we both understand that if most users actually click

19  on the link again, then the assumptions about an 18 percent

20  commission rate and a drop in Apple's revenues would be wrong,

21  correct?

22  **A.**  Correct.

23  **Q.**  And if no user would do that, then the effective rate is

24  going to stay 27 percent and there would be no revenue loss by

25  Apple at all except for some monitoring costs, correct?

1    **A.**   Sorry.  Just for clarification, you mean if everyone

2    clicks through again?

3    **Q.**   Correct.  If everybody after clicking once will say I like

4    the way this works, I'm going to click again.

5    **A.**   Then you're correct, yes.

6    **Q.**   You testified yesterday that the 50/50 percent, I think

7    you said you acknowledged that was the hardest thing to come

8    to identify evidence for, correct?

9    **A.**   Yes.

10   **Q.**   Do you have an understanding why Mr. Roman testified that

11   there is no evidence, or as you said, that there is evidence

12   having not put in a declaration, heard Mr. -- or Apple having

13   heard Mr. Roman's testimony, how come that a week later all of

14   a sudden we have testimony about evidence for this?

15   **A.**   I didn't hear Mr. Roman's testimony.

16   **Q.**   I understand you didn't.  But do you have an understanding

17   how come there was no testimony about this in Mr. Roman's

18   declaration, and when he was asked point blank by me and by

19   the Court, I believe, about this, he testified that there was

20   no analysis done.  Do you have an explanation for that?

21   **A.**   I don't.

22   **Q.**   Okay.  You testified yesterday and I think today that one

23   of the reasons to retain Analysis Group is that it was, quote,

24   clear that we needed to do more work to justify the fees that

25   we were charging.  Correct?

1    **A.**   Yes.

2    **Q.**   You also said in that context that you were aware that the

3    Court found that at trial, that Apple had not adequately

4    justified its 30 percent rate, correct?

5    **A.**   Yes.

6    **Q.**   When you said that Apple needed to do more work to justify

7    the fees, you meant justify the fees to this Court, correct?

8    **A.**   Yes.

9    **Q.**   And the Analysis Group deck was geared towards protecting

10   Apple's position before this Court, correct?

11   **A.**   No.

12   **Q.**   Well, you said you retained them to justify the chart, the

13   rates to this Court.  And so I'm asking you again.  The

14   Analysis Group deck was geared towards protecting Apple's

15   position before this Court, correct?

16   **A.**   It gave us additional data points that help support our

17   position before this Court.

18   **Q.**   It was what we lawyers called made for litigation,

19   correct?

20   **A.**   No.

21   **Q.**   The Analysis Group's -- your goal for the Analysis Group

22   was to provide as much justification about how Apple's fees

23   that you were approaching would be considered reasonable,

24   right?

25   **A.**   That wasn't our goal.

1    **Q.**  That was not your goal?

2        Okay.  So if somebody testified that the goal was to

3    provide as much justification about how Apple's fees that you

4    were approaching would be considered reasonable, that would

5    not be correct?

6    **A.**  We -- we wanted to get additional data points that helped

7    to justify the reasonableness of our --

8    **Q.**  Sir?

9    **A.**  Yes, sir.  I'm -- maybe I'm not understanding the

10   question.

11   **Q.**  If somebody testified that providing as much just -- that

12   the goal for the Analysis Group was to provide as much

13   justification about how Apple's fees that you were approaching

14   would be considered reasonable, that would -- you would

15   disagree with that?

16   **A.**  I -- I believe I would.

17   **Q.**  Okay.  That was your testimony yesterday that I'm reading.

18           **THE COURT:**  So which is it?

19           **THE WITNESS:**  The point I was trying to make is that

20   we are trying to get additional data points that help to show

21   that our fees are reasonable, and so we engaged --

22           **THE COURT:**  Your 27 percent fee?

23           **THE WITNESS:**  And the time window that we used.

24   **BY MR. EVEN:**

25   **Q.**  Sir, at the time you retained them, you didn't have a

1   27 percent fee, correct?

2   **A.**   Not in the U.S.

3   **Q.**   They're not talking about outside of the U.S., sir, do

4   they?  You retained them to justify the fees that you were

5   charging at the time and approaching to charge once the

6   injunction kicks in, correct?

7   **A.**   Helping us to provide data points for that, yes.

8   **Q.**   So let's talk a little bit about some of the things you

9   covered in the Analysis Group just to understand how robust

10  that analysis is.

11      Let's begin with the Court's question to you about the use

12  and cost of tools.  Do you remember that exchange?

13  **A.**   I do, yes.

14  **Q.**   So let's go to CX-14.59.

15                      (Exhibit published.)

16          **THE COURT:**   And it take it CX-54 you want in

17  evidence?

18          **MR. EVEN:**   Yes, Your Honor, please.  I appreciate

19  that.

20          **THE COURT:**   That's admitted.

21       (Plaintiff's Exhibit CX-54 received in evidence.)

22          **MR. EVEN:**   Thank you, Your Honor.

23          **THE WITNESS:**   Yes.

24          **MR. EVEN:**   Sorry.  Go to 14.60.  Let's start there.

25                      (Exhibit published.)

OLIVER - REDIRECT / EVEN

1  **BY MR. EVEN:**

2  **Q.** And do you see here that Analysis Group is coming up with

3  percentages based on aggregate numbers for the value of

4  various tools, correct?

5  **A.** Correct.

6  **Q.** And so for a large developer, let's start with the lower

7  bound, it's -- it's hidden, I guess, but it's somewhere lower

8  than 5.4 percent, correct?

9  **A.** Correct.

10  **Q.** All right.

11  Now, you see that the total charge is 1.62 million for

12  these tools, correct?

13  **A.** Correct.

14  **Q.** And out of that 1.6 million, so like 99-point-something

15  percent comes from something called innovative technologies,

16  correct?

17  **A.** Correct.

18  **Q.** Let's go to the prior page.

19        **THE COURT:** Hold on.  Oh, I see it.  I was looking

20  for that line, but I see it now.  Go ahead.

21  **BY MR. EVEN:**

22  **Q.** On the prior page, you explain what are the assumed

23  packages meaning what are the tools that developers actually

24  use, correct?

25  **A.** Correct.

1   **Q.** And under innovative technologies that are responsible for

2   99-point-something percent of the cost, the innovative

3   technology is *Unreal Engine*, correct?

4   **A.** Correct.

5   **Q.** *Unreal Engine* is not a tool made by Apple, correct?

6   **A.** Correct.

7   **Q.** *Unreal Engine* is a tool that is used by developers to

8   develop -- to develop applications for all kinds of platforms,

9   correct?

10  **A.** Correct.

11  **Q.** One of those platforms is the iPhone, correct?

12  **A.** Correct.

13  **Q.** And so when a developer of a game needs a tool to develop

14  a game for iOS that's very high level, it goes out and it pays

15  Epic for the *Unreal Engine* in addition to the tools that are

16  used that it receives from Apple, correct?

17  **A.** Correct.

18  **Q.** And so what this shows is that out of the 1.62 million

19  that we've seen, 1.6 million would need to be paid to Epic

20  anyway above and beyond any tool that Apple provides because

21  Apple doesn't have a tool that provides commensurate

22  performance with *Unreal Engine*, right?

23  **A.** I don't agree with that.

24  **Q.** Sir, that's what the chart shows.  It shows that a large

25  developer would need to pay for *Unreal Engine*, and you just

 1    agreed with me, I think, that it would need to pay that

 2    whether it uses Apple's tools or not.  That's an additional

 3    cost, correct?

 4    **A.**  Yes.

 5    **Q.**  Okay.  And so if we take out the *Unreal Engine* cost, which

 6    is a separate line item, it's not something that Apple

 7    provides anything that's corollary to that, what we're left

 8    with is somewhere that is around 0.1 percent, right?

 9    **A.**  I don't agree with your statement.

10    **Q.**  Okay.

11    **A.**  Your math is correct, though.

12    **Q.**  I appreciate that.

13        You talked about the value of discovery, correct?

14    **A.**  Correct.

15    **Q.**  One main value of discovery in the App Store is what comes

16    up when I type, for instance, strategic games, correct?

17    **A.**  Correct.

18    **Q.**  And Apple charges for that, right?

19    **A.**  If a developer chooses to use our search ad product, they

20    do, yes.

21    **Q.**  Absolutely.  If a developer wants discovery on the store,

22    they need to pay for it separately and above the 27 or

23    30 percent.  That's search advertising on the store and

24    developers pay millions for it, right?

25    **A.**  To clarify, they pay for search advertising, but there's

 1   also organic search and browse discovery.

 2   **Q.**   Sir --

 3          **THE COURT:**  What do they pay for search advertising?

 4          **THE WITNESS:**  For those developers that want to show

 5   up in a specific -- for a specific key word, they have the

 6   option to pay for that.

 7          **THE COURT:**  How much is my question.

 8          **THE WITNESS:**  On an absolute basis, I -- I don't

 9   know.

10          **THE COURT:**  Well, where is that in this data on

11   search?

12          **THE WITNESS:**  Actually, our discovery section only

13   covers the browse tabs.  So any search capabilities --

14          **THE COURT:**  Where did you address, then, the fact

15   that they need to pay additionally for this premium service?

16          **THE WITNESS:**  We're actually more conservative

17   because we only incorporated organic discovery that was

18   happening to our browse tabs.  So the additional value --

19          **THE COURT:**  You call that conservative.  I'm looking

20   for the analysis -- look, there was lots of testimony at the

21   trial about Apple's search engine, and I've referenced that

22   before.

23          **THE WITNESS:**  Correct.

24          **THE COURT:**  So they've got a problem, and -- and one

25   of the things that they did is they charged so that developers

1   could have better search results.  And this is nowhere in the

2   analysis?

3          **THE WITNESS:**  So we actually for that -- in part

4   because of that reason of the -- the concerns about search, we

5   actually focus exclusively on -- on the browse discovery which

6   doesn't value any of the search capabilities that are provided

7   developers as well.  So --

8          **THE COURT:**  But --

9                    (Simultaneous colloquy.)

10         **THE COURT:**  -- you're still asking developers to pay

11  an additional amount for search advertising.

12         **THE WITNESS:**  That's an additional service.

13  Independent of the commission.

14         **THE COURT:**  And you don't know how much that is?

15         **THE WITNESS:**  I don't.  That's not part of my

16  business responsibility.

17         **THE COURT:**  Go ahead.

18         **MR. EVEN:**  Thank you, Your Honor.

19  Q.  Just so we're clear, Apple collects billions every year on

20  search in the store, correct?

21  A.  I don't know the number.

22  Q.  I'm not asking if you know the number.  Do you understand

23  that it's in the billions?

24  A.  That seems right, yes.

25  Q.  You talked about benchmarking and you suggested to

1  Ms. Richman that you used headline rates from other stores

2  because there's no publicly available information about the

3  discounts that stores provide, correct?

4  **A.**  Yes.

5  **Q.**  Yesterday you told the Court that you did not look at

6  comparables like cloud because you didn't have the data about

7  their rates, correct?

8  **A.**  We didn't have the data about the usage.

9  **Q.**  Sir, so here you did have the data and you decided to use

10  data about headline rates that this Court has already found to

11  be the wrong benchmarking point?

12  **A.**  I'm sorry.  I'm confused by your question.  Can you reask

13  it.

