UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., *Plaintiff, Counter-defendant,* v. APPLE INC., *Defendant, Counterclaimant.* | Case No. 4:20-cv-05640-YGR-TSH <br><br> JOINT STATEMENT OF DISCOVERY DISPUTES <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

The Honorable Thomas S. Hixson
San Francisco Courthouse
Courtroom E - 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Magistrate Judge Hixson,

    Pursuant to Your Honor's Discovery Standing Order, the Parties in the above-captioned action respectfully submit this joint statement regarding discovery disputes related to the ongoing evidentiary hearings concerning Plaintiff Epic Games, Inc.'s ("Epic") Motion to Enforce Injunction (Dkt. 897 (the "Motion")).

    Counsel for Epic and Apple Inc. met and conferred telephonically on June 26, June 28, and July 12, 2024, and exchanged correspondence in a good faith effort to resolve the outstanding disputes.

Respectfully submitted,

| | |
|---|---|
| CRAVATH, SWAINE & MOORE LLP | WEIL, GOTSHAL & MANGES LLP |
| By: */s/ Yonatan Even* <br>     Yonatan Even <br>     *Counsel for Epic Games, Inc.* | By: */s/ Mark A. Perry* <br>     Mark A. Perry <br>     *Counsel for Apple Inc.* |

**Epic's Position:** Evidence provided by Apple before, during and after the evidentiary hearings on Epic's Motion makes clear that Apple's response to the Injunction was to a large extent based on its response to similar regulations in foreign jurisdictions. Documents concerning Apple's decision-making with respect to analogous foreign regulations are therefore relevant to Apple's decision-making in response to the U.S. Injunction, because they informed and shaped Apple's response in the U.S., which is at the heart of Epic's Motion and the Court's discovery order. Apple should therefore produce these documents.

**Relevant Background**: On January 16, 2024, Apple filed what it styled a "Notice of Compliance", describing for the Court its new external purchase link entitlement program that Apple claims complies with the Injunction. (Dkt. 871 *et seq.*) That Notice states that entitlement programs adopted by Apple in response to actions by competition regulators in the Netherlands and Japan (providing for similar entitlement programs) provided a "framework" for Apple's response to the U.S. Injunction (Dkt. 871 at 3-4), and an accompanying declaration by the global head of Apple's App Store, Matt Fischer, states that Apple's U.S. entitlement is "drawn from" those foreign entitlements (Dkt. 871-1 ¶ 21).

Testimony and documents introduced during and since the evidentiary hearings further illustrate the important role that Apple's ex-U.S. responses to regulatory requirements and investigations played in shaping its response to the U.S. Injunction. Mr. Fischer testified that Apple's response to the U.S. Injunction was "based on" the entitlement program it had adopted in response to regulatory action in the Netherlands, and that Apple therefore "wasn't starting on a blank page" when it developed its U.S. response. Phil Schiller, an Apple Fellow who sat on the Price Committee that decided key aspects of the U.S. response, was shown at the hearing a slide deck from a Price Committee deck dated January 11, 2024, which contains a slide illustrating Apple's standard commission rates (30% default, or 15% for special programs) in comparison to the new fees it imposed on developers using alternative payment means in response to regulatory actions in South Korea (26% default) and the Netherlands (27% default, or 12% for special programs). (*See* CX-0054.) Mr. Schiller testified that when the Price Committee made its decision to impose a 27% fee on developers that steer users to complete purchases outside of the app (*i.e.*, on the web): "Of course sitting in this room seeing the options and the analysis, we're also aware of our other pricing in the Netherlands and Korea and understand the context that developers see this in and that they are aware of those. Of course we know that." (Hrg. Tr. 789:15-19.) Other documents confirm that Apple's response to the U.S. Injunction (codenamed "Wisconsin") was based on its programs in the Netherlands, South Korea (███████████████), Japan (███████████) and Europe, where Apple adopted several measures in response to the Digital Markets Act (███████████████). By way of example:

