<pre>
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3      Before The Honorable Thomas S. Hixson, Magistrate Judge

 4

 5   EPIC GAMES, INC.,              )
                                    )
 6            Plaintiff,            )
                                    )
 7   vs.                            )   Case No. C 20-05640-YGR
                                    )
 8   APPLE, INC.,                   )
                                    )
 9            Defendant.            )
     _____)
10
                                    San Francisco, California
11                                  Thursday, August 8, 2024

12
      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13              RECORDING 9:13 - 10:18 = 65 MINUTES

14   APPEARANCES:

15   For Plaintiff:
                                Cravath, Swaine & Moore, LLP
16                              375 Ninth Avenue
                                New York, New York 10001
17                        BY:   GARY A. BORNSTEIN, ESQ.

18   For Defendant:
                                Gibson, Dunn & Crutcher, LLP
19                              One Embarcadero Center
                                Suite 2600
20                              San Francisco, California
                                 94111
21                        BY:   DANA L. CRAIG, ESQ.

22                              Gibson, Dunn & Crutcher, LLP
                                333 S. Grand Avenue
23                              Los Angeles, California 90071
                          BY:   JASON C. LO, ESQ.
24

25
</pre>

2

```
 1                            Weil, Gotshal & Manges, LLP
                              2001 M Street, NW
 2                            Suite 600
                              Washington, D.C. 20036
 3                     BY:    MARK A. PERRY, ESQ.

 4   Transcribed by:          Echo Reporting, Inc.
                              Contracted Court Reporter/
 5                            Transcriber
                              echoreporting@yahoo.com
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

2       P-R-O-C-E-E-D-I-N-G-S

3        --oOo--

4   THE CLERK:  All right, everyone.  We are here in

5 Civil Action 20-5640, Epic Games, Inc. versus Apple, Inc.,

6 the Honorable Thomas S. Hixson presiding.

7  Counsel, please state your appearances for the record.

8 Let's start with Plaintiff's counsel.

9   MR. BORNSTEIN (via Zoom):  Good morning, your

10 Honor.  Gary Bornstein from Cravath.  I'm here for Plaintiff

11 Epic Games.

12   THE COURT:  Good morning.

13   MR. PERRY (via Zoom):  Good morning, your Honor.

14 Mark Perry from Weil.  I'm here for Apple.

15   THE COURT:  Good morning.

16   MR. LO (via Zoom):  Good morning, your Honor.

17 Jason Lo and Dana Craig, from Gibson Dunn, also on behalf of

18 Apple.

19   THE COURT:  Good morning.

20  We are here on three joint discovery letter briefs, and

21 I think we can discuss them in order.  The first one is ECF

22 1000, which raises two issues.  The first is the time frame

23 for the discovery period, and it looks to me like Judge

24 Gonzalez Rogers has ruled on this issue already on the

25 transcript of the May 31st hearing at page 914 where counsel

4

1  for Apple asked for a time parameter for the Court's ruling,

2  and she said from the day that her decision came out until

3  the present.  If we think that the present is the day that

4  she said that, then it would seem that the time period is

5  September 10, 2021 to May 31st, 2024.  I know that Apple

6  resists that conclusion.  So, why don't I turn it over to

7  Apple.

8          MR. PERRY:  Thank you, your Honor.  And, with the

9  Court's permission, I will address the first -- the issues

10  in the first one, and Mr. Lo will address the issues in the

11  other two submissions, just --

12          THE COURT:  That's fine.

13          MR. PERRY:  Thank you.  You're absolutely right,

14  your Honor.  We had that discussion with Judge Gonzalez

15  Rogers in the context of a larger discussion involving the

16  scope of the document production.

17      As the Court will recall from our first meeting, Epic

18  did not seek any discovery in connection with this

19  proceeding.  The injunction was -- the injunction compliance

20  program was announced on January 16th, 2024.  Epic

21  immediately that same day publically announced that Apple is

22  not in compliance and that it intended to sue, and it

23  brought this lawsuit without seeking any discovery and told

24  Judge Gonzalez Rogers that same day in the transcript that

25  it didn't think it needed any discovery to make out its

5

1 claims.

2     As the evidentiary hearing progressed, the Court had --
3 Judge Gonzalez Rogers had some questions regarding the
4 documentary basis for the witnesses' testimony.  Certain
5 documents were produced during trial, and on the last day,
6 May 31st, the Court ordered the production we're now
7 conducting of all documents relative to the decision making
8 process.

9     And our -- our understanding or our view is based in
10 the context of that, including the two very specific orders
11 setting out the parameters of the document production, for
12 example, all documents relative to the decision making
13 process, that process ended on January 16th, 2024.  No
14 decisions were made.  The project hasn't changed.  The
15 parameters haven't changed.  The framework hasn't changed
16 since then.  And we believe that's the -- the appropriate
17 cutoff for the decisions that are being at the issue here.

18     We do, of course, recognize the statement in the
19 transcript regarding the present.  We -- we understand the
20 present to be the present of the framework, that is, January
21 16th, can be read both ways.  We totally understand that.
22 We will do it both ways.  It will -- it will expand the
23 scope of the production and the time it will take to
24 complete it if we have to add five more months.  That's just
25 reality.  So, I mean, we can do it either way.  We think the

6

 1  law of diminishing returns kicks in, but -- but that's our

 2  position.

 3          THE COURT:  All right.  Well, if Epic wants to

 4  test the effects on competition of the way Apple implemented

 5  the injunction, wouldn't it need some evidence from after

 6  the Apple -- the new measures went into effect?

 7          MR. PERRY:  Your Honor, we -- we would be happy to

 8  discuss with Epic any targeted requests for post-

 9  implementation information.  The only one they've identified

10  is the number of developers adopting the program.  We've

11  already provided that as of May.  We'd be happy to update

12  that or any other specific information.  I don't -- I don't

13  think that's what's at issue.  This is a massive custodial

14  search, 52 custodians going through all of their server side

15  information, all of their shared depositories, you know,

16  every bit and byte that these 52, you know, executives and

17  employees of apple have on an ongoing basis so that every

18  day there is additional material being added that, you know,

19  is probably not relevant, probably not responsive but would

20  have to be searched anyway.

21      We are more than happy to engage with Epic on any

22  targeted post-implementation request.  That would be fine

23  with us.  It's the continuation of the custodial search that

24  causes the, you know, expansion of scope and -- and time

25  delay and expense, frankly, that we are concerned about.

7

1        THE COURT:  I see.  Well, I'm not going to say

2   that Apple has to produce through the present, meaning

3   today, or through some, you know, unbounded time frame.  I

4   -- I would think that -- and Epic isn't asking for that.

5   They're asking only through May 31st.

6        So, why don't I turn to Epic and hear your response,

7   please.

8        MR. BORNSTEIN:  Thank you, your Honor.  I really

9   don't have much to add to the Court's comments at the outset

10  of this portion of the discussion.  We believe there is an

11  order from Judge Gonzalez Rogers on the record in open court

12  in response to a direct question from counsel for Apple

13  about the scope of her order.  And we believe that that

14  order from the Court should be followed.

