# EXHIBIT 1

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 2/4/2022 9:31 AM
Reviewed By: R. Walker
Case #20CV370535
Envelope: 8216559

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| MICHELLE BEVERAGE, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>APPLE INC., et al.,<br><br>    Defendants. | Case No.: 20CV370535<br><br>**ORDER CONCERNING DEFENDANT APPLE INC.'S DEMURRER TO PLAINTIFFS' COMPLAINT** |

    Plaintiffs bring this action against Defendant Apple Inc. on behalf of a putative class of California consumers.  They challenge Apple's removal of the social and gaming software application "Fortnite" from its application marketplace (the "App Store") and Apple's related alleged abuse of monopolistic power.

    Following a pause on merits-related proceedings to allow the parties to address the post-trial decision in a related federal case, *Epic Games Inc. v. Apple Inc.* (N.D. Cal., No. 4:20-CV-05640) ("*Epic*"), Plaintiffs filed the operative First Amended Class Action Complaint ("FAC").  Apple now demurs to each cause of action in the FAC for failure to state a claim.  (Code Civ. Proc., § 430.10, subd. (e).)  Plaintiffs oppose the demurrer in its entirety.

1

The Court issued a tentative ruling on February 2, 2022, and no one appeared at the hearing on February 3 to contest it. The Court now issues its final order, which SUSTAINS the demurrer with 60 days' leave to amend.

**I.  BACKGROUND**

**A.  Factual**

Fortnite is a social and gaming application or "app" created by Epic Games, Inc. ("Epic"). Using the app, dozens of participants compete individually or in teams to be the last one standing at the end of a game. (FAC, ¶ 47.) Spectators are a major part of the experience, with sometimes hundreds of thousands watching either in the app or on websites like twitch.tv. (*Ibid.*) A feature called "CrossPlay" allows users to interact with others using Fortnite on different platforms, such as PC, Mac, XboxOne, and PlayStation 4. (*Id.*, ¶ 49.) A significant part of Fortnite's fun and appeal comes from grouping up with friends or random teammates, which also lets users show off their characters and the unique ways they have customized them. (*Id.*, ¶ 48.) Users may purchase digital currency ("V-Bucks") to buy digital goods including costumes for playable characters. (*Id.*, ¶¶ 50–51.) For users of Apple's mobile operating system, iOS, these transactions have occurred through Apple's in-app purchase system (IAP). (*Id.*, ¶ 50.) Apple takes a thirty percent cut, as it typically does for all in-app purchases on iOS devices. (*Ibid.*)

Fortnite was released for iOS in April 2018, and was advertised as being the same as Fortnite on PC, Mac, and console platforms, with the "same gameplay, same map, same content, same weekly updates." (FAC, ¶¶ 52–53.) The app became immensely popular: by May 2020, it reached $1 billion in revenue from mobile (mostly iOS) and attracted a cumulative total of 350 million users—roughly three percent of the world's population. (*Id.*, ¶¶ 54–55.)

Plaintiffs allege that Apple has a total monopoly on the legal distribution of apps to iOS devices and considerable market power in the mobile device market as a whole, and has abused its dominance through its actions towards Fortnite and its related policies and practices. (*Id.*, ¶¶ 62–114.)

Citing to filings in *Epic*, Plaintiffs allege that on June 30, 2020, Epic's CEO contacted Apple's leadership to propose new features related to Fortnight, including an Epic payment processing system and Epic's own app store within the iOS ecosystem. (FAC, ¶ 115.) Apple swiftly and completely rejected these ideas via its legal team. (*Id.*, ¶ 116.) Epic informed Apple that it would nonetheless proceed to launch a direct payment system via Fortnite on iOS devices. (*Id.*, ¶ 118.) Apple responded by unilaterally removing Fortnite from the App Store, preventing users from downloading the app or updating it as updates are released. (*Id.*, ¶ 119.) Epic filed suit against Apple in the Northern District of California. (*Id.*, ¶ 122.)

Despite the issuance of what Plaintiffs characterize an adverse opinion in *Epic*, Apple refuses to reinstate Fortnite on the App Store. (FAC, ¶ 125.) It has stated it will refuse to even consider reinstating Fortnite until the complete resolution of the appeals process, and has applied for a stay of the "baseline" injunctive relief provided by the federal court.[1] (*Id.*, ¶¶ 127–128.)

