# EXHIBIT 5

**ORIGINAL**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SIXTH APPELLATE DISTRICT

RE:   MICHELLE BEVERAGE et al.,
      Plaintiffs and Appellants,
      v.
      APPLE, INC.,
      Defendant and Respondent.

      H050526
      Santa Clara County Super. Ct. No. 20CV370535

## * * REMITTITUR * *

I, Baltazar Vazquez, Clerk of the Court of Appeal of the State of California, for the Sixth Appellate District, do hereby certify that the attached is a true and correct copy of the original opinion or decision entered in the above-entitled cause on April 25, 2024, and that this decision has now become final.

_____ Appellant     __X__ Respondent to recover costs
_____ Each party to bear own costs
_____ Costs are not awarded in this proceeding
_____ See decision for costs determination

Witness my hand and the seal of the Court affixed at my office on August 26, 2024.

BALTAZAR VAZQUEZ
Clerk/Executive Officer

By: _____ **S. RAMIREZ** _____
          Deputy Clerk

Filed 04/25/24                **CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHELLE BEVERAGE et al., | H050526 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 20CV370535) |
| v. | |
| APPLE, INC., | |
| Defendant and Respondent. | |

## I. INTRODUCTION

This case requires us to explore the intersection of laws regulating antitrust activities and unfair competition.  Plaintiffs Michelle Beverage and Joseph Mejia (Plaintiffs) appeal after the trial court sustained without leave to amend a demurrer brought by Defendant Apple, Inc. (Apple) to their class action complaint.  They alleged that Apple's restrictive contractual terms and its coercive conduct toward portable software developers who seek to do business on Apple's App Store constituted unlawful and unfair practices that violated both the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and the Unfair Competition Law (*Id.* § 17200 et seq. (UCL).).  Applying the *Colgate* doctrine, *U. S. v. Colgate & Co.* (1919) 250 U.S. 300 (*Colgate*) and the holding of *Chavez v. Whirlpool Corporation* (2001) 93 Cal.App.4th 363 (*Chavez*), the trial court determined that Plaintiffs did not and could not state causes of action under either legal regime as a matter of law.

On appeal, Plaintiffs challenge only one aspect of the trial court's ruling.  They argue the court erred by relying on *Chavez* to sustain the demurrer to their UCL cause of action alleging unfair practices by Apple toward one developer, Epic Games, Inc. (Epic),

and its gaming application known as Fortnite.  Plaintiffs claim that *Chavez* is inconsistent with the California Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company* (1999) 20 Cal.4th 163 (*Cel-Tech*).

As we will explain, we disagree that *Chavez* reflects a misapplication of *Cel-Tech*. Since the trial court properly relied on *Chavez* to sustain the demurrer without leave to amend, we affirm the judgment.

## II. Factual and Procedural Background

We summarize the facts underlying this action assuming, as we must, the truth of all properly pleaded allegations in Plaintiffs' operative complaint.  (*Heckart v. A-1 Self Storage, Inc.* (2018) 4 Cal.5th 749, 753.)

### A. Apple and the App Store

Apple "designs, manufactures, markets, and sells to consumers" portable electronic devices that can connect to the internet via Wi-Fi or cellular data, such as iPhones and iPads (iOS devices).  Apple released the first iPhone in 2007 and the iPad in 2010.  "Since then, Apple has sold billions of devices—setting a record for 1.5 billion active devices in 2020."  iOS devices have a market share of roughly 50 percent in the United States.

iOS devices operate software programs called "apps" that are specifically designed to run on portable electronics.  Apps are also operating system specific, such that they must be specifically configured to function on iOS devices.  In 2008, Apple launched the App Store, which "makes apps and updates available for purchase, download, and update."  The App Store is the only legal means by which developers can market and sell their apps to users of iOS devices, and the only legal means for those users to purchase and download apps to their devices.  On that point, Plaintiffs allege that "[c]onsumers are unable to legally load apps onto their iOS Devices in any other way—they are required to purchase and download applications on their iOS Devices through the App Store and make In-App Purchases through Apple's payment system."  Additionally, "Apple has

2

complete control over the content found on the App Store—the approval or removal of applications or updates rests entirely with them."  The App Store features 1.96 million apps available for download, the vast majority of which are developed and programmed by third-party developers.

