# EXHIBIT 1

SUPREME COURT OF THE STATE OF CALIFORNIA

**MICHELLE BEVERAGE, et al.**

Petitioners,

v.

**APPLE INC.**

Respondent.

**Supreme Court No**. _____

Court of Appeal No. H050526

Santa Clara County Superior Court
No. 20CV370535

Service on Attorney General required
by Bus. & Prof. Code, § 16750.2

On Appeal from the Judgment of the
Santa Clara County Superior Court
The Honorable Sunil R. Kulkarni

**PETITION FOR REVIEW**

\*Myron Moskovitz (SBN 36476)
Jason R. Marks (SBN 130961)
David A. Kaiser (SBN 215275)
MOSKOVITZ APPELLATE TEAM
90 Crocker Avenue
Piedmont, CA 94611
(510) 384-0354

William M. Audet (SBN 117456)
Ling Y. Kuang (SBN 296873)
Audet & Partners, LLP
711 Van Ness Ave., Suite 500
San Francisco, CA 94102-3275
(415) 568-2555

Counsel for Petitioners

Document received by the CA Supreme Court.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ 3

THE ISSUE FOR REVIEW ........................................................... 5

A SUMMARY OF THIS PETITION ............................................ 6

I.      THE INSTANT CASE. ...................................................... 9

II.     THE CONTROLLING DECISION: *CEL-TECH* ............. 10

III.    THE COURT OF APPEAL OPINION .............................. 11

    A.    "Not Unlawful" = "Not Unfair". .................................. 11

    B.    *Chavez v. Whirlpool Corp.* ........................................... 13

    C.    The Court of Appeal Opinion Relies on a Sentence
    Fragment from *Cel-Tech*. ................................................ 15

    D.    *Zhang v. Superior Court* ............................................ 22

    E.    The Court of Appeal Opinion Eliminates  "Unfair"
    From the UCL. ..................................................................... 24

    F.    The Opinion Relies on Other  Court of Appeal
    Decisions. ............................................................................. 25

    G.    The Court of Appeal Opinion Rejects the Federal
    Courts' *Epic Games* Holdings. ......................................... 27

IV.    A LEGISLATIVE DECISION NOT TO INCLUDE
CERTAIN CONDUCT IN A PROHIBITORY STATUTE
*SHOULD NOT* CREATE A "SAFE HARBOR"  AGAINST A
CLAIM THAT SUCH CONDUCT  IS "UNFAIR" UNDER
THE UCL. .................................................................................. 31

V.     ONLY AN INDEPENDENT STATUTE SHOULD
SERVE AS A "SAFE HARBOR". ................................................ 40

CONCLUSION ............................................................................ 42

CERTIFICATE PURSUANT TO C.R.C.
RULE 8.504(D)(1) ..................................................................... 43

Document received by the CA Supreme Court.

2

# TABLE OF AUTHORITIES

### Cases

*Belton v. Comcast Cable Holdings, LLC* (2007)
   151 Cal.App.4th 1224 ........................................................... 25, 26

*Bernhard v. Bank of America* (1942)
   19 Cal.2d 807 .................................................................... 38

*Cel-Tech Communications v. Los Angeles Cellular Tel. Co.* (1999)
   20 Cal.4th 163 ............................................. 5, 6, 10, 12, 13, 14, 16,
   17, 18, 19, 20, 22, 24, 25, 27, 29, 31, 32, 39, 42

*Chavez v. Whirlpool Corp.* (2001)
   93 Cal.App.4th 363 ................................................ 7, 13, 14, 16, 26

*Davis v. HSBC Bank Nevada N.A.* (Ninth Cir. 2012)
   691 F.3d 1152 ................................................................... 29

*Drum v. San Fernando Valley Bar Assn.* (2010)
   182 Cal.App.4th 247 ........................................................... 25

*Epic Games, Inc. v. Apple, Inc.* (9th Cir. 2023)
   67 F.4th 946 .................................................................. 8, 28

*Epic Games, Inc. v. Apple, Inc.*, (N.D. Calif. 2021)
   559 F.Supp.3d 898 .......................................... 8, 27, 35, 36, 37, 38

*Hobby Industry Assn. of America, Inc. v. Younger* (1980)
   101 Cal.App.3d 358 ............................................................ 18

*Kolling v. Dow Jones & Co.* (1982)
   137 Cal.App.3d 709 ............................................................ 11

*Rubin v. Green* (1993)
   4 Cal.4th 1187 .................................................................. 18

*SC Manufactured Homes, Inc. v. Liebert* (2008)
   162 Cal.App.4th 68 .......................................................... 25, 26

Document received by the CA Supreme Court.

*U.S. v. Colgate* (1919)
    250 U.S. 300 ......................................................................... 12, 30

*Whitman v. American Trucking Assns., Inc.* (2001)
    531 U.S. 457 ............................................................................... 24

*Zhang v. Superior Court* (2013)
    57 Cal.4th 364 .................................................................... 7, 23, 29

### Statutes

Bus. & Prof. Code, § 16700 et seq. .................................................. 11

Bus, & Prof. Code, § 17043 ............................................................ 21

Bus. & Prof. Code, § 17044 ............................................................ 21

Bus. & Prof. Code, § 17200 ............................................................ 25

### Other Authorities

7 Witkin, Cal. Proc. 6th *Judgments*, § 511 (2024) ........................ 38

Document received by the CA Supreme Court.

## THE ISSUE FOR REVIEW

Under *Cel-Tech Communications v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163, where the defendant's conduct is not "unlawful" under California's Unfair Competition Law because it is not barred by a prohibitory statute, is it also automatically not "unfair" under that Law — even though no separate "safe harbor" statute immunizes that conduct?

Document received by the CA Supreme Court.

## A SUMMARY OF THIS PETITION

In *Cel-Tech Communications v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163, this Court held that the "unlawful" and "unfair" prongs of California's Unfair Competition Law ("UCL") each provide a separate, independent basis of liability under the UCL. A finding that a defendant's conduct was not "unlawful" may mandate a finding that it was also not "unfair" *only* when the "not-unlawful" finding was based on a separate "safe harbor" statute that *expressly immunizes* such conduct from liability. *Cel-Tech* made it clear that the fact that such conduct *does not violate a prohibitory* statute is *not* a "safe harbor" and is *not enough* to take it out of the "unfair" prong.

There was, however, a single sentence fragment in the *Cel-Tech* opinion that — according to the Court of Appeal's published Opinion in the present case — undermines the entire thrust of the Court's analysis: "If the Legislature has permitted certain conduct *or considered a situation and concluded no action should lie,* courts may not override that determination." *Cel-Tech* at p. 182; emphasis added. The Court of Appeal's Opinion relies on that fragment to hold that a practice is not "unfair" solely because the Legislature chose not to include that practice in its

Document received by the CA Supreme Court.

6

prohibitory statute — even where the Legislature has enacted no "safe harbor" statute that immunizes the defendant's conduct.

In *Zhang v. Superior Court* (2013) 57 Cal.4th 364, this Court quoted the sentence fragment at issue here (*id*. at 377), but did *not* construe it the way the Court of Appeal did in the present case. *Id*. at 377. Indeed, *Zhang* held that "a practice may violate the UCL even if it is not prohibited by another statute." *Id*. at 370.

This Petition for Review asks this Court to consider whether the Court of Appeal's reading of that fragment is correct, or whether this Court should reaffirm its commitment to maintaining the "unfair" prong of the UCL as a viable remedy separate from the "unlawful" prong.

The Court of Appeal Opinion also relied on *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, where another Court of Appeal also misconstrued *Cel-Tech* — holding that a practice was not "unfair" because it was not "unlawful" because the prohibitory statute did not cover it — even though no "safe harbor" statute immunized it. The Opinion also claims that additional Court of Appeal opinions disallowed "unfair" claims

Document received by the CA Supreme Court.

even where there was no safe harbor statute authorizing the defendant's conduct.

Of equal significance, the Opinion declines to follow recent federal decisions involving *exactly the same facts* as the current case. While the consumers of Fortnite accessories brought the current case, the federal action was brought by the developer of those accessories. In *Epic Games, Inc. v. Apple, Inc.*, (N.D. Calif. 2021) 559 F.Supp.3d 898, the federal district ruled (after a lengthy trial) that the same practices Plaintiffs now challenge violate the "unfair" prong of the UCL — even though Apple's conduct was not "unlawful" under antitrust laws. The United States Court of Appeals for the Ninth Circuit affirmed. *Epic Games, Inc. v. Apple, Inc.* (9th Cir. 2023) 67 F.4th 946.

The Court of Appeal Opinion dismisses the Ninth Circuit opinion as poorly reasoned.

Given these conflicts between our state courts and the federal courts — and the Court of Appeal Opinion's apparent failure to follow *Cel-Tech* — we submit that this Court should grant review to clarify exactly how *Cel-Tech* should be construed.

Document received by the CA Supreme Court.

# I.    THE INSTANT CASE.

Plaintiffs filed a consumer class action against Apple, which sells accessories and digital goods for the application *Fortnite* on Apple's "App Store". Apple charges the owner-developer of Fortnite (Epic Games, Inc.) a 30% commission on these sales, a cost that is passed on to the consumers in the form of higher prices. And Apple's contract with Epic Games includes an "anti-steering" provision that prohibits the developer from informing consumers of alternative ways of purchasing the accessories at prices lower than those charged on the App Store.

The consumers challenged both of these practices under both the "unlawful" and the "unfair" prongs of California's UCL. The Court of Appeal's published Opinion (attached hereto) upheld a demurrer to the consumer's complaint.

Document received by the CA Supreme Court.

