DANIEL G. SWANSON, SBN 116556
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
crichman@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

JULIAN W. KLEINBRODT, SBN 302085
jkleinbrodt@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

MARK A. PERRY, SBN 212532
mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar
No. 1500231; *pro hac vice*)
joshua.wesneski@weil.com
**WEIL, GOTSHAL & MANGES LLP**
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000
Facsimile: 202.857.0940

MORGAN D. MACBRIDE, SBN 301248
morgan.macbride@weil.com
**WEIL, GOTSHAL & MANGES LLP**
Redwood Shores Pkwy, 4th Floor
Redwood Shores, CA 94065
Telephone: 650.802.3044
Facsimile: 650.802.3100

Attorneys for Defendant APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.<br><br>      Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>      Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**DECLARATION OF MARK A. PERRY IN SUPPORT OF APPLE INC.'S MOTION FOR ENTRY OF A RULE 502(d) ORDER**<br><br>The Honorable Yvonne Gonzalez Rogers |

I, Mark A. Perry, hereby declare as follows:

1.     I am an attorney licensed to practice in the State of California, and a member of the Bar of this Court.  I am a partner at the law firm Weil, Gotshal & Manges LLP ("Weil"), counsel of record for Apple Inc. ("Apple") in this case.  I have personal knowledge of the facts stated below and, if called as a witness, would testify competently thereto.

2.     I have represented Apple in this litigation since shortly after it was filed in August 2020.  At that time, I was a partner at Gibson, Dunn & Crutcher LLP ("Gibson").  In May 2022, I left Gibson and joined Weil as a partner.  Since then, I and my team at Weil have worked collaboratively with the Gibson team (and other law firms) to represent Apple in this litigation, including with respect to the motion to enforce the injunction filed by Epic Games, Inc. ("Epic").

3.     In response to this Court's order requiring Apple to produce all documents related to injunction compliance, Apple reviewed more than 1.3 million documents, many of which implicated complex issues of attorney-client privilege and work-product doctrine.  Apple retained numerous law firms and outside consultants to complete this extensive collection, review, production, and re-review.

4.     Below, I provide an overview of Apple's discovery efforts to provide context and support for the Rule 502(d) order Apple is requesting in connection with the resumption of the evidentiary hearing scheduled for February 24, 2025.  I intend to submit a more detailed declaration regarding the discovery process once the Special Masters' review is completed, and the evidentiary hearing has concluded, in order to provide a more complete record for the Court's assessment of any discovery-related sanctions pursuant to the order dated February 4, 2025.  *See* Dkt. 1171.

I.     **The Permanent Injunction**

5.     On August 13, 2020, Epic filed a complaint against Apple, challenging Apple's app distribution and IAP requirements under Sections 1 and 2 of the Sherman Act and analogous provisions of the Cartwright Act, as well as under California's Unfair Competition Law ("UCL").  Dkt. 1.

6.     After a bench trial, this Court issued findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, ruling in favor of Apple on Epic's antitrust claims.  *See* Dkt. 812 ("Rule 52 Order").  The Court held that Apple did not have a monopoly in any relevant market, that procompetitive

1    justifications supported the challenged restrictions on app distribution and in-app payment, and that Epic

2    had not proposed a viable less restrictive alternative.  The Court rejected Epic's contentions that the two

3    requirements challenged in the complaint—app distribution and IAP—were unlawful.

4        7.    The Court held, however, that two of Apple's unilateral restrictions on "steering"—

5    Guideline 3.1.1 prohibiting in-app steering, and Guideline 3.1.3 prohibiting certain out-of-app

6    communications—were "unfair" under the UCL.  *See id.* at 179.  Epic did not bring a standalone

7    challenge to Apple's anti-steering provisions; nor did it seek to enjoin those provisions.  *See id.* at 47–

8    61.  Nevertheless, the Court concluded that those provisions cause a "lack of information transparency

9    about policies which affect consumers' ability to find cheaper prices, increased customer service, and

10   options regarding their purchases."  *Id.* at 118.  The Court enjoined Apple from enforcing those two

11   Guidelines to "balance[] the justification for maintaining a cohesive ecosystem with the public interest

12   in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the

13   marketplace."  *Id.* at 166.

14       8.    On September 10, 2021, this Court entered its Permanent Injunction, which provides in

15   operative part:

16       Apple Inc. and its officers, agents, servants, employees, and any person in active concert
         or participation with them ("Apple"), are hereby permanently restrained and enjoined
17       from prohibiting developers from (i) including in their apps and their metadata buttons,
         external links, or other calls to action that direct customers to purchasing mechanisms, in
18       addition to In-App Purchasing and (ii) communicating with customers through points of
         contact obtained voluntarily from customers through account registration within the app.
19

20       9.    The first clause (i) tracks the language of Guideline 3.1.1(a) in effect at the time of trial.

