UNITED STATES DISTRICT COURT

***ORIGINAL***

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 8** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | **Pages 1425 - 1478 and** |
| | ) | **1491 - 1670** |
| Defendant. | ) | |
| _____ | ) | Oakland, California |
| | | Tuesday, February 25, 2025 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**(Pages 1479 - 1491 UNDER SEAL)**

**APPEARANCES:**

For Plaintiff:              Cravath, Swaine & Moore LLP
                            375 Ninth Avenue
                            New York, New York  10001
                   BY:  GARY A. BORNSTEIN,
                        M. BRENT BYARS
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:         Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1                    <u>**A P P E A R A N C E S (CONT'D.)**</u>

2

3    For Defendant:            Weil, Gotshal & Manges LLP
                               2001 M Street NW, Suite 600
4                              Washington, D.C.  20036
                          BY:  ANNE CORBETT,
5                              MARK A. PERRY,
                               JOSHUA M. WESNESKI, ATTORNEY AT LAW
6

7                              Gibson, Dunn & Crutcher LLP
                               One Embarcadero Center, Suite 2600
8                              San Francisco, California  94111-3715
                          BY:  ANTHONY D. BEDEL,
9                              LAUREN DANSEY, ATTORNEYS AT LAW

10

11                             Gibson, Dunn & Crutcher LLP
                               1050 Connecticut Avenue, N.W.
12                             Washington, DC  20036-5306
                          BY:  HARRY PHILLIPS,
13                             CYNTHIA E. RICHMAN, ATTORNEY AT LAW

14

15

16                             --o0o--

17

18

19

20

21

22

23

24

25

1       **I N D E X**

2

3

4       TUESDAY, FEBRUARY 25, 2025 - VOLUME 8

5
        **PLAINTIFF'S WITNESSES**                        **PAGE**    **VOL.**

6

7       OLIVER, CARSON

8       DIRECT EXAM (RESUMED) BY MR. EVEN                1432        8

9       CROSS-EXAMINATION BY MS. RICHMAN                 1556        8

10      REDIRECT EXAMINATION BY MR. EVEN                 1595        8

11      RECROSS-EXAMINATION BY MS. RICHMAN               1611        8

12

13      VIJ, KUNNAL

14      (SWORN)                                          1618        8

15      DIRECT EXAMINATION BY MR. EVEN                   1619        8

16

17                              --o0o--

18

19

20

21

22

23

24

25

1

# E X H I B I T S

2

3  | **EXHIBITS** | **W/DRAWN** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 216 | | | 1633 | 8 |
| 264 | | | 1647 | 8 |
| 0265 | | | 1622 | 8 |
| 274 (REDACTED) | | | 1501 | 8 |
| 384 | | | 1662 | 8 |
| 499 | | | 1472 | 8 |
| 503 | | | 1514 | 8 |
| 0506 (PROVISIONALLY) | | | 1541 | 8 |
| 509 | | | 1507 | 8 |
| 538 | | | 1546 | 8 |
| 0832 | | | 1598 | 8 |
| 859 | | | 1640 | 8 |
| 1303 | | | 1564 | 8 |
| 1304 | | | 1573 | 8 |
| 1310 | | | 1592 | 8 |

19

20                    --o0o--

21

22

23

24

25

| | |
|---|---|
| **Tuesday, February 25, 2025** | **8:28 A.M.** |

**P R O C E E D I N G S**

--o0o--


    **THE COURT:**  Okay.  Anything that we need to take --
well, I'm sorry.  Call the case.

    **THE CLERK:**  Now calling civil matter 20-5640-YGR,
Epic Games, Inc. versus Apple, Inc.

  Lead counsel, please approach the lecterns and state your
appearances.

    **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary
Bornstein for the plaintiff Epic Games.  And I have with me at
counsel table Michael Zaken, who I will start with today.
Lauren Moskowitz, Yonatan Even, and Tina Seideman.

    **THE COURT:**  Okay.  Good morning.  And the most
important person, your assistant in the back.

    **MR. BORNSTEIN:**  Well, we have both Brent Byars, who
is counsel, and Mr. Lyon, Mike Lyon, who is assisting us with
the technology.

    **THE COURT:**  Yeah, I was talking about Mr. Lyon.

    **MR. BORNSTEIN:**  I assure you, Your Honor, Mr. Byars
is an essential part of the process as well.

    **THE COURT:**  I'm sure.

  Okay.  Mr. Perry, good morning.

    **MR. PERRY:**  Good morning, Your Honor.  Mark Perry for

```
 1    Apple.  With me at counsel table today is Cynthia Richman,

 2    Harry Phillips, and Lauren Dansey, D-A-N-S-E-Y.

 3        And also Ms. Heather Grenier of Apple and Mr. Phil

 4    Schiller of Apple.

 5            THE COURT:  Okay.  Good morning, everyone.

 6        Okay.  Anything that we need to do before we get started?

 7            MR. BORNSTEIN:  Not for Epic, Your Honor.

 8            MR. PERRY:  Not for Apple, Your Honor.

 9            THE COURT:  All right.  Do we have Mr. Oliver?

10        We'll get him back on the stand.

11        Actually, we did have -- I did have one thing which I

12    forgot to do yesterday.  Mr. Bornstein.

13        There was a sidebar yesterday and --

14        It's okay, Mr. Oliver.

15        To the extent that you want to put something on the record

16    about what happened at sidebar, we will do that at the end of

17    a break or at the end of the day where I can clear the

18    courtroom for purposes of sealing if you need it to be sealed.

19        But I don't know that you want to put anything at sidebar.

20    I just wanted to make sure the record was complete.

21            MR. PERRY:  Your Honor, Mark Perry.  I appreciate

22    that.  We sent Epic a note last night about it and asked for a

23    response today and suggested an out-of-court resolution of any

24    issue.  And if that works out, it does.  And if it doesn't,

25    we'll come back to the Court.
```

 1          And Mr. Bornstein and I discussed this morning, and let's

 2     say we don't see eye to eye, but I also don't think we don't

 3     see that there's a resolution.  If there's something for the

 4     Court, we'll bring it back, and if there's not --

 5          THE COURT:  Okay.

 6          MR. PERRY:  -- we will inform the Court one way or

 7     the other.

 8          MR. BORNSTEIN:  Since Mr. Perry has raised the point,

 9     Your Honor, I do think the issue that he and I were discussing

10     before court is the subject of the letter and, to some degree,

11     the subject of the sidebar, could affect some of the testimony

12     today.

13          I don't want to get into it with Mr. Oliver in the room.

14     Sorry, sir.

15          THE COURT:  Okay.  So let's plan on perhaps dealing

16     with it at a break.  And so that we can have, one, a record,

17     and two, a full conversation, we might do it in a sealed -- I

18     suggest we probably want to do it in a sealed context.  Yes or

19     no?

20          MR. BORNSTEIN:  I don't have a position on that, Your

21     Honor.  I think it's Apple's information so I'll defer.

22          MR. PERRY:  I think it would be preferable, Your

23     Honor.

24          THE COURT:  Okay.  All right.  Glad I raised it.

25          Okay.  But for now, Mr. Oliver, welcome back.

1          **THE WITNESS:**  Thank you.

2          **THE COURT:**  You may be seated.

3      And your examination will resume as soon as you're ready.

4      Mr. Even, good morning.

5          **MR. EVEN:**  Good morning, Your Honor.

6

7                      **CARSON OLIVER,**

8  called as a witness for the PLAINTIFF, having been previously

9  duly sworn, continued testifying as follows:

10                  **DIRECT EXAMINATION (RESUMED)**

11  BY MR. EVEN:

12  **Q.**  Good morning, Mr. Oliver.

13  **A.**  Good morning.

14  **Q.**  Do you have your books before you?

15  **A.**  Appears that I do.

16  **Q.**  So I want to turn this morning and talk a little bit about

17  Project Wisconsin and some of the iterations that Apple

18  considered for its response.  Some of this has already been

19  covered with other witnesses so I may jump around a little

20  bit, and please try and bear with me.

21      I want to start in mid May of 2023.

22      And if you take a look at CX488 in your binder, and that's

23  a document that's already been admitted.

24                      (Exhibit published.)

25  / / /

 1   BY MR. EVEN:

 2   **Q.**  Do you see that this is an invitation for a Wisconsin

 3   business update?

 4           **THE COURT:**  Okay.  And we can publish this to the

 5   gallery.

 6           **THE WITNESS:**  I do, yes.

 7   BY MR. EVEN:

 8   **Q.**  And you see that it's slated for May 18th, 2023.

 9   **A.**  I do, yes.

10   **Q.**  And you see that you have been invited and accepted the

11   invitation.

12   **A.**  I do, yes.

13   **Q.**  And may we assume then that you attended a meeting on

14   May 18th with Mr. Schiller and others?

15   **A.**  I think that's a reasonable assumption.

16   **Q.**  Okay.  If you move to CX533 in your binder, do you see

17   that that's a set of text messages from Ms. Pulchny and

18   others.  Do you see that?

19   **A.**  (Reviewing document.)

20        I do, yes.

21   **Q.**  And do you see that Ms. Pulchny is saying that you and

22   others will be presenting to Phil tomorrow?

23   **A.**  That appears to be the message, yes.

24   **Q.**  Okay.  And that's from May 17th, one day before the

25   meeting we just looked at, correct?

1    **A.**  That seems correct, yes.

2    **Q.**  Okay.  And so would it be fair to assume that you

3    presented at the May 18th meeting?

4    **A.**  I don't remember that meeting.  I see the message --

5    **Q.**  Okay.

6    **A.**  -- but I don't remember if I did present at the meeting.

7    **Q.**  So let's take a look at the document that was presented,

8    and that is Exhibit CX272.  And that has already been admitted

9    as well, but it's in your binder.

10            **MR. EVEN:**  And I believe Your Honor asked for an

11    enlarged copy of that which I believe Apple provided.  I don't

12    know if they have hard copies.  It was provided early this

13    morning.  But -- and that's what's on the screen.

14                    (Exhibit published.)

15            **THE COURT:**  Okay.  I only -- I don't have one that's

16    separate from the screen, but I don't know what you mean by

17    provided.  Was that sent?

18            **MR. EVEN:**  It was sent to us.  I don't know that we

19    have hard copies.  They're coming.  I'm told they're coming.

20            **THE COURT:**  Okay.  Go ahead.  Thank you.

21    BY MR. EVEN:

22    **Q.**  And you see this is a deck from May 2023 titled --

23    **A.**  Yes, I do.

24    **Q.**  And you see it's titled Proposed Responses to Epic

25    Injunction?

1    **A.**  I do, yes.

2    **Q.**  And you understand this is the deck that was presented in

3    May 2023?

4    **A.**  In May 2023, but not on -- it doesn't have a specific date

5    within May.

6    **Q.**  I agree.  Do you -- if you look at it, do you recall that

7    you presented or one of the presenters of this deck back in

8    May 2023?

9    **A.**  Do you mind if I look at the deck a little bit?

10   **Q.**  Sure.

11                    (Witness reviewing document.)

12           **THE WITNESS:**  So I don't remember the specific deck,

13   but some of the analysis looks familiar.

14   **BY MR. EVEN:**

15   **Q.**  Okay.  So this is a deck you were involved in preparing

16   and presumably presenting back in May 2023.  Whether it was on

17   the May 18th meeting or something else, not crucial.

18   **A.**  This or a deck like it.  I can't say specifically that I

19   remember --

20   **Q.**  Okay.

21   **A.**  -- this specific deck.

22   **Q.**  Okay.  If you turn to page 7 of this exhibit titled

23   "Proposal 1."  Do you see that?

24           **MS. RICHMAN:**  Your Honor.

25           **THE COURT:**  I can't hear you.  Is your mic on?

 1          **MS. RICHMAN:**  It appears to be.

 2          **THE COURT:**  Hold on just a minute.

 3          **THE CLERK:**  It's on.

 4          **MS. RICHMAN:**  This is one of the slides that contains

 5   language that is the subject of the discussion we're having

 6   with Epic's lawyers.  I would appreciate if we could pull it

 7   down, and also object to the use of language that's been

 8   redacted in other documents.

 9          **THE COURT:**  Okay.

10          **MR. EVEN:**  So I will try to proceed, Your Honor.  But

11   this is a deck that was admitted yesterday, put on the screen

12   yesterday, subject to long examination yesterday, and

13   reproduced by Apple this morning in enlarged form per Your

14   Honor's request with no objection.  So I'm not entirely sure

15   what the issue is at this point.

16          **THE COURT:**  Yeah.  What -- so can you point me to

17   what page is the issue?

18          **MS. RICHMAN:**  Yes, Your Honor.  I think on page 7 in

19   the left-hand column, the bottom bullet point, page 11.

20          **THE COURT:**  Well, I don't -- I don't see that the --

21   I'm looking at page 7.  I don't see a problem with the

22   left-hand side bottom bullet point.

23      I see a potential issue with the third bullet point

24   consistent with what we've done in the past.  I don't know if

25   that was --

```
 1              MR. EVEN:  That portion is blacked out on the
 2   public --
 3              THE COURT:  Okay.
 4              MR. EVEN:  -- document.
 5              THE COURT:  That I didn't notice because I was
 6   looking at my own document.
 7        So I don't see a problem with the -- if there's an
 8   objection to the left-hand side, fifth bullet point, the
 9   objection is overruled.
10              MS. RICHMAN:  Okay.  There is an objection.  So just
11   so the record is clear.
12              THE COURT:  It's overruled.
13              MS. RICHMAN:  Okay.  And then same objection on
14   page 11.
15              THE COURT:  What on?
16              MS. RICHMAN:  The third bullet point on the -- on the
17   right.
18              THE COURT:  The right or the left?  As I'm looking at
19   the document, there's -- there are basically -- and I don't
20   even have bullet points on this one.  On the left-hand side,
21   there are five rows.  On the right-hand side, there are three
22   bullet points.
23              MS. RICHMAN:  Yes, Your Honor.  And I may be
24   confusing my left and right.  I apologize.  But it's the right
25   side, third bullet point.
```

 1             Your Honor, the issue is I understand an identical version

 2     of this document was withheld for privilege and that holding

 3     was upheld by special masters.

 4             **THE COURT:**  On what basis?

 5             **MS. RICHMAN:**  I assume privilege basis.  I don't have

 6     the --

 7             **THE COURT:**  But what's the basis?  Somebody better

 8     argue it so I can rule.

 9             **MR. PERRY:**  It's Mark Perry, Your Honor.

10        The June 2023 deck was -- there are multiple --

11             **THE COURT:**  This is not a June 2023 --

12             **MR. PERRY:**  I'm sorry, May 2023.

13             **MR. BORNSTEIN:**  Excuse me, Your Honor.  I apologize

14     for interrupting just to raise the question whether Mr. Oliver

15     should be present for this discussion or not.

16             **THE COURT:**  All right, Mr. Oliver, go into that room

17     right there.  It's the jury room.

18             **THE WITNESS:**  Yes, Your Honor.

19             **MR. PERRY:**  Your Honor, if we look, for example, at

20     272.7 which was the first page, that final bullet point --

21             **THE COURT:**  Okay.  So you're talking about the

22     left-hand side, not the right-hand -- I mean you're talking

23     about the right-hand side, not the left-hand side?

24             **MR. PERRY:**  Yes, Your Honor.

25                     (Off-the-record discussion.)

 1          **THE COURT:**  And what is the evidence that exists that

 2    this comes from an attorney and not from the principals?

 3          **MR. PERRY:**  The submission to the special masters,

 4    Your Honor, there was a set -- a duplicate version of this

 5    that was submitted to the special masters for review with an

 6    indication that this was from the attorneys, the risk

 7    assessment and the special master sustained that ruling.

 8       Epic objected to that ruling to Judge Hixson.  And Judge

 9    Hixson sustained the special master's ruling.  And Epic did

10    not appeal that ruling to the Court, to this Court.

11       So, again, as we started yesterday, we had understood that

12    the questions of substantive privilege had been resolved in

13    the re-review.  That was the purpose of it.

14       This is an issue of a duplicate document.  It's not a

15    withhold.  It's a redaction of limited issues.  And we are

16    asking that the -- the determination which was made by the

17    special masters and sustained by Judge Hixson over Epic's

18    objection be applied to the second version of the document.

19       And as I mentioned yesterday, this is an issue that arises

20    because there are versions of the same deck or very similar

21    deck that are not exact duplicates so they didn't get weeded

22    out.

23          **THE COURT:**  I understand.  Is there anything else in

24    this deck?

25          **MR. PERRY:**  That's subject to this issue?

1    **THE COURT:**  Yes.

2        **MR. PERRY:**  I believe it is the bullet point on dot

3    seven and the bullet point on dot 11.  And those -- seeking

4    confirmation, Your Honor.  Those are the only -- those are the

5    only issues in this deck.

6        **THE COURT:**  All right.  The objection is sustained.

7        **MR. BORNSTEIN:**  May I be heard on this, Your Honor?

8        **THE COURT:**  Did you -- there were protocols in place

9    for purposes of -- and frankly, I have zero interest in

10   re-resolving 20,000 rulings.

11       So you had a special master who granted the privilege,

12   Judge Hixson who granted the privilege, and to the extent

13   there was an appeal of that, I thought there was a process in

14   place.

15       **MR. BORNSTEIN:**  So, Your Honor, this document was not

16   a subject of any process in front of the special master other

17   than Apple knowingly de-designating it and producing it to us

18   as a category 2 document.  That's the -- the 223, Exhibit 223.

19       And this document, Exhibit 272, I questioned Mr. Schiller

20   about at length yesterday with no objection.  It was produced

21   to us with no redaction.  It was produced to us again this

22   morning with no redaction and in enlarged form.  This is the

23   one that Your Honor asked to be produced in a more legible

24   format.

25       I did receive a letter from Mr. Perry last night regarding

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1   this question about this -- I won't say it out loud, this --

 2   this phrase that appears in the document.

 3          THE COURT:  Yeah.

 4          MR. BORNSTEIN:  This document was not mentioned in

 5   the letter that I received that came from Mr. Perry's

 6   colleague last night.

 7      We have respected every decision that's been made by the

 8   special masters.  What Apple is asking us to do is to

 9   cross-reference all of the documents in their production to

10   assess whether there's some other document somewhere that they

11   continue to maintain a designation over, when as Your Honor

12   noted, they have massively overdesignated their production in

13   a tactical way.

14      When they were called on this issue, they de-designated a

15   large number of documents, presumably a human sat, reviewed

16   them, and produced this document to us twice, Your Honor.  And

17   now we're being --

18          THE COURT:  We're moving very quickly, Mr. Bornstein.

19   And if there was an identical document on which privilege

20   objections were made -- was it identical or not?

21          MR. BORNSTEIN:  It's not identical, Your Honor.  And

22   the issue here is there's a -- a subject -- this -- this

23   issue, I won't say the words again, but this issue is all over

24   the documents.  And Your Honor ruled on this issue on

25   December 31st in Docket number 1095 that this was precisely

 1      the issue that Your Honor was interested in getting

 2      information about to understand the thought process on the

 3      Apple side.

 4              **THE COURT:**  All right.

 5                  (Simultaneous colloquy.)

 6              **THE COURT:**  I agree.  And let me tell you that there

 7      is plenty of evidence already in the record.

 8              **MR. BORNSTEIN:**  And there was an hour and a half of

 9      testimony about this yesterday with no objection from all of

10      the lawyers on this side of the room.  Nobody said, "Oh, this

11      is something we've previously redacted.  Oh, this is obviously

12      privileged."  Nothing.

13         So there's 90 minutes of testimony from Mr. Schiller on

14      this very subject.  It's been waived to the extent there ever

15      was a privilege, and we do contest strongly that there was a

16      privilege here at all.

17         Business people are capable of assessing this issue, and

18      we had our sidebar, Your Honor.  Your Honor asked some

19      questions designed to elicit facts about the nature of whether

20      this was privileged or not.

21         We had -- we -- we had no way to conclude that having

22      produced to us hundreds of documents that say these very

23      words, that Apple was maintaining a privilege over this

24      concept that Your Honor ordered them to produce over their

25      objection.

 1            **THE COURT:**  Response.

 2            **MR. PERRY:**  Your Honor, this has been -- not to delve

 3    too much into the re-review, but this has been a recurring

 4    issue.  The --

 5            **THE COURT:**  Of your own making.

 6            **MR. PERRY:**  Your Honor, there is --

 7            **THE COURT:**  Of your own making.

 8            **MR. PERRY:**  Yes, Your Honor.  I -- I said yes.

 9        To be clear, we have been working very diligently with a

10    large document set with multiple reviewers to meet all the

11    deadlines.  And there are judgment calls.  And they're not

12    made exactly the same every time.

13        And we've dealt with this with the special masters and

14    with Judge Hixson.  We've had multiple hearings on this.  And

15    both the special masters and Judge Hixson have agreed that if

16    a identical or materially similar document is sustained, then

17    Apple can either claw back or apply the same across to others.

18    And we just had a claw-back hearing with Judge Hixson on that

19    last week and he agreed with our position on that.

20        Again that's the substantive privilege determination being

21    made there.

22        The only thing we're asking here, Your Honor -- and -- and

23    Mr. Bornstein and I did have a discussion this morning.  I do

24    understand the cat-is-out-of-the-bag problem from yesterday,

25    but I think we don't need to have additional questions for

1    Mr. Oliver about it given that it's a very limited redaction

2    that was sustained in a materially similar version of the

3    document, which is, by the way, also in this binder, right,

4    291.

5        And -- and, Your Honor, you know, the -- the difficulty

6    here, we're not asking actually Epic to go through our

7    production.  We offered to go through the production, but we

8    didn't get an exhibit list so we couldn't go through it

9    ourselves in advance.

10        **THE COURT:**  You actually did get an exhibit list.  At

11    least that's what I was advised at sidebar yesterday.

12        **MR. PERRY:**  Your Honor, to be clear, we do not have

13    an exhibit list for this hearing, period.

14        **MR. BORNSTEIN:**  Your Honor, we offered to provide an

15    exhibit list.  The answer that we got back was that's fine if

16    you want to do it on a unilateral basis.  That was not

17    acceptable to us for obvious reasons.

18        **THE COURT:**  Well, that would be unacceptable.  So --

19        **MR. PERRY:**  Your Honor, that's not what happened.  I

20    don't want to get in -- I mean I'm happy to explain what

21    happened but...

22        **THE COURT:**  Well, you're making allegations.  I'm

23    getting responses.  And so here we are.

24        So is that what you said, effectively, or not?

25        **MR. PERRY:**  Your Honor --

 1           THE COURT:  Or someone on your team, effectively or

 2   not?

 3           MR. PERRY:  Last week we -- we proposed to exchange

 4   exhibit lists on Friday at noon.

 5           THE COURT:  Yes.

 6           MR. PERRY:  Epic said the Court has not ordered us to

 7   produce exhibit lists and we are not going to produce exhibit

 8   lists.

 9           THE COURT:  All right.  I've got Ms. Moskowitz, it

10   looks likes she's pulling up the email.  So I'll just look at

11   the email.

12           MR. PERRY:  We can -- we're happy to send in the

13   correspondence, Your Honor.

14           THE COURT:  I'd like to know which lawyer drafted

15   that bullet point.

16           MR. PERRY:  Your Honor, I don't have that in front of

17   me, but I do have that information back at the ranch.  I can

18   get it.

19           MR. BORNSTEIN:  To be clear, Your Honor, just so that

20   the record -- I have this on the record, we had six lawyers

21   sitting on that side of the courtroom listening to testimony

22   on this document and this topic.

23           THE COURT:  So --

24               (Off-the-record discussion.)

25           MR. BORNSTEIN:  May Ms. Seideman bring up a copy of

1    the email exchange?

2            THE COURT:  Just give it to the --

3        The testimony is in.  The testimony is in.  And --

4            MR. BORNSTEIN:  As with all emails, you might --

5            THE COURT:  Hold on.

6            MR. BORNSTEIN:  Oh, apologize, Your Honor.  I just

7    wasn't sure which one -- which page was shown to the Court on

8    top.

9            THE COURT:  Hmm.

10            MR. BORNSTEIN:  It should be Mr. Perry's email from

11    Saturday at 6:13 p.m.

12                    (Off-the-record discussion.)

13            THE COURT:  Who is Charlotte Rothschild?

14            MR. BORNSTEIN:  Ms. Rothschild is an associate on our

15    team.

16            THE COURT:  Well, she says on Thursday you're not

17    going to exchange exhibits.

18            MR. BORNSTEIN:  That's correct, Your Honor.

19    Mr. Perry then responded with a lengthy email that begins on

20    what I believe is the fifth page of the document on Friday at

21    7:01 p.m. explaining Epic -- Apple's concerns with the

22    decision not to exchange exhibits.

23        There's then a response on the prior page from Mr. Zaken

24    offering to exchange exhibits with Apple and to provide them

25    approximately 30 hours after the time when Apple originally

1    proposed to receive them.

2        And on the third page of the document, Mr. Perry declined

3    that offer but said if you want to send us your exhibits,

4    that's fine.

5            **THE COURT:**  Yeah.  Okay.

6        So you both played chicken and you both lost so here we

7    are.

8        Yesterday's testimony stands.  I'll make a decision later

9    when I have evidence that I can look at in light of

10    yesterday's effective -- I won't say complete waiver, but

11    we're not going to go backwards.

12        And you show me some evidence that I've got a lawyer who

13    drafted that particular bullet point, then I'll take a look at

14    it.  For now, keep it redacted and let's keep moving.

15            **MR. BORNSTEIN:**  May I just make one other point for

16    the record, Your Honor?  Not to reargue the issue, just so

17    it's clear.

18        During his testimony yesterday, Mr. Schiller did say at

19    one point that the person with more knowledge regarding this

20    deck was Mr. Oliver.  That's part of the reason we've raised

21    it with him today.  But we can come back to that after Your

22    Honor has the evidence that you've requested.

23            **THE COURT:**  Call him in.

24            **MR. PERRY:**  Thank you, Your Honor.

25                    (Pause in the proceedings.)

 1           **THE COURT:**  Okay.  Mr. Oliver is back on the stand.

 2   You may proceed.

 3           **MR. EVEN:**  Okay.  I guess let's take down the public

 4   for now.

 5   **Q.**  Are you at Exhibit 272.7?

 6   **A.**  I am, yes.

 7   **Q.**  Good.  So let's proceed.

 8       I want to actually -- well, first of all, do you see that

 9   this is called "Proposal 1"?

10   **A.**  I do, yes.

11   **Q.**  And do you recall that at the time there were two sort of

12   main proposals on the table?

13   **A.**  (Reviewing document.)

14       At -- at this point in time in May, I don't remember the

15   specific proposals that were --

16   **Q.**  Okay.

17   **A.**  -- being discussed.

18   **Q.**  Let's -- let's go through them and understand --

19   understand what they were.

20       Were you one of the people who put this slide together?

21   **A.**  Again, I don't remember this slide or this deck

22   specifically.

23   **Q.**  But slides like these, were you involved in putting those

24   together, explaining the -- the high level what the proposal

25   is?

1  **A.**  I -- again I don't remember the slides specifically, but

2  slides related to this topic, yes.

3  **Q.**  Okay.  So let's begin at the bottom of the list under --

4  do you see there's a place that says "commission rate"?

5  **A.**  Yes.

6  **Q.**  And so as of May 2023, proposal 1 was that there would be

7  no commission, right?

8  **A.**  That's what it says.

9  **Q.**  And let's go --

10         **THE COURT:**  Do you remember that specifically?  I

11  mean that's a pretty major change.  Do you recall that

12  specifically?

13         **THE WITNESS:**  I -- I remember the discussion of

14  options that included no commission, yes.

15  **BY MR. EVEN:**

16  **Q.**  Okay.  And you remembered that for a long time in many

17  decks, and we can go through a few, but I'm going to try and

18  efficienize [phonetic], and some of this has been covered.

19      For a long time, proposal 1 was a no-commission proposal.

20  Do you recall that?

21  **A.**  I remember that a no-commission option was included in

22  multiple discussions.

23  **Q.**  And do you recall that it was called consistently

24  "proposal 1"?  Proposal 2 was commission.  Proposal 1 was no

25  commission.

1    **A.**  I don't remember the specific numbering.

2    **Q.**  Okay.  Let's go back to the top, see some of the other

3    terms.

4        The first couple of points speak to display placement and

5    display frequency, right?

6    **A.**  (Reviewing document.)

7        Yes.

8    **Q.**  And you recall that those were issues that you considered

9    as part of consideration of these proposals, correct?

10   **A.**  Of all the proposals, yes.

11   **Q.**  Okay.  And the gist of these two points is that the

12   linkout must be independent and outside of the buy flow,

13   correct?

14   **A.**  Yes, that's what the language says.

15   **Q.**  And you recall that that was something that you proposed

16   as part of a no-commission proposal, right?

17   **A.**  I -- I don't remember the specific combinations, but I

18   remember those were elements that were discussed.

19   **Q.**  Okay.  Do you have any reason to doubt that back in May of

20   2023, you and others on the team presented to Mr. Schiller a

21   proposal 1 that was no commission and the placement of the

22   button to be outside or the link to be outside of the buy

23   flow?

24   **A.**  Again, I don't remember the specific presentation that

25   you're discussing right now.

1  **Q.**  It's not a specific presentation.  These are a line of

2  presentations this Court has seen that went on for probably

3  two months.  All of them were proposal 1, no commission, and

4  placement outside of the buy -- buy flow.

5      Is it your testimony you just have no recollection of

6  that?

7  **A.**  That's not my testimony.  I was saying specifically for

8  this presentation, I don't remember who presented it.

9  **Q.**  That wasn't my question, if you remember who presented it.

10     My question was do you recall that at the time there was a

11  proposal on the table consistently for a couple of months

12  saying no commission, placement outside of the buy flow?

13  **A.**  I remember that option being discussed.  I don't remember

14  in which presentations.

15  **Q.**  You understand it's being discussed in this presentation,

16  correct?

17  **A.**  Yes.

18  **Q.**  Okay.  And what this means is that if the app displays

19  something for purchase, an IAP buy button could be placed

20  right next to that item, but the linkout option would have to

21  be placed on some other page in the app, correct?

22  **A.**  That's my general understanding, yes.

23  **Q.**  That is your understanding, correct?

24  **A.**  Yes.

25  **Q.**  There's nothing in the injunction from this Court that

1    says that steering links may be required to be outside of the

2    purchase flow, correct?

3    **A.**   I don't think there's anything specific in the injunction

4    language about the placement of the links.

5    **Q.**   And there's nothing that says Apple will not prevent

6    steering, but it's allowed to tell people to put the steering

7    link in some hidden place, require people to put it in some

8    hidden place; that's not in the injunction, correct?

9    **A.**   That language is not in the injunction, but this is not

10    about being in a hidden place, to clarify.

11    **Q.**   Okay.  Going to the key risks part of the slide, the first

12    one speaks about the fact that this proposal diverges

13    significantly from existing and future approaches, correct?

14    **A.**   Yes.

15    **Q.**   And the divergence here is that in other jurisdictions,

16    and we talked a little bit about that yesterday, Apple imposed

17    a commission on alternate payment solutions, correct?

18    **A.**   That's correct, yes.

19    **Q.**   And the risk that's identified here is that if Apple

20    imposes no commission on linked-out purchases in the

21    United States, it would be hard for Apple to justify imposing

22    a commission on linked-out purchases or alternative payments

23    elsewhere in the world, correct?

24    **A.**   Sorry.  Can you repeat that question?

25    **Q.**   Sure.

1    The risk -- you see that the divergence is listed as a key

2    risk, right?

3    **A.**  Correct.

4    **Q.**  And the risk that's identified here is that if Apple

5    imposes no commission on linked-out purchases in the

6    United States, it would be harder for Apple to justify and

7    impose commissions on linked-out purchases in other

8    geographies, correct?

9    **A.**  I -- I think there are multiple elements of difference

10   between this and the other geographies.  So I think the risk

11   was related to the entire proposed package here, not just to

12   the commission.

13   **Q.**  Just specifically for the commission, the divergence that

14   was worrying you at the time was that if you put no commission

15   on linked-out channels in the United States, that would make

16   it harder to -- not to -- to impose a commission in other

17   geographies, correct?

18   **A.**  I think again there were multiple differences and so there

19   were multiple risks --

20   **Q.**  And one of those --

21   **A.**  -- identified differences.

22   **Q.**  And one of those was the fear that if you have no

23   commission on link-outs in the United States, it's going to be

24   harder to justify a commission elsewhere in the world,

25   correct?

1    **A.**   Yes, that was one of the differences.

2    **Q.**   That was one of the risks that concerned you at the time,

3    correct?

4    **A.**   One of the elements of the differences that created the

5    risk.

6    **Q.**   Okay.  The next risk is that the no-commission option

7    creates new in-app channel for developers without a

8    commission, right?

