UNITED STATES DISTRICT COURT                    *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 9** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1671 - 1916 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, February 26, 2025 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:            Cravath, Swaine & Moore LLP
                          375 Ninth Avenue
                          New York, New York  10001
                    BY:   GARY A. BORNSTEIN,
                          YONATAN EVEN,
                          LAUREN A. MOSKOWITZ,
                          CHARLOTTE ROTHSCHILD,
                          CHRISTINA A. SEIDEMAN,
                          MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                  A P P E A R A N C E S (CONT'D.)

 2

 3    For Defendant:          Weil, Gotshal & Manges LLP
                              2001 M Street NW, Suite 600
 4                            Washington, D.C.  20036
                        BY:  MARK A. PERRY,
 5                            JOSHUA M. WESNESKI, ATTORNEY AT LAW

 6
                              Weil, Gotschal & Manges LLP
 7                            767 FIfth Avenue
                              New York, New York  10153-0119
 8                      BY:  CAMILLA BRANDFIELD-HARVEY,
                               ATTORNEY AT LAW
 9

10                            Gibson, Dunn & Crutcher LLP
                              One Embarcadero Center, Suite 2600
11                            San Francisco, California  94111-3715
                        BY:  LAUREN DANSEY, ATTORNEY AT LAW
12
                              Gibson, Dunn & Crutcher LLP
13                            1050 Connecticut Avenue, N.W.
                              Washington, DC  20036-5306
14                      BY:  HARRY PHILLIPS,
                              CYNTHIA E. RICHMAN, ATTORNEY AT LAW
15

16

17

18                            --o0o--

19

20

21

22

23

24

25
```

1          **I N D E X**

2

3

4    WEDNESDAY, FEBRUARY 26, 2025 - VOLUME 9

5

6    **PLAINTIFF'S WITNESSES**                         **PAGE**    **VOL.**

7    VIJ, KUNAL                                        1681        9

8    DIRECT EXAMINATION BY MR. EVEN                    1681        9

9    CROSS-EXAMINATION BY MS. RICHMAN                  1746        9

10   REDIRECT EXAMINATION BY MR. EVEN                  1756        9

11

12   GOLDBERG, MARNI

13   (SWORN)                                           1765        9

14   DIRECT EXAMINATION BY MS. MOSKOWITZ               1766        9

15   CROSS-EXAMINATION BY MR. PERRY                    1859        9

16

17   SCHILLER, PHILIP

18   FURTHER REDIRECT EXAM BY MR. BORNSTEIN            1879        9

19   RECROSS-EXAMINATION BY MR. PERRY                  1905        9

20   FURTHER REDIRECT EXAM BY MR. BORNSTEIN            1908        9

21

22

23

24

25

**E X H I B I T S**

| <u>EXHIBITS</u> | <u>W/DRAWN</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|---|
| 0231 | | | 1724 | 9 |
| 244 | | | 1814 | 9 |
| 257 | | | 1823 | 9 |
| 399 | | | 1794 | 9 |
| 435 | | | 1735 | 9 |
| 464 | | | 1831 | 9 |
| 477 | | | 1802 | 9 |
| 478 | | | 1800 | 9 |
| 479 | | | 1839 | 9 |
| 0505 | | | 1717 | 9 |
| 506 | | | 1737 | 9 |
| 529 | | | 1807 | 9 |
| 539 | | | 1697 | 9 |
| 540 | | | 1853 | 9 |
| 1504 | | | 1873 | 9 |
| 1505 | | | 1874 | 9 |
| 1506 | | | 1875 | 9 |
| 1507 | | | 1875 | 9 |

--o0o--

```
 1   Wednesday, February 26, 2025                        8:30 A.M.

 2                    P R O C E E D I N G S

 3                         --o0o--

 4

 5        THE CLERK:  Before we begin, a reminder to everyone

 6   observing, these proceedings are being recorded by this Court.

 7   Any other recording of this proceeding, either by video,

 8   audio, including screenshots or other copying of the hearing

 9   is strictly prohibited.

10     Now calling civil matter 20-05640-YGR, Epic Games, Inc.

11   versus Apple Inc.

12     Lead counsel, please state your appearances.

13        MR. BORNSTEIN:  Good morning, Your Honor.  Gary

14   Bornstein for Epic Games, joined today at table by Michael

15   Zaken, Lauren Moskowitz, Yonatan Even, and Tina Seideman.

16     And then we have Mr. Byars and Mr. Lyon sitting on the

17   bench there.

18        THE COURT:  Okay.  Thank you.  Good morning.

19        MR. PERRY:  Good morning, Your Honor.  Mark Perry for

20   Apple.  I'm joined at counsel today by Cynthia Richman, Lauren

21   Dansey, Harry Phillips, as well as Ms. Grenier of Apple,

22   Mr. Schiller of Apple.

23     And for the second witness, Your Honor, we will have

24   Sierra Anderson and Luna Barrington at counsel table.

25        THE COURT:  Okay.  And just so, again, the record is
```

 1   clear, we're not -- we are streaming the audio of this, but we

 2   are no -- there is no video happening.  I just want to make

 3   sure the transcript is clear about what we are and are not

 4   doing.

 5      Okay.  What is the plan, Mr. Bornstein?

 6         **MR. BORNSTEIN:**  Yes, Your Honor.  So we are going to

 7   begin by concluding the testimony of Mr. Vij who was on at the

 8   end of the day yesterday.

 9      Following Mr. Vij, we have Marni Goldberg from the

10   communications function at Apple.

11      And following Ms. Goldberg, we do intend to call

12   Mr. Schiller back for a few questions regarding that recently

13   produced document.

14      And we have advised Apple that we do not intend to call

15   Mr. Oliver back.

16         **THE COURT:**  Okay.

17      Does Apple intend to put on any witnesses?

18         **MR. PERRY:**  We do not, Your Honor, subject -- I can't

19   imagine anything is going to happen this morning, but as of

20   now no.

21         **THE COURT:**  Okay.  Could we have his mic working,

22   please?

23         **MR. PERRY:**  Test, test.

24         **THE CLERK:**  It is.

25         **MR. PERRY:**  We do not believe so, Your Honor.

1            **THE COURT:**  Okay.

2            **MR. PERRY:**  And if Epic does not intend to call

3    Mr. Oliver back, may he be released so he can go back to

4    his -- he's waiting across the street.

5            **THE COURT:**  Mr. Oliver is excused.

6            **MR. PERRY:**  Thank you, Your Honor.

7            **THE COURT:**  Okay.  One of the things that I do want

8    to have happen today, and perhaps after -- well, our schedule

9    will be a little bit different today.  I have a -- I am part

10    of a group of judges and administrators who are looking at AI

11    in the judiciary, and that's why I cannot miss this meeting.

12    There's like 40 people, and they don't care about my schedule.

13    So that's why we have the gap today.  So I can't miss that.

14        But there were a number, I think, of important documents

15    that we've spent a lot of time on in terms of testimony

16    regarding confidential numbers, revenues, percentages, and I

17    think the parties have done a good job of being able to walk

18    through those numbers -- or at least walk through the slides

19    without talking about the numbers.

20        As I mentioned yesterday, I'm having a very difficult time

21    reading those slides, and I am not going to put that document

22    up to a lamp as I am in the courtroom trying to figure out

23    what's there.

24        So, one, it seems to me when Apple did its search of

25    documents, presumably people had this in native format, right?

1          **MR. PERRY:**  There are some documents in native

2     format.  It depends on the -- how they are --

3          **THE COURT:**  So the PowerPoints, didn't they have them

4     in their files in native format?

5          **MR. PERRY:**  I'm not sure which ones you're referring.

6     Some are, yes, Your Honor.

7          **THE COURT:**  I'm talking about the ones that we're

8     talking about in court.  I don't care about the 20- or 30,000

9     others.

10          **MR. PERRY:**  Understood, Your Honor.

11      If I could jump to the end of the line.  We -- now that we

12     have the sort of list of admitted exhibits, if the question is

13     can we go find the most legible version of those, yes.

14          **THE COURT:**  So you will find the best version today.

15     And if -- in fact, this morning.  You've got so many lawyers

16     on your side.  Someone can go find them.

17      If they are not legible, then when we are done, we will go

18     into sealed -- into a sealed proceeding.  Mr. Schiller will

19     get back up on the stand, and we will walk through those

20     slides again and he will recite into the record those numbers.

21     Because I'm not going to do it.

22          **MR. PERRY:**  Understood, Your Honor.

23          **THE COURT:**  Okay.

24      You have time to figure this out.

25      All right.  Let's call the witness back.

 1          **MR. BORNSTEIN:**  And, Your Honor, just one point on

 2     that, if I may.

 3          Since we have the break when Your Honor has this other

 4     obligation, we'll spend some time when Apple has found the

 5     documents just making sure that they are the same because

 6     there are, as Your Honor knows, some iterations.  We'd like to

 7     have the opportunity to ensure that what Your Honor is going

 8     in legible format is the same that's made it into the record.

 9     So we'll work with Apple on that.

10          **THE COURT:**  But the other thing you can do and --

11     well, first of all, let's find out if they're the same.  If

12     they're the same, then there's no issue because they can be

13     substituted.

14          I don't want to waste anybody's time.  I don't have time

15     to waste myself.

16          If -- the other alternative is for you to write on a piece

17     of paper or write on that document what those numbers are and

18     then that gets admitted, again in a -- it's a sealed document

19     so -- because it's proprietary.  But my bottom line is I want

20     it today, and I don't want to have to guess at what those

21     numbers are.

22          **MR. PERRY:**  And, Your Honor, just I want to make sure

23     I'm very clear to send the message to the team.

24          **THE COURT:**  Well, they heard me too.  So speak into

25     the mic.

1    **MR. PERRY:**  This is primarily those black

2    presentation decks is what you're referring -- Your Honor is

3    referring to.  And we -- we will do that.

4    **THE COURT:**  Where we were going line by line --

5    **MR. PERRY:**  I understand.

6    **THE COURT:**  -- about what those numbers are without

7    saying those numbers.

8    **MR. PERRY:**  Understood, Your Honor.

9    **THE COURT:**  Okay.  Let's bring the witness back.

10   **MR. BORNSTEIN:**  Thank you, Your Honor.

11                        (Pause in the proceedings.)

12   **THE COURT:**  Okay.  Good morning, Mr. Vij.

13   **THE WITNESS:**  Good morning, Your Honor.

14   **THE COURT:**  You may be seated.

15   **THE WITNESS:**  Thank you, Your Honor.

16   **THE COURT:**  Now I'm going to ask you to slow down a

17   little bit to make it easier on our court reporter to get the

18   transcript.  Okay?

19   **THE WITNESS:**  Will do.  Thank you.

20   **THE COURT:**  Okay.  Move closer to the microphone.

21   Mr. Even, you've got a strong voice.  Could you go to the

22   defense mic and talk into it for a moment.  Say good morning

23   or something so I can see if it works, if it's just Mr. Perry.

24   **MR. EVEN:**  I think what I'm going to say is this is

25   the first time anybody told me I have a strong voice.  So I

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1   appreciate.

 2          **THE COURT:**  Okay.  So it's the mic.  All right.  Go

 3   back to your side.

 4      Okay.  You may proceed when you're ready.

 5          **MR. EVEN:**  Thank you.

 6

 7                      **KUNAL VIJ**,

 8   called as a witness for the PLAINTIFF, having been previously

 9   duly sworn, testified as follows:

10              **DIRECT EXAMINATION (Resumed)**

11   BY MR. EVEN:

12   **Q.**  Good morning.

13   **A.**  Good morning.

14   **Q.**  I want to follow up a little bit about the modeling we had

15   discussed and the model you had in mind as you were working on

16   this Project Wisconsin back in May and June and since.  Okay?

17   **A.**  Yep.

18   **Q.**  And just to level set, you understand that this Court has

19   decided that out-of-app communications are not a good

20   substitute for in-app communications to try and get people to

21   go and make purchases on the web, correct?

22   **A.**  As I said, I haven't read the injunction, but I believe

23   so, yes.

24   **Q.**  Okay.  And you modeled the effect of adding a link in the

25   app and found that if that link doesn't have any strings

1    attached, doesn't have a commission or anything like that,

2    just a link, that would cause billions in billings to be

3    diverted from IAP to web purchase options, correct?

4    **A.**  It was a sensitivity.  We didn't land on the specific

5    number.

6    **Q.**  I'm sorry.  I didn't understand that.  Maybe get closer --

7    **A.**  It was a sensitivity that we'd done.  We never said that

8    it will be a very specific number in any of the slides.

9    **Q.**  I understand.  But in the sensitivities, you predicted

10   that there could be billions of dollars diverted from IAP to

11   web purchases, correct?

12   **A.**  On the extreme range, yes.

13   **Q.**  Okay.  And so your modeling confirms the fact that having

14   a link inside the app actually gets a lot more people to use

15   web purchases than without any communication in the app,

16   correct?

17   **A.**  I do not agree.

18   **Q.**  You don't agree.  Okay.

19        Nonetheless I want to talk about what you had in mind as

20   the -- the goal here.  So when we talked about the lookback

21   window, you suggested --

22             **THE COURT:**  Can I ask a follow-up on that one?

23        So are you saying that if I order a link inside the app,

24   it's not going to have any marginal or any effect on Apple?

25             **THE WITNESS:**  I said, ma'am, that I -- well, Your

 1    Honor, that I don't agree with the fact that I modeled it.  We

 2    put in a sensitivity around it.  We didn't model anything

 3    wherein a link would be there and a zero was in commission and

 4    how much of a diversion would that cause.

 5         THE COURT:  So when you say you don't agree with the

 6    fact that you modeled it, did someone else model it?

 7         THE WITNESS:  No.  I'm saying we showed a sensitivity

 8    around it.  For zero percent commission there is no modeling.

 9    It just says if 30 percent of the billings go, we lose

10    30 percent of our revenue.  That's all the model did.

11         THE COURT:  So you're taking with his use of the word

12    "model"?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  Go ahead.

15         MR. EVEN:  Thank you, Your Honor.

16    Q.  And I think we're going to talk about that because while

17    you say that you haven't modeled a specific number, it's all

18    sensitivities, your team also came up with ranges that you

19    said you think were middle ground or reasonable ranges,

20    correct?

21    A.  Yes.

22    Q.  And those middle ground and reasonable ranges started with

23    hundreds of millions and ended with billions diverted,

24    correct?

25    A.  Yes.

1    **Q.**   Okay.  And so you thought that it's a reasonable

2    assumption that the addition of a link inside the app would

3    make a material difference in terms of the ability to get

4    people to use web purchases as compared to out-of-the-app

5    communications that anyone can do today and could do before

6    this Court's order, correct?

7    **A.**   Yes.

8    **Q.**   Okay.  So I think we're on the same page now.

9         Now, when we talked about the lookback window, you

10   suggested that to prevent repeated clicking on in-app links,

11   the developer could easily make sure that the link does not

12   appear in the app after it has been clicked the first time,

13   correct?

14   **A.**   Yes.

15   **Q.**   Now, to be clear, if the developer chooses to do that and

16   does not show a link in the app, that means that going forward

17   the developer shows no call to action in the app reminding

18   users to make purchases on the web, correct?

19   **A.**   Developer can do this per customer.

20   **Q.**   No, sir.  Under your rules, the developer cannot, after

21   the first time a user tapped, replace the link with something

22   that just says, "Remember you went to my web store, remember

23   how seamless and cheap that was, please go there again the

24   next time you want to purchase anything."  That's not allowed

25   under your rules, right?

1    **A.**  Yes.

2    **Q.**  And so if the developer chooses, after the first tap-out,

3    to take down the link, there won't be anything in the app, in

4    the app itself, that reminds users going forward to go and

5    complete their purchases on the web rather than on IAP,

6    correct?

7    **A.**  I do not agree.  If you want, I can clarify.

8    **Q.**  Sir, in the world you're envisioning, after the first tap

9    on a link, the developer would rely entirely on out-of-app

10   communications that this Court already decided were not enough

11   to inform users of web purchase options, correct?

12   **A.**  Yes.

13   **Q.**  And so your modeling, or your thinking at least, on the

14   model that developers might use, in the context of an

15   injunction requiring Apple to allow competition with IAP,

16   contemplates IAP -- the IAP button being next to merchandise

17   every time merchandise is shown, whereas the competing URL or

18   click is in some other screen until it's tapped once and then

19   never again seen in the app, correct?

20   **A.**  That was one of the assumptions as well.

21   **Q.**  So links can compete with IAP as long as they do it with

22   both hands strapped behind their back.

23   **A.**  I do not agree.

24   **Q.**  You do not.  Okay.

25        But I want to take a look, since we now have this June 1

```
 1    deck, it --

 2             MR. PERRY:  Excuse me, Your Honor.  Sorry to

 3    interrupt.  I believe Mr. Schiller should leave the courtroom

 4    if that's the subject we're going to turn to.

 5             THE COURT:  I think that's probably right, yes,

 6    Mr. Schiller.  Thank you.

 7             MR. EVEN:  Thank you.

 8             (Mr. Schiller exited the courtroom.)

 9             THE COURT:  And we're calling this 859.

10             MR. EVEN:  859, Your Honor.

11    Q.  And 859 gives us some new insights into the mechanics of

12    the modeling.  So I want to talk about that.  I think it was

13    given to you as --

14    A.  It's in the binder.

15    Q.  It's in the binder now?

16    A.  Yeah.

17    Q.  So let me know when you're there.

18    A.  I'm here.

19    Q.  So as part of your modeling, you created an economic model

20    to predict whether a developer would use a linkout or not,

21    correct?

22    A.  Yes.

23    Q.  And your team referred to that as the developer economic

24    decisioning model, right?

25    A.  Yes.
```

 1    **Q.**  So if you go to 859.23, and the title of this slide is

 2    Option 1, Standard Developer Economics.  Right?

 3        (Exhibit published to witness, counsel, and the Court.)

 4            **THE WITNESS:**  I'm sorry.  On the printout that I

 5    have, it doesn't have any 859.23.  It just have -- has EG

 6    underscored with the V numbers.

 7    **BY MR. EVEN:**

 8    **Q.**  Okay.  That is unfortunate, but let me give you the --

 9            **THE COURT:**  Yeah, I --

10    **BY MR. EVEN:**

11    **Q.**  -- number.  It ends in 42.  542.

12    **A.**  Yeah, I'm on the page.  Thank you.

13    **Q.**  All right.  And this is a representation or an explanation

14    of how the developer economic decisioning model works,

15    correct?

16    **A.**  Yes.

17    **Q.**  And so the model is predicting the impact of using

18    linkouts on a developer's revenue, costs and profits, right?

19    **A.**  Yes.

20    **Q.**  And the scenario on the slide assumes that Apple has

21    implemented option 1 with no commission on the external links,

22    correct?

23    **A.**  Yes.

24    **Q.**  And the scenario depicted in the slide shows a developer

25    who pays 30 percent commission for Apple IAP and sees

1    10 percent linkout adoption, right?

2    **A.**  Yes.

3    **Q.**  And this scenario then assumes that of the 10 percent

4    purchases who shift to external link, 10 percent of those

5    customers drop out during the buy flow process, correct?

6    **A.**  Yes.

7    **Q.**  And that's what we talked about yesterday as breakage,

8    right?

9    **A.**  Yes.

10   **Q.**  And Mr. Barton's speaker notes refer to that as the

11   breakage assumption, right?

12   **A.**  Yes, he does.

13   **Q.**  Now, the breakage assumption in this scenario in effect

14   results in only 9 percent of the developers' users

15   successfully completing a transaction using the external link

16   because they lose 10 percent of 10 percent, which is

17   1 percent, for breakage, right?

18   **A.**  Yes.

19   **Q.**  Now, on the right, we have something called "Net Developer

20   Impact" right?

21   **A.**  Yes.

22                        (Exhibit published.)

23   **BY MR. EVEN:**

24   **Q.**  And the model calculated that the net impact to the

25   developer's revenues would be a negative 1 percent in this

 1    scenario, right?

 2    **A.**   Billings.  Developer's billings.

 3    **Q.**   Developer's billings.  I apologize.

 4    **A.**   Yes.

 5    **Q.**   Okay.  And that is the result of this breakage

 6    essentially.  It went from a hundred percent it would complete

 7    with IAP to 99 percent through a split between IAP and linking

 8    out, correct?

 9    **A.**   Yes.

10    **Q.**   Now, obviously if the finance team had assumed a larger

11    degree of breakage, then that net impact to the developer

12    would be more negative, right?

13    **A.**   Yes.

14    **Q.**   All right.

15        Now, Mr. Barton refers to another assumption baked into

16    this slide.  And he says that the finance team had assumed

17    that it costs the developer five and a half percent to account

18    for the cost of payments and other servicing and

19    infrastructure costs, right?

20    **A.**   Yes.

21    **Q.**   Okay.  Now you remember that yesterday we looked at

22    another chart where you and Mr. Barton talked about payment

23    costs and commerce costs, and we added those up for extra

24    large, large, and medium developers.

25    **A.**   Yes, I do.

1   **Q.**  Okay.  And you understand that roughly speaking, the

2   number that is assumed here corresponds to the number we

3   discussed yesterday that you calculated for extra large

4   developers, correct?

5   **A.**  Yes.

6   **Q.**  And you recall that we established yesterday that large

7   developers would face higher costs and medium developers would

8   face even higher costs than that, correct?

9   **A.**  Yes.

10  **Q.**  Now the cost assumption is depicted in the cost row on the

11  slide under linkout, right?

12  **A.**  Yes.

13  **Q.**  And so essentially on the ten percent that the developer

14  links out, instead of facing 30 percent costs, it faces only

15  five-and-a-half percent costs, right?

16  **A.**  Yes.

17  **Q.**  Okay.  Now, the model also calculates the developer's

18  effect on the -- well, before that actually.

19       So on the cost, what we see is that because the developer

20  takes some of the billings -- albeit a small portion -- and

21  moves it to a much lower cost basis, the developer's cost

22  here, it's circled in green, and I believe it says plus

23  3 percent, right?

24  **A.**  Yes.

25  **Q.**  And that means that the developer actually sees a

1   reduction in cost overall, correct?

2   **A.**  Yes.

3   **Q.**  And obviously that reduction in cost is driven in large

4   part because you're modeling option 1 that has no commission,

5   and so the only cost in the linkout option is the

6   five-and-a-half percent, correct?

7   **A.**  Yes.

8   **Q.**  All right.

9          **THE COURT:**  And in the linkout cost row, is that --

10  does that say 5.5?

11         **MR. EVEN:**  It does, Your Honor.  It's a little

12  clearer on the screen.  So we've blown it up on the screen

13  now, and that may help Your Honor.

14         **THE COURT:**  Thank you.

15                (Exhibit published.)

16  **BY MR. EVEN:**

17  **Q.**  And so for instance, if we added 27 percent to the

18  five-and-a-half percent, this developer would have

19  32.5 percent costs on the linked out portion of its billings,

20  and we would see that the net developer impact on cost would

21  be negative instead of positive, right?

22  **A.**  Yes.  During the linkout duration, yes.

23  **Q.**  Okay.  Now the last row on the slide is labeled

24  "Proceeds," right?

25  **A.**  Yes.

1  **Q.**  And that is essentially netting out revenue -- billings

2  and costs, right?

3  **A.**  Yes, it does.

4  **Q.**  Okay.  And Apple was modeling this developer's net

5  proceeds after subtracting its cost from its billings, right?

6  **A.**  Yes.

7  **Q.**  And whether we move left to right or top to bottom as

8  minus 1 plus 2 -- plus 3, sorry, the end result here is that

9  the proceeds would increase by 2 percent in this scenario,

10 right?

11 **A.**  Yes.

12 **Q.**  And as Mr. Barton's speaker notes make clear in the

13 conclusion, in this case the developer would adopt linking

14 out, correct?

15 **A.**  Yes.

16 **Q.**  And the developer would adopt linking out because the

17 assumption is that developer is profit maximizing and linkout

18 would give it plus 2 percent under this scenario, right?

19 **A.**  Yes.

20 **Q.**  Now, the slide shows the model analyzing a single

21 developer's decision, correct?

22 **A.**  Yes.

23 **Q.**  But you ran this for a whole lot of developers, right?

24 **A.**  Initially, yes.

25                    (Exhibit published.)

1    **BY MR. EVEN:**

2    **Q.**   And the next slide, 859.24 which ends in 543 on the Bates

3    stamp, that one is labeled "Developers opting for link in,"

4    right?

5    **A.**   Yes.

6    **Q.**   And so the X axis shows different linkout billing shares

7    while the Y axis shows different levels of breakage, right?

8    **A.**   Yes, it does.

9    **Q.**   And the speaker note on this slide states that this table

10   removes threshold of 100K indifference and small developers,

11   right?

12   **A.**   Yes.

13   **Q.**   So first of all, you're saying we're not looking at small

14   developers, meaning people with under 1 million in billings,

15   correct?

16   **A.**   For this illustration, no.

17   **Q.**   And then you're also not looking at anybody who will --

18   that -- for whom the difference will be less than $100,000.

19   And you say they are kind of indifferent between IAP and

20   linking out, right?

21   **A.**   Yes.

22   **Q.**   Now, the numbers in each cell in this table represent the

23   number of developers who would opt to link out in each of

24   these combinations of breakage and billing shares, correct?

25   / / /

 1    **A.**  (Reviewing document.)

 2         They would be economically inclined to opt in, yes.

 3    **Q.**  Okay.  It would be -- yes, it would be economically

 4    rational for these developers to say, "I'm going to make more

 5    than $100,000 more if I link out.  Therefore I'm going to link

 6    out"?

 7    **A.**  Yes, that was the assumption.

 8    **Q.**  And the Project Wisconsin team knew that as the breakage

 9    percentage increased, the number of developers, as we can see

10    here, that choose to link out would fall, right?

11    **A.**  Yes.

12    **Q.**  And so we start with tens of thousands of developers if

13    there's zero percent breakage and going all the way down to a

14    few dozens at 25 percent, correct?

15    **A.**  Yes.

16    **Q.**  And as we discussed yesterday, the finance team therefore

17    concluded that 25 percent was a tipping point beyond which it

18    would not make economic sense for any developer to ever adopt

19    a linkout even when there is no commission, right?

20    **A.**  Yes.

21    **Q.**  Now, Apple also used this developer decisioning model to

22    predict how changing the level of breakage would affect

23    Apple's App Store revenues, right?

24    **A.**  (Reviewing document.)

25         We did a sensitivity on it which was just the inverse of

 1    these developer accounts.

 2    **Q.**  Okay.  So let's take a look at that.  And that is CX859.28

 3    which is ending in Bates 547.  And it's titled U.S. Revenue

 4    Impact With Breakage, right?

 5    **A.**  Yes.

 6    **Q.**  And again, on the top from left to right, we see the

 7    billing shares that would be diverted to linking out, right?

 8    **A.**  Yes.

 9    **Q.**  And on the left-hand side, we see the breakage shares,

10    correct?

11    **A.**  Yes.

12         **THE COURT:**  Okay.  So this would be one of those

13    slides that has numbers underneath the numbers in white that

14    is largely unreadable.

15         **MR. EVEN:**  I agree, Your Honor.

16         **THE COURT:**  I know.  I'm just -- I'm just making a

17    note.  I should have started making a note yesterday, but this

18    is what I'm talking about.

19         Go ahead.

20    **BY MR. EVEN:**

21    **Q.**  Then the number in each cell in white represents Apple's

22    revenue impact, correct?

23    **A.**  Yes, it does.

24    **Q.**  And the -- in white it represents that number in revenue

25    impact as in dollars, and in beige that's barely legible it's

1   in percentage, right?

2   **A.**   Yes.

3   **Q.**   Now, if we look at each column as the breakage

4   percentage -- sorry -- in each row, as the breakage percentage

5   increases, Apple's predicted revenue losses decrease, correct?

6   **A.**   Yes.

7   **Q.**   Okay.   So now I want to break to another document for a

8   second.

9          **MR. EVEN:**   And, Your Honor, I'm going to ask to

10   approach and provide.   This is a document that's related to

11   this June 1st thing so it's not in the binder.

12          **THE COURT:**   Okay.   You may.

13          **MR. EVEN:**   So that's going to be CX0539.

14              (Pause in the proceedings.)

15   **BY MR. EVEN:**

16   **Q.**   Sir, do you see that CX0539 is a chat conversation, an

17   iMessage conversation between yourself and Mr. Barton dated

18   June 1st, 2023.

19   **A.**   Yes.

20          **THE COURT:**   And before we get there, I just was sent

21   an electronic version of that chart.   And I can see it in the

22   electronic version.   So perhaps we need to go back.   If you

23   all will check the electronic versions, then that may -- that

24   may deal with the whole issue.   But --

25          **MR. EVEN:**   I think for most of the electronic

