CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
   crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone:  202.955.8500
Facsimile:  202.467.0539

MARK A. PERRY, SBN 212532
   mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No. 1500231; *pro hac vice*)
   joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  202.682.7000
Facsimile:  202.857.0940

Attorneys for Defendant APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.<br><br>     Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>     Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**APPLE INC.'S POST-HEARING BRIEF**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Courtroom 1, 4th Floor |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

LEGAL STANDARD ................................................................................................................. 7

ARGUMENT .............................................................................................................................. 8

**I.**   Apple complied with the Injunction ............................................................................. 9

    **A.**   Apple followed an objectively reasonable process to reach an objectively reasonable
conclusion .......................................................................................................... 10

    **B.**   Apple no longer prohibits developers from including buttons, external links, or other
calls to action .................................................................................................... 15

    **C.**   Context confirms that Apple's rules comply with the Injunction's plain terms ................... 18

**II.**   Epic failed to prove non-compliance by clear and convincing evidence ...................... 20

    **A.**   Epic's textual positions are wrong as a matter of fact and law ............................... 20

    **B.**   Epic's atextual "spirit" arguments are both factually flawed and legally irrelevant ............. 24

        1.   Epic did not prove that the technical requirements violate the Injunction ................... 24

        2.   Epic failed to prove that the commission violates the "spirit" of the Injunction .......... 29

        3.   Epic's atextual contentions about "spirit" cannot support contempt ........................... 33

**III.**   Any additional remedy must be circumscribed and prospective ................................... 37

CONCLUSION ......................................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Armstrong v. Brown*,
    768 F.3d 975 (9th Cir. 2014) ................................................................................................ 40

*Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*,
    928 F.3d 670 (7th Cir. 2019) ................................................................................................ 28

*Beasley v. Wells Fargo Bank, N.A.*,
    235 Cal. App. 3d 1383 (1991) .............................................................................................. 30

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
    1978 WL 1379 (W.D.N.Y. July 28, 1978) ............................................................................ 34

*Cal. Grocers Ass'n v. Bank of Am.*,
    22 Cal. App. 4th 205 (1994) ................................................................................................. 30

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987) .............................................................................................................. 17

*Cameron v. Apple Inc.*,
    No. 4:19-cv-3074-YGR (N.D. Cal. 2021) ............................................................................... 4

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021) .............................................................................................................. 31

*City of Las Vegas v. Clark County*,
    755 F.2d 697 (9th Cir. 1984) ......................................................................................... 18, 29

*Clark v. Coye*,
    60 F.3d 600 (9th Cir. 1995) ............................................................................................... 8, 19

*Doe, 1–13 ex rel. Doe Sr. 1–13 v. Bush*,
    261 F.3d 1037 (11th Cir. 2001) ............................................................................................ 40

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993) .................................................................................................... 7

*In re Dyer*,
    322 F.3d 1178 (9th Cir. 2003) .............................................................................................. 38

*eBay Domestic Holdings, Inc. v. Newmark*,
    16 A.3d 1 (Del. Ch. 2010) ..................................................................................................... 18

*ECM BioFilms, Inc. v. FTC*,
    851 F.3d 599 (6th Cir. 2017) ................................................................................................ 21

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...................................................................................*passim*

*Epona, LLC v. County of Ventura*,
  2019 WL 4187393 (C.D. Cal. Apr. 12, 2019) ............................................................. 35

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ...................................................................................... 18

*Fortyune v. Am. Multi-Cinema, Inc.*,
  364 F.3d 1075 (9th Cir. 2004) ............................................................................. 32, 36

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...................................................................................... 32

*Gates v. Rowland*,
  39 F.3d 1439 (9th Cir. 1994) ...................................................................................... 23

*Gates v. Shinn*,
  98 F.3d 463 (9th Cir. 1996) ......................................................................... 7, 25, 34, 36

*Gill v. Whitford*,
  585 U.S. 48 (2018) ...................................................................................................... 40

*In re Grand Jury*,
  23 F.4th 1088 (9th Cir. 2021) ....................................................................................... 9

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) ................................................................................... 40

*Horne v. Dep't of Agriculture*,
  576 U.S. 350 (2015) .................................................................................................... 31

*Horne v. Flores*,
  557 U.S. 433 (2009) ...................................................................................................... 8

*ILA, Loc. 1291 v. Phila. Marine Trade Ass'n*,
  389 U.S. 64 (1967) ...................................................................................................... 39

*Itel Containers Int'l Corp. v. Huddleston*,
  507 U.S. 60 (1993) ...................................................................................................... 28

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .................................................................................................... 24

*In re Kellogg Brown & Root, Inc.*,
  756 F.3d 754 (D.C. Cir. 2014) ...................................................................................... 9

*Kokesh v. SEC*,
  581 U.S. 455 (2017) .................................................................................................... 38

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005) ........................................................................... 39

*Lazzareschi Inv. Co. v. S.F. Fed. Sav. & Loan Ass'n.*,
22 Cal. App. 3d 303 (1971) ............................................................................... 30

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir. 2014) ........................................................................... 40

*Lewis v. Casey*,
518 U.S. 343 (1996) ........................................................................................... 40

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) .......................................................................... 40

*Moltan Co. v. Eagle–Picher Indus.*,
55 F.3d 1171 (6th Cir. 1995) ............................................................................. 41

*Moody v. Netchoice, LLC*,
603 U.S. 707 (2024) ........................................................................................... 26

*N.C. State Conf. of the NAACP v. McCrory*,
214 F. Supp. 3d 466 (M.D.N.C. 2016) .............................................................. 34

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ........................................................................................... 27

*Navellier v. Sletten*,
262 F.3d 923 (9th Cir. 2001) ............................................................................. 37

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......................................................................... 26

*New.Net, Inc. v. Lavasoft*,
356 F. Supp. 2d 1071 (C.D. Cal. 2003) ............................................................. 26

*Ahearn, ex rel. NLRB v. Int'l Longshore & Warehouse Union, Locals 21 & 4*,
721 F.3d 1122 (9th Cir. 2013) ........................................................................... 38

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ........................................................................................... 25

*Oracle USA, Inc. v. Rimini St., Inc.*,
81 F.4th 843 (9th Cir. 2023) ............................................................................. 38

*Overton v. Bazzetta*,
539 U.S. 126 (2003) ........................................................................................... 21

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986) ............................................................................................... 27

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
   59 U.S. 421 (1855)..................................................................................... 8

*PruneYard Shopping Ctr. v. Robins*,
   447 U.S. 74 (1980).................................................................................. 17

*Pulsifer v. United States*,
   601 U.S. 124 (2024)............................................................................... 22

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) ............................................................... 8

*S. Hospitality, Inc. v. Zurich Am. Ins.*,
   393 F.3d 1137 (10th Cir. 2004) ............................................... 18, 28, 31

*S. Or. Barter Fair v. Jackson County*,
   372 F.3d 1128 (9th Cir. 2004).............................................................. 17

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)................................................................... 8, 36, 37

*Shell Offshore Inc. v. Greenpeace, Inc.*,
   815 F.3d 623 (9th Cir. 2016) .......................................................... 38, 39

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019)......................................................................*passim*

*Terminal R.R. Ass'n. v. United States*,
   266 U.S. 17 (1924).......................................................................... 34, 35

*Theme Promotions, Inc. v. News Am. Mktg FSI*,
   546 F.3d 991 (9th Cir. 2008) ................................................................ 39

*Town of Islip v. E. Air Lines, Inc.*,
   793 F.2d 79 (2d Cir. 1986).............................................................. 8, 34

*United States v. Armour & Co.*,
   402 U.S. 673 (1971)........................................................................ 33, 34

*United States v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. Aug. 5, 2024) ........................................... 25

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................... 40

*United States v. Morales*,
   122 F.4th 590 (5th Cir. 2024) ......................................................... 21, 22

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947)........................................................................ 8, 38

*Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)............................................................................................ 25, 32

*Vlasak v. Super. Ct. of Cal. ex rel. County of Los Angeles,*
    329 F.3d 683 (9th Cir. 2003) ................................................................................. 23

*Willard v. AT&T Commc'ns. of Cal., Inc.,*
    204 Cal. App. 4th 53 (2012) .................................................................................. 30

*Wilson v. USI Ins. Serv. LLC,*
    57 F.4th 131 (3d Cir. 2023) ................................................................................... 28

*Young v. United States ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987)............................................................................................ 2, 37

**Federal Rules**

Fed. R. Civ. P. 60.............................................................................................................. 8

Fed. R. Civ. P. 65...................................................................................................... *passim*

**Other Authorities**

American Heritage Dictionary (5th ed. 2011) ................................................................ 23

Daniel Markovits, *Transactions Benefits*, 38 Yale J. on Regul. 633 (2021) ................. 27

New Oxford American Dictionary (2001)....................................................................... 16

Oxford Dictionary of Computer Science (7th ed. 2016)................................................. 23

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
    (2012).................................................................................................................... 21

Webster's Third New International Dictionary (2002)..................................................... 16

# INTRODUCTION

The Ninth Circuit upheld the App Store's fundamental business model as "clearly lawful." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023). That includes Apple's "requirement" that developers "buy [their] in-app-purchase-processing requirements from Apple." *Id.* at 996 n.20. On a "record [that] was less fulsome," Dkt. 812 ("Rule 52 Order") at 163, the Court found two anti-steering Guidelines unfair under the UCL, and (as relevant) enjoined Apple from "prohibiting developers from including in their apps buttons, external links, or other calls to action" directing users to alternative purchase mechanisms outside of the app. Dkt. 813 ¶ 1. As the Court explained, this remedy required Apple to "sever[]" the enjoined restriction "without any impact on the integrity of the ecosystem." Rule 52 Order at 164.

Nine days of testimony and scores of documents demonstrate the extensive efforts Apple took to develop a framework that complies with the Injunction while preserving the fundamental features of Apple's business model and safeguarding consumers. In Mr. Schiller's words, "there were meetings every week"—with work over "nights [and] weekends"—to wrestle with a "very complex" decision. TT 1295:10–25 (Schiller). In determining an appropriate commission rate for the tools, technology, and services developers would continue to benefit from, Apple engaged external experts to assist in identifying benchmarks. TT 548:7–12 (Oliver). The finance team spent "dozens [or] hundreds of hours coming up" with the assumptions that underlay Apple's competitive and financial analyses. TT 502:2–3 (Oliver); 1749:1–3 (Vij). After "very full discussion" of many options, TT 1277:17–23 (Schiller), Apple adopted a framework under which a developer "may" "include a link to the developer's website . . . that informs users of other ways to purchase digital goods or services," CX-0013 § 3.1.1(a), when that link is "accompanied by language and a button." CX-0002 § 3.3. In-app content must comply with certain technical requirements, and transactions effected using the new link entitlement would be subject to a reduced commission commensurate with the value Apple provided to developers. This framework complied with the Injunction as written, as the Court contemporaneously explained it, and as Apple reasonably understood it.

Like any decision in a "dynamic, innovative" marketplace, Rule 52 Order at 71, Apple did not know *ex ante* exactly how the new framework would work in practice. But Apple knew its actions would

be scrutinized. Apple came to the Court affirmatively, filing a Notice of Compliance the day the Injunction took effect to provide the Court with the primary source materials that demonstrate its compliance. Epic disagreed, accusing Apple of civil contempt. This Court has never found that any specific act by Apple violated any specific term of the Injunction, finding only preliminarily that, "viewed holistically, Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice." Dkt. 925, at 3.

In challenging Apple's injunction compliance, Epic has run roughshod over the procedural protections Apple was due. It invaded Apple's attorney-client privilege and hampered Apple's ability to put on a defense. Epic introduced no evidence that Apple's new framework causes it any harm. Instead, Epic has acted more as a private attorney general, in violation of core due process protections against private prosecution for contempt. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801–14 (1987). But even so, Epic was unable to prove, by clear and convincing evidence, that Apple violated the Injunction, much less that Apple had "no objectively reasonable basis for concluding that [its] conduct might be lawful," as required for civil contempt. *Taggart v. Lorenzen*, 587 U.S. 554, 560–61 (2019). Quite the contrary: Apple's witnesses cogently and consistently explained that the new framework was designed to comply with the Injunction, and the documentary record supports their testimony and the reasonableness of their conclusions.

The Court recognized from the outset that it must apply the law "cautiously" because Apple operates in "a technology context where lawyers and economists can merely hypothesize about the future of the digital frontier." Dkt. 118, at 1. Apple took extraordinary steps to comply with a directive that it, too, recognized was "not an easy problem to solve." TT 1282:12 (Schiller). Apple has and will continue to abide by the Court's orders, subject only to its lawful right to appeal. The Court should conclude that Apple has complied with the Injunction and deny Epic's motion to enforce.

