# EXHIBIT A

## (Redacted)

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

EPIC GAMES, INC.,           )     **Evidentiary Hearing**
                            )
          Plaintiff,    )     **Volume 7**
                            )
  vs.                   )     NO. C 20-05640 YGR
                            )
APPLE, INC.,             )     Pages 1119 - 1424
                            )
          Defendant.    )     Oakland, California
_____)     Monday, February 24, 2025

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:         Cravath, Swaine & Moore LLP
                       375 Ninth Avenue
                       New York, New York  10001
              BY:  GARY A. BORNSTEIN,
                       YONATAN EVEN,
                       LAUREN A. MOSKOWITZ,
                       CHARLOTTE ROTHSCHILD,
                       MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:         Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1        **A P P E A R A N C E S (CONT'D.)**

2

3    For Defendant:            Weil, Gotshal & Manges LLP
                                2001 M Street NW, Suite 600
4                               Washington, D.C.  20036
                          BY:  ANNE CORBETT,
5                               MARK A. PERRY,
                                JOSHUA M. WESNESKI, ATTORNEY AT LAW
6

7                               Weil, Gotschal & Manges LLP
                                767 FIfth Avenue
8                               New York, New York  10153-0119
                          BY:  CAMILLA BRANDFIELD-HARVEY,
9                                ATTORNEY AT LAW

10

                                Gibson, Dunn & Crutcher LLP
11                              One Embarcadero Center, Suite 2600
                                San Francisco, California  94111-3715
12                        BY:  LAUREN DANSEY, ATTORNEY AT LAW

13                              Gibson, Dunn & Crutcher LLP
                                1050 Connecticut Avenue, N.W.
14                              Washington, DC  20036-5306
                          BY:  HARRY PHILLIPS,
15                              CYNTHIA E. RICHMAN, ATTORNEY AT LAW

16

17

18

19                              --o0o--

20

21

22

23

24

25

1

<div align="center">

**I N D E X**

</div>

2

3    MONDAY, FEBRUARY 24, 2025 – VOLUME 7

4
**PLAINTIFF'S WITNESSES**                    **PAGE**    **VOL.**

5

6    SCHILLER, PHILIP

7    (SWORN)                                  1134       7

8    DIRECT EXAMINATION BY MR. BORNSTEIN      1135       7

9    CROSS-EXAMINATION BY MR. PERRY           1271       7

10   REDIRECT EXAMINATION BY MR. BORNSTEIN    1304       7

11

12   ONAK, RAFAEL

13   (SWORN)                                  1316       7

14   DIRECT EXAMINATION BY MS. MOSKOWITZ      1317       7

15   CROSS-EXAMINATION BY MR. WESNESKI        1369       7

16   REDIRECT EXAMINATION BY MS. MOSKOWITZ    1388       7

17

18   OLIVER, CARSON

19   (SWORN)                                  1393       7

20   DIRECT EXAMINATION BY MR. OLIVER         1394       7
21

22

23

24

25

<div align="center">

***RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228***

</div>

**E X H I B I T S**

| EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 0202 | | | 1397 | 7 |
| 206 | | | 1336 | 7 |
| 223 | | | 1175 | 7 |
| 224 | | | 1200 | 7 |
| 225 | | | 1264 | 7 |
| 227 | | | 1243 | 7 |
| 229 | | | 1251 | 7 |
| 0246 | | | 1409 | 7 |
| 0266 | | | 1403 | 7 |
| 268 | | | 1346 | 7 |
| 272 | | | 1156 | 7 |
| 279 | | | 1230 | 7 |
| 281 | | | 1355 | 7 |
| 291 | | | 1239 | 7 |
| 484 | | | 1261 | 7 |
| 485 | | | 1169 | 7 |
| 486 | | | 1141 | 7 |
| 487 | | | 1363 | 7 |
| 488 | | | 1151 | 7 |
| 489 | | | 1174 | 7 |
| 490 | | | 1259 | 7 |
| 496 | | | 1353 | 7 |

**E X H I B I T S**

| EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|----------|---------|------|------|------|
| 520 | | | 1330 | 7 |
| 632 | | | 1229 | 7 |
| 1103 | | | 1287 | 7 |
| 1104 | | | 1298 | 7 |
| 1208 | | | 1380 | 7 |
| 1210 | | | 1385 | 7 |
| 1211 | | | 1382 | 7 |

--o0o--

```
1    Monday, February 24, 2025                        8:30 a.m.

2                    P R O C E E D I N G S

3                         --o0o--

4

5         THE CLERK:  These proceedings are being recorded by

6    this Court.  Any other recording of this proceeding, either by

7    video, audio, including screenshots or other copying of the

8    hearing, is strictly prohibited.

9       Your Honor, now calling 20-5640-YGR, Epic Games vs. Apple,

10   Inc.

11      Lead counsel, please approach the lectern.

12        THE COURT:  And appearances.  Good morning.

13        MR. BORNSTEIN:  Good morning, Your Honor.  Gary

14   Bornstein for plaintiff, Epic Games.

15      And I have with me at counsel table today Yonatan Even:

16   Lauren Moskowitz, and Charlotte Rothschild.

17        THE COURT:  And you have one more.

18        MR. BORNSTEIN:  Oh, we do.  And Michael Zaken.  He

19   was not sitting there just moments ago.

20        THE COURT:  No, he was, but okay.

21      Mr. Perry, good morning.

22        MR. PERRY:  Good morning, Your Honor.  Mark Perry for

23   defendant Apple, Inc.

24      With me at counsel table today is Cindy Richman.

25        MS. RICHMAN:  Good morning, Your Honor.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

```
 1                    MR. PERRY:  Joshua Wesneski.

 2                    MR. WESNESKI:  Good morning, Your Honor.

 3                    MR. PERRY:  Camilla Branfield-Harvey, Heather Grenier

 4       of Apple.

 5                    MS. GRENIER:  Good morning, Your Honor.

 6                    THE COURT:  Good morning.

 7                    MR. PERRY:  And Mr. Schiller, our corporate

 8       representative, will be there later, but he's also the first

 9       witness so we asked him to wait outside in the hall until the

10       preliminaries are finished.

11                    THE COURT:  Okay.

12                    MR. PERRY:  Depending on how far we get today, we may

13       rotate in two other attorneys, Anne Corbett and Harry

14       Phillips, depending on the witness, Your Honor.

15                    THE COURT:  Okay.  It would be great, because I like

16       to try to remember names, and many of you I do remember but

17       the newer people I don't.  If you'd just write down the list

18       and give it to the CRD so she can hand it up to me.  Okay?

19                    MR. BORNSTEIN:  Of course.

20                    THE COURT:  All right.  There is a motion that was

21       filed --

22                         (Off-the-record discussion.)

23                    THE COURT:  It's not clear to me, Mr. Perry, that

24       Rule 502(d) does what you're asking it to do.

25          There have been a number of documents which I have ruled,
```

1    Magistrate Judge Hixson has ruled, are not privileged.  You've

2    asserted the privilege.  That's fine.  You can always take

3    that up at the appropriate time if it gets to that.

4        But, one, I'm not issuing a blanket order that says that I

5    am agreeing that there's some privilege that I've not yet

6    addressed or seen.  So I'm not going to do that.

7        There is a protective order in place.  Those protective

8    orders are -- follow 502(d) and there are -- there are

9    protections there.

10        For purposes of the privilege, Ninth Circuit law controls,

11    and that's what we will follow.  If you have an issue, you

12    have to raise it.

13             **MR. PERRY:**  Thank you, Your Honor.  May I be heard

14    very briefly on that?

15             **THE COURT:**  You may.

16             **MR. PERRY:**  To be clear, we're not seeking to revisit

17    any of the privilege determinations.  This is solely a

18    question of waiver and preservation.

19        Our concern is not with Epic, to be clear, as we've

20    explained to them.  We do have a protective order in this

21    case.

22        There is some law that says the use in a public proceeding

23    of a document that has not finally been determined to be

24    privileged could constitute a waiver from another plaintiff,

25    Your Honor, from a governmental enforcement agency, or

```
 1    something.  That was the purpose of the request of the 502(d)

 2    order was that the use of the documents in this case -- which

 3    we do not -- we understand the Court's ruling, for these

 4    purposes they are not privileged, we understand that -- is not

 5    a waiver.  In the event on appeal one of those documents were

 6    used here and ultimately found to be determined to be

 7    privileged, that that privilege claim has not been waived

 8    simply by the fact that we have proceeded with the hearing.

 9        That was the purpose of the request for the 502(d) order

10    is beyond the scope of this courtroom to other plaintiffs.

11    And I think 502(d) does speak directly to that that says it's

12    not a waiver in this proceeding, which Epic agrees, or any

13    other proceeding, which is what we can't do with a protective

14    order between the parties.  We need an order from the Court to

15    make that clear.

16            THE COURT:  Response.

17            MR. EVEN:  So as I think we tried to say, Your Honor,

18    in our papers, the use in this case may or may not be a

19    waiver.  That depends on what Apple does with the documents.

20        Clearly if the Ninth Circuit ultimately rules that the

21    document is privileged, that means that it's not been waived.

22        I don't think that the use by us is going to waive it, and

23    so we don't understand why there needs to be a blank check for

24    Apple to do whatever use.  And we obviously don't care what

25    happens in other cases.  That's not our -- our issue.  Our
```

1    issue is that there is a 502(d), kind of a standard

2    run-of-the-mill one in this case, says there is no waiver

3    generally.  And the fact that Apple seeks a different order

4    here we think speaks volumes because what Apple wants now is a

5    blank check on documents that have been adjudicated not

6    privileged?

7            **THE COURT:**  Yeah.  And I think my other concern is,

8    is that it is dependent on how you use it.  As you're well

9    aware, you know, there's a general principle that we all

10   follow, and you cannot use something both as a sword and a

11   shield.  So if Epic introduces a document that we've ruled is

12   not privileged, and you know, you're entitled to respond.

13       Now, if you choose to introduce five other documents in

14   response affirmatively, well, you can't claim a privilege.  It

15   seems to me that you've, at that point, either waived or

16   risked waiving because you want to use it in an affirmative

17   way.

18       Now you can use and respond to what it is that they are

19   saying.  But, again, I'm not giving any blanket order.  And so

20   the federal rules control.  The federal rules offer

21   protection.  And I can't tell you how often in trial I get

22   motions in limine with people asking me to enforce the rules.

23       The rules are the rules.  They apply.  You don't need an

24   extra order, and I'm not prepared to give you one.

25            **MR. PERRY:**  Thank you, Your Honor.

1          On a related note, we are most concerned obviously about

2      Epic's use of these documents.  To streamline the proceedings,

3      may we have a standing objection to their use of those

4      documents simply for preservation purposes so we don't to have

5      pop up every time?

6          **THE COURT:**  I'm assuming that there is some document

7      which indicates what you've objected to.  If I need to make a

8      ruling, then -- I just need to -- Mr. Perry, I just need to

9      know what your position is.

10         **MR. PERRY:**  Yes, Your Honor, but --

11         **THE COURT:**  And there are -- and that's always the

12     issue with blanket objections.  Although I agree, it does

13     streamline proceedings.

14         **MR. PERRY:**  And let me be very clear.  There is a

15     document.  We have provided it to Epic.  It's an index of all

16     of the documents that we are calling category 2 under the

17     protocol that this Court ordered, plus those documents that

18     have been reviewed and rejected by the special masters.  Epic

19     has that.  It's several thousand documents.

20         This Court has already ruled on the privilege, we think

21     under Rule 103.  It's a determinative ruling so that there's

22     nothing left to preserve on the privilege claim.  We simply

23     wish to -- we don't know which ones they intend to use in the

24     hearing so --

25         **THE COURT:**  So if they've been identified, I don't

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

 1    think that a standing objection with respect to those

 2    documents is a problem.  Do you?

 3            **MR. EVEN:**  No, Your Honor.

 4            **THE COURT:**  Okay.

 5            **MR. PERRY:**  Thank you, Your Honor.

 6            **THE COURT:**  All right.  So what is the plan for

 7    today?

 8            **MR. BORNSTEIN:**  So, Your Honor, we have in total five

 9    Apple witnesses who we will be calling throughout the course

10    of the proceedings.  And we're prepared to just run through

11    them and get through as many as we can each day.  I anticipate

12    we will get through two.  Maybe we'll start the third today.

13    That's optimistic.

14            **THE COURT:**  Can you tell me who they are?

15            **MR. BORNSTEIN:**  Of course.  So we're starting with

16    Mr. Schiller, whom Your Honor knows.

17        Mr. Schiller is followed by Rafael Onak, that's O-N-A-K.

18            **THE COURT:**  And his role?

19            **MR. BORNSTEIN:**  He's in the user experience and

20    design function at Apple.

21            **THE COURT:**  Okay.

22            **MR. BORNSTEIN:**  After Mr. Onak is Carson Oliver who

23    testified back in May who runs the App Store.

24            **THE COURT:**  Yes.

25            **MR. BORNSTEIN:**  Following Mr. Oliver, we have Kunnal

1    Vij, that's K-U-N-N-A-L, last name, V-I-J.  And Mr. Vij is in

2    the finance function at Apple.

3        And then the last witness is Marni Goldberg.  And

4    Ms. Goldberg is in the communications and PR function at

5    Apple.

6            **THE COURT:**  Okay.  Any other preliminaries?

7            **MR. BORNSTEIN:**  Not from Epic, Your Honor.

8            **MR. PERRY:**  Just one more brief one, Your Honor.

9        The parties have agreed to follow the same confidentiality

10   protocols that we did in the last hearing and at the merits

11   trial where we have done our best to identify those

12   confidential information and highlighted them in the hard

13   copy.

14       There may be some documents that we ask not be displayed

15   on the public screen.  And the parties may talk around certain

16   numbers and personally identifiable information and the like.

17   And we are not asking for the courtroom to be closed as a

18   result of that agreement.

19           **THE COURT:**  Okay.

20           **MR. BORNSTEIN:**  And to be clear, Your Honor, the copy

21   of the binder that's been provided to the Court is completely

22   free and unredacted and no highlighting.  So Your Honor has

23   the documents in the form in which they were produced.  The

24   only things that are blacked out or redacted are redactions

25   that Apple made in the course of producing the documents to

 1    us.

 2            **THE COURT:**  Okay.  And how -- who is controlling the

 3    public access?  I mean we would typically do that.  So how are

 4    we supposed to know?

 5            **MR. BORNSTEIN:**  So what we've done, Your Honor, is we

 6    have, in the documents that are intended to be put on the

 7    screen, we have blacked out or redacted anything that we

 8    understand to be confidential.  So there should be no issues

 9    with the disclosure of confidential information.

10        As a failsafe, we've provided, or will on a

11    witness-by-witness basis, provide to Apple copies of the

12    documents that we're using highlighted to indicate for them

13    which portions we intend to black out.  If there's something

14    that Mr. Perry or one of his colleagues wants us to redact

15    that we haven't, we'll of course abide by that or just keep it

16    off the screen.

17            **THE COURT:**  Okay.

18            **MR. PERRY:**  And, Your Honor, we haven't seen all

19    those redactions so we're hoping not to have to pop up, but

20    there may be a document-by-document issue.

21        There may be one or two documents where essentially the

22    whole page is redacted or confidential or has much

23    confidential information.  And what we did last time was

24    simply the podium counsel requested of the clerk to not

25    display on the public screens, and the Court then ruled

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1      whether or not that was appropriate in light of the

 2      confidentiality ruling, and -- and I think was turned on or

 3      off in that way.

 4              THE COURT:  Okay.

 5              MR. BORNSTEIN:  And we've had some correspondence

 6      over the past few days to make sure that we have clear the

 7      categories of information that Apple wants to keep

 8      confidential.

 9         For example, there are internal project code names that

10      Apple is concerned about revealing.  There's personally

11      identifying information.  There's some financial information.

12      So we've, I think, come to ground on what those categories are

13      to try to facilitate things today.

14              THE COURT:  Okay.  All right.  Anything else?

15              MR. PERRY:  Nothing from Apple, Your Honor.

16              THE COURT:  All right.  Let's go ahead and call

17      Mr. Schiller in.  And just because it's been a few months, I

18      will have him sworn in again even though he's still under

19      oath.

20              MR. BORNSTEIN:  And, Your Honor, we have some witness

21      binders if Ms. Rothchild can bring them up to the witness

22      stand.

23              THE COURT:  You may.

24              MR. BORNSTEIN:  Thank you.

25              THE COURT:  Mr. Schiller, good morning.
```

1      **THE WITNESS:**  Good morning, Your Honor.

2      **THE COURT:**  I know you're still under oath and you

3  have, I'm sure, abided by my last admonition.  But I'm going

4  to have you resworn in just as a good reminder.

5      **THE WITNESS:**  Great.

6      **THE CLERK:**  Please raise your right hand.

7

8                    **<u>PHILIP SCHILLER</u>,**

9  called as a witness for the plaintiff, having been duly sworn,

10  testified as follows:

11      **THE WITNESS:**  I do.

12      **THE CLERK:**  Please be seated.

13     Speak clearly into the microphone.  Please state your full

14  name and spell your last name for the record.

15      **THE WITNESS:**  Philip William Schiller,

16  S-C-H-I-L-L-E-R.

17      **THE COURT:**  And just so the record is clear, we don't

18  have a jury here today, but that's typically how we say things

19  when we swear folks in.  But just so --

20     That's okay.

21     My CRD is on the new side so she's still learning.

22     Go ahead.

23      **MR. BORNSTEIN:**  All right.  Thank you, Your Honor.

24  / / /

25  / / /

| | |
|---|---|
| 1 | **<u>DIRECT EXAMINATION</u>** |
| 2 | **BY MR. BORNSTEIN:** |
| 3 | **Q.** Mr. Schiller, good morning. |
| 4 | **A.** Good morning. |
| 5 | **Q.** Good to see you again. |
| 6 | **A.** You too, sir. |
| 7 | **Q.** Now you've spent a fair bit of time in the courtroom so we |
| 8 | don't need to do a full introduction.  But I do want to do |
| 9 | just a short refresher of your role in the injunction response |
| 10 | process that brings us together, if I may. |
| 11 | So you -- Mr. Schiller, you led the team on the App Store |
| 12 | that was responsible for doing the work to plan for Apple's |
| 13 | response to the injunction; is that right? |
| 14 | **A.** Yes. |
| 15 | **Q.** Okay.  And there was a cross-functional team of people |
| 16 | that were involved in this process; yes? |
| 17 | **A.** Yes. |
| 18 | **Q.** And sometimes at Apple, that's -- cross-functional is |
| 19 | abbreviated XF; is that right? |
| 20 | **A.** I don't recall seeing that. |
| 21 | **Q.** Okay.  Now you were also one of the final decision-makers |
| 22 | for what Apple's response to the injunction would be, correct? |
| 23 | **A.** Yes. |
| 24 | **Q.** And the other final decision-makers besides yourself were |
| 25 | Mr. Cook, the CEO, and Mr. Maestri, who at the time was the |

SCHILLER – DIRECT / BORNSTEIN

 1   chief financial officer, correct?

 2   **A.**   Yes.

 3   **Q.**   And all three of you were on a price committee that made

 4   the final decision about the injunction response plan,

 5   correct?

 6   **A.**   Yes.

 7   **Q.**   But you, Mr. Cook, Mr. Maestri, you were the primary

 8   approvers?

 9   **A.**   Correct.

10   **Q.**   And now we went over this in some detail in May, but it

11   has been a while.  I want to do just a quick refresher on some

12   of the key features of the injunction response plan to set the

13   stage for the next few days, okay?

14   **A.**   Okay.

15   **Q.**   So under what's called the purchase link entitlement

16   program that Apple introduced to respond to the injunction,

17   there is a 27 percent standard fee for external purchases made

18   through the link, correct?

19   **A.**   Yes.

20   **Q.**   And then there is a seven-day tracking window on which

21   that fee is still paid for future purchases that are made on

22   the developer's website after clicking the link, correct?

23   **A.**   Yes.

24   **Q.**   And that's true even if those subsequent purchases made on

25   the developer's website are made by the user on some device

SCHILLER – DIRECT / BORNSTEIN

1    other than their iPhone, correct?

2    **A.**  Yes.

3    **Q.**  All right.  And you, Mr. Cook, Mr. Maestri, you all

4    approved this 27 percent standard commission and seven-day

5    tracking window?

6    **A.**  Yes.

7    **Q.**  The injunction response plan also includes a full-page

8    warning screen that pops up when a user clicks on the link; is

9    that right?

10   **A.**  Yes.

11   **Q.**  And the format and text of the warning screen is something

12   that you and Mr. Cook and Mr. Maestri approved?

13   **A.**  Yes.

14   **Q.**  And there's also, as part of the injunction response plan,

15   a restriction under which the purchase link, the external

16   purchase link, cannot appear in the buy flow that leads to

17   Apple's IAP link; is that right?

18   **A.**  Yes.  There are guidelines about that.

19   **Q.**  Right.  And the guidelines say that the external purchase

20   link to the developer's website may not appear in the buy flow

21   or the merchandising flow for IAP, correct?

22   **A.**  Yes.

23   **Q.**  All right.  So for example, if a developer has in its app

24   an item store where there are items for purchase and the

25   prices are lifted [sic] and the choices are there for the

1   different items, the external purchase link cannot appear

2   there in the store, correct?

3   **A.**   Correct.

4   **Q.**   All right.  And that's another restriction that you,

5   Mr. Cook, Mr. Maestri all approved.

6   **A.**   That is a restriction.  It's not another one.  It's the

7   one you were just describing.

8   **Q.**   Yes.  I mean -- thank you.

9        And there is also a restriction on the format or design of

10   what the link may look like in -- in the app for external

11   purchases, correct?

12   **A.**   Yes.

13   **Q.**   And there's a requirement that developers use what's

14   called the plain button style.

15   **A.**   Yes.

16   **Q.**   And that too, that's a restriction that you, Mr. Cook,

17   Mr. Maestri all approved.

18   **A.**   Yes.

19   **Q.**   All right.

20        Now, I want to turn to the timeline for Apple's response

21   to the injunction.

22        You personally, Mr. Schiller, you started work on the

23   response to the injunction the day or the day after receiving

24   the Court's order; is that right?

25   **A.**   Yes.

1    **Q.**  And at that time when you started in September of 2021,

2    there was a code name for that work.  It was called Project

3    Michigan, correct?

4    **A.**  That I don't recall.

5    **Q.**  All right.  Well, let me see if I can refresh your

6    recollection.

7           **MR. BORNSTEIN:**  We need to be super careful here in

8    what we're about to put on the screen.  But if we could call

9    up CX812.1.  This is from a filing that Apple made with the

10   Court.  And if we could highlight the top button there.

11        (Exhibit published to witness, counsel, and the Court.)

12          **MR. BORNSTEIN:**  Perfect.  Top bullet, I mean.

13   **Q.**  This is from a filing that Apple made with the Court in

14   January 4th of 2025.  And it says:  Michigan was the internal

15   project name used between September 2021 and December 2021 to

16   refer to the changes to the App Store required under the

17   injunction.

18        Do you see that?

19   **A.**  I do.

20   **Q.**  Does that refresh your recollection that "Michigan" was

21   the code name used for the period listed here, September to

22   December 2021?

23   **A.**  I'm sorry, it does not.

24   **Q.**  Okay.  Do you have any reason to doubt that Apple's

25   representation to the Court about the code name is correct?

SCHILLER - DIRECT / BORNSTEIN

 1   **A.**  I have no reason to doubt that.

 2   **Q.**  Okay.  And then in December 2021, the date listed here,

 3   the project to respond to the injunction was put on hold,

 4   correct?

 5   **A.**  I don't recall being put on hold.  We were working on it

 6   throughout.  So I'm not sure what that means, to be put on

 7   hold.

 8   **Q.**  Okay.  Well, December 2021, that was when the Ninth

 9   Circuit issued an order staying the effectiveness of this

10   Court's injunction; do you recall that?

11   **A.**  Yes.

12   **Q.**  Okay.  And that happened -- I'll represent to you it was

13   December 8, 2021.  Sound about right?

14   **A.**  Yes.

15   **Q.**  Okay.  And then Apple went pencils down on Project

16   Michigan the very next day, correct?

17   **A.**  No.  I don't know what that means, "pencils down."

18                    (Simultaneous colloquy.)

19   **BY MR. BORNSTEIN:**

20   **Q.**  All right.  Let's take a look at Exhibit 486 in your

21   binder, dot 1.  And we can put it on the screen if it's easier

22   for you, sir.

23      (Exhibit published to witness, counsel, and the Court.)

24   **BY MR. BORNSTEIN:**

25   **Q.**  Now, 481 is an email dated December 9, 2021.  Do you see

SCHILLER – DIRECT / BORNSTEIN

1    that?

2    **A.**  I do.

3    **Q.**  Okay.  And it refers in the subject line to something

4    called a weekly App Store roadmap sync.  Do you see that?

5    **A.**  I do.

6    **Q.**  All right.  And that's a regular meeting that happens at

7    Apple talking about issues relating to the App Store?

8    **A.**  Yes.

9    **Q.**  Okay.  And the first bullet there reads "Michigan is on

10   hold for now."  Do you see that?

11   **A.**  I do.

12          **MR. BORNSTEIN:**  All right.  Your Honor, I'd move the

13   admission of Exhibit 486.1 -- excuse me -- 486.

14          **THE COURT:**  Any objection?

15          **MR. PERRY:**  No objection, Your Honor.

16          **THE COURT:**  It's admitted.

17          (Exhibit 486 received in evidence.)

18   **BY MR. BORNSTEIN:**

19   **Q.**  And this project, Mr. Schiller, it stayed on hold for

20   nearly a year and a half, correct?

21   **A.**  Again, I don't recall it being on hold.  And I didn't see

22   this email so I can't speak to that.

23   **Q.**  All right.  Well, the Ninth Circuit decision affirming

24   this Court's injunction came down in April of 2023.  Do you

25   remember that?

SCHILLER – DIRECT / BORNSTEIN

 1    **A.**  Yes.

 2    **Q.**  All right.  And you testified previously that when the

 3    Ninth Circuit decision came down, there was a new effort and a

 4    new energy that was given to this project.  Do you stand by

 5    that testimony?

 6    **A.**  Yes.

 7    **Q.**  All right.  And around this time, the project was given a

 8    new code name, wasn't it?

 9    **A.**  Yes.

10    **Q.**  And that was Wisconsin, right?

11    **A.**  Yes.

12    **Q.**  We moved one state over from Michigan to Wisconsin.

13         And Michigan ended in December 2021 and Wisconsin started

14    in mid-2023, correct?

15    **A.**  Again, I don't recall the project you call Michigan

16    ending.  From my perspective and in my discussions in

17    meetings, I do remember the effort around Wisconsin having

18    more people assigned to it and more work going on, on it at

19    that time.

20         **MR. BORNSTEIN:**  All right.  Can we call up again

21    Exhibit CX812.

22         (Exhibit published to witness, counsel, and the Court.)

23    **BY MR. BORNSTEIN:**

24    **Q.**  And this is that filing to the Court which says that

25    Michigan was the project code name between September and

1   December of 2021.  Wisconsin was the internal project name

2   used starting in the summer of 2023.  Do you see that?

3   **A.**  Yes.

4   **Q.**  And there was no code name between December 2021 and the

5   issuance of the Ninth Circuit decision in 2023, correct?

6   **A.**  I don't know.  Again, I don't recall the Michigan code

7   name either.

8   **Q.**  All right.  There was -- there was a lot of work, sir,

9   that was being done on anti-steering and alternative payment

10  requirements in other jurisdictions outside the U.S. during

11  this period, for example, in 2022, correct?

12  **A.**  Yes.

13  **Q.**  And there were projects relating to the Netherlands, to

14  Korea, Japan, and others perhaps, right?

15  **A.**  Yes.

16  **Q.**  But there was not at this point in time between

17  December 2021 and the Ninth Circuit decision in 2023 any

18  serious effort devoted to U.S. injunction compliance, correct?

19  **A.**  I don't recall what we were doing in the meetings during

20  that time in 2022.  I'm sorry.

21  **Q.**  Would it surprise you that in all of the documents that

22  we've gotten in response to the Court's order, there is little

23  to no discussion of U.S. compliance in that period from

24  December '21 when Michigan was put on hold until the Ninth

25  Circuit decision?

SCHILLER - DIRECT / BORNSTEIN

1    **A.**   I don't know.  And I don't recall what was in the meeting

2    agendas during that time.

3    **Q.**   All right.  Is it fair to say, however, that the work that

4    was done for responding to orders and requirements in other

5    jurisdictions, like the Netherlands and Korea and Japan, was

6    then relied on for use in responding to this Court's

7    injunction?

8    **A.**   Not relied on.  I wouldn't use that word, no.

9    **Q.**   Okay.  That -- that work for those other jurisdictions was

10   taken into account and considered in the response to this

11   Court's injunction, correct?

12   **A.**   Again, that isn't quite how I'd describe it, no.

13   **Q.**   Well, I'll give you the opportunity, Mr. Schiller.  How

14   would you describe the way that the work that Apple did in

15   responding to these foreign orders was used in responding to

16   the U.S. injunction from this Court?

17   **A.**   I think throughout all this time, we've certainly given

18   consideration to trying to make the solutions we have for our

19   developers be -- make as much sense as we can around the

20   world, be consistent where they're allowed to be around the

21   world, and some of the engineering work and some of the

22   documentation work to be leveraged and consistent between them

23   where it makes sense.  So we have to think about some of those

24   elements as we're doing any one of these projects.

25   **Q.**   Okay.  Well, we'll -- we'll dive into some of that a bit

SCHILLER - DIRECT / BORNSTEIN

1  more in the course of today.

2      So when -- when Project Wisconsin started after the Ninth

3  Circuit decision in 2023, there were a range of implementation

4  issues in terms of responding to the Court's injunction that

5  had not yet been decided by Apple; is that correct?

6  **A.**  Yes.

7  **Q.**  For example, Apple had not yet decided after the Ninth

8  Circuit decision whether Apple would charge any commission at

9  all on external purchase links, correct?

10 **A.**  Correct.

11 **Q.**  And Apple had not formed a view, if it were going to

12 charge a commission, on what that commission would actually

13 be, correct?

14 **A.**  Correct.

15 **Q.**  And Apple had not made a determination on whether there

16 would be a tracking window or how long it would be, correct?

17 **A.**  Correct.

18 **Q.**  And Apple had not made a final decision on what the format

19 or text of any warning screen would be, correct?

20 **A.**  Correct.

21 **Q.**  And at that point after the Ninth Circuit decision, Apple

22 had not yet made any decision on whether the external purchase

23 link would be allowed to be in the buy flow or not?

24 **A.**  Correct.

25 **Q.**  And lastly, Apple had not made a decision after the Ninth

1    Circuit decision in April 2023 on what the restrictions would

2    be on the format and design of the link itself, correct?

3    **A.**  Correct.

4    **Q.**  All right.  So I want to talk about how it was that Apple

5    made some of those decisions over the course of 2023.  And

6    I'll start with the commission.

7        So when Project Wisconsin started after the Ninth Circuit

8    decision, your preference personally was for Apple not to

9    charge a commission, correct?

10   **A.**  Preference?  I don't think that's an appropriate word.  I

11   don't -- it's not about a preference.  I'm just trying to

12   understand what is required and what it takes to meet the

13   injunction.  And so we had many discussions about the

14   commission or not and what that means.  And so that was

15   certainly an area we talked a lot about.

16   **Q.**  My question, Mr. Schiller, was about your personal view.

17   Your personal view was that Apple should not charge a

18   commission for external purchase links in response to this

19   Court's injunction in the spring of 2023, correct?

20   **A.**  Again, I -- my view was not about what we should or

21   shouldn't do.  It's about what we can or can't do and what

22   meets the requirements of the injunction and what are all the

23   considerations therein.

24   **Q.**  Mr. Schiller, you have a business responsibility for the

25   App Store.  Is it your testimony that you didn't actually have

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    a business preference about how to comply with the injunction

2    and what would be preferable from a business perspective in

3    terms of charging a commission?

4    **A.**   I did not approach it -- my -- my input into the process

5    was not about a business preference.  It was about what is

6    required to meet the injunction and -- and what is allowed or

7    not allowed.  That was -- my thought process on it.

8    **Q.**   Okay.  Well, in the first half of May 2023, you gave

9    guidance to the team working on Project Wisconsin that Apple

10   would not charge a commission; isn't that right?

11   **A.**   Here, I'm -- in order to answer, I have to ask a question.

12   I'm sorry.

13       My discussions with the team about guidance and input on

14   what we can or cannot do was directly with lawyers about what

15   does the legal injunction mean.  And so I want to make sure as

16   I answer that I don't violate privilege that's not mine to

17   violate.

18       So I'm -- I'm concerned just -- I want to make sure I have

19   the right direction on what I'm allowed to and not allowed to

20   say --

21   **Q.**   Well --

22   **A.**   -- that would be violation of privilege.

23   **Q.**   Sure.  Fortunately we've had some guidance from the Court

24   in an order issued on New Year's Eve -- the Court was working

25   hard -- regarding the scope of the privilege that can be

1   asserted here.

2      You can -- and I'll be corrected if I'm wrong about this.

3   You can testify about the decision-making process that you

4   went through and the instructions that you gave because that's

5   exactly the information the Court ordered to be produced and

6   is interested in hearing about.

7      So I'll repeat the question.

8      In the first half of May of 2023, you gave guidance to the

9   team that Apple would not charge a commission on the external

10  purchase link; is that right?

11  **A.**  I don't recall my input as guidance.  I remember having

12  discussions with the legal team and the business teams about

13  whether a commission could be charged or not.  And there were

14  legal discussions I had about what is allowed or not allowed.

15  I don't consider it guidance that we were going to or not

16  going to do something.

17  **Q.**  All right.  I'll -- I'll try it one more time just to make

18  sure I have it clear.

19      Your testimony, sir, is that you did not actually give

20  guidance or instruction to the team on how to proceed in terms

21  of whether to have a commission or not in May of 2023?  That's

22  your testimony?

23  **A.**  My recollection is that I had a discussion with the team

24  and with the lawyers about the commission and whether we could

25  charge one or not.  That's my recollection.

SCHILLER – DIRECT / BORNSTEIN

1   **Q.**  Okay.  Well, let me see if I can refresh your

2   recollection.

3       There's someone who works at Apple and worked with you on

4   this process by the name of Jeff Robbin; is that right?

5   **A.**  Yes.

6   **Q.**  Okay.  And what's Mr. Robbin's role at Apple?

7   **A.**  He works on the Apple Services team leading the

8   engineering of the -- many of the services.

9   **Q.**  Okay.  Let me ask you to take a look at Exhibit 273.

10          **MR. BORNSTEIN:**  Don't put this up on the screen.

11  **Q.**  I want to see if I can refresh your recollection using

12  this document.

13      And I'm looking at 273.1 which is the first page.

14  **A.**  I see that.

15  **Q.**  Okay.

16      Okay for me to proceed?

17      Okay.  And if you see 273 is an email -- sorry -- a set of

18  notes labeled "Wisconsin XF Meeting Notes."

19      Do you see that?

20  **A.**  I do.

21  **Q.**  Okay.  This is why I asked you about cross-functional and

22  whether that's what "XF" means.

23      And does this refresh your recollection about what "XF"

24  means?

25  **A.**  I just see that somebody wrote this.

SCHILLER - DIRECT / BORNSTEIN

1   **Q.** Okay.

2   **A.** I don't normally hear those -- those letters used in that

3   way.

4   **Q.** That's fine.

5      And if you see at the bottom of the first page, there's a

6   thing that says "Notes," and it says "Phil/Jeff provided new

7   guidance." Do you see that?

8   **A.** I see that.

9   **Q.** Is it fair to assume that Phil is you and Jeff is

10  Mr. Robbin?

11  **A.** Yes.

12  **Q.** And I want you, if you can, to just read the top two

13  bullets there about the guidance you gave, including the one

14  that says, "Apple will not seek to charge a commission on

15  those sales."

16     Do you see that?

17  **A.** I see that.

18  **Q.** Okay. Does this refresh your recollection that this is

19  guidance that you gave to the team in May of 2023?

20  **A.** No. My recollection is not this. My recollection is that

21  I had a discussion with the legal team around what we are or

22  not required or allowed to do. And I don't believe I ever

23  specifically gave guidance that we are or are not doing

24  anything one way or the other.

25  **Q.** Okay. Well, let's -- let's look at some -- some

 1    subsequent documents.

 2        There was a meeting a few -- about a week after these

 3    notes we just looked at on May 18 of 2023 that you attended

 4    for a Wisconsin business update.

 5        Do you recall -- happen to recall meeting on that date

 6    about this?

 7    **A.**  I remember we had a meeting in the late spring to early

 8    summer of that time.  I don't recall the date.

 9    **Q.**  Okay.  Let's just take a look, see if we can square this

10    in time, at Exhibit CX488.

11        (Exhibit published to witness, counsel, and the Court.)

12            **MR. BORNSTEIN:**  We should really wait to put things

13    on the screen until they've been admitted into evidence.

14    **Q.**  Now Exhibit 488, this is a calendar invitation for a

15    meeting on May 18, 2023, correct?

16    **A.**  Yes, I see that.

17    **Q.**  All right.  And you see your name there is listed as

18    having accepted the invitation?

19    **A.**  Yes.

20            **MR. BORNSTEIN:**  All right.  Your Honor, I'd move the

21    admission of Exhibit 488.

22            **MR. PERRY:**  No objection.

23            **THE COURT:**  It's admitted.

24                (Exhibit CX-488 received in evidence.)

25    / / /

1   BY MR. BORNSTEIN:

2   Q.  And the subject line for this meeting invite is "Wisconsin

3   Business Update," correct?

4   A.  Yes.

5   Q.  All right.  Can we assume this May 18, 2023, meeting is

6   the one that you were talking about that you remember in the

7   spring?

8   A.  I don't recall if this is the exact meeting or not that I

9   was thinking of.

10  Q.  All right.  Well, let's -- let's take a little further

11  look, see if we can get there.

12      There was a deck that was presented to you at this meeting

13  regarding the current state of proposed responses to the

14  injunction; is that right?

15  A.  I don't recall.

16  Q.  All right.  Well, let's take a look, if you would, at

17  Exhibit 272.

18      Actually, you know what, can we look first, Mr. Schiller,

19  at Exhibit 536.  I apologize for the switcheroo.

20                  (Pause in the proceedings.)

21  BY MR. BORNSTEIN:

22  Q.  Just let me know when you have 536, please.

23  A.  I do.

24  Q.  Great.

25      So Exhibit 536 is a set of messages dated May 18, 2023.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

SCHILLER – DIRECT / BORNSTEIN

1    Do you see that?

2    **A.**  I do.

3    **Q.**  Okay.  And just a little bit of technical plumbing here.

4    These date and time stamps are identified as UTC.  I'll

5    represent to you that's UK Greenwich Mean Time.  So about

6    eight hours typically, sometimes seven, ahead of where we are

7    here in California.  Okay?

8    **A.**  Yeah, Universal Time Code.  Correct.

9    **Q.**  Okay.  So while these people work hard, these probably

10   weren't sent at 2:18 in the morning in the Pacific Time zone.

11   Ot

12       And if you look at the bottom of Exhibit 536.1, you'll see

13   that Bri Cote writes, "Are you presenting today to Phil?"  Do

14   you see that?

15   **A.**  Yes.

16   **Q.**  All right.  And that would be a reference to yourself.

17   **A.**  I believe so.

18   **Q.**  Okay.  And if you look at the next page, you will see that

19   Mr. Kim has two slides, a proposal 1 and a proposal 2 that

20   look like excerpts from a deck to be presented to you,

21   correct?

22   **A.**  Correct.

23   **Q.**  All right.

24       Now, let me put in front of you the deck that these two

25   slides appear to be from.  And that is Exhibit 272.

1   Can you turn there?

2        **MR. BORNSTEIN:**  Oh, and, Your Honor, I would move

3   Exhibit 536 into evidence.

4        **THE COURT:**  Any objection?

5        **MR. PERRY:**  Objection, foundation on this one.

6        **THE COURT:**  You need --

7        **MR. PERRY:**  I'm sorry, Your Honor, objection --

8        **THE CLERK:**  Wait one moment.

9   Okay.

10        **MR. PERRY:**  Objection, Your Honor, as to foundation.

11   Mr. Schiller's involvement on this one.

12        **MR. BORNSTEIN:**  That's fine, Your Honor.  I'll

13   withdraw this one.

14        **THE COURT:**  Okay.

15        **MR. BORNSTEIN:**  Okay.

16   **Q.**  Let's take a look at the deck at Exhibit 272, if you

17   would.

18   **A.**  Okay.

19   **Q.**  Okay.  And Exhibit 272 is a deck from May 2023.  It says

20   "Proposed Responses to Epic Injunction," correct?

21   **A.**  Yes.

22   **Q.**  And if you just page through it, you can see, for example,

23   on page dot 7 there is that proposal 1 slide that we saw on

24   Exhibit 536; on page dot 11, you'll see the proposal 2 slide

25   that we saw on Exhibit 536.  Correct?

1    **A.**  I didn't go back and forth to verify if they're the same

2    as the previous slide deck or not, but I see these slides.

3    **Q.**  All right.

4        Can we assume that this, Mr. Schiller, is the May 18 --

5    the deck that was presented at this May 18 meeting that was

6    being discussed by your colleagues in Exhibit 536?

7    **A.**  I -- I can't verify that.  Again, I don't recall if this

8    was the meeting that I'm thinking of we had in the summer of

9    '23.  And I don't know that this was the deck that was

10   presented to me on that call.  I can't state either way.

11   **Q.**  All right.  Well, let's do it this way, Mr. Schiller.  We

12   saw a May 18, 2023, Wisconsin business update meeting invite

13   that you accepted in Exhibit 488, correct?

14   **A.**  Yes.

15   **Q.**  All right.  And we have a set of messages exchanged

16   between your colleagues about presenting to Phil, on May 18 of

17   2023 that we just saw in Exhibit 536, correct?

18   **A.**  Yes.

19   **Q.**  And we have now a deck, Exhibit 272, about proposed

20   responses to the Epic injunction which contains slides that

21   you can see on Exhibit 536, correct?

22   **A.**  Yes.

23        **MR. BORNSTEIN:**  I would move the admission, Your

24   Honor, of Exhibit 272.

25        **MR. PERRY:**  No objection, Your Honor.

1           **THE COURT:**  It's admitted.

2              (Exhibit CX-272 received in evidence.)

3           **MR. BORNSTEIN:**  Thank you.

4           **THE COURT:**  And do I have an electronic copy of these

5    documents?  Because the print is somewhat small.

6           **MR. BORNSTEIN:**  I don't know that you have one, Your

7    Honor.  We can certainly get you one.  I will say that

8    specifically with respect to 272, I have tried blowing it up

9    as much as I can on my own computer.  And when you blow it up,

10   it just gets blurry.  It's just unfortunately the way it was

11   produced to us.  It's a difficult document to read.

12          **THE COURT:**  Do I have an electronic version -- or do

13   you have an electronic version of this that I could more

14   easily read without magnifying glasses?

15          **MR. PERRY:**  Your Honor, we do not have one here, but

16   we can look for one.

17      This particular document, like some of them, my

18   understanding this is essentially a PDF.  It's not the actual

19   document is the reason for the legibility issue on this one.

20   It's the way it was maintained.

21      But we can get -- we can get the best electronic version

22   available.  The parties can work together --

23          **THE COURT:**  Okay.

24          **MR. PERRY:**  -- and get the Court a set of those.

25          **THE COURT:**  And I don't know if it's ultimately going

 1   to be an issue, but to the extent that I'm relying on these

 2   documents, it would be helpful to be able to read them.

 3          **MR. BORNSTEIN:**  I share that desire, Your Honor.

 4   What we can try to do today, I'll ask Mr. Lyon, who's

 5   controlling the technology for us, to see if he can blow them

 6   up as much as possible, if the screen would help the Court and

 7   the witness read.

 8          **THE COURT:**  Okay.  Thank you.

 9   **BY MR. BORNSTEIN:**

10   **Q.**  Okay.  So I'd like you to turn, Mr. Schiller, to the

11   second page of the slide deck.  It's 272.3.  And if you --

12   you'll see there are three columns:  Requirements, Allowances

13   and Ambiguous.

14       Do you see that?

15   **A.**  I see that.

16   **Q.**  These are all listed as key elements under consideration

17   as of May 2023 for responding to this Court's injunction,

18   correct?

19   **A.**  I see that, yes.

20   **Q.**  Okay.  And I want to focus on the right-hand column that

21   says "Ambiguous."  And there are five different items that are

22   identified here as ambiguous, correct?

23   **A.**  Yes.

24   **Q.**  And then if we move through the deck, you will see -- and

25   we'll go through them so you don't have to trust me just yet.

SCHILLER - DIRECT / BORNSTEIN

1    We move through the deck, there are proposals about how to

2    handle each of these ambiguous items.

3        So let's start by going to 272.7.

4        (Exhibit published to witness, counsel, and the Court.)

5            **MR. BORNSTEIN:**  See if we can blow that up for

6    everybody.  Thank you.

7        (Exhibit published to witness, counsel and the Court.)

8    **BY MR. BORNSTEIN:**

9    **Q.**  And there on the left-hand side of what's labeled

10   "Proposal 1" are ways to deal with each of the five ambiguous

11   items that were identified on the prior slide.

12       Do you see that?

13   **A.**  Yes, I do.

14   **Q.**  All right.  And at the bottom of these five ambiguous

15   items, there is commission rate.  And so proposal number 1

16   that was being shown to you in May of 2023 was no commission,

17   correct?

18   **A.**  I don't recall this slide or this slide deck.

19   **Q.**  Okay.  The people that we saw on Exhibit 536 such as

20   Timothy Kim and Bri Cote, they're people at Apple who were

21   working on Wisconsin and the response to the Court's

22   injunction, correct?

23   **A.**  Timothy Kim, yes.  Bri, I believe so.  I'm not sure.

24   **Q.**  Okay.  You don't have any reason to doubt, sir, that this

25   was a deck they were putting together for you for purposes of

 1    a meeting, right?

 2    **A.**  I don't have any reason to doubt that.

 3    **Q.**  Okay.

 4        Now, I want --

 5            **THE COURT:**  Are there -- are they still employees at

 6    Apple?

 7            **THE WITNESS:**  Timothy Kim, yes.  I'm sorry, I don't

 8    know Bri well so I can't say.

 9            **THE COURT:**  Okay.

10    **BY MR. BORNSTEIN:**

11    **Q.**  Now, this proposal 1 with the no commission, if you look

12    up at the top of the ambiguous column for display placement

13    and display frequency, there are some restrictions identified

14    for where the link can appear.

15        Do you see that?

16    **A.**  Yes.

17    **Q.**  For example, for display placement, it needs to be

18    independent of the buy flow, and for display frequency it has

19    on the outside of the buy flow, correct?

20    **A.**  Yes.

21    **Q.**  And that's consistent with what Apple -- generally

22    consistent with where Apple ultimately landed to require that

23    the link be outside of the buy flow as we discussed, correct?

24    **A.**  Generally, yes.

25    **Q.**  And in the bottom right under "Key Risks," you can see

1    that the deck says that ███████████████████████

2    ████████████████████████?

3    A.  ███████████

4    Q.  ████████████████████████████████████████

5    ████████████████████████████████████████████

6    █████████████████████████

7    A.  ████████████████████████████████████

8    █████████████████████████

9    Q.  ████████████████████████████████████

10   ████████████████████████████████████████

11   █████████████████████

12   A.  ██████████████████████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████

16   Q.  █████████████████████████████████

17   ███████████████████████████████████████

18   ██████████████████████████████████████

19   ██████████████████████████

20   A.  ██████████████████████████████████████

21   ███████████████████████████

22   Q.  All right.  Well, let's -- let's look at proposal 2 then.

23   Proposal 2 is on 272.11.

24       And in this other proposal, proposal 2, at the bottom

25   left, you can see the proposal was to have a discounted

SCHILLER - DIRECT / BORNSTEIN

1    commission, correct?

2    A.   I see that.

3    Q.   And with the discounted commission over on the right on

4    the bottom, ████████████████████████████████████████

5    ████████████████████████████

6    A.   ████████████████████

7    Q.   ██████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████

10   A.   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████

14   Q.   All right.  Well, let's go back to the substance of

15   proposal 2 then.

16       (Exhibit published to witness, counsel, and the Court.)

17   BY MR. BORNSTEIN:

18   Q.   In proposal 2, coupled with this discounted commission

19   were less restrictive rules regarding placement and frequency.

20   Do you see that?

21   A.   I see that.

22   Q.   Okay.  So, for example, in the prior slide, proposal 1, no

23   commission, there was a requirement that the link not appear

24   in the buy flow.  But here in proposal 2, when Apple was

25   contemplating the charging of a commission, display placement

1    says anywhere including on the merchandising page, correct?

2    **A.**   I see that.

3    **Q.**   All right.

4         So let's -- let's turn to Exhibit 272.14 or page 272.14.

5         (Exhibit published to witness, counsel, and the Court.)

6    **BY MR. BORNSTEIN:**

7    **Q.**   And this shows a comparison of the two options that we

8    were just -- sorry -- the two proposals that we were just

9    discussing, proposal 1 and proposal 2, correct?

10   **A.**   Yes.

11   **Q.**   So proposal 1 is the no commission option with the more

12   stringent restrictions on placement of link.  And proposal 2

13   is the discounted commission option with less stringent

14   restrictions on the placement of link, correct?

15   **A.**   Yes, I see that.

16   **Q.**   All right.  And now I don't want you to say any numbers.

17   And we have them blacked out on the screen.  But if you look

18   at the bottom, there is information about the estimated

19   revenue impact of these two proposals, correct?

20   **A.**   Yes.

21   **Q.**   And again without saying any numbers, the estimated

22   revenue impact of proposal 1, no commission, is a lot higher

23   than the estimated revenue impact of proposal 2, correct?

24   **A.**   I see that.

25   **Q.**   And ultimately the entitlement link program that Apple

SCHILLER - DIRECT / BORNSTEIN

```
 1    launched in January of 2024 includes both the placement
 2    restrictions of proposal 1 and the commission from proposal 2.
 3    Correct?
 4    A.   Yes.
 5    Q.   Apple adopted both items ████████████████████████████
 6    ██████████████
 7    A.   Well, I don't think the final implementation is exactly
 8    what either of these are.  I think these were presentations
 9    that you're showing me that have some of the general
10    descriptions but not the exact implementations either way.
11    Q.   We'll get there, sir.  But before we get to the exact
12    implementations, this slide -- excuse me -- this deck
13    indicates that ██████████████████████████████████████████
14    ██████████████████████████
15    A.   ████████████
16    Q.   Right.
17         And Apple chose to implement a commission, correct?
18    A.   Yes.
19    Q.   All right.  And is your testimony just now that the
20    commission that Apple actually chose is ████████████
21    ████████████████████████████████████████████████████
22    ████████████████████████
23    A.   ██████████████████████████████
24    ████████████████████████████████████████████
25    ████████████████████████████████████████████
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1  ██████████████████████████████████████████████████

2  ████████████████████████

3  **Q.**  All right.  Well, we'll see if we can get there as we go

4  through additional items.  But to make sure we have a

5  comparison on these ambiguous items -- we can keep this on the

6  screen -- for display placement, what Apple actually did in

7  the January 2024 purchase link entitlement that it launched is

8  to require that the purchase link not be displayed on any page

9  that is part of an in-app flow to merchandise, correct?

10  **A.**  Yes.

11  **Q.**  So it took the more restrictive of these two options.

12  **A.**  On that one point, yes.

13  **Q.**  Yes.

14     On display frequency, the rule that Apple actually imposed

15  in January of last year is that the link can only appear once

16  in an app, correct?

17  **A.**  Correct.

18  **Q.**  All right.

19     In --

20  **A.**  Which is not the same of either of those lines.

21  **Q.**  That is correct.  It is more restrictive than proposal 2

22  which says once per page.  You actually say only once per app,

23  correct?

24  **A.**  Yes.

25  **Q.**  On display UI and design, Apple requires that -- Apple

 1   requires that we follow the plain -- excuse me -- that

 2   developers who want a purchase link follow what's called the

 3   plain button style; is that correct?

 4   **A.**   Yes.

 5   **Q.**   All right.  Now, I want to just turn back for a second

 6   while we're talking about the button style to page 272.4 in

 7   this deck.

 8        And 272.4 has what are called "working assumptions of the

 9   compliance plan," correct?

10   **A.**   That's what it says.

11   **Q.**   All right.  And one of those working assumptions in May of

12   2023, in the middle, is flexibility of CTA design, e.g.,

13   buttons, correct?

14   **A.**   Yes.

15   **Q.**   And CTA, that means "call to action," correct?

16   **A.**   Correct.

17   **Q.**   In other words, what the link looks like.  Correct?

18   **A.**   I would assume so.

19   **Q.**   Okay.  Now turn to the next page, 272.5.

20        (Exhibit published to witness, counsel, and the Court.)

21   **BY MR. BORNSTEIN:**

22   **Q.**   272.5 near the top -- first of all, it's headed "Known

23   Conditions and Restrictions on External Links," correct?

24   **A.**   Yes.

25   **Q.**   And at the top, it says "Developers must be able to," and

 1    then it has a list of things that Apple understood developers

 2    must be able to do, correct?

 3    **A.**  It says developers must be able to, yes.

 4    **Q.**  Right.  And those are things that the people who put this

 5    together understood at the time Apple must be able to do as

 6    part of the injunction response plan, correct?

 7    **A.**  I wouldn't say that.  It -- it doesn't say that.  And I

 8    don't recall someone saying it that way.

 9    **Q.**  Okay.  But one of these things that was identified by

10    these people at Apple working on the injunction response plan

11    at the time in May of 2023 that developers must be able to do

12    is in the second bullet, "Format these prompts as buttons or

13    other calls to action and not just blue HTML links."  Correct?

14    **A.**  I see that it says that.

15    **Q.**  Right.  And Apple ultimately, though, did choose a --

16    what's called a plain button style for the links.  That's what

17    developers are required to implement, correct?

18    **A.**  Along with a linkout icon button, yes.

19    **Q.**  Correct.  And Apple actually -- contrary to what's on this

20    slide, Apple did that.  Apple chose the plain button style

21    precisely so that it would match what hyperlinks and Internet

22    links look like, correct?

23    **A.**  Well, you said two things in the sentence.  The second

24    part I agree with.  But the first part I don't.  This --

25    this -- this sentence doesn't say either way what the buttons

SCHILLER - DIRECT / BORNSTEIN

1    should look like.

2        But it -- that -- what we did create is -- is the second

3    half of your sentence is -- is what we did.

4    **Q.**  So that that's clear, what you did is you required -- when

5    I say "you," I mean Apple.

6    **A.**  Yes, thank you.

7    **Q.**  What Apple did, subject to your direction, in creating a

8    requirement for the format of the links is require what's

9    called the plain button style.  And Apple did that so that the

10   links would look like hyperlinks or other Internet links that

11   people are used to seeing, correct?

12   **A.**  Yes.  But, again, I don't want to leave out that "and

13   include a actual button, a square with an arrow out of it," as

14   part of it.  It isn't only the text.

15   **Q.**  Okay.  Let's go back to where we were on the list of -- of

16   items on the prior slide that we had up.

17       (Exhibit published to witness, counsel, and the Court.)

18           **MR. BORNSTEIN:**  No, the one before that.  Sorry.

19       (Exhibit published to witness, counsel, and the Court.)

20   **BY MR. BORNSTEIN:**

21   **Q.**  Now going to the list of the five items with proposal 1

22   and proposal 2 that appears here on Slide .14.

23       Do you see that?

24   **A.**  Yes.

25   **Q.**  Okay.  Just going back to where we were.  We had gone

SCHILLER - DIRECT / BORNSTEIN

1    through the first three.

2        On pricing language, Apple chose to adopt specific

3    templates that developers must use for the link, correct?

4    **A.**  Yes.

5    **Q.**  All right.

6        And then finally for the commission rate, Apple obviously

7    chose to impose a commission rather than no commission,

8    correct?

9    **A.**  Yes.

10   **Q.**  All right.

11       Now, let's talk a little bit about how we get from this

12   May 18 deck to the final decision that Apple makes.

13       First of all, after this, there is a meeting on June 1st

14   that you attended along with other senior executives including

15   Mr. Cook.  Do you recall that?

16   **A.**  I recall there was a meeting.  And that is the meeting I

17   was referring to, that there was a meeting in late spring

18   early summer.  That -- that is the meeting I was referring to.

19   I don't remember the exact date.

20   **Q.**  Okay.  Let's just, for the sake of the record, have you

21   look at Exhibit 485, please.

22   **A.**  Yes.

23   **Q.**  Do you have 485?

24       485 is an email invitation, subject, Epic injunction

25   implementation, dated for a meeting on June 1st of 2023, and

1    you see you and Mr. Cook are both listed here as having

2    accepted the invite, correct?

3    **A.**  Yes.

4            **MR. BORNSTEIN:**  All right.  Your Honor, I would move

5    the admission of Exhibit 485.

6            **MR. PERRY:**  No objection, Your Honor.

7            **THE COURT:**  485 is admitted.

8            (Exhibit CX-485 received in evidence.)

9    **BY MR. BORNSTEIN:**

10   **Q.**  And by the way, Mr. Schiller, regarding the prior deck,

11   Exhibit 272, who would be the right person at Apple for us to

12   ask questions about if you were unable to answer what these

13   various items mean?  Is it Mr. Kim?

14   **A.**  (Reviewing document.)

15      Again, since I don't recall the deck, it's hard for me to

16   say who to ask about the deck that I don't recall.  Based on

17   the messages exchanged you showed, it appears he may have

18   worked on this deck and he may be able to answer some

19   questions about it.  But, again, I can't be specific since I

20   don't recall this exact deck.

21   **Q.**  All right.  Let me try the question a different way.

22           **MR. BORNSTEIN:**  Can we put up Exhibit 488 that's

23   already in evidence?

24   **Q.**  This is the -- we can put it on the screen for you if it's

25   easier.  This is the calendar invite for that meeting in

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    May -- May 18 that you are listed as accepting.

2                    (Exhibit published.)

3    **BY MR. BORNSTEIN:**

4    **Q.**  Do you see that?

5    **A.**  Yes.

6    **Q.**  Okay.  Looking at the list of attendees of this meeting,

7    does that help you identify who are the people who'd be

8    responsible for putting together a deck like this for your

9    review?

10   **A.**  I'm sorry, no.  It could come from anybody.  There's no

11   specific strict requirement of who's working on a slide deck.

12   So I don't know who worked on those slides specifically.  So

13   I'm sorry, I can't say.

14   **Q.**  Okay.  Who are the people?

15          **MR. BORNSTEIN:**  Sorry, no, keep that up.

16   **Q.**  Who are the people on this list who are responsible -- who

17   are junior to you who are responsible for making

18   recommendations about whether to charge a commission?

19   **A.**  I don't believe there was any single individual

20   responsible.  I think we all discussed it.  We all had many

21   meetings and discussions about it.  Everybody -- the number of

22   people in this list spoke about it, including the lawyers.

23   And I don't remember any one person being assigned to -- to be

24   the person.  We literally all talked about it.

25   **Q.**  I -- I didn't ask who's the one person.

SCHILLER - DIRECT / BORNSTEIN

1   **A.**  Uh-huh.

2   **Q.**  At Apple people have specific job responsibilities.  There

3   are people who have finance jobs, people who have

4   design-related jobs, people who are in the legal function,

5   right?

6   **A.**  Yes.

7   **Q.**  All right.  So are you able to tell who, looking at the

8   list, would be responsible for making a -- excuse me -- would

9   be responsible for contributing to slide presentations for you

10  on the commission?

11  **A.**  In terms of this project and these slides, a number of

12  people on the list may have worked on it.  I can't be explicit

13  because --

14         **THE COURT:**  Do we need to go through every single one

15  of these people for you to tell me what their primary

16  responsibility is and why they're on the list to attend this

17  meeting?  Is that what we need to do to get a straight answer,

18  Mr. Schiller?

19         **THE WITNESS:**  I'm not trying to be evasive, Your

20  Honor.  I'm sorry.  A number of --

21         **THE COURT:**  But you are being --

22              (Simultaneous colloquy.)

23         **THE WITNESS:**  I was about to read some names.

24         **THE COURT:**  Okay, give me some names, please.

25         **THE WITNESS:**  Certainly.

1    Matt Fischer worked on it more than I did because the

2    people who worked on it from our team reported up to him.

3    Mr. Oliver, Carson Oliver, works for Matt Fischer, and he

4    had some role in this.  And people on his team worked on it.

5    Alex Roman, who you've talked to in here, had a role in

6    it, and people on his team had a role on it.

7    Let's see.  Who else?  I believe Timothy Kimmert

8    [phonetic] -- we call him Timo Kim [phonetic] -- worked on it

9    as discussed.

10    Other than that, there it the lawyers who worked on it as

11    well.  But from -- from our team, I think those names

12    certainly are names I recall working on it at some level.

13    **BY MR. BORNSTEIN:**

14    **Q.**  Okay.  And we'll meet Mr. Vij later.  He's someone who is

15    involved in contributing to decisions about the commission,

16    correct?

17    **A.**  Yes.  Kunnal Vij as well.

18    **Q.**  And Mr. Barton as well, who's in the finance function at

19    Apple, correct?

20    **A.**  Yes.  From the finance team, Mr. Barton as well, yes.

21    **Q.**  Okay.  And we'll come and we'll talk later about some of

22    the design people.  We don't need to do that now.

23    **A.**  Okay.

24    **Q.**  Let's move from this June 1 meeting that we were on that

25    you attended with Mr. Cook.

1     Do you recall about three weeks later there was a meeting

2  again that Mr. Cook attended on June 20?

3  **A.**  I don't recall specifically.

4  **Q.**  All right.  Let's take a look at Exhibit 489, please.

5              (Off-the-record discussion.)

6         **THE COURT:**  You can just move the mic away a tad.

7  Thank you.

8         **MR. BORNSTEIN:**  Just let me know if I'm causing

9  trouble.

10  **Q.**  Do you have Exhibit 489, Mr. Schiller?

11  **A.**  Yes, I do.

12  **Q.**  All right.  And if you look, Exhibit 489 has at the -- the

13  very back on .2, a calendar invite labeled Epic Injunction

14  Scheduled for June 20, 2023.  And there's a list of people

15  including yourself and Mr. Cook.

16     Do you see that?

17  **A.**  I do.

18  **Q.**  Okay.  And if you -- do you recall having a meeting with

19  Mr. Cook where there was on the agenda the question of whether

20  or not Apple should charge a commission?

21  **A.**  No, I don't recall that being on the agenda.  I recall a

22  meeting in this time, around the June time, about our

23  compliance work.  I don't recall that being specifically on

24  the agenda.

25  **Q.**  All right.  I don't mean to get caught up on the use of a

SCHILLER - DIRECT / BORNSTEIN

```
 1    formal agenda.  Do you remember that in the second half of

 2    June of 2023, you had a meeting with Mr. Cook and others where

 3    you discussed and made decisions on whether or not Apple would

 4    charge a commission?

 5    A.  I recall a meeting in June.  And so whether there were one

 6    or two, I don't recall whether it was the first half or second

 7    half of June.  I'm sorry.  I don't recall.

 8        But there was a meeting.  I believe in that meeting we

 9    talked about the plans, and that included a discussion about

10    commission.  But I don't believe it was a decision, it was a

11    discussion.

12    Q.  Right.  Let's -- let's see if we can work our way through

13    this.

14            MR. BORNSTEIN:  If you turn, please --

15        And if I -- sorry.  If I didn't move the last exhibit into

16    evidence, Your Honor, I would like to do so.

17            THE COURT:  Any objection?

18            MR. PERRY:  No objection to 489, Your Honor.

19            MR. BORNSTEIN:  Yes, thank you.

20            THE COURT:  Admitted.

21            (Exhibit 489 received in evidence.)

22    BY MR. BORNSTEIN:

23    Q.  Can I ask you to look, sir, at Exhibit 223.

24            MR. BORNSTEIN:  And so the record is clear, all of

25    these exhibits we're using today have CX prefixes.  If I fail
```

SCHILLER – DIRECT / BORNSTEIN

1    to mention them, that's on me.

2    **Q.**  Do you have CX223, Mr. Schiller?

3    **A.**  Yes, I do.

4    **Q.**  All right.  And CX223 is an email from someone named Shawn

5    Cameron at Apple dated June 16, 2023, that goes to a large

6    group of people including yourself, correct?

7    **A.**  Yes.

8    **Q.**  And in the CC line are an even larger group of people

9    including lawyers and even outside counsel, correct?

10   **A.**  Yes.

11        **MR. BORNSTEIN:**  All right.  Your Honor, I'd move the

12   admission of Exhibit 223?

13        **MR. PERRY:**  No objection, Your Honor.

14        **THE COURT:**  It's admitted.

15            (Exhibit 223 received in evidence.)

16                (Exhibit published.)

17   BY MR. BORNSTEIN:

18   **Q.**  Okay.  And in Exhibit 223, Mr. Cameron writes to you and

19   these others listed here, "As discussed in our prior meeting,

20   there are multiple Epic injunction compliance options under

21   consideration."  Right?

22   **A.**  Yes.

23   **Q.**  And he says that the cross-functional team needs

24   directional guidance early next week in order to comply with

25   the July 5th deadline, right?

1   **A.**   I see that.

2   **Q.**   Okay.  And do you recall that at this point in June of

3   2023, Apple was doing work on the injunction response plan in

4   case it needed to launch the entitlement program on July 5?

5   **A.**   Yes, I recall that.

6   **Q.**   Okay.  And that wound up getting postponed because there

7   was another stay that was granted pending Supreme Court

8   review, correct?

9   **A.**   I don't recall the exact legal process then.

10  **Q.**   All right.  Let me -- let me be one level less specific.

11  You recall that the -- the go-live date got postponed because

12  of some legal order?

13  **A.**   I believe so.

14  **Q.**   Okay.  But at the time here in June, Apple was working

15  towards a July 5 -- a potential July 5 launch, correct?

16  **A.**   I believe so.

17  **Q.**   All right.  And if you skip a few lines down in

18  Mr. Cameron's email, he says, "We have a 30-minute review with

19  Tim on Tuesday at 1:00 p.m. to discuss a no-commission option

20  and several proposals for a commission option.  The objective

21  of the meeting is to get to a decision on whether to pursue a

22  commission so the team can do the necessary work to go live in

23  two weeks' time."

24       Correct?

25  **A.**   Yes.

SCHILLER - DIRECT / BORNSTEIN

1   **Q.**  Okay.  And so at this point in time, you are -- Apple is

2   two weeks away from the potential launch, and it was still an

3   open question as to whether or not Apple would charge a

4   commission on the purchase links, correct?

5   **A.**  Yes.

6   **Q.**  And headed into this meeting, you, Mr. Schiller, you

7   favored not charging a commission, correct?

8   **A.**  Again, "favor" isn't the word I would have used, but it

9   was certainly a consideration at the time that that was a view

10  I had, yes.

11  **Q.**  Okay.  Let me just make sure I have a more direct answer,

12  Mr. Schiller.

13  **A.**  Apologize.  Yeah.

14  **Q.**  Your view at the time was that the best course of action

15  for Apple was not to charge a commission on external

16  purchase -- purchases made through an external link under this

17  program; is that right?

18  **A.**  I'm trying to think of what my view was at the time, how I

19  thought of that.  I'm pausing 'cause I want to be accurate.  I

20  don't want to misstate up here what I thought.

21      I -- I was thinking back then about what was required by

22  the Court's injunction and whether we could charge a

23  commission or not.

24      And I had a question of whether we would be able to charge

25  a commission.  It wasn't a view of what I wanted or not

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

 1    wanted.  It was what was allowed under the injunction.  Yes.

 2    **Q.**  All right.  So your position at the time, what you stated

 3    to your colleagues out loud or in writing in June of 2023, was

 4    that you were concerned that if Apple charged a commission, it

 5    would run afoul of the injunction, correct?

 6    **A.**  I had that concern.

 7    **Q.**  Okay.  And you communicated that concern to your

 8    colleagues at Apple?

 9    **A.**  Yes.

10    **Q.**  Okay.  Now, Mr. Cameron, he says further in his email that

11    this deck has complete details on design, financial modeling,

12    and risk benefit analysis for the commission and no-commission

13    options.  Right?

14    **A.**  Yes.

15    **Q.**  And attached to his email is a deck that is a draft

16    that -- of a deck to be used with Mr. Cook at this meeting on

17    June 20, correct?

18    **A.**  Correct.

19    **Q.**  And he's sharing this with you and some of your colleagues

20    for your review and comment, right?

21    **A.**  I believe so.

22    **Q.**  And so let's take a look at the deck itself which starts

23    on CX223.4.  It's titled "Epic Injunction Implementation

24    Proposal."

25        Do you see that?

```
1    A.   Yes.

2    Q.   And on the bottom left corner, it says "Privileged and

3    confidential.  Prepared at the request of outside counsel."

4         Do you see that?

5    A.   Yes.

6    Q.   All right.  Let's turn to 223.6 which is titled

7    "Compliance Options."

8         And this slide lays out two options.  Do you see that?

9    "No fee" and "fee"?

10   A.   Yes.

11   Q.   And these are at least generally similar to the two

12   proposals that we saw on the May 18 deck, Exhibit 272,

13   correct?

14   A.   As you say, generally, not the -- not exactly the same.

15   Q.   I agree.

16        On the left, option number 1, there is a proposal that has

17   no fee but has more stringent restrictions on style and

18   placement, correct?

19   A.   Yes.

20   Q.   And on the right, option 2, there's either a commission or

21   a flat fee proposed but less restrictive provisions regarding

22   the style and placement of links, correct?

23   A.   Yes.

24   Q.   All right.  Now just to get them out of the way, on the

25   bottom, there's -- there are columns that say "language" and
```

1    "discouragement," and these are the same as between option 1

2    and option 2, right?

3    **A.**  Yes.

4    **Q.**  All right.  So let's just take a look at what Apple was

5    contemplating at the time for those regardless of which option

6    it -- it shows.

7             **MR. BORNSTEIN:**  If we go to 223.7, please.

8        (Exhibit published to witness, counsel, and the Court.)

9    **BY MR. BORNSTEIN:**

10   **Q.**  It says option 1 and 2 proposed sheet.  Right?

11   **A.**  Yes.

12   **Q.**  And this sheet, the image in the middle of the slide is

13   the full-screen warning that, at least at the time, was under

14   contemplation to be shown to users when they clicked on a

15   link, correct?

16   **A.**  Yes.

17   **Q.**  And this full-screen warning would be done regardless of

18   which option was ultimately selected, right?

19   **A.**  Yes.

20   **Q.**  And although the details, the specific text has changed

21   some since June of 2023, this concept of a full-screen warning

22   is what Apple actually implemented in January of 2024,

23   correct?

24   **A.**  Yes.  And also I would just add, if I may, that the

25   intention of this at the time, I believe, was about the flow,

1    not the details of the individual words or implementation.

2    That wasn't the time we would be reviewing language to the

3    extreme detail.

4    **Q.**  Right.  You worked out the language subsequently, in other

5    words?

6    **A.**  Some of it, yes.

7    **Q.**  Great.

8        Well, let's look at the next page, 223.8.

9        (Exhibit published to witness, counsel, and the Court.)

10   **BY MR. BORNSTEIN:**

11   **Q.**  This is the other thing that is contemplated to be the

12   same in both options, and we see here a limited set of

13   templates that developers would be permitted to use for their

14   purchase links, correct?

15   **A.**  Yes.

16   **Q.**  And here, too, there has been some evolution between June

17   and what ultimately got launched, but at least generally,

18   these kinds of templates are where Apple ultimately landed in

19   the final entitlement program, correct?

20   **A.**  Yes.

21   **Q.**  All right.  So let's go back to 223.6 and examine the

22   issues that differed between option 1 and option 2.

23       (Exhibit published to witness, counsel, and the Court.)

24   **BY MR. BORNSTEIN:**

25   **Q.**  So to be specific, an option 1, the no-fee option, the

SCHILLER – DIRECT / BORNSTEIN

1    style would limit developers to using a plain link or button,

2    correct?

3    **A.**  Yes.

4    **Q.**  And that's what Apple ultimately landed on in January of

5    2024, correct?

6    **A.**  Yes.

7    **Q.**  But at the time, in the presentation for Mr. Cook, or this

8    draft presentation for Mr. Cook, for the June 20 meeting, it

9    was contemplated in option 2 that if Apple charged a

10   commission, it would have given developers more freedom about

11   how to design their own link or button, correct?

12   **A.**  I don't recall us linking these two styles specifically to

13   the discussion of fee or no fee.  I recall us discussing them

14   independently as what was the right thing to do and what's

15   allowed to do.

16       You're making them sound like that they were a set that

17   could only be considered one way or the other, and I don't

18   recall the discussion being that way.

19   **Q.**  Okay.  We'll -- we'll come to slides on that, but can we

20   agree that's how it's presented here --

21   **A.**  Yes.

22   **Q.**  -- in the deck?

23   **A.**  Yes, it is.

24   **Q.**  All right.  And so your testimony is although the options

25   were presented as a set, ultimately when you got into the room

1    with each other, you just took them one by one?

2    **A.**  My recollection is the discussions were independent, not

3    connected.

4    **Q.**  All right.  We'll -- we'll come to that some more.

5        But just so it's clear, what was on the slide for Mr. Cook

6    on placement, again, option 1, the no-commission option,

7    required that the link not be on the same page as Apple IAP

8    buy flow, right?

9    **A.**  Yes.

10   **Q.**  But it was contemplated under option 2 if a commission or

11   fee were charged, that that restriction would not be imposed,

12   correct?

13   **A.**  Yes.

14   **Q.**  And where Apple ultimately landed in January of 2024 was

15   to take the more restrictive portion of each of these two

16   options.  It charged a commission from option 2 and it imposed

17   the more restrictive provisions from option 1, correct?

18   **A.**  Yes.

19   **Q.**  All right.  Now in thinking about the pros and the cons of

20   these various options, let's turn to 223.16.

21       (Exhibit published to witness, counsel, and the Court.)

22   **BY MR. BORNSTEIN:**

23   **Q.**  This is a slide focused on option 1 talking about

24   considerations.  And it identifies benefits and risks, right?

25   **A.**  Yes.

SCHILLER - DIRECT / BORNSTEIN

1    Q.    And under option 1, under benefits, one of the benefits

2    identified is ███████████████████████████████████████████████

3    ████████████████        That was a benefit identified to the

4    no-commission option, correct?

5    A.    Yes.

6    Q.    And on the other hand, on the bottom right of this slide,

7    one of the risks is ████████████████████████████████████████████

8    ████████████████████████████████████████?

9    A.    Yes, I see that.

10   Q.    And again, what Apple chose, █████████████████████████████

11   ████████████████████████████████    was to charge a commission ████

12   undertaking that compliance risk and to impose the restrictive

13   policies for the external placement ██████████████████████████

14   ████████████████████████    correct?

15   A.    No.  I -- I recall in the meeting with Mr. Cook, it was a

16   discussion with the legal team.  And again I'm uncomfortable

17   in what I can say or not say about these topics.  And so when

18   you talk about the decision with Mr. Cook, it wasn't discussed

19   in the way you're discussing it.

20         There was a very different discussion about the legal

21   requirements of the order and what can and can't be done.

22         And so I would not frame it the way you're saying from

23   these slides as if that was the discussion in the meeting with

24   Mr. Cook.

25   Q.    Well, let's set aside what the discussion in the room was.

1    The slide that was here -- there's a draft and there's a final

2    we'll look at.  The slides that were presented to him that you

3    commented on, they presented a column A and a column B, a

4    benefits and a risks, a proposal 1 and a proposal 2.

5        Apple chose to take the worst of column A and the worst of

6    column B.  ████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████

8    ████████████████████████████████████

9    **A.**  That's a long statement.  I can't say yes to all of that.

10   **Q.**  I'll make it shorter.

11   **A.**  We certainly --

12   **Q.**  I'll save you.  I'll make it shorter.

13       Apple ultimately chose to ████████████████████████████

14   ████████████████████████████████████████████████████

15   ██████████████████████████████████

16   **A.**  Yes.

17   **Q.**  Okay.  So let's look at the specifics of the commission

18   itself discussed in this deck and turn to 223.23.

19       (Exhibit published to witness, counsel, and the Court.)

20   **BY MR. BORNSTEIN:**

21   **Q.**  And there are three fee options listed on this slide,

22   correct?

23   **A.**  I see that, yes.

24   **Q.**  And you saw this slide and you ultimately provided some

25   comments on these options, right?  Do you remember that?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

SCHILLER - DIRECT / BORNSTEIN

1    **A.**  I don't recall all the discussion around it so...

2    **Q.**  All right.  Well, we'll come to that.  Let's just nail

3    down what these different options were that were under

4    consideration and presented to Mr. Cook.

5        Option A is a 27 percent commission with a 24-hour time

6    limit, right?

7    **A.**  Yes.

8    **Q.**  And what the 24-hour time limit means is that Apple would

9    have a commission payable of 27 percent on purchases made on a

10   developer's website within 24 hours of a link being clicked,

11   right?

12   **A.**  Yes.

13   **Q.**  Okay.  Option B proposed a flat fee for each linkout,

14   correct?

15   **A.**  Yes.

16   **Q.**  And that just means there'd be some number, some dollar

17   number, that would be required to be paid on each purchase

18   made through a linkout, right?

19   **A.**  Yes.

20   **Q.**  And Option C was a 20 percent commission but with a

21   tracking period of a full year, correct?

22   **A.**  Yes.  But just to be clear, as I remember this, I believe

23   these three options, you're presenting them as if these were

24   what the team presenting were recommending we do.  I don't

25   recall it being that.

```
 1        I recall these were three options in order to go and

 2    create models behind each one as sample analysis, not as

 3    saying the commission must be 27 percent and a 24-hour limit.

 4    That's our proposal.

 5        There -- there are many variables, as you know, involved

 6    in this analysis, and these were three they picked to show

 7    three different versions so they then can do the analysis.

 8    They were not recommendations of final decisions.  These were

 9    analysis options, samples.

10    Q.  I -- I appreciate that.  I appreciate the clarification.

11    And we're going to get to the actual recommendation a little

12    bit later.  But so that we have it clear, these are three

13    different straw men essentially that were put out so people

14    could talk about them and understand the consequences; is that

15    fair?

16    A.  Yes.

17    Q.  Okay.  Now, you, Mr. Schiller, you thought options B and C

18    were crazy, right?

19    A.  Yes.

20    Q.  Okay.  So let's -- let's focus on Option A.  Option A has

21    considerations identified in the slide on 223.32.

22        (Exhibit published to witness, counsel, and the Court.)

23    BY MR. BORNSTEIN:

24    Q.  And here we have the benefits and the risks of the

25    27 percent commission with the 24-hour tracking period.
```

1    One of the benefits identified is that this charging a

2  commission reduces the financial risk versus the no-fee

3  option, right?

4  **A.**  I see that it says that, yes.

5  **Q.**  Okay.  We just lost the screen.

6        **MR. BORNSTEIN:**  Your Honor, I can keep going with the

7  paper or we can wait, whatever you prefer.

8        **THE COURT:**  Well, I'm using paper.

9        **MR. BORNSTEIN:**  Okay.

10    Oh.  And it's back.  All right.

11  **Q.**  And now on the right side of this slide, Mr. Schiller, we

12  have identified the risks of the 27 percent commission.  And

13  the first one is ████████████████████████████████████████

14  ████████████████████████████████

15    Do you see that?

16  **A.**  I do.

17  **Q.**  Okay.  ████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ███████████████████████

20  **A.**  ███████████████████████

21  **Q.**  █████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████

25  **A.**  I'm not going to say what they were thinking when they

1    wrote this.  I don't know exactly why that is.

2    **Q.**  All right.

3    **A.**  So I'm not going to say.

4    **Q.**  Well, let me back up and keep it with you.  You were

5    concerned, as you've already said, that there was a compliance

6    risk from charging a commission.

7    **A.**  It was one of my concerns, yes.

8    **Q.**  Okay.  And Apple was -- also noted in the second bullet

9    that developers may claim that a small discount on initial

10   transaction does not allow for price competition, correct?

11   **A.**  Yes.

12   **Q.**  All right.  And so the team at Apple, at this point,

13   whoever put the slide together, Mr. Cameron and others, that

14   shared it with ███████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████

17   **A.**  ██████████

18   **Q.**  And what Apple ultimately chose was that 27 percent

19   commission but a full seven-day tracking window, right?

20   **A.**  Yes.

21           **THE COURT:**  What page is that again?

22           **MR. BORNSTEIN:**  That's 223.32, Your Honor.

23           **THE COURT:**  Thank you.

24   **BY MR. BORNSTEIN:**

25   **Q.**  So let's talk about briefly, because I know you thought it

1    was crazy, but let's talk about option B on 223.37.

2        (Exhibit published to witness, counsel, and the Court.)

3    **BY MR. BORNSTEIN:**

4    **Q.**  This is the one that relates to a flat fee charged each

5    time a customer links out.  And here, on the benefits, the

6    first one, again it reduces financial risk, right?

7    **A.**  Yes.

8    **Q.**  Okay.  I want to talk about the bottom one.  It says,

9    "Sidesteps direct comparisons with commission rates."

10       Do you see that?

11   **A.**  Yes.

12   **Q.**  Do you have an understanding, Mr. Schiller, about why

13   sidestepping direct comparisons with commission rates was

14   considered a benefit of charging a flat fee?

15   **A.**  I think simply that it isn't a commission rate.  I think

16   there's been a lot of press and talk always about the

17   commission rate, the commission rate.  And so this doesn't

18   have a commission rate.

19   **Q.**  Well, you were concerned, Mr. Schiller, that if a

20   commission were charged as a percentage, it would lead to

21   questions about which services Apple was charging for and it

22   would lead to people questioning how to break down and

23   disaggregate your commission, right?

24   **A.**  I don't recall if that's what something I was thinking

25   about in relation to this, no.  I don't recall that.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

SCHILLER - DIRECT / BORNSTEIN

1    **Q.**  Do you have that concern about charging a reduced

2    commission, sir?

3    **A.**  Not where -- as we've come to do the reduction is

4    specifically about payment processing and the ability to

5    identify what that means and what that costs to operate.  I

6    think that's become something that's very clear and easy to at

7    least discuss and understand.

8        I think as you get further beyond that, it gets

9    complicated in terms of trying to disaggregate every single

10   thing Apple provides.

11   **Q.**  And so what you mean by that answer, if I understand you

12   correctly, is the three, and in some instances and some

13   countries --

14           **THE COURT:**  Hold on.

15                 (Discussion off the record.)

16           **THE COURT:**  Try it again.

17       We're going to take a break in about five minutes.

18           **MR. BORNSTEIN:**  Okay.

19   **Q.**  What you're referring to in the answer you just gave,

20   Mr. Schiller, is there's a 3 percent discount here in the

21   U.S., a 4 percent in some countries for alternative payment

22   options, and you're saying that's now become clear as kind of

23   a measure of the value of what Apple is providing for payment,

24   right?

25   **A.**  In the costs in the industry in general, yes.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1    **Q.**  Okay.  Great.

2        If you look over on the right-hand side of this slide,

3    .37, one of the risks identified ████████████████████

4    ███████████████████████████████████████████████████

5    ██████

6    **A.**  ██████

7    **Q.**  ████████████████████████████████████

8    ███████████████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   **A.**  ██████

11   **Q.**  All right.  Let's turn to option 2C.  It's on 223.42.

12       (Exhibit published to witness, counsel, and the Court.)

13   **BY MR. BORNSTEIN:**

14   **Q.**  This, as a reminder, is the 20 percent commission with a

15   one-year tracking period.  Are you with me on .42?

16   **A.**  Yes.

17   **Q.**  And here one of the risks that is identified is ███

18   █████████████████████████████████████████████████

19   ███████████████

20   **A.**  ██████

21   **Q.**  ████████████

22     ████████████████████████████████████████

23   █████████████████████████████████████████████████

24   ███████████████████████████████████████

25   ███████████████████



SCHILLER - DIRECT / BORNSTEIN

```
1    A. ███████████████
2    Q. █████████████████████████████████████
3    ██████████████████
4    A. ████████████████████████████
```

5    **Q.**  Okay.

6        I want to do a little digression here, and hopefully we

7    can finish before the Court wants to take a break.

8              **MR. BORNSTEIN:**  And if not, Your Honor, please stop

9    me.

10   **Q.**  But if you turn to 223.28, this is back on the 27 percent

11   commission, the 24-hour tracking window.  Let me know when

12   you're there.

13   **A.**  I'm on that page, I think.

14   **Q.**  All right.  I just want to make the record clear on how

15   this would work.

16       So on the top, it says non-sub IAP.  And that means

17   nonsubscription; is that right?

18   **A.**  Yes.

19   **Q.**  Okay.  So for a nonsubscription app, the way it works is

20   that if there's a paid transaction that happens within

21   24 hours after a user clicks on the link, there would be a

22   commission that's payable.  And that's what that green dot is

23   for, right?

24   **A.**  Yes.

25   **Q.**  Okay.  And then subsequent transactions that a user makes

1    outside the window that are done directly on the developer's

2    website, those would not be subject to a commission, correct?

3    **A.**  Correct.

4    **Q.**  But if the user were to reach the developer's website a

5    second time by going through the external purchase link on an

6    app on the iPhone, the 24-hour window would restart and there

7    would be commissions payable during that 24-hour window,

8    correct?

9    **A.**  Yes.

10   **Q.**  And that's exactly how the entitlement program works as

11   actually launched except the tracking window is seven days

12   instead of 24 hours, right?

13   **A.**  Yes.

14   **Q.**  Okay.  And then for subscription apps on the bottom, if a

15   user signs up after clicking the link, user signs up on the

16   developer's website for a free trial within the 24-hour window

17   here or the seven-day window in the real world, there's no

18   commission payable because it's a free trial.  So there's no

19   commission to be paid, right?

20   **A.**  Yes.

21   **Q.**  But if there is a paid start to the subscription because

22   the free trial expires, there'd be a commission payable to

23   Apple even if that free trial expired and the free start

24   happened after the end of the tracking window, right?

25   **A.**   I'm sorry.  I lost that halfway through.  I think I know

SCHILLER - DIRECT / BORNSTEIN

1    what you're --

2    **Q.**  Well --

3    **A.**  But could you please repeat it to me?

4    **Q.**  -- sure.  If the screen would stay up, I can do it from

5    the screen.  Or maybe you have the hard copy in front of you?

6    **A.**  I do.

7    **Q.**  Okay.  Great.  So we can look at the hard copy.

8        But if you -- if you see, first there's a 24-hour tracking

9    window which has free trial and a black dot, right?

10   **A.**  Yes.

11   **Q.**  So that's obviously no commission because there's no money

12   being exchanged with the developer, right?

13   **A.**  Yes.

14   **Q.**  And at some point, with a lot of apps the free trials

15   expire and there's an automatic or sometimes optional renewal

16   at which point you start paying the developer for your

17   subscription, right?

18   **A.**  Yes.

19   **Q.**  And if you have a 24-hour tracking window, that renewal

20   period, the expiration of the free trial is likely to happen

21   after 24 hours, right?

22   **A.**  It may.

23   **Q.**  Free trials are often, you know, a week, 30 days, it

24   depends on the developer's choice, right?

25   **A.**  That's right.

1    **Q.**  So let's just say we have a 30-day free trial.  When the

2    30 days are up, if the subscription automatically renews or

3    there's a paid start and all of a sudden the user now has to

4    pay for the next 30 days, Apple would have a commission

5    payable at that point, correct?

6    **A.**  Correct.

7    **Q.**  And that's regardless of whether the commission -- excuse

8    me -- whether the subscription starts in a paid basis after

9    the tracking window has expired, as illustrated here --

10                        (Simultaneous colloquy.)

11            **THE WITNESS:**  Complicated way.

12        Could I say, as I understand it, a little simpler way?

13   **BY MR. BORNSTEIN:**

14   **Q.**  I bet you can.

15   **A.**  Whenever the free trial ends, that's the beginning of the

16   tracking window.  And that tracking window is the same as if

17   it wasn't a subscription.  If it's 24 hours or seven days,

18   whatever the tracking window is, that tracking window occurs

19   when the free trial ends.

20        So in this case of the 24-hour tracking window, at the end

21   of the free trial, if the paid subscription begins in less

22   than 24 hours, then there's a commission.  If the user doesn't

23   automatically opt in, let's say they opt in two days later,

24   there isn't a commission because it's outside the tracking

25   window.  But the tracking window period is immediately

 1   subsequent to the free trial.

 2       Does that make sense or not?

 3   **Q.**  Well, I understand you.  I'm not sure it's consistent with

 4   the slide, and so I just want to make sure that we have the

 5   facts correct.

 6       Let me give you a hypothetical situation if I could.  And

 7   we'll put it in the real world of the seven-day tracking

 8   window.

 9   **A.**  Okay.

10   **Q.**  Let's suppose I click on a link for a subscription app.  I

11   get to the developer's website and I sign up for a free trial

12   and I do that, you know, right away within ten minutes.  Okay?

13   **A.**  Yes.

14   **Q.**  The free trial that I get is a 30-day free trial.  Okay?

15   **A.**  Yes.

16   **Q.**  So when the free trial expires, we're going to be outside

17   that seven-day tracking window, correct?

18   **A.**  Yes.

19   **Q.**  All right.  At that point, if I have my paid start either

20   because it's automatic or because I click a button to

21   authorize it, is there a commission payable or not after

22   those -- the free trial expires after 30 days?

23   **A.**  There is, but my understanding, and I may be incorrect, is

24   that it is as long as that paid start begins within that same

25   time period after the end of the free trial.

1    **Q.**  Okay.

2         **MR. BORNSTEIN:**  So, Your Honor, I'm going to move to

3    a new subject if you want to take a break or have me keep

4    going?

5         **THE COURT:**  No.  Per our schedule we'll take a

6    20-minute break at this point.  So we'll stand in recess until

7    10:22.

8         **MR. BORNSTEIN:**  Thank you, Your Honor.

9         **THE COURT:**  Thank you.

10     (Recess taken at 10:02 A.M.; proceedings resumed at

11   10:23 A.M.)

12        **THE COURT:**  Okay.  We are back on record.  The record

13   will reflect that the parties are present.

14     Mr. Perry, I see you at the podium.  Is there an issue?

15        **MR. PERRY:**  Your Honor, apologies for interrupting

16   Mr. Bornstein's examination.  We may have an issue.

17     Before the break, Mr. Bornstein was asking Mr. Schiller

18   about CX223, which is the June deck.  There are multiple

19   versions of this deck.  I did not object to the introduction.

20   They have a produced version, I know that.

21        **THE COURT:**  I don't know that your mic is on.

22     Go ahead, Mr. Perry.

23        **MR. PERRY:**  Can you hear me now, Your Honor?

24        **THE COURT:**  Yes.

25        **MR. PERRY:**  The -- there are multiple versions of

```
 1    these documents in the production.  Epic declined to provide
 2    an exhibit list before this hearing.  So we couldn't check
 3    through their exhibits.
 4        There is -- there are other versions of this document in
 5    which the references to compliance risk throughout the
 6    document that Mr. Bornstein questioned Mr. Schiller about --
 7              THE COURT:  So I can't have you coaching the witness.
 8              MR. PERRY:  Oh, I'm sorry, Your Honor.
 9              THE COURT:  I'll take you at sidebar.
10              MR. PERRY:  Thank you, Your Honor.
11                   (Sidebar hearing, not reported.)
12              THE COURT:  We're back on the record.
13        You may proceed.
14              MR. BORNSTEIN:   Thank you, Your Honor.
15    Q.  Mr. Schiller, welcome back.
16    A.  Hello.
17    Q.  We had some discussion before the break about your views
18    on whether or not Apple should charge a commission.  Do you
19    recall that?
20    A.  Yes.
21    Q.  Okay.  I want you to take a look, if you would, at
22    Exhibit 224 in your binder.
23        224 is an email string.  The top email from Shawn Cameron
24    at Apple dated June 19, 2023, to you and a number of other
25    people.  Do you see that?
```

SCHILLER - DIRECT / BORNSTEIN

1    **A.**    Yes.

2    **Q.**    And if you go down to the middle of the first -- let me do

3    the housekeeping here.

4            **MR. BORNSTEIN:**    Your Honor, I'd move the admission of

5    Exhibit 224.

6            **MR. PERRY:**    No objection, Your Honor.

7            **THE COURT:**    224 is admitted.

8                (Exhibit 224 received in evidence.)

9        (Exhibit published to witness, counsel, and the Court.)

10   **BY MR. BORNSTEIN:**

11   **Q.**    If you go down the middle of the first page, Your Honor --

12   excuse me -- Mr. Schiller, there is an email from you dated

13   June 16, 2023, which you have labeled privileged and

14   confidential, attorney work product.

15       Do you see that?

16   **A.**    Yes.

17   **Q.**    Okay.  And you provide here in this email a set of

18   comments on a draft presentation, correct?

19   **A.**    Yes.

20   **Q.**    And the draft presentation you're commenting on is the one

21   we were -- we were just looking at.  You can see on the bottom

22   there's Mr. Cameron's email that we read before the break.

23       Do you see that?

24   **A.**    Yes.

25   **Q.**    Okay.  And your first line here after thanking Mr. Cameron

1    for the draft, you say, "Here are my notes.  Clearly I am not

2    on team commission/fee so no surprises here."

3       Do you see that?

4    **A.**  Yes.

5    **Q.**  And that's a reference to the fact that you were not in

6    favor of charging a commission at this point in time, correct?

7    **A.**  Again, I wasn't in favor or not.  It was a discussion

8    about what we're allowed to do or not allowed to do.  Not

9    about favor, what I favor.

10    **Q.**  All right.  Again your view was that you were not allowed

11    to charge a commission or that there were compliance risks

12    associated with it, correct?

13    **A.**  I had concerns with that.

14    **Q.**  All right.  And in fact, you -- as you say later in the

15    email, you had already explained your many issues with the

16    commission concept to your colleagues, correct?

17    **A.**  Yes.

18    **Q.**  So you had other issues besides just the compliance risk

19    with charging the commission, correct?

20    **A.**  Yes.

21    **Q.**  Okay.  What were your other concerns about charging a

22    commission?

23    **A.**  Oh, a few.  I have had concerns throughout this process

24    about collection risk, that developers may or may not pay that

25    and how we deal with that.  The App Store has always been a

 1    business where we pay the developer proceeds and retain our

 2    commission.  And now in this model, we have to go ask the

 3    developer to report to us and then pay us for that.

 4        So I was concerned with what happens if a developer

 5    doesn't pay and what's the process for that.  And the

 6    antagonistic relationship it creates between Apple and

 7    developers over payment of fees or not.

 8        And ultimately do we need to have audit rights to go check

 9    the developers to decide whether they owed us money or didn't

10    and how would we do that.

11        So I had many concerns.

12    **Q.**  And ultimately, despite all those concerns -- which I

13    presume you expressed to your colleagues, correct?

14    **A.**  I believe so.

15    **Q.**  Yeah.  So despite all those concerns that you expressed to

16    your colleagues, Apple nevertheless made the decision to go

17    ahead and charge a commission on the external purchases made

18    through the link implemented in response to this Court's

19    injunction, correct?

20    **A.**  Yes.

21    **Q.**  All right.  Who made that decision?  Which person at Apple

22    ultimately decided to charge a commission?

23    **A.**  Ultimately it was the -- the pricing committee approval

24    that we've already talked about at length, yes.

25    **Q.**  So that would be Mr. Cook, Mr. Maestri, and yourself made

1  the final decision?

2  **A.** Yes, again with a lot of legal counsel involved in that

3  same discussion, yes.

4  **Q.** All right. But you had concerns about doing it and

5  effectively got overruled or outvoted by others?

6  **A.** No, I wouldn't describe it that way.

7  **Q.** All right. So you eventually came around and were part of

8  the consensus in favor of charging a commission?

9  **A.** Again, that all is about the discussion we had with the

10  legal counsel about what the injunction says and what we are

11  allowed or not allowed to do. And so it was about a legal

12  discussion.

13  **Q.** Okay. Well, let me -- we'll -- we'll come back to that a

14  little bit later.

15      You asked a little later in this slide, the next sentence,

16  Mr. Cameron, whether there's a 12 percent commission on a

17  small business developer transaction, otherwise this is an

18  increase in commission level for 95 percent of developers.

19  Right? You posed that question to him?

20  **A.** Yes.

21  **Q.** And what you're referring to there is the fact that

22  developers in Apple's small business program ordinarily pay a

23  15 percent commission rather than 30 percent, correct?

24  **A.** Yes.

25  **Q.** And you asked whether there was a 12 percent commission,

1    and you got to 12 percent by effectively subtracting 3 from

2    the 15 the same way that the 27 is a deduction of 3 from the

3    standard fee of 30, correct?

4    A.  Well, as we've discussed previously, we arrived at those

5    numbers both looking at it from the deduction side, but also

6    from the bottoms-up side as well in terms of the value of the

7    goods provided.  And so there were both discussions that went

8    on ultimately.  But the 12 percent is in fact 15 minus 3 is

9    certainly one of the ways we derived it.

10   Q.  Right.  And in your email when you wrote 12 percent, you

11   hadn't done that bottoms-up analysis yet, had you?

12   A.  Well, we had already had discussions about that, yes.

13   Q.  And it's your testimony that the bottoms-up analysis leads

14   to 12 percent for small developers but leads to 27 percent for

15   developers who just happen to cross the million dollar

16   threshold in revenue?

17   A.  No, of course not.

18   Q.  Okay.

19   A.  It was the justification that the value was there at both

20   of those commissions based on the analysis that had been done

21   externally.

22   Q.  All right.  When you refer here to 95 percent of

23   developers, to be clear you don't mean 95 percent of revenue

24   that participates in the small business program.  You mean

25   95 percent of developers on a sort of one-by-one basis, right?

SCHILLER - DIRECT / BORNSTEIN

1  **A.**  I'm talking about a round number for all the developers

2  eligible for the small business program is roughly 95 percent.

3  **Q.**  Right, but that's not 95 percent of revenue that Apple

4  earns from the App Store, correct?

5  **A.**  Correct.  That's the number of developers, yes.

6  **Q.**  The actual revenue attributed to those developers is far,

7  far less than 95 percent, right?

8  **A.**  Yes.

9  **Q.**  Now, ultimately in the purchase link entitlement program,

10  Apple did include a 12 percent commission rather than a

11  27 percent commission for developers in the small business

12  program, right?

13  **A.**  Yes.

14  **Q.**  Okay.  But there are other programs that Apple offers that

15  come with a reduced commission besides the small business

16  program, correct?

17  **A.**  Yes.

18  **Q.**  There's the video partner program, the news partner

19  program, right?

20  **A.**  Yes.

21  **Q.**  And in the actual purchase link entitlement program,

22  those -- those programs are excluded from eligibility, as we

23  saw in May, correct?

24  **A.**  Yes.

25  **Q.**  And so for those developers, adopting an external link

1   would in fact involve an increase in commission level,

2   correct?

3   **A.**  If they chose that, yes.

4   **Q.**  All right.  Now Mr. Cameron responds to you here at the

5   top of the page by thanking you for your comments and thanking

6   others and attaching a revised version of the deck for use

7   with Mr. Cook, correct?

8   **A.**  I see that.

9   **Q.**  All right.  So let's turn to the deck that's attached.

10   It's at 224.4.

11      (Exhibit published to witness, counsel, and the Court.)

12   **BY MR. BORNSTEIN:**

13   **Q.**  This is titled Epic Injunction Implementation Proposal,

14   and this too is labeled privileged and confidential, prepared

15   at the request of outside counsel, correct?

16   **A.**  I see that, yes.

17   **Q.**  All right.  Turn to 224.6, please.

18      And here in the -- now we have speakers notes that are

19   attached to the slide, right?  That's what's on the bottom?

20   **A.**  I believe so.

21   **Q.**  Okay.  And here, in 224.6 we have the same option 1,

22   option 2, no fee, fee, options that were in Exhibit 223 that

23   we looked at before the break, correct?

24   **A.**  I assume they're the same.  I don't know.  I haven't done

25   a side-by-side comparison.

SCHILLER - DIRECT / BORNSTEIN

1    **Q.**  All right.  They're -- generally speaking there is a

2    no-fee option on the left with more restrictive style and

3    placement provisions and a commission or fee option on the

4    right with less restrictive style and placement options,

5    correct?

6    **A.**  Yes.

7    **Q.**  And the speaker's notes from Mr. Oliver actually make that

8    point down at the bottom, the two options also diverge when it

9    comes to the placement and the style of the link, right?

10   **A.**  I see that.

11   **Q.**  All right.  So go, please, to 224.9.  And here we have

12   notes from somebody named Shawn.

13       This is Shawn Cameron, correct?

14   **A.**  Yes.

15   **Q.**  All right.  And Mr. Cameron makes the point or is -- his

16   speaker notes for this presentation to Mr. Cook make the point

17   that in the no-fee option, the style placement and fee would

18   diverge from the fee breaking option.  Do you see that?

19   **A.**  I see that.

20   **Q.**  And the fee breaking option is a reference to option 2,

21   the version that actually has a commission or a fee in it,

22   right?

23   **A.**  It may.  I don't know.

24   **Q.**  Do you know what is meant by the "fee breaking option"

25   here?

SCHILLER – DIRECT / BORNSTEIN

1  **A.**  No, I do not.

2  **Q.**  Do you consider the commission that Apple charges on the

3  external link entitlement program to break Apple's fee

4  structure?

5  **A.**  No.  I've -- I've not heard that term.

6  **Q.**  Okay.  Can you agree with me, however, that in the

7  presentation, the way it's put here, Mr. Cameron's notes

8  actually do link the fee option with particular style and

9  placement restrictions.  They are a set as he's slated to talk

10  about them here, correct?

11  **A.**  It says that here.

12  **Q.**  Okay.  And now this deck also -- and -- and that's your

13  understanding of how the -- the materials were put together to

14  present to Mr. Cook, right?  There were two options with sets,

15  correct?

16  **A.**  Yes.  But, again, my recollection isn't that those -- the

17  button styles and the fees were directly connected.  I don't

18  recall that being said.

19  **Q.**  Okay.  And ultimately, you didn't land with them in that

20  particular constellation anyway.  You mixed and matched,

21  correct?

22  **A.**  (No audible response.)

23  **Q.**  Okay.  And now the deck includes some financial analysis.

24  If we go -- we're not going to put any numbers on the screen

25  here, but I'll ask you to look at the hard copy,

1    Exhibit 224.15.

2        (Exhibit published to witness, counsel, and the Court.)

3    **BY MR. BORNSTEIN:**

4    **Q.**  We have the speaker notes on the screen.  There's nothing

5    I believe to be confidential there.  And the speaker is, it's

6    labeled Kunnal.  And if I'm pronouncing the gentleman's name

7    wrong, please correct me, but it's Kunnal Vij; is that right?

8    **A.**  Yes.

9    **Q.**  And he is somebody with a finance role at Apple?

10   **A.**  Yes.

11   **Q.**  And the notes have Mr. Vij saying that when -- it's at the

12   bottom -- when a linkout happens, there will be some breakage

13   meaning customer dropping off during the buy flow process due

14   to a less seamless experience.

15       You see that?

16   **A.**  Yes.

17   **Q.**  And what Mr. Vij is referring to is the idea that when

18   users use a purchase link, some number of them won't make it

19   all the way through and make the external purchase because the

20   process is less seamless, has more friction than just using

21   the IAP function in the app; is that right?

22   **A.**  That's one reason.  Or they just may not want to.

23   **Q.**  Okay.  But he's talking about the breakage because of the

24   less seamless experience, that's the specific phenomenon he's

25   focusing on here, right?

SCHILLER - DIRECT / BORNSTEIN

1   **A.**  I don't -- again, I don't read these speaker notes, so I'd

2   be guessing at what he was thinking.

3      But I certainly understand the concept of breakage.

4   **Q.**  Okay.  And there's some analysis in the slide which we

5   don't have on the screen about the impact of breakage on

6   Slide .16, the next page.

7      And there's an conclusion you can see that's reached in

8   the second paragraph of the speaker notes that says, "Beyond a

9   particular blacked-out percentage of developers" -- sorry.

10  "Beyond a particular blacked-out percentage of breakage,

11  developers reach a tipping point where they lose more on

12  linking than they would make sticking with Apple IAP and a

13  higher commission," correct?

14  **A.**  I'm sorry.  I'm just trying to find where the point is

15  where that says this on this slide.

16  **Q.**  Sure.  It's on the second paragraph of the speaker notes

17  which begins "on the rose."

18  **A.**  Thanks.  Yes, I see that.

19  **Q.**  Okay.  And the reason that there is a breaking point, or

20  tipping point to use Mr. Vij's words, is that at some point

21  there's enough breakage that happens that developers don't

22  make any sale at all and it's better for them just to stay

23  with IAP and make more sales at a higher -- but pay a higher

24  commission, correct?

25  **A.**  I would say that just slightly differently.

1          This is -- this is a -- a model where the team is plugging

2     in different breakage numbers, not that they know that will

3     happen.  They're just plugging different numbers to say where

4     does the model start [sic] working for developers.  At what

5     breakage, if it got that high, it would be less advantageous

6     to do a linkout versus stay in the app.

7          And so the breakages is -- is the control variable in this

8     analysis.  It's -- it's -- and so, yes, there's a point

9     where -- I'll give you a ridiculous number.  A hundred percent

10    breakage, why would anyone link out because no one would

11    follow it and no one would pay and you wouldn't make any

12    money.  So logically there's a cutover point on that breakage

13    control variable.

14    **Q.**  Right.  And I think we're saying the same thing.  As usual

15    you're saying it more precisely and eloquently.  But the idea

16    is that the team was modeling where that tipping point was

17    where it ceased to be advantageous for developers because of

18    the amount of breakage, correct?

19    **A.**  Yes.

20    **Q.**  And in the modeling, Mr. Vij and his colleagues come up

21    with a number, which I won't say out loud, but it's there in

22    the second paragraph of the slide, correct?

23    **A.**  They are, yeah.

24    **Q.**  Okay.  And now there's another variable that Mr. Vij

25    focused on which is the share of billings that are linked out.

SCHILLER - DIRECT / BORNSTEIN

1    And you can see that as linkout share on the -- the graphic

2    portion of the slide.  See it says linkout share in blue?

3    A.  Yes, I see that.

4    Q.  All right.  And he says down below in the third paragraph,

5    "For the share of billings linking out, we are showing

6    sensitivities between 10 percent and 50 percent."  Correct?

7    A.  Yes, he says that.

8    Q.  And what he's talking about here, the analysis that Apple

9    was doing here is to assess at the financial impact to

10   developers -- or excuse me -- the financial impact to Apple if

11   the amount of -- or the share of linking out increases or

12   decreases in a particular app, correct?

13   A.  Yes.

14   Q.  Right.  And the higher the linkout share, the greater the

15   impact on Apple's -- the greater the adverse impact on Apple's

16   revenue, correct?

17   A.  Yes.

18   Q.  And Mr. Vij's speaking notes make the observation that the

19   share of billings linking out will depend where is the text

20   and the language that developers are allowed to use.

21       Correct?

22   A.  (Reviewing document.)

23   Q.  It's in that third paragraph, sir.

24   A.  Yes, I see that.

25   Q.  All right.  So this is people at Apple recognizing that

1  more restrictive rules on the placement and the format and the

2  language of links can have the effect of reducing the amount

3  of linkout behavior in which users engage, correct?

4  **A.**  Yes.

5  **Q.**  And Apple has the ability by making those rules more

6  restrictive to reduce the amount of linking out and reduce the

7  adverse impact on Apple's revenue, correct?

8  **A.**  In a general sense.  It's much more complicated than just

9  that.  But in a general sense.

10 **Q.**  Well, it is the case, sir, that the more restrictive the

11 rules are on placement and format and language of links, the

12 less likely it is that those links will be seen and used by

13 users.

14 **A.**  Again, there are more variables than that, but those

15 certainly matter, yes.

16 **Q.**  All right.

17     All else equal -- we'll do it that way -- all else equal,

18 the more restrictive the format rules, the placement rules,

19 and the language rules are, the less likely a user will be to

20 select the link and make a purchase outside of the app,

21 correct?

22 **A.**  In theory, yes.

23 **Q.**  And --

24          **THE COURT:**  Sorry.  And I expect that if there is any

25 other significant consideration, there will be some writing

SCHILLER - DIRECT / BORNSTEIN

1    about it, correct?  Or you're only -- yeah.  I mean, you did

2    analysis, didn't you?

3         **THE WITNESS:**  We did a model to understand what

4    impact it could have.  We didn't analyze whether color or font

5    size or specific page placement or frequency --

6         **THE COURT:**  But this isn't just something in your

7    head, Mr. Schiller.  This is Apple.  And if there was a

8    consideration, we'd find it in writing somewhere.

9         **THE WITNESS:**  We -- we did as much work as we could

10   to analyze everything we could.

11        **THE COURT:**  And if it's not there, that means you

12   didn't analyze it then, right?  The absence of it is equally

13   relevant.

14        **THE WITNESS:**  Yes.  We also discussed things that

15   weren't always in the slide deck, other ideas --

16        **THE COURT:**  And that was --

17        **THE WITNESS:**  -- we cared about.

18        **THE COURT:**  And it was never -- if it wasn't followed

19   up, then obviously it wasn't important.  Because if it was

20   important, some subordinate would have done something with it.

21        **THE WITNESS:**  Yes.

22        **THE COURT:**  Proceed.

23        **MR. BORNSTEIN:**  Thank you, Your Honor.

24   **Q.**  And what we do know, just to follow up on the Court's

25   question, we do know that one of the things that Apple did

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

 1   take into account is what Mr. Vij says here, the more

 2   restrictive the text and the language get, the lower the

 3   linkout share will be, correct?

 4   **A.**  That was in our model.

 5   **Q.**  All right.  And this was in the slide presentation and

 6   the -- the discussion that was given to Mr. Cook on June 20,

 7   correct?

 8   **A.**  I do not recall if these words were read in that meeting,

 9   no.

10   **Q.**  Okay.  But this slide was shown, correct?

11   **A.**  I believe so.  I, again, don't know what edits were done

12   to this between this and the final version, but I believe a

13   version of something like this was shown.

14   **Q.**  Okay.  Take a look then at Slide .25 of Exhibit 224.

15       (Exhibit published to witness, counsel, and the Court.)

16   **BY MR. BORNSTEIN:**

17   **Q.**  Now we have only two fee options for discussion.  And

18   I'll -- I'll ask the question that you might want me to ask,

19   which is at least at this point in time these are not

20   recommendations, these are just options for discussion,

21   correct?

22   **A.**  For modeling, yes.  Thank you.

23   **Q.**  Okay.  And we've -- we have jettisoned now the flat fee

24   option which you thought was crazy, correct?

25   **A.**  Yes.

SCHILLER - DIRECT / BORNSTEIN

1    **Q.** So the two options that we have left are the same one --

2    same two we saw before, the 27 percent commission with a

3    24-hour time limit, and a 20 percent commission for a full

4    year, correct?

5    **A.** Yes.

6    **Q.** Now here, too, there's some financial analysis of these

7    options. I want you to look, please, at .30.

8        (Exhibit published to witness, counsel, and the Court.)

9        **MR. BORNSTEIN:** And we're going to have the numbers

10   themselves blacked out on the screen.

11   **Q.** And .30 is an analysis that's done with respect to the

12   first of those options, the 27 percent commission with -- it

13   says 24 year, but I assume that's supposed to mean 24-hour

14   tracking window, correct?

15   **A.** I would assume so as well.

16   **Q.** I hope so. Otherwise we're having a different discussion.

17       And it notes over on the side on the third bullet, linkout

18   billings not eligible for program discounts, correct?

19   **A.** Yes, it does.

20   **Q.** Okay. And that's a reference to what we talked about

21   before where, for example, the video partner program, the news

22   partner program, developers were not eligible under this

23   construct at least to participate in the external purchase

24   link entitlement program, correct?

25   **A.** Yes.

1   **Q.**   All right.

2        Now if we turn to 224.33.

3        (Exhibit published to witness, counsel, and the Court.)

4   **BY MR. BORNSTEIN:**

5   **Q.**   This is a different version of the 27 percent commission

6   that was under discussion at the -- the June 20 meeting with

7   Mr. Cook, correct?

8   **A.**   (Reviewing document.)

9        I'm sorry, I don't know.  I don't know what the difference

10   is --

11   **Q.**   Sure.

12   **A.**   -- in these slides.

13   **Q.**   Let me see if I can help you, sir.

14        If you look at Slide 224.32.

15   **A.**   Yes.

16   **Q.**   You see there's something called option 2AV2, means

17   version 2?

18   **A.**   Yes.

19   **Q.**   And option 2A version 2 has a -- it says 3 percent

20   commission.  I assume from subsequent slides that's supposed

21   to mean a 3 percent discount -- with a 24-hour time limit

22   including the program discounts.  Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   All right.  So option 2A that we looked at back on

25   Slide .30, the one that had the language about the program

1    partners being excluded, that was just a 27 percent commission

2    on all transactions and the program partners were not

3    included, correct?

4    **A.**  Yes.

5    **Q.**  All right.

6        And version 2 has as 3 percent discount off of whatever

7    commission is payable by the developer, and the program

8    partners are eligible to participate, correct?

9    **A.**  Yes.

10   **Q.**  All right.  And it even says, if you look over on the

11   right on Slide .33, for this 3 percent discount option,

12   third bullet, linkout billings are eligible for program

13   discounts, correct?

14       (Exhibit published to witness, counsel, and the Court.)

15           **THE WITNESS:**  Yes.

16   **BY MR. BORNSTEIN:**

17   **Q.**  And so in this version that was at least being discussed

18   with Mr. Cook, you would have a 27 percent commission on

19   standard payments, people who otherwise would pay 30, and

20   you'd have a 12 percent commission for partners who

21   participated in the video partner or news partner program,

22   correct?

23   **A.**  Yes.

24   **Q.**  All right.

25       And there's some analysis that's done about the revenue

 1    impact of these two options.  So I want to do this without

 2    saying confidential numbers out loud.  So I'll see if I can

 3    try it this way first and hope you'll work with me so we can

 4    maintain the confidentiality of Apple's information.

 5        If you look at .30 and you compare that to .33, you'll

 6    see that there are two different calculations of the revenue

 7    impact of these two different versions of the commission.

 8        Are you with me so far?

 9    **A.**  Yes.

10    **Q.**  Okay.  And without saying any of the numbers out loud, can

11    we agree that these calculations show that the projected

12    revenue loss is higher in the second version when the program

13    partners are permitted to participate in the linkout program?

14    In other words, Apple loses more revenue under these

15    projections if the program partners are included.

16    **A.**  (Reviewing document.)

17        Yes.  However to be specific, in some of the numbers

18    shown, it's the same.  In some, it's less.

19        So it's not absolute, but I'm expecting that's probably

20    due to rounding differences more than anything.

21    **Q.**  Okay.  That's -- that's helpful.  Now I want to go a

22    little bit further, and I think this much we can put on the

23    screen with the numbers blacked out to show you that the

24    comparison on the face of the slides actually substantially

25    understates the difference between the two.

 1       So if you look at .30 --

 2           **MR. BORNSTEIN:**  And we can put that one up now with

 3   the redactions.

 4       (Exhibit published to witness, counsel, and the Court.)

 5   **BY MR. BORNSTEIN:**

 6   **Q.**  If you look over on the bottom right-hand corner, there is

 7   something that says, "These numbers assume a 30 percent

 8   collection risk that are factored into the sensitivities."

 9       Do you see that?

10   **A.**  Yes, I do.

11   **Q.**  Okay.  And this is a reference to, at least conceptually

12   what you were talking about before, that there might be

13   collection issues if you charge a commission; that was one of

14   your concerns?

15   **A.**  Yes.

16   **Q.**  Okay.  So for these numbers on .30 there's a 30 percent

17   collection risk baked in.

18       If you go to .33, this is the one regarding when the

19   program partners are eligible.

20       (Exhibit published to witness, counsel, and the Court.)

21   **BY MR. BORNSTEIN:**

22   **Q.**  Here there's no collection risk factored in, correct?

23   **A.**  I see that.

24   **Q.**  So if you did an apples-to-apples, no pun intended --

25   actually I lied, that was intended -- if you do an

 1   apples-to-apples comparison between these two slides, if you

 2   either include collection risk on both or you exclude

 3   collection risk on both, the revenue loss for including the

 4   partners is actually quite a lot larger than the revenue loss

 5   if the partners are excluded, correct?

 6   **A.**   I would think so.  Again, would have to make sure the team

 7   did that correctly, but, yes.

 8   **Q.**   Okay.  And Apple ultimately made the decision to go with

 9   the version that entailed less revenue loss by excluding the

10   partners from eligibility for the program, correct?

11   **A.**   Well, no.  We have the largest programs included.

12   **Q.**   Right.  You excluded the video partner program, correct?

13   **A.**   Yes.

14   **Q.**   You excluded the news partner program, correct?

15   **A.**   Yes.

16   **Q.**   You excluded the tenured subscriptions?

17   **A.**   No.

18   **Q.**   Okay.  They're included?

19   **A.**   They're included as is the small business program.

20   **Q.**   Understood.

21        The 3 percent discount, by the way, on .33, this -- this

22   makes perfectly clear that what's going on again is it's just

23   a deduction from the rate that would otherwise be charged to

24   these developers.  You're taking 3 percent off and discounting

25   it, as the slide says, correct?

 1    **A.**   Yes.

 2    **Q.**   All right.

 3        And in fact, even for option -- the first of these

 4    options, the 27 percent commission option, if you look at

 5    Slide .35, you'll see Slide .35 refers not to the 3 percent

 6    discount version but to the 27 percent commission on

 7    transactions made within 24 hours.  Do you see that's part of

 8    the title?

 9    **A.**   Yes.

10    **Q.**   And then there are speaker notes here from Carson.  That's

11    Mr. Oliver, right?

12    **A.**   Yes.

13    **Q.**   And Mr. Oliver's speaker notes say in the second bullet,

14    "We believe using our standard commission rate discounted by

15    cost of payments in the U.S. is reasonable."  Do you see that?

16    **A.**   Yes.

17    **Q.**   And again, that's the logic that was being applied at this

18    time to get to 27 percent, the standard commission rate and

19    discount by what was estimated as the cost to payments,

20    correct?

21    **A.**   Again, both were discussed.  Both models looking down --

22    looking as a deduction down as well as building up, but

23    clearly the slide talks only about discounting down.

24    **Q.**   Okay.  Well, you -- you agree that for Korea and the

25    Netherlands, move out of the U.S. for a second -- the

SCHILLER - DIRECT / BORNSTEIN

1  commission rates that were identified there, 27 and

2  26 percent, those were done in a top-down way, right?

3  **A.**  Yes.

4  **Q.**  Okay.

5      And you recall when you were here in May, listening to

6  some of your colleagues testify, they -- at least one of them

7  testified that the fees in Korea and the Netherlands that were

8  charged had nothing to do with the fees that Apple ultimately

9  charged here, right?  Do you recall that?

10  **A.**  Correct.

11  **Q.**  Okay.

12      And the testimony here was that it was entirely based on

13  this bottoms-up analysis, correct?

14  **A.**  Well, again, are you talking about one person's statement

15  or everything --

16  **Q.**  Well, that's what --

17                     (Simultaneous colloquy.)

18  **BY MR. BORNSTEIN:**

19  **Q.**  -- Mr. Roman said, right?

20  **A.**  Yes.  That I recall.

21  **Q.**  Right.  And Mr. Roman was wrong about that, in your view.

22  **A.**  I thought differently because I know the project asked the

23  team to build up from the bottoms as well, yes.

24  **Q.**  Well, Mr. Roman's testimony was it was only a bottoms-up

25  analysis, wasn't it?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    **A.**  I believe so.

 2    **Q.**  And that was incorrect.  There was a also a top-down

 3    component, correct, as reflected in Mr. Oliver's remarks here?

 4    **A.**  Again, we worked -- he worked on a different part of it.

 5    I'm not going to say what Mr. Roman's perspective of what he

 6    worked on and what all he did.  I was very clear when you

 7    asked me about that previously when we were here in May, that

 8    I looked at it from top down as well as the team did work on

 9    the bottom's up.

10    **Q.**  Okay.  Take a look, then, at Exhibit dot -- I'm sorry.

11    Exhibit 224.69.

12       (Exhibit published to witness, counsel, and the Court.)

13    **BY MR. BORNSTEIN:**

14    **Q.**  Now here there are speaker notes for somebody named Nate.

15    Do you see that?

16    **A.**  For Nate, yes.

17    **Q.**  And Nate, we saw his name earlier on the meeting invite.

18    That's Nate Barton?

19    **A.**  Correct.

20    **Q.**  And Mr. Barton is in the finance function at Apple,

21    correct?

22    **A.**  Yes.

23    **Q.**  All right.  And this slide talks about U.S. revenue

24    impact.  Do you see that on top?

25    **A.**  Yes.

1  Q.  And what Mr. Barton's speaker notes say is that "If we

2  decided and had the ability to charge and enforce a

3  commission, we believe there would be very little developer

4  adoption of linkout, assuming a scenario where we would give a

5  cost of payments discount at 3 percent."  Correct?

6  A.  Yes.

7  Q.  But that's exactly what Apple did.  It gave a cost of

8  payments discount at 3 percent, correct?

9  A.  Yes.

10  Q.  And if you look at the next paragraph, this wasn't just

11  guessing on Mr. Barton's part, he says, "We ran the commission

12  option through our developer decisioning model as well, but

13  this will likely not make economic sense for the vast majority

14  of developers with a 3 percent discount in the near term given

15  that's roughly equivalent to the cost of payments."  Correct?

16  A.  Yes.

17  Q.  And now do you remember back in May, Mr. Roman again, he

18  testified that Apple didn't even try to assess the value of

19  the cost of payments to developers.

20  A.  I don't recall that statement.

21  Q.  All right.  Well, let's just see if I can refresh your

22  recollection.

23        MR. BORNSTEIN:  If we can put on the screen from

24  May 10 the transcript of Mr. Roman's testimony, pages 266 to

25  267.

 1          (Exhibit published to witness, counsel, and the Court.)

 2     **BY MR. BORNSTEIN:**

 3     **Q.**  Okay.  And I'm focused here on the bottom, 266, line 22,

 4     Mr. Roman is asked:

 5          "Q.  And because Apple did not set out to assess the value

 6     of IAP, Apple also did not look at comparables to estimate the

 7     costs of alternative payment solutions that developers will

 8     need to procure to facilitate linked purchases, correct?

 9          "A.  That is correct."

10          Do you recall hearing that testimony here in the

11     courtroom?

12     **A.**  Yes.

13     **Q.**  Okay.  And that is inconsistent with what Mr. Barton

14     reflect -- what Mr. Barton's -- let me withdraw that.

15          Let's also take a look, just to get the full context of

16     this, at page 305 of the testimony from the same day.

17          (Exhibit published to witness, counsel, and the Court.)

18     **BY MR. BORNSTEIN:**

19     **Q.**  Here the Court was questioning Mr. Roman, and the Court

20     asks:

21          "So you're telling me --"

22          At line 4.

23          -- "that a thousand people were involved and not a single

24     person of that thousand said, hey, don't you think we should

25     consider the cost of IAP to a developer?  That's what I'm

1   supposed to believe?"

2       And after the witness says:  "Your Honor, we" --

3       The Court says:  "Just yes or no.  Am I -- that not a

4   single person raised this issue of the thousand that were

5   involved, yes or no?"

6       And Mr. Roman says, "No."

7       Do you recall that testimony as well?

8   **A.**  Yes, I do.

9   **Q.**  Okay.

10      Let's move on to the decision [sic] that get made at this

11  June 20 meeting.

12      These options that we saw, they were presented and

13  discussed by you and Mr. Cook and Mr. Maestri and others,

14  correct?

15  **A.**  Yes.

16  **Q.**  And coming out of that June 20 meeting, there was a

17  decision made by Apple that it would charge a commission on

18  the external purchase link, correct?

19  **A.**  Yes.

20  **Q.**  All right.

21      Hadn't yet decided what the commission would be, but the

22  decision was we would charge something.  Right?

23  **A.**  Yes.

24  **Q.**  Okay.  And there was a subsequent meeting on June 28th, a

25  little over a week later, that both you and Mr. Cook attended

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    to talk further about the implementation of the injunction

 2    response, correct?

 3    **A.**  I don't remember specifically.

 4    **Q.**  I'll try and help you out this time.

 5         **MR. BORNSTEIN:**  Let's take a look at Exhibit 532,

 6    please.  Let's keep it off the screen.  We haven't introduced

 7    it yet.

 8         **THE WITNESS:**  I have that.

 9    **BY MR. BORNSTEIN:**

10    **Q.**  All right.  And you can see Exhibit 532.1 near the middle

11    of the page, there is a calendar invite for June 28, 2023.

12    Both you and Mr. Cook are identified as invitees.

13         Do you see that?

14    **A.**  I see that.

15    **Q.**  All right.

16    **A.**  It's actually an email, not a direct calendar invite.  I

17    don't know whether this was written by someone or how that got

18    there.

19    **Q.**  Yes.  Well, there's an email, and it has in it the text of

20    what looks like a calendar invite with a date and a place and

21    a list of attendees or invitees, and a title for the meeting.

22    Correct?

23    **A.**  Yes.

24    **Q.**  Okay.  And you acknowledge that you and Mr. Cook had a

25    subsequent meeting with others to talk about the

1    implementation of the injunction issued by the Court, correct?

2    **A.**  Yes.

3    **Q.**  All right.

4         **MR. BORNSTEIN:**  Your Honor, I'd move the admission of

5    Exhibit 532, please.

6         **MR. PERRY:**  No objection, Your Honor.

7         **THE COURT:**  532 is admitted.

8              (Exhibit 532 received in evidence.)

9    **BY MR. BORNSTEIN:**

10   **Q.**  All right.  And in the leadup to this meeting, you and

11   others participated in working on a deck to be used for

12   discussion; is that right?

13   **A.**  I don't recall specifically.

14   **Q.**  All right.  We'll try and help you out again.  Take a

15   look, please, at Exhibit 279.

16   **A.**  (Reviewing document.)

17   **Q.**  And 279 is an email string involving a group of people at

18   Apple including yourself, correct?

19   **A.**  Yes.

20   **Q.**  Dated June 26 and 27 of 2023, correct?

21   **A.**  Yes.

22        **MR. BORNSTEIN:**  All right.  Your Honor, I move the

23   admission of Exhibit 279.

24        **MR. PERRY:**  No objection, Your Honor.

25        **THE COURT:**  279 is admitted.

```
 1              (Exhibit 279 received in evidence.)

 2    BY MR. BORNSTEIN:

 3    Q.  Okay.  And so this email string begins with somebody named

 4    Tanya Washburn at Apple writing an email.  And Ms. Washburn is

 5    in business operations in the App Store; is that right?

 6    A.  Yes.

 7    Q.  And Ms. Washburn is not a lawyer, is she?

 8    A.  No.

 9    Q.  Meaning -- sorry, that's a bad question.

10        Is Ms. Washburn a lawyer?

11    A.  No, she is not.

12    Q.  Good.  No double negative that way.

13    A.  Thank you.

14    Q.  So Ms. Washburn, however, labels her email to the group

15    "Attorney work product, privileged and confidential, prepared

16    at the request of counsel."

17        Do you see that?

18    A.  I see that.

19    Q.  And she's attaching, she says here is the updated

20    Wisconsin deck for review ahead of our meeting this Wednesday,

21    June 28th.  And she directs that to you, correct?

22    A.  Yes.

23    Q.  And Mr. Cue, correct?  That's Eddy, Eddy Cue.

24    A.  Yes.

25    Q.  And what's Mr. Cue's role?
```

1    **A.**  He is head of our services business.

2    **Q.**  Okay.  And so she sends you this deck.  And in response

3    you provide -- you pose some questions to her, correct?

4    **A.**  Yes.

5    **Q.**  And you label your questions "privileged and confidential,

6    attorney work product," right?

7    **A.**  Sure.  Yes.

8    **Q.**  Okay.  And your -- neither of these questions is a request

9    to Ms. Washburn for legal advice, right?

10   **A.**  No.

11   **Q.**  Meaning neither one -- I'm correct, neither one is a

12   request for legal advice, correct?

13   **A.**  Correct.

14   **Q.**  Okay.  And the first question you ask is:  "Where does the

15   data for the commission duration on Slide 10 come from?  I

16   don't see a source identified.  How do we know what percentage

17   of transactions occur per hour after a linkout from an app?

18   Also I don't see the most logical datapoint which is as a

19   direct result from a linkout regardless of time without

20   leaving the browser session."

21       Do you see that question you posed?

22   **A.**  Yes.

23   **Q.**  And am I right that what you're asking about here is that

24   the slide deck contains some information or estimates about

25   the number of transactions or percentage of transactions that

SCHILLER - DIRECT / BORNSTEIN

1   would happen within a particular tracking window, and you're

2   asking what's the source for the -- for those data?

3   **A.**  Yes.

4   **Q.**  Okay.  And the reliability of the projections on -- or the

5   estimates on the number of percentage of transactions that

6   happen in the tracking window is important in part because

7   Apple uses it to calculate what it calls an effective

8   commission from the entitlement program, right?

9   **A.**  That'd be one example where the data would be used.  I

10  don't think that's the only one.  But that's certainly a use

11  of the data.

12  **Q.**  Great.

13       And so you got a response to your question, not from

14  Ms. Washburn, but from Mr. Oliver, correct?

15  **A.**  Yes.

16  **Q.**  Mr. Oliver also labels his response privileged and

17  confidential, right?

18  **A.**  Yes.

19  **Q.**  And he's not giving you any legal advice, right?

20  **A.**  I do not believe so, no.

21  **Q.**  Meaning he's not giving you any legal advice, correct?

22  **A.**  Correct.

23  **Q.**  Okay.  From now on, I'm going to try to take

24  responsibility for the grammar here.  Sorry about that.

25       Now, Mr. Oliver, in his substantive response, says to you

1    that the data on Slide 10 -- this is the data you were asking

2    about, right?

3    **A.**  Yes.

4    **Q.**  He says, "The data on Slide 10 is internal App Store data

5    based on in-app purchase payer LTV," which is lifetime value?

6    **A.**  Yes.

7    **Q.**  -- "for various time durations after the initial

8    purchase."

9        Right?  That's his response?

10   **A.**  Yes.

11   **Q.**  And what he's telling you there is that the data that they

12   used to estimate the number or percentage of purchases during

13   the tracking window came from data on the revenue collected

14   through IAP transactions in the app for various time durations

15   after a user's first purchase, right?

16   **A.**  Yes.

17   **Q.**  And then the team used that in this deck as a proxy for

18   the number or percentage of purchases that would be made on a

19   developer's website after a linkout; is that right?

20   **A.**  Yes.

21   **Q.**  And you remember there were a lot of questions about the

22   reliability of that data or that assumption for this purpose

23   when we were here in May.  Do you recall that?

24   **A.**  Not specifically, no.

25   **Q.**  Okay.

SCHILLER – DIRECT / BORNSTEIN

1      Well, the record will be what it be.  I'll spare us the --

2   the looking at the testimony.

3      But you -- you had a view on this.  And you respond to

4   Mr. Oliver in Exhibit 279 at June 27, at 3:46 a.m.

5      Do you see that?

6   **A.**   I do.

7   **Q.**   And I'm hopeful that's UTC just for your own sake and not

8   Pacific time.

9   **A.**   I don't know.  It could be either.

10  **Q.**   Okay.  And your response to him, you say, "I'm not

11  confident that the internal data you are using to estimate

12  time duration is a reliable proxy for linking out."  Correct?

13  **A.**   Yes.

14  **Q.**   Okay.  And that was a real question that you had about the

15  reliability of that data for the purpose for which Mr. Oliver

16  and the team were using it, right?

17  **A.**   It was my opinion.

18  **Q.**   Okay.  And if -- if you were right, and if it's not a

19  reliable proxy for the number or percentage of linkouts

20  purchases that are made after the tracking window, that calls

21  into question the reliability of the effective commission

22  calculations that are made using that data, right?

23  **A.**   Yes.

24  **Q.**   Okay.  I'd like to turn to Exhibit 291, please, which

25  should be the next one in your binder.

SCHILLER – DIRECT / BORNSTEIN

1    And Exhibit 291 it starts on .1, Mr. Schiller, with

2    something that I acknowledge you probably haven't seen before.

3    It's a -- a metadata sheet that reflects the information we

4    received from Apple about some of the information associated

5    with this document.

6    So you can take my representation on that.  Okay?

7    **A.**  Okay.

8    **Q.**  And you'll see that this document has a list of custodians

9    from which the document came.  And you'll see you're listed as

10   one of the custodians.  Do you see that?

11   **A.**  I do.

12   **Q.**  And you'll see the title of the document file name down

13   near the bottom is 2023.06.28 Wisconsin clean, team

14   commission.  Privileged and confidential.

15   Do you see that?

16   **A.**  I do.

17   **Q.**  Okay.  And if you look at the second page, you'll see this

18   is a presentation entitled Epic Injunction Implementation for

19   June 2023.  Correct?

20   **A.**  Yes.

21   **Q.**  Also labeled privileged and confidential, prepared at the

22   request of outside counsel, right?

23   **A.**  Yes.

24   **Q.**  Okay.  Now, this deck, this was the deck for that June 28

25   meeting on which you provided your comments, correct?

1   **A.**   I do not know for certain.

2   **Q.**   At the bottom of the deck, on the various pages, you'll

3   see there are speaker notes.  And you can look at .3.  Do

4   you see that?

5   **A.**   I do.

6           **MR. PERRY:**  Your Honor, objection --

7       I'm sorry, my microphone.

8           **THE CLERK:**  Okay.

9           **MR. PERRY:**  This is another document of which there

10  is a --

11          **THE COURT:**  All right.  We have a break coming up in

12  half an hour.  I'm sure you have more?

13          **MR. BORNSTEIN:**  I do have more, Your Honor, yes.

14          **THE COURT:**  Okay.  Why don't -- can we skip over this

15  until later?

16          **MR. BORNSTEIN:**  Oh, you want to skip and come back?

17  It --

18          **THE COURT:**  I mean I don't understand -- I don't want

19  to keep taking sidebars.  So the question is, is the document

20  that I've been given appropriately redacted or not?

21          **MR. PERRY:**  Your Honor, my understanding is the first

22  two pages, .3 and .4, are redacted.  I don't know if

23  Mr. Bornstein intends to use those or not.

24          **THE COURT:**  Okay.  So let's avoid 3 and 4 for now.

25  And if there's an issue, we can come back to it.

 1          **MR. BORNSTEIN:**  What -- I can maybe get through this.

 2   What are the redactions object .3 and .4 --

 3          **THE COURT:**  So we aren't --

 4          **MR. BORNSTEIN:**  Is it the slide or the speaker notes?

 5          **MR. PERRY:**  Speaker notes.

 6          **MR. BORNSTEIN:**  Okay.  Including the very first one?

 7   That's the only one I intend to use on .3.

 8          **MR. PERRY:**  I have no objection to you reading the

 9   very first one on .3, Mr. Bornstein.

10          **MR. BORNSTEIN:**  Great.

11          **MR. PERRY:**  Your Honor, I apologize for speaking

12   directly.

13      Your Honor, we have no objection to Mr. Bornstein reading

14   the very first bullet on Slide 3.

15          **THE COURT:**  Great.

16          **MR. BORNSTEIN:**  Great.  And let's just keep it off

17   the screen then to try to respect the process.

18      Okay.  Thank you for working through that with me.

19   **Q.**  Mr. Schiller, if you look at the very first bullet point

20   on .3, it refers to someone named Jen.

21      Do you understand that's Jen Brown at Apple?

22   **A.**  Yes.

23   **Q.**  And Ms. Brown is in the litigation function; is that

24   right?

25   **A.**  Yes.

1   **Q.**  And Ms. Brown is listed as saying, "When we last met, the

2   direction was that we should charge a commission on

3   transactions resulting from a link."

4       Do you see that?

5   **A.**  Yes.

6   **Q.**  Okay.  And that's a reference here to that prior June 20

7   meeting where you said the decision was made that Apple would

8   charge some yet-to-be-determined commission, correct?

9   **A.**  I would assume so.  I don't recall these speaker notes and

10  the timing of this deck versus that meeting.  So I'm only

11  inferring from what you're showing me.

12  **Q.**  All right.  Well, you can see from the file name, which is

13  why I showed it to you on the first page, that it is from

14  June 28, 2023, a clean version of the Wisconsin presentation,

15  correct?

16  **A.**  Yes.

17  **Q.**  So safe to assume that the speaker notes are from a

18  June 28 presentation?

19  **A.**  I would assume that as well.

20      **MR. BORNSTEIN:**  Okay.  Your Honor, I'd move the

21  admission, subject to potential redaction issues in the future

22  that Apple may wish to raise, of Exhibit 291?

23      **MR. PERRY:**  Subject to that issue, Your Honor, no

24  objection.

25      **THE COURT:**  All right.  It's admitted subject to that

 1    limitation.

 2              (Exhibit 291 received in evidence.)

 3         **MR. BORNSTEIN:**  Great.

 4    **Q.**  Now let's turn if we -- stay -- sorry -- where we are on

 5    that second slide.  I'm not going to read the speaker notes.

 6         At the top of the slide, there are commission parameters

 7    listed.  And if we're able to put on the screen just the slide

 8    itself without the speakers' notes, we can do that.  Otherwise

 9    we'll just go along.

10         (Exhibit published to witness, counsel, and the Court.)

11         **MR. BORNSTEIN:**  Thank you.

12    **Q.**  The commission parameters that are listed here on 291.3

13    are consistent with the commission option that we saw that was

14    option 2 in the June 20 deck, Exhibit 224, correct?

15    **A.**  It looks to be, yes.

16    **Q.**  Okay.  For example, the style is a developer-styled link

17    rather than a requirement of a plain button, correct?

18    **A.**  Yes.

19    **Q.**  All right.  And there's nothing here about keeping --

20    requiring that the link not be somewhere in the buy flow,

21    correct?

22    **A.**  I do not see that here.

23    **Q.**  All right.  So as of June 28, at least, the discussion

24    that was being had with Mr. Cook was grounded in this

25    presentation where Apple had chosen it was going to charge

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    some commission but that it would be allowing developer-styled

 2    links that could be somewhere within the buy flow.

 3    **A.**  I don't believe that was the discussion we had with

 4    Mr. Cook.  So I -- I would not jump to that -- that assumption

 5    just because of this slide.  I -- I do believe we talked about

 6    buy flows and other things in the discussion.

 7    **Q.**  Right.  Before we get to the discussion itself, certainly

 8    the slide that was used as part of the presentation

 9    contemplated that those would be the parameters associated

10    with charging a commission, correct?

11    **A.**  That's what this slide shows, correct.

12    **Q.**  All right.

13        And consistent with what you just testified about the

14    discussion, this is certainly not where Apple ultimately

15    landed, correct?

16    **A.**  Correct.

17    **Q.**  All right.

18        So take a look, if you would at .11, 291.11.

19        (Exhibit published to witness, counsel, and the Court.)

20    **BY MR. BORNSTEIN:**

21    **Q.**  And this shows that there are various commissions and --

22    sorry.  This one has various tracking windows associated with

23    it, correct, commission duration?

24    **A.**  Yes.

25    **Q.**  Do you see that?  Right.

1          And there are just a number of options that are laid out

2     on this particular slide with no recommendation or suggestion

3     about which one Apple should choose, right?

4     **A.**   Correct.

5     **Q.**   But we do see in the middle there the one week that Apple

6     ultimately landed on, right?

7     **A.**   Yes.

8     **Q.**   And if we go to the next slide, here for discussion

9     purposes, there is a 72-hour tracking window that is flagged

10    in green, correct?

11    **A.**   Yes.

12    **Q.**   So at this point in time, there was at least discussion

13    with Mr. Cook on June 28 about whether to select a 72-hour

14    tracking window rather than the full week that Apple

15    ultimately chose, correct?

16    **A.**   No, that was not the purpose of this slide.

17    **Q.**   Was there no discussion about the possibility of a 72-hour

18    tracking window that --

19    **A.**   Not at all.  That's -- again wasn't the purpose of that

20    slide.

21    **Q.**   Okay.  Well, we'll come back to that then.

22         Why don't we look at .14.

23         .14 has a range of commission options for both the

24    standard rate and the program rate.  Do you see that?

25    **A.**   Yes.

1    Q.   Okay.  And for the standard rate, the range runs from

2    20 percent to 27 percent.  Correct?

3    A.   Yes.

4    Q.   Okay.  And you did have a discussion at this meeting about

5    which commission rate ultimately to select, correct?

6    A.   I believe so.

7    Q.   All right.  And in fact there was a proposal that was on

8    the table at the time that you all got together for this

9    meeting, wasn't there?

10   A.   I don't recall the specific proposal.

11   Q.   All right.  Well, let's take a look at .16.  This is

12   labeled "Epic Injunction Proposal," correct?

13   A.   I see that.

14   Q.   And the proposal on the slide is a 20 percent standard

15   commission, correct?

16   A.   Yes.

17   Q.   And the proposal on the slide is that it applied to

18   purchases initiated within 72 hours post linkout, correct?

19   A.   Yes.

20   Q.   And again this is not where Apple ultimately landed,

21   right?

22   A.   Correct.

23   Q.   All right.

24        So the next meeting that happens, there's a price

25   committee meeting that happens on July 5.  This is the day you

1    thought maybe you would have to go live, correct?

2    **A.**  Yes.

3    **Q.**  All right.  Let's have you take a look then at

4    Exhibit 227.

5            **MR. BORNSTEIN:**  Oh, and, Your Honor, I don't know if

6    I moved Exhibit 291 -- oh, I did subject to --

7            **THE COURT:**  You did, subject to --

8            **MR. BORNSTEIN:**  Yeah.  I did.  I did.

9    **Q.**  So let's go to Exhibit 227, please.  And 227,

10   Mr. Schiller, this is the July 5th, 2023, App Store price

11   committee deck, correct?

12   **A.**  Yes, it looks to be that.

13   **Q.**  All right.

14           **MR. BORNSTEIN:**  I move the admission of Exhibit 227,

15   Your Honor.

16           **MR. PERRY:**  No objection, Your Honor.

17           **THE COURT:**  It's admitted.

18           (Exhibit 227 received in evidence.)

19   **BY MR. BORNSTEIN:**

20   **Q.**  Now this deck, the App Store price committee deck, on the

21   day that you anticipated going live, this one is not labeled

22   privileged or confidential, is it?

23       Let me do it better.  This one is not labeled privileged

24   or confidential, correct?

25   **A.**  I believe it is labeled confidential.

1  **Q.**  Right.  It says Apple confidential for internal use only.

2  Right?

3  **A.**  Yes.

4  **Q.**  There's no privilege claim.  There's nothing that says

5  "prepared at the request of counsel" this time, right?

6  **A.**  I don't see that.

7  **Q.**  And this was the one that, at least at the time, you

8  thought might be the final deck because you didn't know yet

9  whether or not the stay -- a further stay would be granted of

10  the injunction, correct?

11  **A.**  I do not recall on July 5th what I thought about whether

12  this was final or not.  I don't recall.

13  **Q.**  Okay.  See if I can help on that.

14      So the page 227.3, Mr. Schiller, you'll see there's a

15  timeline.

16  **A.**  Yes.

17  **Q.**  And it's called a compliance timeline.  And you see in the

18  bottom left corner, it says the Court's ruling on the motion

19  to stay will dictate the date the mandate issues.

20      Right?

21  **A.**  I see that.

22  **Q.**  Okay.  And then there are several columns on the slide

23  that reflect items that are keyed and timing off of when the

24  mandate issues.  Do you see that?

25  **A.**  Yes.

1    **Q.**  So the mandate issues plus one day, the mandate issues

2    plus five days, and so forth.  Correct?

3    **A.**  Yes.

4    **Q.**  So at this point on July 5, what Apple is doing is it's

5    preparing for the imminent issuance of the mandate so that it

6    can be ready to put the injunction response plan into action.

7    Fair?

8    **A.**  I believe so, yes.

9    **Q.**  All right.  Now, look at the next slide .224.

10    On Exhibit 22 --

11    (Exhibit published to witness, counsel, and the Court.)

12    **BY MR. BORNSTEIN:**

13    **Q.**  No.  It's 227.4.

14    **A.**  Thank you.

15    **Q.**  This slide is titled "Link Entitlement Policies and User

16    Experience," right?

17    **A.**  Yes.

18    **Q.**  And now here if you look on the bottom right, now in the

19    final slide it reads that the link cannot be displayed on any

20    page that is part of an IAP flow to merchandise or initiate an

21    IAP, correct?

22    **A.**  Yes.

23    **Q.**  So by this point in time when you're preparing to go live,

24    Apple has decided that it would impose this restriction on the

25    placement of an external purchase link, correct?

 1   **A.**   That is what we're proposing.

 2   **Q.**   Okay.  And this was the decision that was reached at the

 3   July 5 price committee meeting, not just a proposal, correct?

 4   **A.**   Again, I don't recall it as a decision.  Certainly this is

 5   what we went in and proposed in this meeting.  But the

 6   compliance plan did not begin yet so I don't recall how we

 7   talked about what's a decision or not a decision yet because

 8   we weren't doing it yet.

 9   **Q.**   Well, you understood that at this point in time the

10   mandate could issue imminently, right?

11   **A.**   It could, yes.

12   **Q.**   Right.  And so you needed to have an implementation plan

13   that was ready to go for when the mandate come down, correct?

14   **A.**   That was the goal, yes.

15   **Q.**   Right.  And so is your testimony that Apple didn't reach

16   any decisions at this July 5 meeting about what the

17   implementation plan would look like, or that you just don't

18   remember one way or the other?

19   **A.**   I don't remember one way or the other how we talked about

20   it.  I'm sorry.

21   **Q.**   Okay.  Logically, though, Apple needed to have a plan of

22   record for how it would proceed if the mandate come down,

23   correct?

24   **A.**   Yes.

25          **MR. PERRY:**  Objection, Your Honor, assumes facts not

 1    in evidence.

 2            THE COURT:  Overruled.

 3    BY MR. BORNSTEIN:

 4    Q.  Okay.  And that means, Mr. Schiller, that people needed to

 5    walk out of this meeting on July 5 with an understanding of

 6    what it was Apple was going to do if the mandate issued,

 7    right?

 8    A.  I do not recall the discussion of how we ended this

 9    meeting and what we walked out saying.

10    Q.  No.  I -- you've already testified to that.  But as a

11    logical matter, Apple, as an organized entity that had to put

12    into place a complicated response plan, needed to have

13    decisions from its senior management about what that plan

14    would look like when the injunction went effective.  Correct?

15    A.  I do not recall what we did.  Sorry.  I could imagine some

16    things that have -- were said that said don't decide today, we

17    don't need to decide today.

18        I don't recall.

19    Q.  Okay.  I am not asking you, sir, for your specific

20    recollection of what happened at the meeting.  What I'm asking

21    is Apple actually needed to have a plan ready to go in case

22    the mandate issued and it had to comply with the injunction.

23            MR. PERRY:  Same objection, Your Honor.

24    BY MR. BORNSTEIN:

25    Q.  Correct?

```
 1              THE COURT:  The objection is overruled.

 2         You were part of the pricing committee.

 3              THE WITNESS:  Yes.

 4              THE COURT:  Right.  You have a manner in which you

 5    have operated at Apple for decades.

 6              THE WITNESS:  Yes.

 7              THE COURT:  You had to have a plan, didn't you?

 8              THE WITNESS:  We went in with a proposal of a plan of

 9    what we were doing.

10         And to Mr. Bornstein's point, we had engineers working

11    needing to know what should we work on right now.  And that

12    was all occurring, that is true.

13              THE COURT:  Okay.  Proceed.

14    BY MR. BORNSTEIN:

15    Q.  Okay.  And at the time you all walked out of this meeting,

16    just to follow up one more time, there needed to be a decision

17    that people could execute on in order to comply with this

18    Court's injunction, correct?

19    A.  Again, I -- I -- I agree with you in theory.  I just don't

20    remember that point.

21              THE COURT:  That would be your general practice,

22    wouldn't it?

23              THE WITNESS:  Yes.

24              MR. BORNSTEIN:  Thank you, Your Honor.

25    Q.  Why don't we take a look at a different slide in here,
```

1  it's .11.  And we're not going to put the numbers on the

2  screen, but we can put it up blacked out.

3      (Exhibit published to witness, counsel, and the Court.)

4  **BY MR. BORNSTEIN:**

5  **Q.**  One of the purposes of this July 5 meeting was to settle

6  on the commission rate that would be charged and the tracking

7  window that would be associated with it, correct?

8  **A.**  Yes.

9  **Q.**  All right.

10      And there is on Slide .11 an analysis of the financial

11  impact of varying commission rates and tracking windows,

12  correct?

13  **A.**  Yes.

14  **Q.**  All right.  And the decision taken at this meeting was

15  that the plan of record would be the 27 percent standard

16  commission and the seven-day tracking window that Apple

17  actually implemented in January of 2024, correct?

18  **A.**  I don't recall that as a decision, leaving the meeting.

19  It certainly was a discussion, but I don't recall that we left

20  saying it's now a firm decision.

21  **Q.**  Okay.  I will see in a bit if I can refresh your

22  recollection on that.  But first, I just want to make sure --

23  well, you know, why don't we do that.  I'll skip ahead to

24  that.

25      In July of -- July 17 of 2023 -- I'll just represent to

1    you about 12 days later -- that's when the Ninth Circuit

2    issued a further stay of the injunction.  Okay.  So about a

3    week and a half after this meeting.  Does that sound about

4    right to you?

5    **A.**  Yes.

6    **Q.**  I mean you remember that there was another stay and you

7    had some more months before you had to comply?

8    **A.**  Yes.

9    **Q.**  Okay.  And that Apple made a deliberate decision coming

10   out of this meeting not to make another slide deck and not to

11   document the decisions that were reached and the discussion

12   that was had in this meeting; is that right?

13   **A.**  I don't recall that.

14   **Q.**  Well, do you remember, sir, you asked your colleagues

15   whether there was an updated slide deck and you wanted to have

16   one for your own reference.  Do you remember that?

17   **A.**  I don't recall that.

18   **Q.**  Do you remember being told that Apple was not updating the

19   deck in order to keep it privileged and protected from

20   discovery?

21   **A.**  I don't recall that.

22   **Q.**  Well, take a look, if you would, at Exhibit 229.

23       (Exhibit published to witness, counsel, and the Court.)

24   **BY MR. BORNSTEIN:**

25   **Q.**  Exhibit 229 is an email exchange that you participated in

1    with some of your colleagues at Apple on August 15, 2023,

2    correct?

3    **A.**  Yes.

4            **MR. BORNSTEIN:**  Your Honor, I move the admission of

5    Exhibit 229.

6            **MR. PERRY:**  No objection, Your Honor, subject to the

7    standing objection.

8            **MR. BORNSTEIN:**  Okay.

9            **THE COURT:**  229 is admitted.

10           (Exhibit 229 received in evidence.)

11                  (Exhibit published.)

12   **BY MR. BORNSTEIN:**

13   **Q.**  And in 229 at the very end on .2, you write to your

14   colleagues "Privileged and confidential, attorney work

15   product.  Is there a working document outlining the current

16   proposed Wisconsin plan following the last exec meeting?  I

17   don't think I have seen any follow-up document or notes, and I

18   want to have access to something as a reference."

19       Do you see that?

20   **A.**  Yes.

21   **Q.**  Okay.  So you made this request.  And what you received in

22   response from somebody named Ling Liu, just above that, is the

23   message, "Hi, Phil.  We've saved in box the current draft

24   versions of the developer support page and request form which

25   should outline the proposed plan."

SCHILLER – DIRECT / BORNSTEIN

1          Do you see that?

2    **A.**  I do.

3    **Q.**  Okay.  And then you respond to Ms. Liu, "Don't we think it

4    would be helpful to update the slides, along with the

5    financial analysis we presented to reflect the commission and

6    duration discussions that were made in the meeting that were

7    different than what we presented?  Otherwise there's no plan

8    of record or the forecast of ranges of expected results."

9          Do you see that?

10   **A.**  Yes, I do.

11   **Q.**  And you're talking about the discussions at that July 5

12   meeting for the deck that we were just looking at, right?

13   **A.**  Yes.

14   **Q.**  Okay.  And the response you get back is, "Here's an

15   updated version of the deck."

16         And then the following.

17         "At this point the prior deck and this deck are privileged

18   and confidential, reflecting litigation strategy and legal

19   risk analysis.  We would prefer to keep it that way for now.

20   When we have to comply, within days of that date, we will

21   finalize the tentative plan and have a document reflecting the

22   factors considered to support the decision.  Until that point,

23   we would have this document as a point of reference but not

24   share it further."

25         Do you see that?

 1   **A.**   I do.

 2   **Q.**   So you're being told here that Apple is intentionally not

 3   updating the deck in order to maintain privilege.  Correct?

 4   **A.**   I believe so.

 5   **Q.**   Apple is deliberately keeping the plan as tentative and

 6   then finalizing it later with a deck that it is expecting to

 7   produce in discovery, right?

 8   **A.**   I'm sorry.  Could you repeat that?  I lost it halfway

 9   through my -- I apologize.

10   **Q.**   Sure.  What's going on, according to Ms. Brown, the

11   litigation lawyer at Apple, is that "when we have to comply,"

12   when Apple actually has to launch the program, at that point

13   within days of launching, it would finalize the plan that was

14   tentative and create a document at that point that it could

15   produce in discovery and not be privileged.  Correct?

16   **A.**   Well, the -- I was with you to say yes until that last

17   part about discovery and privilege because I don't know that

18   that's what the legal team is thinking or not on that part.

19   So that's not for me to say their thoughts.

20   **Q.**   All right.  Well, let me set that aside, and maybe

21   somebody else will answer that question.

22       It was the case that you're being told by a litigation

23   lawyer at Apple that you are not going to be provided -- in

24   response to your request for an updated deck, you're being

25   told no, no, no, we're going to leave what we have now as

1    privileged, and when we have to comply, within days of that

2    date we'll make something new to reflect our decision-making.

3    Correct?

4    **A.**   Correct.

5    **Q.**   Okay.  And by the way, just in terms of what happened at

6    that July 5 meeting, if you look at your email at the top of

7    the page, you say in the third paragraph.

8        "While I question whether the analysis of net impacts on

9    Slide 15 will be correct at the recommended amounts and

10   duration, 27 percent and seven days, I understand the

11   methodology and assumptions that generated it."

12       Do you see that?

13   **A.**   Yes.

14   **Q.**   Does that refresh your recollection that the

15   recommendation coming out of that July 5 meeting was the

16   27 percent commission and seven-day tracking window that Apple

17   ultimately implemented in January of 2024?

18   **A.**   Yes.

19   **Q.**   Okay.  And now zipping forward.  After the July 5 meeting

20   and the stay that gets granted by the Ninth Circuit, there's

21   not a lot of activity that happens at Apple regarding the

22   injunction response plan until around December of 2023 and

23   January of 2024 as the time is coming when you're anticipating

24   some kind of ruling from the Supreme Court, correct?

25   **A.**   I can't state a lot or not a lot of activity during that

 1    time.  I'm sorry, I don't know how to judge that.

 2  **Q.**  Okay.  Well, let's -- let's do it this way.

 3       Last time you were here, you testified that the final

 4  in-person price committee meeting regarding the injunction

 5  response plan happened on January 11 of 2024.

 6       Does that sound right to you?

 7  **A.**  Yes, it does.

 8  **Q.**  And I'll just represent to you that's what you said last

 9  time.  Do you have any reason to disagree?

10  **A.**  No.

11  **Q.**  Okay.  And there was a deck that was presented at that

12  in-person price committee meeting, correct?

13  **A.**  Yes.

14  **Q.**  All right.

15          **MR. BORNSTEIN:**  And this is already in evidence, Your

16  Honor.  It's Exhibit CX54.

17       (Exhibit published to witness, counsel, and the Court.)

18          **MR. BORNSTEIN:**  The testimony is this is the deck

19  from the January 11, 2024 meeting.

20  **Q.**  And do you see, Mr. Schiller, this deck too is labeled

21  "attorney client privileged, prepared at the direction of

22  counsel."

23  **A.**  Could I get that on my screen?  I don't -- my screen's

24  off.

25  **Q.**  Oh, it's on my screen.  It should be in your binder

 1    though.

 2              THE WITNESS:  You can make sure it's --

 3              THE CLERK:  Do you want it on?

 4              THE COURT:  For him.

 5         MR. BORNSTEIN:  It might help if you tap it.  Maybe

 6    that might make it go on.

 7              THE COURT:  No.  She needs to make sure he has it.

 8       Is it there now?

 9              THE WITNESS:  Yes.  Thank you very much.

10    BY MR. BORNSTEIN:

11    Q.  Okay.  And so CX54, Mr. Schiller, the price committee deck

12    from the January 11 in-person meeting, 2024, in-person

13    meeting, this one is labeled "attorney client privileged,

14    prepared at the direction of counsel."  Correct?

15    A.  I see that, yes.

16    Q.  And then after this meeting, the decision was made to

17    finalize the determination of what would be in the injunction

18    response plan through an exchange of emails among members of

19    the price committee, correct?

20    A.  Yes.  It was more than exchange of emails.  It was -- we

21    call that an email price committee.  We've done it on other

22    occasions as well.  Where we haven't made the final decision

23    and we -- rather than have everyone meet in the room again, we

24    can handle it via email.  So it was an email approval of the

25    price committee.

1    **Q.**  Right.  And there was a deck associated with -- with that

2    email approval of the price committee as well.  Correct?

3    **A.**  Yes, correct.

4    **Q.**  All right.

5         **MR. BORNSTEIN:**  And this is also in evidence, Your

6    Honor, if we can put it on the screen.  It's CX9A.

7      (Exhibit published to witness, counsel, and the Court.)

8    **BY MR. BORNSTEIN:**

9    **Q.**  And Mr. Schiller, this is the final price committee deck

10   dated January 16, 2024, for the external purchase link

11   entitlement that you signed off on, correct?

12   **A.**  I believe so.

13   **Q.**  And for this final one, Apple again took off the privilege

14   stamp, correct?

15   **A.**  I see that, yes.

16   **Q.**  Yes.  And are you aware that Apple then submitted this one

17   to the Court in opposition to Epic's motion to enforce the

18   injunction as evidence of the decision-making process that

19   Apple went through to get to its injunction response plan?

20   **A.**  I'm not sure what was submitted or not.  Sorry.

21   **Q.**  Fine.  The docket will reflect what it reflects at docket

22   entry 916-07.

23        **MR. BORNSTEIN:**  Your Honor had mentioned a break.

24   I'm going to move to a different topic.  I'm happy to keep

25   going or take the break.  I just thought I'd raise the

SCHILLER – DIRECT / BORNSTEIN

 1    question.

 2          THE COURT:  We break at -- so since we're going to go

 3    until 4:00 o'clock, we'll break at 11:50 which is ten minutes.

 4          MR. BORNSTEIN:  Sure.

 5          THE COURT:  And then we'll have a 40-minute break and

 6    then come back for another three-plus hours.

 7          MR. BORNSTEIN:  Very good.

 8    **Q.**  So, Mr. Schiller, I'm going to switch to an entirely

 9    different subject here, which is the warning screen that is

10    associated with the purchase link entitlement program, okay?

11    **A.**  Yes.

12    **Q.**  And the way this works is when a user clicks on the link,

13    the screen pops up word for word the exact same screen with

14    the exception of customizing the name of the developer's link

15    every time, correct?

16    **A.**  Yes.

17    **Q.**  And that's the result of an API that developers have to

18    use so that the exact right screen pops up to warn the user,

19    correct?

20    **A.**  Correct.

21    **Q.**  So I want to talk about how we got to this particular

22    screen.

23          So there was a meeting on May 25, 2023.  We're going back

24    in time now for a different subject.  Right.  May 25, 2023,

25    there's a Wisconsin meeting that you attend.

1          Do you by chance remember that date?

2     **A.** No, sorry, I do not.

3     **Q.** Okay. I will show you tab 490.4. And this is another

4     meeting invite for a meeting on May 25, 2023, where you are

5     listed as having accepted the invitation.

6     **A.** I see that.

7          **MR. BORNSTEIN:** Your Honor, I move the admission of

8     Exhibit 490.

9          **MR. PERRY:** No objection, Your Honor.

10         **THE COURT:** It's admitted.

11              (Exhibit 490 received in evidence.)

12    **BY MR. BORNSTEIN:**

13    **Q.** And then, Mr. Schiller, there's a deck that was presented

14    at this meeting. There are a lot of decks at Apple, aren't

15    there?

16    **A.** Yes, there are.

17    **Q.** And so do you recall there was a deck presented at this

18    meeting as well?

19    **A.** I do not recall that.

20    **Q.** Let me ask you to take a look then at Exhibit 484.

21    **A.** (Reviewing document.)

22    **Q.** And Exhibit 484 is an email dated May 25, 2023, same day

23    we've been talking about. And you're not on this one, but it

24    is titled "Phil Deck Wisconsin." Do you see that?

25    **A.** Yes.

1    **Q.**  And the author of this email is someone named Terry Liu.

2    Mr. Liu in the design function at Apple?

3    **A.**  I'm sorry.  I'm not sure who Mr. Liu is.

4    **Q.**  Okay.  Somebody else will help us during the course of the

5    proceedings.

6         But Mr. Liu writes, "Here a is PDF of what design will

7    present to Phil for Wisconsin tomorrow at 9:00 a.m."

8         Do you see that?

9    **A.**  I see that.

10   **Q.**  Okay.  And keeping in mind that we're dealing with, again,

11   funny time zones so that Mr. Liu's email, it's labeled May 25

12   at 3:44 in the morning was really sent in the Pacific Time

13   zone sometime in the latter half of May 24, can we agree that

14   this is a PDF of the deck that Mr. Liu and his team were

15   intending to present to you at the May 25 meeting?

16   **A.**  I do not know since I was not on this.

17   **Q.**  Okay.  But it does -- we can agree it's labeled "Phil

18   Deck" and -- and Mr. Liu says he's -- this is a PDF of what he

19   will present to Phil, correct?

20   **A.**  Yes.

21            **MR. BORNSTEIN:**  Okay.  Your Honor, I move the

22   admission of Exhibit 484.

23            **MR. PERRY:**  No objection, Your Honor.

24            **THE COURT:**  484 is admitted.

25   / / /

```
 1           (Exhibit 484 received in evidence.)

 2           MR. BORNSTEIN:  All right.

 3        (Exhibit published to witness, counsel, and the Court.)

 4    BY MR. BORNSTEIN:

 5    Q.  And Mr. Liu, by the way, he labels his email privileged

 6    and confidential, and there's a privileged and confidential

 7    stamp on the first page of the deck, on page 2 as well,

 8    correct?

 9    A.  I see that.

10    Q.  Now let's look at Slide 6 or .6 of the deck that Mr. Liu

11    prepared and presented.

12        (Exhibit published to witness, counsel, and the Court.)

13    BY MR. BORNSTEIN:

14    Q.  In the center, there is a warning screen, correct?

15    A.  Yes.

16    Q.  And up on top, it says, "Current reader app entitlement

17    worldwide."  Right?

18    A.  Yes.

19    Q.  And do you understand that to be a reference to the

20    warning screen that Apple, at this point in May of 2023, was

21    using on a worldwide basis for what are called reader apps

22    when people click on a link to go out to a developer's

23    website?

24    A.  I believe so.

25    Q.  And if you jump ahead to Slide .44.  It's right near the
```

1    end.  In fact it is the end.  There's something labeled

2    "future sheet design idea."  Do you see that?

3    **A.**  I do.

4    **Q.**  And on the left, there's the current worldwide design.

5    There's a code name there I won't read.  But on the left, it's

6    the -- what was then the worldwide design we had just looked

7    at, correct?

8    **A.**  Yes.

9    **Q.**  All right.  And on the right, there's a proposal for a

10   future design for use in the Wisconsin program, meaning the

11   U.S. external link program that is the subject of this deck,

12   correct?

13   **A.**  I don't know.  I don't recall this.  And it's after the

14   conclusion or the summary of the meeting.  I don't know if

15   that was presented or not.  And I do not -- so I don't want to

16   make any assumptions about what the intention of the proposal

17   is.

18   **Q.**  All right.  Well, why don't we look at a deck we've looked

19   at before and some ones we know were presented.

20      So let's go to CX224.

21      (Exhibit published to witness, counsel, and the Court.)

22   **BY MR. BORNSTEIN:**

23   **Q.**  Which is in evidence already.  And this is the deck from

24   the June 20 meeting you attended with Mr. Cook.  Okay?

25   **A.**  Okay.

1    Q.   And we're at Slide 22 -- sorry.  Slide .7.

2    A.   I see that.

3    Q.   And here we have a proposed warning sheet to be used with

4    the external purchase link entitlement, correct?

5    A.   Yes.

6    Q.   And this one, you can see the code name, the rest of us

7    can't.  This is the same worldwide warning screen that was

8    being used on reader apps, correct?

9    A.   It looks the same, yes.

10   Q.   So at this point in time, at least for purposes of

11   discussion, people are contemplating the possibility of using

12   that same warning screen for the response plan to the

13   injunction, correct?

14   A.   Yes.

15   Q.   But at this meeting, Mr. Cook suggested some changes,

16   didn't he?

17   A.   Well, I recall there was discussion around the warning

18   screen and whether it was clear to users what was going to

19   occur.  Yes, I remember --

20   Q.   Okay.

21   A.   -- a discussion.

22   Q.   Right.  But my question was at this meeting, Mr. Cook

23   personally suggested some changes to the warning screen.  Do

24   you recall that?

25   A.   I -- I don't recall who made which suggestion.  I know

1    there was a discussion during the meeting with people even

2    suggesting different edits of it.  I don't recall who said

3    what.

4    **Q.**  Okay.  You don't recall Mr. Cook's comments?  He's not

5    just anybody.

6    **A.**  He's certainly not just anybody.  But again there was

7    discussion with everyone in the meeting, and I don't recall

8    who said what.

9    **Q.**  All right.  Let's look at Exhibit 225 then.

10        Exhibit 225 is an email from Shawn -- Shawn Cameron at

11    Apple to Mr. Cook, copying you and others, dated June 23,

12    2023, correct?

13    **A.**  I see that, yes.

14            **MR. BORNSTEIN:**  Your Honor, I move the admission of

15    Exhibit 225.

16            **MR. PERRY:**  No objection, Your Honor.

17            **THE COURT:**  225 is admitted.

18                (Exhibit 225 received in evidence.)

19        (Exhibit published to witness, counsel, and the Court.)

20    **BY MR. BORNSTEIN:**

21    **Q.**  And in Exhibit 225, Mr. Cameron writes, "Tim, at our

22    meeting on Tuesday, you asked the team to revise the customer

23    warning screen."

24        Do you see that?

25    **A.**  I do.

1    Q.   Okay.  Does that refresh your recollection of Mr. Tim --

2    Mr. Cook making this request?

3    A.   Not specifically, no.

4    Q.   No reason to doubt that Mr. Cameron got it right, though,

5    right?

6    A.   No, I do not --

7    Q.   Okay.

8    A.   -- have a reason to doubt it.

9    Q.   Great.  So Mr. Cameron says, "At our meeting on Tuesday,

10   you asked the team to revise the customer warning screen which

11   is surfaced when a customer taps on a link to the developer's

12   website, to reference the fact that Apple's privacy and

13   security standards do not apply to purchases made on the web."

14       Right?

15   A.   Yes.

16   Q.   And he goes on to say that they worked on updated copy and

17   we reviewed with Phil, Matt, and Jeff.

18       And that Phil is a reference to you, of course?

19   A.   Yes.

20   Q.   All right.

21       And so you personally weighed in on this warning screen

22   before it was submitted back to Mr. Cook, correct?

23   A.   I believe -- yeah, I don't recall what the back-and-forth

24   was on it.  I know I saw a new updated warning screen, and it

25   was sent for approval, yes.  I recall that.

SCHILLER – DIRECT / BORNSTEIN

1    **Q.** All right.  Well, let's turn the page and you can see on

2    the -- on the left is that same current worldwide screen that

3    was being used for the reader program with that code name in

4    the top left corner that's blacked out for the rest of us,

5    right?

6    **A.** Yes.

7    **Q.** Okay.  And on the right is the updated proposal that was

8    put together to address Mr. Cook's comment, right?

9    **A.** Yes.

10   **Q.** And says updated copy.  Correct?

11   **A.** Correct.

12   **Q.** All right.

13       And the updated version responding to Mr. Cook's copy --

14   Mr. Cook's comment changes what had been a sentence that says,

15   "You will no longer be transacting with Apple" to a sentence

16   that says, "Apple is not responsible for the privacy or

17   security of purchases made on the web."  Correct?

18   **A.** Yes.

19   **Q.** All right.  So Mr. Cook is the one who suggested replacing

20   one bold sentence on top about not transacting with Apple with

21   a different bold sentence on top that invokes privacy and

22   security risks, correct?

23   **A.** I don't recall how the dialogue happened in the discussion

24   in the meeting.  I know there was a discussion.  I don't

25   remember who said what.

1    **Q.**  All right.  Let's go back to the June 28th deck.  It's

2    Exhibit 291 already in evidence.

3        (Exhibit published to witness, counsel, and the Court.)

4    **BY MR. BORNSTEIN:**

5    **Q.**  And if we go to Slide .5, here on the top, we have on

6    the slide the same two draft warning screens, right, that we

7    were just looking at?

8    **A.**  I see that.

9    **Q.**  All right.  And there are speaker notes from someone named

10   Ann.  Is that Ann Thai?

11   **A.**  It is.

12   **Q.**  And she's also a business person with App Store

13   responsibilities?

14   **A.**  Yes.

15   **Q.**  And Ms. Thai's speaker notes say again, "Tim, based on

16   your feedback, here is the system disclosure sheet with the

17   updated copy on the right."  Correct?

18   **A.**  Yes.

19   **Q.**  And the final version of the warning screen that was

20   adopted in the external link purchase -- the external purchase

21   link entitlement program actually has that sentence in bold at

22   the top as reflected on the right of this slide, correct?

23   **A.**  It is.

24   **Q.**  Okay.  There were some -- some other changes that were

25   made, but that -- that stayed as part of the final slide,

 1    correct?

 2    **A.**  I believe so.

 3    **Q.**  Okay.

 4         **MR. BORNSTEIN:**  Did Your Honor want to take the break

 5    now?

 6         **THE COURT:**  Are you switching topics?

 7         **MR. BORNSTEIN:**  I am, Your Honor.

 8         **THE COURT:**  Okay.

 9              (Discussion off the record.)

10         **THE COURT:**  My court reporter says 30 minutes would

11    be sufficient.

12       I'm going to ask that you all leave the courtroom so that

13    my staff gets a break.  You can leave what you want.  The

14    doors will be closed.  But everybody does need to leave the

15    courtroom.

16       We'll stand in recess for 30 minutes.  Thank you.

17       (Recess taken at 11:53 A.M.; proceedings resumed at

18    12:24 P.M.)

19         **THE COURT:**  Okay.  We're back on the record.

20       The record will reflect the parties are present.  We're

21    getting our mics.

22       One question, we have not been publishing these exhibits

23    to the gallery.  Did you want them published to the gallery?

24         **MR. BORNSTEIN:**  I don't have a strong preference.  I

25    think I guess in the ordinary course, we would, Your Honor.

 1   We are redacting things that are confidential.  And in --

 2          THE COURT:  I just --

 3          MR. BORNSTEIN:  -- the interest of the public record,

 4   that seems like the right thing to do, yes.

 5          THE COURT:  Okay.  That's fine.  We had not been

 6   doing it, and I don't -- maybe I just wasn't clear.

 7       Mr. Perry, you agree?

 8          MR. PERRY:  We have no objection, Your Honor.  The

 9   ones that are showing on our screen, the confidentiality

10   redactions are highlighted, not redacted, so if they're

11   published, then you can see the highlight --

12          THE COURT:  Correct.  What you all are seeing on your

13   screen, if we publish them to the gallery, they will be seen.

14   So I just -- it doesn't matter to me.

15          MR. BORNSTEIN:  The ones that have been appearing on

16   this screen, Your Honor, which is what I've been looking at

17   during the examination, they have material blacked out rather

18   than --

19          THE COURT:  Correct.

20          MR. BORNSTEIN:  -- highlighted.

21          MR. PERRY:  They're done two different ways, Your

22   Honor.  I don't -- Epic's documents, we didn't do these.  We

23   have no problem if they're blacked out.  If they're

24   highlighted, then they're just highlighting the confidential

25   information.

 1          **MR. BORNSTEIN:**  We don't have anything that Mr. Lyon

 2  has for the screen where the confidential information is

 3  highlighted.  That was provided to you.

 4          **MR. PERRY:**  But that's --

 5          **THE COURT:**  We will -- we will then publish them to

 6  the gallery.

 7      Whenever the witness has it, we can publish it to the

 8  gallery unless I explicitly tell you otherwise.

 9      All right.  Go ahead.

10          **MR. BORNSTEIN:**  Your Honor, I took the opportunity

11  during the lunch break to organize my examination, and I am

12  going to pass the witness.

13          **THE COURT:**  Okay.

14      Mr. Perry?

15          **MR. PERRY:**  And, Your Honor, I apologize.  We did it

16  differently.  Ours are highlighted, not redacted.  So we would

17  like to not show ours on the public gallery if there's a

18  highlighting on the document.  There aren't very many, by the

19  way.

20          **THE COURT:**  Okay.  So then do not publicize them

21  unless I -- unless it's explicit.  All right.

22      Is there a binder for me?

23          **MR. PERRY:**  Yes, Your Honor.  We gave them to the

24  clerk earlier.

25          **THE COURT:**  All right.  Mr. Perry, you may proceed.

 1              **MR. PERRY:**  Thank you, Your Honor.

 2                        **CROSS-EXAMINATION**

 3   **BY MR. PERRY:**

 4   **Q.**  Good afternoon, Mr. Schiller.

 5   **A.**  Good afternoon.

 6   **Q.**  I think we touched on this a little bit early, but just to

 7   be clear, you recall when you finished testifying last May,

 8   the Court admonished you not to discuss the case with anyone?

 9   **A.**  Yes.

10   **Q.**  And have you complied with the Court's admonishment, sir?

11   **A.**  Yes, I have.

12   **Q.**  How long has it been since you met with counsel to prepare

13   for your testimony?

14   **A.**  I have not met with counsel to prepare for testimony

15   previous -- since the previous-to-the-last time we were here

16   last May.

17   **Q.**  Fair enough.  And other than this morning when I said good

18   morning to you, when is the last time you and I saw each

19   other?

20   **A.**  I don't recall having seen you since last May other than

21   this morning.

22   **Q.**  Mr. Schiller, are you aware that after your previous

23   testimony, the Court ordered Apple to produce documents about

24   the decision-making process?

25   **A.**  Yes.

1    **Q.**  And you were designated as a custodian of documents and

2    your files were searched.  Do you recall that?

3    **A.**  Yes.

4    **Q.**  Were you provided copies with any of those documents?

5    **A.**  I do not believe I was provided copies of anything that

6    was searched or provided to the Court, no, I don't think so.

7    **Q.**  And did you have the opportunity to review any documents

8    with me or any other counsel before you testified today?

9    **A.**  No, I did not.

10   **Q.**  You understand that you have been designated as Apple's

11   corporate representative in this case, Mr. Schiller?

12   **A.**  Yes.

13   **Q.**  And you sat through the last proceeding and the merits

14   trial; do you recall that?

15   **A.**  Yes, I did.

16   **Q.**  Have you been able to meet with me or the legal team to

17   plan for the strategic or tactical portion of this hearing

18   before today?

19   **A.**  No.

20   **Q.**  All right.  Let's move on, Mr. Schiller, to the injunction

21   compliance work that we are here for.

22        You testified earlier today that you spent basically the

23   time since the decision issued preparing for this injunction

24   compliance; is that right?

25   **A.**  Yes.

 1    **Q.**  Did you read the injunction personally?

 2    **A.**  Yes, I did.

 3    **Q.**  And the order in this case which came out at the same

 4    time, did you read that as well?

 5    **A.**  Yes.

 6    **Q.**  It was 185 pages long?

 7    **A.**  Yes.

 8    **Q.**  Do you recall discussing that order with a reporter

 9    shortly after it came out?

10    **A.**  No, I don't recall.

11    **Q.**  Let me show you a document solely to refresh your

12    recollection, sir.  It's in your tab at CX1100.

13    **A.**  (Reviewing documents.)

14       I see that document.

15    **Q.**  Mr. Schiller, this is a September 12th email from PR

16    group -- within PR group.  What -- do you remember when the

17    Court's decision was in this case?

18    **A.**  In September of 2021.

19    **Q.**  And without reading the document out loud, if you just

20    read the first paragraph or the first sentence, does that

21    refresh your recollection, sir, that you spoke with a reporter

22    shortly after this decision was issued?

23    **A.**  It refreshes my recollection that I spoke with a reporter.

24    I don't remember the conversation at all.

25    **Q.**  You don't remember anything about it?

1    **A.**  I'm sorry, I do not.

2    **Q.**  Okay.  Let me just ask you one -- one question about it

3    that might refresh your recollection.

4        If you look at the last page, which was 17411,

5    Mr. Schiller.

6    **A.**  I see that.

7    **Q.**  Do you see your initials there toward the top, PS?

8    **A.**  I do.

9    **Q.**  And again without reading it out loud, could you just read

10    that to yourself, please?

11    **A.**  (Reviewing document.)

12        I've read that.

13    **Q.**  And does that refresh your recollection about what you

14    discussed with this reporter?

15    **A.**  I'm sorry, it does not.

16    **Q.**  Quite all right, Mr. Schiller.  It was a fair bit of time

17    ago.

18        Let's move on from there.

19        Mr. Bornstein asked you a number of questions today about

20    Apple's work in connection with developing a compliance plan.

21    Do you recall that?

22    **A.**  Yes.

23    **Q.**  And can you describe just in more general terms how that

24    work progressed with your role in it.

25    **A.**  As we stated previously when I was questioned, it began

1  immediately working on a compliance plan in 2021.  First

2  understanding the ruling, reading it, discussing it with legal

3  counsel to understand what it means for us.

4      We began having conversations in '21 working up through

5  '23.  And then as been discussed, there were a number of other

6  activities in 2023 with appeals and things like that, that the

7  team kept us updated.

8      And we added people throughout the process to work on a

9  compliance in a cross-functional way across teams at Apple,

10  eventually culminating in the final plan and implementation.

11  **Q.**  Now you've mentioned a couple times today the involvement

12  of legal counsel, Mr. Schiller.  And without discussing what

13  you addressed with legal counsel, is it usual in your position

14  at Apple to have legal counsel involved in a -- in a project

15  like this?

16  **A.**  Like this?  This is a fairly unique project, I would say.

17  **Q.**  Why is that?

18  **A.**  Because it is a injunction.  It's a legal order.  And so

19  the definition of it involves the legal team and legal

20  understanding.

21  **Q.**  And again without revealing the substance of

22  communications, from your perspective as a business leader at

23  Apple, why, in this unique project, were the lawyers involved?

24  **A.**  Well, in this case, a key element was trying to understand

25  what the requirements of the injunction were and what elements

1   we would put in place to meet the requirements of the

2   injunction, and -- and that all involves legal interpretation

3   and understanding that others need to provide advice to myself

4   and the team about.

5   **Q.**  Now, you're not a lawyer, right, Mr. Schiller?

6   **A.**  I am not.

7   **Q.**  Are you an expert in the doctrine of attorney-client

8   privilege?

9   **A.**  I am not.

10  **Q.**  Mr. Bornstein asked you a number of questions about why

11  certain documents or whether certain documents were labeled

12  "privileged and confidential."

13      Did you -- did you personally make that decision to label

14  documents in that way?

15  **A.**  Most of the time, no.  A few times I've had to put them on

16  because I'm communicating something that already was

17  established or marked as privileged and confidential.  So I

18  try not to break whatever someone else has said, is how we do

19  it.

20      But I -- again I'm no expert on it.  And I always do that

21  assuming that the courts will decide what's right and what's

22  privileged, not me.

23  **Q.**  Now, Mr. Bornstein walked you through several decks today,

24  from May in 2023, that's Exhibit 272; three from June in '23,

25  that's 223, 224, and 291; from July of 2023 which is 227.

1          Are those the only materials that came to you regarding

2     this injunction compliance program?

3     **A.**  No, they are not.

4     **Q.**  Were any of those decks up to July 5th, 2023, finalized by

5     the executives at Apple?

6     **A.**  Finalized in the sense that we -- we did not finalize them

7     in the sense that we did not make a final decision to go

8     forward with implementation yet.  So they were discussions,

9     they were directions, but they were ultimately not the final

10    until we were done.

11    **Q.**  Now, Mr. Bornstein pointed out a few changes, if you will,

12    from iteration to iteration of the deck.  Is that consistent

13    with your experience at Apple?

14    **A.**  Very.

15    **Q.**  Can you explain?  How does that work?  Why does that

16    happen that way?

17    **A.**  We often go into meetings with an example, a proposal, a

18    couple proposals showing what we might do.  And then we have a

19    hopefully very full discussion about why certain elements are

20    the way they are or -- or need to be or don't need to be.  And

21    then often that leads to more work and more investigation and

22    new versions.  And that's just standard collaborative process.

23    **Q.**  Now, you mentioned in response to one of Mr. Bornstein's

24    questions modeling certain assumptions.  Do you recall that?

25    **A.**  Yes.

1  **Q.**  And what -- how does that process work at Apple?  Do you

2  do the modeling, Mr. Schiller?

3  **A.**  I do not.

4  **Q.**  So can you explain a little more about that?

5  **A.**  In order to make progress on a number of these elements of

6  the program, there are a certain number of variables that will

7  ultimately need to be decided on.  And we need to try to

8  create an estimate, a model of how these programs will work.

9  And so we have to identify the variables, decide to constrain

10  some or -- or create variations on others in order to then

11  show the effects of the different variables involved in the

12  decision-making.

13  **Q.**  Now, Mr. Bornstein showed you a -- a memo in which you

14  questioned one of the assumptions in one of the versions.  Do

15  you recall that?

16  **A.**  Yes, I do.

17  **Q.**  And can you tell us a little bit about that and how that

18  works at Apple?

19  **A.**  Well, first, I tend to do that a lot so you'll see through

20  documents I'll -- I'll challenge and question assumptions,

21  trying to make sure I understand how either accurate they are

22  or the degree of variability of these things.  Just so that

23  when we make decisions, we do it eyes open understanding the

24  range of possible outcomes based on the source data and -- and

25  how confident we are in the accuracy of them.

1        And in some of these cases that we were discussing today,

2    they're based on the best data the team knows how to find to

3    model and assume how it will work.

4        And I had to, in this case, decide -- make my own opinion

5    about the accuracy of those models and whether that's the best

6    data available to the team.

7    **Q.**  When you -- in this project the injunction compliance

8    project, Mr. Schiller, when you challenged assumptions, are

9    you suggesting that they are wrong?

10   **A.**  We'd have to look at each individually to be specific.

11   But the one that I recall that was asked in questioning, I

12   challenged the application of one set of data which was in-app

13   purchase time versus what the linkout time might be because

14   they're not identical.

15       But I didn't know they were wrong.  I just didn't know to

16   degree we could measure their accuracy.  And so that -- my

17   questioning was about the application of the data, not that I

18   thought it was wrong.

19   **Q.**  And the team responded to your inquiry, as we saw earlier.

20   Did that satisfy that particular inquiry?

21   **A.**  It did for me.

22   **Q.**  Mr. Bornstein showed you in the slide decks various

23   options for, for example, the placement of links or other

24   information within an app.  Do you recall that?

25   **A.**  Yes.

SCHILLER – CROSS / PERRY

1    **Q.**  Why did Apple look at multiple options through the course

2    of 2023?

3    **A.**  There were a number of reasons for considering options for

4    where links can be placed and how they would appear.  For me,

5    the -- one of the big reasons for wanting that exploration was

6    to try to create a system that would be understood by users,

7    what they are, and as safe as possible such that if a user

8    followed a link, they knew what they were doing and they knew

9    what it meant.

10        So understanding the different options available to us

11   legally from the order, as well as available possible to

12   execute through the software, and that would users understand

13   were all some of the things I was thinking about.

14   **Q.**  And in May of 2024, last time you were here, Mr. Schiller,

15   you testified that you understood the purpose of the

16   injunction was to allow for communication from developers to

17   users about lower prices they may offer on the web.

18        Do you recall that?

19   **A.**  Yes.

20   **Q.**  Is that still your understanding?

21   **A.**  Yes.

22   **Q.**  And how does that relate, if at all, to the point you just

23   made about the placement and style and other information about

24   the links and other information?

25   **A.**  We're trying to create an implementation that allowed

SCHILLER – CROSS / PERRY

1  developers to communicate specifically that users could get

2  lower prices on the web from the developer, and to make it

3  clear that those lower prices are not in the app, not part of

4  the IAP, they're outside the app.

5      And so I believe that was part of the consideration we

6  were trying to solve for with the implementation.

7  **Q.**  Mr. Schiller, you testified in May about that as well, the

8  distinction between purchasing outside the app and within the

9  app using IAP.  Do you recall that?

10  **A.**  Vaguely.

11  **Q.**  Can you explain the distinction you're drawing of the App

12  Store perspective between those types of transactions?

13  **A.**  Well, I think they're -- they're two very distinct things.

14  There are transactions that will occur in the app and that

15  uses IAP.  And there are transactions that developer can steer

16  a user to go outside the app to get on their website.  And

17  that's another thing.

18      And these are two things that must be allowed.  And trying

19  to create a system to make it easy for developers to

20  communicate that to users such that users understand those

21  options, that's what we were trying to create.

22  **Q.**  And in your view, Mr. Schiller, if we talk about the

23  requirements, do you understand I mean the technical

24  requirements for the -- for the link entitlement?

25  **A.**  Yes.

1    **Q.**  Do you have a view whether the final link entitlement

2    meets the criteria you just described?

3    **A.**  I think it does a good job given all the issues involved

4    here.  It's not an easy problem to solve.  We're trying to

5    give freedom to developers to communicate but do it in such a

6    way that hopefully it won't be abused in a way that creates

7    fraud and issues for users' safety and privacy.  And try to

8    find a balance between all those.

9        It is a balancing act between those elements.  And I think

10   we've tried to consider ahead all the different things that

11   could occur and protect users from them.  I'm sure we can do

12   better, and there's more work to do.

13   **Q.**  Mr. Schiller, if you could look in your binder.

14           **MR. PERRY:**  This is already in evidence, Your Honor.

15   **Q.**  There's CX2 which is the final version of the entitlement.

16   **A.**  (Reviewing document.)

17           **THE COURT:**  Okay.  It can be published.

18                   (Exhibit published.)

19           **MR. PERRY:**  Thank you, Your Honor.

20   **Q.**  Do you recognize this document, Mr. Schiller?

21   **A.**  This looks to be the Apple support document or agreement

22   for developers who want to create a linkout from their apps in

23   the U.S.

24   **Q.**  And if you just look at paragraph 3, is that where some of

25   the requirements we've just been discussing and you were

SCHILLER – CROSS / PERRY

1  discussing with Mr. Bornstein earlier, the final version are

2  located?

3  **A.**  (Reviewing document.)

4      Yes.

5  **Q.**  Let me just ask you, Mr. Schiller, for example, in 3.3,

6  the first four bullets basically pertain to requirements for

7  the URL; is that correct?

8  **A.**  Yes.

9  **Q.**  Do any of those, in your view, interfere with developers'

10  ability to communicate to customers the points we've discussed

11  earlier?

12  **A.**  I do not believe so.

13  **Q.**  And I know you just testified in May of 2024 about the

14  security and privacy reasons for that.  Has anything changed

15  since that testimony?

16  **A.**  No.

17  **Q.**  Okay.  The fifth bullet requires developers to submit

18  their links to the App Store.  Why is that?  Or App Review.

19  Why is that?

20  **A.**  So that App Review can check the link and make sure the

21  user is going to a safe place as best as we can tell.

22  **Q.**  Now, Mr. Bornstein asked you a number of questions

23  regarding the formatting or style of the information,

24  including the so-called plain button.

25      Do you recall that?

SCHILLER – CROSS / PERRY

 1    **A.**   I do.

 2    **Q.**   And those requirements are in the separate Apple

 3    materials; is that correct?

 4    **A.**   Yes.

 5    **Q.**   If you turn in your binder to CX3.

 6              **MR. PERRY:**   It's already in evidence, Your Honor.

 7              **THE COURT:**   It can be published.

 8              **MR. PERRY:**   Thank you, Your Honor.

 9                          (Exhibit published.)

10    **BY MR. PERRY:**

11    **Q.**   Are these the Apple materials that set forth some of those

12    requirements?

13    **A.**   Yes, they are.

14    **Q.**   And if you turn, Mr. Schiller, to CX3.5.

15                          (Exhibit published.)

16    **BY MR. PERRY:**

17    **Q.**   Do you see the templates and style requirements there?

18    **A.**   Yes, I do.

19    **Q.**   Let me ask you a couple questions about those.  Let's --

20    let's look at the last one under Templates, for example.

21    Specific price template $54xxx@www.example.com [sic] external

22    link symbol.

23        Do you see that?

24    **A.**   Yes.

25    **Q.**   You're familiar with the App Review Guidelines?

SCHILLER – CROSS / PERRY

1    **A.** Yes.

2    **Q.** You, in fact, sit on the ERB which reviews guidelines

3    compliance?

4    **A.** Yes.

5    **Q.** Under the version of the guidelines in effect at the time

6    of the trial, the old guidelines, Mr. Schiller, would this

7    statement have been permitted in an app?

8    **A.** No.

9    **Q.** Would this statement -- what -- what provision of the

10   guidelines if you -- if you recall would this statement run

11   afoul of?

12   **A.** We had a -- before the injunction, we had a guideline that

13   did not permit linkouts or other calls to action to make

14   purchases from within the app to outside of the app.

15   **Q.** And the guideline 3.1.3 actually said links, buttons, or

16   other calls to action, correct?

17   **A.** Yes.

18   **Q.** Does the example at the bottom here include a link?

19   **A.** Yes.

20   **Q.** And what part of that is the link?

21   **A.** Well, both, yes, the entire thing is a link if the

22   developer wants it to be.

23   **Q.** And does this include a call to action?

24   **A.** Yes, it does.

25   **Q.** And what part is a call to action?

1    **A.**  Well, the language "to buy" for some amount on a website

2    is what we would call a call to action.

3    **Q.**  And does the example here, specific price template,

4    include a button?

5    **A.**  Yes, it does.

6    **Q.**  And what part of that is the button?

7    **A.**  The visual part of the button is that square with the

8    arrow out of it, the linkout button.  The whole thing performs

9    like a button, but that visually looks like a button.

10   **Q.**  And under the pre-injunction guideline, would or could

11   this statement have been rejected under any of those three

12   requirements of the 3.1.3?

13   **A.**  Yes.

14   **Q.**  Under the injunction compliance program established by

15   Apple, are these statements permitted?

16   **A.**  Yes.

17   **Q.**  There's been a lot of discussion in this case about the

18   plain button.  Do you recall that?

19   **A.**  Yes.

20   **Q.**  Okay.  Let me show you another document, Mr. Schiller.

21   It's in your binder, CX1103.

22           **MR. PERRY:**  And this is not confidential, Your Honor.

23           **THE COURT:**  All right.  It can be published.

24           **MR. PERRY:**  Well, I should say it has personally

25   identifiable information redacted.  The rest of it is not

 1    confidential, just to be clear.

 2              THE COURT:  Okay.

 3                   (Exhibit published.)

 4    BY MR. PERRY:

 5    Q.  Do you recognize this document, Mr. Schiller?

 6    A.  I -- yes, it's an email.

 7    Q.  And the second one down, is that from you?

 8    A.  Yes.

 9    Q.  And can you identify what the general subject of this is?

10    A.  This is specifically about the linkout graphic, that

11    square with the arrow out of it that's part of the

12    specifications of the linkout.

13              MR. PERRY:  Your Honor, we move the admission of

14    CX1103.

15              MR. BORNSTEIN:  No objection, Your Honor.

16              THE COURT:  It's admitted.

17                   (Exhibit 1103 received in evidence.)

18    BY MR. PERRY:

19    Q.  Mr. Schiller, you write there that is not the graphic I

20    drew on the board that represents a standard external web link

21    button.

22        What is a standard external web link button, to your

23    understanding?

24    A.  Well, I recall this meeting specifically where I drew

25    this.  We were trying to create a specification that showed

1    not only the text of the linkout but also allowed a button per

2    the language that when buttons are now allowed and wanted to

3    make sure that we created button style that would be easy for

4    users to recognize as a linkout button, not an in-app purchase

5    button.

6         And in this meeting, I actually did a Google search on

7    linkout button styles and up came a graphic as the most common

8    linkout button available on the Internet.  And it was what

9    ultimately we created, that square with the arrow out of it.

10        In this email, I remember as a follow-up to the meeting, a

11   team came back with a picture of a button that didn't look

12   like that button I had seen doing a Google search.  And so

13   that's what this back-and-forth discussion was about.

14   **Q.**  And in the templates that Apple now provides under the

15   link entitlement, what kind of button is identified?

16   **A.**  That same graphic that I found in a Google search for

17   linkout on the web, which is a square that represents a page,

18   with an arrow leaving it to express leaving the page you're

19   on.

20   **Q.**  And do you have a recollection why you identified that as

21   an appropriate button for this purpose?

22   **A.**  Simply that I was encouraging the team to find a graphic

23   button that users would readily recognize and help to make it

24   safe for use when they clicked on it that they were -- had a

25   high likelihood that they understood they were linking outside

1    of an app.

2    **Q.**  Thank you, Mr. Schiller.

3        We can go back to Exhibit CX003, which was the Apple

4    materials, and specifically page .5.

5                          (Exhibit published.)

6    **BY MR. PERRY:**

7    **Q.**  Mr. Bornstein asked you some questions about the system

8    disclosure sheet.  Do you recall that?

9    **A.**  Yes.

10   **Q.**  This image is the final one adopted by Apple, correct?

11   **A.**  Yes, it looks to be.

12   **Q.**  In your view, Mr. Schiller, and given your position at

13   Apple, is there anything misleading about the information

14   provided here?

15   **A.**  No.

16   **Q.**  Does the system disclosure sheet prevent developers from

17   communicating options to users?

18   **A.**  No.

19   **Q.**  And in your view, does the system disclosure sheet help

20   users make informed choices?

21   **A.**  Well, it helps them to know they're leaving and going to

22   another website and what that might occur in terms of where --

23   how the purchases work.

24       I'm sure that's a -- I'm not sure if that's the same

25   definition of an informed choice or not.  I -- I don't know.

SCHILLER – CROSS / PERRY

1    **Q.**  Mr. Bornstein asked you some questions about some changes

2    that were made to the system disclosure sheet during the

3    Wisconsin project.  Do you recall that?

4    **A.**  Yes.

5    **Q.**  Is it common for Apple to make changes along the way?

6    **A.**  Yes.

7    **Q.**  And can you describe a little bit about the changes that

8    were made here?  What do you recall?

9    **A.**  My recollection is in that price committee meeting we had

10   that summer, there was discussion about, as we read through

11   the disclosure sheet, the fact that that second bold sentence

12   that -- up on top was at the bottom of it in small text.  And

13   there was discussion about whether users would realize that

14   they weren't -- when they linked out, that now things that

15   they expected from an in-app purchase with Apple wasn't the

16   case.

17        So there was concern that what was in small text at the

18   bottom would not be understood and it should be bolded at top.

19   I believe that was the dialogue that went on in the meeting.

20   **Q.**  Thank you, Mr. Schiller.

21        If we can go back to CX2 which is the link entitlement.

22                    (Exhibit published.)

23   **BY MR. PERRY:**

24   **Q.**  And we were looking at the bullets in 3.3 which is on

25   CX2.4.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

SCHILLER – CROSS / PERRY

1         Mr. Bornstein asked you some questions, if you'll recall,

2    about placement within the app of the new link.  Do you recall

3    that?

4    **A.**  Yes.

5    **Q.**  And the last four bullets on this page basically, you

6    know, describe that, correct?

7    **A.**  Yes.

8    **Q.**  That's the final decision Apple made.

9    **A.**  I'm not sure what you mean "final decision."

10   **Q.**  In other words, we looked at a number of decks that had

11   iterations of possibilities.  This is what was actually

12   adopted?

13   **A.**  Yes.

14   **Q.**  Why were these requirements regarding the placement

15   adopted by Apple?

16   **A.**  We're trying to find a solution where developers can

17   communicate their offers and help users link out to get them

18   in a way that didn't also then interfere with in-app purchase

19   and the process that was established once a user was starting

20   to buy something in the app.

21   **Q.**  And you just drew a distinction between communication and

22   purchases.  Did I understand that correctly?  I'm sorry, I

23   just might not have caught your answer.

24   **A.**  I'm sorry.  Then maybe my answer was too complex.

25        We're trying to both have a solution for developers to

1  communicate their offers but not interfere or confuse users of

2  what is IAP and how that works.

3  **Q.**  And why is that, Mr. Schiller?

4  **A.**  Because I believe the ruling, as I understood it, allows

5  IAP to still be the only method of in-app purchase.  And so

6  we're trying to not have that be broken by this process.

7  **Q.**  And let me just pause on something you just said.  You

8  said the ruling, as you understood it.  Have you spent -- I

9  mean you said you read it.  But have you spent time with this

10  ruling, Mr. Schiller?

11  **A.**  I've read it multiple times.  We've certainly had many

12  discussions internally about it.  And so I'm not sure if that

13  meets the definition of spent time with it or not.  I don't

14  know.

15  **Q.**  Well, let me ask a more -- a better question, sir.

16      In developing these requirements, the various iterations

17  that Mr. Bornstein went through today, what effect, if any,

18  did you and the others at Apple give the language of the

19  injunction and the ruling that accompanied it?

20  **A.**  We've asked ourselves and -- and reread the language over

21  and over again throughout the process of trying to come up

22  with our compliance plan to understand how it mapped to that

23  and met the needs of it or not.  That happened frequently.

24  **Q.**  And again you're not a lawyer, Mr. Schiller.  Do you have

25  a view as to whether the requirements that Apple ultimately

SCHILLER – CROSS / PERRY

```
 1    adopted for the link and so forth are consistent with the
 2    injunction and the ruling?
 3              MR. BORNSTEIN:  Objection, Your Honor, foundation.
 4              THE COURT:  Well, I'll take it for his understanding.
 5              THE WITNESS:  From the understanding I had and the --
 6              THE COURT:  Well, let me --
 7              THE WITNESS:  Sorry.
 8              THE COURT:  Just say to be clear, I take it from your
 9    understanding, but I don't think your attorney wants you to
10    violate attorney-client privilege.
11        So if your view is only based on lawyer involvement, then
12    you don't have one.
13              THE WITNESS:  I would prefer to say what you said,
14    Your Honor, which is my view is based on discussions with
15    attorneys and I would prefer not to say what my view is
16    independent of that.
17              MR. PERRY:  I appreciate the clarification, Your
18    Honor.
19    Q.  And I apologize, Mr. Schiller, again for asking an
20    inartful question.
21        Let's shift gears for a second and talk about the
22    commission structure; is that all right?
23    A.  Okay.
24    Q.  All right.  In May when we were here last, you
25    testified -- do you recall this -- that there were -- before
```

1  the injunction there were two categories of transactions?

2  **A.**  Yes.

3  **Q.**  And then you testified, and I'm quoting, there's now a

4  third class of transaction different from either the first or

5  second that's -- previously that starts in the app and links

6  out to pay on the website and come back to the app.

7       Am I --

8  **A.**  That is correct, I said that.

9  **Q.**  Okay.  Situate us where we were.

10      Did Apple change anything about the first two categories

11  of transactions, in your taxonomy --

12  **A.**  No.

13  **Q.**  -- as part of this --

14      And how does the third class of transactions then relate

15  to this injunction compliance program?

16  **A.**  Well, I think this program is all about that third class

17  of new transactions that start in the app and then go to a

18  website.

19  **Q.**  Now, Mr. Bornstein showed you several decks that had a

20  no-commission option, a commission option, three commission

21  options, different commission options.  How did -- can you

22  explain how that came about at Apple in the middle of 2023?

23  **A.**  There were many explorations of what a range of options of

24  providing a compliance plan for the injunction that involved

25  many variables, whether there was a commission or not a

1    commission, whether the commission is any different, whether

2    there were rules around the links.  So all of that was -- we

3    spent all our time discussing and considering different

4    options.

5    **Q.**  So we are at a disadvantage, Mr. Schiller, doing

6    archeology with these decks.  How much time -- do you have an

7    estimate of how much time the meetings and the work and the

8    preparation and so forth went into this discussions of the

9    commission leading up to that July meeting?

10   **A.**  Typically, on most weeks, we had a weekly meeting where

11   the App Store team, with some of the finance team, some of the

12   legal team, would talk and work on just this or this and other

13   things.  The meetings would vary.  Some weeks we had more than

14   one meeting.

15       And, yes, there were some weeks with no meeting, but for

16   the most part there were meetings every week.

17       And the -- it began in 2021.  Mostly then with other --

18   other topics.  And then in '23, really became meetings all

19   about this.  There was much work on the team in between those

20   meetings, nights, weekends.  It was -- it was a -- to give you

21   one bit of flavor for it, very complex in the sense that we

22   would sit in a meeting, let's say it was on a Wednesday and

23   say, hey, do we consider this different way of calculating it,

24   did we consider this historical data to get a better model

25   here.

1         And we want the team by the following week to have figured

2     that out and come back with an update to show us.  And so they

3     would spend all week and weekend trying to create that work

4     for us.

5         So that was a typical time.  I don't know how to add up

6     all those hours, but that's what we did.

7     **Q.**  And do you know whether those meetings, those periodic

8     meetings, were recorded in some way?

9     **A.**  I'm not -- I do not believe they were.

10    **Q.**  Not recorded.  Were notes taken?

11    **A.**  Some of those meetings had notes taken by some others, not

12    by me, but some others.  I can't be specific.  I don't know.

13    **Q.**  Well, let me just show you one document, Mr. Schiller.

14        If you look in your binder, it's CX1104.

15    **A.**  (Reviewing document.)

16            **MR. PERRY:**  And this can be published, Your Honor.

17            **THE COURT:**  You may.

18                    (Exhibit published.)

19    **BY MR. PERRY:**

20    **Q.**  Do you recognize this document, Mr. Schiller?

21    **A.**  I'm sorry, no, I don't.

22    **Q.**  Did you personally receive the notes of these meetings

23    that you just testified about?

24    **A.**  I -- I did.  I often didn't look at them.

25    **Q.**  Okay.

1    **A.**   Because I was in the meeting.  And so to read notes about

2    the meeting that I was just in, it was just not a good use of

3    my time.  So I got these but I rarely read them.

4    **Q.**   Let's take a look at this one under Notes.  And again I'm

5    not going to ask you to read it out loud, just see if you

6    remember this meeting.

7         Do you see that first sentence?

8    **A.**   (Reviewing document.)

9    **Q.**   About the compliance date?

10   **A.**   Oh, sorry, I was looking at a different section of it.  I

11   apologize.

12                        (Exhibit published.)

13            **THE WITNESS:**   Yes, I -- I recall that being said.  I

14   don't know which meeting and all of that, but I recall it

15   being stated.

16   **BY MR. PERRY:**

17   **Q.**   And do you remember getting these specific notes, having

18   looked at them for a minute or two?

19   **A.**   I'm sure I did.  I just don't recall sitting here.

20   **Q.**   All right.  We'll leave that for another time,

21   Mr. Schiller.

22         Did you receive notes periodically, however, even if you

23   don't remember the one I just showed you?

24   **A.**   Frequently, yes.

25   **Q.**   And Mr. Bornstein showed you a document in which you

 1    expressed, quote, unquote, issues with the commission.  Do you

 2    recall that?

 3           THE COURT:  I take it you don't want 1104 admitted?

 4           MR. PERRY:  Your Honor, I'll move the admission and

 5    see what my colleague says.

 6           MR. BORNSTEIN:  Your Honor, we have no objection to

 7    1104.

 8           THE COURT:  All right.  1104 is admitted.

 9           (Exhibit 1104 received in evidence.)

10           MR. PERRY:  Thank you, Your Honor.

11    **Q.**  Mr. Schiller, you were shown a document in which you

12    expressed, quote, issues with the commission.  Do you recall

13    that?

14    **A.**  I recall it being stated, yes.

15    **Q.**  And I think you indicated that one of your issues was --

16    well, I won't -- can you explain what your issues were with

17    the commission in the middle of 2023?

18    **A.**  I believe in response to the question, I explained I had

19    issues more than just about determination of how it met

20    compliance, but also I had great concerns about the collection

21    of funds from developers, the change in the role of the App

22    Store to now an organization that needs to collect money from

23    developers.

24        I was concerned with the concept of developers, if they

25    don't pay, how the App Store now needs to be some kind of a

1    collection agency and have rules around how we handle

2    non-payment and whether ultimately it means we're going to

3    have to do audits of developers to ascertain whether we were

4    paid the proper amount or not.

5        And -- and ultimately how all of those things change the

6    relationship between Apple and developers in a way that I

7    thought would be detrimental to that relationship.

8        And so I had concerns about all of those things.

9    **Q.** And I think you mentioned you also had a concern about or

10   a question about whether the commission -- how the commission

11   fit with the ruling; is that correct?

12   **A.** Yes.

13   **Q.** And did that question get resolved for you?  Let me just

14   ask that way.  Yes/no question.

15   **A.** Yes.

16   **Q.** Can you answer any further in light of the observation Her

17   Honor made a few minutes ago?

18   **A.** No, it's the same answer --

19   **Q.** Thank you.

20   **A.** -- as previous.

21   **Q.** Thank you, Mr. Schiller.

22       Mr. Schiller, let's look at one more document and this is

23   the injunction itself, CX1313.

24           **MR. PERRY:**  Your Honor, I don't think we've moved

25   into evidence.  It's a court document obviously, but we'd move

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1    it in just so it has an exhibit number.

 2              THE COURT:  Which one is this?

 3              MR. PERRY:  It's the permanent injunction, Your

 4    Honor, 1313.

 5              THE COURT:  Okay.  Any objection?

 6              MR. BORNSTEIN:  I have no objection to the admission

 7    of Your Honor's order.

 8              THE COURT:  I can take -- well, this way we have a

 9    number.  But I can take judicial notice of it.

10              MR. PERRY:  Agreed, Your Honor.  Several of the other

11    orders have exhibits already so we thought it might be easier

12    just to have a number.

13              THE COURT:  I don't know that I like the number 1313.

14    But go ahead.

15              THE WITNESS:  The same thought had crossed my mind.

16              MR. PERRY:  All right.  To be a clear, the parties

17    have an agreed numbering system that spits them out randomly,

18    Your Honor.  Or not randomly, but they start at a particular

19    number.  There's no significance to 1313.

20    Q.  Mr. Schiller, I think you testified earlier you have

21    personally read the injunction.

22    A.  Yes.

23              MR. PERRY:  Mr. Montgomery, can we blow up

24    paragraph 1.

25                          (Exhibit published.)
```

1    BY MR. PERRY:

2    Q.  You played a significant role, Mr. Schiller?

3        THE CLERK:  Your Honor, are we publishing?

4        THE COURT:  Yeah, that's fine.  It's in the public

5    realm.

6                    (Exhibit published.)

7    BY MR. PERRY:

8    Q.  You played a significant role in this injunction

9    compliance project, as we've testified for many hours already,

10   correct?

11   A.  Yes.

12   Q.  Did you keep the injunction in mind, you personally,

13   Mr. Schiller, during that process?

14   A.  Yes.

15   Q.  And again, with the Court's reminder in mind, without

16   revealing attorney-client privileged communication, do you

17   personally have a view as to whether the injunction compliance

18   plan complies with the injunction?  The injunction, not the

19   ruling.  I'm talking about the actual injunction.

20   A.  It's probably easier, leave that to the same previous

21   answer as before.  I -- my understanding of how we meet this

22   involves a tremendous amount of legal input and so I would

23   rather not say the wrong thing on that.

24   Q.  All right.  But you do know about the guidelines, right,

25   Mr. Schiller?

1    **A.**   Yes.

2    **Q.**   All right.  Let's come back to where you're not a lawyer,

3    we got that right?

4    **A.**   That's right.

5    **Q.**   But you are a guidelines person?

6    **A.**   Yes.

7    **Q.**   All right.

8           **MR. PERRY:**  Mr. Montgomery, if we could put up

9    CDX1001-2.

10                      (Exhibit published.)

11   **BY MR. PERRY:**

12   **Q.**   And, Mr. Schiller, this was a demonstrative that you

13   helped prepare for your testimony in May, but I don't think we

14   actually used it in May.  Do you recall that?

15   **A.**   I do recall that.

16   **Q.**   What is being shown on here, if you recall, having helped

17   prepare it nine months ago.

18   **A.**   Yes.  It simply shows in the first column language of the

19   two major sections of the injunction.  And then what, at the

20   time of the trial, was our guideline language that I believe

21   that may have been referring to.  And then the change in the

22   guidelines on the far right column as a result of that.

23   **Q.**   And I'd like to ask you a guidelines question, not a legal

24   question.  Do you understand the distinction, having looked at

25   this document, Mr. Schiller?

SCHILLER – CROSS / PERRY

1    **A.**  I believe I do.

2    **Q.**  All right.  The injunction says that Apple may not --

3    shall not prohibit developers from including buttons, external

4    links, or other calls to action.  Do you see that?

5    **A.**  Yes.

6    **Q.**  Okay.  Today, under the guidelines, the new guidelines,

7    the link entitlement, does Apple prohibit developers from

8    including buttons?

9    **A.**  No.

10    **Q.**  Today, under the new guidelines and external -- U.S. link

11    requirement, does Apple prohibit developers from including

12    external links?

13    **A.**  No.

14    **Q.**  And today, under the new guidelines and the external link

15    requirement, does Apple prohibit developers from using --

16    including other calls to action?

17    **A.**  No.

18    **Q.**  Today, Mr. Schiller, in your perspective, in your

19    involvement in the App Store since its founding, do developers

20    have more options to communicate with users or fewer than they

21    did at the time of trial?

22    **A.**  More.

23          **MR. PERRY:**  No further questions, Your Honor.

24          **THE COURT:**  Any reexam?

25          **MR. BORNSTEIN:**  May I proceed, Your Honor?

| | |
|---|---|
| 1 | **THE COURT:**  You may. |
| 2 | **MR. BORNSTEIN:**  Thank you. |
| 3 | <div align="center">**REDIRECT EXAMINATION**</div> |
| 4 | BY MR. BORNSTEIN: |
| 5 | **Q.**  All right.  Mr. Schiller, I'm going to try to be |
| 6 | relatively brief on this one. |
| 7 | First of all, you had a couple of questions near the |
| 8 | beginning of your examination about your use of the privileged |
| 9 | and confidential legend.  Do you recall that? |
| 10 | **A.**  Yes. |
| 11 | **Q.**  And you testified to Mr. Perry that you're not responsible |
| 12 | for putting it on the decks, right? |
| 13 | **A.**  Correct. |
| 14 | **Q.**  And you testified that when you send emails, you try not |
| 15 | to break attorney-client privilege when somebody else has put |
| 16 | it on there, correct? |
| 17 | **A.**  Correct. |
| 18 | **Q.**  But we've seen emails today, sir, where you started the |
| 19 | privileged and confidential labeling, haven't we? |
| 20 | **A.**  Yes, I think there were some. |
| 21 | **Q.**  Right.  Exhibit 229, for example, you made the decision? |
| 22 | **MR. BORNSTEIN:**  We can put that on the screen.  It's |
| 23 | in evidence. |
| 24 | **Q.**  You made the decision -- |
| 25 | (Exhibit published.) |

 1          **THE COURT:**  It can be published.

 2    **BY MR. BORNSTEIN:**

 3    **Q.**  -- on the last page of the exhibit, which is the first in

 4    time, to start this exchange with the privileged and

 5    confidential attorney-work product label.  Correct?

 6    **A.**  Yes.

 7    **Q.**  Okay.  You had some questions from Mr. Perry about the

 8    exchange you had with Mr. Oliver about the reliability of the

 9    data he was using or his team was using to estimate the

10    percentage of transactions that users would engage in after

11    clicking the link.

12        Do you recall those questions from Mr. Perry?

13    **A.**  Yes, I do.

14    **Q.**  And he asked you if you had a response from the team that

15    satisfied you at the time.  Do you recall that?

16    **A.**  Yes.

17    **Q.**  And you said you did?

18    **A.**  Correct.

19          **MR. BORNSTEIN:**  Can we look, please, at Exhibit 279,

20    which is in evidence.

21                    (Exhibit published.)

22    **BY MR. BORNSTEIN:**

23    **Q.**  And if we look right on the page we're on, .1,

24    Mr. Schiller, in the middle of the page, and I can wait till

25    you get there.

SCHILLER - REDIRECT / BORNSTEIN

1    **A.**  I am there.  Thank you.

2    **Q.**  Okay.  In the middle of the page, you write back to

3    Mr. Oliver, "I'm not confident that the internal data you're

4    using to estimate time duration is a reliable proxy for

5    linking out."  And you make a suggestion about a change that

6    should be made on the slide.  Right?

7    **A.**  Yes.

8    **Q.**  Okay.  And the response that you get that Mr. Perry asked

9    you about that comes back to you from Mr. Oliver is just,

10   "Thanks, Phil.  We will adjust those slides accordingly."

11   Correct?

12   **A.**  That's right.

13   **Q.**  But Mr. Oliver did not give you any substantive defense or

14   explanation regarding the reliability of the data that he was

15   using in his slides; is that right?

16   **A.**  Not in this email, but we had a follow-up meeting about

17   it.

18   **Q.**  Okay.  We also had some questions just recently -- sorry.

19       Do you remember when that follow-up meeting was?

20   **A.**  I don't.  I remember the discussion with the team working

21   on it.  And we talked at length.  I raised this again and said

22   I'd like to understand where your confidence level is on this.

23   And they talked for a bit with me about the correlation

24   between it and the links out and why the confidence was high

25   on it, and we had a pretty full discussion about it.

SCHILLER – REDIRECT / BORNSTEIN

1  **Q.**  And so the people who are knowledgeable and who you relied

2  were Mr. Oliver and Mr. Roman on this issue, correct?

3  **A.**  I believe Mr. Timo Kim and Mr. Nate Burton [sic] may have

4  been ones who talked about in the meeting more at that time.

5  **Q.**  All right.  And we had testimony from Mr. Oliver and

6  Mr. Roman on this subject, though, in May, correct?

7  **A.**  I'm sorry, I don't recall that.

8  **Q.**  Okay.  The record will be what it is.

9       Let's take a look -- sorry -- turn to questions that you

10  got recently from Mr. Perry about compliance with the

11  injunction.

12          **MR. BORNSTEIN:**  And we can put on the screen

13  Exhibit -- I hate to say it, Your Honor -- 1313 --

14          **THE COURT:**  Go ahead.

15          **MR. BORNSTEIN:**  -- which is the order.

16          **THE COURT:**  Well, the one page following the 185,

17  yes.  Go ahead.  You can put it on.

18          **MR. BORNSTEIN:**  Thank you, Your Honor.

19                    (Exhibit published.)

20  **BY MR. BORNSTEIN:**

21  **Q.**  And you were asked the question whether following on the

22  injunction talks about links, buttons, and other calls to

23  action, correct?

24  **A.**  Yes.

25  **Q.**  And you were asked whether currently under the entitlement

1    program that Apple launched developers can include links,

2    correct?

3    **A.**    Yes.

4    **Q.**    And they can, right?

5    **A.**    Correct.

6    **Q.**    Subject to all of the rules that we've all been talking

7    about for a long time that Apple has published, correct?

8    **A.**    Yes.

9    **Q.**    And you were asked about whether developers can include

10    buttons, correct?

11    **A.**    Yes.

12    **Q.**    The only buttons developers can include are ones that

13    satisfy the plain button style as Apple defines it, correct?

14    **A.**    That and the square button with the arrow out of it.

15    **Q.**    Correct.  So there's no -- there are a variety of

16    different buttons in Apple's human interface guidelines and

17    available button styles that Apple makes available for

18    developers to use, correct?

19    **A.**    That's right.

20    **Q.**    And there's a limitation that the only one allowed here

21    under the entitlement program is the one that looks like a

22    link plus the little square and the arrow, correct?

23    **A.**    Yes.

24    **Q.**    Okay.  And that was a deliberate decision because you

25    wanted it to look more like a link, correct?

SCHILLER – REDIRECT / BORNSTEIN

1    **A.**   Correct.

2    **Q.**   All right.  And then you were asked about whether you

3    could have other calls to action, by Mr. Perry, and you said

4    you could, right?

5    **A.**   Yes.

6    **Q.**   What other calls to action does Apple permit under the

7    entitlement program besides links and buttons?

8    **A.**   Well, as I explained, that's the language that can be used

9    with the link, dollars off, percent off, deals on their

10   website, that language is the call to action.

11   **Q.**   But you can't, under the entitlement program, as a

12   developer you are not permitted to have a call to action

13   unless you also have a link or what Apple calls a button,

14   correct?

15   **A.**   That's right.

16   **Q.**   You're not allowed as a developer to just say 50 percent

17   off on my website and -- and identify the website but not have

18   a link, correct?

19   **A.**   That's right.  We discussed this in -- back in May when I

20   was on the stand.  And as I said then and again I'll say now,

21   which is we didn't consider when we wrote this the -- that a

22   developer would want to not include a link with their call to

23   action, and that if an outcome of this is that we need to

24   change the language such the developer could choose to make a

25   call to action without a link, of course that's something we'd

 1    be happy to consider.  It just hadn't crossed our mind that

 2    somebody would want that.

 3    Q.  Okay.  You were asked a couple of questions about the

 4    concerns that you had about charging a commission.  Do you

 5    recall that?

 6    A.  Yes.

 7    Q.  And I just want to do a little bit of a list.  You told me

 8    that one concern was whether or not it actually would comply

 9    with the Court's order, correct?

10    A.  Yes.

11    Q.  And one concern was the effect of the fact that there

12    might be compliance problems on a developer side in terms of

13    not paying and what that might mean for the App Store,

14    correct?

15    A.  Yes.

16    Q.  There were also conversations at Apple in which you

17    participated in which people expressed concerns that it would

18    be problematic for Apple to be seen to be charging on the web,

19    on web transactions.  Do you recall that?

20    A.  Vaguely.  I don't remember the specifics but --

21    Q.  All right.

22    A.  -- yes.

23    Q.  Let's take a look at Exhibit 1104.  It's one that

24    Mr. Perry showed you.  It's in evidence.

25        Do you have that?

```
 1   A.   Yes, I do.

 2   Q.   And if you --

 3        THE COURT:   I think you may be -- are you having

 4   technical difficulties?  Because you --

 5             (Off-the-record discussion.)

 6        THE COURT:   It's up on our side.  It's just not up on

 7   your side.

 8        MR. BORNSTEIN:   I'm prepared to keep going if

 9   Mr. Lyon --

10        THE COURT:   Go ahead.

11   BY MR. BORNSTEIN:

12   Q.   So, Mr. Schiller, these are, as they're labeled, notes

13   from a June 1 meeting regarding the Wisconsin project,

14   correct?

15   A.   Yes.

16   Q.   And as we saw earlier in Exhibit 485, 485, there was a --

17   a June 1 meeting with Mr. Cook regarding Wisconsin, correct?

18             (Exhibit published.)

19        THE WITNESS:   Yes.

20   BY MR. BORNSTEIN:

21   Q.   All right.  And if you look about three-quarters of the

22   way down, you can see notes regarding one issue on this

23   meeting.  "This might be perceived like we're trying to charge

24   for what happens on the Internet."

25        Do you see that?
```

1    **A.**   Sorry.  No.  I'm looking for it.

2                        (Simultaneous colloquy.)

3              **THE WITNESS:**  Yes.  Thank you.

4    **BY MR. BORNSTEIN:**

5    **Q.**  All right.  And so this was one of the things that people

6    talked about at Apple was a concern for proceeding with the

7    commission, correct?

8    **A.**  (Reviewing document.)

9         I believe I recall vaguely a discussion about that.  I

10   don't remember the specifics, and I don't remember these

11   notes.

12   **Q.**  Okay.  Was there also discussion at Apple that you

13   participated in expressing concern about charging a commission

14   on external purchases when Apple doesn't charge a commission

15   on purchases made through advertisements in apps?

16   **A.**  No, I don't recall that kind of a discussion.

17   **Q.**  Okay.  And on the subject of the other calls to action,

18   where you said it didn't occur to Apple that people might want

19   to have just a textual statement without a link, did it not

20   occur to you that developers might want to have just a textual

21   statement without a link if it would save them the 27 percent

22   commission they would pay by going through the link?

23   **A.**  No.  I don't recall us discussing that.  And to my

24   recollection, we just didn't think about that option in

25   working on the compliance plan.

1  **Q.**  As you sit here now, though, doesn't -- doesn't that make

2  sense that some developers might very well say I'd like to

3  have a textual statement that tells people they can go to my

4  website without a link if it saves them a 27 percent

5  commission?

6  **A.**  Somebody might, yes.

7  **Q.**  Okay.  Almost done.

8      You were asked, looking at Exhibit 1104, you were asked

9  questions about whether notes were taken at meetings regarding

10  compliance with the Court's injunction.  Do you recall that?

11  **A.**  Yes.

12  **Q.**  And you said notes were sometimes taken and you didn't get

13  them sometimes, but there would be notes of at least some

14  meetings, correct?

15  **A.**  Yes.

16  **Q.**  Are you aware that at least as produced to us by Apple,

17  there are no notes of any meeting between December 2021 when

18  Project Michigan was put on hold and April 2023 when the Ninth

19  Circuit issued its opinion regarding work on the U.S.

20  injunction compliance project?

21  **A.**  I am not aware of that.

22  **Q.**  Okay.  You were also asked some questions about whether

23  any of the decks in 2023 that you and I talked about this

24  morning reflected final decisions by Apple, correct?

25  **A.**  Yes.

SCHILLER - REDIRECT / BORNSTEIN

1    Q.  And you said they did not reflect final decisions, right?

2    A.  Correct.

3    Q.  And that was a deliberate decision by Apple, as we talked

4    about this morning, not to finalize its deck or finalize its

5    decision until days before it had to comply.  Correct?

6    A.  Well, that's the normal price committee process, is until

7    we are ready to go with a product, if we can delay the

8    decision on pricing as late as possible to make sure we've

9    considered anything that could occur or any changes in any

10   calculation or anything, don't make it final if it doesn't

11   have to be final yet.

12   Q.  And is it the normal price committee process to label all

13   of the decks privileged and confidential up until the very

14   last one when you take that label off?

15   A.  I'm not sure.

16          MR. BORNSTEIN:  All right.  No further questions,

17   Your Honor.

18          THE COURT:  On that last document, if --

19                 (Exhibit published.)

20          THE COURT:  Am I reading this right that everyone

21   agreed that you were not charging -- three lines down from the

22   highlight -- that you are not charging, we don't charge for

23   it, that you all understood and agreed that you don't charge

24   for things that happen on the Internet?

25          THE WITNESS:  Agreeing that when developers make --

 1    before -- before the compliance plan, that anything that

 2    occurs on the Internet, there is no Apple commission on

 3    Internet purchases, that is true.  And that is still the case

 4    today.

 5              **THE COURT:**  Well, that's not the case with the

 6    tracking.

 7              **THE WITNESS:**  With this new -- right, from the

 8    linking out, correct.

 9              **THE COURT:**  And then on the next page, there at the

10    bottom, there also seemed to be an indication that you needed

11    to quantify the value and tie it to the commission rate, that

12    you understood that?  Right above attorney-client privilege,

13    fifth line.

14              **THE WITNESS:**  Yes, I see that.

15              **THE COURT:**  And yet there's been no production thus

16    far of documents that show that.

17              **THE WITNESS:**  I believe this is referring to the same

18    analyst report work that was going on to understand from a

19    bottom's-up the value of -- of the commission and the services

20    Apple provides.

21              **THE COURT:**  Okay.

22        Anything on those questions?

23              **MR. BORNSTEIN:**  No, Your Honor.  Thank you.

24              **THE COURT:**  Mr. Perry, anything else?

25              **MR. PERRY:**  Nothing, Your Honor.

1        **THE COURT:**  All right.  At this time, Mr. Schiller,

2   you now may talk to your lawyers.  If they choose to put you

3   back on the stand, that's their call.  I won't excuse you yet.

4   But you can talk to them.

5        **THE WITNESS:**  Thank you, Your Honor.

6        **THE COURT:**  All right.  Next witness.

7        **MS. MOSKOWITZ:**  Your Honor, Epic calls Rafael Onak to

8   the stand.

9        **THE COURT:**  Okay.

10       **MS. MOSKOWITZ:**  Your Honor, may we approach with

11  binders?

12       **THE COURT:**  Yes.

13       **MS. MOSKOWITZ:**  And I believe Your Honor has copies

14  already provided for your copy.

15       **THE COURT:**  All right.  Thanks, Ms. Moskowitz.

16       **MS. MOSKOWITZ:**  Thank you.

17       **THE COURT:**  Do I have a witness?

18       If you'll please remain standing, and we'll swear you in.

19       **THE CLERK:**  Please raise your right hand.

20

21                        **RAFAEL ONAK,**

22  called as a witness for the plaintiff, having been duly sworn,

23  testified as follows:

24       **THE WITNESS:**  I do.

25       **THE CLERK:**  Please be seated.  And speak clearly into

 1    the microphone.

 2        Please state your full name and spell your last name for

 3    the record.

 4            **THE WITNESS:**  My name is Rafael Onak, O-N-A-K.

 5            **THE COURT:**  All right.  Good afternoon.

 6            **THE WITNESS:**  Good afternoon.

 7            **THE COURT:**  You may proceed.

 8            **MS. MOSKOWITZ:**  Thank you, Your Honor.

 9                        **DIRECT EXAMINATION**

10    **BY MS. MOSKOWITZ:**

11    **Q.**  Good afternoon, Mr. Onak.

12    **A.**  Good afternoon.

13    **Q.**  My name is Lauren Moskowitz.  I represent Epic Games, and

14    I'll be questioning you.

15        You are a UX writing manager at Apple, correct?

16    **A.**  That's correct.

17            **THE COURT:**  Ms. Moskowitz, hold on.

18        Could you either move closer to the mic or move that mic

19    closer to you.

20            **THE WITNESS:**  Yes, Your Honor.

21            **THE COURT:**  Thank you.  Let's try again.

22            **MS. MOSKOWITZ:**  Should I start back at the prior

23    question, Your Honor, or just keep going?

24    **Q.**  You've been in that role of UX writing manager since April

25    2003 -- 2023, excuse me, correct?

1   **A.**   That's correct.  Yes.

2   **Q.**   And before that, you were a senior UX writer for Apple

3   Services?

4   **A.**   That's correct.

5   **Q.**   And you had been in that role for six years approximately?

6   **A.**   Yes.

7   **Q.**   And UX means user experience?

8   **A.**   Correct.

9   **Q.**   And that role, that sort of job is to conceptualize, to

10  design and create a user experience for Apple products, right?

11  **A.**   Correct, yes.

12  **Q.**   And one of the main goals of that job is to create

13  products that are intuitive and useful to users, correct?

14  **A.**   Correct.

15  **Q.**   And as part of that work, you would agree that

16  communication with users is important, right?

17  **A.**   Absolutely.

18  **Q.**   Words are important, right?

19  **A.**   Yes.

20  **Q.**   You choose words carefully.

21  **A.**   I do.

22  **Q.**   You are aware that over the last several years, Apple has

23  been faced with a number of decisions in various jurisdictions

24  to require it to offer to users ways to make purchases outside

25  of IAP, correct?

1    **A.**    Correct.

2    **Q.**    And this Court's injunction that it issued in September of

3    2021 is one of those decisions, correct?

4    **A.**    Yes.

5    **Q.**    And there was a decision in the Netherlands and a Japanese

6    regulatory investigation that are also examples of that,

7    correct?

8    **A.**    I believe so.  I'm not aware of the Japanese one.  But

9    yes.

10    **Q.**    Are you familiar with changes to allow linkouts for reader

11    apps that was sparked by a Japanese investigation?

12    **A.**    I'm aware of the reader one, yes.

13    **Q.**    Okay.  But you don't draw a connection in your mind to

14    Japan for that?

15    **A.**    I don't, no.

16    **Q.**    All right.  We'll see if we can help with the project name

17    that might help with that, but I'm not allowed to say that out

18    loud so we'll give that a moment.

19         One of the ways that Apple chose to comply with these

20    various decisions that we were just talking about was to offer

21    developers the ability to include linkouts to their websites

22    from within the app, correct?

23    **A.**    That's correct.

24    **Q.**    And in the U.S., that's the only choice that Apple has

25    allowed developers to have for how it chose to comply with the

 1    injunction, right?

 2    **A.**  I believe so, but I can't say for certain.

 3    **Q.**  You haven't worked on any other methodology, correct?

 4    **A.**  That's correct.

 5    **Q.**  And to your knowledge, there is none, right?

 6    **A.**  Correct.

 7    **Q.**  And so from 2021 to 2024, you were part of the team that

 8    worked on designing the user interface that would be used for

 9    complying with the various requirements from those decisions

10    to allow linkouts to the web, correct?

11    **A.**  Correct.

12    **Q.**  And I'm just going to give you a few other names and --

13    and confirm that they were also part of that same team.

14    Brandon Mihai, was he part of that team?

15    **A.**  Yes.

16    **Q.**  And Joe Phillips, was that part of that team?

17    **A.**  Yes.

18    **Q.**  And Josh Elman?

19    **A.**  Yes.

20    **Q.**  And Terry Liu?

21    **A.**  Yes.

22    **Q.**  Those were all user experience or design folks that were

23    part of that team working on that project with you?

24    **A.**  Correct.

25    **Q.**  And the executive team responsible for this work, from

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   your perspective, included Mr. Schiller, for example?

2   **A.**   Correct.

3   **Q.**   And did it also include Tim Cook?

4   **A.**   I'm not sure if Mr. Cook was involved.

5   **Q.**   Okay.  You didn't have any direct interaction with him?

6   **A.**   I did not, no.

7   **Q.**   But you did have direct interaction with Mr. Schiller,

8   correct?

9   **A.**   I was involved in a few meetings with Mr. Schiller, yes.

10  **Q.**   But you understood from your perspective that Mr. Schiller

11  was the decision-maker on these issues?

12  **A.**   Correct.

13  **Q.**   And so your role, in particular, in the various projects

14  that we've just been discussing was to help design and draft

15  the specific language that would be used for screens that the

16  users would be presented with when they were proceeding

17  through the flow to link out to the web, right?

18  **A.**   That's correct.

19  **Q.**   So I just want to try to walk through a little bit of the

20  timeline and some of the terminology up front.  We just

21  mentioned the -- this Court's injunction from September 2021.

22  You're familiar with that?

23  **A.**   Yes.

24  **Q.**   Did you read it at the time?

25  **A.**   I did not, no.

1    **Q.**   Have you subsequently read it?

2    **A.**   I'm sure I've taken a look at it, yes.

3    **Q.**   Okay.  Do you have any sense of when you may have taken a

4    look at it?

5    **A.**   I do not, no.

6    **Q.**   Do you believe that you looked at it at the time you were

7    designing language as part of Apple's compliance work?

8    **A.**   I don't believe that was my intention, no.

9    **Q.**   Did you have an understanding, even if you hadn't looked

10   at it, that the injunction prevented Apple from prohibiting

11   developers from including buttons, external links, or other

12   calls to action that direct customers to purchasing mechanisms

13   beyond IAP?

14   **A.**   I was not aware of those details, no.

15   **Q.**   You are aware that Apple began its work on complying, or

16   at least on its response to the injunction, shortly after it

17   was issued in September 2021; is that your understanding?

18   **A.**   I'm not sure when Apple started working on it.  All I know

19   is when I was brought into the project.

20   **Q.**   And when was that?

21   **A.**   I believe for Project Michigan, I started working in --

22   sometime in 2021.

23   **Q.**   So sometime -- do you have any ballpark on when that was?

24   October sound right?  November?

25   **A.**   I'm really not sure.  Maybe mid, early that year.

1    Q.   That month or year?

2    A.   Year.  2021.

3    Q.   Okay.  The injunction was issued in September 2021.  So do

4    you have any sense for when, in the remaining months of 2021,

5    you became involved?

6    A.   I -- I can't remember but must have been after that.

7    Q.   Okay.  Are you -- and you mentioned Michigan.  That's your

8    understanding of the code name that was used internally within

9    Apple to describe the work that was kicked off following the

10   injunction's issuance in September 2021, correct?

11   A.   Correct.

12   Q.   And do you recall that a couple months later, the

13   injunction was stayed by another court that basically told

14   Apple it did not yet have to comply while further proceedings

15   took place?

16   A.   I was not aware of that, no.

17   Q.   If you didn't understand that, did you at least come to

18   understand that the work was -- that was going to be done to

19   respond to the injunction was put on hold in December of 2021?

20   A.   I was not aware of that either.

21   Q.   Do you remember pausing your work at some point at the end

22   of year in 2021?

23   A.   I don't remember.  We -- we pause a lot of projects at

24   Apple for a lot of different reasons.

25   Q.   Okay.  So you just don't have a recollection at all on

ONAK - DIRECT / MOSKOWITZ

1   being told pencils down on that, you'll do other work?

2   A.   Correct.

3   Q.   So I take it you don't recall picking back up work for the

4   compliance with the United States injunction?

5   A.   I -- I remember we did pick it up obviously, but I -- I

6   don't remember when that was.

7   Q.   And separate from not remembering when, do you have a

8   recollection that there was a pause period for the work being

9   done on the U.S. injunction, including a change in project

10  name as a result?

11  A.   I don't remember specifics about that, no.

12  Q.   Okay.  Do you remember the code name that was used for the

13  second part of the work?

14  A.   I believe so, but I'm not sure which part you're referring

15  to.

16  Q.   Okay.  Well, what -- what do you think it is?

17          THE COURT:  Hold on.  Is this something --

18          MS. MOSKOWITZ:  No, sorry, this is the U.S. one.  But

19  maybe I'll just ask -- I'll use the word to make sure we don't

20  mess up.

21  Q.   Is Wisconsin what you're thinking about?

22  A.   Yes.

23  Q.   Okay.

24  A.   Project Wisconsin is one that I worked on.

25  Q.   Okay.  So without using names for other projects, Michigan

ONAK - DIRECT / MOSKOWITZ

1    and Wisconsin are the only ones that we're able to say.  So I

2    just want to make sure you have that in mind because there

3    were code names for other projects you worked on, for example,

4    for the Netherlands, correct?  Without saying it.

5    **A.**  That's correct.

6    **Q.**  Okay.  And the Netherlands work was referring to the work

7    that was done in response to the Netherlands Authority for

8    Consumers and Markets decision against Apple, correct?

9    **A.**  I -- I believe so, yes.

10   **Q.**  You understood generally that that ACM, the Authority for

11   whatever I just said, Consumers and Markets, had issued a

12   ruling that Apple had to make changes to allow alternative

13   purchase mechanisms for dating apps, correct?

14   **A.**  That's correct.

15   **Q.**  And you understood that one of the ways Apple chose to

16   comply with that was to offer a linkout, ability for

17   developers to present a linkout to web purchases for those

18   dating apps in the Netherlands, correct?

19   **A.**  Correct.

20   **Q.**  And do you recall starting work on that in approximately

21   January of 2022?

22   **A.**  I don't remember specifically, but that sounds about

23   right.

24   **Q.**  And -- and you were part of the team that worked on the

25   language and the screens that would be presented to users for

ONAK — DIRECT / MOSKOWITZ

1   that Netherlands project, right?

2   **A.**   Correct.

3   **Q.**   And I mentioned the Japanese project.  You don't recall

4   specifically for Japan, but you do recall being involved in a

5   project of developing language for screens that would be

6   presented to users who were linking out for reader apps; is

7   that correct?

8   **A.**   That's correct.

9   **Q.**   And that was to be implemented worldwide, right?

10  **A.**   I believe so.  I'm not sure, though.

11  **Q.**   And do you recall starting that work in January of 2022?

12  **A.**   I don't remember specifically.

13  **Q.**   Do you recall, if you don't remember the specific time

14  period, basically working on those two projects, the one being

15  the Netherlands linkout and the second being the linkout for

16  reader apps, happening at the same time, overlapping?

17  **A.**   Yes.  Yeah, I think so.

18  **Q.**   And do you recall, however, that when you were working on

19  the Netherlands and the reader app projects, that you were not

20  at the same time working on the United States injunction

21  compliance?

22  **A.**   I -- I believe so, yes.

23  **Q.**   You believe that my description was correct that you were

24  not working simultaneously on the U.S. injunction?

25  **A.**   I -- I can't remember.

 1    **Q.**  Okay.  I'm just making sure.  There was a double negative.

 2    So I just want to get your best understanding.  Is it your

 3    best recollection that while you were working on the

 4    Netherlands and the reader app projects, that you were not

 5    simultaneously working on the U.S. injunction compliance?

 6    **A.**  I -- I can't remember if I was or --

 7    **Q.**  No recollection one way or the other?

 8    **A.**  No.

 9    **Q.**  Okay.  So let's go back to the work that when you first

10    became involved in Project Michigan, which is the U.S.

11    injunction compliance that you believe started sometime after

12    the issuance in September 2021, right?

13    **A.**  Correct.

14    **Q.**  So when you first got involved, had it already been

15    decided that Apple would comply or seek to say it was

16    complying by offering a linkout to users to follow to make an

17    external purchase on the web?

18    **A.**  I'm -- I'm not sure what Apple thought.  I was just, you

19    know, tasked with -- to create language for the -- for a

20    system disclosure sheet at that time.

21    **Q.**  Okay.  And the system disclosure sheet that you were

22    tasked to help design and draft was presented to you as a

23    screen that would be shown to users after clicking on a link

24    to go to an external website?

25    **A.**  Correct.

 1   **Q.**  So let's -- let's level set.

 2            **MS. MOSKOWITZ:**  If you could please publish CX0003,

 3   which is in evidence and .5.

 4                      (Exhibit published.)

 5   **BY MS. MOSKOWITZ:**

 6   **Q.**  And on the bottom here, we'll just blow that up a little

 7   bit, is it your understanding that this is the final language

 8   and the final screen that Apple arrived at for the linkout

 9   entitlement program for the U.S.?

10   **A.**  Yes.

11   **Q.**  And you were involved in the design of that screen?

12   **A.**  I was, yes.

13   **Q.**  And you were involved in drafting the language that

14   appears on this screen?

15   **A.**  Correct.

16   **Q.**  And that included working with Mr. Schiller directly on

17   the word choice for this screen.

18   **A.**  I wouldn't say I worked with Mr. Schiller directly, no.

19   **Q.**  You got feedback directly from Mr. Schiller from time to

20   time on the language that would be used in this screen,

21   correct?

22   **A.**  Correct, yes.

23   **Q.**  All right.

24        Let's please turn in your binder.  So before I put things

25   on the screen I'm going to ask you to look at them in the

```
 1   binder first.  This is CX520.

 2       And I'll just -- let me know when you're there, please.

 3   A.  (Reviewing documents.)

 4       Okay.

 5   Q.  This is a document, the -- the metadata which is the sort

 6   of title and underlying information we get from your lawyers,

 7   say that the title of this document is Michigan V3, and it's

 8   dated November 15, 2021.

 9       Does that look right to you?

10   A.  (Reviewing document.)

11       I'm sorry if -- I don't know, I'm not sure if I'm looking

12   at the right thing here.

13   Q.  Is the first page App Store Michigan IAP links?

14   A.  Yes.

15   Q.  Okay.  Does this look familiar to you?

16   A.  I believe so.

17   Q.  Okay.

18       MS. MOSKOWITZ:  Your Honor, I didn't include it in

19   the document, but may I approach and hand up the metadata

20   sheet just to see if this helps.

21       THE COURT:  I don't know what it's supposed to help.

22   But go ahead, you can.

23       MS. MOSKOWITZ:  Thank you.

24       THE WITNESS:  Thank you.

25   / / /
```

 1    BY MS. MOSKOWITZ:

 2    **Q.**  Sir, you see on the custodian list that your name is

 3    listed as having this document in your files?

 4    **A.**  Yes.

 5    **Q.**  And the date been the file name indicates November 15,

 6    2021, Michigan V3.  Do you see that?

 7    **A.**  I do, yes.

 8    **Q.**  Does this help you understand that this document is a

 9    presentation that you were involved with as part of Project

10    Michigan from mid-November?

11    **A.**  Yes.

12        **MS. MOSKOWITZ:**  Okay.  Your Honor, I move 520 into

13    evidence.

14        **MR. WESNESKI:**  No objection.

15        **THE COURT:**  It's admitted.

16       And who was that?

17        **MR. PERRY:**  That's Mr. Wesneski, Your Honor, who will

18    be handling this witness.

19        **THE COURT:**  Okay.  Thank you.

20           (Exhibit 520 received in evidence.)

21    BY MS. MOSKOWITZ:

22    **Q.**  All right.  Mr. Onak, you worked on this deck, correct?

23    **A.**  I'm not sure if I worked on it, but I think it was -- may

24    have been sent to me.

25    **Q.**  Okay.  Well, let's -- let's look at it, and we'll -- we'll

1    come back to that question in a bit.

2        If you could go to page .2, there's an overview slide.

3    Do you see that?

4    **A.**  I do, yes.

5    **Q.**  And there are three points in here.  The first one says

6    allow developers to linkout to a website featuring alternate

7    payment methods.  Do you see that?

8    **A.**  I do, yes.

9    **Q.**  Do you understand that that was one of the requirements of

10   the injunction?

11   **A.**  I believe so, yes.

12   **Q.**  And the point being that developers had to be allowed to

13   offer users an alternative payment other than IAP, right?

14   **A.**  Correct.

15   **Q.**  And the second bullet here says allow developers to

16   communicate the benefits of buying on the web.

17       Do you see that?

18   **A.**  Correct.

19   **Q.**  Did you understand that also to be a requirement of the

20   injunction?

21   **A.**  I was not aware of that, no, at that time.

22   **Q.**  You didn't have an understanding that the whole idea was

23   that developers were supposed to be able to offer users

24   incentives to have competition among the various payment

25   options?

1  **A.**  I was not aware of that, no.

2  **Q.**  Okay.

3       Do you recall seeing this in this deck or otherwise?

4  **A.**  I don't remember.

5  **Q.**  Let's look at number 3 then.  This says the link must be

6  detached from purchase buttons and placed elsewhere in their

7  experience.  Do you see that?

8  **A.**  I do, yes.

9  **Q.**  "Their" meaning users?

10  **A.**  (Reviewing document.)

11       I believe so.

12  **Q.**  Did you think this was part of the requirement of the

13  injunction?

14  **A.**  I was not aware of this either.

15  **Q.**  Okay.  You don't know where this requirement comes from?

16  **A.**  No.

17  **Q.**  Okay.  So you have no understanding as to whether any of

18  this is or is not within the injunction or is or is not within

19  the spirit of the injunction?

20  **A.**  No.

21  **Q.**  That wasn't something that you viewed as important to

22  complete your task?

23  **A.**  No.

24  **Q.**  All right.  Let's look all the way -- I think it might, in

25  fact, be the last page, .44.

1          **MS. MOSKOWITZ:**  And we'll put it up on the screen too

2     if that helps.  I believe it's up there now.

3          (Exhibit published to witness, counsel, and the Court.)

4     **BY MS. MOSKOWITZ:**

5     **Q.**  Do you see it?

6     **A.**  I do, yes.

7     **Q.**  The -- the title includes --

8     **A.**  I'm sorry.  It went away.

9          **MS. MOSKOWITZ:**  Oh, did you touch it maybe?

10    Sometimes that happens.

11         **THE WITNESS:**  Oh, I see it now.

12    **BY MS. MOSKOWITZ:**

13    **Q.**  You got it?

14    **A.**  Yes.

15    **Q.**  Great.  The title includes the words "warning options."

16    Do you see that?

17    **A.**  Yes.

18    **Q.**  This slide is discussing potential options for what users

19    would be first shown as part of the linkout flow, correct?

20    **A.**  I believe so, but I'm not sure.

21    **Q.**  Well, is that how you understand it, looking at it?

22    **A.**  Yes, this looks like an explore of -- of a design of

23    something that we could create for the user, yes.

24    **Q.**  Right.  And so let's look at them.

25         So we have three boxes left to right.  Let's start on the

 1    left.  The left is called "link" on the bottom.

 2        Do you see that?

 3    **A.**  Yes.

 4    **Q.**  And the middle is called "dialogue," right?

 5    **A.**  Yes.

 6    **Q.**  And the right is called "sheet," right?

 7    **A.**  Yes.

 8    **Q.**  And the rightmost is -- sheet is a full screen takeover

 9    after the user clicks a link.

10    **A.**  Correct.

11    **Q.**  And the dialogue is a sort of small pop-up that would come

12    up when a user clicked the link.  That's another approach that

13    was considered here.

14    **A.**  Correct.

15    **Q.**  And the -- the one all the way on the left is really just

16    a link.  You just go, right?

17    **A.**  Yes.

18    **Q.**  All right.  So as we move left to right, the warning level

19    to the users, that is being signaled to the users is going up,

20    right?

21    **A.**  I just believe you're -- as a user, you're -- you're

22    getting more information from left to right, yes.

23    **Q.**  Well, the -- you're being warned more.  The warning

24    options are getting more and more, saying to the user exercise

25    more caution, right?

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1    **A.**  Yeah, you're -- as a user you're receiving more

2    information and more facts, absolutely.

3    **Q.**  Well, it's not just receiving more facts.  It's warning

4    them more about whether or not they want to proceed, right?

5    **A.**  It's -- it's a warning to let them know what -- what's

6    going to happen, yes.

7    **Q.**  And ultimately Apple went with the sheet approach, the

8    full-screen takeover, right?

9    **A.**  Correct.

10   **Q.**  The dialogue here, just for example, though, is

11   communicating to the user that they would be going outside the

12   app into the browser, right?

13   **A.**  Correct.

14   **Q.**  And that is communicating to the user that they are

15   leaving the app, right?

16   **A.**  Correct.

17   **Q.**  But the dialogue approach was rejected by Apple, correct?

18   **A.**  We ultimately decided to go in a different direction, yes.

19   **Q.**  Were you part of that decision?

20   **A.**  I was not, no.

21   **Q.**  It was just communicated to you?

22   **A.**  Yes.

23   **Q.**  So let's talk about the language then that was arrived at

24   ultimately for that full-screen takeover.  If you could

25   please -- and we'll come back to this -- but if you could

 1  please turn to CX206 in your binder.

 2  **A.**  (Reviewing document.)

 3      Okay.

 4  **Q.**  This is a series of messages among you, Mr. Mihai,

 5  Mr. Phillips, Mr. Elman, and some others on November 16, 2021.

 6  Do you see that?

 7  **A.**  I do, yes.

 8          **MS. MOSKOWITZ:**  Your Honor, I move CX206 into

 9  evidence.

10          **MR. WESNESKI:**  No objection.

11          **THE COURT:**  It's admitted.

12              (Exhibit 206 received in evidence.)

13          **MS. MOSKOWITZ:**  All right.  If we could put that up.

14  **Q.**  And the first, just to orient us, the first message here

15  is from Mr. Phillips.  He says, "FYI, I have made a new

16  version of Michigan V3."  Do you see that?

17  **A.**  I do, yes.

18  **Q.**  Does that lead you to believe that you are discussing the

19  deck that we were just looking at from 520?

20  **A.**  Possibly, but I'm not sure.  We -- we have a lot of

21  different versions, a lot of different decks.

22  **Q.**  Okay.  So the title being "Michigan V3" in both doesn't

23  lead you to believe that we're talking about the same deck?

24  **A.**  No.

25  **Q.**  Okay.  Well, in any event, we will look at some of the

```
 1    messages here.
 2        But what you're -- what you're discussing in this chat
 3    exchange is workshopping language for the various options to
 4    be used for the full-screen takeover that would be used in a
 5    linkout scenario, right?
 6    A.   That's correct.
 7    Q.   And let's flip quickly back to 520, page 18.
 8                        (Exhibit published.)
 9        MS. MOSKOWITZ:   And let's just blow this up.
10    Q.   This is a set of options, alternatives for what a
11    full-screen takeover for the linkout could look like, right?
12    A.   Correct.
13    Q.   And do you remember that these were at one point options
14    that were under consideration or drafting by you?
15    A.   Yes, I believe these -- these were very early drafts.
16    Q.   Okay.  Well, early as in as of mid-November 2021?
17    A.   I can't remember.
18    Q.   Okay.  Well, let's look on the left to the two options on
19    the left, I guess A1 and A2.  Do you see that on the bottom?
20    A.   I do, yes.
21    Q.   And the headline there is "continue to the developer's
22    website."  Do you see that?
23    A.   I do.
24    Q.   And the 2B options are open external website as the
25    headline, right?
```

 1    **A.**   Correct.

 2    **Q.**   And "continue to the developer's website" is a fair

 3    description of what was going to be happening when a user

 4    clicked on an external link, right?

 5    **A.**   Personally, I didn't believe that it was an accurate

 6    description.

 7    **Q.**   You did not think it was accurate to tell users that they

 8    were going to be going to the developer's website?

 9    **A.**   In my opinion, we weren't able to tell if they were going

10    to developer's website or not.   We didn't know where they were

11    going.

12    **Q.**   Okay.   So in your view, "open external website" was

13    better?

14    **A.**   Correct.

15    **Q.**   Okay.   And so let's go back to the chats we were just

16    looking at, 206.

17                       (Exhibit published.)

18    **BY MS. MOSKOWITZ:**

19    **Q.**   And we're going to walk through some of the back-and-forth

20    here.   On page 2, at 1:15 a.m., and the time zone is in UTC.

21    We've had some discussion about that, and we're not done with

22    the discussions about that, but I won't translate it at this

23    point.

24        You send a message that you say -- start off with "I think

25    this one is good."   Do you see that?

 1    **A.**  I do.

 2    **Q.**  At the top?

 3    **A.**  I do, yes.

 4    **Q.**  And the thing you think is a good option is "By continuing

 5    on the web, you will leave the app and be taken to an external

 6    website."  Do you see that?

 7    **A.**  Yes.

 8    **Q.**  A couple lines down, you explain why you think it's good.

 9    You say, "External website sounds scary so execs will love

10    it."  Do you see that?

11    **A.**  I do, yes.

12    **Q.**  So as you were crafting the warning screen for Project

13    Michigan, for the U.S. injunction compliance, you were trying

14    to make sure that the language sounded scary, right?

15    **A.**  No, that's not correct.

16    **Q.**  But that's what you wrote here, right?

17    **A.**  That's what I wrote, yes.

18    **Q.**  So one of the reasons you wrote that is that you thought

19    the executives at Apple would love scary language, right?

20    **A.**  No, that's -- that's incorrect.

21    **Q.**  But that's what you wrote here, right?

22    **A.**  That's what I wrote but in --

23                     (Off-the-record discussion.)

24    **BY MS. MOSKOWITZ:**

25    **Q.**  I have my answer.  You can have a chance with your counsel

ONAK — DIRECT / MOSKOWITZ

1    to explain what you think you really meant.  But I just want

2    to confirm that's what you wrote there, right?

3    **A.**  That's what I wrote, correct.

4    **Q.**  Okay.  And the execs that worked on this, from your

5    perspective, were Mr. Schiller at the top, right?

6    **A.**  Correct.

7    **Q.**  So let's look at a couple of other examples.  And, again,

8    before we do, words matter, right?  We talked about that.

9    **A.**  Absolutely.

10   **Q.**  And you chose your words very carefully, right?

11   **A.**  I -- I'm -- in terms of UX writing, the word "scary"

12   doesn't -- doesn't mean the same thing as instilling fear.

13   **Q.**  Okay.

14   **A.**  It means raising awareness and caution and grabbing the

15   user's attention.  So that's what I meant here.

16   **Q.**  Okay.  Well, you didn't say that.  You said "sounds scary

17   so execs will love it," right?

18   **A.**  That's what I wrote, correct.

19   **Q.**  And the idea was that you were trying to choose words that

20   would deter users from proceeding, right?

21   **A.**  That's incorrect.

22   **Q.**  You were trying to make sure that the users were

23   proceeding with caution so that they wouldn't actually go

24   through with exiting the iOS App and make the purchase

25   elsewhere, right?

ONAK — DIRECT / MOSKOWITZ

1    **A.**  I wanted to raise caution so the user would have all the

2    facts so that they can make an informed decision on their own.

3    **Q.**  So your position was that you were in no way, shape, or

4    form trying to make sure that the language was such that users

5    would be deterred from proceeding?

6    **A.**  Correct.

7    **Q.**  Okay.

8        Let's keep going.  So on page .3 at the time stamp 136,

9    there is some discussion about Mr. Elman's suggestion of

10   adding a URL.  Do you see that?

11   **A.**  I do, yes.

12   **Q.**  And one thing he says is that one problem with that is

13   that the URL could be really long.  Do you see that?

14   **A.**  I do.

15   **Q.**  And again, Mr. Elman responds -- here's this word again --

16   that a long URL makes it look scarier.  Do you see that?

17   **A.**  I do, yes.

18   **Q.**  Okay.  Let's go down and make sure we see that.

19                    (Exhibit published.)

20   **BY MS. MOSKOWITZ:**

21   **Q.**  Makes it look scarier, right?

22   **A.**  Correct, that's what he wrote.

23   **Q.**  Then there's some discussion that proceeds about how to

24   indicate the benefits of staying inside the app and using IAP.

25   Do you see that?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**  I do, yes.

2    **Q.**  And so, for example, at the bottom of page 3, there's some

3    discussion about suggesting the user can pay quickly through

4    IAP as opposed to how cumbersome it will be for the user if

5    they click on an external link, right?

6    **A.**  That is what he writes, correct.

7    **Q.**  And at the top of page 4, Mr. Phillips continues.  He

8    says, "I think personally that is why I wouldn't bother.  More

9    steps, have to find my card, type it all out, and then giving

10   another company my details."

11        Do you see that?

12   **A.**  I do, yes.

13   **Q.**  So what's being communicated here is that you were all

14   looking for ways to make clear to the user why they shouldn't

15   bother to use the alternative payment method because of these

16   additional steps, right?

17   **A.**  No, that's -- that's not correct.

18   **Q.**  Okay.

19                    (Simultaneous colloquy.)

20        **THE COURT:**  Answer her question.  And then we're

21   going to move on.  And your lawyer gets to get up and have you

22   explain.

23        **THE WITNESS:**  Okay.  Yes, Your Honor.

24        **THE COURT:**  Proceed.

25        **MS. MOSKOWITZ:**  Thank you, Your Honor.

ONAK - DIRECT / MOSKOWITZ

1  **Q.**  At 1:44 time stamp, he goes on, Mr. Phillips goes on.  He

2  says, "to make your version even worse."  Do you see that?

3  **A.**  I do, yes.

4  **Q.**  And again, "even worse" means less transparent to the user

5  so that they are less inclined to follow through with the

6  link, right?

7  **A.**  No, that's not correct.

8  **Q.**  Even worse, his idea to make it even worse was to add the

9  developer name rather than the app name, right?

10  **A.**  That -- that's what he believed, yes.

11  **Q.**  You don't think that he's communicating to you that this

12  is a way to make it less transparent to the users what they

13  were about to do?

14  **A.**  I'm not sure what Mr. Phillips was saying, but I

15  personally didn't agree with this.

16  **Q.**  Well, whether or not you agreed, you understood that

17  that's exactly what he was suggesting, correct?

18  **A.**  No.  That's not what I understood.

19  **Q.**  You did not understand that?

20  **A.**  No.

21           **THE COURT:**  Well, is that what happened?

22           **THE WITNESS:**  Sorry, Your Honor?  Did what happen?

23           **THE COURT:**  Is that what happened?  Did you add the

24  developer name rather than the app name in the end?

25           **THE WITNESS:**  Yes, Your Honor, we did end up adding

```
 1   the developer name, yes.

 2   BY MS. MOSKOWITZ:

 3   Q.  So he proposes a way to make your version even worse by,

 4   instead of saying the app name, saying the developer name.

 5   And Mr. Elman in below.

 6                        (Exhibit published.)

 7   BY MS. MOSKOWITZ:

 8   Q.  He says, "Ooh, keep going.

 9       Do you see that?

10   A.  I do, yes.

11   Q.  You wouldn't describe your job as making things worse for

12   users, right?

13   A.  No, absolutely not.

14   Q.  But Mr. Elman, his response, "Ooh, keep going," is making

15   light of how to make this user flow even worse for users,

16   right?

17   A.  No, I don't believe that's what he meant here at all.

18   Q.  Well --

19            THE COURT:  Who is Josh Elman again?

20            THE WITNESS:  Your Honor, Josh, Mr. Elman, at this

21   time, was a product manager working on this.

22            THE COURT:  And who is Joe Phillips?

23            THE WITNESS:  Joe Phillips was the design manager for

24   the App Store.

25            THE COURT:  Keep going, Ms. Moskowitz.
```

1      **MS. MOSKOWITZ:**  Thank you, Your Honor.

2   **Q.**  So you don't recall subsequent to this ever being told

3   sort of pause on Michigan, you just don't recall that?

4   **A.**  I don't recall that, no.

5   **Q.**  Okay.  But let's -- let's go on to the work that you were

6   doing for the Netherlands.

7      If you could turn to 268 in your binder.

8      **THE COURT:**  Ms. Moskowitz, can you explain to me, my

9   version has crossouts.

10     **MS. MOSKOWITZ:**  I believe that is in the chat that we

11  were just looking at, Your Honor.  I believe that is how it

12  was produced, where they were live editing things and seeing

13  each other's sort of comments and edits.  That's how it was

14  produced to us.

15     **THE COURT:**  All right.  Thank you.

16     **MS. MOSKOWITZ:**  May I proceed with the next document

17  or --

18     **THE COURT:**  You may.

19     **MS. MOSKOWITZ:**  Thank you, Your Honor.

20  **Q.**  Have you turned to 268 in your binder, sir?

21  **A.**  I have, yes.

22  **Q.**  Thank you.

23     This is an email chain.  The bottom of page 2 is an email

24  from Mr. Schiller to you and to Mr. Elman, among others, dated

25  January 28, 2022.

                        ONAK – DIRECT / MOSKOWITZ

```
1            Do you see that?

2     A.  (Reviewing document.)

3            I don't see that, no.

4     Q.  Okay.

5            THE COURT:  What page?

6            MS. MOSKOWITZ:  Two.

7            THE WITNESS:  Oh, yes.  Now I see it, yes.

8     BY MS. MOSKOWITZ:

9     Q.  Okay.  And the subject line, please don't read it out

10    loud, it has a code name.  Do you associate that code name

11    with the Netherlands work?

12    A.  (Reviewing document.)

13           I do, yes.

14           MS. MOSKOWITZ:  Okay.  So we won't say that out loud

15    and it should be marked off of the exhibit, blocked off.  I

16    will move to admit CX268?

17           MR. WESNESKI:  No objection.

18           THE COURT:  It's admitted.

19              (Exhibit 268 received in evidence.)

20           MS. MOSKOWITZ:  Thank you, Your Honor.

21           So let's publish that, please.

22                   (Exhibit published.)

23    BY MS. MOSKOWITZ:

24    Q.  This is an email about Netherlands compliance planning,

25    right?
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**  I -- I believe so, yes.

2    **Q.**  And the formatting is a bit messy, but this is how it was

3    produced to us.  So let's just try to work through it

4    together.

5        But just to be clear, in the subject line, including

6    what's redacted -- you have the full in front of you --

7    there's no reference to Michigan, Wisconsin, or the United

8    States in here, right?

9    **A.**  No.

10   **Q.**  No, there's not any such reference, correct?

11   **A.**  Correct.

12   **Q.**  Thank you.

13       So let's go to page 11.  There's an email from a Monika

14   Gromek.  I'm probably mispronouncing that.  Gromek.

15   **A.**  Gromek, yes.

16   **Q.**  Gromek, okay.  Is she one of your colleagues in the design

17   world?

18   **A.**  Yes, that's correct.

19   **Q.**  Okay.  She writes at 1:46 p.m., she writes, "Privileged

20   and confidential, Phil and team."  And she goes on to say that

21   in response to some feedback she received or they -- the team

22   received, that there are a few updates and additional options

23   to share.  Do you see that?

24   **A.**  I do, yes.

25       **MR. WESNESKI:**  I'm sorry to interrupt, Your Honor.  I

1    think this document may have a similar issue that we discussed

2    earlier.  I don't know if Ms. Moskowitz is going to go over it

3    or not.

4          THE COURT:  Okay.  So it's actually time for a break.

5    Let's go ahead and stand in recess.  And I'll let you all

6    figure out that particular issue.

7       All right, we'll stand in recess for 20 minutes.

8       (Recess taken at 2:01 P.M.; proceedings resumed at

9    2:22 P.M.)

10         THE COURT:  Okay.  We're back on the record.  The

11   record will reflect the parties are present.  The witness is

12   on the stand.

13      Did you resolve this issue?

14         MS. MOSKOWITZ:  Yes, we did, Your Honor.  There were

15   two redactions that Apple has asked us to make.  We have

16   implemented them on the version that will go on the screen,

17   and we can replace Your Honor's copy at some point subsequent.

18         THE COURT:  Okay.  Go ahead.

19         MS. MOSKOWITZ:  Thank you.  May I proceed with the

20   exam?

21         THE COURT:  You may.

22         MS. MOSKOWITZ:  Thank you.

23   **Q.**  Mr. Onak, we were looking at 268.  And I believe we

24   were -- or I was about to send you to page 11.  And the -- oh,

25   I did send you there.  So we just didn't put it on the screen.

1      There was an email from Ms. Gromek telling Phil that there

2   was an updated set of updates, right?

3   **A.**  That's correct.

4   **Q.**  And if you go to the next page, on page 12, she writes

5   about halfway down this title "in-app messaging."  Do you see

6   that at the top of the screen?

7   **A.**  I don't see anything on the screen.

8   **Q.**  Oh.

9          **THE COURT:**  So go ahead.  And it should be on your

10  screen.

11         **THE WITNESS:**  Oh, now I see it, yes.

12         **MS. MOSKOWITZ:**  Great.

13  **Q.**  So she says in-app messaging and then she says new copy

14  and updated user flow in the app.  And has two screenshots

15  below.  Do you see that?

16  **A.**  I do, yes.

17  **Q.**  The screenshots are not there.  I didn't get them either

18  so we don't have them.  But do you understand what she's

19  communicating here to be some screenshots of what the user

20  flow would look like for the linkout?

21  **A.**  Yes, I believe so.

22  **Q.**  And she asks Mr. Schiller, underneath that, if he has any

23  feedback or anything else that she should do before the

24  meeting tomorrow with Tim.  Do you see that?

25  **A.**  I do, yes.

1  **Q.**  And you understand that to be a reference to a meeting

2  that would be happening with Tim Cook?

3  **A.**  I assume so, yes.

4  **Q.**  Okay.  So if you go back a couple of pages to page 10, at

5  the bottom, Mr. Schiller responds to that email and provides

6  his feedback.  He says my thought on each.  Do you see that?

7  **A.**  I do, yes.

8  **Q.**  And there's a bunch of comments he has, but the one I want

9  to focus on is about three-quarters of the way down.  He has

10  comments to the in-app messaging linkout.  Do you see that?

11  **A.**  I do, yes.

12  **Q.**  He says -- Mr. Schiller says, "This is not good.  This is

13  a big warning that the user is about to be sent out of the app

14  to a website.  I do not think the headline should say

15  continue.  This is a warning that the user is about to go out

16  to the web and are they sure they want to do that, we cannot

17  verify that anything that occurs on the web is private and

18  secure.  The default button should not be continue."

19      Do you see that?

20  **A.**  I do, yes.

21  **Q.**  So that was specific instructions that Mr. Schiller was

22  giving about what the language and the tone of the message

23  that would be presented to users for the linkout should be.

24  **A.**  I believe Mr. Schiller was providing his feedback on what

25  he -- on what he saw in the -- in the comps, yes.

ONAK — DIRECT / MOSKOWITZ

1   **Q.**  And his comment and his feedback was you're being too

2   light, you need to be more warning, you need to be alert, this

3   is a warning, the user should be told in no uncertain terms

4   proceed with caution, right?

5   **A.**  The way -- the way I understood this, that he wanted to

6   see some more direct language that stated more of the facts

7   and -- and educated the user about where to go and what was

8   happening.

9   **Q.**  That he -- his feedback was that the message should have

10  more of a warning tone, right?

11  **A.**  That's not what I understood from this.  The term

12  "warning" is something that we use everywhere throughout

13  Apple.

14  **Q.**  So you don't think that his feedback was to have more of a

15  warning tone.

16  **A.**  I believe he wanted to make --

17  **Q.**  Yes or no?

18  **A.**  -- sure --

19                    (Simultaneous colloquy.)

20  **BY MS. MOSKOWITZ:**

21  **Q.**  Yes or no?

22  **A.**  Could you repeat your question again?  I'm sorry.

23  **Q.**  Is it your testimony that you did not understand this

24  feedback from Mr. Schiller to be telling the team have more of

25  a warning tone in the screen language?

1    **A.**   That's not how I understood it, no.

2    **Q.**   All right.  Well, let's look at how Ms. Gromek understood

3    it.  Let's turn to page 9.  She responds.  She says,

4    "Privileged and confidential, hi, Phil and team," and she

5    continues.

6         Do you see that?

7    **A.**   I do, yes.

8    **Q.**   So on the next page near the middle, she writes in-app

9    messaging, and she says, she updated the title and the copy to

10   be super clear on what is about to happen and have more of

11   that warning tone.  Right?

12   **A.**   Correct, that's what she wrote.

13   **Q.**   So she understood Mr. Schiller's direction to be having a

14   more warning tone in the language that was going to be shown

15   to users, right?

16   **A.**   I believe I can't speak for Ms. Gromek.

17   **Q.**   That's how you understand her sentence there?

18   **A.**   That's -- that's correct, yes, that's what she wrote.

19   **Q.**   In connection with your work on these projects in

20   developing these screens that would be used in compliance,

21   purported compliance with these various decisions across the

22   world, you had various meetings to discuss that language,

23   right?

24   **A.**   Correct.

25   **Q.**   And you did attend at least one meeting with Mr. Schiller,

```
 1    right?

 2    A.   At least one, yes.

 3    Q.   Do you recall how many?

 4    A.   I don't, no.

 5    Q.   Five?  More than five?  Less than five?

 6    A.   I -- I really don't know.

 7    Q.   You have no ballpark?  It could have been 20?

 8    A.   It may have been 20, yes.

 9    Q.   But none with Mr. Cook?

10    A.   None with Mr. Cook.

11    Q.   Do you recall one of the meetings you attended with

12    Mr. Schiller was on March 15th, 2022?

13    A.   I don't recall that, no.

14    Q.   Why don't you take a look in your binder, CX496.

15    A.   (Reviewing document.)

16    Q.   It's a chat exchange with you and others on March 15,

17    2022.

18         Do you see that?

19    A.   I do, yes.

20         MS. MOSKOWITZ:  Your Honor, I'll move in 496.

21         MR. WESNESKI:  No objection.

22         THE COURT:  It's admitted.

23             (Exhibit 496 received in evidence.)

24         MS. MOSKOWITZ:  Thank you.

25                 (Exhibit published.)
```

1    BY MS. MOSKOWITZ:

2    **Q.**  There's a reference here to -- from my -- I absolutely

3    cannot read -- from Mr. Mihai saying as a heads-up that there

4    was an 11:00 a.m. meeting with Monica in advance of the Phil

5    review at 1:00 later that day on March 15th.

6        Do you see that?

7    **A.**  I do, yes.

8    **Q.**  And do you understand that to be saying that you would be

9    having a meeting with Phil Schiller at 1:00 p.m. and a sort of

10   huddle with the team in advance of that?

11   **A.**  Yes.  I -- I'm not sure if I was going to be included in

12   this Phil review, but it seems like Monica wanted to meet

13   beforehand.

14   **Q.**  Okay.  And you don't recall whether or not you attended it

15   with Mr. Schiller?

16   **A.**  I -- I don't recall, no.

17   **Q.**  Okay.  Let's try 281 in your binder.

18   **A.**  (Reviewing document.)

19   **Q.**  This is a set of messages between, you, Mr. Mihai,

20   Mr. Elman and Mr. Liu on March 15th, 2022.  Do you see that?

21   **A.**  I do, yes.

22          **MS. MOSKOWITZ:**  Your Honor, I move CX281 into

23   evidence.

24          **MR. WESNESKI:**  No objection.

25          **THE COURT:**  It's admitted.

```
 1                    (Exhibit 281 received in evidence.)

 2              MS. MOSKOWITZ:  Thank you.  Let's pull that first

 3    page up there.

 4    Q.  It starts off with Mr. Mihai saying, hey, guys, nice work.

 5        Do you see that?

 6    A.  I do, yes.

 7    Q.  And the time stamp, and this is where we're back to fun

 8    with time zone conversion, this is at 8:30 UTC p.m., which I

 9    will represent to you is 1:30 p.m. Pacific Time on March 14th,

10    2022.

11        Okay?

12    A.  Okay.

13    Q.  So do you understand what's happening in this chat to be a

14    debrief from the 1:00 p.m. meeting that happened with

15    Mr. Schiller?

16    A.  I do, yes.

17    Q.  Does that refresh your recollection that you were at that

18    meeting?

19    A.  It does not, no.

20    Q.  So the chain nonetheless is discussing how to implement

21    Mr. Schiller's comments from that meeting, fair?

22    A.  I believe so, yes.

23    Q.  And he had given specific feedback at that meeting about

24    the language that would be used, right?

25    A.  He -- he may have, but I'm -- I don't remember.
```

1    **Q.** Well, let's look at a couple of examples of where that's

2    being discussed and see if it helps.

3        Mr. Schiller's comments are repeatedly referred to, for

4    example, on page 1.  You -- you comment:  Not sure how

5    important, quote, leaving the app is in Phil's eyes.

6        That's a reference to Mr. Schiller, right?

7    **A.** Correct.

8    **Q.** And on page 2, Mr. Elman refers to:  Phil did like the,

9    quote, "this app is" language.

10       Do you see that?

11   **A.** (Reviewing document.)

12   **Q.** On the screen as well.

13   **A.** Yes.  I see that.

14   **Q.** And that's a reference to Mr. Schiller liking some

15   language, right?

16   **A.** Correct.

17   **Q.** And you understand that that's feedback from the meeting.

18   **A.** I assume so, yes.

19   **Q.** Okay.

20       There's a couple of more, one other one we can point to on

21   page 3.  This is from you where at 9:33 you say:  For sure,

22   I'm just reacting to it because Phil specifically called out,

23   quote, when you leave the app today.

24       Do you see that?

25   **A.** I do, yes.

```
 1    Q.  And does that lead you to believe that you were present at
 2    a meeting at which Mr. Schiller gave feedback on the language?
 3    A.  It does not, no.
 4    Q.  That's not how you read it?
 5    A.  No.  It -- I don't think it means that I was at the
 6    meeting, no.
 7    Q.  Okay.  But you understand that it's comments that
 8    Mr. Schiller gave that day about the language.
 9    A.  Correct.
10    Q.  All right.
11        Let's look at page 5.
12                        (Exhibit published.)
13    BY MS. MOSKOWITZ:
14    Q.  There's a graphic at the top of the page.  Do you see
15    where I am?
16    A.  I do, yes.
17    Q.  And the title --
18            MS. MOSKOWITZ:  Oh, pull it, pull it, pull it.
19    Sorry.
20        Can we please redact the top of that page and republish
21    it.
22                        (Exhibit published.)
23    BY MS. MOSKOWITZ:
24    Q.  Okay.  You have in front of you the actual title of that
25    slide on page 5.  Do you see that?
```

1    **A.**  I do, yes.

2    **Q.**  And it says "unified linkout sheet," right?

3    **A.**  Yes.

4    **Q.**  And it's referring to two code names, right?

5    **A.**  Correct.

6    **Q.**  And what this is referring to is a unified warning screen

7    that would be used for the Netherlands and for the reader app

8    linkout, right?

9    **A.**  Correct, yes.

10   **Q.**  And there's no reference to Michigan, Wisconsin, or the

11   United States here, right?

12   **A.**  Correct.

13   **Q.**  And so the plan as of this time was to have the same

14   language being used for both the Netherlands linkout and the

15   reader app linkout, right?

16   **A.**  I believe there -- we had a conversation about that, yes.

17   **Q.**  But the language had not yet been arrived at, right?

18   **A.**  I believe so, yes.

19   **Q.**  That's what you're workshopping here, right?

20   **A.**  Correct.

21   **Q.**  So let's go back to the first page of 281.

22        About halfway down you provide three proposals for that

23   warning screen language.  Right?

24                         (Exhibit published.)

25             **THE WITNESS:**  Correct.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1    BY MS. MOSKOWITZ:

2    Q.  And there's some back-and-forth on variations of that

3    language.  And I'm going to skip ahead to page 2.  In the

4    middle, you write, "Josh, for some reason saying, quote, this

5    app is about to take you, end quote, feels safe to me like

6    don't worry, you're still within the app, and it's just

7    guiding you somewhere else right now."

8         Do you see that?

9    A.  I do, yes.

10   Q.  So what you were communicating is you didn't like that

11   language because that could make the user feel safe and the

12   goal was to not make them feel safe, right?

13   A.  It's not my responsibility to make the user feel safe.

14   It's my responsibility to make the user feel educated and

15   well-informed.

16   Q.  You wanted them to feel like it was not safe to proceed,

17   right?

18   A.  No, that's not correct.

19   Q.  Do you believe it's unsafe for them to proceed?

20   A.  Yes, I believe it's -- it's safe.  They can -- the user

21   can do whatever they want.

22   Q.  Okay.  But that's not what you said to users, right?  You

23   wanted to make sure that they were told that it was super

24   unsafe to proceed, right?  That was the goal.

25   A.  No, that was not the goal.

1    **Q.**  Okay.  Well, it keeps going.

2        Mr. Elman responds.  He says, "Yeah, good point.  About to

3    go is a little more like into the great wide open."

4        Right?

5    **A.**  Correct.  That's what he wrote.

6    **Q.**  So the idea here was to make users feel like they were

7    going into the great wide open, the unknown, right?

8    **A.**  That's what Mr. Elman said, yes.

9    **Q.**  You don't think that this discussion is about making the

10   users feel like it was not safe to proceed through the link?

11   **A.**  I don't believe so.  I believe this was a healthy

12   discussion looking at different copy options and design

13   elements.

14   **Q.**  On the bottom of the same page, you say that the language

15   "this app is about to send" is better than "this app is about

16   to take" because it doesn't sound like the app will be holding

17   your hand.  Do you see that?

18   **A.**  I do, yes.

19   **Q.**  So you wanted to make sure the user felt like they were

20   going to be on their own after flicking the link, right?

21   **A.**  I believe that because that was -- that was what actually

22   was going to happen.  So it's factual, yes.

23   **Q.**  So you wanted the user to feel like they were at risk?

24   **A.**  I wanted the user to be informed that this was going to

25   happen and raise some caution.

1   Q.  You think that users are not familiar with clicking on

2   links on the Internet?

3   A.  I'm sure some users are, but I don't think a lot of people

4   understand how technology works and how links work.

5   Q.  There's more back—and—forth.  And now in the middle of

6   page 3, you suggest some language.  You say, "This app is

7   about to send you out to an external website.  You will no

8   longer be transacting with Apple."  And you can -- continue.

9   "I have no preference for out.  It works either way."

10      Do you see that?

11  A.  I do, yes.

12  Q.  But you -- you come back to that a couple lines down on

13  the bottom.  You say, "Josh," this is you speaking, "Josh, if

14  we want to scare users a bit, I like the addition of 'out'

15  because it raises questions and hesitancy, haha, out, out

16  where?  OMG, what do I do?"

17      Do you see that?

18  A.  I do, yes.

19  Q.  So you were communicating to your colleagues that you

20  liked the addition of the word "out" because it was going to

21  make users feel hesitant about proceeding and feel scared

22  about what was going to happen when they were out there,

23  right?

24  A.  No, that's incorrect.

25  Q.  You understood your assignment was to develop language

ONAK – DIRECT / MOSKOWITZ

1    that would lead users to feel uncertain and scared about what

2    would happen to them if they proceeded to follow the link out

3    to the website, right?

4    **A.**  That's -- that's incorrect.  My goal was to inform the

5    user about all the facts.

6    **Q.**  You wanted to raise hesitancy in the user, right?

7    **A.**  I wanted to grab their attention so they would stop and

8    read the entire sheet.

9    **Q.**  You wanted to raise hesitancy to the user, correct?

10   **A.**  That's -- that's not correct.

11   **Q.**  That's what you said here, right?

12   **A.**  I don't believe I said that.  I -- I said it could

13   potentially raise hesitancy.

14   **Q.**  Sir, that's not here.  You said, "I like the addition of

15   'out' because it raises questions and hesitancy, ha, ha,"

16   right?

17   **A.**  That's what it says, yes.

18   **Q.**  Right.  There's no "potential" in there, right?

19   **A.**  Correct.

20   **Q.**  So if you could turn to another exhibit in your binder,

21   487, please.

22       And if you want to look at page 4, you join the -- the

23   channel, the discussion on page 4, if that helps.  But this is

24   a text chain or a chat chain on May 15, 2023, that you

25   participated in.  Do you see that?

 1    **A.**  I do, yes.

 2            **MS. MOSKOWITZ:**  Your Honor, I move CX487 into

 3    evidence.

 4            **MR. WESNESKI:**  No objection.

 5            **THE COURT:**  It's admitted.

 6                (Exhibit 487 received in evidence.)

 7            **MS. MOSKOWITZ:**  Thank you.

 8        Can I just make sure the -- no code names here.  Okay.

 9                    (Exhibit published.)

10    **BY MS. MOSKOWITZ:**

11    **Q.**  Okay.  So there's a graphic in the middle under -- there's

12    Josh Elman.

13            **MS. MOSKOWITZ:**  Actually if we could pill up the

14    chain as well.  Yes, thank you.

15                    (Exhibit published.)

16    **BY MS. MOSKOWITZ:**

17    **Q.**  Let's just look at that.  At the top, there's a chat to

18    Josh Elman saying, "Are we using the," blanked out, "in-app

19    sheet copy button as is?"

20        Do you see that?

21    **A.**  Yes.

22    **Q.**  And what's blanked out we won't say out loud, but what

23    it's referring to is the unified Netherlands and reader app

24    warning screens that we were just discussing, right?

25    **A.**  Correct.

1    **Q.** And so the question that's being asked is we're now back

2    to talking about the United States injunction, right?

3    **A.** Correct.

4    **Q.** And the question is, okay, well, picking back up on the

5    U.S., is the plan to use the screen that we developed, the

6    unified screen that we developed for the Netherlands and the

7    reader app project, right?

8    **A.** Correct.

9    **Q.** And the response from Mr. Elman is the current plan is

10   yes.  Do you see that?

11   **A.** Yes.

12   **Q.** So this is May 2003, and the plan as of that time as

13   you -- your colleagues understood it, was to use the same

14   language that had been workshopped and developed, including

15   through all the messages we just looked at for the Netherlands

16   and the reader app, to use that same screen for responding to

17   this Court's injunction, right?

18   **A.** I -- I believe that's what, yes, we were discussing and

19   seeing if that's the right decision.

20   **Q.** Well, it's not what ended up happening, right?

21   **A.** I don't believe it was, no.

22   **Q.** Right.  You understand that a different screen was arrived

23   at and finalized for purposes of the compliance with the U.S.

24   injunction, this Court's injunction?

25   **A.** Correct.

1    **Q.** And you understood, did you not, that that was in response

2    to the executives dictating that there would be changes to

3    that screen specifically for the U.S. users?

4    **A.** I was -- I was not aware of that, no.

5    **Q.** You -- did you have any understanding as to from whom the

6    direction came to not just use the same screen that you all

7    had spent so much time developing?

8    **A.** I wasn't sure. I mean I assumed, but I wasn't sure.

9    **Q.** You assumed it was Mr. Schiller and other executives?

10   **A.** I believe, yeah. I believe that's a fair assumption, yes.

11   **Q.** Is that what the assumption is that you made?

12   **A.** Yes.

13   **Q.** Had you ever heard that it was from Mr. Cook or

14   Mr. Schiller?

15   **A.** No.

16   **Q.** Well, you worked on the project to take what was currently

17   the screen that we're looking at here and turn it into the

18   final screen that was ultimately chosen, right?

19   **A.** Correct.

20   **Q.** And let's pull -- while we have that here, let's look at

21   the middle screen there that we have.

22        **MS. MOSKOWITZ:** And if we could pull that up and then

23   at the same time -- I don't know if this is doable -- pull up

24   the final screen from CX3 which is in evidence. I just want

25   to sort of put those two screens -- wonderful, look at that.

 1                    (Exhibit published.)

 2   **BY MS. MOSKOWITZ:**

 3   **Q.**  So on the left we have the unified Netherlands and reader

 4   app screen, correct?

 5   **A.**  Correct.

 6   **Q.**  And on the right, we have the final screen that was

 7   selected for compliance with this Court's injunction.  Right?

 8   **A.**  Correct.

 9   **Q.**  All right.

10       So let's focus on the -- the couple language pieces here.

11   There's an additional sentence at the end for the U.S.

12   injunction that is not present on the left.  It says, "Apple

13   can't verify any pricing or promotions offered by the

14   developer."  Do you see that?

15   **A.**  I do, yes.

16   **Q.**  That's not present in the Netherlands or the reader app

17   warning screen, right?

18   **A.**  It is not, no.

19   **Q.**  And the message that's being communicated here is you

20   might be getting duped by the developer, staying with Apple is

21   safe.  Right?

22   **A.**  No, that's not what it's saying at all.

23   **Q.**  It's saying proceed with caution because you may not in

24   fact be getting any of the pricing or promotions that you're

25   being promised to lead to you click this link, right?

 1    **A.**  No, that's not correct.

 2    **Q.**  Okay.  Let's look at the bold language.

 3        At the top, the left-hand says, the second sentence, "You

 4    will no longer be transacting with Apple," right?

 5    **A.**  Correct.

 6    **Q.**  That's a statement that says you're -- Apple is not

 7    responsible, you're transacting with someone else, right?

 8    **A.**  Correct.

 9    **Q.**  But instead of that language, what the U.S. language now

10    says is Apple is not responsible for the privacy or security

11    of purchases made on the web.  Right?

12    **A.**  Correct.

13    **Q.**  That language is scarier than you will no longer be

14    transacting with Apple, right?

15    **A.**  I don't believe it's scarier.  I believe it's more factual

16    and informative.

17    **Q.**  You don't think it's scarier, sir?

18    **A.**  I -- I do not, no.

19    **Q.**  You don't think that it's going to deter more users from

20    following through with the link?

21    **A.**  I'm -- I can't speak for users.  I don't believe so, no.

22    **Q.**  You can't speak for users, but it's your job to choose

23    words that allow users to make informed decisions?

24    **A.**  It's my job to educate them so they make informed

25    decisions, yes.

1    **Q.**  You understand that the -- the decision that was taken by

2    Apple was to take language that had been already decided and

3    arrived at for worldwide reader apps, and the Netherlands for

4    compliance with a similar order, and add warning language,

5    additional warning language that would in all likelihood deter

6    users from proceeding, right?

7    **A.**  That's not correct.  For all of our projects at Apple, we

8    always look for ways to iterate and improve language.  And I

9    believe this is one of those instances.

10   **Q.**  Well, you acknowledge, though, that if this is the new and

11   improved version, you have not used this new and improved

12   version and changed the reader app screen or changed the

13   Netherlands screen, right?

14   **A.**  I -- I believe that's right.  I'm not sure.

15   **Q.**  Right.  You understand sitting here today that the

16   left-hand screen is still currently in use for all reader apps

17   and for the Netherlands dating apps, correct?

18   **A.**  If you say so, yes.

19   **Q.**  You have no reason to doubt that, right?

20   **A.**  I do not, no.

21         **MS. MOSKOWITZ:**  I pass the witness, Your Honor.

22         **THE COURT:**  And we have Mr. Wesneski.

23         **MR. WESNESKI:**  Wesneski, Your Honor.

24         **THE COURT:**  Did I say it wrong?  Wesneski.

25         **MR. WESNESKI:**  Wesneski.

 1          May we approach Mr. Onak with a binder, please?

 2              THE COURT:  You may.

 3                      (Pause in the proceedings.)

 4              MR. WESNESKI:  May I proceed, Your Honor?

 5              THE COURT:  Once I have a binder.  Is it the same

 6      binder?

 7                      (Off-the-record discussion.)

 8              THE COURT:  You may proceed.

 9              MR. WESNESKI:  Thank you, Your Honor.

10                      **CROSS-EXAMINATION**

11      BY MR. WESNESKI:

12      **Q.**  Mr. Onak, you mentioned to Ms. Moskowitz that you're a UX

13      writer.  What is your -- what are your responsibilities as a

14      UX writer?

15      **A.**  As a UX writer, I'm responsible for crafting clear,

16      concise, and helpful copy for the user to help them achieve

17      something that they're trying to do in an app or service.

18      **Q.**  And can you just explain for the Court maybe some examples

19      of what we might see of your writing in an app or the App

20      Store?

21      **A.**  Sure.  It's -- it's things like error messages, button

22      labels, notifications, banner text, things that you see

23      throughout the UI in an app.

24      **Q.**  Do you write marketing or advocacy materials for the App

25      Store?

ONAK - CROSS / WESNESKI

1    **A.**  I do not, no.  We have a separate marketing team that

2    writes that.

3    **Q.**  For a particular user message, how do you know what the

4    content of that message is going to be?

5    **A.**  The -- the content is typically provided by other teams

6    from product, maybe legal.  So I take that information.  Then

7    I draft a copy around that.

8    **Q.**  And as a UX writer, do you have the final approval on user

9    copy?

10   **A.**  I definitely provide input.  I provide my feedback, but

11   no, I do not have the final say.

12   **Q.**  Okay.  Can you just explain maybe your personal writing

13   process when you have a new assignment given to you?

14   **A.**  Yeah.  So when an assignment is given to me, I gather all

15   the -- all the details, everything that initially needs to be

16   included.

17       And then I take that and I draft a few different copy

18   proposals, playing around with the hierarchy, the tone, the

19   length, things like that.  And then once I feel good about

20   some options, I then present them to my other team members.

21   **Q.**  Is it ever your practice to put something in user copy

22   that is inaccurate?

23   **A.**  No, absolutely not.

24   **Q.**  Is it ever your practice to put something in user copy

25   that would be misleading?

ONAK – CROSS / WESNESKI

1    **A.**  No.

2    **Q.**  Okay.  I want to talk a little bit about your role in

3    Project Michigan which you went over with Ms. Moskowitz.

4         To just be clear, what was your role in Project Michigan?

5    **A.**  My role was to draft the copy for the system disclosure

6    sheet.

7    **Q.**  Did you decide whether there would be a system disclosure

8    sheet?

9    **A.**  I did not, no.

10   **Q.**  Did you have responsibility for any other aspect of

11   Project Michigan other than the words on the system disclosure

12   sheet?

13   **A.**  No.

14   **Q.**  That individual writing process that you just described,

15   did you follow that for project Michigan?

16   **A.**  I did, yes.

17   **Q.**  And how did you know what the content of the system

18   disclosure sheet was supposed to be?

19   **A.**  I believe the content was provided from product and -- and

20   legal.  And then again, I took that information and I started

21   drafting copy around that.

22   **Q.**  Was it -- what was your understanding of what you were

23   trying to accomplish with the system disclosure sheet?

24   **A.**  My understanding, we wanted to inform users about what was

25   going to happen if the user left the app and the App Store.

ONAK - CROSS / WESNESKI

1   **Q.**  Did anyone ever tell you that the copy should be drafted

2   in such a way as to deter users from actually leaving the app?

3        **THE COURT:**  So this is your witness.  Stop leading.

4        **MR. WESNESKI:**  Yes, Your Honor.

5   **Q.**  What instructions, if any, did you receive about the

6   purpose of the system disclosure sheet?

7   **A.**  We did not really receive instructions about the purpose.

8   It was more just to educate users and give them all the facts

9   that -- that they needed to know.

10  **Q.**  You discussed with Ms. Moskowitz a little bit about the

11  Court's orders and the injunction.  Do you remember that?

12  **A.**  I do, yes.

13  **Q.**  Did you have responsibility for making sure that the

14  system disclosure sheet was in compliance with the Court's

15  injunction?

16  **A.**  No.

17  **Q.**  To best of your understanding, whose responsibility was

18  that?

19  **A.**  I believe that was App Store leadership and legal.

20  **Q.**  Did -- was legal at all involved in the system disclosure

21  sheet?

22  **A.**  Yes, absolutely.

23  **Q.**  Okay.  All right.  Ms. Moskowitz showed you a document

24  from November 16th, 2021, and I believe it's CX206.  I'm not

25  sure if we have an electronic version on our side.

```
 1              (Pause in the proceedings.)

 2            MR. WESNESKI:  Thank you.  Could we please go to the

 3     second page of the document.

 4        (Exhibit published to witness, counsel, and the Court.)

 5     BY MR. WESNESKI:

 6     Q.  All right.  Counsel directed you to a conversation near

 7     the top where you say "external website sounds scary."

 8        Do you see that?

 9     A.  I'm sorry.  206?

10     Q.  Yes.  I'm sorry.  It's not in the binder I handed you.

11     A.  Oh, I see.

12     Q.  It would be in Ms. Moskowitz's binder.

13     A.  Oh, I see it on the screen now.

14     Q.  Yes.  Do you see the statement that you went over with

15     Ms. Moskowitz, "external website sounds scary"?

16     A.  I do, yes.

17     Q.  What did you mean by that?

18     A.  In -- in this situation, I meant that external website

19     sounds scary in the way that it would raise caution and grab

20     the user's attention.  When it comes to UX writing, "scary" is

21     a term that's used to -- in certain context to make sure that

22     the user stops and reads everything to make sure that they got

23     all their information up front.

24     Q.  Is this a term you've used in other UX projects?

25     A.  Yes, absolutely.  It's a way that sometimes I describe
```

1     different copy options, yes.

2     **Q.**  All right.  Then after that, it says "so execs will love

3     it."  What did you mean by that?

4     **A.**  In my experience, working with our App Store leadership,

5     they like seeing versions that use strong direct language and

6     provide the facts.  So in this case, I thought "external

7     website" was an accurate label.  So I thought they would --

8     they would like to see that so -- and have some healthy

9     discussion around it.

10          **MR. WESNESKI:**  Okay.  If we could please go to the

11     next page, page 3.

12        (Exhibit published to witness, counsel, and the Court.)

13     **BY MR. WESNESKI:**

14     **Q.**  There is another exchange there about -- from Mr. Elman

15     about the inclusion of a URL in the system disclosure sheet.

16     Do you remember that exchange?

17     **A.**  I do, yes.

18     **Q.**  And the comment that was read to you is near the top,

19     about makes it look scarier, lets the user validate it.

20        Do you see that?

21     **A.**  I do, yes.

22     **Q.**  To the best of your understanding, what did you understand

23     Mr. Elman to mean by that?

24     **A.**  In my opinion, I thought Mr. Elman was saying that if we

25     included you a URL that was long and maybe included some

1   characters that were a bit strange, it would raise the user's

2   attention and grab their attention and -- and instill a little

3   caution in them.

4   **Q.**   If you go about halfway down the page, there's another

5   message from Mr. Elman.  It says, "Just for one variant, it

6   can be an alt, I just think it puts the develop on the spot

7   for a readable URL which seems like a net positive for

8   customers."  Do you see that?

9   **A.**   I do, yes.

10  **Q.**   What do you think Mr. Elman meant by a net positive for

11  customers?

12  **A.**   I believe Mr. Elman thought that if we included a readable

13  URL, meaning a little shorter, maybe a little bit more

14  recognizable, that it would be beneficial for customers

15  because it would be something that they're more familiar with.

16  **Q.**   Do you know whether the system disclosure sheet in effect

17  today for Project Wisconsin has the URL in it?

18  **A.**   It does not, no.

19  **Q.**   Then we looked at the fourth page near the top where

20  counsel directed you to a comment from -- a couple comments

21  from Mr. Phillips.  The first two said, "I think personally

22  that's why I wouldn't bother.  More steps.  Have to find my

23  card."

24          Do you see that message up there?

25  **A.**   I do, yes.

1  Q.  What did you understand Mr. Phillips to be discussing or

2  raising there?

3  A.  I'm not entirely sure.  I believe Mr. Phillips was just

4  kind of walking through his process of how he would feel if he

5  went through with this.

6  Q.  What do you mean if he went through with this?

7  A.  If he was -- if he was in the user's shoes and was

8  interacting with this sheet.

9  Q.  Then Mr. Phillips, below that, counsel directed you to the

10  statement to make your version even worse, you could add the

11  developer name.

12      See that?

13  A.  I do, yes.

14  Q.  To the best of your recollection or understanding, what

15  did you understand Mr. Phillips to mean by that?

16  A.  I believe Mr. Phillips was discussing whether or not we

17  would add the developer name or the app name.  When I -- when

18  I read this, I didn't necessarily agree with Mr. Phillips.  I

19  think there's a lot of benefit of adding the developer name

20  because it allows -- it gives the user some additional

21  information.  But I think we were just having a discussion

22  about which one is -- is preferred.

23  Q.  Okay.  Let's go, if we could, move away from Project

24  Michigan and we'll talk about your work in the Netherlands,

25  which Ms. Moskowitz covered with you.

1    **MR. WESNESKI:** If we could pull up CX0281.

2    (Exhibit published to witness, counsel, and the Court.)

3    **BY MR. WESNESKI:**

4    **Q.** And Ms. Moskowitz directed you to a comment on the second

5    page, if we could go there. About halfway down the page, you

6    mentioned certain language, making you feel safe. And it

7    looks like you propose an alternative.

8    Do you remember going over that with Ms. Moskowitz?

9    **A.** I do, yes.

10   **Q.** And can you just explain what you meant by that?

11   **A.** To me, the -- the term "this app is about to take you"

12   felt inaccurate. I didn't want the -- the user to wrongly

13   believe that the App Store or Apple was going to hold their

14   hand as they -- as they leave to external websites. So I

15   wanted to make it more accurate by changing some of the copy.

16   **Q.** You see -- you say there, I think you're speaking in the

17   voice of the user, like don't worry, you're still within the

18   app. Do you see that?

19   **A.** I do, yes.

20   **Q.** Is it accurate that the user is still within the app if

21   they proceed past the system disclosure sheet?

22   **A.** If they proceed, no, it is not accurate.

23   **Q.** Okay. Can we please go to the next page, 281.3.

24   (Exhibit published to witness, counsel, and the Court.)

25   / / /

1    BY MR. WESNESKI:

2    Q.  And there's a comment from you at the very bottom of the

3    screen that Ms. Moskowitz went over with you.  Do you recall

4    that?

5    A.  I do, yes.

6    Q.  So just, I think we've covered this already, but when you

7    say, "if we want to scare users a bit," can you just explain

8    what you mean by that?

9    A.  Yeah.  To me -- to me, the term "scare" in UX writing,

10   it's -- it's not instilling fear or -- or causing anxiety.

11   It's to bring caution and -- and grab the user's attention so

12   they stop and -- and really read every word so they are

13   well-informed.

14   Q.  Do you know whether the final system disclosure sheet in

15   effect for Project Wisconsin includes this word "out" that you

16   proposed here?

17   A.  It does not, no.

18   Q.  Let's move on and talk a little bit about Project

19   Michigan -- or excuse me -- Project Wisconsin.  What was your

20   role in Project Wisconsin, and how was it different, if at

21   all, from what you did for Project Michigan?

22   A.  It was not different at all.  I was tasked to write the

23   system disclosure sheet for that as well.

24   Q.  And how did you know what content was going to be in the

25   system disclosure sheet?

ONAK - CROSS / WESNESKI

1    **A.**  Similar to Project Michigan, I received some initial

2    content suggestions from -- from legal and the product team,

3    and I took that information and started drafting copy.

4    **Q.**  All right.  If we could please go to another document that

5    Ms. Moskowitz showed you, CX0487.

6                          (Exhibit published.)

7    **BY MR. WESNESKI:**

8    **Q.**  And I believe you went over with Ms. Moskowitz the then

9    current proposal about using an existing system disclosure

10   sheet.  Do you remember that exchange?

11   **A.**  I do, yes.

12   **Q.**  And I think you told Ms. Moskowitz that you ultimately

13   didn't use that preexisting system disclosure sheet; is that

14   right?

15   **A.**  Correct.

16   **Q.**  Why -- why not?

17   **A.**  At -- at Apple, we're always iterating on copy.  We're

18   receiving feedback from different teams.  So I -- I assume at

19   this point we -- we wanted -- we looked at the copy and wanted

20   to improve it.  Maybe we had to meet some different

21   requirements, things like that.

22   **Q.**  Okay.  Thank you.

23         **MR. WESNESKI:**  Mr. Montgomery, could we please pull

24   up CX1208.

25      (Exhibit published to witness, counsel, and the Court.)

```
 1      BY MR. WESNESKI:

 2      Q.   Mr. Onak, do you recognize this document?

 3      A.   I'm sorry, I don't see anything on the screen yet.

 4           MR. WESNESKI:  Oh, I'm sorry.

 5           THE WITNESS:  Yep, now I see it.  I do, yes.

 6      BY MR. WESNESKI:

 7      Q.   And what is it?

 8      A.   This appears to be a Slack conversation between Ms. Cote

 9      Mr. Magnani, and Mr. Liu and myself.

10      Q.   Do you see the date at the top right, May 15th, 2023?

11      A.   I do, yes.

12      Q.   Okay.  Do you understand what work this exchange relates

13      to based on the content and the date?

14      A.   I do, yes.

15      Q.   What -- what work does this relate to?

16      A.   I believe this is Project Wisconsin.

17      Q.   And is this a document created and maintained in the

18      ordinary course of business at Apple?

19      A.   Correct.

20           MR. WESNESKI:  I'd like to move CX1208 into evidence.

21           MS. MOSKOWITZ:  No objection.

22           THE COURT:  It's admitted.

23           (Exhibit 1208 received in evidence.)

24           MR. WESNESKI:  Thank you.

25                    (Exhibit published.)
```

ONAK – CROSS / WESNESKI

1   BY MR. WESNESKI:

2   Q.  At the bottom of the page there's a message from someone

3   named Bri Cote to you and several others.  Do you see that?

4   A.  I do.

5   Q.  Who is Ms. Cote?

6   A.  Ms. Cote is a App Store producer.

7   Q.  What does that mean?

8   A.  A producer at Apple is essentially a project manager.

9   Q.  Okay.  You see in Ms. Cote's message there's a few bullet

10  points.  Do you know what those bullets points are?

11  A.  I do, yeah.  It seems like there was an engineering or

12  design review or a meeting, and out of that -- out of that

13  review, there came out some -- some three different copy

14  options, proposals to move forward with.

15  Q.  Is it normal for Apple or for you, when working on user

16  copy, to consider more than one option or alternative?

17  A.  Yes, absolutely.

18  Q.  Why is that?

19  A.  Working on different options, me personally allows me to

20  play around with different tone, different length.  And I also

21  note that presenting different options creates better

22  discussion among -- among teams, and I receive better

23  feedback.

24  Q.  Okay.  Thank you.

25          MR. WESNESKI:  Mr. Montgomery, if we could please

 1    pull up CX1211, not published to the gallery yet, please.

 2        (Exhibit published to witness, counsel, and the Court.)

 3    BY MR. WESNESKI:

 4    Q.   Do you recognize this document?

 5    A.   I do, yes.

 6    Q.   What is it?

 7    A.   This appears to be another Slack conversation between

 8    Mr. Phillips, Mr. Magnani, and -- and me.

 9    Q.   And you see the date at the top right, June 21st, 2023?

10    A.   Yes.

11    Q.   Based on the date and the content, do you have an

12    understanding of what project or projects this relates to?

13    A.   Yes.  I believe this is Project Wisconsin.

14    Q.   Is this a document created and maintained in the ordinary

15    course of business at Apple?

16    A.   Yes.

17            MR. WESNESKI:  I'd like to move CX1211 into evidence.

18            MS. MOSKOWITZ:  No objection, Your Honor.

19            THE COURT:  It's admitted.

20            (Exhibit 1211 received in evidence.)

21            MR. WESNESKI:  Thank you, Your Honor.

22                    (Exhibit published.)

23    BY MR. WESNESKI:

24    Q.   At the top of the document, you write to Joseph Magnani.

25    Well, first off, who is Mr. Magnani?

ONAK - CROSS / WESNESKI

```
 1    A.  Magnani is another designer for the App Store that I work

 2    with.

 3    Q.  And you mentioned he's a designer.  Are you a designer for

 4    the App Store?

 5    A.  I'm not, no.  I'm a UX writer for the App Store.

 6    Q.  What's the difference between those two jobs?

 7    A.  A UX writer, I focus primarily on the words and -- and

 8    what users read.  Designers primarily focus on the design

 9    elements and the pixels and how things look and appear.

10    Q.  Okay.  You say to Mr. Magnani, "I have some alts for the

11    Wisconsin title.  Can you put these in situ and I can email

12    them to the group."  Do you see that?

13    A.  I do, yes.

14    Q.  What's the Wisconsin title?

15    A.  The Wisconsin title is the -- the big bold text at the top

16    of the screen.

17    Q.  And just for our own education, what is situ?

18    A.  Situ is -- it's designer language.  Basically I was

19    telling Mr. Magnani to put my words into the design elements

20    so we can see the entire design.

21    Q.  Okay.  And below this message then it looks like you have

22    four numbered paragraphs.  Do you see that?

23    A.  I do, yes.

24    Q.  What are those numbered paragraphs?

25    A.  Those numbered paragraphs are -- are different copy
```

1    variations.

2    Q.   Now we saw in the previous document that there were three

3    options on the table.  And here you have four alternatives.

4    Why are you offering four alternatives if you already have

5    these other three options that you discussed a month before?

6    A.   I -- I probably received additional feedback.  I was told

7    to come up with additional options to look at.  So I think

8    I -- this is me providing more copy options to get feedback on

9    from the team.

10   Q.   Is that unusual to have feedback in multiple iterations?

11   A.   It is not, no.

12       MR. WESNESKI:  And finally, Mr. Montgomery, if we

13   could pull up CX1210, please.

14       (Exhibit published to witness, counsel, and the Court.)

15   BY MR. WESNESKI:

16   Q.   Do you recognize this document?  I'm sorry.

17   A.   I do, yes.

18   Q.   Okay.  What is it?

19   A.   This appears to be a discussion in the private Slack

20   channel.

21   Q.   Do you see that -- words at the top, private channel

22   hashtag amp-Wisconsin?

23   A.   I do, yes.

24   Q.   What does that signify to you?

25   A.   This signifies that this is a channel related to Project

ONAK – CROSS / WESNESKI

1    Wisconsin.

2    **Q.**  And the date there, June 21st, 2023?

3    **A.**  Correct.

4    **Q.**  Is this a document created and maintained in the ordinary

5    course of business at Apple?

6    **A.**  Yes.

7            **MR. WESNESKI:**  I'd like to move CX1210 into evidence,

8    please.

9            **MS. MOSKOWITZ:**  No objection, Your Honor.

10           **THE COURT:**  It's admitted.

11           (Exhibit 1210 received in evidence.)

12   **BY MR. WESNESKI:**

13   **Q.**  At the top, Mr. Onak, there's a note from someone named

14   Atusa Savio.  Do you see that?

15   **A.**  I do, yes.

16   **Q.**  Who is Ms. Savio?

17   **A.**  Ms. Savio is another project manager at Apple.

18   **Q.**  Okay.  And you see that she asked you when can you target

19   sending copy to Shawn Cameron?

20   **A.**  I do, yes.

21   **Q.**  Who is Shawn Cameron?

22   **A.**  Mr. Cameron is -- leads the App Store legal team at Apple.

23   **Q.**  Why would you be sending the copy to Mr. Cameron?

24   **A.**  Mr. Cameron was heavily involved in the process and was

25   providing guidance and feedback along the way.

```
 1    Q.  Thank you.

 2            MR. WESNESKI:  Mr. Montgomery, can we please pull up

 3    the demonstrative for Mr. Onak.

 4        And I'm sorry, did we hand out copies of that?  It's just

 5    the system disclosure sheet but --

 6                    (Pause in the proceedings.)

 7            MR. WESNESKI:  May we approach Mr. Onak with the

 8    demonstrative, please?

 9            THE COURT:  You may.

10            MR. WESNESKI:  Thank you.

11            THE WITNESS:  Thank you.

12    BY MR. WESNESKI:

13    Q.  Mr. Onak, do you recognize what this is?

14    A.  I do, yes.

15    Q.  What is it?

16    A.  This is the final system disclosure sheet for Project

17    Wisconsin.

18    Q.  And did you write or contribute to the writing of the

19    words on this page?

20    A.  I did, yes.

21    Q.  Is there anything in here that you believe is inaccurate

22    or that you would like to correct?

23    A.  No, there is not.

24    Q.  Is there anything in here that, with the benefit of

25    hindsight, you think may be misleading?
```

1   **A.**   No.

2   **Q.**   What, in your view, is the purpose and effect of this

3   system disclosure sheet from a UX writing perspective?

4   **A.**   I believe this sheet clearly tells the user what is going

5   to happen, presents all the facts and allows them to make a

6   choice based on what they read.

7                      (Demonstrative published.)

8           **THE COURT:**  Here it is, Jennie, right here.

9   **BY MR. WESNESKI:**

10  **Q.**   And I'm sorry, Mr. Onak, I asked you this already, but

11  maybe just remind us what you understood the purpose of the

12  system disclosure sheet to be for Project Wisconsin.

13  **A.**   I believe the purpose of this sheet was to inform the user

14  with facts and tell them exactly what was -- what was going to

15  happen if they left the App Store or the app that they were

16  currently in.

17  **Q.**   And in your view as a UX writer, do you believe that this

18  system disclosure sheet accomplishes that?

19  **A.**   I do absolutely.

20          **MR. WESNESKI:**  No further questions, Your Honor.

21          **THE COURT:**  Reexam?

22          **MS. MOSKOWITZ:**  May I proceed, Your Honor?

23          **THE COURT:**  You may.

24

25

| | |
|---|---|
| 1 | **REDIRECT EXAMINATION** |
| 2 | **BY MS. MOSKOWITZ:** |
| 3 | **Q.**  I just want to make sure -- I don't have the quotes, but I |
| 4 | just want to understand.  You were asked about the same |
| 5 | language I had asked you about when you talked about how some |
| 6 | language about external website would be scary and execs would |
| 7 | love it.  Do you remember me asking about it and your counsel |
| 8 | asking about it? |
| 9 | **A.**  I do, yes. |
| 10 | **Q.**  And I think I heard you say that you thought the reason |
| 11 | execs would love it is because it was strong direct language, |
| 12 | because "external website" is an accurate label and execs |
| 13 | would like to see that.  Did I get that right? |
| 14 | **A.**  I -- I believe so.  I can't say exact, but, yes, that |
| 15 | sounds right. |
| 16 | **Q.**  So your testimony is that when you were speaking to your |
| 17 | colleagues about how the language you were proposing was scary |
| 18 | and that execs would love it was just that you were being |
| 19 | accurate; that's what you meant? |
| 20 | **A.**  That's correct. |
| 21 | **Q.**  Okay.  There was some follow-up on the discussion you were |
| 22 | having with your colleagues about using the developer name in |
| 23 | the warning screen instead of the app name; do you recall |
| 24 | that? |
| 25 | **A.**  I do, yes. |

 1  **Q.**  And your testimony was that you thought it was actually a

 2  benefit of adding the developer name; do you recall that

 3  testimony?

 4  **A.**  I do, yes.

 5  **Q.**  But you didn't just add the developer name.  You replaced,

 6  you have no reference to the app name in the there, correct?

 7  **A.**  That's correct.

 8  **Q.**  And without the app name being there, there's no way for

 9  the user to understand the connection between where they are

10  right now and the developer name that they're being thrown

11  out, right?

12  **A.**  I -- I disagree.  I think it's pretty easy because they're

13  in the app and they're tapping a link from the app.  So I

14  think there's enough context there.

15         **THE COURT:**  Why would you do that?  Why is it not

16  obvious that you would not have just the app name?  You're

17  talking about transparency, and that's not transparent.

18         **THE WITNESS:**  Your Honor, I -- I believe that it's --

19  it's a common practice when somebody links -- taps a link and

20  then they see a sheet that it's related.

21         **THE COURT:**  That's not -- that's not my -- that's not

22  an answer to my question.

23         **THE WITNESS:**  I'm sorry, Your Honor.

24         **THE COURT:**  On average, how many apps do developers

25  have?

```
 1              THE WITNESS:  Your Honor, I'm not sure.

 2              THE COURT:  No guess?  No guesstimate based on your

 3     practice?

 4              THE WITNESS:  Your Honor, I would say most developers

 5     probably have one or two apps.

 6              THE COURT:  Really?

 7              THE WITNESS:  I --

 8              THE COURT:  So you don't know.  Is that what you're

 9     saying?

10              THE WITNESS:  Your Honor, I'm not sure, no.

11              THE COURT:  And yet you want to be transparent.  You

12     don't know the answer to that question, and yet you assume

13     that by putting that language in there, somehow you're making

14     it more transparent for the users who you claim don't know

15     what they're doing.

16         That's -- that's what I take from your testimony?

17              THE WITNESS:  That's correct, Your Honor.

18              THE COURT:  And you want me to, even though you want

19     to be plain and transparent, you don't want me to interpret

20     the word "scary" in the normal way that people would interpret

21     the word "scary."  That's also what you want me to take from

22     your testimony?

23              THE WITNESS:  Your Honor, I think, you know, I was

24     using the term "scary" within our design team.  And we, as a

25     team, know the context that we were using it in.  But I don't
```

1  believe there -- there was anything scary on the actual system

2  disclosure sheet.  I believe it was all factual and pretty

3  neutral.

4          **THE COURT:**  Proceed.

5          **MS. MOSKOWITZ:**  Thank you, Your Honor.

6  **Q.**  One last topic.  You were -- I had asked you about the

7  changes that happened between the unified sheet that had been

8  vetted and finalized for the Netherlands and the reader app,

9  the changes that had been made to that to arrive at the final

10 United States injunction response, right?

11 **A.**  That's right.

12 **Q.**  And then you were asked about it too and you said that you

13 assumed a number of things about why those changes were made,

14 right?

15 **A.**  That's correct.

16 **Q.**  But you don't know why those changes were made, right?

17 **A.**  I do not know.

18 **Q.**  No one told you, right?

19 **A.**  That's right.

20 **Q.**  So you don't have any knowledge actually about that it was

21 an iterative process or that we wanted to do better, right?

22 That's not actually anything you have personal knowledge

23 about?

24 **A.**  I just -- I just assumed that based on my experience

25 working on projects at Apple.

1  **Q.** Right, but you don't have any personal firsthand

2  knowledge?

3  **A.** That's correct.

4  **Q.** And the sum of the emails you were shown, for example,

5  1210 which was the last one we looked at, June 21st was the

6  date of a bunch of these flurry of revisions.  Do you remember

7  that?

8  **A.** Off -- not off the top of my head, but I believe you.

9  **Q.** Okay.  Do you have any idea of any meetings among any

10 executives that happened on or around that time that may have

11 had to do with the changes that would be made?

12 **A.** I don't recall.

13 **Q.** And you have no idea why executives may or may not have

14 wanted those changes, right?

15 **A.** That's correct.

16 **Q.** So if Mr. Cook and Mr. Schiller were in a room together

17 saying here's what we're going to do, you have no idea about

18 that?

19 **A.** Correct.

20     **MS. MOSKOWITZ:** No further questions, Your Honor.

21     **THE COURT:** Reexam?

22     **MR. WESNESKI:** Nothing further, Your Honor.

23           (Pause in the proceedings.)

24     **THE COURT:** Is there any reason to keep this witness

25 on recall status?

```
 1              MS. MOSKOWITZ:  Not that we can think of, Your Honor.

 2              THE COURT:  You're excused.

 3              THE WITNESS:  Thank you, Your Honor.

 4              THE COURT:  That means you can step down.

 5         Next witness.

 6              MR. EVEN:  Your Honor, Epic calls Mr. Carson Oliver.

 7                    (Pause in the proceedings.)

 8              MR. EVEN:  And, Your Honor, Ms. Tina Seideman is

 9    going to join us at counsel table for this.

10         And also if we may bring up some binders, Your Honor.

11              THE COURT:  Mr. Oliver, take the stand.  You're still

12    under oath, sir, but we are going to go ahead and reswear you

13    in to remind you of your obligations to this court.

14              THE WITNESS:  Yes, Your Honor.

15              THE COURT:  Please stand.  Please raise your right

16    hand.

17

18                          CARSON OLIVER,

19    called as a witness for the plaintiff, having been duly sworn,

20    testified as follows:

21              THE WITNESS:  I do.

22              THE CLERK:  Please be seated.  Speak clearly into the

23    microphone.  Please state your full name and spell out your

24    last name for the record.

25              THE WITNESS:  My full name is Carson Oliver.  My last
```

 1     name is spelled O-L-I-V-E-R.

 2              **THE COURT:**  All right.  Good afternoon.

 3              **THE WITNESS:**  Good afternoon, Your Honor.

 4              **THE COURT:**  You may proceed.

 5              **MR. EVEN:**  Thank you, Your Honor.

 6                      **DIRECT EXAMINATION**

 7     **BY MR. EVEN:**

 8     **Q.**  Good afternoon, Mr. Carson.  Good seeing you again.

 9     **A.**  You as well.

10     **Q.**  When we last met back in May -- you -- sorry.

11                      (Off-the-record discussion.)

12     **BY MR. EVEN:**

13     **Q.**  Sir, when we last met back in May, you were the senior

14     director of business management for the Apple App Store,

15     correct?

16     **A.**  That's correct, yes.

17     **Q.**  At the time, you reported to Mr. Fischer who was the head

18     of the store, correct?

19     **A.**  That's correct, yes.

20     **Q.**  Since then, Mr. Fischer has left Apple; is that right?

21     **A.**  Yes.

22     **Q.**  And you are now heading what is known as the App Store

23     division; is that right?

24     **A.**  That's correct.

25     **Q.**  And as far as the U.S. App Store is concerned, you

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1   essentially replaced Mr. Fischer; is that right?
 2   A.   As -- as far as the App Store is concerned, that's
 3   effectively correct.
 4   Q.   And as the current head of the App Store, at least in the
 5   U.S., you report directly to Mr. Schiller now?
 6   A.   That's correct, yes.
 7   Q.   You recall that we're here because of this Court's
 8   injunction that was issued back in September 10 of 2021?
 9   A.   Yes.
10   Q.   And you were one of the leaders of the working group that
11   was tasked with modeling, analyzing, and making
12   recommendations on Apple's response to the injunction; is that
13   right?
14   A.   That's correct, yes.
15   Q.   And in that context, you prepared slides for, presented
16   it, and attended meetings with executives about Apple's
17   planned response to the injunction, correct?
18   A.   That's correct, yes.
19   Q.   And I take it Mr. Schiller and the rest of the executive
20   team are the people who instructed you to prepare those slides
21   for them and -- and those analyses; is that fair?
22   A.   I would say that's generally correct.
23   Q.   And you analyzed and presented to the executive team on a
24   variety of topics including the structure of the commission
25   that Apple considered imposing on linked out purchases, the
```

 1    placement of external links, and the design of external links,

 2    correct?

 3    **A.**   I would not say that I necessarily covered all of those

 4    elements in the same level, but in general, yes.

 5    **Q.**   And Mr. Cook, Mr. Maestri, and Mr. Schiller, as part of

 6    something referred to as the pricing committee, ultimately

 7    decided on the parameters of Apple's response to the

 8    injunction, right?

 9    **A.**   That's correct, yes.

10    **Q.**   If you turn to Exhibit CX0202 in your binder.

11    **A.**   Is it okay if I put these -- some of these old binders to

12    the side or on the ground?

13         **MS. MOSKOWITZ:**   Your Honor, may I collect them?

14         **THE COURT:**   You may.

15              (Off-the-record discussion.)

16         **THE WITNESS:**   Yes.

17    BY MR. EVEN:

18    **Q.**   Without mentioning the title of this document that

19    includes a project name that we're not allowed to say out loud

20    in court, so don't say that name, but do you see that this is

21    a regroup of a certain project dated September 13, 2021?

22    **A.**   Would you mind repeating the exhibit number just so I can

23    get to the tab.

24    **Q.**   The exhibit number is CX0202.  I believe it's probably the

25    first or second exhibit in your binder.

OLIVER – DIRECT / EVEN

1  **A.**  Yes, I have that.

2  **Q.**  And do you see that this is a regroup of a certain

3  project, the name of which we shall not name, that's dated

4  September 13, 2021?

5  **A.**  Yes, that looks like it's the title.

6  **Q.**  And do you see on the first page that there's a metadata

7  sheet that lists you as a custodian?

8  **A.**  (Reviewing document.)

9      Yes, that looks to be correct.

10        **MR. EVEN:**  Your Honor, I move to admit CX0202 into

11  evidence.

12        **MS. RICHMAN:**  No objection.

13        **THE COURT:**  It's admitted.

14        (Exhibit 0202 received in evidence.)

15        **THE COURT:**  Ms. Richman.

16        **MS. RICHMAN:**  Yes, I'm sorry.  And I've been joined

17  by Mr. Phillips and Ms. Dansey.  I apologize.

18        **THE COURT:**  Go ahead.

19  BY MR. EVEN:

20  **Q.**  Now, the date of this document, September 13, 2021, is

21  three days after the injunction in this case at issue,

22  correct?

23  **A.**  I believe that is correct, yes.

24  **Q.**  And the project this document talks about was intended to

25  consider a potential response to increased regulatory pressure

     1    on Apple in several geographies to allow the use of

     2    alternative payment solutions, correct?

     3    **A.**  (Reviewing document.)

     4        I remember this specifically related to one geography.  I

     5    don't -- I don't know if this project was covering multiple

     6    geographies or just one.

     7    **Q.**  I've seen documents stating that this was a worldwide

     8    effort.  That's why I'm asking.  Do you remember it as being

     9    related to specific geography?

    10    **A.**  I do, but I don't have a great memory of this project in

    11    general.

    12    **Q.**  Okay.  If you look up at the top of the page, do you see

    13    that the notes say "three options"?

    14    **A.**  I do, yes.

    15    **Q.**  And these are all potential options Apple considered at

    16    the time for responding to any requirement, either worldwide

    17    or in a particular geography, to allow alternative payments,

    18    correct?

    19    **A.**  (Reviewing document.)

    20        Again I remember this specifically for one geography.  But

    21    within the context of that geography, that looks to be

    22    correct.

    23    **Q.**  Okay.  And the geography you remembered this for is which

    24    geography?

    25    **A.**  It was for Korea.

OLIVER - DIRECT / EVEN

1    **Q.**  Okay.

2        And in Korea, there were rules that required the

3    introduction of alternative payments, correct?

4    **A.**  That is correct, yes.

5    **Q.**  Okay.  And the very first option is one, do nothing but

6    allow the separate payment methods in.  Right?

7    **A.**  (Reviewing document.)

8        Yes, that is what the option says.

9    **Q.**  And what this option would mean is that there would be the

10   removal of some guidelines that prohibit alternative payments

11   without imposing any new requirements, correct?

12   **A.**  (Reviewing document.)

13   **Q.**  That's what "do nothing" means?

14   **A.**  I don't remember specifically, but within the context of

15   the document that seems to be reasonable.

16   **Q.**  Okay.  The second option is charge an alternative

17   commission but audit developers, correct?

18   **A.**  That's what it says, yes.

19   **Q.**  And under this option, Apple would allow alternative

20   payments but seek a commission for the use of alternative

21   payments, correct?

22   **A.**  That seems to be the understanding I have of it, yes.

23   **Q.**  And this is essentially the option Apple chose in Korea,

24   correct?

25   **A.**  That's correct, yes.

1    **Q.**   And this is the option that Apple chose in the

2    Netherlands, correct?

3    **A.**   That is correct, yes.

4    **Q.**   And this is option that Apple chose in this particular --

5    in response to this particular injunction in the U.S.,

6    correct?

7    **A.**   Probably, yes.

8    **Q.**   And so back in September '21, the option of responding to

9    requirements to allow alternate billing, one of the options on

10   the table were to just allow alternative billings without any

11   commission, correct?

12   **A.**   That's correct, yes.

13   **Q.**   Now, do you see about halfway down the page, a bullet that

14   reads, "YGR opinion needs to be taken into account."

15      Do you see that?

16   **A.**   Yes.

17   **Q.**   And the reference to the YGR opinion here, that's a

18   reference to this Court's injunction and opinion, correct?

19   **A.**   I believe so, yes.

20   **Q.**   And the notes then say, "Charging for commission, is it

21   fine to do?"  Correct?

22   **A.**   Yes.

23   **Q.**   And so three days after the injunction issued in September

24   '21, this working group at Apple raised the question of

25   whether imposing a commission on linked-out purchases is a

1    permissible option under the U.S. injunction, correct?

2    **A.**   That seems to be correct from my reading of this document.

3    **Q.**   Now, between September '21 and January '24 when Apple

4    announced that it would be imposing a commission on linked-out

5    purchases, Apple took no steps and made no effort to seek

6    clarification from this Court to the basic question posed in

7    this document back in September of '21, charging a commission,

8    is it fine to do.  Correct?

9    **A.**   I'm not sure.

10   **Q.**   You -- you're not aware of any steps that Apple has taken

11   to get clarification from this Court as to the answer to this

12   question, correct?

13   **A.**   None that I'm currently aware of, but I wouldn't have been

14   the one who was working with the Court.

15   **Q.**   Sir, you were the one who worked on a response to the

16   injunction for a long time, correct?

17   **A.**   Yes, correct.

18   **Q.**   And during this time, did anybody come up and say, we now

19   have a clear answer to this question from the Court,

20   definitive answer?

21   **A.**   No.

22   **Q.**   Thank you.

23        So you mentioned that this document, in your recollection

24   at least, dealt with Korea.  And in Korea, in August 2021, I

25   think it was, do you recall that that was when the Korean

OLIVER - DIRECT / EVEN

1  legislature adopted rules requiring Apple and Google to allow

2  the use of alternative payment solutions for in-app purchases?

3  **A.**  I don't remember the specific date.

4  **Q.**  Okay.  But you understand it was shortly before the

5  September document that we just looked at, correct?

6  **A.**  That seems reasonable to assume.

7  **Q.**  Okay.  Now in response to these new rules, do you recall

8  that in late '21, around November, Google announced that it

9  would allow alternative payment solutions in apps distributed

10  through Google Play store, but that Google would charge a

11  26 percent commission on purchases made using those

12  alternative payment solutions?

13  **A.**  I remember the announcement, but I don't remember the

14  timeline.

15  **Q.**  Okay.  Do you remember that when Google made that

16  announcement, Apple had not yet announced its own response to

17  this statutory change?

18  **A.**  I believe that is correct.

19  **Q.**  And fair to say that you were interested in how Google's

20  plan was -- would be received, correct?

21  **A.**  In Korea, yes.

22  **Q.**  So if you turn to Exhibit CX0266.

23  **A.**  (Reviewing document.)

24      I'm there.

25  **Q.**  You're there.  Good.  Do you see that this is a January 7,

 1    2022, email, sent by an Apple employee named Shawn to you and

 2    several others with the subject Alternative Payments in Korea,

 3    developer feedback?  Do you see that?

 4    **A.**  I see that, yes.

 5           **MR. EVEN:**  Your Honor, I move to admit Exhibit

 6    CX0266.

 7           **MS. RICHMAN:**  No objection.

 8           **THE COURT:**  It's admitted.

 9           (Exhibit 0266 received in evidence.)

10                (Exhibit published.)

11    **BY MR. EVEN:**

12    **Q.**  So first of all, who is the sender of this email?

13    **A.**  It looks to be Sean Lee.

14    **Q.**  Sean Lee.  And what is the role of Mr. Lee?

15    **A.**  At the time, he was a member of the App Store team in

16    Korea.

17    **Q.**  Okay.  Is Mr. Lee still with Apple?

18    **A.**  No, he is not.

19    **Q.**  Okay.  Now, Mr. Lee writes that per your request, he's

20    updating you on developers' reactions, he's observing the

21    market to Google's 26 percent commission on alternative

22    payment solutions for in-app payments, right?

23    **A.**  Yes.

24    **Q.**  And the feedback Mr. Lee is conveying is that adoption is

25    low or nonexistent, or as he puts it, quote, "We have not

 1    heard developers starting to implement their own payments."

 2    Close quote.

 3        Do you see that?  The second paragraph, second sentence.

 4    It's also on your screen highlighted if that's helpful.

 5    **A.**  Oh, yes, that is helpful.  Thank you.

 6        Yes, I do see that sentence.

 7    **Q.**  And Mr. Lee also reports based on conversations he had

 8    with a couple of top developers, that a commission that is

 9    only 4 percent lower than the commission Google imposes on

10    transactions using Google's own payment solution, quote,

11    "doesn't help their business," close quote.  Do you see that?

12    **A.**  Just to clarify, that's what the developers communicated

13    to him?  Is that the question?

14    **Q.**  Correct.  Well, let's take it one at a time and break it

15    down.

16        Do you see the last sentence of the second paragraph

17    saying, "Having talked to a couple top developers last year,

18    their response was the following."  Do you see that?

19    **A.**  I do, yes.

20    **Q.**  And you understand that he's providing you feedback based

21    on conversations he himself had with developers who have apps

22    in Korea on the Google Play store?

23    **A.**  That's my understanding, yes.

24    **Q.**  And what he's saying is they feel that Google Play's new

25    announcement doesn't help their business.  Did I read that

OLIVER – DIRECT / EVEN

```
 1   correctly?
 2   A.   Yes.
 3   Q.   And he then says -- he gives reasons for that, correct?
 4   A.   Yes.
 5   Q.   And the first reason is that developers still have to pay
 6   fee to credit card 2 percent, DCB 7 to 8 percent, e-wallets
 7   1 percent.  No material monetary benefit.
 8        Do you see that?
 9   A.   I do.  Yes.
10   Q.   Just to clarify, DCB is Direct Carrier Billing, right?
11   A.   That seems correct given the rate that it shows.
12   Q.   Okay.  And that is when somebody purchases something and
13   instead of paying in the app, the payment goes directly to
14   their cellular carrier bill, like go to Verizon or AT&T in the
15   U.S.; correct?
16   A.   That's correct.
17   Q.   And so that part of the sentence essentially says it's
18   just as expensive for these developers or roughly just as
19   expensive to use this alternative with a 26 percent fee and
20   therefore there's not a material monetary benefit, correct?
21   A.   Yes, that's what the bullet says.
22   Q.   And then in the parenthetical, he goes further and says in
23   some cases would be payment fees would cost more, which means
24   would cost more than using Google's in-app payment system,
25   correct?
```

1   **A.**  I would assume that's what that means, yes.

2   **Q.**  Now, about a week after this email in mid-January '22, in

3   response to a separate regulatory change, Apple announced that

4   it would allow alternative payment solutions in dating apps in

5   the Netherlands; do you remember that?

6   **A.**  That is correct, yes.

7   **Q.**  And in the Netherlands, Apple imposed a 27 percent

8   commission on transactions that use alternative payments,

9   right?

10  **A.**  That's correct, yes.

11  **Q.**  Even higher than the 26 percent that this email was

12  talking about, right?

13  **A.**  Yes, it was a different market.

14  **Q.**  Then in late June '22, Apple enabled alternative payments

15  for in-app transactions in Korea, right?

16  **A.**  That's correct, yes.

17  **Q.**  And with the feedback we just reviewed in mind, Apple

18  imposed a 26 percent commission on in-app transactions made

19  using an alternate payment solution in Korea, correct?

20  **A.**  That's correct, yes.

21  **Q.**  Okay.  Now, consistent with the feedback you received from

22  Mr. Lee, very few iOS app developers actually opted to use

23  alternate payments in either the Netherlands or Korea; isn't

24  that right?

25  **A.**  It is a handful, yes.

OLIVER - DIRECT / EVEN

1    **Q.**   So, for example, as of October 2022, ten months into the

2    Netherlands program and four months into the Korea program,

3    only one developer had signed up for alternative payments

4    across the two programs.

5    **A.**   That seems roughly correct, yes.

6    **Q.**   Now, last time you testified that as you were planning

7    your response to the injunction, your team was speaking to

8    large developers about the linkout entitlement program.  Do

9    you recall that?

10   **A.**   I believe that I was speaking about after we'd announced

11   the injunction that we were speaking to large developers.  Or

12   after we announced our response to the injunction.

13   **Q.**   Okay.  Well, let's see one that you spoke to while you

14   were considering.

15        So if you go to Exhibit CX0246.

16        Are you there?

17   **A.**   No.

18   **Q.**   Let me know when you're there.

19   **A.**   (Reviewing document.)

20        Okay.

21   **Q.**   And this is as email titled "Privileged and confidential

22   forward Bumble, Inc. alternative billing program learnings for

23   App Store."  Correct?

24   **A.**   Yes.

25   **Q.**   And if you turn to that exhibit in the binder, you see

 1    that it's an email from Mr. Canter, Chip Canter, to you and

 2    others.  Do you see that?

 3    **A.**  That's correct, yes.

 4    **Q.**  And do you see that Mr. Canter is -- that's I think around

 5    page 5 or 6 -- attaching a presentation, a slide deck dated

 6    May 2023 entitled Bumble, Inc. X alternative Payment Learnings

 7    for App Store.

 8        Do you see that?

 9    **A.**  I do, yes.

10        **MR. EVEN:**  Your Honor, I move to admit Exhibit CX0246

11    into evidence.

12        **MS. RICHMAN:**  Your Honor, no objection except for in

13    my binder.  There are like a hundred pages here of just

14    printed blank pages.  Is that --

15        **MR. EVEN:**  And I apologize for that.  That -- I meant

16    to preempt this.

17        Your Honor, this is the way the document was produced to

18    us.  And because we're lawyers --

19        **THE COURT:**  Okay.

20        **MR. EVEN:**  -- we don't cut documents.  But --

21        **THE COURT:**  That's fine.  I'll -- I'll admit to

22    page 17.  And the record can reflect that pages 18 through 220

23    are blank.

24        **MS. RICHMAN:**  Thank you, Your Honor.

25        **THE COURT:**  And I'll take them out of my binder and

 1    find some use for them.

 2             **MR. EVEN:**  Thank you, Your Honor.

 3             (Exhibit 0246 received in evidence.)

 4    **BY MR. EVEN:**

 5    **Q.**  So let's start with the email to you from Mr. Canter.

 6                      (Exhibit published.)

 7    **BY MR. EVEN:**

 8    **Q.**  Mr. Canter leads your apps business development team; is

 9    that right?

10    **A.**  That's correct, yes.

11    **Q.**  And that was true back in May of '23 as well, correct?

12    **A.**  Yes.

13    **Q.**  And the word "Bumble" in the subject line and throughout

14    the email, that refers to Bumble, Inc., the developer of the

15    Bumble dating app and some other dating apps as well, correct?

16    **A.**  Yes, I believe so.

17    **Q.**  And you agree that Bumble is a large, well-known

18    developer, correct?

19    **A.**  Yes.

20    **Q.**  So Mr. Canter states in the top email that Bumble shared

21    some of its thoughts on Google UCB, e.g., alt billing, to

22    provide their recommended guidance to Apple and Apple's

23    response to the injunction and the DMA in Europe.

24        Do you see that?

25    **A.**  I do, yes.

OLIVER – DIRECT / EVEN

1   **Q.**  So let's just unpack some of the acronyms here.

2        So first of all, Google UCB refers to Google user choice

3   billing; is that right?

4   **A.**  I believe so, yes.

5   **Q.**  And you know that Google user choice billing is a program,

6   I think back then it was a pilot program where Google allowed

7   certain developers to use alternative billing for in-app

8   purchases and Google imposed a commission of 26 percent on

9   purchases made through such alternative billing solutions.

10  Right?

11  **A.**  That's my general understanding of the program, yes.

12  **Q.**  And if you turn quickly just for a second to 246.7, do you

13  see that Bumble is reminding Apple that it was the second

14  developer chosen by Google to try out Google UCB in the

15  United States.

16  **A.**  (Reviewing document.)

17       Sorry.  I -- I don't remember this document.  Do you mind

18  if I take a minute to just --

19  **Q.**  Sure.

20  **A.**  -- make sure I --

21                  (Witness reviewing document.)

22          **THE WITNESS:**  Okay.  I have broadly reviewed the

23  document.  I don't remember it.  So I may need some additional

24  time to review it if you ask more detailed questions.

25  / / /

OLIVER – DIRECT / EVEN

1   BY MR. EVEN:

2   **Q.**  That's fine.  I think we can walk through it together, and

3   bear with me.  And if you need more time, just let me know and

4   I'll let you read what you need to read.

5       Do you see on page 246.7 at the top, it says context

6   setting, Google user choice billing announced in spring 2022

7   for nongame apps with Bumble, Inc., announced a second

8   strategic pilot partner in November 2022?

9   **A.**  I do, yes.

10  **Q.**  And Bumble also reports that before adopting UCB, Bumble

11  actually used its own billing platform in its Android app,

12  correct?

13  **A.**  Yes, I see that.

14         **MS. RICHMAN:**  Excuse me, Your Honor.  I'm so sorry to

15  interrupt.  But could we have this taken down from the public

16  screens?  This is third-party confidential information.

17         **MR. EVEN:**  Okay.  Happy to take it down, although

18  I -- we have redacted anything that we thought is even

19  remotely --

20         **MS. RICHMAN:**  It's not Apple's data so --

21         **THE COURT:**  Well, that particular slide referenced a

22  news article, right?  So --

23         **MS. RICHMAN:**  Yeah.

24         **THE COURT:**  -- given that it's a news article, I

25  don't know how confidential it could be.

 1          **MS. RICHMAN:**  Of course, Your Honor.  I'm just

 2    looking a couple pages ahead and there is some data.

 3          **MR. EVEN:**  There is.  And I'm not going to show any

 4    data that is --

 5          **MS. RICHMAN:**  Okay.

 6          **MR. EVEN:**  -- numerical data or anything.

 7          **MS. RICHMAN:**  Again, I apologize.

 8          **MR. EVEN:**  Okay.

 9    **Q.**  So based on the fact that Bumble was chosen by Google to

10    try out UCB, had tried its own billing, is a large developer,

11    certainly Bumble was a developer with some valuable experience

12    in the space of using alternative billing; fair?

13    **A.**  It looks like they had used alternative payments in the

14    past with Google.

15    **Q.**  Okay.  And you agree with me that their experience from

16    doing that would be valuable for someone who's planning a

17    response to an injunction that requires allowing steering

18    [sic] to use alternative payments.

19    **A.**  We're always interested in feedback from developers.

20    **Q.**  Okay.  And you -- you agree with me that among the

21    feedback from developers, feedback from somebody who actually

22    has tested something and is a large serious developer is more

23    meaningful than input from somebody you have -- you barely

24    know or who hasn't tried alternative payments ever, correct?

25    **A.**  Yes, with the caveat that the implementation details will

OLIVER – DIRECT / EVEN

1    matter here.

2    **Q.**  Okay.  Going back to Mr. Canter's email.

3        (Exhibit published to witness, counsel, and the Court.)

4    **BY MR. EVEN:**

5    **Q.**  He states that high level, their recommendation to allow

6    third-party in-app billing that either has no commission or

7    varying rate to accommodate the cost of payments.

8        Do you see that?

9    **A.**  (Reviewing document.)

10       I see that, yes.

11   **Q.**  Okay.  If you go to page 2 of the document, you see that

12   this is an email from Ms. Segodnia of Bumble.  Do you see

13   that?

14   **A.**  I do, yes.

15   **Q.**  And in the second paragraph, three lines in, do you see

16   that she says optimizing the billing user experience for fewer

17   steps and a better user experience has a significant impact on

18   transaction conversion rates.  Do you see that?

19   **A.**  (Reviewing document.)

20       I do, yes.

21   **Q.**  Now, transaction conversion rates means the rate at which

22   transactions are completed, correct?

23   **A.**  I -- I'm sorry.  I don't know in this specific case.

24   **Q.**  You have no understanding as the current head of the Store

25   what developers talk about when they transaction conversion

OLIVER – DIRECT / EVEN

1   rates?

2   **A.**  It really depends on a variety of different variables

3   so...

4   **Q.**  Okay.  We'll get to that maybe.

5      In the next bullet point Ms. Segodnia writes that payment

6   processing fees are higher for developers overall than the

7   3 percent or 4 percent currently set aside under UCB and other

8   alternative billing programs.  Do you see that?

9   **A.**  I do, yes.

10  **Q.**  Okay.  And you understand that Mr. [sic] Segodnia here is

11  conveying that when Apple is charging a commission of 26 or

12  27 percent on alternative payment solutions, the overall cost

13  to the developer, including the cost of processing the

14  payments through an alternative billing solution, any kind of

15  support, fraud detection, et cetera, would be more than the

16  30 percent that Apple charges for transactions conducted

17  through IAP?

18  **A.**  I think they're talking specifically about Google's

19  program here.

20  **Q.**  Sir, Ms. Segodnia is writing this as feedback for Apple,

21  for Apple to use in Apple's implementation of this injunction,

22  correct?

23  **A.**  I don't know what they were providing it for.  I see what

24  they said, and I see what my team member said.

25  **Q.**  And you see that what they said was that this is

 1   alternative payment learnings for App Store, right?

 2   **A.**   (Reviewing document.)

 3   **Q.**   That's what they said in the heading of their slide deck.

 4   **A.**   Yes, and I interpret that to mean that it was delivered to

 5   the App Store team.

 6   **Q.**   And you see that your team member said that they shared

 7   their thoughts on Google UCB to provide their recommended

 8   guidance to Apple on both DMA and U.S. Epic ruling; correct?

 9   **A.**   I see what my team member wrote, but not what the member

10   of the Bumble team wrote.

11   **Q.**   Okay.  So you believe your team member, I assume, right?

12   **A.**   I don't remember this document.

13   **Q.**   That's not what I asked.  You believe that Mr. Canter,

14   when he reports to you, he tries to be accurate and truthful,

15   right?

16   **A.**   Yes.

17   **Q.**   Okay.  And so when he tells you Bumble gave us something

18   so that we can consider it as guidance when we think about DMA

19   and injunctions response, you understood that he's conveying

20   to you that either based on a communication he had with Bumble

21   or something else, he knows that that was the goal of what

22   Bumble did.  Right?

23   **A.**   Again, I don't remember what the intent of this was.

24   **Q.**   That's not what I'm asking, sir.  I'm asking you

25   understand, reading this, that Mr. Canter is conveying that

 1    message to you and that you have no basis to doubt that what

 2    he's telling you is true?

 3    **A.**  I understand what Chip was conveying to me, yes.

 4    **Q.**  And you don't have any doubt that what he's conveying to

 5    you is true, correct?

 6    **A.**  I'm just noting that there's a difference between what he

 7    conveyed and what the Bumble team conveyed in their own email.

 8    **Q.**  Okay.  So you think Mr. Canter made it up?

 9    **A.**  No.

10    **Q.**  Going back to what Ms. Segodnia said, she talked about

11    payment processing fees are higher for developer overall than

12    the 3 percent or 4 percent currently set aside under UCB and

13    other alternative billing programs, right?

14    **A.**  I see that sentence, yes.

15    **Q.**  Okay.  That doesn't say anything about Google.  That talks

16    about 3 and 4 percent currently set aside under UCB and other

17    alternative billing programs, correct?

18    **A.**  (Reviewing document.)

19        Yes, but based on my --

20    **Q.**  Sir, I'm just asking a simple question.

21    **A.**  It did --

22                     (Simultaneous colloquy.)

23        **THE WITNESS:**  It does not say Google.

24    **BY MR. EVEN:**

25    **Q.**  It does not say Google.  Thank you.

1       And Apple did in fact at the time, as we just established,

2   had two programs where Apple set aside, to use Ms. Segodnia

3   language, 4 percent and 3 percent respectively, in Korea and

4   in the Netherlands.

5   **A.**  I know our Netherlands one was live at that point.  I

6   don't remember if the Korea program was live at that point.

7   **Q.**  Sir, I just asked you if Korea went live in June of 2022 a

8   year before --

9   **A.**  Oh --

10  **Q.**  -- this deck and you said yes.

11  **A.**  -- sorry.  Sorry.

12  **Q.**  Are you changing?

13  **A.**  No, no, I was looking at the wrong year.  Yes, 2022, yes.

14  **Q.**  Okay.  So you understand that when Ms. Segodnia is

15  conveying here is that 3 percent to 4 percent is not enough to

16  allow alternative payments to make financial sense for

17  developers.  Do you understand that?

18  **A.**  As it relates to Google's program is what I understand.

19  **Q.**  So you think it doesn't make sense for -- financial sense

20  for Google, but it would make sense for Apple.  Okay.

21      Let's proceed.  Let's turn to the attached slide deck and

22  to a slide on page 8 titled Bumble, Inc.'s key asks for

23  alternative payment solutions in platform stores in order to

24  maximize revenue and optimal user experience.

25      Do you see that?

OLIVER – DIRECT / EVEN

```
 1    A.  I do, yes.
 2    Q.  And you understand that these are asks for Apple, not just
 3    for Google, correct?
 4    A.  Yes.  I believe that it's correct.
 5    Q.  Okay.  The second bullet labeled UX and UI flexibility,
 6    Bumble asks for minimal UX design mandates from platform
 7    stores to allow optimal trustworthy conversion.
 8         Do you see that?
 9    A.  I do, yes.
10    Q.  And UX means "user experience" here, right?
11    A.  Yes, I believe so.
12    Q.  And UI means "user interface," right?
13    A.  Yes.
14    Q.  Okay.  Turning to page 12, the slide is titled "User
15    experience design requirements should be minimal and optimized
16    for low friction transaction flow to ensure maximized
17    conversion and optimal user experience."
18         Right?
19                       (Exhibit published.)
20         THE WITNESS:  That's correct.
21    BY MR. EVEN:
22    Q.  Okay.  Do you understand that here, conversion means how
23    many transactions actually get completed?
24    A.  Will you give me just a minute to review this slide
25    specifically.
```

OLIVER – DIRECT / EVEN

 1    **Q.**  Sure.

 2                        (Pause in the proceedings.)

 3    **BY MR. EVEN:**

 4    **Q.**  Sir, it's not a complicated question.

 5    **A.**  No, I'm just trying to read the whole slide.

 6    **Q.**  I didn't ask you about the whole slide.  I just asked you

 7    if, as the head of the Store, you understand that conversion

 8    means how many transactions actually get completed.

 9    **A.**  Relative to this slide, I understand that conversion --

10    transaction conversion is referencing the purchases that

11    happened from within the app.

12            **THE COURT:**  So the answer is yes.

13            **THE WITNESS:**  Yes.  I just wanted to make sure it was

14    specific to this slide, not in general.

15    **BY MR. EVEN:**

16    **Q.**  Okay.  And the slide then states that because Google

17    mandates additional steps as part of the UCB checkout flow,

18    there is a drop in transaction conversion and poor user

19    experience, correct?

20    **A.**  I see the mention of the dropoff rate.  And -- and I see

21    the poor user experience reference as well.

22    **Q.**  Okay.  So that's a "yes" again?

23    **A.**  Yes.

24    **Q.**  And a drop in transaction conversion, as understood by the

25    industry and by you for this slide, means that fewer

OLIVER – DIRECT / EVEN

 1   transactions are completed and more transactions are

 2   abandoned, correct?

 3   **A.**  (Reviewing document.)

 4       That would be my understanding, yes.

 5   **Q.**  Okay.  If we turn to the next slide, 246.13.

 6       (Exhibit published to witness, counsel, and the Court.)

 7   **BY MR. EVEN:**

 8   **Q.**  Do you see this one talks about Apple's design, correct?

 9   **A.**  (Reviewing document.)

10       Yes.  It looks like it does.

11   **Q.**  And -- and you see that this says specifically, Apple

12   mandates UX with extra step that may result in poor user

13   experience.  Do you see that?

14   **A.**  Yes, I do.

15   **Q.**  Okay.  And what this shows is Apple's design for the

16   Netherlands, correct?

17   **A.**  Yes, it looks to be the Netherlands.

18   **Q.**  Now, in the Netherlands -- I'm not sure we mentioned that,

19   but Apple was required to allow alternative payments only in

20   dating apps, correct?

21   **A.**  That's correct, yes.

22   **Q.**  And so Bumble was actually one of a relatively small

23   number of developers who was entitled to use alternative

24   payments in the Netherlands, correct?

25   **A.**  Relative to the whole catalog, yes.

1   **Q.**  That's a yes, it's a relatively small number of developers

2   who can use it?  Only developers of dating apps, correct?

3   **A.**  Yes.

4   **Q.**  Okay.  Let's go back to Slide 11.

5        **MR. EVEN:**  And let's not put that one up on the

6   screen, please.

7   **Q.**  And this slide is titled "Platform fee reduction for

8   payment processing fees should reflect actual payment

9   processing costs incurred by developers."  Do you see that?

10  **A.**  I do, yes.

11  **Q.**  And here, under the heading, Bumble tells Apple in the

12  first bullet points, the developers take on fraud protection

13  costs in addition to payment processing fees, right?

14  **A.**  Yes.

15  **Q.**  And then to the right of that -- sorry, going to the next

16  bullet, it also says payment processing fees average out

17  significantly higher than the 3 percent fee difference Apple

18  instituted in the Netherlands, correct?

19  **A.**  Yes, that's roughly what the bullet says.

20  **Q.**  And Bumble also is saying that payment processing fees

21  average out to more than the 4 percent fee difference Google

22  instituted under UCB and in Korea, correct?

23  **A.**  Yes.

24  **Q.**  And on the right-hand side of the page is a table of

25  payment processing fees for Bumble for certain forms of

OLIVER – DIRECT / EVEN

1   payments, correct?

2   **A.**  Yes.

3   **Q.**  And you understand that these are actual numbers of the

4   costs to Bumble of payment processing?

5   **A.**  I'm not sure exactly what they are.

6   **Q.**  Okay.  It says sample FOP fees for Bumble in top revenue

7   markets.  Do you see that?

8   **A.**  Yes.  I'm sorry, I don't know what FOP refers to.

9   **Q.**  You don't know what FOP is?

10  **A.**  I'm sorry, I don't.

11  **Q.**  You never heard the term "form of payment."

12  **A.**  I just now did.

13  **Q.**  Okay.  Without mentioning any numbers on this slide, if

14  you go all the way down, do you see that Bumble reports the

15  fees that it faces in the United States for credit cards,

16  PayPal and Venmo?

17  **A.**  Yes, I do.

18  **Q.**  And without stating the numbers, you would agree with me

19  that these processing fees, setting aside the fraud detection

20  they were talking about and all that, these fees in and of

21  themselves are more than 3 percent, right?

22  **A.**  These numbers are more than 3 percent.  But I'm not sure

23  if these --

24  **Q.**  Sir, I just asked a simple question.  The numbers reported

25  here by Bumble for the United States for these three forms of

1    payments are more than 3 percent, correct?

2    **A.**  But you stated in your prior question that they included

3    the fraud protection costs or not, and I'm not sure whether

4    they do.

5    **Q.**  You're not sure.  Okay.  Let's look at the rest of slide.

6    Maybe you'll understand.

7       To the left of the chart, Bumble cites what it's called --

8    what it calls proposed solutions, right?

9    **A.**  Yes.

10   **Q.**  And it states that Apple should, quote, vary rates to

11   match payment method basis, close quote, or, quote, revise the

12   4 percent global average to developers' actualized average.

13      Do you see that?

14   **A.**  I see that, yes.

15   **Q.**  Okay.  And in the second bullet where it says revise the

16   4 percent global average closer to developers' actualized

17   average, the number that Bumble proposes as actual average,

18   those are multiples of 3 percent, correct?  Without naming the

19   numbers.

20   **A.**  They are, yes.

21   **Q.**  I take it you don't remember this slide deck.  I take it

22   you also don't remember ever responding to Bumble to say your

23   data is out of whack, that's not true, or anything like that,

24   correct?

25   **A.**  I don't remember this document or email.

```
 1              MR. EVEN:  Okay.  Your Honor, I'm about to move to a
 2      completely different topic so if this is --
 3              THE COURT:  All right.  Why don't we go ahead and
 4      break for the day.
 5         Mr. Oliver, you are instructed that given that you're
 6      still under examination, you cannot have any discussions with
 7      anyone whatsoever about your testimony, including lawyers,
 8      friends, family, no one.  Understand me?
 9              THE WITNESS:  Yes, Your Honor.
10              THE COURT:  Okay.  Then we'll stand in recess and get
11      started again tomorrow morning at 8:30.
12         We're adjourned for the day.
13              (Proceedings were concluded at 4:02 P.M.)
14                          --o0o--
15                    CERTIFICATE OF REPORTER
16
17              I certify that the foregoing is a correct transcript
18      from the record of proceedings in the above-entitled matter.
19      I further certify that I am neither counsel for, related to,
20      nor employed by any of the parties to the action in which this
21      hearing was taken, and further that I am not financially nor
22      otherwise interested in the outcome of the action.
23      _____
24          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR
25                  Monday, February 24, 2025
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*