CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
   crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone:  202.955.8500
Facsimile:  202.467.0539

MARK A. PERRY, SBN 212532
   mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice*)
   joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  202.682.7000
Facsimile:  202.857.0940

Attorneys for Defendant APPLE INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.<br><br>      Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>      Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**APPLE INC.'S RESPONSE TO ORDER REGARDING DISCOVERY SANCTIONS [DKT. 1171]**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Courtroom 1, 4th Floor |

**INTRODUCTION**

Apple respectfully responds to the Court's February 4, 2025 Order Regarding Evidentiary Hearing and Special Master Review (the "February 4 Order"), in which the Court stated that Apple had over-designated documents as privileged during the evidentiary phase of the injunction compliance dispute and that "sanctions are warranted" upon a "full record" and the Court's "overall findings." Dkt. 1171. Construing this as the functional equivalent of an Order to Show Cause, Apple is entitled to respond before any sanctions may be imposed.[1] Apple respectfully submits that discovery-related sanctions are not warranted under these circumstances for three reasons.

*First*, Apple's document review was conducted in good faith with robust review protocols in place. While a significant number of Apple's originally withheld or redacted documents were ultimately downgraded to not privileged during the re-review, Apple's conduct in originally designating these documents as privileged was a good-faith effort to protect the attorney-client privilege while also producing responsive material out of a population of 1.3 million documents. The documents at issue concerned difficult issues of injunction compliance, regulatory investigations and responses, and other legal proceedings related to the App Store around the globe, with attorneys appearing on thousands of the documents. Apple's privilege assertions were made on an extremely truncated timeline and based on coding decisions of hundreds of different contract reviewers that Apple had to engage in order to meet the required pace for the substantial completion deadline (which Apple consistently argued was unreasonably compressed for a review of this size). But Apple made all efforts to conduct significant quality control review of those assertions with an expanded outside counsel team. There was no coordinated effort among Apple, its outside counsel, and/or its document vendors to over-claim privilege. In connection with this response, Apple is providing the Court with copies of the written protocol instructions its outside counsel provided to document reviewers at each stage of the review, as

---

[1] "A district court may impose sanctions *sua sponte*. . . . [b]efore doing so, however, the persons against whom the sanctions were imposed must have been given the same notice and opportunity to respond that are required for sanctions generally." *Foster v. Wilson*, 504 F.3d 1046, 1053 (9th Cir. 2007) (reversing sanctions order where district court imposed sanctions without providing adequate notice or opportunity to respond); *see also Navellier v. Sletten*, 262 F.3d 923, 943 (9th Cir. 2001) ("When a court imposes sanctions *sua sponte*, the general rule is that it must first issue an order to show cause why sanctions should not be imposed to give the lawyer or party an opportunity to explain his or her conduct.").

well as Apple's own internal privilege training materials for its employees, which underscore that Apple and its outside counsel directed the application of the correct privilege standards here.

*Second*, sanctions are unwarranted here because Epic's conduct contributed directly to the situation at hand, and Apple has already borne the consequence of any alleged noncompliance by conducting the re-review.  At the outset, Epic demanded an extremely broad document collection across more than 50 custodians and over 100 unique search terms, which resulted in a universe of 1.3 million documents for Apple to review.  Apple met its substantial completion deadline despite the volume of documents generated by Epic's demands.  Epic, however, did not raise its concerns with Apple's privilege assertions until months after receiving the relevant privilege logs, and *after* the substantial completion deadline passed, straining Apple's ability to make any meaningful changes to its privilege review and logging process.  When Epic demanded a full re-review, with every single document over which Apple asserted privilege to be reviewed by Special Masters, Apple agreed in an effort to bring this matter to conclusion.  Yet, after all this time and effort spent to obtain the documents, during the resumed evidentiary hearing in 2025, out of the 49 exhibits Epic sought to admit into evidence, only approximately 30 of them were documents obtained following the re-review.

*Third*, Apple's outside and in-house counsel have dutifully executed their obligations of loyalty to their client and duty of candor to the Court by maintaining genuine privilege assertions and avoiding asserting frivolous claims.  The fact that documents were downgraded during the re-review process when reviewed by a smaller, more senior team of attorneys, does not mean that the original claims were not made in good faith.  To the contrary, as Judge Hixson has acknowledged, it is inevitable and understandable that even experienced and well-trained attorneys may come out differently on particularly close privilege questions, and complete consistency among all reviewers and all 54,000 documents is unrealistic.  That is particularly true here, where attorneys appeared on and contributed to thousands of the documents in the review and where many of the documents concerned Apple's responses to new regulatory and legal obligations.  Moreover, Apple continues to maintain that this Court has imposed an unduly narrow view of the attorney-client privilege in this proceeding and that many of the documents at issue—including a number that were introduced by Epic at the hearing—are privileged under a proper application of the doctrine.

1    For these reasons, Apple respectfully submits that discovery sanctions are not warranted.

2                                        **BACKGROUND**

3    On January 16, 2024, Apple filed is Notice of Compliance with the UCL Injunction. On March

4    13, 2024, Epic filed a Motion to Enforce Injunction. Dkt. 897. On April 23, 2024, the Court found that

5    Epic had "made a sufficient preliminary showing that, viewed holistically, Apple's practice changes

6    undermine the spirit of the injunction" and convened an evidentiary hearing. Dkt. 925, at 3. The initial

7    phase of the evidentiary hearing took place over the course of six days in May 2024. Epic did not seek

8    discovery before or during the evidentiary hearing. *See* Dkt. 915, at 14 n.2. During the hearing, the

9    Court asked Apple for certain documents related to the testimony of individual witnesses. Apple

10   produced the requested documents promptly and to the best of its ability. *See* Declaration of Mark A.

