CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
    crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone:  202.955.8500
Facsimile:  202.467.0539

MARK A. PERRY, SBN 212532
    mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice*)
    joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  202.682.7000
Facsimile:  202.857.0940

Attorneys for Defendant APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.<br><br>    Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>    Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**DECLARATION OF MARK A. PERRY IN SUPPORT OF APPLE INC.'S RESPONSE TO ORDER REGARDING DISCOVERY SANCTIONS [DKT. 1171]**<br><br>The Honorable Yvonne Gonzalez Rogers |

I, Mark A. Perry, hereby declare as follows:

1.    I am an attorney licensed to practice in the State of California, and a member of the Bar of this Court.  I am a partner at the law firm Weil, Gotshal & Manges LLP ("Weil"), counsel of record for Apple Inc. ("Apple") in this case.  Unless otherwise indicated, I have personal knowledge of the facts stated below and, if called as a witness, would testify competently thereto.  I am submitting this declaration in support of Apple's Response to Order Regarding Discovery Sanctions [Dkt. 1171].

2.    I have represented Apple in this litigation since shortly after it was filed in August 2020.  At that time, I was a partner at Gibson, Dunn & Crutcher LLP ("Gibson").  In May 2022, I left Gibson and joined Weil as a partner.  Since then, I and my team at Weil have worked collaboratively with the Gibson team (and other law firms) to represent Apple in this litigation, including with respect to the motion to enforce the injunction filed by Epic Games, Inc.  ("Epic").

3.    In response to this Court's order requiring Apple to produce all documents related to injunction compliance, Apple reviewed more than 1.3 million documents, many of which implicated complex issues of attorney-client privilege and work-product doctrine.  Apple retained numerous law firms and outside consultants to complete this extensive collection, review, production, and re-review.  Below, I provide an overview of those efforts to show that Apple's discovery conduct was in good faith.

## I.    The Permanent Injunction

4.    On August 13, 2020, Epic filed a complaint against Apple, challenging Apple's app distribution and IAP requirements under Sections 1 and 2 of the Sherman Act and analogous provisions of the Cartwright Act, as well as under California's Unfair Competition Law ("UCL").  *See* Dkt. 1.

5.    On September 10, 2021, this Court entered its Permanent Injunction, which provides in operative part:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ("Apple"), are hereby permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

6.    The first clause (i) tracks the language of Guideline 3.1.1(a) in effect at the time of trial.

CX-0001 § 3.1.1(a).  The second clause (ii) tracks the language of Guideline 3.1.3 in effect at the time of trial.  CX-0001 § 3.1.3.

7.    The Court denied Apple's motion for a stay pending appeal.  *See* Dkt. 830.  The Ninth Circuit stayed the Injunction pending appeal.  *See* C.A. Dkt. 27.

8.    On April 24, 2023, the Ninth Circuit affirmed in part and reversed in part.  *See* C.A. Dkt. 222.  As relevant here, the Ninth Circuit affirmed dismissal of Epic's Sherman Act claims, confirming Apple's right to require that developers use IAP for in-app purchases of digital goods and services.  *Id.* at 67, 76–77, 87.  The Ninth Circuit also affirmed the UCL judgment and Injunction.  *Id.* at 80.  It held that Epic's failure to prove its claims under the Sherman Act did not preclude a finding that the conduct was "unfair" under the UCL.  *Id.* at 81.

9.    Following further appellate proceedings, the Ninth Circuit mandate issued on January 16, 2024, thus ending the stay pending appeal.  C.A. Dkt. 258.

## II.    The Parties' Competing Submissions Regarding Injunction Compliance

10.    On the day the Ninth Circuit mandate issued, Apple filed a Notice of Compliance in this Court, explaining the steps that it had taken to comply with the Injunction.  Dkt. 871.  In brief, Apple deleted the prior Guidelines that contained the enjoined prohibitions, replaced them with new Guidelines that allowed the relevant communications, created an External Purchase Link Entitlement ("Entitlement") with rules regarding links, buttons, and calls to action, and established a new commission structure for transactions completed within 7 days of a user tapping a link within an iOS app.

11.    On January 30, 2024, Epic filed a Notice of Non-Compliance, disputing Apple's compliance and indicating its intent to file a motion setting forth the bases of non-compliance.  Dkt. 883.  Epic did not seek any discovery.  Dkt. 915, at 14 n.2.

12.    On March 13, 2024, Epic filed a Motion to Enforce Injunction.  Dkt. 897.  Epic contended that Apple's conduct was contrary to the "purpose" and "spirit" of the Injunction.  *Id.* at 17.  Epic sought an order (i) holding Apple in civil contempt for violating the Injunction; (ii) requiring Apple to promptly bring its policies into compliance; and (iii) requiring Apple to revise Section 3.1.3 of the Guidelines.  *Id.*

1    at 23.

2    13.    On April 23, 2024, this Court set an evidentiary hearing on Epic's Motion to Enforce.

3    Dkt. 925.    The Court found that Epic had "made a sufficient preliminary showing that, viewed

4    holistically, Apple's practice changes undermine the spirit of the injunction." *Id.* at 3.  Epic again did

5    not seek any discovery.  The initial phase of the evidentiary hearing took place over the course of 6 non-

6    consecutive days, from May 8, 2024 to May 31, 2024.

