# EXHIBIT A
## (Redacted)

GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
MICHAEL J. ZAKEN (*pro hac vice*)
mzaken@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

PAUL J. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

*Attorneys for Plaintiff and Counter-defendant*
*Epic Games, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., | Case No. 4:20-CV-05640-YGR-TSH |
| Plaintiff, Counter-defendant, | **EPIC GAMES, INC.'S POST-HEARING FINDINGS OF FACT** |
| v. | Courtroom:  1, 4th Floor |
| APPLE INC., | Judge:  Hon. Yvonne Gonzalez Rogers |
| Defendant, Counterclaimant. | |

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3    PRELIMINARY STATEMENT ......................................................................................................1

4    PROPOSED FINDINGS OF FACT ...........................................................................................8

5    I.    Despite Apple's Awareness that a Commission Did Not Comport with This
          Court's Injunction, Apple Imposed a Commission to Prevent Use of the Program. ..........9

6          A.    Apple Believed Charging a Commission Could Violate the Injunction.................9

7          B.    Under Project Wisconsin, Apple Adopted a Commission to Prioritize Its
                Bottom Line Over Complying with the Injunction.................................................10

8          C.    The Commission Violates This Court's Injunction. ..............................................17

9    II.   Apple's Placement, Design and Format Restraints, and Its Imposed Friction,
10         Violate the Letter and the Purpose of the Injunction. .......................................................18

11         A.    From the Very Start of Its Injunction Response Planning, Apple Designed
                the Program to Impose Placement, Format and Design Restrictions to
12               Prevent Users from Adopting It.............................................................................18

13         B.    The Program Was Designed to Maximize Friction and Breakage in Order
                to Prevent Users from Completing Linked Purchases...........................................22

14         C.    Apple Continues to Prohibit Other Calls to Action While Limiting How
                Developers Can Communicate with Users. ...........................................................28

15   III.  Apple Excluded the Largest Developers from the Program. .............................................30

16   IV.   Just as Apple Planned, Developers Have Not Adopted the Program. ..............................33

17   V.    Apple Abused Privilege to Mislead the Court About its Compliance Plan......................33

18         A.    Apple Manipulated Privilege to Shroud Its Decision-Making Process. ...............33

19         B.    Apple Abused Privilege to Frustrate and then Delay Discovery. ..........................35

20   VI.   The Remedy Should Enforce Compliance and Prevent Future Circumvention. ...............37

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

After trial, this Court found that Apple's anti-steering rules prevent informed choice among iPhone users, raise prices for consumers and developers, and maintain Apple's excessive, unjustified profit margins. (Dkt. 812 at 163-164.) This Court therefore enjoined Apple from enforcing those rules and expressly required Apple to allow developers to use the various steering mechanisms that Apple's Guidelines previously prohibited, namely any "buttons, external links or other calls to action that direct consumers to purchasing mechanisms" other than Apple's IAP. (Dkt. 813 ¶ 1, the "Injunction".)[1]

Apple struck the unlawful anti-steering language from its Guidelines but in its place erected a new set of obstacles to competition that violate the plain language, and frustrate the purpose, of the Injunction. From day one, Apple deliberately set out to minimize the effectiveness of the Injunction. It decided to impose fees and severe restrictions that Apple knew would render alternative purchasing options useless to developers. The scheme was intended to (and did) make links inferior to IAP in every way. Apple did so because it knew that, had it simply complied with the plain language of the Injunction, competition would have blossomed, and developers and consumers would have threatened to shift billions of dollars in billings to cheaper and/or better options, forcing Apple to compete for that business by lowering its commission, improving IAP, or both.

Having obtained a stay of the Injunction, Apple had years to plan its response. Apple's internal plans, which Apple improperly tried to conceal from this Court, and the begrudging admissions of its executives on the stand, reveal that Apple did not use that time to develop a genuine compliance plan. Instead, Apple spent that time planning to render the Injunction an empty shell. Apple planned to announce its purported "compliance" with the Injunction through a new "External Link Purchase Entitlement Program" (the "Program") while making certain that developers and consumers would never want or be able to implement it and thus would not

---

[1] The Injunction's language tracked Paragraph 3.1.1 of Apple's App Review Guidelines at the time, which mandated that "[a]pps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than" Apple's IAP.

benefit from the steering options the Injunction was intended to make available. Apple carefully considered the effects of a commission and of restrictions on the appearance and placement of links, as well as of rules regarding the user flow and warning screens Apple would have those links trigger. At every turn, Apple picked the worst option for developers and consumers in order to preserve Apple's profits. Apple continues to prohibit all buttons and all "other calls to action", allowing only "links" to steer users outside the app. Worse, those links are commercially unusable because Apple's fees, restrictions and limitations, both separately and together, prevent developers from steering consumers to less expensive payment options. And many large developers, which would be most likely to use steering, and use it effectively, are excluded from the Program altogether.

None of Apple's new fees, restrictions or limitations is allowed by the Injunction, which simply required Apple to strike the anti-steering rules from its Guidelines. (Dkt. 813 ¶ 1.) The Injunction never allowed Apple to change its longstanding business model by singling out linked purchases as the **only** non-IAP transaction, **ever**, on which Apple charges a commission. And the Injunction likewise never condoned the enactment of a program that conditions, restricts, limits or penalizes steering **in any way**—let alone with the result of preventing steering just as effectively as the old Guidelines did.

Simply put, Apple purposely designed the Program to fail. And its efforts succeeded: no major app developer has even applied to participate. (Tr. 499:18-25, 761:1-8.) As a result, the price competition intended by the Injunction has not materialized, and developers are unable to pass on lower costs of competing payment options to consumers. Developers and consumers alike continue to pay inflated prices that are unrelated to the value of any services that Apple provides. That unlawful status quo makes Apple billions of dollars each year and will continue unless and until Apple is forced to comply with the Injunction.

**Apple Improperly Imposes a Commission on External Links**. After the Injunction was issued, Apple managers tasked with developing a response plan posed a fundamental question: "charging for commission - is it fine to do?!" (CX-0202.2.) Apple recognized that nothing in the Injunction contemplated commissions on web transactions—something Apple had never imposed.

1  (Tr. 1314:20-1315:8.) ███████████████████████████████████████

2  ████████████████████████████████████████████████████████████████

3  ████████████████████████████████ Mr. Schiller declared himself an opponent of

4  "team commission".  (CX-0224.1.)

5       But Mr. Schiller's resistance was overcome.  Apple's financial analysts determined that

6  allowing *any* links without a commission—even heavily restricted links—risked Apple losing a

7  ███ of its U.S. App Store revenues, more than ███ billion annually, to web purchases.  (CX-

8  0859.28.)  Accordingly, Apple's CFO, Luca Maestri, advocated that Apple impose a commission

9  to protect Apple's bottom line.  (CX-0399.1.)  Tim Cook, Apple's CEO, was the third senior

10  management member of the Price Committee that ultimately approved the commission

11  (Tr. 1135:21-1136:9), and Mr. Cook sided with Mr. Maestri (Tr. 1522:12-15).  Apple thus

12  imposed a commission of 27% on linked purchases (12% when the developer is eligible for

13  certain discounts).  That commission applies to all purchases made within seven days after a user

14  clicks on an external link, even if those transactions have nothing to do with that initial click and

15  nothing to do with Apple's platform.  (Tr. 1136:20-1137:6.)

16       Apple tethered the new commission to the 30% commission it charges on IAP

17  transactions—a rate this Court already found to be supracompetitive.  (Dkt. 812 at 166.)  Apple

18  then reduced this rate by 3%, which Apple misleadingly characterized as a "cost of payments

19  discount".  Apple chose 3% because it knew that even the largest developers using external links

20  would have to cover external costs (including payment processing fees, fraud detection and

21  customer service costs) that are at least nearly double that number.  (CX-0265.27; Tr. 1627:15-

22  1628:10, 1689:15-1690:9.)  The net effect, Apple determined, is that developers would bear

23  *higher* costs for using a link than even the supracompetitive cost of using IAP—negating the very

24  goal of the Injunction to drive developer costs of payments *down*.  (CX-0859.31 ("[T]his will

25  likely not make economic sense for the vast majority of developers with the 3% discount.").)

26  Apple analysts predicted that practically *no* developers would choose to use external links as a

27  result of the commission.  (*Id*.; Tr. 1225:10-16.)  Apple then concluded that the resulting impact

28  to its profit margins would be "negligible".  (CX-0859.31.)  This was consistent with Apple's

experience with alternative payment regimes in other jurisdictions, where its commissions resulted in very little developer uptake.  (Tr. 1417:1-18, 1406:21-25.)

To hide its blatant noncompliance, Apple employed smoke and mirrors.  First, notwithstanding this Court's finding that the 30% is excessive, Apple hired a consulting group to manufacture *post hoc* justifications for that rate, based on made-for-litigation comparisons to the rates charged by Google—an adjudicated monopolist—and by irrelevant comparators employing radically different business models.  (Tr. 516:4-517:19, 644:3-17.)  Moreover, disregarding this Court's finding that, "under any normative measure", Apple's App Store margins are "extraordinarily high" (Dkt. 812 at 43), Apple and its finance witness, Alex Roman, engaged in creative accounting to suggest that the App Store profits were actually quite modest.  (Dkt. 926-2 ¶¶ 6-8.)  Apple then used these fabricated analyses to claim that external link commissions were necessary for Apple to make a fair return on the App Store.  (Dkt. 916-5 ¶ 25; Tr. 225:15-227:3.)

None of these contrived "bottoms-up" analyses played any role in Apple's actual business planning.  Rather, in deck after deck (which Apple initially tried to conceal), Apple's actual business planning focused singularly on the risk to Apple's bottom line that would result from the Injunction achieving its pro-competitive purpose.  In fact, Apple knew that its commission could not be objectively justified by the services it provides iOS developers and users—and did not try to prove that at the hearing.  Apple recognized that the majority of developers (including physical goods retailers, reader apps or apps that monetize through ads) use exactly the same Apple services but, because they do not use IAP, pay Apple nothing.  (Tr. 474:6-475:6.)  Apple thus knew there was no defensible basis to extend its commission to other kinds of transactions that do not use IAP.  But because of the need to protect Apple profits by preventing use of the external links, "Team Commission" won the day.  Through its executive-level Price Committee, Apple chose—deliberately and intentionally—to protect its 30% commission and its bottom line *rather than* comply with the Injunction.

***Apple Imposes Placement and Language Restrictions that Hide External Links from Consumers***.  Imposing a commission was not the only tactic Apple came up with to prevent or deter the use of external links.  Apple also considered whether it could achieve the same result by

severely limiting the placement, language and design of steering options, a proposal Apple called Option 1. (CX-1104.2 ("If you don't charge a commission, you need to lock it down to a plain url link and internet style 'button'").) Apple knew that, by adopting these severe restrictions, it could ensure that only a small minority of users would be able to discover and use external links, making links impractical even without a commission. (Tr. 1212:4-1213:22; CX-0224.16.) Ultimately, Apple chose the worst of all worlds for consumers and developers, imposing **both** a commission **and** severe restrictions on the placement and format of external links. ███

██████████████████████████████████████████████████████████

███████████████████████████

Despite the plain language of the Injunction directing Apple not to prohibit "buttons", Apple prohibits developers from making web purchases available with anything that actually looks like a button. Apple resists this conclusion to the hilt, claiming that it allows developers to use what it calls the "Plain Button" style. (CX-0003.5.) This Orwellian nomenclature does not satisfy the letter or the purpose of the Injunction. What Apple insists is a button looks exactly like a link and does not look like a button at all (to anyone except Apple's witnesses). (Tr. 77:3-14, 82:8-83:3.) The former head of Apple's App Store, Matt Fischer, who was Apple's designated witness on Apple's response to the Injunction, admitted on the stand that he could think of no plausible purpose for Apple's ban on buttons—other than to stifle competition. (Tr. 84:14-25.)

