# EXHIBIT B
# (Redacted)

GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
MICHAEL J. ZAKEN (*pro hac vice*)
mzaken@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

PAUL J. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

*Attorneys for Plaintiff and Counter-defendant
Epic Games, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., | Case No. 4:20-CV-05640-YGR-TSH |
| Plaintiff, Counter-defendant, | **RESPONSE OF EPIC GAMES TO APPLE'S OPPOSITION TO DISCOVERY SANCTIONS** |
| v. | |
| APPLE INC., | Courtroom: 1, 4th Floor |
| Defendant, Counterclaimant. | Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ............................................................................................................4

LEGAL STANDARD.........................................................................................................12

ARGUMENT ...................................................................................................................15

I.   APPLE WITHHELD NON-PRIVILEGED DOCUMENTS WITHOUT
     SUBSTANTIAL JUSTIFICATION AND IN BAD FAITH. ...........................................15

II.  APPLE SHOULD BE SANCTIONED FOR SEVERE AND INTENTIONAL
     MISCONDUCT. .......................................................................................................20

     **A.**   Apple's Complaints About the Scope of the Discovery Should Be Rejected. ......20

     **B.**   Epic's Diligence Revealed Apple's Misconduct. ..................................................22

     **C.**   Sanctions, Beyond Re-Reviews, Are Necessary To Remedy Apple's
             Misconduct..........................................................................................................24

1

**TABLE OF AUTHORITIES**

2
                                                                                    **Page(s)**
**Cases**

3

*Adriana Int'l Corp. v. Thoeren*,
4
    913 F.2d 1406 (9th Cir. 1990) ...........................................................................15

5
*Alyeska Pipeline Serv. Co. v. Wilderness Society*,
    421 U.S. 240 (1975) ...........................................................................................14
6

7
*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .............................................................................................14

8
*F.J. Hanshaw Enters., Inc. v. Emerald River Develop., Inc.*,
9
    244 F.3d 1128 (9th Cir. 2001) .......................................................................14, 15

10
*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) .............................................................................14
11

12
*Fjelstad v. Am. Honda Motor Co., Inc.*,
    762 F.2d 1334 (9th Cir. 1985) ...........................................................................13

13
*Haeger v. Goodyear Tire & Rubber Co.*,
14
    813 F.3d 1233 (9th Cir. 2016) ...........................................................................14

15
*Hochberg v. Lincare, Inc.*,
    334 Fed App'x 831 (9th Cir. 2009) (unpublished) ................................................13
16

17
*Hyde & Drath v. Baker*,
    24 F.3d 1162 (9th Cir. 1994) .............................................................................13

18
*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
19
    655 F. Supp. 3d 899 (N.D. Cal. 2023) ...........................................................2, 15

20
*Lahiri v. Universal Music & Video Distrib. Corp.*,
    606 F.3d 1216 (9th Cir. 2010) ...........................................................................14
21

22
*Merrick v. Paul Revere Life Ins. Co.*,
    500 F.3d 1007 (9th Cir. 2007) ...........................................................................13

23
*Micromesh Tech. Corp. v. Am. Recreation Prods., Inc.*,
24
    2007 WL 2501783 (N.D. Cal. Aug. 30, 2007) ....................................................12

25
*Pierce v. Underwood*,
    487 U.S. 552 (1988)...........................................................................................13
26

27
*Primus Auto. Fin. Servs., Inc. v. Batarse*,
    115 F.3d 644 (9th Cir. 1997) .............................................................................14

28

**Statutes & Rules**

Federal Rule of Civil Procedure 37 ..................................................................................2, 12, 13, 14

**Other Authorities**

8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2289 (3d
    ed. 1998.) ...........................................................................................................................12

1

## PRELIMINARY STATEMENT

2        Long before these contempt proceedings began, Apple deliberately planned to conceal

3    evidence showing how it developed its plan for responding to this Court's Injunction.  As Epic

4    proved at the hearing, Apple employees routinely and intentionally mislabeled documents as

5    attorney-client privileged when no legal advice was being sought or given, solely to prevent those

6    documents from being reviewed in judicial proceedings that Apple recognized may be coming in

7    this jurisdiction and others.  (Epic's Proposed Findings of Fact (Dkt. 1326) ¶¶ 86-91.)  In parallel,

8    Apple created a separate set of sanitized presentations with any eye toward eventual discovery.

9    These sanitized materials, from which Apple removed the "privileged" legend, did not reflect the

10   real reasons Apple designed the External Purchase Link Entitlement Program the way it did.  (*Id.*

11   ¶ 86.)  The real reasons were intended to stay shrouded by privilege, and Apple fought throughout

12   these proceedings to prevent (and, when that failed, to delay) the real decision-making process

13   from coming to light.

14       When the initial evidentiary hearings in May 2024 exposed that Apple's proffered

15   explanations for its Link Entitlement Program were unsupportable, the Court ordered Apple to

16   produce "all of Apple's documents relative to its decision-making process with respect to the

17   issues in front of the Court.  All of them.  All.  If there is a concern, then be overly broad."

18   (Dkt. 981 at 914:10-21; *see also* Dkt. 974.)  Knowing that the materials the Court ordered Apple

19   to produce would undermine its Notice of Compliance and its witnesses' sworn testimony, Apple

20   chose to avoid and delay compliance with yet another Court Order.  Apple first sought to impose

21   date range, search terms and responsiveness limitations, which were rejected by Judge Hixson as

22   inconsistent with this Court's Order.  (Dkt. 1008.)  Apple then repeatedly sought to delay the

23   production, concealing from the Court and Epic the magnitude of its review and then, four days

24   before substantial compliance was due, unilaterally declaring itself unable to comply because of a

25   review population that was twice as large as what Apple had previously disclosed to Epic and the

26   Court.  Judge Hixson recognized this gambit for what it was—"bad behavior" intended to further

27   delay Apple's production and hence its day of reckoning, and to allow Apple to keep earning

28   massive profits from its unlawful business practices.  (Dkt. 1017.)

1    But Apple did not stop at delay.  Continuing its misuse of the privilege, Apple withheld as

2    privileged more than a third of the documents that, by Apple's own account, were responsive to

3    this Court's Order.  This was no accident:  Apple systematically and consistently withheld the

4    most critical and significant evidence concerning its response to the Injunction—including the

5    very presentations its most senior executives used to make decisions about how to respond to the

6    Injunction—when it knew that these business analyses were clearly not privileged.  (*E.g.*, CX-

7    0223, -0224, -0272, -0274, -0291, -0859.)  When pressed on this massive abuse of the privilege,

8    Apple doubled down, insisting that because the Link Entitlement Program was a response to an

9    injunction that involved many lawyers, ***everything*** about it is privileged.  (Br. 21 (claiming that

10   "[t]he entire injunction compliance process was a legal project with business inputs" and that

11   "business discussions of ways to comply with the legal requirements of the Injunction are

12   inseparable" from privileged advice); *see also* Perry Decl. ¶ 57 ("Every document concerning the

13   Entitlement was created as a direct result of the Injunction—there was no preexisting business

14   motivation for Apple to develop the Entitlement.").)  Apple has never cited any precedent

15   remotely supporting this broad position.

16   Indeed, as this Court saw during the hearing, Apple continued to make baseless privilege

17   claims even after this Court and Judge Hixson held that the privilege standard Apple had applied

18   was dead wrong as a matter of law.  (Dkt. 1056, 1095.)  After representing that Apple's re-review

19   would comply with this Court's decision regarding the scope of the privilege (Dkt. 1092), Apple

20   still decided to withhold, in full, a critical presentation concerning decision-making by Apple

21   executives including Tim Cook and Phil Schiller at a June 1, 2023 meeting (CX-0859), even

22   though large portions of that deck reflected, as recognized by the Court, obviously unprivileged

23   business analyses.

