1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                   **NORTHERN DISTRICT OF CALIFORNIA**

8

9     **EPIC GAMES, INC.,**                    Case No. 4:20-cv-05640-YGR

10          Plaintiff and Counter-Defendant,    **ORDER GRANTING EPIC GAMES, INC.'S MOTION TO ENFORCE INJUNCTION;**

11                      v.                       **DENYING APPLE INC.'S MOTION TO SET ASIDE JUDGMENT;**

12    **APPLE INC.,**

13          Defendant and Counterclaimant.       **DENYING APPLE INC.'S MOTION UNDER FEDERAL RULE OF EVIDENCE 502(D);**

14

15                                               **DENYING APPLE INC.'S MOTION FOR ENTRY OF JUDGMENT ON ITS INDEMNIFICATION COUNTERCLAIM WITHOUT PREJUDICE; AND**

16

17                                               **REFERRAL TO THE UNITED STATES ATTORNEY RE CRIMINAL CONTEMPT**

18

19                                               Re: Dkt. Nos. 876, 897, 1018, 1198, and 1328.

20

21

22    I.      **OVERVIEW**

23            For the reasons set forth herein, the Court **FINDS** Apple in willful violation of this Court's

24    2021 Injunction which issued to restrain and prohibit Apple's anticompetitive conduct and

25    anticompetitive pricing.  Apple's continued attempts to interfere with competition will not be

26    tolerated.

27            By way of background, after a May 2021 trial between Epic Games and Apple, this Court

28    issued a 180-page order which, in part, enjoined Apple's conduct impeding competition with

United States District Court
Northern District of California

respect to in-app and out-of-app purchases.  On April 24, 2023, in a 91-page order, the Ninth Circuit affirmed.  On January 16, 2024, the Supreme Court declined review.  The next day, the Injunction issued.

Apple's response to the Injunction strains credulity.  After two sets of evidentiary hearings, the truth emerged.  Apple, despite knowing its obligations thereunder, thwarted the Injunction's goals, and continued its anticompetitive conduct solely to maintain its revenue stream. Remarkably, Apple believed that this Court would not see through its obvious cover-up (the 2024 evidentiary hearing).  To unveil Apple's actual decision-making process, not the one tailor-made for litigation, the Court ordered production of real-time documents and ultimately held a second set of hearings in 2025.

To summarize: *One*, after trial, the Court found that Apple's 30 percent commission "allowed it to reap supracompetitive operating margins" and was not tied to the value of its intellectual property, and thus, was anticompetitive.  Apple's response: charge a *27 percent commission* (again tied to nothing) on off-app purchases, where it had previously charged nothing, and extend the commission for a period of seven days after the consumer linked-out of the app. Apple's goal: maintain its anticompetitive revenue stream.  *Two*, the Court had prohibited Apple from denying developers the ability to communicate with, and direct consumers to, other purchasing mechanisms.  Apple's response: impose *new* barriers and *new* requirements to increase friction and increase breakage rates with full page "scare" screens, static URLs, and generic statements.  Apple's goal: to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream. In the end, Apple sought to maintain a revenue stream worth billions in direct defiance of this Court's Injunction.

In stark contrast to Apple's initial in-court testimony, contemporaneous business documents reveal that Apple knew exactly what it was doing and at every turn chose the most *anti*competitive option.  To hide the truth, Vice-President of Finance, Alex Roman, outright lied under oath.  Internally, Phillip Schiller had advocated that Apple comply with the Injunction, but Tim Cook ignored Schiller and instead allowed Chief Financial Officer Luca Maestri and his finance team to convince him otherwise.  Cook chose poorly. The real evidence, detailed herein,

2

United States District Court
Northern District of California

1  more than meets the clear and convincing standard to find a violation.  The Court refers the matter

2  to the United States Attorney for the Northern District of California to investigate whether

3  criminal contempt proceedings are appropriate.

4  This is an injunction, not a negotiation.  There are no do-overs once a party willfully

5  disregards a court order.  Time is of the essence.  The Court will not tolerate further delays. As

6  previously ordered, Apple will not impede competition. The Court enjoins Apple from

7  implementing its new anticompetitive acts to avoid compliance with the Injunction.  ***Effective***

8  ***immediately*** Apple will no longer impede developers' ability to communicate with users nor will

9  they levy or impose a new commission on off-app purchases.

## II.    THE INJUNCTION AND PRIOR JUDICIAL FINDINGS

11  After a full trial on the merits, this Court issued the Injunction.  Key holdings of both this

12  Court and the Ninth Circuit are summarized here.[1]

### A.    Trial, Judgment, and Injunction

14  After a bench trial, this Court entered judgment on September 10, 2021, finding that

15  certain of Apple's anti-steering rules violate the California Unfair Competition Law ("UCL")

16  under its unfair prong.  With respect to the issues raised in these contempt proceedings,[2] most

17  relevant here are the Court's prior determinations regarding (i) Epic's standing, (ii) Apple's

18  "unfair" practices, (iii) injunctive relief, (iv) Apple's commission rate, and (v) Apple's

19  indemnification counterclaim.  *See Epic Games, Inc.*, 559 F.Supp.3d at 1051–58, 1065–66.  The

20  Court addresses each.

---

[1] See Dkt. Nos. 812 and 813 (Rule 52 Order and Injunction), and 814 (judgment); *see also Epic Games, Inc. v. Apple Inc.*, 559 F.Supp.3d 898 (N.D. Cal. 2021) (Rule 52 Order), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023). As the Injunction concerns this Court's findings with respect to the UCL, the Court does not recite its findings with respect to Epic's other state and federal claims.  For the Reader's Convenience, a table of contents is included as Attachment A.

[2] On March 13, 2024, Epic filed a motion to enforce this Court's injunction because Apple "is in blatant violation of this Court's injunction." (Dkt. No. 897.)  Epic requests that this Court "enter an order (1) holding Apple in contempt for violating the Court's Injunction; (2) requiring Apple to promptly bring its policies into compliance with the Injunction; and (3) requiring Apple to remove all anti-steering provisions" in its developer guidelines." (*Id.*)

United States District Court
Northern District of California

*Standing.* As to standing, the Court explained that "Apple does not dispute Epic Games' standing as a potential competitor: Epic Games wanted to open a competing iOS game store and could not. Because Epic Games would earn revenues from a competing store, it has suffered an economic injury." *Id.* at 1052. However, Apple challenged Epic's standing as a consumer. While the UCL distinguishes between "consumer" and "competitor" suits, "[t]here is no specific third category for non-competitor business." *Id.* Because "both parties' experts agree that developers like Epic Games jointly consume Apple's game transactions and distribution services together with iOS users," the Court held that "Epic Games has standing to bring a UCL claim as a quasi-consumer, not merely as a competitor." *Id.*

*Unfair Practices.* As to Apple's "unfair" practices under the UCL, the Court explained that Epic could demonstrate unfairness under either a "tethering" test or a "balancing" test. *Id.* at 1053. The "tethering" test required Epic to "show that Apple's conduct (1) 'threatens an incipient violation of an antitrust law,' (2) 'violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law,' or (3) 'otherwise significantly threatens or harms competition.'" *Id.* at 1052 (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999)). While the Court held that Epic's claims based on app distribution and in-app payment processing restrictions failed to state a claim of unfair practices, the Court held that Apple's anti-steering provisions were severable and constituted unfair practices under the UCL. The core of the Court's finding was summarized succinctly as follows:

> **[T]he evidence presented showed anticompetitive effects and excessive operating margins under any normative measure. The lack of competition has resulted in decrease[d] information which also results in decreased innovation relative to the profits being made. The costs to developer are higher because competition is not driving the commission rate. As described, the commission rate driving the excessive margins has not been justified. . . .**

> Apple's own records reveal that two of the top three "most effective marketing activities to keep existing users coming back" in the United States, and therefore increasing revenues, are "push notifications" (no. 2) and "email outreach" (no. 3). Apple not only controls those avenues but acts anticompetitively by blocking developers from using them to Apple's own unrestrained gain. As explained before, Apple uses anti-steering provisions prohibiting apps from including

4

> "buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase," and from "encourag[ing] users to use a purchasing method other than in-app purchase" either "within the app or through communications sent to points of contact obtained from account registrations within the app (like email or text)." Thus, developers cannot communicate lower prices on other platforms either within iOS or to users obtained from the iOS platform. Apple's general policy also prevents developers from informing users of its 30% commission.
>
> . . .
>
> In the context of technology markets, the open flow of information becomes even more critical. As explained above, information costs may create "lock-in" for platforms as users lack information about the lifetime costs of an ecosystem. Users may also lack the ability to attribute costs to the platform versus the developer, which further prevents them from making informed choices. In these circumstances, the ability of developers to provide cross-platform information is crucial. While Epic Games did not meet its burden to show actual lock-in on this record, the Supreme Court has recognized that such information costs may create the potential for anticompetitive exploitation of consumers. *Eastman Kodak*, 504 U.S. at 473–75, 112 S. Ct. 2072.

*Id.* 1054–55 (footnotes omitted) (emphasis supplied).

The Court held that Apple's anti-steering provisions constituted an incipient violation of antitrust law by preventing informed choice among users of the iOS platform and violate the "'policy [and] spirit' of these laws because anti-steering has the effect of preventing substitution among platforms for transactions." *Id.* at 1055–56 (alteration in original) (quoting *Cel-Tech*, 973 P.2d at 544).

The Court found that Epic likewise showed that Apple violated the UCL's balancing test. The "balancing" test, as contrasted to the tethering prong, "requires the challenged business practice to be 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers' based on the court's weighing of 'the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Id.* at 1053 (quoting *Drum v. San Fernando Valley Bar Assn.*, 106 Cal. Rptr. 3d 46, 53 (Cal. Ct. App. 2010)). Thus the Court found:

> In retail brick-and-mortar stores, consumers do not lack knowledge of options. Technology platforms differ. Apple created a new and innovative platform which was also a black box. It enforced silence to control information and actively impede users from obtaining the knowledge to obtain digital goods on other platforms. Thus, the closer analogy is not American Express' prohibiting steering towards Visa or Mastercard but a prohibition on letting users know that these

5

options exist in the first place. Apple's market power and resultant ability to control how pricing works for digital transactions, and related access to digital products, distinguishes it from the challenged practices in *Amex*. [*See Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018).] . . . **Apple has not offered any justification for the actions other than to argue entitlement. Where its actions harm competition and result in supracompetitive pricing and profits, . . . .**

*Id.* at 1056–57 (footnotes omitted) (emphasis supplied).[3]

 *Injunctive Relief.* "[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction." *Id.* at 1057 (quoting *In re Tobacco II Cases*, 207 P.3d 20, 34 (Cal. 2009)). A private party seeking injunctive relief under the UCL may request public injunctive relief, and federal courts apply equitable principles derived from federal common law for equitable relief under the UCL. *Id.* The Court found equitable relief was warranted:

> While Apple's conduct does not fall within the confines of traditional antitrust law, **the conduct falls within the purview of an incipient antitrust violation with particular anticompetitive practices which have not been justified. Apple contractually enforces silence, in the form of anti-steering provisions, and gains a competitive advantage. Moreover, it hides information for consumer choice which is not easily remedied with money damages. The injury has occurred and continues and can best be remedied by invalidating the offending provisions.** In terms of balancing, Apple's business justifications focus on other parts of the Apple ecosystem and will not be significantly impacted by the increase of information to and choice for consumers. Rather, this limited measure balances the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace.

*Id.* (emphasis supplied). Thus, because "Apple's conduct in enforcing anti-steering restrictions is anticompetitive," a "remedy to eliminate those provisions is appropriate. This measured remedy will *increase* competition, *increase* transparency, *increase* consumer choice and information while preserving Apple's iOS ecosystem which has procompetitive justifications." *Id.* at 1069 (emphasis supplied).

---

[3] Apple's "entitlement" perspective and mantra persisted beyond the Injunction. For example, Apple's Communications Director, Marni Goldberg, texted her colleague during the first evidentiary hearings, that "It's Our F***ING STORE." (CX-0244.38.) Not surprisingly (nor convincingly), she did not "recall" sending those messages. (Feb. 2025 Tr. 1817:5-9 (Goldberg).)

United States District Court
Northern District of California

1   The Court also held that, irrespective of the appropriate market definition for Epic's

2   antitrust claims, injunctive relief was warranted with respect to Apple's anti-steering provisions as

3   to *all* apps, not just mobile gaming transactions. *See id.* at 1057–58.

4   Concurrent with the 180-page Rule 52 Order, the Court issued a one-page injunction that

5   enjoined Apple's anti-steering provisions, and provided in relevant part:

> Apple Inc. and its officers, agents, servants, employees, and any
> person in active concert or participation with them ("Apple"),
> are hereby permanently restrained and enjoined from prohibiting
> developers from (i) including in their apps and their metadata buttons,
> external links, or other calls to action that direct customers to
> purchasing mechanisms, in addition to In-App Purchasing [("IAP")]
> and (ii) communicating with customers through points of contact
> obtained voluntarily from customers through account registration
> within the app.

11   (Dkt. No. 813; *see also Epic Games, Inc.*, 559 F.Supp.3d at 1058.)

12   **Commission.**  The Court explicitly found that "Apple's initial [commission] rate of 30%

13   . . . has apparently allowed it to reap supracompetitive operating margins." *Id.* at 992.  The rate

14   was a historic relic not tied to intellectual property.  Further, there was no actual commission

15   charged for link-out transactions, then or in the past.  The Court focused on Apple's anti-steering

16   provisions, finding as discussed above, that a "remedy to eliminate those provisions is

17   appropriate." *Id.* at 1068.  That remedy, notably, would "not require the Court to micromanage

18   business operations which courts are not well-suited to do as the Supreme Court has appropriately

19   recognized." *Id.* at 1069.  However, the Court warned that, with respect to Apple's commission

20   rate, "Apple cannot hide behind its lack of clarity on the value of its intellectual property.  Not all

21   functionality benefits all developers.  Further, . . . **Apple has actually never correlated the value**

22   **of its intellectual property to the commission it charges**.  Apple is responsible for the lack of

23   transparency and whole-cloth arguments untethered to its rates do not ultimately persuade." *Id.* at

24   994 (emphasis supplied).

25   **The DPLA and Indemnification.**  Apple asserted a counterclaim against Epic for a breach

26   of the Developer Product Licensing Agreement ("DPLA") arising out of Project Liberty, the

27   "highly choreographed attack" by Epic on Apple and Google, Inc., that flouted the DPLA's

28   obligations. *Id.* at 935–40, 1063.  Epic admitted that it breached the DPLA and conceded that

United States District Court
Northern District of California

7

Apple would be entitled to relief if the Court found that the DPLA was enforceable and did not violate antitrust laws or public policy. *Id.* The Court held that "[b]ecause Apple's breach of contract claim is also premised on violations of DPLA provisions independent of the anti-steering provisions, the Court finds and concludes, in light of plaintiff's admissions and concessions, that Epic Games has breached these provisions of the DPLA and that Apple is entitled to relief for these violation[s]." *Id.* at 1063–64.

Apple also asserted a counterclaim against Epic for indemnification of attorneys' fees and costs defending this litigation and advancing counterclaims. *Id.* at 1065. Section 10 of the DPLA provides, in pertinent part, that Epic indemnify Apple for "any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs . . . arising from or related to," among other things, Epic's "breach of any certification, covenant, obligation, representation or warranty in this Agreement." *Id.* at 1065. However, under *Alki Partners, LP v. DB Fund Servs., LLC*, 209 Cal.Rptr.3d 151, 171 (Cal. Ct. App. 2016), this Court held that the DPLA lacked the "express language" required under *Alki* to find that the DPLA covered more than just third-party claims. *Id.* at 1065–66. As a result, Apple had "not shown that it [was] entitled to recover attorneys' fees and costs from Epic Games pursuant to Section 10 of the DPLA.

### B.      Ninth Circuit Affirmance in Part

On April 24, 2023, the Ninth Circuit affirmed this Court's holding with respect to the UCL and agreed that Epic had standing, Apple violated the "unfair" prong of the UCL, and injunctive relief was appropriate. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 999 (9th Cir. 2023); Dkt. No. 852.[4] The Ninth Circuit reversed this Court, however, as to Apple's ability to recover attorneys' fees under the DPLA.

***Standing.*** As to standing, the Ninth Circuit held that while Epic no longer has apps on

---

[4] The Court denied Apple's motion to stay the Injunction pending Apple's appeal to the Ninth Circuit. (Dkt. No. 830.) On December 8, 2021, the Ninth Circuit granted Apple's motion to stay the Injunction pending appeal. (Dkt. No. 841.)

United States District Court
Northern District of California

Apple's app store,[5] Apple's anti-steering provisions caused injury to Epic via loss of its subsidiaries' earnings. *Id.* at 1000. Further, "Epic is a competing game distributor through the Epic Games Store and offers a 12% commission compared to Apple's 30% commission. If consumers can learn about lower app prices, which are made possible by developers' lower costs, and have the ability to substitute to the platform with those lower prices, they will do so— increasing the revenue that the Epic Games Store generates." *Id.*

**Unfair Practices.** As to the merits of Apple's UCL violations, Apple did not directly challenge this Court's application of the UCL's tethering and balancing tests, instead arguing that (i) the UCL's "safe harbor" doctrine insulates its liability because Epic failed to establish Sherman Act liability, and (ii) two principles from Sherman Act case law preclude UCL liability. *Id.* at 1001–02. The Ninth Circuit rejected both. *First,* as to the safe-harbor doctrine, Apple failed to cite any case that "when a federal antitrust claim suffers from a *proof deficiency*, rather than a *categorical legal bar*, the conduct underlying the antitrust claim cannot be deemed unfair pursuant to the UCL." *Id.* at 1001. *Second,* the Supreme Court's decision in *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) is, simply put, distinguishable. *Id.* at 1002. Otherwise, Apple was incorrect that the UCL requires trial courts to conduct the "balancing" test within the relevant market. *Id.*

**Injunctive Relief.** With respect to injunctive relief, the Ninth Circuit held that this Court did not clearly err in finding that Epic's injuries were irreparable and that monetary damages would be inadequate, nor did this Court abuse its discretion to apply the injunction against *all* developers. *Id.* at 1002–03.

**Commission Rate.** Again, while not a part of the Court's UCL findings, the Ninth Circuit held that this Court did not clearly err in finding that Apple's 30% commission was supracompetitive under step one of the Rule of Reason, stating in relevant part:

> Apple attacks the supracompetitive-pricing finding on factual grounds by asserting that Apple charges a substantially similar commission as its competitors. That assertion is true as far as headline rates go, but the district court reasonably based its

---

[5] Apple declined to reinstate Epic's developer account after this Court held in its Order that Epic had breached the DPLA. *See Epic Games, Inc.*, 67 F.4th at 999.

1
2
3
4
5
6
7

> supracompetitive-price finding on effective commission rates instead
> of headline rates. The district court found Apple's reliance on
> headline rates to be "suspect" because, unlike the App Store, other
> platforms "frequently negotiate[] down" the rates they charge
> developers. The court noted that Amazon has a headline rate of 30%
> but an effective commission rate of 18%. And it credited testimony
> that game-console transaction platforms often "negotiate special deals
> for large developers." While the district court's finding that the
> Google Play Store (the App Store's "main competitor") charges a
> 30% rate seemingly undermines the characterization of Apple's
> commission as supracompetitive, we cannot say that the district court
> clearly erred absent evidence about the Google Play Store's effective
> commission—the metric that the district court at trial found to be the
> key to determining the competitiveness of a price in this market.

8    *Id.* at 984–85.

9         ***The DPLA and Indemnification.*** The Ninth Circuit affirmed Apple's win on its breach of

10   contract counterclaim. "The parties agree[d] that Epic's illegality defense rises and falls with its

11   Sherman Act claims," and because the court "affirm[ed] the district court's holding that Epic

12   failed to prove Apple's liability pursuant to the Sherman Act," the court "also affirm[ed] its

13   rejection of Epic's illegality defenses" to Apple's breach of contract counterclaim. *Id.* at 999.

14        However, the Ninth Circuit reversed this Court's "holding that the DPLA's

15   indemnification provision does not require Epic to pay Apple's attorney fees related to this

16   litigation." *Id.* at 1003. The Ninth Circuit held that the clause in the DPLA's indemnification

17   provision which applied to Epic's breach of any obligation under the DPLA "rebut[ted] the *Alki*

18   *Partners* presumption" by specifically providing for attorneys' fees in an action on the contract.

19   *Id.* at 1004. Thus, the Ninth Circuit held that Apple is entitled to attorneys' fees stemming from

20   "intra-party disputes," however the court "express[ed] no opinion on what portion of Apple's

21   attorney fees incurred in this litigation can be fairly attributed to Epic's breach of the DPLA, such

22   that they fall within the scope of [that] clause." *Id.* at 1004 & n.24.

23                                    *          *          *

24        On September 28, 2023, Apple filed a petition for writ of certiorari with the U.S. Supreme

25   Court. (*See* Dkt. Nos. 862, 863; Petition for Writ of Certiorari, *Apple Inc. v. Epic Games, Inc.*,

26   No. 23-344 (U.S. Sept. 28, 2023).) On January 16, 2024, the Supreme Court denied Apple's

27   petition. (Dkt. No. 871-4, Ex. 20; *Apple Inc. v. Epic Games, Inc.*, No. 23-344 (U.S. Jan. 16,

28   2024).) The Ninth Circuit's mandate issued the next day (Dkt. No. 879), and the Injunction thus

United States District Court
Northern District of California

United States District Court
Northern District of California

came into effect on January 17, 2024.

