DANIEL G. SWANSON, SBN 116556
    dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
    crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

JULIAN W. KLEINBRODT, SBN 302085
    jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

MARK A. PERRY, SBN 212532
    mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice*)
    joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000
Facsimile: 202.857.0940

MORGAN D. MACBRIDE, SBN 301248
    morgan.macbride@weil.com
WEIL, GOTSHAL & MANGES LLP
Redwood Shores Pkwy, 4th Floor
Redwood Shores, CA 94065
Telephone: 650.802.3044
Facsimile: 650.802.3100

MARK I. PINKERT (Fla. Bar No. 1003102; *pro hac vice*)
    mark.pinkert@weil.com
KATHERINE G. BLACK (Fla. Bar No.
1031465; *pro hac vice*)
    katie.black@weil.com
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: 305.577.3100
Facsimile: 305.374.7159

Attorneys for Defendant APPLE INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.<br><br>            Plaintiff, Counter-defendant<br>v.<br><br>APPLE INC.,<br><br>            Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**DECLARATION OF ALEX ROMAN IN SUPPORT OF APPLE INC.'S OPPOSITION TO EPIC GAMES, INC.'S MOTION TO ENFORCE INJUNCTION**<br><br>The Honorable Yvonne Gonzalez Rogers |

I, Alex Roman, hereby declare as follows:

1.      I am a Vice President of Finance at Apple Inc. and am responsible for, among other things, supporting our Services business, which includes the App Store.  Prior to my current position, I was the Senior Director of Finance and Business Management supporting Worldwide Product Marketing at Apple for 5 years.  Before Apple, I held positions at Thomson Reuters as Vice President of Finance, at Amgen as Treasury Senior Manager, and at General Motors as Treasury Manager of the New York Treasurer's Office, among various other roles in finance over the past 25 years.

2.      In my current role, I work extensively on financial controllership, forecasting, planning, and analysis related to Apple's key products and services, including the App Store, and have a deep knowledge and understanding of the financial drivers and performance associated with the App Store.

3.      As part of my current role, I work closely with different senior leaders who make pricing decisions for different products and services.  When Apple needs to make a pricing decision, the senior leaders responsible for that product or service will convene what Apple sometimes refers to as a price committee (the "Price Committee").  Alongside members of other Apple teams, I assisted in creating a presentation for the Price Committee responsible for determining the commission structure for Apple's "StoreKit External Purchase Link Entitlement (US)"[1] ("Link Entitlement") program (the "Price Committee Deck"), which recommended the commission structure that the Price Committee ultimately adopted.  A copy of that deck is attached as Exhibit 1.  I was principally responsible for directing, reviewing, and presenting the financial impact of the various pricing options, as well as articulating a set of options within the Price Committee Deck to the Price Committee, and I have personal knowledge of the facts testified to herein.

**APPLE ENGAGED EXPERT GUIDANCE PRIOR TO ADOPTING THE 27% STANDARD COMMISSION RATE AND 7-DAY TIME WINDOW FOR LINK ENTITLEMENT**

4.      Apple's Link Entitlement permits any developer to apply to include in apps on the U.S. storefronts of the iOS and iPadOS App Stores information about alternative purchase options and a link to the developer's external website.

---

[1] Terms used herein are defined within the Declaration of Matthew Fischer Regarding Compliance with UCL Injunction.  Dkt. 871-1.

5.      Apple charges developers a 27% commission on digital goods and services transactions that take place on a developer's website within 7 days after a user taps through an External Purchase Link from the system disclosure sheet to an external website.

6.      Developers eligible for and participating in the App Store Small Business Program are charged a 12% commission on purchases made within 7 days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external website.  Auto-renewals in the second year or later of an auto-renewing subscription that was purchased within 7 days after a user taps through an External Purchase Link are also charged a 12% commission.

7.      Apple's commission has always been set based on Apple's evaluation of the value of its services and the pricing of competitors or comparable platforms.  In this case, prior to determining its commission structure for Link Entitlement, Apple also engaged an outside consultant, Analysis Group. Analysis Group compiled relevant data by identifying comparable services and products, the associated fees of those services and products, and the duration of the attribution window for any fees.  I incorporated certain aspects of Analysis Group's findings in the Price Committee Deck provided to the Price Committee.

**APPLE CONSIDERED THE VALUE OF THE UNIQUE STACK OF PRODUCTS AND SERVICES PROVIDED BY APPLE'S ECOSYSTEM TO DEVELOPERS**

8.      The Price Committee Deck describes the categories of products and services that the Apple ecosystem provides to developers, including, but not limited to: (1) platform technology, which includes access to core Apple technologies, intellectual property, and a platform integrating hardware and software; (2) developer tools and services, which includes those that help developers build apps and optimize performance, engagement, and monetization; (3) distribution, which includes hosting and distributing apps and updates to global users at a large scale, fostering user trust, and preventing piracy; and (4) discovery of apps via advertising, marketing, and measuring channel performances.  *See* Price Committee Deck at 5.  Using the data compiled by Analysis Group, the Price Committee Deck provides ranges of the estimated value of those services, expressed as a percentage of developer revenue if they were to otherwise procure these services that Apple provides through the App Store.  *See id.*

