| | | |
|---|---|---|
| 1 | THEODORE J. BOUTROUS JR., SBN 132099 | MARK A. PERRY, SBN 212532 |
| 2 | tboutrous@gibsondunn.com | mark.perry@weil.com |
| | RICHARD J. DOREN, SBN 124666 | JOSHUA M. WESNESKI (D.C. Bar No. 1500231; *pro hac vice pending*) |
| 3 | rdoren@gibsondunn.com | joshua.wesneski@weil.com |
| | DANIEL G. SWANSON, SBN 116556 | WEIL, GOTSHAL & MANGES LLP |
| 4 | dswanson@gibsondunn.com | 2001 M Street NW, Suite 600 |
| | JAY P. SRINIVASAN, SBN 181471 | Washington, DC 20036 |
| 5 | jsrinivasan@gibsondunn.com | Telephone: 202.682.7000 |
| | GIBSON, DUNN & CRUTCHER LLP | Facsimile: 202.857.0940 |
| 6 | 333 South Grand Avenue | |
| | Los Angeles, CA 90071 | MORGAN D. MACBRIDE, SBN 301248 |
| 7 | Telephone: 213.229.7000 | morgan.macbride@weil.com |
| | Facsimile: 213.229.7520 | WEIL, GOTSHAL & MANGES LLP |
| 8 | | Redwood Shores Pkwy, 4th Floor |
| | CYNTHIA E. RICHMAN (D.C. Bar No. | Redwood Shores, CA 94065 |
| 9 | 492089; *pro hac vice*) | Telephone: 650.802.3044 |
| | crichman@gibsondunn.com | Facsimile: 650.802.3100 |
| 10 | GIBSON, DUNN & CRUTCHER LLP | |
| | 1050 Connecticut Avenue, N.W. | MARK I. PINKERT (Fla. Bar No. 1003102; *pro hac vice pending*) |
| 11 | Washington, DC 20036 | mark.pinkert@weil.com |
| | Telephone: 202.955.8500 | KATHERINE G. BLACK (Fla. Bar No. 1031465; *pro hac vice pending*) |
| 12 | Facsimile: 202.467.0539 | katie.black@weil.com |
| 13 | RACHEL S. BRASS, SBN 219301 | WEIL, GOTSHAL & MANGES LLP |
| | rbrass@gibsondunn.com | 1395 Brickell Avenue, Suite 1200 |
| 14 | JULIAN W. KLEINBRODT, SBN 302085 | Miami, FL 33131 |
| | jkleinbrodt@gibsondunn.com | Telephone: 305.577.3100 |
| 15 | GIBSON, DUNN & CRUTCHER LLP | Facsimile: 305.374.7159 |
| | One Embarcadero Center, Suite 2600 | |
| 16 | San Francisco, CA 94111 | |
| | Telephone: 415.393.8200 | |
| 17 | Facsimile: 415.393.8306 | |

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC. | Case No. 4:20-cv-05640-YGR |
| Plaintiff, Counter-defendant | **DECLARATION OF CARLYN IRWIN IN SUPPORT OF APPLE INC.'S MOTION FOR ENTRY OF JUDGMENT ON ITS INDEMNIFICATION COUNTERCLAIM** |
| v. | |
| APPLE INC., | |
| Defendant, Counterclaimant | The Honorable Yvonne Gonzalez Rogers |
| | **FILED UNDER SEAL** |

**TABLE OF CONTENTS**

Page

I. Introduction ........................................................................................................................1
   A. Summary of Qualifications .....................................................................................1
   B. Professional Standards Applicable to My Work in this Matter ..............................2
   C. Retention .................................................................................................................2
   D. Compensation .........................................................................................................3

II. Background and Assignment ..............................................................................................3

III. Apple's Total Legal and Professional Fees and Expenses Related to the *Epic* Litigation ........3

IV. Bases for My Conclusions ..................................................................................................6

V. Analysis of Total Losses Incurred by Apple in Connection with the *Epic* Litigation ................7

VI. Analysis of the Prevalence of References to Work Performed in Connection with UCL Claim ........9

I, Carlyn Irwin, declare:

1. I am a senior advisor with Cornerstone Research, an economic and financial consulting firm where I serve as an expert witness and consultant for Counterclaimant Apple Inc. ("Apple") in *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal. Aug. 13, 2020) ("*Epic* litigation").

