**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EPIC GAMES, INC., | No. 25-2935 |
| *Plaintiff-ctr-defendant - Appellee*, | D.C. No. 4:20-cv-05640-YGR |
| v. | |
| APPLE INC., | |
| *Defendant-ctr-claimant - Appellant*. | OPINION |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted October 21, 2025
San Francisco, California

Filed December 11, 2025

Before: SIDNEY R. THOMAS and MILAN D. SMITH,
JR., Circuit Judges, and MICHAEL J. MCSHANE, Chief
District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Michael J. McShane, United States Chief District Judge
for the District of Oregon, sitting by designation.

## SUMMARY[**]

### Contempt / Sanctions

The panel (1) affirmed in part and reversed in part the district court's order imposing civil contempt sanctions on Apple Inc. for failing to comply with an injunction in an action brought by Epic Games, Inc.; and (2) declined to vacate the injunction.

After a bench trial, the district court enjoined Apple from certain anticompetitive business practices related to its App Store, and this court affirmed the injunction. Apple claimed to comply with the injunction, but it instead prohibited App Store developers from using buttons, links, and other calls to action without paying a prohibitive commission to Apple, and it restricted the design of the developers' links to make it difficult for customers to use them. The district court found Apple in contempt, and it issued an order to address Apple's violations of the injunction.

Affirming the district court's contempt findings, the panel held that the district court did not abuse its discretion by finding Apple in contempt. Addressing Apple's methodological arguments, the panel concluded that the district court did not improperly rely on the injunction's spirit. The district court did not err in considering evidence of Apple's bad faith and did not clearly err in finding that Apple acted in bad faith. And the district court properly considered materials that Apple contended were protected by the attorney-client privilege. Addressing the merits of the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court's contempt analysis, the panel concluded that Apple's civil contempt was shown by clear and convincing evidence. Under the injunction, Apple could not prohibit developers from including in their apps and their metadata buttons, external links, or other calls to action that directed customers to purchasing mechanisms outside of Apple's App Store. The panel concluded that charging a 27% commission had a prohibitive effect, in violation of the injunction. Apple also prohibited users from making purchases on developers' sites, in violation of the injunction, with its restrictions on link design. Two restrictions violated the strict letter of the injunction, and others violated the injunction's implicit command to refrain from action designed to defeat it.

The panel reversed and remanded in part the district court's imposition of civil contempt sanctions. The panel concluded that most of the six prescriptive restrictions that the district court imposed on Apple's conduct properly restated Apple's existing obligations under the injunction, but some parts of the restrictions were overbroad. In addition, a commission prohibition did not qualify as a civil contempt sanction in its present form. The panel modified part of the district court's order and remanded to the district court for further modifications. The panel concluded that the district court's order did not impose price controls requiring equitable abstention under California's Unfair Competition Law. The order did not violate the Takings Clause by forbidding Apple from charging a commission on linked-out purchases, and the order did not violate Apple's First Amendment rights. In addition, the district court did not deny Apple due process.

The panel rejected Apple's arguments that the injunction must be vacated. The panel concluded that a recent decision

Case: 25-2935, 12/11/2025, DktEntry: 170.1, Page 4 of 54
Case 4:20-cv-05640-YGR   Document 1668   Filed 12/11/25   Page 4 of 5

4          EPIC GAMES, INC. V. APPLE INC.

from a California Court of Appeal did not conflict with the injunction. Apple argued that the Supreme Court's recent ruling on nationwide injunctions in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), clashed with the injunction, but the panel concluded that *CASA* did not undermine this court's prior analysis of the injunction's scope, and the district court's injunction was not an impermissible nationwide injunction.

---

## COUNSEL

Gary Bornstein (argued), Yonatan Even, Lauren A. Moskowitz, Justin Clarke, Michael J. Zaken, and M. Brent Byars, Cravath Swaine & Moore LLP, New York, New York; Daniel Woofter, Kevin Russell, Russell & Woofter LLC, Washington, D.C.; Paul J. Riehle, Faegre Drinker Biddle & Reath LLP, San Francisco, California; for Plaintiff-counter-defendant-Appellee.

Gregory G. Garre (argued), Roman Martinez, Peter E. Davis, and Soren J. Schmidt, Latham & Watkins LLP, Washington, D.C.; Sarah M. Ray and Nicholas Rosellini, Latham & Watkins LLP, San Francisco, California; Ben Harris and Kristin C. Holladay, Latham & Watkins LLP, New York, New York; Zachary D. Tripp, Mark A. Perry, and Joshua M. Wesneski, Weil Gotshal & Manges LLP, Washington, D.C.; Cynthia E. Richman, Gibson Dunn & Crutcher LLP, Washington, D.C.; Theodore J. Boutrous Jr. and Daniel G. Swanson, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Defendant-counter-claimant-Appellant.

Scott A. Keller, Steven P. Lehotsky, and Jeremy E. Maltz, Lehotsky Keller Cohn LLP, Washington, D.C., for Amici

Case: 25-2935, 12/11/2025, DktEntry: 170.1, Page 5 of 54
Case 4:20-cv-05640-YGR    Document 1668    Filed 12/11/25    Page 5 of 5

EPIC GAMES, INC. V. APPLE INC.                    5

Curiae NetChoice and Computer & Communications Industry Association.

Karl Huth, Matthew Reynolds, J. Lee Hill, and Jack Mitchell, Huth Reynolds LLP, Huntington, New York, for Amicus Curiae Digital Content Next.

Sara T. Schneider, ArentFox Schiff LLP, Los Angeles, California, for Amicus Curiae the International Center for Law & Economics.

Aaron M. Panner, Alex A. Parkinson, Sven E. Henningson, and Jared M. Stehle, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C., for Amicus Curiae Microsoft Corporation.

Brendan P. Cullen and Renata B. Hesse, Sullivan & Cromwell LLP, Palo Alto, California; Shane M. Palmer, Sullivan & Cromwell LLP, New York, New York; for Amicus Curiae Spotify USA Inc..

H. Hunter Bruton, Edward F. Roche, and Noel F. Hudson, Smith Anderson Blount Dorsett Mitchell & Jernigan LLP, Raleigh, North Carolina; Jennifer Sturiale, Delaware Law School, Widener University, Wilmington, Delaware; for Amici Curiae Civil Procedure and Antitrust Professors.

Justin H. Sanders, Sanders Roberts LLP, Los Angeles, California, for Amicus Curiae Information Technology & Innovation Foundation.

Brian D. Wang, Deputy Attorney General; Michael W. Jorgenson, Supervising Deputy Attorney General; Paula L. Blizzard, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Francisco, California; for Amicus Curiae the State of California.

Lawrence S. Ebner, Atlantic Legal Foundation, Washington, D.C.; Alejandro L. Sarria and Bradley E. Markano, Miller & Chevalier Chartered, Washington, D.C.; for Amicus Curiae Atlantic Legal Foundation.

Tyler P. Young, Christian J. Ward, and Susanna R. Allen, Yetter Coleman LLP, Houston, Texas; for Amici Curiae Law Professors Samuel L. Bray, F. Andrew Hessick, and Michael T. Morley.

Jonathan M. Redgrave and Gareth T. Evans, Redgrave LLP, Chantilly, Virginia, for Amicus Curiae Lawyers for Civil Justice.

Jennifer Daskal and J. Daniel Everson, Venable LLP, Washington, D.C.; Sarah L. Scott, Venable LLP, Baltimore, Maryland; for Amicus Curiae the Center for Cybersecurity Policy and Law.

Adam Gershenson, Cooley LLP, Boston, Massachusetts; Michelle C. Doolin and Allison W. O'Neill, Cooley LLP, San Diego, California; Ephraim McDowell, Cooley LLP, Washington, D.C.; for Amici Curiae Former Federal Antitrust Enforcers.

R. Trent McCotter, Boyden Gray PLLC, Washington, D.C.; Drew Hudson, TechNet, Washington, D.C.; Susanna McDonald and Amy C. Chai, Association of Corporate Counsel, Washington, D.C.; for Amici Curiae TechNet & Association of Corporate Counsel.

Calvin House, Gutierrez Preciado & House LLP, Pasadena, California, for Amicus Curiae Civil Justice Association of California.

Lawrence J. Spiwak, Phoenix Center for Advanced Legal and Economic Public Policy Studies, Washington, D.C., for

Amicus Curiae Phoenix Center for Advanced Legal and
Economic Public Policy Studies.

Sanjiv P. Laud, Lucien Wang, and Meredith A. Stewart,
McCurdy Laud LLC, Minneapolis, Minnesota, for Amicus
Curiae Software & Information Industry Association.

Mark G. Weiss, Creighton J. Macy, Kaitlyn E. Barry, and
Stephen T. Loertscher, Baker & McKenzie LLP,
Washington, D.C., for Amicus Curiae ACT | The App
Association.

Gina F. Elliott and Darin M. Sands, Bradley Bernstein Sands
LLP, Pasadena, California, for Amicus Curiae for Chamber
of Progress.

Zac Morgan and Cory Andrews, Washington Legal
Foundation, Washington, D.C., for Amici Curiae
Washington Legal Foundation and TechFreedom.

Catherine S. Simonsen, Shaoul Sussman, and Nicolas A.
Stebinger, Simonsen Sussman LLP, Los Angeles,
California, for Amicus Curiae Y Combinator LLC.

