James P. Rouhandeh (*pro hac vice*)
David B. Toscano (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
rouhandeh@davispolk.com
david.toscano@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Tel: (650) 752-2000
micah.block@davispolk.com

*Attorneys for Defendant Apple Inc.*

Sarah M. Ray (SBN 22970)
*sarah.ray@lw.com*
Aaron T. Chiu (SBN 287788)
*aaron.chiu@lw.com*
Blake R. Davis (SBN 294360)
*blake.davis@lw.com*
Brett M. Sandford (SBN 302072)
*brett.sandford@lw.com*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

Gary S. Feinerman (*pro hac vice*)
*gary.feinerman@lw.com*
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611-3695
Telephone: +1.312.876.7700

Christopher Bower (SBN 301379)
*christopher.bower@lw.com*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>APPLE INC.,<br><br>                    Defendant. | Case No. 4:20-cv-05640-YGR-TSH<br><br>**DEFENDANT APPLE INC.'S REMAND PROFFER**<br><br>Judge: Honorable Yvonne Gonzalez Rogers<br><br>**Redacted Version** |

**TABLE OF CONTENTS**

<u>PAGE</u>

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND ............................................................................................................................. 5

      A.     The Ninth Circuit's December 2025 Decision ......................................................... 5

      B.     Proceedings on Remand................................................................................... 10

      C.     The Current "Zero-Commission" Regime ..............................................................11

<u>APPLE'S PROFFER</u> ..................................................................................................................... 13

I.     APPLE'S PROPOSAL REGARDING LINK-OUT COMMISSIONS ........................... 13

      A.     Apple's Significant Investments to Develop, Maintain, and Enhance the IP-Protected Tools, Technologies, and Services Provided to Developers ................. 14

      B.     Apple's Revenue-Based Commissions Incentivize Continued Investment .......... 17

      C.     Valuation Analyses................................................................................................ 18

      D.     Apple's Proposed Linked-Out Commission Is Consistent with Competitors' Commissions........................................................................................................ 19

      E.     Large Numbers of Developers Would Potentially Be Able to Link Out Profitably Under Apple's Proposed Commission Rates ....................................... 20

      F.     Developer Inefficiency and Breakage................................................................... 23

II.    COST-BASED ANALYSIS ......................................................................................... 24

      A.     "Necessary Costs" Under the Ninth Circuit's Decision ...................................... 24

      B.     Cost-Based Pricing Creates Significant Economic Pathologies ........................... 27

      C.     Limiting Apple's Linked-Out Commission to "Necessary Costs" Would Not Be Tailored to the Underlying UCL Violation ...................................................... 28

      D.     The "Necessary Costs" Analysis Suffers from Several Legal Deficiencies ......... 29

**TABLE OF AUTHORITIES**

PAGE

*Apple Inc. v. Epic Games, Inc.*,
__ U.S. __, 2026 WL 1871316 (Jun. 30, 2026) .......................................................................... 1, 10

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ........................................................................................ 30

*Cal. Grocers Ass'n v. Bank of Am.*,
22 Cal. App. 4th 205, (1994) ........................................................................................ 29

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ................................................................................................. 29

*De La Torre v. CashCall, Inc.*,
5 Cal. 5th 966 (2018) ................................................................................................... 29

*Epic Games, Inc. v. Apple Inc.*,
161 F.4th 1162 (9th Cir. 2025) ................................ 1, 2, 3, 5, 6, 7, 8, 9, 23, 24, 25, 26, 28, 29, 30

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................ 8, 9, 13, 14, 15, 16, 18, 19, 29, 30

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ........................................................................................... 9

*Epic Games, Inc. v. Apple Inc.*,
781 F. Supp. 3d 943 (N.D. Cal. 2025) .............................................................................. 8, 23, 26

*Epic Games, Inc. v. Google LLC et al.*,
No. 3:20-cv-05671-JD (N.D. Cal.) ................................................................................. 19

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) ............................................................................................ 3

*Horne v. Dep't of Agric.*,
576 U.S. 351 (2015) ...................................................................................................... 27

*Horne v. Flores*,
557 U.S. 433 (2009) ...................................................................................................... 30

*In re Chapter 13 Tr.'s Motions for Dec. Relief Challenging Constitutionality of 28 U.S.C. §
586(e) & 11 U.S.C. § 1326(b)(2)*,
666 B.R. 659 (B.A.P. 9th Cir. 2024) ................................................................................ 9

*In re Grand Jury Investigation*,
542 F.2d 166 (3d Cir. 1976) ............................................................................................ 9

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991) ........................................................................................ 29

ii

*Landreth v. C.I.R.*,
  859 F.2d 643 (9th Cir. 1988) .................................................................................................. 9

*NCAA v. Alston*,
  594 U.S. 69 (2021).................................................................................................................. 30

*Sherman v. Reilly*,
  2007 WL 9747656 (D. Or. Apr. 4, 2007) ............................................................................... 9

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)................................................................................................................ 10

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)................................................................................................................ 30

**Rules**

Federal Rule of Civil Procedure 65(d)(1) ...................................................................................... 30

**Other Authorities**

Areeda & Hovenkamp,
  *Antitrust Law: An Analysis of Antitrust Principles & Their Application* (5th ed. 2026).............. 30

APPLE'S REMAND PROFFER
CASE NO. 4:20-CV-05640-YGR-TSH

**PRELIMINARY STATEMENT**

This case is on remand from the Ninth Circuit for further proceedings arising from the post-judgment motion of Plaintiff Epic Games, Inc. ("Epic") to enforce the permanent injunction that this Court entered against Defendant Apple Inc. ("Apple") on September 10, 2021 (the "Injunction"). *See Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1174 (9th Cir. 2025) ("*Epic IV*"), *cert. granted*, __ U.S. __, 2026 WL 1871316 (Jun. 30, 2026).[1]

On appeal, the Ninth Circuit upheld this Court's finding of contempt but found error in the civil contempt sanction prohibiting Apple from charging any linked-out commission. *See id.* at 1176–77, 1180–81, 1185–86. "[T]o resolve [this] error," the Ninth Circuit mandated that this Court may "amend the April 30 [2025] Order's commission prohibition as either a purgeable civil contempt sanction or properly tailored modification of the Injunction." *Id.* at 1187.[2]

On June 30, 2026, the Supreme Court granted certiorari to review the Ninth Circuit's judgment. On August 11, 2026, this Court denied Apple's motion to stay these proceedings pending Supreme Court review, invoking its power to modify the Injunction. Dkt. No. 1706 at 1–2. This Court stated in part that "[t]he current charge from the Ninth Circuit is to oversee proceedings reflecting the appropriate commission to be allowed 'on linked-out purchases based on the costs that are genuinely and reasonably necessary for its coordination of external links for linked-out purchases, but no more.'" *Id.* at 2.

Pursuant to the Court's orders, Apple respectfully submits this proffer "regarding implementation of the Ninth Circuit's mandate" to "propose commissions for linked-out purchases, and present to the Court the evidence upon which Apple relies for its proposal." Dkt. No. 1687 at 3. By submitting this proffer, Apple does not waive, and expressly reserves, all rights flowing from the Supreme Court's forthcoming ruling.

---

[1] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

[2] The Ninth Circuit also stated that this Court should "consider whether Apple's exclusion of VPP [Video Partner Program] and NPP [News Partner Program] developers violated the Injunction, or whether it was necessary to protect or give life to the Injunction." 161 F.4th at 1187. That issue is now moot, however, because VPP and NPP developers are currently able to link out and Apple proposes in this proffer to continue to allow them to link out.

1

*First*, Apple submits that "necessary costs" are defined in an extraordinarily narrow fashion by the Ninth Circuit.  The Ninth Circuit addresses **only** Apple's actual incremental costs to provide link-out capabilities—the "equitably and proportionately" apportioned value of Apple's IP that is directly used to permit linked-out transactions—and expressly excludes security and privacy features that are fundamental to providing a safe and trusted platform.[3]  The resulting "necessary costs" are *de minimis* in relation to linked-out transaction revenue and do not support a commission above 0%.  In other words, if a link-out commission is set as a percentage of U.S. developer revenue from linked-out purchases, the percentage sufficient to cover Apple's "necessary costs" under the Ninth Circuit's highly restrictive definition would be essentially zero.  *See infra* Section II.A.

*Second*, although the Ninth Circuit discussed analyzing Apple's "necessary costs" among the "possible courses of action" on remand, Apple respectfully submits that, as further explained below, modifying the Injunction to limit Apple's rate structure to recovery of only those "costs" would be inconsistent with governing law, as well as the Ninth Circuit's decision, which—in the context of modification—requires consideration of the threshold at which the commission becomes prohibitive.  That inquiry does not depend on Apple's "necessary costs."  The Ninth Circuit repeatedly explained that this Court's Injunction "bars only *prohibitive* commissions or fees."  *Epic IV*, 161 F.4th at 1186  (emphasis in original).  Imposing price controls based on a cost analysis would not only deny Apple appropriate compensation for developers' use of the IP embodied in the tools, technologies, and services that Apple provides—the very "uncompensated use" this Court held Apple is entitled to "guard against"—but would also ignore the requirement that the injunction be tethered to the UCL violation in this case.

