# Exhibit 3
## <u>Redacted Version</u>

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Epic Games, Inc.,<br>　　　　*Plaintiff*<br><br>　　v.<br><br>Apple Inc.,<br>　　　　*Defendant* | Case No. 4:04–cv–05640-YGR |

**Expert Report of Dennis W. Carlton**

**Epic Games, Inc. v. Apple Inc. Remand Proceedings**

**August 12, 2026**

## Redacted Version

**TABLE OF CONTENTS**

I. INTRODUCTION................................................................................................1

    A. QUALIFICATIONS.................................................................................1

    B. ASSIGNMENT.......................................................................................2

    C. ECONOMIC FRAMEWORK FOR EVALUATING THE EFFECT OF LINK-OUT COMMISSIONS ON THE ABILITY OF DEVELOPERS TO PROFITABLY OFFER LINK-OUT TRANSACTIONS.................................................................5

    D. OVERVIEW AND CONCLUSIONS.........................................................7

II. BACKGROUND ...............................................................................................11

    A. THE iOS AND APP STORE PLATFORMS HAVE CREATED BENEFITS FOR USERS AND DEVELOPERS.................................................................11

    B. THE ROLE OF THE APP STORE IN THE iOS/iPHONE PLATFORM..............13

    C. CONCENTRATION OF APP STORE REVENUE.......................................16

III. THE EXTENT AND IMPACT OF LINK-OUT ACTIVITY TO DATE ...................17

    A. LINK-OUT ACTIVITY TO DATE.........................................................17

    B. LINK-OUTS HAVE RESULTED IN SUBSTANTIAL REDUCTIONS IN APPLE'S IAP REVENUE .................................................................................19

IV. APP STORE MONETIZATION FRAMEWORK ..............................................27

    A. DEVELOPERS CAN SELL DIGITAL GOODS FOR USE IN iOS APPS DIRECTLY TO USERS THROUGH WEBSITES WITHOUT GENERATING APPLE COMMISSIONS .................................................................................28

    B. THE APP STORE COMMISSION STRUCTURE ENCOURAGES DEVELOPER ENTRY .............................................................................................29

V. FRAMEWORK FOR EVALUATING THE PROFITABILITY OF LINK-OUT TRANSACTIONS UNDER DIFFERENT COMMISSION RATES ...............31

VI. EFFICIENT DEVELOPERS AND SOME INEFFICIENT DEVELOPERS CAN PROFITABLY OFFER LINK-OUTS ACROSS A RANGE OF LINK-OUT COMMISSION RATES .........................................................................33

    A. ESTIMATING THE COSTS OF PROCESSING LINK-OUT TRANSACTIONS AND DEVELOPER PROFIT FROM LINK-OUTS ............................................34

    B. LINK-OUT PROFITABILITY AND INEFFICIENCY CUSHIONS AT ALTERNATIVE LINK-OUT COMMISSION RATES .....................................................40

    C. TRADEOFFS IN ESTABLISHING LINK-OUT COMMISSIONS.......................46

**VII.    ECONOMIC PERSPECTIVES ON COST-BASED PRICE REGULATION ..........47**

      A.      Commissions Based on Short-Run Incremental Costs................................48

      B.      Commissions Based on Long-Run Incremental Costs ..................................49

**APPENDIX A: CURRICULUM VITAE OF DENNIS W. CARLTON ...............................53**

**APPENDIX B: MATERIALS RELIED ON ............................................................70**

**APPENDIX C: MAJOR CHANGES IN IPHONE FEATURES, 2007 - 2024 ......................76**

**APPENDIX D: TOP 30 APPS BY U.S. IAP REVENUE, MAY 2024 - APRIL 2025 ...........77**

**APPENDIX E: U.S. IAP REVENUE, BY GENRE, MAY 2024 - APRIL 2025 .....................78**

**APPENDIX F: ESTIMATED DECLINE IN U.S. IAP REVENUE RESULTING FROM 2025 ORDER, BY APP, DIFFERENCE-IN-DIFFERENCES ESTIMATES ......................................................................................79**

**APPENDIX G: ANALYSIS OF LARGE APPS (APPS WITH GREATER THAN $1 MILLION IN U.S. IAP REVENUE)................................................................82**

**APPENDIX H: ANALYSIS OF SBP APPS (APPS WITH LESS THAN $1 MILLION IN U.S. IAP REVENUE THAT EXPERIENCED AN AVERAGE IAP COMMISSION OF 15%).........................................................................90**

**APPENDIX I: ANALYSIS OF ALL NON-SBP APPS (APPS WITH AT LEAST $1 MILLION IN U.S. IAP REVENUE AND APPS WITH LESS THAN $1 MILLION IN U.S. IAP REVENUE THAT PAY AN IAP COMMISSION RATE GREATER THAN 15%).................................................................98**

## I.    INTRODUCTION

### A.    QUALIFICATIONS

1.    I am the David McDaniel Keller Professor of Economics Emeritus at the Booth School of Business of the University of Chicago. I received my A.B. in Applied Mathematics and Economics from Harvard University and my M.S. in Operations Research and Ph.D. in Economics from the Massachusetts Institute of Technology. I have served on the faculties of the Law School and the Department of Economics at the University of Chicago and the Department of Economics at the Massachusetts Institute of Technology.

2.    I specialize in the economics of industrial organization. I am co-author of the book *Modern Industrial Organization*, a leading text in the field of industrial organization, and I also have published approximately 150 articles in academic journals and books. In addition, I serve as Co-Editor of the *Journal of Law and Economics*, a leading journal that publishes research applying economic analysis to industrial organization and legal matters; serve on the Editorial Board of *Competition Policy International*, a journal devoted to competition policy; and serve on the Advisory Board of the *Journal of Competition Law and Economics*. I have also served as an Associate Editor of the *International Journal of Industrial Organization* and *Regional Science and Urban Studies*, and on the Editorial Board of *Intellectual Property Fraud Reporter*. I was the 2014 Distinguished Fellow of the Industrial Organization Society.

3.    In addition to my academic experience, I served as Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice from October 2006 through January 2008. My responsibilities included supervising approximately 50 Ph.D. economists, helping formulate antitrust policy toward ongoing proposed mergers, analyzing general antitrust policies both horizontal and vertical, and communicating such policies to foreign and domestic agencies, as well as to practitioners. I also served as a Commissioner of the Antitrust Modernization Commission, created by Congress to evaluate U.S. antitrust laws. I have served as a consultant to the Department of Justice and Federal Trade Commission on the Horizontal Merger Guidelines, as a general consultant to the Department of Justice and Federal Trade Commission on antitrust matters, as a member of the American Bar Association Advisory Committee that advises the incoming President on antitrust policy, and as an advisor to the Bureau of the Census on the collection and interpretation of economic data.

4.      I also am a Senior Managing Director of Compass Lexecon, a consulting firm that specializes in the application of economics to legal and regulatory issues and for which I served as President (of Lexecon) for several years. I have provided expert testimony before various U.S. state and federal courts, the U.S. Congress, a variety of state and federal regulatory agencies, and foreign tribunals.

5.      My *curriculum vitae*, which includes a list of my publications in the last ten years and testifying experience in the last four years, is attached as Appendix A to this report. Compass Lexecon is being paid $2,250 per hour for my work on this matter, and I receive additional compensation from Compass Lexecon that depends in part on my billings during the year. Neither my compensation, nor that of Compass Lexecon, is dependent on the outcome of this proceeding. A list of the materials I have relied on is attached to this report as Appendix B.

### B.    ASSIGNMENT

6.      I have been asked by Counsel for Apple to evaluate the extent to which developers would be able to profitably provide link-out transactions at alternative link-out commission rates given developers' current IAP commission rates.[1] A developer earns positive incremental profits from link-outs (compared to IAP) if the incremental costs it faces in doing so plus Apple's link-out commission are less than the IAP commission that Apple charges. My analysis helps inform the question of whether developers could earn positive incremental profits by distributing digital goods as link-outs instead of IAPs within the framework set by the Court that enables developers to include an in-app link to an external website for the purchase of digital goods and services.

7.      Addressing this question requires estimates of the costs developers face in processing link-outs.[2] All else equal, different developers may face different processing costs so that a commission that allows some developers to link out profitably may not allow all developers to do so. Developers offering link-outs may also face additional costs resulting from inefficiencies associated with providing digital goods via link-out rather than IAP (that is, costs the developer

---

1.      I use the terms "developers" and "app" interchangeably in this report. My app-specific analyses do not distinguish between single-app and multi-app developers.

2.      The components of the costs developers face in providing link-outs are discussed in Section I.C below. Note that costs faced by Apple in processing IAP transactions are not relevant to my analysis.

incurs when linking out that it would not incur if the developer used IAP). For example, a developer may have high link-out-related operating costs (other than processing costs), or a developer's link-out offering may create a negative user experience or fail to secure users' trust relative to IAP—either of which could reduce the frequency that link-out transactions are successfully completed (i.e., breakage). For the remainder of this report, when I say a developer is "inefficient" in providing link-outs, I am referring to these additional costs (other than processing costs) above those faced when offering IAP that the developer incurs in providing link-outs. I use the term "efficient developer" to refer to a developer that has no such inefficiencies.[3] When estimates of the processing costs developers face in offering link-outs are available (as they are here), it is possible to estimate the share of efficient developers that can profitably offer link-outs at any given level of link-out commissions and at a given level of IAP commissions. I do not analyze the magnitude of inefficiencies that developers may face in offering link-out.

8.      My analysis yields conservative estimates of (i) the link-out commission rates that would enable a given developer to profitably offer link-outs if the developer were efficient; (ii) the share of developers that, if efficient, can profitably provide link-outs at any given set of link-out commission rates and any given set of IAP commission rates; (iii) a developer-specific "inefficiency cushion" that reflects the difference between the highest commission rate at which the developer, if efficient, can profitably offer link-outs and any lower link-out commission rates; and (iv) the average of these developer-specific inefficiency cushions across developers. This inefficiency cushion provides inefficient developers with an opportunity to profitably link out so long as their inefficiencies do not exceed the inefficiency cushion.

9.      I have also been asked to use the framework described above to evaluate Apple's proposal to set a 15% headline link-out commission rate ("Link-out Headline rate"), a 10% commission rate for Apple's Video Partner Program ("VPP"), News Partner Program ("NPP"), and subscription renewals ("Link-out Program/Renewal rate"), and a 5% commission rate for participants in Apple's Small Business Program ("Link-out SBP rate").

---

3.      The terms "efficient" or "inefficient" relate only to costs related to a developer's ability to provide link-out transactions, other than transaction processing costs. The terms do not relate to developers' abilities in providing other elements of app content.

10.    I have been asked to explain the economic tradeoffs the Court can consider in its evaluation of link-out commission rates. Specifically, the lower the chosen link-out commission (which benefits developers in the short run), the lower is Apple's incentive to invest in innovations (which harms developers and users in the long run). Setting commission rates low to enable inefficient developers to profitably offer link-outs is, in effect, an economic transfer or subsidy from Apple to inefficient developers that increases the overall costs to society of distributing digital goods or a transfer to efficient developers who would have linked out at higher link-out commission rates. These subsidies do not reflect economic competition; rather, they reflect a regulated outcome that results in higher than necessary costs to society as a result of the misallocation of resources.

11.    I have been asked to analyze data on link-out activity and the impact of link-outs on Apple's IAP revenue since the Court's 2025 Order.[4] This analysis provides the Court with background information that might inform its analysis.

12.    Finally, I have been asked to discuss, solely from an economic perspective, some of the complications of cost-based price regulation.

13.    As noted, whether developers can profitably offer link-outs depends on IAP and link-out commission rates and the estimated processing costs currently faced by developers when offering link-outs. In analyzing developer processing costs, I focus on the standard, undiscounted rates charged by Stripe, a leading firm offering payment processing services to developers offering link-outs. I also evaluate the costs of payment processing services offered by Paddle. The analysis does not consider actual processing costs paid by developers because I do not have access to such data. In relying on third party estimates I also do not rely on Apple's past estimates of processing costs that developers might face in providing link-out transactions. As discussed below, third party estimates overstate actual processing costs that developers face to the extent that developers can obtain discounts from published rates or can self-provision processing services at lower costs. Note that my analysis does not consider processing costs

---

4.    Epic Games, Inc. v. Apple Inc., 781 F. Supp. 3d 943 (N.D. Cal. 2025) ("2025 Order"). Note that I use the term 'IAP Revenue' throughout this report to mean the billings transacted using IAP, not the commission revenue Apple receives on those billings.

faced by Apple because these are not relevant to a developer's evaluation of the profitability of link-outs.[5]

### C.   ECONOMIC FRAMEWORK FOR EVALUATING THE EFFECT OF LINK-OUT COMMISSIONS ON THE ABILITY OF DEVELOPERS TO PROFITABLY OFFER LINK-OUT TRANSACTIONS

14.     A developer can profitably offer link-outs if the developer's cost of providing link-out transactions plus Apple's link-out commission is less than the IAP commission. As noted above, developers' link-out costs include costs of processing transactions and costs associated with inefficiencies that result from the provision of digital goods via link-out relative to IAP. The expenses developers face in processing link-out transactions include credit card fees, chargebacks, tax compliance, fraud detection, customer service, and other transaction-related expenses. These are sometimes referred to as "merchant of record" fees. Henceforth, I refer to such costs collectively as "processing costs."[6]

15.     I define an "efficient" developer as one that can complete link-out transactions at costs no higher than the developer would incur when using IAP, apart from processing costs. As discussed below, if a developer is efficient, it has the incentive to offer link-outs as a profitable alternative to using IAP any time the commission savings from providing link-out exceeds its processing costs. This focus also allows analysis of how any link-out rate enables inefficient firms to profitably provide link-outs.

16.     I first focus on estimating the processing costs developers face for link-out transactions based on the standard rates charged by both Stripe and Paddle. As I discuss below, because

---

5.      I assume throughout that it is profitable for Apple to offer IAP.

6.      "What is a Merchant of Record? (And Why Should You Care?)," FastSpring, December 5, 2025, available at https://fastspring.com/blog/what-is-a-merchant-of-record-and-why-you-should-care/; "How app developers can reduce fees and create an optimized checkout," Stripe, available at https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout; "Keep more revenue with the smart alternative to in-app payments," Paddle, available at https://www.paddle.com/in-app-purchase; "Paddle 101," Paddle, available at https://www.paddle.com/paddle-101; "App compliance: how to overcome compliance hurdles and scale with confidence," Paddle, available at https://www.paddle.com/blog/app-compliance-fltr; "Grow beyond the app stores," Paddle, available at https://www.paddle.com/solutions/web-stores.

processing fees vary by transaction size, and therefore vary by developer, some developers may find a particular link-out commission profitable while others do not.

17.    For efficient developers, the profitability of link-outs depends on three developer-specific factors: (i) the IAP commission the developer faces; (ii) the link-out commission the developer faces; and (iii) estimates of the processing costs the developer faces. All else equal: (i) the lower the IAP commission rate, the lower the share of developers that can profitably link out; (ii) the lower the link-out commission, the higher the share of developers that can profitably link out; and (iii) the higher the developer processing costs, the lower the share of developers that can profitably link out. These ideas are developed more formally in Section V below.

18.    The difference between the link-out commission at which link-outs become profitable for an efficient developer and a given link-out commission establishes an "inefficiency cushion" that can enable at least some inefficient developers to profitably offer link-outs.[7] Given developer-specific IAP rates and processing costs, my empirical analysis identifies for each developer the link-out commission at which link-outs become profitable, assuming the developer is efficient. Because developers differ in their IAP commission rates as well as their link-out processing costs, some developers may find link-out profitable at a given link-out commission rate while others do not. As such, I aggregate across developers by determining the share of IAP revenue attributed to developers that, if efficient, could profitably offer link-outs at alternative link-out commission rates. As noted above, I do not evaluate the magnitude of inefficiencies, but even without quantification, I can say that the link-out commissions proposed by Apple could allow an inefficient developer to offset some inefficiencies and thereby increase the likelihood that such a developer could profitably offer link-outs. That is, such rates effectively subsidize inefficient developers and also enable efficient developers to become more profitable.[8]

19.    Efficient developers receive the entire inefficiency cushion as profit, and even inefficient developers may be able to profitably offer link-outs. For example, if the IAP commission is 30%,

---

7.    A developer that faces actual inefficiencies greater than the inefficiency cushion would not find link-out profitable, all else equal. As discussed below, there can be additional benefits to link-outs that makes my analysis conservative.

8.    At any commission level that enables 100% of efficient developers to link out profitably, many developers will earn positive profits or have inefficiencies subsidized.

processing costs are 8% of revenue, and the link-out commission is 15%, an efficient developer can profitably link out with an incremental link-out profit of 7% (= 30% - 8% - 15%). In this example, the 7% profit that an efficient developer would earn also defines the inefficiency cushion that a developer could face and still profitably offer link-outs. A developer with the same processing cost, IAP commission, and link-out commission as the efficient developer could profitably link out if it could attract link-outs from all the IAP sales and incur inefficiency costs that were no more than 7% of its IAP revenue. The analysis presented below is more complicated than this simple example because it takes account of the different processing costs that different developers would face.[9]

20.     Notably, my analytical framework is not specific to current IAP commission rates and could be used to assess the profitability of linking out at other IAP commission rates.

##### D.     OVERVIEW AND CONCLUSIONS

21.     The economic rationale for commissions on link-outs is similar to the rationale for IAP commissions: both make use of Apple's intellectual property and technology; benefit from access to the same large user base generated by Apple; and utilize the same App Store technology that enables users to discover apps and for app distribution. Moreover, there is nothing inherently anticompetitive about commissions as a compensation mechanism: they are widely used and can promote competition by aligning the incentives of developers and Apple, enabling both parties to share the risks associated with app development and thus promoting development of new apps.

22.     I reviewed the 200 apps that generated the largest IAP revenue in the U.S. to identify the extent to which they offer link-out. These 200 apps account for almost ▮▮▮▮ of Apple's U.S. IAP revenue. My review indicates that nearly one-third of these apps have introduced link-outs since the 2025 Order. On average, Apple's U.S. IAP revenue in recent months for the largest developers that offer link-outs is ▮ below levels otherwise expected based on trends in

---

9.     My analysis may underestimate the profitability of link-outs and therefore the inefficiency cushion for some developers to the extent that standard processing rates offered by Stripe (and Paddle) exceed actual costs for developers that can negotiate discounts or provide such services for themselves at lower costs than the third-party processors charge. In addition, although I use the current, standard rates charged by Stripe and Paddle, those standard rates could decline in the future as link-outs become more widely used.

countries unaffected by the 2025 Order. Even among large apps that I did not identify as offering link-outs, IAP revenue has also fallen an average of ▮▮▮ relative to trends in IAP revenue earned for the same apps in other countries. This suggests that link-outs are more pervasive than identified in my review and/or that the elimination of anti-steering rules (i.e., restrictions on developers' ability to communicate with users) is having success in enabling developers to induce users to transact through webstores instead of the App Store, and thus avoid Apple commissions.

23.    I understand that the Court will now evaluate the commission rate for link-out transactions. This report estimates the share of developers, and the share of revenue attributable to developers, that could profitably offer link-outs, if efficient, at alternative link-out commission rates. The analysis also can be used to evaluate how alternative link-out rates could enable even inefficient developers to profitably offer link-outs. The lower is the link-out rate, the greater is the number of developers that will be able to profitably offer link-outs. If the main effect of these lower link-out rates is to induce the entry of inefficient developers, and not of efficient developers, then the link-out rates provide an implicit subsidy that does not reflect economic competition. Instead, this reflects a regulated outcome that results in the misallocation of resources and reduces Apple's incentive to invest and provide the technology and services that benefit users and developers, including on-going innovation and the provision of software tools to developers. This is ultimately harmful to users and developers. Therefore, there is a tradeoff between the goals of, on the one hand, achieving widespread usage of link-outs by developers (even if they are inefficient) and, on the other hand, avoiding harm to Apple's innovation and investment incentives. My framework summarizes the extent to which apps, if efficient, have the opportunity to profitably offer link-outs at different link-out commission rates, which helps the analyst evaluate the tradeoffs associated with any link-out commission proposal.

24.    The rest of this report is organized as follows. Section II provides background information on the iPhone/iOS platform and the role of the App Store in providing services to users and developers. The section explains that IAP revenue is highly concentrated among a small share of apps offering IAP. This concentration means that, among those apps that monetize through IAP, the benefits of link-out commissions below the levels at which most efficient developers can profitably offer link-outs would accrue primarily to a small group of already-successful apps.

25.    Section III analyzes (i) the extent of link-out activity in the U.S. to date and (ii) the impact of link-outs on Apple's IAP revenue among the 200 apps with the highest IAP revenue in the U.S., which together account for ▮▮ of total U.S. IAP revenue. The analysis shows that roughly one-third of apps that generate the largest IAP revenue have deployed link-outs to date, but this is likely an underestimate because the review cannot identify apps that offer link-outs only to selected users. Thus, Epic's prior claim that "few developers have taken advantage of their steering rights,"[10] is not supported by available data. Instead, the analysis indicates that among the 165 (out of the top 200 apps) that could be analyzed—including those with and without identified link-outs—Apple's IAP revenue in the U.S. was ▮▮▮▮ less than otherwise expected based on trends in IAP revenue in other countries for the same apps for the 13-week period ending June 6, 2026 alone.

26.    Section IV reviews the App Store's monetization framework and establishes that developers have wide latitude in how they monetize apps. This section also explains that, when developers choose to monetize using IAP, compensating Apple through commissions promotes entry by enabling developers to share with Apple the risks associated with developing new apps.

27.    Section V presents a more formal economic framework for evaluating the profitability of link-out transactions under different link-out commission rates. As discussed above, a developer can profitably provide link-outs if the cost of doing so is less than the IAP commission that the developer would otherwise face. This framework allows one to determine whether any particular set of link-out commissions would be profitable for a developer, given the IAP commissions and estimated transaction processing costs it faces. Using information on the standard rate that developers face for processing link-outs, as well as information on the average price of a developer's transactions and the IAP commission it faces, this framework enables me to empirically evaluate the extent to which efficient developers can profitably offer link-outs at any given level of link-out commissions and the size of the inefficiency cushion that developers benefit from for any given level of link-out commissions.

28.    In Section VI, I use standard rates for link-out processing charged by Stripe and Paddle to identify empirically the share of revenue attributable to developers that could profitably offer

---

10.    Opposition by Appellee Epic Games, Inc. to Motion to Stay Mandate, *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir. 2026), April 6, 2026, p. 3.

link-outs, if efficient, at a wide range of link-out commission rates. My analysis focuses on the more than 2,700 "large developers" (defined as those that generated at least $1 million in U.S. IAP revenue in the year prior to the 2025 Order), which together accounted for ▇ of Apple's IAP revenue in the U.S. Separately, I also consider the more than ▇ developers in the U.S. that participate in Apple's Small Business Program.[11] For each developer I calculate the size of the inefficiency cushion that the developer benefits from at different link-out commission rates (assuming the developer is efficient). For example, for large developers—and using Stripe's processing fees, a headline link-out rate of 15%, and a renewal/program link-out rate of 10%—developers accounting for ▇ of IAP revenue, if efficient, could profitably offer link-outs. On average, these developers who could profitably link out would be the beneficiaries of an inefficiency cushion of approximately 5%.[12] This means that a developer facing inefficiencies of up to 5% of revenue would also be able to profitably offer link-outs (or, alternatively, that an efficient developer keeps approximately 5% more in revenue than it requires to profitably offer link-outs). Based on Paddle's fees, a headline link-out rate of 15% and a renewal/program link-out rate of 10%, ▇ of developers, if efficient, could profitably offer link-outs. These developers would, on average, be the beneficiaries of an inefficiency cushion of approximately ▇. The resulting estimates can understate the size of the inefficiency cushion to the extent that, for example, developers can obtain discounts from published rates or can self-provision processing services at lower costs.

