Matthew J. Adler (SBN 273147)
Matthew.adler@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Counsel for Plaintiff Epic Games, Inc.*

James P. Rouhandeh (*pro hac vice*)
rouhandeh@davispolk.com
David B. Toscano (*pro hac vice*)
david.toscano@davispolk.com
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 701-5800

Micah G. Block
micah.block@davispolk.com
900 Middlefield Road, Suite 200
Redwood City, California 94063
Tel: (650) 752-2000
Fax: 752-2111

Sarah M. Ray (SBN 229670)
sarah.ray@lw.com
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

*Counsel for Defendant Apple Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.,<br>Plaintiff, Counter-defendant,<br>v.<br>APPLE INC.,<br>Defendant, Counterclaimant. | Case No. 4:20-CV-05640-YGR<br>**STATUS REPORT REGARDING APPLE'S DOCUMENT PRODUCTION**<br>Judge: Hon. Yvonne Gonzalez Rogers |

Plaintiff Epic Games, Inc. ("Epic") and Defendant Apple Inc. ("Apple") (the "Parties") write to apprise the Court of the status of proceedings pursuant to the Joint Stipulation and Order Regarding Proceedings on Remand entered on May 20, 2026. (Dkt. 1687 ("May 20 Order"); Dkt. 1719.) The Parties are continuing to meet and confer about the scope of Apple's document productions and agree that Epic's 60-day deadline under the May 20 Order has not yet begun to run.

**<u>Epic's Position</u>**:

Having failed to achieve a stay of these remand proceedings pending Supreme Court review (Dkt. 1706; *Apple Inc. v. Epic Games, Inc.*, No. 25-1311 (U.S. Aug. 13, 2026)), Apple is now manufacturing a *de facto* stay by prolonging discovery in clear violation of this Court's orders.

Pursuant to a stipulation ordered by this Court, Apple was required to "produce to Epic ***all*** non-privileged documents relating to the decision-making process leading to the proposal in its proffer, including any fee proposal reflected in its proffer" within ten days of that filing, meaning by August 24, 2026. (May 20 Order ¶ 2 (emphasis added).) It did not. Nearly two months after its production deadline, Apple has scarcely produced any documents. (Dkt. 1717 at 1; Dkt. 1719 at 2–3.) Instead, for over six weeks, Apple has dragged out supposed "negotiations" over its willingness to comply with its Court-ordered discovery obligations. This is *déjà vu*: Apple is once again seeking to force Epic to choose between the Court-ordered schedule and the Court-ordered discovery; Apple refuses to comply with both.

After six wasted weeks of conferrals and empty promises that Apple will produce relevant documents by some indeterminate future date, Apple for the first time offered, in a prior draft of this filing, that it "hope[d] to be able to commit" to produce documents for seven custodians by Thanksgiving. Then just one day later, after having the opportunity to read Epic's portion of this filing, it tentatively offered November 1 as the date by which it "*anticipates being in a position* to *substantially* complete production" of documents for the same seven custodians, with the remainder to follow by November 25. That is progress, but Apple's hedging and continued unwillingness to commit to a date certain by which it will complete its production demonstrates

that Court intervention is essential. Indeed, it is the threat of such intervention that brought Apple, in the span of two days, from claiming that a November 1 production is "impossible" to an agreement to produce at least *some* documents on that timeline.

But more is needed. As Magistrate Judge Hixson previously noted, "Apple is one of the largest companies in the world, with nearly infinite resources available to it. . . . If Apple really wanted to, with all the resources available to it, it could probably [collect and] review [over a million] documents in a weekend." (Dkt. 1017 at 2.) Of course, Epic does not seek production that quickly. But Epic is entitled to "all" documents without further delay. Epic therefore requests that **the Court order Apple (i) to immediately begin rolling document productions and fully complete its productions on a reasonable timeline, and by no later than November 1, 2026**; and (ii) **to produce by said deadline *all* relevant documents, without regard to the artificial limitations Apple has placed on the scope of its production**, as further detailed below.

* * *

Despite the Court's directive to produce "all" relevant documents relating to the decision-making process in the proffer by August 24, 2026, Apple has to date produced only 55 responsive documents,[1] of which 16 are moderately or heavily redacted, four are exact or near duplicates, and none is the "genuine business records" this Court has instructed Apple to produce.[2] (Aug. 11, 2026 Hr'g Tr. 8:15-17; Dkt. 1719 at 2.) And based on its privilege log, Apple claims to be withholding only 15 documents as privileged.

