CRAVATH

Gary A. Bornstein
gbornstein@cravath.com
T+1-212-474-1084
New York

September 11, 2026

Re: *Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR (N.D. Cal.)

**<u>Attachment A: Epic Document Requests re Apple's Proffer</u>**

1. All communications involving any of Tim Cook, Kevan Parekh, Eddy Cue, Carson Oliver, Phil Schiller, Alex Roman, and any other person involved in any way in the decision-making process (the "Relevant Persons"), that relate to the decision-making process, and all documents regarding any such communications.
    - This should include a collection of all email, Slack, iMessage, Notes and any other communication or note-taking tool used by any Relevant Person for work purposes, and a search of the collected documents.
    - This should include hard copy documents and any notes taken thereon.
    - This should include documents in Box, Quip or any other shared repository accessible by any Relevant Person.

2. All drafts of the proffer and expert reports, or other expert analyses, that were shared with, reviewed by or in any way described to any Apple business person involved in the decision-making process, including drafts (or portions thereof) that Apple previously withheld pursuant to Apple's position on the expert stipulation, privilege, and work-product doctrines.

3. All notes, agendas, presentations, or other documents from all meetings relating to the decision-making process (including meetings where different commission rates were considered and rejected).
    - This should include but not be limited to meetings to prepare for or follow up from meetings attended by any Relevant Person and meetings attended by any of Apple's experts or their staff that were related to the decision-making process.

4. All documents reflecting Apple's internal analysis of the impact on Apple's finances or business of the commissions proposed in Apple's proffer or any alternative commissions.
    - This should include analyses of each rate proposed (15%/10%/5%) as well as any alternatives that were considered or analyzed.
    - This should include documents discussing any lookback window that might be applied to the proposed commissions.

5. All documents reflecting Apple's internal analyses of the expected or actual impact on Apple's finances or business of the alternative commission structures Apple has considered, proposed or implemented in Japan, the EU, the UK, Brazil or any other foreign jurisdiction.

6. All communications involving any of the Relevant Persons, between December 11, 2025, and August 13, 2026, relating to proposed or actual methods or strategies to dissuade developers from offering link-outs to alternative payment options or to retaliate or discriminate against developers who offer such link-outs.

7. All communications involving any of the Relevant Persons, between December 11, 2025, and August 13, 2026, relating to alternative methods of collecting a percentage of revenue from app developers other than implementing a commission on linked-out purchases, including but not limited to API software licensing fees, patent licensing fees, or carriage fees.

8. App Store profit-and-loss statements prepared in the ordinary course for fiscal years 2023 through 2026 YTD, including all line items for revenue, cost allocations, and operating results.

9. All internal reports, including any prepared by Apple's Corporate FP&A group, that reconcile App Store results to total company results, together with the underlying data and analyses, for fiscal years 2023 through 2026 YTD.
    - This should include documents sufficient to show whether or not the App Store results reflected therein are fully burdened.

10. Documents sufficient to show Apple's R&D allocations to the App Store (*see* Proffer at 14, 18-19) over the period discussed in the proffer, including direct, shared, and allocated R&D, and the back-up data for such documents.

11. Documents sufficient to show Apple's actual return on R&D investments attributable to the App Store, including direct, shared, and allocated R&D, and the back-up data for such documents. (*See* Proffer at 14, 18-19.)

12. All documents reflecting Apple's internal analysis of the impact on App Store profitability of operating under the zero-commission regime since the April 30, 2025 Order. (*See* Proffer at 11-12.)

13. Documents and data sufficient to show Apple's basis for its quantitative statement that its incremental costs related to facilitating link-out purchases are "essentially zero" or in "the low single-digit millions of dollars." (Proffer at 2, 26.)

14. Documents and data reflecting analyses of the costs to developers of facilitating link-out transactions (*e.g.*, payment processing, breakage, customer service). (Proffer at 20-23.)

15. Documents and data reflecting analyses of potential profitability to developers that would result from Apple's proposed link-out commission rates, or from the adoption of any other link-out commission rate. (Proffer at 20-22.)

16. Documents and data reflecting internal sensitivity analyses of breakage rates for linked-out transactions, which the proffer itself references. (Proffer at 23 (citing CX-539, CX-859, CX-224).)