14  **Q.**  Yesterday you presented to this Court that when you didn't

15  have the data, you didn't use that information from

16  benchmarking.  Here you have data that is, not that you don't

17  know it, you know that it's wrong.  You went ahead and used

18  it, correct?

19  **A.**  It was one of a variety of data points we used.

20  **Q.**  Sir, it's the whole part two of the analysis.  It's

21  benchmarking to other stores, correct?

22  **A.**  A variety of other stores and marketplaces, yes.

23  **Q.**  And if the variety of other stores -- and you are

24  comparing to their headline rate of all of them, correct?

25  **A.**  In our pricing deck, we do compare to headline rates, yes.

1    **Q.**   In the Analysis Group deck, that's what they've done,

2    correct?

3    **A.**   That's correct.

4    **Q.**   And then you took that and reflected a similar analysis in

5    your price committee deck?

6    **A.**   Yes.

7    **Q.**   And you know that that has already been found to be, not

8    just unknown data, wrong data.

9    **A.**   So I know there are lower effective rates that are offered

10   that --

11   **Q.**   Sir, you know that this Court has found that this is data

12   that is improper, suspect for benchmarking purposes?

13   **A.**   Yes, that sounds correct.

14          **THE COURT:**  But you consciously did it anyway, right?

15          **THE WITNESS:**  The data -- it was the data points that

16   we had available to us as one of a variety of data points.

17          **THE COURT:**  So the answer to my question is yes.

18          **THE WITNESS:**  Yes.

19   **BY MR. EVEN:**

20   **Q.**   If you go to Slide 5.10 -- sorry -- 15.10.

21                     (Exhibit published.)

22          **THE WITNESS:**  Yes.

23   **BY MR. EVEN:**

24   **Q.**   I think I asked you about a similar slide yesterday and

25   then Ms. Richman asked you today, and you keep saying that the

 1    rate is between one and four percent, right?

 2    **A.**  Yes.

 3    **Q.**  The only store here that actually provides a good

 4    comparison is the ONE Store, correct?  That's the closest

 5    thing, it's an actual app store?

 6    **A.**  Google Play is also listed here.

 7    **Q.**  All right.  So you want to compare to a known monopolist

 8    in violation of the antitrust laws, that's your benchmark?

 9    **A.**  We compete actively with Google Play.

10            **THE COURT:**  I didn't hear that.  What?

11            **THE WITNESS:**  Sorry.  We compete actively with Google

12    Play.

13            **THE COURT:**  That wasn't the question.  A jury found

14    that they were -- that they violated the antitrust rules, and

15    you knew when you included it, right?  You knew what the jury

16    finding was?

17            **THE WITNESS:**  Yes.

18    BY MR. EVEN:

19    **Q.**  So let's go to the ONE Store which is, in fact, an app

20    store, correct?

21    **A.**  Yes.

22    **Q.**  And it has not been found to be in violation of the

23    antitrust laws as far as we know, right?

24    **A.**  Yes.

25    **Q.**  And for the ONE Store, the fees for platform use are

 1   5 percent and incremental fees when payment occurs on platform

 2   is 15 percent, right?

 3   **A.**   Yes.

 4   **Q.**   And that would mean that the charge for payment-related

 5   services is how much?

 6   **A.**   10 percent.

 7   **Q.**   Is that between one and four percent?

 8   **A.**   No.

 9   **Q.**   Okay.  We can agree on that.

10           **THE COURT:**  So what do you know about the ONE Store?

11           **THE WITNESS:**  So the ONE Store is a store that is

12   only available in Korea and is focused on -- it's an Android

13   store only, focused on the Korean market at this point, though

14   they've expressed interest in expanding beyond Korea.

15           **MR. EVEN:**  May I proceed, Your Honor?

16           **THE COURT:**  I'm trying to understand the difference

17   between -- because I haven't studied this deck as much as

18   you -- the difference between the five and the 15 on here.

19           **MR. EVEN:**  I think I can clarify that, Your Honor.

20           **THE COURT:**  Thank you.

21   **BY MR. EVEN:**

22   **Q.**   What this deck is showing is that the ONE Store actually

23   allows developers to choose whether to use the ONE Store's

24   payment solution or another payment solution, correct?

25   **A.**   Correct.

1   **Q.**  And if the developer chooses to use the ONE Store for

2   distribution but PayPal, for instance, for payment solution,

3   it will only pay the ONE Store 5 percent fee, correct?

4   **A.**  That would be correct.

5   **Q.**  Whereas if it uses both distribution and payments from the

6   ONE Store, it will pay a 15 percent fee, correct?

7   **A.**  Correct.

8   **Q.**  And so the delta between using and not using the

9   ONE Store's payment solution for in-app purchases is

10  10 percent, correct?

11  **A.**  That's correct, yes.

12  **Q.**  And that's a comparison to the 3 percent delta in Apple's

13  proposed case, correct?

14  **A.**  Yes, but there are significant differences --

15  **Q.**  Sir, not what I asked.

16  **A.**  Yes.

17  **Q.**  That is the comparison here, correct?

18  **A.**  Yes.

19  **Q.**  Thank you.

20      If you go to 15.12, I want to try and make sure that we

21  understand what this slide is showing.

22      So you were asked some questions by Ms. Richman about this

23  and by the Court.  Do you recall that?

24  **A.**  I do, yes.

25                      (Exhibit published.)

OLIVER – REDIRECT / EVEN

1    BY MR. EVEN:

2    Q.   So what this is showing under affiliates, for instance,

3    for Microsoft is one to seven percent, correct?

4    A.   That's correct, yes.

5    Q.   And that would be a fee that Microsoft is willing to pay

6    affiliates, correct?

7    A.   Correct.

8    Q.   And so if you, for instance, are a famous influencer and

9    have a famous website, mroliver.com, and you have a lot of

10   users coming, you can put ads in that website, you can go on

11   and recommend Microsoft's products, et cetera.

12       And then if somebody clicks on a link at your site to

13   Microsoft and completes a purchase, Microsoft would be willing

14   to pay one to seven percent of that purchase, correct?

15   A.   That's correct.

16   Q.   Now, this reflects the fact that in my example you would

17   be making a real investment in trying to get people to the

18   Microsoft websites to purchase Microsoft products, right?

19   A.   I think it depends, but generally you are helping them to

20   market their products, yes.

21   Q.   So you are recommending them, advertising them, anything

22   like that, correct?

23   A.   That sounds right.

24   Q.   All right.  Now when I'm in Boom Beach [sic], for

25   instance --

1   **A.**   Yes.

2   **Q.**   Sorry -- *Beach Boom*, nothing from Apple tells me please go

3   outside of the app and buy some diamonds, correct?

4   **A.**   That's correct.

5   **Q.**   Nothing from Apple even tells me to buy diamonds, period.

6   That's up to Supercell, correct?

7   **A.**   That's correct.

8   **Q.**   Apple is not investing any effort in marketing the

9   diamonds within my game?

10   **A.**   That's not true.

11   **Q.**   Correct?

12      Sir, within the app, Apple is not going to cause anything

13   to cause me to buy more diamonds, correct?

14   **A.**   We drive a significant amount of usage into apps from the

15   store.

16   **Q.**   Sir, I'm not asking about the original download.  I'm now

17   asking --

18   **A.**   Neither am I.  Sorry.

19   **Q.**   -- within the app.  Within the app, you're not showing any

20   ads, you're not putting pop-ups saying we really think you

21   should upgrade to the next type of shape, you should really go

22   out and buy this additional weapon, all that within the app is

23   up to Supercell, correct?

24   **A.**   That's correct.

25   **Q.**   And yesterday, Analysis Group, under your supervision,

 1    thought that that it's relevant to compare the efforts in

 2    driving demand by affiliates to what's going on with in-app

 3    sales?

 4    **A.**   In terms of how to understand the attribution back to a

 5    click that happens from one location and the transactions that

 6    occur after that click, yes.

 7    **Q.**   Sir, we went yesterday at some length over the frictions

 8    that Apple puts up before somebody actually clicks on an -- on

 9    a purchase link.  You remember that?

10    **A.**   I do, yes.

11    **Q.**   Apple is not trying to enhance a developer's out-of-app

12    sales, it's trying to prevent those sales from happening,

13    right?

14    **A.**   No.

15    **Q.**   You talked a little bit about CX-14.36.  And that's this

16    calculation of --

17                        (Exhibit published.)

18    **BY MR. EVEN:**

19    **Q.**   -- so-called effective revenue -- effective commission

20    rate.  Sorry.

21    **A.**   Yes.

22    **Q.**   So this Court has heard, I believe, three and a half weeks

23    of testimony about Apple's App Store and commission.  You

24    understand that?

25    **A.**   Yes.

1    Q.   And that included economists and Apple personnel and

2    economists supported by Analysis Group.  You understand that?

3    A.   Yes.

4    Q.   And not one of them presented any calculation like this

5    where you add purchases on other platforms even though there's

6    no suggestion that Apple contributed to the linking of these

7    folks, and you add advertising revenue to try and drive down

8    the commission.  No one has presented that to this Court.

9         Do you understand that?

10   A.   That -- not to my knowledge.  You're correct.

11   Q.   In fact, this analysis is -- is so out there that you

12   didn't even put it in the pricing committee deck, right?

13   A.   We didn't end up using it for the price committee deck.

14   Q.   Next to what you call the effective commission rate,

15   there's a number for actual commission rate, right?

16   A.   Yes.

17   Q.   And that is the blended weighted average of the actual

18   commission that Apple collects on store billings, correct?

19   A.   Correct.

20   Q.   And that, as we discussed yesterday, is about six times

21   closer to 30 than to 15, correct?

22   A.   Correct.

23   Q.   And it's more than twice the effective commission rate

24   that Analysis Group managed to calculate here, correct?

25   A.   Correct.

1    **Q.**  The Court asked you about the delta between some of the

2    value numbers that Analysis Group came up with, 12.3 percent,

3    other numbers, and the 27 percent you actually landed on.  And

4    you said that the delta is reflected by the unique trust and

5    safety that Apple provides, right?

6    **A.**  There was a variety of factors.  That was one of the

7    factors, yes.

8    **Q.**  You agree with me that you've done no effort to actually

9    value that squishy concept of trust and safety, did you?

10   **A.**  Yeah, there are a number of intangible elements that are

11   very hard to value and so they are considered within the

12   range.

13   **Q.**  And so they're so hard to value that they could justify

14   just as easily a 20 percent delta between the numbers AG came

15   up with, a zero percent delta, a 50 percent delta.  There's

16   just no way for us to value or put a number on that, correct?

17   **A.**  They're very hard to value directly.

18   **Q.**  You've -- have you done any effort to value them?

19   **A.**  No.

20   **Q.**  You discussed that you talked about the ramp-up to a

21   steady state -- steady state of the world in adoption of new

22   programs.  Remember?

23   **A.**  New products and features, yes.

24   **Q.**  New products and features, okay.  One basic element of

25   that time to ramp is whether the consumers, whether they are

1   developers or users, actually want that product, correct?

2   **A.**   Correct.

3   **Q.**   So for instance, Apple new pretty quickly that the Apple

4   Newton is not going to ramp up, right?

5   **A.**   Before my time.

6   **Q.**   But you know what it is, right?

7   **A.**   Yes.