- Notes from a May 1, 2024 meeting—one of the earliest meetings in connection with the "Wisconsin" project—█████████████████████████████████████████████████████████████████████████████████████. (APL-EG_10679997.)
- Notes from a meeting on May 10, 2024 state that █████████████████████████████████████████████████████████. (APL-EG_10678998).
- An instant message thread among engineers from May 24, 2023 describes that Wisconsin would have ███████████████████████████████████████████████████████████████

1



(APL-EG_10676613); and
- Multiple documents in Apple's productions thus far ███████████████ ███████████████████████████████████████. (*See* APL-EG 10679787 (April 30, 2023 spreadsheet titled "████████████████████████████"); APL-EG 10679956 (January 14, 2022 document titled "████████████ ████████████").

On May 31, 2024, the Court ordered Apple to produce *all* documents relative to its decision-making process concerning its response to the Injunction (the "May 31 Order"), admonishing Apple to err on the side of over-breadth. (Hrg. Tr. 913:20-24, 914:10-15 ("I want all of Apple's documents relative to its decision-making process with respect to the issues in front of the Court. All of them. All. If there is a concern, then be overly broad.").). In light of this broad directive from the Court and the clear evidence that Apple considered its response to the Injunction and to these ex-U.S. regulatory challenges holistically, Epic requested that Apple run searches for and produce documents reflecting its decision making with respect to its response to these ex-U.S. regulatory requirements as well.[1] Apple refuses to produce such documents, claiming they are irrelevant unless they reveal, on their face, a "nexus" to the U.S. Injunction. (Dkt. 998 at 3-4.) Specifically, Apple takes the position that a sufficient nexus exists only if the document specifically references Apple's response to the U.S. Injunction. (July 11, 2024 email from N. Comparato to B. Wylly et al.) The Parties could not reach agreement on this issue.

**Argument:** As described above, evidence from before, during and after the evidentiary hearings on Epic's Motion shows that Apple's program for compliance with the U.S. Injunction is largely based on, and informed by, its responses to similar regulations in other jurisdictions. Documents pertaining to these programs, from the files of custodians that worked on Apple's response to the U.S. Injunction, have a sufficient nexus to Apple's compliance with the U.S. Injunction, particularly in light of the Court's admonition for Apple to err on the side of being "overly broad" in its productions. (Hrg. Tr. at 914:14-15.)

Further, Apple's proposed limitation—to consider a document responsive only if the document itself shows a foreign program impacted the U.S. program—makes no sense. Many of the ex-U.S. programs were developed *before* Apple relied on them for its U.S. program, and thus would not have *any* references to the U.S. Injunction. Yet if Apple adopted elements of its U.S. response— for example, the new fee it imposes on linked purchases—on the basis of ex-U.S. deliberations, those deliberations would be reflected in documents concerning the *ex-U.S. program*; documents created more recently that simply refer back to those deliberations may not shed light on Apple's contemporaneous substantive decision making.

---

[1] Apple implies below that Epic seeks these documents as part of a "fishing expedition" because of ongoing actions between these Parties in other jurisdictions. This is absurd. Epic is not litigating against Apple in many of these ex-U.S. jurisdictions, such as the Netherlands or South Korea, and in any event, the Protective Order in this case obviously prohibits using any confidential documents Epic obtains in these proceedings in furtherance of any other actions. (Dkt. 274 ¶ 7.1.)

In its position statement below, Apple also claims that it *adopted* its DMA policies in the weeks after it responded to the U.S. Injunction.  But Apple's documents clearly show that Apple *developed* the policies responding to the U.S. Injunction and the DMA in tandem.  Apple also draws a false analogy between unrelated changes it made to its App Store policies in the past 16 years and the responses to ex-U.S. regulatory requirements that parallel the Injunction; the two are nothing alike.  Apple considered these regulatory response projects to be related to one another, unlike other arbitrary changes Apple has made to its App Store guidelines over the years.  Further, Apple claims below that if it adopted a policy previously developed in another jurisdiction, only the justifications for importing that policy to the U.S. is relevant; not the justifications for adopting the original ex-U.S. policy.  That wrongly and unrealistically assumes that Apple would create new documents reiterating all the reasons for a policy each time the policy is imported to a new jurisdiction.  That is exceedingly unlikely to be the case, making it essential to review the original materials.