15       The references that Apple has made to a subsequent

16  minute order and a possible interpretation of how you could

17  read that order when it doesn't actually speak to the

18  question of time period is, in our view, simply trying to

19  wiggle out of the response to a direct question that the

20  Court gave in open court.

21       THE COURT:  All right.  Let's turn to the next

22  issue, which is a deadline for substantial completion of

23  document production, and I would like to turn to Apple.

24       Can you please give me a status update on where you are

25  in terms of collecting from the custodians.  I believe you

8

1 said it was 52 custodians, and in the letter briefs, there

2 are references to approximately 650,000 documents, but I

3 would appreciate a status update as to where you are in

4 terms of collecting from the custodians and interviewing the

5 custodians and identifying any noncustodial sources if they

6 are -- if there are any.

7          MR. PERRY:  Absolutely, your Honor.  If I can just

8 give a bit of an overview of sort of what's happened up

9 through today, I think it would be helpful.

10          THE COURT:  I agree.  That would be helpful.

11 Thank you.

12          MR. PERRY:  So, we have first reached agreement

13 with Epic on, we believe, the vast majority of this project,

14 which is 52 custodians, 51 -- it turns out one has left the

15 company before the -- before the date in question.  And

16 we've agreed to nearly 100 search terms.  There's four or

17 five that Mr. Lo will discuss later, but, you know, we -- we

18 reached agreement on the search terms and on the custodians.

19 We also reached an agreement on a specialized or a custom

20 collection and review of folders related to injunction

21 compliance, including collaborative data sources such as

22 Quip and Box.  I'm going to talk about that in a minute, but

23 that was in addition to the, you know, computerized search

24 term search.  This is a -- a manual search that I -- I will

25 describe.

9

1    We did an initial step one phase, as the Court may

2 recall from the last time, involving a witness named Carson

3 Oliver who testified at the hearing, and we were directed to

4 produce certain materials from him.  That really helped us

5 scope the work as to first getting the server side

6 documents, the emails and -- and other materials that can be

7 pulled directly from the system.

8    More importantly, Epic requested -- and we agreed at

9 the end of the day -- to "chase" -- e-Discovery term -- all

10 the links in the Box files that were maintained, boxes of

11 program that -- that maintains files.  That has been a very

12 labor intensive project.  We've had to go to either other

13 employ -- at least eight other employees to get these Quip

14 and Box files just from Mr. Oliver.  And, again, we're not

15 complaining about that.  We're just -- it's just a -- it's a

16 manual process to do that.  It can't be searched on the

17 server side like emails can.  It -- it has added to the

18 project.

19    We have -- on phase two, which is the main production,

20 we have developed a significant, you know, protocol set,

21 including responsiveness, privilege, relevance,

22 confidentiality, PII, all the things that you would expect.

23 Your Honor, in this case, there is a significant privilege

24 issue as we discussed last time.  All of this work was done

25 in order to comply with the Court's injunction.  Therefore,

10

1  the legal department, both inside the company and outside

2  counsel, were involved in virtually every process so that

3  there are on the front end detailed privileged, you know,

4  flag and -- and parameters issues.  On the back end, there

5  will be escalated review for far more than the usual number

6  of documents given the nature of the privileged calls.

7       We are most of the way through the custodial

8  interviews.  Epic -- we -- we discussed this with Epic,

9  having a custodial interview for every custodian.  We have

10 done the initial interviews with at least 35 of them as of

11 yesterday and scheduled follow ups with the majority of

12 them.  Those have taken on average 90 minutes, and they --

13 as I said, they will have follow ups.  The others are all

14 scheduled.  They are -- they're literally happening -- there

15 are some today.

16      A -- they have been very substantive, including at

17 Epic's request, questions regarding compliance related

18 materials and locations that might not be picked up in the

19 server side review.

20      It's come out to more than three hours per custodian,

21 but then that's -- as I said, we're almost done with that.

22 We have in the meantime -- we have pulled all the available

23 documents from the servers based on the search terms and

24 these custodians that we've agreed to.  It is north of

25 600,000.  I -- the exact count is something like 650,000.  I

11

1    don't want to give you a very precise number because I get

2    it a couple of different ways, but it's something like that.

3    That review has begun using the search terms and the -- or

4    it's on -- more than begun.  It's underway, using the search

5    terms.  And, of course, that's documents with families and

6    -- and attachments and so forth.

7        To give the Court a sense of what we are doing, we have

8    seven in house counsel and e-Discovery specialists working,

9    you know, a significant amount of their time on this, 15

10   outside counsel doing the same, and 150 contract reviewers

11   who have all been trained and are reviewing these documents

12   at the first level.  This is a massive undertaking, your

13   Honor.  Since -- since that May 31st order, just to give you

14   a sense, at least 1500 outside counsel hours devoted to this

15   -- this project and -- and doing the interviews and the

16   protocols and the -- and the scoping, hundreds if not

17   thousands of hours from the in house e-Discovery team at

18   Apple, which, you know, has not just this case but many

19   other big litigations to handle.

20       These are professionals.  Ms. Craig, who's on the line,

21   is an e-Discovery expert.  The -- the e-Discovery team at

22   Apple is fully engaged with this as well, and -- and, as we

23   said, we have a vendor with 150 reviewers working on it as

24   well.

25       The process is going.  You know, we -- we have it

1  underway.  But the longest part that I predict, in addition

2  -- you know, the -- the search has to be done in the usual

3  way or the -- the collection is done -- the service side

4  collection is done.  The longer part here is going to be

5  these collaborative data sources that Epic has requested and

6  we agreed to because they have to be manually reviewed and

7  -- and chased.  That is under way for the custodians.  And

8  the privilege review is going to take longer.  We're already

9  seeing significant privilege flags, and those do require, as

10 the Court may expect, you know, human review, often outside

11 counsel review, sometimes inside counsel review, depending

12 on the nature of it.

13      That's where we are today.  I mean, I -- we are --

14 subject to the issues that Mr. Lo is going to discuss with

15 the Court, we are confident that we can get to substantial

16 completion by early December given the scope of what we

17 know, the custodians we've interviewed, the number of

18 documents we have, the perimeters and the -- and the

19 privilege issues.  We are not confident we could get it done

20 faster than that.  I mean, we -- we -- we have a lot of

21 resources devoted to this, and it is going to take that many

22 people, you know, that much time to get it done is our best

23 assessment having, you know, fully scoped the project to

24 this point.  This is not a -- I mean, we're not done, but we

25 have not -- we've got our arms around it now.  We know what

13

1  it looks like.  And, as I described just now, that is the --

2  the nature of the -- the project.

3         THE COURT:  Okay.

4         MR. PERRY:  Does that answer the question?  I'm

5  happy to give more details, but that -- that's the overview.

6         THE COURT:  Okay.  Thank you.  I appreciate that

7  overview.  I find that helpful.

8     Let me turn to Epic for your argument about when Apple

9  should be ordered to substantially complete its document

10  production.

11         MR. BORNSTEIN:  Thank you, your Honor.

12     I'll start by saying just by way of background in terms

13  of what we have received so far, the answer is in the past

14  two months, we've received nothing.  We got two documents,

15  to be fair, two documents at the end of June.  But, aside

16  from that, since June 14th, we have received literally zero

17  beyond those two from Apple.