Based on these allegations, Plaintiffs bring this action on behalf of a putative class of "[a]ll California citizens that (a) possess, own, or have access to an iOS Device manufactured by Apple; (b) have downloaded the Fortnite application onto their iOS Device; and (c) have purchased digital currency or goods within the Fortnite application utilizing Apple's in-app purchase system." (FAC, ¶ 131.) Plaintiffs "seek[] to obtain, in one proceeding, before one trier of fact, a ruling on Apple's unjust and unfair use of power to raise prices for consumers on the App Store in the mobile gaming market." (*Id.*, ¶ 134.)

The complaint asserts the following causes of action: (1) violation of the Cartwright Act, Business & Professions Code section 16700 et seq.; (2) violation of the Unfair Competition Law ("UCL"), Business & Professions Code section 17200 et seq., "unlawful" prong; (3) violation of the UCL, "unfair" prong; and (4) breach of the implied covenant of good faith and fair dealing.

---

[1] That stay was granted as to one portion of the permanent injunction. (See *Epic Games, Inc. v. Apple, Inc.* (9th Cir. Dec. 8, 2021, Nos. 21-16506, 21-16695) 2021 U.S. App. LEXIS 36191, at *1–2.)

**B.     Procedural**

Plaintiffs filed this action on September 17, 2020. The initial discovery stay was lifted on February 18, 2021, and the parties began to meet and confer about discovery. Apple filed a demurrer, which was scheduled to be heard in July 2021.

The related action in *Epic* was filed by Epic on August 13, 2020. In that case, Epic alleged violations of federal and state antitrust laws and the UCL based upon Apple's operation of its App Store. (*Epic Games, Inc. v. Apple Inc.* (N.D.Cal. Sep. 10, 2021, No. 4:20-cv-05640-YGR) 2021 U.S.Dist.LEXIS 172303, at *10 ("*Epic* Trial Decision").)

The Court denied Apple's motion to stay this entire action in favor of *Epic* in an order filed on May 5, 2021. But it suggested that it would be beneficial for the parties and the Court to review the decision in *Epic* before conducting any merits-related proceedings in this case—including on Apple's demurrer. The parties agreed to delay full briefing and hearing of the demurrer until after the decision in *Epic* issued.

The *Epic* Trial Decision issued on September 10, 2021.[2] Plaintiffs filed the FAC on October 12, addressing that decision as they deemed appropriate. Apple has again demurred.

## II.     REQUESTS FOR JUDICIAL NOTICE

Both Apple and Plaintiffs request judicial notice of agreements, guidelines, and other materials published to Apple's website, the contents of which are undisputed. The parties do not oppose one another's requests, and the Court GRANTS them. (See Evid. Code, § 452, subd. (h); *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1285, fn. 3 ["Since the contents of the letter and media release form the basis of the allegations in the complaint, it is essential that we evaluate the complaint by reference to these documents."].)

## III.    LEGAL STANDARD

A demurrer tests the legal sufficiency of the complaint. (*Chen v. PayPal, Inc.* (2021) 61 Cal.App.5th 559, 568.) Consequently, it "reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice." (*Weil v. Barthel* (1955) 45

---

[2] Apple appealed the *Epic* Trial Decision, and its appeal remains pending.

Cal.2d 835, 837; see also Code Civ. Proc., § 430.30, subd. (a).) "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. … [T]he facts alleged in the pleading are deemed to be true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the Court must liberally construe the allegations of the complaint, with a view to substantial justice between the parties. (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.) Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.) A demurrer will succeed where the allegations and matters subject to judicial notice clearly disclose a defense or bar to recovery. (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.)

**IV.   THE *EPIC* TRIAL DECISION**

The *Epic* Trial Decision is too long to be addressed in detail here, but the Court will summarize its key findings. As to the antitrust claims in that case, the federal court defined the relevant market as "digital mobile gaming transactions," and found that the record at trial did not ultimately support the conclusion "that Apple is a monopolist under either federal or state antitrust laws." (*Epic* Trial Decision at *12.)

> While the Court finds that Apple enjoys considerable market share of over 55% and extraordinarily high profit margins, these factors alone do not show antitrust conduct. … The final trial record did not include evidence of other critical factors, such as barriers to entry and conduct decreasing output or decreasing innovation in the relevant market. The Court does not find that it is impossible; only that Epic Games failed in its burden to demonstrate Apple is an illegal monopolist.

(*Epic* Trial Decision at *12–13.)