Developers who wish to do business on the App Store must agree to a non-negotiable contract that requires them to use Apple's in-app purchase system. Developers are also prohibited from "steering" users to alternative payment methods outside of the app.  When it first launched the App Store, Apple collected 30 percent of the price paid for each app and the developer received the remaining 70 percent.  A year later, Apple also began collecting 30 percent of all sales of digital goods and currency made within apps.  Aside from a handful of developers who have negotiated with Apple to receive a larger percentage of purchases made on the App Store, "[d]evelopers and firms had no way to avoid or minimize Apple's 30% cut for purchases of digital content."

### B. Fortnite

Epic created Fortnite, which is a social and gaming app "where dozens of participants, either individually or in teams, are dropped into a landscape" to engage in a "King of the Hill" style match where "the last one standing at the end wins."  Within Fortnite, users can pay for digital currency, known as V-Bucks, which can then be used to "buy" digital goods for use in the application, such as costumes or specialized dances for the playable characters.  When users on iOS devices purchase V-Bucks or digital goods in Fortnite, "the transaction goes through Apple," who takes a 30 percent cut of the user's payment and sends the remaining 70 percent to Epic "as is the custom for in-app purchases on iOS devices."

Fortnite was released for iOS devices in April 2018 and, by July 2018, reached $1 billion in revenue for in-app purchases of digital currency and goods.  By May 2020, Fortnite had a cumulative total of 350 million users, and the mobile application reached $1 billion in revenue, with the vast majority coming from iOS devices and the App Store.

3

In August 2020, Epic contacted Apple about the company's plans to launch a direct payment system via Fortnite on iOS devices where users could purchase digital currency and goods at a discounted price. Apple responded by removing Fortnite from the App Store, which prevented users from downloading or updating Fortnite. This led Epic to initiate legal action against Apple in federal court.[1]

After Apple removed Fortnite from the App Store, it began promoting Fortnite's biggest competitor on both the App Store and on Twitter. Apple also "threatened" to remove the apps of other companies who contracted with Epic from the App Store, and "considered punitive measures against Netflix when Netflix was considering the removal of in-app purchases."

### C. The Pleadings and Demurrers

Plaintiffs are two individuals who made purchases through the App Store in Fortnite for use on iOS devices. They initiated this action in September 2020 on behalf of themselves and a putative class of iOS device users who downloaded Fortnite onto their device and made purchases of digital goods or currency within the app using Apple's purchase system.

After the trial court sustained a demurrer to Plaintiffs' first amended complaint, they filed a second amended complaint (SAC) in April 2022. Plaintiffs alleged that Apple's restrictions on app distribution increased the prices developers charge iOS device users, and that Apple's anti-steering restrictions "artificially increase" Apple's power within the market for mobile gaming transactions.[2]

---

[1] The federal lawsuit, which we will refer to as the "district court case" to avoid confusion with a related appellate proceeding in the Ninth Circuit Court of Appeals, was filed in the United States District Court for the Northern District of California. (See *Epic Games, Inc. v. Apple Inc.* (N.D. Cal. 2021) 559 F. Supp. 3d 898.).

[2] Although Plaintiffs alleged that Apple promulgated "monopolistic policies and practices," they did not allege that Apple held a monopoly over the market for mobile gaming transactions. Rather, Plaintiffs alleged in the SAC that Google was Apple's (continued)

Plaintiffs asserted three causes of action in the SAC.  The first was under the Cartwright Act, which Plaintiffs alleged Apple violated by leveraging "its market power to make developers and consumers accept unreasonable and anticompetitive terms in order to access the iOS marketplace."  The second, for violation of the "unlawful" prong of the UCL, was based on the same conduct.

In the third cause of action, Plaintiffs asserted that Apple violated the "unfair" prong of the UCL by "threatening an incipient violation of an antitrust law by preventing an informed choice among users of the iOS platform by limited information regarding pricing and purchase option[s]."  Plaintiffs further alleged that Apple's conduct "violates the policy and spirit of antitrust laws because anti-steering has the effect of preventing substitution among platforms for transactions."

Apple filed a demurrer to the SAC, which the trial court sustained without leave to amend.  The court found that Plaintiffs did not state claims under the Cartwright Act or the "unlawful" prong of the UCL as a matter of law because they alleged only unilateral conduct by Apple that was immunized from antitrust liability by the *Colgate* doctrine. Analyzing the UCL cause of action under the "unfair" prong separately, the trial court determined it was barred by *Chavez*.

Plaintiffs timely appealed.