## II.    THE CONTROLLING DECISION: *CEL-TECH*

We contend that the Court of Appeal Opinion fails to correctly construe this Court's holding in *Cel-Tech* that "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." *Cel-Tech* at 182.

This Court summarized its analysis as follows:

> We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it. *That other provision must actually bar it, however, and not merely fail to allow it.* In other words, courts may not use the unfair competition law to condemn actions the Legislature permits. Conversely, the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair. Plaintiffs may not "plead around" a "safe harbor," but the safety must be more than the absence of danger.
> [*Cel-Tech* at 184; emphasis added.]

Document received by the CA Supreme Court.

## III.   THE COURT OF APPEAL OPINION

### A.    "Not Unlawful" = "Not Unfair".

The Opinion holds that the complaint failed to state a cause of action under the "unlawful" prong.  California's antitrust law is the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), which is similar to but narrower than the federal Sherman Act.  While the Sherman Act bars monopolies as well as conspiracies, the Cartwright Act prohibits only *conspiracies* in restraint of trade.  It does not reach actions by one business acting unilaterally.  For this reason, California courts have adopted the U.S. Supreme Court's "*Colgate*" doctrine, which holds a firm's unilateral decision on whom the firm will deal with does not violate the Sherman Act.  *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 720.  Because Apple's decisions regarding what commission to charge and barring Epic Games from telling customers about competing purchasing venues were unilateral — that is, they involved no conspiracy — the Court of Appeal held they were not "unlawful" under the Cartwright Act.  Slip Opinion at 9-11.  We do not challenge that holding.

Document received by the CA Supreme Court.

But we do challenge the Opinion's *further* conclusion that, *because* Apple's actions were not "unlawful", they necessarily were not "unfair" — even though no "safe harbor" statute protects unilateral decisions. This holding is inconsistent with *Cel-Tech's* holding that a "safe harbor" statute "must actually bar [the plaintiff's claim], however, and not merely fail to allow it." *Cel-Tech* at 184. Under the *Colgate* doctrine, the antitrust laws simply "fail to allow" a suit based on unilateral conduct. But neither Congress nor the California Legislature has enacted any "safe harbor" statute that immunizes unilateral conduct.

The Supreme Court in *Colgate* merely held that the Sherman Act did not bar the conduct at issue. *U.S. v. Colgate* (1919) 250 U.S. 300, 306: "Our problem is . . . to determine whether, so construed, it fairly charges violation of the Sherman Act".[1] The Court cited no "safe harbor" statute that immunized Colgate's unilateral conduct, because none exists.

---

[1] See also 250 U.S. at 307: "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own

Document received by the CA Supreme Court.

So how did the Court of Appeal Opinion arrive at a conclusion that appears to be directly contrary to *Cel-Tech's* directions about how to determine when a defendant's conduct may be "unfair" even where it is not "unlawful"?

## B.     *Chavez v. Whirlpool Corp.*

The Opinion relies heavily on a single Court of Appeal opinion: *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375.  See Slip Opinion at 1, 5, 11-13.

But *Chavez* misconstrued *Cel-Tech*.  *Chavez* held as follows:

> [W]e conclude as a matter of law that conduct that the courts have determined to be permissible under the *Colgate* doctrine cannot be deemed "unfair" under the unfair competition law.
>
> * * * *
>
> If the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—*the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward*

---

independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell."

13

Document received by the CA Supreme Court.

*consumers*. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.

[93 Cal.App.4th at 375; emphasis added.]

The emphasized language is wholly inconsistent with *Cel-Tech*. A determination that the defendant's conduct was not encompassed by some statute prohibiting an unreasonable restraint of trade does *not* establish that it was not "unfair" under the UCL. *Cel-Tech* made this clear:

- "a practice may be deemed unfair even if not specifically proscribed by some other law,"

- "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair", and

- "[t]hat other provision must actually bar it, however, and not merely fail to allow it."

  [*Cel-Tech*, *supra*, 20 Cal.4th at 180-184.]

Only a statute that provides a "safe harbor" *explicitly immunizing* a defendant's conduct would provide the exclusion sought by the defendant in *Chavez*. But the *Chavez* opinion cites

Document received by the CA Supreme Court.

no such statute.  And neither does the Court of Appeal Opinion in the present case.

## C.    The Court of Appeal Opinion Relies on a Sentence Fragment from *Cel-Tech*.

The Opinion relies heavily on a sentence fragment in the *Cel-Tech* opinion.  The Opinion states:

> Looking closely at *Cel-Tech*, however, we disagree that it countenances Plaintiffs' theory. As Apple points out, the court's description of qualifying "safe harbors" in *Cel-Tech* was not limited solely to instances where explicit statutory language either authorizes conduct as lawful or imposes a litigation bar. Instead, the court explained that "safe harbors" can arise in two ways: "If the Legislature has permitted certain conduct or *considered a situation and concluded no action should lie*, courts may not override that determination." (*Cel-Tech, supra*, 20 Cal.4th at p. 182, italics added.)
> [Slip Opinion at page 14.  See also page 8.]

The Court of Appeal Opinion then reviews "the text and history of the Cartwright Act", noting that "Since its enactment over 100 years ago, the Cartwright Act has by its own terms prohibited only anticompetitive conduct by two or more entities

Document received by the CA Supreme Court.

or in combination." Slip Opinion at page 15. This shows no more than a legislative decision not to bar unilateral conduct — exactly the type of enactment that *Cel-Tech* held would *not* block an "unfairness" claim. The Opinion then says: "Nor did the Legislature act in response to *Chavez*," which gives rise to a presumption that the Legislature was aware of *Chavez* and chose not to amend the Cartwright Act or the UCL to overrule it. Slip Opinion at page 16. We submit that such a "presumption" presumes far too much about the legislative process, which might well be preoccupied with other issues.

In logic and law, the fact that Apple did not violate the Cartwright Act does not mean its conduct was not "unfair" to competitors and consumers under the UCL. There is no principle of law holding that only conspiratorial conduct is subject to liability under the UCL's "unfairness" prong.

We submit that the Opinion misreads *Cel-Tech*, whose lengthy disquisition on this issue made it quite clear that the "or" in the above sentence was not meant as an *alternative* way of immunizing a defendant's conduct, but only as a further explication of what the Supreme Court meant by "safe harbor". This Court explained the policy it was implementing:

Document received by the CA Supreme Court.

[T]he unfair competition law's scope is broad. * * * *

The statutory language referring to "any unlawful, unfair *or* fraudulent" practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law.  * * * *

The unfair competition law, which has lesser sanctions than the Unfair Practices Act, has a broader scope for a reason. [T]he section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive.  * * * *

'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one....'
[*Cel-Tech* at 180-181; internal citations omitted.]

From these premises, the Supreme Court developed its "safe harbor" exemption:

Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.
[*Cel-Tech* at 182.]

Document received by the CA Supreme Court.

The Court then elaborated on what it meant by the above paragraph:

- The Supreme Court provided *an example* of the type of legislation that would provide immunity from an accusation of "unfairness" under the UCL. The Court cited *Rubin v. Green* (1993) 4 Cal.4th 1187, where a statute (separate from the prohibitory statute) provided a *litigation privilege* that immunized the defendant's conduct, and therefore "We found 'the conduct of defendants alleged in the complaint' came 'within the scope of [Civil Code] section 47(b).' and thus was 'absolutely immune from civil tort liability'". *Cel-Tech* at 182-183.

- The Court then noted that "A plaintiff may thus not "plead around" an "absolute bar to relief" simply "by recasting the cause of action as one for unfair competition." [Citation] "*The rule does not, however, prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct.*" *Cel-Tech* at 182-183; emphasis added.

- The Supreme Court then provided *another* example of what it intended to exempt: *Hobby Industry Assn. of America, Inc. v. Younger* (1980) 101 Cal.App.3d 358, where a federal statute expressly provided immunity to wholesalers and retailers. *Cel-Tech* at 183.

Document received by the CA Supreme Court.

- "Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts *may*, if otherwise unfair, be challenged under the unfair competition law *even if the Legislature failed to proscribe them in some other provision.*"  *Cel-Tech* at 183; emphasis added.

- The *Cel-Tech* opinion multiple times called the type of statute it deemed adequate to defeat an "unfair" claim a "safe harbor" — a statute *expressly conferring immunity* on the defendant's conduct.  See, e.g., *Cel-Tech* at 164, 183-190.

- "When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."  *Cel-Tech* at 182.

And finally, as noted above, at the very *end* of the Supreme Court's extensive discussion of this issue, the Court states:

> We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it. *That other provision must actually bar it, however, and not merely fail to allow it.* In other words, courts may not use the unfair competition law to condemn actions the Legislature permits. Conversely, *the Legislature's mere failure to prohibit an activity does not*

Document received by the CA Supreme Court.

19

*prevent a court from finding it unfair*.
[*Cel-Tech* at 184; emphasis added.]

The sentence fragment that the Court of Appeal Opinion relies upon appears well *before* the Court's conclusion:

> Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct *or considered a situation and concluded no action should lie, courts may not override that determination*. When specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.
> [*Cel-Tech* at p. 182; emphasis added.]

Read in the context of the Supreme Court's entire analysis, this less-than-clear sentence fragment should be understood as no more than an alternative (and awkward) way of describing an express "safe harbor" statute.  It should not be construed to undermine the remainder of the opinion.

This reading is borne out by *the sentence that immediately follows* the disputed sentence fragment: "When *specific legislation* provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."  *Cel-Tech* at p. 182.

Document received by the CA Supreme Court.

20

"Specific legislation" means a separate statute, not mere omission from a prohibitory statute.