21   CX-0001 § 3.1.1(a).  The second clause (ii) tracks the language of Guideline 3.1.3 in effect at the time

22   of trial.  CX-0001 § 3.1.3.

23       10.   The Court denied Apple's motion for a stay pending appeal.  Dkt. No. 830.  The Court

24   noted that it could "envision numerous avenues for Apple to comply with the injunction and yet take

25   steps to protect users."  *Id.* at 3.  The Court explained that it did not intend to "micromanage" Apple's

26   implementation of the Injunction.  *Id.* at 3.

27       11.   The Ninth Circuit stayed the Injunction pending appeal.  *See* C.A. Dkt. 27.

28

Declaration of Mark A. Perry in Support          2          Case No. 4:20-cv-05640-YGR
of Apple Inc.'s Motion for Entry of a
502(d) Order

12.     On April 24, 2023, the Ninth Circuit affirmed in part and reversed in part.  *See* C.A. Dkt. 222.  As relevant here, the Ninth Circuit affirmed dismissal of Epic's Sherman Act claims, confirming Apple's right to require that developers use IAP for in-app purchases of digital goods and services.  *Id.* at 67, 76–77, 87.  The Ninth Circuit also affirmed the UCL judgment and Injunction.  *Id.* at 80.  It held that Epic's failure to prove its claims under the Sherman Act did not preclude a finding that the conduct was "unfair" under the UCL.  *Id.* at 81.

13.     Following further appellate proceedings, the Ninth Circuit mandate issued on January 16, 2024, thus ending the stay pending appeal.  C.A. Dkt. 258.

**II.     The Parties' Competing Submissions Regarding Injunction Compliance**

14.     On the day the Ninth Circuit mandate issued, Apple filed a Notice of Compliance in this Court, explaining the steps that it had taken to comply with the Injunction.  Dkt. 871.  In brief, Apple deleted the prior Guidelines that contained the enjoined prohibitions, replaced them with new Guidelines that allowed the relevant communications, created an External Purchase Link Entitlement ("Entitlement") with rules regarding the time, place, and manner for including links, buttons, and calls to action, and established a new commission structure for transactions completed within 7 days of a user tapping a link within an iOS app.

15.     Hours after Apple filed its Notice, Epic CEO Tim Sweeney tweeted that "Epic will contest Apple's bad-faith compliance plan in District Court."  Dkt. 916-9.

16.     On January 30, 2024, Epic filed a Notice of Non-Compliance, disputing Apple's compliance and indicating its intent to file a motion setting forth the bases of non-compliance.  Dkt. 883.  Epic did not seek any discovery.  Dkt. 915, at 14 n.2.

17.     On March 13, 2024, Epic filed a Motion to Enforce Injunction.  Dkt. 897.  Acknowledging that the Injunction did not "explicitly prohibit" Apple's new Entitlement framework, Epic contended that Apple's conduct was contrary to the "purpose" and "spirit" of the Injunction.  *Id.* at 17.  Epic sought an order (i) holding Apple in civil contempt for violating the Injunction; (ii) requiring Apple to promptly bring its policies into compliance; and (iii) requiring Apple to revise Section 3.1.3 of the Guidelines.  *Id.* at 23.

18. On April 23, 2024, this Court set an evidentiary hearing on Epic's Motion to Enforce. Dkt. 925. The Court found that Epic had "made a sufficient preliminary showing that, viewed holistically, Apple's practice changes undermine the spirit of the injunction." *Id.* at 3. Epic again did not seek any discovery. The initial phase of the evidentiary hearing took place over the course of 6 non-consecutive days, from May 8, 2024 to May 31, 2024.

19. Among other things, the testimony and other evidence established that Apple has deleted the two Guidelines enjoined in the Injunction and replaced them with new Guidelines.

20. *First*, Apple deleted Guideline 3.1.1 and replaced it with 3.1.1(a). That ended Apple's prior prohibition on developers including links, buttons, or other calls to action within their apps directing users to other purchase mechanisms in addition to IAP. New Guideline 3.1.1(a) provides:

> StoreKit External Purchase Link Entitlements: apps on the App Store in specific regions ***may*** offer in-app purchases and ***also use a StoreKit External Purchase Link Entitlement to include a link to the developer's website that informs users of other ways to purchase digital goods or services***. Learn more about these entitlements. In accordance with the entitlement agreements, ***the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price***. The entitlements are limited to use only in the iOS or iPadOS App Store in specific storefronts. In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase.