9    **A.**   Yes.

10   **Q.**   And that risk is the risk of leakage, right?

11   **A.**   That's one way to frame it, yes.

12   **Q.**   And by leakage, you mean that a lot of developers and a

13   lot of users would prefer the linked-out channel because

14   absent a commission, it would present a lower cost for

15   developers and potentially lower prices for users, correct?

16   **A.**   It would be a way for developers to divert their business

17   from outside of the app where they pay commission to a place

18   where they don't to have pay a commission, correct.

19   **Q.**   And it will be an attractive alternative in that instance

20   because of the lower cost of diverting purchases, diverting

21   billings away from IAP to the linkout option, right?

22   **A.**   With no commission, yes, it would be an extremely

23   attractive option.

24   **Q.**   And the risk therefore is that if a lot of billing shifts

25   away from IAP, Apple's IAP revenues would decline, correct?

1   **A.**   (Reviewing document.)

2   **Q.**   That's the concern?

3   **A.**   Our ability to be compensated for the services and value

4   that we're providing through the App Store would have been

5   inhibited.

6   **Q.**   Sir, not what I asked.  Although I think you're putting it

7   in -- in consultant speak.  But I think that was a yes.

8        Let's just focus on my question.

9        My question was:  The risk that you're identifying here is

10   that if a lot of billings shift away from IAP, Apple's IAP

11   revenues would decline, correct?

12   **A.**   Again, what I said is that the --

13   **Q.**   I heard what you said, sir.

14            **THE COURT:**  Is it yes or no?

15            **THE WITNESS:**  Yes.  The billings would decline.  But

16   the risk was actually about our ability to be compensated for

17   the value that we're providing.

18            **THE COURT:**  So I've never seen a single document that

19   gives me the actual amount that -- of the value for these

20   services.  I haven't seen a single document.

21            **THE WITNESS:**  We've -- we've produced documents that

22   we discussed in the prior hearing about --

23            **THE COURT:**  I've seen one document that talks about

24   that.

25        He's asking about revenues.  Answer the question about

 1    revenues.

 2           **THE WITNESS:**  Yes, Your Honor.

 3           **THE COURT:**  Proceed.

 4           **MR. EVEN:**  Thank you, Your Honor.

 5    **Q.**  Now, you understand that creating a leakage risk was a

 6    goal at least, if not the goal, of the injunction, right?

 7    **A.**  Roughly, yes.

 8    **Q.**  And so Apple here identifies as a risk the injunction

 9    fulfilling its goal, correct?

10    **A.**  (Reviewing document.)

11         Sorry.  I mean the term "leakage" was not used in the

12    injunction.  But if we're talking about being able to guide

13    users from within an app to outside of an app, then the answer

14    is yes.

15    **Q.**  Well, I think we'll cover it some more, but to be clear,

16    what you're saying here is that, as you said, the -- the

17    no-commission option going to be very attractive to

18    developers, correct?

19    **A.**  Correct.

20    **Q.**  And that would cause a lot of developers to adopt the

21    linkout options, correct?

22    **A.**  That's correct.

23    **Q.**  And that would create competitive pressure on IAP,

24    correct?

25    **A.**  It would -- it would drive -- yes, spend outside of the

 1   app.

 2   **Q.**  And that would be competitive pressure, correct?

 3   **A.**  It would -- it would be driving spend outside of an app

 4   for a variety of reasons.

 5   **Q.**  Okay.  It would be driving spend out of an app for a

 6   cheaper option, correct?

 7   **A.**  A cheaper option which isn't the same as the value that

 8   we're providing through the app in the App Store.

 9   **Q.**  I understand, sir.  You you're -- you have your points,

10   but you need to answer my question right now.

11       So the question was it's going to be driving spend outside

12   of the app to a cheaper option, correct?

13   **A.**  Correct.

14   **Q.**  And --

15           **THE COURT:**  And --

16   **BY MR. EVEN:**

17   **Q.**  -- that is a competitive pressure, correct?

18   **A.**  Yes.

19   **Q.**  And what you're saying here, or what your team was saying

20   here back in May, is that creating that competitive pressure,

21   which is the goal of the injunction, is a risk factor, a key

22   risk factor, correct?

23   **A.**  We didn't say it in those words, but yes.

24   **Q.**  Okay.  Reading down the list of other risks, do you see

25   that there is a point about more restrictive policies?  Do you

1    see that?

2    **A.**    (Reviewing document.)

3        Yes.

4    **Q.**    Now, you understand that because the injunction said

5    nothing about restricting placement or format or language of

6    the steering prompt, Apple foresaw that imposing such

7    restrictions could be determined to be not compliant, right?

8            **MS. RICHMAN:**    Objection, Your Honor.

9            **THE COURT:**    Sustained.

10    **BY MR. EVEN:**

11    **Q.**    Apple's entitlement program does impose placement and

12    design restrictions of the sort discussed on this slide,

13    correct?

14    **A.**    It does have restrictions similar to some of those

15    discussed on this slide.

16    **Q.**    Now, between May 2023 and January 2024, Apple never sought

17    clarification from this Court on whether placement and design

18    restrictions of this kind are permissible for Apple to do

19    under the injunction, correct?

20    **A.**    I'm not aware of whether we asked for guidance from the

21    Court.

22    **Q.**    Okay.  So you're not aware of Apple doing that, correct?

23    **A.**    I'm not aware.

24    **Q.**    Turning to page 10 of the deck, do you see we have a slide

25    titled "Proposal 2"?

```
 1    A.  (Reviewing document.)

 2        Is this Slide 11?

 3    Q.  Slide 11.  Sorry.

 4        (Exhibit published to witness, counsel, and the Court.)

 5            THE WITNESS:  Yes.

 6            UNIDENTIFIED SPEAKER:  Do you see it?

 7            MR. EVEN:  Let's take it down from the public.

 8            THE COURT:  If it's redacted --

 9            MR. EVEN:  If it's redacted, we can put it up.  Thank

10    you.

11        (Exhibit published to witness, counsel, and the Court.)

12    BY MR. EVEN:

13    Q.  And if we go --

14            THE COURT:  It can be published.

15                    (Exhibit published.)

16            MR. EVEN:  It is.

17            THE COURT:  It was not.

18            MR. EVEN:  Oh, it's not?

19            THE COURT:  So it will be now.

20            MR. EVEN:  Okay.

21            MR. BYARS:  It's redacted.

22                (Off-the-record discussion.)

23            THE COURT:  Don't worry.

24            MR. BYARS:  Sorry.  We redacted the bullet that Apple

25    identified.
```

 1              **MR. EVEN:**  Okay.

 2     **Q.**  So on Slide 11, do you see that under proposal 2, if you

 3     go all the way down, there is a commission rate that says

 4     "Discounted Commission."

 5         Do you see that?

 6     **A.**  (Reviewing document.)

 7         Yes, I do.

 8     **Q.**  And what that means is that Apple would impose a

 9     commission on linked-out transaction that is somewhat lower

10     than the commission on transactions going through IAP,

11     correct?

12     **A.**  Yes.

13     **Q.**  And as we already discussed, that is the commission model

14     that Apple employed in Korea and the Netherlands, correct?

15     **A.**  (Reviewing document.)

16         Approximately, yes.

17     **Q.**  Going to the top of the list on the left, do you see that

18     proposal 2 would allow for the link to be displayed anywhere

19     including in the merchandising page; do you see that?

20     **A.**  I do, yes.

21     **Q.**  So going back to the example we used before, if an app

22     offers something for purchase under proposal 2, both the IAP

23     buy button and the linkout purchase option could be shown on

24     the same page essentially side by side, right?

25     **A.**  That's my reading of this document.

1    **Q.**  And that's your recollection of a proposal that was on the

2    table at the time for a commission-based option, right?

3    **A.**  Again, we had a lot of variations, but I do remember one

4    variation where the merchandising was happening on the same

5    page as the merchandising of IAP.

6    **Q.**  And then we see the proposal 2 also has no pricing

7    language restrictions, right?

8    **A.**  (Reviewing document.)

9         Yes, appears so.

10   **Q.**  So if we take proposal 1 and 2 and put them next to each

11   other, proposal 2 trades fewer user interface restrictions for

12   charging a commission on linked purchases; is that right?

13   **A.**  I wouldn't describe it as a trade.  Those are the

14   differences between the two options.

15   **Q.**  Well, one would have a commission and fewer restrictions,

16   one would have no commission and more restrictions; is that

17   fair?

18   **A.**  That's the -- the right description of the two.

19   **Q.**  But you just wouldn't call that a trade, for some reason?

20   **A.**  No.

21   **Q.**  Okay.

22        **THE COURT:**  Okay.  What am I missing?  Why isn't it a

23   trade?

24        **THE WITNESS:**  I -- these are the two options that

25   were presented in this deck.

```
 1              THE COURT:  Why isn't it a trade?

 2              THE WITNESS:  I don't see those things as being

 3     trade-offs.  They're just different elements of the proposals.

 4              THE COURT:  So one doesn't have value?

 5              THE WITNESS:  I'm sorry.  I don't understand the

 6     question.

 7              THE COURT:  Well, if you're -- if you're -- if you

 8     are charging a commission and you put that side by side with

 9     proposal 1, but you're having fewer restrictions as a result

10     of charging a commission, that would seem to me to be a trade.

11              THE WITNESS:  I don't remember it as a trade.  I just

12     remember those as two options that we were discussing at the

13     time.

14              THE COURT:  Did you ever have a proposal where you

15     did not charge a commission and did not have the restrictions

16     that were being imposed by charging a commission?

17              THE WITNESS:  I don't remember.

18              THE COURT:  But if you did, it would be in these

19     documents, right?

20              THE WITNESS:  I assume so, yes.

21              MR. EVEN:  May I proceed, Your Honor?

22              THE COURT:  You may.

23              MR. EVEN:  Thank you.

24     Q.  Turning to Slide 9, 272.9.  This is a chart of revenue

25     impacts under proposal 1, correct?
```

1    **A.**  Correct, yes.

2    **Q.**  Now, on the left-hand side, we have a column with the

3    heading "Developer Count."  Do you see that?

4    **A.**  Yes.  It's hard to read, but I can see it.

5    **Q.**  And what those numbers represent are the number of top

6    developers that may adopt linkout transactions, correct?

7    **A.**  I believe that is correct.

8    **Q.**  And when I say "top developers" that's because we are

9    actually looking at the top.  So, for example, the number ten

10   speaks to the top ten developers on the App Store, correct?

11   **A.**  Yeah.  But for clarification, I believe that's the top ten

12   developers in the U.S. App Store.

13   **Q.**  Okay.  Thank you for that clarification.

14       And the number 200, for instance, would speak to the top

15   200 developers on the U.S. App Store by revenue, correct?

16   **A.**  Yes.

17   **Q.**  Now, the next column talks about total billings, right?

18   **A.**  Correct.

19   **Q.**  And so without saying any of the numbers, because that's

20   not allowed in -- in open court, what we see here are that the

21   billings -- are the billings generated by these top

22   developers, correct?

23   **A.**  Yes.

24   **Q.**  And so the top 200 developers, for instance, account for

25   that number of billions of billings reflected in the cell to

1    the right of the number 200, correct?

2    **A.**   That's correct.

3    **Q.**   Now, billings refers to the total value of in-app

4    transactions generated by these developers, correct?

5    **A.**   In-app transactions for digital goods and services only.

6    **Q.**   Okay.  And Apple's revenue is going to be around 25,

7    26 percent of the numbers in this column, correct?

8    **A.**   That's roughly correct.

9    **Q.**   Moving to the right, we see at the top a heading customer

10   adoption, right?

11   **A.**   (Reviewing document.)

12       Yes.

13   **Q.**   And the percentages here refer to the percentage of

14   customers that use linkout transactions and therefore take

15   billings outside Apple's IAP, correct?

16   **A.**   I don't remember at this point, but that's the assumption

17   that we used later on.

18   **Q.**   Okay.  But that's how you would read this slide sitting

19   here today, correct?

20   **A.**   That would be.  It's similar to ones we ended up using

21   later as well.

22           **THE COURT:**  Do we have a time frame for this slide?

23           **MR. EVEN:**  This slide is from May 2023, Your Honor.

24           **THE COURT:**  No, but over what -- a period of what

25   time?

 1              **MR. EVEN:**  Oh, I can ask the witness.

 2    **Q.**  These are annual revenue --

 3                   (Simultaneous colloquy.)

 4              **THE WITNESS:**  That would be my guess.  It's --

 5    there's a box in the upper right side and sometimes it would

 6    say if there's a specific year.  But I believe looking at

 7    these roughly that this is an annual revenue number.

 8    BY MR. EVEN:

 9    **Q.**  And so in May 2023, that would be annual revenue

10    presumably based on 2022 or 2023 forecasts?

11    **A.**  Yeah.  I -- I have a hard time reading the slide 'cause

12    it's so small and it's grayed out, but I believe it's roughly

13    an annual revenue.

14              **THE COURT:**  So you think --

15                   (Simultaneous colloquy.)

16              **THE COURT:**  -- this is annual, not from the 12 months

17    preceding but from some other year?

18              **THE WITNESS:**  It would have likely been the 12 months

19    preceding, whatever the most recent annual number would have

20    been.

21    BY MR. EVEN:

22    **Q.**  And so what we're showing here really is a measure of

23    leakage, right?  That's what you're modeling here?

24    **A.**  (Reviewing document.)

25         This is the percentage of developers that -- or sorry --

1  customers that would have adopt [sic] and so billings that

2  would have gone through the linkout.

3  **Q.**  And that's leakage, right?

4  **A.**  Yes, that's one definition.

5  **Q.**  And so -- and what you're looking at here is the numbers

6  or the impact to Apple's revenue based on how many top

7  developers may use the linkouts and the number of customers of

8  those developers that would actually opt to use the linkouts,

9  correct?

10  **A.**  Yes.  I -- this looks roughly similar to slides that we've

11  looked at later, but I think our assumptions would have

12  evolved over the subsequent weeks.

13  **Q.**  Okay.

14  **A.**  But that seems roughly correct.

15  **Q.**  Okay.  So we're now looking as of May.  So I want to focus

16  on that.

17      Now, the magnitude of Apple's revenue loss in this chart

18  is going to be dependent on those two factors, meaning how

19  many of the top developers actually adopt linkouts and how

20  many customers of these developers then opt to use the

21  linkout, correct?

22  **A.**  I think those are the two factors that we're looking at in

23  this specific slide.  There are other factors that would be

24  incorporated in later variations on this slide.

25  **Q.**  Understood.

1          Now, on this chart, the top two rows are grayed out,

2    right?  Shaded.

3    **A.**  (Reviewing document.)

4          It looks to be the case.  It looks almost completely

5    dark --

6    **Q.**  Okay.

7    **A.**  -- on my slide.

8    **Q.**  Okay.  And you understand that the reason for this is that

9    Apple assumed as of May 2023, that if it imposed no

10   commission, certainly most large developers and potentially

11   thousands of medium or maybe even small developers would offer

12   linkout purchases to their users, correct?

13   **A.**  I think we assumed that they would have high adoption.

14   **Q.**  That's a "yes," then?

15   **A.**  Yes.

16   **Q.**  And what we see here, without reading aloud the numbers,

17   are very large revenue losses to Apple especially if 20 or

18   25 percent of users adopt linked-out transactions, correct?

19   **A.**  (Reviewing document.)

20         Yes.

21   **Q.**  Let's turn to 272.13.

22                      (Exhibit published.)

23   **BY MR. EVEN:**

24   **Q.**  Do you see that this is a very similar slide, but it reads

25   "Proposal 2 cost of payment discount revenue impact minus

1    3 percent scenario"?

2    **A.**  (Reviewing document.)

3       Yes.

4    **Q.**  A 3 percent scenario here refers to a 3 percent difference

5    between the commission on transactions conducted using IAP and

6    linked-out transactions, right?

7    **A.**  Yes.

8    **Q.**  So a 30 percent IAP transaction would be subject to a

9    27 percent fee if used through a linkout, correct?

10   **A.**  Yes.  I -- I don't think we had thought through all the --

11   all the nuances at that point, but that's roughly, I think,

12   where this would probably have been modeled on.

13   **Q.**  Okay.  And the nuances, you mean what to do with people

14   who are subject to 15 percent and special programs and all

15   that?

16   **A.**  That's correct.

17   **Q.**  Right?

18      Okay.  Now, in this slide, the rows for 200 developers and

19   all developers are shaded, right?

20   **A.**  That's correct, yes.

21   **Q.**  And that is because Apple expected that a linked-out

22   option that is subject to a 27 percent commission might only

23   be attractive to the very largest developers, here represented

24   by the top ten and top 50 developers, correct?

25   **A.**  We assumed that if it was charged, again in this case in

1    perpetuity on those transactions, yes, then it would be only

2    more attractive to the largest developers.

3    **Q.**  Not even the two -- the top 200 based on this slide, just

4    the top ten or 50, correct?

5    **A.**  I don't -- I don't remember specifically the ranges, but

6    that's what's boxed out in this slide.

7    **Q.**  Okay.  Now, before we looked at the no-commission slide,

8    that looked only at leakage of zero to 25 percent of users.

9    The highlighted box drawn in this slide suggests that Apple

10   believed that these large developers could push out between

11   20 to 50 percent of their users to use outside links, correct?

12   **A.**  That's what the box indicates.

13   **Q.**  Now, on the next slide, we have a summary comparing the

14   two proposals, commission and no commission.

15       Do you see that on Slide 14?

16   **A.**  I do, yes.

17                       (Exhibit published.)

18   **BY MR. EVEN:**

19   **Q.**  And all the way at the bottom, Apple's estimate as of

20   May 2023 was that the revenue hit to Apple would be over an

21   order of magnitude larger under the no-commission option than

22   under a 27 percent commission option, correct?

23   **A.**  Correct.  And that's the 27 percent in perpetuity

24   commission option at this point.

25   **Q.**  Okay.  And that reflects both the fact that adoption --

1    well, let me step back.

2        That reflects primarily the fact that Apple believed that

3    adoption would be far -- far more extensive under the

4    no-commission model.  That's one factor that went into it,

5    correct?

6    **A.**  (Reviewing document.)

7        I'd have to look more closely to figure out which are the

8    elements that are driving it, whether it's the amount of

9    billings adoption happening by customers or the amount of --

10   of developers adopting it.  Those are both factors that play a

11   role in the range.

12   **Q.**  Okay.  Do you recall that we just looked at it and

13   actually the assumption was that more users of the -- of the

14   affected developers would be diverted under the commission

15   model?

16   **A.**  Yes, I do remember that.

17   **Q.**  Okay.  In any event, the assumption here is, in order of

18   magnitude, bigger loss to Apple from a no-commission model,

19   correct?

20   **A.**  Yes, the no-commission model in perpetuity.

21   **Q.**  And just to be clear, because we've seen what proposal 1s

22   and 2 are, that assumption assumes the trade-off between a

23   no-commission and a lot of restrictions and a commission with

24   no restrictions, correct?

25   **A.**  Again, I think those are encaptured in those two

OLIVER - DIRECT (RESUMED)/ EVEN

1    proposals.

2    **Q.**  Okay.  And so fair to assume that a no-commission,

3    no-restriction proposal would potentially cause even higher

4    losses to Apple, correct?

5    **A.**  I -- I don't think we looked at that specifically, in this

6    slide.

7    **Q.**  I'm not asking if you looked at it this slide.  It stands

8    to reason, and you looked at it elsewhere, that if the link is

9    in the purchase flow, you're going to see more leakage,

10   correct?

11   **A.**  That's -- I think that's fair to assume.

12   **Q.**  All right.  You can leave this document.

13        I want to talk a little bit what happens in the following

14   weeks.

15        So a couple weeks later on June 1, 2023, you attended a

16   meeting titled "Epic Injunction Implementation" which included

17   Tim Cook, Luca Maestri, Phil Schiller, and other executives.

18        Do you remember that?

19   **A.**  Sorry.  What was the date again?

20   **Q.**  June 1, 2023.

21   **A.**  I remember a meeting in -- on that date, yes.

22   **Q.**  Okay.  And the purpose of this meeting was to discuss how

23   Apple would implement the injunction, correct?

24   **A.**  I believe it was our first meeting on the injunction, yes.

25   **Q.**  And you assisted with creating and finalizing a

1    presentation for this meeting, correct?

2    **A.**  I did, yes.

3    **Q.**  Do you have a copy of this slide deck on your computer?

4    **A.**  I believe -- if it's not on my computer locally, it would

5    probably be in a shared cloud storage or in a box folder.

6    **Q.**  Okay.  If you look at CX499.

7    **A.**  (Reviewing document.)

8    **Q.**  Do you see that?

9    **A.**  I do, yes.

10   **Q.**  And this is a June 1, 2023, I-message conversation between

11   you, Ann Thai, and Shawn Cameron, correct?

12   **A.**  Yes, it looks so.

13          **MR. EVEN:**  We move to admit, Your Honor.

14          **THE COURT:**  Any objection?

15          **MS. RICHMAN:**  No objection, Your Honor.

16          **THE COURT:**  It's admitted.

17              (Exhibit 499 received in evidence.)

18   **BY MR. EVEN:**

19   **Q.**  Now the time stamp on these messages is just after

20   midnight Greenwich Mean Time.  Do you see that?

21              (Exhibit published.)

22          **THE WITNESS:**  Yes, it looks -- looks like that's the

23   case.

24   **BY MR. EVEN:**

25   **Q.**  And so the conversation took place in the afternoon on

1    May 31st, 2023, California time, right?

2    **A.**  That seems right.

3    **Q.**  And you're asking Mr. Cameron whether he's sending the

4    Wisconsin deck to Phil.  Do you see that?

5    **A.**  Yes.

6    **Q.**  And this would be the Wisconsin deck for the June 1

7    meeting with Mr. Cook and the entire executive team, correct?

8    **A.**  I don't know specifically, but I think that's fairly safe

9    to assume given the dates.

10   **Q.**  Okay.  And you're next telling Mr. Cameron that if he is

11   going to send, you can help finalize the deck and email,

12   right?

13   **A.**  Yes.

14   **Q.**  And Mr. Cameron is asking you whether all the edits are in

15   and is it cleaned up, and he's saying he's on grill duty for

16   another hour, correct?

17   **A.**  Yes.

18   **Q.**  And you respond to say you're almost done from your end,

19   and Ms. Thai is stating she has no further edits, right?

20   **A.**  That looks to be the case, yes.

21   **Q.**  Okay.  And you were putting in edits that are on the

22   business side, right?

23   **A.**  I would assume so, yes.

24   **Q.**  And Ms. Thai, what was her role in terms of editing this

25   slide deck?

1   **A.**   She was doing work with the legal team and design team on

2   some of the design and product elements.

3   **Q.**   Okay.  And you asked Mr. Cameron, who's a lawyer, to send

4   it out to the group, correct?

5   **A.**   It was a collaborative document.  So it looks like I did

6   ask Sean if he was sending it out.

7   **Q.**   Okay.  Do you have a policy of asking lawyers to send

8   slide decks?

9   **A.**   No.

10   **Q.**   Is there a reason why you asked Mr. Cameron to send out

11   the deck even though he was on grill duty and even though you

12   and Ms. Thai were making the final edits?

13   **A.**   I think we were all likely making edits in the deck,

14   including Sean's team.  So I don't remember why Sean sent that

15   deck.

16   **Q.**   Well, Sean was telling you -- was asking you are all edits

17   in, right?

18   **A.**   I see that, yes.

19   **Q.**   Well, let me put the question differently.

20       Do you have any idea why no version of this June 1 meeting

21   deck, final or draft, was ever produced to Epic in this

22   litigation?

23   **A.**   I do not, no.

24   **Q.**   All right.  Let's turn to Exhibit CX1104.

25   **A.**   (Reviewing document.)

1    **Q.**  That's already been admitted.  And these are notes titled

2    "Wisconsin Proposal 6/1."

3        Do you see that?

4    **A.**  Yes.  Sorry, I'm just -- 1104.  I'm just trying to find

5    the document.

6            **THE COURT:**  We don't have it in this particular book.

7        Could be in a prior book.

8            **MR. EVEN:**  Oh, sorry.  You would find it as under

9    CX0221.  It's the same document.  I apologize.  I just used

10   the number of the document that was admitted.

11           **THE WITNESS:**  (Reviewing document.)

12           **THE COURT:**  Okay.  Thank you.

13           **THE WITNESS:**  Yes.

14   **BY MR. EVEN:**

15   **Q.**  Did you take these notes?

16   **A.**  No, I don't believe so.

17   **Q.**  In any event, these are notes from the meeting with

18   Mr. Cook on June 1, right?

19   **A.**  I do not know.

20   **Q.**  You don't see that these are Wisconsin Proposal 6/1, and

21   these are notes and that was the date of the meeting?  That

22   doesn't stand to reason that these are notes from that

23   meeting?

24   **A.**  (Reviewing document.)

25       Would you mind if I look --

1    Q.  Sure.

2    A.  -- more closely?

3        (Reviewing document.)

4        So I'm -- I'm not certain exactly what these are.  I see

5    the date.  I remember a meeting on that date.

6    Q.  Okay.

7    A.  But I don't have any memory of these notes.

8    Q.  All right.  Do you have an understanding how these notes

9    got to you?

10   A.  No.

11   Q.  All right.

12       You recall that at the meeting there was discussion that

13   July 5th is going to be the compliance date?

14   A.  I don't remember that in a meeting specifically, but I

15   remember early July being a focus for compliance.

16   Q.  All right.  Let's look at the first set of bullets.

17       Do you see that the finance team was told to look at the

18   business impact of options 1 and 2, right?

19   A.  (Reviewing document.)

20       I see that, yes.

21   Q.  And you understand or recall that options 1 and 2 are the

22   no-commission and commission options respectively, right?

23   A.  I -- I'm sorry, I don't remember which is which or what

24   the variations on those are.

25   Q.  Even after we just went through the slide deck from May,

```
 1    you still don't remember that option 1 was always the no

 2    commission; option 2 was always the commission?

 3    A.   I -- I don't remember which options were which.

 4    Q.   Okay.

 5              THE COURT:  It's okay.  Where is the June 1st deck?

 6              MS. RICHMAN:  Your Honor, that deck, I understand,

 7    has been upheld by the special masters as privileged.

 8              THE COURT:  I can't imagine how it could be

 9    completely privileged.  And I'd like a copy.

10              MS. RICHMAN:  Oh, and --

11              THE COURT:  I'd like a copy of the June 1 deck.

12              MS. RICHMAN:  Understood, Your Honor.

13        I'm just trying to understand the chain of events.  And I

14    think that has been appealed to Magistrate Judge Hixson.

15              THE COURT:  Well, I'll take it now and I'll make a

16    ruling.

17              MS. RICHMAN:  Okay.  We will get it for you.

18              THE COURT:  We'll stand in recess.

19        Do not talk to anyone.

20        You can step down.  I want the courtroom sealed.  So

21    anybody who's not a party must leave the courtroom.

22        You need to leave.

23              MR. BORNSTEIN:  Your Honor, a question of

24    clarification on personnel.  May we have in-house counsel for

25    the parties remain?
```

1          THE COURT:  Yes.

2          MR. BORNSTEIN:  Thank you, Your Honor.

3      (Recess taken at 9:37 A.M.; proceedings resumed at

4   9:58 A.M.)

5

6                  *      *      *      *      *

7              (The transcript of proceedings at pages 1479

8   through 1490 are under seal and bound separately.)

1                    *      *      *      *      *

2                (The transcript of proceedings at pages 1479

3    through 1490 are under seal and bound separately.)

4        (proceedings in open court continue as follows:)

5            **THE COURT:**  While we're waiting, does this not have

6    an exhibit number?  Because it was -- what's the next in

7    order?

8            **MR. EVEN:**  We will -- I don't know off the top of my

9    head, but we will give it an exhibit number if we --

10           **THE COURT:**  We're going to need it for purposes of

11   the record.

12           **MR. EVEN:**  859?

13           **THE COURT:**  We will call that document CX859.

14               (Witness reentered the courtroom.)

15           **THE COURT:**  Have a seat, sir.

16       Okay.  We're back on the record.

17       The record will reflect that the Court has been addressing

18   issues regarding attorney-client privilege with the parties in

19   closed session.  Those issues are now resolved.

20       And you may proceed.

21           **MR. EVEN:**  Thank you, Your Honor.

22   **Q.**  Mr. Oliver, welcome back.

23       We were talking about a document that's already in the

24   record, CX1104.  In your binder, it's under tab marked 221,

25   but it's the same document.

 1          Do you remember that?

 2   **A.**   Yes.

 3          (Exhibit published to witness, counsel, and the Court.)

 4   **BY MR. EVEN:**

 5   **Q.**   And those are June 1 Wisconsin Proposals and they seem

 6   like notes from a meeting, correct?

 7   **A.**   Yes, that appears to be correct.

 8   **Q.**   Okay.  And you see that at the top there's something that

 9   says "Next Steps," correct?

10   **A.**   Yes, I see that.

11   **Q.**   And you see that it says finance team to look at impact to

12   the business of both option 1 and 2.

13          Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   Okay.  If you go to the next step, the second bullet there

16   states that your team, the business team, would define the

17   two, three scenarios where Apple can limit the ruling where

18   Tim, Phil, and legal are comfortable with, right?

19   **A.**   Yes, that's what it says.

20   **Q.**   "Tim" here is a reference to Mr. Cook, right?

21   **A.**   I believe so, yes.

22   **Q.**   And "Phil" is a reference to Mr. Schiller, right?

23   **A.**   Yes.

24   **Q.**   And so one of the goals for your team coming out of this

25   meeting was to come up with limitations on the type of

1    steering the developers can engage in, in terms of design and

2    placement, correct?

3    **A.**   My team was not focused on doing any work related to where

4    the placements of the links were.

5    **Q.**   Okay.  Whose team did that?

6    **A.**   It -- not my team.

7    **Q.**   That's not what I asked, sir.  Whose team did that?  It

8    says business.  You're the business person.  Whose team did

9    that?

10   **A.**   It may have been the product and design teams.

11   **Q.**   Okay.  And you understand the reference to finding

12   limitations that Mr. Cook, Mr. Schiller, and the legal team

13   were comfortable with reflects the understanding that no

14   limitations were mentioned in the injunction itself so any

15   limitations would raise some risk, correct?

16   **A.**   I -- I don't exactly understand the language of this

17   sentence in terms of what it means by "limit the ruling."

18   **Q.**   You don't understand what it says by "limit the ruling"?

19   **A.**   No, I don't.

20   **Q.**   That's your testimony?

21   **A.**   Yes.

22   **Q.**   Okay.  You understand that Mr. Cook and Mr. Schiller, with

23   advice of counsel, et cetera, were, based on this, supposed to

24   be the arbiters of what Apple considered would be an

25   acceptable level of risk to limit the injunction in terms of

1    placement and design?

2    **A.**  Based on the guidance of counsel, about what they felt was

3    acceptable.

4    **Q.**  Okay.  So if you go to the heading "Option 2, Charging a

5    Commission."  That's on the second page.

6    **A.**  Yes.

7                          (Exhibit published.)

8    **BY MR. EVEN:**

9    **Q.**  Do you see that the thinking at the time was -- it says,

10   "If you want to charge a commission, you have to give them

11   better placement."

12       Did I read that correctly?

13   **A.**  Yes, that's what it says.

14   **Q.**  And you recall that that was the thinking at the time?

15   **A.**  I -- I don't recall -- I assume this was a note from a

16   conversation during the meeting.

17   **Q.**  Okay.  And that would be the meeting with Mr. Cook and

18   others, correct?

19   **A.**  Yes.

20   **Q.**  Now, conversely, if you don't charge a commission, it says

21   you need to lock it down to a plain URL link and

22   Internet-style button.  Do you see that?

23   **A.**  I do yes.

24   **Q.**  Now, talking about the first bullet point, the "better"

25   here is in comparison to a world where Apple does not impose a

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    commission, right?

2    A.   (Reviewing document.)

3        Better placement.  That would seem to be a reasonable

4    reading of this, but I -- I don't know for sure.

5    Q.   And when it says under the next bullet, "if we don't

6    charge a commission, you need to lock it down," by

7    implication, the thinking at the time was that in a commission

8    model, developers would have more freedom in terms of link

9    design and would not be limited to a plain URL link and

10    Internet-style buttons, right?

11    A.   My assumption is that this may have been an individual in

12    the meeting who made a comment to this -- to this position.

13    I'm not sure specifically who said that.

14    Q.   Certainly the notes don't suggest that Mr. Cook or anybody

15    said no, that's a bad idea, right?

16    A.   It does not suggest that.

17    Q.   And what it does suggest is that the thinking at the time

18    was that there is a trade-off between the two things, between

19    the commission and the placement and design restrictions,

20    correct?