```
 1      versions, we can see the numbers, Your Honor.  And we can even
 2      see it on the screen as when we can put up the numbers.  But
 3      we can check.
 4              THE COURT:  Okay.  All right.  Let's keep going.
 5      BY MR. EVEN:
 6      Q.  And you understand that because this is 11 minutes past
 7      midnight in Greenwich Mean Time, this conversation at least
 8      started in the afternoon of May 31st California time.
 9      A.  Yes.
10      Q.  Thank you.
11              MR. EVEN:  Your Honor, I'll move to admit CX539.
12              THE COURT:  Any objection?
13              MS. RICHMAN:  No objection.
14              THE COURT:  It's admitted.
15                  (Exhibit 539 received in evidence.)
16              MR. EVEN:  And so if we can go to 539.25.
17                      (Exhibit published.)
18      BY MR. EVEN:
19      Q.  And you see there's a question here from Mr. Barton saying
20      "Why on the option 1 breakage slide," which is the slide we're
21      looking at, "between zero percent and 5 percent rows, the
22      numbers don't move much?"
23          Do you see that?
24      A.  Yes.
25      Q.  And if you go two pages forward to 539.27.
```

1                    (Exhibit published.)

2     **BY MR. EVEN:**

3     **Q.**  You see there that you are in fact sending the slide we're

4     talking about to Mr. Barton, although the numbers are not

5     rounded in your version that you're sending.

6        Do you see that?

7     **A.**  Yes, I do.

8     **Q.**  And then you say, "Rounding.  And since this is developer

9     decisioning model driven, a few developers drop out as the

10    breakage inc."  And that means "increases," right?

11    **A.**  Yes.

12    **Q.**  And so what you're telling Mr. Barton here is that the

13    move from 5 percent -- from zero percent to 5 percent is not

14    the same as the move from 15 percent to 20 percent because

15    it's not just the billings that move, it's that in fact, less

16    developers would even try to bill in the first place, right?

17    **A.**  A couple of things.  One, what I mean here is as you move,

18    it's billings, which is a proxy for the developers as well.

19    It's the hundred K threshold.  That number keeps changing.

20    Hence a few developers drop out because of that hundred K

21    rounding that we spoke about.

22    **Q.**  Okay.  And now, in fact, your assumption here is -- you

23    can think of it as aggressive unconservative [sic], but in

24    reality, the dropout is going to be faster because, as we

25    discussed yesterday, medium-sized developers, for instance,

1   would face higher costs for payments and therefore they would

2   drop out earlier than you had modeled them here with a cost of

3   five-and-a-half percent, right?  The higher the cost, the

4   sooner they would drop out as breakage increases.

5   **A.**  (Reviewing document.)

6       This was already accounting for that.

7   **Q.**  Sir, Mr. Barton said that the assumption here is that the

8   cost is five-and-a-half percent for everyone.  That's what's

9   on the slide.  We just read that.

10      You don't remember that?

11  **A.**  I'm trying to find it on the slide.

12  **Q.**  Okay.  You can go back.  It's on the slide ending in 42.

13  **A.**  Yes.

14  **Q.**  Exhibit 859 and 42?

15  **A.**  That was an illustration for this slide.  And this slide

16  it was five-and-a-half percent, yes.

17  **Q.**  Okay.  Now, because 25 percent is a tipping point beyond

18  which no developer would rationally use a linkout, Apple would

19  not experience any revenue loss if breakage was greater than

20  25 percent, no matter the linkout billing share and no matter

21  the commission, right?

22  **A.**  If no developers opt in, yes.

23  **Q.**  Okay.  And just to get back to what you said earlier, are

24  you suggesting that in the slides on 259.28 you used different

25  costs for different size developers according to the costs we

 1   saw yesterday?  You used medium-sized -- medium-sized

 2   developer costs for medium-sized developers, et cetera?

 3   **A.**   I don't fully recall.  But looking at the numbers, it

 4   looks like that I would have.  Otherwise the math would have

 5   been very different.

 6   **Q.**   Okay.  Now, on the third paragraph of Mr. Barton's speaker

 7   notes, he writes, "For the share of billing linkouts, we're

 8   showing sensitivities from 10 percent to 50 percent, which

 9   will depend where is the text and the language developers are

10   allowed to use."  Right?

11   **A.**   Yes.

12   **Q.**   And so Mr. Barton here was referring to the placement and

13   language requirements that Apple was considering imposing on

14   external linkouts, right?

15   **A.**   Seems like it, yes.

16   **Q.**   And by reducing the linkout share through placement and

17   language requirements, the Project Wisconsin team knew,

18   because you and your finance colleagues told them, that Apple

19   could reduce the revenue Apple would lose to linkouts, right?

20   **A.**   That's not what he said.

21   **Q.**   That is exactly what he said, sir.

22   **A.**   It's just --

23   **Q.**   He is saying it's going to depend on the placement and the

24   language, and so the team understood that any restrictions

25   they place on language and placement is going to have a real

1    impact on the revenue hit to Apple.

2    A.   It also goes on to say we don't have a great idea -- great

3    datapoint on this and this will end up being based on

4    situations we've encountered, NetEase, which was outside the

5    store, much higher, Disney much higher, and then Epic, which

6    was much higher as well.

7        So we were just talking about the sensitivities, and that

8    can be one of the factors that --

9    Q.   Sir --

10   A.   -- sensitivity.

11   Q.   Sir, he's not saying anything about much higher.  He's not

12   saying of these things.  He's saying it will depend where is

13   the text and the language developers are allowed to use.  And

14   that is a message to the team that Apple's decision on the

15   restrictions on placement and -- and language, are going to

16   have a real impact on Apple's revenue.  Correct?

17   A.   (Reviewing document.)

18       My understanding is he's talking about the sensitivity

19   between zero to 50 percent.

20   Q.   Sir, he's talking about the sensitivity and says we're

21   giving you the sensitivities so you can play with it and think

22   about it, but you need to understand that the more

23   restrictions you place, the further to the left you're going

24   to move in terms of number of people who link out and the

25   smaller our revenue hit is going to get.

1    That's what the sensitivity is serving here.  It's telling

2    the team your decisions on restrictions on placement and

3    language is going to have impact on dollars, right?

4    **A.**  I don't see the word "placement" here, but it was about

5    the link.  Whatever the link is, that will have an impact.

6    And then he goes on to talk about other factors that --

7    **Q.**  You don't understand that he's talking about placement and

8    language?

9    **A.**  I do.  I don't understand it's talking about any

10    restrictions.

11    **Q.**  Okay.  I see.  So he's explaining that the language and

12    placement are going to have an effect, and the team may or may

13    not understand that restrictions could affect those factors.

14    That's what you're saying?  He's not saying anything about

15    restrictions, the team may or may not understand that?

16    **A.**  I'm just saying he's laying out fact -- one of the factors

17    that can impact the sensitivity.

18    **Q.**  I understand.  He's just modeling, right?  And what he's

19    modeling is this -- these numbers.  And you can move up or

20    down and you can move left or right in this chart, and that

21    has an effect on dollars.

22    And what he's telling the team is you can move left or

23    right, up or down, based on the text and the language

24    developers are allowed to use, right?

25    **A.**  I see it a bit differently.  I think, sir, he's trying to

1    say depending on where the language and the text lines, we

2    will be between these, we don't know where we will be.  I

3    think, sir, it's the other way around, the way --

4            THE COURT:  Do you have a specific recollection of

5    this meeting?  Do you have a specific recollection of this

6    meeting?

7            THE WITNESS:  I do, Your Honor.

8            THE COURT:  Do you specifically recall Nate talking

9    about this slide?

10           THE WITNESS:  I do, Your Honor.

11           THE COURT:  And what did he say specifically?

12       Without looking at the text, what did he say specifically?

13   Because what you're saying is inconsistent with this slide.

14           THE WITNESS:  What he said, Your Honor, was the

15   sensitivities can range between 10 to 50 percent depending on

16   where the text is and what the language of the text is.

17       We don't have great data on this, but we have scenarios

18   and sensitivities that we've seen.  And then he goes on to

19   give three examples of those which we used to do our modeling.

20           THE COURT:  And what were the three examples?

21           THE WITNESS:  It was Disney, NetEase, and Epic.

22           THE COURT:  And what did the Disney text say

23   specifically?

24           THE WITNESS:  Disney text talks about the bundling

25   that Disney was offering outside the Apple ecosystem and how

 1    customers were able to adopt that bundling and what impact did

 2    they see from that on us.

 3              **THE COURT:**  And where was it placed?

 4              **THE WITNESS:**  It wasn't placed -- it wasn't placed in

 5    the app.  None of these were in-app except Epic.

 6              **THE COURT:**  So what you're saying is that he didn't

 7    actually follow his notes on the slide?

 8              **THE WITNESS:**  Notes are usually, ma'am, for -- He

 9    said it, but I'm trying to explain what he meant because we

10    worked on the slide together.

11              **THE COURT:**  Go ahead.

12    **BY MR. EVEN:**

13    **Q.**  Sir, the notes back -- went back and forth including with

14    the executive team, correct?

15    **A.**  Can I get a sip of water?

16    **Q.**  The notes --

17    **A.**  Can I take a sip of water?

18    **Q.**  Sure.

19    **A.**  Thank you.

20                   (Off-the-record discussion.)

21              **THE WITNESS:**  Yes, sir.  You were saying?

22    **BY MR. EVEN:**

23    **Q.**  The notes, together with the slides, went back and forth

24    inside the team, everybody signed off on it before it went to

25    Mr. Cook, right?  Before the actual presentation was given.

 1   **A.**   The notes went back and forth, yes, but --

 2   **Q.**   And what the note says is this will depend where in the

 3   text, and the language, developers are allowed to use,

 4   correct?

 5   **A.**   Yes.  That's what the notes say.

 6   **Q.**   And "allowed" ties directly to restrictions, right?

 7   That's what allows or doesn't allow where and what text to

 8   use.  It's restrictions by Apple, correct?

 9   **A.**   That's not my understanding of it.  But I understand how

10   the word can be read, yes.

11   **Q.**   Okay.  "Allowed" means something else in Apple finance?

12   **A.**   I'm sorry.  There's some spilled water.

13   **Q.**   Never mind.  We can go on.

14        Do you see that going further down, all the way to the

15   penultimate paragraph, Mr. Barton says, "The range of impacts

16   on the low end with 25 percent breakage and 10 percent billing

17   shift," bottom left corner, "is more negligible at...," a

18   number that I won't read out, but you can see it, right?

19   **A.**   Yes.

20   **Q.**   However, on the other end, with zero percent breakage and

21   50 percent billing shift, top right corner, it's closer to

22   another number that's much bigger of U.S. revenue that Apple

23   would lose, right?

24   **A.**   Yes.

25   **Q.**   And that's the sensitivity analysis.  He's essentially

1   saying those are the best- and worst-case scenario, right?

2   **A.**  Yes, on the slide.

3   **Q.**  But he does not stop there.  He then says, "A more middle

4   ground scenario" -- and that's something we discussed this

5   morning, that your team provided middle ground scenarios that

6   you believed were more reasonable -- "of 10 percent breakage

7   and 30 percent billing shift would result in," another big

8   number that I'm not going to mention, "of revenue loss."  And

9   he gives that as a fraction of the U.S. App Store revenue,

10  correct?

11  **A.**  Yes.

12  **Q.**  And it is a very significant fraction of the App Store

13  U.S. store revenue, correct?

14  **A.**  Yes.

15          **THE COURT:**  And that's on an annual basis, correct?

16          **THE WITNESS:**  Yes, Your Honor.

17  **BY MR. EVEN:**

18  **Q.**  And that is really the bottom line of this slide to say

19  look, we think that in a no-commission scenario, a reasonable

20  middle ground approach would be a severe hit to the revenues

21  of the App Store.

22  **A.**  I don't think so.

23  **Q.**  You don't think so.  Okay.

24      Let's move on.

25          **THE COURT:**  But you are giving them information about

1   what the hit is going to be in that last line.

2          **THE WITNESS:**  Yes, Your Honor.

3          **THE COURT:**  Based upon your best information.

4          **THE WITNESS:**  Yes, Your Honor.

5   **BY MR. EVEN:**

6   **Q.**  Now, let's talk a little bit about option 2 and what you

7   told them about option 2.

8       So if you go to 859.31.  And that's the number -- page

9   ending in 50.

10  **A.**  Five zero, you said.

11                      (Exhibit published.)

12                  (Witness reviewing document.)

13         **THE COURT:**  All right.  One other question before we

14  go on.

15      Did you ever update these numbers on that last slide, 5 --

16  ending 547?

17      That last paragraph there that's highlighted.

18         **THE WITNESS:**  Not on this deck.  There might be other

19  versions of this deck we might have done, but not on this

20  deck.

21         **THE COURT:**  Did you -- do you remember ever giving

22  more up-to-date numbers other than the ones in that last

23  paragraph that is highlighted?

24         **THE WITNESS:**  I -- for this scenario, I don't

25  remember, Your Honor, updating these numbers after this.

1      **THE COURT:**  So as you sit here today, these are the

2    best numbers that -- that the team had modeled?

3           **THE WITNESS:**  For this scenario, yes, ma'am.

4           **THE COURT:**  Thank you.

5    BY MR. EVEN:

6    **Q.**  Now, option 2 that's modeled here is modeling a 27 percent

7    commission, right?

8    **A.**  27 percent without any time window, yes.

9    **Q.**  Okay.  Now, going back to the Court's question a second

10   ago, the reason that -- for the option 1 numbers were never

11   updated was that soon after this presentation, option 1 of no

12   commission was abandoned, right?  You were just not looking at

13   it anymore.

14   **A.**  (Reviewing document.)

15        There might have been a few more decks of this.  I don't

16   fully recall.  But the reason why I'm saying it wasn't updated

17   was the numbers wouldn't have changed.  We had already used an

18   annualized number at that time.

19   **Q.**  You do remember that option 1 was in fact abandoned about

20   two or three weeks after this deck, right?

21   **A.**  Somewhere around that time, yes.

22   **Q.**  And once it was abandoned, you stopped working on that,

23   correct?

24   **A.**  Yes.

25   **Q.**  Okay.  So Mr. Barton's first speaker notes indicates that

1    at a 27 percent commission, the finance team believes that

2    there would be very little developer adoption of linkout,

3    correct?

4    **A.**   Without any time window, yes.

5    **Q.**   Okay.  I'm not going to go back to the time window, but we

6    can assume that every time I talk about this deck, it's

7    without a time window.  I understand your point.

8        The third paragraph of Mr. Barton's speaker notes

9    indicates that "We believe based on low developer count

10   adoption and low billing share," top left corner, "the revenue

11   impact would be closer to zero."  Right?

12   **A.**   Yes.

13   **Q.**   And Mr. Barton then ends up at the very bottom that from a

14   margin perspective, the impact is essentially negligible,

15   right?

16   **A.**   Yes.

17   **Q.**   And so the message here is very clear.  If we choose the

18   27 percent without the window, you're going to have almost no

19   impact to Apple's revenues and profitability, right?

20   **A.**   In the 10 percent scenario we spoke about, yes, very

21   little impact.

22   **Q.**   Okay.  So I want to now switch gears and talk about

23   something slightly different.

24       And specifically I want to talk to you a little bit about

25   the treatment --

```
 1              THE COURT:  Hold on a moment.

 2              MR. PERRY:  Sorry to interrupt, Your Honor.

 3          May Mr. Schiller return to the courtroom?  Are we done

 4      with the --

 5              MR. EVEN:  Yes, he may.  I apologize.

 6              THE COURT:  Yes.

 7              MR. PERRY:  Thank you, Your Honor.

 8              THE COURT:  Thank you.

 9                (Mr. Schiller reentered the courtroom.)

10              MR. EVEN:  May I proceed, Your Honor?

11              THE COURT:  You may.

12      BY MR. EVEN:

13      Q.  So I want to talk a little bit about the treatment of

14      programs under Wisconsin.  Okay?

15      A.  Yes.

16      Q.  And you know what I mean by programs, right?

17      A.  Yes, I do.

18      Q.  And you were very much involved in that aspect of Project

19      Wisconsin, right?

20      A.  I was.

21      Q.  And the thinking about what to do with those programs has

22      evolved over time, correct?

23      A.  It has, yes.

24      Q.  So let's begin with CX0223, which we already looked at for

25      other purposes yesterday.  And this is the June 16 draft deck.
```

 1                      (Exhibit published.)

 2    BY MR. EVEN:

 3    Q.  And if you go to 223.29, this is a model that you

 4    conducted on the potential impacts on Apple's revenue of a

 5    model that imposes a commission of 27 percent with a lookback

 6    window of 24 hours, right?

 7    A.  Yes.

 8    Q.  And on the right-hand of the slide, the third bullet point

 9    says "linkout billings not eligible for program discounts,"

10    right?

11    A.  Yes.

12    Q.  And the meaning of that was that linkouts would be subject

13    to a 27 percent commission regardless if the ordinary course

14    IAP transaction were subject to a 30 percent fee or a

15    15 percent fee, correct?

16    A.  Yes.

17    Q.  And in other words, in this model, it simply does not

18    include the 12 percent reduced fee that we saw in other

19    iterations, right?

20    A.  I believe so.  Yes.

21    Q.  If you turn to CX224, that's the June 19 email from

22    Mr. Cameron and the attached deck which we also talked about.

23        If you turn to Mr. Schiller's email on the first page of

24    the document, he has some comments on Slide 21.

25                      (Exhibit published.)

1    **BY MR. EVEN:**

2    **Q.**   And he notes this anomaly and states:  "Is there a

3    12 percent commission on a small business developer

4    transaction?  Otherwise this is an increase in commission

5    level for 95 percent of developers.  I don't see programs

6    mentioned."  Right?

7    **A.**   Yes.

8    **Q.**   And essentially what Mr. Schiller is saying is I think we

9    can't impose 27 percent on all these linkout transactions even

10   when the regular transaction on IAP is at 15 percent, that

11   would be an anomaly.

12       Right?

13   **A.**   Yes.

14   **Q.**   And if you turn to CX224.32.

15                    (Exhibit published.)

16   **BY MR. EVEN:**

17   **Q.**   This presents a variation on the 27 percent commission,

18   which is why it's called version 2 or V2, which is referred to

19   here as 3 percent commission with 24-hour time limit including

20   program discounts.  Right?

21   **A.**   (Reviewing document.)

22       What sheet number are we on?

23   **Q.**   I'm sorry?

24   **A.**   What page number are we on?

25   **Q.**   224.32.

1   **A.**   Thirty-two.

2   **Q.**   It's also on the screen for you.

3   **A.**   Yeah, I'm here.

4   **Q.**   And what this is talking about is a place where the

5   3 percent difference would apply whether the IAP transaction

6   is at 30 percent or 15 percent, right?

7   **A.**   Yes.

8   **Q.**   And so this is essentially the 27 percent/12 percent

9   commission depending on the IAP corollary that Apple, with

10   some exceptions, went for ultimately, correct?

11   **A.**   Yes.  I believe so.  I'm not sure which all programs were

12   included here.  I don't recall.

13   **Q.**   Yeah, I understand.  This talks about programs generally.

14   **A.**   Yes.

15   **Q.**   And -- and that's part of my point.  The thinking then

16   started going into specific programs.  Right?  Which program

17   will be included and which program will not be included,

18   right?

19   **A.**   Yes, we debated everything.

20   **Q.**   And following this June 20 meeting with Mr. Cook, that

21   thinking started to evolve and it was referred to as

22   eligibility, right?  You remember using that word "program

23   eligibility"?

24   **A.**   I do remember that, but I don't remember the link between

25   20th meeting and this.

1   **Q.**  Okay.  This -- this slide deck is for the 20th, and

2   there's no mention of eligibility anywhere in this slide deck.

3   I can represent that to you.

4   **A.**  It's on Slide 33.  It says linkout billings are eligible

5   for program discounts.  It's a similar word for eligibility.

6   **Q.**  Okay.  The linkout programs are eligible, but there's

7   nothing about specific programs that are or aren't eligible,

8   right?

9       It essentially says anything that's at 15 percent is going

10  to be billed at 12 percent on linkouts.

11  **A.**  (Reviewing document.)

12      I do not remember if it was or not.

13  **Q.**  Okay.  Let me -- let's talk about it.  There you have some

14  specific slides about that.  They're not anywhere before the

15  20th.  And we can talk about that.

16      So if you go now to 384, this is a June 24, 2023 email

17  from Ms. Pulchny to yourself and others.  I think we discussed

18  this one yesterday as well.

19      This time it really is already admitted.

20                    (Exhibit published.)

21  **BY MR. EVEN:**

22  **Q.**  And this is with the subject "Wisconsin Prep for Tim

23  Meeting 6/28."

24      Do you see that?

25  **A.**  Yes, I do.

1    **Q.**  Now, at the very bottom of the first page, there is a --

2    and going over to the second page, is an email from

3    Ms. Washburn who's assigning actions needed on the deck for a

4    June 28 meeting with Mr. Cook.

5       Do you see that?

6    **A.**  Yes, I do.

7    **Q.**  And Mr. -- sorry -- Ms. Washburn is asking Mr. Barton and

8    you to work on slides separating VPP from subs Y2.

9       Is that correct?

10   **A.**  Yes.

11   **Q.**  Okay.  And that is the work on eligibility of VPP and what

12   she calls sub Y2 and the divergence of the eligibility of

13   those, right?

14   **A.**  I think so.  It was -- again I don't fully recall this,

15   but I think so.  It was about showing all programs separately.

16   This is what I remember.  'Cause VPP and sub 02 can be

17   commingled together.

18   **Q.**  Okay.  And just so we're clear, VPP is the Video Partner

19   Program, right?

20   **A.**  Yes, it is.

21   **Q.**  And it actually in most slides and all your analyses went

22   together with something called NPP as well, correct?

23   **A.**  Yes.

24   **Q.**  And What is NPP?

25   **A.**  News Partner Program.

1    **Q.**   Okay.  And subs Y2 is what's called the Tenured

2    Subscription Program, right?

3    **A.**   Yes.

4    **Q.**   And just to remind the Court, under the Tenured

5    Subscription Program, subscription fees go down from

6    30 percent to 15 percent beginning in the second year of

7    renewals, right?

8    **A.**   Yes.

9    **Q.**   And by contrast, VPP and NPP give you a -- give the

10   developer a 15 percent subscription rate -- subscription

11   commission beginning on day one, correct?

12   **A.**   Yes, I think so.  There are some requirements.  I'm not an

13   expert on it, but there are some requirements that they need

14   to meet for VPP and NPP --

15   **Q.**   We'll, talk about the requirements, sir.  I understand you

16   have your points that you want to make.  But now answer my

17   question.

18   **A.**   Yes.

19   **Q.**   VPP and NPP, the benefit of them for developers is that

20   they give the developer 15 percent on day one, correct?

21   **A.**   Yes.

22   **Q.**   And so the huge difference for developers between being

23   just in the tenured program versus being in VPP or NPP is

24   that -- is the difference between 15 percent commission and

25   30 percent commission for any new subscriptions for the first

 1    year, correct?

 2    **A.**  Yes.

 3    **Q.**  Okay.  Now, if you turn to CX0505 in your binder, that's a

 4    June 28 email from Ms. Washburn to you and others attaching

 5    the final slides to be presented to Mr. Cook that day,

 6    correct?

 7    **A.**  Yes.

 8              **MR. EVEN:**  Your Honor, I move to admit CX0505.

 9              **MS. RICHMAN:**  No objection.

10              **THE COURT:**  It's admitted.

11              (Exhibit 0505 received in evidence.)

12    **BY MR. EVEN:**

13    **Q.**  And if you go to CX505.16, that is a slide called Program

14    Eligibility.  Right?

15                        (Exhibit published.)

16              **THE WITNESS:**  (Reviewing document.)

17        Yes.

18    **BY MR. EVEN:**

19    **Q.**  And the slide lists out the Small Business Program, the

20    Tenured Subscription Program, and the VPP/NPP programs which

21    are treated jointly, correct?

22    **A.**  Yes.

23    **Q.**  And this is the slide that you prepared together with

24    Mr. Barton, I assume, in response to Ms. Washburn's June 24th

25    request that we just looked at to present to Mr. Cook on

1  June 28th, correct?

2  **A.**  No.

3  **Q.**  Well, that is the slide that you presented to Mr. Cook,

4  right?

5  **A.**  I presented it, but I did not prepare it.  The way -- the

6  way that usually we present is we present a section.  There

7  can be slides from other people in the deck as well.

8  **Q.**  Okay.

9  **A.**  So --

10  **Q.**  All right.  You knew what this slide was.  You -- you

11  presented it.  You fully understand what it conveys.  Right?

12  **A.**  I -- I understood part of it, but I relied on Carson and

13  my other business partners to jump in 'cause they understand

14  programs better than I do.

15  **Q.**  Okay.

16        **THE COURT:**  So you presented on a slide that -- where

17  you weren't -- to Tim Cook that you weren't the expert on?

18        **THE WITNESS:**  Yes.  I was more focused on the

19  billings on the left-hand side, Your Honor.  And on the

20  eligibility, I relied on my business partners to speak.

21  **BY MR. EVEN:**

22  **Q.**  Okay.  Well, maybe it was my mistake to let Mr. Oliver go.

23  But let's start with you and see where we end up.  Because I

24  do want to talk about the numbers, and I understand that the

25  numbers and implications are something that actually you were

1    the source for, right?

2    **A.**  Yes.

3    **Q.**  Okay.  And what I understand is that the text on the right

4    is something that Mr. Oliver was more responsible for?

5    **A.**  Yes.

6    **Q.**  Okay.  So a slide lists out the Small Business Program --

7    sorry -- on the left of that list of programs is sort of a

8    Venn diagram showing the billings generated by developers

9    covered by each program, right?

10   **A.**  Yes.

11   **Q.**  And the members of the Small Business Program are, by

12   definition, small developers, correct?

13   **A.**  Yes.

14   **Q.**  And so the program covers 95 percent of developers, but

15   the developers covered by it generate the small -- a small --

16   the small fraction of billings that we see in the Venn

17   diagram, and we won't say out loud, right?

18   **A.**  Yes.

19   **Q.**  Now, the members of the Tenured Subscription Program are

20   varied.  Some are very large, some are medium, some are small,

21   correct?

22   **A.**  Yes.

23   **Q.**  It's anybody who sells subscriptions essentially.

24   **A.**  Yes.  They're mainly large.  You can see the intersection

25   of the small business were tenured.  They're mainly large.

1  Very small intersection is small.

2  **Q.**  Okay.  Are you suggesting that this Venn diagram is

3  somehow exactly to scale?

4  **A.**  It's developed to scale, yes.

5  **Q.**  Okay.  I think we have testimony saying otherwise, but

6  okay.

7    Now the members of the NPP/VPP program generally are large

8  or extra large developers, correct?

9  **A.**  Yes.

10  **Q.**  And in fact on the slides, you mention that there's only a

11  limited number of developers in that -- in those programs,

12  right?

13  **A.**  Yes.

14  **Q.**  And yet these limited number of developers are the source

15  of a very significant billing number, as we see in the Venn

16  diagram, correct?

17  **A.**  It's smaller than tenured but --

18  **Q.**  I understand.  But it's big, right?  For a small number of

19  developers, these are large developers or extra large

20  developers, it's kind of concentrated, right?

21  **A.**  I don't remember the count of developers in VPP/NPP, but

22  the billing contribution is decent, yes.

23  **Q.**  Okay.  And you see that you say it's a limited number of

24  developers, right?

25  **A.**  I --

1    **Q.**  That's what the slide says.

2    **A.**  Yes.

3    **Q.**  Okay.  I assume you did not intend to misrepresent the

4    size of the number of developers or the number of developers

5    to Mr. Cook, correct?

6    **A.**  No.

7    **Q.**  Okay.  And so VPP, for instance, would cover the likes of

8    Disney, Amazon Prime and HBO Max, correct?

9    **A.**  Yes.

10   **Q.**  And NPP covers the major newspapers like *New York Times*

11   and *Wall Street Journal*, right?

12   **A.**  I don't know if they are a part, but, yes, they are

13   relatively -- they would be.

14   **Q.**  Okay.  But those are kind of developers in --

15   **A.**  Yes.

16   **Q.**  -- those programs.  They're major developers with major

17   kind of streaming or news outlets, right?

18   **A.**  Yes.  There are some small ones as well, but, yes.

19   **Q.**  Okay.  Now as we discussed yesterday --

20         **THE COURT:**  Hold on, Mr. Even.

21      Did you not have speaker notes?

22         **THE WITNESS:**  I do not use speaker notes, Your Honor.

23         **THE COURT:**  Okay.

24         **THE WITNESS:**  Usually I do not use speaker notes.

25   / / /

1    BY MR. EVEN:

2    **Q.**  As we discussed yesterday and as others testified, very

3    large developers like the ones covered by VPP/NPP were the

4    developers that Apple believed were the most likely to use

5    linked purchases if Apple charged a commission, right?

6    **A.**  Yes.

7    **Q.**  And what this slide is proposing, and we see that with the

8    red X, is that VPP and NPP participants would not be eligible

9    to participate in the linkout entitlement program, right?

10   **A.**  They would be eligible to participate.  They wouldn't get

11   the program discount.

12   **Q.**  Okay.  So they can't be in the program while using

13   linkouts, right?

14   **A.**  Yes.

15   **Q.**  So they're not eligible to use linkouts as long as they're

16   in the program.  If they use a linkout for a single sale, they

17   lose their ability to be in the program, right?

18   **A.**  I don't remember how the language is written, but my

19   understanding is on the linkout transactions they don't get --

20   **Q.**  Sir --

21   **A.**  -- discount.

22   **Q.**  -- you presented to Mr. Cook a slide that is called

23   "Program Eligibility."  I understand that everybody -- you're

24   not the first witness I'm asking about it.  Everybody's trying

25   to run away from the word "eligible."  I understand.

 1         Nonetheless that's what you presented to Mr. Cook.  You

 2    presented these -- these developers would not be eligible.

 3    You marked it with a red X.  Correct?

 4    **A.**  They will not be eligible for program discount.  The title

 5    says "Program Eligibility."  We are saying they won't be

 6    eligible for the program discount.

 7    **Q.**  Okay.  They have to make a choice, in other words.  Either

 8    they're in the program or they use linkouts.

 9    **A.**  Yes.

10    **Q.**  Okay.  And so what that means is that VPP and NPP

11    developers would lose the benefits of these programs if they

12    choose to offer any linked-out transactions, right?

13    **A.**  Yes.

14    **Q.**  So let's discuss a bit about how Apple reached the

15    decision to exclude VPP and NPP developers from the linkout

16    program.  Okay?

17         If you turn to CX231.

18    **A.**  (Reviewing document.)

19    **Q.**  That is a deck titled "Existing Program and Exceptions,"

20    right?

21                         (Exhibit published.)

22              **THE WITNESS:**  Yes.

23    BY MR. EVEN:

24    **Q.**  And it's dated December 2022, correct?

25    **A.**  Can I just orient myself on this deck?

 1    **Q.**  Sure.

 2    **A.**  (Reviewing document.)

 3       I don't think so this deck pertains to this injunction.

 4    This is a --

 5    **Q.**  I agree it does not pertain to this injunction at all, but

 6    today we're going to talk about this deck.

 7       Do you recognize -- so just answer my questions.

 8       Do you see that that is a deck from December 2022?

 9    **A.**  Yes.

10    **Q.**  And if you look at the first page, you see that it was

11    found in your files, correct?

12    **A.**  It was found in the box folder, yes, which I had access

13    to.

14    **Q.**  Okay.  And this deck discusses the treatment of programs

15    including VPP and NPP should Apple need to change its business

16    model to meet the requirements of the DMA, correct?

17    **A.**  (Reviewing document.)

18       I believe so, yes.

19    **Q.**  Okay.

20          **MR. EVEN:**  Your Honor, I'll move to admit CX0231 at

21    this point.

22          **THE COURT:**  It's admitted.

23          **MS. RICHMAN:**  No objection.

24          (Exhibit 0231 received in evidence.)

25    / / /

```
 1    BY MR. EVEN:

 2    Q.  And if you look, by the way, on the first page, you see

 3    that this deck was also found in the files of Mr. Oliver and

 4    Mr. Roman and others, right?

 5    A.  Yes.  Probably we had access to the same box folder.

 6    Q.  Okay.  And so a whole slew of people who were involved in

 7    Wisconsin also had access to this deck, correct?

 8    A.  Yes.

 9    Q.  Okay.  Turning to page 8 of the slide deck.

10                      (Exhibit published.)

11    BY MR. EVEN:

12    Q.  We see a slide that is very similar to the slide we just

13    reviewed from the Wisconsin deck; is that right?

14    A.  Yes.

15    Q.  Okay.  Fair to assume that this slide was reused as the

16    basis for the slide that we just saw in the deck presented to

17    Mr. Cook?

18    A.  Yes, we reused the formatting.

19    Q.  Okay.  It's more than the formatting, right?  It's the

20    same Venn diagram, all that, right?

21    A.  Just the Venn diagram.  The language is different.  And

22    the numbers are different, yes.

23    Q.  Okay.

24    A.  It's the formatting.

25    Q.  All right.  So we see here that we talk about small
```

1  business programs.  The slide says that the Small Business

2  Program is great for small developers and its cost is

3  financially minimal to Apple, correct?

4  **A.**  (Reviewing document.)

5      Can I read a couple of slides?  I just want to understand

6  what this is in context with.

7  **Q.**  Sure.

8  **A.**  (Reviewing document.)

9      Yes.

10  **Q.**  And under "Other Programs," which includes VPP, NPP, and

11  tenured subscription, the slide notes that these programs have

12  a larger financial impact on Apple; is that right?

13  **A.**  Yes.

14  **Q.**  And that is reflected in the Venn diagram and consistent

15  what we saw in the presentation to Mr. Cook that we looked at

16  earlier, correct?

17  **A.**  Yes.  This treatment is cumulative for VPP, NPP, and

18  tenured, yes.

19      (Exhibit published to witness, counsel, and the Court.)

20  **BY MR. EVEN:**

21  **Q.**  Okay.  And then the third bullet notes that these programs

22  serve as a, quote, tool for retaining developers exclusively

23  on Apple IAP, end quote, right?

24  **A.**  Yes.

25  **Q.**  And tool for retaining developers exclusively on Apple IAP

1    means a tool for preventing developers from using alternative

2    billing solutions including linkouts that Apple was required

3    to allow under the DMA, correct?

4    **A.**  I don't believe it was just that.  It was alternative

5    distribution as well we were talking about.

6                        (Pause in the proceedings.)

7    **BY MR. EVEN:**

8    **Q.**  I'm sorry.  You're saying this is just about distribution,

9    you think?

10   **A.**  I -- these are not my slides so I'm just guessing at this

11   point in time.

12   **Q.**  Okay.  Well, let's go and see the analysis that was done.

13   Maybe that will remind you.

14       If you go to the next slide, 231.9, it lays out some

15   assumptions for a numerical analysis of the effects of these

16   programs.

17   **A.**  Yes.

18   **Q.**  Do you see -- do you see that?

19   **A.**  Yes, I do.

20   **Q.**  And assumption number 1 is the developers maximize

21   earnings.  Do you see that?

22   **A.**  Yes, I do.

23   **Q.**  Assumption number 2 is that developers maintain IAP, and

24   that's true for the U.S., correct?  Developers have to use IAP

25   alongside any linkouts, right?

1    **A.**   Yes.

2    **Q.**   Assumption number 3 is that a mixed strategy resulting

3    loss of all program benefits.  Do you see that?

4    **A.**   Yes.

5    **Q.**   That is exactly the proposition that was reflected in the

6    slide that was presented to Mr. Cook that we looked at earlier

7    from June 28th, right?  If you use a linkout, if you use any

8    alternative, you lose all program benefits, right?

9    **A.**   Yes.

10   **Q.**   Assumption number 4 is that cost of alternative payments

11   varies by developer size and debt, as we discussed today and

12   yesterday, holds in the United States as well, right?

13   **A.**   Yes, it does.

14   **Q.**   Turning to page 12 of the document.

15                    (Exhibit published.)

16   **BY MR. EVEN:**

17   **Q.**   This slide looked at how a developer decides whether to

18   use IAP exclusively or pursue alternative billing solutions,

19   right?

20   **A.**   And/or distribution, yes.  And/or -- or distribution, yes.

21   There are three elements to it.

22   **Q.**   There are three elements because the DMA requires to allow

23   alternative payments in the app, linkouts, and alternative

24   distribution, right?

25   **A.**   Yes.

1  **Q.**  And if the developer elects any of those, they lose all

2  the benefits, correct?  That's the assumption we just looked

3  at.

4  **A.**  (Reviewing document.)

5  **Q.**  If they link out, if they use alternative payments, if

6  they use alternative distribution, they lose all benefits,

7  correct?

8  **A.**  Yes.

9  **Q.**  All right.

10      And this slide's a little complicated so I want you to try

11  and help me break it down.

12                    (Exhibit published.)

13  **BY MR. EVEN:**

14  **Q.**  You see that these calculations are trying to assist the

15  blended rate the developer would face if he chooses to stay

16  exclusive on IAP versus if he elects to diversify to a mix of

17  IAP and alternative billing and distribution solutions, right?

18  **A.**  Yes.

19  **Q.**  And the assumption is that the developer would only

20  diversify if the blended rate is equal to or lower than the

21  IAP-only rate, right?

22  **A.**  Yes.

23  **Q.**  And this is essentially the same analysis that we

24  discussed this morning in the developer decisioning model that

25  was done for Wisconsin, right?

1  **A.**  Similar, yes.

2  **Q.**  And not the same numbers but the same kind of rationale.

3  The developer is going to think am I going to leave and try to

4  divert some billings to IAP -- away from IAP?  I'm only going

5  to do that if overall that makes me money.  Right?

6  **A.**  Yes.

7  **Q.**  And the effect of losing the program benefits makes

8  choosing alternative payments more costly and therefore less

9  appealing because once the developer elects to diversify, its

10  cost for using IAP goes up.  Correct?

11  **A.**  Yes.

12  **Q.**  So in this slide, for instance, the calculation is done

13  for a developer that sells 60 percent on regular IAP and

14  40 percent under a program such as VPP, correct?

15  **A.**  Yes.

16  **Q.**  And the calculation here assumes a standard rate of

17  15 percent and a program rate of 10 percent, which were rates

18  that Apple considered at the time for commissions in Europe,

19  right?

20  **A.**  On my screen they are blacked out.  I'm not sure I'm

21  allowed to speak to the numbers.  But, yes.

22  **Q.**  These are just assumptions in a model.  I don't think the

23  numbers are problematic.  It's -- there's no revenue numbers

24  or anything.

25       But those are the numbers that are assumed here, right?

1    **A.**   Yes.

2    **Q.**   Okay.  And what the slide reflects on the left-hand side

3    is that if the developer uses IAP exclusively, the developer

4    would have a blended rate of 13 percent, right?

5    **A.**   Yes.

6    **Q.**   And on the right, if we just look at the IAP portion, we

7    see that if a developer sends a single sale outside to

8    alternative payments or distribution, it loses all the program

9    benefits, and so its blended rate for the IAP transactions

10   goes up to 15 percent, right?

11   **A.**   Yes.

12   **Q.**   And as a result, a developer would switch to alternative

13   payments only if using them would not only be cheaper than IAP

14   on a transaction-by-transaction basis, but would also somehow

15   make up for the loss of the program benefits for sales that

16   remain on IAP, correct?

17   **A.**   Yes.

18   **Q.**   And the talking points suggest that in this scenario, for

19   example, with these particular numbers, the developer would

20   need to believe they can drive more than 17 percent of

21   billings through alternative distribution to make the use of

22   alternatives to IAP worthwhile, correct?

23   **A.**   In this example, yes.

24   **Q.**   And then the next slide, if you flip over --

25                     (Exhibit published.)

1   BY MR. EVEN:

2   Q.  -- suggests that if a developer makes most or all of its

3   sales through the program, the developer would need to drive a

4   much larger percentage of billings through alternative

5   distribution in order to break even.

6          MS. RICHMAN:  Take this down.  This is a recurring

7   issue today.

8   BY MR. EVEN:

9   Q.  Sir, do you understand my question?

10  A.  No.  Sorry, I got lost.  Can you please repeat?

11  Q.  On the next slide, it shows that if a developer makes most

12  or all of its sales through the program, the developer would

13  need to drive a much larger percentage of billings through

14  alternative distribution in order to break even because the

15  loss of the program would be much more pronounced, correct?

16  A.  Yes.

17  Q.  Now in the U.S., the numbers would be different.  The loss

18  of VPP/NPP would mean that the commission rate on all new and

19  first-year subscriptions would go up from 15 percent to

20  30 percent, correct?

21  A.  Yes.

22  Q.  And so for a developer who's -- who's in VPP or NPP and

23  has a lot of new subscribers, that would be a very meaningful

24  cost, taking its IAP commissions from potentially something

25  close to 15 to 30?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**    Yes.

2    **Q.**    And the rationale in the U.S. would be the same.  If the

3    use of linkout means that the loss of VPP/NPP benefits, no

4    developer would use linkouts unless that use can make up for

5    the doubling of its IAP commission on all new and first-year

6    subscriptions, right?

7    **A.**    Yes.  Financially, yes.

8    **Q.**    Financially.  You're a finance guy.  I'm only asking you

9    financially.

10    And so in the U.S. too, the threat of the loss of program

11    benefits would deter adoption of linkouts in the U.S. just as

12    it does in the EU in the examples we just saw, correct?  It

13    would make it much more costly to adopt linkouts, correct?

14    **A.**    Yes.

15    **Q.**    And in the U.S. by focusing on VPP/NPP, this exclusivity

16    tool would operate on the largest developers that Apple

17    believed are the most likely to actually use linkouts, right?

18    **A.**    I don't believe that was the reasoning.

19    **Q.**    I'm not asking what you believe, sir.  I'm asking as a

20    mechanical matter, by focusing on VPP/NPP, this tool would

21    operate in the U.S. on the largest developers who otherwise

22    would be most likely to use linkouts, correct?

23    **A.**    Part of the VPP/NPP, yes.

24    **Q.**    Let's go back to the June 28 deck.  That's CX505.16.

25    (Exhibit published.)

 1   BY MR. EVEN:

 2   Q.  Here, even though the graphic on the slide is virtually

 3   identical and the template is identical to the slide we just

 4   saw for Europe, and even though the eligibility recommendation

 5   is identical, there's no mention on this slide of the

 6   observation that the team's recommendation would make the

 7   NPP/VPP program a tool to ensure IAP exclusivity, right?

 8   A.  I'm sorry.  I'm trying to get to the slide.

 9       Can you tell me the sheet number, please.

10   Q.  505.16.  Let me know when you're there.

11   A.  Yes, I'm there.

12   Q.  Okay.

13                    (Exhibit published.)

14   BY MR. EVEN:

15   Q.  What we see on this slide is that it looks like a very

16   similar slide.  And you telling me that yes, you used the same

17   templates, it was taken from the other slide probably.

18       There is no mention from you, from Mr. Oliver, from

19   anyone, that by deciding that VPP/NPP would not be eligible,

20   that would make these programs a tool to ensure IAP

21   exclusivity.  That's just not mentioned on the slide, right?

22   A.  It is not.

23   Q.  And the reason it's not mentioned on the slide is that in

24   the U.S., because everyone knew that this maybe needs -- may

25   need to go before a court, you wanted to use more nuanced

```
 1    wording that won't suggest that it's an exclusivity tool,

 2    right?