## FACTUAL BACKGROUND

On September 10, 2021, after a bench trial, the Court rejected Epic's antitrust claims (which, among other things, challenged Apple's requirement that developers use IAP for in-app purchases of digital content) but found two categorical anti-steering provisions in Apple's App Review Guidelines to be "unfair" under the UCL: Guideline 3.1.1, which categorically prohibited developers from including

in their apps "buttons, external links, or other calls to action that direct customers to purchasing mecha-

nisms other than" IAP; and Guideline 3.1.3, which categorically prohibited developers from communi-

cating with users through "points of contact obtained from account registration within the app (like email

or text)" to "encourage users to use a purchasing method other than" IAP.  Rule 52 Order at 31–32, 163–

64.  The Court found that those anti-steering provisions "prevent[ed] developers from communicating

about lower prices on other platforms."  *Id.* at 93.  The Court issued the following Injunction:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert
> or participation with them ("Apple"), are hereby permanently restrained and enjoined
> from prohibiting developers from (i) including in their apps and their metadata buttons,
> external links, or other calls to action that direct customers to purchasing mechanisms, in
> addition to In App Purchasing and (ii) communicating with customers through points of
> contact obtained voluntarily from customers through account registration within the app.

Dkt. 813 ¶ 1.  The first clause (i) draws nearly verbatim from the language of Guideline 3.1.1(a) in effect

at the time of trial.  CX-0001 § 3.1.1(a).  The second clause (ii) draws nearly verbatim from the language

of Guideline 3.1.3 in effect at the time of trial.  *Id.* § 3.1.3.

The Court explained that "[a] remedy to eliminate those provisions is appropriate."  Rule 52

Order at 179; *see id.* at 2 (requiring Apple "to eliminate those provisions"). The Court further explained

that the "measured remedy" of eliminating those twin categorical prohibitions would "increase compe-

tition, increase transparency, [and] increase consumer choice and information," while "preserving Ap-

ple's iOS ecosystem which has procompetitive justifications" and without "micromanag[ing] [Apple's]

business operations, which courts are not well-suited to do as the Supreme Court has appropriately rec-

ognized." *Id.* at 179.  At the same time, the Court recognized that Apple was entitled to collect compen-

sation from developers for use of its platform, including its intellectual property, as well as access to the

iOS userbase.  *Id.* at 1, 14, 65–67, 117, 150 & n.617, 169.

Apple moved to stay the Injunction pending appeal.  *See* Dkt. 821.  This Court denied the motion,

reiterating that it would not "micromanage" Apple's business and stating it could "envision numerous

avenues for Apple to comply."  Dkt. 830, at 3–4.  The Court recognized that Apple would "perhaps,

need[] time to establish Guidelines" and noted that "[l]inks can be tested by App Review."  *Id.*

The Ninth Circuit stayed the Injunction pending appeal.  *See* Order, C.A. Dkt. 27.  On April 24,

2023, the Ninth Circuit affirmed in part and reversed in part.  *See Epic Games, Inc. v. Apple, Inc.*, 67

1    F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024).   As relevant, the Ninth Circuit

2    affirmed this Court's findings that Apple had not violated the antitrust laws, confirming Apple's right to

3    require that developers use IAP for in app purchases of digital goods and services.   *Id.* at 981–99.   The

4    Ninth Circuit also affirmed the UCL judgment and Injunction.   *Id.* at 1002–04.   After the Supreme Court

5    denied review, the mandate issued on January 17, 2024, terminating the stay.   C.A. Dkt. 258.

6         The day before the mandate issued, Apple filed a Notice of Compliance summarizing the changes

7    it had made to comply with the Injunction.   Dkt. No. 871.   The new framework is set forth in revised

8    Guidelines, a new StoreKit External Purchase Link Entitlement ("Entitlement"), and certain Apple Ma-

9    terials referenced therein.   Apple had previously come into compliance with the second clause of the

10   Injunction, involving external communications, by revising the relevant Guideline pursuant to a court-

11   approved settlement in another case.   *See* Stipulation of Settlement*, Cameron v. Apple Inc.*, No. 4:19-

12   cv-3074-YGR (N.D. Cal. Nov. 5, 2021), ECF No. 451-1.   To comply with the first clause of the Injunc-

13   tion, Apple deleted Guideline 3.1.1, which had prohibited developers from including any "buttons, ex-

14   ternal links, or other calls to action" to alternatives to IAP.   Apple replaced that provision with new

15   Guideline 3.1.1(a), which now provides that developers may apply for the new Entitlement, permitting

16   them to include in their apps "a link to the developer's website that informs users of other ways to

17   purchase digital goods or services."   CX-0013 § 3.1.1(a).   The link must be "accompanied by language

18   and a button adhering to the requirements provided in the Apple Materials."   CX-0002 § 3.3.   There is

19   no cost or fee for including buttons, links, or other calls to action within an app.   If a user completes a

20   transaction within 7 days of tapping through a link within an iOS app, Apple collects a commission of

21   12% or 27% of the purchase price, depending on the size of the developer.   *Id.* §§ 1, 5.14.

22        Hours after Apple filed its Notice of Compliance, Epic's CEO Tim Sweeney publicly announced

23   Epic's intent to contest Apple's "bad-faith compliance."   Dkt. 916-9.   On January 30, 2024, Epic filed a

24   Notice of Non-Compliance.   Dkt. 883.   On March 13, 2024, Epic filed a motion to enforce the Injunction

25   and to hold Apple in civil contempt.   Dkt. 897.   Acknowledging that the Injunction did not "explicitly

26   prohibit" Apple's new Entitlement framework, Epic contended that Apple's conduct was contrary to the

27   "purpose" and "spirit" of the Injunction.   *Id.* at 17–18.   Epic did not seek any discovery.

28

On April 23, 2024, this Court set an evidentiary hearing on Epic's motion.  Dkt. 925.  The Court did not find that Apple had violated any specific command in the Injunction.  Rather, the Court found that Epic had made a preliminary showing that, "viewed holistically, Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice."  *Id.* at 3.

The initial phase of the hearing took place over six days in May 2024.  Epic called four Apple witnesses, and cross-examined them before Apple examined them: Matt Fischer (then-Vice President of the Worldwide App Store), Alex Roman (Vice President of Finance), Carson Oliver (Senior Director of Business Management for the App Store), and Phil Schiller (Apple Fellow).  TT 11:18–12:1 (Fischer), 267:21–23 (Roman), 437:4–438:12 (Oliver), 669:17–671:9 (Schiller). After all the witnesses had testified, and even though Epic had not requested any discovery, the Court directed Apple to produce "*all* Apple's documents relative to the decision-making process leading to the link entitlement program and associated commission rates."  Dkt. 974 (emphasis added).  The evidentiary hearing was adjourned until those materials had been collected, reviewed, and produced.  Dkt. 985, 996.  In the interim months, Apple was not permitted to discuss the case, the newly produced documents, or any historical decision making with any of the four testifying witnesses, including its corporate representative.  TT 668:24–669:14 (Oliver), 710:2–6 (Schiller).

Apple collected documents from 52 custodians and applied expansive search terms proposed by Epic, resulting in a total review population of approximately 1.3 million documents.  Dkt. 1198-1 ¶ 36. Apple completed substantial production by the deadline of September 30, 2024.  *Id.* ¶ 62.  In October 2024, Epic sent Apple a letter raising objections to certain privilege assertions Apple had made in its privilege logs served in June.  Dkt. 1198-1 ¶¶ 63–64.  After this Court affirmed Judge Hixson's ruling rejecting many of the privilege assertions in 11 exemplar documents, Dkt. 1095; *see also* Dkt. 1056, Epic demanded that Apple re-review all documents over which it had asserted privilege and submit those documents to independent Special Masters.  Dkt. 1092, at 2.  Apple did so by January 17, 2025.  *See* Dkt. 1198-1 ¶ 81.  Apple has consistently maintained its privilege objections.  The Special Masters have upheld Apple's privilege assertions at a rate of approximately 92%.  Apple also downgraded a number

of documents over which it had previously asserted privilege, in part based on the Court's intervening

discovery orders, and produced those to Epic by January 21, 2025.  *See* Dkt. 1198-1 ¶¶ 77, 84.

The evidentiary hearing resumed on February 24, 2025 and lasted through February 26, 2025.

Dkt. 1071.  Epic re-called Mr. Schiller and Mr. Oliver, as well as three additional witnesses from Apple:

Rafael Onak (a User Experience writer), Kunal Vij (a Senior Manager of Finance), and Marni Goldberg

(a Corporate Communications Director).  Epic requested the attendance of these additional witnesses

just 10 days before the hearing resumed. Dkt. 1241. Once again, Epic cross-examined Apple's witnesses

before Apple examined them.  At the hearing, Epic introduced approximately 30 exhibits that were pro-

duced during the privilege re-review.  *See* Dkt. 1287.

As requested by the Court, TT 1914:2–14, a summary chronology of Apple's injunction compli-

ance efforts, focusing on significant meeting and events, follows:

| Date | Event | Citation |
|------|-------|----------|
| September 2021 | Apple begins work to respond to and comply with Injunction (Project Michigan). | TT 1138:22–25 (Schiller) |
| December 8, 2021 | Ninth Circuit grants stay pending appeal, and Injunction compliance is temporarily paused. | CX-0486.1; C.A. Dkt. 27 |
| April 24, 2023 | Ninth Circuit affirms judgment in relevant part but mandate does not yet issue. | C.A. Dkts. 215, 222 |
| April 2023 | Apple reengages work to comply with Injunction (Project Wisconsin). | TT 1295:5–25 (Schiller) |
| May 18, 2023 | Cross-functional team meets to discuss proposals for complying with Injunction. | CX-0488; CX-0272; TT 1433:13–1433:15 (Oliver) |
| May 25, 2023 | Cross-functional team meets to discuss design elements, including system disclosure sheet. | CX-0490; TT 1258:8–1259:6 (Schiller) |
| June 1, 2023 | Cross-functional team meets to discuss proposals for complying with Injunction. | CX-0485; CX-1104; CX-0859; TT 1168:11–1169:3 (Schiller) |
| June 20, 2023 | Cross-functional team meets to further discuss proposals for complying with Injunction. | CX-0223; CX-0224; CX-0489; TT 1173:10–24 (Schiller) |

| Date | Event | Citation |
|------|-------|----------|
| June 28, 2023 | Cross-functional team meets to further discuss proposals for complying with Injunction. | CX-0291; CX-0532; TT 1227:24–1229:2, 1267:15–23 (Schiller) |
| July 5, 2023 | Price Committee makes preliminary decisions regarding pricing and other requirements. | CX-0227; TT 1245:1–1246:1, 1254:5–18 (Schiller) |
| July 17, 2023 | Ninth Circuit issues stay of the mandate. | C.A. Dkt. 250 |
| January 11, 2024 | Price Committee meets to discuss pricing and other requirements. | TT 679:20–23 (Schiller) |
| January 16, 2024 | Supreme Court denies certiorari, ending stay. | 144 S. Ct. 681 & 682 (2024) |
| January 16, 2024 | Price Committee approves final compliance structure. | CX-0009A at 3; TT 1257:9–15 (Schiller) |

## LEGAL STANDARD

Civil contempt is a "severe remedy" that is unavailable where there is "*fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart*, 587 U.S. at 561 (emphasis in original and quotation marks omitted). Epic had the burden of proving, by clear and convincing evidence, that (1) Apple violated "a specific and definite" order; (2) the violation was "beyond substantial compliance"; and (3) its conduct was not "based on a good faith and reasonable interpretation" of the order. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The "standard is generally an objective one," asking whether there is "no objectively reasonable basis for concluding that the [defendant's] conduct might be lawful." *Taggart*, 587 U.S. at 560–61.

"Every order granting an injunction … must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). The operative terms of an injunction must appear "'within its four corners,' and not by reference to the court's purpose or the purpose of the party seeking to hold the other in contempt." *Gates v. Shinn,* 98 F.3d 463, 468 (9th Cir.

1    1996); *see Town of Islip v. E. Air Lines, Inc.*, 793 F.2d 79, 83 (2d Cir. 1986).  "[T]he specificity provi-

2    sions of Rule 65(d) are no mere technical requirements"; "basic fairness requires that those enjoined

3    receive explicit notice of precisely what conduct is outlawed."  *Schmidt v. Lessard*, 414 U.S. 473, 476

4    (1974).  The recipient "should not be left guessing as to what conduct is enjoined."  *Reno Air Racing*

5    *Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006).  "[A]ll ambiguities are resolved in favor of

6    the person subject to the injunction."  *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (citation omitted).

7    **ARGUMENT**

8    As explained below, (I) Apple complied with the Injunction by eliminating the categorical pro-

9    hibitions on steering from its Guidelines; (II) Epic did not carry its burden of proving non-compliance

10   by clear and convincing evidence; and (III) if the Court were to find non-compliance, any remedy must

11   be both circumscribed and prospective.  Those points are all subject to two threshold considerations:

12   *First*, Apple's pending Rule 60(b) motion (Dkt. 1018) must be decided before Epic's motion to

13   enforce, because granting the former would render the latter moot.  "[T]he right to remedial relief falls

14   with an injunction which events prove was erroneously issued."  *United States v. United Mine Workers*

15   *of Am. ("UMWA")*, 330 U.S. 258, 295 (1947); *see also Horne v. Flores*, 557 U.S. 433, 448 (2009);

16   *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 431–32 (1855).  Because prospective

17   enforcement of the Injunction is now inequitable, this Court should vacate the Injunction and terminate

18   these proceedings.