11   Perry in Support of Apple Inc.'s Response to Order Regarding Discovery Sanctions [Dkt. 1171] ("Perry

12   Decl.") ¶ 15. On May 31, 2024, after the conclusion of witness testimony, the Court directed Apple to

13   produce "all Apple's documents relative to the decision-making process leading to the link entitlement

14   program and associated commission rates." Dkt. 974. The evidentiary hearing was adjourned until those

15   materials had been collected, reviewed, and produced. *Id.* ¶ 16.

16   The parties agreed that discovery would proceed in two phases. In the first phase, Apple

17   identified and produced certain documents relevant to the testimony of Carson Oliver, one of Apple's

18   testifying witnesses. *See* Dkt. 988, at 2. In the second phase, Apple identified and produced all other

19   documents "relative to the company's decision-making process concerning the link entitlement program

20   and associated commission rate." Dkt. 983. Apple completed the first phase of discovery on June 14,

21   2024, when Apple produced several hundred documents related to Mr. Oliver's testimony and an

22   accompanying privilege log. Perry Decl. ¶ 19. The second phase was marked by frequent disputes over

23   scope of discovery and the timing of Apple's productions. *Id.* ¶ 21. As to scope, the parties disagreed

24   on the appropriate number of document custodians. Apple initially proposed 17 custodians, and Epic

25   countered with 54. *Id.* ¶ 22. During the merits phase of the litigation, Apple had produced documents

26   from only 11 custodians. *Id.* In order to resolve the dispute, Apple ultimately agreed to 52 custodians

27   for the compliance-related review. *Id.*

28

The parties also disagreed over the scope of responsive topics and corresponding search terms, including the relevance of Apple's responses to various regulatory changes around the world.  *Id.* ¶ 23.  After reaching an impasse on this and certain additional items, the parties took the open issues to Magistrate Judge Hixson to resolve.  *See* Dkts. 998, 1000, 1002, and 1003.  Judge Hixson ruled on those issues on August 8, 2024, largely siding with Epic regarding search terms and timeframes.  *See* Dkt. 1008.  Epic's search terms included more than 100 variables, most of which had nothing or little to do with Apple's injunction compliance work.  Perry Decl. ¶ 22.

Apple reported to the Court on July 17, 2024 that applying Epic's requested search terms to the requested custodians would result in "*at least* 642,000 documents and attachments from server side emails alone."  Dkt. 1000, at 5 (emphasis in original).  As Apple explained, however, that estimate did not include the "dozens or hundreds of folders containing potentially relevant documents" contained on each of the custodians' computers and network drives.  *Id.*  In order to collect those additional documents, Apple had to conduct more than 100 extensive custodial interviews and collections with the 52 custodians.  Perry Decl. ¶ 25.  To account for the significant volume of anticipated documents, Apple requested that it be allowed 6 months total for this discovery effort, up to and including December 6, 2024. Dkt. 1000, at 6.  But on August 8, 2024, Judge Hixson directed Apple to substantially complete its review and production by September 30, 2024.  Dkt. 1008.  Judge Hixson later denied Apple's request for a two-week extension of the deadline once Apple determined that the final number of collected documents would make it difficult to meet that deadline.  Dkts. 1016, 1017.

The email searches and custodial collections yielded a total of approximately 1.3 million documents for review.  Perry Decl. ¶ 28.  As described in Section I *infra*, to conduct the initial document review, Apple engaged Deloitte Transaction and Business Analytics ("Deloitte") in July 2024.  *Id.* ¶ 31.  Apple later added Consilio in September 2024 as a second vendor to assist with the review given the volume of documents and truncated timeline for review.  *Id.*  The bulk of the review was conducted by third-party contract attorneys at Deloitte and Consilio in August and September 2024.  *Id.*

Apple's outside counsel provided training and a written review protocol to the first and second-pass reviewers responsible for making privilege determinations.  *Id.* ¶ 36.  The training and protocol directed the reviewers to review for privilege under the governing Ninth Circuit standards,

1  including identifying material that should be redacted and drafting privilege log entries for each

2  privileged document.  *Id.*  Apple's outside counsel instructed reviewers to take a "narrow" view of

3  privilege, including that █████████████████████████████████████████████████████

4  ████████████████████  *Id.* ¶ 37.  This was reinforced by instructions that the inclusion of an

5  attorney on an email chain is not sufficient to invoke attorney-client privilege and that the privilege does

6  not extend to purely business related advice, even if the Apple employee is a lawyer.  *Id.*  For documents

7  containing both legal and business analysis, Apple's guidance recited the Ninth Circuit standard: if the

8  primary purpose of the communication is to give or receive legal advice (as opposed to business or tax

9  advice), that communication is protected as attorney-client privilege.  *Id.*

10  Apple emphasized these same privilege principles internally in training materials prepared by

11  its in-house and outside counsel separate from this litigation as part of its effort to educate employees

12  within Apple regarding the application of legal privilege to their communications.  Perry Decl. ¶ 50 and

13  Ex. D.  The materials state that █████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████  *Id.*

18  The global training advises employees to ████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

which is even further illustrated by the evidentiary proffer Apple submitted in response to Epic's criticism of two employees during the evidentiary hearing. *See* Dkt. 1316.

Many documents in the collection were labeled as "Privileged and Confidential" at the time of their creation, as a reflection of the extensive involvement by in-house and outside counsel with these various legal projects that Epic's search terms were designed to target. Perry Decl. ¶ 47. Indeed, a great number of the documents discussed Apple's work in responding to new regulatory and legal requirements. As a result, a significant number of the documents reviewed were of the kind that contract or outside counsel document reviewers are likely to identify as implicating attorney-client privilege. Ultimately, upon Apple's completion of its document review and production, out of the 1.3 million documents reviewed, Apple identified and produced approximately 100,000 documents that were responsive and not privileged, and withheld or redacted approximately 54,000 documents on the basis of privilege.