7    14.    Among other things, the testimony and other evidence established that Apple has deleted

8    the two Guidelines enjoined in the Injunction and replaced them with new Guidelines.

9    **III.    Document Discovery**

10    15.    At various points during the first phase of the evidentiary hearing, the Court directed

11    Apple to produce particular documents in connection with the testimony of individual witnesses.  In each

12    instance, Apple worked with outside counsel to produce the specified documents promptly and to the

13    best of its ability.  *See* Hrg. Tr. 33:1–11 (Fischer) (number of apps offering in-app purchases for digital

14    goods and services; produced to Epic on May 8 and to the Court on May 9); Hrg. Tr. 34:14–36:4 (Fischer)

15    (list of developers who applied for the External Link Entitlement; produced to Epic on May 8 and to the

16    Court on May 9); Hrg. Tr. 337:24–338:23 (Roman) (list of top 200 developers on the App Store by

17    revenue; produced to Epic on May 13 and to the Court on May 16); Hrg. Tr. 342:2–344:5 (Roman)

18    (summary report of data regarding the time windows in which users make successive purchases;

19    produced to Epic on May 13 and May 15, and to the Court on May 16); Hrg. Tr. 446:7–447:18 (Oliver)

20    (Price Committee Deck presented on January 11, 2024; produced to Epic on May 16 and introduced as

21    an exhibit at the hearing on May 17); Hrg. Tr. 458:1–14 (Oliver) (electronic notes on computer related

22    to Entitlement; produced to Epic and the Court on May 24); Hrg. Tr. 460:20–24 (Oliver) (email,

23    iMessage, and Slack communications regarding analysis of the commission for the Entitlement;

24    produced to Epic and the Court on May 24); Hrg. Tr. 502:16–17 (Oliver) (case studies Apple relied on

25    in forming the assumptions it used for financial analysis; produced to Epic and the Court on May 24).

26    16.    On May 31, 2024, after all the witnesses called by both parties had testified, the Court

27

directed Apple to produce "all Apple's documents relative to the decision-making process leading to the link entitlement program and associated commission rates." Dkt. 974. The evidentiary hearing was adjourned until those materials had been collected, reviewed, and produced.

17. The evidentiary hearing-related discovery directed by the Court on May 31, 2024 proceeded in two phases. *See* Dkt. 983.

18. In the first phase, Apple identified and produced certain documents relevant to the testimony of Carson Oliver, one of Apple's testifying witnesses at the evidentiary hearing. Those documents included "Quip" documents—essentially shared workspaces—to which Mr. Oliver had access and that concerned Project Michigan and/or Project Wisconsin (the codenames for the U.S. Link Entitlement program at issue in this hearing).

19. Apple completed the first phase of discovery on June 14, 2024, producing several hundred documents to Epic and providing a privilege log for documents withheld or redacted on privilege grounds.

20. In the second phase, the Court ordered Apple to identify and produce all other documents "relative to the company's decision-making process concerning the link entitlement program and associated commission rate." *Id*. On June 18, 2024, the Court referred all discovery matters related to this second phase to Magistrate Judge Hixson. Dkt. 985.

### A. Document Identification and Collection

21. Apple and Epic spent significant time negotiating the scope of the collection and review via multiple meet-and-confers and exchanges of written proposals in June and July 2024.

22. Apple had initially proposed 17 custodians for the second phase of discovery. Epic countered with 54 custodians. In order to resolve the dispute, Apple ultimately agreed to produce documents from 52 custodians. During the merits phase of the litigation, by contrast, Apple produced documents from 11 custodians.

23. For Apple's 52 custodians, Epic requested over 100 unique search terms be applied. Apple objected to several search terms that it knew would produce large numbers of irrelevant results if

not properly limited by additional terms.  For example, Apple objected to the use of "unbounded search terms related to the Digital Markets Act ('DMA')" because limited overlap between the foreign regulatory scheme and the Injunction did not justify the disproportionately high number of results the search was likely to produce.  Dkts. 998, 1002.  Apple also pushed for a narrower timeframe for discoverable information.  *See* Dkt. 1002.  After reaching an impasse on this and certain additional items, the parties took the open issues to Magistrate Judge Hixson to resolve.  *See* Dkts. 998, 1000, 1002, and 1003.  Judge Hixson ruled on those issues on August 8, 2024, largely siding with Epic regarding search terms and timeframes.  *See* Dkt. 1008.

24.    Apple reported to the Court on July 17, 2024 that applying Epic's requested search terms to the requested custodians would result in "at least 642,000 documents and attachments from server side emails alone."  Dkt. 1000, at 5.  As Apple explained, however, that estimate did not include documents that would have to be retrieved from each of the custodians' computers and network drives.  *Id.*  In order to collect those documents, Apple had to conduct extensive custodial interviews and collections with each of the custodians.

25.    Apple conducted more than 100 custodial interviews and collections on a rolling basis in June, July, and August 2024 in order to exhaust all available data sources for relevant documents.

26.    Each of those interviews involved at least one Apple in-house counsel, at least two outside counsel (from Weil and/or Gibson), and at least two Apple discovery specialists.  The interviews often lasted several hours and required the attorneys and discovery specialists to comb through every possible file location on a custodian's computer or network drives.  Some custodians required three or four interviews to get through the significant volume of documents on their computer and network drives.