In a similarly blatant contravention of the Injunction, Apple prohibits all other in-app "calls to action", such as non-linked text informing users of web-purchasing options. Apple prohibits such text unless it is an external link consistent with the handful of Apple-approved templates. (Tr. 107:21-109:15.) Although Mr. Schiller implausibly denied that anyone at Apple had ever even **considered** allowing non-linked informational text (Tr. 1309:16-1310:2, 1312:17-25), in reality ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████. (CX-0859.54; Tr. 1891:18-1893:5.) Of course, that was the point of the Injunction: when consumers are informed about competing payment options, some of them will choose to switch away from IAP. But Apple again chose to prioritize its bottom line over compliance.

1    And finally, among other Option 1 limitations Apple adopted, Apple severely curtails the

2    use of links by restricting their placement and messaging.  Apple prevents developers from

3    placing a link in the most logical place users would expect to find it:  in the in-app "buy flow",

4    next to merchandise being offered for sale, where Apple's own IAP "BUY" button is invariably

5    placed.  (Tr. 97:4-98:9.) █████████████████████████████████████████

6    ████████████████████████████████████████

7    **_Apple Imposes Scare Screens and Static Links To Ensure Consumers Do Not Complete_**

8    **_Linked Transactions._**  Apple also knew that maintaining its profits depended on maximizing the

9    amount of "breakage", which occurs when users initiate the process of using an external link but

10   abandon it before completing a transaction.  (Tr. 1629:13-19.)  Using an external link necessarily

11   creates more breakage than using IAP, because external links require exiting the app and

12   transitioning to a web browser—a less seamless experience than using the deeply integrated IAP

13   option.  (CX-0224.15.)  But Apple knew that it could increase the level of breakage even more,

14   and that doing so would build a moat around IAP:  the more breakage, the less revenue loss.

15   (_Id_. at .16.)  In fact, Apple calculated that 25% breakage was a "tipping point" beyond which it

16   would be infeasible for **_any_** developer to use links, even if Apple charged no commission at all.

17   (_Id_.)

18   Apple therefore tasked its user experience (UX) team with designing and writing full-

19   screen, interstitial warning pages intended to deter users from completing transactions with

20   external links.  (Tr. 1321:13-18; CX-0399.1.)  Apple's UX experts understood their assignment:

21   they joked and egged each other on about making the warning screen appear as "scary" to

22   consumers as possible, knowing that Apple "execs will love it".  (CX-0206.2; Tr. 1339:8-1340:3.)

23   The resulting screens, which are displayed every time a user chooses to use an external link, are

24   intentionally designed to increase breakage.  Indeed, Apple had experience using similar warning

25   screens in other programs and jurisdictions where it allows access to alternative payments (such

26   as in reader apps).  (Tr. 1263:3-14.)  But Mr. Cook and Mr. Schiller decided to make the screen

27   used under the Program even worse, personally directing Apple managers to augment the then-

28   existing screen with additional bolded cautionary language.  (CX-0225.1.)  Apple's only

1    purported justification for its scare screen—to provide users information about the supposed risks

2    of completing transactions on the web—is sheer pretext.  Many thousands of iOS apps selling

3    physical goods use non-IAP payment mechanisms, with no warning at all.  (Tr. 70:9-13.)

4         Apple also makes using links less seamless—and therefore increases breakage—by

5    prohibiting developers from using dynamic links, which would permit developers to send users to

6    a webpage that is already personalized for the user, with the user already logged into her account.

7    (Tr. 88:12-89:7.)  Apple instead requires developers to send every user to the same generic

8    landing page, which Mr. Fischer admitted results in a worse user experience.  (Tr. 92:18-25.)

9         ***Apple Excludes Some of the Largest Developers from External Links.***  Despite the

10   Injunction being written to cover ***all*** iOS app developers, Apple excluded some developers from

11   the Program altogether:  the streaming video and news apps in its Video Partner and News Partner

12   Programs (VPP and NPP).  Apple knew that VPP and NPP include some of the largest and most

13   sophisticated developers on the App Store—household brands like HBO/Max, Disney+ and *The*

14   *New York Times*—and that these companies were best positioned to steer users outside their apps.

15   (Tr. 1721:7-1722:6.)  So Apple made external links completely uneconomic for them, allowing

16   them to use links only if they agreed to exit VPP/NPP, forego the preferential 15% commission

17   those programs provide, and begin paying the full 30% rate on all new and first-year subscriptions

18   purchased using IAP.  (Tr. 261:23-262:10, 359:17-23.)  Apple intended that VPP/NPP would thus

19   act as a "tool for retaining developers exclusively" and prevent some of its largest and most

20   valuable developers from steering transactions off IAP.  (CX-0231.8; Tr. 1726:21-24.)  Apple did

21   so in order to prevent the very competition this Court intended to spark.

22        ***Apple's Scheme to Conceal Its Malicious Non-Compliance***.  Apple's scheme also

23   included a corrupt attempt to conceal from this Court the facts about Apple's non-compliance and

24   its reasons for proceeding as it did.  Those efforts began well before these proceedings, when

25   Apple employees routinely misused attorney-client privilege labels in an effort to prevent their

26   true planning materials from being discovered.  At the same time Apple was planning how to hide

27   its real decision-making process, it was carefully constructing an alternative set of sanitized

28   business plans for judicial and public consumption.  Rather than a complete and accurate

explanation of Apple's response to the Injunction, Apple's so-called Notice of Compliance and the accompanying sworn declarations and presentations were a charade.

When Apple's witnesses could not defend those materials, this Court ordered Apple to produce the internal documents that provided the actual bases for its business decisions. Apple improperly delayed production of these materials for months, failing to comply with the orders of this Court and further delaying Apple's day of reckoning. (Dkt. 1017.) Apple did so because it knew that "every day we don't hear anything from the Court" is "one day" in which Apple rakes in its excessive profits. (CX-0399.1.) Apple then misused baseless claims of attorney-client privilege to hide its secret planning documents and engage in even further delay. (Dkt. 1171.) Apple did this with full knowledge that the documents it was trying to conceal would contradict its representations to this Court and its witnesses' sworn testimony. That continued throughout these proceedings, and at the hearing itself: even after this Court determined that it would sanction Apple for its misuse of privilege, Apple continued making improper assertions of privilege over obviously non-privileged materials that Apple wanted to hide. (Tr. 1488:2-12.)

* * *

Apple should be sanctioned for its brazen misconduct and held in contempt. As described more fully in Part VI, *infra*, ensuring true compliance requires an order prohibiting Apple from imposing any new commission on linked-out purchases; Apple should not be allowed to single out linked-out transactions for fees it does not impose on any other non-IAP transactions (and which are not even conducted in the app), especially given its non-compliance to date and its complete failure to consider (let alone prove) the value of any services it provides for such transactions. And Apple should likewise be ordered not to impose any non-monetary restriction, impediment, condition, prohibition or obstacle on any measure used to steer users to alternate payment options outside of an app. In short, Apple should be held accountable so that it finally complies with this Court's Injunction.

## PROPOSED FINDINGS OF FACT

1.     To achieve its goal of rendering the Injunction useless, Apple considered (1) levying a commission; (2) restricting the placement, flow and appearance of links and restricting other calls

1   to action; and (3) applying eligibility criteria.  It ultimately picked the most restrictive options in

2   all of these categories.  It then employed a series of meritless privilege claims in an attempt to

3   hide the paper trail of its misconduct and to delay these proceedings.

4   **I.      Despite Apple's Awareness that a Commission Did Not Comport with This Court's Injunction, Apple Imposed a Commission to Prevent Use of the Program.**

5          **A.      Apple Believed Charging a Commission Could Violate the Injunction.**

6   2.      Following issuance of the Injunction, Apple immediately began considering whether it

7   could charge a commission or other fee for linked purchases.  On September 13, 2021, three days

8   after the issuance of the Injunction, a meeting titled "█████████ Regroup" took place to discuss

9   requirements "to allow alternative payments".  (CX-0202.1; Tr. 1398:7-1399:4 (Oliver).)  This

10  discussion included responses to the Injunction and regulatory requirements in Korea.  (*Id.*)

11  3.      The meeting notes list three options for responding to those requirements:  *First*, "[d]o

12  nothing but allow the separate payment methods"; *second*, "[c]harge an alternative commission

13  but audit"; and *third*, "[c]harge on a different metric (downloads/redownloads)".  (CX-0202.1.)

14  These notes also indicate that Apple "raised the question of whether imposing a commission on

15  linked-out purchases is a permissible option":  "YGR opinion needs to be taken into account;

16  charging for commission – ***is it fine to do?***".  (Tr. 1400:13-1401:1 (Oliver); CX-0202.1 (emphasis

17  added).)

18  4.      Apple then promptly began considering its response to the Injunction under the code name

19  "Michigan".  (Tr. 1323:7-11 (Onak).)  However, on December 8, 2021, the Ninth Circuit issued

20  an order staying the Injunction.  (Appellate Docket, Dkt. 27; Tr. 1140:8-11 (Schiller).)  As a

21  result, Apple essentially ceased work on its Injunction response until 2023.  (CX-0486.1

22  ("Michigan is on hold for now").)

23  5.      During this hiatus, Apple confirmed that, when faced with a commission, developers do

24  not adopt alternative payment options.  In January 2022, Apple obtained developer feedback from

25  other international markets where the Google Play Store was charging a 26% commission for

26  third-party payment options.  (CX-0266.1.)  This feedback specifically informed Apple that

27  developers were not adopting linkouts subject to a 26% commission because developers would

28  "still have to pay a fee to [processors]" and "in some cases, . . .  payment fees would cost more"

than the 4% difference compared to Google's standard fee of 30%.  (CX-0266.1; Tr. 1402:22-1403:23, 1404:24-1406:01 (Oliver).)  Developers reported that Google's "discounted" commission did not help their business because the fees associated with alternative payment solutions made third-party options "just as expensive" as Google's version of IAP—therefore, there was no monetary benefit.  (Tr. 1404:24-1406:01 (Oliver); CX-0266.1.)

**B.    Under Project Wisconsin, Apple Adopted a Commission to Prioritize Its Bottom Line Over Complying with the Injunction.**

6.    On April 24, 2023, the Ninth Circuit issued its opinion, giving rise to "a new effort and new energy given to" Apple's Injunction response planning.  (Tr. 1142:2-8 (Schiller).)  That effort was given a new code name:  Wisconsin.  (Tr. 1142:10-11 (Schiller).)

7.    Apple initially considered two options.  Option 1 would restrict developers from placing links in product purchasing flows where customers would be likely to find and use the links and would restrict the appearance of links, but would not include a commission.  (CX-0272.7.) Option 2 would allow developers more freedom on link placement and style, but would require payment of a commission.  (CX-0272.11.)  Ultimately, Apple chose to combine the most burdensome aspects of both options:  charging a commission *and* placing stringent requirements on link placement and style, to the detriment of both developers and customers.

8.    On May 18, 2023, Apple held a meeting titled "Wisconsin Business Update", attended by Messrs. Schiller, Fischer, Oliver and Vij, among others, to discuss these two options.  (CX-0488.1; CX-0272.7.)  At the time of this meeting, Apple identified the loss of revenue as a key risk of a no-commission model.  A presentation used at that meeting noted that "the no-commission option [would be] very attractive to developers", which would "cause a lot of developers to adopt the linkout options" and would be "driving spend outside of the app to a cheaper option", creating "competitive pressure on IAP".  (Tr. 1456:20-1457:18 (Oliver).)  Apple thus "assumed as of May 2023, that if it imposed no commission, certainly most large developers and potentially thousands of medium or maybe even small developers would offer linkout purchases to their users", leading to "very large revenue losses" for Apple.  (Tr. 1467:8-20 (Oliver).)  In fact, Apple considered this a "key risk" of a no-commission option, which Mr. Oliver admitted meant that "creating competitive pressure, which is the goal of the injunction,

is a risk factor, a key risk factor". (Tr. 1457:19-23 (Oliver).)