24   Pursuant to Federal Rule of Civil Procedure 37 and this Court's inherent powers, the Court

25   should sanction Apple's discovery misconduct, which was not substantially justified (warranting

26   sanctions under Rule 37) and is "tantamount to bad faith" (warranting inherent powers sanctions).

27   *See, e.g.*, *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 655 F. Supp. 3d 899, 933

28   (N.D. Cal. 2023) (finding Facebook "operated in bad faith" because Facebook employees "are

taught to improperly 'privilege' documents based on their perceived sensitivity", and Facebook then "designated a massive number of documents as privileged, even though for many of them it's impossible to imagine any conceivable argument in support" of privilege).

Apple's response does nothing to justify this misconduct or undermine this Court's conclusion that "sanctions are warranted". (Dkt. 1171 at 3.) To the contrary, Apple's attempts to conceal and shirk responsibility for its misconduct only confirm that sanctions are necessary. Apple's response largely relies on the number of documents Apple was required to review, the number of attorney reviewers it employed, its alleged quality control checks and its written review protocols. But none of those self-serving statistics or materials explains Apple's fundamental failing: why did Apple consistently withhold the evidence that would illuminate Apple's actual decision-making, including more than half of the exhibits that were ultimately admitted at the February 2025 hearings? This was not inadvertent; it was systematic. It is not as though Apple accidentally withheld some documents it should have produced, while producing other documents it should have withheld. Apple's supposed "human errors" went overwhelmingly in one direction—withholding non-privileged documents. And Apple's self-serving description of its own review process cannot excuse its decision to deem as privileged *all* documents reflecting Apple's genuine decision-making about the Link Entitlement Program. The only conclusion that matches these facts is that Apple intended to use the privilege to conceal evidence and then followed through on that plan.

Apple's attempts to avoid sanctions by blaming Epic for Apple's own misconduct are without merit. (Br. 14.) Apple complains about the scope of the required production, but the scope of discovery was determined by this Court's Order to produce "all of Apple's documents" concerning the Injunction. (Dkt. 981.) If Apple had concerns about that Order, it could and should have sought relief from this Court at that time, rather than engaging in self-help by delaying and withholding the required production. Apple also tries to fault Epic for raising concerns about Apple's abuse of privilege just one day after Apple produced a large majority of responsive documents and (falsely) declared substantial compliance. But that was the earliest time the number and proportion of withheld documents—and hence Apple's strategy of

1    withholding—could have become apparent.  Epic acted reasonably and diligently in challenging

2    Apple's discovery misconduct based on the limited information Epic obtained about Apple's

3    privilege calls, which is the only reason that Apple's misconduct ever came to light.

4          Apple's attempts to downplay the seriousness of its misconduct and the resulting prejudice

5    should also be rejected.  Apple claims that its conduct has not delayed the case because it

6    "promptly completed the re-review".  (Br. 17.)  That is absurd:  the very fact that a re-review was

7    required as a result of Apple's misconduct has caused delay.  And even after the end of the

8    evidentiary hearings, with the Court ready to rule on the motion for contempt, the Special Masters

9    are *still* not finished with their review of Apple's privilege determinations, and Epic and the Court

10   *still* do not have access to materials that Apple should have produced six months ago.  Indeed,

11   Apple is still producing documents showing its deliberate manipulation of the privilege.  (Byars

12   Decl. Ex. A.)  Apple similarly claims that it already has borne the consequences of its misconduct

13   because it incurred "great expense" to conduct the re-review required by its own withholding.

14   (Br. 18.)  This is the very definition of chutzpah.  Apple had to do the re-review because it got

15   caught abusing privilege.  Producing the non-privileged documents was neither compensation nor

16   punishment; it was what Apple should have done in the first place.

17         Apple should be sanctioned.  In particular, because Apple's discovery misconduct formed

18   part of its overall scheme to violate the letter and spirit of the Injunction, conceal the relevant

19   facts from the Court, and delay the need for compliance, the Court also should consider Apple's

20   misconduct as additional evidence in support of Apple's contempt of the Injunction.  Epic is

21   prepared to provide any additional information the Court would find helpful in crafting a sanction

22   or additional substantive injunctive relief aimed at achieving the procompetitive goals of the

23   Injunction that Apple deliberately frustrated.

24                                    **BACKGROUND**

25         Evidence at the February hearing made clear that Apple has deliberately misused the

26   attorney-client privilege to shield the key materials regarding its Injunction response from

27   discovery.  Throughout Apple's planning process, Apple employees and counsel routinely

28   directed each other to include lawyers in communications, solely to assert privilege, even when

1   no legal advice was being sought or received, and to mislabel materials as privileged or prepared

2   at direction of counsel, even when they were not.  (*See* Dkt. 1326 § V.A.)  Knowing that scrutiny

3   of their actions was possible, and also that international regulators may assess Apple's

4   compliance under their regulations, Apple employees working on the injunction response used

5   these tactics in an improper effort to clothe Apple's ***business*** analyses in the trappings of ***legal***

6   advice so that they would be shielded from scrutiny.

7        Apple's scheme to conceal the facts about its supposed compliance while offering the

8   Court a sanitized, fictional account of its Injunction response started to unravel after the Court

9   ordered Apple to produce the real materials concerning its response.  On May 31, 2024, following

10  several days of testimony in which cross examination poked hole after hole in Apple's fabricated

11  story—and after Apple failed to abide by the Court's Order to produce all the files related to

12  Project Wisconsin that Carson Oliver had access to—the Court directed Apple to produce "all of

13  Apple's documents relative to its decision-making process with respect to the issues in front of

14  the Court." (Dkt. 974.)  Apple represented that the discovery would take approximately three

15  months to complete.  (May 31, 2024 Hr'g Tr. 921:3-922:25.)

16       But rather than work to comply within that time frame, Apple immediately began

17  employing tactics to avoid or delay compliance with the Court's Order.  First, Apple attempted to

18  impose baseless limitations not contemplated by the Order, which Epic and the Court had to

19  spend time and effort to address.  For example, at the May 31 hearing, Apple had specifically

20  sought the Court's instructions concerning "the time parameter" for its production, and the Court

21  made clear that the production should run "from the day that my decision came out to the

22  present", *i.e.* an end date of May 31, 2024.  (Tr. 914:20-21.)  But Apple tried to ignore that

23  instruction, unilaterally seeking to cut off its production at on January 26, 2024, which is four

24  months earlier than the date the Court ordered.  Rejecting Apple's arguments, Judge Hixson

25  found that "Judge Gonzalez Rogers already answered this question . . . at the May 31 hearing"

26  and rejected Apple's limitation.  (Dkt. 1008 at 1-2.)

27       Apple also reneged on its representation that it could substantially complete its production

28  within three months of the May 31 hearing, *i.e.* by the end of August 2024.  Apple instead sought

a deadline for completion of December 6, 2024, six months after the hearing, based on its estimate that it would need to review at least 650,000 documents.  Judge Hixson found that "the volume of documents Apple identifies doesn't justify the lengthy schedule it proposes" but partially accommodated Apple by ordering a September 30, 2024 deadline.  Judge Hixson then made clear to Apple the importance of meeting this deadline, which was based on "the resources available to Apple, the importance of the issues at stake, and the importance of the discovery in resolving the issues".  (Dkt. 1008 at 2.)