**C.    Apple's Purported Compliance**

On January 16, 2024, Apple filed a notice of compliance with the Injunction.  The major components included:

1.    New policy charging developers 27% on link-out purchases instead of IAP's 30%.  *See infra* Section II.A.

2.    Various restrictions on the manner and mode of communicating with customers which were distinctly less user-friendly than those otherwise allowed.  *See infra* Sections II.B–D.

3.    Exclusions on the concurrent participation in other programs that offered discounted commissions, like the Video Partner Program and the News Partner Program.  *See infra* Section II.E.

(Dkt. No. 871.)

**D.    Epic's Motion to Enforce the Injunction and Evidentiary Hearings**

On March 13, 2024, Epic moved to enforce the injunction and hold Apple in civil contempt, and the latest stage of this saga began.[6]  On April 23, 2024, the Court set a evidentiary hearing commencing on May 8, 2024.  (*See* Dkt. Nos. 925, 974.)  Over the course of six days, Epic called (i) Ned Barnes, Epic's expert witness; (ii) Matthew Fischer, Vice President, Head of Worldwide App Store at Apple; (iii) Alex Roman, Vice President of Finance at Apple; (iv) Alec Shobin, Director of Marketing at Epic; and (v) Benjamin Simon, CEO, president, and co-founder at Down Dog, a mobile app developer.  (*See* Dkt. No. 931.)  Apple called (i) Carson Oliver, Senior Director of Business Management, App Store; (ii) Philip Schiller, Apple Fellow; (iii) Alex Roman; (iv) Matthew Fischer; and (v) Ned Barnes.  (*See* Dkt. No. 932.)

As testimony unfolded, and Apple attempted to justify its response, the Court became

---

[6] The Court also granted the filing of *amici curiae* briefs in support of Epic's motion to enforce from Meta Platforms, Inc., Microsoft Corporation, X Corp., and Match Group, LLC (Dkt. No. 904); Spotify USA Inc. (Dkt. No. 906); and Digital Content Next (Dkt. No. 908.) (Dkt. No. 913.)

increasingly concerned that Apple was not only withholding critical information about its business

decision for complying with the Injunction, but also that it had likely presented a reverse-

engineered, litigation-ready justification for actions which on their face looked to be

anticompetitive. The Court immediately ordered Apple to produce all injunction-compliance

related documents (Dkt. No. 974), and referred all discovery matters to Magistrate Judge Thomas

S. Hixson (Dkt. No. 985.) Judge Hixson later set a deadline for substantial completion of

document production by September 30, 2024 (Dkt. No. 1008 at 2) and denied Apple's request for

an extension (Dkt. No. 1017.)

Apple engaged in tactics to delay the proceedings. The Court later concluded that delay

equaled profits. By September 30, 2024, Apple represented that it had produced around 89,000

documents out of the 1.5 million it had reviewed and expected to produce a few thousand more by

October 7, 2024. (Dkt. No. 1024.) Apple, however, had asserted privilege over more than a third

of responsive documents. (*See* Dkt. Nos. 1056, 1095.)

Magistrate Judge Hixon largely found Apple's privilege claims to be unsubstantiated after

reviewing eleven exemplar documents (characterized by Epic as evidence of Apple's overreach).

(Dkt. No. 1056.)[7] Apple used this decision to delay further and "offered" to re-review all 57,000

documents for which it claimed privilege in full or in part. Ultimately, Apple withdrew

approximately 42.1% of its privilege claims. Although Apple now tries to recast its re-review as

"of its own accord," that framing belies the reality that the documents should have never been

withheld in the first instance. (Dkt. No. 1151 at 5–6.)[8] Ultimately, Epic and Apple hired three

special masters to review Apple's privilege claims after its re-review. (*See, e.g.*, Dkt. No. 1191.)

Apple's production positions, after its dissembling at the evidentiary hearing, revealed that

delay worked to its advantage. On February 4, 2025, the Court ordered that the evidentiary hearing

---

[7] Later, on December 31, 2024, this Court upheld Judge Hixson's findings in full. (Dkt. No. 1095.)

[8] Including documents Apple identified as falling within Judge Hixson's ruling on the 11 exemplar documents—for which Apple maintains its claims of privilege—that number jumps to 55.9% of documents downgraded from Apple's original claims. (*Id.* at 6 & n.7.)

United States District Court
Northern District of California

United States District Court
Northern District of California

would resume on February 24, 2025, and that the special master review and production of non-privileged documents to Epic would continue in parallel to the evidentiary hearing. (Dkt. No. 1171 at 2.)[9]  The Court permitted the parties to designate priority documents for immediate review, with Epic selecting the first 1,000 documents for immediate review.  (*Id.*)

During the three days of testimony in February 2025,[10] Epic called back to the stand Philip Schiller and Carson Oliver, and called for the first time Rafael Onak, User Experience ("UX") Writing Manager at Apple; Kunnal Vij, Senior Manager of Finance at Apple Services; and Marni Goldberg, Corporate Communications Director at Apple.  (*See* Dkt. No. 1273.)  Apple called no witnesses.  The evidentiary hearing preliminarily concluded on February 26, 2025.[11]

The Court sets forth the evidence and findings revealed through the hearings and evidence received.

### III.   APPLE'S 2024 RESPONSE TO THE INJUNCTION: COMPONENTS

Apple chose to comply with the Injunction with the following five categories of changes:

Apple imposed (A) a 27% commission on link-out purchases, (B) new external purchase link placement and design restrictions, (C) requirements that induce purchase-flow friction, (D) limitations on developers' ability to use calls to action, and (E) exclusion of certain programs utilized by large developers from the Link Entitlement.

The Court evaluates each in terms of whether Apple took reasonable steps to comply, and in fact has complied, with the Injunction.

---

[9] At least as of January 31, 2024, the special masters upheld Apple's privilege claims on this reduced body of proposed redactions at a rate of approximately 89.1%, overruling in part as to 0.8%, and rejecting the balance as to 10.1%.  (*Id.*)

[10] The transcripts of the hearing from May 2024 and February 2025 are consecutively paginated and cited as "May 2024 Tr." or "Feb. 2025 Tr." throughout.  (*See* Dkt. Nos. 976 (May 8, 2024), 977 (May 10, 2024), 978 (May 16, 2024), 979 (May 17, 2024), 980 (May 22, 2024), 981 (May 31, 2024), 1306 (February 24, 2025), 1307 (February 25, 2025), 1308 (February 25, 2025 (sealed portion)), and 1309 (February 26, 2025).)

[11] The Court left open the option of a further evidentiary hearing in the event the ongoing document review revealed the need for further hearings.

United States District Court
Northern District of California

### A.    First Component: Commission on Linked-Out Purchases

Prior to the Injunction, Apple did not allow "linked-out purchases" and, thus, did not charge any commission for purchases made outside of, or off, its platform.[12] Now, it does.

In its most simple configuration, "linked-out purchases" after the Injunction are purchases made off the Apple platform, but from which a consumer can leave the platform using a link on the app.   Now, under the revised Guidelines, Apple not only charges developers "a 27% commission," but also expanded the scope of the commission requirement by demanding a 27% commission on digital goods and services transactions that take place on a developer's website upon immediate use of the link, *and* payment for any "digital goods and services transactions that take place on a developer's website within *seven days after a user taps through* an External Purchase Link . . . to an external website."  (Dkt. No. 871-1, Declaration of Matthew Fischer ("Fischer Decl.") ¶ 33; *see also* CX-2, StoreKit External Purchase Link Entitlement Addendum for US Apps § 5.1 (emphasis supplied).)

Apple hid its decision-making process from the Court only to have it uncovered at the second evidentiary hearing in 2025:

*Initial Discussions.*  Rolling the clock back, the Injunction issued Friday, September 10, 2021.  On Monday, September 13, 2021, discussions began about the specific rate and under what circumstances a commission on external purchases should be charged, if any.  Notes of a meeting that day describe three options for how to charge a commission and focused on linked-out purchases already required in Korea:

- One: "Do nothing but allow the separate payment methods in";

- Two: "Charge an alternative commission but audit"; and

- Three: "Charge on a different metric (downloads/redownloads) but cuts into

---

[12] *See* May 2024 Tr. 543:23–544:8 (Oliver) ("Historically, . . . we only commissioned the sale of digital goods and services that were sold directly within apps that were distributed through the App Store.  For all other digital goods and services sold outside the App Store, there was no commission.  And the basic principle there was that if we provided a user to a developer, that we were commissioned on those users that purchased . . . within the app, and where the developer was able to guide a user outside of the store to a sale of the digital goods or service, they were welcome to use that within their own app.").

different set of developers than we do today".  (CX-202.1; Feb. 2025 Tr. 1399:2–18 (Oliver).)[13]

While the meeting was evidently focused on actions in Korea,[14] the notes indicate that "YGR's opinion needs to be taken into account; charging for commission - is it fine to do?!" and "YGR's decision - are we in a different place?  Commission is ok under YGR but decision stated to allow Devs to link out to other payment methods." (CX-202.1; Feb. 2025 Tr. 1400:13–22 (Oliver).)

Thus, the Court finds it was immediately apparent to the Apple working group that the commission issue, including whether and how much, was core to compliance with the Injunction. Given the nature, length, and content of the Injunction, on which Apple is on notice, both constructive and actual, the working group's view is hardly surprising.

Apple coded its activities relating to Injunction compliance as "Project Michigan." (*E.g.*, Feb. 2025 Tr. 1323:7–11 (Onak).)  When the Ninth Circuit issued its stay of the Injunction on December 8, 2021 (Dkt. No. 841), Apple appears to have ceased any compliance efforts.  (*See* CX-486.1 (December 9, 2021 Email: "Michigan is on hold for now".).)  Once the Ninth Circuit issued its decision affirming this Court's ruling in relevant part on April 24, 2023, Apple renewed its compliance efforts, this time under the codename "Wisconsin."  (Feb. 2025 Tr. 1142:2–11 (Schiller); *see also* Dkt. No. 852 (Ninth Cir. opinion).)[15]

That information was hidden from the Court and not revealed until the 2025 hearing.

***May 18, 2023 Meeting.***  On May 18, 2023, Messrs. Fischer, Oliver, Schiller, and Vij, among others, attended a meeting titled "Wisconsin Business Update." (CX-488.1.)  An internal presentation proposed two options for achieving compliance with the Injunction.  (CX-272.)

---

[13] As Mr. Oliver confirmed, this second option—under which "Apple would allow alternative payments but seek a commission for the[ir] use"—is essentially the option Apple chose in Korea, the Netherlands, and in the United States.  (Feb. 2025 Tr. 1399:16–1400:7.)

[14] *See also* Feb. 2025 Tr. 1398:4–6 (Mr. Oliver: "I remember this specifically related to one geography [Korea].  I don't . . . know if this project was covering multiple geographies or just one.").

[15] On January 17, 2024, the Ninth Circuit's mandate issued, after the Supreme Court declined review.  (Dkt. No. 879.)

United States District Court
Northern District of California

1    *Proposal 1* would include *no* commission but would restrict the placement and appearance

2    of links in purchasing flows.  (*See* CX-272.7.)  The "Key Risks" identified with Proposal 1 include

3    that the proposal: "[d]iverges significantly from existing and future approaches"; "[c]reates new

4    in-app channel for developers without commission"; "[r]equires Apple to review against multiple

5    new policies and restrictions"; and that "[r]eview cannot prevent all policy evasion, but will allow

6    for remediation."  (*Id.*)

7    *Proposal 2*, by contrast, permitted display placement "[a]nywhere, including

8    merchandising page," with "[n]o restrictions" on pricing language but *would* include a

9    "[d]iscounted commission" of 3% off its prior 30% rate, i.e., a 27% commission.  (*See* CX-

10    272.11.)  Key risks identified with Proposal 2 included that: the "[c]urrent approach to collections

11    is manual and will not scale"; and it was "[d]ifficult to estimate impacts of non-economic

12    developer rationales (e.g. value of direct customer relationship)."  (*Id.*)

13    Documents revealed that Apple believed Proposal 1's no-commission model would "be

14    very attractive to developers," "cause a lot of developers to adopt the link[-]out options," and

15    "would create competitive pressure on IAP," which in turn "would drive . . . spend outside of the

16    app."  (Feb. 2025 Tr. 1456:15–1457:23 (Oliver).)  Mr. Oliver acknowledged, and understood, that

17    creating this competitive pressure, which Apple identified as a key risk factor of Proposal 1, was

18    one of the goals of the Injunction.  (Feb. 2025 Tr. 1457:19–23 (Oliver).)[16]

19    Apple also considered the revenue impact of the commission and no-commission models,

20    under various customer adoption scenarios.  Under Proposal 1's no-commission model, Apple

21    anticipated that most large developers and potentially many medium and small developers would

22    offer link-out purchases to their users.  (Feb. 2025 Tr. 1467:8–15 (Oliver).)  As a result, Apple

23    estimated a revenue impact of hundreds of millions to billions under the no-commission model for

24

25

26    ————————————

27    [16] As to the risk that Option 1 "[d]iverges significantly from existing and future approaches" (CX-272.7), Mr. Oliver acknowledged that this risk encompasses the concern that if Apple adopted a no-commission approach on link-outs in the United States, it would be harder to

28    justify a commission elsewhere in the world (Tr. 1453:22–1454:5).

United States District Court
Northern District of California

customer adoption ranging from 10% to 25%.[17]  (*See* CX-272.10, .14.)  By contrast, and importantly, for Proposal 2, Apple anticipated that a linked-out option subject to a 27% commission, at most, might only be attractive to the largest developers.  (Feb. 2025 Tr. 1468:21–1469:2 (Oliver).)  Specifically, the presentation focused on potential adoption by only the top 10 and 50 largest developers with 20% to 50% adoption, indicating potential revenue impact of tens of millions.[18]  (CX-272.14.)[19]  In short, Apple estimated, and both Messrs. Schiller and Oliver acknowledged, that as of May 2023 the revenue impact of a no-commission option with placement restrictions (Proposal 1) posed a significantly larger hit to Apple than the impact of a 27% commission option without placement restrictions (Proposal 2). (Feb. 2025 Tr. 1469:19–24 (Oliver); *id.* at 1162:16–24 (Schiller).)

Ultimately, Apple's 2024 response to the Injunction was the most anticompetitive option: a link entitlement program that included *both* the placement restrictions of Proposal 1 *and* the 27% commission from Proposal 2.  (*E.g.*, Feb. 2025 Tr. 1162:25–1163:4 (Schiller).)

Further, in May 2023, Apple through Oliver and others received feedback from Bumble, a large, well-known developer on Apple's and Google's alternative billing programs.  (*See* CX-246.2; Feb. 2025 Tr. 1409:5–1411:9 (Oliver).)[20]  Bumble specifically advised Apple that "[p]ayment processing fees average out significantly higher than the 4% fee reduction currently offered by Google in the [user choice billing] program or [the] 3% fee in Apple's . . . solution resulting in negative margin for developers."  (CX-246.11.)[21]  In other words, Bumble explained

---

[17] More precisely, Apple estimated a revenue impact of ███ million to ███ billion.

[18] More precisely, Apple estimated a revenue impact of ███ million to ███ million.

[19] The slide presenting revenue impacts of a 27% commission focused on adoption by the top 10 and 50 developers, greying out the rows for top 200 developers and all developers because Apple expected that this option "would be only more attractive to the largest developers."  (Feb. 2025 Tr. 1469:1–2; CX-272.13.)

[20] While Mr. Oliver testified that he did not recall the document (Feb. 2025 Tr. 1410:12–24 (Oliver)), the email reflects that Bumble's slides were sent to him and at least 14 other members of Apple's legal, business, and finance teams (CX-246.1.)

[21] Bumble proposed as solutions to (1) "[v]ary fee rates to match payment method basis (e.g. credit card ████, carrier billing ███)" or (2) "[r]evise 4% global 'average' closer to"

United States District Court
Northern District of California

United States District Court
Northern District of California

to Apple that a "3% discount" was not economically viable for a developer because the external cost of payments exceeds 3%. Apple's own internal assessment from February 2023 reflects data meriting the same conclusion—that the external costs of payments for developers on link-out purchases would exceed Apple's 3% discount if it demanded a 27% commission rate.[22]

The evidence uncovered in the 2025 hearing demonstrated Apple's knowledge and expectation that the restrictions would effectively dissuade any real developer participation, to Apple's economic advantage.[23]

***June 1, 2023 Meeting.*** Two weeks later, on June 1, 2023, Apple executives, including Messrs. Cook, Luca Maestri, Schiller, Fischer, and Oliver, held a meeting titled "Epic Injunction Implementation." (CX-485.1.) The presentation accompanying the meeting painted a clearer picture. One chart estimated revenue impacts to Apple based on potential commission discount (3%, 5%, 7.5%)[24] and link-out billings share (10–60%). (CX-859.32.) For the section of the chart covering 3% and 5% discounts, no revenue impacts were listed. Notably, the chart simply notes that it "[m]ight not be economically viable for developer to shift" at those rates, irrespective of the link-out billings share." (*Id.*; Feb. 2025 Tr. 1638:18–1639:7 (Vij).)[25]

---

developer's actualized average (e.g. ▮▮▮▮▮)". (CX-246.11.)

[22] *Compare* CX-246.11 (Bumble estimating developer's actualized average costs at ▮▮▮ ▮▮▮), *with* CX-265.27 (Apple estimating external costs for "extra large developers" at ▮▮▮ and external costs for "medium" sized developers at ▮▮▮); *see also* Feb. 2025 Tr. 1627:15–1628:10 (Vij).

At the time, Apple also knew of the virtually nonexistent adoption rates of the Netherlands and Korea programs. Those, similar to the at-issue program, additionally suggested to Apple the non-viable economics of the proposed program. *See* Feb. 2025 Tr. 1407:1–5 ("Q. [F]or example, as of October 2022, ten months into the Netherlands program and four months into the Korea program, only one developer had signed up for alternative payments across the two programs. A. That seems roughly correct, yes.") (Oliver).

[23] Apple executive Alex Roman testified under oath that he did not look at comparables to estimate the costs of alternative payment solutions that developers would need to procure to facilitate linked-out purchases. That testimony is not believable. (May 2024 Tr. 266:22–267:11 (Roman).)

[24] As throughout, each discount reflects a discount from a 30% commission, i.e., a 3% discount results in a 27% commission, a 5% discount results in a 25% commission, and a 7.5% discount results in a 22.5% commission. Feb. 2025 Tr. 1638:15–17 (Vij).

[25] As to another option—Option 3, included in the presentation's appendix and which

18

United States District Court
Northern District of California

Crucially, at this point, Apple's notes reflect uncertainty about whether it could in fact impose a commission without violating the Injunction.  In one slide deck, Apple's notes explain that "[i]f we decided *and had the ability* to charge a commission, we believe there would be very little developer adoption of link-out, assuming a scenario where we would give a cost of payments discount at 3%."  (CX-859.33 (emphasis supplied).)  Those same notes indicate that Apple planned to "[c]ome up with a couple of models in the spectrum of what we think the judge will accept" but to "[s]tart with the minimum."  (CX-1104.1.)

Apple's knowledge and consideration of these issues was hidden from the Court and not revealed until the 2025 hearing.

***June 13, 2023 Meeting.***  Twelve days later, on June 13, 2023, the Project Wisconsin team met again, including Messrs. Fischer, Oliver, and Vij, this time to discuss three commission proposals.  (CX-509.1; Feb. 2025 Tr. 1497:20–1498:3 (Oliver).)  The meeting presentation indicated "[t]hree options for link-out pricing."  (CX-274.3.)  Option A concerned the "Standard Commission Discount," under which "Apple would discount the commission on link-outs based on cost of payments."  (*Id.* at .4.)  Option B involved a "Time-limited, Discounted Commission," where "Apple would charge a discounted commission for 1 year and then 0% thereafter."  (*Id.* at .5.)  Finally, Option C proposed a "Flat Affiliate Fee," where "Apple would charge a flat fee per

---

would provide a commission on linking out and a 0% commission on in-app text communications —the speaker notes explain that "[w]e ran the commission option through our developer decisioning model as well but this will likely not make economic sense for the vast majority of developers with the 3% discount.  However, we know that the model is economic in nature and does not capture softer elements like customer relationship and developers ability to monetize in others [sic] ways they don't today with a transaction going through linking-out, hence we did a sensitivity."  CX-859.55.

Additionally, Apple witnesses occasionally noted that their models reflected a commission imposed "in perpetuity," i.e., the look-back window for imposing a commission after a user clicks on a link is "perpetual," instead of the seven-day look-back window Apple in fact adopted.  (*See, e.g.,* May 2024 Tr. 132: ("[T]o comply with the injunction, we have reduced the commission, you know, in the case of these larger developers, from 30 to 27, and added a seven-day [window].  So instead of having a 27 percent commission in perpetuity, it's just a 27 percent commission for these seven days. . . .  [W]e expect that many, many transactions will take place after that seven-day window which would in essence bring that 27 percent rate much lower to around 18 percent.")) (Fischer).  The testimony in February 2025 adduced no evidence to support Apple's contention that that it relied on a perpetual look-back window to consider its effective rate at 18%.

19

customer tap-through on an in-app link-out." (*Id.* at .6.)

The presentation provided "Proposed Justifications" and "Considerations" of each option. Most relevant here is Option A, the commission structure Apple ultimately deployed.