9. For "platform technology," the analysis reported various ranges of value, including that integrated game consoles charge 30% of total revenues, physical retail centers including platform technology with demand generation charge between 5% and 20%, and e-commerce business services including platform technology with no demand generation charge between 0.3% and 6%. *See id.* As noted in the Price Committee Deck, these costs reflect only the lower bound on the value provided by Apple's platform technology, because substitutes do not replicate all capabilities of the Apple platform. *See id.*

10. For "developer tools and services," a key benefit of Apple's model is that it lowers startup costs and risks, compared to where developers would need to pay up front for tools and services. *See id.* Developers could try to obtain alternative tools through third parties, but that would typically be for a flat fee per developer seat, subscription, or usage-based fee. Comparing and contrasting those alternatives based on product type and developer size, estimated pricing would be between 3% and 16% of developer revenues depending on size of the developer, as well as whether the developer is a game developer or non-game developer. *See id.*

11. For "distribution," the data relied on for the Price Committee Deck indicated that Apple offers 1.5 billion devices across 175 regions and 40 languages, 747 million weekly app downloads and 1.5 billion redownloads, 41 billion weekly app updates (mostly automatic), and most importantly, users' trust in the App Store. Accordingly, Analysis Group found that any estimate only provides a lower bound that does not include the significant value of users' trust in the App Store's privacy and piracy protection measures. Still, in consideration of annual revenue, downloads, redownloads, updates, app size, and estimated cost per GB, estimated distribution costs to developers would be between 4% and 25% (depending on whether they are small or large and games or non-games developers). *See id.*

12. Lastly, for "discovery," the data relied on for the Price Committee Deck showed that Apple has 650+ million visitors to the App Store per week on average, as well as the 130,000 apps featured on the App Store and Apple Channels. Analysis Group determined that assembling a package of third-party discovery tools involves substantial effort on the part of developers and may require paying for services without realizing revenue. *See id.* Accordingly, the estimated cost of alternatives for app discovery could be between 5% and 21% of developer revenue (depending on whether they are small or

1  large and games or non-games developers).  *See id.*

2  **APPLE CONSIDERED COMMISSION RATES CHARGED BY OTHER INTEGRATED MAR-**

3  **KETPLACE COMPETITORS**

4   13.    In addition to considering the value of the services and tools that Apple provides, Apple

5  considered commission rates charged by integrated app marketplace competitors (which are market-

6  places offered as part of an integrated hardware and software platform, such as a game console), as well

7  as the range and quality of services and tools they provide to developers.  *See id.* at 6.

8   14.    Commission rates across app marketplaces typically fall between 15% and 30%.  *See id.*

9  For example, for app marketplaces that provide platform technology, Google Play Store has a 30% de-

10  fault commission rate for revenues over $1 million.  *See id.*  Select game marketplaces with integrated

11  platform technology, including Xbox, PlayStation, and Nintendo, all have 30% standard commission

12  rates, and the Microsoft Store has a 15% commission rate on apps and a 12% commission rate on PC

13  games.  *See id.*

14   15.    Apple also considered similar metrics for standalone marketplace competitors (meaning

15  marketplaces which are offered independent of an integrated hardware and software platform): Steam

16  has a 30% default commission rate for revenues under $10 million, Amazon Appstore has a 30% default

17  commission rate for revenues over $1 million, Samsung Galaxy Store has a similar 30% default rate or

18  otherwise agreed-upon rate, and Epic Games Store has a 12% standard commission rate or 0% with third

19  party billing.  *See id.* at 7.  For an app store without platform technology, One Store (Korea) has a 20%

20  default commission rate, or 5% if the developer uses third-party payment, and Codashop (a web-based

21  marketplace for in-game currencies and content) has a 15% commission rate.  *See id.*

22   16.    The Price Committee Deck reflects that the 27% Link Entitlement commission rate is

23  lower than the App Store's regular 30% commission rate, as well as the 30% commission rates of Google

24  Play, Microsoft Store (Xbox), Playstation Store, Nintendo eShop, and others.  *See id.*  And significantly,

25  Apple's Link Entitlement includes benefits and features not available on all of the alternatively compared

26  platforms in the marketplace.  *See id.*

27

28

**APPLE CONSIDERED HOW OTHER PLATFORMS COMMISSION LINK TRANSACTIONS**

17.    Apple considered various examples within the marketplace for how Apple could charge a commission for a purchase happening after the user clicks a link that goes out of the app, including offering affiliates a commission on referrals; tracking windows or cookie durations to determine the time period within which affiliates can earn a commission; and placing a commission on installs attributed to ad campaigns run by developers with the help of mobile measurement partners ("MMPs").

18.    Apple also considered multiple examples of the time period during which an affiliate earns a commission for a referral, which varied significantly between 24 hours and 90 days.  *See id.* at 8.