2. I make this Declaration in support of Apple's Motion for Entry of Judgment on its Indemnification Counterclaim. I have personal knowledge of the matters set forth herein and, if called as a witness, could and would testify competently thereto.

I.   INTRODUCTION

A.   **Summary of Qualifications**

3. I am a senior advisor with Cornerstone Research, an economic and financial consulting firm where I serve as an expert witness and consultant. I have been retained as an expert witness and have provided testimony in federal and state courts, international arbitration, and other venues. As an expert and as a consultant, I have analyzed financial, economic, and accounting issues, prepared valuations and damages claims, and conducted financial forensic analysis. In doing so, I have worked on matters involving intellectual property disputes, including patents, copyrights, trademarks, and trade secrets, as well as cases involving allegations of breach of contract, unfair business competition, false advertising, and fraud. In addition, I have been retained by clients to analyze data to reconstruct financial records, estimate profitability, and assess the consistency and reliability of data. I have testified and previously qualified as an expert regarding economic damages, valuation, accounting, and forensic accounting issues.

4. Prior to joining Cornerstone Research, I was employed as a litigation consultant with the accounting firm of PricewaterhouseCoopers (formerly Price Waterhouse) from 1994 to 2002. From 1992 to 1994, I served as the assistant controller for a law firm where I was primarily responsible for, among other things, maintaining the general ledger, producing the firm's financial statements, and assisting the executive committee with strategic analyses.

5. I hold a Bachelor of Arts degree from the University of California at Santa Barbara where I graduated with honors. I have an MBA from the University of Southern California. I am also a Certified

Public Accountant and a Certified Fraud Examiner; I am Certified in Financial Forensics and in Enterprise and Intangible Valuation; and I am Accredited in Business Valuation by the American Institute of Certified Public Accountants. A current copy of my curriculum vitae is attached as **Exhibit A.**

**B.     Professional Standards Applicable to My Work in this Matter**

6. The American Institute of Certified Public Accountants publishes professional standards applicable to my work on this engagement. In general, those standards require CPAs engaged in litigation services to: (i) maintain integrity and objectivity; (ii) only undertake engagements that are expected to be completed with professional competence; (iii) exercise due professional care in performing the services; (iv) adequately plan and supervise the performance of the services; and (v) obtain sufficient relevant data to provide a reasonable basis for the conclusions. I have complied with these professional standards in this engagement.[1]

7. Similarly, the Association of Certified Fraud Examiners publishes standards of professional conduct that are applicable to this matter. The Association recommends that CFEs adhere to the standards of: (i) integrity and objectivity; (ii) professional competence; (iii) due professional care; (iv) understanding with client or employer; (v) communication with client or employer; and (vi) confidentiality.[2] I have also complied with these standards of professional conduct in this matter.

**C.     Retention**

8. I was retained following the appellate phase of this litigation in the Ninth Circuit in *Epic Games, Inc. v. Apple Inc.*, No. 21-16506 (9th Cir.), to calculate Apple's attorneys' fees and litigation expenses for purposes of its indemnification claim. My team of only nine other Cornerstone Research staff and I operated entirely independently of the Cornerstone Research team that worked on the *Epic* litigation in prior phases. Neither I nor any member of my team was previously involved with the *Epic* litigation matter. Only my team and I had access to the Apple billing data provided for this assignment, and that

---

[1] Statement on Standards for Forensic Services No. 1, effective for engagements accepted on or after 1/1/20; early application is permissible.

[2] Association of Certified Fraud Examiners 2017 Fraud Examiners Manual, CFE Code of Professional Standards, p 4.1101-4.1103

data was kept confidential from other members of Cornerstone Research.

**D. Compensation**

9. With respect to this matter, Cornerstone Research shall be compensated at ▮▮▮▮ per hour for my time spent ▮▮▮▮ in preparation and support of my work. Cornerstone Research shall also be compensated for my colleagues who worked on this matter under my direction. Neither my compensation nor my colleagues' compensation is contingent or based on the content of my conclusions or the outcome of this matter.