Marie W. L. Martin and Matthew Michaloski, Assistant
Attorneys General; Stanford E. Purser, Solicitor General;
Derek Brown, Utah Attorney General; Office of the Utah
Attorney General, Salt Lake City, Utah; Treg R. Taylor,
Alaska Attorney General, Office of the Alaska Attorney
General, Anchorage, Alaska; Brian L. Schwalb, District of
Columbia Attorney General, Office of the District of
Columbia Attorney General, Washington, D.C.; Theodore E.
Rokita, Indiana Attorney General, Office of the Indiana
Attorney General, Indianapolis, Indiana; Liz Murrel,
Louisiana Attorney General, Office of the Louisiana
Attorney General, Baton Rouge, Louisiana; Dana Nessel,
Michigan Attorney General, Office of the Michigan

Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, Minneapolis, Minnesota; Raul Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Jeff Jackson, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Portland, Oregon; Jonathan Skrmetti, Tennessee Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; John B. McCuskey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae State of Utah, 11 Other States, and the District of Columbia.

Randy Stutz, American Antitrust Institute, Kensington, Maryland; John M. Newman, University of Memphis School of Law, Memphis, Tennessee; for Amicus Curiae American Antitrust Institute.

Margaret C. MacLean, Lowey Dannenberg PC, White Plains, New York, for Amici Curiae Consumer Federation of America and Public Knowledge.

Case: 25-2935, 12/11/2025, DktEntry: 170.1, Page 9 of 54
Case 4:20-cv-05640-YGR   Document 1668   Filed 12/11/25   Page 9 of 5

EPIC GAMES, INC. V. APPLE INC.                    9

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellee Epic Games, Inc. (Epic) sued Defendant-Appellant Apple, Inc. (Apple) for alleged antitrust violations related to Apple's App Store. After a bench trial, the district court enjoined Apple from certain anticompetitive business practices. Namely, Apple could not prohibit App Store developers from using buttons, links, or other calls to action to encourage customers to make purchases from the developers rather than Apple. We affirmed. Apple claimed to comply with the injunction, but it instead prohibited developers from using buttons, links, and other calls to action without paying a prohibitive commission to Apple, and it restricted the design of the developers' links to make it difficult for customers to use them.

The district court found Apple in contempt, and it issued an order to address Apple's violations of the injunction. We affirm the district court's contempt findings. We reverse and remand in part the district court's imposition of civil contempt sanctions, but we otherwise affirm that order. Separate from the contempt issues, Apple urges us to vacate the injunction, citing new cases from the California Court of Appeal and the U.S. Supreme Court. We reject its arguments. We also reject its request for a new district judge on remand.

## FACTS AND PRIOR PROCEEDINGS

Epic develops video games, most notably *Fortnite*. It also runs the online Epic Games Store to distribute its own apps and apps belonging to other companies.

10          EPIC GAMES, INC. V. APPLE INC.

Apple developed the iPhone and iPad; the operating system, iOS; and the App Store. Apple licenses its intellectual property to developers (like Epic) so they can build iOS software applications (apps) and distribute them through the App Store. Developers can earn money off their apps using the In-App Purchase (IAP) system. With IAP, users can buy digital goods and services from developers in the App Store, and in doing so, users pay Apple, which remits 70% to the developers and keeps 30% for itself as a commission.[1]

Five years ago, Epic sued Apple, alleging claims pursuant to the Sherman Act, in addition to California's Cartwright Act and California's Unfair Competition Law (UCL). Epic alleged that Apple could not require developers like itself to use Apple's IAP for purchases of digital products within iOS apps. Epic also alleged that Apple could not ban developers from using "buttons, external links, or other calls to action [to] direct customers to purchasing mechanisms other than" IAP, which could allow them to avoid Apple's commission.

After a bench trial, the district court reached a mixed result. It found in Apple's favor with respect to the IAP requirement for purchases within iOS apps but in Epic's favor with respect to Apple's ban on developers directing customers to non-IAP purchasing mechanisms (*i.e.*, Apple's "anti-steering" provisions). *See Epic Games, Inc. v. Apple Inc.* (*Epic I*), 559 F. Supp. 3d 898, 1052–57, 1068–69 (N.D. Cal. 2021). It dismissed the antitrust claims but concluded that Apple's anti-steering provisions violated the UCL by

---

[1] Users can also purchase physical goods from developers using IAP, although only digital goods and services are at issue here. There is no commission on purchases of physical goods.

"'threaten[ing] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform." *Id.* at 1055 (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)). The district court explained its findings in a written order.

Based on those findings, the district court, in relevant part, "permanently restrained and enjoined" Apple "from prohibiting developers from . . . including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to [IAP]." This was memorialized in a separate document (the Injunction).

Both parties appealed to us, and we affirmed in part, reversed in part, and remanded. *See Epic Games, Inc. v. Apple, Inc.* (*Epic II*), 67 F.4th 946, 973 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681–82 (2024). In particular, we affirmed the Injunction. *Id.* at 1002.

Prior to the Injunction, purchases made off the Apple platform (linked-out purchases) were not subject to a commission because Apple did not allow for such purchases. However, while appealing the Injunction, Apple contemplated whether to charge a commission on those purchases, given the Injunction requires Apple to allow for these transactions they had previously banned.

In May 2023, after our court ruled on the appeal, Apple examined two proposals. With Proposal 1, Apple would charge no commission but would restrict what links could say, what they could look like, and where they could be located. With Proposal 2, Apple would lift most of those restrictions but charge a 27% commission on linked-out purchases. Apple studied the potential revenue consequences of both proposals and eventually decided that

it would combine the commission from Proposal 2 with the restrictions from Proposal 1.

In conceiving the 27% commission, Apple took the 30% commission for the purchases through IAP and applied a "cost of payments discount" of 3%.[2] Importantly, however, Apple believed that the 3% discount was too small to lead to meaningful "developer adoption of link-out." In a linked-out purchase, developers would pay more than 30% because they would pay 27% commission to Apple plus more than 3% to cover the external costs of processing payments. In a transaction using IAP, developers would pay only Apple's 30% commission.

Apple also studied the effects of its link restrictions. It found that "when a link-out happens, there will be some breakage," meaning a fraction of "customer[s] [will] drop[] off during the buy-flow process due to a less seamless experience" on the developer's site compared to Apple's IAP. Apple calculated that, if it could push breakage above a certain percentage, "developers reach a tipping point where they [would] lose more on linking out than they would make sticking with Apple [I]AP and [paying] the higher commission."

Based on these analyses, Apple decided it would adopt certain restrictions on external links, which were incorporated into Apple's "Link Entitlement" program. Such restrictions included:

1.  External payment links had to follow the so-called "Plain Button style," meaning the link

---

[2] The 27% commission would be applied to purchases made for a period of seven days after the consumer followed the link out of the app.

could not be enclosed in a visible shape. The link could be enclosed in a shape, but it would not be visible because "[t]he background surrounding the text must match the background of [the] app's page."

2. External payment links had to follow one of five templates and could not say anything else.

3. External payment links could not "be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using" IAP.

4. Each time a user clicked an external payment link, the user would be presented with a warning that they were "about to go to an external website"; that Apple was "not responsible for the privacy or security of purchases made on the web"; that "[a]ny accounts or purchases made" using the link would "be managed by the developer"; that the user's "App Store account, stored payment method, and related features, such as subscription management and refund requests" would not be available; and that Apple could not "verify any pricing or promotions offered by the developer."

5. External payment links had to be static, not dynamic, meaning the link could not identify the user or automatically log that user into their account after clicking the link.

14          EPIC GAMES, INC. V. APPLE INC.

> 6. External payment links could not be used by
>    participants in Apple's Video Partner
>    Program (VPP) or News Partner Program
>    (NPP).
>
> 7. External payment must "[b]e displayed no
>    more than once in app, on no more than one
>    app page the user navigates to . . . in a single,
>    dedicated location on such page, and may not
>    persist beyond that page[.]"

We will generally refer to these restrictions as "link design restrictions," despite the fact that they restrict more than link design. In its App Review Guidelines, Apple determined that developers would be required to participate in the program if they intended "to include a link to the developer's website that informs users of other ways to purchase digital goods or services."

Apple put its plan (27% commission and Link Entitlement program) into action several months after our court issued its decision affirming the Injunction. The Supreme Court denied Apple's certiorari petition on January 16, 2024, *see Apple Inc. v. Epic Games, Inc.*, 144 S. Ct. 681 (2024), and the plan went into effect later that same day. Apple filed a Notice of Compliance with the district court, which "summarize[d]" the changes that it made to comply with the Injunction. The Injunction went into effect the next day.

Two months later, Epic moved to enforce the Injunction, contending Apple was not in compliance. The district court then set an evidentiary hearing for May 2024. That hearing lasted six court days and involved testimony from seven witnesses. The district court "became increasingly

concerned that Apple was not only withholding critical information about its business decision for complying with the Injunction, but also that it had likely presented a reverse-engineered, litigation-ready justification for actions which on their face looked to be anticompetitive."

In light of its concerns, the district court "ordered the production of all Apple's documents relat[ed] to the decision-making process leading to the link entitlement program and associated commission rates." Apple asserted privilege over many of those documents, but most of its privilege claims were eventually withdrawn or rejected. In September 2024, Apple filed a motion for relief from the Injunction pursuant to Fed. R. Civ. P. 60(b). After Apple's document production concluded, the evidentiary hearing resumed in February 2025. The second hearing lasted three days and involved testimony from five witnesses.