---

[3] The Ninth Circuit "refer[red]" to "costs that are genuinely and reasonably necessary for [Apple's] coordination of external links for linked-out purchases, but no more."  161 F.4th at 1187.  The Ninth Circuit also explained that, to determine those costs, "Apple is entitled to some compensation for the use of its intellectual property that is directly used in permitting Epic and others to consummate linked-out purchases"—subject to the caveat that "most of the intellectual property at issue is already used to facilitate IAP [in-app purchases], and costs attributed to linked-out purchases should be reduced equitably and proportionately."  *Id.* at 1187–88.  The Ninth Circuit further provided that "Apple should receive no commission for the security and privacy features it offers to external links, and its calculation of its necessary costs for external links should not include the cost associated with the security and privacy features it offers with its IAP."  *Id.* at 1188.

*Third*, both "avenues" set forth by the Ninth Circuit to correct this Court's error—a revised contempt sanction and a modification of the injunction—are a means to remedy the finding of contempt affirmed by the Ninth Circuit, which is now on appeal to the Supreme Court. *Epic IV*, 161 F.4th at 1187. A ruling by the Supreme Court that Apple should not have been held in contempt in the first place will render both remedial avenues inapplicable.

*Fourth*, proceedings to modify the Injunction are expressly subject to footnote 9, which instructs that "[i]f the district court chooses to modify the Injunction to enjoin commissions for linked-out purchases, the district court **must** tailor the Injunction modification to the underlying UCL violation" that "resulted in an informational harm." *Id.* at 1187 n.9; *see Galvez v. Jaddou*, 52 F.4th 821, 835–36 (9th Cir. 2022) (explaining that a permanent injunction must be "narrowly tailored to avoid the irreparable harm that the district court identified"). As the panel explained, "[t]he presence or absence of a [non-prohibitive] commission does not alter consumers' access to information about purchase options," so "[t]he district court must be mindful of the threshold upon which commissions become 'prohibitive.'" *Epic IV*, 161 F.4th at 1187 n.9. In the context of the modification of the Injunction advocated by Epic, restraints beyond the prohibitive threshold would **not** be "narrowly tailored to avoid" the informational harm underlying the UCL violation. *See Galvez*, 52 F.4th at 835–36.

*Fifth*, the issue presented before the Supreme Court is whether Apple can be held in civil contempt based on a violation of the injunction's "spirit" or only the letter of an injunction. In delineating the modification avenue, the Ninth Circuit in footnote 9 stated expressly that its conclusion that the Injunction restricted Apple from charging a prohibitive commission was derived from the spirit but not the letter of the Injunction. *Epic IV*, 161 F.4th at 1187 n.9 (explaining that "the spirit of the Injunction contemplates the *prohibitive* commissions, and the text of the Injunction does not address commissions at all"). Accordingly, the Supreme Court's forthcoming ruling will necessarily and directly impact the modification avenue itself because that ruling will resolve whether contempt can be based on a violation of the "spirit" of an injunction—an issue that is at the heart of the modification pathway.

Apple respectfully proposes that it should be permitted to charge linked-out commissions in

3

the U.S. as set forth below:

- 15% for standard apps, which are subject to a 30% in-app purchase ("IAP") commission;

- 10% for the Video Partner Program ("VPP"), the News Partner Program ("NPP"), the Mini Apps Partner Program ("MPP"), and subscription renewals; and

- 5% for Small Business Program apps.

Fact and expert evidence with respect to these proposed commission rates are concurrently submitted herewith. Based on expert analysis, it appears that large numbers of U.S. developers collectively accounting for the lion's share of App Store revenue will be able to link out profitably[4] at the proffered rates, resulting in substantial competitive pressure on IAP, a goal this Court has repeatedly emphasized. And at these rates, Apple can recover at least some compensation for the value that its IP-protected tools, technologies, and services provide to developers, which the Court and the Ninth Circuit have also repeatedly acknowledged as legitimate and procompetitive.

In connection with this proposal, Apple proffers the opinion of its expert economist, Dr. Dennis W. Carlton of Compass Lexecon, Professor of Economics Emeritus at the University of Chicago, and the former Deputy Assistant Attorney General for Economic Analysis of the Antitrust Division at the U.S. Department of Justice. Dr. Carlton evaluates the extent to which developers could provide linked-out transactions profitably at Apple's proposed commissions. Dr. Carlton concludes that, as to the approximately 2,700 largest apps—accounting for the vast majority of App Store revenue—the vast majority of efficient developers could profitably offer linked-out purchases under Apple's proposal. Dr. Carlton also concludes that Apple's proposal provides an "inefficiency cushion" that would also allow many inefficient developers to link out profitably.[5] Dr. Carlton's

---

[4] When this proffer and Dr. Carlton's report discuss developers' ability to "link-out profitably," they are referring to the ability to increase profits by linking out as compared to IAP. Because special programs like VPP, NPP, MPP, and the Small Business Program pay a heavily discounted IAP rate, there is less opportunity to increase their profits by linking out as compared to other developers, but that is not because linking out is more expensive for special program developers.

[5] Dr. Carlton focuses on efficient developers to avoid conflating a developer's ability to link out profitably with any idiosyncratic inefficiency, above and beyond processing costs, in the developer's implementation of linking out. *See* Carlton Rpt. ¶¶ 92–100. Indeed, any advantage Apple may have in completing transactions beyond processing costs (such as a superior user experience or greater user trust) is a dimension of competition on the merits, and it would be

4

analysis is conservative in many respects, including because it does not account for any benefit to developers from linking out beyond saving on the commission rate. Among those benefits is the ability to upsell users and offer promotions, including based on the valuable data regarding their users' purchasing behavior that developers harvest from linked out transactions, and the opportunity to capture users' future transactions free of any commission. It also uses the list prices of third-party payment processing and merchant-of-record providers even though large developers, which make up the vast majority of IAP revenue, pay far lower rates and provision many of those services in-house.

Apple also proffers expert opinions of Mr. Christopher Thompson of 233 Analytics, LLC and Mr. Paul Meyer of HKA Global, LLC. Mr. Thompson identifies the portfolio of IP-protected tools, technologies, and services that Apple provides to developers; identifies Apple's IP rights protecting those innovations; and explains the significant economic and technical benefits they provide. Relying on Mr. Thompson's technical identification of the relevant Apple IP, Mr. Meyer explains that Apple's proposed commissions are supported by the economic value that developers obtain as a result of Apple granting them limited use rights to the IP-protected tools, technologies, and services that enable them to create, optimize, distribute, and monetize their apps, including through linked-out transactions.

Concurrently with this proffer, Apple is filing an Administrative Motion for Referral to Settlement Conference. A settlement conference would meaningfully assist the parties' efforts to reach resolution and promote judicial economy by narrowing or resolving the remaining issues.

## BACKGROUND

### A.    The Ninth Circuit's December 2025 Decision

On appeal of this Court's April 2025 Order, the Ninth Circuit affirmed this Court's findings that Apple was in civil contempt. *See Epic IV*, 161 F.4th at 1176–80. As to sanctions, the Ninth Circuit upheld most of the link design restrictions as "restat[ing] (albeit more specifically) Apple's existing obligations under the Injunction," but concluded that "some parts" were overly broad and

detrimental to competition and overall welfare to require Apple to guarantee every developer can profitably link out regardless of the efficiency of its link-out implementation.

5

modified them accordingly. *Id.* at 1183; *see id.* at 1183–85.[6]  Further, although the Ninth Circuit held that the prohibition on linked-out commissions "d[id] not qualify as a civil contempt sanction in its present form," it maintained a temporary prohibition pending these proceedings. *Id.* at 1183; *see id.* at 1185–88.

In reviewing the civil contempt findings, the Ninth Circuit reasoned that this Court properly considered the "spirit" of the Injunction in determining whether Apple violated it and held that "the spirit of the Injunction contemplates the *prohibitive* commissions." *Id.* at 1176–77, 1187 n.9 (emphasis in original).  The Ninth Circuit observed that the Injunction thus barred Apple from "prohibit[ing]" apps from including certain technological means of linking out to purchasing mechanisms outside Apple's App Store. *Id.* at 1180.  The Ninth Circuit affirmed this Court's conclusion that Apple's 27% commission on linked-out purchases violated the Injunction because it had "a prohibitive effect." *Id.*  The Ninth Circuit reasoned that because the linked-out commission was prohibitive, developers did not link out and consumers were deprived of "access to information" about purchasing alternatives. *Id.* at 1187 n.9.

As to the sanction, the Ninth Circuit concluded that this Court's order permanently barring Apple from charging any commission on linked-out transactions was not an appropriate civil contempt sanction, reasoning it was "more like a punitive criminal contempt sanction," and that "[t]he biggest problem with the commission prohibition is that it permanently prohibits the compensation that Apple can receive for linked-out purchases of digital products, regardless of whether the commission is itself prohibitive." *Id.* at 1185.  A civil contempt sanction must be coercive or compensatory, but "[t]he commission prohibition is clearly not compensatory" and "neither is the commission prohibition coercive." *Id.* at 1186.  The Ninth Circuit explained that the spirit of the Injunction "**bars only prohibitive commissions**," but "[r]ather than coercing Apple to comply with the spirit of the Injunction with ***a reasonable, non-prohibitive commission***," the April 2025 Order permanently "ban[ned] all commissions." *Id.*

---

[6] The Ninth Circuit modified the April 2025 Order so that (i) Apple may restrict developers from placing off-platform payment links or buttons more prominently than Apple's own equivalent; (ii) Apple may restrict developers from using language that violates existing general content standards; and (iii) "Apple is not specifically enjoined from excluding developers participating in the VPP and NPP programs from simultaneously obtaining link access." *Id.* at 1187.