29.      Section VII provides an economic perspective on methods of price regulation, including an example of past attempts to impose such regulations based on costs, where the aim is to determine how to price a scarce input required by downstream rivals. In the context of App Store commissions, these methods include pricing based on (i) Apple's short-run incremental costs in accommodating link-outs, and (ii) Apple's long-run incremental costs in accommodating link-outs. This economic perspective is particularly relevant given statements by Epic's CEO that appear to interpret the Ninth Circuit's opinion (which I understand is now under review by the

---

11.      I approximate participation in the SBP as apps that had less than $1 million in U.S. revenue in the year prior to the 2025 Order and that experienced an average IAP commission of 15%.

12.      I report the average inefficiency cushion because each developer is different and will face a different inefficiency cushion.

Supreme Court) as a recommendation for setting commissions based on Apple's short-run incremental costs. The review first establishes that pricing based on short-run incremental costs would reduce Apple's incentives that existed prior to the 2025 Order to create and deploy desirable technologies and services for users and developers. Related approaches based on incremental short-run costs have been rejected in other regulatory contexts. The review then discusses how commissions based on Apple's long-run incremental costs would be highly complex to determine and administer and describes one example in which past efforts to implement this regulatory approach (in telecommunications) failed, resulting in harm to consumers.

## II.    BACKGROUND

30.    In this section, I provide a brief overview of how Apple's investments in its platforms and App Store contribute to developer and user welfare.

### A.    THE iOS AND APP STORE PLATFORMS HAVE CREATED BENEFITS FOR USERS AND DEVELOPERS

31.    Apple's iOS operating system runs the iPhone and iPad hardware and manages the interaction between apps and the iPhone and related devices. Apple's App Store hosts apps offered by developers, enabling users to download iOS apps, access content generated by developers, and engage in a wide variety of transactions. The App Store platform provides users with access to over 2 million apps, including apps provided by third-party developers and Apple (e.g., Apple Music, Wallet, Maps, etc.).[13]

32.    The App Store enables developers to sell digital goods to users through IAPs. IAPs utilize Apple's payment processing and customer service technologies (e.g., processing credit card transactions, issuing refunds, responding to consumer complaints, payment of relevant taxes).[14] Developers offering IAPs also benefit from users' trust in Apple's security and privacy protections and from the convenience of Apple's centralized payment system, which stores

---

13.    "2025 App Store Transparency Report," Apple, available at https://www.apple.com/legal/app-store/transparency/2025/.

14.    "In-App Purchase," Apple, available at https://developer.apple.com/in-app-purchase/.

users' payment information to facilitate transactions across apps offered by thousands of third-party developers. Together, these features help make IAP transactions attractive to users.

33.      In creating iOS, the iPhone, and the App Store, Apple created the environment that enables third-parties to develop apps and profit from business opportunities supported by those apps, including the opportunity to sell digital goods. Critical among the features of Apple's environment is the fact that Apple enables developers to reach and transact with a large potential customer base of iPhone users in the U.S. To enable this interaction, Apple provides tools and services to developers, including software developer kits that enable developers to make use of the capabilities of iOS devices and features; app review and testing; and fraud prevention services.[15]

34.      The launch of the iPhone in 2007 and the App Store in 2008 have dramatically affected daily life and economic activity in the U.S. and worldwide. By 2016, nine years after the launch of the first iPhone, 1 billion iPhones had been sold worldwide, and by 2025 cumulative worldwide iPhone sales had surpassed 3 billion.[16] The number of apps available through the App Store grew to more than 2.1 million by 2025.[17] Over the nearly two-decade period since the iPhone was launched, Apple has made continuous investments in product improvements that have continued to attract users and developers alike. In inflation-adjusted terms, Apple's R&D spending has increased each year since 2008 and in 2024 exceeded $30 billion.[18] (See Figure 1.)

---

[15]      "Membership Details," Apple, available at https://developer.apple.com/programs/whats-included/; "In-App Purchase," Apple, available at https://developer.apple.com/in-app-purchase/; "Maintaining a safe App Store experience," Apple, available at https://support.apple.com/en-us/122712.

[16]      Amanda Silberling, "Apple has now sold 3 billion iPhones," *TechCrunch*, July 31, 2025, available at https://techcrunch.com/2025/07/31/apple-has-now-sold-three-billion-iphones/.

[17]      "2025 App Store Transparency Report," Apple, available at https://www.apple.com/legal/app-store/transparency/2025/.

[18]      All dollar figures are inflation-adjusted to constant 2024 dollars using the U.S. Bureau of Labor Statistics' annual average Consumer Price Index for All Urban Consumers (CPI-U), U.S. City Average.

**Figure 1: Apple R&D Spending, 2008 - 2024**
**($ billion, inflation-adjusted to 2024 dollars)**

35.    Apple's investments have resulted in continuous expansions in the capabilities of iPhones, including improvements to storage capability, screen resolution, screen size, processor capabilities, battery life, GPS capabilities, camera and video capabilities, face ID, near field communications capabilities, voice assistance (Siri), wireless charging, and other features. Appendix C briefly summarizes major changes in iPhone features between 2007 and 2024.

### B.    THE ROLE OF THE APP STORE IN THE iOS/iPHONE PLATFORM

36.    The success of the Apple platform creates a large population of potential users for all developers worldwide, with an estimated 1.6 billion active iPhone users as of 2025.[19] The App Store enables iOS users to discover and download apps, typically at no charge to users and

---

19.    In 2025, there were approximately 158 million active iPhone users in the U.S. (David Curry, "Apple Statistics (2026)," Business of Apps, February 26, 2026, available at https://www.businessofapps.com/data/apple-statistics/).

generating no commission revenue for Apple.[20] The Apple platform enables developers to sell digital goods to users through in-app purchases, which in turn generates commission revenue for Apple.

37.     In economic terms, Apple operates a multi-sided platform in which, among other things, (i) users purchase devices from Apple, (ii) developers create iOS apps that are distributed through the App Store; and (iii) the App Store enables users to discover and download apps, and purchase digital goods. It is recognized in the economics literature that margins earned by the operator of a multi-sided platform will vary across the various services provided.[21] Pricing above or below cost for various products on the platform is common. A standard example (in the context of two-sided platforms) is newspapers offering subscriptions to readers at prices that fail to generate enough revenues to cover printing and distribution costs, but selling advertising that generates additional revenues sufficient to cover all costs.[22]

38.     Just as the newspaper's chosen monetization model for subscribers is based on a consideration of the positive indirect revenue effect on the other (advertising) side of its platform, so too can Apple's chosen monetization model for one aspect of its iPhone/iOS platform impact the monetization of other Apple product and service offerings.

---

20.     Statista reported that over 95% of iOS apps were free apps. (Statista, "App Stores," slide 27.) Commissions earned by Apple on download fees accounted of ▮▮▮ of Apple's commission revenue in May 2024 through April 2025.

21.     See, for example, Jean-Charles Rochet and Jean Tirole (2006), "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics* 37(3): 645-667, at 660 ("Platform competition thus creates downward pressure on prices on both sides of the market, and the impact on relative prices is ambiguous."); Marc Rysman (2009), "The Economics of Two-Sided Markets," *Journal of Economic Perspectives* 23(3): 125-143, at 129-130 ("Pricing in two-sided markets has received considerable attention in formal economic research. The main result is that pricing to one side of the market depends not only on the demand and costs that those consumers bring but also on how their participation affects participation on the other side and the profit that is extracted from that participation…. Such seeming anomalies as price below marginal cost or even negative prices can easily arise in a two-sided market.")

22.     Jean-Charles Rochet and Jean Tirole (2006), "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics* 37(3): 645-667, at 659 ("Accordingly, it is quite common for a platform to charge below-cost (perhaps zero) price to one side and high prices to the other. For example, media platforms usually give away newspapers or free TV programs not to prey on rival platforms, but to be able to charge higher markups to advertisers.").

39.     The economic literature also recognizes that changes in competitive conditions (including price regulation) affecting one side of a multi-sided platform can affect prices and margins earned on other sides of the platform. Here, reductions in prices charged by Apple on one side of the platform (e.g., commissions on digital goods) may affect prices charged on other sides of the platform (e.g., increases in device prices or reductions in Apple's incentive to provide developers with tools and technologies at zero or low prices). Any such impacts of reductions in commission revenue depend on the competitive constraints faced by Apple for the different products and services it provides.

40.     Apple's ability to earn commissions from digital transactions creates an incentive for Apple to lower device prices below the level that would be set absent Apple's ability to earn commission revenue. This is because lower device prices expand the user base, which in turn generates revenue from IAPs by the additional users. Similarly, the ability to earn revenue from IAPs increases Apple's incentive and ability to make IAP easy for users, and to provide tools and technologies to developers at zero (or very low) prices because the development of more and better apps increases both demand for Apple devices and IAP revenue.

41.     By the same token, reductions in commissions can harm consumers by creating upward pressure on device prices. Higher device prices can also harm developers if they result in a smaller base of potential users. Reductions in commissions can also harm consumers and developers by reducing Apple's incentives to provide tools and technologies to developers at zero (or very low) prices, which can reduce the quality and availability of apps.

42.     Reductions in Apple's investments in developer tools also adversely affects competition among developers, to the likely disadvantage of smaller developers. If Apple-provided tools and technologies were to be degraded or made unavailable, developers would need to either build their own tools and technologies or purchase them from other providers. Software development can involve large fixed costs, and such a change would likely disproportionately burden smaller developers, thereby lessening competition and increasing developer concentration. Put differently, Apple provides tools that help all developers. If those tools became less available, more expensive, or were otherwise degraded, then developers—especially large ones—would have an incentive to develop their own proprietary tools, thus gaining an advantage over smaller

15

developers. The effect of this would be to disadvantage smaller developers and to lessen competition among developers.

### C.    CONCENTRATION OF APP STORE REVENUE

43.    Within the subset of apps that offer IAP, revenue generated within the App Store is highly concentrated among a small number of large, well-established apps. Therefore, the benefits of low link-out commissions is likely to be concentrated among this small group of highly successful developers that elect to use link-outs. At the same time, as just discussed, any reduction in availability or quality of Apple's developer tools is likely to be felt most heavily by the large number of smaller developers, including those that do not offer IAP.

44.    As shown in Table 1, in the U.S. between May 2024 and April of 2025, ███████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████

**Table 1: Distribution of U.S. IAP Revenue by App**
**May 2024 - April 2025**



| Revenue Percentile (IAP Apps) | Revenue Threshold ($M) | Number of Apps | Percent of App Store Revenue |
|---|---|---|---|
| Top 0.001% | | | |
| Top 0.005% | | | |
| Top 0.01% | | | |
| Top 0.02% | | | |
| Top 0.05% | | | |
| Top 0.1% | | | |
| Top 0.3% | | | |
| Top 0.5% | | | |
| Top 1% | | | |
| Top 5% | | | |
| Top 10% | | | |
| Apps with IAP Revenue | | | |
| Total Apps | | | |

**Source:** U.S. App Store Data

**Notes:** Apps with zero revenue or only downloads revenue are excluded from this analysis. Excludes observations with negative revenue and non-positive quantity.

45.     Appendix D reports revenue and related app characteristics for the 30 leading IAP-generating apps in May 2024 through April 2025. The largest were TikTok ███████ in IAP revenue); YouTube ████████ ); and Monopoly Go! ███████ ). As this indicates, the benefits to developers resulting from zero or low link-out commissions are likely to be concentrated among a small number of large, successful developers that use link-outs.[23]

## III.     THE EXTENT AND IMPACT OF LINK-OUT ACTIVITY TO DATE

46.     This section reviews the extent of link-out activity to date and the impact of that link-out activity on Apple's IAP revenue. This review addresses the claim by Epic that "few developers have taken advantage of their steering rights,"[24] and provides the Court background for informing the evaluation of the profitability of link-outs for developers.

47.     Because Apple does not require developers that offer link-outs to seek prior approval from Apple due to the 2025 Order, I understand that Apple has no way to determine definitively which apps are offering link-outs. As a result, I and my staff attempted to review the extent of link-out activity for the 200 apps that generated the greatest U.S. IAP revenue from May 2024 - April 2025. For reasons I discuss below, this review likely understates the full extent of link-out activity.

48.     In contrast to Epic's claim, the review establishes that many apps have been successful in using link-outs to divert significant revenue from IAPs relative to levels expected in the absence of the 2025 Order.

### A.     LINK-OUT ACTIVITY TO DATE

49.     This section examines the extent of current link-out activity based on a manual review of the 200 apps that generated the greatest U.S. IAP revenue in May 2024 - April 2025. These apps—which, for simplicity, I will refer to as the "top 200 apps"—accounted for ███ of IAP

---

23.     Appendix E summarizes IAP revenue by genre in May 2024 through April 2025. Gaming was the largest category, accounting for ███ of IAP revenue; entertainment apps were the next largest category accounting for ███ of IAP revenue.

24.     Opposition by Appellee Epic Games, Inc. to Motion to Stay Mandate, *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir. 2026), April 6, 2026, p. 3.

revenue in the U.S. over this period.[25] The review was conducted in March and April of 2026 and involved (i) downloading apps from the App Store; (ii) registering as new users; and (iii) navigating the app to ascertain the availability of a link to the developer's website.[26] Screens evidencing the availability of link-out within these apps were preserved as screen shots.[27]

50.     The review likely understates current link-out activity because some developers appear not to offer link-outs to all users but instead offer link-outs to some of their users.[28] If, for example, link-outs are offered only to existing users who have made prior purchases and not to individuals setting up new accounts, then they will not be identified in this review. In addition, because the zero link-out commission injunction was issued less than a year before this app review, observed levels of link-out activity may understate the deployment patterns that will be observed in the longer term for a variety of reasons, including that it is possible that some developers may take time to make decisions regarding link-out adoption.

51.     As summarized in Table 2, ▮▮ of the 25 largest apps were identified as offering link-outs, as do ▮▮ of apps ranked 26-100, and ▮▮ of apps ranked 101-200.

---

25.     Since the 2025 Order, there have been no restrictions on the ability of Reader apps to present offers to users. As a result, the review does not distinguish Reader apps from others offering link-outs.

26.     Three of the Top 200 apps are excluded from the analysis because the manual app review was unable to obtain information on link-out activity. Blink Home Monitor requires a Blink device to use and Raya requires a referral code/invitation to access the app, so information on link-outs could not be determined for either. Microsoft Word appears to no longer allow any purchases (whether through IAP or link-out).

27.     These screen shots are included in my backup materials.

28.     For example, the review did not identify link-out for Duolingo yet it appears that this app in fact offers link-out to at least some users (Zach Witzel, "Your paywall is leaving money on the table. Here's why," Paddle, June 5, 2026, available at https://www.paddle.com/blog/your-paywall-is-leaving-money-on-the-table#benefits-beyond-fee-arbitrage). Moreover, as I discuss below, there are several apps that the app review did not identify as offering link-out but that demonstrated significant declines in IAP revenue after the 2025 Order.

**Table 2: Frequency of Link-Outs for Top 200 Apps,
by App U.S. IAP Revenue Rank**

| Revenue Ranking of Apps | Revenue Range (Upper Bound) | Revenue Range (Lower Bound) | Number of Apps Reviewed | % Any Link-Out |
|---|---|---|---|---|
| Top 1-25 Apps | | | | |
| Top 26-50 Apps | | | | |
| Top 51-75 Apps | | | | |
| Top 76-100 Apps | | | | |
| Top 101-125 Apps | | | | |
| Top 126-150 Apps | | | | |
| Top 151-175 Apps | | | | |
| Top 176-200 Apps | | | | |

**Notes:** The sample of apps were selected based on U.S. App Store revenue between May 2024-April 2025, excluding download fee revenue. Three apps are excluded because the required information could not be obtained.

### B.    LINK-OUTS HAVE RESULTED IN SUBSTANTIAL REDUCTIONS IN APPLE'S IAP REVENUE

52.    This section analyzes IAP revenue in the U.S. in March – June 2026 (through June 6) relative to levels that would have been expected in the absence of the 2025 Order.[29] The analysis establishes that, on average, changes in IAP revenue have been substantial for apps identified as offering link-outs, although a wide range of outcomes is observed. The analysis also finds that several apps not identified by my review as offering link-outs experienced significant declines in IAP revenue relative to levels otherwise expected.

53.    The analysis is based on two datasets provided by Apple. The first contains weekly, app-specific data for 50 major country storefronts, including the U.S, for the period April 2024 through June 6, 2026.[30] After restricting attention to apps with substantial IAP revenue in

---

29.    I estimate the extent of link-outs and their impact because data on developers' link-out offers and link-out revenue are not available to Apple.

30.    The storefronts are the 50 App Store markets with the highest IAP revenue in the year prior to the 2025 Order, excluding China, South Korea, the United Kingdom, and European Union countries, for which there were privacy restrictions. I exclude Australia, Brazil, and Japan because I understand that those countries experienced regulatory changes relating to alternative payment methods that would limit their relevance as benchmarks for U.S. IAP revenue. I also exclude Russia and Ukraine from the analysis due to potential confounding impacts of the war in Ukraine. These exclusions leave 45 countries available for my analysis.

multiple countries, I analyze data for 165 of the top 200 apps in the U.S.,[31] 50 of which were identified as offering link-outs based on my app review. The second dataset contains weekly total IAP revenue by storefront, aggregated across all apps, covering the same countries over the same time period.

54.    As a starting point, I compare aggregate levels of U.S. and international IAP revenue over time. Figure 2 reports the aggregate IAP revenue by week for the U.S. and for the average of all non-U.S. storefronts, with both series normalized to average 100 in the week before the Order. The graph shows that IAP spending in the U.S. has decreased since the 2025 Order, relative to IAP spending in other countries, which is the pattern expected as more developers implement link-outs in the U.S., refine the user experience, and generally become more effective at directing transactions to their own websites.[32] Figure 3 reports the same analysis, but averaged across the 50 apps for which my manual app review identified link-outs. This figure shows an even larger decline in IAP revenue in the U.S. relative to other countries. Over the final 13 weeks of the data (March 8, 2026 through June 6, 2026), U.S. IAP revenue is an average of ▆ lower compared to other countries than it was before the Order.

---

31.    Of the top 200 U.S. apps 32 apps are excluded for having insufficient international data. Specifically, I first exclude app-country pairs with week-over-week growth greater than 500% or a week-over-week decline greater than 80% or a week with zero or negative IAP. I then require that an app have average weekly revenue of at least $1,000 in at least four non-U.S. countries in the year prior to the 2025 Order. I also exclude three apps (Disney+, Hulu, and Netflix) that shifted to Reader status prior to the 2025 Order, as these apps would be expected to experience declines in IAP revenue independent of the Order (Jibin Joseph, "Hulu, Disney+ Ditch iOS App Store Sign-Ups," *PCMag*, October 22, 2024, available at https://www.pcmag.com/news/hulu-disney-plus-ditch-ios-app-store-sign-ups.) This leaves 165 of the top 200 U.S. apps available for analysis.

32.    Two apps owned by ByteDance (TikTok and CapCut) were temporarily removed from the U.S. App Store from January 18, 2025 to February 12, 2025 in response to a U.S. federal ban. (See, Jonathan Vanian, "Apple, Google remove TikTok from stores as app halts service in U.S.," *CNBC,* January 18, 2025, available at https://www.cnbc.com/2025/01/18/apple-google-remove-tiktok-from-stores-as-app-halts-service-in-us.html; Jay Peters and Alex Heath, "TikTok is back in the App Store," *The Verge*, February 13, 2025, available at https://www.theverge.com/news/612768/tiktok-app-store-apple-google-us-ban); and Lauren Feiner, "CapCut is back online in the US," *The Verge*, January 21, 2025, available at https://www.theverge.com/2025/1/21/24348629/capcut-back-online-us-tiktok-bytedance. Figures 2 and 3 do not report U.S. values during the blackout and the following week.

**Figure 2: Average IAP Revenue Index,**
**U.S. and Benchmark Countries**
**(Data Normalized to Equal 100 in the Week Ending April 26, 2025)**



Note: The dotted line (1/18/25–2/22/25) corresponds to the weeks affected by TikTok's temporary removal from the U.S. App Store, which are not representative of typical U.S. IAP revenue.

21



**Figure 3: Average IAP Revenue Index for Apps with Link-Out,
U.S. and Benchmark Countries
(Data Normalized to Equal 100 in the Week Ending April 26, 2025)**



Note: The dotted line (1/18/25–2/22/25) corresponds to the weeks affected by TikTok's temporary removal from the U.S. App Store, which are not representative of typical U.S. IAP revenue.

55.    Next, I assess whether the change in U.S. IAP revenue following the 2025 Order is unusual relative to the changes observed in countries not subject to the Order. For each country, I compute the percent change in IAP revenue from before to after the Order, using a revenue-weighted average across the 50 apps for which my manual app review identified link-outs. To make the two periods comparable, I match the 9-week window between TikTok's U.S. reinstatement and the Order (the "pre-Order" period: February 23, 2025 through April 26, 2025) against the equivalent 9-week window one year later (the "post-Order" period: February 22, 2026 through April 25, 2026). As the Order applies only to the U.S., the changes in non-U.S. storefronts provide benchmarks to reflect the range of changes in IAP revenue expected from causes other than the Order. The changes observed in other countries form a reference distribution for the change one would expect to occur by chance, against which the U.S. change can be compared.

22

56.    This reference distribution allows a simple comparison of changes in IAP revenue in the U.S. and benchmark countries. Figure 4 plots the percent change in IAP revenue from the pre- to the post-Order periods for each country, ranked from the smallest to the largest. The U.S. lies at the far left tail of the distribution, with a percent change in IAP revenue (███) that is more negative than that of any other country, which means that the U.S. experienced a decline in IAP revenue relative to every other country for which data are available. This indicates that the observed decline in IAP revenue in the U.S. is unlikely to be explained by the ordinary variation affecting all storefronts, and is evidence that the 2025 Order led to a decline in U.S. IAP revenue.[33] This descriptive analysis is consistent with the statistical analysis below which utilizes a more sophisticated app-specific framework.

**Figure 4: Percent Change in IAP Revenue for Apps Identified to have Link-Out, by Country**
**February 23 – April 26, 2025 vs. February 22 – April 25, 2026**



■U.S.    ■Benchmark Countries

---

33.    The results are similar if I consider the percent change in IAP revenue across all apps or across the 165 top apps, not just those identified as offering link-out. The U.S. change remains among the lowest. See my backup.