[1] As Epic explained in the Parties' September 25, 2026 status report, the other 1,811 documents Apple produced with its August 13, 2026 proffer are materials on which its litigation experts relied in preparing their expert reports. They do not show how Apple's businesspeople decided which rates to propose. (Dkt. 1719 at 2 n.2.)

[2] Apple's emphasis on the volume of transaction and billing data it produced misses the point. The Court asked for "genuine business records" of the *decision-making process*. (Aug. 11, 2026 Hr'g Tr. 8:15-17.) The data Apple produced (and the documents Apple produced more broadly) do not reflect Apple businesspeople's process for deciding what rates to propose or why. Similarly, the 34 documents Apple produced on its August 24, 2026 deadline consist largely of calendar invitations, filings from this matter, and eight heavily redacted materials. Not one is a substantive email, text, chat, or message among business or finance personnel; a custodial document from Apple leadership; or a business analysis of Apple's proposed commission rate.

Apple's primary defense for this near absence of documents has been to take a radically constricted view of the relevant decision-making process. In Apple's telling, its decision-making process for the commission structure in its proffer was limited to a defined set of formal meetings of four senior executives assisted by counsel, which Apple treats as hermetically sealed from the rest of its decision-making regarding link-out commissions. (*See, e.g.*, October 5, 2026 Letter from J. Rouhandeh to G. Bornstein at 10 ("[T]he process by which Apple determined the link-out commission proposal contained within the August 13 proffer was significantly narrower [than the prior link-out commission decision]—temporally, logistically, and substantively. . . . Tim Cook, Kevan Parekh, Eddy Cue, and Carson Oliver determined the proposed rates during a finite set of meetings over a matter of months based on a finite set of documents that they reviewed.").) That artificial distinction is a litigation construct. The reality—which Apple does not deny—is that teams of people at Apple have discussed and analyzed the commission structure proposed in the proffer, as well as alternative link-out commissions that Apple chose not to present to the Court, for multiple business purposes across multiple jurisdictions. Those discussions and analyses necessarily informed and contributed to the few meetings that Apple wishes to isolate for purposes of this proceeding. Treating the decision-making process here as entirely disconnected from the other work that Apple has done in setting link-out commissions simply denies reality.

To further insulate its businesspeople, Apple asserts that the decision relied largely on its litigation experts. But the documents produced to date demonstrate that Apple, and not its experts, selected the proffered rates. Even the earliest drafts of Apple's expert reports reflect an "understanding" by the experts of the contours of Apple's proposed fees.[3] Someone at Apple determined those ranges as well as the ultimate rates, but Apple's productions thus far contain no

[3] Apple's September 24, 2026 production, made a full month after its Court-ordered deadline and on the eve of the last status report's filing, consists of 21 "drafts of the proffer and expert materials that Apple's decision makers received." (September 24, 2026 Letter from D. Toscano to G. Bornstein at 1 (emphasis added).) The earliest is dated June 19, 2026, just over two weeks before the initial proffer deadline; four are exact or near duplicates of each other; and eight are moderately to heavily redacted. Yet Apple now maintains—beggaring belief—that these 21 documents fully satisfy Epic's request for "[a]ll drafts of the proffer and expert reports . . . that were shared with, reviewed by or in any way described to any Apple business person involved in the decision-making process." (October 5, 2026 Letter from J. Rouhandeh to G. Bornstein at 4.)

documents or business records relating to who made that decision or how those rates were selected over other possible alternatives.

In addition to these sophistic efforts to limit the scope of its obligations, Apple has engaged in plain old-fashioned litigation rope-a-dope. Despite Apple's clear burden to identify "all non-privileged documents relating to the decision-making process leading to the proposal in its proffer" (May 20 Order ¶ 2), Apple feigns surprise at every request Epic raises, as if the Parties, this Court, Magistrate Judge Hixson, and three Court-appointed special masters did not just recently complete a months-long process to extract from Apple documents Epic was clearly entitled to receive.