8   **Q.**   And you understand that everybody understood pretty

9   quickly it's not going to ramp up.

10  **A.**   I -- I don't want to speak for what people understood at

11  the time.

12  **Q.**   Okay.

13       Well, I want to talk a little bit about that ramp-up.   So

14  why don't you go back to CX-54 and 54.26.

15  **A.**   Sorry.   This is the new document.

16  **Q.**   Correct.   So this is now in evidence.

17                       (Exhibit published.)

18  **BY MR. EVEN:**

19  **Q.**   And this is the draft deck essentially from the January 11

20  or 12 of this year.   Correct?

21  **A.**   Sorry.   I just need to orient myself.   What slide are we

22  on?

23  **Q.**   We're not -- before we get to a slide, you see that the

24  first page says "App Store Price Committee U.S. Linked

25  Transactions January 11, '24."

1    **A.**   Yes.

2    **Q.**   And so you understand that this is the document we

3    discussed yesterday that was discussed and is essentially the

4    penultimate draft of the price committee deck, correct?

5    **A.**   That appears so, yes.

6    **Q.**   Okay.  So with that, why don't you turn to CX-54.26.

7    **A.**   Yes.

8    **Q.**   You're there?

9    **A.**   (Reviewing document.)

10   **Q.**   Are you there?

11   **A.**   I am, yes.  Thank you.

12   **Q.**   So first of all, in your -- you see that this is the same

13   kind of -- it's a draft of the analysis of net impact on

14   App Store margins that we discussed yesterday, correct?

15   **A.**   I believe so, yes.

16   **Q.**   Okay.  And you see in the right-hand side -- that one is

17   actually on the screen as well -- it's one of the few things

18   that Apple did not ask to -- to seal.  It says that the

19   assumption about billing linkout implementation is linear ramp

20   for FY24, correct?

21   **A.**   That looks like what it says, yes.

22   **Q.**   And linear means the ramp-up is going to be in a straight

23   line, correct?

24   **A.**   Correct.

25   **Q.**   And if four months in, we are at zero adoption under a

1   linear ramp-up assumption, that means we're going to stay at

2   zero forever, right?

3   **A.**  On a -- if we're assuming that this is reflective of the

4   linear ramp, yes.

5   **Q.**  I didn't assume linear.  You assumed linear, right?

6   **A.**  Correct.

7   **Q.**  Under a linear assumption, if we're at zero four months

8   in, we'll be at zero 40 years in, correct?

9   **A.**  Correct.

10  **Q.**  Notwithstanding that, do you see on the left-hand side

11  that there is all kind of the same sensitivity analysis based

12  on commission rates and duration of the window, correct?

13  **A.**  Correct.

14  **Q.**  And there are assumptions about what's going to happen to

15  Apple's revenue on the left side, and what's going to

16  happen -- sorry.  On the left side, what's going to happen to

17  the revenue for fiscal year '24.  And below that -- and,

18  sorry, to the right of that what's going to happen in steady

19  state, correct?

20  **A.**  Correct.

21  **Q.**  All right.

22      And this talks about what's going to happen in both

23  absolute values and as a percentage of revenue, correct?

24  **A.**  Correct.

25  **Q.**  And so if we look at 27 percent, for instance, without

1    talking about the numbers, but if we look at 27 percent in a

2    seven-day window, which is what actually was recommended and

3    adopted, you see that we are looking at an assumption that --

4    or an estimate that by the end of fiscal year 2024, there will

5    be a reduction -- a hit to Apple's revenues of hundreds of

6    millions of dollars.

7    **A.**   Correct.

8    **Q.**   Now, so far that hit has been zero, correct?

9    **A.**   That's correct.

10   **Q.**   And Apple's fiscal year for 2024, just so we're all clear,

11   ends on September 28, 2024, correct?

12   **A.**   That's correct.

13   **Q.**   So that's in less than four months?

14   **A.**   Correct.

15   **Q.**   So we're at zero now.  Your estimate was hundreds of

16   millions of dollars of hit to the revenue by September 28,

17   correct?

18   **A.**   That was the estimate at the time, yes.

19   **Q.**   Do you have a different estimate now?

20   **A.**   I would -- I would assume that we're going to be below

21   that for the fiscal year.

22   **Q.**   Okay.  Just so we're clear, for that assumption to be

23   correct, we would need linked purchases in the value of

24   billions, correct?

25   **A.**   The number of -- or in terms of the transactions flowing

1    through, the dollars flowing through?

2    **Q.**  Yes.

3    **A.**  Yes.

4    **Q.**  You testified that your team spoke to dozens of large

5    developers about the entitlement program?

6    **A.**  That's what they reported to me, yes.

7    **Q.**  Who on your team reported this?

8    **A.**  I spoke to one of my leaders, Chip Canter, who leads my

9    apps business development team.  And he reflected what he'd

10   heard from his -- his team and himself.

11            **THE COURT:**  What's the name?

12            **THE WITNESS:**  Chip Canter?

13            **THE COURT:**  C-A-N-T-O-R?

14            **THE WITNESS:**  T-E-R.

15   BY MR. EVEN:

16   **Q.**  Have any of these large developers indicated their belief

17   that they're actually going to adopt a link entitlement?

18   **A.**  That -- they were primarily asking a lot of questions.

19   **Q.**  Has any large developer indicated to your team that they

20   are going to adopt a purchase link?

21   **A.**  No.  I think primarily we're hearing questions at this

22   point.

23   **Q.**  No such large developer has been put forward by Apple,

24   correct?

25   **A.**  That's correct.

1           **THE COURT:**  As you sit here, you don't know of a

2     single large developer who's going to join this program,

3     right?

4           **THE WITNESS:**  None that I can name, no.

5     **BY MR. EVEN:**

6     **Q.**  There was some discussion between you and Ms. Richman

7     about the video and news partners program.

8     **A.**  Yes.

9     **Q.**  And you said that they have a meaningful installed base of

10    folks who are already tenured subscriptions, right?

11    **A.**  Yes.

12    **Q.**  We both understand that for that installed base, that

13    installed base is not going to use a linked purchase or IAP or

14    an IAP button, correct?  It's just the auto renews, correct?

15    **A.**  Correct.

16    **Q.**  So the only question is about new customers or customers

17    who churn, correct?

18    **A.**  Correct.

19    **Q.**  And the customers may churn because they leave the

20    subscription and come back, or as you said, a host of other

21    reasons, they may switch to a different program, different

22    subscription build, anything like that, correct?

23    **A.**  Correct.

24    **Q.**  Each of these events would be a churn, correct?

25    **A.**  I think all events you named would be a customer action

1    that would stop the commission.

2    **Q.**  Okay.  And under your eligibility criteria, the minute the

3    developer opts to have a link -- well, strike that.  Let me

4    ask it this way.

5        For a churn event, a renewal of a subscription, not auto

6    renew, a manual renew of a subscription or for a new customer,

7    for somebody like the *New York Times* or somebody like that,

8    they would be subject either to a 15 percent commission if

9    this is done on IAP and they don't steer, or to a 27 percent

10   if they do steer people outside of the app, correct?

11   **A.**  Once they leave the program, is that -- you're just

12   talking about one in the program and then one out of the

13   program.

14   **Q.**  I'm talking about -- yes.  If -- well, they have to leave

15   the program in order to have a purchase link, correct?

16   **A.**  Then once they're out of the program, the new subscription

17   would start at 30 percent within the app.

18   **Q.**  Understand.  Just trying to clarify the matrix, the

19   decision-making matrix.

20   **A.**  Yes.

21   **Q.**  What they see before them is if I don't steer, I get

22   15 percent for every new use or a churn, correct?

23   **A.**  In the program, yes.

24   **Q.**  In the program?

25   **A.**  Correct.

1    **Q.**  The minute I steer, I'm out of the program and I'm looking

2    at either 30 percent if the user chooses to do it within the

3    app or 27 percent if the user goes outside the app, correct?

4    **A.**  Correct.

5         **MR. EVEN:**  I have no further questions, Your Honor.

6    Thank you.

7         **THE COURT:**  Any reexamination limited to the scope?

8         **MS. RICHMAN:**  Yes, Your Honor.

9                         **RECROSS-EXAMINATION**

10   BY MS. RICHMAN:

11   **Q.**  Mr. Oliver, can you explain for the Court how Apple set a

12   commission rate of 27 percent in the Netherlands?

13   **A.**  Yes.  When we looked at the Netherlands, we looked at both

14   an opportunity -- or a requirement to allow for alternative

15   payments within the app as well as linking out from within the

16   app.  And for both of those, we set a commission rate that was

17   27 percent, which was equal to the commission minus the cost

18   of payments including the services provided around payments,

19   customer care, as well as a reasonable margin.

20   **Q.**  And in connection with that analysis, did you study what

21   it would cost for developers to acquire alternative payment

22   processing services?

23   **A.**  I believe we looked primarily at Apple's costs of

24   providing those services in that instance.

25   **Q.**  And beyond the Netherlands example, have you had occasion

OLIVER - RECROSS / RICHMAN

1  to analyze what payment processors charge to developers for

2  their services?

3  **A.**  Yes.

4  **Q.**  And do you have an understanding of what that range is?

5  **A.**  Yes.

6  **Q.**  And what is it?

7  **A.**  It's -- depends on the market.  It can range anywhere from

8  1 percent up to 4 percent or even higher for certain payment

9  methods.

10  **Q.**  Mr. Even asked you about a line item on Slide CX14.59

11  related to innovative technologies.

12  **A.**  Sorry.  Do I need to go to the --

13  **Q.**  Maybe not.  The question is does Apple offer any

14  innovative technologies that would fall into that category to

15  developers?

16  **A.**  Yes, it does.

17  **Q.**  And are those innovative technologies included in the

18  commission rate that Apple has set to developers who avail

19  themselves of the entitlement program?

20  **A.**  Yes, they are.

21  **Q.**  Can you give a couple examples of the innovative --

22          **THE COURT:**  Well, let me have the slide.

23      Slide number?

24          **MS. RICHMAN:**  Oh, I'm sorry, Your Honor.  It's 14.59.

25                  (Exhibit published.)

1          **THE COURT:**  Okay.  So are you saying that this

2     document doesn't reflect what they were thinking?

3          **THE WITNESS:**  So actually if you go to the prior

4     slide, 14.58, I think it reflects the logic from Analysis

5     Group.

6                         (Exhibit published.)

7          **THE WITNESS:**  So this lists some of the comparable

8     innovative technologies, things likes ARKit and LiveChat.

9          **THE COURT:**  Mr. Oliver, you've got -- you have

10    percentages on here.

11         **THE WITNESS:**  Sorry.  Where, Your Honor?

12         **THE COURT:**  This says --

13        Put 14.59.

14                        (Exhibit published.)

15         **THE COURT:**  No.  That's not my 14 --

16        Right there, 14.59.

17        It says that you're valuing the *Unreal Engine* at 5 percent

18    of revenues above 1 million, right?

19         **THE WITNESS:**  Yeah.  That's the comparison for

20    innovative technologies --

21         **THE COURT:**  Right.

22         **THE WITNESS:**  -- that AG used.