Finally, the Court should be wary of any discretion given to Apple on this issue in light of Apple's intentional obfuscation with respect to the role that its commission rates for foreign entitlements played in setting the rate in the U.S.  Specifically, Alex Roman—a VP of Finance at Apple—testified that Apple's near-identical commissions for its entitlements in the Netherlands and South Korea had nothing to do with its adoption of the 27% commission for the U.S. entitlement (Hrg. Tr. 287:8-16), and the version of the Price Committee Deck that Apple *voluntarily* submitted to the Court omitted any reference to those foreign commission rates (*see* CX-0009)—even though an earlier draft of this deck, which Apple was forced to produce (*see* Hrg. Tr. 447:4-13), *does* compare Apple's commission rates for in-app purchases with those for alternative purchases in the Netherlands and South Korea (CX-0054.9), and has notes concerning some of the factors that Apple considered in setting those rates (CX-0054.42).  Apple should therefore be ordered to treat as responsive and produce all documents concerning its decision-making with respect to analogous regulatory requirements in foreign jurisdictions, including in the Netherlands, South Korea, Japan, and the anti-steering or alternative payment aspects of the DMA.

**Apple's Position:**  This proceeding involves Apple's compliance with the Court's injunction, enjoining Apple from prohibiting iOS app developers in the United States from including with their apps links, buttons, or other calls to action steering users to purchase platforms other than Apple's In-App Purchase ("IAP") system.  On January 16, 2024, Apple implemented new developer Guidelines that permit U.S. developers to include such external purchase links.  In connection with an evidentiary hearing to determine whether Apple is in violation of the injunction, the Court ordered Apple to produce documents "relative to the decision-making process leading to the new framework."  Dkt. 974.

After conferring with Epic several times, Apple agreed to produce documents from 52 custodians (out of the 54 Epic proposed) using more than 100 unique search terms (objecting to only six search terms from Epic) covering a period of two-and-a-half years.  And Apple agreed to produce any non-privileged documents that, consistent with the Court's direction, relate to Apple's "decision-making process" for external purchase links.  Epic seeks to use discovery in this limited-scope matter to try to obtain discovery regarding *all* changes to the App Store across *all* jurisdictions in response to *foreign* law.  That is not what the Court ordered.

The Court ordered "the production of all Apple's documents relative to the decision-making

process leading to *the link entitlement program and associated commission rates*." Dkt. 974 (emphasis added). The "link entitlement program and associated commission rates" refer to the changes made in the U.S. App Store to comply with the Court's permanent injunction. That permanent injunction, however, is expressly limited to the U.S. storefront of the App Store, notwithstanding that Epic asked for global relief. *See* Dkt. 812, at 167–68 ("Epic Games provides the Court with no authority that an injunction could issue globally based upon a violation of California's UCL").

Other App Store storefronts in other jurisdictions are subject to different laws, which have been evolving over the past several years. By the time Apple implemented the permanent injunction in January 2024, it had already responded to regulatory action in other countries by making changes to the App Store storefronts in the Netherlands and Korea regarding third-party payment systems and in-app steering. In response to regulatory action in Japan, Apple also had made a global change to all of its App Store storefronts regarding third-party payment systems and in-app steering for certain types of apps. Additionally, *after* implementation of the permanent injunction in January 2024, Apple made changes to its European storefronts in March 2024 in order to comply with the Digital Markets Act ("DMA"), an E.U. regulation applicable to digital platforms. To comply with the DMA, Apple has designed and implemented an entirely new monetization structure for apps on European storefronts. Those changes were the product of hundreds of different Apple employees working across groups over several months.