18     So, we're now over two months from the May 31st

19  hearing, at which we took a break at the judge's instance so

20  that Apple could consult on its side about how long it would

21  take to complete this production.  And your Honor has

22  obviously looked at the transcript and, so, is aware that

23  after the break, Apple assumed that there would be about 50

24  custodians, which assumption turned out to be correct.

25  Apple was fully aware of the scope of the review.  Apple was

14

1  fully aware of the privilege issues that Mr. Perry just
2  described, and with full knowledge of what it was facing,
3  Apple told Judge Gonzalez Rogers in court that it expected
4  it would take three months.
5      Now, in fairness, that was an estimate at the time, and
6  I recognize people can't be absolutely held to that, but I
7  have every expectation that that was not just a guess in the
8  circumstances where the Court had asked for this expressly,
9  and Apple was well aware of what the issues were.  Apple
10 spent the time to give an answer.  And now we are two months
11 and a week into that three-month period, and we have
12 received nothing beyond approximately 1900 documents that we
13 got on June 14th, which were part of, although not all of,
14 what the parties have been referring to as the step one
15 production.
16     So, that's the context in which we approach this, in
17 addition to which it is very much in Apple's interest here
18 to delay production.  The Court has already made -- Judge
19 Gonzalez Rogers has already made a preliminary finding or a
20 -- a finding that we have made a preliminary showing that
21 Apple is not in compliance with her injunction.  At the
22 hearing, she asked some probing questions, and I recognize
23 one can't predict an outcome from a hearing, but the Judge
24 was certainly taking this matter very seriously, as well she
25 should.  And it is in Apple's interest to put off as long as

15

1  it can a final resolution of this matter, and I believe that

2  is what is happening.

3      So, we have gotten over the course of these two months

4  and a week, almost nothing.  We believe Apple should be held

5  to its representation to the Court about how long it would

6  take to get this done.  Nothing has changed from May 31st

7  until now other than we've learned only two-thirds of the

8  custodial interviews have even been done in over two months,

9  and this is news to me right now.  Mr. Perry said they've

10 done only 35 interviews of the 52 custodians, maybe 51

11 because of the individual who's left the company.  So, two-

12 thirds of the custodial interviews are completed, with one

13 -- with one-third remaining.

14     The suggestion the custodial interviews themselves are

15 somehow unduly burdensome because custodians need to be

16 asked about things other than email is simply incorrect.

17 We always ask custodians about other sources and other

18 repositories in which they may have relevant documents.

19 Otherwise, they're not doing their jobs.  That's just part

20 of a custodial interview in the ordinary course.

21     And even setting aside whatever difficulties or special

22 circumstances may exist with respect to what Mr. Perry

23 referred to as chasing the links on these shared data

24 sources, we know that there are approximately 650,000

25 documents that have been already pulled from the emails, and

16

1  we've gotten none of them, literally none from that -- from

2  that set of materials.  So, I don't know how to conclude

3  anything other than that Apple is dragging its feet here.

4  So, I do believe, in response somewhat circuitously, to your

5  Honor's question, that Apple should be held to its

6  representation to complete this within three months.

7      I am willing -- and I -- I recognize there was a period

8  of time where the parties discussed search terms and -- and

9  custodians, but those were almost entirely resolved as of

10 the middle of June, within about two weeks of the -- the

11 order we're discussing.  So, three months from substantial

12 agreement on search terms and custodians would take us to

13 mid September, and we had in our papers suggested that Apple

14 be held to the end of August date.  I -- I think mid

15 September is fine, is fair given the time we spent to land

16 on custodian search terms, but I do believe that's where we

17 should land, your Honor.

18          THE COURT:  All right.  Thank you.

19      And let me hear Apple's response.

20          MR. PERRY:  Thank you, your Honor.  Just a few

21 points.  The estimate we gave Judge Gonzalez Rogers in

22 court, as Mr. Bornstein noted, she gave us 45 minutes to

23 caucus.  We estimated at that time that a computerized

24 search, that is, a back-end server search of emails and

25 texts and the like, with agreed upon custodians and agreed

1  upon search terms, would take about three months.  It would

2  have.  We have added this additional layer of Boxes and

3  Quips that took the parties a significant time to work out.

4  We didn't even get the Epic search term and custodian

5  proposals until June 18th.  We didn't have agreement until

6  July.  I mean, again, I'm -- this is the nature of these,

7  but we got to agreement.  We did agree to virtually other

8  requests.  Once we had that agreement, the -- the gears

9  started rolling.  The Court has seen these massive

10  productions.  They do take time.  The -- the protocols are

11  in place.  The review is underway.  The -- the custodial

12  interviews could not start until we had agreement on the non

13  -- non-ordinary sources, right, because, otherwise, we would

14  have to go back and do them again.  Epic made a big deal

15  about this.  We -- we had several hearing -- we had a

16  hearing about it with Judge Gonzalez Rogers.  We had many

17  discussions.  We came to an agreement.  I want to be clear

18  on that, but once we came to the agreement, then we have to

19  go and ask nonstandard questions of these custodians.  We

20  are doing things in a different way than we have in other --

21  in other cases.

22     In this very case, your Honor ruled, for example, in

23  the -- in the Pepper case, which applied in the earlier part

24  of the Epic case, that we only had to chase certain links if

25  they were identified by the parties and there was a

18

1  reasonableness limitation and agreement on -- on links.

2  That's not applying here.  So, we have to go on a -- you

3  know, we -- again, I'm not complaining.  It's just it --

4  it's a -- it expanded the scope.  It expanded the time.

5      You know, we -- we have been rolling.  That estimate --

6          THE COURT:  I have a question for you.

7          MR. PERRY:  Yes, your Honor.

8          THE COURT:  For search Quip and Box, you described

9  that as manual searching.  Does that mean, for example, that

10  Apple isn't using the search terms as part of those

11  searches?

12          MR. PERRY:  So, there's -- there's two different

13  answers to that, your Honor, and I'm going to quickly get

14  out of my depth, and Ms. Craig is going to jump in and tell

15  me where I get it wrong.

16      There is an initial assessment of the Quip and Box

17  materials to determine whether they are relevant or, you

18  know, have materials related to this issue.  If there is,

19  for example -- and this is a hypothetical, but if there is a

20  Box folder labeled "Epic Injunction Compliance", then our

21  agreement is to manually review all of the documents or the

22  materials within that folder rather than running search

23  terms on it.  So, it -- you know, it is identifying --

24  manually identifying and search term identifying sources,

25  folders or their equivalence -- I think in terms of folders

19

1  because of my age -- and -- and then manually reviewing

2  those contents.  That was Epic's request than we agreed to.

3  So, it -- it's different than the computerized search term

4  review of the email, and now I should pause and let Ms.

5  Craig -- because I'm sure I got part of that wrong.  And I

6  apologize.  I just -- I don't understand Box and Quip the

7  way my colleagues do.  So, I've invited Ms. Craig to

8  supplement my answer.

9         MS. CRAIG (via Zoom):  Your Honor, Mr. Perry got

10  it right.  I would just add that because of this process, we

11  have to do essentially two different collections.  We do the

12  collection of the sources that can have search terms run

13  through it, and then we do the collection that Mr. Perry

14  referred to, which is folders that appear to be fully

15  dedicated to the injunction compliance work.  Those have to

16  be collected separately so we can track them and make sure

17  that the search terms aren't running through them and we do

18  a manual review of all of its contents.