But as to the claim under the "unfair" prong of the UCL, the trial court held "that Apple's anti-steering provisions hide critical information from consumers and illegally stifle consumer choice. When coupled with Apple's incipient antitrust violations, these anti-steering provisions

5

are anticompetitive and a nationwide remedy to eliminate those provisions is warranted." (*Epic* Trial Decision at *13.)  The court accordingly held that

> a nationwide injunction shall issue enjoining Apple from prohibiting developers to include in their:
>
> > Apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to IAP.
>
> Nor may Apple prohibit developers from:
>
> > Communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

(*Epic* Trial Decision at *303.)

## IV. DISCUSSION

Apple demurs to the FAC on the following grounds: (1) Plaintiffs are not entitled to an injunction forcing Fortnite back onto the App Store because such relief is foreclosed by federal law; (2) the Cartwright Act cause of action fails to plead a relevant market, concerted action, cognizable anticompetitive conduct, or separate products under a tying theory; (3) the UCL claims fail with the Cartwright Act claim and "because Plaintiffs have not satisfied basic pleading standards"; and (4) the claim for breach of the implied covenant of good faith and fair dealing fails to identify the contractual terms at issue, and is foreclosed by the express terms and limitations of liability in the Media Services Terms and Conditions between Plaintiffs and Apple, the only contract that could be at issue.

Before addressing the issue of relief, the Court will address whether the FAC otherwise states a cause of action.

### A. The First Cause of Action Under the Cartwright Act and the Second Cause of Action Under the UCL "Unlawful" Prong

The Cartwright Act, contained in Business and Professions Code section 16700, et seq., generally codifies the common law prohibition against restraint of trade. (*G.H.I.I. v. MTS,*

*Inc.* (1983) 147 Cal.App.3d 256, 264 (*G.H.I.I*).)³ Recovery is provided where the activities of a combination of capital, skill, or acts by two or more persons result in a restraint of trade. (*Id*. at pp. 264–265, citing Bus. & Prof. Code, §§ 16720 [defining a "trust" for purposes of the Act] & 16750 [establishing a private right of action].) "In order to maintain a cause of action for such combination in restraint of trade, the complaint must allege: The formation and operation of the conspiracy; the illegal acts done pursuant thereto; a purpose to restrain trade; and the damage caused by such acts." (*Id*. at p. 265; see also *Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 492–493 (*Marsh*).)

> Our high court demands a "high degree of particularity in the pleading of Cartwright Act violations. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 326–328 [(*Chicago Title*)].)" Consequently, generalized allegations of civil antitrust violations are usually insufficient and the unlawful combination or conspiracy must be alleged with specificity. … [G]eneral allegations of a conspiracy unaccompanied by a statement of facts constituting the conspiracy and explaining its objectives and impact in restraint of trade will not suffice. …
>
> At the same time, as with any demurrer, the material allegations of an antitrust cause of action are deemed admitted and assumed to be true, while the general rule of pleading that a complaint must be given liberal construction in order to achieve substantial justice between the parties is applicable.

---

³ "The Cartwright Act is patterned after the federal Sherman Antitrust Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable to the former." (*G.H.I.I., supra*, 147 Cal.App.3d at p. 265 [citing cases].) But notably, "the Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2)," and it thus "applies only to a 'combination' involving 'two or more persons' (§ 16720), not to unilateral conduct." (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*. (2011) 198 Cal.App.4th 1366, 1386.) Notably, *Apple Inc. v. Pepper* (2019) ___U.S.___ [139 S.Ct. 1514, 1520, 203 L.Ed.2d 802, 808], which is cited in the FAC, was alleged under Section 2 of the Sherman Act.

(*G.H.I.I., supra*, 147 Cal.App.3d at pp. 265–266, citations omitted.)

Ultimately (unless a per se framework applies),[4] an antitrust plaintiff "must prove that the defendant's conduct harmed competition in the relevant market and that any procompetitive justifications for the conduct did not outweigh that harm," applying the "rule of reason." (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*. (2020) 55 Cal.App.5th 381, 396, citing *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672 (*Exxon*).)  In analyzing the pleadings, "the identification of the relevant market should be treated as a matter of law…." (*Marsh, supra*, 200 Cal.App.4th at p. 499.)

Here, Plaintiffs allege that Apple has violated the Cartwright Act "by maintaining complete control of the approval of all software and/or applications listed in the App Store marketplace, maintaining an unreasonably high 30% fee for all purchases of apps on the App Store and digital purchases within said apps, and … barring creation of separate app store fronts on iOS Devices," as well as by "disallow[ing] developers and firms from maintaining their own payment system within apps …." (FAC, ¶¶ 145–146.)