### III.   DISCUSSION

Plaintiffs contend that the trial court wrongly relied on *Chavez* and misapplied *Cel-Tech* to sustain Apple's demurrer to their cause of action under the "unfair" prong of the UCL.  The central premise of Plaintiffs' argument is that *Chavez* was wrongly decided to the extent it held that a failed antitrust claim cannot be replead as an unfair business practice under the UCL.  Our review of *Cel-Tech*, *Chavez*, and related antitrust principles shows otherwise.

---

"main competitor" within the market.  These "two companies combine to dominate the mobile operating system market" and the market for mobile gaming transactions.

### A.  Standard of Review

" 'The purpose of a demurrer is to test the sufficiency of a complaint by raising questions of law.' " (*Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1143 (*Candelore*).)  "We review an order sustaining a demurrer de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law." (*Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1190.)  In doing so, " '[w]e assume the truth of the properly pleaded factual allegations, [and] facts that reasonably can be inferred from those expressly pleaded.' [Citation.]  But we do not assume the truth of 'contentions, deductions, or conclusions of law.' [Citation.]  We liberally construe the complaint 'with a view to substantial justice between the parties,' drawing 'all reasonable inferences in favor of the asserted claims.' " (*Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, 919.)  "To survive a demurrer, the complaint need only allege facts sufficient to state a cause of action." (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 872.)  "[B]ecause we are reviewing the trial court's ruling and not its reasoning, we may affirm on any ground supported by the record regardless of whether the trial court relied upon it." (*Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App.4th 953, 960.)

"When a demurrer is sustained without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.' [Citation.]  Plaintiff has the burden to show a reasonable possibility the complaint can be amended to state a cause of action." (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1609.)  "Where, however, amendment could not correct a deficiency in the complaint or where the action is barred as a matter of law, the demurrer is properly sustained without leave to amend." (*State of California Automobile Dismantlers Assn. v. Interinsurance Exchange* (1986) 180

Cal.App.3d 735, 742.)  "The issue of leave to amend is always open on appeal, even if not raised by the plaintiff."  (*City of Stockton v. Super. Ct.* (2007) 42 Cal.4th 730, 746.)

### B.    The UCL and Cel-Tech

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'  [Citation.]  Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' "  (*Kwikset v. Super. Ct.* (2011) 51 Cal.4th 310, 320 (*Kwikset*).)  The law is "broad" and " 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' "  (*Cel-Tech, supra,* 20 Cal.4th at p. 180.)

Functionally, "[t]he UCL operates as a three-pronged statute: 'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a "separate and distinct theory of liability." ' "  (*Beaver v. Tarsadia Hotels* (9th Cir. 2016) 816 F.3d 1170, 1177; accord *Adhav v. Midway Rent A Car, Inc.* (2019) 37 Cal.App.5th 954, 970 [since the UCL is written in the disjunctive, it establishes three varieties of unfair competition].)  "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable."  (*Cel-Tech, supra*, 20 Cal.4th at p. 180; *Candelore, supra*, 19 Cal.App.5th at p. 1155.)  However, "[i]t is not necessary for a business practice to be 'unlawful' in order to be subject to an action under the unfair competition law."  (*Smith v. State Farm Mutual Automobile Insurance Co.* (2001) 93 Cal.App.4th 700, 718.)  Under the UCL's "unfair" prong, "a practice may be deemed unfair even if not specifically proscribed by some other law."  (*Cel-Tech, supra*, 20 Cal.4th at p. 180.)  " ' "In other words, a practice is prohibited as 'unfair' . . . even if not 'unlawful' and vice versa." ' "  (*Ibid*.)  In creating this distinction, the Legislature recognized that " 'unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery' " and sought to account for " 'the creative nature of the scheming mind.' "  (*Id.* at p. 181.)

7

Although the UCL's scope is broad, it is not unlimited.  (*Cel-Tech, supra*, 20 Cal.4th at p. 182.)  "Courts may not simply impose their own notions of the day as to what is fair or unfair."  (*Ibid*.)  To prevent that from occurring, the California Supreme Court has held that "[s]pecific legislation may limit the judiciary's power to declare conduct unfair.  If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination."  (*Ibid*.)  Thus, "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."  (*Ibid*.)