This reading is also confirmed by the Supreme Court's *application* of its rationale to the facts at issue in *Cel-Tech* itself, which involved a claim by cell phone sellers that the defendant had engaged in unfair competition by selling cell phones at a price below cost in order to gain more subscribers to its cell phone service program. The Unfair Practices Act did not deem such practices "unlawful" when done for reasons other than injuring competitors or destroying competition, and defendant claimed those other reasons. The Supreme Court held that the statute's lack of coverage was *not* equivalent to a "safe harbor" statute. "L.A. Cellular argues, however, that because sections 17043 and 17044 deal with the same *subject* as this case—below-cost sales— and do not proscribe the conduct here, courts may not find it unfair. We are not persuaded. * * * * "The Unfair Practices Act neither outlaws nor affirmatively permits all nonpurposeful below-cost sales. Accordingly, it does not preclude a court from deeming nonpurposeful conduct unfair under the unfair

competition law." *Cel-Tech* at 187-188.[2] Thus, *this Court rejected virtually the same argument the Court of Appeal invokes in the current appeal.*

### D.    *Zhang v. Superior Court*

While we cannot be sure what this Court meant by the sentence fragment[3], we *can* be sure what the Court did *not* mean — to negate or undermine its holding (stated several times in several ways) that "[A] practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech* at 180.

---

[2]   The Supreme Court then compared the prohibitory statute to another statute that *would have* provided a "safe harbor" if defendant could satisfy its requirements — a statute that *expressly exempted* "providers of cellular services *shall be permitted* to sell cellular telephones below cost, provided that sales below cost are a good faith endeavor to meet the legal market prices of competitors in the same locality or trade area." *Cel-Tech* at 187-188.

[3]   In its discussion rejecting defendant's argument, the Supreme Court in *Cel-Tech* stated "The Legislature undoubtedly did not consider below-cost sales in this context." *Cel-Tech.* at 188.  The words "did not consider" closely resemble the words used in the sentence fragment, suggesting that the Court had intended the fragment to mean no more than a "safe harbor" statute showing that the Legislature had expressly "considered" an exemption.

Document received by the CA Supreme Court.

Indeed, this is how this Court itself later read *Cel-Tech*. In *Zhang v. Superior Court* (2013) 57 Cal.4th 364, this Court quoted the sentence fragment at issue here (*id*. at 377), but did *not* construe it the way the Court of Appeal did in the present case. *Id*. at 377. Indeed, *Zhang* held that "a practice may violate the UCL even if it is not prohibited by another statute." *Id*. at 370. See also *id*. at 387 (*Cel-Tech* established "the distinction between declining to create a right of action and precluding a right of action").

*Zhang* also said that in "*Cel-Tech,* we explained that to bar a UCL action, another statute must absolutely preclude private causes of action or clearly permit the defendant's conduct." *Id*. at 370 and 379-380. See also *id*. at 386 (*Cel-Tech* "clarified that UCL suits are precluded when the Legislature immunizes particular conduct from suit"). And, under *Cel-Tech* and other cases, "a UCL cause of action will not lie to enforce violation of a particular statute only if the Legislature affirmatively intended to preclude such indirect enforcement. *It is not enough that the Legislature in drafting the predicate statute simply failed to 'provide for the action.'*" *Id*. at 388; emphasis added.

Document received by the CA Supreme Court.

In *Cel-Tech,* this Court gave *no* indication that the small sentence fragment was meant to override the Court's lengthy explanation of its rationale or its later conclusion that "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." *Cel-Tech* at 184.  Like Congress, the California Supreme Court does not hide "elephants in mouseholes." *Whitman v. American Trucking Assns., Inc.* (2001) 531 U.S. 457, 468.

### E.    The Court of Appeal Opinion Eliminates "Unfair" From the UCL.

There is no way to reconcile the Opinion's conclusion with this Court's multiple and explicit statements that "a practice may be deemed unfair even if not specifically proscribed by some other law", "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair", and "[t]hat other provision must actually bar it, however, and not merely fail to allow it." *Cel-Tech* at 180-184.

If the Court of Appeal Opinion's conflating "unlawful" with "unfair" were correct, then *the effect* of the Legislature's decision to establish an "unfair" prong of the UCL independent from the

Document received by the CA Supreme Court.

"unlawful" prong would *disappear*, having been swallowed up by the "unlawful" prong.  There could be no instance where the defendant's conduct was "lawful" (in the sense that it did not violate any prohibitory statute) but was still "unfair".  Such an outcome would directly contradict *Cel-Tech's* holding that:

> [A] practice may be deemed unfair even if not specifically proscribed by some other law. "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa.' "
>
> [*Cel-Tech* at 180.]

### F.    The Opinion Relies on Other Court of Appeal Decisions.

At Slip Opinion, page 16, the Opinion states that "*Chavez* does not stand alone", and its holding has been adopted by the following cases: *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247; *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68; and *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240.

Document received by the CA Supreme Court.

Drumm cited *Chavez*, but did not say or imply that *Chavez* had correctly construed *Cel-Tech*. *SC Manufactured Homes* did cite and quote *Chavez* to support the theory the Court of Appeal in the present case invokes — though its analysis was very cursory and said nothing about the *Cel-Tech* language we discussed above. 162 Cal.App.4th at 93. To that extent, *SC Manufactured Homes* too was wrongly decided. This shows a special need for this Court to directly assess the correct reading of *Cel-Tech*.

In *Belton*, the plaintiff's evidence that defendant's conduct was "unfair" was no more than the exact same evidence that brought the conduct outside the prohibitory statute. 151 Cal.App.4th at 1240. In the present case, we have more — *much more*. See below for a summary of the federal district court's findings in *Epic Games, Inc. v. Apple, Inc.*

Document received by the CA Supreme Court.

### G.    The Court of Appeal Opinion Rejects the Federal Courts' *Epic Games* Holdings.

While this case was pending, Epic Games, Inc. brought an action against Apple in federal court, asserting the same two basic claims that the class Plaintiffs assert: both the thirty percent commission and Apple's ban on notifying customers of competing ways of purchasing *Fortnite* accessories were "unfair" under California's Unfair Competition Law.

Unlike the trial court in the instant case, the federal district court allowed these claims to go to trial. After a lengthy trial, the court and rendered a verdict against Apple on the second claim.[4] *Epic Games, Inc. v. Apple, Inc.* (N.D. Calif, 2021) 559 F.Supp.3d 898.

The district court expressly rejected the argument adopted by the Court of Appeal in the present case. The district court relied on this Court's opinion in *Cel-Tech*:

> Here, Epic Games seeks relief for the same conduct that it challenged under the Sherman and Cartwright Acts.

---

[4] The court rejected Epic's quest to invalidate the *entire* 30% commission, finding that Apple was entitled to part of it. We do not pose this problem, as we are not asking to void the entire 30%.

Document received by the CA Supreme Court.

Apple argues that separate consideration under the UCL is inappropriate. Fn 631. The Court disagrees. *Cel-Tech* expressly recognizes that "incipient" violations of antitrust laws and violations of the "policy or spirit" of those laws with "comparable" effects are prohibited. [Citation] Under Apple's interpretation, that standard would be rendered meaningless because any conduct that fails under the Sherman Act failed would also fail the UCL. The UCL, however, has "broad, sweeping language precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of [one's] invention would contrive." [Citation to *Cel-Tech* opinion.] Thus, it warrants separate consideration apart from antitrust laws. [*Id.* at 1053-1054].

Apple appealed. In *Epic Games, Inc. v. Apple, Inc.* (9th Cir. 2023) 67 F.4th 946, the Ninth Circuit affirmed the district court's rejection of Apple's argument that, because its ban on telling customers about alternative ways of purchasing was not "unlawful", it could not be "unfair". The Ninth Circuit too relied on this Court's opinions in *Cel-Tech* and *Zhang*:

Apple argues that Epic's failure to establish Sherman Act liability forecloses UCL liability pursuant to the UCL's "safe harbor" doctrine, which bars a UCL action where California or federal statutory law "absolutely preclude[s] private causes of action or clearly permit[s] the defendant's

Document received by the CA Supreme Court.

conduct." *Zhang v. Superior Court*, 57 Cal.4th 364, 379-380
(2013).  The safe-harbor doctrine emphasizes that there is a
"difference between (1) not making an activity unlawful,
and (2) making that activity lawful." *Cel-Tech*, 20 Cal.4th
at 183; *accord Zhang,* 57 Cal.4th at 379. . . . * * * *

      Apple's rule would convert any Rule of Reason
shortcoming into a UCL defense and undermine the UCL's
three-prong structure by collapsing the "unfair" and
"unlawful" prongs into each other. We reject Apple's
proposed rule as foreclosed by California law.
[67 F.4th at 1001]

The Ninth Circuit had read *Cel-Tech* the same way in an

earlier decision: *Davis v. HSBC Bank Nevada N.A.* (Ninth Cir.

2012) 691 F.3d 1152:

> [T]o fall under a safe harbor, the omission of the
> annual disclosure from Defendants' advertisements must
> be expressly permitted by some other provision. *It is not
> enough if TILA and Regulation Z merely fail to prohibit
> such an omission.*  *Cel-Tech*, 83 Cal.Rptr.2d 548.  * * * *
> Thus, we cannot conclude that some provision affirmatively
> permits the absence of the annual fee disclosure from the
> advertisements.
> [*Id.* at 1167; emphasis added.]

But the Court of Appeal declined to follow these federal

decisions, because "The Ninth Circuit and the district court

Document received by the CA Supreme Court.

mentioned *Chavez* only in passing, and neither court engaged a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims. We therefore do not find these decisions persuasive on the precise issue presented by this appeal." Slip Opinion at 18, fn. 6.