CX-0013 § 3.1.1(a) (emphases added).

21. Under Guideline 3.1.1(a), Apple enabled developers to apply for a new External Purchase Link Entitlement ("Entitlement"). CX-0013 § 3.1.1(a). Developers may use the Entitlement to include links and other information in their apps that direct users to non-IAP purchasing mechanisms, so long as they adhere to certain requirements regarding the time, place, and manner for including such content. CX-0002 § 3. Apple charges a 12% or 27% commission on purchases users make on a developer's website within 7 days after following an external link in an iOS app and continuing to the developer's website. CX-0002 § 4.

22. *Second*, Apple deleted the prior prohibition on out-of-app communications that used information obtained during account registration. Apple amended Guideline 3.1.3 to provide that "[d]evelopers can send communications outside of the app to their user base about purchasing methods

other than in-app purchase."  CX-0013 § 3.1.3.  Apple also added Guideline 5.1.1(x) to provide that "[a]pps may request basic contact information (such as name and email address) so long as the request is optional for the user."  CX-0013 § 5.1.1(x).

### III.    Document Discovery

23.    At various points during the first phase of the evidentiary hearing, the Court directed Apple to produce particular documents in connection with the testimony of individual witnesses.  In each instance, Apple produced the specified documents promptly and to the best of its ability, in view of the limitations on its ability to speak with witnesses and the compressed timeframe.  *See* TT 33:1–11 (Fischer) (number of apps offering in-app purchases for digital goods and services; produced to Epic on May 8 and to the Court on May 9); TT 34:14–36:4 (Fischer) (list of developers who applied for the External Link Entitlement; produced to Epic on May 8 and to the Court on May 9); TT 337:24–338:23 (Roman) (list of top 200 developers on the App Store by revenue; produced to Epic on May 13 and to the Court on May 16); TT 342:2–344:5 (Roman) (summary report of data regarding the time windows in which users make successive purchases; produced to Epic on May 13 and May 15, and to the Court on May 16); TT 446:7–447:18 (Oliver) (Price Committee Deck presented on January 11, 2024; produced to Epic on May 16 and introduced as an exhibit at the hearing on May 17); TT 458:1–14 (Oliver) (electronic notes on computer related to Entitlement; produced to Epic and the Court on May 24); TT 460:20–24 (Oliver) (email, iMessage, and Slack communications regarding analysis of the commission for the Entitlement; produced to Epic and the Court on May 24); TT 502:16–17 (Oliver) (case studies Apple relied on in forming the assumptions it used for financial analysis; produced to Epic and the Court on May 24).

24.    On May 31, 2024, after all the witnesses called by both parties had testified, the Court directed Apple to produce "all Apple's documents relative to the decision-making process leading to the link entitlement program and associated commission rates."  Dkt. 974.  The evidentiary hearing was adjourned until those materials had been collected, reviewed, and produced.

25.    The evidentiary hearing-related discovery directed by the Court on May 31, 2024 proceeded in two phases.  *See* Dkt. 983.

Declaration of Mark A. Perry in Support    5    Case No. 4:20-cv-05640-YGR
of Apple Inc.'s Motion for Entry of a
502(d) Order

26.     In the first phase, Apple identified and produced certain documents relevant to the testimony of Carson Oliver, one of Apple's testifying witnesses at the evidentiary hearing.  Those documents included "Quip" documents—essentially shared workspaces—to which Mr. Oliver had access and that concerned Project Michigan and/or Project Wisconsin (the codenames for the U.S. Link Entitlement program at issue in this hearing).

27.     Apple completed the first phase of discovery on June 14, 2024, producing several hundred documents to Epic and providing a privilege log for documents withheld or redacted on privilege grounds.

28.     In the second phase, the Court ordered Apple to identify and produce all other documents "relative to the company's decision-making process concerning the link entitlement program and associated commission rate."  Dkt. 983.  On June 18, 2024, the Court referred all discovery matters related to this second phase to Magistrate Judge Hixson.  Dkt. 985.

### A.    Document Identification and Collection

29.     Apple and Epic spent significant time negotiating the scope of the collection and review via multiple meet-and-confers and exchanges of written proposals in June and July 2024.  After reaching an impasse on certain items, the parties took the open issues to Magistrate Judge Hixson to resolve.  *See* Dkts. 1000, 1002, and 1003.  Judge Hixson ruled on those issues on August 8, 2024.  *See* Dkt. 1008.