21    A.   (Reviewing document.)

22    Q.   That's what the note says.  If you want to do one, you

23    have to do the other, and vice versa.  That's what a trade-off

24    is, correct?

25    A.   I'm -- I'm reading the note.  I assumed that this was a

1    statement made by someone in the meeting.

2    **Q.**  Could it be a statement made by Mr. Cook in the meeting?

3    **A.**  I don't know.

4    **Q.**  Okay.  You understand that the note, assuming that the

5    notes reflect what occurred in the meeting, the note suggests

6    that the thinking was that these two things are a trade-off,

7    correct?

8    **A.**  I assume that someone made that statement in the meeting.

9    I don't know specifically who.

10   **Q.**  And you understand that that statement reflects a

11   trade-off between the commission and the restrictions on

12   placement and design, correct?

13   **A.**  Specifically in terms of the design, I don't think it says

14   anything about the placement in that bullet.

15   **Q.**  Sir, you understand that the idea here was that Apple, at

16   the June 1 meeting, had the thinking that we need to make this

17   unattractive either by imposing a high commission or by making

18   it really hard for users to use one or the other?

19   **A.**  No, I don't agree with that.

20   **Q.**  You don't agree with that?

21   **A.**  No.

22   **Q.**  Okay.  Apple, in fact, at the end chose both a commission

23   and restrictions, right?

24   **A.**  They chose to -- we ended up using different elements to

25   make it clears to users what they were --

1    **Q.**  You ended up imposing a commission, right?

2    **A.**  Correct.

3    **Q.**  And you ended up restricting placement and design,

4    correct?

5    **A.**  We provided templates and -- we instructed where the

6    placement could --

7    **Q.**  Sir, this says you need to lock it down to a plain URL

8    link and Internet-style button.  That's exactly what you did.

9    You locked it down to a plain URL link and Internet-style

10   buttons, collect?

11   **A.**  Again, that's not discussing placement, it's discussing

12   the style.

13   **Q.**  I understand.  And that's what you did.  This restriction

14   you actually imposed, correct?  You locked it down to a plain

15   URL link and Internet-style button, correct?

16   **A.**  That is similar to what we ended up doing, yes.

17   **Q.**  And in addition, you also restricted placement to make it

18   outside of the buy flow, correct?

19   **A.**  That's correct.

20   **Q.**  Okay.  Let's move on two weeks more.  And June 13, you

21   attended a meeting of a group referred to as the Wisconsin

22   Team Commission.

23        Do you recall that being a group?

24   **A.**  Yes.

25   **Q.**  And do you remember that you attended a meeting in June 13

1    or thereabouts?

2    **A.**  I -- yes.  I was attending a number of meetings in June on

3    this topic.

4    **Q.**  You recall that you worked on a presentation for this

5    meeting with Mr. Kim and Mr. Vij?

6    **A.**  Again, I was working on a number of different

7    presentations.  I don't remember specifically for this

8    meeting.

9    **Q.**  Okay.  So let's turn to Exhibit CX274.

10        And this is a presentation titled Pricing Options.  And

11    based on the metadata, it is dated June 12, 2023.

12        Do you see that?

13            **MR. EVEN:**  Let's not publish yet.

14            **THE WITNESS:**  (Reviewing document.)

15        I see the document.  And I see the date on the first

16    page -- or the date, first slide.

17    **BY MR. EVEN:**

18    **Q.**  Okay.  And this would have been a deck that you would have

19    worked on back in June of 2023, correct?

20    **A.**  Mind if I take a quick look at it?

21    **Q.**  Sure.

22                (Off-the-record discussion.)

23            **THE WITNESS:**  All right.  This is a --

24            **THE COURT:**  Hold on.  Let her get situated.

25            **THE WITNESS:**  Sorry about that, Your Honor.

 1                    THE COURT:  Let us know when you're ready.

 2                    THE COURT REPORTER:  I'm ready.  Thank you, Your

 3     Honor.

 4                    THE COURT:  Go ahead.

 5                    THE WITNESS:  I don't remember this deck

 6     specifically, but I remember decks similar to this one.

 7     BY MR. EVEN:

 8     Q.   Okay.  So you -- you remember that there were decks that

 9     seemed the same as this, but you don't remember if this is a

10     particular draft that you had in your -- in your files?

11     A.   Correct.

12     Q.   Okay.  You're certainly familiar with the contents of the

13     deck and at what the thinking was around it at the time,

14     correct?

15     A.   I would assume so, yes.

16     Q.   Okay.  You know so, correct?  It's a simple question.

17     Either you are familiar or you're not familiar.

18     A.   Generally familiar about this topic.  I don't remember if

19     this deck specifically.

20                    MR. EVEN:  All right.  I move to admit this exhibit,

21     Your Honor.

22                    THE COURT:  No objection?

23                    MS. RICHMAN:  No.  Your Honor, this is subject to our

24     standing objection.  And also there's some language reflected

25     in the deck that's similar to the language that's been

1    redacted on -- in other documents this morning.

2            THE COURT:  Similarity of language is not the key

3    component.  The question is where is the attorney listed, and

4    I see none.

5            MS. RICHMAN:  Well, Your Honor, I would say that that

6    reflects advice from attorneys.

7            THE COURT:  Well, you would say that.  Of course you

8    would.

9            MS. RICHMAN:  Well, I mean --

10            THE COURT:  The question is what is the evidentiary

11    basis for it?

12            MS. RICHMAN:  The evidentiary basis is there was a

13    series of meetings leading up to this with lawyers in which

14    they gave advice on compliance with the injunction.

15            THE COURT:  Okay.  What page?  And who was it?

16            MS. RICHMAN:  Page ending in Bates number 870, under

17    "Considerations" on the right-hand side, the third bullet

18    point.

19            THE COURT:  All right.  I'll sustain it as to that

20    one bullet point.

21            MR. EVEN:  Just so the record is clear, Your Honor,

22    is the document admitted?

23            THE COURT:  The document is admitted with that one

24    redaction.

25            MR. EVEN:  Thank you, Your Honor.

1          **MS. RICHMAN:**  I'm sorry, Your Honor.  My colleague

2    just referred me to page 871, second bullet point under

3    considerations also contains similar language.

4          **THE COURT:**  So the last line, not the entire bullet,

5    but the last line will be redacted.

6          **MS. RICHMAN:**  Thank you, Your Honor.

7          **MR. EVEN:**  May I proceed, Your Honor?

8          **THE COURT:**  Anything else?

9          **MS. RICHMAN:**  That's it.  Thank you, Your Honor.

10          **THE COURT:**  All right.  Admitted with those two

11    redactions.

12          **MR. EVEN:**  Thank you, Your Honor.

13              (Exhibit 274 received in evidence.)

14    **BY MR. EVEN:**

15    **Q.**  If you turn to the second page of the presentation that's

16    274.3.  There were three options for linkout pricing discussed

17    in this presentation.

18        Do you see that?

19    **A.**  I do, yes.

20    **Q.**  One of them is standard commission discount, one of them

21    is time limited discounted commission, and a flat affiliate

22    fee, right?

23    **A.**  Yes.

24        (Exhibit published to witness, counsel, and the Court.)

25    / / /

1    BY MR. EVEN:

2    Q.   The option of not charging a commission is not discussed

3    in this slide deck, correct?

4    A.   It doesn't appear so.

5    Q.   Now turning to the next page titled Option A Standard

6    Commission Discount, Apple would discount the commission on

7    linkouts based on cost of payment.

8         Do you see that?

9    A.   I do, yes.

10            THE COURT:   This can be published.

11        Go ahead.

12   BY MR. EVEN:

13   Q.   And the idea here is again the same was we discussed

14   earlier and the same is in the Netherlands and Korea that

15   Apple would impose a commission on linkout transaction that is

16   slightly lower than the commission charged on transactions

17   made through IAP, correct?

18                      (Exhibit published.)

19            THE WITNESS:   Again in perpetuity.

20   BY MR. EVEN:

21   Q.   And the proposed justification, the second one states,

22   "Our 30 percent commission is fair and defensible."

23        That's what the slide says, right?

24   A.   Yes.

25   Q.   And that is directly contrary to the findings of this

1  Court, right?

2  **A.**  (Reviewing document.)

3      I believe I think the -- the Court found that we needed to

4  do more to justify our 30 percent commission.

5  **Q.**  Sir, the Court found that the 30 percent is unjustified,

6  correct?

7  **A.**  I don't remember the specific language.

8  **Q.**  Okay.  On the right-hand side, there is a set of

9  considerations presenting the pros and cons of these options,

10  correct?

11  **A.**  It looks to be the case, yes.

12  **Q.**  And the first point is that this approach is consistent

13  with what Apple did in Korea and the Netherlands, right?

14  **A.**  That's correct, yes.

15  **Q.**  And that's a pro, correct?

16  **A.**  It doesn't say pro or con, but the language is generally

17  neutral to --

18  **Q.**  Sir --

19  **A.**  -- positive.  It says simplest and most consistent.  So it

20  doesn't say pro.

21  **Q.**  Do you recall that the thinking then at the time by you as

22  somebody working on these slides was that consistency with

23  Korea and the Netherlands was a pro?

24  **A.**  That was one of the elements that we considered, yes.

25  **Q.**  Sir, that was one of the elements you considered as a pro

1  for the discounted commission approach, correct?

2  **A.**  I -- again, I don't remember it as a pro, but I remember

3  it being an element that we considered.

4  **Q.**  Okay.  Going to the last consideration, it says developers

5  will claim that a small discount will not provide enough

6  margin to compete on price.

7      Do you see that?

8  **A.**  Yes.

9  **Q.**  And it says, i.e., difficulties with Netherlands'

10  approach.

11      Do you see that?

12  **A.**  I do, yes.

13  **Q.**  And I get -- I understand the i.e., meaning that in the

14  Netherlands, complaints by developers to that tune were

15  already made, correct?

16  **A.**  I don't remember specifically, but that seems to be the

17  reading from the bullet.

18  **Q.**  You don't remember developers complaining that the

19  27 percent in the Netherlands is too high?

20  **A.**  I think there were multiple points of feedback from

21  developers about the approach in the Netherlands.

22  **Q.**  I mean we looked at feedback from Bumble yesterday.  You

23  remember that they were saying that the Netherlands rate was

24  too high?

25  **A.**  I do remember that, yes.  But I didn't remember the

1  document when we looked at it yesterday.

2  **Q.** Okay.  So your -- your recollection is that developers

3  were not saying that the rate is too high in the Netherlands?

4  **A.** I didn't say that, no.

5  **Q.** Okay.  So I'll ask my question again.

6    Do you recall that in fact this is a true report, there

7  were complaints from developers about the rate being too high

8  in the Netherlands?

9  **A.** I -- again, I don't have specific memory of feedback

10  relative to the Netherlands.

11  **Q.** So when I asked you the first time, sir, you said that you

12  had various feedback.  Now you don't have recollection of any

13  feedback?

14  **A.** Sorry.

15  **Q.** Stick with me, please.

16  **A.** Yeah.

17  **Q.** Do you have a recollection of developers claiming or

18  complaining that the 27 percent in the Netherlands is too

19  high?

20  **A.** I -- I don't have any specific memory of that.

21  **Q.** Okay.

22    Competition on price that's mentioned here between IAP and

23  web sales is a goal of the injunction, right?

24  **A.** Yes.

25  **Q.** Let's now turn to Exhibit CX0251 in your binder.

```
 1                    (Pause in the proceedings.)

 2   BY MR. EVEN:

 3   Q.  Do I understand correctly that these are notes from a

 4   meeting you attended that day?

 5   A.  (Reviewing document.)

 6       Just looking at the notes, I don't remember any notes from

 7   this meeting.  And I don't remember the meeting specifically

 8   itself.  But it looks like notes from a meeting.

 9   Q.  Okay.  And it's note that you took, correct?

10   A.  I don't believe so.

11   Q.  Well, they're -- you're the only custodian of these notes,

12   and you testified last time that you would take notes every

13   now and then at meetings.  So would these be notes that you

14   took?

15   A.  (Reviewing document.)

16       I -- I would be very surprised if these are my notes.

17   Q.  Okay.  They ended up in your files anyway.  Fair to assume

18   that you read them at least?

19   A.  I would not assume that.  I don't think I took these

20   notes.

21            THE COURT:  You went to the June 13th meeting.  That

22   was my understanding, correct?

23            THE WITNESS:  I -- I don't remember the June 13th

24   meeting.  But I went to most of the meetings on this topic.

25            THE COURT:  Well, that was the PowerPoint we were
```

 1   just talking about, June 13th.

 2              **THE WITNESS:**  Sorry.  I thought we were talking about

 3   the June 1st meeting.

 4   **BY MR. EVEN:**

 5   **Q.**  Let me try and help maybe.

 6   **A.**  Yeah.

 7   **Q.**  Take a look at CX509 in your -- in your binder.

 8   **A.**  (Reviewing document.)

 9        Yes, June 13th.

10   **Q.**  Yes.  Do you see that that is an invitation to a June 13

11   meeting titled Wisconsin Team Commission Follow-up?

12   **A.**  Yes.

13   **Q.**  Your name is on it, correct?

14   **A.**  I do.  Yes, I see that.

15   **Q.**  And you accepted that invitation, correct?

16   **A.**  Yes.

17   **Q.**  And I -- fair to assume you attended that meeting,

18   correct?

19   **A.**  I think that's fair to assume.

20   **Q.**  Okay.

21              **MR. EVEN:**  May I admit CX509, Your Honor?

22              **THE COURT:**  I'll admit it.

23              (Exhibit 509 received in evidence.)

24   **BY MR. EVEN:**

25   **Q.**  Going back now CX251.  Do you understand that these are

 1   notes from the meeting you attended coming from your files?

 2   **A.**   They appear to be notes from that meeting, yes.

 3           **MR. EVEN:**  May I admit CX251, Your Honor?

 4           **THE COURT:**  It's admitted.

 5       **MS. RICHMAN:**  Your Honor, objection.  Sorry to be

 6   doing this on the fly, but I believe there's some language

 7   that needs to be redacted.

 8           **THE COURT:**  Well, there's already been language

 9   redacted in my version of 251.

10       **MS. RICHMAN:**  Additional language under the

11   description about one, two, three, four, five, six, seven

12   hashtags down, option 1.

13           **MR. EVEN:**  Your Honor, if I may.  That is exactly the

14   issue we're talking about.  This is clearly a document

15   somebody sat and thought about line by line and left that

16   language in there.

17       **MS. RICHMAN:**  Your Honor, there are multiple meetings

18   at -- multiple lawyers at this meeting.  Jennifer Brown, Kyle

19   Andeer, Ling Lew, Shawn Cameron.

20           **THE COURT:**  Well, if it's -- if it's reflective of

21   what I have redacted in terms of the attorney-client

22   privilege, then that would be consistent.

23           **MR. EVEN:**  May I proceed, Your Honor?

24           **THE COURT:**  Yeah, that one line is redacted.

25           **MR. EVEN:**  Okay.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1          **MS. RICHMAN:**  Your Honor, it also appears under

 2    number 2, commission justification and financial options,

 3    three hashtags down.

 4          **THE COURT:**  None of those people that are referenced

 5    there in talking about it are lawyers.

 6          **MS. RICHMAN:**  That's correct, Your Honor, but that

 7    doesn't mean that they're not reflecting the advice received

 8    from lawyers, including in the room.  This is a notes from a

 9    discussion.  They may have presented on that topic.

10          **THE COURT:**  All right.  I'll allow it.

11          **MS. RICHMAN:**  Thank you, Your Honor.

12          **THE COURT:**  Go ahead.

13          **MR. EVEN:**  I'm sorry, Your Honor, you'll allow it

14    meaning it's sustained or overruled?

15          **THE COURT:**  The request -- the attorney-client

16    request is sustained, the objection.

17          **MR. EVEN:**  So let's keep it off the public screen for

18    now unless we can redact on the fly.  But --

19          **THE COURT:**  If you can redact on the fly, then we can

20    publish.

21       He's saying that he can.

22          **MR. BYARS:**  We have --

23                    (Exhibit published.)

24    BY MR. EVEN:

25    **Q.**  Okay.  So you also have it on the screen now, sir, and do

1    you see that the key takeaways, the first one is present all

2    three options starting with option 1, no commission, to Tim

3    sent over email ASAP.

4        Do you see that?

5    **A.**   Yes, I see that.

6    **Q.**   And the idea here is that the team that we just looked at

7    invited to the June 13 meeting, the Wisconsin team, a large

8    team, would create a slide deck presenting these -- these

9    options and send those to Mr. Cook, correct?

10   **A.**   That seems to be the implication of the line.

11   **Q.**   Okay.  And do you recall that in fact, you did send a

12   slide deck and present a slide deck to Mr. Cook a week later

13   on June 20th?

14   **A.**   Again there were a lot of meetings.  I don't remember the

15   specific date of those meetings.

16   **Q.**   Okay.  But you remember that Mr. Schiller and others

17   instructed group to create slides, explain these points to

18   Mr. Cook, and slides were created, and there were subsequent

19   meetings.  Is that a fair characterization of the process?

20   **A.**   Yes.  We iterated a lot on slides and then shared them a

21   bunch of different forms.

22   **Q.**   Okay.  So -- and Mr. Schiller was the head of the

23   Wisconsin effort, right?

24   **A.**   As the -- as overseeing the App Store at the time, yes.

25   **Q.**   Okay.  And so he would instruct this large team to create

1    these slides.  These slides would iterate between the team and

2    the executives, and eventually make their way to Mr. Cook,

3    correct?

4    **A.**  That wasn't always exactly the process.  In certain cases,

5    we would develop slides and then bring them to Phil for

6    consideration, and then he would instruct us.

7    **Q.**  I see.  Okay.  So one process is Mr. Schiller instructed

8    you to create the slides.  Another process is you had your own

9    thoughts and ideas in the business or the finance team.  You

10   created your own slides.  You brought those to Mr. Schiller,

11   and -- and took it from there, correct?

12   **A.**  Yeah.  It depended on the topic.

13   **Q.**  Got it.

14       And then all of this funneled up to Mr. Cook for meetings

15   with him, correct?

16   **A.**  Generally.

17   **Q.**  Okay.  The first commission option here -- do you see that

18   there are several commission options, right?

19   **A.**  Yes.

20   **Q.**  And they are very helpfully numbered 1, 2, and 2 [sic].

21       Do you see that?

22   **A.**  I do.

23   **Q.**  Okay.  And all that while option 1 is still no commission,

24   as is being reflected in the first line, correct?

25   **A.**  Yeah.  It's -- it's a little confusing between those two,

 1    but I believe that's what that means.  There was a

 2    no-commission option and then three commission options.

 3    Q.  Okay.  So option 1, no commission, and options 2A, B, and

 4    C essentially, correct?

 5    A.  Correct.

 6    Q.  Okay.  And the first commission option is standard

 7    commission with a 3 percent discount, right?

 8    A.  Yes.

 9    Q.  And that is a reference to a 27 standard 12 percent

10    program commission on linked-out transactions, right?

11    A.  That seems to be correct, yes.

12    Q.  And the bullet point then states that the team needs to

13    come up with a session time of between 24 hours and 48 hours,

14    right?

15    A.  That's correct, yes.

16    Q.  And "session time" here means the lookback window that

17    would trigger a commission, right?

18    A.  I believe so, yes.

19    Q.  And under that lookback window, the idea is that any

20    transaction on the developer's website within that lookback

21    window would be subject to a commission, right?

22    A.  So long as it came from a linkout from the app.

23    Q.  Well, it doesn't matter how they came.  They can click on

24    the link on Sunday, and then on Monday come from their PC

25    because it's a multi-platform game, they would still be

1   subject to a commission, correct?

2   **A.**  But for clarification, the initial opening of that window

3   happens with a link that is clicked on from within the app.

4   **Q.**  Okay.  So just so the record is clear --

5   **A.**  Uh-huh.

6   **Q.**  -- there needs to be a click within the app on a -- on a

7   URL or Internet-style button to link out first --

8   **A.**  That's correct.

9   **Q.**  -- correct?

10      And from that point in time, for the duration of the

11  lookback window, wherever it lands ultimately, any purchase on

12  the website of the developer is going to be subject to the

13  commission regardless how the user arrived at the website,

14  correct?

15  **A.**  That's the case, yes.

16  **Q.**  Further down the page under "Notes From Meeting," it looks

17  like it's explaining the justification for charging a

18  commission and modeling the financial options were tasks that

19  were assigned to a business and finance team made up of

20  Mr. Kim, Mr. Vij, and Mr. Barton; is that right?

21  **A.**  Sorry.  Where is this in the --

22  **Q.**  It's under --

23  **A.**  Oh, yeah.

24  **Q.**  -- notes from the meeting.  Do you see that?

25  **A.**  Yes, I see that now.  Thank you.

1    **Q.**  And that's a yes?

2    **A.**  Yes.

3       Sorry.  Sorry.  Just to clarify, in terms of that was

4    assigned, I'm not sure if that was the presenter group or if

5    that was the folks that were doing the work.

6    **Q.**  Okay.  Following this meeting, Mr. Roman told you that he

7    was leaning heavily towards charging a 27 percent commission,

8    correct?

9    **A.**  I don't remember specifically.

10   **Q.**  Okay.  If you go to CX503.

11   **A.**  (Reviewing document.)

12      All right.

13   **Q.**  Do you see that this is an exchange between yourself, Matt

14   Fischer, and Nate Barton?

15   **A.**  (Reviewing document.)

16      I do, yes.

17   **Q.**  And it's dated June 13, correct?

18   **A.**  Yes.

19           **THE COURT:**  Do we have a time?

20           **MR. EVEN:**  I would move to admit this, Your Honor.

21           **THE COURT:**  It's admitted.

22              (Exhibit 503 received in evidence.)

23           **THE COURT:**  Do we have a time relative to the

24   minutes?

25           **MR. EVEN:**  I'm sorry, Your Honor?

1          (Exhibit published to witness, counsel, and the Court.)

2          **THE COURT:**  I'm trying to figure out which came

3    first, the text or the meeting.

4          **MR. EVEN:**  So it's not entirely clear to me, Your

5    Honor, but --

6          **THE COURT:**  Or maybe it was during the meeting.

7          **MR. EVEN:**  I believe it's either during or after.

8    But, well, the --

9                    (Exhibit published.)

10         **MR. EVEN:**  -- let's do it like that.

11         **THE WITNESS:**  We would probably have the ability to

12   look at the iCal invite.

13                   (Simultaneous colloquy.)

14   **BY MR. EVEN:**

15   **Q.**  So in the iCal, which is 509, the invitation is for

16   June 23.  And it says between noon and 1:00.  Do you see that?

17   That's 509?

18   **A.**  (Reviewing document.)

19      Yes, oh, I see that.  Sorry, I wasn't sure if you're

20   asking me.

21   **Q.**  Okay.  And if we're going back to 503, you see that the

22   time stamp here is at 10:30 at night Greenwich Mean Time which

23   would be probably 2:30 in the afternoon.  Fair?

24   **A.**  Sounds roughly correct, yes.

25   **Q.**  And so these would be after the meeting probably, right?

 1    **A.**  It sounds reasonable.

 2                        (Exhibit published.)

 3    BY MR. EVEN:

 4    **Q.**  Okay.  And what Mr. Barton is reporting to you and to

 5    Mr. Fischer is that he spoke with Alex on Wisconsin and went

 6    through the key slides.  He strongly thinks option 1 is the

 7    right one and believes Luca will think the same.

 8        Do you see that?

 9    **A.**  I do, yes.

10    **Q.**  And Alex here is Mr. Roman?

11    **A.**  I would assume so, yes.

12    **Q.**  And Luca here is Mr. Maestri, correct?

13    **A.**  I would assume so, yes.

14    **Q.**  And Mr. Roman reports to Mr. Maestri, correct?

15    **A.**  Yes.

16    **Q.**  And then Mr. Fischer asks:  Option 1 equals no commission

17    or option 1 equals baseline commission?  It says "mine

18    cost" -- I assume that means "minus cost of payment."

19        Do you see that?

20    **A.**  Yes, I see that.

21    **Q.**  And so Mr. Fischer apparently has the same confusion

22    reflected in the notes we were just looking at regarding the

23    numbering nomenclature, right?

24    **A.**  Yep.

25    **Q.**  Then Mr. Barton says:  Sorry, the latter.  What we were

1   calling 2A, the 27 percent option.

2       Do you see that?

3   **A.**  I do, yes.

4   **Q.**  And so by June 13, 2023, the finance team supported the

5   27 percent commission proposal, correct?

6   **A.**  I can only say what is represented here.  I can't say what

7   the broader finance team represented.  I think this is

8   representing one team member's variation of what he heard from

9   his boss.

10  **Q.**  Okay.  And his boss was the top finance person on the

11  Wisconsin team, correct?

12  **A.**  That's correct.

13  **Q.**  And his boss was reporting directly to Mr. Maestri,

14  correct?

15  **A.**  That's correct.

16  **Q.**  Okay.  And you don't recall that the finance team,

17  including Mr. Maestri, were proponents of the 27 percent

18  approach?

19  **A.**  We were talking about a lot of different approaches there.

20  So I don't remember specifically.

21  **Q.**  Do you recall that there came a time when Mr. Maestri was

22  clearly advocating for the 27 percent approach, and on the

23  other hand Mr. Schiller was advocating more for the

24  no-commission approach?

25  **A.**  I remember there was debate about the approaches.

1   **Q.** Okay. And do you remember that on the debate, on the one

2   side was Mr. Maestri saying 27 percent, team commission, and

3   on the other side there was Mr. Schiller, team no commission?

4   **A.** I don't believe Mr. Maestri was part of team commission

5   officially. And so I don't remember specifically who was on

6   which side.

7   **Q.** Okay. You remember that Mr. Schiller was on team no

8   commission, correct?

9   **A.** I remember that he had strong feelings about the

10  commission, yes.

11  **Q.** And his strong feelings were that there should be none,

12  correct?

13  **A.** I remember that he expressed those opinions at one point

14  in time during the process.

15  **Q.** Is that a "yes," sir?

16  **A.** Again, at one point in time in the process, yes.

17  **Q.** And do you remember that the finance team, including

18  Mr. Maestri, were on the other side of that expressing a

19  preference for the 27 percent?

20  **A.** I -- I don't remember specifically who on the finance team

21  was representing the 27 percent, but there were a number of us

22  who were working on the options across both.

23  **Q.** You remember that people on the finance team, whoever it

24  was, were on team commission supporting the 27 percent, right?

25  **A.** There was -- there was debate on both sides.

1    THE COURT:  Was there -- was there anyone on the

2    finance team supporting Mr. Schiller's position of no

3    commission?

4    THE WITNESS:  Most of the -- the finance team was

5    actively doing work across both options.  And so their role

6    was more to provide the financial analysis and not to provide

7    opinions.

8    THE COURT:  503 suggests that they're supporting the

9    27 percent.

10    THE WITNESS:  No, I -- I see that.  I see that Nate

11    said --

12    THE COURT:  You were on this text, correct?

13    THE WITNESS:  Yes.

14    THE COURT:  Okay.  So clearly, as of 6/13, according

15    to this text, they are on the side of 27 percent.  Whether or

16    not they also did analysis is a separate question.  But that's

17    what it says.

18    THE WITNESS:  That's what Nate said Alex said.

19    That's all I know --

20    THE COURT:  Okay.

21    THE WITNESS:  -- in this case.

22    THE COURT:  And you never had a conversation with

23    Alex?

24    THE WITNESS:  I'm sure we did.  I don't remember

25    specifically.

 1          **THE COURT:**  Did he ever advocate for Mr. Schiller's

 2     position of no commission?

 3          **THE WITNESS:**  I don't remember.

 4          **THE COURT:**  Given what you remember of those

 5     conversations, safe to assume he always wanted a commission?

 6          **THE WITNESS:**  Mr. Roman?

 7          **THE COURT:**  Correct.

 8          **THE WITNESS:**  I believe that Mr. Roman generally was

 9     supportive of a commission.

10          **THE COURT:**  What does that mean?  What -- I don't

11     know what "generally supportive" is.

12          **THE WITNESS:**  In the circumstance of Wisconsin and

13     our compliance with Wisconsin, I think he was generally

14     supportive of a commission.

15          **THE COURT:**  Do you mean by that he was advocating for

16     a commission?

17          **THE WITNESS:**  I -- I don't know if I would describe

18     it as advocating.

19          **THE COURT:**  Do you mean by that that he was

20     suggesting a commission or promoting a commission as part of

21     the final -- final approach?

22          **THE WITNESS:**  As part of the final approach, yes.  He

23     did end up recommending a commission.  But it -- in this point

24     in time, I don't remember exactly what his state was other

25     than seeing this text.

1          **THE COURT:**  Go ahead.

2          **MR. EVEN:**  Thank you, Your Honor.

3  **Q.**  Do you remember that at meetings with Mr. Cook, there were

4  in fact people who felt strongly that there should not be a

5  commission and people who felt strongly that there should be a

6  27 percent commission?

7  **A.**  I remember there was debate about that, yes.

8  **Q.**  Well, to have a debate, you need people advocating both

9  positions.  Those in fact existed in the room, there were

10  people advocating no commission, and other people advocating a

11  27 percent commission, right?

12  **A.**  I would say that's fair.

13  **Q.**  And among the people who are on the no commission, we

14  named Mr. Schiller, correct?

15  **A.**  I remember that, yes.

16  **Q.**  Was there anybody else on Mr. Schiller's team advocating

17  no commission that you remember?

18  **A.**  Not that I remember.

19          **THE COURT:**  Overruled.

20          **MS. RICHMAN:**  Your Honor, well, objection to the

21  extent it calling for views of lawyers.

22          **THE COURT:**  Overruled.

23      I mean -- well, he doesn't remember anyway.

24  **BY MR. EVEN:**

25  **Q.**  Okay.  Do you remember anybody on the finance team

1    supporting the no-commission view?

2    **A.**  Specifically, no.

3    **Q.**  Okay.  Do you remember that there were people who were

4    advocating 27 percent?

5    **A.**  Yes.  At -- at this point in time in June 13th?

6    **Q.**  As of June of 2023.

7    **A.**  Yes.

8    **Q.**  Okay.  Who were those people?

9    **A.**  I believe that Luca Maestri and Alex Roman would have been

10   among those people.

11   **Q.**  Thank you.

12        And the ultimate arbiter between those two teams was

13   Mr. Cook, correct?

14   **A.**  Well, informed by legal's guidance as well about what they

15   felt was reasonable in terms of complying with the injunction.

16   **Q.**  Okay.

17        A week later, if you go to Exhibit CX510 in your binder.

18        **THE COURT:**  Can you remind me who was the -- who was

19   the third on the pricing commission with Mr. Cook and

20   Mr. Schiller.

21        **MR. EVEN:**  Mr. Maestri.

22        **THE COURT:**  Thank you.

23   BY MR. EVEN:

24   **Q.**  Do you see that Exhibit 510 is an invitation for a

25   meeting, Subject Epic Injunction, on June 20th, between 1:00

 1    and 1:30?

 2    **A.**  Yes, I do.

 3    **Q.**  And do you see that you're on the invitee list and

 4    accepted?

 5    **A.**  I do, yes.

 6    **Q.**  And do you see that this meeting was with Mr. Cook, right?

 7    **A.**  Yes.  It looks like it.

 8    **Q.**  If you now turn to Exhibit CX223 in your binder.

 9    **A.**  (Reviewing document.)

10    **Q.**  And this was previously admitted and it's subject to

11    certain objections and I'm not going to talk about the text

12    that's under objection.

13    **A.**  (Reviewing document.)

14    **Q.**  Do you see that this is a June 16, 2023 email from

15    Mr. Cameron to Phil Schiller, Greg Joswiak, Craig Federighi,

16    Eddy Cue, and Kate Adams, copying you and many others, and

17    attaching a presentation titled Epic Injunction Implementation

18    Proposal?

19    **A.**  I do, yes.  Sorry, I don't see -- oh, the attachment's

20    here, yes.

21    **Q.**  Do you see it now?

22    **A.**  I do.

23    **Q.**  Okay.  Now in the cover, Mr. Cameron explains the team has

24    a 30-minute review with Mr. Cook on Tuesday, June 20 to

25    discuss a no-commission option and several proposals for a

1    commission option.  Do you see that?

2    **A.**  Yes.

3    **Q.**  Mr. Cameron then notes that the attached deck has complete

4    details on design, financial modeling, and risk benefit

5    analysis for the commission and no-commission options, right?

6    **A.**  I see that, yes.

7    **Q.**  If you then go to CX224.  That's already admitted as well.

8    **A.**  (Reviewing document.)

9    **Q.**  Do you see that this is a June 19 email on the same chain

10   from Mr. Cameron.

11                        (Exhibit published.)