 3    A.  I do not agree.

 4    Q.  You do not agree.  Okay.

 5        Let's go to CX435.  Do you see that CX435 is an invitation

 6    where you are the organizer of a meeting about Wisconsin

 7    programs slide decks?

 8    A.  Yes.

 9    Q.  And it's dated June 26?

10    A.  Yes.

11            MR. EVEN:  Your Honor, I move to admit CX435.

12            MS. RICHMAN:  No objection.

13            THE COURT:  It's admitted.

14                (Exhibit 435 received in evidence.)

15            MR. EVEN:  We can put it up on the screen.

16                    (Exhibit published.)

17    BY MR. EVEN:

18    Q.  Others at the meeting are Mr. Oliver, Mr. Barton, and

19    Mr. Kim, right?

20    A.  Yes.

21    Q.  So it's a small meeting, right?

22    A.  Yes.

23    Q.  If you turn to CX506 in your binder, these are notes from

24    that meeting.  Do you see that?

25    / / /
```

 1    **A.**  (Reviewing document.)

 2         They're not from that meeting.

 3    **Q.**  Sir, they're notes dated June 26.  And you see it has your

 4    name all over the place.  Do you recognize these notes?

 5    **A.**  I do recognize these notes, but they're not from the same

 6    meeting.

 7    **Q.**  Okay.  What meeting are those notes from?

 8    **A.**  These notes?

 9    **Q.**  Yes.

10    **A.**  (Reviewing document.)

11         I don't recall because I did not take these notes.  But

12    these are not from that meeting because they talk about system

13    disclosure.  They talk about a lot of other things which none

14    of us were involved in.

15    **Q.**  Okay.  They're notes from a team meeting that you

16    participated in on June 26, correct?

17    **A.**  Yes.

18    **Q.**  Okay.  And you recognized them, you said?

19    **A.**  I recognize the notes.

20    **Q.**  Okay.

21         **MR. EVEN:**  Your Honor, the notes were previously

22    provisionally admitted.  I'd like to admit them

23    non-provisionally at this point.

24         **THE COURT:**  No.  They're admitted.

25    / / /

1              (Exhibit 506 received in evidence.)

2                    (Exhibit published.)

3     **BY MR. EVEN:**

4     **Q.**  The last page, do you see there's a discussion of program

5     eligibility?  Do you see that?

6     **A.**  Yes, I do.

7     **Q.**  And it says, "Kunal to present."  Right?

8     **A.**  Yes.

9     **Q.**  And the third bullet is VPP/NPP more nuanced way to write

10    our positioning here.

11          Did I read that correctly?

12    **A.**  Yes.

13    **Q.**  "Nuanced" here means sanitized for consumption by the

14    Court, correct?

15    **A.**  I do not agree.

16    **Q.**  You do not agree.  Okay.

17          Is it your testimony that the decision to exclude VPP and

18    NPP developers from the linkout program had nothing to do with

19    the fact that this would incentivize the largest developers to

20    remain exclusively on IAP?

21    **A.**  I wasn't the decision-maker on it.  I was -- as I said, I

22    was running the financials based on what was being told to me.

23    And I wasn't deciding what to be included and what not to be

24    included.

25    **Q.**  Sir, you were part of the team that worked on both things.

1   Everybody knew that the implication of this -- of this

2   exclusion is the same implication we just walked through.

3   It's a tool for exclusivity.

4       Are you telling me that nobody discussed that?  That was

5   not on anybody's mind?  That's your testimony, that you just

6   put that out of your brain because it was six months ago and

7   said now we are going to have completely different reasons?

8   **A.**   I don't remember discussing this, no.

9   **Q.**   Okay.  Let's look at what happened further.

10      The notes state that the nuanced rationale to be used

11  should be that Apple wants to, quote, "maintain high bar of

12  user experience for participants," right?

13  **A.**   Yes.

14  **Q.**   And that language verbatim is part of the language that

15  you presented to Mr. Cook, correct?

16  **A.**   It was on the slide, yes.

17  **Q.**   You actually didn't believe that that's a good reason to

18  exclude these programs, right?

19  **A.**   I never said I did not believe.  I was confused about it,

20  wanted clarity on these things --

21  **Q.**   Sir, you didn't --

22                  (Simultaneous colloquy.)

23          **THE WITNESS:**  -- from my business partners.

24  **BY MR. EVEN:**

25  **Q.**   -- want clarity.  You thought it made no sense.  You

1  thought it was weak, right?

2  **A.**  I thought the language earlier being used in this was

3  weak, but I never felt that the reasoning was weak.

4  **Q.**  Sir, sir, you thought this reasoning was weak, it made no

5  sense, right?

6  **A.**  I do not agree that that's what I felt with this.

7  **Q.**  Let's go to CX0511 then.  That's a chat between you and

8  Mr. Oliver on June 28th, the very morning of your presentation

9  to Mr. Cook, right?

10 **A.**  Yes.

11          **MR. EVEN:**  Your Honor, I move to admit CX511.

12          **MS. RICHMAN:**  It's already been admitted.

13 **BY MR. EVEN:**

14 **Q.**  And on June 28, you tell Mr. Oliver, "Hey, let me know

15 when you have five minutes to talk."  Right?

16                (Exhibit published.)

17          **THE WITNESS:**  Yes, I do.

18 **BY MR. EVEN:**

19 **Q.**  Let's flip to the next page.  Mr. Oliver says he's

20 currently on route to Brussels.  "Do we need to catch up over

21 the phone?"

22     And you say?  "Can text.  I think our argument on VPP/NPP

23 is weak."

24     Did I read the correctly?

25 **A.**  Yes, you read that correctly.

1    **Q.**   That's what you conveyed to Mr. Oliver at that time,

2    right?

3    **A.**   Yes.  But if you go down --

4    **Q.**   Hold on, sir.  I'm going to go through it.

5    **A.**   Okay.

6    **Q.**   For now, you agree that you say that the argument is weak,

7    right?

8    **A.**   Those were the words, yes.

9    **Q.**   Going to 511.5.

10                        (Exhibit published.)

11   **BY MR. EVEN:**

12   **Q.**   Mr. Carson is asking:  "Is anyone pushing back on VPP/NPP

13   decisioning, or are you just worried about the logic?"

14        Right?

15   **A.**   Yes.

16   **Q.**   And the logic here refers to the justification on the

17   slide for the decision to exclude VPP/NPP developers from the

18   linkout program, right?

19   **A.**   Yes.

20   **Q.**   And so what Mr. Oliver is asking you is anybody concerned

21   about the actual decision or just the reason we're giving on

22   the slide.

23        And you say, "thumb's up, just the logic"; right?

24   **A.**   Emphasized on the word "logic."

25   **Q.**   Emphasized is thumb's up, right?  That's the way it's done

 1    here, but --

 2                THE COURT:  No.  I don't think so.

 3                THE WITNESS:  It's not.

 4                THE COURT:  -- exclamation point?

 5                MR. EVEN:  Emphasize -- exclamation, sorry.

 6                THE WITNESS:  Yes.

 7    BY MR. EVEN:

 8    Q.  Exclamation.  I apologize.

 9         But what you meant to say is, yes, I'm only talking about

10    the words on the slide, right?

11    A.  I'm telling him I want to prepare since I have to present

12    the slide and it's not my areas of expertise.  I just want to

13    understand from him, yes.

14    Q.  Okay.  And then you say, "Just prepping in case someone

15    does on VPP and NPP the argument on the high bar can be made

16    with discount as well."  Correct?

17    A.  Yes, because I don't understand how these programs work

18    and I was asking him very straightforward --

19    Q.  Sir, I'm not asking for the interpretation.  The words are

20    pretty clear.  What you're telling him is that the argument

21    doesn't make sense to you because the high bar of using

22    experience can be achieved even if these people actually get a

23    break on linkouts.

24    A.  I said the argument on high bar can be made with discount

25    as well --

1   **Q.**  And so --

2                        (Simultaneous colloquy.)

3   **BY MR. EVEN:**

4   **Q.**  What you're saying is, "We're saying there's a high bar

5   that has nothing to do with excluding them from the linkout.

6   I don't see how these things make sense.  Please help me,

7   Mr. Oliver."

8       Right?

9   **A.**  As a finance guy, I'm not an expert on it.  I'm taking his

10  advice on how to speak to it.  Yes.

11  **Q.**  Sir, I take it that it was Mr. Oliver's words that -- the

12  nuanced version is Mr. Oliver's version, right?

13  **A.**  I don't remember who finally ended up --

14  **Q.**  Well, you went to Mr. Oliver for more words.  So I assume

15  he was the contributor of the --

16  **A.**  Yes.

17  **Q.**  -- original statement?

18  **A.**  He would have been, yes.

19  **Q.**  He would have been.  Thank you.

20      In response, Mr. Oliver is providing you with some

21  verbiage about how these are, quote, unique programs that have

22  specific requirements to ensure distinct user experience on

23  Apple's platform.  Right?

24  **A.**  In response, he's correcting me and saying --

25  **Q.**  Sir.

1    **A.**  -- it's not the same.

2    **Q.**  Sir.

3                      (Pause in the proceedings.)

4    **BY MR. EVEN:**

5    **Q.**  You go to the next page, 373, he says, "VPP and NPP are

6    unique programs that have specific requirements to ensure

7    distinct user experience on Apple's platform."  Right?

8    **A.**  Yes.

9    **Q.**  And he's then sending you some links outlining the VPP

10   requirements, right?

11   **A.**  Yes.  He's helping me understand what that means.

12   **Q.**  Sir, he's sending you links, correct?

13   **A.**  Yes.

14   **Q.**  On the requirements.  And he says how they must integrate

15   with Siri and they must be on Apple TV and they must support

16   AirPlay, right?

17   **A.**  Yes.

18   **Q.**  And you respond and say, "Awesome, thanks."  Right?

19   **A.**  Yes.

20   **Q.**  And you add some verbiage along those lines to the slide,

21   correct?

22   **A.**  I do not add the verbiage, no.

23   **Q.**  Well, if we go back to the slide that's 505.16.

24   **A.**  Sixteen.

25          (Reviewing document.)

1    **Q.**  You see we do not stop after maintain high bar of user

2    experience.  There's also system integration aligned with

3    partner program goals, right?

4    **A.**  Yeah.  I'm saying I did not add that line.

5    **Q.**  Sir --

6    **A.**  That's what I'm saying.

7    **Q.**  Sir, Mr. Oliver got you verbiage to make you sound like

8    you worked McKenzie [sic].

9        This is not the real reason, is it?  You can have AirPlay

10   and linkout.  Those are not mutually exclusive, right?

11   **A.**  I -- I don't know if you've gone to the link and checked.

12   There's one of major --

13   **Q.**  Sir?

14   **A.**  -- things that's required which I understood and hence I

15   said "awesome" to him.

16   **Q.**  Sir, you can have AirPlay and link out, right?  In fact

17   there are -- there are apps on the store that are reader apps

18   and have AirPlay.

19   **A.**  (Reviewing document.)

20   **Q.**  Sir --

21   **A.**  You can have --

22                    (Simultaneous colloquy.)

23   **BY MR. EVEN:**

24   **Q.**  Sir, you understand that you came up with this

25   recommendation to exclude.  You shot the arrow.  And now on

1    the 28th in the morning, you and Mr. Oliver are texting each

2    other about how exactly to draw a target around it.

3        You're inventing justification -- justifications two hours

4    before the meeting with Mr. Cook to a recommendation that was

5    made days before to exclude this.

6        You understand that, don't you?

7    **A.**  I do not agree.

8    **Q.**  You do not agree.

9        Sir, the real reason is the reason that all of you worked

10   on six months earlier and everybody understood that by

11   excluding VPP and NPP, you're essentially ensuring that the

12   largest developers who are subscription developers and are

13   therefore the most likely to actually use linkouts are never

14   going to do it.  It's an exclusivity tool, correct?

15   **A.**  I do not agree.

16   **Q.**  Sir, you agree with me then that nothing in the U.S.

17   injunction allows to exclude any developers from the Court's

18   injunction, correct?

19   **A.**  Yes.

20        **MR. EVEN:**  I'll pass the witness at this time, Your

21   Honor.

22        **THE COURT:**  Okay.  This would be a good time for a

23   break then.  We'll stand in recess for 20 minutes.

24        Again you're on examination, and I don't want you to speak

25   to anybody about your testimony.

 1          **THE WITNESS:**  Yes, Your Honor.

 2          **THE COURT:**  All right.  Thank you.

 3      Stand in recess for 20 minutes.

 4      (Recess taken at 10:12.M.; proceedings resumed at 10:37

 5  A.M.)

 6          **THE CLERK:**  Come to order.  We are back in session.

 7      Please be seated.

 8          **THE COURT:**  Okay.  Were back on the record.  The

 9  record will reflect that witness is on the stand, and

10  Ms. Richman is at the microphone.

11      You may proceed.

12          **MS. RICHMAN:**  Thank you, Your Honor.

13                  <u>**CROSS-EXAMINATION**</u>

14  BY MS. RICHMAN:

15  **Q.**  Good morning, Mr. Vij.

16  **A.**  Good morning.

17  **Q.**  There seems to be a bit of confusion both inside and

18  outside Apple as to how your first name is spelled.

19      Can you please state that for the record?

20  **A.**  It's K-U-N-A-L.

21  **Q.**  K-U-N-A-L.

22  **A.**  Yes.

23  **Q.**  Okay.  Thank you.

24      Mr. Vij, when did you start working at Apple?

25  **A.**  2015.

1    **Q.**  And how long have you been a senior finance manager?

2    **A.**  Since about 2021.

3    **Q.**  Before you were at Apple, where were you employed?

4    **A.**  American Express.

5    **Q.**  And what was your role there?

6    **A.**  I used to head the consumer card business, finance for the

7    consumer card business in India.

8    **Q.**  And I think there's already been testimony on this, but

9    who do you directly report to?

10   **A.**  Mr. Nate Barton.

11   **Q.**  And who does Mr. Barton report to?

12   **A.**  Mr. Alex Roman.

13   **Q.**  Generally speaking what are the job responsibilities of

14   you and your team?

15   **A.**  So my team looks at two aspects of the business.  One is

16   the App Store.  The other is the gift card business.

17       We do forecasting analysis and analysis on any new product

18   from the App Store or gift card business that needs to be

19   launched.  And we also do quarterly forecasting for the

20   company.

21   **Q.**  And how long have you worked on App Store-specific issues?

22   **A.**  I just completed three years.

23   **Q.**  And you said you're involved in forecasting App Store

24   revenues?

25   **A.**  Yes.

1   Q.  Who relies on your forecasts?

2   A.  The business team, the exec team, both.

3   Q.  Okay.  And how does that forecasting get reported to the

4   business team and the executive team?

5   A.  We do monthly reporting as well as quarterly reporting.

6   Every month we do a forecast.  And then we do a comparison of

7   that forecast every time we change it.  And then we present it

8   to the leadership as well as the business team.

9   Q.  So you've testified that you were a member of the link

10  entitlement program working group; is that correct?

11  A.  Yes.

12  Q.  And can you describe what your role was in the working

13  group?

14  A.  I was responsible for doing the financial analysis to see

15  the impact of these changes on Apple's revenue and financials,

16  as well as doing the sensitivities to figure out different

17  implementation and combinations and the impact of those on the

18  financials as well.

19  Q.  Who within Apple was your work at the direct -- performed

20  at the direction of?

21  A.  It was usually the working group, but I got direction from

22  my boss, Mr. Nate Barton and Mr. Alex Roman.

23  Q.  Okay.  And what about Mr. Oliver?

24  A.  Mr. Oliver as well.  He was my business partner so he was

25  part of the working group that gave me the directions as well.

1    **Q.**  Do you have a ballpark of how many hours you spent working

2    on forecasts related to the link entitlement program?

3    **A.**  Hundreds.  More than -- more 4-, 500 hours easily.

4    **Q.**  And do you remember when you became part of the working

5    group?

6    **A.**  Somewhere around '23.  2023, early part of 2023.

7    **Q.**  Okay.

8        You can use the binder that Mr. Even gave you, and please

9    turn to tab CX0009A.

10   **A.**  (Reviewing document.)

11       I'm on the tab.

12   **Q.**  Are you familiar with this document, Mr. Vij?

13   **A.**  Yes.  This is the price committee deck from January of

14   24th.

15   **Q.**  This is the final price committee deck?

16   **A.**  (Reviewing document.)

17       Yes, it looks like one, yes.

18   **Q.**  And were you involved in preparing this deck?

19   **A.**  I was involved in preparing parts of this deck, yes.

20   **Q.**  What was the extent of your involvement?

21   **A.**  I was involved in doing the financial analysis that became

22   a part of this deck.

23   **Q.**  Okay.

24       Can you look at Slide 12.  So that's 0009.12.

25   / / /

VIJ - CROSS / RICHMAN

1     **A.**   (Reviewing document.)

2           Yes, I'm on that.

3     **Q.**   And it should be entitled "Projected Effective Commission

4     on Entitlement Transactions"?

5     **A.**   Yes.

6     **Q.**   Okay.  And are you familiar with this slide?

7     **A.**   Yes, I am.

8     **Q.**   Is this one of the slides that was prepared by your team?

9     **A.**   Yes, it was.

10    **Q.**   What does the slide -- the table show?

11    **A.**   The table shows sensitivities around the effective

12    commission rate.  On the top we have the commission rate going

13    from 20 to 30 percent.  And then in the rows, we have the time

14    duration which goes from current session to as high as 30 days

15    and how does the effective commission rate for the developer

16    vary as you move from one point to another.

17    **Q.**   And what does the header "time duration" reflect?

18    **A.**   Time duration reflects the amount of time that would --

19    that Apple would charge commission on, post the linkout.

20    **Q.**   And I think Mr. Even referred to that as the lookback

21    window?

22    **A.**   Yes, I think that's what he was using.

23    **Q.**   And then do you see the heading "Commission Rate"?

24    **A.**   Yes.

25    **Q.**   And what does that top row reflect?

1    **A.**    That is the commission that, on the linkout piece, we

2    would charge for that said duration.

3    **Q.**    Do you have any understanding as to why Apple selected a

4    seven-day time duration instead of, for example, the 24-hour

5    or the 72-hour time durations discussed on this slide?

6    **A.**    Yes.    We -- we had multiple discussions on this.    And on

7    the seven-day, it was more than operational nuance that we had

8    to end up selecting the seven-day window because of something

9    called as a session model.    I -- I -- I don't know if the

10   Court understands what the session model is but --

11   **Q.**    Maybe you could go ahead and explain what is a session

12   model.

13   **A.**    So the way credit card charges work is there are two

14   components to a credit card fee charge.    One is a fixed fees

15   wherein the fees is levied irrespective of what the amount of

16   the transaction is.    And then there is a discount rate which

17   is the percentage rate depending on the --

18           **THE COURT:**    Okay.    You're going way too fast.

19           **THE WITNESS:**    So --

20           **THE COURT:**    It's --

21           **THE WITNESS:**    Sorry.

22           **THE COURT:**    You have a heavy accent, and so I need to

23   process that.    So you need to slow down.

24           **THE WITNESS:**    Sorry.

25           **THE COURT:**    And the other thing is I understood that

 1    there was a -- a group of three individuals who made the

 2    ultimate decisions with respect to what Apple was going to do.

 3    Correct?

 4            THE WITNESS:  Yes.

 5            THE COURT:  Were you part of that discussion, that

 6    ultimate discussion?

 7            THE WITNESS:  I was not.

 8            THE COURT:  So then you're testifying only about what

 9    you know, not -- the question asked what Apple did as opposed

10    to you.  And I need to know just what it is that you know or

11    what you did.

12       Do you understand the distinction?

13            THE WITNESS:  Yes, I do.

14            THE COURT:  All right.  So let's start again because

15    I didn't catch what you were saying.

16    BY MS. RICHMAN:

17    Q.  Okay.  Let's start at the top.

18       Mr. Vij --

19            THE COURT:  We're at session model.  He was trying to

20    explain that.

21            MS. RICHMAN:  Well, maybe I can fill in some of the

22    gaps that you just identified, Your Honor.

23    Q.  Mr. Vij, did the working group make a proposal to the

24    price committee on what the time duration window should be for

25    the link entitlement program?

1    **A.**  Yes, we did.

2    **Q.**  Okay.  And you were part of the discussions about which

3    time duration period to recommend?

4    **A.**  Yes, I was.

5    **Q.**  Okay.  And you were explaining the reasons why Apple chose

6    the seven-day instead of the 24-hour or 72-hour period?

7    **A.**  Yes.

8    **Q.**  Correct?

9        Let's explain to the Court from the top what the reasoning

10   was, slow -- slower.

11   **A.**  Yes.  Apologies for that.

12       So the credit card fees that a bank charges for the

13   transaction is split into two pieces.  One is a fixed fees

14   which is known as a transaction origination fees.  And then

15   one thing is called a discount revenue which is a percentage

16   fees that the bank charges on the transaction that happens.

17       That fixed fees is irrespective of what the transaction

18   value is.

19       A lot of companies, what they do is they want to minimize

20   the impact of that fixed fees.  The fixed fees usually varies

21   between 10 cents to 12 cents, at times as high as 15 cents as

22   well.  So you can imagine on a one dollar transaction, it is

23   as high as 15 percent, that fixed fee can be.

24       So in order to minimize the impact of that fixed fees,

25   what companies have done is called a session model wherein you

1    start a transaction but you don't close that transaction with

2    the bank.  You let the customer continue to make purchases up

3    to a set duration or the set value, and then you cut off and

4    then you go to the bank and close that transaction.

5         Usually that window, depending on companies, at least in

6    Apple, that window varies from three days to nine days, but

7    about five to seven days is when we hit about 90 percent of

8    the billings.

9    Q.   Okay.  And what does the existence of a session model have

10   to do with Apple's decision to select a seven-day duration?

11   A.   It was more around the operational cause of this.  And

12   once we get the developer reporting, Apple had the rights to

13   go and audit and check if the reporting from the developer on

14   the billings was right or not.

15        For that, we have to go and check their books.  But until

16   and unless a session is closed, those transactions are not

17   recorded in a developer's books.

18        So if he went into the smaller window and the developer

19   had a session model implemented and then he went and checked

20   the books, we won't be able to audit it.

21   Q.   Okay.  And was this concept of a session model something

22   that was discussed in the working group meetings?

23   A.   It was.  You know, I discussed it with the smaller group

24   as well.  I -- you know, we spoke about it, I think so, since

25   2023, middle of 2023, I think so, we've been speaking about

1  this.

2  Q.  Okay.  And -- and do you have any background experience

3  that led you to become familiar with the session model

4  concept?

5  A.  Yes.  I've worked in American Express for about six years

6  of my career.

7  Q.  Okay.  And I think you mentioned this, but just to be

8  clear, based on your experience, how long does it typically

9  take for a transaction window to close?

10  A.  It -- it varies 'cause it's based on both an amount as

11  well as a window.  But it varies from three days to as high as

12  nine days.  But around five and seven days is when 90 percent

13  of the billings go through.

14  Q.  Okay.  Thank you for that.

15      Let's turn back to the slide we were just looking at in

16  the final price committee deck 9.12.

17  A.  Yes.

18  Q.  So, Mr. Vij, you were asked earlier about some of the

19  commission scenarios that you prepared at the beginning of

20  June that you tested a sensitivity with a 27 percent

21  commission model.

22      Do you remember that?

23  A.  Yes.

24  Q.  And you were asked a number of questions about your

25  response to those -- those questions and your use of the word

1    "perpetuity" to describe the difference between those analyses

2    and what's reflected in this slide; is that right?

3    **A.**  Yes.

4    **Q.**  Can you explain what you mean by "perpetuity" in

5    connection with that analysis, that earlier analysis?

6    **A.**  It just meant we didn't have any time duration during that

7    point, and we -- and the model just assumed on all billings

8    Apple will get 27 percent.  And the financial analysis that we

9    did was on all Apple billings like App Store billings at that

10   point.

11   **Q.**  And can you explain to the Court how you know that it was

12   perpetual in those sensitivities?

13   **A.**  'Cause the way -- the way we did the sensitivity was we

14   took a 3 percent impact on the numbers which meant we can

15   calculate it at 27 percent commission on all the billings that

16   were going through the link which we presumed to be equal to

17   the Apple IAP links.

18   **Q.**  And are you the person that actually did that modeling?

19   **A.**  Yes, I was.

20        **MS. RICHMAN:**  Okay.  Thank you.  No further

21   questions, Your Honor.

22        **THE COURT:**  Any reexam on that set of questions?

23                    <u>**REDIRECT EXAMINATION**</u>

24   **BY MR. EVEN:**

25   **Q.**  Mr. Vij, if you turn to CX505.

1    **A.**   (Reviewing document.)

2    **Q.**   That is the slide deck that was presented to Mr. Cook --

3         (Exhibit published to witness, counsel, and the Court.)

4    **BY MR. EVEN:**

5    **Q.**   -- on June 28th, right?

6    **A.**   Yes.

7    **Q.**   Can you take me to the portion that explains the issue of

8    session models for credit cards and how that impacts the

9    windows?

10   **A.**   (Reviewing document.)

11        It's not on this deck.

12   **Q.**   It's not on any deck, sir.  Right?

13   **A.**   We don't -- there's limited -- on decks.  We don't --

14                      (Simultaneous colloquy.)

15   **BY MR. EVEN:**

16   **Q.**   Sir, Mr. Cook was the decision-maker.  That has been

17   established over and over again.  We've not seen a single

18   document explain what you just explained as the reasoning for

19   choosing seven days.

20        Is there an explanation for that?

21   **A.**   I don't think so it's on the documents.  But we discussed

22   in the working group with the commerce team on how to

23   implement this.

24   **Q.**   I see.

25                      (Simultaneous colloquy.)

1    **THE WITNESS:** -- operational decision.

2    **BY MR. EVEN:**

3    **Q.** So you have all these 90- to 120-page decks explaining

4    everything, but you just failed to put this particular thing

5    on paper anywhere.

6    **A.** So the way things work is you try and go piece by piece.

7    Operational analysis of things is the bottom part.

8    **Q.** Sir --

9    **A.** You get to it once you get to know where you're landing

10   stuff.

11   **Q.** Sir, it's a simple question.  That particular thing did

12   not reach paper.  It was not put in writing in any

13   presentation to the executive team, to Mr. Cook, correct?

14   **A.** Not on this deck, no.

15   **Q.** Not on any deck, you remember sitting here today?

16   **A.** I -- I do not remember.

17   **Q.** Okay.

18         **THE COURT:** You -- you don't remember or you remember

19   that it didn't exist?

20         **THE WITNESS:** I don't remember it being there in any

21   deck, Your Honor.

22         **THE COURT:** Well, where -- where is the

23   recommendation stated?

24         **THE WITNESS:** It -- it's in the price committee email

25   that Mr. Alex Roman sent out.

| | |
|---|---|
| 1 | **BY MR. EVEN:** |
| 2 | **Q.**  Sir, the recommendation on the model including the |
| 3 | lookback window is on the decks, right?  It's in the decks? |
| 4 | Every deck says we recommend 20 percent, 27 percent, 72 hours, |
| 5 | 48 hours.  We looked at all of those yesterday. |
| 6 | **A.**  None of the decks say the recommendation, sir. |
| 7 | **Q.**  I'm sorry.  They say proposal, which you call illustrative |
| 8 | proposal, as opposed to recommendation.  I take it back. |
| 9 | You remember the illustrative proposals? |
| 10 | **A.**  Yes, I do. |
| 11 | **Q.**  Those illustrative proposals included the lookback window? |
| 12 | **A.**  They did. |
| 13 | **Q.**  They did not include anything about the session model |
| 14 | driving that, correct? |
| 15 | **A.**  Yes, 'cause it was -- |
| 16 | **Q.**  Sir, I didn't ask why.  They did not include anything |
| 17 | about the session model driving that, correct? |
| 18 | **A.**  They did not. |
| 19 | **Q.**  Okay.  Now, the session model was known going into this |
| 20 | process, right? |
| 21 | **A.**  It was. |
| 22 | **Q.**  And yet we saw that you moved from what you called |
| 23 | perpetual, which you tried to explain now, through 24 hours, |
| 24 | through 48 hours, through 72 hours, and landed on a week, |
| 25 | correct? |

1   **A.**  Session model was not discussed.

2   **Q.**  Sir --

3   **A.**  Going from there to there.

4   **Q.**  Sir, session model was not discussed at all.  I think we

5   just established that.  But -- but on the -- on the specifics

6   of their proposals, the illustrative proposals that you

7   called --

8   **A.**  Uh-huh.

9   **Q.**  -- those moved from infinity and beyond to zero, to

10  24 hours, to 48 hours, to seven days, correct?

11  **A.**  Yes.

12  **Q.**  And throughout that point in time, that did not follow

13  some big announcement by American Express, hey, my session

14  model is changing.  I'm -- it's not -- no longer seven days

15  I'm now doing it 48 hours, that you guys all said, Oh, my God,

16  we need to adjust the window, right?

17      That did not happen?

18  **A.**  Session models are not maintained by card companies.

19  They're maintained by companies like Apple or anyone who's

20  actually charging the customer so --

21  **Q.**  Okay.  So they're on the developer-by-developer basis?

22  **A.**  Yes.

23  **Q.**  And each developer would have a different one?

24  **A.**  Probably.

25  **Q.**  Okay.  And so the session models of across all developers

 1    could not drive the decision between 72 hours, seven days, and

 2    24 hours because each developer has a different one, right?

 3    **A.**   We will divide the decision based on what we do, and that

 4    was the only example we had to go by.

 5    **Q.**   Okay.   Now the rules actually require developers to report

 6    30 days after any transaction, right?

 7    **A.**   Yes.

 8    **Q.**   So any session at any point, at any length, any session

 9    would be closed by then, right?

10    **A.**   Yes.

11    **Q.**   Okay.

12            **THE COURT:**   We need to break at -- in a few minutes.

13            **MR. EVEN:**   I'm going to break in less than a minute,

14    Your Honor.

15            **THE COURT:**   Okay.

16    **BY MR. EVEN:**

17    **Q.**   You were shown the slide with the so-called effective

18    royalty calculations in the ultimate deck that's 9A, I think.

19    You remember that?

20    **A.**   Effective commission, yes.

21    **Q.**   Okay.   That effective commission assumes -- assumes that

22    which we discussed this morning that developers are able after

23    the first click to drive a large proportion of users to go

24    back to their website without clicking again, correct?

25    **A.**   Yes.

1           **MR. EVEN:**  No further questions, Your Honor.

2           **THE COURT:**  Anything on those questions?

3           **MS. RICHMAN:**  No, Your Honor.

4           **THE COURT:**  All right.

5       Sir, you're excused.

6       We'll stand in recess until 12:35.

7       While I'm gone, please work on that topic.  Okay.

8           **MS. MOSKOWITZ:**  Yes, Your Honor.

9           **THE COURT:**  Thank you.

10      (Recess taken at 10:57 A.M.; proceedings resumed at

11      .M.)

12          **THE CLERK:**  Please remain seated.  Court is back in

13      session.

14          **THE COURT:**  Okay.  We're back on the record.

15      The record will reflect the parties are present.  I see

16      Mr. Perry at the stand, but I don't know if that mic is

17      working yet so we may need to move --

18          **THE CLERK:**  It is.

19          **THE COURT:**  It is?  Okay.

20      All right.  Mr. Perry.

21          **MR. PERRY:**  Would the Court like a report on the

22      documents now or at the end of the witnesses?

23          **THE COURT:**  So I understand that you all sent us a

24      link with native files, which we could not open, and that you

25      were going to bring us a thumb drive.

1          **MR. PERRY:**  Your Honor, I'm handing to the Courtroom

2     Deputy a flash drive that includes the native files of the

3     exhibits of the Keynote presentations that were introduced and

4     admitted into evidence by the parties.

5          The parties have been meeting and conferring.  There's one

6     exhibit I believe we are still figuring out.  But we will --

7     if we need to update the list, we will and submit another

8     drive.

9          The Keynotes -- Keynote is the Apple product that is the

10    equivalent of PowerPoint, Your Honor.

11         **THE COURT:**  Okay.

12         **MR. PERRY:**  So those black decks the Court has been

13    looking at are Keynote decks.  The flash drive contains the

14    native files.  Native Keynote files cannot be redacted by our

15    document vendor, which is why the production is in PDFs

16    because of the way the document platform works and according

17    to the ESI protocol.

18         However, in responding to the Court's inquiry this

19    morning, there are much more legible versions in the database

20    of the PDFs because as they get produced and reproduced, they

21    degrade over time.  And when the stamping is applied and when

22    the highlighting is applied and when the redactions are

23    applied, it makes -- I don't know all the technology, Your

24    Honor, but apparently it makes another copy and it gets worse

25    to read.

VIJ – REDIRECT / EVEN

1    We are also assembling, and it is not quite done, a

2    complete set of the documents both parties submitted.  We're

3    then going to run that with Epic to make sure we agree on the

4    exhibits, the stamping, and the redactions approved by the

5    Court's rulings so far in the proceeding.  And we would

6    propose that that be the evidence set.

7        The native set on the hard drive is for in-camera review

8    because it contains none of the redactions and/or stamping or

9    exhibit numbers or anything.  To be clear, they're very

10   legible, they are the native files, but they don't have the

11   litigation additions.

12       Does that make sense, Your Honor?

13           **THE COURT:**  That makes sense.  And that should solve

14   the problem.

15       And who are you?

16           **MR. ZAKEN:**  Michael Zaken.

17       Your Honor, one clarification.  I believe there are also

18   some PowerPoint decks and other things that are not Keynotes.

19   I don't think you have those in -- in the flash drive.  But

20   you will receive them as a part of the stamped revised set.

21           **THE COURT:**  Okay.

22           **MR. PERRY:**  That's correct, Your Honor.  And just for

23   complete finishing, there is one of the documents on the flash

24   drive is a PDF because that is the only way it is maintained

25   in the production.  There is no native version, in other

```
 1    words, so we got the best version we could find on that flash

 2    drive.