19   *Second*, the orders requiring Apple to produce privileged documents, and Epic's use of those

20   documents at the resumed evidentiary hearing, are improper and cannot support contempt.  The entire

21   injunction compliance process was a legal project with business inputs, TT 1275:21:1276:4 (Schiller),

22   and many documents associated with that project—including the interim presentation decks—are privi-

23   leged and not discoverable.  The Court required Apple to show that legal advice was "*the* primary pur-

24   pose" of the documents, and demanded that the privilege claim be apparent on the face of each document.

25   Dkt. 1095, at 2 (emphasis added).   The Court granted Apple a standing objection to Epic's use of "Dis-

26   puted Documents" over which Apple maintains privilege.  TT 1129:25–1130:5; *see also* Dkt. 1198, at

27   4.  Fourteen of the documents Epic introduced are in this category.  CX-0223, CX-0224, CX-0225, CX-

28   0272, CX-0274, CX-0477, CX-0478, CX-0479, CX-0520, CX-0529, CX-0540, CX-0859, CX-1104, and

CX-1208.  Apple contends they are privileged under the Ninth Circuit standard, *see In re Grand Jury*, 23 F.4th 1088, 1094–95 (9th Cir. 2021), and preserves the argument that the "primary purpose" standard should be abandoned or modified, *see In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014).

## I.    APPLE COMPLIED WITH THE INJUNCTION

Compliance with an injunction is primarily an "objective" inquiry.  *Taggart*, 587 U.S. at 561.  At most, a party's subjective good or bad faith "may help to determine an appropriate sanction" for any non-compliance, *id.* at 562, but it cannot form the basis for a finding of contempt in the first place.  A party cannot be held in contempt "where there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct."  *Id.* at 561.

In response to the Injunction, Apple adopted rules that expressly allow developers to include buttons, links, and calls to action within their apps.  The primary source materials Apple submitted with its Notice of Compliance (the new Guideline, Entitlement, and Apple Materials) establish that point, and Epic has introduced no contrary evidence.  The evidentiary record confirms that the new framework complies with the Injunction and, at a minimum, that Apple reasonably concluded that its framework complies after working at all times toward compliance with—not defiance or disregard of—the Injunction.  TT 1292:16–23 (Schiller).  There is a robust record of meetings, presentations, analyses, and workstreams in which Apple developed and refined numerous options for compliance.  TT 444:4–12, 452:7–17 (Oliver); 802:4–8 (Schiller).  Apple's business teams worked hand-in-glove with in-house and outside counsel throughout the exercise, because Apple directed its entire compliance project toward finding and choosing a solution to a *legal* problem (*i.e.*, the prohibition the Injunction imposed).  TT 785:17–20, 1275:11–20 (Schiller).  The final Price Committee deck—the formal corporate approval mechanism for the compliance framework—includes the full text of the Injunction.  CX-0009A, at 3.  Apple reasonably concluded that this framework complied with the Injunction in the context of the

Court's contemporaneous orders.  TT 1280:1–17, 1282:1–12 (Schiller).[1]

### A. Apple followed an objectively reasonable process to reach an objectively reasonable conclusion

**1.** As Mr. Schiller explained, Apple "began immediately working on a compliance plan in 2021 . . . understanding the ruling, reading it, discussing it with legal counsel to understand what it means. We began having conversations in '21 working up through '23. . . We added people throughout the process to work on [] compliance in a cross-functional way across teams at Apple, eventually culminating in the final plan and implementation."  TT 1274:25–1275:10 (Schiller); *see also* TT 174:4–7 (Fischer); 303:24–304:3 (Roman); 444:17–19 (Oliver).  Extensive evidence showed that Apple engaged numerous people, inside and outside the company, considered many options, and expended significant resources to develop a solution that met the Injunction's terms and purpose while safeguarding user security and privacy, protecting IAP, and providing Apple a return for the extensive services Apple provides to developers.  Over a period of several years, Apple spent thousands of hours working toward a solution that balanced the interests of consumers, developers, and the platform itself.

*First*, the technical requirements were the result of a cross-functional team's effort to develop and implement measures to help consumers make informed decisions and protect them from fraud and scams by developers while still preserving the iOS ecosystem and experience.  TT 803:23–804:6, 805:9–16, 813:6–14, 829:15–830:5, 830:10–25 (Schiller).  For example, Apple decided to require developers to use the "Plain Button" style—which predates the Entitlement and in fact predates iOS—to make it clear to users they were being presented with a web link and not an alternative in-app purchase mechanism.  TT 840:13–24, 1286:20–1288:13 (Schiller); *see also* CX-1103.  Additionally, Apple decided to require developers to interpose a system disclosure sheet, and drafted the language, in order to objectively "explain[] to the user that they'll be leaving the app and going to an external website to make a purchase through a source other than Apple."  CX-0003; *see also* TT 46:5–12 (Fischer).  This Court found that, under IAP, "[c]onsumers do not understand that developers have effectively no control over

---

[1] The injunction compliance framework is a duly authorized act of Apple, the corporation, and Epic has sought sanctions only against Apple and not any individual officer or employee.  This Court, likewise, has indicated only that "*Apple's* practice changes" warrant further scrutiny, Dkt. 925, at 3 (emphasis added), and has put no individual on notice.  This submission therefore focuses exclusively on Apple.

payment issues and even access to consumers' information.  Consequently, it can be frustrating for both sides when issues arise relating to the inability to issue and manage the legitimacy of requests for re-funds."  Rule 52 Order at 40.  That is the precise issue Apple seeks to address, but in the other direction.  Finally, Apple's system disclosure sheet is consistent with industry practice.  The Federal Trade Com-mission, for example, surfaces a similar system disclosure sheet whenever a visitor to its website clicks on a link to a social media website.  CX-1001.003; *see also* TT 853:7–854:13 (Schiller).

The requirements were also the result of Apple's desire to design a framework that was scalable, that is, able to be applied across all types of developers without having to create individual rules and exceptions.  TT 137:7–17 (Fischer).  For example, regarding the template requirement, Apple determined that, by using a "defined set of examples," the App Review process "has a better chance of being able to check them all" and ensure that developers are communicating truthfully to users.  TT 834:21–835:2 (Schiller).  Likewise, the link requirements allow Apple to check the destination URL against the actual landing page to ensure they sync up and removes the potential for friction that may arise if a redirect does not work or a user is otherwise not directed to the desired destination.  TT 825:1–3, 827:14–22 (Schiller).  These requirements do not limit a developer's ability to direct a user to a customized webpage tailored to his individual interests or shopping habits.  TT 827:10–13 (Schiller).

Finally, the link placement requirements preserve Apple's right to offer IAP as the exclusive in-app purchase mechanism, as well as a user's decision to use IAP.  TT 859:9–861:19 (Schiller).  Just as a store is not obliged to advertise its competitor's prices in the checkout aisle, the Injunction did not require Apple to allow developers to replace or displace IAP for in-app purchases.  TT 861:7–19 (Schil-ler).  As a matter of business judgment, Apple does not want to distribute a product (an iOS app) that discourages use of Apple's products or services, or creates consumer confusion about whether a pur-chasing option is an Apple system.  TT 856:25–857:4 (Schiller).  The Ninth Circuit recognized this right.

*Second*, Apple's decisions to impose a commission and the applicable rate and window were the result of an extensive process involving significant analysis, which began shortly after the Court issued its Injunction in 2021.  TT 674:13–18, 681:6–25 (Schiller); TT 1400:8-1401:2 (Oliver).  Apple's work accelerated in early to mid-2023, around the time of the Ninth Circuit's decision.  TT 1142:2–19 (Schil-ler).  Apple held discussions throughout 2023 among its executive team and the cross-functional team

1   regarding whether to charge a commission on linked transactions at all.  TT 471:2–18 (Oliver).  Apple

2   considered charging no commission on linked transactions, TT 544:13–15 (Oliver), and there were some

3   who raised questions about Apple charging a commission, TT 1294:19–1295:4 (Schiller).  Apple also

4   considered alternatives to a commission structure.  TT 1400:8–11 (Oliver).  Ultimately, after rigorous

5   analysis and discussion, Apple determined that access to Apple's intellectual property, services, userbase

6   and platform justify a commission.  TT 543:20–544:24, 545:1–10, 1558:10–23 (Oliver).

7       Apple engaged an outside, independent firm (Analysis Group) to evaluate the value of services

8   Apple provides to developers that choose to link out, including Apple's platform and app discovery

9   services, and to explore commission rates and windows other platforms employ.  TT 550:8–551:16,

10  558:2–6 (Oliver); *see also* CX-0014.3.  Analysis Group's task was to determine how Apple could "fairly

11  charge for the value that it provides to developers . . . while implementing a linkout to allow [users] to

12  purchase from the web."  TT 550:5–11 (Oliver).  To answer that, Analysis Group produced a detailed

13  slide deck setting forth its conclusions and analyses.  CX-0014; CX-0015; *see also* TT 441:7–9 (Oliver).

14  Analysis Group estimated the cost to developers of the various services Apple provides through its plat-

15  form, and concluded that (1) Apple's platform technology is worth up to ~30% of developer revenue

16  (depending on the other services offered), (2) Apple's developer tools and services are worth ~3–16%,

17  (3) Apple's distribution services are worth ~4%–14%, and (4) Apple's discovery services are worth

18  ~5%–14%. CX-0014.7. Analysis Group also assessed different frameworks for assessing a fee on linked

19  transactions, *i.e.*, "how to charge a commission or fee for a purchase that happens after the user clicks a

20  link that goes out of the app," CX-0014.39, identified affiliate programs and developer ad campaigns as

21  benchmarks for situations where a fee is paid for referrals, and observed that tracking windows in such

22  programs range from 24 hours to 90 days after a user taps on a link.  TT 589:8–13, 591:25–592:1,

23  596:12–16 (Oliver); CX-0014.39; CX-0014.40; CX-0014.41.

24      After considering a wide range of rates, Apple's finance and business teams narrowed the com-

25  mission percentage to between 20% and 30% based on Analysis Group's benchmarking data, TT

26  282:21–283:2 (Roman), before recommending a commission at the higher end of the range given Ap-

27  ple's unique services (including user trust, safety, and privacy) and demand generation.  TT 559:18–25

28

(Oliver); *see also* Dkt. 916-5. Apple's finance and business teams recommended selecting a 7-day window for a commission, relying on data showing that the effective commission rate remained relatively stable at 18% for windows of 24 hours, 72 hours, and 7 days, but jumped materially if the window was extended to 30 days. TT 608:4–18 (Oliver); *see also* TT 623:3–15 (Oliver). These teams projected that the Entitlement would make transactions less expensive for developers overall and that Apple would lose hundreds of millions of dollars in revenue after a ramp up period. TT 624:2–15 (Oliver); TT 365:5–366:25 (Roman); CX-0009.13. The teams based those projections on data regarding past developer and user behavior, including developers' success at using direct marketing to divert game and subscription transactions outside the App Store; while not perfect, the projections represented Apple's best effort at predicting developer behavior in response to the new Entitlement. TT 761:20–23 (Schiller); 1570:2–16, 1578:10–1582:5, 1590:2–1591:24 (Oliver); 1687:13–19 (Vij); *see also* CX-1303; CX-1304; CX-0054.39.

Apple convened a Price Committee to make a final decision—based on the recommendations of the working group, as well as the Analysis Group report—on how much to charge for a commission and what the framework should be. TT 209:16–211:14, 442:11–16 (Oliver). The final decision-makers were Tim Cook (Apple's Chief Executive Officer), Luca Maestri (Apple's Chief Financial Officer), and Mr. Schiller. TT 198:20–24 (Roman). Apple employees across the various relevant segments contributed collectively hundreds of hours to the financial analysis and assumptions presented within the deck presented to the Price Committee. TT 304:4–8, 305:4 (Roman); 501:17–502:3 (Oliver); 1749:1–3 (Vij). As Apple's authorized decision-maker, the Price Committee concluded that a 12%/27% commission structure with a 7-day window was an appropriate amount to charge developers for use of Apple's platform, tools, and services while providing a discount to IAP that would incentivize developers to adopt the Entitlement. TT 622:25–623:15 (Oliver).