On October 1, 2024, a day after the substantial completion date and over three months after receiving Apple's first privilege log, Epic sent Apple a letter raising objections to certain privilege assertions. Perry Decl. ¶ 70. This letter was the first time Epic had raised any specific privilege objection. *Id.* Epic could have raised these objections earlier, but did not. *Id.* The parties thereafter met and conferred regarding Epic's privilege objections. *Id.* ¶ 71. At the same time, Apple was finalizing its remaining privilege logs, during which Apple removed several thousand documents from its privilege logs as a result of additional quality control checks. *Id.* The parties ultimately briefed their privilege dispute through a joint discovery submission to Judge Hixson on October 27, 2024, principally focused on Epic's identification of four categories of documents, under which Epic identified eleven exemplar documents. *See* Dkt. 1039.

On December 2, 2024, Judge Hixson issued a discovery order ruling that the eleven exemplar documents were, for the most part, not privileged or otherwise protected from discovery. *See* Dkt. 1056. Following Judge Hixson's discovery order of December 2, Epic requested that Apple conduct a re-review of all documents over which it had asserted privilege and that all such privilege assertions be reviewed by one or more special masters. *See* Hrg Tr. 8:23–9:14 (Dec. 3, 2024). Although Apple disagreed that Judge Hixson's ruling regarding eleven exemplar documents justified such measures, it

agreed to undertake the re-review in order to reach resolution as soon as possible. The parties thereafter negotiated a protocol for that re-review (the "Special Master Protocol"), and on December 23, 2024, this Court approved a joint stipulation "govern[ing] the re review process directed by Judge Hixson." Dkt. 1092, at 1. The Special Master Protocol requires Apple to re-review all documents previously withheld or redacted as privileged or otherwise protected and provides for three Special Masters to review Apple's privilege assertions, with either party retaining the ability to seek judicial review of the Special Masters' determinations. *Id.* at 2, 5. The Court subsequently affirmed Judge Hixson's order of December 2. Dkt. 1095.

Apple re-reviewed approximately 54,000 documents over which it had originally asserted a claim of privilege or work product in whole or in part. Perry Decl. ¶ 85. For those documents over which Apple maintained its assertion of privilege or work product, Apple began sending those documents on a rolling basis to the Special Masters on December 23. *Id.* Apple finished its re-review on January 17 and completed its final production to the Special Masters on January 22. *Id.* ¶ 89. Out of the 53,820 documents reviewed, Apple downgraded approximately 56% to not privileged. *Id.* ¶ 98. There were 7,059 documents that Apple designated as Category Two under the Special Master review protocol, which corresponds to: "Documents that Apple maintains are privileged or otherwise protected in whole or in part, but that Apple acknowledges are not privileged or otherwise protected under Judge Hixson's order of December 2, 2024 (Dkt. 1056)." *Id.* ¶ 97. Excluding the Category Two documents—over which Apple maintains its assertion of privilege—the downgrade percentage is approximately 42%. *Id.* ¶ 98. Of the documents reviewed by the Special Masters so far, the Special Masters have upheld approximately 92.2% of Apple's remaining privilege assertions. *Id.* ¶ 99.

## LEGAL STANDARD

The Court's orders have not indicated under what authority the Court may impose sanctions for Apple's privilege assertions. There are three possible sources: the Court's inherent power to sanction, Federal Rule of Civil Procedure 37, and/or Federal Rule of Civil Procedure 11.

A court can impose sanctions pursuant to its inherent power ""when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59 (1975)));

1 | *see also Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)

2 | (finding that conduct "constituted or was tantamount to bad faith" is prerequisite to sanctions).

3 | Compensatory sanctions must be supported by clear and convincing evidence of bad faith. *Lahiri v.*

4 | *Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). Punitive sanctions

5 | require "the same due process protections that would be available in a criminal contempt proceeding,"

6 | including the burden of establishing bad faith beyond a reasonable doubt. *F.J. Hanshaw Enterprises,*

7 | *Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1139 (9th Cir. 2001).

8 | Under Rule 37(b), a court may impose sanctions for violation of a discovery order, so long as the

9 | violation was *not* "substantially justified" and so long as "other circumstances [do not] make an award

10 | of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Conduct is substantially justified when "reasonable

11 | people could differ" over the appropriateness of the conduct. *See Reygo Pac. Corp. v. Johnston Pump*

12 | *Co.*, 680 F.2d 647, 649 (9th Cir. 1982); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (noting

13 | the "substantially justified" standard in Rule 37 does not mean "justified to a high degree" but rather

14 | "satisfied if there is a 'genuine dispute'" about the propriety of the conduct at issue (citation omitted)).

15 | It is unclear that Rule 37 applies here, because there is no discrete discovery order that Apple could have

16 | violated through its assertion of privilege.

17 | Finally, Rule 11 permits sanctions if a party or counsel has made a filing that "is frivolous, legally

18 | unreasonable, or without factual foundation, or is brought for an improper purpose." *Estate of Blue v.*

19 | *County of L.A.*, 120 F.3d 982, 985 (9th Cir. 1997). Rule 11 requires that a party be given "notice and a

20 | reasonable opportunity to respond" to proposed sanctions before they are imposed. Fed R. Civ. P.

21 | 11(c)(1); *see also Foster*, 504 F.3d at 1053 (reversing sanctions order where district court imposed

22 | sanctions without providing adequate notice or opportunity to respond); *see also Navellier*, 262 F.3d at

23 | 943 ("When a court imposes sanctions *sua sponte*, the general rule is that it must first issue an order to

24 | show cause why sanctions should not be imposed to give the lawyer or party an opportunity to explain

25 | his or her conduct."). Rule 11, however, "is not intended to permit sanctions just because 'the court later

26 | decides that the lawyer is wrong.'" *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1508 (9th Cir.

27 | 1987). Rule 11 likely does not apply here, because there is no pleading, written motion, or other paper

28 | that Apple or its counsel is alleged to have filed for an improper purpose.

Accordingly, the most likely source for any sanctions that could be imposed here is the Court's inherent power, which requires clear and convincing evidence of bad faith. Under any standard, however, sanctions are not warranted here.