27.    Altogether, Apple estimates hundreds of outside counsel hours were spent on the custodial interview process.

28.    Ultimately, after completion of all collections from the 52 custodians, there were approximately 1.3 million documents in the total review population.

**B.    *Document Review***

29.    In tandem with the collection process, Apple engaged outside vendors to conduct the document review itself.

30.    The document review platform Apple used is maintained by a company called OpenText. OpenText provides support for operating and managing the document review platform, including with respect to uploading collected documents, distributing documents for review, and processing documents for production.    OpenText and its staff do not provide substantive input on issues regarding responsiveness or privilege.

31.    To conduct the initial document review, Apple engaged Deloitte Transaction and Business Analytics ("Deloitte") in July 2024.  *See* Declaration of Deloitte Managing Director Jonathan Foster Regarding Discovery Process in Support of Apple Inc.'s Response to Order Regarding Discovery Sanctions [Dkt. 1171] (hereinafter, the "Deloitte Decl.") ¶ 7.  Apple later added Consilio in September 2024 as a second vendor to assist with the review given the volume of documents and truncated timeline for review. *See* Declaration of Consilio Senior Director Clayton Leech Regarding Discovery Process in Support of Apple Inc.'s Response to Order Regarding Discovery Sanctions [Dkt. 1171] (hereinafter, the "Consilio Decl.") ¶ 4.  The bulk of the review was conducted by third-party contract attorneys at Deloitte and Consilio in August and September 2024.

32.    The document review proceeded in two stsages, or "passes."  *See* Deloitte Decl. ¶ 7.

33.    In the "first-pass review," conducted entirely by Deloitte attorneys, the reviewers tagged documents in all scope fields, including for relevance, privilege, personally identifiable information, confidentiality, and more.  *Id.* ¶ 8.  While Deloitte initially began with approximately 75 reviewers in the first week of August, Deloitte increased the number of reviewers each week thereafter until ultimately 451 reviewers were engaged in the first-pass review to accomplish the needed pace.  *Id.* ¶ 5.

34.    In the "second-pass review," conducted by both Deloitte and Consilio attorneys, the reviewers evaluated the documents more closely for privilege specifically, applied redactions as necessary, and completed information for logging documents.  *Id.* ¶ 9.  Deloitte utilized approximately 161 professionals to review documents in the second-pass review, while Consilio utilized 113

professionals. *Id.* ¶ 5; *see also* Consilio Decl. ¶ 5.  All professionals who reviewed documents have J.D.s (or equivalent Indian degrees) and were eligible (or sat) for a bar exam.  *See* Deloitte Decl. ¶ 6; Consilio Decl. ¶ 6.

35.     Documents proceeded through the first and second-pass reviews depending on their coding.  Documents tagged "Not Responsive" did not require second-pass review and instead went directly to the outside counsel team (made up of Gibson and Weil attorneys) for quality control through a sampling review.  Documents tagged as "Responsive" and "Potentially Privileged" by Deloitte during the first-pass review were escalated to a second-pass review by Deloitte and Consilio.

36.     Apple's outside counsel provided training to the first and second-pass reviewers.  Outside counsel provided written document review protocols to Deloitte on August 7, 2024, including a privilege-specific protocol (attached hereto as Ex. A) and a general review protocol (attached hereto as Ex. B).  Those written protocols directed the second-pass reviewers to review for privilege under the governing Ninth Circuit standards, including identifying material that should be redacted and drafting privilege log entries for each privileged document.

37.     Specifically, in the privilege-specific protocol, outside counsel instructed the second-pass reviewers that:

38.     In addition to the written protocol, Gibson and Weil conducted a live privilege training with Deloitte attorneys on August 12, 2024 in anticipation of ramping up the second-pass review given Deloitte's progress on the first-pass review up to that point.  Consilio received similar training when it was added to the review.

39.     Deloitte maintained a running decision log and query tracker that tracked daily reviewer privilege questions, which the outside counsel team reviewed and responded to weekly, and at times daily.  *See* Deloitte Decl. ¶ 11.

40.     Once the second-pass review was complete, a subset of documents was then released to outside counsel (led by Weil and Gibson) for quality control checks and sampling.

41.     Given the nuances and complexities of this privilege review, on top of Deloitte's and Consilio's work in the second-pass review, outside counsel's review included a robust quality control process (conducted by a team of more senior outside attorneys).

42. Specifically, the privilege quality control process involved a third level of review by the outside counsel team of certain categories of documents, including those with in-house attorneys on them as well as a significant sample of all documents withheld for privilege, among other conditions.

43. The outside counsel quality control team included 30 reviewers to start (in August 2024), but Apple increased those reviewers weekly as the substantial completion deadline neared, with up to 80 experienced attorneys engaged in the quality control process at the height of the review. The outside counsel quality control team also received written and live training.

44. The outside counsel quality control protocol—attached hereto as Exhibit C—emphasized the same instruction that "Apple has instructed reviewers to take a *narrow* view of privilege. Where a document that is privileged may be redacted instead of withheld in full, please err on the side of redacting." *Id.* The document also included all of the additional guidance described above that was provided in the protocol distributed to the second-level reviewers. In addition, the outside counsel quality control protocol provided guidance on certain case-specific privilege issues, including:

45. Weil and Gibson worked closely with the outside counsel quality control team week by

week, providing iterative substantive privilege guidance and answering numerous questions raised by reviewers daily. Weil and Gibson emphasized repeatedly to the outside counsel quality control team that they should critically assess the first and second-pass review calls, and downgrade any documents withheld or redacted as privileged that should not have been coded that way in the first place. Indeed, Weil and Gibson continued to downgrade documents up to the finalization of each privilege log at issue where documents were found not to be privileged.