9.    Moreover, Apple was concerned that the no-commission option would not harm Apple's bottom line only in the United States, but that it could have a domino effect in other countries, hurting Apple's global bottom line. The deck used at the meeting states that another key risk of Option 1 was that it "[d]iverges significantly from existing and future approaches" (CX-0272.7, .11), raising "the fear that if you have no commission on link-outs in the United States, it's going to be harder to justify a commission elsewhere in the world". (Tr. 1453:22-1454:5 (Oliver).)

10.    In contrast, Apple knew that a commission would lead to relatively low adoption. Specifically, Apple expected that "a linked-out option that is subject to a 27% commission might only be attractive to the very largest developers" as opposed to Option 1 (no commission) which would be attractive to a much broader swath of developers. (Tr. 1468:21-1469:2.) Apple modeled the impact of both options, projecting that under the no-commission option, most developers would adopt links and Apple would lose between ██████████████ in annual revenue, whereas under the commission model, only the top 10 to 50 developers would adopt links, leading to revenue losses that would be more than an order of magnitude smaller, at ████ ████. (CX-0272.10, .13 and .14; Tr. 1162:16-1163:4 (Schiller), 1469:19-24 (Oliver).)[2]

11.    Around this time, Apple again received feedback from developers that the commission model would not be viable. In May 2023, Bumble delivered a presentation to Apple's business team regarding Apple's and Google's commissions on third-party payment processing in other jurisdictions. (Tr. 1409:13-25 (Oliver).) Bumble told Apple that "[p]ayment processing fees average out significantly higher than the 4% fee reduction currently offered by Google in the [User Choice Billing] program or 3% fee in Apple's [similar program in the Netherlands] resulting in negative margin for developers". (CX-0246.11.) Although Mr. Oliver claimed he did not recall seeing this presentation (Tr. 1410:12-24 (Oliver)), these slides were sent to legal, business, and finance personnel, including Mr. Oliver. (CX-0246.1-.2.) Bumble's data was

---

[2] Tellingly, all of Apple's modeling assumes that the IAP rate remains unchanged. Of course, one goal of the Injunction was that the IAP fee, when faced with real competitive pressure, might actually be lowered.

1    consistent with Apple's analysis, which showed that costs to developers would be too high to be

2    viable.  Apple modeled  "the various costs the developers face in connection with sales of digital

3    goods for use in iOS apps" (Tr. 1623:5-9 (Vij)), and its data show that the external costs of

4    payments to developers in the United States ranged between ███ (for "extra-large developers")

5    to ███ (for medium sized developers).  (CX-0265.27; Tr. 1627:20-1628:4 (Vij)).

6    12.    Adoption rates in other jurisdictions also suggested that developers would not adopt

7    alternative payment methods with a commission.  Ten months after Apple launched alternative

8    payments in the Netherlands and four months after it launched such payments in Korea, only one

9    developer had signed up across the two programs.  (Tr. 1407:1-5 (Oliver).)

10    13.    Apple's top executives, including Messrs. Cook, Maestri, Schiller, Fischer and Oliver, met

11    again on June 1, 2023 to discuss Apple's "Epic Injunction Implementation".  (CX-485.1.)  The

12    presentation from this meeting (which Apple attempted to withhold—and even claw back—as

13    privileged in full) shows that Apple was aware that the commission model would make the

14    Program a non-viable option for developers.  (Tr. 1638:23-1639:7 (Vij) (agreeing that it "might

15    not be economically viable for developers to shift" to using linked-out purchases while discussing

16    CX-859.32).)  Other slides from the presentation make the same point and show that Apple was

17    aware that charging a commission could violate the Injunction:  "If we decided and had the ability

18    to charge a commission, we believe there would be very little developer adoption of link-out

19    assuming a scenario where we would give the cost of payments discount at 3%".  (CX-0859.33.)[3]

20    14.    Notes from this June 1 meeting also demonstrate that Apple knew full well that imposing

21    a new commission would violate the Injunction and risk contempt.  These notes state that Apple

22    planned to "[c]ome up with a couple of models in the spectrum of what we think the judge will

23

24    ───────────────
          [3] Several Apple witnesses claimed these assessments are incorrect because they pertain to a
      "perpetual" lookback window, and not the seven-day lookback Apple ultimately adopted.  This
25    too was a made-for-litigation claim.  There is no evidence Apple actually considered a
      "perpetual" lookback window, meaning that once a user clicks on a link, the developer would be
26    subject to Apple commissions on all future web sales in perpetuity (to the contrary—Mr. Schiller
      believed "the most logical data point . . . is as a direct result from a link out (regardless of time),
27    without leaving the browser session", which would likely be shorter than even a 24-hour
      window).  (CX-0279.2.)  Moreover, any suggestion that the lookback window reduces the
28    commission is contingent on the entirely unsubstantiated assumption that most future purchases
      by the user would not utilize the link from within the app.  (Tr. 1657:11-1658:4 (Vij).)

accept", but that it deliberately planned to "[s]tart with the minimum". (CX-1104.1.) As it turns out, Apple ultimately started well below that.

15.    On June 13, 2023, Apple held another Wisconsin meeting, attended by Messrs. Fischer, Oliver, Vij and others. (CX-0509.1; Tr. 1497:20-1498:3 (Oliver).) At that meeting, Apple considered three proposals for a commission: (i) "Standard Commission Discount"; (ii) "Time-limited Discounted Commission"; and (iii) "Flat Affiliate Fee". (CX-0274.3.) Apple again recognized that the "Standard Commission Discount" would lead to low adoption based on its experience in foreign jurisdictions. Apple listed as one of its considerations that "[d]evelopers will claim that a small discount will not provide enough margin to compete on price *i.e.* difficulties with Netherlands approach". (*Id* at .4.) That referred to the fact that "in the Netherlands, complaints by developers to that tune were already made". (Tr. 1504:13-17 (Oliver).) Notes from this meeting show that, at this point, Apple was considering a shorter tracking window than it ultimately adopted. For the "Standard Commission Discount", the team "need[ed] to come up with a session time (~24-48 hours)". (CX-0251.1.) "Session time" referred to the "lookback window that would trigger a commission". (Tr. 1512:16-18 (Oliver).)

16.    On June 20, 2023, another "Epic Injunction" meeting with Messrs. Cook, Schiller and Fischer took place. (CX-489.2.) At the time, Apple "was doing work on the injunction response plan in case it needed to launch the entitlement program on July 5". (Tr. 1176:2-5 (Schiller).)

17.    Heading into the June 20 meeting, there was still no alignment at Apple on whether a commission was permissible or the best path forward. Within Apple, there were "people advocating both positions", "there were people advocating no commission, and other people advocating a 27% commission". (Tr. 1521:3-12 (Oliver).) Among those advocating for a commission were Mr. Maestri and Mr. Roman. (Tr. 1522:3-10 (Oliver).) Mr. Schiller was on the opposite side of the debate. (CX-0224.1.)

18.    Mr. Schiller had several concerns about Apple charging a commission. To start, Mr. Schiller "had [the] concern" that "if Apple charged a commission, it would run afoul of the injunction". (Tr. 1178:2-5 (Schiller), 1518:7-14 (Oliver).) ██████████████████ ████████████████████████████████████████████████ He communicated

1   his concern about the commission to other Apple employees (Tr. 1178:7-9 (Schiller)) and, in an

2   email sent shortly before the June 20 meeting, wrote: "I am not on team commission/fee" and "I

3   have already explained my many issues with the commission concept" (CX-0224.1).[4]

4   19.     Mr. Schiller also testified that he "[v]aguely" recalled conversations "in which people

5   expressed concerns that it would be problematic for Apple to be seen charging" on "web

6   transactions".  (Tr. 1310:16-20 (Schiller).)  That concern is also borne out in Apple's internal

7   documentation about Project Wisconsin, including notes from one meeting that state "[t]his might

8   be perceived like we're trying to charge for what happens on the internet".  (CX-1104.1.)

9   20.     Notably, none of Apple's documents or witnesses suggests that anyone at Apple argued

10  that a commission was **permissible** under the Injunction.  And Apple never sought to clarify this

11  issue with the Court rather than "start with the minimum" and take on the risk of contempt.

12  21.     Despite Mr. Schiller's acknowledgment that he was "concerned . . . that there was a

13  compliance risk from charging a commission" (Tr. 1189:4-6 (Schiller)), at the June 20, 2023

14  meeting, Apple identified several "benefits" to charging a commission, primarily protecting its

15  bottom line.  For example, the June 20, 2023 presentation listed as a benefit that a commission

16  "[r]educes financial risk versus no-fee option".  (CX-0223.32.)  It also shows that Apple was then

17  considering a 27% commission with only a 24-hour tracking window (Option 2A) (CX-0224.25)

18  and a 20% commission for a full year (Option 2C) (CX-0224.38).  Throughout this discussion,

19  Apple recognized that "[a]s long as there is a 27 percent commission on a linked-out transaction,

20  that linked-out transaction is going to be more expensive to any developer and every developer"

21  than just using IAP at a 30% commission.  (Tr. 1633:5-10 (Vij) (discussing CX-0265.27).)

22  22.     At the June 20, 2023 meeting, Team Commission finally prevailed; Apple decided it

23  "would charge a commission on the external purchase link", although it did not yet decide what

24  that commission would be.  (Tr. 1227:16-23 (Schiller); *see also* CX-0291.3.)  Whatever that

25

26          [4] Epic understands that Apple may contend that Mr. Schiller's testimony on this topic should
        be stricken from the record.  That would be contrary to this Court's ruling.  (Tr. 1447:5-14.)  In
27      any event, even aside from Mr. Schiller's testimony, the record is clear that Apple's goal with the
        Program was not to comply with the Injunction; it was to protect its bottom line by, in part,
28      adopting a commission.

1    commission would be, however, Apple was fully aware that the Injunction did not condone *any*

2    commission and moreover that commissions would frustrate the Injunction by negating any

3    prospect of price competition with IAP.  Indeed, Apple identified as a "risk" of charging a

4    commission, that "[d]evelopers may claim that a small discount on initial transaction does not

5    allow for price competition".  (CX-0223.32.)

6    23.    In advance of a June 28, 2023 meeting with Mr. Cook, there were several Wisconsin

7    meetings on June 26, 2023.  Ms. Goldberg's notes from one such meeting demonstrate that Apple

8    was opting to charge the highest commission possible.  Ms. Goldberg testified that Mr. Maestri,

9    who was Apple's CFO at the time, "wanted to charge a 27 percent commission for these linkout

10   purchases".  (Tr. 1797:17-1798:1 (Goldberg).)  In her notes, she wrote "[c]ommission, 20-23

11   percent" and that "Luca [Maestri] wanted to make it 27 percent".  (CX-0399.1.)

12   24.    At the June 28, 2023 meeting with Mr. Cook, also attended by Messrs. Maestri, Schiller,

13   Fischer, Oliver and others (CX-0532.1), Apple discussed commission rates from 20 to 27% (CX-

14   0291.4).  Ms. Goldberg listened in on this meeting and came away from the meeting feeling that

15   "Apple might get bad press for charging a commission".  (Tr. 1176:16-1777:1 (Goldberg).)

16   During the meeting, Fred Sainz, a senior communications professional, messaged "I think this is

17   all very shaky to me", to which Ms. Goldberg agreed (CX-0540.11), confirming on the stand she

18   was "agreeing that the rationale and the defense for the commission rate and the time period, the

19   seven days, was shaky". (Tr. 1856:8-11 (Goldberg); id. 1858:11-14 (Goldberg).)