Apple also baselessly sought to exclude from discovery any documents concerning its compliance with regulations in other jurisdictions concerning alternative payments.  Judge Hixson rejected Apple's efforts to do so, finding that "Epic has shown that Apple's program for compliance with the permanent injunction in this case is based on and informed by responses to similar regulations in other countries".  (Dkt. 1008 at 2.)  Judge Hixson thus ordered Apple to produce such documents "from the files of custodians that worked on Apple's compliance with the injunction".  (*Id.*)  Evidence such as the developer feedback Apple obtained on the fees charged in Korea, or Apple's internal analysis showing that the exclusion of VPP and NPP developers from the Program would act as a tool for IAP "exclusivity" would not have been discovered if Epic had not challenged Apple's attempt to exclude ex-U.S. projects.  (*See, e.g.*, Dkt. 1326 ¶¶ 2-5, 11-12, 75-77.)  And Judge Hixson rejected Apple's effort to limit the search terms, finding that Epic's proposed terms were "reasonable" and "aimed at core issues of importance".  (Dkt. 1008 at 3.)  Again, documents hitting on these search strings would not have been discovered had Epic not challenged Apple's too-narrow proposed search terms.

Despite there being substantial resolution on the search terms and custodians by mid-June, Apple significantly delayed its document production.  (Dkt. 1011 at 2.)  As of August 14, 2024, Apple had produced fewer than 1,500 documents, and its filing regarding sanctions confirms that it did not begin its document review in earnest until at least August.  (*Id.;* Br. 9.)  Even based on this small production, Epic raised serious concerns with Apple's privilege calls as early as August 28, 2024.  (Dkt. 1013 at 2.)  Apple made another small production on September 9, 2024, bringing the total production to a mere 8,000 documents (Dkt. 1014 at 2-3) with only three weeks

1  remaining before the substantial completion deadline, contrary to Apple's representation that it

2  would produce documents on a rolling basis (Dkt. 1014).

3       During this time, the parties submitted biweekly Status Reports to Judge Hixson.  Apple

4  never in any of these Status Reports indicated that its initial assessment that it would need to

5  review 650,000 documents had changed, or that it would not complete its production by the

6  September 30 deadline.  It was not until September 26, 2024, four calendar days and two court

7  days before the deadline, that Apple disclosed *for the first time* that it would need to review 1.3

8  million documents, not the 650,000 documents it had previously identified, and requested a 30-

9  day extension.  Judge Hixson found that it was "simply not believable that Apple learned of this

10  information only in the two weeks following the last status report" and identified "several related

11  concerns" about Apple's misconduct.  (Dkt. 1017 at 1.)  "First, Apple's status reports weren't any

12  good.  Apple knew it wasn't on track to make the substantial completion deadline and kept that a

13  secret."  (*Id.*)  Apple's failure of candor and "bad behavior" prevented Epic and the Court from

14  addressing possible solutions, such as hiring more document reviewers.  (*Id*. at 2.)

15       Judge Hixson put his finger on Apple's motive for this "bad behavior" and rejected

16  Apple's claim that it was unable to comply with the deadline, noting that "this document

17  production is all downside for Apple because it relates to Apple's alleged lack of compliance with

18  the Court's injunction" and "it is not in Apple's interest to do any of this quickly".  (Dkt. 1017 at

19  2.)  Judge Hixson also rejected Apple's claim that it was unable to comply with the deadline

20  because "Apple is one of the largest companies in the world, with nearly infinite resources

21  available to it", and that it could have complied with its deadline "if it wanted to".  (*Id*.)  The

22  Court found that Apple's choice to announce its purported inability to comply "out of the blue

23  four days before the substantial completion deadline" was inconsistent with responsible behavior.

24  (*Id.*)  Judge Hixson therefore denied Apple's request for an extension.

25       On September 30, 2024, Apple produced approximately 65,000 documents, bringing its

26  total production to 89,000, a small fraction of the 1.3 million documents Apple said it would

27  review.  (Dkt. 1024 at 2.)  Apple also informed Epic that it believed it had produced 85-95% of

28  the responsive documents.  (*Id.*)  Apple informed Epic that it would produce any remaining

documents by October 7, 2024—one week after the already-extended deadline.  Based on Apple's production and its representations, Epic became more concerned about the size of Apple's production and its delay.  (*Id.*)  Epic raised questions about Apple's privilege calls on October 1, 2024, the day after substantial completion.  But even then Epic could not have known the magnitude of over-designation.  That became clear only when Epic eventually learned that Apple would be producing ***less than 7%*** of the documents it reviewed and withholding more than one third of the responsive documents as privileged.  Epic could not have raised its objections earlier because Apple withheld that critical information along the way.

Throughout October, Epic continued to evaluate the privilege logs Apple produced in the weeks following substantial completion and sought additional information about Apple's privilege claims.  Many of Apple's privilege claims appeared to be facially untenable, and its logs contained many privilege claims that lacked any meaningful supporting information.  For example, Apple claimed privilege over virtually all documents reflecting Apple's user interface design for the external purchase links—including scare screens—as well as draft Price Committee presentations used to plan the Program and communications with the outside consulting group that prepared the presentation that purportedly supported Apple's choice of commission.  (Dkt. 1039 at 1-2.)  Apple went so far as to redact virtually every statement reflecting even the ***timeline*** of Apple's planned compliance.  (*Id*.)  Ultimately, on October 27, 2024, after Apple repeatedly doubled down on its claim that all the core aspects of its response planning are privileged because they involved lawyers and were directed at supposed compliance with a legal requirement, Epic challenged Apple's privilege calls in a joint discovery letter to Judge Hixson.  (*Id*.)  In its response, although Apple acknowledged that it "had to exercise business judgment on a number of issues" relating to the Program, Apple again claimed that all its privilege claims were substantiated because "advice from counsel as to the legal requirements of the injunction was sought and received at every step" of its Injunction response planning.  (*Id*. at 2.)  In other words, Apple was withholding documents that indisputably reflected business analyses on the basis that lawyers were included in those communications—and in so doing, was thumbing its nose at this Court's clear Orders to produce documents reflecting that very planning and decision making

1  process.  (*Id.; see* Tr. 913:20-22 ("The whole point, Mr. Perry, was to get the documents relative

2  to the decision-making with respect to the issues in front of the Court.  That was the point.").)  On

3  the basis of Epic's showing, Judge Hixson granted Epic's request to review exemplar documents

4  *in camera*.

5        On December 2, 2024, based on review of the exemplar documents and Apple's

6  representations about its privilege review, Judge Hixson rejected Apple's position as inconsistent

7  with established law:  "Privilege does not descend like a giant fog bank over every document that

8  is in some way connected with an effort to achieve legal compliance."  (Dkt. 1056 at 1.)  When

9  "business people decide among the options legally available to them, and they consider things like

10  profit, cost, competition, and so on; those communications are not privileged."  (*Id.*)  Judge

11  Hixson thus found that almost all of the sample documents contained unprivileged business

12  analyses, not legal advice.  This Court later affirmed Judge Hixson's December 2 Order, finding it

13  to be consistent with Ninth Circuit privilege standards.  (Dkt. 1095.)  The Court found that the

14  documents withheld by Apple "are precisely the kinds of documents the Court ordered produced

15  as they reflect the business rationale at issue" in these proceedings, and found untenable Apple's

16  argument that every document responding to an Injunction is inherently legal and privileged:  "In

17  short Apple's business decisions cannot be shielded because they were prompted by a Court

18  order".  (*Id.* at 3.)  The Court also observed that "Companies have been repeatedly advised that

19  merely attaching a lawyer's name to a document does not suffice for invoking the privilege",

20  making clear that Apple's practice of including lawyers in communications solely to shield them

21  from discovery was improper.  (*Id.* at 2-3.)  The Court also rejected as inadequate a sworn

22  Declaration submitted by Apple's Commercial Litigation Director, Jennifer Brown, finding that

23  general assertions that lawyers "may review" documents or "frequently revise" them do not create

24  a privilege.  (Dkt. 1095 at 3.)[1]

25

26      [1] Documents produced since that Order further confirm the improper practice at Apple to try
    and shield business communications from discovery through misuse of privilege.  One such
27  document, produced on the eve of trial, prompted the Court to order Ms. Brown to appear and
    explain why she should not be sanctioned for directing Apple employees to mislabel a core
    Wisconsin deck as "prepared at the advice of outside counsel" when, in fact, it was not prepared
28  at the direction of *any* counsel.  (CX-0538; Feb. 25 Hr'g Tr. 1556:4-16.)  And since the February

1    Epic then proposed that Apple be required to produce all documents within the categories

2    identified as non-privileged in Judge Hixson's December 2 Order, which Apple resisted.  Apple

3    instead asserted that Epic should only be permitted to challenge Apple's privilege calls on a

4    document-by-document basis, which would have ground the process to a halt.  Epic was prepared

5    to seek relief from this Court but compromised on an agreement that Apple would re-review all

6    documents it had previously withheld as privileged under the improper standard that Apple had

7    applied, and submit any documents Apple still maintained as privileged to Special Masters for

8    their review.  (Dkt. 1092.)  Apple's re-review was delayed from the start.  Apple sought to delay

9    it until the Protocol and the Special Master panel were finalized.  (*See* Dec. 13, 2024 Status Conf.