To justify Option A, advocates inside Apple claimed that the developer "will still benefit from all of Apple's tools, technologies, and services, and only have to cover payments themselves at the end" and noted several reasons why Apple's "30% commission [was] fair and defensible" (*id. at .4*), even though this Court and the Ninth Circuit had already found the rate was "supracompetitive."[26]  Apple personnel noted, for example, "Steam charges 20-30%, but does not offer platform services" and "[t]he App Store is a premium, comprehensive, at-scale offering." (*Id.*)[27]  The presentation final "consideration" notes did reveal that Apple believed "[d]evelopers will claim that a small discount will not provide enough margin to compete on price i.e. difficulties with Netherlands approach." (*Id.*)[28]

Additionally, notes of the meeting state that the team "need[ed] to come up with a session time (~24-48hrs)," which refers to the lookback window that triggers a commission on a linked-out purchase. (CX-251.2; Feb. 2025 Tr. 1512:16–18 (Oliver).)

Apple's knowledge and consideration of these issues was hidden from the Court and not revealed until the 2025 hearing.

---

[26] To remind: *see* quote, *supra*, at 9; *see also*, Injunction at 98 ("Apple's initial rate of 30%, although set by historic gamble, has apparently allowed it to reap supracompetitive operating margins."); Injunction at 92 ("As an initial matter, as detailed above, the 30% commission was not set by competition or the costs of running the App Store, but as a corollary to other gaming commission rates"); Injunction at 119 ("As described above, Apple has not adequately justified its 30% rate.  Merely contending that its commission pays for the developer's use of the App Store platform, license to Apple's intellectual property, and access to Apple's user base only justifies a commission, not the rate itself.  Nor is the rate issue addressed when Apple claims that it would be entitled to its commission even for games distributed outside the App Store because it provides the device and OS that brings users and developers together.")

[27] The slide, at least, fails to provide a basis for the value of the App Store's "premium, comprehensive, at-scale offering," other than that headline description.

[28] Mr. Oliver, for his part, could not recall any specific feedback from developers in this vein, but acknowledged that it "seems to be the reading from the bullet" that developers in the Netherlands complained about an insufficient price margin due to Apple's commission rate.  (Feb. 2025 Tr. 1504:13–17 (Oliver).)

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***June 20, 2023 Meeting.*** Seven days later, on June 20, 2023, Apple held another meeting regarding implementing the Injunction. (CX-489.1.) At that point, Apple's go-live date for implementing the Injunction was July 5, 2023, only 15 days later. (Feb. 2025 Tr. 1176:2–5 (Oliver); *see also* CX-223.1.)

Prior to the June 20 meeting, there were individuals within Apple who were advocating for a commission, and others advocating for no commission. (Feb. 2025 Tr. 1521:3–12 (Oliver).) Those advocating for a commission included Mr. Maestri and Mr. Roman. (*Id.* 1522:3–10 (Oliver).) Mr. Schiller disagreed. (*Id.* 1521:13–18 (Oliver).) In an email, Mr. Schiller relayed that, with respect to the proposal for "a 27% commission for 24 hours," "I have already explained my many issues with the commission concept," and that "clearly I am not on team commission/fee." (CX-224.1.)[29] Mr. Schiller testified that, at the time, he "had a question of whether we would be able to charge a commission" under the Injunction, a concern which he communicated. (Feb. 2025 Tr. 1177:24–1178:9 (Schiller).) Unlike Mr. Maestri and Mr. Roman, Mr. Schiller sat through the entire underlying trial and actually read the entire 180-page decision. That Messrs. Maestri and Roman did neither, does not shield Apple of its knowledge (actual and constructive) of the Court's findings.

A businessperson at Apple explained the team's current thinking in a June 15, 2023 email and reveals a core decision. Apple has chosen not to value its intellectual property (the opening allowed by the Court in its Order) and does not want to relinquish its hold on this revenue stream:

> [T]he team has discussed variations on the commission options with lower rates, but we struggled to land on ironclad pricing rationales that would (1) stand up to scrutinizing comparisons with defenses of the commission and existing discounting approaches in other jurisdictions and (2) that we could substantiate solidly on a bottoms up basis without implicitly devaluing our IP / proprietary technology.
>
> . . .
>
> All things being equal, . . . a lower commission rate option doesn't represent a material improvement in the logical grounding relative to

---

[29] Regardless of whether Mr. Schiller's comment that he had a question of whether Apple could impose a commission under the injunction, this was only one of the "many issues" he alluded to. (*See* CX-224.1.)

> the 27%, continues to place the lion's share of the financial risk and
> calculus on Apple, and just makes us less money.

(CX-538.2–3; *see also* Feb. 2025 Tr. 1546:13–1550:20 (Oliver).)

Despite Mr. Schiller's concerns, the June 20, 2023 presentation forged ahead and identified benefits to several different commission/fee options, one of which was a 27% commission on transactions made within 24 hours of a customer's link-out.  (CX-223.23.)[30]  For that option, the presentation identified that the proposal "[r]educes financial risk versus no-fee option," which simply refers to the fact that Apple would generate more revenue under this option than a no-commission option.  (*See* CX-223.32.)

In fact, documents revealed that not only would Apple generate more revenue, it would lose minimal to none:  as Apple's earlier financial modeling had indicated, because developers' external costs will exceed 3% when utilizing linked-out transactions, Apple's 27% commission on linked-out transactions renders every linked-out transaction more expensive to a developer than an IAP transaction at 30% commission.  (*See* Feb. 2025 Tr. 1633:5–10 (Vij) ("As long as there is a 27 percent commission on a linked-out transaction, that linked-out transaction is going to be more expensive to any developer and every developer based on this chart than an IAP transaction at 30 percent, correct?  A. Yes, for that particular transaction.").)  Ironically, the presentation then stated that this option "[p]rovides more margin opportunity for developers compared to standard IAP commission."  (CX-223.32.)[31]  While literally true in one sense, likely the outward facing/public sense—27% is less than 30%—Apple also knew that any such opportunity vanishes in the face of external costs and thus was not viable for developers.

Despite the fact that the Court now has evidence that Apple investigated the landscape, knew how it would harm developers, and understood it would not comply with the goal of the Injunction, Apple nonetheless determined at the June 20, 2023 meeting that it *would* charge a

---

[30] Apple also considered imposing a flat fee per link-out or a 20% commission for the first year.  CX-223.23.

[31] The identified "Risks" with the proposal were the same as previously described: developers "may claim" that the 3% discount does not permit price competition; the proposal diverges from planned alternative payment programs given its time duration; and there is a significant collection risk if linking-out adoption scales.  CX-223.32.

1    commission on link-out purchases, although it had not yet decided what that commission would

2    be.  (Feb. 2025 Tr. 1227:16–23 (Schiller).)

3          Apple's knowledge and consideration of these issues was hidden from the Court and not

4    revealed until the 2025 hearing.

5          ***June 28, 2023 Meeting.***  Seven days later, on June 28, Apple held another meeting

6    regarding "Epic Injunction Implementation," this time attended by Mr. Cook, as well as

7    Messrs. Maestri, Schiller, Fischer, and Oliver, among others.  (CX-532.1.)  The presentation

8    accompanying the meeting indicates that the potential commission rate for linked-out purchases in

9    the United States could range from 20% to 27%.  (CX-291.14.)  In her notes dated June 26, two

10   days prior, Ms. Goldberg wrote, "[c]omission[:] 20-23 percent," but that "Luca [Maestri] wanted

11   to make it 27 percent."  (CX-399.1; Feb. 2025 Tr. 1797:5–1798:8 (Goldberg).)[32]

12         Again, this was hidden from the Court and not revealed until the 2025 hearing.

13         ***July 5, 2023 Price Committee Meeting.***  One week later, on July 5, Apple held a Price

14   Committee meeting to prepare for potentially imminent Injunction compliance.  (Feb. 2025

15   Tr. 1242:24–1243:2 (Schiller).)  One purpose of this meeting was to settle on the commission rate

16   that Apple would charge and its associated tracking window.  (*Id.* 1249:5–9 (Schiller).)  At the

17   meeting, Apple settled on a 27% commission for linked-out purchases, a decision ultimately made

18   by Messrs. Cook, Maestri, and Schiller.  (*Id.* 1202:15–1203:3 (Schiller).)  As Mr. Schiller was not

19   advocating for a commission, and Mr. Maestri was fully advocating for the lucrative approach,

20   Mr. Cook was the tie-breaker.  (*Id.* 1202:21–1203:12 (Schiller).)  Commissions would be collected

21   on a seven-day window, even if those subsequent purchases on a developer's website were made

22

23         [32] Ms. Goldberg does not clearly describe the context. (CX-399.)  At any rate, she conceded
     that "I view these notes as my attempt to record what was being said in whatever conversation I
24   was having."  Feb. 2025 Tr. 1794:23–1795:4.

25         While Ms. Goldberg's opinions carry little to no weight, her real-time revelations provide
     context for the environment in which these decisions were being made.  For instance, Ms.
26   Goldberg showed her impressions of the potential bad press Apple may receive from charging a
     commission, as well as messages among her and others in the "Communications" department
27   agreeing: "this is all very shaky to me" and that "the rationale and the defense for the commission
     rate [20%–27%] and the time period, the seven days, was shaky."  *See* CX-0540.11; Feb. 2025
28   Tr. 1776:16–1777:1, 1856:8–11, 1858:11–24 (Goldberg).

United States District Court
Northern District of California

1    on a device other than the user's iPhone.  (*Id*. 1136:24–1137:6 (Schiller), 1798:25–1799:13

2    (Goldberg).)

3        Thus, in response to the Injunction, Apple chose to impose a new commission representing

4    the most anticompetitive option considered (Primary and Overarching Finding No. 1).

5        Apple's knowledge and consideration of these issues was hidden from the Court and not

6    revealed until the 2025 hearing.

7        ***Analysis Group Report.***  Apple hired the Analysis Group ("AG") purportedly to conduct a

8    bottoms-up study, dated January 2024, which (1) "[e]stimate[d] the value of services provided by

9    the Apple ecosystem to developers," (2) "[c]ompare[d] Apple's commission with those of other

10   app stores and digital marketplaces," and (3) "[p]rovide[d] an economic framework for

11   considering alternative pricing options."  (CX-14.3; *see also* CX-15.)  No references to the study

12   appear in any of the materials upon which Apple relied in its meetings leading up to its July 5,

13   2023 decision to impose a 27% commission, although the presentation for that July 5, 2023

14   meeting does refer to an AG report.

15       Nonetheless, AG "estimated" that the value of Apple's technology and services to

16   developers was precisely what the business groups had been debating.  AG "concluded" that:

17   (1) Apple's platform technology is worth up to 30% of a developer's revenue, depending on other

18   services offered; (2) Apple's developer tools and services are worth approximately 3%–16%;

19   (3) Apple's distribution services are worth approximately 4%–14%; and (4) Apple's discovery

20   services are worth approximately 5%–14%.  (CX-0014.7.)  The AG report also considered the

21   "[e]conomic framework for considering alternative pricing options," i.e., "[h]ow to charge a

22   commission or fee for a purchase that happens after the user clicks a link that goes out of the app."

23   (*Id.* at .38–39.)  Further, the AG report identified affiliate programs and developer ad campaigns

24   as a relevant benchmark for referral fees and observed that the tracking windows in, e.g., first-

25   party affiliate programs ranged between 14 and 90 days.  (May 2024 Tr. 589:8–24, 591:23–592:1,

26   596:12–16 (Oliver); CX-0014.39–.41.)[33]

27   _____

28       [33] Epic argues that the AG's report is flawed because, among other reasons, the report
     relies on the Google Play store whose practices have been found in violation of antitrust law (*see*

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Despite its own considerable evaluation, during the first May 2024 hearing, Apple

2   employees attempted to mislead the Court by testifying that the decision to impose a commission

3   was grounded in AG's report.  (*See, e.g.*, May 2024 Tr. 544:16–24 (Oliver); *see also*

4   Dkt. No. 1324, Apple Trial Brief at 12.)  The testimony of Mr. Roman, Vice President of Finance,

5   was replete with misdirection and outright lies.  He even went so far as to testify that Apple did

6   not look at comparables to estimate the costs of alternative payment solutions that developers

7   would need to procure to facilitate linked-out purchases.  (May 2024 Tr. 266:22–267:11

8   (Roman).)

9   The Court finds that Apple *did* consider the external costs developers faced when utilizing

10  alternative payment solutions for linked out transactions, which conveniently exceeded the 3%

11  discount Apple ultimately decided to provide by a safe margin.  (*See* CX-265.27 (Apple's

12  estimates of external costs for developers); Feb. 2025 Tr. 1627:15–1628:10 (Vij) (discussing

13  external costs).)  Apple *did not* rely on a substantiated bottoms-up analysis during its months-long

14  assessment of whether to impose a commission, seemingly justifying its decision after the fact

15  with the AG's report.

16  Mr. Roman did not stop there, however.  He also testified that up until January 16, 2024,

17  Apple had no idea what fee it would impose on linked-out purchases:

18          Q. And I take it that Apple decided to impose a 27 percent fee
            on linked purchases prior to January 16, 2024, correct?
19

20          A. The decision was made that day.

21          Q. It's your testimony that up until January 16, 2024, Apple had
            no idea what -- what fee it's going to impose on linked
22          purchases?

23          A. That is correct.

24  (May 2024 Tr. 202:12–18 (Roman).)  Another lie under oath: contemporaneous business

25

26  _____

27  May 2024 Tr. 644:3–17 (Oliver)), and because Apple engaged in "creative accounting" that
    falsely implied Apple required external link commissions to make a fair return on the App Store,
    even though this Court has found that the App Store operates at a 75% margin (*see* May 2024
28  Tr. 225:15–226:14 (Oliver); Dkt. No. 1325-2, Epic's Post-Hearing Findings of Fact at 16).

documents reveal that on the contrary, the main components of Apple's plan, including the 27% commission, were determined in July 2023.

Neither Apple, nor its counsel, corrected the, now obvious, lies.  They did not seek to withdraw the testimony or to have it stricken (although Apple did request that the Court strike *other* testimony).  Thus, Apple will be held to have adopted the lies and misrepresentations to this Court. [34]

## B.    Second Component: Link Placement and Design

Apple's restrictions on link placement and design come in two flavors: (i) where Apple limits placement of links for a linked-out purchase in the purchasing flow, and (ii) whether Apple permits a "button"-style link.

***Initial Discussions.***  As outlined earlier, in May 2023, Apple initially considered two program proposals.  Proposal 1 would include *no* commission but would restrict the placement and appearance of links in purchasing flows.  (*See* CX-272.7.)  As far as link placement, this generally means that if an app displays something for purchase, an IAP buy button could be placed next to that item, but the link-out option would have to be placed on another page in the app.  (Feb. 2025 Tr. 1451:18–22 (Oliver).)  Proposal 2, by contrast, permitted display placement "[a]nywhere, including merchandising page," with "[n]o restrictions" on pricing language but *would* include a 27% commission.  (*See* CX-272.11.)

On its face, the Court finds the juxtaposition of the two proposals indicates that Apple considered imposition of a commission a trade off with the placement and appearance of a link.  During testimony, Apple pushed back on the "trade off" characterization.  Mr. Schiller explained that he didn't "recall us linking these two styles specifically to the discussion of fee or no fee.  I recall us discussing them independently as what was the right thing to do and what's allowed to do."  (Feb. 2025 Tr. 1182:12–15 (Schiller).)  Mr. Oliver similarly demurred that he "recall[ed]

---

[34] The Court understands the technicality that a decision is not made until it is made, but this was not a seat-of-the-pants decision.  Considerable work and debate had occurred.  The evidence demonstrates that the decision had been made, and all things being equal, nothing would change. To suggest otherwise was to manifest an intent to mislead, misdirect, and lie.

United States District Court
Northern District of California

1    specifically discussions about the commission level and discussions about the features around

2    implementation of linking out. . . .  I don't remember them being discussed linked." (Feb. 2025

3    Tr. 1888:13–16 (Oliver).)

4         Yet, the side-by-side proposals evidence that the link placement and restriction served as

5    an explicit offset to a lack of commission.  Further, the June 1, 2023 presentation confirms that

6    connection: in discussing one proposal, Apple indicates that, "[s]*ince* we are charging a

7    commission, the link could be placed once per page, including alongside IAP." (CX-859.52

8    (emphasis supplied).)  Notes of the meeting further confirm as much: "If you want to charge a

9    commission, you have to give them better placement," but "[i]f you don't charge a commission,

10    you need to lock it down to a plain url link and internet style 'button'." (CX-1104.2.)  The notes

11    also indicate the business team was tasked "to define the 2-3 scenarios where we can limit the

12    ruling where Tim, Phil, and Legal are comfortable with." (*Id.* at .1.)

13         While Mr. Oliver claims he did not "exactly understand" what the notes "mean[] by 'limit

14    the ruling'" (Feb. 2025 Tr. 1493:11–21 (Oliver)), the Court finds that the obvious inference to

15    draw from these statements collectively is that, absent a commission, placement restrictions would

16    "lock [the app] down" to protect Apple from an anticipated loss of revenue which would naturally

17    spring from the competition the Injunction sought to stimulate.  Mr. Schiller's lapse of memory on

18    the topic does not control.

19         ***Revenue Impact.***  The June 20, 2023 presentation evidenced, and thereby confirmed, the

20    same trade-off discussed above.  Option 1 had no fee but included "more stringent restrictions on

21    style and placement," specifically, the link would be "[o]nce per page," "[n]ot on same page as

22    Apple IAP buy flow," and a "[p]lain link or button." (Feb. 2025 Tr. 1179:16–19 (Schiller);

23    CX-223.6.)  Option 2, by contrast, imposed a "[c]omission or flat fee" but permitted a

24    "[d]eveloper-styled link or button" and allowed the link to be on the same page as the Apple IAP

25    buy flow.  (CX-223.6; Feb. 2025 Tr. 1183:10–13 (Schiller).)

26         As to Option 1, the presentation explains that the "share of billings linking-out . . . will

27    depend where is the text and language developers are allowed to use." (CX-224.16.)  As

28    Mr. Schiller acknowledged, the more restrictive Apple became on its suggested placement, format,

United States District Court
Northern District of California

and language of a link that a developer uses for a linked-out transaction, the less likely those links would be seen and used. (Feb. 2025 Tr. 1213:10–15 (Schiller).) More to the point, the more restrictive Apple's rules about how developers can format links, the lower a developer's link-out share and adverse impact on Apple's revenue. (*See* Feb. 2025 Tr. 1212:9–1213:22 (Schiller).)[35]

Here again, Apple ultimately chose the most aggressive, *anti*competitive option, namely to take the more restrictive elements of both options: Apple charged a commission as in Option 2, and it imposed the more restrictive link placement and design requirements of Option 1 (Primary and Overarching Finding No. 2).

Friction in transactions matter. Apple modelled the revenue impact of a no-fee link-out purchase scenario based on breakage (i.e., percentage of purchases where a user fails to complete a link-out transaction) and the developer's link-out share (i.e., percentage of purchases diverted from IAP to a developer's external payment system).[36] (*See* CX-224.16.) Specifically, Apple's sensitivity analysis projected revenue impact where breakage ranged from 0%–25% and where link-out share ranged from 10%–50%. (*Id.*) The speaker notes indicate that, "[b]eyond ██%" breakage, "developers reach a tipping point where they lose more on linking out than they would sticking with Apple IAP and the higher commission." (*Id.*)

The sensitivity analysis projected that "[t]he range of impact on the low end with 25% breakage and 10% billings shift . . . is more negligible at $██. However on the other end with 0% breakage and 50% billings shift . . . , it's closer to $██ of U.S. revenue that Apple would lose. A more middle ground scenario of 10% breakage and 30% billings shift would result in $██ of revenue loss, nearly ██ of our U.S. App Store revenue." (CX-224.16.) As to what

---

[35] Mr. Schiller acknowledged this is true "[i]n theory." (Feb. 2025 Tr. 1213:17–22.) When pressed by the Court whether "if there is any other significant consideration, there will be some writing about it," Mr. Schiller speculated as to what Apple did *not* analyze, e.g., "whether color or font size or specific page placement or frequency" had a particular impact. (Feb. 2025 Tr. 1213:24–1214:5 (Schiller).) As noted at the hearing, if the consideration was not pursued and presented in the various meetings, or otherwise documented in the voluminous discovery produced, then it bears to reason it was not a particularly important consideration.

[36] In Apple's words, breakage refers to when a "customer drop[s] off during the buy-flow process due to a less seamless experience compared to Apple's iAP [*sic*]." (CX-224.15; *see also* Tr. 1631:20–22 (Vij).)