19.    For first-party affiliate programs, where firms can use affiliates to sell their own products (such as Microsoft or Norton Lifelock), tracking windows ranged between 14 days and 90 days.  *See id*. For platform affiliate programs, where firms use affiliate programs to boost sales of third party merchants on the platform (such as eBay, Amazon, or Etsy), tracking windows ranged between 24 hours and 30 days.  *See id.*

20.    Looking at advertising benchmarks, where developers measure effectiveness of ad campaigns, the typical length of MMP lookback windows, like those of Adjust, AppsFlyer, or Branch, are 7 days click and 1 day view-through, while ad networks called self-attributing networks ("SANs") like Google, Meta Ads, or Snapchat use longer click default windows up to 30 days.  *See id.*

**APPLE ESTIMATED THE APP STORE ECOSYSTEM'S INDICATIVE PROFITS AND LOSSES AS WELL AS EFFECTIVE COMMISSION ON ENTITLEMENT TRANSACTIONS**

21.    The Price Committee also considered indicative profits and losses ("P&L") in an effort to determine the impact of the proposal on App Store's operating margins.  *See id.* at 9.

22.    Apple maintains its P&L at the enterprise level, and that enterprise-wide P&L is "fully burdened," meaning that it includes all direct and indirect costs for the entire company, but is not fully burdened for individual products or services (meaning that it does not fully and accurately allocate all direct and indirect costs attributable to that product or service).

23.    Apple is not able to attribute joint operating expenses to specific products or services.  As

1   a result, Apple cannot create an accurate, fully burdened P&L for the App Store (that is, one that fully

2   and accurately accounts for all of the direct and indirect operating expenses for the App Store) or accu-

3   rately isolate an operating margin for the App Store.

4     24. Apple uses various methodologies for internal modeling purposes depending on the ob-

5   jective of the exercise.  Accordingly, Apple sometimes performs trend analyses that compare the

6   year-to-year performance (actual and forecasted) within various products and services.  In this instance,

7   Apple aimed to evaluate the comparative impact of different commission models on the estimated gross

8   and operating margins of the App Store.  In order to establish a baseline for comparison purposes, Apple

9   calculated the billings for the App Store and then applied two methodologies for estimating costs and

10   expenses that could be attributed to the App Store, including the judgment and estimates of senior man-

11   agement to allocate such costs and expenses.  The purpose of this exercise was not to definitively estab-

12   lish the margins of the App Store, but rather to understand the different effects the possible commission

13   models would have on Apple's business.

14     25. Using these estimates, the analysis indicated operating margins of between ████

15   for the worldwide App Store and operating margins of between ██████ for the U.S. App Store.

16   *See id.*

17     26. Apple also considered the resulting effective commission rates based on different time

18   durations and using certain financial assumptions, such as assuming 50% of customers return to use

19   entitlement for subsequent purchases.  *See id.* at 11–12.  In projecting the effective commission rate on

20   entitlement transactions, Apple's Price Committee evaluated a range of numbers between 20% and 30%

21   for the commission rate, as well as a range of time durations from a single purchasing session to 30 days

22   after the session has ended.  *See id.* at 11.  The effective commission rate for a 27% commission rate and

23   7-day time duration window resulted in a projected 18% effective commission rate, whereas a 30%

24   commission rate with a 24-hour time duration window was projected to result in a 20% effective com-

25   mission rate.  *See id.*

26     27. Apple utilized these assumptions in evaluating both revenue impact and gross margin

27   impact.  *See id.* at 13.  With a 27% commission rate and 7-day time window duration, Apple projected,

28

1   on an annual basis and in steady-state, ▮▮▮▮▮▮ in revenue impact and ▮▮▮▮▮▮ in gross margin

2   impact.

3       28.    Based on the information summarized in the Price Committee Deck, Apple's Price Com-

4   mittee accepted the recommendation that Apple adopt a 27% standard commission rate, and 12% com-

5   mission rate for the Small Business Program, for transactions effected within 7 days after a user taps

6   through an External Purchase Link from the system disclosure sheet to an external website.  For program

7   eligibility, the Price Committee determined that developers in the Small Business Program and Tenured

8   Subscriptions will be eligible for the Link Entitlement, while apps in the Video Partner Program and

9   News Partner Program will not be.  *See id.* at 2, 14.

10  **CONFIDENTIALITY OF APPLE'S FINANCIAL ANALYSIS AND PRICING DECISIONS**

11      29.    I have reviewed Apple's Opposition to Epic Games, Inc.'s Motion to Enforce Injunction

12  (the "Opposition").

13      30.    Based on my review, I believe that the Opposition, this declaration, and Exhibit 1, contain

14  certain information that is confidential, proprietary, and/or commercially sensitive.  These documents

15  contain information on Apple's internal decision-making regarding financial analyses and pricing deci-

16  sions that were made just months ago.  If this information were made public, it would create a substantial

17  risk of competitive, financial, or other injury to Apple.

18      31.    I understand that Apple has taken great lengths to shield this information to the extent

19  possible.  Given the sensitive nature of these records, they have been kept strictly confidential in the

20  ordinary course of business.

21      I declare under penalty of perjury that the foregoing is true and correct.

22      Executed on April 12, 2024

23

24  By: _____

25  Alex Roman

26

27

28