**II. BACKGROUND AND ASSIGNMENT**

10. Counsel for Apple retained me on behalf of Apple to analyze information and data produced in this matter. Specifically, my primary assignment is to assess the Losses[3] incurred by Apple in connection with Epic's breach of the Developer Program License Agreement ("DPLA"), including the fees, costs, and expenses of the *Epic* litigation and trial, the related appeal in the Ninth Circuit in *Epic Games, Inc. v. Apple Inc.*, No. 21-16506 (9th Cir.), and the related indemnification litigation. In addition, I was asked to search Apple's billing data for references to work performed in those same matters in connection with Epic's claim under California's Unfair Competition Law ("UCL").

11. The conclusions in this declaration and portions of the information presented in the accompanying exhibits are my conclusions as of the date of execution of this declaration. At the request of counsel for Apple, I may amend or supplement this declaration and the accompanying exhibits as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of other witnesses in deposition or trial.

12. Should a trial or hearing be held in this matter, I anticipate using demonstratives that may include, but are not limited to, selected exhibits attached to this declaration, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits included in this declaration, and additional graphics illustrating concepts or information included in this declaration.

**III. APPLE'S TOTAL LEGAL AND PROFESSIONAL FEES AND EXPENSES RELATED TO THE *EPIC* LITIGATION**

13. Apple has paid a total of approximately $83 million to law firms and vendors for all invoices

---

[3] *See* PX-2619.40 (DPLA § 10).

billed to the *Epic* domestic litigation matter through October 31, 2023. Excluded from this total are approximately ▇▇▇▇▇ in fees and expenses Apple paid for invoices related to litigations abroad, specifically in Australia and the United Kingdom.

14. After analyzing the payment data received from Apple, as well as working with Apple's in-house counsel and individual vendors to confirm the relevant amount, I determined that Apple has paid approximately $81.6 million in legal and professional fees and litigation expenses for work actually performed on the *Epic* domestic litigation, through October 31, 2023, including pass-through amounts. As part of this process, I resolved any discrepancies with the total payments to individual vendors. I understand that Apple is seeking indemnification only for amounts actually paid for work related to the domestic *Epic* litigation, which does not include any payments made for the international *Epic* litigation.

15. **Exhibit B** shows the fees and expenses aggregated by law firm and vendor with the respective total net amounts actually paid by Apple—i.e., the amount billed to Apple, the write-off amounts, and the amount Apple paid net of write-offs.

16. **Exhibit B** also shows the adjusted totals for some law firms and vendors, where an adjustment was necessary. Numbers were adjusted where, for example, there was a discrepancy between Apple's payment data and the vendors' payment data, and adjustments were only made downward. An example of such a difference is a vendor that billed time to the ▇▇▇▇▇ for the domestic *Epic* litigation for work it performed related to international *Epic* litigation. At my instruction, my team worked with Apple's in-house counsel and individual vendors to reconcile any differences and determine the appropriate downward adjustment. In addition, outside counsel instructed us it was appropriate to reduce or eliminate the amounts billed by certain vendors. An example is an establishment where Apple hosted a social event for members of the trial team at the conclusion of the trial.

17. A total of 68 law firms and vendors provided services and were paid by Apple in connection with the *Epic* litigation in the U.S.[4] Vendor expenses were billed through law firms, except for Compass Lexecon LLC, Consilio Holdings Inc., Cornerstone Research Inc., and Open Text Inc., which billed at least some of their services directly to Apple. Law firms were paid net total amounts ranging from

---

[4] This excludes vendors in the category "Other Expenses" in Exhibits B and C for which Apple is not seeking recovery.

▆▆▆ to approximately ▆▆▆, with the adjusted total amount ranging from ▆▆▆ to approximately ▆▆▆. Those numbers are summarized in Table 1 below:

Table 1: Vendor Payments and Adjusted Total

| Vendor | Total Amount Paid | Adjusted Total |
|---|---|---|
| Gibson, Dunn & Crutcher LLP | ▆▆▆ | ▆▆▆ |
| Cornerstone Research Inc. | ▆▆▆ | ▆▆▆ |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | ▆▆▆ | ▆▆▆ |
| Consilio Holdings Inc. | ▆▆▆ | ▆▆▆ |
| Open Text Inc. | ▆▆▆ | ▆▆▆ |
| McDermott Will & Emery | ▆▆▆ | ▆▆▆ |
| Weil, Gotshal & Manges LLP | ▆▆▆ | ▆▆▆ |
| Orrick, Herrington & Sutcliffe LLP | ▆▆▆ | ▆▆▆ |
| Compass Lexecon LLC | ▆▆▆ | ▆▆▆ |
| Skadden, Arps, Slate, Meagher & Flom LLP | ▆▆▆ | ▆▆▆ |
| O'Melveny & Myers LLP | ▆▆▆ | ▆▆▆ |
| Latham & Watkins LLP | ▆▆▆ | ▆▆▆ |
| **Total:** | **$82,971,401** | **$81,560,362** |

18. **Exhibit C** shows the breakdown of both the net total payments and the adjusted total amounts for the law firms and the four vendors that billed Apple directly. For example, Gibson, Dunn, & Crutcher LLP ("Gibson Dunn") was paid approximately a total of ▆▆▆ and adjusted total of ▆▆▆. Approximately ▆▆▆ of these adjusted payments were Gibson Dunn's attorney fees, while the other ▆▆▆ were fees and expenses Apple paid to other vendors supporting Gibson Dunn, including approximately ▆▆▆ to Cornerstone Research and ▆▆▆ to Analysis Group Inc.

19. Hourly rates that law firms billed to Apple (inclusive of discounts) ranged between ▆▆▆ and ▆▆▆ across all staff members, with a weighted average billing rate of ▆▆▆. Excluding paralegals and other supporting staff, the hourly rates billed by law firms ranged between ▆▆▆ and ▆▆▆ with a weighted average billing rate of ▆▆▆.

20. I was asked by counsel for Apple to apply a 10 percent discount to the adjusted total amount paid by Apple in connection with the U.S. *Epic* litigation, resulting in a total of $73.4 million in expenses.[5]

### IV. BASES FOR MY CONCLUSIONS

21. In reaching my conclusion about Apple's total Losses, I have relied on information from sources reasonably relied upon by experts in my field and my professional expertise. In addition, I have relied upon my education, experience, and training in accounting, finance, economics, and general business subject matters. Specifically, I have relied on legal pleadings in this matter, billing data and supporting documentation produced by Apple, and other data and documents.

22. My work involved processing and analyzing Apple billing data, which came in separate files containing over 50,000 line items from over 200 invoices since August 2020 and paid through October 2023. Because Apple continues to incur expenses related to this litigation, I will supplement this declaration at a later date to reflect Apple's expenses paid from November 1, 2023 forward.

23. In the data, expenses are reported ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In addition, the data has ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, resulting in a total of more than 1.3 million data entries. Using programmatic methods, I processed the data and identified each vendor paid by Apple, aggregating the fees and expenses into totals by vendor and expense category.

24. At my direction, members of my team had conversations with Apple representatives, including the Legal Admin Manager for Legal Operations and Business Intel Analyst for Legal Operations. These discussions informed my utilization and handling of Apple's billing data, including my understanding of data labels and variables unique to Apple's system. A complete list of the information I relied upon is attached as **Exhibit D**. In addition to working with Apple, members of my team worked with Apple's in-house counsel and Apple's vendors to ensure the billing amounts were accurate and only for work performed on the domestic *Epic* litigation.

25. In addition to relying on data and documents, counsel for Apple has asked me to assume that

---

[5] My understanding from counsel is that Apple is legally entitled, by contract and under California law, to indemnification for all fees and expenses in the *Epic* litigation, but that it has chosen to apply a 10 percent discount to account for the outcome of Epic's claim under the California Unfair Competition Law.

recoverable Losses are those covered by the DPLA and thus include "any and all . . . expenses and costs, including without limitation, attorneys' fees and court costs."[6] I have therefore accounted for and itemized all of those expenses, as noted above.

## V. ANALYSIS OF TOTAL LOSSES INCURRED BY APPLE IN CONNECTION WITH THE *EPIC* LITIGATION

26. As mentioned above, I have been asked to review and analyze the electronic billing data and supporting documentation produced by Apple, and to calculate the total Losses incurred by Apple in connection with the *Epic* litigation.