On April 30, 2025, the district court issued an omnibus order (the April 30 Order). *See Epic Games, Inc. v. Apple Inc.* (*Epic III*), 781 F. Supp. 3d 943 (N.D. Cal. 2025). It denied Apple's motion to set aside the Injunction. *See id.* at 983–89. It granted Epic's motion to enforce the Injunction and held Apple in civil contempt for noncompliance with the Injunction. *See id.* at 989–95. The district court noted that as of the May 2024 hearing, Apple provided no evidence of developer adoption rates, with no evidence that any large developer was willing to comply with Apple's conditions to offer linked-out purchases. *See id.* at 982 & n.50. It permanently enjoined Apple from:

1. Imposing any commission or any fee on purchases that consumers make outside an app, and as a consequence thereof, no reason exists to audit, monitor, track or require

> developers to report purchases or any other
> activity that consumers make outside an app;

2. Restricting or conditioning developers' style,
   language, formatting, quantity, flow or
   placement of links for purchases outside an
   app;

3. Prohibiting or limiting the use of buttons or
   other calls to action, or otherwise
   conditioning the content, style, language,
   formatting, flow or placement of these
   devices for purchases outside an app;

4. Excluding certain categories of apps and
   developers from obtaining link access;

5. Interfering with consumers' choice to
   proceed in or out of an app by using anything
   other than a neutral message apprising users
   that they are going to a third party-site; and

6. Restricting a developer's use of dynamic
   links that bring consumers to a specific
   product page in a logged-in state rather than
   to a statically defined page, including
   restricting apps from passing on product
   details, user details or other information that
   refers to the user intending to make a
   purchase.

*Id.* at 1003–04 (footnote omitted).  The district court also
resolved some outstanding privilege disputes and other
issues.  *See id.* at 995–1002.  Finally, it referred Apple and
one of its officers for criminal investigation.  *See id.* at 1005.
Apple timely appeals from the April 30 Order.

## STANDARD OF REVIEW

"This court reviews a district court's contempt finding and imposition of sanctions for abuse of discretion." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992). However, "[w]e review a district court's factual findings in connection with a contempt order for clear error." *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025). Our court has been less than clear about the standard of review applicable to privilege calls. *See Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1222 (9th Cir. 2025). Because we would affirm the district court's privilege analysis regardless of the standard of review, we will not resolve the apparent intra-circuit split over the correct standard of review. Finally, we review "the denial of a Rule 60(b) motion for relief from judgment" "for abuse of discretion." *Marroquin v. City of Los Angeles*, 112 F.4th 1204, 1211 (9th Cir. 2024).

## ANALYSIS

The district court found Apple in contempt for violating the Injunction, and in the April 30 Order, it issued specific restraints on Apple's conduct pursuant to the Injunction. The district court did not abuse its discretion by finding Apple in contempt. The district court's restrictions in the April 30 Order are affirmed in part and reversed and remanded in part. Despite Apple's arguments to the contrary, most of the restrictions imposed by the district court align with the Injunction, although they are overbroad in some respects. However, the commission prohibition is not an appropriately cabined civil contempt sanction. Accordingly, the April 30 Order is reversed in relevant part and remanded to the district court. We otherwise affirm the April 30 Order.

Separately, Apple contends that the Injunction must be vacated in light of recent authority from the California Court of Appeal and the U.S. Supreme Court. These arguments lack merit. We also reject Apple's request that a different district judge be assigned to the case on remand.

## I.  Jurisdiction

According to Apple, we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Apple explains that the April 30 Order is a final order for the purposes of § 1291 that disposes of the post-judgment contempt proceeding and Apple's motion to set aside the judgment. Epic does not disagree. We conclude that we have jurisdiction over this appeal because the Injunction and April 30 Order were drafted as final orders, despite our remand in part of the April 30 Order to clarify some of its provisions, as detailed below. The outcome of the appeal does not change our jurisdictional status.

## II.  The District Court's Contempt Findings and Analysis

Apple makes three methodological challenges to the district court's contempt analysis. It contends that the district court improperly: (i) relied on the Injunction's spirit; (ii) considered evidence of Apple's bad faith; and (iii) considered privileged material in making its rulings. Each methodological challenge fails, and we affirm the contempt findings on the merits. The district court did not abuse its discretion by finding Apple in contempt.

### A.  The Injunction's Spirit

"Civil contempt . . . consists of a party's disobedience to a specific and definite order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck*

*Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). "In contempt proceedings[,] . . . a decree will not be expanded by implication or intendment beyond the meaning of its terms," but those terms must be "read in the light of the issues and the purpose for which the suit was brought." *Terminal R.R. Ass'n of St. Louis v. United States*, 266 U.S. 17, 29 (1924).

In *Institute of Cetacean Research v. Sea Shepherd Conservation Society* (*Sea Shepard*), 774 F.3d 935 (9th Cir. 2014), we determined that because "it is proper to observe the objects for which the relief was granted," courts can "find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *Id.* at 949 (quoting *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)).

Thus, pursuant to *Sea Shepard*, the district court did not err in concluding that courts "look to the spirit of the injunction when a litigant applies a dubiously literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals." *Epic III*, 781 F. Supp. 3d at 990–91. Apple resists this conclusion, arguing that *Sea Shepherd* "does not apply when . . . the injunction's plain terms do not proscribe the conduct at issue, and there is no contention of aiding and abetting." The first argument fails because, in the above-quoted part of *Sea Shepherd*, we assumed that the strict letter of the injunction was not violated. *See Sea Shepherd*, 774 F.3d at 949. The second argument fails because, although *Sea Shepherd* was an aiding-and-abetting case, the above-quoted portion says nothing about aiding and abetting. Indeed, courts must prevent defendants from evading injunctions even when they have not enlisted an aider or abettor. In

short, *Sea Shepherd* means what it says: parties may be held
in contempt for violating the spirit of an injunction.

*Sea Shepard*'s holding makes practical sense.  Were
"narrow literalism . . . the rule of interpretation, injunctions
w[ould] spring loopholes, and parties in whose favor
injunctions run w[ould] be inundating courts with requests
for modification in an effort to plug the loopholes."
*Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 906 (7th
Cir. 1995) (internal citations omitted).

Next, Apple argues that the district court violated Fed.
R. Civ. P. 65(d)(1).  Pursuant to that rule, "[e]very order
granting an injunction . . . must . . . state its terms
specifically; and . . . describe in reasonable detail—and not
by referring to the complaint or other document—the act or
acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(B), (C).
The district court complied with this rule.  The Injunction
was filed as a separate docket entry, and it does not reference
another document, including the district court's opinion
evaluating liability.    Instead, it merely notes that the
Injunction is "consistent with its findings of fact and
conclusions of law."  The Injunction also stated its terms
specifically and in reasonable detail: it enjoined Apple, in
relevant part, "from prohibiting developers from . . .
including in their apps and their metadata buttons, external
links, or other calls to action that direct customers to
purchasing mechanisms, in addition to In-App Purchasing."
It did not exhaustively enumerate the ways that Apple might
design the App Store to prohibit those calls to action, but
Rule 65 does not require it to do so.

Apple's position also breaks down because Rule 65(d)
regulates only the "contents and scope of every injunction
and restraining order."    Fed. R. Civ. P. 65(d) (citation

modified). It does not purport to limit what materials courts may consider during contempt proceedings to interpret the plain terms of the Injunction. In fact, it says nothing about contempt. Even if district courts holding contempt proceedings could consider only the materials identified in Rule 65, that would make no difference here. Rule 65 applies to "orders granting injunctions," not just the injunctions themselves.

## B. Apple's Bad Faith

Apple first disputes that its bad faith was legally relevant to the court's contempt determination and then argues that the district court erred by finding that it acted in bad faith. The district court did not err in deciding that it could consider evidence of Apple's bad faith, nor did it clearly err in finding that Apple acted in bad faith.

Beginning with the first challenge, Apple cannot obtain reversal because "[t]he doctrine of invited error prevents a defendant from complaining of an error that was his own fault." *United States v. Magdaleno*, 43 F.4th 1215, 1219 (9th Cir. 2022) (quoting *United States v. Myers*, 804 F.3d 1246, 1254 (9th Cir. 2015)). In opposing Epic's motion to enforce the Injunction, Apple argued that Epic was required to prove "that Apple did not make good-faith efforts to substantially comply with the Injunction," arguing that "Epic ha[d] not adduced any relevant evidence to that effect" and "the undisputed evidence establishe[d] Apple's good-faith compliance with the Injunction." Having put its good faith at issue, it cannot fault the district court for considering it.

Even if Apple had preserved the point, there was no error. The standard for evaluating contempt "is generally an *objective* one," in that "a party's subjective belief that she was complying with an order ordinarily will not insulate her

from civil contempt if that belief was objectively unreasonable." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (emphasis in original). However, there is a "narrow" exception: a party should not be held in contempt if "[their] action appears to be based on a good faith and reasonable interpretation of (the court's order)." *Sea Shepard*, 774 F.3d at 953 (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)). Because this exception rises and falls on an objective inquiry (*i.e.*, whether a defendant's interpretation is "reasonable"), the exception is not helpful for Apple, which based its conduct on an objectively unreasonable interpretation of the Injunction. *See id.* That being said, the exception shows that good faith can be relevant to a court's contempt evaluation, refuting Apple's argument that its "subjective motivations ha[ve] no bearing on whether Apple can be held in civil contempt."