6

The Ninth Circuit explained that this Court, in fashioning its contempt sanction, could have imposed a conditional remedy that "banned any commission … for linked-out purchases until Apple proposed, and the district court approved, a ***reasonable, non-prohibitive*** commission that was supported with analysis by an independent, court-appointed individual or firm." *Id.* at 1186 (also identifying a cost-based commission as a second alternative). Moreover, in the context of discussing remand, the Ninth Circuit once again set forth "determining a reasonable fee and/or commission that Apple can charge for linked-out purchases" as one of several "possible courses of action … on remand." *Id.* at 1188. In other words, the Ninth Circuit twice set forth approval of a "reasonable" or "reasonable, non-prohibitive" commission as an alternative to a commission based on "actual costs." *Id.* at 1187–88.

The Ninth Circuit set forth "two avenues" that this Court could "take on remand to resolve its error:" "(i) . . . modify the commission prohibition to be a conditional civil contempt sanction," or "(ii) . . . restrict Apple from imposing a ***prohibitive*** commission by modifying the Injunction." *Id*. at 1187. Epic is pursuing the second avenue—"restrict[ing] Apple from imposing a ***prohibitive*** commission by modifying the Injunction." Under that avenue, the Ninth Circuit instructed that "[i]f the district court chooses to modify the Injunction to enjoin commissions for linked-out purchases, the district court must tailor the Injunction modification to the underlying UCL violation" that "resulted in an informational harm." *Id.* at 1187 n.9. The panel therefore held that "[t]he district court must be mindful of the threshold upon which commissions become '*prohibitive*'" because "[t]he presence or absence of a [non-prohibitive] commission does not alter consumers' access to information about purchase options." *Id.*

The Ninth Circuit also explained what it meant by "prohibitive." Specifically, the Ninth Circuit explained that a prohibitive commission "prevent[s], preclude[s], or severely hinder[s]" link-out, which depends on whether developers' costs of linking out (including the commission) exceed the IAP commission, rendering link-out "economically non-viable" since no "rational developer" would choose to link out at a negative profit margin. *Id*. at 1180.

The Ninth Circuit's definition of "prohibitive" is tethered to the underlying UCL violation and the original Injunction. *Id*. at 1187 n.9. In issuing that Injunction, this Court found that

7

Apple's anti-steering provisions "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1055 (N.D. Cal. 2021) ("*Epic I*"); *see also id.* at 1013–14 (discussing the harm from a "lack of information and transparency"); *id.* at 1057 (finding that Apple's anti-steering provisions "hid[e] information for consumer choice which is not easily remedied with money damages"); *id.* (finding a "public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace"). The Ninth Circuit linked the "prohibitive" inquiry to this "informational harm," *Epic IV*, 161 F.4th at 1187 n.9, emphasizing that the Injunction "was intended to eliminate barriers 'prevent[ing] [users] from making informed choices,'" *id.* at 1184 (quoting *Epic I*, 559 F. Supp. 3d at 1055). As the panel explained: "The presence or absence of a commission does not alter consumers' access to information about purchase options. . . . [T]he 27% commission here violated the Injunction not because it was a commission; it violated the Injunction ***because it was prohibitive***, and consequently, developers did not opt into Apple's Link Entitlement program, effectively stripping consumers of access to information about other purchase options." *Id.* at 1187 n.9.

This Court also recognized that the Injunction's goal was to create the conditions under which link-outs could "compete with Apple's IAP" on the merits. *Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943, 971 (N.D. Cal. 2025) ("*Epic III*"); *see also id.* at 992–93 (explaining that a prohibitive commission "forecloses competitive alternatives"). The Ninth Circuit similarly explained that some of Apple's policies violated the Injunction because they prevented developers from "steer[ing] consumers to any competitive, favorable alternatives." *Epic IV*, 161 F.4th at 1182. A non-prohibitive commission, by contrast, would allow developers to compete with IAP on the merits while permitting Apple to, for example, recoup its investments and obtain compensation for the value of the IP-protected tools, technologies, and services that Apple provides developers, consistent with its procompetitive commission-based business model. This Court has recognized that "Apple is entitled to license its intellectual property for a fee[] and to guard its intellectual property from uncompensated use by others," *Epic I*, 559 F. Supp. 3d at 1039, and that it is "the developer's use of the App Store platform, license to Apple's intellectual property, and access to

8

Apple's user base" that "justifies" Apple's ongoing commission, *id.* at 1013.  The Ninth Circuit agreed, holding that "IP-compensation is a cognizable procompetitive rationale." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 986 (9th Cir. 2023) ("*Epic II*").

Separate from its discussion of the second avenue on remand—which Epic has elected to pursue here and under which this Court may only "restrict Apple from imposing a prohibitive commission by modifying the Injunction"—the Ninth Circuit "recommend[ed] some possible courses of action to [this Court] regarding an appropriate commission or fee limitation." *Epic IV*, 161 F.4th at 1187.  Among these, the Ninth Circuit stated that Apple should be able to charge a linked-out commission "based on the costs that are genuinely and reasonably necessary for its coordination of external links for linked-out purchases, but no more." *Id.*  The Ninth Circuit noted that, "[i]n making a determination of Apple's necessary costs, Apple is entitled to some compensation for the use of its intellectual property that is directly used in permitting Epic and others to consummate linked-out purchases," with the caveat that "costs attributed to linked-out purchases should be reduced equitably and proportionately" considering "the fact that most of the intellectual property at issue is already used to facilitate IAP." *Id.* at 1187–88.  The Ninth Circuit stated that "Apple should receive no commission for the security and privacy features it offers to external links, and its calculation of its necessary costs for external links should not include the cost associated with the security and privacy features it offers with its IAP." *Id.* at 1188.

The Ninth Circuit thereafter denied Apple's petition for rehearing.[7]  CA9 Dkt. 184.1  On April 6, 2026, the Ninth Circuit granted Apple's motion to stay the court's mandate pending the filing of a petition of certiorari to the Supreme Court.  CA9 Dkt. 188.1.  On April 28, 2026, the Ninth Circuit granted Epic's motion for reconsideration of that stay, reasoning that it was

---

[7] A denial of rehearing does not "imply any judgment on the merits and has no jurisprudential significance." *In re Grand Jury Investigation*, 542 F.2d 166, 173 (3d Cir. 1976).  The Ninth Circuit has approvingly cited that Third Circuit case.  *See Landreth v. C.I.R.*, 859 F.2d 643, 648 (9th Cir. 1988).  And courts within the Ninth Circuit have explained that "[a] denial of rehearing is not persuasive or binding precedent." *Sherman v. Reilly*, 2007 WL 9747656, at *3 (D. Or. Apr. 4, 2007); *see also In re Chapter 13 Tr.'s Motions for Dec. Relief Challenging Constitutionality of 28 U.S.C. § 586(e) & 11 U.S.C. § 1326(b)(2)*, 666 B.R. 659, 665 (B.A.P. 9th Cir. 2024) (same).  In addition, Apple has never had an opportunity to be heard on the "necessary costs" issue since it was never raised or litigated in any proceeding.

9

"persuaded by Epic's arguments" that the Supreme Court would not grant certiorari.  CA9 Dkt. 192.1 at 2.  Accordingly, the Ninth Circuit issued its mandate on May 6, 2026.  Dkt. 1677.

### B.    Proceedings on Remand

On May 15, 2026, the parties stipulated, subject to the Court's approval, to a procedure pursuant to which Apple would submit to the Court "a proffer regarding implementation of the Ninth Circuit's mandate."  Dkt. No. 1686 at 3.

On May 21, 2026, Apple petitioned the Supreme Court for review of the Ninth Circuit's judgment.  Apple's petition presented two questions.  First, the petition presented the question: "Whether a court may hold a party in civil contempt based on a violation of an injunction's 'spirit' where the injunction is silent as to the conduct upon which contempt is based, as the Ninth Circuit holds; or, instead, whether a court must ground a finding of civil contempt on the violation of an order that clearly and unambiguously proscribes the precise conduct at issue, as other circuits hold."  Pet. at i.  Second, the petition presented the question:  "Whether the Ninth Circuit has properly created an 'antitrust' or 'competition' exception to *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and the longstanding equitable principles on which *CASA* rests, or otherwise disregarded *CASA*'s limits."  *Id.*  On June 30, 2026, the Supreme Court granted certiorari on the first question presented.  __ U.S. __, 2026 WL 1871316 (Jun. 30, 2026).

On July 1, 2026, the parties stipulated, subject to the Court's approval, to "a short continuance of the remand deadlines previously entered by the Court"—including the July 6, 2026 deadline for Apple's proffer—"while the parties brief Apple's motion to stay."  Dkt. No. 1694 at 3. On July 2, 2026, this Court "so ordered" the stipulation.  Dkt. No. 1696 at 6.

On August 11, 2026, after holding a hearing, this Court denied Apple's stay motion.  Dkt. No. 1706 at 1–2.  The Court reasoned that it may modify or expand its Injunction on remand notwithstanding Supreme Court review, explaining that "[t]he current charge from the Ninth Circuit is to oversee proceedings reflecting the appropriate commission to be allowed 'on linked-out purchases based on the costs that are genuinely and reasonably necessary for its coordination of external links for linked-out purchases, but no more.'"  *Id.* at 2.