57.     To better quantify the impact of the 2025 Order on U.S. IAP revenue for each app, I estimate a series of difference-in-differences regressions. This approach compares the change in an app's U.S. IAP revenue before and after the 2025 Order to the change in that same app's IAP revenue in other countries over the same period. The regression equation for each app is given by:

$$IAP_{ijt} = \alpha_{ij} + \gamma_{it} + \beta_i * (US_j \times Post_t) + \varepsilon_{ijt}$$

where:

- $IAP_{ijt}$ is the natural log of IAP revenue for app $i$ in country $j$ in week $t$;
- $\alpha_{ij}$ are country fixed effects;
- $\gamma_{it}$ are week fixed effects;
- $US_j$ is an indicator equal to one for the United States;
- $Post_t$ is an indicator equal to one for periods after the 2025 Order;
- $\beta_i$ is the coefficient of interest, capturing the incremental change in U.S. IAP revenue relative to international IAP revenue following the 2025 Order.

58.     Taking the natural log of revenue means the regression captures proportional rather than absolute changes over time and across apps and countries, which puts apps and countries of different sizes on a comparable scale. The country-specific fixed effects control for time-invariant differences across countries, while the week fixed effects control for common shocks that affect all countries in a given week. In order to focus on the current impact of the 2025 Order after developers have had time to implement and refine their link-out systems, I restrict the post-period to include only the final 13 weeks (one quarter-year) for which data are available (March 8, 2026 through June 6, 2026). Thus, the coefficient $\beta_i$ measures the impact of the 2025 Order on U.S. IAP revenue in those final 13 weeks. This provides a rough estimate of the proportion of IAP revenue that has been diverted to link-out.

59.     Table 3 summarizes the regression results, and Appendix F provides the app-specific estimate for each of the 165 apps analyzed.[34] The effect of the treatment varies by app, but the

---

34.     The dependent variable is log-transformed, so the coefficient on the dummy variable approximates a percent change. To recover an estimate, I exponentiate the coefficient and subtract one. See my back-up.

results are consistent with Figures 2 and 3. Across the 165 apps analyzed, the results indicate that ▇ showed declines in U.S. IAP revenue relative to benchmark countries, with ▇ of those declines being statistically significant at the 95% confidence level.[35, 36] The median change among the 165 apps analyzed is ▇, and the revenue-weighted average change is ▇.[37] For the 165 apps analyzed, this equates to a decline in U.S. IAP revenue of ▇ over the final 13 weeks.

**Table 3: Estimated Percentage Change in U.S. IAP Revenue Resulting From 2025 Order**

| Sample | # of Apps | Median | Simple Mean | Revenue Weighted Mean |
|---|---|---|---|---|
| Top Apps | 165 | | | |
| Apps Identified as Offering Link-Out | 50 | | | |
| No Link-Out Identified | 115 | | | |

60.    My app review identified 50 of the apps in the analysis as offering link-outs. Among this group, ▇ showed declines in U.S. IAP revenue relative to international levels, with ▇ of those declines being statistically significant. The median change for these 50 apps is ▇, and the revenue-weighted change is ▇. This equates to a decline in U.S. IAP revenue of ▇ over the 13-week period for the 50 apps identified as offering link-outs. Examples of apps offering link-outs that have experienced large estimated declines in U.S. IAP revenue relative to "but for" levels include TikTok (▇), Roblox (▇), and RAID: Shadow Legends (▇). As noted, the range of declines estimated for these apps may reflect differences in factors such as the timing of link-out deployment, whether link-outs were deployed to all users, and the

---

35.    My conclusions are unchanged if I include separate time trends for each country in the app-specific regressions. See my backup.

36.    I have also estimated a similar regression that includes a treatment effect separately for each 13-week period in the post-treatment period, with no change to my general conclusions. See my backup. My conclusions are also unchanged if I estimate the regressions in stacked form with a common $\beta$ coefficient across apps. See my backup.

37.    I also conducted a difference-in-differences analysis to compare the change in aggregate U.S. IAP revenue to aggregate IAP revenue in other countries before and after the 2025 Order. This analysis finds that aggregate U.S. IAP revenue declined by ▇ relative to benchmark countries. See my backup.

25

effectiveness of developers' link-out interfaces. Appendix F reports results for all 165 apps and identifies the 50 apps that were identified as offering link-outs.

61.     The analysis also shows that several apps not identified by my review as offering link-outs nonetheless experienced significant declines in IAP revenue relative to levels otherwise expected, and that the revenue-weighted reduction in IAP revenue for these apps in the March 8-June 6 period was ▮▮▮. There are at least two likely explanations for this finding. First, false negatives: while my app review found no evidence of link-outs for these apps, the presence of link-outs may not have been visible during the review to the extent the apps offer link-outs only to a subset of users. For example, some developers may offer link-outs only to users who have made a threshold level of prior purchases but not to new users, as would have been identified in the app review process. Second, IAP for some apps not identified as having link-outs could have been affected by other changes such as the removal of anti-steering rules (i.e., restrictions on developers' ability to communicate with users), which also may have affected IAP sales over this period. For example, as user awareness of developers' alternative purchase channels (e.g., webstores) increases, transaction flows may increasingly bypass iOS apps altogether as a result of users going directly to those channels whenever they want to make a purchase.

62.     The difference-in-differences framework used to generate the estimates in Table 3 is a common econometric technique used to evaluate effects of a policy such as allowing link-outs in the U.S. As a further robustness check, I employ an alternative empirical approach known as the synthetic control method (SCM), which compares an outcome (here, IAP revenue in the U.S.) to a synthetic control formed by weighting observations from other countries. The SCM allows the data to determine the weight assigned to each country based on how closely it approximates U.S.

IAP revenue patterns in the pre-period.[38] The results based on the SCM approach are consistent with the difference-in-differences approach.[39, 40]

63.    While it is not possible to determine a precise estimate of the effect of link-outs on IAP due to data limitations, the analysis nonetheless demonstrates that the 2025 Order requiring link-outs at zero commission has led to large and growing declines in IAP activity, in contrast to Epic's suggestion that link-out activity was unimportant.

## IV.    APP STORE MONETIZATION FRAMEWORK

64.    This section reviews how Apple gives developers wide latitude in monetizing apps, describes how many developers use alternatives to IAP in selling digital goods that avoid Apple commissions (even in the absence of link-outs), and describes how commission-based compensation encourages developer entry through the sharing of risks and thus can be viewed as pro-competitive.

---

38.    SCM is an econometric technique used to evaluate the impact of a policy change by constructing a data-driven counterfactual. For each app, I first normalize IAP revenue to each country's average weekly revenue for that app in the pre-period, so that countries of different sizes can be compared on a common scale. The SCM algorithm selects weights on comparison countries to minimize the discrepancy between normalized U.S. IAP revenue and the weighted average of normalized comparison-country IAP revenue in the pre-treatment period. For the purpose of selecting these weights, weekly data are aggregated into 13 consecutive four-week periods. The resulting weighted average represents a "synthetic" United States and is used to estimate what U.S. IAP revenue would have been in each week of the post-period absent the Order. The difference between actual and synthetic U.S. IAP revenue provides an estimate of the causal effect of the Order on IAP revenue.

39.    Across the 165 apps analyzed, the synthetic control results indicate that ▮▮ showed declines in U.S. IAP revenue relative to the synthetic United States. The median change is ▮▮, and the revenue-weighted average change is ▮▮. Among the 50 apps identified as offering link-outs, ▮▮ showed declines in U.S. IAP revenue relative to the synthetic United States. The median change is ▮▮, and the revenue-weighted average change is ▮▮. Applying the synthetic control method to the aggregate IAP revenue data yields an estimated change of ▮▮ relative to the synthetic United States. This difference is statistically significant. See my backup materials.

40.    There is a 0.8 correlation between app-specific results across the difference-in-difference and synthetic control-based estimates.

A.      DEVELOPERS CAN SELL DIGITAL GOODS FOR USE IN IOS APPS DIRECTLY TO
        USERS THROUGH WEBSITES WITHOUT GENERATING APPLE COMMISSIONS

65.     Many developers enable users to purchase digital goods through developers' websites or

webstores. Apple permits iOS apps to use digital goods purchased outside of IAP: users

download the app from the App Store and link their account to the app so that they can use the

digital goods purchased on the developer's website. In the U.S., transactions made through

developers' webstores today do not generate commissions for Apple.

66.     Although any developer can sell digital goods through its websites or webstores and

avoid Apple commissions on those sales, Apple requires most apps to also offer IAP. Thus, for

most apps, whether the developer incurs a commission on a given sale depends on the user's

decision as to how to purchase the digital good. For example, apps such as Zoom, Calm, and

Strava allow users to create an account and buy a subscription or other digital goods on the

developer's website, or users can make purchases using IAP within the app.[41] These apps would

avoid Apple commissions when users make their purchases on the app developers' websites.

67.     Apps that qualify for (and request) "Reader" status are not required to offer IAP and can

instead sell digital goods exclusively through a webstore while still allowing users to access

purchased content within their iOS apps.[42, 43] Netflix, for example, has Reader status and

---

41.     "Canceling a Zoom subscription on the Apple App Store," Zoom, July 2, 2025, available
at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0059292; Layna
Smith, "How to Purchase a Yearly Calm Premium Subscription," Calm, May 5, 2026, available
at https://support.calm.com/hc/en-us/articles/115002473687-How-to-Purchase-a-Yearly-Calm-
Premium-Subscription; "How to Subscribe," Strava, available at https://support.strava.com/en-
us/articles/15401704-how-to-subscribe.

42.     Apps eligible for Reader status are "apps that provide one or more of the following
digital content types—magazines, newspapers, books, audio, music, or video—as the primary
functionality of the app." ("Distributing 'reader' apps with a link to your website," Apple,
available at https://developer.apple.com/support/reader-apps/.) See also Jordan Golson, "Apple
Reverses Course on In-App Subscriptions [Apple Confirms]," MacRumors, June 9, 2011,
available at https://www.macrumors.com/2011/06/09/apple-reverses-course-on-in-app-
subscriptions/.

43.     Beginning in 2022, apps with Reader status that chose to remove IAP were permitted to
provide a website link within the app. Prior to the 2025 Order, developers of Reader apps faced
limitations on the appearance and placement of these links, and were restricted from in-app
disclosure of the prices available through the developer's website. ("Update on 'reader' app
distribution," Apple, March 30, 2022, available at https://developer.apple.com/news/?id=grjqafts;

28

currently does not offer subscriptions through Apple's IAP, instead requiring users to subscribe through the Netflix website before accessing content on its iOS app.[44, 45] Today, more than ███ apps worldwide have Reader status and could sell digital goods exclusively through their own website and include an in-app link to that website. These apps range from major services such as Hulu, Netflix, YouTube TV, and Amazon Kindle to smaller apps such as the Arkansas Democrat-Gazette, Crain's business publications, and the Yazoo Herald (in Yazoo City, MS).[46]

68.    As this indicates, even in the absence of link-outs, developers have the ability to sell digital goods directly to users through websites, which provides an alternative to IAPs as a channel for distributing digital goods. In the U.S., all apps that offer IAPs can offer digital goods at developers' webstores (which avoid Apple commissions) while Reader apps may rely exclusively on developers' websites, avoiding all Apple commissions. The elimination of Apple's anti-steering rules have removed impediments to developers' ability to encourage users to purchase digital goods from developers' websites, which improves the viability of the website distribution channel for all developers independently of the availability of link-outs.

### B.    THE APP STORE COMMISSION STRUCTURE ENCOURAGES DEVELOPER ENTRY

69.    From the inception of the App Store, Apple has charged commissions expressed as a percent of revenue earned by developers from selling digital services. Commission-based pricing

---

Mitchell Clark, "Apple finally lets 'reader' apps like Kindle, Netflix, and Spotify link to their own sites," The Verge, March 30, 2022, available at https://www.theverge.com/2022/3/30/23003503/apple-reader-app-developer-external-link-guidelines-announced-entitlements; "Distributing reader apps with a link to your website," Apple, available at https://developer.apple.com/support/reader-apps/; "App Review Guidelines," Apple, available at https://developer.apple.com/app-store/review/guidelines/#other-purchase-methods, Sections 3.1.1(a) and 3.1.3(a)).

44.    "Netflix Billing through Apple," Netflix, available at https://help.netflix.com/en/node/25097.

45.    Some apps that appear to be eligible for Reader status have not applied for the IAP exemption and still offer IAP sales. For example, The New York Times app is eligible to be a Reader app (and avoid IAP) but instead chooses to sell subscriptions both through its website and through IAP. ("Digital Subscriptions," The New York Times, available at https://help.nytimes.com/11015852367-Digital-Subscriptions; "iOS News App," The New York Times, available at https://help.nytimes.com/360007626393-iOS-News-App.).

46.    Epic_20260320.xlsx.

is a common mechanism for compensating distributors of products produced by third parties. Commissions can promote competition by aligning the incentives of producers (here, developers) and distributors (here, the App Store) because the compensation received by distributors is directly related to the success of the product. Commission-based compensation mechanisms enable developers and Apple to share the risks of app development. This facilitates entry of new developers and apps, and it enables Apple to share in the success of apps that have benefited from the iPhone/iOS platform. Regardless of whether developers use IAP or link-out, they make use of Apple's intellectual property and technology; benefit from access to the same user base generated by Apple; and utilize the same App Store technology for discovering and distributing apps. Thus, the economic rationale for charging commissions on link-out transactions is the same as for IAP.

70.     As discussed above, Apple's headline IAP commission in the U.S. is currently 30% of developer IAP revenue.[47] This rate applies to non-recurring purchases (including subscriptions that do not automatically renew). For recurring subscription services, the initial commission is 30%, and commissions on renewals after one year is 15%. Several Apple programs provide discounted commissions of 15% to certain developers through the VPP, NPP, and SBP programs.[48]

71.     Apple's commission structure means that each app that pays an IAP commission will fall into one of three categories: (i) apps that face a 30% commission on all IAP sales; (ii) apps that face a 15% commission on all IAP sales;[49] and (iii) apps that face average commissions between 15% and 30% based on a blended rate of headline transactions and subscription renewals after the first year. Table 4 reports the share of apps, weighted by IAP revenue, that faced

---

47.     This commission also applies to paid downloads of apps through the App Store.

48.     "Apple Video Partner Program," Apple, available at https://developer.apple.com/programs/video-partner/; "News Partner Program," Apple, available at https://developer.apple.com/apple-news/program/; "Membership Details," Apple, available at https://developer.apple.com/programs/whats-included/. These developers also provide content to be distributed through Apple News.

49.     In addition to VPP, NPP, and SBP, this category includes apps that no longer offer new subscriptions via IAP but have recurring subscriptions processed by the App Store.

commissions of 15%, 30%, or a "blended" rate between May 2024 and April 2025. Over this period, Apple's average commission on IAP transactions was ███ .

**Table 4: IAP Transactions and Revenue by Commission Tier**
**May 2024 - April 2025**

| Commission Rate | % of Transactions | % of Revenue | Average Commission Rate |
|---|---|---|---|
| 15% | | | |
| Between 15% and 30% | | | |
| 30% | | | |

**Source:** U.S. App Store Data

**Note:** Commission rates are calculated at the app level as total commission revenue divided by total revenue. Each app's commission rates are then rounded to the nearest whole number: rates <15.5% are classified as 15%, rates >=29.5% as 30%, and rates between 15.5% and 29.5% as between 15% and 30%.

## V.    FRAMEWORK FOR EVALUATING THE PROFITABILITY OF LINK-OUT TRANSACTIONS UNDER DIFFERENT COMMISSION RATES

72.    A developer can profitably provide link-outs if the cost of doing so is less than the IAP commission that the developer would otherwise face. This logic holds without regard to the specific IAP rate, i.e., the general framework does not depend on any specific IAP rate. As discussed above, the costs developers face in providing link-outs include the (i) link-out commission, (ii) processing costs, and (iii) inefficiency costs, if any. Apple's costs are irrelevant to whether link-outs are profitable for developers.

73.    The efficient developer's incremental profitability from link-outs can be expressed as:

*Incremental developer profits from link-out for an efficient developer =*
*IAP commissions – (Link-out commissions + Processing costs)*

Link-outs are profitable as long as the combined costs of offering link-outs are no greater than the IAP commissions:

*Incremental profits from link-out for an efficient developer ≥ 0*
*if*
*IAP commissions ≥ Link-out commissions + Processing costs*

Put differently, link-outs for an efficient developer are profitable as long as the link-out commission is no greater than the IAP commission less processing costs:

31

***Incremental profits from link-out for an efficient developer ≥ 0***

***if***

***Link-out commissions ≤ IAP commissions - Processing costs***

74.     This framework allows one to determine whether any particular link-out commission would be profitable for an efficient developer, given the IAP commission and developer processing costs. While the IAP commission that a developer faces is known and the processing costs it faces can be estimated, any inefficiency costs that a developer might face are unobserved. However, the framework yields an estimate of the size of the inefficiency cushion which a developer could possibly use to offset inefficiencies and still profitably offer link-outs (given the IAP and link-out commissions it faces and its estimated processing costs).

75.     For example, if an efficient developer (which sells digital services in App A) faces processing costs of 10% of revenue and an IAP commission of 30%, then that developer will find it profitable to offer link-outs as long as the link-out commission is below 20% (= 30% - 10%). If the link-out commission were 15%, that developer would earn an incremental profit of 5% of revenue on those transactions. If another efficient developer (who sells digital services in App B) faces processing costs of 5% of revenue and an IAP commission of 30%, then that developer will find it profitable to offer link-outs as long as the link-out commission is below 25% (= 30% - 5%). If the link-out commission were 15%, that developer would earn an incremental profit of 10%.

76.     The link-out commission that just makes link-out profitable for efficient developers can be calculated for any IAP commission rate and processing cost. In addition, given information on IAP commissions and processing costs, one can calculate the share of efficient developers that can profitably offer link-outs at a given link-out commission rate. In the example above, there are two developers, A and B; 100% of these developers could profitably link out at any link-out commission below 20%, and 50% of these developers could profitably link out at any link-out commission below 25%.

77.     Now consider an inefficient developer. Since I cannot observe the inefficiencies of each developer, it is not possible to calculate the link-out commission that enables an inefficient developer to link out profitably. However, for any given link-out commission, I can calculate the profitability for an efficient developer facing the same processing costs, IAP commission, and

link-out commission. I then define the inefficiency cushion for that developer as the profit that that efficient developer earns. That profit could be used by the inefficient developer to possibly offset its inefficiencies and profitably offer link-outs.

78.    This framework does not account for potential benefits to developers of link-outs beyond commission savings on link-out transactions. For example, developers who offer link-outs may be able to migrate users from making purchases via IAP or link-out to making purchases directly from the developers' own webstores, thus allowing developers to avoid commissions altogether. Moreover, link-outs may offer developers additional tools to increase their digital sales, such as allowing more pricing flexibility than IAPs allow and the ability to collect additional information about user purchase patterns, which enables developers to better target their marketing efforts. These factors would increase the long-term profitability of offering link-outs and could induce developers to offer link-outs even if offering them appears to be unprofitable under my framework.

## VI.    EFFICIENT DEVELOPERS AND SOME INEFFICIENT DEVELOPERS CAN PROFITABLY OFFER LINK-OUTS ACROSS A RANGE OF LINK-OUT COMMISSION RATES

79.    In this section, I empirically implement the framework described above for evaluating the profitability of link-outs for efficient developers and the inefficiency cushion resulting from different link-out commission rates.

80.    I first estimate developer processing costs and evaluate the share of efficient developers that could profitably offer link-outs across a wide range of potential link-out rates for large apps—those that generated at least $1 million in IAP revenue in the U.S. in the year prior to the 2025 Order. I then evaluate the average inefficiency cushion that efficient developers would benefit from across this range of link-out rates. For example, I show that at a headline link-out rate of 15% and a renewal/program rate of 10%, apps accounting for ▮▮▮ of large app revenue can profitably provide link-outs if efficient, and the average inefficiency cushion among those developers is ▮▮▮. Because the size of the inefficiency cushion is larger when link-out commission rates are lower, greater numbers of inefficient developers (and developers that are more inefficient) can profitably offer link-outs as link-out commissions fall.

33

81.     In Section VI.C below, I discuss, from an economic perspective, the tradeoffs that resulting from incentivizing inefficient firms to participate in link-outs.

### A.     ESTIMATING THE COSTS OF PROCESSING LINK-OUT TRANSACTIONS AND DEVELOPER PROFIT FROM LINK-OUTS

82.     Developers offering link-outs may perform certain processing tasks internally or, if more cost effective, may outsource the processing tasks entirely. Several third-party vendors offer complete processing services to developers that wish to offer link-outs, including Stripe and Paddle. Stripe is a prominent third-party vendor of payment processing services for link-out transactions and publishes standard rates for developers offering link-outs.[50] Paddle is another third-party vendor that offers complete processing services to developers that wish to link-out and also publishes standard rates for these services.[51] My analysis focusses on Stripe and Paddle, but the presence and continued emergence of additional third-party payment processing options (or self-provisioning) should only serve to increase profitability of link-out among app developers. Other third-party processors are available to developers, including, for example,

---

50.     Stripe is a large provider with a published rate schedule that has been used by developers to implement link-out (as I observed in my app review). I also understand from an Apple executive that Stripe is a leading third-party provider of payment processing services for link-out transactions in the U.S. Stripe's marketplace success indicates that it is a credible supplier of payment processing services for developers offering link-out.

51.     Stripe and Paddle were discussed during the injunction compliance proceedings in this matter. For example, Down Dog's CEO Benjamin Simon testified that Down Dog used Stripe as one of its payment processors for user purchases made through its website and estimated Stripe charged it between 3.5% and 6.5%. (Evidentiary Hearing Transcript Volume 6, Testimony of Benjamin Simon, *Epic Games, Inc. v. Apple Inc.*, May 8, 2024, pp. 981-982.) While Down Dog relied on Stripe as a payment processor and handled other processing responsibilities internally, Stripe also offers a merchant of record service, where Stripe takes on those responsibilities for an additional 3.5% fee. (Stripe Managed Payment pricing, https://stripe.com/pricing.) Paddle's founder, Christian Owens, also filed a declaration as part of the proceeding, in which he stated that "Paddle handles every aspect of a transaction. This includes checkout, billing, invoicing, tax calculation and remittance, chargeback services, refunds, subscription management, analytics, and cross-platform support," and does so for a fee of 5% plus $.50 per transaction (with a flat 10% fee offered for smaller transaction sizes). (Declaration of Christian Bailey Owens, *Epic Games, Inc., v. Apple Inc.*, March 12, 2024, p. 4; See, also, Evidentiary Hearing Transcript Volume 1, Testimony of Matthew Fischer, *Epic Games, Inc. v. Apple, Inc.*, May 8, 2024, pp. 129-130).

Xsolla. However, these firms do not publish rate information needed to estimate fees for payment processing and merchant of record services.[52, 53]

83.    As summarized in Table 5, Stripe and Paddle charge a percentage of the revenue generated by a transaction and a fixed per-transaction fee.[54]

**Table 5: Link-Out Transaction Processing Fees**

| Third Party Vendor | Percentage of Revenue | Fee | Fee Cap |
|---|---|---|---|
| Stripe | 6.4% | $0.30 | No |
| Paddle | 5.0% | $0.50 | Capped at 10% |

**Sources:** Stripe Managed Payment Pricing (see here: https://stripe.com/pricing#payments); Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios)

84.    Third-party processors' standard rates, together with information on the average revenue for IAP transactions for each developer, yield an estimate of a developer's processing cost of

---

52.    Xsolla advertises a full payment service offering and charges "5% of transactions + cost of channel." (See "In-Game Virtual Goods Payment Software Pricing," available at https://xsolla.com/products/in-game-store/pricing). While Xsolla's fees depend on an app's specific payment mix, public estimates of Xsolla's all-in costs are cited as 7-10% ("Xsolla vs. Stripe: Which is Better for Gaming Payments Processing?" Noda, November 3, 2025, (available at https://noda.live/articles/xsolla-vs-stripe).