Thus, for example, Apple did not initially provide custodians or search terms, or identify *any* proposed categories of documents it was willing to produce. After Epic promptly identified deficiencies in Apple's production, which it did well in advance of the schedule anticipated in this Court's order (May 20 Order ¶ 2),[4] Apple insisted that only four people took any part in the relevant decision-making process—Messrs. Cook, Cue, Parekh, and Oliver—and that its "manual" review of their documents sufficed. Apple then sought to shift the burden to *Epic*, requesting that Epic provide Apple with a list of the document categories it expected to see in Apple's production. Epic did so on September 11, 2026.[5]

On September 16, 2026, the Parties met and conferred regarding Apple's deficient production. Epic requested that Apple add at least Phil Schiller and Nate Barton as custodians, since both appear on meeting invitations that Apple produced. As to others, because Epic lacks visibility into Apple's various link-out-related workstreams since the last proceeding, Epic

[4] Epic noted the deficiencies in Apple's productions first in writing, on August 27, and then on a meet and confer on August 28.

[5] Apple asserts below that it was "necessarily incumbent" on Epic to "identify the [additional] materials" it seeks under the stipulated order. That is not so. Apple had an initial obligation to produce "all" documents relating to the decision-making process. (May 20 Order ¶ 2.) While the order also allowed Epic to request "additional materials," Apple completely failed to meet its initial obligation. Apple's retort that it "believes that it has already produced the documents that led to the proposal contained in Apple's proffer" rings hollow; it is simply not credible for Apple, which in the contempt proceeding produced many tens of thousands of documents in response to exactly the same order, to now claim it believed its production of 34 documents would suffice.

suggested that Apple's baseline for building a custodian list on remand should be the list of custodians whose documents were produced in the contempt proceeding (subject, of course, to necessary modifications).[6] In response, Apple professed surprise that *any* custodians beyond its initial four designations were needed, despite the fact that Messrs. Schiller and Barton were on meeting invites for the specific meetings that satisfy even Apple's unduly narrow characterization of the decision-making process for the proposed commission structure. On September 21, 2026, Apple agreed to add Messrs. Schiller and Barton, as well as Mr. Roman, and to search their files using a set of search terms it had proposed on September 18, 2026. But Apple declined to designate any other custodians from the prior proceeding, and the search terms Apple proposed were plainly deficient: they omitted basic terms such as "necessary costs," "actual costs," "P&L," "injunction," and "contempt," which go to the core of Apple's decision-making about the commission rates in its proffer.

To prevent further delay, on September 22, 2026, Epic provided Apple with a list of 20 proposed additional custodians (for a total of 27) and revised search terms and asked Apple to confirm the date by which it would complete its productions. (*See* Dkt. 1719 at 2.)[7] Following a September 25 meet and confer, Apple let nearly two weeks pass without any substantive response before finally responding on October 5, 2026. Apple's 11-page response contained a litany of boilerplate responses and objections to Epic's requests, as if they were document requests under Fed. R. Civ. P. 34. And while Apple purported to agree to Epic's search terms and custodians, it in substance did not. *First*, as Apple notes in its statement, it has reserved the right to revisit and potentially withhold categories of documents following its review. And *second*, Apple imposed

[6] Epic recognized that certain of the custodians from the contempt proceeding would be irrelevant, such as individuals involved in the design of the user interface, so Epic has never insisted that all prior custodians be included. In fact, Epic has agreed to cut the number of custodians nearly in half.

[7] Apple claims that Epic's "only explanation" for its proposed custodians is their membership on "prior committees that were relevant to the previously set commission." That is false. In a lengthy meet and confer in which the Parties discussed each proposed custodian one-by-one, Epic explained multiple reasons why the 20 additional custodians it proposed appear relevant here, including that those custodians hold roles directly relevant to the remand proceedings, were prior custodians of relevant financial or other documents, or appear on meeting invitations in Apple's own remand production for meetings that Apple claims were central to *this* process.

important substantive limitations on its agreement, such as (a) excluding documents relating to link-out commissions outside the United States, even though such foreign workstreams necessarily informed the decision-making process leading to Apple's proposed commission structure here, and (b) limiting its production in response to certain requests by restricting the definition of "Relevant Persons" to a narrow group of individuals, instead of including any person that participated in the decision-making process, as Epic requested.