23         **THE COURT:**  And so I'm looking at that in

24    relationship to the next slide.  So there may be something

25    else, but it's -- the value isn't -- is over and above the

```
1    5 percent that you've already identified on the prior slide,

2    isn't it?

3           THE WITNESS:  So AG was using --

4           THE COURT:  Is it not?  Or is it?  Is this accurate

5    or is it not accurate?

6           THE WITNESS:  It's a comparison of innovative

7    technologies that are charged for.  So they're --

8           THE COURT:  Right.  And you didn't ignore the

9    5 percent that needs to be paid, did you?

10          THE WITNESS:  No, that would be in addition.

11   BY MS. RICHMAN:

12   Q.  Mr. Oliver, what was the purpose of -- of Analysis Group's

13   inclusion of valuation of innovative technologies in its

14   report?

15   A.  So there are a number --

16          THE COURT:  I don't understand that question.

17          MS. RICHMAN:  Excuse me?

18          THE COURT:  So rephrase it.

19   BY MS. RICHMAN:

20   Q.  Mr. Oliver, you see on Slide 14.59 that Analysis Group

21   included a row entitled "Innovative Technologies"?

22   A.  I do, yes.

23   Q.  And do you have understanding as -- as to why Analysis

24   Group attempted to value Apple's innovative technologies that

25   it makes available to developers?
```

1    **A.**   Yeah.  So there are a category of technologies that are

2    fairly unique to Apple, like Augmented Reality Kit or ARKit,

3    and those technologies are hard to value based on direct

4    comparables in the market.

5        So they used another bundle of similar tools and

6    technologies with the game engine as a representative example

7    to compare against.

8        So the intent was to provide a set of tools and

9    technologist that were comparable but not necessarily the

10   same -- the same line items.

11   **Q.**  Mr. Even asked you --

12           **THE COURT:**  So on the next slide, .60, that

13   5.4 percent that's there, are you saying that the innovative

14   technologies portion of this represents five percent and that

15   all that's left is the .4?  That everything else is .4?

16           **THE WITNESS:**  In this instance, yes.  It is heavily

17   weighted towards innovative technologies.

18           **THE COURT:**  Go ahead.

19   **BY MS. RICHMAN:**

20   **Q.**  Mr. Even asked you about Apple's discovery services.  Do

21   you remember that?

22   **A.**  I do, yes.

23   **Q.**  And you talked about Apple charging for Apple ads; is that

24   right?

25   **A.**  Correct.

1   **Q.**   Is Apple ads encompassed -- payment for Apple ads

2   encompassed in the valuation of discovery that AG provided?

3   **A.**   It's not, no.

4   **Q.**   And I think you characterized that as conservative; is

5   that right?

6   **A.**   Correct.

7   **Q.**   And can you explain why that was conservative?

8   **A.**   So in talking to AG, we tried to narrow this to

9   installations or downloads that are only coming from Apple's

10  browse tabs.  That means the today tab, the apps tab, and the

11  games tab.

12       And so in terms of valuing the cost to replace those

13  installations that aren't driven by the App Store, we

14  intentionally excluded all of the search downloads which means

15  that we were only valuing a subset of the total installs that

16  would need to be replaced by a developer outside of the App

17  Store.

18  **Q.**   And I think you mentioned this earlier, but has Apple made

19  any improvements to its organic search capabilities since

20  May 2021?

21  **A.**   Yes.

22  **Q.**   And can you just remind us what those are?

23  **A.**   We have made a number of different improvements to the

24  search algorithm to make sure that we are incorporating new

25  signals to make it even easier for users to discover the apps

1    and games they're looking for.

2        We've also changed the search -- the search landing page

3    to make that better at driving discovery of new apps and

4    games.

5    **Q.**  Mr. Oliver, could you please turn to Slide CX-15.10.

6    **A.**  (Reviewing document.)

7                         (Exhibit published.)

8              **THE WITNESS:**  Yes.

9    **BY MS. RICHMAN:**

10   **Q.**  There was discussion about ONE Store's payment fees.  Do

11   you remember that?

12   **A.**  I do, yes.

13   **Q.**  Could you explain whether you think ONE Store is a good

14   comparable for determining payment processing fees that

15   developers pay?

16   **A.**  We didn't think it was a great comparable because it's a

17   store with incredibly limited scale.  It only operates in one

18   market and it has a fairly small percentage of the business

19   in -- on Android in that market.

20       It also has a very different set of kind of payment

21   capabilities than the App Store offers.  So we -- we didn't

22   think it was a direct comparable to what we were looking at in

23   the U.S.

24   **Q.**  Thank you.

25       Can you turn to Slide 15.12.

1    **A.**   (Reviewing document.)

2                        (Exhibit published.)

3    **BY MS. RICHMAN:**

4    **Q.**   The first party affiliate program slide.

5    **A.**   Yes.

6    **Q.**   And Mr. Even asked you about Microsoft's payment to its

7    affiliates of a commission rate.  Do you remember that?

8    **A.**   I do yes.

9    **Q.**   And I think there's some confusion over this, but can you

10   explain how that program, that Microsoft affiliate program, is

11   comparable to Apple's discovery services that's providing

12   through the App Store?

13   **A.**   Yes.  So what Microsoft is effectively paying for with

14   this affiliate program is for influencers, bloggers, and other

15   affiliate partners to drive discovery back to a product or

16   service.

17       That is very comparable to what the App Store does from a

18   discovery perspective for apps and for the in-app content

19   within those apps.  And so we provide a comparable service.

20   And AG independently valued our discovery services in their

21   first section.

22   **Q.**   And was the primary purpose of AG's analysis of affiliate

23   programs -- well, strike that.

24       In Apple's price committee deck, did -- does it reflect

25   AG's findings regarding the commission rates charged by

OLIVER – RECROSS / RICHMAN

```
 1   affiliates?

 2   A.   It does not, no.

 3   Q.   And what aspect of the affiliate programs does the price

 4   committee deck reference in making its recommendation?

 5   A.   Only the time windows that affiliate programs use.

 6   Q.   And did you view that as the relevant aspect of AG's

 7   analysis here?

 8   A.   Yes.

 9   Q.   Could you please turn to 54.27.  It's in the new document.

10                    (Exhibit published.)

11           THE WITNESS:  Yes.

12   BY MS. RICHMAN:

13   Q.   Can you please explain what the percentage of churn is

14   from subscriptions?

15   A.   (Reviewing document.)

16       Sorry.  I don't know if I'm on the right slide.

17   Q.   Oh, sorry.  54.27.

18           THE COURT:  That's the Venn diagram.

19           THE WITNESS:  Okay.  Yes, got it.

20   BY MS. RICHMAN:

21   Q.   I think in connection with this slide you were talking

22   about churn?

23   A.   Yes.

24   Q.   From tenured subscription program or from subscriptions?

25   A.   Yes.  Sorry.  I think you may need to repeat the prior
```

1    question.

2                          (Simultaneous colloquy.)

3    **BY MS. RICHMAN:**

4    **Q.**  What did you mean by churn?

5    **A.**  So churn is when a user who is a subscriber decides to

6    leave a subscription.

7    **Q.**  And what -- do you have a number as to what average churn

8    rate is on subscriptions sold through the App Store?

9    **A.**  The average retention is fairly short, close to three

10   months, based on analysis that we've seen.

11   **Q.**  And you mentioned that customer actions will stop the

12   imposition of the commission.  Do you remember that?

13           **MR. EVEN:**  Objection.  Objection.

14           **THE COURT:**  What's the objection?

15           **MR. EVEN:**  Your Honor, I think we're far afield from

16   my cross at this point.  These were questions that Ms. Richman

17   asked the witness in her direct.  I did not even show this

18   slide.

19           **THE COURT:**  Sustained.

20           **MS. RICHMAN:**  Nothing further, Your Honor.

21           **THE WITNESS:**  All right.

22       Reexam limited to the scope?

23           **MR. EVEN:**  No further questions, Your Honor.

24           **THE COURT:**  You may step down.  You are not excused.

25   You may not talk to lawyers.  You may not talk to anyone until

1    I do not need your testimony again.

2          **MS. RICHMAN:**  Your Honor, may I just -- I'm sorry to

3    try your patience, but we still need access to Mr. Oliver for

4    the purpose of pulling documents.  So I just want to make

5    clear that we, for that limited purpose, can speak with him.

6          **THE COURT:**  For that limited purpose, yes, but I want

7    to make sure that you understand that you cannot talk to

8    anyone about your testimony, including your spouse, your

9    friends, the lawyers, parties, no one.  Do you understand?

10         **THE WITNESS:**  Yes, Your Honor.

11         **THE COURT:**  All right.

12      If I don't need you back here, the lawyers will advise

13   that you've been excused.  Until then, the order stands.

14      You may step down.

15         **THE WITNESS:**  Thank you.

16         **THE COURT:**  Next witness.

17       **MR. BORNSTEIN:**  Your Honor, Epic calls Phil Schiller

18   to the stand.

19      And, Your Honor, we have some binders for Mr. Schiller.

20   May we approach to bring those up?

21         **THE COURT:**  While you're doing that, let's take you

22   under oath, Mr. Schiller.

23         **THE CLERK:**  Please raise your right hand, sir.

24

25   / / /

1          **PHILIP SCHILLER,**

2    called as a witness by the plaintiff, having been duly sworn,

3    testified as follows:

4               **THE WITNESS:**  I do.

5               **THE CLERK:**  Thank you.  Please be seated.

6          Speak clearly into the microphone.  Please state your full

7    name and spell out your last name for the record.

8               **THE WITNESS:**  Philip William Schiller,

9    S-C-H-I-L-L-E-R.

10              **THE COURT:**  All right.  Good afternoon.

11              **THE WITNESS:**  Good afternoon, Your Honor.

12              **THE COURT:**  You may proceed.

13              **MR. BORNSTEIN:**  Thank you, Your Honor.

14              **DIRECT EXAMINATION**

15   BY MR. BORNSTEIN:

16   **Q.**  Mr. Schiller, good afternoon.

17   **A.**  Good afternoon.

18   **Q.**  You may, during the course of the exam, need to -- oh,

19   you're not going to need those binders.  I hope you have your

20   own binder then?

21   **A.**  I have no binders yet.

22   **Q.**  Okay.

23   **A.**  Thank you.  Now I have two binders.

24   **Q.**  Wonderful.  If -- if we need to refer to them, I'll ask

25   you to.  Otherwise you can just let them sit in front of you.

1          So you've -- you've been here before.  We don't need to do

2   a big introduction, but you are a person who was responsible

3   for helping create the App Store; is that right?

4   **A.**  Yes, I was.

5   **Q.**  And you helped to -- excuse me -- you helped to build the

6   processes behind the App Store as well?

7   **A.**  Yes, I did.

8   **Q.**  And currently your title at Apple is a somewhat unusual

9   one of Apple fellow; is that right?

10  **A.**  That is correct.

11  **Q.**  And to be clear, that's not some kind of honorary

12  retirement title, you are still working a day job at Apple,

13  right?

14  **A.**  I thought I might be working less now so it might have

15  been a little bit of that kind of a title, but turns out I'm

16  still working full-time.

17  **Q.**  Okay.  And one of the things that you do as an Apple

18  fellow working full-time is you explain and you defend the

19  practices of the App Store that you helped build when it comes

20  under scrutiny; is that right?

21  **A.**  That's not in my job description, but I do think there are

22  certainly times when I do that.

23  **Q.**  But you spend a lot of your -- a lot of your time

24  defending and explaining the App Store when it comes under

25  review; is that fair?