Apple will produce all non-privileged documents relating to its development and implementation of the "link entitlement program and associated commission rates" as directed by the Court. Apple also agreed to produce documents relating to App Store changes in other jurisdictions if such documents reflect that Apple considered or took into account those changes when developing and implementing the "link entitlement program and associated commission rates." Epic, however, insists that Apple must produce *all* documents relating to changes to the App Store made in non-U.S. jurisdictions in response to non-U.S. law, regardless of whether they have a direct nexus to the permanent injunction here. But the permanent injunction is expressly limited to the U.S. storefront for the App Store, even though Epic sought broader relief. Dkt. 812, at 167–68. As a matter of law, then, Apple's work in non-U.S. jurisdictions is irrelevant to anything at issue in this proceeding unless there is a direct nexus between that work and the "link entitlement program and associated commission rates." And as noted, Apple has agreed to produce documents that have such a direct nexus.

Epic argues that because Apple was aware of and in some instances took into consideration the changes made in other jurisdictions when designing the link entitlement, it follows that *all* documents regarding those changes necessarily are relevant. Epic is wrong in at least two ways.

*First*, because Apple did not complete its changes pursuant to the DMA until after January 2024, Epic's logic cannot support requiring Apple to produce *all* DMA-related documents. Many of those documents will, by definition, be beyond the scope of the hearing and the Court's discovery order, which requires production of documents "relative to the decision-making process leading to the new framework." Dkt. 974.

*Second*, Epic's logic makes no sense. Apple has been operating the App Store for 16 years. Every time it makes a change to the App Store—particularly one as significant as that called for by the

4

permanent injunction—it draws on its years of experience and data. It therefore is not surprising that documents regarding Apple's compliance efforts in the United States sometimes reference App Store policies in other parts of the world. But that does not mean that every decision Apple has made for the past 16 years is relevant to the decision at issue *here*. Apple's compliance with the Court's injunction is measured against the injunction itself, based on Apple's conduct. Apple's analysis and business considerations surrounding decisions made for other jurisdictions, under foreign law, are not probative of any disputed issue in this proceeding.

The conclusions that Apple drew (or did not draw) from its past experiences in the context of its decision-making under the permanent injunction may be relevant, and Apple has agreed to produce documents reflecting those conclusions. If, as Epic opines, Apple "adopt[ed]" in the United States a policy or guideline originally developed for another jurisdiction, the only possible relevance for this proceeding would be the motivations or justifications for implementing that guideline in the United States—which would appear in the documents Apple will produce. But the motivation for the original policy or guideline in the foreign jurisdiction would be irrelevant. Demanding that Apple produce documents regarding changes to the App Store in other jurisdictions is nothing more than a fishing expedition. Notably, Epic is challenging Apple's practices in a number of other jurisdictions, and it may seek relevant discovery in those cases relevant to those jurisdictions, as provided for under local law. But it may not use this proceeding to obtain discovery from Apple for use overseas.

Epic urges that this Court should be "wary" of giving Apple any "discretion" regarding relevancy in light of testimony from one of Apple's witnesses regarding whether and to what extent Apple considered the commission charged in another jurisdiction when designing its plan of compliance here. Apple is not asking for any special "discretion"—it is asking this Court to limit the scope of document discovery to the issue in this case (*i.e.*, U.S. injunction compliance). Epic, by contrast, is seeking worldwide discovery into matters that are irrelevant to (and in many cases post-date) the decision challenged in this litigation.

Apple has made several concessions and agreed to substantially all of Epic's proposals, accepting 52 of 54 custodians and 100+ search terms. Epic unreasonably seeks documents regarding foreign regulations, without connection to injunction compliance. Apple respectfully requests that the Court limit the scope of relevance to the topics at issue in this proceeding.

Respectfully submitted,

DATED: July 17, 2024

CRAVATH, SWAINE & MOORE LLP
By: */s/ Yonatan Even*
*Counsel for Plaintiff Epic Games, Inc.*

WEIL, GOTSHAL & MANGES LLP
By: */s/ Mark A. Perry*
*Counsel for Defendant Apple Inc.*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1

I, Mark A. Perry, am the ECF User whose ID and password are being used to file the foregoing. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Yonatan Even concurred in this filing, and I shall maintain records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request by a party.

Dated: July 17, 2024

/s/ Mark A. Perry
Mark A. Perry