19         THE COURT:  Okay.  Thank you.  That's helpful.  I

20  appreciate that.

21     Well --

22         MR. BORNSTEIN:  Your Honor, if I may just make one

23  comment as --

24         THE COURT:  Sure.

25         MR. BORNSTEIN:  Thank you.  Just -- well, I

20

1  actually have two quick comments.  One is, with respect to

2  the custodial interviews, it's striking that regardless of

3  the contents, 16 of them haven't even happened yet, over two

4  months after the order was entered.  I don't and haven't

5  heard a reason for that.

6      The other thing is Mr. Perry did just say that they

7  would have been done in three months with respect to the

8  650,000 emails.  At minimum, we should get those in the

9  three months.  There's no reason that the work being done

10 with respect to the other repositories should stand in the

11 way of getting done what they told the Court they could

12 accomplish, and that's setting aside the fact that they were

13 fully aware at the time of the existence of the

14 collaborative data sources which had been the subject of

15 testimony at the hearing.

16     Thank you for the indulgence, your Honor.

17         THE COURT:  Okay.  Thank you.

18     Does Apple want to address the issue of why one-third

19 of the custodians have not yet been interviewed?

20         MR. PERRY:  Yes, your Honor.  The protocol -- we

21 -- we built out the protocols for the review, for the

22 reviewers for the -- for the interviewers so that once the

23 -- the process started, everything could -- could run along.

24 That actually took a significant amount of time given the

25 nature of the case, including the privilege review, so that

1 we had the protocols in place.  That is the -- the review

2 parameters for the entire project, because we only want to

3 do it once, and this is a point we have made with Epic over

4 and over again.  We needed the custodians.  We needed the

5 search terms.  Then we needed the -- the review parameters.

6 That all took some time -- as I said, 1500 hours of outside

7 counsel time so far -- to get the system set up.  It's also

8 the answer to the -- to Mr. Bornstein's issue about the

9 documents.  We -- we want a uniform production here where

10 the same privilege standards, the same relevance standards

11 are being applied.  The contract reviewers are great, but

12 they can only do a first level review.  There's going to be

13 a manual review of many many of these documents.  We're

14 doing test work.  This is a -- this is a massive production

15 that has to be done very carefully in light of the privilege

16 issues.  Judge Gonzalez Rogers has given us guidance on

17 privilege.  We will follow it, but it is a -- it is

18 intensely manual, and we want to be consistent.  We need --

19 we can't just put out 10 documents on a first round and then

20 see if it's going to be different later.  So, that -- that

21 is the reason that we've built the -- we've built the system

22 first, and the custodial interviews literally, I mean, they

23 -- they are all scheduled.  I already said that.  They --

24 they will be done very quickly, but the -- this is all

25 because we had to get the system in place so that the

22

consistency can be done subject to the resolution of the
other two issues we have on the docket for today.  Then --
then the process will finish.  That's -- that's how we got
here.

THE COURT:  Okay.  Well, thank you.

So, I understand that Apple is doing a large document
review.  I do not agree that it is a massive document
review.  We're not talking about millions of documents.  At
least as to custodial documents, it seems to be around
650,000 documents, more or less.  I do understand that there
are a large number of custodians, and I'm aware of the
privilege issues that Apple justifiably has to be concerned
about.  And then, of course, there are the -- the Quip and
Box searches as well.

But what Apple has described as the effort that it's
undertaking does not seem to me to require until December to
implement.  Apple has a large amount of resources that it
can dedicate to this effort.  And from counsel's
description, it appears that Apple has dedicated a large
amount of resources to this important endeavor, and I think
the issues that this discovery is about are important issues
that need to be addressed promptly.  And, so, Apple needs to
do that.

And I'm not going to hold Apple to its estimate at the
May 31st hearing that it could complete document production

23

1 within three months.  I understand that was a guess or an
2 estimate and that since that time, Apple has acquired
3 greater knowledge and there has been some refinement to what
4 Apple has agreed to produce.  So, I'm not going to hold
5 Apple to that three-month estimate, and that -- that means
6 I'm not going to order Apple to complete discovery by the
7 end of August.  But I'm also not going to give Apple until
8 December because, as I've said, the effort that Apple is
9 undertaking just doesn't need that kind of time.

10      And, so, what I'm going to order is for Apple to
11 substantially complete its document production by the end of
12 September.  I think that provides a sufficient amount of
13 time for Apple to review all the documents to perform any
14 necessary privilege review to chase down the links and the
15 Quip and Box sources and to appropriately review documents'
16 full responsiveness and whether they ought to be produced.

17      So, that's going to be my order is for Apple to
18 substantially complete document production by the end of
19 September.

20      Now I would like to turn to ECF 1002, and that deals
21 with documents concerning Apple's responses to regulatory
22 options in other jurisdictions.  And, first, I would like to
23 turn to Epic.

24      If you can help me to understand what is the specific
25 ask here.  Is it true that the -- the -- once the custodians

24

1  are identified, that this issue about response to regulatory

2  actions outside the United States, does that implicate all

3  52 custodians or can you tell me who is implicated by this

4  issue?

5       MR. BORNSTEIN:  Your Honor, we don't know

6  precisely who is implicated by the issue.  It's certainly

7  our expectation that there is -- and Apple has informed us

8  that there is some overlap between the individuals who are

9  involved in the U.S. and the individuals who were involved

10 in the efforts to comply with foreign requirements.  Apple

11 has said that that is at the senior level.  We anticipate

12 there are going to be people at a more working level who

13 were involved in both efforts as well, but I don't know if

14 it's, you know, all 52 or all 51 for example.  It's just not

15 visibility that -- that we have.

16      The requirements at issue in the foreign jurisdictions

17 that we are focused on are requirements with respect to

18 anti-steering rules, which is the subject of the Court's

19 injunction, and alternative payment systems, which is also

20 related to the Court's injunction, and in some

21 jurisdictions, those two matters were the subject of a

22 common -- a common order.

23      And, so, we expect that people who were involved in the

24 payment side of things at Apple, both on the engineering

25 level and the policy level, business level, and the steering

25

issues would be common at least to some degree across

jurisdictions because the subject matter is common across

jurisdictions.

THE COURT:  All right.  Thank you.  Let me turn to

Apple, and I'll pose to you the same question that I posed

to Epic, which is which custodians are implicated by this

issue?  Would it affect how you review the documents from

all 51 or 52 or is it a subset?  If you can please chime in

on that.

MR. LO (via Zoom):  Your Honor, Jason Lo on behalf

of Apple.  I -- I generally agree with Mr. Bornstein's

answer.  We are confident that there is some overlap, and

certainly at the higher levels there's going to be overlap

in the custodians.

Given the broad scope of the foreign jurisdiction

action such as the DMA and the work in the Netherlands, it

is certainly possible that even lower level employees may

have received documents and, therefore may have those

documents, but never really took in -- took them into

account for purposes of a U.S. injunction, and that's why

we're having the dispute that we are is because this is an

effort that -- it took a lot of effort in the company to

comply with the various regulations in the different

jurisdictions, and people were involved.  But just because

they were involved in those jurisdictions doesn't mean that

26

1 they imported any of that into their work in -- in

2 connection with the injunction at issue here.