### 1. Failure to Plead a Relevant Market

Apple first contends that Plaintiffs fail to allege a relevant market, complaining that the FAC refers to ten different markets.[5]  Plaintiffs respond that many of these references, for example, those that address the mobile phone or mobile phone operating system markets, are merely for background purposes.  This is a fair reading of the FAC.  However, even where Plaintiffs expressly allege the relevant market for antitrust purposes, their framing of it is not

---

[4] "Historically, some combinations, such as agreements to fix prices, divide markets, or tie the purchase of one product or service to another, as well as certain boycotts, have been considered unreasonable per se and, therefore, illegal." (*Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co*. (2020) 51 Cal.App.5th 867, 872–873.)

[5] Apple notes that "[t]he FAC references: a 'mobile operating system market,' (FAC ¶ 65); a 'mobile gaming purchases market,' (*id*); a 'mobile phone market,' (*id*. ¶ 72); a 'mobile device market,' (*id*.); an 'App Store market,' (*id*. ¶ 79); an 'app distribution market,' (*id*. ¶ 81); a 'purchasing market on iOS,' (*id*. ¶ 93); an 'iOS device market,' (*id*. ¶ 98); the 'App Store marketplace,' (*id*. ¶ 145); 'the mobile gaming market,' (*id*.); and 'the market for in-app purchases,' (*id*. ¶ 162)."

consistent. (See, e.g., FAC, ¶¶ 145 ["mobile gaming market"], 149 ["the App Store marketplace, a valid antitrust market"].)

In opposition to Apple's motion, Plaintiffs state that the relevant market is "digital mobile gaming transactions," consistent with the marketplace defined in the *Epic* Trial Decision. This phrase is found nowhere in the FAC, but it is close to the "mobile gaming market" to which the FAC does repeatedly refer. It is fair to read the FAC to allege that this is the relevant market, and the Court will focus its analysis on this market rather than the "App Store market" to which many of Apple's arguments on demurrer are addressed (since Plaintiffs do not defend an "App Store market" theory on opposition).

While Apple contends that any "mobile gaming market" is not described in sufficient detail in the FAC, the Court does not read *Marsh* and *Chicago Title* to require the level of detail demanded by Apple at the pleading stage in every case. Like those authorities, the Court will read the FAC liberally to assess whether it states a claim. (See *Chicago Title, supra*, 69 Cal.2d at pp. 325–326 [while noting that market was not specifically defined in the complaint, going on to analyze why a theory based on defendants' control of the "title insurance market" failed based on the allegations and facts subject to judicial notice]; *Marsh, supra*, 200 Cal.App.4th at p. 499 [similarly analyzing the merits of the claim with reference to the relevant market; "the circumstances described in the pleadings show that Appellant has been able to retain privileges to practice at other outpatient facilities … [and] do not support her claim she has been wholly excluded from practice in the relevant market area (since it is undisputed that San Diego … has a number of hospital facilities within the immediate area)"].)

2.  *Failure to Allege Bilateral Conduct*

"It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business. An antitrust case must be based upon conspiratorial rather than unilateral conduct." (*G.H.I.I., supra*, 147 Cal.App.3d at pp. 267–268, citations omitted.) "It is also established, however, that a necessary 'conspiracy' or 'combination' cognizable as an antitrust action is formed where a trader uses coercive tactics to impose restraints upon otherwise uncooperative businesses. If a

9

'single trader' pressures customers or dealers into pricing arrangements, an unlawful combination is established, irrespective of any monopoly or conspiracy, and despite the recognized right of a trader to determine with whom it will deal." (*Id.* at p. 268.)

Here, Plaintiffs contend that they allege bilateral conduct based on the theory that Apple coerces developers to pay its 30 percent fee and abide by other terms described in the FAC. But "coercion" in this context requires something more than a simple policy that business partners agree to certain terms. "[A]n illegal combination may be found where a supplier secures compliance with announced policies in restraint of trade by means which go beyond mere announcement of policy and the refusal to deal," for example, by "tak[ing] 'affirmative action' to bring about the involuntary acquiescence of its dealers…." (*Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 721.)  This might include "threatening commands" aimed at price-fixing. (*Id.* at pp. 721–722.)  Or it could include a "boycott" to extract price concessions. (*G.H.I.I., supra*, 147 Cal.App.3d at pp. 263, fn. 3, 269 [contrasting adequate allegations of one record store's boycott of distributors accompanied by threats with inadequate allegations as to other stores that apparently obtained favorable terms from distributors "in an atmosphere of free competition"].)