In *Cel-Tech*, the California Supreme Court examined whether the defendant, a seller of cellular telephones and services, could invoke a "safe harbor" to prevent liability under the unfair prong of the UCL.  (*Cel-Tech, supra*, 20 Cal.4th at p. 187.)  The defendant was one of two federally licensed providers of cellular telephone service in the Los Angeles area and "formulated a strategy of selling cellular telephones below cost in order to increase the number of subscribers" to its service.  (*Id*. at p. 169.)  The plaintiffs sued the defendant over that practice, alleging that selling telephones below cost violated the Unfair Practices Act (UPA) (Bus. & Prof. Code, § 17000 et seq.)[3] and constituted an unfair business practice under the UCL.  (*Cel-Tech* at p. 187.)  The California Supreme Court held that plaintiffs did not prove a violation of the UPA because the evidence did not show that the defendant acted with the necessary mental state. (*Id*. at p. 178.)  At the same time, however, the court also determined that the UPA did not provide the defendant a "safe harbor" for the UCL cause of action since "nothing in [the UPA] makes all other below-cost sales lawful, including those that have the effect, although not the purpose, of destroying competition." (*Id.* at pp. 174-175, 178, 187.)  The court reasoned

---

[3] Unlike the UCL, the UPA "prohibits specific 'practices which the [L]egislature has determined constitute unfair trade practices," such as "purposeful below-cost sales and loss leaders."  (*Cel-Tech, supra*, 20 Cal.4th at p. 179.) "The [UCL] is independent of the [UPA] and other laws."  (*Ibid*.)

that because the defendant was a " 'duopolist,' employing an overall strategy that might not be available to its nonduopolist competitors," the Legislature "undoubtedly did not consider below-cost sales in this context." (*Id.* at p. 188.)  The court also rejected the defendant's argument that, because the UPA addressed below-cost sales but did not prohibit the defendant's specific conduct, its practice could not be considered unfair. (*Ibid.*)

### C.  The Cartwright Act and the Colgate Doctrine

"The Cartwright Act was passed in 1907 as part of a wave of turn-of-the-century state and federal legislation intended to stem the power of monopolies and cartels." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 772.)  But unlike its federal counterpart, the Sherman Act (15 U.S.C. §§ 1, 2),[4] "single firm monopolization is not cognizable under the Cartwright Act." (*Asahi Kasei Pharma Corp. v. CoTherix, Inc.* (2012) 204 Cal.App.4th 1, 8 (*Asahi*); *Dimidowich v. Bell & Howell* (9th Cir. 1986) 803 F.2d 1473, 1478 (*Dimidowich*) ["No California statute deals expressly with monopolization or attempted monopolization"].)  Instead, "[t]he act 'generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices' [citation], and declares that, with certain exceptions, 'every trust is unlawful, against public policy and void' [citation]." (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1147; accord *Kolling v. Down Jones & Co.* (1982) 137 Cal.App.3d 709, 717 (*Kolling*) [Cartwright Act codifies "the common law prohibition against restraint of trade"].)  A violation of the Cartwright Act "requires 'a combination of capital, skill or acts by two or more persons' that seeks to achieve an anticompetitive end." (*Asahi, supra*, 204 Cal.App.4th at p. 8.)  Accordingly, "a corporation cannot conspire with itself

---

[4] The two sections of the Sherman Act "focus on different problems.  Section 1 deals with concerted activity, outlawing 'combination[s] . . . in restraint of trade.' [Citation.]  Section 2, on the other hand, concerns unilateral activity, punishing 'every person who shall monopolize, or attempt to monopolize . . . .' [Citation.]" (*Alaska Airlines, Inc. v. United Airlines, Inc.* (9th Cir. 1991) 948 F.2d 536, 540-541.)

or its agents for purposes of the antitrust laws." (*Kolling* at p. 720.)  "Only separate entities pursuing separate economic interests can conspire within the proscription of the antitrust laws." (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 189.)

In order to state a claim under the Cartwright Act, a plaintiff must allege " 'the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy.' " (*Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 493; *Kolling, supra*, 137 Cal.App.3d at p. 720 ["The Cartwright Act . . . requires an illegal 'combination' or 'conspiracy' to restrain trade"].)  Conversely, a claim describing only a unilateral refusal to deal without alleging a corresponding illegal conspiracy or combination does not state an actionable antitrust claim.  (*Kolling, supra*, 137 Cal.App.3d at p. 720.)  This premise, that "[a]bsent a legal provision to the contrary, a private party generally may choose to do or not do business with whomever it pleases" without violating antitrust laws (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 254 (*Drum*)), is known as the *Colgate* doctrine, arising from the United States Supreme Court's opinion of the same name.  (*Chavez, supra,* 93 Cal.App.4th at p. 370.)  In *Colgate*, "the Supreme Court recognized that, subject to antitrust laws such as the Sherman Act, there is a 'long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " (*People's Choice Wireless, Inc. v. Verizon Wireless* (2005) 131 Cal.App.4th 656, 663, fn. omitted; accord *Monsanto Co. v. Spray-Rite Service Corp.* (1984) 465 U.S. 752, 761 (*Monsanto*) ["A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"]; *Dimidowich, supra*, 803 F.3d at p. 1478 ["A manufacturer may choose those with whom it wishes to deal and unilaterally may refuse to deal with a distributor or customer for business reasons without running afoul of the antitrust laws"].)