However, a "rigorous analysis of the *Colgate* doctrine" was unnecessary, because that doctrine is irrelevant to an "unfairness" claim. *Colgate* might be a good defense to a claim that defendant's conduct is *"unlawful"* under the UCL. But, under *Cel-Tech,* it was no defense to Epic Games's claim that Apple's conduct was *"unfair"* under the UCL. All *Colgate* establishes is what constitutes a violation of the antitrust laws, but under *Cel-Tech*, the fact that Apple did not violate a prohibitory statute did not bestow a "safe harbor" exemption on Apple's conduct.

The Ninth Circuit correctly considered the "unfairness" claim as independent from the "unlawful" claim, and the Court of Appeal should have followed that approach here.

Document received by the CA Supreme Court.

## IV.   A LEGISLATIVE DECISION NOT TO INCLUDE CERTAIN CONDUCT IN A PROHIBITORY STATUTE *SHOULD NOT* CREATE A "SAFE HARBOR" AGAINST A CLAIM THAT SUCH CONDUCT IS "UNFAIR" UNDER THE UCL.

We believe the Court of Appeal's effort to bring the Legislature's failure to bar unilateral decisions within the "safe harbor" exemption is inconsistent with *Cel-Tech*.  But let's assume we are mistaken: that *Cel-Tech* did not fully resolve this issue, and the question is an open one.

If so, the question then becomes: *should* a Legislature's decision to limit the scope of a prohibitory statute mean that conduct outside that scope can never be found to be "unfair" under the UCL?  No, because a particular defendant might employ such "lawful" practices in unpredictable ways that unfairly exploit consumers and competitors.

*Cel-Tech* emphasized the Legislature's purpose to enable our courts to deal with a commercial defendant's "new schemes which the fertility of man's invention would contrive."  *Cel-Tech* at 181.

- "When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of

31

equity is not impotent to frustrate its consummation because the scheme is an original one...."

[*Cel-Tech* at 181.]

- "[G]iven the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate."

[*Cel-Tech* at 181.]

When the Legislature enacts a prohibitory statute, it decides that virtually *all* conduct so prohibited is harmful to society.  But that does not mean that *some* conduct falling a bit *outside* the prohibition is not *also* harmful.  "[T]he Legislature cannot anticipate all possible forms in which unfairness might occur." *Cel-Tech* at 183.   See also *Cel-Tech* at 188: "The Legislature could not have anticipated this precise situation any more than it could 'draft in advance detailed plans and specifications of all acts and conduct to be prohibited.' [Citation] The originality of this practice does not place it beyond the reach of the unfair competition law."

The present case provides a good example of this.  The two federal *Epic Games* decisions were based not on the sufficiency of

Document received by the CA Supreme Court.

the allegations of a complaint[5], but on a sixteen-day trial that

*fleshed out the facts in detail*, with live witnesses — both

--------------------

[5]    Here are some of the key allegations of the SAC in the present case:

Apple collects 30% of the price of apps sold at its App Store, with the remaining 70% going to the developer of the app.  1 CT 3:16-21.  This practice produced $519 billion worth of commerce for Apple in 2019.  1 CT 18:12-13.

There is no evidence that Apple's costs of maintaining the App Store come anywhere near the 30% cut it extracts from every App Store sale.  1 CT 21:24-22:2.  Apple adds nothing to the value of the app.  1 CT 22:7-8.  Apple has attempted to justify its 30% by comparing the App Store to a mall — ignoring the fact that malls must compete with other malls when they set their rents.  1 CT 22:9:13.

Apple maintains complete control over the content of apps in the App Store.  1 CT 17:12-13.  Apple's approval might depend on subjective factors, such as "substandard user interface." 1 CT 17:13-14.  Apple does not even allow developers to provide upgrades to free apps without Apple's approval.  1 CT 21:11-15.

Developers who want to sell their apps to consumers who use iOS Devices have no other legal way to reach them.  1 CT 3:22-24.  Apple's contracts with developers require them to use Apple's App Store and to pay the 30% fee that Apple demands.  1 CT 3:16-21.[5]  Developers are barred from selling their products directly to their customers (called "jailbreaking").   1 CT 5:13-18, 15:12-17, 17:19-18:2.  Apple sues firms that facilitate jailbreaking to prevent consumers from escaping Apple's "black box". 1 CT 18:3-4.  This forces developers to raise their prices to consumers to take into account Apple's 30% surcharge.  1 CT 5:13-18.

Apple's contracts with developers also include "anti-steering" provisions, which forbid developers from telling their customers about any way of purchasing the product other than through Apple's App Store.  1 CT 14:12-17.[5]  Apple's "black box" enforces silence — to control information available to consumers and impede their learning about ways to obtain information about obtaining digital goods at lower prices.  1 CT 20:21-23.

Document received by the CA Supreme Court.

percipient and expert — and over nine hundred exhibits. This resulted in a 185-page opinion, written by a highly respected federal judge: The Honorable Yvonne Gonzalez Rogers (a former Alameda County Superior Court judge). Here is a summary of her findings of fact:

- While the court could not conclude that Apple has a monopoly in the relevant market, "the evidence does suggest that Apple is near the precipice of substantial market power, or monopoly power, with its considerable market share." 559 F.Supp.3d at 1032;

---

Apple has admitted that its business goal is to force users into its ecosystem and to institute policies that disincentivize or outright prevent consumers from leaving Apple's ecosystem. 1 CT 7:9-14.

Apple's only significant competitor in this market is Google, which owns the Android operating system. 1 CT 15:1-3. The only other companies that have tried to enter this market are two large, well-funded firms: Microsoft and Amazon. But neither company was able to penetrate this market, and both gave up the effort. 1 CT 15:4-11.

Apple's anti-competitive conduct forecloses potential competitors in app distribution by preventing consumers from legally downloading or updating applications by any means other than the App Store. 1 CT 20:12-14. United States Senator Elizabeth Warren has called for the divestment of Apple's App Store, calling it a prime example of anticompetitive conduct. 1 CT 20:6-11. The European Commission is also investigating whether Apple's App Store restrictions violate antitrust laws. 1 CT 23-18:21.

Document received by the CA Supreme Court.

- "Epic Games is a would-be and self-avowed competitor of Apple in the distribution of apps.  Absent the restrictions imposed by Apple, Epic Games would operate a mobile version of the Epic Games Store on iOS that would compete with Apple's App Store."  559 F.Supp.3d at 933;

- Epic's argument that Apple's restraints increase prices for consumers is "plausible", based on the evidence presented at trial.  559 F.Supp.3d at 996.  "[T]he court finds that common threads run through Apple's practices which unreasonably restrains competition and harms consumers, namely the lack of information and transparency about policies which effect [*sic*] consumer's ability to find cheaper prices, increased customer service, and options regarding their purchases.  Apple employs these policies so that it can extract supracompetitive commissions from this highly lucrative gaming industry."  559 F.Supp.3d at 1013.

- Regarding Epic's challenge to Apple's <u>30% commission</u>, the court found:

  "Apple has not adequately justified its 30% rate."  559 F.Supp.3d at 1013.  "Apple chose the 30% commission without regard to or analysis of the costs to run the App

Document received by the CA Supreme Court.

35

Store." 559 F.Supp.3d at 947. Apple's 30% commission "was not set by competition or the costs of running the App Store." 559 F.Supp.3d at 991. Apple's investment in the App Store is "low". 559 F.Supp.3d at 993, 1000. Apple's App Store revenue is based mainly on "long-term relationships between developers and consumers independent of Apple," and "this engagement is almost completely driven by [App Store] developers, and the App Store does not participate in a meaningful way." 559 F.Supp.3d at 946-947.

- Apple's intellectual property justification for its 30% commission is "pretextual." 559 F.Supp.3d at 1010.

- "Apple's maintenance of its commission rate stems from market power, *not competition* in changing markets. * * * * That commission has enabled Apple to collect extraordinary profits . . . ." 559 F.Supp.3d at 1037.

- "[N]othing other than legal action seems to motivate Apple to reconsider pricing and reduce rates." 559 F.Supp.3d at 948.

Document received by the CA Supreme Court.

- Regarding Epic's challenge to Apple's <u>anti-steering</u> provisions, the court found that the evidence shows that "Apple's anti-steering restrictions artificially increase Apple's market power by preventing developers from communicating about lower prices on other platforms." 559 F.Supp.3d at 993.

- "[B]y employing anti-steering provisions, consumers do not know what developers may be offering on their websites, including lower prices." Opinion, p. 118. 559 F.Supp.3d at 1014.

- "Apple created an innovative platform but it did not disclose its rules to the average consumer. Apple has used this lack of knowledge to exploit its position." Opinion, p. 119. 559 F.Supp.3d at 1014.

- Apple's "restrictions harm competition by precluding developers, especially larger ones, from opening competing game stores on iOS and compete for other developers and users on price." Opinion, p. 144. 559 F.Supp.3d at 1037.

- "Apple's anti-steering provisions hide critical information from consumers and illegally stifle consumer choice. When coupled with Apple's incipient antitrust violations, these

Document received by the CA Supreme Court.

anti-steering provisions are anticompetitive and a
nationwide remedy to eliminate those provisions is
warranted." Opinion, p. 2, 118. 559 F.Supp.3d at 922.[6]

The district court noted that the courts have applied two
tests for what is "unfair" — the "tethering" test and the
"balancing" test. The court found that Apple's anti-steering
provisions were "unfair" under *both* tests. The court concluded
that Apple's "anti-steering provisions violate the UCL's unfair
prong under the tethering test." 559 F.Supp.3d at 1056. The
court also found that "the harm from the anti-steering provisions
outweighs its benefits, and the provision violates the UCL under
the balancing test." 559 F.Supp.3d at 1056-1057.