30.     Apple had initially proposed 17 custodians for the second phase of discovery.  Epic countered with 54 custodians.  Apple ultimately agreed to produce documents from 52 custodians.  During the merits phase of the litigation, by contrast, Apple produced documents from 11 custodians.

31.     For Apple's 52 custodians, Epic requested over 100 unique search terms be applied.

32.     Apple reported to the Court on July 17, 2024 that applying Epic's requested search terms to the 52 custodians would result in "at least 642,000 documents and attachments from server side emails alone."  Dkt. 1000, at 5.  As Apple explained, however, that estimate did not include documents that would have to be retrieved from each of the 52 custodians' computers and network drives.  *Id.*  In order to collect those documents, Apple had to conduct extensive custodial interviews and collections with each of the 52 custodians.

33.    Apple conducted more than 100 custodial interviews and collections on a rolling basis in June, July, and August 2024 in order to exhaust all available data sources for relevant documents.

34.    Each of those interviews involved at least one Apple in-house counsel, at least two outside counsel (from Weil and/or Gibson), and at least two Apple discovery specialists.  The interviews often lasted several hours and required the attorneys and discovery specialists to comb through every possible file location on a custodian's computer or network drives.  Some custodians required three or four interviews to get through the significant volume of documents on their computer and network drives.

35.    Altogether, Apple estimates hundreds of outside counsel hours were spent on the custodial interview process.

36.    Ultimately, after completion of all collections from the 52 custodians, there were approximately 1.3 million documents in the total review population.

**B.    *Document Review***

37.    In tandem with the collection process, Apple also engaged outside vendors to conduct the document review itself.

38.    The document review platform Apple used is maintained by a company called OpenText.  OpenText provides support for operating and managing the document review platform, including with respect to uploading collected documents, distributing documents for review, and processing documents for production.    OpenText and its staff do not provide substantive input on issues regarding responsiveness or privilege.

39.    To conduct the initial document review, Apple engaged Deloitte Transaction and Business Analytics ("Deloitte") in July 2024.  Apple later added Consilio in September 2024 as a second vendor to assist with the review given the volume of documents and truncated timeline for review.  The bulk of the review was conducted by third-party contract attorneys at Deloitte and Consilio in August and September 2024.

40.    The document review proceeded in two stages, or "passes."

41.    In the "first-pass review," conducted entirely by Deloitte attorneys, the reviewers tagged documents in all scope fields, including for relevance, privilege, personally identifiable information,

1    confidentiality, and more.

2        42.    In the "second-pass review," conducted by both Deloitte and Consilio attorneys, the

3    reviewers evaluated the documents more closely for privilege specifically, applied redactions as

4    necessary, and completed information for logging documents.

5        43.    Documents proceeded through the first and second-pass reviews depending on their

6    coding.  Documents tagged not responsive did not require second-pass review and instead went directly

7    to the outside counsel team (made up of Gibson and Weil attorneys) for quality control through a

8    sampling review.  Documents tagged as responsive and potentially privileged by Deloitte during the

9    first-pass review were escalated to a second-pass review by Deloitte and Consilio.

10        44.    Apple's outside counsel provided training to the second-pass reviewers responsible for

11    making privilege determinations.  Outside counsel provided written document review protocols to

12    Deloitte on August 7, 2024, including a privilege-specific protocol and a general review protocol.  Those

13    written protocols directed the second-pass reviewers to review for privilege under the governing Ninth

14    Circuit standards, including identifying material that should be redacted and drafting privilege log entries

15    for each privileged document.[1]

16        45.    In addition to the written protocol, Gibson and Weil conducted a live privilege training

17    with Deloitte attorneys on August 12, 2024 in anticipation of ramping up the second-pass review given

18    Deloitte's progress on the first-pass review up to that point.  Consilio received similar training when it

19    was added to the review.

20        46.    Deloitte maintained a running decision log and query tracker that tracked daily reviewer

21    privilege questions, which the outside counsel team reviewed and responded to weekly, and at times

22    daily.

23        47.    Once the second-pass review was complete, a subset of documents was then released to

24    outside counsel (led by Weil and Gibson) for quality control checks and sampling.

25        48.    Given the nuances and complexities of this privilege review, on top of Deloitte's and

26    Consilio's work in the second-pass review, this review included a more robust quality control process

27    _____

28    [1] Apple is prepared to submit the privilege review protocols to the Court for *in camera* review.

1  (conducted by a team of more senior outside attorneys) than typically employed in Apple document

2  reviews.