12            **THE WITNESS:**  (Reviewing document.)

13       Yes, I see it.

14   **BY MR. EVEN:**

15   **Q.**  And do you see Mr. Cameron thanks the executives for their

16   feedback and states that the deck will be used -- the deck

17   attached to CX224 will be used the next day with Mr. Cook.

18       Do you see that?

19   **A.**  (Reviewing document.)

20       Yes, I see that.

21   **Q.**  Okay.  And in both instances, again, these decks present

22   the work of the entire team, correct?

23   **A.**  (Reviewing document.)

24       I'd have to look at the deck.  But I would assume this is

25   similar to the other decks we've looked at as well.

1    **Q.**  Okay.  You remember that we looked at 223 and it actually

2    said that the deck includes finance analysis and design

3    analysis, et cetera, right?

4    **A.**  Yes.

5    **Q.**  Okay.  And yet Mr. Cameron, the lawyer, is the designated

6    sender of this deck back and forth, right?

7    **A.**  Yes.  That was in compliance with a injunction.  So the

8    legal team was deeply involved in all this.

9    **Q.**  Okay.

10          **MS. RICHMAN:**  And, Your Honor, just to clarify.

11   There are redactions in this deck.  Some of them are

12   inconsistent internally.  And there are additional redactions

13   needed on page 874 and 946.

14          **THE COURT:**  We'll discuss it later.

15          **MS. RICHMAN:**  Okay.  Thank you, Your Honor.

16          **THE COURT:**  Unless we're going to use those pages.

17   BY MR. EVEN:

18   **Q.**  Let's turn to page 6.  This was a slide that you

19   ultimately presented to Mr. Cook, correct?

20          **THE COURT:**  We're still on 223?

21          **MR. EVEN:**  No.  224.6.  Sorry.

22          **THE WITNESS:**  Yes.

23   BY MR. EVEN:

24   **Q.**  And you see that you are the presenter based on the

25   speaker notes, right?

1    **A.**    Yes.

2    **Q.**    The slide presents the same two main options we saw since

3    back in May, option 1 no fee, option 2 fee, right?

4    **A.**    Yes.

5    **Q.**    And as the talking points note -- that's in the second

6    sentence -- the key focus of these options is the fee because

7    whether a fee is or is not imposed would heavily influence

8    developer decisioning about directing users out of the app to

9    complete purchases, right?

10    **A.**    Yes, I see that.

11    **Q.**    That's, in other words, you're telling Mr. Cook if we

12    impose a fee, there will be far less adoption of the linkout

13    option, correct?

14    **A.**    That's correct.

15    **Q.**    And in addition to the fee itself, the two options also

16    diverge when it comes to placement and style of the link,

17    correct?

18    **A.**    (Reviewing document.)

19        Yes.

20    **Q.**    And so here again, we see the same notion in a slide that

21    you were presenting that there was a relationship or a

22    trade-off between the commission and the placement and design

23    restrictions, correct?

24    **A.**    Yes, those things are grouped together.

25    **Q.**    So for option 1, the slide states that the style of the

1  link must be plain link or button, correct?

2  **A.**  Correct.

3                    (Exhibit published.)

4  **BY MR. EVEN:**

5  **Q.**  And if we turn to page 10 entitled "Link or Button Style,"

6  these are the design options presented to Mr. Cook as what

7  Apple would allow under option 1, correct?

8  **A.**  That looks correct, yes.

9  **Q.**  And the presenter of this slide about the design is

10  Mr. Cameron, a lawyer, right?

11  **A.**  That's correct.

12  **Q.**  And if you go to Slide 19, this slide shows designs of

13  what you would agree to as a button if you adopted the

14  commission, right?

15  **A.**  That was the recommendation in this deck.

16  **Q.**  And unlike in the prior slide, that thing at the bottom in

17  yellow actually looks like a button, right?

18  **A.**  It's -- it's developer-styled, yes, so it looks like the

19  button that they would have included in their own -- in their

20  own app.

21  **Q.**  It looks like a button, sir.  Where the other ones look

22  like a link, this one looks like a button, right?

23  **A.**  Again, I would frame it as developer-styled.  So it looks

24  likes it would -- it looks like the other buttons in that app.

25  **Q.**  Okay.  The injunction says that Apple will not prohibit

1  buttons, correct?

2  **A.**  That's correct.

3  **Q.**  Now, today under the new guidelines, are developers

4  allowed to use this kind of button in their app to steer users

5  to outside purchase options?

6  **A.**  No.  They have to use a plain-style button.

7  **Q.**  So as of June 20, '23, the team you were on recommended to

8  Mr. Cook this button would be allowed if a commission model is

9  adopted, right?

10  **A.**  That was the recommendation in this presentation, yes.

11  **Q.**  And so the team did not believe that this kind of button

12  would cause any kind of confusion by users, correct?

13  **A.**  It doesn't say anything about confusion in the slide.

14  **Q.**  And it doesn't say it because you didn't think it would

15  cause confusion.  If you thought this button would be a real

16  problem causing confusion to users, you would have said

17  something in the slide to the head of Apple, right?

18  **A.**  We weren't talking about the customer implications of it

19  at this point.

20  **Q.**  Sir, you were recommending this button be adopted if

21  there's a commission, correct?

22  **A.**  We were recommending that the button be -- the

23  developer-style button rather than the plain-style button be

24  adopted in this instance.

25  **Q.**  You were recommending this button on the screen would be

1    allowed, correct?

2    **A.**  As an example.  These are just -- these are just examples.

3    **Q.**  Okay.  You did not provide Mr. Cook any warning in this

4    slide deck saying this may cause user confusion, correct?

5    **A.**  I don't know in the rest of the slide deck.  I -- I don't

6    think we discussed it on this slide.  But I think Shawn was

7    the one who was speaking to that.

8    **Q.**  Sir, sitting here today, you don't recall anybody telling

9    Mr. Cook we recommend we allow this button, but just so you

10   know, sir, users are going to be mightily confused.

11        Nobody said that, correct?

12   **A.**  We -- we generally talked about the risk of user

13   confusion.  I don't know if we talked about it with this

14   specific slide or in this deck.

15   **Q.**  Sir, you recommended this button be used and allowed in a

16   commission scenario, correct?

17   **A.**  It was part of the recommendation in this slide, yes.

18   **Q.**  Okay.

19        And there's also nothing in this slide deck, I can

20   represent to you, but I'm sure you also remember, that warns

21   Mr. Cook that this kind of button might harm privacy or

22   security, right?

23   **A.**  I don't remember all the details in the slide deck.  We

24   did generally talk about user confusion and the risk there.

25   **Q.**  Sir, the only recommendation against or for using this

1    kind of button would be whether it's good or bad for Apple's

2    bottom line, correct?

3    **A.**    I don't believe that's the case.

4    **Q.**    Okay.  If you go to -- well, take a step back.

5    You agreed with me that the injunction says that Apple

6    should not prohibit buttons, right?

7    **A.**    That's my memory of the injunction, yes.

8    **Q.**    And your recommendation to Mr. Cook as to option 1 was

9    that Apple would in fact prohibit this kind of button,

10    correct?

11    **A.**    No.  We believed that that is a plain-style button based

12    on the design and product --

13    **Q.**    Sir --

14    **A.**    -- recommendations.

15    **Q.**    -- your belief was, your recommendation was that Apple

16    prohibit this kind of button that's on the screen if it

17    adopted a no-commission model, correct?

18    **A.**    The developer-style button, correct.

19    **Q.**    And you understood at the time as a layperson that if you

20    have an injunction that says you shall not prohibit buttons,

21    and Apple is about to prohibit buttons, that may be a

22    compliance risk, correct?

23    **A.**    We didn't believe we were prohibiting buttons because we

24    specifically called out --

25    **Q.**    You were prohibiting this kind of button, right?  We just

1  established that.  You're recommending to prohibit this kind

2  of button under the no-commission option, correct?

3  **A.**  I think you're talking about stylistic details here.

4  **Q.**  The injunction doesn't say Apple shall allow some buttons

5  subject to stylistic details, correct?

6  **A.**  I don't believe so.

7  **Q.**  The injunction says Apple shall not prohibit buttons,

8  period, correct?

9  **A.**  That's correct.

10  **Q.**  And this is a button.  You agree with that?

11  **A.**  This is a developer-style button on this slide.

12  **Q.**  And a developer-style button is a button, correct?

13  **A.**  That's correct.

14  **Q.**  And Apple -- your recommendation to Mr. Cook at the time,

15  your team's recommendation was to prohibit this button,

16  correct?

17  **A.**  Developer-style buttons, but not all buttons.

18  **Q.**  Sir.  Is it your testimony that, putting aside any legal

19  advice, it never occurred to you as a layperson that

20  prohibiting certain buttons when you have an injunction saying

21  Apple shall not prohibit buttons raises a real risk that

22  you're not in compliance with the Court's injunction?

23  **A.**  My memory is that we debated that and we believed that the

24  plain-style button that was recommended as the option for

25  option 1 was going to be in compliance with the injunction

```
 1    based on --

 2            THE COURT:  What you're calling here a link?  What

 3    you're calling on this document a link, right?  Is that what

 4    you're saying?

 5            THE WITNESS:  Sorry.  The --

 6            THE COURT:  You can circle it.  There are two --

 7    option 2 has two figures.

 8            THE WITNESS:  That's correct.

 9            THE COURT:  The bottom is a button.  We can agree,

10    right?

11            THE WITNESS:  Correct.

12            THE COURT:  And in fact, that's what the slide says,

13    button, correct?

14            THE WITNESS:  Yeah, developer-style --

15            THE COURT:  That's what it says.

16            THE WITNESS:  Yes.

17            THE COURT:  And the one on top is called a link.

18            THE WITNESS:  Sorry.  These are both intended to be

19    examples of developer-style buttons.

20            THE COURT:  That's not what it says.

21            THE WITNESS:  I believe that -- that's my memory of

22    what this slide is intended to represent versus the prior

23    slide --

24            THE COURT:  There is a disjunctive there, correct?

25            THE WITNESS:  I'm sorry?
```

```
 1              THE COURT:  Do you know what a disjunctive is?  The
 2     word "or."
 3              THE WITNESS:  Yes.
 4              THE COURT:  Do you know what the word "or" means?
 5              THE WITNESS:  I do.
 6              THE COURT:  One or the other.
 7              THE WITNESS:  Yes.
 8              THE COURT:  And what this says to me is the top is a
 9     link and the bottom is the button.  That's -- that's what --
10     in plain words that's what it says.  Right?
11              THE WITNESS:  That's what the label says.  I don't
12     think that's what this is intended to represent, Your Honor.
13              THE COURT:  But that's what it says.
14              THE WITNESS:  Yes.  They -- both of these buttons
15     have links within them.  They both say -- I can read the link
16     language in both of them.  But I think they're both intended
17     to be different variations of buttons.
18              THE COURT:  But that's not what it says.
19              THE WITNESS:  That's not what the label says.
20              THE COURT:  Correct.
21              THE WITNESS:  But that's what is intended to be
22     represented on the slide, Your Honor.
23              THE COURT:  But that's not what it says.
24              THE WITNESS:  That's correct.
25              THE COURT:  Let's move on.
```

1    BY MR. EVEN:

2    Q.  If you go to page 17, titled "Option 1 Considerations."

3                        (Exhibit published.)

4            THE WITNESS:  Yes.

5    BY MR. EVEN:

6    Q.  On the right under "Risk" --

7            MS. RICHMAN:  Your Honor, this is one of the slides

8    that I mentioned.

9            THE COURT:  What page are we on?

10           MS. RICHMAN:  Bates number 874.  It's in the speaker

11    notes.

12           THE COURT:  Hold on.

13                        (Pause in the proceedings.)

14           THE COURT:  Well, I have redactions on this.

15           MS. RICHMAN:  I know.  And there's similar slides to

16    this one with properly applied redactions in this same deck

17    so --

18           THE COURT:  I don't see where there's a problem with

19    this slide.

20           MS. RICHMAN:  So it's the same bullet point on the

21    right-hand side under Risks, one, two, three down.  And then

22    the speaker notes, there is a sentence starting "However,"

23    it's two bullets from that, the last line of that bullet.

24           MR. EVEN:  And, Your Honor, I'm not going to speak to

25    that.  But to be clear, that is the document that Apple gave

 1  us as the example of the more redacted document that gets it

 2  right.

 3          **MS. RICHMAN:**  I -- yes.  And there are other pages in

 4  this deck, like 893, 901, 917, where the -- excuse me --

 5  940 -- where the redactions are correctly applied.

 6     So, again, we're doing this on the fly.

 7          **THE COURT:**  On the fly because of Apple's conduct,

 8  yes, I understand.

 9          **MS. RICHMAN:**  Well --

10          **THE COURT:**  Third bullet on the right is redacted.

11  And then the language, just the line, not the entire bullet,

12  that is duplicative of what's in the slide.

13          **MR. EVEN:**  Thank you.

14          **MS. RICHMAN:**  And, Your Honor, I think going back to

15  your comment earlier about which number we're using, if we're

16  using the Bates number versus the CX number, the numbers I

17  gave you earlier when we first addressed this document were

18  Bates numbers so --

19          **THE COURT:**  Correct, 224 --

20                  (Simultaneous colloquy.)

21          **THE COURT:**  -- dot 17.

22     Go ahead.

23          **MR. EVEN:**  Thank you, Your Honor.

24  **Q.**  So on the right, under Risks, the very top risk is a

25  meaningful financial risk due to the new in-app channel for

1    developers without commission; is that correct?

2    **A.**  Yes.

3                         (Exhibit published.)

4    **BY MR. EVEN:**

5    **Q.**  And this is again the same leakage risk we discussed

6    earlier, correct?

7    **A.**  That's correct.

8    **Q.**  And as we discussed earlier, you understood that posing a

9    meaningful competitive threat to IAP was the goal of the

10   injunction, correct?

11   **A.**  Being able to direct users outside of the app to lower

12   prices, yes.

13   **Q.**  And you understood that being able to send users outside

14   would be a competitive threat to IAP, that was the goal of the

15   injunction, correct?

16   **A.**  It was again my understanding of the goal of the

17   injunction was to allow users to understand that there were

18   options outside of the app and be directed to those options.

19   **Q.**  And another goal was, through that, to create competition

20   on price for IAP, correct?

21   **A.**  Yes.

22   **Q.**  And so, again, what you're presenting to Mr. Cook here is

23   that achieving the goal of the injunction is a risk?

24   **A.**  I wouldn't put that it way.

25   **Q.**  Okay.  I think the slide puts it that way, doesn't it?

 1    **A.**    There -- there's financial risk and leakage in all of

 2    these options --

 3    **Q.**    Sir --

 4    **A.**    -- so --

 5    **Q.**    -- what you're telling Mr. Cook is the real risk with this

 6    option is that people actually might use the linked-out

 7    options and that would put pressure on IAP.  Right?

 8    **A.**    No.  We expected that users would use this in all options.

 9    **Q.**    You expected many more people would use it in this option,

10    correct?

11    **A.**    We expected more usage in this option, yes.

12    **Q.**    And that is the risk.

13    **A.**    That is the risk.

14    **Q.**    And going to the third -- sorry, the fourth bullet, you

15    see that this goes again to the divergence from other markets?

16    **A.**    Yes.

17    **Q.**    And you see that here, it's explained explicitly what I

18    asked you earlier, and you said there are many ways, it says

19    specifically "could spread to other markets," correct?

20    **A.**    Yes, I see that.

21    **Q.**    And the risk therefore is that if Apple adopted a

22    no-commission model in the U.S., other markets may follow suit

23    through regulation, court orders, what have you, correct?

24    **A.**    That's correct.

25    **Q.**    Turning to page 36, titled "Option 2A Considerations," we

1  see the list of benefits and risks to a 27 percent commission

2  with a 24-hour time window.  Correct?

3  **A.**  Yes.

4  **Q.**  And on the left, the first benefit listed is that this

5  option reduces financial risk in comparison to the

6  no-commission option, correct?

7  **A.**  Correct.

8          **THE COURT:**  Did you say we're on page 36?

9          **MR. EVEN:**  Yes, Your Honor.

10          **THE COURT:**  Thank you.

11  **BY MR. EVEN:**

12  **Q.**  And in terms of risk, the risk listed is -- number 2 there

13  is that developers are likely to claim that the 3 percent

14  discount for cost of payments does not allow for price

15  competition versus IAP, correct?

16  **A.**  On the initial transaction is what it says, yes.

17  **Q.**  Okay.  And we discussed the price competition against IAP

18  was the goal of the injunction, correct?

19  **A.**  Yes.

20  **Q.**  And so this slide is telling Mr. Cook in no uncertain

21  terms that the 27 percent will avoid financial risk but will

22  frustrate the goal of the injunction, correct?

23  **A.**  That's not true.

24  **Q.**  Okay.

25          If you go to Slide 25, this shows that the team also

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    presented Mr. Cook a 20 percent fee option, correct?

 2                        (Exhibit published.)

 3            **THE WITNESS:**  (Reviewing document.)

 4        Sorry.  What slide is this?

 5    **BY MR. EVEN:**

 6    **Q.**  This is Slide 25.

 7    **A.**  All right.  I'm there.

 8    **Q.**  Do you see that the team also proposed a commission of

 9    20 percent?

10    **A.**  Yes, I do.

11    **Q.**  And you recall that there was a short time frame when the

12    team discussed 27 percent versus 20 percent?

13    **A.**  Yeah, I don't remember exactly how long the time frame

14    was, but yes.

15    **Q.**  Let me give you a suggestion.  It started around here on

16    June 20 and it went all the way to July 5th.  Does that

17    makes -- ring a bell?

18    **A.**  A few weeks seems reasonable, yes.

19    **Q.**  Okay.  After the June 20 meeting, the team continued to

20    update the presentation; is that correct?

21    **A.**  Yes.  I believe so.

22        Sorry, this specific presentation or other presentations

23    like it?

24    **Q.**  Presentations like it.

25    **A.**  Yes.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  **Q.**  Now, if you turn to CX0506, these are notes from the

2  June -- from June 26 from your files.

3      Do you see that?

4  **A.**  (Reviewing document.)

5      Sorry.  This is 0506?

6  **Q.**  Yes.

7          **MS. RICHMAN:**  It's not in my binder.

8          **THE COURT:**  It's not in my binder either.

9          **MR. EVEN:**  It's all the way in the back, Your Honor,

10  I believe.

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  I see.  It's the very last tab.

13  BY MR. EVEN:

14  **Q.**  Sir, do you see these are notes from a June 26 meeting

15  coming from your files?

16  **A.**  Again I would clarify that I don't believe these are my

17  files.  I think this is a -- must be a shared document that I

18  was -- had access to.

19  **Q.**  Sir, we collected documents from 50 custodians including

20  most or all of the Wisconsin members, and you were the only

21  one who had these -- these notes.  So --

22  **A.**  All I can say is I don't take notes in Pages, which is

23  where this file was.  And I don't think I would have named a

24  file the same thing.  So in looking at the notes, they don't

25  look like my notes so --

1   **Q.**  If they come from your files, you would have seen them at

2   the time --

3                      (Simultaneous colloquy.)

4   **BY MR. EVEN:**

5   **Q.**  -- whether they're shared or not?

6   **A.**  No, not necessarily.

7   **Q.**  Okay.  You recall that there was a meeting in June 26 that

8   you attended?

9   **A.**  I don't remember specifically that meeting.

10          **MR. EVEN:**  Your Honor, I would nonetheless move to

11  admit this as a party admission if it's not Mr. Oliver's --

12          **THE COURT:**  Any objection?

13          **MS. RICHMAN:**  Objection, foundation.

14          **THE COURT:**  Let's go -- I'll provisionally admit it.

15          **MR. EVEN:**  Thank you, Your Honor.

16      (Exhibit 0506 provisionally received in evidence.)

17                    (Exhibit published.)

18  **BY MR. EVEN:**

19  **Q.**  Sir, do you see that these are notes from a meeting titled

20  "Wisconsin Overview"?

21  **A.**  That appears to be the case, yes.

22  **Q.**  And do you see that this is speaking about a meeting with

23  team Luca and most of the executive team on Wednesday, under

24  "Notes"?

25  **A.**  Yes, I see that.

1    **Q.**  Okay.  And do you see if you go down to Option 2,

2    Commission, and it has all kinds of instructions, correct?

3    **A.**  I see -- I see Option 2, Commission.

4    **Q.**  Okay.  And you see that on this slide -- on these notes,

5    sorry, there is no Option 1 No Commission anymore, correct?

6    **A.**  (Reviewing document.)

7        There's some things that are redacted, but I don't see an

8    option 1 listed.  I don't know if that necessarily means that

9    option 1 was removed at the time.

10   **Q.**  Okay.  If we don't see discussion of a no-commission

11   option after the June 20 meeting with Mr. Cook, that would

12   mean that the decision has been made to remove that option

13   from consideration, correct?

14   **A.**  I don't specifically remember when that option was taken

15   off the table.

16   **Q.**  Well, going forward, the options presented in subsequent

17   meetings all involved Apple charging a commission.  Do you

18   recall that?  There was another meeting on the 28th and

19   another one on July 5th.

20   **A.**  Again, I don't remember all the meetings that we had on

21   this topic.

22   **Q.**  And Apple chose to implement a commission even though it

23   still had no answer to the question it posed in the document

24   we looked at yesterday from September 13, 2021, "Charging a

25   commission, is it fine for us to do?"  Correct?

1    **A.**  We had had significant debate and guidance from our legal

2    team about whether we could charge --

3    **Q.**  Sir --

4    **A.**  -- a commission.

5    **Q.**  -- I'm not asking about guidance from the legal team

6    because I don't want to broach the -- breach the privilege.

7         I'm asking you had no guidance from this Court that you

8    know about on an answer to the question, "Charging a

9    commission, is it fine for us to do?"  Right?

10   **A.**  I'm -- I'm not aware of any.

11   **Q.**  Now, we talked about the 20 percent option, and you said

12   it lived -- you agreed with me that it only lived for a couple

13   of weeks or a few short weeks, correct?

14   **A.**  I -- I remember it lasting for a few weeks.  I don't know

15   how long.

16   **Q.**  And the reason it was rejected was that it created serious

17   business risk, correct?

18   **A.**  I -- I don't remember that specifically.

19   **Q.**  Well, do you remember specifically that the business team

20   believed it would make it harder to defend a 30 percent fee on

21   IAP if you impose a 20 percent fee on linked-out purchases?

22   **A.**  I think we were specifically talking about that relative

23   to the 27 percent and the ability to make it clear why there

24   was a -- a difference between those things.

25   **Q.**  Well, let me --

```
 1          MR. EVEN:  Your Honor, may we approach with another

 2    exhibit that's not in the binder?  It was just produced to us.

 3          THE COURT:  Okay.

 4          MR. EVEN:  Thank you, Your Honor.

 5       So I'm going to hand up to you CX538.

 6               (Pause in the proceedings.)

 7    BY MR. EVEN:

 8    Q.  Sir, do you see that the top email here is from Jennifer

 9    Brown to you and others dated June 15, '23?

10    A.  Yes.

11    Q.  And so that's five days before the deck in which we saw

12    the 20 percent option for the first time in the back slides in

13    the June 20 meeting with Mr. Cook, right?

14    A.  That seems reasonable, yes.

15    Q.  Okay.

16          MR. EVEN:  Your Honor, I move to admit Exhibit CX538.

17          THE COURT:  Any objection?

18          MS. RICHMAN:  Your Honor, I -- I don't know what the

19    providence of this document is, what you mean when you say it

20    was just produced, but it seems that on a quick review on the

21    second page, there may be privileged communications including

22    reflecting advice of Apple senior attorneys that's not

23    redacted.

24       I just haven't had a chance to review it.

25          THE COURT:  Well, there are redactions already on
```

 1   this.

 2           MR. EVEN:  And the providence, Your Honor, is that

 3   this document went through the special masters with those

 4   redactions and was produced with -- to us, I believe, on

 5   Sunday night?

 6                   (Off-the-record discussion.)

 7           MR. EVEN:  Sunday night.  And it took us obviously a

 8   while to digest things.

 9           MS. RICHMAN:  Your Honor, if you look at the bottom

10   of the second page, there's an email that starts with a

11   mention of "Kate's feedback."  I believe that would refer to

12   Kate Adams, Apple's general counsel.  She's also mentioned

13   again on the third page.

14           MR. EVEN:  Your Honor, I don't want to start an

15   argument with the witness here because I want to ask about

16   that.  But that is a business response to Ms. Adams who --

17           THE COURT:  Yeah, I need to read it.

18           MR. EVEN:  Okay.  Thank you, Your Honor.

19           THE COURT:  Again, just because a lawyer's name is

20   not -- just because a lawyer's name is on a document does not

21   mean that it comes within the context of the attorney-client

22   privilege.

23           MS. RICHMAN:  I understand that.  I think --

24           THE COURT:  And it's odd that you would redact so

25   much except for that.  And it's been through the entire

 1    process already.

 2                    (Pause in the proceedings.)

 3         THE COURT:  You may proceed.  The objection is

 4    overruled.

 5         MR. EVEN:  Thank you, Your Honor.

 6      And I think, Your Honor, I just asked to admit the

 7    document.

 8         THE COURT:  Granted.

 9              (Exhibit 538 received in evidence.)

10         MR. EVEN:  Thank you, Your Honor.

11                    (Exhibit published.)

12    BY MR. EVEN:

13    Q.  So on 538.2 is an email from Timo Kim; do you see that?

14    A.  I do, yes.

15    Q.  And Timo Kim was a business person at Apple at the time,

16    correct?

17    A.  Yes.

18    Q.  And he writes:  "The team has discussed variations on the

19    commission option with lower rates, but we struggled to land

20    on ironclad pricing rationales."

21      Do you see that?

22    A.  Yes, I do see that.

23    Q.  And you understand that Mr. Kim is explaining the

24    difficulty in landing on ironclad justifications or pricing

25    rationales as a business matter.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    **A.**   (Reviewing document.)

 2    **Q.**   Yes-or-no question.

 3                      (Simultaneous colloquy.)

 4    **BY MR. EVEN:**

 5    **Q.**   Or are you reading everything he says?

 6    **A.**   I'm just reading what this line says.

 7          I think the justification that he's talking about is

 8    related to the question from the legal team related to

 9    justification.

10    **Q.**   Sir --

11    **A.**   I'm just trying to -- I'm just trying to frame up why this

12    was answered in this way.

13    **Q.**   All right.  Let's read the justification.

14          You agree with me that the 20 percent proposal is one of

15    the various options with rates lower than 27 that the team was

16    working on at the time, right?

17    **A.**   That's correct.

18    **Q.**   And Mr. Kim continues by giving two criteria the team was

19    struggling to satisfy.  Do you see that?

20    **A.**   Yes.

21    **Q.**   The first criteria is that the rationale would have to

22    stand up to scrutinizing comparisons with defenses of the

23    commission and existing discounting approaches in other

24    jurisdictions.

25          Do you see that?

1    **A.**   Yes.

2    **Q.**   And so the Project Wisconsin team was struggling to come

3    up with rationales for a 20 percent fee, for example, that

4    would withstand comparisons to whatever defenses Apple was

5    making off its commission in other countries such as the

6    27 and 26 percent in Korea, right?

7    **A.**   Yeah, justifying the -- the difference between those two.

8    **Q.**   Correct.

9         And next, Mr. Kim states that the team was struggling with

10   substantiating a 20 percent commission on a bottoms-up basis

11   without implicitly devaluing our IP/proprietary technology,

12   correct?

13   **A.**   Correct.

14   **Q.**   And that means that what Mr. Kim is saying is we find it

15   really hard to say 20 percent without driving a real stake

16   through the work we've paid Analysis Group and others to do to

17   say actually our -- the value of our services is 30 percent.

18   **A.**   I don't think this was related specifically to the

19   Analysis Group's work.

20   **Q.**   Okay.  This was related to bottoms-up basis, correct?

21   **A.**   Yes.

22   **Q.**   And in context of this particular injunction, the only

23   bottoms-up analysis that was presented to this Court, whatever

24   we think of it, is from Analysis Group, right?

25   **A.**   Yes.  That -- that is the only thing that was --

1    **Q.**   Okay.

2    **A.**   -- presented.

3    **Q.**   And what Mr. Kim is saying, if we now charge 20 percent,

4    that is going to be really hard for us to then stand up and

5    still justify 30 percent on IAP on a bottoms-up basis,

6    correct?

7    **A.**   I think he was saying it from multiple perspectives.

8    **Q.**   The next thing Mr. Kim writes is:  "My two cents is that a

9    lower commission rate option doesn't represent a material

10   improvement in the logical ground relative to the 27 percent

11   commission."

12        Do you see that?

13   **A.**   I do, yes.

14   **Q.**   And Mr. Kim then goes on to say that the lower commission

15   rate option continues to place the lion's share of the

16   financial risk and calculus on Apple, correct?

17   **A.**   Yes.

18   **Q.**   You understand that the injunction was intended to place

19   probably all of the financial risk on Apple, correct?

20   **A.**   Yes, I assume so.

21   **Q.**   And Mr. Kim writes the lower commission just makes us less

22   money, correct?

23   **A.**   (Reviewing document.)

24        Sorry, I'm missing that.  Is it highlighted?

25   **Q.**   You understand that that's the gist of his point, it's

1    just making us less money?

2    **A.**   Yeah, I see those words.

3    **Q.**   And you understand that's what he's saying.  If we were

4    going to lower the commission, the only thing that's going to

5    happen is more adoption and less money for us on every

6    linkout, it's just going to cost us more money, correct?

7    **A.**   Well, I think he was saying that the ability to justify

8    20 percent commission versus 27 percent commission had to be

9    balanced in light of the financial implications of doing so.

10   **Q.**   Okay.  And in fact, from some of the charts we saw earlier

11   today, the internal financial analysis that your team, the

12   Wisconsin team, in fact showed that the financial harm to

13   Apple would be much greater the lower the commission, correct?

14   **A.**   In general that's the case, though there are multiple

15   variables involved including the time length of the window

16   which I think was also --

17   **Q.**   Sir, I'm just asking the -- all else being equal, the

18   lower the commission, the greater the financial hit to Apple,

19   correct?

20   **A.**   That's correct, yes.

21   **Q.**   And in fact, from the charts we have seen, if Apple

22   managed to delay compliance with the injunction -- if Apple

23   managed to institute a 27 percent even for a year or a year

24   and a half, that would save Apple hundreds of millions if not

25   billions of dollars, correct?

1    **A.**   That wasn't the goal.

2    **Q.**   I wouldn't --

3          **THE COURT:**  That was not the question.

4    **BY MR. EVEN:**

5    **Q.**   Was not the question.

6                    (Simultaneous colloquy.)

7    **BY MR. EVEN:**

8    **Q.**   Let me ask the question again.

9    **A.**   Yes, please.

10   **Q.**   If Apple managed to delay the adoption of something like a

11   no-commission option or even a lower commission option, and

12   instead institute a noncompliant 27 percent commission, if

13   Apple managed to delay that by a year or a year and a half,

14   based on the numbers we looked at today, that would save Apple

15   hundreds of millions if not billions of dollars, correct?

16   **A.**   I don't think so that's exactly true.  The -- there's a

17   ramp-up that would have to happen for any rollout.  And so we

18   would assume that the impact in the short term would be

19   smaller.

20        I think the numbers that you're referencing are steady

21   state numbers, as we talked about in the past.

22   **Q.**   The ramp-up would be much faster if there was no

23   commission, correct?

24   **A.**   I don't know how fast the ramp-up would go.

25   **Q.**   Okay.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1              THE COURT:  Well, explain that to me.  If there was

 2    no commission, you just stop collecting, period.  If you were

 3    ordered to have zero commission, then you just couldn't

 4    collect.

 5              THE WITNESS:  That's correct.

 6              THE COURT:  So the ramp-up is immediate.

 7              THE WITNESS:  Sorry.  The -- the developers would

 8    still to have implement whatever they -- they wanted to, to

 9    direct users out to their own websites.  They would have to

10    set up those websites and all the infrastructure to do that.

11              THE COURT:  True.

12              THE WITNESS:  So I assume that the ramp-up would

13    still be required to --

14              THE COURT:  But from Apple's perspective, there is no

15    ramp-up because you could just not collect, period.

16              THE WITNESS:  Yeah.  Sorry.  I was talking only about

17    the developer implementation required, not in Apple's

18    implementation.

19    BY MR. EVEN:

20    Q.  Sir, if Apple managed to delay compliance, that would

21    delay the ramp-up, correct?  It would just time shift it.

22    A.  That's correct.

23    Q.  And so in the year or year and a half of delay, Apple

24    would save hundreds of millions, if not billions.