 3              THE COURT:  Okay.

 4         All right.  Thank you very much.

 5              MR. PERRY:  Okay.  Thank you, Your Honor.

 6              THE COURT:  Okay.  So I understand Marni Goldberg is

 7    next; is that correct?

 8              MS. MOSKOWITZ:  That's correct, Your Honor.

 9                   (Pause in the proceedings.)

10              THE CLERK:  Please raise your right hand.

11

12                          MARNI GOLDBERG,

13    called as a witness by the plaintiff, having been duly sworn,

14    testified as follows:

15              THE WITNESS:  I do.

16              THE CLERK:  Please be seated.  And speak clearly into

17    the microphone.  Please state and spell your full name for the

18    record.

19              THE WITNESS:  Marni Goldberg.  M-A-R-N-I,

20    G-O-L-D-B-E-R-G.

21              THE COURT:  Good afternoon.

22              THE WITNESS:  Good afternoon.

23              THE COURT:  You may proceed.

24              MS. MOSKOWITZ:  Thank you, Your Honor.

25         May we approach with binders?
```

```
 1              THE COURT:  You may.

 2              MS. MOSKOWITZ:  Thank you.  And Your Honor, I

 3     believe, already has your set.  And counsel's been handed so

 4     this is just for the witness.

 5                        DIRECT EXAMINATION

 6     BY MS. MOSKOWITZ:

 7     Q.  Good afternoon, Ms. Goldberg.

 8     A.  Good afternoon.

 9     Q.  My name is Lauren Moskowitz, and I represent Epic Games.

10     I'll be questioning you.

11         You are a corporate communications director at Apple,

12     correct?

13     A.  That's correct.

14     Q.  And you've been in that role --

15              THE COURT:  Hold on.

16              MS. MOSKOWITZ:  Pardon me.

17              THE COURT:  Can we move -- can you move closer to the

18     microphone or bring that mic closer to you?

19              THE WITNESS:  Better.

20              THE COURT:  That's a little bit better.  Let's try

21     another question.

22              MS. MOSKOWITZ:  Sure.

23     Q.  You've been in that role for over four years; is that

24     correct?

25     A.  That's correct.
```

1    Q.   You started about October 2020, right after the case was

2    filed actually by Epic against Apple, right?

3    A.   Yes.

4    Q.   As corporate communications director, you provide counsel

5    on internal and external communications, messaging, and media?

6    A.   Yes.

7    Q.   And in your role, you are -- you were involved in

8    developing and executing the communications strategy for this

9    case, right?

10   A.   That's correct.

11   Q.   And that work included having that role with respect to

12   Apple's response to the injunction that this Court ordered.

13   A.   My role was to correspond with the media about the

14   compliance plan determined by the business, yes.

15   Q.   You were involved in developing and executing the

16   communications strategy with respect to Apple's compliance or

17   response to this Court's injunction?

18   A.   Correct.

19   Q.   And as part of that work, you were involved in the

20   planning stages of how Apple was going to approach its

21   response to the injunction, correct?

22   A.   I was involved only insofar as I was learning about some

23   information as the process went along but not making any

24   business decisions.

25   Q.   Understanding that you weren't responsible for making

1    business decisions, you participated along the way in a number

2    of meetings and discussions that covered the topic of how

3    Apple would in fact respond to this Court's injunction,

4    correct?

5    **A.**   I can recall one.

6    **Q.**   You only -- believe you only had one single meeting?

7    **A.**   There's one meeting that comes to mind.  But I'm sure

8    there were others.  I just don't recall them with specificity.

9    **Q.**   Is the one that you remember June 1st?

10   **A.**   No.

11   **Q.**   June 26?

12   **A.**   No.

13   **Q.**   Okay.  When was it?

14   **A.**   June 28th.

15   **Q.**   Do you recall it because you looked at notes in

16   preparation for your testimony?

17   **A.**   That's correct.

18   **Q.**   You didn't remember it until then?

19   **A.**   That's correct.

20   **Q.**   Did you -- so other than that one meeting that sounds like

21   your memory was refreshed about, you do not believe sitting

22   here today that you were in any meeting with any business

23   people ever at which the topic of discussion was how Apple

24   would be responding to this Court's injunction?

25   **A.**   I don't recall specific meetings, no.

GOLDBERG - DIRECT / MOSKOWITZ

1  **Q.**  You looked at documents and materials about how Apple was

2  going to approach its response to the Court's injunction,

3  right?

4  **A.**  Yes.

5  **Q.**  Did some of those documents include reports that -- of

6  meetings that had taken place even if you don't recall

7  attending?

8  **A.**  I don't recall.

9  **Q.**  Okay.  You read the Court's opinion and injunction,

10 correct?

11 **A.**  I don't recall reading it in its entirety.

12 **Q.**  Did you read the injunction in its entirety?

13 **A.**  I don't recall.

14 **Q.**  You recall it's about a page or so?

15 **A.**  I don't recall.

16 **Q.**  Is it fair to say that you had to understand what the

17 rulings were because you were responsible for briefing and

18 speaking to the press about them?

19 **A.**  That's correct.

20 **Q.**  But to do that, you don't recall actually reading the full

21 opinion?

22 **A.**  That's correct.

23 **Q.**  In response to the injunction, you understand that Apple

24 modified its app review guidelines to permit developers to

25 include a link to their website where users could purchase

1    digital goods and services?

2    **A.**  Yes.

3    **Q.**  And are you aware that Apple used code names to refer to

4    its work in response to the Court's injunction?

5    **A.**  I -- I'm aware of one code name.

6    **Q.**  Is the one that you know of Wisconsin?

7    **A.**  Yes.

8    **Q.**  You're not familiar with Michigan?

9    **A.**  I did not have any work on Michigan.

10   **Q.**  Okay.  Do you know what Michigan referred to?

11   **A.**  No.

12   **Q.**  Is it your understanding that the work on Wisconsin

13   started at or around the end of April 2023?

14   **A.**  I don't know.

15   **Q.**  Do you recall that there was a court action that led Apple

16   to sort of recommence work on its compliance with the

17   injunction after some things had been stayed?

18   **A.**  I don't recall with specificity.

19   **Q.**  Just so I can understand the extent of your recollection,

20   whether or not you remember sort of being in the room or being

21   on a Zoom, do you have any belief that you were ever at any

22   meetings at which Project Wisconsin was discussed?

23   **A.**  I may have been, yes.

24   **Q.**  Okay.  Do you recall ever being in any discussion at -- at

25   which Mr. Schiller was present at which Project Wisconsin was

1    discussed?

2    **A.**  I don't recall.

3    **Q.**  Do you believe you may have been involved in such

4    discussions?

5    **A.**  I don't recall.

6    **Q.**  One way or the other?

7    **A.**  One way or the other.

8    **Q.**  Is the same true for Mr. Cook and Mr. Maestri?

9    **A.**  I recall one meeting with Mr. Cook.

10   **Q.**  Okay.  And do you recall when that was?

11   **A.**  June 28th.

12                    (Simultaneous colloquy.)

13   **BY MS. MOSKOWITZ:**

14   **Q.**  Okay.  That's the same meeting.

15        Okay.  Apologies.  I'm trying to go slowly.

16        Okay.  So the June 28th meeting that you are referring to,

17   Mr. Cook was present at that?

18   **A.**  Yes.

19   **Q.**  Was Mr. Maestri present at that?

20   **A.**  I don't recall.

21   **Q.**  Okay.  You just don't recall one way or the other?

22   **A.**  Correct.

23   **Q.**  Do you recall how many people in general were at that

24   meeting?

25   **A.**  I don't know.  I don't recall.

1    Q.   Was it in person?

2    A.   No.

3    Q.   It was a Zoom or video?

4    A.   It was virtual, correct.

5    Q.   Okay.  You recall that in June 2023, one of the things

6    that Apple was deciding was whether to charge a commission for

7    linkouts, correct?

8    A.   That sounds correct.

9    Q.   And do you recall that topic being discussed at meetings?

10   A.   At that one meeting, yes.

11   Q.   Okay.  That's the late June 28th meeting?

12   A.   (Nods head.)

13   Q.   Sorry.  I do need an audible answer.

14   A.   Sorry.  Yes.

15   Q.   Thank you.

16       I'm going to show you a document, see if it helps refresh

17   your recollection.

18           MS. MOSKOWITZ:  Let's put on the screen CX1104 in

19   evidence.

20                       (Exhibit published.)

21   BY MS. MOSKOWITZ:

22   Q.   I can represent to you that this document was also in your

23   files as one of the custodians of it.

24       Does this look familiar to you?

25   A.   It does not.

1    **Q.**  Fair to say that you don't recall this meeting?

2    **A.**  Correct.  I do not.

3    **Q.**  I'm going to still ask you a couple questions about it,

4    see if it helps.

5        This is a reference to Wisconsin proposals on June 1st.

6    Were you working on Wisconsin at this point in time?

7    **A.**  I don't recall.

8    **Q.**  Do you recall at all in general when your work on

9    Wisconsin was performed?

10    **A.**  I do not recall, no.

11    **Q.**  Do you believe that you worked on Wisconsin the whole time

12    Wisconsin was happening?

13    **A.**  No.

14    **Q.**  Why not?

15    **A.**  I do believe the work streams commenced and I was not a

16    part of them, and I don't recall when I was brought in.

17    **Q.**  Okay.  If this document was in your files, do you have any

18    reason to doubt that you were involved in Wisconsin at this

19    point in time?

20    **A.**  I don't recognize the document.  But I understand that it

21    was in my files.

22    **Q.**  Well, let's look at a couple of pieces of this, even if

23    you don't remember the document.  Let's look on page 2,

24    there's a reference to option 2.  Do you see that?  It's on

25    the screen as well.

 1    **A.**   I see, yes.

 2    **Q.**   Okay, great.

 3                           (Exhibit published.)

 4    **BY MS. MOSKOWITZ:**

 5    **Q.**   There's a question here.  It says:  How will the public

 6    view this?

 7        Do you see that?

 8    **A.**   I do.

 9    **Q.**   So one of the issues discussed, and which you were

10    involved, was the question of how would the public perception

11    be or sentiment be of Apple charging a commission for the

12    linkouts, correct?

13    **A.**   My role as a PR practitioner in this was to consider that

14    we would receive questions from press.  But my role was not to

15    consider how the public would view charging a commission as a

16    business decision was made.

17    **Q.**   I'm not sure I understand the distinction.  So let me try

18    again.

19        One of the issues that was discussed, you are aware, was

20    how the public would perceive Apple charging a commission for

21    the linkouts, right?

22    **A.**   I don't know if that was part of the discussion amongst

23    the business leaders.  From a PR perspective, we certainly

24    were prepared to answer questions from the media about the

25    commission.

1    **Q.**    So you have no idea whatsoever as to whether any

2    discussion that included business people factored in how the

3    public would perceive it?

4    **A.**    I don't recall that.

5    **Q.**    Okay.  But you were wondering how the public would

6    perceive it, right?

7    **A.**    How the -- how we would talk about it with the press,

8    correct.

9    **Q.**    And what the press would say to you as a criticism or

10    feedback on Apple charging a commission, right?

11    **A.**    We were ready to answer questions from the press about the

12    commission, yes.

13    **Q.**    And you anticipated that there would be pushback from

14    press about the commission, right?

15    **A.**    Not pushback.  Just questions.

16    **Q.**    Okay.  Well, we'll get to that.

17        You -- do you recall there being concern raised that if

18    Apple decided to charge a commission for purchases made in

19    these linkouts, that Apple would be criticized for charging

20    for something that it was not charging for prior to this new

21    program?

22    **A.**    I recall those discussions amongst communications people

23    but not amongst business people.

24    **Q.**    I don't need the distinction.  I'm asking if that concern

25    was discussed.  The answer is yes?

1    **A.**   Yes.

2    **Q.**   And let's look at more on page 2, right above -- right

3    above -- let's see.  There's the second bullet, several

4    bullets under the attorney-client privilege on the top there

5    that says "In the land of public opinion, some feel we're

6    going to get bad press for charging a commission."

7        Do you see that?

8    **A.**   I see that.

9    **Q.**   Were you one of the people that felt that Apple was going

10   to get bad press for charging a commission?

11   **A.**   I don't recall what I felt at the time.

12   **Q.**   You have no recollection of ever feeling one way or the

13   other, any -- any feelings about what Apple was going to be

14   perceived as in terms of charging a commission for this?

15   **A.**   I don't recall what I was feeling at the time, no.

16         **THE COURT:**  That wasn't the question.  That wasn't

17   the question.  The question was ever.  Did you ever feel that

18   way?

19         **THE WITNESS:**  Yes.

20   BY MS. MOSKOWITZ:

21   **Q.**   Okay.  So you're -- when did you first feel that way?

22   **A.**   The soonest I can remember is the June 28th, 2023 meeting.

23   **Q.**   So at the June 28th, 2023 meeting, you started to feel for

24   the first time that Apple might get bad press for charging a

25   commission?

 1    **A.**   That's the soonest I can remember, yes.

 2    **Q.**   And so at that meeting it was discussed that Apple would

 3    receive criticism for charging the commission?

 4    **A.**   I don't recall what was discussed at the meeting.  I just

 5    recall my sentiments.

 6    **Q.**   You have no recollection as to what prompted those

 7    sentiments to come into existence?

 8    **A.**   I don't recall.

 9    **Q.**   Okay.  Let's keep going on this one.

10        About the fifth bullet down, there -- the notes are

11    flagging an inconsistency problem with charging a new

12    commission for web purchases when Apple is not charging for

13    ads.  Do you see that?

14    **A.**   I see that.

15    **Q.**   And that's also mentioned on page 1, if we flip there,

16    about five bullets below that second attorney-client privilege

17    box.  Do you see that?

18    **A.**   I see that.

19                         (Exhibit published.)

20    **BY MS. MOSKOWITZ:**

21    **Q.**   And right above that it talks about there being value

22    being provided for access to the customer, but that's the case

23    today and we don't charge for it.

24        Do you see that?

25    **A.**   I see those words, yes.

1    **Q.**  So let's go to any time, not at this point in time, but at

2    any time, did you share those concerns?

3    **A.**  To myself, not to business leaders, no.

4    **Q.**  Sorry.  Did you feel those concerns?

5    **A.**  Yes.

6    **Q.**  Okay.  But you did not share those to any business

7    leaders; is that what you're saying?

8    **A.**  Correct.

9    **Q.**  Were those concerns discussed at June 28th?

10   **A.**  I don't recall.

11   **Q.**  Did you start feeling those concerns on June 28th?

12   **A.**  June 28th is the earliest I can remember having expressed

13   those feelings.

14   **Q.**  But you expressed them only to yourself?

15   **A.**  To communications colleagues.

16   **Q.**  Okay.

17       So just to try to get the timeline, best as you recall,

18   you sat in on a June 28th meeting at which Mr. Cook was

19   present, right?

20   **A.**  Correct.

21   **Q.**  And during that meeting, you started to develop feelings

22   about the criticism that Apple would receive for charging a

23   commission, including the ones we've just discussed, right?

24   **A.**  That's the soonest I can recall having those feelings.

25   **Q.**  That's the soonest you can recall developing those

1  feelings?

2  **A.**  Yeah, having those feelings, correct.

3  **Q.**  Okay.  And you didn't express those feelings at that

4  meeting, correct?

5  **A.**  Correct.

6  **Q.**  Subsequent to that meeting, you shared those feelings with

7  your communications colleagues?

8  **A.**  Correct.

9  **Q.**  Including Fred Sainz?

10  **A.**  Correct.

11  **Q.**  And others?

12  **A.**  Yes.

13  **Q.**  Did they share -- well, did they express to you that they

14  shared those feelings?

15  **A.**  We, together, were cognizant of the fact that press would

16  ask us why we were charging a commission, why Apple was

17  charging a commission, and we -- that is part of our job is to

18  anticipate what media will likely inquire about.

19      We wanted just to be sure that we understood fully why the

20  commission would be charged.  And so that is -- that was the

21  focus of our conversations.

22  **Q.**  Do you feel like you actually came to a full understanding

23  as to why the commission would be charged?

24  **A.**  I believe that the statement of compliance included a

25  justification for the commission, yes.

GOLDBERG - DIRECT / MOSKOWITZ

1   **Q.**  So the extent of your understanding is what was submitted

2   to the Court?

3   **A.**  Precisely.

4   **Q.**  Okay.  Anything else beyond that?

5   **A.**  The court filings represented my best knowledge of -- of

6   what was -- of the plan of record.

7   **Q.**  Okay.  And so understanding that your job was to respond

8   to the press, did you feel like you had adequate

9   justifications to respond to the press?

10  **A.**  By the time the statement of compliance was filed with the

11  Court, yes.

12  **Q.**  Okay.  Let's keep going back to page 2.  The next bullet

13  down from where we were, there's a "it's not going to go over

14  well" sentence.  Do you see that?

15  **A.**  I see that.

16  **Q.**  It says, "It's not going to go over well in the developer

17  community if we're providing value in other instances and

18  decide to charge for some but not others."

19      Do you see that?

20  **A.**  I do.

21  **Q.**  So this is talking about expected feedback from the

22  developer community for what they could perceive as a switch

23  for how they had been sort of expecting to have Apple's iOS

24  platform work, right?

25  **A.**  Well, my role is not to intersect --

1    **Q.**   That's not my question.

2    **A.**   -- with the community.

3    **Q.**   Do you understand that this is communicating the

4    anticipated reception by the developer community of a

5    perceived switch in Apple's policies?

6    **A.**   I see that's what's written here.

7    **Q.**   And I think you were about to say that you have no role

8    whatsoever in how developers react to anything Apple does?

9    **A.**   That's correct.

10   **Q.**   Are other of your colleagues involved in handling

11   developer sentiment?

12   **A.**   I don't know.  We have a developer relations team.

13   **Q.**   Okay.  So that wouldn't be part of the communications

14   department?

15   **A.**   That's correct.

16   **Q.**   Okay.  There's a reference -- if you -- back to the first

17   page, below the second redaction, there's a note about if

18   Apple were to charge a commission on these external purchases,

19   it might be perceived like we're trying to charge for what

20   happens on the Internet.

21        Do you see that?

22   **A.**   I see that.

23   **Q.**   That was something you also anticipated the press asking,

24   right?

25   **A.**   I don't recall preparing that question with response for

1    press, no.

2    Q.  Okay.  Well, we might come back to that.

3        But you were aware that Apple does not charge, other than

4    this new program, for anything that happens on the Internet

5    including purchases, right?

6    A.  I am not an expert in all the nuances of the guideline so

7    I really couldn't say with complete confidence.

8    Q.  So if you got a call from the press today, you wouldn't

9    know how to answer that question?

10   A.  I would have to go to some of my colleagues to help me

11   with the response, yes.

12   Q.  Did you have an understanding at any point in time that

13   Apple was considering for some period of time an option where

14   it was not going to charge any commission and an option where

15   it was going to charge a commission?

16   A.  I -- yes.

17   Q.  And when did you first come to understand that?

18   A.  The first I can recall is that same June 28th meeting.

19   Q.  So when did you prepare for your testimony today?  What

20   date?

21   A.  Beginning Monday, the 17th.

22   Q.  Okay.  So before Monday the 17th, did you have any

23   recollection of anything you did on Wisconsin?

24   A.  No.

25              THE COURT:  So this wasn't a big deal for you?

1      **THE WITNESS:**  It was a big deal certainly at the

2   time, but a number of months have passed, Your Honor, and I

3   don't recall with specificity --

4      **THE COURT:**  I'm not asking about specificity.  It

5   sounds to me like -- like this is business as usual.  Does

6   this always happen that you have to go out and justify things

7   that you don't think the press is going to like?

8      **THE WITNESS:**  We -- we face tough questions from the

9   press on lots of issues.

10      **THE COURT:**  And so this was a nothing, that -- that

11   they were faced with an injunction, your clients faced with an

12   injunction, they have to comply, you are the communicator and

13   yet it's not a big enough deal that you remember nothing?

14      **THE WITNESS:**  I don't recall with specificity at this

15   time.

16      **THE COURT:**  What do you remember generally then?

17      **THE WITNESS:**  I remember that in the leadup to the

18   injunction compliance plan being put into place, the

19   communications team worked with the legal team.

20      We used the statement of compliance filed with the Court

21   to develop a set of questions and answers with which we could

22   converse with the press.

23      I recall that our statement of record was the statement of

24   compliance.  And so for media inquiries on the injunction

25   compliance plan, we would point reporters directly to the

1    on-the-record statement with the Court.

2        I recall that we briefed three outlets when the injunction

3    compliance plan was launching to ensure that they understood

4    the nuances and technicalities of the program.  And those

5    briefings were led by someone from the business and someone

6    from legal.

7        And I recall that we monitored the press that resulted

8    from the implement -- or the launch of the injunction

9    compliance plan.  We analyzed that, and we reported it on up

10   to executives.

11       And that is -- that is what I recall.

12           **THE COURT:**  And that was in January?

13           **THE WITNESS:**  That would have been in January of

14   2024.

15           **THE COURT:**  So six months after you recall a specific

16   meeting.

17           **THE WITNESS:**  Correct.

18           **THE COURT:**  And leading up to that, you don't have

19   any recollection of -- of how significant your involvement was

20   other than one meeting?

21           **THE WITNESS:**  With -- I recall with -- one specific

22   meeting.  But other than that, I don't have specific memories

23   of other meetings.

24       I remember that we did work to comply with the plan in

25   July of 2023, but that it didn't end up launching until

1    January of 2024.

2            **THE COURT:**  Go.

3            **MS. MOSKOWITZ:**  Thank you, Your Honor.

4    **Q.**  Just a follow -- couple follow-up questions there.  And we

5    will be coming back to some of that.

6        The specific meeting you do recall, you only recalled

7    after being shown notes of that meeting in your prep for this

8    testimony?

9    **A.**  That's correct.

10   **Q.**  And the -- the briefings and all of that that you were

11   discussing in January 2024, I think you just said those were

12   re-upped work products that had been created for the July 2023

13   when you first thought it was going to go live.

14   **A.**  The plan of record in July 2023 was the basis of the plan

15   that we executed in January 2024.  I don't -- I can't speak to

16   how much changed between, you know, those six months.

17   **Q.**  And we're going to cover that too.  But in terms of the

18   materials, the Q and A had been drafted in July 2023, right?

19   **A.**  Correct.

20   **Q.**  The press briefing deck had been prepared in July 2023?

21   **A.**  I believe so, yes.

22   **Q.**  You had even seen draft statements of compliance and

23   Mr. Fischer's declaration in July 2023?

24   **A.**  That's correct.

25   **Q.**  Okay.  And what you're just saying is they were ultimately

 1   finalized and filed or given in January 2024.

 2   **A.**   Correct.

 3   **Q.**   You also -- you remember a little bit more than just that,

 4   right?  You remember being present and monitoring the

 5   proceedings in May of 2024 in this Court?

 6   **A.**   Yes.

 7   **Q.**   And you were here, in fact, one of the days?

 8   **A.**   That's correct.

 9   **Q.**   And you were monitoring press reactions to what was

10   unfolding in the courtroom?

11   **A.**   That's correct.

12   **Q.**   Okay.  We'll come back to that as well.

13        Have we then exhausted all of your memory of what your

14   work was in connection with Project Wisconsin?

15   **A.**   Yes.

16   **Q.**   I'm going to keep going just again to see if we can

17   refresh you since you do seem to at least possibly be able to

18   be refreshed.

19        Let's keep going on 1104 on page 2.

20                      (Exhibit published.)

21   **BY MS. MOSKOWITZ:**

22   **Q.**   Do you recall that there was discussion -- again, maybe

23   not at this meeting but at some point in time -- about what

24   the placement within the app the link should be allowed to

25   have?

1    **A.**   (Reviewing document.)

2          I recall that was a topic of conversation.  It was not a

3    discussion that I had.

4    **Q.**   I understand.  And I'm really just asking for what you

5    saw, heard, all of that, right?  Not necessarily what you

6    said.  Okay?

7    **A.**   Sure.  I recall hearing discussions about placement, yes.

8    **Q.**   Okay.  And you recall hearing discussion about having

9    different placement allowances or restrictions depending on

10   whether or not a commission would be charged, correct?

11   **A.**   I don't recall that, no.

12   **Q.**   Okay.  So if we look at these two bullets here, it says:

13   If you want to charge a commission, you have to give them

14   better placement.  If you don't charge a commission, you need

15   to lock it down to a plain URL link and Internet-style button.

16   In quotes.

17          Do you see that?

18   **A.**   I see that.

19   **Q.**   That does not spark any recollection in your mind about

20   this framework of commission, better placement, no commission,

21   lock it down?

22   **A.**   No.

23   **Q.**   Separate from these bullets, do you have any recollection

24   at all about the concept of having different placement

25   positions based on whether a commission would be charged?

GOLDBERG - DIRECT / MOSKOWITZ

1    **A.** No.

2    **Q.** Do you recall hearing discussion about what the placement

3    restrictions may or may not be decided by Apple?

4    **A.** Vaguely.

5    **Q.** And do you vaguely recall there being discussions about

6    having it be outside of the buy flow, for example?

7    **A.** Yes. I'm not quite sure what that even means. But yes.

8    **Q.** You don't understand that the placement restrictions that

9    Apple put as one of the primary restrictions in this policy

10   that developers were not going to be able to put the link in

11   anywhere that could lead that user to purchase any goods

12   within the app?

13   **A.** So for the specifics of the entitlement program, I would

14   refer myself and I would also refer press to the entitlement

15   itself just to make sure I had all the specifics correct.

16   **Q.** This time I wasn't asking what you would do when a press

17   called. I'm just trying to understand do you have an

18   understanding, given that your role was to press -- deal with

19   press and at least have a baseline understanding of what this

20   program was? Do you agree that or not?

21   **A.** Can you restate the question?

22   **Q.** Do you believe that your role was to have even a baseline

23   understanding of what this program was?

24   **A.** Yes.

25   **Q.** Okay. As part of that baseline understanding, do you

1    understand that there is a restriction in the program that

2    prevents a developer from putting the link anywhere in the app

3    where a user might be able to end up purchasing a good?

4    **A.**  I would have to look at the entitlement myself to refresh

5    my memory on those specifics.

6    **Q.**  So the answer is no, you do not even have that baseline

7    understanding sitting here today?

8    **A.**  That's correct.

9    **Q.**  Do you have even a baseline understanding that Apple had

10   restrictions on what the actual link could look like?

11   **A.**  Yes.

12   **Q.**  Okay.  You have a baseline understanding of what that was.

13   What is your baseline understanding of what that is?

14   **A.**  My baseline understanding would be there was restrictions

15   on visuals and perhaps language.  But I would again need to

16   look at the entitlement to ensure that I have all the

17   specifics correct.

18   **Q.**  All right.  Let's -- let's look to the first page, a few

19   more questions on this.

20              (Exhibit published.)

21   **BY MS. RICHMAN:**

22   **Q.**  There's a Next Steps section at the top.  Do you see that?

23   **A.**  Yes.

24   **Q.**  And there's a reference to the business team defining some

25   scenarios where we can, quote, limit the ruling.

1          Do you see that?

2     **A.**  I do.

3     **Q.**  Do you understand that to be referring to scenarios where

4     Apple could minimize the impact on Apple of the Court's

5     injunction?

6     **A.**  No, I'm not familiar with what this means.

7     **Q.**  You have no understanding whatsoever as to what those

8     words mean?

9     **A.**  No.

10    **Q.**  Okay.  A few bullets down it talks about some references

11    to coming up with what Apple could do that the Court would

12    accept.  Do you see that?

13    **A.**  I do.

14    **Q.**  And it says start with the minimum.  Do you see that?

15    **A.**  I do.

16    **Q.**  Okay.  Do you understand that this is talking about what

17    Apple could do at the bare minimum to comply with the

18    injunction?

19    **A.**  That's what it seems to mean, yes.

20    **Q.**  And there's a bullet that says "Who should decide?"

21         I'm sort of back at the bottom of that Next Steps.

22         Do you see that?

23    **A.**  I do.

24    **Q.**  It says "Phil, legal, someone else on opposite ends of

25    goalpost."

1          Do you see that?

2   **A.**   I do.

3   **Q.**   Did you understand this to be -- or do you understand this

4   to be a reference to Mr. Schiller and legal being on one end

5   of the spectrum in terms of conservativeness of approach?

6   **A.**   I don't know -- I was not privy to those discussions, and

7   I don't know what this means and didn't at the time.

8   **Q.**   You were privy to the discussion on June 28th, right?

9   **A.**   That's correct.

10  **Q.**   Were -- was your perception of those discussions that

11  there were folks on opposite ends of the spectrum in terms of

12  willingness to be aggressive in terms of how they were going

13  to approach complying with the injunction?

14  **A.**   I don't recall having that interpretation at the time, no.

15  **Q.**   So just given your lack of understanding on some of these

16  things sitting here today, what would your answer be to a

17  reporter who asked why some buttons are not allowed and why

18  placement next to merchandise is not allowed?  Would you just

19  say, "Go consult the guidelines"?  Or would you do something

20  else?

21  **A.**   The first thing I'd do is look to the materials that we

22  created, the Q and A.  I would look to the statement of

23  compliance.  I would look to the entitlement.  And I likely

24  would find the answer in one of those documents.

25  **Q.**   Okay.  So the Q and A would have your best response to

1    those questions?

2    **A.**  That's correct.

3    **Q.**  All right.

4        So let's keep talking about commission.  You were present

5    at a meeting on June 28th around what commission Apple would

6    charge for this external purchase link, right?

7    **A.**  I was present at the meeting.  I don't recall the express

8    purpose for the meeting.

9    **Q.**  I didn't ask what the purpose was.  I am asking do you

10   recall the discussion at that meeting including what

11   commission Apple would charge?

12   **A.**  Yes.

13   **Q.**  Okay.  And you are aware that Apple ended up choosing to

14   charge 27 percent, right?

15   **A.**  With some exceptions, but yes.

16   **Q.**  The exception being for like the small business program;

17   is that what you're referring to?

18   **A.**  That one, and I'm -- I believe there are others, but I

19   would need to go back to the materials.

20   **Q.**  Okay.  But standard rack rate would be 27 percent.

21   **A.**  Yeah.

22   **Q.**  And in that same discussion, there were lower numbers

23   tossed around, right, before arriving at 27 percent?

24   **A.**  Yes.

25   **Q.**  And it was Luca Maestri, Apple's CFO at the time, who

1    pushed for the commission to be 27 percent, right?

2    **A.**    I don't recall that from that meeting.

3    **Q.**    Okay.  Let's turn to 399 in your binder, please, CX399.

4    **A.**    (Reviewing document.)

5    **Q.**    Let me know when you're there, please.

6    **A.**    I am here.

7    **Q.**    Okay.  Are these the -- the notes that you were referring

8    to earlier that refreshed your recollection?

9    **A.**    No.

10    **Q.**    Okay.  What were the notes that refreshed your

11    recollection?

12    **A.**    A different set of notes.  It was a conversation amongst

13    communications colleagues.

14    **Q.**    Okay.  And they were -- were they produced to us in this

15    litigation?

16    **A.**    Yes.

17    **Q.**    Okay.  So they had a little Bates number on the bottom?

18    **A.**    I believe so, yes.

19    **Q.**    Okay.  Well, let's stick with this.

20       These are -- if you look at the last page of the document,

21    it will show that these are notes from your files.

22       Do you see that?

23    **A.**    Yes.

24    **Q.**    And you don't recall seeing these?

25    **A.**    The notes?

1    Q.   These.   This document.

2    A.   I -- I have seen this document, yes.

3    Q.   Okay.

4         MS. MOSKOWITZ:   Your Honor, I move CX399 into

5    evidence.

6         MR. PERRY:   No objection, Your Honor, with the

7    clarification of the date that is also stated on the last page

8    of the document.

9         THE COURT:   399 is admitted.

10        (Exhibit 399 received in evidence.)

11             (Exhibit published.)

12   BY MS. MOSKOWITZ:

13   Q.   So these are notes that you took?

14   A.   I took these notes.

15   Q.   And you took these notes from a different meeting?

16   A.   I don't recall from where I took these notes.

17   Q.   Okay.  And so looking at these does not refresh your

18   recollection at all?

19   A.   Not at all.

20   Q.   Okay.  Well, let's walk through it.

21        There's a line up on the front -- well, let's not go

22   line-by-line yet.

23        Reading these notes, it looks to me like you are sort of

24   doing a blow-by-blow of some discussion and taking notes as

25   the conversation unfolded.

1          Is that fair to read that from these notes?

2    A.   (Reviewing document.)

3          I view these notes as my attempt to record what was being

4    said in whatever conversation I was having.

5    Q.   Okay.  And so these notes, if you do look at that last

6    page, as your counsel helpfully pointed out they're dated

7    June 26.

8          Do you see that?

9    A.   I do.

10   Q.   That doesn't help refresh your memory at all?

11   A.   No.

12   Q.   Do you think it was in connection with the upcoming

13   meeting you were going to be having with Mr. Cook?

14   A.   I don't recall.

15   Q.   Okay.  June 26 was about -- just about a week out from

16   July 5th which at the time was your expected go-live date for

17   compliance with the injunction, right?

18   A.   Correct.

19   Q.   And so let's go back to the first line here.  It says,

20   "Every day we don't hear anything from the Court past the

21   28th, it's one day -- one day."

22         Do you see that?

23   A.   I see that.

24   Q.   And what this is saying is every day not having to comply

25   is a good day for Apple, right?

 1   **A.**  I don't -- that's not how I read it.  I actually don't

 2   know what I was writing here.

 3   **Q.**  Okay.  So you have no memory or understanding as to what

 4   that meant?

 5   **A.**  No.

 6   **Q.**  You do understand that Apple makes a lot of money every

 7   day off of IAP, correct?

 8   **A.**  I -- I'm not a financial person.  I don't know the

 9   figures.

10          **THE COURT:**  Well, they're not losing money, are they?

11          **THE WITNESS:**  I -- I really couldn't speak to it.

12   **BY MS. MOSKOWITZ:**

13   **Q.**  You have no understanding whatsoever of even any order of

14   magnitude that Apple makes from in-app purchases on the App

15   Store?

16   **A.**  I know that Apple makes money off in-app purchases.  I --

17   I don't know how much or how much it is per day or -- or any

18   of that information.

19   **Q.**  Okay.  But you did understand that compliance with this

20   Court's injunction was, if in fact it worked, Apple was going

21   to lose some of that revenue, yes?

22   **A.**  Yes.

23   **Q.**  Okay.  So every day Apple didn't have to comply with the

24   injunction, the status quo of making a hundred percent of what

25   Apple was going to make was present, right?

1    **A.**   That's not how I read this line but --

2    **Q.**   That was a different question.

3    **A.**   Yes.

4    **Q.**   Okay.

5        So there was then a discussion of commission, right, at

6    this meeting?

7    **A.**   There must have been.  I don't recall.

8    **Q.**   And you say there must have been because there's

9    discussion that says "Commission" and then some numbers,

10   right?

11   **A.**   Correct.

12   **Q.**   And it looks like, if we're following along your notes,

13   20 to 23 percent commission was discussed at first.

14   **A.**   Someone must have said that, and I wrote it down, yes.

15   **Q.**   Okay.  You don't recall who said it?

16   **A.**   No.

17   **Q.**   But you -- we know who said something next because it says

18   "Luca wanted to make it 27 percent," right?

19   **A.**   That's what it says, yes.

20   **Q.**   And that's Luca Maestri?

21   **A.**   Yes.

22   **Q.**   And so Mr. Maestri, Apple's CFO, as far as you were

23   reflecting in real time, wanted to charge a 27 percent

24   commission for these linkout purchases, right?

25   **A.**   That must have been what was relayed and that's what I

1    wrote down.

2    Q.  Do you think it was relayed by Luca Maestri or someone

3    else?

4    A.  I don't think it was Luca.  I don't recall.

5    Q.  You don't think it was Luca because you don't recall

6    meeting with Mr. Maestri, or you don't have one recollection

7    one way or the other?

8    A.  I don't have any recollection.

9    Q.  Okay.  Well, let's -- so between this meeting -- well,

10   withdrawn.

11       Subsequent to this June 26th meeting that you don't

12   recall, we've discussed that you had a meeting with Mr. Cook

13   on June 28th, right?

14   A.  Correct.

15   Q.  Was 27 percent already decided at the time of that

16   meeting?

17   A.  I don't believe so.

18   Q.  Okay.  So was there still debate between 20 to 23 percent

19   and 27 percent?

20   A.  I believe there was still debate at the time.

21   Q.  Okay.  Was there a decision reached at that meeting?

22   A.  I don't recall.

23   Q.  Okay.  You have no recollection at all?

24   A.  That's correct.

25   Q.  You understand at some point before July 5th, there was a

1  final decision made on the commission, right?

2  **A.**  That's correct.

3  **Q.**  And that final decision was 27 percent, right?

4  **A.**  With some exceptions, yes.

5  **Q.**  And the exceptions you're referring to are the Small

6  Business Program and maybe some other program that you'd have

7  to go back and check?

8  **A.**  Correct.

9  **Q.**  Okay.  But the -- there was also a decision by July 5,

10  2023 that it would be a seven-day window at which the

11  purchases would be -- the commission would be collected,

12  right?

13  **A.**  Correct.

14  **Q.**  Okay.  Now, let's look at some of these press materials.

15  If you could turn in your binder to CX478, please.

16  **A.**  (Reviewing document.)

17  **Q.**  Let me know when you're there, please.

18  **A.**  I'm there.

19  **Q.**  This is an email you sent to Carson Oliver copying some

20  others on December 8, 2023.

21      Do you see that?

22  **A.**  I do.

23          **MS. MOSKOWITZ:**  Your Honor, I move CX478 into

24  evidence.

25          **MR. PERRY:**  No objection, Your Honor.