**2.** The testimonial and documentary record makes clear that Apple reasonably concluded that its framework complied with the Injunction. During the first phase of the evidentiary hearing, each of Apple's witnesses testified that Apple's framework complies and testified about the specific steps Apple took to comply within their respective area of responsibility. Mr. Fischer explained that Apple "deleted [its] [prior] guideline and created a new guideline to specifically address the injunction." TT 144:11–16

1   (Fischer); *see also* TT 143:7–144:10 (demonstrative containing side-by-side comparison). Mr. Roman

2   explained that his financial modeling team spent "several months" and ran "thousands of calculations

3   [to] support" the new framework while accounting for "assumptions and [] projections . . . to determine

4   that developers would be incentivized to proceed with [] linkout entitlements." TT 303:24–304:3,

5   306:15–17 (Roman). Mr. Oliver explained how Apple "incorporated the data points provide by [Anal-

6   ysis Group] and their bottoms-up value comparables analysis" to reflect the "costs of replacement for

7   developers of the . . . value that Apple provides to developers." TT 602:25–603:4 (Oliver); *see also* CX-

8   0009A. And Mr. Schiller explained that Apple's technical requirements were "created to help ensure

9   the developer makes a link that's safe and easy for the user to use" while protecting "the integrity of the

10  app experience." TT 820:19–22 (Schiller).

11      At the conclusion of the first phase, Epic had not carried its burden of proving that Apple vio-

12  lated the Injunction, and Epic did not seek any discovery in connection with its motion. TT 924:1–7.

13  Rather than simply denying the motion, this Court ordered Apple to produce "all" documents related to

14  injunction compliance. Dkt. 974. Apple reviewed 1.3 million documents, producing more than 100,000

15  documents to Epic (of which Epic only introduced 49 at the resumed evidentiary hearing). As the Court

16  explained, the aim of the resumed evidentiary hearing was to determine whether these documents were

17  consistent with the prior testimony of Apple's witnesses. Dkt. 1050, at 4 ("Look, your folks came in

18  here and they told me how and why they did what they did, and I expect, from your perspective, the

19  documents will be consistent with that testimony.").

20      The resumed evidentiary hearing made clear that the testimony of Apple's witnesses was con-

21  sistent with and supported by the documentary record—further establishing the objective reasonableness

22  of Apple's process and conclusions. Epic recalled only two witnesses: Mr. Oliver and Mr. Schiller. Dkt.

23  1235. Just as they had previously testified, the relevant documents included or referenced multiple anal-

24  yses and meeting decks that established that Apple took numerous steps to comply with the Injunc-

25  tion. *See, e.g.*, CX-0009A; CX-0014; CX-224; *see also* TT 1274:23–1275:10 (Schiller). The evidence

26  also showed that Apple affirmatively considered the Injunction, the Court's Rule 52 Order, and even the

27  "spirit" of the decision while considering the available compliance options. *See, e.g.*, TT 870:11– 874:3

28  (Schiller); CX-0013; CX-1104. This was a compliance program.

Epic repeatedly challenged the witnesses on whether various aspects of the new framework were consistent with the Injunction. Each of Apple's witnesses pushed back and testified that Apple had complied with the Injunction:

- "**Q.** And so this slide is telling Mr. Cook in no uncertain terms that the 27 percent will avoid financial risk but will frustrate the goal of the injunction, correct? **A.** That's not true." TT 1538:17–23 (Oliver).

- "**Q.** All right. But you had concerns about doing it and effectively got overruled or outvoted by others? **A.** No, I wouldn't describe it that way." TT 1203:4–6 (Schiller).

- "**Q.** And the idea was that you were trying to choose words that would deter users from proceeding, right? **A.** That's incorrect." TT 1340:19–20 (Onak).

- "**Q.** So links can compete with IAP as long as they do it with both hands strapped behind their back. **A.** I do not agree." TT 1685:21–23 (Vij).

- "**Q.** So what this is communicating is that the injunction didn't spell out the contours of exactly how Apple had to comply with it, right? **A.** This is communicating that the injunction compliance followed what was contained in the injunction itself." TT 1850:12–17 (Goldberg).

Not a single Apple witness testified that the new framework is non-compliant, and no document establishes non-compliance. Epic's *arguments* are refuted by the *evidence*.

Mr. Schiller, Mr. Oliver, and the rest of Apple's witnesses candidly explained the injunction compliance process. Apple spent months grappling with how best to comply with the Injunction from a legal-business perspective. Mr. Oliver explained how Apple "debated [options]" but ultimately "believed . . . [they] were going to be in compliance with the injunction." *See* TT 1531:23–25 (Oliver). Mr. Schiller testified to similar effect. TT 1274:23–1275:10, 1295:5–1296:6 (Schiller). The only conclusion to be drawn from this record is that Apple followed an objectively reasonable process and reached an objectively reasonable conclusion. Epic's motion must be denied.

**B.    Apple no longer prohibits developers from including buttons, external links, or other calls to action**

The Court enjoined Apple from "prohibiting developers from … including in their apps and their metadata buttons, external links, or other calls to action" directing customers to out-of-app purchasing

mechanisms.  Dkt. 813 ¶ 1.  To "prohibit" primarily means "to forbid by authority or command."  Webster's Third New International Dictionary (2002); *see also Prohibit*, New Oxford American Dictionary (2001); *Prohibit*, American Heritage Dictionary (5th ed. 2011).  It secondarily means to "prevent" or "make impossible."  *Prohibit*, Webster's Third; *see also Prohibit*, New Oxford American Dictionary; *Prohibit*, American Heritage Dictionary.  The Injunction's prohibitory command therefore is that Apple must not (1) forbid developers, by authority or rule, from including buttons, external links, or other calls to action to alternatives to IAP; or (2) prevent or otherwise make it impossible for developers to include such buttons, links, or other calls to action.  The Injunction includes no other mandates or prohibitions and describes no other "act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).

Apple complied with the Injunction.  Apple eliminated its prior categorical prohibition against in-app steering, former Guideline 3.1.1.  The replacement Guideline expressly allows developers "to include a link to the developer's website that informs users of other ways to purchase digital goods or services," and "the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price." CX-0013 § 3.1.1(a).  The Entitlement further provides that the link must be "accompanied by language and a button adhering to the requirements provided in the Apple Materials."  CX-0002 § 3.3.  Those materials provide templates for language to call the user to click the button and thereby activate the link.  CX-0003.5 (*e.g.*, "To get XX% off, go to www.example.com").  Apple's new templates comprise a button, link, and a call to action.  *See* TT 1286:10–12 (Schiller) (template includes a button, link, and a call to action, and thus would "have been rejected under any" of the three provisions of former Guideline 3.1.3); *see also id.* at 1286:14–16 (Schiller) (template is permitted under new Guideline 3.1.3 and Entitlement).  Put simply, before the Injunction, developers could not include buttons, links, or other calls to action within their app.  Now they can.

The rules that Apple developed to regulate such developer communication, such as Apple's accompaniment requirement, button rules, technical requirements, and the commission, comply with the Injunction because they do not prohibit developers from engaging in such communications.  Rather, each of those rules allow developers to include such content, subject to rules and regulations that developers can readily follow, without any significant added cost or burden.

1   The Supreme Court recently juxtaposed prohibitions with regulations, explaining that "regulat-

2   ing" something—"fix[ing] the time, amount, degree, or rate of an activity according to rule"—does not

3   "prohibit" it. *Ysleta Del Sur Pueblo*, 596 U.S. at 697 (cleaned up); *see also California v. Cabazon Band*

4   *of Mission Indians*, 480 U.S. 202, 209 (1987) (cleaned up) (a law does not "prohibit" conduct if it "gen-

5   erally permits the conduct at issue, subject to regulation").  The Court explained that, unlike a prohibi-

6   tion, "to *regulate* something is usually understood to mean to 'fix the time, amount, degree, or rate' of

7   an activity 'according to rule[s].'  Frequently, then, the two words are 'not synonymous.'" *Ysleta Del*

8   *Sur Pueblo*, 596 U.S. at 687 (citations omitted) (quoting dictionary definitions).  The Ninth Circuit has

9   long recognized the same point, upholding regulations as not "prohibiting" or even "effectively prohib-

10  iting" the underlying communications or conduct.  For example, in *Sprint Technology PCS, L.P. v.*

11  *County of San Diego*, the court held that the Telecommunications Act of 1996, which preempts local

12  laws that "prohibit" or "have the effect of prohibiting" the provision of telecommunications services, did

13  not preempt a local ordinance that "impose[d] restrictions and permit requirements on the construction

14  and location of wireless telecommunications facilities." 543 F.3d 571, 573–74 (9th Cir. 2008) (en banc).

15  The Ninth Circuit explained that conduct that "'creates a substantial … barrier' to the provision of ser-

16  vices" is not an "actual or effective prohibition." *Id.* at 577–78 (cleaned up); *see also S. Or. Barter Fair*

17  *v. Jackson County*, 372 F.3d 1128, 1139 (9th Cir. 2004). And this same distinction—between prohibi-

18  tions versus rules that allow subject to regulation—applies between private parties as well.  *See Prune-*

19  *Yard Shopping Ctr. v. Robins*, 447 U.S. 74, 83–84 (1980) (private mall owner that is barred from pro-

20  hibiting certain speech on mall property can still establish rules for engaging in such speech).

21  Apple's rules and commission on linked transactions do not prohibit developers from including

22  buttons, links, or other calls to action.  Apple expressly allows such communications, subject to rules

23  and a commission that the Injunction does not address and that the Court has never adjudicated.  Devel-

24  opers can readily comply with those rules: the application for the Entitlement is short, applying is free,

25  and approval is automatic and has never been denied.  TT 33:5–7 (Fischer).  Including links in an app is

26  similarly easy and free: there is no change for including links and the requirements do not make including

27  the links any more difficult or burdensome.  TT 808:8–9 (Schiller). There is accordingly no prohibition

28  in name *or* effect—developers can now include buttons, links, and calls to action.  Apple has complied.

1   Epic has suggested that Apple set the commission and the related requirements to discourage

2   developer adoption and minimize the financial impact on Apple.  *See, e.g.*, TT 1221:8–9 (Schiller);

3   1664:21–25 (Vij); 1790:3–4 (Goldberg).  But the Injunction does not require Apple to ignore the finan-

4   cial consequences of available compliance mechanisms.  To the contrary, it islegitimate for a business

5   to "promote the value of the corporation for the benefit of its stockholders" when choosing among legally

6   available options for compliance.  *E.g.*, *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 34 (Del.

7   Ch. 2010).  Apple adopted a framework that has a lower commission on linked transactions, and, at the

8   time of final approval by the Price Committee, Apple projected that the new Entitlement would result in

9   hundreds of millions of dollars of lost revenue annually.  TT 365:5–366:25 (Roman); CX-0009.13.  That

10  projection depends on an assumption regarding developer adoption that has not yet been achieved, but

11  that is attributable at least in part to the very pendency of this proceeding.  TT 366:21–25 (Roman).

12  Epic, which has the burden of proof by clear and convincing evidence, failed to prove why other

13  developers have not yet implemented the Entitlement.  Indeed, Epic did not call as a witness any devel-

14  oper that had even applied for the Entitlement, much less a developer that was unable to comply with its

15  requirements.  Evidence of third-party inactivity is insufficient to prove that Apple's new rules (whether

16  viewed in isolation or in combination) prohibit that activity.  *See, e.g.*, *S. Hospitality, Inc. v. Zurich Am.*

17  *Ins.*, 393 F.3d 1137, 1140 (10th Cir. 2004).  Nor can contempt turn on the independent decision-making

18  of third parties.  *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 (9th Cir. 1983)

19  ("The power to impose coercive sanctions to compel obedience to an order in a civil contempt is limited

20  by the *individual's* ability to comply with the court's order.") (emphasis added).  Epic also has no apps

21  on the App Store and therefore cannot benefit from the Injunction, which is reason enough to deny its

22  motion.

23  **C.    Context confirms that Apple's rules comply with the Injunction's plain terms**

24  The context of the Injunction confirms that Apple's rules comply with the Injunction.  *See City*

25  *of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1984) (stating that a court's order "must be

26  discerned within its four corners," but that "a court may consider surrounding circumstances as aids in

27  construing" the order) (citation omitted).  The Injunction tracks nearly verbatim Apple's previous Guide-

28  line 3.1.1, which effected a complete prohibition against in-app buttons, links, or other calls to action

1    directing users to purchase mechanisms other than IAP.  Rule 52 Order at 31–32, 163–64.  The Court

2    emphasized that the Injunction was a "measured remedy" requiring Apple to "eliminate" its prior cate-

3    gorical anti-steering prohibitions.  *Id.* at 179.  And in the order denying Apple's motion to stay the In-

4    junction, the Court stated that it "can envision numerous avenues for Apple to comply with the injunction

5    and yet take steps to protect users," including by implementing "engineering or guidelines" similar to

6    the "reader-rule, cross-play, and cross-wallet."  Dkt. 830, at 3.