## ARGUMENT

## I.    APPLE'S INJUNCTION COMPLIANCE PHASE DOCUMENT REVIEW DID NOT VIOLATE ANY RULES OF CONDUCT AND SANCTIONS ARE NOT WARRANTED

### A.    Apple conducted its document review in good faith, asserted genuine privilege claims over which reasonable minds could differ, and its conduct was substantially justified.

The facts here show a good-faith effort by Apple to make genuine and colorable privilege assertions in a complex document review over a short timeframe. Throughout the expedited discovery period for this proceeding, Apple directed its outside counsel to work diligently to ensure document reviewers made reasonable, non-frivolous privilege determinations over a significant volume of documents—most of which involved Apple's compliance with a Court ordered-injunction or emerging regulatory requirements around the world. Perry Decl. ¶ 47. There were extensive discussions between the parties in the summer of 2024 regarding the scope of the review, custodians, search terms, and completion period, which culminated in a joint submission of discovery disputes to Judge Hixson on July 17, 2024. *See* Dkt. 1000. Apple emphasized repeatedly that it would not be able to begin its review in earnest until the parties agreed (or the Court ruled) on custodians and search terms, "which is a necessary, threshold step for discovery." *Id.* Judge Hixson resolved the parties' remaining disputes as to scope on August 8, 2024. Dkt. 1008. Given the parties' disputes, combined with the need for Apple to conduct over 100 custodial interviews to fully capture the universe of potentially relevant documents for 52 individuals and also set up the protocols and infrastructure to conduct the review, Apple was not able to have its reviewers begin their review of 1.3 million documents until around that time. Perry Decl. ¶ 61. That left just about 7 weeks for Apple to substantially complete its review (and quality checks) of 1.3 million documents and meet its September 30 deadline.

At the direction of Apple, outside counsel made significant efforts to ensure that however expedited the review needed to be, it would be conducted by a qualified set of reviewers, under the applicable Ninth Circuit privilege standards, with as robust quality control checks as possible in the time period. *Id.* ¶ 36. To conduct the initial document review, Apple, through outside counsel, engaged

Deloitte in July 2024 and later added Consilio in September 2024 as a second vendor to assist with the review given the volume of documents and truncated timeline for review. *Id.* ¶ 31. Both vendors had years of experience working with Apple on its privilege reviews, and provided hundreds of reviewers to conduct the review who had significant prior review experience. *See generally* Declaration of Deloitte Managing Director Jonathan Foster Regarding Discovery Process in Support of Apple Inc.'s Response to Order Regarding Discovery Sanctions [Dkt. 1171] (hereinafter, the "Deloitte Decl.") and Declaration of Consilio Senior Director Clayton Leech Regarding Discovery Process in Support of Apple Inc.'s Response to Order Regarding Discovery Sanctions [Dkt. 1171] (hereinafter, the "Consilio Decl."). Apple requested and approved the vendors to add additional reviewers weekly to meet the heavy demand of the substantial completion deadline, with Deloitte utilizing up to 451 reviewers at the height of its review, and Consilio utilizing up to 113 reviewers. *See* Deloitte Decl. ¶ 5; Consilio Decl. ¶ 5.

Apple's outside counsel conducted training for all reviewers brought onboard to the project and provided written protocols that have been submitted with this filing. These materials demonstrate Apple's thorough approach to these reviews. Perry Decl., Exs. A, B, and C.

Outside counsel's training message to all of its reviewers, whether they were Deloitte, Consilio, or outside counsel team members, was clear and consistent: the reviewers were to take a "narrow" view of privilege and apply the operative "primary purpose" test from the Ninth Circuit. Perry Decl. ¶¶ 37, 44. As reflected in all three of the written review protocols submitted with the Perry Decl. (*see id.* Exs. A, B, and C), reviewers were directed to avoid relying purely on "privileged & confidential" labels as indicators of privilege, and to view documents and their context as a whole, applying careful thought to privilege calls. Specifically, in the privilege review, outside counsel instructed the second-pass reviewers:





*See id.* ¶ 37.  The supervising outside counsel gave weekly and often daily feedback to the vendor and outside counsel quality control teams.  *Id.* ¶ 39.  Neither Apple nor its outside counsel ever instructed Deloitte, Consilio, or any other reviewers to intentionally over-withhold or claim privilege without a good-faith basis.  *See* Deloitte Decl. ¶ 13; Consilio Decl. ¶ 8.  Indeed, the evidence shows Apple's intention was just the opposite: Apple expressly sought to avoid unsubstantiated assertions of privilege.

There were several aspects of the discovery that presented special challenges for Apple's discovery process.  Most of the responsive documents concerned Apple's compliance with a Court-ordered injunction and with emerging regulatory requirements from around the world.  Those changing regulatory requirements and related projects include (but are not limited to) the European Union's enactment of the DMA in 2022, the Netherlands competition authority's action against Apple related to the App Store's rules for dating apps in 2019, Apple's worldwide App Store rule changes for "reader apps" in 2022 in response to a regulatory investigation by the Japan Fair Trade Commission,

Apple's changes in 2022 for apps in South Korea to allow iOS apps to include a payment system other than IAP, and an ongoing regulatory matter stemming back to 2019 with Spotify in Europe. *See* Perry Decl. ¶ 47. And Apple has also been engaged in litigation with Epic in Australia since 2020 over substantially the same issues litigated in this case. *Id.*

In addition, the subject matter of the documents likewise made privilege determinations more complicated. Even for documents on which no lawyer appears, the content frequently relates to Apple's response to new *legal* requirements in various jurisdictions. *Id.* ¶ 58. The documents thus often contain references to orders from regulatory or judicial bodies, newly passed laws, and discussions with regulators. *Id.* And again, for those documents at issue here, these challenges are even more acute—virtually every slide deck prepared in connection with Apple's Injunction compliance efforts included some discussion of the terms and scope of the Injunction, content that a reviewer would reasonably understand to have been prepared or informed by counsel. *Id.*

Given these nuances and complexities, on top of Deloitte's and Consilio's work in the second-pass review, outside counsel's review included a robust quality control process (conducted by a team of more senior outside attorneys). *Id.* ¶ 42. Specifically, the privilege quality control process involved a third level of review by the outside counsel team of certain categories of documents, including those with in-house attorneys on them as well as a 10% sample of all documents withheld for privilege, among other conditions. *Id.* That outside counsel team included up to 80 experienced attorneys. *Id.* ¶ 43. While this process provided an opportunity for outside counsel to review a significant sample of documents completely withheld by the first-level team, the nature of such a large-scale document review utilizing contract reviewers necessarily meant that many withheld documents rested on the first-level reviewers' training and good-faith judgment calls.