### C.    *Privilege Determinations*

46.    There were several aspects of the discovery that presented special challenges for Apple's discovery process.

47.    *First*, most of the responsive documents concerned Apple's compliance with a Court-ordered injunction and with emerging regulatory requirements from around the world. Those changing regulatory requirements and related projects include (but are not limited to):

- In 2022, the European Union enacted the DMA, which went effective in substantial part in 2023. The DMA required Apple and other technology companies to make a number of changes regarding the design of use of their platforms. As part of its compliance with the DMA, Apple made changes in the European Union regarding developers' ability to include links within their apps (similar to what is required under the Injunction) or alternatives to IAP in their apps, third parties' ability to offer alternatives to the App Store for distribution on iOS, and other App Store features permitting alternative payment and distribution options for iOS apps.

- In 2019, the Netherlands competition authority initiated an action against Apple relating to the App Store's rules for dating apps. The Netherlands competition authority eventually required Apple to make changes to the rules for dating apps in the Netherlands storefront similar to that required by the Injunction.

- In 2022, Apple changed its App Store rules worldwide to allow certain types of apps ("reader apps") to include links to websites where the user could create or manage an account with

the developer.  The changes were made in response to a regulatory investigation by the Japan Fair Trade Commission.

- In 2022, Apple changed its App Store rules for apps in South Korea to allow iOS apps to include a payment system other than IAP within their apps.

- From 2019 to the present, Apple has been engaged in a regulatory matter involving Spotify (a music-streaming app developer) in Europe regarding issues similar to that under the Injunction.

- From 2020 to the present, Apple has been engaged in litigation with Epic in Australia over substantially the same issues litigated in this case.

48.    Lawyers (both in-house and outside counsel) were involved in all of Apple's projects around the globe to comply with these requirements.

49.    Apple instructs its employees that adding a lawyer to a communication does not automatically make the communication privileged, and that documents should be labeled as "Privileged Confidential" only for communications with lawyers with the primary purpose of seeking legal advice or when working at the direction of a lawyer.

50.    On information and belief, I understand that Apple makes significant efforts internally to ensure that Apple's legal and non-legal employees understand the circumstances under which their communications or work product may (or may not) be protected by a legal privilege.  Apple recommends privilege training for all corporate employees upon joining Apple.  Apple also provides regular quarterly trainings for select employees and divisions.

51.    Attached hereto as Exhibit D is a true and correct copy of Apple's company-wide training to employees regarding the use of "Privileged and Confidential," which was created in 2021 and last revised in December 2023.

52.    Apple's company-wide privilege training explains the concept of privilege and emphasizes the consequences of claiming privilege too broadly or too often, which devalues the "Privileged and Confidential" label.  *See* Exhibit D at 12.  The materials state ▮▮▮▮▮▮▮▮▮▮

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ████████████

6      53.    The global training advises employees to ███████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 ████████████████████

17     54.    The materials ███████████████████████████████████

18 ███████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ████████████████████████████

24     55.    Nonetheless, even under Apple's robust guidance, many documents in this review were

25 labeled as "Privileged" at the time of their creation, as a reflection of the extensive involvement by in-

26 house and outside counsel with these various projects.  As a result, a significant number of the documents

27

28

reviewed are of the kind that contract or outside counsel document reviewers are likely to flag as potentially implicating attorney-client privilege.

56.    Although outside counsel provided detailed training to document reviewers—including instructions that the presence of a lawyer does not render a document privileged and that documents labeled "Privilege" by the sender are not presumptively privileged—the presence of (and often active participation by) lawyers on so many documents is the kind of signal document reviewers are frequently trained to look for when evaluating documents for privilege.

57.    Many of the documents most directly at issue—those concerning Apple's efforts to comply with the Injunction—raise these challenges.  Every document concerning the Entitlement was created as a direct result of the Injunction—there was no preexisting business motivation for Apple to develop the Entitlement.  None of the analyses produced in discovery would have been undertaken but for the Injunction.  And consequently, drafts of documents were sent to legal for review or were drafted in part (sometimes substantial part) by lawyers.  While final versions of these documents sometimes ended up being made public (through Apple's website) or were produced to Epic, the *drafts* of those documents frequently reflected iterative feedback from counsel.

58.    *Second*, the subject matter of the documents likewise made privilege determinations more complicated.  Even for documents on which no lawyer appears, the content frequently relates to Apple's response to new *legal* requirements in various jurisdictions.  The documents thus often contain references to orders from regulatory or judicial bodies, newly passed laws, and discussions with regulators.  And again, for those documents at issue here, these challenges are even more acute—virtually every slide deck prepared in connection with Apple's Injunction compliance efforts included some discussion of the terms and scope of the Injunction, content that a reviewer would reasonably understand to have been prepared or informed by counsel.

59.    Although document reviewers received training to help them understand the business context for these slide decks and other similar documents, it is not surprising that many reviewers considered these documents to have been created for the primary purpose of seeking, obtaining, or

implementing legal advice.