20   25.    Apple held a Price Committee Meeting on July 5, 2023, in light of a possible imminent

21   need to comply with the Injunction.  (Tr. 1242:24-1243:2 (Schiller).)  Mr. Schiller testified that

22   "one of the purposes of this July 5 meeting was to settle on the commission rate that would be

23   charged and the tracking window that would be associated with it".  (Tr. 1249:5-8 (Schiller).)

24   26.    At this meeting, Apple finally decided on 27%.  (Tr. 1799:3-8 (Goldberg).)  This decision

25   was made by those at the very top—Messrs. Cook, Maestri and Schiller.  (Tr. 1202:25-1203:3

26   (Schiller).)  Apple also decided "that it would be a seven-day window" for which the commission

27   would be collected.  (Tr. 1798:25-1799:13 (Goldberg).)  During that window, the commission is

28   paid "even if those subsequent purchases made on the developer's website are made by the user

1   on some device other than their iPhone".  (Tr. 1136:24-1137:2 (Schiller).)

2   27.    Apple gave the 20% option short shrift because Apple discussed "variations on the

3   commission options with lower rates, but we struggled to land on ironclad pricing rationales that

4   would (1) stand up to scrutinizing comparisons with defenses of the commission and existing

5   discounting approaches in other jurisdictions and (2) that we could substantiate solidly on a

6   bottoms up basis without implicitly devaluing our IP / proprietary technology".  (CX-0538.2.)

7   Mr. Oliver testified that the "Project Wisconsin team was struggling to come up with rationales

8   for a 20 percent fee, for example, that would withstand comparisons to whatever defenses Apple

9   was making of its commission in other countries such as the 27 and 26 percent in Korea".

10  (Tr. 1548:2-7 (Oliver).)  Apple employees also believed that, "[a]ll things being equal", a lower

11  commission rate option "doesn't represent a material improvement in the logical grounding

12  relative to the 27%, continues to place the lion's share of the financial risk and calculus on Apple,

13  and just makes us less money."  (CX-0538.3.)  Simply put, Apple understood that "all else being

14  equal, the lower the commission, the greater the financial hit to Apple".  (Tr. 1550:17-20

15  (Oliver).)  And of course, a 20% rate would solve none of the issues giving rise to the compliance

16  risk identified by Mr. Schiller:  such a commission would still be a new fee that diverges from

17  Apple's years-long business model, singles out linked out purchases from all other non-IAP

18  transactions occurring on iPhones, and is not condoned by the Injunction.

19  28.    To hide how it arrived at the commission, Apple prepared *post-hoc* rationalizations of the

20  commission to present to the Court.  Apple tasked Analysis Group to prepare a made-for-

21  litigation analysis of its commission rate based on comparisons to the rates charged by Google—

22  an adjudicated monopolist—and companies employing radically different business models.

23  (Tr. 516:4-517:19 , 644:3-17 (Oliver).)  Apple and its finance witness also engaged in creative

24  accounting to falsely suggest that the App Store profits were modest (Dkt. 926-2 ¶¶ 6-8) so that

25  they could claim that external link commissions were necessary for Apple to make a fair return on

26  the App Store.  (Dkt. 916-5 ¶ 25; Tr. 225:15-227:3 (Oliver).)  But as demonstrated above, these

27  *post-hoc* analyses were not the real basis for Apple's decision.

28  29.    During the hearing, Apple witnesses were also not forthcoming about how or why they

1   arrived at the commission.  In May 2024, Mr. Roman—a member of the finance function at

2   Apple—testified that "the linked purchase fee in the United States is based on [a] complicated

3   bottoms-up analysis".  (Tr. 287:8-16 (Roman).)  Mr. Oliver initially offered similar testimony.

4   (Tr. 622:6-14, 622:25-623:15 (Oliver).)  But documents produced by Apple make very clear this

5   was false.  Speaker notes from June 20 show that, at that meeting, Mr. Oliver planned to say that

6   "[w]e believe using our standard commission rate discounted by cost of payments in the US is

7   reasonable".  (CX-0224.35.)  That plainly is not a bottoms-up analysis.

8           **C.      The Commission Violates This Court's Injunction.**

9   30.      The Court's Injunction clearly posits Apple removing its then-existing prohibitions on

10  "buttons, external links or other calls to action that direct consumers to purchasing mechanisms"

11  and otherwise operating under the existing status quo in which Apple did not and has never

12  sought commissions on transactions happening off-platform.  However, under Apple's Program,

13  developers are required to pay Apple a new percentage-based fee on all transactions for digital

14  goods and services that take place outside the app within seven days after the user clicks an

15  external link.  (Tr. 196:25-197:4 (Roman).)  This fee is being charged—for the first time in

16  Apple's history—on purchases that take place on the web, outside of an App Store app, and

17  without using IAP.  (Tr. 274:7-15 (Roman).)

18  31.      These commissions intentionally make external links more expensive than IAP because

19  developers who use external links must cover other costs in addition to Apple's commission that,

20  in Apple's own estimation, range between ███████%.  (CX-0265.27; *see also* Tr. 1627:20-

21  1628:4 (Vij).)  To try and conceal these numbers and their implications, Apple witnesses lied on

22  the stand, claiming falsely at the May 2024 hearing that Apple "did not look at comparables to

23  estimate the costs of alternative payment solutions that developers will need to procure to

24  facilitate linked purchases."  (Tr. 266:22-267:1 (Roman).)  Apple was well aware that the

25  commission it was charging would not allow developers to obtain alternative payment options.

26  But these numbers were analyzed and their implications are clear: Apple's finance team fully

27  expected the commission model would result in "almost no impact to Apple's revenues and

28  profitability" (Tr. 1709:17-21 (Vij)) and for obvious reasons—"taken as a whole", Apple's new

1    commission makes the Program "worse" for developers than not having the option at all.

2    (Tr. 962:5-8 (Simon).)

3    32.    None of this was contemplated by the Injunction or justified by some value Apple

4    supposedly delivers to developers.  To the contrary: Apple never before charged commissions on

5    non-IAP transactions, and hundreds of thousands of developers thus derive the same supposed

6    value from iOS yet never pay anything.  Apple also never seriously considered this supposed

7    value before it decided to impose a commission on linked purchases, and it certainly did not

8    quantify that value or prove any of it in Court.  Apple's "charging for value" argument should be

9    seen for what it is—pretext.  Apple expressly considered a no-commission option, showing that it

10    is indeed a viable path—but Apple rejected it because the no-commission model threatened to

11    fulfill the goals of the Injunction and place competitive constraints on IAP.

12    **II.    Apple's Placement, Design and Format Restraints, and Its Imposed Friction, Violate
         the Letter and the Purpose of the Injunction.**

13    33.    At the same time that it considered a commission, Apple also considered how it could

14    impose restrictions and frictions on the external link to make it unusable for both developers and

15    users.  As time progressed, Apple considered more and more obstructive requirements for the

16    placement, format and design of the link.  It also included features designed to increase friction

17    and prevent consumers from actually completing purchases using the link.  These decisions were

18    made at the highest level of the company, including by Tim Cook himself.

19    **A.    From the Very Start of Its Injunction Response Planning, Apple Designed the
          Program to Impose Placement, Format and Design Restrictions to Prevent
20          Users from Adopting It.**

21    34.    When Apple restarted its Injunction response efforts in spring 2023, the Wisconsin team

22    initially assumed a trade-off:  if Apple charged a commission (Option 2), it would allow

23    developers relative freedom to control the design and placement of any external links within their

24    apps and vice versa—but in a no-commission option (Option 1), Apple would severely curtail the

25    design and placement of any links.  That initial thinking quickly went by the wayside.  Under the

26    direction of Mr. Cook, Apple coalesced around the most aggressive worst-of-all-worlds approach,

27    layering on top of the commission the strictest restrictions it could envision, deliberately

28    designing the Program to prevent users from finding and clicking on external links.

35.    As discussed above, in May 2023, when Apple restarted work on the Program, it considered two Options.  Option 1 contemplated that external links needed to be standalone or independent of the "buy flow"—the very place within an app where merchandise is offered for sale.  (CX-0272.7.)  As Mr. Oliver testified, this restriction meant that "if the app displays something for purchase, an IAP buy button could be placed right next to that item, but the linkout option would have to be placed on some other page in the app".  (Tr. 1451:18-22 (Oliver).)  In addition, Apple considered a restriction that would not allow any specific reference by the developer to discounts or price differences.  (CX-0272.7.)

36.    Mr. Schiller testified that he did not recall Apple linking the placement and design restrictions "specifically to the discussion of fee or no fee" and instead recalled "discussing them independently as what was the right thing to do".  (Tr. 1182:7-18 (Schiller).)  Mr. Oliver likewise denied any "trade off".  (Tr. 1888:7-11 (Oliver).)  That testimony is belied by Apple's internal documents.  In the previously withheld June 1, 2023 presentation, Apple made clear that it was connecting commission and placement and considering them tradeoffs, stating that "***since*** we are charging a commission, the link could be placed once per page, including alongside IAP."  (CX-0859.52 (emphasis added).)  Notes from the June 1, 2023 meeting likewise confirm that Apple's thinking at the time was that "[i]f you want to charge a commission, you have to give [developers] better placement" but "[i]f you don't charge a commission, you need to lock it down to a plain url link and internet style 'button'".  (CX-1104.2.)  They also show the plan was for the "business team to define the 2-3 scenarios where we can ***limit the ruling*** where Tim [Cook], Phil [Schiller], and Legal are comfortable with . . . What will we allow [developers] to do, and where we will allow them to do it".  (CX-1104.1; Tr. 1492:20-23 (Oliver).)

37.    The June 20, 2023 meeting presentations featured the same trade off Options that Apple was discussing throughout May and June 2023.  Option 1 was "a proposal that has no fee but has more stringent restrictions on style and placement".  (Tr. 1179:6-19 (Schiller) (discussing CX-0223.6).)  It would "limit developers to use a plain link or button" and require that "the link not be on the same page as Apple IAP buy flow", but the developers would not have to pay a fee.  (Tr. 1181:25-1182:3, 1183:4-9 (Schiller).)  Option 2 had "either a commission or a flat fee

proposed but less restrictive provisions regarding the style and placement of links". (Tr. 1179:20-22 (Schiller) (discussing CX-0223.6).) In Option 2, with a commission, it was contemplated that the link would be permitted to be in the Apple IAP buy flow. (Tr. 1183:10-13 (Schiller).)

38.     The speaker notes from the June 20, 2023 deck show that Apple modeled "billings linking-out" and found that its extent would "depend where is the text and the language developers are allowed to use". (CX-0224.16.) Mr. Schiller admitted "that more restrictive rules on the placement and the format and the language of links can have the effect of reducing the amount of linkout behavior in which users engage" and that "all else equal, the more restrictive the format rules, the placement rules, and the language rules are, the less likely a user will be to select the link and make a purchase outside of the app". (Tr. 1212:25-1213:22 (Schiller).)

39.     The June 20, 2023 presentation also shows starkly the distinction between what Apple decided to label a "button" and the ordinary meaning of that word. The June 20, 2023 presentation also shows starkly the distinction between what Apple decide to label a "button" and the ordinary meaning of that word. The Option 2 slide shows actual "link" and "button" styles. The Option 1 slide, by contrast, essentially shows two links, labeling one of them a "button" even though it looks nothing like a button. (*Compare* CX-0224.10 *with* CX-0224.19.)