10   Tr. 5-10-6:9.)  But Judge Hixson stated that "Apple should start its re-review right now".  (*Id.* at

11   6:10-11.)  Once it started, Apple's re-review was slower than the pace set by the Protocol—Apple

12   repeatedly failed to meet its target of reviewing 15,000 documents per week, often reviewing far

13   fewer than that target.  But because "[t]ime is of the essence", the Court scheduled the hearing to

14   resume on February 24, 2025, and kept the hearing open "as a stopgap for Apple's advantage

15   created by its own delay" (Dkt. 1171 at 2).

16   As a result of this re-review process, Apple ended up producing at least some portion of

17   approximately 58% of the documents it initially withheld as privileged.  (Dkt. 1151 at 5; *see also*

18   Br. at 7.)  This staggering "error" rate proved that contrary to Apple's assertion, this was no error

19   but, as the Court fairly concluded, "a tactic" of over-designation that provided Apple with a win-

20   win situation:  if Epic fought to obtain the documents Apple was ordered to produce, the

21

---

22   2025 hearings concluded, Apple produced at least one additional, previously withheld document
     that shows these practices.  The email begins with Apple personnel and outside counsel

23   discussing work done by Analysis Group ("AG"), which Apple offered in purported support of
     the commission rate it chose to apply to external links. (Byars Ex. A.) In the email chain,

24   Ms. Brown instructs her colleagues:  "Just a reminder that its best to keep our outside counsel
     who worked closely on these privileged and confidential materials included in all

25   communications. While inadvertently failing to include them is not dispositive and does not
     change the privileged status of the materials, it's best practice to leave no room for confusion."

26   (*Id.* at 182.) Ms. Brown then advised Apple employees to include Apple outside and inside
     litigation counsel in  "any further calls, questions, comments, about this work", without reference

27   to any legal advice being sought or provided. When Carson Oliver then requested a call  "to
     discuss next steps on this work stream" regarding the AG materials, one of Apple's outside

28   counsel responded that she personally was unavailable to attend but would  "make sure there is
     outside lawyer coverage for ***privilege purposes***". (*Id.* at  '179 (emphasis added).)

---

underlying contempt proceeding would be delayed—a win for Apple. (Jan. 14, 2025 Case Mgmt. Conf. Tr. 23:20-24:1.) If Epic forewent these documents, then Apple's motives and planning would be concealed—again, a win for Apple. Epic chose a middle ground: the proceeding was delayed by months due to Apple's misconduct, but the hearings ultimately proceeded long before the Special Masters concluded their review (both a win for Apple).

Nonetheless, critical evidence related to Apple's non-compliance with the Injunction was revealed by this re-review. Ultimately, 27 of the 51 exhibits that Epic moved for admission during the May 2025 hearing were originally improperly withheld as privileged. Still more unadmitted documents were used by Epic to learn the facts about Apple's decisions, to prepare cross-examinations and to prepare to impeach Apple's witnesses. The 27 improperly withheld exhibits included several slide decks critical to understanding Apple's decision-making: (1) the deck from a senior staff meeting on May 18, 2023 (CX-0272), (2) the June 1, 2023 deck that was not produced until ordered by the Court during the February 2025 hearing (CX-0859), (3) the pricing analysis deck from a June 13, 2023 staff meeting (CX-0274), (4) the two decks leading up to the June 20, 2023 meeting with Tim Cook (CX-0223 and -0224) and (5) the deck presented to Tim Cook at a June 28, 2023 meeting (CX-0291). For example, they revealed that when Apple began planning its response to the Injunction in the spring of 2023, Apple planned to either charge a commission *or* charge no commission but restrict the formatting, placement and design of external links. (Dkt. 1326 ¶¶ 34-40; CX-0272, CX-0859, CX-0223 and CX-0224 (all initially withheld).) They further showed that, by July 5, 2023, Apple decided to do both—to restrict the formatting, placement and design of external links *while also* charging a commission—thereby choosing the worst of both options. (Dkt. 1326 ¶ 40; CX-0227 (initially withheld).) Without these withheld documents, Epic and the Court would not have understood how the initial trade-off was made between charging a commission and restricting external links, which provided important context for Apple's decision to choose the most aggressive approach.

The majority of Apple's financial analyses were also initially withheld, despite being clearly not privileged. Improperly withheld documents showed, for example, that Apple fully understood that commission-burdened links would not be widely adopted by developers and

1  would therefore result in only marginal loss of billings, revenues and profits. (Dkt. 1326 ¶ 10.)

2  Late-produced documents wrongly claimed as privileged also revealed that Apple calculated its

3  expected financial losses based on the amount of "breakage" (users abandoning the link-out

4  process before completing a transaction). And they also revealed the fact that Apple calculated

5  that it needed to generate just 25% breakage before developers reached a "tipping point" beyond

6  which it would be infeasible for any developers to use links, ***even if Apple charged no***

7  ***commission***. (CX-224.15.) And CX-0859, improperly withheld until the second day of the

8  February hearing, revealed that Apple considered allowing non-linked informational text,

9  ██████████████████████████████████████████████████

10  ████████████████████  (Dkt. 1326 ¶ 70; CX-859.54.)

11  <u>**LEGAL STANDARD**</u>

12      The Court may impose sanctions on Apple for discovery-related misconduct pursuant to

13  Federal Rule of Civil Procedure 37 or the Court's inherent powers.

14      Rule 37(b)(2)(A) authorizes sanctions when "a party or party's officer, director or

15  managing agent . . . fails to obey an order to provide or permit discovery". The Rule authorizes

16  the Court to "issue further just orders" as a remedy for the violation. Accordingly, the Rule

17  confers "a broad discretion to make whatever disposition is just in the light of the facts of the

18  particular case". 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*

19  § 2289 (3d ed. 1998.). Rule 37(b)(2)(A), for example, expressly provides that sanctions may

20  include an order designating certain facts to "be taken as established for the purposes of the

21  action" or an order "treating as contempt of court the failure to obey any order" (with certain

22  exceptions not applicable here). The Court may consider Apple's improper efforts to conceal

23  discovery into Apple's non-compliance as additional evidence in support of Apple's lack of good

24  faith and contempt of the Injunction. *See Micromesh Tech. Corp. v. Am. Recreation Prods., Inc.*,

25  2007 WL 2501783, at *7 (N.D. Cal. Aug. 30, 2007) (considering improper privilege

26  determinations as evidence against the party because "to hold otherwise would provide an

27  incentive for parties in similar actions to adopt dilatory discovery tactics").

28      Under Rule 37, the party being sanctioned bears the burden of demonstrating that its

1   conduct was "substantially justified". *Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir.

2   1994).  No finding of bad faith is required for Rule 37 sanctions.  *See id*.  Nor do such sanctions

3   require a finding that conduct was frivolous.  *See Pierce v. Underwood*, 487 U.S. 552, 566 (1988).