United States District Court
Northern District of California

Apple expected an actual link-out share would be, the speaker notes explained that "we don't have great data points on what this will end up being," but pointed to instances where developers accomplished a █% (NetEase) and █% (Disney) shift in billings by offering discounted pricing *outside* the app store.  (*Id.*)  Notably, when Epic itself offered their own payment option with discounted pricing for a few weeks, Apple saw about █% of billings shift. (*Id.*)

As early as the July 5, 2024 price committee meeting, the evidence is compelling that Apple had decided upon combining the most restrictive aspects of the June 20, 2023 proposal: impose both a commission *and* restrictions on link placement and design.  (Feb. 2025 Tr. 1245:23–1246:24 (Schiller).)  The link entitlement required developers to adhere to the following restrictions: "[l]anguage and design must follow templates"; "[o]ne URL per app"; "[l]ink can only be displayed once in an app, on an app page user navigates to (not an interstitial, modal, or pop up), and can't persist when user leaves page"; "[l]ink can not be displayed on any page that is part of an in-app flow to merchandise/initiate an IAP."  (CX-227.4; *see also* Tr. 1497:7–19 (acknowledging Apple decided to "lock[] it down to a plain URL link and Internet-style button" and "restrict[] placement to make it outside of the buy flow") (Oliver).) Messrs. Cook, Schiller, and Maestri were the ultimate decisionmakers "about what they felt was [an] acceptable" level of risk to cabin the Injunction's effect in terms of link placement and design.  (Feb. 2025 Tr. 1493:22–1494:3 (Oliver); *see also* Tr. 676:23–677:6 (Schiller).)[37]

***Link Placement Restrictions.***  Consistent with the July 5, 2023 price committee meeting presentation, Apple's final Link Entitlement program requires that an external link "[n]ot be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase."  (CX-2.4; May 2024 Tr. 221:23–25 ("Q. The developer may not put the purchase link in their app anywhere near the purchase flow?  A. That is correct.") (Roman); *id.* at 727:11–

_____

[37] May 2024 Tr. 676:23–677:6 (Schiller) ("Q. And were you the final decision-maker on the details and contours of the response plan that Apple announced on January 16?  [Mr. Schiller:] I was one of the decision-makers, not the only one.  Q. Who were the other final decision-makers along with you?  [Mr. Schiller:] Mr. Cook, Mr. Maestri, and there were other senior executives who were involved in the meeting and provided input, but I would say we were the primary approvers at the end.").

15 ("Q. . . [T]he link must not be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase, correct?  A. Yes.") (Schiller).)

That restriction presents serious problems for developers' ability to compete with Apple's IAP and Apple knew it. Consider a concrete example: if an app has an item shop where a user could purchase a digital product—e.g., an in-game outfit or currency—nowhere in that shop could the external purchase link appear.  (May 2024 Tr. 93:21–94:7 (Fischer).)  Rather, the external purchase link would have to be on some other page within the app.  (*Id*. 94:8–13 (Fischer).)  Epic's witness, app developer Ben Simon, represented that the inability to "present both options to the user on the same screen, as we did on Android . . . very much inhibits our ability to give users a choice in how to subscribe," and "is also likely to lead to user confusion, as it suggests that the two options are unrelated offerings."  (Dkt. No. 897-1, Simon Decl. ¶ 28.)

When asked to explain the business justification of this requirement, Mr. Fischer first sidestepped by explaining that "the developer could easily, before they ever get to that page"—e.g., the in-app item shop—"communicate to the user of benefits and pricing discounts."  (May 2024 Tr. 94:21–95:9 (Fischer).)  When pressed further, Mr. Fischer alluded to "some concern around user confusion with having lots of different purchase options all in one place," but otherwise admitted that the requirement would be more profitable for Apple and less profitable for developers.  (*Id*. 95:10–97:1 (Fischer).)

Additionally, based on his experience, Mr. Simon explained that "over two thirds of users who subscribe in-app do so when the purchase page is presented as a 'pop-up' after they create their account or after their trial has ended."  (Simon Decl. ¶ 29.)  As Mr. Schiller acknowledged, the most useful time for a user to know their purchase options is when the user is in the in-app store reviewing prices.  (May 2024 Tr. 732:23–733:4 (Schiller); *see also* Injunction at 164.)  However, that is precisely when Apple instructs developers that they *cannot* share alternative purchase information with users.  (May 2024 Tr. 733:5–7 (Schiller).)

In its notice of compliance and at the May 2024 hearing, Apple claimed that restrictions on link placement protect against "security risks."  (*See* Dkt. No. 871, Notice of Compliance at 6, 9–11; May 2024 Tr. 734:22–743:21 (Schiller).)  Again, Apple attempted to mislead.  Mr. Schiller

United States District Court
Northern District of California

asserted that having an external link appear on the same page as IAP can increase the risk of a user's exposure to fraudulent conduct.  (May 2024 Tr. 735:20–24 (Schiller).)  No real-time business documents credit that view.  Mr. Schiller acknowledged that Apple does not permit developers to include an external link in an app under the Link Entitlement unless Apple first reviews and signs off on the link.  (*Id*. 736:7–10 (Schiller).)  Apple can sign off on an external link regardless of whether it was placed in the IAP purchase flow or elsewhere in the app.  (*Id*. 736:11–14 (Schiller).)  The link itself would be the same, and the only difference would be a user's perception and potential confusion.  (*Id*. 736:15–17 (Schiller).)  The confusion, Mr. Schiller explained, is that a user "may not understand which purchase method is not in-app purchase and which isn't."  (*Id*. 737:3–7 (Schiller).)  Yet, as Apple has structured the program, a user would nonetheless understand the external link directs them outside the app by virtue of Apple's scare screen informing them of such and the link's appearance as a hyperlink to an outside web page.  (*See id*. 737:8–738:8 (Schiller).)  Confusion is not a security risk.  Given the lack of any document identifying this alleged concern, the Court finds these justifications pretextual; said differently, the proffered rationales are nothing more than after-the-fact litigation posturing or outright misrepresentations to the Court.

**Link Design Restrictions.**  As to external link design, Apple's internal materials reflect awareness that the Injunction requires that "[d]evelopers must be able to . . . format these prompts as buttons or other calls to action, not just blue HTML links."  (CX-272.5 (May 2023 presentation); *see also id.* at .4 ("Working assumptions of compliance plan" include "[f]lexibility of CTA [call-to-action] design, e.g. buttons.").)  Yet, the Link Entitlement prohibits what consumers would expect to see as a button.  (May 2024 Tr. 82:18–23 (Fischer).)  The *only* button Apple permits under its guidelines is what it refers to as the "Plain Button style," which "may not be enclosed in a shape that uses a contrasting background fill," but rather the "background surrounding text must match the background of [the] app's page."  (CX-3.5.)  A "link out icon provided by Apple must be displayed directly to the right of [the] website URL" and "must visually match the size of the text."  (*Id.*)

The June 20, 2023 presentation highlights Apple's self-created distinction between a "link"

31

or "button."  Option 1, which did not include a commission or fee, presented the following options

for a "plain link or button" style:



(CX-224.10.)  Nothing about either example appears to be a "button," by the ordinary usage and

understanding of the word.  There is, certainly, an external-link icon next to the call to action and

hyperlink, but Apple strains to call either of these strings of text a "button."

By contrast, Option 2, which would include a commission, presented the following

"[d]eveloper styled link or button":



(*Id.* at .19.)  The lower example is readily identifiable as a button.

Apple's witnesses acknowledged that the plain-link-style "button" is the least visually

prominent of the button styles that Apple's guidelines provide:

United States District Court
Northern District of California

(CX-16.3; May 2024 Tr. 76:15–77:5 (Fischer), 897:18–898:1 (Schiller); Feb. 2025 Tr. 1308:15–23 (Schiller).)

Understanding that developers use visually prominent buttons to attract users to click on a link (as recommended by Apple in other contexts), Apple's own witness Mr. Fischer testified that he could think of no other reason to require developers to use a plain-link-style "button" other than to stifle competition.[38]

Mr. Schiller, who sat through both sets of evidentiary hearings, attempted to reverse course on this admission, claiming that Apple required the plain-link-style button so that the external link would look like hyperlinks or other internet links that consumers are used to seeing, along with a link-out icon, which Apple also refers to as a "button".  (Feb. 2025 Tr. 1166:15-1167:14 (Schiller).)[39]  Yet, Apple prohibits developers from using what their consumers would expect to see as an actual "button."  (May 2024 Tr. 82:18–23 (Fischer); *see also* Feb. 2025 Tr. 1531:4–1533:24 (Oliver).)  At the end of the day, Apple's internal documents reflect the underlying motivation to stifle competition by cabining developers' ability to attract users to alternate payment methods: "How much can we limit what devs do with the text and links?"  (CX-1104.2 (notes of June 1, 2023 meeting).)

---

[38] May 2024 Tr. 83:15–22, 84:14–25 (Fischer) ("The Court: . . . When you were all talking about this, . . . was any rationale provided for requiring this, not suggesting it, but requiring it when you all know that what it will do is stifle competition?  Any other reason given?  Because if you cannot identify one, that's my assumption.  [Mr. Fischer]: I don't remember exactly . . . .  The Court: So the answer is no, you cannot think of any other reason for requiring that.  [Mr. Fischer]: No.").

[39] The Court notes here that while, generally speaking, Mr. Schiller provided some credible testimony, he was in the courtroom to hear everyone testify.  Thus, when he testified and attempted to rehabilitate the record, he is less credible and the Court discounts that testimony.

## C.  Third Component: Purchase-Flow Friction

As discussed above, the June 20, 2023 presentation informed Apple executives that "[w]e know it's very likely that when a link-out happens, there will be some breakage, meaning [the] customer drop[s] off during the buy-flow process due to a less seamless experience compared to Apple's iAP [sic]."  (CX-224.15; *see also* Feb. 2025 Tr. 1631:20–22 (Vij).)  Apple understood, and used to its advantage, that the more friction in a purchase flow, the more breakage a developer faces.  (May 2024 Tr. 70:23–71:16 (Fischer); Feb. 2025 Tr. 1644:17–20 (Vij).)  Apple found that, "[b]eyond ███ " breakage, developers reach a tipping point where they lose more on linking out than they would sticking with Apple IAP and the higher commission."  (CX-224.16.)  In other words, to stifle competition, Apple was modeling the tipping point where external links would cease to be advantageous for developers due to friction in the purchase flow.  (Feb. 2025 Tr. 1211:14–19 (Schiller).)

Two aspects of Apple's Link Entitlement in particular increase purchase-flow friction for users attempting to conduct an external purchase outside of Apple's IAP: deploying a scare screen and requiring static URLs.

### 1.  The Scare Screen

Apple deployed a warning message, referred to as a "scare screen," to deter users from using third-party payment options. Apple does not require developers selling *physical* goods to display any warning at all before users proceed to make a payment with a third-party payment solution.  (May 2024 Tr. 70:9–13 (Fischer).)  By contrast, Apple now requires developers selling *digital* goods to display an "[i]n-app system disclosure sheet"[40] when a user links-out to a third-party payment solution:

---

[40] The "[i]n-app system disclosure sheet" explained that "[e]ach time your app calls the StoreKit External Purchase Link API, it will surface a disclosure sheet provided by the system (iOS 15.4 and/or iPadOS 15.4 or later) that explains to the user that they'll be leaving the app and going to an external website to make a purchase through a source other than Apple. When a user taps the Continue button, they will be directed to your website within a web browser." (CX-3.5.)

United States District Court
Northern District of California



(CX-3.5; May 2024 Tr. 70:14–18 (Fischer).)

Two months after the Injunction issued, Apple began evaluating options for its warning screen.  In an appendix to a draft November 15, 2021 Apple presentation, Apple details three different "[w]arning Options," involving escalating levels of warning messages, presumably as exemplars to show customers as part of the link-out flow under consideration.  (CX-520.39; Feb. 2025 Tr. 1333:18–23 (Onak).)



(CX-520.39.)  The screen on the left is called a "link," where the user would simply be taken directly to the external site.  (Feb. 2025 Tr. 1333:25–1334:17 (Onak).)  The middle screen is called a "dialogue," which generates a small pop-up after a user clicks on an external link that communicates to the user they are leaving the app.  (*Id.*; *also id.* 1335:10–16 (Onak).)  The screen on the right is called a "sheet," which is a full screen takeover after the user clicks on an external link.  (*Id.* 1333:25–1334:17 (Onak).)  Moving left to right, the warning level to the user increases. (*Id.* 1335:3–6 (Onak).)

Again, Apple chose the most anticompetitive option, namely the full screen takeover. (*Id.* 1335:7–9 (Onak).); (Primary and Overarching Finding No. 3)

In Slack communications dated November 16, 2021, the Apple employees crafting the warning screen for Project Michigan discussed how best to frame its language.  (CX-206.) Mr. Onak suggested the warning screen should include the language: "By continuing on the web, you will leave the app and be taken to an external website" because "'external website' sounds scary, so execs will love it."  (*Id.* at .2.)  From Mr. Onak's perspective, of the "execs" on the project, Mr. Schiller was at the top.  (Feb. 2025 Tr. 1340:4–6 (Onak).)  One employee further wrote, "to make your version even worse you could add the developer name rather than the app

United States District Court
Northern District of California

1    name." (CX-206.4.)  To that, another responded "ooh - keep going."  (*Id.*)

2         Again, Apple decided on the most anticompetitive option, that is, the "even worse" option

3    of including the developer's name rather than the app name (Primary and Overarching Finding

4    No. 4). (Feb. 2025 Tr. 1343:23–1344:1 (Onak); CX-3.5.)  All of this was hidden from the Court

5    and not revealed in the May 2024 evidentiary hearings.

6         From 2021 to 2023, while this Court's Injunction was stayed, Apple employees also

7    worked on warning screens for similar compliance requirements imposed in other jurisdictions,

8    including the Netherlands and Japan.[41]  In a January 2022 email, Mr. Schiller was asked for

9    feedback on "In App Messaging - link out", and he responded: "This is not good.  This is a big

10   warning that the user is about to be sent out of the app to a website.  I do not think the headline

11   should say 'continue', this is a warning that the user is about to go out to the web, and are they

12   sure they want to do that, we cannot verify that anything that occurs on the web is private and

13   secure.  The default button should not be 'continue'." (CX-268.11.)  In response, an employee

14   confirmed that "[w]e updated the title and the copy to be super clear on what is about to happen

15   and have more of that warning tone." (*Id.* at .10.)

16        On March 15, 2022, Apple held a meeting to discuss the warning screen for the

17   Netherlands and Japan response, which included Messrs. Schiller and Onak.  (CX-496.1.)

18   Immediately afterwards, employees developing the warning screen language had a debrief over

19   Slack to discuss how to implement Mr. Schiller's comments.  (Feb. 2025 Tr. 1355:13–22 (Onak);

20   CX-281.)  They also discussed how to make the language "scarier."  One employee said some of

21   the draft language "feels safe . . . like, don't worry, you're still within the app and it's just guiding

22   you somewhere else right now."  (CX-281.2.)  Rather, the language should sound like users are

23

24        [41] The Netherlands Authority for Consumers and Markets ("NACM") had issued a ruling
     requiring Apple to make changes to allow for alternative purchase mechanisms for dating apps.
25   Feb. 2025 Tr. 1325:6–19 (Onak).  Apple's work in response to the NACM's ruling was referred to
     as "████."  *See* CX-268.1; CX-281.5; Feb. 2025 Tr. 1357:24–1358:9 (Onak).  Similarly, Apple
26   was developing language for screens presented to users linking out for reader apps, in response to
     a Japanese Fair Trade Commission investigation.  Feb. 2025 Tr. 1326:2–10 (Onak).  Apple's work
27   in response to the Japanese FTC's investigation was referred to as "████."  *See* CX-281.5; Feb.
     2025 Tr. 1357:24–1358:9 (Onak).
28

1    sent "into the great wide open." (*Id.*) Mr. Onak commented that "if we want to 'scare' users a bit,

2    i like the addition of 'out' because it raises questions and hesitancy haha. out? out where? omg

3    what do i do?" (CX-281.3.)

4         Mr. Onak testified that "in term of UX writing, the word 'scary' doesn't . . . mean the same

5    thing as instilling fear." (Feb. 2025 Tr. 1340:10–12 (Onak).) Rather, "scary" is a term of art that

6    "means raising awareness and caution and grabbing the user's attention." (Feb. 2025 Tr. 1340:13–

7    15 (Onak).) Mr. Onak repeatedly asserted that the team's goal was simply "to raise caution so the

8    user would have all the facts so that they can make an informed decision on their own." (Feb.

9    2025 Tr. 1340:22–1341:2 (Onak).) Mr. Onak's testimony was not credible and falls flat given

10   reason, common sense, and the totality of the admitted exhibits. The designers' discussions

11   contextualize their use of the word "scary" to indicate its ordinary meaning and, most applicable

12   here, indicate the goal of deterring users as much as possible from completing a linked-out

13   transaction. Apple repeatedly acted to maintain its revenues and stifle competition. This was no

14   exception. His attempts to reframe the obvious meaning of these communications do not

15   persuade. All of this was hidden from the Court and not revealed in the May 2024 evidentiary

16   hearing.

17        After the June 20, 2023 meeting regarding this Court's Injunction, Apple decided that it

18   would implement a full screen warning after users click on an external link, regardless of which

19   commission option was ultimately selected. (Tr. 1180:12–19 (Schiller); CX-223.7.) At the

20   meeting, Mr. Cook "asked the team to revise the customer warning screen . . . to reference the fact

21   that Apple's privacy and security standards do not apply to purchases made on the web."

22   (CX-225.1.) The team updated the warning screen, sent it to Mr. Schiller for approval, and

23   returned the revised copy to Mr. Cook on June 23, 2023. (*Id.*) The updated warning screen

24   changed a sentence from "You will no longer be transacting with Apple" to "Apple is not

25   responsible for the privacy or security of purchases made on the web." (Feb. 2025 Tr. 1266:12–

26   18 (Schiller); CX-225.2.) As Ms. Goldberg's notes reflect, the idea discussed was that this

27   "[i]nterstitial . . . tells ppl its dangerous and they are leaving the app store." (CX-399.1; Feb. 2025

28   Tr. 1810:5–24 (Goldberg).)

United States District Court
Northern District of California

1    The presentation for the June 28, 2023 meeting reflects Mr. Cook's revision (*see* CX-291.5

2    ("Tim, based on your feedback, here is the System disclosure sheet with the updated copy on the

3    right.")), and is included in the final version of the warning screen that Apple adopted (Feb. 2025

4    Tr. 1267:19–23 (Schiller)).[42]  This "system disclosure sheet" pops up for every single user that

5    clicks on an external link, and for every single instance that a user clicks on any external link, not

6    just the first time.  (CX-3.5; May 2024 Tr. 725:8–14 (Schiller).)  Further, these chilled consumer

7    conduct, especially given the use of other informative "warning screens," like those asking to track

8    a user's activity across companies' apps and websites.  That information is not a "trivial" ask, but

9    by Mr. Fischer's admission, those "warnings" cover only a third or less than half of the screen,

10   this one covers the entire screen.  (CX-3.5; May 2024 Tr. 44:11–45:12 (Fischer).)

## 2.    Static URLs

12   A static URL is a web address that "simply is a specific place that the user is going to be

13   sent to."  (May 2024 Tr. 811:12–18 (Schiller).)  By contrast, a dynamic URL "can change"—it

14   "can send a user to different places."  (*Id.* 811:21–24 (Schiller).)  "[E]ven if it doesn't . . . a

15   dynamic URL can attach parameters, data, to the URL," which can include information "like user

16   identity, geolocation," or "[s]ession information about what the user's been doing, to pass along to

17   that website."  (*Id.* 811:24–812:17 (Schiller).)  For the Link Entitlement program, Apple requires

18   developers to use static URLs for external links.  (*Id.* 813:3–5 (Schiller).)

19   As explained by Epic's witness, Mr. Simon, static URLs can introduce friction in a

20   purchase flow where dynamic URLs do not.  Increased friction decreases competition.  For

21   instance, a dynamic link can identify the user and automatically log that user into their account

22   after clicking the link.  (May 2024 Tr. 953:8–23 (Simon).)  For a static URL, however, a user

23   would have to log in before making a purchase.  (*Id.* at 954:20–25.)[43]  As Mr. Simon attested,

---

25   [42] The final version adds an additional sentence absent from the June 28, 2023 version in small font: "Apple can't verify any pricing or promotions offered by the developer."  (CX-3.5.)

27   [43] That said, as Mr. Schiller explained, users can use Apple's key chain or password management tool so that the user automatically fills in their credentials and "[e]very subsequent visit [the site] will remember that and you will be logged in," as long as a user utilizes those tools. (May 2024 Tr. 813:17–814:9 (Schiller).)

some users on the fence about a purchase may decide to stop pursuing the transaction at that point. (*Id.* at 954:25–955:2.)[44]  He also indicated the static URL can create user confusion—some users may feel frustrated "because they feel misled about having purchased . . . in the app without knowing about the other [cheaper] options." (*Id.* at 959:6–8.)  Or a user may accidentally log in to or create a different account, purchasing the product for the wrong account. (*Id.* at 955:3–8.)[45]

As with the other restrictions discussed above, Apple claimed the static URL requirement protects users' security and privacy.  Mr. Schiller explained that a static URL "keeps the URL from being used to pass along information about the user without their knowledge from the app out to the website.  It has nothing to do with sending them to a page to find pricing.  It's about passing along parameters like their demographics." (May 2024 Tr. 813:6–14 (Schiller).)  Yet, despite these concerns, developers can program dynamic links for any other purpose—Apple in general only prohibits the use of dynamic links for external links for link-out purchases. (*See* May 2024 Tr. 90:8–17 (Fischer), 881:3–6 (Schiller), 952:16–19 (Simon).)  In fact, "any app that's connected to the internet doing anything nontrivial is going to have to use dynamic URLs." (May 2024 Tr. 957:3–20 (Simon) (explaining developers' various uses of dynamic URLs in-app).)  Thus, according to Mr. Simon, "[i]f dynamic URLs are a security risk," then "all of iOS is a security risk because the platform gives you every ability to make Internet requests with dynamic URLs." (*Id.* 957:21–958:2 (Simon).)[46]

Apple understood well that breakage increases with additional friction in the purchase flow (*see* Feb. 2025 Tr. 1643:4–8 (Vij); CX-224.16) and capitalized on that option.  Documents reveal

---

[44] Chatter among Apple's UX design team reveals agreement.  As one employee said, "i think personally that is why i wouldnt bother"—"more steps, have to find my card, type it all out. and then giving another company my details." (CX-206.4.)