27. I understand that Apple has provided me with all billing and fee data for the United States *Epic* litigation, including billing data related to its Motion for Entry of Judgment on its Indemnification Counterclaim ("indemnification litigation"), along with additional supporting documentation for the larger expenses paid by Apple.

28. Specifically, I received three mutually exclusive electronic files containing expenses submitted to Apple—[redacted]—as well as supporting invoices of non-law firm expenses exceeding $1,000.

29. To ensure its confidentiality, Cornerstone Research stored the data on an encrypted, password-protected server and restricted access to a selected group of people within the company. Nine other Cornerstone Research staff who assisted me on this assignment had access to the data. These individuals were not involved in the *Epic* litigation and were instructed to treat the data as confidential, keeping any information about the data or the litigation within the group of people working directly under my supervision.

30. Cornerstone Research staff processed Apple's electronic billing data, combining the three different files received into a single file. As requested by counsel for Apple, I excluded certain matters that included expenses associated with related litigations abroad.

31. The combined data have 50,560 invoice line items, [redacted]

---

[6] See PX-2619.40 (DPLA § 10).

1 █████████████████████████████████████
2 █████████████████████████████████████
3 ███████████████████████████████. For a list of fields and their descriptions, see **Exhibit E**.

32. The billing data identify service providers that submitted their respective invoices directly to Apple in the field "Firm/Vendor Name." Companies listed under this field are mostly law firms and a few other service providers (e.g., consulting firms) that sent invoices directly (and electronically) to Apple. Several other companies had their services and expenses billed through the law firm by whom they were hired or worked with closely. I identified these companies by the narrative of the expenses submitted by law firms under ████████████████████████

33. I identified company invoices billed indirectly to Apple through law firms as a line item with descriptions containing the text "Vendor," "Merchant," "Payee", or "Invoice." I excluded from this set ████████████████████████████████████████████████████████████████████████████████████████ Additionally, invoices that are associated with third-party vendors that directly billed to Apple are aggregated separately. These vendors are Compass Lexecon LLC; Open Text Inc.; Cornerstone Research, Inc.; and Consilio Holdings Inc. I further checked for names that appear to be individuals, confirming whether the person is a legal professional billing expenses for reimbursement. If there is evidence that the person is an employee of one of the law firms, the individual's expenses are aggregated with other expenses from the respective law firm.

34. After processing the data, I compiled net total expenses by service provider, i.e., companies that billed directly and indirectly to Apple, and a total across all service providers.

35. I also included the amount of fees and expenses written off (i.e., discounted or excluded for any reason) for each service provider and total across the data. To compile write-offs, ████████████ ████████████████████████ In total, Apple wrote off ██████████ from invoices in the *Epic* litigation as of October 31,

2023.

36. As mentioned above, my team worked at my instruction with Apple's in-house counsel and individual vendors to confirm relevant amounts for the work performed on the *Epic* domestic litigation. If there was a discrepancy between Apple's payment data and the vendors' payment data, I made a downward adjustment to the total by taking the lowest value.

37. In addition, I compiled categories of expenses by classifying third-party vendors using Apple billing data and law firm and vendor declarations, as well as discussions with Apple and individual vendors, as shown in **Table 2** below:



## VI. ANALYSIS OF THE PREVALENCE OF REFERENCES TO WORK PERFORMED IN CONNECTION WITH UCL CLAIM

38. As mentioned above, I have also been asked to search the electronic billing data provided by Apple for references to work performed in connection with Epic's UCL claim. Counsel provided me with a list of seven search terms to use for this analysis: "UCL" OR "ULC" OR "17200" OR "Unfair" OR "Unlawful" OR "Unfair /2 Competition" OR "Unlawful /2 Competition."

39. In the electronic billing data provided by Apple for work performed in the *Epic* litigation, 144 out of 50,560 invoice line items contain references consistent with the search terms above. The total amount of expenses associated with these line items is $275,030 or approximately 0.33 percent of the total expenses in the billing data—i.e., substantially less than 10 percent of the total amount Apple paid in connection with the *Epic* litigation.

1  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and
2  correct. Executed this 15th day of January, 2024, in Fullerton, California.

Respectfully submitted,

By: *Carlyn Irwin*
CARLYN IRWIN