Good faith, when coupled with an objectively reasonable interpretation of a court's order, can be enough to avoid a contempt finding. Here, even assuming that Apple's interpretation of the Injunction is reasonable (it is not), evidence of Apple's bad faith negates a good-faith defense. In any case, the Supreme Court has acknowledged that "civil contempt sanctions may be warranted when a party acts in bad faith." *Taggart*, 587 U.S. at 561–62.

Apple offers three reasons that the district court clearly erred in its April 30 Order in finding that Apple acted in bad faith, "unfairly impugn[ing] its motives when responding to the original injunction." None of them is persuasive.

First, the district court noted that Apple "hid its decision-making process from the Court," *Epic III*, 781 F. Supp. 3d at 960, but Apple argues that it filed a "transparent 'Notice of

Compliance'" about its compliance plans.  Apple further
argues that it was not required to provide additional details
about its compliance plan because Epic did not seek
discovery prior to the first evidentiary hearing.  However, as
Epic counters, Apple has ignored the district court's finding
that Apple "attempted to mislead" in its Notice of
Compliance and May 2024 hearing with "pretextual"
justifications. *See Epic III*, 781 F. Supp. 3d at 971–72.

Second, the district court noted that, "[u]ltimately,
Apple's 2024 response to the Injunction was the most
anticompetitive option" among those options that Apple
considered. *Id.* at 962.  Apple argues that the district court
"penalized Apple for choosing what [it] understood to be the
most advantageous option for its business and shareholders,"
which is not evidence of bad faith.  But the district court did
not find Apple in contempt because it picked the most
advantageous of several purportedly compliant options.
Instead, it found that "at every step Apple considered
whether its actions would comply, and at every step Apple
chose to maintain its anticompetitive revenue stream over
compliance." *Epic III*, 781 F. Supp. 3d at 992.  It also found
that Apple "opted to construct a program that nullified the
revenue impact of the Injunction by prohibiting any viable
alternative." *Id.* at 991.

Third, the district court found that the Analysis Group's
"recommendation of a commission rate on link-out
transactions as the basis for [Apple's] commission
determination [was] entirely manufactured, and Apple's
reliance thereon [was] a sham." *Id.* at 993.  According to
Apple, Apple hired the consulting firm Analysis Group,
which started in the spring of 2023, to explore how Apple
might "fairly charge for the value that it provides to
developers . . . while implementing a linkout to allow [users]

to purchase from the web." Yet, the district court found that
the "report did not materially factor into Apple's decision-
making process." *Epic III*, 781 F. Supp. 3d at 993. This
factual finding is not clearly erroneous given that, as the
district court explained, the record suggests that Apple
picked its commission rate in July 2023, and the report is
dated January 2024. *See id.* at 967–968.

Regardless, the district court found Apple in contempt
for other reasons. Specifically, it found that Apple "*willfully*
chose to ignore the Injunction, *willfully* chose to create and
impose another supracompetitive rate and new restrictions,
and thus *willfully* violated the Injunction." *Id.* at 992.

### C. Apple's Allegedly Privileged Materials

Apple's last methodological challenge to the district
court's contempt findings is part legal and part factual. On
the law, Apple argues that the district court applied the
wrong test for assessing communications that involve both
legal and business advice. We disagree.

We held in *In re Grand Jury*, 23 F.4th 1088 (9th Cir.
2021), "that the primary-purpose test applies to attorney-
client privilege claims for dual-purpose communications."
*Id.* at 1092. "Under the 'primary purpose' test, courts look
at whether the primary purpose of the communication is to
give or receive legal advice, as opposed to business or tax
advice." *Id.* at 1091. However, *Grand Jury* left open
whether legal advice must be "*the* primary purpose" or just
"*a* primary purpose." *Id.* at 1094 (emphases in original).
The latter test was adopted by the D.C. Circuit in *In re
Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014).
According to Apple, we should apply the *Kellogg* test to
dual-purpose communications, as those at issue here.

We decline Apple's invitation to apply *Kellogg* in this case. As in *Grand Jury*, we find "no need to adopt or apply the *Kellogg* formulation of the primary-purpose test here." 23 F.4th at 1095. First, although one can "see the merits of the reasoning in *Kellogg*," Apple cites nothing to change our court's conclusion that "[n]one of [its] other sister circuits have openly embraced *Kellogg* yet." *Id.* at 1094. Second, the "*Kellogg* test would only change the outcome of a privilege analysis in truly close cases, like where the legal purpose is just as significant as a non-legal purpose." *Id.* at 1095.

On these facts, Apple has not presented a close privilege call, even reviewing de novo. Apple's briefing addresses only two documents in any detail. First, the district court relied on an "internal presentation" that "proposed two options for achieving compliance with the Injunction" entitled "Proposed responses to Epic injunction." Second, the district court relied on a June 2023 presentation titled "Epic Injunction Implementation Proposal." While some of these documents contained some privileged communications, those communications were redacted.

Among what remains, legal advice was not the primary purpose of the communications. Rather, the communications largely relate to Apple's business personnel, and their consideration of how the company could offer linked-out purchases without losing revenue. Apple contends that these documents "were 'prompted by a Court order.'" But whether *Kellogg* applies or not, Apple must do more than show the "dual-purpose communication was made 'because of' the need to give or receive legal advice." *Grand Jury*, 23 F.4th at 1092. The fact that the Injunction prompted, or caused, these communications is not enough.

Next, Apple argues that one of these documents contained a slide with a screenshot of the Injunction and the other contained a slide listing some "[r]equirements" and "[k]ey elements under consideration" from the Injunction. But neither slide shows that receiving legal advice was even *a* primary purpose, much less *the* primary purpose. Both slides were at the beginning of the presentation, and in the following slides, Apple analyzed how various compliance options would affect its revenue, not the strength or risk of its legal positions. In context, these initial slides were merely an introduction to the bulk of the presentation. Because the unredacted parts of the following slides consisted of classic business advice regarding business risks, there was no error in the district court's privilege analysis.

## D.  The District Court's Contempt Findings

Having resolved Apple's methodological arguments, we turn to the merits of the district court's contempt analysis. Civil contempt must be shown by clear and convincing evidence. *See In re Dual-Deck*, 10 F.3d at 695. Under the Injunction, Apple could not "prohibit[] developers from . . . including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms" outside of Apple's App Store. Ultimately, the parties' dispute turns on the meaning of the key word "prohibit," which can be interpreted to mean "[t]o prevent, preclude, or severely hinder." *Prohibit*, Black's Law Dictionary (12th ed. 2024).

### i.  Apple's 27% commission

The first question is whether charging a 27% commission has a prohibitive effect, in violation of the Injunction. We agree with the district court that it does. On purchases made through IAP, Apple charges 30%

commission.   On linked-out purchases, it charged 27%.
However, Apple knew that processing linked-out purchases
would cost developers more than 3%.   As the district court
found, "Apple willfully set a commission rate that in practice
made all alternatives to [its platform] economically non-
viable." *Epic III*, 781 F. Supp. 3d at 992.   The district court
found no evidence that any developer chose to direct
customers to their own purchasing mechanisms and pay
Apple's 27% commission in doing so. *See id.* at 982.

Apple is not the first litigant to try burdening what it
could not prohibit.   Two hundred years ago, Congress
created the Bank of the United States, and the state of
Maryland tried to tax it. *See M'Culloch v. Maryland*, 17 U.S.
316, 317–18 (1819).   The Supreme Court saw through this
ploy: Maryland could not tax the bank because "the power
to tax involves the power to destroy[.]" *Id.* at 431.   In the
same   way,   Apple   has   demonstrated   that   charging
commissions on linked-out purchases gives it the power to
prohibit them.     "An unlimited power to tax involves,
necessarily, a power to destroy; because there is a limit
beyond which no institution and no property can bear
taxation." *Id.* at 327.   Once Apple's commission on those
transactions was large enough, no rational developer would
offer them.   The Injunction prohibits that kind of conduct.

Apple responds that the Injunction says nothing about
commissions.   But Apple does not "have an immunity from
civil contempt because the plan or scheme which [it] adopted
was not specifically enjoined." *McComb v. Jacksonville
Paper   Co.*,   336   U.S.   187,   192   (1949).     Having
"experiment[ed] with disobedience of the law," *id.*, it must
now bear the burden of being found in contempt.   If Apple
was correct that "[c]ivil contempt [could be] avoided today
by showing that the specific plan [it] adopted . . . was not

enjoined," the district court would have to enter "a new" injunction targeting Apple's "particular plan." *Id.* "Thereafter," Apple could "work out a plan that was not specifically enjoined" and "once more obtain[]" "[i]mmunity . . . because the new plan was not specifically enjoined." *Id.* at 192–93.  By doing so, "a whole series of wrongs [would be] perpetrated and [the Injunction would] go[] for naught." *Id.* at 193.