### C.    The Current "Zero-Commission" Regime

For over a year, U.S. developers have implemented external purchase links and actively directed users toward alternative payment channels through link-outs and other means.  In this "zero-commission" regime, developers have deployed a variety of methods to communicate external payment options to users and have implemented outbound links at a significant rate. Dr. Carlton's manual review of the 200 apps that generated the greatest U.S. IAP revenue over the one-year period preceding April 2025 identified that link-out adoption rises sharply with app size: █ of the top 25 apps, █ of apps ranked 26–100, and █ of apps ranked 101–200.  *Id.* ¶ 51. Dr. Carlton opines that his methodology likely understates the true extent of developer activity because, for example, the review "cannot identify apps that offer link-outs only to selected users." *Id.* ¶ 25.

Dr. Carlton's independent analysis shows link-out activity has materially impacted Apple's App Store billings in the U.S.  One of Dr. Carlton's analyses, which compares trends in Apple's U.S. IAP billings to international benchmarks, indicates that for █ of the 165 top apps analyzed, Apple experienced declines in U.S. IAP billings relative to international levels in the 13 weeks from March 8, 2026 through June 6, 2026, 80% of which were statistically significant.  *Id.* ¶ 59. Among these apps, Apple's median decline in billings was █, and its weighted average decline in billings was █—equating to a reduction in U.S. IAP billings of approximately █ over that 13-week period.  *Id.*  Among the 50 apps specifically identified as offering link-outs, █ showed declines in U.S. IAP billings relative to international levels, with █ of the declines being statistically significant.  *Id.* ¶ 60.  Those 50 apps experienced a median decline of █ and a weighted average decline in billings of █  *Id.*  This analysis "demonstrates that the [April] 2025 Order requiring link-outs at zero commission has led to large and growing declines in IAP activity."  *Id.* ¶ 63.  These declines will likely continue to increase so long as there are developers that have yet to implement link-out but who would increase their profits if they did so.  That is because, among other reasons, extremely low link-out commissions threaten Apple's ability to generate revenue from IAP.  Prohibiting Apple from charging a meaningful link-out commission therefore threatens Apple's ability to recoup its App Store investments not only with respect to

11

developers who decide to link out, but also with respect to Apple's ability to generate revenue from the App Store more generally.

Evidence also indicates that linking out has financial benefits to developers that extend far beyond avoiding the IAP commission. For example, one provider of payment processing services explains that linking out allows developers to "[b]uild direct connections with subscribers" including by "collect[ing] first-party emails and payment details" that flow into a developer's "CRM and marketing tools" so that they can "nurture subscribers, run win-back campaigns, and unify customer profiles across app and web." RevenueCat, *Run web checkout from your app* (last visited August 11, 2026).[8] Developers are already taking advantage of new data and strategies available via link-out to increase revenue. RevenueCat, *How GRTV uses RevenueCat Web Billing to Power App-to-Web* (last visited August 11, 2026) (spotlighting a developer who processes 76% of U.S. revenue via linked-out payments);[9] Paddle, *Staying in the fast lane: The web monetization playbook for resilient revenue growth in 2026* (last visited August 11, 2026) (app developer Stoikk "was able to create a web checkout in days," saw "[n]o drop in conversions" and estimated a "25% revenue boost" and "15% increase in LTV [lifetime value] for web-customers").[10]

IAP provides benefits to developers through a comprehensive package of IP-protected tools, technologies, and services, among other things. Apple has focused on educating developers about the value of IAP and protecting the IAP brand—which stands for security, privacy, trust, innovation, and best-in-class technologies. The active embrace of linked-out transactions by many developers confirms that competition between IAP and alternative payment channels is now a reality—with the links embedded by many developers into their apps informing users of their payment alternatives.

---

[8] *Available at* https://www.revenuecat.com/app-to-web.
[9] *Available at* https://www.revenuecat.com/customers/grtv-revenuecat-web-billing.
[10] *Available at* https://www.paddle.com/app-staying-in-the-fast-lane.

12

APPLE'S REMAND PROFFER
CASE NO. 4:20-CV-05640-YGR-TSH

**APPLE'S PROFFER**

I.     **APPLE'S PROPOSAL REGARDING LINK-OUT COMMISSIONS**

Apple's investments in the App Store and associated IP-protected tools, technologies, and services provide benefits and value to developers and users of iPhone and iPad apps.  *See Epic I*, 559 F. Supp. 3d at 923.  Apple's development of the iPhone created a "new and innovative ecosystem" in the cellular device market.  *Id.* at 941.  After launching the iPhone in 2007, Apple decided to "allow third-party developers to create iOS apps by licensing them with the interfaces and technology to do so."  *Id*. at 942.  Apple and these developers symbiotically benefit "from the ever-increasing innovation and growth in the iOS ecosystem."  *Id.* at 923.

Apple has invested to create, maintain, and enhance a broad suite of tools, technologies, and services that developers can use to make and monetize apps—all protected by a substantial portfolio of Apple IP.  *See, e.g.*, *id.* at 942, 946.  As this Court explained, for example, "[t]he creation, constant update, and modernization of the SDKs and APIs was not insignificant.  To protect its system, Apple built tools, kits, and interfaces that would allow [third-party] developers to build native apps," and that "simplified and accelerated" their development.  *Id.* at 942.  This engineering work by Apple "was novel, sophisticated, time-consuming and expensive."  *Id.*

Apple's offerings provide substantial ongoing benefits to a wide array of developers.  *Id.*; *see also id.* at 1009–10 (Apple "invests enormous sums into developing new tools and features for iOS," among them "thousands of developer tools, SDKs, and APIs (150,000 today), many of which are directed specifically at game developers").  All iOS app developers derive substantial value from Apple's IP-protected offerings, regardless of whether they sell digital goods, and regardless of whether they do so via in-app transactions, linked-out transactions, independent web stores, or some combination of these or other channels.

Apple is compensated for its investments in part from its ability to charge an ongoing commission.  Moreover, as Dr. Carlton explains:

> Commission-based pricing is a common mechanism for compensating distributors of products produced by third parties. Commissions can promote competition by aligning the incentives of producers (here, developers) and distributors (here, the App Store) because the compensation received by distributors is directly related to the success of the product. Commission-based compensation mechanisms enable developers and Apple to share the risks of app development. This facilitates entry of

13

> new developers and apps, and it enables Apple to share in the success of apps that have benefited from the iPhone/iOS platform. Regardless of whether developers use IAP or link-out, they make use of Apple's intellectual property and technology; benefit from access to the same user base generated by Apple; and utilize the same App Store technology for discovering and distributing apps. Thus, the economic rationale for charging commissions on link-out transactions is the same as for IAP.

Carlton Rpt. ¶ 69.

Against this backdrop, Apple respectfully submits that the Court approve the following linked-out commissions in the U.S.: 15% for standard apps, 10% for VPP, NPP, MPP, and subscription renewals, and 5% for Small Business Program apps.

Apple's proposal properly reflects the value that Apple provides to developers through limited use rights to Apple's IP-protected tools, technologies, and services; Apple's significant investments to develop, maintain, and enhance those IP-protected tools, technologies, and services to provide a safe and trusted platform; and the importance of incentivizing Apple to continue to invest in them to the benefit of both developers and end users.  Apple created iOS, iPadOS, and the App Store,[11] which together have transformed how developers build, distribute, and monetize apps for over one billion active iPhones and iPads worldwide.  Apple also submits the analysis of Dr. Carlton, who concludes that, as to the approximately 2,700 largest apps—accounting for the vast majority of App Store revenue—the vast majority of efficient developers would be able to offer linked-out purchases under Apple's proposal.  *See* Carlton Rpt. § VI.

A.    **Apple's Significant Investments to Develop, Maintain, and Enhance the IP-Protected Tools, Technologies, and Services Provided to Developers**

Developers, including those that link out, are in a position to benefit from Apple's investments.  From FY2005 to FY2025, Apple's total R&D spend exceeded $245 billion.  *See* Meyer Rpt. ¶¶ 88–90; *see also, e.g.*, *Epic I*, 559 F. Supp. 3d at 972 ("Creating a seamless system to manage all its e-commerce was not an insignificant feat.  Further, expanding it to address the scale of the growth required a substantial investment, not to mention the constant upgrading of the cellphones to allow for more sophisticated apps.").  Apple continues to invest in order to ensure iOS and iPadOS remain the preeminent platforms for mobile app development.  For example,

---

[11] References to iOS herein also include iPadOS, and the App Store refers to the App Store for iOS and iPadOS apps.  *See* Thompson Rpt. ¶¶ 38–39.

14

Apple spent over $34 billion in 2025 alone on total research and development expenditures, including to enhance and maintain the IP-protected tools, technologies, and services that provide substantial value to developers. *See* Meyer Rpt. ¶ 88.