53.    In addition, Epic in October 2025 launched a new service that enables developers to build "direct-to-consumer web shops for mobile and PC games" where Epic provides site hosting, payment processing, and merchant of record services. Epic does not charge a developer any fee on the first $1 million in net revenue processed through the web shop per year, per app, and charges a 12% fee for revenue beyond $1 million. ("Introducing Epic Web Shops," *Epic,* October 2, 2025, available at https://store.epicgames.com/news/introducing-epic-web-shops?lang=en-US; "Web Shops Powered by Epic," *Epic*, available at https://store.epicgames.com/distribution/web-shops?lang=en-US.) Epic advertised that these web shops could be used to process link-out transactions by iOS developers. ("New Epic Games Store Webshops and Revenue Share Update," *Epic,* available at https://store.epicgames.com/news/new-epic-games-store-webshops-and-revenue-share-update?lang=en-US.)

54.    The Stripe fees include the combination of 2.9% + $.30 charged for Stripe's "Payments" service and the 3.5% additional fee charged for Stripe's "Managed Payments" service ("Pricing & Fees," Stripe, available at https://stripe.com/pricing#:~:text=Standard,volume%20or%20unique%20business%20models). Several additional Stripe a-la-carte services come included for developers paying for these two services including "Payment Links" (which provides no-code payment checkout links), "Checkout" (which provides pre-built and customizable checkout pages), "Radar" (which provides fraud detection and prevention).

providing link-out transactions.[55] For any assumed link-out commission rate, the estimated developer's processing costs based on standard rates and IAP commission rate yield an estimate of efficient developers' incremental profit (or loss) from diverting IAP sales to link-outs.

85.     Available data indicate that third-party processors, including Stripe and Paddle, do not charge for the initial costs of setting up link-out transactions, so no start-up costs are included in the calculation. For example, Stripe states that it provides "[a]ccess [to] a complete payments platform with simple, pay-as-you-go pricing. No setup fees, monthly fees, or hidden fees."[56] Similarly, Paddle states that there are "[n]o migration fees, monthly fees, or hidden extras" associated with their per-transaction merchant-of-record service.[57] Some third-party services, including Stripe and Paddle, offer do-it-yourself options for implementing link-outs, and provide

---

55.     I understand from speaking to an Apple executive that developers may offer link-outs while opting to purchase a reduced set of payment processing services from Stripe or another provider, which might increase the profitability of link-out offerings. My analysis is flexible and can easily be updated to accommodate alternative processing costs.

56.     "Pricing & Fees," Stripe, available at https://stripe.com/pricing#:~:text=Standard,volume%20or%20unique%20business%20models. Stripe advertises that it "offers a holistic solution that helps [developers] make the transition to web-based payments quickly and with confidence" and that it's Checkout and Managed Payment services are aimed at "replac[ing] the comprehensive infrastructure Apple previously provided" when developers sell through IAP ("How app developers can reduce fees and create an optimized checkout," Stripe, available at https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout).

57.     "All-in-One Pricing, No Hidden Costs," Paddle, available at https://www.paddle.com/pricing. Paddle advertises that it's service includes payment processing, customizable checkout pages, tax registration, filing and remittance, billing support, analytics and reporting, assumption of chargeback liability, data protection and regulatory compliance, fraud protection, and subscription management ("SaaS Billing Software," Paddle, available at https://www.paddle.com/billing; "Website Checkout," Paddle, available at https://www.paddle.com/billing/checkout; "Saas Payment Solution," Paddle, available at https://www.paddle.com/billing/payments; "Sales Tax & Compliance Software," Paddle, available at https://www.paddle.com/billing/tax-and-compliance; "Payment Fraud Protection Software," Paddle, available at https://www.paddle.com/billing/fraud-protection; "Payment Analytics Software for SaaS," Paddle, available at https://www.paddle.com/billing/reporting; "SaaS Subscription, Management Software," Paddle, available at https://www.paddle.com/billing/subscriptions).

guides to assist with set-up.[58] Some providers claim that implementation can be done in only a day.[59, 60]

86.     Because the Stripe and Paddle fee structures include a fixed per-transaction fee, Stripe and Paddle would charge different amounts (both in dollar terms and as a percentage of transaction value) for different link-out transactions, even within a single app. To see how transaction prices (and therefore processing costs) vary across apps, I examine data for 2,721 large apps (those with at least $1 million in IAP revenue in the U.S. in the year prior to the 2025 Order). These apps accounted for ███ of U.S. IAP revenue in this period. I calculate the transaction price (revenue per transaction) for each IAP sold on each app. Table 6 reports the distribution of average transaction prices for the apps included in the analysis.[61] As Table 6

---

58.     See, e.g. "How app developers can reduce fees and create an optimized checkout," Stripe, available at https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout; "Website Checkout," Paddle, available at https://www.paddle.com/billing/checkout; These services provide step-by-step guides to setting up and implementing link-out within iOS apps, including SDKs and APIs, as well as sample code snippets. (See, e.g. "Accept payments for digital goods on iOS with a prebuilt payment page," Stripe, available at https://docs.stripe.com/mobile/digital-goods/checkout; "Stripe iOS SDKs," Stripe, available at https://stripe.dev/stripe-ios/documentation/stripe; "Add a hosted checkout to your mobile app," Paddle, available at https://developer.paddle.com/build/mobile-apps/link-out-mobile-app-hosted-checkout-app.)

59.     Stripe advertises that a developer "can start accepting web payments in just a few days" ("How app developers can reduce fees and create an optimized checkout," Stripe, available at https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout). Also see, e.g., Amit Porat, "Introducing: Appcharge's iOS Payments SDK," Appcharge, June 30, 2025, available at https://www.appcharge.com/blog/introducing-appcharge-ios-payments-sdk; "Accept in-game payments across iOS and Android," Appcharge, available at https://www.appcharge.com/products/payment-links ("Increase revenue from in-app purchases with a 1-day integration.").

60.     Paddle advertises that developers can "[l]aunch on Paddle in days, not weeks," and offers "[d]eveloper-friendly APIs; SDKs and tools; Comprehensive Developer Docs; Sandbox environment; [and] Responsive support" to "make the transition easy." ("SaaS Billing Software," Paddle, available at https://www.paddle.com/billing.)

61.     I received U.S. App Store data that contains monthly billings, monthly Apple commissions, and monthly count of transactions for each product sold by apps in the U.S. storefront. Average revenue per transaction is estimated for each app by taking the revenue weighted average of the monthly level revenue per transaction across all products sold by an app.

shows, there is a wide distribution in the average price across apps: 5% of apps have an average price of ▮▮▮ or below, and 5% of apps have an average price of ▮▮▮ or above.

87.    Table 6 also reports the distribution of average processing fees that apps would face for link-out transactions if processed by Stripe and by Paddle at their standard rates based on the average transaction prices observed among the apps with greater than $1 million in IAP revenue. The average fees are expressed as a percentage of the average transaction size for an app.

**Table 6: Distribution of Estimated Processing Fees for Link-Outs, Apps with $1M+ in U.S. IAP Revenue May 2024 - April 2025**

| Transaction Price | | Corresponding Implied Stripe Fee | Corresponding Implied Paddle Fee |
|---|---|---|---|
| Point on Distribution | IAP Price | | |
| Mean | ▮ | 8.1% | 7.8% |
| Min | ▮ | 23.6% | 10.0% |
| 5% | ▮ | 12.1% | 10.0% |
| 10% | ▮ | 11.2% | 10.0% |
| 25% | ▮ | 10.0% | 10.0% |
| 50% | ▮ | 8.8% | 8.9% |
| 75% | ▮ | 7.8% | 7.4% |
| 90% | ▮ | 7.3% | 6.5% |
| 95% | ▮ | 7.0% | 6.1% |
| 99% | ▮ | 6.7% | 5.5% |
| Max | ▮ | 6.5% | 5.1% |

Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments); Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios)

Notes: Stripe's public rate is 6.4% + $0.30 per transaction. Paddle's public rate is 5% + $0.50 per transaction and caps at 10%. The Stripe and Paddle fee columns reflect the distribution of app-level effective fee rates. The average transaction size is calculated at the app-level.

88.    The processing fees I estimate above may overstate actual processing fees for many developers and thus may (conservatively) understate the profitability of link-out transactions to developers. For example, larger developers are likely to be able to negotiate discounts from fees

38

published by Stripe and Paddle.[62] These estimates are also likely to overstate the costs faced by developers that choose to process transactions internally instead of contracting with a third party.

89.    For each of the approximately 2,700 apps with greater than $1 million in IAP revenue, I calculate the profitability of link-outs at different link-out commission rates assuming developers are efficient. To illustrate, Table 7 shows sample calculations of link-out profitability for two hypothetical developers, one facing the headline 30% IAP commission, and the other facing an IAP commission of 15%. I use an average transaction price of ███, which reflects the average transaction price across apps, and calculate profitability using Stripe's fee structure (6.4% of the transaction amount plus $.30 per transaction), which yields a processing cost of ██.

90.    Scenario 1 reflects a hypothetical example of a developer that faces an IAP commission of 30% and a link-out commission of 15%. An efficient developer facing this scenario would earn an incremental profit of ██ from transactions that use link-outs instead of IAP or, equivalently, there is an inefficiency cushion of ██ that could possibly enable an inefficient developer to offset its inefficiencies and profitably offer link-outs. Scenario 2 reflects a hypothetical example of a developer that faces an IAP commission of 15% and a link-out commission of 5%. An efficient developer facing this scenario would earn an incremental profit of ██ from transactions that use link-outs instead of IAP or, equivalently, there is an inefficiency cushion of ██.

**Table 7: Sample Calculations of Inefficiency Cushion Based on Stripe Fees**

| Description | Formula | Scenario 1 | Scenario 2 |
|---|---|---|---|
| IAP Commission Rate | [a] | 30% | 15% |
| Average Transaction Price | [b] | ██ | ██ |
| Stripe Processing Fee ($ / Transaction) | [c] | $0.30 | $0.30 |
| Stripe Processing Fee (% / Transaction) | [d] | 6.4% | 6.4% |
| Effective Processing Fee (% of Transaction Price) | [e] = ([c] / [b]) + [d] | ██ | ██ |
| Assumed Link-Out Rate | [f] | 15% | 5% |
| Inefficiency Cushion or Profitability of Efficient Developer at Assumed Link-Out Rate | [g] = [a] - [e] - [f] | ██ | ██ |

---

62.    Stripe advertises several "custom" pricing models that are "available for businesses with large payments volume or unique business models." ("Pricing & Fees," Stripe, available at https://stripe.com/pricing.)

91.     As the example shows, the inefficiency cushion depends only on IAP and link-out commission rates and processing fees. The example highlights that, all else equal, at any given link-out rate, a developer facing the IAP commission rate of 15% has a smaller inefficiency cushion than the developer facing the IAP commission rate of 30%.

### B.    LINK-OUT PROFITABILITY AND INEFFICIENCY CUSHIONS AT ALTERNATIVE LINK-OUT COMMISSION RATES

92.     I analyze the potential profitability of link-out transactions at alternative link-out commission rates for large apps (which I define as apps with greater than $1 million in U.S. IAP revenue in the year prior to the 2025 Order). This initial analysis ignores inefficiencies and assumes that each developer uses a single firm to implement and process link-out transactions. I present multiple versions of this analysis: I assume developers face Stripe's standard fee schedule and alternatively assume developers face Paddle's standard fee schedule;[63] I also evaluate results on a revenue-weighted basis as well as based on app counts.[64]

93.     In Table 8 below, I calculate the share of IAP revenue attributable to apps that, if efficient, would find link-out profitable at different link-out rates.[65] In order to illustrate for the rates most relevant to Apple's proffered link-out headline rate of 15% and the link-out program/renewal rate of 10%, the table below reports results for link-out headline rates ranging from 10%-20% and link-out program/renewal rates ranging from 8%-12%.

94.     Each cell in the table shows the share of revenue attributable to apps that could profitably offer link-outs, if efficient, at each combination of headline and program/renewal link-out rate. For example, if the link-out headline rate is 15% and the link-out program/renewal rate is 10%, then based on Stripe's fee schedule, apps accounting for ▮▮▮ of large app revenue could

---

63.     Processing fees for each app are calculated as follows: first, I calculate the average monthly price for each product sold by the app and determine the standard, undiscounted fee Stripe or Paddle would apply to each average monthly price. I then calculate the revenue-weighted average of the product-specific fees for each app. I conservatively assume that link-out would be offered across all products within an app, whether or not link-out is profitable for each product on a standalone basis.

64.     I discuss some results in the text with additional results shown in Appendices G-I.

65.     For simplicity, I consider link-out to be profitable for an efficient developer where the combined costs of offering link-out (i.e. link-out commissions + processing costs) is equal to or less than the IAP commission.

profitably link out, if efficient.[66] At those same link-out rates but using Paddle's fee schedule, apps accounting for ███ of large app revenue could profitably link out, if efficient.[67, 68]

---

66.     Average prices and commissions for each app are based on data from the one year prior to the 2025 Order. As discussed above, because developers can have a mix of new subscriptions and subscription renewals after the first year, some developers face both the headline 30% IAP commission and the program/renewal IAP commission of 15%. When estimating the total cost of moving transactions to link-out, I assume that the equilibrium mix of transactions subject to the link-out headline and program/renewal commissions will equal the mix realized by the developer on IAP. For example, if 50% of a developer's IAP revenue is from new subscriptions and 50% from subscription renewals after the first year, the developer will appear in the data with an average IAP commission of 22.5% (50%×30% + 50%×15%). When calculating profitability for a headline link-out commission rate of 15% and program/renewal link-out commission rate of 10%, I would assume this developer has an effective link-out commission of 12.5% (50%×15% + 50%×10%).

67.     Appendix Tables G.1 and G.2 present extended versions of Table 8 for Stripe and Paddle respectively that report results for link-out headline rates ranging from 0%-30% and link-out program/renewal rates ranging from 0%-15%.

68.     Appendix Tables G.3 and G.4 present the unweighted share of large apps that would find link-out profitable at various link-out commission rates based on Stripe fees and Paddle fees respectively. On an unweighted basis, at a link-out headline rate of 15% and a link-out program/renewal rate of 10%, ███ of large apps, if efficient, would find link-out profitable based on Stripe's fees. At these rates, ███ of large apps, if efficient, would find link-out profitable based on Paddle's fees.

41

**Table 8: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities**
**Large Apps**

| | | Based on Stripe Fees | | | | | Based on Paddle Fees | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Assumed Link-Out Program/Renewal Rate (Relative to 15% IAP Rate) | | | | | Assumed Link-Out Program/Renewal Rate (Relative to 15% IAP Rate) | | | | |
| | | 8% | 9% | 10% | 11% | 12% | 8% | 9% | 10% | 11% | 12% |
| Assumed Link-Out Headline Rate (Relative to 30% IAP Rate) | 10% | | | | | | | | | | |
| | 11% | | | | | | | | | | |
| | 12% | | | | | | | | | | |
| | 13% | | | | | | | | | | |
| | 14% | | | | | | | | | | |
| | 15% | | | | | | | | | | |
| | 16% | | | | | | | | | | |
| | 17% | | | | | | | | | | |
| | 18% | | | | | | | | | | |
| | 19% | | | | | | | | | | |
| | 20% | | | | | | | | | | |

Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments); Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
Notes: Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency.

95.    As discussed above, the average inefficiency cushion can be calculated for each set of potential link-out commission rates. Table 9 reports the revenue-weighted average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Results are again reported for a range of headline and renewal/program link-out rates around the rates proposed by Apple. As an example, Table 9 indicates that at a link-out headline rate of 15%, a program/renewal rate of 10%, and based on Stripe fees, the average large app has an inefficiency cushion of ███ of IAP revenue.[69] At those same link-out

---

69.    In this example, the average inefficiency cushion is calculated for the large apps identified in Table 8 that, if efficient, would find link-out profitable at a link-out headline rate of 15% and program/renewal rate of 10% (i.e., the apps that accounted for ███ of revenue generated by large apps).

42

rates but using Paddle's fee schedule, the average large app has an inefficiency cushion of ███ of IAP revenue.[70, 71]

**Table 9: Revenue-Weighted Average Inefficiency Cushion**
**Large Apps**

| | | Based on Stripe Fees | | | | | Based on Paddle Fees | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Assumed Link-Out Program/Renewal Rate (Relative to 15% IAP Rate) | | | | | Assumed Link-Out Program/Renewal Rate (Relative to 15% IAP Rate) | | | | |
| | | 8% | 9% | 10% | 11% | 12% | 8% | 9% | 10% | 11% | 12% |
| Assumed Link-Out Headline Rate (Relative to 30% IAP Rate) | 10% | | | | | | | | | | |
| | 11% | | | | | | | | | | |
| | 12% | | | | | | | | | | |
| | 13% | | | | | | | | | | |
| | 14% | | | | | | | | | | |
| | 15% | | | | | | | | | | |
| | 16% | | | | | | | | | | |
| | 17% | | | | | | | | | | |
| | 18% | | | | | | | | | | |
| | 19% | | | | | | | | | | |
| | 20% | | | | | | | | | | |

**Sources**: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments); Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
**Notes**: Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency.

96.    I have also analyzed large apps excluding any apps that received a discounted IAP commission of 15% on IAP transactions as part of the VPP and NPP programs.[72] These large, non-program apps account for ███ of all U.S. IAP revenue. At a headline rate of 15%, a link-out renewal rate of 10%, and based on Stripe fees, apps accounting for ███ of large, non-program

---

70.    Appendix Tables G.5 and G.6 present extended versions of Table 9 for Stripe and Paddle respectively that report results for link-out headline rates ranging from 0%-30% and link-out program/renewal rates ranging from 0%-15%.

71.    Appendix Tables G.7 and G.8 present the unweighted percentage of large apps that, if efficient, would find link-out profitable at various link-out commission rates based on Stripe fees and Paddle fees respectively. On an unweighted basis, at a link-out headline rate of 15% and a link-out program/renewal rate of 10%, the average large app has an inefficiency cushion ███ using Stripe's fees and ███ using Paddle's fees.

72.    I define large, non-program apps as those with at least $1 million in U.S. IAP revenue and an average IAP commission exceeding 15% in the year prior to the 2025 Order.

app revenue could profitably link out, if efficient.[73] At those same link-out rates but using Paddle's fee schedule, apps accounting for ████ of large, non-program app revenue could profitably link out, if efficient. I have also calculated the average inefficiency cushions for this set of apps. At a link-out headline rate of 15%, a link-out renewal rate of 10%, and based on Stripe fees, the average large, non-program app has an inefficiency cushion of ████ of IAP revenue. At those same link-out rates but using Paddle's fee schedule, the average large, non-program app has an inefficiency cushion of ████ of IAP revenue.[74]

97.    As a further sensitivity analysis, I evaluate the impact of a 10% reduction in Stripe's assumed processing fees on the percentage of apps that could profitably link out, if efficient, at Apple's proposed link-out commission rates, as well as the impact on the inefficiency cushion. The example extends the calculation immediately above in focusing on apps with at least $1 million in U.S. IAP revenue and excluding apps that are part of the VPP and NPP programs. The results indicate that on a revenue-weighted basis, a 10% reduction in Stripe fees would increase the share of apps that could profitably link out, if efficient, from ██████████ and would increase the inefficiency cushion from ██████████ [75]

98.    Thus far, the analyses in this section have focused on large apps (those with at least $1 million of U.S. IAP revenue in the year prior to the 2025 Order), which, as discussed above, account for the vast majority of IAP revenue in the U.S. App Store. The framework described in this section can also be used to evaluate apps that participate in Apple's Small Business Program (i.e., developers with less than $1 million in annual worldwide IAP revenue that sign up to receive a discounted IAP commission of 15% on IAP transactions). As noted above, the analysis approximates participation in the SBP as apps with less than $1 million in U.S. revenue in the

---

73.    On an unweighted basis, at a link-out headline rate of 15% and a link-out renewal rate of 10%, ████ of large, non-program apps, if efficient, would find link-out profitable based on Stripe's fees. At these rates, ████ of large, non-program apps, if efficient, would find link-out profitable based on Paddle's fees.

74.    On an unweighted basis, at a link-out headline rate of 15% and a link-out renewal rate of 10%, the average large, non-program app has an inefficiency cushion of ████ using Stripe's fees and ████ using Paddle's fees.

75.    On an unweighted basis, a 10% reduction in Stripe processing fees for these apps would increase the share of apps that could profitably link out, if efficient, from ██████████ and would increase the inefficiency cushion from ██████████

year prior to the 2025 Order and that experienced an average IAP commission of 15%. Approximately ▮▮▮▮ apps meet these criteria.

99.     Appendix H presents an analysis of the share of SBP apps that, if efficient, would face profitable link-out opportunities at alternative SBP link-out rates as well as the average inefficiency cushion among SBP apps. (This is analogous to the analysis done for large apps reported in Table 8 and Table 9 above.) Based on Stripe processing fees, the results reported in Appendix Table H.1 indicate that at Apple's proposed SBP link-out rate of 5%, SBP apps accounting for approximately ▮▮▮ of SBP revenue, if efficient, could profitably offer link-out. When the analysis is based on Paddle fees, SBP apps accounting for 100% of SBP revenue, if efficient, could profitably offer link-out. This analysis is reported in Appendix Table H.2.[76] Appendix Tables H.5 and H.6 presents the analysis of the average inefficiency cushion for SBP apps that find link-out profitable, if efficient. The revenue-weighted results indicate that at a SBP link-out rate of 5%, the average inefficiency cushion among SBP apps is ▮▮▮ based on Stripe's fees and ▮▮▮ based on Paddle's fees.[77]

100.    Available data identify another ▮▮▮▮ apps with less than $1 million in U.S. IAP revenue in the year prior to the May 2025 Order with average commissions above 15%. These apps, which account for approximately ▮▮ of U.S. App Store revenue over that time period, do not fit the definitions of either large apps or SBP apps described above. They may reflect apps that are eligible for, but choose not to participate in, the SBP program, or that fail to qualify for the SBP program due to non-U.S. revenue. For completeness, I have repeated the analyses of link-out profitability and inefficiency cushion including these apps with large apps to provide an

---

76.     Appendix Tables H.3 and H.4 present the unweighted percentage of SBP apps that, if efficient, would find link-out profitable at various link-out commission rates. At a 5% SBP link-out rate, this figure is ▮▮▮ based on Stripe fees and ▮▮▮ based on Paddle fees. Unweighted profitability rates are lower than revenue-weighted figures because apps with relatively low IAP revenue also tend to have lower average IAP prices, which result in higher per-transaction processing fees.