Apple's contentions now to the contrary are unavailing. Apple admits that it intends to exclude documents relating to commissions outside the United States if they have "no connection to the United States or Apple's decision-making process leading to the proposal contained in the Proffer."[8] Given Apple's restrictively narrow definition of the decision-making process for the proposal in its proffer, this caveat will swallow the rule. In other words, as Apple characterizes things, its objections will necessarily exclude all documents relating to commissions outside the United States. But as Epic has previously established, any link-out rates Apple considers in the United States are necessarily informed by its experience with other link-out commissions around the world. (*See, e.g.*, Dkt. 1508 at 42–44.) Apple's contention that this limitation was intended to prevent delay strains credulity, given its obvious effort to once again drag this process out as long as possible.[9]

[8] Apple asserts that only one of Epic's requests relates to link-out commissions outside the United States. That is incorrect. While Request No. 5 is the only request that *expressly* mentions foreign jurisdictions, many of Epic's document requests seek documents beyond the United States. For example, Epic seeks "[d]ocuments and data reflecting analyses of the costs to developers of facilitating link-out transactions (*e.g.*, payment processing, breakage, customer service)" and "[d]ocuments and data reflecting analyses of potential profitability to developers that would result from Apple's proposed link-out commission rates, or from the adoption of any other link-out commission rate." Apple itself interpreted these requests as broader than U.S.-only analyses, because its October 5 letter carved ex-U.S. documents out of its responses to at least five other requests. (*See* October 5, 2026 Letter from J. Rouhandeh to G. Bornstein at 5–6, 7, 8–10 (limiting production to documents concerning "U.S. app developers," "U.S. apps," or "U.S. link-out commission rates" in response to Request Nos. 6, 7, 14, 15, and 16—and objecting to Request Nos. 8, 9, and 13 for lacking a "limitation to the link-out commission proposal for the United States").) Indeed, Apple objected to every request "to the extent [it] seek[s] documents and information related to consumers located outside of the United States." (*Id.* at 2–3 (General Objection No. 9).)

[9] Apple now says that it will produce documents responsive to Epic's Request No. 5 "without regard to geographic limitation" for only four custodians. This concession is insufficient.

Moreover, Apple's October 5 letter did not confirm that it was actively collecting any of the documents it was ordered to produce back in August; rather, it repeatedly made vague reservations regarding the volume of documents that its searches will yield,[10] which suggested that it had not even begun the collection process. It is only in this submission that Apple confirms collections are ongoing. And although Apple now also says that it has "begun review," this review must have just started today. Just yesterday, in a prior draft of this submission, Apple stated that it "expect[ed] to begin reviewing documents this week"—despite having had Epic's document requests for nearly a month and its proposed custodians and search term proposals for over two weeks. And as noted, Apple continues to refuse to commit to a date certain for final production, stating below only that it "*anticipates being*" (not that it will be) "*in a position to*" (not that it will) "*substantially*" (not entirely) complete production for seven of Epic's custodians by November 1, with the same hedging for the remaining custodians by November 25.[11]

Apple's October 5 response, along with its statement below, makes clear Apple's strategy is delay, once again. Apple's hedging of its commitment to produce and repeated reservation of arguments to revisit and object to production "as discovery progresses" create substantial uncertainty as to when—if ever—Epic can expect the documents to be produced. (*Id.* at 11.) Apple claims it preserved these objections only to avoid waiving them. This proves the point:

---

Apple's geographic limitation should be removed from its searches for documents responsive to any of Epic's requests as to all custodians.

[10] *See, e.g.*, *id.* at 11 (Epic's search terms are *"likely* to return large numbers of clearly non-responsive documents" (emphasis added)); *id.* at 3–5, 8–9 (Objections to Request Nos. 1, 4, 5, 6, 12, and 14–16) ("Apple will produce non-privileged documents, *if any* . . . ." (emphasis added)).

[11] Apple's assertion that Epic was required to meet and confer on the issue of a production deadline issue before raising it with the Court are not well taken. The Parties discussed production deadlines on a meet and confer over two weeks ago. On that meet and confer, under the impression that Apple was actively collecting and reviewing documents responsive to Epic's requests, Epic proposed a Thanksgiving completion deadline as a compromise. For two weeks, Apple declined to respond to Epic's proposal, including in its October 5 letter—which Apple sent only two days before the Parties had agreed to exchange drafts of this report. Given Apple's failure to commit to any timeline, it was entirely warranted for Epic to raise this issue in the status report. And because Apple's October 5 response made clear Apple's limited interpretation of Epic's document requests, Epic developed serious concerns about Apple's responsiveness review, and concluded it will require additional time to vet Apple's production, necessitating an earlier completion date.