SCHILLER - DIRECT / BORNSTEIN

1    **A.**   I'm the executive in charge of it so --

2    **Q.**   So that's a yes.

3    **A.**   It happens from time to time, yes.

4    **Q.**   Okay.  Well, are you aware that at the end of March, the

5    *Wall Street Journal* wrote an article about you?

6    **A.**   I'm not sure if they wrote an article about me.  I know

7    they mentioned me in an article.

8    **Q.**   Okay.  Well, you're aware that in this article they

9    referred to you as the most ardent public defender of Apple's

10   ecosystem; did you hear that?

11   **A.**   I read that.

12   **Q.**   And is it true?  Are you in fact an ardent defender of

13   Apple's ecosystem, sir?

14   **A.**   Again it's my job to work on it and to talk about it

15   whenever I can help.  I don't know about -- I've never thought

16   of myself as a, quote, ardent defender.  It's not a term I

17   would have thought of.

18   **Q.**   All right.  Well, you do in fact defend the App Store when

19   it comes under review, correct?

20   **A.**   Some of the times when I speak to people, you may consider

21   that being a defensive explanation, but not always.

22   **Q.**   All right.  Let's try it a different way.  Sir, you

23   strongly believe that Apple's App Store practices are

24   beneficial for users, right?

25   **A.**   I do.

1    **Q.**   And you strongly believe that Apple's App Store practices

2    are beneficial for developers; is that right?

3    **A.**   Yes, I do.

4    **Q.**   And you strongly believe that Apple's App Store practices

5    are beneficial for Apple, correct?

6    **A.**   Yes, I do.

7    **Q.**   And you understand, though, that at the time of trial,

8    portions of Apple's app review guidelines were in violation of

9    California law, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And you understand that in order to comply with the

12   law, Apple has been ordered to change some of those practices,

13   right?

14   **A.**   Yes.

15   **Q.**   You understand that the Court found that what we'll call

16   the anti-steering provisions, if that's okay, were

17   anti-competitive, right?

18   **A.**   Yes.

19   **Q.**   And the Court imposed a remedy that requires Apple to

20   eliminate those provisions, correct?

21   **A.**   Yes.

22   **Q.**   And you're aware that Apple appealed the injunction to the

23   Ninth Circuit, and it survived, right?

24   **A.**   Yes.

25   **Q.**   And Apple brought the request to overturn the injunction

SCHILLER - DIRECT / BORNSTEIN

1   to the Supreme Court of the United States as well, which

2   declined to overturn the injunction, correct?

3   **A.**   Yes.

4   **Q.**   And so the injunction is final.  It's now in effect.  And

5   Apple has to comply with it.  Yes?

6   **A.**   Yes.

7   **Q.**   All right.

8       Now, the testimony we have heard is that the effort to put

9   together a plan to respond to the injunction began in earnest

10  in around April or May of 2023.  Is that accurate to your

11  recollection?

12  **A.**   No, that is not accurate.

13  **Q.**   Tell me, sir, when did the work really begin to respond to

14  the injunction?

15  **A.**   I began personally from the day the original order was

16  published and we received it in 2021.  I think some of the

17  people who have been testifying here got involved later than

18  that.  But we began as soon as we read the order.

19  **Q.**   Okay.  And the order was, at Apple's request, stayed in

20  2021, correct, pending appeal?

21  **A.**   Correct.

22  **Q.**   Okay.  And the group of people who've testified here and

23  who've put in declarations and otherwise given evidence to the

24  Court did not get involved until April or May of 2023; is that

25  right?

1    **A.**  Yes.

2    **Q.**  Okay.  And in April of 2023, there was an event of

3    significance.  That is when the Court of Appeals affirmed this

4    Court's order in relevant part with respect to the injunction,

5    correct?

6    **A.**  Yes.

7    **Q.**  Okay.  And so at that point in time, there were additional

8    people at Apple who were brought in, and the project was

9    expanded and increased; is that right?

10   **A.**  I -- well, it certainly took on a new effort.  I can't

11   think of the number of people before and the number of people

12   after and say expanded.  There were certainly people brought

13   on, but there were people involved previously too.

14   **Q.**  All right.  There was a new energy and a new effort given

15   to the response to the injunction in light of the Ninth

16   Circuit decision, right?

17   **A.**  Perhaps that would be a good description.

18   **Q.**  Okay.  And now you were personally involved in this

19   process of responding to the injunction, right?

20   **A.**  Yes.

21   **Q.**  Did you give an instruction of some kind in the spring of

22   2023 after the Ninth Circuit's decision to ramp up the

23   process?

24   **A.**  No, I did not.  I -- I remember my instructions to the

25   team I began working with in '21.  I don't remember a

SCHILLER - DIRECT / BORNSTEIN

1   different instruction in '23 other than, as you say, there

2   were new ruling and new work going on.  I'm not sure my

3   instructions were different.

4   **Q.**  Were the instructions that you gave in 2021 in writing?

5   **A.**  No, they were not.

6   **Q.**  Okay.  Tell the Court, please, what exactly your role was

7   in the efforts at Apple to respond to the Court's injunction.

8   I just want to understand the nature of your precise personal

9   role in the process.

10  **A.**  Through the previous approximately three years on working

11  on this, I have been leading my team and the cross-functional

12  team on the App Store to do work to plan for implementing the

13  changes for the injunction, to bring together the different

14  functions of Apple that need to work on it, which were many.

15      In meetings from quite frequently from -- at times to

16  review proposals, suggestions, ideas, and to help keep moving

17  the process along to implementation that would be shared and

18  enabled for developers.

19  **Q.**  And are you the senior person leading this effort?

20  **A.**  I would say that.  There are certainly other senior people

21  involved and in meetings with me of at least as senior as I

22  am, but I certainly try to take that leadership role in it.

23  **Q.**  And were you the final decision-maker on the details and

24  contours of the response plan that Apple announced on

25  January 16?

SCHILLER - DIRECT / BORNSTEIN

1   **A.**  I was one of the decision-makers, not the only one.

2   **Q.**  Who were the other final decision-makers along with you?

3   **A.**  Mr. Cook, Mr. Maestri, and there were other senior

4   executives who were involved in the meeting and provided

5   input, but I would say we were the primary approvers at the

6   end.

7   **Q.**  Did this go to the board of directors at Apple?

8   **A.**  I'm -- when you say "this," I'm not sure what you --

9   **Q.**  Did the response plan to the injunction that we've been

10  talking about go for approval to the board of directors?

11  **A.**  I don't believe -- I don't know if there was such a thing

12  as approval.  I believe there was an update.  And I was not in

13  attendance at that, but I believe there was some level of

14  update.

15  **Q.**  Okay.  So if we're looking for where the buck stops, the

16  buck stops with you, with Mr. Cook, and Mr. Maestri; is that

17  right?

18  **A.**  We were the senior decision-makers on the proposal that

19  you've been discussing here, yes.

20  **Q.**  And incidentally did this project have a name at Apple?

21  **A.**  I believe the team had more than one name throughout the

22  three years.  The last name I heard of was Wisconsin.

23  **Q.**  Do you know where that comes from, sir?

24  **A.**  No, I have had no idea.

25  **Q.**  Okay.  Well, let's -- let's clear up a couple of facts

1   about the timeline.

2       So there's a 27 percent standard fee for the external

3   purchase link which was approved by the price committee,

4   correct?

5   **A.** Yes.

6   **Q.** And that's you, Mr. Cook, and Mr. Maestri?

7   **A.** Well, the price committee is the whole group of people

8   meeting, but we were the decision-makers in that committee.

9   **Q.** Okay.  And so who else constitutes the price committee

10  besides the three of you?

11  **A.** Well, it -- it -- it varies from product to product.

12  **Q.** I apologize.  Who else constituted the price committee

13  beside the three of you for this matter?

14  **A.** Well, in addition to the three of us, there were Kate

15  Adams, our legal -- chief legal counsel was there.

16  Mr. Federighi, Mr. Cue, Mr. Joswiak.  Let's see.  Ms. Grenier.

17  Let's see.

18      Those are the names that come to mind.  There were

19  approximately just under 20 people in that committee meeting.

20  Of course Mr. Roman and Mr. Oliver as well as you're heard

21  from.

22  **Q.** Okay.

23  **A.** And Mr. Fischer.

24  **Q.** And all those people constitute the price committee, as

25  you understand?

 1   **A.**   I always refer to the price committee as the full

 2   committee even though there are a smaller subset making the

 3   final approval.

 4   **Q.**   All right.  Now you've -- you've been sitting here

 5   throughout these proceedings, correct?

 6   **A.**   Yes.

 7   **Q.**   All right.  So you heard some differing testimony from

 8   Mr. Roman and Mr. Oliver about when the last price committee

 9   meeting happened.

10       Do you recall Mr. Roman said he woke up on the morning of

11   the 16th and finalized the deck and presented and explained

12   everything in an in-person meeting on that day.

13       And Mr. Oliver said, no, no, no, it was four or five days

14   earlier and what happened on the 16th was just an email

15   exchange.

16       Do you recall all that?

17   **A.**   Yes, I do.

18   **Q.**   Okay.  Can you set it straight, Mr. Schiller?  When was

19   the last price committee meeting in person?

20   **A.**   The in-person meeting was on January 11th.  The deck was

21   presented there and we discussed it.  We did not finalize it.

22   There was still open questions about what we would decide.

23   And the final decision was handled via an email on the 16th.

24   **Q.**   Okay.  So you met on January 11 with the understanding

25   that the decision from the Supreme Court was likely to be

1    coming soon, correct?

2    **A.**   I believe that was known, yes.

3    **Q.**   Okay.  And at the time that you met on January 11, you had

4    already had a tentative plan of record for what this pricing

5    structure would look like, correct?

6    **A.**   Well, we had had a number of elements --

7    **Q.**   Did you or did you not have a tentative plan of record as

8    of January 11 when the price committee met for the last time?

9    **A.**   I would call it a likely plan of record.  It wasn't a plan

10   of record.  It was likely.  We --

11   **Q.**   Right.

12   **A.**   We knew we might likely --

13   **Q.**   You had a likely plan of record.

14   **A.**   Yes.

15   **Q.**   Okay.  And the likely plan of record on January 11 was a

16   27 percent standard fee with a 12 percent program fee just

17   like you ultimately landed on, correct?

18   **A.**   Yes.

19   **Q.**   And the tentative plan of record on January 11 was a

20   seven-day tracking window, correct?

21   **A.**   Yes.

22   **Q.**   Just like you ultimately landed on?

23   **A.**   Correct.

24   **Q.**   And it was the tentative plan of record on January 11 that

25   apps in the news partner program and the video partner program

1    would not be eligible for participation in the purchase link

2    entitlement, correct?

3    **A.**   Correct.

4    **Q.**   Okay.  And that's where you ultimately landed as well?

5    **A.**   That was the final decision.

6    **Q.**   All right.  Now you've made very clear, including your

7    testimony just now, about working back -- starting work back

8    in 2021, that Apple has put a lot of time and effort into

9    responding to the Court's injunction, correct?

10   **A.**   We try to, yes.

11   **Q.**   There have been significant resources in the effort,

12   correct?

13   **A.**   I believe so.

14   **Q.**   And Apple has carefully analyzed how it intended to

15   proceed; is that right?