3      And I want to focus on the language that Epic put in

4 its letter brief, particularly in 1002, in terms of what the

5 testimony is in terms of the connection between, for

6 example, the DMA in the European Union and the Epic

7 injunction.  All of the cited testimony and the documents

8 that they're referring to say that at a high level, when

9 Apple was trying to comply with Judge Gonzalez  Rogers'

10 injunction, they wanted to make sure that the general

11 framework that Apple was putting forth in the United States

12 had some similarities and consistencies to the other

13 jurisdictions.

14      That was really the extent of the testimony, and that's

15 what they're pointing to.  And even the documents that they

16 cite show that that's basically what Apple did.  At a high

17 level, it looked to see, Okay, what we are doing here, is it

18 similar or is it dissimilar to what we are doing in -- in

19 the European Union.  And those types of documents on their

20 face will show that comparison and that contrast.  And,

21 again, for those types of documents where it specifically

22 references, for example, the DMA in the European Union and

23 then also says, Now, how does that compare to what we're

24 doing in connection with the Epic injunction, we have no

25 problems with that, and we agree that that is responsive.

1      What we do not agree to and where the fight is over is

2  you've got a document that is specific to the DMA, no

3  reference to what is happening in the United States.  And

4  those types of documents we think are overbroad and not

5  responsive to the issues here.  They filed a case under U.S.

6  law.  They got an injunction under U.S. law.  They actually

7  sought an injunction that was worldwide in nature, but the

8  Court only gave them an injunction in the United States.

9  And, so, anything that doesn't tie into Apple's efforts to

10 comply with the injunction we believe are not relevant and

11 would be extremely burdensome for us to both search through

12 those documents for even, for example, the anti-steering

13 documents that Mr. Bornstein talks about.  And the reason

14 for that is the DMA is wide ranging.  It does have those

15 provisions.  Those have impacts on alternative payment

16 systems, but it's got a bunch of other provisions such as

17 relating to browser engines, to data sharing, and to other

18 issues.

19      And, so, the search terms and the relevance arguments

20 that Mr. Bornstein are making adds a -- adds a tremendous

21 burden on Apple to sort through that whole vast, you know,

22 system of documents with -- with very little return we might

23 add or we anticipate with very little return.  Because these

24 are regulatory measures, we anticipate that a lot of these

25 documents will end up being privileged and logged.  And, so

28

1  we would undertake a tremendous effort to search and to

2  review documents, and at the of the day, what that

3  ultimately changes is the size of the log, and the size of

4  the -- and the size of the production will not be

5  substantially different.

6          THE COURT:  Well, here is a concern that I have.

7          MR. LO:  Yes.

8          THE COURT:  When Apple first takes a measure to

9  respond to a regulatory concern, for example, in the

10 European Union, presumably Apple does some analysis on its

11 options and the ways that it could respond, and that would

12 likely include the effect on Apple, potentially the effect

13 on competitors, the effect on the market, and what different

14 proposals, how those might have different effects on Apple

15 and -- and users and all of that stuff.  And then, if Apple

16 subsequently as part of the injunction compliance in the

17 United States borrows from a measure it implemented in the

18 European Union, I wouldn't think that the very same Apple

19 employees who did that analysis for the European measure

20 would need to repeat all of that analysis when implementing

21 that measure in the United States.  They would already know

22 all of that.  They would -- it would -- the effect on Apple,

23 the effect on consumers, the effect on competition would

24 already have been vetted and analyzed, and presumably Apple

25 had reached a favorable conclusion when it implemented the

29

1  measure in the European Union, and then it would just do the

2  same thing in the United States.

3        Presumably, documents reflecting the analysis in the

4  European Union would likely not reference the U.S.

5  injunction because they might be earlier in time than

6  Apple's injunction compliance, but all of that analysis

7  would still be relevant to the U.S. injunction compliance.

8  It just wouldn't be restated because Apple would already

9  have done that analysis, and the people would already know

10  what it was.  And, so, I'm worried that if I deny Epic's

11  request, then all of the initial analysis that went into

12  developing these measures gets lost simply because it

13  doesn't directly reference the U.S. injunction, even though

14  that analysis might be an important part of showing how

15  Apple decided to comply with the U.S. injunction.

16        So, if you could speak to that concern, that would be

17  helpful.

18            MR. LO:  Yes, your Honor.  Two answers to that.

19  First, I understand the concern that certainly something

20  earlier in time is not going to reference the compliance

21  with the U.S. injunction, but the reverse is not true, and

22  the documents that Epic cites to and the documents that were

23  presented at the hearing show that.  In other words, where

24  the team in the United States was using evidence and data

25  from other jurisdictions as a starting point, as a point of

30

1  comparison, as a point of data analysis, those documents are

2  explicitly referenced, and they are in the keynotes, which

3  is Apple's versions of presentations.  And they are in the

4  emails.  That's the very type of documents that Epic is

5  citing in its bullet pointed list on pages one and two of

6  Docket 1002.

7      So, when Apple is importing its prior findings from

8  another jurisdiction, that's explicit on the face of the

9  document, and we -- we agree, and there's no disagreement

10 there.

11     My second answer to that, though, is we've already had

12 the hearing where Epic has called witnesses and examined the

13 witnesses, and the injunction compliance in the United

14 States had a host of different provisions and different

15 responses, and Epic was able to question a host of witnesses

16 about every single aspect of that.  And there were answers

17 to every single aspect of that.  In other words, in their

18 letter brief, they are not pointing out, Look, in the U.S.,

19 Apple put forth this thing, and when we asked witnesses

20 about it, they said, I have no idea other than this is what

21 we did in Europe, and I was told to do the same thing here.

22 That is not in their brief at all.  There's no gap in the

23 evidence that they are pointing to that they don't know what

24 the rationale is.

25     At the end of the day, Epic and Apple will disagree

1  whether the rationale for its implementation is consistent

2  or inconsistent with the injunction.  That's a decision that

3  obviously Judge Gonzalez Rogers needs to make, but they are

4  not pointing to any aspect of the implementation where

5  witnesses have not been able to say this was our rationale.

6  This is the data that supports it, and where a witness

7  purportedly said, The only thing I know is this is what we

8  did in the Netherlands, and I was told the same thing.  So,

9  there's no gap in the data that they can point to in their

10  letter.

11         THE COURT:  Well, but I don't know that that

12  really helps you because the whole concern is that, yes, of

13  course, the witnesses know what the analysis was that led to

14  the Action in the European Union because they were

15  participants in that, but Epic's ability to test or cross

16  examine that testimony would be hindered because Apple

17  hasn't produced the documents that went into the development

18  of the measures in the European Union.  That would really be

19  the concern is about testing those -- those assertions.