Coercion must be alleged with specificity. (See *Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 196 (*Freeman*).)  And critically, under the so-called *Colgate* doctrine, coercion does not include the mere "announcement" of a policy and refusal to deal with those who do not comply, even when coupled with "measures to monitor compliance that do not interfere with … freedom of choice." (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 373 (*Chavez*).)  Accordingly, in *Chavez*, allegations "that Whirlpool announced [a] price policy prescribing minimum resale prices … and informed retailers that it would refuse to sell products to any retailer who did not comply," and "would monitor the retailers' compliance with the policy by reviewing their advertising, collecting sales receipts, and sending 'mystery shoppers' to retail stores," were deemed "insufficient to establish a coerced agreement in violation of the Cartwright Act…." (*Ibid.*)

10

The theory urged by Plaintiffs here is indistinguishable from the announcement plus monitoring theory alleged in *Chavez*:

> As put forth in the FAC, Plaintiffs alleged that Apple entered into agreements with both consumers and developers, forcing them to abide by Apple's terms and conditions in order to have access to the Mobile Gaming Purchases Marketplace. (FAC ¶ 152.) Any violation of these rules would lead to the removal of an app or the voiding of a consumer's warranty. (FAC ¶¶ 79, 81.)

(Opp'n, at p. 7.) This amounts to open, unilateral conduct by Apple, essentially a "take it or leave it" deal—not threats, boycotts or other such "affirmative action" to coerce developers into a conspiracy with Apple against others. (See *Epic* Trial Decision at *251–252 [finding Apple's agreements with developers demonstrated only unilateral conduct]; see also *Freeman, supra,* 77 Cal.App.4th at p. 200 ["[t]he law is clear that unilateral pricing decisions do not violate section 1 of the Sherman Act"].)

In arguing to the contrary, Plaintiffs rely heavily on a preliminary trial court ruling in federal antitrust litigation against Qualcomm. But there, the agreements at issue barred manufacturers (OEMs, including Apple) from sourcing modem chips from other suppliers by imposing excessive penalties, which "led to exclusivity and effectively shut Qualcomm's competitors out of the market." (*In re Qualcomm Antitrust Litig*. (N.D.Cal. 2017) 292 F. Supp. 3d 948, 974–975.) And critically, the opinion distinguished *Chavez* based on allegations "that Qualcomm employed its superior market power *and threatened to withhold chips* if OEMs did not agree to Qualcomm's licensing terms." (*Id.* at pp. 976–977.) Nothing like that is alleged here.[6]

### 3. Conclusion

Plaintiffs fail to state a claim under the Cartwright Act because the conduct they allege in restraint of trade is Apple's unilateral conduct. So the Court does not need to address Apple's remaining arguments about this claim.

---

[6] Apple notes that the district court's eventual ruling against Qualcomm in this case was reversed on appeal. (See *FTC v. Qualcomm Inc.* (9th Cir. 2020) 969 F.3d 974.)

Plaintiffs' second cause of action for violation of the UCL's "unlawful" prong is based on their Cartwright Act claim, and fails for the same reason.

Apple's demurrer to both of these claims is SUSTAINED with 60 days' leave to amend.

### B.  The Third of Action Under the UCL "Unfair" Prong

In their third cause of action under the UCL's "unfair" prong, Plaintiffs allege that Apple's practices were unfair because (1) they caused consumers to pay unfairly inflated prices for goods sold inside Fortnight and (2) "Anti-steering provisions by Apple prevented consumers from receiving information, … preventing them from being fully educated about options, including purchase options" and preventing them "from attributing the cost to the platform versus the developer." (FAC, ¶¶ 178–183.)  Apple's unfair practices caused Plaintiffs and the putative class "to pay supra-competitive and artificially-inflated prices for digital goods and currency within the Fortnite app." (FAC, ¶ 176.)

Apple contends that this claim must fail because "the predicate acts are not actionable," Plaintiffs have an adequate remedy at law, and Plaintiffs have no available remedy under the UCL.

#### 1.  *Actionable Conduct*

Apple's first argument regarding "actionable conduct" is that because Plaintiffs fail to state a claim under the Cartwright Act, they cannot state a UCL "unfair prong" claim, either.