The *Colgate* doctrine is "firmly entrenched in antitrust jurisprudence."  (*The Jeanery, Inc. v. James Jeans, Inc.* (9th Cir. 1988) 849 F.2d 1148, 1154.)  It reflects a limitation to the reach of antitrust liability, grounded in the concept that "a single firm's conduct, absent the danger of monopolization, is not the object of intense antitrust scrutiny because to treat it with such scrutiny would heighten 'the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.' "  (*Id.* at p. 1152.)  "[C]oncerted action poses a substantially greater risk of anticompetitive harm than does independent behavior" because it " 'deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.' "  (*Id.* at pp. 1152-1153.)

"California courts have adopted the *Colgate* doctrine for purposes of applying the Cartwright Act."  (*Chavez, supra*, 93 Cal.App.4th at p. 370; see *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 267 ["It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business]; *Drum, supra*, 182 Cal.App.4th at p. 254 [" 'right to refuse to deal remains sancrosanct' "].)

### D.  Chavez

In *Chavez*, a case decided after *Cel-Tech*, the court applied the *Colgate* doctrine to preclude a UCL cause of action.  There, the consumer plaintiff alleged that the defendants, a home appliances manufacturer and retailer, had agreed to maintain minimum resale prices for products in violation of the Cartwright Act and the UCL.  (*Chavez, supra*, 93 Cal.App.4th at p. 367.)  The plaintiff alleged that the manufacturer announced a unilateral resale price policy and advised retailers it would monitor their compliance and terminate any retailers who failed to implement the minimum resale prices with no " 'second chances.' "  (*Ibid*.)  The plaintiff further contended that the retailer from whom he purchased an appliance either voluntarily agreed to implement the manufacturer's policy or did so under coercion.  (*Ibid*.)  Reviewing these allegations, the

11

trial court sustained the defendants' demurrer to the complaint without leave to amend, relying on the *Colgate* doctrine.  (*Id.* at p. 368.)

The Second District Court of Appeal affirmed, holding that the plaintiff failed to plead facts sufficient to establish a coerced agreement in violation of the Cartwright Act or the "unlawful" prong of the UCL.  (*Chavez, supra*, 93 Cal.App.4th at p. 367.)  Citing *Colgate* and *Monsanto*, the court reasoned that the plaintiff did not state a claim under the Cartwright Act because "a manufacturer's announcement of a resale price policy and its refusal to deal with the dealers who do not comply coupled with the dealers' voluntary acquiescence in the policy does not constitute an implied agreement or an unlawful combination as a matter of law."  (*Id.* at p. 372.)  Although the plaintiff alleged that the manufacturer went beyond merely announcing a policy and refusing to deal by taking several steps to monitor retailers' compliance, such as reviewing advertisements, collecting sales receipts, and sending in "mystery shoppers," the court held that the manufacturer's conduct was permitted by the *Colgate* doctrine.  (*Id.* at p. 373.)  To that end, the court explained that "measures to monitor compliance that do not interfere with the dealers' freedom of choice are permissible," because "[t]o hold otherwise would render the manufacturer's announced policy ineffective and undermine rights protected by the *Colgate* doctrine."  (*Ibid.*)  "In this manner, a manufacturer that announces a resale price policy and enforces the policy by monitoring the dealers' compliance and refusing to deal with dealers who do not comply does not violate the Cartwright Act."  (*Ibid.*)

The court also held that the plaintiff's allegations did not state a claim under the UCL's "unfair" prong.  (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  Since "[t]he purpose of federal and state antitrust laws is to protect and promote competition for the benefits of consumers," the court reasoned that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is

not 'unfair' toward consumers." (*Ibid.*)  In the *Chavez* court's view, permitting a "separate inquiry" under the UCL "into essentially the same question" raised by the Cartwright Act claim "would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." (*Ibid*.)