We presented these findings to the Court of Appeal, whose
Opinion ignores them. We submit that — under either of the two
tests currently used to establish "unfairness" under the UCL —
these findings show that Apple's conduct reached an especially

---

[6] Now that these findings have been effectively affirmed on
appeal, Apple should be collaterally estopped from disputing
them at a trial on Plaintiffs' claims. *Bernhard v. Bank of
America* (1942) 19 Cal.2d 807; 7 Witkin, Cal. Proc. 6th
*Judgments*, § 511 (2024).

Document received by the CA Supreme Court.

egregious level of "unfairness". And yet the Court of Appeal ruled that, solely because that conduct was outside the scope of a prohibitory statute and was therefore not "unlawful", Plaintiffs' claim of "unfairness" cannot even go to trial.

The Court of Appeal's hyper-narrow approach is inconsistent with *Cel-Tech's* determination that the Legislature adopted the "unfairness" prong to protect the public from practices that result from "the creative nature of the scheming mind" — in this case, Apple's mind.

Document received by the CA Supreme Court.

## V.     ONLY AN INDEPENDENT STATUTE SHOULD SERVE AS A "SAFE HARBOR".

While *Cel-Tech* held that "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair", *Cel-Tech* at 180-184, the Court did provide examples of *separate statutes* that would immunize defendant's conduct from an "unfairness" claim.  Should separate statutes constitute the *only* form of a "safe harbor"?  Yes.

In many of these instances, the Legislature's decision to enact a separate statute is meant to further a policy (such as a litigation privilege) that often cuts across many types of activity. Thus, as a matter of policy, the need to allow parties to speak freely in litigation *always* (almost) outweighs the need to learn the true facts about a substantive dispute.

Other "safe harbor" statutes might further a narrower policy, but the fact that the Legislature has gone to the trouble of enacting an independent statute shows the importance it attached to this protection.

In the present case, the Court of Appeal looked to the legislative history of the prohibitory statute — almost always an iffy project, where one can only rarely be sure of what the

Document received by the CA Supreme Court.

Legislature intended.  Allowing the "safe harbor" exemption to turn on such an examination will lead to confusion and inconsistency.  A categorical rule allowing "safe harbors" in independent statutes but not in the legislative history of prohibitory statutes will lead to more certainty — and let the Legislature know just how to immunize conduct it chooses to immunize.

Document received by the CA Supreme Court.

41

## CONCLUSION

*Cel-Tech* appears to have left open some significant questions about the scope of the "safe harbor" exemption from the "unfairness" prong of the UCL.  This has led to various answers and approaches, some more consonant with the policies discussed in *Cel-Tech* than others.  It has also led to serious conflicts among our Courts of Appeal and our federal courts.  We have suggested some solutions, but it is up to this Court to decide how this problem should be handled.

This Court should grant review to provide this badly-needed guidance.[7]

Respectfully submitted,
Moskovitz Appellate Team

Date: May 27, 2024

/s/ Myron Moskovitz
By: Myron Moskovitz
Attorney for Petitioners

---

[7]  At a minimum, the Court should grant review and direct the Court of Appeal to reconsider its Opinion in light of the following language from *Cel-Tech Communications v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163, 184: "We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it. That other PROVISION must actually bar it, however, and not merely fail to allow it."

Document received by the CA Supreme Court.

**CERTIFICATE PURSUANT TO C.R.C. RULE 8.504(d)(1)**

I hereby certify that the attached Petition for Review, including footnotes, contains 6,811 words, according to the word count indicator on my Microsoft Word program.

Date: May 27, 2024                    /s/ Myron Moskovitz
                                      Myron Moskovitz
                                      Attorney for Petitioners

Document received by the CA Supreme Court.

43

# ATTACHMENT

Document received by the CA Supreme Court.

Filed 4/25/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHELLE BEVERAGE et al., | H050526 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 20CV370535) |
| v. | |
| APPLE, INC., | |
| Defendant and Respondent. | |

## I.  INTRODUCTION

This case requires us to explore the intersection of laws regulating antitrust activities and unfair competition.  Plaintiffs Michelle Beverage and Joseph Mejia (Plaintiffs) appeal after the trial court sustained without leave to amend a demurrer brought by Defendant Apple, Inc. (Apple) to their class action complaint.  They alleged that Apple's restrictive contractual terms and its coercive conduct toward portable software developers who seek to do business on Apple's App Store constituted unlawful and unfair practices that violated both the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and the Unfair Competition Law (*Id.* § 17200 et seq. (UCL).).  Applying the *Colgate* doctrine, *U. S. v. Colgate & Co.* (1919) 250 U.S. 300 (*Colgate*) and the holding of *Chavez v. Whirlpool Corporation* (2001) 93 Cal.App.4th 363 (*Chavez*), the trial court determined that Plaintiffs did not and could not state causes of action under either legal regime as a matter of law.

On appeal, Plaintiffs challenge only one aspect of the trial court's ruling.  They argue the court erred by relying on *Chavez* to sustain the demurrer to their UCL cause of action alleging unfair practices by Apple toward one developer, Epic Games, Inc. (Epic),

Document received by the CA Supreme Court.

and its gaming application known as Fortnite.  Plaintiffs claim that *Chavez* is inconsistent with the California Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company* (1999) 20 Cal.4th 163 (*Cel-Tech*).

As we will explain, we disagree that *Chavez* reflects a misapplication of *Cel-Tech*. Since the trial court properly relied on *Chavez* to sustain the demurrer without leave to amend, we affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

We summarize the facts underlying this action assuming, as we must, the truth of all properly pleaded allegations in Plaintiffs' operative complaint.  (*Heckart v. A-1 Self Storage, Inc.* (2018) 4 Cal.5th 749, 753.)

### A.  *Apple and the App Store*

Apple "designs, manufactures, markets, and sells to consumers" portable electronic devices that can connect to the internet via Wi-Fi or cellular data, such as iPhones and iPads (iOS devices).  Apple released the first iPhone in 2007 and the iPad in 2010.  "Since then, Apple has sold billions of devices—setting a record for 1.5 billion active devices in 2020."  iOS devices have a market share of roughly 50 percent in the United States.

iOS devices operate software programs called "apps" that are specifically designed to run on portable electronics.  Apps are also operating system specific, such that they must be specifically configured to function on iOS devices.  In 2008, Apple launched the App Store, which "makes apps and updates available for purchase, download, and update."  The App Store is the only legal means by which developers can market and sell their apps to users of iOS devices, and the only legal means for those users to purchase and download apps to their devices.  On that point, Plaintiffs allege that "[c]onsumers are unable to legally load apps onto their iOS Devices in any other way—they are required to purchase and download applications on their iOS Devices through the App Store and make In-App Purchases through Apple's payment system."  Additionally, "Apple has

2

Document received by the CA Supreme Court.

complete control over the content found on the App Store—the approval or removal of applications or updates rests entirely with them."  The App Store features 1.96 million apps available for download, the vast majority of which are developed and programmed by third-party developers.

Developers who wish to do business on the App Store must agree to a non-negotiable contract that requires them to use Apple's in-app purchase system. Developers are also prohibited from "steering" users to alternative payment methods outside of the app.  When it first launched the App Store, Apple collected 30 percent of the price paid for each app and the developer received the remaining 70 percent.  A year later, Apple also began collecting 30 percent of all sales of digital goods and currency made within apps.  Aside from a handful of developers who have negotiated with Apple to receive a larger percentage of purchases made on the App Store, "[d]evelopers and firms had no way to avoid or minimize Apple's 30% cut for purchases of digital content."

### B.  *Fortnite*

Epic created Fortnite, which is a social and gaming app "where dozens of participants, either individually or in teams, are dropped into a landscape" to engage in a "King of the Hill" style match where "the last one standing at the end wins."  Within Fortnite, users can pay for digital currency, known as V-Bucks, which can then be used to "buy" digital goods for use in the application, such as costumes or specialized dances for the playable characters.  When users on iOS devices purchase V-Bucks or digital goods in Fortnite, "the transaction goes through Apple," who takes a 30 percent cut of the user's payment and sends the remaining 70 percent to Epic "as is the custom for in-app purchases on iOS devices."

Fortnite was released for iOS devices in April 2018 and, by July 2018, reached $1 billion in revenue for in-app purchases of digital currency and goods.  By May 2020, Fortnite had a cumulative total of 350 million users, and the mobile application reached $1 billion in revenue, with the vast majority coming from iOS devices and the App Store.

Document received by the CA Supreme Court.

In August 2020, Epic contacted Apple about the company's plans to launch a direct payment system via Fortnite on iOS devices where users could purchase digital currency and goods at a discounted price. Apple responded by removing Fortnite from the App Store, which prevented users from downloading or updating Fortnite. This led Epic to initiate legal action against Apple in federal court.[1]

After Apple removed Fortnite from the App Store, it began promoting Fortnite's biggest competitor on both the App Store and on Twitter. Apple also "threatened" to remove the apps of other companies who contracted with Epic from the App Store, and "considered punitive measures against Netflix when Netflix was considering the removal of in-app purchases."

### C. The Pleadings and Demurrers

Plaintiffs are two individuals who made purchases through the App Store in Fortnite for use on iOS devices. They initiated this action in September 2020 on behalf of themselves and a putative class of iOS device users who downloaded Fortnite onto their device and made purchases of digital goods or currency within the app using Apple's purchase system.