3          49.     Specifically, the privilege quality control process involved a third-level of review by the

4  outside counsel team of certain categories of documents, including those with in-house attorneys on them

5  as well as a 10% sample of all documents withheld for privilege, among other conditions.

6          50.     The outside counsel quality control team included 30 reviewers to start (in August 2024),

7  but Apple increased those reviewers weekly as the substantial completion deadline neared, with up to 80

8  reviewers engaged in the quality control process at the height of the review (who were all outside counsel

9  with two or more years of practice at large firms).  The outside counsel quality control team also received

10  written and live training.

11         51.     Weil and Gibson worked closely with the outside counsel quality control team week by

12  week, providing iterative substantive privilege guidance and answering numerous questions raised by

13  reviewers daily.  Weil and Gibson emphasized repeatedly to the outside counsel quality control team

14  that they should critically assess the first and second-pass review calls, and downgrade any documents

15  withheld or redacted as privileged that should not have been coded that way in the first place.  Indeed,

16  Weil and Gibson continued to downgrade documents up to the finalization of each privilege log at issue

17  where documents were found not to be privileged.

18         **C.     *Privilege Determinations***

19         52.     There were several aspects of the discovery that presented special challenges for Apple's

20  discovery process.

21         53.     *First*, most of the responsive documents concerned Apple's compliance with a

22  Court-ordered injunction and with emerging regulatory requirements from around the world.  Those

23  changing regulatory requirements and related projects include (but are not limited to):

24      •   In 2022, the European Union enacted the Digital Markets Act (frequently abbreviated to

25          "DMA"), which went effective in substantial part in 2023.  The DMA required Apple and

26          other technology companies to make a number of changes regarding the design of use of their

27          platforms.  As part of its compliance with the DMA, Apple made changes in the European

28

Union regarding developers' ability to include links within their apps (similar to what is required under the Injunction) or alternatives to IAP in their apps, third parties' ability to offer alternatives to the App Store for distribution on iOS, and other App Store features permitting alternative payment and distribution options for iOS apps.

- In 2019, the Netherlands competition authority initiated an action against Apple relating to the App Store's rules for dating apps. The Netherlands competition authority eventually required Apple to make changes to the rules for dating apps in the Netherlands storefront similar to that required by the Injunction.

- In 2022, Apple changed its App Store rules worldwide to allow certain types of apps ("reader apps") to include links to websites where the user could create or manage an account with the developer. The changes were made in response to a regulatory investigation by the Japan Fair Trade Commission.

- In 2022, Apple changed its App Store rules for apps in South Korea to allow iOS apps to include a payment system other than IAP within their apps.

- From 2019 to the present, Apple has been engaged in a regulatory matter involving Spotify (a music-streaming app developer) in Europe regarding issues similar to that under the Injunction.

- From 2020 to the present, Apple has been engaged in litigation with Epic in Australia over substantially the same issues litigated in this case.

54. Lawyers (both in-house and outside counsel) were involved in all of Apple's projects around the globe to comply with these requirements. Apple instructs its employees that adding a lawyer to a communication does not automatically make the communication privileged, and that documents should be labeled as "Privileged Confidential" only for communications with lawyers with the primary purpose of seeking legal advice or when working at the direction of a lawyer.[2] Even under that guidance, many documents in the review were labeled as "Privileged" at the time of their creation. As a result, a significant number of the documents reviewed are of the kind that contract or outside counsel document

---

[2] Apple is prepared to submit its internal privilege training materials to the Court for *in camera* review.

1    reviewers are likely to flag as potentially implicating attorney-client privilege.

2    55.    Although outside counsel provided detailed training to document reviewers—including

3    instructions that the presence of a lawyer does not render a document privileged and that documents

4    labeled "Privilege" by the sender are not presumptively privileged—the presence of (and often active

5    participation by) lawyers on so many documents is the kind of signal document reviewers are frequently

6    trained to look for when evaluating documents for privilege.

7    56.    Many of the documents most directly at issue—those concerning Apple's efforts to

8    comply with the Injunction—raise these challenges.  Every document concerning the Entitlement was

9    created as a direct result of the Injunction—there was no preexisting business motivation for Apple to

10   develop the Entitlement.  None of the analyses produced in discovery would have been undertaken but

11   for the Injunction.  And consequently, drafts of documents were sent to legal for review or were drafted

12   in part (sometimes substantial part) by lawyers.  While final versions of these documents sometimes

13   ended up being made public (through Apple's website) or were produced to Epic, the *drafts* of those

14   documents frequently reflected iterative feedback from counsel.