25    A.  I don't think that number is correct.  But I don't know
```

1  specifically.  It depends on the delay.  And the ramp-up.

2  Q.  Let's make it simpler.  If the numbers in the slides we

3  looked at are representative and correct, then a year and a

4  half of noncompliance instead of compliance would save Apple

5  hundreds of millions or billions, correct?

6  A.  Again, I think it would depend on the scenarios you're

7  talking about.

8  Q.  Okay.

9      Before I leave this document, I just have a couple of

10  questions about another of Ms. Brown's email.  That's at

11  page 4.

12      You see that Ms. Brown is telling you:  One procedural

13  tweak.  Can we change the "prepared at request of counsel"

14  label in the slides to "prepared at the request of external

15  counsel"?

16                      (Exhibit published.)

17          THE WITNESS:  Yes.

18  BY MR. EVEN:

19  Q.  And that is, whether can or cannot be done, that's not a

20  true representation of the facts, correct?  These slides were

21  not prepared at the request of any outside counsel, correct?

22  A.  We were working with internal and outside counsel for the

23  entire --

24  Q.  Sir, not what I asked.  I understand that you had counsel

25  all over this process.

1   **A.**  Yes.

2   **Q.**  Counsel was not directing you.  I asked you earlier.  You

3   told me Mr. Schiller directed us and sometimes      we did

4   our own slides and sent to Mr. Schiller.  That's who requested

5   the work.

6   **A.**  Again for this specific deck, I don't remember who was

7   requesting the work.

8   **Q.**  Mr. Brown -- Ms. Brown doesn't even say because this was

9   actually requested by external counsel, correct?

10  **A.**  No, she doesn't say.

11  **Q.**  And if we go a little bit above, you say, "Will also

12  change the footer as requested," correct?

13  **A.**  Yes.

14          **MR. EVEN:**  I have no further questions at this point,

15  Your Honor, with the reservation, Your Honor, as to the

16  additional documents.

17          **THE COURT:**  Granted.

18          **MR. EVEN:**  Thank you, Your Honor.

19          **THE COURT:**  All right.  What time did we get started

20  with this session?

21      Jennie?

22                  (Off-the-record discussion.)

23          **THE COURT:**  All right.  Let's go ahead and we'll

24  stand in recess until 12:30.

25          **MR. BORNSTEIN:**  I apologize, Your Honor.  May I make

1    one administrative request before we go off the record?

2            THE COURT:  Sure.

3            MR. BORNSTEIN:  The document that we were discussing,

4    I won't say anything about it, during the sealed session, we

5    had the opportunity to review it, Apple gave it to us, it

6    appears to be a draft.  I just wanted to ask the Court to

7    require Apple to produce to us the final document from -- that

8    was used.

9            MR. PERRY:  Your Honor, I was about to say I have the

10   copies here for both the Court and Mr. Bornstein.  This is the

11   document that Mr. Even referred to that was withheld by the

12   special masters.  In other words, this is the document that

13   was at issue.  I don't know -- and there are other versions.

14   I don't know --

15           THE COURT:  Okay.  Let's --

16                   (Simultaneous colloquy.)

17           THE COURT:  My court reporter really needs a break.

18   We're going to stand in recess until 12:30.

19       Let's try to figure this out, and we can put this things

20   on the record afterwards.

21       All right.  You can stand down.

22       (Recess taken at 11:53 A.M.; proceedings resumed at

23   12:29 P.M.)

24           THE CLERK:  Please remain seated and come to order.

25           THE COURT:  We are back on the record.  The record

```
 1    will reflect that the parties are present.

 2         You may be seated.

 3         The witness is on the stand.

 4         Before we get restarted, is Jennifer Brown still with

 5    Apple?

 6              MS. RICHMAN:  Yes, she is, Your Honor.

 7              THE COURT:  Is she local?

 8              MS. RICHMAN:  Yes, she is.

 9              THE COURT:  She's ordered to appear here at 8:00 a.m.

10    tomorrow on an order to show cause as to why she wrote what

11    she did in Docket -- document 538, on order to show cause why

12    she should not be sanctioned or disciplined for suggesting to

13    her client to do something that was inaccurate solely for

14    purposes of asserting the attorney-client privilege.

15         Understood?

16              MS. RICHMAN:  Understood, Your Honor.

17              THE COURT:  Proceed.

18              MS. RICHMAN:  Thank you, Your Honor.

19                         CROSS-EXAMINATION

20    BY MS. RICHMAN:

21    Q.  Good afternoon, Mr. Oliver.

22    A.  Good afternoon.

23    Q.  Are you aware that after your prior testimony, the Court

24    admonished you to refrain from discussing the decision-making

25    process leading to the link entitlement program and associated
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

OLIVER - CROSS / RICHMAN

1  commission rates?

2  **A.**  I am, yes.

3  **Q.**  And are you also aware that the Court admonished you not

4  to discuss your prior testimony with anybody?

5  **A.**  Yes.

6  **Q.**  And do you understand that the Court indicated that if

7  there's any doubt, the witnesses are instructed to err on the

8  side of caution and nondisclosure?

9  **A.**  Yes.

10  **Q.**  And did you strictly comply with the Court's instruction?

11  **A.**  I did, yes.

12  **Q.**  And remind us, how long has it been in months since you

13  were last on the stand here?

14  **A.**  It was May of last year.

15  **Q.**  So about nine months?

16  **A.**  Yeah.

17  **Q.**  Are you aware that after your prior testimony, the Court

18  ordered Apple to produce documents about the decision-making

19  process related to the link entitlement program?

20  **A.**  I'm aware it happened, I think, while I was testifying.

21  **Q.**  And have you had the opportunity to review the documents

22  produced to Epic?

23  **A.**  No.

24  **Q.**  And have you had the opportunity to review any of those

25  documents with counsel?

1  **A.**  No.

2  **Q.**  Okay.

3      **MS. RICHMAN:**  I think there's a binder.  Have those

4  been handed out?

5              (Pause in the proceedings.)

6      **MS. RICHMAN:**  Your Honor, may we approach?

7      **THE COURT:**  You may.

8              (Pause in the proceedings.)

9      **MS. RICHMAN:**  Okay.

10 **Q.**  Mr. Oliver, you testified about this last year and I think

11 today as well, but can you please provide an overview of the

12 bottoms-up valuation project that Apple commissioned in

13 connection with Wisconsin?

14 **A.**  Sure.  As part of our compliance plan for the injunction,

15 we wanted to make sure that we had different ways to help to

16 justify the value of the commission and the services provided

17 by Apple in the App Store specifically.

18      So as part of that, we worked with Analysis Group which is

19 an economic consulting firm that we'd worked with previously,

20 and they helped us to identify a framework and then a

21 different kind of buckets of value that they then proceeded to

22 evaluate and reflect as a share of commission.  Or sorry, a

23 commission or was a share of -- of revenue.

24 **Q.**  And what was the work product that came out of that

25 project?

1  **A.**  It was a report.

2  **Q.**  Was it a single document, or were there more than one

3  document prepared?

4  **A.**  I believe there were two.  There was a kind of a summary

5  report and then there was a more detailed report.

6  **Q.**  And do you remember testifying about those reports last

7  May?

8  **A.**  I do, yes.

9  **Q.**  Okay.  And did Analysis Group come back with a

10  recommendation to Apple as to which commission rate it should

11  charge?

12  **A.**  No, they did not.

13  **Q.**  What did they come back with?

14  **A.**  They came back with a -- a bunch of analysis, but the

15  bottoms-up analysis specifically looked at a reasonable range

16  of commission for each component bucket that they looked at.

17       **MS. RICHMAN:**  Okay.  Can we -- I'm sorry, let's see.

18  This is Epic's Exhibit CX0538.

19       Could Mr. Floyd [sic] pull that up?  We don't have it.

20       The second page.

21       **THE WITNESS:**  Sorry.  Is this in the new binder?

22  **BY MS. RICHMAN:**

23  **Q.**  It's in the old binder.  I'm sorry.  But they'll put it on

24  your screen in a second, Mr. Oliver.  I think we just need to

25  activate the screens.

 1          **THE CLERK:**  It's activated.

 2          **MS. RICHMAN:**  It's activated, okay.  Mine's not

 3   working.

 4          **MR. BORNSTEIN:**  Your Honor, I think control needs to

 5   be --

 6          **THE COURT:**  She's shifted control.

 7          **MR. BORNSTEIN:**  Thank you.

 8          **MS. RICHMAN:**  Can you go to the next page.

 9     (Exhibit published to witness, counsel, and the Court.)

10   **BY MS. RICHMAN:**

11   **Q.**  Do you remember Mr. Even asking you about this document?

12   **A.**  I'm sorry.  I don't see anything on my screen.

13   **Q.**  Okay.

14          **THE COURT:**  All right.  All right.

15     Publicize it to his screen.

16     Do you have it now?

17          **THE WITNESS:**  I do, yes.

18   **BY MS. RICHMAN:**

19   **Q.**  And I think you were trying to explain your interpretation

20   of Mr. Kim's email here.

21     Give you a second to read the whole thing.

22     But what do you -- what is your impression as to what he's

23   trying to convey in this message?

24   **A.**  My impression is that he was looking for a reasonable

25   comparable that we could use to draw the 20 percent commission

OLIVER - CROSS / RICHMAN

1  that had been proposed in that -- in that email and in the

2  presentation we reviewed for the purposes of helping to

3  justify it.  And for that purpose, he used a comparison with

4  another store.

5  Q.  And what was that store?

6  A.  That was Steam.

7  Q.  Okay.  And if you look at the bottom of that paragraph,

8  point 2, he says, "This approach is still not specifically

9  grounded in direct valuation of component services."

10     Do you see that?

11  A.  Yes.

12  Q.  And was the AG report intended to provide --

13         **THE COURT:**  Again, this is your witness.  Stop

14  leading.

15         **MS. RICHMAN:**  Okay.

16  Q.  And, Mr. Oliver, was the Analysis Group prepared to

17  provide direct valuation of Apple services?

18  A.  They were doing a kind of component valuation of those

19  services.

20  Q.  Okay.  Thank you.

21     Mr. Even asked you a number of questions about the

22  alternative payment model that was implemented in the

23  Netherlands.

24     Do you remember that?

25  A.  I do, yes.

OLIVER - CROSS / RICHMAN

1  **Q.** And in the Netherlands, if -- for dating apps what is the

2  commission rate that applies if they choose to avail

3  themselves of that program?

4  **A.** I believe it is 27 percent.

5  **Q.** And is that the same as the 27 percent that was determined

6  to -- or selected to be the commission rate in connection with

7  Wisconsin?

8  **A.** No.

9  **Q.** What are the differences between the Netherlands

10  implementation and the Wisconsin implementation?

11  **A.** One of the key differences is that in the Netherlands, you

12  are not able to offer IAP at the same time that you offer the

13  alternative options, which I believe include both alternative

14  in-app payments and linking out.

15      And the second notable option -- or difference is that the

16  commission applies in perpetuity rather than as a seven-day

17  from the linkout.

18  **Q.** And is that what you were referring to when you kept

19  saying in perpetuity?

20  **A.** Yes.

21  **Q.** Okay, thank you.

22      Let's go to a new topic.

23      Last time you were here, you testified about a series of

24  assumptions that were the foundation for the effective

25  commission rate calculated --

1    **A.**    Yes.

2    **Q.**    -- by -- one of the assumptions you testified about was an

3    assumption that large developers representing a significant

4    portion of App Store billings would implement the link

5    entitlement.

6        Do you recall that?

7    **A.**    Yes, I do.

8    **Q.**    Okay.  And do large developers represent a substantial

9    majority of App Store billings?

10   **A.**    They do, yes.

11   **Q.**    Can you please turn to, I think it should be tab 4 in your

12   binder, CX1303.

13   **A.**    Yes.

14   **Q.**    What's the title of this document?

15   **A.**    Business Risks Update.

16   **Q.**    And what's the date?

17   **A.**    The date is May 2023.

18   **Q.**    And do you recognize this document?

19   **A.**    Can you give me a minute to look at it?

20   **Q.**    Yes.

21   **A.**    (Reviewing document.)

22        Yes, I do.

23   **Q.**    And what is this document?

24   **A.**    I believe this is a document that was prepared by members

25   of my team, most notably my games team, related to the -- an

1    update kind of on the state of the games business for the

2    App Store.

3            **MS. RICHMAN:**  Your Honor, I move CX1303 into

4    evidence.

5            **MR. EVEN:**  No objection, Your Honor.

6            **THE COURT:**  It's admitted.

7            (Exhibit 1303 received in evidence.)

8            **MS. RICHMAN:**  Thank you.

9    **Q.**  You may have touched on this, but can you expand on why

10   this document was created?

11   **A.**  The reason that this document was created is that we're

12   kind of constantly looking at the business to understand kind

13   of underlying trends in the market and how that affects the

14   customer experience on the App Store and developers' business

15   success.

16       And I believe that this deck was prepared as kind of an

17   update in that time frame to kind of share a fairly

18   comprehensive overview of some of the more recent trends that

19   had been showing up in the market.

20   **Q.**  And was this deck prepared in connection with Project

21   Wisconsin?

22   **A.**  It was not.

23   **Q.**  Okay.  Can you please turn --

24           **MS. RICHMAN:**  And this is a highly confidential

25   document, Your Honor.  It contains a lot of financial data and

 1    also third-party financial data.  So we'd ask it to be left

 2    off the screen.

 3         **THE COURT:**  Okay.

 4         **MS. RICHMAN:**  Thank you.

 5    **Q.**  If you turn to page 521.

 6    **A.**  Yes.

 7    **Q.**  Which actually could be on the screen.

 8         But can you read the speaker notes there out loud?

 9    **A.**  Web stores.  You've heard us talking about this before.

10    Web stores are gaining popularity and the majority of our game

11    developers are exploring this option to increase margins.

12         **THE COURT:**  Okay.  First of all, I don't know where

13    we are.  Second of all, when you read, most people, including

14    lawyers, read too fast for the court reporter.

15         **THE WITNESS:**  Sorry, Your Honor.

16         **THE COURT:**  All right.  What page again?

17         **MS. RICHMAN:**  Your Honor, it's 521 are the last three

18    numbers of the -- the Bates.

19         **THE COURT:**  Okay.  Thank you.

20         All right.  Go ahead.

21         Let's start again.

22         **THE WITNESS:**  Should I read it again?

23    **BY MS. RICHMAN:**

24    **Q.**  Yes, please.

25    **A.**  "Web stores.  You've heard us talking about this before.

1  Web stores are gaining popularity and the majority of our game

2  developers are exploring this option to increase margins."

3  **Q.**  Thank you.

4      And just so we make sure everyone is on the same page, can

5  you explain what a web store is?

6  **A.**  Web stores are direct-to-consumer websites that game

7  developers, usually mobile game developers, have set up in

8  order to capture payments directly from consumers so that they

9  can then use those digital goods and services within games

10  distributed through the App Store or Google Play.

11  **Q.**  Can you give us an example of a web store?

12  **A.**  One fairly well-known one is Codashop which represents

13  multiple games, but they're also developer-specific websites

14  that have been set up.

15  **Q.**  Could you please look at the next page which is 522.

16          **MS. RICHMAN:**  And this one should not be on screen.

17          **THE WITNESS:**  Yes.

18  **BY MS. RICHMAN:**

19  **Q.**  Can you read the second sentence in the notes there.  Or

20  actually read the whole thing out loud, please.

21  **A.**  "And with our top-heavy business, where the top 1 percent

22  of our highest vendors generate 27 percent of our billings,

23  this becomes feasible and attractive for developers."

24  **Q.**  And in that first sentence, what is the "this," what

25  becomes feasible and attractive for developers?

1  **A.**  I believe they're talking about the ability to migrate

2  those spenders to direct-to-consumer channels or web stores.

3  **Q.**  And without saying any numbers, can you explain what the

4  table on the slide reflects?

5  **A.**  The table on the slide reflects the payor distribution and

6  the billings distribution based on cohorts of monthly spend.

7  **Q.**  And just directionally, what is the relationship between

8  the payor distribution and the billings distribution reflected

9  here?

10  **A.**  There are a small number of payors who make up a

11  disproportionate share of the billings distribution at the

12  higher end.

13  **Q.**  And then could you please read the second sentence in the

14  speaker notes?

15  **A.**  "They just need to target a small and highly engaged group

16  of players to move a meaningful amount of billings to their

17  web stores."

18  **Q.**  And -- and what do you interpret that to mean?

19  **A.**  Given the payor distribution is as I just described, they

20  are -- these game developers are able to target a very small

21  proportion of spenders within the game.  And by moving them

22  into their own websites to spend that money, they are able to

23  capture a meaningful share of their billings.

24  **Q.**  And could you please turn to --

25        **THE COURT:**  Before we do that, what is the --

OLIVER - CROSS / RICHMAN

 1          MS. RICHMAN:  Yes.

 2          THE COURT:  -- title on the top left?

 3          THE WITNESS:  Top left is "U.S. Monthly" --

 4          THE COURT:  No, in the -- in the actual chart.

 5          THE WITNESS:  "Monthly RPPU."

 6          THE COURT:  Which means what?

 7          THE WITNESS:  Average revenue per paying user.

 8          THE COURT:  Thank you.

 9          THE WITNESS:  No problem.

10     BY MS. RICHMAN:

11     Q.   So can you please turn to slide on page 530.

12     A.   (Reviewing document.)

13          Yes.

14     Q.   And what does the slide show?

15     A.   This slide shows the number of top 100 developers on the

16     App Store that have web stores available at that time.

17     Q.   So May 2023?

18     A.   I believe so, yes.

19     Q.   And do you know how this analysis was conducted or how

20     this figure was calculated?

21     A.   I believe this was done manually by my team.

22     Q.   Okay.

23          What does the slide say about the proportion of the top

24     100 games on the App Store that have a web presence almost two

25     years ago in May 2023?

1    **A.**  And just to clarify, I believe this is developers, not --

2                     (Simultaneous colloquy.)

3             **MS. RICHMAN:**  We'll start that over again.

4    **Q.**  So what does this slide say about the proportion of top

5    100 developers on the App Store that --

6    **A.**  Do you want me to reference numbers or not reference

7    numbers?

8    **Q.**  Please don't.  If you could do percentages --

9    **A.**  Yeah.

10   **Q.**  -- order of magnitude.

11   **A.**  The majority and nearly two-thirds are -- of those

12   developers have web stores at that time.

13            **THE COURT:**  How many games does an average developer

14   have?

15            **THE WITNESS:**  It really varies.

16            **THE COURT:**  From what to what?

17            **THE WITNESS:**  So there are some developers that have

18   one or two hit games that would be in the top 100, and there

19   are others who are very large, think Microsoft which owns

20   Activision Blizzard and King, which makes Candy Crush, and so

21   they have a whole portfolio.

22        So it really varies from, you know, just a couple to

23   dozens.

24            **THE COURT:**  Thank you.

25   / / /

1  BY MS. RICHMAN:

2  Q.  Did this analysis here of the number of top 100 developers

3  that have web stores, was that -- did that inform your

4  assumptions related to Wisconsin?

5  A.  It did, yes.

6  Q.  And in what way?

7  A.  One of the assumptions that we looked at was whether a

8  developer would be able to stand up a direct-to-consumer web

9  store and would make that available to customers through the

10 entitlement linkout.

11     And so our assumption was that 75 percent of billings

12 would be available to the entitlement, meaning that those apps

13 or games would have the entitlement made available to them.

14     And that 75 percent was informed in part by the fact that

15 60 -- you know, a meaningful percentage of our top developers

16 currently had them available today.

17 Q.  Do you recall our discussion last year about the

18 linkout -- linkout share assumption?  Let me -- maybe --

19 A.  I don't know if I do.

20 Q.  I could direct you to your testimony.  It's -- if you go

21 to tab 1 of your binder.

22 A.  Yes.

23 Q.  Let's look at page 500, lines 3 to 15.

24 A.  (Reviewing document.)

25     Yes.

1  **Q.**  And you're answering a question from the Court about

2  the -- how much of the revenues would flow outside of the app.

3  **A.**  Correct.

4          **THE COURT:**  That's actually from Mr. Even.

5          **MS. RICHMAN:**  I'm sorry, Your Honor?

6          **THE COURT:**  It -- it looks like it's from Mr. Even,

7  not me.

8          **MS. RICHMAN:**  Oh, I'm sorry, okay.

9      From Mr. Even.  I just have the excerpt.

10 **Q.**  And you say -- and can you see your answer to his

11 question?

12 **A.**  (Reviewing document.)

13     I see my answer to his question, yes.

14 **Q.**  Okay.  So -- and I think we referred to this as the

15 linkout share.

16 **A.**  Yes.

17 **Q.**  Okay.  Do you recall that this linkout share assumption

18 was referred to in the January 16 price committee deck?

19 **A.**  Yes, it was.

20 **Q.**  Okay.  And was this also referred to as entitlement share?

21 **A.**  Yes, it was.

22 **Q.**  Okay.  Can you turn in the same deck to page 615 -- oh,

23 sorry, no.  This is --

24     Okay.  Before we do that, let's look at your testimony at

25 page 501, lines 9 to 16.

```
 1           MR. EVEN:  Objection.  Your Honor, I'm not sure

 2   what's the basis in sending back to --

 3           THE COURT:  So first of all, I can't hear you.

 4           MR. EVEN:  I apologize, Your Honor.

 5      I'm -- I was trying to lodge an objection on the -- it's

 6   not clear what is it is basis to send him to read or reread

 7   his own testimony.

 8           THE COURT:  Yeah --

 9           MS. RICHMAN:  May I respond, Your Honor?

10           THE COURT:  You may.  If it's foundational to ask

11   some questions, then I understand because we had this long

12   gap.  But you didn't actually ask a question the last time.

13   So I'm looking for a question.

14           MS. RICHMAN:  That's fine, Your Honor.  I'm -- we

15   were using his testimony as a reference point because I

16   understood Your Honor wanted us to link up the testimony with

17   the documents that have been produced.  So that was the

18   purpose but --

19           THE COURT:  Okay.

20           MS. RICHMAN:  -- we can do it a different way.

21   Q.  Okay.  Let's leave this document momentarily and go to

22   tab 5 of your binder.

23      And are you there?

24   A.  I am, yes.

25   Q.  It's CX1304.  Do you recognize this document?  You can
```

1    take a minute to flip through it.

2    **A.**  (Reviewing document.)

3       It looks like a document that was created as part of the

4    Wisconsin work.

5    **Q.**  Do you recall reviewing this document in the ordinary

6    course of business?

7    **A.**  (Reviewing document.)

8       I certainly remember documents like it.

9    **Q.**  Do -- do you recognize the analysis in the document as

10   having been prepared by your team?

11   **A.**  I -- I believe it was prepared by my team in conjunction

12   with the finance team.

13   **Q.**  Okay.

14          **MS. RICHMAN:**  Your Honor, we offer CX1304 into

15   evidence.

16          **MR. EVEN:**  No objection.

17          **THE COURT:**  It's admitted.

18          (Exhibit 1304 received in evidence.)

19   **BY MS. RICHMAN:**

20   **Q.**  So if we could go to page 814 of the PDF.  And this one

21   should not go -- this slide -- particular slide should not be

22   shown on the screen.

23       Are you there?

24   **A.**  I am, yes.

25   **Q.**  Okay.

1    What's the title of this slide?

2    **A.**  The slide is Customer Adoption Range Examples.

3    **Q.**  And can you explain, without saying the numbers, what this

4    slide shows?

5    **A.**  This shows a few case studies that we had pulled together

6    at different points in time that looked at the ability for

7    different developers to shift customer spend from within apps

8    to web stores or direct consumer channels.

9    **Q.**  Is the information reported here based on data that Apple

10   collected in the ordinary course of business?

11   **A.**  Yes.

12   **Q.**  Now, in these case studies, were the developers paying any

13   commission to Apple for the transactions that took place on

14   the web?

15   **A.**  They were not, no.

16   **Q.**  And if that's the case, why did you -- why are they

17   included in this deck on Wisconsin?

18   **A.**  We wanted to understand how developer -- how likely was

19   the developers would be able to shift spend from within an app

20   to outside of an app.  And we felt like these were reasonable

21   case studies that were reflective of a developer's ability to

22   do so.

23   **Q.**  Okay.  At this time in May 2023, was there any other data

24   available to help Apple determining the amount of entitlement

25   share?

1    **A.**  We had other case studies that weren't listed here.  But

2    outside of those case studies, we didn't have a ton of

3    information relative to that assumption.

4    **Q.**  Okay.  Well, let's talk about some of the case studies.

5    The first one is NetEase.  Do you see that?

6    **A.**  Yes.

7    **Q.**  What is NetEase?

8    **A.**  NetEase is a large game developer based in China.

9    **Q.**  And again without saying actual numbers, can you summarize

10   what this slide says about NetEase.

11   **A.**  Yes.  It says that they offer discounted pricing outside

12   of the App Store, and using out-of-app marketing they were

13   able to move high spenders, making up a meaningful share of

14   their total business, based on our analysis.

15   **Q.**  Okay.  Let's look at the document that we were previously

16   on.  Sorry for the flipping, but tab 4, which is that business

17   risk update document.

18       And if you go to the page ending in 526.

19   **A.**  (Reviewing document.)

20   **Q.**  Is this --

21   **A.**  Yes.

22   **Q.**  Is this the analysis that underlies the information in the

23   Wisconsin financials update?

24   **A.**  It looks very similar, yes.  I believe this is the same or

25   very similar analysis.

1    **Q.**  Can you explain what this graph shows?

2    **A.**  So this -- oh, sorry, I'm looking at the wrong slide.

3    Yeah, so this graph shows a few things.

4    Give me one second.

5    **Q.**  Yeah, take your time.

6    **A.**  (Reviewing document.)

7    Okay.  This shows in blue the publicly available

8    information -- I think we gathered this from public filings --

9    that showed their mobile games net revenue trended over a

10   period of time from Q3 2018 through Q4 2022.

11   And you can see from that blue line that that grows fairly

12   steadily in a positive direction.

13   Then in comparison, there's a gray line that shows the App

14   Store billings for that same developer.  And you can see that

15   beginning in about 2021, we saw a fairly notable decline that

16   was not in line with the -- the public file -- the public

17   information that was shared by that same developer.

18   And so we did some analysis with our analytics data

19   science and finance team to understand what we believed was

20   basically a -- a baseline of loss that had been established

21   because of the use of direct-to-consumer channels.

22   **Q.**  And in the second sentence of the speaker notes, do you

23   see the estimated lost -- loss?

24   **A.**  Yes.

25   **Q.**  In the last quarter?

OLIVER - CROSS / RICHMAN

1    **A.**    Yes.

2    **Q.**    And without saying the number out loud, is it over a

3    hundred million dollars?

4    **A.**    It is, yes.

5    **Q.**    Is it over a $150 million?

6    **A.**    It is, yes.

7    **Q.**    Okay.

8        Let's look at 527, please, on the next page.

9        And this is again about NetEase.

10   **A.**    (Reviewing document.)

11       Correct.

12   **Q.**    But what is the purpose of this slide?  An you -- can you

13   tell?

14   **A.**    Yes.  So what this looks at is a -- a kind of a double

15   click at a specific game that is one of NetEase's largest

16   games.  And this particular slide, if we're talking about

17   Slide 27, looks at a breakout for that game of payor segments.

18   So based on their spend in different buckets.

19       And what you can see is that the loss or migration that is

20   happening is coming from the highest spenders.  And so that

21   aligns with what we had previously discussed that the majority

22   of the billings migration happening with web stores is a

23   fairly small cohort of high spenders.

24   **Q.**    And do you know how NetEase was able to drive high

25   spenders to their web store?

1   **A.**   We believe that they were able to do that primarily with

2   out-of-app communications, though there may have been some

3   instances where they were using things within the games that

4   were outside of policy.  And when those were identified, the

5   app review team would respond accordingly.

6   **Q.**   And was NetEase's success with both in-app and out-of-app

7   marketing informative in any way when you were deciding on the

8   entitlement share?

9   **A.**   It was, yes.

10  **Q.**   Okay.  Do -- does anything in Apple's rules prevent

11  developers from using a -- in Apple's entitlement share

12  program prevent developers from using a link to target

13  high-spend users?

14  **A.**   No.

15  **Q.**   Are there other developers Apple has observed shifting

16  significant billings to their web stores?

17  **A.**   Yes.

18  **Q.**   Let's go to page 525.

19      And what -- without again mentioning any numbers, what

20  does this slide show?

21  **A.**   This shows two other examples of individual games, so not

22  whole developers, that have been able to shift spend over from

23  within a game to web stores.

24  **Q.**   Okay.  And we need to be careful about identifying even

25  these developers because I -- this is not public information.

 1    But would you characterize those developers as small, medium,

 2    large developers?

 3    **A.**   They're both among the largest on the Store.

 4    **Q.**   Okay.  So we've talked about games, these three developers

 5    on Slide 525, correct?

 6    **A.**   Correct.

 7    **Q.**   Let's talk about nongame apps.  Can you go to 539 of this

 8    deck.

 9    **A.**   (Reviewing document.)

10    **Q.**   I'm sorry.  That's not the right slide.

11            **THE COURT:**  While you're on 539 --

12            **MS. RICHMAN:**  Yes, thank you.

13            **THE COURT:**  -- explain the last -- are you on there?

14    Could you explain that last statement to me?

15            **THE WITNESS:**  Sure, Your Honor.  Could you remind of

16    the statement?

17            **THE COURT:**  539 is where she --

18            **THE WITNESS:**  Oh, 539.

19            **THE COURT:**  -- had initially asked you.

20            **MS. RICHMAN:**  Yes, I do.  Let's just stay on 539,

21    please.

22            **THE COURT:**  Explain the last sentence.

23            **THE WITNESS:**  Of the -- of the -- the last -- fourth

24    bullet, "In Contrast"?

25            **THE COURT:**  Correct.

1           **THE WITNESS:**  So I think this is talking -- this is

2    looking at kind of a history of how web stores and

3    direct-to-consumer has evolved.

4        I think early on there was this idea that we saw

5    subscriptions moving very quickly to kind of web channels.

6    And so that was -- that's been happening for, you know,

7    five-plus years.

8        But it's really been the last couple of years where

9    transactional businesses like games have actually figured out

10   how to shift their spend over.

11          **THE COURT:**  So what does it mean -- what do you all

12   mean when you use the phrase "transactional business models"?

13          **THE WITNESS:**  Transactional business models are so

14   things that are individual consumable purchases.  So think in

15   a game like a gem or a digital good that is not renewing.  So

16   basically non-subscription purchases.

17          **THE COURT:**  So --

18          **MS. RICHMAN:**  Maybe I can help.

19   **Q.**  Mr. Oliver, were the last three examples we were talking

20   about, were those developers that have a transaction-based

21   monetization model or subscription-based?

22   **A.**  Transaction based.

23   **Q.**  And maybe we can talk about subscription.

24       Have you seen subscription app developers drive traffic

25   away from the App Store using direct sales?

OLIVER - CROSS / RICHMAN

1   **A.**   Yes.  As I was mentioning, that's actually been a common

2   practice for a longer period of time.

3   **Q.**   And do you see the first bullet on this slide?

4   **A.**   On 539?

5   **Q.**   Yes.

6   **A.**   Yes.

7   **Q.**   And can you read that out loud?

8   **A.**   Given the auto-renewable nature of subscriptions,

9   developers only need to prompt once -- users once for their

10  method of payment once to fully disintermediate us.

11  **Q.**   And what does that mean?

12  **A.**   The idea there is that developers are able to acquire

13  users directly through web stores and then generally can

14  retain them until a customer churns out.

15  **Q.**   And is this consistent with your experience working on the

16  App Store for the past ten-plus years?

17  **A.**   Yes.

18  **Q.**   Did these -- did these findings have significance to your

19  formulation of the link entitlement assumptions?

20  **A.**   Yes.

21  **Q.**   And what is that relevance -- significance?

22  **A.**   Specifically for the subscriptions?

23  **Q.**   Yes, please.

24  **A.**   Yeah.  We assumed that there would be a significant shift

25  of both transactional subscription billings.  And part of the

 1    reason that we maintained a commission on any transaction that

 2    was initiated from within the app going forward until there

 3    was a churn event was because the fact that you only need to

 4    do it once with a subscription user to get them out of the

 5    app.

 6    **Q.**   Can you please turn to Slide 545.

 7    **A.**   Yes.

 8    **Q.**   Again, no numbers.  What does this slide show?

 9    **A.**   (Reviewing document.)

10         Will you give a minute --

11    **Q.**   Yeah.

12    **A.**   -- just to review it?

13         (Reviewing document.)

14         So I believe this is an analysis that my team did that

15    looks at paid plans as a share of active iOS devices.

16    **Q.**   And what was your conclusion here?  And if you'd like to

17    reference the speaker notes or read those out -- out loud.