```
1              THE COURT:  It's admitted.

2              (Exhibit 478 received in evidence.)

3              MS. MOSKOWITZ:  Thank you.

4    Q.  If you look on the bottom, there's the first email from

5    you on December 7.

6         Do you see that?

7    A.  I do.

8    Q.  This is you suggesting that you were going to resurface

9    the PR plan and materials for when the external purchase link

10   may go live.

11        Do you see that?

12   A.  I do.

13   Q.  And a couple paragraphs down you say outlined below is our

14   plan of record from July.

15        Do you see that?

16   A.  I do.

17   Q.  So what you're communicating here is that you didn't go

18   live in July 5th like you had expected so you sort of shelved

19   the materials and now you're resurfacing those materials in

20   advance of actually going live in January?

21   A.  That's correct.

22   Q.  And there's a couple paragraphs down on page 2 down from

23   the top where you include the Q and A that you had put

24   together over the summer to guide the discussions, right?

25   A.  Yes.
```

1    Q.    And that's a reference to the question and answer,

2    anticipated questions from the press and draft answers that

3    you discussed earlier as part of the materials you had worked

4    on?

5    A.    Correct.

6    Q.    And you say:  Additionally, here's the latest version of

7    the deck from the summer.

8         Do you see that?

9    A.    I do.

10   Q.    And that's a reference to the press briefing presentation

11   slide deck that was going to be used with the press?

12   A.    That's correct.

13   Q.    And you said it was going to be presented by business and

14   legal.  Do you remember that?

15   A.    I do.

16   Q.    The idea was going to be Carson Oliver and Jen Brown?

17   A.    That's correct.

18   Q.    And is that ultimately what happened in January?

19   A.    I believe so, yes.

20   Q.    Okay.  So if you could turn in your binder to CX477.

21   A.    Okay.

22   Q.    Thank you.

23        This is a July 2023 press briefing presentation about

24   Apple's implementation of the injunction.

25        Do you see that?

```
 1    A.   I do.

 2    Q.   And if you turn all the way to the end, there's that same

 3    metadata sheet that shows the file name as July 6, 2023, Epic

 4    Injunction PR Briefing.

 5         Do you see that?

 6    A.   I see that's the file name, yes.

 7         MS. MOSKOWITZ:   Your Honor, I move CX477 into

 8    evidence.

 9         MR. PERRY:   No objection, Your Honor.

10         THE COURT:   It's admitted.

11             (Exhibit 477 received in evidence.)

12                  (Exhibit published.)

13    BY MS. MOSKOWITZ:

14    Q.   Does this look like the document that you were linking to

15    in your email?

16    A.   It -- it very well could have been, yes.

17    Q.   There is the -- what you would expect that document to be?

18    A.   Correct.

19    Q.   If you could please turn to Slide .13.

20    A.   (Reviewing document.)

21    Q.   This is a slide showing the restrictions that Apple

22    decided to place on the placement of the external link.

23         Do you see that?

24    A.   One moment.

25         (Reviewing document.)
```

 1    **Q.**    Sure, and it should be on the screen as well.

 2    **A.**    Okay.  I see it.

 3    **Q.**    Is that what you understand this to be?

 4    **A.**    (Reviewing document.)

 5         Yes.

 6    **Q.**    Does that refresh your recollection of the restrictions

 7    that were imposed?

 8    **A.**    (Reviewing document.)

 9         Yes.  This was July -- I don't actually know if the

10    restrictions were exactly the same in January, but this

11    refreshes my memory on where we were in July.

12    **Q.**    And if -- if these are all present today, it's fair to say

13    that these had been arrived at and decided back in July 2023.

14    **A.**    If they're all present today, it looks like we -- we had

15    them here in July as well.

16    **Q.**    This was the plan of record in July?

17    **A.**    In July, yes.

18         **MS. MOSKOWITZ:**  Next slide, please.  This is .14.

19                   (Exhibit published.)

20    **BY MS. MOSKOWITZ:**

21    **Q.**    This is a slide that's reflecting Apple's decision to only

22    allow a plain button style for the linkout.

23         Do you see that?

24    **A.**    I do.

25    **Q.**    Does that refresh your recollection of one of the

1    restrictions Apple put on the program?

2    **A.**   Yes, it does.

3    **Q.**   And Apple had already decided to put that restriction on

4    as of July 2023, right?

5    **A.**   Yes.   This was the plan of -- as of July, yes.

6    **Q.**   And to your best knowledge, it stayed the plan and is in

7    fact in the program today?

8    **A.**   Not actually sure, but I would have to look at the plan

9    itself to refresh my memory.

10   **Q.**   So even the plain button style, you have just no

11   independent knowledge of that sitting here today?

12   **A.**   I would have to look at the -- the specifications again.

13   **Q.**   Do you remember that being the subject of quite a bit of

14   discussion back in May in front of this Judge, this Court?

15   **A.**   I remember it was part of the discussion, yes.

16   **Q.**   Okay.   Let's go to 16, please.

17                      (Exhibit published.)

18   **BY MS. MOSKOWITZ:**

19   **Q.**   This slide again talks about commission, and it shows

20   27 percent.   And it refers to that lower commission for some

21   of the -- for the Small Business Program and subscriptions.

22       Do you see that?

23   **A.**   I do.

24   **Q.**   Does that refresh your recollection that the Small

25   Business Program and subscriptions are the only exceptions to

1  the 27 percent?

2  **A.**  It does.

3  **Q.**  That's consistent with how you understand it to work as in

4  fact implemented?

5  **A.**  I believe so.

6  **Q.**  And those decisions were made back in July 2023?

7  **A.**  That's -- this is the plan from then, yes.

8  **Q.**  And the plan remained as finally executed?

9  **A.**  I would have to look at it again.

10  **Q.**  Well, I did just ask whether you understood that in fact

11  as implemented, this is correct.  Is that your understanding?

12  **A.**  I would have to look at it again to be a hundred percent

13  sure.

14  **Q.**  I'm not asking for a hundred percent certainty.  I know

15  you can only tell us what you understand.  So I'm just asking

16  for your understanding, best you have sitting here today.

17     Is it your understanding that this slide in fact reflects

18  the final implementation of the commission and what programs

19  it would apply to?

20  **A.**  I believe so.

21  **Q.**  All right.  Let's go back for a moment to 478.

22     You get a response actually on page 1, please.

23                    (Exhibit published.)

24  **BY MS. MOSKOWITZ:**

25  **Q.**  Mr. Oliver responds, and he says, "These materials look

1    good and are consistent with our current plan of record."

2        Do you see that?

3    **A.**   I do.

4    **Q.**   So what Mr. Oliver was communicating to you was that in

5    fact, all of the restrictions and the commission structure

6    that we were just looking at, that had been the plan of record

7    in July 2023, remained Apple's plan of record as of the

8    December 8th, 2023.

9    **A.**   That's what it says, yes.

10   **Q.**   Let's please turn in your binder to CF529, please.

11   **A.**   (Reviewing document.)

12   **Q.**   You there?

13   **A.**   Yes.

14   **Q.**   Thank you.

15       This is a January 2024 press briefing presentation titled

16   "Epic Injunction Compliance Press Briefing."

17       Do you see that you?

18   **A.**   I do.

19   **Q.**   And this is the final version that was actually used for

20   the go-live in January 2024?

21   **A.**   (Reviewing document.)

22       I -- I cannot be a hundred percent certain that this is

23   the actual final --

24   **Q.**   Okay.

25   **A.**   -- presentation.

 1    **Q.**  But it was January 2024 version of this presentation?

 2    **A.**  It was a January 2024 version.

 3          **MS. MOSKOWITZ:**  And, Your Honor, I move 529 into

 4    evidence.

 5          **MR. PERRY:**  No objection, Your Honor.

 6          **THE COURT:**  Admitted.

 7               (Exhibit 529 received in evidence.)

 8          **MS. MOSKOWITZ:**  Thank you.

 9                    (Exhibit published.)

10    **BY MS. MOSKOWITZ:**

11    **Q.**  You were actually one of the contemplated presenters of

12    one of the slides in this deck.

13          Do you recall that?

14    **A.**  I don't.

15    **Q.**  I can help.

16    **A.**  Okay.

17    **Q.**  Page 15.

18    **A.**  Okay.

19    **Q.**  There's a speaker note on the bottom that says, "Thank you

20    for your time today.  Now I'll pass it back to Marni."

21          Do you see that?

22    **A.**  (Reviewing document.)

23    **Q.**  It's on the screen as well, if that helps.

24    / / /

25    / / /

1  **A.**  Hold --

2      (Reviewing document.)

3      Yes, I see -- I see that.

4  **Q.**  So at least it was contemplated that you would be uttering

5  some words during this press briefing?

6  **A.**  What I would have said at this point was "Thank you so

7  much for your time, Jen and Carson.  And now we will open it

8  to questions from the media."

9  **Q.**  Okay.  So those were the only words that you planned to

10  speak?

11  **A.**  That's correct.

12  **Q.**  Okay.  But you were planning on the call?

13  **A.**  That's correct.

14  **Q.**  Okay.  So whether or not this was the final, final, final

15  that was actually used, this deck or its final version was in

16  fact presented to the press?

17  **A.**  The final version would have been, yes.

18  **Q.**  And fair to say that this was just a reiteration of the

19  July 2023 deck we looked at a moment ago?

20  **A.**  I would want to compare them side by side, but a lot of

21  the material looks similar.

22  **Q.**  Well, I have another way we might be able to establish

23  that.  If you look at the last page, the metadata sheet, do

24  you see the title of this document from January 2024 in fact

25  is the file name "2023 July 6 Epic Injunction PR Briefing."

1          Do you see that?

2    **A.**   Yes, I see that.

3    **Q.**   Do you understand that to be exact same title of the

4    July one we looked at?

5    **A.**   What exhibit was that one?

6    **Q.**   477.

7    **A.**   (Reviewing document.)

8          Yes, those look to be the same.

9              **MS. MOSKOWITZ:**   Okay.  You can take that down,

10   please.

11   **Q.**   So I think we talked about you acknowledging that you

12   were -- you recall hearing discussion about link placement

13   and -- well; is that right?

14   **A.**   Yes, I recall that.

15   **Q.**   Do you also recall hearing discussion of language around

16   what the link would look like and what the pop-up screen that

17   would be presented to users would say?

18   **A.**   I recall conversations about that.

19   **Q.**   And you understood that the goal of the pop-up screen was

20   to tell users that following the linkout is dangerous, right?

21   **A.**   No.

22   **Q.**   Okay.  Let's go back to 399, please.

23              **MS. MOSKOWITZ:**   And we can put this on the screen.

24   It's in evidence.

25                          (Exhibit published.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   BY MS. MOSKOWITZ:

2   Q.  There is some language that says -- right under that

3   middle redaction.  Do you see where I am?

4   A.  I do.

5   Q.  All right.  There's a reference to where the link could

6   go, what the language around the link will be.  And then the

7   third line says "interstitial."

8       Do you understand that to be referring to the pop-up that

9   users would be presented with?

10  A.  I do.

11  Q.  So the pop-up that, quote, "tells people it's dangerous."

12      Do you see that?

13  A.  I do.

14  Q.  So those were your notes?

15  A.  That must have been something that someone said and I

16  wrote down, yes.

17  Q.  So you recall hearing discussion then that the purpose of

18  the pop-up was to tell users that the link was dangerous?

19  A.  I view this as reflecting one moment in time where --

20  Q.  That's not my question.

21  A.  -- where someone said these words and I wrote them down,

22  yes.

23  Q.  So someone said these words and you wrote them down?

24  A.  That's right.

25  Q.  There's also some discussion in these same notes about PR

1  strategy, right?

2  **A.**  Can you tell me what you're looking at?

3  **Q.**  I mean sort of all over the place, but in the -- in the

4  beginning there, there's talking about how you're going to be

5  doing a legal filing, you can point reporters to it.

6     Do you see that?

7  **A.**  (Reviewing document.)

8     I see -- yes, I see that.

9  **Q.**  That's talking about PR strategy, right?

10  **A.**  Yes.

11  **Q.**  Okay.  And you mentioned that to the Court in response to

12  the Court's questions about how you would be pointing

13  reporters to what had been filed, right?

14  **A.**  That's right.

15  **Q.**  That's the same thing we're talking about both places,

16  right?

17  **A.**  That's right.

18  **Q.**  And you also specifically call out Matt Fischer's

19  declaration.

20     Do you see that?

21  **A.**  That's right.

22  **Q.**  And you say he is going to have to justify this.

23     Do you see that?

24  **A.**  I do.

25  **Q.**  Who said that at the meeting?

1    **A.**    I have no idea.

2    **Q.**    It wasn't you?

3    **A.**    No.

4    **Q.**    Did you say a single word at this meeting?

5    **A.**    I don't have any recollection.

6    **Q.**    You understood whoever said it, and you wrote it down, you

7    understood that this was meaning that Mr. Fischer was going to

8    have to justify to this Court Apple's approach to how it would

9    comply with the Court's injunction, right?

10    **A.**    I believe that was the purpose of the declaration.

11    **Q.**    Right.  So as of June 26, 2023, the plan was for

12    Mr. Fischer to testify through this declaration under oath to

13    the Court to justify Apple's response to the injunction.

14    **A.**    That's my understanding, yes.

15    **Q.**    And that was still the plan in January 2024 when Apple in

16    fact submitted that sworn declaration for Mr. Fischer, right?

17    **A.**    That's right.

18    **Q.**    You understand, though, at some point that it was decided

19    that Mr. Fischer was not going to be a good spokesperson for

20    Apple?

21    **A.**    I don't recall that.

22    **Q.**    Okay.  That's not ringing any bells in your mind?

23    **A.**    Discussions of that are not ringing any bells in my mind.

24    **Q.**    Okay.  So we talked about this briefly.  I just want to

25    come back to it.

1    You were aware that the Court was holding evidentiary

2    hearings back in May of 2024 about the compliance with the

3    injunction?

4    **A.**   Yes.

5    **Q.**   And the first day was May 8th.  Do you remember that?

6    **A.**   I do.

7    **Q.**   And you were here in the courtroom for that?

8    **A.**   I was.

9    **Q.**   Mr. Sainz was also present.  I'm sorry if I'm pronouncing

10   that incorrectly?

11   **A.**   He was.

12   **Q.**   And is he your boss?

13   **A.**   He is.

14   **Q.**   And your communications colleague, Hannah Smith, attended

15   remotely; is that right?

16   **A.**   That's right.

17   **Q.**   Meaning listened in?

18   **A.**   Uh-huh.

19   **Q.**   Yes?  Sorry, I'm just --

20   **A.**   Yes.

21   **Q.**   -- that "um-hmm" doesn't get caught.  Okay.

22       And you also attended the May 10th hearing, but you were

23   listening in, not in person, right?

24   **A.**   That's correct.

25   **Q.**   Did you attend the other two days in May?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

GOLDBERG – DIRECT / MOSKOWITZ

1    **A.**    No.

2    **Q.**    Did you attend any of the hearings this week?

3    **A.**    No.

4    **Q.**    Throughout the course of the May 8th hearing, you

5    exchanged a series of text messages with Ms. Smith commenting

6    on how the hearing was unfolding and how the press was going

7    to be responding and how you were going to respond to the

8    press, et cetera.

9        Do you recall that?

10    **A.**    I recall the series of text messages, yes.

11    **Q.**    All right.  Let's turn to Exhibit 244, please, in your

12    binder.

13    **A.**    (Reviewing document.)

14        Okay.

15    **Q.**    These are the text messages that you exchanged with

16    Ms. Smith on May 8, 2024?

17    **A.**    That's right.

18        **MS. MOSKOWITZ:**  Your Honor, I move CX244 into

19    evidence.

20        **MR. PERRY:**  No objection, Your Honor.

21        **THE COURT:**  It's admitted.

22        (Exhibit 244 received in evidence.)

23        **MS. MOSKOWITZ:**  Thank you.

24    **Q.**    And so this text chain is quite long and pretty colorful

25    at times, but I'm only going to be focusing on a few specific

1    portions so I think we could probably follow along on --

2                    (Off-the-record discussion.)

3    **BY MS. MOSKOWITZ:**

4    **Q.**  I was just setting the stage that this text chain is

5    pretty long and that I'm going to be focusing on specific

6    portions that I will put on the screen as we go.

7        So you were texting Ms. Smith and Ms. Smith was texting

8    you sort of as Mr. Fischer's testimony was unfolding on

9    May 8th, right?

10   **A.**  Yes.  This was our real-time reaction.

11   **Q.**  And throughout Mr. Fischer's testimony, fair to say that

12   you were commenting that you did not like his answers?

13   **A.**  We believed that there were portions of his testimony that

14   were weaker.

15   **Q.**  And at times you expressed your view that the hearing was

16   not going well for Apple?

17   **A.**  That is correct.

18   **Q.**  And you expressed disagreement with the criticism Apple

19   was receiving at the hearing, right?

20   **A.**  At one point, I believe I did, yes.

21   **Q.**  At a couple points, right?

22   **A.**  I would have to read the whole thing, but I know I did

23   express disagreement.

24   **Q.**  All right.  Let's look at a couple.

25       On page 18 to 19 -- or actually just 19, I think, let's

1    try there first.

2                        (Exhibit published.)

3    **BY MS. MOSKOWITZ:**

4    **Q.**  The top there says, "I don't agree with her."

5        Do you see that?

6    **A.**  I do.

7    **Q.**  Do you know whether "her" was me in this point or the

8    Judge?

9    **A.**  I don't.

10   **Q.**  Okay.  It could have been either?

11   **A.**  It could have been either.

12   **Q.**  All right.  But you were disagreeing with one of us?

13   **A.**  I was.

14   **Q.**  And you did disagree specifically with the Court at times

15   as well, right?

16   **A.**  Correct.

17   **Q.**  And we can look at that at page 20.

18                       (Exhibit published.)

19   **BY MS. MOSKOWITZ:**

20   **Q.**  You disagreed with the Judge vehemently, right?

21   **A.**  That is what I wrote at the time.

22   **Q.**  And you were infuriated, right?

23   **A.**  I was frustrated that I did not feel Apple's message was

24   being delivered effectively.

25   **Q.**  I won't say the word specifically, but if you go to

1    page 38, you say at one point in all caps, "It's our F'ing

2    store."

3        Do you see that?

4    **A.**  I do.

5    **Q.**  You were frustrated that Apple was being questioned about

6    Apple's App Store practices because it's Apple's store, it

7    should be able to do what it wants, right?

8    **A.**  I don't recall what I was reacting to specifically.  I

9    don't recall the dialogue.

10   **Q.**  Sitting here today, is that how you would read that?

11   **A.**  I don't recall the underlying dialogue that prompted my

12   reaction.

13   **Q.**  Okay.  Go up to page 28.

14                    (Exhibit published.)

15   **BY MS. MOSKOWITZ:**

16   **Q.**  There's a reference to -- you -- you send Ms. Smith, "This

17   will be a quote for sure in coverage."

18       Do you see that?

19   **A.**  I do.

20   **Q.**  And you continue on to say, "Other than to stifle

21   competition."

22       Do you see that?

23   **A.**  I do.

24   **Q.**  Do you recall at the hearing on May 8th the Court asked

25   Mr. Fischer whether Apple had a rationale for demanding

1    competitor -- for developer apps to use simple links instead

2    of prominent buttons other than to stifle competition; do you

3    remember that question?

4    **A.**   I don't recall that question specifically.

5    **Q.**   Okay.  We can put that up on the screen.

6                        (Exhibit published.)

7    **BY MS. MOSKOWITZ:**

8    **Q.**   This is page 84, lines 14 to 25, from Mr. Fischer's

9    testimony.  You can see that on the screen.  Can you?

10   **A.**   I can.

11   **Q.**   And you see the Court's question asking whether -- was

12   there any rationale for requiring when all you know that what

13   it will do is stifle competition, any other reason given,

14   et cetera.

15        Do you see that?

16   **A.**   Yeah, I'm reading it now.

17   **Q.**   Let me know when you've read it.

18   **A.**   (Reviewing document.)

19        Okay.  I've read it.

20   **Q.**   And so Mr. Fischer, upon these questions, was unable to

21   think of any other reason for those requirements other than to

22   stifle competition, correct?

23   **A.**   That is what he said.

24   **Q.**   And that was what you were referring to in your texts?

25   **A.**   It must have been.

1  Q.  And we just talked about this a moment ago.  Mr. Fischer

2  put that declaration in support of its -- Apple's response to

3  the injunction all the way back in July of 2023, right?

4  A.  There was a version then, yes.

5  Q.  And it was finalized and put together in January, right?

6  A.  It was submitted in January.

7  Q.  And so that was four, five months before he was siting

8  right where you're sitting?

9  A.  Yes.

10  Q.  So everyone, including Mr. Fischer, understood that he was

11  going to be talking about what Apple did and what its

12  justifications were for months, right?

13  A.  Correct.

14  Q.  And you would expect that Mr. Fischer knew the rationales

15  and justifications for every action Apple took, right?

16  A.  Yes.

17  Q.  But he wasn't able to come up with any other reason other

18  than to stifle competition when he was asked, right?

19  A.  That's right.

20  Q.  You -- on page 35, 244.35.

21           (Exhibit published.)

22  BY MS. MOSKOWITZ:

23  Q.  You posit a question, you pose a question, "I wonder if

24  they're spending so much time here because they know Matt is

25  the worst of our witnesses."

1          Do you see that?

2   **A.**  I do not have that up on the screen, no.

3          **THE COURT:**  It can be published.  I don't know why

4   it's not being published.

5          **THE WITNESS:**  I see it now.

6   **BY MS. MOSKOWITZ:**

7   **Q.**  You see it?  Okay, thank you.

8          **THE COURT:**  Hold on.  There we go.

9                      (Exhibit published.)

10         **THE WITNESS:**  I see.

11  **BY MS. MOSKOWITZ:**

12  **Q.**  At the top?

13  **A.**  I see it.

14  **Q.**  Thank you.

15         And you go on to say, "Phil will clean up a lot of this."

16  Right?

17  **A.**  I do.

18  **Q.**  And Phil refers to Mr. Schiller?

19  **A.**  It does.

20  **Q.**  Mr. Schiller was present for all of Mr. Fischer's

21  testimony, right?

22  **A.**  I believe so.

23  **Q.**  And you thought Mr. Fischer was a bad witness for Apple,

24  right?

25  **A.**  I thought our message was not being delivered effectively.

1    Q.   Well, Mr. Fischer, after months of knowing he was the guy

2    that was supposed to be justifying this, to use your words

3    from your notes, he was not justifying it, right?

4    A.   It was frustrating.  We --

5    Q.   And you thought Mr. Schiller would clean it up, he would

6    clean up Mr. Fischer's testimony, right?

7    A.   I had every reason to believe Mr. Schiller would be an

8    excellent witness.

9    Q.   You said, "Phil will clean up" Mr. Fischer's testimony,

10   right?

11   A.   That's what I wrote, yes.

12   Q.   So you thought Mr. Phillip -- Mr. Schiller could clean up

13   Matt's failure to come up with a single reason for imposing

14   the restrictions instead of to stifle competition.

15   A.   I believe Mr. Schiller would know the answers to those

16   questions, yes.

17   Q.   Mr. Fischer knew the answers to those questions, too,

18   right?  He gave an answer.  Right?

19   A.   I -- he gave an answer in court, correct.

20   Q.   And he was an expert in what all of Apple's reasons were

21   for coming up with the restrictions, right?

22   A.   He submitted the declaration, yes.

23   Q.   He was an expert in all of the reasons Apple made its

24   decisions and restrictions for this program.  He was chosen to

25   submit a declaration to this Court justifying it, right?

 1   **A.**  I can't speak to if he was an expert, but I do know he

 2   submitted a declaration.

 3   **Q.**  He was handpicked by Apple to be the one to justify every

 4   decision Apple took, to this Court, right?

 5   **A.**  I know he submitted the declaration, yes.

 6   **Q.**  All right.  Let's keep going.  On page 35.

 7                    (Exhibit published.)

 8   **BY MS. MOSKOWITZ:**

 9   **Q.**  You -- you get an answer from Ms. Smith to your question

10   of "I wonder why they're spending so much time.  Is it because

11   they know Matt's the worst witness?"

12        And she says, "I think your guess is accurate."

13        Do you see that?

14   **A.**  Yes.

15   **Q.**  She says, "They know we didn't plan to call him."

16        Do you see that?

17   **A.**  I do.

18   **Q.**  So does this refresh your recollection that there had been

19   a decision made at some point to drop Mr. Fischer as the

20   spokesperson after submitting his declaration?

21   **A.**  No, I don't -- I don't recall that at all.

22   **Q.**  You also listened in on the second day of the contempt

23   proceedings, right?

24   **A.**  That's correct.

25   **Q.**  And that was the day Mr. Roman testified?

1   **A.**   That's correct.

2   **Q.**   And you did the same texting with Ms. Smith that day?

3   **A.**   Yes.

4   **Q.**   If you could turn in your binder to 257, please.

5   **A.**   (Reviewing document.)

6        I'm there.

7   **Q.**   These are the text messages you exchanged with Ms. Smith

8   on May 10, 2024?

9   **A.**   That's correct.

10          **MS. MOSKOWITZ:**   Your Honor, I move CX257 into

11   evidence.

12          **MR. PERRY:**   No objection, Your Honor.

13          **THE COURT:**   It's admitted.

14          (Exhibit 257 received in evidence.)

15   **BY MS. MOSKOWITZ:**

16   **Q.**   Again there's a lot of back and forth and a lot of stuff

17   that is a fun read, but I -- I'm going to go to page 23.

18          (Exhibit published.)

19   **BY MS. MOSKOWITZ:**

20   **Q.**   This is during Mr. Roman's testimony.  You say, "Carson

21   has an answer for this."

22        Do you see that?

23   **A.**   I do.

24   **Q.**   And Ms. Smith agrees, "We have got to get Carson on the

25   stand."  Right?

1    **A.**  She does.

2    **Q.**  Carson refers to Carson Oliver, right?

3    **A.**  That's correct.

4    **Q.**  And so you were both looking forward to getting Mr. Oliver

5    on the stand because you thought he would have more polished

6    answers than Mr. Roman, right?

7    **A.**  We believed he'd have great answers, yes.

8    **Q.**  Better answers than Mr. Roman, right?

9    **A.**  Correct.

10    **Q.**  And that was a common theme.  You returned to it on

11    page 51.  Let's go there.

12                        (Exhibit published.)

13    **BY MS. MOSKOWITZ:**

14    **Q.**  On the bottom, Ms. Smith says, "The list of things to

15    discuss with Carson is like ten pages long at this point."

16         Do you see that?

17    **A.**  I do.

18    **Q.**  And you respond with a bit of a joke, but there's truth in

19    jest, "Carson, clean up aisle 9."  Right?

20    **A.**  Correct.

21    **Q.**  So your expectation, like with respect to Mr. Schiller,

22    that Mr. Oliver was going to have to deal with and clean up

23    things that Mr. Roman had answered in his testimony.

24    **A.**  I believed Mr. -- Mr. Oliver would have excellent answers

25    to the questions.

1    **Q.**  That wasn't my question.

2         Your expectation was that Mr. Oliver was going to have to

3    deal with and clean up Mr. Roman's answers from his testimony

4    under oath?

5    **A.**  Yes.

6    **Q.**  And so the whole idea here that you were discussing, and

7    in the prior text, was that Mr. Schiller and Mr. Oliver, they

8    just had to get up there, they were going to smooth over all

9    of the admissions that Mr. Fischer and Mr. Roman had made.

10   **A.**  Yes.

11   **Q.**  Let's go to page 54.

12                        (Exhibit published.)

13   **BY MS. MOSKOWITZ:**

14   **Q.**  You say, "I hope Alex doesn't get fired."

15        Do you see that?

16   **A.**  I do.

17   **Q.**  You were expressing concern that Mr. Roman might get fired

18   for the testimony he provided under oath to this Court?

19   **A.**  I felt badly because the testimony was not going very

20   well.

21   **Q.**  You said, "Maybe Matt deserves to."

22        Do you see that?

23   **A.**  I do.

24   **Q.**  So you were saying Mr. Fischer might deserve to get fired

25   for the testimony he gave under oath?

 1   **A.**   That's what I wrote at the time.

 2   **Q.**   And Mr. Fischer, in fact, did leave Apple in August 2024,

 3   three months after his testimony in this court?

 4   **A.**   I believe he did.

 5   **Q.**   Before we leave these text messages, if we could go back

 6   to 244.51.

 7                         (Exhibit published.)

 8   **BY MS. MOSKOWITZ:**

 9   **Q.**   So it's about a slightly different topic.  I think during

10   these text messages you had moments where you were talking

11   about other things.  Fair?

12   **A.**   Fair.

13   **Q.**   Okay.

14        This text from Ms. Smith is talking about Anna and Shane

15   bugging for some questions and answers about another topic.

16   Is that fair?

17   **A.**   It looks that way, yes.

18   **Q.**   Anna and Shane are your communications colleagues?

19   **A.**   Correct.

20   **Q.**   And she asks you if it's okay to share a response that you

21   had suggested from the earnings the last week.

22        You see that in the middle?

23   **A.**   Yes.

24   **Q.**   And there's the proposed response that follows in the

25   second half of that text.

1    **A.**  (Reviewing document.)

2        I see that.

3    **Q.**  If you continue to the next page.

4                        (Exhibit published.)

5    **BY MS. MOSKOWITZ:**

6    **Q.**  There's some -- some follow-up where you're saying, "I'm

7    not sure that that was" -- the response that you had sent was

8    meant for background briefing, it was an on-the-record

9    statement; is that right?

10   **A.**  I was saying that the draft language that Hannah proposed

11   was intended to be used as a guidance for the earnings call.

12   It wasn't intended to be used as background to be distributed

13   to reporters.

14   **Q.**  And that was language that you had drafted for the

15   earnings call?

16   **A.**  I may have or may have had input, I don't recall.

17   **Q.**  But it would have been a communications person?

18   **A.**  I can't say with certainty if it was a communications

19   person or someone else.

20   **Q.**  Do you expect that it would have been part of a

21   communications person's job to put together the draft

22   statement like that?  If you want to look at it again on the

23   prior page.

24            **THE WITNESS:**  (Reviewing document.)

25                        (Exhibit published.)

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **THE WITNESS:**  We often, in putting together responses

2     like this, work hand in glove with business people and -- and

3     legal people.  So, yes, communications would have had a hand

4     in it.

5     BY MS. MOSKOWITZ:

6     **Q.**  Okay.  And it says here that you suggested it for earnings

7     last week, right?

8     **A.**  Correct.

9     **Q.**  So you expect that you were involved?

10    **A.**  I expect that I was involved, yes.

11    **Q.**  You just don't remember drafting it yourself?

12    **A.**  Correct.

13    **Q.**  And this statement, was it used in earnings call?

14    **A.**  I don't know.

15    **Q.**  Do you think that this statement is attorney-client

16    privileged?

17    **A.**  As written in this message?

18    **Q.**  Yes.

19    **A.**  I don't think these messages are attorney-client

20    privileged.

21    **Q.**  Well, this response, this proposed response, is that

22    attorney-client privileged?

23          **MR. PERRY:**  Objection to the extent it calls for a

24    legal conclusion, Your Honor.

25          **THE COURT:**  Objection is noted.

1          You can answer.

2              **THE WITNESS:**  I -- I don't think this language is

3      privileged.

4      **BY MS. MOSKOWITZ:**

5      **Q.**  So let's keep going on page 53.  You -- you refer to the

6      language having been pulled together so quickly and wanting

7      more approval.

8          Do you see that?

9      **A.**  I do.

10     **Q.**  And on the next page, it says that Shane is going to send

11     it through an approval process.

12         Do you see that?

13     **A.**  I do.

14     **Q.**  And that it would be part of a larger Q and A?

15     **A.**  I do.

16     **Q.**  And the Q and A again is a communications document, right?

17     **A.**  It's a communications-driven document, yes.

18     **Q.**  And if you go to the next page.

19                     (Exhibit published.)

20     **BY MS. MOSKOWITZ:**

21     **Q.**  You then ask, "Can he note that it was prepared by outside

22     counsel?"

23         Do you see that?

24     **A.**  I do.

25     **Q.**  It wasn't prepared by outside counsel, correct?

1    **A.**   It must have been if that's what I wrote.   I said I don't

2    remember who wrote the statement.   So that -- that's probably

3    where I got it from, outside counsel.

4    **Q.**   Do you think that that communication statement and the

5    broader Q and A that was being drafted that you just said was

6    a communications-driven document was prepared by outside

7    counsel?

8    **A.**   Well, now that I've read this exchange, what I believe

9    that I was saying was --

10   **Q.**   So the answer is yes, you think it was prepared by outside

11   counsel, the whole Q and I?

12   **A.**   No, not the whole Q and A.   Just the part that we looked

13   at in Hannah's text was prepared by outside counsel.

14   **Q.**   Let's go back a page.

15                    (Exhibit published.)

16   **BY MS. MOSKOWITZ:**

17   **Q.**   He's going to send the whole thing as part of a larger

18   Q and A, right?

19   **A.**   Sure, sure.

20   **Q.**   Yes?

21   **A.**   Yes.

22   **Q.**   And you suggested that he mark that thing as prepared by

23   outside counsel?

24   **A.**   No.

25   **Q.**   Just that one little snippet?

 1    **A.**   That's correct.

 2    **Q.**   So that's your position?

 3    **A.**   I believe that's what I was saying here.  I don't recall.

 4    **Q.**   Okay.

 5         Let's look at another document.  If you could turn to 464,

 6    please.

 7    **A.**   (Reviewing document.)

 8    **Q.**   Let me know when you're there, please.

 9    **A.**   I'm there.

10    **Q.**   This is a text exchange between you and a few of your

11    communications colleagues.  Do you see that?

12    **A.**   I do.

13              **MS. MOSKOWITZ:**  Your Honor, I move CX464 into

14    evidence.

15              **MR. PERRY:**  No objection, Your Honor.

16              **THE COURT:**  It's admitted.

17                   (Exhibit 464 received in evidence.)

18              **MS. MOSKOWITZ:**  Thank you.

19    BY MS. MOSKOWITZ:

20    **Q.**   There's one -- you won't see it on the screen, but in your

21    hard copy there's a number of phone numbers.  One of them

22    doesn't have a name next to it.  That's Fred Sainz, right?

23    **A.**   (Reviewing document.)

24    **Q.**   It's on the first page.

25    / / /

GOLDBERG - DIRECT / MOSKOWITZ