7         The Injunction does not address, one way or the other, Apple's ability to set more detailed terms

8    and conditions for engaging in such steering communications and the contemporaneous Rule 52 Order

9    indicates that Apple could adopt such requirements.  Rule 52 Order at 142–43.  Moreover, during the

10   merits stage of this proceeding, Epic never sought an injunction prohibiting Apple's in-app steering—

11   let alone an injunction addressing the technical requirements for how such communications could be

12   made.  *See* Dkt. 821 at 1.  The Court in fact recognized there was a "less fulsome" record on the anti-

13   steering provisions as compared to other aspects of the challenged rules.  Rule 52 Order at 163.  Judicial

14   imposition of such detailed technical requirements would involve the very "micromanage[ment]" this

15   Court has properly disavowed.  *Id.* at 179.  Doing so is especially inappropriate here, where "all ambi-

16   guities are resolved in favor of the person subject to the injunction."  *Clark*, 60 F.3d at 604.

17        The context of the Court's and the Ninth Circuit's determinations about the lawfulness of Apple's

18   requirement that developers use IAP for in-app purchase further supports Apple's conclusion.  The Court

19   indicated that Apple was entitled to charge a commission for access to the iOS platform and userbase.

20   *See* Rule 52 Order at 150 ("Even in the absence of IAP, Apple could still charge a commission on de-

21   velopers.").  It was objectively reasonable for Apple to conclude that a commission on linked transac-

22   tions is not prohibited by the Injunction.  TT 1274:23–1275:10, 1295:5–1296:6 (Schiller).  And the Ninth

23   Circuit held that Apple's app distribution and IAP requirements are "clearly lawful."  *See Epic Games*,

24   67 F.4th at 998.  That is, the requirement that developers pay Apple a commission in order to sell in-app

25   goods as a condition of app distribution is a lawful form of competition.  The Injunction does not require

26   that Apple provide developers a way to circumvent that lawful business model and any associated com-

27   mission.  To now read into the Injunction unwritten limitations on the same thing—through technical

28   requirements and/or a commission—would undermine Apple's victory on Epic's antitrust claims.

* * *

Apple respects this Court's orders and has endeavored at all times to comply with them fully. The Apple witnesses with decision-making authority uniformly testified that they had read the Injunction. TT 12:21–23 (Fischer); 1273:1–2 (Schiller). Mr. Schiller read the entire 185-page Rule 52 order, as did Mr. Oliver. TT 1273:3–7, 1274:23–1275:10 (Schiller); TT 453:2–7 (Oliver). No witness with any level of authority testified that they disregarded or ignored the Injunction. No document even suggests as much. Instead, the record is replete with references to the Injunction, this Court's orders, and even its "spirit." To be sure, Apple recognized that Epic would likely challenge any compliance plan: As Epic's own counsel put it, "everyone knew that this … may need to go before a court." TT 1734:24–1734:25 (Vij). But the recognition of a likely challenge by an adversary does not suggest that Apple acted in defiance of the Injunction. The evidence establishes that Apple weighed a number of compliance options based on informed and careful analyses, with the Injunction front-and-center. Apple used a reasonable process to make a reasonable conclusion that it complied.

## II. EPIC FAILED TO PROVE NON-COMPLIANCE BY CLEAR AND CONVINCING EVIDENCE

Epic advances two sets of challenges to Apple's compliance framework. *First*, Epic contends that Apple did not comply with the plain text of the Injunction. While that is the proper mode of analysis, Epic's textual positions are simply incorrect. *Second*, Epic contends that Apple did not comply with the atextual "spirit" or "purpose" of the Injunction. But Apple fulfilled the purpose of the Injunction by eliminating the kinds of categorical prohibitions against steering that this Court found unlawful and enjoined. Such categorical restrictions are gone. In any event, Epic's argument also fails on the law because its contentions are unambiguously outside the text of the Injunction and therefore cannot support a finding of a violation, much less contempt.

### A. Epic's textual positions are wrong as a matter of fact and law

On the actual terms of the Injunction, Epic raises only three arguments. Epic asserts that Apple violated the Injunction's text by: (1) requiring that the link "be accompanied by language and a button"; (2) by requiring a "Plain Button" style; and (3) by requiring that some developers of subscription apps choose between participating in the Entitlement or the VPP/NPP programs. Each of them fails as a

matter of law and fact because none of these rules prohibit developers from including buttons, links, or other calls to action. Moreover, even if the Court were to agree with Epic on any or all of these, the proper way to address such issues is by modifying the injunction to clarify its scope, after which Apple could seek to restrike the appropriate balance on its platform.[2]

**1.** The "accompaniment" requirement does not prohibit developers from including buttons, links, or other calls to action; it allows developers to include all three items, subject to a requirement that they must appear together on the same screen at the same time. *See* CX-0013 § 3.1.1(a). A requirement that some speech or conduct must be accompanied by other speech or conduct is not a prohibition on the speech. For example, the Sixth Circuit upheld an agency rule that required the term "biodegradable" on a product label to be accompanied by a disclaimer. *See ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 615–16 (6th Cir. 2017). The court explained that the "restriction is not a prohibition on speech; it does not ban [manufacturers] from using the word 'biodegradable'" even if it prevented them from "speaking in a certain manner." *Id.* at 616; *cf. Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) (upholding rule that required minors to be accompanied by adults during inmate visits in order to protect minors' safety). So too for Apple's accompaniment rule: developers may include all three elements, subject to a requirement governing the time, place, and manner for including those elements.

Contrary to Epic's arguments, *see* Dkt. 897, at 20; Dkt. 923, at 8, the "accompaniment" requirement is fully consistent with the disjunctive "or" in the phrase "buttons, external links, *or* other calls to action." The disjunctive "or" does not require Apple to allow developers to mix and match these in-app actions. Rather, in ordinary English, the disjunctive command "'not A, B, *or* C' means 'not A, not B, *and* not C.'" Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 119 (2012); *see also United States v. Morales*, 122 F.4th 590, 596 (5th Cir. 2024) ("Simply put, a requirement that a defendant 'must not do *X* or *Y*' has the same results as a requirement that a defendant 'must not do *X* and must not do *Y*.'"). This Court has recognized as much. Dkt. 830, at 4 ("The Court … enjoined the prohibition to communicate external alternatives *and* to allow links to those external sites.") (emphasis added). The Injunction thus creates a checklist, forbidding Apple from prohibiting any of the listed

---

[2] Indeed, Epic previously argued that Apple had improperly excluded "multiplatform" apps from the Entitlement. *See* Dkt. 897, at 9–11. The evidence establishes that Apple does *not* exclude such apps, TT 114:5–24 (Fischer), and Apple published guidance to developers to confirm as much, CX-0031.

items. *See Morales*, 122 F.4th at 596. Apple has complied because it now permits developers to include all three things. *See* CX-002 § 3.3 (allowing developers to include a link "accompanied by language and a button.").

Apple's accompaniment requirement also does not change "or" to "and." Had the Injunction used "and" to bar Apple from prohibiting "buttons, links, *and* other calls to action," then Apple arguably would comply by allowing *only one* of the three elements (rather than allowing all three, as Apple currently does). *See Pulsifer v. United States*, 601 U.S. 124, 134–36 (2024) (discussing the possible "checklist" and "combination" readings of a prohibitory list separated by "and"). The word "other" is similarly inapposite: It requires that the call to action be "other" ("not the same: different") from the button and link. *See Other*, Webster's Third. Apple has complied because the accompanying language is different from the button and the external link. TT 1285:9–1286:16 (Schiller). The Injunction is a legal text, and principles of legal construction confirm that Apple has complied with its terms.

**2.** The requirement that the "button" appear in "Plain Button" style likewise complies because the "Plain Button" is a "button." The Injunction mirrors Apple's former Guideline 3.1.1, which prohibited developers from including certain "buttons." The term "button," as used by Apple, has a defined meaning that predates the Entitlement. Specifically, Apple's Human Interface Guidelines provide several different "buttons" for developers to use. CX-0016; TT 840:13–16 (Schiller). Mr. Schiller confirmed in his testimony that the "Plain Button" is a "button" as that term is used in Apple's developer materials, because "it can be clicked on and it will take an action." TT 1881:11–21 (Schiller); *see also* TT 1286:3–9 (Schiller). Indeed, Mr. Schiller agreed that, before the Injunction, if a developer had attempted to include a "Plain Button" directing a user to a non-IAP purchasing mechanism, Apple would have rejected that app for violating Guideline 3.1.1. TT 1285:5–1286:16 (Schiller). The Injunction's reference to a "button" thus plainly includes Apple's "Plain Button."

Epic offered no evidence to contradict Mr. Schiller's testimony that the "Plain Button" is a "button." Industry usage confirms that understanding. *See Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994) ("technical words" in a court's order "are interpreted as usually understood by persons in the profession or business to which they relate"). As that term is used in the context of software applications, a button is "[a]n area on a screen that when activated … causes an action to be initiated," and which "can

1  be any shape or size and need not be visible." *Button*, Oxford Dictionary of Computer Science (7th ed.

2  2016); *see Button*, American Heritage Dictionary ("[A] well-defined area within the interface that is

3  clicked to select a command.").  When a user presses the plain button—an area on the screen—it "acti-

4  vate[s]" the link, causing "an action to be initiated" (i.e., opening the disclosure sheet linked to the de-

5  veloper's website).  This is the exact explanation Mr. Schiller gave at trial.  The design features that Epic

6  challenges thus do not mean that the "Plain Button" ceases to be a button.  Apple's button rule complies.

7  **3.**  Epic suggested at the hearing that Apple is violating the Injunction by requiring developers

8  of certain subscription apps to choose between participating in the News Partner Program ("NPP") or

9  Video Partner Program ("VPP"), on one hand, and the Entitlement, on the other.  TT 475:14–478:5

10  (Oliver).  Not so.  Apple permits *any* developer to include buttons, links, or other calls to action, subject

11  to the limitation that developers cannot *also* participate in the NPP/VPP programs at the same time.

12  Rules that two things must occur at different times do not prohibit either activity; they regulate the time

13  and manner for engaging in those activities.  *E.g.*, *Vlasak v. Super. Ct. of Cal. ex rel. County of Los*

14  *Angeles*, 329 F.3d 683, 686 (9th Cir. 2003) (upholding rule against carrying oversized equipment while

15  participating in a demonstration).  Apple made the decision to require developers to choose between

16  these programs based, as the contemporaneous evidence shows, on the special requirements developers

17  must satisfy in order to receive the NPP and VPP discounts, including integration with Apple's commer-

18  cial services such as IAP.   TT 1593:8–1594:24 (Oliver); CX-1310.

19  The Injunction does not address the NPP or VPP programs, much less require Apple to allow

20  developers to extend those programs to developers at the same time they include external links.  All

21  participants in the VPP and NPP programs are subscription apps—yet the Rule 52 Order made clear that

22  subscriptions are not part of this case and that the Court was not even addressing the separate steering

23  provisions applicable to subscription apps.  Rule 52 Order at 32 n.194, 33 n.198, 123.  (Epic also is not

24  a VPP/NPP participant, highlighting the problems in allowing Epic to litigate issues in which it has no

25  cognizable interest.)  Notably, the Injunction requires Apple to allow links "in addition to" IAP, but it

26  does not impose a similar requirement that Apple must allow links "in addition to" the NPP and VPP

27  programs.  Dkt. 813 ¶ 1.  The only plausible inference is that no such requirement exists.  *See, e.g.*,

28  *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("The expression of one thing implies the exclusion of

others (*expressio unius est exclusio alterius*)" (citation omitted)).

**B.   Epic's atextual "spirit" arguments are both factually flawed and legally irrelevant**

Epic failed to prove that (1) the technical requirements or (2) the commission structure contravene the "spirit" of the Injunction; and in any event, (3) Epic's invocation of an atextual "spirit" cannot support contempt liability or sanctions.

**1.   Epic did not prove that the technical requirements violate the Injunction**

Epic has focused much of its attention on certain technical requirements that Apple imposes on external links, including where in the app they can (and cannot) be located, as well as the system disclosure sheet surfaced after a user taps an external purchase link.  Epic has *conceded* that "the Court did not explicitly prohibit" these requirements, but nonetheless argues that they violate the "spirit" or "purpose" of the Injunction.  *See* Dkt. 897, at 18.  That concession is all but dispositive, because contempt is available only if a party has violated the clear and definite terms of the Injunction.  *See* Fed. R. Civ. P. 65(d); *see also Taggart*, 587 U.S. at 560–61.  If the Court were to conclude that Apple's new rules do not comport with the "spirit" of the Injunction, the only remedy would be a new (or modified) injunction; Apple cannot be found in contempt of the extant Injunction or sanctioned as a result.

As set forth above, Apple's technical requirements comply because they do not "prohibit[] developers from … including in their apps and their metadata buttons, external links, or other calls to action." Dkt. 813 ¶ 1.  Each of Apple's rules allows developers to engage in such in-app steering, subject to rules that are clear, easy to follow, and impose little to no additional cost on the developer.  None of these regulations prohibits—or even make it hard for developers to include—the in-app communications described in the Injunction.