Notwithstanding the detailed trainings, at the end of the day, Apple used human reviewers for this effort. Each potentially privileged document was reviewed by at least two people, and reasonable people can differ in assessment of privilege for a given document. In fact, Judge Hixson recognized this very principle in one of his most recent orders allowing Apple to claw back a document that was produced despite it being withheld in duplicate versions. *See* Dkt. 1281. In that order, Judge Hixson acknowledged that "the clawback right in the protective order and Rule 26(b)(5)(B) exists because

1    people make mistakes." *Id.* at 3.  He acknowledged that "Apple used a large team of reviewers to make

2    privilege calls on a large number of documents, and a mistake does not mean that the company

3    deliberately produced the document." *Id.*  Apple has never disputed that its reviewers may have made

4    inconsistent calls across the group of reviewers, because that is simply the reality of large document

5    production.  As just one example, a document that contains both legal and business analysis could

6    plausibly have either a primary legal or primary business purpose.  Determining which purpose

7    predominated ultimately came down to individual judgment calls made by reviewers considering

8    nuanced situations.  *In re Grand Jury Subpoena (Mr. S)*, 662 F.3d 65, 71 (1st Cir. 2011) ("Determining

9    whether documents are privileged demands a highly fact-specific analysis—one that most often requires

10   the party seeking to validate a claim of privilege to do so document by document.").

11       Epic's repeated contention that Apple engaged in bad faith during the review lacks any

12   evidentiary basis and is false.  "A good faith assertion of a valid privilege (even if such assertion later

13   proves unsuccessful) is hardly the kind of shocking behavior warranting discovery sanctions."

14   *Aristocrat Techs. v. Int'l Game Tech.*, No. C 06-03717 RMW (RS), 2009 WL 3573327, at *4 (N.D. Cal.

15   Oct. 30, 2009).  And here, Epic has offered no evidence that Apple's outside reviewers and counsel did

16   anything other than make good-faith—even if ultimately overruled or withdrawn—assertions of

17   privilege.  For example, Epic has not offered any evidence that Apple's outside counsel provided

18   inaccurate or inappropriate guidance to reviewers, that it did not staff its review adequately, that its

19   reviewers lacked the proper credentials, or any other indicia of intentional or deliberate misconduct.  The

20   only support Epic has for its claim is the fact that Apple downgraded approximately 30,000 documents

21   to "Not Privileged."  But that fact in and of itself does not demonstrate bad faith; it merely shows that

22   upon a re-review, with more time allotted and with the benefit of specific guidance from the Court

23   regarding the type of documents at issue, a team of 100 more senior attorneys tasked with this re-review

24   made different judgment calls than the Deloitte, Consilio, or other outside counsel reviewers did in the

25   first round of review.  Perry Decl. ¶¶ 87–88.  Indeed, the protocol reiterated that the reviewers should

26   take a narrow view of privilege and included some more specific guidance for privilege assertions based

27   on the Dec. 2, 2024 Judge Hixson decision on 11 exemplar documents.  *Id.* ¶ 92, Ex. J.

28

Just as Judge Hixson recognized in his clawback order, it is inevitable and understandable that even experienced and well-trained attorneys may come out differently on particularly close privilege questions, and that complete consistency among all 100 reviewers and all 54,000 documents in the re-review is unrealistic (let alone consistency among *hundreds* of reviewers over 1.3 million documents in the original review).  This is particularly true when reviewers are working on a compressed timeframe with materials that are closely related to developing legal issues, investigations, and litigation.  Nevertheless, Apple made every effort to ensure that reviewers had the clearest possible guidance and used a coding system designed to ensure uniformity across a large number of documents.

Apple engaged experienced vendors, ensured all reviewers had adequate credentials, had its outside counsel train and continuously communicate with those reviewers, and adjusted its review in real-time.  There is no suggestion that any of the procedures described herein were wrong, frivolous, or careless. There is nothing more than a "genuine dispute" regarding Apple's conduct, which does not rise to the level of sanctionable conduct.  *See Pierce*, 487 U.S. at 565 (noting the "substantially justified" standard in Rule 37 does not mean "justified to a high degree of certainty" but rather "satisfied if there is a 'genuine dispute'" about the propriety of the conduct at issue).

**B.     Other Circumstances Confirm Sanctions Against Apple Would Be Unjust**

Beyond Apple's extensive and good-faith efforts to conduct an efficient, reliable, and consistent privilege review, other factors further confirm that sanctions are inappropriate here.  In particular: (1) Epic's conduct during discovery contributed to the length and complexity of the privilege review; (2) Apple has not caused delay or prejudice to Epic; and (3) Apple has already undertaken a lengthy and costly effort to come into compliance with the Court's privilege rulings.

**1.     Epic's overbroad discovery demands unjustifiably contributed to the present dispute.**

The lengthy and complex privilege review (and subsequent re-review) is the ultimate consequence of Epic's insistence on a disproportionately large scope for discovery (far beyond the scope of discovery during the merits phase of this litigation).  The Advisory Committee Notes to Rule 37 contemplate that "other circumstances mak[ing] an award of expenses unjust" include situations "where

1   the prevailing party also acted unjustifiably." Fed. R. Civ. P. 37(a)(4) 1970 amendment. The facts

2   demonstrate that Epic's conduct was unjustifiable.