60.     *Third*, Apple had to work on a highly truncated timeline.   Apple consistently communicated to Judge Hixson that it needed sufficient time to conduct a careful review given the high volume of documents anticipated, and requested that the deadline for substantial completion be set for December 6, 2024.  *See* Dkt. 1008.  But on August 8, 2024, Judge Hixson directed Apple to substantially complete its review and production by September 30, 2024.  *Id.* Beginning with the Court's order of May 31, that timeframe gave Apple four months to collect, review, log, and produce responsive documents.  Apple ultimately collected and reviewed ~1.3 million documents, which even assuming a highly aggressive rate of 100 documents per reviewer per hour, requires approximately 13,000 attorney hours to review on the *first* pass.  That time does not include the additional second-pass review, quality control reviews, privilege log refinements, or production logistics.  Even for a company with Apple's resources, this was a substantial task.

61.     In light of the substantial collection work needed and the time spent negotiating with Epic over custodians and terms in May, June, and July, Deloitte's review did not begin in earnest until August 6, 2024 and documents were not ready for Apple's outside counsel quality control team to review until mid-August.  Apple continuously added resources to the Deloitte and Consilio teams, and also its outside counsel quality control team, in an effort to meet its deadlines.  Each incremental addition of reviewers, however, required additional onboarding and training, adding logistical burdens throughout the process. And it is a basic principle of modern discovery that the more reviewers that are added, the greater variance there will be among privilege determinations.

62.     Given that Apple's original estimate of documents (based on server-side emails alone) more than doubled following the collection efforts, and in recognition that the review ramp-up took time, on September 26, Apple requested a two-week extension of its time to substantially complete its review and production.  *See* Dkt. 1016, at 5–6.  Judge Hixson denied that request on September 27, 2024.  *See* Dkt. 1017.

63.     Apple thereafter substantially completed its document production by September 30, 2024.

64. In the course of denying Apple's two-week extension request, Judge Hixson made several statements that about Apple's conduct during the review process with which Apple disagreed.

65. *First*, Judge Hixson noted that Apple had not previewed to Epic or the Court that the number of documents to be reviewed substantially exceeded its earlier estimate. *Id.* at 1–2. From that, Judge Hixson inferred that "Apple knew it wasn't on track to make the substantial completion deadline and kept that a secret." *Id.* at 1.

66. Despite its longstanding position that a September 30, 2024 deadline would be difficult to meet, Apple ramped up its review teams and efforts to make its best efforts to meet the September 30, 2024 deadline for substantial completion. It was in the weeks leading up to September 30 that Apple recognized the difficulty meeting that deadline would pose. Notifying a court that it will be difficult to meet a deadline and requesting a short extension is not evidence of "bad behavior." *Id.* at 2.

67. *Second*, Judge Hixson opined that Apple has "nearly infinite resources available to it," and that "[i]f Apple really wanted to," it could "collect and review 1.3 million documents" in the time allotted, and went on to suggest that Apple "could probably review that many documents in a weekend."

68. Respectfully, this characterization of Apple's capabilities is not in line with the realities of modern discovery. It is not a matter of simply hiring enough reviewers to get through the documents (although even that is a limiting factor, because Apple's vendors and outside counsel only have so many reviewers available at any moment to engage on a project). A large document review requires the personal attention of the attorneys most knowledgeable about the underlying facts of the case. Reviewers can be trained, but there is no substitute for the institutional knowledge and experience of the attorneys actually litigating the matter. Attorneys with those capabilities are a relatively finite population. Those attorneys draft and refine review guidelines, train reviewers, answer questions and issues escalated by the reviewers, coordinate day-to-day project management, conduct quality control checks, finalize productions, and revise and finalize privilege logs, among many other tasks. Particularly in a complex and difficult discovery project like this—where Apple's responsiveness and privilege determinations have been closely scrutinized—if Apple is to have any confidence as to the quality of its document

1    review, there must be meaningful involvement from those attorneys with the most experience.  The faster

2    a production is made, the more reviewers are required; and the more reviewers, the more inconsistency.

3        69.    *Third*, Judge Hixson indicated that Apple was motivated to delay the document

4    production.  Dkt. 1017, at 2.  Apple has sought from the beginning to resolve any disputes about its

5    compliance with the Injunction promptly.  It filed its Statement of Compliance on January 16 (the day

6    before the Injunction went into effect), it sought no extensions of time for its submissions outside of the

7    mutually agreed upon briefing schedule, and it prepared its witnesses in a matter of weeks without

8    seeking to delay or otherwise postpone the evidentiary hearing.  Apple has always wanted prompt

9    resolution of this dispute, so that it may have certainty (one way or another) as to its business model in

10   the United States going forward.

11   **IV.    Privilege Re-Review**

12       70.    On October 1, 2024, one day after the substantial completion date of September 30, Epic

13   sent Apple a letter raising objections to certain privilege assertions Apple had made in its privilege logs

14   served on June 14.  This letter was the first time Epic had raised any specific privilege objection.  *See*

15   Dkt. 1024, at 4.  The objections Epic did raise in October could have been raised in July, August, or

16   September—but were not.

17       71.    The parties thereafter met and conferred regarding Epic's privilege objections.  At the

18   same time, Apple was finalizing its privilege logs, during which Apple removed several thousand

19   documents from its privilege logs as a result of quality control checks.