40.     By the July 5, 2023 meeting, however, Apple decided to restrict the formatting, placement and design of external links ***even though it decided to charge a commission***. Apple decided that "language and design must follow templates", only "one URL per app" could be used, "link can only be displayed once in an app, on an app page user navigates to (not an interstitial, modal, or pop-up) and can't persist when user leaves page", and "link cannot be displayed on any page that is part of an in-app flow to merchandise/initiate an IAP". (CX-0227.4.) This meant that "at this point in time when [Apple was] preparing to go live, Apple had decided that it would impose [these] restriction[s] on the placement of an external purchase link". (Tr. 1245:23-1246:1 (Schiller).)

41.     As Mr. Oliver acknowledged, Apple chose the worst of both options. (Tr. 1497:7-19 (Oliver).) The decision to do so, again, was made by Apple's top executives. Mr. Oliver testified that Mr. Cook and Mr. Schiller were the "arbiters of what Apple considered would be an

acceptable level of risk to limit the injunction in terms of placement and design" and the decision would be "about what they felt was acceptable".  (Tr. 1493:22-1494:3 (Oliver).)

42.     The final result is that Apple requires that developers may not place an external link "on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase".  (CX-0002.4; Tr. 221:23-25 (Roman), 727:10-23 (Schiller).)  But the purchase flow is precisely where steering is most relevant.  In order to compete with IAP, developers need to be able to present an alternative payment option to the user at the same time and in the same place that those users are presented with IAP.  (Simon Decl., Dkt. 897-1 ¶ 28.)  Mr. Fischer perfectly encapsulated the problem with Apple's buy-flow restriction:  he testified that if an app has an "item shop where a user could shop" within the app, "nowhere in that whole shop, that screen, can the external purchase link appear".  (Tr. 93:21-94:7 (Fischer).)

43.     App developer Ben Simon testified that based on his experience, "[a]lthough the purchase page is accessible from the menu, over two thirds of users who subscribe in-app do so when the purchase page is presented as a 'pop-up' after they create their account or after their trial has ended."  (Simon Decl., Dkt. 897-1 ¶ 29.)  By prohibiting links to appear in pop-ups, Apple hides critical information from customers when they make their purchase decision—precisely what the Injunction sought to address and prevent.  (Dkt. 812 at 164; Tr. 732:19-733:7 (Schiller).)

44.     At the hearing, Apple attempted to claim that restrictions on the placement of links are grounded in part in security concerns.  (Tr 735:20-736:2 (Schiller).)  But when pressed, the only concern identified was that having the link in the purchase flow would make it more likely for the link to be used.  (Tr. 737:1-739: 25 (Schiller).)  Nothing about the placement of the link would increase any security risk; for example, if Apple wishes to review an external link for fraudulent behavior, it can do so regardless of where in the app that link appears.  (Tr. 736:7-14 (Schiller).)  In any event, this purported justification was an obvious pretext; Apple clearly contemplated not having these restrictions as part of Option 2, and at the time this proposal did not raise any security or other concerns.  The security argument was made up after the fact to try to justify Apple's efforts to circumvent the Injunction.

45.     As to design, the Injunction also requires Apple not to prohibit developers from "including

1   in their apps and their metadata ***buttons***…". (Dkt. 813, Permanent Injunction.) Apple was well

2   aware of this requirement; internal materials show that Apple acknowledged that "Developers

3   must be able to . . . format these prompts as ***buttons*** or other calls to action, *not just blue HTML*

4   *links*". (CX-0272.5 (emphasis added).) Indeed, in May 2023, one of the "working assumptions

5   of compliance plan" was "[f]lexibility of CTA [call to action] design, e.g. buttons". (CX-0272.4.)

6   But Apple opted to prohibit buttons. (Tr. 82:18-23 (Fischer).) Apple does not allow any link

7   "enclosed in a shape that uses a contrasting background fill". (CX-0003.5.) And the only

8   "button" Apple does supposedly allow—what it refers to as the "Plain Button" style—is not a

9   button at all, in any ordinary understanding of the word; it is a link. (*Id.*)

10   46.    Notably, Apple's witnesses admitted that the Plain Button Style is the least prominent of

11   the various button options that Apple's Human Interface Guidelines provide. (Tr. 76:23-77:5

12   (Fischer), 897:18–898:1 (Schiller), 1308:15-1309:1 (Schiller).) Requiring this least prominent

13   style shows that the Program is aimed at minimizing the effectiveness of external links. As

14   Mr. Fischer was forced to admit, the only reason for Apple to limit developers to the Plain Button

15   style was to "stifle competition". (Tr. 84:14-25 (Fischer).)

16   47.    Mr. Schiller tried to clean up that testimony, claiming that "Apple chose the plain button

17   style precisely so that it would match what hyperlinks and Internet links look like". (Tr. 1166:19-

18   24 (Schiller).). That is no fix, because that is not what the Injunction requires. Apple's internal

19   documents also show that Apple imposed these requirements to limit developers' flexibility. (*See*

20   CX-1104.02 ("How much can we limit what devs do with the text and links?").) Apple mandates

21   that "developers cannot use what their consumers would expect to see as an actual button".

22   (Tr. 82:18-23 (Fischer), 1531:4-1533-24 (Oliver); CX-0224.19.) Apple's claim that it allows

23   buttons is not compliance; it is gaslighting.

**B.    The Program Was Designed to Maximize Friction and Breakage in Order to Prevent Users from Completing Linked Purchases.**

25   48.    Apple's Program was designed to maximize friction and push the user towards dropping

26   out of the process of using links to complete purchases. Apple achieved this by crafting an

27   aggressive warning screen, and by requiring that external links must link to a single website URL

28   with no query parameters (the "Static Link Requirement"), preventing developers from using

1   buttons to send users to their web sites in a logged-in, ready-to-transact state.  (CX-0003.3.)

2   49.      Friction was important to Apple because it contributed to breakage—a measure of the

3   number of users who embarked on a linked purchase flow but did not complete the purchase.

4   Apple modeled the effects of breakage on its bottom line as part of Project Wisconsin.  According

5   to the speaker notes for the June 20, 2023 deck presented to Mr. Cook, Mr. Vij presented to

6   Apple's executives that "[w]e know it's very likely that when a link-out happens, there will be

7   some breakage, meaning customer[s] dropping off during the buy-flow process due to a less

8   seamless experience compared to Apple's IAP".  (CX-0224.15.)  In the same meeting, Mr. Vij

9   presented that "[b]eyond 25%, developers reach a tipping point where they lose more on linking

10  out then they would make sticking with Apple IAP and the higher commission".  (*Id*. at .16.)

11  Mr. Schiller acknowledged that this referred to the fact that Apple "was modeling where that

12  tipping point was where it ceased to be advantageous for developers [to use external links]

13  because of the amount of breakage".  (Tr. 1211:14-19 (Schiller).)  And Mr. Vij testified that

14  additional friction—including specifically scare screens or the need to sign in to an account as

15  part of a purchase flow—would increase breakage.  (Tr. 1644:17-20 (Vij).)

16                          *i.   Scare Screens*

17  50.      Apple began working on the warning screen to show users who click an external link as

18  soon as the Injunction was handed down in fall 2021.  The goal from the get-go was singular: to

19  make the language used in the warning screen "scary" to users.  Even as most work paused on

20  Project Michigan due to the stay (*see supra* § I.A), Apple employees—including executives like

21  Mr. Schiller—continued to workshop the language for warning screens in other jurisdictions with

22  that same goal in mind.  Apple expected to re-use those warning screens if this Court's Injunction

23  came into force.  But as Project Wisconsin launched, Apple decided to make the warning screen

24  for the Program even more aggressive than anything used elsewhere.

25  51.      As of fall 2021, Apple already was contemplating some sort of warning screen for external

26  links.  This is notable because, throughout the existence of the App Store, developers of apps

27  selling physical goods (like Amazon, Nike or eBay) use billing solutions other than IAP for all

28  their transactions, and Apple never required them to display any warning about such purchases.

1    (Tr. 70:8-13 (Fischer).)  Nonetheless, a November 15, 2021 presentation titled Michigan V3

2    shows that for linked out purchases of digital goods, Apple already had considered several

3    "Warning Options" (CX-0520.39), *i.e.*, "potential options for what users would first be shown as

4    part of the linkout flow".  (Tr. 1333:18-23 (Onak).)  Those options included (i) a "link", which

5    meant the user "would just go" to the external site, (ii) a "dialogue" which is "a sort of small pop-

6    up that would come up when a user clicked the link" and (iii) a full-screen warning sheet.

7    (Tr. 1334:8-17 (Onak).)  Options (i) and (ii) were much less obstructive than the full-screen

8    warning sheet in option (iii).  Option (iii)—the largest, most conspicuous option—is the type of

9    warning screen Apple ultimately selected.  (Tr. 1333:25-1334:17 (Onak); CX-0520.39.)

10   52.    Apple employees then turned to "workshop[ping]" the language for "the full-screen

11   takeover that would be used in a linkout scenario".  (Tr. 1336:25-1337:6 (Onak).)  Internal

12   documents show that the Apple employees working on this project selected the warning screen

13   language specifically to make users feel scared and unsafe if they clicked on a link, because they

14   knew that is what Apple executives wanted.  (CX-0206.2.)

15   53.    For example, in a discussion among Apple employees who were "crafting the warning

16   screen for Project Michigan" (Tr. 1339:12-15 (Onak)), Mr. Onak suggested that the warning

17   screen should include the language: "By continuing on the web, you will leave the app and be

18   taken to an external website" because "'external website' sounds scary, so execs will love it".

19   (CX-0206.2.)  Mr. Onak confirmed that from his perspective, Mr. Schiller was "at the top" among

20   the "execs" for whom he was working on this project.  (Tr. 1340:4-6 (Onak).)

21   54.    Employees also gleefully discussed ways to make the warning screen more and more

22   discouraging.  One employee wrote:  "to make your version even worse you could add the

23   developer name rather than the app name".  (CX-0206.4.)  Another employee responded:  "ooh –

24   keep going".  (*Id.*)  The idea to use the developer rather than the app name to make the screen

25   "even worse" ultimately made it into the final version of the warning screen, and its goal is

26   clear—to sow doubt with users as to whether the link was taking them to the correct website.

27   (*See* CX-0003.5; Tr. 1343:23-1344:1 (Onak).)

28   55.    In the period from 2021 to 2023, while Apple's work on the Injunction was on hold,

1    Apple employees continued to work on a warning screen for similar changes Apple was planning

2    to make in other jurisdictions in response to regulatory or legislative developments.  This included

3    work done in response to "the Netherlands Authority for Consumers and Markets decision against

4    Apple" which required Apple to "make changes to allow alternative purchase mechanisms for

5    dating apps" including through allowing a link out to web purchases.  (Tr. 1325:6-14 (Onak).)

6    This work was referred to as "████".  (CX-0281.5.)  It also included work done to develop

7    language "for screens that would be presented to users who were linking out for reader apps",

8    which Apple allowed in response to an investigation by the Japanese Fair Trade Commission.

9    (Tr. 1326:2-10 (Onak).)  This work was referred to as "████".  (CX-0281.5.)

10    56.    In January 2022, Mr. Schiller was asked for feedback on the "in-app messaging – link

11    out", *i.e.*, the warning screen for the external links.  The warning screen proposed to him included

12    a "continue" button for users to follow the link.  Mr. Schiller wrote back: "This is not good.  This

13    is a big warning that the user is about to be sent out of the app to a website.  I do not think the

14    headline should say 'continue', this is a warning that the user is about to go out to the web, and

15    are they sure they want to do that, we cannot verify that anything that occurs on the web is private

16    and secure.  The default button should not be 'continue'".  (CX-0268.11-12; Tr. 1346:24-1347:1

17    (Onak).)  In response, an Apple employee wrote:  "[w]e updated the title and the copy to be super

18    clear on what is about to happen and have more of that warning tone."  (CX-0268.10.)