4   Rather, substantial justification requires that the party's conduct was "justified to a degree that

5   could satisfy a reasonable person" and had a "reasonable basis both in law and fact".  *See id*. at

6   565.

7          Apple claims that "[i]t is unclear that Rule 37 applies here, because there is no discrete

8   discovery order that Apple could have violated through its assertion of privilege".  (Br. 8.)  Apple,

9   however, ignores this Court's Order requiring Apple to produce "all of Apple's documents

10  relative to its decision-making process with respect to the issues in front of the Court.  All of

11  them.  All.  If there is a concern, then be overly broad."  (Dkt. 981 at 914:10-21; *see also* Dkt.

12  974.)  Further, Judge Hixson entered additional discovery orders requiring Apple to produce

13  documents responsive to this Order.  (Dkt. 1008 at 2 ("the Court **ORDERS** Apple to substantially

14  complete document production by September 30, 2024"); Dkt. 1017 at 2 ("The deadline for the

15  substantial completion of document production is Monday, September 30.  It's up to Apple to

16  figure out how to meet that deadline, but Monday is indeed the deadline.").)  By failing to

17  produce non-privileged, responsive documents, Apple violated these orders.  *See Merrick v. Paul*

18  *Revere Life Ins. Co.*, 500 F.3d 1007, 1014 (9th Cir. 2007) (affirming sanctions based on finding

19  that party withheld evidence it had been ordered to produce); *Hochberg v. Lincare, Inc.*, 334 Fed

20  App'x 831, 832 (9th Cir. 2009) (unpublished) ("The district court did not abuse its discretion in

21  finding that the compelled discovery was not subject to the attorney-client privilege, and therefore

22  [party's] objections were not substantially justified.").  Apple's claim that the Court's Orders

23  were insufficiently "discrete" to trigger Rule 37 is contrary to law.  *See Fjelstad v. Am. Honda*

24  *Motor Co., Inc.*, 762 F.2d 1334, 1339 (9th Cir. 1985) (holding that violation of discovery order

25  "to answer all interrogatories fully and completely" was sanctionable under Rule 37(b)

26  notwithstanding argument that district court "did not refer to specific interrogatories and did not

27  analyze [the party's] answers" prior to issuing the discovery order).  Rule 37 plainly applies here.

28         The Court also has the inherent power to use sanctions to remedy "a full range of litigation

1   abuses". *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). As a function of this power, courts

2   can dismiss cases in their entirety, bar witnesses and assess fines. *F.J. Hanshaw Enters., Inc. v.*

3   *Emerald River Develop., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001). The Court's inherent powers

4   are "not limited by overlapping statutes or rules" and "can be invoked even if procedural rules

5   exist which sanction the same conduct", such as Rule 37. *Haeger v. Goodyear Tire & Rubber*

6   *Co.*, 813 F.3d 1233, 1243 (9th Cir. 2016). Inherent power sanctions are appropriate when a party

7   or its counsel engages in "willful disobedience of a court order" or acts "in bad faith, vexatiously,

8   wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S.

9   240, 258-59 (1975). The sanctioned party's conduct must at least be "tantamount to bad faith".

10   *Haeger*, 813 F.3d at 1244. A party "demonstrates bad faith by delaying or disrupting the

11   litigation or hampering enforcement of a court order" or by "knowingly or recklessly rais[ing] a

12   frivolous argument". *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997).

13   Bad faith also occurs "when a party acts for an improper purpose—even if the act consists of

14   making a truthful statement or a non-frivolous argument or objection". *Fink v. Gomez*, 239 F.3d

15   989, 992 (9th Cir. 2001).

16          Apple argues that, under the Court's inherent power, "[c]ompensatory sanctions must be

17   supported by clear and convincing evidence of bad faith". (Br. 8.) Apple completely

18   misrepresents the sole case on which it relies, *Lahiri v. Universal Music & Video Distrib. Corp.*,

19   606 F.3d 1216, 1219 (9th Cir. 2010). The *Lahiri* Court found the burden of proof to be an open

20   question of law and then ***declined*** to decide it: "The burden of proof issue need not be resolved

21   here because the district court's bad faith finding is supported by clear and convincing evidence."

22   *Id.* at 1219; *see also Haeger*, 813 F.3d at 1243 ("[w]e need not resolve whether a bad faith finding

23   must be supported by clear and convincing evidence, or whether a lesser quantum of evidence

24   suffices"). In any event, because clear and convincing evidence proves Apple's bad faith, this

25   Court need not resolve this open question either. *See Lahiri*, 606 F.3d at 1219.

26          In determining sanctions, the Court may consider the entirety of Apple's discovery

27

28

1    conduct.  *See Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990).[2]

2                                                  **ARGUMENT**

3    **I.    APPLE WITHHELD NON-PRIVILEGED DOCUMENTS WITHOUT**
      **SUBSTANTIAL JUSTIFICATION AND IN BAD FAITH.**

4          In response to this Court's determination that "sanctions are warranted" based on Apple's

5    improper withholding of an astounding number of non-privileged documents (Dkt. 1171 at 3),

6    Apple asks this Court to conclude that its failure was innocent and inadvertent.  In support of that

7    claim, Apple relies on a litany of purported facts about its privilege review process, such as the

8    number of documents reviewed, the number of reviewing attorneys involved, and the time Apple

9    had to complete that review.  (Br. 9-14.)  These statistics are irrelevant, misleading, or both.  They

10   do not show that Apple's conduct was substantially justified or that Apple lacked bad faith, as

11   required to avoid sanctions.  For example, Apple's claim that it had a short time to review

12   1.3 million documents is overstated and does not explain its improper privilege calls.  (Br. 9.)

13   Only 154,000 of those 1.3 million documents were deemed responsive (Br. 16), and Apple had no

14   reason to perform a privilege review on non-responsive documents.  For a litigant of Apple's size

15   and resources, performing an appropriate privilege review on 154,000 documents would not

16   present a significant obstacle, even on a relatively short timeline.[3]  Apple states that it employed a

17   dedicated team of outside counsel to check privilege calls made by first- and second-pass

18   reviewers, and that this team reviewed all documents with in-house counsel on them (which is

19   likely to be a large proportion of the 154,000 documents, given Apple's practice of including in-

20   house counsel on virtually all Injunction-related materials), as well as a sample of all documents

21   ─────────────────

22        [2] Apple also asserts that "punitive sanctions" require the same due process protections as a
      criminal trial, such as the beyond-a-reasonable-doubt standard, but that rule applies only when a
23   court assesses sanctions that are "criminal in nature," such as large, non-compensatory fines.  *See*
      *F.J. Hanshaw*, 24 F.3d at 1138.  Such sanctions are not at issue here.

24        [3] Furthermore, because Apple intentionally delayed its review until after Judge Hixson
25   reaffirmed the scope of the discovery that had already been ordered by the Court, at least as to the
      material Apple was not disputing it would have to produce, any time constraints were entirely of
26   Apple's own making.  (Perry Decl. ¶ 23 (referring to Judge Hixson's rulings on August 8, 2024),
      ¶ 31 ("The bulk of the review was conducted by third-party contract attorneys at Deloitte and
27   Consilio in August and September 2024.").)  *See In re Facebook*, 655 F. Supp. 3d at 933 ("The
      more likely explanation is that Facebook and Gibson Dunn had backed themselves into a corner:
28   After delaying production for years, they were forced to meet this Court's deadlines, and they
      took the shortcut of over-designating documents rather than reviewing them properly.").

─────────────────

1    deemed privileged by Apple's contracted reviewers.  (Perry Decl. ¶¶ 40-43.)  Even this 154,000

2    number overstates the challenge because many of these documents were duplicates or near-

3    duplicates of each other, and Apple would only need to make a privilege determination once

4    before propagating that determination across the universe of relevant documents.