[45] As Mr. Simon explained, after clicking a static URL, users may "log in or create an account with a different email address, which happens more often than you might think, in which case they would purchase for the wrong account, return to their mobile app, not have access, and usually that leads to them reaching out to our customer support."  May 2024 Tr. 955:3–8 (Simon).

[46] *See also* May 2024 Tr. 958:3–5 (Simon) ("Web browsing also, every web page has dynamic URLs on it.  So I think all of the Internet would sort of have to be a security risk for dynamic URLs to be a security risk.").

United States District Court
Northern District of California

that Bumble informed Apple in a May 2023 presentation that one additional step in Google's three-screen User Choice Billing system resulted in an approximately ■% drop-off rate for customers in a link-out transaction.  (CX-246.12.)

Again, here, the Court finds that Apple chose the most anticompetitive option to reduce the efficacy of external link-outs that compete with IAP (Primary and Overarching Finding No. 5).

### D.    Fourth Component: Limitations on Calls to Action

Under the final component of the Link Entitlement program, Apple prohibits developers from using calls to action other than the text of external links.  (*See* CX-3.5.)  Even when using an external link, a developer "must match the template language" that Apple provides—e.g., the "purchase template" requires a develop to say "Purchase from the website at www.example.com".  (*Id.*)  That statement—one of five templates which constitutes the external link for a link-out—is the entirety of the call to action that developers may use.  (May 2024 Tr. 85:21–25 (Fischer).)



(CX-3.5.)

A developer cannot use words beyond those provided in the templates to communicate with users about external purchase availability.  (May 2024 Tr. 85:25–86:3 (Fischer).)  A developer cannot say something like "buy cool new stuff over here," or "unlock new and special subscription content only when you [subscribe] on our website."  (*Id.* 86:4–10 (Fischer); *see also* Tr. 958:8–12 (Simon).)  If a developer wanted to compete on price not by offering lower prices but by offering other products or benefits on the web, there is no way to communicate that to a user in-app.  (May 2024 Tr. 86:14–18 (Fischer).)  Apple is aware that, absent these restrictions,

United States District Court
Northern District of California

developers *would* like to include calls to action directing users to their websites, including through text without a link if the developer can do so without paying a commission to Apple.  (*Id.* 107:21–108:1 (Fischer); Feb. 2025 Tr. 1883:3–7 (Schiller).)

Despite testimony to the contrary,[47] some working on Project Wisconsin did consider permitting unlinked and unrestricted calls to action with no commission as to calls of action.  The appendix to the June 1, 2023 presentation given to Mr. Cook includes an Option 3, which would provide for a commission on linking out with "0% Commission on In-App Text Communications."  (CX-859.54.)  Option 3 would "introduce[] . . . the additional information allowed to be presented but without a link to customers as mentioned where we would not charge a commission."  (*Id.*)  In this scenario, Apple assessed "the incremental impact that may happen as more customers might migrate to the web with this additional information being presented to them."  (*Id.*)  Apple estimated that, if in-app text communications caused 5% migration to the web, Apple would lose hundreds of millions ($███████) in revenue.  (*Id.*)  On the high end, at 25% migration, Apple would lose over a billion ($██████) in revenue.  (*Id.*)  As Mr. Schiller acknowledged, Apple recognized—at least from Mr. Barton and the finance team, who were designated to present Option 3—that unlinked and unrestricted calls to action could foster competition against Apple's IAP by causing customer migration to developer websites.  (Feb. 2025 Tr. 1891:18–1892:2 (Schiller); CX-859.54.)

Again, Apple chose the most anticompetitive option (Primary and Overarching Finding No. 6).

### E.    Program Exclusions

In creating the Link Entitlement program, Apple specifically excluded certain developers,

---

[47] Before this Court required that the June 1, 2023 presentation be produced, Mr. Schiller testified that "we didn't consider . . . that developer would want to not include a link with their call to action . . . .  It just hadn't crossed our mind that somebody would want that."  (Tr. 1309:21–1310:2 (Schiller); *see also id.* at 1882:24–1883:2.)  He qualified that "of course that's something we'd be happy to consider."  (Tr. 1309:25–1310:1 (Schiller).)  When shown the presentation, Mr. Schiller acknowledged that the presentation, albeit in an appendix, does discuss in-app text communication without a link and without commission, although he still did not recall the discussion.  (Tr. 1890:13–20 (Schiller).)

namely those in Apple's Video Partner Program ("VPP") and its News Partner Program ("NPP"). (May 2024 Tr. 261:23–262:1 (Roman).) Those programs have a standard commission rate of 15%, rather than IAP's 30% commission. (*Id.* at 262:2–4.) Under the new rule, if a subscription video app like Disney+ or a newspaper publisher like the New York Times uses external purchase links in their app, they will no longer be eligible for the VPP or NPP 15% commission rate and would be subject to the standard 30% IAP commission for all in-app purchases. (*Id.*) Said differently, and simply, including an external purchase link in their app doubles their commission rate. (*Id.* at 262:11–13.)

In December 2022, Apple considered how to treat programs including VPP and NPP in the event Apple would need to change its business model to meet the requirements of the Digital Markets Act, a European Union regulation. (Feb. 2025 Tr. 1724:8–18 (Vij); CX-231.) The presentation notes that, among other benefits to Apple, VPP and NPP "can serve as a tool for retaining developers exclusively on Apple IAP." (CX-231.8.) This is because the effect of losing program benefits—the lower commission rate—makes choosing alternative payments more costly given the commission rate increases to Apple's standard IAP commission. (*See* Feb. 2025 Tr. 1730:7–21 (Vij).)

Apple repurposed its EU analysis for the June 28, 2023 presentation regarding this Court's injunction. (*Compare* CX-231.8 *with* CX-291.13.) This time, no reference is made to how the exclusion can serve as a tool for IAP retention, noting instead that excluding VPP and NPP developers from the Link Entitlement "[r]equire[s] participants to maintain high bar of user experience and ecosystem integration aligned with partner program goals" and there would be a "[l]imited number of developers impacted." (CX-291.13.) At the same time, Apple believed that very large developers like those participating in VPP and NPP were the most likely to use linked purchases if Apple charged a commission. (Feb. 2025 Tr. 1722:2–14 (Vij).) Apple acknowledged that excluding these developers from the program would deter adoption of link-out purchases in the United States, because link-outs would be much more costly due to the commission rate doubling from 15% to 30%. (*Id.* 1733:2–15 (Vij).) To underscore this reasoning, the presentation for the June 20, 2023 meeting with Mr. Cook provides data projecting that Apple would lose more

United States District Court
Northern District of California

1    revenue if developers participating in VPP or NPP were still eligible for program discounts.

2    (*Id.* 1218:17–1221:7 (Schiller).)[48]

3         Apple workshopped how to articulate the rationale for VPP and NPP program exclusion

4    from the Link Entitlement. Notes from a June 26, 2023 Project Wisconsin meeting indicate that

5    Mr. Vij was slated to present on "Program Eligibility" and that the team wanted a "more nuanced

6    way to write our positioning here," floating the idea that they "want to maintain a high bar of user

7    experience for participants." (CX-506.3.) Yet, on June 28, 2023, Mr. Vij messaged Mr. Oliver

8    that he thought "our argument on vpp npp is weak" and acknowledged "[o]n VPP and NPP the

9    argument on the high bar can be made with the discount as well." (CX-511.2, .5.) Mr. Oliver

10   responded that he did not "think it's the same" and that "VPP and NPP are unique programs that

11   have specific requirements to ensure a distinct user experience on Apple's platforms."

12   (CX-511.6.) Thus, even though the program eligibility slide in the June 28, 2023 presentation was

13   pulled from the EU presentation that indicated VPP and NPP exclusion could serve as an IAP

14   retention tool, the slide used for Project Wisconsin presents Mr. Oliver's rationale instead and

15   scrubs any mention of the retention benefits for excluding VPP and NPP. (CX-505.16.)[49]

16        Here too, Apple chose the most *anti*competitive course.

17                          *       *       *

18        Finally, under the Link Entitlement, Apple reserves the right in its sole discretion to revoke

19

20        [48] *Compare* CX-224.30 (revenue impact with "[l]ink-out billings not eligible for program
     discounts") *with id.* at CX-224.33 (revenue impact where "[l]ink-out billings are eligible for
21   program discounts"). On their face, the revenue difference is minimal. However, Mr. Schiller
     agreed that because the revenue impact projections for link-out billings where program discounts
22   are ineligible factors in a 30% collection risk, on an "apples-to-apples comparison" of the two
     slides, the projected revenue loss is actually much larger. Feb. 2025 Tr. 1220:16–1221:7
23   (Schiller).

24        [49] Epic also emphasizes Apple witness testimony acknowledging that even though the
     Injunction applies to all developers, they made the deliberate decision to exclude participation in
25   VPP and NPP from participation in the Link Entitlement. *See, e.g.*, May 2024 Tr. 488:23–489:22
     (Oliver). While VPP and NPP developers lose program benefits if they choose to utilize external
26   links, they are ultimately subject to the same restrictions as any other developer selling digital
     products. To be sure, this loss of program benefits highlights Apple's clear design to forbid
27   competitive alternatives to IAP, but this does not mean that Apple has carved out a class of
     developers from their compliance program. Viewed from any angle, Apple's first priority was to
28   protect its bottom line.

United States District Court
Northern District of California

a link entitlement at any time.  (May 2024 Tr. 31:14–16 (Fischer); CX-2.3 § 2.3.)  This rule targets external links mandated by the Injunction—Apple permits developers to include links to external websites for non-transaction purposes without applying for an entitlement or obtaining permission from Apple.  (May 2024 Tr. 31:23–32:2 (Fischer).)  Apple does *not* require developers who sell physical goods or services to apply for any type of entitlement before their app links to a third-party payment solution.  (*Id.* at 32:7–11.)

As of the May 2024 hearing, only 34 developers out of the approximately 136,000 total developers on the App Store applied for the program, and seventeen of those developers had not offered in-app purchases in the first place.[50]  In May 2024, Apple argued that it would take more time for developers to take advantage of the Link Entitlement and that the adoption rates could not be known.  (*E.g.*, May 2024 Tr. 278:3–5 (Roman), 761:12–762:8 (Schiller).)  Apple attempted here to mislead.

Given the revelations of the February 2025 hearing, Apple modeled the lack of adoption. That Apple adduced no testimony or evidence indicating developer adoption of the program is no surprise.  As shown above, Apple knew it was choosing a course which would fail to stimulate any meaningful competition to Apple's IAP and thereby maintain its revenue stream.

## IV.    DISCUSSION

Before the Court are several motions, three of which form the primary discussion.  *First*, Apple moves to set aside this Court's judgment and injunction based on two intervening cases handed down after the judgment issued.  *Second*, Epic moves to enforce the injunction and hold Apple in civil contempt for blatantly violating the injunction.  *Third*, Apple moves for indemnification under the DPLA after the Ninth Circuit's reversal of this Court's prior findings. The Court considers each.

### A.    Apple's Motion to Set Aside Judgment

As a preliminary matter, Apple moves under Rule 60(b) to set aside this Court's judgment

---

[50] As of the May 2024 hearings, Mr. Oliver testified that he had no discussions with any large developers about using the Link Entitlement.  (May 2024 Tr. 499:22–25 (Oliver).)

United States District Court
Northern District of California

1    based on two decisions issued after the judgment and injunction: *Beverage v. Apple, Inc.*, 320 Cal.

2    Rptr. 3d 427 (Cal. Ct. App. 2024), *review denied* (July 10, 2024), and *Murthy v. Missouri*, 603

3    U.S. 43 (2024).

4         Reconsideration under Federal Rule of Civil Procedure 60(b) "is an 'extraordinary remedy

5    that works against the interest of finality and should be applied only in exceptional circum-

6    stances.'" *FTC v. Apex Cap. Grp.*, 2021 WL 7707269, at *2 (C.D. Cal. Sept. 3, 2021) (citation

7    omitted). "Motions for relief from judgment pursuant to Rule 60(b) are addressed to the sound

8    discretion of the district court and will not be reversed absent an abuse of discretion." *Casey v.*

9    *Albertson's Inc*, 362 F.3d 1254, 1257 (9th Cir. 2004).

10         Rule 60(b)(5) permits a court, "[o]n motion and just terms," to "relieve a party or its legal

11    representative from a final judgment" when "applying it prospectively is no longer equitable."[51]

12    Relief is warranted "when the party seeking relief from an injunction or consent decree can show

13    'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215

14    (1997) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). "[W]hen a

15    district court reviews an injunction based solely on law that has since been altered to permit what

16    was previously forbidden, it is an abuse of discretion to refuse to modify the injunction in the light

17    of the changed law." *California by & through Becerra v. U.S. Env't Prot. Agency*, 978 F.3d 708,

18    718–19 (9th Cir. 2020).

19         According to Apple, *Beverage* and *Murthy* present significant changes in the law under-

20    lying Apple's judgment that warrant relief therefrom. In *Beverage*, Apple contends the California

21    Court of Appeal now explicitly permits what this Court held was forbidden. As for *Murthy*, Apple

22    argues the decision changed the law of standing as to require this Court, at a minimum, to limit the

23    injunction's reach to only Epic and its affiliates.

24

25

26        [51] Apple also references Rule 60(b)(6), which permits a court to relieve a party from a final
judgment for "any other reason that justifies relief." Rule 60(b)(6) is "used sparingly as an

27    equitable remedy to prevent manifest injustice" and is used "only where extraordinary circum-
stances prevented a party from taking timely action to prevent or correct an erroneous judgment."

28    *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1103 (9th Cir. 2006) (citations omitted).

### 1.    *Beverage v. Apple, Inc.*

In *Beverage*, two plaintiffs who made purchases through the App Store in Fortnite for use on iOS devices sued Apple on behalf of themselves and a putative class, alleging that "Apple's restrictions on app distribution increased the prices developers charge iOS device users, and that Apple's anti-steering restrictions 'artificially increase' Apple's power within the market for mobile gaming transactions." *Beverage*, 320 Cal. Rptr. 3d at 433. Plaintiffs asserted three causes of action for violations of (1) the Cartwright Act, (2) the "unlawful" prong of the UCL, and (3) the "unfair" prong of the UCL. *Id.* at 433–34.

The trial court granted Apple's demurrer, finding that plaintiffs failed to state a claim under the Cartwright Act and the "unlawful" prong of the UCL as a matter of law because they alleged only unilateral conduct by Apple, which was immunized from antitrust liability under *Colgate*. *Id.* At 434. The claim for violations of the "unfair" prong of the UCL was then barred by *Chavez*. *Id.*

The Court of Appeal affirmed and elaborated on the legal framework. Under the Cartwright Act, "unlike its federal counterpart, the Sherman Act, 'single firm monopolization is not cognizable . . . .'" *Id.* at 436 (citation omitted) (quoting *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 138 Cal. Rptr. 3d 620, 626 (Cal. Ct. App. 2012)). Instead, a plaintiff must allege the formation and operation of a conspiracy and illegal acts done in furtherance of the conspiracy. *Id.* at 437. "Conversely, a claim describing only a unilateral refusal to deal without alleging a corresponding illegal conspiracy or combination does not state an actionable antitrust claim." *Id.* The premise underlying this proposition—that "'a private party generally may choose to do or not do business with whomever it pleases' without violating antitrust laws"—is known as the *Colgate* doctrine. *Id.* (quoting *Drum v. San Fernando Valley Bar Assn.*, 106 Cal. Rptr. 3d 46, 51 (Cal. Ct. App. 2010)); *see also United States v. Colgate & Co.*, 250 U.S. 300 (1919). Additionally, under *Cel-Tech*, "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." *Id.* at 435 (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999)).

"In *Chavez*, a case decided after *Cel-Tech*, the court applied the *Colgate* doctrine to

preclude a UCL cause of action" because "the plaintiff failed to plead facts sufficient to establish a coerced agreement in violation of the Cartwright Act or the 'unlawful' prong of the UCL." *Id.* at 438 (discussing *Chavez v. Whirlpool Corp.*, 113 Cal.Rptr.2d 175 (Cal. Ct. App. 2001)).[52]  By the same token, the *Chavez* plaintiffs failed to state a claim under the UCL's "unfair" prong, because "the determination that the conduct is not an unreasonable restraint of trade" under the Cartwright Act or the "unlawful" prong of the UCL "necessarily implies that the conduct is not 'unfair' toward consumers." *Id.* (quoting *Chavez*, 113 Cal.Rptr.2d at 184).  "To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." *Chavez*, 113 Cal.Rptr.2d at 184.

Before the Court of Appeal, the *Beverage* plaintiffs' "challenge [was] limited only to the dismissal of their cause of action under the 'unfair' prong of the UCL," because plaintiffs had "abandoned any claim of error in the other aspects of the trial court's ruling on Apple's demurrer." *Id.* at 439.  Thus, the Court of Appeal presumed that plaintiffs' causes of action under the Cartwright Act and the "unlawful" prong of the UCL were legally insufficient under the *Colgate* doctrine.  *Id.*  As a consequence, plaintiffs presented the Court of Appeal with a narrow question, namely whether plaintiffs "adequately alleged an 'unfair' act or practice under the UCL considering the trial court's ruling that Apple's practices constituted permissible unilateral conduct." *Id.*; *see also id.* at 434 ("The central premise of Plaintiffs' argument is that *Chavez* was wrongly decided to the extent it held that a failed antitrust claim cannot be replead as an unfair business practice under the UCL.").

The Court of Appeal concluded "that the *Colgate* doctrine provides Apple with a 'safe harbor' against Plaintiffs' UCL claim under the 'unfair' prong." *Id.* at 441.  Consistent with *Chavez*, "a plaintiff cannot plead around the absolute bar imposed by the *Colgate* doctrine by

---

[52] *See also Beverage*, 320 Cal.Rptr.3d at 438 ("[A] manufacturer's announcement of a resale price policy and its refusal to deal with the dealers who do not comply coupled with the dealers' voluntary acquiescence in the policy does not constitute an implied agreement or an unlawful combination as a matter of law." (quoting *Chavez*, 113 Cal.Rptr.2d at 182.))

*United States District Court*
*Northern District of California*

resurrecting a failed antitrust claim as an unfair business practice under the UCL, especially when, as here, the only other cause of action alleged in the SAC was a violation of the Cartwright Act." *Id.* at 440.

Applied to this case, *Beverage* does not warrant setting aside this Court's judgment and Injunction. *First*, *Beverage* did not change California law. The plaintiffs argued that "*Chavez* was wrongly decided and is 'wholly inconsistent' with *Cel-Tech*." *Id.* at 439. The Court of Appeal disagreed: "*Chavez* is entirely consistent with *Cel-Tech*," and "[i]ts holding has been adopted and applied by other California Courts of Appeal." *Id.* at 440–41. In other words, the *Beverage* decision explicitly declined to change California law. Ironically, Apple agrees: despite Apple's motion before this Court, in Apple's answer to the *Beverage* plaintiffs' petition for review in the Supreme Court of California, Apple wrote that the "decision below followed a decision of the Second Appellate District that reached the same result more than 20 years ago, *Chavez v. Whirlpool Corp.* . . . . California courts have followed *Chavez* for more than two decades, and no California appellate court has questioned or departed from its holding." Answer to Petition for Review ("Apple's Answer to Petition") at 7, *Beverage v. Apple Inc.*, No. S285154 (Cal. June 18, 2024).[53]

*Second*, this Court's judgment does not conflict with *Beverage*. The *Beverage* court stressed that its "decision is a narrow one" which "is limited to situations typified by this case, where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the 'unfair' prong of the UCL." *Beverage*, 320 Cal. Rptr. 3d at 442. That is not this case. Neither this Court nor the Ninth Circuit have held that Apple's conduct at-issue in this case is immune from antitrust liability under the *Colgate* doctrine, nor did either court disagree

---

[53] Apple continued, explaining that "[i]n the Court of Appeal, plaintiffs conceded that the *Chavez* decision would bar their 'unfair' claim under the UCL. Plaintiffs urged the Court of Appeal to disagree with *Chavez* and adopt a different rule. In declining to do so, that court relied on settled principles and emphasized the 'narrow' nature of its holding, stressing that its 'decision is limited to' situations 'where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the "unfair" prong of the UCL.'" Apple's Answer to Petition at 7.

United States District Court
Northern District of California

1  with the law articulated in *Colgate* or *Chavez*.[54]

2          Once again, Apple's answer to the *Beverage* plaintiffs' petition for review in the Supreme

3  Court of California is instructive.  In its briefing, Apple argued that the *Beverage* plaintiffs "are

4  wrong" to "argue that *Chavez* and the decision below are inconsistent with decisions in a federal

5  court lawsuit involving Epic Games," i.e., this case.  Apple's Answer to Petition at 11–12.  "The

6  Ninth Circuit did not disagree with *Chavez*, nor did it address the applicability of the *Colgate*

7  doctrine to the conduct challenged in that case, and therefore did not resolve the issue presented in

8  this case."  *Id.* at 12.  The *Beverage* court itself acknowledged as much.  *See Beverage*, 320 Cal.