Apple emphasizes that, in its view, the district court expressly permitted it to charge a commission on linked-out purchases. *See Epic I*, 559 F. Supp. 3d at 1042.  Apple overreads the district court's decision.  The language that Apple quotes from the district court's liability opinion is pulled from its discussion of in-app purchases and alternatives to IAP that would still allow Apple to collect a commission.[3]  The district court did not mention a commission for linked-out purchases, presumably because linked-out purchases were not permitted at that time.  The same is true of our previous opinion. *See generally Epic II*, 67 F.4th 946.

---

[3] In *Epic I*, the district court assessed the market "for in-app purchases of in-app content." 559 F. Supp. 3d at 1042. Epic argued that "Apple [should] be barred from restricting or deterring in any way 'the use of in-app payment processors other than IAP.'" *Id.* The district court rejected this argument because "IAP is the method by which Apple collects its licensing fee from developers," and "[e]ven in the absence of IAP, Apple could still charge a commission on developers"; "[i]t would simply be more difficult for Apple to collect that commission." *Id.* The court explained that, "in such circumstances[,] [] Apple may rely on imposing and utilizing a contractual right to audit developers annual accounting to ensure compliance with its commissions, among other methods." *Id.* at 1042 n.617. This discussion was aimed at the practical reality of using IAP versus another commission method for in-app purchases of in-app content.

That being said, it would be difficult to say that *all* commissions violate the Injunction, and, as discussed below, we decline to do so.[4] However, Apple did not charge *any* commission; it charged a prohibitive commission. The district court did not abuse its discretion for finding Apple in contempt for imposing it.

### ii. Apple's link design restrictions

The next question is whether Apple prohibited users from making purchases on developers' sites, in violation of the Injunction, with its restrictions on link design in the Link Entitlement Program. There are several restrictions at issue, and although we address each separately, all violate the Injunction. The first two restrictions violate the strict letter of the Injunction. For the remaining restrictions, we will assume *arguendo* that Apple did not violate the strict letter of the Injunction. Even so, these restrictions violated the Injunction's "implicit command to refrain from action designed to defeat it." *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 413 (1960) (Frankfurter, J., concurring).

First, the Injunction requires Apple to allow developers to use both "links" and "buttons." Apple did not allow buttons: it allowed developers to use something it calls a "plain button," but the "plain button" is no button at all. A plain button "may not be enclosed in a shape that uses a contrasting background fill"; instead, the "background surrounding text must match the background of [the] app's page." Thus, the alleged "button" is invisible. Because the

---

[4] In its April 30 Order, the district court seems to indirectly acknowledge that the Injunction allows Apple to charge some commission on linked-out purchases, but it explains that Apple lost the "opportunity" to "valu[e] its intellectual property" given its "retroactive[] justif[ication of its] desired end result." *Epic III*, 781 F. Supp. 3d at 993.

Injunction requires Apple to permit both "buttons" and "links," merely making the link, not the button, visible does not comply with the Injunction; the Injunction contemplates *both* "buttons" and "links," not one of the two.

Second, beyond "buttons" and "links," the Injunction requires Apple to permit "other calls to action." Apple did not do so. Developers can use only five different templates, and these templates are essentially links. Each contains a single phrase like "Lower price offered" or "Buy for $X.XX" and the link itself. Whether these templates are characterized as "buttons" or "links," the Injunction permits developers to use "other calls to action." By limiting developers to particular, limited templates, Apple violated the Injunction.

Third, Apple requires that external purchase links "[n]ot be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase." For example, according to the district court, "if an app has an item shop where a user could purchase a digital product . . . nowhere in that shop could the external purchase link appear." *Epic III*, 781 F. Supp. 3d at 971. As a result, external purchase links never appear where users naturally expect to see their purchase options and would find them most useful: at the time of purchase. In practical effect at least, this restriction prohibited linked-out purchases.

Fourth, Apple deployed a so-called "scare screen." Before users could use an external purchase link, they would be warned in large, bold font that they were "about to go to an external website" and that "Apple is not responsible for the privacy or security of purchases made on the web." The record confirms that Apple designed the scare screen to prevent external purchases. It chose the phrase "external

website" because it "sounds scary." It used the developer's name, rather than the app name, to make the screen "even worse." It discussed how to make the screen "scarier" and how to "'scare' users a bit." By engineering this screen to prevent users from completing linked-out purchases, Apple engaged in conduct designed to defeat the Injunction.

Fifth, Apple required developers to use static URLs rather than dynamic URLs. Clicking dynamic links can automatically log a user into their account; with static links, the user must log in manually. Yet again, the record shows that Apple designed the purchasing experience to make external links as hard to use as possible. This flies in the face of the Injunction's spirit. As the district court found, "Apple's sensitivity analyses of breakage reveal that Apple was modeling precisely the amount of friction needed in a transaction to ensure that link-out transactions were not viable for a developer." *Epic III*, 781 F. Supp. 3d at 994. It created "an ensemble of requirements that significantly reduces developers' ability to steer consumers to any competitive, favorable alternatives." *Id.*

Apple responds that it adopted all these restrictions to advance users' privacy and security. This is irrelevant to the contempt analysis here. Whatever the Injunction prohibited, Apple must not do.[5] In any event, the district court found that Apple's privacy and security justifications are pretextual, and there was no clear error in its ruling. *See Epic III*, 781 F. Supp. 3d at 972. For example, one of Apple's

---

[5] Indeed, for contemnors like Apple who "are not unwitting victims of the law" but "took a calculated risk when under the threat of contempt," and "where as here the aim is remedial and not punitive, there can be no complaint that the burden of any uncertainty in the decree is on [Apple's] shoulders." *McComb*, 336 U.S. at 193.

witnesses testified that he could think of no other reason to use a plain, link-style "button" other than to stifle competition. *See id.* at 973. As another example, Apple claimed that dynamic links were dangerous because they could be used to pass along private information, but Apple allows developers to set up dynamic links for purposes other than linked-out purchases. *See id.* at 979. Apple offers no credible reason for its restrictions on external purchase links.

Accordingly, the district court did not abuse its discretion by holding Apple in contempt for imposing its link design restrictions.

## III.  The District Court's Contempt Sanctions

The April 30 Order imposes sanctions for Apple's contempt by listing six proscriptive restrictions on Apple's conduct. Most of them restate (albeit more specifically) Apple's existing obligations under the Injunction. That being said, some parts of the April 30 Order's restrictions are overbroad, and the commission prohibition does not qualify as a civil contempt sanction in its present form. As outlined below, we modify part of the April 30 Order and remand to the district court for further modification.

We reject the rest of Apple's challenges. Excluding the reversed portions of the April 30 Order, some of Apple's challenges should have been, but were not, raised when Apple appealed the Injunction. Moreover, to the extent that they are not waived, those challenges fail on the merits. The district court also did not deprive Apple of due process. We therefore affirm the balance of the April 30 Order.

EPIC GAMES, INC. V. APPLE INC.                    33

## A. The April 30 Order's Permanent Restriction on Apple's Link Design Restrictions

The court frames its April 30 Order as a civil contempt order. *See Epic III*, 781 F. Supp. 3d at 1002–04. However, Apple argues that "[t]he district court [improperly] imposed a new and far broader injunction . . . under the guise of exercising its civil contempt power." According to Apple, the April 30 Order's "new" prohibitions are unjustified. It argues that "[t]he[] new restrictions are inherently punitive and cannot be imposed using the non-punitive civil contempt power, no matter the court's findings." We agree with Apple only in part. We begin with the April 30 Order's restrictions related to Apple's link design restrictions, which we conclude largely do no more than coerce Apple to comply with the Injunction, and thus, do not abuse the district court's discretion.

When a defendant is in contempt, a district court can "'coerc[e] the defendant to do' what a court had previously ordered [it] to do." *Turner v. Rogers*, 564 U.S. 431, 441 (2011) (first alteration in original) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)). "District courts have broad equitable power to order appropriate relief in civil contempt proceedings." *Sec. & Exch. Comm'n v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003), *amended on denial of reh'g*, 335 F.3d 834 (9th Cir. 2003). Even so, we "review the court's exercise of that power for an abuse of discretion." *Id.*

Applying these standards, we review the restrictions from the April 30 Order. First, the district court enjoins Apple from "[r]estricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app." *Epic III*, 781 F. Supp. 3d at

1003. The district court did not necessarily abuse its discretion with this restriction. Prohibiting Apple from limiting developers to "plain buttons" and to the five templates is necessary to coerce compliance with the Injunction, by ensuring that developers can place their buttons, links, and other calls to action in the purchase flow.

However, part of this restriction is too broad. As Apple argues, if there are no limits to developer links, "developers [can] create link-out mechanisms that so elevate the external link over Apple's IAP mechanism—e.g., by putting the external link in large and noticeable font and the IAP link in small or near-unreadable font—as to trample Apple's right to offer IAP entirely." Under the Injunction, Apple cannot undermine developers' right to offer linked-out purchases, but that does not mean that developers can trample Apple's payment option either. Even under the district court's broad equitable power, allowing developers to muzzle Apple's messaging is not necessary to protect or give life to the Injunction. After all, the Injunction was intended to eliminate barriers "prevent[ing] [users] from making informed choices." *Epic I*, 559 F. Supp. 3d at 1055.

Accordingly, we modify the April 30 Order so that, where both Apple and a developer offer a purchase option, Apple may restrict the developer from placing its buttons, links, or other calls to action in more prominent fonts, larger sizes, larger quantities, and more prominent places than Apple uses for its own buttons, links, or other calls to action. But Apple must let developers place their buttons, links, or other calls to action in at least the same fonts, sizes, quantities, and places as Apple's own, and the district court's prohibition on "language" restrictions must not include Apple's typical restrictions (if any) to ensure that its general

content standards are upheld by limiting offensive language and similar portrayals.