The economic and technical value that developers obtain from Apple's IP-protected tools, technologies, and services stems from, among other things, the limited use rights that Apple grants to its extensive IP portfolio; the extensive resources that Apple devotes to educate, train, and support developers; Apple's promotion of its devices and App Store; user trust in Apple devices; and facilitating discovery by, and distribution to, Apple's user base. *See* Thompson Rpt. ¶¶ 30–34 (developers' limited use rights to Apple's extensive IP underlying the tools, technologies, and services are valuable); Meyer Rpt. ¶¶ 284–98 (support resources are valuable to developers); *id.* ¶¶ 299–305 (discovery resources are valuable to developers), *id.* ¶¶ 80–86 (Apple reputation and brand value is valuable to developers); *id.* ¶ 297 (access to Apple user base is valuable to developers). The App Store provides "a comprehensive array of distribution, discovery, marketing, and analytics services that help Developers market and distribute apps to users, while simultaneously upholding high standards of quality, safety, and security across the platform." *Id.* ¶ 290. This value flows to developers regardless of whether sales occur in-app or via link-out. *Id.*

Through almost two decades of investment, rigorous app review, and brand development, Apple has secured a well-founded reputation for innovation, quality, and safety, with substantial attendant goodwill. *See Epic I*, 559 F. Supp. 3d at 1038. Apple provides developers with a host of IP-protected tools and technologies, including related to Xcode, User Interfaces, 3D Graphics, 2D Graphics, Core Video, Core Motion, GameKit, and Game Center, Augmented Reality, Haptics, Spotlight, Live Activities and Widgets, FairPlay, Connectivity, Apple Intelligence and Machine Learning, HealthKit, HomeKit, Core Location, Camera, Wallet, and Privacy, Security, and App Integrity. *See, e.g.*, *id.* at 1009–10; Thompson Rpt. ¶¶ 30–34; *see generally id.* § VIII ("Apple's Developer Tools and Technologies"), ¶¶ 56–562 (detailing Apple U.S. patents, copyrights, and trade secrets corresponding to each category of tools, technologies, and services).

Apple owns an extensive and strong portfolio of issued U.S. patents and published patent applications, trade secrets, trademarks, and registered and unregistered copyrights that protect the

15

tools, technologies, and services provided to developers.  *See generally* Thompson Rpt. ¶¶ 56–562, App. C.  As Mr. Thompson details, Apple has created expansive developer documentation and hundreds of thousands of Application Programming Interfaces ("APIs") that developers can use to leverage Apple's patented functionality as well as Apple's trade secrets and copyrights (both registered and unregistered).  *See, e.g.*, *id.* ¶¶ 52–53 ("When an app calls an Apple API, the call passes parameters and data into Apple's proprietary software, which executes internal logic not disclosed to developers or the public."); *Epic I*, 559 F. Supp. 3d at 942 (developers may access "advanced APIs (many of which are protected by patents, copyrights, and trademarks)").  Mr. Thompson provides examples of over 6,000 issued U.S. patents and pending patent applications relating to 25 categories of tools, technologies, and services provided to developers— which help protect the functionality developers are allowed to use and allow them to leverage that functionality.  *See* Thompson Rpt. App. C.  And Mr. Meyer identified over 100 U.S. trademarks relating to the tools, technologies, and services (e.g., Xcode®, Metal®, Apple Intelligence™), all of which provide additional value to developers and help monetize their apps, including through link-out transactions.  *See, e.g.*, Meyer Rpt. ¶¶ 80–86, 106, 123, 212, 338–40.

Beyond tools and technologies, Apple provides developers with IP-protected developer services including direct support through training and expert sessions.  Thompson Rpt. § IX; Meyer Rpt. ¶¶ 284–89.  Apple's investments in security and privacy tend to earn user trust, which produces procompetitive benefits: users willingly try apps from lesser-known developers, lowering barriers to entry.  *See, e.g.*, *Epic I*, 559 F. Supp. 3d at 995–96.  Apple's individualized app review provides security benefits, both by "thwarting social engineering attacks" and by filtering "fraud, objectionable content, and piracy … while imposing heightened requirements for privacy."  *Id.* at 1005–07.  This Court previously found that Apple's model is procompetitive by promoting interbrand competition, with Apple differentiating iOS from Android.  *See Epic I*, 559 F. Supp. 3d at 1005–06, 1024 ("[I]t is undisputed by the parties that a key distinguishing feature of the iOS platform is its closed platform model, as compared to the open Android platform maintained by its main competitor."), 1038 ("[T]he 'walled garden' approach differentiates Apple from Google. . . . This, too, is a legitimate procompetitive justification.").

16

U.S. developers also benefit from Apple's IP-protected App Store Services, which enhance the distribution, discovery, and marketing of their apps. *See* Meyer Rpt. ¶¶ 290–314; Thompson Rpt. § X. Apple's investments in search, editorial curation, and personalization help users find apps. Meyer Rpt. ¶¶ 299–300. Apple's analytics and performance tools give developers visibility to compete, thereby increasing monetization through both IAP and linked-out purchases. *Id.* ¶¶ 315–22. Mr. Thompson provides examples of over 200 of the approximately 6,000 issued U.S. patents and pending patent applications relating to this suite of services. *See* Thompson Rpt. App. C. He also identifies examples of numerous related APIs based on Apple's trade secrets, as well as extensive copyrighted documentation. *See* Thompson Rpt. ¶¶ 596–607. And Mr. Meyer identifies numerous trademarks that relate to these services. *See, e.g.*, Meyer Rpt. ¶ 327.

This technological innovation, IP, services, and consumer reputation tend to create compounding benefits for developers seeking to market their products to customers.

### B.      Apple's Revenue-Based Commissions Incentivize Continued Investment

Unlike cost-only based commissions, Apple's revenue-based commissions incentivize continued investment. Apple charges developers a $99 annual fee for the Apple Developer Program. May 17, 2021 Trial Tr. at 2762:21–2763:13. This modest fee—designed to prevent fraud and expressly not intended to compensate Apple for the use of its IP-protected tools, technologies, and services (*id.*)—allows developers to build apps using Apple's offerings and deliver experiences to iOS and iPadOS users worldwide. *See, e.g.*, Meyer Rpt. ¶¶ 42, 51–52.

The annual developer fee is nominal. Apple relies on percentage-based commissions to recoup and profit from its investments. *See id.* ¶¶ 87–93. Apple is incentivized to invest in IP-protected tools, technologies, and services that generate ***revenue for developers*** (and benefit users). And, importantly, developers benefit from these investments regardless of whether sales occur via IAP or linked-out purchases. *See id.* ¶¶ 94–95, 415.[12]

---

[12] For example, developers make use of Apple's confidential source code—which is protected by copyrights, embodies trade secrets, and implements Apple's patented inventions—by using Apple's APIs. APIs are essentially pre-built connectors that allow an app to "plug into" Apple's technology so it can perform complex functions—such as displaying user interfaces, determining user locations, unlocking camera functionality, efficiently processing data, managing user accounts, and interacting with Apple's proprietary OS—without the developer having to build those capabilities

17

Dr. Carlton opines that an appropriate linked-out commission would tend to benefit all market participants. Without one, Apple would have less incentive to maintain its current investments in the App Store. *See* Carlton Rpt. ¶¶ 101–02. Dr. Carlton explains that "reduc[ing] Apple's incentive to invest and provide the technology and services that benefit users and developers" would harm users and developers, as well as Apple. *Id.* ¶¶ 23, 101–02. Such a reduction could disproportionately harm small developers. *See id.* ¶¶ 101–02, 108–09. While the short-run benefit of a lower linked-out commission would be "highly concentrated among a small number of large, well-established apps" including Epic, the longer-run harm would fall most heavily on small developers. *Id.* ¶¶ 43, 107–09.

### C.    Valuation Analyses

Apple submits a three-step methodology from valuation expert Paul Meyer, which relies on Mr. Thompson's technical identification of relevant Apple IP.[13]

*First*, Mr. Meyer's market-based analysis assesses Apple's commission structures in Japan, the EU, and Brazil (yielding benchmarks of 10% to 20% for linked-out purchases) and Epic's agreement to 20%/15%/10% link-out commissions in *Epic v. Google*. Meyer Rpt. ¶¶ 30, 378–405. Mr. Meyer finds these benchmarks are insightful but conservatively serve as a floor because, for example, they resulted from regulatory proceedings where bargaining dynamics inherently favor concessions below market value. *Id.* ¶¶ 401–05.

*Second*, Mr. Meyer's investment-based analysis documents certain of Apple's historical and ongoing investments to develop and enhance the IP-protected tools, technologies, and services provided to developers. As Mr. Meyer explains, Apple's investments—that include both internal R&D investment and a cumulative investment of over $1.35 billion in acquisitions that involved IP-protected technologies and directly enhanced the tools, technologies, and services provided to

---

from scratch, which "would be extremely resource intensive, and for many developers not reasonably feasible" to replicate independently. *See* Thompson Rpt. ¶ 76, § VIII.

[13] Apple proffers the analyses of Mr. Thompson and Mr. Meyer in response to this Court's previous indication that it would be helpful to correlate the value of Apple's IP to a commission. *See, e.g.*, *Epic I*, 559 F. Supp. 3d at 994, 1009–10.

developers—evidence the resources required to build and maintain Apple's IP portfolio that protects the tools, technologies, and services provided to developers.  *Id.* ¶¶ 28, 347–70.

*Third*, Mr. Meyer's cost-of-analogous technology analysis assesses some of the costs to replicate portions of the functionality that Apple provides to developers through its integrated software platform, confirming that this IP-protected technology delivers economic value that developers would otherwise need to develop or procure at considerable expense.  *Id.* ¶¶ 371–77.  Mr. Meyer explains that by providing limited use rights to these IP-protected tools, technologies, and services, as well as Additional Services, under the Developer Agreement and Developer Program License Agreement ("DPLA"), Apple significantly lowers the startup costs and risks that developers would otherwise need to incur.  *Id.* ¶ 371.  This analysis suggests that the value to developers exceeds the rates proposed by Apple herein.  *Id.* ¶¶ 29, 418.