77.     These analyses are presented in Appendix Tables H.5 and H.6 based on Stripe and Paddle fees respectively. Appendix Tables H.7 and H.8 present unweighted average inefficiency cushions for SBP apps based on Stripe and Paddle fees respectively. On an unweighted basis, at an SBP link-out rate of 5%, the average SBP app has an inefficiency cushion of ▮▮▮ using Stripe's fees and ▮▮▮ using Paddle's fees.

illustration of results across all apps that do not participate in the SBP program.[78] These results are presented in Appendix I. Revenue-weighted estimates of profitability rates and inefficiency cushions are very similar to those reported for large apps in Tables 8 and 9 above.[79]

### C.    TRADEOFFS IN ESTABLISHING LINK-OUT COMMISSIONS

101.    The choice of link-out commissions has implications for the share of developers that, if efficient, could profitably offer link-outs, and for economic efficiency more broadly. Suppose one is choosing between two link-out rates, one higher than the other. There are at least four economic implications of selecting the lower rate: (i) efficient developers who would have linked out at the higher rate will earn higher profits; (ii) a greater number of efficient developers will have an opportunity to profitably link out; (iii) a greater number of inefficient developers will have an opportunity to profitably link out, resulting in a greater misallocation of resources (because services are not being provided by the lowest cost providers); and (iv) Apple will have less incentive to invest and innovate.

102.    As this indicates, there is a tradeoff between the goals of, on the one hand, providing incentives to developers to offer link-outs (including inefficient developers) and, on the other hand, preserving Apple's incentives to invest. Increased numbers of inefficient developers offering link-outs does not reflect economic competition and instead reflects a regulated outcome that misallocates resources. Artificially low link-out commissions harm users, developers, and Apple by reducing Apple's incentive to provide technology and services. The link-out commissions Apple has proffered enable developers that account for roughly ▮ of U.S. IAP revenue, if efficient, to profitably offer link-outs. Of course, my framework can be easily

---

78.    Appendix Tables I.1-I.4 present analysis of the share of non-SBP apps that, if efficient, would be profitable at alternative link-out rates based on Stripe and Paddle fees, and on a revenue-weighted and unweighted basis. Appendix Tables I.5-I.8 present analysis of the inefficiency cushion for apps that, if efficient, would be profitable at alternative link-our rates based on Stripe and Paddle fees, and on a revenue-weighted and unweighted basis.

79.    On an unweighted basis, profitability rates are lower than the corresponding unweighted estimates for large apps, reflecting the fact that the low-revenue apps added to this analysis tend to have lower average revenue per transaction and thus have higher per-transaction processing costs.

adjusted to reflect different views on how to balance the tradeoff between developers' incentives and Apple's incentives.

## VII.   ECONOMIC PERSPECTIVES ON COST-BASED PRICE REGULATION

103.    Courts and regulators have been involved in setting the price at which firms can access platforms or networks owned by others, including railroad networks, telecommunications networks, and computer operating systems. Following standard nomenclature in the economic literature, these situations involve an upstream firm (here, Apple) providing access to its platform to downstream firms (developers) that then provide services (link-out transactions) that compete with the upstream firm's downstream services (IAP transactions).

104.    When providing platform access to downstream rivals is mandated by regulation or results from litigation, the economic goal of access pricing systems should be to enable an efficient provider of downstream services to compete while still providing the upstream firm with incentives to continue to maintain and improve its platform. There can of course be non-economic goals such as provision of services to particular populations.

105.    The effects of different approaches to access pricing on competition and economic efficiency have been widely studied in the economics literature.[80] These approaches include pricing access based on the platform provider's short-run incremental costs or long-run incremental costs.[81]

---

80.    See e.g., William J. Baumol and J. Gregory Sidak (1994), "The pricing of inputs sold to competitors," *Yale Journal on Regulation* 11: 171-202; William J. Baumol, Janusz A. Ordover, and Robert D. Willig (1997), "Parity pricing and its critics: A necessary condition for efficiency in the provision of bottleneck services to competitors," *Yale Journal on Regulation* 14: 145-163; Jean-Jacques Laffont and Jean Tirole (1994), "Access pricing and competition," *European Economic Review* 38(9): 1673-1710; Dennis W. Carlton and Jeffrey M. Perloff (2005), "Regulation and Deregulation," Ch. 20 in *Modern Industrial Organization*, 4th ed. (Boston: Pearson/Addison Wesley): 682-735.

81.    While not discussed here, any pricing scheme based on some notion of Apple's costs would likely be difficult to administer since Apple is a multiproduct firm and determining which costs should be considered would be complicated and subject to error.

### A.    COMMISSIONS BASED ON SHORT-RUN INCREMENTAL COSTS

106.    Epic's CEO appears to have interpreted the Ninth Circuit's latest ruling in this case[82] (which I understand is now under review by the Supreme Court) as a call for setting commissions based on Apple's short-run incremental costs ("SRIC"), that is, the additional costs Apple incurs to support a link-out given its existing platform infrastructure.[83, 84] I take no position on the legal questions related to the ruling, but I have been asked to opine on the economic implications of Epic's view.

107.    Because it is likely that Apple faces low SRIC in enabling developers to offer link-out transactions, setting the commission at this low rate would directly benefit Epic, at least in the short run. Although access prices based on SRIC may benefit developers like Epic in the short run, this approach is inconsistent with dynamic economic efficiency, which reflects a firm's incentive to maintain its operations and to continue to invest and innovate over the longer term. That is because access pricing based on SRIC does not consider the continuing upfront

---

82.    Epic Games, Inc. v. Apple Inc., 161 F.4th 1162, 1187 (9th Cir. 2025).

83.    Tim Sweeney, Epic's CEO, told The Verge that that "If you want to have an app go through review with custom linkouts, maybe there's several hundred dollars of fees associated with that every time you submit an app, which is perfectly reasonable because there are real people at Apple doing those things and Apple pays them, and we should be contributing to that[.]" Jay Peters, "Tim Sweeney on the future of Fortnite after another win over Apple," The Verge, December 11, 2025, available at https://www.theverge.com/news/843265/apple-epic-games-tim-sweeney-interview. This article also featured a post from Mr. Sweeney's Twitter account, stating, "Apple can collect fees for actual costs of facilitating links and IP associated with links."

84.    In contrast to marginal cost, which is the cost of producing one additional unit of output, incremental cost is the total additional cost of offering a service or product line at some volume level. In a multiproduct setting such as the App Store, where link-out is a discrete service rather than a continuous output, incremental cost is the relevant concept. William J. Baumol and J. Gregory Sidak (1994), *Toward Competition in Local Telephony,* The MIT Press and The American Enterprise Institute, p. 57 available at https://www.aei.org/research-products/book/toward-competition-in-local-telephony/ ("Incremental cost is a generic concept referring to the addition, per unit of the additional output in question, to the firm's total cost when the output of X expands by some preselected increment."); Federal Communications Commission, First Report and Order, CC Docket No. 96-98, CC Docket Number 95-185, 675 ("Incremental costs are the additional costs (usually expressed as a cost per unit) that a firm will incur as a result of expanding the output of a good or service by producing an additional quantity of the good or service… The costs that are considered incremental will vary greatly depending on the size of the increment.").

48

investments (that don't depend on the level of digital sales) required for a firm's long-term success. Platform operators such as Apple incur large fixed and sunk costs (some of which are common across different products that Apple provides), and access prices based on short-run incremental costs would not contribute to the recovery of those costs, and hence, would fail to maintain Apple's incentives that existed prior to the 2025 Order to continue to create desirable technologies and services.[85]

108.    Over time, reductions in such investments would be expected to harm users and developers by reducing the quality of Apple's services. Such reductions would also harm developers by reducing Apple's incentive that existed prior to the 2025 Order to provide at zero or low-cost tools and technologies made available to developers. This in turn may lead developers to rely on proprietary tools for app development and iOS interfaces. This likely would benefit large developers (that can more easily support development of proprietary tools) at the expense of small developers and thus lessen competition among developers.

109.    The economic literature recognizes that innovation and the development of new goods are the source of most long-run gains in consumer welfare.[86] Accordingly, reductions in Apple's incentives to invest can be expected to result in Apple's reducing its investment to the detriment of consumers, small developers, and perhaps all developers.

## B.    COMMISSIONS BASED ON LONG-RUN INCREMENTAL COSTS

110.    Another approach to regulating access pricing that has been studied involves allowing the platform owner (here, Apple) to charge an amount equal to its long-run incremental costs

---

85.    Fixed costs are costs that do not vary with the level of output in a given period; in the long run, all costs are variable since fixed assets need to be replaced over time. Sunk costs are a subset of fixed costs that, once incurred, cannot be recovered if the firm exits or discontinues the activity. Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th ed. (Boston: Pearson/Addison Wesley): 29-30.

86.    Joseph A. Schumpeter (1934), *The Theory of Economic Development,* Cambridge: Harvard University Press; Paul M. Romer (1986), "Increasing Returns and Long-Run Growth," *Journal of Political Economy* 94(5): 1002-1037; William D. Nordhaus (2004), "Schumpeterian Profits in the American Economy: Theory and Measurement," NBER Working Paper 10433; Jerry A. Hausman (1997), "Valuing the Effect of Regulation on New Services in Telecommunications," *Brookings Papers: Microeconomics 1997,* 1-54; Walter Y. Oi (1996), "The welfare implications of invention," *The Economics of New Goods*, University of Chicago Press: 109-142.

(LRIC). In the long run, all factors of production are variable.[87] Long-run incremental costs therefore include all of the costs a firm must recover to sustain its operations over the long run, including continuing upfront investments that do not enter the SRIC calculation.[88] LRIC also include costs related to all of the firms' investments even those that ultimately fail, since these costs too are an unavoidable part of any successful business activity. Properly implemented, pricing of access services based on long-run incremental costs (LRIC) can theoretically promote dynamic efficiency by maintaining incentives for a firm to maintain its operations and to continue to invest and innovate but operationally this becomes very difficult especially in an environment where the investment affects many related products such as a telecommunications network or in this case a multisided platform.

111.    Access pricing based on LRIC can lead to an efficient outcome, but only if regulators are able to accurately identify and measure all relevant long-run costs. Past attempts to implement LRIC-based access pricing have attempted to develop forward-looking estimates of the cost of implementing an efficient network, including investments that, once made, are fixed and sunk. But recent history establishes that such attempts have failed. For example, in implementing the Telecommunications Act of 1996 following antitrust challenges that resulted in the breakup of the Bell system, the FCC attempted to establish a framework for setting prices at which competitive telecommunications carriers could access incumbent carriers' networks based on LRIC. Indeed, in attempting to implement its TELRIC (Total Element Long-Run Incremental Cost) framework, the FCC recognized that pricing network elements based on SRIC is economically inefficient and does not provide sufficient incentive for incumbent carriers to invest in maintaining and improving their networks.[89]

---

87.    Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th ed. (Boston: Pearson/Addison Wesley): 33-34.

88.    Federal Communications Commission, First Report and Order, CC Docket No. 96-98, CC Docket Number 95-185, 675 ("In competitive markets, the price of a good or service will tend towards its long-run incremental cost.").

89.    Federal Communications Commission, First Interconnection Order implementing Sections 251/252 of the Telecommunications Act of 1996, which stated: "In a TELRIC methodology, the 'long run' used shall be a period long enough that all costs are treated as variable and avoidable. This 'long run' approach ensures that rates recover not only the operating costs that vary in the short run, but also fixed investment costs that, while not variable in the

112.    The TELRIC framework was complex and attempted to estimate the forward-looking cost faced by incumbent local phone companies in establishing a hypothetical network based on efficient available technology.[90] For example, attempts to implement the TELRIC framework for switching involved evaluation of network elements relating to line-side and trunk-side elements, routing tables, switch software and other service elements. Implementation of TELRIC for switching, and other network elements, involved efforts to allocate common costs (used by both incumbent carriers and entrants).[91] Rules were implemented by state regulatory commissions and often varied widely from state to state. The TELRIC rules related to switching proved to be unworkable and were abandoned in 2005 in FCC's Triennial Review Remand Order.[92]

113.    Today there is widespread agreement that the FCC's approach resulted in access prices below levels that reflected true long-run costs, which resulted in entry of inefficient firms and discouraged investment and innovation by incumbents. Nearly all firms that attempted to enter by this mechanism failed.[93]

---

short term, are necessary inputs directly attributable to providing the element." (Telecommunications Act of 1996, 61 Fed. Reg. 45546 (Aug. 29, 1996)).

90.    Federal Communications Commission, First Report and Order, CC Docket No. 96-98, CC Docket Number 95-185, ¶¶ 674-703.

91.    47 CFR Part 51 Subpart F – Pricing of Elements, available at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-51/subpart-F.

92.    Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 70 Fed. Reg. 8942 (Feb. 24, 2005), available at https://www.govinfo.gov/content/pkg/FR-2005-02-24/pdf/05-3511.pdf.

93.    Commentators highlight that the FCC's methodology incorrectly focused on the costs associated with successful investments and ignored unsuccessful ones that mark any firm's long-run performance, was complex and resulted in errors in cost measurement, and was marred by inconsistent implementation. They conclude that the FCC's methodology subsidized entry by inefficient firms and discouraged efficient investment by incumbent firms. See, for example, Robert Pindyck (2007), "Mandatory Unbundling and Irreversible Investment in Telecom Networks," *Review of Network Economics* 6(3): 266-7; Jerry Hausman and J. Gregory Sidak (2014), "Telecommunications Regulation: Current Approaches with the End in Sight," in Nancy L. Rose, ed., *Economic Regulation and its Reform: What Have We Learned?*, University of Chicago Press, p. 360; and Alfred Kahn (2004), *Lessons from Deregulation: Telecommunications and Airlines after the Crunch*, AEI-Brookings Joint Center for Regulatory Studies, p. 26.

Dennis W. Carlton
August 12, 2026

53

# APPENDIX A: CURRICULUM VITAE OF DENNIS W. CARLTON

**DENNIS WILLIAM CARLTON**                                                                    August 2026
Senior Managing Director

Business Address:        Compass Lexecon                                (202) 753-5206
                         555 12th Street NW, Suite 501
                         Washington, DC 20004

                         Two Prudential Plaza                           (312) 322-0215
                         180 North Stetson Avenue
                         Suite 5300
                         Chicago, IL 60601

Email Address:           dcarlton@compasslexecon.com


## EDUCATION

Ph.D., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts: Economics, 1975.

M.S., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts: Operations Research, 1974.

A.B., HARVARD UNIVERSITY (Summa cum laude): Applied Math and Economics, 1972.


## EMPLOYMENT

COMPASS LEXECON (formerly Lexecon), (2008 – present) Senior Managing Director; LEXECON INC., (1977 – 2006), President 1997 – 2001, Senior Managing Director 2003 - 2006

UNIVERSITY OF CHICAGO, Booth School of Business, David McDaniel Keller Professor of Economics (2011 – July 2022; Emeritus July 2022- present); Katherine Dusak Miller Professor of Economics (2008 – 2011); Professor of Economics (1984 – 2008); Law School, Professor of Economics (1980 – 1984); Department of Economics, Assistant Professor (1976 – 1979); Associate Professor (1979)

U.S. DEPARTMENT OF JUSTICE, Washington, District of Columbia (2006 – 2008) Deputy Assistant Attorney General for Economic Analysis, Antitrust Division

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Cambridge, Massachusetts, Department of Economics (1975 – 1976) Instructor in Economics


## OTHER PROFESSIONAL EXPERIENCE

HARVARD UNIVERSITY, Public Policy Summer Course in Economics (1977), Professor

BELL TELEPHONE LABORATORIES (Summers 1976, 1977)

JOINT CENTER FOR URBAN STUDIES OF M.I.T. AND HARVARD UNIVERSITY, Cambridge, Massachusetts (1974 - 1975)

CHARLES RIVER ASSOCIATES, Cambridge, Massachusetts (Summers 1971, 1972) Research Assistant

## FIELDS OF SPECIALIZATION

54

Theoretical and Applied Microeconomics
Industrial Organization

## ACADEMIC HONORS AND FELLOWSHIPS

Keynote Address, Substance Over Slogans: Strengthening the Foundations of Antitrust, Paris, 2025

Keynote Address, 32nd Annual Workshop of the Competition Law & Policy Institute of New Zealand, 2021

2020 Award for Best Article in *Economic Inquiry* for the article "Antitrust Treatment of Nonprofits: Should Hospitals Receive Special Care? (with C. Capps and G. David)".

Best Academic Economics Article in Antitrust - 2019 Antitrust Writing Awards, given by Concurrences and George Washington University Law School for the article "Vertical Most-Favored-Nation Restraints and Credit Card No-Surcharge Rules" (with R. Winter) in *The Journal of Law and Economics.*

Harris Professor Lecture, Clemson University, 2019

Taft Lecture, New York Bar Association, 2018

Keynote Address, CRESSE Conference, June 2018

Best Academic Economics Article in Antitrust - 2016 Antitrust Writing Awards, given by Concurrences and George Washington University Law School for the article "Rethinking Antitrust in the Presence of Transaction Costs: Coasian Implications" (with B. Keating) in *Review of Industrial Organization*.

Keynote Address, Federal Trade Commission, Auto Distribution: Current Issues and Future Trends, January 19, 2016

Award for Antitrust Litigation Consultants of the Year 2015, awarded by Corporate Vision

Keynote Address, International Industrial Organization Conference, 2014

The 2014 Distinguished Fellow, Industrial Organization Society

Economist of the Year, Global Competition Review, 2014

Keynote Address, Sixth Annual Federal Trade Commission Microeconomics Conference, 2013

Heath Memorial Lecture, University of Florida, 2013

Award (w. Mark Israel) for Best Antitrust Analysis in Litigated Cases, Global Competition Review, 2013

Keynote Address, 21st Annual Workshop of the Competition Law & Policy Institute of New Zealand, 2010

Keynote Address, Japanese Symposium on Competition, sponsored by Japan Fair Trade Commission, 2009

Recipient of Inaugural Robert F. Lanzilotti Prize, awarded by the Industrial Organization Society for Best Paper in Antitrust Economics, 2008

Keynote Address to Israel Antitrust Conference, 2008

Lewis Bernstein Memorial Antitrust Lecture, Washington, D.C., 2006

Distinguished Visitor, University of Melbourne, April 2005

Milton Handler Lecture, New York, 2004

Keynote Address to the International Competition Network, Mexico, 2004

Alexander Brody Distinguished Lecture, Yeshiva University, 2000

Ph.D. Thesis chosen to appear in the Garland Series of Outstanding Dissertations in Economics

Recipient of the 1977 P.W.S. Andrews Memorial Prize Essay, best essay in the field of Industrial Organization by a scholar under the age of thirty

National Science Foundation Grant, 1977 - 1985

Recipient of Post-doctoral Grant from the Lincoln Foundation, 1975

National Science Foundation Fellowship, 1972 - 1975

Phi Beta Kappa, 1971

John Harvard Award, 1970

Detur Book Prize, 1969

Edwards Whitaker Award, 1969

M.I.T., National Scholar Award, 1968

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

Appointed to ABA Leadership in Antitrust Section: 2018-2019

55

Participant in the FTC Competition and Consumer Protection Hearings: "The State of U.S. Antitrust Law", September 21, 2018 (Session 1) and "Merger Retrospective Hearing", April 12, 2019

Co-Organizer and Instructor, Antitrust Law and Economics Institute, Federal Judicial Center, 2017, 2018, 2023

Member, Task Force on International Divergence in Dominance Standards, American Bar Association 2017 - 2018

Board Member, The Taub Center for Social Policy Studies, 2017 - present

Member, U.S. Chamber of Commerce International Competition Policy Expert Group for report on International Trade and Competition, 2017

Appointed Member of the ABA Presidential Transition Task Force, Antitrust Law, 2016

Appointed Member of the ABA Presidential Transition Task Force, Antitrust Law, 2012

Advisory panel to the Department of Justice and the FTC on the merger guidelines, 2010

Co-editor, The Journal of Law and Economics, 1980 - present

Visiting Committee, MIT, Department of Economics, 1995 - 2011

Member, Advisory Board, Economics Research Network, 1996 - present

Member, Advisory Board of Antitrust and Regulation Abstracts, Social Science Research Network, 1998 - present

Advisory Board, Massachusetts Institute of Technology, Department of Economics, 1999

Editorial Board, Competition Policy International (CPI), 2010 - present, Co-Editor, Competition Policy International (CPI), 2004 – 2009

Member, Economic Task Force – Antitrust Division, American Bar Association, 2010

Advisory Board, Journal of Competition Law and Economics, 2004 - present

Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, 2006 – 2008

Presidential Appointment to the Antitrust Modernization Commission, 2004 – 2007

Invited Panelist at Public Hearing on the Retail Banking Sector Inquiry: Payment Cards, before the European Commission in Brussels, Belgium, July 17, 2006.

Consultant on Merger Guidelines to the FTC, 2003

Professor, George Mason Institute for Judges, October 2001

Chairman, FTC Round Table on Empirical Industrial Organization (September 11, 2001)

Participant in the Round Table on the Economics of Mergers Between Large ILECS before the Federal Communications Commission, February 5, 1999

Member, Steering Committee, Social Science Research Council, Program in Applied Economics, 1997 - 1999

Participant in roundtable discussions on "The Role of Classical Market Power in Joint Venture Analysis," before the Federal Trade Commission, November 19, 1997 and March 17, 1998.

Participant in meetings with Committee of the Federal Reserve on Payment Systems, June 5, 1997

Associate Editor, Regional Science and Urban Economics, 1987 - 1997

Resident Scholar, Board of Governors of the Federal Reserve System, Summer, 1995

Accreditation Committee, Graduate School of Business, Stanford University, 1995

Associate Editor, The International Journal of Industrial Organization, 1991 - 1995

Editorial Board, Intellectual Property Fraud Reporter, 1990 - 1995

Consultant on Merger Guidelines to the U.S. Department of Justice, 1991 - 1992

Member, Advisory Committee to the Bureau of the Census, 1987 – 1990

National Bureau of Economic Research, Research Associate

American Bar Association, Associate Member

American Economic Association, Member

## BOOKS

Market Behavior Under Uncertainty, Ph.D. Thesis, Massachusetts Institute of Technology (September 1975); Garland Publishing (1984).

Modern Industrial Organization, Scott, Foresman & Co., co-authored with Jeffrey Perloff, first edition (1990), (Chapter 17 of first edition reprinted as "The Economics of Information" for the University of Connecticut, Food Marketing Policy Center (1989)), second edition (1994), translated into Chinese, French, Hungarian and Italian; Addison Wesley Longman, third edition (2000), fourth edition (2005), translated into Chinese (2009).

## RESEARCH PAPERS

"The Equilibrium Analysis of Alternative Housing Allowance Payments," (with Joseph Ferreira) Chapter 6 of Analysis of a Direct Housing Allowance Program, The Joint Center for Urban Studies of M.I.T. and Harvard University, (July 1975).

"Theories of Vertical Integration," presented at Fourth Annual Telecommunications Conference. Appears in a volume of Proceedings of the Fourth Annual Telecommunications Conference, Office of Telecommunications Policy, (April 1976).

"Uncertainty, Production Lags, and Pricing," American Economic Review, (February 1977).

"Selecting Subsidy Strategies for Housing Allowance Programs," (with Joseph Ferreira) Journal of Urban Economics, (July 1977).

"Peak Load Pricing With Stochastic Demand," American Economic Review, (December 1977). (Reprinted in Economic Regulation edited by P.L. Joskow, Edward Elgar Publishing Limited, 1998 and Reprinted in The Economics of Public Utilities edited by Ray Rees, Professor of Economics at the University of Munich, Germany, 2005.)

"The Distribution of Permanent Income," (With R. Hall) Income Distribution and Economic Inequality, edited by Zvi Griliches, et al. (Halsted Press, 1978).