Apple is keeping open the option to withhold some or all responsive documents, even though the Court has already ordered it to produce "all" of them. (May 20 Order ¶ 2.) Apple also contends its reservations account for the possibility that certain search terms may not prove effective, which Epic can then object to. But Epic provided Apple with the proposed search terms over two weeks ago; Apple had ample time to test them by now. And in any event, this is not a standard litigation proceeding where parties have months to negotiate the metes and bounds of production. Apple is under a clear directive to produce "all" relevant documents, and this production should have been completed over a month ago. Apple must complete its production as expeditiously as possible.

Moreover, as noted, prior to today, Apple declined to commit to *any* timeline on which to produce the documents it was required to produce over a month ago. Instead Apple lamented Epic's requests as "unduly burdensome" and complained that they will "needlessly prolong the discovery process and timelines." (*Id.* at 1, 10.) That is not so: under the terms of the Court's stipulated order, Apple should have produced these documents already, and none of Epic's requests should come as a surprise to Apple at this stage of these proceedings. It cannot now rely on the burden associated with expediting a production it should have made in August.

Time is of the essence. **Epic therefore asks that the Court order Apple immediately to begin producing *all* documents related in any way to the decision-making process—consistent with Epic's requests, using Epic's definition of "Relevant Person," and reaching any link-out fees or commissions around the world—on a rolling basis, and to complete its full production on a reasonable timeline and no later than November 1, 2026.**

**Apple's Position**:

Apple has agreed to search for and produce, on a rolling basis, nonprivileged documents responsive to all of Epic's 16 document requests. Apple has also agreed to search the files of all 27 custodians proposed by Epic and to utilize all of the broad search terms Epic has proposed. In some instances, Epic has requested "documents sufficient to show" or described specific categories of reports for production. In those cases, Apple will utilize targeted searches to locate and produce the requested documents to the extent they exist. The foregoing agreements are

subject to various objections and reservations. These include a reservation regarding a reasonable date by which Apple's rolling production can be completed, and a reservation to revisit search terms and custodians with Epic as discovery progresses if cause arises. However, Apple has not delayed or withheld production. Apple's collections are well underway, and it has begun reviewing documents. This was made possible as a result of Apple's decision to adopt Epic's document requests, custodians and search terms in the interest of time, notwithstanding that they are facially overbroad.

Epic's search terms and custodians go far beyond what is necessary to evaluate Apple's proposal and lack any reasonable connection to this proceeding, as explained below. Nonetheless, Apple has adopted Epic's proposal and refrained from rejecting any of Epic's proposed custodians or search terms at this time in the interest of facilitating a discovery process that is not stalled at the outset by protracted negotiations over appropriate search terms and custodians.

While Apple is working to expedite the discovery process, Epic has used its portion of the status report in an attempt to manufacture a dispute between the parties. No such dispute exists. Epic set forth 16 document requests and Apple agreed to produce documents in response to each of them. Epic proposed 27 total document custodians and Apple agreed to all of them. Epic proposed a set of search terms (rejecting those proposed by Apple almost in their entirety) and Apple agreed to use Epic's search terms. Apple has repeatedly said "yes" to Epic's discovery demands. Under these circumstances, Epic's charge that Apple has manufactured a "*de facto* stay" rings hollow.

Epic now asks that Apple produce by Sunday, November 1 "all documents related in any way to the decision-making process—consistent with Epic's requests, using Epic's definition of 'Relevant Person', and reaching any link-out fees or commissions around the world." Apple learned of Epic's demanded November 1 deadline for the first time in Epic's draft of this status report. The last proposal Epic made prior to including the November 1 deadline in its portion of the status report was a deadline of November 26 (Thanksgiving). There have been no discussions between the parties in the interim. Epic's suggestion that November 26 was a "compromise"

reached among both parties is not true. Epic had not requested an earlier deadline and Apple had not proposed a later one before Epic proposed Thanksgiving. Nor is it true that Epic made repeated requests for a completion date. Epic proposed a Thanksgiving deadline and then moved that proposed deadline up by cutting in half the remaining time left between October 7 and Thanksgiving. Both parties obviously are required by the stipulation and order to meet and confer in good faith. This duty requires—at a bare minimum—that before asking the Court to intervene as to a particular issue Epic should first raise the issue with Apple.[12]