16   **A.**   Yes.

17   **Q.**   Okay.  And this effort, as you said, involved really the

18   most senior people at Apple, including yourself, including the

19   CEO, correct?

20   **A.**   As all our pricing committee processes do.

21   **Q.**   And this one did?

22   **A.**   Yes.

23   **Q.**   Okay.  And it involved legal advice, correct?  I don't

24   want to know the content, but you got legal advice, right?

25   **A.**   Yes, sir.

1    **Q.**   And you got legal advice from inside counsel and outside

2    counsel on this?

3    **A.**   I primarily dealt with inside counsel.  I'm sure there was

4    outside counsel involved for the process.

5    **Q.**   So there was a very thoroughly vetted plan, right?

6    **A.**   I'm not sure compared to what you're using that reference.

7    It's -- there was a lot of work and a lot of people involved

8    in it.

9    **Q.**   But, Mr. Schiller, it's fair to say that this got

10   extensive review and attention at the company, correct?

11   **A.**   Yes.

12   **Q.**   Every piece of this plan was thought through, it's

13   purposeful, it's deliberate, there's no accidents in here,

14   right?

15   **A.**   In the major elements we're talking about, there was a lot

16   of time and thought on, and we worked very hard to make them

17   accurate and correct.

18   **Q.**   So if the Court ultimately concludes that there are

19   aspects of this plan or the entirety of this plan that don't

20   comply with the injunction, that's because of some deliberate

21   choice that Apple made, not because of carelessness or

22   inattention to the process, right?

23   **A.**   We certainly worked deliberately on these items.  We

24   didn't set out to be deliberately doing anything that would be

25   in disagreement with the Court.

1    **Q.**  Well, neither you nor I gets to decide that one.

2                        (Simultaneous colloquy.)

3    **BY MR. BORNSTEIN:**

4    **Q.**  You're aware that Apple submitted to the Court, once all

5    of the appeals of the injunction became final, something it

6    called a notice of compliance on January 16, right?

7    **A.**  Yes.

8    **Q.**  And you reviewed that document before it was filed,

9    correct?

10   **A.**  I believe I saw it before it was filed.

11   **Q.**  Right.  And you recall Mr. Fischer submitted a declaration

12   together with that filing, right?

13   **A.**  Yes, he did.

14   **Q.**  And you personally participated in preparing and

15   finalizing that declaration, right?

16   **A.**  I simply reviewed it.

17   **Q.**  Okay.  Well, Mr. Fischer, you recall he testified that you

18   read every word and you participated in the process.  Is

19   that -- was his testimony not right?

20   **A.**  I try to read every word that's sent to me.  Again, yes.

21   **Q.**  All right.  So you participated in the preparation of that

22   declaration and you agreed that what was in there was accurate

23   and complete, correct?

24   **A.**  Yes, the last part I agree with.

25   **Q.**  Okay.  I'll take that last part then.

1        You did not submit a declaration, right?

2    **A.**   No, I did not.

3    **Q.**   And this notice of compliance, you understand that it was

4    a voluntary filing by Apple, correct?

5    **A.**   I'm sorry.  I don't understand the legal distinction of

6    that so I'm not one to speak to what's -- kind of filing is of

7    what --

8    **Q.**   Fair.  Were you under the understanding that there was

9    some deadline that Apple was required to make this filing by

10   the Court or that Apple chose to make the filing on its own

11   volition?

12   **A.**   I'm not aware whether there was a deadline or not.

13   **Q.**   Okay.  The purpose of the filing, was it fair to say it

14   was to be transparent with the Court about what Apple was

15   doing?

16   **A.**   I -- I certainly would assume so.  Again, I'm not a lawyer

17   and I don't want to make assumptions about filings with the

18   Court.

19   **Q.**   All right.  Well, you read the filing, we've established,

20   right?

21   **A.**   Yes, I did.

22   **Q.**   Okay.  And in the filing, Apple laid out the rationales

23   that it had for the specific elements of the program that it

24   was announcing; is that right?

25   **A.**   I believe so.  Again, I don't remember the details of the

SCHILLER - DIRECT / BORNSTEIN

1  filing.

2  Q.  All right.  Well, the whole point of filing, Mr. Schiller,

3  was to explain it to the Court what the reasons were and what

4  you were doing, right?

5  A.  That makes sense.

6  Q.  All right.  And Apple intended to provide the Court with a

7  complete explanation for why it believes it is complying with

8  the injunction, correct?

9  A.  Again, I didn't write that filing.  I'm --

10 Q.  I understand you didn't write it.  You have lawyers.  I

11 get that.  We've met them.

12     The point is, Mr. Schiller, that Apple made this filing,

13 and the purpose of the brief and the declaration was to

14 provide the Court with as complete an explanation of what

15 Apple was doing as possible, right?

16 A.  I believe so.

17 Q.  All right.  You didn't have some significant justification

18 for your actions that you were hiding from the Court, right?

19 A.  I do not believe we were trying to hide anything from the

20 Court, no.

21 Q.  And -- and you didn't have some significant justification

22 for your actions that you just left out of the filing.  As you

23 say, you had careful lawyers working with you, right?

24 A.  Again, I -- I'm not quite sure what you want me to say

25 about the intention of the thing I didn't prepare.

1    **Q.**  Well, Mr. Schiller, you --

2                        (Simultaneous colloquy.)

3    **BY MR. BORNSTEIN:**

4    **Q.**  -- read the document, you participated in the content of

5    the document, and you signed off on filing the document,

6    right?

7    **A.**  I don't know what signed off means.  I read it before it

8    was filed.

9    **Q.**  Did you say, "No, we shouldn't file this document"?

10   **A.**  No, I did not.

11   **Q.**  Okay.  And you provided some comments on the document

12   before it was filed?

13   **A.**  I don't recall that I did.

14   **Q.**  But you believe it was accurate and complete?

15   **A.**  Sitting here today, I -- I believe it was.  I haven't seen

16   it or looked at it in a while.

17   **Q.**  All right.  Well, let's do a little bit different topic

18   then.

19       You know, because here we are, that Epic made a motion to

20   challenge Apple's compliance with the injunction, right?

21   **A.**  Yes.

22   **Q.**  And you know that Apple filed an opposition brief to that

23   motion.

24   **A.**  Yes.

25   **Q.**  And you reviewed that too, yes?

SCHILLER - DIRECT / BORNSTEIN

1   **A.**   I believe I saw it.  I wouldn't say I reviewed it.

2   **Q.**   Okay.  And you know that Mr. Roman filed a declaration in

3   support?

4   **A.**   Yes.  Yes, I do.

5   **Q.**   And no declaration from you, though?

6   **A.**   No.

7   **Q.**   And this was another opportunity for Apple to tell the

8   Court what it was doing and why.  Right?

9   **A.**   I believe so.

10  **Q.**   Okay.  And it wasn't just a general explanation of the

11  program.  Here Epic had made specific challenges and so Apple

12  had an opportunity to tell the Court why Epic was wrong and

13  why Apple had done what it had done.  Correct?

14  **A.**   I believe so.

15  **Q.**   And, again, Apple didn't leave out some significant reason

16  justifying its actions from that filing, right?

17  **A.**   Not to my knowledge.

18  **Q.**   Okay.  So if we do, over the course of your testimony,

19  hear some new rationale, Mr. Schiller, that's not in any of

20  these filings, we know it is just that, it is a new rationale

21  we're hearing, right?

22  **A.**   I don't know that that's necessarily the case.

23  **Q.**   Okay.  Well, this injunction, it requires Apple to

24  remove -- sorry -- to stop prohibiting developers from

25  including in their apps and in their meta data, buttons,

 1   external links, and other calls to action directing customers

 2   to other purchasing mechanisms, right?

 3   **A.**  Yes.

 4   **Q.**  Okay.  And you're aware that there is a detailed order

 5   that explains the rationale for the injunction.

 6   **A.**  Yes.

 7   **Q.**  Have you read the order?

 8   **A.**  Yes.

 9   **Q.**  Okay.  What is your understanding, Mr. Schiller, of the

10   rationale for the injunction?

11   **A.**  The injunction -- and I'm speaking as a layperson, not a

12   lawyer -- directed us to remove the veil, so to speak, from

13   the anti-steering terms of our guidelines that kept consumers

14   from having pricing information about other offers available

15   outside of the app.

16   **Q.**  Okay.  And what is your understanding of why the Court

17   ordered that to be done?

18   **A.**  The Court said that under the California laws, it was

19   illegal to not allow that information to be shared with

20   consumers.

21   **Q.**  Okay.  Mr. Schiller, do you have an understanding of why

22   the Court found that that practice or those practices were

23   illegal?  What was wrong with them?

24   **A.**  Again I have a layperson's understanding from listening in

25   court and from reading the document.  I am not a lawyer.

SCHILLER - DIRECT / BORNSTEIN

1    Q.   What is your understanding?

2    A.   The Court believed --

3         And, Your Honor, apologies if my characterizations of

4    these are so imprecise to your language.  I am not a lawyer.

5         The Court believed that pricing was being kept high by not

6    having price competition that -- from consumers seeing lower

7    prices that might be offered on the web through that

8    communication being withheld.

9    Q.   Okay.  And so what then do you understand the purpose of

10   the injunction to have been?

11   A.   The purpose of the injunction is to allow for

12   communication from developers to users about lower prices they

13   may offer on the web.

14   Q.   So the idea, you understand, is for there to be an open

15   flow of information that becomes available, right?

16   A.   No.  I don't recall reading something saying an open flow

17   of communication.

18   Q.   You don't recall the Court saying that the open flow of

19   information is critical in technology markets?

20   A.   I don't remember that exact phrase.

21   Q.   Okay.  Well, do you understand that the point of the

22   injunction was to make sure that iOS users could make informed

23   choices about their purchasing options?

24   A.   Yes.

25   Q.   Okay.  Because those informed choices would lead to more

1    price competition, right?

2    **A.**   Yes.

3    **Q.**   Okay.  So let's talk about how Apple has gone about trying

4    to comply with the injunction.

5        Mr. Fischer, when he testified last week, on questioning

6    from your counsel explained that Apple had four clear goals

7    that it aimed to achieve.  Do you recall that?

8    **A.**   Vaguely.  I don't remember the --

9    **Q.**   Well --

10   **A.**   -- exact four goals he said.

11   **Q.**   Well, one of the clear goals that he said Apple was

12   pursuing was to maintain the App Store's business model.  Do

13   you recall that?

14   **A.**   Yes.

15   **Q.**   Okay.  Now for the entirety of its existence, the App

16   Store's business model in the United States has been never to

17   charge a commission on out-of-app transactions, correct?

18   **A.**   No.

19   **Q.**   Well, you heard Mr. Oliver yesterday call that a

20   fundamental building block of Apple's monetization strategy

21   for the App Store, did you not?

22   **A.**   I did.

23   **Q.**   All right.  In what circumstance has Apple charged for

24   out-of-app transactions in the past, Mr. Schiller, in the

25   United States?

1   **A.**   Yes.   I believe that people who answered that question

2   didn't work on the App Store from the very beginning and don't

3   recall that there was a time before the multi-platform rule

4   where we required developers to charge users for any digital

5   goods or services consumed on the app and there wasn't the

6   ability to do the multi-platform rule.   So even if a user were

7   to purchase somewhere else, they -- the rules were at the time

8   that you would have to pay again in iOS.