20         MR. LO:  Yes, but that's -- but all of these

21  arguments are being made in the abstract when the testimony

22  has already occurred.  In other words, in their letter, Epic

23  doesn't point out, Here is the testimony that somebody said

24  we looked at and here's what we want to test.  The -- the

25  implementations here that are really at issue are things

1  like here is the warning screen that is given to the user,
2  and so there were fights about whether that warning screen
3  was -- was -- was a scare screen, as Epic would -- would
4  term it, or a legitimate warning screen.  And there was
5  testimony in terms of how Apple came up with that.
6       There were questions about the commission rate that
7  Apple instituted, and there were multiple decks and analysis
8  in terms of what the comparison points Apple made were in
9  order to reach that.
10      So, all of this in terms of what might have been is
11 actually not in the testimony.  The only thing that the
12 testimony that they're pointing to says is, We came up with
13 a measure that we believe complied with the injunction.  We
14 did want to look back and make sure that we were generally
15 consistent with the framework in other jurisdictions, and --
16 and that type of analysis is in the documents, and that type
17 of analysis we are doing.
18      But in terms of the suggestion that there is other
19 studies that were done in advance that people knew about in
20 their head and then imported into the United States, that's
21 nowhere in the testimony, and that's nowhere in -- in the
22 record, and they've already completed the examination of the
23 witnesses.
24          THE COURT:  Well, but that's not in the record
25 because how could it be?  Apple didn't produce those

1  documents.

2      Let me turn to Epic, if you would like to respond.

3          MR. BORNSTEIN:  Thank you, your Honor.  I'll start

4  by just saying we've had -- I want to come back to the

5  question of burden, which hasn't really been touched but I

6  think may cut through a lot of the issues here given that

7  Apple has said that on these issues there are only 21,000

8  unique documents on the analysis group side and only 71,000

9  unique documents on -- sorry.  These are on the -- on the

10 search terms.

11     On the issue of the -- the foreign jurisdictions, a

12 couple of things.  Number one is I agree with the analysis

13 that your Honor laid out in terms of why we need to have

14 these documents, so that we can fully understand and the

15 Court can fully understand the bases on which the decisions

16 were made.

17     We are not the ones who introduced the relevance of the

18 foreign compliance efforts into this case.  In Apple's very

19 first filing on January 16, in its brief and in the

20 supporting declaration from the Apple employee, Mr. Fisher,

21 Apple indicated that these foreign efforts provided the

22 framework for and were the basis for the injunction

23 compliance efforts in the United States.

24     We now have some documents, in part because Judge

25 Gonzalez Rogers required their production, that support that

34

1  point, that show that during the course of the U.S.

2  injunction compliance effort there were references to and

3  drawing upon the work that was done in other jurisdictions.

4      Your Honor is exactly right that it's not the case that

5  each time there's a reference to, for example, what was done

6  in the Netherlands, Apple repeated every single fact about

7  the analysis in the Netherlands in that document.  I'll give

8  a -- a concrete example.

9      In the initial January 16 filing, Apple produced

10  something called the Price Committee Deck.  I believe the

11  substance of that deck is confidential.  So, I will be

12  careful here on the record.

13      But there -- this I know came out in the hearing.

14  There was no reference in that produced version of the deck

15  to -- to the Netherlands or the efforts in Korea after Judge

16  Gonzalez Rogers ordered a production of a prior iteration of

17  that deck.  It was evident that both of those matters were

18  relevant to the work that Apple was doing, that references

19  to Netherlands and Korea were in there.  They were the

20  subject of testimony at the hearing.  So, I know I'm not

21  violating the protective order here.

22      And that came out only because we got the documents.

23  We otherwise never would have known.  And the document --

24  Mr. Lo is correct.  The document does not recite all of the

25  prior information.  It doesn't need to.  As Mr. Schiller

1  (phonetic), the witness who testified at the hearing, said

2  on the stand, I knew what the work was in the past because I

3  was involved in it, and, so, I was aware of it when we were

4  analyzing this in the United States.

5       So, if, for example, there had been work done in the

6  Netherlands or in Korea or in Europe or in Japan to

7  understand likely developer adoption of the measures that

8  were being put in place, either the price or the other

9  restrictions on -- on links and so forth, if that work had

10 been done, that is work that the people responsible for

11 U.S. injunction compliance would have been aware of.  It

12 formed part of the -- the basis for the decision that was

13 made in the Netherlands and in Korea and Japan and in

14 Europe, and then, when they have a deck that says, Hey,

15 look, we've got the same price as we have in those other

16 jurisdictions, they don't need to say, And, hey, remember

17 when we did the work in the other jurisdictions, this is

18 what our analysis showed about developer adoption.

19      So, if -- if there is work that was done -- and we have

20 every reason to believe there is -- to support the foreign

21 injunction compliance, that's work that's going to be

22 relevant to show Apple's expectations, Apple's intent, and

23 the likely effect of the work that was done here in the

24 United States, and there's no reason to think it would be

25 repopulated over and over each time the U.S. work had been

36

1  done by people like Mr. Schiller and others who were

2  involved in both efforts.

3      And, as for whether or not this is in the record, Mr.

4  Lo's final point, two -- two observations.  One is to the

5  extent it's not in the record now, it's because we haven't

6  been given the documents, right.  And we do need to test it,

7  as your Honor has said.

8      And the other point is we're not done examining these

9  witnesses.  I'm not sure why Mr. Lo made that point.  Some

10 of these witnesses have been expressly held open by Judge

11 Gonzalez Rogers subject to the production of documents.  So,

12 we certainly intend to ask additional questions of the

13 witnesses once we get the materials the Court has ordered to

14 be produced.

15          THE COURT:  All right.  Thank you.

16      Mr. Lo, would --

17          MR. LO:  May I --

18          THE COURT:   -- you like to respond?

19          MR. LO:  Yeah.  One -- two quick points, your

20 Honor.  First, I do want to draw a distinction between the

21 work that is occurring in the European Union and the work

22 that's referenced in terms of Netherlands and other

23 jurisdictions.

24      Apple's DMA work came -- compliance with the DMA came

25 after the work that it did to comply with the Judge's

37

injunction.  So, the suggestion that that would have
informed the work here doesn't work that way.  So, we do
believe that at the minimum, the DMA should be treated
differently because that compliance work happened after the
work that was completed for the United States.

The second point is that all of these things in terms
of whether there is likely -- likely adoption, there's no
evidence in the record that that exists.  They never asked
any questions about that or they certainly haven't cited any
questions about that.

But, more importantly, the documents that have been
produced so far -- and they have been produced and will be
produced pursuant to the other search terms, for example,
just things relating to the compliance -- injunction
compliance in the U.S. and the code names for that show that
when there was relevant evidence, there was no effort to
hide that or to just say wink, wink, nod, nod, remember we
did that.

When Apple was taking into account the data that had
accumulated earlier or when it was making a comparison, it's
obvious on the face of the documents, and that -- those
documents have been produced, and similar documents will be
produced.  So, the suggestion that perhaps there's more out
there, that -- that people are just intuitively knowing,
there's no suggesting that that's the case either in the

38

1  testimony or in the actual documents that have been produced

2  so far and will be produced.