As noted by Plaintiffs, there are varying standards in the appellate courts as to what constitutes an "unfair" act or practice under the UCL in the consumer context.  (See *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 303, fn. 10 [describing, but not resolving, split of authority].)  One line of appellate decisions has adopted a "balancing" test, which requires a court to examine the challenged practice's "impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718, internal quotation marks omitted.)  Another line of decisions has adopted a "tethering test," requiring that "the public policy which is a predicate to [a consumer unfair competition action under the 'unfair' prong of the UCL] must be 'tethered' to specific constitutional, statutory or regulatory

provisions." (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854.)  A final line of decisions has adopted a "section 5 test," namely that: "(1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." (*Camacho v. Automobile Club of Southern California* (2006) 142 Ca1.App.4th 1394, 1403.)

But *Chavez* held that regardless of which test applies in the consumer context, "we conclude as a matter of law that conduct that the courts have determined to be permissible under the *Colgate* doctrine cannot be deemed 'unfair' under the unfair competition law." (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  Subsequent California authorities are in accord.  (See *Drum v. San Fernando Valley Bar Assn*. (2010) 182 Cal.App.4th 247, 255 [citing *Chavez* for the proposition that the fact "that a unilateral resale price policy is 'not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers' under the UCL," affirming judgment for defendant on  demurrer emphasizing its unilateral conduct]; *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 93 (*SC*) [citing *Chavez* for the proposition that " '[i]f the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers' "; sustaining judgment for defendant on demurrer]; *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240 [citing *Chavez* for the same proposition as *SC* and sustaining judgment for defendant on summary adjudication].)

Here, Plaintiffs' theories both depend on unilateral conduct by Apple that is protected by the *Colgate* doctrine.  This includes the "anti-steering" theory.  (See, e.g., FAC, ¶ 69 ["Developers are forced into non-negotiable contracts if they wish to do business on the App Store — these developers are required to use Apple's In-App Purchase system and may not include [any] alternative payment solutions in the app whatsoever.  They cannot steer users to alternative payment methods outside the app, as apps and their metadata may not include

13

buttons, external links, or other calls to action that direct customers to purchasing methods other than Apple's In-App Purchase system."].)[7]

Per *Chavez* and the other authorities cites above, Plaintiffs' UCL "unfair" prong claim must also fail.

2.   *Conclusion*

The Court SUSTAINS Apple's demurrer to the third cause of action under the UCL's "unfair" prong, also with 60 days' leave to amend.

C.   **The Fourth Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing arises from Apple's "terms and conditions," which they allege that they and other putative class members agreed to in order to use the App Store. (FAC, ¶ 188.) Plaintiffs allege that they performed their duties under the terms and conditions, but Apple unfairly and in bad faith (1) "restrict[ed] payment options for in-app purchases, resulting in Plaintiffs and the Class paying an inflated price for purchases within Fortnite" and (2) "refus[es] to reinstate Fortnite onto the App Store, and is thus acting in bad faith by deliberately acting to deprive Plaintiffs and the Class of the use of Fortnite and any digital goods found within, and further by interfering with Plaintiffs and the Class use of the Fortnite application downloaded through the App Store." (*Id.* at ¶¶ 191–194.)

Apple contends that Plaintiffs fail to specify the "terms and conditions" upon which this claim is based, and the only terms upon which it could be based expressly permit the conduct at issue. On opposition, Plaintiffs are non-committal about what "terms and conditions" this claim is based on. But Plaintiffs' own authority emphasizes that "[t]he implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation." (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1204 (*Avidity*), citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 (*Foley*).)  "[T]he scope of conduct prohibited by the

---

[7] While the *Epic* Trial Decision found a UCL "unfair prong" violation based on the "anti-steering" theory, its discussion of *Chavez* was cursory, and it did not address *Chavez*'s application of the other California authorities cited above.

covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Avidity, supra,* 221 Cal.App.4th at p. 1204, quoting *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.) "[S]ince the covenant is an implied term in the contract," the contract is a prerequisite. (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49.) And to state a claim for breach of contract, the terms of the contract must be alleged in some manner. (See *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 270, fn. 1 [taking judicial notice of terms of operative contract that were not pleaded as required].)

In the Court's view, applying these authorities, Plaintiffs must at least allege what "terms and conditions" their claim for breach of the implied covenant arises from. Apple's demurrer to this claim is therefore SUSTAINED, but the Court will give Plaintiffs 60 days' leave to amend.

## V. CONCLUSION

As discussed above, each cause of action in the FAC fails to state a claim. On this basis, Apple's demurrer is SUSTAINED with 60 days' leave to amend. The Court therefore does not need to address Apple's arguments regarding permissible remedies in this case.

**IT IS SO ORDERED.**

Date:     February 4, 2022

The Honorable Sunil R. Kulkarni
Judge of the Superior Court

15