### E.  Analysis of this Case

With these principles in mind, we now turn to the parties' arguments.  But first, we comment on the scope of this appeal.  Since Plaintiffs' challenge is limited only to the dismissal of their cause of action under the "unfair" prong of the UCL, they have abandoned any claim of error in the other aspects of the trial court's ruling on Apple's demurrer.  (See *Limon v. Circle K Stores, Inc.* (2022) 84 Cal.App.5th 671, 687.) Applying well-settled appellate standards, we therefore presume the trial court correctly found that Plaintiffs' causes of action under the Cartwright Act and the "unlawful" prong of the UCL were legally insufficient by application of the *Colgate* doctrine and we conduct our analysis with that presumption in mind.  (See *Denham v. Super. Ct.* (1970) 2 Cal.3d 557, 564 [judgment of the trial court is presumed correct on appeal and error must be affirmatively shown]; *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158 ["We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise"].)  The question that remains is whether Plaintiffs adequately alleged an "unfair" act or practice under the UCL considering the trial court's ruling that Apple's practices constituted permissible unilateral conduct.  Under these circumstances, we hold that Plaintiffs did not state a claim as a matter of law.

Looking at the SAC, there is no doubt that Plaintiffs' UCL cause of action based on the "unfair" prong fell squarely within the rule announced in *Chavez*.  Like their Cartwright Act cause of action, Plaintiffs alleged under the UCL that Apple's practices toward Epic and other developers that dictated the terms of business on the App Store and imposed restrictions on contacting and steering the users of iOS devices to other app

storefronts threatened "an incipient violation of an antitrust law by preventing an informed choice among users of the iOS platform" and violated "the policy and spirit of antitrust laws because anti-steering has the effect of preventing substitution among platforms for transactions."  Thus, the same conduct was alleged in the SAC "to be both an antitrust violation and an 'unfair' business act or practice for the same reason— because it unreasonably restrains competition and harms consumers." (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  According to *Chavez*, once the trial court determined that the *Colgate* doctrine applied to these practices, this "necessarily implie[d] that the conduct [was] not 'unfair' toward consumers." (*Ibid*.)  *Chavez*, therefore, forecloses Plaintiffs' UCL claim.

To resist that outcome, Plaintiffs argue that *Chavez* was wrongly decided and is "wholly inconsistent" with *Cel-Tech*.  According to Plaintiffs, the implication from *Chavez* that a "safe harbor" can be found outside of explicit statutory language immunizing specific conduct cannot be reconciled with *Cel-Tech*, particularly with the court's declaration that the "Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." (*Cel-Tech, supra*, 20 Cal.4th at p. 184.)  Stated differently in the context of this case, Plaintiffs theorize that because the Legislature has not enacted a statute or provision condoning conduct embraced by the *Colgate* doctrine as lawful, *Cel-Tech* establishes that such conduct may constitute a predicate "unfair" practice for a UCL cause of action even though it could not support an antitrust claim.

Looking closely at *Cel-Tech*, however, we disagree that it countenances Plaintiffs' theory.  As Apple points out, the court's description of qualifying "safe harbors" in *Cel-Tech* was not limited solely to instances where explicit statutory language either authorizes conduct as lawful or imposes a litigation bar.  Instead, the court explained that "safe harbors" can arise in two ways: "If the Legislature has permitted certain conduct or *considered a situation and concluded no action should lie*, courts may not override that determination." (*Cel-Tech, supra*, 20 Cal.4th at p. 182, italics added; accord *Zhang v.*

14

*Super. Ct.* (2013) 57 Cal.4th 364, 379, fn. 8.)  Building on that concept, the court emphasized the principle that a plaintiff may not " 'plead around' an 'absolute bar to relief' simply 'by recasting the cause of action as one for unfair competition.' " (*Cel-Tech* at p. 182.)  This rule ensures that courts are not imposing "their own notions of the day as to what is fair or unfair" under the guise of the UCL, as the *Cel-Tech* court cautioned.  (*Ibid.*)  Indeed, "[a]lthough its reach is broad, the UCL ' " 'is not an all-purpose substitute for a tort or contract action.' " ' " (*People v. Potter Handy, LLP* (2023) 97 Cal.App.5th 938, 950.)  In substance, that is exactly what *Chavez* held; a plaintiff cannot plead around the absolute bar imposed by the *Colgate* doctrine by resurrecting a failed antitrust claim as an unfair business practice under the UCL (*Chavez, supra*, 93 Cal.App.4th at p. 375), especially when, as here, the only other cause of action alleged in the SAC was a violation of the Cartwright Act.  (Cf. *Zhang, supra*, 57 Cal.4th at p. 384 [UCL action may lie if defendant's alleged conduct independently violates "obligations imposed by other statutes or the common law" even if "safe harbor" also applies].)  To find otherwise would permit plaintiffs to use the UCL to "assault" the " 'absolute bar to relief' " established by the *Colgate* doctrine.  (*Cel-Tech, supra*, 20 Cal.4th at p. 182.)  Viewed in that way, *Chavez* is entirely consistent with *Cel-Tech*.