After the trial court sustained a demurrer to Plaintiffs' first amended complaint, they filed a second amended complaint (SAC) in April 2022. Plaintiffs alleged that Apple's restrictions on app distribution increased the prices developers charge iOS device users, and that Apple's anti-steering restrictions "artificially increase" Apple's power within the market for mobile gaming transactions.[2]

---

[1] The federal lawsuit, which we will refer to as the "district court case" to avoid confusion with a related appellate proceeding in the Ninth Circuit Court of Appeals, was filed in the United States District Court for the Northern District of California. (See *Epic Games, Inc. v. Apple Inc.* (N.D. Cal. 2021) 559 F. Supp. 3d 898.).

[2] Although Plaintiffs alleged that Apple promulgated "monopolistic policies and practices," they did not allege that Apple held a monopoly over the market for mobile gaming transactions. Rather, Plaintiffs alleged in the SAC that Google was Apple's (continued)

Document received by the CA Supreme Court.

Plaintiffs asserted three causes of action in the SAC. The first was under the Cartwright Act, which Plaintiffs alleged Apple violated by leveraging "its market power to make developers and consumers accept unreasonable and anticompetitive terms in order to access the iOS marketplace." The second, for violation of the "unlawful" prong of the UCL, was based on the same conduct.

In the third cause of action, Plaintiffs asserted that Apple violated the "unfair" prong of the UCL by "threatening an incipient violation of an antitrust law by preventing an informed choice among users of the iOS platform by limited information regarding pricing and purchase option[s]." Plaintiffs further alleged that Apple's conduct "violates the policy and spirit of antitrust laws because anti-steering has the effect of preventing substitution among platforms for transactions."

Apple filed a demurrer to the SAC, which the trial court sustained without leave to amend. The court found that Plaintiffs did not state claims under the Cartwright Act or the "unlawful" prong of the UCL as a matter of law because they alleged only unilateral conduct by Apple that was immunized from antitrust liability by the *Colgate* doctrine. Analyzing the UCL cause of action under the "unfair" prong separately, the trial court determined it was barred by *Chavez*.

Plaintiffs timely appealed.

### III. DISCUSSION

Plaintiffs contend that the trial court wrongly relied on *Chavez* and misapplied *Cel-Tech* to sustain Apple's demurrer to their cause of action under the "unfair" prong of the UCL. The central premise of Plaintiffs' argument is that *Chavez* was wrongly decided to the extent it held that a failed antitrust claim cannot be replead as an unfair business practice under the UCL. Our review of *Cel-Tech*, *Chavez*, and related antitrust principles shows otherwise.

---

"main competitor" within the market. These "two companies combine to dominate the mobile operating system market" and the market for mobile gaming transactions.

Document received by the CA Supreme Court.

### A.  Standard of Review

" 'The purpose of a demurrer is to test the sufficiency of a complaint by raising questions of law.' " (*Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1143 (*Candelore*).)  "We review an order sustaining a demurrer de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law." (*Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1190.)  In doing so, " '[w]e assume the truth of the properly pleaded factual allegations, [and] facts that reasonably can be inferred from those expressly pleaded.' [Citation.]  But we do not assume the truth of 'contentions, deductions, or conclusions of law.' [Citation.]  We liberally construe the complaint 'with a view to substantial justice between the parties,' drawing 'all reasonable inferences in favor of the asserted claims.' " (*Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, 919.)  "To survive a demurrer, the complaint need only allege facts sufficient to state a cause of action." (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 872.)  "[B]ecause we are reviewing the trial court's ruling and not its reasoning, we may affirm on any ground supported by the record regardless of whether the trial court relied upon it." (*Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App.4th 953, 960.)

"When a demurrer is sustained without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.' [Citation.]  Plaintiff has the burden to show a reasonable possibility the complaint can be amended to state a cause of action." (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1609.)  "Where, however, amendment could not correct a deficiency in the complaint or where the action is barred as a matter of law, the demurrer is properly sustained without leave to amend." (*State of California Automobile Dismantlers Assn. v. Interinsurance Exchange* (1986) 180

Document received by the CA Supreme Court.

6

Cal.App.3d 735, 742.)  "The issue of leave to amend is always open on appeal, even if not raised by the plaintiff."  (*City of Stockton v. Super. Ct.* (2007) 42 Cal.4th 730, 746.)

### B.  *The UCL and Cel-Tech*

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'  [Citation.]  Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' "  (*Kwikset v. Super. Ct.* (2011) 51 Cal.4th 310, 320 (*Kwikset*).)  The law is "broad" and " 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' "  (*Cel-Tech, supra,* 20 Cal.4th at p. 180.)

Functionally, "[t]he UCL operates as a three-pronged statute: 'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a "separate and distinct theory of liability." ' "  (*Beaver v. Tarsadia Hotels* (9th Cir. 2016) 816 F.3d 1170, 1177; accord *Adhav v. Midway Rent A Car, Inc.* (2019) 37 Cal.App.5th 954, 970 [since the UCL is written in the disjunctive, it establishes three varieties of unfair competition].)  "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable."  (*Cel-Tech, supra*, 20 Cal.4th at p. 180; *Candelore, supra*, 19 Cal.App.5th at p. 1155.)  However, "[i]t is not necessary for a business practice to be 'unlawful' in order to be subject to an action under the unfair competition law."  (*Smith v. State Farm Mutual Automobile Insurance Co.* (2001) 93 Cal.App.4th 700, 718.)  Under the UCL's "unfair" prong, "a practice may be deemed unfair even if not specifically proscribed by some other law."  (*Cel-Tech, supra*, 20 Cal.4th at p. 180.)  " ' "In other words, a practice is prohibited as 'unfair' . . . even if not 'unlawful' and vice versa." ' "  (*Ibid*.)  In creating this distinction, the Legislature recognized that " 'unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery' " and sought to account for " 'the creative nature of the scheming mind.' "  (*Id.* at p. 181.)

Document received by the CA Supreme Court.

Although the UCL's scope is broad, it is not unlimited.  (*Cel-Tech, supra*, 20 Cal.4th at p. 182.)  "Courts may not simply impose their own notions of the day as to what is fair or unfair."  (*Ibid*.)  To prevent that from occurring, the California Supreme Court has held that "[s]pecific legislation may limit the judiciary's power to declare conduct unfair.  If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination."  (*Ibid*.)  Thus, "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."  (*Ibid*.)

In *Cel-Tech*, the California Supreme Court examined whether the defendant, a seller of cellular telephones and services, could invoke a "safe harbor" to prevent liability under the unfair prong of the UCL.  (*Cel-Tech, supra*, 20 Cal.4th at p. 187.)  The defendant was one of two federally licensed providers of cellular telephone service in the Los Angeles area and "formulated a strategy of selling cellular telephones below cost in order to increase the number of subscribers" to its service.  (*Id*. at p. 169.)  The plaintiffs sued the defendant over that practice, alleging that selling telephones below cost violated the Unfair Practices Act (UPA) (Bus. & Prof. Code, § 17000 et seq.)[3] and constituted an unfair business practice under the UCL.  (*Cel-Tech* at p. 187.)  The California Supreme Court held that plaintiffs did not prove a violation of the UPA because the evidence did not show that the defendant acted with the necessary mental state. (*Id*. at p. 178.)  At the same time, however, the court also determined that the UPA did not provide the defendant a "safe harbor" for the UCL cause of action since "nothing in [the UPA] makes all other below-cost sales lawful, including those that have the effect, although not the purpose, of destroying competition."  (*Id*. at pp. 174-175, 178, 187.)  The court reasoned

---

[3] Unlike the UCL, the UPA "prohibits specific 'practices which the [L]egislature has determined constitute unfair trade practices," such as "purposeful below-cost sales and loss leaders."  (*Cel-Tech, supra*, 20 Cal.4th at p. 179.) "The [UCL] is independent of the [UPA] and other laws."  (*Ibid*.)

Document received by the CA Supreme Court.

that because the defendant was a " 'duopolist,' employing an overall strategy that might not be available to its nonduopolist competitors," the Legislature "undoubtedly did not consider below-cost sales in this context." (*Id.* at p. 188.) The court also rejected the defendant's argument that, because the UPA addressed below-cost sales but did not prohibit the defendant's specific conduct, its practice could not be considered unfair. (*Ibid.*)

### C. The Cartwright Act and the Colgate Doctrine

"The Cartwright Act was passed in 1907 as part of a wave of turn-of-the-century state and federal legislation intended to stem the power of monopolies and cartels." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 772.) But unlike its federal counterpart, the Sherman Act (15 U.S.C. §§ 1, 2),[4] "single firm monopolization is not cognizable under the Cartwright Act." (*Asahi Kasei Pharma Corp. v. CoTherix, Inc.* (2012) 204 Cal.App.4th 1, 8 (*Asahi*); *Dimidowich v. Bell & Howell* (9th Cir. 1986) 803 F.2d 1473, 1478 (*Dimidowich*) ["No California statute deals expressly with monopolization or attempted monopolization"].) Instead, "[t]he act 'generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices' [citation], and declares that, with certain exceptions, 'every trust is unlawful, against public policy and void' [citation]." (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1147; accord *Kolling v. Down Jones & Co.* (1982) 137 Cal.App.3d 709, 717 (*Kolling*) [Cartwright Act codifies "the common law prohibition against restraint of trade"].) A violation of the Cartwright Act "requires 'a combination of capital, skill or acts by two or more persons' that seeks to achieve an anticompetitive end." (*Asahi, supra*, 204 Cal.App.4th at p. 8.) Accordingly, "a corporation cannot conspire with itself

---

[4] The two sections of the Sherman Act "focus on different problems. Section 1 deals with concerted activity, outlawing 'combination[s] . . . in restraint of trade.' [Citation.] Section 2, on the other hand, concerns unilateral activity, punishing 'every person who shall monopolize, or attempt to monopolize . . . .' [Citation.]" (*Alaska Airlines, Inc. v. United Airlines, Inc.* (9th Cir. 1991) 948 F.2d 536, 540-541.)

or its agents for purposes of the antitrust laws." (*Kolling* at p. 720.) "Only separate entities pursuing separate economic interests can conspire within the proscription of the antitrust laws." (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 189.)