15   57.    *Second*, the subject matter of the documents likewise made privilege determinations more

16   complicated.  Even for documents on which no lawyer appears, the content frequently relates to Apple's

17   response to new *legal* requirements in various jurisdictions.  The documents thus often contain references

18   to orders from regulatory or judicial bodies, newly passed laws, and discussions with regulators.  And

19   again, for those documents at issue here, these challenges are even more acute—virtually every slide

20   deck prepared in connection with Apple's Injunction compliance efforts included some discussion of the

21   terms and scope of the Injunction, content that a reviewer would reasonably understand to have been

22   prepared or informed by counsel.

23   58.    Although document reviewers received training to help them understand the business

24   context for these documents, it is not surprising that many reviewers considered these documents to have

25   been created for the primary purpose of seeking, obtaining, or implementing legal advice.

26   59.    *Third*, Apple had to work on a highly truncated timeline.  Judge Hixson directed Apple

27   to substantially complete its review and production by September 30, 2024.  Dkt. 1008.  Beginning with

28

the Court's order of May 31, that timeframe gave Apple four months to collect, review, log, and produce responsive documents.  Apple ultimately collected and reviewed ~1.3 million documents, which even assuming a highly aggressive rate of 100 documents per reviewer per hour, requires approximately 13,000 attorney hours to review on the *first* pass.  That time does not include the additional second-pass review, quality control reviews, privilege log refinements, or production logistics.  Even for a company with Apple's resources, this was a substantial task.

60.    Apple continuously added resources to the Deloitte and Consilio teams, and also its outside counsel quality control team, in an effort to meet its deadlines.  Each incremental addition of reviewers, however, required additional onboarding and training, adding logistical burdens throughout the process.  And it is a basic principle of modern discovery that the more reviewers that are added, the greater variance there will be among privilege determinations.

61.    Given that Apple's original estimate of documents (based on server-side emails alone) more than doubled following the collection efforts, and in recognition that the review ramp-up took time, on September 26, Apple requested a two-week extension of its time to substantially complete its review and production.  *See* Dkt. 1016, at 5–6.  Judge Hixson denied that request on September 27, 2024.  *See* Dkt. 1017.

62.    Apple thereafter substantially completed its document production by September 30, 2024.

**IV.    Privilege Re-Review**

63.    Shortly after the substantial completion date of September 30, Epic sent Apple a letter raising objections to certain privilege assertions Apple had made in its privilege logs served in June. This letter was the first time Epic had raised any specific privilege objection.

64.    The parties thereafter met and conferred regarding Epic's privilege objections.  At the same time, Apple was finalizing its privilege logs, during which Apple removed several thousand documents from its privilege logs as a result of quality control checks.

65.    The parties ultimately briefed their privilege dispute through a joint discovery submission to Judge Hixson on October 27, 2024, principally focused on Epic's identification of four categories of documents, under which Epic identified eleven exemplar documents.  *See* Dkt. 1039.

66. On December 2, 2024, Judge Hixson issued a discovery order ruling that the eleven exemplar documents were, for the most part, not privileged or otherwise protected from discovery. *See* Dkt. 1056.

67. Following Judge Hixson's discovery order of December 2, Epic requested that Apple conduct a re-review of all documents over which it had asserted privilege and that all such privilege assertions be reviewed by one or more special masters. *See* Hr'g Tr. 8:23–9:14 (Dec. 3, 2024). Although Apple disagreed that Judge Hixson's ruling regarding eleven exemplar documents justified such measures, it agreed to undertake the re-review in order to reach resolution as soon as possible.

68. The parties thereafter negotiated a protocol for that re-review (the "Special Master Protocol"), and on December 23, 2024, this Court approved a joint stipulation "govern[ing] the re-review process directed by Judge Hixson." Dkt. 1092, at 2. The Special Master Protocol requires Apple to re-review all documents previously withheld or redacted as privileged or otherwise protected and provides for three Special Masters to review Apple's privilege assertions, with either party retaining the ability to seek judicial review of the Special Masters' determinations. *Id.* at 2, 5.

### A. *Category Two Documents and Apple's Reservation of Rights*

69. The Special Master Protocol divides the re-reviewed documents into three categories:

- Category One: "Documents that Apple continues to maintain are privileged or otherwise protected in whole or in part (including for the avoidance of doubt any documents downgraded from withheld to redacted and/or as to which the redactions have changed), including under the December 2 Order." Dkt. 1092 ¶ 1(b)(i);

- Category Two: "Documents that Apple maintains are privileged or otherwise protected in whole or in part, but that Apple acknowledges are not privileged or otherwise protected under Judge Hixson's order of December 2, 2024 (Dkt. 1056)." *Id.* ¶ 1(b)(ii);

- Category Three: "Documents that Apple no longer maintains are privileged or otherwise protected." *Id.* ¶ 1 (b)(iii).