18    **A.**   Sure.  I can -- I can read them if it would be helpful.  I

19    can also try to paraphrase.

20    **Q.**   Go ahead and paraphrase then.

21    **A.**   So when we looked at the percentage of paid plans that

22    were on in-app purchase relative to our estimates for the

23    total active devices that were using those services, we found

24    that there was a very small percentage, often in the single or

25    low double digits, that were actual subscribers on in-app

1    purchase relative to active users who were using those

2    services on iOS.

3    **Q.**  And can you read the last paragraph of the speaker notes,

4    which I think is the language you were maybe paraphrasing?

5    **A.**  Yes.

6    **Q.**  Go ahead.

7    **A.**  "However, even after all of our business optimization and

8    featuring efforts with top developers and despite a few

9    exceptions for smaller managed developers, we are typically

10   only a small share of their subscriber base for Apple

11   customers."

12   **Q.**  Was the data on this slide relevant to you in analyzing

13   how subscription developers might drive billings outside of

14   the App Store with in-app links?

15   **A.**  Yes.

16   **Q.**  How so?

17   **A.**  Again, we assumed that developers on the subscription side

18   were doing this already very actively based on -- based on

19   what we were seeing.  And we assumed that they would only need

20   to be able to do this once to kind of retain those subscribers

21   thereafter.

22   **Q.**  Let's turn back to tab 5, page 814.

23   **A.**  (Reviewing document.)

24       Yes.

25   **Q.**  And what is the developer listed in the middle there?

1    **A.**   The developer listed there -- can I say the name or --

2    **Q.**   Yes.

3    **A.**   Is Disney.

4    **Q.**   Disney Plus.

5    **A.**   Disney.  Well, the developer is Disney.  The app is Disney

6    Plus.

7    **Q.**   Okay.  Is Disney Plus an example of a subscription

8    developer?

9    **A.**   It is, yes.

10   **Q.**   And what does this slide report about Disney's ability to

11   drive billings outside of the app?

12   **A.**   So this is related to a specific point in time where we

13   saw Disney went from having a couple of services that were

14   available in in-app purchase to creating a bundle of services,

15   and that bundle was only available outside of the App Store on

16   the website.

17       And so this reflects our analysis of basically the

18   increased churn or the share of customers that we saw leaving

19   the App Store through their subscriptions to basically what we

20   believe to be purchase bundles directly through the web.

21   **Q.**   And how does that percentage of billings shift compare to

22   your assumptions about the link entitlement share?

23   **A.**   It's right around the same amount.

24   **Q.**   And is that the same for NetEase as well?

25   **A.**   It's a little bit higher than NetEase, but around the same

OLIVER - CROSS / RICHMAN

 1    amount, yes.

 2    **Q.**  What's the final example listed on this slide?

 3    **A.**  It's Epic.

 4    **Q.**  And why is Epic on here?

 5    **A.**  This provided a slightly different case study that we felt

 6    was useful as a comparison to the first two.

 7         In the first two, we largely believe that developers were

 8    complying with the rules and telling users about these new

 9    options outside of their apps or games.  And they were able to

10    move a meaningful customer base over with that.

11         In the case of Epic, they knowingly broke the rules and

12    were actually putting the pricing language within the app

13    itself.  And so -- or the game itself.

14         And so we felt like this was representative of an example

15    where the messaging was happening within the app, and so there

16    was going to be a greater migration with that additional

17    messaging.

18    **Q.**  Well, do you recall with Epic, was it -- what -- what

19    language they put in the app?

20    **A.**  I believe they offered certain digital goods at a lower

21    price.

22    **Q.**  And was there any way to make those transactions included?

23    **A.**  I believe they could purchase directly there.

24    **Q.**  And is there -- is that different from the link

25    entitlement program?

1    **A.**    In that case, you had to link out --

2    **Q.**    Whereas --

3    **A.**    -- to an --

4                      (Simultaneous colloquy.)

5    BY MS. RICHMAN:

6    **Q.**    Whereas in Epic, how is that -- how is Epic different from

7    the linkout entitlement example?

8    **A.**    Again it's been a little while since I -- but if I'm

9    remembering the implementation correctly, they were actually

10    able to purchase using an alternative form of payment

11    processing within the game.

12    **Q.**    So was the Epic percentage there relevant to your link

13    entitlement share assumption?

14    **A.**    It was, yes.

15    **Q.**    Was it higher or lower than the share you assumed?

16    **A.**    It was meaningfully higher.

17    **Q.**    And why didn't you match your assumption with the Epic

18    example?

19    **A.**    It was a -- a fairly short example or period of time where

20    they were able to do this.  And so we thought that when you --

21    you know, if we were trying to generalize that to be

22    applicable to the entire catalog of apps and games, we felt

23    like it was likely to be at the very high end of the spectrum

24    of how much a specific app or game was going to be able to

25    move over to web stores.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  **Q.**  Were these case studies created for the purposes of this

2  case?

3  **A.**  No.

4  **Q.**  Well, what was the purpose they were created for?

5  **A.**  We were trying to understand what was happening with our

6  business in specific instances so we could understand how we

7  could respond or evolve.

8  **Q.**  And as the head of the App Store, why is this data

9  important to you?

10  **A.**  We want to know what our developers are doing so that we

11  can continue to service them and provide, you know, a great

12  business opportunity.

13  **Q.**  Going back to May 2023, was there other data available to

14  you to help you gauge a reasonable entitlement share?

15  **A.**  We had additional case studies beyond the three we listed

16  here.

17  **Q.**  And we talked about some of those?

18  **A.**  Yes, we did.

19  **Q.**  Okay.  And did you believe this was the best data

20  available for the purposes of establishing the entitlement

21  share?

22  **A.**  We did, yes.

23  **Q.**  Okay.  Let's talk briefly about the effective commission

24  rate.  Under the link entitlement program, when does the

25  developer pay a commission to Apple?

OLIVER - CROSS / RICHMAN

1   **A.**   They pay a commission to Apple after -- sorry, can you

2   repeat the question?  I'm just trying to make sure I

3   understand it.

4   **Q.**   Sure.  If -- under the link entitlement program, if a

5   consumer links out, in what circumstances would the developer

6   pay a commission to Apple?

7   **A.**   They pay a commission for the purchases of digital goods

8   or services for the period of seven days after that.

9   **Q.**   And did you believe that developers would have the ability

10  and incentive to adopt external links even though Apple was

11  commissioning transactions within seven days of linkout?

12  **A.**   Yes.

13  **Q.**   And why is that?

14  **A.**   We have seen many examples where developers have been able

15  to use various forms of communication.  We just covered a

16  couple of them.  And not only move those customers over once

17  but actually keep them within those existing channels, and

18  that's what's driven a lot of the spend migration that we --

19  we just looked at.

20  **Q.**   Let's talk a little bit about the seven-day window.  In

21  choosing the seven-day window, was that decision based on

22  data?

23  **A.**   Yes.

24  **Q.**   And I think you testified about this previously.  But can

25  you remind us what that data was?

1    **A.**   Yeah.  We looked at a few different data points.  The

2    first was we got data points from Analysis Group about the

3    windows of time that were used for what we felt like were

4    reasonable comparables.  That included both affiliate programs

5    as well as advertising windows of time.

6         And then that gave us a range of, I think, anywhere from

7    24 hours up to 90 days.  And then we looked at our spend

8    distribution for customers who make their first purchase and

9    kind of what their spend looks like in periods of time after

10   that.

11        And we felt like the seven-day -- the seven-day window

12   struck a reasonable balance between allowing developers to

13   capture most of the value from those customers after seven

14   days while still being within the range that Analysis Group

15   had provided.

16   **Q.**   Can you please go to tab 7 in your binder.  And this is a

17   previously admitted exhibit, CX0054.

18   **A.**   Yes.

19   **Q.**   And what is this document?

20   **A.**   This looks like it is the price committee deck that was

21   used in the meeting in January 2024.

22   **Q.**   Okay.  Can you please turn to page 54.39.

23        (Exhibit published to witness, counsel, and the Court.)

24             **THE WITNESS:**  Yes.

25   / / /

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

OLIVER - CROSS / RICHMAN

1  BY MS. RICHMAN:

2  **Q.**  Do you recall who prepared this slide?

3  **A.**  I believe this was prepared by the working group, and more

4  specifically the finance team.

5  **Q.**  And what does this slide show?

6  **A.**  This looks at the percentage of billings that happened

7  within certain time windows from the initial purchase.

8  **Q.**  And I know it's difficult to read.  It might be easier to

9  see on your screen.  There is an asterisk with a small

10  footnote on the bottom left-hand side.

11  Do you see that?

12  **A.**  Yes, I do.  Do you want me to read it?

13  **Q.**  Yes, please.

14  **A.**  LTV estimates for linking out based on IAP payor LTV.

15  **Q.**  And can you explain what that means?

16  **A.**  Yes.  Our best proxy for understanding what spend behavior

17  would look like on the web was to use in-app purchase

18  behavior.  And we looked at basically the spend over a period

19  of, it looks like in this case a year, and then looked at what

20  percentage of spend happened in different time frames leading

21  up to that year.

22  **Q.**  Does the data presented here support your assumption that

23  there would be a significant amount of consumer spend after

24  seven days?

25  **A.**  Yes, it does.

OLIVER - CROSS / RICHMAN

1    **Q.**  And is that true for both non -- non-sub IAPs and

2    subscriptions?

3    **A.**  Yes, it is.

4    **Q.**  And is that your view even though Apple charges a

5    commission on recurring subscriptions?

6    **A.**  Yes.  It is because there would be churn events that would

7    happen or changes that would remove the commission.

8    **Q.**  And do you recall how this data was incorporated into the

9    effective commission rate calculation?

10   **A.**  Yes.  This was incorporated by basically assuming that

11   looking at a specific time window, the amount captured after

12   that was not commissioned.  So the commission would have been

13   zero percent at that point.

14   **Q.**  And did you -- at the time did you feel that this was the

15   best data you had available to estimate the percentage of

16   transactions that would take place within and outside the

17   window?

18   **A.**  We did, yes.

19   **Q.**  Okay.  Mr. Oliver, do you --

20        **MS. RICHMAN:**  You can take that down.

21   **Q.**  Do you recall that during your previous testimony, you

22   were asked several questions about Apple's video partner

23   program and the news partner program?

24   **A.**  I do, yes.

25   **Q.**  And you were specifically asked a number of questions of

OLIVER - CROSS / RICHMAN

1    why Apple decided that developers who are part of VPP and NPP

2    could not simultaneously take advantage of that program and

3    the link entitlement program.

4         Do you remember that?

5    **A.**  Yes.

6    **Q.**  Can you please turn to tab 11 of your binder.

7    **A.**  (Reviewing document.)

8         Okay, I'm there.

9    **Q.**  And what is this?

10   **A.**  This looks like it's a text thread.

11   **Q.**  Between who?

12   **A.**  Between me and Kunnal, though it looks like there may be

13   additional -- maybe it's just the two of us.

14   **Q.**  And Kunnal is Mr. Vij?

15   **A.**  Yes, it is.

16              **MS. RICHMAN:**  Your Honor, I move 1310 into evidence.

17              **THE COURT:**  Is there an objection?

18              **MR. EVEN:**  No objection, Your Honor.

19              **THE COURT:**  It's admitted.

20              (Exhibit 1310 received in evidence.)

21                   (Exhibit published.)

22   **BY MS. RICHMAN:**

23   **Q.**  And you recognize this document to be a iMessage exchange

24   you had on June 28th?

25   **A.**  I don't recognize it, but do you mind if I take a quick

OLIVER - CROSS / RICHMAN

```
 1   look?
 2   Q.  Sure.
 3   A.  (Reviewing document.)
 4       All right.
 5   Q.  Can you -- well, do you recognize -- do you remember this
 6   text exchange now?
 7   A.  I don't remember it specifically.
 8   Q.  Okay.  Can you look at the second page.
 9       You see what Mr. Vij writes?
10   A.  Yes.
11   Q.  What does he say?
12   A.  Says, "I think our argument on VPP NPP is weak."
13   Q.  And can you turn to page 551.
14   A.  (Reviewing document.)
15       Yes.
16   Q.  And you start your response to Mr. Vij's comment, is that
17   right?  And feel free to look through the pages we skipped
18   over.
19   A.  (Reviewing document.)
20       Sure.  Do you want me to read it?
21   Q.  Yes, please.
22   A.   I say, "I don't think it's the same.  VPP and NPP are
23   unique programs that have specific requirements to ensure
24   distinct user experience on Apple's platforms.  Here is the
25   page outlining the VPP requirements."  And then it looks like
```

1    I shared a link to the public documentation.

2        "The apps must be available on both iOS and tvOS, support

3    live tune in for your live content, integrate with Apple -- or

4    universal search, Siri, and the Apple TV app in all regions

5    for those features and your service are available support air

6    play."

7    **Q.**  And do you interpret this exchange as these messages being

8    a response to Mr. Vij's comments about VPP/NPP?

9    **A.**  I do, yes.

10   **Q.**  Okay.  Can you turn the page.

11   **A.**  Yes.

12   **Q.**  And Is that a continuation?

13   **A.**  Yes, it is.

14   **Q.**  And what do you say?

15   **A.**  I say, "There are also have program" -- I think that's a

16   typo.  "There are also program-specific benefits like allowing

17   customers who subscribe using a payment method outside of the

18   app to use that payment method for additional video

19   transactions within the app."

20   **Q.**  And is the rationale you gave Mr. Vij here in June 2023

21   for precluding simultaneous participation in VPP/NPP and the

22   link entitlement program the same rationale that you provided

23   to this Court in May 2024?

24   **A.**  It is, yes.

25          **MS. RICHMAN:**  Okay.  Thank you.

```
 1              No further questions, Your Honor.

 2              THE COURT:  Reexam?

 3                      REDIRECT EXAMINATION

 4   BY MR. EVEN:

 5   Q.  So I'll be jumping around a little bit, and try and bear

 6   with me.

 7        First of all, let me start, you were here when the Court

 8   was asking some question about Ms. Brown, correct?

 9   A.  Yes.

10   Q.  And Ms. Brown was sitting here at the time, correct?

11   A.  Yes.

12   Q.  And then she got up and left?

13   A.  I -- I don't know what happened after that.

14              MR. EVEN:  She's no longer here, right?

15              THE COURT:  She was here?

16              MS. RICHMAN:  She is in the courthouse today, Your

17   Honor.  I don't know if she's still here though 'cause my back

18   was turned.

19              THE COURT:  I didn't even -- okay.

20        Get her, Mr. Perry, right now.

21              MR. PERRY:  I don't know where she is, Your Honor.

22              THE COURT:  Leave the courtroom and go find her.

23              MR. PERRY:  Yes, Your Honor.

24   BY MR. EVEN:

25   Q.  Sir, we looked at a few decks today from May and June, I
```

 1    think all the way up to July of 2023.  Remember those?

 2    **A.**  The ones you and I talked about previously?

 3    **Q.**  Yes.

 4    **A.**  Yes.

 5    **Q.**  Okay.  And we saw notes from around the same time and we

 6    saw notes from meetings, right?

 7    **A.**  Yes.

 8    **Q.**  And in all the -- all the things we looked at, the word

 9    "Analysis Group" was not mentioned, right?  We didn't discuss

10    a single slide where it said we think this is okay because

11    something Analysis Group said.

12    **A.**  I -- I don't have any memory of that.

13    **Q.**  Okay.

14    **A.**  That's correct.

15    **Q.**  You talked about the difference and said in the

16    Netherlands in perpetuity whereas here we have the window, the

17    seven-day window.  Remember that?

18    **A.**  Correct.

19    **Q.**  All right.

20         **MR. EVEN:**  So can we bring up CX0832.

21      And I'm sorry, Your Honor, that's not in the binder, but

22    it's a publicly available document and we'll get a copy to

23    Your Honor as soon as we can.

24      (Exhibit published to witness, counsel, and the Court.)

25    / / /

 1   BY MR. EVEN:

 2   Q.  Do you see that this is --

 3          MR. EVEN:  Let's not put it up yet.

 4   Q.  You see that this is the guidelines from Apple about

 5   distributing apps in the Netherlands.

 6   A.  I can't see anything on my screen.

 7          MR. EVEN:  Can we --

 8      (Exhibit published to witness, counsel, and the Court.)

 9          THE WITNESS:  Yes.

10   BY MR. EVEN:

11   Q.  It is in the binder, I'm told.  And so I stand corrected

12   and you should have it in your binder.

13   A.  Sorry.  What's the CX number again?

14   Q.  832.

15   A.  Is this in your binder?

16   Q.  Yes.

17      Do you recognize these as the dating apps in the

18   Netherlands guidelines?

19          THE COURT:  No, I don't see it in the binder.  But go

20   ahead.

21          THE WITNESS:  I'm still getting there in the binder.

22   832.

23          THE COURT:  Oh, wrong binder.

24          THE WITNESS:  Okay.  Yes.

25          MR. BORNSTEIN:  It is in the binder that we provided,

 1    Your Honor.

 2                    **THE COURT:**  Yeah, I was looking at the wrong one.

 3                    **THE WITNESS:**  Yes.

 4                    **MR. EVEN:**  Your Honor, we'd like to admit CX0832.

 5                    **MS. RICHMAN:**  No objection.

 6                    **THE COURT:**  It's admitted.

 7                    (Exhibit 0832 received in evidence.)

 8    **BY MR. EVEN:**

 9    **Q.**  Okay.  If you turn to CX0832.8, do you see that there's a

10    section that says "Commission and Sales Reporting."

11    **A.**  Yes.

12    **Q.**  And in the Netherlands, if somebody clicks a link, then at

13    some point, the developer will have to report that to Apple,

14    correct?

15    **A.**  Yes.

16    **Q.**  And in the second paragraph, it says, "Developers using

17    these entitlements will be required to provide a report to

18    Apple recording each sale of digital goods and content that

19    has been facilitated through the App Store."

20        Do you see that?

21    **A.**  (Reviewing document.)

22        What sentence is it?  Oh, the first sentence.

23    **Q.**  Do you see that?  It's highlighted on your screen.

24    **A.**  I'm sorry, I'm looking at my folder.

25        Yes, I see that.

1  **Q.** And is it your testimony today that Apple considers the

2  words "facilitated through the App Store" meaning subsequent

3  to a click on a link at any point in time in perpetuity?

4  **A.** I -- I don't know what this meaning of facilitated is

5  relative to other meanings.

6  **Q.** Sir --

7  **A.** That's my reading of this sentence.

8  **Q.** Sir, is it your testimony that Apple expects developers in

9  the Netherlands to report to Apple under this guideline a

10 transaction that occurred seven years after somebody hit a

11 click?

12 **A.** That would be my understanding.

13 **Q.** That's how you read "facilitated through the App Store"?

14 **A.** That's my understanding, yes.

15 **Q.** Okay. Has Apple ever litigated that with any developer?

16 **A.** I don't believe we have.

17 **Q.** Has Apple ever audited any developer and said, "We noticed

18 that somebody, 18 months after they clicked the link, actually

19 signed up to your service and you didn't report"?

20 **A.** I don't think so.

21 **Q.** Sir, "facilitated through the App Store" may well in fact

22 be less than seven days, correct?

23 **A.** Correct.

24 **Q.** In fact, Mr. Schiller, when he was talking to you back in

25 June of 2023, said that the most natural time point is in the

 1    same browser session without leaving the browser session,

 2    correct?

 3    **A.**   I don't remember that specific discussion.

 4    **Q.**   Okay.  You agree with me that if a reasonable

 5    interpretation of "facilitated through the App Store" is

 6    within the browser session, then for the vast majority of

 7    users, the window in the Netherlands is greatly shorter than

 8    the seven days adopted in the U.S., correct?

 9    **A.**   Can you repeat the question?

10    **Q.**   Sure.

11        You agree with me that if a reasonable interpretation of

12    "facilitated through the App Store" means before the user left

13    the browsing session, then for the vast majority of users,

14    that would be far less than seven days after the click,

15    correct?

16    **A.**   Yes.

17        Can I provide one clarification?

18    **Q.**   No, you may not.

19        Now, I think the next section in the questioning by your

20    counsel pertained to CX1303.  Is that right?

21    **A.**   (Reviewing document.)

22    **Q.**   That's the business risks update.  Do you remember the

23    long conversation about that?

24    **A.**   (Reviewing document.)

25        I do, yes.

1    Q.   And that conversation pertained to an analysis of the --

2    that's in this slide deck of developers', and mainly gaming

3    developers', ability to direct users to web stores and other

4    out-of-app purchasing options, correct?

5    A.   Yes.

6    Q.   And this entire analysis pertains to directing users to

7    web stores without a link, correct?

8    A.   The --

9    Q.   That is the focus of this.  There was no link here.

10   A.   Well, most of them are happening through out-of-app

11   channels so not through an in-app link, that's correct.

12   Q.   And you understand that there was a trial on the merits of

13   Epic's claims in 2021, right?

14   A.   Yes.

15   Q.   Okay.  You testified at that trial, correct?

16   A.   I was deposed.  I did not testify.

17   Q.   Okay.  In your deposition and others at trial testified

18   that developers had the ability to direct users to websites

19   and other out of -- out-of-app purchasing options using

20   out-of-app communications.  You understand that that was one

21   of Apple's defense, correct?

22   A.   Yes.

23   Q.   And after hearing all that evidence, this Court already

24   ruled that that's not enough and there needs to be links,

25   buttons, and other calls to action in the app to facilitate

1    out-of-app purchases, correct?

2    **A.**   Yes, that was the -- the ruling.

3    **Q.**   And compliance with that injunction what -- why we're here

4    today, correct?

5    **A.**   Correct.

6    **Q.**   And you understand that it is not a defense to

7    noncompliance with the injunction to say, well, developers can

8    do it without a link, they're fine?

9    **A.**   I understand that, yes.

10   **Q.**   Now, all of the numbers that you show here of how much

11   developers have been able to do this, to direct people to

12   out-of-app solutions and web stores, those are done in a

13   situation where there is no commission, correct?

14   **A.**   Yes.

15   **Q.**   And just so we're clear, the web stores that are mentioned

16   here that are already up there and exist on the web, your link

17   entitlement program would not allow developers to link to

18   those, correct?

19   **A.**   I don't believe that's the case.

20   **Q.**   Sir, the linkout rules require that the developer link to

21   a website owned by the developer, correct, not to a

22   third-party store?

23   **A.**   I believe almost all of these examples direct to

24   first-party stores, not third-party stores.

25   **Q.**   A web store that serves more than one developer would not

1  be allowed to link to under the entitlement program, correct?

2  **A.**  I believe all these examples link to the developer's own

3  website.

4  **Q.**  I'm asking a simple question.  You mentioned yesterday I

5  think Codashare or some other store somebody --

6  **A.**  Codashop.

7  **Q.**  Codashop.  That sells third-party things as well, right?

8  **A.**  Correct.

9  **Q.**  And a developer would not be allowed to link to that store

10  because of that, right?

11  **A.**  That's correct.

12  **Q.**  Thank you.

13      Now, you said that you -- based on this analysis, you

14  expected that 75 percent of top games developers, I think you

15  said, would in fact opt for linkouts, correct?

16  **A.**  I think we said 75 percent of billings from the top

17  developers.

18  **Q.**  Whichever it was, that did not happen, correct?

19  **A.**  That's correct.

20  **Q.**  Not even close.

21  **A.**  That's correct.

22  **Q.**  Going to slide ending in 539 in the same CX1303.

23  **A.**  Yes.

24  **Q.**  The first point there is given the auto-renewable nature

25  of subscriptions, developers only need to prompt users once

1  for their methods of payment once to fully disintermediate us,

2  right?

3  **A.**  Correct, that's what it says.

4  **Q.**  Okay.  And you took care of that when you decided that

5  upon linkout, that one link is all it needs for Apple to then

6  charge a commission on all renewals in perpetuity, correct?

7  **A.**  Until there's a customer action.

8  **Q.**  Until there is a customer action canceling the

9  subscription, correct?

10  **A.**  That's not just -- that's not the only customer action

11  that would cancel the commission.

12  **Q.**  As long as there's auto-renewal, you are charging your

13  commission based on that one click, correct?

14  **A.**  Auto-renewal on the same plan.  If they change plans, it

15  would change -- it would change the -- it would remove the

16  commission in that case.

17  **Q.**  Okay.  Auto-renewal -- I don't know what auto-renewal --

18  I've never seen auto-renewal that changes the plan.  That

19  sounds illegal to me.  So I'll assume that most people

20  auto-renew only if you stay on the same plan.  Auto-renewal

21  will be subject to commissions under your entitlement program

22  in perpetuity, correct?

23  **A.**  That's correct.

24  **Q.**  Okay.  You were also asked about document CX1304 and on

25  the slide ending in 814.  And that's the NetEase, Disney Plus,

1    and Epic examples, right?

2    **A.**  Yes.

3    **Q.**  So first of all Disney Plus here, the example is that

4    Disney did something -- sold something that wasn't available

5    on the web, correct?

6         Let me rephrase that.

7         Disney sold something on the web that was not available

8    in-app, correct?

9    **A.**  It was a bundle.  The individual services were available

10   in-app.

11   **Q.**  I understand, but the actual product, the bundle that

12   Disney sold on the web was not available in-app, correct?

13   **A.**  Correct.

14   **Q.**  And that led to 35 percent, correct?

15   **A.**  I don't think I said the number.

16   **Q.**  Okay.  Now since your program has started, Disney stopped

17   selling subscriptions in the app, correct?

18   **A.**  That's correct.

19   **Q.**  And so Disney opted to go reader rather than adopt a

20   linkout with commission, correct?

21   **A.**  They chose to go reader, yes.

22   **Q.**  Okay.

23        Talking about Epic, I think you mentioned something about

24   the large number, and you mentioned that Epic used that large

25   number by -- or managed to divert a large number of people to

1    another solution by offering a lower price, correct?

2    **A.**  Based on our analysis, yes.

3    **Q.**  Okay.  And Epic was able to offer that lower price because

4    it was not subject to a commission, correct?

5    **A.**  They were breaking the rules of the App Store.

6    **Q.**  I understand they were breaking the rules, but the

7    alternative was not subject to a commission and therefore

8    offered lower prices by 30 percent, right?

9    **A.**  Yes.  They chose to price lower in the app and did not pay

10   a commission on that.

11   **Q.**  And by not paying a commission and offering a lower price,

12   they were able to attract a lot of users.  This is what this

13   shows, right?

14   **A.**  Based on our analysis, yes.

15   **Q.**  Okay.  You had no analysis of how much Epic would be able

16   to divert if it were subject to a commission and therefore the

17   price on the alternative payment would be as high or higher

18   than through IAP, correct?

19   **A.**  We assumed that they would be able to divert this amount.

20   We don't know.  This is the only case study we had.

21   **Q.**  You assumed.  Okay.

22          **MR. EVEN:**  If we can go to CX5439 -- 54.39, I should

23   say.

24   **A.**  (Reviewing document.)

25                  (Simultaneous colloquy.)

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1          **THE WITNESS:**  Is that in your binder?

2          **MR. EVEN:**  That is in the binder given to you by your

3    counsel.  And we're going to put it on the screen now.

4          **THE WITNESS:**  Oh, yes.  I've got it.

5          **MR. EVEN:**  And if we can enlarge it, that would be

6    good.

7                    (Exhibit published.)

8    BY MR. EVEN:

9    **Q.**  And that is this LTV analysis, correct?

10   **A.**  Yes.

11   **Q.**  Okay.  Now, you understand that setting aside the window,

12   if every new transaction goes through the tapping out a link,

13   then all these transactions throughout the first year are

14   going to be subject to 27 percent, correct?

15   **A.**  If every subsequent transaction goes through the exact

16   same link?

17   **Q.**  Correct.

18   **A.**  Yes.

19   **Q.**  And so when your counsel asked you if you assume or did

20   you believe that a large number of transactions actually will

21   not be subject to the commission, that is based on your

22   assumption that developers actually can get people to come

23   back to their website through what you describe as direct

24   channels rather than going back to the link in the app,

25   correct?

1    **A.**  Yes, which is supported by the case studies we just walked

2    through.

3    **Q.**  Sir, I'm not asking about what you think the support is.

4    I'm just saying this is the assumption, the hidden assumption

5    here is that once a developer -- once a user clicks and makes

6    an initial purchase, the next time they come back outside of

7    the seven-day window, they will come back by opening a browser

8    and just going to the website, correct?

9    **A.**  We do assume in the model that 50 percent would go back

10   through.

11   **Q.**  Okay.  So you have a model of a hundred percent or

12   50 percent?

13   **A.**  No.  We used 50 percent in the model.

14   **Q.**  You used 50 percent.  Okay.

15        Just so we're clear, that puts us in a world -- well, let

16   me take a step back.  We talked about how the goal of this

17   injunction would be to introduce an alternative payment

18   mechanism to IAP, correct?

19   **A.**  Yes.

20   **Q.**  And IAP is in fact a payment mechanism where Apple expects

21   every time the user to buy something, to go back and click on

22   IAP again, correct?

23   **A.**  It's available within the app so it only applies when a

24   user clicks on it within the app.

25   **Q.**  Okay.  And so your assumption is that while IAP is going

1  to function as a payment mechanism, the linkout is going to

2  function as a discovery mechanism, not as a payment mechanism

3  at all.  Your idea is that I click once and from there on, I'm

4  doing my payments on a completely different platform, not

5  touching the linkout again, correct?

6  **A.**  To clarify, we only assume that for 50 percent of

7  customers.

8  **Q.**  Okay.  But to make financial sense with a 27 percent

9  commission, for the vast majority of developers, you would

10  have to assume that a large percentage of the users are only

11  going to be using the linkout once in their life as a

12  discovery mechanism of this other wonderful world on the web,

13  correct?

14  **A.**  That's not correct.

15  **Q.**  Okay.  And these are -- developers who have been, let's

16  call it trained for years by Apple, whenever they want

17  something in an app to click on the nearest button they see

18  that says "buy," correct?  That's the training that a billion

19  people have gone through.

20  **A.**  I don't agree with that.

21  **Q.**  You don't agree that people's habits in apps are to see

22  something they want to buy, they expect a button that says

23  "buy" and click on it.

24  **A.**  We just looked at multiple examples that show that

25  customers are able and willing to shift significant amounts of

 1  their spend from what had previously been totally in-app

 2  purchases --

 3                    (Simultaneous colloquy.)

 4  BY MR. EVEN:

 5  Q.  We covered that.  Apple tried that for a month, and this

 6  Court decided that was not enough and not too persuasive.

 7      So the question I'm asking is your assumption is that in

 8  fact, the alternative of a linkout would make sense because it

 9  would be used as a discovery tool rather than an ongoing

10  payment tool, correct?  For 50 percent of users.

11  A.  I'm sorry.  I don't understand what you mean by a

12  discovery tool.

13  Q.  You don't understand what a discovery tool is?

14  A.  I -- I'm confused by your question.  So I wonder if you

15  could --

16  Q.  Sir, I think in the Analysis Group there are like four

17  pages about the App Store as a discovery mechanism, right?

18  A.  Correct.

19  Q.  Okay.  So we understand what discovery means; is that

20  fair?

21  A.  For the App Store, yes.  But I just want to make sure I

22  understand it for your question.

23  Q.  And your assumption is that for 50 percent of users, the

24  linkout, the URL that you would put outside of the purchase

25  flow would serve only to discover the developers' websites,

OLIVER - RECROSS / RICHMAN

 1   not as an ongoing payment mechanism that you hit a click and

 2   go pay.

 3   **A.**  It depends on the developer's implementation.

 4   **Q.**  That was your assumption, sir.  You just told us the

 5   assumption was that 50 percent of users will click it only

 6   once and not go back to the link, correct?

 7   **A.**  So the assumption is 50 percent of billings, which means

 8   that it could be the same customer doing it half the time, or

 9   it could be half the customers doing a hundred percent of the

10   time.  So I just want to be clear --

11                      (Simultaneous colloquy.)

12   **BY MR. EVEN:**

13   **Q.**  Stand corrected, sir.

14                      (Simultaneous colloquy.)

15   **BY MR. EVEN:**

16   **Q.**  Fifty percent of the billings would come from users who

17   only ever click on the link once.

18   **A.**  Again, no.

19   **Q.**  That's the -- no, okay.

20           **MR. EVEN:**  I don't think I have further questions at

21   this point, Your Honor.

22           **THE COURT:**  Reexam.

23                      **RECROSS-EXAMINATION**

24   **BY MS. RICHMAN:**

25   **Q.**  Just two quick questions for you, Mr. Oliver.

1    I think you didn't get a chance to complete one of your

2   answers about the Netherlands program.  There was something

3   you wanted to clarify.  Do you remember what it was?

4   **A.**  I don't.  I'm sorry.

5   **Q.**  Okay.  And then Mr. Even asked you about the trial and

6   your deposition in 2021.  Do you remember that?