```
 1    A.   (Reviewing document.)

 2         Um, I think so because he's referenced later in the

 3    message.

 4    Q.   Okay.  And if you pulled up your phone, you would expect

 5    to see that phone number as Mr. Sainz in your contacts?

 6    A.   Yes.

 7    Q.   Okay.  All of the folks on this text message work in

 8    corporate communications, right?

 9    A.   That's correct.

10    Q.   None of you is a lawyer, right?

11    A.   That's correct.

12    Q.   If you look, the first --

13              MS. MOSKOWITZ:  May I publish, Your Honor?

14              THE COURT:  You may.

15                     (Exhibit published.)

16    BY MS. MOSKOWITZ:

17    Q.   The first six pages of this text chain -- I don't know if

18    we're having technical difficulties.  It's okay.

19              TECH PERSONNEL:  I'm sorry.  What page?

20              MS. MOSKOWITZ:  Just the document.  Thank you.

21              THE COURT:  Page 1, 464.

22              MS. MOSKOWITZ:  Yes, thank you.  464.

23                     (Exhibit published.)

24    BY MS. MOSKOWITZ:

25    Q.   All right.  The first six pages, if we just scroll, are
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    all pretty much fully redacted as attorney-client privilege

 2    and work product.

 3        Do you see that?

 4    **A.**  I do.

 5    **Q.**  On page 8, you tell Mr. Sainz, you say "Fred," that you

 6    had sent him a draft Q and A about whatever we couldn't see in

 7    the redacted materials.  Right?

 8    **A.**  "Fred, materials and email are in your inbox."  Yes.

 9    **Q.**  Fair to assume that you're talking about materials

10    relating to the stuff we couldn't see that was redacted?

11    **A.**  I can't see what's redacted so I don't know.

12    **Q.**  Okay.  He responds on page 9.  Do you see that?

13                        (Exhibit published.)

14            **THE WITNESS:**  (Reviewing document.)

15        Okay.  Yes.

16    **BY MS. MOSKOWITZ:**

17    **Q.**  He says, "Okay, it's a good start."

18        Do you see where I am?

19    **A.**  I do.

20    **Q.**  So he says your draft was a good start, but he had some

21    comments.  And he then goes on to say, "The email should also

22    be written in the form of an email to Phil, like AR emails, so

23    that the team can see what we are sending Phil."

24        Do you see that?

25    **A.**  I do.

1    Q.  And you asked Mr. Sainz on page 11, "What do you mean by

2    AR emails?"

3        Do you see that?

4    A.  I do.

5    Q.  And he responds, "The way Peter/Dema write emails to Phil

6    for his approval."

7        Do you see that?

8    A.  I do.

9    Q.  And then if you follow on the next page.

10                      (Exhibit published.)

11   BY MS. MOSKOWITZ:

12   Q.  He says, "Something like Privileged and Confidential.

13   Colleagues, please review this email that we would like to

14   share with Phil.  Or Privileged and Confidential, Phil, below

15   please find."

16       Do you see that?

17   A.  I do.

18   Q.  So you were being told to make sure that you started your

19   email to Phil Schiller with your draft communications Q and A

20   with the words "privileged and confidential."

21       Do you see that?

22   A.  I see that, but that's not what this means.

23   Q.  We'll hear maybe what it means, but that's what you were

24   being told, right?

25   A.  No.  He wasn't instructing me to use "privileged and

1    confidential."

2    **Q.**  The two samples he gave you said "privileged and

3    confidential," right?

4    **A.**  I was copy pasting, I'm almost certain.

5    **Q.**  So Mr. Sainz said in the two samples he gave you on how to

6    draft an email to Mr. Schiller containing a draft

7    communications Q and A, contained as the opening words

8    "Privileged and Confidential."  Yes or no?

9    **A.**  The words are there.

10   **Q.**  Okay.  And Mr. Sainz is not a lawyer, right?

11   **A.**  That's correct.

12   **Q.**  And he was not asking you to seek legal advice, right?

13             **MR. PERRY:**  Objection.

14             **THE COURT:**  Overruled.

15        Answer the question.  It's a "yes" or "no" question.

16             **THE WITNESS:**  What is the "yes" or "no" question?

17   BY MS. MOSKOWITZ:

18   **Q.**  Were you seek -- Mr. Sainz was not instructing you to seek

19   legal advice, correct?

20   **A.**  He may have been, depending on who the email referred to

21   earlier was going to go to.

22   **Q.**  You are testifying that you believe that you were actually

23   seeking legal advice in drafting a Q and A to send to

24   Mr. Schiller?

25   **A.**  It wasn't going to Mr. Schiller.  It was going to go to

1   another team who then -- it was going to go to another team

2   who would then review and approve an email that would

3   subsequently be sent to Mr. Schiller.

4   **Q.**  Well, let's keep going then.  Page 13.  You ask a

5   follow-up question.

6                        (Exhibit published.)

7   **BY MS. MOSKOWITZ:**

8   **Q.**  Do you see that?

9   **A.**  (Reviewing document.)

10       Yes.

11  **Q.**  And he says, "We do this five times a day.  He said he

12  wants them to see what we will tell Phil."  Right?

13  **A.**  (Reviewing document.)

14       Correct.

15  **Q.**  So the purpose of the email he's asking you to send is so

16  that other people can see what you, the communications folks,

17  are sending Mr. Schiller, correct?

18  **A.**  Right.  But in the --

19  **Q.**  That -- that -- is that correct?

20  **A.**  -- in the text.

21  **Q.**  No.  Is that correct?

22  **A.**  Say the question again, please.

23  **Q.**  Mr. Sainz was telling you that the purpose for your email

24  was for the team, for them to see what you, the communications

25  department, were telling Mr. Schiller.

 1   **A.**   Yes.  But the team included legal.

 2   **Q.**   The -- The purpose of what Mr. Sainz was asking you to do

 3   was to show other people, including legal, what you, the

 4   communications department, were saying in a draft Q and A to

 5   Mr. Schiller, right?

 6   **A.**   Correct.

 7   **Q.**   You were not giving legal advice to Mr. Schiller, right?

 8   **A.**   No.

 9           **MR. PERRY:**  Objection, Your Honor.

10           **THE COURT:**  Overruled.

11   **BY MS. MOSKOWITZ:**

12   **Q.**   There was no legal advice.  You were just copying them in

13   for them to be aware of what you, the communications

14   department, were telling Mr. Schiller?

15   **A.**   No.

16   **Q.**   You -- your position is that you were asking for legal

17   advice?  Yes or no?

18   **A.**   No.

19        Sorry.  Yes.  We were going to ask for legal input and

20   advice in the email that would then be reviewed and sent to

21   Mr. Schiller.

22   **Q.**   That is not what Mr. Sainz says, correct?

23        He says, "We just want them to see what we are telling

24   Phil."  Right?

25   **A.**   He --

1    **Q.**   That's what he says, right?

2    **A.**   A few pages back he writes, "This is a good start but I do

3    have some questions and comments I'd like to walk through with

4    the team."

5        The team likely included legal counsel.

6            **THE COURT:**   No.  So now you're making that up because

7    you don't know.

8            **THE WITNESS:**   I know how we normally do things in the

9    normal course of business, Your Honor.

10           **THE COURT:**   Well, that's a new approach.

11                   (Off-the-record discussion.)

12           **THE COURT:**   I'll try to speak louder.  I don't know

13   what's wrong with the mic.  Go ahead.

14           **MS. MOSKOWITZ:**   Thank you.  We'll move on.

15           **MR. PERRY:**   Your Honor, may I be heard at sidebar on

16   this issue, please?

17           **THE COURT:**   No.

18           **MR. PERRY:**   Thank you, Your Honor.

19   **BY MS. MOSKOWITZ:**

20   **Q.**   If you could please turn to CX479, please, in your binder.

21   **A.**   (Reviewing document.)

22       I see it.

23   **Q.**   This is an email exchange from January 16, 2024 in which

24   you participated?

25   / / /

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**  (Reviewing document.)

2        Yes.

3            **MS. MOSKOWITZ:**  Your Honor, I move CX479 into

4    evidence.

5            **MR. PERRY:**  No objection, Your Honor.

6            **THE COURT:**  Admitted.

7                (Exhibit 479 received in evidence.)

8            **MS. MOSKOWITZ:**  Thank you, Your Honor.

9    **Q.**  These are the final talking points and Q and A for the

10   press for the go-live injunction response, yes?

11   **A.**  (Reviewing document.)

12       This is a version.  I -- I can't speak to whether it's the

13   final.

14   **Q.**  Okay.  Well, it says:  Below is a draft note to Carson and

15   Jen containing the updated Q and A deck and talk track, based

16   on the final documents at least.  Right?

17   **A.**  Based on the final documents at least, yes.

18   **Q.**  Okay.  So you had the final documents, but what you're

19   saying is you can't confirm that these were the final speaking

20   notes and Q and A?

21   **A.**  Right.  The purpose of this email to them would be to

22   solicit their feedback and input on those materials.

23   **Q.**  Okay.  And if these aren't the final, where would we

24   expect to find them?

25   / / /

 1    **A.**   (Reviewing document.)

 2        I -- I don't know.  I --

 3    **Q.**   Okay.  Well, let's look at least what the draft was.

 4        On Tuesday January 16th, which is after the go -- the day

 5    of the go-live, right?

 6    **A.**   I believe it was the 16th, yes.

 7    **Q.**   Okay.  So pretty darn close to final at least?

 8    **A.**   Probably, yes.

 9    **Q.**   All right.

10        Let's go to page --

11            **THE COURT:**  So --

12            **MS. MOSKOWITZ:**  Pardon me.

13            **THE COURT:**  We need to take a break soon for the

14    court reporter.

15            **MS. MOSKOWITZ:**  Sure.

16            **THE COURT:**  Is now a good time?

17            **MS. MOSKOWITZ:**  Sure, that's fine.  Thank you, Your

18    Honor.

19            **THE COURT:**  All right.  Let's stand in recess for

20    20 minutes.

21        Now, Mr. Perry, I'll see you at sidebar.

22            **MR. PERRY:**  Thank you, Your Honor.

23            **MS. MOSKOWITZ:**  Shall I be included?

24            **THE COURT:**  Yes.

25            **MS. MOSKOWITZ:**  Thank you.

 1            **THE COURT:**  I don't do things --

 2       You may step down.  You're instructed not to have any

 3   discussions with anyone about your testimony.  Do you

 4   understand?

 5                      (Pause in the proceedings.)

 6       (Recess taken at 2:03 P.M.; proceedings resumed at

 7   2:23 P.M.)

 8            **THE CLERK:**  Come to order.  Court is now in session.

 9            **THE COURT:**  All right.  Be seated.

10       We're back on the record.  The record will reflect -- I

11   need my mic on.

12       The record will reflect that the parties are present.

13       You may proceed.

14            **MS. MOSKOWITZ:**  Thank you, Your Honor.

15   **Q.**  Right before the break, we were -- I believe I moved in

16   479 into evidence.  If I didn't, someone will tell me?

17            **THE COURT:**  You did.

18            **MS. MOSKOWITZ:**  Thank you, Your Honor.

19   **Q.**  If we could turn to page 6, we were just going to look at

20   a few of these Q and As for the January 2024 go-live.

21       Is that what we're -- we agree we're talking about that

22   right now?

23   **A.**  Yes.

24                      (Exhibit published.)

25   / / /

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    BY MS. MOSKOWITZ:

2    **Q.**   Okay.  Page 6, there's a question:  Why is Apple still

3    collecting a commission on payments made outside the App

4    Store?  Is Apple now taxing web purchases?

5        Do you see that?

6    **A.**   I do.

7    **Q.**   And that's the same question we talked about before the

8    break that had been written down on those June 1st notes that

9    you just couldn't recall if that ended up in the Q and A.  Do

10   you remember that?

11   **A.**   I do now, yeah.

12   **Q.**   So do you see that it did end up in the Q and A?

13   **A.**   I do.

14   **Q.**   So this was a question that Apple anticipated the press

15   would ask that Apple would have to answer.

16   **A.**   Yes.

17   **Q.**   So let's look at that proposed answer.

18                       (Exhibit published.)

19   BY MS. MOSKOWITZ:

20   **Q.**   The second paragraph says:  Charging a commission on

21   transactions facilitated by external purchase links not only

22   complies with the injunction's plain terms, but it is also

23   consistent with the Court's rationale for upholding Apple's

24   other App Store policies.

25       Right?

1    **A.**   That's what it says.

2    **Q.**   And I think you said earlier you don't remember reading

3    the injunction or not?

4    **A.**   I don't recall.

5    **Q.**   But you drafted or worked on drafting this Q and A?

6    **A.**   I did.

7    **Q.**   Do you have a basis sitting here today that -- to support

8    the sentence that it complies with the injunction's plain

9    terms to tax web purchases?

10   **A.**   I believe it's the statement of compliance, page 13.

11   **Q.**   Okay.  So your basis would be to cite to the same thing

12   that was cited in the Q and A?

13   **A.**   That's right.

14   **Q.**   You don't have an independent basis sitting here right now

15   to understand how charging a commission on web purchases

16   complies with the plain terms of the injunction?

17   **A.**   No.  The justification used was drawn directly from the

18   statement of compliance.

19   **Q.**   So you don't know what the plain terms of the injunction

20   do or do not say?

21   **A.**   Correct.

22   **Q.**   But by "plain terms," you understand that to be saying the

23   letter of the injunction, the actual words used in the

24   injunction supports charging for web purchases; that's what

25   that sentence is saying, right?

 1   **A.**   I think "plain terms" refers to the words.

 2   **Q.**   Let's look at the injunction together.  It's CX1313.

 3          **MS. MOSKOWITZ:**  Let's put that on the screen, please.

 4                    (Exhibit published.)

 5   **BY MS. MOSKOWITZ:**

 6   **Q.**   And we're talking about paragraph 1.

 7          **MS. MOSKOWITZ:**  So let's blow that up.

 8   **Q.**   Does this look familiar to you now that you're seeing it?

 9   **A.**   Yes.

10   **Q.**   So you do think you've seen this before?

11   **A.**   Yes.

12   **Q.**   All right.  Paragraph 1, if we could blow that up, is what

13   we're talking about here, right?

14   **A.**   (Reviewing document.)

15        Yes.

16   **Q.**   So you acknowledge, having just read that, that the plain

17   language of the injunction does not explicitly say that Apple

18   can charge a commission, right?

19   **A.**   (Reviewing document.)

20        Those words are not written here.

21   **Q.**   Right.  So what you mean by "plain terms" is that the

22   plain language of the injunction does not explicitly say that

23   Apple cannot charge a commission, right?

24   **A.**   Correct.

25   **Q.**   Let's go back to 479 on another question.  I'm on page 8.

 1          Near the bottom there's a question:  Will developers be

 2     allowed to use both IAP and an external link within their app?

 3          Do you see that?

 4     **A.**  I do.

 5     **Q.**  And the answer says that:  In fact developers must

 6     continue to offer IAP.

 7          Right?

 8     **A.**  It does.

 9     **Q.**  And on the next page, there's a sentence that says:

10     Developers may not discourage end users from making in-app

11     purchases.

12          Do you see that?

13     **A.**  I do.

14     **Q.**  So one of the requirements is that in order to use this

15     link, the developer can't say things like use our website, we

16     have such better refund policies than Apple's IAP.

17          Right?  They can't say that?

18     **A.**  I don't know what is expressly prohibited, but it says

19     that you can't discourage end users from making in-app

20     purchases.

21     **Q.**  Okay.  So you don't know what the words mean other than

22     reading them?

23     **A.**  Just what they say.

24     **Q.**  Okay.  But you understand that while developers cannot

25     discourage end users from making in-app purchases, Apple can

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  discourage end users from actually following the external

2  link, right?

3  **A.** I don't know where that's written.

4  **Q.** It's not.  I'm asking you.

5      Do you understand that Apple can discourage end users from

6  following the external link?

7  **A.** No.

8  **Q.** You don't think that that's in any way what the

9  restrictions and the pop-up language that's telling people

10  it's dangerous is actually doing, is discouraging end users

11  from actually following through and clicking on the link?

12  **A.** I wasn't involved in the decision-making process or how

13  those decisions were arrived at.  So I cannot speak to what

14  their intentions were.

15  **Q.** I didn't ask what their intentions were.  I said Apple is

16  in fact discouraging users from following through the link by

17  imposing the restrictions and imposing the scary language that

18  tells people it's dangerous to actually proceed to click.

19      Right?

20  **A.** I can't speak to that.

21  **Q.** But you were speaking to this policy.  Right?

22  **A.** Well, I was using the statement of compliance to answer a

23  potential question that would be raised by the media.

24  **Q.** Okay.  So let's go on the bottom of page 9.  There's a

25  heading "Tough Q and A."

1    Do you see that?

2    **A.**   I do.

3    **Q.**   So this is where the part of the draft of document has the

4    hard questions, the difficult questions that Apple would face

5    from the press about its compliance program, right?

6    **A.**   That's correct.

7    **Q.**   So let's look at the first tough question on page 10.

8    (Exhibit published.)

9    **BY MS. MOSKOWITZ:**

10   **Q.**   It says, "I have to believe that cynics or antagonists of

11   the App Store are going to say this is really a ruse" -- I

12   think you meant ruse, or whoever drafted this, right, not

13   rouse -- rouse.  Excuse me.  Let me start over.

14       "I have to believe that cynics or antagonists of the

15   App Store are going to say this is really a ruse because

16   charging 27 percent versus 30 percent is not going to make

17   financial sense to developers.  Hence they are going to have

18   to continue using IAP.  Is that a fair accusation against

19   Apple?"

20       Do you see that?

21   **A.**   I see that.

22   **Q.**   So you and your team knew that it was going to be an issue

23   for developers that they might in fact not be financially able

24   to actually use the links, right?

25   **A.**   No.  What you see here is exactly the job of a PR

1  practitioner, which is to identify questions that might be

2  asked and figure out the best way to explain the -- to figure

3  out the best response to provide.

4  **Q.** Okay. But that question didn't just come out of nowhere,

5  right? There was a basis for thinking that question was going

6  to be posed, right?

7  **A.** Well --

8  **Q.** Yes or no?

9  **A.** Yes.

10 **Q.** The basis for that question being anticipated was that

11 there was a recognition that in fact there was going to be a

12 legitimate argument made that a 3 percent discount off of the

13 headline rate was not going to be financially viable for a

14 developer to actually take advantage of because they'd end up

15 paying more to go outside of IAP than just staying, right?

16 **A.** I can't speak to the business particulars, but we were

17 anticipating a question like this because Apple's commission

18 has often faced pushback from critics.

19 **Q.** But this is a specific pushback, right? That 3 percent

20 off of that rate, to go somewhere else and pay someone else to

21 process the payments was going to put a developer in a

22 position where they would end up paying more to actually go

23 outside of IAP, right?

24 **A.** I can't speak to that because I don't know the financials.

25 **Q.** You have no idea whatsoever about any of the basis for

 1  this question?

 2  **A.**  The basis for this question comes from the criticism we

 3  have often faced about charging a commission.

 4  **Q.**  You think that it's the same criticism you always get?

 5  Has nothing to do with the fact that payments cost more than

 6  3 percent for developers?

 7  **A.**  I can't speak to any of that.  I don't know the

 8  financials.

 9  **Q.**  Were you involved in any of the press about the

10  Netherlands compliance program?

11  **A.**  I was.

12  **Q.**  Did you see similar criticism there?

13  **A.**  I don't recall the criticism there.

14  **Q.**  The proposed -- let's go to page 10.

15                      (Exhibit published.)

16  **BY MS. MOSKOWITZ:**

17  **Q.**  There's another question:  How would you respond to the

18  allegation that these changes do not seem to comply with the

19  spirit of what YGR said in her ruling?

20      Do you see that?

21  **A.**  I do.

22  **Q.**  And your response -- your team's proposed response is,

23  "Let's be clear about what the Judge said."

24      Right?

25  **A.**  Yes.

1    **Q.**  And goes on to say that "She modified guidelines but

2    didn't provide replacement language."

3       Right?

4    **A.**  Correct.

5    **Q.**  And so the last bullet says that "She maintained your

6    ability to collect a commission and to use IAP."

7       Right?

8    **A.**  Yes.

9    **Q.**  "We have done exactly what she asked for."

10      Do you see that?

11   **A.**  I do.

12   **Q.**  So what this is communicating is that the injunction

13   didn't spell out the contours of exactly how Apple had to

14   comply with it, right?

15   **A.**  (Reviewing document.)

16      This is communicating that the injunction compliance

17   followed what was contained in the injunction itself.

18   **Q.**  Right.  So, so long as the injunction itself did not

19   expressly prohibit Apple from doing X, Y, or Z, Apple could

20   impose whatever restrictions and whatever commission it

21   wanted.  Right?

22   **A.**  I can only read what the third line says, which says that

23   she maintained our ability to collect a commission on our

24   intellectual property and use IAP and we have done exactly

25   what she asked for.

1   Q.   Well, we saw in the injunction she didn't say anything

2   about what you could do on commission for the linkouts, right?

3   A.   Right.

4   Q.   So what she said about commission on IAP and using IAP has

5   nothing to do with what you could do on linkouts, right?

6   A.   I wasn't a part of the decision-making on this.  I'm

7   simply -- simply worked with the teams to craft an answer to

8   this question.

9   Q.   Well, I'm trying to understand what you and your team

10  thought.  So you understood that the Court's order and opinion

11  spoke to what Apple could do in terms of IAP, right?

12      You have no understanding of that?

13  A.   That's not my role.  And I didn't have any role in

14  crafting the compliance plan for the injunction.

15  Q.   Well, let me just ask you.  Separate from any of it, do

16  you believe that if the Court said that Apple could charge a

17  commission on IAP, that that means that Apple could charge a

18  commission on external purchases made outside of IAP and

19  conducted on a developer's website?

20          MR. PERRY:   Objection, Your Honor.  Calls for a legal

21  conclusion.

22          THE COURT:   Well, it doesn't call for a legal

23  conclusion, but her opinion on this doesn't actually matter.

24          MS. MOSKOWITZ:   Okay.  Fair enough.

25  Q.   So let's go to one more document.  You testified before

1    the break about a set of messages that refreshed your

2    recollection about the June 28th meeting with Mr. Cook.

3       Do you remember that?

4    **A.** Yes.

5    **Q.** I think we found it so I'm going to show it to you.

6          **MS. MOSKOWITZ:** Your Honor, you have a hard copy that

7    we left for you.

8       May I approach the witness with it? It's in loose copy?

9          **THE COURT:** You may.

10         **MS. MOSKOWITZ:** Thank you.

11      Apologies for the handwritten stamping here. This is

12   CX540.

13   **Q.** Do you have that in front of you, Ms. Goldberg?

14   **A.** I do.

15   **Q.** And this is a series of text messages between you and your

16   communications colleagues on June 28th. Do you see that?

17   **A.** I do.

18   **Q.** Is this the document you're referring to?

19   **A.** Yes.

20   **Q.** Thank you.

21         **MS. MOSKOWITZ:** Your Honor, I move CX540 into

22   evidence.

23         **MR. PERRY:** No objection, Your Honor.

24         **THE COURT:** It's admitted.

25   / / /

```
 1              (Exhibit 540 received in evidence.)

 2    BY MS. MOSKOWITZ:

 3    Q.   So the messages start out with a text from you saying:  Is

 4    Tim in this meeting?

 5         Do you see that?

 6    A.   I do.

 7    Q.   And you get the answer yes, right?

 8    A.   I do.

 9    Q.   And there's a bunch of screenshots being shared.

10                      (Exhibit published.)

11    BY MS. MOSKOWITZ:

12    Q.   Are those screenshots that were sort of being discussed as

13    the meeting was unfolding?

14    A.   I believe so.

15    Q.   Okay.  And you see here there's the first slide is

16    placement and language.  And it's talking about some

17    restrictions that were being contemplated for those?

18    A.   Yes.

19    Q.   Right?

20                      Exhibit published.)

21    BY MS. MOSKOWITZ:

22    Q.   And there's some response -- there's a slide on the next

23    page on compliance options where it talks about option 1, no

24    commission, option 2 commission.

25         Do you see that?
```

GOLDBERG - DIRECT / MOSKOWITZ

1    **A.**   I do.

2    **Q.**   And we talked about that earlier.

3        Does this refresh your recollection that there were these

4    two options, no commission and commission, being presented?

5    **A.**   Yes.

6    **Q.**   And then there's also some language about restrictions on

7    what the linkout could say.

8        Do you see that on the bottom?

9    **A.**   I do.

10   **Q.**   And then on the third page, there's the pop-up warning

11   screen and the language that was being discussed there.

12       Do you see that?

13   **A.**   I do.

14   **Q.**   All right.  So if you keep going, couple pages back,

15   there's some discussion and some redactions.  There's -- let's

16   just pause on page 8.

17                        (Exhibit published.)

18   **BY MS. MOSKOWITZ:**

19   **Q.**   There's a reference to "I think what Eddy said is

20   important."  Do you see that?

21   **A.**   I do.

22   **Q.**   That's Eddy Cue?

23   **A.**   I believe so.

24   **Q.**   So he was at the meeting?

25   **A.**   I believe so.

1    **Q.**  Do you remember what he said that was so important?

2    **A.**  I do not.

3    **Q.**  Let's go to page 10 after some -- some more exchanges.

4    Mr. Sainz says:  There's no way she will allow a month.

5    Do you see that?

6    **A.**  I do.

7    **Q.**  Is that a reference to possibly asking this Court for a

8    delay in compliance?

9    **A.**  I don't know.

10   **Q.**  Okay.

11   He -- Mr. Ajemian, is that the right pronunciation?

12   **A.**  Ajemian.

13   **Q.**  Ajemian, thank you.

14   That's Peter A.?

15   **A.**  Um-hmm.

16   **Q.**  And he says:  Yes, but the rationale/defense.