Epic complains that the requirements are less attractive for large developers, but Epic ignores the many benefits to other developers and consumers.  Determining the technical and design requirements for a feature or function for the App Store is an obligation of the platform operator, balancing the interests of participants on both sides of the two-sided platform.  *See* Rule 52 Order at 127; *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 546–47 (2018).  Apple cannot consider the interests of only (large) developers; it also endeavors to protect, to the extent possible, user security and privacy.  TT 829:15–21; 1283:13–16 (Schiller).  The Injunction does not address such decisions, which were never examined or

1    adjudicated as unlawful by this Court in the merits proceeding.

2        **a**. Epic asserts there is not adequate "justification" for Apple's technical requirements. Dkt. 897,

3    at 16. But as set forth above, after a careful and thorough process, Apple determined that each technical

4    requirement was justified by legitimate concerns about user safety, avoiding consumer confusion, and

5    protecting the iOS ecosystem—all of which are recognized as legitimate in this Court's Rule 52 Order.

6    *Supra* pp. 13–15. The Injunction does not prohibit Apple from imposing such requirements. Moreover,

7    Rule 65(d)'s specificity requirement would bar any requirement that Apple affirmatively create "mech-

8    anisms to *competitively constrain*" Apple's IAP commission. Dkt. 897, at 17 (emphasis added). "The

9    practical effect of such a vague standard" would be that Apple's policies would improperly "remain

10   under the continuing and largely unfettered supervision of the district court." *Gates*, 98 F.3d at 471. For

11   example, the Ninth Circuit has held that an injunction requiring a prison to set an "appropriate level of

12   psychiatric evaluation and treatment" could not be invoked as the basis for contempt. *Id.* at 465, 471–

13   72; *see also United States v. Google LLC*, 747 F. Supp. 3d 1, 183 (D.D.C. Aug. 5, 2024) (observing that

14   any standard seeking to regulate "otherwise rational business conduct" would be "highly subjective").

15   The Supreme Court has likewise cautioned federal courts against becoming "central planners," respon-

16   sible for setting a party's "terms of dealing" with others. *Verizon Commc'ns Inc. v. L. Offs. Of Curtis V.*

17   *Trinko, LLP*, 540 U.S. 398, 408 (2004). Courts construe injunctions to "preserve [their] validity," a

18   maxim that Epic's expansive interpretation contravenes. *DAS*, 18 F.4th at 1042.

19       That principle also forecloses Epic's arguments that the Injunction precludes Apple from surfac-

20   ing a system disclosure sheet or preventing developers from placing steering content within the IAP

21   payment flow. Those arguments are not only divorced from the text but also, if accepted, would violate

22   the First Amendment—which "offers protection when an entity engaging in expressive activity … is

23   directed to accommodate messages it would prefer to exclude." *Moody v. Netchoice, LLC*, 603 U.S.

24   707, 731 (2024). Forcing Apple "to carry speech with which it disagree[s]" would thus "alter its own

25   message," triggering First Amendment scrutiny. *Id.* at 729 (quoting *Pac. Gas & Elec. Co. v. Pub. Utils.*

26   *Comm'n of Cal.*, 475 U.S. 1, 13–14 (1986) ("*PG&E*")). An injunction burdening speech before "an

27   adequate determination that it is unprotected by the First Amendment" constitutes a presumptively un-

28   constitutional prior restraint. *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003)

1 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973)).

2      The system disclosure sheet contains truthful and non-misleading information that informs users

3 about commercial services they will not obtain if they leave Apple's platform for a third-party website.

4 TT 1289:7–23 (Schiller). Epic's suggestion that the system disclosure sheet is misleading is simply

5 wrong—every sentence is objectively truthful, and none suggests anything about the developer's alter-

6 native purchase mechanisms other than the fact that *Apple* is not responsible for the privacy or security

7 of those mechanisms. TT 52:2–7 (Fischer); TT 1266:13–18 (Schiller); TT 1367:9–12 (Onak).[3] But even

8 were it the case that the system disclosure sheet might "scare" users, Apple is permitted to advise users

9 (or even *advocate* to users) on *its own platform* about the shortcomings or risks of competitor products.

10 *See New.Net*, 356 F. Supp. 2d. at 1084 (refusing to enjoin the defendant from displaying a warning about

11 the dangers of the plaintiff's software). The Injunction does not prohibit Apple from speaking to users

12 on its own platform, nor could it.

13      Similarly, requiring Apple to host third-party speech inside the IAP payment flow, directing users

14 to external purchase options, would not survive even intermediate scrutiny. *See NetChoice, LLC v.*

15 *Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (intermediate scrutiny ordinarily applies to commercial

16 speech). Requiring Apple to host such directly competitive messaging at the point of sale cannot be

17 justified on the ground that this would "better balance[] the marketplace of ideas," because that is true

18 of any compelled speech promoting competitor products. *Moody*, 603 U.S. at 732. Indeed, the Ninth

19 Circuit has already held that Apple's tie between app distribution and IAP is "clearly lawful." *See Epic*

20 *Games*, 67 F.4th at 998. Moreover, developers already have ample less-restrictive opportunities to in-

21 form consumers about alternatives to IAP, including in their apps outside of the IAP payment flow,

22 "without burdening [Apple] with unwanted speech" inside its own checkout aisle. *Nat'l Inst. of Fam. &*

23 *Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 775 (2018). Requiring Apple to host competitor

24 speech in the IAP buy-flow would be analogous to *PG&E*, where the Supreme Court held unconstitu-

25 tional an order requiring a utility to include a third party's newsletter containing "hostile views" in the

26

27 [3] During the evidentiary hearing, Epic showed three instances in which lower-level employees working

28 on the system disclosure sheet used the word "scary" or its variants to describe a particular word or aspect of the proposed sheet. In two out of those three instances, Apple did not adopt the purportedly "scary" language. TT 1375:16–18, 1378:14–17 (Onak).

company's billing statements.  *PG&E*, 475 U.S. at 13–14.  Apple similarly cannot be compelled to promote its competitors' products.  *See NIFLA*, 585 U.S. at 767; *PG&E*, 475 U.S. at 13–14.  That is particularly so because this Court (and the Ninth Circuit) previously sustained Apple's IAP requirement against Epic's challenge.

**b**.  Epic's arguments about so-called transaction "friction" for users to complete a linked transaction do not establish contempt.  The evidence showed, at most, users might need to take several additional steps between pressing a link and completing a transaction, such as pressing "continue" on the disclosure sheet and potentially logging into the developer's website if account information is not already saved.  *E.g.*, TT 58:17–24 (Fischer); TT 814:11–25 (Schiller).  The evidence showed that Apple found each of those steps to be amply justified by concerns about avoiding consumer confusion and protecting against social engineering and other user-safety risks.  *Supra* pp. 12–13.  The Injunction did not bar Apple from making those determinations.

In any event, Epic's arguments about transaction friction fail as a matter of law.  In the words of Epic's counsel, "friction" is "the phenomenon that increasing the number of steps in a flow … increases the likelihood that users will become frustrated and give up."  TT 70:25–71:4 (Fischer).  Every transaction involves some friction—a transactional cost beyond the value of the good or service being offered. *See* Daniel Markovits, *Transactions Benefits*, 38 Yale J. on Regul. 633, 634–37 (2021).  Friction is thus inevitable—but it also can be valuable, because friction can help make a transaction more secure or legitimate.  *See id.* at 635–37.  Indeed, Apple's witnesses explained that the "friction" associated with the technical requirements is helpful to users, because it helps users understand the new service the developer is offering and helps prevent developers from misleading users.  *See, e.g.*, TT 102:8–13 (Fischer); TT 1289:19–25 (Schiller); TT 1387:2–6 (Onak).

Epic failed to prove by clear and convincing evidence that any friction is so great as to be tantamount to a prohibition even on linked transactions.  The very fact that Epic speaks in terms of "friction"—rather than "prohibition"—shows that Apple is not in violation of the Injunction.  TT 538:12–15 (Oliver) ("[Y]ou understand that the Court's goal was that the injunction would lower the friction of making purchases outside the app . . . correct?").  The Injunction itself says nothing about friction.  *See Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 676 (7th Cir.

2019) (the "four corners" of an injunction must "spell[] out … exactly what the enjoined parties must or must not do").  None of the terms of the Injunction can fairly be construed as regulating transaction "friction," much less defining how much transaction friction is too much.

Epic does not even contend that there is significant "friction" to including buttons, links, and calls to action in an app—the subject of the Injunction.  The uncontroverted evidence is that including this content is both free and straightforward.  A few additional steps for a user to complete a transaction, *after* following a link a developer previously added, does not indirectly prohibit developers from adding links or in-app communications in the first place.  Numerous cases hold that an act is not "prohibited" simply because a *different* but related act is subject to an economic or other burden.  *See, e.g.*, *S. Hosp.*, 393 F.3d at 1140 (government grounding of flights on September 11, 2001 did not "prohibit" access to airport hotels, even though the order had "the indirect effect of restricting or hampering access to the business premises" by impeding the travel that brought guests to the hotel); *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 147 (3d Cir. 2023) (similar for COVID-19 closure orders not prohibiting access to the businesses' properties); *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 77–78 (1993).  That principle forecloses Epic's argument that downstream transaction "friction" after a user follows a link somehow indirectly prohibits the inclusion of links in the first place.

**c.**  Epic's challenge to the technical requirements implicitly assumes that once Apple complied with the Court's directive to "eliminate" the former anti-steering Guideline, it was required to leave a vacuum in its place.  But the Injunction's text and the context provided by the contemporaneous orders establishes otherwise.  The Rule 52 Order recognized Apple's right to require IAP for in-app purchases of digital content.  Rule 52 Order at 150.  The stay order recognized that Apple could adopt replacement Guidelines to (among other things) protect users.  Dkt. 830, at 3.  Both orders recognized that the Court was not in a position to micromanage Apple's affairs.  Rule 52 Order at 179; Dkt. 830, at 3.  Yet that is what Epic's challenge to the technical requirements boils down to.

Apple's rules advance the goal of "preserving Apple's iOS ecosystem," and allowing Apple (rather than a court) to set those rules advances the goal of avoiding micromanagement of its business operations. Rule 52 Order at 179.  For example, the "accompaniment" rule centralizes information about the out-of-app purchase option in one place, instead of—as Epic would have it—telling users in one

1  place that they can get discounts on a developer's website but then making them search for the standalone

2  URL or standalone button elsewhere within an app. Conversely, mandating standalone textual calls to

3  action would impede Apple's ability to preserve the iOS ecosystem, because it would facilitate freeriding

4  on access to Apple's platform and intellectual property without paying any commission. *See id.* at 118,

5  150 & n.617. Epic has admitted that desire to evade any commission is the primary reason a developer

6  would prefer to use standalone text. TT 1883:3–7 (Schiller). Apple's requirement that the links be

7  placed outside of the IAP purchase flow similarly reflects the Court's balance between informing users

8  and maintaining a cohesive iOS ecosystem, recognizing that Apple can continue to require IAP to be the

9  exclusive *in-app* purchase mechanism for the sale of digital goods or services. *See id.* at 150.

10  **2.  Epic failed to prove that the commission violates the "spirit" of the Injunction**

11  Much of the testimony at the evidentiary hearing focused on Apple's decision to levy a commis-

12  sion—of either 12% or 27%—on purchases made on a developer's website within 7 days after a user

13  taps on an external purchase link and continues to the developer's website. But once again, Epic failed

14  to prove that this aspect of the compliance program violates either the letter or spirit of the Injunction,

15  particularly in context of the contemporaneous orders.

16  **a.**  The Injunction does not address commissions, much less forbid Apple from charging a com-

17  mission or dictating either the rate or the window. Epic has admitted that the Injunction does "not pre-

18  vent [Apple] from … introducing a new fee … on linked out-of-app transactions." Dkt. 871–4, at 561.

19  And context confirms that the Injunction does not preclude Apple from charging a commission. *See*

20  *City of Las Vegas*, 755 F.2d at 702. This Court's Rule 52 Order recognizes that, "*[e]ven in the absence*

21  *of IAP*, Apple could still charge a commission on developers," even if doing so "would seemingly impose

22  both increased monetary and time costs to both Apple and the developers." Rule 52 Order at 150 &

23  n.617 (emphasis added). The Court explained that "the developer's use of the App Store platform …

24  and access to Apple's user base … justifies a commission." *Id.* at 118. That is no less true for developers

25  who link out from an iOS app. Analysis Group's extensive work validated that conclusion by analyzing

26  the services Apple provides to developers *beyond IAP* and estimating a range of value based on compa-

27  rable services from other providers. *See supra* pp. 12–14. Epic has criticized the *value* Apple and Anal-

28  ysis Group assigned to those services, but it never refuted that developers benefit from them.

1    Further supporting the reasonableness of Apple's conclusion, this Court could *not* have restricted

2    Apple's ability to charge a commission for purchases made through in-app links.  The sole basis for the

3    Injunction was the UCL, but California courts have rejected efforts to use the UCL as a ratemaking tool.

4    For instance, in a suit challenging bank fees, a state appellate court held that ordering a lower fee would

5    be "an inappropriate exercise of judicial authority" given the "general preference for legislative or ad-

6    ministrative regulation in the field of price control."  *Cal. Grocers Ass'n v. Bank of Am.*, 22 Cal. App.