3          At the end of the May 2024 evidentiary hearing, the Court ordered Apple to identify and produce

4   all other documents "relative to the company's decision-making process concerning the link entitlement

5   program and associated commission rate." Dkt. 983. The parties commenced negotiations, which were

6   quickly bogged down by Epic's demands over custodians, search terms, time period, and other logistics.

7   Apple had initially proposed 17 custodians for the second phase of discovery. Perry Decl. ¶ 22. This

8   alone was a more than reasonable offer, with 6 more custodians than the parties had agreed to in the

9   merits phase of the litigation. But Epic countered with 54 custodians, many of whom had tangential, if

10  any, roles in the injunction compliance issues subject to this proceeding. Following multiple meet and

11  confers and after Epic would not budge, to avoid Court intervention, Apple ultimately agreed to produce

12  documents from 52 custodians. Consequently, the review involved nearly five times as many custodians

13  as the merits discovery. *Id.*

14         But Epic's broad approach did not stop at custodians. For Apple's 52 custodians, Epic requested

15  over 100 unique search terms be applied. *Id.* ¶ 23. Apple objected to several search terms that it knew

16  would produce large numbers of irrelevant results if not properly limited by additional terms. For

17  example, Apple objected to the use of "unbounded search terms related to the Digital Markets Act

18  ('DMA')"—a significant new competition law in the European Union that required work across

19  numerous aspects of the App Store—because limited overlap between the foreign regulatory scheme and

20  the Injunction did not justify the disproportionately high number of results the search was likely to

21  produce. Dkt. 998 at 5; Dkt. 1002. Apple also pushed for a narrower timeframe for discoverable

22  information. *See* Dkt. 1002, at 4-5. After reaching an impasse on this and certain additional items, the

23  parties took the open issues to Magistrate Judge Hixson to resolve. *See* Dkts. 998, 1000, 1002, and 1003.

24  Judge Hixson ruled on those issues on August 8, 2024, largely siding with Epic regarding search terms

25  and timeframes. *See* Dkt. 1008. Applying the search terms to *just* the server-side emails of the 52

26  requested custodians resulted in 642,000 documents and attachments, and then Apple estimates hundreds

27  of outside counsel hours were spent on the custodial interview process to reach the final universe of 1.3

28  million documents.

After all this time and effort—months of discovery during which Apple expended many millions of dollars to meet Epic's demands, and following numerous filings with both Judge Hixson and this Court—Epic's conduct during the final days of the hearing begs the question of how necessary it all was. The fact that only approximately 154,000 of the 1.3 million documents reviewed were responsive (whether produced or withheld or redacted as privileged) demonstrates that the scope of Epic's request was not proportional. Further, during the resumed evidentiary hearing in 2025, only approximately 30 of the 49 exhibits that Epic sought to admit into evidence were produced following the re-review. Perry Decl. ¶ 103. And at least some of the information Epic relied upon in these documents was available to Epic in unredacted form prior to the re-review. For example, the relevant slide in CX-0520 that Epic discussed at the evidentiary hearing was produced unredacted on October 1, 2024. *See* CX-0520.18; APL-EG_10851848, at 18. Thus, the entirety of the dispute now before the Court, and the threat of sanctions, stems from an overbroad discovery demand that turned up a limited set of documents that Epic found necessary to put into evidence with live witnesses.

### 2. Apple's conduct has not delayed the case or prejudiced Epic.

The Court's February 4 Order stated that Apple gained an advantage "by its own delay" and that Apple's over-designation of privilege "was the source of the current delay" for resuming the hearings. Dkt. 1171, at 2-3. Apple respectfully disagrees. As noted above, Apple promptly produced a significant number of the documents relevant to its decision-making process in July 2024. It predictably takes a significant amount time to review 1.3 million documents for relevance and privilege, but Apple has promptly and efficiently reviewed and produced those documents. Apple cannot be sanctioned for the time necessary to comply with Epic's expansive discovery requests.

Further, Epic exacerbated the delay caused by the document review by not raising its concerns with Apple's privilege assertions until *after* the substantial completion deadline. Apple produced privilege logs 10 days after each production, pursuant to the ESI protocol in this case. Dkt. 1000, at 4. But despite Apple's timely production of privilege logs, Epic did not articulate any specific complaint about Apple's privilege assertions or logging until its correspondence on October 1, 2024. That correspondence came nearly three-and-a-half months after Apple served the first privilege log that presented the issues Epic complains about—issues that Epic claims permeate all subsequent logs that

Apple has served.  By waiting until a day after Apple's September 30 substantial completion deadline to raise these specific issues, Epic impaired Apple's ability to make any meaningful changes to its privilege review and logging process before the deadline.  Epic's claim that it suddenly "became clear" to Epic in October that it had significant issues with Apple's privilege assertions is baseless, as Apple always maintained that this case presents a uniquely difficult set of privilege considerations given the inherently legal nature of decision-making related to compliance with an injunction.  *See* Evid. Hrg. Tr. 921:3–922:25 (providing "preliminary" three-month estimate given the number of custodians and complexity of privilege review); Dkt. 1000, at 5 (explaining size of review and need for individualized privilege and relevance determinations).

In addition, before Apple agreed to a full re-review at Epic's request following Judge Hixson's December 2 order, in November, this Court set the resumption of the evidentiary hearing for January 13, 2025.  *See* Nov. 4, 2024 Hrg. Tr. 6:25–7:9.  The parties ultimately returned to court on February 24, 2025, demonstrating that Apple promptly completed the re-review, provided the documents and materials to the Special Masters needed to make rulings as quickly as they could, and that the delay caused by the re-review was six weeks from the original date the hearing was set to resume, which is not substantial given Epic's more than three-month delay in raising privilege issues to begin with.