20       72.    The parties ultimately briefed their privilege dispute through a joint discovery submission

21   to Judge Hixson on October 27, 2024, principally focused on Epic's identification of four categories of

22   documents, under which Epic identified eleven exemplar documents.  *See* Dkt. 1039.

23       73.    On December 2, 2024, Judge Hixson issued a discovery order ruling that the eleven

24   exemplar documents were, for the most part, not privileged or otherwise protected from discovery.  *See*

25   Dkt. 1056.

26       74.    Following Judge Hixson's discovery order of December 2, Epic requested that Apple

27

28   DECLARATION OF MARK A. PERRY IN SUPPORT        16        CASE NO. 4:20-CV-05640-YGR
     OF APPLE INC.'S RESPONSE TO ORDER
     REGARDING DISCOVERY SANCTIONS [DKT..
     1171]

1  conduct a re-review of all documents over which it had asserted privilege and that all such privilege

2  assertions be reviewed by one or more special masters. *See* Hrg. Tr. 8:23–9:14 (Dec. 3, 2024). Although

3  Apple disagreed that Judge Hixson's ruling regarding eleven exemplar documents justified such

4  measures, it agreed to undertake the re-review in order to reach resolution as soon as possible.

5    75.    The parties thereafter negotiated a protocol for that re-review (the "Special Master

6  Protocol"), and on December 23, 2024, this Court approved a joint stipulation "govern[ing] the re-review

7  process directed by Judge Hixson." Dkt. 1092, at 1. The Special Master Protocol requires Apple to

8  re-review all documents previously withheld or redacted as privileged or otherwise protected and

9  provides for three Special Masters to review Apple's privilege assertions, with either party retaining the

10 ability to seek judicial review of the Special Masters' determinations. *Id.* at 1, 4.

11    76.    Concurrently with these efforts, Apple appealed Judge Hixson's rulings on nine of the

12 eleven exemplar documents. Dkt. 1079. Judge Gonzalez Rogers affirmed Judge Hixson's rulings on

13 December 31, 2024. Dkt. 1095.

14    ***A.    Category Two Documents and Apple's Reservation of Rights***

15    77.    The Special Master Protocol divides the re-reviewed documents into three categories:

16  • Category One: "Documents that Apple continues to maintain are privileged or otherwise

17     protected in whole or in part (including for the avoidance of doubt any documents

18     downgraded from withheld to redacted and/or as to which the redactions have changed),

19     including under the December 2 Order." Dkt. 1092 ¶ 1(b)(i);

20  • Category Two: "Documents that Apple maintains are privileged or otherwise protected in

21     whole or in part, but that Apple acknowledges are not privileged or otherwise protected under

22     Judge Hixson's order of December 2, 2024 (Dkt. 1056)." *Id.* ¶ 1(b)(ii);

23  • Category Three: "Documents that Apple no longer maintains are privileged or otherwise

24     protected." *Id.* ¶ 1 (b)(iii).

25    78.    These categories—and in particular, Category Two—served two purposes. First, at the

26 time Apple began its privilege re-review, it had pending before this Court an objection to Judge Hixson's

27

28

December 2 Order. *See* Dkt. 1079. As Judge Hixson recognized, Apple should not be ordered to produce documents affected by his discovery order until Apple had exhausted its right of review in this Court. Hrg. Tr. 22:4–10 (Dec. 3, 2024). Documents sorted into Category Two were therefore initially withheld from both the Special Masters and Epic, and released only after this Court ruled on (and denied) Apple's appeal. *See* Dkt. 1095. Second, the identification of documents in Category Two, both before and after resolution of Apple's appeal from Judge Hixson's discovery order, allows Apple to track those documents it maintains are privileged and preserve for appeal its contentions that those documents are protected from discovery under the attorney-client privilege and/or work-product doctrine.

79.     Pursuant to the protocol, Apple began producing Category Two documents to Epic five court days after this Court denied Apple's appeal. *See* Dkt. 1092 ¶ 1(h). In conjunction with those productions, on January 8, I wrote to counsel for Epic advising, in relevant part:

- "It remains Apple's position that many or all of the 'Category Two' documents are protected from discovery or disclosure under the attorney-client privilege and/or work product doctrine, in whole or in part." A true and correct copy of that letter is attached as Ex. E, *see* at 1.

- "The 'Category Two' documents are accordingly being produced to Epic at this time pursuant to Court order, over Apple's objections, and subject to a forthcoming appeal." *Id.*

- Apple's current "production and any prior or future productions of 'Category Two' documents—and any use of the documents in district court proceedings—do not constitute a waiver of any applicable privilege or other protection." *Id.*

- "To avoid possible prejudice to Apple until the privilege issue has been finally resolved on appeal, Epic shall not take any actions with respect to the 'Category Two' documents, including but not limited to further dissemination, that could constitute (or be deemed to constitute) a waiver or invasion of any applicable privilege or other protection, as to particular documents or their subject matter." *Id.* at 1–2.

- "So that there is no ambiguity in the record, Apple will create an index identifying all 'Category Two' documents at the conclusion of the re-review process. Such documents

should be treated as 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' pursuant to the Amended Protective Order in effect for this litigation (Dkt. 274, at 2)."