19    57.    On March 15, 2022, Apple employees, including Messrs. Schiller and Onak, attended a

20    meeting to discuss the warning screen for the Netherlands and reader app projects.  (CX-0496.1.)

21    Immediately after that meeting, a subset of employees—including Mr. Onak—had a debrief via

22    chat to discuss "how to implement Mr. Schiller's comments from that meeting" on the "warning

23    screen" for those projects.  (Tr. 1355:13-22, 1358:6-9 (Onak).)  Apple employees again discussed

24    how to make the language scarier for users.  For example, one employee expressed concern that

25    some of the language "feels safe" "like, don't worry, you're still within the app and it's just

26    guiding you somewhere else right now".  (CX-0281.2.)  Instead, they wanted the language to

27    sound "a little more like into the great wide open".  (*Id*.)  They also suggested language designed

28    to "scare users a bit" with the addition of the word "out" because "it raises questions and

hesitancy, haha, out, out where? OMG, what do I do?" (*Id*. at .3-.4.)

58.    Mr. Onak testified incredibly that the word "scary" is a special term of art in the UX industry (pointing to nothing to support that claim) and that all of these exchanges reflected "a healthy discussion looking at different copy options and design elements" and were just about wanting to "inform the user about all the facts".  (Tr. 1360:9-13 (Onak), 1361:25-1362:4 (Onak).) That testimony is incredible on its face but also in light of the fact that Apple's anti-steering rules were intended specifically to *deny* information to users.  The messages clearly show that Apple employees workshopped the warning screen language, at the direction of executives including Mr. Schiller, with the express goal of making users feel unsafe such that they would not use the link.

59.    Following the June 20, 2023 meeting, Apple decided that "a full-screen warning" would be "shown to users when they clicked a link"—that "would be done regardless of which [of the commission options] was ultimately selected".  (Tr. 1180:17-20 (Schiller).)  At the time, there already was a unified warning screen for the Netherlands and reader apps.  (CX-0281.5.)  And that unified screen already included the language that Apple employees had workshopped in an attempt to make it "scarier" to users.  But at the June 20, 2023 meeting, Mr. Cook "asked the team to revise the customer warning screen" further, in order to "reference the fact that Apple's privacy and security standards do not apply to purchases made on the web".  (CX-0225.1; Tr. 1358:2-9 (Onak).)  Apple employees then worked on an updated warning screen for the Injunction, which was "sent for approval" to Mr. Schiller.  (Tr. 1265:20-25.)

60.    On June 23, 2023, this updated warning screen was sent to Mr. Cook and Mr. Schiller, among others.  (CX-0225.1.)  The updated warning screen took the unified screen and changed "what had been a sentence that says 'You will no longer be transacting with Apple' to a sentence that says 'Apple is not responsible for the privacy or security of purchases made on the web.'" (Tr. 1266:12-18 (Schiller); CX-0225.2.)  In other words, it made it even "scarier" than the scary screen that had been developed previously.  This warning screen was understood within Apple to "tell[] ppl it's dangerous" to use the links.  (CX-0399.1)  Ms. Goldberg confirmed that she recalled discussion within Apple "that the purpose of the pop-up was to tell users that the link was

1  dangerous".  (Tr. 1810:17-24 (Goldberg) (discussing CX-0399.1).)

2  61.    The presentation from the June 28, 2023 meeting shows that Mr. Cook's direct feedback

3  on the warning screen was implemented.  The speaker notes on a slide showing "updated copy"

4  for the "[s]ystem disclosure sheet" say "Tim, based on your feedback, here is the System

5  disclosure sheet with the updated copy on the right".  (CX-0291.5.)  The change Mr. Cook made

6  to the warning screen is the final version of the warning screen that Apple adopted as part of the

7  Program.  (Tr. 1267:19-23 (Schiller).)

8  62.    Apple's Program requires developers to display the "In-app system disclosure sheet" to

9  every user that clicks on an external link.  (CX-0003.5.)  This screen is shown every time a user

10  clicks on an external link—not just the first time.  (Tr. 725:8-10 (Schiller).)  The warning covers

11  the entire phone screen (CX-0003.5), even though other pop-up screens—such as the one asking

12  for permission to track a user's activity across other companies' apps and websites, which

13  Apple's own witness admitted is "not a trivial" ask—take up "less than a third of the screen" and

14  use a smaller font.  (Tr. 44:23-45:4 (Fischer).)

15                              *ii.    Static URLs*

16  63.    As Project Wisconsin launched, Apple decided to require any external links to be limited

17  to a static URL.  (Tr. 813:3-5 (Schiller).)  This means that the link may not (a) transfer the user's

18  login credentials or (b) land the user on the page of the product they were browsing in the app.

19  Users who follow the link must navigate anew on the web page to find the purchase they want to

20  make, and may also need to sign in again to make the purchase.

21  64.    The static URL requirement "adds a step of friction" because "users who were on the

22  fence about purchasing are going to decide to quit at that point."  (Tr. 954:20-955:2 (Simon);

23  Tr. 881:14-19 (Schiller).)  It can also increase user confusion.  (Tr. 955:2-955:8 (Simon).)  Apple

24  knew that this Static Link Requirement creates a "worse" user experience "than having a dynamic

25  link that sends them where they were already interested in going, already logged in".  (Tr. 92:18-

26  25 (Fischer).)  Apple employees said as much.  (CX-0206.4.)  Indeed, as one employee put it, "I

27  think personally that is why I wouldn't bother" "more steps, have to find my card, type it all out.

28  And then giving another company my details".  (CX-0206.4.)

65.     Although Apple again asserted a security justification for this restriction, it was obviously pretextual.  Apple has no similar restrictions against dynamic links to the web for any other purpose.  Only links that compete with IAP are limited in this way.  (Tr. 90:8-12 (Fischer), 881:3-6 (Schiller), 952:16-29 (Simon).)  Moreover, as Mr. Simon explained, "if dynamic URLs are a security risk, then all of iOS is a security risk because the platform [provides users] every ability to make Internet requests with dynamic URLs."  (Tr. 957:21-958:5 (Simon).)

66.     Apple knew that the friction from the warning screen and Static Link Requirement would increase breakage.  Apple also knew that the more seamless the transaction process for linked-out transactions, the smaller the breakage, and that as friction increases, the breakage would increase.  (Tr. 1643:22-1644:8 (Vij); CX-0224.16.)  Apple heard the same thing directly from developers.  (CX-0246.)  For example, Bumble told Apple that the one additional step in Google's comparator User Choice Billing system caused a ▮▮▮▮▮▮▮▮▮ for its customers in a linked transaction.  (CX-0246.)  Apple decided to add friction to the external link process specifically for those reason—to increase breakage, minimize losses to Apple, and frustrate the Injunction.

### C.     Apple Continues to Prohibit Other Calls to Action While Limiting How Developers Can Communicate with Users.

67.     On top of the placement and design restrictions and other frictions Apple designed as part of the Program, Apple still prohibits steering through "other calls to action", in violation of the plain language of the Injunction.

68.     Apple expressly considered allowing unlinked and unrestricted "calls to action" with no commission.  The June 1, 2023 presentation to Mr. Cook showed that Apple considered an Option 3, which included a "0% Commission on In-App Text Communications".  (CX-0859.52.)  Under this option, Apple would have allowed "additional information . . . to be presented but without a link to customers as mentioned where we would not charge a commission".  (CX-0859.54.)  Apple's final Program does not provide this option to developers—it does not permit a developer to have a call to action unless it is part of a link.  (Tr. 1209:6-15 (Schiller).)

69.     Apple initially denied that it had even considered allowing calls to action without a commission.  Mr. Schiller testified that "Apple didn't consider when we wrote this that a developer would want to not include a link with their call to action" and that "it just hadn't

1    crossed our mind that somebody would want to do that". (Tr. 1309:19-1310:2 (Schiller).) In fact,

2    he testified that, to his recollection, "Apple didn't discuss that internally, Apple didn't consider or

3    think about that option." (Tr. 1882:22-1883:2 (Schiller).) During the hearing, however, the Court

4    required Apple to produce the June 1 presentation, which Apple had previously withheld in full.

5    That presentation shows that Apple did consider such an option, and slides about it were even

6    included in the appendix to a presentation for a meeting with Mr. Cook.

7    70.    When shown the presentation, Mr. Schiller admitted that what the relevant slides discuss

8    was "in-app textual communication without a link and without a commission". (Tr. 1890:13-15

9    (Schiller).) The presentation also quantified the impact on Apple of allowing "in-app textual

10   communication without a link"—it showed the "incremental impact that may happen as more

11   customers might migrate to the web with this additional information being presented to them".

12   (Tr. 1891:13-17 (Schiller).) Apple projected that under the "0% commission on In-App Text

13   Communications" option, Apple would lose between $███████ in revenue. (CX-0859.54.)

14   Mr. Schiller admitted that the analysis Apple did with respect to this Option showed that "if

15   people were provided with additional information" in the form of in-app text communications,

16   "there would be more competition against Apple's IAP", which is "exactly what this Court's

17   injunction was intended to achieve". (Tr. 1891:18-1892:5 (Schiller).)

18   71.    The Program Apple adopted prohibits the use of "calls to action" other than external links.

19   (CX-0003.5.) For example, a developer may not "include in the app a simple statement" such as

20   "Go to our website, subscribe for less." (Tr. 958:8-12 (Simon)). Apple is well aware that, in the

21   absence of this restriction, developers would like to be able to include calls to action directing

22   users to go to the developer's website. (Tr. 107:21-108:1 (Fischer).) In fact, even Mr. Schiller

23   admitted that "some developers may very well want to have that option to tell their users about

24   alternative purchasing options in text without a link if they can do so without paying a

25   commission to Apple". (Tr. 1883:3-7 (Schiller).)

26   72.    Under the Program, Apple also dictates exactly the words that developers may use for

27   their links. Developers can choose among only five Apple-curated statements; they cannot

28   communicate in their own words the benefits of the developer's external offerings. (Tr. 85:21-24

1    (Fischer); CX-0003.5.)  Developers are permitted to communicate only the fact and price of

2    external purchases—developers cannot communicate other benefits such as superior refund

3    policies or customer service.  (Tr. 86:14-18, 106:17-22 (Fischer).)  Likewise, Apple forbids

4    developers from "running an end-of the week or a weekend promotion"—the developer cannot

5    "put up a message on Monday" to inform users of a special Friday deal on the developer's

6    website.  (Tr. 108:2-9 (Fischer).)  The templates also limit developers from communicating to

7    consumers any information about the fact that Apple charges a commission and why the prices

8    are higher through IAP.  (Tr. 87:15-20 (Fischer).)  This increases user confusion, as it suggests

9    that the two options (IAP versus pricing available outside the app) are unrelated offerings as

10   opposed to head-to-head competitors.  (Simon Decl., Dkt. 897-1 ¶ 28.)  As a result of these

11   restrictions, developers are not able to freely communicate with customers as the Injunction

12   intended.

13   **III.    Apple Excluded the Largest Developers from the Program.**

14   73.    Apple was concerned that despite the commissions and restrictions, some of the largest

15   developers might still want to control their own billings and customer relationships, and thus

16   adopt external links.  It therefore set out to exclude the developers most likely to use it from the

17   Program—specifically, developers in Apple's Video Partner Program ("VPP") and News Partner

18   Program ("NPP").  Apple witnesses acknowledged this exclusion was adopted deliberately,

19   intentionally, and with full knowledge the Injunction does not permit it.  (Tr. 489:14-19, 490:25-

20   491:12 (Oliver), 1745:16-19 (Vij).)