5        Apple's claim that its over-designation resulted from "mistake" or "inconsistent calls

6    across the group of reviewers" is not credible.  (Br. 13.)  If Apple's failure resulted from mere

7    inconsistency, it is common sense that there would be errors going in both directions—both

8    privileged documents being erroneously produced as well as non-privileged documents being

9    erroneously withheld.  The vast majority of Apple's errors went in one direction—withholding

10   more than 30,0000 documents that Apple itself concedes are not privileged under the applicable

11   Ninth Circuit standard (as laid out by this Court).  And indeed, Apple was remarkably consistent

12   in withholding its most sensitive materials, including the business presentations made to its most

13   senior executives, as they carefully analyzed and designed the Program.  (*Supra* at 11-12.)  It is

14   not credible that Apple left review of these materials to inexperienced contract reviewers, and

15   even Apple does not say so.  These materials are far more likely to have garnered the attention of

16   Apple's more experienced counsel who deliberately decided to withhold them.

17       Apple's argument is also not credible given its response to Epic's concerns, the

18   December 2 Order and even this Court's Order on Apple's Motion for Relief.  At each step along

19   the way, Apple never claimed innocent error.  Instead, it invariably doubled down on its claims

20   that its core business documents are privileged, and further upped the ante by accusing Judge

21   Hixson of denying Apple an opportunity to be heard; claiming that both Judge Hixson and this

22   Court misapplied basic Ninth Circuit law; and arguing that Ninth Circuit law is itself incorrect.

23   To top it all off, Apple claimed that, throughout this process, Epic (with the Court's approval)

24   "invaded" Apple's attorney-client privilege.  (*See* Dkt. 1079; Dkt. 1324 at 36; Br. 21-22.)  Apple

25   cannot have it both ways; either it claims error and admits it withheld documents that are not

26   privileged, or it claims it believes the documents are privileged and it withheld them intentionally.

27       Most specifically, this inconsistency is apparent with respect to Apple's self-serving

28   claims that it instructed its reviewers to take a "*narrow* view of privilege".  (*E.g.*, Perry Decl.

¶ 44.)  That is not so.  Apple acknowledges that its review was based on the broad premise that "[e]very document concerning the Entitlement was created as a direct result of the Injunction— there was no preexisting business motivation for Apple to develop the Entitlement.  None of the analyses produced in discovery would have been undertaken but for the Injunction."  (Perry Decl. ¶ 57.)  This premise is both factually wrong and legally untenable.  It is factually wrong because the evidence demonstrated that Apple executives mostly considered non-legal, non-Injunction reasons for designing the Program as it did.  Apple provided no evidence that it constructed the Program primarily to comply with the Injunction; rather, the evidence showed that Apple disregarded known risks that the Program would be non-compliant so that it could adopt the set of restrictions that would best protect its profits and hamper its competition.  (Dkt. 1326 ¶¶ 2-5, 14, 18-19.)  Apple's related claim that its reviewers were instructed to err on the side of redacting privileged communications rather than withholding full documents is belied by the sheer number of documents Apple completely withheld, the number of such documents Apple then had to produce in full or in redacted form, as well as Apple's position "that business discussions of ways to comply with the legal requirements of the Injunction are inseparable from the underlying legal purpose of Injunction compliance" and that "the entire injunction compliance process was a legal project".  (Br. 21.)  Simply put, Apple withheld so many documents because Apple decided that all of its materials having anything to do with the Injunction—whether based on legal advice or not—were "inherently legal".  (Br. 17.)  As both Judge Hixson and this Court recognized, these positions were baseless as a matter of Ninth Circuit law.  (*See* Dkt. 1056, 1095.)

Apple resists these conclusions, asserting that it applied a "good faith" but debatable view of privilege.  (Br. 20.)  But Apple provides no real evidence to support that assertion.  Nor does Apple's one case cite, *Greer v. County of San Diego*, 127 F.4th 1216 (9th Cir. 2025), support Apple's position.  In *Greer*, a plaintiff sought documents from a municipal agency tasked with investigating certain "critical incidents" within its jurisdiction.  *Id*. at 1219.  Consistent with established Ninth Circuit law that the Court has applied in this case, whether the agency's documents were privileged hinged on its "primary purpose", which the parties disputed.  *Id.* at 1224.  The Court ultimately determined that the agency's primary purpose was to consult with

1   municipal attorneys to understand its potential liability for past events it was investigating and to

2   avoid liability for future similar events, and that such legal advice was privileged.  *Id*. at 1225.

3   This was not a novel result because the court relied on the unremarkable proposition that, when

4   litigation is expected to follow an incident, investigation of that incident "is a necessary predicate

5   to assessing liability for that past event and thus is not separate from the provision of legal

6   advice".  *See id*. at 1224.  But the present dispute is not about attorney investigation of a past

7   incident, and *Greer* provides no support for Apple's distinct position that "that business

8   discussions of ways to comply with the legal requirements of the Injunction are inseparable from

9   the underlying legal purpose of Injunction compliance".  (Br. 21.)[4]  Taken to its logical

10  conclusion, Apple's position would mean that, ***whenever*** a company is under an obligation to

11  comply with some legal mandate—whether a Court order or even a statute—then ***all*** of its

12  business decisions governed by that mandate would be privileged, whether or not those business

13  conversations actually concern legal advice about that mandate.  Under this interpretation,

14  privilege would not be the exception to discovery, but would instead cover entire aspects of a

15  company's business.  It is not surprising that Apple is unable to identify any relevant case

16  remotely supporting that novel and remarkably broad view of privilege.

17       Apple's positions also have nothing to do with its alleged disagreements with the Ninth

18  Circuit's "primary purpose" test or with "this Court's interpretation" of that test, and these alleged

19  disagreements can not justify Apple's conduct.  (Br. 21.)  For example, Apple has repeatedly

20  sought to "preserve for appeal" its argument that "the Ninth Circuit's standard is wrong".

21  (Br. 21.)  But, whether or not Apple has any basis to seek review of the Ninth Circuit standard by

22  the Supreme Court, Apple is still bound by the Ninth Circuit's standard unless and until it is

23  overruled.  Apple also complains that "[t]he Court required Apple to show that legal advice was

24  '*the* primary purpose' (rather than a primary purpose) of the documents" (Br. 21), but that rule is

25  consistent with established Ninth Circuit law, including as described in Apple's own precedent.

26  *See Greer*, 127 F.4th at 1224 ("Importantly, under our current formulation of the test, 'a dual-

27

28       [4] That case was decided in 2025, so it could not have provided Apple's contemporaneous
    justification for its privilege determinations in the summer of 2024.

1  purpose communication can only have a single "primary" purpose.'") (quoting *In re Grand Jury*,

2  23 F.4th 1088, 1091 (9th Cir. 2021)).  Apple also argues that this Court erred "by demanding that

3  the privilege claim be apparent on the face of each document", but the Order cited by Apple (at

4  Br. 21) does no such thing.  (Dkt. 1095.)  To the contrary, the Court considered "the context that

5  prompted the creation of each of these documents" and noted that Apple's claims that it lacked

6  the ability to develop additional facts supporting its privilege determinations "strain[] credulity".

7  (Dkt. 1095 at 2-3.)  The Court concluded, consistent with precedent, that "Apple's business

8  decisions cannot be shielded because they were prompted by a Court order".  (Dkt. 1095 at 3.)

9       Apple's argument that the outcome of the Special Master process shows that its initial

10  privilege calls were reasonable is illogical.  (Br. 20.)  Apple re-reviewed its previously withheld

11  documents and downgraded a not insignificant *majority* of the documents it previously

12  withheld—more than 30,000 documents in total.  That happened only because Apple understood

13  that its leash was starting to run out:  Apple knew that another widespread abuse of the privilege

14  was likely to be detected and revealed by the panel of neutrals.  (Dkt. 1092 at 3.)  So Apple got

15  closer to applying the privilege standard it should have applied in the first place.  *See Facebook*,

16  655 F. Supp. 3d at 933 (finding bad faith because "[a]lthough Facebook and Gibson Dunn

17  revisited these privilege designations and produced a significant number of documents, they did

18  so only after the plaintiffs requested it").  But there is substantial evidence that the *in terrorem*

19  effect of the Special Master review did not completely remedy Apple's abuse of privilege.  For

20  example, Epic pointed out at the hearing that Apple was withholding the June 1, 2023

21  presentation (CX-0859) in its entirety, and after *in camera* review this Court agreed that the

22  majority of the presentation was clearly unprivileged and should have been produced to Epic.