9  Rptr. 3d at 446 n.6 ("The Ninth Circuit and the district court mentioned *Chavez* only in passing,

10  and neither court engaged a rigorous analysis of the *Colgate* doctrine and its effect on UCL

11  claims.  We therefore do not find these decisions persuasive on the precise issue presented by this

12  appeal.").

13          Apple had the opportunity to argue that *Colgate* immunized its antitrust liability before this

14  Court in the first instance, before the Ninth Circuit, and on petition for certiorari at the Supreme

15  Court.  Direct appeal was the appropriate route for a challenge under *Colgate*, and Apple lost on

16  appeal.  Apple cannot revisit its prior losses under Rule 60(b) absent a significant change in

17  factual conditions or the law, and *Beverage*'s affirmance of settled California law does not change

18  to the legal theories previously available to Apple at trial and on appeal.[55]

19          *Third*, *Beverage* does not "permit what was previously forbidden."  *See California v. EPA*,

20

21          [54] The Ninth Circuit in fact acknowledged that in *Chavez*, "the *Colgate* doctrine—that it is

22  lawful for a company to unilaterally announce the terms on which it will deal—precluded a UCL
    action."  *Epic Games, Inc.*, 67 F.4th at 1001.  However, the Ninth Circuit explained that "[n]either

23  Apple nor any of its *amici* cite a single case in which a court has held that, when a federal antitrust
    claim suffers from a *proof deficiency*, rather than a *categorical legal bar*, the conduct underlying

24  the antitrust claim cannot be deemed unfair pursuant to the UCL."  *Id.*

25          [55] The parties also use Apple's Rule 60(b) motion to dive into the merits of *Colgate*'s
    applicability.  For example, Epic appears to suggest that *Colgate* may not apply because the Ninth

26  Circuit's decision—issued after the *Beverage* trial court's decision—concluded that Apple's
    agreements with developers constituted bilateral contracts rather than unilateral conduct for the

27  purposes of Epic's Sherman Act Section 1 claims.  (*See* Dkt. No. 1049, Epic's Opp. at 16 n.4.)
    Regardless, for the reasons stated above, this Court declines the invitation to revisit those merits

28  where *Beverage* made no change to settled California law.

United States District Court
Northern District of California

978 F.3d at 719.  The *Beverage* trial court dismissed the plaintiffs' claims at the motion to dismiss stage, and the Court of Appeal *assumed without deciding* that Apple's conduct *as pled* was permissible under the Cartwright Act, because plaintiffs conceded that issue for purposes of appeal.  *Beverage*, 320 Cal. Rptr. 3d at 439.  The Court of Appeal did not decide whether Apple's anti-steering provisions violated antitrust law and was faced instead with the narrow question of whether plaintiffs' concession as to their Cartwright Act claims rendered their UCL unfairness claim non-cognizable as a matter of pleading.[56]

Beverage* does not warrant setting aside this Court's judgment and injunction under Rule 60(b).

### 2. *Murthy v. Missouri*

In *Murthy*, the "plaintiffs, two States and five social-media users, sued dozens of Executive Branch officials and agencies, alleging that they pressured the platforms to suppress protected speech in violation of the First Amendment."  *Murthy*, 603 U.S. at 49.  The Fifth Circuit agreed and "affirmed a sweeping preliminary injunction."  *Id.*  The Supreme Court reversed, holding that the plaintiffs failed to establish standing by "demonstrat[ing] a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek."  *Id.* at 49–50, 76.

The Supreme Court reiterated the familiar rule that, to establish standing, at least one plaintiff "must show that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Id.* at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  The *Murthy* plaintiffs claimed "standing based on the 'direct censorship' of their own speech as well as the 'right to listen' to others who faced social media censorship."  *Id.*  However, both theories depended on the conduct of *third-party* social media platforms, rather than the conduct of the *defendant* Government agencies and officials alone.  *Id.*  This "one-step-removed, anticipatory

---

[56] By contrast, both this Court and the Ninth Circuit developed and evaluated a trial record that involved both state and federal antitrust claims not implicated in *Beverage*.

1   nature of their alleged injuries" presented two particular challenges.  *Id.*

2   First, "it is a bedrock principle that a federal court cannot redress 'injury that results from

3   the independent action of some third party not before the court,'" *id.* (quoting *Simon v. E. Ky.*

4   *Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)), and as a consequence courts are "reluctant to

5   endorse standing theories that require guesswork as to how independent decisionmakers will

6   exercise their judgment," *id.* (quoting *Clapper*, 568 U.S. at 413).  For those theories, plaintiffs

7   must show that the third party "will likely react in predictable ways" to the defendants' conduct.

8   *Id.* at 57–58 (citation omitted).  Second, the Supreme Court explained that "because the plaintiffs

9   request forward-looking relief, they must face 'a real and immediate threat of repeated injury.'" *Id.*

10  at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

11  "Putting these requirements together, the plaintiffs must show a substantial risk that, in the

12  near future, at least one platform will restrict the speech of at least one plaintiff in response to the

13  actions of at least one Government defendant."  *Id.*  "On this record, that is a tall order."  *Id.*  "The

14  primary weakness in the record of past restrictions is the lack of specific causation findings with

15  respect to any discrete instance of content moderation."  *Id.* at 59.  Neither the district court nor

16  the Fifth Circuit made any specific causation findings.  *Id.*  Operating at such a high level of

17  generality, the Supreme Court explained, was insufficient to establish standing in a "sprawling suit

18  like" *Murthy* where "plaintiffs faced speech restrictions on different platforms, about different

19  topics, at different times," "[d]ifferent groups of defendants communicated with different

20  platforms, about different topics, at different times," and each platform had "independent

21  incentives to moderate content."  *Id.* at 61.  Nor did plaintiffs' allegations support "obtain[ing]

22  forward-looking relief": "without proof of an ongoing pressure campaign, it is entirely speculative

23  that the platforms' future moderation decisions will be attributable, even in part, to the

24  defendants."  *Id.* at 69.

25  Applied to this case, *Murthy* does not warrant setting aside this Court's judgment and

26  Injunction against Apple.  *First*, *Murthy* did not change the law of standing, but rather applied

27  familiar rules of standing to a novel circumstance.  Apple argues that the "Court in *Murthy*

28  explained that it is a 'tall order' to establish standing for an injunction when the plaintiff's theory

of future injury depends on anticipated conduct of 'independent decisionmakers.'" (Dkt. No. 1018 at 12.) That mischaracterizes *Murthy*: as to establishing plaintiffs' standing, the Court wrote that "[o]*n this record*, that is a tall order." *Murthy*, 603 U.S. at 58 (emphasis supplied). Rather, the Court stressed that it was *not* applying a new and elevated standard. *See id.* at 74 n.11.

Second, Apple muddles the law and advances an argument that has little to do with *Murthy*. As Epic points out, Apple conflates two issues: whether Epic has standing to obtain an injunction, and the appropriate scope of that injunction. As to Epic's standing, while *Murthy* articulates the applicable legal framework at a high level, *Murthy* neither changes that framework nor addresses the foundation of Epic's standing to challenge Apple's anti-steering provisions, i.e., injury to Epic as a competing game distributor and injury to Epic's subsidiaries' earnings. *See Epic Games, Inc.*, 67 F.4th at 1000.

As to the appropriate *scope* of an injunction once a party has established standing, *Murthy* provides no instruction because *Murthy* did not reach that distinct question. The Ninth Circuit's opinion in this case is indicative: that opinion discussed Epic's standing in one section under one set of legal standards, and the availability and scope of the injunction in another section under a different set of legal standards. *See Epic Games, Inc.*, 67 F.4th at 999–1000, 1002–03. The same is true for Judge Smith's concurrence in the order granting the motion to stay the mandate pending filing a petition for certiorari. *See Epic Games, Inc. v. Apple, Inc.*, 73 F.4th 785 (9th Cir. 2023) (Smith, J., concurring).

Apple's citation to *Murthy* is the latest installment in its repeated attempts to cabin the scope of the injunction. Fundamentally, Apple argues that "[u]nder *Murthy*, Epic lacks standing to enjoin Apple's application of its anti-steering rules toward third-party developers." (Dkt. No. 1018 at 13.)[57] To be clear, neither this Court nor the Ninth Circuit have held, as Apple continues

---

[57] *See also* Dkt. No. 1018, Apple's Mot. to Set Aside at 13 ("Epic had the burden of proving that (1) third-party developers would imminently react to a change in Apple's policies by steering iOS users to the Epic Games Store as a place for purchasing in-app digital goods or services; (2) such steering by third-party developers would imminently cause their customers to make purchases on the Epic Games Store through external links; and (3) enjoining Apple's restrictions on such steering would imminently cause an indirect increase in Epic's profits.").

1    to try and mischaracterize, that Epic has obtained injunctive relief *on behalf of* third parties.[58]

2    Rather, Epic has standing to seek injunctive relief with respect to *its own injuries*.  That relief, as

3    this Court, the Ninth Circuit, and Judge Smith's concurrence on the order to stay made clear,

4    "enjoin[ed] Apple's anti-steering provision as to all iOS developers because doing so was

5    necessary to fully remedy the harm *that Epic suffers* in its role as a competing games distributor."

6    *Epic Games, Inc.*, 73 F.4th at 787 (Smith, J., concurring) (emphasis supplied).  Apple's arguments

7    to the contrary and mischaracterization of those findings have been repeatedly rejected.[59]

8         In short, *Murthy* has little to do with this case, does not change the relevant law, and as

9    such does not warrant setting aside this Court's judgment and injunction.[60]

10                          *        *        *

11        Because neither *Beverage* nor *Murthy* have altered the law, the factual circumstances of

12   this case, or now "permit what was previously forbidden," *California v. EPA*, 978 F.3d at 719,

13   Apple has failed to show that applying the judgment "prospectively is no longer equitable."

14   Fed. R. Civ. P. 60(b)(5).  Thus, Apple's motion for relief from the judgment is **DENIED**.

---

[58] *See, e.g.*, Dkt. No. 1018, Apple's Mtn. to Set Aside at 14 ("To be sure, Judge Smith's concurrence in the order staying the mandate stated that record is 'filled with support' for Epic's standing to enjoin Apple's conduct towards third-party developers.").

[59] Apple advanced the same argument in substance when seeking a stay of the injunction pending filing of a writ of certiorari.  *See Epic Games, Inc.*, 73 F.4th at 788 (Smith, J., concurring) ("Apple contends that the district court's injunction impermissibly allowed Epic's suit to proceed as a 'de facto' class action in which Epic obtained nationwide injunctive 'relief on behalf of others.' . . . Like its standing argument, this argument overlooks aspects of the panel opinion's analysis that are inconvenient to its position and is incorrect.  As the opinion explained, it was Epic's role as a competing games distributor—not its role as a parent company—that justified application of the injunction beyond just Epic's subsidiaries.").

[60] Apple's other contentions with respect to *Murthy* lack merit.  For instance, Apple's argument focuses on *Murthy*'s language that courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 413).  However, Epic's injury does not depend on third-party decisionmakers, but Apple's anti-steering provisions.  Apple also argues that the *Murthy* court engaged in a detailed, plaintiff-by-plaintiff analysis of injury, and the Ninth Circuit's "two short sentences" of analysis are insufficiently specific under *Murthy*.  Dkt. No. 1018 at 12–13.  For one, *Murthy* did not alter the standard of review applicable in this case.  Regardless, as Judge Smith wrote in his concurrence on the order to stay, the record is "filled with support for the common-sense proposition that Epic is harmed as a competing games distributor."  *Epic Games, Inc.*, 73 F.4th at 786.  That the panel's *analysis* is concise does not reduce the support in the record.

54

### B.    Epic's Motion to Enforce Injunction

On March 13, 2024, Epic moved to enforce the Injunction after Apple released its compliance program with the Link Entitlement.  (Dkt. No. 897.)  Epic requests that this Court "enter an order (1) holding Apple in contempt for violating the Court's Injunction; (2) requiring Apple to promptly bring its policies into compliance with the Injunction; and (3) requiring Apple to remove all anti-steering provisions" in its developer guidelines." (*Id.*)

The Court may hold Apple in civil contempt if Apple violated "a specific and definite court order by failure to take all reasonable steps within the part's power to comply."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  "[T]he party alleging civil contempt must demonstrate by clear and convincing evidence that (1) the contemnor violated a court order, (2) the non-compliance was more than technical or de minimis, and (3) the contemnor's conduct was not the product of a good faith or reasonable interpretation of the violated order."  *Facebook, Inc. v. Power Ventures, Inc.*, 2017 WL 3394754, at *8 (N.D. Cal. Aug. 8, 2017).  Sanctions for civil contempt are warranted where a court "weighs all the evidence properly before it" and determines that there is a "present ability to obey" and past "failure to do so [that] constitutes deliberate defiance or willful disobedience which a coercive sanction will break."  *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 n.6 (9th Cir. 1983).  In awarding civil contempt sanctions, the Court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probably effectiveness of any suggested sanction."  *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1983).[61]

"Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).[62]  "In deciding whether an injunction has been

---

[61] "Substantial compliance with the court order is a defense to civil contempt," and "a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order."  *Id.* (cleaned up); *but see In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) ("The contempt 'need not be willful,' and there is no good faith exception to the requirement of obedience to a court order." (quoting *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987))).

[62] *See also Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (The "injunction must be clear

55

United States District Court
Northern District of California

1    violated it is proper to observe the objects for which the relief was granted and to find a breach of

2    the decree in a violation of the spirit of the injunction, even though its strict letter may not have

3    been disregarded." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935,

4    949 (9th Cir. 2014) (quoting *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d

5    Cir. 1942)).  "[A]ll ambiguities are resolved in favor of the person subject to the injunction."

6    *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (citation omitted).

7         The Court's analysis is divided in two parts.  *First*, the Court considers Apple's defense

8    that it need not look outside the text of the Injunction and considered this Court's and the Ninth

9    Circuit's orders that explained the legal basis for the injunction.  *Second*, for efficiency purposes,

10   the Court has indicated in the factual section above each time it found that Apple had chosen to

11   respond to the Injunction with the most anticompetitive options it considered.  That, taken

12   together, evidences clear and convincing evidence of Apple's violation of the Injunction.

13   Nonetheless, the Court expounds further on how Apple's response violates this Court's orders.

### 1.    The Letter and Spirit of the Injunction

15        As a preliminary matter, Apple disputes whether this Court can look outside the four

16   corners of the injunction to hold it in civil contempt.  In *Sea Shepard*, the Ninth Circuit provided

17   that "it is proper to observe the objects for which the relief was granted and to find a breach of the

18   decree in a violation of the spirit of the injunction, even though its strict letter may not have been

19   disregarded."  774 F.3d at 949.  Despite this unequivocal language, Apple argues that the Court

20   cannot look to the spirit or other objects of the Injunction and judgment issued against it relying on

21   one district court case that appears to have tried to limit *Sea Shepherd* to its facts.  *See Epona, LLC*

22   *v. Cnty. of Ventura*, 2019 WL 4187393, at *14 (C.D. Cal. Apr. 12, 2019) ("*Sea Shepherd* did not

23   conclude that a party may be held in contempt for refusing to engage in affirmative conduct that is

24   not required by the terms of a prohibitory injunction, or for engaging in conduct that is not

25   specifically and definitely prohibited therein.").

27   enough on its face to give . . . notice that the behavior is forbidden."); *cf. Reno Air Racing Ass'n,*
     *Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) ("The recipient of a TRO, which usually
28   takes effect immediately, should not be left guessing as to what conduct is enjoined.").

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court disagrees.  There are several issues with Apple's argument.  *First*, it is ludicrous to expect any court to repeat the contents of a 180-page order issued in conjunction with a simultaneously issued one-paragraph injunction.  The latter flows from the former.  To suggest otherwise strains credulity.  *Second*, even limited to the four corners of the Injunction, Apple violated the literal text.  *Third*, contrary to Apple's position, other courts within this and other circuits will look to the spirit of the injunction when a litigant applies a dubiously literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals.  *See, e.g.*, *Simon v. City & Cnty. of San Francisco*, No. 22-CV-05541-JST, 2024 WL 4314207, at *3 (N.D. Cal. Sept. 26, 2024) ("Arguably, this conduct does not violate the strict terms of the injunction . . . .  [However,] there can be no question that the conduct violates the spirit of the injunction."); *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942) ("In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded."); *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972) (While ambiguities are resolved in favor of the person charged with contempt, "this is not to say that where an injunction does give fair warning of the acts that it forbids, it can be avoided on merely technical grounds.  The language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent."); *see also Cnty. of Fulton v. Sec'y of Commonwealth*, 292 A.3d 974, 1007 (Pa.), *cert. denied* 144 S. Ct. 283 (2023) ("To similar effect is a long list of cases, including a Second Circuit case in which the court rejected a defense based upon a dubiously literal interpretation of an order . . . .").

*Fourth*, Apple's approach would require courts to effectively engage in a "whack-a-mole" game to require compliance.  Consider Justice Douglas's reasoning in *McComb v. Jacksonville Paper Company*:

> It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined.  Such a rule would give tremendous impetus

United States District Court
Northern District of California

> to the program of experimentation with disobedience of the law which we condemned [previously]. The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.

336 U.S. 187, 192–93 (1949). This case presents the same reality today and risk for tomorrow. The Court prohibited certain of Apple's policies that prevented meaningful competition with IAP. Apple rewrote those policies by choosing a different anticompetitive path (that was *more* expensive for developers) with full knowledge of what it was doing. Apple had its opportunity to conduct a bottoms-up analysis of the value of its services. It declined to do so. Instead, it opted to construct a program that nullified the revenue impact of the Injunction by prohibiting any viable alternative.

*Fifth*, Apple's arguments that the Court did not enjoin Apple's commission ignore explicit findings in the Injunction. Most importantly, this Court, and the Ninth Circuit, found Apple's 30% commission on IAP transactions was supracompetitive and unjustified. The Court and the Ninth Circuit further found that Apple's then-existing program to stifle competition violated the UCL, especially as seen in the anti-steering provisions. Thus, all acts are based upon those identified above as the "Primary and Overarching Findings" resulting in this contempt order.

Crucially, no commissions had ever existed on external link-out purchases. That is undisputed. Apple's *new* attempt to change this "zero commission" rubric are evaluated under the terms of the Injunction. While true that the Court did not select a rate, the Court is authorized to evaluate Apple's response to the Injunction as based on its Primary and Overarching Findings. *See Epic Games, Inc.*, 559 F. Supp. 3d at 1069 (explaining that eliminating Apple's anti-steering provisions "does not require the Court to micromanage business operations which courts are not well-suited to do as the Supreme Court has appropriately recognized").

As set forth in detail above, the Court finds that the evidence clearly and convincingly demonstrates that Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the

United States District Court
Northern District of California

injunction.[63]  In fact, despite numerous opportunities, not once did Apple choose a path that would have shown compliance.

In short, Apple's conduct lacks any justification: it does not comport with the text of the Injunction, requires a strained and questionable interpretation of that language, completely ignores this Court's 180-page Injunction and the Ninth Circuit's 91-page opinion, and prompted lies on the witness stand.  The law requires that Apple be on notice of the scope of permissible conduct to hold Apple in civil contempt.  Apple was.  In fact, at every step Apple considered whether its actions would comply, and at every step Apple chose to maintain its anticompetitive revenue stream over compliance.  Given the repeated misrepresentations, the real-time business documents, and the proffer of a made-for-litigation expert "report," the Court reasonably concludes that Apple knew it was violating the Injunction.

### 2.    More Specific Findings of Civil Contempt

Several aspects of the Link Entitlement program, taken together and to a certain extent independently, violate the Injunction.  The Court considers them in two groups: (i) the commission rate, and (ii) design restrictions and purchase-flow friction.

***The Commission Rate.***  As described above, Apple assessed the external costs developers face when utilizing linked-out transactions, which generally ranged based on the size of the developer—the larger the developer, the better able to reduce the external costs of linked-out transactions.  With that information, Apple selected a 3% discount on its 30% IAP commission that it knew was anticompetitive.  In doing so, Apple willfully set a commission rate that in practice made all alternatives to IAP economically non-viable.[64]  The Court cannot conceive of

---

[63] Apple also points to Rule 65(d), which provides that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  For the reasons stated above and in the Court's 180-page Injunction, Apple received a more than fulsome notice of what specific conduct was prohibited at law.

[64] The *amici* agree.  (*See, e.g.*, Dkt. No. 904-1 at 14 ("[D]evelopers incur additional costs for transactions outside of their apps that would exceed the 3% 'discount' to Apple's normal IAP commission in almost every case.  For example, payment processing fees alone often exceed 3% of the amount of the transaction.").)

59

how any reasonable mind interpreting this Court's and the Ninth Circuit's orders would find that structure permissible, because it ***forecloses competitive alternatives***.  That appears to have been the point. Business documents reveal that the internal justification was to maintain the existing anticompetitive revenue stream.

This Court previously recognized that "[e]ven in the absence of IAP, Apple could still charge a commission on developers."  *Epic Games, Inc.*, 559 F.Supp.3d at 1042.[65]  Apple was tasked with valuing its intellectual property, not with reverse engineering a number right under 30% that would allow it to maintain its anticompetitive revenue stream.  *Id.* at 994 ("Apple cannot hide behind its lack of clarity on the value of its intellectual property.").  Apple and Mr. Schiller knew this.  (*See* Feb. 2025 Tr. 1893:11–1894:22 (Schiller).)  Apple ignored this opportunity choosing instead to retroactively justify the desired end result.