Second, Apple cannot "[p]rohibit[] or limit[] the use of buttons or other calls to action, or otherwise condition[] the content, style, language, formatting, flow or placement of these devices for purchases outside an app." *Epic III*, 781 F. Supp. 3d at 1003. This restriction is nearly identical to the previous one, except that it applies to "buttons" and "other calls to action," rather than "links." Because the Injunction applies equally to "buttons," "links," and "other calls to action," we modify this restriction the same way as the previous one.

Third, Apple cannot "exclud[e] certain categories of apps and developers from obtaining link access." *Epic III*, 781 F. Supp. 3d at 1003. In effect, this restriction means that Apple cannot exclude developers in the VPP and NPP programs.[6] However, the district court found in the April 30 Order that excluding these developers "does not itself constitute a violation of the Injunction." *Id.* at 994 n.67. Although the district court found that this exclusion "highlight[ed] Apple's all-or-nothing approach," *id.*, it did not find that allowing VPP and NPP developers to use external links is necessary to enforce the Injunction, *see id.* at 993–995, 1002–04. Without more, imposing this restriction was an abuse of discretion. This problem, however, may be cured if the district court finds against Apple on either of the two issues that it did not consider: whether the exclusion violated the Injunction, or whether enjoining it was necessary to protect and give life to the

---

[6] Developers in these programs have a standard commission rate of 15% rather than Apple's standard 30% IAP commission.

Injunction.  We remand to allow the district court to modify
the April 30 Order (or not) depending on its findings.

Fourth, Apple is prohibited from "[i]nterfering with
consumers' choice to proceed in or out of an app by using
anything other than a neutral message apprising users that
they are going to a third-party site."  *Id.* at 1003.  Such
conduct is prohibited by the Injunction.  Apple's "scare
screen" is, at best, designed to evade that rule.[7]  *See supra*
Section II.D.  The district court permitted Apple to use a
neutral message apprising users that they are leaving the App
Store, meaning that the only banned messages are those that
would effectively prohibit linked-out purchases.  Thus, this
fifth restriction is limited to coercing compliance with the
Injunction.

Fifth, Apple cannot "[r]estrict[] a developer's use of
dynamic links that bring consumers to a specific product
page in a logged-in state rather than to a statically defined
page[.]"  *Epic III*, 781 F. Supp. 3d at 1004.  Because Apple's
static-link restriction violates the Injunction, this restriction
does nothing more than more specifically enjoin what the
Injunction already generally enjoined.  *See supra* Section
II.D.

## B.  The April 30 Order's Permanent Restriction on
## Apple's Ability to Charge a Commission

We review the sixth restriction (the commission
prohibition) pursuant to a separate analysis.  Under the April
30 Order, Apple cannot "[i]mpos[e] any commission or any
fee on purchases that consumers make outside an app[.]"

---

[7] As the district court noted, Apple "does not require developers selling
*physical* goods to display any warning at all before users proceed to make
a payment with a third-party payment solution."  *Id.* at 974.

*Epic III*, 781 F. Supp. 3d at 1003.  Apple argues that "[t]he district court's sweeping new zero-commission rule . . . is not tailored to Epic's claimed harm[ and] improperly imposes a punitive sanction."  We agree.

In our view, as the April 30 Order is written, it is more like a punitive criminal contempt sanction than a civil contempt sanction or modification of the Injunction.  The biggest problem with the commission prohibition is that it permanently prohibits the compensation that Apple can receive for linked-out purchases of digital products, regardless of whether the commission is itself prohibitive.

"To determine whether contempt sanctions are civil or criminal, we examine 'the character of the relief itself.'" *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994)).  "Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb*, 336 U.S. at 191.

"The difference between criminal and civil contempt is in the intended effects of the court's punishment." *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980).  A contempt remedy is "punitive and criminal if it is imposed retrospectively for a 'completed act of disobedience,' such that the contemnor cannot avoid or abbreviate the confinement through later compliance." *Bagwell*, 512 U.S. at 828–29 (citation modified) (quoting *Gompers*, 221 U.S. at 443); *see also Powers*, 629 F.2d at 627 ("[Criminal contempt] serves to vindicate the authority of the court and does not terminate upon compliance with the court's order. The punishment is unconditional and fixed.").

On the other hand, a remedy is civil—and may be imposed without a jury trial or proof beyond a reasonable doubt—if it is meant to coerce the contemnor into complying with an order or compensate someone else for losses caused by the contempt. *See Bagwell*, 512 U.S. at 827, 829. Civil contempt sanctions "are . . . avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* at 827.

Here, to be a civil contempt sanction, the commission prohibition must either: (i) compensate Epic for Apple's willful noncompliance with the Injunction; or (ii) coerce Apple into complying with the Injunction moving forward. The commission prohibition is clearly not compensatory. In fact, it is unlikely that any sanction could compensate Epic for Apple's noncompliance here; there is no way to quantify the number of developers who would have implemented external links to Epic's Games Store, or the number of consumers who would have purchased digital content using those links, had Apple not prohibited them. However, neither is the commission prohibition coercive. Rather than coercing Apple to comply with the spirit of the Injunction with a reasonable, non-prohibitive commission, the district court used blunt force to ban all commissions, abusing its discretion.

Apple must be able to purge its civil contempt by complying with the Injunction. *See Bagwell*, 512 U.S. at 829 ("Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge."). It is true, as discussed above, that the power to charge commissions on linked-out purchases is effectively the power to prohibit those purchases. *See supra* Section II.D. But it is not true that the Injunction enjoins *any* commission and *any* fee. It bars only *prohibitive* commissions or fees. The district

court's commission prohibition goes too far by denying Apple any way to purge its contempt by, for example, imposing a non-prohibitive, reasonable commission or fee to ensure security and privacy for users.**[8]** This was an abuse of the district court's discretion. While the April 30 Order's restrictions related to link design are also permanent, those restrictions are more closely tied to the strict terms and spirit of the Injunction that Apple has violated, and more easily affirmed as a clarification of that Injunction.

The district court could have fashioned this prohibition to be conditional. For example, the prohibition would have been conditional if the district court had banned any commission or any fee for linked-out purchases until Apple proposed, and the district court approved, a reasonable, non-prohibitive commission that was supported with analysis by an independent, court-appointed individual or firm. It also would have been conditional if the district court banned any commission or any fee for linked-out purchases until Apple proposed a "reasonable fee" for linked-out purchases based on Apple's "actual costs" to "ensure user security and privacy." *See, e.g.*, *In re Google Play Store Antitrust Litig.*,

---

[8] In its April 30 Order, the district court cites *H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd*., 2022 WL 104730 (S.D. Cal. Jan. 11, 2022), for its authority to impose civil contempt sanctions by clarifying the terms of a permanent injunction. *See Epic III*, 781 F. Supp. 3d at 1003. However, in that case, the district court's clarifications to the permanent injunction were tailored to the initial harm (trademark infringement). *See Franmar*, 2022 WL 104730 at *6. In contrast, here, the district court went beyond the underlying UCL violation in ordering relief. Recall that the underlying UCL violation was that Apple's anti-steering provisions "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform." *Epic I*, 559 F. Supp. 3d at 1055 (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)).

147 F.4th 917, 945 (9th Cir. 2025).  Instead, the district court permanently prohibited all commissions and fees.

We reverse and remand this portion of the April 30 Order.  There are two avenues that the district court could, in theory, take on remand to resolve its error: (i) it could modify the commission prohibition to be a conditional civil contempt sanction; or (ii) rather than imposing a contempt sanction, the district court could restrict Apple from imposing a prohibitive commission by modifying the Injunction.[9]  On remand, the district court should amend the April 30 Order's commission prohibition as either a purgeable civil contempt sanction or properly tailored modification of the Injunction, as we consider in more detail below.

*** 

In sum, having reviewed all six restrictions in the April 30 Order, we modify the April 30 Order as follows: (i) where

---

[9] If the district court chooses to modify the Injunction to enjoin commissions for linked-out purchases, the district court must tailor the Injunction modification to the underlying UCL violation.  *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief, however, must be tailored to remedy the specific harm alleged.").  However, the UCL violation, which resulted in an informational harm, does not require that *all* commissions and *all* fees be prohibited: the spirit of the Injunction contemplates the *prohibitive* commissions, and the text of the Injunction does not address commissions at all.  The presence or absence of a commission does not alter consumers' access to information about purchase options.  All else being equal, the 27% commission here violated the Injunction not because it was a commission; it violated the Injunction because it was prohibitive, and consequently, developers did not opt into Apple's Link Entitlement program, effectively stripping consumers of access to information about other purchase options.  The district court must be mindful of the threshold upon which commissions become "prohibitive."

both Apple and a developer offer a purchase option, Apple may restrict the developer from placing its buttons, links, or other calls to action in more prominent fonts, larger sizes, larger quantities, and more prominent places than Apple uses for its own buttons, links, or other calls to action; (ii) Apple may restrict developers from using language that violates its general content standards, if such standards exist; (iii) Apple is not specifically enjoined from excluding developers participating in the VPP and NPP programs from simultaneously obtaining link access; and (iv) as clarified below, Apple is not enjoined from imposing a commission or fee on purchases that consumers make in an app utilizing iOS outside Apple's App Store (a linked-out purchase) as permitted by the district court on remand. The Injunction and April 30 Order should otherwise remain in full effect.