Based on this framework, Mr. Meyer concludes that the value that developers obtain from limited use rights to Apple's IP-protected tools, technologies, and services and Additional Services, which enable developers to build, market, monetize, and distribute iOS-compatible apps on the App Store, is supportive of Apple's proposed commission rates.  *See id.* ¶¶ 33, 412–20.

### D.      Apple's Proposed Linked-Out Commission Is Consistent with Competitors' Commissions

Apple's proposed linked-out commission can also be compared to commissions for app stores that compete with the App Store.  *See Epic I*, 559 F. Supp. 3d at 976–78 (discussing mobile gaming competition among Apple's App Store, the Google Play app store, the Samsung Galaxy Store, and the Amazon Android App Marketplace); *id.* at 1021 (identifying mobile gaming transactions as the relevant antitrust product market).  Notably, the Google Play Store charges linked-out rates of a 20% "standard" rate, a 15% program rate, and a 10% subscription rate—and Epic agreed to those rates.  *See Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD, Dkts. 802 at 2, 802-1 (N.D. Cal. Mar. 4, 2026); Sameer Samat, *A new era for choice and openness, Google*

19

*Android Developer Blog* (Mar. 4, 2026).[14]  The Samsung Galaxy Store appears to impose a 15% commission on subscription revenue and a 20% commission on other revenue.[15]

### E.    Large Numbers of Developers Would Potentially Be Able to Link Out Profitably Under Apple's Proposed Commission Rates

The proposed linked-out commission structure that Apple proposes would allow developers to continue to offer outbound payment links to users of their iOS and iPadOS apps.  Apple's economic expert, Dr. Carlton, analyzes the profitability of link-outs at different commission rates.  Dr. Carlton opines that a given linked-out commission will provide efficient developers with the opportunity to link out profitably if the difference between the IAP rate and the linked-out rate is greater than developers' costs of processing linked-out transactions.  Carlton Rpt. ¶¶ 72–74.

For each of the 2,721 apps with greater than $1 million in IAP billings (accounting for ███ of total U.S. IAP billings), Dr. Carlton calculates the processing costs each developer would face based on undiscounted, standard rates charged by third-party processors Stripe and Paddle.  *See* Carlton Rpt. ¶¶ 82–86.[16]  Stripe and Paddle are leading full-service, turnkey payment processing, and merchant-of-record providers handling all the services necessary for link-out, including payment processing, tax compliance, fraud detection, and customer service.  *Id.* ¶ 82.  Across the top apps, the mean implied processing and merchant-of-record fee based on Stripe's and Paddle's rack rates (which few, if any, large developers actually pay because they negotiate discounts or provision in-house) is 8.1% using Stripe rates, or 7.8% using Paddle rates.  *Id.* ¶ 87 & table 6.  Dr. Carlton applies the same framework to approximately 193,000 apps with less than $1 million in IAP, including participants in Apple's Small Business Program.  *Id.* ¶¶ 98–100.

---

[14] *Available at* https://android-developers.googleblog.com/2026/03/a-new-era-for-choice-and-openness.html?sjid=14814634096446483089-NA.

[15] The Samsung Galaxy Store's terms and conditions provide for a 15% commission on subscription revenue and a 20% commission on other revenue and further provide that "[d]ifferent revenue share arrangements may apply to sales made outside of our Services"—and do not specify any such "different" rate.  Galaxy Store Terms & Conditions §§ 6.1, 6.2, *available at* https://seller.samsungapps.com/help/termsAndConditions.as.  In contrast, Amazon's App Marketplace prohibits linking out.  *See* Amazon Developer Services Agreement, In-App Products Schedule § 6, *available at* https://developer.amazon.com/support/legal/da.

[16] Stripe's rates vary by transaction size because Stripe charges 6.4% plus $0.30 per transaction.  *Id.* ¶ 83 & table 5.  Paddle charges 5.0% plus $0.30 per transaction, with the fee capped at 10%.  *Id.*

Applying this methodology, Dr. Carlton identifies the commission rates at which various percentages of efficient developers could profitably offer link-outs.  Dr. Carlton analyzes large apps (those with greater than $1 million in IAP billings) excluding any apps that received a discounted IAP commission of 15% on IAP transactions as part of the VPP and NPP programs.  *Id.* ¶ 96. These apps represent the vast majority of revenue generated from the IAP commission on which the Court has sought to apply competitive pressure.[17]  At Apple's proposed headline link-out rate of 15% and link-out renewal rate of 10%, apps accounting for ██ of large, non-program app revenue could profitably link out based on Stripe's fees.  *Id.*  Using Paddle's fees, apps accounting for ██ of large, non-program app revenue could profitably link out.  *Id.*  Dr. Carlton also performs the same analysis for all large apps (inclusive of program apps) and finds that apps accounting for ██ of revenue could profitably link-out using Stripe rates, or ██ using Paddle rates.  *Id.* ¶¶ 93–95. For apps with less than $1 million in IAP billings in the Small Business Program, Dr. Carlton found that apps accounting for over ██ of revenue could profitably link out using Stripe rates, or ██ using Paddle rates.  *Id.* ¶¶ 99–100.[18]

Dr. Carlton's methodology allows him not only to opine as to whether an efficient developer can profitably link out at any given link-out commission rate and IAP commission rate, but also allows him to determine the amount of inefficiency which a developer could experience and still link out profitably—what he refers to as an "inefficiency cushion."  *Id.* ¶¶ 74–100. Developer inefficiency is discussed further below.

Dr. Carlton's conclusions are conservative in several respects.  Large developers often negotiate processing fees below published rates or perform processing more cheaply in-house.  *Id.* ¶ 88.  This is entirely consistent with Apple's extensive business experience when dealing with large developers.  For example, record evidence in this case establishes that Epic's costs for

---

[17] This category of apps also includes subscription renewal apps, which pay the 30% IAP rate the first year and a discounted 15% IAP rate thereafter.  Under Apple's proposal, renewal apps would pay a 15% link-out rate the first year and a 10% link-out rate thereafter.

[18] These program apps pay a lower IAP rate of 15%, in addition to receiving a lower link-out rate under Apple's proposal.  Under Dr. Carlton's analysis, Apple's providing a *lower* IAP rate *reduces* the portion of apps and developers for whom linking out is accretive.

21

payment processing allow it to link out profitably at Apple's proposed commission rate.  Hyo Ko, Epic's Head of Payments, testified at trial in this case that Epic's "average cost of using . . . payment service providers … [i]n [the] U.S., [is] around 3.5%" and "Epic [has] the opportunity to negotiate these costs with its payment service providers."  May 6, 2021 Trial Tr. at 807:4–9.  Moreover, because Stripe and Paddle's fee structure includes fixed per transaction components, effective processing costs are significantly lower as a percentage of revenue for higher-value transactions.  *See* Carlton Rpt. ¶¶ 86–87.

Dr. Carlton's calculations are also conservative in that they do not reflect the benefits to developers in addition to avoiding the IAP commission.  Most notably, his calculations do not include the value to developers of directly obtaining consumer data, which helps developers to target their marketing efforts, and of directly dealing with users, which allows upselling and promotional sales.  *Id.* ¶ 78.  Nor do Dr. Carlton's calculations include the value that developers may place on directly building their customer relationships via the link-out offering, which may increase the customer's lifetime value to the developer.  *Id.*

Further, Dr. Carlton's analysis supports that, even if only the largest developers were to offer outbound payment links, that would suffice to create the competitive pressure that Epic contends is necessary to redress the UCL violation in this case.  In defending the application of the Injunction to all developers (and not just Epic and those developers that want to link out to Epic's Games Store), Epic argued that "[t]he only way to redress Epic's injury as an app developer subjected to supracompetitive IAP commissions is to allow all developers—including large developers like Spotify and Microsoft—to steer to lower-priced out-of-app payment methods, thereby generating the competitive pressure needed to discipline Apple's commissions."  Br. in Opp'n of Epic Games, Inc., at 33, *Apple Inc. v. Epic Games, Inc.*, No. 25-1311 (9th Cir.) ("Epic Br.").  As Dr. Carlton explains, the top 0.1% of apps (by billings) account for ▮▮▮ of U.S. IAP billings, and the top 10% account for ▮▮▮ of billings.  Carlton Rpt. ¶ 44.  Under these circumstances, linking out by large apps could—in the words of Epic—readily impose "the competitive pressure needed to discipline Apple's commissions."  Epic Br. at 33.

22

### F.    Developer Inefficiency and Breakage

As noted, Dr. Carlton's analysis accounts for the possibility of inefficient developers.  His analysis explains, however, why the link-out commission should not hinge on inefficiencies.

One example of developer inefficiency is "breakage," which refers to a customer's abandonment of a purchase during the purchase-flow process relative to IAP.  Breakage may be highly dependent on individual facts and circumstances, such as the quality of the link-out user experience the developer has implemented and whether a user has sufficient trust in the developer to enter payment credentials and complete a purchase.