"Vertical Integration--An Overview," in Congressional Record Hearings on the Communications Act of 1978. Bill H.R. 13105, (August 3, 1978).

"Market Behavior with Demand Uncertainty and Price Inflexibility," American Economic Review, (September 1978).

"Vertical Integration in Competitive Markets Under Uncertainty," Journal of Industrial Economics, (March 1979). Awarded the P.W.S. Memorial Prize for the best essay in the field of Industrial Organization by a scholar under the age of thirty.

"Valuing Market Benefits and Costs in Related Output and Input Markets," American Economic Review, (September 1979).

"Contracts, Price Rigidity and Market Equilibrium," Journal of Political Economy, (October 1979).

"Why New Firms Locate Where They Do: An Econometric Model," in Studies in Regional Economics, edited by W. Wheaton, (Urban Institute, 1980).

"Benefits and Costs of Airline Mergers: A Case Study," (with W. Landes and R. Posner) <u>Bell Journal of Economics</u>, (Spring 1980). (Reprinted in "Air Transport" in <u>Classics In Transport Analysis</u> series, edited by Kenneth Button and Peter Nijkamp, 2001.)

"The Limitations of Pigouvian Taxes as a Long Run Remedy for Externalities," (with G. Loury) <u>Quarterly Journal of Economics</u>, (November 1980).

"The Law and Economics of Rights in Valuable Information: A Comment," <u>Journal of Legal Studies</u>, (December 1980).

"Price Discrimination: Vertical Integration and Divestiture in Natural Resources Markets," (with J. Perloff) <u>Resources and Energy</u>, (March 1981).

"The Spatial Effects of a Tax on Housing and Land," <u>Regional Science and Urban Economics</u>, (November 1981).

"Comments on Weicher," <u>The Journal of Law and Economics</u>, (December 1981).

Comment, in Sherwin Rosen ed. <u>Studies in Labor Markets</u>, University of Chicago Press, (1981).

"Planning and Market Structure," in <u>The Economics of Information and Uncertainty</u>, edited by J.J. McCall, University of Chicago Press, (1982).

"The Disruptive Effect of Inflation on the Organization of Markets," in Robert Hall, ed. <u>The Economics of Inflation</u>, University of Chicago Press, (1982).

"The Need for Coordination Among Firms With Special Reference to Network Industries," (with J. M. Klamer) <u>University of Chicago Law Review</u>, (Spring 1983).

"A Reexamination of Delivered Pricing," <u>The Journal of Law and Economics</u>, (April 1983).

"Futures Trading, Market Interrelationships, and Industry Structure," <u>American Journal of Agricultural Economics</u>, (May 1983).

"The Regulation of Insider Trading," (with D. Fischel), Stanford Law Review, (May 1983), reprinted in J. Macey ed., <u>Classics in Corporate Law and Economics</u>, Edward Elgar Publishing (2008), reprinted in part in Roberto Romano, <u>Foundations of Corporate Law</u>, Oxford University Press (1993), and <u>Corporate Law Series – Insider Trading</u>, Edward Elgar Publishing (2012).

"The Location and Employment Choices of New Firms: An Econometric Model with Discrete and Continuous Endogenous Variables," <u>The Review of Economics and Statistics</u>, (August 1983).

"Economic Goals and Remedies of the AT&T Modified Final Judgment," (with W. Lavey), <u>Georgetown Law Review</u>, (August 1983).

"Equilibrium Fluctuations When Price and Delivery Lags Clear the Market," <u>Bell Journal of Economics</u>, (Autumn 1983).

"Energy and Location," <u>Energy Costs, Urban Development, and Housing</u>, Brookings Institution, (1984).

"Futures Markets: Their Purpose, Their History, Their Growth, Their Successes and Failures," Journal of Futures Markets, (September 1984). (Reprinted in Futures Markets edited by A.G. Malliaris and W.F. Mullady, Edward Elgar Publishing Limited, 1995; and in Classic Futures: Lessons from the Past for the Electronics Age, edited by Lester Telser, Risk Books, 2000.)

"The Economics of Gray-Market Imports," (with C. DeMuth), written for the Coalition to Preserve the Integrity of American Trademarks (COPIAT), (May 1985).

"The Limitation of Pigouvian Taxes As A Long Run Remedy for Externalities: Extension of Results," (with G. Loury) Quarterly Journal of Economics, (August 1986).

"The Rigidity of Prices," American Economic Review, (September 1986).

"The Theory and The Facts of How Markets Clear: Is Industrial Organization Valuable for Understanding Macroeconomics?" in Handbook of Industrial Organization, eds. Schmalensee and Willig, (1989).

"Market Power and Mergers in Durable-Good Industries," (with R. Gertner), The Journal of Law and Economics, (October 1989).

"Comments on Vertical Integration and Market Foreclosure," Brookings Papers on Economic Activity: Microeconomics, (1990).

Book Review of Tirole's "The Theory of Industrial Organization", Journal of Political Economy, (June 1990).

"The Genesis of Inflation and the Costs of Disinflation: Comment," Journal of Money, Credit & Banking, (August 1991, Part 2).

"The Theory of Allocation and its Implications for Marketing and Industrial Structure: Why Rationing is Efficient," The Journal of Law and Economics, (October 1991).

"The Economics of Cooperation and Competition in Electronic Services Network Industries," in Economics of Electronic Service Networks, Wildman Steven ed., Praeger Press, (1992).

"Merger Policy and Market Definition Under the EC Merger Regulation," (with W. D. Bishop). Conference on Antitrust in a Global Economy, Fordham Corporate Law Institute, (1994).

"The Antitrust Economics of Credit Card Networks," (with A. Frankel) Antitrust Law Journal, (Winter 1995).

"Economic Organization and Conflict," Journal of Institutional and Theoretical Economics, (March 1995).

"Antitrust and Higher Education: Was There a Conspiracy to Restrict Financial Aid?" (with G. Bamberger and R. Epstein) The Rand Journal of Economics, (Vol. 26, No. 1, Spring 1995, pp. 131-147).

"The Competitive Effects of Line-of-business Restrictions in Telecommunications," (with K. Arrow and H. Sider), Managerial and Decision Economics, (Vol. 16, pp. 301-321, 1995). (Reprinted in Deregulating Telecommunications - The Baby Bells Case for Competition, edited by Richard S. Higgins and Paul H. Rubin, John Wiley & Sons Ltd., 1995.)

"The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee," (with A. Frankel), Antitrust Law Journal, (Spring 1995).

"Antitrust and Payment Technologies," (with A. Frankel), Review, Federal Reserve Bank of St. Louis (November/December 1995).

"Antitrust Policy Toward Mergers When Firms Innovate: Should Antitrust Recognize the Doctrine of Innovation Markets?" Testimony before the Federal Trade Commission Hearings on Global and Innovation-based Competition (October 1995).

"You Keep on Knocking But You Can't Come In: Evaluating Restrictions on Access to Input Joint Ventures," (with S. Salop), Harvard Journal of Law & Technology, (Volume 9, Summer, 1996). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"Comments on Causes and Consequences of Airline Fare Wars," Brookings Papers on Economic Activity: Microeconomics, (1996).

"A Critical Assessment of the Role of Imperfect Competition in Macroeconomics," in Market Behavior and Macro Economic Modeling, Brakman, Van Ees, & Kuipers (eds.), MacMillan Press (1997).

"Price Rigidity," Business Cycles and Depressions, David Glasner ed., Garland Publishing, Inc., (1997).

"Communication Among Competitors: Game Theory and Antitrust," (with R. Gertner and A. Rosenfield), George Mason Law Review, (1997). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"Comments on Born and Viscusi," Brookings Papers on Economic Activity: Microeconomics, (1998).

"Antitrust and Higher Education: MIT Financial Aid (1993)," (with G. Bamberger), The Antitrust Revolution, in eds. J. Kwoka and L. White, (Oxford University Press, 3rd edition 1999).

"Market Power and Vertical Restraints in Retailing: An Analysis of FTC v. Toys 'R' Us," (with H. Sider), The Role of the Academic Economist in Litigation Support, edited by Daniel Slottje, North Holland, (1999).

"The Economics of Religion, Jewish Survival and Jewish Attitudes Toward Competition on Torah Education," (with A. Weiss), Journal of Legal Studies, (2001). (Reprinted in Essential Readings on Jewish Identities, Lifestyles and Beliefs, edited by Stanford M. Lyman, Gordian Knot Books, 2003).

"A General Analysis of Exclusionary Conduct and Refusal to Deal -- Why Aspen and Kodak are Misguided," Antitrust Law Journal, (2001). (Reprinted in e-Commerce Antitrust & Trade Practices, Practicing Law Institute, 2001.)

"The Lessons from Microsoft," Business Economics, (January 2001).

"Lessons from Halacha About Competition and Teaching," (with A. Weiss), Center for Business Ethics Social Responsibility, http://besr.org/library/competition.html, (March 2001).

"The Choice of Organizational Form in Gasoline Retailing and The Costs of Laws Limiting that Choice," (with A. Blass), The Journal of Law and Economics, (October 2001). Reprinted in Franchise Contracting and Organization, edited by Francine Lafontaine, Elgar Publishing, (2005).

"Should The Merger Guidelines Be Scrapped? Introduction to a Debate," in Symposium On The Antitrust Analysis Of Mergers: Merger Guidelines vs. Five Forces, 33 U. WEST L.A. L. REV. (2001).

"Free Riding and Sales Strategies for the Internet," (with J. Chevalier), The Journal of Industrial Economics, (December 2001).

"The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries," (with M. Waldman), <u>The Rand Journal</u> (Vol. 33, No. 2, Summer 2002). (Reprinted in B. Klein and A. Lerner eds. <u>Economics of Antitrust Law</u>, Edward Elgar Publishing Ltd, 2008, and <u>Recent Developments in Monopoly and Competition Policy, The International Library of Critical Writings in Economics</u>, edited by George Norman, Edward Elgar Publishing Ltd, 2008.)

"The Competitive Effects of Fannie Mae," (with D. Gross and R. Stillman) in <u>Housing Matters: Issues in American Housing Policy</u>, Fannie Mae (January 2002, reprinted 2004).

"Intellectual Property, Antitrust and Strategic Behavior," (with R. Gertner), in eds. Adam Jaffee and Joshua Lerner, <u>Innovation Policy and the Economy</u>, Volume 3, MIT Press (2003).

"Airline Networks and Fares," (with G. Bamberger), <u>Handbook of Airline Economics</u>, 2nd ed., Darryl Jenkins, ed., McGraw Hill (2003).

"Contracts that Lessen Competition -- What is Section 27 for, and How Has it Been Used?" (with David Goddard), in Mark N. Berry and Lewis T. Evans eds., <u>Competition Law at the Turn of the Century: A New Zealand Perspective</u>, Victoria University Press (2003).

Interview, Economists' Roundtable, <u>Antitrust Magazine</u>, (Spring 2003).

"The Relevance for Antitrust Policy of Theoretical and Empirical Advances in Industrial Organization," (Fall 2003), <u>George Mason Law Review</u>.

"The Control of Externalities in Sports Leagues: An Analysis of Restrictions in the National Hockey League," (with A. Frankel and E. Landes), <u>Journal of Political Economy</u>, (February 2004), reprinted in <u>Recent Developments in the Economics of Sport</u>, edited by W. Andreff (2011).

"An Empirical Investigation of the Competitive Effects of Domestic Airline Alliances," (with G. Bamberger and L. Neumann), <u>The Journal of Law and Economics</u>, Vol. 47, No. 1, (April 2004, pp. 195-222).

"Why Barriers to Entry are Barriers to Understanding," <u>American Economic Review</u>, (May 2004).

"Using Economics to Improve Antitrust Policy," Milton Handler Lecture, <u>Columbia Business Law Review</u>, (June 2004).

"The Proper Role for Antitrust in an International Setting," (Keynote address: Second Annual Conference of the International Competition Network (ICN), Merida City, Mexico (June 25, 2003), appears as Appendix to "Using Economics to Improve Antitrust Policy", <u>Columbia Business Law Review</u> (June 2004).

"Econometric Analysis of Telephone Mergers," (with H. Sider) pp. 373-395 in American Bar Association, <u>Econometrics: Legal, Practical, and Technical Issues</u>, (2005).

"How Economics Can Improve Antitrust Doctrine Towards Tie-in Sales," (with M. Waldman), <u>Competition Policy International</u>, (Spring 2005).

Preface to: "Law and Economics of the Mexican Competition Laws," by Francisco Gonzalez de Cossio (2005).

"Transaction Costs, Externalities and "Two-Sided" Payment Markets," (with A. Frankel), <u>Columbia Business Law Review</u>, No. 3 (2005).

"Predation and the Entry and Exit of Low-Fare Carriers," (with G. Bamberger), in <u>Advances in Airline Economics: Competition Policy and Antitrust</u>, Darin Lee, ed., (2006).

"Why Tie An Essential Good," (with Michael Waldman), in Hahn R. ed., <u>Antitrust Policy and Vertical Restraints</u>, AEI-Brookings, (July 2006).

"Market Definition: Use and Abuse," <u>Competition Policy International</u> (Spring 2007)

Interview with Deputy Assistant Attorney General, <u>The Antitrust Source</u> (February 2007)

Separate Statement of Dennis W. Carlton, in <u>The Report of the Antitrust Modernization Commission</u>, (April 2007)

"Does Antitrust Need to be Modernized?," <u>Journal of Economic Perspectives</u> (Summer 2007)

"The Year in Review: Economics at the Antitrust Division 2006-2007" (with K. Heyer), <u>Review of Industrial Organization</u>, (2007).

"Economic Analysis of Competition Practices in the EU and the U.S.: A View from Chief Economists," (with M. Salinger), <u>Competition Policy International</u> (Autumn 2007).

"Merger Analysis," Palgrave Dictionary, (with J. M. Perloff), (2008). Also appears as "Merger Analysis (United States)" (with J.M. Perloff), The New Palgrave Dictionary of Economics, (2018).

"Tying," (with M. Waldman), in W. Collins ed. <u>Issues in Competition Law and Policy</u>, American Bar Association, (2008).

"Barriers to Entry," in W. Collins ed. <u>Issues in Competition Law and Policy</u>, American Bar Association, (2008).

"Product Variety and Demand Uncertainty: Why Mark-ups Vary with Quality," (with James D. Dana Jr.), <u>Journal of Industrial Economics</u> (2008)

"Regulation, Antitrust, and Trinko," (With H. Sider), in eds. J. Kwoka and L. White, <u>The Antitrust Revolution</u>, (2008).

"A Solution to Airport Delays," (with W. Whalen, K. Heyer and O. Richard), <u>Regulation</u> (2008).

"Should 'Price Squeeze' Be A Recognized Form of Anticompetitive Conduct?," <u>Journal of Competition Law & Economics</u> (2008).

"Safe Harbors for Quantity Discounts and Bundling," (with M. Waldman),  <u>George Mason Law Review</u> (2008).

"Appropriate Antitrust Policy Towards Single-Firm Conduct: Extraction vs. Extension" (with K. Heyer)," <u>Antitrust</u>, (condensed version of subsequent paper), (Summer 2008).

"Extraction vs. Extension: the Basis for Formulating Antitrust Policy Towards Single-Firm Conduct" (with K. Heyer), <u>Competition Policy International</u>, (Autumn 2008).

"Assessing the Anticompetitive Effects of Multiproduct Pricing," (with P. Greenlee and M. Waldman), <u>Antitrust Bulletin</u>, (Fall, 2008).

"The Need to Measure the Effect of Merger Policy and How to Do It," <u>Antitrust</u>, (condensed version of subsequent paper), (Summer 2008).

"How to Measure The Effectiveness of US Merger Policy," http://voxeu.org/index.php?q=node/3344, (2009), and a slightly revised version appears as "Measuring the Effectiveness of US Merger Policy" in The Economists' Voice: Vol. 6: Iss. 7, Article 2, (2009). These are condensed versions of the subsequent paper.

"Why We Need to Measure the Effect of Merger Policy and How to Do It," Competition Policy International (Spring 2009).

"Competition, Monopoly, and Aftermarkets," (with M. Waldman), Journal of Law, Economics and Organization, (April 2009).

"Competition Policy: Beware of Using It to Harm Competition," Fair Trade, Japan, (Spring 2009).

"Should Competition Policy Prohibit Price Discrimination?" (with M. Israel), Global Competition Review, (2009).

"Merger Guidelines Revisited?" an interview, Antitrust, American Bar Association, (Fall 2009).

"How Should Economic Evidence be Presented and Evaluated," proceedings of the EU Competition Workshop, Florence, Italy, (June 2009).

"Externalities in Payment Card Networks: Theory and Evidence: A Commentary," The Changing Retail Payments Landscape: What Role for Central Banks?, Federal Reserve Bank of Kansas City (2010).

"Why Tie a Product Consumers Do Not Use?," (with J. Gans and M. Waldman), Recipient of Inaugural Robert F. Lanzilotti Prize, awarded by the International Industrial Organization Society for Best Paper in Antitrust Economics, (2008), American Economic Journal: Microeconomics (2010).

"Mergers in Regulated Industries: Electricity," in Competition Law and Economics: Advances in Competition Policy Enforcement in the EU and North America, A. Mateus and T. Moreira editors, (2010).

"Financial Issues (Comments on Bankruptcy and Clearing Houses)," Chapter X in Competition as Public Policy, American Bar Association, (2010).

"Revising the Horizontal Merger Guidelines," Journal of Competition Law & Economics (2010), also appears in Journal of Competition Law – CADE (Brazil) Vol. 1, No. 23 (2011), also appears in Revista de Direito da Concorrencia, Conselho Administrativo de Defesa Economica, (Brazilian Government Publication), translated into Portuguese by T. Aranovich, p. 83-114 (2011).

"Net Neutrality and Consumer Welfare," (with G. Becker and H. Sider), Journal of Competition Law & Economics, (2010).

"Will The New Guidelines Clarify or Obscure Antitrust Policy?," (with M. Israel), The Antitrust Source, (2010).

"Introduction to Stigler's Theory of Oligopoly," (with S. Peltzman), Competition Policy International, (2010).

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of Courts: A Response to Carlton and Israel," (with M. Israel), The Antitrust Source, (2010).

"Use and Misuse of Empirical Methods in the Economics of Antitrust," 3(1) Competition Policy International Antitrust Chronicle, (2011).

"The Economics of Patent Ambush," Concurrences, New Frontiers of Antitrust, (2011).

"Proper Treatment of Buyer Power in Merger Review," (with M. Israel), Review of Industrial Organization, (2011).

"Upgrades, Switching Costs, and the Leverage Theory of Tying," (with M. Waldman), Economic Journal, (2012).

"Brantley Versus NBC Universal: Where's the Beef?," (with M. Waldman), Competition Policy International, (2012).

"An Economic Interpretation of FRAND," (with A. Shampine), Journal of Competition Law & Economics, (2013)

"Economists' Roundtable on Hot Patent-Related Antitrust Issues," Antitrust Magazine, Vol. 27, No. 3, (Summer 2013).

"Identifying Benchmarks for Applying Non-Discrimination in FRAND," (with A. Shampine), Competition Policy International, CPI Antitrust Chronicle, (August 2014).

"Patent Litigation, Standard Setting Organizations, Antitrust and FRAND," (with A. Shampine), University of Texas Intellectual Property Law Journal, (2014).

"Antitrust and Regulation," (with R. Picker) in N. Rose ed., Economic Regulation and Its Reform: What Have We Learned?, NBER, (2014).

"Competition Policy and Regulation in Credit Card Markets: Insights from Single-sided Market Analysis," (with R. Winter), Competition Policy International, (2014).

"Robert Bork's Contributions to Antitrust Perspectives on Tying Behavior," (with M. Waldman), The Journal of Law and Economics, (2014).

"A Tribute to Ronald Coase," in Ronald H. Coase: Nobel Laureate, Economist, Teacher, Friend, 1910-2013, University of Chicago Law School (2014).

"Buyer Power in Merger Review," (with M. Coleman and M. Israel), Oxford Handbook of International Antitrust Economics, eds. R. Blair and D. Sokol (2015).

"Antitrust, Transaction Costs and Merger Simulation with Non-linear Pricing," (with B. Keating), The Journal of Law and Economics, (2015).

"Rethinking antitrust in the presence of transaction costs: Coasian Implications," (with B. Keating), Review of Industrial Organization, (2015), Best Academic Economics Article in Antitrust - 2016 Antitrust Writing Awards, given by Concurrences and George Washington University Law School.

"Does The FTC's Theory of Product-Hopping Promote Competition?," (with F. Flyer and Y. Shefi) Journal of Competition Law and Economics, (2016)

"Price Discrimination," published on OECD website, (November 2016) (https://one.oecd.org/document/DAF/COMP/WD(2016)82/en/pdf)

"Hopes for Antitrust Policy Under the Trump Administration," The Antitrust Source, ABA Antitrust Law Section (2017).

"Penalties for collusion: Can there be an overlap between fines and damages? Balancing criminal and civil penalties domestically and internationally", Concurrences, Competition Law Review, No.1-17 (2017)

"Antitrust Conversations with some of the world's most distinguished experts", Revue Concurrentialiste, (2017)

"Eugene Fama and Industrial Organization," The Fama Portfolio, edited by John Cochrane and Tobias Moskowitz, University of Chicago Press, (2018), slightly revised version appears as "How Eugene F. Fama has left his mark on industrial organization", in the Chicago Booth Review, (May 10, 2017).

"Roundtable with Economists: Discussing Practice and Theory with the Experts", Antitrust Magazine, Vol. 32, No. 2, (Spring 2018).

"Vertical Most-Favored-Nation Restraints and Credit Card No-Surcharge Rules," (with R. Winter), The Journal of Law and Economics, (2018), Best Academic Economics Article in Antitrust - 2019 Antitrust Writing Awards, given by Concurrences and George Washington University Law School.

"Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline Mergers," (with M. Israel, I. MacSwain and E. Orlov), International Journal of Industrial Organization, (2019).

"The Anticompetitive Effects of Vertical Most-Favored-Nation Restraints and the Error of Amex," Columbia Business Law Review, (2019).

"Lessons from AT&T/Time Warner," (with M. Israel and A. Shampine), CPI Antitrust Chronicle, (July 2019).

"Antitrust Treatment of Nonprofits: Should Hospitals Receive Special Care?" (with C. Capps and G. David), Economic Inquiry, (March 2020). 2020 Award for Best Article in Economic Inquiry.

"Some Observations on Claims that Rising Market Power is Responsible for the US Economy Ills and that Lax Antitrust is the Villain," CPI Antitrust Chronicle, (August 2020).

"The Revolution in Antitrust: An Assessment," (with K. Heyer), Antitrust Bulletin, (2020).

"Transaction Costs and Competition Policy," International Journal of Industrial Organization, (2020).

"Effects of the 2010 Horizontal Merger Guidelines on Merger Review: Based on Ten Years of Practical Experience," (with M. Israel), Review of Industrial Organization, (November 2020).

"Is Consumer Welfare in Hot Water?," Antitrust Magazine, (Summer 2022).

"Understanding Basic Principles and Facts about Antitrust to Create a Basis for Some (Any?) Consensus?" CPI Antitrust Chronicle, (August 2022).

"How to Make Sensible Merger Policies?," Network Law Review, (September 14, 2022).