Worse yet, having demanded exceedingly broad discovery and having obtained Apple's conditional agreement to undertake the massive effort necessary to produce the documents, Epic now seeks to whipsaw Apple by asking the Court to impose a deadline for the production of such documents – a deadline that is on its face impossible to meet. On the front end of the discovery period Epic waited four weeks to put together its discovery plan and then on the back end is trying to make up for lost time by cutting 3½ weeks out of the time they previously proposed that Apple should have to make its production. Epic further expresses that it will need "additional time to vet Apple's production" without acknowledging the vast search terms and custodians proposed, including searching foreign jurisdictions, are the reasons Apple needs more time, not less.

Apple disagrees with Epic's characterization that Apple failed to meet its initial obligation. However, Apple has agreed to Epic's search terms and custodians ensuring that Epic will get the documents they have requested. Apple anticipates being in a position to substantially complete its production of documents requested for the seven individuals included in Epic's definition of "Relevant Persons" by November 1. Apple further anticipates being in a position to substantially complete productions for the remaining custodians[13] by November 25—the day

[12] Epic's use of this status report to purportedly seek relief is also procedurally improper under the Local Rules, this Court's Standing Order and Orders in this case regarding discovery disputes.

[13] One custodian is currently on maternity leave which will likely impair Apple's ability to produce all of her responsive documents by this deadline.

before Thanksgiving, the completion date originally requested by Epic.[14]

Epic's claim that Apple has spent six weeks delaying discovery is baseless. After Apple's August 24 production, pursuant to the remand stipulation Epic was free to request additional information it believes it needs to evaluate and respond to Apple's proposal. See *id.* at 4. It took Epic three weeks to propose any document requests and an additional 11 days to propose both search terms and custodians. If there has been any delay here it has been the result of Epic's slow start.

Epic's only explanation for why it is seeking documents from so many custodians (and using such broad search terms) is that numerous custodians were members of prior committees that were relevant to the previously set commission. Those individuals were not part of the committee that decided what commission to propose to this Court for its review in connection with this remand proceeding. Additionally, Epic does not even claim that any of the 20 additional custodians it added took part in the decision-making process that led to the Proffer. It is Epic's delayed demand for such custodians and for the use of extraordinarily broad search terms that has caused any unnecessary delay.

Epic's position statement also includes a litany of additional, unfounded criticisms of Apple, all of which are inaccurate or unfair:

*First,* Epic continues to press its position that Apple did not comply with its August 24 obligation to produce "all non-privileged documents relating to [Apple's] decision-making process leading to the proposal in its proffer." Dkt. 1687 ¶ 2. But that position rests on mischaracterizations of the documents that Apple produced and of Apple's decision-making process, as detailed below. As Apple explained to the Court previously, it believes that it produced by August 24 the non-privileged documents relating to this process. Dkt. 1719 at 4. And Apple has agreed to produce additional documents that Epic believes that it "needs … to evaluate and respond to Apple's proposal." Dkt. 1687 ¶ 2.

[14] To the extent Epic wished to prioritize the completion of discovery by a near-term date, it was incumbent on Epic to take that priority into account by narrowing the scope of its proposed custodians and search terms, which to date it has declined to do.

*Second*, Epic chides Apple for responding and objecting to Epic's document requests as if they were Fed. R. Civ. P. 34 requests. *Supra* at 5. Apple has preserved these objections in writing only because if it had not, Epic could argue that Apple had waived any objections.