9   **Q.**   All right.   So --

10  **A.**   So that was a time before multi-platform rule where that

11  was a different scenario.

12  **Q.**   So your clarification is to say let's go back several

13  years and there was a time where we did charge for out-of-app

14  transactions in some limited circumstances; that's what you're

15  saying?

16  **A.**   In any circumstance, yes.

17  **Q.**   Right.   Circumstances that where the multi-platform rule

18  would now capture them?

19  **A.**   Exactly.   The multi-platform rule changed that.

20  **Q.**   Right.   And so since the institution of the multi-platform

21  rule, the fundamental building blocks of these models are we

22  charge in the app and we don't charge for transactions that

23  happen outside the app, right?

24  **A.**   Yes.

25  **Q.**   Okay.   And with the exceedingly narrow exception recently

1    of dating apps in the Netherlands, that's what you've been

2    doing for years and years, right?

3    **A.**  Yes.

4    **Q.**  And with this brand-new external purchase link

5    entitlement, Apple is establishing a new commission for

6    out-of-app purchases, right?

7    **A.**  Yes.

8    **Q.**  All right.  So rather than maintaining the current

9    business model that exists, this is a change to the way Apple

10   has been operating, to impose a commission on out-of-app

11   purchases, right?

12   **A.**  No.  I -- I don't agree.  The first part of your statement

13   isn't accurate.

14   **Q.**  The first part of my statement is that right now, because

15   nobody's using this link entitlement, Apple doesn't charge

16   anything on out-of-app transactions.  Correct?

17   **A.**  Correct.

18   **Q.**  All right.

19       With the purchase link entitlement, Apple is imposing a

20   brand-new charge on purchase -- on external out-of-app

21   transactions.  That's what's happening, right?

22   **A.**  Again, I don't think that's completely accurate.

23   **Q.**  It's a new charge that's not being charged currently,

24   right?

25   **A.**  That is true.

1    **Q.**  You are imposing a new charge on these external purchase

2    links, correct?

3    **A.**  Correct.

4    **Q.**  All right.  And this is an expansion of the scope of

5    transactions on which Apple levies a charge.  Right?

6    **A.**  I don't agree with that.

7    **Q.**  And you don't agree that because of what Mr. Oliver said

8    earlier that right now those transactions happen through IAP,

9    and now that there's steering, there will be some transactions

10   that happen out of the app but you're still going to take a

11   commission on them; is that what you mean?

12   **A.**  It's based on the same thing.  It's not based on what he

13   said, but it's on what I believe.  There are, as you explained

14   it previously, two categories of transactions, to simplify it.

15   There's those that happen in the app for which there's a

16   commission, and there are those that happen through the user

17   going through the developer's website from any means the

18   developer guides them there, and those don't.

19       There's now a third class of -- of transaction different

20   than either the first or the second previously that starts in

21   the app and links out to pay in the app -- on the website and

22   come back to the app.  And so that is a new mode that did not

23   exist.  It's not exactly the same of either of the two.

24       So it's not that we're changing either of the two.  Those

25   remain.  There's now a third class to figure out how you

1     handle.

2          THE COURT:  Well --

3     BY MR. BORNSTEIN:

4     Q.  The only reason --

5          THE COURT:  -- not -- not if it's on day two, three,

6     four, five, six or seven.  And in fact, not if it's a linkout

7     with an hour later.  You want everything within the scope of

8     seven days so you've created yet another subcategory, correct?

9          THE WITNESS:  Close.  Not exactly.  There are --

10    again, a developer can continue to do all the things they do

11    today to drive transactions to their website for which Apple

12    gets no commission.

13       This -- in this scenario where they begin in the app,

14    Apple does want to get a commission during that seven-day

15    window --

16          THE COURT:  Right, but you -- you want to get it

17    without the link.  You're extending a link for a seven-day

18    period, correct?

19          THE WITNESS:  We are extending the link for seven-day

20    period, Your Honor, true.

21          THE COURT:  Right.  Next question.

22          MR. BORNSTEIN:  Thank you, Your Honor.

23    Q.  The only reason, Mr. Schiller, that there were two

24    categories previously, as you put it, and there wasn't this

25    third category is because Apple didn't allow developers to

 1    link out of the app, correct?

 2    **A.**   That's not the only reason, but that is part of what

 3    occurred.

 4    **Q.**   It is --

 5          **THE COURT:**   There was a prohibition, wasn't there,

 6    Mr. Schiller?

 7          **THE WITNESS:**   Yes.

 8          **THE COURT:**   Yes.  Answer the question.

 9    **BY MR. BORNSTEIN:**

10    **Q.**   The only reason that this category is new now is because

11    you didn't let people do it before, Mr. Schiller, right?

12    **A.**   Yes.

13    **Q.**   And you -- the Court determined that your decision not to

14    let people do it before was unlawful, right?

15    **A.**   Yes.

16    **Q.**   So why, Mr. Schiller, why do you think that Apple should

17    get the benefit on a go-forward basis of something that the

18    Court found to be unlawful?

19    **A.**   Because we are -- we are enabling what -- what was found

20    to be unlawful to occur.

21    **Q.**   You're enabling what was unlawful to occur?

22    **A.**   We are meeting the -- the requirements of the injunction

23    by removing the prohibition on linking out.

24          In considering what happens with that linkout, there was

25    a -- there was mention in the -- in the order about if a -- if

SCHILLER - DIRECT / BORNSTEIN

1   Apple has a right to a fee even without IAP being involved.

2   And there was --

3   **Q.**  So now you're giving a legal interpretation.

4   **A.**  I'm trying to answer my -- as a business person what I

5   understood from the order.

6   **Q.**  All right.  Well, let's do it this way.  I'll take your

7   categories.

8       Previously there were people who made purchases inside the

9   app using IAP, and they paid whatever commission was due on

10  those transactions, right?

11  **A.**  Yes.

12  **Q.**  Okay.  And that's still going to happen, right?

13  **A.**  Yes.

14  **Q.**  Okay.  And there were people who would go on the web,

15  however they got there, and they would make purchases on a

16  developer's website, and those would not be subject to a

17  commission, right?

18  **A.**  Yes.

19  **Q.**  And those are those fundamental building blocks that

20  Mr. Oliver talked about, right?

21  **A.**  Yes.

22  **Q.**  Okay.  There's another category that the order enables

23  which is linked-out purchases, right?

24  **A.**  Yes.

25  **Q.**  And before the order, those linked-out purchases were

1    prohibited by Apple.

2    **A.**   Yes.

3    **Q.**   Okay.  So transactions that now happen if this link

4    entitlement ever gets off the ground, transactions that now

5    happen through the link entitlement, your testimony is they

6    would previously have been IAP transactions; is that right?

7    **A.**   That is the belief, yes --

8    **Q.**   Okay.

9    **A.**   -- that we have.

10   **Q.**   And the only reason that those could not have been the

11   link transactions previously is that you didn't let link

12   transactions happen.  So what you're saying is that

13   transactions -- that developers are getting the benefit of

14   this link and they're saving money only because you previously

15   prohibited these transactions from happening at all.

16   **A.**   Those are not my words.

17   **Q.**   I understand those aren't your words, but that's what's

18   going on, Mr. Schiller, right?  When you say that people are

19   saving money by having a link, the only reason they're saving

20   money is because you were doing something unlawful previously

21   that stopped them from doing these transactions.

22   **A.**   But in the world where Apple does allow linking out

23   previously, it could have been or could not have been up to

24   Apple's terms with or without a commission, correct?

25   **Q.**   But -- but you didn't do it.  You told people that they

 1    couldn't link out.

 2    **A.**   I agree.

 3    **Q.**   Right.  And now you are trying to justify the fee that

 4    you're charging on the linked transactions on the basis of the

 5    unlawful behavior in which you were previously engaged.

 6    **A.**   No.  We're trying to enable what the law requires, and

 7    we've tried to figure out whether there's a rule about whether

 8    those are allowed to have commerce attached to them with Apple

 9    or not.

10    **Q.**   But -- again --

11                        (Simultaneous colloquy.)

12             **THE WITNESS:**  -- it could.

13    **BY MR. BORNSTEIN:**

14    **Q.**   Well, again, you and I don't get to decide that final

15    question.

16    **A.**   Yes.

17    **Q.**   Let's -- let's think about how Apple has handled similar

18    orders in other contexts.

19         There's been a lot of testimony about the Netherlands.

20    You've heard that all.  Right?

21    **A.**   Yes.

22    **Q.**   Okay.  Now in fact in Apple's notice of compliance that we

23    talked about, Apple said that it was in response to an order

24    of a competition regulator in the Netherlands that helped

25    provide a framework for Apple's implementation of the

1    injunction here in the United States, right?

2    **A.**   Yes.

3    **Q.**   Okay.  And the order we're talking about from the

4    Netherlands, it allowed dating apps -- or required Apple to

5    allow dating apps to use third-party payment systems and also

6    to link out to the developer's website.

7    **A.**   Yes, that sounds correct.

8    **Q.**   Okay.  And the order was, in part, then a prohibition on

9    anti-steering, just like the order here.

10   **A.**   I believe it was more focused on the payment method.

11   **Q.**   The order was --

12                      (Simultaneous colloquy.)

13            **THE WITNESS:**   -- but it also allowed for the

14   linking-out capability.

15   **BY MR. BORNSTEIN:**

16   **Q.**   Right.  That was part of the order.

17   **A.**   Yes.

18   **Q.**   Okay.  And Mr. Fischer, you may recall, gave testimony

19   about this.  He said that the entitlement was developed by

20   Apple at -- sorry.  He testified that the entitlement that was

21   developed by Apple was informed by discussions with Dutch

22   regulators.  Do you recall that?

23   **A.**   I believe he said that.

24   **Q.**   Is that true?  Was it informed by discussions with Dutch

25   regulators?

SCHILLER - DIRECT / BORNSTEIN

1   **A.**  I believe there were members of Apple that had discussions

2   with the Dutch -- Dutch regulators.  I was not party to that.

3   **Q.**  All right.  Well, let's just be very clear about it.  In

4   case the implication is that the Dutch regulators were happy

5   with what Apple did, the fact is the Dutch competition

6   authority found that Apple violated this order.  Correct?

7   **A.**  I am not sure about that.

8   **Q.**  You're not sure about that?  All right.  Well, should we

9   look at your binder please, CX-143.

10  **A.**  (Reviewing document.)

11      All right.  I have that open.

12  **Q.**  All right.  You see CX-143 is a -- a press release from

13  the Authority for Consumers and Markets?

14  **A.**  Yes, it looks to be that.

15  **Q.**  Okay.  And the title is "Apple fails to satisfy

16  requirements set by ACM."

17  **A.**  Yes, I see that.

18  **Q.**  And you understand the ACM is the Dutch competition

19  regulator?

20  **A.**  Yes, it is.

21  **Q.**  Okay.  And if you look down to the paragraph that says

22  "What is the matter right now?"  Do you see that?

23  **A.**  Yes, I see that.

24  **Q.**  It says that Apple has failed to satisfy the requirements

25  on several points.

1      Do you see that?

2   **A.**  Yes, I do.

3   **Q.**  And why don't we go up to the top of the document where it

4   says, "Apple has failed to satisfy requirements set by the

5   Netherlands Authority for Consumers and Markets regarding

6   payment systems for dating app providers."