3        THE COURT:  All right.  Thank you, Counsel.

4    I am going to rule in Epic's favor on this issue.  I

5  think that when Apple, as part of its U.S. injunction

6  compliance adopts measures that are similar to measures it

7  has adopted in other jurisdictions, that renders the

8  analysis in discussion about the measures when they were

9  adopted in the other jurisdictions irrelevant.  There's no

10 reason to assume that Apple would repeat all of that prior

11 analysis when it imports a measure that it used elsewhere

12 into the United States, and I think that walling off that

13 evidence would unfairly deprive Epic of documents that would

14 likely be relevant to why Apple did things, what its

15 analysis was, its effect on developer adoption and other

16 issues that are relevant to injunction compliance.  So, I'm

17 going to rule in Apple's favor on that issue -- sorry -- in

18 Epic's favor on that issue.

19    Let's turn to ECF Number 1003.  That is a dispute about

20 two proposed search strings, and it looks like from the hit

21 counts one of them gets 21,200 unique hits, and the other

22 gets 71,200 unique hits.  That's a fair number of documents,

23 but it's not a huge number of documents, and it does seem

24 like the search strings aim at important issues in the case.

25 So, my thought is that Apple should implement those search

39

1  strings.  It doesn't seem overly burdensome, but let me turn

2  to Apple for your thoughts.

3          MR. LO:  Thank you, your Honor.  And may I ask a

4  point of clarification about your prior order, because it

5  might affect my argument here, which is that I heard Mr.

6  Bornstein say that primarily what they're interested in in

7  Apple's work in foreign jurisdictions is those aspects that

8  are similar to what is at issue here, meaning the steering

9  provisions and the alternative payments.  In other words, I

10 don't think he's interested in the data protection and the

11 browser engines in the other jurisdiction.

12     So, if the Court's order in terms of relevance can be

13 limited to that, then on the search terms, what I would

14 suggest is that Epic and Apple then negotiate whether there

15 are particular limiters that would limit, for example, the

16 DMA work and the analysis group work to the things that are,

17 you know, broadly related to the steering provisions and

18 alternative payment mechanisms.

19          THE COURT:  Well, I'll let Epic speak to that in a

20 minute.  The way I had understood the dispute is that Apple

21 has to produce all documents relevant to its proposed

22 injunction compliance and that the issue is when that

23 injunction compliance results in the adoption in the United

24 States of something that was done elsewhere, then Apple is

25 asking me to say that only if there's a direct reference to

40

1  the U.S. injunction would the documents about elsewhere

2  become relevant, and Epic is saying, no, it would -- the

3  documents about elsewhere would be relevant whether or not

4  they refer to the U.S. injunction.  But all of this is

5  bounded by the more basic relevance subject of compliance

6  with the U.S. injunction.  So, if Apple did something

7  elsewhere that has nothing to do with how it complied with

8  the U.S. injunction, I would think those documents would

9  just fail the basic relevance inquiry that is the whole

10  reason we're -- the whole thing that we're talking about.

11      But let me turn to Epic.  What are your thoughts?

12          MR. BORNSTEIN:  Yes.  Thank you, your Honor.  It

13  is my understanding that this is an agreed issue already

14  which may alleviate Mr. Lo's concerns, and it's very close I

15  think to what your Honor just articulated is what the

16  parties had agreed, but to put a little bit of concreteness

17  around it, the efforts in Japan, in the Netherlands, and in

18  Korea overlap with the -- the efforts here in the United

19  States in the sense that they relate to anti-steering and

20  alternative payment issues.

21      The DMA, as Mr. Lo says, is a broader statute in the

22  European Union, but the parties have discussed that, and we

23  did agree that any aspects of Apple's DMA compliance on

24  issues other than anti-steering or alternative payment need

25  not be produced.

41

1      So, to the extent, for example, there is an issue

2  around alternative app stores that arises from the DMA,

3  that's not something that we have asked Apple to -- to

4  produce in this matter.

5            THE COURT:  I see.  So, then let me -- I'm

6  wondering if I should put language in my order -- when I

7  refer to similar -- Apple's responses to similar regulations

8  in other countries, should I reference, say, with respect to

9  anti-steering and alternative payments?

10      Epic, do you think that would reflect the parties'

11  agreement?

12            MR. BORNSTEIN:  I do, your Honor.

13            THE COURT:  And would that address Apple's

14  concerns about vagueness?

15            MR. LO:  It -- it would -- it would, your Honor.

16            THE COURT:  All right.  Let me just make a note.

17  Okay.  Then I'll -- I'll limit the order in that respect.

18      Are we now ready to turn to -- to ECF 1003 and get

19  Apple's thoughts on that?

20            MR. LO:  Yes.  Thank you, your Honor.  And that's

21  why I wanted to ask that question first because, given that

22  limitation -- well, first, let me address the Court's

23  concerns about the burden.

24      In the context of what we're already doing in the

25  context of deadline, we do think that roughly 100,000

42

1  documents is an additional burden and is a material burden,

2  but it's not just a burden in terms of the cost of reviewing

3  it, which is obviously something we don't have to do.  We do

4  anticipate that a lot of these documents are going to need

5  careful review for privilege and may result in privileged

6  logging.  And, so, it's -- we anticipate that a large

7  majority of these will require burden, not just the initial

8  review but also in terms of logging and checking for

9  privilege claims.

10      And, so, the reason I wanted the clarification in terms

11  of 1002 is, given that clarification, again, we -- we have

12  always said we are willing to search for analysis group and

13  things like the DMA in conjunction with certain limiters,

14  and what I would suggest, your Honor, is that given the

15  limitation that your Honor is putting in with respect to

16  1002, I think Apple and Epic can agree on additional

17  limiters with respect to 1003 search terms so that we can

18  clearly get rid of some of the things that will not have a

19  bearing on alternative payments and on anti-steering.

20          THE COURT:  Let me make sure I understand what the

21  ask is.  With respect to ECF 1003, is Apple asking me to

22  order the parties to meet and confer further?

23          MR. LO:  Yes.  To -- to add limiters to the

24  analysis group and the DMA search terms to reflect the

25  Court's ruling 1002.

43

1           THE COURT:  And what is Epic's response?

2           MR. BORNSTEIN:  Your Honor, this is not a new -- a

3  new outcome.  We don't think further meeting and conferring

4  and further delay is necessary.  What the Court has just

5  ruled, as Mr. Lo put it, on 1002 is something the parties

6  had already agreed to.

7       In terms of the scope of the production to be done or

8  the relevance review to be done with respect to the foreign

9  compliance efforts, I'll add that the analysis group work is

10 not impacted by the ruling on -- on 1002.  That's separate

11 from the foreign compliance efforts that are implicated by

12 the DMA search terms and the code name search terms for the

13 DMA that are in 1003.

14      But I think further delay and further meeting and

15 conferring on these when we have a universe of if you put

16 them both together, and I don't know if they both go

17 together completely or if there's some overlap, whether you

18 give Apple the benefit of the doubt and say about 92,000

19 unique documents.

20      In the context in which Judge Gonzalez Rogers has

21 ordered Apple to make a production to err on the side of

22 being overly broad when there is a concern, that number does

23 not strike me as -- as unduly burdensome.

24      If it is, in fact, the case that there are a lot of DMA

25 or analysis group documents that don't have to do with

44

1  alternative payments or don't have to do with anti-steering,

2  there's no privilege review necessary.  Those can easily be

3  put to the side.  The privilege review would become

4  necessarily only when the documents are -- are relevant.