In any event, we find sufficient indication from the text and history of the Cartwright Act that the Legislature has determined that "no action should lie" for unilateral refusals to deal that are permissible under the *Colgate* doctrine.  (*Cel-Tech, supra*, 20 Cal.4th at p. 182.)  Since its enactment over 100 years ago, the Cartwright Act has by its own terms prohibited only anticompetitive conduct by two or more entities in conspiracy or in combination.  (See *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1161 (*Texaco*), superseded by statute on another ground as stated in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570.)  Although other states' antitrust acts in existence at the time of its adoption had broader application, the California Legislature chose to model the Cartwright Act after a "more

15

narrowly worded" Texas act that defined a "trust" as a " 'combination of capital, skills or acts . . .' for various improper purposes." (*Texaco* at pp. 1154-1155, italics omitted.)

As we have mentioned, the *Colgate* doctrine "has been a basic part of antitrust law concepts since it was first announced in 1919" by the United States Supreme Court. (*United States v. Parke, Davis & Co.* (1960) 362 U.S. 29, 49 (dis. opn. of Harlan, J.).) Rather than retreat from the doctrine over time, the high court continues to recognize its viability.  (See, e.g., *Monsanto, supra*, 465 U.S. at p. 760; *Leegin Creative Leather Products, Inc. v. PSKS, Inc.* (2007) 551 U.S. 877, 901 [observing that Supreme Court decisions have accommodated the *Colgate* doctrine].)  The *Colgate* doctrine was first recognized by California courts in 1979.  (See *R.E. Spriggs Co. v. Adolph Coors Co.* (1979) 94 Cal.App.3d 419, 424-425, fn. 1.)  Although the Legislature has amended the Cartwright Act at least twice since 1979 (Stats. 1983, ch. 1069, § 1; Stats 1987, ch. 865, § 2), not to mention numerous times since 1919 (*Texaco, supra*, 46 Cal.3d at pp. 1162-1163), it has not undermined the applicability or effect of the *Colgate* doctrine. Nor did the Legislature act in response to *Chavez*.  Because "[w]e generally presume the Legislature is aware of appellate court decisions" (*Therolf v. Super. Ct.* (2022) 80 Cal.App.5th 308, 335), its inaction on this subject for at least the past 45 years is significant.  (See *Texaco, supra*, 46 Cal.3d at p. 1162.)

Moreover, *Chavez* does not stand alone.  Its holding has been adopted and applied by other California Courts of Appeal.  (See *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240; *SC Manufactured Homes, Inc. v Liebert* (2008) 162 Cal.App.4th 68, 93; *Drum, supra*, 182 Cal.App.4th at p. 254.)  Additionally, the Ninth Circuit Court of Appeals recognized in *Epic Games, Inc. v. Apple, Inc.* (9th Cir. 2023) 67 F.4th 946 (*Epic Games*), that a "*categorical legal bar*"—as opposed to express statutory language— can also operate as a "safe harbor" against UCL liability in the area of antitrust.  There, the court acknowledged the distinction outlined in *Cel-Tech* that "there is a 'difference between (1) not making an activity unlawful, and (2) making that activity

16

lawful.' " (*Epic Games, supra*, 67 F.4th at p. 1001.)  But it continued its discussion of "safe harbors" by explaining that "in every instance where a court found the Sherman Act to preclude a UCL action, a *categorical* antitrust rule formed the basis of the decision." (*Ibid.*)  By way of example, the court cited its decision in *City of San Jose v. Office of the Commissioner of Baseball* (9th Cir. 2015) 776 F.3d 686, in which it "held that the judge-made baseball exemption—that 'the business of providing public baseball games for profit . . . [is] not within the scope of the federal antitrust laws'—precluded a UCL action." (*Epic Games, supra*, 67 F.4th at p. 1001.)  While the baseball exemption applies to a particular industry not at issue here, the exemption is nonetheless indistinguishable from the *Colgate* doctrine since it operates as a categorical rule exempting certain business conduct from the reach of the antitrust laws.