In order to state a claim under the Cartwright Act, a plaintiff must allege " 'the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy.' " (*Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 493; *Kolling, supra*, 137 Cal.App.3d at p. 720 ["The Cartwright Act . . . requires an illegal 'combination' or 'conspiracy' to restrain trade"].) Conversely, a claim describing only a unilateral refusal to deal without alleging a corresponding illegal conspiracy or combination does not state an actionable antitrust claim. (*Kolling, supra*, 137 Cal.App.3d at p. 720.) This premise, that "[a]bsent a legal provision to the contrary, a private party generally may choose to do or not do business with whomever it pleases" without violating antitrust laws (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 254 (*Drum*)), is known as the *Colgate* doctrine, arising from the United States Supreme Court's opinion of the same name. (*Chavez, supra,* 93 Cal.App.4th at p. 370.) In *Colgate*, "the Supreme Court recognized that, subject to antitrust laws such as the Sherman Act, there is a 'long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " (*People's Choice Wireless, Inc. v. Verizon Wireless* (2005) 131 Cal.App.4th 656, 663, fn. omitted; accord *Monsanto Co. v. Spray-Rite Service Corp.* (1984) 465 U.S. 752, 761 (*Monsanto*) ["A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"]; *Dimidowich, supra*, 803 F.3d at p. 1478 ["A manufacturer may choose those with whom it wishes to deal and unilaterally may refuse to deal with a distributor or customer for business reasons without running afoul of the antitrust laws"].)

Document received by the CA Supreme Court.

The *Colgate* doctrine is "firmly entrenched in antitrust jurisprudence." (*The Jeanery, Inc. v. James Jeans, Inc.* (9th Cir. 1988) 849 F.2d 1148, 1154.) It reflects a limitation to the reach of antitrust liability, grounded in the concept that "a single firm's conduct, absent the danger of monopolization, is not the object of intense antitrust scrutiny because to treat it with such scrutiny would heighten 'the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.' " (*Id.* at p. 1152.) "[C]oncerted action poses a substantially greater risk of anticompetitive harm than does independent behavior" because it " 'deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.' " (*Id.* at pp. 1152-1153.)

"California courts have adopted the *Colgate* doctrine for purposes of applying the Cartwright Act." (*Chavez, supra*, 93 Cal.App.4th at p. 370; see *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 267 ["It is well settled that the antitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business]; *Drum, supra*, 182 Cal.App.4th at p. 254 [" 'right to refuse to deal remains sancrosanct' "].)

### D. Chavez

In *Chavez*, a case decided after *Cel-Tech*, the court applied the *Colgate* doctrine to preclude a UCL cause of action. There, the consumer plaintiff alleged that the defendants, a home appliances manufacturer and retailer, had agreed to maintain minimum resale prices for products in violation of the Cartwright Act and the UCL. (*Chavez, supra*, 93 Cal.App.4th at p. 367.) The plaintiff alleged that the manufacturer announced a unilateral resale price policy and advised retailers it would monitor their compliance and terminate any retailers who failed to implement the minimum resale prices with no " 'second chances.' " (*Ibid*.) The plaintiff further contended that the retailer from whom he purchased an appliance either voluntarily agreed to implement the manufacturer's policy or did so under coercion. (*Ibid*.) Reviewing these allegations, the

Document received by the CA Supreme Court.

11

trial court sustained the defendants' demurrer to the complaint without leave to amend, relying on the *Colgate* doctrine.  (*Id.* at p. 368.)

The Second District Court of Appeal affirmed, holding that the plaintiff failed to plead facts sufficient to establish a coerced agreement in violation of the Cartwright Act or the "unlawful" prong of the UCL.  (*Chavez, supra*, 93 Cal.App.4th at p. 367.)  Citing *Colgate* and *Monsanto*, the court reasoned that the plaintiff did not state a claim under the Cartwright Act because "a manufacturer's announcement of a resale price policy and its refusal to deal with the dealers who do not comply coupled with the dealers' voluntary acquiescence in the policy does not constitute an implied agreement or an unlawful combination as a matter of law."  (*Id.* at p. 372.)  Although the plaintiff alleged that the manufacturer went beyond merely announcing a policy and refusing to deal by taking several steps to monitor retailers' compliance, such as reviewing advertisements, collecting sales receipts, and sending in "mystery shoppers," the court held that the manufacturer's conduct was permitted by the *Colgate* doctrine.  (*Id.* at p. 373.)  To that end, the court explained that "measures to monitor compliance that do not interfere with the dealers' freedom of choice are permissible," because "[t]o hold otherwise would render the manufacturer's announced policy ineffective and undermine rights protected by the *Colgate* doctrine."  (*Ibid.*)  "In this manner, a manufacturer that announces a resale price policy and enforces the policy by monitoring the dealers' compliance and refusing to deal with dealers who do not comply does not violate the Cartwright Act."  (*Ibid.*)

The court also held that the plaintiff's allegations did not state a claim under the UCL's "unfair" prong.  (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  Since "[t]he purpose of federal and state antitrust laws is to protect and promote competition for the benefits of consumers," the court reasoned that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is

Document received by the CA Supreme Court.

not 'unfair' toward consumers." (*Ibid.*)  In the *Chavez* court's view, permitting a "separate inquiry" under the UCL "into essentially the same question" raised by the Cartwright Act claim "would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." (*Ibid*.)

### E.  Analysis of this Case

With these principles in mind, we now turn to the parties' arguments.  But first, we comment on the scope of this appeal.  Since Plaintiffs' challenge is limited only to the dismissal of their cause of action under the "unfair" prong of the UCL, they have abandoned any claim of error in the other aspects of the trial court's ruling on Apple's demurrer.  (See *Limon v. Circle K Stores, Inc.* (2022) 84 Cal.App.5th 671, 687.) Applying well-settled appellate standards, we therefore presume the trial court correctly found that Plaintiffs' causes of action under the Cartwright Act and the "unlawful" prong of the UCL were legally insufficient by application of the *Colgate* doctrine and we conduct our analysis with that presumption in mind.  (See *Denham v. Super. Ct.* (1970) 2 Cal.3d 557, 564 [judgment of the trial court is presumed correct on appeal and error must be affirmatively shown]; *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158 ["We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise"].)  The question that remains is whether Plaintiffs adequately alleged an "unfair" act or practice under the UCL considering the trial court's ruling that Apple's practices constituted permissible unilateral conduct.  Under these circumstances, we hold that Plaintiffs did not state a claim as a matter of law.

Looking at the SAC, there is no doubt that Plaintiffs' UCL cause of action based on the "unfair" prong fell squarely within the rule announced in *Chavez*.  Like their Cartwright Act cause of action, Plaintiffs alleged under the UCL that Apple's practices toward Epic and other developers that dictated the terms of business on the App Store and imposed restrictions on contacting and steering the users of iOS devices to other app

Document received by the CA Supreme Court.

storefronts threatened "an incipient violation of an antitrust law by preventing an informed choice among users of the iOS platform" and violated "the policy and spirit of antitrust laws because anti-steering has the effect of preventing substitution among platforms for transactions." Thus, the same conduct was alleged in the SAC "to be both an antitrust violation and an 'unfair' business act or practice for the same reason— because it unreasonably restrains competition and harms consumers." (*Chavez, supra*, 93 Cal.App.4th at p. 375.) According to *Chavez*, once the trial court determined that the *Colgate* doctrine applied to these practices, this "necessarily implie[d] that the conduct [was] not 'unfair' toward consumers." (*Ibid*.) *Chavez*, therefore, forecloses Plaintiffs' UCL claim.

To resist that outcome, Plaintiffs argue that *Chavez* was wrongly decided and is "wholly inconsistent" with *Cel-Tech*. According to Plaintiffs, the implication from *Chavez* that a "safe harbor" can be found outside of explicit statutory language immunizing specific conduct cannot be reconciled with *Cel-Tech*, particularly with the court's declaration that the "Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." (*Cel-Tech, supra*, 20 Cal.4th at p. 184.) Stated differently in the context of this case, Plaintiffs theorize that because the Legislature has not enacted a statute or provision condoning conduct embraced by the *Colgate* doctrine as lawful, *Cel-Tech* establishes that such conduct may constitute a predicate "unfair" practice for a UCL cause of action even though it could not support an antitrust claim.

Looking closely at *Cel-Tech*, however, we disagree that it countenances Plaintiffs' theory. As Apple points out, the court's description of qualifying "safe harbors" in *Cel-Tech* was not limited solely to instances where explicit statutory language either authorizes conduct as lawful or imposes a litigation bar. Instead, the court explained that "safe harbors" can arise in two ways: "If the Legislature has permitted certain conduct or *considered a situation and concluded no action should lie*, courts may not override that determination." (*Cel-Tech, supra*, 20 Cal.4th at p. 182, italics added; accord *Zhang v.*

Document received by the CA Supreme Court.