70. These categories—and in particular, Category Two—served two purposes. First, at the time Apple began its privilege re-review, it had pending before this Court an objection to Judge Hixson's

December 2 Order. *See* Dkt. 1079. As Judge Hixson recognized, Apple should not be ordered to produce documents affected by his discovery order until Apple had exhausted its right of review in this Court. Hr'g Tr. 22:4–10 (Dec. 3, 2024). Documents sorted into Category Two were therefore initially withheld from both the Special Masters and Epic, and released only after this Court ruled on (and denied) Apple's appeal. *See* Dkt. 1095. Second, the identification of documents in Category Two, both before and after resolution of Apple's appeal from Judge Hixson's discovery order, allows Apple to track those documents it maintains are privileged and preserve for appeal its contentions that those documents are protected from discovery under the attorney-client privilege and/or work-product doctrine.

71. Pursuant to the protocol, Apple began producing Category Two documents to Epic five court days after this Court denied Apple's appeal. *See* Dkt. 1092 ¶ 1(h). In conjunction with those productions, on January 8, I wrote to counsel for Epic advising, in relevant part:

- "It remains Apple's position that many or all of the 'Category Two' documents are protected from discovery or disclosure under the attorney-client privilege and/or work product doctrine, in whole or in part." Ex. A, at 1.

- "The 'Category Two' documents are accordingly being produced to Epic at this time pursuant to Court order, over Apple's objections, and subject to a forthcoming appeal." *Id.*

- Apple's current "production and any prior or future productions of 'Category Two' documents—and any use of the documents in district court proceedings—do not constitute a waiver of any applicable privilege or other protection." *Id.*

- "To avoid possible prejudice to Apple until the privilege issue has been finally resolved on appeal, Epic shall not take any actions with respect to the 'Category Two' documents, including but not limited to further dissemination, that could constitute (or be deemed to constitute) a waiver or invasion of any applicable privilege or other protection, as to particular documents or their subject matter." *Id.* at 1–2.

- "So that there is no ambiguity in the record, Apple will create an index identifying all 'Category Two' documents at the conclusion of the re-review process. Such documents should be treated as 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' pursuant

to the Amended Protective Order in effect for this litigation (Dkt. 274)."

72.     Epic did not respond to the January 8 letter until February 7, 2025, as discussed below.

73.     Since January 8, the parties have briefed to Judge Hixson several rounds of objections to rulings of the Special Masters on certain of Apple's privilege assertions.  Judge Hixson has ruled on some, but not all, of those objections.  *See* Dkts. 1139, 1150, 1157.  For those documents Judge Hixson has ruled are not privileged, Apple was required to (and did) produce those documents to Epic within three court days of Judge Hixson's rulings.  *See* Dkt. 1092 ¶ 4(c).  A list of all documents upheld by the Special Masters but ordered produced by Judge Hixson as of the date of this declaration is attached as Ex. B.

74.     On February 5, 2025—after Apple had re-reviewed all of the documents over which it had originally maintained privilege—I wrote a second letter to counsel for Epic following up on my prior letter, stating, in relevant part:

- "We are currently finalizing the index that we stated we would provide that identifies all 'Category Two' documents now that Apple's re-review has concluded."  Ex. C, at 1.

- "In light of Apple's express reservation of rights, Apple has not waived its privilege assertions over any documents produced pursuant to the orders of the Court, including all 'Category Two' documents."  *Id.*

- "Nevertheless, in an abundance of caution and to avoid any dispute about this issue in the future, in this or any other forum, we request that Epic enter into the attached stipulation under the Federal Rule of Evidence 502(d) providing that Epic's or Apple's use of any of the Category Two documents at the hearing, as well as any use of documents that the Court has ordered produced notwithstanding objections to the Special Master rulings, does not constitute a waiver of any applicable privilege or other protection."  *Id.*

75.     Counsel for Epic responded on February 7, 2025, stating: "Epic treats and will continue to treat as 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' (pursuant to the Amended Protective Order, Dkt. 274 (the 'PO')) any document appropriately designated as such under Section 5.2 of the PO.  Epic does not agree to Apple's other demands reflected in your letters and reserves all rights."

Ex. D.

76.    On February 11, 2025, I responded to counsel for Epic, providing the appendix of Category Two documents.  Ex. E.  That appendix is attached as Ex. F.