7   **A.**  That, yes.

8   **Q.**  And when did you prepare the business risk update?

9   **A.**  I believe that business risk update was from May 2023.

10  **Q.**  And when were you formulating the assumptions that were

11  part of the effective rate calculation?

12  **A.**  Around that time.

13  **Q.**  Okay.  Thank you.  No further questions.

14          **THE COURT:**  Anything on those?

15          **MR. EVEN:**  I don't think on this, Your Honor.  We

16  would ask to keep Mr. Oliver on the stand until we have a

17  chance to study the new document and figure out whether we

18  need more on it.

19          **THE COURT:**  So you're not excused, Mr. Oliver.

20    We will let you know if you need to be back here tomorrow.

21  That means also you cannot talk to anybody yet, since you're

22  still under examination, about anything related to your

23  testimony or anything related to this litigation or Apple's

24  response to it.  Do you understand?

25          **THE WITNESS:**  Yes, Your Honor.

 1          **THE COURT:**  All right.  You may step down.

 2          **THE WITNESS:**  Thank you.

 3          **THE COURT:**  All right.  Ms. Brown, come forward.

 4     Not here?

 5          **MR. PERRY:**  Your Honor, she is here.  I wish to make

 6     a comment first, if I may.

 7          **THE COURT:**  Okay.

 8          **MR. PERRY:**  When the Court issued an order for

 9     Ms. Brown to appear tomorrow morning, she was in the

10     courtroom.  We had a witness on the stand.  We have a

11     sequestration order that precludes witnesses from hearing any

12     other testimony.  So I asked her to step out so as not to run

13     afoul of that order.

14     That was my decision.  She followed that decision.  She

15     walked across the street to the hotel and did not listen to

16     proceedings.

17     When the Court asked for her to get back, I called the

18     hotel and she walked back over.  And she's in the lobby.

19     I just wanted to make clear why she was not here is that I

20     was concerned that there would be some suggestion that the

21     sequestration order had been triggered.

22          **THE COURT:**  Okay.  Call her in.

23          **MR. PERRY:**  Thank you, Your Honor.

24                    (Pause in the proceedings.)

25          **THE COURT:**  Come to the mic.

1    **MR. PERRY:**  Your Honor, this is Jennifer Brown.  I

2    don't know if you want her at the podium or at the --

3            **THE COURT:**  At the microphone.

4        **MR. PERRY:**  Thank you, Your Honor.

5            **THE COURT:**  Ms. Brown.

6        **MS. BROWN:**  Good afternoon, Your Honor.

7            **THE COURT:**  So I'm looking at this document 538.

8    Can somebody put it on the overhead, please?  The last

9    page where she's instructing --

10            **MR. PERRY:**  May I give her a hard copy, Your Honor?

11            **THE COURT:**  You may.

12    Can somebody put it on.  We've got plaintiff's.

13            **MS. BROWN:**  Yes, Your Honor, I see it.

14            **THE COURT:**  You see on that third page where you say:

15    "Also one procedural tweak, can we change that 'prepared at

16    the request of counsel label in the slides' to 'prepared at

17    the request of the external counsel.'  This work is necessary

18    for our outside counsel to advocate our compliance."

19    Do you see that?

20            **MS. BROWN:**  Yes, Your Honor, I see that.

21            **THE COURT:**  All right.  So first of all, with respect

22    to this document, who told you outside counsel -- or which

23    outside counsel was working on that document?

24            **MS. BROWN:**  Your Honor, we were working with --

25            **THE COURT:**  Who specifically?

```
 1          MS. BROWN:  Mr. Perry and Ms. Richman.

 2          THE COURT:  So they actually had access to it and

 3   were working on it?

 4          MS. BROWN:  Correct, Your Honor.  We were working

 5   very closely with them throughout the entire process.

 6          THE COURT:  And who told you to do that?

 7          MS. BROWN:  Um, who told me --

 8          THE COURT:  Who told you to change the phrasing?

 9          MS. BROWN:  Your Honor, I don't have a recollection

10   if someone told me to change the phrasing particularly.  I --

11   I believe it's accurate, though, and it reflects more

12   accurately what was going on at -- at this time.

13          THE COURT:  And which of those outside counsels was

14   actually communicating with Mr. Oliver?

15          MS. BROWN:  We had pretty regular communications --

16          THE COURT:  We.  Don't use the word "we."

17          MS. BROWN:  Yes, Your Honor.

18          THE COURT:  I need to know specifically who.

19          MS. BROWN:  Ms. Richman and Mr. Perry, as well as

20   Mr. Wesneski were intimately involved in providing the

21   instruction and had direct communications with Mr. Oliver and

22   myself.

23          THE COURT:  Okay.  But not with -- well, Mr. Oliver

24   didn't -- he just testified --

25          MS. BROWN:  Uh-huh.
```

1          THE COURT:  -- that he was not communicating with

2     outside counsel.

3          MS. BROWN:  The -- my recollection, Your Honor, was

4     that there were conversations where he would communicate with

5     outside counsel.  We would be on phone calls together or on

6     emails where outside counsel is copied on those emails.

7          MS. RICHMAN:  Your Honor, this is a year before the

8     hearing.

9          THE COURT:  Do you have any questions, Mr. Even?

10         MR. EVEN:  I -- Your Honor, I'm not trying to cross

11    Ms. Brown.  I think -- we think this speaks for itself.  It's

12    not our understanding that any of these slide decks were

13    prepared at the request of any outside counsel, even if they

14    were involved.  I think we elicited testimony on that.

15       I don't know that I have much to add beyond that.

16         MS. BROWN:  I mean, Your Honor, I'm happy to -- I

17    mean, throughout this process we worked very closely and

18    the -- I don't know particularly which slide deck in question

19    this is, but we were involved very closely and directing and

20    working with the business to have these conversations and to

21    facilitate those conversations, so...

22         THE COURT:  What was it that -- what was it that you

23    were concerned about that compliance had to be advocated for?

24         MS. BROWN:  I don't have a specific recollection,

25    Your Honor, about this particular compliance.  I will say just

 1   based on the timing of this, because of the overlap with

 2   the -- matters in -- in Europe and et cetera, I do -- I do

 3   recall at that time the distinction between understanding the

 4   involvement of external counsel may be important to -- may be

 5   important and in an instance if the document became relevant

 6   elsewhere so --

 7           THE COURT:  Explain that.

 8           MS. BROWN:  So just meaning, Your Honor, that

 9   potentially -- it might be potentially important for other

10   jurisdictions to reflect the involvement of extern -- that the

11   involvement of external counsel just to make sure that that

12   was contemporaneously noted.

13           THE COURT:  I have significant concerns about Apple's

14   approach in this litigation given the overdesignation of

15   attorney-client privilege that you and your colleagues were a

16   part of.  This does not help.

17           MS. BROWN:  I understand, Your Honor.

18           THE COURT:  You all have ethical obligations, you

19   have obligations to the court, and I understand you have

20   obligations to your client.  But your duty of loyalty and

21   honesty takes precedence.

22           MS. BROWN:  Yes, Your Honor.

23           THE COURT:  Your client is not entitled to have you

24   engage in unethical conduct.

25           MS. BROWN:  Yes, Your Honor.

```
 1            THE COURT:  I'll leave it for now.
 2        We'll stand in recess for 20 minutes.
 3            MR. EVEN:  Thank you, Your Honor.
 4        (Recess taken at 2:00 P.M.; proceedings resumed at
 5    2:15 P.M.)
 6            THE CLERK:  Please remain seated and come to order.
 7            THE COURT:  All right.  We're back on the record.
 8        The record will reflect the parties are present.
 9        Mr. Even, next witness.
10            MR. EVEN:  Your Honor, Epic calls Mr. Kunnal Vij.
11            THE COURT:  Do we have a new set of binders?
12            MR. EVEN:  We do, Your Honor.
13                    (Pause in the proceedings.)
14            THE CLERK:  Please raise your right hand.
15
16                        KUNNAL VIJ,
17    called as a witness for the plaintiff, having been duly sworn,
18    testified as follows:
19            THE WITNESS:  I do.
20            THE CLERK:  Please be seated.
21        Speak clearly into the microphone.  State your full name
22    and spell your last name for the record.
23            THE WITNESS:  Kunnal Vij, V-I-J.
24            THE COURT:  Okay.  Good afternoon, sir.
25        You, may proceed.
```

```
 1            MR. EVEN:  Thank you, Your Honor.

 2                    DIRECT EXAMINATION

 3   BY MR. EVEN:

 4   Q.  Good afternoon, Mr. -- do you pronounce it Vij or Vij?

 5   A.  Vij.  Both works.

 6   Q.  Okay.  Thank you.

 7       I'm Yonatan Even.  That's how I pronounce it.  I represent

 8   Epic Games, and I'll be asking you some questions.

 9   A.  Uh-huh?

10   Q.  Nice meeting you.

11       I believe we put a binder before you and I will be

12   referring you to that binder --

13   A.  That too.

14   Q.  -- throughout.

15   A.  Yes.

16   Q.  It should have your name on it.  If there are some older

17   binders there, I apologize.

18       Mr. Vij, you are a senior manager of finance at Apple

19   Services; is that right?

20   A.  Yes, it does.

21   Q.  Who do you report to?

22   A.  Mr. Nick Barton.

23   Q.  And who did you report to between May and -- 2023 and

24   January 2024?

25   A.  Mr. Nate Barton.
```

 1          **THE COURT:**  Can you move closer to the mic or move

 2     the mic closer to you.

 3          How do you spell his last name?

 4          **THE WITNESS:**  B-A-R-T-O-N.

 5          **THE COURT:**  B-A-R-T-O-N?

 6     BY MR. EVEN:

 7     **Q.**  You're aware that we are here today in connection with a

 8     motion for contempt regarding Apple's response to this Court's

 9     injunction?

10     **A.**  I am.

11     **Q.**  And you're aware the injunction issued in September 2021?

12     **A.**  I am.

13     **Q.**  Between spring of 2023 and through January 2024, as part

14     of Apple's consideration of its response to the injunction,

15     you undertook some financial analysis of the impacts of

16     various commission rate options, correct?

17     **A.**  Yes.

18     **Q.**  Who directed you to undertake these financial analysis

19     work?

20     **A.**  It was part of the working group.  Multiple people in the

21     working group were assigning different commission dates, and I

22     was asked to work on those.

23     **Q.**  Okay.  Who was directly in charge of the finance team of

24     which you were -- I understand you were a part of?

25     **A.**  Mr. Alex Roman.

1  **Q.**   Okay.  And you created slides for and presented slides at

2  meetings with Apple's executive team discussing Apple's

3  response to the injunction; is that right?

4  **A.**   Yes, it does.

5  **Q.**   Did you review this Court's injunction in connection with

6  your work on the external link entitlement program?

7  **A.**   I did not.

8  **Q.**   Do you understand that the injunction restrains Apple from

9  prohibiting developers from steering customers to external

10  purchasing mechanisms through links, buttons, and other calls

11  to action?

12  **A.**   That's the language I understood, yes.

13  **Q.**   And you understand that a fundamental problem this Court

14  had identified with Apple's anti-steering rules was that they

15  resulted in higher costs to developers because competition was

16  now driving down Apple's commission rates?

17  **A.**   Yes.

18  **Q.**   If you turn to Exhibit CX0265 in your binder.

19  **A.**   (Reviewing document.)

20      I'm there.

21  **Q.**   Do you see that this is an iMessage chat between yourself

22  and Nate Barton from February 10, 2023?

23  **A.**   Yes.

24          **MR. EVEN:**  Your Honor, I move to admit

25  Exhibit CX0265.

1          **MS. RICHMAN:**  No objection.

2          **THE COURT:**  It's admitted.

3              (Exhibit 0265 received in evidence.)

4    **BY MR. EVEN:**

5    **Q.**  In this text chain, you send Mr. Barton various slides,

6    correct?

7    **A.**  Can I get a minute to review it?

8    **Q.**  Sure.

9    **A.**  (Reviewing document.)

10   **Q.**  I'll turn your attention specifically to 265.27, which is

11   entitled "Baseline Assumptions."

12   **A.**  (Reviewing document.)

13   **Q.**  Do you see that slide?

14   **A.**  I do.

15   **Q.**  Are the assumptions in the baseline assumptions based on

16   publicly available data?

17   **A.**  (Reviewing document.)

18       No.

19   **Q.**  This is proprietary Apple data?

20   **A.**  Yes.  And this does not pertain to the U.S. case.

21   **Q.**  That's not what I asked.  I asked whether this is

22   proprietary app data or not.

23   **A.**  (Reviewing document.)

24       Some of it is, yes.

25   **Q.**  Okay.

```
 1          So we're not going to put this up on the screen, but I'm
 2     going to try and talk through it, and let's not mention any of
 3     the numbers, please, out loud.  Okay?
 4     A.  Yes.
 5     Q.  Thank you.
 6          So the chart shows some baseline financial assumptions
 7     related to the various costs the developers face in connection
 8     with sales of digital goods for use in iOS apps, correct?
 9     A.  Yes.
10     Q.  On the right is a summary of external costs.  Do you see
11     that?
12     A.  I do.
13     Q.  And there are two main columns there.  Do you see that?
14     A.  I do.
15     Q.  And the left one is titled "Payments," correct?
16     A.  Yes, it is.
17     Q.  And that column shows the costs associated with payment
18     processing fees across various geographies and developer
19     sizes, correct?
20     A.  Yes.
21     Q.  So for example, this column reflects the average cost to
22     developers of credit card fees, direct carrier billing fees,
23     eWallet fees, et cetera.  Correct?
24     A.  No.
25     Q.  Well, payment fees would include credit card fees?
```

1    **A.**    Yes.

2    **Q.**    And they would include direct carrier billing fees?

3    **A.**    This does not.

4    **Q.**    This does not.  Okay.

5         And direct carrier billing fees are generally higher than

6    credit card fees, correct?

7    **A.**    Usually, yes.

8    **Q.**    Okay.  The right-hand column is entitled "Commerce Plus

9    Customer Service," right?

10    **A.**    Yes.

11    **Q.**    And this column shows the cost to developers of other

12    services related to in-app or web purchases, again across

13    various geographies and developer sizes, correct?

14    **A.**    Yes.

15    **Q.**    And so the costs reflected in this column would include

16    the costs of things like fraud detection, customer service,

17    et cetera, right?

18    **A.**    Yes.

19    **Q.**    And when a developer use IAP to sell digital goods, Apple

20    is responsible for providing these services on those

21    transactions, right?

22    **A.**    Yes.

23    **Q.**    But if a developer chooses to use an external link, for

24    instance, the developer would have to bear the costs of these

25    services for transactions completed on the web, correct?

1    **A.**    Yes.

2    **Q.**    Now, the costs reflected in the two -- the payment columns

3    and the commerce and customer service columns are cumulative

4    meaning that a developer using external links would have to

5    bear both the payment fees and the commerce and customer

6    service costs for these transactions, correct?

7    **A.**    Yes.

8    **Q.**    Now, the charts, as we said, discusses various sizes of

9    developers; is that right?

10    **A.**    Yes, it does.

11    **Q.**    And those are medium, large, and extra large?

12    **A.**    Yes.

13    **Q.**    Do you know what is the definition in this chart of a

14    medium developer?

15    **A.**    Someone who's between a million dollars and $10 million in

16    annual billings.

17            **THE COURT:**  I'm sorry.  I missed that.  Between a

18    million and...?

19            **THE WITNESS:**  Ten million.

20            **THE COURT:**  Thank you.

21    BY MR. EVEN:

22    **Q.**    And how does Apple define a large developer?

23    **A.**    Someone from between ten to about a hundred million

24    dollars.

25    **Q.**    And how does Apple define an extra large developer?

1    **A.**  I want to be clear.  That's not an Apple definition.

2    That's a finance definition.  But extra large is hundred

3    million dollars and above.

4    **Q.**  Okay.  And just to make it absolutely crystal, when you

5    say "finance definition," that's an Apple finance definition?

6    **A.**  No, it's a internal definition that our team created for

7    simplifying the analysis.

8    **Q.**  I understand.  Thank you.

9        And fair to say that on the App Store there are a lot of

10   medium developers, fewer large developers, and even fewer

11   extra large developers, correct?

12   **A.**  I'll have to check the numbers to be very specific.  But a

13   lot of developers have more than hundred millions dollars in

14   billings on the App Store.

15   **Q.**  Okay.

16       And just so we're clear, I think you mentioned it, but the

17   numbers you just a give me, those are billing numbers?

18   **A.**  They are.

19   **Q.**  Okay.  Now the chart shows that payment fees decrease with

20   size, correct?

21   **A.**  Yes.

22   **Q.**  And so large developers pay less than medium developers

23   but more than extra large developers, for instance, right?

24   **A.**  Yes.

25   **Q.**  And that is just because the assumption or the data

1   suggests that a very large developer that has a lot of

2   transactions of a lot of money can get better rates from

3   credit card companies for instance, correct?

4   **A.**   Yes.

5   **Q.**   And the chart does not assess costs for small developers,

6   correct?

7   **A.**   It does not on this chart, yes.

8   **Q.**   And but fair to assume that the costs faced by small

9   developers would be even higher than those faced by medium

10  developers, correct?

11  **A.**   No, it's not.  It's not.

12  **Q.**   Okay.  So I want to ask you some specific questions.  And

13  again, let me remind you not to speak the numbers because you

14  assured us that these are not public.

15      So I want to take a look at the total external costs for a

16  medium developer, for example.  Okay?

17      And so according to this chart, what I'm going to have to

18  do is add up -- let's take a look at the U.S., that's the

19  first row, right?

20  **A.**   Yes.

21  **Q.**   So what I'm going to have to do is add up the number under

22  payments, medium, under the row U.S., correct?

23  **A.**   Yes.

24  **Q.**   And I would have to add that to commerce and customer

25  service, medium U.S., correct?

1    **A.**   Yes.

2    **Q.**   Okay.  And the same is going to be true for large and

3    extra large developers, correct?

4    **A.**   Yes.

5    **Q.**   And if I do that for any size developer under the U.S. on

6    the U.S. row --

7    **A.**   Yes.

8    **Q.**   -- that sum is going to be higher and sometimes

9    significantly higher than 3 percent, correct?

10   **A.**   Yes.

11   **Q.**   Now, let's take a step back.  You agree that linked-out

12   transactions are not as seamless as IAP, correct?

13   **A.**   I do not.

14   **Q.**   You do not agree with that?

15   **A.**   I do not.

16   **Q.**   You do not agree that there will be more breakage when

17   somebody links out because that is a less seamless experience

18   compared to IAP?

19   **A.**   It depends on the developer's implementation.

20   **Q.**   If you go to CX224.15, that's a document that's already

21   been admitted.

22                    (Exhibit published.)

23   **BY MR. EVEN:**

24   **Q.**   Do you recognize this slide, sir, from a June 20

25   presentation given by yourself and others to Mr. Cook?

 1   **A.**   (Reviewing document.)

 2        Yes, I do.

 3   **Q.**   And I assume that when you speak to Mr. Cook, you are

 4   trying to be as truthful and forthcoming and informative as

 5   you can be, right?

 6   **A.**   Yes.

 7   **Q.**   And do you see that there are talking -- speaking notes on

 8   this slide, and it says "Kunnal" at the top, correct?

 9   **A.**   Yes, it does.

10   **Q.**   And notwithstanding the fact that I understand Kunnal

11   should have one "n," this is you, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  If I look at the second paragraph, do you see that

14   it says:  "We know it's very likely that when a linkout

15   happens, there will be some breakage, meaning customer

16   dropping off during the buy flow process due to a less

17   seamless experience compared to Apple's IAP."

18        Did I read that correctly?

19   **A.**   Yes, you did.

20   **Q.**   Okay.  And assuming that statement is correct and there's

21   going to be more breakage on linkouts than on IAP, that would

22   mean that for linked-out transactions to make sense to a

23   developer, they would have not only to meet the price of IAP,

24   they would have to be cheaper than IAP, correct?

25   / / /

1    **A.**   (Reviewing document.)

2         Can I review this deck for a second?  I just want to be

3    sure --

4    **Q.**   We can close out the deck.  I'm not talking about the deck

5    anymore.

6    **A.**   It depends actually.

7    **Q.**   It depends?

8    **A.**   It depends.

9    **Q.**   Sir, you are a finance person?

10   **A.**   Yes, I am.

11   **Q.**   You agree that if you are selling a lesser product against

12   a superior product in terms of quality, the lesser product to

13   make sales would have to be cheaper, correct?

14   **A.**   Yes.

15   **Q.**   Okay.  And so if linkouts are an inferior product because

16   of they are less seamless than IAP, they would have to be

17   cheaper to make sense, correct?

18   **A.**   I don't believe linkout will be less seamless as well.

19   All I'm saying is it depends on the developer's implementation

20   of the linkout.  If the implementation is bad, I agree with

21   your statement.

22   **Q.**   Sir, we just saw what you told Mr. Cook.  You don't speak

23   to Mr. Cook on a daily basis, I assume, correct?

24   **A.**   I do not.

25   **Q.**   And you take any opportunity to speak to Mr. Cook

1    seriously?

2    **A.**  Yes, I do.

3    **Q.**  And nothing on that slide that we just read said depending

4    on implementation, only if the implementation is bad, nothing

5    about implementation.  The assumption was that there will be

6    more breakage on linkouts than on IAP because they're less

7    seamless, correct?

8    **A.**  We were not certain.  Hence, if you flip to the next

9    slide, I show as you --

10       If you flip to the next slide, I do show a zero --

11   scenario as well 'cause you were not certain about developer

12   implementation.

13       So I say if the development implementation is bad, the

14   breakage would exist.

15   **Q.**  Sir --

16   **A.**  But if the development implementation good, it will not.

17   **Q.**  Sir, I'm not asking you about sensitivity analysis that

18   everyone does and takes it from zero to 100 or zero to

19   whatever.

20       I'm asking you the statement to Mr. Cook was that there

21   will be more breakage because it's less seamless, correct?

22   **A.**  There would be breakage.

23   **Q.**  You understand that one of the goals of the injunction was

24   for linked-out purchases to put pricing pressure on IAP?

25   **A.**  That was my understanding, yes.

1   **Q.**  I'm sorry.  I did not --

2   **A.**  That was my understanding, yes.

3   **Q.**  And you understand that based on this chart, that simply

4   cannot happen if Apple charges a commission of 27 percent on

5   every linked-out transaction, correct?

6   **A.**  (Reviewing document.)

7       This chart is a no-fee chart.

8   **Q.**  Sir, I'm looking at the charts -- you can close out of

9   CX264.

10  **A.**  Okay.

11  **Q.**  Go back to the chart that you had discussed with

12  Mr. Barton, that CX265.27.

13      According to the numbers on CX265.27, there is no scenario

14  under which any developer can offer lower prices on linked-out

15  transactions if Apple imposes a 27 percent commission.

16  **A.**  Oops, give me one second.  I'm lost.  It was 264, you

17  said?

18  **Q.**  265.

19  **A.**  Five, okay.

20  **Q.**  Dot 27.

21  **A.**  Twenty-seven.

22      Sorry about that.  Can you repeat your question, please?

23          **THE COURT:**  It's really just simple math.  You don't

24  understand the question?

25          **THE WITNESS:**  If the question is on our transactions,

1    then yes.  But I think should be implemented for seven days.

2    Hence I was confused, Your Honor.  Just wanted to make sure I

3    got the question right.

4    **BY MR. EVEN:**

5    Q.  Okay.  We'll get to the seven days.  As long as there is a

6    27 percent commission on a linked-out transaction, that

7    linked-out transaction is going to be more expensive to any

8    developer and every developer based on this chart than an IAP

9    transaction at 30 percent, correct?

10   A.  Yes, for that particular transaction.

11   Q.  Right.

12       All right.  Let's turn to a different document.  Let's go

13   to CX216.

14   A.  (Reviewing document.)

15   Q.  This is an iMessage chat between you and Meredith Thieme.

16   Do you see that?

17   A.  Yes, I do.

18   Q.  And it's from April 3rd, 2023.  Correct?

19   A.  Yes, it is.

20       **MR. EVEN:**  Your Honor, I move to admit Exhibit CX216.

21       **MS. RICHMAN:**  No objection.

22       **THE COURT:**  It's admitted.

23       (Exhibit 216 received in evidence.)

24   **BY MR. EVEN:**

25   Q.  Back in April 2023, Meredith Thieme worked as a senior

VIJ - DIRECT / EVEN

```
 1    financial analyst at Apple; is that right?

 2    A.   Yes, it is.

 3    Q.   She's no longer at Apple, I gather?

 4    A.   She's not.

 5    Q.   So let's go to the slide on CX216.12.

 6         Do you see that slide?

 7                       (Exhibit published.)

 8         THE WITNESS:  Yes, I do.

 9    BY MR. EVEN:

10    Q.   That slide is titled "Alternative Payments With

11    Commission/Revenue Impacts."  Do you see that?

12    A.   (Reviewing document.)

13         Yes.

14    Q.   And the slide has two rows.  One says "Exclusivity" and

15    one says "No Exclusivity," right?

16    A.   Yes.

17    Q.   The exclusivity row talks about alt payments allowed

18    alongside Apple IAP, right?

19    A.   Not allowed.

20    Q.   Sorry.  Under no exclusivity, alt payment allowed

21    alongside Apple IAP, correct?

22    A.   Yes.

23    Q.   And under exclusivity, alt payment not allowed alongside

24    Apple IAP, correct?

25    A.   Yes.
```

 1    **Q.**  What does exclusivity mean in this context, that alt

 2    payment is not allowed alongside Apple IAP?

 3    **A.**  If the developer has to choose between Apple IAP or any

 4    other alt payment method.

 5    **Q.**  Now, if we look at the numbers here, you see that there

 6    are commission discount numbers, correct?

 7    **A.**  Yes.

 8    **Q.**  And that means what is the difference of the commission

 9    that Apple charges between the alternative payment solution

10    and the IAP transaction, correct?

11    **A.**  Yes.

12    **Q.**  And so we have two and a half percent, for instance, that

13    would equate to a 27.5 percent commission on the alternative

14    payment on a transaction that, if done through IAP, would be

15    subject to the standard 30 percent, correct?

16    **A.**  Yes.

17    **Q.**  And it goes all the way to seven and a half percent which

18    would equate to a 22.5 percent commission on alternative

19    payments, correct?

20    **A.**  Yes.

21    **Q.**  And if we look at the no exclusivity part, you see that it

22    says for two and a half percent, so that's 27.5 percent,

23    correct?

24    **A.**  Yes.

25    **Q.**  Might not be economically viable for developer to shift

1   considering potential billing loss risk.  Correct?

2   **A.**  Yes.

3   **Q.**  And so your analysis, it was that at 27-1/2 percent, it

4   would just not be worth it to have an alternative payment at

5   all?

6   **A.**  Perpetual 27-1/2 percent without any time period, yes.

7   That was the statement.

8   **Q.**  Okay.  Now I want you to look at your screen, and I'm

9   going to put up a slide.  And I apologize, I don't have that

10  in your binder.  We just received this document.

11      And this is CX859.  That's the document Your Honor

12  discussed.

13      If we can go to page -- well, let's start with the first

14  page.

15          **MR. PERRY:**  Your Honor?

16      Mr. Schiller is here.  May I escort him out, given the

17  earlier instruction about this document?

18          **THE COURT:**  You're potentially still going to call

19  him?

20          **MR. EVEN:**  I am potentially going to still call him.

21  I haven't had a chance to really look at it.

22          **THE COURT:**  Okay.  Yes.  Thank you, Mr. Schiller.

23          **MR. EVEN:**  And it seems like we do have a copy, Your

24  Honor, so if we may --

25          **THE COURT:**  You may.

| | |
|---|---|
| 1 | **MR. EVEN:**  -- present. |
| 2 | **THE WITNESS:**  Thank you. |
| 3 | BY MR. EVEN: |
| 4 | **Q.**  Sir, do you see that this deck is called Epic Injunction |
| 5 | Implementation Proposal? |
| 6 | **A.**  Yes, I do. |
| 7 | (Mr. Schiller exited the courtroom.) |
| 8 | BY MR. EVEN: |
| 9 | **Q.**  And I can represent to you that this is a deck or at least |
| 10 | a draft of the deck that was present to Tim Cook at a meeting |
| 11 | on June 1, 2023. |
| 12 | You remember that you were at a meeting back in June 1, |
| 13 | 2023, with Mr. Cook? |
| 14 | **A.**  I don't remember the exact date, but, yes, I do remember |
| 15 | there was a meeting at that time. |
| 16 | **Q.**  If you go to Slide 51, do you see that we have a slide |
| 17 | that is very similar to the slides we just saw? |
| 18 | **A.**  Sorry.  The page numbers are stapled.  It's difficult to |
| 19 | see. |
| 20 | **THE COURT:**  It's the last. |
| 21 | (Simultaneous colloquy.) |
| 22 | BY MR. EVEN: |
| 23 | **Q.**  The page number is 359.32. |
| 24 | **A.**  Yes, I got it.  Thank you. |
| 25 | **Q.**  Okay.  And you see it says alternative payments with |

1  discounted commission.  Do you see that?

2  **A.**  Yes, I do.

3  **Q.**  And you see that there's linkout billing share at the top,

4  right?

5  **A.**  Yes.

6  **Q.**  And it's between 10 and 60, right?  Do you see that?

7  **A.**  Yes, I do.

8  **Q.**  And on the side, it says commission discount.  Do you see

9  that?

10 **A.**  Yes, I do.

11 **Q.**  And do you see that this too has nearly the same range

12 except instead of coming -- starting at 2.5 percent discount,

13 this one starts at 3, correct?

14 **A.**  Yes.

15 **Q.**  And so the three rows correspond to 27 percent commission,

16 25 percent commission, and 22.5 percent commission.  Correct?

17 **A.**  Yes.

18 **Q.**  And for the 3 percent and 5 percent commission rows, what

19 the slide says in terms of the impact, the revenue impact on

20 Apple is that might not be economically viable for developer

21 to shift.  Did I read that correctly?

22 **A.**  Yes, you read it correctly.

23 **Q.**  And what this means is that it might not be worthwhile for

24 any developer to shift any billing to -- to linked-out

25 purchases if the discount is 3 or 5 percent, correct?

1    **A.**   Three or 5 percent, which means Apple charges a 27 percent

2    or 25 percent commission perpetually without any --

3    **Q.**   Sir, I understand that you have this theory about the

4    window, and we're going to talk about it.  All this says is

5    that at 22 percent and 25 percent, this might not be

6    economically viable for developers to shift, correct?

7    **A.**   Without the time period, yes.

8    **Q.**   Okay.  And if you go to the next slide, do you see there's

9    a note there?

10   **A.**   (Reviewing document.)

11       Yes.

12   **Q.**   And it reads:  If we decided and had the ability to charge

13   a commission, we believe there would be very little developer

14   adoption of linkout, assuming a scenario where we would give a

15   cost of payments discount at 3 percent.  Correct?

16   **A.**   Yes.

17   **Q.**   Do you remember whether it was you or Mr. Barton or

18   somebody else who presented this slide to Mr. Cook?

19   **A.**   I think it was Mr. Barton.

20   **Q.**   Okay.  And Mr. Barton, I think we talked about that he was

21   your boss, correct?

22   **A.**   Yes.

23   **Q.**   Now, on the same slide, it also shows us at the very

24   bottom that even at seven and a half percent, or anything

25   under 50 percent of shiftouts, the numbers, the hit to Apple

 1  is going to be very small, correct?

 2  **A.**  (Reviewing document.)

 3      I wouldn't define the loss very small.

 4  **Q.**  Pretty small?  Okay.

 5  **A.**  I wouldn't define it as pretty small as well.

 6  **Q.**  Oh, you would define this as big in terms of the overall

 7  U.S. App Store business?

 8  **A.**  (Reviewing document.)

 9      It is -- it is a decent hit.

10  **Q.**  How much is it in terms of percentages?

11  **A.**  It's about -- about three and a half percentage points.

12  **Q.**  Are you talking about 10 percent and 20 percent?

13  **A.**  You said below 50.  So I was looking at the 40.

14  **Q.**  Okay.

15  **A.**  And if I look at ten and 20, yes, the number is very

16  small.

17  **Q.**  Okay.

18          **MR. EVEN:**  Oh, Your Honor, we would move to admit

19  CX859.

20          **THE COURT:**  It's admitted in its redacted form.

21              (Exhibit 859 received in evidence.)

22  **BY MR. EVEN:**

23  **Q.**  If you turn to CX224.

24  **A.**  (Reviewing document.)

25  **Q.**  You see this is an email from Mr. Shawn Cameron to

 1  yourself and multiple others dated June 19, 2023?

 2  **A.**  Yes.

 3                      (Exhibit published.)