17   Do you see that?

18   **A.**  I do.

19   **Q.**  And that's a reference to the rationale/defense for

20   Apple's approach to how it was going to comply with the

21   injunction, right?

22   **A.**  I don't recall specifically what he was referencing.

23   **Q.**  Well, Mr. Sainz says, "I think this is all very shaky to

24   me."

25   Right?

1    A.   Yes.

2    Q.   Meaning the rationale defense is all very shaky to him,

3    right?

4    A.   That's what it says here.

5    Q.   And you write back, "Both the rate and the time frame."

6         Do you see that?

7    A.   I do.

8    Q.   You were agreeing that the rationale and defense for the

9    commission rate and the time period, the seven days, was

10   shaky, right?

11   A.   It seems that way at the time, yes.

12   Q.   And the time being the meeting with Tim Cook on June 28th,

13   2023?

14   A.   Yes.  It seemed that there were a number of options still

15   being discussed at that time.

16   Q.   And you thought that the one that said 27 percent and

17   seven days was -- the defense of that seemed shaky?

18   A.   I don't know what I was referring to, what set of

19   specifications I was referring to.

20   Q.   Well, can we agree that it was somewhere between

21   20 percent and 27 percent for the commission rate, right?

22   A.   (Reviewing document.)

23        I -- I truly don't remember.

24   Q.   Do you remember there being anything higher than

25   27 percent ever discussed?

1    **A.**    I don't remember.

2    **Q.**    Okay.  So you have no idea what was being discussed at all

3    that you were discussing the rationale or defense for?

4    **A.**    That's correct.  I don't recall.

5    **Q.**    If the only numbers that we've seen in any of the

6    materials are between 20 and 27 percent as anything being

7    actually being contemplated, you would not have any reason to

8    doubt that, right?

9    **A.**    No.

10            **THE COURT:**  No, you don't?  Or are you agreeing with

11   her?

12            **THE WITNESS:**  I -- are -- can you say -- can you

13   repeat the statement?

14   **BY MS. MOSKOWITZ:**

15   **Q.**    Sure.  If the only numbers that we've seen under any

16   serious discussion were 20 percent at the bottom and 27 at the

17   top, would you have any reason to doubt that that is the range

18   that was being contemplated at the time?

19   **A.**    I -- I just can't speak to it because it's -- I wasn't

20   part of any of those discussions and the decision-making on --

21   on the rates.

22   **Q.**    Well, but you were.  You were at the June 28th meeting,

23   right, with Mr. Cook?

24   **A.**    This is an isolated incidence, yes.

25   **Q.**    Well, we looked at the notes earlier from June 26th where

1    20 to 23 percent was discussed, and then Luca Maestri said 27,

2    right?

3    **A.**   Yes.

4    **Q.**   Okay.  So you at least agree that as of June 26th, that

5    20 to 23 percent was on the bottom and 27 was being pushed by

6    the CFO?

7    **A.**   I will agree that, yes, I've seen 20, I've seen 23, I've

8    seen 27, yes.

9    **Q.**   Have you seen any other numbers?

10   **A.**   Not to my recollection, no.

11   **Q.**   Okay.  So is the rationale or defense that you are saying

12   or agreeing were shaky as to the rate is at least in the band

13   of 20 to 27 percent.

14   **A.**   That sounds right.

15            **MS. MOSKOWITZ:**  No -- pass the witness, Your Honor.

16            **THE COURT:**  Well, and in fact that's what the next

17   page shows.

18            **MS. MOSKOWITZ:**  Oh, thank you.

19            **THE COURT:**  Right?  It says the commission rates

20   they're debating are 20 to 27 percent, correct?

21            **THE WITNESS:**  Correct.

22            **THE COURT:**  So there is nothing else that would be

23   shaky other than the 20 or 27 percent, correct?

24            **THE WITNESS:**  Correct.

25            **MS. MOSKOWITZ:**  Thank you for the help, Your Honor.

1    I pass the witness.

2            THE COURT:  Mr. Perry.

3            MR. PERRY:  May I approach the witness, Your Honor?

4            THE COURT:  You may.

5            MR. PERRY:  (Handing document.)

6                    (Pause in the proceedings.)

7            THE COURT:  I'm sorry, Mr. Perry, whenever you're

8    ready.

9            MR. PERRY:  Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11   BY MR. PERRY:

12   Q.  Good afternoon, Ms. Goldberg.

13   A.  Good afternoon.

14   Q.  Rewind the tape a little bit.  How did you get to Apple?

15   Where did you go to college, and what did you do after that?

16   A.  In went to school at Miami University in Ohio.

17   Q.  And what's your degree in?

18   A.  I have a degree in journalism and political science.

19   Q.  And what did you do after graduating?

20   A.  After graduating I moved to Washington, and I worked in

21   the United States Senate as a press secretary for a number of

22   members and senators.  And then moved to the Obama

23   administration and served as the head of communications for

24   the Secretary of Commerce.

25   Q.  And after your government experience, Ms. Goldberg, what

1    came next?

2    **A.**    I went to Visa where I served as senior director of public

3    affairs.

4    **Q.**    And how long did you do that?

5    **A.**    About almost four years.

6    **Q.**    Okay.  And what -- after Visa, what next?

7    **A.**    Then I came to Apple.

8    **Q.**    And when did you start at Apple, Ms. Goldberg?

9    **A.**    October of 2020.

10                    (Discussion off the record.)

11                **MR. PERRY:**  Is that better?

12    **Q.**    Ms. Goldberg, you mentioned at the outset you're a

13    director of corporate communications at Apple; is that

14    correct?

15    **A.**    That's correct.

16    **Q.**    Can you explain just in general what the communications

17    department does at Apple?

18    **A.**    Sure.  In broad strokes, we are responsible for providing

19    strategic counsel on issues facing the company and how they'll

20    play out in public, in the public and in the press.

21        We work a lot on messaging.  Work a lot on -- we work a

22    lot with internal stakeholders, of course.  And we also are

23    keen observers of the news climate.  We are constantly

24    watching for how media are reporting on issues of interest to

25    the company.  And we are always digesting that information,

```
 1    analyzing it, and making sure we're able to present it
 2    accurately to executives.
 3    Q.  Now, in one of your answers to Ms. Moskowitz, you drew a
 4    distinction between communications people and business people.
 5    Do you recall that?
 6    A.  I do.
 7    Q.  And she didn't want you to talk about that.
 8        Could you explain a little bit what you meant by that?
 9    A.  Yeah.  As communications people, we're responsible for
10    communicating the decisions made by the business, but we
11    aren't responsible for making any decisions related to the
12    business.
13    Q.  What does that mean?  I'm -- what distinction are you
14    drawing there?
15    A.  Well, as it relates to this case, while we were
16    responsible for communicating what the terms of the injunction
17    compliance program were, we were not responsible in any form
18    or fashion for making any decisions related to the injunction
19    compliance program.
20    Q.  Now, who is "we" when you refer to that?
21    A.  By "we," I mean myself and my communications colleagues.
22    Q.  And in respect to this case, who are those folks?
23    A.  Names Fred and Hannah and Peter, among others.
24    Q.  Fred Sainz and Hannah Smith and Peter Ajemian.
25    A.  Correct.
```

1  Q.  And we saw them in some of the --

2  A.  That's right.

3          THE COURT:  Mr. Perry, try to speak up a little,

4  please.

5          MR. PERRY:  I apologize, Your Honor.

6  Q.  Within the communications team, Ms. Goldberg, do you have

7  a particular area of focus?

8  A.  I do.

9  Q.  And what is that?

10  A.  I focus on antitrust and competition issues facing the

11  company.

12  Q.  And in that capacity, do you ever have occasion to work

13  with lawyers?

14  A.  Consistently.

15  Q.  Why is that?

16  A.  Because the lion's share of my work relates to ongoing

17  litigation and regulation and legislation.  And so in almost

18  every instance, whatever messages we are delivering to media

19  or whatever interactions we are having with them requires the

20  expertise of a lawyer.

21  Q.  Now, Ms. Goldberg, let's switch to or move to the

22  injunction compliance efforts.

23      Could you describe -- I know you did in response to Her

24  Honor's question, but just at a high level, your role, your

25  particular role with respect to Apple's injunction compliance

1    program?

2    **A.**   Certainly.

3        My role was to, you know, follow along to the extent that

4    I could on developments that were taking place.  But

5    ultimately it came down to receiving the final materials, the

6    statement of compliance, the entitlement program itself, and

7    the Fischer declaration.

8        And once those final materials were in hand, we were able

9    to, as you saw, craft a question-and-answer document that

10   would guide our interactions with the press.  As you saw, the

11   answers were derived directly from the legal documentation.

12       And so we were instrumental in putting that together.  By

13   "we," I mean me and my communications colleagues.

14       We also, as you heard, conducted a set of briefings for

15   reporters to ensure that they understood the specifics of the

16   program.  And the reason for that is because it's technical,

17   includes a lot of legal language, and we wanted to make sure

18   that they understood it and could report it accurately.

19   **Q.**   And in your area of focus, Ms. Goldberg, is it unusual to

20   draw from legal filings or legal materials to prepare your

21   press materials?

22   **A.**   No.  We do that often.

23   **Q.**   And why is that?

24   **A.**   Because legal materials are an on-the-record source and

25   they contain factual, accurate, and useful information.

1    **Q.**  And was this particular circumstance -- you mentioned you

2    drew this from the statement of compliance.  Was that the

3    first time you had drawn from legal materials to --

4    **A.**  No.

5    **Q.**  I apologize.

6    **A.**  No.  Sorry.

7    **Q.**  Of course.

8        So that's a little bit on what you did do.  Let's talk

9    what you didn't do, Ms. Goldberg.

10       First of all, did you have any role in deciding how to

11   comply with the injunction?

12   **A.**  No.

13   **Q.**  Did anyone ever ask you how to comply with the injunction?

14   **A.**  No.

15   **Q.**  Did anyone ever ask you whether the plan Apple developed

16   did comply with the injunction?

17   **A.**  No.

18   **Q.**  Did you have any role in designing or establishing any of

19   the technical requirements for the link entitlement?

20   **A.**  No.

21   **Q.**  Did you have any role in designing the URL

22   characteristics, for example?

23   **A.**  No.

24   **Q.**  Did you have any role in or input into the format or

25   placement of links or buttons or calls to action?

GOLDBERG - CROSS / PERRY

1    **A.** No.

2    **Q.** Did you have any role or input into the system disclosure

3    sheet?

4    **A.** No.

5    **Q.** Did you have any role or input into the placement of

6    links?

7    **A.** No.

8    **Q.** Did you have any role in deciding whether to charge a

9    commission?

10   **A.** No.

11   **Q.** Did you have any role in establishing the commission rate?

12   **A.** No.

13   **Q.** Did you have any role in establishing the commission

14   window?

15   **A.** No.

16   **Q.** Did you have any input, not role, but input, did anybody

17   ask your opinion on any of those issues?

18   **A.** No.

19   **Q.** Did you have any involvement, Ms. Goldberg, whatsoever in

20   the decision-making for how Apple would comply with the

21   injunction?

22   **A.** No.

23   **Q.** I think this is probably obvious, but were on the price

24   committee for the U.S. link entitlement?

25   **A.** No.

1    **Q.**  Did you attend the price committee meeting?

2    **A.**  No.

3    **Q.**  And even if nobody asked for your opinion, did you make

4    any recommendations regarding Apple's injunction compliance

5    plan?

6    **A.**  I did not.

7    **Q.**  As to requirements for the links or other technical

8    requirements?

9    **A.**  No.

10   **Q.**  And how about did you make any recommendations regarding

11   the commission or the rate or the window?

12   **A.**  I did not.

13   **Q.**  Okay.  Switching gears, Ms. Goldberg.

14       Ms. Moskowitz showed you a press briefing deck.  It was

15   CX579 in your -- in the binder that Epic gave you.

16       Do you recall that?

17   **A.**  Yes.

18   **Q.**  Can you explain what a press briefing is for anyone who

19   has not been to one?

20   **A.**  Sure.  In a press briefing, we often put together a visual

21   presentation accompanied by what we call a talk track which is

22   designed to explain a certain issue that is of interest to the

23   media.  It could be an announcement.  It could be a policy

24   change.  But we conduct briefings like that regularly.

25   **Q.**  And do you recall the Epic injunction compliance press

GOLDBERG – CROSS / PERRY

1    briefing?

2    **A.**  I do.

3    **Q.**  And what role did you personally play in that briefing?

4    **A.**  I opened the call.  I closed the call.  And I was

5    instrumental in developing materials for the call.

6    **Q.**  Did you explain to the reporters or the participants in

7    the call how the U.S. link entitlement works?

8    **A.**  No.

9    **Q.**  Did you explain the rationales or justification for the

10   U.S. link entitlement?

11   **A.**  I did not.

12   **Q.**  Did anyone do that?

13   **A.**  Yes.  A lawyer and a business person.

14   **Q.**  Why did a lawyer and a business person make that

15   presentation rather than you, the communications person?

16   **A.**  Because I don't have the expertise to explain the details

17   of such a program in granularity.

18   **Q.**  Ms. Moskowitz pointed out that the metadata shows that the

19   January press briefing deck has a July 2023 title.

20       Do you recall that?

21   **A.**  I do.

22   **Q.**  Do you have any idea why that is?

23   **A.**  I -- I probably used the original draft as a basis for an

24   updated press -- an updated press deck.

25   **Q.**  And is that common in your work as a communications

1    director at Apple?

2    **A.**   Yes.

3    **Q.**   Why is that?

4    **A.**   Well, we oftentimes, you know, use materials that have

5    already been developed and vetted to the best -- to the extent

6    that we can.  And a lot of work had already been done in July

7    to get us as far down the path as we could get and it was a

8    good foundation upon which to build.

9    **Q.**   Do you recall whether you just used the same deck or did

10   you update the deck in January?

11   **A.**   I -- I don't recall.

12   **Q.**   Now, you used the word "vetted."

13   **A.**   Uh-huh.

14   **Q.**   Can you explain for that press deck, for example, what is

15   the vetting process like, at a high level of generality?

16   **A.**   At a high level of generality, we as communicators don't

17   invent language and simply present it to the press.  We work

18   with our business partners and our legal partners to ensure

19   that what we are representing to the press is accurate and

20   correct.

21   **Q.**   And let's break that into two pieces.  When you say you

22   work with your business partners to make sure that what you're

23   presenting is accurate before presenting it to the press, how

24   do you do that on the business side?

25   **A.**   Oftentimes that would mean that we would share a draft

1    with -- with our business partners and receive their input,

2    their edits, and their -- any strategic guidance they may want

3    to offer.

4    Q.   And if we go to the legal side you also mentioned, how

5    would you ensure on the legal side that the materials are as

6    you described?

7    A.   The same thing.  We would share with them a draft and make

8    sure that what we had put on the paper was accurate, that it

9    didn't require any edits, and that it was consistent with

10   whatever -- with the legal perspective.

11   Q.   In your capacity as a communications director at Apple,

12   have you ever had occasion to ask for legal advice from the

13   legal team?

14   A.   Daily.

15   Q.   Now, you mentioned the press briefing.  And Ms. Moskowitz

16   also addressed with you the Q and A document.

17        Do you recall that?

18   A.   Yes.

19   Q.   Can you just explain what a Q and A is for?  What is -- at

20   Apple what is the purpose of a document like that?

21   A.   Well, the purpose of a document like a Q and A is to serve

22   as a vehicle to quickly and accurately respond to media on

23   questions they may have about a particular program or

24   announcement.

25        We prepare them so that we aren't flat-footed when media

1    come to us with questions.

2    Q.   And do you typically give written or oral responses or

3    both when media come?

4    A.   Both.

5    Q.   How does a Q and A relate, if at all, to the vetting

6    process you just described?

7    A.   All language in a Q and A that was going to be used with

8    media would most certainly be approved or edited by both the

9    business side and the legal side.

10   Q.   Now, in addition to communicating with reporters through

11   press statements or Q and A's, is there another part of your

12   job as a communications director at Apple as it may relate to

13   legal proceedings?

14   A.   We also monitor legal proceedings and the press coverage

15   that emanates from them.

16   Q.   Why do you do that?

17   A.   To present an accurate picture to executives of how things

18   are playing out in the press, both from -- in a positive way

19   and also what criticisms we may be facing.

20   Q.   Ms. Goldberg, if you could look in your binder, the one

21   that I gave you, there's a document marked CX1504.

22   A.   (Reviewing document.)

23        Yes.

24   Q.   Can you explain what this document is?

25   A.   This is what we call a press coverage report, essentially

1  on a certain topic, and this one is coverage of the launch of

2  our injunction compliance plan.

3      We have surveyed the news coverage that has published,

4  inclusive of social media, and put together an analysis of

5  sort of the themes that we're seeing emerge in the press.

6  **Q.**  And this is dated January 17th, 2024?

7  **A.**  Yes.

8  **Q.**  And were you -- did you have any responsibility in

9  compiling this information?

10 **A.**  Yes.

11         **MR. PERRY:**  Your Honor, we move the admission of

12 CX1504.

13         **THE COURT:**  Any objection?

14         **MS. MOSKOWITZ:**  Not really.  Technically there's a

15 bunch of hearsay within it.  But with that limitation, for its

16 contents, not for the truth.  And no objection.

17         **THE COURT:**  Okay.  So for what purpose is it being

18 offered?

19         **MR. PERRY:**  Your Honor, it's an -- it's an ordinary

20 business record establishing what Ms. Goldberg does in her

21 day-to-day job for monitoring this case and reporting up to

22 the executives what is being said about Apple in the -- in the

23 public.

24         **THE COURT:**  Okay.  So you're not offering it for its

25 truth, it's --

1        **MR. PERRY:**  That's correct, Your Honor.

2        **THE COURT:**  -- hearsay.

3        **MR. PERRY:**  Well, it's a state of mind at Apple, for

4   one thing.  But the first page is Ms. --

5        Well, let me ask a different question, Your Honor.  One

6   more question, if I may.

7        **THE COURT:**  Go ahead.

8   **BY MR. PERRY:**

9   **Q.**  Ms. Goldberg, at the bottom of the first page, the first

10  paragraph that begins "In contrast," do you see that?

11  **A.**  I do.

12  **Q.**  Who wrote that?

13  **A.**  Likely myself or a colleague in PR department.

14  **Q.**  And are those summary paragraphs like that -- and they

15  continue on the next page -- part of your regular job at

16  Apple?

17  **A.**  They are.

18  **Q.**  And what is the purpose of that?

19  **A.**  To provide a thoughtful analysis so that executives have a

20  sense of how things are playing writ large, rather than

21  sending up individual news items that don't provide a holistic

22  fiction.

23  **Q.**  And how often do you personally prepare coverage reports

24  in a format similar to this document?

25  **A.**  Multiple time a week.

1  Q.  And are they maintained by Apple in the ordinary course of

2  business?

3  A.  They are.

4  Q.  And are they transmitted to the executives in the ordinary

5  course of business?

6  A.  Yes.

7           MR. PERRY:  Your Honor, we renew our request to admit

8  CX1504 for those purposes?

9           THE COURT:  I'll admit it for the limited purpose.

10           MR. PERRY:  Thank you, Your Honor.

11           (Exhibit 1504 received in evidence.)

12  BY MR. PERRY:

13  Q.  Ms. Goldberg, could you turn in your binder to the next

14  document, CX1505?

15  A.  Yes.

16  Q.  And what is that?

17  A.  This is another coverage report.

18  Q.  And what's this one about, can you tell?

19  A.  Yes.  This coverage report is about the news that Epic had

20  filed with the Court accusing Apple of failing to comply with

21  the anti-steering injunction.

22  Q.  And is this another document that you prepared or were

23  involved in preparing?

24  A.  Yes.

25           MR. PERRY:  Your Honor, we'd move the admission of

 1    this document for the same purpose.

 2              **MS. MOSKOWITZ:**  No objection as to that purpose, Your

 3    Honor.

 4              **THE COURT:**  All right.  Admitted for a limited

 5    purpose.

 6              **MR. PERRY:**  Thank you, Your Honor.

 7              (Exhibit 1505 received in evidence.)

 8    **BY MR. PERRY:**

 9    **Q.**  And then, Ms. Goldberg, two quick documents.

10       Ms. Moskowitz asked you some questions about the hearing

11    dates on which Mr. Fischer and Mr. Roman testified.

12       Do you recall that?

13    **A.**  I do.

14    **Q.**  And do you recall the dates?

15    **A.**  I believe May 8th and May 10th.

16    **Q.**  Thank you.

17       If we could turn in your binder to CX1506.

18    **A.**  (Reviewing document.)

19    **Q.**  What is this document?

20    **A.**  This is a coverage report following the May 8th hearing

21    date.

22    **Q.**  Now this one's a little -- has some different people.  Can

23    you explain what this one is?

24    **A.**  Yes.  Sometimes we work with an agency who helps us

25    collate articles, format them, and get them into a draft form

 1   for us to work from.

 2   Q.   And are the materials received from the agency regularly

 3   received and used by Apple in the ordinary course of business?

 4   A.   Yes.

 5           MR. PERRY:   Your Honor, we move the admission of

 6   CX1506 for the same purpose.

 7           MS. MOSKOWITZ:   No objection as to the limited

 8   purpose, Your Honor.

 9           THE COURT:   Admitted for a limited purpose.

10           (Exhibit 1506 received in evidence.)

11   BY MR. PERRY:

12   Q.   And finally, Ms. Goldberg, can you turn to CX1507?

13   A.   Yes.

14   Q.   And what is that?

15   A.   It is a coverage report following the May 10th hearing.

16   Q.   And is that similar to one we just looked at?

17   A.   It is.

18           MR. PERRY:   Your Honor, we move that document for the

19   same purpose.

20           MS. MOSKOWITZ:   No objection as to that purpose.

21           THE COURT:   Admitted for a limit purpose.

22           (Exhibit 1507 received in evidence.)

23           MR. PERRY:   Thank you, Your Honor.

24   Q.   Ms. Goldberg, you were asked a number of questions today

25   about how the injunction works, how the entitlement plan works

1    and so forth.  And you referred to the business a number of

2    times.

3        Can you just explain a little bit whether you do

4    understand these things and who -- who is responsible for it?

5    **A.**  Yes.  While I do have understanding of the -- the

6    different programs mentioned, I'm not an expert in any of

7    them.  So we rely on our business partners to be our

8    spokespeople, for example, when we talk to the press.

9        And we rely on the public documentation a great deal

10   because the public documentation is sort of the source of

11   truth.

12   **Q.**  And just final question.  To reiterate, what

13   responsibility did you personally have --

14           **THE COURT:**  I don't understand that.  Public

15   documentation is a source of truth?  What does that mean?

16           **THE WITNESS:**  In a -- I probably should phrase it

17   better.  In other words, in this case, the statement of

18   compliance contained all of the necessary information about

19   the compliance program.  And so it would be a very useful

20   resource for anyone, including reporters, who wanted to learn

21   about the injunction compliance program, Your Honor.

22   **BY MR. PERRY:**

23   **Q.**  Ms. Goldberg, is "source of truth" a term that PR

24   professionals use?

25   **A.**  It is.

1   Q.  Can you explain, not with respect to this document, but in

2   general what is a, quote, source of truth in your professional

3   capacity?

4   A.  I probably should have said document of record.

5   Q.  And what does that mean?

6   A.  It means it is the official document that catalogs soup to

7   nuts this is what the program is, this is the justification,

8   et cetera, whatever, whatever it all contains.  That would

9   contain all of the appropriate factual, specific, accurate

10  information.

11          THE COURT:  So --

12               (Simultaneous colloquy.)

13          THE COURT:  -- if it lacked information, then by

14  definition, if it was -- if it was lacking information, or

15  misrepresenting information, that too would be an admission as

16  to the company.  That's what you're telling me.

17          THE WITNESS:  I'm not sure I understand, Your Honor.

18          THE COURT:  Well, if it affirmatively -- it can't be

19  used as a, what we call a sword and a shield.  That is, you

20  can't say on the one hand that it is the best statement of

21  truth for the company without understanding that if it is

22  lacking and misleading, it is also an admission of a

23  misrepresentation by its omission.

24          THE WITNESS:  I -- I can only say that in my

25  function, we use the statement of compliance as the document

 1    of record to describe the injunction compliance program.

 2            THE COURT:  So that is the document.  That is -- so

 3    if you -- if that document omits or misleads, that's the

 4    critical document.  Right.

 5            THE WITNESS:  That is the document we used, Your

 6    Honor.

 7    BY MR. PERRY:

 8    Q.   And by "we" there, Ms. Goldberg, who are you referring to?

 9    A.   The communications team.

10    Q.   And to reiterate, what role, if any, did the

11    communications team or you personally have in developing or

12    implementing Apple's injunction compliance plan?

13    A.   None.

14    Q.   Thank you, Ms. Goldberg.

15            MR. PERRY:  No further questions, Your Honor.

16            THE COURT:  Any reexam?

17            MS. MOSKOWITZ:  I have nothing further, Your Honor.

18            THE COURT:  You may step down.  You're excused.

19        Anything else?

20            MR. BORNSTEIN:  Yes, Your Honor.  Epic recalls

21    Mr. Schiller to the stand.

22            THE COURT:  All right.  Come on back, Mr. Schiller.

23            MR. BORNSTEIN:  And Your Honor should have a binder

24    that we provided to the Court during the break.

25        It's not the same binder we used with Mr. Schiller

 1    previously, but there is some overlap, but we thought it would

 2    be helpful to have it all in one place, both for you.

 3        And if Ms. Rothschild could approach, we'll give one to

 4    Mr. Schiller as well.

 5            **THE COURT:**  You may.

 6            **MR. BORNSTEIN:**  May I proceed, Your Honor?

 7            **THE COURT:**  You may.

 8            **MR. BORNSTEIN:**  Thank you.

 9

10                    **PHILIP SCHILLER,**

11    recalled as a witness for the PLAINTIFF, having been

12    previously duly sworn, testified as follows:

13            **FURTHER DIRECT EXAMINATION (Resumed)**

14    BY MR. BORNSTEIN:

15    **Q.**  All right.  Mr. Schiller, good afternoon.

16    **A.**  Good afternoon.

17    **Q.**  On Monday, I asked you a few questions about in-app text

18    communications that are not accompanied by a link.  Do you

19    recall that subject?

20    **A.**  Yes.

21    **Q.**  And just to level set, under the purchase link entitlement

22    program that Apple has launched, Apple requires any developer

23    that wants to tell users that they can make purchases

24    elsewhere, that they have to include a link in the app that

25    will take the user to the developer's website, right?

1    **A.**  Correct.

2    **Q.**  It's not permitted currently to just have a simple in-app

3    text communication that is not accompanied by a link, correct?

4    **A.**  Correct.

5    **Q.**  And as we've discussed at some length, and I won't go

6    through in detail again, but there are a variety of rules on

7    how that link may appear and where in the app it may appear,

8    correct?

9    **A.**  Yes.

10   **Q.**  For example, the link must show the URL of the developer's

11   website, right?

12   **A.**  Yes.

13   **Q.**  And the developer has to use what Apple calls a plain

14   button style, correct?

15   **A.**  Correct.

16   **Q.**  And that means that the link can't be inside a shape of

17   some kind like a rectangle or a -- or an oval with a

18   contrasting color, correct?

19   **A.**  Correct.

20   **Q.**  It needs to have background color around the text that is

21   the same as the rest of the background on the app's page,

22   right?

23   **A.**  Yes.

24   **Q.**  And there also -- we talked about this a little bit.

25   There also needs to be right next to the URL a little icon

1   that I think you called the linkout icon, right?

2   **A.**  Yes.

3   **Q.**  And that looks kind of like a square with an arrow coming

4   off to the side diagonally and generally upward, correct?

5   **A.**  Yes.

6   **Q.**  All right.

7       And that -- that's the linkout icon you explained in

8   testimony to Mr. Perry that you drew at one point and shared

9   with the team, correct?

10  **A.**  Yes.

11  **Q.**  And just to clarify some testimony you gave to Mr. Perry,

12  that linkout icon, that's not what Apple calls "the button,"

13  correct?

14  **A.**  I'm not sure if we refer to it specifically anywhere as

15  that.  The definition of the entire string, the text, the call

16  to action in that icon is in effect all a button 'cause it can

17  be clicked on and it will take an action.  So in effect the

18  plain text button is all of that.

19      Some may look at that icon 'cause it can be clicked on as

20  well as, quote, a button, and it wouldn't be wrong.  It

21  depends how you want to describe it.

22  **Q.**  Well, Apple has what it calls human interface guidelines

23  that it shares with developers that has a description of what

24  buttons are, correct?

25  **A.**  I believe so.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1    Q.   Okay.  And so in Apple terminology, and I think you were

2    saying this, I think we agree -- the button is that whole

3    thing.  It's the URL and that little linkout icon together

4    constitute the plain button that developers are required to

5    use if they want to participate in this program; is that fair?

6    A.   I believe so.

7    Q.   Okay.  Now, turning back to the in-app text communications

8    without a link, you've explained now multiple times that Apple

9    didn't consider the possibility that developers might want to

10   have a call to action without a link, correct?

11   A.   That's my recollection.

12   Q.   Okay.  All right.  That possibility just did not cross the

13   mind of the team working on this project, right?

14   A.   Not that I recall.

15   Q.   Okay.  And -- and I asked you on Monday whether it

16   occurred to you and to Apple whether developers might want to

17   have text communications without a link because there would

18   then be no commission associated with purchases that the

19   developer managed to -- to get from users as a result of users

20   having reviewed that message and then acted on it by going to

21   the website, correct?

22   A.   I don't recall if that's the exact question, but we did

23   speak about that.

24   Q.   All right.  And you testified Apple didn't discuss that

25   internally, Apple didn't consider or think about that option,

1    right?

2    **A.**  Not that I recall hearing.

3    **Q.**  Okay.  But you agree some developers may very well want to

4    have that option to tell their users about alternative

5    purchasing options in text without a link if they can do so

6    without paying a commission to Apple, right?

7    **A.**  Yes.

8    **Q.**  And in fact that's not just speculation on your part.

9    Right?

10   **A.**  I'm not sure what you mean.

11   **Q.**  Well, I mean it's obvious, Mr. Schiller, that if a

12   developer can have a textual, truthful statement in its app

13   that its users can go make purchases on the website without

14   paying a commission, at least some developers will find that

15   to be attractive, correct?

16   **A.**  Yes, I believe some would.

17   **Q.**  Okay.  And it's more than that, sir.  Contrary to the

18   testimony you have given now three times, Apple did in fact

19   consider the possibility of giving developers this choice,

20   correct?

21   **A.**  I don't recall that.

22   **Q.**  All right.

23       So you -- you were here and you heard there's some

24   discussion about this June 1 deck, correct?

25   **A.**  Yes.

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1    **Q.**  All right.

2         And this is a document that you understand was withheld

3    from us by your counsel as privileged, correct?

4    **A.**  I do not know.

5    **Q.**  Well, you heard some of the discussion, didn't you, that

6    we received this document only recently because the Court

7    ordered it to be produced, correct?

8    **A.**  Again, I heard some discussion about it.  I didn't pay

9    attention to the who ordered what and -- and all of that part

10   of it because that didn't pertain to me.

11   **Q.**  Okay.  So you don't remember, though, or you didn't

12   understand that your counsel withheld this document and that

13   there were other versions of the document that Apple intended

14   to produce to Epic in a redacted form, and then changed its

15   mind and withheld all three versions of the document as fully

16   privileged and even took that to the Magistrate Judge.  That's

17   not something anybody made you aware of?

18   **A.**  No.

19   **Q.**  Okay.  But you know we now finally have the document,

20   correct?

21   **A.**  I believe so.

22   **Q.**  All right.  Well, it's -- it's in your binder.  That won't

23   surprise you.  If you could look, please, at CX859, please.

24   **A.**  (Reviewing document.)

25        I'm open to that document.

1   **Q.** Okay.  And I ask you, first of all, does the version you

2   have, have the kind of dot numbers where it says 859 dot

3   something?

4   **A.** Yes.

5   **Q.** Okay.  Just to make sure we're on the same page, when I

6   refer you to pages in here, I'm going to use those dot

7   numbers, but I'm also going to use the long string of Bates

8   numbers only because we've had both things talked about and I

9   want to make sure the record is clear about which pages are

10  being referred to.

11      So I just wanted to give you that kind of preliminary.

12  Okay?

13  **A.** Okay.  Thank you.

14  **Q.** All right.  So I'll start by asking you to look at the

15  page that's at .52.  And that is also the page that ends

16  with 571.

17                    (Exhibit published.)

18          **THE WITNESS:**  (Reviewing document.)

19      I am on that page.

20  BY MR. BORNSTEIN:

21  **Q.** Okay.  And -- and this -- this document, it was a

22  presentation that was prepared for a meeting that you had on

23  June 1st with Mr. Cook and others.  Correct?

24  **A.** That's what I'm told.  Again, I only recall we had some

25  meetings around that time of year.  I don't remember which one

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1    was on specifically which date.

2    **Q.**   Okay.  Well, we saw when you were here on Monday, sir, a

3    meeting invite, it's Exhibit 485, that showed a meeting that

4    you and Mr. Cook and others attended at -- in the afternoon on

5    that day, I'll just represent to you.

6         Do you have any reason to disagree that we saw that on

7    Monday?

8    **A.**   No, no reason at all.

9    **Q.**   Okay.  So let's look at this slide which is .52 or 571.

10   And it's entitled on the top "Option Three Proposed Placement

11   Policy."

12        Do you see that?

13   **A.**   I see that.

14   **Q.**   Okay.  And the subheading is "Commission on linking out

15   plus zero percent commission on in-app text communications."

16        Do you see that subheading there?

17   **A.**   I see that.

18   **Q.**   Okay.  And these in-app text communications, that's

19   exactly what we've been talking about.  These are

20   communications that developers can have in text without a

21   commission, correct?

22   **A.**   (Reviewing document.)