7    4th 205, 217–18 (1994); *see also Lazzareschi Inv. Co. v. S.F. Fed. Sav. & Loan Ass'n.*, 22 Cal. App. 3d

8    303, 311 (1971) (holding that "the control of charges . . . is better accomplished by statute or by regula-

9    tion authorized by statute than by ad hoc decisions of the courts").  Another UCL appellate decision

10   affirmed a trial court's decision to abstain from engaging in judicial review of a company's fees, because

11   the claim "implicate[d] a question of economic policy: whether service fees charged by banks are too

12   high and should be regulated."  *Willard v. AT&T Commc'ns. of Cal., Inc.*, 204 Cal. App. 4th 53, 59–61

13   (2012); *see also Beasley v. Wells Fargo Bank, N.A.*, 235 Cal. App. 3d 1383, 1391 (1991) (courts are not

14   "well suited to regulat[e] retail . . . pricing via injunction on an ongoing basis").  Courts are "compelled

15   to construe" injunctions "in order to preserve [their] validity," *DAS*, 18 F.4th at 1042, yet Epic's effort

16   to add an unwritten cap on Apple's commission would render the Injunction invalid under the UCL.

17    Additionally, requiring Apple to set a commission of zero—requiring Apple to permanently

18   provide access to its services and technologies for free—would constitute an unconstitutional taking.

19   *See Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021).  Such a restriction would "appropriat[e] for

20   the enjoyment of third parties [Apple's] right to exclude."  *Id.* at 149; *see also Horne v. Dep't of Agri-

21   culture*, 576 U.S. 350, 359–60 (2015) (Takings Clause protects intellectual property).

22    **b.**  Nor has Epic proven that the commission indirectly or effectively prohibits the inclusion of

23   buttons, links, or other calls to action.  The commission is not levied on the inclusion of steering content

24   within an app.  Apple does not charge developers any fee for applying for the Entitlement or including

25   buttons, links, or calls to action—which is the conduct the Injunction forbids Apple from prohibiting.

26   Developers may include such content completely free of charge.  Apple does not charge a commission

27   or fee when a user taps a link, or when the user continues through the link to the developers' website.

28   Apple charges nothing for the communications covered by the Injunction:  Including buttons, links, or

1    other calls to action is free. As set forth above, a burden—or even an outright prohibition—on one

2    transaction does not indirectly prohibit a different transaction. *See, e.g.*, *S. Hosp.*, 393 F.3d at 1140.

3        **c.** Epic has advanced policy arguments about whether Apple has "justified" the amount of its

4    commission or whether the commission will facilitate, in Epic's eyes, sufficient competitive pressure on

5    IAP from external purchase options. *See, e.g.*, TT 203:20–204:2 (Roman); TT 453:8–21, TT 1536:8–24

6    (Oliver); TT 1331:19–1332:2 (Onak). But Apple studied this issue extensively and found that a com-

7    mission, the rate, and the structure were all adequately justified. *See* CX-0014 (Analysis Group report

8    analyzing the value of Apple's ecosystem and services to developers). The stated rate of 12% and 27%

9    is lower than the standard 15%/30% commission for IAP transactions, reasonably reflecting that Apple

10   provided fewer services. CX-0002 § 4. The window only lasted for 7 days (shorter than longer periods

11   that Apple considered), after which the rate was zero. *Id.* Apple reasonably calculated, using actual

12   purchase data and reasonable assumptions based on developer behavior, that the effective commission

13   rate on transactions following a link would be 18%, representing a significant reduction from the Apple's

14   IAP commission. *Supra* pp. 13; *see also* TT 623:16–624:15, 1590:15–1591:18, 1607:19–1608:2 (Oli-

15   ver). Developers of course remain free to steer users to transactions on their websites without clicking

16   a link, or outside the 7-day window, for which there is no commission at all. TT 1575:4–14, 1578:19–

17   1579:3, 1584:1–1585:17 (Oliver). Most digital goods and services have only a marginal cost, meaning

18   developers will still make a significant profit on each sale under the 12%/27% commission. *See* Rule

19   52 Order at 11; *see also* Merits Trial Tr. 2410:3–4 (Evans).

20       The Injunction provides no basis to hold Apple in contempt for making those determinations. As

21   set forth above, Apple was under no obligation to justify its commission in any particular way—the

22   Injunction contains no such requirement, and the Court could not have imposed one. *Supra* pp. 30.

23   Requiring Apple to adequately justify its commission would not provide "fair and precisely drawn notice

24   of what the injunction actually prohibits." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086–

25   87 (9th Cir. 2004). Such a requirement would invite endless questions, such as which services or prod-

26   ucts Apple may charge for, the value of those services or products, whether certain developers should

27   pay more or less than other developers, and the profit margin Apple may earn. None of those questions

28   are issues that courts are empowered to answer under the UCL (or, for that matter, the antitrust laws).

1    *See Trinko*, 540 U.S. at 408 (federal courts should not dictate the "proper price" for a product).

2    The Court asked whether Apple had conducted a complete valuation of its intellectual property.

3    TT 1893:11–15 (Schiller).  As Mr. Schiller explained, the purpose of the Price Committee and Analysis

4    Group process was to perform both a top-down and a bottom-up assessment of the value of Apple's

5    services.  *See id.*  The question of whether Apple's commission precisely reflects the value of its intel-

6    lectual property is not an issue for injunction compliance.  *Cf. FTC v. Qualcomm Inc.*, 969 F.3d 974, 999

7    (9th Cir. 2020) (rejecting argument that royalties charged for a patented product are "'anticompetitive'—

8    in the antitrust sense—unless they precisely reflect a patent's current, intrinsic value and are in line with

9    the rates other companies charge for their own patent portfolios").  Moreover, the value that Apple pro-

10   vides to developers is not limited to its intellectual property.  *See supra* pp. 12.

11   Ultimately, the compliance analysis should be straightforward: the commission rate is *lower* than

12   the standard IAP commission, which obviously does not prohibit in-app transactions.  And the commis-

13   sion is not even levied on the inclusion of links—the subject of the Injunction.  It is levied on a subse-

14   quent transaction.  Nothing in the Injunction obliges Apple to make external purchase options more

15   economically attractive for developers than Apple's own services.  It would be a radical departure from

16   the law to hold that the UCL (or any competition statute, for that matter) requires a party to set prices in

17   such a way as to guarantee that its competitors' products will be cheaper than its own.  *Cf. Qualcomm*

18   *Inc.*, 969 F.3d at 999.  There has been no evidence that the commission—3% *lower* than what Apple

19   charges for purchases made through IAP, before even accounting for the 7-day window—forbids, pre-

20   vents, or makes it impossible for developers to include links within their apps, or even that doing so

21   would be unprofitable.  Moreover, developers are free to charge lower prices for their own digital content

22   outside the iOS App Store, regardless of commission rates.  And in any event, the Ninth Circuit noted

23   on appeal that developers may select alternative payment processors for reasons *other* than price.  *See*

24   *Epic Games*, 67 F.4th at 996.

25   The context thus confirms that it was objectively reasonable for Apple to conclude that its com-

26   mission is consistent with the Injunction.  In fact, Epic asks in contempt proceedings for the very relief

27   this Court rejected on the merits in denying Epic antitrust claims: to benefit from Apple's platform free

28   of charge.  *See* Rule 52 Order at 158–59.

### 3. Epic's atextual contentions about "spirit" cannot support contempt

Even if, *arguendo*, the arguments Epic now advances might have been considered in formulating the original injunction, or even in modifying the extant injunction upon proper request, they are "out of place" in determining whether Apple complied with the injunction actually entered by the Court. *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) (so explaining in the context of consent decrees). As a matter of law, a contempt finding cannot be based on an atextual "spirit" of the Injunction. In any event, Apple has complied with the purpose of the Injunction per the contemporaneous orders.

**a.** On the facts, Apple *has* complied with the Injunction's purpose enshrined in its text and confirmed by the context of this Court's orders that speak directly to the Injunction: The purpose is to "eliminate" the categorical prohibition on in-app steering. Rule 52 Order at 2; *see id.* at 179 ("Apple's conduct in enforcing anti-steering restrictions is anticompetitive. *A remedy to eliminate those provisions is appropriate*." (emphasis added)). Specifically, the Court found that "Apple contractually enforce[d] silence, in the form of anti-steering provisions." *Id.* at 166. The Court found that the injury "can best be remedied by invalidating the offending provisions." *Id.* Apple fulfilled that purpose by eliminating the Guidelines that were the subject of the Injunction, thereby removing the categorical prohibition against steering that the Court enjoined.

In issuing the Injunction, the Court also observed that the "measured remedy" of eliminating the categorical restrictions on speech would strike a balance between competing goals: it would "increase competition, increase transparency, increase consumer choice and information" while at the same time it would be "preserving Apple's iOS ecosystem which has procompetitive justifications," and would avoid any need "to micromanage business operations which courts are not well-suited to do as the Supreme Court has appropriately recognized." Rule 52 Order at 179; *see also id.* at 166 ("this limited measure balances the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace."). To the extent this language articulates secondary purposes, Apple's conduct advances those purposes as well. For example, the system disclosure sheet advances legitimate interests in informing consumers and avoiding confusion; the templates and appearance requirements maintain cohesiveness and facilitate app review; the link requirements protect user safety; the link placement requirements

advance Apple's interest in maintaining the tie that this Court upheld; and the commission protects the iOS ecosystem from freeriding.  *Supra* pp. 10–11.

**b**.  Epic's contrary arguments fail as a matter of law.  The command of an injunction is defined by its "'four corners,' and not by reference to the court's purpose or the purpose of the party seeking to hold the other in contempt."  *Gates*, 98 F.3d at 468 (citing *Armour & Co.*, 402 U.S. at 682); *see also Town of Islip*, 793 F.2d at 83 (similar).  Although an accompanying order or opinion may provide context for *interpreting* the terms of an injunction, courts have long rejected efforts to rely on atextual "spirit" arguments to *add* new enjoined acts that are unambiguously outside an injunction's terms:  "In contempt proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in light of the issues and the purpose for which the suit was brought."  *Terminal R.R. Ass'n. v. United States*, 266 U.S. 17, 29 (1924); *see also, e.g.*, *Armour & Co.*, 402 U.S. at 683 (rejecting atextual "purpose" as the basis for contempt); *N.C. State Conf. of the NAACP v. McCrory*, 214 F. Supp. 3d 466 (M.D.N.C. 2016) (rejecting atextual "spirit" as a basis for contempt); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 1978 WL 1379 (W.D.N.Y. July 28, 1978) ("[T]he spirit of the injunction cannot be used to expand the language [of the injunction] beyond what was clearly intended or implied."); *see also* Scalia & Garner at 57 ("Purpose sheds light only on deciding which of various *textually permissible meanings* should be adopted.").

That rule forecloses most of Epic's arguments.  The additional acts Epic complains of are beyond the text of the Injunction—for the commission to be too high to impose a "competitive[] constrain[t]" on Apple's IAP commission, or to unduly limit competition, impede information flow, or constrain user choice.  Epic's arguments are not an exercise in interpretation—they would rewrite the text wholesale, radically expanding the Injunction's scope.  That is not permitted.  *Terminal R.R. Ass'n*, 266 U.S. at 29.

To support its "spirit" argument, Epic takes language out of context from *Institute of Cetacean Research v. Sea Shepherd Conversation Society*, which involved an injunction that barred the defendants "and any party acting in concert with them" from attacking whaling vessels.  774 F.3d 935, 941 (9th Cir. 2014) (citation omitted).  The defendants aided and abetted third parties to perpetrate the very enjoined attacks, "flagrantly and materially assisting others to do what they themselves are forbidden to do."  *Id.* at 952.  The defendants then contended that they could not be held in contempt because the injunction

did not specifically bar the means they used to perpetrate the attacks.  The Ninth Circuit invoked the "object" and "spirit" in rejecting that unduly narrow reading of the "strict letter" of the injunction.  *Id.* at 949 (citation omitted).  The court observed that its "objective in issuing the injunction was to stop [defendants] from attacking the Plaintiffs' vessels," but the defendants had nonetheless circumvented the injunction by giving third parties the means to perpetrate the enjoined attack.  *Id.*

As another district court has explained, "*Sea Shepherd* did not conclude that a party may be held in contempt for refusing to engage in affirmative conduct that is not required by the terms of a prohibitory injunction, or for engaging in conduct that is not specifically and definitely prohibited therein."  *Epona, LLC v. County of Ventura*, 2019 WL 4187393, at *14 (C.D. Cal. Apr. 12, 2019).  Rather, *Sea Shepherd* "held that a party may be held in contempt for 'giving a non-party the means to violate an injunction, if the party knows it is [] likely the non-party will use those means to violate the injunction.'"  *Id.* (quoting *Sea Shepherd*, 774 F.3d at 950).  The conduct prohibited—and any associated "spirit"—is still only the conduct actually identified in the injunction itself.  *Sea Shepherd* thus simply makes clear that an enjoined party may not circumvent an injunction by outsourcing its non-compliance to a third party.  None of the circumstances from *Sea Shepherd* are present here.  *Taggart* controls, *Sea Shepherd* is inapposite, and contempt is unavailable as a matter of law.