Epic continues to challenge each and every aspect of Apple's privilege review.  After it demanded that Apple re-review approximately 54,000 documents withheld or redacted for privilege, Apple agreed to conduct the re-review, as well as submit every single document over which it maintained privilege over to a panel of three Special Masters.  Apple re-reviewed these documents in just a month over the holiday season (as required by the Court) and has spent significant time and resources preparing the documents in formats requested by the Special Masters so they may review and rule on them efficiently. And despite the Special Masters overwhelmingly upholding Apple's remaining privilege claims at a rate of over 90%, Epic continues to protest.  For example, Epic challenged the Special Masters' decision to rule some documents as privileged in part (even though Apple had suggested they be withheld in full), and objected to the Special Masters' decision to allow Apple a chance to produce a redacted version instead.  Rather than allow Apple to follow the Special Masters' rulings, Epic has required Apple to now resubmit those documents (with the proposed redactions) to the Special Masters, for their additional

review, even when asked by one of the Special Masters whether Epic considers that "a very efficient way to forward" given the high uphold rate of Apple's redacted privilege assertions. *See* Feb. 18, 2024 Hrg. Tr. 13:20–17:10.

Finally, Epic has not shown that it was prejudiced by Apple's conduct in its privilege review. There is no allegation that Epic's ability to present its case was impaired by Apple's privilege assertions. Indeed, given Epic only presented a few dozen documents that came out of the re-review, Epic could not say it faced any impairment. Epic had the evidence it needed by the time of the evidentiary hearing. Sanctions are unjust in the absence of any prejudice.

### 3. Apple has already borne the consequences of any alleged discovery misconduct.

Notwithstanding Epic's conduct that contributed to the dispute at issue, sanctions are not warranted here because they are not necessary to cure any "noncompliance." Apple has already agreed, at great expense, to conduct a re-review of 54,000 documents, provide all documents over which it maintains privilege to the Special Masters, and coordinate weekly with the Special Masters to facilitate with that review. Sanctions are not necessary to cure Apple's alleged over-designation of privileged documents because Apple has already re-reviewed every document and downgraded privilege assertions that it no longer felt were supported. The Special Masters have upheld the privilege assertions submitted to the panel on over 92.2% of the documents submitted to them so far. Perry Decl. ¶ 99. Because sanctions are not necessary to cure noncompliance, and the Court could award attorneys' fees to Epic if it so chooses, any sanctions imposed for Apple's discovery process would simply punish Apple for apparent human mistakes its reviewers made during the first document review. It would be purely punitive—and accordingly require establishing Apple's bad faith beyond a reasonable doubt through criminal process. *See F.J. Hanshaw Enterprises, Inc.*, 244 F.3d at 1139. Parties routinely offer competing interpretations of legal standards, but where one party's interpretation was wrong or not adopted by the court, that is not a basis for sanctions. *See Peeler v. State Farm Mut. Auto. Ins. Co.*, No. 2:17-cv-02735-JAD-DJA, 2022 WL 118302, at *5 (D. Nev. Jan. 12, 2022) (finding discovery sanctions and attorney's fees not warranted in discovery dispute over privilege claims where "Plaintiff's counsel, Defendant's counsel, and the Court have all interpreted [the legal authority] differently".). This is

particularly so where, as here, the vast majority of Apple's remaining privilege determinations have been upheld by judicial officers.

## II.    APPLE'S COUNSEL HAS A DUTY TO ASSERT THE ATTORNEY-CLIENT PRIVILEGE AND DID NOT VIOLATE A DUTY OF CANDOR TO THE COURT

During the 2025 resumption of the evidentiary hearing, the Court prompted a discussion regarding the interplay of Apple's duty of loyalty to its client and Apple's duty of candor to the Court. Apple's assertion of the attorney-client privilege does not violate counsel's duty of candor to the Court, even if some of Apple's privilege claims were ultimately overruled. The Court was undoubtedly correct in its statement, at the 2025 evidentiary hearing, that "[a] client is not entitled to have [their attorney] engage in unethical conduct." Hrg. Tr. 1617:23–24. But there is no evidence that counsel's assertion of the privilege in this case has been unethical. Indeed, it is unethical for counsel *not* to make a good-faith assertion of privilege where possible.

Under California law, "[a]n attorney has an affirmative duty to claim the privilege if he is present when a privileged communication is sought to be disclosed." *VIA Techs., Inc. v. SONICBlue Claims, LLC*, 782 F. Supp. 2d 843, 867 (N.D. Cal. 2011) (citing Cal. Evid. Code § 955 ("The lawyer who received or made a communication subject to the privilege under this article *shall* claim the privilege . . . ." (emphasis added))). "The California Legislature has codified certain exceptions to the attorney-client privilege. . . . [b]ut [c]ourts are not permitted to imply additional unwritten exceptions to the privilege." *Lincoln Gen. Ins. Co. v. Ryan Mercaldo LLP*, No. 13-cv-2192-W (DHB), 2015 WL 12672143, at *2 (S.D. Cal. July 31, 2015) (citing Cal. Evid. Code §§ 956-962; *Costco Wholesale Corp. v. Superior Court*, 47 Cal. 4th 725, 739 (2009)). The documents at issue in this evidentiary hearing are documents over which Apple has claimed privilege based on the direct presence of an attorney that provided or received the request for advice, personal knowledge that the request or advice came from an attorney, or other circumstances where Apple had a duty to assert that privilege, despite Epic's disagreement (and the Court's) regarding whether that document contained indicia of privilege.

Apple of course acknowledges that an attorney also owes a duty of candor to the tribunal. An attorney must not: (1) "knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law;" (2) "fail to disclose to the tribunal legal authority in the

1    controlling jurisdiction known to the lawyer to be directly adverse to the position of the client;" or (3)

2    "offer evidence that the lawyer knows to be false." California Rule of Ethics 3.3(a). But Counsel's

3    assertion of the privilege in this case has not violated its duty of candor to the Court. Epic has challenged

4    many of Apple's privilege arguments, and the Court has ruled that Apple's application of the privilege

5    was overbroad in some cases. But a good-faith debatable or incorrect application of the privilege is a

6    far cry from making false statements, offering false evidence, or failing to disclose adverse authority,

7    and there is no accusation that counsel has engaged in such conduct. *Rachel*, 831 F.2d at 1508 ("[Rule

8    11] is not intended to permit sanctions just because 'the court later decides that the lawyer is wrong.'").