80.    Epic did not respond to the January 8 letter until February 7, 2025, as discussed below.

81.    Since January 8, the parties have briefed to Judge Hixson several rounds of objections to rulings of the Special Masters on certain of Apple's privilege assertions. Judge Hixson has ruled on some, but not all, of those objections. *See* Dkts. 1139, 1150, 1157, 1209, 1242, 1251, 1264, 1281. For those documents Judge Hixson has ruled are not privileged, Apple was required to (and did) produce those documents to Epic within three court days of Judge Hixson's rulings. *See* Dkt. 1092 ¶ 4(c). A list of all documents upheld by the Special Masters but ordered produced by Judge Hixson as of the date of this declaration is attached as Ex. F.

82.    On February 5, 2025—after Apple had re-reviewed all of the documents over which it had originally maintained privilege—I wrote a second letter to counsel for Epic following up on my prior letter, stating, in relevant part:

- "We are currently finalizing the index that we stated we would provide that identifies all 'Category Two' documents now that Apple's re-review has concluded." A true and correct copy of that letter is attached as Ex. G, *see* at 1.

- "In light of Apple's express reservation of rights, Apple has not waived its privilege assertions over any documents produced pursuant to the orders of the Court, including all 'Category Two' documents." *Id.*

- "Nevertheless, in an abundance of caution and to avoid any dispute about this issue in the future, in this or in any other forum, we request that Epic enter into the attached stipulation under the Federal Rule of Evidence 502(d) providing that Epic's or Apple's use of any of the Category Two documents at the hearing, as well as any use of documents that the Court has ordered produced notwithstanding objections to the Special Master rulings, does not constitute a waiver of any applicable privilege or other protection." *Id.*

83.    Counsel for Epic responded on February 7, 2025, stating: "Epic treats and will continue

to treat as 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' (pursuant to the Amended Protective Order, Dkt. 274 (the 'PO')) any document appropriately designated as such under Section 5.2 of the PO. Epic does not agree to Apple's other demands reflected in your letters and reserves all rights." A true and correct copy of that letter is attached as Ex. H.

84.    On February 11, 2025, I responded to counsel for Epic, providing the appendix of Category Two documents. A true and correct copy of that letter is attached as Ex. I. That appendix is attached as Ex. J.

### B.    The Re-Review Process

85.    Apple re-reviewed approximately 54,000 documents over which it had originally asserted a claim of privilege or work product in whole or in part. For those documents over which Apple maintained its assertion of privilege or work product, Apple began sending those documents on a rolling basis to the Special Masters on December 23. Apple completed its final production to the Special Masters on January 22.

86.    During that same time period, Apple produced to Epic the documents over which it is no longer asserting privilege.

87.    At the outset of the re-review project, Apple identified approximately 40 reviewers—all attorneys at law firms—to conduct the re-review. Based on the target rate of 15,000 documents per week, Apple reasonably believed that 40 reviewers was sufficient to meet that target, requiring reviewers to review approximately 375 documents per week.

88.    In the initial weeks of the re-review, Apple believed it could reach and maintain the desired pace with the 40 reviewers retained. Over the winter holidays, however, as some reviewers began to fall short of their weekly targets, Apple determined that additional reviewers would be needed. Beginning on December 28, Apple added more attorneys from the firms involved in the privilege re-review. As a result of those efforts, the re-review team grew to approximately 100 reviewers.

89.    At a hearing on January 3, Judge Hixson directed that Apple should aim to finish its review of the documents by January 17. Hrg. Tr. 16:17–20 (Jan. 3, 2025). With the help of the larger

group of reviewers and significant effort by all involved, Apple was able to meet that deadline.

90.     Epic has raised questions during and after the privilege re-review about the percentage of downgrades from week to week.  *See* Hrg. Tr. 4:16–5:6 (Jan. 14, 2025); *see also* Dkts. 1149, 1151.  The reviewers added later in the process received the same re-review training as those added at the beginning. At no point were reviewers instructed to alter their general standards for evaluating privilege or to assert privilege over a great proportion of reviewed documents.

91.     A significant proportion of Apple's re-review team consisted of experienced attorneys (including partners) with institutional knowledge of the case and experience applying privilege doctrine. Apple took on the steep additional cost of including these senior attorneys in the re-review in effort to ensure that the team was well-equipped to make the nuanced privilege calls necessitated by Judge Hixson's order.

92.     Apple created a revised review protocol for the privilege re-review, which is attached hereto as Ex. K.  The protocol reiterated that "Apple has instructed reviewers to take a *narrow* view of privilege" and similar guidance contained in the second-pass protocol quoted above.  The re-review protocol added to this general guidance ███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
  █ ██████████████████████████████████████████████
    ███████████████████████████████████
  █ ████████████████████████████████████████████████████
    ██████████████████████████████████████████████████████
    ██████████████████████████████████████████████████████
  █ ████████████████████████████████████████████████
    █████████████████████████████████████████████
  █ ████████████████████████████████████████████████████████
    ████████████████████████████████████████████████

Declaration of Mark A. Perry in Support          21          Case No. 4:20-cv-05640-YGR
of Apple Inc.'s Response to Order
Regarding Discovery Sanctions [Dkt..
1171]

93.     The re-review protocol also detailed a nuanced coding system designed to comply with the Special Master Protocol and the three categories of documents described therein. ███████

94.     Each week, members of the review team assisted with finalizing the production and creating a privilege log.  In creating and revising the privilege log, attorneys were instructed to re-examine any privilege calls that did not seem justified based on the reviewer's narrative explanation or other features of the document.  For example, if a document marked privileged was described as a "system disclosure sheet"—something Judge Hixson's order and the re-review protocol explicitly state is not privileged—the attorney working on the privilege log would re-examine the document to determine if the reviewer made the correct call.  Additional documents were downgraded to not privileged as part of this process.