21   74.    VPP and NPP developers pay a reduced commission on IAP.  Whereas all other

22   developers (with billings of over $1 million per year) pay a 30% commission during the first year

23   of any subscription they sell, VPP and NPP developers, such as Disney+ or *The New York Times*,

24   have a standard commission "rate of 15 percent instead of 30 percent" on all subscriptions from

25   the day the subscription is first sold.  (Tr. 262:2-4 (Roman).)

26   75.    In December 2022, Apple analyzed the "treatment of programs including VPP and NPP

27   should Apple need to change its business model to meet the requirements" of the Digital Markets

28   Act, a European Union regulation.  (Tr. 1724:14-16 (Vij); CX-0231.)

76.     Based on that analysis, Apple determined that if it conditioned the benefits of VPP/NPP on the developer not using alternate billing solutions, it could keep those developers on IAP exclusively.  Such conditioning gave developers an ultimatum: stay in the VPP/NPP, use IAP exclusively, and benefit from a 15% commission; or adopt alternative payments and see the commission on IAP subscriptions jump to 30%.  As Apple acknowledged, "the effect of losing the program benefits [of VPP/NPP]" for developers "makes choosing alternative payments more costly and therefore less appealing because once the developer elects to diversify, its cost for using IAP goes up".  (Tr. 1730:7-11 (Vij).)  As a result, VPP and NPP were considered "tool[s] for retaining developers exclusively on Apple IAP".  (Tr. 1726:21-24 (Vij); CX-0231.8.)

77.     Apple repurposed its EU analysis in Project Wisconsin but sanitized the presentation slide to omit the real impact on VPP/NPP developers and to conceal the reason Apple chose to exclude them from the Program—so that VPP/NPP would be a tool for IAP exclusivity.  (Tr. 1729:23-1730:1; Tr. 1734:18-22.)  As Mr. Vij testified, "[i]f the use of linkout means the loss of VPP/NPP benefits, no developer would use linkouts unless that use can make up for the doubling of its IAP commission on all new and first-year subscriptions".  (Tr. 1722:2-14 (Vij).)  As a practical matter, for VPP/NPP participants, the "threat of the loss of program benefits would deter adoption of linkouts in the U.S." by making linkouts "much more costly to adopt".  (Tr. 1733:10-14 (Vij).)

78.     At the June 20, 2023 meeting with Mr. Cook, data was presented showing that Apple "loses more revenue under these projections if the [VPP/NPP developers] are included" in the Program.  (Tr. 1219:10-20 (Schiller); *compare* CX-0224.30 *with* CX-0224.33.)  Apple therefore decided to make VPP and NPP developers ineligible to participate in the Program.  (Tr. 261:23-262:1 (Roman).)  As a result, if a participating developer wanted to include even a single external purchase link in its app, the developer would forgo all the benefits of VPP/NPP, and instead effectively agree "to pay Apple twice, 30 percent, for in-app purchases" completed on IAP. (Tr. 262:11-13 (Roman).)  Mr. Oliver testified that "Apple's decision to deem certain developers ineligible to use the benefits of the injunction was not an oversight"— this was "a deliberate, intentional decision".  (Tr. 491:8-12 (Oliver).)  Apple again chose to protect its bottom line.

79.     Once it made that decision, Apple needed to concoct an excuse as to why those programs

were excluded *other than* to keep some of the most important developers, who were best situated to use links, from actually doing so. (Tr. 1729:23-1730:1; Tr. 1734:18-22.) Notes from a June 26, 2023 meeting attended by Messrs. Oliver and Vij (among others) show that Mr. Vij was supposed to present on "Program Eligibility" at the upcoming June 28, 2023 meeting with Mr. Cook. For "VPP/NPP", Apple sought to find a "more ***nuanced*** way to write our positioning". (CX-0506.3.) In other words, Apple was workshopping a *post hoc* explanation for excluding VPP and NPP that would not reveal what was really going on.

80. The explanation Mr. Oliver concocted was that VPP/NPP developers should be excluded to "maintain [a] high bar of user experience for [VPP/NPP] participants". (*Id*.) Internally, Apple recognized that this was a makeweight position. On June 28, 2023, Mr. Vij wrote to Mr. Oliver that "our argument on vpp npp is weak". (CX-0511.2.) He stated further that "the argument on the high bar can be made with discount as well." (*Id*. at .5.) Mr. Oliver then fed Mr. Vij alternative verbiage about how VPP and NPP are "unique programs that have specific requirements to ensure a distinct user experience on Apple's platforms" (*id*. at .6), which was integrated into the June 28 presentation (CX-505.16). Lo and behold, although Mr. Vij lifted the June 28 eligibility slide from the December 2022 deck, any mention of VPP/NPP being used as a "tool" for IAP exclusivity was scrubbed from the slide. (*Compare* CX-0231.8 *with* CX-0505.16.)

81. Apple's intent is clear. It decided to exclude the VPP and NPP programs to protect its bottom line and then manufactured an alternative explanation for that decision. Apple did so with full knowledge that "nothing in the U.S. injunction allows [Apple] to exclude any developers from the Court's injunction" (Tr. 1745:16-19 (Vij)) and that "[t]he Injunction applies to all developers" (Tr. 488:22-24 (Oliver)).

82. Moreover, under Apple's Program rules, Apple maintains the "sole discretion to revoke a link entitlement at any time". (Tr. 31:14-15 (Fischer); CX-0002.3.) This allows Apple to further wield its discretion to arbitrarily exclude other developers. Notably, this rule again singles out Injunction-mandated links. Apple permits developers to include links to external websites for non-transaction purposes without applying for any entitlement or otherwise obtaining permission from Apple in advance. (Tr. 31:23-32:2 (Fischer).) It also does not require developers who sell

1   physical goods or services to apply for any type of entitlement before their app can link to a third-

2   party payment solution.  (Tr. 32:7-11 (Fischer).)  Apple's ability to revoke participation in the

3   Program is simply another measure by which Apple can arbitrarily circumvent the Injunction.

4   **IV.    Just as Apple Planned, Developers Have Not Adopted the Program.**

5   83.    As a result of Apple's restrictions, the Program has not been adopted by developers.

6   (Tr. 1603:13-21 (Oliver).)  As of May 2024, only 34 developers with apps on the App Store—out

7   of approximately 136,000 total developers—had applied for the Program.  Seventeen of these

8   developers did not offer in-app purchases to begin with.  (Tr. 758:6-12 (Schiller).)  Mr. Oliver

9   admitted that not a single large developer had told him that they were planning to participate in

10  the Program.  (Tr. 499:18-25 (Oliver).)

11  84.    During the May 2024 hearing, Apple tried to claim that the failure of the Program was due

12  to the fact that "in rolling out a new program, oftentimes it actually takes a lot of hard work to get

13  it up to speed and to get developers to understand it and be interested in it and take advantage of

14  it".  (Tr. 761:24-762:12 (Schiller), 278:3-5 (Roman).)  Apple's delay tactics allow the Court to

15  test these claims.  Nearly a year later, at the February 2025 hearing, Apple did not put forth ***any***

16  evidence of actual adoption of the Program by developers.  Apple's creation of a response to this

17  Court's Injunction that was destined to fail has gone exactly to plan.

18  **V.    Apple Abused Privilege to Mislead the Court About its Compliance Plan.**

19  85.    Part and parcel of Apple's plan to ensure that the Injunction would never succeed was its

20  plan to conceal its true motives.  Apple presented the Court with made-for-litigation rationales

21  and, when the Court ordered that a light be shone on Apple's *real* reasoning, Apple misused

22  privilege to prolong these proceedings and hide the evidence of its misconduct from the Court.

23  **A.    Apple Manipulated Privilege to Shroud Its Decision-Making Process.**

24  86.    Apple's first tactic was to mark virtually all documents associated with the decision-

25  making process as attorney-client privileged.  Each presentation prepared for senior management

26  about Project Wisconsin was labeled not just attorney-client privileged but also "Prepared at the

27  Request of Outside Counsel" or "Prepared at the request of Counsel".  (Tr. 1179:2-5 (Schiller)

28  (discussing CX-0223.1), 1206:13-16 (discussing CX-0224.4), 1235:12-16 (discussing CX-

0291.1).)  Apple then created a single presentation at the very end with made-for-litigation reasoning, sanitized of Apple's actual motives and rationales.  (CX-0009-A.)

87.        In the summer of 2023, after the Ninth Circuit had issued its decision affirming the Injunction, Apple believed the Injunction might go into effect by July 5, 2023, when the Ninth Circuit mandate was set to issue.  (Tr. 1242:23-1243:2 (Schiller).)  Accordingly, it held a Price Committee meeting on that date to finalize its Injunction response plan.  Unlike all of its predecessors, the presentation for that meeting is not labeled privileged.  (Tr. 1243:20-1244:6 (discussing CX-0227.1).)  And unlike all of its predecessors, the presentation for that meeting contains work from Analysis Group and other purported justifications that Apple eventually put forward before this Court—but that were not part of the real decision-making process conducted under cover of privilege prior to July 5, 2023.  (CX-0859.)

88.        Once the Ninth Circuit granted a stay, Apple hurried to bring back the veil of privilege.  On August 15, 2023, Mr. Schiller sent an email asking for an updated presentation "to reflect the commission and duration decisions that were made" at the July 5 meeting.  (CX-0229.2.)  Jennifer Brown, the Director of Commercial Litigation at Apple, responded:

> "At this point, the prior deck and this deck are privileged and confidential, reflecting litigation strategy and legal risk analysis.  We would prefer to keep it that way for now.  When we have to comply, within days of that date, we will finalize the tentative plan and have a document reflecting the factors considered to support that decision.  Until that point, we would have this document as a point of reference but not share it further."  (CX-0229.1.)

Mr. Schiller understood that he was "being told here that Apple is intentionally not updating the deck to maintain privilege".  (Tr. 1253:2-4 (Schiller).)

89.        This process repeated itself in January 2024.  Apple labeled interim presentations as privileged and prepared at the request of counsel, but removed those labels for the final January 16, 2024 Price Committee presentation that Apple voluntarily submitted to the Court.  (CX-0009-A.)  Then at the May 2024 hearing before the Court, in the apparent expectation that the prior presentations would remain hidden, Apple witnesses relied exclusively on that final January 16, 2024 deck.  Mr. Schiller and other witnesses testified that no final decision was made until January 16, 2024, as to how Apple would respond to the Court's Injunction, and that "there

[were] still open questions about what [Apple] would decide until that point". (Tr. 679:18-23 (Schiller).) Mr. Roman went even further, testifying that "Apple decided to impose a 27 percent fee on linked purchases" on January 16, 2024, and that "up until January 16, 2024, Apple had no idea what fee it was going to impose on linked purchases". (Tr. 202:15-18 (Roman).)

90.    That testimony was not true. The main features of Apple's plan—including the 27% commission, placement and design restrictions and the scare screen—were fully baked as of July 2023. (*E.g.*, Tr. 1798:25-1799:13 (Goldberg).)

91.    The hearing proved Apple's inappropriate use of privilege and work product protection. For example, Ms. Brown instructed Mr. Oliver to make what she called "a procedural tweak"— "change the 'Prepared at the Request of Counsel' label in the slides to 'Prepared at the Request of External Counsel'", even though external counsel had made no such request. (CX-0538.4; 1395:19-22 (Oliver) (testifying that Mr. Schiller and the executive team instructed Mr. Oliver to prepare slides and analyses), Tr. 1615:13-1616:2.)[5]

### B.    Apple Abused Privilege to Frustrate and then Delay Discovery.

92.    Having improperly marked its documents as privileged, Apple then embarked on a campaign to frustrate and then delay the document discovery process.

93.    Delay has always been Apple's objective. As reflected in Ms. Goldberg's notes from June 2023, Apple developed its compliance plan with the view that "every day we don't hear anything from the Court past the 28th, it's one day". (CX-0399.1.) Apple has continued to stifle competition and reap billions in ill-gotten profits for the nearly 3.5 years since this Court entered its Injunction.