23  (Feb. 25, 2025 Hr'g Tr. 1479:6-1490:8.)  Apple refers to the fact that a Special Master sustained

24  Apple's claim of privilege, which was affirmed by Judge Hixson.  (Br. 20.)  Errors by judicial

25  officers do not change the fact that it was Apple's duty to produce unprivileged materials, a duty

26  Apple violated time and time again, despite being in the best position to apply privilege law to its

27  own documents.  And Apple cannot blame its document reviewers for that failing.  For example,

28  after Apple's claim of privilege over CX-0859 was upheld, Apple chose to claw back two similar

versions of that document that Apple had previously determined should have been redacted, rather than withheld in full. (Tr. 1488:2-5 ("This slide deck should have been presented and provided to Epic, all the pages that were clearly not attorney-client privileged.").) That considered and conscious decision to deny this Court and Epic critical evidence was not made by junior document reviewers. It rose to whatever level was necessary to authorize a filing with, and argument before, Judge Hixson, which surely includes individuals who were aware of this Court's previous rejection of Apple's overbroad privilege standard. At the hearing, Apple barely tried to defend its decision to withhold that entire document, which the Court found was clearly not fully privileged. (Feb. 25, 2025 Hr'g Tr. 1479:6-1490:8.)[5]

The evidence clearly and convincingly proves that Apple withheld documents based on an improper motive to conceal evidence, and Apple utterly fails to justify that violation or rebut the evidence of its bad faith. *See Facebook*, 655 F. Supp. 3d at 933 (finding that the over-designation of documents as privileged supports a conclusion that the party and its counsel acted in bad faith).

## II.    APPLE SHOULD BE SANCTIONED FOR SEVERE AND INTENTIONAL MISCONDUCT.

Apple cannot justify its misconduct, so it attempts to blame the Court and Epic for its misconduct. Apple also improperly seeks to minimize the severity of its violations and the resulting prejudice to this Court's factfinding process. Apple's excuses only confirm that Apple should face sanctions for severe and intentional misconduct.

### A.    Apple's Complaints About the Scope of the Discovery Should Be Rejected.

Apple seeks to avoid discovery sanctions by slinging allegations that Epic acted improperly in seeking the relevant discovery. (Br. 14-15.) Apple blames Epic for the scope of

---

[5] During the re-review, one of the Special Masters overruled Apple's claims that several documents were entirely privileged, but suggested that Apple may be able to appropriately withhold some portions of the documents. Epic expressed concerns about the possibility that Apple would be able to redact material without resubmitting them for review by the Special Masters, and, after a conference with the Special Masters, Apple eventually agreed to re-submit the redacted documents. (2/18/25 Special Master Status Conf. Tr. at 64:4-14.) After this agreement, Apple determined not to withhold any portion of several of these documents, which Apple had previously claimed, twice, were entirely privileged. (Feb. 19, 2025, 3:33PM email from N. Comparato to Special Master Panel.) Apple re-submitted other redacted documents for review, but a Special Master overruled all of Apple's proposed redactions on several of them. (March 11, 2025, 11:58AM Special Master report of Judge Segal.) With respect to these documents, Apple made three separate inappropriate privilege calls.

1    the discovery it was required to produce, falsely claiming that this bogged down Apple's ability o

2    comply.  The Court should reject Apple's effort to make these proceedings about Epic's conduct,

3    rather than Apple's misconduct.  But, in any event, Apple ignores that this Court and Judge

4    Hixson ordered Apple to produce the responsive documents.  If Apple disagreed with those

5    Orders, then the appropriate path would have been to seek judicial relief, not engage in self-help

6    by delaying and avoiding compliance.  For that reason, when a party is being sanctioned, district

7    courts do not reconsider the propriety of the discovery that was already ordered; any challenge to

8    that discovery should have already been resolved.  *See* 8B Charles Alan Wright & Arthur R.

9    Miller, *Federal Practice & Procedure*.§ 2289 (3d ed. 1998) ("The propriety of the discovery

10   sought is not in issue at the time sanctions are being imposed under Rule 37(b).  That question

11   will have been decided when the court ordered the discovery.") (collecting cases).  (In any event,

12   when Apple did challenge the scope of the discovery, Judge Hixson rejected Apple's efforts to

13   limit the date range, search terms[6] and responsive topics, finding that they targeted "core issues of

14   importance".  (Dkt. 1008 at 3.))  Apple may claim that the Court's determinations on these issues

15   was wrong, but that is no excuse for its violations of the Court's Orders.

16        Apple's attempt to show that the discovery was unnecessary is flatly wrong.  Because of

17   the Court's discovery orders and Epic's efforts to force Apple to comply with them, evidence at

18   the hearing revealed critical, new information about Apple's non-compliance with the Injunction.

19   Apple engages in gaslighting when it disputes this conclusion on the basis that "only

20   approximately" 30 of the 49 admitted exhibits were produced as a result of Apple's re-review.

21   (Br. 2.) (Epic actually counts 27 of the 51 exhibits in that category).)  The exhibits constitute a

22   significant volume and proportion of relevant evidence, especially at a three-day hearing,

23   reflecting the large quantity of evidence Epic was able to bring to bear.  Apple concedes that a

24   majority of those exhibits would not have been available without Epic's efforts (and the efforts of

25   this Court and Judge Hixson) and that Apple thus initially wrongfully concealed the majority of

26

27        [6] Apple's claim that Epic improperly requested "100 unique search terms" (Br. 2) is doubly
     wrong because these terms were combined into just 13 search strings, and many of these terms

28   were joined by Boolean operators that served to limit, not expand, the universe of documents
     identified as potentially responsive.

1    the evidence put on at the hearing.[7]  Among those initially withheld exhibits were some of the

2    most critical and illuminating evidence presented at the hearing.  (*See supra* p. 11-12.)  Epic used

3    other initially withheld documents to learn the facts about Apple's non-compliance, to prepare

4    cross-examinations and to prepare to impeach its witnesses.

5           Apple also argues that "only approximately 154,000 of the 1.3 million documents

6    reviewed were responsive", which is supposed to show that Epic's demands were improperly

7    broad.  (Br. 16.)  This claim is extremely misleading because Apple did not disclose to Epic or the

8    Court that it would need to review 1.3 million documents—omitting that information from

9    biweekly status reports submitted by the parties—until just four days before its substantial

10   completion deadline, when it belatedly requested an extension.  As Judge Hixson found, that was

11   far too late to work on solutions for Apple's supposed problem.  (Dkt. 1017.)

12          **B.      Epic's Diligence Revealed Apple's Misconduct.**

13          In addition to faulting Epic for purportedly asking for too much discovery, Apple also

14   contends that Epic was insufficiently prompt in notifying Apple of its overbroad privilege

15   designations.  Specifically, Apple complains that Epic "exacerbated the delay . . . by not raising

16   its concerns with Apple's privilege assertions until after the substantial completion deadline."

17   (Br. 16 (emphasis omitted).)  How quickly Epic caught Apple abusing privilege is irrelevant to

18   Apple's failure to comply with well-established Ninth Circuit law and is irrelevant to the further

19   question of whether Apple engaged in sanctionable conduct.  But Apple is also wrong to suggest

20   Epic moved slowly in rooting out Apple's over-designation and raising it with the Court.

21          The timeline of events makes clear that Epic acted quickly once it had sufficient

22   information to understand that Apple had been falsely designating documents as privileged.