The AG report's recommendation of a commission rate on link-out transactions as the basis for its commission determination is entirely manufactured, and Apple's reliance thereon is a sham.  (*See, e.g.*, Dkt. No. 1324, Apple's Post-Hearing Br. at 12.)  As the 2025 hearing revealed, the AG's report did not materially factor into Apple's decision-making process. It was created as a show piece for the Court.  The plan backfired.

The real-time business documents which the Court ordered Apple to produce revealed the

---

[65] Apple emphasizes that California courts have declined to use the UCL as a ratemaking tool.  (Dkt. No. 1324 at 30); *see, e.g.*, *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn.*, 99 Cal.Rptr.417, 422 (Cal. Ct. App. 1971) ("[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by ad hoc decisions of the courts.").  Apple also argues that the question of whether Apple's commission appropriately reflects the value of its intellectual property is not an issue for injunction compliance, and that it is legitimate for a business to promote the value of its corporation for stockholders.  (Dkt. No. 1324 at 18, 32.)  Apple misses the point.  The issue is that Apple flouted the Court's order by designing a top-down anticompetitive system, in which its commission played a fundamental role.

For the same reasons, the Court disagrees that requiring Apple to set a commission of zero constitutes and unconstitutional taking.  *See* Dkt. No. 1324 at 30 (citing *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021)).  For instance, as described *infra* Section IV, in the trademark context, "a party who has once infringed is allowed less leniency for purposes of injunction enforcement than an innocent party."  *Forever 21, Inc. v. Ultimate Offprice, Inc.*, 2013 WL 4718366, at *3 (C.D. Cal. Sept. 3, 2013).  Apple does not have an absolute right to the intellectual property that it wields as a shield to competition without adequate justification of its value.  Apple was provided with an opportunity to value that intellectual property and chose not to do so.

60

United States District Court
Northern District of California

true business decision. Apple's focus was on the impacts to its revenue as well as some analysis of the costs developers would face when implementing a link-out transaction. The AG report only appears in a public-facing presentation for the July 5, 2023 meeting where Apple decided to impose a 27% commission. Thus, the Court does not credit the AG report as support for a bottoms-up analysis of the value of Apple's intellectual property.

***Design Restrictions and Purchase-Flow Friction.*** In addition to a commission rate, Apple imposed a variety of restrictions on developers' ability to craft a link-out program: requiring any external purchase link be placed outside of the IAP purchase-flow to which a user is ordinarily directed; prohibiting developers from designing "buttons" aside from Apple's "plain 'link' button" style; prohibiting developers from using any calls to action aside from a limited set defined by Apple; instituting a full-window takeover (scare screen) after clicking on an external link *only* in the context of purchases of digital goods; and prohibiting the use of dynamic URLs.

This Court previously explained that the "measured remedy" of eliminating Apple's anti-steering provisions "will increase competition, increase transparency, increase consumer choice and information while preserving Apple's iOS ecosystem which has procompetitive justifications." *See Epic Games, Inc.*, 559 F.Supp.3d at 1069. Despite that directive, Apple decided to replace the explicit anti-steering provisions the Injunction prohibited with a mosaic of the same: an ensemble of requirements that significantly reduces developers' ability to steer consumers to any competitive, favorable alternatives. Nor was this accidental: Apple's sensitivity analyses of breakage reveal that Apple was modeling precisely the amount of friction needed in a transaction to ensure that link-out transactions were not viable for a developer. While Apple initially considered imposing some of these restrictions *as an alternative* to a commission, it decided to impose *all* restrictions *and* set a commission rate. In other words, Apple sought to secure its illegal revenue stream from every angle.

Apple's justifications for these requirements (set forth above) strain credulity. Most notably, and to underscore Apple's meritless justifications, Apple does not require developers selling physical goods to apply for a link entitlement before deploying link-out transactions. Apple imposes these restrictions *only* for link-outs that compete with IAP.

Further, two of Apple's restrictions are explicitly at odds with the Injunction.  The Injunction prevented Apple from stopping developers from "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to" IAP.  Apple resorts to dictionaries (*see* Dkt. No. 1324 at 15–16) to argue that it no longer categorically prohibits developers from using buttons or other calls to action.[66]  While perhaps literally true, the gamesmanship abounds as the business documents reveal the true motive (and do not rely on dictionaries).

For button styles, Apple limits developers to what Apple calls the "plain" button style— essentially just a hyperlink—because Apple does not want the developers to use the more effective "button."  A more effective button would increase competition.  (*See* Feb. 2025 Tr. 1212:9– 1213:22 (Schiller).)  Similarly, Apple limits calls to action to five, narrowly cabined templates. (*See* CX-3.5.)  Nowhere does the Court authorize those limitations.  At a minimum, the Court need not decide whether these restrictions alone violate the Injunction, because Apple has violated the central mandate of this Court's orders: that Apple not foreclose competitive alternatives to IAP.[67]

To summarize, this Court's orders required that Apple not impose restrictions in its iOS marketplace which would prohibit consumer access to and awareness of competitive alternatives to IAP.  The Injunction specifically enjoined Apple's anti-steering provisions which at the time prohibited developers from raising that consumer awareness and access.  In response, Apple

---

[66] Apple also points to authority that interprets the distinction between "regulating" and "prohibiting," particularly in the context of statutory interpretation.  Dkt. No. 1324 at 17; *see, e.g.*, *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 697 (2022) (explaining that "to *regulate* something is usually understood to mean to fix the time, amount, degree, or rate of an activity according to rules" whereas "to *prohibit* something means to forbid, prevent, or effectively stop it, or make it impossible" (cleaned up)).  In this way, Apple argues that its rules *regulate* and do not *prohibit* the use of calls to action or buttons.  Other options may have constituted regulation.  Here, the business documents prove the opposite: the overall effect is quite literally, intentional *de facto* prohibition.

[67] Additionally, Apple has excluded simultaneous participation in the VPP or NPP programs and the Link Entitlement program.  While this mutual exclusion does not itself constitute a violation of the Injunction, it does highlight Apple's all-or-nothing approach—every developer would be subject to the same link-out program which, as discussed exhaustively, is not economically viable.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  intentionally devised a compliance scheme to prevent developers from deploying competitive

2  alternatives to IAP.  Apple's discounted commission rate, on its own, forecloses a developer's use

3  of link-out purchases.  Adding to that, Apple's various design restrictions and purchase-flow

4  friction arbitrarily decrease the attractiveness of competitive alternatives (if they were utilized) and

5  increase breakage in a purchase flow.

6      Apple's conduct violates the Injunction.  The non-compliance was far from "technical or

7  de minimis."  Apple's lack of adequate justification, knowledge of the economic non-viability of

8  its compliance program, motive to protect its illegal revenue stream and institute a new de facto

9  anticompetitive structure, and then create a reverse-engineered justification to proffer to the Court

10  cannot, in any universe, real or virtual, be viewed as product of good faith or a reasonable

11  interpretation of the Court's orders.

12      The Court **HOLDS** Apple in civil contempt.  Sanctions and relief with respect to Apple's

13  noncompliance are set forth *infra* Section IV.

14      **C.      Privilege Disputes[68]**

15          **1.      Apple's Motion to Strike**

16      Apple moves to strike Philip Schiller's February 2025 testimony concerning a document

17  that Apple improperly under-redacted for privilege.  (Dkt. No. 1328.)   The Court rejects Apple's

18  invitation to reconsider its prior ruling from the bench.  Apple waited to raise its privilege

19  objection until *after* Mr. Schiller testified about the document at length.  At the hearing the

20  following day, Apple's attorneys conceded their oversight in failing to object to the exhibit and

21  Epic's questioning. (Feb. 2025 Tr. at 1443:23–24) ("I do understand the cat-is-out-of-the-bag

22  problem from yesterday. . . .") The Court agreed and ruled that "[y]esterday's testimony stands."

23  (Feb. 2025 Tr. at 1447:8.) That Apple is having second thoughts about its decision does not make

24  for a proper motion for reconsideration. The testimony stands. Apple's Motion for

25

26      _____

        [68] The Court will decide in a separate order Apple and Epic's rolling motions for relief for
27  relief from non-dispositive orders issued by Judge Hixson involving his and the special masters'
    determinations of privilege in Apple's document productions.  (Dkt. Nos. 1193, 1221, 1285, 1298,
28  and 1305).

1    Reconsideration is **DENIED**.

2    ##        2.        Apple's Rule 502(d) Motion

3            Prior to the February 2025 testimony, Apple moved for an order pursuant to Federal Rule

4    of Evidence 502(d) that would "confirm[] that Apple's production of certain documents to [Epic]

5    over which Apple continues to maintain claims of attorney-client privilege or work product

6    protection," and any use of those documents at the hearing or in connection with Epic's motion to

7    enforce, "does not waive any applicable protections in this proceeding or any other."  (Dkt. No.

8    1198 at 2.)  At the hearing, the Court rejected Apple's motion for an order pursuant to Rule

9    502(d).  (Feb. 2025 Tr. at 1125:23–1126:12.)  In short, a Rule 502(d) order is inappropriate where

10   the Court has held that the at-issue documents are not privileged.  The Court elaborates as to two

11   further considerations presented in the papers:

12           *First*, as to documents Apple has produced to Epic, Apple has been "compelled" by this

13   Court to produce those documents over its objection, so in general Apple has not waived privilege

14   with respect to documents by virtue of their production alone.  *See Transamerica Computer Co. v.*

15   *Int'l Bus. Machines Corp.*, 573 F.2d 646, 651 (9th Cir. 1978).  That said, the Court does not and

16   need not decide in general whether Apple's production constitutes waiver absent a review of

17   specific documents and the particular context of their production.

18           *Second*, as to the use of any documents in the evidentiary hearing for which Apple

19   maintains a claim of privilege, the Court cannot issue a carte blanche ruling that any use of

20   privileged documents will not constitute waiver.  Waiver will depend on what documents are used

21   by which party and how they are used.  On the one hand, should Epic make an *offensive* use of a

22   privileged communication, Apple's *defensive* use of the portions of that *same* communication for

23   which this Court has rejected Apple's claim of privilege will likely not constitute waiver, just as in

24   Apple's cited case, *Shenzhenshi*, 2017 WL 8948739, at *5 (N.D. Cal. Nov. 15, 2017).  On the

25   other hand, Apple's *offensive* introduction of a privileged communication will likely constitute

26   waiver, under the well-established doctrine that attorney-client privilege may not be used both as a

27   sword and shield.

28           All this is to say, the Court declined to permit Apple to pre-litigate whether it will waive

United States District Court
Northern District of California

privilege over unspecified documents that it might use for different purposes at this evidentiary hearing.  Apple's motion for an order pursuant to Rule 502(d) is **DENIED**.

### 3.    Abuse of Privilege

The Court discussed Apple's abuse of its privilege assertions *supra* Section I.D, which caused months of delay in this proceeding.  Notably, as discussed earlier, on re-review Apple withdrew a significant body of its privilege claims, effectively withdrawing approximately 42.1% of those claims.  These dilatory tactics were unwarranted, wasted party and judicial resources, and delayed the Court's ability to effectuate relief.

The Court's discussion in its December 31, 2024 order on Apple's first motion for relief provided the foundation for how Apple integrated the presence of legal personnel into documentation of business decisionmaking that, by this Court's and Judge Hixson's determinations, did not involve the provision of legal advice.  (*See* Dkt. No. 1095.)

Adding a lawyer's name to a document does not create a privilege.  Instructions from Apple's internal counsel Jennifer Brown are illustrative.  In a set of email exchanges discussing drafts of a Project Wisconsin presentation, Ms. Brown wrote, "[a]lso, one procedural tweak - can we change the 'Prepared at the Request of Counsel' label in the slides to 'Prepared at the Request of External Counsel'.  This work is necessary for our outside counsel to advocate our compliance."  (CX-538.4.)  Every email on this email thread self-designates as privileged, as does every slide in the presentation, even though the vast majority of information therein this Court and Judge Hixson have held do not contain privileged information, but rather documents the business assessment Apple was conducting that is central to enforcement of the Injunction.  While Ms. Brown explained that Apple was "working very closely with" external counsel "throughout the entire process" (Feb. 2025 Tr. 1615:4–5), that does not automatically confer privilege protections on all documents relevant to that process.

The record is rife with such examples of over-designation of privilege.  As another example, consider an email discussed above from Apple's counsel Sean Cameron sent to Tim Cook, among others, on Friday, June 23, 2023.  The email reads, in full:

Privileged and Confidential

Tim,

At our meeting on Tuesday, you asked the team to revise the customer warning screen (which is surfaced when a customer taps on a link to the developer 's web site) to reference the fact that Apple's privacy and security standards do not apply to purchases made on the web.

The team worked on updated copy — please see the original and updated versions below. We reviewed with Phil, Matt, and Jeff and believe that the revised language in bold clearly highlights the issue for customers.

Please let us know if you have any comments, or if we are clear to move ahead with this change.

Thank you.

(CX-225.1.)

Here, legal counsel provides "updated copy" after discussion with non-legal members of the team. The only substantive comment as to the changed copy refers to how the revised language "clearly highlights the issue for customers." Nothing about this email indicates the presence or provision of legal advice, but rather implementing Mr. Cook's request. Like many of Apple's documents produced in connection with Epic's motion to enforce, this document does indicate, however, a desire to conceal Apple's real decisionmaking process, particularly where those decisions involved senior Apple executives. Given those abuses and others, the Court concluded that "sanctions are warranted" in its February 4, 2025 Order. (Dkt. No. 1171.)

Apple filed a "response," but that response ultimately harms its position. (Dkt. No. 1329-3 (sealed); Dkt. No. 1330 (redacted).) In its defense, Apple blames everyone but itself, claiming that it acted in good faith and under a compressed timeframe in conducting its privilege review. The first to be faulted are Apple's third-party document review vendors, Deloitte and Consilio. Apple claims that it appropriately instructed those teams on designating for privilege and argues that those instructions reflected Ninth Circuit precedent. Although Apple's outside counsel purportedly gave "weekly and often daily feedback to the vendor and outside counsel quality control teams," (Dkt. No. 1330 at 11), Apple did not catch, *and should have caught*, those errors. The notion that Apple mistakenly over-designated documents is not credible. Almost all "mistakes" and "inconsistencies" flow in one direction: toward withholding and redacting.

United States District Court
Northern District of California

1    Further, Apple held steadfast with its privilege designations until ordered otherwise.

2        Next, Apple blames Epic. Apple argues that its over-designation was the "ultimate

3    consequence" of Epic's overbroad custodian and search term requests. (Dkt. No. 1330 at 14.) To

4    boot, Apple argues that Epic failed to police *Apple's* privilege calls until months after Apple

5    served its first privilege log, which "impaired Apple's ability to make any meaningful changes to

6    its privilege review and logging process before the deadline." (*Id.* at 16–17.) The Court rejects

7    Apple's fingerpointing to justify its own misconduct.

8        Finally, Apple urges that it should not be sanctioned because it has already borne the

9    consequence of its discovery misconduct by re-reviewing the documents that it initially withheld

10    for privilege. (Dkt. No. 1330 at 18.) Apple argues that because it cured compliance, punitive

11    sanctions, as it characterizes them, are not warranted. Complying with a court order cannot be

12    deemed a sanction. Holding otherwise would incentivize any litigant to avoid complying with

13    unfavorable discovery rulings until ordered to do so after more litigation. The Court elaborates on

14    a remedy *infra* Section IV.

15        **D.**    **Apple's Motion for Indemnification**

16        As discussed *supra* Section I, the Ninth Circuit reversed this Court insofar as the DPLA's

17    indemnification provision requires Epic to pay Apple's attorneys' fees related to this litigation,

18    specifically as to Apple's counterclaim for breach of contract. *See Epic Games, Inc.*, 67 F.4th at

19    1004. However, the panel "express[ed] no opinion on what portion of Apple's attorney fees

20    incurred in this litigation can be fairly attributed to Epic's breach of the DPLA." *Id.* at 1004 n.24.

21        On the day Apple's petition for certiorari was denied, Apple moved for entry of judgment

22    on its indemnification counterclaim, seeking an adjusted, discounted total of $73,404,326 in

23    attorneys' fees and costs. (Dkt. Nos. 872-3 (sealed motion), 876 (redacted).) Epic opposed

24    (Dkt. No. 886), and below the Court considers the appropriate scope of attorneys' fees Apple may

25    recover under the DPLA, given the nature of this litigation.

26        **1.**    **Legal Standard**

27        The DPLA's indemnification provision provides, in relevant part:

28            To the extent permitted by applicable law, You agree to indemnify

67

and hold harmless, and upon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to any of the following . . . : (i) Your breach of any certification, covenant, obligation, representation or warranty in this Agreement . . . .

(PX-2619.40; *see also Epic Games, Inc.*, 559 F.Supp.3d at 1065–66.)

"Based on the DPLA's choice-of-law provision," the Court "interpret[s] its indemnification provision pursuant to California contact-interpretation principles." *Epic Games, Inc.*, 67 F.4th at 1003. "Under California law, '[a]n indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.'" *Epic Games, Inc.*, 559 F.Supp.3d at 1065 (quoting *Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.*, 17 Cal.Rptr.2d 242, 253 (Cal. Ct. App. 1993); *see also* Cal. Civ. Proc. Code § 1021 ("[T]he measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ."). As with any contract, California courts "apply the rule that words in a contract are to be understood in their usual sense." *Xuereb v. Marcus & Millichap, Inc.*, 5 Cal. Rptr. 2d 154, 158 (Cal. Ct. App. 1992).

### 2.    Analysis

The central question in Apple's motion for entry of judgment on its indemnification counterclaim is "what portion of Apple's attorney fees incurred in this litigation can be fairly attributed to Epic's breach of the DPLA." *Epic Games, Inc.*, 67 F.4th at 1004 n.24.[69] However, it is not possible to cleanly separate what costs and fees are attributable to Epic's breach, because Epic stipulated that it breached the DPLA and "[t]he parties agree[d] that Epic's illegality defense" to Apple's claim for breach of contract "rises and falls with its Sherman Act claims." *Id.* at 999.[70]

---

[69] The DPLA, as well as the Ninth Circuit's opinion, make clear that Apple is entitled to all "losses . . . , expenses and costs, including without limitation, attorneys' fees and court costs," "arising from or related to" Epic's "breach of any certification, covenant, [or] obligation" in the DPLA. PX-2619.40.

[70] "Epic Games alleges that Apple's counterclaims are barred because 'the contracts on which Apple's counterclaims are based' are 'illegal and unenforceable' on the basis that they violate the Sherman Act, the Cartwright Act, and the UCL." *Epic Games*, 559 F.Supp.3d at 1060.

United States District Court
Northern District of California

In other words, Apple's fees and costs expended defending against Epic's federal claims—the bulk of Epic's affirmative case—are the same fees and costs Apple expended to ultimately win its breach of contract claim, for which Apple is entitled to indemnification under the DPLA.[71]

Centrally, Epic argues that, under California law, prevailing defendants cannot recover attorneys' fees or litigation costs incurred while defending against antitrust claims, even where the parties have entered into a fee-shifting agreement.  (Dkt. No. 886 at 9–12.)  Epic relies on *Carver v. Chevron U.S.A., Inc.*, 14 Cal. Rptr. 3d 467, 469 (Cal. Ct. App. 2004).  There, plaintiffs alleged 18 causes of action, including intentional and negligent misrepresentation, concealment, breach of contract, beach of the implied covenant of good faith and fair dealing, and violations of the Cartwright Act.  The parties did "not dispute that Chevron, as prevailing party, has a contractual right to attorney fees for defending non-Cartwright causes of action."  *Id.*  However, "certain claims were inextricably intertwined and could not be further separated because they had elements of both Cartwright Act and non-Cartwright Act causes of action."  *Id.* at 472.

The Court of Appeal explained that "[t]he Cartwright Act contains a unilateral fee-shifting provision that allows an award of attorney fees to a prevailing plaintiff but not to a prevailing defendant."  *Id.* at 471.  The public policy implicit in such a nonreciprocal fee provision is, in the case of the Cartwright Act, "to encourage injured parties to broadly and effectively enforce the Cartwright Act 'in situations where they otherwise would not find it economical to sue.'"  *Id.* (quoting *Covenant Mut. Ins. Co. v. Young*, 225 Cal. Rptr. 861, 865 (Cal. Ct. App. 1986)).  "The Legislature clearly intended to give special treatment to antitrust claims under the Cartwright Act by creating this one-way fee-shifting right for a successful plaintiff but not for a defendant who

---

[71] The Court disagrees with Epic that its antitrust claims cannot be said to arise out of or relate to a breach of the DPLA "because they are completely independent of Epic's violation of the terms of the DPLA," and that "[i]t is undisputed that Epic's antitrust claims could have been brought against Apple even if Epic had not violated the terms of the DPLA."  Dkt. No. 886 at 13.  While perhaps true in theory, neither contention reflects what has in fact occurred in this litigation. Epic crafted a litigation strategy that involved a deliberate and conceded breach of the DPLA, and in turn Epic made its own antitrust claims the cornerstone defense against Apple's breach of contract counterclaim.  Nor was Epic's breach without its benefits—some of the data revealed by that breach has been incorporated into this order in support of Epic's motion for enforcement. Epic's strategy involved certain risks and payoffs, and potential liability for Apple's attorneys' fees formed a possible trade-off.