We remand to the district court for the following: (i) to consider whether Apple's exclusion of VPP and NPP developers violated the Injunction, or whether it was necessary to protect or give life to the Injunction; and (ii) to amend the April 30 Order's commission prohibition as either a purgeable civil contempt sanction or properly tailored clarification or modification of the Injunction.

We recommend some possible courses of action to the district court regarding an appropriate commission or fee limitation on remand. Apple should be able to charge a commission on linked-out purchases with the following in mind: (a) Apple should be able to charge a commission on linked-out purchases based on the costs that are genuinely and reasonably necessary for its coordination of external links for linked-out purchases, but no more. We refer to these costs as "necessary costs."; (b) In making a determination of Apple's necessary costs, Apple is entitled to some compensation for the use of its intellectual property

that is directly used in permitting Epic and others to
consummate linked-out purchases.  In deciding how much
that should be, the district court should consider the fact that
most of the intellectual property at issue is already used to
facilitate IAP, and costs attributed to linked-out purchases
should be reduced equitably and proportionately; (c) Apple
should receive no commission for the security and privacy
features it offers to external links, and its calculation of its
necessary costs for external links should not include the cost
associated with the security and privacy features it offers
with its IAP[10]; (d) Apple should not be able to charge any
commission for linked-out purchases until such time as the
district court has approved an appropriate fee, but both
parties should be encouraged to reach agreement and/or seek
the court's approval of its proposed fee expeditiously; and
(e) The district court may determine how best to make the
referenced determination but one possibility includes
inviting the parties to provide expert testimony based upon
which it would determine the appropriate fee or commission
to be chargeable for Apple's actual costs of providing
services for linked-out transactions.  The district court might
also consider whether to establish a "Technical Committee"
somewhat like what was done in *In re Google*, 147 F.4th
917, to aid it in determining a reasonable fee and/or
commission that Apple can charge for linked-out purchases.
*See id.* at 954–55.

---

[10] According to Apple, its app review process includes "meticulous
review by human experts to 'protect against fraud, privacy intrusion, and
objectionable content beyond levels achievable by purely technical
measures.'"

### C. Apple's Miscellaneous Challenges to the April 30 Order

We next evaluate Apple's other miscellaneous challenges to the district court's contempt sanctions in the April 30 Order. We start by noting Apple's waiver. "When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter." *United States v. Nagra*, 147 F.3d 875, 882 (9th Cir. 1998). To the extent that the April 30 Order merely restates the Injunction's restrictions in a more specific manner, these restrictions originate in the Injunction, not the April 30 Order. Thus, where the district court's April 30 Order enjoined Apple from conduct that was already enjoined, Apple waived its challenges to the April 30 Order on equitable abstention Takings Clause, and First Amendment grounds. We now turn to these arguments on their merits, to the extent that the April 30 Order is not subsumed by the Injunction. We reject them all.

#### i. Equitable abstention

Apple argues that the April 30 Order's commission prohibition is "judicial ratemaking that is not permitted under the UCL." Courts "will abstain from employing the remedies available under [California's UCL] in appropriate cases[.]" *Willard v. AT&T Commc'ns of Cal., Inc.*, 204 Cal. App. 4th 53, 59 (2012) (internal quotation omitted). This "equitable abstention is appropriate" when a UCL claim "would drag a court of equity into an area of complex economic or similar policy." *Id.* (citation modified) (internal quotation omitted).

For example, in *California Grocers Association v. Bank of America*, 22 Cal. App. 4th 205 (1994), a California court determined that it could not resolve "whether service fees

charged by banks are too high and should be regulated." *Id.*
at 218. That is "a question of economic policy" reserved for
legislatures and regulators. *Id.* Federal banking regulators
"decided that all charges to customers should be arrived at
by each bank on a competitive basis." *Id.* at 218–19 (citation
modified) (quoting 12 C.F.R. § 7.8000(a)).

In *Willard v. AT&T Communications of California, Inc.*,
204 Cal. App. 4th 53 (2012), a California court also
determined that it was not an abuse of discretion for a trial
court to determine that it could not "judicial[ly] review . . .
AT & T's fees for nonpublished service and unlisted
service." *Id.* at 60. The court explained that "[t]he
administrative agency charged with responsibility over the
challenged fees ha[d] expressly taken [the] industry from
regulation to deregulation, after concluding the complex
market forces in play were sufficient to avoid abuse." *Id.* at
60–61 (citing Cal. Pub. Util. Code § 2893(e)). Thus,
although the plaintiffs had not "alleg[ed] the market [wa]s
less competitive now than it was [when the agency
deregulated], [they were] asking the judiciary to reregulate
fees which the [agency] determined should be deregulated."
*Id.* at 61.

This case is not comparable to *California Grocers* or
*Willard*. Apple can point to no statute or regulation
subjecting commissions for linked-out purchases to
unrestricted market forces. Without that, Apple has given
no reason to hold that "[i]t is primarily a legislative and not
a judicial function" to apply the UCL here. *See Cal.
Grocers*, 22 Cal. App. 4th at 218 (quoting *Max Factor & Co.
v. Kunsman*, 5 Cal. 2d 446, 454–55 (1936), *aff'd sub nom.*,
*Pep Boys v. Pyroil Sales Co.*, 299 U.S. 198 (1936)). In any
case, the district court did not attempt to "regulat[e] . . .
pricing via injunction on an ongoing basis." *Id.* (quoting

*Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1391 (1991)). It did not set a price; it instead enjoined Apple from charging a commission at all (albeit improperly). Thus, the April 30 Order did not impose price controls requiring equitable abstention under the UCL.

### ii. Regulatory taking

Apple also argues that the April 30 Order violated the Takings Clause by forbidding it from charging a commission on linked-out purchases. According to Apple, the commission prohibition is problematic because it will not receive the compensation that it claims for its intellectual property. We conclude that even if Apple has not waived this challenge, the April 30 Order was not a regulatory taking.

Judicial decisions "contraven[ing] the established property rights" of a person may violate the Takings Clause. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 733 (2010). "[S]everal factors . . . have particular significance" in deciding whether a taking has occurred, *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978), and those factors do not favor Apple.

First, the "character of the governmental action" matters, and takings are "more readily . . . found when the interference with property can be characterized as a physical invasion by government." *Id.* There is no physical taking here. Second, courts consider "[t]he economic impact of the regulation on the claimant." *Id.* Here, while the April 30 Order would deprive Apple of "its anticompetitive revenue stream," *see Epic III*, 781 F. Supp. 3d at 952, Apple is hardly otherwise uncompensated for its efforts to create the iOS and App Store. It may, for example, charge consumers for iOS devices and for commissions on in-app purchases. Third, an

action is more likely a taking if it "interfere[s] with distinct investment-backed expectations." *Penn. Cent.*, 438 U.S. at 124. Here, Apple had no expectation that it would be able to charge commissions, much less anticompetitive commissions, on linked-out purchases when investing into its iOS system because it previously prohibited such transactions.

### iii.  First Amendment

Apple next argues that the April 30 Order's "prohibitions are so broad that they violate Apple's First Amendment rights." We likewise reject this argument. Sometimes, "ordering a party to provide a forum for someone else's views implicates the First Amendment." *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024). However, this is true only if "the regulated party is engaged in its own expressive activity, which the mandated access would alter or disrupt." *Id.*

The April 30 Order (and the Injunction) may alter or disrupt Apple's ability to effectively prohibit consumers from completing linked-out purchases, but it has not interfered with Apple's own expressive activity. Apple claims that its speech has been limited because it cannot restrict developers' style, language, formatting, or quantity of links for purchases outside an app or otherwise condition the content, style, or language for purchases outside an app. But that restriction describes the developers' expressive activity, not Apple's expressive activity. Apple claims that without such restrictions, it will be effectively compelled to engage in expressive activity by allowing developers to engage in speech that it may not agree with, such as offensive speech.

Apple's argument proves too much.  If Apple is correct, a regulated party's expressive activity is implicated whenever it cannot restrict someone else's speech on a forum it runs.  If so, ordering a party to provide a forum for someone else's views will always alter or disrupt expressive activity.  That absolute rule is inconsistent with *Moody*. Ultimately, Apple is unlike "the editors, cable operators, . . . parade organizers[, and] . . . social-media platforms" that can take advantage of *Moody*.  603 U.S. at 738.  Unlike them, it has not shown it is "in the business . . . of combining 'multifarious voices' to create a distinctive expressive offering."  *Id.*

### D.  Due Process

According to Apple, "[i]f the district court believed that Apple's new commission violated the UCL, it could have instituted proceedings to modify the injunction consistent with due process."  We disagree with Apple that the district court violated due process here.  "Before issuing injunctive relief, the court must provide the affected party with notice and an opportunity to be heard."  *Armstrong v. Brown*, 768 F.3d 975, 979–80 (9th Cir. 2014).  The district court could not have run afoul of this rule to the extent that it did not impose new or modified injunctive relief.  But to the extent it did, or to the extent that the district court imposed civil contempt sanctions, Apple received notice and an opportunity to be heard.