Although Dr. Carlton acknowledges breakage, he principally focuses on "efficient" app developers—defined as a developer that, putting aside processing costs, has no "additional costs resulting from inefficiencies associated with providing digital goods via link-out rather than IAP." Carlton Rpt. ¶ 7.  By focusing on efficient developers, Dr. Carlton avoids confounding the analysis of profitable link-out opportunities with developer inefficiencies, which are a dimension of competition between IAP and link-outs that Apple should not have to subsidize.  Breakage, for example, depends on the quality of a developer's user experience and the extent to which a developer has earned users' trust, both of which developers should be incentivized to improve through competition with IAP.  Indeed, it would be detrimental to competition and overall welfare to require Apple to guarantee every developer can profitably link out regardless of the efficiency of its link-out implementation, including with respect to breakage.  *See* Carlton Rpt. ¶¶ 10, 23, 101–02, 107–108.  Moreover, developers who adopt link-out transactions would be incentivized to become more efficient and, for example, would improve performance by reducing breakage.

There are also practical challenges to taking account of developer inefficiencies, which are inherently idiosyncratic to particular developers.  In internal decision-making, Apple has at times assumed that breakage in linked-out transactions reduces transaction revenue by up to 10%.  CX-539.10; CX-859.23.  But that is merely an assumption, as reflected by breakage rates ranging from 0% to 25% in Apple's sensitivity analyses.  CX-224.16; CX-224.87; CX-539.27; CX-859.24.[19]

---

[19] In its April 2025 decision, this Court considered breakage as a factor in whether developers would link out as an alternative to IAP.  *See, e.g.*, *Epic III*, 781 F. Supp. 3d at 969–70, 995.  But the Court did not consider breakage in finding that Apple's linked-out commission rate rendered

23

## II.    COST-BASED ANALYSIS

### A.    "Necessary Costs" Under the Ninth Circuit's Decision

The Ninth Circuit's narrow definition of "necessary costs," *Epic IV*, 161 F.4th at 1187, encompasses only *de minimis*, largely nonrecurring costs and a sliver of Apple's IP that all developers benefit from.  Accordingly, limiting Apple to a linked-out commission that covers its "necessary costs" would result in a 0% rate.  In other words, if a linked-out commission is set as a percentage of developer revenue from linked-out purchases, the percentage sufficient to cover Apple's "necessary costs" as defined by the Ninth Circuit would be essentially zero.

The Ninth Circuit narrowly defined "necessary costs" as follows:

> (a) Apple should be able to charge a commission on linked-out purchases based on the costs that are genuinely and reasonably necessary for its coordination of external links for linked-out purchases, but no more. We refer to these costs as "necessary costs.";

> (b) In making a determination of Apple's necessary costs, Apple is entitled to some compensation for the use of its intellectual property that is directly used in permitting Epic and others to consummate linked-out purchases. In deciding how much that should be, the district court should consider the fact that most of the intellectual property at issue is already used to facilitate IAP, and costs attributed to linked-out purchases should be reduced equitably and proportionately;

> (c) Apple should receive no commission for the security and privacy features it offers to external links, and its calculation of its necessary costs for external links should not include the cost associated with the security and privacy features it offers with its IAP….

*Id.* at 1187–88.

Pursuant to part (a), the Ninth Circuit's definition of "necessary costs" begins with costs that are "genuinely and reasonably necessary for its coordination of external links for linked-out purchases, but no more." *Id.* at 1187.  Apple understands that definition to encompass only the incremental costs that Apple would actually incur to offer link-out capabilities in the U.S., excluding all other costs that Apple bears to provide the IP-protected tools, technologies, and services to developers—including to those who earn revenue through linked-out transactions.

---

linking out "economically non-viable." *Id.* at 992–93.  Similarly, the Ninth Circuit considered breakage in considering Apple's link design restrictions, but not in considering the linked-out commission.  *See Epic IV*, 161 F.4th at 1173, 1183.

24

Under that definition, the relevant costs are substantially limited to one-time engineering costs of no more than a few million dollars that Apple incurred to provide the ability for developers to link out in the U.S.

Part (b) of the Ninth Circuit's discussion of "necessary costs" includes "some compensation for the use of [Apple's IP] that is directly used in permitting Epic and others to consummate linked-out purchases," subject to reducing this IP-based compensation "equitably and proportionately" to account for "the fact that most of the intellectual property at issue is already used to facilitate IAP." *Id.* at 1187–88.

Apple has a vast and growing IP portfolio.  Its IP covers, among other things, the popular devices on which the App Store is offered, such as the iPhone and iPad; the iOS and iPadOS platforms; the App Store itself; and the broad suite of tools, technologies, and services that allow developers to build, optimize, enhance, and monetize their apps.  According to the analysis of Apple's technical expert, Mr. Christopher Thompson, this overall portfolio includes, for example, 40,000 U.S. patents and patent applications, extensive registered and unregistered copyrights, and 250,000 APIs enabling access to a vast portfolio of trade secrets across a wide range of technologies.  *See* Thompson Rpt. ¶ 55.  Apple also holds approximately 1,000 active registered or pending trademarks—including Apple®, App Store®, and Xcode®—that contribute to the success of developers' apps, including through linked-out purchases.  Meyer Rpt. ¶¶ 80–81, 106.

A subset of Apple's IP portfolio protects the tools, technologies, and services that Apple provides to developers.  *Id.* ¶¶ 94–95.  According to the same analysis, that subset encompasses, for example, more than 6,000 U.S. patents and published applications, and numerous copyrighted works, trade secrets, and trademarks.  *See* Thompson Rpt. § VIII, App. B; Meyer Rpt. ¶¶ 94–97.  Within that subset, however, only certain Apple IP is "directly used in permitting Epic and others to consummate linked-out purchases" and not related to "security and privacy" features.  Thompson Rpt. ¶¶ 608, 634–635.[20]  Mr. Thompson identified 14 patents and patent applications in this category.  *Id.* ¶ 635.  However, the majority of that IP relates to technology that can also be used to consummate in-app purchases, *see id.* ¶ 636, which requires further apportionment under the Ninth

[20] There are no trademarks "directly used" to consummate such purchases.

25

Circuit's narrow definition of "necessary costs." Mr. Thompson identifies 10 of the 14 patent assets in this category to be related to technology that can be used for both linked-out and in-app purchases (8 U.S. patents and 2 U.S. published patent applications). *Id.* ¶¶ 636–37.

Finally, part (c) of the Ninth Circuit's discussion of "necessary costs" deducts from those costs "the security and privacy features [Apple] offers to external links." *Epic IV*, 161 F.4th at 1188. As to actual incremental costs of providing link-out capability (i.e., part (a)), the costs Apple has identified do not include costs relating to security and privacy features. *See* Thompson Rpt. ¶ 635; Meyer Rpt. ¶¶ 276–83, 413. As to compensation for the IP directly used to permit developers to consummate linked-out transactions, Mr. Thompson identified 13 patent assets (12 U.S. patents and 1 U.S. published patent application) that relate to security and privacy, which further reduces the scope of the relevant IP. *See* Thompson Rpt. ¶ 635.

Taking parts (a), (b), and (c) together, Apple understands that its "necessary costs" as defined by the Ninth Circuit are the combination of Apple's actual incremental costs to provide link-out capabilities and the apportioned value of Apple's IP that is directly used to permit linked-out transactions. The actual incremental costs are primarily one-time, and in the low single-digit millions of dollars. *See supra* p. 24. As to IP, Apple's valuation expert concludes that the value of the IP within the Ninth Circuit's narrowly drawn definition would not support charging developers an ongoing commission on linked-out purchases relative to the remainder of Apple's IP provided to developers. *See* Meyer Rpt. ¶¶ 419–20. Although Apple does not track linked-out transactions per this Court's order, *Epic III*, 781 F. Supp. 3d at 1003, Apple's "necessary costs" would be a negligible percentage of any reasonable projection of linked-out revenue.

In short, "necessary costs" as the Ninth Circuit defined them are *de minimis* and would result in a 0% commission. As this Court recognized, absent an appropriate commission, developers could "avoid the commission while benefitting from Apple's innovation and intellectual property free of charge." *Epic I*, 559 F. Supp. 3d at 1042 n.617. Apple respectfully submits that modifying the Injunction to limit Apple to recovery of those costs would raise serious questions under the Takings Clause, and ignore fundamental principles that the Ninth Circuit repeatedly emphasized regarding the need to tether the injunction to the UCL violation in this case.

26

## B. Cost-Based Pricing Creates Significant Economic Pathologies

Apple respectfully submits that determining Apple's link-out commission based solely on "necessary costs" is not economically or legally sound, especially where, as here, it leads to a 0% commission that is neither tethered to the economic and technical value that Apple provides developers (regardless of whether they link out or not), the value of the relevant Apple IP, or the prohibitive threshold.  *Cf. id.* at 1185 ("The biggest problem with the commission prohibition is that it permanently prohibits the compensation that Apple can receive for linked-out purchases of digital products, regardless of whether the commission is itself prohibitive.").  A 0% commission would eliminate a critical and longstanding incentive for Apple to reinvest in IP-protected tools, technologies, and services, with negative consequences for both developers and end users.