"Introduction" A Special Issue in Honor of Sam Peltzman, The Journal of Law and Economics, Vol. 65, No. S2, (November 2022).

"A Retrospective Analysis of the AT&T/Time Warner Merger," (with G. Giozov, M. Israel, and A. Shampine), The Journal of Law and Economics, (November 2022).

"Evaluating a Theory of Harm in a Vertical Merger: AT&T/Time Warner," (with G. Giozov, M. Israel, and A. Shampine), John Kwoka, Jr., Tommaso M. Valletti, and Lawrence J. White, eds., Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents, (2023).

"Have the Draft Guidelines Demoted Economics?" Promarket Merger Guidelines Symposium, PROMARKET, (August 4, 2023).

"The Draft Merger Guidelines Demote Economics to Justify Aggressive Antitrust Enforcement," Promarket Merger Guidelines Symposium Round II, PROMARKET, (September 12, 2023).

"Errors in Antitrust Enforcement Matter More than You Think," George Mason Law Review, Vol. 30, Issue 4, (September 2023)

"The 2023 Merger Guidelines: A Critical Assessment," The Review of Industrial Organization, (May 2024).

"The Challenges of Cartelization with Many Products and Ongoing Technological Advancements: LCD Crystal Displays Worldwide," (with Mark Israel, Ian MacSwain, and Allan Shampine), Chapter 10 in Cartels Diagnosed: New Insights on Collusion, Joseph E. Harrington, Jr. and Maarten Pieter Schinkel, eds., (December 2024).

Using Data, not Anecdotes, to Analyze Criticisms of Pharmacy Benefit Managers, CPI Antitrust Chronicle, (January 2025).


## UNPUBLISHED PAPERS

"Modeling the Housing Allowance Program," M.A. Thesis, Massachusetts Institute of Technology (September 1974).

"The Cost of Eliminating a Futures Market and The Effect of Inflation on Market Interrelationships," (1984).

"The Empirical Importance of Delivery Lags as an Explanation of Demand," (1984).

"Statistical Supplement to The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee Comment, 63 Antitrust Law Journal 903 (1995)," (with Alan Frankel), (May 1997).

"FTC v. Meta: The Importance of Quantitative Evidence in Antitrust," SSRN, (with John A. List, Allan Shampine, Hal Sider, and Theresa Sullivan), (July 2026).

Expert Testimonial Experience (Includes last 4 years)

Expert Reports, Depositions, Testimony and Surrebuttal Report of Dennis W. Carlton in Re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869, Misc. No. 07-489 (PLF), in the United States District Court for the District of Columbia, January 22, 2013, (Expert Report) May 14, 2013 (Deposition), July 15, 2015 (Expert Report), September 1-2, 2015 (Deposition), September 17, 2015 (Expert Report), September 30, 2016 (Testimony), April 15, 2021 (Expert Report), November 11, 2021 (Deposition), May 11, 2022 (Surrebuttal Report), in Re: Rail Freight Fuel Surcharge Antitrust Litigation (No. II), in the United States District Court for the District Court of Columbia, MDL Docket No. 2925, Misc. No. 20-8 BAH, August 15, 2023 (Expert Report), October 25-26, 2023 (Deposition).

Report, Rebuttal Reports, Deposition, Supplemental Report, Declaration, Report and Deposition of Dennis W. Carlton in Re: Viamedia, Inc., v. Comcast Corporation, and Comcast Spotlight, LP, in the United States District Court for the Northern District of Illinois, Case No.16-cv-5486, October 16, 2017 (Report), November 30, 2017 (Rebuttal Report), December 20, 2017 (Deposition), January 5, 2018 (Supplemental Report), September 17, 2018 (Declaration), June 21, 2022 (Report), September 21, 2022 (Rebuttal Report), November 4, 2022 (Deposition).

Expert Report, Deposition, Expert Reply Report and Declarations of Dennis W. Carlton in Re: Andrew Mackmin; et al v. Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc.; et al, in the United States District Court for the District of Columbia, Case No. 1:11-cv-01831-RJL, September 19, 2019 (Expert Report), January 23, 2020 (Deposition), September 3, 2020 (Expert Reply Report), February 25, 2022 (Declaration), October 31, 2024 (Declaration).

Expert Report, Reply Report and Testimony of Dennis W. Carlton in Re: Namecheap, Inc. v. Internet Corporation for Assigned Names and Numbers (ICANN), in the matter of an independent review process before the International Centre for Dispute Resolution, ICDR Case No. 01-20-0000-6787, January 14, 2022 (Expert Report), March 14, 2022 (Reply Report), April 1, 2022 (Testimony).

Expert Report and Deposition of Dennis W. Carlton in Re: Broiler Chicken Antitrust Litigation, in the United States District Court for the Northern District of Illinois, Case No.: 1:16-cv-08637, February 21, 2022 (Expert Report), June 9, 2022 (Deposition).

Expert Report, Deposition, Declaration and Testimony of Dennis W. Carlton in Re: United States of America, et al., v. American Airlines Group Inc. and JetBlue Airways Corporation, in the United States District Court for the District of Massachusetts, Civil Action No. 1:21-cv-11558-LTS, July 11, 2022 (Expert Report), August 23, 2022 (Deposition), September 2, 2022 (Declaration), October 26, 2022 (Testimony).

Expert Report, Deposition and Testimony of Dennis W. Carlton in Re: Federal Trade Commission v. Meta Platforms, Inc. and Within Unlimited, Inc., in the United States District Court Northern District of California San Jose Division, Case No. 3:22-cv-04325, November 11, 2022 (Expert Report), Case No. 5:22-cv-04325-EJD, December 1, 2022 (Deposition), December 20, 2022 (Testimony).

Expert Report of Dennis W. Carlton and Summary of Empirical Analyses Supporting Carlton Opinions in Re: United States of America v. Mahesh Patel, Robert Harvey, Harpreet Wasan, Steven Houghtaling, Tom Edwards, and Gary Prus, in the United States District Court District of Connecticut, Case No. 3:21-cv-220 (VAB), February 2, 2023 (Expert Report), March 14, 2023 (Summary of Empirical Analyses).

Expert Rebuttal Report, Deposition, Declaration and Testimony of Dennis W. Carlton in Re: In the Matter of Microsoft Corp., a corporation and Activision Blizzard, Inc., a corporation, in the United States of America Federal Trade Commission Office of Administrative Law Judges, FTC Docket No. 9412, May 25, 2023 (Expert Rebuttal), in Re: Federal Trade Commission, v. Microsoft Corporation, et al., in the United States District Court Northern District of California San Francisco Division, Case No. 23-cv-02880-JSC, June 26, 2023 (Deposition), June 26, 2023 (Declaration), June 28, 2023 (Testimony).

Expert Report of Dennis W. Carlton in Re: IQVIA Inc. and IMS Software Service, Ltd., v. Veeva Systems, Inc., in the United States District Court District of New Jersey, Case No. 2:17-cv-00177-JXN-JSA, June 15, 2023 (Expert Report).

Expert Report and Deposition of Dennis W. Carlton in Re: IQVIA Inc. and IMS Software Services, Ltd. v. Veeva Systems, Inc., in the United States District Court District of New Jersey, Case No. 2:19-cv-15517-JXN-JSA and Veeva Systems Inc. v. IQVIA Inc. and IMS Software Services, Ltd., in the United States District Court District of New Jersey, Case No. 2:19-cv-18558-JXN-JSA, June 15, 2023 (Expert Report), October 13, 2023 (Deposition).

Rebuttal Expert Report, Declaration and Testimony of Dennis W. Carlton in Re: Federal Trade Commission v. Meta Platforms, Inc., in the United States District Court for the District of Columbia, Case No.: 1:20-cv-03590-JEB, October 3, 2023 (Rebuttal Expert Report), March 6, 2025 (Declaration), May 21, 2025 (Testimony).

Expert Report, Expert Reply Report and Deposition of Dennis W. Carlton in Re: Maximilian Klein, et al., v. Meta Platforms, Inc. in the United States District Court Northern District of California San Francisco Division, Case No.: 3:20-cv-08570-JD, January 12, 2024 (Expert Report), February 9, 2024 (Expert Reply Report), March 7, 2024 (Deposition).

Expert Report of Dennis W. Carlton in Re: EpiPen Direct Purchaser Litigation, in the United States District Court District of Minnesota, Case No. 20-cv-00827-ECT-JFD, April 12, 2024.

Expert Report, Expert Rebuttal Report and Depositions of Dennis W. Carlton in Re: Libor-Based Financial Instruments Antitrust Litigation, in the United States District Court Southern District of New York, MDL No. 2262, Master File No. 1:11-md-2262-NRB, Case No.: 1:11-cv-05450-NRB, April 19, 2024 (Expert Report), June 18, 2024 (Expert Rebuttal Report), July 30, 2024 (Deposition), September 12, 2024 (Deposition).

Report of Dennis W. Carlton, Mary Coleman, Nauman Ilias, Theresa Sullivan and Nathan Wilson in Re: PBMs and Prescription Drug Distribution: An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers, research funded by Caremark, Express Scripts, and Optum Rx, October 9, 2024.

Expert Report, Expert Rebuttal Report, Deposition and Testimony of Dennis W. Carlton in Re: United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C., in the United States District Court for the Southern District of New York, Case 1:24-cv-03973-AS, September 16, 2025 (Expert Report), October 29, 2025 (Expert Rebuttal Report), November 6, 2025 (Deposition), April 6, 2026 (Testimony).

Rebuttal Expert Report and Deposition of Dennis W. Carlton in Re: District of Columbia v. RealPage Inc., et al, in the Superior Court of the District of Columbia, Civil Division Action No. 2023-CAB-006762, February 17, 2026 (Rebuttal Expert Report), May 7, 2026 (Deposition).

Expert Report of Dennis W. Carlton in Re: Elizabeth DeCoster et al., v. Amazon.com, Inc., in the United States District Court for the Western District of Washington, Case 2:21-cv-00693-JHC, July 9, 2026.

Rebuttal Expert Report of Dennis W. Carlton in Re: RealPage, Inc., Rental Software Antitrust Litigation (No. II), in the United States District Court Middle District of Tennessee Nashville Division, Case No. 3:23-MD-3071, MDL No. 371, July 15, 2026.

## APPENDIX B: MATERIALS RELIED ON

**Legal Documents**

1.      Declaration of Christian Bailey Owens (Founder, Paddle), *Epic Games, Inc. v. Apple Inc.*, No. 4:20–cv–05640-YGR, March 12, 2024

2.      Evidentiary Hearing Volume 1, Testimony of Matthew Fischer, *Epic Games, Inc., v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. 2024), May 8, 2024

3.      Evidentiary Hearing Volume 6, Testimony of Benjamin Simon, *Epic Games, Inc., v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. 2024), May 8, 2024

4.      Order Granting Epic Games, Inc.'s Motion to Enforce Injunction, *Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943 (N.D. Cal. 2025), April 30, 2025

5.      Opinion, *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025), December 11, 2025

6.      Opposition by Appellee Epic Games, Inc. to Motion to Stay Mandate, *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir. 2026), April 6, 2026

**Academic Literature**

1.      William J. Baumol and J. Gregory Sidak (1994), "The pricing of inputs sold to competitors," *Yale Journal on Regulation* 11: 171-202

2.      William J. Baumol and J. Gregory Sidak (1994), *Toward Competition in Local Telephony*, American Enterprise Institute

3.      William J. Baumol, Janusz A. Ordover, and Robert D. Willig (1997), "Parity pricing and its critics: A necessary condition for efficiency in the provision of bottleneck services to competitors," *Yale Journal on Regulation* 14: 145-163

4.      Dennis W. Carlton and Jeffrey M. Perloff (2005), "The Firm and Costs," Ch. 2 and "Regulation and Deregulation," Ch. 20 in *Modern Industrial Organization*, 4th ed. Boston: Pearson/Addison Wesley

5.      Jerry A. Hausman (1997), "Valuing the Effect of Regulation on New Services in Telecommunications," *Brookings Papers: Microeconomics 1997*, 1-54

6.      Jerry Hausman and J. Gregory Sidak (2014), "Telecommunications Regulation: Current Approaches with the End in Sight," in Nancy L. Rose, ed., *Economic Regulation and its Reform: What Have We Learned?*, University of Chicago Press

7.      Alfred Kahn (2004), *Lessons from Deregulation: Telecommunications and Airlines after the Crunch*, AEI-Brookings Joint Center for Regulatory Studies

8.      Jean-Jacques Laffont and Jean Tirole (1994), "Access pricing and competition," *European Economic Review* 38(9): 1673-1710

9.      William D. Nordhaus (2004), "Schumpeterian Profits in the American Economy: Theory and Measurement," NBER Working Paper 10433

10.     Walter Y. Oi (1996), "The welfare implications of invention," in Timothy F. Bresnahan and Robert J. Gordon (eds.), *The Economics of New Goods*, University of Chicago Press: 109-142

11.     Robert Pindyck (2007), "Mandatory Unbundling and Irreversible Investment in Telecom Networks," *Review of Network Economics* 6(3): 266-267

12.     Jean-Charles Rochet and Jean Tirole (2006), "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics* 37(3): 645-667

13.     Paul M. Romer (1986), "Increasing Returns and Long-Run Growth," *Journal of Political Economy* 94(5): 1002-1037

14.     Marc Rysman (2009), "The Economics of Two-Sided Markets," *Journal of Economic Perspectives* 23(3): 125-143

15.     Joseph A. Schumpeter (1934), *The Theory of Economic Development*, Cambridge: Harvard University Press

**Online Sources, News Articles, and Miscellaneous Sources**

1.      "2025 App Store Transparency Report," Apple, available at https://www.apple.com/legal/app-store/transparency/2025/

2.      "Accept in-game payments across iOS and Android," Appcharge, available at https://www.appcharge.com/products/payment-links

3.      "Accept payments for digital goods on iOS with a prebuilt payment page," Stripe, available at https://docs.stripe.com/mobile/digital-goods/checkout

4.      "Add a hosted checkout to your mobile app," Paddle, available at https://developer.paddle.com/build/mobile-apps/link-out-mobile-app-hosted-checkout-app

5.      "All-in-One Pricing, No Hidden Costs," Paddle, available at https://www.paddle.com/pricing

6.      "App compliance: how to overcome compliance hurdles and scale with confidence," Paddle, available at https://www.paddle.com/blog/app-compliance-fltr

7.      "App Review Guidelines," Apple, available at https://developer.apple.com/app-store/review/guidelines/#other-purchase-methods

8.      "Apple has now sold 3 billion iPhones," TechCrunch, available at https://techcrunch.com/2025/07/31/apple-has-now-sold-three-billion-iphones/

9.      "Apple Statistics (2026)," Business of Apps, available at https://www.businessofapps.com/data/apple-statistics/

10.     "Apple Video Partner Program," Apple, available at https://developer.apple.com/programs/video-partner/

11.     "Canceling a Zoom subscription on the Apple App Store," Zoom, available at https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0059292

12.     "Digital Subscriptions," The New York Times, available at https://help.nytimes.com/115015852367-Digital-Subscriptions

13.     "Distributing reader apps with a link to your website," Apple, available at https://developer.apple.com/support/reader-apps/

14.     "Fraud protection," Paddle, available at https://www.paddle.com/billing/fraud-protection

15.     "Grow beyond the app stores," Paddle, available at https://www.paddle.com/solutions/web-stores

16.     "How app developers can reduce fees and create an optimized checkout," Stripe, available at https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout#other-benefits-of-using-stripe

17.     "How to Purchase a Yearly Calm Premium Subscription," Calm, available at https://support.calm.com/hc/en-us/articles/115002473687-How-to-Purchase-a-Yearly-Calm-Premium-Subscription

18.     "How to Subscribe," Strava, available at https://support.strava.com/en-us/articles/15401704-how-to-subscribe

19.     "In-App Purchases," Apple, available at https://developer.apple.com/in-app-purchase/

20.     "In-Game Virtual Goods Payment Software Pricing," Xsolla, available at https://xsolla.com/products/in-game-store/pricing

21.     "Introducing Epic Web Shops," Epic, October 2, 2025, available at https://store.epicgames.com/news/introducing-epic-web-shops?lang=en-US

22.     "iOS News App," The New York Times, available at https://help.nytimes.com/360007626393-iOS-News-App

23.     "iPhones in Order: Compare Every iPhone Model Ever Made," Lifewire, available at https://www.lifewire.com/compare-iphone-models-1999430

24. "Keep more revenue with the smart alternative to in-app payments," Paddle, available at https://www.paddle.com/in-app-purchase

25. "Maintaining a safe App Store experience," Apple, available at https://support.apple.com/en-us/122712

26. "Membership Details," Apple, available at https://developer.apple.com/programs/whats-included/

27. "Netflix Billing through Apple," Netflix, available at https://help.netflix.com/en/node/25097

28. "New Epic Games Store Webshops and Revenue Share Update," Epic, available at https://store.epicgames.com/news/new-epic-games-store-webshops-and-revenue-share-update?lang=en-US

29. "News Partner Program," Apple, available at https://developer.apple.com/apple-news/program/

30. "Overview," Paddle, available at https://www.paddle.com/billing

31. "Paddle 101," Paddle, available at https://www.paddle.com/paddle-101

32. "Paddle vs. Stripe: Why Businesses Outgrow Stripe," Paddle, available at https://paddle.com/compare/stripe

33. "Payments," Paddle, available at https://www.paddle.com/billing/payments

34. "Pricing and Fees," Stripe, available at https://stripe.com/pricing#payments

35. "Pricing built for businesses of all sizes," Stripe, available at https://stripe.com/pricing

36. "Reporting," Paddle, available at https://www.paddle.com/billing/reporting

37. "Stripe iOS SDKs," Stripe, available at https://stripe.dev/stripe-ios/documentation/stripe

38. "Subscriptions," Paddle, available at https://www.paddle.com/billing/subscriptions

39. "Tax & compliance," Paddle, available at https://www.paddle.com/billing/tax-and-compliance

40. "The leading billing solution for scaling revenue," Paddle, available at https://www.paddle.com/billing

41. "Web Shops Powered by Epic," Epic, available at https://store.epicgames.com/distribution/web-shops?lang=en-US

42.    "What is a Merchant of Record? (And Why Should You Care?)," FastSpring, December 5, 2025, available at https://fastspring.com/blog/what-is-a-merchant-of-record-and-why-you-should-care/

43.    "Xsolla vs Stripe: Which is Better for Gaming Payments Processing?" Noda, November 3, 2025, available at https://noda.live/articles/xsolla-vs-stripe

44.    "Your paywall is leaving money on the table. Here's why," Paddle, June 5, 2026, available at https://www.paddle.com/blog/your-paywall-is-leaving-money-on-the-table#benefits-beyond-fee-arbitrage

45.    47 CFR Part 51 Subpart F – Pricing of Elements, available at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-51/subpart-F

46.    Amit Porat, "Introducing: Appcharge's iOS Payments SDK," Appcharge, June 30, 2025, available at https://www.appcharge.com/blog/introducing-appcharge-ios-payments-sdk

47.    Christian Owens, "An update on Paddle In-App Purchase for iOS," Paddle, January 7, 2022, available at https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios

48.    Federal Communications Commission, First Report and Order, CC Docket No. 96-98, CC Docket Number 95-185, 674-703

49.    Jay Peters, "TikTok is back in the App Store," The Verge, February 13, 2025, available at https://www.theverge.com/news/612768/tiktok-app-store-apple-google-us-ban

50.    Jay Peters, "Tim Sweeney on the future of Fortnite after another win over Apple," The Verge, December 11, 2025, available at https://www.theverge.com/news/843265/apple-epic-games-tim-sweeney-interview

51.    Jibin Joseph, "Hulu, Disney+ Ditch iOS App Store Sign-Ups," PCMag, October 22, 2024, available at https://www.pcmag.com/news/hulu-disney-plus-ditch-ios-apple-app-store-sign-ups

52.    Jonathan Vanian, "Apple, Google remove TikTok from stores as app halts service in U.S.," CNBC, January 18, 2025, available at https://www.cnbc.com/2025/01/18/apple-google-remove-tiktok-from-stores-as-app-halts-service-in-us.html

53.    Jordan Golson, "Apple Reverses Course on In-App Subscriptions [Apple Confirms]," MacRumors, June 9, 2011, available at https://www.macrumors.com/2011/06/09/apple-reverses-course-on-in-app-subscriptions/

54.    Mitchell Clark, "Apple finally lets 'reader' apps like Kindle, Netflix, and Spotify link to their own sites," The Verge, March 30, 2022, available at https://www.theverge.com/2022/3/30/23003503/apple-reader-app-developer-external-link-guidelines-announced-entitlements

55. Sam Costello, "Explore the History of iPhones: From the Original to the Latest Model," Lifewire, September 17, 2025, available at https://www.lifewire.com/compare-iphone-models-1999430

56. Telecommunications Act of 1996, 61 Fed. Reg. 45546 (Aug. 29, 1996)

57. Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 70 Fed. Reg. 8942 (Feb. 24, 2005)

**Calls/Interviews**

1. Interview with the Carson Oliver, Apple's Head of Global App Store, June 30, 2026

**Data Sources and Related Materials**

1. Apple Inc., Form 10Ks, 2008 - 2024

2. Apple Monthly U.S. App Store revenue and transactions data, May 2024 - December 2025 (App Store Data-part-00000.csv; App Store Data-part-00001.csv)

3. Apple Weekly App Store revenue data for select apps and countries, May 2024 - February 2026 (rdar_178696548_Top_Apps_Data_Collection_related_to_EPIC.xlsx; rdar_178696548_Top_Apps_Data_Collection_related_to_EPIC_updated.csv)

4. Link-out information gathered from iOS apps

5. List of reader apps (Epic_20260320.xlsx)

6. Statista, "App Stores," 2025

7. U.S. Bureau of Labor Statistics' annual average Consumer Price Index for All Urban Consumers (CPI-U), U.S. City Average

## APPENDIX C: MAJOR CHANGES IN iPHONE FEATURES, 2007 - 2024

| iPhone (2007) | Component | iPhone 16 Pro (2024) |
|---|---|---|
| 4GB, 8GB | Storage Options | 128 GB, 256 GB, 512 GB, 1TB |
| 3.5" | Screen Size (Diagonal) | 6.3" |
| 480x320 | Resolution | 2556x1206 |
| 412 Mhz Samsung ARM | Processor | A18 Pro chip 6-core CPU |
| No | 5G | Sub-6 GHz and mmWave with 4x4 MIMO |
| AT&T | U.S. Carrier | AT&T, T-Mobile, Verizon, Boost |
| Traditional SIM | SIM Support | Dual eSIM |
| No | GPS | GPS, GLONASS, Galileo, QZSS, BeiDou, and NavIC |
| iOS3 | Newest OS Supported | No Max |
| 2MP | Camera | Front: 12MP Back: 48 MP |
| No | Records Video | Front: 4K HDR, 1080p, 720p Back, 4K HDR, 1080p |
| No | LiDAR | Yes |
| No | Portrait Mode | Both cameras |
| No | FaceTime | Yes |
| No | Touch/Face ID | Yes |
| No | Near-Field Communication | Yes |
| No | Siri | Yes |
| No | Water & Dust Resistant | IP68: up to 6 meters for up to 30 minutes |
| No | Spatial Audio | Yes |
| No | Wireless Charging | Yes |
| Talk: 7 hours Video: 10 hours Web: 10 hours Audio: 40 hours | Battery Life | Video: 27 hours Streamed Video: 22 hours |

Source: *"iPhones in Order: Compare Every iPhone Model Ever Made," Lifewire*, available at https://www.lifewire.com/compare-iphone-models-1999430.