*Third,* Epic questions Apple's reservation of rights to revisit the agreed upon custodians and search terms. *Supra* at 6. The purpose of this reservation of rights is to take into account the possibility that specific search terms or custodians may prove not to be useful in locating the requested materials. And, of course, in the event that Apple raises such an issue at a later point in time, Epic is free to disagree if it wishes.[15]

*Fourth,* Epic states that Apple has raised "artificial" or "substantive" limitations on the scope of its production. It first states that Apple seeks to "exclude[e] documents relating to link-out commissions outside the United States even though such foreign workstreams necessarily informed the decision-making process leading to Apple's proposed commission structure here." *Supra* at 5–6. Epic misstates what Apple has agreed to do. Apple's objection to the foreign-jurisdiction aspects of Epic's requests reflects a genuine scoping concern: searching every custodian's files for documents relating to link-out commissions anywhere in the world threatens to sweep in vast quantities of extraneous material bearing no relationship to the proposal in the Proffer. Nonetheless, to eliminate any dispute, Apple agrees to produce documents responsive to Epic's Request No. 5—concerning link-out commissions outside the United Sates—without regard to geographic limitations for the files of the four individuals who made the decision regarding the proposal in the Proffer. In other words, documents relating to commissions outside the United States would be excluded only if they had no connection to the United States or Apple's decision-making process leading to the proposal contained in the Proffer. Given that Epic has requested alternative commission structures Apple has considered, proposed or implemented in Japan, the European Union, the United Kingdom, Brazil or *any other foreign jurisdiction*, this limitation was intended to provide documents to Epic to evaluate the proposal made in the

[15] For example, one search string would return results if a document contains both "eu" and the words "structure" or "alternative," with no connection to the App Store or link-out commissions at all. And none of Epic's strings contain proximity limiters, meaning they may return documents that contain search terms many pages apart in unrelated contexts.

Proffer, without slowing down the production process by producing discovery relating to any and every link-out commission discussion anywhere in the world. Once again, Epic did not attempt to meet and confer on this issue, as it is required to do before raising the issue with the Court.

*Fifth*, the only other purported limitation that Epic describes is simply incorrect. Epic claims that Apple will exclude from production "Phil Schiller, Alex Roman, and any other person involved in any way in the decision-making process." *Supra* at 6. That is incorrect. Without prompting, and before receiving Epic's position statement, Apple informed Epic in writing that its response to certain requests had inadvertently omitted that Apple intends to produce documents from those three individuals. Apple objected to Epic's purporting to label these three individuals—counterfactually—as decision-makers via a defined term in its requests, but did not and does not object to producing documents from them, which it has confirmed to Epic in writing.

*Sixth,* Epic complains that Apple "sought to shift the burden to Epic, requesting that Epic provide Apple with a list of the document categories it expected to see in Apple's production." *Supra* at 4–5. But under the stipulated order, Apple's burden was to produce the documents related to the decision-making process that led to the proposal in its Proffer and Epic may then identify any additional material it believes it needs to evaluate and respond to Apple's proposal. Dkt. 1687 ¶ 2. It was therefore necessarily incumbent on Epic to identify the materials it seeks. Once Epic served its document requests, it was Apple—not Epic—that first proposed custodians and search terms. Epic should not be heard to blame Apple if the broad discovery it seeks takes longer than Epic would prefer.

*Seventh,* Epic repeats its complaint regarding the volume of documents Apple previously produced. But Epic acknowledges that Apple produced over 1,800 documents to Epic on August 13 (as Apple previously informed the Court, *see* Dkt. 1719 at 3). Epic insists, however that the more than 1,800 documents "do not show how Apple's businesspeople decided which rates to propose." *Cf. id.* at 2 n.2. But, as Apple has explained, Apple's experts relied on these documents to generate reports that "served as principal inputs to the link-out commission proposal included in Apple's proffer." *Id.* at 4. In a new spin, Epic now charges that Apple has not produced any "genuine business records" and that the business records Apple produced "do not

reflect Apple businesspeople's process for deciding what rates to propose or why." *Supra* at 3. Epic misunderstands which business records went into Apple's decision. Apple has already produced the business records on which the decision-makers relied: the records and data on which Apple's experts based their analyses on and which informed the proposal in Apple's Proffer. As previously discussed, however, Apple has produced voluminous business records to Epic. *See* Dkt. 1719 at 3–4. Apple's August 13 production included data covering billions of transactions in the U.S. App Store from May 2024 through December 2025. This data contains information on 2.1 million apps, including all 259,000 apps with IAP transactions and 1.7 million unique IAP products. Apple's production also included aggregated billings data for every IAP transaction in the United States and 49 other countries from May 2023 through early June 2026. Epic erroneously argues that this App Store data are not "'genuine business records' of the decision-making process." *Supra* at 3. (emphasis in original). That argument ignores that—as Apple previously explained, see Dkt. 1719 at 3–4—the data were direct inputs into the decision-making process, including into Dr. Carlton's prohibitiveness analysis. What Epic actually seeks are business records beyond those that informed the decision-making process.