7      Do you see that?

8   **A.**  Yes, I do.

9   **Q.**  Okay.  And you understand that Apple was fined for this

10  violation, $5 million a week, correct?

11  **A.**  I see that.

12  **Q.**  Sorry.  Five million euros per week?

13  **A.**  Euros, yes.

14  **Q.**  Now you're saying that as an Apple Fellow in charge of the

15  App Store, you were not aware that Apple received a

16  5-million-euro-per-week fine for violation of a Dutch

17  regulator's order?

18  **A.**  I didn't recall this from -- from December of '21.

19  **Q.**  Do you recall it now?  And it's not December of '21, by

20  the way.  This is in -- in 2022.

21  **A.**  Ah, January.

22  **Q.**  Do you recall now being find five million euro a week for

23  violating an order of the competition regulator regarding

24  payment systems and anti-steering?

25  **A.**  Vaguely.  I don't remember the details.

1    **Q.**  Okay.  Well, do you remember that in Korea, there was a

2    law passed that required Apple to allow developers to use

3    alternative payment methods in their apps?

4    **A.**  Yes.

5    **Q.**  And that law went into effect about two years ago?

6    **A.**  That sounds about right.

7    **Q.**  Okay.  And do you maybe recall that the Korea

8    Communications Commission concluded that Apple violated that

9    law, too?

10   **A.**  I, again, vaguely remember something about that, but not

11   the details.

12   **Q.**  All right.  Well, you have said, Mr. Schiller, that you

13   believe the requirements in Korea and in the Netherlands

14   detract from users' experiences on the App Store; is that

15   right?

16   **A.**  I don't recall that statement.

17   **Q.**  Well, do you believe that to be true that they detract

18   from users' experience on the App Store?

19   **A.**  Detract, no, I do not believe that right now, no.

20   **Q.**  Have you changed your mind?

21   **A.**  No.  I just -- I think we've worked to try to make it so

22   that it's -- it could work for everybody.  That's what I think

23   we've tried to do.

24   **Q.**  So if you said detract in the past, you've just gotten

25   better at fixing them; is that the import of what you're

SCHILLER - DIRECT / BORNSTEIN

1    saying now?

2    **A.**   No.   I've always been concerned about -- about models that

3    may not be safe for users in the risks that we create.   And

4    that hasn't changed.   My concern is always about those items.

5    **Q.**   Well, you believe that the law, as it has evolved in these

6    other countries, and we'll get to the United States, is

7    interfering with the operation of the App Store as you

8    envisioned it and you would prefer it to be run, right?

9    **A.**   It's not what -- about what I prefer.   I just worry about

10   the --

11   **Q.**   Well, Mr. Schiller --

12                   (Simultaneous colloquy.)

13   **BY MR. BORNSTEIN:**

14   **Q.**   -- I'm asking you about your preference.   So you can say

15   your preference isn't relevant.   That's my question.

16       You would rather not have to have linkouts, correct?

17   **A.**   In a perfect world, if -- if -- if -- if we could provide

18   customers the safest way to make a transaction, I think that's

19   great, that's always been something I'd prefer.   But I think

20   the world has changed, and linking out is becoming more

21   required for good reasons, and -- and I'm fine with that.

22   **Q.**   Okay, but that's not an answer.

23                   (Simultaneous colloquy.)

24           **THE WITNESS:**   Then my answer is I do not have a

25   preference against linkouts, no.

 1   BY MR. BORNSTEIN:

 2   Q.  You don't have a preference one way or the other?

 3   A.  I want to try to make the solution safe for our customers.

 4   That's what I'm focused on.

 5   Q.  You would not, in the Netherlands, in Korea, or in the

 6   United States, have allowed linkouts without a court order or

 7   regulatory action or legislative action, correct?

 8   A.  Those certainly led to us doing them, yes.

 9   Q.  And you would not have done it otherwise.  That was my

10   question.

11   A.  I don't know.  We've made so many changes through the

12   years, I'm not willing to say that we would never make this

13   change either.

14                    (Simultaneous colloquy.)

15   BY MR. BORNSTEIN:

16   Q.  But you appealed this Court's order all the way to the

17   Supreme Court.  You did not welcome it as a change that you

18   wanted to make.  Correct?

19   A.  Not me.  Apple did.  You're asking my preference and what

20   I would do and so --

21                    (Simultaneous colloquy.)

22   BY MR. BORNSTEIN:

23   Q.  Mr. Schiller, are you saying you disagreed with the

24   decision of your company to appeal the Court's injunction on

25   your App Store?

1    **A.**   No, I'm not --

2    **Q.**   Okay.

3    **A.**   -- saying that.

4    **Q.**   So Apple would not have added external purchase links

5    without action from a court, a regulator, or a legislature,

6    correct?

7    **A.**   Would not have?  No.  I think eventually, I think this is

8    something that could have occurred.  But it didn't matter.

9    It's not why it occurred.  Why it occurred is because of the

10   very actions you say.

11   **Q.**   Okay.  You did it because you were forced to do it?

12   **A.**   In this instance --

13   **Q.**   Correct?

14   **A.**   -- yes.

15   **Q.**   All right.  And then let's just round out the global

16   picture here for a second on Europe.

17        In Europe there are developments relating to anti-steering

18   and Apple as well, correct?

19   **A.**   Yes.

20   **Q.**   Right.  So one thing is Apple was fined over 1.8 billion

21   euros by the European commission relating to its anti-steering

22   provisions in connection with music streaming apps, right?

23   **A.**   Yes.

24   **Q.**   Because the EC found that Apple had applied restrictions

25   on app developers that prevented them from informing iOS users

SCHILLER – DIRECT / BORNSTEIN

1    about alternative and cheaper music subscription services

2    available outside the app, right?

3    **A.**  Yes.

4    **Q.**  Okay.  And in addition, in Europe, there is new

5    legislation called the Digital Markets Act, right?

6    **A.**  Yes.

7    **Q.**  And part of that legislation would require Apple to let

8    developers use alternative payments and also to include links

9    outside the app, correct?

10   **A.**  Yes.

11   **Q.**  Okay.  And Apple has, on its developer support page,

12   relating to this new European law stated that it believes that

13   it can create new threats to user security and to privacy and

14   may compromise the user experience, correct?

15   **A.**  Yes.

16   **Q.**  And you believe that to be true?

17   **A.**  I do.

18   **Q.**  Again, you believe this legal requirement that you are

19   facing to change the way the App Store functions and allow

20   linkouts is interfering with the App Store as you would prefer

21   it to be run.

22   **A.**  No.  I -- again, that's an extrapolation of the point.  I

23   believe these things create risks and things that we have to

24   work on to help mitigate and minimize so that users are safe.

25   It's not about what I prefer.

1    **Q.** All right. But Apple wouldn't do it unless it were forced

2    to do it, again, by the DMA.

3    **A.** The things we've added in Europe to address the DMA are

4    because of the regulations for the DMA.

5    **Q.** Right. And -- and let me ask the question a little bit of

6    a different way.

7        Do you, Mr. Schiller, consider transactions that are made

8    through external purchase links to be in competition with

9    transactions that are made through IAP?

10    **A.** No. I've not thought of them in that term at all, no.

11    **Q.** So is that -- you're saying you haven't thought about it

12    or you're saying that they're not competitive transactions?

13    **A.** They're just different transactions. We have transactions

14    that go through IAP and transactions that don't. I don't --

15    competition isn't a word that I apply to that.

16    **Q.** So your testimony is that transactions that are made

17    through a link are not in competition with transactions that

18    are made on IAP; is that correct?

19    **A.** That's not -- yeah, that's not how I think about it.

20    Similarly I don't think about physical goods as competition

21    for digital goods. They happen differently.

22    **Q.** It's the same good being purchased in the context of a

23    link versus IAP, Mr. Schiller, right?

24    **A.** Right. So, for example, with a multi-platform rule, never

25    thought about the multi-platform purchase as a competition for

 1    it.  It affects what we do.  It influences what we do.  But I

 2    just haven't thought of it with that word.

 3    Q.  So you don't recall during the trial your lawyers and your

 4    economists arguing and testifying to the Court that

 5    transactions that happen out of the app are in competition

 6    with transactions that happen through IAP?

 7    A.  I don't recall.

 8    Q.  Do you disagree with that?

 9    A.  Again, I think I haven't thought of them that way.

10    They -- you know, I don't know the legal standard and

11    terminology for that.  It's just now how I thought of it.

12        These are all different methods that -- that we need to

13    support for our customer to be able to make purchases through

14    different channels.

15    Q.  All right.  So let me make it even more basic,

16    Mr. Schiller.  When I go on -- I've never played *Beach Boom* or

17    whatever it was Mr. Even was talking about, but when -- when I

18    go on a game, if I play a game on my phone, and I buy

19    something through IAP, Apple gets a commission, right?

20    A.  Yes, we do.

21    Q.  Okay.  And if this game has a linkout and I buy something

22    through the linkout, Apple may or may not get a commission,

23    we'll see how everything shakes out, but it's not going to get

24    the same commission it gets as if I buy it through IAP, right?

25    A.  Correct.

1  **Q.**  Apple makes less money --

2  **A.**  Yes.

3  **Q.**  -- if I use the link.

4  **A.**  Yes.

5  **Q.**  And that's a choice that I have as a user about how I'm

6  going to make the purchase of the very same item?

7  **A.**  Yes.

8  **Q.**  And you don't view those two things as being in

9  competition with one another?

10  **A.**  I could see how they make sense with that description.  I

11  just hadn't thought of it that way.  But -- but, yes, again

12  I've just thought about here are things I need to work to

13  provide for our customers, and my job is to try to make them

14  work well and make them safe.

15  **Q.**  And you would rather have users make purchases through IAP

16  instead of making purchases through linked -- through external

17  purchase links because Apple makes more money through IAP

18  purchases, right?

19  **A.**  That's one consideration but not the only one.

20  **Q.**  All right.  Let me talk about some of the specifics of the

21  program and --

22          **THE COURT:**  So it sounds like you might be

23  transitioning.

24          **MR. BORNSTEIN:**  Yes, Your Honor.

25          **THE COURT:**  We have three minutes.  So I think it's

 1      probably best to pause here.

 2          Mr. Schiller, as you know, at this juncture you're ordered

 3      not to have any discussions with anyone, including the

 4      lawyers, about anything related to this hearing.  Do you

 5      understand?

 6              **THE WITNESS:**  Yes, I do, Your Honor.

 7              **THE COURT:**  And that includes anything that occurred

 8      during today's proceedings or any prior proceedings.  You're

 9      still under examination.

10          So go and do anything else you want to do, but you will

11      not discuss and talk to anybody about this particular hearing.

12      Do you understand?

13              **THE WITNESS:**  I do, Your Honor.

14              **THE COURT:**  All right.  And we'll stand in recess

15      then until May 22nd at 9:00 a.m.

16          I will remind everybody that the courthouse closes in

17      30 minutes so do not dally, do not get locked in.  Okay?

18          Everybody have safe travels.  We'll see you next week.

19              **MR. BORNSTEIN:**  Thank you, Your Honor.

20              **THE CLERK:**  Court is in recess.

21          (Proceedings were concluded at 4:29 P.M.)

22                              --o0o--

23

24

25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Friday, May 17, 2024