5  So, that concern in terms of scope of privilege review is

6  not going to change whether we have limiters or not.  The

7  only issue at play with the limiters is the scope of the

8  responsiveness analysis, and if it really is the case that

9  there are aspects of the DMA or the analysis group documents

10 that don't relate to the issues in play in the Court's

11 injunction, it will be very easy for reviewers at Apple to

12 set those to the side.

13     Our concern is that we're going to miss important

14 documents if we don't have the search terms we're looking

15 for, as shown already by the documents referenced in the

16 letter that we submitted to the Court where there are

17 important documents that we've received as a result of the

18 Court's orders previously that would not have been captured

19 by the search terms and the limiters that Apple proposed to

20 us.

21          THE COURT:  Let me hear Apple's response,

22 including your response to the specific documents that Epic

23 refers to that they say would not have -- that were relevant

24 but that would not have turned up in your proposed search

25 terms?

1       MR. LO:  Well, they -- they -- first of all, they

2 would not show up in the proposed search terms in the letter

3 brief, but I think they probably would show up in response

4 to what I'm suggesting now in response to the Court's ruling

5 on 1002, which is if it relates, for example, to the DMA and

6 also relates to anti-steering or alternative payments.  So,

7 that's number one.

8     Number two, what Epic fails to mention is that there

9 are a host of other search terms, and those other search

10 terms already did and would capture these very documents.

11 So, yes, in -- in the specific terms that we had proposed in

12 the letter, which I don't think are at issue currently, they

13 would not have been captured, but they would have been

14 captured by the many other terms that the parties had

15 already negotiated and agreed upon.  So, we -- we did

16 confirm that those documents would have been captured by

17 other search terms, and I think they would be captured by

18 the search terms that I am proposing now.

19     In terms of the substance of Mr. Bornstein's argument,

20 I think we are all agreed that regulatory measures such as

21 the DMA include a host of other things that are absolutely

22 unrelated to it, and I think that there are -- we already

23 have search terms and -- and phrases in other search terms

24 that are intended to get -- filter out the things that we

25 all agree are not relevant here, you know, browser engines,

46

1  data privacy, data sharing, and things like that.  And, so,

2  what we are asking for is simply reasonable limitations on

3  terms so that we're not required to filter through all of

4  those documents and can get out and can look at the

5  documents that actually do relate to alternative payment

6  systems and -- and steering provisions in other

7  jurisdictions and get those out quickly.

8      There seems to be no benefit to either side to -- to

9  have a delay in having us look at all of the DMA related

10 documents when everybody knows that it's a broad ranging

11 regulatory measure.  And -- and, frankly, I don't think I'm

12 saying anything surprising.  There were other -- many more

13 perhaps difficult and controversial portions of that that

14 are not at issue in this particular case.

15      THE COURT:  All right.  Well, thank you, Counsel.

16      I'm going to rule in Epic's favor on this issue.

17 Search terms are -- are useful, but they're not intended to

18 be perfect.  They are a first step at going through

19 custodial documents and a measure to identify what are the

20 documents that should be reviewed to see if they're relevant

21 or not, and search terms will necessarily capture some

22 documents that aren't relevant.  That's why Apple's doing

23 the relevance review after it runs the search terms and sees

24 what documents come up in them.

25      The -- the particular search terms here are important

47

1 ones.  They -- they are very important to the U.S.

2 injunction compliance, and, so, I agree that Epic's proposed

3 search terms are appropriate here given the importance of

4 these issues.

5      The hit counts aren't so high that just looking at

6 those numbers I can conclude that the search terms are

7 improper.  There are about -- if you add the two numbers

8 together -- and, as Epic says, I'm not sure that that's

9 right, but if you did, it's about 92,000 documents.  That's

10 not huge.  It's a large number of documents, but it's not

11 huge, and given the importance of these particular issues, I

12 think requiring Apple to review those documents to see which

13 ones are relevant and should be produced is a worthwhile and

14 proportional endeavor.  So, I'm going to rule in Epic's

15 favor on that issue as well.

16      That addresses the joint discovery letter briefs that

17 are on file in front of me.  One thing I want to do is to

18 get some previewing by the parties if you think there may be

19 further issues coming up down the line.  You don't have to

20 identify any if you -- if none come to mind, but I wanted to

21 give you the opportunity just to apprise me if there are

22 likely other disputes that may be coming up.

23      So, let me turn first to Epic.  Are there other further

24 disputes you see coming up that you would like to alert me

25 to?

48

1          MR. BORNSTEIN:  I'm not currently aware of

2   anything, your Honor, other than the continued concerns that

3   we have over how the searches are being done with respect to

4   the collaborative data sources, but we are discussing with

5   Apple and I'm hopeful we'll get to resolution and don't have

6   anything to drag to the Court with sufficient specificity

7   now.  We are, of course, looking at Apple's privilege log,

8   and we will speak to Apple first, of course, if we have

9   concerns.  We haven't done that yet, but that's something

10  that I anticipate given what we've heard from Apple again

11  and again about privilege in this matter could become an

12  issue, but we don't have anything to raise at this point.

13          THE COURT:  Okay.  Thank you.

14      Let me turn to Apple.  Are there any discovery issues

15  that you see percolating that you would like to preview for

16  me today?

17          MR. PERRY:  Your Honor, I think between the

18  parties' agreements and the Court's rulings today, there are

19  no outstanding issues from Apple's perspective regarding

20  this production.

21          THE COURT:  Okay.  Well, thank you, Counsel.  If

22  further issues arise, please meet and confer promptly.  And

23  then if you're not able to resolve them, please get a joint

24  discovery letter brief on file promptly.

25      It's important to keep the discovery process moving,

49

1  and I don't want things to be held up by disputes.  So, if

2  further disputes arise, please quickly see if you can work

3  them out, and if you're not able to, then promptly get a

4  joint discovery letter brief on file with the Court, and we

5  can take it from there.

6          MR. BORNSTEIN:  Thank you very much, your Honor.

7  And just by way of clarification, it is the parties'

8  understanding when we were discussing this earlier in the

9  week that the Court would like to continue receiving the bi

10  -- biweekly status reports.  Is that correct?

11          THE COURT:  I would like to continue receiving

12  those.  I find those helpful, and I want to be apprised of

13  the status of the document production.  So, yes, please

14  continue to file those.

15          MR. BORNSTEIN:  Thank you, your Honor.

16          MR. PERRY:  Thank you, your Honor.

17          THE COURT:  All right.  Thank you, Counsel.  The

18  Court will issue a written order likely later today.  Thank

19  you.  The matter is submitted.

20          MR. LO:  Thank you.

21          THE CLERK:  Thank you everyone.  We're off the

22  record.   Court is in recess.

23      (Proceedings adjourned at 10:18 a.m.)

24

25

50

1                    CERTIFICATE OF TRANSCRIBER

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14 

15

16         Echo Reporting, Inc., Transcriber

17           Tuesday, August 13, 2024

18

19

20

21

22

23

24

25