Consistent with *Chavez*, we conclude—taking into account the Cartwright Act's prohibition only on coordinated conduct, the *Colgate* doctrine's longstanding and prominent role in federal and state antitrust jurisprudence, and the Legislature's nonintervention against that backdrop—that the *Colgate* doctrine provides Apple with a "safe harbor" against Plaintiffs' UCL claim under the "unfair" prong.  Although we disagree with Plaintiffs that *Chavez* is irreconcilable with *Cel-Tech*, this result harmonizes the two.

In their appellate briefing, Plaintiffs argue that the trial court conflated the "unlawful" and "unfair" prongs of the UCL by sustaining Apple's demurrer.  They imply that affirming the trial court in this instance would have the effect of collapsing the two prongs into one in a manner contrary to *Cel-Tech*, such that "[t]here could be no instance where the defendant's conduct was 'lawful' (in the sense that it did not violate any prohibitory statute) but was still 'unfair.' "  However, we do not perceive that danger because our decision is a narrow one.  We do not broadly hold that a "safe harbor" precluding a UCL claim can necessarily arise from legislative inaction in connection with other statutory schemes or in contexts outside of the *Colgate* doctrine's application to

antitrust claims based on unilateral refusals to deal.  We also acknowledge, as did the *Chavez* court, that an "unfair" business act or practice need not violate an antitrust law to be actionable under the UCL.  (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  Instead, our decision is limited to situations typified by this case, where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the "unfair" prong of the UCL.  Because both antitrust laws and the UCL are designed to protect and promote competition for the benefit of consumers (*Kwikset, supra*, 51 Cal.4th at p. 320; *Chavez, supra*, 93 Cal.App.4th at p. 375), logic dictates that there can be no harm to consumers under the UCL based on the same unilateral practices that have been historically accepted as procompetitive and categorically shielded from antitrust liability by the *Colgate* doctrine.  (See *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* (2004) 540 U.S. 398, 407-408 (*Verizon Communications*).)[5]  This remains true whether the "unlawful" and "unfair" prongs are considered jointly or separately.[6]

---

[5] In *Verizon Communications*, the United States Supreme Court explained why the *Colgate* doctrine protects unilateral conduct as procompetitive: "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.  Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are illsuited.  Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion."  (*Verizon Communications, supra*, 540 U.S. 398, 407-408.)

[6] Plaintiffs also argue we should depart from *Chavez* and instead follow *Epic Games* and the order filed after trial in the underlying district court case.  We have reviewed these decisions but decline to do so.  Although we recognize that the "decisions of . . . the lower federal courts may be instructive to the extent we find their analysis persuasive, they are neither binding nor controlling on matters of state law."  (*T.H. v. Novartis Pharmaceuticals Corporation* (2017) 4 Cal.5th 145, 175.) The Ninth Circuit and the district court mentioned *Chavez* only in passing, and neither court engaged a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims.  We therefore do not find these decisions persuasive on the precise issue presented by this appeal.

Turning back to the SAC, we find that the trial court correctly sustained Apple's demurrer because Plaintiffs did not state a cause of action against Apple for violation of the "unfair" prong of the UCL.  Since Plaintiffs do not argue in their opening brief on appeal that the trial court abused its discretion in denying leave to amend under these circumstances, we therefore affirm the judgment.

## IV. DISPOSITION

The judgment is affirmed.  Apple may recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2)

19

_____
ADAMS, J.*

WE CONCUR:

_____
GREENWOOD, P.J.

_____
BAMATTRE-MANOUKIAN, J.

*Beverage et al. v. Apple, Inc.*
H050526

_____

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                                          Santa Clara County
                                                      Superior Court No.: 20CV370535


Trial Judge:                                          The Honorable Sunil Kulkarni


Attorneys for Plaintiffs and Appellants              Kurt Kessler
Michelle Beverage & Joseph Mejia:                    William Audet
                                                     Ling Kuang
                                                     Myron Moskovitz


Attorneys for Defendant and Respondent               Julian Kleinbrodt
Apple, Inc.:                                          Ethan Dettmer
                                                     Anna Mathieson


<u>Beverage et al. v. Apple, Inc.</u>
H050526