14

*Super. Ct.* (2013) 57 Cal.4th 364, 379, fn. 8.)  Building on that concept, the court

emphasized the principle that a plaintiff may not " 'plead around' an 'absolute bar to

relief' simply 'by recasting the cause of action as one for unfair competition.' "

(*Cel-Tech* at p. 182.)  This rule ensures that courts are not imposing "their own notions of

the day as to what is fair or unfair" under the guise of the UCL, as the *Cel-Tech* court

cautioned.  (*Ibid*.)  Indeed, "[a]lthough its reach is broad, the UCL ' " 'is not an

all-purpose substitute for a tort or contract action.' " ' " (*People v. Potter Handy, LLP*

(2023) 97 Cal.App.5th 938, 950.)  In substance, that is exactly what *Chavez* held; a

plaintiff cannot plead around the absolute bar imposed by the *Colgate* doctrine by

resurrecting a failed antitrust claim as an unfair business practice under the UCL (*Chavez,

supra*, 93 Cal.App.4th at p. 375), especially when, as here, the only other cause of action

alleged in the SAC was a violation of the Cartwright Act.  (Cf. *Zhang, supra*, 57 Cal.4th

at p. 384 [UCL action may lie if defendant's alleged conduct independently violates

"obligations imposed by other statutes or the common law" even if "safe harbor" also

applies].)  To find otherwise would permit plaintiffs to use the UCL to "assault" the

" 'absolute bar to relief' " established by the *Colgate* doctrine.  (*Cel-Tech, supra*, 20

Cal.4th at p. 182.)  Viewed in that way, *Chavez* is entirely consistent with *Cel-Tech*.

 In any event, we find sufficient indication from the text and history of the

Cartwright Act that the Legislature has determined that "no action should lie" for

unilateral refusals to deal that are permissible under the *Colgate* doctrine.  (*Cel-Tech,

supra*, 20 Cal.4th at p. 182.)  Since its enactment over 100 years ago, the Cartwright Act

has by its own terms prohibited only anticompetitive conduct by two or more entities in

conspiracy or in combination.  (See *State of California ex rel. Van de Kamp v. Texaco,

Inc.* (1988) 46 Cal.3d 1147, 1161 (*Texaco*), superseded by statute on another ground as

stated in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570.)

Although other states' antitrust acts in existence at the time of its adoption had broader

application, the California Legislature chose to model the Cartwright Act after a "more

Document received by the CA Supreme Court.

narrowly worded" Texas act that defined a "trust" as a " 'combination of capital, skills or acts . . .' for various improper purposes." (*Texaco* at pp. 1154-1155, italics omitted.)

As we have mentioned, the *Colgate* doctrine "has been a basic part of antitrust law concepts since it was first announced in 1919" by the United States Supreme Court. (*United States v. Parke, Davis & Co.* (1960) 362 U.S. 29, 49 (dis. opn. of Harlan, J.).) Rather than retreat from the doctrine over time, the high court continues to recognize its viability. (See, e.g., *Monsanto, supra*, 465 U.S. at p. 760; *Leegin Creative Leather Products, Inc. v. PSKS, Inc.* (2007) 551 U.S. 877, 901 [observing that Supreme Court decisions have accommodated the *Colgate* doctrine].) The *Colgate* doctrine was first recognized by California courts in 1979. (See *R.E. Spriggs Co. v. Adolph Coors Co.* (1979) 94 Cal.App.3d 419, 424-425, fn. 1.) Although the Legislature has amended the Cartwright Act at least twice since 1979 (Stats. 1983, ch. 1069, § 1; Stats 1987, ch. 865, § 2), not to mention numerous times since 1919 (*Texaco, supra*, 46 Cal.3d at pp. 1162-1163), it has not undermined the applicability or effect of the *Colgate* doctrine. Nor did the Legislature act in response to *Chavez*. Because "[w]e generally presume the Legislature is aware of appellate court decisions" (*Therolf v. Super. Ct.* (2022) 80 Cal.App.5th 308, 335), its inaction on this subject for at least the past 45 years is significant. (See *Texaco, supra*, 46 Cal.3d at p. 1162.)

Moreover, *Chavez* does not stand alone. Its holding has been adopted and applied by other California Courts of Appeal. (See *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240; *SC Manufactured Homes, Inc. v Liebert* (2008) 162 Cal.App.4th 68, 93; *Drum, supra*, 182 Cal.App.4th at p. 254.) Additionally, the Ninth Circuit Court of Appeals recognized in *Epic Games, Inc. v. Apple, Inc.* (9th Cir. 2023) 67 F.4th 946 (*Epic Games*), that a "*categorical legal bar*"—as opposed to express statutory language— can also operate as a "safe harbor" against UCL liability in the area of antitrust. There, the court acknowledged the distinction outlined in *Cel-Tech* that "there is a 'difference between (1) not making an activity unlawful, and (2) making that activity

Document received by the CA Supreme Court.

lawful.' " (*Epic Games, supra*, 67 F.4th at p. 1001.)  But it continued its discussion of "safe harbors" by explaining that "in every instance where a court found the Sherman Act to preclude a UCL action, a *categorical* antitrust rule formed the basis of the decision." (*Ibid*.)  By way of example, the court cited its decision in *City of San Jose v. Office of the Commissioner of Baseball* (9th Cir. 2015) 776 F.3d 686, in which it "held that the judge-made baseball exemption—that 'the business of providing public baseball games for profit . . . [is] not within the scope of the federal antitrust laws'—precluded a UCL action." (*Epic Games, supra*, 67 F.4th at p. 1001.)  While the baseball exemption applies to a particular industry not at issue here, the exemption is nonetheless indistinguishable from the *Colgate* doctrine since it operates as a categorical rule exempting certain business conduct from the reach of the antitrust laws.

Consistent with *Chavez*, we conclude—taking into account the Cartwright Act's prohibition only on coordinated conduct, the *Colgate* doctrine's longstanding and prominent role in federal and state antitrust jurisprudence, and the Legislature's nonintervention against that backdrop—that the *Colgate* doctrine provides Apple with a "safe harbor" against Plaintiffs' UCL claim under the "unfair" prong.  Although we disagree with Plaintiffs that *Chavez* is irreconcilable with *Cel-Tech*, this result harmonizes the two.

In their appellate briefing, Plaintiffs argue that the trial court conflated the "unlawful" and "unfair" prongs of the UCL by sustaining Apple's demurrer.  They imply that affirming the trial court in this instance would have the effect of collapsing the two prongs into one in a manner contrary to *Cel-Tech*, such that "[t]here could be no instance where the defendant's conduct was 'lawful' (in the sense that it did not violate any prohibitory statute) but was still 'unfair.' "  However, we do not perceive that danger because our decision is a narrow one.  We do not broadly hold that a "safe harbor" precluding a UCL claim can necessarily arise from legislative inaction in connection with other statutory schemes or in contexts outside of the *Colgate* doctrine's application to

Document received by the CA Supreme Court.

17

antitrust claims based on unilateral refusals to deal.  We also acknowledge, as did the *Chavez* court, that an "unfair" business act or practice need not violate an antitrust law to be actionable under the UCL.  (*Chavez, supra*, 93 Cal.App.4th at p. 375.)  Instead, our decision is limited to situations typified by this case, where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the "unfair" prong of the UCL.  Because both antitrust laws and the UCL are designed to protect and promote competition for the benefit of consumers (*Kwikset, supra*, 51 Cal.4th at p. 320; *Chavez, supra*, 93 Cal.App.4th at p. 375), logic dictates that there can be no harm to consumers under the UCL based on the same unilateral practices that have been historically accepted as procompetitive and categorically shielded from antitrust liability by the *Colgate* doctrine.  (See *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* (2004) 540 U.S. 398, 407-408 (*Verizon Communications*).)[5]  This remains true whether the "unlawful" and "unfair" prongs are considered jointly or separately.[6]

---

[5] In *Verizon Communications*, the United States Supreme Court explained why the *Colgate* doctrine protects unilateral conduct as procompetitive: "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.  Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are illsuited.  Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion."  (*Verizon Communications, supra*, 540 U.S. 398, 407-408.)

[6] Plaintiffs also argue we should depart from *Chavez* and instead follow *Epic Games* and the order filed after trial in the underlying district court case.  We have reviewed these decisions but decline to do so.  Although we recognize that the "decisions of . . . the lower federal courts may be instructive to the extent we find their analysis persuasive, they are neither binding nor controlling on matters of state law."  (*T.H. v. Novartis Pharmaceuticals Corporation* (2017) 4 Cal.5th 145, 175.) The Ninth Circuit and the district court mentioned *Chavez* only in passing, and neither court engaged a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims.  We therefore do not find these decisions persuasive on the precise issue presented by this appeal.

Document received by the CA Supreme Court.

Turning back to the SAC, we find that the trial court correctly sustained Apple's demurrer because Plaintiffs did not state a cause of action against Apple for violation of the "unfair" prong of the UCL.  Since Plaintiffs do not argue in their opening brief on appeal that the trial court abused its discretion in denying leave to amend under these circumstances, we therefore affirm the judgment.

### IV. DISPOSITION

The judgment is affirmed.  Apple may recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2)

Document received by the CA Supreme Court.

_____
ADAMS, J.*

WE CONCUR:

_____
GREENWOOD, P. J.

_____
BAMATTRE-MANOUKIAN, J.

*Beverage et al. v. Apple, Inc.*
H050526

_____

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant
to article VI, section 6 of the California Constitution.

Document received by the CA Supreme Court.

Trial Court:                              Santa Clara County
Superior Court No.: 20CV370535

Trial Judge:                             The Honorable Sunil Kulkarni

Attorneys for Plaintiffs and Appellants    Kurt Kessler
Michelle Beverage & Joseph Mejia:       William Audet
                                           Ling Kuang
                                           Myron Moskovitz

Attorneys for Defendant and Respondent   Julian Kleinbrodt
Apple, Inc.:                             Ethan Dettmer
                                           Anna Mathieson

Document received by the CA Supreme Court.

Beverage et al. v. Apple, Inc.
H050526