**B.    The Re-Review Process**

77.    Apple re-reviewed approximately 54,000 documents over which it had originally asserted a claim of privilege or work product in whole or in part.  For those documents over which Apple maintained its assertion of privilege or work product, Apple began sending those documents on a rolling basis to the Special Masters on December 23.  Apple completed its final production to the Special Masters on January 21.

78.    During that same time period, Apple produced to Epic the documents over which it is no longer asserting privilege.

79.    At the outset of the re-review project, Apple identified approximately 40 reviewers—all attorneys at law firms—to conduct the re-review.  Based on the target rate of 15,000 documents per week, Apple reasonably believed that 40 reviewers was sufficient to meet that target, requiring reviewers to review approximately 375 documents per week.

80.    In the initial weeks of the re-review, Apple believed it could reach and maintain the desired pace with the 40 reviewers retained.  Over the winter holidays, however, as some reviewers began to fall short of their weekly targets, Apple determined that additional reviewers would be needed.  Beginning on December 28, Apple added more attorneys from the firms involved in the privilege re-review.  As a result of those efforts, the re-review team grew to approximately 100 reviewers.

81.    At a hearing on January 3, Judge Hixson directed that Apple should aim to finish its review of the documents by January 17.  Hr'g Tr. 16:17–20 (Jan. 3, 2025).  With the help of the larger group of reviewers and significant effort by all involved, Apple was able to meet that deadline.

82.    Epic has raised questions during and after the privilege re-review about the percentage of downgrades from week to week.  *See* Hr'g Tr. 4:16–5:6 (Jan. 14, 2025); *see also* Dkts. 1149, 1151.  The reviewers added later in the process received the same re-review training as those added at the

beginning.[3]  At no point were reviewers instructed to alter their general standards for evaluating privilege or to assert privilege over a great proportion of reviewed documents.

### C.    Final Results of the Privilege Re-Review

83.    On January 31, 2025, Apple provided the metrics of its re-review to this Court (Dkt. 1151).

**Total documents re-reviewed:** 53,820

**Categories**

 **Category 1:** 22,658

 **Category 2:** 7,059

 **Category 3:** 24,103

**Privilege assertions**

 **Documents tagged "Not Privileged":** 30,104

 **Documents tagged "Privileged":** 23,716

84.    Out of the 53,820 documents reviewed, Apple downgraded approximately 55.9%. Excluding the Category Two documents—over which Apple maintains its assertion of privilege—the downgrade percentage is approximately 42.1%.

85.    The Special Masters' review of Apple's documents remains underway.  The following metrics represent the Special Masters' progress as of January 31, as previously reported to the Court:

**Documents Ruled On:** 5,506

 **Privilege Upheld in Full:** 4,906 (89.1%)

 **Privilege Upheld in Part, Overruled in Part:** 46 (0.8%)

 **Privilege Overruled in Full:** 554 (10.1%)

**Requests for Additional Information:** 89

86.    Judge Hixson has overruled Apple's privilege assertions with respect to an additional 9 documents sustained by the Special Masters but objected to by Epic.  *See* Dkts. 1139, 1157.

87.    Between the 7,059 Category Two documents, the 600 documents overruled by the Special

---

[3] Apple is prepared to submit the re-review training materials to the Court for *in camera* review.

Masters in whole or in part, as of January 31, and the 9 additional documents overruled by Judge Hixson, Apple has produced approximately 7,668 documents over which it maintains its privilege assertions but that were ordered produced to Epic, on direction from either the Court or the Special Masters pursuant to the re-review protocol. We anticipate that there will be additional such documents as the Special Masters complete their determinations, and will include the final numbers in a further submission following completion of the document production. *See* ¶ 4, *supra*.

88.     As the Court has already recognized, the privilege rulings are not immediately appealable to the Ninth Circuit. Hr'g Tr. 12:12–15 (Dec. 18, 2024). Accordingly, Apple has produced these documents to Epic pursuant to Court orders. As expressed in its letters to Epic, however, Apple reserves its rights to challenge the adverse rulings as to the documents once an appealable order is entered in this Court.

89.     Apple therefore seeks, prior to the resumption of the evidentiary hearing, an order pursuant to Rule 502(d) to clarify and eliminate any dispute that its production and/or use of (1) Category One documents that Apple has been required (or may be required in the future) to produce given privilege rulings from the Special Masters or Judge Hixson and (2) all Category Two documents has produced or will produce to Epic does not effect a waiver of any claim of attorney-client privilege or work product protection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of February 2025, in Cupertino, California.

Dated: February 12, 2025                          Respectfully submitted,


                                                  By: */s/ Mark A. Perry*

                                                      Mark A. Perry