 4  **BY MR. EVEN:**

 5  **Q.**  And this has been admitted already so we're going to jump

 6  right in.

 7       First of all, you see that Mr. Cameron is writing to Phil,

 8  Joz, Craig, Eddy, Kate, and that's essentially the executive

 9  team, correct?

10  **A.**  Part of the exec team, yes.

11  **Q.**  And it says prepared at the request of external counsel,

12  correct?

13  **A.**  Yes.

14  **Q.**  Okay.  Let's turn to 224.15.  And that is tiled "Option 1

15  Steady State Revenue Impact."

16       Do you see that?

17  **A.**  Give me one second.

18       (Reviewing document.)

19       Yes, I do.

20                      (Exhibit published.)

21  **BY MR. EVEN:**

22  **Q.**  And you recall that option 1 at the time was a

23  no-commission option?

24  **A.**  Yes, it was.

25  **Q.**  And you presented this slide, correct?

1    **A.**   Yes, I did.

2    **Q.**   On the leftmost column is a developer count, correct?

3    **A.**   Yes.

4    **Q.**   And this indicates the number of potential developers that

5    would join and use the linkout program, correct?

6    **A.**   Yes.

7    **Q.**   And this refers to the top -- top developers by revenue in

8    the U.S. App Store, correct?

9    **A.**   Yes.

10   **Q.**   And the other variable here to the right is the linkout

11   share.  And there's a range of values from 10 percent to

12   50 percent reflecting the percentage of revenue Apple loses

13   because transactions shift from IAP to linked-out transactions

14   on the web, correct?

15   **A.**   It does not --

16   **Q.**   Let me actually correct that.

17       The ten to 50 percent reflects the number of users that

18   would shift, correct?

19   **A.**   The billings that would shift, yes.

20   **Q.**   The percentage billing that would shift; is that right?

21   **A.**   Yes.

22   **Q.**   Thank you.

23       And then below that is a series of numbers that you

24   modeled based on the assumption of developer count adoption

25   and the number of billings from these developers that would

1    shift, and you extrapolated the hit to Apple's revenue,

2    correct?

3    A.  Yes.

4    Q.  Now in the talking points, you mentioned the notion that

5    we just discussed, that linking out will introduce some

6    breakage, meaning that a user might not complete the

7    transaction, right?

8    A.  Yes.

9    Q.  So let's turn to the next slide titled "Revenue Impact

10    With Breakage."  And this slide models how Apple's revenue is

11    affected based on how much of a developer's revenue is shifted

12    to linked purchases and how much breakage the developer

13    experiences, correct?

14                    (Exhibit published.)

15              THE WITNESS:  Yes.

16    BY MR. EVEN:

17    Q.  Now, on the leftmost column, we now have the breakage

18    percentage, correct?

19    A.  Yes.

20    Q.  And that goes from zero to 25 percent.  Right?

21    A.  Yes.

22    Q.  And the expectation is that breakage would be smaller the

23    more seamless the process is, correct?

24    A.  Yes.

25    Q.  That's part of what you said earlier, it depends in the

1    implementation, correct?

2    **A.**  Yes.

3    **Q.**  Now the breakage would increase as friction increases,

4    correct?

5    **A.**  From the developer's point of view, yes.

6            **THE COURT:**  From what?

7            **THE WITNESS:**  From a developer's point of view, yes,

8    the breakage will increase.

9            **THE COURT:**  What other point of view is there?

10           **THE WITNESS:**  'Cause we are talking about the

11   developer's billings.  So the breakage will be for him, yes.

12           **THE COURT:**  Okay, you just qualified it.  I

13   thought -- so I was trying to understand if there's a reason

14   for the qualification.  The answer is yes, isn't it?

15           **THE WITNESS:**  Yes, it is.

16   **BY MR. EVEN:**

17   **Q.**  Okay.  And I think I'm getting what you're trying to say.

18   So the more friction there is, the more breakage there is for

19   the developer, correct?

20   **A.**  Yes.

21   **Q.**  For Apple it actually may be good that there's breakage

22   because the hit to Apple's revenue may or may not increase.

23   It's not necessarily that the more breakage there is, the

24   more -- the hit increases to Apple, right?

25   **A.**  That's not what I'm saying.

1    **Q.**  Okay.  We'll get back to it then.

2        Now the chart only goes up to 25 percent breakage,

3    correct?

4    **A.**  Yes.

5    **Q.**  And the talking points note that this is because beyond

6    25 percent breakage, developers reach a tipping point where

7    linking out would no longer make economic sense, correct?

8    **A.**  Yes.

9    **Q.**  So your model shows that if friction results in 25 percent

10   breakage, linking out would not be worthwhile even when there

11   is no commission at all, correct?

12   **A.**  Yes.

13   **Q.**  And of course, as we saw in some of the earlier charts we

14   discussed today, if a developer does need to pay Apple a

15   commission, the breakage tipping point would be lower,

16   correct?

17   **A.**  Yes.

18   **Q.**  And of course Apple at least partially controls how much

19   friction and therefore how much breakage there is in the

20   linkout process, correct?

21   **A.**  I do not agree.

22   **Q.**  You do not agree.

23   **A.**  No.

24   **Q.**  Well, you understand, for instance, that Apple requires

25   the presentation of a scare screen before somebody links out

VIJ - DIRECT / EVEN

 1    to the web.

 2    **A.**   I'm not familiar with the term 'cause I wasn't working on

 3    it, the term you're using, but there is a screen that pops up

 4    for the user.

 5    **Q.**   Okay.  And if the screen is very scary to users, you would

 6    expect that that would result in more breakage, correct?

 7    **A.**   Logically, yes.

 8    **Q.**   And if it's less scary, then less breakage, correct?

 9    **A.**   Yes.

10    **Q.**   And if there's no screen at all, even less breakage,

11    correct?

12    **A.**   Yes.

13    **Q.**   And if the user needs to enter their account credentials

14    on the linked-out website, that would cause additional

15    breakage, correct?

16    **A.**   Yes.

17    **Q.**   And if they need to put in their payment credentials, that

18    would cause additional breakage, correct?

19    **A.**   Without payment credentials, there is no payment.  So I

20    don't understand the point of breakage if the developer

21    cannot --

22    **Q.**   I understand that you don't understand it.  But let's

23    focus on my question.

24         If you need to put in the payment credentials instead of

25    the payment credentials appearing automatically when you link

 1    out, that would create additional breakage, correct?

 2    **A.**  For that question, yes.

 3    **Q.**  Okay.  Then I apologize if I wasn't clear before.

 4         And if the user, to link out, needs to leave the

 5    merchandising flow and go to some other place in the app, that

 6    would affect breakage, correct?

 7    **A.**  It might, yes.

 8    **Q.**  Okay.  And you understand that Apple actually does control

 9    what this screen says and what -- whether the linkout is in or

10    out of the purchase flow and whether you use a dynamic or a

11    static URL, all that is controlled by Apple, correct?

12    **A.**  Yes.

13    **Q.**  Different topic.

14         Go to CX264.

15         Do you see that those are text messages between Nate

16    Barton and yourself?

17    **A.**  Yes.

18    **Q.**  And those are dated May 17, right?

19    **A.**  Yes, you're right.

20              **MR. EVEN:**  Your Honor, I move to admit Exhibit 264.

21              **MS. RICHMAN:**  No objection.

22              **THE COURT:**  It's admitted.

23                   (Exhibit 264 received in evidence.)

24                        (Exhibit published.)

25    / / /

 1   BY MR. EVEN:

 2   Q.  So if you go to page 11 of the document, that's 264.11,

 3   Mr. Barton is asking for an update on a conversation you had

 4   with Matt, right?

 5   A.  Can I orient myself on this for a second?

 6   Q.  Sure.

 7   A.  (Reviewing document.)

 8       Yes.

 9   Q.  And you respond by telling Mr. Barton that, quote, "Mainly

10   the push will be toward commission options," correct?

11   A.  Yes.

12   Q.  And you next say to Mr. Barton that, quote, "No one like

13   the no-commission option," right?

14   A.  (Reviewing document.)

15       Yes.

16   Q.  And you said to Mr. --

17           THE COURT:  Can you tell me what page we're on?

18           MR. EVEN:  I am on page now 264.13.

19           THE COURT:  Thirty or 13?

20           MR. EVEN:  Thirteen, one three.

21           THE COURT:  Okay, I see.

22           MR. EVEN:  The bubble saying "no one like the

23   commission option."

24           THE COURT:  Okay.  Go ahead.

25   / / /

 1    BY MR. EVEN:

 2    **Q.**  And further on Slide 13, you said that Mr. Fischer wanted

 3    to go back to the Court to explore if the Court would accept

 4    something like the DMA, right?

 5    **A.**  Yes.

 6    **Q.**  And you commented that this would be a weird ask, correct?

 7    **A.**  Yes.

 8    **Q.**  And then you told Mr. Barton that the crux of the

 9    conversation was that Apple will try for commission, correct?

10    **A.**  That's not what I meant from the text.

11    **Q.**  That's what the text says:  The crux of the conversation

12    is we will try for a commission.  Right?

13    **A.**  It does not say Apple.

14    **Q.**  I see.  So this refers to what?

15    **A.**  The -- for which -- the meeting for which I was giving the

16    update on, I'm talking about that specific group.  They will

17    try and pitch for the commission option.

18    **Q.**  I see.  And that group was which group again?

19    **A.**  They were a group of people who were in the room who were

20    talking about this.  I don't remember exactly who all were

21    there.  It's two years old.  But from the conversation,

22    definitely Mr. Fischer was there, Mike Fischer was there.  And

23    I don't remember who else was there in that room that day.

24    **Q.**  Okay.

25        And so fair to say that as soon as -- as early as mid May,

 1    there was a group of people who were supportive or intended to

 2    advocate for a commission solution, correct?

 3    A.   There was an ongoing debate to figure out which way we

 4    want to go.  And there was some people who were advocating for

 5    one option, yes.

 6    Q.   Okay.  And part of that debate occurred because it wasn't

 7    clear to anyone whether Apple could impose a commission,

 8    correct?

 9    A.   I wasn't involved in deciding why that was happening.  I

10    wasn't involved in those discussions and meetings,

11    unfortunately.

12    Q.   Okay.

13         In any event, while Mr. Fischer suggested that Apple might

14    come to this Court to seek clarification as to whether a

15    commission structure similar to the one adopted in the EU

16    would be permissible, no one at Apple, to your knowledge, has

17    done so before announcing Apple's response to the injunction,

18    correct?

19    A.   I think she was talking about the whole DMA and not just

20    the commission.

21    Q.   Okay.  But no one came to the Court to seek clarification

22    whether that would be a structure that's acceptable or not,

23    correct?

24    A.   I'm not aware of that.

25    Q.   So I want to talk a little bit about the lookback window

1   that you've mentioned, the seven-day lookback window, and see

2   how it developed.

3       So the lookback window defines how long after a user

4   clicks a link an out-of-app purchase would be subject to

5   Apple's commission, correct?

6   **A.**  Yes.

7   **Q.**  Under Apple's linkout entitlement program currently, all

8   purchases made within seven days after an external purchase

9   link are subject to a commission, correct?

10  **A.**  Yes.

11  **Q.**  And if you turn to CX251, which has already been admitted,

12  do you see that these are notes from a June 13 Wisconsin

13  meeting?

14  **A.**  (Reviewing document.)

15      I do see it on the screen.  You said 251?

16  **Q.**  Yes.  You can look on the screen as well.  It's the same

17  document.

18  **A.**  Yeah, I got it.

19  **Q.**  And you see that it says here under option 1, standard

20  commission with 3 percent discount from cost of payment for

21  transaction that are resulting from a link in-app, you see

22  that it says we need to come up with a session time 24 to 48

23  hours.  Right?

24  **A.**  (Reviewing document.)

25      Yes, I do see it.

1  **Q.**  And you remember that you were tasked with presenting

2  slides on this issue and analyzing what the lookback window

3  means?

4  **A.**  Yes, I was.  I did make a few presentations, but not all

5  of them.  But, yes, I was.

6  **Q.**  Okay.  If you turn next to CX223 that we looked at I think

7  earlier.  That's -- maybe we haven't.

8     So that's a June 16 email attaching a deck.  And if you go

9  to CX223.23 under fee option, do you see that Option A speaks

10  to a 27 percent commission with a 24-hour time limit, right?

11                    (Exhibit published.)

12          **THE WITNESS:**  Yes, I do.

13  BY MR. EVEN:

14  **Q.**  And that was something that was analyzed by yourself in

15  the context of this deck, correct?

16  **A.**  Yes, it was.

17  **Q.**  If you turn to page 28, 223.28, you see that there's a

18  graphic describing this lookback window, correct?

19  **A.**  (Reviewing document.)

20     Yes.

21  **Q.**  And what this graphic is showing us at the top is that for

22  one-off purchases, there's a green bubble for a transaction

23  occurring within the first 24 hours after tapping a link,

24  correct?

25  **A.**  Yes.

1    **Q.** And that means that that transaction would be subject to a

2    commission, correct?

3    **A.** Yes.

4    **Q.** And then there are other bubbles that are blacked out

5    after the 24-hour window, and those would not be subject to a

6    commission, correct?

7    **A.** Correct.

8    **Q.** Then below we see that for subscription, if a free trial

9    begins within the 24-hour window, that window is essentially

10   tolled, correct?

11   **A.** Yes.

12   **Q.** And then the first subscription payment is going to be the

13   subject of a commission, correct?

14   **A.** Correct.

15   **Q.** And all subsequent subscription payments are not subject

16   to a commission as described on this slide, correct?

17   **A.** Yes.

18   **Q.** If we next go to CX224, which is the June 19 deck we

19   already looked at which is an -- an updated slide deck, three

20   days later.  And if you go to 224-29.

21                        (Exhibit published.)

22   **BY MR. EVEN:**

23   **Q.** There's a very similar slide, correct?

24   **A.** (Reviewing document.)

25          Yes.

1    **Q.**  And that's another slide that you created, correct?

2    **A.**  This slide I did not create, no.

3    **Q.**  I see.  But you did -- well, we can go to 224.30 maybe?

4    **A.**  Yes.

5                    (Exhibit published.)

6    **BY MR. EVEN:**

7    **Q.**  Okay.  Let's go back to 29.  This slide is a slide that's

8    the analysis for -- you were involved in, correct?  The LTV

9    analysis and things of that nature, correct?

10                    (Exhibit published.)

11             **THE WITNESS:**  Yes.

12   **BY MR. EVEN:**

13   **Q.**  Now, what we see on this slide is for non-sub IAP or

14   one-off transactions that the proposal has not shifted in the

15   three days since CX223, correct?  It's the same.

16   **A.**  Correct.

17   **Q.**  For subscriptions, however, there's a significant change

18   that now all paid renewals would also be subject to a

19   commission in perpetuity, correct?

20   **A.**  That's what the slide shows, yes.

21   **Q.**  So this change between charging a commission on the first

22   subscription payment and charging a commission on all renewals

23   forever, that's a very significant change in the commission

24   burden on developers selling subscriptions, right?

25   / / /

**A.** (Reviewing document.)

I'm sorry. I'm just trying to orient myself --

**Q.** Sure.

**A.** -- on the two decks, if you don't mind.

**Q.** Of course.

**A.** (Reviewing document.)

Yes.

**Q.** And this change would make linking out far less appealing to developers offering a subscription than the proposal we saw on the 16 where only the first payment is subject to a commission, right?

**A.** Yes.

**Q.** Whose proposal was it to apply the commission to all subsequent renewals?

**A.** Unfortunately I don't remember.

**Q.** You don't know if it was somebody from the executive team, someone in your team?

**A.** I do not remember this change.

**Q.** Okay. If you go to Slide 35, here one of Apple's proposed justifications for a model with 27 percent commission and a 24-hour lookback window is that developers will retain customers through direct channels after linking out will keep a hundred percent of customer billings after the initial transaction.

Do you see that?

1    **A.**   I do.

2    **Q.**   And in the talking points, Mr. Oliver goes as far as

3    estimating this would mean that the effective rate would be

4    5 percent for developers in year one, correct?

5    **A.**   Yes.

6    **Q.**   To get to that number, the assumption here is that

7    following an initial purchase, developer would be able to

8    cause some or most users to come back to their website

9    directly without tapping the in-app link again, correct?

10   **A.**   Yes.

11   **Q.**   Now, you ran some of these numbers including, I assume,

12   the numbers that Mr. Oliver relied on for this?

13   **A.**   Yes, I did.

14   **Q.**   You have conducted no study on the ability of developers

15   to cause customers to return to their web store directly,

16   correct?

17   **A.**   We have looked at internal data that we have.

18   **Q.**   You conducted no study on that, correct?

19   **A.**   We looked at internal data points that we had and we

20   import this based on that.

21   **Q.**   Okay.  That is the Epic Games and Disney and NetEase

22   examples?

23   **A.**   Amongst others.

24   **Q.**   You conducted no dedicated study of this point?

25   **A.**   We looked at data points that were developed to us and got

1    to this.

2    **Q.**  Have you looked at the breakage that may be caused when a

3    developer pushes users to come to its website directly rather

4    than by using the link?

5    **A.**  (Reviewing document.)

6        We did not specifically look at that.

7    **Q.**  Have you considered how a developer would try to encourage

8    people to get to its website and yet ignore the way by which

9    they got to its website the first time?

10   **A.**  I didn't follow the question.

11   **Q.**  Your assumption is that developers would be able to tell

12   users in the future, please open a browser and come back to my

13   website, don't click on the link by which you got to my

14   website the first time.  Right?

15   **A.**  Developers have multiple ways of doing it, even showing

16   the link or not showing the link to a customer is in the

17   developer's hand.  So they can choose after the customer

18   clicks the link, they can choose not to show the link to them

19   again.

20       So the cost --

21   **Q.**  That, sir --

22                        (Simultaneous colloquy.)

23   **BY MR. EVEN:**

24   **Q.**  That, sir, would cause massive user confusion, wouldn't

25   it?  If a user knows that they tapped a button, or a link in

 1   this case, to get somewhere, and the next time they want

 2   something in the same app, that link is just not there,

 3   wouldn't that cause user confusion?

 4   **A.**  I don't think so.

 5   **Q.**  You don't think so.  Okay.  But you've done no studies on

 6   that, correct?

 7   **A.**  As I said, we've looked at internal data which actually

 8   points that the developers, after a customer goes to their

 9   website, retain almost hundred percent of the customers.

10   **Q.**  Okay.  I guess somebody will shows us those studies.

11        Now in a world where users actually keep tapping the link,

12   a seven-day lookback window may well result in an effective

13   rate that is far higher than 27 percent, correct?

14   **A.**  If the developer continues to show the link and the

15   customers keep tapping, yes.

16   **Q.**  For example, if the developer is a multi-platform game,

17   then every time the user clicks a link on iOS, the developer,

18   for seven days, is going to pay Apple a commission for things

19   that the user got through on their PC, for example, correct?

20   **A.**  (Reviewing document.)

21   **Q.**  That's the simple reality.

22                    (Simultaneous colloquy.)

23   **BY MR. EVEN:**

24   **Q.**  Every purchase in the seven days, even if it's done on a

25   PC seven days after a click-through, is going to be subject

1  now to an Apple commission, correct?

2  **A.**  I'm not sure about the implementation.  But if you're

3  talking about my modeling, I did not model that.  I just

4  modeled Apple IAP billings for seven days.

5  **Q.**  I know, sir.  That's part of the problem, that you didn't

6  model that.  But the reality is just in terms of the way the

7  rules work, is once the user hits the link, for seven days

8  Apple is going to get 27 percent commission regardless if the

9  user comes back to the store through the iPhone, through

10  another device, because of the link, because of something

11  else.  Correct?

12  **A.**  That's what I'm saying.  I haven't written the language.

13  I'm not hundred percent sure about that.

14        **THE COURT:**  So you worked on this project and you

15  have no clue what was decided?

16        **THE WITNESS:**  My understanding was after the user

17  clicks, for seven days we get the commission.  And my

18  understanding was that commission is pertaining to all

19  billings.  And I modeled based exactly on that, Your Honor.

20        **THE COURT:**  Right.  So all billings.  It doesn't

21  matter how they do it, how they get it, whether or not they

22  use the iPhone, Apple gets the 27 percent on -- on all the

23  billings, right?

24      Did you -- do you not have an understanding of that basic

25  premise?

1          **THE WITNESS:**  I do.  What I'm trying to say is but

2     that's not how the financial modeling for this was done.  We

3     only relied on Apple IAP billings, and that's what we factored

4     in our billing models as well.

5     **BY MR. EVEN:**

6     **Q.**  Your financial modeling assumed that developers -- that

7     users are not going to come to the website through other means

8     in the seven days and will only come through other means

9     thereafter.  Right?

10    **A.**  My financial modeling assumed the customer spend within

11    that seven days would be very similar to what they are

12    spending on IAP today.  That's what my financial modeling

13    assumed.  Not about where they were coming from, but how much

14    they were spending, that's what I considered.

15    **Q.**  On IAP, they keep clicking on IAP every time, correct?

16    **A.**  Yes.

17    **Q.**  And so you're trying to analogize from a world where

18    people keep clicking and getting to the websites in the same

19    exact way, and say the same is going to happen except I'm

20    going to assume they're going to get to that website in a

21    completely different way thereafter.

22    **A.**  Yes.  I was being conservative in terms of the revenue

23    that Apple would generate --

24    **Q.**  I'm sorry.  You said you were conservative?

25    **A.**  In terms of the revenue that Apple will generate.

 1    **Q.**   Okay.

 2    **A.**   If I go with your point --

 3    **Q.**   Sir, it was a yes-or-no question.  I have my answer.

 4        If we turn to CX384.  It's already admitted.

 5        This is a June 24, 2023 email from Liz Pulchny to you and

 6    others, with the subject "Wisconsin Prep for 6/28 Team Meeting

 7    Actions."

 8        Do you see that?

 9    **A.**   Yes, I do.

10                        (Exhibit published.)

11    **BY MR. EVEN:**

12    **Q.**   And the team meeting would be a meeting with Mr. Cook,

13    correct?

14    **A.**   Yes, it would be.

15    **Q.**   And you recall that there were two meetings within a week

16    with Mr. Cook, or three actually, one on the 20th of June, one

17    on the 28th, and then another one on July 5th.

18    **A.**   Yes, I do.

19    **Q.**   Okay.  In a June 23 email that starts at the very bottom

20    of the first page and goes to the second page, Tanya Washburn

21    asked you and Mr. Barton to change the lookback window to

22    72 hours but now with a 20 percent commission, right?

23    **A.**   Yes.

24          **MR. EVEN:**  I'm sorry, let's take it down.  I'm told

25    that I was wrong.

 1            So I would like to admit CX384, which is an email from

 2     Ms. Pulchny to Mr. Vij.

 3            MS. RICHMAN:  No objection.

 4            THE COURT:  It's admitted.

 5            (Exhibit 384 received in evidence.)

 6            MR. EVEN:  Thank you.  And I apologize.

 7            (Exhibit published.)

 8     BY MR. EVEN:

 9     Q.  So this change from 24 to 72 was based on input from

10     Mr. Cook and the team on June 20th, and in anticipation of

11     June 28, correct?

12     A.  This was a discussion that had happened and there was a

13     sensitivity that was required to be done.

14     Q.  Okay.  This was required, you said?

15     A.  They wanted to see a sensitivity, I meant.

16     Q.  Okay.  If you turn to CX506.

17            MR. EVEN:  Is this already admitted, I believe?

18            (Off-the-record discussion.)

19            MR. EVEN:  Five -- this was provisionally admitted.

20        (Exhibit published to witness, counsel, and the Court.)

21     BY MR. EVEN:

22     Q.  And this is a June 26 Wisconsin meeting notes.

23        Do you see that on page 506.3, under Commission Duration,

24     this says "Kunnal to present."

25     A.  Yes, I do.

1    **Q.** And that was, again, expected presentation on June 28th,

2    correct?

3    **A.** I believe so, yes.

4    **Q.** And then a question was presented on subscriptions: Are

5    we commissioning on just the first purchase, on subsequent

6    renewals?

7       So that point was still up in the air at that time?

8    **A.** I think so. That was one of the points of discussion,

9    yes.

10   **Q.** Okay. Turn to CX291.

11      That's already admitted as well.

12                    (Exhibit published.)

13   **BY MR. EVEN:**

14   **Q.** And this is the deck that was presented to Mr. Cook by you

15   and others on June 28th.

16      On page 291.11, you presented an analysis on commission

17   duration showing certain percentages of transactions occurring

18   within a certain time of a user tapping out through a link,

19   correct?

20   **A.** Yes.

21   **Q.** And the goal here was to show that a 72-hour window is

22   justified because it supposedly captures a small portion of

23   the transactions facilitated by the initial tapout; correct?

24   **A.** I didn't think we were justifying anything. We were just

25   showing options.

1    Q.  The analysis here says nothing about whether transactions

2    occurring beyond the 72-hour window would occur through direct

3    channels or by tapping out through link again, correct?

4    A.  Yes.

5    Q.  And if you turn to 291.16, we see the proposal you

6    presented to Mr. Cook was a 72-hour lookback window and

7    20 percent commission, right?

8    A.  Yes, I do.

9    Q.  So here the lookback window was extended, but the proposed

10   commission rate was lowered, correct?

11   A.  Yes.

12   Q.  But by January 24, Apple adopted a plan that in fact

13   extended the lookback window from 24 hours we saw originally

14   to more than the 72 hours and landed on one week, correct?

15   A.  That was what was announced, yes.

16   Q.  And Apple imposed a plan that imposed a commission of

17   27 percent, not the 20 percent on this slide, correct?

18   A.  It was an illustration and a sensitivity that was being

19   done.  I didn't think we were making any decisions at this

20   time.

21   Q.  Sir, this says Epic injunction proposal, not sensitivity

22   analysis.  We saw the slide on the sensitivity analysis.

23       Here the proposal was 20 percent standard commission,

24   12 percent program commission.  We'll talk about business

25   programs, et cetera, but purchase initiated within 72 hours,

1  correct?

2  **A.**  The slide also says the numbers are for illustration

3  purposes to aid discussion.

4  **Q.**  I understand that.  But that was a proposal that was

5  presented on the 28th, and that proposal moved from 72 to a

6  week, correct?

7  **A.**  Illustrative the proposal which moved to an actual

8  proposal, yes.

9  **Q.**  That proposal moved from 20 percent standard commission to

10 27, correct?

11 **A.**  They're both very different.  This was an illustrative

12 proposal.  That was the final proposal.

13 **Q.**  No.  The final was a final decision.  This was a proposal,

14 correct?

15 **A.**  Illustrative proposal, yes.

16 **Q.**  I don't know if there -- the difference between a proposal

17 and illustrative proposal, but this was a proposal, right?  It

18 doesn't say "illustrative proposal."  It says Epic Injunction

19 Proposal.

20 **A.**  I'm saying the -- clearly states it's illustrative for

21 discussion.  We do it on proposals, we do it on scenarios, to

22 get the discussion from an executives if you're missing any

23 sensitivities or if you're missing anything on scenarios that

24 they want us to run again.  We started in May to run these

25 scenarios, and we've changed things day in, day out.

```
 1                    (Simultaneous colloquy.)

 2   BY MR. EVEN:

 3   Q.  I understand.  You've changed them in a single direction,

 4   is all I'm saying.  You started out at 24 hours, you moved to

 5   48 hours, then you moved to 72 hours, and you landed on a

 6   week, correct?

 7   A.  I don't -- I do not agree.  We started the perpetual.  We

 8   started introducing a time window after that.  So we actually

 9   did not move it --

10   Q.  Sir --

11   A.  -- directionally so I don't agree with that.

12                    (Simultaneous colloquy.)

13   BY MR. EVEN:

14   Q.  Sir, sir, the notion of perpetual, let's put it to the

15   side.  But let me just understand what is the idea because

16   people keep saying "perpetual" here.

17        Are you telling me that the initial idea was that once

18   somebody tapped a link, Apple's original consideration was

19   27 percent from here on will apply to anything bought on that

20   website in perpetuity regardless of how the user got there,

21   regardless of anything?

22   A.  That's not what I'm saying.  What I'm saying is --

23   Q.  That is perpetual, sir.

24   A.  I didn't say that was Apple's proposal.  I'm saying my

25   financial analysis initially was based on that.  And then your
```

VIJ - DIRECT / EVEN

 1    statement was, was Apple moving the things in one direction.

 2    I'm saying they were not.  So since I'm --

 3                    (Simultaneous colloquy.)

 4    BY MR. EVEN:

 5    Q.  Sir, sir, sir, the word "perpetual" was first heard when

 6    we got to this Court on a contempt hearing.  None of these

 7    slides say "perpetual" next to anything, right?  It says

 8    27 percent, period.  Nobody said "perpetual" at any point in

 9    time.

10        And then you came up with this idea of a window, and it

11    grew and grew and grew until it landed on a full week.

12    Correct?

13    A.  Once we started the window, it went from 24 to seven days,

14    yes.

15    Q.  And the commission rate went from 20 percent here in

16    mid-June to 27 percent, correct?

17    A.  Twenty-seven, 20, 27.

18    Q.  Okay.  And the subscription point went from only pay on

19    the first subscription to pay in perpetuity on all

20    subscription renewals, correct?

21    A.  On all renewals?  One discussion on just once and then all

22    renewals.

23    Q.  Okay.

24            MR. EVEN:  Your Honor, I'm moving to a different

25    subject, and I don't know what is the --

1    **THE COURT:**  Well, I'd like to know because this word

2    has come up multiple times.

3         I've admitted all these exhibits.  And Apple's produced

4    thousands of documents.

5    **THE WITNESS:**  Yes, Your Honor.

6    **THE COURT:**  So where am I going to find this word

7    "perpetual"?  Did you ever see the word "perpetual" in a

8    document?

9    **THE WITNESS:**  No, Your Honor.

10    **THE COURT:**  So who told you to use the word

11    "perpetual"?

12    **THE WITNESS:**  It's just my understanding of how I

13    modeled it, Your Honor.

14    **THE COURT:**  Who talked to -- did you have a

15    conversation with anyone at Apple, other than lawyers, during

16    those discussions where the word "perpetual" was used?

17    **THE WITNESS:**  No, Your Honor.

18    **THE COURT:**  We still have half an hour.

19    **MR. EVEN:**  Oh, okay.  Thank you, Your Honor.

20    **THE COURT:**  Wait.  No, no, no.  You're right.

21         Well, let me ask you this.  How long are we going

22    tomorrow?

23    **MR. EVEN:**  Well, it depends on what I'm doing now,

24    but -- but so give or take that half an hour, I'm -- I think I

25    probably have maybe half an hour, maybe less for -- for

1  Mr. Vij.  And then we have one more witness tomorrow who I

2  don't believe is very long but --

3        **MS. MOSKOWITZ:**  Under an hour.

4        **MR. EVEN:**  Under an hour.

5              (Off-the-record discussion.)

6        **THE COURT:**  All right.  Let me know when you're

7  ready.

8     Okay.  We've worked our court reporter as long as we're

9  going to work her today.  So we'll go ahead and stand in

10 recess until tomorrow at 8:30.

11    Sir, you are under oath.  You are instructed that you

12 cannot have any conversation with anyone whatsoever, no

13 lawyers, no family, no anybody, regarding your testimony here

14 in court, regarding the topics related to Apple's response to

15 the injunction, nothing related to what's going on in the

16 courtroom.  Do you understand?

17       **THE WITNESS:**  Yes, I do, Your Honor.

18       **THE COURT:**  All right.  Be back here no later than

19 8:20 or whenever else they want you.

20    All right.  You may stand down.

21       **THE WITNESS:**  Thank you, Your Honor.

22       **MR. BORNSTEIN:**  Your Honor, this may apply to

23 Mr. Vij, but just by a point of clarification, the written

24 order Your Honor issued asked us to be here at 8:00 a.m.

25 tomorrow.  I'm certainly happy for it to be 8:30.  I just want

VIJ - DIRECT / EVEN

1    to make sure we all show up at the right time.

2         THE COURT:  I already spoke to Ms. Brown, so we don't

3    need to be here at 8:00 a.m.  I mean, you should be ready to

4    go, but we'll start at 8:30 tomorrow.

5         MR. BORNSTEIN:  Very good.  Thank you for the

6    clarification.

7         THE COURT:  Okay.  Thank you.

8         (Proceedings were concluded at 3:37 P.M.)

9                          --o0o--

10

11

12

13                   **CERTIFICATE OF REPORTER**

14

15         I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17    I further certify that I am neither counsel for, related to,

18    nor employed by any of the parties to the action in which this

19    hearing was taken, and further that I am not financially nor

20    otherwise interested in the outcome of the action.

21

22    _____

23    Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24              Tuesday, February 25, 2025

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**