23        I'm not sure that that's what that means.

24   **Q.**   All right.  I'll -- I'll see if I can help you in just a

25   second.  Before we move off this slide, though, I do want to

1    look at one thing in the speaker notes at the bottom which you

2    see are attributed to someone named Shawn.  That's Shawn

3    Cameron, correct?

4    **A.**  Yes.

5    **Q.**  Mr. Cameron is a lawyer at Apple?

6    **A.**  Yes.

7    **Q.**  And you may remember we had some discussion on Monday

8    about these two options that were being considered at various

9    points in May and June at Apple of charging a commission and

10   having less restrictive rules on placement and format of the

11   link versus not charging a commission and having more

12   restrictive rules on where the link could be and what it could

13   look like.

14       Do you recall that?

15   **A.**  I do.

16   **Q.**  And you testified you didn't remember them being discussed

17   as a set.  You remember both issues being discussed but not

18   being yoked or linked together in that way.  Correct?

19   **A.**  That's right.

20   **Q.**  All right.  Now look at the bottom of the line of the

21   speaker notes from Mr. Cameron.  They read, "Since we are

22   charging a commission, the link could be placed once per page

23   including alongside IAP."

24       Do you see that?

25   **A.**  I do.

1    **Q.**  Can we agree that at least as the speaker notes for this

2    deck with Mr. Cook reflect, people at Apple were linking

3    together the charging of a commission and the placement and

4    format of the link?

5    **A.**  Well, I agree that the speaker note implies that

6    connection.  I'm not sure that was said in the meeting.

7    **Q.**  You just don't recall it, but you've seen this speaker

8    note and you've seen lots of testimony over the course of the

9    past three days about what people have called this trade-off,

10   correct?

11   **A.**  Yes.

12   **Q.**  And you just don't recall it yourself.

13   **A.**  I recall specifically discussions about the commission

14   level and discussions about the features around implementation

15   of linking out.  And so I do remember those both being

16   discussed.  I don't remember them being discussed linked.

17   **Q.**  Okay.  So you see that here on the page, that they are

18   linked and you've heard other people talk about them linked,

19   and we've seen other documents that show the link.  You just

20   don't personally remember them specifically being linked,

21   correct?

22   **A.**  Correct, yes.

23   **Q.**  Okay.  So let me now go and see if I can help you on the

24   meaning of this phrase.

25        If you could turn to the slide that is .54, which is

 1    also Bates ending 573.

 2                        (Exhibit published.)

 3    **BY MR. BORNSTEIN:**

 4    **Q.**   Do you see that?

 5    **A.**   I am on that page, yes.

 6    **Q.**   Great.

 7         And this one is titled "Option 3 U.S. Revenue Impact," and

 8    it has the same subheading, "Commission on linking out plus

 9    zero percent commission on in-app text communications."

10         Correct?

11    **A.**   Yes.

12    **Q.**   All right.

13         And this one too has speaker notes, and these are

14    attributed to Nate, which is Mr. Barton from the finance

15    function, correct?

16    **A.**   Yes.

17    **Q.**   All right.  And Mr. Barton, in these speaker notes, first

18    says that the table on the left on the slide is the same as

19    option 2.

20         Do you see that?

21    **A.**   Yes.

22    **Q.**   Okay.  And option 2, this is the option in which Apple was

23    charging a commission, correct?

24    **A.**   Yes.

25    **Q.**   And it says commission on linking out.  And there are some

 1    financial projections and sensitivities that appear on the

 2    left side that are projections and sensitivities that

 3    Mr. Barton and his colleague in the finance group prepared

 4    with respect to a commission on linking out, correct?

 5    **A.**  Yes.

 6    **Q.**  All right.

 7        And he then goes on to say what option 3 introduces is the

 8    additional information allowed to be presented but without a

 9    link to customers as mentioned where we would not charge a

10    commission.

11        Do you see that?

12    **A.**  I do.

13    **Q.**  Can we agree that Mr. Barton is talking here about in-app

14    textual communication without a link and without a commission?

15    **A.**  It appears that he is.

16    **Q.**  Okay.  And this is also exactly the situation that I asked

17    you about multiple times, and you said you don't remember

18    being discussed at Apple because it never crossed anybody's

19    mind.  Correct?

20    **A.**  And I still do not recall that discussion.

21    **Q.**  Okay.  We'll see if -- well, let me just stop for a

22    second.

23        You're sure about that?

24    **A.**  Yes, sir.  I would -- I would admit it if I were wrong,

25    and if this were refreshing my memory, I would be happy to say

1    I'm sorry, I now recall this.  It just isn't the case.

2    **Q.**  Okay.  In addition -- and to contemplating the option,

3    Apple also did some quantitative work on what in-app text

4    communication without a link and without a commission would --

5    would look like for Apple's revenue.

6        Do you recall that?

7    **A.**  No, I do not.

8    **Q.**  Well, let's look on the last paragraph of Mr. Barton's

9    speakers' notes.  He says that on the right side, and he means

10   the right side of the slide labeled in-app text

11   communications, right?

12   **A.**  I believe so.

13   **Q.**  So on the right side, this shows the incremental impact

14   that may happen as more customers might migrate to the web

15   with this additional information being presented to them.

16       Correct?

17   **A.**  Yes, it says that.

18   **Q.**  All right.  And what this reflects is a recognition at

19   Apple, at least Mr. Barton in the finance team, and we'll see

20   who else was involved -- that if people were provided with

21   additional information, more of them might migrate to the web,

22   correct?

23   **A.**  (Reviewing document.)

24       I believe so.

25   **Q.**  In other words, there would be more competition against

1  Apple's IAP.

2  **A.**  Yes.

3  **Q.**  And you understand that that is exactly what this Court's

4  injunction was intended to achieve, correct?

5  **A.**  Yes.

6  **Q.**  And so let's look at the revenue that -- the revenue

7  impact that Apple projected here.  And it's on that right-hand

8  part of the slide which is .54 and Bates 573.

9              (Exhibit published.)

10  **BY MR. BORNSTEIN:**

11  **Q.**  The numbers are done here only for the top 200 developers.

12  Do you see that?

13  **A.**  Yes.

14  **Q.**  Okay.  And there are different sensitivities presented

15  here based on what percentage of spend would shift to the web

16  as a result of users being better informed about their

17  options, right?

18  **A.**  Yes.

19  **Q.**  Okay.  Now I -- I don't want you to say the -- the dollar

20  numbers here.  But at -- at just 5 percent of spend, with just

21  the top 200 developers shifting to the web, 5 percent of spend

22  to those top 200 developers, there is a revenue hit to Apple

23  identified here of hundreds of millions of dollars, correct?

24  **A.**  (Reviewing document.)

25      I believe so.  It's again small for me to read here, but I

 1    believe that's what it is.

 2    Q.   Okay.  And 5 percent is the most conservative of the

 3    various sensitivities of revenue shift that is presented on

 4    this slide, and the numbers go up quite a bit higher as the

 5    revenue shift increases, correct?

 6    A.   Yes.

 7    Q.   And --

 8         THE COURT:  Can I ask just a follow-up question on

 9    that?

10         MR. BORNSTEIN:  Of course, Your Honor.

11         THE COURT:  I have seen no document in all of these

12    productions that shows that Apple did any analysis whatsoever

13    to justify that its intellectual property, at a minimum, cost

14    it hundreds of millions of dollars.  And I guess the question

15    is was there one and not produced?  Because it hasn't been

16    produced.

17         THE WITNESS:  The work on that, I believe, was the

18    work that was discussed under -- in testimony of Mr. Roman for

19    the -- the attempt to create a bottoms-up P&L analysis of what

20    the total costs are at Apple for the App Store.

21         And it was an analysis that's not our normal way of

22    looking at it, but there was, I believe, work done on that to

23    try to answer that very question of how to --

24         THE COURT:  But in terms of complying the

25    injunction --

 1          **THE WITNESS:**  Right.

 2          **THE COURT:**  -- and in terms of trying to decide the

 3    value of the IP, which could then be perhaps charged --

 4          **THE WITNESS:**  Yes.

 5          **THE COURT:**  -- I've seen zero analysis that

 6    justifies, at a minimum, hundreds of millions of dollars and,

 7    at a maximum, billions of dollars.

 8          **THE WITNESS:**  The -- the -- the two things I'm aware

 9    of that were done for that question was the Analysis Group's

10    study which have an external organization try to estimate the

11    value of what we've created.  And then the work from Mr. Roman

12    to bottoms-up try to estimate the costs of the work to create

13    it.  Those were the two attempts to try to do that.

14          **THE COURT:**  There was none of that discussion in the

15    business decision documents that we've been speaking about

16    over the last few days.  None of that was in here, correct?

17          **THE WITNESS:**  The -- both of those were included in

18    the price committee presentations.  There was data from the

19    Analysis Group that was used in the price committee

20    presentation.  And there was the pseudo P&L bottoms-up work

21    from Mr. Roman also in that price committee slide deck.

22       We did try to include that, Your Honor.

23          **THE COURT:**  Go ahead.

24    **BY MR. BORNSTEIN:**

25    **Q.**  I'll follow up just on one piece of that, Mr. Schiller.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    In the June, July -- May, June, July 2023 time frame,

2    we've seen a series of presentations that were used for the

3    basis of discussion among you and other senior executives at

4    Apple about how to respond to the Court's injunction, correct?

5    **A.**  Yes.

6    **Q.**  All right.  And the Court referenced those in some of the

7    Court's questions just now.

8        And you -- you saw a number of those decks were labeled

9    "privileged and confidential," correct?

10   **A.**  Yes.

11   **Q.**  All right.  And deck after deck after deck through May and

12   June, there's no discussion, no mention of Mr. Roman's work or

13   of the Analysis Group work to facilitate the discussions that

14   you and Mr. Cook and Mr. Maestri and your colleagues are

15   having in order to decide how to comply with the injunction.

16   It's just not there, correct?

17   **A.**  I don't recall seeing them in those decks either.  I

18   believe during --

19   **Q.**  Right.  It shows up for the first time in the July 5th

20   price committee deck, which is the one that for the first time

21   is not labeled "privileged and confidential," the one that was

22   intended for external consumption at some point in the future.

23   Those materials were finally layered in as a justification for

24   the decisions that you all took, correct?

25   **A.**  My -- my recollection --

1    **Q.**  Is that right, sir?

2    **A.**  Not entirely, no.  My -- my understanding was the work on

3    the Analysis Group was already going on at this time in June.

4    It took quite a while to compile and develop it with the

5    external groups.  So it wasn't ready yet to be included.

6        I don't remember the date at which Mr. Roman's team was

7    tasked with also creating the bottoms-up analysis.  And -- and

8    that was added in when that work was done.  I believe that

9    started later.

10   **Q.**  All right.  But none of that fed into the discussions that

11   we've been talking about at some length over the course of the

12   past few days, and they appear for the first time in that

13   July 5 deck, which is the day that Apple at the time

14   anticipated it might need to go live with this program.

15   That's when it showed up, right?

16   **A.**  I believe so.

17   **Q.**  Okay.

18       **MR. BORNSTEIN:**  If we can have back on the screen

19   Exhibit --

20       **THE COURT:**  Just remind me.  Remind me what the

21   exhibit number is for the July deck.

22       **MR. BORNSTEIN:**  We do have it, Your Honor.

23   The July deck is Exhibit 227.

24       **THE COURT:**  Okay.

25       And when we're done with this, if you all would meet and

1  confer and get me an index of everything that was admitted

2  with a short description, that would be helpful.

3          **MR. BORNSTEIN:**  I have a head start, Your Honor.

4          **THE COURT:**  Perfect.  Thank you.  I don't have that.

5  Go ahead.

6          **MR. BORNSTEIN:**  Thank you, Your Honor.

7  **Q.**  All right.  If we could turn back to the exhibit at 859

8  and I want to jump ahead to Slide .57 which is Bates 576.

9  And I'll just -- if we can get that on the screen.  There we

10  go.  Do we have that?

11                    (Exhibit published.)

12          **MR. BORNSTEIN:**  Great.

13      I'll just note for the record, Your Honor, and for Apple,

14  frankly, there was a bullet here that we think they likely

15  intended to redact that was not discussed with the Court the

16  other day.

17      Just for the sake of the presentation today, we've taken

18  the liberty of redacting the second bullet on the right side.

19          **THE COURT:**  Okay, thank you.

20          **MR. BORNSTEIN:**  But that was not discussed with Your

21  Honor.

22          **MR. PERRY:**  We appreciate that, Your Honor, and we

23  did send a note to Epic last night to that effect.  So we

24  appreciate the agreement.

25  / / /

1    **BY MR. BORNSTEIN:**

2    **Q.**   So, Mr. Schiller, you can see on the left side of this

3    slide which identifies benefits and risks of this option 3

4    that includes the in-app text communications with no link and

5    no commission, on the left side you see benefits, which is

6    that it reduces some financial risk of the zero percent

7    commission scenario on linking out, correct?

8    **A.**   I see that.

9    **Q.**   And that's because under this option 3, there is at least

10   a commission on linkout transactions, correct?

11   **A.**   I would assume that, yes.

12   **Q.**   And on the right side identifying the risks, Apple noted

13   that there are -- there is more financial risk than option 2,

14   the commission option, due to similar collection risk plus

15   shift in spend to zero percent commission option.

16       Do you see that?

17   **A.**   Yes, I do.

18   **Q.**   And the zero percent commission option, as noted in the

19   subheading, that's the in-app text communication with no link,

20   correct?

21   **A.**   Yes.

22   **Q.**   And the shift in spend is the shift in spend that we saw

23   back on Slide .54 which is Bates 573, correct?

24   **A.**   Yes.

25   **Q.**   All right.

 1        So with the benefit of having seen all of this, can we

 2   agree that the reason that Apple does not currently allow

 3   in-app text communications with no link and no commission

 4   cannot be that it just never crossed anybody's mind at Apple?

 5   Can we agree that that's just not true?

 6   **A.**   Well, clearly it crossed somebody's mind because you're

 7   showing me slides that include it.

 8   **Q.**   Right.

 9   **A.**   I really did not recall that discussion but -- but it was

10   in some slides.

11   **Q.**   Okay.  Let's talk just a minute about who was involved in

12   these slides.

13        First of all, this is a slide deck for a meeting with

14   Mr. Cook.  We established that, right?

15   **A.**   Yes.

16   **Q.**   Okay.  And you were at the meeting with him as well on

17   June 1st, correct?

18   **A.**   Correct.

19   **Q.**   There were no important meetings about Project Wisconsin

20   that took place with Mr. Cook that you skipped, right?

21   **A.**   Not that I recall, no.

22        **MR. BORNSTEIN:**   If we could have up on the screen,

23   and I hope it is in your binder as well, Exhibit CX539.

24        This is already in evidence, Your Honor.

25   **Q.**   Do you have that, Mr. Schiller?

1    **A.**  I do.

2    **Q.**  Oh, good.  Okay.

3       So this is a text exchange, an iMessage exchange that you,

4    I readily acknowledge, were not a participant in between Nate

5    Barton, who we discussed, and Kunal Vij who testified earlier

6    today.  Correct?

7    **A.**  Yes.

8    **Q.**  And if I could ask you to look at the slide labeled .10.

9    Sorry the page labeled .10.

10   **A.**  (Reviewing document.)

11   **Q.**  Do you see here that Mr. Vij is sending to his boss,

12   Mr. Barton, slides that look like some of the slides that were

13   in that presentation?

14                   (Exhibit published.)

15       **THE WITNESS:**  They do.

16   **BY MR. BORNSTEIN:**

17   **Q.**  Okay.  And I'll focus you specifically, and we'll blow it

18   up to make it a little easier to see if we need to, the slide

19   on the bottom that says Option 3, U.S. Revenue Impact.

20       Do you see that?

21   **A.**  I do.

22   **Q.**  And you see that subheading again refers to information,

23   no link without commission, correct?

24   **A.**  Yes.

25   **Q.**  All right.  So Mr. Vij and Mr. Barton, at least, are two

1   of the people who were working on putting together financial

2   modeling and analysis with respect to this option, correct?

3   **A.**  Yes.

4   **Q.**  All right.

5          **MR. BORNSTEIN:**  And if we turn to Slide .12,

6   page .12.  Thank you.

7                    (Exhibit published.)

8   **BY MR. BORNSTEIN:**

9   **Q.**  At the bottom, you'll see Mr. Vij has an update version of

10  this same slide with the same general content about an

11  information, no link without commission?

12  **A.**  Yes.

13  **Q.**  Okay.  And then if you move forward just three more pages

14  to .15, you can see at the top that Mr. Barton relays to

15  Mr. Vij in this iMessage that he was chatting with Carson for

16  the information with the no linkout table, and he's suggesting

17  we just base it on top 200.

18      Do you see that?

19  **A.**  I do.

20  **Q.**  All right.  So to break this down, Carson is of course

21  Mr. Oliver, right?

22  **A.**  Yes.

23  **Q.**  And the "no linkout table" is what we were just looking

24  at, correct?

25  **A.**  I don't know that.  It -- again, I -- my first read of

 1    that would have been an analysis that did not allow linking

 2    out.  I don't understand why.  But a no linkout means no

 3    linkout.  I don't understand why you assume it's that table.

 4    **Q.**  Well, that I can help you with.

 5    **A.**  Okay.

 6    **Q.**  First if we -- if we go back, you can see, to Slide 12.

 7                        (Exhibit published.)

 8    **BY MR. BORNSTEIN:**

 9    **Q.**  This is the one -- sorry, page .12 at the bottom -- that

10    refers to the revenue impact of this option 3, which is a

11    linkout and a -- plus information no link without commission.

12    Correct?

13    **A.**  Yes.

14    **Q.**  All right.

15         On the next page, Mr. Vij says that he's done, he's made

16    some conversions, and then he asks whether Mr. Barton had

17    taken out -- I assume that's "out" instead of "taken put" --

18    the collection risk callout.

19         Do you see that?

20    **A.**  I do.

21    **Q.**  All right.  And as they talk a bit further, Mr. Barton

22    then says what we were looking at the top of 15:  Chatting

23    with Carson for the information with no linkout table.  He's

24    suggesting we just base it on the top 200.

25         Do you see that?

1    **A.**    I do.

2    **Q.**    Okay.  And as we saw on that slide where the financial

3    modeling is done for the option of no linkout with a no

4    commission and an in-app text communication, those numbers are

5    done, as Mr. Oliver suggested, solely on the basis of the top

6    200 developers.  Correct?

7    **A.**    They are based on the top 200, yes.

8    **Q.**    Okay.  And if you keep going to Slide 18, you will see

9    Mr. Vij on the left still talking about this option, says:

10    Haha, actually I like option 3.

11        Right?

12    **A.**    I see that.

13    **Q.**    So this discussions, it's all about option 3, sir.

14    Correct?

15    **A.**    Yes, it is.

16    **Q.**    Okay.  So we know Mr. Vij was working on this, Mr. Barton

17    was working on this, and Mr. Oliver was involved in this as

18    well, correct?

19    **A.**    Yes.

20    **Q.**    And this went into a deck for Mr. Cook, correct?

21    **A.**    Yes.

22    **Q.**    And it somehow missed you?  Or your testimony is just

23    despite your command of the material and your responsibility

24    for running this process, it just completely slipped your

25    mind.

1    **A.** I still don't recall this discussion. I'm sorry.

2    **Q.** Okay. Can we agree, however, that you must have been

3    involved in the work that was done to either assess the option

4    or to conclude that this option should not go forward?

5    **A.** I -- I truly do not recall. I was clearly in a meeting

6    that you showed the slides were there. I -- I was. I just

7    don't recall that discussion one way or another.

8    **Q.** I -- I've -- I've heard you say that. I'm asking a

9    somewhat different question about the way this project was run

10   at Apple. You were in charge, correct?

11   **A.** Yes, absolutely.

12   **Q.** And if there were an option 3 that was presented at a

13   meeting with Mr. Cook with financial analysis done, you would

14   have known about it, right?

15   **A.** Very likely, yes.

16   **Q.** Okay. And what that deck shows is that these in-app text

17   communications could cost Apple hundreds of millions of

18   dollars in revenue, if not more, on an annual basis, correct?

19   **A.** Yes.

20   **Q.** And these in-app text communications after this June 1

21   deck were scrapped from consideration and never heard from

22   again, right?

23   **A.** I don't recall hearing about them.

24   **Q.** And they're not in the documents certainly that we've seen

25   after June 1, correct?

```
 1    A.   I don't recall hearing about them.

 2              MR. BORNSTEIN:   Your Honor, I have no further

 3    questions.

 4              THE COURT:   Anything else, Mr. Perry?

 5              MR. PERRY:   Very briefly, Your Honor.

 6                     RECROSS-EXAMINATION

 7    BY MR. PERRY:

 8    Q.   Good afternoon, Mr. Schiller.

 9    A.   Good afternoon.

10    Q.   My friend Mr. Bornstein just asked you, and I'm quoting:

11    If there were an option 3 that was presented to Mr. Cook -- at

12    a meeting with Mr. Cook with financial analysis done, you

13    would have known about it, right?

14         Do you recall that?

15    A.   Yes.

16    Q.   So if there was on an option 3 that was presented to

17    Mr. Cook, you would have known about it.  And every question

18    Mr. Bornstein just asked you was about this option 3, right?

19    A.   Yes.

20    Q.   And we've looked at a lot of decks in this case.  They all

21    had option 1 and option 2, correct?

22    A.   Or 2A and 2B and two for option 1.  So it was a bit

23    confusing.

24    Q.   Do you remember any option 3?

25    A.   I don't recall it.
```

1    **Q.**  And as you sit here today, do you recall ever discussing

2    option 3?

3    **A.**  I do not.

4    **Q.**  If you could turn in your binder there, sir, to CX859,

5    which is that June 1 deck at page .52.

6    **A.**  (Reviewing document.)

7        I am on that page.

8    **Q.**  That's the first page that Mr. Bornstein asked you about.

9    Do you recall that, Mr. Cameron's placement notes?

10   **A.**  I recall him asking me, yes.

11   **Q.**  And all the rest of his questions were for pages

12   subsequent to that, right, later?

13   **A.**  Correct.

14   **Q.**  Okay.  Why don't we turn back a page, actually two pages

15   to .49 in that deck, sir.

16   **A.**  Yes.  I see that.

17   **Q.**  What is that?

18   **A.**  Well, we're in the appendix.

19   **Q.**  What does that mean?

20   **A.**  These are backup slides.

21   **Q.**  What does that mean at Apple?

22   **A.**  Traditionally -- I won't say a hundred percent of the

23   time, but the majority of the time, we are -- we create a

24   slide presentation for a meeting, and then we have a backup

25   set of slides in case we want to talk about those in a

1    meeting.  And we put those at the end in a backup or appendix

2    section.  And so this is the appendix section.

3    **Q.**  Do you have any recollection that the appendix was

4    actually presented to yourself and Mr. Cook at the June 1

5    meeting?

6    **A.**  I do not recall that.

7    **Q.**  Have you ever reviewed this option 3 that's in this

8    appendix?

9    **A.**  I don't recall that.

10   **Q.**  And the text messages between Mr. Barton and Mr. Vij that

11   Mr. Bornstein showed you, were you part of that text message

12   chain?

13   **A.**  I was not.

14   **Q.**  And had you seen any of that before today?

15   **A.**  I did not.

16        **MR. PERRY:**  Thank you, Mr. Schiller.

17      No further questions, Your Honor.

18        **THE COURT:**  I take it we don't have notes from that

19   meeting, Mr. Perry?

20        **MR. PERRY:**  Your Honor, we don't have notes for

21   Mr. Schiller for that meeting.

22        **THE COURT:**  Any notes.

23        **MR. PERRY:**  We do have some notes.

24        **THE COURT:**  Okay.  Someone give me an exhibit number.

25        **MS. MOSKOWITZ:**  I believe it's 1104, Your Honor.

1    **THE COURT:** All right. Thank you.

2    **MR. PERRY:** I believe it is too, Your Honor. Thank

3    you.

4    **THE COURT:** Follow-up?

5    **MR. BORNSTEIN:** Thank you, Your Honor.

6                    **FURTHER REDIRECT EXAMINATION**

7    BY MR. BORNSTEIN:

8    **Q.** So I think we just established with Mr. Perry that the

9    only place that this option -- the only deck for presentation

10   with senior management in which option 3 appeared is the one

11   that was originally withheld from Epic, correct?

12   **A.** I believe so. I'm not the expert on which deck it is.

13   **Q.** Okay. Well, let -- let me turn to the question about the

14   significance of the fact that this option 3 appeared in the

15   appendix.

16       Is it your testimony that Mr. Oliver, Barton, and Vij put

17   together a bunch of slides on an option for how to structure

18   the response to this Court's injunction that got included at

19   least in the appendix for a presentation to Mr. Cook entirely

20   without your knowledge?

21   **A.** It is possible. I don't recall either way.

22   **Q.** Is it your testimony that these gentlemen developed an

23   option 3 without you knowing?

24   **A.** Without me knowing, it's possible. They did work on

25   options without my direction. I encourage them to work on

1    many options, and they got directions from multiple people,

2    not only me, to work on options.

3    **Q.**  And the decision to kill this option which clearly didn't

4    go any further, that's not a decision that gets made below

5    your level.  Mr. Oliver was here testifying that he took

6    direction on this project from you.  Correct?

7    **A.**  He did.

8    **Q.**  Right.  So if this well-developed set of slides for a

9    presentation in a meeting with Mr. Cook was put together, this

10   was not freelancing by a group of junior people, correct?

11   **A.**  Correct.

12   **Q.**  These are people empowered to be responsible for how Apple

13   will respond to an injunction issued by a Court of the United

14   States, correct?

15   **A.**  Yes.

16   **Q.**  Subject to your direction.

17   **A.**  That's right.

18   **Q.**  All right.

19   **A.**  But you used examples when I was on the stand on Monday

20   which I said I thought they were crazy and we shouldn't

21   consider them.  And -- and there were options developed by the

22   team that weren't ideas that I had or that I had input into.

23   **Q.**  Absolutely and you killed them.

24   **A.**  Some of them that were presented to me.

25   **Q.**  Right.

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1    **A.**  I can't affect that wasn't presented to me.

2    **Q.**  It's clear, Mr. Schiller, that people who had

3    responsibility for working on this project considered an

4    in-app text communication option with no link and no

5    commission; fair?

6    **A.**  Fair.

7    **Q.**  Those people determined that would have cost Apple a lot

8    of money.  Correct?

9    **A.**  They did an analysis on it.

10   **Q.**  Right.

11   **A.**  Yes.

12   **Q.**  And somebody killed it, correct?

13   **A.**  Or never brought it forward.  I don't know.

14   **Q.**  And if they never brought it forward, it means somebody

15   killed it.  Somebody concluded this was not a good idea,

16   correct?

17   **A.**  Not necessarily.

18   **Q.**  Well, and certainly they didn't conclude that it was good

19   enough to show to Mr. Cook, right?

20   **A.**  Perhaps.

21   **Q.**  All right.  So they didn't show, it seems, you're telling

22   us they didn't think it was even good enough to show to you;

23   is that your testimony?

24   **A.**  I'm not saying anything about what others thought.  I

25   don't recall seeing this.  I've always stipulated I haven't

1    recalled seeing it.  I still, seeing the slides, don't recall

2    seeing it.

3    **Q.**  All right.  Somebody -- you're saying it's not you, to the

4    best of your recollection, I take -- but somebody, after doing

5    this analysis, concluded this was not the road that Apple

6    should go down, right?

7    **A.**  I think you're putting words in people's mouths.  I don't

8    know that's the case.

9    **Q.**  Well, it's just a fact, Mr. Schiller, somebody made the

10   decision that Apple was not going to go down this road, right?

11   **A.**  That is one possible answer.  Another is they had another

12   idea for an analysis for a set of compliance options, did some

13   work on it and put it in an appendix in case anybody was asked

14   about, hey, what about this option.  And if nobody asked, they

15   didn't bring it forward.

16   **Q.**  I think we're saying the same thing, sir.

17   **A.**  Great.

18   **Q.**  Somebody did a lot of work on this.  And ultimately

19   somebody, whether it was them or whether it was you or whether

20   it was Mr. Cook and you're just not sure who it was, somebody

21   decided Apple wasn't going to go down that road, and Apple

22   didn't implement it, correct?

23   **A.**  I think you're saying different words than me.  But -- but

24   we agree there were slides in the appendix.

25   **Q.**  And that Apple considered the option and Apple did not

1  implement the option, right?

2  **A.**  I'm not sure that's a statement or a question.  I didn't

3  answer 'cause I didn't --

4  **Q.**  That's a question, sir.  That's a question.  I'll put a

5  question mark at the end.

6  **A.**  I don't know that someone considered this a serious

7  option.  I see work was done on it.

8  **Q.**  Okay.  I think -- I think the facts are clear.  I'll leave

9  it there.

10  **A.**  Thank you.

11          **THE COURT:**  Any follow-up?

12          **MR. PERRY:**  Nothing further, Your Honor.

13          **THE COURT:**  Mr. Schiller, I believe you are now

14  finally excused.

15          **THE WITNESS:**  Thank you so much, Your Honor.

16          **THE COURT:**  All right.  Anybody else?

17      **MR. BORNSTEIN:**  Not from Epic, Your Honor.

18          **THE COURT:**  Any witnesses on your side, Mr. Perry?

19      **MR. PERRY:**  No witnesses for Apple, Your Honor.

20          **THE COURT:**  All right.

21      **MR. PERRY:**  May -- I would like -- if I may have a

22  clarification.  They've all been excused.  Are they released

23  from the admonishment that they may talk to the lawyers and so

24  forth?

25          **THE COURT:**  They are.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1     **MR. PERRY:**  Thank you, Your Honor.  And that's all

2  the witnesses?

3          **THE COURT:**  All right.

4          **MR. PERRY:**  Thank you.

5          **THE COURT:**  Are you -- do you all want to either

6  argue or file something?

7          **MR. PERRY:**  Your Honor --

8          **THE COURT:**  If you want to file something, you must

9  file it by next Friday no later than 5:00 p.m.  This has gone

10  on too long and I'm not waiting any more.

11          **MR. PERRY:**  Yes, Your Honor.

12          **THE COURT:**  So do you want to file something?

13          **MR. BORNSTEIN:**  Well, from my perspective, Your

14  Honor, it's whatever would be more useful for the Court.

15  We're happy to file findings of fact.  We're happy to file

16  argument.  Whatever would be useful to help Your Honor reach a

17  decision, we are prepared to do on the timing that Your Honor

18  just articulated.

19     If Your Honor does not want to be inundated with paper,

20  I'm sure there are people who would be happy not to work on

21  it.  I just want to make sure that Your Honor has the record

22  that Your Honor feels you needs.

23          **MR. PERRY:**  And, Your Honor, Apple affirmatively

24  requests the opportunity to file something to lay this out in

25  a logical fashion.

1    **THE COURT:**  All right.

2        What is helpful to me -- or what will be helpful to me,

3    you moved very quickly through exhibits, and I've tried --

4    I've got a transcript and I took a lot of notes.  But it would

5    be helpful to me to have the logic flow with the -- I don't --

6    with citations to the evidence.  That -- that would be

7    helpful.

8        So the logic in terms of you went -- you obviously have a

9    view on what all of these documents show and the flow of

10   decision-making.  But it went through many, many documents.

11   And there are snippets from many documents and pages that come

12   from a variety of these various documents.

13       So having that in kind of a chronological way would be

14   helpful.

15           **MR. BORNSTEIN:**  Understood, Your Honor.

16           **THE COURT:**  Any questions?

17       Can we agree on a page limit?

18           **MR. BORNSTEIN:**  That would be appreciated, Your

19   Honor.

20       I guess the question I would have to try to think about

21   what page limit might make sense is we had of course the

22   hearings in May.  We've done work on thinking about what your

23   findings of fact coming out of those hearings would be as

24   well.  I would think the most useful thing for the Court,

25   subject to Your Honor's preferences, of course, would be

1    something that combined all of that together so you had a

2    unified picture.

3           **THE COURT:**  I agree.  So what do you need?

4           **MR. BORNSTEIN:**  I think we can do that in 25 pages.

5           **MR. PERRY:**  Your Honor, 100 pages.

6           **THE COURT:**  No.

7           **MR. PERRY:**  Fifty pages?

8           **THE COURT:**  Forty.

9           **MR. PERRY:**  Thank you, Your Honor.

10          **THE COURT:**  Do not use ten-point font.  I will strike

11   it if anybody tries to use ten-point font.  Footnotes

12   included.  I know when you do it because I have to pick up

13   glasses.

14          **MR. PERRY:**  Your Honor, would the Court prefer

15   12-point.

16          **THE COURT:**  Twelve-point is the standard.  I'm not on

17   the Circuit.  I don't need 14.

18          **MR. PERRY:**  Thank you, Your Honor.

19          **MR. BORNSTEIN:**  I will say I do like the word limit

20   rule of the Circuit.

21          **THE COURT:**  I think that's -- that's a helpful limit

22   as well.  But I haven't figured that out in terms of pages.

23      So all right.  You can expect that a decision will come

24   out pretty quickly.

25          **MR. PERRY:**  Thank you, Your Honor.

 1          **THE COURT:**  All right.  We're adjourned.  Thank you.

 2          **MR. BORNSTEIN:**  Thank you, Your Honor.

 3          **MR. PERRY:**  Apologize, Your Honor.

 4      We are completing the meet-and-confer on the physical

 5  documents pursuant to the Court's request earlier today, and

 6  we will deliver them -- I think courthouse closes at 5:00.

 7  I'm not sure we'll get them in at 5:00 -- by 5:00.  May we

 8  deliver them tomorrow so we have --

 9          **THE COURT:**  Tomorrow is fine.

10          **MR. PERRY:**  -- an agreed set.

11          **THE COURT:**  Tomorrow's fine.  And I need a joint

12  index.  Not -- I don't want two indexes.  I want one index.

13          **MR. PERRY:**  Understood, Your Honor.

14          **THE COURT:**  All right.  We're adjourned.  Thank you.

15          **MR. BORNSTEIN:**  Thank you for the time, Your Honor.

16          (Proceedings were concluded at 3:55 P.M.)

17                          --o0o--

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Wednesday, February 26, 2025