**c.** Epic's contrary position raises grave due process problems, which alone bar the entry of contempt sanctions.  "[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."  *Schmidt*, 414 U.S. at 476.  To implement that requirement, Rule 65(d) requires every injunction to "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  As applicable here, the Court entered a discrete, prohibitory injunction comprising a single sentence.  Dkt. 813.  The Injunction puts Apple on specific notice that it may not "prohibit developers from including buttons, links, or calls to action."  Dkt. 813 ¶ 1.  Apple has complied:  Acting in reliance on the text of the Injunction, Apple deleted the enjoined Guideline and adopted a replacement framework.

The Injunction does not put Apple on specific notice of precisely what Epic's grievances would require it to do.  Indeed, Epic still has not identified specifically what acts Apple must do (or not do) to comply, and the "spirits" Epic divines are ill-defined and amorphous.  For example, even if it were in

the text, requiring Apple to effect a "competitive constraint" would not provide "fair and precisely drawn notice of what the injunction actually prohibits," *Fortyune*, 364 F.3d at 1086–87, and would impermissibly invite "continuing and largely unfettered supervision of the district court," *Gates*, 98 F.3d at 471. The lack of notice is particularly glaring because Epic's perspective on the supposed "spirit" is both unspecific and has continually shifted throughout the proceeding:

- "[Y]ou understand that the Court's goal was that the injunction would lower the friction of making purchases outside the app by allowing steering, correct?" TT 538:12–14 (Oliver).

- "You didn't have an understanding that the whole idea was that developers were supposed to be able to offer users incentives to have competition among the various payment options?" TT 1331:22–25 (Onak).

- "Now, you understand that creating a leakage risk was a goal at least, if not the goal, of the injunction, right?" TT 1456:5–6 (Oliver).

- "[Y]ou understood that posing a meaningful competitive threat to IAP was the goal of the injunction, correct?" TT 1536:8–24 (Oliver).

In contrast, Apple fairly read the Injunction and the Rule 52 Order to have a different, specific, and unchanging goal: to eliminate Apple's categorical prohibitions against steering while preserving the integrity of the iOS ecosystem. To nonetheless hold Apple in contempt for failing to comply with Epic's ill-defined "spirits" would thus create the very notice problems Rule 65(d) was enacted to prevent. *See DAS*, 18 F.4th at 1040–41 (construing injunction to avoid similar problems).

These issues have combined to deprive Apple of fundamental protections that ensure basic fairness, *see Schmidt*, 414 U.S. at 476, and they are compounded by the procedural shortcomings in the proceeding. Apple's attorney-client privilege has been pervasively invaded, which irreparably tainted the entire proceeding. Apple was prevented from talking to its own witnesses for nearly a year to formulate its case, including on the documents that the Court *sua sponte* ordered produced. *Supra* pp. 5. It has been subjected to extraordinary burdens, including making witnesses available on short notice and with no exhibits disclosed in advance. Dkt. 1235; *see also* TT 1445:3–8, 1446:6–7. And Epic has made itself a private prosecutor prosecuting an inquiry into Apple's subjective decision-making process without any claim it harms Epic. *See Young*, 481 U.S. at 801–14. Those procedural deficiencies, standing

1   alone, violate Apple's due-process rights. Taken together with Epic's open-ended reading of the Injunc-

2   tion, they leave no doubt that any contempt finding or sanction imposed on Apple would be incompatible

3   with due process. The Injunction put Apple on notice that it may not prohibit developers from including

4   buttons, links or other calls to action—period. It did not put Apple on notice that it would need to satisfy

5   all of Epic's grievances. A contempt action requires more procedural protections than ordinary civil

6   litigation, but here Apple received less process than it was due.

7          The Court's contemporaneous orders recognized Apple's right to regulate and charge for access

8   to the iOS App Store. The Injunction required Apple to delete the anti-steering Guidelines, but did not

9   specify their replacement or preclude an alternative commission. All of Epic's arguments ultimately

10  founder on those realities.

11  **III.    ANY ADDITIONAL REMEDY MUST BE CIRCUMSCRIBED AND PROSPECTIVE**

12         This Court never made a finding that *any* specific act or conduct by Apple violated *any* term of

13  the Injunction—as required by the show-cause procedure applicable to civil contempt proceedings. *See*

14  *Navellier v. Sletten*, 262 F.3d 923, 943 (9th Cir. 2001). As Epic explains in its motion, however, "the

15  [C]ourt need not find the defendant in civil contempt in order to find that the defendant has violated the

16  injunction and to enter appropriate relief." Dkt. 897, at 14 (citing *ADT Security Servs., Inc. v. Security*

17  *One Int'l, Inc.*, Case No. 11-cv-05149-YGR (N.D. Cal.), ECF No. 185 (order denying motion for civil

18  contempt but modifying preliminary injunction)). If the Court were to conclude that Apple has not

19  complied with one or more specific aspects of the Injunction, it can order Apple to comply without

20  contempt findings or sanctions. If, however, the Court were to hold Apple in contempt—and, again,

21  Apple submits that there is no basis for such a finding—then the available sanctions would be limited.

22         *First*, the Court cannot punish Apple for any alleged noncompliance because this is a civil con-

23  tempt proceeding. *See Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 858 (9th Cir. 2023) (citing *Int'l*

24  *Union, UMWA v. Bagwell*, 512 U.S. 821, 826–27 (1994)). "A court may wield its civil contempt powers

25  for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's

26  order'; and (2) 'to compensate the complainant for losses sustained.'" *Shell Offshore Inc. v. Greenpeace,*

27  *Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (quoting *UMWA*, 330 U.S. at 303–04). "Because civil compen-

28  satory sanctions are remedial, they typically take the form of unconditional monetary sanctions; whereas

coercive civil sanctions, intended to deter, generally take the form of conditional fines." *Id.*

Civil compensatory sanctions "must of course be based upon evidence of complainant's actual loss[.]" *UMWA*, 330 U.S. at 304; *see also Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1130 (9th Cir. 2013). Here, Epic has not even attempted to prove any losses. Epic has no apps on the App Store and has proven no cognizable injury from the new Guideline and Entitlement framework. Although the Court stated before the resumption of the evidentiary hearing that "should Apple be found to be in violation of the injunction, every day presents further injury to Epic," Dkt. 1171, at 2, Epic failed to adduce any evidence of such injury (and there is no such evidence in the entire record of this case). Thus, the Court cannot award any money to Epic (save, perhaps, its attorneys' fees). *See In re Dyer*, 322 F.3d 1178, 1195 (9th Cir. 2003).

Contrary to a suggestion Epic appeared to be making during the hearing, disgorgement is not available as a compensatory sanction for civil contempt. Nonrestitutionary disgorgement is a penalty, and penalties are not permissible sanctions in a civil contempt proceeding. *See Kokesh v. SEC*, 581 U.S. 455, 465–67 (2017) (holding that disgorgement is a penalty because it "is imposed as a consequence of violating a public law and it is intended to deter, not to compensate"). To the extent disgorgement intended to act as restitution for an aggrieved party could be a permissible remedy for civil contempt, Epic introduced no evidence that it sustained any actual losses nor any evidence seeking to quantify such losses, much less evidence that any losses were a result of Apple's violation of the Injunction. Moreover, the UCL does not permit disgorgement, *see Theme Promotions, Inc. v. News Am. Mktg FSI*, 546 F.3d 991, 1009 (9th Cir. 2008), so the Court could not modify the judgment to impose such a requirement.

At most, therefore, the Court could levy a prospective sanction to coerce Apple to come into compliance within a reasonable period of time. *See Shell Offshore*, 815 F.3d at 629. In other words, if the Court were to find that specific conduct by Apple violated a specific term of the Injunction, and required Apple to come into compliance within a reasonable time, it could ensure timely compliance by levying a coercive sanction. Any such sanction would have to be prospective only, and Apple must be given the opportunity to avoid (or "purge") it by coming into compliance. *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110 (9th Cir. 2005) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)) ("A civil contemnor 'carries the keys of his prison in his own pocket' because civil contempt is

1  'intended to be remedial by coercing the defendant to do what he had refused to do.'").

2  These limitations are especially appropriate given that this proceeding has deviated far from the

3  accepted procedures for injunction compliance. Coercive sanctions are a "potent weapon" designed to

4  address "violation of a court order by one who fully understands its meaning but chooses to ignore its

5  mandate." *ILA, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). While Epic has chal-

6  lenged aspects of Apple's compliance efforts, the Court has yet to specify what conduct (if any) violates

7  what aspect (if any) of the Injunction. The proper course at this point is for the Court to determine

8  whether Apple's conduct complied with the terms of the Injunction and, if not, to instruct Apple what

9  further steps would be required to comply on pain of civil sanctions for future non-compliance. Apple

10  would have the opportunity within a reasonable time to comply with such an instruction, if within the

11  Court's lawful authority under the UCL, with no sanctions required.

12  *Second*, contempt sanctions are entirely unwarranted to the extent Epic is now seeking a new,

13  prescriptive decree that would include conduct never analyzed at trial under the UCL standards. Epic

14  never moved to modify the Injunction and cannot belatedly do so now. Had it done so, Epic would have

15  had to identify the specific practices it seeks to enjoin and explain why the modifications are consistent

16  with and warranted by the underlying UCL judgment. *See Armstrong v. Brown*, 768 F.3d 975, 979–80

17  (9th Cir. 2014). As the Supreme Court has explained, "[t]he scope of injunctive relief is dictated by the

18  extent of the violation established[.]" *Lewis v. Casey*, 518 U.S. 343, 360 (1996) (quoting *Califano v.

19  Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("[A] 'remedy

20  must ... be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'").

21  But Epic never challenged under the UCL—and this Court never adjudicated—the practices Epic attacks

22  in this post-judgment proceeding. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1137 (9th Cir. 2014) (when

23  evaluating UCL claim courts must determine whether the defendant's conduct "amounts to a violation

24  of antitrust laws or otherwise significantly threatens or harms competition" (quotation marks omitted)).

25  And absent such a merits determination, the Court cannot enjoin such conduct.

26  An equitable remedy must be tied to the underlying substantive violation. *See Hecox v. Little*,

27  104 F.4th 1061, 1089 (9th Cir. 2024) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970,

28  974 (9th Cir. 1991) ("[I]njunctive relief 'must be tailored to remedy the specific harm alleged,' and '[a]n

1   overbroad injunction is an abuse of discretion.'")).  The Court never considered (because they did not

2   exist) the rules and commission that Apple imposes under the new framework.  The Court cannot base

3   a contempt finding on Apple's new and materially different conduct.  *See Doe, 1–13 ex rel. Doe Sr. 1–*

4   *13 v. Bush*, 261 F.3d 1037, 1063–64 (11th Cir. 2001) (conduct that has "not been addressed in the final

5   judgment … cannot serve as a valid basis for holding defendants in contempt").

6        The UCL does not permit a court to dictate the terms of business along the lines Epic now urges.

7   As discussed above, the UCL is not a rate-setting statute, and Epic therefore cannot use the UCL to limit

8   (or eliminate) Apple's ability to charge for its products or services.  Likewise, California courts in UCL

9   cases abstain from issuing equitable relief under the UCL that would require the court to intervene in

10  "matters of complex economic policy."  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473

11  (2006).  The appropriate rules to ensure consistency and inform users of their options are matters of

12  difficult economic policy in an area of fast-moving technological innovation.

13       Finally, structural injunctive relief is complex and typically requires a "remedies-specific evi-

14  dentiary hearing" before an injunction goes into effect, in which the parties and the Court evaluate the

15  scope and implementation of the relief.  *United States v. Microsoft Corp.*, 253 F.3d 34, 101, 103 (D.C.

16  Cir. 2001); *see Moltan Co. v. Eagle–Picher Indus.*, 55 F.3d 1171, 1174–75 (6th Cir. 1995).  The Court

17  did not hold such a hearing before issuing the extant Injunction.  The contempt hearing held over the

18  past year—which focused principally on Apple's subjective intent or motivations—is no substitute for

19  *ex ante* evaluation and consideration of appropriate structural remedies.  Epic cannot now use contempt

20  proceedings as a *post hoc* mechanism to import new requirements into the UCL Injunction that Epic

21  itself never requested, and the Court issued *sua sponte*.

## CONCLUSION

23       Epic's Motion to Enforce should be denied.

Dated: March 7, 2025                                   Respectfully submitted,

                                                       By: */s/ Mark A. Perry*
                                                       Mark A. Perry
                                                       WEIL, GOTSHAL & MANGES LLP

                                                       Attorney for Apple Inc.