9    To the contrary, the written protocols Apple has submitted in support of this response demonstrate that

10   Apple made its best efforts to *avoid* frivolous privilege claims, and Apple's own internal training

11   materials show that it cautions its own employees against over-labeling documents as privileged. Perry

12   Decl. ¶¶ 50–54. An attorney is not relieved of her duty to assert the privilege simply because the

13   opposing party claims the assertion is "frivolous." *See VIA Techs.*, 782 F. Supp. 2d at 867.[2]

14       This Court's rulings and the decisions to date from the Special Masters also make clear that

15   Apple's privilege claims are not in fact frivolous or otherwise unethical. Again, the Special Masters

16   have upheld over 92.2% of Apple's privilege claims. Perry Decl. ¶ 99. Judge Hixson has overruled the

17   vast majority of Epic's objections to these decisions and affirmed the Special Masters and Apple's

18   privilege claims. *Id.* ¶ 100. For example, Apple withheld as privileged a slide deck detailing an "Epic

19   Injunction Implementation Proposal" both in the first document review and during the re-review. CX-

20   0859. The Special Masters upheld Apple's privilege assertion, and Judge Hixson overruled Epic's

21   objections. *See* Dkt. 1202, at 3 (Epic's Objection to Certain Special Master Determinations for Entry

22   1471 (PRIV-APL-EG_00162520), which was admitted as CX-0859); Dkt. 1251, at 1 (Judge Hixon's

23   Discovery Order overruling Epic's objection to entry 1471). When Epic mentioned at the hearing that

24

25   _____

     [2] Epic's generic arguments prove empty in specific situations. *See* Proffer of Evidence Relating to
26   Certain Attorney-Client Privilege Designations [Dkt. 1316] (explaining that several of Epic's criticisms
     during the hearing have no evidentiary basis and are contrary to the contextual documents). Epic also
27   noted during the hearing that many documents related to injunction compliance are labeled "Privileged
     and Confidential," but of course that is because Apple maintains that they are. This entire project was
28   an effort to comply with an order of this Court in pending litigation, and Apple sought and received legal
     advice throughout.

1   Apple had withheld the document, the Court inspected the document itself and ruled on redactions in

2   real-time, reaching a different conclusion than two independent judicial officers had.  The disparate

3   treatment of this document—which Epic argued was not privileged at all; Apple, the Special Masters,

4   and Judge Hixson agreed was fully privileged; and the Court ultimately determined was partially

5   privileged—illustrates the complexity of the privilege claims at issue and that reasonable minds can (and

6   did) differ on the appropriate application of the privilege.

7          These differences stem not from a lack of candor but from Apple's good-faith and reasonable

8   disagreement with the Court's interpretation of the Ninth Circuit's primary purpose test.  Apple has

9   preserved for appeal the argument that the Ninth Circuit's standard is wrong.  *See* Dkts. 1079, 1193.

10  Still, Apple has asserted throughout the recent privilege dispute that it views the Court's application of

11  even the existing test as too narrow.  The entire injunction compliance process was a legal project with

12  business inputs, Evid. Hrg. Tr. 1275:21:1276:4 (Schiller), and many documents associated with that

13  project—including the interim presentation decks—are privileged and not discoverable.  The Court

14  required Apple to show that legal advice was "*the* primary purpose" (rather than a primary purpose) of

15  the documents, and by demanding that the privilege claim be apparent on the face of each document.

16  Dkt. 1095, at 2. Apple's assertion that the Court's interpretation of the test is too narrow is far from

17  frivolous or unethical and is in fact supported by the recent Ninth Circuit decision in *Greer v. County of*

18  *San Diego*.  127 F.4th 1216 (9th Cir. 2025).  The majority in that case held that the primary purpose of

19  reports related to jailhouse investigations was to obtain legal advice, because "[i]nvestigation—that is,

20  discovering what happened—is a necessary predicate to assessing liability for that past event and thus is

21  not separate from the provision of legal advice." *Id.* at 1224.  Likewise, Apple takes the position in this

22  case that business discussions of ways to comply with the legal requirements of the Injunction are

23  inseparable from the underlying legal purpose of Injunction compliance.  The Injunction mandated that

24  Apple change its business practices and thus drafts and discussions of such changes are a necessary

25  predicate to assessing compliance.

26         Furthermore, while there have been some statements made on the record by Judge Hixson or this

27  Court regarding the correctness of Apple's privilege claims, there has been no finding that Apple's

28  assertions of privilege were frivolous—let alone based on false statements or other unethical conduct.

1   For example, in examining Judge Hixson's December 2 order on the 11 exemplar documents, this Court

2   affirmed the findings and found that none of the rulings reflected clear error, and rejected Apple's claims,

3   but stopped short of stating Apple's privilege claims were baseless in any way.  Dkt. 1095.  The Court

4   simply disagreed with Apple's judgment calls.  Apple concedes that it has withdrawn some privilege

5   claims following the re-review or Special Masters' rulings, but those instances are simply correcting

6   inconsistencies among or mistakes of reviewers and/or applying the Court's interim guidance.

7   Accordingly, there is no plausible violation of the duty of candor, and counsel was in fact ethically bound

8   to assert non-frivolous privilege claims on Apple's behalf.

9   **CONCLUSION**

10      For the foregoing reasons, Apple respectfully submits that there is no basis for sanctions against

11   Apple for its conduct in the injunction compliance document review.

12

13   Dated: March 7, 2025             Respectfully submitted,

14                     By: */s/ Mark A. Perry*

15                    Mark A. Perry

                      WEIL, GOTSHAL & MANGES LLP

16                    Attorney for Apple Inc.

17

18

19

20

21

22

23

24

25

26

27

28