95.     The reviewers retained by Apple for the privilege re-review were all included on a single

listserv to allow for easy communications.  Much of the communications consisted of logistical reminders about weekly document review targets.  However, the review team also engaged in rigorous discussions about individual documents that reviewers were unsure about.  The attorneys supervising the team carefully considered the sometimes-difficult privilege questions raised by these documents and attempted to provide categorical advice to all reviewers to ensure consistent treatment of similar documents.  For example, the supervising attorneys clarified that calendar items and agendas are not privileged, and that certain non-lawyers at Apple who frequently worked with the legal team—such as the communications team—could not themselves serve as the basis for a privilege claim.

96.    It is inevitable and understandable that even experienced and well-trained attorneys may come out differently on particularly close privilege questions, and that complete consistency among all 100 reviewers and all 54,000 documents is unrealistic.  This is particularly true when reviewers are working on a compressed timeframe, and new reviewers are constantly being added to the team in an effort to complete the review within the timeframe.  Nevertheless, Apple made every effort to ensure that reviewers had the clearest possible guidance and used a coding system designed to ensure uniformity across a large number of documents.

### C.    Final Results of the Privilege Re-Review

97.    On January 31, 2025, Apple provided the metrics of its re-review to this Court (Dkt. 1151, at 5-6).

**Total documents re-reviewed:** 53,820

**Categories**

    **Category 1:** 22,658

    **Category 2:** 7,059

    **Category 3:** 24,103

**Privilege assertions**

    **Documents tagged "Not Privileged":** 30,104

    **Documents tagged "Privileged":** 23,716

98.    Out of the 53,820 documents reviewed, Apple downgraded approximately 56%. Excluding the Category Two documents—over which Apple maintains its assertion of privilege—the downgrade percentage is approximately 42%.

99.    The Special Masters' review of Apple's documents remains underway.  The following metrics represent the Special Masters' progress as of March 7 (updating the numbers previously reported to the Court):

**Documents Ruled On:** 12,078

> **Privilege Upheld in Full:** 11,132 (92.2%)

> **Privilege Upheld in Part, Overruled in Part:** 94 (0.8%)

> **Privilege Overruled in Full:** 739 (6.1%)

**Requests for Additional Information:** 89

100.    As of March 4, 2025, Apple has objected to nine sets of Special Master rulings, and Epic has objected to eight.  See Dkts. 1139, 1157, 1209, 1242, 1251, 1264.  Judge Hixson has sustained Epic's objections (and overruled Apple's privilege claim) as to 29 individual documents.  Judge Hixson has sustained Apple's objections (and upheld its privilege claim) as to 10 individual documents.  The vast majority of both parties' objections to the Special Masters' rulings have been overruled.  Apple has appealed three of Judge Hixson's rulings to Judge Gonzalez Rogers.  *See* Dkts. 1193, 1221, 1285, 1298. Two of the appeals are deemed denied and two are pending

101.    Between the 7,059 Category Two documents, the 833 documents overruled by the Special Masters in whole or in part, as of March 7, and the 29 additional documents overruled by Judge Hixson, Apple has produced approximately 7,921 documents over which it maintains its privilege assertions but that were ordered produced to Epic, on direction from either the Court or the Special Masters pursuant to the re-review protocol.

102.    As the Court has already recognized, the privilege rulings are not immediately appealable to the Ninth Circuit.  Hrg. Tr. 12:12–15 (Dec. 18, 2024).  Accordingly, Apple has produced these documents to Epic pursuant to Court orders.  As expressed in its letters to Epic, however, Apple reserves

its rights to challenge the adverse rulings as to the documents once an appealable order is entered in this Court.  Epic stated in its response to Apple's motion for entry of a 502(d) order (Dkt. 1198) that "Epic agrees" that "Apple clearly has *not* waived the privilege claims overruled by this Court over Apple's vociferous objection." Dkt. 1259, at 5.

103.    At the 2025 resumed evidentiary hearing, based on the exhibits, it appears that Epic sought to admit 49 documents into evidence, of which only approximately 30 were obtained through the re-review.

104.    Apple acknowledges that some inconsistent or even incorrect privilege calls may have been made by its reviewers during the various document reviews.  In my professional judgment, such variations are not uncommon in a large and complex document review conducted on a highly compressed time frame, and they are not the result of any failure by Apple to provide adequate training or guidance. Nor do they indicate that the initial designations were made in bad faith, particularly given that they were made before Judge Hixson issued his December 2 order.  Again, a large number of the documents at issue were created in connection with either this litigation or regulatory compliance projects in other jurisdictions.  Particularly when viewed in that context, there is no basis to infer that any privilege assertions were made in bad faith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of March 2025, in Middleburg, Virginia.

Dated: March 7, 2025                                    Respectfully submitted,


By: */s/ Mark A. Perry*
Mark A. Perry
WEIL, GOTSHAL & MANGES LLP

Attorney for Apple Inc.

Declaration of Mark A. Perry in Support          25                          Case No. 4:20-cv-05640-YGR
of Apple Inc.'s Response to Order
Regarding Discovery Sanctions [Dkt..
1171]