94.    On May 31, 2024, this Court ordered Apple to produce "all Apple's documents relative to the decision-making process leading to the Program and associated commission rates". (Dkt. 974; Dkt. 981 at 913:20-24, 914:10-15.)

95.    Apple represented to the Court that it could complete its document production in three

---

[5] A plethora of other examples exist in the record of Apple intentionally mislabeling documents as privileged and confidential. (*See, e.g.* Tr. 1835: 5-12 (Goldberg); CX-0464.11; CX-0223; CX-0224; Tr. 1828:15-1829:3 (discussing CX-0244).)

1    months.  (Dkt. 981 at 921.)  But on July 17, 2024, Apple sought a deadline of December 6,

2    2024—more than double Apple's initial estimate.  (Dkt. 1000 at 5.)  Magistrate Judge Hixson

3    rejected that request, ordering Apple to complete its productions by September 30, 2024.

4    (Dkt. 1008 at 2.)  Apple committed to produce documents on a rolling basis in the months leading

5    up to that deadline (Dkt. 1001 at 3; Dkt. 1004 at 3), but it failed to do so.  On September 26, 2024,

6    mere days before its substantial completion deadline of September 30, Apple again requested an

7    extension.  (Dkt. 1016 at 5.)  As Judge Hixson recognized, Apple engaged in "bad behavior"

8    because "this document production is all downside for Apple".  (Dkt. 1017 at 2.)  Given the

9    financial benefit Apple continues reaping from delay, "[i]t [was] not in Apple's interest to do any

10   of this quickly.  This is a classic moral hazard, and the way Apple announced out of the blue four

11   days before the substantial completion deadline that it would not make that deadline because of a

12   document count that it had surely been aware of for weeks hardly creates the impression that

13   Apple is behaving responsibly".  (*Id.*)

14   96.    But delay was not the only problem.  Apple also improperly withheld a significant number

15   of responsive documents—around 55,000—on privilege grounds, nearly one-third of the

16   responsive documents it identified.  On October 27, 2024, Epic raised concerns about this

17   exceedingly high privilege withholding with Judge Hixson, highlighting 11 exemplar documents

18   that Epic believed were indicative of Apple's over-withholding problem.  (Dkt. 1039.)  On

19   December 2, 2024, Judge Hixson overruled virtually all the privilege claims Epic had challenged

20   in those 11 exemplar documents (as well as certain redactions that Epic did not challenge due to

21   lack of sufficient information).  (Dkt. 1056.)  Apple moved for relief from the December 2 Order

22   (*see* Dkt. 1079), but this Court upheld Judge Hixson's determinations in full (Dkt. 1095).

23   97.    Following Judge Hixson's ruling, the parties agreed that Apple would re-review all of its

24   privilege assertions and submit any remaining assertions for further review by a panel of special

25   masters.  (Dkt. 1069 at 2.)  This process confirmed Apple's bad faith.  Following re-review,

26   Apple determined that nearly 60% of the documents it initially withheld as privileged were not

27   privileged ***at all***.  Apple further downgraded thousands of documents from "withhold" to

28   "redact", with many requiring only minor redactions.  The Court accordingly found that Apple's

1    privilege calls were "a tactic" designed to delay the proceedings.  (1/14/2024 Tr. 23:22-24.)  The

2    Court also found that Apple's over-designation of privilege was improper and that "sanctions are

3    warranted", leaving their exact contours to be determined "in the context of a full record and [the

4    Court's] overall findings".  (Dkt. 1171 at 3.)

5    98.     Notably, the remarkable number of documents Apple improperly withheld still vastly

6    *understates* Apple's misuse of privilege.  That is because Apple did not simply withhold a vast

7    number of non-privileged documents; Apple specifically targeted documents that were core to

8    this proceeding.  Indeed, over half of the exhibits Epic ultimately admitted at the February 2025

9    hearing were initially withheld for privilege, including *virtually all May-July 2023 planning*

10   *documents*.  A prime example of Apple's improper withholding of documents is the presentation

11   for the June 1, 2023 meeting of Apple executives including Mr. Cook regarding Apple's response

12   to the Injunction (eventually marked as CX-0859).  Apple knew full well that substantial (and

13   substantive) portions thereof were not privileged at all.  Apple initially withheld every single copy

14   of the June 1 presentation.  Following re-review, Apple still withheld CX-0859 entirely, but

15   agreed to produce two other versions of the presentation in redacted form.  When a Special

16   Master upheld the claim that CX-0859 was privileged in full, Apple opportunistically decided to

17   claw back the other two versions and withhold those versions entirely.  At the hearing on

18   February 25, 2025, after reviewing CX-0859 *in camera*, the Court ordered its production, with

19   redactions of only limited portions that reflect attorney-client privileged communications.

20   (Tr. 1488:2-5 ("This slide deck should have been presented and provided to Epic, all the pages

21   that were clearly not attorney-client privileged.").)  And notably, at the hearing, Apple did not

22   even attempt to defend its privilege assertions as to most of CX-0859.  Apple's obfuscation tactics

23   should be taken into account as part of its larger scheme to avoid compliance.

24   **VI.     The Remedy Should Enforce Compliance and Prevent Future Circumvention.**

25   99.     This Court has broad powers to hold Apple in contempt, enforce the Injunction and clarify

26   its application.  *See Craters & Freighters v. Daisychain Enters*., 2014 WL 2153924, at *1 (N.D.

27   Cal. May 22, 2014).  "[T]he party alleging civil contempt must demonstrate by clear and

28   convincing evidence that (1) the contemnor violated a court order, (2) the noncompliance was

1    more than technical or de minimis, and (3) the contemnor's conduct was not the product of a good

2    faith or reasonable interpretation of the violated order." *Facebook, Inc. v. Power Ventures, Inc.,*

3    2017 WL 3394754, at *8 (N.D. Cal. Aug. 8, 2017).

4    100.    "In deciding whether an injunction has been violated, it is proper to observe the objects for

5    which the relief was granted and to find a breach of the decree in a violation of the spirit of the

6    injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Rsch. v.*

7    *Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014).

8    101.    In determining what sanction to impose, a court "should weigh all the evidence properly

9    before it determines whether or not there is actually a present ability to obey and whether failure

10   to do so constitutes deliberate defiance or willful disobedience which a coercive sanction will

11   break". *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 n.6 (9th Cir. 1983).

12   The court must "consider the character and magnitude of the harm threatened by continued

13   contumacy, and the probable effectiveness of any suggested sanction" in bringing about the result

14   desired. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) (quotation

15   omitted). Courts have broad discretion to provide appropriate relief for contempt. *SEC v. Hickey*,

16   322 F.3d 1123, 1128 (9th Cir. 2003). This power includes the imposition of sanctions to coerce

17   the contemnor into compliance. *Gen. Signal Corp.*, 787 F.2d at 1380.

18   102.    Where, as here, a permanent injunction has been violated, compliance may be effectively

19   coerced by holding in contempt the party that violated the injunction and also clarifying the terms

20   of the previously ordered injunction. *See H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd.*, No.

21   3:16-cv-0480-BEN-WVG, 2022 WL 104730, at *6 (S.D. Cal. Jan. 10, 2022) (clarifying the scope

22   of a permanent injunction to articulate more precisely what of the contemnor's conduct would and

23   did violate the injunction). Analogizing to the trademark context is illustrative; there, courts have

24   observed that "a party who has once infringed is allowed less leniency for purposes of injunction

25   enforcement than an innocent party". *Forever 21, Inc. v. Ultimate Offprice, Inc.*, 2013 WL

26   4718366, at *3 (C.D. Cal. Sept. 3, 2013) (citing *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d

27   1320, 1323 (9th Cir. 1997)). Such infringers "must keep a fair distance from the 'margin line'".

28   *Wolfard,* 118 F.3d at 1323. Thus, courts take care to ensure that an infringer cannot keep making

1    minor changes to the intellectual property of another, culminating in contempt hearing after

2    contempt hearing.  *See id*.

3    103.    The Court should take the same approach here.  Apple's initial gambit was to "[s]tart with

4    the minimum" (CX-1104.1), virtually assuring an endless game of whack-a-mole.  Apple then

5    violated the Injunction with full knowledge that its conduct raised a compliance risk.  Apple

6    engaged in a wide-ranging campaign to avoid at all costs complying with the Injunction, to hide

7    relevant evidence and to delay its day of reckoning.  Apple's prior misconduct—its deliberate and

8    calculated scheme to defy the Injunction—makes clear that Apple will continue to flout the

9    Injunction if it is given free rein to develop another "compliance" plan.  To obviate the need to

10   come back to this Court the next time Apple adopts strategies to circumvent the Injunction, the

11   Court should provide additional clarity to keep Apple "a fair distance from the 'margin line'".

12   *Wolfard*, 118 F.3d at 1322.  The Court should therefore make clear that compliance with the

13   Injunction requires Apple to discontinue the imposition of any fees on purchases made outside of

14   apps.  Moreover, the Court should make clear that Apple must allow developers to include *any*

15   links, buttons and other calls to action in their apps, as well as to freely communicate with users,

16   without Apple's interference.

17   104.    The Injunction prohibited Apple from enforcing guidelines that, among other things,

18   prevented developers from "including in their apps and their metadata buttons, external links, or

19   other calls to action that direct customers to purchasing mechanisms".  (Dkt. 813 ¶ 1.)  This

20   language was taken directly from, and was accordingly expressly intended to eliminate, the

21   provision of Apple's 2020 App Review Guidelines that barred developers from including such

22   features in their apps.  (*Id*.)  What the Injunction did not authorize, and could not plausibly have

23   been understood to have authorized, is Apple imposing a new fee that singles out injunction-

24   mandated transactions as the ***only*** non-IAP transactions on which Apple charges a fee—let alone

25   when that fee renders economically nonviable the very opportunity that the Injunction requires

26   Apple to allow.  Nor could the Injunction be fairly understood to have authorized the various

27   obstacles that Apple has imposed to make the links unworkable and hide them from users,

28   including:  prohibiting buttons and other calls to action in their entirety, relegating links to

ineffective locations in an app, imposing "scary" warning screens, excluding the largest developers who were most likely to adopt external payments and prohibiting dynamic links.

The Court should accordingly hold that the Injunction prohibits Apple from in any way:

- imposing a commission or any fee on purchases that consumers make outside an app;

- auditing, monitoring, tracking or requiring developers to report purchases or any other activity that consumers make outside an app;

- restricting or conditioning developers' style, language, formatting, quantity, flow or placement of links;

- prohibiting or limiting the use of buttons or other calls to action, or otherwise conditioning the content, style, language, formatting, flow or placement of these devices;

- excluding certain categories of apps and developers from obtaining link access;

- interfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message apprising users that they are going to a third-party site; and

- restricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase.

105.   The above changes are necessary to bring Apple into compliance with the Injunction and ensure that Apple does not simply come back with another set of restrictions that violate the Injunction.  This relief effects the basic purpose of a civil contempt order to ensure prompt compliance with all judgments and orders of the court.  *Gus's Franchisor, LLC v. Terrapin Rest. Partners, LLC*, 2020 WL 5121364, at *2 (W.D. Tenn. Aug. 31, 2020) (citing *Redken Labs., Inc. v Levin*, 843 F.2d 226, 229 (6th Cir. 1988)); *see also In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 11264985, at *2 (N.D. Cal., 2018).  In light of Apple's deliberate campaign to avoid complying with the Injunction, anything short of the above clarity will simply extend Apple's evasion efforts and require further litigation arising from Apple's refusal to abide by this Court's Injunction.

Dated:  March 7, 2025

Respectfully submitted,

By:    */s/ Gary A. Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*