23   Apple was slow to interview custodians and collect and produce documents from the very start,

24   including by asking for an excessively long time to complete its production.  (*See* Dkt. 1008 at 2

25   (Judge Hixon rejecting Apple's excessive timeline); Dkt. 1017 at 2 (Judge Hixson rejecting

26   Apple's further attempt to delay production when "Apple announced out of the blue four days

27   ───────────────
        [7] Out of the 30 exhibits produced after re-reviews, comprising hundreds and hundreds of
28   slides and pages, Apple manages to identify just one slide in one document that it claims had
     already been produced to Epic in another form.  That's it.

1    before the substantial completion deadline" that it could not meet the deadline); Perry Decl.¶¶ 21-

2    28).  As of August 14, 2024, Apple had produced fewer than 1,500 documents in response to the

3    Court's May 31 Order.  (Dkt. 1011 at 2.)  This is despite the fact that search terms were

4    substantially agreed upon by mid-June, the substantial complete deadline of September 30, 2024

5    was quickly approaching, and Apple had already agreed that it would produce documents on a

6    rolling basis leading up to substantial completion.  (Dkt. 1011 at 2; Dkt. 1001 at 3; Dkt. 1004 at

7    3).)  Even at that early juncture, Epic was reviewing Apple's privilege log, but because Apple's

8    conduct forced Epic to do so based on such a small sample size, Epic could not have anticipated

9    the scale of Apple's over-designation and the abuse that scale revealed.  Nonetheless, Epic raised

10   "serious concerns" with Apple's privilege calls as early as August 28, 2024, despite the limited

11   information available to Epic at that time.  (Dkt. 1013 at 2.)  Apple's next production was made

12   on September 9, 2024, bringing Apple's total production up to about 8,000 documents as of three

13   weeks prior to the substantial completion deadline.  (Dkt. 1014 at 2-3.)  In that following three

14   weeks, Apple produced roughly 81,000 documents, 65,000 of which were produced on the

15   September 30, 2024 substantial completion deadline.  (Dkt. 1024 at 2.)

16        The very next day, on October 1, 2024, Epic raised with Apple its concern that of 1,122

17   total privilege log entries Apple produced at the time, 994 descriptions were insufficient.  (Dkt.

18   1024.)  As of that date, Apple still had declined to quantify the number of documents withheld as

19   privileged.  (*Id*. at 3.)  Thus even after the substantial completion deadline (before which point

20   Apple now contends Epic needed to have raised its concerns with Apple's designations), Epic still

21   had no sense of the volume of documents Apple had withheld as privileged.  (*Id*.)  Epic

22   nevertheless continued to move quickly to get to the bottom of Apple's privilege abuse, raising

23   the issue with Judge Hixson just two days later on October 3, 2024, specifically noting the

24   concern that "Apple appears to have over-withheld documents on privilege grounds".  (*Id*. at 2.)

25        Epic continued to meet and confer with Apple in an attempt to understand the scope of

26   Apple's over-designation.  Epic first raised with Judge Hixson on October 27, 2024 a formal

27   discovery dispute, stating that Apple had improperly withheld approximately 55,000 documents,

28   which amounted to nearly a third of the responsive documents.  (Dkt. 1039.)  Judge Hixson

1  agreed that Apple had over-withheld the documents he reviewed, (Dkt. 1041), and this Court

2  affirmed (Dkt. 1095).  Those decisions prompted Apple's re-review, during which Apple

3  determined that ***nearly 60%*** of the documents it withheld as privileged were in fact not privileged

4  at all.  The Court accordingly found in January that Apple's privilege designations were used as

5  "a tactic" to delay the adjudication of the pending Injunction enforcement action.  (Jan. 14, 2025

6  Case Mgmt. Conf. Tr. 23:22-24.)  Apple's conduct, not Epic's, has substantially delayed Apple's

7  being held to account for failing to comply with the Court's Injunction.

8       **C.    Sanctions, Beyond Re-Reviews, Are Necessary To Remedy Apple's**

9            **Misconduct.**

10      Apple claims that sanctions are barred because it is bearing the cost of re-reviewing the

11 previously withheld documents and producing non-privileged documents.  (Br. 18.)  Of course,

12 Apple should have produced the documents more than six months ago.  It is not a sanction to be

13 required to comply with the law and the Court's orders.  Indeed, Apple knows that the cost of the

14 re-review pales in comparison to the profits it has continued to earn while its misconduct delayed

15 these proceedings, so that the "expenses" it claims are a "burden" are no sanction at all—they are

16 money well spent.  As Apple's internal documents showed, "every day we don't hear anything

17 from the Court" is "one day" in which Apple rakes in its excessive profits.  (CX-0399.1.)

18      If Apple's argument that the only available sanctions under the law lay in requiring

19 compliance, then any party who had an incentive to avoid complying with discovery orders would

20 not comply, knowing that if it did get caught, the worst that could happen is that it would be made

21 to provide the required discovery after the fact (which means that, like Apple, such party would

22 be better off given the resulting delay).  Apple cites no legal support for that absurd result.

23      Apple concedes that attorney fees are one permissible sanction (Br. 18) but Apple knows

24 the amount of those fees would not put a dent in the profits it continues to earn every day as a

25 result of its dilatory misconduct.  For that reason, Apple would consider a sanction requiring

26 payment of such fees to be a win.  Epic has not sought and does not seek attorney fees because

27 they would not adequately remedy the damage Apple has caused to the integrity of this Court's

28 factfinding process, nor provide any deterrence to future misconduct in this or in any other

1    litigation.  That is why Epic previously sought an order deeming Apple's privilege waived and

2    requiring Apple to produce all responsive documents without further delay.  (Jan. 14, 2025 Case

3    Mgmt. Conf. Tr. 6:12-7:13.)  Although the Court denied that particular sanction based on the

4    record available at the time (Dkt. 1171 at 3), it has since become clear that Apple's misconduct

5    was even more egregious and prejudicial than previously thought, and only a similarly severe and

6    impactful sanction would be appropriate now—up to and including a sanction or additional

7    substantive injunctive relief aimed at achieving the procompetitive goals of the Injunction.

8            Contrary to Apple's attempt to limit the sanctions available to the Court, the Court retains

9    "broad discretion to make whatever disposition is just in the light of the facts of the particular

10   case".  8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2289 (3d ed.

11   1998)  Apple attempts to confuse the issue by suggesting that any additional sanctions would be

12   merely punitive, and seeks to require the application of criminal procedures and burdens of proof.

13   But Apple's sole precedent does not hold that all sanctions beyond an order requiring compliance

14   are punitive, only that a large fine that was "criminal in nature" was punitive.  *See F.J. Hanshaw*

15   *Enterprises, Inc.*, 244 F.3d at 1139.  Indeed, courts routinely impose sanctions—including

16   compensatory sanctions—even after a party finally provides the discovery it was ordered to

17   provide.  *See, e.g.*, *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d

18   1062, 1068 (2d Cir. 1979) ("Under the deterrence principle of *National Hockey*, plaintiff's

19   hopelessly belated compliance should not be accorded great weight.  Any other conclusion would

20   encourage dilatory tactics, and compliance with discovery orders would come only when the

21   backs of counsel and the litigants were against the wall.") (citing *NHL v. Metro. Hockey Club*,

22   427 U.S. 639, 642 (1976)).

23                                      **CONCLUSION**

24           The Court should use its broad discretion to sanction Apple for its intentional and bad

25   faith abuses of the discovery process and attempts to delay this Court's factfinding process.

26   Moreover, the Court should consider Apple's misconduct as further evidence in support of its

27   contempt of the Injunction.

28

Dated:  March 14, 2025

Respectfully submitted,

By:    _/s/  Gary A. Bornstein_

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle ( SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*