United States District Court
Northern District of California

successfully defends such a claim." *Id.*

The court concluded that "[i]n light of these public policy considerations," the Cartwright Act's fee-shifting provision "prohibits an award of attorney fees for successfully defending Cartwright Act and non-Cartwright Act claims that overlap." *Id.* Permitting a defendant to recover fees for work on Cartwright Act issues "would superimpose a judicially declared principle of reciprocity on the statute's fee provision, a result unintended by the Legislature, and would thereby frustrate the legislative" public policy. *Id.*

While *Carver* concerned Cartwright Act claims, which Epic abandoned on appeal, *see Epic Games, Inc.*, 67 F.4th at 970 n.4, one federal court has extended *Carver*'s reasoning to the defense of federal antitrust claims. In *Dominick v. Collectors Universe, Inc.*, plaintiffs asserted nine claims, which included violations of the Sherman Act, the Clayton Act, the Latham Act, the Cartwright Act, and the UCL, among other state-law tort and breach of contract claims. 2013 WL 990825, at *1 (C.D. Cal. Mar. 13, 2013). After prevailing on a motion to dismiss, defendants argued that they could "recover their fees under the Clayton Act's fee-shifting provision" and also could "recover all fees under the fee-shifting provision of the" applicable agreement. *Id.* at *2.

The *Dominick* court disagreed, explaining that "under California law, prevailing defendants may not recover attorneys' fees for successfully defending against antitrust claims, even if a contractual fee-shifting clause may have otherwise allowed for such fees. The California Court of Appeal has held that where a statute contains a unilateral fee-shifting provision for prevailing plaintiffs, courts should not allow contractual fee-shifting for prevailing defendants, as this allowance would override congressional intent." *Dominick*, 2013 WL 990825, at *5 (citations omitted) (citing *Carver*, 14 Cal.Rptr.3d at 471). Even absent a statutory fee-shifting provision, the court cited a Third Circuit case which "held that attorneys' fees may not be awarded to prevailing defendants in antitrust lawsuits absent express congressional authorization," in a case that did not involve an indemnification agreement among the parties. *See id.* at *5 (citing *Byram Concretanks, Inc. v. Warren Concrete Prods. Co. of N. J.*, 374 F.2d 649, 651 (3d Cir. 1967)).[72]

---

[72] *See also Byram*, 374 F.2d at 651 ("We hold that in the absence of specific legislative authorization attorneys' fees may not be awarded to defendants in private anti-trust litigation. Our

1    However, the Ninth Circuit appears to have rejected this approach as to Sherman Act

2    claims in *Reudy v. CBS Corp.*  Before the district court, plaintiffs argued that "the Sherman Act

3    authorizes recovery of attorneys' fees only for successful plaintiffs," citing 15 U.S.C. § 15.  *Reudy*

4    *v. Clear Channel Outdoors, Inc.*, 693 F.Supp.2d 1091, 1100 (N.D. Cal. 2010), *aff'd sub nom.*

5    *Reudy v. CBS Corp.*, 430 F.App'x 568 (9th Cir. 2011).  The court explained that while this may be

6    true of "certain statutes, such as the Cartwright Act," "it is not true under these facts and the

7    statutes at issue."  *Id.*  Specifically, "[a]s for Plaintiffs' antitrust cause of action, Plaintiffs failed to

8    cite any case, either in their briefing or at the hearing, in support of their argument that the

9    Sherman Act trumps a private contract when it comes to a fee award.  The only cases cited

10   pertained to actions pursuant to the Cartwright Act."  *Id.* at 1101.  Thus, the court rejected

11   plaintiffs' objections to an award of attorneys' fees relating to Sherman Act claims.

12   On appeal, plaintiffs posed the question of "[w]hether the district court erred in awarding

13   attorney fees on the Sherman Act cause of action."  Opening Brief of Appellants, *Reudy v. CBS*

14   *Corp.*, No. 10-15533 (9th Cir. June 10, 2010), 2010 WL 6762022.  In an unpublished opinion, the

15   Ninth Circuit succinctly affirmed: "There is no support for appellants' contention that the fee-

16   shifting rule applicable to antitrust claims displaces the different rule set forth in the agreement."

17   *Reudy*, 430 F.App'x at 569.

18   As applied to this case, the Court finds that Apple's requested fee award does not

19   appropriately account for *Carver*.  Apple calculated its total litigation expenses through October

20   31, 2023, at $82,971,401, and "to ensure every dollar is covered by the DPLA" adjusted that total

21   down to $81,560,362.  (Dkt. No. 876 at 15.)  Then, because Apple "won 9 out of 10 claims that

22   Epic asserted challenging the DPLA" as well as Apple's own breach of contract counterclaim,

23   Apple discounted its adjusted total by 10%, to $73,404,326.  Absent *Carver*, this could be a

24   sensible starting point.  However, the California Court of Appeal was clear that the Cartwright

25   Act's fee-shifting provision "prohibits an award of attorney fees for successfully defending

26   Cartwright Act and non-Cartwright Act claims that overlap."  *Carver*, 14 Cal. Rptr. 3d at 471.

27   _____

28   conclusion is based on policy considerations reflected in the Clayton Act.").

Here, that ultimately means that Apple is entitled to attorneys' fees and expenses covering its defense against Epic's Sherman Act claims that do *not* overlap with Apple's defense against Epic's Cartwright Act claims.[73] Said differently, the question is what *unique* attorneys' fees or expenses did Apple incur in defense against Epic's Sherman Act claims that were not also incurred in defense against Epic's Cartwright Act claims.

To summarize, this is because, first, the DPLA provides that Apple's indemnity extends to its attorneys' fees and expenses arising from or relating to Epic's breach of the DPLA, i.e., Apple's breach of contract counterclaim. Second, the parties agreed that the success of Apple's breach of contract claim was coextensive with Apple's defense against Epic's Sherman Act claims, because Epic stipulated to breach of the DPLA and only argued an illegality defense under the Sherman Act. Thus, given Apple's success as to the Sherman Act claims, the DPLA entitles Apple to attorneys' fees and expenses incurred in its defense against those claims. However, *Carver* limits that award to the extent it overlaps with Epic's Cartwright Act claims. *See Carver*, 14 Cal. Rptr. 3d at 473 ("When a defendant incurs attorney fees for successfully defending both Cartwright Act and non-Cartwright Act claims, the portion of those fees related exclusively or by 'inextricable overlap' to Cartwright Act claims are not recoverable.").

The Court declines to attempt an estimate in the first instance. Apple bears the burden of identifying those attorneys' fees and costs that it can attribute solely to the breach of the DPLA and/or its defense against Epic's Sherman Act claims that did not overlap with its defense of Epic's Cartwright Act claims.[74] The Court **DENIES WITHOUT PREJUDICE** Apple's motion for

---

[73] That said, Epic overreaches by seeking to apply *Carver*'s rule to all federal antitrust claims, in particular here Epic's Sherman Act claims. While *Dominick* provides support for Epic's argument, this Court will defer to the Ninth Circuit's unpublished holding in *Reudy* and find that the fee-shifting rules articulated in *Carver* or otherwise do not displace Apple's contractual indemnity for attorneys' fees expended in defense of Epic's illegality defense under the Sherman Act.

[74] The Court notes that the parties' prior representations, as always, are relevant. For instance, at trial Epic argued that "even if its claims under the Sherman Act fail, it is nevertheless entitled to relief on its Cartwright Act claims because the Cartwright Act is broader in range and deeper in reach than the Sherman Act." *Epic Games, Inc.*, 559 F.Supp.3d at 1048. Apple disagreed, arguing that Epic had "not identified any specific and material differences between the Cartwright Act and the Sherman Act," and so could not "prevail on a Cartwright Act where its

United States District Court
Northern District of California

entry of judgment on its indemnification counterclaim.

*Next*, the parties dispute whether Apple is entitled to collect costs and expenses in addition to attorneys' fees. Epic argues that Apple's recovery of any "losses" other than attorneys' fees exceeds the Ninth Circuit's mandate, which provided that this Court is to determine "what portion of Apple's *attorney fees* incurred in this litigation can be fairly attributed to Epic's breach of the DPLA." (Dkt. No. 886 at 17 (quoting *Epic Games, Inc.*, 67 F.4th at 1004 n.24 (emphasis supplied)).) On the other hand, Apple points to the expansive language of the DPLA—notably, that the indemnification provision covers "any and all" "expenses and costs" and "losses," "including without limitation, attorneys' fees and court costs." (PX-2619.40; *see also* Dkt. No. 876 at 12–14.) The Court agrees with Apple. Nowhere did the Ninth Circuit hold that Apple is prohibited from recovering costs and expenses arising from or related to Epic's breach of contract. Rather, the Ninth Circuit recited the DPLA's expansive language that includes costs "without limitation," and the scope of the question presented on appeal was simply focused on "attorneys' fees." *See Epic Games, Inc.*, 67 F.4th at 1004 & n.24.

*Finally*, Epic argues that Apple failed to meet and confer with Epic pursuant to Federal Rule of Civil Procedure 54(d), which Apple claims does not apply to its motion for entry of judgment. Apple's "restyling" of its request for attorneys' fees as a motion of entry of judgment does not persuade. Judgment was entered on September 10, 2021 at Docket No. 814. Apple filed an appeal thereon. Rule 54(d)(2)(A) requires claims to attorneys' fees to be asserted by way of motion "unless the substantive law requires those fees to be proved at trial as an element of damages." California Civil Code § 1717(a) allows the prevailing party to recover attorneys' fees in a contract dispute "as an element of the cost of the suit" and requires that reasonable fees be "fixed by the court." The Ninth Circuit has read those rules in tandem to mean that contract provisions for attorney's fees "are not an element of damages to be proved at trial" and, therefore,

---

claims fail under the Sherman Act." *Id.*

Given the lack of an appropriate accounting, the Court takes no position on whether Apple can include attorneys' fees which may have overlapped with the related *Cameron* and *Pepper* actions. (Dkt. No. 886 at 16.)

Rule 54(d) applies. *Port of Stockton v. W. Bulk Carrier KS*, 371 F.3d 1119, 1121 (9th Cir. 2004)

(internal quotations omitted); *see also Zhu v. Li*, 2023 WL 4770431, at *1 (N.D. Cal. July 26,

2023); *Instrumentation Lab'y Co. v. Binder*, No. 11-cv-965, 2013 WL 12049072 (S.D. Cal. Sept.

18, 2013), aff'd, 603 F. App'x 618 (9th Cir. 2015) (applying Rule 54(d) to recover indemnity

award). Apple's suggestion to the contrary is merely an attempt to avoid the rules. The district's

local rule 54-5, as authorized by Rule 54(d)(2)(D), requires parties to meet and confer in advance

of filing any motion. Compliance is required.

With respect to Apple's argument that Epic has not challenged the reasonableness or

accuracy of Apple's calculations of its attorneys' fees, costs or expenses, the Court finds the issue

premature given the parties' misapplication of the standard and because Apple failed to provide

evidentiary support for its request. (Dkt. No. 886 at 3–4.) Anticipating further disputes on this

topic, if the parties cannot agree on the reasonable amount of attorneys' fees and costs, the Court

orders the issue referred to a special master of the parties choosing under Rule 54(d)(2)(D). In the

first instance, the parties shall split the costs of the special master. However, the special master

may reallocate the costs if appropriate.

## V.    RELIEF AND SANCTIONS

"District courts have broad equitable power to order appropriate relief in civil contempt

proceedings." *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). That broad power includes

"the inherent authority to enforce compliance with its orders," *Craters & Freighters v. Daisychain*

*Enterprises*, 2014 WL 2153924, at *1 (N.D. Cal. May 22, 2014), as well as issuance of

"[s]anctions . . . to coerce obedience to a court order, or to compensate the party pursuing the

contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal*

*Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986).

With respect to violations of a permanent injunction, a civil contempt order may clarify the

terms of the injunction to coerce compliance. *See, e.g., H.I.S.C., Inc. v. Franmar Int'l Importers,*

*Ltd.*, 2022 WL 104730, at *6 (S.D. Cal. Jan. 11, 2022). Analogous here, "a party who has once

infringed is allowed less leniency for purposes of injunction enforcement than an innocent party."

*Forever 21, Inc. v. Ultimate Offprice, Inc.*, 2013 WL 4718366, at *3 (C.D. Cal. Sept. 3, 2013)

United States District Court
Northern District of California

1    (trademark-infringement actions).  An "infringer must keep a fair distance from the 'margin line.'"

2    *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1323 (9th Cir. 1997) (same).

3         With respect to monetary sanctions, "[p]rior to issuing a coercive civil contempt order, a

4    court should weigh all the evidence properly before it determines whether or not there is actually a

5    present ability to obey and whether failure to do so constitutes deliberate defiance or willful

6    disobedience which a coercive sanction will break."  *Falstaff Brewing Corp. v. Miller Brewing*

7    *Co.*, 702 F.2d 770, 781 n.6 (9th Cir. 1983).

8         Apple was afforded ample opportunity to respond to the Injunction.  It chose to defy this

9    Court's order and manufacture *post hoc* justifications for maintaining an anticompetitive revenue

10   stream.  Apple's actions to misconstrue the Injunction continue to impede competition.  This

11   Court will not play "whack-a-mole," nor will it tolerate further delay.

12        Accordingly, for the reasons set forth herein, and good cause appearing, the Court

13   **PERMANENTLY RESTRAINS AND ENJOINS** Apple Inc. and its officers, agents, servants, employees,

14   and any person in active concert or participation with them, from:

15         1.   Imposing any commission or any fee on purchases that consumers make outside an
              app, and as a consequence thereof, no reason exists to audit, monitor, track or
16            require developers to report purchases or any other activity that consumers make
              outside an app;

17         2.   Restricting or conditioning developers' style, language, formatting, quantity, flow
18            or placement of links for purchases outside an app;

19         3.   Prohibiting or limiting the use of buttons or other calls to action, or otherwise
20            conditioning the content, style, language, formatting, flow or placement of these
              devices for purchases outside an app;

21         4.   Excluding certain categories of apps and developers from obtaining link access;
22

23         5.   Interfering with consumers' choice to proceed in or out of an app by using anything
              other than a neutral message apprising users that they are going to a third-party site;
24            and[75]

25

26

27

28   _____

     [75] The Court pre-authorizes the "dialogue" version of Apple's screen in advance so as not

6.    Restricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase.

As these are *restrictions* on the specific actions Apple took to violate this Court's Injunction and as they require no affirmative action on Apple's part, the **INJUNCTION IS EFFECTIVE IMMEDIATELY**.  The Court will not entertain a request for a stay given the repeated delays and severity of the conduct.

Time is of the essence.  Every day since January 16, 2024, the date of the Supreme Court's refusal to hear its appeal, Apple has sought to interfere with competition and maintain an anticompetitive revenue stream.  This Injunction terminates the conduct.

*        *        *

**THE COURT FURTHER FINDS** that Apple's abuse of attorney-client privilege designations to delay proceedings and obscure its decision-making process warrants sanction to deter future misconduct.  Apple is **SANCTIONED** in the amount of the full cost of the special masters' review and Epic's attorneys' fees on this issue alone through approximately May 15, 2025, the anticipated date of completion. (Dkt. No. 1459.)  The parties shall meet and confer on the actual amount due.  Any dispute shall be submitted to the special masters by motion for review in the first instance.

*        *        *

**MOREOVER,** a more significant response may be warranted.

Despite Apple's misconduct, civil contempt sanctions are limited to instances where a sanction would "coerce obedience to a court order" or "compensate the party pursuing the

_____

to hinder developer progress:



CX-520.39 (middle example); *see* Feb. 2025 Tr. 1333:25–1334:17, 1335:10–16 (Onak).

76

1   contempt action for injuries resulting from the contemptuous behavior." *Gen. Signal Corp. v.*

2   *Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986); *see also United States v. Mine Workers,* 330

3   U.S. 258, 303–304 (1947). Compensatory sanctions are limited to a party's "actual loss." *Id.*  Epic

4   Games does not, at this juncture, seek sanctions.  Should Apple again attempt to interfere with

5   competition and violate the Court's injunctive relief, civil monetary sanctions to compel

6   compliance may be appropriate.

7            By contrast, criminal contempt sanctions are "punitive," and are meant to punish past

8   misconduct and deter future noncompliance. *Int'l Union, United Mine Workers of Am. v. Bagwell*,

9   512 U.S. 821, 827 (1994); *Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 858 (9th Cir. 2023)

10  ("Criminal contempt sanctions are 'punitive'—meant to punish prior offenses"); *Nat'l Abortion*

11  *Fed'n v. Ctr. for Med. Progress*, 926 F.3d 534, 538 (9th Cir. 2019) ("[D]eterrence is one of the

12  purposes served by compensatory and punitive awards alike.") Sanctions paid to the public or to

13  parties outside of the proceeding are categorized as criminal.  *Hicks on Behalf of Feiock v. Feiock*,

14  485 U.S. 624, 632 (1988). With criminal sanctions comes additional proceedings where "punitive

15  sanctions may not be imposed without the constitutional protections afforded ordinary criminal

16  proceedings." *Oracle*, 81 F.4th at 858.

17           Due process and a potential punitive sanction require government, not private,

18  involvement. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444–45 (1911) ("Proceedings

19  for civil contempt are between the original parties, and are instituted and tried as a part of the main

20  cause. But, on the other hand, proceedings at law for criminal contempt are between the public and

21  the defendant, and are not a part of the original cause.")[76];  *Int'l Union, United Mine Workers*, 512

22  U.S. at 834 ("Under these circumstances, criminal procedural protections such as the rights to

23  counsel and proof beyond a reasonable doubt are both necessary and appropriate to protect the due

24  process rights of parties and prevent the arbitrary exercise of judicial power.")

25

26           [76] Corporations have due process rights with respect to criminal sanctions.  *Falstaff*
27  *Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770 (9th Cir. 1983)

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Accordingly, under Rule 42(a)(2) of the Federal Rules of Criminal Procedure, the Court
2   refers the issue to the United States Attorney for the Northern District of California, Patrick D.
3   Robbins, or his designee(s), for investigation against Apple and Alex Roman, Apple's Vice
4   President of Finance specifically.  The Court takes no position on whether a criminal prosecution
5   is or is not warranted.  The decision is entirely that of the United States Attorney.  It will be for the
6   executive branch to decide whether Apple should be deprived of the fruits of its violation, in
7   addition to any penalty geared to deter future misconduct.

8                                         *          *          *

9   Apple *willfully* chose not to comply with this Court's Injunction.  It did so with the express
10  intent to create *new* anticompetitive barriers which would, by design and in effect, maintain a
11  valued revenue stream; a revenue stream previously found to be anticompetitive.  That it thought
12  this Court would tolerate such insubordination was a gross miscalculation.  As always, the cover-
13  up made it worse. For this Court, there is no second bite at the apple.

15  **IT IS SO ORDERED.**[77]

18  Dated: April 30, 2025

                                          _____
19                                        **YVONNE GONZALEZ ROGERS**
                                          **UNITED STATES DISTRICT JUDGE**

23  cc:  Patrick D. Robbins, United States Attorney for the Northern District of California

27  ───────────────────────
    [77] This terminates Dkt. Nos. 876, 897, 1018, 1198, and 1328.  All material redacted in this
28  Order is sealed.  If not redacted, the request to do so is denied.  All exhibits admitted during the
    evidentiary hearing shall be filed on the docket within five business days.

**ATTACHMENT A**

**TABLE OF CONTENTS**

I.      OVERVIEW ............................................................................................................. 1

II.     THE INJUNCTION AND PRIOR JUDICIAL FINDINGS........................................... 3

        A.      Trial, Judgment, and Injunction ..................................................................... 3

        B.      Ninth Circuit Affirmance in Part.................................................................... 8

        C.      Apple's Purported Compliance ...................................................................... 11

        D.      Epic's Motion to Enforce the Injunction and Evidentiary Hearings ...................... 11

III.    APPLE'S 2024 RESPONSE TO THE INJUNCTION: COMPONENTS..................... 13

        A.      First Component: Commission on Linked-Out Purchases ...................................... 14

        B.      Second Component: Link Placement and Design ................................................. 26

        C.      Third Component: Purchase-Flow Friction........................................................ 34

                1.      The Scare Screen ................................................................................ 34

                2.      Static URLs ........................................................................................ 39

        D.      Fourth Component: Limitations on Calls to Action............................................. 41

        E.      Program Exclusions........................................................................................ 42

IV.     DISCUSSION ........................................................................................................ 45

        A.      Apple's Motion to Set Aside Judgment ............................................................. 45

                1.      *Beverage v. Apple, Inc.*....................................................................... 47

                2.      *Murthy v. Missouri* ............................................................................. 51

        B.      Epic's Motion to Enforce Injunction.................................................................. 55

                1.      The Letter and Spirit of the Injunction ................................................... 56

                2.      More Specific Findings of Civil Contempt ............................................... 59

        C.      Privilege Disputes ........................................................................................ 63

                1.      Apple's Motion to Strike...................................................................... 63

                2.      Apple's Rule 502(d) Motion ................................................................ 64

                3.      Abuse of Privilege ............................................................................... 65

        D.      Apple's Motion for Indemnification ................................................................. 67

United States District Court
Northern District of California

1            1.      Legal Standard.............................................................................................. 67

2            2.      Analysis ........................................................................................................ 68

3  **V.**       **RELIEF AND SANCTIONS ........................................................................................ 74**