Apple received notice because Epic requested the alleged modifications.  It challenged: the 27% commission; Apple's restrictions on the language, look, and location of developers' links; the "scare screen"; the ban on dynamic links; and the restriction to "plain buttons."  Even when the "district court d[oes] not provide the defendant with formal

notice of a possible injunction," it may impose "injunctive relief . . . [if] the defendant was aware of the potential injunction based on various filings by the parties." *Armstrong*, 768 F.3d at 980 (summarizing *Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986)).

Apple also had the opportunity to be heard. The district court held an evidentiary hearing over several days, and Apple was able to call witnesses and cross-examine Epic's witnesses. Apple does not argue that its presentation of evidence or arguments supporting its Link Entitlement program would have been different if the district court had detailed its relief earlier. *See id.* (determining that there is "no merit" to a due process challenge based on a "district court's modification to [an] injunction . . . made in response to a request by [the plaintiffs] to hold the [defendant] in contempt."). The district court took every step necessary to afford Apple due process.[11]

## IV.   Apple's Request to Vacate the Injunction

Before the district court, Apple argued that, whether it violated the Injunction or not, the Injunction ought not to be enforced going forward. We disagree. First, although Apple argues that a recent decision from a California Court of Appeal conflicts with the Injunction, we find no conflict. Second, although Apple argues that the Supreme Court's recent ruling on nationwide injunctions clashes with the Injunction, that ruling does not undermine our previous analysis of the Injunction's scope.

---

[11] It is unlikely that the district court intended to impose criminal contempt sanctions with the commission prohibition here. *See supra* Section III.B.

EPIC GAMES, INC. V. APPLE INC.                    49

### A.  Apple's Rule 60(b)(5) Motion

A party can obtain relief from a judgment if "applying it prospectively is no longer equitable[.]"  Fed. R. Civ. P. 60(b)(5).  "[I]t is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction . . . can show 'a significant change either in factual conditions or in law.'"  *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).  Here, Apple argues that the Injunction must be vacated in light of the California Court of Appeal's recent decision in *Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736 (2024), *review denied* (July 10, 2024).

There is no conflict between the judgment here and *Beverage*.  In *Beverage*, the California Court of Appeal explained that its "decision [wa]s a narrow one."  101 Cal. App. 5th at 755.  That decision "is limited to situations typified by [*Beverage*], where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the 'unfair' prong of the UCL."  *Id.*  Here, Apple has violated the "unfair" prong of the UCL, but Apple has not identified when its conduct was found immune from antitrust liability pursuant to the *Colgate* doctrine.  In contrast, this court held that Epic's antitrust claims "suffer[ed] from a proof deficiency, rather than a categorical legal bar" as in *Colgate*.  *Epic II*, 67 F.4th at 1001 (citation modified).

Moreover, although Apple was the defendant in *Beverage*, the Court of Appeal did not hold that *Colgate* aided Apple.  There, the plaintiffs abandoned part of their claim, and the court assumed without deciding that the plaintiffs' allegations were legally insufficient under *Colgate*.  *See* 101 Cal. App. 5th at 752.  Instead, the court

focused on "whether [the plaintiffs] adequately alleged an 'unfair' act or practice under the UCL considering the trial court's ruling that Apple's practices constituted permissible unilateral conduct." *Id.* Thus, *Beverage* never analyzed the question that Apple says was decided in its favor.

The opinion in *Beverage* also distinguished this court's opinion, which undermines Apple's claim that the decisions irreconcilably conflict. *Beverage* distinguished this court's opinion because it did not "engage[] [in] a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims" and was thus not "persuasive *on the precise issue* presented by th[e] appeal" in *Beverage*. *Id.* at 756 n.6 (emphasis added). That precise issue was whether the plaintiffs could sue under the UCL's "unfair" prong assuming that *Colgate* immunized Apple. That issue is not presented here because, again, no court has held that *Colgate* immunized Apple.

Apple's prior arguments also undercut its current position. Apple told the California Supreme Court that it should not review the Court of Appeal's decision in *Beverage* because it did not conflict with this court's prior opinion. *See* Answer to Petition for Review at *11–12, *Beverage v. Apple Inc.*, No. S285154 (Cal. June 18, 2024) (rejecting the argument that "the decision below [was] inconsistent with [the] decisions in a federal court lawsuit involving Epic Games"). Apple stated that "[t]he Ninth Circuit did not . . . address the applicability of the *Colgate* doctrine to the conduct challenged in that case." *Id.* at *12.

## B. Apple's Argument Pursuant to *CASA*

In its reply brief and in a Rule 28(j) letter, Apple argues that the Injunction and "new injunction" (referring to the injunctive relief in the April 30 Order) must be vacated because they are impermissible nationwide injunctions. The

Supreme Court recently expressed its disapproval of "injunctions . . . broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). The test "is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 852 (emphasis in original). If it does, it may also "advantage nonparties," albeit "incidentally." *Id.* at 851 (citation modified) (quoting *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)).

Here, we previously determined that the Injunction is consistent with *CASA*'s underlying principle because its "scope is tied to Epic's injuries" as a developer and games distributor, not to the other developers' injuries. *Epic II*, 67 F.4th at 1003. The enjoined conduct, in relevant part, "harmed Epic by . . . preventing other apps' users from becoming would-be Epic Games Store consumers." *Id.* "Because Epic benefits in this second way from consumers of other developers' apps making purchases through the Epic Games Store, an injunction limited to Epic's subsidiaries would fail to address the full harm caused by the anti-steering provision." *Id.* To the extent that Apple is challenging the original Injunction, the Injunction does nothing more than provide complete relief to Epic, and this court has already considered, and rejected, arguments to the contrary. That Epic opted out of a class action for developers does not change the result.

The April 30 Order does not fare differently under *CASA*. Apple argues that the April 30 Order is overbroad because it enjoins Apple's conduct with respect to all developers, whether or not consumers are making a purchase using the Epic Game Store. Apple would have our court limit the April 30 Order to Epic and its subsidiaries alone, or to only gaming apps that seek to implement links out to the Epic

Games Store. Epic counters that limiting the April 30 Order in the manner proposed by Apple would not facilitate the competition necessary to grant Epic complete relief. We agree with Epic on this question.

Moreover, we are persuaded by our court's discussion of *CASA* in *In re Google*.[12] In that case, we determined that "the scope of a permanent injunction following a finding of antitrust liability is hardly comparable to that of a preliminary injunction on a constitutional question." 147 F.4th at 958. We further explained that "*CASA*'s holding about district courts' authority under the Judiciary Act of 1789 has no bearing on whether the district court here exceeded its equitable powers under Section 16 of the Clayton Act," and "[t]he nationwide prohibitions [in that case] fit squarely within the district court's 'large discretion' to craft equitable antitrust remedies." *Id.* (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972)). While there is no antitrust liability here, the scope of a permanent injunction following an incipient antitrust violation pursuant to the UCL is also distinguishable from the injunction's scope in *CASA*. Specifically, the complete relief here is molded to "the necessities of th[is] particular case,'" which centers on anticompetitive conduct by Apple and aims to restore the information to consumers that is necessary to foster competition. *CASA*, 606 U.S. at 854 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

Thus, the Injunction and April 30 Order will continue to apply to all linked-out purchases and not just to Epic Games

---

[12] Google has petitioned the Supreme Court for a writ of certiorari. *See Google LLC v. Epic Games, Inc.*, No. 25-521 (Oct. 29, 2025).

or links out to the Epic Games Store. The underlying Injunction is not an impermissible nationwide injunction.

## V. Apple's Request for a New Judge

Apple argues that "[t]o the extent this Court determines that a remand is required . . . it should assign the case to a different district judge." "We reassign only in 'rare and extraordinary circumstances.'" *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1045 (9th Cir. 2015), *overruled on other grounds by Ariz. All. For Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024)). Apple argues that the district judge "found that Apple and its executives had violated an earlier order," "imposed a new injunction," "assess[ed] . . . Apple's subjective motives" using allegedly privileged documents, and referred Apple for a criminal investigation. In short, Apple seeks reassignment based solely on the district court's rejection of its arguments and its determination that Apple willfully violated the court's order. This argument lacks merit. Apple may disagree with those outcomes, but they supply no basis for reassignment.

## CONCLUSION

We modify the April 30 Order as follows: (i) where both Apple and a developer offer a purchase option, Apple may restrict the developer from placing its buttons, links, or other calls to action in more prominent fonts, larger sizes, larger quantities, and more prominent places than Apple uses for its own buttons, links, or other calls to action; (ii) Apple may restrict developers from using language that violates its general content standards, if such standards exist; (iii) Apple is not specifically enjoined from excluding developers participating in the VPP and NPP programs from

simultaneously obtaining link access; and (iv) Apple is not enjoined from imposing a commission or fee on purchases that consumers make in an app utilizing iOS outside the Apple Store (a linked-out purchase) as permitted by the district court on remand. The Injunction and April 30 Order otherwise remain in full effect.

We remand to the district court for the following: (i) to consider whether Apple's exclusion of VPP and NPP developers violated the Injunction, or whether it was necessary to protect or give life to the Injunction; and (ii) to amend the April 30 Order's commission prohibition as either a purgeable civil contempt sanction or properly tailored clarification or modification of the Injunction.

**AFFIRMED in part, REVERSED in part, and REMANDED.** Each side shall bear its own costs on appeal.