As Dr. Carlton opines, setting a linked-out commission at a rate based ***only*** on Apple's "short-run incremental costs" (SRIC), without regard for Apple's long-term investments, "is inconsistent with dynamic economic efficiency, which reflects a firm's incentive to maintain its operations and to continue to invest and innovate over the longer term."  Carlton Rpt. ¶¶ 103–09.  Dr. Carlton explains that

> pricing based on SRIC does not consider the continuing upfront investments (that don't depend on the level of digital sales) required for a firm's long-term success. Platform operators such as Apple incur large fixed and sunk costs (some of which are common across different products that Apple provides), and access prices based on short-run incremental costs would not contribute to the recovery of those costs, and hence, would fail to maintain Apple's incentives that existed prior to the 2025 Order to continue to create desirable technologies and services.

*Id.* ¶ 107.

Similarly, Mr. Meyer opines that using Apple's "necessary costs" as a cap on a linked-out commission is economically unsound because it ignores the fundamental principle that the value of IP is properly measured not by the marginal incremental cost of deploying a specific feature, but by the value of the technological contribution being licensed, among other things.  *See* Meyer Rpt. ¶ 420.  Further, imposing a 0% commission for linked-out purchases would result in an IP taking, *see Horne v. Dep't of Agric.*, 576 U.S. 351, 359–60 (2015), and fail to properly compensate Apple for the tremendous economic and technical value provided to developers through the IP-protected tools, technologies, and services.

The existing prohibition on any linked-out commission provides insight into the effects of the restriction. Dr. Carlton both analyzes the extent to which developers link out and estimates the revenue impact to Apple. Linking out by developers is significant—and accelerating. Dr. Carlton observed that ▮ of the top 25 apps link out, and that link-out adoption falls off sharply as app size decreases. *See supra* pp. 11–12 (discussing Carlton Rpt. ¶ 51). The benefits of linking out have thus overwhelmingly accrued to the largest developers, not only because they account for a disproportionate share of IAP revenue, but also because they link out disproportionately. *See id.*

Dr. Carlton's regression analysis of Apple's billings transacted using IAP on 165 of the top 200 apps in the U.S. finds an approximately ▮ decline in one 13-week period since Apple stopped collecting a linked-out commission. *See supra* p. 11 (discussing Carlton Rpt. ¶ 59). It also shows that, among the 50 apps identified as offering link-outs, Apple experienced a weighted average decline in billings of ▮ for the 50 apps. *See id.* (discussing Carlton Rpt. ¶ 60).

**C.      Limiting Apple's Linked-Out Commission to "Necessary Costs" Would Not Be Tailored to the Underlying UCL Violation**

As the Ninth Circuit instructed, a modification of the Injunction "must [be] tailor[ed] to the underlying UCL violation"—"which resulted in an informational harm," and the analysis on remand "must be mindful of the threshold upon which commissions become 'prohibitive.'" *Epic IV*, 161 F.4th at 1187 n.9. Although the Ninth Circuit also refers to Apple's "necessary costs," as shown above, it turns out that, under the Ninth Circuit's narrow definition, those costs in this case are *de minimis*. As a result, if the Court were to set a linked-out commission based ***only*** on Apple's "necessary costs," the rate would be 0%. The Ninth Circuit did not know Apple's "necessary costs" because that topic was never raised. There is no indication the panel intended to effectively cap Apple at a zero commission. To the contrary, the panel reversed the commission prohibition because it "permanently prohibits the compensation that Apple can receive for linked-out purchases of digital products, regardless of whether the commission is itself prohibitive." *Id.* at 1185. It is also not apparent from the Ninth Circuit's decision how ***Apple's*** costs to implement linking out (as opposed to the costs ***developers*** incur if they take advantage of the opportunity to link out) have any relevance to whether a linked-out commission would be "prohibitive" to developers or otherwise

28

tailored to the underlying UCL violation. On the other hand, Apple's proposed linked-out commission structure permits developers to offer link-outs that inform users of alternative payment options, thus eliminating an informational barrier and subjecting Apple's IAP commission to competitive pressure.

Barring non-prohibitive commissions that exceed Apple's "necessary costs" is also inappropriate because California courts are properly reluctant to cap prices or impose cost-based rates as a UCL remedy. *See, e.g.*, *Cal. Grocers Ass'n v. Bank of Am.*, 22 Cal. App. 4th 205, 217–18 (1994) (reversing cost-plus-15% fee injunction as "inappropriate exercise of judicial authority"); *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 991 (2018) (declining to endorse "rate-cap setting" as a UCL remedy); *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999) ("[C]ourts have 'neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature.'"). Limiting Apple to a 0% commission reflecting only "necessary costs" would be impermissible rate-setting under California law.

### D.        The "Necessary Costs" Analysis Suffers from Several Legal Deficiencies

Apple sought relief regarding the Ninth Circuit's opinion in *Epic IV* before the Ninth Circuit (via rehearing, which the Ninth Circuit declined) and before the Supreme Court (via certiorari, which has been granted). Apple respectfully maintains the contentions set forth in those petitions, as well as in its motion to stay before this Court. In addition, Apple respectfully reserves all rights relating to a Supreme Court decision in this case, including as set forth above. For avoidance of doubt, Apple expressly contends that any modified injunction limiting Apple's linked-out commission under the Ninth Circuit's decision must be appropriately tailored to the UCL violation.

*First*, settled law holds that injunction modifications, like all injunctive relief, "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Accordingly, any order limiting Apple's discretion to charge a linked-out commission must be an appropriately tailored remedy for the UCL violation in view of the "informational" nature of the harm. *See Epic I*, 559 F. Supp. 3d at 1054, 1057 (finding that Apple's

UCL violation resulted in a "decrease[d] information"); *Epic IV,* 161 F.4th at 1187 n.9 ("If the district court chooses to modify the Injunction to enjoin commissions for linked-out purchases, the district court must tailor the Injunction modification to the underlying UCL violation" that "resulted in an informational harm.").  As discussed above, California courts are properly reluctant to cap prices or impose cost-based rates as a UCL remedy.  *See supra* pp. 28-29.  Because of this, it is unclear whether a limit on the commission Apple may charge is an appropriate remedy based on the sole UCL violation found by this Court.  In any event, unlike a cost-based price regulation regime, anchoring the Injunction to prohibitive conduct (here, charging a prohibitive commission) ensures the remedy is closely tied to preventing Apple from excluding rivals to IAP and "alter[ing] consumers' access to information about purchase options." *Epic IV*, 161 F.4th at 1185–87, 1187 n.9.  For the same reason, it allows for competition with IAP without imposing price caps untethered to the law or the underlying violation.[21]

*Second*, the Injunction should not be modified except upon adequate justification by Epic. As the party seeking to modify the Injunction to obtain broader relief, Epic bears the burden of justifying any modification to the Injunction in these proceedings.  *See* Dkt. No. 813 ¶ 2 ("Any party may seek modification of [the Injunction], at any time, by written motion and for good cause based on changed circumstances or otherwise."); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief.").  Any modification must also comply with the requirements of Federal Rule of Civil Procedure 65(d)(1), including that the injunction must "state its terms specifically."

*Third*, Apple respectfully submits that this Court should not "micromanage business operations," *Epic I*, 559 F. Supp. 3d at 1069, or regulate prices.  The Supreme Court has repeatedly admonished that antitrust courts should not regulate prices.[22]  *See, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 102 (2021) ("Judges must be wary … of the temptation to specify 'the proper price, quantity,

---

[21] In any modification proceeding unencumbered by a contempt finding and the Ninth Circuit's remand instructions, Apple reserves the right to argue that the sole UCL violation found by this Court, based on an informational harm stemming from Apple's anti-steering provisions, does not support an injunction (or modification of an injunction) regulating Apple's commission.

[22] This Court held that Apple did not violate the federal antitrust laws but determined that Apple violated the UCL through an incipient violation of those laws. *Epic I*, 559 F. Supp. 3d at 1055.

30

and other terms of dealing'—cognizant that they are neither economic nor industry experts.") (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) ("[T]he antitrust laws are not a price-control statute or a public-utility or common-carrier rate-regulation statute."). As the leading antitrust treatise confirms, "the purpose of antitrust law is … to make markets competitive and thus able to function without the need for ongoing supervision." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 325a (5th ed. 2026).

31

Dated: August 13, 2026

Respectfully submitted,

*/s/ James P. Rouhandeh*
DAVIS POLK & WARDWELL LLP
James P. Rouhandeh (*pro hac vice*)
David B. Toscano (*pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
rouhandeh@davispolk.com
david.toscano@davispolk.com

Micah G. Block (SBN 270712)
900 Middlefield Road, Suite 200
Redwood City, California 94063
Tel: (650) 752-2000
micah.block@davispolk.com

*/s/ Sarah M. Ray*
LATHAM & WATKINS LLP
Sarah M. Ray (SBN 22970)
*sarah.ray@lw.com*
Aaron T. Chiu (SBN 287788)
*aaron.chiu@lw.com*
Blake R. Davis (SBN 294360)
*blake.davis@lw.com*
Brett M. Sandford (SBN 302072)
*brett.sandford@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

Gary S. Feinerman (*pro hac vice*)
*gary.feinerman@lw.com*
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611-3695
Telephone: +1.312.876.7700

Christopher Bower (SBN 301379)
*christopher.bower@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant Apple Inc.*

32

APPLE'S REMAND PROFFER
CASE NO. 4:20-CV-05640-YGR-TSH

## **ATTESTATION**

I am the ECF user whose identification and password are being used to file the foregoing document, I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in this filing's content and have authorized such filing.


Dated: August 13, 2026                    By:        */s/ Sarah M. Ray*

33