76

## APPENDIX D: TOP 30 APPS BY U.S. IAP REVENUE,
## MAY 2024 - APRIL 2025

| Rank | App Name | App Developer | App Genre | Total IAP Revenue (Millions) | Average Commission Rate |
|------|----------|---------------|-----------|------------------------------|-------------------------|



**Source:** Based on App Store Data

**Notes:** Apps with zero revenue or only downloads revenue are excluded from this analysis. Excludes observations with negative revenue and non-positive quantity.

**APPENDIX E: U.S. IAP REVENUE, BY GENRE,
MAY 2024 - APRIL 2025**

| App Genre | N | Total IAP Revenue (Millions) |
|---|---|---|
| Games | | |
| Entertainment | | |
| Photo & Video | | |
| Lifestyle | | |
| Health & Fitness | | |
| Productivity | | |
| Social Networking | | |
| Education | | |
| Music | | |
| Book | | |
| Utilities | | |
| Business | | |
| Sports | | |
| News | | |
| Navigation | | |
| Reference | | |
| Graphics & Design | | |
| Finance | | |
| Weather | | |
| Travel | | |
| Medical | | |
| Shopping | | |
| Food & Drink | | |
| Magazines & Newspapers | | |
| Developer Tools | | |
| Stickers | | |
| **Total** | | |

78

## APPENDIX F: ESTIMATED DECLINE IN U.S. IAP REVENUE RESULTING FROM 2025 ORDER, BY APP, DIFFERENCE-IN-DIFFERENCES ESTIMATES



80





# APPENDIX G: ANALYSIS OF LARGE APPS
## (APPS WITH GREATER THAN $1 MILLION IN U.S. IAP REVENUE)

## Table G.1: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities
## Large Apps
## Stripe Processing Fees



Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).
Notes: Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency.

82

**Table G.2: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities**
**Large Apps**
**Paddle Processing Fees**



Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency.

**Table G.3: Unweighted Share of Apps with Profitable Link-Out Opportunities**
**Large Apps**
**Stripe Processing Fees**



Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency.

**Table G.4: Unweighted Share of Apps with Profitable Link-Out Opportunities**
**Large Apps**
**Paddle Processing Fees**



Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency.

**Table G.5: Revenue-Weighted Average Inefficiency Cushion**
**Large Apps**
**Stripe Processing Fees**



**Sources**: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).
**Notes**: The table reports the revenue-weighted average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table G.6: Revenue-Weighted Average Inefficiency Cushion**
**Large Apps**
**Paddle Processing Fees**

| | | Assumed Link-Out Program/Renewal Rate (Relative to 15% IAP Rate) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
| Assumed Link-Out Headline Rate (Relative to 30% IAP Rate) | 0% | | | | | | | | | | | | | | | | |
| | 1% | | | | | | | | | | | | | | | | |
| | 2% | | | | | | | | | | | | | | | | |
| | 3% | | | | | | | | | | | | | | | | |
| | 4% | | | | | | | | | | | | | | | | |
| | 5% | | | | | | | | | | | | | | | | |
| | 6% | | | | | | | | | | | | | | | | |
| | 7% | | | | | | | | | | | | | | | | |
| | 8% | | | | | | | | | | | | | | | | |
| | 9% | | | | | | | | | | | | | | | | |
| | 10% | | | | | | | | | | | | | | | | |
| | 11% | | | | | | | | | | | | | | | | |
| | 12% | | | | | | | | | | | | | | | | |
| | 13% | | | | | | | | | | | | | | | | |
| | 14% | | | | | | | | | | | | | | | | |
| | 15% | | | | | | | | | | | | | | | | |
| | 16% | | | | | | | | | | | | | | | | |
| | 17% | | | | | | | | | | | | | | | | |
| | 18% | | | | | | | | | | | | | | | | |
| | 19% | | | | | | | | | | | | | | | | |
| | 20% | | | | | | | | | | | | | | | | |
| | 21% | | | | | | | | | | | | | | | | |
| | 22% | | | | | | | | | | | | | | | | |
| | 23% | | | | | | | | | | | | | | | | |
| | 24% | | | | | | | | | | | | | | | | |
| | 25% | | | | | | | | | | | | | | | | |
| | 26% | | | | | | | | | | | | | | | | |
| | 27% | | | | | | | | | | | | | | | | |
| | 28% | | | | | | | | | | | | | | | | |
| | 29% | | | | | | | | | | | | | | | | |
| | 30% | | | | | | | | | | | | | | | | |

**Sources:** U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
**Notes:** The table reports the average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table G.7: Unweighted Average Inefficiency Cushion**
**Large Apps**
**Stripe Processing Fees**



Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: The table reports the average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table G.8: Unweighted Average Inefficiency Cushion**
**Large Apps**
**Paddle Processing Fees**



**Sources:** U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
**Notes:** The table reports the average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

89

# APPENDIX H: ANALYSIS OF SBP APPS
## (APPS WITH LESS THAN $1 MILLION IN U.S. IAP REVENUE THAT EXPERIENCED AN AVERAGE IAP COMMISSION OF 15%)

**Table H.1: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities**
**SBP Apps**
**Stripe Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
| | | | | | | | | | | | | | | | |

Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency.

90

**Table H.2: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities**
**SBP Apps**
**Paddle Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
| | | | | | | | | | | | | | | | |

Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency.

91

**Table H.3: Unweighted Share of Apps with Profitable Link-Out Opportunities**
**SBP Apps**
**Stripe Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |

Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency.

**Table H.4: Unweighted Share of Apps with Profitable Link-Out Opportunities**
**SBP Apps**
**Paddle Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |

Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency.

93

**Table H.5: Revenue-Weighted Average Inefficiency Cushion**
**SBP Apps**
**Stripe Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).
Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

94

**Table H.6: Revenue-Weighted Average Inefficiency Cushion**
**SBP Apps**
**Paddle Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
| | | | | | | | | | | | | | | | |

Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table H.7: Unweighted Average Inefficiency Cushion**
**SBP Apps**
**Stripe Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table H.8: Unweighted Average Inefficiency Cushion**
**SBP Apps**
**Paddle Processing Fees**

| Assumed Link-Out Small Business Program Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% |
| | | | | | | | | | | | | | | | |

Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Small Business Program (SBP) apps are identified as those with less than $1 million in IAP revenue that faced 15% IAP commissions in the year prior to the 2025 Order. Apps with average commission rates over this period of <15.5% are classified as facing 15% IAP commissions. Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

97

## APPENDIX I: ANALYSIS OF ALL NON-SBP APPS
## (APPS WITH AT LEAST $1 MILLION IN U.S. IAP REVENUE AND APPS WITH LESS THAN $1 MILLION IN U.S. IAP REVENUE THAT PAY AN IAP COMMISSION RATE GREATER THAN 15%)

**Table I.1: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities**
**All Non-SBP Apps**
**Stripe Processing Fees**



Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency.

**Table I.2: Revenue-Weighted Share of Apps with Profitable Link-Out Opportunities**
**All Non-SBP Apps**
**Paddle Processing Fees**



Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).

Notes: Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency.

99

**Table I.3: Unweighted Share of Apps with Profitable Link-Out Opportunities**
**All Non-SBP Apps**
**Stripe Processing Fees**



Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency.

**Table I.4: Unweighted Share of Apps with Profitable Link-Out Opportunities**
**All Non-SBP Apps**
**Paddle Processing Fees**



Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
Notes: Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency.

101

**Table I.5: Revenue-Weighted Average Inefficiency Cushion**
**All Non-SBP Apps**
**Stripe Processing Fees**



**Sources**: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

**Notes**: The table reports the revenue-weighted average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table I.6: Revenue-Weighted Average Inefficiency Cushion**
**All Non-SBP Apps**
**Paddle Processing Fees**



**Sources:** U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
**Notes:** The table reports the average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table I.7: Unweighted Average Inefficiency Cushion**
**All Non-SBP Apps**
**Stripe Processing Fees**



Sources: U.S. App Store Data; Stripe Payment Pricing (see https://stripe.com/pricing#payments).

Notes: The table reports the average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Stripe's public rate (=6.4% + $0.30 per transaction). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Stripe fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

**Table I.8: Unweighted Average Inefficiency Cushion**
**All Non-SBP Apps**
**Paddle Processing Fees**



Sources: U.S. App Store Data; Paddle Payment Pricing (see https://www.paddle.com/compare/stripe and https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios).
Notes: The table reports the average efficiency cushion for apps that find link-out profitable at each combination of link-out headline and program/renewal rate. Analysis uses Paddle's public rate (=5% + $0.50 per transaction, and caps at 10%). The average transaction size is calculated at the app-product-month level and used to estimate the effective cost of processing purchases for that app via link-out (Paddle fee + link-out commissions). Analysis assumes no inefficiency. Reports average inefficiency cushion for each combination of link-out commission rates for which apps find link-out profitable, if efficient. Where the analysis indicates that no app would find link-out profitable at a given combination of link-out rates, the cell is left blank.

| Bates Beginning | Bates End | Apple documents |
|---|---|---|
| APL-EG-R_00017361 | APL-EG-R_00017361 | Epic_20260320.xlsx |
| APL-EG-R_00017362 | APL-EG-R_00017362 | rdar_178696548_Top_Apps_Data_Collection_related_to_EPIC_updated.csv |
| APL-EG-R_00017363 | APL-EG-R_00017363 | rdar_178696548_Top_Apps_Data_Collection_related_to_EPIC.xlsx |
| APL-EG-R_00017364 | APL-EG-R_00017364 | App Store Data-part-00000.csv |
| APL-EG-R_00017365 | APL-EG-R_00017365 | App Store Data-part-00001.csv |
| Bates Beginning | Bates End | URL / Publicly available sources |
| APL-EG-R_00017366 | APL-EG-R_00017368 | https://developer.apple.com/apple-news/program/ |
| APL-EG-R_00017369 | APL-EG-R_00017370 | https://developer.apple.com/app-store/review/guidelines/#other-purchase-methods |
| APL-EG-R_00017371 | APL-EG-R_00017374 | https://developer.apple.com/programs/video-partner/ |
| APL-EG-R_00017375 | APL-EG-R_00017381 | https://developer.apple.com/support/reader-apps/ |
| APL-EG-R_00017382 | APL-EG-R_00017385 | https://help.netflix.com/en/node/25097 |
| APL-EG-R_00017386 | APL-EG-R_00017401 | https://stripe.com/pricing#:~:text=Standard,volume%20or%20unique%20business%20models |
| APL-EG-R_00017402 | APL-EG-R_00017403 | https://stripe.com/pricing#payments |
| APL-EG-R_00017404 | APL-EG-R_00017409 | https://www.appcharge.com/products/payment-links |
| APL-EG-R_00017410 | APL-EG-R_00017414 | https://www.macrumors.com/2011/06/09/apple-reverses-course-on-in-app-subscriptions/ |
| APL-EG-R_00017415 | APL-EG-R_00017419 | https://www.paddle.com/pricing |
| APL-EG-R_00017420 | APL-EG-R_00017424 | https://www.theverge.com/news/612768/tiktok-app-store-apple-google-us-ban |
| APL-EG-R_00017425 | APL-EG-R_00017430 | https://www.theverge.com/news/843265/apple-epic-games-tim-sweeney-interview |
| APL-EG-R_00017431 | APL-EG-R_00017462 | Baumol and Sidak (1994), The pricing of inputs sold to competitors.pdf |
| APL-EG-R_00017463 | APL-EG-R_00017654 | Baumol and Sidak (1994), Toward Competition in Local Telephony.pdf |
| APL-EG-R_00017655 | APL-EG-R_00017675 | Baumol, Ordover, and Willig (1997), Parity pricing and its critics A necessary condition for efficiency in the provision of bottleneck services to competitors.pdf |
| APL-EG-R_00017676 | APL-EG-R_00018469 | Carlton and Perloff (2005), Modern Industrial Organization, 4th Edition.pdf |
| APL-EG-R_00018470 | APL-EG-R_00018508 | Hausman (1997), Valuing the Effect of Regulation on New Services in Telecommunications.pdf |
| APL-EG-R_00018509 | APL-EG-R_00018571 | Hausman and Sidak (2014), Telecommunications Regulation_ Current Approaches with the End in Sight.pdf |
| APL-EG-R_00018572 | APL-EG-R_00018609 | Laffont and Tirole (1994), Access pricing and competition.pdf |

106

| APL-EG-R_00018610 | APL-EG-R_00018645 | Nordhaus (2004), Schumpeterian Profits in the American Economy_ Theory and Measurement.pdf |
|---|---|---|
| APL-EG-R_00018646 | APL-EG-R_00018680 | Oi (1996), The welfare implications of invention.pdf |
| APL-EG-R_00018681 | APL-EG-R_00018706 | Pindyck (2007), Mandatory Unbundling and Irreversible Investment in Telecom Networks.pdf |
| APL-EG-R_00018707 | APL-EG-R_00018730 | Rochet and Tirole (2006), Two-sided markets_ a progress report.pdf |
| APL-EG-R_00018731 | APL-EG-R_00018767 | Romer (1986), Increasing Returns and Long-Run Growth.pdf |
| APL-EG-R_00018768 | APL-EG-R_00018787 | Rysman (2009), The economics of two-sided markets.pdf |
| APL-EG-R_00018788 | APL-EG-R_00018983 | Schumpeter (1934), The Theory of Economic Development.pdf |
| APL-EG-R_00018984 | APL-EG-R_00019063 | 2025 Order Granting Epic's Motion to Enforce Injunction.pdf |
| APL-EG-R_00019064 | APL-EG-R_00019117 | 9th Circuit 2025 Opinion.pdf |
| APL-EG-R_00019118 | APL-EG-R_00019128 | Declaration of Christian B. Owens (Paddle) 2024 03 13.pdf |
| APL-EG-R_00019129 | APL-EG-R_00019156 | Opposition by Appellee Epic Games, Inc. to Motion to Stay Mandate, April 6, 2026.pdf |
| APL-EG-R_00019157 | APL-EG-R_00019893 | FCC, First Report and Order (FCC 96-325).pdf |
| APL-EG-R_00019894 | APL-EG-R_00020448 | Telecommunications Act of 1996, Federal Register Volume 61, Number 169 (Thursday, August 29, 1996), pages 45319-45870.pdf |
| APL-EG-R_00020449 | APL-EG-R_00020508 | App Stores _ Statista.pdf |
| APL-EG-R_00020509 | APL-EG-R_00020524 | https://www.govinfo.gov/content/pkg/FR-2005-02-24/pdf/05-3511.pdf |
| APL-EG-R_00020525 | APL-EG-R_00020529 | https://www.paddle.com/billing/payments |
| APL-EG-R_00020530 | APL-EG-R_00020534 | https://www.paddle.com/billing/reporting |
| APL-EG-R_00020535 | APL-EG-R_00020540 | https://www.paddle.com/billing/fraud-protection |
| APL-EG-R_00020541 | APL-EG-R_00020546 | https://www.paddle.com/billing/subscriptions |
| APL-EG-R_00020547 | APL-EG-R_00020552 | https://www.paddle.com/billing/checkout |
| APL-EG-R_00020553 | APL-EG-R_00020557 | https://www.paddle.com/billing/tax-and-compliance |
| APL-EG-R_00020558 | APL-EG-R_00020566 | https://www.paddle.com/billing |
| APL-EG-R_00020567 | APL-EG-R_00020584 | https://stripe.com/pricing |
| APL-EG-R_00020585 | APL-EG-R_00020592 | https://www.apple.com/legal/app-store/transparency/2025/ |
| APL-EG-R_00020593 | APL-EG-R_00020601 | https://www.paddle.com/paddle-101 |
| APL-EG-R_00020602 | APL-EG-R_00020607 | https://www.paddle.com/blog/app-compliance-fltr |
| APL-EG-R_00020608 | APL-EG-R_00020614 | https://www.paddle.com/solutions/web-stores |
| APL-EG-R_00020615 | APL-EG-R_00020626 | https://developer.apple.com/in-app-purchase/ |
| APL-EG-R_00020627 | APL-EG-R_00020631 | https://techcrunch.com/2025/07/31/apple-has-now-sold-three-billion-iphones/ |

| APL-EG-R_00020632 | APL-EG-R_00020634 | https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0059292 |
|---|---|---|
| APL-EG-R_00020635 | APL-EG-R_00020637 | https://support.calm.com/hc/en-us/articles/115002473687-How-to-Purchase-a-Yearly-Calm-Premium-Subscription |
| APL-EG-R_00020638 | APL-EG-R_00020640 | https://support.strava.com/en-us/articles/15401704-how-to-subscribe |
| APL-EG-R_00020641 | APL-EG-R_00020645 | https://help.nytimes.com/115015852367-Digital-Subscriptions |
| APL-EG-R_00020646 | APL-EG-R_00020651 | https://help.nytimes.com/360007626393-iOS-News-App |
| APL-EG-R_00020652 | APL-EG-R_00020653 | https://developer.apple.com/news/?id=grjqafts |
| APL-EG-R_00020654 | APL-EG-R_00020657 | https://store.epicgames.com/news/introducing-epic-web-shops?lang=en-US |
| APL-EG-R_00020658 | APL-EG-R_00020665 | https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-51/subpart-F |
| APL-EG-R_00020666 | APL-EG-R_00020700 | https://www.lifewire.com/compare-iphone-models-1999430 |
| APL-EG-R_00020701 | APL-EG-R_00020706 | https://www.theverge.com/2022/3/30/23003503/apple-reader-app-developer-external-link-guidelines-announced-entitlements |
| APL-EG-R_00020707 | APL-EG-R_00020712 | https://developer.apple.com/programs/whats-included/ |
| APL-EG-R_00020713 | APL-EG-R_00020716 | https://support.apple.com/en-us/122712 |
| APL-EG-R_00020717 | APL-EG-R_00020738 | https://www.businessofapps.com/data/apple-statistics/ |
| APL-EG-R_00020739 | APL-EG-R_00020754 | https://www.cnbc.com/2025/01/18/apple-google-remove-tiktok-from-stores-as-app-halts-service-in-us.html |
| APL-EG-R_00020755 | APL-EG-R_00020759 | https://store.epicgames.com/distribution/web-shops?lang=en-US |
| APL-EG-R_00020760 | APL-EG-R_00020767 | https://developer.paddle.com/build/mobile-apps/link-out-mobile-app-hosted-checkout-app/ |
| APL-EG-R_00020768 | APL-EG-R_00020771 | https://www.appcharge.com/blog/introducing-appcharge-ios-payments-sdk |
| APL-EG-R_00020772 | APL-EG-R_00020775 | https://www.aei.org/research-products/book/toward-competition-in-local-telephony/ |
| APL-EG-R_00020776 | APL-EG-R_00020778 | https://store.epicgames.com/news/new-epic-games-store-webshops-and-revenue-share-update?lang=en-US |
| APL-EG-R_00020779 | APL-EG-R_00020789 | https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout#other-benefits-of-using-stripe |
| APL-EG-R_00020790 | APL-EG-R_00020793 | https://www.paddle.com/blog/an-update-on-paddle-in-app-purchase-for-ios |
| APL-EG-R_00020794 | APL-EG-R_00020799 | https://www.paddle.com/blog/your-paywall-is-leaving-money-on-the-table#benefits-beyond-fee-arbitrage |
| APL-EG-R_00020800 | APL-EG-R_00020805 | https://www.paddle.com/compare/stripe |
| APL-EG-R_00020806 | APL-EG-R_00020833 | https://www.pcmag.com/news/hulu-disney-plus-ditch-ios-apple-app-store-sign-ups |

108

| APL-EG-R_00020834 | APL-EG-R_00020837 | Evid. Hearing Tr., Vol. 1 - Fischer Testimony, pp. 129-130.pdf |
|---|---|---|
| APL-EG-R_00020838 | APL-EG-R_00020841 | Evid. Hearing Tr., Vol. 6 - Simon Testimony pp. 981-82.pdf |
| APL-EG-R_00020842 | APL-EG-R_00020870 | Kahn (2004), Lessons from Deregulation, Ch. 3.pdf |
| APL-EG-R_00020871 | APL-EG-R_00020881 | https://fastspring.com/blog/what-is-a-merchant-of-record-and-why-you-should-care/ |
| APL-EG-R_00020882 | APL-EG-R_00020887 | https://www.paddle.com/in-app-purchase |
| APL-EG-R_00020888 | APL-EG-R_00020892 | https://www.theverge.com/2025/1/21/24348629/capcut-back-online-us-tiktok-bytedance |
| APL-EG-R_00020893 | APL-EG-R_00020897 | https://xsolla.com/products/in-game-store/pricing |
| APL-EG-R_00020898 | APL-EG-R_00020905 | https://noda.live/articles/xsolla-vs-stripe |
| APL-EG-R_00020906 | APL-EG-R_00020915 | https://docs.stripe.com/mobile/digital-goods/checkout |
| APL-EG-R_00020916 | APL-EG-R_00020918 | https://stripe.dev/stripe-ios/documentation/stripe |
| APL-EG-R_00020919 | APL-EG-R_00020929 | https://stripe.com/guides/how-app-developers-can-reduce-fees-and-create-an-optimized-checkout |
| APL-EG-R_00020971 | APL-EG-R_00020971 | CPIAUCNS.csv  (U.S. BLS CPI-U (annual average, All Urban Consumers, U.S. City Average)) |
| APL-EG-R_00020984 | APL-EG-R_00021101 | Apple Form 10-K 2010.pdf |
| APL-EG-R_00021102 | APL-EG-R_00021207 | Apple Form 10-K 2011.pdf |
| APL-EG-R_00021208 | APL-EG-R_00021297 | Apple Form 10-K 2012.pdf |
| APL-EG-R_00021298 | APL-EG-R_00021395 | Apple Form 10-K 2013.pdf |
| APL-EG-R_00021396 | APL-EG-R_00021513 | Apple Form 10-K 2014.pdf |
| APL-EG-R_00021514 | APL-EG-R_00021597 | Apple Form 10-K 2015.pdf |
| APL-EG-R_00021598 | APL-EG-R_00021701 | Apple Form 10-K 2016.pdf |
| APL-EG-R_00021702 | APL-EG-R_00021824 | Apple Form 10-K 2017.pdf |
| APL-EG-R_00021825 | APL-EG-R_00021920 | Apple Form 10-K 2018.pdf |
| APL-EG-R_00021921 | APL-EG-R_00022021 | Apple Form 10-K 2019.pdf |
| APL-EG-R_00022022 | APL-EG-R_00022126 | Apple Form 10-K 2020.pdf |
| APL-EG-R_00022127 | APL-EG-R_00022208 | Apple Form 10-K 2021.pdf |
| APL-EG-R_00022209 | APL-EG-R_00022288 | Apple Form 10-K 2022.pdf |
| APL-EG-R_00022289 | APL-EG-R_00022368 | Apple Form 10-K 2023.pdf |
| APL-EG-R_00022369 | APL-EG-R_00022489 | Apple Form 10-K 2024.pdf |
| APL-EG-R_00022490 | APL-EG-R_00022595 | Apple Form 10-K 2009.pdf |
| APL-EG-R_00022596 | APL-EG-R_00022698 | Apple Form 10-K 2008.pdf |