*Finally*, Epic insists that there are "teams of people" at Apple whose "discussions and analyses necessarily informed and contributed to" the decision-making process. *Supra* at 4. Epic has no basis for that assertion. Epic assumes that most of the 27 custodians on its list are "necessarily" relevant to the commission rate proposed in Apple's Proffer regarding compliance with the Ninth Circuit's opinion ***because*** they were relevant to the creation of an entirely new commission business model when Apple first introduced link-out entitlements. As Apple has explained, the decision-making process was significantly more limited this time. Dkt. 1719 at 4. Apple's prior commission was selected through a business process involving a series of decisions about launching a brand new program for developers to link out their payment processing, which required processes relating to technological implementation, link design, processing flow, and commission rates. Apple's decision-making related to all of those issues and drew heavily on Apple's internal expertise (other than with respect to analyzing the economic value of Apple's tools, technologies, and services to developers, which was the focus of the Analysis Group

report). Accordingly, the documents produced, and the search terms and custodians employed, reflected that wide-ranging effort.

In contrast, the process by which Apple determined the link-out commission proposal was substantively and substantially constrained by the Ninth Circuit's decision. The Ninth Circuit prohibited Apple from unilaterally imposing any commission, and instead required that Apple propose commission rates to this Court for its approval. *See Epic Games, Inc. v. Apple Inc*., 161 F.4th 1162, 1188 (9th Cir. 2025). Key aspects of Apple's decision were better suited to analysis by outside experts than to internal analysis. For instance, whether commission rates are "prohibitive" to developers depends in part on facts not known firsthand by Apple. Under these circumstances, Apple did not make a decision pursuant to ordinary business processes, proceeding instead pursuant to the Ninth Circuit's guidance which limited the scope and basis for Apple's proposal, and in reliance on outside experts.

But, again, Apple has agreed to Epic's custodians and search terms—which presumably target the "teams" to which Epic refers—so Epic will receive discovery from these "teams" to the extent they exist. The additional time this will require follows directly from the scope of discovery Epic chose to demand, and the time it took to demand it. Epic cannot choose that path and then blame Apple for the time it takes to execute it. Apple's agreement to collect, review and produce documents from 27 custodians—including by using Epic's overly broad search terms—by Thanksgiving bears no resemblance to a stay.

*     *     *

The Parties are available to answer any questions the Court may have and intend to update the Court two weeks from today.

Respectfully submitted,

Dated: October 9, 2026

By: /s/ *Gary A. Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**
Matthew J. Adler (SBN 273147)
matthew.adler@faegredrinker.com
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

Dated: October 9, 2026

By: */s/ James P. Rouhandeh*

**DAVIS POLK & WARDWELL LLP**
James P. Rouhandeh (*pro hac vice*)
David B. Toscano (*pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 701-5800
Email: rouhandeh@davispolk.com
david.toscano@davispolk.com

Micah G. Block
900 Middlefield Road, Suite 200
Redwood City, California 94063
Tel: (650) 752-2000
Fax: 752-2111
Email: micah.block@davispolk.com

**LATHAM & WATKINS LLP**
Sarah Meyers Ray (SBN 229670)
Aaron T. Chiu (SBN 287788)
Brett M. Sandford (SBN 302072)
Blake Richard Davis (SBN 294360)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: 415-391-0600
Fax: 415-395-8095
Email: sarah.ray@lw.com
aaron.chiu@lw.com
blake.davis@lw.com
brett.sandford@lw.com

Gary Feinerman
(*pro hac vice* application pending)
330 N Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312-876-7700
Email: gary.feinerman@lw.com

Christopher Bower (SBN 301379)
555 11th Street NW, Suite 1000
Washington, DC 20004
Tel: 267-746-0398
Email: christopher.bower@lw.com

*Attorneys for Defendant Apple Inc.*

**E-FILING ATTESTATION**

I, Gary A. Bornstein, am the ECF User whose user ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above have concurred in this filing.

*/s/ Gary A. Bornstein*

Gary A. Bornstein